United States District Court

Western District of New York

United States of America,

*Plaintiff*                     Amended Defendant Joseph
*vs*                           Bongiovanni's Pretrial Motions

Joseph Bongiovanni                              19-cr-227

*Defendant*

Defendant Joseph Bongiovanni, by and through his attorneys, Harrington & Mahoney, James P. Harrington, Esq., hereby moves the Hon. Michael J. Roemer, United States Magistrate Judge in the U.S. District Court for Western New York, Robert H. Jackson Courthouse, 2 Niagara Square, Buffalo, New York 14202Michael Dillon for the following relief:

1.      Dismissal of all counts of the indictment against Mr. Bongiovanni;

2.      Particularization of the allegations against Mr. Bongiovanni;

3.      Suppression of evidence and statements for violations of Mr. Bongiovanni's Fourth Amendment rights;

4.      Notice of evidence to be presented under Rule 404(b) of the Federal Rules of Evidence;

5.      Notice of expert testimony the government intends to present at trial under

FRCP Rule 16(1)(g);

6.      Notice of any prior conduct the government intends to present pursuant to Rule 609 of the Federal Rules of Evidence;

7.      A schedule for trial disclosures, including disclosures under 18 U.S.C § 3500

8.      All other relief as this Court finds just and proper.

Dated: January 12, 2021

Respectfully submitted,

/s/ James P. Harrington

James P. Harrington
harrington A mahoney
Attorneys for Defendant
70 Niagara Street, Third Floor
Buffalo, NY  14202-3407
(716) 853-3710 (*facsimile*)
(716) 853-3700 (*voice*)
*jph@harringtonmahoney.com*
Attorneys for Joseph Bongiovanni

TO:   United States Attorney
        138 Delaware Avenue
        Buffalo, New York 14202
        Attention:     Joseph Tripi, Esq.
                          Assistant United States Attorney

United States District Court
Western District of New York

---

United States of America,

*Plaintiff*

v.

Joseph Bongiovanni,

*Defendant*

Affirmation
in Support of Pretrial Motions

19-cr-227

---

James P. Harrington, Esq., affirms to be true and states under penalty of perjury as follows:

1.      I am the attorney for the defendant, Joseph Bongiovanni, and I make this affidavit in support of the foregoing pretrial motions.

# Introduction

2.      Mr. Bongiovanni has been indicted by superseding Indictment [46] with conspiracy to defraud the United States (Count 1), conspiracy to traffic narcotics (Count 2), accepting bribes (Count 3), obstruction of justice (Counts 5-11), and making false statements to federal agents (Counts 12 & 13).

3.      Mr. Bongiovanni was initially indicted on October 31, 2019. The superseding indictment was issued on June 4, 2019.

4.      For the reasons stated below, the defendant moves this Court to dismiss all counts against him.

5.      Alternatively, should the Court decline to dismiss these charges, this Court

should order the government to produce a bill of particulars detailing the specific allegations against him.

6.     The Court should also suppress evidence and statements attributed to Mr. Bongiovanni, as detailed in the supporting memorandum of law, which were obtained in violation of Mr. Bongiovanni's Fourth Amendment rights.

7.     Moreover, the Court should compel additional discovery from the government, including but not limited to an inventory of all matter, including books, papers, documents, data, photographs, and objects within its possession, custody, or control, or in the possession, custody or control of any agency which participated in the investigation (identifying all such agencies) in any way relevant to the charges or conduct herein, and identifying any such matter which it has not yet disclosed to all defendants, and, within that matter, specifying any matter it claims is not material to preparing the defense or otherwise not subject to disclosure, and the reason why it is not subject to disclosure at this time.

8.     Defendant also moves this Court to enter an order directing the government to immediately disclose any information or matter that could reasonably be construed as favorable to the accused with respect to the determination of any preliminary question in the case, the merits of the accusation, or sentencing, without regard to the "materiality" of that information or matter.

9.     Defendant also requests the government provide notice of any evidence it intends to offer pursuant to Rule 404(b).

# Motion to Dismiss

## A.    All Counts

10.     As detailed in the supporting memorandum of law, the defense moves to dismiss the indictment under Rule 12(b)(3) for selective prosecution.

**B.     Count 13 (False statements)**

11.     Similarly, as to Counts 13, the defense moves for dismissal for failure to state an offense, as described in the supporting memorandum of law.

# Particularization

12.     Should the Court not dismiss the indictment, it should direct the government under Rule 7(f) of the Federal Rules of Criminal Procedure to produce a Bill of Particulars detailing what conduct alluded to in the Indictment specifically constituted the wrongful conduct.

13.     The defense recognizes that Courts, unfortunately, do not order the government to state their theory of prosecution in an Indictment or a Bill of Particulars. For conspiracy cases in particular, the vaguest allegations are often enough to allow a trial, where whatever theories of guilt the government can come up with, no matter how attenuated from the original Indictment, are permitted.

14.     This is especially problematic where, as here, the Indictment is relatively detailed, but claims specific facts as part of its pleading of the case which are themselves otherwise vague and not supported by the discovery disclosures.

15.     The government's response to this request is often no more than to provide a detailed litany of all the evidence it has provided voluntarily, usually with some glib remark that the defense can "figure it out" from what has been provided. This is not, however, what should happen.

16.     As the government itself often points out, particularization is not an evidentiary tool. Simply providing thousands of pages of discovery, no matter how magnanimous or diversionary a gesture, simply does not constitute a necessary *pleading,* which is the issue

here. Indeed, volumes of discovery are more harmful than helpful in this respect, since it leaves the defense with the unfair burden of trying to figure out which of myriad possible approaches will be the one by which the defendant could sink or swim. Meanwhile, even after that preparation, the government can simply alter its theory at trial, claiming that it has some leverage when it comes to presenting its case, thus avoiding charges of fatal variance or constructive amendment.

17.    This is more than a mere attempt by the defense to acquire additional evidentiary detail; as explained above and in our Memorandum, the conduct the Indictment alleges against Mr. Bongiovanni is actually legal. Without more, the government effectively concedes that it has no case. Otherwise, the burden of establishing how this conduct could give rise to criminal liability to too great for the defense to have to bear. Rule 7(f) provides that particularization is warranted to avoid undue surprise or potential double jeopardy. It is absolutely warranted in this case.

18.    For this reason, this Court should compel the government to produce a Bill of Particulars as detailed in the supporting Memorandum of Law.

# Suppression of Evidence

19.    As detailed in the supporting memorandum of law, the Court should suppress evidence and statements obtained from Mr. Bongiovanni on April 23, 2019, and on June 6, 2019, as the circumstances of both violated Mr. Bongiovanni's Fourth and Fifth Amendment rights.

# Discovery

## A.    Scope of *Brady* Disclosure

20.    Next, Mr. Bongiovanni moves this Court to compel the government to make additional discovery.

21.    In the undersigned's experience, there is no practical way to enforce the requirements of *Brady v. Maryland* when it comes to disclosure of material favorable to the defense.

22.    While the government often promises the Court that it is "fully aware" of its responsibilities, and has complied with or intends to comply with them, and most courts are deferential to that repetition, there is no real basis beyond simply trusting the government's word for ensuring compliance.

23.    Not to impugn the trustworthiness of the government, but it is an undeniable truth that the U.S. Attorney's Manual, 2006 ed., actually teaches government attorneys the wrong standard for *Brady* material. *See Brady v. Maryland,* 373 U.S. 83, 87 (1963) ("We now hold that the suppression by the prosecution of evidence *favorable to an accused* upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.")(emphasis added).

24.    As far as the defense is aware, this manual is still the one taught and used by U.S. attorneys nationwide.

25.    Whereas the Supreme Court actually required disclosure of any material that could be "favorable to the defense," the official DOJ position is that Brady does not reach information which "may not, on its own, result in an acquittal." USAM 9-5.001 "Policy Regarding Disclosure of Exculpatory and Impeachment,"21 section "C." Thus, "exculpatory," does not mean "favorable" and does not even mean "tending to exculpate."

It means evidence which "may on its own result in an acquittal." That is not the constitutional standard.

26.     Moreover, this standard has been codified in Fed. R. Crim. P. 16. While the government often argues that *Brady* did not create an evidentiary right, the command in *Brady* and the Rules are actually quite clear that this is a Due Process right to which a defendant is always entitled.

27.     Thus, while an individual Assistant United States Attorney (AUSA) may have a correct understanding of the standard, this Court should not accept a mere promise by an AUSA that it is in compliance with the standard when their official doctrine on the matter is nakedly wrong. When experience so often shows that AUSAs do *not* appreciate the true extent of *Brady,* leading to surprises and unfair disadvantages at trial, this Court should require more.

28.     The government also tries to deflect the Court by reciting all the evidence it has disclosed voluntarily. This is a logically inadequate answer, however, to the demand we are making here. Quantity is not quality, and what has been disclosed does not identify at all what the government might still be withholding. Thus, pointing to the benevolent gesture of voluntary discovery is irrelevant and fundamentally misleading when it comes to ensuring the government's compliance with the commands of *Brady* and its progeny. In other words, it doesn't matter what the government has provided if it is still withholding something important–one piece of potentially favorable evidence could be worth more than a thousand others. The Supreme Court has recognized this, and requires its disclosure. Also, new revisions to the criminal rules, passed this year, require issuance of an order, even though totally inaccurate. A proposed order is attached as **Exhibit E**.

29.     Thus, the defense moves this Court for two remedies, which are as follows.

30.     **First,** this Court should require the government to provide, under seal, a full

inventory of *all* the evidence it has which it has not yet disclosed in this case. The Court should review this material *in camera,* determine what, if any, materials could be "favorable" to the defense, and then issue an order compelling the government to produce it.

31.     **Second,** this Court should establish a schedule of sanctions to be used at trial if it emerges that the government has fibbed about its compliance with *Brady* at this stage. For example, if the government produces a hitherto undisclosed document favorable to the defense to help one of its witnesses refresh his or her memory, and the Court determines this document should have been disclosed, the Court should exclude the witness from then offering his or her testimony altogether. This schedule could be discussed in detail with the Court at a later date.

## B.     Jencks Act Material vs. Rule 26.2

32.     It is also a frequent occurrence, in the undersigned's experience, that the government will use a peculiar tactic to prevent disclosure of FBI 302 reports and other documents by claiming they are protected from disclosure by 18 U.S.C. § 3500 ("the Jencks Act") because they are witness statements. But later, at trial, when the defense tries to use one of these reports to impeach a witness, the government will argue vigorously that it is *not* a statement under Fed. R. E. Rule 26.2, thus foreclosing its use by the defense.

33.     This is an obviously illogical inconsistency. If the function of § 3500 is to protect witnesses from reprisal by providing legal protection to their discussions with law enforcement as "statements," it makes no sense to then drop that pretense at trial, when the identity of the witness is known and the testimony he or she has provided no longer needs protection.

34.     Thus, this Court should compel the government to produce any and all witness statements it intends to use at trial, notwithstanding any claim by the government that they are protected by § 3500.

# Rule 404(b) Notice

35.     The defense requests the government provide notice of any evidence it intends to offer under Rule 404(b), and for the Court to set a date for such disclosure.

# Expert Witnesses

36.     The defense requests notice of whatever expert testimony the government intends to offer at trial, pursuant to FRCP 16(1)(g).

# Rule 609

37.     The defense requests notice of whatever prior conduct attributed to the defendant that the government intends to use at trial, pursuant to FRE 609.

# Conclusion

Wherefore, the undersigned respectfully requests that this Court grant permission to file the above motion and consider it on the merits, along with consideration of other issues raised in the supporting Memorandum of Law.

Dated:  January 12, 2021                       /s/ James P. Harrington
_____

James P. Harrington
harrington A mahoney
Attorneys for Defendant
70 Niagara Street, Third Floor
Buffalo, NY  14202-3407
(716) 853-3710 (*facsimile*)
(716) 853-3700 (*voice*)
*jph@harringtonmahoney.com*

United States District Court
Western District of New York

United States of America,
                    *Plaintiff*

            *vs*.

Joseph Bongiovanni,
                    *Defendant*

**Amended Defendant Joseph Bongiovanni's
Memorandum: Pretrial Motions
19-CR-227-S**

Dated: January 11, 2021

harrington A mahoney
70 Niagara Street, 3rd Floor
Buffalo, NY   14202-3407
*Tele*:  716-853-3700
*Facs*: 716-853-3710
*Attorneys for Joseph Bongiovanni*

# Table of Contents

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

          Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Joseph Bongiovanni . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

              *1.*    *Personal life and background* . . . . . . . . . . . . . . . . . . . . . . . . . 6

                   Early relationship with █████████ . . . . . . . . . . . . . . . . . . . 7

              *2.*    *Career with Buffalo DEA* . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                   Typical casework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                   DEA Investigations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                            █████████████ . . . . . . . . . . . . . . . . . . . . . . 9

                            Michael Masecchia . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                            ██████████ . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                            ████████ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    C.    Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

              *1.*    *Retirement: January, 2019* . . . . . . . . . . . . . . . . . . . . . . . . . 11

              *2.*    *Stop at the Baltimore-Washington International Airport: April, 2019*
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

              *3.*    *Search warrant: June, 2019* . . . . . . . . . . . . . . . . . . . . . . . . . 13

D.     Prosecution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     *1.*    *Indictment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     *2.*    *Government media claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     *3.*    *Raid on Pharaoh's Gentlemen's Club: December 12, 2019* . . . . . . 15

     *4.*    *Enter Masecchia: June 4, 2019* . . . . . . . . . . . . . . . . . . . . . . . . . . . 15


Motion to dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     A.    Vindictive prosecution due to racial animus or bias. . . . . . . . . . . . . . . . . 16

     B.    Failure to state an offense: false statements charge (Count 13) . . . . . . . . 17


Motion to Suppress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     A.    Evidence obtained by CBP from Mr. Bongiovanni's mobile phone at the U.S. border in April, 2019 should be suppressed . . . . . . . . . . . . . . . . . . . . . . . 19

          *1.*    *The search fell outside the bounds of a "free border search"* . . . . 19

               The background of "free" border searches . . . . . . . . . . . . . . . . . . 19

               The Fourth Amendment's protections for mobile phones . . . . . . . . 20

               The problem with searching phones at the border: the free border search should not be used to further ongoing domestic investigations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

                    Cases limiting the free border search . . . . . . . . . . . . . . . . . . 22

                    The search was unjustified and impermissibly intrusive . . . 26

          *2.*    *The good faith exception is inapplicable* . . . . . . . . . . . . . . . . . . . . 27

     B.    Statements made at the execution of the search warrant at Mr. Bongivanni's house in 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

          *1.*    *Agents' questioning of Mr. Bongiovanni on June 6, 2019 was fruit of*

*the poisonous tree* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

2.   *The government lacked a warrant or consent to search the defendant's phone on June 6, 2019.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

3.   *Mr. Bongiovanni was in custody, and was not advised of his* Miranda *warnings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Even law enforcement officers are entitled to clear *Miranda* warnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

4.   *Agents coerced Mr. Bongiovanni's statements by unjustifiable and unreasonable threat of force against him and his family while he was detained* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

5.    *There is no good faith doctrine or inevitable discovery argument through which the government can escape here* . . . . . . . . . . . . . . 32

Motion for Particularization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

A.   "Italian Organized Crime" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

B.   "Information" passed to co-conspirators . . . . . . . . . . . . . . . . . . . . . . . . . 35

C.   Alleged bribes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

A.   *Brady* compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

1.   *Potential* Brady *materials in the government's possession which have not yet been disclosed* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

2.   *Need for an order to ensure the government's compliance.* . . . . . . . 37

B.   Electronic originals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

C.   Alleged bribes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

1.   *Expert witness disclosure* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

D.    Additional disclosures under Rule 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

      1.    *The existence of "IOC"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

      2.    *"Operation Willamette Falls"* . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

      3.    *Unnecessarily and inexplicably redacted documents* . . . . . . . . . . 40

E.    Rule 404(b) Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41


Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## Table of Authorities

*United States v. Leon*, 468 U.S. 897 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Alasaad v. Nielsen,* 419 F.Supp.3d 142 (D. Mass. 2019) . . . . . . . . . . . . . . . . . . . . . . . . 25

*Carroll v. United States*, 267 U.S. 132 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Chimel v. California,* 395 U.S. 752 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Colorado v. Connelly*, 479 U.S. 157 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*In re Terrorist Bombings of US. Embassies in E. Africa*, 552 F.3d 93 (2d Cir. 2008) . . 33

*Mincey v. Arizona*, 437 U.S. 385 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Miranda v. Arizona,* 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Nardone v. United States,* 308 U.S. 338 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Nix v. Williams,* 467 U.S. 431 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Opper v. United States,* 348 U.S. 84 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Oregon v. Elstad*, 470 U.S. 298 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Silverthorne Lumber Co. v. United States,* 251 U.S. 385 (1920) . . . . . . . . . . . . . . . . . . 29

*United States v. Aigbekaen,* 943 F.3d 713 (4th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . 23, 24

*United States v. Armstrong,* 517 U.S. 456 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Bin Laden*, 92 F. Supp. 2d 225 (S.D. N.Y. 2000). . . . . . . . . . . . . . . . . 33

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Bye*, 919 F.2d 6 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Cano,* 934 F.3d 1002 (9th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Chen*, 378 F.3d 151 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

v

*United States v. Cotterman,* 709 F.3d 952 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Djibo,* 151 F.Supp.3d 297 (E.D.N.Y. 2015) *rev'd on other grounds,* 730
Fed.Appx. 52 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Fares,* 978 F.2d 52 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Feola,* 651 F. Supp. 1068 (S.D. N.Y. 1987), *aff'd,* 875 F.2d 857 (2d Cir.)
(mem.), *cert. denied,* 493 U.S. 834 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Jabar (Bowers),* 18-1233-cr, 18-1857-cr (2d Cir.) . . . . . . . . . . . . . . . . 18

*United States v. Jaswal*, 47 F.3d 539 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Johnson,* 171 F.3d 139 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Kaba*, 999 F.2d 47 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Kirschenblatt*, 16 F. 2d 202, 203 (2d Cir.) . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Montoya de Hernandez,* 473 U.S. 531 (1985) . . . . . . . . . . . . . . . . . . . 23

*United States v. Mullens*, 536 F.2d 997 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Murgio*, 15-CR-769 (AJN), 209 F. Supp. 3d 698, 2016 WL 5107128, at *13
(S.D. N.Y. Sept. 19, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Rainey,* 12-cr-291 (E.D.N.Y., Aug. 11, 2014) . . . . . . . . . . . . . . . . . . . . 37

*United States v. Ramsey,* 431 U.S. 606 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Riley,* 573 U.S. 373 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 24

*United States v. Ruggles*, 70 F.3d 262 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Rybicki,* 354 F.3d 124 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Smasal*, No. Crim. 15-85 JRT/BRT, 2015 U.S. Dist. LEXIS 105923, 2015

WL 4622246 (D. Minn. June 19, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Thirty-seven Photographs,* 402 U.S. 363 (1971) . . . . . . . . . . . . . . . . . 20

*United States v. Torres*, 901 F.2d 205 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Zimmerman*, 2020 WL 4749855, at *6 (E.D.N.Y. Aug. 17, 2020) . . . 31, 32

*Wong Sun v. United States,* 371 U.S. 471 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Wyoming v. Houghton,* 526 U.S. 295 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# Introduction

This memorandum of law is submitted in support of defendant Joseph Bongiovanni's pretrial motions. Mr. Bongiovanni, together with co-defendant Michael Masecchia, has been charged by superseding Indictment [46] with conspiracy to defraud the United States (Count 1), conspiracy to traffic narcotics (Count 2), accepting bribes (Count 3), obstruction of justice (Counts 5-11), and making false statements to federal agents (Counts 12 & 13).

For the following reasons, Mr. Bongiovanni seeks various relief, including dismissal of the Indictment due to prejudicially motivated prosecution; dismissal of Count 13 for failure to state an offense; suppression of evidence taken by Customs and Border Patrol in Baltimore, Maryland, in April, 2019; suppression of statements allegedly made by Mr. Bongiovanni at the execution of a search warrant of his home in Buffalo on June 6, 2019; an order requiring disclosure of additional statements and evidence from the government, including potential *Brady* material likely in the government's possession and which has not yet been disclosed; particularization of the Indictment, especially as to the conclusory and incomplete allegations of specific actions taken as part of the conspiracy; and other miscellaneous relief.

The need for this relief is shown by the complex and unusual facts of this case, as described below.

# Background

## A.    Overview

The Indictment alleges a vast and complex conspiracy involving what the government calls "Italian Organized Crime" ("IOC"), claims of bribes, protection rackets, drug-trafficking, and high-level corruption inside the Drug Enforcement Agency (DEA). The government alleges that Mr. Bongiovanni, a former DEA agent, accepted bribes to protect alleged co-conspirators from investigation in their drug-trafficking activities. The government claims that Mr. Bongiovanni passed law enforcement-sensitive information to

these persons in exchange for money, and that he also monitored and occasionally stopped or interfered with active investigations to protect the co-conspirators. He did so, the government consistently avers, because he "believed" that the co-conspirators were members of "IOC." The government also alleges that he lied when he was confronted by federal agents about these allegations at the execution of a search warrant at his home in 2019.

Behind these sensational allegations, however, is a different story, as shown both by Mr. Bongiovanni's personal history and the government's own discovery in this case. Mr. Bongiovanni is a Buffalo native who worked for over twenty years for the local DEA before retiring in 2019. He spent his long career investigating local drug dealers, running undercover informants, and participating in numerous successful drug prosecutions, all while contending with a bureaucratic and inefficient culture at the local DEA.

Born and raised in the tight-knit Italian-American community of the North Buffalo area, Mr. Bongiovanni and his family were personally acquainted with a handful of persons he would later investigate, many of whom were, like him, of Italian-American ancestry. On a number of occasions before this case began, Mr. Bongiovanni had casual but distant interactions with these individuals, including men he had known since childhood like ███, ██████████████████ and █████████, ████████████████████████ both of whom among others are now alleged to have engaged in drug-trafficking.

Mr. Bongiovanni occasionally received electronic messages from █████████, to which he would politely but distantly respond. The two were not close, nor had they ever been. Aware that ██████████ and ████████████████ were potential DEA targets for narcotics trafficking, Mr. Bongiovanni disclosed to his superior several times that ████ ████ had sent him unsolicited and unwanted messages through Facebook from approximately June, 2018 to December, 2018. His supervisors eventually directed to draft two memoranda memorializing these contacts. *See* Bongiovanni memoranda to DEA (GOV-6496 and GOV-6489[1]), attached as **Exhibit A**. No other action was taken at that time. Copies of these same messages were provided by the government, which now claims they

---

[1] Throughout this memo, documents disclosed by the government are identified by the "GOV-" Bates number of the first page of the document.

2

are incriminating. Concerned with the appearance of any impropriety, Mr. Bongiovanni asked to be removed from cases involving ███████████. These memoranda were also disclosed by the government as part of the discovery. However, none of Mr. Bongiovanni's supervisors took the matter seriously, so he was not formally removed from any of these cases or an other case for which Bongiovanni disclosed that he knew the target. Naturally, Mr. Bongiovanni never directly told ████ that he did not want to talk to him because of his status as a DEA target, as this would have alerted ████ to that reality. Instead, he chose to ignore ████ as the messages show.

████████, meanwhile, was someone Mr. Bongiovanni considered to be an actual friend,. He and Mr. Bongiovanni spoke, but Mr. Bongiovanni had suspicions that ████ knew others who were involved in illicit activity, so he once again maintained some distance. Mr. Bongiovanni even contemplated recruiting him as an informant, as ████ seemed to be connected (or at least represented at times that he was) to persons engaged in marijuana dealing, including ██████████████████.

Mr. Bongiovanni had also investigated ████████ during his DEA tenure, and knew that they were connected with another north Buffalo native, Michael Masecchia, a school teacher whom the DEA had long suspected of being a large-scale marijuana dealer. While Mr. Bongiovanni did not know ████████ personally, he had known Masecchia growing up, which is unsurprising given the close-knit nature of the Italian-American community in north Buffalo.[2] Despite the government's allegations here, Mr. Bongiovanni had no relationship whatsoever with Masecchia, nor did Mr. Bongiovanni provide information to ████ to pass to Mr. Masecchia or anyone else in exchange for "bribes."

The DEA put tremendous pressure on Mr. Bongiovanni and other agents to investigate hard drug cases involving cocaine, heroin, or fentanyl, while generally ignoring marijuana-trafficking as a waste of resources. The local DEA field office during much of his time there operated in a culture of careerism and self-interest. Several supervisors ignored his repeated

---

[2] This dynamic is illustrated by the fact that the U.S. District Judge *in this very case,* himself part of the same community, has disclosed to the parties that he once had lunch at his home with Mr. Masecchia's parents, who were also apparently friends with his own parents. *See* Minute Entry of Status Conference, June 22, 2020 [53].

disclosures and did not remove him from cases where he had some connection to the suspects. All that mattered to his superiors was meeting their quotas for arrests and seizing crack cocaine, fentanyl, and heroin, and, more importantly, large quantities of cash. Case file management was loose. Quarterly case statuses were never adequately reviewed by management. Periodic office inspections, conducted by DEA headquarters, were always done by out-of-town supervisors who had no intimate knowledge of local case details. Files were "cleaned up" whenever inspectors came, sometimes by having agents sign incomplete forms for each-other and completing long-overdue reports. These practices were directed by local DEA supervisors to avoid "findings" of mismanagement or inadequacy by inspectors.

A handful of investigations that Mr. Bongiovanni and other agents handled involving marijuana went nowhere, including (among others) investigations of Masecchia and ███████ ███████. Mr. Bongiovanni opened or participated in active investigations against these men, but because the DEA prioritized harder drugs over marijuana. Agents could not receive officially authorized funds (OAF) to conduct marijuana controlled purchases because supervisors would not approve it. The DEA often worked in tandem with other local law enforcement agencies which would take up the marijuana cases, these cases rarely resulted in federal prosecution, due to the fact that statutory thresholds for such prosecutions were rarely met.

Mr. Bongiovanni filed routine reports and forms as part of these cases, forms which he signed with and circulated among other agents and his supervisors. He also recruited undercover informants whom he carefully managed and monitored. On occasion, as had happened in some other cases, Mr. Bongiovanni came to suspect that some of his informants were double-dealing, and so some of them were later discarded as resources because they were not reliable.

Now, having apprehended ████████████ Masecchia, ██████████████, the government has imagined a common thread between them and Mr. Bongiovanni. First, the government has noticed that all of the participants have Italian last names, and as such, has imagined the existence of an Italian-American organized crime syndicate. It has done so, however, without a single shred of evidence as to the actual existence, structure, leadership, or activity of such a syndicate beyond the vague facts alleged in this case, or anything that

ties Mr. Bongiovanni to any such organization. If an IOC syndicate existed, who is the boss? Why has the government not presented RICO charges? Where are the flow charts showing the command structures, the patronage networks, or the extortion rackets that federal prosecutors are so glad to present at press-conferences? They do not exist. Either this is an unusual mafia case, or it is not really a mafia case at all. The "Bills Mafia" has more structure and substance. These allegations are rooted mainly in alleged activities of past generations, visiting the sins of grandparents on their grandchildren.

Next, the government, perplexed as to why major marijuana traffickers like Masecchia or ███████ were left at liberty by the DEA for so long, has imagined that Mr. Bongiovanni must have provided cover for these men because he was involved in all of their investigations. They have pored over his case files and, apparently for no other reason than disbelief that these cases went nowhere, have alleged that he falsified documents and double-crossed the agency in order to protect the alleged co-conspirators. Yet there is nothing inherently contradictory or suspicious in these documents, nor can the government point to any obvious instance of Mr. Bongiovanni interfering with a case in any way, let alone in such a way that would lead to diverted prosecution. The government has even informally claimed that signatures on these forms were falsified, yet it is not apparent that this is so, nor is it credible to accept that these forms could have been falsified when they were obviously circulated among other case-agents and upper-management, none of whom appear to have suspected falsehood.

Furthermore, the government claims that Mr. Bongiovanni did all of this for money, $250,000 or more. Yet, in the thousands of pages of bank records from both Mr. Bongiovanni and his wife Lindsay Bongiovanni which the government provided in discovery, there is no hint of any such money. Mr. Bongiovanni's lifestyle does not reflect that of a man who has supposedly taken a quarter of a million dollars in bribes. His home is the same modest home in Tonawanda in which he has lived for seven years. Beyond occasional trips which were well within the means of his salary and retirement pension, he indulges in no luxuries. A classic car in his garage, which he bought with a loan several years ago and has slowly restored a few parts at a time, is his only uniquely prized possession. *To date, the government has not identified or seized a single penny of the alleged bribe money.*

5

Nor has the apparently irrelevant avalanche of financial information disclosed in discovery shown the route of such money.

In sum, the government's sensational case appears to be a reverse-engineered narrative, starting with conclusions (Mr. Bongiovanni is Italian and therefore a mafioso; these cases were not investigated, therefore there was a Mafia mole inside the DEA; Mr. Bongiovanni must have done all of this for money, like any other crooked man) and working backwards, despite an absence of clear evidence. After taking down a handful of local narcotics traffickers, the government suddenly found the witnesses it needed, men like ██ ████████████████████████ who were desperate enough to concoct stories to help fit the government's narrative theory and take down Mr. Bongiovanni in the process.

These allegations do not square with the reality of who Joseph Bongiovanni is. His otherwise immaculate record and commendable career in law enforcement are not reflective of a man who has been accused of lying to the government and taking bribes from the mafia.

## B.    Joseph Bongiovanni

### 1.    *Personal life and background*

Joseph Bongiovanni was born in Buffalo in 1964. His adoptive father, Frederick Bongiovanni, worked as the plant superintendent at the Buffalo Sewer Authority. His mother, Maria Bongiovanni (nee Sebastian), worked as an executive secretary for the City of Buffalo. Mr. Bongiovanni had two younger sisters: Lisa, who now works as a nurse in Canada, and Marla, who is a cardiovascular medical technician in Buffalo.

The family grew up together in a tight-knit community in the West Side and North Side of Buffalo. The Bongiovannis were close with other families in their neighborhood, most of whom were also Italian-American. He grew up with and socialized with the children of his parents' friends and acquaintances.

Mr. Bongiovanni went to grade school at PS 81, then attended Canisius High School and Cardinal O'Hara High School, graduating in 1982. He later attended some courses at the SUNY University at Buffalo (UB) in the late 1980s, but then transferred first to Canisius

College and later to Medaille, graduating in 1996 with a diploma in sociology and a minor in criminal justice.

### Early relationship with ████████

Mr. Bongiovanni met ████████ when they were both in the sixth grade. Frederick Bongiovanni operated a clam-stand part-time in the late 1970s at La Nova Pizzeria on Tacoma and Delaware Streets in North Buffalo. When Mr. Bongiovanni worked at the pizzeria, ████████ grandfather owned La Nova. ████ and Mr, Bongiovanni would play arcade games and foose-ball together.

They did not attend the same schools. As they grew up, they continued to see one another at the same places where other teenage boys would gather. They even occasionally played at each-other's houses.

By the time they reached adulthood, Mr. Bongiovanni saw ████ more rarely. When they did, their childhood friendship made them familiar, but they had no close relationship. They were at a number of large social occasions together.

### 2.    Career with Buffalo DEA

After graduating from high school, Mr. Bongiovanni worked seasonally for Buffalo Parking Enforcement as an officer in the late 1980s. He later worked for the Buffalo Bureau of Adjudication in 1994-95. He accepted his first position as an Erie County Sheriff's Deputy in 1996. He left in 1998 to attend DEA training at the FBI Academy in Quantico, Virginia, graduating the following year in March, 1999. He became a DEA agent upon graduation.

Mr. Bongiovanni was first assigned to the DEA Orlando District Office in the Miami Field Division. He immediately began investigating federal drug violations under Title 21 of the U.S. Code. He was eventually assigned to the HIDTA ("High Intensity Drug Trafficking Area") Taskforce specializing in heroin and fentanyl investigations. He remained in this office until shortly before the 9/11 Terror Attacks, when he accepted a hardship transfer to return to Buffalo to be closer to his ex-wife's family. He thus began working for

the Buffalo resident office in the New York Field Division. Mr. Bongiovanni also moved back to be closer to his aging parents.

Mr. Bongiovanni and his first wife Jo-Ann divorced in 2001. He met his current wife Lindsay in 2009 when she rented an apartment from him. They began dating and married in 2015. She has a son, Matthew, from a previous relationship, who Mr. Bongiovanni has adopted. He also has a daughter, Chelsea, whom he had by his ex-wife, who lives in South Carolina.

## Typical casework

Mr. Bongiovanni was the lead case-agent on numerous successful DEA prosecutions,. He received a national citation for federal law enforcement awarded for heroism and excellence in 2012. He received numerous other DEA citations and inter-agency awards. After transferring to Buffalo, Mr. Bongiovanni's typical casework for the DEA included street-level and multi-jurisdictional narcotics investigations. Aside from his collateral duties, which included membership in the DEA's trauma-team and serving as drug custodian for the office, Mr. Bongiovanni routinely investigated the sale of narcotics in the Buffalo area, performed arrests, recruited informants, conducted searches and arrests, and eventually worked with the Department of Homeland Security Air Marine unit as a supplemental aircrew member in charge of handling camera and FLIR equipment for aerial narcotics investigations.

## DEA Investigations

During his tenure, Mr. Bongiovanni worked an a number of specific investigations dealing with heroin, fentanyl, and cocaine, specifically heroin and fentanyl. Due to the federal thresholds for prosecuting cases involving it, marijuana investigations were considered a low-priority and Mr. Bongiovanni and his colleagues were discouraged by their supervisors from investigating such cases. Several of his supervisors urged Mr. Bongiovanni to focus instead on investigations of heroin, fentanyl, cocaine, and methamphetamine investigations due to their deadliness. This was supported by state and local law enforcement

8

agencies, including Buffalo Police, as they tended to assume a greater role in such cases.

████████████████████

During the course of several investigations and interviewing countless undercover sources, Mr. Bongiovanni learned the identity of ███████████████████████ ████, who were allegedly using rental properties in the Buffalo area to grow large quantities of marijuana. He opened a case to investigate them along with other officers. Because of the DEA's focus on other drugs, however, Mr. Bongiovanni did not successfully bring a prosecution against ██████████.

*Michael Masecchia*

Mr. Bongiovanni had known of Michael Masecchia from childhood. His parents were acquaintences with Mr. Masecchia's parents, and Mr. Masecchia attended high school with Mr. Bongiovanni's sisters. Mr. Masecchia's father worked for a time at the Buffalo Municipal Housing Authority with Mr. Bongiovanni's mother. The two were briefly close during college when Mr. Bongiovanni took a handful of classes at UB with Mr. Masecchia in the late 1980s. Mr. Bongiovanni observed that Mr. Masecchia had a "mean-streak" and was prone to engage in fist-fights and petty drug-dealing and use. He decided to stay away from Mr. Masecchia and they had no intentional contact until this case. They would occasionally see one another in public but never spoke or interacted beyond saying hello.

Later, when Mr. Bongiovanni worked for the DEA, he became aware that Mr. Masecchia had become a target in an investigation opened by another agent. Mr. Bongiovanni participated in these investigations to some extent, and even discovered possible connections between Mr. Masecchia and ████████, but once more, the case involved only marijuana, and Mr. Bongiovanni did nothing to intervere with or disrupt the investigation.



During his time with the DEA, Mr. Bongiovanni occasionally interacted with ███ ████, who would message Mr. Bongiovanni about social gatherings and mutual acquaintances and friends. They also attended some of the same social functions in Buffalo and Las Vegas. Mr. Bongiovanni eventually learned, from his colleague SA Anthony Casullo, that ████ was the target of a potential investigation, but Mr. Bongiovanni did not participate in that investigation and had no role in it.



Mr. Bongiovanni also knew ████████ from childhood. ██████ was never the target of a DEA investigation, though Mr. Bongiovanni became aware that ██████ was familiar with ████████ and Mr. Masecchia. In the course of his investigation of ███████, Mr. Bongiovanni became aware that ████ knew the ██████ through Mr. Masecchia. ████████ and Mr. Bongiovanni remained very close.

## C.   Investigation

It is unclear when the government began to suspect that Mr. Bongiovanni had been involved in illicit activity. Included in the discovery is a Homeland Security Report of Investigation (ROI) (GOV-6480) listing Mr. Bongiovanni's border crossing history, dated October 23, 2019, referencing an investigation code-named "OPERATION WILLAMETTE FALLS," giving a "CASE OPENED" date of January 28, 2016.

Mr. Bongiovanni had no suspicion that he was under investigation until late 2018, shortly before he retired. He was told by one of his supervisors that an inter-agency government operation was investigating ████████, and as consequence, AUSA Joseph Tripi and the DEA's Office of the Inspector General (OIG) were looking at Mr. Bongiovanni's past relationship and contacts with ████.

Mr. Bongiovanni began to feel like a pariah within the DEA. Other agents became

10

distant and withdrawn around him. Friends told him that other agents whispered that he was disloyal and corrupt. Now in his early fifties, he began to consider retirement. After a lifetime of dedicated service, he did not want to remain at the agency with a cloud of suspicion over his head. Nor did he wish to continue to do the dangerous and demanding work of managing informants and occasionally conducting armed raids while working with other agents whom he felt mistrusted and suspected him.

### 1.    Retirement: January, 2019

Mr. Bongiovanni finally retired from the DEA on January 29, 2019. The day before, agents raided ▮▮▮▮▮▮▮. Mr. Bongiovanni had no idea this was planned nor was he included in its execution. The government has since implied that the timing of this was suspicious, but the government's own discovery disclosures include correspondence between Mr. Bongiovanni and the DEA's human resources regarding his retirement, showing that he had been considering retirement before this time.

### 2.    Stop at the Baltimore-Washington International Airport: April, 2019

In April, 2019, Mr. Bongiovanni and his wife and stepson went on vacation to the Dominican Republic. On April 25, they re-entered the U.S. at the Baltimore-Washington International Airport in Baltimore, Maryland. Mr. Bongiovanni and his family were stopped and taken to secondary inspection by Customs and Border Patrol (CBP). His phone and the phones of his wife and stepson were taken. After approximately 30-45 minutes, their phones were returned, they were released and continued on to Buffalo. They were not questioned.

The government has disclosed a report prepared by CBP from this stop. *See* CBP Report (GOV-7030), attached as **Exhibit B.** The report lists two authors, Agents Jack Gernatt and Joseph Spadone. On the first page of the report (which gives the date as April 24, though Mr. Bongiovanni's flight records show the interaction happened on April 23), it states that

On April 24th [sic], 2019 subject Joseph BONGIOVANNI, his wife

11

and step-son were encountered at the Baltimore International Airport returning to their home in Buffalo, NY after vacationing in the Dominican Republic. BONGIOVANNI is the subject of a HSI/BEST Buffalo investigation, case number ▮▮▮▮▮▮▮▮ for his association and/or involvement with Transnational Organized Crime (TOC) characters to include Italian Organized Crime (IOC) and Outlaw Motorcycle Gangs (OMG). ***Based on his involvement,*** a logical electronic exam was performed, but was unsuccessful. A basic electronic exam was conducted which will be highlighted in this report.

(Emphasis added). There then follows several pages of highly redacted information. On page 5, the report states that "a basic review of [Mr. Bongiovanni's] phone revealed several contacts to include [sic]:



The report states that "the following individuals are contacts in BONGIOVANNI's phone,

---

[3] It is unclear why the birth date and month of some of the contacts were redacted while others were not; it is also unclear who redacted this document, or what justification was offered for the redactions.

[4] The meaning of the notation "T/H's" is unclear.

[5] During his career at DEA, Mr. Bongiovanni used one phone for business and personal reasons. This included relatives, friends, physicians, co-agents, informants, and other miscellaneous persons.

believed to be associates/confidants to the Buffalo Crime Family and/or have additional derogatory information," but all the names have been redacted. *Id.*

Mr. Bongiovanni recounts his own experience of the encounter in his affidavit attached as **Exhibit C.** According to Mr. Bongiovanni, CBP agents who took his phone assured him it was a "routine" search. He did not realize at that time that he was the target of an investigation.

### 3.   *Search warrant: June, 2019*

At 6 a.m. on June 6, 2019, a force of heavily armed federal agents executed a federal search warrant at Mr. Bongiovanni's house at 85 Alder Place, Tonawanda. Mr. Bongiovanni was home with his wife and stepson. While none of the reports or narratives of the raid record these details, the agents used flash-bang grenades and entered the house by battering ram, after giving no warnings. The agents wore ballistic armor and carried assault weapons. Mr. Bongiovanni was startled out of bed by the detonation of the flash-bang, and was confronted and handcuffed by agents, who had their weapons drawn and trained on him, before eventually being taken to the dining room of the house. Simultaneously, agents drew weapons on and detained Mr. Bongiovanni's un-armed wife and stepson.

Mr. Bongiovanni has recounted some of what happened next in his affidavit in support of the motion to suppress statements. Homeland Security compiled its own ROI of the interview (GOV-6526), which is also attached as **Exhibit D.**

In both accounts, SA Curtis Ryan asked Mr. Bongiovanni about his association with suspected co-conspirators. What Homeland Security's account omits is that agents took Mr. Bongiovanni's Samsung phone it is not clear when or where they had obtained it and opened it. According to Mr. Bongiovanni, SA Ryan began the conversation, holding Mr. Bongiovanni's phone, by saying "tell us about the mafia." Around this time, Mr. Bongiovanni was taken out of handcuffs, but he remained surrounded by armed agents while his wife and son remained detained in other rooms of the house, also under armed guard.

Mr. Bongiovanni did not give the agents permission to access his phone or its

13

contents. They did not advise him of his *Miranda* rights. The ROI makes no mention of advice or rights or waiver thereof, nor of consent to search or access the phone. At GOV-6529, the report states that "SA Ryan asked BONGIOVANNI about contacts found in his phone during a border search conducted on April 23, 2019, when BONGIOVANNI entered the United States at the Baltimore-Washington International Airport," and then describes Mr. Bongiovanni's response to the names listed. This carefully and craftily written omission conceals the fact that SA Ryan actually held Mr. Bongiovanni's phone and read the names of the contacts to him *from the phone* as he asked questions. The search warrant application allowed the agents to seize electronic devices from the home, but did not allow them to execute on-site searches of those devices.

Beyond questions based on the phone, the agents also asked Mr. Bongiovanni questions about his relationship with ███████ and ███████, and about his alleged involvement in Italian Organized Crime. Again, the ROI does not state that Mr. Bongiovanni was advised of his rights or that he waived them.

The ROI and an accompanying manifest of seized items (GOV 3673) note that a handful of items were seized from Mr. Bongiovanni's home, including various and ultimately irrelevant electronic devices, a lawfully owned firearm, ballistic vests from his time as an agent, and assorted documents and loose notes from some of the files Mr. Bongiovanni investigated. No cash was seized.

## D.    Prosecution

### 1.    *Indictment*

Mr. Bongiovanni was initially indicted on October 31, 2019. [1]. Mr. Bongiovanni was released with conditions. [5] He has had no issues complying with the conditions in the thirteen months since his arrest.

14

### 2.    Government media claims

On November 5, 2019, the government issued a press release regarding the indictment. The release paraphrases the indictment, stating that Mr. Bongiovanni aided associates engaged in drug trafficking, including "individuals whom the defendant believed to be members of, connected to, or associated with Italian Organized Crime (IOC)."

### 3.    Raid on Pharaoh's Gentlemen's Club: December 12, 2019

A month and a half after Mr. Bongiovanni was indicted, federal agents raided Pharaoh's Gentlemen's Club in Cheektowaga, New York on December 12, 2019. Local news outlets repeated claims that the raid was tied to Mr. Bongiovanni and his alleged involvement in the "Buffalo Mafia." *See, e.g.,* Phil Fairbanks, "Federal agents raid Cheektowaga strip club," THE BUFFALO NEWS, Dec. 12, 2019.

How the news and media made that connection will have to be addressed by the United States Attorney's Press and Media offices or by the prosecutors or agents who leaked his information.

### 4.    Enter Masecchia: June 4, 2019

Six months after the initial indictment, the government unsealed a Superseding Indictment, adding co-defendant Michael Masecchia.

# Motion to dismiss

15

## A.    Vindictive prosecution due to racial animus or bias

After a review of the discovery, there appears to be no basis to infer the existence of an "Italian" organized crime syndicate beyond the fact that the alleged co-conspirators, including Mr. Bongiovanni, are all of Italian descent. Otherwise, some law enforcement documents in the discovery refer in passing, and without elaboration, to "IOC" or "Buffalo LCN" (i.e. "La Cosa Nostra") as if its existence were self-evident. None of the law-enforcement reports or other documents in the discovery actually detail the existence, structure, membership, or activities of any such group, even though the government has alleged that Mr. Bongiovanni was a part of this group, or at least protected co-conspirators because he "believed [they] were connected to or associated with IOC, from criminal investigations." Indictment [46] at ¶ 4.

Federal Criminal Rule 12(b)(3)(A)(iv) allows the defense to allege a defect in the indictment for "selective or vindictive prosecution." *United States v. Johnson,* 171 F.3d 139, 140 (2d Cir. 1999). A prosecution can be selective if predicated on the defendant's race. *United States v. Armstrong,* 517 U.S. 456 (1996). As the Supreme Court noted in *Armstrong,* "[t]he vast majority of Courts of Appeals require the defendant to produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not." 517 U.S. at 469. A defendant must also demonstrate that the discriminatory selection of him or her for prosecution is invidious or in bad faith, in that it rests on such impermissible considerations as race. *United States v. Fares,* 978 F.2d 52, 59 (2d Cir. 1992).

The government has placed the improper burden on the defense of disproving a negative by alleging a concrete connection to "IOC." The organization does not appear to exist, yet the lore of the Italian mafia is so pervasive in our society that the government can benefit just from alleging a connection without having to prove it. The government has made this an issue, however, and has alleged membership in an organization whose predicate for membership is status as an ethnic minority. If the government styled gangs on Buffalo's East Side as "African-American crime syndicates," the prejudicial effects would be immediately obvious and condemned. The government will doubtless repeat "Italian Organized Crime" endlessly, before and during trial. This injection of racial and ethnic controversy demonstrates obvious bias in the indictment. The Court should dismiss the indictment on this

basis.

## B.  Failure to state an offense: false statements charge (Count 13)

The defense also moves under Rule 12(b)(3)(B)(v) to dismiss the false statements charges (Counts 12 & 13) for failure to state an offense.

18 U.S.C § 1001 makes it an offense when any person "(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact" or "makes any materially false, fictitious, or fraudulent statement or representation." The emphasis in either subsection is that the representation or falsehood is "material." A statement is "material" if, under the circumstances, it has the ability to affect or influence the course of the investigation. See Modern Federal Jury Instructions, §44-11, Instruction 44-4; see also *United States v. Rybicki,* 354 F.3d 124, 147 (2d Cir. 2003)(in the similar context of materiality for fraud, "where the misrepresentations (or omissions) made by the defendants are material in that they have the natural tendency to influence or are capable of influencing the employer to change its behavior").

The government alleges, under Count 13, that Mr. Bongiovanni made material misrepresentations about his relationships with a number of co-conspirators, essentially echoing memorandum of his alleged statements to agents during the raid of his home on June 6, 2019. The government alleges that Mr. Bongiovanni made the following false statements:

> (i) he denied he was in a close relationship with Coconspirator 1, a person known to the Grand Jury;
>
> (ii) that he had not spoken with Coconspirator 1 in over a year;
>
> (iii) that he had never attended a party with Coconspirator 2, a person known to the Grand Jury;
>
> (iv) that he never socialized with Coconspirator 3, a person known to the Grand Jury, and they never went on any trips together;
>
> (v) that Coconspirator 3's number was in the defendant's telephone because Coconspirator 3 had done the defendant's landscaping;
>
> (vi) that Coconspirator 1 once tried to cooperate with the DEA and that the defendant recused himself at the time because he knew Coconspirator 1 personally;

(vii) that Coconspirator 1 and the defendant were together, with others, a few years ago at Lake Erie around the 4th of July by chance encounter;

(viii) that he kept the file regarding DEA Case Number C2-13-0026 in his house because it was an old case and he thought it would come up again and the defendant wanted to verify everything was on the up and up; and

(ix) that Peter Millitello was the source in DEA Case Number C2-13-0026;

Indictment [46] at p. 30-31. The government counters each representation by claiming "whereas in truth and in fact, and as the defendant then and there well knew," and claims that each statement above was simply false. *Id.*

As argued below (at p.19), these statements should be suppressed because they were improperly gathered in violation of the Fourth and Fifth Amendments. The government essentially admits that it attempted to solicit incriminating statements from Mr. Bongiovanni while he was in *de facto* custody without actually advising him of his rights. In such a context, where the government seeks to illegally obtain a confession, the fact that Mr. Bongiovanni does not supply such a confession does not make his statements "material," especially since the government has failed to provide *any* documents in discovery which would actually call Mr. Bongiovanni's answers into doubt. Also, it seems clear that the agents believed that they understood Mr. Bongiovanni's relationships with these individuals before asking questions; the only purpose of their questioning, aside from soliciting a confession, would have been to produce a false statements charge, as here. This obviously cannot be permitted, or else government agents would engage in these kinds of interviews for no other reason than to "stack charges" against the defendant for refusing to endorse the government's narrative of their own guilt.[6]

---

[6] This very question is being litigated by the undersigned's law partner, Mark Mahoney, Esq., in an ongoing appeal before the Second Circuit. *See, generally United States v. Jabar (Bowers),* 18-1233-cr, 18-1857-cr (2d Cir.).

# Motion to Suppress

The Court should suppress evidence obtained by CBP when Mr. Bongiovanni was stopped at the airport in Baltimore, and it should suppress evidence and statements gathered at the execution of the search warrant on June 6, 2019 relating to Mr. Bongiovanni's cell phone. These seizures and the solicitation of statements all violated Mr. Bongiovanni's rights under the Fourth Amendment to the U.S. Constitution.

## A.   Evidence obtained by CBP from Mr. Bongiovanni's mobile phone at the U.S. border in April, 2019 should be suppressed

The government will likely argue that evidence obtained from Mr. Bongiovanni's cell phone when he re-entered the U.S. in April, 2019 will be admissible under the so-called "free border-search" exception to the Fourth Amendment's warrant requirement. This argument will be wrong. The "free" border search is a dragnet designed to prevent entry of contraband, specifically by foreign nationals entering the country. Like any other dragnet, it is not designed to provide a loophole to further previously existing law enforcement investigations, particularly if the target is a U.S. citizen re-entering the country. The report prepared by CBP states that agents decided to search Mr. Bongiovanni's phone *because* they knew he was a suspect in a federal criminal investigation. This rationale takes the seizure outside the established purpose and scope of warrantless border searches, and instead makes it a pretextual and therefore unconstitutional warrantless search.

### 1.   *The search fell outside the bounds of a "free border search"*

**The background of "free" border searches**

The concept of a "free border search" was established by *United States v. Ramsey,* 431 U.S. 606 (1977). The Supreme Court endorsed the search of suspicious packages from Thailand by postal inspectors in New York City, insofar as the inspectors had "reasonable

19

cause to suspect" that the packages contained narcotics. Citing the longstanding common law right of the sovereign to search incoming vessels and persons for contraband or smuggled goods, the Court held that "searches made at the border [. . .] are reasonable simply by virtue of the fact that they occur at the border," and that the framers of the Constitution had clearly intended some exception to the Fourth Amendment in this context. 431 U.S. at 616-17. The Court explained that

> a port of entry is not a traveler's home. His right to be let alone neither prevents the search of his luggage nor the seizure of unprotected, but illegal, materials when his possession of them is discovered during such a search. Customs officials characteristically inspect luggage and their power to do so is not questioned in this case; it is an old practice and is intimately associated with excluding illegal articles from the country.

*Id.* at 618 (quoting *United States v. Thirty-seven Photographs,* 402 U.S. 363, 376 (1971)).

### The Fourth Amendment's protections for mobile phones

This doctrine would seem to be a "slam-dunk" for the government. The fatal problem, however, is that *Ramsey* and the precedent it relies upon vastly antedates modern mobile phones and more recent Fourth Amendment case law surrounding them.

In *United States v. Riley,* 573 U.S. 373 (2014), the Supreme Court held that the Fourth Amendment protects the contents of mobile phones because of their increasing sensitivity and ubiquity in modern American society. Riley's phone had been searched without a warrant by a police officer during a routine traffic stop because the officer found suggestions that Riley was a member of the "Bloods" street gang in his car, and wanted to find further evidence of gang-related activity on his mobile phone. 573 U.S. at 379. The officer justified this as a search incident to arrest. *See Chimel v. California,* 395 U.S. 752 (1969). The Supreme Court reasoned that this exception, designed to find physical evidence or weapons on a suspects person, was inapplicable. Mobile phones, unlike a defendant's pockets or wallet, contained too much personal, sensitive information to be treated as any other property, especially given its ubiquity in modern American life: "modern cell phones [. . .] are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars

might conclude they were an important feature of human anatomy." 573 U.S. at 385. But it is not merely their ubiquity which makes them so sensitive:

> Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse. A conclusion that inspecting the contents of an arrestee's pockets works no substantial additional intrusion on privacy beyond the arrest itself may make sense as applied to physical items, but any extension of that reasoning to digital data has to rest on its own bottom.

*Id.* at 393. The Court observed that warrantless searches had generally been licensed under the Constitution "by assessing, on the one hand, the degree to which [a search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate government interests." *Id.* at 385 (quoting *Wyoming v. Houghton,* 526 U.S. 295, 300 (1999)). Given the extraordinary and unprecedented amount of personal information contained in most cell phones ("[t]hey could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers," *id.* at 393), the Court reasoned that warrantless searches of phones are thus too intrusive to fall into any exception to the Fourth Amendment's warrant requirement:

> In 1926, Learned Hand observed (in an opinion later quoted in *Chimel*) that it is "a totally different thing to search a man's pockets and use against him what they contain, from ransacking his house for everything which may incriminate him." *United States v. Kirschenblatt*, 16 F. 2d 202, 203 (CA2). If his pockets contain a cell phone, however, that is no longer true. Indeed, a cell phone search would typically expose to the government far more than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form    unless the phone is.

*Id.* at 396-97. Thus, a search of a mobile phone is not like merely looking through a person's pockets, or in loose papers next to them on a car seat; it is equivalent to conducting a thorough raid of their most sensitive papers and personal information.

### The problem with searching phones at the border: the free border search should not be used to further ongoing domestic investigations

It is unsurprising that the "free border search" doctrine and the recent doctrine on mobile phones from *Riley* have come into conflict. While some cases have generally affirmed the right of border agents to search phones, these cases hinge on the reasoning articulated in *Ramsey* that border searches are justified to hunt for contraband and any evidence of a crime *that a foreign national entering the U.S.* might be committing by entering the country. What separates Mr. Bongiovanni's case from that precedent is the fact that he, a U.S. citizen, was already a target of a domestic law enforcement investigation, and CBP agents admitted in their report of their search of his phone that they were investigating him because of his suspected involvement in criminal activity within the U.S., *not* to screen for contraband or prevent commission of a suspected crime during entry. A growing number of courts have rejected or limited the free search of phones at the border *per se* as an overreach neither contemplated nor justified by *Ramsey* or its progeny. Mr. Bongiovanni's case should follow the same pattern.

### *Cases limiting the free border search*

There is currently a circuit split on whether free border searches should include thorough searches of cell phones. The Second Circuit has not yet taken a side on the issue, but the preponderance of decisions limiting such searches, and the soundness of their reasoning, should assure this Court that it has the power to find the search of Mr. Bongiovanni's phone to have been intrusive.

In *United States v. Cano,* 934 F.3d 1002 (9th Cir. 2019), a panel of the Ninth Circuit Court of Appeals reversed the denial of a suppression motion brought by a defendant whose phone had been searched at the border under the "free border search" doctrine. Cano was arrested crossing the U.S.-Mexico border at Tiajuana after several large, vacuum-sealed packages of cocaine were found hidden in his truck. After his arrest, agents began to search his phone without a warrant. They found messages suggestive of arrangements for a suspicious rendezvous. *Id.* Cano moved to suppress these messages, which was denied. He

22

was convicted after a trial. *Id.*

Reversing this decision, the Ninth Circuit reasoned that any warrantless search must be constrained by the permitted scope of the search and by the inherent intrusiveness of the search. 934 F.3d at 1011. As to scope, the panel cited *Riley* in concluding that phones are perhaps inherently beyond the scope of what *Ramsey* and other cases had intended. As to intrusiveness, the panel compared Cano's case with that of the defendant in *United States v. Montoya de Hernandez,* 473 U.S. 531 (1985). Montoya had been stopped at the border and, on suspicion she had swallowed cocaine-filled balloons, was subjected to a rectal examination. This was done pursuant to an order from a magistrate judge, but this order was *not* a warrant supported by probable cause. 473 U.S. at 533-40. The Supreme Court held that the search was far too intrusive to be warrantless, notwithstanding the fact it had happened at the border, and that the level of intrusion ought to have required a warrant with particularized probable cause. *Id.*

A third factor which the *Cano* panel had to consider was the body of case law allowing border agents to conduct *brief* searches of phones to both ensure the identity of the traveler and to prevent entry of "digital" contraband  which, in almost every case, means the presence of child pornography. *Id.* at 1013-14 (citing *Carroll v. United States*, 267 U.S. 132 (1925)(allowing search of border-entrants to verify identity and lawfulness of their possessions)). In situations where law enforcement had suspicion that a particular person's phone might have contained child pornography, more intrusive warrantless  searches had been sanctioned. *Id.* (citing *United States v. Cotterman,* 709 F.3d 952 (9th Cir. 2013)(en banc)(brief searches for contraband are permissible, but forensic searches on suspicion of more particularized crimes are not)).

Reconciling these doctrines, the *Cano* panel reasoned that the search of Cano's phone was not the kind of generic, randomized search of a phone that any entrant to the U.S. border could reasonably expect. Beyond a brief look for the presence of *digital* contraband, the thorough search was actually targeted at finding further evidence of a suspected crime, but was not supported by a particularized warrant founded on probable cause.

In a similar case, *United States v. Aigbekaen,* 943 F.3d 713 (4th Cir. 2019), a panel of the Fourth Circuit affirmed the conviction of a man suspected of sex trafficking whose

electronic devices had been confiscated for over a month and forensically searched as part of a border crossing. The panel affirmed the conviction after ruling that these searches were unconstitutionally intrusive and beyond the scope of proper border searches, sustaining the search only under the "good faith" exception because the search, which happened in 2015, had preceded many of the opposing circuit decisions on the issue. The *Aigbekaen* panel did, however, make clear that the type of search to which Mr. Bongiovanni was subjected here would be deemed inappropriate moving forward:

> ***The Government may not invoke the border exception on behalf of its generalized interest in law enforcement and combatting crime.*** This restriction makes particularly good sense as applied to intrusive, nonroutine forensic searches of modern digital devices, which store vast quantities of uniquely sensitive and intimate personal information, yet cannot contain many forms of contraband, like drugs or firearms, the detection of which constitutes the strongest historic rationale for the border-search exception.
>
> To conduct an intrusive and nonroutine search under the border search exception (that is, without a warrant), ***the Government must have individualized suspicion of an offense that bears some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband***. If a nonroutine search becomes too "attenuated" from these historic rationales, it no longer will fall under the exception. In such circumstances, the search will be unconstitutional unless accompanied by a warrant or justified under a different exception to the warrant requirement.

943 F.3d at 721 (emphasis added). The panel added, rejecting a specific finding by the lower court that the government's border security interests "trump" all other considerations, that *Riley* and other cases clearly mandate a balancing of those interests against their level of intrusiveness. *Id.* at 722. Also, Aigbekaen did not challenge routine border searching *per se,* only the type of intrusive, warrantless search to which he had been subjected. *Id.* "[T]he ultimate touchstone of the Fourth Amendment is reasonableness [. . .]. [T]he reasonableness of requiring law enforcement to secure a warrant before conducting an intrusive forensic search of a traveler's digital device, solely to seek evidence of crimes with no transnational component, is readily apparent." *Id.* (quoting *Riley,* 573 U.S. at 381)(internal quotation marks

omitted).

In another case, *Alasaad v. Nielsen,* 419 F.Supp.3d 142 (D. Mass. 2019), a U.S. district court judge in Massachusetts entered summary judgments for plaintiffs who alleged that their Fourth Amendment rights had been violated by intrusive searches of their electronics at the U.S. border, including both "basic" and "advanced" searches. The court also rejected the government's urgent claims about its need to enforce criminal laws at the border, observing that

> To the extent that the government attempts to invoke "general law enforcement" purposes, that is not what gives rise to the border search exception, *Cano*, 934 F.3d at 1013, even as "the interdiction of contraband can serve both customs and law enforcement purposes." *United States v. Smasal*, No. Crim. 15-85 JRT/BRT, 2015 U.S. Dist. LEXIS 105923, 2015 WL 4622246, at *10 (D. Minn. June 19, 2015) (Report and Recommendation). "No doubt a text message or email may reveal evidence of crimes, but that is true both at and inside the border. But it is uncertain whether the evidence-gathering justification is so much stronger at the border that it supports warrantless and suspicionless searches of the phones of the millions crossing it." *United States v. Molina-Isidoro*, 884 F.3d 287, 295 (5th Cir. 2018) (Costa, J., specially concurring).

*Id.* at 156.

In yet another case, *United States v. Djibo,* 151 F.Supp.3d 297 (E.D.N.Y. 2015) *rev'd on other grounds,* 730 Fed.Appx. 52, an individual stopped at the border while entering from Morocco was found with heroin in his suitcase. Agents seized this man's phone and searched it, through which they discovered text messages with the defendant, Djibo, containing what they later alleged were coded conversations about smuggling the heroin. *Id.* at 298. Learning that Djibo was planning to leave JFK airport for London, agents arranged to intercept him there, where they told him he was being subjected to a "border enforcement exam" to search for "any money" or "contraband" he might have had. *Id.* Agents, taking Djibo aside, found a number of phones in his luggage, including an iPhone for which they asked Djibo for the passcode. Djibo was then arrested. There was considerable ambiguity about when the passcode was obtained and later used  whether before Djibo was arrested, when he invoked his *Miranda* rights, or after.  In either case, the agents claimed to have used the passcode at

some point to conduct what they termed a "peek" at the phone, which yielded over 921 pages of material allegedly taken from the phone, "including hundreds of text messages, WhatsApp[7] messages, photographs, and emails." *Id.* at 303. The government later sought and obtained a search warrant for the phone, but later consistently represented that the 921 pages of material had been obtained just from the brief "peek," rendering the warrant essentially useless. *Id.* at 309.

In reviewing a motion to suppress the contents of the phone, the district court found that the search of the phone had been improper for a number of reasons. First, by stopping Djibo, asking him for a passcode, and likely searching his phone *before* arresting him and advising him of his *Miranda* rights, the agents had likely sought "to expand the definition of a 'border search' in a way this Court cannot abide and in a way that invokes *Wong Sun v. United States,* 371 U.S. 471 (1963)(suppressing drugs found following a warrantless search as 'fruit of the poisonous tree') and its progeny." *Id.* at 309. Second, though the court (barely) credited agents' statements that there was plausible reason to search for contraband, "the search was undertaken to find contraband and currency and neither were found. There was no need to then seek out Djibo's passcode. It had nothing to do with national security at the airport on that day." *Id.*

### The search was unjustified and impermissibly intrusive

The facts of the cases above are, viewed together, similar to the facts alleged here. The government will claim that it had prior belief that Mr. Bongiovanni was engaged in "narcotics trafficking activity" (viz. *Cano, Aigbekan, Djibo*), though in fact it has not alleged that he personally trafficked narcotics, only that he conspired to help others do so. The government will argue this was sufficient reasonable suspicion to search, but the cases above clearly show evidence of prior ongoing crime is insufficient, even in *Cano* where the defendant was actually caught with large quantities of drugs. *Ramsey* makes clear that the government's search power must be reasonably connected to searches for contraband (i.e. drugs, or in digital terms, child pornography), or to ensure the subject's identity. Here, there

---

[7] A free, encrypted program for exchanging messages that can be used on mobile phones.

was never any suspicion that Mr. Bongiovanni had contraband, or that he was not who he said he was. Indeed, the government says that it searched Mr. Bongiovanni *because* they knew who he was.

Moreover, the government's disclosure of the contents of Mr. Bongiovanni's phone and those of his wife and stepson show the intrusive extent of even such a "basic" search. The contents include the phone's entire internet browsing history, every photo saved on all three phones, call logs, and messages. The unnecessary exposure of such private information  not just for Mr. Bongiovanni but also for his wife, who is not alleged to have any connection to his accused activities, or for his adolescent stepson  is manifest. This search was unduly intrusive to qualify as a "routine" border search.

### 2.    *The good faith exception is inapplicable*

The government may attempt to bypass the reasoning of *Cano* and other decisions above by arguing that border agents did not know about the limitations of the "free border search" and thus relied on their old, misused, and mis-named friend the "good faith exception" in effecting their search. *See, generally, United States v. Leon*, 468 U.S. 897 (1987)(establishing good faith exception to exclusionary rule). This argument, however, will not succeed.

Even when it established the border search concept in *Ramsey*, the Supreme Court did not claim that the "free border search" allows the depth and intrusiveness allowed in Mr. Bongiovanni's case, nor has it done so since. Such a claim would not square with the historic doctrine allowing such searches, as observed by the courts in *Cano, Aigbekaen,* and *Alsaad.* After *Riley,* the government cannot continue to argue that *carte blanche* seizure and search of phones at the border is in any way a good faith national security measure, especially where, as here, government agents *admit* in writing that they conducted the search "because" the defendant was a target in an ongoing investigation. Not only was the search unreasonably intrusive under any rationale, it was obviously not connected to the kind of justifications for warrantless border searches articulated under *Ramsey*. Also, as noted in Mr. Bongiovanni's affidavit (Ex. C at ¶¶ 5, 6), agents lied to Mr. Bongiovanni and told him it was a "random"

27

search in order to delay him and his family.

The precedent which creates these searches itself limits them. Thus, agents cannot claim in good faith that they did not know they could do warrantless border searches without also admitting they would know the intrinsic limitations on them. Nor can they claim that they effected such a search here, when their own memorandum of the encounter shows it was done deliberately because Mr. Bongiovanni was the target of an ongoing investigation.

## B.   Statements made at the execution of the search warrant at Mr. Bongiovanni's house in 2019

The HSI search warrant memo states, at GOV-00006529, that, on June 6, 2019, "SA Ryan asked BONGIOVANNI about contacts found in his phone during a border search conducted on April 23, 2019 when BONGIOVANNI entered the United States at Baltimore-Washington International Airport." Ex. B at 1. The report then recites a list of these contacts and what Mr. Bongiovanni allegedly said about them. These observations are peppered with gratuitous annotations by the agents about supposedly suspicious or guilty things Mr. Bongiovanni said and did as he answered agents' questions.

Mr. Bongiovanni's recollection in his affidavit of this encounter differs from the report in one key respect: he says that the agents took his phone and scrolled through the contacts *on his actual phone* as they spoke to him. Ex. C at ¶ ¶ 21, 22. He says that they implied that they already had this information from the April, 2019 search of his phone. *Id.* This raises the concerning prospect that additional information was solicited from or about the contents of the phone which was previously unavailable to law enforcement after their April 23 search.

This fact  along with the fact that Mr. Bongiovanni was not advised of his *Miranda* rights, nor did he waive them or give clear consent for the search of his phone  raises a trilemma for the government. First, the statements and evidence should be suppressed because the first phone search was never valid; second, even if it was, the second phone search was not, which irreparably tainted the statements elicited about the phone's contents; and third, even if the first and second phone searches were somehow valid, Mr. Bongiovanni

was never advised of, nor did he waive, his Fifth and Sixth Amendment rights. No matter how the issue is parsed, the evidence and statements were tainted.

### 1.     *Agents' questioning of Mr. Bongiovanni on June 6, 2019 was fruit of the poisonous tree*

As argued above, the use of Mr. Bongiovanni's contacts from the April 23, 2019 border encounter was improper, because that search was improper. Using Mr. Bongiovanni's phone to then solicit statements from him was "fruit of the poisonous tree," that is evidence derived from other, improperly gathered evidence. *Silverthorne Lumber Co. v. United States,* 251 U.S. 385 (1920); *Nardone v. United States,* 308 U.S. 338 (1939).

Agents failed to advise Mr. Bongiovanni of his *Miranda* warnings nor did they obtain consent to search his phone as they questioned him on June 6, 2019, during execution of the search warrant. These points are argued more substantively below. Even if, however, the Court deems that there was consent or that the circumstances were not custodial, the Court should find that the government's questions regarding the contents of Mr. Bongiovanni's phone flowed from their improper search on April 23. This renders them fruit of the poisonous tree, and as such, they should be suppressed.

### 2.     *The government lacked a warrant or consent to search the defendant's phone on June 6, 2019*

Mr. Bongiovanni alleges that the government solicited statements using his phone during the June 6 interview, probably in an attempt to entice Mr. Bongiovanni into providing more incriminating information than the government believed it had obtained from the April 23 search. Mr. Bongiovanni did not consent to this. The HSI ROI does not mention advise of rights, waiver, or consent. A single memorandum (GOV-6534) compiled by agents from the Department of Justice Office of the Inspector General (OIG) claim that "[d]uring the search of his residence, Joseph Bongiovanni agreed to speak voluntarily with SA Carpenter, SA Fusco, and HSI SA Curtis Ryan (a complete summary was conducted by SA Ryan)." This

vague detail is not enough to establish actual waiver of rights, especially since SA Ryan's ROI does not allege such details. No signed waiver or advise of rights forms were supplied in the discovery.

### 3.     Mr. Bongiovanni was in custody, and was not advised of his Miranda warnings

It will be profoundly difficult for the government to claim that Mr. Bongiovanni was not in custody for the purpose of the interview. As Mr. Bongiovanni alleges in his affidavit, (Ex. C at ¶ 24), he was not advised of his *Miranda* warnings before questioning, though he was clearly in a custodial context where he felt he was not free to leave. *Miranda v. Arizona,* 384 U.S. 436 (1966).

"[I]f a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent." *Id.* at 467-66. The Court further stated that: "[a]ny statement taken after the person invokes his privilege [to remain silent] cannot be other than the product of compulsion, subtle or otherwise." *Id.* at 474. "[U]nless and until such [*Miranda*] warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." *Id.* at 479.

**Even law enforcement officers are entitled to clear**
**_Miranda_ warnings**

There is no case law which the discovery can find that limits the application of *Miranda* warnings to law enforcement or other persons who might be supposed to be generally familiar with their use. The government may attempt to argue that Mr. Bongiovanni knew his rights, as a former police officer, and that by speaking, he constructively waived them. If it does so, the government will almost certainly argue without any precedential support.

4. *Agents coerced Mr. Bongiovanni's statements by unjustifiable and unreasonable threat of force against him and his family while he was detained*

Even if the Court finds that Mr. Bongiovanni did consent and was not entitled to *Miranda* warnings, the Court should find that the unreasonable and unjustifiable display of force against Mr. Bongiovanni and his innocent, unarmed family was sufficient to overbear Mr. Bongiovanni's will, making any voluntary statements inadmissible as coerced.

It is clear that "any criminal trial use against a defendant of his involuntary statement is a denial of due process of law . . ." *Mincey v. Arizona*, 437 U.S. 385, 398 (1978). A statement is involuntary, and thus inadmissible, if it is procured through "techniques and methods offensive to due process, or under circumstances in which the suspect clearly had no opportunity to exercise a free and unconstrained will." *Oregon v. Elstad*, 470 U.S. 298, 304 (1985).

In determining the voluntariness of confessions, the Second Circuit has used an objective analysis which "look[s] at the totality of the circumstances in which they were given to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined.'" *United States v. Zimmerman*, 2020 WL 4749855, at *6 (E.D.N.Y. Aug. 17, 2020) (citing *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir. 1993)); see also *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987). Factors to consider include the suspect's "background and experience, the conditions of his interrogation and the conduct of the law enforcement officers." *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995). "No single factor determines whether a confession is voluntary." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citing *United States v. Bye*, 919 F.2d 6 (2d Cir. 1990)).

In determining whether a statement is voluntary, courts need to be mindful of the distinction between "choices which are physically or psychologically coerced and those which are merely difficult." *Zimmerman*, 2020 WL 4749855 at *6 (quoting *United States v. Mullens*, 536 F.2d 997, 1000 (2d Cir. 1976)). "Only the former are void under our law." *Id.* This distinction is "often a subtle one and must depend in each instance upon an evaluation

31

of the totality of the circumstances presented." Id. The burden is on the government to prove that a confession is voluntary by a preponderance of the evidence. *Zimmerman*, 2020 WL 4749855 at \*6 (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)).

In this case, Mr. Bongiovanni's situation was not merely difficult, but patently threatened. Having previously been in tense, armed stand-offs as part of his DEA career, Mr. Bongiovanni was, if anything, *more* vulnerable to being targeted with armed weapons than the ordinary member of the public. Mr. Bongiovanni saw his wife and stepson removed from their home at gunpoint, his stepson handcuffed, and then did not see where they were taken or under what circumstances. Surrounded by heavily armed, intimidating, and tense government agents, wearing only his underwear, and fearful for his family's safety, Mr. Bongiovanni was intimidated and threatened into making statements. The unnecessary use of a flash-bang and a dynamic entry through his front door at an early hour in the morning further served to make Mr. Bongiovanni susceptible to confusion and disorientation.

Mr. Bongiovanni's alleged statements should be suppressed on this basis.

### 5.      There is no good faith doctrine or inevitable discovery argument through which the government can escape here

Once again, the government cannot avail itself of the good faith exception to the Fourth Amendment, insofar as advising defendants in custody of *Miranda* warnings and securing waivers thereof is part of the bread and butter of every law enforcement official's work. No officer could, in good faith, claim they did not think *Miranda* necessary, especially having just pointed guns at Mr. Bongiovanni while he was in his underwear, while simultaneously detaining his wife and stepson at gunpoint.

Nor will the doctrine of "inevitable discovery" be available here. *Nix v. Williams,* 467 U.S. 431 (1984). The government had no recourse by which to solicit what it claimed were incriminating  albeit false  statements from Mr. Bongiovanni, except by getting him to speak. The contents of the phone themselves, improperly obtained through the first, warrantless border search and then reviewed again without consent or warrant during the second search, were merely used as a pretext to solicit statements. The government cannot claim inevitable

discovery under such circumstances.

# Motion for Particularization

Federal Rule of Criminal Procedure 7(f) allows   a defendant to seek a bill of particulars to enable him "to identify with sufficient particularity the nature of the charge pending against him." *United States v. Murgio*, 15-CR-769 (AJN), 209 F. Supp. 3d 698, 2016 WL 5107128, at *13 (S.D.N.Y. Sept. 19, 2016)(citing *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987)(*per curiam*)). A bill of particulars under Rule 7(f) will "enable[] a defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *Murgio*, 209 F.Supp.3d. at 719 (quoting *In re Terrorist Bombings of US. Embassies in E. Africa*, 552 F.3d 93, 150 (2d Cir. 2008) (internal quotation marks and citation omitted)).

Where, as here, the charges of the indictment are relatively specific, it would not seem that a bill of particulars is necessary. However, the government has made specific and detailed allegations which add more confusion than clarity, in such a way "that they do not advise the defendant of the specific acts of which he is accused," *Id.* (quoting *United States v. Chen*, 378 F.3d 151,163 (2d Cir. 2004) (internal quotation marks and citation omitted)); see also *United States v. Torres*, 901 F.2d 205,234 (2d Cir. 1990) (*citing United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987), *affd*, 875 F.2d 857 (2d Cir.) (mem.), *cert. denied*, 493 U.S. 834 (1989)).

The Court must "examine the totality of the information available to the defendant through the indictment, affirmations, and general pretrial discovery and determine whether, in light of the charges that the defendant is required to answer, the filing of a bill of particulars is warranted." *Murgio, id.* (quoting *United States v. Bin Laden*, 92 F. Supp. 2d 225, 233 (S.D. N.Y.2000), aff'd *sub nom. In re Terrorist Bombings*, 552 F.3d 93 (2d Cir. 2008)). This requires that the Court consider the complexity of the charges against the defendant. See *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988)( explaining that the general principles regarding bills of particulars "must be applied with some care when the Government charges criminal offenses under statutes as broad as RICO" so as to

ensure realistic preparation of the defense).

## A.   "Italian Organized Crime"

The government's repeated references to Italian Organized Crime in the Indictment are problematic, aside from their obvious prejudicial effect, as described above. There are a number of references to IOC or "Buffalo LCN" in the discovery, but nothing that offers substance beyond the apparent belief or say-so of a handful of federal officers that a mob actually exists in Buffalo. The government assumes that the existence of IOC is self-evident, or at least operates as if whatever internal, "law-enforcement sensitive" information it has about the existence of the mob can be trusted without being seen. Objectively, however, the Buffalo Mafia seems to have been dismantled over a generation ago, and has not been active for decades, nor has it been replaced by any successor organization.[8]

The fact that the government has not presented RICO charges in this case, has not identified a mob-leader or lieutenants, and has not identified any concrete acts of racketeering, intimidation, or violence, suggests that there is no real "Italian Organized Crime" syndicate. Rather, the government has identified an *ad hoc* conspiracy to deal drugs, and recognizing that the alleged co-conspirators are largely Italian-American, has elected to label it "Italian Organized Crime" in order to prejudice the defendants and add a patina of sensationalism and media appeal to its case.

The government has put the existence of IOC into play as an essential part of its theory of this case. While the existence of IOC is not an element of the case, the government

---

[8]   *See* Herbeck, Dan, "The Mafia is all but dead in Western New York. So what killed it?" *The Buffalo News* (March 19, 2017; Updated Oct. 30, 2020); Fairbanks, Phil, "Is the Buffalo mafia dead or alive?" *The Buffalo News*. (Dec. 8, 2013); Beebe, Michael and Herbeck, Dan, "Raids on telemarketing firms find numerous ties to organized crime." *The Buffalo News* (July 27, 1993). In 2017, the FBI's top Buffalo agent declared the organization defunct and numerous other local and retired law enforcement agents agree. Beginning in 1995, the FBI broke the mob's grip on Laborer's Local 210, a major construction industry trade union, and the Department of Justice declared the union mob-free in 2006. Numerous Buffalo-area telemarketing firms with mob ties were also raided in the early '90s. While the FBI maintained for years without proof that the Todaro family heads the Buffalo mob, Todaro Sr. died in 2012 and Todaro Jr., 71, is kept busy running La Nova, a pizzeria with annual gross sales of $5 million.

34

has pleaded it as if it were, and since the government has done so, it must offer further particularization to ensure that its theory is not varied at trial.

The government should therefore particularize:

1. The specific identity and structure of the alleged "IOC" organization, to distinguish it from others which may be in operation, or which have operated historically, in the area;

2. The precise role or membership of the alleged co-conspirators in "IOC," and to what extent that membership was related to the allegations (i.e. whether the conspiracies were part of the organizations's activities, or whether a co-conspirator's membership in IOC was incidental to these allegations);

3. Whether Mr. Bongiovanni was actually a "member" of this organization

4. The structure, characteristics, and other activities of this alleged organization.

## B.    "Information" passed to co-conspirators

The government alleges that Mr. Bongiovanni passed specific information to his co-conspirators to further their efforts, but avoids specifying what this information was, or how it aided the conspirators.

## C.    Alleged bribes

The government alleges that Mr. Bongiovanni received approximately $250,000 in bribes. It fails to allege who paid these bribes to him, or how. While the source or means of a bribe are not explicit elements of the offense under 18 U.S.C § 201, the government must allege and prove those aspects anyway, just as it would need to argue method and identity of a victim if alleging murder. Count 3 merely claims that Mr. Bongiovanni "was paid." It is not

35

alleged by whom, or by what method.

The Court should order the government to particularize the identity of the persons paying the bribes and the means by which the bribes were paid.

# Discovery

To date, the government has disclosed at least 96 gigabytes of discovery, consisting of 10,541 files, many of which are documents of multiple pages.

The government frequently boasts about the size of its disclosures in response to defense demands for particularization or additional discovery, but the Court should recognize that size is not relevant in this context. Given the specific allegations in the Indictment, disclosing tens of thousands of pages of material when only 100-500 pages are relevant is hardly impressive. When, as here, many of those relevant pages are heavily redacted or transmitted in a slightly corrupted format, the result is even more unhelpful.

The government should be required to provide more discovery that actually substantiates the allegations, if they possess it.

## A.   *Brady* **compliance**

### 1.   *Potential* Brady *materials in the government's possession which have not yet been disclosed*

The government has alleged, both in the indictment and in private communications between government counsel and the defense, that at least some of the DEA forms that Mr. Bongiovanni submitted as part of his investigation of the ██████████ and their associates included signatures that he forged for other agents. The government has also alleged generally that Mr. Bongiovanni falsified reports and the identity of undercover informants in order to protect his co-conspirators.

Mr. Bongiovanni does not concede that he falsified these forms, nor does he concede

that he forged other agents' signatures. However, on information and belief, it was a common practice at the DEA during Mr. Bongiovanni's tenure for agents to fill out forms and sign on behalf of other agents to complete overdue paperwork, particular before the office was audited periodically by the OIG.

The government likely has other forms from these same investigations containing details or signatures provided by other agents, but which have not resulted in charges or accusations of falsifying reports. To the extent such forms or documents exist, they constitute *Brady* material and should be disclosed immediately.

### 2. Need for an order to ensure the government's compliance

The Court is doubtless aware of the recent passage of the Due Process Protections Act (Public Law No. 116-182 (2020)). This law amends Rule 5 of the Federal Rules of Criminal Procedure to require judges to issue an order that confirms the disclosure obligations of the prosecutor under *Brady v. Maryland* at the outset of each criminal case, and the possible consequences of violating the order. In our district, the following form order has been approved by the judges:

> As required by the Due Process Protections Act [Pub. L. 116-182, 134 Stat. 894] and Fed. R. Crim. P. 5(f)(1), the Court confirms the United States' obligation to produce all exculpatory evidence to the defendant pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, and orders it to do so. The government must make these "disclosures in sufficient time that the defendant will have reasonable opportunity to act upon the information efficaciously." *United States v. Rodriquez*, 496 F.3d 221, 226 (2d Cir. 2007); *Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir. 2001); *United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001). Failure to do so may result in consequences, including, but not limited to, exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, or sanctions by the Court.

This district order satisfies neither the substance nor the spirit of the Rule. We ask the Court to enter a proposed order, attached as **Exhibit E**, adapted from a similar order issued by U.S. District Judge Kurt Engelhardt in a case in the Eastern District of Louisiana, *United*

37

*States v. Rainey,* 12-cr-291 (E.D.N.Y., Aug. 11, 2014). This order has been implemented in other cases by other courts around the country.

## B.    Electronic originals

The government has provided "images" (i.e. .pdf files) of thousands of pages of documents. These files appear to have been created by scanning printed copies of the documents, rather than duplicating digital originals. The result is that the printed copies are lower-quality than the digital originals and have resulted in lower-quality images, some of which cannot be subjected to text-recognition processes by document processing software like Adobe. This means that the defense cannot search for specific terms or sentences in documents, making it immensely difficult to parse through the thousands of pages of materials. This causes unfair burdens in terms of time and manpower for the defense, which is already greatly outmatched in both by the immense size and resources of the Department of Justice.

Whether this practice is intentional or merely an oversight, it greatly complicates the process and impairs the defense's ability to prepare the case. The government should be required, wherever possible, to provide the defense with digital copies of the original electronic files, rather than merely printing and scanning hard-copies.

## C.    Alleged bribes

The government's disclosures include thousands of pages of Mr. Bongiovanni's financial records, and those of his wife Lindsay, but these do not appear to be relevant. Nothing else provided identifies the source or the fate of the $250,000 which the government alleges Mr. Bongiovanni took in bribes.

The government must disclose whatever documents or other materials it possesses, in whatever format, that make out the government's claims for where the money allegedly went, who provided it, or in what form. There is otherwise not one shred of evidence for their existence. If the government actually intends to prove this allegation, it must do so with more

38

than mere cooperating witness testimony.[9]

### 1.    *Expert witness disclosure*

There are indications in the discovery that the government may call a "forensic accountant" to testify about Mr. Bongiovanni's financial records.

The government should be required under Federal Rule 16(a)(1)(G)  to provide a written summary of any such forensic accountant that the government intends to use during its case-in-chief at trial under Rules 702, 703, or 705 of the Federal Rules of Evidence.

## D.    Additional disclosures under Rule 16

### 1.    *The existence of "IOC"*

The government will likely argue that it is excused from providing additional information about the existence of an "Italian Organized Crime" syndicate in Buffalo because of security concerns and the need to protect ongoing investigations. By squarely placing the existence of "IOC" at the heart of its theory of the case, however, the government has essentially waived any privilege it might have had to withhold this information. Nothing provided in the discovery establishes the existence of "IOC" beyond the government's *ipse dixit* that such an organization exists.

The government should disclose, under Rule 16(a)(1)(E), all relevant documents or objects in its possession which establish the existence, structure, and alleged activities of

---

[9]  As a general matter, a confession or allegation by a witness of a specific act is usually insufficient to convict without at least some accompanying evidence of *corpus delicti*. The government could not, for example, prove a murder merely because one confessed to it, or because a witness testified that it had occurred, without at least *some* other body of evidence to suggest that a person was missing, had been killed, etc. *See, generally, Opper v. United States,* 348 U.S. 84 (1954)(admissions or statements without body of evidence insufficient for conviction). The only reason the defense has not moved to dismiss Count 3 outright is that it is expected the government may reserve the right to attempt to prove this charge by witness testimony alone, however weak that approach may be.

"IOC" in Buffalo. This information is material to preparing the defense. Like all such information, it may also contain *Brady* material, but there is no way of knowing until it is scrutinized.

### 2.     *"Operation Willamette Falls"*

Numerous documents reference an investigation code-named "Operation ███████ ███" The scope and method of this investigation are unclear, but it obviously focused on Mr. Bongiovanni as a key target. As not all of the investigation documents provided by the government reference "Operation ███████," it is unclear whether this investigation was directed only at Mr. Bongiovanni or at others, or whether the investigation yielded additional materials relevant to the defense.

To ensure that the government does not attempt to withhold information by claiming it is not "material" because it does not relate to "this" case or "this" investigation, the Court should compel the government to disclose additional information regarding the scope, methods, personnel, and outcome of "Operation ███████." This is reflected in the proposed order in Exhibit E.

### 3.     *Unnecessarily and inexplicably redacted documents*

The government has provided numerous forms which have been so heavily redacted as to be useless. It is likely that the government will argue that this has been done to protect witness identity under 18 U.S.C § 3500. However, § 3500 and Rule 16(a)(2) only exempt witness *statements* from disclosure. There is no other vehicle that allows the government to hide critical information behind redaction, including classification.

The government should be required to disclose un-redacted copies of critical documents to the defense, or else should be made to invoke some recognized statutory privilege which allows them to do so. The defense should be afforded the opportunity to

challenge this claim before the Court so as to ensure the government does not hide critical evidence.

## E.  Rule 404(b) Notice

The government's Indictment paints Mr. Bongiovanni as a "corrupt cop," and it is expected that the government will attempt to introduce any evidence it can to support this, including past disciplinary records or infra-office notes at the DEA or any other organization regarding Mr. Bongiovanni's integrity. No such documents were disclosed in discovery, and it is not even certain that such documents exist, but to the extent that they do and the government intends to use them, they must be disclosed under Rule 404(b) of the Federal Rules of Evidence. The government must also provide any record of any other uncharged bad acts it intends to introduce at trial.

# Conclusion

For the foregoing reasons, the Court should grant the requested relief and all other relief as it may deem just and proper.

Dated:  January 11, 2021

Respectfully submitted,                       Respectfully submitted,

/s/ Jesse C. Pyle                             /s/ James P. Harrington

Jesse C. Pyle                                 James P. Harrington
harrington 🍀 mahoney                         harrington 🍀 mahoney
70 Niagara Street, 3rd Floor                  70 Niagara Street, 3rd Floor
Buffalo, New York 14202-3407                  Buffalo, New York 14202-3407
Tel.: 716-853-3700                            Tel.: 716-853-3700
Facs.: 716-853-3710                           Facs.: 716-853-3710
jpyle@harringtonmahoney.com                   jph@harringtonmahoney.com

# EXHIBIT A

# Memorandum



| Subject | Date |
|---|---|
| Communication with ▮▮▮▮ Between June 30 - October 27, 2018 | November 1, 2018 |

To

Edward A. Orgon, Jr. *EO*
Resident Agent in Charge
Buffalo Resident office

From

Joseph Bongiovanni
Special Agent
Buffalo Resident Office

Thru:

Gregory R. Yensan
Group Supervisor
Buffalo Resident Office

It was brought to my attention that ▮▮▮▮ had become a target of a federal investigation. Based on the intelligence I have received, I have attempted to terminate all contact with ▮▮▮▮ It should be known that any contact I have had with ▮▮▮▮ in the past was minimal in person contact and primarily consisted of a random telephonic communication based on the fact we were childhood friends. I would sometimes randomly encounter ▮▮▮▮ at a restaurant or golf outing and have not made personal plans to meet him socially in several years.

Over the past several months, I have received a series of phone calls from ▮▮▮▮ which I did not answer. On October 23 and October 27, 2018, I received a series of text messages from ▮▮▮▮ which was out of the ordinary. In the aforementioned text messages, ▮▮▮▮ seemed very concerned by my failure to return his calls or text messages and was questioning why I did not return a social text inquiry.

In an effort to maintain a sense of normal activity and with hopes of not alerting ▮▮▮▮ that something may be wrong, I returned a text and stated that I was working "midnights" and was sorry for my large gaps of no communication. I hoped that this reply would satisfy ▮▮▮▮ curiosity as to my absence of returning calls and texts. Please see the attached text messages.

I have reported this unsolicited contact with ▮▮▮▮ to my Group Supervisor Gregory Yensan and will continue to avoid any future contact.

iMessage

Sat, Jun 30, 10:30 AM

JUNE 30 18

FROM ME →

Miss ya bro I'm going up to Sunset today

Do you have a cottage

← FROM 

→ FROM ME 

No just going up Tommy Doc is in town and a couple of Lindsay's friends

GOV-00006494

 Verizon   3:28 PM

**Peter** 

I There's a girl in town from Las Vegas staying with me with some other chick that works for me let me see what they wanna do



JUNE 30 2018

I'll be cool for a happy hour anytime I'm off the 4 5 6

FROM ME

Ok we are going in the afternoon about 1 or 2

GOV-00006495

 Verizon   2:56 PM   

## Peter (i)

JUNE 30, 18

FROM ME →

> Ok we are going in the afternoon about 1 or 2

Is there that concert today heard it's going to be a zoo

← 

FROM ME →

Don't know but I'm sure it will be busy we usually go to Cabanna Sam

  

     eba

 Verizon

**Peter** 

But I heard
something on
Facebook that
there's a huge
concert and they
sold a couple
thousand tickets
and they were
saying to get there
early to park way
down in five

JUNE 30,18



Rt

   

    eba

GOV-00006497

**Peter** 

JUNE 30, 18

→

FROM ME

> Wow 😵 I don't know waiting for Lindsay I ol ask her

I thought it was this weekend because of the Fourth of July maybe I'm wrong maybe it's next weekend



> We are gonna see Fortini play the on

  

     eba

 verizon 5:58 PM 

< **Peter** (i)

JUNE 30

FROM ME →

We are gonna see Fortini play the on the 6th and I know there is a band playing then but I don't thing Fortini could pack em in to Rt 5 

Hahahhahahahah a. Only joe bong could do that ←

FROM ME →

I'm like the old David Cassidy

  Jo 

     eba

GOV-00006499



**Peter**  (i)

JUNE 30, 18

Hahahhahahahah
a. Only joe bong
could do that  ← FROM



FROM ME → 

I'm like the old
David Cassidy
now 😂

Yeah you and I feel
like Milton Burrell  ← 

Lol

FROM
ME → Uncle Misty

Uncle Milty..

   

     eba

GOV-00006500



< **Peter** 

JUNE 30, 18

I'm thinking about taking them down to Riverworks last time I was there was with you and Lindsey

← FROM

Then we went to dock of the bay remember we had to help Lindsay through the parking lot



FROM ME →

Yes I do 😆 have fun be safe

  

GOV-00006501



Sat, Jun 30, 7:43 PM

Thanks brother I'm home



Sun, Jul 1, 2:14 AM

**FROM ME** →

Glad you got home safe

Mon, Jul 2, 9:10 AM

GOV-00006502

Golf money due
this week.

JULY 2, 2018

25 th

Pharaohs 8th
annual golf outing
wed august 2 nd.
Kiss n green.
Alden. Limo buses
Lunch and drinks .
Dinner after at
pharaohs.
Shotgun start   Will
get time this week.



GOV-00006503

8th annual golf
outing wed July
25. Kis-n-green
buses leave
pharaohs 900 am.
Shotgun 10 am.
Pig roast at
pharaohs after
600.00 per
foursome limited
to 128 golfers  first
to pay are in


Tue, Oct 23, 11:13 AM

GOV-00006504

Are you alive just get a new phone did you move out of town what the fuck

OCTOBER 27, 18



Saturday 1:13 PM

OCTOBER 27, 18

Is there a reason why you're not talking to me



Saturday 3:21 PM

GOV-00006505

**OCTOBER 29**
**FROM ME**
→

Dude sorry been working midnights and I've been sleeping til 3 or 4 sorry my bad

Ok. I'm just making sure brother

**FROM ME**
→

Hope all is well Your not the only one mad at me lol

Delivered

GOV-00006506

Your not the only
one mad at me lol

**Delivered**

# I'm not mad brother just keep in touch

OCTOBER 27



GOV-00006507



OCTOBER 97



GOV-00006508

# Memorandum



| | |
|---|---|
| Subject | Date |
| Communication with Peter ▓ | December 10, 2018 |

| | |
|---|---|
| To | From ~Joseph Bongiovanni~ |
| Edward A. Orgon, Jr. ~EłO~ | SA Joseph Bongiovanni |
| Resident Agent in Charge | Enforcement Group D-57 |
| Buffalo Resident office | Buffalo Resident Office |

Reference memorandum dated November 1, 2018 titled Communication with Peter ▓

On December 10, 2018, I have received an incoming phone call from Peter ▓ and ignored the call. Immediately following the call from ▓ I received another incoming call from the number ▓ and I ignored the call because I did not recognized the number. Immediately after my failure to answer the aforementioned calls, I received a series of text messages from ▓ out of the ordinary and over a span of a couple minutes. In the text messages, ▓ seemed very concerned and in his text ▓ asked me to text him back "on the number they just called you on ". ▓ immediately followed the call with another text which read "ASAP".

In effort to maintain a sense of normal activity, and with hopes of not alerting ▓ that something may be wrong, I responded and called the number ▓ answered the phone and I was agitated and asked ▓ why was he calling me over and over. I then asked ▓ why he was calling me on a different number? ▓ stated that the number ▓ belonged to his girlfriend. I stated that I did not respond to his calls and texts because I was in court. At that time, ▓ stated that he need to tell me something important but he didn't want to talk on the phone. I told ▓ that it was fine to talk on the phone and asked ▓ what was the problem? ▓ stated that he (▓ was told that I was being watched. I asked ▓ who was watching me? ▓ responded that he heard I was being watched by Internal Affairs. I responded, is that so? I asked ▓ who was giving him this information? At that time, ▓ seemed to stumble and said that this information was told to him by somebody he encountered while he was dining or drinking at Salvatore's Restaurant and Hotel. ▓ stated that he did not recall the person's name. Again, I asked ▓ who said I was being watched by Internal Affairs? Again, ▓ failed to identify his source. At that time, I told ▓ that his information was "Bull Shit". I also told ▓ that DEA does not even have a Bureau of Internal Affairs.

▓ stated that the person believes that Internal Affairs is watching me because ▓ and I have been friends since we were kids and now he owns PHARAOH's Gentleman Club. I responded that yes we have been friends for years, but I never come into your club. ▓ said, he agrees. ▓

2

reiterated that we are friends, and the reason for the call was that ▮▮▮▮ was looking out for me. I responded that there is nothing going on, and his information was false.

GERACE sent me a text shortly after the conclusion of the telephone call and in sum and substance stated that, "we haven't talked in a while but he considered me one of his best friends and that he always had my back". As a continued effort to maintain a sense of normal activity, I texted ▮▮▮▮ back "we have been friends for 25 years Bud all good". On December 8, 2018, a received a reply text from ▮▮▮▮ "You mean 36 years".

I have and will report all contact with ▮▮▮▮ to a DEA supervisor like I have in the past and will in the future should unsolicited communication with ▮▮▮▮ occur.

Call me on the
phone they just
called your
number

← FROM
   PETER GERACE
12-7-18

ASAP

← FROM PETER GERACE
   12-7-18

Hey brother I know
we haven't talked
in a while but
you'll always be
one of my best
friends and you
know I always
have your back

← FROM
   PETER
   GERACE
   12-7-18

GOV-00006491

know I always
have your back

Friday 8:56 PM

FROM ME



We have been
friends for 25
years bud all good

Delivered

Saturday 10:31 PM

You mean 36
years

← FROM PETER
GERACE
12-8-18

GOV-00006492

EXHIBIT B

U.S. CUSTOMS & BORDER PROTECTION – PORT OF BUFFALO
ADVANCED TARGETING UNIT AND CONTRAND ENFORCEMENT TEAM



**Warning: This document is for OFFICIAL USE ONLY (FOUO). It is to be controlled, handled, transmitted, distributed and disposed of in accordance with DHS policy relating to FOUO information. This information shall not be distributed beyond the original addressees without prior authorization of the originator.**

| Date of Report:<br>April 25, 2019 | Source:<br>CBP | Workspace Number: | Crime Group:<br>TOC/IOC/OMG |
|---|---|---|---|
| Author:<br>Officer Jack Gernatt<br>Officer Joseph Spadone | Badge #: | Phone Number: | Email Address: |
| IOEM Number: | Event Number:<br>27150470 | Seizure Number:<br>N/A | TECS Record Created:<br>P3M27377900CBU |

| TOMBSTONE DATA | | | |
|---|---|---|---|
| **SUBJECT** | **DOB**<br>**MM/DD/YYY** | **ADDRESS** | **PHONE NUMBER** |
| Joseph BONGIOVANNI | /1964 | 85 Adler Place, Buffalo, NY | 716-507-2784 |
| | | | |
| | | | |
| | | | |
| | | | |

## GIST / SYNOPSIS

On April 24th, 2019 subject Joseph BONGIOVANNI, his wife and step-son were encountered at the Baltimore International Airport returning to their home in Buffalo, NY after vacationing in the Dominican Republic. BONGIOVANNI is the subject of a HSI/BEST Buffalo investigation, case number _____ for his association and/or involvement with Transnational Organized Crime (TOC) characters to include Italian Organized Crime (IOC) and Outlaw Motorcycle Gangs (OMG). Based on his involvement, a logical electronic exam was performed, but was unsuccessful. A basic electronic exam was conducted which will be highlighted in this report.

## IDENTIFIED

GOV-00007030

| NAME: | Joseph BONGIOVANNI | |
|---|---|---|
| DOB: | ███ 1964 | |
| ADDRESS: | 85 Adler Place, Buffalo, NY | |
| DL: | FL: B521497642580 – 221 Lovering Avenue, Buffalo, NY | |
| FIN# | N/A | |
| Phone # | 716-507-2784 | |
| Employment | Federal Law Enforcement – Drug Enforcement Agency (DEA Buffalo) – Retired xxxx, xx 2019 | |
| NAME: | ███████ | ████████ |
| DOB: | ███████ | |
| ADDRESS: | | |
| DL: | | |
| FIN# | | |
| Phone# | ███████ | |
| Employment | | |
| ███ | ██████ | █████ |
| ███ | ██████ | |
| ███ | | |
| ████ | ██████ | |
| █████ | | |
| ███ | ████████ | |
| ███ | | |
| ██ | | |
| ████ | █████ | |
| █████ | | |
| ███ | ██████ | █████ |
| ██ | | |
| ██ | | |
| █████ | ████████████ | |
| ███ | ████ | █████ |
| ████ | █████ | |
| █ | | |
| ████ | █████ | |
| █████ | █████ | |



| NAME: | ███████████ |  |  |
|---|---|---|---|
| DOB: | ████████ |  |  |
| ADDRESS: |  |  |  |
| DL: |  |  |  |
| FIN# |  |  |  |
| Phone# | ██████ |  |  |
| Employment |  |  |  |

| NAME: | ██████████ |  |  |
|---|---|---|---|
| DOB: | █████ |  |  |
| ADDRESS: | █████ ██████ |  |  |
| DL: |  |  |  |
| FIN# |  |  |  |
| Phone# | █████ |  |  |
| Employment | ████ █████████ |  |  |

| NAME: | ████████ |
|---|---|
| DOB: | ███ 1943 |
| ADDRESS: |  |
| DL: |  |
| FIN# |  |
| Phone# | █████ |
| Employment |  |

| ███ | ███████ |
|---|---|
| ██ | 1964 |
| ADDRESS: |  |
| DL: |  |
| FIN# |  |
| Phone# | █████ |
| Employment |  |

| NAME: | ████████ |  |  |
|---|---|---|---|
| DOB: | █████ |  |  |
| ADDRESS: | ██████████ |  |  |
| DL: |  |  |  |
| FIN# |  |  |  |
| Phone# | ████ 8 ██ |  |  |
| Employment |  |  |  |



| NAME:<br>DOB:<br>ADDRESS:<br>DL:<br>FIN#<br>Phone#<br>Employment | ███████ 1977 ███████ ██████ | |
| ███ ███ █ ███ ████ | ███████ ███████ | |
| ███ █ █ ███ ████ | ███████ | |
| ███<br>ADDRESS:<br>DL:<br>FIN#<br>Phone #<br>Employment | ███████ ███████ ████████ ███████ | |
| NAME:<br>DOB:<br>ADDRESS:<br>DL:<br>FIN#<br>Phone #<br>Employment | | |

**INFORMATION:**

Joseph BONGIOVANNI retired abruptly from the Drug Enforcement Agency (DEA) Buffalo office as a Federal Law Enforcement Agent mid-January, 2019. The day before his unexpected retirement, an associate to BONGIOVANNI was arrested for narcotics trafficking. Those arrested and other subjects of the case have close associations to Organized Crime.

A crossing history of BONGIOVANNI shows that he was in a vehicle with New York tag DJV2251 number on November 29, 2012 at 2211 hours. Also in the vehicle was Buffalo Crime Family associate/confidant ████████████████████ 1948) who is closely associated to Buffalo Crime Boss, ████████████████████. ████████████████ is a frequent border crosser in the Buffalo AOR and last crossed the border at the Rainbow Bridge on April 4, 2019 at 2350 hours with ████████████████████.

A basic review of his phone revealed several contacts to include:



) T/H's

1. The following individuals are contacts in BONGIOVANNI's phone, believed to be associates/confidants to the Buffalo Crime Family and/or have additional derogatory information.

   ████████████
   ████████████████
   ████████
   ████████

2. A review of ████████████████████████ shows that he is associated to longtime Buffalo Crime Family associate, ████████████████████████████████████████████████ ████████████████████████████████████████████

3. A review of ████████████████████ shows that he is associated to ████ Crime Family associate ████ ████████████.

4. A review of ████████████ links him to a workspace as being associated to Joseph BELLA (████-1972) who is believed to be involved in narcotics activity within the Port of Buffalo.
   ➤ ████████████████████████████████████████████
   ➤ ████████████████████████████████

5. A search of ████████████ revealed that he has a HSI Buffalo case record from 2009 ████████████████ ) for possible involvement with currency and narcotics trafficking. He also has a HSI Buffalo record from 2015 for being associated to local payday loan collection companies that allegedly use illegal tactics and hard threats to extort money from people.

➢         is frequent land border crossing within the Port of Buffalo, last crossing on April 29, 2019 with a Ashley SCHUH (   -1986)

➢ Advised that      brother's girlfriend used to smuggle marijuana across the border. Apparently over 80 times in a spare tires

➢       has a valid NEXUS card

6. Research on      revealed that he is a retired Law Enforcement Officer. It is believed that he worked with BONGIOVANNI at one time.

# *****AMMEDMENT on June 18, 2019*****

7. Tolls records indicate that BONGIOVANNI had contact with following individuals:



➢ On 12/07/18 BONGIOVANNI was in contact with      two times. The following text exchange on December 8, 2018 was obtained from      phone which was detained by HSI in April of 2019:



➢ On December 19, 2018      texted BONGIVANNI the below picture:





GOV-00007036

EXHIBIT C

United States District Court
Western District of New York

United States of America,                              AFFIRMATION

                    *Plaintiff*

            *vs*                                      19-cr-227

Joseph Bongiovanni

                    *Defendant*

Joseph Bongiovanni affirms under penalty of perjury:

1.      I am the defendant in the above indictment in the United States District Court for the Western District of New York.

2.      I make this affidavit in support of the defense's motion to suppress evidence and statements obtained from me on two separate occasions, first on April 23, 2019, and again on June 6, 2019.

**April 23, 2019 search at Baltimore International Airport**

3.      On April 23, 2019, at approximately 8:10 p.m., I was returning to the United States arriving in Baltimore, Maryland at Baltimore-Washington International Airport (BWI) with my wife Lindsay Bongiovanni and my stepson  Matthew Maglietto from a family vacation in the Dominican Republic. We flew from the Dominican Republic with a final destination in Buffalo, NY, re-entering the U.S. at BWI for a short lay-over and to change airplanes.

4.      After deplaning, we retrieved our luggage and were required to report to United

States Customs for interview along with all other passengers arriving from the Dominican Republic. A short time latter, my wife, step-son, and I were interviewed by a U.S. Customs officer. At that time, we were asked to proceed to an area for further inspection. The initial U.S. Customs officer we encountered did not offer a reason for the need for additional inspection other the singling out my family from the other passengers to step aside. No other individuals from our flight from the Dominican Republic were detained for further inspection except my family.

5.      Approximately 15 minutes later, we were met by another U.S. Customs officer and were told that we were singled out for a "routine" search. The U.S. Customs officer explained that he would need to examine the contents of our luggage. We immediately complied with the request. Approximately 10 minutes later, the US Customs officer requested that we present our cellular telephones and asked if we possessed any other phones. At that time, we said no, as we each had our own cellular phones. The U.S. Customs officer then immediately seized our cellular telephones and turned over all three (3) of our cellular telephones to a different U.S. Customs officer, who then took custody of them and proceeded to walk away to a private office.

6.      I asked the U.S. Customs officer who remained with us why they took our cellular phones and the U.S. Customs officer replied that it was a "routine" practice and part of what the U.S. Customs Officer described as a "random" search. I asked the U.S. Customs officer what my options were regarding the this "random" search. I was informed that I had no options and that I could either comply or my cellular phones would be seized and returned me via mail at a later date. I informed the U.S. Customs officer that I was required to report to another terminal to board on a connecting flight in a short time. The U.S. Customs officer replied that he had "no idea" how long we would be delayed. While we waited for the return of our phones, a Customs agent searched our baggage, which we could see.

7.      Approximately 45 minutes later, the U.S. Customs officer who took my family's

cellular telephones returned with my wife's and my stepson's phones. Approximately 10 minutes later, another agent returned with my phone. At this time, we were in serious jeopardy of missing our connecting flight. I asked for a receipt or an explanation detailing the reason for  the U.S. Custom Service taking our phones away and detaining us. The agent did not reply. At that time, our luggage also was returned to us. We were extremely puzzled by the being singled out but needed to proceed quickly to try and make our connecting flight.

### June 6, 2019 search at my residence at 85 Alder Place, Tonawanda

8.      Early on the morning of June 6, 2019, I was dozing and lying on the bed in  my bedroom located in the east, rear side of my home at 85 Alder Place in the  Town of Tonawanda, New York. My wife and stepson were also home. My wife was up and getting ready for her work as a nurse. My stepson was still asleep.

9.      I was startled at approximately 6 a.m. by an extremely loud explosion, which vibrated throughout my house and caused me to fall out of bed. Having worked for over 20 years in law enforcement, and being familiar with the sound of gunfire, my first impression was that this was not any type of a gun being discharged. My first conscious thought was that an airplane had crashed very near my home because the sound was so loud. My residence is in  a  glide  path  for  the  Buffalo/Niagara  International  Airport  but  I  did  not  immediately understand what had happened.

10.      As I got to my feet and collected my senses, I heard an extremely loud crashing sound downstairs in my home. I was still very confused and proceeded to the hallway outside my  bedroom  and  started  down  the  stairs  to  the  living  room  and  front  door  area  on  my residence.  As I made it to the bottom of the stairs and turned the corner from my stairs to the front door of my home, I encountered a person with an assault rifle. This person, who wore full ballistic gear with a helmet, goggles, and vest, immediately aimed the rifle toward my

head. He shouted at me and told me to put my hands in the air. I was unarmed, and I still did not full understand what was happening. I immediately complied. I raised my hands and became aware that there was another armed person behind the first one, who was also aiming a rifle at me. I then recognized that a group of  law enforcement officers had made a "dynamic entry" with a battering ram into my home. At no point during or before their entry into my home, however, did I ever hear any agent or officer identify themselves as police.

11.     I was immediately handcuffed and pulled violently through the front entrance of my home. I saw several other law enforcement personnel enter my home with weapons drawn, including both handguns and assault rifles and shotguns. Once outside, I saw other law enforcement personnel outside, including units from local police. I would estimate that there were at least 20 officers and agents present. All of these agents were wearing tactical or ballistic gear, including vests.

12.      As I was quickly dragged out of the front door by two officers, I could not inform them who was in my home or that I fully intended to comply with their demands and instructions. I was wearing boxer shorts and a t-shirt at the time, without socks or shoes. At a time, as I was pulled and pushed down the front stairs from my home, my boxer shorts began to slip from my hips and exposed my buttocks to other law enforcement individuals and many of my neighbors, who had begun to amass in the area of my home. I tried to communicate with the officer who was detaining me but he would not answer my questions.

13.     In my career with the Drug Enforcement Agency (DEA), I had participated in numeric "dynamic entry" operations, including operations where I was tasked with breaching the front door as well as making entry with an assault rifle. I am familiar with the weapons and tactics of these raids. In particular, I am aware that one objective in these raids is to establish "total control" of the premises and all present, which can be done by disorienting and overwhelming residents to ensure that no one flees or destroys evidence. I am aware that in these circumstances, agents often become tense or excited. However, based on my

observation, I believe that these officers were unusually excited and tense, and I felt an air of extreme intimidation. I felt, from their body language, their violent yelling, and the way in which they displayed their weapons, that the officers would quickly use force against me or anyone else present.

14.     However, despite my experience, at the time that law enforcement entered my home, and especially because they had not announced themselves before entry, I remained extremely confused and in a state of shock. I have never before been the target of such a raid or investigation, and to undergo it from the suspect's perspective was extremely foreign and traumatic to me. The demonstration of force was overwhelming to me.

15.     Also, from the moment of my first encounter with the agents, I observed that they were extremely aggressive and confrontational. They seemed tense and kept their weapons trained on me at all times, even after I was handcuffed. This was different than my experiences in similar situations in the past.

16.     Seeing the large number of extremely armed officers, and in my state of shock and distress, I called out in fear for my wife, who was still upstairs  in the process of getting ready for work for her shift that day as a nurse. I was extremely worried that the agents would hurt her or my stepson, who was sleeping in his bedroom. I also became worried that the aforementioned explosion, which I subsequently learned had been the detonation of a "flash bang grenade," might have caused my 17-year old stepson to wake up frightened or disoriented and pick up some object or implement to defend himself, not knowing what was going on. I am familiar with the "flash bang grenade device" having seen it used during my career as an special agent with the Drug Enforcement Agency (DEA). The purpose of this device is to frighten and disorient targets during law enforcement raids.

17.     I repeatedly told agents that my wife and stepson were at home and upstairs and that our family dog, a Golden Retriever, was upstairs with my family and was a friendly dog and not a threat to anyone. Given my background and experience as a law enforcement

officer, I was concerned that the officers would shoot my dog, as I have seen officers in similar situations shoot dogs on very little pretext and justify it afterward as a safety precaution.

18.     At short time later, I observed an officer take my wife, Lindsay, out of the front door of my home. The officer held her forcefully by the arm. He then positioned her face-forward and up against our garage door and kept her there with his hand on her back. I do not believe she was handcuffed but she did appear unable to leave. I did not see my stepson until I was led back into my home approximately 30 minutes later. I later learned that my stepson had been confronted in his bed by officers at gun point and handcuffed while officers searched the rest of the home.

19.     I remained outside for some time while officers searched my home. I cannot say how much time passed, but at least a few minutes. I was then taken by an officer  to the back dining room area of my home. I was seated at a dining room chair and remained handcuffed. My wife was still outside, and I believe by this time that my stepson had been taken outside also. I later learned that my wife was taken back inside and interviewed in a different room of the house while I remained in the dining room.

20.     In the dining room, there were numerous agents moving around in my house. I observed several agents rifling through my effects and turning over my couches. I observed other agents in my kitchen searching my pantry, throwing bags and cans of food across the floor. I heard breaking glass and believed the officers were damaging my property while searching it. I saw that some of these agents had their badges turned upside down, so I did not recognize the agencies they belonged to.

21.     Shortly after I was seated in the dining room, I recognized ICE SA Curtis Ryan, whom I recognized from my previous work with the DEA. I also recognized David Carpenter, an agent with the Office of the Inspector General (OIG). SA Ryan, Agent Carpenter, and a third agent who I did not recognize then sat with me at the table. There were

also at least five other agents standing by during the interview, with their weapons still visible.

22.     I asked where my family was and who was in charge of the operation. The agents did not answer my questions. The agents removed my handcuffs around this time. I was still in my underwear.

23.     I then observed SA Ryan in possession of what I recognized as my Samsung Galaxy cellular phone. I believe that this phone had been in my bedroom before agents entered the home.

24.     SA Ryan opened my phone. He began scrolling through its contents. I asked him if he had been responsible for the seizure of my phone and my family's phones at the Baltimore-Washington Airport, and he answered "yes, that was me." He then asked me to tell him "all about the mafia." I answered that I did not know what he was asking about, after which he began to ask me about my association with persons whom I had encountered during my time at the DEA. He began to read names from the contacts directory of my phone. I noticed and commented at that time that the only individuals they asked about were those with Italian last names.

25.     At no point was I advised of my rights not to speak to the agents, or to ask for presence of counsel. At no point did I waive any of these rights.

26.     I was not free to leave. Given the totality of the circumstances, including the overwhelming display of force against me and my family, and my fear that the agents' tension could result in violence, I felt compelled to answer their questions. While SA Ryan and the other agents at the table seemed calm to me, they asked their questions while agents continued to ransack my home and while my wife and stepson remained, as far as I knew, detained under guard in another room.

/s/ Joseph Bongiovanni

January 11, 2021                         Joseph Bongiovanni


Sworn to this 11th day
of January, 2020

/s/Denise M. Dzierzewski

Notary Public, State of New York
Qualified in Erie County
My Commission Expires 8/17/2022

EXHIBIT D



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

**CASE NUMBER**

**CASE OPENED**
1/28/2016

**CURRENT CASE TITLE**
OPERATION

**REPORT TITLE**
Interview of Joseph BONGIOVANNI

**REPORTED BY**
Curtis Ryan
SPECIAL AGENT

**APPROVED BY**
William Gamble
SUPERVISORY SPECIAL AGENT

**DATE APPROVED**
6/20/2019

## SYNOPSIS

On June 6, 2019, HSI and DOJ-OIG interviewed Joseph BONGIOVANNI during the execution of a search warrant at his residence.

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

GOV-00006526



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



06/20/2019 15:36 EDT

Page 2 of 8

## DETAILS OF INVESTIGATION

At approximately 6:00 a.m. on June 6, 2019, HSI Buffalo, FBI, and DOJ-OIG executed a federal search warrant at 85 Alder Place, Tonawanda, NY, which is the residence of Joseph BONGIOVANNI. BONGIOVANNI was present and agreed to be interviewed. SA Curtis Ryan, HSI Buffalo, SA David Carpenter, DOJ-OIG, and SA David Fusco, DOJ-OIG, interviewed BONGIOVANNI at his dining room table. BONGIOVANNI provided the following information.

At first contact between SAs Ryan and Carpenter and BONGIOVANNI, BONGIOVANNI asked is the warrant being executed was an arrest warrant for him or if it was a search warrant for the house only.

BONGIOVANNI denied he was in a close relationship with ▮▮▮▮▮▮, and said there were a lot of times that he saw ▮▮▮▮▮▮ and walked the other way. BONGIOVANNI would not go to lunch with ▮▮▮▮▮▮, and said that had been his personal policy for years. BONGIOVANNI denied he ever "reached out" to ▮▮▮▮▮▮ to arrange a meeting.

BONGIOVANNI had not spoken with ▮▮▮▮▮▮ in over a year. ▮▮▮▮▮▮ recently tried to call BONGIOVANNI's wife Lindsey.

BONGIOVANNI and ▮▮▮▮▮▮ did not celebrate birthdays together.

BONGIOVANNI said ▮▮▮▮▮▮ is a "pain in the ass." ▮▮▮▮▮▮ is obnoxious and you want to get away from him.

BONGIOVANNI said you cannot penalize a person for growing up in the same circle, speaking about himself and ▮▮▮▮▮▮.

▮▮▮▮▮▮ grandfather had something to do with the mafia. ▮▮▮▮▮▮'s uncle owns the pizza place (referring to LaNova Pizza). BONGIOVANNI was not close enough with ▮▮▮▮▮▮ to know if ▮▮▮▮▮▮ was involved with the mafia.

**AGENT'S COMMENT:** ▮▮▮▮▮▮ grandfather was ▮▮▮▮▮▮ now deceased, who was the boss of the Buffalo LCN family. ▮▮▮▮▮▮ uncle, is the current boss of the Buffalo LCN family.

BONGIOVANNI described Pharaohs Gentlemens Club as a seedy place, but did not think it was connected to organized crime. BONGIOVANNI said he once asked ▮▮▮▮▮▮ why he would take the risk of being associated with Pharaohs given his (▮▮▮) criminal record.

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| OPERATION ▮▮▮▮▮▮ | ▮▮▮▮▮▮ | 6/20/2019 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

06/20/2019 15:36 EDT                                                                 Page 3 of 8

BONGIOVANNI knew ▮▮▮▮▮▮ was arrested in the days before BONGIOVANNI retired. BONGIOVANNI was worried ▮▮▮▮ arrest would raise suspicion about him (BONGIOVANNI). BONGIOVANNI was happy ▮▮▮▮▮ was arrested.

BONGIOVANNI stated he knew both ▮▮▮▮▮▮. ▮▮▮▮▮ is a drug user.

BONGIOVANNI had talked to ▮▮▮▮▮ at a Just Pizza golf tournament but had never attended a party with ▮▮▮▮.

BONGIOVANNI knew ▮▮▮▮▮ because ▮▮▮▮▮ did BONGIOVANNI's landscaping.

▮▮▮▮ just became engaged to ▮▮▮▮▮.

BONGIOVANNI never socialized with ▮▮▮. ▮▮▮, and they never went on any trips together.

▮▮▮ used to date Lindsey's younger sister ▮▮▮.

▮▮▮ called BONGIOVANNI earlier this year and told BONGIOVANNI he ▮▮▮ ) had been robbed. ▮▮▮ called BONGIOVANNI to ask him why police were not moving faster to obtain a search warrant for the place where ▮▮▮ believed his stolen money to be.

▮▮▮ number was in BONGIOVANNI's telephone because ▮▮▮ had done BONGIOVANNI's landscaping.

BONGIOVANNI used his DEA issued mobile telephone for work and personal calls throughout his entire DEA career. BONGIOVANNI turned in his DEA phone with his other accountable property when he retired. BONGIOVANNI erased the data in his DEA phone because he believed DEA policy required him to do so before turning in his phone. BONGIOVANNI had done the same with all of his previous DEA issued phones. BONGIOVANNI also wanted to erase the work and personal photos in his last phone.

BONGIOVANNI attended one Pharaohs golf tournament between 12 and 15 years ago. BONGIOVANNI does not like Pharaohs and does not want to be around Pharaohs or Pharaohs events.

BONGIOVANNI stated organized crime is "dead" in Buffalo, NY. BONGIOVANNI said he does not know anything about organized crime and never conducted an organized crime investigation because it was "out of his wheelhouse." BONGIOVANNI said new agents always want to sit on LaNova and make an organized crime case.

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| OPERATION ▮▮▮▮ | ▮▮▮▮▮▮ | 6/20/2019 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

GOV-00006528



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

06/20/2019 15:36 EDT                                                                    Page 4 of 8

SA Ryan asked BONGIOVANNI why ▐▐▐▐▐ associates with members of motorcycle
gangs.  BONGIOVANNI said he did not understand why ▐▐▐▐▐ would do that and it made
BONGIOVANNI want to be around ▐▐▐ even less.

The Cheektowaga Police Department watched Pharaohs.  BONGIOVANNI never developed information
solid enough to begin an investigation of Pharaohs.

▐▐▐▐▐ once tried to cooperate with DEA.  BONGIOVANNI's supervisor at the time,
Dale Kasprzak made the decision to refer ▐▐▐ to the FBI.  BONGIOVANNI was not sure why the
decision was made.  BONGIOVANNI recused himself at the time because he knew ▐▐▐
personally.  BONGIOVANNI did not know if ▐▐▐ was ever signed up as an informant by the FBI or
any other police agency.

SA Ryan asked BONGIOVANNI if ▐▐▐▐▐ ever spoke to him about someone overdosing on drugs in
Pharaohs.  BONGIOVANNI said ▐▐▐ either told him someone had overdosed in the club or that he
(▐▐▐) was worried someone would overdose in the club.  BONGIOVANNI recommended ▐▐▐ become
certified to administer NARCAN in case of an overdose in the club.  BONGIOVANNI said it is
common knowledge that strip clubs have problems.

While BONGIOVANNI was a DEA agent he always told people if you're not doing anything wrong you
don't have anything to worry about.

▐▐▐▐▐ might hang out with ▐▐▐▐▐.

SA Ryan asked BONGIOVANNI about contacts found in his phone during a border search conducted on
April 23, 2019 when BONGIOVANNI entered the United States at Baltimore-Washington International
Airport.  The contacts are listed below.

▐▐▐▐▐

- BONGIOVANNI has been a good friend of ▐▐▐ all his life.
- BONGIOVANNI last spoke to ▐▐▐ when ▐▐▐▐▐ thought he was having a heart attack.
- Lindsey treated ▐▐▐ at the hospital.
- ▐▐▐ used to own Soho restaurant on Chippewa in Buffalo.
- DEA Buffalo Resident Office had Christmas parties at Soho when ▐▐▐ owned the restaurant.

**AGENT'S COMMENT:**  While answering questions about ▐▐▐, BONGIOVANNI directed agents attention
away from him and toward his wife who was adding details about ▐▐▐ heart attack.  While

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| OPERATION ▐▐▐▐▐ | ▐▐▐▐▐ | 6/20/2019 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of
this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

other agents were looking in the direction of Lindsey BONGIOVANNI, SA Carpenter observed Joseph BONGIOVANNI looking at his wife and shaking his head from side to side as if he was indicating to his wife that she should not talk about ▮▮▮.

▮▮▮▮▮▮▮▮▮

- ▮▮▮▮▮ is an electrician from Buffalo, NY.
- ▮▮▮▮▮ is Lindsey's friend.
- ▮▮▮▮▮ did some work on 85 Alder Place.

▮▮▮▮▮▮▮▮

- ▮▮▮▮▮▮ works on cars
- ▮▮▮▮▮▮ is a friend of J. BONGIOVANNI
- ▮▮▮▮▮▮ plows J. BONGIOVANNI's father's driveway.
- ▮▮▮ is the brother of ▮▮ ▮▮▮▮▮▮, AKA ▮▮▮▮
- BONGIOVANNI traveled to Canada with ▮▮▮▮▮▮▮▮ to go to Swiss Chalet restaurant on one occasion.

▮▮▮▮▮▮

- ▮▮▮'s grandfather lived next door to BONGIOVANNI.
- ▮▮▮▮▮▮▮ owns Collision Masters.
- DEA Buffalo agents used to take their GOVs to Collision Masters for repairs.

▮▮▮▮▮▮

- ▮▮▮▮▮▮ was a work friend.
- ▮▮▮▮▮▮ might be ▮▮ ▮▮▮▮▮ cousin.
- ▮▮▮▮▮▮ works at a medical marijuana dispensary.
- BONGIOVANNI sometimes sees ▮▮▮▮▮ when he (BONGIOVANNI) picks up his mother's medical marijuana.

▮▮▮▮▮▮

- ▮▮▮▮ is BONGIOVANNI's uncle.

▮▮▮▮▮▮

- ▮▮▮▮ is a good friend and corrections officer.

▮▮▮▮

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| OPERATION ▮▮▮▮▮▮▮ | ▮▮▮▮▮▮▮▮ | 6/20/2019 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

06/20/2019 15:36 EDT

Page 6 of 8

- █████ is ████████ girlfriend.
- ████ is a friend of BONGIOVANNI since childhood.

**AGENT'S COMMENT:** When first asked who ████████ was, BONGIOVANNI responded she was the girlfriend of a friend. When asked who the friend was, BONGIOVANNI looked down at the floor and mumbled ████████.

████████

- ████ used to date Lindsey's sister.

████████

- ████ is an old friend.
- BONGIOVANNI last saw ████ at a wake.
- ████ does carpet work.

████████

- ████ is a Town of Tonawanda Police detective that BONGIOVANNI knew from his time in DEA.

████████

- ████ is the wife of his old partner ████████.
- ████████ was a TFO at DEA.
- ████████ is retired and lives in Florida.

SA Ryan asked BONGIOVANNI about a picture of BONGIOVANNI and several other males. BONGIOVANNI related the photo was taken at a party in Toronto. The party was arranged by ████████, who was at the time BONGIOVANNI's brother in law. ████████ was in the photo. ████ became the target of a DEA investigation while BONGIOVANNI was still working. BONGIOVANNI reported to his supervisor, Greg Yenson, that he had been at the party with ████. Others in the photo were ████████ ████████ ████████ ████████ The party took place in 2015. There were other people at the party who were not in the photo. They included ████████ and ████████. BONGIOVANNI and his wife spent the night at the Intercontinental hotel in Toronto. BONGIOVANNI did not remember if ████████ was at the party.

SA Ryan asked BONGIOVANNI about a picture that depicted him, his wife and several other people. He related the picture was taken at Lake Erie a couple of years ago. ████████ is in the picture. ████ and BONGIOVANNI were in the same place by chance. The meeting was not

---

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| OPERATION ████████ | ████████ | 6/20/2019 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

GOV-00006531



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

---

planned.  The picture was taken around the 4th of July.  BONGIOVANNI gave DEA the texts between him and ▮▮▮▮▮ from that time period.  BONGIOVANNI said he did not want to see ▮▮▮ that day.  Others in the photo included ▮▮▮▮ ▮▮▮▮ ▮▮▮▮ BONGIOVANNI related that was the last time he saw ▮▮▮.

SA Ryan asked BONGIOVANNI why he had reports related to ▮▮▮▮ in his home.  BONGIOVANNI related ▮▮ was an old case, and he kept his case file.  BONGIOVANNI thought it would come up again and he wanted to be able to verify everything was on the up and up.  BONGIOVANNI also said he knew there was an ongoing investigation of Italian Organized Crime.  BONGIOVANNI never met ▮▮▮.  BONGIOVANNI said ▮▮▮ last name qualified.  That is why he kept the file.

**AGENT'S COMMENT:**  Throughout the interview BONGIOVANNI questioned agents about why they were only asking him about people of Italian ancestry.

BONGIOVANNI had three DEA bullet resistant vests in his home because he was not asked to turn them in when he retired.

SA Ryan asked BONGIOVANNI about a series of texts he exchanged with ▮▮▮▮ that referenced a meeting at Riverworks in Buffalo.  BONGIOVANNI said he was at Riverworks with his wife when ▮▮▮ ▮ showed up unexpectedly.  ▮▮▮▮ was also there.  When BONGIOVANNI and his wife left, ▮▮▮▮ helped them to the car because Lindsey was intoxicated.

▮▮▮ is the godfather to ▮▮▮▮ son.

▮▮▮ is good friends with ▮▮▮▮.

▮▮▮ is good friends with retired New York State Police trooper ▮▮▮.

▮▮▮ is good friends with ▮▮▮▮.

▮▮▮ obsessively called BONGIOVANNI, and has been for as long as BONGIOVANNI has known ▮▮.

▮▮▮ just started a job as a corrections officer for the Erie County Sheriff's Office.

SA Ryan closed the interview by asking BONGIOVANNI to again explain why he kept the ▮▮▮ file.  BONGIOVANNI related he burned his other papers but brought the ▮▮▮▮ file home at retirement.  SA Ryan asked what happened in the ▮▮▮▮.  BONGIOVANNI related Peter MILLITELLO was the source in the case, but MILLITELLO was arrested for selling fentanyl and heroin.  BONGIOVANNI then said he knew you guys, referring to SA Ryan, were investigating ▮▮▮ ▮▮  SA Ryan asked how BONGIOVANNI learned of the current ▮▮▮▮.  BONGIOVANNI stated SA Carpenter asked BONGIOVANNI about ▮▮ during an interview earlier in the year.

---

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| OPERATION ▮▮▮▮ | ▮▮▮▮ | 6/20/2019 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

06/20/2019 15:36 EDT                                                                                 Page 8 of 8

**AGENT'S COMMENT:**   SA Carpenter interviewed BONGIOVANNI after BONGIOVANNI retired from DEA.

SA Ryan asked BONGIOVANNI about an unlabeled pill bottle found in the master bath medicine cabinet.   BONGIOVANNI stated he was not aware of the pills being in the medicine cabinet and did not know what the pills were.

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| OPERATION | | 6/20/2019 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

GOV-00006533

# EXHIBIT E

United States District Court
Western District of New York

---

United States of America,

                        *Plaintiff*                    Proposed Order

              *vs*

Joseph Bongiovanni                                     19-cr-227

                        *Defendant*

---

The United States Department of Justice ("Government") has previously recognized that providing broad and early discovery promotes the truth-seeking mission of the Department of Justice and fosters speedy resolutions of cases such as this, which furthers compliance with the Speedy Trial Act, Title 18, United States Code, Section 3161. In addition to obligations imposed on the Government pursuant to Fed.R.Crim.P. 16 and 26.2, *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), 18 U.S.C. § 3500 (the Jencks Act), and Chapters 9-5.001 and 9-5.100 of the United States Attorney's Manual,

A. **IT IS ORDERED** that counsel of record for the Government shall provide to the defendant (through his authorized counsel) any "covered information"

    (1) that is within the possession, custody, or control of the prosecution team; or

    (2) the existence of which is known, or by the exercise of due diligence would become known, to the attorney for the Government and/or any member of the prosecution team.

B. In this Order,

    (1) the term "covered information" means information, data, documents, evidence, or objects that may appear to be favorable to the defendant in this prosecution with respect to

        (a) the determination of guilt;

(b) any preliminary matter before this Court in these proceedings; or

(c) the sentence which might be imposed in the event of conviction.

"Covered information" shall also include "e-communications" which includes but shall not be limited to emails, text messages, SMS (short message service), instant messages, voicemail, pin-to-pin communications, social networking sites, bulletin boards, blogs, and similar means of electronic communication.

(2) the term "prosecution team" includes:

(a) The "Operation ███████████" Task Force including all counsel associated with or previously associated with such Task Force, and any other person employed by or expending efforts on behalf of or in coordination with this Task Force by way of investigation or prosecution of any person or entity by such Task Force.

(b) The United States Attorney's Office for the Western District of New York;

(c) any entity or individual, including a law enforcement or investigatory agency or official, that

(i) acts on behalf of the Government with respect to this criminal prosecution, either pre- or post indictment;

(ii) acts under the control of the Government with respect to the criminal prosecution, either pre- or post indictment; or

(iii) participates jointly with the Government in any investigation with respect to this criminal prosecution, either pre- or post- indictment.

(d) "Prosecution Team" shall also include any federal, state or local law enforcement officer and/or other government official participating in the investigation and prosecution of this case by the "Operation ███████████" task force.

(e) Government counsel of record are to err on the side of inclusiveness when identifying the members of the "prosecution team" for purposes of this Order.


C. Materiality.

(1) In identifying and compiling "covered information" in compliance with this Order,

the prosecution team shall not, in any way, consider, distinguish or omit documents or other information on the basis of materiality of such information to the prosecution or defense in this matter. Evaluations of materiality shall not in any way limit the Court's Order, or the prosecution team's responsibility to comply with it.

(2) To the extent the Government believes, in good faith, that any "covered information" compiled in connection with this Order is not subject to disclosure pursuant to Fed.R.Crim.P. 16(a)(1)(E)(i), the Government shall prepare an itemized log of all such covered information, and submit such log along with any and all documents to the Court *ex parte* for *in camera* review.

D. **IT IS FURTHER ORDERED** that the Government shall provide to the defendant any covered information

(1) within thirty (30) days of the signing of this Order;

(2) if the existence of the covered information is not known on the date of the initial disclosure under this Order, as soon as is reasonably practicable upon the existence of the covered information becoming known;

(3) except as provided in paragraph (4) ("classified information"), the requirements under this Order shall apply notwithstanding 18 U.S.C. § 3500(a);

(4) classified information (as defined in section 1 of the Classified Information Procedures Act (18 U.S.C. app. 3)) shall be treated in accordance with the Classified Information Procedures Act. In the event the Government deems any covered information to be so classified under this Order, and withholds production to the defendant on such grounds, it shall immediately notify the Court in writing that it has done so; and

(5) This Order is continuing in nature. The obligations set forth hereunder shall not terminate at any time prior to final disposition of this matter.

E. **IT IS FURTHER ORDERED** that, with regard to protective orders,

(1). Upon motion of the Government, the Court may issue an order to protect

against the immediate disclosure of covered information otherwise required to be disclosed under this Order if

> (a) the covered information is favorable to the defendant solely because the covered information would provide a basis to impeach the credibility of a potential witness; and

> (b) the Government establishes a reasonable basis to believe that

>> (i) the identity of the potential witness is not already known to any defendant; and

>> (ii) disclosure of the covered information to a defendant would present a threat to the safety of the potential witness or of any other person.

(2). The Court may delay disclosure of covered information under this Order until the date that the Court determines provides a reasonable amount of time before the date set for trial.

(3). The Government may file all or a portion of a motion under this Order under seal to the extent necessary to protect the identity of a potential witness, but the United States

> (a) may not file a motion under this subsection *ex parte*; and

> (b) shall summarize any undisclosed portion of a motion filed under this Order for the defendant in sufficient detail to permit the defendant a meaningful opportunity to be heard on the motion, including the need for a protective order or the scope of the requested protective order.

F. **IT IS FURTHER ORDERED** that the defendant may not waive a provision of this section except in open court. The Court may not accept the waiver of a provision of this Order by the defendant unless the Court determines that

(1) the proposed waiver is knowingly, intelligently, and voluntarily offered; and

(2) the interests of justice require the proposed waiver.

G. **IT IS FURTHER ORDERED** that,

(1). Upon motion of the defendant or by the Court *sua sponte*, if there is reason to believe that counsel for the Government has failed to comply with this Order, the Court shall order the Government to show cause in writing why the Court should not find the Government is not in compliance with this Order.

(2). If the Court determines under paragraph V.A. that the Government is not in compliance with this Order, the Court shall

(a) determine the extent of and reason for the noncompliance; and

(b) enter into the record the findings of the Court.

(3). If the Court determines that the Government has violated the requirement to disclose covered information under this Order or the requirement to disclose covered information in a timely manner under this Order, the Court shall order an appropriate remedy:

(a) A remedy under this subsection may include

(i) postponement or adjournment of the proceedings;

(ii) exclusion or limitation of testimony or evidence;

(iii) ordering a new trial;

(iv) dismissal of the proceedings with or without prejudice;

(v) sanctioning responsible counsel, including but not limited to monetary penalty assessed against him/her personally; disqualification from further representation in this matter and striking him/her as counsel of record; institution of criminal contempt proceedings against responsible counsel; reporting counsel's conduct to relevant bar associations for further investigation and institution of disciplinary proceedings; or

(vi) any other remedy determined appropriate by the Court.

(b) In fashioning a remedy under this subsection, the Court shall consider the totality of the circumstances, including

(i) the seriousness of the violation;

(ii) the impact of the violation on the proceeding;

(iii) whether the violation resulted from innocent error, negligence, recklessness, or knowing conduct; and

(iv) the effectiveness of alternative remedies to protect the interest of the defendant and of the public in assuring fair prosecutions and proceedings.

(4). If the Court grants relief under paragraph G(3)(a)(v) on a finding that the violation of this Order was due to negligence, recklessness, or knowing conduct by the Government, the Court may order that the defendant, or the attorney for the defendant, recover from the Government the costs and expenses incurred by the defendant, and/or the attorney for the defendant, as a result of the violation, including reasonable attorney's fees (without regard to the terms of any fee agreement between the defendant and the attorney for the defendant). Costs and expenses ordered by the Court under this Order

(a) shall be paid by the Government, and/or

(b) shall be paid personally by individual counsel of record, where such conduct, demonstrated by clear and convincing evidence, is the result of bad faith or contumacious conduct by individual counsel.


H. **IT IS FURTHER ORDERED** that the prosecution team shall, at all times, comply with 28 C.F.R. § 50.2, Chapter 1-7.000, et sequitur of the United States Attorney's Manual; Local Criminal Rule 53 of the United States District Court for the Eastern District of Louisiana; and Rules 3.8 and 8.4 of the Louisiana Rules of Professional Conduct, and be prepared to certify on the record that all members of the prosecution team are in compliance at the outset of the trial in this case.

I. **IT IS FURTHER ORDERED** that, upon completion of all disclosures set forth in paragraph I of this Order, government counsel of record shall forthwith file into the record a sworn certification of compliance with all the provisions of this Order, affirmatively stating the Government's completion of compliance with this Order, signed personally by all counsel of record for the Government.

The Court will, in a subsequent Order, require disclosure of discovery items from defendant at a later date.

Buffalo, New York, this _____ day of _____, 2021.

_____

The Hon. Michael J. Roemer
United States Magistrate Judge