IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.                                                    19-CR-227-JLS

JOSEPH BONGIOVANNI

Defendant.

---

## GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS

The United States of America, by and through its attorneys, James P. Kennedy Jr., United States Attorney for the Western District of New York, and Corey R. Amundson, Chief of the Public Integrity Section, hereby files its opposition to the defendant's pretrial motions. (Dkt. No. 81).

## I.    PROCEDURAL AND FACTUAL BACKGROUND

The defendant is presently charged in a Superseding Indictment with violations of Title 21, United States Code, Section 846, and Title 18, United States Code, Sections 371, 201(b)(2)(C), 1519, and 1001(a)(2). Prior to the filing of the Superseding Indictment, the defendant was similarly charged via a predecessor indictment on October 31, 2019.

On November 5, 2019, the defendant appeared for an arraignment. (*See* Minute Entry, Dkt. No. 5.)

From November 27, 2019, until February 24, 2020, litigation in this case focused upon the government's motion to disqualify predecessor counsel for the defendant due to an actual

conflict of interest. (*See* Dkt. Nos. 10-31.) On February 24, 2020, predecessor counsel filed a motion to withdraw as counsel, which was granted on March 9, 2020. (*See* Dkt. Nos. 37-38.)

From March 9, 2020, until filing of a Notice of Appearance by current counsel on April 22, 2020, the defendant requested time and was engaged in the process of selecting and retaining counsel. (*See* Dkt. Nos. 38-41.)

On April 24, 2020, an Amended Scheduling Order was issued, and in May and June 2020 Protective Orders were issued relating to discovery. (*See* Dkt. Nos. 43-45.) Once the counsel issue was resolved, voluntary discovery was provided pursuant to Rules 16 and 16(c) on or about May 22, July 10, October 9, October 16, October 23, and November 18, 2020.

On June 4, 2020, the present Superseding Indictment was returned adding a co-defendant, Michael Masecchia, and related charges to the case. (*See* Dkt. Nos. 46-47.)

On June 12, 2020, the defendant and his co-defendant were arraigned, and a Second Amended Scheduling Order was issued. (*See* Dkt. Nos. 50-51.)

On June 22, 2020, the parties appeared before United States District Court Judge John L. Sinatra, Jr., whereupon the judge placed certain information on the record (*see* Dkt. Nos. 49-53).

On September 4, 2020, counsel for co-defendant Masecchia filed a motion to withdraw, which was granted on September 9, 2020. (*See* Dkt. Nos. 55-57.)

Between September 11, 2020, and November 16, 2020, the defendant moved for extensions of time to file motions and amended scheduling orders were issued as well as a Second Amended Protective Order relating to discovery. (*See* Dkt. Nos. 58-65.)

On December 9, 2020, co-defendant Masecchia entered a plea agreement and, in the factual basis of the plea, publicly acknowledged that "at various times, codefendant Joseph Bongiovanni, a former DEA agent in the Buffalo, New York resident office, has provided law enforcement sensitive information, including the names of potential cooperators and whether or not Masecchia and others were under federal investigation, to enable Masecchia and others to continue in their marijuana distribution activities undetected by other members of law enforcement." (*See* Dkt. No. 68.)

## II.    THE DEFENDANT'S REQUESTS FOR DISCOVERY BEYOND THE PARAMETERS OF RULE 16 SHOULD BE DENIED.

The defendant's motion does not claim any Rule 16 materials have been withheld. However, the defendant's motion seemingly contains conflicting accounts, such as that there is too much discovery (i.e., "volumes of discovery are more harmful than helpful…" *see* Dkt. No 78, at p. 5, ¶16); that there is not enough discovery (*see id.* at p. 54); that discovery is "heavily redacted" or transmitted in a "slightly corrupted format" (*see id.* at p. 54); and that the nature of the case and *Brady* requires additional disclosures, including a bill of particulars. The defendant's discovery-related requests lack merit and should be denied.

3

A.  Rule 16's requirements.

In Federal Court, "pre-trial discovery in criminal cases is strictly circumscribed." *United States v. Nelson*, 606 F. Supp. 1378, 1389 (S.D.N.Y. 1985). There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).   The limits of such discovery are delineated in Federal Rule of Criminal Procedure 16, "which by its terms governs discovery in criminal cases." *United States v. Armstrong*, 517 U.S. 456, 461 (1996).

Rule 16(a)(1) provides, in relevant part, that the government must disclose:

(A)   Defendant's Oral Statement . . . if the government intends to use the statement at trial.
(B)   Defendant's Written or Recorded Statement . . .
(C)   Organizational Defendant…
(D)   Defendant's Prior Record . . .
(E)   Documents and Objects . . .
(F)   Reports of Examinations and Tests…[and]
(G)   Expert Testimony.

Rule 16 specifically excludes certain items from discovery. According to Rule 16(a)(2) and (a)(3), information not subject to disclosure or inspection includes "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case;" . . . "statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500;" and "discovery or inspection of a grand jury's recorded proceedings, except as provided in Rules 6, 12(h), 16(a)(1), and 26.2."

B. <u>The voluntary discovery provided has exceeded the requirements of Rule 16 and is organized and searchable.</u>

As the defendant acknowledges, the government has provided voluminous voluntary discovery. The defendant fails to acknowledge that the discovery provided exceeds the requirements of Rule 16, has been provided in a searchable and format, and that with each discovery transmission the government advised that if the defendant had any questions or concerns related to the discovery- to contact the government. The defendant never contacted the government to raise any issues with accessing discovery.

As noted above, voluntary discovery was provided pursuant to Rules 16 and 16(c) on May 22, July 10, October 9, October 16, October 23, and November 18, 2020. Much of the discovery was provided during the May 22 and July 10 transmissions.   A copy of discovery correspondence and logs are attached hereto and incorporated herein by reference as *Exhibit A.*

The discovery produced includes DEA confidential source (CS) files pertinent to this case (with only source names redacted)[1]; multiple DEA case files[2]; evidence, reports, and photos pertaining to seizures from defendant Bongiovanni and others; search warrants and reports pertaining to defendant Bongiovanni and others; phone records pertaining to defendant Bongiovanni and others; border crossing records pertaining to defendant

---

[1] Despite redaction, one could reasonably infer that Bongiovanni knows the identity of the CSs despite redaction in the documents produced to his counsel.

[2] This includes DEA Case Number C2-13-0026 specifically referenced in the Superseding Indictment, which includes all DEA forms and reports authored or caused to be prepared as referenced in the Superseding Indictment pertaining to DEA Case Number C2-13-0026.

Bongiovanni and others; bank records; police reports; defendant Bongiovanni's personal cell phone extraction (searched and extracted pursuant to a search warrant); defendant Bongiovanni's DEA cell phone extraction (indicating it was "wiped" prior to him returning it to the DEA); cell phone extractions for cell phone seized and searched pertaining to Coconspirators 1, 2, and 3; search warrants 19-MJ-1056, 19-5002, 19-5154, 19-5209, 19-5303-01-02, 19-M-1065, 19-MJ-213; PayPal records; Bank of America records; Transunion records; an investigator's activity log referencing interactions with Bongiovanni and others regarding file C2-13-0026; an HSI Report of Information (ROI) documenting an interview of AUSA Timothy C. Lynch; search warrants and extractions related to the search of devices seized from co-defendant Masecchia; reports memorializing statements defendant Bongiovanni made to Department of Justice, Office of Inspector General (DOJ-OIG) on March 29, 2019, and to DOJ-OIG, Homeland Security Investigations (HSI), and the Federal Bureau of Investigation (FBI) on June 6, 2019; emails from and between an IRS Agent and defendant Bongiovanni regarding DEA file C2-13-0026; defendant Bongiovanni internal DEA emails, DEA database searches, DEA reports, and internal DEA memos; a search warrant affidavit submitted by defendant Bongiovanni in another case regarding his DEA experience and training (consisting of the biographical information that typically is at the beginning of a search warrant affidavit); the state search warrant and New York State Police reports underlying what became DEA Case Number C2-13-0026; the U.S. Attorney's Office's closed electronic and paper file relating to the case defendant Bongiovanni purported to have investigated; scanned documents comprising the DEA file materials and list of names found in defendant Bongiovanni's basement; a DEA 6 authored by defendant Bongiovanni on November 6, 2009 (regarding Coconspirator 1); a CBP phone extraction of an IOC member;

DEA mission statements and oath; defendant Bongiovanni's Erie County pistol permit application records; a video of an assault at Snooty Fox depicting defendant Bongiovanni and others; police reports regarding uncharged coconspirators; U.S. Probation records regarding defendant Bongiovanni's contacts with U.S. Probation in 2009 on behalf of Coconspirator 1; photos of Bongiovanni with others, including co-conspirators; and other materials. Contrary to the claims set forth in the defendant's motions, discovery has been robust, specific, and in full compliance with Rule 16.

To the extent the defendant lodges conclusory claims about the format of the discovery, any such claims lack merit. Discovery was not provided to the defense by scanning documents and then sending them to the defense, as the defense claims. To the contrary, the documents were obtained by the government, mostly in digital format, and then produced to the defense in an organized format so the documents could be searched. The quality of the documents produced to the defense is the same as the USAO-WDNY received it, and consists of searchable pdfs and native files where appropriate (like spreadsheets and videos, for example, that cannot be printed).  The defense has not identified, formally or informally, a single document that is of poor quality and has never indicated to the government that it has had any issues searching documents. Moreover, the government has provided a comprehensive chart with Bates ranges and a description of the discovery, along with helpful letters further describing that which has been produced. Each discovery production letter advises the defense that the discovery will be used at trial, that discovery is ongoing pursuant to Rule 16(c), and invites the defense to call the undersigned with any questions or concerns. Furthermore, in response to the defense claim that documents are of poor quality, the

government has rechecked the documents produced and has not identified any documents that are of poor quality. In sum, the discovery is searchable, organized, numbered, and was accompanied by a comprehensive index/chart and helpful letters. *See Exhibit A*; *see also United States v. Briggs*, 831 F.Supp.2d 623, 629-630 (W.D.N.Y. Nov. 23, 2011) (denying defense request for the government to produce discovery in the manner requested by defense); *United States v. Quintana*, 12-CR-214S, 2017 WL 4620987, at *3 (W.D.N.Y. Oct. 16, 2017) (same).[3]

The discovery produced to date exceeds the requirements of Rule 16. Since the date of the indictment, the United States has complied, and intends to continue to comply, with the requirements of Rule 16. As the government identifies any other evidence which falls within the scope of Rule 16, it will provide such evidence to the defendant's counsel. The government will continue to comply with its continuing duties to disclose set forth in Rule 16(c). As it has in each disclosure letter, the government herein notifies the defendant that it intends to introduce all evidence that has been provided, and/or which the defendant has been made aware, pursuant to Rule 12(b)(4).

---

[3] Discovery in this case has been minimally redacted, and redactions only relate to identities of non-parties, witnesses, law enforcement work-product, and/or identifying information of non-parties and witnesses in documents the government submits have been produced beyond the required parameters of Rule 16. Courts commonly approve of redactions of Rule 16 material or similar means of protecting witness identity. *See United States v. Urena,* 989 F. Supp. 2d 253, 262 (S.D.N.Y. 2013) (citing *United States v. Fort,* 472 F.3d 1106, 1121 (9th Cir.2007) (approving of "the government's disclosure of redacted copies of local police reports [sought under Rule 16], where the redactions were consistent and supported by an articulated intention to protect witness identities in the context of a case in which the district court has already found a serious risk of harm to witnesses.") Here, the defendant has not identified any specific documents to which he is challenging or objecting to redaction.

1. <u>Defendant's Statements</u>

Rule 16(a)(1)(A) requires, upon the defendant's request, the government to produce for discovery or inspection the substance of any relevant oral substance made by the defendant, before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial. The government has previously produced this information during voluntary discovery. The defendant participated voluntarily in non-custodial interviews with DOJ-OIG on March 29, 2019[4], and with HSI, FBI, and DOJ-OIG on June 6, 2019, and reports of these interviews have been provided. The rule does not require disclosure of any statement made by the defendant to any person or in any context. *See In re United States*, 834 F.2d 283, 286-87 (2d Cir. 1987); *see also United States v. Percevault*, 490 F.2d 126, 131 (2d Cir. 1974); *United States v. Green*, 144 F.R.D. 631, 638 (W.D.N.Y. 1992); Fed. R. Crim. P. 16(a)(2).

Rule 16(a)(1)(B)(i) requires the government to produce, upon request, written or recorded statements of a defendant any written or recorded statement of the defendant if the statement is within the government's possession custody and control; and the attorney for the government knows-or through reasonable diligence could know- that the statement exists. These statements have been provided during voluntary discovery consisting of reports, memos, emails, search warrant affidavit, as detailed above and in *Exhibit A*. Any additional statements identified by the government within the parameters of this Rule will be provided voluntarily pursuant to Rule 16(c). In the event the defendant believes there are other

---

[4] The defendant has not filed any motion to suppress or affidavit with respect to the March 29, 2019, interview with DOJ-OIG.

statements of his relevant to his defense, the government requests the defendant to identify those statements and the government will make requests of the DEA and will endeavor to produce the statement(s) voluntarily.

The government is not in possession of any written or recorded statements of the defendant made before or after arrest to a person the defendant knew was a government agent, and the defendant has not testified in the grand jury relating to the charged offense. *See* Rule 16(a)(1)(B)(ii) & (iii).

2.  Organizational Defendant

Rule 16(a)(1)(C) relating to an organizational defendant is inapplicable to this case.

3.  Defendant's Prior Record

The defendant does not appear to have a prior criminal record, but pertinent reports regarding his prior law enforcement contact were provided within the disclosure of the defendant's Erie County, New York pistol permit application.   *See* Rule 16(a)(1)(D).

4.  Documents and Objects

Rule 16(a)(1)(E) requires, upon a defendant's request, the government to permit the defendant to inspect and copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copiers or portions of any of these items, if the item is within the government's custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case in chief at trial; or (iii) the items

was obtained from or belongs to the defendant. The government has produced Rule 16(a)(1)(E) material, *see Exhibit A*, and will continue to comply with its discovery obligation pursuant to Rule 16(c). All physical items are available for inspection, and all photos and documents pertaining to such items have been provided to the defense.

The defendant's lone specific request is that the government should provide "all relevant documents or objects in its possession which establish the existence, structure, and alleged activities of IOC in Buffalo." (*See* Dkt. No. 81, at 57-58.) However, the defendant's request is beyond the parameters of Rule 16, is immaterial to the charges, and inconsistent with the defendant's acknowledgment that he has already received pertinent discovery.

Indeed, there is no element of any charge contained in the indictment that will require the government to prove the "existence, structure, and alleged activities of IOC in Buffalo." The Superseding Indictment alleges that the defendant engaged in the conduct "to shield his friends and associates, and others including defendant **MASECCHIA**, who he believed were connected to or associated with IOC, from criminal investigations." The government has produced, in discovery, an email sent to defendant Bongiovanni from a fellow member of law enforcement apprising defendant Bongiovanni that codefendant Masecchia was associated with the Buffalo LCN Family, consistent with the allegations of the Superseding Indictment, as follows:

11



*See also* Superseding Indictment, Overt Act 42. This email was produced at Bates numbered

discovery GOV-00018125 on May 22, 2020, and was reproduced in subsequent disclosures.

Other law enforcement reporting regarding co-defendant Michael Masecchia's links to

traditional organized crime, including the Buffalo Organized Crime Family, were provided

at a minimum at GOV-00037301-00037302, GOV-00037327-37332, and GOV-00037333-

00037347. The defense acknowledged receiving information regarding IOC in discovery (*see*

Dkt. No. 81, at p. 52), and the government anticipates there will also be testimonial evidence

from non-law enforcement at trial regarding defendant Bongiovanni's knowledge in this

regard. Any additional materials identified by the government that it will use during its case-

in-chief at trial and/or required to be produced pursuant to Rule 16, will be provided

voluntarily pursuant to Rule 16(c).[5]

---

[5] Upon information and belief, Michael Masecchia would deny being a member of the Buffalo
LCN Family, or mafia, and he made no such admissions in the factual basis of his plea
agreement, *see* Dkt. No. 68. Michael Masecchia is represented by Patrick Brown, Esq.
Although not specifically requested by the defendant, copies of a 2004 DEA Buffalo case file
regarding co-defendant Masecchia (in which defendant Bongiovanni was a listed agent), and
a 2009 DEA Buffalo case file regarding co-defendant Masecchia have been or will be
provided, subject to appropriate redaction. At a minimum, pertinent portions of these files
have been provided during voluntary discovery, as have pertinent portions of a 2004 DEA
Las Vegas case file regarding co-defendant Masecchia.

Information is "material to the defense" within the meaning of Rule 16 "if it could be used to counter the Government's case or bolster a defense; information not meeting either of those criteria is not to be deemed within the meaning of the Rule merely because the government may be able to use it to rebut a defense position. [...] Nor is it to be deemed material merely because it would have dissuaded the defendant from proffering easily impeached testimony." *United States v. Stevens,* 985 F.2d 1175, 1180 (2d Cir.1993). "Put another way, a document is material if its pretrial disclosure will enable a defendant to *alter significantly* the quantum of proof in his favor." *United States v. Finnerty*, 411 F. Supp. 2d 428, 431 (S.D.N.Y. 2006) (citations and punctuation omitted) (emphasis added); *see also United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991) ("Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case. There must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor."). "Where the defendant has not specified what he is looking for in [the files], why he expects it to be there, and what use he intends to make of the information, defendant has failed to make the required prima facie showing of materiality." *United States v. Reddy*, 190 F. Supp. 2d 558, 573 (S.D.N.Y. 2002) (punctuation omitted). By its terms, Rule 16 does not "authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500." Fed.R.Crim.P. 16(a)(2). Section 3500 "is the exclusive vehicle for disclosure of statements made by government witnesses." *United States v. Percevault,* 490 F.2d 126, 128–29 (2d Cir.1974) (citation omitted). The defendant must make a *prima facie* showing of materiality, *see Finnerty supra*, and must "offer more than the conclusory allegation that the requested evidence is material," *United States v. Rigas,* 258 F.Supp.2d 299, 307

(S.D.N.Y.2003); *see also United States v. Jordan*, 316 F.3d 1215, 1250 (11th Cir. 2003) ("the defendant must make a specific request for the item together with an explanation of how it will be helpful to the defense.") (internal punctuation and citation omitted).

Here, as noted above, the government will not be required to prove at trial the actual existence of the mafia, or the "existence, structure, and alleged activities of IOC in Buffalo." It will not alter the quantum of proof in the defendant's favor if the government were to prove, or the defendant to disprove, the "existence, structure, and alleged activities of IOC in Buffalo." Rather, the relevant evidence in this case will relate to defendant Bongiovanni's knowledge and motives "to shield his friends and associates, and others including defendant **MASECCHIA**, *who he believed were connected to or associated with IOC*, from criminal investigations."(emphasis added.) Information regarding defendant Bongiovanni's knowledge and awareness was produced in voluntary discovery and will be further disclosed when Jencks Act materials are produced. As a member of law enforcement, defendant Bongiovanni was provided and made aware of information indicating that Masecchia and others were members or associates of organized crime. Rather than avoiding these individuals, evidence will establish that defendant Bongiovanni helped them in exchange for money, friendship, and/or both. *United States v. Salameh*, 152 F.3d 88, 111 (2d Cir. 1998) ("Although it does not bear directly on the charged elements of a crime, evidence offered to prove motive is commonly admitted."). Thus, the disclosure sought by the defense is immaterial because nothing in this Superseding Indictment requires the government to prove the "existence, structure, and alleged activities of IOC in Buffalo," in order to prove the defendant's motive, intent, or knowledge to commit the charged offenses. Moreover, such

disclosure is also immaterial because it would not counter the government's case, bolster the defense, or significantly alter the quantum of proof in the defendant's favor. What is relevant to this case, and material to the defense, is what defendant Bongiovanni thought, believed, knew, and/or what motivated him, and not what the "existence, structure, and alleged activities of IOC in Buffalo," might or might not be. A document or item is not "material" simply because it might be "useful." *United States v. Rigas*, 258 F. Supp. 2d 299, 307 (S.D.N.Y. 2003).

"The government is not required to create a document to respond to a defense request for discovery." *United States v. Cameron*, 672 F. Supp. 2d 133, 141 (D. Me. 2009), *amended* (Nov. 30, 2009). "Courts have typically required the prosecution to disclose under Rule 16 documents material to the defense that (1) it has actually reviewed, or (2) are in the possession, custody, or control of a government agency so closely aligned with the prosecution so as to be considered part of the prosecution team." *United States v. Finnerty*, 411 F. Supp. 2d 428, 432 (S.D.N.Y. 2006) (citations omitted). In addition to failing to establish materiality, even if such a document did exist precisely "defining the existence, structure, and alleged activities of IOC Buffalo," it would undoubtedly violate 28 C.F.R. § 16.26 (5) which prohibits disclosure by any Department official where "[d]isclosure would reveal investigatory records compiled for law enforcement purposes, and would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired." *See, United States v. Quintana*, 2016 WL 6191884 (W.D.N.Y. October 24, 2016); *see also, United States v. Kosherides*, 877 F.2d 1129, 1133-34 (2d Cir. 1989) (Rule 16(a)(2)

precludes the disclosure of government reports in connection with the investigation and prosecution of a particular case); Fed. R. Crim. P. Rule 16(a)(2).[6]

Defendant Bongiovanni was a DEA agent for 20 years, with the bulk of his time spent at the Buffalo Resident Office. The government continues to obtain and review materials related to his tenure and if any relevant materials are identified that will be introduced at trial during the government's case in chief, or which are material to the defense, such items will be produced voluntarily pursuant to Rules 16(c) and 16(a)(1)(E).

5.  <u>Reports of Examinations and Tests</u>

Rule 16(a)(1)(F) requires the government, upon request, to permit a defendant to copy and inspect or photograph the reports of any physical or mental examination.   The government has disclosed lab reports pertaining to controlled substances seized from, or associated with, defendant Bongiovanni and other individuals. Additionally, the government has disclosed a report of analysis of the DEA cell phone belonging to the defendant indicating no information is/was on the phone (*i.e.,* that it was wiped), and extraction reports related to his personal cell phone. Additional reports will be produced, if applicable, as experts are identified by the government pursuant to Rule 16(c), and expert summaries will be provided consistent with the timing of the District Court's pre-trial order. Notably, like all other aspects

---

[6] To the extent the defendant seeks to compel all information regarding the "scope, methods, personnel, and outcome of Operation Willamette Falls" (*see* Dkt. 81, at p. 58), the overbroad request is unaccompanied by any authority and lacks merit.  An agency operation is not commensurate with a case, and HSI has other unrelated cases or investigations associated with its Operation Willamette Falls. The discovery principals defining the government's obligations are Rule 16, *Brady, Giglio*, and the Jencks Act.

of Rule 16, the defendant has not made any specific discovery requests of the government and all information provided to date has been produced voluntarily.

With regard to agents who conducted searches of cell phones and similar electronic devices belonging to or obtained from defendant, "[T]he Federal Rules of Evidence allow the admission of fact testimony so long as the witness has personal knowledge, *see* Fed.R.Evid. 602, while opinion testimony can be presented by either a lay or expert witness, *see* Fed.R.Evid. 701 & 702." *United States v. Cuti,* 720 F.3d 453, 457–58 (2d Cir.2013) (internal quotation marks, punctuation, and citation omitted). "A witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony 'expert' as long as it was based on his investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise[.]" *United States v. Marsh*, 568 F. App'x 15, 16–17 (2d Cir. 2014).

6.  Expert Witnesses

As noted above, the government will identify experts and provide expert summaries, if applicable, pursuant to Rule 16(a)(1)(G) consistent with the timing of the District Court's pre-trial order.

7.  Conclusion

The government has provided Rule 16 discoverable materials voluntarily without demand. The defendant's motion is largely devoid of specific Rule 16 requests, except as detailed above, and fails to offer any non-conclusory statements of materiality. Moreover,

there is no basis in law or fact for the defendant to request the Court to order "an inventory of all evidence it has not yet disclosed in this case," (*see* Dkt. No. 81, at p. 8). Cases do not work that way -there is not a master list of evidence and relevant information handed to all government attorneys and federal agents comprising the prosecution team at the outset of a case or an investigation. Rather, information and evidence are discovered, evaluated, and learned about over time through, for example, the issuance of subpoenas, search warrants, interviews, open source research, and other investigative steps, and those materials are evaluated and produced in accordance with Rule 16. To insinuate or claim otherwise demonstrates a basic lack of awareness of how investigations of any kind, other than the most simplistic stove-pipe prosecutions, progress. There is simply no constitutional requirement for law enforcement to provide an accounting to the defense of all investigatory work done on a case. *United States v. Sessa,* 711 F.3d 316, 322 (2d Cir. 2013) (quoting *Moore v. Illinois,* 408 U.S. 786, 795 (1972)).

The defendant's request to compel discovery should be denied. The government will continue to comply with its discovery obligations and is aware of its ongoing obligation to produce discoverable materials pursuant to Rule 16(c). This investigation is ongoing and will continue through and until the trial of this matter, and discovery will be provided accordingly. The defendant's requests for a bill of particulars and/or for expanded disclosures under the auspices of *Brady* will be addressed, *infra*, and should also be denied.

C. <u>The Defendant's request for additional discovery relating to bribes paid to defendant Bongiovanni lacks merit and should be denied.</u>

As set forth above, the government has complied and will continue to comply with Rule 16. Nevertheless, while acknowledging that "[t]he government's disclosures include thousands of pages of Mr. Bongiovanni's financial records[,]" the defendant further requests "that the government must provide whatever documents or other materials it possesses." The defendant need look no further than the Superseding Indictment to learn that it alleges, among other things, at Overt Act 23, that defendant Bongiovanni "accepted, bribes on a recurring basis totaling at least $250,000 U.S. currency[.]" In addition to being provided all financial records obtained from the government, the defendant has full access to all of his financial information and can complete his own financial analysis, if applicable. Additionally, there is no support for the defense claim that witness testimony would be insufficient to prove the elements of all charges in the Superseding Indictment. Although the government submits that ample evidence supporting the defendant's guilt will be introduced at trial, "a conviction may be supported only by the uncorroborated testimony of a single accomplice . . . if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt. Any lack of corroboration goes merely to the weight of the evidence, not to its sufficiency." *United States v. Riggi*, 541 F.3d 94, 110 (2d Cir. 2008).[7]

---

[7] The case cited by the defense, *Opper v. United States*, 348 U.S. 84 (1954), relates to confessions of an accused person, not the testimony of an accomplice or witness, and is wholly inapplicable in the context in which the defendant cited it (*see* Dkt. No. 81, at 57 n.9.).

D. The defense request for a bill of particulars should be denied.

In this case, the government has provided voluminous pertinent discovery in a searchable format, which was accompanied by an index and helpful letters. When the discovery provided is considered in conjunction with the detailed and specific indictment, which meets and far exceeds the minimum pleading requirements of Rule 7(c)(1), there is no basis for the Court to order a bill of particulars which would forever set the parameters of the government's proof at trial.

The prosecution is not required to particularize all of its evidence. *United States v. Gottlieb*, 493 F.2d 987 (2d Cir. 1974). The defendant is simply seeking a preview of the government's evidence, and to confine the government's trial proof to the particulars furnished. Here, the specific allegations contained in the indictment, coupled with voluminous pertinent discovery in a searchable format, more than adequately apprises the defendant of the nature of the charges pending against him, thereby enabling him to prepare for trial. The Superseding Indictment is thirty-seven (37) pages long and contains detailed "Introduction," "Manner and Means", and "Overt Acts" sections. Indeed, paragraphs 22 through 71 of Count 1 consist of overt acts with detailed allegations, and additional allegations are set forth in the other substantive counts of the Superseding Indictment. When considered in conjunction with discovery previously provided, the defendant's request for a bill of particulars lacks merit.

Despite his request for particularization, the defendant offers no specific facts, reasons, or controlling legal authority, to justify a finding that further particularization is necessary in

this case to prevent unfair surprise or to preclude a later prosecution barred by double jeopardy. The defendant submits, in conclusory terms, that the charges contained in the Superseding Indictment are so general that they do not advise the defendant of what specific acts he is accused. Defense counsel's conclusory claims do not rise to the level of demonstrating necessity.

It is well-settled that a bill of particulars is required only where the terms of the indictment are so broad that they do not adequately inform the defendant of the particular acts of which he is accused. *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (a bill of particulars not required where the defendant was provided a wealth of discovery). A bill of particulars may not be used to compel the government to provide the defendant with "evidentiary detail" about its case, as plainly is sought here. *Torres*, 901 F.2d at 234; *see also United States v. Cephas*, 937 F.2d 816, 823 (2d Cir. 1991) (holding that bill of particulars was not required to identify the specific activities by which defendant furthered conspiracy, which is precisely what many of the defendants here are requesting). "A bill of particulars is not a general investigative tool, a discovery device, or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." *United States v. Gibson*, 175 F. Supp.2d 532, 537 (S.D.N.Y. 2001). Similarly, a bill of particulars may not be used to compel the government to disclose the manner in which it will prove the charges, the precise manner in which the defendant committed the crimes charged, or to preview the evidence or legal theory of its case as the defendants here repeatedly request. *See United States v. Sattar*, 272 F. Supp.2d 348, 375 (S.D.N.Y. 2003); *United States v. Mitlof*, 165 F. Supp.2d 558, 569 (S.D.N.Y. 2001); *United States v. Perez*, 940 F. Supp. 540, 550 (S.D.N.Y. 1996); *United States v. Facciola*,

21

753 F. Supp. 449, 451 (S.D.N.Y. 1990), *aff'd sub nom., United States v. Skowronski*, 968 F.2d 242 (2d Cir. 1992); *United States v. Taylor*, 707 F. Supp. 696, 699 (S.D.N.Y. 1989); *United States v. Biaggi*, 675 F. Supp. 790, 809 (S.D.N.Y. 1987). "An application for a bill of particulars seeking, as is the case here, to obtain evidence *must be* rejected." *Facciola*, 753 F. Supp. at 451 (emphasis added). The standard to be applied to the information sought is not whether it is helpful to the defense, but whether it is *necessary*. *See United States v. Love*, 859 F.Supp. 725, 738 (S.D.N.Y. 1994), *aff'd sub nom., United States v. Roberts*, 41 F.3d 1501 (2d Cir. 1994) (emphasis supplied).

A bill of particulars is unnecessary in this case because the Superseding Indictment is sufficiently clear to allow the defendant to identify the nature of the charge pending against him, to allow him to prepare his defense, and to preclude his prosecution for the same offense on another occasion. *United States v. Walsh*, 194 F.3d 37, 44-47(2d Cir. 1999) (affirming trial court's denial of a bill of particulars where the indictment gave the defendant adequate notice of the charges against him, allowed him to prepare a defense and protected him from double jeopardy). Moreover, because the government has adequately and voluntarily disclosed to the defendant relevant evidentiary material within the purview of Rule 16 and in compliance with Rule 12(b)(4)(B), a bill of particulars is not necessary. *See Walsh*, 194 F.3d at 47 ; *Torres*, 901 F.2d at 234 (affirming trial court's denial of bill of particulars in part because the defendant was provided with significant discovery material). The information sought by the defendant is contained in the Superseding Indictment or "some acceptable alternative form," such as discovery materials previously provided by the government. *United States v. Desantis*, 802 F. Supp. 794, 797-798 (E.D.N.Y. 1992); *see also Walsh*, 194 F.3d at 47; *Torres*, 901 F.2d at 234;

*Payden*, 613 F. Supp. at 817. When the discovery in this case is viewed in combination with the Superseding Indictment, it provides the defendant with a virtual roadmap through that evidence.

The only significant items which have not been provided voluntarily consist of grand jury transcripts of witnesses who testified before the grand jury and witness statements. Thus, any order by the Court requiring the government to particularize in the fashion the defendants seek would be tantamount to ordering the government to provide the defendants with a recap of a number of witness' anticipated testimony. When informed as entitled by law, as this defendant is, defendants are generally not entitled to formal bills of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure either: (1) to "particularize all of [the government's] evidence," *Cephas*, 937 F.2d at 823; *Torres*, 901 F.2d at 234; (2) to disclose the manner in which the crimes charged were committed, *United States v. Andrews*, 381 F.2d 377, 378 (2d Cir. 1967); *Torres*, 901 F.2d at 233-34 (demands for "whens" and "wheres" and "by whoms" improper); or, (3) to provide the defendants with previews of the United States' case or legal theories. *Torres*, 901 F.2d at 234; *United States v. Davidoff*, 845 F.2d 1151, 1152 (2nd Cir. 1988); *United States v. Muyet*, 945 F. Supp. 586, 598-99 (S.D.N.Y. 1996). Defendants are precluded from reducing the case to particulars merely by claiming that they are inadequately informed. When specific information that a defendant claims should be revealed in a bill of particulars is available to a defendant through other means, such as through Rule 16 discovery, a motion for a bill of particulars should be denied. *United States v. Bortnovsky*, 820 F.2d 572, 574 (2nd Cir. 1987).

The defendant acknowledges that the government has made "specific and detailed allegations[.]" (*See* Dkt. No. 81, at p. 51.) When coupled with the extensive discovery detailed above, the defendant's acknowledgement should be sufficient to deny the request for a bill of particulars.

1. *The defendant's request for a bill of particulars related to IOC should be denied.*

As set forth above, the Superseding Indictment does not require the government to prove, as an element of any offense, that defendant Bongiovanni or anyone else is a member or associate of Italian Organized Crime. (*See generally* Dkt. No. 46.) Rather, the Superseding Indictment alleges that defendant Bongiovanni's engaged in the conduct "to shield his friends and associates, and others including defendant **MASECCHIA**, *who he believed were connected to or associated with IOC*, from criminal investigations." (Emphasis added.) Bongiovanni's knowledge and motives are relevant to the charges, and he has been provided discovery directed towards that allegation. Indeed, evidence of motive is always relevant, and defendant Bongiovanni may have had several overlapping and intertwined motives, including bribe payments, friendship, and loyalty. The defendant cites no authority for his claim that the government needs to particularize who the mob leader is, who the lieutenants are, or any racketeering activity, etc., and any effort to find case law supporting the defendant's position is futile in a case where, as here, the government need not prove any of those things to prove the elements of the offense. As noted *supra*, what is relevant in this case is what defendant Bongovanni's motives, knowledge, and beliefs were, and not whether there is actually an organization called the Buffalo LCN Family, mafia, or otherwise. Although it is anticipated that there will be evidence that Bongiovanni was specifically advised about co-defendant

24

Masecchia's association with IOC by fellow members of law enforcement, and knew of the reputation of Masecchia and other individuals he was associating with and helping, "[a] bill of particulars is not intended to function as an investigative tool for the defense, and requests seeking evidentiary detail or a preview of the Government's legal theories must be denied." *United States v. Columbo,* No. 04 CR 273, 2006 WL 2012511, at *4 (S.D.N.Y. Jul. 18, 2006).

     2.  *The defendant's request for specific information passed by Bongiovanni to co-conspirators should be denied.*

The Superseding Indictment and the discovery provided sufficiently apprise the defendant of the essential allegations in this case such that a bill of particulars is unnecessary. Despite the detailed allegations in the Superseding Indictment, the defendant requests that the government further specify what information he passed to his co-conspirators. (*See* Dkt. No. 81, at p. 53.) However, the defendant's request is particularly puzzling since the Superseding Indictment specifically alleges, among other things, that "***BONGIOVANNI** used his position as a DEA SA to gain and provide information about federal investigations, and about individuals cooperating or suspected to be cooperating with law enforcement, to enable his coconspirators, friends, and associates to continue their drug trafficking activities without disruption by law enforcement.*" (*See* Dkt. No. 46, Count 1, ¶ 6.) (emphasis added.)   The government is not required to particularize its evidence. *See Cephas*, 937 F.2d at 823.

     3.  *The defendant's request for particulars regarding alleged bribes paid should be denied.*

As detailed above, and acknowledged by the defendant, the government has provided financial records to the defense in discovery. Additionally, the Superseding Indictment alleges, at Count 1, Overt Act ¶ 23, that defendant Bongiovanni "accepted, bribes on a

recurring basis totaling at least $250,000 U.S. currency[.]" Notwithstanding the foregoing, the

defendant requests particularization about who paid the bribes and how they were paid.

However, demands for "whens" and "wheres" and "by whoms" are improper, s*ee Torres*, 901

F.2d at 233-34, and the defendant's request should be denied.


As a district court aptly summarized denying a defense motion for a bill of particulars

in *United States v. Abakporo* :

> A bill of particulars is not a matter of right. A bill of particulars is required only
> where the indictment is so general that it does not advise the defendant of the
> specific acts of which he is accused. It is not enough that the information would
> be useful to the defendant; if the defendant has been given adequate notice of
> the charges against him, the government is not required to disclose additional
> details about its case. The court must be cognizant of the fact that a bill of
> particulars confines the government's evidence at trial to the particulars
> furnished.
>
> The bill of particulars may not be used for the purpose of discovering the
> government's evidence, however, if the defendant demonstrates the requisite
> necessity for the information, the bill must be granted, regardless of whether it
> will result in the disclosure of the government's evidence. In deciding whether
> the bill of particulars is needed, the court must determine whether the
> information sought has been provided elsewhere, such as in other items
> provided by discovery, responses made to unobjected requests for particulars,
> prior proceedings, and the indictment itself.
>
> Thus, it is not the function of a bill of particulars to allow defendants to preview
> the Government's evidence and theory of its case; a bill of particulars is not a
> general investigative tool, a discovery device or a means to compel the
> government to disclose evidence or witnesses to be offered at trial.

959 F. Supp. 2d 382, 388–89 (S.D.N.Y. 2013) (citations, punctuation, and alterations

omitted).

In addition to all of the foregoing, a bill of particulars is especially inappropriate in the Western District of New York because, in this District, prior to trial consistent with the District Court's standard pre-trial order, the government will be required to: (i) file a pre-trial memorandum outlining much of its proof and any anticipated legal issues; (ii) file a witness list summarizing the anticipated testimony of government witnesses; (iii) file an exhibit list/3500 exhibit list; (iv) file expert summaries; and (v) file motions *in limine*. In sum, the procedures in this District ensure that all defendants are more than adequately prepared for trial. Based upon the foregoing, the defendant's motion for a bill of particulars should be denied in all respects.

## III.   THE DEFENDANT'S REQUESTS FOR EXPANDED DISCOVERY UNDER THE AUSPICES OF BRADY SHOULD BE DENIED.

As described above, the Supreme Court's decision in *Brady v. Maryland*[8] did not expand Rule 16. Nevertheless, the defendant invokes *Brady* underlying virtually all of his requests in this case, including requests for discovery, particularization, and even an unprecedented request for a pre-trial schedule for government sanctions in anticipation of a *Brady* violation.[9]   The Court should deny the defendant's *Brady*-based claims, and should

---

[8] *Brady v. Maryland*, 373 U.S. 83 (1986).

[9] Despite defense prognostications that a *Brady* violation is inevitable in this case, the defense has failed to cite a single case where prosecutors in this District have been found to have violated *Brady*. Moreover, the defense's proposed order would require the government to disclose to the defendant documents and information without regard to materiality (*see* Dkt. No. 81, at 110). Such an order would violate the Second Circuit's holding in *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001) (in vacating a district court order requiring immediate production of all favorable exculpatory and impeaching information–without regard to "materiality," Court held that the scope of the disclosure required by *Brady* is limited to information that is "material" as defined by *Bagley* and *Kyles*.).

deny the defendant's request to implement the order attached as Exhibit E to the defendant's motion (*see* Dkt. No. 78, at 108-114).

Defendant moves for immediate disclosure of *Brady* and *Giglio* [10], exculpatory information. The United States believes it is complying with its obligations to provide potentially exculpatory information to the defendant. The defendant seems to overlook that Brady and its progeny do not provide a right to discover each and every piece of information that might be of theoretical or conceivable use to a defendant preparing for trial, however. *See e.g.*, *Weatherford v. Bursey*, 429 U.S. 545, 559-60 (1977). At this time, the government is unaware of any exculpatory *Brady* material related specifically to the defendant. Evidence is not exculpatory because it is not affirmatively incriminating. *United States v. Scarpa*, 913 F.2d 993, 1010-11 (2d Cir. 1990). [11]  "A defendant may not seek to establish his innocence, however, through proof of the absence of criminal acts on specific occasions." *Id.* at 1011.

A defendant is not entitled to disclosure of work product or other privileged documents or information of the sort he requests, Fed. R. Crim. P. 16(a)(2), is not entitled to a list of

---

[10]  *Giglio v. United States*, 405 U.S. 150 (1972).

[11]  By letter dated November 18, 2020, the government advised the defendant that, upon information and belief, Coconspirator 2, who is known to counsel for the defendant, "would deny your client ever did anything for him," and the government advised defense counsel the name of the defense counsel representing Coconspirator 2. Similarly, in this filing, the government has highlighted the fact that co-defendant Masecchia's plea agreement does not contain an admission that he is in the mafia and further advises that, upon information and belief, co-defendant Masecchia would deny being a member of the Buffalo LCN Family. This is an example of the government erring on the side of caution by highlighting information for the defendant despite the fact that information is not *Brady* material simply because it is not affirmatively incriminating. *See Scarpa supra*.

witnesses at this stage of the case, *United States v. Bejasa*, 904 F.2d 137-39 (2d Cir. 1990), and is not entitled to all information which might conceivably reveal something to impeach a witness. Evidence which may be used to substantially impeach the credibility of a key government witness must be disclosed to the defense. *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Bagley*, 473 U.S. 667 (1985). Impeachment evidence is evidence "having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *United States v. Avellino*, 136 F.3d 249,255 (2d Cir. 1998). Materiality is established when there is a reasonable likelihood that disclosure of the evidence would have affected the outcome of the case, *Bagley*, 473 U.S. at 682, or would have put the case in such a different light as to undermine confidence in the outcome. *Kyles v. Witley*, 514 U.S. 419, 434-35 (1995). The standard for materiality is "stringent." *United States v. Spinelli*, 551 F.3d 759, 165 (2d Cir. 2008). Viewed retrospectively, undisclosed impeachment evidence is not material when, "although 'possibly useful to the defense,' it is 'not likely to have changed the verdict.'" *Avellino*, 136 F.3d at 257, (quoting *Giglio*, 405 U.S. at 154). In general, impeachment evidence has been found to be material "where the witness at issue 'supplied the only evidence linking the defendant(s) to the crime'" or "where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." *United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995). "[A]s long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." *United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001). "There is no *Brady* or *Giglio* violation unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial." *Id.* To the extent that additional *Brady* and impeachment material becomes known to the government,

such information will be disclosed sufficiently in advance of the proof during trial for the information to be effectively useful to the defendant. *See Coppa*, 267 F.3d at 144; *United States v. Feldman*, 731 F. Supp. 1189, 1200-01 (S.D.N.Y. 1990) (government agreement to provide *Brady* impeachment material along with *Jencks* Act material for each witness is sufficient); *United States v. Wilson*, 565 F.Supp. 1416, 1438 (S.D.N.Y. 1983) (government need not produce material regarding impeachment of witnesses before trial).

As part of its *Brady* disclosure request, the defense seeks examples of documents where other DEA agents signed forms for one another. (*See* Dkt. No. 81, at 55.) Any such examples, if they exist, do not constitute *Brady* material. Not committing a crime on other occasions is not *Brady* material. *Scarpa*, 913 F.2d at 1011. The defendant has a complete copy of file C2-13-0026 and the related CS file, which were files initiated by the defendant. The defendant can assess the signatures in the files that he opened, managed, and maintained. Moreover, even if, as the defendant claims, it was common for agents to sign forms for one another- that is information known and available to the defendant through his personal experiences at the DEA and is not information suppressed by the prosecution. "Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001). Further, it is anticipated that fellow DEA agents will testify, as it relates to this case and the defendant's conduct, that their names were signed on forms without their knowledge and/or that their names were forged. Jencks Act materials of these DEA agents will be provided at the appropriate time, consistent with the law and the timing of the District Court's pre-trial order.

Even actions that are lawful on their face, can provide relevant evidence of a crime. "To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt. […] [r]ather, evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010) (internal citations and punctuation omitted.). Even, assuming *arguendo,* if other DEA agents violated law or policy, such hypothetical evidence would not be exculpatory as to defendant Bongiovanni. *See, United States v. Samuel,* 605 Fed.Appx. 39, 40 n.1 (2d Cir. 2015) (defendant's allegation that his victims also engaged in fraudulent conduct was not exculpatory as to him.").[12]  Thus, Bongiovanni's claim that it was "common practice at the DEA during Mr. Bongiovanni's tenure to fill out forms and sign on behalf of other agents to complete overdue paperwork[,]" is not evidence suppressed by the government, is not exculpatory, and is not *Brady* material.  Accordingly, the defendant's speculative and broad request for other such forms should be denied.[13]

The defendant's *Brady* motion, and his request for this Court to adopt his unprecedented proposed *Brady* order, should also be denied. The government is aware of its *Brady* obligations, as set forth above, and will continue to comply with its requirements. "In the typical case where a defendant makes only a general request for exculpatory material

---

[12] Of course, if such hypothetical unlawful conduct involved a testifying witness, disclosure may be required pursuant to *Giglio*.

[13] If the defendant has a specific request for a document from a specific file that he has in mind due to his experience as a long tenured DEA agent in the Buffalo Resident Office- then he should advise the government of his specific request and the government will evaluate it.

under *Brady* . . . it is the [prosecuting entity] that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final." *Pennsylvania v. Ritchie,* 480 U.S. 39, 59 (1987).


IV.   **THE DEFENDANT'S MOTION TO DISMISS ALL COUNTS OF THE SUPERSEDING INDICTMENT AND, SEPARATELY, TO DISMISS COUNT 13 SHOULD BE DENIED.**

The defendant makes two baseless requests of the Court related to dismissal of charges against him in the Superseding Indictment.   First, the defendant requests the dismissal of the Superseding Indictment in its entirety by making the meritless claim that the government has engaged in selective prosecution against him. (*See* Dkt. No. 81 at 16.) Second, the defendant requests the dismissal of Count 13, charging the defendant with a violation of 18 U.S.C. § 1001(a)(2), for failure to state an offense. (*See* Dkt. No. 81 at 17.) Each of the defendant's requests for dismissal relies on fundamental mischaracterizations or misinterpretations of applicable legal principles, lacks factual support, depends on conclusory allegations and self-serving inferences, and should be denied by this Court.


A.   The defendant's motion to dismiss the Superseding Indictment on selective prosecution grounds should be denied without a hearing or further discovery on the issue.

The defendant claims he is a victim of selective prosecution ostensibly because he is of "Italian descent." (*See* Dkt. No. 81 at 16.) The defendant suggests that the Court should dismiss the Superseding Indictment because of the "obvious bias in the indictment," citing the Superseding Indictment's reference to Italian Organized Crime ("IOC"). (*See* Dkt. No. 81

at 16–17.) The defendant's claim fundamentally mischaracterizes and misinterprets controlling law on the issue of selective prosecution. Moreover, the defendant's claim lacks any factual merit and is completely unsupported by any evidence.

    1. *The defendant mischaracterizes and misinterprets the rigorous legal standard governing the proof a defendant must show to dismiss an indictment on selective prosecution[14] grounds.*

The Federal Rules of Criminal Procedure permit dismissal of an indictment on the grounds of selective or vindictive prosecution. *See* Fed. R. Crim. P. 12(b)(1), 12(b)(3)(A)(iv). However, "the presumption of regularity supports [prosecutors'] prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quotations omitted). Prosecutors retain discretion on "whether or not to prosecute[] and what charge to file or bring before a grand jury" as long as "the prosecutor has probable cause to believe that the accused committed an offense defined by statute." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *see also United States v. Al Jibori*, 90 F.3d 22, 25 (2d Cir. 1996) ("[T]he nation's prosecutors retain broad discretion to enforce our criminal laws[.]").

___

[14] The defendant conflates the legal concepts of selective prosecution and vindictive prosecution. *Compare* Dkt. No. 81 at 16 ("Vindictive Prosecution due to racial animus or bias") *with* Dkt. No. 81 at 16 ("A prosecution can be selective if predicated on the defendant's race."). Selective and vindictive prosecution are distinct. A prosecution is selective if it is undertaken with "intentional and purposeful discrimination" based upon "such impermissible considerations as race, religion, or the desire to prevent [a defendant's] exercise of constitutional rights." *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974). A prosecution is vindictive if it is undertaken "in retaliation for the exercise of a statutory or constitutional right." *United States v. Aviv*, 923 F. Supp. 35, 36 (S.D.N.Y. 1996). Because the defendant asserts that the prosecution was undertaken against him because of his race or ethnicity, the government has assumed, for purposes of this filing, that the defendant intended to request dismissal of the Superseding Indictment based on selective prosecution.

A prosecutor's charging decisions are, however, "subject to constitutional constraints." *United States v. Batchelder*, 442 U.S. 114, 125 (1979). One such constraint—the prohibition of selective prosecution—is "imposed by the equal protection component of the Due Process Clause of the Fifth Amendment." *Armstrong*, 517 U.S. at 464 (internal citations omitted). Because of a prosecutor's broad discretion and the Supreme Court's "reluctance to look behind prosecutorial decision making," it is the defendant's burden to prove a claim of selective prosecution. *See Al Jibori*, 90 F.3d at 25.

For an indictment to be dismissed on selective prosecution grounds, a defendant must "provide 'clear evidence' that the prosecutorial decision or policy in question had both 'a discriminatory effect . . . and was motivated by a discriminatory purpose.'" *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003) (quoting *Armstrong*, 517 U.S. at 465). To establish a discriminatory effect, a defendant "must show that similarly situated individuals of a different race were not prosecuted." *Armstrong*, 517 U.S. at 465.  In other words, a defendant is required to prove, "others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against [the defendant.]" *United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992).

To prove that the prosecution was motivated by a discriminatory purpose, a defendant must prove, "that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *United States v. Sun Myung Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983) (citing *Berrios*, 501 F.2d at 1211). The Supreme Court has

34

described the proof required to support the "discriminatory purpose" prong as "impl[ying] that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Wayte v. United States*, 470 U.S. 598, 610 (1985) (internal quotations omitted). The standard to prove a selective prosecution claim "is a demanding one." *Armstrong*, 517 U.S. at 463; *see Alameh*, 341 F.3d at 173 ("To make out a claim of selective prosecution, a defendant confronts a deliberately 'rigorous standard[.]'" (quoting *Armstrong*, 517 U.S. at 468)).

The required standard of proof for an indictment to be dismissed on selective prosecution grounds, described above, corrects the defendant's mischaracterization or misunderstanding of the Supreme Court's decision in *Armstrong*. In asking the Court to dismiss the Superseding Indictment, the defendant describes the standard of proof required by quoting a passage of *Armstrong* that does not relate to dismissing an indictment. *See* Dkt. No 81 at 16 ("As the Supreme Court noted in *Armstrong*, '[t]he vast majority of Courts of Appeals require the defendant to produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not.'").

The "some evidence" standard discussed in *Armstrong* is not the standard for dismissing an indictment. Instead, it is the standard of proof required for a defendant to be entitled to discovery on a selective prosecution claim. *See, e.g.*, *Alameh*, 341 F.3d at 173 ("Rather than 'clear' evidence of discriminatory effect and motive (as required for the merits), to obtain discovery defendants need only produce 'some' evidence of discriminatory effect and intent."); *Al Jibori*, 90 F.3d at 25 ("Under the *Armstrong* standard a defendant must make

at least 'a credible showing of different treatment of similarly situated persons' to establish a colorable basis for a finding of discriminatory effect and consequently to become eligible for discovery." (quoting *Armstrong*, 517 U.S. at 470)).   To obtain discovery or an evidentiary hearing, the defendant must show some evidence of the "essential elements" of a selective prosecution claim and that the documents in the government's possession would be probative of these issues. *See Fares*, 978 F.2d at 59. The standard for obtaining discovery for a selective prosecution claim is, nonetheless, a "rigorous" one that is "itself . . . a significant barrier to the litigation of insubstantial claims." *Armstrong*, 517 U.S. at 464, 468.

2.   *The defendant fails to present any evidence to merit dismissing the indictment or warranting discovery on selective prosecution grounds.*

The defendant asserts, without presenting any evidence, that the government has engaged in selective prosecution. But "[m]ere assertions and generalized proffers on information and belief are insufficient." *Fares*, 978 F.2d at 59. That is all the defendant provides, here. The defendant offers only conclusory, self-serving, and inaccurate assumptions related to the government's motivations in bringing charges against him. For example, the defendant inaccurately asserts that the Superseding Indictment "allege[s] that Mr. Bongiovanni was a part of IOC". (*See* Dkt. No. 81 at 16.) But the Superseding Indictment never alleges that the defendant was or is a part of an IOC group. Rather, the Superseding Indictment alleges that the defendant, in exchange for hundreds of thousands of dollars in bribes, used his position as a DEA Special Agent to protect his friends and individuals he believed to be associated with IOC and, by doing so, defrauded the United States government. (*See generally* Dkt. No. 46.) Indeed, the Superseding Indictment alleges, among other things,

that the defendant engaged in the conduct "to shield his friends and associates, and others including defendant **MASECCHIA**, *who he believed were connected to or associated with IOC*, from criminal investigations." (emphasis added). The defendant's motion even acknowledges that he was provided information in discovery regarding other members of law enforcement (*see* Docket 81, at 52) referencing IOC or the "Buffalo LCN". The discovery referencing IOC or the "Buffalo LCN" consists of an email sent directly to Bongiovanni from another member of law enforcement and other law enforcement reports provided in discovery. The email to the defendant specifically informed the defendant Bongiovanni that Michael Masecchia was categorized by fellow law enforcement as a member or associate of the Buffalo LCN family. That defendant Bongiovanni may have had several intertwined and overlapping motives as alleged in the Superseding Indictment is relevant, admissible, and appropriately alleged. *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012), *as amended* (Nov. 15, 2012) ('unlike issues of knowledge and intent, the defendant's motive—an explanation of *why* the defendant would engage in the charged conduct—becomes highly relevant when the defendant argues that he did not commit the crime.")   Even if the defendant's motion to dismiss were to be construed as a motion to strike IOC references as surplusage, it would likewise lack merit. "[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *Scarpa*, 913 F.2d at 1013.

Regardless of the defendant's inaccurate assumptions, the defendant offers no evidence to prove either prong required in a selective prosecution claim. The defendant presents no affidavits, studies, analyses, or any other evidence to show that he has been singled out for prosecution amongst those similarly situated. The defendant has given this

Court nothing to even suggest that other law enforcement agents, of a different race or ethnicity than the defendant, and who were alleged to have taken hundreds of thousands of dollars in bribes from the very people they were supposed to be investigating, were investigated by the federal government and then never prosecuted.

Likewise, the defendant presents no evidence that government decisionmakers had an improper motivation in bringing charges against him. Instead, the defendant alleges that the government's characterization of his coconspirators and associates as being connected to IOC in the Buffalo area injects "racial and ethnic controversy" into this case and "demonstrates obvious bias in the indictment." (*See* Dkt. No. 81 at 16.) Not only does the   defendant fail to offer any support for this baseless assertion, it is irrelevant to a claim of selective prosecution. The defendant makes no arguments about and presents no evidence of alleged improper motives on the part of the prosecutors in this case. The defendant cannot make such arguments or present such evidence because no improper motives exist.

Since the defendant has failed to meet the rigorous standard required to prove a claim of selective prosecution and has presented no evidence to support such a claim, the Court should deny the defendant's motion to dismiss without a hearing or further discovery.

B. <u>The defendant's motion to dismiss Count 13 should be denied because the indictment properly alleges all required elements of a false statements charge and the materiality of those statements is a matter for the jury to decide.</u>

The defendant seeks dismissal of Count 13[15] of the Superseding Indictment, charging him with a violation of 18 U.S.C. § 1001(a)(2), for failure to state an offense. (*See* Dkt. No. 81 at 17.)   The defendant seemingly asserts that the false statements he made to federal agents are not "material," as the term is used in § 1001(a)(2), because, he speculates, federal agents already knew the truthful answers to the questions that prompted the defendant to make the alleged false statements. (*See* Dkt. No. 81 at 17.) The Court should deny the defendant's motion to dismiss Count 13 because Count 13 properly alleges all of the elements of a false statement charge, provides proper notice to the defendant of the factual allegations against him, and because a jury should decide whether the defendant's false statements were, in fact, material.

1.   *The legal standard required to dismiss a Count charging a violation of § 1001(a)(2) sets a high bar that the defendant cannot meet.*

A motion to dismiss an indictment or a count contained in the indictment must satisfy a "high standard." *United States v. Kerik*, 615 F. Supp. 2d 256, 262 (S.D.N.Y. 2009).   A motion to dismiss for failure to state an offense must be denied if the count at issue: "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which

---

[15]   The defendant was unclear about whether he intended to move to dismiss just Count 13 or Counts 12 and 13.   *Compare* Dkt. No 81 at 17 ("Failure to state an offense: false statements charge (Count 13)") *with* Dkt. No. 81 at 17 ("The defense also moves . . . to dismiss the false statements charges (Counts 12 & 13) for failure to state an offense."). Because the substance of the defendant's argument refers only to the allegations contained in Count 13, the government has assumed, for purposes of this filing, that the defendant intended to move to dismiss only Count 13.   However, the government's argument applies with equal weight to any request to dismiss Count 12.

he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). Generally, it is sufficient for a count to "set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" *Id.* at 117 (quoting *United States v. Caroll,* 105 U.S. 611, 612 (1882)). An indictment or individual count is sufficient to withstand a motion to dismiss when it employs the language of the relevant statute in its general description of the offense and is "'accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.'" *See Hamling*, 418 U.S. at 117 (quoting *United States v. Hess*, 124 U.S. 483, 487 (1888)); *see also United States v. Khalil*, No. 13-CR-386 (RRM), 2014 WL 1599943, at *1 (E.D.N.Y. Apr. 21, 2014) ("An indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." (quotations omitted)).

Following *Hamling*'s guidance, a count charging a violation of 18 U.S.C. § 1001(a)(2) must sufficiently allege "that a defendant (1) knowingly and willfully, (2) made a *materially* false, fictitious, or fraudulent statement, (3) in relation to a matter within the jurisdiction of a department or agency of the United States, (4) with knowledge that it was false or fictitious or fraudulent." *United States v. Litvak*, 808 F.3d 160, 170 (2d Cir. 2015) (emphasis in original) (citations and quotations omitted). A statement is "material" if it has "a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed, or if it is capable of distracting government investigators' attention away from

a critical matter." *United States v. Coplan*, 703 F.3d 46, 79 (2d Cir. 2012) (citations and quotations omitted). Whether a false statement was material is generally a question of fact left for the jury to decide. *See United States v. Gaudin*, 515 U.S. 506, 511 (1995). And when there is a dispute over a question of fact, "there is but one means authorized by the Federal Rules of Criminal Procedure for resolving the parties' disagreement over the question whether Defendants committed the crimes charge[d] in the indictment: a trial." *United States v. Caltabiano*, 1:14-CR-276 (MAD), 2015 WL 13662179, at *2 (N.D.N.Y. Oct. 3, 2015).

A claim that a false statement is not material is generally not a basis for dismissing a count charging a violation of 18 U.S.C. § 1001(a)(2). In *Khalil*, the defendant made a nearly identical argument as the defendant makes here—that the indictment charging him with a violation of § 1001(a)(2) should be dismissed because the federal agents to whom the defendant made the false statements already knew the answers to the questions they asked, and thus, the statements could not be material. 2014 WL 1599943 at *1. The court held, "It would be improper, at this stage, for the Court to dismiss the indictment on the grounds that defendant's alleged false statements were not material." *Id.* at *2. The court reasoned that it would be improper to assess materiality of an alleged false statement because the court would "need to determine (a) whether defendant made these statements (and whether they were false), (b) what decision the FBI was trying to make at the time, and (c) whether defendant's statements were material to that decision. In other words, the Court would need to make several factual determinations, which would require it to assess the sufficiency of the government's proof." *Id.* Other district courts in the Second Circuit have come to similar conclusions when asked to dismiss a § 1001 charge on materiality grounds. *See, e.g.*, *United*

41

*States v. Brooks*, No. 08 Civ. 35., 2008 WL 2092433, at *2–*3 (S.D.N.Y. May 16, 2008) ("As the issue of materiality is a factual matter to be determined by the jury, the Court may not dismiss the indictment based on Brooks' challenges to the Government's ability to prove this element of the offense."); *United States v. Kurtz*, No. 98 CR. 733(BSJ), 1999 WL 349374, at *4 (S.D.N.Y. May 28, 1999) (rejecting defendant's request to dismiss § 1001(a)(2) counts against him on materiality grounds because "the Indictment *alleges* that the false statements were material, which is sufficient to withstand a motion to dismiss the charge." (emphasis in original)).

> 2. *Count 13 properly tracks the statutory language of § 1001(a)(2) to put the defendant on notice of the charges against him, and whether his false statements are material should be left for the jury to decide.*

Count 13 of the Superseding Indictment sufficiently alleges that the defendant violated 18 U.S.C. § 1001(a)(2). Count 13 adequately states the elements of the offense and provides sufficient factual detail to put the defendant on notice of the conduct that forms the basis for the charge. It identifies nine specific statements made by the defendant to federal agents. Count 13 further alleges that those nine statements were materially false, fictitious, or fraudulent and that the defendant knew those statements were false, fictitious, or fraudulent. It also identifies for the defendant the approximate date and place of the defendant's false statements.   As detailed above, the Federal Rules of Criminal procedure and controlling precedent require nothing more of Count 13.

The defendant asserts, without authority, that the Court should determine the materiality of a false statement when, according to the defendant, agents already knew the truthful answers to the questions that prompted the defendant's false statements. But

materiality is a question for the jury.   *Gaudin*, 515 U.S. at 511. In the proper forum for determining materiality—the trial—the government will present sufficient evidence to prove beyond a reasonable doubt that the defendant's false statements were material. The jury will then decide.

As Count 13 properly tracks the statutory language of 18 U.S.C. § 1001(a)(2) and materiality of the defendant's false statements is not a question for the Court, the Court should deny the defendant's motion to dismiss Count 13.

## V.   THE DEFENDANT'S MOTION TO SUPPRESS STATEMENTS MADE ON JUNE 6, 2019, AND TO SUPPRESS EVIDENCE FROM A CELL PHONE, SHOULD BE DENIED.

A.  The facts pertaining to the defendant's motion to suppress.

On November 1, 2018, December 10, 2018, and January 28, 2019, defendant Bongiovanni submitted several internal DEA memos containing false and misleading statements.  (*See* Dkt. No. 46, Count 1, Overt Acts ¶¶ 64-66; *see also* Counts 7-9.)[16] By the time defendant Bongiovanni submitted his November 1, 2018, memorandum, if not sooner, the defendant knew he was under some type of internal affairs investigation because, among other things, DEA informed him that he was not permitted to sign affidavits in connection with any cases being prosecuted or investigated by the USAO-WDNY. By February 1, 2019, defendant Bongiovanni retired from the DEA. In addition to an internal affairs investigation

---

[16]  These memos are not part of the defendant's motion to suppress, but two of the three are attached to the defendant's motion, *see* Dkt. No. 81, at pp. 61-80. They are mentioned as part of the factual background.

being conducted by the DOJ-OIG, there was also a criminal investigation being conducted by DOJ-OIG in conjunction with other federal agencies, including HSI and FBI.

On or about March 29, 2019, defendant Bongiovanni, while retired, traveled to the USAO-WDNY and participated in a voluntary interview with DOJ-OIG agents in a conference room at the USAO-WDNY.   During this interview, defendant Bongiovanni made several false statements as alleged in Count 1, Overt Act ¶69, and Count 12 of the Superseding Indictment.[17]

On or about April 23, 2019, the defendant was subject to a border search upon reentering the United States from Punta Cana, Dominican Republic. Border Patrol agents conducted a routine and limited cursory search of defendant Bongiovanni's cell phone and returned it to him. As referenced in the report attached to the defense motion, a basic exam of his phone, a Samsung Model SM-J337T, was conducted (a logical exam was unsuccessful -in other words, there was no forensic search of the phone). (*See* Dkt. No. 81, Exhibit B, at 82.)[18] A manual cursory look inside Bongiovanni's phone was conducted by agents who documented same. *See id.* ("A basic review of his phone revealed several contacts to include.[...].). The entire phone search lasted 15 minutes. *See Exhibit B* attached hereto and incorporated herein by reference.

---

[17] The defendant has not moved to suppress these statements, and these details are included merely for factual background.

[18] Only a portion of Defendant's Exhibit B relates to the April 23, 2019, border search.   The document is a law enforcement intelligence document, provided as a courtesy as part of expanded voluntary discovery, and contains a compendium of information about defendant Bongiovanni gathered from various sources.

On May 31, 2019, HSI Special Agent Curtis Ryan applied for a federal search warrant (19-M-5154) seeking to search 85 Alder Place, Kenmore, New York and its curtilage related to violations of various specified federal statutes, and "no knock" search warrant was authorized by United States Magistrate Judge Michael J. Roemer, which required execution on or before June 14, 2019. The search warrant application remains under seal by order of the Court, and the reasons for the sealing as detailed in the affidavit in support of the warrant remain in place. A copy of search warrant 19-M-5154 is attached hereto and incorporated herein by reference as *Exhibit C.* Notably, Attachment B to search warrant 19-M-5154 specifically authorized, among other things, seizure of "[M]obile phones, smart phones, and other communication devices[.]" *See Exhibit C,* Attachment B, at ¶*g.*

On June 4, 2019, United States Magistrate Judge Jeremiah J. McCarthy authorized a search of defendant Joseph Bongiovanni.   A copy of search warrant 19-mj-1056 is attached hereto and incorporated herein by reference as *Exhibit D.*

On June 6, 2019, at approximately 6:00 a.m., agents from DOJ-OIG, HSI, and the FBI executed search warrants 19-M-5154 and 19-mj-1056 at the defendant's residence located at 85 Alder Place, Kenmore, New York. The search revealed a number of items, including a box of DEA documents and materials seized from the basement of defendant Bongiovanni's

residence[19], a quantity of lorazepam tablets (a Schedule IV controlled substance), a Samsung SM-J337T cell phone, and other items.[20] Defendant Bongiovanni, who was home, asked if he was under arrest and was advised that it was only a search warrant. Defendant Bongiovanni voluntarily agreed to be interviewed notwithstanding the fact that both he, and his wife, were given the option to leave the premises while the search warrant was conducted. Defendant Bongiovanni was unrestrained during the interview with agents, which occurred at Bongiovanni's dining room table. Contrary to allegations made in defendant Bongiovanni's affidavit, HSI Special Agent Curtis Ryan did not search defendant Bongiovanni's cell phone, the Samsung SM-J337T cell phone, and question defendant Bongiovanni while looking at the contents of defendant Bongiovanni's phone. Defendant Bongiovanni voluntarily answered questions on a variety of topics, and asked questions of the agents. Defendant Bongiovanni made numerous false and misleading statements during the interview, which were documented in reports authored by HSI SA Curtis Ryan and DOJ OIG SA Dave Carpenter and were later charged in the Superseding Indictment. (*See* Dkt. No. 46, Count 1, Overt Act 70; *see also* Count 13.) Additionally, contrary to defendant Bongiovanni's claims, he and his wife were not forcibly separated during the interview.

---



[19]

[redacted photo of file cover]



[redacted photo of file inside a box labeled DEA]

[20] The seizure report was provided in discovery. It is not attached as an exhibit to this response due to its length.

On June 7, 2019, HSI Special Agent Curtis Ryan applied for and received a search warrant, 19-M-1065, from United States Magistrate Judge Leslie G. Foschio authorizing the search of electronic devices, including the aforementioned Samsung SM-J337T cellphone, seized on June 6, 2019, from 85 Alder Place. A copy of search warrant 19-M-1065 and sealing Order is attached hereto and incorporated herein by reference as *Exhibit E*. Results from the full forensic extraction of the aforementioned cell phone were provided to the defendant in discovery on or about May 26, 2020[21], and was re-provided on October 9, 2020.

B. <u>The basic cursory search of defendant Bongiovanni's phone, which was returned to him, at the border on April 23, 2019, was a lawful border search.</u>

Searches made at the border "are reasonable simply by virtue of the fact that they occur at the border." *United States v. Ramsey*, 431 U.S. 606, 616 (1977). "Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant[.]" *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). Pursuant to the border-search exception, the Second Circuit has long held that "routine" searches conducted at the border do not require probable cause or even reasonable suspicion. *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006); *United States v. Charleus*, 871 F.2d 265, 267 (2d Cir. 1989). "Routine" border searches include searches of personal belongings, such as luggage. *Charleus*, 871 F.2d at 267-68.

---

[21] The discovery letter is dated May 22, 2020, which was a Friday (*see Exhibit A*). The discovery was picked up from the USAO-WDNY from the front desk on May 26, 2020.   Monday, May 25, 2020, was the Memorial Day holiday.

A basic manual search of a cell phone, as occurred here, is a routine search not requiring any level of suspicion, and numerous courts have held that routine searches generally include searches of computers and electronic devices that are cursory in nature. *See, e.g., United States v. Young*, 12-CR-0210, 2013 WL 885288, at *2 (W.D.N.Y. Jan. 16, 2013) ("Searches of computers and electronic devices are likewise considered routine searches that may be conducted in the absence of reasonable suspicion....Therefore, I conclude that the review of the contents of defendant's cellular telephones was a permissible border search.") *United States v. Cotterman*, 709 F.3d 952, 960-61 (9th Cir. 2013) (en banc) (officers may take a quick look and unintrusive search of laptops and devices during a border search without reasonable suspicion)[22]; *United States v. Touset,* 890 F.3d 1227, 1233 (11th Cir. 2018) (Fourth Amendment does not require any suspicion for searches of electronic devices at the border)[23]; *United States v. Arnold*, 533 F.3d 1003, 1008 (9th Cir. 2008); *cf. United States v. Borello*, 766 F.2d 46, 58-59 (2d Cir. 1985) ("[T]he opening of the cartons and the screening of the films were plainly permissible steps in a reasonable border search."); *see also United States v. Pickett*, 598 F.3d 231, 234-35 (5th Cir. 2010) (holding that border search of thumb drives, portable hard drives, and laptop memory card was permissible without a warrant); *United States v. Arnold*, 533 F.3d 1003, 1008 (9th Cir. 2008) (holding that border search of laptop computer, separate

---

[22] In *Cotterman* the Ninth Circuit determined the later forensic search by a computer expert required reasonable suspicion because of the scope of the search conducted.

[23] The Eleventh Circuit requires no suspicion for either routine cursory searches, or even more thorough forensic searches of electronic devices. "A forensic search of an electronic device is not like a strip search or an x-ray; it does not require border agents to touch a traveler's body, to expose intimate body parts, or to use any physical force against him. Although it may intrude on the privacy of the owner, a forensic search of an electronic device is a search of property. And our precedents do not require suspicion for intrusive searches of any property at the border." *Touset*, 890 F.3d at 1234.

hard drive, computer memory stick, and six compact discs found in vehicle was permissible without a warrant); *United States v. Linarez-Delgado*, 259 Fed.Appx. 506, 508 (3d Cir. 2007) (holding that border search of contents of camcorder during search of belongings was permissible without a warrant); *United States v. Ickes*, 393 F.3d 501, 504 (4th Cir. 2005) (holding that border search of computer and disks found in vehicle was permissible without a warrant); *United States v. Jenkins*, No. 5:11-CR-0602 (GTS), 2013 WL 12204395, at *2 (N.D.N.Y. Dec. 12, 2013). Moreover, the Second Circuit has explained that "the validity of a border search does not depend on whether it is prompted by a criminal investigative motive[,]" and "pretext should not determine the validity of a border search, it also should not determine whether a border search is routine (meaning it does not require reasonable suspicion). Rather, as we have earlier held, the level of intrusion into a person's privacy is what determines whether a border search is routine." *Irving*, 452 F.3d 110 at 123-124.

The Supreme Court's decision in *Riley v. California*, 573 U.S. 373 (2014), prohibiting searches of cell phones incident to arrest, has no applicability to border searches. Indeed, "not a single court addressing border searches of computers since *Riley* has read it to require a warrant[,]" and "[t]he bottom line is that only two of the many federal cases addressing border searches of electronic devices have ever required any level of suspicion. They both required only reasonable suspicion and that was for the more intrusive forensic search." *United States v. Molina-Isidoro*, 884 F.3d 287, 293 (5th Cir. 2018) (citing *Cotterman*, 709 F.3d at 962 and *United States v. Saboonchi*, 990 F.Supp.2d 536, 569–70 (D. Md. 2014)); *Alasaad v. Mayorkas*, 2021 WL 521570 *5 (1st Cir. 2021) ("Every circuit that has faced this question has agreed that

49

<u>Riley</u> does not mandate a warrant requirement for border searches of electronic devices, whether basic or advanced.").

Here, Customs and Border Protection, working in conjunction with HSI, placed a one-day lookout on Bongiovanni, which essentially flagged him for a border search upon his re-entry into the United States from the Dominican Republic. Thereafter, a basic cursory search of defendant Bongiovanni's phone was conducted by Customs and Border Protection agents after he returned to the United States from the Dominican Republic. *See Exhibit B*, attached. As noted above, the Second Circuit has long held, "the validity of a border search does not depend on whether it is prompted by a criminal investigative motive." *Irving*, 452 F.3d at 124. Although the agents attempted a forensic examination (*i.e.*, a logical examination), it was not successful and only a basic search[24] was conducted before the phone was returned to the defendant and he proceeded on his way (without missing his flight). *See Exhibit B,* at 2 (agents "conducted a basic search of the devices"); *see also* Defendant's Exhibit B, Dkt. No. 81, at 82 (a "basic electronic exam was conducted"); Defendant's Exhibit C, Bongiovanni Affidavit, Dkt. No. 81, at 90, ¶ 5 ("we were told that we were singled out for a 'routine' search"). The search of defendant Bongiovanni's phone took fifteen minutes, from 21:05 to 21:20 (s*ee Exhibit B,* at 2). Agents did not forensically extract content from the phone prior to returning the phone to defendant Bongiovanni, and Bongiovanni's factual affidavit does not allege otherwise. Based upon the foregoing, there is no basis to suppress evidence from the routine and cursory border search of defendant Bongiovanni's phone on April 23, 2019.

---

[24] The basic search consisted of Border Patrol Agents manually looking at the phone and photographing some of the screens.

Even if this Court were to decide to become the only court to hold that reasonable suspicion was required for a routine search of an electronic device, that standard was easily satisfied as well. "A reasonable suspicion inquiry simply considers, after taking into account all the facts of a particular case, 'whether the border official ha[d] a reasonable basis on which to conduct the search.'" *Irving,* 452 F.3d at 124 (quoting *United States v. Asbury,* 586 F.2d 973, 975–76 (2d Cir.1978)). Reasonable suspicion is a relatively low standard and border officials are afforded deference due to their training and experience. *See Montoya de Hernandez,* 473 U.S. at 542. "In the case of searches at airports, it would make little sense to allow random searches of any incoming passenger, without reasonable suspicion, *see United States v. Montoya de Hernandez,* 473 U.S. 531, 538, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985), but require reasonable suspicion for searches of passengers that are suspected of criminal activity. From this we reason that the validity of a border search does not depend on whether it is prompted by a criminal investigative motive." *See Asbury,* 586 F.2d at 975.

At a minimum, by the time defendant Bongiovanni crossed the international border on April 23, 2019, the investigation indicated[25], among other things, at least the following: (i) that defendant Bongiovanni had been under investigation since on or about July 20, 2018, which was continuing, expanding, and involved multiple federal agencies; (ii) that there was information that Bongiovanni had provided law enforcement sensitive information to non-law enforcement individuals engaged in drug trafficking; (iii) that defendant Bongiovanni was closely associated with Coconspirator 1; (iv) that defendant Bongiovanni submitted DEA

---

[25] This information constitutes a general summary and does not comprise all information developed at the time of the April 23, 2019, border search.

memos containing false statements about his relationship with Coconspirator 1, and related issues, in DEA memos he submitted in November 2018, December 2018, and January 2019; (v) that defendant Bongiovanni made false and misleading statements to other members of law enforcement regarding his relationship with Coconspirator 1, and others; (vi) that defendant Bongiovanni retired from the DEA, and the retirement appeared to occur abruptly after defendant Bongiovanni knew that he was under some type of investigation; (vii) that a Federal Grand Jury had commenced investigation into defendant Bongiovanni and others; and (viii) that defendant Bongiovanni made false statements regarding, among other things, his relationship with Coconspirator 1 during an interview with DOJ OIG agents on March 29, 2019. Additionally, on April 23, 2019, defendant Bongiovanni was traveling back into the United States from the Dominican Republic, which is a source country for narcotics. Accordingly, the routine border search, consisting of a basic search of the defendant's phone, was lawful even if the reasonable suspicion standard is applied.[26]

The defendant's reliance on *United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019) is unavailing. In *Cano*, which limited the scope of a forensic border search to digital contraband (*i.e.,* child pornography), the Ninth Circuit became the only Circuit Court to limit the scope of a border search to *digital contraband*. However, unlike here, *Cano* involved an intrusive nonroutine forensic search of a cell phone, and not a basic routine search. Even the Court in

---

[26] The government submits that by the time of the April 23, 2019, border search, law enforcement agents, including HSI, had probable cause that defendant Bongiovanni had violated several laws of the United States. However, "prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt." *United States v. Lovasco*, 431 U.S. 783, 791, 97 S. Ct. 2044, 2049, 52 L. Ed. 2d 752 (1977).

*Cano* stated that "[W]e conclude that cell phones—including the phones' data—are subject to search at the border[,]" *Cano*, 934 F.3d at 1014, and that "post-*Riley*, no court has required more than reasonable suspicion to justify even an intrusive border search[,] *id.* at 1015. Indeed, *Cano* held that "manual searches of cell phones at the border are reasonable without individualized suspicion, whereas the forensic examination of a cell phone requires a showing of reasonable suspicion." 934 F.3d at 1016. To the extent the Ninth Circuit would limit the scope of an intrusive nonroutine forensic search to digital contraband, the First Circuit has repudiated that view. *Alasaad v. Mayorkas*, No. 20-1077, 2021 WL 521570, at *8 (1st Cir. Feb. 9, 2021) ("We acknowledge that our holdings on both of these points are contrary to the Ninth Circuit's holdings in *United States v. Cano*, 934 F.3d at 1018 (holding that the border search exception "is restricted in scope to searches for contraband"). We cannot agree with its narrow view of the border search exception because *Cano* fails to appreciate the full range of justifications for the border search exception beyond the prevention of contraband itself entering the country. Advanced border searches of electronic devices may be used to search for contraband, evidence of contraband, or for evidence of activity in violation of the laws enforced or administered by CBP or ICE."). Nevertheless, the defendant's *Cano* discussion is inapplicable here because only a basic cell phone search occurred at the border.

Here, defendant Bongiovanni's affidavit is devoid of any factual allegations that the border search of his cell phone on April 23, 2019, was an intrusive forensic search. By omission, the defendant implicitly acknowledges that the cursory manual search of his phone, which revealed only a limited amount of information, was a routine search. [27]

---

[27] The defendant's counsel proffers erroneous or misleading claims that, with respect to the

53

Notwithstanding the lack of factual allegations set forth in the Bongiovanni affidavit, the defendant's motion papers seem to conflate the routine border search of the cell phone on April 23, 2019, with the later forensic search of the phone which occurred pursuant to a subsequent federal search warrant authorized on June 7, 2019. Moreover, the defendant's claim that the border search of Bongiovanni's phone occurred "because they knew he was a suspect in a federal investigation," and that "[t]his rationale takes the seizure outside the established purpose and scope of warrantless border searches, and instead makes it a pretextual- and therefore unconstitutional- warrantless search," (*see* Dkt. No. 81, at p. 37) lacks merit and is simply not the law. Border searches are reasonable because they occur at the border, *see Ramsey*, 431 U.S. at 616, and it is settled law that "the validity of a border search does not depend on whether it is prompted by a criminal investigative motive." *See Irving*, 452 F.3d at 123-24; *see also United States v. Levy*, 803 F.3d 120, 123 (2d Cir. 2015) ("Official interagency collaboration, even (and perhaps especially) at the border, is to be commended, not condemned. Whether a Customs official's reasonable suspicion arises entirely from her own investigation or is prompted by another federal agency is irrelevant to the validity of a border search. […] We see no constitutional reason to prevent these and other federal law enforcement agents from also supplying information to Customs officials in aid of a border search. Nor are Customs officials prevented by the Fourth Amendment from

---

border search, "the government's disclosure of the contents of Mr. Bongiovanni's phone and those of his wife and stepson show the intrusive extent of even such a *'basic'* search. The contents include the phone's entire internet browsing history, every photo saved on all three phones, call logs and messages." (*See* Dkt. No. 81, at 45.) (emphasis added.) This information was not forensically extracted from the phone during a border search on April 23, 2019, but rather, pursuant to a subsequent federal search warrant authorized on June 7, 2019, as set forth above. As described above, the basic border search of Bongiovanni's phone was limited to documenting only contact names and phone numbers. (*See* Dkt. No. 81, at 82-86.)

conducting such a search merely because it furthers another federal agency's criminal investigation."

Here, the defendant's affidavit, motion, and exhibits implicitly acknowledge that only a routine[28] cell phone search occurred at the border.  Even while conflating information seized at the border with the later seizure of information seized pursuant to a search warrant, the defense use the term "basic" to describe what they claim was an "unduly intrusive" the search. (*See* Dkt. No. 81, at 45.). The defendant's motion, and particularly his affidavit, are devoid of any facts establishing an intrusive forensic search of his cell phone occurred at the border and, as such, this court is not required to hold an evidentiary hearing where the defendant's moving papers fail to "state sufficient facts which, if proven, would have required the granting of the relief requested." *United States v. Culotta,* 413 F.2d 1343, 1345 (2d Cir.1969), *cert. denied,* 396 U.S. 1019, 90 S.Ct. 586, 24 L.Ed.2d 510 (1970); *see also United States v. Young*, No. 12-CR-00210-RJA-JJM, 2013 WL 885288, at *3 (W.D.N.Y. Jan. 16, 2013), *report and recommendation adopted,* No. 12-CR-210A, 2013 WL 885170 (W.D.N.Y. Mar. 8, 2013). Accordingly, the defendant's motion to suppress evidence seized from the search of his phone at the border on April 23, 209, should be denied.

C.  Inevitable Discovery- The defendant's Samsung SM-J337T cell phone was searched pursuant to a federal search warrant.

As set forth above, the defendant's Samsung SM-J337T cell phone was subject to a basic search at the border on April 23, 2019, wherein limited information was observed and

---

[28] Alternatively described as "basic" and/or "cursory" searches.

documented. The same cell phone was later searched forensically pursuant to a federal search warrant authorized on June 7, 2019. As a result, the contact names and numbers observed and documented from the phone during the border search would have inevitably been discovered and, like the other data forensically extracted from the cell phone pursuant to the search warrant, should not be suppressed.

Regarding inevitable discovery, the Second Circuit has held:

Under the "inevitable discovery" doctrine, evidence obtained during the course of an unreasonable search and seizure should not be excluded "if the government can prove that the evidence would have been obtained inevitably" without the constitutional violation. *Nix v. Williams*, 467 U.S. 431, 447, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *see also United States v. Eng*, 997 F.2d 987, 990 (2d Cir. 1993) (inevitable discovery doctrine "requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred" (emphasis in original) (internal quotation marks omitted)). In essence, the inevitable discovery doctrine's application turns on a central question: Would the disputed evidence inevitably have been found through legal means "but for" the constitutional violation? If the answer is "yes," the evidence seized will not be excluded.

*United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006). Additionally, in *United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013), the Court stated:

We have made clear, however, that "proof of inevitable discovery 'involves no speculative elements but focuses on *demonstrated historical facts capable of ready verification or impeachment*,'" *United States v. Eng*, 971 F.2d 854, 859 (2d Cir. 1992), *quoting Nix*, 467 U.S. at 444 n.5 (emphasis in *Eng*). The focus on demonstrated historical facts keeps speculation to a minimum, by requiring the "district court to determine, viewing affairs as they existed at the instant before the unlawful search occurred, what *would have happened* had the unlawful search never occurred." Id. at 861 (emphasis in original). Evidence should not be admitted, therefore, unless a court "can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." *Heath*, 455 F.3d at 60; see also id. ("Under the inevitable discovery exception, unlawfully seized evidence is admissible if there is *no doubt* that the police would have lawfully discovered the evidence later."), quoting *United States v. Romero*, 692 F.2d 699,

704 (10th Cir. 1982) (emphasis in *Heath*); *United States v. Roberts*, 852 F.2d 671, 676 (2d Cir. 1988) (holding that the issuance of a subpoena may not "inevitably result[ ] in the discovery of . . . suppressed documents" because several contingencies may not have been resolved in the government's favor).

*Id.*

Here, the Court can confidently conclude that the limited information resulting from the border search of defendant Bongiovanni's cell phone would have been inevitably discovered and seized from the phone after it was located during the search at 85 Alder Place on June 6, 2019, and searched pursuant to the search warrant authorized by United States Magistrate Judge Leslie G. Foschio on June 7, 2019. *See, Exhibit E*; *see also United States v. Morales-Ortiz*, 376 F. Supp. 2d 1131, 1143 (D.N.M. 2004) ("Even though the cell phone and pager were unlawfully searched, the contents are admissible based on the doctrine of inevitable discovery. Because the pager and the cell phone would have been searched legally pursuant to the search warrant that was issued, discovery of the information contained in the pager and the cell phone would have been discovered inevitably."); *United States v. Ochoa*, 667 F.3d 643, 650 (5th Cir. 2012) (denying suppression of cell phone based on the inevitable discovery rule).

D. <u>Good Faith</u>

Even if a search is judged to be constitutionally flawed in some way, its fruits need not be suppressed if the agents acted "in reasonable reliance on binding precedent." *Davis v. United States*, 564 U.S. 229, 241, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011); *see United States v. Baker*, 719 F.3d 313, 320–21 (4th Cir. 2013) (describing *Davis*).   Here, as set forth above, no courts have required probable cause for a border search of a cell phone; a limited number of courts

57

have required reasonable suspicion, but only for a thorough forensic search (not the type of basic search that occurred here); and it appears that every court agrees that no reasonable suspicion is required for a basic/routine border search of a cell phone. Thus, under these circumstances, suppression would do little to deter police misconduct, and the "social costs" of suppression—the exclusion from trial of reliable evidence bearing on guilt or innocence—outweigh any deterrence benefits. *Davis*, 564 U.S. at 237–38, 131 S.Ct. 2419.

The fruits of a search need not be suppressed if the agents acted with the objectively reasonable belief that their actions did not violate the Fourth Amendment. *United States v. Curtis*, 635 F.3d 704, 713 (5th Cir. 2011) (citing   (1984)). This is the so-called "good faith" exception to the exclusionary rule. *See Leon*, 468 U.S. at 924–25 (courts may apply the good-faith exception without deciding the underlying constitutional issue). Even when the search is held unconstitutional, suppressing evidence is not appropriate if the officers acted reasonably in light of law existing at the time of the search. *Curtis*, 635 F.3d at 713–14. In such circumstances, the cost of suppression—excluding the evidence from the truth-finding process—outweighs the deterrent effect suppression may have on police misconduct. *See Davis v. United States*, 564 U.S. 229, 237–38 (2011). Here, agents undoubtedly relied upon existing law, and acted in good faith, in conducting a routine and basic search of defendant Bongiovanni's phone at the border on April 23, 2019, and any motions to suppress predicated upon the limited search of the cell phone at the border should be denied.

E.  <u>Defendant Bongiovanni's statements were voluntarily made and non-custodial.</u>

Defendant Bongiovanni claims he was interviewed on June 6, 2019, while in custody and without *Miranda* warnings such that his statements to federal agents on June 6, 2019, should be suppressed. To the contrary, the defendant was told he was not under arrest, and he was free to leave his residence while the search warrant was executed. Defendant Bongiovanni voluntarily participated in an interview with agents. Moreover, the defendant was able to see and communicate with his wife, who was also free to leave, during the interview. Furthermore, HSI SA Ryan did not "read the names from the contacts directory" from defendant Bongiovanni's Samsung Galaxy cell phone during the interview, as alleged in defendant Bongiovanni's affidavit (*see* Dkt. No. 81, at 96). In other words, there was no search of the defendant's phone on June 6, 2019, and the defendant's motion conveniently omitted any reference to the search warrant obtained on June 7, 2019, to search this device (*see Exhibit E*).

Additionally, there was no unlawful border search from which any poison fruit flowed into the June 6, 2019, interview. In any event, only a small portion of the June 6, 2019, interview related to any of contact names observed by agents on April 23, 2019. Indeed, only two pages of an eight-page interview report documenting the substance of Bongiovanni's statements pertain to contacts observed in Bongiovanni's phone on April 23, 2019. (*See* Defense Exhibit D, Dkt. No. 81, at 102-04). None of the statements documented in the report drafted by DOJ OIG SA David Carpenter (which was not attached to the defense motion) pertain to any of the contacts names from Bongiovanni's phone search, and on June 6, 2019, Bongiovanni only provided limited generic information about the people observed in the

contacts of his phone during the border search on April 23, 2019. The overwhelming majority of the June 6, 2019, interview had nothing to do with contacts previously observed by law enforcement in defendant Bongiovanni's phone on April 23, 2019, during the lawful border search.

Since the search of the phone was lawful on April 23, 2019, as detailed above, there was no fruit of the poisonous tree. Also, the limited information seized from Bongiovanni's cell phone during the routine border search on April 23, 2019, were available through other means, such as phone record subpoenas, searches of cell phones belonging to others, witness interviews, and/or would have inevitably been discovered via the search warrant executed on defendant Bongiovanni's phone (*see also Inevitable Discovery, supra*). The exclusionary rule does not apply if the government has an independent untainted source, or the evidence would have been inevitably discovered. *Murray v. United States*, 487 U.S. 533, 537 (1988); *Nix v. Williams*, 467 U.S. 431, 443 (1984); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920). As a result, there was no fruit of any poisonous tree, and the defendant's motion to suppress any statements or evidence from the cell phone should be denied.[29]

*Miranda* warnings are not required where, as here, a person interviewed is free to leave. Here, defendant Bongiovanni and his wife were advised he was not under arrest and were

---

[29] Although the exclusionary rule is inapplicable for the reasons set forth herein, the exclusionary rule does not apply in circumstances where law enforcement officials do not exploit the constitutional violation, but obtain the evidence by means sufficiently attenuated from the constitutional violation so as to purge the evidence of its initial taint. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). This note is intended to preserve any additional attenuation arguments, if necessary, in any future briefing.

free to leave, if they so desired, during the execution of the search warrant. Defendant Bongiovanni chose to remain at the house and speak. During the ensuing interview at his dining room table, defendant Bongiovanni was unrestrained. As a 20 year DEA agent, when defendant Bongiovanni was told by agents that it was just a search warrant being executed, and not an arrest warrant, he understood that he was not under arrest and was free to leave. A reasonable person in defendant Bongiovanni's position (and with his experience) would understand that he was free to leave. *See United States v. Ceballos,* 812 F.2d 42, 46 (2d Cir.1987); *see also United States v. Maneti*, 781 F. Supp. 169, 185 (W.D.N.Y. 1991) (no custody where defendant was advised he was not under arrest the day of the search; the agents did not have an arrest warrant; and after agents completed the search, they left the premises and the defendant remained there). However, given the conflicting factual accounts, the government consents to an evidentiary hearing **limited to** determining whether the defendant was in custody under circumstances requiring *Miranda* warnings, and the voluntariness of the defendant's statements at his residence on June 6, 2019.

F. <u>The costs of applying the Exclusionary Rule would far outweigh the benefits.</u>

In *United States v. Julius*, 610 F.3d 60 (2d Cir. 2010), the Second Circuit held that in cases in which the exclusionary rule is implicated, the Court must, before suppressing evidence, conduct a cost/benefit analysis to consider whether the deterrent effect of applying the exclusionary rule outweighs the cost of the rule's application. *Id.* at 66.

The decision in *Julius* relied on the Supreme Court's pronouncement in *Herring v. United States*, 129 S. Ct. 695 (2009). The Second Circuit stated that "*Herring* makes plain that

a search that is found to be violative of the Fourth Amendment does not trigger automatic application of the exclusionary rule." *Id.* at 66. In *Herring*, the Supreme Court reiterated that application of the exclusionary rule was a "'last resort,' not our first impulse.'" *Herring*, 129 S. Ct. at 700 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). The exclusionary rule is not an individual right and is applicable only where it results in "'appreciable deterrence'" and the benefits of deterrence must outweigh the costs, specifically the cost of letting a guilty defendant go free. *Id.* at 700-701 (internal citation omitted). The Court stated:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the judicial system.   As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless or grossly negligent conduct, or in some circumstances, recurring or systemic negligence.

*Id.* at 702.

Thus, this Court must make a judgment as to whether the deterrent effect of suppression is substantial under the circumstances and whether it outweighs any harm to the justice system. *Id.* at 704.   Here, law enforcement officers did not overstep by any measure, and certainly not blatantly, the bounds of appropriate conduct. Rather, they conducted an appropriate border search, prepared search warrant applications, submitted them to United States Magistrate Judges, requested the search warrants under oath, and permitted a 20 year DEA veteran to engage them in a voluntary interview wherein he asked almost as many questions as he answered. Simply stated, the law enforcement agents in this case did what is constitutionally appropriate. In short, the conduct here demonstrates that, even if a Fourth Amendment violation occurred, no deliberate misconduct occurred. Accordingly, application of the exclusionary rule here would have little, if any, deterrent effect, and certainly would be insufficient to outweigh the compelling government interest in using evidence that is probative

of the defendant's guilt.

## VI.     THE DEFENDANT'S MOTION TO COMPEL DISCLOSURE OF EVIDENCE UNDER RULES 404(B), 608, AND 609 SHOULD BE DENIED.

Regarding disclosure pursuant to Federal Rules of Evidence 404(b), 608 and 609, the defendant is fully aware of his past conduct which may fall within the ambit of Fed. R. Evid. 608 and 609.   There is no pre-trial disclosure requirement with respect to either Rule 608 or 609.

Regarding Rule 404(b) of the Federal Rules of Evidence requires the government to provide "reasonable notice in advance of trial" of the "general nature" of prior uncharged crimes that the government intends to use at trial.   No set timetable for notice is required, however, as evidence the government may seek to offer at trial often changes as the proof unfolds or as possible defenses are revealed at trial.   *United States v. Aguirre-Parra*, 763 F. Supp. 1208, 1217 (S.D.N.Y. 1991).   The reasonableness of Rule 404(b) notice is determined by the particular circumstances of the case.   *United States v. Falkowitz*, 214 F. Supp. 2d 365, 393 (S.D.N.Y. 2002) (permitting disclosure of Rule 404(b) evidence two weeks before trial).

In this case, the defendant has not advanced any concrete reason for early disclosure of Rule 404(b) evidence and, therefore, his request should be denied, without prejudice. *Falkowitz*, 214 F. Supp. 2d at 393.   The government will disclose evidence in its possession which might fall within the ambit of Fed. R. Evid. 404(b), 607, 608 and 609, and to provide notice of its intention to rely upon such evidence at the time it is ordered to do so by the trial court. The government has already disclosed volumes of information that the government

will argue is intrinsic to the charged offenses, inextricably intertwined, and/or background of the conspiracy and, as the defendant is aware, these issues are usually decided during the course of pre-trial briefing, motions in limine, at or near the time of the final pre-trial conference.

With respect to the disclosure of evidence which falls within the ambit of Fed. R. Evid. 608, as noted above, the government has no obligation to provide a defendant with any information that could be used to impeach him pursuant to Rule 608, should he elect to testify. *See United States v. Livoti*, 8 F. Supp. 2d 246, 250 (S.D.N.Y. 1998); *see also United States v. Song*, 95 CR 129, 1995 WL 736872 *7 (S.D.N.Y. 1995) ("Rule 608 and 609 do not require the government to produce notice of impeachment evidence."); *United States v. Comere*, 1996 WL 492704 *2 (N.D.N.Y. 1996) (holding it is premature to disclose impeachment evidence until witnesses testify.).

The government preliminarily notifies the defendants that it intends to introduce at trial, pursuant to Rule 404(b), all prior criminal conduct acts or wrongs for the purpose of showing proof of a defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, and the absence of mistake or accident.   This notice is only preliminary in nature and is not intended to foreclose the government from relying on other Rule 404(b) evidence should it deem the introduction of such evidence appropriate at the time of trial.   The government will provide the defendants with more definitive notice of its intent to rely on 404(b) evidence when directed by the trial judge, or during trial if the trial judge excuses pretrial notice on good cause shown.   In accordance with usual administrative practices of

the trial court, issues relating to the admissibility and use of such evidence should be resolved by the trial judge at the time of pretrial conferences in this case.

## VII.   JENCKS ACT MATERIAL

The government will produce Jencks Act material as required by law, *see* 18 U.S.C. § 3500.   The government will also produce materials early, consistent with the timing of the District Court's standard pre-trial order, except for any witnesses the government determines need to be protected. The Court lacks authority to order early disclosure of Jencks materials. *See Coppa,* 267 F.3d at 146 (2d Cir. 2001) (holding district court exceeded its authority by ordering pre-trial disclosure, without regard to materiality, of witness statements that may contain impeachment information). However, the government is mindful that early disclosure is encouraged and facilitates an efficient and orderly trial.

## VIII.   RULE 12(b)(4) NOTICE

Finally, the government has notified the defendant of its intention to use all evidence the defendant has been provided, made aware of, or made available, at trial pursuant to Rule 12(b)(4).

## IX.   NOTICE OF INTENTION TO INTRODUCE STATEMENTS CONTAINED IN THE DEFENDANT'S MEMORANDUM OF LAW

The defendant's counsel has included a "background" at pages 1 through 10 of his memorandum of law (*see* Dkt. No. 81, at 19-28). This background includes defendant Bongiovanni's version of his relationship with various individuals, including named co-

65

conspirators such as Michael Masecchia, and uncharged co-conspirators. These statements made by the defendant's counsel concerning his background and history are admissible as admissions of the defendant's agent, pursuant to Federal Rules of Evidence 801(d)(2)(A), (C), & (D), and the government will seek to introduce these statements during its case-in-chief at trial. *See* Rule 12(b)(4); *see also United States v. Amato*, 356 F.3d 216, 220 (2d Cir. 2004) (letter by former defense counsel in support of reconsideration of revocation of bail was admissible pursuant to Rule 801(d)(2)(D) as statement "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.").

## GOVERNMENT'S REQUEST FOR RECIPROCAL DISCOVERY

Pursuant to Rule 16(b) of the Federal Rules of Criminal Procedure, the government hereby requests reciprocal discovery. Specifically, the government requests that it be allowed to inspect and copy books, papers, documents, photographs, tangible objects, or copies of portions thereof which are within the possession, custody or control of the defendant in which the defendant intends to introduce as evidence-in-chief at the trial. Additionally, the government requests to inspect and copy any results or reports of physical or mental examinations and/or of scientific tests or experiments made in connection with this case within the possession or control of the defendant which the defendant intends to introduce as evidence-in-chief at the trial or which was prepared by a witness whom the defendant intends to call at the trial when the results or reports relate to that witness's testimony. As of this date, defendant has not provided any reciprocal discovery to the government.

Pursuant to Fed. R. Evid. 807, the government also requests advance disclosure of any statement(s) the defendant proposes to utilize at a trial of this matter.   In the absence of any opposition by the defendant, it is respectfully requested that the relief sought, consistent with Fed. Rule of Crim. P. 16 and Fed. Rules of Evid. 807 be granted.

The government specifically reserves its right to file any necessary Memorandums of Law with respect to any factual or legal issues developed during argument on the instant motions and to respond to any motions or requests to which the defendant has requested leave to file or reserved.

## **REQUEST TO FILE SUR-REPLY**

In the event the defendant files a reply to this response, the government respectfully requests permission to file a sur-reply.

## **REQUEST TO FILE RESPONSE IN EXCESS OF 25 PAGES**

The defendant's motion was lengthy, and with exhibits totaled 114 pages. As a result, the government's response exceeds 25 pages. The government respectfully requests permission to file this response in excess of 25 pages in order to adequately address all of the issues raised by the defendant.

## **CONCLUSION**

For the foregoing reasons, the defendant's motions should be denied in their entirety and the government's requests for discovery, to file a sur-reply, and to file a response exceeding 25 pages, should be granted.

DATED:   Buffalo, New York, February 16, 2021.

JAMES P. KENNEDY, JR.
United States Attorney

BY:   S/JOSEPH M. TRIPI
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York   14202
716/843-5839
Joseph.Tripi@usdoj.gov