```
11:23:40    1              UNITED STATES DISTRICT COURT

            2              WESTERN DISTRICT OF NEW YORK

            3

            4

            5    - - - - - - - - - - - - - - X
                 UNITED STATES OF AMERICA    )      19CR227
            6                                )
                 vs.
            7                                       Buffalo, New York
                 JOSEPH BONGIOVANNI,         )   November 18, 2021
            8              Defendant.              9:30 a.m.
                 - - - - - - - - - - - - - - X
            9    EVIDENTIARY HEARING
                 Transcribed from an Electronic Recording Device
           10

           11              TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE MICHAEL J. ROEMER
           12           UNITED STATES MAGISTRATE JUDGE

           13

                           TRINI E. ROSS, ESQ.
           14              United States Attorney
                           BY:   JOSEPH M. TRIPI, ESQ.
           15                    BRENDAN T. CULLINANE, ESQ.
                                 JORDAN ALAN DICKSON, ESQ.
           16              Assistant United States Attorney
                           138 Delaware Avenue
           17              Buffalo, New York 14202

           18              JAMES P. HARRINGTON, ESQ.
                           JESSES COLTON PYLE, ESQ.
           19              Harrington and Mahoney
                           70 Niagara Street
           20              Third Floor
                           Buffalo, NY 14202

           21

           22

           23

                 COURT REPORTER: Karen J. Clark, Official Court Reporter
           24                    Karenclark1013@AOL.com
                                 100 State Street
           25                    Rochester, New York 14614
```

```
1                       USA VS. J. BONGIOVANNI

2                              INDEX

3

4  WITNESS FOR
   THE GOVERNMENT          DX      CX      RDX     RCX

5  K. CARTER                6      50      74      77

6  C. RYAN                 85     198     219

7

8  WITNESS FOR
   THE DEFENSE

9  L. BONGIOVANNI         223     229     241

10

11 EXHIBIT NUMBER      PAGE MARKED

12   2                    24
     1                    37
13 5 THROUGH 10          135
     11 & 12             142
14   13                 155
     14                 176
15   15                 178
     16                 185
16   34                 217
     35                 235

17                    P R O C E E D I N G

18            *              *              *

19

20

21
```

11:23:44  22            THE CLERK:   United States District Court for

11:23:46  23  the Western District of New York is now in session.  The

11:23:48  24  Honorable Michael J. Roemer presiding.  We're here on

11:23:52  25  the matter of the United States versus Joseph

1                   USA VS. J. BONGIOVANNI

11:24:07  2  Bongiovanni, case No. 19CR227 for an evidentiary

11:24:11  3  hearing.

11:24:12  4  Counsel for the government, please state your name for

11:24:14  5  the record.

11:24:14  6         MR. TRIPI:  Joseph Tripi, Brendan Cullinane

11:24:17  7  and Jordan Dickson for the United States.

11:24:31  8         Good morning, Judge.

11:24:32  9         THE CLERK:  Thank you.  Counsel for the

11:24:34  10  defendant, please state your name for the record.

11:24:43  11         MR. HARRINGTON:  Morning, Judge.  James

11:24:46  12  Harrington and Jesse Pyle for Mr. Bongiovanni, who is

11:24:52  13  here.

11:24:53  14         THE CLERK:  Thank you.

11:24:54  15         MAGISTRATE JUDGE ROEMER:  Good morning,

11:24:55  16  counsel.  We're here for a hearing.  Are we ready to go,

11:24:58  17  Mr. Tripi?

11:24:59  18         MR. TRIPI:  Yes, Judge.  As you ordered, I

11:25:02  19  believe, prior to today, the two issues that we were to

11:25:05  20  cover today involve the border search cell phone on

11:25:23  21  April 23rd, 2019, and the statements from June 6, 2019

11:25:37  22  and the circumstances surrounding the statements.  So

11:25:41  23  the government is ready to proceed.  I don't know if Mr.

11:25:46  24  Harrington has anything to add.

11:25:48  25         MAGISTRATE JUDGE ROEMER:  Mr. Harrington?

4

|           |    |                                                          |
|-----------|----|----------------------------------------------------------|
|           | 1  | USA VS. J. BONGIOVANNI                                    |
| 11:25:50  | 2  | MR. HARRINGTON:  Judge, after our                        |
| 11:25:51  | 3  | preparation of this in receipt of the 3500 material, we  |
| 11:25:58  | 4  | decided we're going to withdraw the motion of the        |
| 11:26:00  | 5  | suppression of the statement at the time of the search   |
| 11:26:12  | 6  | warrant.                                                 |
| 11:26:12  | 7  | MAGISTRATE JUDGE ROEMER:  Okay.                          |
| 11:26:12  | 8  | MR. HARRINGTON:  We'll need some testimony               |
| 11:26:14  | 9  | regarding some of the circumstances of when that was     |
| 11:26:17  | 10 | taken because it relates back to the airplane or         |
| 11:26:23  | 11 | airport.                                                 |
| 11:26:24  | 12 | MAGISTRATE JUDGE ROEMER:  The border search?            |
| 11:26:25  | 13 | MR. HARRINGTON:  Yes.  It won't be very                  |
| 11:26:27  | 14 | much.                                                    |
| 11:26:27  | 15 | MAGISTRATE JUDGE ROEMER:  Okay.                          |
| 11:26:29  | 16 | MR. TRIPI:  And just, I advised -- Judge,               |
| 11:26:32  | 17 | I'm going to proceed as I had planned just to create a   |
| 11:26:36  | 18 | fulsome record, but I understand what the issues are now |
| 11:26:39  | 19 | a little more limited.  Okay?                            |
| 11:26:41  | 20 | MAGISTRATE JUDGE ROEMER:  Okay.  Well, I                |
| 11:26:43  | 21 | would hope we're not going to have a bunch of testimony  |
| 11:26:47  | 22 | we don't need for me to decide anything, I guess.        |
| 11:26:50  | 23 | MR. TRIPI:  Well, I'm going to call                     |
| 11:26:52  | 24 | witnesses regarding the surrounding circumstances,       |
| 11:26:55  | 25 | unless, as we get into it, the Court says it doesn't     |

```
          1               USA VS. J. BONGIOVANNI
11:27:00  2    need it.
11:27:00  3               MAGISTRATE JUDGE ROEMER:  Have you discussed
11:27:01  4    this limitation with Mr. Harrington or did this just
11:27:06  5    come up this morning?
11:27:07  6               MR. TRIPI:  He tried to call me last night
11:27:09  7    and I was dealing with family matters in the evening and
11:27:13  8    so we didn't link up until this morning.
11:27:37  9               MAGISTRATE JUDGE ROEMER:  All right.  We'll
11:27:38 10    start with the border search and maybe when we take a
11:27:41 11    break, you two can discuss where the rest of it's going
11:27:45 12    to go.  Does that make sense, Mr. Harrington?  I don't
11:27:49 13    have a good handle in what regard we're talking about.
11:27:52 14    Okay?  Does that make sense?  Want to call your first
11:27:55 15    witness?
11:27:55 16               MR. TRIPI:  One moment, Judge.
11:27:57 17               MAGISTRATE JUDGE ROEMER:  Sure.
11:28:13 18               MR. TRIPI:  All right.  Judge, we're going
11:28:16 19    to re-shift the order a little bit.  Mr. Dickson will
11:28:21 20    have the first witness.
11:28:24 21               MR. DICKSON:  Good morning, your Honor, the
11:28:28 22    United States will call Kipplin Carter.
11:29:10 23               THE CLERK:  Officer, if you can step over
11:29:13 24    here, please.
11:29:16 25    (K. CARTER WAS CALLED TO THE WITNESS STAND AND SWORN.)
```

```
            1                   K. CARTER - DX BY MR. TRIPI
11:29:19    2              THE CLERK:  Thank you.  Please have a seat.
11:29:21    3   And when seated, you may remove your mask.  And this is
11:29:25    4   being recorded and so stay close to your microphone so
11:29:29    5   the recording will come through.  And please state your
11:29:31    6   name and spell it for the record.
11:29:33    7              THE WITNESS:  Yes, ma'am.
11:29:34    8              THE CLERK:  Thank you.
11:29:35    9              THE WITNESS:  My name is Kipplin Carter,
11:29:39   10   spelled K -- i-p-p-l-i-n, last name Carter, common
11:29:44   11   spelling.
11:29:45   12              THE CLERK:  Thank you.
11:29:47   13              MR. DICKSON:  May I proceed, Judge?
11:29:48   14              MAGISTRATE JUDGE ROEMER:  Sure.
11:29:52   15   DIRECT EXAMINATION BY MR. DICKSON:
11:29:52   16      Q.  Can you please tell the Court, what is your
11:29:54   17   educational background?
11:29:55   18      A.  I have a Bachelor's in Science in Psychology from
11:30:12   19   Howard University.  I've taken some Master's classes,
11:30:15   20   but I never completed my Master's.
11:30:18   21      Q.  Where do you work?
11:30:19   22      A.  Work for U.S. Customs and Border Protection in
11:30:25   23   Baltimore.
11:30:25   24      Q.  And what is your title?
11:30:26   25      A.  I am an 1895 CBPO, which is a Customs and Border
```

```
 1                    K. CARTER - DX BY MR. DICKSON
```

11:30:50  2  Protection Officer assigned to the TTRT unit.  That

11:30:54  3  stands for Tactical Terrorism Response Team.

11:30:59  4      Q.  Let's break that down a little.  So, you're an

11:31:10  5  officer with Customs and Border Patrol, right?

11:31:13  6      A.  Customs and Border Protection.

11:31:16  7      Q.  And if I call Customs and Border Protection

11:31:21  8  "CBP," will you know what I'm talking about?

11:31:23  9      A.  I will.

11:31:24 10      Q.  And do you have a particular duty station as a

11:31:36 11  CBP Officer?

11:31:39 12      A.  Yes, I am mostly assigned to the seaport of

11:31:51 13  Baltimore, which includes the airport and seaport.

11:31:54 14      Q.  Does that mean that you work at the airport

11:31:57 15  sometimes?

11:31:58 16      A.  Yes, sir.

11:31:58 17      Q.  And within that duty station, do you have a

11:32:01 18  particular unit that you're assigned to?

11:32:03 19      A.  Yes, the Tactical Terrorism Response Team.

11:32:06 20      Q.  What are the responsibilities of an officer in

11:32:10 21  the Tactical Terrorism Response Team?

11:32:21 22      A.  The Tactical Terrorism Response Team primarily

11:32:24 23  handles higher-level investigations or inspections

11:32:28 24  rather of individuals arriving into the United States

11:32:30 25  dealing with terrorism, narcotics or other criminal

```
            1              K. CARTER - DX BY MR. DICKSON
11:32:34    2    matters.
11:32:36    3        Q.   How do the responsibilities of somebody, an
11:32:39    4    officer on the Tactical Terrorism Response Team, differ
11:32:42    5    from the responsibilities of an officer in another unit?
11:32:47    6        A.   Well, we do perform targeting functions, but our
11:32:51    7    targeting functions are usually set up with information
11:32:54    8    from our national targeting center in Virginia.  We do
11:32:59    9    not work primarily inspections.  We rove on our own.  We
11:33:04   10    work in between various areas within the port, and
11:33:08   11    things of that nature.  Sometimes we are even assigned
11:33:11   12    off to other agencies to assist them.
11:33:15   13        Q.   I just want to define a few of these terms that
11:33:18   14    you said.  You said that you do not do primary
11:33:21   15    inspections.  What does that mean?
11:33:23   16        A.   I apologize.  The primary inspections are where
11:33:26   17    an individual arriving into the United States, be it a
11:33:29   18    U.S. citizen or foreign national comes in for their
11:33:33   19    initial inspection where they provide their passport and
11:33:46   20    their information for identification purposes and to
11:33:48   21    state the purpose of their trip abroad or coming into
11:33:51   22    the United States.
11:33:52   23        Q.   Do you perform a different kind of inspection in
11:33:55   24    your role?
11:33:55   25        A.   We normally perform secondary inspections.
```

1    K. CARTER - DX BY MR. DICKSON

11:34:01  2    Q.  We'll talk about secondary inspections in a

11:34:04  3    second.  But you also said part of your responsibility

11:34:07  4    is to rove.  What did you mean when you said that?

11:34:10  5    A.  Roving is walking the floor, checking people's

11:34:14  6    patterns of behaviors for activities that may have been

11:34:19  7    missed by primary.  There is a gap between primary

11:34:35  8    inspections and secondary inspections where there are no

11:34:39  9    eyes watching individuals walking back and forth

11:34:42  10   grabbing certain bags.  So when we rove, we're looking

11:34:45  11   for individuals that may have behaviors that are

11:34:58  12   abnormal to the travel patterns that we're accustomed to

11:35:02  13   in Baltimore.

11:35:03  14   Q.  And you also said that you do secondary

11:35:05  15   inspections.  Can you tell the Judge what a secondary

11:35:09  16   inspection is?

11:35:09  17   A.  Yes.  Secondary inspection is a more intensive

11:35:12  18   inspection.  In primary, you have about three minutes

11:35:17  19   per traveler to figure out whether to refer or determine

11:35:31  20   to let them go onto the rest of their travels.  In

11:35:37  21   secondary, you do have the amount of time needed to

11:35:57  22   perform those inspections.  They are a little bit more

11:36:01  23   evasive, where you're inspecting luggage or maybe

11:36:05  24   electronic media or just getting the full story all

11:36:18  25   together.

K. CARTER - DX BY MR. DICKSON

11:36:18  2   Q.  How many secondary inspections would you say that

11:36:21  3   you've performed over your time with CBP?

11:36:24  4   A.  Thousands.

11:36:26  5   Q.  How many times have you searched somebody's cell

11:36:29  6   phone as part of one of those secondary inspections?

11:36:32  7   A.  Probably around 40 or 50 times.

11:36:38  8   Q.  Have you received any training as an officer with

11:36:42  9   CBP in terms of conducting searches of electronics?

11:36:47  10  A.  Yes, all officers are trained in basic searches

11:36:50  11  of electronic media, TTRT officers are tasked with

11:36:57  12  advance searches, which are performed, we use equipment

11:37:01  13  to extract information from the phones.

11:37:03  14  Q.  Are there instances where you do not use

11:37:06  15  equipment to get information off of a person's phone?

11:37:08  16  A.  Yes, basic searches are manual searches where the

11:37:12  17  phone is put into a certain airplane mode, which stops

11:37:16  18  it from receiving any other outside information and

11:37:19  19  we're just using our hands, we're not using any devices

11:37:23  20  to pull that information out.

11:37:24  21  Q.  I want to talk in just a second a little bit more

11:37:28  22  about basic searches or searches that use equipment.

11:37:31  23  But making sure I understand, do you have a boss at CBP?

11:37:35  24  A.  I do.

11:37:36  25  Q.  Who is that?

K. CARTER - DX BY MR. DICKSON

11:37:37  2    A.  At that time or at this time?

11:37:39  3    Q.  Looking for the title of the person, the person's

11:37:41  4    title.

11:37:42  5    A.  The title is normally a watch commander is who we

11:37:45  6    report to as TTRT.

11:37:48  7    Q.  Above your watch commander, is there a higher

11:37:51  8    level boss?

11:37:51  9    A.  There are several level higher level bosses.  You

11:37:54  10   have the assistant port director, the port director, all

11:37:59  11   the way up to the director of the field office.

11:38:01  12   Q.  If the watch commander or one of the other higher

11:38:04  13   level bosses gave you an order to do something, what

11:38:08  14   would you do?

11:38:08  15   A.  If the order is lawful, we follow the order.

11:38:12  16   Q.  I want to talk then, Officer Carter, a little bit

11:38:16  17   more about the process that somebody has to go through

11:38:18  18   when they come back into the United States.  Who is the

11:38:21  19   first CBP Officer that a person coming into the United

11:38:26  20   States will interact with?

11:38:28  21   A.  They will interact with primary inspection

11:38:37  22   officer at the inspection lane and there are a bunch of

11:38:41  23   booths and they are sent off to an officer, whichever

11:38:44  24   officer is available.

11:38:45  25   Q.  Is there circumstances where, after you speak to

K. CARTER - DX BY MR. DICKSON

11:38:58  2  the primary inspection officer, that person will have to

11:39:00  3  speak to another CBP officer?

11:39:02  4      A.  Yes.  If a person is referred to secondary or the

11:39:07  5  person is selected by a rover, they would be speaking to

11:39:27  6  a second officer.

11:39:29  7      Q.  When you say referred, who is it that does the

11:39:33  8  referring?

11:39:33  9      A.  A roving officer can do the referring or a

11:39:38  10  primary inspection can refer.

11:39:40  11      Q.  What kind of circumstances might lead a primary

11:39:49  12  inspection or a rover to refer somebody to a secondary

11:39:54  13  inspection?

11:39:54  14      A.  When they inspect somebody at primary, they run

11:39:58  15  their name and date of birth and sometimes also matching

11:40:02  16  up images along with records within NCIC or other

11:40:06  17  lookouts that have been put into a system.  They can be

11:40:10  18  referred back to secondary because they have an active

11:40:15  19  warrant, they have a lookout for them, or they may have

11:40:26  20  displayed behaviors on primary that indicate they need

11:40:30  21  further questioning.

11:40:31  22      Q.  Tell the Judge what you mean when you say

11:40:35  23  "lookout."

11:40:35  24      A.  Your Honor, look out is information that a law

11:40:38  25  enforcement entity may have obtained or somebody has

K. CARTER - DX BY MR. DICKSON

11:40:41   2   obtained who works for the U.S. Government who has

11:40:52   3   system access to TECS.  They will drop that information

11:40:56   4   in there and they will basically identify maybe a person

11:41:01   5   is part of an active investigation or this person has

11:41:05   6   been known to interact with a smuggling organization,

11:41:16   7   things of that matter, in which CBP then uses that

11:41:20   8   information to make a determination if they want to see

11:41:22   9   somebody further, if there is any active crime going on

11:41:27   10   right there at the port.

11:41:30   11      Q.   Does CBP have discretion of whether to take

11:41:34   12   somebody to a secondary inspection even if there is a

11:41:54   13   lookout put out for them?

11:41:56   14      A.   Yes.  CBP has a discretion to send somebody to

11:42:00   15   secondary if there is a lookout put on them.

11:42:03   16      Q.   So, if a primary officer or rover refers somebody

11:42:21   17   to a secondary inspection, where did that person go?

11:42:24   18      A.   That person is then escorted over to secondary.

11:42:37   19   The secondary area is an area, such as this, with a

11:42:41   20   bunch of chairs.  And when the next available officer is

11:42:53   21   ready, they will take a passport out of a rack and

11:42:57   22   they'll look up the information of why that person was

11:43:00   23   referred back to secondary.

11:43:03   24      Q.   And you mentioned earlier there are circumstances

11:43:05   25   or sometimes you look at a person's phone during a

K. CARTER - DX BY MR. DICKSON

1

11:43:08   2    secondary search, can you tell us what some of those

11:43:12   3    circumstances typically?

11:43:13   4        A.   Circumstances such as that would be such as with

11:43:26   5    foreign nationals, possible immigration violations.

11:43:31   6    We're trying to see if they are working or overstaying

11:43:36   7    their Visa status.  U.S. citizens, it's usually child

11:43:50   8    pornography or narcotics or terrorism as well.  But it's

11:43:54   9    any evidence of a crime in that phone at that time.

11:44:00   10       Q.   Are there other circumstances where you might

11:44:03   11   chose to look at a person's phone during a secondary

11:44:06   12   inspection?

11:44:06   13       A.   Yes.  If we do have lookout information or if

11:44:10   14   we've been approached by other ports within the agency,

11:44:14   15   being that the agency is so big, they may reach out to

11:44:17   16   us and say, hey, you have this person coming in, can you

11:44:21   17   take a look at this information for us or just check

11:44:24   18   their phone for us to verify what we think is going on.

11:44:28   19       Q.   When you're going to conduct a search of a

11:44:31   20   person's phone, do you give them any information about

11:44:35   21   the authority that you have to search that phone?

11:44:37   22       A.   Yes, sir.  We explain it verbally and we also

11:44:42   23   provide an electronic media tier sheet that explains our

11:44:58   24   authority what they can expect during that instance.

11:45:01   25       Q.   Would you recognize a copy of one of those tier

                          K. CARTER - DX BY MR. DICKSON

11:45:18  2   sheets if I showed it to you today?

11:45:19  3      A.  I would.

11:45:20  4              MR. DICKSON:  Your Honor, I am going to

11:45:23  5   direct opposing counsel to or what has been marked as

11:45:26  6   Government's Exhibit 33.  We provided this to opposing

11:45:30  7   counsel already.  May I approach the witness, your

11:45:32  8   Honor?

11:45:32  9              MAGISTRATE JUDGE ROEMER:  Sure.

11:45:44  10     Q.  Officer Carter, what did I just hand you?

11:45:47  11     A.  You handed us the electronic or paper tier sheet

11:45:52  12  that we hand people about inspection of electronic

11:45:57  13  media.

11:45:57  14     Q.  Is that a fair and accurate copy of a tear sheet

11:46:07  15  that you would have given somebody back in April of

11:46:10  16  2019?

11:46:10  17     A.  Yes, it is.

11:46:11  18     Q.  Anything been altered or changed about it?

11:46:14  19     A.  No.

11:46:16  20              MR. DICKSON:  Your Honor, the government

11:46:17  21  moves Exhibit 33 into evidence.

11:46:19  22              MR. HARRINGTON:  No objection.

11:46:19  23              MAGISTRATE JUDGE ROEMER:  Government Exhibit

11:46:21  24  33 shall be admitted into evidence.

11:46:29  25              MR. DICKSON:  Judge, can you see that okay?

                    K. CARTER - DX BY MR. DICKSON

11:46:31  2          MAGISTRATE JUDGE ROEMER:  Yes, plus I have a

11:46:33  3   hard copy right here.

11:46:34  4          MR. DICKSON:  Okay.  Thank you, your Honor.

11:46:37  5     Q.  Generally, Officer Carter, what is a tear sheet

11:46:42  6   supposed to tell people after you give it to them?

11:46:44  7     A.  It tells them what happens during electronic

11:46:50  8   media searches and where we derive that authority from.

11:46:53  9   That is pretty much all it really tells them.

11:46:56  10    Q.  If you look at the bottom of the second page or

11:47:00  11  the back where it says "routine uses," can you go ahead

11:47:09  12  and read that for us?

11:47:10  13    A.  "Routine uses.  The subject information may be

11:47:14  14  made available to other agencies for investigation

11:47:17  15  and/or for obtaining assistance relating to

11:47:21  16  jurisdictional or subject matter expertise, or for

11:47:33  17  translation, description or other technical assistance.

11:47:37  18  This information may also be made available to assist in

11:47:40  19  border security and intelligence activities.  Domestic

11:47:54  20  law enforcement and the enforcement of other crimes of

11:48:08  21  transnational nature and shared with elements of federal

11:48:11  22  government responsible for analyzing terrorist threat

11:48:15  23  information."

11:48:16  24    Q.  Is every person who's phone is going to be

11:48:21  25  searched by CBP given one of these tear sheets?

K. CARTER - DX BY MR. DICKSON

11:48:24  2   A.  Yes, sir, that is part of our policy.

11:48:26  3   Q.  And did you -- do you give the person this tear

11:48:29  4   sheet before or after you take their phone to search it?

11:48:32  5   A.  It's to be before.

11:48:36  6   Q.  You can set Exhibit 33 aside.  Officer Carter, a

11:48:43  7   few minutes ago, you were talking to us about different

11:48:46  8   kinds of searches that you can conduct on a person's

11:48:49  9   phone.  Can you tell the Judge, what are different kinds

11:48:52  10  of searches that you can do as a CBP Officer on a

11:48:57  11  person's phone?

11:48:57  12  A.  Your Honor, we have a basic search, which is the

11:49:01  13  manual review of information in a phone.  And then we

11:49:13  14  have the advanced search.  The advanced search, the

11:49:17  15  phone is hooked up to an electronic device and that

11:49:31  16  electronic device can extract hidden files or things not

11:49:45  17  meant to be seen or that we're unable to manipulate

11:49:49  18  manually on the phone.

11:49:51  19  Q.  So let's just break that down a little bit.  You

11:49:54  20  said a basic search involves a manual look at the phone.

11:49:58  21  What do you mean when you say a "manual search" of the

11:50:01  22  phone?

11:50:01  23  A.  When I say "manual," the phone is unlocked and

11:50:05  24  placed in airplane mode and the officer doing the

11:50:08  25  inspection will use their fingers to click on sections

K. CARTER - DX BY MR. DICKSON

11:50:12   2   of the phone to expand on whatever information would be

11:50:15   3   in that section, such as, you may click "text" and it

11:50:19   4   would open text messages, and you would look at the text

11:50:22   5   messages.

11:50:23   6       Q.   You said the phone is unlocked.  If a person's

11:50:26   7   phone has a password, how do you unlock it?

11:50:29   8       A.   Preferably, if it's a basic search, the only way

11:50:34   9   to unlock it is the actual traveler or the owner of the

11:50:38   10  phone would have to unlock it.

11:50:39   11      Q.   That's my question.  In a basic search, would you

11:50:43   12  be able to unlock it?

11:50:44   13      A.   No.

11:50:45   14      Q.   Who would unlock it?

11:50:46   15      A.   The owner of the phone.

11:50:48   16      Q.   How would they go about doing that?

11:50:51   17      A.   I would hand them the phone and whatever password

11:51:08   18  they've entered, whether it be numbers or a pin or a

11:51:13   19  pattern, however they got their phone locked, they would

11:51:16   20  unlock it.

11:51:18   21      Q.   You said that during the basic search, officers

11:51:22   22  will use their fingers to click on pieces of the phone.

11:51:26   23  What pieces of the phone do you typically look at during

11:51:29   24  a basic search?

11:51:31   25      A.   Nearly all basic searches conducted by officers

1          K. CARTER - DX BY MR. DICKSON

11:51:35   2  would include contacts, text messages, photos.  There is

11:51:40   3  a preference among people to use WhatsApp and we'll

11:51:44   4  click on WhatsApp if that is available.

11:51:46   5      Q.   What is WhatsApp?

11:51:48   6      A.   WhatsApp is a messages service that people use.

11:51:52   7  It's an app that is not included with phones, but it's

11:51:55   8  one that people download.  It's commonly believed to be

11:52:00   9  encrypted end to end so people tend to think they are

11:52:04  10  hiding messages within WhatsApp.

11:52:07  11      Q.   You also said during a basic search, you put the

11:52:10  12  phone on airplane mode.  What does that mean?

11:52:13  13      A.   Airplane mode.  Once you put a phone in airplane

11:52:26  14  phone, it does not allow us to pull in information off

11:52:37  15  of clouds or other servers that are not present.  In a

11:52:41  16  basic search, in all of our searches, we're just looking

11:52:45  17  on what's actually on the phone.  We don't want to bring

11:52:49  18  in other information that could be stored elsewhere.

11:52:51  19      Q.   For instance, if a person were to receive a text

11:52:53  20  message while the phone is in airplane mode, would you

11:52:57  21  be able to see that?

11:52:58  22      A.   No.

11:53:00  23      Q.   You talked to us a little bit, let me ask you

11:53:06  24  this first.  Is it your understanding that CBP has legal

11:53:11  25  authority to do a basic search of a person's cell phone

K. CARTER - DX BY MR. DICKSON

11:53:23   2   at any time they come into the United States?

11:53:25   3       A.   At any time they come into the United States and

11:53:28   4   any time they leave the United States, yes.

11:53:31   5       Q.   You told us a little bit about an advanced

11:53:35   6   search, tell us what that is?

11:53:37   7       A.   An advanced search requires the use of electronic

11:53:42   8   equipment.  You're hooking a cable between a phone and

11:53:45   9   another computer device that speaks the phone's code and

11:53:49   10  it pulls off the selected media that you want it to pull

11:53:53   11  off.  You can pull off just pictures or you can pull off

11:53:56   12  100 percent of the data that is stored on that phone.

11:53:59   13      Q.   To do that, do you have to use some kind of

11:54:03   14  equipment?

11:54:03   15      A.   You have to use a computer.  And when we pull

11:54:06   16  that information, that is not stored on that computer,

11:54:18   17  that information is actually stored on a serial numbered

11:54:23   18  flash drive, a USB drive that CBP issues out to each

11:54:28   19  port for their use.

11:54:39   20      Q.   So you have to connect the phone to some kind of

11:54:42   21  external equipment?

11:54:44   22      A.   Yes.

11:54:45   23      Q.   Let's talk a little bit about some of the

11:54:48   24  differences between basic searches and advanced searches

11:54:52   25  that we haven't already gone over.  How long does a

```
 1                 K. CARTER - DX BY MR. DICKSON
```

11:54:57  2  basic search a person's phone usually take?

11:55:00  3      A.   Typically 15 to 30 minutes.

11:55:10  4      Q.   How long does an advanced search of a person's

11:55:14  5  phone usually take?

11:55:15  6      A.   An advanced search can take several hours.

11:55:19  7      Q.   During a basic search, is the person's phone

11:55:22  8  connected to any equipment?

11:55:23  9      A.   No.

11:55:24  10     Q.   What about during an advanced search?

11:55:26  11     A.   No.  I'm sorry, I apologize, I misspoke.  During

11:55:30  12  an advanced search, yes, it is.  It's connected to the

11:55:34  13  actual machine that is extracting the information.

11:55:38  14     Q.   During a basic search, how is information pulled

11:55:41  15  off of a person's phone?

11:55:43  16     A.   During the basic search, we are reviewing it

11:55:46  17  manually.  If there is stuff that we are taking from the

11:55:50  18  phone, stuff we need to review later, we would use

11:55:58  19  government phones to take pictures.

11:56:02  20     Q.   During an advanced search, how is information

11:56:06  21  pulled off of the phone?

11:56:07  22     A.   It's pulled off by that machine and dropped onto

11:56:10  23  that flash drive.

11:56:11  24     Q.   Is there a difference in terms of the amount of

11:56:14  25  information that a person can expect to get from a basic

K. CARTER - DX BY MR. DICKSON

11:56:17  2    search as opposed to an advanced search?

11:56:20  3         A.   Yes.

11:56:22  4         Q.   How so?

11:56:23  5         A.   Advanced search is way -- is a lot more thorough.

11:56:28  6    It can replicate everything that is on that phone onto a

11:56:32  7    flash drive.  A basic search, you're not replicating

11:56:36  8    everything that is on that phone at all, you just can't.

11:56:40  9         Q.   For example, Officer Carter, can a basic search

11:56:45  10   find a hidden or encrypted files on a phone?

11:56:48  11        A.   It may find the actual driver if you know what

11:56:52  12   you're looking for, but it can't -- I can't think of the

11:56:58  13   word, it can't exploit that.  You can't just get into

11:57:02  14   that.  You need whatever the subject is using as a

11:57:04  15   password or however they are getting into that file.

11:57:07  16        Q.   I want to talk then about April 23 of 2019.  Do

11:57:13  17   you remember if you were working as a CBP Officer that

11:57:16  18   day?

11:57:16  19        A.   I was.

11:57:16  20        Q.   Where were you working?

11:57:21  21        A.   TTRT in the office at BWI.

11:57:24  22        Q.   Just remind us of what is TTRT stand for?

11:57:28  23        A.   That is the Tactical Terrorism Response Team.

11:57:39  24        Q.   And you said you were working at BWI, is that

11:57:42  25   right?

K. CARTER - DX BY MR. DICKSON

1

11:57:42  2    A.  Yes, Baltimore Washington International Airport.

11:57:45  3    Q.  What time was your shift?

11:57:47  4    A.  I work 12 to 8.

11:57:48  5    Q.  P.m.?

11:57:49  6    A.  Yes.

11:57:49  7    Q.  On that day, do you remember if you conducted any

11:57:53  8  secondary inspections?

11:57:54  9    A.  We did.

11:57:55  10   Q.  Do you remember how many?

11:57:56  11   A.  I do not recall how many we did that day.

11:58:02  12   Q.  Do you remember the name of any particular person

11:58:05  13  who you did a secondary inspection on that day?

11:58:08  14   A.  I remember the first name of an individual that

11:58:11  15  we did an inspection on that day.

11:58:16  16   Q.  As part of your responsibilities, are there

11:58:21  17  reports that are generated describing the results of a

11:58:25  18  secondary inspection?

11:58:26  19   A.  Yes.

11:58:27  20   Q.  Would seeing one of those reports help you

11:58:30  21  remember the name of a person who you did a secondary

11:58:34  22  inspection on?

11:58:34  23   A.  Yes.

11:58:43  24       MR. DICKSON:  Your Honor, I'm going to

11:58:45  25  direct opposing counsel's attention to Government's

```
                          K. CARTER - DX BY MR. DICKSON
11:58:49   2   Exhibit 2, which they already have.  May I approach the
11:58:52   3   witness?
11:58:52   4              MAGISTRATE JUDGE ROEMER:  Sure.
11:58:58   5      Q.  Officer Carter, can you just look quickly at
11:59:01   6   Government's Exhibit 2?
11:59:02   7      A.  Yes.
11:59:03   8      Q.  And what is this?
11:59:04   9      A.  This is a secondary inspection report.
11:59:10  10      Q.  Does that look like a secondary inspection report
11:59:13  11   from April 23 of 2019?
11:59:16  12      A.  It does.
11:59:19  13      Q.  Does it look like a fair and accurate copy of a
11:59:22  14   secondary inspection report?
11:59:24  15      A.  It does.
11:59:25  16      Q.  Anything appear to have been changed or altered
11:59:28  17   in any way?
11:59:28  18      A.  No, sir.
11:59:29  19              MR. DICKSON:  Your Honor, the government
11:59:31  20   moves Exhibit 2 into evidence.
11:59:35  21              MR. HARRINGTON:  I have no objection.
11:59:37  22              MAGISTRATE JUDGE ROEMER:  Okay.
11:59:38  23   Government's Exhibit 2 shall be admitted into evidence.
11:59:38  24              (Whereupon, Government's Exhibit 2 was
11:59:41  25   received into evidence.)
```

K. CARTER - DX BY MR. DICKSON

11:59:41   Q.   Officer Carter, looking at Exhibit 2.  Is there a

11:59:46   name of the person who you performed a secondary

11:59:49   inspection on that day?

11:59:49   A.   Yes.

11:59:51   Q.   What is that name?

11:59:52   A.   Joseph Samuel Bongiovanni.

11:59:58   Q.   Do you remember this particular secondary

12:00:01   inspection?

12:00:01   A.   I remember it.

12:00:03   Q.   Can you tell the Court how you learned that you

12:00:06   needed to conduct a secondary inspection of Mr.

12:00:09   Bongiovanni?

12:00:10   A.   On that date, my watch commander came in and he

12:00:13   informed myself and another officer that there is an

12:00:16   individual coming in that we needed to perform a DOMEX

12:00:22   on his phone.

12:00:23   Q.   And remind us, is the watch commander, that's

12:00:27   your boss?

12:00:27   A.   Yes.

12:00:27   Q.   And when you say your watch commander told you

12:00:31   you needed to perform a DOMEX on that person's phone,

12:00:35   what is a DOMEX?

12:00:36   A.   DOMEX is CBP terminology for actual advanced

12:00:42   search.

1        K. CARTER - DX BY MR. DICKSON

12:00:42    2    Q.   What is your watch commander's last name?

12:00:45    3    A.   Candela.

12:00:46    4    Q.   So did Watch Commander Candela tell you anything

12:00:51    5    else about the individual who was coming in who you

12:00:54    6    needed to do this DOMEX search on?

12:00:57    7    A.   He told us the DOMEX, because it requires

12:01:00    8    approval of higher management, he told us the request

12:01:04    9    was coming in from Buffalo, from CBP in Buffalo.

12:01:08    10   Q.   Anything else?

12:01:09    11   A.   No.

12:01:10    12   Q.   Did Watch Commander Candela tell you why CBP

12:01:15    13   Buffalo was ordering that you do this search?

12:01:18    14   A.   He did say it involved a case, but he never

12:01:21    15   relayed any case details to us.

12:01:23    16   Q.   So he said it involved a case.  Did he tell you

12:01:26    17   anything about that case?

12:01:27    18   A.   No.

12:01:28    19   Q.   Did he tell you whether the person whose phone

12:01:30    20   you were searching was the target or subject of that

12:01:34    21   case?

12:01:35    22   A.   No, he just said this person was involved in a

12:01:39    23   case.  I'm not sure if he was the subject of it or the

12:01:42    24   target of it, it was just that he was involved in this

12:01:46    25   case.

1        K. CARTER - DX BY MR. DICKSON

12:01:46   2    Q.   Did Watch Commander Candela tell you what kind of

12:01:51   3    evidence you should be looking for when you do this

12:01:55   4    DOMEX search?

12:01:56   5    A.   I don't know if he was making an assumption, but

12:01:58   6    he was saying they are probably looking for contacts.

12:02:02   7    Q.   And when you say "contacts," what do you mean?

12:02:05   8    A.   He never got specific on any names or anything.

12:02:08   9    He just said they are probably looking for contacts or

12:02:12   10   anything that worked for this case, which I have no idea

12:02:17   11   what the case was even about.

12:02:18   12   Q.   Did Watch Commander Candela tell you anything

12:02:22   13   about the allegation or any allegations related to the

12:02:25   14   individual whose phone you were supposed to search?

12:02:27   15   A.   No.

12:02:28   16   Q.   Did Watch Commander Candela tell you anything

12:02:32   17   about specific contacts to look for?

12:02:34   18   A.   No.

12:02:34   19   Q.   Did you know anything about the investigation or

12:02:38   20   any investigation at the time that you searched this

12:02:41   21   person?

12:02:41   22   A.   No, I knew there was a case.  The specifics of

12:02:46   23   the investigation for that case, I did not know.

12:02:50   24   Q.   After Watch Commander Candela tells you what that

12:02:55   25   you need to do the secondary inspection, the DOMEX

K. CARTER - DX BY MR. DICKSON

1

12:03:00   2   search of the this person's phone, what did you do?

12:03:04   3       A.   At that time, I wasn't DOMEX certified, so I went

12:03:15   4   and got Officer Sadowski, who, at that time, was one of

12:03:20   5   our DOMEX certified officers, and I informed him this

12:03:23   6   was going to take place when this individual arrived.

12:03:26   7       Q.   Did Mr. Bongiovanni ultimately arrive?

12:03:28   8       A.   He did.

12:03:31   9       Q.   When he -- did he ultimately come back to the

12:03:35  10   secondary inspection spot?

12:03:36  11       A.   He did.

12:03:37  12       Q.   When Mr. Bongiovanni got to the secondary

12:03:40  13   inspection spot, what did you do?

12:03:42  14       A.   He was already being engaged by secondary

12:03:46  15   officers at that time.  I came out to assist Sadowski

12:03:50  16   with the phone search, so my presence was there to try

12:03:53  17   and acquire the phones from Mr. Bongiovanni, which, at

12:03:56  18   that moment, I don't know if it was being explained to

12:04:00  19   him or not, but that is what I was out there waiting

12:04:03  20   for.

12:04:03  21       Q.   So when you go up to Mr. Bongiovanni, what did

12:04:06  22   you do?

12:04:06  23       A.   Well, it took some time.  He had be to comforted

12:04:15  24   or explained to why we were taking the phones, under

12:04:27  25   what authority, and, eventually, he came around to

```
                        K. CARTER - DX BY MR. DICKSON
```

|  |  |  |
|--|--|--|
| 12:04:29 | 2 | giving us the phones unlocked to inspect. |
| 12:04:34 | 3 | Q.  Did you give him one of those tear sheets that is |
| 12:04:37 | 4 | in Government's Exhibit 33? |
| 12:04:39 | 5 | A.  He was given a tear sheet. |
| 12:04:42 | 6 | Q.  Did Mr. Bongiovanni ultimately give you his |
| 12:04:45 | 7 | phone? |
| 12:04:45 | 8 | A.  He did. |
| 12:04:47 | 9 | Q.  Do you remember whether Mr. Bongiovanni's phone |
| 12:04:50 | 10 | had a password? |
| 12:04:51 | 11 | A.  Both of the phones we received, they were locked. |
| 12:04:57 | 12 | He unlocked them or they unlocked them. |
| 12:05:00 | 13 | Q.  When you say "they," who else are you referring |
| 12:05:02 | 14 | to? |
| 12:05:02 | 15 | A.  His traveling companion. |
| 12:05:04 | 16 | Q.  Did you know who that person was? |
| 12:05:06 | 17 | A.  No. |
| 12:05:09 | 18 | Q.  You said they unlocked them.  What do you mean? |
| 12:05:11 | 19 | A.  I mean, we were not capable of unlocking them, so |
| 12:05:15 | 20 | they did whatever they did to unlock their phones and |
| 12:05:18 | 21 | gave them to us. |
| 12:05:24 | 22 | Q.  Did Mr. Bongiovanni ever tell you, "I don't want |
| 12:05:27 | 23 | to give you the password"? |
| 12:05:28 | 24 | MAGISTRATE JUDGE ROEMER:  Mr. Dickson, you |
| 12:05:30 | 25 | want to try clarifying again who "they" were? |

```
         1              K. CARTER - DX BY MR. DICKSON
12:05:34 2              MR. DICKSON:  Sure, your Honor.
12:05:35 3     Q.  So you said you took phones from them, so who was
12:05:40 4   with Mr. Bongiovanni during that secondary inspection,
12:05:43 5   if you know?
12:05:43 6     A.  There was a female in his traveling party that
12:05:46 7   was also at the inspection booth or the inspection
12:05:50 8   table.
12:05:50 9     Q.  Did you take both of the phones?
12:05:52 10    A.  We took both of the phones.
12:05:54 11    Q.  Did you find out any other information about who
12:05:56 12  that second person was?
12:05:57 13    A.  No.
12:06:01 14             MAGISTRATE JUDGE ROEMER:  I think he
12:06:02 15  testified they unlocked the phones, I guess that is what
12:06:06 16  I was looking for clarification.
12:06:09 17             MR. DICKSON:  Understood, your Honor.
12:06:11 18    Q.  Did you see, Officer Carter, when you said "they
12:06:14 19  unlocked the phones," was that Mr. Bongiovanni and his
12:06:18 20  traveling partner or traveling companion or somebody
12:06:21 21  else?
12:06:22 22    A.  That was their traveling party.  It wasn't
12:06:26 23  someone employed by CBP who unlocked the phones.
12:06:29 24    Q.  So nobody from CBP unlocked the phones?
12:06:33 25    A.  Nobody from CBP, nobody from the airlines.  It
```

K. CARTER - DX BY MR. DICKSON

12:06:36  2   was his traveling party.

12:06:37  3       Q.   Would you have had any way or CBP had any way in

12:06:42  4   BWI airport during a basic search to unlock their

12:06:46  5   phones?

12:06:47  6       A.   No, sir.

12:06:51  7       Q.   Did the defendant -- excuse me.

12:06:54  8            Did Mr. Bongiovanni or anybody in his traveling

12:06:57  9   party ever tell you that you couldn't have the -- or

12:07:01  10  that they wouldn't unlock the phones for you?

12:07:03  11      A.   That wasn't said to me.

12:07:06  12      Q.   So after Mr. Bongiovanni and his traveling

12:07:09  13  companion unlocked the phones, what did you do?

12:07:14  14      A.   I took the phones back to Sadowski where the

12:07:18  15  DOMEX machine was.  The DOMEX is or the DOMEX is behind

12:07:26  16  a secured location, so secondary is about 40 yards from

12:07:39  17  that location, so I had to transfer the phones over

12:07:41  18  there.

12:07:41  19      Q.   So you had to walk the phones away from Mr.

12:07:44  20  Bongiovanni 40 yards away to another room?

12:07:48  21      A.   Yes, sir.

12:07:50  22      Q.   What did you do when you got to that other room?

12:07:54  23      A.   I handed the phones to Officer Sadowski.

12:07:57  24      Q.   Were you still in the room when Officer Sadowski

12:08:00  25  got the phones?

K. CARTER - DX BY MR. DICKSON

12:08:00  2   A.   Yes.

12:08:01  3   Q.   What did Officer Sadowski try to do then?

12:08:05  4   A.   He attempted to perform an advanced search.

12:08:08  5   Q.   Was the advanced search successful?

12:08:10  6   A.   No.

12:08:11  7   Q.   When you say it wasn't successful, what do you

12:08:17  8   mean?

12:08:17  9   A.   The system that we used, the cables were not

12:08:22 10   recognizing the phone, so it was hooked up to the phone.

12:08:26 11   And once it hooks up to the phone, it initializes, but

12:08:30 12   it never did that.  It just acted like there was nothing

12:08:33 13   hooked up to it.

12:08:34 14   Q.   When you say it acted like there was nothing

12:08:37 15   hooked up, what are you referring to as "it"?

12:08:40 16   A.   I'm referring to our DOMEX machine in the port of

12:08:44 17   Baltimore as it was.

12:08:46 18   Q.   Was any information taken off those phones using

12:08:52 19   that DOMEX machine?

12:08:53 20   A.   No.

12:08:53 21   Q.   Once you realized the DOMEX machine wasn't

12:08:57 22   working, what did you do?

12:08:59 23   A.   Informed Watch Commander Candela.

12:09:02 24   Q.   Did Watch Commander Candela say anything to you?

12:09:05 25   A.   Yes.  He said we need to perform manual reviews

K. CARTER - DX BY MR. DICKSON

12:09:10  2  of the phone at that point.

12:09:12  3      Q.  When you say a "manual review," is that a

12:09:14  4  specific type of search that CBP usually does?

12:09:17  5      A.  Yes, that would be a basic search.

12:09:19  6      Q.  Did you ultimately perform a basic search on Mr.

12:09:24  7  Bongiovanni's phone?

12:09:25  8      A.  Yes, we did.

12:09:28  9      Q.  Would you have been able to perform a basic

12:09:30  10 search of Mr. Bongiovanni's phone if he hadn't unlocked

12:09:34  11 it for you?

12:09:34  12     A.  No.

12:09:38  13     Q.  Did Officer Sadowski participate at all in the

12:09:41  14 basic search of the phone?

12:09:43  15     A.  He was present in the room, but I can't recall if

12:09:50  16 he did anything else other than just be present in the

12:09:53  17 room.

12:09:53  18     Q.  Was there anybody else in the room with you?

12:09:56  19     A.  Yes, Watch Commander Candela.

12:09:59  20     Q.  Did Watch Commander Candela participate in the

12:10:03  21 basic search?

12:10:04  22     A.  Yes, he did.

12:10:05  23     Q.  So, it was just you and Watch Commander Candela

12:10:07  24 doing the basic search?

12:10:09  25     A.  From my knowledge, yes.

K. CARTER - DX BY MR. DICKSON

12:10:11   Q.   What, if anything, did you look at during your
12:10:15   basic search of Mr. Bongiovanni's phone?

12:10:18   A.   Contact, text messages.

12:10:22   Q.   When you say you looked at contacts and text
12:10:25   messages, how did you actually get into the contacts or
12:10:28   the text messages?

12:10:29   A.   There is just extremely random, we scrolled up,
12:10:37   stopped at random, and hit the screen button and
12:10:41   whatever was there, we hit it and took a picture of it.

12:10:44   Q.   Sorry, Officer Carter.  I'm asking how you
12:10:48   actually started to see the contacts or the messages.
12:10:50   Did you have to click on something to get into the
12:10:52   messages or contacts?

12:10:54   A.   Yes.  We clicked on the native applications to
12:11:06   the phone, the contacts list on the phone as it is and
12:11:10   the text message list as it is on the phone.

12:11:15   Q.   Does that mean you just had to click the app?

12:11:18   A.   Yes, one button didn't have to unlock anything or
12:11:23   do anything special.

12:11:24   Q.   Did you have to connect the phone to any
12:11:33   equipment to see the contacts or the messages?

12:11:36   A.   No.

12:11:36   Q.   Do you remember clicking on any other apps on Mr.
12:11:43   Bongiovanni's phone?

K. CARTER - DX BY MR. DICKSON

12:11:44   2    A.   No.

12:11:45   3    Q.   Do you know whether you accessed any password

12:11:48   4    protected files?

12:11:49   5    A.   The only thing that was password protected was

12:11:54   6    the actual phone.   No password protected files and the

12:12:08   7    password for the phone was provided by him and it was

12:12:13   8    never given to us either, he had it.

12:12:16   9    Q.   As you were looking at the contacts and messages,

12:12:21   10   did you do anything to document what you were seeing?

12:12:24   11   A.   Yes, we took pictures.

12:12:27   12   Q.   Would you recognize those pictures if I showed

12:12:31   13   them to you?

12:12:31   14   A.   I would.

12:12:35   15        MR. DICKSON:   Your Honor, I'll direct

12:12:36   16   opposing counsel's attention to Government's Exhibit 1,

12:12:41   17   which they've already received a copy of.   And may I

12:12:44   18   approach the witness?

12:12:45   19        MAGISTRATE JUDGE ROEMER:   Sure.

12:12:57   20   Q.   Officer Carter, do you recognize what I just

12:13:00   21   handed you?

12:13:00   22   A.   Yes.

12:13:01   23   Q.   What is it?

12:13:02   24   A.   Pictures of a phone that we took of a basic

12:13:05   25   search.

```
              1              K. CARTER - DX BY MR. DICKSON

12:13:06      2      Q.   Does this look like the photos that you took of

12:13:09      3   Mr. Bongiovanni's phone on April 23, 2019?

12:13:13      4      A.   Yes.

12:13:13      5      Q.   Does it fairly and accurately depict those photos

12:13:17      6   that you took?

12:13:18      7      A.   Yes.

12:13:18      8      Q.   Anything look like it's been altered or changed?

12:13:23      9      A.   No.

12:13:25     10              MR. DICKSON:   Your Honor, the government

12:13:26     11   offers exhibit 1 into evidence.

12:13:29     12              MR. HARRINGTON:   Judge, if he could just

12:13:32     13   clarify which ones he took.

12:13:39     14              MAGISTRATE JUDGE ROEMER:   Do you know who

12:13:40     15   took what photos?

12:13:42     16              THE WITNESS:   No.   The government phone, I

12:13:44     17   believe, was in Officer Candela's hand, and so we were

12:13:48     18   together, so he was standing next to me as I was

12:13:51     19   scrolling through the phone.

12:13:54     20              MAGISTRATE JUDGE ROEMER:   So it sounds like

12:13:57     21   you scrolled through the phone and the other officer

12:14:00     22   took the pictures.

12:14:01     23              THE WITNESS:   Yes, it was a joint effort.

12:14:03     24   We normally do inspections in that manner.

12:14:05     25              MAGISTRATE JUDGE ROEMER:   Mr. Harrington?
```

```
 1              K. CARTER - DX BY MR. DICKSON
 2              MR. HARRINGTON:  No objection.
 3              MAGISTRATE JUDGE ROEMER:  Government's
 4  Exhibit 1 shall be admitted into evidence.
 5              MR. DICKSON:  Thank you, your Honor.
 6              (Whereupon, Government's Exhibit 1 was
 7  received into evidence.)
 8     Q.  Officer Carter, you've told us a little bit about
 9  this, but I want to understand how you decided which
10  contacts or messages to photograph.  Let's start with
11  the contacts.  When you opened up Mr. Bongiovanni's
12  contact app, how did you decide which contacts to
13  photograph?
14     A.  Random, just luck, just going through and
15  stopping and clicking.
16     Q.  Was there any rhyme or reason as to why you took
17  photos of certain contacts and didn't take photos of
18  others?
19     A.  No.
20     Q.  Did you have any idea what specific contacts
21  might be useful or helpful in that investigation out of
22  Buffalo?
23     A.  No idea.
24     Q.  What about the text messages?  How did you decide
25  which messages to photograph?
```

```
 1              K. CARTER - DX BY MR. DICKSON
```

12:15:05  2      A.  The same manner, and we looked at the stuff for

12:15:09  3  anything in the text messages.  If it was blatantly a

12:15:12  4  criminal activity in a text message, we would have taken

12:15:17  5  a picture.  We didn't have that, so it was a random

12:15:22  6  selection.

12:15:22  7      Q.  When you say blatant criminal activity, is that

12:15:33  8  what you typically look for when you do a basic search

12:15:36  9  of a person's phone?

12:15:37 10      A.  Yes, sir.

12:15:37 11      Q.  But as you said, you didn't see any of that here?

12:15:40 12      A.  No.

12:15:41 13      Q.  So, when you took a photo of certain messages, it

12:15:45 14  was just random?

12:15:46 15      A.  Yes, sir.

12:15:53 16      Q.  Just as an example, Officer Carter, if you can

12:15:57 17  flip to the third page of Exhibit 1.  If you look at the

12:16:05 18  photo in the middle there, do you see where it has a

12:16:09 19  couple of phone numbers that don't look like they have

12:16:13 20  contact names associated with them?

12:16:14 21      A.  I see that.

12:16:17 22      Q.  Any particular reason why you took a photograph

12:16:20 23  of these phone numbers and the messages that it appears

12:16:25 24  were sent or received by those numbers?

12:16:29 25      A.  No reason, just collecting what we could collect

K. CARTER - DX BY MR. DICKSON

1

12:16:32   2   in that moment to send off.

12:16:37   3        Q.   Officer Carter, were you given any search

12:16:40   4   parameters from Watch Commander Candela or anybody else

12:16:45   5   for what to look for during the basic search of Mr.

12:16:49   6   Bongiovanni's phone?

12:16:50   7        A.   No.

12:16:50   8        Q.   Any direction about what messages or contacts you

12:16:54   9   should be photographing?

12:16:55   10        A.   No.

12:16:56   11        Q.   Did you have any idea what evidence might be

12:17:00   12   helpful or useful in any investigation as you were

12:17:04   13   taking photos of Mr. Bongiovanni's contacts and

12:17:08   14   messages?

12:17:08   15        A.   No.

12:17:11   16        Q.   I want to direct your attention back quickly to

12:17:15   17   Government's Exhibit 2.  Do you still have that in front

12:17:17   18   of you?

12:17:18   19        A.   Yes, sir.

12:17:22   20        Q.   On the second page there, Officer Carter, if you

12:17:26   21   can flip to that, looks like there is a narrative

12:17:30   22   portion here.  Can you just tell the Court quickly what

12:17:34   23   does that narrative portion generally say on these types

12:17:37   24   of reports?

12:17:39   25        A.   The narrative portion is, in general, getting to

K. CARTER - DX BY MR. DICKSON

1

12:17:43  2   negative or positive findings in an exam.

12:17:49  3       Q.   Let's look at this narrative in particular.  If

12:17:54  4   you look here on Government's 2 in that narrative

12:17:58  5   portion, it says, "entered by Whitfield, Christopher."

12:18:02  6   Do you see that there?

12:18:03  7       A.   I do.

12:18:04  8       Q.   Who is Christopher Whitfield?

12:18:06  9       A.   Christopher Whitfield is the other individual who

12:18:09 10   I work with that is on the Tactical Terrorist Response

12:18:14 11   Team in the port of Baltimore.

12:18:15 12       Q.   Did Officer Whitfield write this narrative?

12:18:19 13       A.   He did.

12:18:19 14       Q.   Did you give him information about the search of

12:18:22 15   Mr. Bongiovanni's phone to help fill in this narrative?

12:18:25 16       A.   We did; he was present.

12:18:28 17       Q.   Is your name listed in that narrative section

12:18:32 18   somewhere?

12:18:32 19       A.   Yes, I see it in the last line there, the last

12:18:47 20   sentence.

12:18:48 21       Q.   Can you read that sentence?

12:18:49 22       A.   "CBPOs Carter and Sadowski, as well as Watch

12:18:56 23   Commander Candela conducted a basic search of the

12:18:59 24   devices which yielded no derogatory information."

12:19:03 25       Q.   I want to talk for a second about that phrase

1          K. CARTER - DX BY MR. DICKSON

12:19:06   2   "derogatory information."  Does that phrase have a

12:19:09   3   particular meaning within CBP?

12:19:11   4       A.  Yes, it does.

12:19:12   5       Q.  Tell the Judge what that means?

12:19:14   6       A.  Your Honor, in our agency, that means we had no

12:19:18   7   findings of a criminal action in which we could take

12:19:30   8   immediate action, which means an arrest or seizure.

12:19:33   9       Q.  What is an example of something that would be

12:19:37   10  considered derogatory information?

12:19:38   11      A.  You could have somebody participating in the

12:19:41   12  murder of somebody that they videotaped as terrorist

12:19:45   13  activities.  If we had people videotaping themselves

12:19:51   14  selling drugs or habitually using drugs, if they are a

12:20:18   15  foreign national, is a violation of Visa.

12:20:29   16      Q.  So when you said a no derogatory information from

12:20:33   17  the search of Mr. Bongiovanni's phone, what did you mean

12:20:37   18  by that?

12:20:37   19      A.  I meant we found nothing of a criminal nature

12:20:41   20  that was actionable in that moment.

12:20:43   21      Q.  Were you making an assessment of whether the

12:20:47   22  photos that you had taken would be helpful in some other

12:20:51   23  investigation involving Mr. Bongiovanni?

12:20:52   24      A.  No.

12:20:53   25      Q.  I want to talk now, quickly, Officer Carter,

K. CARTER - DX BY MR. DICKSON

12:20:56  2  about the length of time that you had Mr. Bongiovanni's

12:20:59  3  phone and that Mr. Bongiovanni was in the secondary

12:21:04  4  inspection.  So let's look at Government's Exhibit 2,

12:21:08  5  which you still have.  Based off of what it says on

12:21:11  6  Government's Exhibit 2, can you tell us what time did

12:21:14  7  the primary officer refer Mr. Bongiovanni for a

12:21:18  8  secondary inspection?

12:21:19  9      A.  The primary officer referred him at 2019, which

12:21:27  10  would be 8:19.

12:21:29  11      Q.  Can you tell us where on Government's Exhibit 2

12:21:32  12  you see that information?

12:21:33  13      A.  I see that at the bottom under "referral reason

12:21:37  14  history."

12:21:37  15      Q.  Does that say, "referred by Joseph Nnakwe"?

12:21:41  16      A.  Yes, sir.

12:21:42  17      Q.  Was Mr. Nnakwe, the primary officer that day?

12:21:45  18      A.  Yes, he was.

12:21:49  19      Q.  So you said that Mr. Nnakwe referred Mr.

12:21:52  20  Bongiovanni to secondary inspection at 8:19 p.m.  Did

12:21:59  21  you take Mr. Bongiovanni's phone at 8:19 p.m.?

12:22:02  22      A.  No, sir.

12:22:05  23      Q.  Do you remember what time you took Mr.

12:22:09  24  Bongiovanni's phone?

12:22:10  25      A.  Mr. Bongiovanni's phone was in our possession for

K. CARTER - DX BY MR. DICKSON

12:22:17   2   actual inspection around the time listed in the

12:22:20   3   narrative, which is 2105.

12:22:22   4   Q.  So 9:05 p.m.?

12:22:26   5   A.  Yes.

12:22:27   6   Q.  So at 9:05 p.m. you actually take Mr.

12:22:31   7   Bongiovanni's phone to do the search?

12:22:47   8   A.  For inspection, yes.

12:22:53   9   Q.  Starting at 9:05 then, Officer Carter, do you

12:22:58   10  remember how long you had Mr. Bongiovanni's phone in

12:23:02   11  your possession to do the inspection?

12:23:04   12  A.  We had his phone until 2120, pretty much, yes,

12:23:12   13  about 2120.

12:23:14   14  Q.  That is 9:20 p.m.?

12:23:16   15  A.  Yes.

12:23:16   16  Q.  So you had Mr. Bongiovanni's phone for inspection

12:23:19   17  for 15 minutes?

12:23:20   18  A.  Yes, I do recall the DOMEX failing immediately.

12:23:25   19  Q.  Is that 15 minutes that you had Mr. Bongiovanni's

12:23:28   20  phone in your possession, is that out of the ordinary in

12:23:32   21  terms of the amount of time it typically takes to do a

12:23:35   22  basic search of a person's phone?

12:23:37   23  A.  No.

12:23:38   24  Q.  What time was Mr. Bongiovanni allowed to leave

12:23:46   25  the secondary inspection?

|  | 1 | K. CARTER - DX BY MR. DICKSON |
|---|---|---|

12:23:48   2      A.   When we returned his phones.

12:23:50   3      Q.   So at 9:20 p.m.?

12:23:51   4      A.   Yes.

12:23:54   5      Q.   When Mr. Bongiovanni left the secondary

12:23:57   6   inspection location, did you still have his phone?

12:24:00   7      A.   No.

12:24:00   8      Q.   Did anybody in CBP still have his phone?

12:24:04   9      A.   No.

12:24:04   10     Q.   Now, up at the top of the narrative here, next to

12:24:11   11   where it says "Christopher Whitfield" on Government's

12:24:15   12   Exhibit 2, you see where it says "created date/time"?

12:24:18   13     A.   I do.

12:24:19   14     Q.   What is the date and time that is listed there?

12:24:21   15     A.   4/23/2019, 2143 hours.

12:24:26   16     Q.   So that is 9:43 p.m.?

12:24:28   17     A.   Yes, sir.

12:24:29   18     Q.   What is that time referring to?

12:24:30   19     A.   That is the time that he actually entered into

12:24:33   20   the secondary or the closeout findings.

12:24:36   21     Q.   When you say he entered in, who are you referring

12:24:38   22   to?

12:24:39   23     A.   I'm referring to Christopher Whitfield.

12:24:42   24     Q.   So Officer Whitfield entered in this narrative

12:24:47   25   portion at 9:43 p.m.?

```
         1              K. CARTER - DX BY MR. DICKSON
12:24:49 2       A.   Yes, sir.
12:24:50 3       Q.   Does that mean you still had Mr. Bongiovanni's
12:24:53 4   phone at 9:43 p.m.?
12:24:55 5       A.   No, sir.
12:24:56 6       Q.   Above that, you see where it says "created date
12:24:59 7   and time"?
12:25:01 8       A.   I do.
12:25:14 9       Q.   What is the date and time there?
12:25:16 10      A.   That is 4/24/20189, 1638 hours.
12:25:22 11      Q.   Did you still have Mr. Bongiovanni's phone the
12:25:25 12  next day at 4:38 p.m.?
12:25:28 13      A.   No, sir.
12:25:31 14      Q.   As far as you know, Officer Carter, was the
12:25:35 15  inspection of Mr. Bongiovanni's phone, did it last any
12:25:39 16  longer than that 15 minutes that you had it?
12:25:41 17      A.   Of his phone, no.
12:25:46 18      Q.   After you gave the defendant his phone back -- -
12:25:49 19  excuse me -- Mr. Bongiovanni his phone back, after that
12:25:53 20  15-minute basic search, did you have any idea whether
12:25:58 21  Mr. Bongiovanni and his party had to catch another
12:26:01 22  flight?
12:26:01 23      A.   I did not.
12:26:02 24      Q.   Does a person having to catch a flight factor
12:26:07 25  into CBP's decision to do a secondary inspection or not?
```

K. CARTER - DX BY MR. DICKSON

12:26:11    A.   No, sir.

12:26:12    Q.   Why not?

12:26:12    A.   We're there, we're charged by the citizens of the
12:26:17 United States and the U.S. Government to do full and
12:26:19 complete thorough inspections.  We don't handle flight
12:26:23 connections or anything of that matter.

12:26:25    Q.   Does a person having another flight factor into
12:26:29 your decision about how long a basic search of a
12:26:32 person's phone should take?

12:26:34    A.   It does not.

12:26:35    Q.   In BWI airport, where your phone or where your
12:26:39 office is located, what part of that airport is it in?

12:26:42    A.   We are in terminal E, downstairs, which would be
12:26:48 arrivals.

12:26:49    Q.   Are you familiar with where the A Gates are in
12:26:54 BWI airport?

12:26:55    A.   Yes, sir, I am.

12:26:56    Q.   Based on your experience in that airport, Officer
12:27:00 Carter, how long does it take to walk from your office
12:27:03 to the A Gates of BWI airport?

12:27:07    A.   Ten to 15 minutes, barring anybody having an
12:27:10 injury or anything like that.

12:27:12    Q.   Officer Carter, prior to April 23rd, 2019 when
12:27:18 you conducted the basic search of Mr. Bongiovanni's

|  |  |  |
|---|---|---|
|  | 1 | K. CARTER - DX BY MR. DICKSON |
| 12:27:21 | 2 | phone, did you know Joseph Bongiovanni? |
| 12:27:22 | 3 | A.  I did not. |
| 12:27:24 | 4 | Q.  Had you ever heard his name before? |
| 12:27:26 | 5 | A.  I have not. |
| 12:27:26 | 6 | Q.  Did you know what his job was? |
| 12:27:28 | 7 | A.  I did not. |
| 12:27:29 | 8 | Q.  Did you know whether he was under any kind of |
| 12:27:32 | 9 | investigation? |
| 12:27:32 | 10 | A.  I knew there was a case when he arrived that day, |
| 12:27:35 | 11 | that was it, that was the first time I ever heard of him |
| 12:27:38 | 12 | at all. |
| 12:27:39 | 13 | Q.  When you conducted the basic search of his phone, |
| 12:27:42 | 14 | did you know anything about Mr. Bongiovanni's |
| 12:27:44 | 15 | background? |
| 12:27:45 | 16 | A.  I did not. |
| 12:27:45 | 17 | Q.  Did you know anything about who his friends were? |
| 12:27:48 | 18 | A.  I did not. |
| 12:27:49 | 19 | Q.  Anything about who his associates were? |
| 12:27:51 | 20 | A.  I did not. |
| 12:27:53 | 21 | MR. DICKSON:  Just a moment, your Honor, |
| 12:27:55 | 22 | please. |
| 12:28:51 | 23 | Q.  Just a couple more questions for you, Officer |
| 12:28:54 | 24 | Carter.  Let's look at Government's Exhibit 2 again, |
| 12:28:57 | 25 | quickly.  Can you go ahead and read that narrative |

```
             1              K. CARTER - DX BY MR. DICKSON
12:29:02     2   portion for us?
12:29:06     3      A.  "The subject and his family were referred to
12:32:43     4   secondary as a match to a one-day customs lookout.
12:32:49     5   Subject is returning from a six-day trip to Punta Cana,
12:33:03     6   Dominican Republic.  He traveled with his wife, Lindsay"
12:33:07     7   -- I don't want to miss pronounce this -- "Schuh DOB
12:33:36     8   11/2/1984, USC, and her son" --
12:33:37     9              MR. HARRINGTON:  Judge, I'll object to this.
12:33:40    10   It's in evidence.  I don't know why it has to be read.
12:33:42    11              MAGISTRATE JUDGE ROEMER:  It's in evidence.
12:33:43    12   He asked for him to read it.  Overruled.
12:33:46    13      A.  "And her son, Matthew Maglietto, date of birth
12:33:46    14   6/27/2002 USC."
12:33:57    15      Q.  Let me stop you there for a second, Officer
12:33:59    16   Carter.  I'll have you keep reading in a minute.  There
12:34:04    17   is that referring to the rest of Mr. Bongiovanni's
12:34:09    18   travel companions?
12:34:11    19      A.  Yes, sir.
12:34:12    20      Q.  And earlier you told us there was Mr. Bongiovanni
12:34:16    21   and his traveling companion unlocked their phones?
12:34:21    22      A.  Yes.
12:34:21    23      Q.  Was Mr. Bongiovanni's traveling companion a
12:34:31    24   woman?
12:34:35    25      A.  Yes, those were the only two we were interacting
```

K. CARTER - DX BY MR. DICKSON

1

12:34:40  2  with.

12:34:50  3      Q.  Go ahead and keep reading, please.

12:34:51  4      A.  "They stayed at the Majestic Mirage resort.  This

12:35:04  5  is their first trip to the Dominican Republic.  They are

12:35:07  6  returning to their home in Buffalo, New York.  Subjects

12:35:10  7  had a total of six bags in their possession, which were

12:35:14  8  searched with negative results.  The subject and his

12:35:26  9  wife had a Samsung cell phones, which were subjected to

12:35:30  10  search in accordance with agency policy due to a one-day

12:35:33  11  lookout.  Subject had his Samsung, model SM-J337T IMEI

12:35:40  12  354272090809267, phone number (716) 507-2784, and his

12:36:02  13  wife had Samsung model SM-G960U, IMEI 354825091177901,

12:36:27  14  phone number (716) 828 -- 6865.  Both unlocked the

12:36:43  15  devices without providing the passwords and each

12:36:47  16  disabled wireless communications on their respective

12:36:51  17  devices."

12:36:53  18      Q.  I'll stop you there, Officer Carter.  Thank you.

12:36:56  19  Officer Carter, is it your understanding that had CBP

12:37:00  20  wanted to, could it have kept Mr. Bongiovanni's phone if

12:37:04  21  he had refused to open it for you?

12:37:06  22      A.  It's my understanding, they could have.

12:37:09  23      Q.  What is that based off of?

12:37:11  24      A.  It's based off of the watch commander had already

12:37:14  25  approved the advanced search of the phone and an

1          K. CARTER - CX BY MR. HARRINGTON

12:37:20   2   unwillingness to provide an unlocked device would allow

12:38:27   3   CBP to detain the phones for our people to do a forensic

12:38:31   4   inspection and unlock the phones themselves.

12:38:34   5      Q.  So had the watch commander -- because the watch

12:38:36   6   commander had approved the advanced search, you would

12:38:39   7   have had authority to keep Mr. Bongiovanni's phone?

12:38:41   8      A.  Yes.

12:38:41   9      Q.  Did you keep Mr. Bongiovanni's phone when they

12:38:44   10   left that secondary inspection site?

12:38:47   11      A.  No.

12:39:01   12          MR. DICKSON:  Just a moment, your Honor.

12:39:03   13          Your Honor, I have no further questions at

12:39:05   14   this time.

12:39:06   15          MAGISTRATE JUDGE ROEMER:  Thank you.

12:39:07   16          MR. DICKSON:  Would you like me to keep the

12:39:10   17   exhibits, your Honor?

12:39:13   18          MAGISTRATE JUDGE ROEMER:  Is there any

12:39:14   19   reason you want to leave those exhibits up there?

12:39:16   20          MR. HARRINGTON:  We might.

12:39:17   21          MAGISTRATE JUDGE ROEMER:  Okay.

12:39:17   22   CROSS EXAMINATION BY MR. HARRINGTON:

13:28:38   23      Q.  Good morning, Mr. Carter.

13:28:40   24      A.  Good morning, sir.

13:28:41   25      Q.  My name is Jim Harrington and I represent Mr.

1          K. CARTER - CX BY MR. HARRINGTON

13:28:45   2   Bongiovanni in this hearing.

13:28:47   3       A.   Yes, sir.

13:28:48   4       Q.   You gave some of your background with the Customs

13:28:53   5   and Border Patrol.  How long have you been with the

13:29:01   6   Tactical Terrorism Response Team?

13:29:01   7       A.   Since 2019, 2019.

13:29:05   8       Q.   When in 2019 did you start with them?

13:29:08   9       A.   February, March.

13:29:09   10      Q.   So on the date that you met Mr. Bongiovanni, you

13:29:12   11   would have been doing that particular task for about two

13:29:16   12   months, correct?

13:29:16   13      A.   Yes, sir.

13:29:17   14      Q.   What did you do before that?

13:29:19   15      A.   I was a Customs and Border Patrol Officer without

13:29:24   16   the Tactical Terrorism Response Team.

13:29:25   17      Q.   Did you work primary and secondary before?

13:29:29   18      A.   Yes, I worked primary and secondary as well as a

13:29:32   19   rover.

13:29:32   20      Q.   Now, before coming to testify today, did you

13:29:35   21   review any documents?

13:29:36   22      A.   Yes.

13:29:36   23      Q.   What did you review?

13:29:38   24      A.   I reviewed all of the documents present.

13:29:41   25      Q.   The ones that Mr. Dickson showed before?

1    K. CARTER - CX BY MR. HARRINGTON

13:29:50    2    A.   Yes, all of these exhibits.

13:29:52    3    Q.   And you were not the author of those documents,

13:29:55    4    were you?

13:29:56    5    A.   No.

13:29:56    6    Q.   And did those documents help to refresh your

13:29:59    7    recollection of what happened that day?

13:30:00    8    A.   Yes.

13:30:01    9    Q.   Without those documents, would you have been able

13:30:04    10   to testify in the detail that you did about what

13:30:07    11   happened?

13:30:07    12   A.   Only the pictures, the Exhibit 33, I'm

13:30:11    13   knowledgeable about because we have it, but these

13:30:17    14   Exhibit 2 I would have needed the refresher, yes.

13:30:19    15   Q.   And did you speak with anybody before you

13:30:22    16   testified today?

13:30:23    17   A.   Yes.

13:30:24    18   Q.   With whom did you speak?

13:30:26    19   A.   I spoke with the gentleman that preceded you

13:30:29    20   right there.

13:30:30    21   Q.   And did you speak with any other Assistant U.S.

13:30:33    22   Attorneys?

13:30:33    23   A.   There was one other gentleman that was setting up

13:30:37    24   the travel arrangements, that was it.

13:30:39    25   Q.   And where did you come from, in Baltimore?

```
          1              K. CARTER - CX BY MR. HARRINGTON
13:30:43   2        A.   Yes, sir.
13:30:43   3        Q.   And did you travel with somebody else?
13:30:45   4        A.   I did, sir.
13:30:46   5        Q.   Who is that?
13:30:48   6        A.   Steven Wachstein.
13:30:49   7        Q.   And did you discuss this incident with Mr.
13:30:53   8   Wachstein?
13:30:54   9        A.   Yes.
13:30:54  10        Q.   And when did you do that?
13:30:55  11        A.   We discussed it in the room when we were talking
13:31:03  12   to the attorney before you.  We no longer work together.
13:31:22  13        Q.   Okay.  Did you fly up here together?
13:31:24  14        A.   We did fly up here together.
13:31:27  15        Q.   You didn't talk about it in the plane?
13:31:29  16        A.   We talked about it in a generality.
13:31:31  17        Q.   What did you talk about?
13:31:32  18        A.   We talked about, have you been to a case before
13:31:35  19   or trial before.
13:31:36  20        Q.   And what about the details of this case?
13:31:38  21        A.   No details.
13:31:40  22        Q.   Okay.  And you said when you met with the
13:31:43  23   gentlemen, Mr. Wachstein was with you, is that right?
13:31:48  24   So did you review your testimony with Mr. Wachstein?
13:31:51  25        A.   Can you rephrase that?  I missed something there.
```

K. CARTER - CX BY MR. HARRINGTON

13:31:53  2   Q.  You mentioned a minute ago that you talked to the

13:31:56  3   gentleman, I assume you mean the Assistant U.S.

13:32:01  4   Attorney?

13:32:01  5   A.  Yes.

13:32:02  6   Q.  And you mentioned Mr. Wachstein was there?

13:32:03  7   A.  Yes.

13:32:04  8   Q.  Did you talk to him while Mr. Wachstein was in

13:32:06  9   the room with him?

13:32:07  10   A.  Yes.

13:32:07  11   Q.  And did Mr. Wachstein also answer questions for

13:32:11  12   the U.S. Attorney while you were in the room?

13:32:13  13   A.  Yes.

13:32:14  14   Q.  Did he over the questions with you that he was

13:32:17  15   going to ask you?

13:32:17  16   A.  With Wachstein?

13:32:19  17   Q.  No, with you, with you.  Did he with you?

13:32:23  18   A.  Just with me.

13:32:24  19   Q.  Did you hear him ask the questions of Wachstein

13:32:27  20   that he was going to ask him?

13:32:28  21   A.  No, sir.

13:32:30  22   Q.  When you discussed it with him, did you and

13:32:32  23   Wachstein have to kind of piece things together of what

13:32:36  24   you had recalled?

13:32:36  25   A.  No.

K. CARTER - CX BY MR. HARRINGTON

13:32:40  2   Q.  Did you talk to the Watch Commander Candela
13:32:45  3   before you came to testify?
13:32:46  4   A.  I did.
13:32:46  5   Q.  And when was that?
13:32:47  6   A.  I spoke with him when he first was told that he
13:32:52  7   had to come up here.
13:32:55  8   Q.  And did he come up here with you?
13:32:57  9   A.  No, sir.
13:32:59  10  Q.  Did you talk about the incident itself with
13:33:02  11  Candela?
13:33:02  12  A.  No.  Our conversation was about that, hey, expect
13:33:05  13  the attorneys to call you, you have a case to go testify
13:33:11  14  to in Baltimore.
13:33:12  15  Q.  Is he still your watch commander now?
13:33:14  16  A.  No.
13:33:14  17  Q.  Now, when you met Mr. Bongiovanni on April the
13:33:35  18  19th, the 23rd, I'm sorry, of 2019, you said that you
13:33:40  19  had no knowledge of him before, correct?
13:33:42  20  A.  No knowledge.
13:33:43  21  Q.  And he had already passed through primary when
13:33:47  22  you met him, is that right?
13:33:51  23  A.  Yes, sir.
13:33:51  24  Q.  And when were you told about the lookout for him?
13:33:54  25  A.  Maybe a couple hours to a few minutes before, but

K. CARTER - CX BY MR. HARRINGTON

13:34:00    2    the lookout, that is not what I was told about.  I

13:34:04    3    wasn't told about the lookout.  I was told we had a

13:34:08    4    DOMEX or advanced search to perform on his phone.

13:34:11    5        Q.  So, before you saw him and talked to him about

13:34:15    6    his request to do that DOMNEX or DOMEX?

13:34:23    7        A.  DOMEX is the term.

13:34:24    8        Q.  Before that, what exactly had you been told about

13:34:28    9    him?  You testified on direct examination that somebody

13:34:33   10    had a case, is that right?  Is that what you were told?

13:34:36   11        A.  Yes.

13:34:36   12        Q.  With no details about the case?

13:34:38   13        A.  There was no details.

13:34:40   14        Q.  And when you approached Mr. Bongiovanni, where

13:34:51   15    was he?

13:34:51   16        A.  He was in the secondary area.

13:34:53   17        Q.  And that is an area off to the side with people

13:34:56   18    to be taken care of?

13:34:57   19        A.  Yes, sir.

13:34:58   20        Q.  And you said he was with a companion?

13:35:01   21        A.  Yes, sir.

13:35:02   22        Q.  Did you learn it was his wife?

13:35:03   23        A.  I learned it since I read the report, but the

13:35:08   24    report had to jog my memory that that was his wife.

13:35:23   25        Q.  Well, you read that report before you came to

K. CARTER - CX BY MR. HARRINGTON

13:35:26   2   testify, didn't you?

13:35:26   3       A.   I did.

13:35:27   4       Q.   And didn't you notice in there it said it was his

13:35:31   5   wife?

13:35:31   6       A.   I did.

13:35:33   7       Q.   Now, you mentioned earlier in your testimony also

13:35:43   8   something about the TECS computer.  Could you tell the

13:35:46   9   Court what that is?

13:35:46  10       A.   TECS is a law enforcement tool in which data is

13:35:51  11   dropped in that allows law enforcement agencies, at

13:35:57  12   least, mostly federal agencies, to let another agency be

13:36:00  13   aware what is going on with an individual that may be

13:36:05  14   traveling in their presence.

13:36:07  15       Q.   And entries are made into TECS that stay in there

13:36:11  16   for perpetuity.  Isn't that right?

13:36:15  17       A.   As far as I know.

13:36:16  18       Q.   Unless somebody does something and miraculously

13:36:20  19   gets an order from some court, information goes into

13:36:25  20   TECS and just stays there, right?

13:36:26  21       A.   I'm not an expert on that, but as far as I know,

13:36:30  22   yes.

13:36:30  23       Q.   And that can be information of not just

13:36:34  24   somebody's criminal convictions or arrests, but it could

13:36:52  25   be information about suspicions of somebody, correct?

K. CARTER - CX BY MR. HARRINGTON

13:36:58    2    A.   This is true.

13:36:59    3    Q.   And it's meant to be an investigative aid for you

13:37:08    4    and other officers doing your kind of work.  Is that

13:37:12    5    right?

13:37:12    6    A.   Yes.

13:37:13    7    Q.   You mentioned that you gave the tear sheet to --

13:37:39    8    the tear sheet to Mr. Bongiovanni, is that right?

13:37:42    9    A.   I didn't give it to him, but I was there when he

13:37:44   10    was handed one.

13:37:45   11    Q.   Who gave him one?

13:37:46   12    A.   I can't recall who gave it to him, but I recall

13:37:51   13    him reading it.

13:37:51   14    Q.   Was one given to his wife, also, separate?

13:37:55   15    A.   I don't recall that.

13:38:16   16    Q.   Now, do you recall hearing or discussing with Mr.

13:38:19   17    Bongiovanni any questions regarding the tear sheet,

13:38:22   18    Exhibit 33?

13:38:23   19    A.   I did not recall.

13:38:24   20    Q.   Do you recall hearing or having any discussion

13:38:28   21    with his wife about the tear sheet?

13:38:31   22    A.   I do not recall.

13:38:34   23    Q.   Do you recall having discussions with either of

13:38:37   24    them about her son and Mr. Bongiovanni's stepson, who is

13:38:43   25    mentioned in Exhibit 2, Matthew?  Do you remember

K. CARTER - CX BY MR. HARRINGTON

13:38:46  2 discussing his phone?

13:38:47  3   A. I do not recall.

13:38:49  4   Q. Do you recall taking his phone?

13:38:54  5     MR. DICKSON:  Objection, relevance.

13:38:56  6     MAGISTRATE JUDGE ROEMER:  Overruled.

13:38:56  7   A. The stepson's phone?

13:38:59  8   Q. Yes.

13:38:59  9   A. I only recall the two phones that we had.

13:39:04  10   Q. Do you recall a discussion with them about the

13:39:06  11 fact that his phone was dead, it had no charge in it, so

13:39:11  12 you didn't take it?  Do you remember that?

13:39:13  13   A. No.  There were several other officers involved

13:39:17  14 in discussing that with them, so it may have been

13:39:20  15 somebody else.

13:39:20  16   Q. How many officers were involved?

13:39:22  17   A. Myself, Officer Whitfield, Officer Sadowski and

13:39:27  18 Watch Commander Candela.

13:39:28  19   Q. And all at the time this form was given, this

13:39:31  20 tear sheet was given?

13:39:32  21   A. They were all involved in the inspection.

13:39:34  22   Q. I know that.  I'm talking now about this moment

13:39:37  23 in time when you hand the tear sheet to them and I'm

13:39:41  24 asking you questions about whether there was any

13:39:42  25 discussions by them about your authority or anything

K. CARTER - CX BY MR. HARRINGTON

13:39:45   2   else about your taking the phone?

13:39:47   3      A.   I believe there was a discussion about the

13:39:49   4   authority, which is why he was handed the tear sheet.

13:39:52   5   There was a small objection at first, yes.

13:39:54   6      Q.   What was the small objection?

13:39:56   7      A.   "Why do you need our phones?"

13:39:59   8      Q.   And then what was responded to them and by whom?

13:40:03   9      A.   That was a conversation between them, Officer

13:40:06   10   Whitfield and Watch Commander Candela.

13:40:09   11      Q.   And you could hear this conversation, couldn't

13:40:11   12   you?

13:40:11   13      A.   I was probably within earshot of it, but I don't

13:40:16   14   recall of that conversation.

13:40:17   15      Q.   Do you remember anything else in conversation

13:40:21   16   between Mr. Bongiovanni or his wife with those other

13:40:26   17   agents that were working with you about the taking of

13:40:31   18   the phone?

13:40:31   19      A.   No, I just remember, after his objection, they

13:42:20   20   were very compliant.

13:42:22   21      Q.   Did you tell him or did any of them tell him, did

13:42:25   22   you hear him tell them that you could seize their phones

13:42:30   23   if they didn't give you the password or open the phone?

13:42:34   24      A.   No, I didn't hear anybody say that.

13:42:36   25      Q.   You could have done that, though, isn't that

K. CARTER - CX BY MR. HARRINGTON

13:42:38   2   true?

13:42:39   3       A.   That is true.

13:42:39   4       Q.   So when they said, "why do you need our phones,"

13:42:42   5   was there an explanation given to them for that?

13:42:45   6       A.   Verbally, I don't recall the explanation, but I

13:42:48   7   know they were given the tear sheet, which would be an

13:42:51   8   explanation.

13:42:51   9       Q.   And were they allowed to the read the tear sheet

13:42:56  10   before they gave you the phone?

13:42:57  11       A.   Yes.

13:42:58  12       Q.   How long did that take?

13:42:59  13       A.   I don't recall.

13:43:02  14       Q.   And so, the four of you, the three of you,

13:43:05  15   whatever the number of you just stood there while

13:43:08  16   reading the tear sheet?

13:43:09  17       A.   Yes.  It's the way the inspection site was set

13:43:13  18   up.  We were in no rush.  We have the amount of time we

13:43:17  19   deem necessary to perform the inspection.

13:43:19  20       Q.   And you can't recall after them reading the tear

13:43:22  21   sheet them saying anything to you asking more questions?

13:43:25  22       A.   If they were asked, they were not to me.

13:43:28  23       Q.   And you didn't hear any?

13:43:29  24       A.   No.

13:43:47  25       Q.   Did you hear anyone else or did you say anything

K. CARTER - CX BY MR. HARRINGTON

13:43:51  2  else to the support what is in the tear sheet to amplify

13:43:58  3  and explain anything else?

13:44:01  4      A.  No.

13:44:02  5      Q.  So what you're saying to me is no officer said,

13:44:06  6  we have the authority to take this, if you don't give us

13:44:09  7  your consent, we can take your phones and hold them to

13:44:12  8  do our inspection?

13:44:13  9      A.  That is not what I'm saying.  I'm saying I did

13:44:15  10  not, and I'm saying that I do not recall anybody else

13:44:18  11  saying that.

13:44:19  12      Q.  So you did not hear that, anything like that from

13:44:22  13  anybody?

13:44:22  14      A.  No.

13:44:22  15      Q.  Explaining the situation.  Okay.  And while this

13:44:28  16  tear sheet was given to them, how far away were you from

13:44:31  17  the others that were there?

13:44:34  18      A.  Seven to 15 feet.  It's an inspection area.  So,

13:44:40  19  I'm walking back and forth between that booth, other

13:44:43  20  booths, right there, but it's the entire inspection

13:44:47  21  area.  Maybe the size, the width of this courtroom,

13:44:52  22  maybe a little bit longer than this courtroom.

13:44:54  23      Q.  When the tear sheet was given, Exhibit 33, were

13:44:58  24  they standing or sitting?

13:44:59  25      A.  They were standing.

```
                    K. CARTER - CX BY MR. HARRINGTON
```

13:45:00  2    Q.   And how long had they been waiting?

13:45:03  3    A.   They had been there for a while, but it's not

13:45:06  4    something I would deem inordinate for an inspection.

13:45:09  5    But they had been there for 40 minutes or so.

13:45:13  6    Q.   Forty minutes from when?

13:45:15  7    A.   From their arrival in secondary.  And I wasn't

13:45:18  8    the first officer to encounter them in secondary.  But

13:45:21  9    when I came out to secondary, they were already engaged

13:45:24  10   in conversation with officers.  So I don't know if it

13:45:26  11   started as soon as they arrived or later.

13:45:29  12   Q.   Did Mr. Bongiovanni appear to be upset?

13:45:31  13   A.   If he did, if he was upset, it didn't come off

13:45:37  14   that way to me.

13:45:38  15   Q.   Did Ms. Schuh appear to be upset?

13:45:41  16   A.   There was a tad bit of confusion, I would say.

13:45:44  17   Q.   Why don't you explain what that means?

13:45:46  18   A.   She didn't understand why we were taking the

13:45:49  19   phones, and I saw her defer to his decision making when

13:45:53  20   they were talking back and forth.  But that was just a

13:45:56  21   visual queue that I saw.

13:45:58  22   Q.   Did she tell you or did you hear her say that "I

13:46:03  23   don't use wifi on my phone, I don't have to disable it"?

13:46:07  24   A.   No, I don't recall that at all.

13:46:09  25   Q.   Were the phones on or were they disabled when

                    K. CARTER - CX BY MR. HARRINGTON

13:46:13   2   they handed them to you?

13:46:14   3       A.   The phones were on.  They had to unlock them, so

13:46:20   4   the phones were on when they were handed to us.

13:46:23   5       Q.   As far as you could tell, just what you could

13:46:26   6   conclude.  You came over there, they had their phones,

13:46:29   7   it appeared that their phones were on, is that right,

13:46:32   8   when they gave them to you?

13:46:33   9       A.   By the time I saw it, yes.

13:46:45  10       Q.   Now, if the attempt was made to use the DOMEX

13:46:51  11   download, correct?

13:46:52  12       A.   Yes, sir.

13:46:52  13       Q.   So it was every intention by you and the others,

13:46:58  14   Sadowski, to complete what you were directed to do.  Is

13:47:02  15   that right?

13:47:03  16       A.   Yes, sir.

13:47:03  17       Q.   And had the machine worked, you would have

13:47:06  18   completed it.  Is that right?

13:47:08  19       A.   Yes, sir.

13:47:15  20       Q.   Were either Mr. Bongiovanni or his wife, were

13:48:04  21   either one of them told that this advance search was

13:48:08  22   going to be done on their phone?

13:48:11  23       A.   I believe their phones were told they would be

13:48:30  24   searched.  I can't commit to saying whether they were

13:48:34  25   told it would be an advance search or a basic search.

K. CARTER - CX BY MR. HARRINGTON

13:50:00  2    Q.  And the direction that you had, you testified,

13:50:04  3    was that you were looking for contacts.  Is that right?

13:50:07  4    A.  During the DOMEX or can you clarify that?

13:50:12  5    Q.  Yep.  When you had -- you were told this was

13:50:16  6    about a case, correct?

13:50:17  7    A.  Yes.

13:50:18  8    Q.  So were you given -- you were given no

13:50:23  9    instruction about what kind of case it was?

13:50:25  10   A.  I was not.

13:50:26  11   Q.  And you testified earlier that your watch

13:50:33  12   commander told you you were looking for contacts, is

13:50:36  13   that right?

13:50:36  14   A.  Watch commander told us that this was about a

13:50:40  15   case and we need to do a DOMEX.  When it went to

13:50:45  16   contacts during the basic search, that is really -- that

13:50:50  17   is all there that we can find.

13:50:52  18   Q.  Were you told to look for contacts or not at any

13:50:55  19   time?

13:50:55  20   A.  I don't believe so.

13:50:59  21   Q.  Were you told to look for any particular type of

13:51:02  22   contacts?

13:51:03  23   A.  No.

13:51:04  24   Q.  No designation of any kind whatsoever?

13:51:08  25   A.  None whatsoever.

K. CARTER - CX BY MR. HARRINGTON

13:51:13  2    Q.   And when you conduct one of these searches and

13:51:16  3    you're looking for contacts, you said there is some

13:51:19  4    randomness in what you do.   Is that right?

13:51:22  5    A.   For this phone search, yes, just due to the

13:51:25  6    nature, we were told there was a case, but no parameters

13:51:30  7    of the case.

13:51:31  8    Q.   And I take it in Exhibit 1, which has the

13:51:34  9    photographs that were taken with you and Candela took

13:51:39  10   the photographs, right?

13:51:40  11   A.   Yes.

13:51:40  12   Q.   And that was not the entirety of what was on Mr.

13:51:44  13   Bongiovanni's phone, was it?

13:51:45  14   A.   No.

13:51:46  15   Q.   In terms of contacts?

13:51:47  16   A.   It was not.

13:51:48  17   Q.   And so, who was spinning through and stopping or

13:51:52  18   moving the screen for the contacts, is that you or

13:51:55  19   Candela?

13:51:56  20   A.   We're standing next to each other holding the

13:52:00  21   phone and kind of spinning and somebody would just take

13:52:03  22   their finger and hit at random and you put your finger

13:52:07  23   on it and it would stop and that would be that.

13:52:09  24   Q.   Were you the person that hit it?

13:52:11  25   A.   I did it a few times and I believe he did it a

K. CARTER - CX BY MR. HARRINGTON

13:52:15  2  few times.

13:52:15  3     Q.  So whatever came up?

13:52:17  4     A.  Whatever came up is what came up.

13:52:19  5     Q.  Was it ever mentioned to you something about

13:52:22  6  looking for Italians?

13:52:24  7     A.  No, sir, not at all.

13:52:26  8     Q.  So the names that came up on Exhibit 1 is just

13:52:29  9  random, that they happen to be 95 percent Italian, just

13:52:34  10  random?

13:52:35  11     A.  It's my belief that your friends are your

13:52:37  12  friends, so when we go through, like, Jamaican phones,

13:52:41  13  there are a lot of names that seem to be Jamaican names.

13:52:47  14  Your friends are your friends.  I don't get to make that

13:52:50  15  determination.

13:52:50  16     Q.  You didn't think Mr. Bongiovanni was from Italy,

13:52:55  17  did you?

13:52:56  18     A.  I didn't think he was from Italy, no.

13:52:58  19     Q.  And he was a U.S. citizen coming back from

13:53:03  20  Dominican Republic?

13:53:03  21     A.  Yes.

13:53:24  22     Q.  You were asked some questions about Government's

13:53:27  23  Exhibit 2.  I believe you have a copy in front of you?

13:53:29  24     A.  I do, sir.

13:53:52  25     Q.  If I could direct your attention on Government's

```
              1              K. CARTER - CX BY MR. HARRINGTON
13:53:55      2    Exhibit 2 to the portion where Mr. Wachstein's name
13:54:03      3    appears on that?
13:54:03      4        A.  I see that.
13:54:04      5        Q.  And it indicates underneath his name that it says
13:54:09      6    he started -- inspection started at April 23, 2019 at
13:54:16      7    2142, correct?
13:54:18      8        A.  I see that.
13:54:19      9        Q.  And then it says that it ended on April 23, 2019
13:54:25     10    at 2143, is that right?
13:54:28     11        A.  I see that.
13:54:29     12        Q.  And this is under the category of "baggage," is
13:54:32     13    that right?
13:54:33     14        A.  Yes, sir.
13:54:33     15        Q.  Are you telling me that the baggage search for
13:54:37     16    the Bongiovanni's, is that what this document indicates,
13:54:40     17    took a minute?
13:54:40     18        A.  No, that is an incorrect time, sir.
13:54:43     19        Q.  Which is incorrect?
13:54:44     20        A.  The starting time.
13:54:48     21        Q.  Okay.  You know what the correct time should be?
13:54:51     22        A.  The correct time should be indicated by when
13:54:54     23    Officer Nnakwe still, in part of exhibit 2 page two, his
13:55:01     24    time states 2019, that was the actual time he was
13:55:04     25    referred.
```

                   K. CARTER - CX BY MR. HARRINGTON

13:55:11    2    Q.  So you're referring to the second page of Exhibit

13:55:16    3    33, correct?

13:55:16    4    A.  Yes, sir.

13:55:17    5    Q.  And at the top, after his name, it says "created

13:55:23    6    date and time 4/23/2019, 2143," right?

13:55:28    7    A.  I see that -- I see the time, the correct time at

13:55:34    8    the bottom, sir, next to Joseph Nnakwe's name.

13:55:41    9           MAGISTRATE JUDGE ROEMER:  Mr. Harrington, I

13:55:43   10    thought you referred to Exhibit 33.  I'm confused.

13:55:47   11           MR. HARRINGTON:  It's 2, I apologize.

13:55:49   12           MAGISTRATE JUDGE ROEMER:  Okay.

13:55:51   13           MR. HARRINGTON:  It's 2.

13:55:55   14    Q.  All right.  So at the bottom, this is the initial

13:55:59   15    referral from primary, correct?

13:56:02   16    A.  That's correct, sir.

13:56:03   17    Q.  My question to you was about the baggage.

13:56:05   18    A.  Yes, sir.

13:56:06   19    Q.  Is there anything on this report that indicates

13:56:09   20    when the baggage search was started and stopped other

13:56:13   21    than on the first page?

13:56:13   22    A.  I'm sorry continue.  For U.S. Customs and Border

13:56:17   23    Protection, the referred time starts, the secondary

13:56:19   24    time, they actually keep a wait time report of that, so

13:56:22   25    his secondary search begins whether he is being

K. CARTER - CX BY MR. HARRINGTON

13:56:25   2    inspected or not at 2019.

13:56:27   3        Q.   Secondary search is what you did, right?

13:56:31   4        A.   That I participated in.

13:56:32   5        Q.   Is that a search of the baggage, also?

13:56:35   6        A.   Yes, that includes the baggage.

13:56:37   7        Q.   So, his baggage was not inspected until 2019, is

13:56:43   8    that right?

13:56:43   9        A.   I don't know the exact time his baggage was

13:56:46  10    actually looked at physically.  But once he hits

13:56:50  11    secondary for U.S. Customs and Border Protection, we

13:56:53  12    consider that to be your time in which you started your

13:56:57  13    secondary inspection at that time period.

13:56:59  14        Q.   Now, when you saw Mr. Bongiovanni and his wife

13:57:03  15    waiting at secondary, did they have their baggage with

13:57:07  16    them then?

13:57:07  17        A.   The inspection had already started.  I came out

13:57:11  18    through the inspection late.  They already started

13:57:14  19    conversating.  I had gone and got Sadowski to get him

13:57:18  20    set up for the DOMEX and then I came outside and they

13:57:23  21    had already begun.

13:57:23  22        Q.   My question is:  Did they have their bags with

13:57:27  23    them then?

13:57:28  24        A.   At some point, they got their bags.

13:57:31  25        Q.   Did they get them before their phones were given

K. CARTER - CX BY MR. HARRINGTON

13:57:35    2  back to them?

13:57:36    3      A.  I'm not following the line of questioning.  I'm

13:57:38    4  sorry.

13:57:38    5      Q.  My question is about the bags and whether you

13:58:02    6  know when they got their bags returned to them.  Was it

13:58:05    7  before you did the phone attempted extraction or was it

13:58:09    8  during or was it after, if you know?  If you don't know

13:58:12    9  that's fine?

13:58:12   10      A.  Okay.  They retrieved their bags before

13:58:15   11  inspection because we have to inspect the bags, then the

13:58:18   12  bags are inspected in their presence, and then the bags

13:58:21   13  are returned either when we're done with the bags or

13:58:26   14  when we're done with the phones.  But once we handed

13:58:29   15  them back the phones, we've concluded the inspection.

13:58:33   16      Q.  And who gave them the phones back?

13:58:35   17      A.  I believe it was me.

13:58:36   18      Q.  And did they have the bags when you gave the

13:58:39   19  phones back?

13:58:40   20      A.  I didn't look to see if they had their bags or

13:58:44   21  not.

13:58:44   22      Q.  Okay.  You testified to referring to Exhibit 2,

13:59:13   23  page two, about the inspection taking 20 minutes, 15

13:59:19   24  minutes?

13:59:19   25      A.  The phone inspection.

K. CARTER - CX BY MR. HARRINGTON

13:59:21   2    Q.   Does that include the attempt to use the DOMEX?

13:59:24   3    A.   Yes.

13:59:24   4    Q.   So how long did that take?

13:59:27   5    A.   The DOMEX?

13:59:29   6    Q.   Attempt.

13:59:30   7    A.   The DOMEX failed probably within two minutes, we

13:59:34   8 were done with that.

13:59:34   9    Q.   And I take it the machine either starts or it

13:59:37  10 doesn't like it did?

13:59:39  11    A.   It was kind of warmed up and prepped ahead of

13:59:43  12 time.  So it didn't work immediately.  It didn't

13:59:46  13 recognize it immediately.

13:59:48  14    Q.   And who is it that kept track of the time for

13:59:57  15 your search of the phone?

13:59:58  16    A.   That would be Officer Whitfield.  He is the one

14:00:01  17 that entered in the special result.

14:00:02  18    Q.   And what was his role in this inspection?

14:00:05  19    A.   He was doing -- he was out there for the initial

14:00:10  20 beginning of the inspection, like he was talking to

14:00:12  21 them.

14:00:12  22    Q.   And is he one of your unit or was he a different

14:00:18  23 type of inspector?

14:00:19  24    A.   No, he is part of my unit.

14:00:25  25    Q.   Just for a point of clarification.  On Exhibit 2,

<pre>
                    K. CARTER - CX BY MR. HARRINGTON
14:00:38   2   it is has the initials up above and then down again in
14:00:47   3   the middle of the document IOEM.  What do those stand
14:00:53   4   for?
14:00:53   5      A.   Inspection of electronic media.
14:01:54   6      Q.   After the inspection had been done, did you make
14:01:57   7   any inquiries of what the case was, Mr. Bongiovanni's
14:02:00   8   was?
14:02:00   9      A.   No, sir.
14:02:01  10      Q.   Didn't everyone say to Candela what was this
14:02:05  11   about or anything?
14:02:05  12      A.   No, we get a lot of these requests.  This is not
14:02:08  13   uncommon.  So after a while, it's kind of
14:02:12  14   run-of-the-mill, without making light of the situation.
14:02:15  15      Q.   No, I understand.
14:03:04  16           In the normal course of your duties, when you're
14:03:07  17   doing these kinds of inspections, do you often get told
14:03:10  18   what type of case it is, such as drugs or it could be
14:03:13  19   terrorism or could be anything else?
14:03:16  20      A.   When it's terrorism, we get a lot more
14:03:20  21   information.  When it's anything else, we don't
14:03:22  22   necessarily get a whole lot of information about what's
14:03:25  23   going on, especially if it's something that is an open
14:03:28  24   case.
14:03:38  25      Q.   Other than this lookout and the fact that any
</pre>

K. CARTER - RDX BY MR. DICKSON

14:03:45  2  primary inspector who has some suspicions about anything

14:03:48  3  can refer somebody to secondary, was there anything else

14:03:52  4  that stood out to you about Mr. Bongiovanni or his wife

14:03:54  5  or their son that would have triggered some kind of

14:03:58  6  secondary inspection by you?

14:03:59  7     A.  No.  Normal circumstances, no.  They seemed like

14:04:02  8  a normal family.  No odd behaviors at all.

14:04:06  9            MR. HARRINGTON:  All right.  That's all I

14:04:07  10  have, Judge.  Thanks.

14:04:09  11            MAGISTRATE JUDGE ROEMER:  Thank you, sir.

14:04:12  12  Mr. Dickson?

14:04:14  13            MR. DICKSON:  Yes, your Honor.

14:04:27  14            May I proceed?

14:04:28  15            MAGISTRATE JUDGE ROEMER:  Sure.

14:04:29  16  REDIRECT EXAMINATION BY MR. DICKSON:

14:04:29  17     Q.  Officer Carter, Mr. Harrington asked you some

14:04:32  18  questions about Mr. Wachstein.  Do you know Steve

14:04:35  19  Wachstein?

14:04:36  20     A.  I do.

14:04:36  21     Q.  What is his position with CBP?

14:04:40  22     A.  Right now, he is in the field office as a program

14:04:46  23  manager.  He is still an officer, but he has a program

14:04:49  24  manager role.

14:04:50  25     Q.  Back in 2019, was Mr. Wachstein a supervisor?

```
            1              K. CARTER - RDX BY MR. DICKSON

14:04:53    2      A.  He was a first line supervisor directly

14:04:57    3  supervising the floor in Baltimore Washington

14:05:02    4  International Airport.

14:05:02    5      Q.  Did Mr. Wachstein participate in the search of

14:05:05    6  Mr. Bongiovanni's phone?

14:05:07    7      A.  No.  He was just a supervisor present.

14:05:12    8      Q.  Now, I'm going to ask you a couple of questions

14:05:15    9  about the airport where this search happened.  You told

14:05:19   10  us you worked at BWI, right?

14:05:21   11      A.  Yes, sir.

14:05:22   12      Q.  Does BWI service international flights?

14:05:26   13      A.  Yes, sir.

14:05:26   14      Q.  And is a flight from the Dominican Republic

14:05:29   15  considered an international flight?

14:05:31   16      A.  Yes, sir.

14:05:31   17      Q.  And does that mean that people on that flight

14:05:34   18  from the Dominican Republic are coming into the U.S.

14:05:37   19  border?

14:05:37   20      A.  Yes, sir.

14:05:38   21      Q.  Based off of that, would it be your understanding

14:05:41   22  that CBP has authority to do a border search at BWI

14:05:45   23  airport?

14:05:46   24      A.  Yes, sir.

14:05:48   25      Q.  If you look quickly at Government's Exhibit 2 and
```

K. CARTER - RDX BY MR. DICKSON

14:05:52   2   I'll ask you one question about that.  Mr. Harrington

14:05:55   3   asked you about a TECS report.  Is that a T-E-C-S?

14:06:00   4       A.  Yes, sir.

14:06:01   5       Q.  Do you know what a TECS report is?

14:06:07   6       A.  Yes.

14:06:08   7       Q.  A TECS report is what is Government's Exhibit 2,

14:06:12   8   right?

14:06:13   9       A.  Yes.

14:06:13   10      Q.  And Mr. Harrington also asked you some questions

14:06:16   11   about the photos that you took of Mr. Bongiovanni's

14:06:20   12   contacts.  Do you remember that?

14:06:21   13      A.  Yes.

14:06:22   14      Q.  And do you remember Mr. Harrington asking you

14:06:24   15   about whether you knew that the people in the photos

14:06:30   16   were Italian?

14:06:32   17      A.  I remember him asking that question.

14:06:33   18      Q.  Officer Carter, when you searched Mr.

14:06:37   19   Bongiovanni's phone, did you know what his ethnicity

14:06:41   20   was?

14:06:41   21      A.  Did I know for sure?  He is an American, that is

14:06:44   22   what I knew, that is all I knew.

14:06:46   23      Q.  Did you know his ethnicity?

14:06:48   24      A.  All I knew, he was American.  I didn't know he

14:06:50   25   was Italian or anything like that.

K. CARTER - RCX BY MR. HARRINGTON

14:06:52  2   Q.  Did you look at any of the contacts and know

14:06:55  3   whether any of those people were Italian?

14:06:57  4   A.  The name doesn't necessarily mean that you're

14:07:00  5   Italian or anything, so, I didn't know who I was taking

14:07:05  6   a picture of in the phone contacts.

14:07:06  7   Q.  Did you know any of the people who you took a

14:07:12  8   photo of their contacts?  Did you know any of those

14:07:15  9   people?

14:07:15  10   A.  None of the people or none of the phone numbers.

14:07:20  11        MR. DICKSON:  Just a moment, your Honor.

14:07:22  12   That's it, Judge.  Thank you.

14:07:23  13        MAGISTRATE JUDGE ROEMER:  Mr. Harrington?

14:07:24  14   RECROSS EXAMINATION BY MR. HARRINGTON:

14:07:30  15   Q.  Just a clarification.  When the DOMEX did not

14:07:34  16   work and you did the basic search, was it still plugged

14:07:38  17   in the DOMEX or not?

14:07:39  18   A.  No, that's not possible.

14:07:41  19        MR. HARRINGTON:  Okay.  That's all.

14:07:43  20        MAGISTRATE JUDGE ROEMER:  Thank you, sir.

14:07:44  21   I'm sorry.

14:07:45  22        Officer Carter, you can step down, sir.

14:07:48  23   Thank you.

14:07:49  24        THE WITNESS:  Yes, sir.

14:08:07  25        MAGISTRATE JUDGE ROEMER:  We're going to

```
            1              USA VS. J. BONGIOVANNI
14:08:08    2   take a 10-minute break.  During that time, Mr. Tripi,
14:08:11    3   can you talk to Mr. Harrington about the rest of the
14:08:14    4   scope of this hearing so we can figure that out?
14:08:17    5              MR. TRIPI:  We'll have to go on the record a
14:08:19    6   little bit before the next witness.
14:08:21    7              MAGISTRATE JUDGE ROEMER:  About that or
14:08:22    8   something else?
14:08:22    9              MR. TRIPI:  About that.
14:08:23   10              MAGISTRATE JUDGE ROEMER:  All right.
14:08:23   11              (Whereupon, there was a break in the
14:08:23   12   proceeding.)
14:08:30   13              THE COURT:  Okay.  We're back on the record.
14:08:31   14   Mr. Tripi.
14:08:32   15              MR. TRIPI:  Yes, Judge.  I've spoken with
14:08:34   16   Mr. Harrington and here is my understanding of what the
14:08:38   17   scope of the hearing is.  Obviously, the April 23rd,
14:08:42   18   2019 border search of the phones, but as to the June
14:08:47   19   6th, 2019 motion to suppress the statements of Mr.
14:08:51   20   Bongiovanni on that date, the defense is withdrawing
14:08:55   21   their motion with respect to any argument that Mr.
14:08:59   22   Bongiovanni was in custody requiring Miranda or that the
14:09:02   23   statement was otherwise involuntary that day, they are
14:09:09   24   still persisting in their argument that the unlawful
14:09:16   25   search of the cell phone at the border, that there were
```

                           USA VS. J. BONGIOVANNI

14:09:22   2   statements during the subsequent interview on June 6th,

14:09:27   3   2019 that were the fruit of the poisonous tree.  What I

14:09:31   4   will say about that, if that is the only aspect of their

14:09:34   5   motion that remains as to the statement, then it would

14:09:38   6   only be statements during that interview that related to

14:09:43   7   the contacts of the phone search at the border.  In

14:09:47   8   other words, there are other parts of the interview that

14:09:49   9   had nothing to do with stuff that the special agent

14:09:53   10  asked about the border search that would affect any of

14:09:57   11  the other statements from that day.  So I just want to

14:10:00   12  make that clear before I call Special Agent Ryan so I

14:10:03   13  know what I'm dealing with when I'm examining the

14:10:07   14  witness.

14:10:07   15           MAGISTRATE JUDGE ROEMER:  Mr. Harrington,

14:10:10   16  you can stay there if you want, sir.  It's up to you.

14:10:13   17           MR. HARRINGTON:  Judge, that is an accurate

14:10:16   18  statement of where we are without my concession

14:10:19   19  necessarily that it obviates anything other than the

14:10:23   20  call information.  But that is a sub issue that you

14:10:26   21  would have to --

14:10:27   22           MAGISTRATE JUDGE ROEMER:  Everything except

14:10:30   23  for what?

14:10:30   24           MR. HARRINGTON:  Mr. Tripi just made a

14:10:32   25  distinction that in the June 6th statement, if there is

```
 1                   USA VS. J. BONGIOVANNI
```

14:10:35  2   part of it is going to be suppressed because of the

14:10:38  3   airport search.

14:10:39  4           MAGISTRATE JUDGE ROEMER:  Right, right.

14:10:40  5           MR. HARRINGTON:  It would only apply to the

14:10:42  6   uses of names that were derived or whatever it is.  And

14:10:46  7   all I'm saying to the Court, we're not conceding that.

14:10:49  8   We're not conceding that in terms of the whole

14:10:52  9   statement.  But that is, obviously, a conclusion the

14:10:55  10  Court could reach and say.

14:10:56  11          MAGISTRATE JUDGE ROEMER:  So you basically

14:10:57  12  want to ask -- is it -- I guess, Agent Ryan, he did the

14:11:09  13  questioning.

14:11:13  14          MR. TRIPI:  On June 6th.

14:11:15  15          MAGISTRATE JUDGE ROEMER:  You want Agent

14:11:18  16  Ryan to testify and you want to ask him questions about

14:11:20  17  what he asked him about with regard to this phone.  Is

14:11:23  18  that what you're saying?

14:11:25  19          MR. TRIPI:  Right.

14:11:25  20          MAGISTRATE JUDGE ROEMER:  And that is so you

14:11:27  21  can link that to a poisonous tree argument going back

14:11:30  22  to, and you're making that same argument, if I recall,

14:11:33  23  for all subsequent search warrants or anything like that

14:11:36  24  where any of this information gleaned from the phone was

14:11:40  25  got.

1                    USA VS. J. BONGIOVANNI

14:11:41   2          MR. TRIPI:  Correct, yes.

14:11:42   3          MAGISTRATE JUDGE ROEMER:  Are we straight on

14:11:44   4  that then?

14:11:45   5          MR. TRIPI:  I understand.  I just think it

14:11:48   6  might be helpful.

14:11:49   7          MAGISTRATE JUDGE ROEMER:  We're not going to

14:11:50   8  be talking about flash bang grenades and going in and

14:11:54   9  all of that.  That is done, right?

14:11:56  10          MR. TRIPI:  That is my understanding.  That

14:11:57  11  is done and we don't anticipate calling those witnesses.

14:12:01  12  We haven't released them, they are still here.

14:12:03  13          MAGISTRATE JUDGE ROEMER:  And I guess we're

14:12:06  14  not going to be covering whether or not his statements

14:12:09  15  were voluntary or involuntary?

14:12:12  16          MR. HARRINGTON:  Correct.

14:12:13  17          MAGISTRATE JUDGE ROEMER:  You just want to

14:12:15  18  know what questions were asked, at least in relationship

14:12:18  19  to the seizure of this phone or search of this phone?

14:12:22  20          MR. HARRINGTON:  Right, because there are

14:12:23  21  representations by Ryan during the course of the

14:12:26  22  conversation relating back to this.  That is what

14:12:28  23  triggers it.

14:12:29  24          MR. TRIPI:  If I could just give a proffer

14:12:31  25  before he testifies, it might be helpful to see what's

```
  1              USA VS. J. BONGIOVANNI
```

14:12:34  2    coming.

14:12:35  3              MAGISTRATE JUDGE ROEMER:  Sure.

14:12:35  4              MR. TRIPI:  Judge, I anticipate, obviously,

14:12:38  5    to address this issue, I still have to go through the

14:12:40  6    interview that he did.  He does a report, which,

14:12:42  7    ultimately, I'll offer into evidence when he is

14:12:45  8    testifying.  But it's an eight-page report, and the

14:12:47  9    first page is a cover sheet.  But page two doesn't deal

14:12:51  10   with anything from the border search phone.  I

14:12:54  11   anticipate the testimony will be that those statements

14:12:57  12   about, for example, Peter Gerace and Pharaoh's, that was

14:13:05  13   not anything from the phone, that was resulting from the

14:13:09  14   border search.  That continues onto page two, where

14:13:13  15   there is the discussion of Michael Sinatra and

14:13:19  16   Bongiovanni's DEA issued mobile phone, which when he

14:13:23  17   turned it in, had nothing left on it.  They talked about

14:13:28  18   erasing the phone.  That has nothing to do with the

14:13:30  19   border search.  They talked about the Pharaoh's golf

14:13:34  20   tournament.  That had nothing to do with the border

14:13:36  21   search.  There were comments about organized crime in

14:13:40  22   Buffalo.  That had nothing to do with the names found at

14:13:43  23   the border search.  Now we're up at the top of page

14:13:47  24   four, more conversation about Peter Gerace.  Again, he

14:13:50  25   is not in the list of names that were seized at the

                          USA VS. J. BONGIOVANNI

14:13:54   2   border search, if you look at Exhibit 1.  They ask about
14:14:00   3   Bongiovanni and Gerace speaking about overdose, that is
14:14:04   4   nothing from the border search of the phone.  It's not
14:14:07   5   until -- it's not until you get to the almost corner of
14:14:15   6   page 4 where he documented about speaking about contacts
14:14:19   7   in the phone in the border search.  That goes on the
14:14:29   8   next page, two, three, four, five, six, seven people
14:14:33   9   that are asked about, nine, ten, eleven, twelve.  Twelve
14:14:41   10  people that get you to page six of this report.  After
14:14:45   11  that last name, then there are questions about party in
14:14:51   12  Toronto.  That is nothing that came from the border
14:14:54   13  search phone and people there.  You know, I have the
14:14:58   14  photo that he is being questioned about, and I will put
14:15:02   15  that into evidence.  And then he asks about another
14:15:05   16  party at a lake house on 4th of July.  That is nothing
14:15:08   17  from the border search of Mr. Bongiovanni's phone.  And
14:15:12   18  then there are questions about a file that they had
14:15:14   19  recovered during the search of the residence.  And then
14:15:19   20  the rest of the conversation is about that.  Other
14:15:23   21  people that aren't related to the search of the border
14:15:27   22  search phone, such as, obviously, a former police chief,
14:15:33   23  Derinda, Peter Gerace, Rocco Dina, a state judge, a
14:15:38   24  state trooper, none of that comes from the border search
14:15:41   25  of the phone.  And then they closed again the interview

                          USA VS. J. BONGIOVANNI

14:15:46  2   by asking about the file, the last part of page 7 going

14:15:49  3   onto page 8, talk about, again, there were discussions

14:15:55  4   about that investigation regarding the file that was

14:15:57  5   recovered from Bongiovanni's residence.  So, as I argued

14:16:02  6   before when we were setting the hearings, a very small

14:16:08  7   portion of the interview relates to names that came from

14:16:11  8   the search of the phone.  I just want the government's

14:16:14  9   position to be very clear that any aspects of this

14:16:17  10  suppression motion that remain live is the fruit of a

14:16:20  11  poisonous tree should only relate to the names from the

14:16:28  12  phone, if that is the only source.  That is my position.

14:16:31  13  If they have another position, I wanted to make that

14:16:34  14  clear.

14:16:35  15            MAGISTRATE JUDGE ROEMER:  Mr. Harrington,

14:16:36  16  anything else?

14:16:37  17            MR. HARRINGTON:  No, your Honor.

14:16:38  18            MAGISTRATE JUDGE ROEMER:  Okay.  Who is your

14:16:40  19  next witness?

14:16:40  20            MR. TRIPI:  I call Special Agent Ryan.

14:16:44  21            MAGISTRATE JUDGE ROEMER:  Okay.

14:16:50  22  (C. RYAN WAS CALLED TO THE WITNESS STAND AND SWORN.)

14:16:50  23            THE CLERK:  Please state your name and spell

14:18:07  24  it for the record.

14:18:07  25            THE WITNESS:  Curtis Ryan, C-u-r-t-i-s,

```
          1              C. RYAN - DX BY MR. TRIPI
14:18:15  2    R-y-a-n.
14:18:15  3                MR. TRIPI:  May I proceed, your Honor?
14:18:16  4                MAGISTRATE JUDGE ROEMER:  Sure.
14:18:17  5    DIRECT EXAMINATION BY MR. TRIPI:
14:18:17  6    Q.  Good morning, Special Agent Curtis Ryan.  By whom
14:18:21  7    are you employed?
14:18:22  8    A.  Homeland Security Investigations.
14:18:24  9    Q.  In what capacity?
14:18:25  10   A.  I'm a supervisory special agent.
14:18:28  11   Q.  And how long have you been a supervisory special
14:18:31  12   agent?
14:18:31  13   A.  Since October of last year.
14:18:35  14   Q.  What are your duties as a supervisory special
14:18:38  15   agent?
14:18:38  16   A.  I supervise a group of six HSI agents, that many
14:18:46  17   task force officers.  That ebbs and flows.  Our
14:22:03  18   programatic areas of responsibility are transnational
14:22:06  19   organized crime and illegal exports.
14:22:10  20   Q.  And that term "transnational organized crime,"
14:22:13  21   what does that encompass?  What does that entail?
14:22:17  22   A.  Any organized group that is seeking to exploit,
14:22:22  23   you know, the Customs or Immigration laws of the United
14:22:25  24   States.
14:22:25  25   Q.  Borders?
```

1          C. RYAN - DX BY MR. TRIPI

14:22:26  2      A.   Borders.

14:22:28  3      Q.   And the domestic crimes that flow from the

14:22:32  4  border?

14:22:32  5      A.   Correct.

14:22:33  6      Q.   How long have you been a Special Agent with

14:22:35  7  Homeland Security?

14:22:36  8      A.   Since early 2012, February.

14:22:38  9      Q.   And what were your duties as a special agent?

14:22:40  10     A.   The first group that I was assigned to did just

14:22:47  11  the illegal exports of control technologies.  So, items

14:22:52  12  controlled by either the State Department or the

14:22:54  13  commerce department that require a license for export,

14:22:59  14  you know, we investigated people that attempted to

14:23:02  15  smuggle those goods out of the country without the right

14:23:06  16  license.

14:23:06  17     Q.   What other positions did you have within HSI?

14:23:09  18     A.   So, I was in that group for a few years and then

14:23:12  19  in mid 2016, I was assigned to the border enforcement

14:23:18  20  security task force.  That is a task force that

14:23:22  21  investigates primarily drug smuggling.

14:23:26  22     Q.   And the acronym for that border enforcement

14:23:35  23  security task force is BEST?

14:23:42  24     A.   That's correct.

14:23:56  25     Q.   And you were with BEST up until October of last

| | | C. RYAN - DX BY MR. TRIPI |
|---|---|---|
| | 1 | |
| 14:23:59 | 2 | year when you became supervisor of this other group? |
| 14:24:02 | 3 | A.   Yes. |
| 14:24:02 | 4 | Q.   And as a special agent in BEST, there are also |
| 14:24:09 | 5 | task force officers that work with BEST? |
| 14:24:11 | 6 | A.   Yes, there are Canadian law enforcement officers, |
| 14:24:15 | 7 | CBP officers, border patrol agents, state and local law |
| 14:24:20 | 8 | enforcement officers. |
| 14:24:21 | 9 | Q.   And CBP is an acronym for Custom and Border |
| 14:24:26 | 10 | Protection? |
| 14:24:26 | 11 | A.   U.S. Customs and Border Protection. |
| 14:24:29 | 12 | Q.   And you work with all those different agencies in |
| 14:24:32 | 13 | the course of your work? |
| 14:24:33 | 14 | A.   Yes. |
| 14:24:33 | 15 | Q.   That being the agencies represented by the task |
| 14:24:48 | 16 | force officers on the BEST team? |
| 14:24:49 | 17 | A.   Yes, that's correct. |
| 14:24:50 | 18 | Q.   And you began your job as a Homeland Security |
| 14:24:53 | 19 | Special Agent in 2012, was that here in Buffalo? |
| 14:24:56 | 20 | A.   Yes, it was.  2012 is when I began training, that |
| 14:25:02 | 21 | is Intercoastal Georgia, so I was hired for the Buffalo |
| 14:25:04 | 22 | office, reported to training in February, and reported |
| 14:25:07 | 23 | to Buffalo in August. |
| 14:25:10 | 24 | Q.   And can you describe that training that you |
| 14:25:12 | 25 | received experience as an HSI Special Agent? |

1          C. RYAN - DX BY MR. TRIPI

14:25:15  2     A.   Yes.   So the training is, it's a two-part

14:25:20  3  training at the fed law enforcement training center in

14:25:25  4  Glenco, Georgia, which is called FLETC, that is the

14:25:29  5  acronym.

14:25:29  6     Q.   Just for the record, FLETC, what are the letters

14:25:33  7  for that acronym?

14:25:35  8     A.   F-L-E-T-C.

14:25:38  9     Q.   And that stands for Federal Law Enforcement

14:25:41  10  Training Center?

14:25:41  11     A.   Centers plural, because there are more than one,

14:25:45  12  but my training was at the one located in Glenco,

14:25:50  13  Georgia.

14:25:50  14     Q.   Please continue.

14:25:50  15     A.   It's two-part training for HSI Special Agents.

14:25:54  16  The first part is administered by FLETC, provided by

14:25:59  17  FLETC, it's called criminal investigator training

14:26:02  18  program or CITP for short.   And it's a general criminal

14:26:06  19  investigator training and it lasts 11-weeks.

14:26:10  20     Q.   And generally what does that cover?

14:26:11  21     A.   Interviews, interrogations, search, seizure,

14:26:15  22  constitutional law.   It's a mix of academic and

14:26:18  23  practical exercise that covers the duties and

14:26:21  24  responsibilities of a special agent.

14:26:22  25     Q.   Is that the same type of training that agents

```
1              C. RYAN - DX BY MR. TRIPI
```

14:26:25   2   from other federal agencies would attend?

14:26:27   3      A.   Yes.

14:26:28   4      Q.   Like what other federal agencies take that FLETC

14:26:32   5   training?

14:26:33   6      A.   ATF agents, specifically CITP, it's almost every

14:26:38   7   other federal agency except for the FBI and DEA.  Postal

14:26:45   8   inspectors also run their own academy and they don't go

14:26:49   9   there.

14:26:49   10     Q.   What was the second part of the training you

14:26:59   11   received?

14:26:59   12     A.   It's HSI specific training.  So, it's with the

14:27:03   13   HSI Special Agent training program and it covers the

14:27:06   14   same topics but the CITP, because it's used by different

14:27:12   15   agencies, does not incorporate any agency policy in its

14:27:16   16   training.  And then the agencies that offer add-on

14:27:20   17   trainings like HSI, do that training to incorporate the

14:27:25   18   agency policy that you'll be working under.

14:27:27   19     Q.   And in that training to become an HSI agent, are

14:27:30   20   you trained in border search authority?

14:27:33   21     A.   Yes.

14:27:33   22     Q.   Just, generally, what does that training cover?

14:27:36   23     A.   Again, it's a mix of academic and practical

14:27:41   24   exercise that covers the governing statutes, the

14:27:45   25   governing agency policies, the mechanics of how to

```
              1              C. RYAN - DX BY MR. TRIPI
14:27:49      2   execute a proper border search.
14:27:51      3       Q.   The authority to do a border search?
14:27:53      4       A.   Yes.
14:27:55      5       Q.   Is that derived from Title 19 and other statutes?
14:27:59      6       A.   Title 19, yes.
14:28:00      7       Q.   And before I go further with your training and
14:28:05      8   experience, just overall, Homeland Security
14:28:12      9   investigations falls under the Department of Homeland
14:28:14     10   Security, is that correct?
14:28:15     11       A.   Yes.
14:28:15     12       Q.   And can you describe the components of the
14:28:18     13   Department of Homeland Security, the different agencies?
14:28:20     14       A.   It's vast.  So it's Immigration and Custom
14:28:26     15   Enforcement, which HSI is a part of, the other part of
14:28:30     16   Immigration and Custom Enforcement is enforcement and
14:28:45     17   removal operations.  The Coast Guard, when not in time
14:28:49     18   of war, U.S. Customs and Border Protection, which is,
14:28:53     19   you know, the border patrol and CBP, U.S. Citizenship
14:28:58     20   and Immigration Service, DHS has an air and marine unit
14:29:06     21   that falls under that, FEMA falls under that, the
14:29:11     22   Federal Emergency Management Agency and many more.
14:29:13     23       Q.   What is the mission and function of the
14:29:17     24   Department of Homeland Security Investigations?
14:29:20     25       A.   Homeland Security Investigations, I'm sorry?
```

```
 1                    C. RYAN - DX BY MR. TRIPI
 2     Q.   Your agency.
 3     A.   My agency?
 4     Q.   Yes.
 5     A.   Okay.  I wanted to be clear.  So Homeland
 6  Security Investigations uses, we conduct criminal
 7  investigations, it's generally of things that involve
 8  the illegal movement of people, money or some sort of
 9  contraband in international commerce over the U.S.
10  border.  And then there are several programatic areas,
11  programatic areas that we created under those areas to
12  address those responsibilities.  So we conduct federal
13  investigations of drug smuggling, other contraband
14  smuggling, human rights violations, human trafficking,
15  war crimes, smuggling of people, associated financial
16  crimes that affect all of those, so whether it's a fraud
17  crime or an after-the-fact money laundering, illegal
18  importation of counterfeit goods, goods that are
19  mismarked, the illegal export of controlled
20  technologies, child pornography, it's very broad.
21     Q.   And is part of the objective to investigate
22  transnational organized crime groups such as the group
23  that you're part of?
24     A.   Yes transnational organized crime groups could
25  effect almost any of those different programatic areas
```

1                C. RYAN - DX BY MR. TRIPI

14:31:09  2    that we've created.

14:31:10  3        Q.   To include drug trafficking and drug smuggling?

14:31:18  4        A.   Yes.

14:31:19  5        Q.   And what is your educational background?

14:31:21  6        A.   I have a Bachelor of Arts degree from St.

14:31:33  7    Martin's University in Lacey, Washington in criminal

14:31:41  8    justice.

14:31:42  9        Q.   When did you receive your degree?

14:31:44  10       A.   2003.

14:31:48  11       Q.   Do you have military and other law enforcement

14:31:51  12   experience that predates your employment with Homeland

14:31:58  13   Security?

14:31:58  14       A.   Yes, beginning in 1992.

14:31:59  15       Q.   Can you describe your experience beginning back

14:32:03  16   in 1992?

14:32:04  17       A.   In 1992, I joined the Army National Guard in

14:32:08  18   Pennsylvania where I grew up as an artillery man.  I was

14:32:13  19   there until April of '95 in the National Guard, and then

14:32:26  20   I left and went on active duty in the Army and went to

14:32:29  21   Fort Campbell in Kentucky and continued as an artillery

14:32:34  22   man until 1997 as an unlisted member of the Army and

14:32:39  23   then I began the process to apply to become an Army CID

14:32:45  24   Special Agent.

14:32:46  25       Q.   Real quick, what is an Army CID Special Agent?

C. RYAN - DX BY MR. TRIPI

14:32:49  A.   So, there is a command within the U.S. Army
14:32:52  called the U.S. Army criminal investigation command.
14:33:28  Historically it was known as CID, which is criminal
14:33:32  investigation division, Army CID, Special Agents, effect
14:33:37  crimes that involve Army members and Army installations.

14:33:41  Q.   And what are the range crimes that an Army CID
14:33:51  Special Agent investigates?

14:33:52  A.   Fraud crimes, crimes against persons, crimes
14:33:55  against property, drug crimes.

14:33:58  Q.   Okay.  Please continue with your experience
14:34:00  regarding Army CID?

14:34:02  A.   So, because I was not already a member of the
14:34:06  military police, the process that I had to follow to
14:34:09  apply was to start with an internship at the CID office
14:34:13  in Fort Campbell, I started that in 1997.

14:34:18  Q.   That is Fort Campbell, Kentucky?

14:34:23  A.   Yes.

14:34:24  Q.   Okay, continue.

14:34:25  A.   After six months, I applied to change my MOS to
14:34:39  CID Special Agent.  I was successful.  I was accepted.
14:34:43  And then I began Army CID special agent training in Fort
14:34:49  McClellan in Alabama in 1998, or, excuse me, 1999.

14:34:54  Q.   And what did that training cover?

14:34:56  A.   Similar to the other training, I attended a mix

```
          1            C. RYAN - DX BY MR. TRIPI
14:35:01  2   of classroom and practical exercise training, covered
14:35:15  3   search and seizure, interview and interrogation,
14:35:19  4   evidence processing.
14:35:20  5       Q.  And as an Army CID Special Agent, do you have
14:35:26  6   some practical experience?
14:35:28  7       A.  Yes.
14:35:28  8       Q.  And does that include domestic and overseas
14:35:32  9   deployments?
14:35:33 10       A.  Yes.
14:35:33 11       Q.  And please describe that.
14:35:35 12       A.  I was assigned to three domestic CID offices
14:35:38 13   between April -- August 1999, and when I left the Army
14:35:43 14   in November of 2004.  The first one was Fort Lewis,
14:35:48 15   which is in Washington.  And after that, I was in
14:35:52 16   Carlisle barracks in Pennsylvania.  And after that, I
14:35:55 17   left Carlisle barracks and I was assigned to Fort Bragg,
14:36:12 18   North Carolina was the last office I was in.  And then
14:36:16 19   from Fort Bragg, I went to Iraq in 2003.
14:36:22 20       Q.  And how many overseas deployments to Iraq did you
14:36:27 21   do?
14:36:28 22       A.  One as an Army CID Special Agent on active duty.
14:36:35 23   And after I left Army CID, I kind of fell into a
14:36:40 24   two-track career for a while after that.  So I continued
14:36:51 25   in the military reserve in the Navy as an intelligence
```

1                 C. RYAN - DX BY MR. TRIPI

14:36:56  2  officer, and then I worked as a civilian special agent

14:36:59  3  for the Army, and then a couple of other agencies before

14:37:02  4  ultimately working for HSI, and then I went to Iraq one

14:37:07  5  time as a Naval Intelligence Officer.

14:37:09  6     Q.  At some point after your employment with the Army

14:37:13  7  CID, did you become a Naval Criminal Investigative

14:37:18  8  Services Investigator?

14:37:18  9     A.  Yes.

14:37:19  10    Q.  And when was that?

14:37:19  11    A.  2018 -- that is not right -- 2008, sorry.

14:37:24  12    Q.  And what type of work did you do with -- that is

15:38:16  13  commonly referred to as NCIS, correct?

15:38:20  14    A.  Very similar to the work that I did at Army CID,

15:38:24  15  I worked for a part of NCIS called Contingency Response

15:38:39  16  Field Office.  It was the heaviest period of overseas

15:38:43  17  deployment for the Navy and NCIS, U.S. military in my

15:38:50  18  career.  We were stationed at the training center in

15:38:56  19  Glenco, Georgia.  We weren't trainers, we were there

15:38:58  20  preparing for deployments to primarily the sentcom

15:39:13  21  period of responsibility in support of the Navy and the

15:39:15  22  Marine Corps, and then I deployed from there three times

15:39:19  23  to Afghanistan.

15:39:21  24    Q.  Have you also done time as a Department of

15:39:24  25  Defense Investigator as well as a Department of Justice

|     |    |                                              |
|-----|----|----------------------------------------------|
|          | 1  | C. RYAN - DX BY MR. TRIPI |
| 15:39:36 | 2  | OIG Special Agent? |
| 15:39:37 | 3  | A.   Yes, yes.   In between Army CID and NCIS. |
| 15:39:42 | 4  | Q.   What type of work did you do for the Department |
| 15:39:46 | 5  | of Justice Office and the Inspector General? |
| 15:39:48 | 6  | A.   I was in a squad that investigated fraud in DOJ |
| 15:39:57 | 7  | grant programs. |
| 15:39:58 | 8  | Q.   Are you retired from the military? |
| 15:40:00 | 9  | A.   I am. |
| 15:40:01 | 10 | Q.   And when did you retire from the military? |
| 15:40:04 | 11 | A.   A couple years ago, August of 2019. |
| 15:40:12 | 12 | Q.   Now, as an HSI Special Agent here in Buffalo, |
| 15:40:19 | 13 | have you also been assigned to work with any other |
| 15:40:21 | 14 | agencies local? |
| 15:40:22 | 15 | A.   I worked in a DEA task force group for about two |
| 15:40:28 | 16 | years. |
| 15:40:28 | 17 | Q.   And that is here in Buffalo, New York? |
| 15:40:30 | 18 | A.   In Buffalo. |
| 15:40:31 | 19 | Q.   When did you begin as a DEA task force officer |
| 15:40:35 | 20 | here in Buffalo? |
| 15:40:36 | 21 | A.   Working close with them in late 2016 and every |
| 15:40:40 | 22 | time in the office sometime in early 2017. |
| 15:40:43 | 23 | Q.   And just so the record is clear, you're still an |
| 15:40:46 | 24 | HSI Special Agent, but you're working there on cases |
| 15:40:50 | 25 | with DEA on their task force? |

```
          1              C. RYAN - DX BY MR. TRIPI
15:40:53  2     A.   Yes.
15:40:53  3     Q.   And you maintain all of your HSI obligations and
15:40:57  4   duties as well?
15:40:58  5     A.   Yes.
15:40:58  6     Q.   And as a DEA TFO or task force officer, did you
15:41:09  7   generally become familiar with DEA policies and
15:41:18  8   procedures in the DEA office here in Buffalo?
15:41:21  9     A.   Yes.
15:41:30 10     Q.   And during that time when you were a DEA Task
15:41:36 11   Force Officer, how long were you a task force officer?
15:41:38 12     A.   About two years to early 2019, January.
15:41:42 13     Q.   And did some of your time working as a task force
15:41:45 14   officer overlap with the time that Joseph Bongiovanni
15:41:48 15   was a DEA Special Agent in that office?
15:41:51 16     A.   Yes.
15:41:52 17     Q.   And do you see Mr. Bongiovanni in court?
15:41:54 18     A.   Yes.
15:41:55 19     Q.   And could you point to him and describe something
15:41:57 20   he is wearing?
15:41:58 21     A.   He is at the defense table, blue suit, white
15:42:03 22   shirt and striped tie.
15:42:05 23     Q.   And when you worked with him within DEA, were you
15:42:08 24   in different groups?
15:42:09 25     A.   We were in different groups, yes.
```

```
              C. RYAN - DX BY MR. TRIPI
```

1

15:42:11   2    Q.   DEA has several groups that work cases?

15:42:14   3    A.   Three groups in that office, I think.

15:42:16   4    Q.   But everyone reports to the same, at the time,

15:42:19   5    reported to the same location and the same floor?

15:42:21   6    A.   Two floors, so the 4th and 5th floor of the

15:42:27   7    Electric Tower, parts of the 4th floor.

15:42:31   8    Q.   Now, we touched on it.  Have you received

15:42:34   9    training as it relates to border searches?

15:42:37   10   A.   Yes.

15:42:37   11   Q.   How many border searches have you been involved

15:42:42   12   with as an HSI Special Agent?

15:42:44   13   A.   Many, more than 50.

15:42:50   14   Q.   Is utilizing and understanding border search

15:42:55   15   authority an important part of your job?

15:42:58   16   A.   Yes.

15:42:58   17   Q.   How often as an HSI Special Agent do you deal

15:43:03   18   with border search issues during the course of your

15:43:14   19   duties?

15:43:14   20   A.   At least once a month.

15:43:16   21   Q.   Does Homeland Security Investigations work in

15:43:21   22   conjunction with CBP on border enforcement issues?

15:43:25   23   A.   Yes.

15:43:25   24   Q.   CBP is the Customs and Border Protection,

15:43:30   25   correct?

```
            1              C. RYAN - DX BY MR. TRIPI
15:43:30    2      A.   Yes.   So U.S. Customs and Border Protection is
15:43:34    3  the agency that both the Border Patrol and the Office of
15:43:39    4  Field Operations fall under.
15:43:42    5      Q.   And CBP works at ports of entry?
15:43:49    6      A.   Office of Field Operations officers work at the
15:43:53    7  port of entries.
15:43:54    8      Q.   What is a port of entry?
15:43:57    9      A.   It's a place that has been designated as an area
15:44:00   10  on the border where either people can apply for
15:44:03   11  admission, goods can be imported, they are found in
15:44:10   12  airports, Peace Bridge, land borders.
15:44:12   13      Q.   So where people can enter from outside of the
15:44:28   14  United States into the country?
15:44:30   15      A.   Or goods.
15:44:30   16      Q.   I'm sorry?
15:44:31   17      A.   Or goods.
15:44:32   18      Q.   Those are located at airports, bridges, train
15:44:43   19  stations?
15:44:44   20      A.   Sea ports, yes.
15:44:46   21      Q.   Generally speaking, does HSI and CBP have access
15:45:16   22  to similar information as does border enforcement?
15:45:19   23      A.   Yes.
15:45:22   24      Q.   And so would you have access to the same
15:45:24   25  information CBP has?
```

```
                              C. RYAN - DX BY MR. TRIPI
15:45:26   2      A.   Yes.
15:45:27   3      Q.   In terms of your ability to look up information?
15:45:29   4      A.   Yes.
15:45:33   5      Q.   Does HSI and CBP share information?
15:45:36   6      A.   We share information.  Some of the systems are
15:45:39   7  shared even if they are administered by just one of the
15:45:43   8  agencies.
15:45:44   9      Q.   And both agencies are under the Department of
15:45:48   10 Homeland Security?
15:45:48   11     A.   Yes.
15:45:49   12     Q.   Correct?
15:45:50   13     A.   Yes, that's correct.
15:45:59   14     Q.   Now, when you're conducting an investigation, are
15:46:05   15 you able to obtain information during the regular course
15:46:08   16 of your duties on individuals who are scheduled for
15:46:11   17 international travel?
15:46:13   18     A.   Yes.
15:46:16   19     Q.   And do you do that or do you receive that
15:46:20   20 information in situations where it's relevant to
15:46:24   21 investigations that you are conducting?
15:46:27   22     A.   Yes.
15:46:33   23     Q.   And is that done as a matter of routine system
15:46:38   24 notification to you?
15:46:39   25     A.   Yes.
```

```
                        C. RYAN - DX BY MR. TRIPI
```

15:46:44  2     Q.  As of April of 2019, had you been involved in

15:46:48  3    investing the activities of Joseph Bongiovanni?

15:46:51  4     A.  Yes.

15:47:01  5     Q.  A couple months prior to that, January 31, 2019

15:47:09  6    or February 1st, 2019, was it your understanding that

15:47:12  7    Mr. Bongiovanni retired?

15:47:13  8     A.  Yes.

15:47:23  9     Q.  Your investigation of him began before that

15:47:30  10   retirement date, correct?

15:47:32  11    A.  Yes, that's correct.

15:47:34  12    Q.  In April of 2019, did you learn information

15:47:37  13   indicating that Mr. Bongiovanni was traveling

15:47:40  14   internationally?

15:47:40  15    A.  Yes, to the Dominican Republic.

15:47:43  16    Q.  And as to specifically what did you learn?

15:47:47  17    A.  Mr. Bongiovanni had reservation on a flight to go

15:47:50  18   to the Dominican Republic.

15:47:53  19    Q.  Do you recall learning at that time when his

15:47:57  20   anticipated return to the United States was going to be?

15:48:00  21    A.  Yes, April 23rd.

15:48:01  22    Q.  What year?

15:48:02  23    A.  2019.

15:48:03  24    Q.  What location?

15:48:04  25    A.  Baltimore Washington International Airport.

1           C. RYAN - DX BY MR. TRIPI

15:48:07   2      Q.   And is that also referred to as BWI airport?

15:48:10   3      A.   Yes.

15:48:14   4      Q.   Based upon that notification to you through your

15:48:18   5   system, did you make efforts to flag Mr. Bongiovanni for

15:48:27   6   a border search?

15:48:28   7      A.   Yes.

15:48:30   8      Q.   Is that done in the normal course of your duties?

15:48:34   9      A.   Yes.

15:48:41   10     Q.   What efforts did you make in that regard?

15:48:44   11     A.   I asked the CBP task force officers that we

15:48:49   12   worked with to coordinate a border search.

15:48:51   13     Q.   So there are CBP officers here in Buffalo, New

15:48:56   14   York, correct?

15:48:56   15     A.   Yes.

15:48:56   16     Q.   At the time you're working with him on the BEST

15:49:02   17   task force, correct?

15:49:03   18     A.   Yes.

15:49:03   19     Q.   And you made arrangements for them to contact

15:49:07   20   counter parts of theirs in Baltimore BWI airport?

15:49:11   21     A.   Yes, that's correct.

15:49:18   22     Q.   And what type of -- what type of notice was

15:49:25   23   arranged as it related to Mr. Bongiovanni for his travel

15:49:32   24   on April 23rd, 2019?

15:49:34   25     A.   They used a one-day lookout.

1          C. RYAN - DX BY MR. TRIPI

15:49:36  2    Q.  What is a one-day lookout?

15:49:39  3    A.  It's just a type of record in the systems that we

15:49:43  4  share that alerts BWI that a person is expected to

15:49:50  5  return.  And if that person does show up, to send them

15:49:53  6  to what's called secondary inspections for Customs.

15:49:57  7    Q.  So there is a secondary inspection, but there is

15:49:59  8  also a primary inspection?

15:50:00  9    A.  Yes.

15:50:01  10    Q.  Briefly can you describe what a primary

15:50:04  11  inspection is?

15:50:04  12    A.  Primary inspection is the first officer that you

15:50:09  13  run into if you're coming back from Canada on the Peace

15:50:13  14  Bridge or you're coming in on an international flight,

15:50:16  15  you're asked to present your passport travel document,

15:50:22  16  asked the purpose of your trip, why you're there.  If

15:50:25  17  your travel requires a Visa, they'll check to see that

15:50:29  18  you have it.

15:50:29  19    Q.  And is the person who does the primary

15:50:34  20  inspection, do they have information available to them,

15:50:38  21  for example, based upon a lookout that is in the system

15:50:41  22  or information that flags somebody for the secondary

15:50:45  23  inspection?

15:50:45  24    A.  Yes.

15:50:47  25    Q.  And so describe what a secondary inspection was?

C. RYAN - DX BY MR. TRIPI

15:50:51    2    A.   A secondary inspection takes a little bit longer

15:51:00    3    to move the person out of the line, whether it's a line

15:51:04    4    of people, line of cars, whatever, to somewhere else

15:51:09    5    there and ask more questions about the purpose of the

15:51:11    6    person's travel, where they went, where they stayed,

15:51:16    7    they might search luggage they might search phones, it

15:51:20    8    just depends.

15:51:21    9    Q.   Other electronic devices?

15:51:24    10   A.   Other electronic devices.   It depends on the

15:51:28    11   questions the officers ask, the answers they get, their

15:51:32    12   evaluation of the person they are talking to at

15:51:37    13   secondary.

15:51:38    14   Q.   Now, did you provide the BWI CBP officers any

15:51:58    15   specific details of your case or your investigation

15:52:01    16   regarding Mr. Bongiovanni?

15:52:02    17   A.   No.

15:52:05    18   Q.   Did you provide any instructions or give any

15:52:08    19   directives about how the search of Mr. Bongiovanni

15:52:11    20   should be conducted?

15:52:12    21   A.   No, I did not.

15:52:15    22   Q.   If you had wanted to have that type of control

15:52:18    23   over the search, would you have taken other steps?

15:52:25    24   A.   Yes.

15:52:25    25   Q.   What could you have done if you wanted that type

1          C. RYAN - DX BY MR. TRIPI

15:52:29  2  of control?

15:52:30  3      A.   I would have coordinated directly with HSI

15:52:42  4  Special Agents at Baltimore Washington International

15:52:45  5  Airport and put myself in a position to have more

15:52:48  6  control over their actions.

15:52:50  7      Q.   And but you didn't do that?

15:52:51  8      A.   No.

15:52:53  9      Q.   Do HSI Special Agents also have border search

15:52:59  10  authority?

15:52:59  11      A.   Yes.

15:52:59  12      Q.   And can you explain briefly how CBP and HSI

15:53:03  13  interact when there is someone who comes into the

15:53:09  14  country and is subject to a primary or secondary search,

15:53:14  15  where there is contraband immediately found in their

15:53:18  16  possession, can you describe how the two agencies

15:53:21  17  interact?

15:53:21  18      A.   Yes.  Well, at least here in Buffalo, every day

15:53:25  19  there is an HSI Special Agent designated as the duty

15:53:29  20  agent.  In a situation like you have described where CBP

15:53:34  21  Officer has done a primary or secondary inspection that

15:53:37  22  results in the discovery of contraband, call the HSI

15:58:42  23  duty agent and the duty agent responds to the port of

15:58:54  24  entry where that person is located and assists CBP with

15:59:01  25  completing anything that is supposed to be completed at

1                    C. RYAN - DX BY MR. TRIPI

15:59:04   2   the port and evaluates the situation to determine if a

15:59:07   3   follow on investigation is required.

15:59:12   4       Q.   Now, in this case.  As it relates to the April

15:59:17   5   23rd, 2019 border search, you didn't give any directives

15:59:22   6   to the CBP officers involved; is that correct?

15:59:25   7       A.   That's correct.

15:59:25   8       Q.   Did you ever speak with the CBP officers who did

15:59:30   9   the search prior to the search occurring?

15:59:32  10       A.   No.

15:59:33  11       Q.   Or during their search?

15:59:34  12       A.   No.

15:59:35  13       Q.   Did you know the names of the officers who

15:59:37  14   conducted the search prior to them doing the search?

15:59:40  15       A.   I was copied on an e-mail, but I wouldn't have

15:59:45  16   everyone.  No, I don't think I did.  I wouldn't have

15:59:48  17   bothered to find out it.  Just depends on who is on

15:59:52  18   shift.  It's not, it's something that I probably would

15:59:57  19   have even been able to find out had I chosen to.

16:00:00  20       Q.   I'll ask it more directly.  Did you ever speak

16:00:03  21   with Kipplin Carter?

16:00:06  22       A.   No.

16:00:06  23       Q.   Did you know who that was prior to this hearing?

16:00:09  24       A.   No.  Well, I know that an Officer Carter did the

16:00:13  25   search from the report, but his first name is not even

```
                              C. RYAN - DX BY MR. TRIPI
16:00:17   2   mentioned in the report.
16:00:18   3       Q.   You helped us identify a document which had a
16:00:22   4   name on it?
16:00:22   5       A.   Yes.
16:00:25   6       Q.   And then travel was arranged through other means?
16:00:28   7       A.   Correct.
16:00:29   8       Q.   For Mr. Carter, correct?
16:00:31   9       A.   Correct.
16:00:31  10       Q.   You had no role in it?
16:00:33  11       A.   None.
16:00:39  12       Q.   While Mr. Carter has been in town, have you told
16:00:43  13   him about your case?
16:00:44  14       A.   No.
16:00:44  15       Q.   Have you talked to him at all?
16:00:46  16       A.   I said hello to him this morning and that's it.
16:01:22  17       Q.   Did you receive something back subsequent to the
16:01:28  18   April 23rd, 2019 border search regarding Mr.
16:01:32  19   Bongiovanni?
16:01:32  20       A.   Yes.
16:01:33  21       Q.   What did you receive back from CBP?
16:01:35  22       A.   A PDF electronic document with a series of
16:01:39  23   photographs.
16:01:45  24       Q.   I'm going to show you Government's Exhibit 1,
16:01:47  25   which is already in evidence.
```

```
 1                    C. RYAN - DX BY MR. TRIPI
```

16:01:49   2              MR. TRIPI:  And I'll hand that up if that is

16:01:50   3   okay, Judge?

16:01:51   4              MAGISTRATE JUDGE ROEMER:  Yes.

16:02:22   5      Q.  Do you recognize that?

16:02:23   6      A.  Yes.

16:02:23   7      Q.  What is that?

16:02:24   8      A.  It's a printed copy of the PDF I just described.

16:02:28   9      Q.  So that would be the PDF of the information you

16:02:30  10   received back from the search of Mr. Bongiovanni's

16:02:33  11   phone?

16:02:33  12      A.  Yes.

16:02:36  13      Q.  And that PDF consists of pictures of various

16:02:42  14   screens of the phone?

16:02:43  15      A.  Yes.

16:02:50  16      Q.  Now, as it relates to phones, are you familiar

16:02:53  17   with the term "basic search"?

16:02:55  18      A.  Yes.

16:02:56  19      Q.  Is that interchangeable in your mind with the

16:03:00  20   phrase "manual search"?

16:03:01  21      A.  Yes.

16:03:01  22      Q.  What is a basic or manual search of a cell phone?

16:03:05  23      A.  An officer or an agent, using your eyeballs and

16:03:09  24   your finger, and just looking through the phone.

16:03:13  25      Q.  And what you have there, Government's Exhibit 1,

1          C. RYAN - DX BY MR. TRIPI

16:03:19  2  is that consistent in your experience with a manual

16:03:22  3  search or a basic search of the cell phone?

16:03:25  4      A.  Yes, it looks like photographs taken during a

16:03:29  5  manual search.

16:03:31  6      Q.  And, now, are you familiar with the phrase -- is

16:03:37  7  the term "basic search" also used interchangeably with

16:03:42  8  "cursory search"?

16:03:43  9      A.  Yes.

16:03:44  10     Q.  And are you familiar with the phrase "forensic

16:03:49  11  search" or "logical examination"?

16:03:51  12     A.  Yes.

16:03:51  13     Q.  And what is a forensic search in the case of a

16:03:55  14  cell phone or logical examination?

16:03:57  15     A.  It's where you use an automated computerized tool

16:04:14  16  that extracts the data that is saved on the phone and

16:04:18  17  then it organizes it.  It has an interface built into it

16:04:22  18  and then you then use a computer after the fact to view

16:04:25  19  the data.

16:04:26  20     Q.  In your experience, does a forensic or a logical

16:04:30  21  examination of a cell phone using that type of forensic

16:04:37  22  tool that you described, does that typically result in

16:04:55  23  more information than a manual or basic search?

16:04:57  24     A.  Yes, it's exponentially greater.

16:05:00  25     Q.  Much more?

```
        1                  C. RYAN - DX BY MR. TRIPI
16:05:01   2       A.   Much.
16:05:07   3       Q.   If a logical or forensic search of a cell phone
16:05:13   4   was conducted, would you expect more than 14 pages of
16:05:17   5   photos, roughly?
16:05:18   6       A.   Yes.
16:05:18   7       Q.   Comprised in Exhibit 1?
16:05:20   8       A.   Yes, I mean, it could be a terabyte of
16:05:23   9   information, just depends on how much is saved on the
16:05:26  10   phone.
16:05:32  11       Q.   Okay.  Now, as long as we're discussing this
16:05:36  12   Exhibit 1, I'm going to ask you a couple of questions
16:05:40  13   about it.  Bear with me.  So, looking at page one, there
16:05:50  14   is some -- there is a phone number at the top and there
16:05:53  15   is a couple of names that are visible, Gino, Laura, Mike
16:05:58  16   Mecca.  Is that correct?
16:05:59  17       A.   Yes.
16:06:20  18       Q.   So page two shows a series of three photographs
16:06:36  19   and you could see an individual's hand as if taking a
16:06:40  20   picture of the phone, correct?
16:06:41  21       A.   Yes.
16:06:42  22       Q.   Beginning with the top or the picture furthest to
16:06:50  23   the left of the screen, there is a phone number
16:06:59  24   17164323875, correct?
16:07:00  25       A.   Yes.
```

C. RYAN - DX BY MR. TRIPI

16:07:01  Q.  And below that there is a number 58720?

16:07:15  A.  Yes.

16:07:15  Q.  And then there is underneath, that is a Mike
16:07:20  Mecca?

16:07:20  A.  Yes.

16:07:21  Q.  And then under that is a Louie, and then another
16:07:25  partial view of a number 17168 and then follows with a
16:07:31  parenthetical (2), right?

16:07:33  A.  Yes.

16:07:33  Q.  And then below that, there is say name Palmieri,
16:07:37  correct?

16:07:38  A.  Yes.

16:07:38  Q.  Those appear to be text messages on that screen?

16:07:42  A.  Yes.

16:07:43  Q.  Now, the screen depicted in the middle photo on
16:07:47  page two has names, Tom Gerace, mom, below that 729,
16:07:55  below that a phone number, 17168708083, and below that
16:08:04  2957, is that correct?

16:08:06  A.  Yes.

16:08:07  Q.  And those all appear to be text messages as well?

16:08:10  A.  Yes.

16:08:10  Q.  And on this screen, so for these two pictures
16:08:15  we've seen, the screens are not expanded to show the
16:08:18  full text messages, are they?

<pre>
              1                    C. RYAN - DX BY MR. TRIPI
16:08:20      2       A.   No.
16:08:21      3       Q.   And, in fact, going back to the first picture to
16:08:25      4    the far left where there is the second from the bottom,
16:08:30      5    Louie, and then another phone number there with the
16:08:33      6    parenthetical (2), and based on your knowledge and use
16:08:36      7    of cell phones personally, does that appear to be a
16:08:39      8    group text?
16:08:40      9       A.   Yes.
16:08:40     10       Q.   And we don't see the full group text there, do
16:08:44     11    we?
16:08:44     12       A.   No.
16:08:45     13       Q.   And then going to the third picture on page two
16:08:48     14    to the furthest right of the screen, there is a name Joe
16:08:52     15    Massy, there is a name Hill, and then appears to be two
16:08:56     16    more phone numbers, and then there is a name Victor,
16:08:59     17    correct?
16:08:59     18       A.   Yes.
16:09:00     19       Q.   And on that screen, does it appear that the
16:09:03     20    entirety of the texts are visible?
16:09:05     21       A.   No, it's appears to just be a preview of the
16:09:10     22    first few words in each text.
16:09:12     23       Q.   In other words, you would have to click on each
16:09:15     24    one to open up the full conversation?
16:09:17     25       A.   Yes.
</pre>

                          C. RYAN - DX BY MR. TRIPI

16:09:18   Q.   I'll move to page 3.  Page 3 of Exhibit 1, do

16:09:28   these appear to be more text conversations in all three

16:09:32   photos?

16:09:32   A.   Yes.

16:09:33   Q.   Okay.  By way of speeding this up just a little

16:09:39   bit, do you see any references to Peter Gerace in any of

16:09:45   those photos?

16:09:45   A.   No.

16:09:48   Q.   In fact, after reviewing Exhibit 1 in its

16:09:52   entirety, Peter Gerace's name and number are not on

16:09:55   these screens that were captured, is it?

16:10:00   A.   No.

16:10:01   Q.   How about Anthony Gerace?

16:10:05   A.   No.

16:10:06   Q.   And how about Michael Sinatra?

16:10:12   A.   No.

16:10:25   Q.   How about an individual named Ron Cerel?

16:10:28   A.   No.

16:10:28   Q.   Those were all people referenced during your

16:10:31   later interview with Mr. Bongiovanni, June 6th, 2019,

16:10:35   correct?

16:10:36   A.   Yes.

16:10:37   Q.   Did any of the questions that you posed in those

16:10:40   areas on June 6th, 2019, have anything to do with the

```
            1              C. RYAN - DX BY MR. TRIPI
16:10:44    2    search of this phone?
16:10:45    3        A.   No.
16:10:46    4        Q.   And I'm going to continue with Exhibit 1.
19:08:17    5             Over to the left begins with Victor, the text
19:08:21    6    under that is 27589?
19:08:26    7        A.   Yes.
19:08:26    8        Q.   And under that appears to be a phone number with
19:08:30    9    an 815 area code?
19:08:32   10        A.   Yes, correct.
19:08:33   11        Q.   And below that with a 302 area code?
19:08:36   12        A.   Correct.
19:08:37   13        Q.   And below that with a 708 area code?
19:08:40   14        A.   Yes.
19:08:41   15        Q.   And the next picture to the right of that on the
19:08:44   16    screen at the top is a text to 708 area code, right?
19:08:48   17        A.   Yes.
19:08:51   18        Q.   Below that is the name "Linda" and then there is
19:08:56   19    a last name there, correct?
19:08:58   20        A.   Yes.
19:08:58   21        Q.   Under there there is a Gentile?
19:09:01   22        A.   Yes.
19:09:01   23        Q.   And you know that to be a DEA Special Agent?
19:09:05   24        A.   I know a special agent to be Mark Gentile, yes.
19:09:10   25        Q.   Sorry, withdrawn.
```

                    1            C. RYAN - DX BY MR. TRIPI

19:09:12    2            Do you know a DEA Special Agent with the name

19:09:34    3    Gentile?

19:09:36    4    A.   Yes.

19:09:36    5    Q.   And that is someone that Mr. Bongiovanni worked

19:09:50    6    with previously at DEA?

19:09:52    7    A.   They were in the same group during my time there,

19:10:00    8    part of my time, I should say.

19:10:01    9    Q.   Under that, there is a Laura?

19:10:03   10    A.   Yes.

19:10:04   11    Q.   And under that there is a Lisa?

19:10:05   12    A.   Yes.

19:10:06   13    Q.   And below that, there is the number 32858, but it

19:10:13   14    appears to cut off?

19:10:15   15    A.   Yes.

19:10:15   16    Q.   And go to the next page of Exhibit 1, I believe

19:10:18   17    we're up to page five, your Honor.

19:10:24   18            Fair to the say now these appear to be contact

19:10:27   19    entries in the phone as opposed to text as we were

19:10:32   20    looking at before, correct?

19:10:35   21    A.   Yes.

19:10:35   22    Q.   And there are three pictures of screens here.

19:10:55   23    There is a Parisi, correct?

19:10:57   24    A.   Correct.

19:10:58   25    Q.   And that is at the far left.  And there is a Nick

|  | 1 | C. RYAN - DX BY MR. TRIPI |

19:11:01  2  with a last name listed there?

19:11:03  3      A.  Yes.

19:11:03  4      Q.  In the middle picture?

19:11:05  5      A.  Yes.

19:11:05  6      Q.  And the picture to the far right is a Tom with a

19:11:08  7  last name, the last name there, correct?

19:11:13  8      A.  Yes, that's correct.

19:11:20  9      Q.  We'll go to page six of Exhibit 1.  Again, does

19:11:24  10  this show three pictures on this page?

19:11:28  11      A.  Yes, there are three photos.

19:11:30  12      Q.  And do those appear to be contact entries that

19:11:33  13  were in the phone?

19:11:33  14      A.  Yes.

19:11:34  15      Q.  And there is a first one to the left is a Steve

19:11:36  16  with a last name?

19:11:37  17      A.  Correct.

19:11:38  18      Q.  And middle entry, middle picture, Uncle Sam?

19:11:41  19      A.  Correct.

19:11:42  20      Q.  Far right, an individual named Ron with what

19:11:45  21  appears to be a last name listed there?

19:11:47  22      A.  Yes.

19:11:57  23      Q.  Page 7, Exhibit 1.  There are three more pictures

19:12:00  24  of what appear to be contacts, is that correct?

19:12:03  25      A.  Yes.

```
         1              C. RYAN - DX BY MR. TRIPI
19:12:03 2     Q.  There is a Victor?
19:12:04 3     A.  Correct, on the left.
19:12:05 4     Q.  And in the middle, there is a Tommy Frankaforte,
19:12:09 5   is that right?
19:12:10 6     A.  Yes.
19:12:10 7     Q.  And on the far right, there is a Roy?
19:12:13 8     A.  Yes.
19:12:13 9     Q.  And with the last name there, correct?
19:12:16 10    A.  Yes.
19:12:20 11    Q.  And moving onto page 8, that consists of three
19:12:32 12  more photos of what appears to be contacts that were in
19:12:53 13  the phone?
19:12:54 14    A.  Yes.
19:12:54 15    Q.  Far left, there is a name Promaglin?
19:12:57 16    A.  Yes.
19:12:58 17    Q.  And in the middle there is a name Romeo?
19:13:00 18    A.  Yes.
19:13:00 19    Q.  And in the far right, there is a name Philly
19:13:05 20  Torre, is that correct?
19:13:05 21    A.  Yes.
19:13:14 22    Q.  If we go to page nine now.  Three more photos of
19:13:18 23  Exhibit 1?
19:13:19 24    A.  Yes.
19:13:19 25    Q.  Far left, there is a phone number there?
```

|  | 1 | C. RYAN - DX BY MR. TRIPI |
|---|---|---|
| 19:13:22 | 2 | A.  Yes, (716) 870-8083. |
| 19:13:27 | 3 | Q.  No contact name associated with? |
| 19:13:29 | 4 | A.  No name. |
| 19:13:30 | 5 | Q.  In the middle picture, there is a name Tom |
| 19:13:33 | 6 | Gerace? |
| 19:13:33 | 7 | A.  Correct. |
| 19:13:34 | 8 | Q.  And the far right, there is another phone number, |
| 19:13:36 | 9 | correct? |
| 19:13:37 | 10 | A.  Yes, an 829 area code phone number. |
| 19:13:58 | 11 | Q.  I think we're up to page 10.  Three more photos |
| 19:14:02 | 12 | of what appear to be contacts in the phone.  Is that |
| 19:14:05 | 13 | correct? |
| 19:14:05 | 14 | A.  Yes. |
| 19:14:05 | 15 | Q.  Picture to the far left is the name Lapenna? |
| 19:14:09 | 16 | A.  Yes. |
| 19:14:09 | 17 | Q.  And in the middle, there is a Lociano Cerasi |
| 19:14:15 | 18 | FLEOA, and then all caps, F-l-e-o-a. |
| 19:14:19 | 19 | A.  Yes. |
| 19:14:19 | 20 | Q.  And then in the far right, there is a Joe Massy |
| 19:14:34 | 21 | name, correct? |
| 19:14:34 | 22 | A.  Yes. |
| 19:14:51 | 23 | Q.  Turning to page 11 of Government's Exhibit 1. |
| 19:14:55 | 24 | Three more photos of contacts.  Is that correct? |
| 19:14:57 | 25 | A.  Yes. |

|       |    | C. RYAN - DX BY MR. TRIPI |
|-------|----|---------------------------|

19:14:58   2    Q.   There is a Derrick, with what appears to be a

19:15:02   3  last name that begins with an M in the far left?

19:15:05   4    A.   Correct.

19:15:06   5    Q.   And the middle page is the name Frank Todaro?

19:15:10   6    A.   Yes.

19:15:11   7    Q.   And the far one is a name that seems to appear to

19:15:16   8  be cut off, but it looks like Ozzy?

19:15:19   9    A.   Yes.

19:15:25  10    Q.   Turning to page 12 of Exhibit 1.  Are those three

19:15:29  11  more pictures from the phone that appear to be from the

19:15:32  12  contacts of Mr. Bongiovanni's phone?

19:15:34  13    A.   Yes.

19:15:34  14    Q.   Far left is a Joelle Moranto?

19:15:39  15    A.   Yes.

19:15:40  16    Q.   And in the middle picture, is a Lenny with a last

19:15:45  17  name there?

19:15:45  18    A.   Yes.

19:15:45  19    Q.   And then the last page is a Philly with the last

19:15:50  20  name, correct?

19:15:51  21    A.   Yes.

19:15:58  22    Q.   Page 13 of Exhibit 1.  Three more pictures.

19:16:04  23  Nick, the far left, Parisi in the middle and Roy with

19:16:09  24  the last name that is listed there to the far right?

19:16:12  25    A.   Correct.

1          C. RYAN - DX BY MR. TRIPI

19:16:19  2      Q.  Last page is page 14 of Exhibit 1.  Two names,

19:16:24  3  two photos.  Photo to the left is the name Ron, the last

19:16:28  4  name is listed there, and one to the right, Tom, and the

19:16:31  5  last name that appears to be the listed as well,

19:16:35  6  correct?

19:16:35  7      A.  Yes.

19:16:40  8      Q.  And I'm going to hand the exhibit up to you one

19:16:52  9  more time.  Look through it and look through it where

19:16:56  10  there are entries for what appear to be phone numbers

19:16:59  11  with no name associated.  Based on your knowledge of the

19:17:04  12  investigation, do any of those appear to be phone

19:17:06  13  numbers for Peter Gerace, Anthony Gerace or Michael

19:17:10  14  Sinatra?

19:17:11  15      A.  No, I don't think so.  No, I don't see any.

19:23:01  16      Q.  Would it be accurate to state that any questions

19:23:04  17  that you later request asked Mr. Bongiovanni at his

19:23:07  18  residence on June 6th, 2019 about Anthony Gerace, Peter

19:23:13  19  Gerace or Michael Sinatra were questions independent of

19:23:16  20  any information you received from the search or search

19:25:06  21  of the phone?

19:25:07  22      A.  Yes, that's correct.

19:25:08  23      Q.  Would it be correct that any questions that you

19:25:10  24  asked Mr. Bongiovanni with respect to the fact that his

19:25:21  25  DEA issued cell phone was wiped when he returned it to

```
  1                  C. RYAN - DX BY MR. TRIPI
```

19:25:25   2   DEA, is that independent of anything that you learned

19:25:28   3   from the search of his personal cell phone at the border

19:25:44   4   on April 23, 2019?

19:25:46   5       A.   That is also correct.

19:25:47   6       Q.   Would it be accurate to say that any questions

19:25:50   7   that you asked Mr. Bongiovanni about a DEA file

19:25:53   8   materials located in his house on the day of the search

19:25:57   9   was wholly independent from anything that you learned at

19:26:01   10   the border search of his phone on April 23, 2019?

19:26:06   11       A.   Yes, also correct.

19:26:29   12       Q.   And I'd like to briefly hand up Government's

19:26:37   13   Exhibit 2 and let you briefly look at it, and then I'll

19:26:41   14   ask you questions.  Looking at Government's Exhibit 2,

19:27:07   15   this front page and second page appear to have names of

19:27:10   16   various CBP officers, correct?

19:27:13   17       A.   Yes.

19:27:13   18       Q.   Okay.  I'm going to go through some.  Joseph

19:27:18   19   Nnakwe,N-n-a-k-w-e, do you see his name in the top left

19:27:23   20   box for referred by?

19:27:24   21       A.   Yes.

19:27:25   22       Q.   Do you know Joseph Nnakwe?

19:27:29   23       A.   No.

19:27:29   24       Q.   Have you ever spoken to him, as far as you know?

19:27:32   25       A.   No.

```
            1              C. RYAN - DX BY MR. TRIPI

19:27:32    2      Q.   Did you provide him any instructions about how to

19:27:35    3   do his job that day?

19:27:36    4      A.   No.

19:27:39    5      Q.   About the middle of the page, do you see a name

19:27:44    6   Wachstein Stephen, secondary officer's name?

19:27:47    7      A.   Yes.

19:27:48    8      Q.   Do you know Steven Wachstein?

19:27:51    9      A.   Only that I introduced myself to him today and I

19:27:55   10   saw his name tag.

19:27:56   11      Q.   Did you know him?

19:27:58   12      A.   No.

19:27:58   13      Q.   Did you tell Mr. Wachstein how to do his job at

19:28:02   14   all on April 23rd, 2019?

19:28:04   15      A.   No.

19:28:12   16      Q.   Turning to page two.  Do you see a name under

19:28:19   17   "entered by Whitfield, Christopher"?

19:28:21   18      A.   Yes.

19:28:22   19      Q.   As far as you know, do you know Mr. Whitfield?

19:28:25   20      A.   I do not know him.

19:28:27   21      Q.   Did you ever meet him, as far as you know?

19:28:30   22      A.   No.

19:28:30   23      Q.   Did you provide him any instruction or tell him

19:28:33   24   how to do his job on April 23, 2019?

19:28:36   25      A.   I did not.
```

1          C. RYAN - DX BY MR. TRIPI

19:28:37   2     Q.  How about in the second to last sentence where it

19:28:40   3   references CBPO Carter, did you ever meet him prior to

19:28:44   4   his travels here and out in the hallway today?

19:28:48   5     A.  No.

19:28:48   6     Q.  Did you provide him any direction or instruct him

19:28:52   7   how TO do his job on April 23, 2019?

19:28:56   8     A.  I did not.

19:28:56   9     Q.  How about CBPO Sadowski, do you know him or have

19:29:01   10  you met him as far as you're aware?

19:29:03   11    A.  I have not and I don't know him.

19:29:05   12    Q.  Did you provide him any direction or instruction

19:29:07   13  about how he should do his job on April 23, 2019?

19:29:11   14    A.  No, I did not.

19:29:20   15    Q.  I'm sorry I missed one name.  There is a

19:29:23   16  reference to W, I'm sorry, blurry.  There is also a

19:29:28   17  reference to a Candela.  Did you provide him direction

19:29:31   18  or instruction about how he should do his job on April

19:29:34   19  23, 2019?

19:29:35   20    A.  No.

19:29:36   21    Q.  Have you ever personally met him as far as you're

19:29:40   22  aware?

19:29:40   23    A.  No.

19:29:53   24    Q.  Now in terms of getting the PDF, as far as

19:29:56   25  Exhibit 1, were you listed with several other CBP

```
 1              C. RYAN - DX BY MR. TRIPI
```

19:30:11  2  officers that received that e-mail with the PDFs?

19:30:14  3     A.   Yes.

19:30:15  4     Q.   And that came from Candela?

19:30:17  5     A.   Yes.

19:30:34  6     Q.   Was it a conscious decision by you not to provide

19:30:38  7  any case details to the CBP people who would be

19:30:43  8  conducting the investigation beyond a secondary search

19:30:47  9  was being requested?

19:30:59  10     A.   Yes.

19:30:59  11     Q.   Why was it a conscious decision not to provide

19:31:05  12  those specifics about your investigation into Mr.

19:31:08  13  Bongiovanni?

19:31:08  14     A.   It's a sensitive investigation.

19:31:10  15     Q.   How so?

19:31:11  16     A.   Because of the allegations of public corruption,

19:31:15  17  we limited even, in our own office, who had knowledge

19:31:19  18  about the case.

19:31:25  19     Q.   Now, was the search -- let me direct you to

19:31:39  20  Government's Exhibit 2.  Based on your training and

19:31:42  21  experience, was the search conducted by CBP within the

19:31:49  22  scope of their authority?

19:31:51  23     A.   Yes.

19:31:52  24     Q.   Based on your training and experience, could they

19:31:56  25  have gone further in the search?

```
        1              C. RYAN - DX BY MR. TRIPI
19:31:57  2      A.   Yes.
19:31:57  3      Q.   And in your experience, are sometimes phones
19:32:01  4  detained for days or even longer while the search of a
19:32:06  5  cellular phone is being conducted?
19:32:08  6      A.   Yes.
19:32:09  7      Q.   That didn't happen in this case, did it?
19:32:11  8      A.   No.
19:32:12  9      Q.   As far as you understand it, did Mr. Bongiovanni
19:32:18 10  and his wife make their flights on time?
19:32:21 11      A.   Yes, I think they did.
19:32:25 12      Q.   Does CBP conduct searches of cell phones on their
19:32:33 13  own without HSI?
19:32:34 14      A.   All of the time.
19:32:36 15      Q.   As an HSI agent, are you entitled to receive
19:32:41 16  information from CBP officers about the searches they
19:32:44 17  do?
19:32:44 18      A.   Yes.
19:32:50 19      Q.   I'm going to show you Exhibit 33 in evidence.
19:32:56 20  It's captioned U.S. Customs and Border Protection
19:33:00 21  Inspection of Electronic Devices.  Is that correct?
19:33:04 22      A.   Yes.
19:33:05 23      Q.   And it appears to provide information, true?
19:33:07 24      A.   It does.
19:33:08 25      Q.   Just, can you just read the various headings
```

1          C. RYAN - DX BY MR. TRIPI

19:33:12   2   about what this document is designed to inform people

19:33:18   3   of?

19:33:18   4      A.   So, the first heading is why you may be chosen

19:33:21   5   for an inspection and it lists reasons.  The second

19:33:25   6   heading is "authority to search."  And it lists those

19:33:29   7   authorities below.  And the third heading is what

19:33:31   8   happens now.  Describes the process.  And then the

19:33:36   9   fourth heading is return or seizure of detained

19:33:40   10  electronic devices.

19:33:41   11     Q.   And it continues on the back, correct?

19:33:44   12     A.   Yes.  The next heading on the back is privacy and

19:33:49   13  civil liberties protection.

19:33:49   14     Q.   Let's go back to the front page of Exhibit 33.

19:33:54   15  I'm going to Zoom in.  I ask you to read, "return or

19:33:58   16  seizure of detained electronic devices"?

19:34:02   17     A.   "CBP will contact you by telephone when the

19:34:13   18  examination of the electronic device (s) is complete to

19:34:20   19  notify.  You may pick up the item or items during the

19:34:24   20  regular business hours from the location where the items

19:34:37   21  were detained" or -- excuse me -- "was detained.  If it

19:34:41   22  is impractical for you to pick up the device, CPB can

19:34:48   23  make" --

19:34:50   24     Q.   Continuing to the back.

19:35:02   25     A.   -- "arrangements to ship the device to you at our

1          C. RYAN - DX BY MR. TRIPI

19:35:11   2   expense.  CBP may retain documents or information

19:35:24   3   relating to immigration, customs and other enforcement

19:35:28   4   matters only if such retention is consistent with the

19:35:31   5   privacy and data protection standards of the system in

19:35:47   6   which such information is retained.  Otherwise if after

19:35:50   7   reviewing the information there exists no probable cause

19:35:53   8   to seize it, CBP will not retain any copies."

19:35:58   9        Q.  Okay.  Can you read the next paragraph?

19:36:02   10       A.  "If CBP determines that the device is subject to

19:36:15   11  seizure under law, for example, if the device contains

19:36:19   12  evidence of a crime, contraband or other prohibited or

19:36:23   13  restricted items or information, then you will be

19:36:26   14  notified of the seizure as well as your options to

19:36:29   15  contest it through the local CBP fines, penalties and

19:36:34   16  forfeitures office."

19:36:36   17       Q.  Now, I want to go down to "routine uses."  If you

19:36:40   18  could read that part?

19:36:41   19       A.  "The subject information may be made available to

19:36:44   20  other agencies for investigation and/or for obtaining

19:36:47   21  assistance relating to jurisdictional or subject matter

19:36:51   22  expertise or for translation encryption or other

19:36:55   23  technical assistance.  This information may also be made

19:36:58   24  available to assist in border security and intelligence

19:37:24   25  activities, domestic law enforcement and the enforcement

```
           1              C. RYAN - DX BY MR. TRIPI
19:37:27   2   of other crimes of a transnational nature and shared
19:37:31   3   with elements of the federal government responsible for
19:37:34   4   analyzing terrorist threat information."
19:37:40   5       Q.  Is that consistent with your training and
19:37:44   6   experience that you were permitted to receive the
19:37:46   7   information from CBP?
19:37:48   8       A.  Yes.
19:37:48   9       Q.  And, in fact, CBP officers were on your BEST task
19:37:53  10   force, is that correct?
19:37:54  11       A.  Yes.
19:37:55  12       Q.  Who were some of the CBP officers that were on
19:37:58  13   the BEST task force with you?
19:38:44  14       A.  Jack Gernatt, Joseph Spidone, Thomas Moss, being
19:38:51  15   was a border patrol agent working with us.
19:39:13  16       Q.  I'm going to go back to Exhibit 2.  We've already
19:39:22  17   read the whole paragraph, and I'm not going to ask you
19:39:26  18   to do that.  But, I'm going to ask you a couple of
19:39:31  19   questions.  In this paragraph subject is referred to as
19:39:39  20   "Joseph Bongiovanni," is that correct?
19:39:40  21       A.  Yes.
19:39:41  22       Q.  And there is a sentence that says "subject had a
19:39:43  23   Samsung model SM-J," and a long IME number and a phone
19:39:51  24   number of 7165072784; is that correct?
19:40:06  25       A.  Yes.
```

1        C. RYAN - DX BY MR. TRIPI

19:40:09    2    Q.   And then the second to last sentence reads "CBPO

19:40:14    3    Carter," and said "along with Watch Commander Candela,

19:40:20    4    conducted a basic search of the devices which yielded no

19:40:34    5    derogatory information," is that correct?

19:40:36    6    A.   Yes.

19:40:37    7    Q.   What is your understanding of the meaning of that

19:40:42    8    sentence when it says "yielded no derogatory

19:40:46    9    information"?

19:40:46   10    A.   There were no images in the phone of contraband

19:40:49   11    that would have caused them to contact the HSI BWI duty

19:40:54   12    agent.

19:40:57   13    Q.   The term "no derogatory information," do you

19:41:01   14    interpret that as an assessment of the case you were

19:41:05   15    investigating?

19:41:05   16    A.   No, it's their assessment of their secondary

19:41:08   17    inspection.

19:41:09   18    Q.   The details of what was relevant to your

19:41:14   19    investigation were known to you and a close number of

19:41:19   20    people you were working with.  Is that correct?

19:41:21   21    A.   Yes.

19:41:25   22    Q.   And among the things that you were investigating,

19:41:35   23    what were some of the offenses you were investigating

19:41:38   24    just by generic term?

19:41:40   25    A.   Drug trafficking, bribery, obstruction of

|   | 1 | C. RYAN - DX BY MR. TRIPI |
|---|---|---|

19:41:43   2   justice, conspiracy.

19:41:45   3      Q.  And for conspiracy investigations, are

19:41:50   4   associations among people important for an

19:41:52   5   investigation?

19:41:53   6      A.  Yes, yes, they, are.

19:41:59   7      Q.  I'm going to show you --

19:42:19   8                MR. TRIPI:  Just a moment, your Honor.

19:42:21   9                MAGISTRATE JUDGE ROEMER:  Mr. Tripi, how

19:42:23  10   much longer do you think with this witness?

19:42:25  11                MR. TRIPI:  Probably an hour on direct,

19:42:29  12   Judge.  If you want a lunch break, it might be a good

19:42:31  13   time.

19:42:32  14                MAGISTRATE JUDGE ROEMER:  Mr. Harrington?

19:42:34  15                I don't know if I want to take a lunch

19:42:36  16   break, but I need about 10 minutes.  But I'll take 15

19:42:40  17   minutes to twenty to 12.

19:42:42  18                MR. TRIPI:  No problem, Judge.

19:42:45  19                MAGISTRATE JUDGE ROEMER:  Or 1.

19:42:45  20                MR. TRIPI:  I need a few minutes anyway.

19:42:49  21                MAGISTRATE JUDGE ROEMER:  All right.  Thank

19:42:50  22   you.

19:42:51  23                (Whereupon, there was a break in the

19:42:55  24   proceeding.)

19:42:55  25      Q.  I'm going to skip forward that day, the day of

1    C. RYAN - DX BY MR. TRIPI

19:42:59    2    the search, to your interview with Mr. Bongiovanni,

19:43:01    3    okay?  Just to orient you as to time and place.

19:43:04    4    A.  Okay.

19:43:05    5    Q.  Can you describe when you first approached Mr.

19:43:40    6    Bongiovanni's residence and where he was.  Start there.

19:43:42    7    A.  So, I remember going through the front door on

19:43:47    8    the level that has the kitchen and the dining room and

19:43:49    9    family room and living room, and almost immediately upon

19:43:54    10   entering the house, saw Mr. Bongiovanni.

19:44:02    11   Q.  Can you describe sort of where he was situated

19:44:05    12   when you first encountered him?

19:44:07    13   A.  He was in the center of the level, there is an L,

19:44:11    14   a sectional sofa, behind that is a dining room and to my

19:44:35    15   right, as I'm looking in the house, the kitchen was to

19:44:38    16   the left with an island.  And in between the table, the

19:44:41    17   island and the sofa.

19:44:44    18   Q.  And what was he doing?

19:44:45    19   A.  He was standing there and he was still handcuffed

19:44:48    20   and he almost immediately started to speak to me.

19:44:51    21   Q.  And what did he start to say to you?

19:44:53    22   A.  He asked me if he was under arrest.

19:44:56    23   Q.  And what did you say?

19:44:57    24   A.  I told him that he was not.  That our purpose for

19:45:01    25   the day was to execute a search warrant.  And he asked

<pre>
                         C. RYAN - DX BY MR. TRIPI
</pre>

1

19:45:06  2   me one or two more times if he was under arrest.  And I

19:45:11  3   told him that he was not.

19:49:19  4        Q.  I'd like to show you Government's Exhibit 5, 6,

19:49:32  5   7, 8, 9.  If you can take a look at those.  Inaudible.

19:50:02  6   Starting with exhibit No. 5.  Do you recognize that?

19:50:05  7        A.  I do.

19:50:07  8        Q.  What is that?

19:50:08  9        A.  That is a photograph of Mr. Bongiovanni's

19:50:10  10  residence taken in the morning of June 6th, 2019.

19:50:14  11       Q.  And that is a view from where?

19:50:16  12       A.  The street Alder Place looking at the front of

19:50:19  13  the residence.

19:50:20  14       Q.  Does that fairly and accurately depict how the

19:50:23  15  residence looked that day?

19:50:24  16       A.  Yes.

19:50:24  17       Q.  If you could turn to exhibit No. 6, please.  Do

19:50:28  18  you recognize that?

19:50:28  19       A.  Yes.  It's another photograph from that morning.

19:50:31  20  It's taken from the entryway of the front door of the

19:50:36  21  house, looking into the kitchen.

19:50:39  22       Q.  Does that fairly and accurately depict the view

19:50:43  23  from the front entryway looking into the kitchen?

19:50:45  24       A.  Yes.

19:50:47  25       Q.  Flip to exhibit No. 7, please.  Do you recognize

1            C. RYAN - DX BY MR. TRIPI

19:50:51   2   that?

19:50:51   3       A.   Yes.  It's a photograph of the dining room table

19:50:54   4   in the dining room at 85 Alder Place taken the morning

19:50:59   5   of June 6th, 2019.

19:51:00   6       Q.   And does that fairly and accurately depict the

19:51:04   7   dining room table that is adjacent to the kitchen area?

19:51:08   8       A.   Yes.

19:51:09   9       Q.   And next exhibit, exhibit 8, please.  Is that

19:51:12   10  correct?

19:51:12   11      A.   Yes.

19:51:13   12      Q.   Do you recognize exhibit 8?

19:51:15   13      A.   Yes.  It's a photograph of the kitchen at 85

19:51:17   14  Alder Place taken the morning of June 6th, 2019.

19:51:21   15      Q.   And does it fairly and accurately depict the

19:51:24   16  kitchen as it appeared that day?

19:51:26   17      A.   Yes.

19:51:26   18      Q.   And if you look at exhibit 9, please.  Do you

19:51:32   19  recognize that?

19:51:32   20      A.   Yes.

19:51:33   21      Q.   What is that?

19:51:33   22      A.   It's the view from the level I entered the house

19:51:38   23  on looking down the stairs to the lower level, the

19:51:42   24  garage level of the house.

19:51:43   25      Q.   Does it fairly and accurately depict the house?

```
         1              C. RYAN - DX BY MR. TRIPI
19:51:48 2      A.   Yes.
19:51:49 3      Q.   And exhibit 10, please.  Do you recognize what
19:54:54 4  that is?
19:54:54 5      A.   Yes.
19:54:55 6      Q.   What is that?
19:54:56 7      A.   That is a box that was found in the house that
19:55:00 8  morning.
19:55:00 9      Q.   And you were not present when the box was
19:55:07 10 located, correct?
19:55:07 11     A.   That's correct.
19:55:08 12     Q.   It was brought to your attention later, brought
19:55:10 13 to where you were in the house?
19:55:12 14     A.   Yes.
19:55:14 15     Q.   That is a photo from your official case file of
19:55:19 16 the box that was seized that day in the house, though,
19:55:22 17 correct?
19:55:22 18     A.   Yes.
19:55:23 19          MR. TRIPI:  I'll offer exhibits 5, 6, 7, 8,
19:55:28 20 9, and 10.
19:55:30 21          MR. HARRINGTON:  I have no objection to
19:55:31 22 these coming in, but I'm not sure what the relevance of
19:55:35 23 it is.
19:55:36 24          MAGISTRATE JUDGE ROEMER:  I had the thought
19:55:37 25 occur to me for what we're doing now.
```

```
 1              C. RYAN - DX BY MR. TRIPI
 2              MR. TRIPI:  Judge, there is some relevance.
 3    Shows the area where the interview occurred and it shows
 4    a picture of one of the things that was discussed during
 5    the interview that we're going to talk about.
 6              MAGISTRATE JUDGE ROEMER:  Okay.  All right.
 7              MR. HARRINGTON:  That is not an issue,
 8    Judge.  We're just talking about questions that he asked
 9    and the source of the information.  That is all we're
10    talking about.
11              MR. TRIPI:  Relevance is a pretty low bar
12    and the ground has shifted under my feet a little bit
13    today, so I think, in fairness, it's not much to ask
14    that the photos come in.
15              MAGISTRATE JUDGE ROEMER:  Okay.  I'll
16    overrule the objection.  I don't know that he made an
17    objection.  If he did, it's overruled.
18              (Whereupon, Government Exhibits 5, 6, 7, 8,
19    9 and 10 were received into evidence.)
20    Q.  I'm going to just publish, put on the monitor,
21    Exhibit No. 7.  As it relates to your view of Mr.
22    Bongiovanni, can you describe what is depicted in
23    Exhibit 7?
24    A.  The table where we sat and where we spoke.
25    Q.  Okay.  And now I believe that we're talking with
```

1          C. RYAN - DX BY MR. TRIPI

19:56:53    2    a touchscreen here.  So I'm going to hand you up a pen

19:56:57    3    afterwards.  Can you tell the Court where people were

19:57:01    4    positioned around that table as the interview got

19:57:05    5    underway?

19:57:05    6         A.  Yes.  So the chair that is the furthest to the

19:57:09    7    right in the photograph is where Mr. Bongiovanni was

19:57:11    8    sitting.

19:57:12    9         Q.  Can you touch the screen?  It should leave a

19:57:15   10    mark.

19:57:15   11         A.  It's not, it did not mark, no.

19:57:27   12         Q.  It's okay.  If I can point with my pen, that's

19:57:33   13    all right.  Are you pointing to this chair?

19:57:36   14         A.  Yes, that is the chair I'm referring to.

19:57:38   15         Q.  That is the chair on the far side of the table?

19:57:41   16         A.  Yes.

19:57:41   17         Q.  And then there is a middle chair there?

19:57:43   18         A.  I sat there.

19:57:44   19         Q.  And a middle chair on the far side of the table?

19:57:48   20         A.  Correct.

19:57:48   21         Q.  And then there is another chair on the far side

19:57:51   22    of the table on the other end closest to the window that

19:58:09   23    is in the picture, correct?

19:58:10   24         A.  That chair was empty.

19:58:12   25         Q.  Okay.  Now, moving to the near side of the table,

```
          1              C. RYAN - DX BY MR. TRIPI
19:58:15  2  the farthest side of the table?
19:58:19  3       A.   That chair was empty.
19:58:20  4       Q.   And a middle chair on the near side of the table?
19:58:23  5       A.   Special Agent David Carpenter sat there.
19:58:26  6       Q.   And then an end chair on the near side of the
19:58:29  7  table, which would be across from where Mr. Bongiovanni
19:58:32  8  was sitting, who was sitting there?
19:58:34  9       A.   Special Agent David Fusco, F-u-s-c-o.
19:58:46 10       Q.   All right.  Now, I asked you your initial
19:58:49 11  interactions with Mr. Bongiovanni, can you continue from
19:58:54 12  there?  You left by saying he asked if he was under
19:59:00 13  arrest and you responded to that several times.  Can you
19:59:14 14  pick it up from there?
19:59:15 15       A.   Yes, we ultimately, very quickly, moved to the
19:59:23 16  table.  Mr. Bongiovanni was still in handcuffs and I
19:59:33 17  asked him if I took his handcuffs off, was everything
19:59:37 18  going to be okay, was he all right.  He told me he was.
19:59:41 19  I took his handcuffs off and we sat down at the table
19:59:45 20  and I asked him if he would be willing to talk with us.
19:59:48 21  He said he was willing to talk with us.  I explained the
19:59:52 22  warrant to him, so he understood why we were there.
19:59:55 23       Q.   Describe how you explained the warrant to him to
19:59:59 24  set the stage.
19:59:59 25       A.   Sure.  I showed him a copy of the warrant, so I
```

```
             1              C. RYAN - DX BY MR. TRIPI
20:00:32     2   showed him a copy and talked to him a little bit about
20:00:38     3   some of the offenses that were listed on the front.
20:00:41     4       Q.   What did you say?
20:00:42     5       A.   Just what the offenses were, described them
20:00:44     6   generally.
20:00:45     7       Q.   What did you say?
20:00:46     8       A.   Conspiracy, bribery, drug trafficking.
20:00:54     9       Q.   Please continue?
20:00:55    10       A.   And then I turned to the attachment B, the list
20:01:02    11   of items that we were searching for or we were
20:01:05    12   authorized to search for, types of items.
20:01:11    13       Q.   And do you remember your discussion in that
20:01:15    14   regard?
20:01:15    15       A.   And, again, I didn't read this word for word, but
20:01:18    16   I described each of these, generally, what types of
20:01:21    17   evidence we were searching for.
20:01:33    18       Q.   What did he say?
20:01:34    19       A.   I asked him if he had any questions about what
20:01:39    20   the warrant, what was on the warrant.  He didn't that I
20:01:43    21   recall.  I asked him if he would be willing to speak
20:01:48    22   with us.  He said that he was.  And he was asking both
20:01:51    23   looking back and forth between Dave Carpenter and myself
20:01:55    24   and asking us which of us was the case agent.
20:01:59    25       Q.   And what agency was Dave Carpenter with?
```

1        C. RYAN - DX BY MR. TRIPI

20:02:04   2      A.   Department of Justice, Office of Inspector

20:02:15   3    General.

20:02:15   4      Q.   Can you describe taking off Mr. Bongiovanni's

20:02:18   5    cuffs, please?

20:02:19   6      A.   Just we were standing there by the chair that he

20:02:22   7    ended up sitting in.  And I took his handcuffs off and

20:02:26   8    sat them with my things that were on the table in front

20:02:30   9    of the empty chair on the side where we were sitting.

20:02:34  10      Q.   And what, if any, statements or comments or

20:02:40  11    questions did Mr. Bongiovanni pose to you about books

20:02:43  12    and records?

20:02:44  13      A.   So, in the exchange where he had asked me if he

20:02:49  14    was under arrest, he didn't question me about books and

20:02:53  15    records, but he did make a comment to Mrs. Bongiovanni

20:02:56  16    that we were there for books and records, that it was a

20:03:02  17    books and records warrant.

20:03:03  18      Q.   What did he say?

20:03:04  19      A.   He said "It's okay, it's a books and records

20:03:08  20    warrant."

20:03:08  21      Q.   What did you understand that to mean?

20:03:11  22      A.   That he understood, one, that he was not under

20:03:16  23    arrest; and, two, he had a general idea of the types of

20:03:19  24    evidence that we were looking for.

20:03:25  25      Q.   Now, as you spoke to Mr. Bongiovanni, describe

```
              1              C. RYAN - DX BY MR. TRIPI
20:03:29      2    his demeanor.
20:03:30      3        A.  He was, of course, excited when I first spoke to
20:03:37      4    him.  He calmed down as we spoke.  He struck me as
20:03:43      5    generally open.  It wasn't difficult to have a
20:03:46      6    conversation.  We spoke back and forth and stayed calm.
20:03:49      7        Q.  What was your demeanor?
20:03:50      8        A.  The same.
20:03:53      9        Q.  How long did you end up speaking with him there?
20:03:56     10        A.  We spoke for almost the entire duration of the
20:04:00     11    search.
20:04:01     12        Q.  Which was how long, roughly?
20:04:03     13        A.  Two and a half hours.
20:04:10     14        Q.  By that point, would it be fair to say you were
20:04:16     15    the investigator who had the most case knowledge
20:04:20     16    overall?
20:04:20     17        A.  At that point in time, yes, that is a true
20:04:27     18    statement.
20:04:27     19        Q.  And were you the one taking notes?
20:04:29     20        A.  Yes.
20:04:29     21        Q.  And were you the one who was to generate a report
20:04:35     22    of the interview?
20:04:36     23        A.  Yes.
20:04:45     24        Q.  I'm going to hand you up Exhibits 11 and 12.  Do
20:05:07     25    you recognize Government's Exhibit 11?
```

1          C. RYAN - DX BY MR. TRIPI

20:05:08  2     A.   Yes.

20:05:18  3     Q.   What do you recognize that to be?

20:05:20  4     A.   It's the report that I prepared documenting my

20:05:25  5  interview of Mr. Bongiovanni with Special Agent

20:05:39  6  Carpenter and Special Agent Fusco from June 6th.

20:05:45  7     Q.   How did you prepare that report?  What was it

20:05:54  8  based upon?

20:05:55  9     A.   The notes that I took that day, and my

20:05:58  10  conversations with Special Agent Carpenter and Fusco.

20:06:01  11    Q.   How about your discussion with Mr. Bongiovanni?

20:06:03  12    A.   And about our discussion with Mr. Bongiovanni,

20:06:05  13  yes.

20:06:06  14    Q.   And did you take the notes as you were speaking

20:06:09  15  with Mr. Bongiovanni?

20:06:10  16    A.   Yes.

20:06:11  17    Q.   And what was the purpose of your taking notes?

20:06:13  18    A.   To give me a reference to use to put the report

20:06:19  19  together, to document the things he was saying, document

20:06:23  20  the things we talked about.

20:06:25  21    Q.   Are the notes designed to jog your memory?

20:06:28  22    A.   They are designed to jog my memory.

20:06:31  23    Q.   Are you also relying on your memory when you talk

20:06:34  24  about what Mr. Bongiovanni said and what you said to

20:06:38  25  him?

```
 1              C. RYAN - DX BY MR. TRIPI
```

20:06:38     2     A.   Yes.

20:06:39     3              MR. TRIPI:   I would like to enter

20:06:39     4   Government's Exhibit 11 and 12, the notes, Judge.

20:06:44     5              MR. HARRINGTON:   No objection.

20:06:44     6              MAGISTRATE JUDGE ROEMER:   Government's

20:06:47     7   Exhibit 11 and 12 shall be admitted into evidence.

20:06:47     8              (**Whereupon, Government Exhibits 11 and 12**

20:07:27     9   **were received into evidence.**)

20:07:27    10     Q.   Now, looking at page one of Government's Exhibit

20:07:31    11   11 in evidence.   Is that essentially a cover sheet for

20:07:36    12   your report?

20:07:36    13     A.   Yes.

20:07:36    14     Q.   And what does it say under the synopsis?

20:07:41    15     A.   "On June 6th, 2019, HSI and DOJ OIG interviewed

20:07:47    16   Joseph Bongiovanni during the execution of a search

20:07:50    17   warrant at his residence."

20:08:00    18     Q.   And moving onto page two.   See paragraph one

20:08:07    19   there?

20:08:08    20     A.   Yes.

20:08:08    21     Q.   Did any information in paragraph one that you

20:08:13    22   wrote there on page two, was any of that derived from

20:08:18    23   the search of Mr. Bongiovanni's phone at the border on

20:08:22    24   April 23, 2019?

20:08:24    25     A.   No.

1         C. RYAN - DX BY MR. TRIPI

20:08:25   2    Q.   Second paragraph, begins with the word "at first

20:08:29   3    contact," correct?

20:08:30   4    A.   Correct.

20:08:32   5    Q.   Is anything that you wrote there in this report

20:08:36   6    documenting the interview, was any of that derived from

20:08:41   7    the border search of the phone April 23, 2019?

20:08:44   8    A.   No, that is based on my observations and

20:08:47   9    conversation with Mr. Bongiovanni when I walked into the

20:08:50   10   house.

20:08:50   11   Q.   Paragraph three on page two, begins "Bongiovanni

20:08:53   12   denied he was in a close relationship with Peter Gerace"

20:08:57   13   and then it continues from there, correct?

20:08:59   14   A.   Correct.

20:09:00   15   Q.   Is any of that information in that paragraph

20:09:04   16   derived from the questions that you asked based upon the

20:09:22   17   border search of the phone April 23, 2019?

20:09:28   18   A.   No.

20:09:30   19   Q.   The next page or next paragraph on page two

20:09:35   20   begins "Bongiovanni had not spoken to Peter Gerace in

20:09:39   21   over a year," and it continues from there.  Were any of

20:09:42   22   the questions that you asked derived from the border

20:09:45   23   search that took place on April 23, 2019 that comprised

20:09:57   24   the responses that Mr. Bongiovanni gave in that

20:10:00   25   paragraph?

|  | 1 | C. RYAN - DX BY MR. TRIPI |
|--|--|--|

20:10:00  2   A.   No.

20:10:01  3   Q.   The next paragraph, it's a one-sentence

20:10:06  4   paragraph, reads "Bongiovanni and Peter Gerace did not

20:10:10  5   celebrate birthdays together."  Was your question or the

20:10:14  6   response that Mr. Bongiovanni gave you that led to the

20:10:19  7   documentation of that statement, was that, was your

20:10:23  8   question at all derived from the border search of Mr.

20:10:26  9   Bongiovanni's phone April 23, 2019?

20:10:28  10   A.   No.

20:10:29  11   Q.   The next paragraph reads, starts, "Bongiovanni

20:10:32  12   said Peter Gerace is a pain in the ass," and then

20:10:36  13   continues for another sentence.  Was anything about your

20:10:39  14   questioning or Mr. Bongiovanni's response based upon the

20:10:42  15   border search of the phone, April 23, 2019?

20:10:45  16   A.   No.

20:10:46  17   Q.   The next sentence or the next paragraph down

20:10:50  18   begins "Bongiovanni said you cannot penalize for growing

20:10:54  19   up" and it continues from there.  Do you see that?

20:10:56  20   A.   Yes.

20:10:57  21   Q.   Was anything you were asking about or anything

20:11:01  22   Mr. Bongiovanni was responding based upon the border

20:11:03  23   search of the phone April 23, 2019?

20:11:06  24   A.   No.

20:11:06  25   Q.   The next sentence begins "Peter Gerace's

1          C. RYAN - DX BY MR. TRIPI

20:11:14    2   grandfather had something to do with the mafia" and it

20:11:18    3   continues from there.  Do you see that paragraph?

20:11:21    4        A.  Yes.

20:11:21    5        Q.  Those statements that Mr. Bongiovanni made, were

20:11:25    6   any of your questions that led to those statements based

20:12:54    7   upon the border search of Mr. Bongiovanni's phone on

20:12:58    8   April 23, 2019?

20:12:59    9        A.  No.

20:13:00   10        Q.  And then there is an agent comment there.  Is any

20:13:03   11   of that based upon the border search of Mr.

20:13:07   12   Bongiovanni's phone?

20:13:08   13        A.  No.

20:13:08   14        Q.  And then the next paragraph, the bottom paragraph

20:13:11   15   of that page says "Bongiovanni described Pharaoh's

20:13:18   16   Gentleman Club," and it continues from there, correct?

20:13:19   17        A.  Correct.

20:13:20   18        Q.  Were any of the questions that you asked about

20:13:23   19   Pharaoh's Gentleman Club based or any answers Mr.

20:13:37   20   Bongiovanni gave you based upon the border search of Mr.

20:13:41   21   Bongiovanni's phone April 23, 2019?

20:13:43   22        A.  No.

20:13:43   23        Q.  Page 3 of exhibit 11.  First paragraph begins,

20:13:56   24   "Bongiovanni through Anthony Gerace, was arrested in the

20:14:00   25   days before Bongiovanni retired," and it continues for a

|   |   |
|---|---|
|   | 1 |

C. RYAN - DX BY MR. TRIPI

20:14:03   2   few more sentences, correct?

20:14:05   3       A.   Yes.

20:14:05   4       Q.   Were any questions that led to Mr. Bongiovanni's

20:14:08   5   statements as documented in that paragraph derived from

20:14:11   6   the search of the phone on April 23, 2019?

20:14:15   7       A.   No.

20:14:15   8       Q.   Were any questions that you asked Mr. Bongiovanni

20:14:18   9   about Anthony Gerace on that day derived from the search

20:15:49   10   of the phone April 23, 2019?

20:15:51   11       A.   No.

20:15:52   12       Q.   Were any questions about Peter Gerace derived

20:15:55   13   from the border search of the phone?

20:15:58   14       A.   No.

20:15:58   15       Q.   Next paragraph down, "Bongiovanni stated he knew

20:16:01   16   both Anthony and David Gerace.  David is a drug user."

20:16:06   17   Was any questioning or comments made by you or by Mr.

20:16:11   18   Bongiovanni as documented in that paragraph derived from

20:16:15   19   the border search of the phone?

20:16:17   20       A.   No.

20:16:17   21       Q.   Next paragraph down begins "Bongiovanni had

20:16:22   22   talked to Anthony Gerace" and continues from there.

20:16:25   23   Were any of those questions or answers as a result of

20:16:29   24   the border search of the phone?

20:16:31   25       A.   No.

1    C. RYAN - DX BY MR. TRIPI

20:16:31    2    Q.   Next sentence begins "Bongiovanni knew Michael

20:16:35    3    Sinatra," and continues from there.   Were any of those

20:16:38    4    statements derived from the border search of Mr.

20:16:44    5    Bongiovanni's phone April 23, 2019?

20:16:47    6    A.   No.

20:16:47    7    Q.   Were any of the questions that you asked about

20:16:49    8    Michael Sinatra based upon the border search of Mr.

20:16:54    9    Bongiovanni's phone?

20:16:54    10    A.   No.

20:16:55    11    Q.   Next paragraph reads, one sentence, "Michael

20:17:06    12    Sinatra just became engaged in Carrie Serafin," were any

20:17:12    13    questions or answers that Mr. Bongiovanni gave you as

20:17:14    14    documented in that paragraph derived from your receipt

20:17:19    15    of the border search information of Mr. Bongiovanni's

20:17:25    16    phone?

20:17:25    17    A.   No.

20:17:25    18    Q.   Next paragraph down.   One sentence, "Bongiovanni

20:17:41    19    never socialized with Michael Sinatra and they never

20:17:45    20    went on any trips together."   He said that to you

20:17:48    21    correct?

20:17:48    22    A.   Yes.

20:17:49    23    Q.   And was any information that you asked about

20:17:51    24    Michael Sinatra that culminated in that statement

20:17:55    25    derived from the border search of the phone?

|  |  |
|---|---|
|  | 1 |

C. RYAN - DX BY MR. TRIPI

20:17:58    2    A.   No.

20:17:58    3    Q.   Sinatra used to date Lindsay's younger sister

20:18:03    4    Christie.   Were any information that Mr. Bongiovanni

20:18:07    5    provided to you as documented in this report about that

20:18:10    6    derived from the border search of the phone?

20:18:13    7    A.   No.

20:18:13    8    Q.   The next paragraph reads, "Sinatra called

20:18:18    9    Bongiovanni earlier this year" and continues from there.

20:18:22    10   Were any of Mr. Bongiovanni's statements in that

20:18:24    11   paragraph as a result of questions based upon the border

20:18:40    12   search of Mr. Bongiovanni's phone April 23, 2019?

20:18:44    13   A.   No.

20:18:44    14   Q.   The next paragraph begins "Sinatra number was in

20:18:47    15   Bongiovanni's telephone because Sinatra had done

20:18:53    16   Bongiovanni landscaping."   Do you see that?

20:18:55    17   A.   Yes.

20:18:56    18   Q.   Were any questions you asked based upon the

20:18:58    19   border search of Bongiovanni's phone had culminated in

20:19:03    20   that answer?

20:19:04    21   A.   No.

20:19:04    22   Q.   And we looked at Government's Exhibit 1 earlier,

20:19:10    23   the photos from CBP did not have Michael Sinatra's phone

20:19:16    24   number, correct?

20:19:17    25   A.   Correct.

1        C. RYAN - DX BY MR. TRIPI

20:19:21   2    Q.   The next paragraph reads "Bongiovanni used his

20:19:24   3  DEA issued mobile phone for work and personal calls."

20:19:29   4  Do you see that?

20:19:29   5    A.   Yes.

20:19:30   6    Q.   And it goes on to talk about the last sentence

20:19:33   7  "Bongiovanni wanted to erase the work and personal

20:19:36   8  photos in his last phone"?

20:19:38   9    A.   Yes.

20:19:42  10    Q.   Was that discussion based upon information that

20:19:55  11  Bongiovanni had wiped the content of his DEA issued

20:20:01  12  phone at or around the time of retirement?

20:20:03  13    A.   Yes.

20:20:04  14    Q.   Did anything, any questions about his DEA issued

20:20:10  15  cell phone have anything to do with the border search

20:20:13  16  April 23, 2019?

20:20:15  17    A.   No.

20:20:15  18    Q.   Next paragraph down reads "Bongiovanni attended

20:20:20  19  one of Pharaoh's golf tournaments between 12 and 15

20:20:24  20  years ago."  Do you see that?

20:20:26  21    A.   Yes.

20:20:26  22    Q.   And then it continues for another sentence.  Were

20:20:31  23  any questions about that, Pharaoh's or golf tournaments

20:20:37  24  or Gerace, made by you as a result of the border search

20:20:41  25  of the phone April 23, 2019?

|       |    | C. RYAN - DX BY MR. TRIPI |
|-------|----|---------------------------|

20:20:43  2    A.  No.

20:20:44  3    Q.  There is a sentence -- withdrawn.

20:20:49  4        The next paragraph begins Bongiovanni stated

20:20:54  5   "organized crime is dead in Buffalo, New York," and then

20:21:06  6   it continues from there.  Were any questions or any of

20:21:10  7   Mr. Bongiovanni's answers regarding that topic of

20:21:13  8   conversation as a result of the border search of the

20:21:16  9   phone April 23, 2019?

20:21:18  10   A.  No.

20:21:19  11   Q.  Up to this point, we're through page 3, are all

20:21:28  12  of these topics and discussion points things you would

20:21:33  13  have discussed and were discussing with Mr. Bongiovanni

20:21:36  14  regardless of where whether that border search ever

20:21:39  15  happened on April 23, 2019?

20:21:41  16   A.  Yes, that's correct.

20:22:38  17   Q.  We're up to page 4 of exhibit 11.  Generally, is

20:22:42  18  your report generally written in chronological order in

20:22:45  19  which the manner of the topics were discussed as you

20:22:49  20  went through the interview?

20:22:50  21   A.  Generally, yes.

20:22:51  22   Q.  There may be times when you circled back to

20:22:54  23  something earlier, but, for the most part, the logic,

20:22:57  24  the sequence that you see in this report is consistent

20:23:01  25  with the sequence of discussion?

1          C. RYAN - DX BY MR. TRIPI

20:23:03   2     A.   Yes, that's correct.

20:23:06   3     Q.   Page four, top paragraph, begins "SA Ryan asked

20:23:11   4   Bongiovanni why Peter Gerace associates with members of

20:23:16   5   motorcycle gangs," and continues from there?

20:23:18   6     A.   Yes.

20:23:18   7     Q.   And was any of your questions or any of Mr.

20:23:21   8   Bongiovanni's statements documented in that paragraph in

20:23:25   9   response to any questions the result of the border

20:23:29   10   search on April 23, 2019 of Mr. Bongiovanni's phone?

20:23:32   11     A.   No.

20:23:33   12     Q.   The next paragraph begins "The Cheektowaga Police

20:23:36   13   Department watched Pharaoh's," and then continues for

20:23:39   14   another sentence.  Do you see that?

20:23:40   15     A.   Yes.

20:23:41   16     Q.   Were any of Mr. Bongiovanni's statements, as

20:23:45   17   documented in that paragraph, were or any questions you

20:23:49   18   asked based upon the information you had received from

20:23:51   19   the border search of Mr. Bongiovanni's phone April 23,

20:23:55   20   2019?

20:23:55   21     A.   No.

20:23:56   22     Q.   The next paragraph down, "Peter Gerace once tried

20:24:01   23   to cooperate with DEA," and then continues from there

20:24:07   24   third paragraph.  Do you see that?

20:24:08   25     A.   I do.

1           C. RYAN - DX BY MR. TRIPI

20:24:10    2      Q.   And a third paragraph down from the top.  Were

20:24:13    3   any questions or discussions that you had with Mr.

20:24:16    4   Bongiovanni led to you documenting those statements, was

20:24:18    5   any of that based upon information you received from the

20:24:21    6   border search of Mr. Bongiovanni's phone April 23rd

20:24:27    7   2019?

20:24:27    8      A.   No.

20:24:27    9      Q.   The next paragraph down begins "SA Ryan."  That

20:24:32   10   is you, correct?

20:24:33   11      A.   Yes.

20:24:33   12      Q.   "Asked Bongiovanni if Peter Gerace ever spoke

20:24:38   13   about someone overdosing," and then it continues,

20:24:42   14   correct?

20:24:42   15      A.   Yes.

20:24:42   16      Q.   Were any of your questions about that topic or

20:24:45   17   Mr. Bongiovanni's statements that you documented in

20:24:47   18   response in that paragraph the result of something you

20:24:51   19   learned from the border search of the phone April 23,

20:24:54   20   2019?

20:24:54   21      A.   No.

20:24:57   22      Q.   Next paragraph down.  "While Bongiovanni was a

20:25:00   23   DEA agent, he always told people," and the sentence

20:25:04   24   continues.  Was that paragraph or that sentence that Mr.

20:25:09   25   Bongiovanni provided you, was that as a result of

C. RYAN - DX BY MR. TRIPI

20:25:12   2   anything you were talking about related to the border

20:25:15   3   search of the phone?

20:25:16   4       A.   No.

20:25:16   5       Q.   There is a name Paul Puglise and more information

20:25:20   6   about that name.  Was that a name that was brought up as

20:25:25   7   a result of the border search of the phone April 23,

20:25:28   8   2019?

20:25:28   9       A.   No.

20:25:29   10      Q.   Next paragraph begins "SA Ryan asked Bongiovanni

20:25:38   11  about contacts found in his phone during a border search

20:25:57   12  conducted on April 23, 2019, when Bongiovanni entered

20:26:02   13  United States at Baltimore Washington International

20:26:06   14  Airport, the contacts are listed below."  Then you have

20:26:10   15  a series of bold names that go from the bottom of the

20:26:14   16  page four, beginning with the name Frank Parisi, and

20:26:19   17  continues on page five and a little past the middle of

20:26:43   18  page six with the name (inaudible.)  Do you see that?

20:27:04   19      A.   Yes.

20:27:05   20      Q.   Those were names that you were asking about based

20:27:08   21  upon a list of contacts that were in Government's

20:27:11   22  Exhibit 1, is that correct?

20:27:12   23      A.   Yes, a combination of Government's Exhibit 1 and

20:27:15   24  a report that Officer Gernatt prepared after doing some

20:27:19   25  analysis of Government's Exhibit 1.

1          C. RYAN - DX BY MR. TRIPI

20:27:21   2    Q.   Right.  So would it be accurate to say that you

20:27:23   3  did not have Government's Exhibit 1 with you, correct?

20:27:27   4    A.   Correct.

20:27:28   5    Q.   I'll show you Government's Exhibit 13.  This has

20:27:36   6  some redactions in it.  But do you recognize

20:27:42   7  Government's Exhibit 13?

20:27:44   8    A.   Yes.

20:27:44   9    Q.   What do you recognize that to be?

20:27:47   10   A.   It's Officer Gernatt's report that he did after

20:27:52   11  his analysis of Government's Exhibit 1.

20:27:55   12   Q.   Okay.  Thank you.  And Officer Gernatt, at the

20:28:01   13  time, he was a CBP Officer on the BEST task force,

20:28:06   14  correct?

20:28:06   15   A.   Yes.

20:28:06   16   Q.   And how did -- as you understand it, how did CBP

20:28:19   17  Officer Gernatt start to compile that report?

20:28:22   18   A.   An analysis of the names and phone numbers from

20:28:28   19  Government's Exhibit 1, queried them in various systems

20:28:32   20  that he had access to try and identify the users of the

20:28:37   21  unnamed numbers.

20:28:38   22   Q.   And Government's Exhibit 13, that is a copy of

20:28:42   23  that as of what date?

20:28:45   24   A.   April 25, 2019.

20:28:49   25   Q.   And is that a completed draft?

1                    C. RYAN - DX BY MR. TRIPI

20:28:53   2        A.   No, it was still a working document at that

20:28:59   3   point.

20:28:59   4        Q.   Is this the version of the document that you had

20:29:02   5   with you at the time of the interview with Mr.

20:29:05   6   Bongiovanni?

20:29:05   7        A.   Yes.

20:29:05   8        Q.   And is it a fair and accurate copy, other than

20:29:08   9   the redactions to certain information of the report, as

20:29:11   10   it existed the day of your interview with Mr.

20:29:18   11   Bongiovanni?

20:29:18   12        A.   Yes.

20:29:19   13             MR. TRIPI:   Government offers Exhibit 13,

20:29:23   14   your Honor.

20:29:24   15             MR. HARRINGTON:   No objection.

20:29:24   16             MAGISTRATE JUDGE ROEMER:   Government's

20:29:25   17   Exhibit 13 should be admitted into evidence.

20:29:25   18             (**Whereupon, Government's Exhibit 13 was**

20:29:25   19   **received into evidence**.)

20:29:29   20             Mr. Tripi, can I just ask a clarifying

20:29:37   21   question?

20:29:38   22             MR. TRIPI:   Sure.

20:29:40   23             MAGISTRATE JUDGE ROEMER:   Agent Ryan, about

20:29:51   24   three-quarters of the way down, and this is exhibit 11

20:29:58   25   on page four.

```
          1              C. RYAN - DX BY MR. TRIPI
20:30:02  2              THE WITNESS:  Yes, sir.
20:30:03  3              MAGISTRATE JUDGE ROEMER:  You say or
20:30:04  4  somebody wrote "Special Agent Ryan asked Bongiovanni
20:30:07  5  about contacts found in his phone during the border
20:30:10  6  search."  Did you tell him that, "I'm going to ask you
20:30:17  7  now about contacts from the phone" or is this just your
20:30:21  8  note that is what you were doing?  Do you understand my
20:30:25  9  question?
20:30:25 10              THE WITNESS:  We did talk at the time about
20:30:27 11  the fact that his phone was border searched.
20:30:30 12              MAGISTRATE JUDGE ROEMER:  And that you were
20:30:31 13  asking him about these people because of what you found
20:30:34 14  in the phone?
20:30:35 15              THE WITNESS:  Yes.
20:30:36 16              MAGISTRATE JUDGE ROEMER:  Okay, thank you.
20:30:38 17              MR. TRIPI:  Thank you, Judge.
08:38:51 18     Q.  Without getting into too much detail of your
08:38:54 19  underlying investigation, I don't want to do that, would
08:38:58 20  it be fair that some of the investigation is continuing?
08:39:01 21     A.  Yes.
08:39:05 22     Q.  At that time, are some of the names that were in
08:39:09 23  the phone that are listed between pages four, five and
08:39:14 24  six, are they names that you, at the time, may have
08:39:20 25  asked Mr. Bongiovanni about regardless of the border
```

                      C. RYAN - DX BY MR. TRIPI

08:39:23    2   search of the phones?

08:39:26    3        A.   Yes.

08:39:55    4        Q.   Okay.   I'm going to switch to exhibit 13 in a

08:39:59    5   moment.   See that up on your screen?

08:40:01    6        A.   Yes, I can.

08:40:02    7        Q.   To the upper left is date of report, indicates

08:40:08    8   April 25, 2019, so a couple of days after the border

08:40:12    9   search, correct?

08:40:13   10        A.   Yes.

08:40:14   11        Q.   And then it has author, Officer Jack Gernatt.   He

08:40:20   12   is a CBP Officer in Buffalo, New York?

08:40:23   13        A.   That's correct.

08:40:23   14        Q.   And then it has some information up in the

08:40:28   15   subject, "Mr. Bongiovanni" and then a gist synopsis

08:40:33   16   paragraph, correct?

08:40:34   17        A.   Yes.

08:40:34   18        Q.   And it begins with, "On April 24th, 2019," now,

08:43:47   19   that is incorrect, that's the incorrect date of the

08:43:50   20   border search, correct?

08:43:52   21        A.   That's correct.

08:43:52   22        Q.   The border search was April 23rd of 2019?

08:43:57   23        A.   Yes, that's correct.

08:43:58   24        Q.   In any event, there is an identified paragraph

08:44:06   25   for Mr. Bongiovanni, correct?

C. RYAN - DX BY MR. TRIPI

08:44:07  A.  Yes.

08:44:09  Q.  Moving to page two, it lists Frank Parisi at the
08:44:15  top, right?

08:44:17  A.  Yes.

08:44:17  Q.  And that is a name that you asked Mr. Bongiovanni
08:44:20  about on, sorry, June 6th, 2019, correct?

08:44:24  A.  Yes.

08:44:24  Q.  Is that someone you would have independently
08:44:27  asked him about regardless of the contact being in the
08:44:30  phone?

08:44:30  A.  Yes.

08:44:32  Q.  And then there is a name Nicholas Puglise,
08:44:38  correct?

08:44:39  A.  Yes.

08:44:39  Q.  And that is a name that you asked about during
08:44:42  the interview, June 6th, 2019?

08:44:46  A.  Yes.

08:44:47  Q.  And then there is a name Tommy Francoforte
08:44:53  (check) possibly Paul Frankaforte, right?

08:44:59  A.  Yes.

08:45:00  Q.  In your report, you documented statements
08:45:03  regarding that Mr. Bongiovanni made about a Tommy
08:45:06  Frankaforte, is that correct?

08:45:08  A.  Yes.

                       1              C. RYAN - DX BY MR. TRIPI

08:45:13   2       Q.  At some point, he also told you that Tommy is the

08:45:18   3   brother of Paul A/K/A Hotdog, correct?

08:45:22   4       A.  Correct.

08:45:23   5       Q.  And Paul Frankaforte A/K/A Hotdog was someone

08:45:30   6   that you already knew about, correct?

08:45:31   7       A.  That's true.

08:45:34   8       Q.  And then there is an entry for a Frank Todaro?

08:45:39   9       A.  Yes.

08:45:39  10       Q.  And that is someone you talked about on June 6th,

08:45:43  11   2019, correct?

08:45:45  12       A.  That's true, correct.

08:45:47  13       Q.  And then there is a Tom Gerace?

08:45:50  14       A.  Yes.

08:45:50  15       Q.  And is that someone that you talked about on June

08:45:53  16   6th, 2019?

08:45:54  17       A.  Yes.

08:45:57  18       Q.  Now, on this report, there is a Maglietto,

08:46:02  19   correct?

08:46:02  20       A.  Yes.

08:46:03  21       Q.  Now, Matthew is Mr. Bongiovanni's son or stepson?

08:46:09  22       A.  Stepson.

08:46:09  23       Q.  And he was one of the people at the house on the

08:46:14  24   day of the search warrant?

08:46:16  25       A.  Yes.

```
              1              C. RYAN - DX BY MR. TRIPI
08:46:17      2       Q.   And so going off this report, you didn't ask
08:46:25      3   about Matthew and put that in your report, did you?
08:46:28      4       A.   No.
09:52:27      5       Q.   For record purposes, about how old was Matthew on
09:52:31      6   that date?
09:52:32      7       A.   Junior high, high school.
09:52:36      8       Q.   Next, in Exhibit 13, there is a name, it says
09:52:45      9   Nick Puglise.  You asked about a name Nicholas Puglise.
09:52:50     10   Is that the same name?
09:52:51     11       A.   Yes.
09:52:52     12       Q.   And then you documented Mr. Bongiovanni's
09:52:54     13   statements about that?
09:52:55     14       A.   Yes.
09:53:01     15       Q.   On this report, there is a name Sam Catalano,
09:53:06     16   right?
09:53:06     17       A.   Yes.
09:53:06     18       Q.   And you asked Mr. Bongiovanni about that name?
09:53:09     19       A.   Yes.
09:53:09     20       Q.   On this report there is a name Victor Sorrento?
09:53:15     21       A.   Yes.
09:53:15     22       Q.   And you asked Mr. Bongiovanni about that name and
09:53:18     23   documented what he told you, right?
09:53:19     24       A.   Yes.
09:53:20     25       Q.   There is a name Kim Mecca, right?
```

1          C. RYAN - DX BY MR. TRIPI

09:53:23   2     A.   Yes.

09:53:24   3     Q.   And you asked Mr. Bongiovanni about that name,

09:53:27   4   correct?

09:53:27   5     A.   Yes.

09:53:27   6     Q.   And he made statements regarding Ms. Mecca and

09:53:35   7   Louis Salva, correct?

09:53:35   8     A.   Yes.

09:53:35   9     Q.   Is Mr. Salva someone you would have asked Mr.

09:53:40   10  Bongiovanni about regardless of the search of the phone?

09:53:42   11    A.   Yes.

09:53:52   12    Q.   This report has Jimmy Chebot's name on it from

09:53:59   13  being one of the numbers on that phone, correct?

09:54:02   14    A.   Yes.

09:54:02   15    Q.   And you is asked him about that name, correct?

09:54:06   16    A.   True.

09:54:06   17    Q.   Is that a name you would have asked Mr.

09:54:11   18  Bongiovanni about regardless of the search of the phone,

09:54:13   19  if you know, at that time?

09:54:14   20    A.   At that time, I can't say one way or the other.

09:54:17   21    Q.   Next name here, David Lapenna.  And you asked

09:54:27   22  about that individual?

09:54:27   23    A.   I did.

09:54:28   24    Q.   And Mr. Bongiovanni told you about that

09:54:30   25  individual and you documented those statements, true?

```
          1              C. RYAN - DX BY MR. TRIPI
09:54:32  2      A.   True.
09:54:38  3      Q.   Now, there is a Thomas Oswald in this report,
09:54:43  4  right?
09:54:43  5      A.   Yes.
09:54:43  6      Q.   And there was a Thomas Oswald that you asked
09:54:46  7  about Mr. Bongiovanni, correct?
09:54:47  8      A.   Correct.
09:54:47  9      Q.   And Mr. Bongiovanni told you about Mr. Oswald, a
09:54:54 10  Tonawanda police detective, correct?
09:54:55 11      A.   Correct.
09:54:55 12      Q.   And, again, that is someone that you knew
09:54:59 13  independent of Mr. Bongiovanni, true?
09:55:01 14      A.   True.
09:55:10 15      Q.   And there is another name, Kerry Doctor, correct?
09:55:14 16      A.   Yes.
09:55:15 17      Q.   On this report, Government's Exhibit 13, you
09:55:18 18  asked about Kerry Doctor, Mr. Bongiovanni made
09:55:21 19  statements and you documented those, right?
09:55:23 20      A.   Yes.
09:55:25 21      Q.   Is Tom Doctor someone that you understand to be
09:55:29 22  related to Kerry Doctor?
09:55:31 23      A.   Yes.
09:55:31 24      Q.   Who is Tom Doctor as you understand it?
09:55:34 25      A.   Retired Buffalo Police Department detective and a
```

```
        1              C. RYAN - DX BY MR. TRIPI
09:55:37  2    former DEA task force officer.
09:55:39  3         Q.  And is that someone you would have asked Mr.
09:55:42  4    Bongiovanni about?
09:55:42  5         A.  Yes.
09:55:46  6         Q.  And that is regardless of any search of the phone
09:55:50  7    on April 23, 2019, correct?
09:55:52  8         A.  Correct.
09:55:53  9         Q.  Now, I know it's no longer the scope of this
09:56:45 10    hearing, but I'm going to ask you this question, Agent
09:56:49 11    Ryan.  Did Mr. Bongiovanni decline to answer any of your
09:56:52 12    questions during this investigation?
09:56:53 13         A.  No.
09:56:54 14         Q.  Had he declined to answer any questions, would
09:56:57 15    that be okay?
09:56:58 16         A.  Yes.
09:56:58 17         Q.  And you explained to him that he was allowed to
09:57:02 18    leave, correct?
09:57:03 19         A.  Yes.
09:57:03 20         Q.  And had he chose to leave, would you have allowed
09:57:07 21    him to leave and not talk to him?
09:57:08 22         A.  Yes.
09:57:09 23         Q.  What did you explain in that regard?
09:57:13 24              MR. HARRINGTON:  I'll object.
09:57:14 25              MAGISTRATE JUDGE ROEMER:  Why are we going
```

```
         1              C. RYAN - DX BY MR. TRIPI
09:57:16 2   down this path?
09:57:17 3              MR. TRIPI:  We're going down this path
09:57:19 4   because initially it was relevant until I walked in this
09:57:22 5   morning.  And, second, it goes to the credibility of
09:57:27 6   Special Agent Ryan.  And they've consented, they've
09:57:30 7   conceded that he wasn't in custody.  I understand that.
09:57:32 8   And he wasn't subject to Miranda.  But I think some
09:57:38 9   context of the interaction between the two of them is
09:57:41 10  just relevant for the Court to hear and --
09:57:44 11             MAGISTRATE JUDGE ROEMER:  But why?
09:57:45 12             MR. TRIPI:  Well, you have credibility
09:57:47 13  determinations to make.  And how Special Agent Ryan was
09:57:50 14  treating Mr. Bongiovanni, I think, is pertinent.
09:57:53 15  Surrounding --
09:57:54 16             MAGISTRATE JUDGE ROEMER:  To what issue is
09:57:55 17  it pertinent?
09:57:56 18             MR. TRIPI:  Well, you have credibility
09:57:58 19  determinations to make here as well.  So, some of that
09:58:05 20  is pertinent, I don't think just because they walked in
09:58:08 21  and stipulated to certain things prevents me from
09:58:11 22  putting on certain proof.
09:58:14 23             MR. HARRINGTON:  Judge --
09:58:15 24             MAGISTRATE JUDGE ROEMER:  Yes, sir.
09:58:16 25             MR. HARRINGTON:  I think if I attacked his
```

```
          1                C. RYAN - DX BY MR. TRIPI
09:58:18  2    credibility, and that is relevant, he can come back and
09:58:21  3    redirect, but it's not relevant now.
09:58:23  4              MAGISTRATE JUDGE ROEMER:  Okay.  I'll
09:58:24  5    sustain the objection.
09:59:39  6         Q.  I'm going to continue with exhibit 11 in a
09:59:43  7    moment.  But I would like to stop there.
09:59:45  8              Now, you've read Mr. Bongiovanni's affidavit that
09:59:50  9    he submitted in support of getting these hearings,
09:59:53 10    correct?
09:59:53 11         A.  Yes, I have.
09:59:54 12         Q.  And in that affidavit, does he make certain
10:00:01 13    allegations about you?
10:00:02 14         A.  He does.
10:00:04 15         Q.  Would you like to address some of those
10:00:07 16    allegations?
10:00:07 17              MR. HARRINGTON:  Objection.
10:00:08 18              MAGISTRATE JUDGE ROEMER:  What are we doing?
10:00:10 19              MR. TRIPI:  Judge, there is a sworn
10:00:11 20    affidavit submitted to this Court alleging an animus on
10:00:19 21    behalf of this agent.  He should be able to testify
10:00:22 22    about it now.  They don't get to get out of it because
10:00:25 23    now they have all this Jencks material and now they are
10:00:29 24    scared about hearing the answers.
10:00:31 25              MAGISTRATE JUDGE ROEMER:  Mr. Harrington?
```

```
        1              C. RYAN - DX BY MR. TRIPI
10:00:33  2              MR. HARRINGTON:  Judge --
10:00:34  3              MR. TRIPI:  Unless they are going to
10:00:36  4    withdraw this affidavit.
10:00:38  5              MAGISTRATE JUDGE ROEMER:  Calm down, Mr.
10:00:39  6    Tripi.  Mr. Harrington?
10:00:40  7              MR. HARRINGTON:  Judge, it has nothing to do
10:00:43  8    with what the issues that we're talking about right now.
10:00:46  9              MAGISTRATE JUDGE ROEMER:  My only thought,
10:00:47 10    Mr. Harrington, is you brought up during the cross
10:00:50 11    examination of the previous witness about statements
10:00:54 12    about Italians and stuff like that.  And what is the
10:00:59 13    question, can I ask?  I also don't like the form of the
10:01:03 14    question.  Is there anything you want to say about an
10:01:05 15    affidavit.
10:01:06 16              MR. TRIPI:  I understand.  I was trying to
10:01:08 17    get the issue before the Court.  Maybe I did it poorly,
10:01:11 18    but I'm operating on the fly here and trying to
10:01:14 19    articulate for the Court why you should hear some things
10:01:17 20    that are a little bit beyond where the defense has now
10:01:20 21    walked in today and stipulated they want to go.  I
10:01:23 22    apologize for the form of that question, Judge.  But
10:01:26 23    there are paragraphs in there that, one, deal with the
10:01:29 24    cell phone, so we're going to have to talk about those,
10:01:33 25    and then there is -- there is a paragraph in here, if I
```

```
            1              C. RYAN - DX BY MR. TRIPI
10:01:38    2     could just find it.
10:01:43    3              MAGISTRATE JUDGE ROEMER:  You said something
10:01:44    4     about Italians, he doesn't like Italians or he is going
10:01:50    5     after Italians or something like that.
10:01:53    6              MR. TRIPI:  That's correct.  I want to read
10:01:54    7     it for the Court and get it right.  This would be on
11:32:39    8     page, the page I'm dealing with, docket 81, page 96.
11:32:44    9              MAGISTRATE JUDGE ROEMER:  Is this affidavit
11:32:46   10     an exhibit in the case?
11:32:47   11              MR. TRIPI:  It's -- well, they've submitted
11:32:50   12     it to you, so it's a judicial document.
11:32:52   13              MAGISTRATE JUDGE ROEMER:  I'm just asking,
11:32:53   14     is it an exhibit in this case.
11:32:55   15              MR. TRIPI:  I marked it as an exhibit, I'm
11:32:58   16     not offering it as an exhibit.
11:32:59   17              MAGISTRATE JUDGE ROEMER:  I just want to
11:33:00   18     look at it.
11:33:01   19              MR. TRIPI:  Sorry, docket 32.  Sorry, Judge.
11:33:08   20        Q.  Specifically docket, Government's Exhibit 32,
11:33:13   21     page 96, paragraph 23, addresses the cell phone.
11:33:22   22     Paragraph 24 addresses the cell phone.  And then Mr.
11:33:33   23     Bongiovanni, his affidavit reads, "He then asked me to
11:33:38   24     'tell him all about the mafia.'  I answered I didn't
11:33:41   25     know what he was talking about?"
```

```
              1                 C. RYAN - DX BY MR. TRIPI
11:33:42      2                 MAGISTRATE JUDGE ROEMER:  What paragraph?
11:33:43      3                 MR. TRIPI:  Paragraph 24.
11:33:46      4                 "He began to read names from the contact
11:34:10      5     directory of my phone.  I noticed and commented at that
11:34:13      6     time that the only individuals he asked me about were
11:34:16      7     those with Italian last names."  And then it goes on
11:34:21      8     about not being free to leave.  We're basically looking
11:34:24      9     at paragraph 23 and 24.
11:34:26     10                 MAGISTRATE JUDGE ROEMER:  I overrule the
11:34:27     11     objection.  You can ask questions about those two
11:34:30     12     paragraphs.
11:34:31     13                 MR. TRIPI:  Thank you, Judge.
11:34:34     14       Q.  All right.  Now, at some point during your
11:34:47     15     discussion, did searching agents bring a cell phone to
11:34:56     16     your attention?
11:34:56     17       A.  Yes.
11:34:56     18       Q.  Describe how that happened.
11:34:58     19       A.  One of the agents, I don't remember which one,
11:35:02     20     brought the phone to the table and said that they
11:35:05     21     thought it was Mr. Bongiovanni's.
11:35:09     22       Q.  At that point, just by looking at the cell phone,
11:35:13     23     did you know one way or another whether it was Mr.
11:35:17     24     Bongiovanni's?
11:35:17     25       A.  No.
```

1        C. RYAN - DX BY MR. TRIPI

11:35:17   2     Q.  And at that point, by looking at the cell phone,

11:35:22   3   did you know one way or another whether that cell phone

11:35:26   4   was the phone that had been border searched April 23,

11:35:30   5   2019?

11:35:30   6     A.  No.

11:35:31   7     Q.  So, I'm just going to ask you to describe what

11:35:37   8   happened after the agent brought the phone to you and

11:35:40   9   said they thought it was Mr. Bongiovanni?

11:35:43  10     A.  I asked him if it was his phone.  He said that it

11:35:46  11   was.  Talked about the fact that the phone was in the

11:35:48  12   warrant.  I asked him, so we would be taking it, I asked

11:35:52  13   him if the phone had a security code or pass code and if

11:35:56  14   he would be willing to share the code with me.  He said

11:35:58  15   it was not numbers, but dots, and described the code to

11:36:03  16   me.  I made the dot pattern in my notes and drew a line

11:36:08  17   to show the swipe pattern to follow.  And then I said

11:36:12  18   "like this" and swiped on the phone to see if the code

11:36:16  19   was correct, and that I had it right.  It unlocked the

11:36:20  20   phone.  I hit the button on the side of the phone and

11:36:23  21   locked the phone and then I set it on the table next to

11:36:43  22   me.

11:36:43  23     Q.  So, did you search the phone as you sat there

11:36:46  24   next to Mr. Bongiovanni?

11:36:47  25     A.  No.

1          C. RYAN - DX BY MR. TRIPI

11:36:47   2     Q.   Did you scroll through the contacts of the phone

11:36:57   3   and sit and ask him about the contacts in the phone as

11:37:01   4   you scrolled through it?

11:37:01   5     A.   No.

11:37:02   6     Q.   Is it your understanding that FBI Special Agent

11:37:09   7   Brian Burns had been going around the house with Mr.

11:37:12   8   Bongiovanni's wife and she was pointing out items to

11:37:16   9   him?

11:37:16   10    A.   Yes.

11:37:18   11    Q.   And is it your understanding that when you were

11:37:21   12   informed that this might be Mr. Bongiovanni's phone,

11:37:26   13   that that belief was formed on the basis of what Special

11:37:30   14   Agent Burns and Lindsay were doing?

11:37:31   15    A.   In that moment, I don't know -- I wasn't paying

11:37:38   16   that much attention to what was going on elsewhere in

11:37:41   17   the house.

11:37:42   18    Q.   Okay.  I'm going to show you Government's Exhibit

11:37:54   19   No. 12 in evidence.

11:37:58   20         MR. TRIPI:  Judge, this is page 3 of 10 on

11:38:00   21   the monitor.  Just to show at the bottom, it says "3 of

11:38:05   22   10" on the bottom left.

11:38:14   23    Q.   There is a little bit of glare and I'll try and

11:38:17   24   move.  I'm looking at the upper-right-hand part of the

11:38:20   25   screen.  Do you see that?

C. RYAN - DX BY MR. TRIPI

11:38:21   A.   Yes.

11:38:21   Q.   It looks to be a symbol drawn.  Can you describe
11:38:25   what is drawn there?

11:38:26   A.   That is the nine dot front of the phone that had
11:38:33   the swipe code, so Mr. Bongiovanni described it to me.
11:38:38   It was dots.  I drew the dots and then I made the line
11:38:42   to show the code that the swipe pattern that unlocked
11:38:45   the phone.

11:38:46   Q.   And you drew the pattern in your notes?

11:38:48   A.   Yes.

11:38:49   Q.   And you wrote next to it, what did you write next
11:38:52   to it?

11:38:53   A.   "Phone code."

11:38:55   Q.   Was that the extent of your dealing with the
11:38:58   phone that -- the physical phone that day?

11:39:00   A.   Yes.

11:39:23   Q.   Reading from paragraph 24 of Mr. Bongiovanni's
11:39:26   affidavit now and then I'll ask you some questions about
11:39:29   it.  Special Agent Ryan opened my phone, he began
11:39:32   scrolling through its contents.  Did you scroll through
11:39:35   its contents?

11:39:36   A.   No.

11:39:37   Q.   I asked him if he had been responsible for the
11:39:40   seizure of my phone and my family's phone at Baltimore

```
              1              C. RYAN - DX BY MR. TRIPI
11:39:44      2   Washington Airport.  Did Mr. Bongiovanni ask you that?
11:39:47      3       A.  We did discuss the border search as it related to
11:39:51      4   the people I was going to ask him about.
11:39:54      5       Q.  Did you say to him the words, "yes, that was me"?
11:39:57      6       A.  I may have.
11:39:58      7       Q.  He then asked me to "tell him all about the
11:40:02      8   mafia."  Did you ever say that during this interview?
11:40:05      9       A.  No.
11:40:07     10       Q.  Do you think that would be an effective
11:40:09     11   interrogation technique to ask a question that way?
11:40:13     12       A.  No.
11:40:13     13       Q.  There is another sentence that follows that and
11:40:35     14   then I'll read the next sentence reads, "He began to
11:40:47     15   read numbers from the contact directory of my phone."
11:40:52     16   Did you read the names from the contact directory of Mr.
11:40:56     17   Bongiovanni's phone on June 6th, 2019?
11:40:58     18       A.  No.
11:40:59     19       Q.  "I noticed and commented at the time that the
11:41:08     20   only individuals they asked me about were those with
11:41:12     21   Italian last names."  Did Mr. Bongiovanni make a
11:41:15     22   statement to you to that effect?
11:41:16     23       A.  He did.
11:41:17     24       Q.  And did you respond?
11:41:18     25       A.  I did.
```

C. RYAN - DX BY MR. TRIPI

11:41:18  2     Q.  And describe it.

11:41:19  3     A.  I told him that we were asking him about the

11:41:21  4  names that we learned from his phone from the border

11:41:24  5  search and it was in this section of the interview where

11:41:29  6  we were going through those names, the names in bold in

11:41:33  7  my report.

11:41:34  8     Q.  So the names were what the names were?

11:41:36  9     A.  Yes.

11:41:38  10    Q.  Do you have any animus towards Mr. Bongiovanni

11:41:41  11 because he may be Italian?

11:41:43  12    A.  None.

11:42:01  13          MR. TRIPI:  One moment, please, Judge.

11:42:02  14          MAGISTRATE JUDGE ROEMER:  Sure.

11:42:06  15          THE WITNESS:  Judge, would it be all right

11:42:08  16 if I stood up for a second?

11:42:09  17          MAGISTRATE JUDGE ROEMER:  Sorry?

11:42:11  18          THE WITNESS:  May I stand up for a second?

11:42:16  19          MAGISTRATE JUDGE ROEMER:  Sure.  He just

11:42:19  20 asked to stand up.

11:42:34  21    Q.  One more question, I guess, about the phone.  If

11:42:38  22 Mr. Bongiovanni chose to not give you the code to the

11:42:41  23 phone when you asked him, would you have tried to verify

11:42:46  24 or open the phone to verify the code?

11:42:49  25    A.  No, I wouldn't have had anything to verify.

```
          1              C. RYAN - DX BY MR. TRIPI
11:42:53  2      Q.  Did he object at all when you did that?
11:42:55  3      A.  No.
11:42:57  4      Q.  And as it relates to the phone, the very next
11:43:02  5  day, what did you do?
11:43:03  6      A.  We sought a search warrant for the device that we
11:43:20  7  found in the house.
11:43:21  8      Q.  And that phone was included in the warrant
11:43:24  9  application?
11:43:24 10      A.  Yes.
11:43:25 11      Q.  And that was to a different magistrate, correct?
11:43:29 12      A.  Yes.
11:43:30 13      Q.  And that warrant was signed and authorized,
11:43:33 14  correct?
11:43:33 15      A.  It was.
11:43:34 16      Q.  Okay.  Let me pick back up on page six of
11:43:49 17  Government's Exhibit 11.  So after the last bolded name
11:43:52 18  on page six, Terry Doctor, there is a paragraph under
11:44:08 19  that that reads "SA Ryan asked Bongiovanni about a
11:44:11 20  picture and several other males."  Now, you had a
11:44:20 21  picture with you, correct?
11:44:21 22      A.  Yes.
11:44:23 23      Q.  The picture that you showed Mr. Bongiovanni, did
11:44:27 24  that come from the search of the phone April 23, 2019?
11:44:31 25      A.  No, it did not.
```

1          C. RYAN - DX BY MR. TRIPI

11:44:32    2      Q.  Without naming anybody, how did you acquire the

11:44:37    3  photo that you showed Mr. Bongiovanni?

11:44:39    4      A.  From a witness.

11:44:44    5      Q.  I'll show you Government's Exhibit 14.  Do you

11:44:52    6  recognize Government's Exhibit 14?

11:44:53    7      A.  Yes.

11:44:54    8      Q.  What do you recognize it to be?

11:44:56    9      A.  It's the photograph that we're discussing that I

11:45:00   10  showed Mr. Bongiovanni on June 6th, 2019.

11:45:03   11      Q.  And does it fairly and accurately depict the

11:45:06   12  photo that you acquired during the investigation and

11:45:08   13  then had with you when you showed it to Mr. Bongiovanni

11:45:11   14  at the point in the interview where it's reflected on

11:45:14   15  page six of Government's Exhibit 11?

11:45:19   16      A.  Yes.

11:45:19   17      Q.  What did Mr. Bongiovanni say about that photo?

11:45:22   18      A.  He said it was a photo from a birthday party,

11:45:25   19  party in Toronto.  And that was arranged by a friend of

11:45:30   20  his.

11:45:32   21      Q.  And you documented the specifics in your report

11:45:35   22  there?

11:45:35   23      A.  I did.  I asked him who the people in the photo

11:45:38   24  were and he gave me names and I documented them in the

11:45:41   25  report.

| | 1 | C. RYAN - DX BY MR. TRIPI |
|---|---|---|

11:45:41  2    Q.  And all of those names are listed in Government's

11:45:43  3  Exhibit 11?

11:45:44  4    A.  Yes.

11:45:44  5    Q.  And the statements that Mr. Bongiovanni made

11:45:46  6  about those people?

11:45:47  7    A.  Yes.

11:46:03  8    Q.  Does that photo --

11:46:04  9        MR. TRIPI:  Did I offer it yet?  If I

11:46:07  10  didn't, I'm offering exhibit 14.  I can't remember if I

11:46:10  11  offered it.

11:46:12  12        MAGISTRATE JUDGE ROEMER:  You did not.

11:46:13  13        MR. TRIPI:  May I please offer it?

11:46:14  14        MR. HARRINGTON:  I object on its relevance.

11:46:16  15        MAGISTRATE JUDGE ROEMER:  Overruled.

11:46:18  16  Government's Exhibit 14 shall be admitted into evidence.

11:46:18  17        **(Whereupon, Government Exhibit 14 was**

11:46:23  18  **received into evidence.)**

11:46:23  19    Q.  Did you have another photo that you then asked

11:46:26  20  Mr. Bongiovanni about?

11:46:27  21    A.  I did.

11:46:28  22    Q.  Was that other photo a photo that you obtained as

11:46:33  23  a result of the border search on April 23, 2019 or by

11:46:36  24  some other means?

11:46:37  25    A.  Other means.

1          C. RYAN - DX BY MR. TRIPI

11:46:38  2      Q.   And I'm going to show you Government's Exhibit

11:46:42  3   No. 15.   Do you recognize Government's Exhibit 15?

11:46:56  4      A.   I do.

11:46:58  5      Q.   What do you recognize that to be as it relates to

11:47:00  6   your interview of Mr. Bongiovanni, June 6, 2019?

11:47:05  7      A.   The second photograph that I showed him, the one

11:47:09  8   that I described as a picture that depicted him his wife

11:47:20  9   and several other people.

11:47:21  10      Q.   So, begins on the bottom paragraph of page six,

11:47:26  11   Government's Exhibit 11?

11:47:27  12      A.   Yes.

11:47:28  13      Q.   And continues onto the next page?

11:47:29  14      A.   Correct.

11:47:32  15      Q.   And what did Mr. Bongiovanni say about that

11:47:36  16   photograph?

11:47:36  17      A.   He said that he remembered the day, he described

11:47:40  18   the circumstances surrounding the photograph and

11:47:42  19   identified some of the people in the photo.

11:47:44  20      Q.   And who did he identify in the photo?

11:47:46  21      A.   Tom Doctor, Peter Gerace, some of the other

11:47:53  22   people in the photo, his wife.

11:48:03  23      Q.   In the blue shirt, far right, is that Mr.

11:48:06  24   Bongiovanni as depicted in the photo?

11:48:07  25      A.   Yes.

```
          1              C. RYAN - DX BY MR. TRIPI
11:48:08   2              MR. TRIPI:  Judge, I'm offering this
11:48:10   3    exhibit, Exhibit 15.  I should have done that before.
11:48:14   4              MR. HARRINGTON:  I'll object to it.
11:48:16   5              MAGISTRATE JUDGE ROEMER:  Overruled
11:48:17   6    Government's Exhibit 15 shall be admitted into evidence.
11:48:17   7              (Whereupon, Government Exhibit 15 was
11:48:26   8    received into evidence.)
11:48:26   9       Q.  Far right in the blue shirt, is that Mr.
11:48:30  10    Bongiovanni?
11:48:30  11       A.  Yes, it is.
11:48:31  12       Q.  The male next to him in the red shirt, is that
11:48:35  13    Peter Gerace?
11:48:36  14       A.  Yes.
11:48:37  15       Q.  A co-defendant in this case?
11:48:38  16       A.  Yes.
11:48:38  17       Q.  Far left, maybe third from left, appearing to
11:48:45  18    have no shirt, sunglasses, possibly drinking a beer, is
11:48:49  19    that Tom Doctor?
11:48:49  20       A.  Yes.
11:49:06  21       Q.  So going back to your interview report page six
11:49:15  22    under Kerry Doctor, where you noted Mr. Bongiovanni said
11:49:18  23    Kerry is the wife of his old partner Tom Doctor.  Tom
11:49:24  24    Doctor was an agent with DEA.  Tom Doctor is retired and
11:49:43  25    lives in Florida.
```

1        C. RYAN - DX BY MR. TRIPI

11:49:45   2        Independently, would you have asked about Mr.

11:49:47   3   Doctor and the relationship with Mr. Bongiovanni based

11:49:50   4   upon the photo that you had, separate and apart from the

11:49:53   5   border search name Kerry Doctor?

11:49:55   6   A.   Yes.

11:50:04   7   Q.   Turning to page 7 of the report, Government's

11:50:07   8   Exhibit 11.   Top paragraph, does that continue the

11:50:12   9   discussion about the photo that is in exhibit 15 that we

11:50:17   10  just discussed?

11:50:18   11  A.   Yes.

11:50:18   12  Q.   Switch to Government's Exhibit 10 in evidence.

11:50:37   13  This is a piece of evidence that was located during the

11:50:40   14  search.   Is that correct?

11:50:41   15  A.   Yes.

11:50:42   16  Q.   And where was it located?

11:50:43   17  A.   On the lower level, the garage level of the

11:50:47   18  house.

11:50:47   19  Q.   And was that box brought up to you during your

11:50:50   20  interview with Mr. Bongiovanni?

11:50:51   21  A.   Yes.

11:50:52   22  Q.   Did you ask him about it?

11:50:53   23  A.   Specifically about the file inside.

11:50:57   24  Q.   And what, in basic terms, is that the file that

11:51:06   25  is referenced in the second superseding indictment in

```
         1              C. RYAN - DX BY MR. TRIPI
11:51:10  2   this case?
11:51:10  3       A.  Yes.
11:51:13  4       Q.  We see a C2 on the file.  See that C2 and then
11:51:19  5   it's covered by a book or something?
11:51:21  6       A.  Yes.
11:51:21  7       Q.  The rest of that number that was on that file,
11:51:26  8   once that book is removed, is that the file number that
11:51:29  9   is referenced specifically in the second superseding
11:51:31 10   indictment?
11:51:31 11       A.  Yes.
11:51:39 12       Q.  I'll ask you one more question about that.  And
11:51:41 13   the names written on that file, those are names you
11:51:47 14   would have asked Mr. Bongiovanni about during this
11:51:52 15   interview?
11:51:52 16       A.  Yes.
11:51:55 17       Q.  And generally you asked him why he had this file?
11:51:58 18       A.  Yes.
11:51:59 19       Q.  And he provided you a series of answers, is that
11:52:01 20   correct?
11:52:02 21       A.  He did.
11:52:02 22       Q.  And you documented those?
11:52:04 23       A.  I did.
11:52:14 24       Q.  Are those answers documented on page 7 somewhere?
11:52:25 25       A.  Yes, towards --
```

```
              1                C. RYAN - DX BY MR. TRIPI
11:52:27      2       Q.   Can we Zoom out?
11:52:28      3       A.   The top of the screen, I can see it.  So the
11:52:33      4   first full paragraph.
11:52:36      5       Q.   Where it begins "SA Ryan asked Bongiovanni why he
11:52:39      6   had reports"?
11:52:39      7       A.   Yes.
11:52:46      8       Q.   Okay.  And then after that, did you ask him about
11:52:49      9   some bulletproof vests that were found in the house?
11:52:52     10       A.   Yes.
11:52:54     11       Q.   And that is the paragraph that is underneath the
11:52:56     12   agent's comment?
11:52:58     13       A.   That's correct.
11:53:03     14       Q.   Did you ask Mr. Bongiovanni about text exchanges
11:53:06     15   he had with Peter Gerace?
11:53:08     16       A.   I did.
11:53:09     17       Q.   Where did you get those texts from?
11:53:11     18       A.   From a memorandum he submitted, two memoranda he
11:53:15     19   submitted to DEA.
11:53:18     20       Q.   So as a part of the investigation, you're aware
11:53:22     21   that he submitted some internal DEA memos?
11:53:25     22       A.   Yes.
11:53:26     23       Q.   And he attached some text messages between
11:53:28     24   himself and Peter Gerace?
11:53:30     25       A.   Yes.
```

                    C. RYAN - DX BY MR. TRIPI

11:53:30    2    Q.   And some of those memos, the dates of those memos
11:53:37    3    are the dates of some of the obstruction counts in the
11:53:40    4    second superseding indictment, correct?
11:53:41    5    A.   Yes.
11:53:48    6    Q.   By the time you are having this conversation with
11:53:51    7    Mr. Bongiovanni on June 6th, 2019, separately in the
11:53:55    8    investigation, had Mr. Gerace's phone been seized during
11:53:58    9    a separate border search?
11:54:00   10    A.   Yes.
11:54:01   11    Q.   On a different date?
11:54:02   12    A.   Yes.
11:54:07   13    Q.   And that phone in the Gerace border search phone,
11:54:12   14    that is not part of this hearing, did you acquire some
11:54:16   15    text exchanges between Mr. Gerace and Mr. Bongiovanni?
11:54:21   16    A.   Yes.
11:54:21   17    Q.   Did you acquire a voicemail that was left from
11:54:24   18    Mr. Gerace to Mr. Bongiovanni?
11:54:25   19    A.   There was a voicemail.
11:54:27   20    Q.   And pictures?
11:54:28   21    A.   And pictures.
11:54:32   22    Q.   Was the picture in Government's Exhibit 15 one of
11:54:36   23    the pictures in that Gerace phone?
11:54:37   24    A.   Yes.
11:55:09   25    Q.   Did you ask Mr. Bongiovanni questions about Dan

```
               1              C. RYAN - DX BY MR. TRIPI
11:55:13       2    Derinda?
11:55:13       3        A.  Yes.
11:55:14       4        Q.  How did the comment about Peter Gerace being good
11:55:27       5    friends with Judge Michalski come up?
11:55:31       6        A.  That was volunteered as it was a name I wasn't
11:55:34       7    familiar with leading up to this.  We were talking about
11:55:41       8    people that Peter Gerace knew.
11:55:45       9        Q.  And does that cover the next couple of lines as
11:55:48      10    well, the name Joe Chirelli and Rocco Dina?
11:55:53      11        A.  Yes.  I'm asking him about law enforcement
11:55:57      12    friends of Peter Gerace.
11:55:58      13        Q.  Of Peter Gerace?
11:56:00      14        A.  Yes.
11:56:02      15        Q.  And then under, there is a paragraph that reads
11:56:06      16    "Peter Gerace obsessively called."  Do you see that?
11:56:11      17        A.  Yes.
11:56:11      18        Q.  Was that in response to a question or how did
11:56:13      19    that come up?
11:56:14      20        A.  It was Mr. Bongiovanni was describing Peter
11:56:18      21    Gerace's behavior to me and that is the way he described
11:56:22      22    it.
11:56:23      23        Q.  How did the name Lou Salva come up?
11:56:27      24        A.  When I asked him about Kim Mecca.
11:56:32      25        Q.  But you knew who that was already?
```

```
          1              C. RYAN - DX BY MR. TRIPI
11:56:34  2      A.  I did.
11:56:36  3      Q.  And then the last paragraph on that page begins
11:56:39  4  "SA Ryan closed the interview by asking Bongiovanni," do
11:56:46  5  you see that?
11:56:46  6      A.  I do.
11:56:47  7      Q.  And you documented his statements about that,
11:56:49  8  correct?
11:56:49  9      A.  Yes.
11:56:54 10      Q.  And that, again, related to the file that is
11:56:57 11  found that we just talked about depicted in Government's
11:57:01 12  Exhibit 10, correct?
11:57:01 13      A.  Correct.
11:57:07 14      Q.  And was there unlabeled pill bottles that were
11:57:12 15  found during the search that you became aware of before
11:57:24 16  you ended the interview?
11:57:25 17      A.  Yes.
11:57:25 18      Q.  And did you ask him about that?
11:57:27 19      A.  I did.
11:57:27 20      Q.  And did you document his response on page 8
11:57:30 21  there?
11:57:30 22      A.  Yes.
11:58:02 23      Q.  I'm going to show you now Government's Exhibit
11:58:05 24  No. 16.  Do you recognize Government's Exhibit 16?
11:58:40 25      A.  I do.
```

                              C. RYAN - DX BY MR. TRIPI

11:58:41   2    Q.   What do you recognize that to be?

11:58:42   3    A.   It's an application for a search warrant that I

11:58:44   4    submitted to this Court for the search of 85 Alder Place

11:58:49   5    Kenmore, in Kenmore, New York.  And then a portion of

11:58:53   6    the or an excerpt of the supporting affidavit that has

11:58:56   7    been redacted.

11:58:57   8    Q.   And it's a small excerpt and it contains

11:59:02   9    redactions.  Is that accurate?

11:59:03   10   A.   Yes.

11:59:03   11   Q.   And for the portions --

11:59:06   12        MAGISTRATE JUDGE ROEMER:  Mr. Tripi, I need

11:59:07   13   you to stand by the microphone.

11:59:11   14   Q.   The portions of the application that are visible,

11:59:16   15   so the first page, and then the paragraphs that are

11:59:19   16   included in that excerpt, are those all accurate

11:59:23   17   paragraphs in terms of what was in the affidavit?

11:59:56   18   A.   Yes, they appear to be.

12:00:03   19        MR. TRIPI:  Judge, for purposes of this

12:00:04   20   hearing, I'm going to offer the excerpted redacted

12:00:08   21   Government's Exhibit 16.

12:00:11   22        MAGISTRATE JUDGE ROEMER:  Mr. Harrington?

12:00:12   23        MR. HARRINGTON:  No objection.

12:00:12   24        MAGISTRATE JUDGE ROEMER:  Okay.

12:00:14   25   Government's Exhibit 16 shall be admitted into evidence

```
 1              C. RYAN - DX BY MR. TRIPI
```

12:00:21  2          (**Whereupon, Government's Exhibit 16 was**

12:00:24  3  **received into evidence.)**

12:00:27  4      Q.   Now, I'm going to show you a paragraph that is

12:00:33  5  unredacted, which appears on page 20 of the affidavit.

12:00:39  6  Says, "On April 24, 2019, Joseph Bongiovanni, his wife

12:00:44  7  and stepson entered the United States at Baltimore

12:00:47  8  Washington International Airport after returning to the"

12:00:51  9  and continues onto the next page.  I ask you about that

12:00:54 10  date for a moment.  That date is an error, correct?

12:00:57 11      A.   It is.  That is the date of the secondary report

12:01:02 12  and when they actually entered on the 23rd.

12:01:05 13      Q.   Did you transpose, essentially, the typographical

12:01:09 14  error on Officer Gernatt's report using that date?

12:01:14 15      A.   Yes.

12:01:14 16      Q.   And make an error as to the date in that

12:01:17 17  paragraph?

12:01:17 18      A.   Yes, I did.

12:01:22 19      Q.   That paragraph continues onto the next page.  It

12:01:27 20  says "United States from Dominican Republic.  At that

12:01:30 21  time U.S. Customs and Border Protection officers

12:01:34 22  conducted a border search of Joseph Bongiovanni's

12:01:37 23  telephone.  Officers attempted a full forensic

12:01:41 24  examination of the phone, but were unsuccessful,

12:01:44 25  nonetheless significant results of the search are

```
        1              C. RYAN - DX BY MR. TRIPI
12:01:47 2   detailed below."  And then there are three paragraphs,
12:01:52 3   A, B, and C on this page and carries onto a D top of the
12:01:57 4   next page.  Do you see that?
12:01:58 5       A.  Yes.
12:01:59 6       Q.  Four of the names, did you include four of those
12:02:04 7   names from that border search in paragraph 55 of the
12:02:09 8   search warrant affidavit?
12:02:10 9       A.  Yes.
12:02:12 10      Q.  And what is blacked out is the actual name and,
12:02:17 11  well, just characterize what is blacked out in each of
12:02:20 12  these paragraphs, please?
12:02:21 13      A.  The name of the person and then what I was able
12:02:26 14  to learn about that person from various law enforcement
12:02:28 15  reports.
12:02:29 16      Q.  So the relevance of the person to your
12:02:32 17  investigation provided, correct?
12:02:36 18      A.  Correct.
12:02:37 19      Q.  And that is relevance that you were able to glean
12:02:40 20  after doing some looking at the names, correct?
12:02:44 21      A.  Correct.
12:02:44 22      Q.  Other than that, did the rest of the affidavit,
12:02:54 23  did the rest of the, if you can characterize it did the
12:02:58 24  rest of the affidavit rely upon anything that was
12:03:04 25  stemmed from the border search on April 23, 2019?
```

```
          1                   C. RYAN - DX BY MR. TRIPI
12:03:12  2       A.   No.
12:13:19  3       Q.   If paragraph 55 had been deleted and never put
12:13:49  4   into this search warrant affidavit, would you have still
12:13:54  5   submitted the search warrant for Judge Roemer's
12:13:56  6   approval?
12:13:57  7       A.   Yes.
12:14:04  8                   MR. TRIPI:  May I have just a few moments,
12:14:09  9   Judge.
12:14:09 10                   MAGISTRATE JUDGE ROEMER:  Sure.
12:14:30 11       Q.   I'd just like to circle back before I end here.
12:14:34 12   Okay.  At the time you worked with CBP Buffalo officers
12:14:54 13   to work with their counterparts in Baltimore to put a
12:14:59 14   lookout for Mr. Bongiovanni, did you believe, based on
12:15:03 15   your training and experience, it was lawful to do a
12:15:06 16   basic search of someone's cell phone at the border?
12:15:09 17       A.   Yes.
12:15:09 18       Q.   And was that belief based on your training and
12:15:12 19   experience regarding the search and seizure of items and
12:15:19 20   evidence at the border?
12:15:20 21       A.   Yes.
12:15:21 22       Q.   Based on your understanding of the Fourth
12:15:23 23   Amendment in that area?
12:15:24 24       A.   Yes.
12:15:29 25       Q.   Did you believe you were following existing law?
```

```
          1              C. RYAN - DX BY MR. TRIPI
12:15:32  2      A.   Yes.
12:15:37  3      Q.   Did you act in good faith in doing that?
12:15:39  4      A.   Yes.
12:15:47  5            MR. TRIPI:  I don't have anything further,
12:15:50  6   Judge, on direct.  Thank you.
12:15:51  7            MAGISTRATE JUDGE ROEMER:  Thank you.  You
12:16:11  8   ready, Mr. Harrington, or did you need a break?
12:16:14  9            MR. HARRINGTON:  I may need five, ten
12:16:16  10  minutes.
12:16:16  11           MAGISTRATE JUDGE ROEMER:  Let's come back at
12:16:18  12  ten after 2.
12:16:20  13           (Whereupon, there was a break in the
12:16:20  14  proceeding.)
12:16:29  15           THE CLERK:  We're all set.
12:16:30  16           MAGISTRATE JUDGE ROEMER:  I'm glad I waited
12:16:32  17  for a second.  I didn't know Mr. Bongiovanni wasn't back
12:16:34  18  in the room.
12:16:36  19           THE DEFENDANT:  Sorry, sir.
12:16:37  20           MAGISTRATE JUDGE ROEMER:  That's okay.
12:16:38  21  We're all back.  Mr. Harrington.
12:16:40  22           MR. HARRINGTON:  Judge, before we begin the
12:16:42  23  questioning, Mr. Tripi went into questions with Mr. Ryan
12:16:47  24  about the search warrant application for my client's
12:16:49  25  home and it is severely redacted and he asked him for --
```

1          C. RYAN - DX BY MR. TRIPI

12:16:56   2  asked him questions about other parts.

12:16:59   3          THE CLERK:  Just a minute, Jim.  I'm sorry.

12:17:14   4  Okay.  Thank you.

12:17:17   5          MR. HARRINGTON:  And since that was now an

12:17:18   6  issue.

12:17:18   7          MAGISTRATE JUDGE ROEMER:  Could you start

12:17:19   8  over?

12:17:20   9          THE CLERK:  Judge, I'm sorry.  Just one

12:17:22  10  second, please.  I just need to, I think it's just been

12:17:32  11  too long.  Okay.  I'm sorry.

12:17:34  12          MR. HARRINGTON:  Start over?

12:17:36  13          THE CLERK:  We're good.  Yes, please.

12:17:39  14          MR. HARRINGTON:  Judge, Mr. Tripi asked Mr.

12:17:41  15  Ryan some questions about Government's Exhibit 16, which

12:17:44  16  is a search warrant application for my client's home,

12:17:47  17  which is redacted, significantly redacted, and there are

12:17:51  18  parts of it that are supposed to relate to the telephone

12:17:57  19  issue, but he asked him questions about the unredacted

12:18:00  20  part, and I think we're entitled to see that.  And I

12:18:03  21  understand the Court has ruled on that before, but we're

12:18:07  22  in a different posture with it right now.  We're

12:18:10  23  certainly willing to consent to a protective order if

12:18:14  24  the Court wants to issue one with respect to the

12:18:18  25  disclosure of it to our client.  But I think we're

```
          1              C. RYAN - DX BY MR. TRIPI
12:18:21  2   entitled to see it.  And to be able to determine whether
12:18:26  3   there is further questioning that needs to be done of
12:18:29  4   Mr. Ryan.
12:18:30  5              MAGISTRATE JUDGE ROEMER:  Mr. Tripi?
12:18:32  6              MR. TRIPI:  Judge, that's not accurate.
12:18:33  7   Under Rule 26.2, the Court is permitted to review the
12:18:38  8   unredacted and redacted in camera.  You certainly have
12:18:42  9   reviewed this entire search warrant affidavit a number
12:18:45  10  of times.  You can see the redactions that I made.
12:18:48  11             MAGISTRATE JUDGE ROEMER:  That is usually in
12:18:49  12  the context of determining a probable cause or something
12:18:52  13  like that.  Now here, you asked him questions about it
12:18:56  14  saying, okay, in the affidavit you talked about the
12:19:00  15  different contacts that he received from the phone,
12:19:08  16  right?
12:19:09  17             MR. TRIPI:  Right.
12:19:09  18             MAGISTRATE JUDGE ROEMER:  And then he
12:19:11  19  testified, I collected this other information and I put
12:19:13  20  it in there.  And I believe that was in the context of
12:19:16  21  was to show he didn't rely just on the phone contact, he
12:19:19  22  had other information on there.
12:19:21  23             MR. TRIPI:  Well, Judge, the rule, the rule
12:19:24  24  talks about under 26, I believe 26.2, talks about --
12:19:31  25             MAGISTRATE JUDGE ROEMER:  Let me pull out
```

```
 1              C. RYAN - DX BY MR. TRIPI
 2   26.2.
 3              MR. TRIPI:  It's definitely point 2, I think
 4   it's 26.2, but, basically, it stands from the
 5   proposition that if there is Jencks Act material that
 6   needs to be redacted, the Court can look at what has
 7   been provided and what has been redacted and make that
 8   determination.  Here we've unredacted, we've unredacted
 9   paragraph 55 and a couple of other paragraphs that
10   relate to the hearing testimony today what we've left
11   redacted, obviously, is the overwhelming majority of
12   that search warrant affidavit, which has nothing to do
13   with the border search as well as the agent's analysis
14   of the names.  That also has nothing to do with this
15   hearing.  The analysis of the names that were included
16   in the affidavit is separate and apart from what is
17   pertinent here.  The only reason I got into it is
18   because now we're in some sort of weird fruit of the
19   poisonous tree hearing.
20              MAGISTRATE JUDGE ROEMER:  We're definitely
21   in an odd posture.
22              MR. TRIPI:  And, again, defense counsel
23   operated in good faith, I'm not saying otherwise, but,
24   we have to address what came from the phone versus what
25   the agent did.  And if you read that paragraph in
```

                              C. RYAN - DX BY MR. TRIPI

12:21:00   2   camera, and you compare it to Government's Exhibit 1,

12:21:03   3   which is the raw data from the phone, you'll see that

12:21:06   4   there is a lot more there.  Now, if I'm wrong about

12:21:09   5   that, you could, after you do that comparison, Judge, in

12:21:13   6   camera, you can tell me I'm wrong and we can come back

12:21:17   7   and address it.

12:21:18   8                  MAGISTRATE JUDGE ROEMER:  This is a good

12:21:19   9   time to get into this.  I've been thinking about it as

12:21:23  10   we've gone through.  We're a little bit of cart before

12:21:25  11   the horse type deal here.  We're talking about what will

12:21:29  12   happen if or when I were to say that this should be the

12:21:33  13   border search should be suppressed, right?

12:21:36  14                  MR. TRIPI:  Right.

12:21:36  15                  MAGISTRATE JUDGE ROEMER:  That is why it's

12:21:39  16   in an odd posture, okay.  Because, Mr. Harrington, I'm

12:21:44  17   anticipating, that during your cross, you may ask,

12:21:48  18   because Mr. Tripi went down and said, okay, you stated

12:21:50  19   this or asked this question and did that have anything

12:21:56  20   to do with what got on the phone and the agent said no,

12:21:59  21   it didn't.  So I anticipate your next question will be,

12:22:03  22   well, where did you get that.

12:22:05  23                  MR. TRIPI:  And I'll be objecting to that.

12:22:07  24                  MAGISTRATE JUDGE ROEMER:  And I would assume

12:22:08  25   that Mr. Tripi would object to that.  And the posture

C. RYAN - DX BY MR. TRIPI

12:22:11   2   that we're in, now we're almost in discovery type of
12:22:16   3   posture where you're asking questions that, so my
12:22:21   4   thought on that is to keep this hearing open with regard
12:22:25   5   to that.  Have you ask today all of the questions that
12:22:29   6   you want to ask about suppressing the border search, we
12:22:34   7   brief it and decide the border search issue.  If I
12:22:41   8   decide it shouldn't be suppressed, this is all
12:22:45   9   irrelevant.  There is no fruit of the poisonous tree.
12:22:48   10  If it is, if I decide it should be suppressed, well
12:22:53   11  then, one, I think there is a whole other legal issue I
12:22:57   12  think.  I think Mr. Tripi's from -- I take it from the
12:23:01   13  way he has asked his questions, that he thinks, well,
12:23:05   14  that would only get rid of stuff that was directly
12:23:09   15  relevant to the phone contact and that is what he has
12:23:12   16  done today, gone through and said this wasn't, this was.
12:23:17   17  I anticipate you'll take the legal position then it
12:23:20   18  doesn't matter, tainted the whole thing, right?  Also,
12:23:26   19  another issue will be, okay, if it was unlawfully, an
12:23:34   20  unlawful search at the border and that was used in this
12:23:38   21  search warrant affidavit and that we're then to
12:23:44   22  determine that the search warrant affidavit was no good
12:23:47   23  that then brings up an issue of they shouldn't even have
12:23:51   24  been in the house to ask him these questions, I guess.
12:23:54   25  Right?  So that is a whole other issue.  You follow my

```
          1              C. RYAN - DX BY MR. TRIPI
12:23:58  2    train of thought?
12:23:58  3              MR. HARRINGTON:  You're doing very well.
12:24:00  4              MAGISTRATE JUDGE ROEMER:  All right.  Thank
12:24:01  5    you.  So, I think what we're going to do is I'll let you
12:24:06  6    ask whatever questions about the border search, I'll
12:24:09  7    keep it open with regard to the fruit of the poisonous
12:24:12  8    tree, and if we have to address that after I decide this
12:24:15  9    border search, then we will.  Because I'm not sure that
12:24:19 10    at that point you wouldn't have a right to ask him about
12:24:23 11    where did you get this information.  You know, I can't
12:24:28 12    say now you wouldn't have a right no matter what.  You
12:24:32 13    just have to take his answers, right?  I didn't rely on
12:24:35 14    the phone for that.  Whatever.  I think you would have a
12:24:38 15    chance to test that, right, under cross examination.  I
12:24:42 16    just think it's premature at this point.
12:24:44 17              Your thoughts, Mr. Harrington.
12:24:46 18              MR. HARRINGTON:  Judge, that is a logical
12:24:49 19    way to do it.  If you want to give me another five
12:24:52 20    minutes, I can pare this down by questioning of Mr.
12:24:56 21    Ryan, he is really not that instrumental about the
12:24:59 22    search at the border.
12:25:01 23              MAGISTRATE JUDGE ROEMER:  Right.
12:25:02 24              MR. HARRINGTON:  If I could get a few
12:25:03 25    minutes.
```

```
        1              C. RYAN - DX BY MR. TRIPI
12:25:03 2         MAGISTRATE JUDGE ROEMER:  Mr. Tripi, your
12:25:05 3   thoughts on that.
12:25:05 4         MR. TRIPI:  I think you've laid out the
12:25:07 5   issues, Judge.  And where we would fall on that spectrum
12:25:11 6   is probably accurate in terms of the positions the
12:25:14 7   parties will take reserving my rights to modify it from
12:25:18 8   how you characterized it.
12:25:20 9         MAGISTRATE JUDGE ROEMER:  Sure.  I just
12:25:21 10  think I have to decide this border search.  There is the
12:25:25 11  search warrant affidavit is hinging on that.  There are
12:25:28 12  the statements that he made hinging on that.  So trying,
12:25:32 13  like I said, I think we're the cart before the horse.
12:25:34 14        MR. TRIPI:  The only thing I would take
12:25:36 15  issue is "hinging" on it.  You know in terms of we think
12:25:39 16  it doesn't hinge on the border search.  We think, for
12:25:43 17  example --
12:25:43 18        MAGISTRATE JUDGE ROEMER:  That will be the
12:25:44 19  argument you'll make is if you take that out of the
12:25:47 20  search warrant, there was still enough information there
12:25:50 21  to.  I get all of that.
12:25:51 22        MR. TRIPI:  We're on the same page, Judge.
12:25:53 23        MAGISTRATE JUDGE ROEMER:  But I think,
12:25:55 24  really, in fairness to the defendant, they have the
12:25:57 25  right to know now or, you know, when I get it decided
```

```
 1                    C. RYAN - DX BY MR. TRIPI
12:26:01  2  about the border search, okay?  And same thing with the
12:26:05  3  government.  You know, like I say, I don't think at this
12:26:08  4  point it would be appropriate for Mr. Harrington to
12:26:13  5  start asking where did you get this information, this
12:26:15  6  information, then it's just a discovery thing.  Does
12:26:18  7  that all make sense?  Everybody is agreeable to that?
12:26:21  8           MR. TRIPI:  It does, Judge.
12:26:22  9           MAGISTRATE JUDGE ROEMER:  Mr. Harrington,
12:26:23 10  I'll give you however long you want.
12:26:25 11           MR. HARRINGTON:  Give me 10 minutes.  I
12:26:27 12  don't know if Mr. Tripi has another witness.  We have a
12:26:29 13  witness we could probably go ahead with after Mr. Ryan.
12:26:33 14           MAGISTRATE JUDGE ROEMER:  Mr. Tripi.
12:26:35 15           MR. TRIPI:  I don't think we're going to
12:26:36 16  have any other direct witnesses.  We may, depending on
12:26:39 17  their witness, may have a rebuttal witness, but no one
12:26:57 18  who is not on our list already.
12:26:58 19           MAGISTRATE JUDGE ROEMER:  Who you going to
12:27:00 20  call?
12:27:00 21           MR. HARRINGTON:  My client's wife.
12:27:02 22           MAGISTRATE JUDGE ROEMER:  Okay.  So just to
12:27:04 23  give Mr. Tripi a head's up as to what is going to
12:27:08 24  happen.  Okay.  We'll come back in 10 minutes.  I'll go
12:27:12 25  back and finish the rest of my sandwich and I'll be back
```

```
            1              C. RYAN - CX BY MR. HARRINGTON
12:27:16    2    out.
12:27:16    3              MR. TRIPI:  Do you have an extra sandwich,
12:27:18    4    Judge.  (Laughter)
12:27:18    5              (Whereupon, there was a break in the
13:39:09    6    proceeding.)
13:39:09    7              MAGISTRATE JUDGE ROEMER:  I'm sorry.  Go
13:39:11    8    ahead, Mr. Harrington.
13:39:14    9    CROSS EXAMINATION BY MR. HARRINGTON:
13:39:14   10       Q.  Mr. Ryan, when did you first become involved in
13:39:17   11    the investigation of Mr. Bongiovanni?
13:39:18   12       A.  Mid 2018.
13:39:21   13       Q.  Okay.
13:39:21   14       A.  And it was because something that I was assigned
13:39:25   15    to me when I was first assigned at BEST, I seemed to
13:39:30   16    touch on parts of it.
13:39:32   17       Q.  Were you still working with the DEA then?
13:39:34   18       A.  In mid 2018?
13:39:36   19       Q.  Yes.
13:39:36   20       A.  I was.
13:39:37   21       Q.  And so, you continued with this case certainly up
13:39:42   22    until the time that Mr. Bongiovanni left, right, and
13:39:45   23    through the events that we talked about today in June?
13:39:51   24       A.  Yes.
13:39:51   25       Q.  And when you sent the request for the search of
```

1          C. RYAN - CX BY MR. HARRINGTON

13:40:00  2    his phone to the BWI airport or started the process for

13:40:06  3    it, how did you know where he was and what he was doing?

13:40:11  4        A.  Well, I relied on the CBP officers for the

13:40:15  5    process, I guess.  I'm not sure.

13:40:17  6        Q.  How did you know where he was on vacation?

13:40:19  7        A.  I received an alert from our system that he was

13:40:23  8    manifested on a flight.

13:40:26  9        Q.  On the original flight going down?

13:40:29 10        A.  You get an alert for each manifest.  So you get

13:40:33 11    an outbound alert and an inbound alert.

13:40:36 12        Q.  So his name was in some system that would alert

13:40:39 13    you, that is what you're saying?

13:40:41 14        A.  Yes.

13:40:41 15        Q.  And is this the TECS system?

13:40:44 16        A.  Yes.

13:40:45 17        Q.  Okay.

13:40:46 18             MAGISTRATE JUDGE ROEMER:  Well, you said it

13:40:49 19    was an TECS system or something else, and he said,

13:40:52 20    "yes."  I don't know if it was TECS system or something

13:40:55 21    else.

13:40:56 22        Q.  Very bad question.

13:40:57 23        A.  There are multiple systems that communicate.  So

13:41:01 24    those systems, TECS is one of them.

13:41:03 25        Q.  But his name must have been in there and you must

1          C. RYAN - CX BY MR. HARRINGTON

13:41:06   2   have been a recipient about alerts about him, correct?

13:41:11   3       A.   Yes.

13:41:11   4       Q.   Now, so you learn that he is coming back on April

13:41:15   5   the 23rd, right?

13:41:16   6       A.   Yes.

13:41:16   7       Q.   And a one day lookout is sent, right, that is a

13:41:20   8   something, customary that is done, right, when you know

13:41:24   9   someone is coming on a particular day?

13:41:26  10       A.   Yes.

13:41:26  11       Q.   And what is the process that you go through to

13:41:29  12   initiate this stopping of him and searching of his

13:41:35  13   phone?

13:41:36  14       A.   My only part of it was to ask the CBP officers

13:41:39  15   that I was working with to coordinate it and then I

13:41:42  16   relied on them.

13:41:43  17       Q.   Isn't it true that you have to be a certain grade

13:41:46  18   level in order to authorize these kinds of searches?

13:41:51  19       A.   No.

13:41:52  20       Q.   So it didn't matter whether you were a new

13:41:55  21   special agent or you had been a supervisory special

13:41:58  22   agent, you could still request it.  Is that what you're

13:42:01  23   saying?

13:42:01  24       A.   Yes.

13:42:02  25       Q.   And do you know the process within CBP, how they

C. RYAN - CX BY MR. HARRINGTON

13:42:06   2   receive it?  Do they just do that upon the request of

13:42:09   3   anyone, any law enforcement officer?

13:42:11   4       A.  I don't know.

13:42:11   5       Q.  Had you done these before April 23rd, gave this

13:42:18   6   kind of request?

13:42:18   7       A.  I had done them, yes.

13:42:20   8       Q.  And all you do is contact somebody locally,

13:42:23   9   right, and you don't have to give them any information

13:42:25   10   whatsoever?

13:42:27   11       A.  I contacted the CBP officers that work with me

13:42:30   12   that understood the case, and I asked them to coordinate

13:42:33   13   that search at BWI.

13:42:35   14       Q.  Great who were they?

13:42:37   15       A.  Jack Gernatt, Joe Spidone and Thomas Moss.

13:42:41   16       Q.  And do they have to fill out some form to

13:42:45   17   initiate this?

13:42:46   18       A.  Maybe an online entry for that one day lookout,

13:42:55   19   but not a paper form.

13:43:01   20           MR. HARRINGTON:  Judge, I ask that they

13:43:02   21   disclose whatever forms or online application, whatever

13:43:20   22   it is that was used, that was used to initiate this stop

13:43:23   23   at the border.

13:43:24   24           MAGISTRATE JUDGE ROEMER:  Mr. Tripi?

13:43:25   25           MR. TRIPI:  On what basis?  They have a

1          C. RYAN - CX BY MR. HARRINGTON

13:43:27  2  witness on the stand and they have his Jencks material.

13:43:30  3  I don't see the basis for that kind of request.

13:43:35  4          MR. HARRINGTON:  Well then, Judge, I'll have

13:43:36  5  to subpoena, I guess, another witness, so just prolong

13:43:40  6  this.  If he could just give it to us, we could deal

13:43:43  7  with it.

13:43:44  8          MAGISTRATE JUDGE ROEMER:  Do you have it

13:43:45  9  now?

13:43:46  10         MR. TRIPI:  No, I don't know what -- no.

13:43:48  11         MAGISTRATE JUDGE ROEMER:  Provide it to him

13:43:49  12  as soon as you can.

13:43:52  13         MR. TRIPI:  Provide, I need to be clear what

13:43:55  14  I am to provide.

13:43:56  15         MAGISTRATE JUDGE ROEMER:  If there was any

13:44:05  16  written document of him requesting this lookout.

13:44:09  17         MR. HARRINGTON:  Or electronic.

13:44:10  18         MR. TRIPI:  There is no entry of him.  I

13:44:15  19  would have made sure, he said earlier.

13:44:18  20         MAGISTRATE JUDGE ROEMER:  He said the CBP

13:44:20  21  that he works with did it.

13:44:22  22         MR. TRIPI:  He said earlier he was on an

13:44:24  23  e-mail, but that e-mail thread was not initiated by him

13:44:28  24  and those witnesses, those people are not witnesses in

13:44:31  25  this hearing.  So, their Jencks material is not

1          C. RYAN - CX BY MR. HARRINGTON

13:44:36  2   discoverable if they are not a witness in the hearing.

13:44:40  3   Right?  It's not Rule 16.

13:44:43  4          MAGISTRATE JUDGE ROEMER:  You asked the CBP

13:44:46  5   guys to make this request.  Do you know if they filled

13:44:49  6   out a form or not?

13:44:51  7          THE WITNESS:  I do not.  And there are

13:44:53  8   multiple ways to do it, and I'm not sure which way they

13:44:57  9   used.

13:44:58  10          MAGISTRATE JUDGE ROEMER:  Go ahead, Mr.

13:45:00  11   Harrington.

13:45:00  12          MR. HARRINGTON:  Pardon me?

13:45:01  13          MAGISTRATE JUDGE ROEMER:  Go ahead.

13:45:02  14          MR. HARRINGTON:  What is the answer?

13:45:03  15          MAGISTRATE JUDGE ROEMER:  He doesn't know

13:45:04  16   what form it is.

13:45:05  17          MR. HARRINGTON:  I understand that, but this

13:45:07  18   witness brought out something in terms of the procedure

13:45:11  19   and there is no way I would be aware and now he brought

13:45:14  20   it out and it is what leads to the search of my client

13:45:27  21   and we're entitled to have it.  And if I have to

13:45:30  22   subpoena another witness.  Mr. Gernatt was listed as a

13:45:33  23   witness today, but he hasn't been called.  Maybe he can

13:45:36  24   answer the question.

13:45:37  25          MR. TRIPI:  I have don't believe -- he was

1                C. RYAN - CX BY MR. HARRINGTON

13:45:38   2   not listed as a witness.

13:45:39   3              MR. HARRINGTON:  He wasn't?

13:45:40   4              MR. TRIPI:  He was not, no.

13:45:42   5              MAGISTRATE JUDGE ROEMER:  I deny your

13:45:43   6   request.  Go onto your next question.

13:45:46   7              MR. HARRINGTON:  I'm reserving my right to

13:45:48   8   call another witness, Judge.

13:45:50   9              MAGISTRATE JUDGE ROEMER:  Okay.  Well, I

13:45:51   10  deny that request, too, okay?  So go ahead.

13:45:57   11  CONTINUING CROSS EXAMINATION BY MR. HARRINGTON:

13:45:57   12     Q.  So you don't know what was written to the agents

13:46:00   13  down in Baltimore at BWI, do you?

13:46:04   14     A.  No.

13:46:04   15     Q.  And you don't know whether any information was

13:46:06   16  provided about Mr. Bongiovanni, is that right?

13:46:09   17     A.  No.

13:46:10   18     Q.  I'm right?

13:46:11   19     A.  No.  I mean, I don't know what information was

13:46:14   20  provided.

13:46:14   21     Q.  And, the request is for a forensic examination of

13:46:21   22  his phone, correct?

13:46:22   23     A.  No.  It was for a secondary inspection.

13:46:26   24     Q.  Secondary inspection, which is beyond the basic?

13:46:28   25     A.  No, it was secondary inspection encompasses more

1          C. RYAN - CX BY MR. HARRINGTON

13:46:32  2   than his phone.  That is why I drew that distinction.

13:46:35  3   It's a search of baggage, an interview about your

13:46:39  4   travel, it's much more than the phone.

13:46:41  5      Q.  But what you were really interested in was his

13:46:45  6   phone, was it not?

13:46:46  7      A.  No, not just his phone.

13:46:47  8      Q.  What else were you interested in?  Whether he was

13:46:51  9   carrying dope back from the Dominican Republic?

13:46:54  10     A.  Who knows.  It's possible.  I'm not saying that

13:46:57  11  is what I'm interested in.  That is not what I'm saying.

13:47:12  12  He could have flown to the Dominican Republic and flown

13:47:15  13  somewhere else and had documents related to that in his

13:47:21  14  baggage.  He could have had a foreign bank statement in

13:47:36  15  his baggage.  He could have had a document or something

13:47:38  16  that identified somebody that he met with in the

13:47:41  17  Dominican Republic.  Those were the types of things I

13:47:44  18  was interested in.

13:47:45  19     Q.  But is a secondary inspection always involve

13:47:50  20  searching somebody's phone, if you know?

13:47:56  21     A.  I don't know.

13:47:57  22     Q.  If I come through landing at BWI coming from the

13:48:01  23  Dominican Republic, you're not investigating me and

13:48:03  24  nobody is, and the guy at the primary says, "I don't

13:48:07  25  like the way you look, go to secondary," right, do they

```
              1              C. RYAN - CX BY MR. HARRINGTON
13:48:11      2    inspect my phone?
13:48:12      3         A.   They likely will.
13:48:13      4         Q.   Do they do a forensic exam of my phone in those
13:48:19      5    situations?
13:48:19      6         A.   If their policy allows it.
13:48:22      7         Q.   Okay.  You're not familiar with a regulation that
13:48:25      8    says you have to be a certain grade of law enforcement
13:48:28      9    officer to authorize these searches?
13:48:30     10         A.   There is no HSI policy that requires that, no.
13:48:35     11         Q.   And you're not familiar with Customs and Border
13:48:38     12    Patrol, what their policy is, either?
13:48:40     13         A.   No, not in regards to that.
13:48:43     14         Q.   Okay.  When you received the information from the
13:49:19     15    border patrol inspection, you talked about the pictures
13:49:30     16    of the phone in Exhibit 1.  I'll just put one up here.
13:49:35     17    Right?
13:49:36     18         A.   Yes.
13:49:37     19         Q.   And showing you page 2 of Exhibit 1, which are
13:49:45     20    some other entries there, do you know what the blue dots
13:49:49     21    mean?
13:49:49     22         A.   No, that was not in focus, either.
13:49:55     23              MAGISTRATE JUDGE ROEMER:  It had never
13:49:56     24    gotten to focus.
13:49:58     25         A.   To which blue dot are you referring?
```

                1           C. RYAN - CX BY MR. HARRINGTON

13:50:01    2       Q.   There are blue dots next to some of the numbers

13:50:04    3   or names?

13:50:04    4       A.   I don't know.

13:50:34    5       Q.   Was in the request that was sent to CBP by you

13:50:39    6   for the stopping of Mr. Bongiovanni, was his wife

13:50:42    7   included in that or not?

13:50:45    8       A.   I don't recall.

13:50:50    9       Q.   Were you investigating her at the time?

13:50:53   10       A.   No.

13:50:58   11       Q.   You identified Government's Exhibit 13, which I

13:51:08   12   believe you said was a draft report that was done by

13:51:22   13   Agent Gernatt, is that right?

13:51:22   14       A.   Yes.

13:51:23   15       Q.   And this is dated April the 25th of 2019,

13:51:29   16   correct?

13:51:29   17       A.   Yes.

13:51:29   18       Q.   That is two days after the stop has happened,

13:51:33   19   right?

13:51:33   20       A.   Yes.

13:51:33   21       Q.   And I believe you said you had this with you when

13:51:36   22   you went to Mr. Bongiovanni's house?

13:51:37   23       A.   I did, a copy of it, yes.

13:51:39   24       Q.   Was this not updated in the six weeks before you

13:51:43   25   went?

1          C. RYAN - CX BY MR. HARRINGTON

13:51:44   2     A.   No, it hadn't been updated yet.

13:51:49   3     Q.   And who was doing that, Gernatt?

13:51:52   4     A.   Yes.

13:51:57   5     Q.   Did you ask him why it hadn't been?

13:52:00   6     A.   No.

13:52:01   7     Q.   You used that, though, for the basis for asking

13:52:04   8   Mr. Bongiovanni questions, right?

13:52:06   9     A.   I did.

13:52:06   10    Q.   And names that were listed in there?

13:52:09   11    A.   I did.

13:52:10   12    Q.   Do you know if Mr. Gernatt did any sort of search

13:52:14   13  on Exhibit 1 for the entries that just had phone

13:52:17   14  numbers?

13:52:20   15    A.   He did, yes.

13:52:22   16    Q.   And did he give you a report about those before

13:52:24   17  you went?

13:52:25   18    A.   That is that report.

13:52:28   19    Q.   Government's Exhibit 13 is the report?

13:52:30   20    A.   He used the photos that are Government's Exhibit

13:52:35   21  1 and performed his analysis and produced Government's

13:52:38   22  Exhibit 13, and I relied on that report.

13:52:41   23    Q.   I understand that.  But his report on 13 only

13:52:47   24  includes entries for people's names, right?

13:52:52   25    A.   I don't understand your question.

1          C. RYAN - CX BY MR. HARRINGTON

13:52:54    2      Q.  Well, for example, what I just put on the screen,

13:52:57    3   which is the second page of exhibit 13, the top says

13:53:04    4   Frank Parisi, correct?

13:53:07    5      A.  Yes.

13:53:07    6      Q.  And the next is Nick Puglise, correct, the next

13:53:19    7   entry?

13:53:19    8      A.  Yes, I can see it.

13:53:21    9      Q.  All I'm saying to yo, is, there are no entries

13:53:24   10   here for phone numbers that appeared in Government's

13:53:29   11   Exhibit 1 that didn't have names next to them, right?

13:53:35   12      A.  There is some process of analysis that he used

13:53:44   13   starting here, I don't know what intermediary steps he

13:53:48   14   took, what other things he added to it to produce that

13:53:52   15   report.

13:53:53   16      Q.  But did you ask him or was he directed to check

13:53:57   17   on every number that was in Mr. Bongiovanni's phone and

13:54:01   18   determine who that number was subscribed to?

13:54:05   19      A.  We didn't -- we had only what was in the

13:54:08   20   photographs and he tried to learn what he could about

13:54:11   21   those numbers.

13:54:14   22      Q.  And he didn't give you any information about the

13:54:16   23   numbers, though, is that right?

13:54:18   24      A.  He gave me the report, his report.

13:54:39   25      Q.  Now, when Mr. Tripi went through individually the

1        C. RYAN - CX BY MR. HARRINGTON

13:54:43   2   names on the phone numbers for Exhibit 1, some he used

13:54:50   3   last names, some he didn't.  I'm not going to go through

13:54:54   4   them all.  But you mentioned Tom Gerace, is that right?

13:55:00   5      A.   Yes.

13:55:00   6      Q.   Do you know Tom Gerace?

13:55:02   7      A.   I don't.

13:55:03   8      Q.   You didn't know he was a DEA agent?

13:55:06   9      A.   I knew there was a Tom Gerace who was an Amherst

13:55:11  10   Detective who had been a task force officer.  I don't

13:55:14  11   know him personally.

13:55:15  12      Q.   And how about Phil Torre?

13:55:17  13      A.   I don't know that person.

13:55:19  14      Q.   You didn't know he was a DEA agent, either?

13:55:22  15      A.   No.

13:55:38  16           MR. HARRINGTON:  Just one second, Judge.

13:55:40  17           MAGISTRATE JUDGE ROEMER:  Sure.

13:56:19  18           MR. HARRINGTON:  Judge, the next of the

13:56:21  19   questions I have all go to the second prong.

13:56:23  20           MAGISTRATE JUDGE ROEMER:  I've been sitting

13:56:25  21   here cogitating about your request.  Mr. Tripi, I think

13:56:30  22   he has a right to either have that witness on the stand,

13:56:33  23   I didn't realize there was this intermediary between

13:56:36  24   this agent and the CBP agent down in Maryland.  Now the

13:56:44  25   guy from Maryland said he wasn't told anything about the

                    1          C. RYAN - CX BY MR. HARRINGTON

13:56:47    2    details.  But I think Mr. Harrington has the right to

13:56:53    3    find out that information as to was there not or was

13:56:56    4    there not any information given.

13:56:58    5                MR. TRIPI:  Before we end this witness, I

13:57:00    6    was going to say what I have is an e-mail thread, Agent

13:57:05    7    Ryan explained he was on an e-mail thread, copied that

13:57:08    8    e-mail thread is from Watch Commander Candela and Thomas

13:57:13    9    Moss, and there are several other people copied on it.

13:57:16   10    None of the content was written by Special Agent Ryan.

13:57:19   11    He is CC'd on an e-mail thread, so that is what we have.

13:57:23   12    You could see it if you want.  That is the only other

13:57:26   13    document we have about that.

13:57:29   14                MAGISTRATE JUDGE ROEMER:  I don't know if --

13:57:30   15    did you do a search?  Do you know for sure CBP didn't

13:57:34   16    send any type of written document down to Baltimore?

13:57:37   17    You know that for certain?  You've already searched all

13:57:41   18    of the records for it?

13:57:43   19                MR. TRIPI:  No.  What I have is an e-mail

13:57:45   20    thread that has the information regarding the port

13:57:49   21    arrival, the scheduled port arrival, with a phone number

13:58:00   22    that says the point of contact is Special Agent Ryan.

13:58:06   23    That is what we have.  I could send it up for you, if

13:58:12   24    you want to.

13:58:14   25                MAGISTRATE JUDGE ROEMER:  Mr. Harrington,

C. RYAN - CX BY MR. HARRINGTON

13:58:15  you take a look at it first, okay.

13:58:18       MR. TRIPI:  And I believe that is the e-mail

13:58:19  thread with which the PDF was returned to Special Agent

13:58:27  Ryan, which is Exhibit 1.  There are two Buffalo CBP

13:58:41  officers on there, that is Durnat and Moss, who he

13:59:10  mentioned in his testimony.

13:59:12       THE COURT:  But does that include any

13:59:13  communication between the CBP officers he was working

13:59:16  with here in Buffalo and the people in Maryland?

13:59:22       MR. TRIPI:  I wouldn't know.

13:59:23       MAGISTRATE JUDGE ROEMER:  Somehow, somebody

13:59:25  communicated to the people in Maryland, we want this guy

13:59:30  stopped.

13:59:31       MR. TRIPI:  It's in an e-mail thread.

13:59:33       MAGISTRATE JUDGE ROEMER:  And that is it,

13:59:35  that is all there is?

13:59:36       MR. TRIPI:  I wouldn't know the answer to

13:59:37  that as I sit here today.  What I'm required to do is

13:59:40  produce Jencks for the witnesses I'm calling.  That is

13:59:43  what I've done.

13:59:44       MAGISTRATE JUDGE ROEMER:  Okay.  Well,

13:59:45  you're going to bring in whoever the guy is that he

13:59:49  communicated with to get the information to and bring

13:59:54  him in as a witness.

| | |
|---|---|
| | 1 |
| 13:59:55 | 2 |
| 14:00:00 | 3 |
| 14:00:25 | 4 |
| 14:00:28 | 5 |
| 14:00:29 | 6 |
| 14:00:30 | 7 |
| 14:00:31 | 8 |
| 14:00:43 | 9 |
| 14:00:48 | 10 |
| 14:00:50 | 11 |
| 14:00:53 | 12 |
| 14:00:55 | 13 |
| 14:00:57 | 14 |
| 14:00:58 | 15 |
| 14:01:00 | 16 |
| 14:01:01 | 17 |
| 14:01:02 | 18 |
| 14:01:02 | 19 |
| 14:01:03 | 20 |
| 14:01:06 | 21 |
| 14:01:10 | 22 |
| 14:01:12 | 23 |
| 14:01:14 | 24 |
| 14:01:15 | 25 |

C. RYAN - CX BY MR. HARRINGTON

MR. TRIPI:  In fairness, he has had Jack
Gernatt's report.  I'm just saying, Mr. Harrington has
had Jack Gernatt's stuff.

MAGISTRATE JUDGE ROEMER:  He had what you
just gave him?

MR. TRIPI:  He didn't have the e-mail
thread.  Mr. Gernatt is not on the stand, he had exhibit
13, the intel report prepared by author Jack Gernatt.

MR. HARRINGTON:  But, Judge, this is all
after the fact.  I'm not saying I didn't have it.  I'm
saying, until today, we didn't learn what the process
was.

MAGISTRATE JUDGE ROEMER:  And there was no
phone call down to Maryland?

MR. TRIPI:  Judge, I don't know.

MAGISTRATE JUDGE ROEMER:  You don't know.

MR. TRIPI:  I don't know.

MAGISTRATE JUDGE ROEMER:  Well, we're going
to continue the hearing and you're going to have whoever
he talked to who communicated this to Maryland as a
witness, okay, from the CBP?

MR. TRIPI:  I will identify that person and
he can call them as a witness.

MAGISTRATE JUDGE ROEMER:  You identify him

```
              1                    C. RYAN - CX BY MR. HARRINGTON
14:01:17      2    and I'll open up the hearing.
14:01:19      3                    MR. TRIPI:  We'll get him arranged, no
14:01:21      4    problem.  But, Judge, I have my obligations.
14:01:24      5                    MAGISTRATE JUDGE ROEMER:  Mr. Tripi, I don't
14:01:26      6    care about that.
14:01:26      7                    MR. TRIPI:  I can't do it in a vacuum.
14:01:29      8                    MAGISTRATE JUDGE ROEMER:  I'm just saying,
14:01:30      9    logically, I thought, and I think Mr. Harrington thought
14:01:32     10    that Agent Ryan was the guy who communicated with the
14:01:37     11    people down in Maryland.  We found out today, it wasn't,
14:01:40     12    it was somebody in CBP.
14:01:42     13                    MR. TRIPI:  Fellow officer, that happens all
14:02:00     14    of the time.
14:02:00     15                    THE COURT:  A guy from the CBP.  Excuse me,
14:02:04     16    sir.  A guy from the CBP down in Maryland says, "I
14:02:09     17    wasn't given any details."  I think he has the right to
14:02:23     18    explore if that was true, if no details were given or
14:02:26     19    not.  We have to have that guy testify.
14:02:29     20                    MR. TRIPI:  And he can certainly subpoena
14:02:31     21    them or just tell us and we'll get him here.  I can't
14:02:34     22    guess for him who he needs to talk to.
14:02:37     23                    MAGISTRATE JUDGE ROEMER:  Mr. Tripi, I'm not
14:02:39     24    faulting you.  I want to make sure that is what is done.
14:02:42     25                    MR. TRIPI:  No problem.
```

1                     C. RYAN - CX BY MR. HARRINGTON

14:02:42   2              MAGISTRATE JUDGE ROEMER:  I'm not giving you

14:02:43   3     a hard time about why you did it or didn't do it, I just

14:02:47   4     want you to do it.

14:02:48   5              MR. TRIPI:  I misunderstood.  Thank you,

14:02:50   6     Judge.

14:02:50   7              MAGISTRATE JUDGE ROEMER:  Does that satisfy

14:02:51   8     you, Mr. Harrington, for what you want?

14:02:53   9              MR. HARRINGTON:  And one of these e-mails

14:02:55   10    has some of that here that Mr. Tripi just gave me.

14:02:59   11             MAGISTRATE JUDGE ROEMER:  You still want the

14:03:00   12    witness?

14:03:00   13             MR. HARRINGTON:  What?

14:03:01   14             MAGISTRATE JUDGE ROEMER:  You still want the

14:03:02   15    witness?

14:03:02   16             MR. HARRINGTON:  I want whatever other

14:03:04   17    documents there are, and I'll let Mr. Tripi know if I

14:03:09   18    want a witness.  We may stipulate to put the document in

14:03:13   19    evidence.  I don't know.  Once I see the document, then

14:03:16   20    I can make a determination.  Mr. Ryan can't testify as

14:03:21   21    to these documents.  I don't know, he isn't copied.

14:03:24   22             MR. TRIPI:  He is copied.

14:03:25   23             MR. HARRINGTON:  Maybe I can.

14:03:26   24             MAGISTRATE JUDGE ROEMER:  You want to ask

14:03:27   25    him questions about that?

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | C. RYAN - CX BY MR. HARRINGTON                           |
| 14:03:28 | 2  | MR. TRIPI:  I think we'll need to mark that,          |
| 14:03:30 | 3  | Jim.  It's a three-page thread.                        |
| 14:03:35 | 4  | THE CLERK:  Government or defendant.                  |
| 14:03:36 | 5  | MR. TRIPI:  We can mark it as a Government            |
| 14:03:38 | 6  | Exhibit, that is fine.                                 |
| 14:03:39 | 7  | MAGISTRATE JUDGE ROEMER:  Maybe Government            |
| 14:03:43 | 8  | Exhibit.                                                |
| 14:03:43 | 9  | THE CLERK:  34.                                        |
| 14:03:48 | 10 | MAGISTRATE JUDGE ROEMER:  34.                         |
| 14:03:48 | 11 | CONTINUING CROSS EXAMINATION BY MR. HARRINGTON:       |
| 14:04:07 | 12 | Q.  Mr. Ryan, let me show you a three-page document   |
| 14:04:10 | 13 | that is marked.  I'm showing you a document marked    |
| 14:04:14 | 14 | Government's Exhibit 34 and ask you to read through   |
| 14:04:17 | 15 | those e-mails yourself.                                 |
| 14:04:54 | 16 | Have you had a chance to look at those?              |
| 14:04:56 | 17 | A.  Yes.                                               |
| 14:04:56 | 18 | Q.  It appears that the e-mail on the second page,    |
| 14:04:59 | 19 | you were copied on that e-mail, is that right?        |
| 14:05:02 | 20 | A.  Are you talking about the e-mail addressed to Mr. |
| 14:05:05 | 21 | Mileck here?                                            |
| 14:05:06 | 22 | Q.  Yes.                                               |
| 14:05:07 | 23 | A.  Yes.                                               |
| 14:05:07 | 24 | Q.  Do you recall getting that at that time?          |
| 14:05:14 | 25 | A.  Yes.                                               |

|  | 1 | C. RYAN - CX BY MR. HARRINGTON |
| 14:05:17 | 2 | MR. HARRINGTON:  And, Judge, I would like to |
| 14:05:19 | 3 | offer this into evidence, if I could. |
| 14:05:21 | 4 | MR. TRIPI:  No objection. |
| 14:05:22 | 5 | MAGISTRATE JUDGE ROEMER:  Government's |
| 14:05:24 | 6 | Exhibit 34 is going to be admitted into evidence. |
| 14:05:24 | 7 | (**Whereupon, Government Exhibit 34 was** |
| 14:05:26 | 8 | **received into evidence**.) |
| 14:05:26 | 9 | Q.  Could you read what the substance of the e-mail? |
| 14:05:31 | 10 | A.  Mr. Mileck authored by Thomas Moss.  Mr. Mileck, |
| 14:05:38 | 11 | I'm contacting you per CBPO Jack Gernatt's instructions |
| 14:06:04 | 12 | the following subject is part of an HSI Buffalo |
| 14:06:08 | 13 | investigation case VU13ZA16EU0023 involving |
| 14:06:38 | 14 | transnational organized crime.  We're requesting |
| 14:06:51 | 15 | discretionary dissemination of the request for a DOMEX |
| 14:06:56 | 16 | extraction of the passenger's cell phone.  The subject |
| 14:06:58 | 17 | is recently retired from federal law enforcement.  I |
| 14:07:02 | 18 | entered a one day lookout for referral and then there is |
| 14:07:05 | 19 | a number for the lookout and then Mr. Bongiovanni's |
| 14:07:08 | 20 | biographical information and passport number and it says |
| 14:07:11 | 21 | he is coming from Punta Cana in the Dominican Republic |
| 14:07:15 | 22 | and identifies the flight. |
| 14:07:31 | 23 | Q.  So, the request, either you said before you just |
| 14:07:33 | 24 | asked for a secondary inspection, right? |
| 14:07:36 | 25 | A.  Yes. |

1          C. RYAN - CX BY MR. HARRINGTON

14:07:36   2      Q.   This e-mail says they are asking for a phone

14:07:39   3   extraction, right?

14:07:40   4      A.   It appears they are requesting approval from his

14:07:44   5   supervisor for the phone extraction.

14:07:54   6      Q.   Who is Melick?

14:07:59   7      A.   I think he is Thomas' supervisor at the border

14:08:03   8   patrol; he may be a CBP Officer.

14:08:05   9      Q.   So it appears from this that somebody does have

14:08:08  10   to approve this at some level?

14:08:10  11      A.   You asked me if somebody in HSI has to approve it

14:08:14  12   and that answer is no.   And CBP has a different policy.

14:08:33  13   I rely on them to follow their policy.

14:08:36  14      Q.   I understand you answered with respect to your

14:08:39  15   agency and you said with respect to their agency, you

14:08:41  16   didn't know, right?

14:08:42  17      A.   Yes.

14:08:43  18      Q.   And now we have some other information about that

14:09:00  19   now.   You don't know whether this was ever approved by

14:09:04  20   Mileck?

14:09:04  21      A.   I don't know what the outcome from that was.   If

14:09:08  22   I could look at it.

14:09:21  23      Q.   So the e-mail above in the string is between Mr.

14:09:26  24   Mileck and Watch Commander Candela or, excuse me, it's

14:09:30  25   about Watch Commander Candela?

```
 1                  C. RYAN - RDX BY MR. TRIPI
```
14:09:33  2        That follows the one that you read?

14:09:34  3   A.   Yes.

14:09:36  4   Q.   What does that say?

14:09:38  5   A.   It says Thomas, Curtis, Watch Commander

14:09:49  6   Christopher Candela copied here will be managing the

14:10:12  7   encounter at BWI.  Is there any specific ask aside from

14:10:16  8   the advance search of any electronic devices, any line

14:10:20  9   of questions or any questions to steer away from.

14:10:23  10  Thanks, Mike.  And then his phone number.

14:10:25  11  Q.   So that would appear that that was -- let me get

14:10:29  12  back here.  That would appear that this was approved,

14:10:33  13  right?

14:10:33  14  A.   Yes.

14:10:34  15  Q.   And that they were asking whether anything

14:10:36  16  further was needed, is that right?

14:10:38  17  A.   Yes.

14:10:51  18        MR. HARRINGTON:  All right.  That's all I

14:10:52  19  have.

14:10:52  20        MAGISTRATE JUDGE ROEMER:  Thank you, sir.

14:10:53  21        Mr. Tripi.

14:10:55  22        MR. TRIPI:  Just a moment, Judge.

14:10:56  23        MAGISTRATE JUDGE ROEMER:  Sure.

14:11:35  24  REDIRECT EXAMINATION BY MR. TRIPI:

14:11:35  25  Q.   I'm on exhibit 34, which is the e-mail page.

```
             1              C. RYAN - RDX BY MR. TRIPI
14:11:41     2  It's an e-mail authored by Christopher Candela.  And as
14:11:46     3  you understand it, that was the watch commander in
14:11:48     4  Baltimore, correct?
14:11:49     5      A.  Yes.
14:11:50     6      Q.  And it's back to Thomas, correct?
14:11:52     7      A.  Yes.
14:11:53     8      Q.  And it's copied, you're copied, Joseph Spidone
14:11:57     9  and Jack Gernatt, who are the CBP officers on the BEST
14:12:03    10  task force at the time?
14:12:04    11      A.  Yes.
14:12:04    12      Q.  And Curtis Mileck and yourself, correct?
14:12:07    13      A.  Michael Mileck.
14:12:09    14      Q.  I'm sorry, Michael Mileck?
14:12:11    15      A.  Yep, and myself.
14:12:13    16      Q.  And this Bongiovanni PDF, that was the PDF of the
14:12:20    17  Government Exhibit 1 that you just testified about
14:12:22    18  earlier that you received a PDF of the pictures of the
14:12:25    19  phone?
14:12:26    20      A.  That's correct.
14:12:27    21      Q.  So that is how that is sent back to you on the
14:12:32    22  e-mail thread, the PDF, correct?
14:12:34    23      A.  Yes.
14:12:35    24      Q.  And then Watch Commander Candela writes a
14:12:41    25  summary, looks like about six paragraphs, some of those
```

```
          1                  C. RYAN - RDX BY MR. TRIPI
14:12:47  2    paragraphs are one sentence long, correct?
14:12:49  3        A.  That's correct.
14:12:50  4        Q.  And that summary that he e-mailed showing you now
14:12:57  5    Exhibit 2, Exhibit 2, page two in evidence, the summary
14:13:09  6    contained some, but not all information that is in page
14:13:14  7    two of Exhibit 2.  Is that fair to say?
14:13:16  8        A.  Yes.
14:13:16  9        Q.  In other words, Exhibit 2 of page two is a more
14:13:19 10    fulsome summary of what transpired?
14:13:22 11        A.  Yes.
14:13:27 12        Q.  But even though you've testified earlier you
14:13:32 13    received the e-mail and this information, does all your
14:13:35 14    prior testimony about your participation stand
14:13:38 15    unchanged?
14:13:38 16        A.  It does.
14:13:52 17                MR. TRIPI:  I have nothing further.
14:13:53 18                MAGISTRATE JUDGE ROEMER:  Mr. Harrington?
14:13:54 19                MR. HARRINGTON:  Nothing further.
14:13:55 20                MAGISTRATE JUDGE ROEMER:  What do we want to
14:13:56 21    do about the extra witness?  You want to talk to Mr.
14:14:02 22    Tripi about this?
14:14:03 23                MR. HARRINGTON:  Let me do it, Judge.  Can
14:14:05 24    we do it after or you want me to do it right now?
14:14:09 25                MAGISTRATE JUDGE ROEMER:  You want to do it
```

```
 1              C. RYAN - RDX BY MR. TRIPI
```

14:14:10  2  after?

14:14:10  3              MR. HARRINGTON:  After we finish the day.

14:14:12  4              MAGISTRATE JUDGE ROEMER:  All right.  We'll

14:14:13  5  do it then.

14:14:14  6              MR. HARRINGTON:  We'll let the Court know.

14:14:16  7              MAGISTRATE JUDGE ROEMER:  Mr. Tripi?

14:14:17  8              MR. TRIPI:  Your Honor --

14:14:20  9              MAGISTRATE JUDGE ROEMER:  Agent Ryan, you

14:14:23  10  can step down.

14:14:24  11             MR. TRIPI:  I have nothing further of the

14:14:26  12  witness.  For hearing purposes today, we don't have any

14:14:28  13  other witnesses.

14:14:29  14             MAGISTRATE JUDGE ROEMER:  Okay.  Thank you,

14:14:30  15  sir.

14:14:31  16             Mr. Harrington.

14:14:32  17             MR. HARRINGTON:  Ms. Bongiovanni.

14:15:23  18  (L. BONGIOVANNI WAS CALLED TO THE WITNESS STAND AND

17:08:37  19  SWORN.)

17:08:37  20             THE CLERK:  Please have a seat.  When

17:08:39  21  seated, please state your name and spell it for the

17:08:41  22  record.  Please speak into the microphone since this is

17:08:44  23  being recorded.  You may take your mask off.

17:08:46  24             THE WITNESS:  Sure.

17:08:48  25             THE CLERK:  Thank you.

```
 1              L. BONGIOVANNI - DX BY MR. HARRINGTON
17:08:48    2              THE WITNESS:  First name Lindsay,
17:08:53    3    L-i-n-d-s-a-y, last name Bongiovanni,
17:08:53    4    B-o-n-g-i-o-v-a-n-n-i.
17:09:03    5    DIRECT EXAMINATION BY MR. HARRINGTON:
17:09:04    6        Q.   Lindsay, who is your husband?
17:09:06    7        A.   Joseph Bongiovanni.
17:09:07    8        Q.   And he is here in the courtroom, right?
17:09:08    9        A.   Yes.
17:09:09   10        Q.   And you know why you're here, do you not?
17:09:11   11        A.   I do.
17:09:12   12        Q.   And did you travel in April of 2019 to the
17:09:16   13    Dominican Republic?
17:09:17   14        A.   I did.
17:09:18   15        Q.   And who went with you?
17:09:20   16        A.   Joe, my husband, and my son, Matthew.
17:09:23   17        Q.   What is Matthew's last name?
17:09:25   18        A.   Maglietto.
17:09:26   19        Q.   Spell it.
17:09:27   20        A.   M-a-g-l-i-e-t-t-o.
17:09:31   21        Q.   And how long were you in the Dominican Republic?
17:09:34   22        A.   From April 18th, 2019 through April 23rd, 2019.
17:09:41   23        Q.   And on the 23rd, when you came back, I take it
17:09:46   24    you flew, is that right?
17:09:48   25        A.   That's right.
```

1                L. BONGIOVANNI - DX BY MR. HARRINGTON

17:09:49   2     Q.   And what airline did you take, do you remember?

17:09:53   3     A.   Southwest.

17:09:55   4     Q.   And where did it land in the United States?

17:09:59   5     A.   Baltimore.

17:10:00   6     Q.   And after it landed in Baltimore, what happened

17:10:05   7   then?   What did you do then?

17:10:06   8     A.   Well, we got off the plane and we went to

17:10:12   9   Customs.

17:10:12   10    Q.   And what happened when you initially went to

17:10:16   11  Customs?

17:10:16   12    A.   We were pulled aside and told that we had to go

17:10:20   13  to a different area.

17:10:21   14    Q.   Had you already picked up your bags at that

17:10:25   15  point?

17:10:25   16    A.   Yes, we had bags with us.

17:10:27   17    Q.   And do you remember where you were taken and

17:10:35   18  where you were sent to?

17:10:36   19    A.   Yes.   We were brought to a separate area where

17:10:39   20  there were kind of conveyor belts where the luggage

17:10:44   21  would go through an x-ray machine, just like when you

17:10:47   22  first get to the airport here in Buffalo.

17:10:50   23    Q.   And then what happened?

17:10:52   24    A.   Our bags went through and then after they went

17:10:55   25  through, they were gone through physically by somebody.

L. BONGIOVANNI - DX BY MR. HARRINGTON

17:10:58   2   I think TSA.  And after that, our phones were taken.

17:11:03   3   Q.  Tell us the circumstances of how your phones were

17:11:06   4   taken?

17:11:06   5   A.  So, we were asked, all of us were asked if our

17:11:11   6   phones were on.  My son's was the only one that was not

17:11:15   7   on because it was dead.

17:11:16   8   Q.  Back up a little bit.

17:11:17   9   A.  I'm sorry.

17:11:18   10   Q.  There you go.  There you go.

17:11:21   11   A.  So all of our phones were taken.  My son's phone

17:11:26   12   was off, but we were asked if all of our phones were

17:11:29   13   already powered on, which they were except for my son's.

17:11:33   14   His phone was dead, and they took our phones and they

17:11:37   15   said, you know, they would be back with them.  And they

17:11:43   16   were gone for a while with our phones.

17:11:46   17   Q.  When you say "they," who are you talking about?

17:11:48   18   A.  People that worked at the airport.

17:11:50   19   Q.  Was this done at the same place where they

17:11:53   20   inspected your bags or a different place?

17:11:56   21   A.  Yes, same place.

17:11:57   22   Q.  And when your phones were taken, did you ask any

17:12:03   23   questions or your husband ask any questions about the

17:12:06   24   taking of the phone?

17:12:07   25   A.  No, we didn't.  We just thought it was kind of

L. BONGIOVANNI - DX BY MR. HARRINGTON

routine.  We thought they were going to be taken and
given right back.  But it kind of got a little weird
when they were taken out of the proximity where we could
see them.

Q.  Okay.  And neither you nor your husband said why
are you doing this?

A.  No, they said it was just random.

Q.  Okay.  Did they make any other representations to
you about the phone, how long they were going to be,
anything like that?

A.  No.  They said it wouldn't be long.

Q.  And you keep saying "they."  Was there more than
one person talking to you?

A.  There was a gentleman that stood with us the
whole time when they took our phones.  And then there
were two people, one person had took the phone and
another person that had came back with the phone that
was different from the one that initially took the
phone.

Q.  All right.  And what were you doing while they
had your phones?

A.  Just standing there wondering if we were going to
miss our flight.

Q.  What time was your flight scheduled to leave?

L. BONGIOVANNI - DX BY MR. HARRINGTON

17:13:10  2    A.  I think it was around twenty after 10 at night

17:13:13  3    with a bored time of right after 10, like five after 10,

17:13:17  4    I believe.

17:13:18  5    Q.  And can you tell me what time was it that you had

17:13:23  6    landed in Baltimore, if you remember?

17:13:25  7    A.  I think it was sometime after 8, like 8:20,

17:13:29  8    around there.

17:13:31  9    Q.  And do you recall what time it was that you had

17:13:40  10   this conversation and they took your phones?

17:13:42  11   A.  Possibly around 8:45, maybe 9.

17:13:55  12   Q.  And do you know how long they had your phone?

17:13:57  13   A.  About 45 minutes.

17:13:59  14   Q.  And you said you were able to make your plane,

17:14:02  15   though, right?

17:14:02  16   A.  Yes, it was very close.  They started asking

17:14:05  17   people to stand in position shortly after we got to our

17:14:10  18   gate.

17:14:10  19   Q.  And this is Southwest where you line up by a

17:14:14  20   position?

17:14:14  21   A.  There are boarding positions, A, B and C, and

17:14:17  22   they go through.

17:14:18  23   Q.  When did you get your luggage back?

17:14:20  24   A.  They never took our luggage from us.  That was in

17:14:23  25   our sight the whole time.

L. BONGIOVANNI - DX BY MR. HARRINGTON

17:14:25  2    Q.   So while you were waiting, while they had the

17:14:27  3    phones, you had your luggage with you?

17:14:30  4    A.   Mm-hmm.

17:14:30  5    Q.   And it had already been inspected?

17:14:33  6    A.   Yes.

17:14:33  7    Q.   And how is it that you got your phones back?

17:14:36  8    Tell us what happened.

17:14:38  9    A.   Well, they gave them back to us, eventually, but

17:14:43  10   we had to ask quite a few times, like, how many times,

17:14:46  11   how long it was going to be before we would get them

17:14:50  12   back.  The gentleman that was standing with us the whole

17:14:53  13   time that worked for the airport, had made a few trips

17:14:58  14   back to find out what the status was because it was

17:15:01  15   taking quite a while.

17:15:02  16   Q.   Do you know his name?

17:15:03  17   A.   I do not.

17:15:04  18   Q.   And so, eventually, someone brings your phones

17:15:11  19   back to you?

17:15:11  20   A.   That's right.

17:15:13  21   Q.   Was this one of the people you talked to before?

17:15:16  22   A.   I believe so.

17:15:17  23   Q.   And what condition were the phones in when you

17:15:20  24   got them back?

17:15:20  25   A.   They were returned to the home screen just like

                    L. BONGIOVANNI - CX BY MR. TRIPI

17:15:24   2    we gave it to them.

17:15:25   3        Q.   They are still on, though?

17:15:27   4        A.   Yes.

17:15:29   5             MR. HARRINGTON:  All right.  That's all I

17:15:31   6    have, Judge.

17:15:32   7             MR. TRIPI:  Just a moment, Judge.  I will

17:15:35   8    have some questions.

17:15:51   9             MAGISTRATE JUDGE ROEMER:  Ma'am, if you need

17:15:52  10    a drink of water, there is water there for your use.

17:15:55  11    Okay?

17:15:56  12             THE WITNESS:  Thanks.

17:16:44  13    CROSS EXAMINATION BY MR. TRIPI:

17:16:44  14        Q.   Good afternoon.  Let me start with a couple of

17:17:38  15    questions, things we might be able to agree on.  So you

17:17:42  16    traveled to the Dominican Republic with Mr. Bongiovanni

17:17:45  17    and your son, correct?

17:17:46  18        A.   Correct.

17:17:47  19        Q.   And you traveled back to Buffalo through BWI

17:17:52  20    airport, is that correct?

17:17:53  21        A.   Correct.

17:17:54  22        Q.   And you made all of your flights as scheduled, is

17:17:57  23    that true?

17:17:57  24        A.   Correct.

17:17:59  25        Q.   You didn't miss any flight?

                    L. BONGIOVANNI - CX BY MR. TRIPI

17:18:02   2    A.   No.

17:18:12   3    Q.   Now, when you were told to go to a secondary

17:18:25   4   location, a secondary search area, your baggage was in

17:18:28   5   your sight the whole time, correct?

17:18:29   6    A.   Yes.

17:18:29   7    Q.   And as far as you were aware, it was just a

17:18:33   8   routine random search?

17:18:35   9    A.   Yes.

17:18:35  10    Q.   Did the agents or the officers you were dealing

17:18:39  11   with seem professional?

17:18:40  12    A.   Yes.

17:18:42  13    Q.   No one physically restrained you or Mr.

17:18:48  14   Bongiovanni or your son, correct?

17:18:50  15    A.   No.

17:18:51  16    Q.   Nobody threatened you, your husband or your son,

17:18:54  17   correct?

17:18:54  18    A.   No.

17:18:57  19    Q.   At that point, it seemed as annoying as any other

17:19:02  20   trip through the airport, is that fair to say?

17:19:04  21    A.   Well, given the fact that we were coming from a

17:19:07  22   different country, it felt like just a random, a random

17:19:12  23   -- like we were pulled out of line just selectively, you

17:19:15  24   know, just as part of, like, a random, I figured so many

17:19:20  25   people maybe get pulled out and randomly searched the

```
              1                  L. BONGIOVANNI - CX BY MR. TRIPI
17:19:24      2    way we did.  It didn't feel off at first.
17:19:27      3        Q.   That is what I was asking.  You've traveled
17:19:31      4    internationally before?
17:19:32      5        A.   I have.
17:19:32      6        Q.   I assume you've flown internationally before?
17:19:35      7        A.   I have.
17:19:36      8        Q.   You've driven over a border internationally
17:19:39      9    before?
17:19:39     10        A.   I have.
17:19:40     11        Q.   And so you have an expectation that when you're
17:19:44     12    going through a border, you're going to be asked
17:19:47     13    questions, people might search you, things like that?
17:19:50     14        A.   Yes.
17:19:57     15        Q.   And when you're going through the airport such as
17:20:00     16    BWI, there are signs telling you that your items are
17:20:04     17    subject to search, correct?
17:20:05     18        A.   I'm not sure that I've ever seen one of those
17:20:08     19    signs, but, okay, sure.
17:20:10     20        Q.   Well, that is what you do when you go through the
17:20:14     21    conveyor belts at the Buffalo Airport and they are
17:20:17     22    examining your items and they are going through an x-ray
17:20:21     23    machine and you're going through an x-ray machine,
17:20:24     24    you're familiar with that process, correct?
17:20:27     25        A.   Yes.
```

L. BONGIOVANNI - CX BY MR. TRIPI

17:20:27  2    Q.   And by virtue of travel through airports, you're

17:20:31  3    consenting to using those airports through those

17:20:35  4    searches, correct?

17:20:36  5    A.   That's right.

17:20:36  6    Q.   And when traveling internationally, there is

17:20:40  7    another layer to that because now you understand you're

17:20:55  8    coming through an international border, right?

17:20:58  9    A.   Yes, that's correct.

17:20:59  10                MR. HARRINGTON:   Judge, I'll object.   She

17:21:01  11   may have an understanding, but whether it's accurate or

17:21:04  12   not, what difference does it make?

17:21:06  13                MAGISTRATE JUDGE ROEMER:   Overruled.

17:21:11  14   Q.   The point is, this wasn't your first

17:21:13  15   international travel, right?

17:21:15  16   A.   No, it wasn't.

17:21:16  17   Q.   And you had had an international travel when you,

17:21:20  18   for example, when you were married in Mexico, correct?

17:21:23  19   A.   Yes, that's correct.

17:21:24  20   Q.   And that was in about 2015?

17:21:26  21   A.   Yes, that's correct.

17:21:35  22   Q.   I apologize.   Just a moment.   When you were first

17:21:41  23   asked to give over your phones?

17:21:44  24   A.   Mm-hmm.

17:21:45  25   Q.   You and Mr. Bongiovanni provided the phones, you

L. BONGIOVANNI - CX BY MR. TRIPI

17:21:48   2   unlocked them, correct?

17:21:49   3   A.   No, we did not unlock them.

17:21:52   4   Q.   Is it your testimony that you provided the pass

17:21:55   5   codes to the CBP officers?

17:21:57   6   A.   No, I did not.  We just handed our phones over

17:22:01   7   the way they were, which would have been locked.

17:22:04   8   Q.   Were they already unlocked, is that your claim?

17:22:06   9   A.   No, they were not unlocked.

17:22:09   10   Q.   So, you would dispute the notion that you

17:22:14   11   unlocked your phone voluntarily, is that what you're

17:22:17   12   testifying about?

17:22:17   13   A.   Yes, that is correct.

17:22:31   14   Q.   Your phone number, at the time, was 7168286865

17:22:37   15   and you had a Samsung, is that correct?

17:22:39   16   A.   Yes.

17:22:40   17   Q.   And Mr. Bongiovanni's was 7165072784, and he also

17:22:47   18   had a Samsung, different model, correct?

17:22:49   19   A.   Yes.

17:22:55   20   Q.   You were coming back from a six-day trip to Punta

17:23:00   21   Cana, correct?

17:23:01   22   A.   Yes.

17:23:01   23   Q.   You stayed at the Majestic Mirage resort?

17:23:10   24   A.   Yes.

17:23:13   25   Q.   It was your and Mr. Bongiovanni's first trip to

                    L. BONGIOVANNI - CX BY MR. TRIPI

17:23:17   2   the Dominican Republic?

17:23:18   3       A.   Yes.

17:23:19   4       Q.   You were returning home to Buffalo, New York from

17:23:24   5   there, that is why you were traveling through BWI,

17:23:27   6   correct?

17:23:27   7       A.   Yes.

17:23:29   8       Q.   You had a total of six bags in your possession?

17:23:32   9       A.   I believe so.

17:23:45   10       Q.   Did they search your bags in front of you?

17:23:49   11       A.   They did.

17:23:51   12       Q.   Were you -- you were asked to disable the

17:23:56   13   wireless connection on your phone?

17:23:57   14       A.   No.

17:24:34   15               MR. TRIPI:   May I have two exhibit stickers,

17:24:37   16   please?

17:24:38   17               THE CLERK:   Sure.

17:25:21   18       Q.   Were you standing there taking written,

17:25:26   19   handwritten notes about what was transpiring around you?

17:25:30   20       A.   No, but I have a very good memory.

17:25:32   21       Q.   My question was, were you taking contemporaneous

17:25:36   22   notes.  So the answer to that question is no?

17:25:38   23       A.   No.

17:25:40   24       Q.   I'm going to show you Government's Exhibit 35.

17:25:44   25               MAGISTRATE JUDGE ROEMER:   Mr. Tripi, why

                    L. BONGIOVANNI - CX BY MR. TRIPI

17:25:45  2   don't you show those to Mr. Harrington?

17:25:48  3             MR. TRIPI:  They were actually provided to

17:25:50  4   me by Mr. Harrington.

17:25:52  5             MAGISTRATE JUDGE ROEMER:  You've seen these,

17:25:53  6   Mr. Harrington?

17:25:54  7             MR. HARRINGTON:  Yes.

17:25:55  8             MAGISTRATE JUDGE ROEMER:  Okay.

17:25:58  9   Q.   Is that a photocopy of your boarding pass for the

17:26:01 10   flight we're talking about back to Buffalo?

17:26:03 11   A.   Yes.

17:26:06 12   Q.   And I assume you provided that to Mr. Harrington

17:26:10 13   and he provided it to me, that looks like a photocopy?

17:26:13 14   A.   Yes.

17:26:14 15             MR. TRIPI:  Judge, I'm going to offer

17:26:16 16   exhibit 35.

17:26:17 17             MR. HARRINGTON:  No objection.

17:26:17 18             MAGISTRATE JUDGE ROEMER:  Government's

17:26:18 19   Exhibit 35 shall be admitted into evidence.

17:26:18 20             **(Whereupon, Government Exhibit 35 was**

17:26:29 21   **received into evidence.)**

17:26:29 22   Q.   So, it's up on the screen there.  Do you see it?

17:26:32 23   A.   Yes.

17:26:32 24   Q.   So, it has your name on the upper left-hand

17:26:35 25   corner, the flight number and the date, April 23rd, the

| | |
|---|---|
| | 1 |

L. BONGIOVANNI - CX BY MR. TRIPI

17:26:40  2  gate appears to be A-6, right?  Is that all correct?

17:26:45  3  A.  Yes, I see that, mm-hmm.

17:26:46  4  Q.  And then it says, time of the flight, 10:35 p.m.

17:26:50  5  That is the time you were flying back, correct?

17:26:52  6  A.  Correct.

17:26:53  7  Q.  And the boarding time is 10:05 p.m., correct?

17:26:56  8  A.  Correct.

17:26:56  9  Q.  And you were at Southwest, as you indicated, so

17:27:00  10  you were in boarding group A.  Is that the first group

17:27:04  11  that boarded?

17:27:04  12  A.  No.

17:27:05  13  Q.  How does that work?

17:27:06  14  A.  So, it's usually like seats 1 through 15 board

17:27:10  15  first, position A, and then so on and so forth.

17:27:13  16  Q.  So you were boarding group A, but position 38?

17:27:19  17  A.  Yes.  So we were probably called up the third

17:27:22  18  group to be called.

17:27:24  19  Q.  So you made your group and you made your flight

17:27:27  20  and you flew home, correct?

17:27:28  21  A.  Yes.

17:27:53  22  Q.  So earlier in your testimony, you said in terms

17:27:56  23  of them taking your phone, it felt like 45 minutes.  Do

17:28:01  24  you remember saying that?

17:28:02  25  A.  Yes, I do.

```
              1                 L. BONGIOVANNI - CX BY MR. TRIPI

17:28:02      2        Q.  And so you know that you have a flight and they

17:28:05      3   have your phones and you're waiting on that, basically,

17:28:08      4   that is the position you were in at secondary, correct?

17:28:24      5        A.  That's correct.

17:28:24      6        Q.  I'd imagine it was a little irritating, right?

17:28:28      7        A.  It was.

17:28:28      8        Q.  But, even though it might have felt like 45

17:28:35      9   minutes, you weren't looking at your watch and writing

17:28:37     10   down the times, is that fair to say?

17:28:40     11        A.  Yes.

17:28:41     12        Q.  It wasn't your job to be doing that that day,

17:28:44     13   correct?

17:28:44     14        A.  That wasn't my job, no.

17:28:46     15        Q.  So as far as you knew, it was a normal search

17:28:49     16   that occurs when you get back into the country and you

17:28:51     17   had no reason at that time to be jotting it down.  You

17:28:55     18   didn't anticipate being in this position today talking

17:28:58     19   about this, is that fair?

17:29:00     20        A.  Yes.

17:29:34     21        Q.  Would you agree that that is probably unlike the

17:29:37     22   agents and the officers who were involved whose job it

17:29:40     23   is to make time live reports.  Is that fair to say?

17:29:43     24        A.  I'm sorry.  Repeat the question, I'm not

17:29:46     25   understanding.
```

L. BONGIOVANNI - CX BY MR. TRIPI

17:29:46    Q.   Like it wasn't your job to document everything as
17:29:50   it was happening?

17:29:51    A.   Right.

17:29:53    Q.   That is different?

17:29:54    A.   But somebody else, I would imagine, that works
17:29:57   for the airport, should have been doing that.

17:30:01    Q.   Okay.  On the screen, I'm going to show you
17:30:16   Government's Exhibit 36.

17:30:17    A.   I recognize it.

17:30:18    Q.   That was handed to you or Mr. Bongiovanni?

17:30:20    A.   Yes.

17:30:20    Q.   Do you know which?

17:30:23    A.   I believe my husband got one of those, yes.

17:30:27    Q.   And between the two of you, do you still have
17:30:31   your copy?

17:30:31    A.   Yes, we do.

17:30:32    Q.   And while you were standing sort of waiting for
17:30:35   your phone, you had an opportunity to review this, this
17:30:38   document?

17:30:38    A.   The gentleman that stood with us the whole time
17:30:42   while our phones were out of our sight, when he -- he
17:30:46   had given this to us and he said if we had any
17:30:49   questions, there was a phone number at the bottom.  So,
17:30:52   no, we didn't really look at that, no, not until we got

L. BONGIOVANNI - CX BY MR. TRIPI

17:30:56    home.

17:30:56    Q.   But it was handed to your husband?

17:30:57    A.   Yes.

17:30:59    Q.   And it was certainly available for you to read at

17:31:07    that time?

17:31:12    A.   Yes.

17:31:13    Q.   Did you guys, when he told you, when the officer

17:31:16    who is standing there with you said, "If you have

17:31:20    questions, you can call, did you ever call the number on

17:31:23    the back or anything like that?

17:31:24    A.   No.

17:31:40    Q.   Was the person who handed you back your phones

17:31:45    courteous, professional and polite?

17:31:48    A.   Yes.

17:32:00    Q.   Now, you've known Mr. Bongiovanni since 2009?

17:32:03    A.   That's right.

17:32:06    Q.   You married in 2015, is that correct?

17:32:09    A.   That's correct.

17:32:11    Q.   You were a tenant originally in his apartments at

17:32:15    221 Lovery?

17:32:17    A.   That's right.

17:32:18            MR. HARRINGTON:   Objection, I don't know

17:32:19    what is the relevance.

17:32:22            MAGISTRATE JUDGE ROEMER:   Mr. Tripi.

```
            1              L. BONGIOVANNI - CX BY MR. TRIPI
17:32:24    2              MR. TRIPI:  Bias and interest, some
17:32:26    3    background.
17:32:27    4              MAGISTRATE JUDGE ROEMER:  Sustained.  Next
17:32:28    5    question.
17:32:43    6    Q.  Obviously, he is your husband, you're not happy
17:32:46    7    to be here.  Is that fair to say?
17:32:48    8    A.  Happy to be where?
17:32:49    9    Q.  Happy to be here in this situation.  Is that fair
17:32:54   10    to say?
17:32:54   11    A.  Yes.  I wish the circumstances were different.
17:33:03   12    Q.  You blame the government for the circumstances
17:33:08   13    today?
17:33:08   14              MR. HARRINGTON:  Objection.
17:33:09   15              MAGISTRATE JUDGE ROEMER:  Overruled.
17:33:10   16    A.  Do I blame the government?
17:33:11   17              MAGISTRATE JUDGE ROEMER:  Hold on, ma'am.
17:33:12   18    Overruled.
17:33:13   19    Q.  Do you blame the government for the circumstances
17:33:22   20    today, yes or no?
17:33:22   21    A.  Yes, actually I do.
17:33:23   22    Q.  Okay.  So you would say, if you have a rooting
17:33:28   23    interest?
17:33:28   24    A.  I think what is happening to my husband is not
17:33:31   25    right.
```

L. BONGIOVANNI - RDX BY MR. HARRINGTON

17:33:32   2        MAGISTRATE JUDGE ROEMER:  Hang on.  Let him

17:33:33   3   complete the question.

17:33:35   4   Q.  If you have a rooting interest in the results of

17:33:54   5   this hearing, it's clearly on the side of your husband,

17:33:56   6   correct?

17:33:57   7        MR. HARRINGTON:  Objection, Judge.

17:33:58   8        MAGISTRATE JUDGE ROEMER:  Overruled.

17:33:58   9   A.  I'm here to tell the truth and I'm telling you

17:34:01  10   the truth.

17:34:02  11   Q.  Is that a yes or no?

17:34:03  12   A.  And if that happens to help my husband, then,

17:34:06  13   yes.

17:34:06  14   Q.  So your answer to my question is yes.  Thank you.

17:34:09  15   A.  Yes.

17:34:11  16        MAGISTRATE JUDGE ROEMER:  Mr. Tripi?

17:34:15  17        MR. TRIPI:  Thank you very much.

17:34:18  18        MAGISTRATE JUDGE ROEMER:  Mr. Harrington?

17:34:20  19        MR. HARRINGTON:  I have a couple of

17:34:22  20   questions.

17:34:22  21        MAGISTRATE JUDGE ROEMER:  I thought you said

17:34:23  22   you had no other questions, maybe it was Mr. Tripi.

17:34:27  23        MR. HARRINGTON:  Just a couple of questions.

17:34:27  24   REDIRECT EXAMINATION BY MR. HARRINGTON:

17:34:29  25   Q.  When your phones were handed over, did

```
         1              L. BONGIOVANNI - RDX BY MR. HARRINGTON
17:34:45 2     somebody -- did one -- did the agent who took your
17:34:49 3     phones, did he talk about disabling the wireless
17:34:52 4     connection?
17:34:53 5         A.  No.
17:34:53 6         Q.  Did you use wireless?
17:34:55 7         A.  I never use wireless because I have had an
17:34:59 8     unlimited plan for quite a while.  The only time I
17:35:02 9     connect to wifi is when I connect to a hospital where I
17:35:06 10    work.  So I wouldn't have needed to disable my wifi and
17:35:09 11    I wasn't asked to.
17:35:10 12        Q.  To be clear, when you handed your phone over and
17:35:13 13    your husband handed his phone over, were those phones,
17:35:17 14    they were on?
17:35:18 15        A.  They were on with passwords that were not
17:35:21 16    unlocked.
17:35:21 17             MR. HARRINGTON:  Okay.  Thank you.  That's
17:35:23 18    all.
17:35:23 19             MAGISTRATE JUDGE ROEMER:  Mr. Tripi.
17:35:24 20             MR. TRIPI:  I have nothing further.
17:35:25 21             MAGISTRATE JUDGE ROEMER:  Now I can safely
17:35:27 22    say you can step down.
17:35:30 23             THE WITNESS:  Thank you.
17:35:33 24             MAGISTRATE JUDGE ROEMER:  Mr. Harrington?
17:35:34 25             MR. HARRINGTON:  I have no further
```

1                     USA VS. J. BONGIOVANNI

17:35:35   2    witnesses.

17:35:36   3              MAGISTRATE JUDGE ROEMER:  Mr. Tripi.

17:35:36   4              MR. TRIPI:  We have no further witnesses.

17:35:39   5              MR. HARRINGTON:  Subject to our discussion

17:35:40   6    about the other.

17:35:40   7              MAGISTRATE JUDGE ROEMER:  You want to have

17:35:41   8    that now while I'm waiting here?

17:35:50   9              Why don't you go out in the hallway?

17:35:52   10             MR. TRIPI:  We'll get a conference room and

17:35:55   11   walk outside.

17:35:55   12             MAGISTRATE JUDGE ROEMER:  I'll be here

17:35:56   13   waiting.

17:35:57   14             MR. TRIPI:  Thank you.

17:35:43   15             (Whereupon, there was a pause in the

17:35:49   16   proceeding.)

17:36:36   17             MAGISTRATE JUDGE ROEMER:  I note we're all

17:36:37   18   back in the courtroom.  Mr. Tripi.

17:36:39   19             MR. TRIPI:  Yes, Judge, I've spoken briefly

17:36:42   20   with Mr. Harrington and Mr. Pyle, and I'm going to look

17:36:45   21   in to see if there are any other communications

17:36:48   22   surrounding that issue that we discussed.  I will get

17:36:51   23   back to Mr. Harrington and back to the Court.  Give me a

17:36:54   24   week or two to get this ironed out and figure out if

17:36:57   25   there is anything else we need to do.  Mr. Harrington

```
                        USA VS. J. BONGIOVANNI
17:37:00   2  may or may not call a witness based upon what I find.
17:37:04   3            MAGISTRATE JUDGE ROEMER:  Okay.  That just
17:37:05   4  leaves us hanging, and I would like to get the thing
17:37:08   5  going and the briefing started and that sort of thing.
17:37:13   6            MR. TRIPI:  Could I just get on a timeline?
17:37:16   7            MAGISTRATE JUDGE ROEMER:  Sure.
17:37:30   8            MR. TRIPI:  Judge, I would like just at
17:37:32   9  least a couple of days to verify if this is it or there
17:37:36  10  is any other communication.
17:37:37  11            MAGISTRATE JUDGE ROEMER:  Let me know what
17:37:38  12  is the day after the Thanksgiving time, Rosalie.
17:37:41  13            THE CLERK:  The Friday after Thanksgiving?
17:37:45  14            MAGISTRATE JUDGE ROEMER:  The Monday.
17:37:46  15            THE CLERK:  The 29th.
17:37:48  16            MAGISTRATE JUDGE ROEMER:  Let me know by the
17:37:50  17  29th.
17:37:51  18            MR. TRIPI:  That's totally fine.
17:37:53  19            MAGISTRATE JUDGE ROEMER:  And, Mr.
17:37:53  20  Harrington, if we're not going to do anything else, I'll
17:37:56  21  issue a scheduling order for the briefing on the
17:37:58  22  suppression of the border search.  Okay?
17:38:01  23            MR. TRIPI:  Thank you, Judge.
17:38:02  24            MAGISTRATE JUDGE ROEMER:  Does that make
17:38:03  25  sense?
```

1          USA VS. J. BONGIOVANNI

17:38:03   2          MR. HARRINGTON:  And if he can get it

17:38:05   3   sooner, Judge, I'll let you know right away.

17:38:07   4          MR. TRIPI:  Thank you.

17:38:07   5          MAGISTRATE JUDGE ROEMER:  Anything else then

17:38:09   6   today?

17:38:09   7          MR. TRIPI:  That's it for the government.

17:38:11   8          MAGISTRATE JUDGE ROEMER:  Okay.  Mr.

17:38:11   9   Harrington?

17:38:13   10          MR. HARRINGTON:  That's it, Judge.

17:38:14   11          MAGISTRATE JUDGE ROEMER:  Have a good day.

17:38:17   12          MR. TRIPI:  Thank you, Judge.

13                     *    *    *

14              CERTIFICATE OF REPORTER

15

16      I certify that the foregoing is a correct transcript

17   of the record to the best of my ability of proceedings

18   transcribed from the audio in the above-entitled matter.

19

20   S/ Karen J. Clark,  RPR

21   Official Court Reporter

22

23

24

25