18:44:51

1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF NEW YORK

3

4

5     - - - - - - - - - - - - - - X
      UNITED STATES OF AMERICA      )      19CR227
6                                   )
      vs.
7                                          Buffalo, New York
      JOSEPH BONGIOVANNI,           )   January 5, 2022
8                  Defendant.           10:00 a.m.
      - - - - - - - - - - - - - - X
9     **CONTINUATION OF EVIDENTIARY HEARING**
      **Transcribed from an Electronic Recording Device**
10

11                     TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE MICHAEL J. ROEMER
12              UNITED STATES MAGISTRATE JUDGE

13

14                     TRINI E. ROSS, ESQ.
                       United States Attorney
                       BY:  JOSEPH M. TRIPI, ESQ.
15                          BRENDAN T. CULLINANE, ESQ.
                            JORDAN ALAN DICKSON, ESQ.
16                     Assistant United States Attorney
                       138 Delaware Avenue
17                     Buffalo, New York 14202

18                     JAMES P. HARRINGTON, ESQ.
                       Harrington and Mahoney
19                     70 Niagara Street
                       Third Floor
20                     Buffalo, NY 14202

21

22

23

24     **COURT REPORTER: Karen J. Clark, Official Court Reporter**
                       **Karenclark1013@AOL.com**
25                     **100 State Street**
                       **Rochester, New York 14614**

**INDEX**

WITNESS FOR
THE DEFENDANT          DX        CX      RDX      RCX

J. GERNATT            249       271      283

T. MOZG              285       296

EXHIBIT NUMBER      PAGE MARKED

C, D, E                249
F                      294

P R O C E E D I N G
          *                    *                     *

18:44:56  15          THE CLERK:  The United States District Court

18:45:00  16  in the Western District of New York is now in session,

18:45:02  17  the Honorable Michael J. Roemer is presiding.  We're

18:45:30  18  here on the matter of the United States versus Joseph

18:45:33  19  Bongiovanni, case No. 21CR227 for a continued

18:45:37  20  evidentiary hearing.  I'm sorry, it's 19CR227.

18:45:41  21      Counsel for the government, please state your

18:45:43  22  name for the record.

18:45:43  23          MR. TRIPI:  Joseph Tripi, Brendan Cullinane

18:46:05  24  and Jordan Dickson for the United States.

18:46:09  25          THE CLERK:  Thank you.  Counsel for the

1                    USA VS. J. BONGIOVANNI

18:46:10   2   defendant, please state your name for the record.

18:46:15   3                   MR. HARRINGTON:  Judge, James Harrington for

18:46:15   4   Joseph Bongiovanni.  Judge, also with me, with your

18:46:15   5   permission, is a law clerk from my office Winter Eaton

18:46:16   6   (phonetic).  With your permission.

18:46:26   7                   MAGISTRATE JUDGE ROEMER:  Sure, she

18:46:27   8   certainly has permission.  Welcome.

18:46:28   9                   We're here for a continuation of the

18:46:30   10  evidentiary hearing.  Mr. Tripi.

18:46:31   11                  MR. TRIPI:  Yes, Judge.  I believe defense

18:46:35   12  were going to call some witnesses today and we have

18:46:35   13  those witnesses that we anticipate the defense calling

18:46:47   14  here.

18:46:47   15                  MAGISTRATE JUDGE ROEMER:  Mr. Harrington?

18:46:48   16                  MR. HARRINGTON:  Yes, I call Jack Gernatt.

18:47:01   17  (J. GERNATT WAS CALLED TO THE WITNESS STAND AND SWORN.)

18:47:13   18                  THE CLERK:  Please state your name and spell

18:47:14   19  the name for the record.

18:47:16   20                  THE WITNESS:  Jack, J-a-c-k, Gernatt,

18:47:16   21  G-e-r-n-a-t-t.

18:47:16   22                  MR. TRIPI:  Judge, can we just have a

18:47:16   23  moment?  There are a couple of exhibits that we want to

18:47:24   24  talk about.  Sorry about that.

18:47:24   25                  MAGISTRATE JUDGE ROEMER:  Sure.  Sure.

| | | |
|---|---|---|
| | 1 | J. GERNETT - DX BY MR. HARRINGTON |
| 18:47:24 | 2 | (Whereupon, there was a pause in the |
| 18:47:24 | 3 | proceeding.) |
| 18:59:06 | 4 | MR. TRIPI:  Judge, I think there are three |
| 18:59:08 | 5 | Defense Exhibits C, D and E that are going to be marked. |
| 18:59:12 | 6 | I'll stipulate them into evidence.  They are e-mail |
| 18:59:15 | 7 | threads, and so I'll argue to you that certain e-mails |
| 18:59:18 | 8 | within the threads should have little to no weight.  But |
| 18:59:21 | 9 | for purposes of the hearing and to move things along, |
| 18:59:24 | 10 | I'll stipulate them in. |
| 18:59:26 | 11 | MAGISTRATE JUDGE ROEMER:  So that is |
| 18:59:27 | 12 | Defendant's Exhibits C, D and E, is that what you said? |
| 18:59:31 | 13 | MR. HARRINGTON:  Yes, Judge. |
| 18:59:31 | 14 | MAGISTRATE JUDGE ROEMER:  Those shall be |
| 18:59:33 | 15 | admitted into evidence. |
| 18:59:33 | 16 | (**Whereupon, Exhibits C, D and E were** |
| 18:59:46 | 17 | **received into evidence**.) |
| 18:59:46 | 18 | MR. HARRINGTON:  Inaudible. |
| 18:59:48 | 19 | MAGISTRATE JUDGE ROEMER:  Sure.  Thank you. |
| 18:59:51 | 20 | MR. HARRINGTON:  All set? |
| 18:59:58 | 21 | MAGISTRATE JUDGE ROEMER:  All set. |
| 19:00:15 | 22 | DIRECT EXAMINATION BY MR. HARRINGTON: |
| 19:00:15 | 23 | Q.  Mr. Gernatt, who are you employed by? |
| 19:00:18 | 24 | A.  U.S. Customs and Border Protection. |
| 19:00:27 | 25 | Q.  And how long have you been working for them? |

                    1              J. GERNETT - DX BY MR. HARRINGTON

19:00:28    2       A.   Approximately since 2004, so about 18 years.

19:00:32    3       Q.   What is your current position?

19:00:34    4       A.   An officer with U.S. Customs.

19:00:48    5       Q.   Back in 2019, were you also an officer?

19:00:53    6       A.   Correct.

19:00:54    7       Q.   And were you aware of why you were called to

19:01:00    8   testify today?

19:01:01    9       A.   I am.

19:01:01   10       Q.   You and I have not spoken?

19:01:03   11       A.   That's correct, sir.

19:01:04   12       Q.   And did you review anything to help you prepare

19:01:08   13   to testify?

19:01:09   14       A.   I spoke with Mr. Tripi.

19:01:12   15       Q.   Did you review any document?

19:01:14   16       A.   I looked at the e-mail threads.

19:01:21   17       Q.   At any point in time, were you involved in the

19:01:23   18   case against United States versus Joseph Bongiovanni?

19:01:28   19       A.   I wasn't privy to much information in the case

19:01:35   20   against Joe Bongiovanni.

19:01:37   21       Q.   Back in April of 2019, did you play some role in

19:01:42   22   coordinating a stop of him at the BWI airport in

19:01:48   23   Baltimore?

19:01:49   24       A.   I did.  I received a phone call from Agent Tom

19:02:26   25   Mozg and Curtis Ryan.

1          J. GERNETT - DX BY MR. HARRINGTON

19:02:28    2    Q.   And what was your role in that particular

19:02:32    3  operation?

19:02:33    4    A.   I was asked by Agent Mozg if a border stop could

19:02:39    5  be conducted on Mr. Bongiovanni, and who he would need

19:02:44    6  to contact to coordinate that.  And I advised him to

19:02:49    7  speak with border security coordinator Mike Millich.

19:02:52    8    Q.   And what was your position at that point in time?

19:02:54    9    A.   I was a liaison to Homeland Security

19:03:02   10  Investigations Border Enforcement Security Task Force.

19:03:02   11    Q.   And you were contacted by Homeland Security

19:03:06   12  officers, is that right?

19:03:08   13    A.   Correct.

19:03:09   14    Q.   And, as far as you knew, at that time were there

19:03:16   15  any other agencies involved in this particular part of

19:03:19   16  the investigation of Mr. Bongiovanni?

19:03:22   17    A.   I don't recall what agencies.  Obviously, HSI I

19:03:29   18  knew was involved.

19:03:31   19    Q.   And were you advised what was desired by

19:03:38   20  Department of Homeland Security with respect to Mr.

19:03:41   21  Bongiovanni?

19:03:42   22    A.   I believe they wanted a secondary exam done on

19:03:46   23  him to include his electronic devices.

19:03:49   24    Q.   What does that mean secondary?

19:03:53   25    A.   So all persons entering the United States from a

J. GERNETT - DX BY MR. HARRINGTON

foreign country are subject to an inspection and subject

to search.  So, he was selected for a secondary exam

where his luggage was searched and his phone was

examined.

Q.  Was he selected at random?

A.  I don't believe so. I believe it was based on the

information from Agent Mozg and the associations.

Q.  Do you know whether there was a request for a

secondary search sent to somebody at the U.S. Customs in

Baltimore?

A.  Yes.

Q.  And you indicated that the secondary search

includes a phone search.  Is that right?

A.  It can, yes.

Q.  And what do you mean by that?

A.  That the officers can search a phone at the

border.

Q.  And what's the extent of that search, if you

know?

A.  They can do an advance exam, which is hooking up

a device to the phone, or they can do a basic exam,

which is just reviewing the phone itself.

Q.  And is there a requirement by the traveler to

give permission for these kinds of searches?

J. GERNETT - DX BY MR. HARRINGTON

19:05:04   A.  The traveler to give permission?

19:05:08   Q.  Yes.

19:05:09   A.  Not necessarily, no, not permission.

19:05:12   Q.  And this advance search, this device that it can

19:05:15   be hooked up to, do you know the name of that device?

19:05:18   A.  I wasn't -- there are different types of devices

19:05:21   that are used, I believe.  I don't know what device they

19:05:26   used.  I wasn't there for the inspection.

19:05:28   Q.  Does the use of that device require the traveler

19:05:32   giving a password to their phone?

19:05:34   A.  If it's locked, yes.

19:05:36   Q.  And if it's locked, do you know if those devices

19:05:39   can get access to the phone?

19:05:41   A.  I'm not an expert in utilizing the devices.  So I

19:05:44   know sometimes there can be problems.

19:05:46   Q.  Do you know if Customs and Border Patrol can

19:05:50   seize someone's phone at the border and keep it?

19:05:53   A.  They can detain a phone and keep it for thorough

19:05:57   investigation, correct.

19:06:00   Q.  For how long?

19:06:01         MR. TRIPI:  Objection, Judge.  These are

19:06:03   legal issues for this Court.

19:06:04         MAGISTRATE JUDGE ROEMER:  Overruled.

19:06:05   A.  I believe, in policy, if they wanted to, they

1          J. GERNETT - DX BY MR. HARRINGTON

19:06:11   2   could detain it up to five days and ask for further, but

19:06:15   3   I'm not 100 percent certain.

19:06:17   4       Q.  Have you ever worked on the seizure of phones

19:06:21   5   yourself in your capacity?

19:06:24   6       A.  I've never seized a phone.

19:06:26   7       Q.  So you've never operated the advance machine or

19:06:28   8   anything like that to get into the phone?

19:06:30   9       A.  No.  I have operated the machines, but it was

19:06:33   10  years ago.  It was quite a few years.

19:06:38   11      Q.  Okay.

19:06:38   12      A.  So things have changed.

19:06:43   13      Q.  Now, you indicated that you had reviewed some

19:06:48   14  e-mail threads, and I take it those are ones that would

19:06:54   15  include you as either a recipient or someone that was

19:06:57   16  copied on them?

19:06:58   17      A.  That's correct.

19:06:59   18      Q.  And I'd like to show you Defendant's Exhibit C.

19:07:28   19           THE CLERK:  Should be on.

19:07:37   20           MR. TRIPI:  I see part of the Judge.

19:07:38   21           MAGISTRATE JUDGE ROEMER:  We're looking at

19:07:39   22  the witness.  I think you just have to adjust.  We're

19:08:06   23  just upside down now.  There we go.

19:08:38   24      Q.  Can you see the display there?

19:08:44   25      A.  Yes, sir.

1                  J. GERNETT - DX BY MR. HARRINGTON

19:08:45   2      Q.  I direct your attention to the middle of the page

19:08:47   3   right to the name next to sticker?

19:08:49   4      A.  Yes, sir.

19:08:50   5      Q.  And --

19:08:51   6              THE CLERK:  Jim, could you move?  Thank you.

19:08:54   7              MR. HARRINGTON:  I'm sorry.

19:08:56   8              THE CLERK:  Thank you.

19:08:56   9      Q.  In the middle of the page at exhibit, Defendant's

19:09:00  10   Exhibit C, there is an e-mail, and it's addressed to

19:09:04  11   Jack?

19:09:04  12      A.  That's correct.

19:09:05  13      Q.  And would that be you?

19:09:06  14      A.  That's correct.

19:09:07  15      Q.  And it says it's from Curtis, is that right?

19:09:11  16      A.  Correct.

19:09:11  17      Q.  Who is Curtis?

19:09:12  18      A.  It's a HSI Special Agent Curtis Ryan.

19:09:16  19      Q.  And he is with DHS?

19:09:18  20      A.  He is with Department of Homeland Security,

19:09:20  21   Homeland Security Investigations.

19:09:22  22      Q.  And this is dated on Tuesday April 23, 2019, is

19:09:27  23   that right?

19:09:27  24      A.  Yep.

19:09:28  25      Q.  And the request to you is, "can you coordinate

J. GERNETT - DX BY MR. HARRINGTON

19:09:34  2  getting him secondary and getting his phone dumped," is

19:09:38  3  that right?

19:09:38  4      A.  Correct.

19:09:39  5      Q.  And that refers, does it not, down at the lower

19:09:43  6  part of the page, to Mr. Bongiovanni?

19:09:46  7      A.  Correct.

19:09:48  8      Q.  Now, you testified a few minutes ago as to what

19:09:54  9  you meant by "secondary."  What does the word "dumped"

19:09:57  10  mean to you?

19:09:57  11      A.  Dumped means the phone -- looking at the phone

19:10:00  12  information.

19:10:03  13      Q.  That is a term that is common with you and border

19:10:07  14  patrol and DHS?

19:10:09  15      A.  I'd say yes.

19:10:19  16      Q.  And then at the top of Defendant's Exhibit C is

19:10:25  17  another e-mail, and this appears to be from Mr. Curtis

19:10:32  18  Ryan.  Is that right?

19:10:33  19      A.  Correct.

19:10:36  20      Q.  And it appears that you were copied on that, but

19:10:38  21  you're not the direct recipient?

19:10:42  22      A.  Correct.

19:10:43  23      Q.  And that is to Mike Millich?

19:10:46  24      A.  Correct.

19:10:46  25      Q.  And who is Mike Millich?

1          J. GERNETT - DX BY MR. HARRINGTON

19:10:48   2     A.   He is the border security coordinator for office

19:11:04   3   of field operations under Customs and Border Protection.

19:11:08   4     Q.   And is he the person that you contacted to get

19:11:11   5   this process rolling?

19:11:15   6     A.   Yes.

19:12:52   7     Q.   If I could, I'd like to show you Defendant's

19:12:56   8   Exhibit E, and direct your attention to the third page.

19:13:08   9   And at the bottom of the page, it appears to be an

19:13:14   10   e-mail from Thomas Mozg.  Is that how you pronounce his

19:13:22   11   name?

19:13:23   12     A.   Yes, sir.

19:13:23   13     Q.   To Michael Millich that you referred to earlier?

19:13:27   14     A.   Correct.

19:13:28   15     Q.   And you were copied on that, are you not?

19:13:31   16     A.   Yes, sir.

19:13:31   17     Q.   And he, Mr. Mozg confirms the fact that he is

19:13:35   18   contacting Millich at your instruction, correct?

19:13:45   19     A.   Correct.

19:13:47   20     Q.   And then he says that the following subject is

19:13:51   21   part of an HSI Buffalo investigation and gives the case

19:13:59   22   number involving transnational organized crime, correct?

19:14:04   23     A.   Correct.

19:14:05   24     Q.   And did you know the subject matter or reason for

19:14:09   25   the secondary search in this case?

1          J. GERNETT - DX BY MR. HARRINGTON

19:14:10   2      A.   From what the e-mail says.

19:14:12   3      Q.   Do you recall now, did you have any knowledge

19:14:16   4   what it alleged that Mr. Bongiovanni did?

19:14:19   5      A.   I didn't have much information about Mr.

19:14:21   6   Bongiovanni prior to this encounter, very limited.

19:14:24   7      Q.   And then it requested DOMEX extraction, that is

19:14:29   8   the computer search or phone search, correct?

19:14:33   9      A.   That is correct.

19:15:04  10      Q.   Now directing your attention to page two of an

19:15:10  11   e-mail there that is appears at the bottom of the page

19:15:13  12   and it's from Christopher Candela, is that right?

19:15:17  13      A.   Correct.

19:15:17  14      Q.   And it indicates that this Mr. Mozg and you are

19:15:21  15   CC'd on that, right?

19:15:24  16      A.   Correct.

19:15:24  17      Q.   And do you know who Mr. Candela is?

19:15:27  18      A.   Personally, I don't know who he is.

19:15:30  19      Q.   Do you know what his role in this investigation

19:15:33  20   was?

19:15:33  21      A.   Per the e-mail, he is a watch commander in the

19:15:38  22   area port of Baltimore.

19:15:40  23      Q.   But other than seeing it on the e-mail you don't

19:15:43  24   have any personal knowledge?

19:15:44  25      A.   No.

J. GERNETT - DX BY MR. HARRINGTON

19:15:44  2    Q.  Now, in the body of that e-mail, it appears to be

19:15:50  3    a summary of what happened when Mr. Bongiovanni was

19:15:54  4    encountered at BWI airport.  Is that right?

19:15:58  5    A.  Correct.

19:15:59  6    Q.  And do you know why you were copied on that?

19:16:04  7    A.  I think it was just a string of e-mails it looks

19:16:07  8    like.

19:16:08  9    Q.  But you did not have any further role in

19:16:10  10   following up on that following this?

19:16:12  11   A.  I followed up a little bit on it.

19:16:14  12   Q.  What role did you play in following up?

19:16:16  13   A.  I thanked Mr. Candela and then I followed up with

19:16:21  14   Mr. Millich.

19:16:22  15   Q.  But other than what is reflected in these

19:16:26  16   e-mails, would that be the extent of your part of the

19:16:29  17   investigation of Mr. Bongiovanni?

19:16:30  18   A.  Up to this point, yes.

19:16:31  19   Q.  After that, did you participate in the

19:16:34  20   investigation?

19:16:34  21   A.  Very limited.

19:16:36  22   Q.  When was that?

19:16:36  23   A.  After this inspection occurred.

19:16:39  24   Q.  When, when?

19:16:42  25   A.  Immediately after.

1          J. GERNETT - DX BY MR. HARRINGTON

19:16:43   2    Q.   Same day, same night?

19:16:45   3    A.   I don't know if it was the same day or the next

19:16:48   4    day, but I did review information that was collected

19:16:51   5    during the inspection.

19:16:53   6    Q.   And what was the purpose of your doing that?

19:16:56   7    A.   I don't recall who, but I believe I was asked to

19:17:00   8    look at some of the contacts.

19:17:05   9    Q.   By contacts, what do you mean by that?

19:17:07   10   A.   Contacts that were in the phone.

19:17:17   11   Q.   And were you told what it was you were to look

19:17:20   12   for?

19:17:20   13   A.   No, just the contacts on the phone.

19:17:33   14   Q.   Now, showing you the first page of exhibit E,

19:17:42   15   there is an e-mail from Mr. Candela to Mr. Millich.  Is

19:17:50   16   that right, at the bottom?

19:17:51   17   A.   Correct.

19:17:51   18   Q.   You were not CC'd on that e-mail, is that right?

19:17:55   19   A.   Yeah, it looks that way.

19:17:57   20   Q.   Do you know why?

19:17:58   21   A.   No, I don't.

19:18:00   22   Q.   And then right above that there is an e-mail from

19:18:03   23   apparently from Mr. Millich, same day, Friday, April

19:18:07   24   206th.  I'm sorry the other e-mail was April 26th, 9:54,

19:18:15   25   there is an e-mail from Mr. Millich to you?

1          J. GERNETT - DX BY MR. HARRINGTON

19:18:18   2     A.   Correct.

19:18:18   3     Q.   And it says, "Jack, let us know if this was

19:18:33   4   helpful to the cause"?

19:18:36   5     A.   Correct.

19:18:36   6     Q.   What does that mean?

19:18:37   7     A.   I think Mr. Millich was probably asking if this

19:18:41   8   inspection was helpful to the agents that were

19:18:44   9   requesting the exam.

19:18:45  10     Q.   What does "the cause" mean?

19:18:48  11     A.   Their investigation, I'm guessing, that is my

19:18:53  12   assumption.

19:18:55  13     Q.   And then it says, "I will keep it discrete.   If

19:19:12  14   you would like to let the boss know."   And that is

19:19:14  15   directed to you?

19:19:15  16     A.   Correct.

19:19:15  17     Q.   Why is this being kept discrete?

19:19:19  18     A.   You know, my best recollection is through

19:19:23  19   conversations with Agent Mozg and Curtis, that it was a

19:19:27  20   sensitive investigation.

19:19:29  21     Q.   Who is the boss?

19:19:33  22     A.   That would be Director of Field Operations, Rose

19:19:37  23   Brophy.

19:19:37  24     Q.   Where is she located?

19:19:39  25     A.   She is in Buffalo.

1        J. GERNETT - DX BY MR. HARRINGTON

19:19:44  2      Q.   Did he need your permission to let her know that?

19:19:48  3      A.   No.

19:19:56  4      Q.   Now, in the e-mail above that, that is an e-mail

19:20:04  5   from you to Mr. Millich?

19:20:06  6      A.   Correct.

19:20:06  7      Q.   Same day, April 26th, 10:22.  Is that right?

19:20:11  8      A.   Correct.

19:20:17  9      Q.   And you indicate to Mr. Millich, you said "yes, I

19:20:26  10  did"?

19:20:26  11     A.   Yes, I did.  I'm basically saying it was helpful

19:20:32  12  to HSI investigators.

19:20:33  13     Q.   And then you said, "I believe warrants will be

19:20:36  14  written soon for phone information because there were

19:20:47  15  mafia associates and/or possible members listed from the

19:20:47  16  pictures they sent."  Is that right?

19:20:49  17     A.   Correct.

19:20:50  18     Q.   This is you writing this?

19:20:51  19     A.   Correct.

19:20:52  20     Q.   And what was that based on?

19:20:54  21     A.   Based on --

19:20:55  22          MR. TRIPI:  Objection.

19:20:56  23          MAGISTRATE JUDGE ROEMER:  Overruled.

19:20:57  24     A.   Based on the information seen in the phone.

19:21:04  25     Q.   But you're stating that you believe that there

```
                    J. GERNETT - DX BY MR. HARRINGTON
19:21:06   2   were mafia associates and possible members, I assume
19:21:12   3   "possible members" you mean members of the mafia, is
19:21:15   4   that right?
19:21:16   5       A.   Yes.
19:21:16   6       Q.   And how did you know that?
19:21:18   7       A.   Based on conversations with other law
19:21:23   8   enforcement, the investigators.
19:21:24   9       Q.   And you said this was based on the pictures that
19:21:31  10   were shown?
19:21:33  11       A.   Correct.
19:21:33  12       Q.   And you looked at those pictures yourself?
19:21:35  13       A.   Correct.
19:21:37  14       Q.   And did you see anybody in those pictures that
19:21:41  15   you knew who is associated with the mafia?
19:21:42  16            MR. TRIPI:   Objection for clarification
19:21:45  17   we're talking about pictures of the screen shots in the
19:21:50  18   contact list of the phone.   I don't believe there were
19:21:52  19   pictures in the phone.   There were not pictures of
19:21:57  20   individuals from the phone, so I want just the record to
19:22:01  21   be clear that the pictures that are being referenced in
19:22:04  22   the e-mail are the pictures of the screen shots that
19:22:06  23   were sent via PDF.
19:22:09  24            MAGISTRATE JUDGE ROEMER:   Mr. Harrington.
19:22:10  25            MR. HARRINGTON:   That's correct.   I'll
```

```
 1              J. GERNETT - DX BY MR. HARRINGTON
 2    clarify.
 3              MAGISTRATE JUDGE ROEMER:  Okay.
 4    Q.  Mr. Gernatt, you didn't actually see any pictures
 5    of people's faces?
 6    A.  No, just contacts, just names with numbers.
 7    Q.  There were photographs taken of contacts on the
 8    phone.  Is that right?
 9    A.  I believe so, yes.
10    Q.  And did you look through those pictures of those
11    contacts?
12    A.  I looked for some, yes.
13    Q.  And let me just show you for a minute.  And look
14    at it by yourself, Government Exhibit No. 1.
15    A.  Just number one?
16    Q.  Go through them all, just to yourself.
17              MR. TRIPI:  Judge, while he is reviewing
18    that, I'm going to have an objection.  My objection is
19    the subsequent analysis about what this witness did or
20    may have done with anything has zero impact on the
21    border search that occurred April 23rd, which is really
22    what this hearing is about.  And although I stipulated
23    these e-mail threads in, really none of the e-mail track
24    after April 23rd has anything to do with the issue that
25    is before this court for the hearing.  This may be well
```

| | | J. GERNETT - DX BY MR. HARRINGTON |
|---|---|---|

19:25:40  2  and good for trial, but this is not part of the motions

19:25:43  3  that were made before you or the hearing that you

19:25:45  4  granted.

19:25:47  5          MAGISTRATE JUDGE ROEMER:  Mr. Harrington.

19:25:48  6          MR. HARRINGTON:  Judge, this goes back to

19:25:50  7  the motivations for the stop of Mr. Bongiovanni, the

19:25:53  8  extent that the search of him at the border and gives

19:25:58  9  some weight for the Court to consider what the agents

19:26:01  10  did and there is no connection with that.

19:26:03  11          MR. TRIPI:  There is no dispute, Judge,

19:26:05  12  about the fact that he was selected for a one-day

19:26:08  13  lookout and targeted.  There is no dispute.  But this is

19:26:12  14  just a fishing expedition.

19:26:13  15          MAGISTRATE JUDGE ROEMER:  Well, the issue is

19:26:16  16  we're supposed to be doing today is what information was

19:26:21  17  given to Baltimore as to what to look for in the phones.

19:26:26  18  This might have a tendency to do that.  I agree, to some

19:26:29  19  extent, this is a little bit beyond what the hearing was

19:26:32  20  for, but I'm going to overrule the objection.  Mr.

19:26:32  21  Harrington.

19:26:37  22  CONTINUING DIRECT EXAMINATION BY MR. HARRINGTON:

19:26:37  23    Q.  Have you had a chance to look at the screen shots

19:26:41  24  contained in exhibit 1?

19:26:44  25    A.  Yeah.  Yes.

```
              1              J. GERNETT - DX BY MR. HARRINGTON
19:27:14      2      Q.  And if you know, are those the same screen shots
19:27:20      3   that you looked at?
19:27:21      4      A.  I believe so, yes.
19:27:23      5      Q.  And did you recognize the names of any of the
19:27:26      6   people in the screen shots?
19:27:27      7      A.  I recognize a couple of names in the screen
19:27:31      8   shots, yes.
19:27:31      9      Q.  Which ones?
19:27:32     10              MR. TRIPI:  Objection.
19:27:33     11              MAGISTRATE JUDGE ROEMER:  Overruled.
19:27:34     12              MR. TRIPI:  Judge, may I just state the
19:27:35     13   basis?
19:27:36     14              MAGISTRATE JUDGE ROEMER:  Surely.
19:27:37     15              MR. TRIPI:  This answer will get into the
19:27:39     16   whole reason that our search --
19:27:39     17              MAGISTRATE JUDGE ROEMER:  This is about as
19:27:41     18   far as I'm going to let him go.
19:27:43     19              MR. TRIPI:  Once he starts mentioning names,
19:27:46     20   then we're getting into the whole reason why our search
19:27:50     21   warrants remain sealed.  As soon as he reveals what
19:27:53     22   names law enforcement had an interest in and people that
19:27:57     23   are not charged and are subject to current
19:27:59     24   investigation.
19:28:00     25              MAGISTRATE JUDGE ROEMER:  These are
```

```
 1              J. GERNETT - DX BY MR. HARRINGTON
 2    government's exhibits, it's in evidence and it's a
 3    public document.
 4              MR. TRIPI:  It's a public document, but
 5    there are many more names in the series of screen0 shots
 6    than this witness is going to know about in response to
 7    this question.
 8              MAGISTRATE JUDGE ROEMER:  The original basis
 9    of the objection is it's going to put out information
10    that nobody else knows; this is public.
11              MR. TRIPI:  Yeah, but there is probably 30
12    names on here and if he answers the question about who
13    he knew about, not only does this have nothing to do
14    with the border search, now we're getting into the
15    reason why our search warrants remain sealed and other
16    aspects of the case.
17              MAGISTRATE JUDGE ROEMER:  I don't follow
18    you.
19              MR. TRIPI:  There are current subjects or
20    targets listed in these who are not publically
21    identified.  That is what I'm saying --
22              MAGISTRATE JUDGE ROEMER:  They are
23    publically identified, this exhibit is a public exhibit.
24              MR. TRIPI:  But the exhibit doesn't tell
25    anyone in the world who the subject of the investigation
```

|   | | |
|---|---|---|
| | 1 | J. GERNETT - DX BY MR. HARRINGTON |
| 19:29:14 | 2 | is.  This answer may that is all I'm saying. |
| 19:29:18 | 3 | MAGISTRATE JUDGE ROEMER:  Mr. Harrington. |
| 19:29:19 | 4 | MR. HARRINGTON:  Judge -- |
| 19:29:22 | 5 | MAGISTRATE JUDGE ROEMER:  I'm not going to |
| 19:29:23 | 6 | let you go too much further, Mr. Harrington.  The |
| 19:29:26 | 7 | purpose of today's hearing was what information did he |
| 19:29:29 | 8 | have that they sent to Baltimore for them to look for. |
| 19:29:32 | 9 | That was the purpose of today's hearing. |
| 19:29:37 | 10 | MR. HARRINGTON:  But, again, I go back to |
| 19:29:40 | 11 | what I argued before, Judge, was that we will argue to |
| 19:29:43 | 12 | the Court about the improper motivation for what was |
| 19:29:46 | 13 | done here and the extent of what was done, and that we |
| 19:29:50 | 14 | believe that it went beyond the authority of Customs and |
| 19:29:54 | 15 | Border Patrol in this particular case. |
| 19:29:55 | 16 | MAGISTRATE JUDGE ROEMER:  I'm not sure their |
| 19:29:56 | 17 | motivation is relevant. |
| 19:29:59 | 18 | MR. HARRINGTON:  It can be relevant, Judge, |
| 19:30:01 | 19 | if it's -- |
| 19:30:02 | 20 | MAGISTRATE JUDGE ROEMER:  I mean, either |
| 19:30:03 | 21 | they weren't allowed to look at it, or they were allowed |
| 19:30:06 | 22 | to look at it. |
| 19:30:09 | 23 | MR. HARRINGTON:  It goes to. |
| 19:30:11 | 24 | MAGISTRATE JUDGE ROEMER:  I mean, there is |
| 19:30:11 | 25 | no claim here of outrageous government conduct or |

1    J. GERNETT - DX BY MR. HARRINGTON

19:30:15   2    anything like that.

19:30:15   3         MR. HARRINGTON:  We don't know that.

19:30:16   4         MAGISTRATE JUDGE ROEMER:  Then you are on a

19:30:18   5    fishing expedition.

19:30:19   6         MR. HARRINGTON:  This case started with all

19:30:21   7    sorts of media publicity.  This was an investigation of

19:30:25   8    the Italian organized crime, they put it in the

19:30:28   9    indictment and have press conferences and all other

19:30:32   10   types of things.  Mr. Tripi is trying to walk back from

19:30:36   11   that and trying to hide from that.  And what we're

19:30:38   12   saying to the Court, that may be an invidious motivation

19:30:43   13   and it may lead to outrageous government conduct.

19:30:43   14        MAGISTRATE JUDGE ROEMER:  I don't know

19:30:43   15   having him identify the individual people, I don't know.

19:30:43   16   I am going to sustain the objections.  Ask the next

19:30:43   17   question.

19:56:35   18   Q.   Directing your attention to Exhibit E. At the top

19:56:40   19   it's got in the second paragraph of the first e-mail, at

19:56:44   20   the top, it's got "FYI"; is that right?

20:31:57   21   A.   Correct.

20:31:58   22   Q.   And it's got looks like a paragraph redacted or

20:32:02   23   blacked out.  Is that right?

20:32:04   24   A.   Correct.

20:32:04   25   Q.   Did you do that?

J. GERNETT - DX BY MR. HARRINGTON

20:32:05   A.   I didn't black it out.

20:32:07        MR. TRIPI:   I redacted it, your Honor.   And
20:32:09   I explained to Mr. Harrington why and the nature of
20:32:13   what's in that paragraph.   I did that last week.

20:32:16        MAGISTRATE JUDGE ROEMER:   He asked the
20:32:18   question, the witness said he didn't black it out.   I
20:32:21   don't know what the next question is.

20:32:24        MR. HARRINGTON:   Judge, I would request that
20:32:25   the Court be given an unredacted copy of that email for
20:32:32   the Court to review.

20:32:32        MAGISTRATE JUDGE ROEMER:   Okay.

20:32:33        MR. TRIPI:   I can do that, your Honor.

20:32:34        MAGISTRATE JUDGE ROEMER:   You got one right
20:32:36   now?

20:32:36        MR. TRIPI:   I don't.   It's saved on my
20:32:38   Cloud.   I can get it to you after the hearing or if you
20:32:42   want it after the hearing.   I didn't bring an unredacted
20:32:46   copy.   Generally, the paragraph relates to this witness'
20:32:58   view of what the larger investigation scope was and so I
20:33:03   redacted it out.

20:33:04        MAGISTRATE JUDGE ROEMER:   Okay.   Just get
20:33:06   that to me, okay, after the hearing.

20:33:08        MR. TRIPI:   I will.

20:33:10        MR. HARRINGTON:   That's all the questions I

```
  1               J. GERNETT - CX BY MR. TRIPI

  2    have.

  3               MAGISTRATE JUDGE ROEMER:  Thank you, Mr.

  4    Harrington.  Hang on, sir.  Hang on, sir.  Mr. Tripi

  5    gets a chance to ask you questions.

  6    CROSS EXAMINATION BY MR. TRIPI:

  7    Q.   CBP Officer, is this your first time testifying

  8    in Federal Court?

  9    A.   Yes, sir.

 10    Q.   And you are a CBP Officer assigned to the Office

 11    of Field Operations, correct?

 12    A.   Correct.

 13    Q.   And generally your involvement has been searching

 14    bridges, being at bridges in and around the Buffalo

 15    area.  Is that correct?

 16    A.   The ports of entries, correct.

 17    Q.   What ports of entries?

 18    A.   Buffalo, Lewiston, Rainbow Bridge, Broco bridge,

 19    Buffalo Airport and liaisoning with the HSI.

 20    Q.   So the bulk of your career has been involved with

 21    dealing with passenger vehicles at the bridges?

 22    A.   Correct, passengers and commercial.

 23    Q.   Trucks and stuff?

 24    A.   Trucks, correct.

 25    Q.   And how long have you been with CBP?
```

1        J. GERNETT - CX BY MR. TRIPI

20:35:03    2    A.   Since January of 2004.

20:35:05    3    Q.   And that was all in the Buffalo area?

20:35:07    4    A.   All in the Buffalo area, correct.

20:35:12    5    Q.   And, is it accurate that with CBP, you were part

20:35:17    6    of their anti-terrorism and contraband enforcement team

20:35:21    7    from roughly 2008 to 2018 doing work at the bridges?

20:35:24    8    A.   Roughly, yep.

20:35:26    9    Q.   And in 2019 you, begin this role sort of a

20:35:31   10    liaison to HSI, correct?

20:35:33   11    A.   Correct.

20:35:34   12    Q.   And what did that mean?

20:35:35   13    A.   It gave HSI singular points of contacts to the

20:35:40   14    bridges, to CBP.  So instead of 6, 700 officers that

20:35:44   15    work there, it gave them a singular contact being myself

20:35:48   16    and my partner Joe Spadone.

20:35:51   17    Q.   And do you understand that is the reason you were

20:35:54   18    the person in contact with HSI to start the ball rolling

20:36:00   19    -- withdrawn.  To start facilitating efforts to do this?

20:36:04   20    A.   I believe so.

20:36:06   21    Q.   Now, at that point in time, early 2019, did you

20:36:24   22    know HSI Special Agent Curtis Ryan very well?

20:36:28   23    A.   Not too well, I would say.

20:36:31   24    Q.   Did you know CBP Officer Thomas Mozg very well?

20:36:37   25    A.   I knew him more than I knew Curtis Ryan, but at

```
              1              J. GERNETT - CX BY MR. TRIPI
20:36:41      2    that time, not very well, but I knew them both.
20:36:44      3        Q.   At that time, you didn't have daily interactions?
20:36:47      4        A.   That's correct.
20:36:54      5        Q.   And, airports that receive incoming international
20:36:59      6    flights would be the border, or the functional
20:37:04      7    equivalence of the border, right?
20:37:07      8        A.   Correct, they are a functional equivalent to the
20:37:10      9    border.
20:37:10     10        Q.   And that would include BWI in Baltimore?
20:37:13     11        A.   Correct.
20:37:13     12        Q.   And now are Homeland Security Investigations and
20:37:17     13    CBP both under the Department of Homeland Security
20:37:42     14    umbrella?
20:37:43     15        A.   Correct.
20:37:44     16        Q.   And do HSI and CBP share the same system to
20:38:11     17    access information?
20:38:12     18        A.   Correct.
20:38:12     19        Q.   And CPB Officer Thomas Mozg, he is with CBP, but
20:38:23     20    he has a different job than you, is that correct?
20:38:26     21        A.   Correct.  He is with Customs and Border
20:38:29     22    Protection, but with border patrol.
20:38:31     23        Q.   Very briefly, how does that differ from your
20:38:33     24    role?
20:38:34     25        A.   So under Customs and Border Protection, there is
```

J. GERNETT - CX BY MR. TRIPI

20:38:38  2  air and marine operations, AMO, border patrol and then

20:38:53  3  OFO.  I work at the ports of entries.  Tommy works

20:38:57  4  between the ports of entry, Agent Mozg, between the

20:39:02  5  ports of entries.  A lot of time we clarify that Tom is

20:39:06  6  the guy in the green uniform, and I'm the guy in the

20:39:09  7  blue uniform if that makes sense.

20:39:12  8      Q.  And Border Patrol, they will do follow up into

20:39:24  9  the interior of the United States?

20:39:27  10      A.  Correct.

20:39:32  11      Q.  And you've already explained primary and

20:39:35  12  secondary inspections.  Are one-day lookouts common in

20:39:38  13  your line of work?

20:39:39  14      A.  They are common, yes.

20:39:40  15      Q.  Are searches that are predicated or as a result

20:39:48  16  of law enforcement information shared by other agencies

20:39:51  17  a common part of your job?

20:39:53  18      A.  It can be, yes.

20:39:55  19      Q.  In your role at the bridges, have you done

20:39:58  20  searches coordinating with border searches coordinating

20:40:11  21  with other law enforcement agencies?

20:40:34  22      A.  Yes.

20:40:34  23      Q.  And is that based on information that the other

20:40:38  24  law enforcement agencies held that you might not have

20:40:42  25  been privy to?

J. GERNETT - CX BY MR. TRIPI

20:40:43  2    A.   Correct.

20:40:44  3    Q.   What other agencies have you helped facilitate

20:40:48  4    searches at bridges?

20:40:49  5    A.   The HSI, FBI, DEA, pretty much about it.

20:40:57  6    Q.   State and local?

20:40:58  7    A.   State and local, yeah, New York State Police we

20:41:02  8    have, sometimes local, local cops.

20:41:04  9    Q.   So what you were being asked to do as it related

20:41:08  10   to Mr. Bongiovanni, did you see any problem with it?

20:41:11  11   A.   No.

20:41:15  12   Q.   Did it seem like a routine part of your job?

20:41:18  13   A.   It seemed pretty routine being that he was coming

20:41:22  14   from another country.

20:41:23  15   Q.   And by early 2019, did you know who Joseph

20:41:30  16   Bongiovanni was?

20:41:31  17   A.   Prior to when?

20:41:32  18   Q.   Prior to your involvement in this event, this

20:41:36  19   sequence of events, did you know who Mr. Bongiovanni

20:41:39  20   was?

20:41:39  21   A.   Very limited at this point.

20:41:42  22   Q.   Had you ever met him personally?

20:41:44  23   A.   Never met him personally.

20:41:46  24   Q.   Had you ever seen him, as far as you know?

20:41:49  25   A.   No.

1          J. GERNETT - CX BY MR. TRIPI

20:41:50   2     Q.   Would it be accurate to say this was the first or

20:42:01   3   among the first actual involvement you had in this

20:42:05   4   investigation?

20:42:05   5     A.   That would be correct.

20:42:09   6     Q.   So to state it more accurately, you did not have

20:42:13   7   much involvement in this investigation prior to April

20:42:16   8   23rd, 2018?

20:42:20   9     A.   That is pretty accurate.

20:42:28   10    Q.   Now, I'm going to put on the screen Government's

20:42:31   11  Exhibit 34, which is already in evidence from a prior

20:42:36   12  occasion?

20:42:36   13    A.   Mm-hmm.

20:42:37   14    Q.   I'm just going to start the third page just has a

20:42:42   15  signature block, so I'm going to start with the second

20:42:45   16  page.  Second page of exhibit 34 has an e-mail from

20:42:51   17  Thomas Mozg to Mr. Millich, correct?

20:42:55   18    A.   Correct.

20:42:56   19    Q.   And in the context of your organization, is Mr.

20:42:59   20  Millich a supervisor several levels above you?

20:43:02   21    A.   Several, yes.

20:43:03   22    Q.   And he is someone who can make contact with a

20:43:07   23  watch commander in Baltimore?

20:43:08   24    A.   Correct.

20:43:12   25    Q.   Now, looking at the body of this e-mail, April

|          |    | J. GERNETT - CX BY MR. TRIPI |
|----------|----|------------------------------|

```
                    1        J. GERNETT - CX BY MR. TRIPI
20:43:15    2    23rd, 2019 at 2:46 p.m., my next question is, Defense
20:43:25    3    Exhibit E, page 3, it's the same e-mail, correct?  April
20:43:39    4    23rd, 2019, 2:46.
20:43:42    5        A.  Correct, yes.
20:43:43    6        Q.  Right.
20:43:45    7            MR. TRIPI:  So on the screen now, Judge, is
20:43:47    8    defense, Government's Exhibit 34 in evidence.  And we're
20:43:53    9    moving that.  And now on the screen is page two, Defense
20:43:57   10    Exhibit E.
20:44:08   11        Q.  Next I'm showing you Government's Exhibit 34,
20:44:13   12    page 1. This is an e-mail back from that is Watch
20:44:22   13    Commander Candela, correct?
20:44:23   14        A.  Correct.
20:44:23   15        Q.  And has copied Joseph Spadone, yourself and
20:44:38   16    Curtis Ryan and Thomas Mozg, correct?
20:44:41   17        A.  And Mike Millich.
20:44:43   18        Q.  And Mike Millich, sorry.
20:44:44   19        A.  Yep.
20:44:45   20        Q.  And it begins with "Alcon," gives a description
20:44:51   21    and ends with "Regards, Chris Candela," correct?
20:44:54   22        A.  Correct.
20:44:55   23        Q.  Now I'm going to put on the screen Defense
20:44:58   24    Exhibit E, page two.  The e-mail from Candela and
20:45:05   25    Defense Exhibit E page 2, April 23, 2019 at 10:13 p.m.
```

1        J. GERNETT - CX BY MR. TRIPI

20:45:43  2   That is the same e-mail that we just showed you in

20:45:47  3   Government's Exhibit 34, correct?

20:45:49  4       A.   Correct.

20:45:54  5       Q.   And we'll bring back on the screen Government's

20:45:57  6   Exhibit 34, I'm going to hand you up, actually,

20:46:02  7   Government's Exhibit 34 and Defense Exhibit E. Look at

20:46:05  8   both of them.  And then I'll ask you a question.

20:46:25  9           Page one of Government's Exhibit 34, the e-mail

20:46:29  10  from Watch Commander Candela describing the results.

20:46:38  11  That e-mail is where those pictures you were shown was

20:46:43  12  transmitted, correct?

20:46:47  13      A.   I believe so, yes.

20:51:06  14      Q.   And Government's Exhibit 34, the only difference

20:51:09  15  with Defense Exhibit E is that e-mail thread stops with

20:51:13  16  the results of the search as described by Watch

20:51:19  17  Commander Candela and the photos that were sent via PDF,

20:51:26  18  correct?

20:51:26  19      A.   That's correct.

20:51:27  20      Q.   Defense Exhibit E continues with certain e-mails

20:51:40  21  that occurred in the days that follow April 23rd, 2019,

20:51:46  22  correct?

20:51:46  23      A.   Correct.

20:52:31  24      Q.   I'm going to show you, again, put on the screen

20:52:35  25  Defense Exhibit E that is in evidence.  And I'm going to

```
              1                 J. GERNETT - CX BY MR. TRIPI
20:52:52      2    focus back in on that e-mail that is duplicated on
20:52:56      3    Government's Exhibit 34.  On Defense Exhibit E from
20:53:03      4    Commander Candela, do you see a sentence in there that
20:53:12      5    said, "We examined the photos and some of the text
20:53:15      6    messages with no derog to report."  Do you see that?
20:53:19      7        A.  I see that, correct.
20:53:20      8        Q.  What does the term "derog" mean as you understand
20:53:24      9    it?
20:53:25     10        A.  Derogatory information.
20:53:27     11        Q.  Would that be a reference to nothing to arrest
20:53:31     12    Mr. Bongiovanni for at that time?
20:53:33     13        A.  That's correct.
20:53:34     14        Q.  Now, of course, you didn't know much about the
20:53:37     15    investigation, correct?
20:53:38     16        A.  Correct.
20:53:39     17        Q.  And would it be fair to say, the officers
20:53:44     18    involved in the offense in Baltimore didn't know much,
20:53:51     19    either?
20:53:51     20        A.  Correct.
20:53:52     21        Q.  Is there anything wrong with them sharing the
20:53:54     22    information from you that they obtained from the phone
20:53:56     23    and with Special Agent Curtis Ryan, as far as you
20:53:59     24    understand it?
20:54:00     25        A.  No.
```

                    J. GERNETT - CX BY MR. TRIPI

20:54:02  Q.  Do you, as members of law enforcement, share

20:54:08  information frequently?

20:54:09  A.  Yes, correct.

20:54:11  Q.  And is sharing of information encouraged,

20:54:14  generally?

20:54:14  A.  Correct.

20:54:22  Q.  If someone is, in your experience, a subject or a

20:54:26  target of an ongoing investigation of another agency and

20:54:30  you or a member of CBP generally is aware of it, is it

20:54:34  more likely or less likely that person will be secondary

20:54:37  at the border.

20:54:44  A.  Depends on the investigation and how the

20:55:01  investigators would like that to be handled, you know.

20:55:05  Q.  In a case like this, where there is a request, is

20:55:08  that common?

20:55:09  A.  That we do it, yes.

20:55:12  Q.  Now, did you -- did you exercise any supervision

20:55:17  over the way the people in Baltimore did the search?

20:55:20  A.  No.

20:55:21  Q.  Did you offer any advice?

20:55:22  A.  No.

20:55:23  Q.  Did you give them any directives?

20:55:25  A.  No.

20:55:25  Q.  Could it have been within their discretion to not

                        J. GERNETT - CX BY MR. TRIPI

20:55:30   2   do the search if so they so decided?

20:55:32   3       A.   Yes, they could have not done it.

20:55:34   4       Q.   I'm going to show you Defense Exhibit D. Just

20:55:44   5   very quickly.  You see those e-mails both on page one of

20:55:48   6   the exhibit, the e-mail, April 23rd, 2019, 12:44 p.m.

20:55:54   7   from Curtis Ryan to you with a CC to Joseph Spadone?

20:56:08   8       A.   Correct.

20:56:09   9       Q.   It says, "Jack, can you coordinate secondary,"

20:56:13  10   Mr. Harrington asked you about that?

20:56:15  11       A.   Correct.

20:56:15  12       Q.   Is that consistent with any phone conversations

20:56:19  13   you had with Curtis Ryan?

20:56:20  14       A.   It is.

20:56:23  15       Q.   And is that about all you did was put Mozg and

20:56:27  16   Ryan in touch with Millich?

20:56:29  17       A.   I would say so, yes.

20:56:40  18       Q.   Just to clarify, was it prior to the search, that

20:56:44  19   is all you did?

20:56:44  20       A.   Correct.

20:57:17  21       Q.   Now, the e-mail that Mr. Harrington asked you

20:57:19  22   about from April 26th, right?

20:57:24  23       A.   Mm-hmm.

20:57:25  24       Q.   The first one is from a supervisor several levels

20:57:30  25   above you, Mr. Millich, where he asks you, "let us know

J. GERNETT - CX BY MR. TRIPI

20:57:35   2   if it was helpful to the cause, I will keep it discrete,

20:57:39   3   but would like to let the boss know," correct?

20:57:41   4       A.   Correct.

20:57:42   5       Q.   When a supervisor asks you a question, are you

20:57:54   6   allowed to ignore their question to you?

20:57:57   7       A.   Probably not a good idea.

20:57:58   8       Q.   And so you indicated that and boss in this e-mail

20:58:06   9   you understood to be Rose Brophy?

20:58:08   10      A.   Yes.

20:58:09   11      Q.   And would she be the ultimate boss on your job?

20:58:12   12      A.   She would be the ultimate boss in charge of all

20:58:16   13   New York State for Customs and Border Protection minus

20:58:42   14   New York City.

20:58:43   15      Q.   And did you have an interest in becoming involved

20:58:46   16   in more involved in these types of investigations?

20:58:48   17      A.   I did.

20:58:49   18      Q.   So when you were responding to Mr. Millich, did

20:58:54   19   you have any of your desire to remain involved in these

20:58:58   20   types of investigations in your mind?

20:59:00   21      A.   Yeah.

20:59:00   22      Q.   In your experience, you were asked about, and I

20:59:49   23   understand sometimes you used a Cellebrite or some type

20:59:53   24   of device, but in your experience or things that you

20:59:55   25   learned, are there times when phones are hooked up to

1          J. GERNETT - RDX BY MR. HARRINGTON

20:59:59   2   those devices and they ask for passwords, and if a

21:00:02   3   password is not had, then you can't do a full logical

21:00:10   4   examination?

21:00:11   5   A.   Correct, that has happened.

21:00:17   6          MR. TRIPI:   Just a minute, your Honor.

21:00:18   7          MAGISTRATE JUDGE ROEMER:   Sure.

21:00:52   8          MR. TRIPI:   I don't have anything further.

21:00:53   9          MAGISTRATE JUDGE ROEMER:   Thank you.

21:00:54   10         Mr. Harrington?

21:00:55   11   REDIRECT EXAMINATION BY MR. HARRINGTON:

21:01:02   12   Q.   Mr. Gernatt, Mr. Tripi just asked you a question

21:01:07   13   about your interest about being involved in

21:01:09   14   investigations like this?

21:01:10   15   A.   Mm-hmm.

21:01:11   16   Q.   What do you mean by that?

21:01:13   17   A.   I'm more involved than probably not working if

21:01:16   18   the primary environment at the borders, but more closely

21:01:20   19   with some of the other federal partners.

21:01:24   20   Q.   So regardless of this case, you're talking just

21:04:12   21   in general, like, being involved in something more that

21:04:15   22   you're interested in or promoting your career or that

21:04:18   23   kind of thing, is that what you mean?

21:04:19   24   A.   Correct.

21:04:19   25   Q.   And Mr. Tripi asked you on Government's Exhibit E

1                  J. GERNETT - RDX BY MR. HARRINGTON

21:04:23   2   about your giving advice to the CBP in Baltimore about

21:04:32   3   how they would conduct the examination.  I direct your

21:04:37   4   attention to page 3 at the top.  And there appears to be

21:04:43   5   an e-mail there from Mr. Mozg on April 23 at 5:06 to

21:04:50   6   Michael Millich, correct?

21:04:51   7        A.   Correct.

21:04:52   8        Q.   And you are CC'd on that; is that right?

21:04:55   9        A.   Correct.

21:04:55   10       Q.   And in that e-mail from him, he is recommending

21:05:03   11   what the approach should be to Mr. Bongiovanni and his

21:05:05   12   family, is he not?

21:05:07   13       A.   Correct.

21:05:07   14       Q.   And so while you didn't do that in this case,

21:05:12   15   that is not uncommon from somebody from Buffalo to

21:05:15   16   Baltimore to make recommendations on how to proceed, is

21:05:19   17   that right?

21:05:19   18       A.   Correct.

21:05:20   19            MR. HARRINGTON:  That's all I have, Judge.

21:05:21   20            MAGISTRATE JUDGE ROEMER:  Thank you, sir.

21:05:23   21   Anything further?

21:05:23   22            MR. TRIPI:  No, your Honor.  No, thank you.

21:05:25   23            MAGISTRATE JUDGE ROEMER:  Now you can step

21:05:26   24   down, sir.

21:05:28   25            THE WITNESS:  Thank you, sir.

                        T. MOZG - DX BY MR. HARRINGTON

21:05:33   2           MAGISTRATE JUDGE ROEMER:  Mr. Harrington,

21:05:34   3   you want to call your next witness?

21:05:35   4           MR. HARRINGTON:  (Inaudible).

21:06:29   5           THE CLERK:  Step up this way, please.  Right

21:06:34   6   this way, and I'll swear you in.

21:06:36   7   (T. MOZG WAS CALLED TO THE WITNESS STAND AND SWORN.)

21:06:44   8           Thank you.  Please have a seat.  When

21:06:46   9   seated, you may take off your mask and speak into the

21:06:49  10   microphone and state your name for the record.

21:06:51  11           THE WITNESS:  Okay.

21:06:55  12           THE CLERK:  Thank you.

21:06:58  13           THE WITNESS:  Thomas William Mozg.

21:07:05  14           THE CLERK:  Thank you.

21:07:09  15   DIRECT EXAMINATION BY MR. HARRINGTON:

21:07:12  16      Q.  Morning, Mr. Mozg.

21:07:14  17      A.  Morning.

21:07:14  18      Q.  My name is Jim Harrington.  I represent Mr.

21:07:17  19   Bongiovanni in this case.  And whom are you employed by?

21:07:21  20      A.  I've been employed as a law enforcement agent

21:07:26  21   with the U.S. Border Patrol for over 12 years.

21:07:31  22      Q.  So I take it you were employed by them back in

21:07:34  23   April of 2019?

21:07:35  24      A.  Yes.

21:07:36  25      Q.  And what is your position now?

1          T. MOZG - DX BY MR. HARRINGTON

21:07:38   2      A.   I'm currently a border patrol agent intelligence.

21:07:41   3   I'm attached to Homeland Security Investigations and the

21:07:44   4   Federal Bureau of Investigations here in Buffalo.

21:07:48   5      Q.   So I take it you work regularly with Homeland

21:07:53   6   Security and the FBI?

21:07:53   7      A.   Yes.   I work in a plain-clothes capacity and

21:07:56   8   perform liaison and assist with investigations.

21:07:59   9      Q.   And back in April of 2019, was your job the same

21:08:03   10  then or was it different?

21:08:05   11     A.   Same position, I was employed here in Buffalo

21:08:08   12  with the Border Patrol as a plain clothes intelligence

21:08:24   13  agent and conducted liaison and assisted in Homeland

21:08:30   14  Security Investigations.

21:08:30   15     Q.   Did there come a time when you became involved in

21:08:34   16  a case in the investigation of Joseph Bongiovanni?

21:08:37   17     A.   Yes.

21:08:38   18     Q.   And do you remember when that was?

21:08:40   19     A.   Approximately late 2018, early 2019.

21:08:44   20     Q.   And from then until April 23 of 2019, were you

21:08:49   21  involved in his case, in the investigation in this case?

21:08:52   22     A.   Certain aspects.   I was assisting, I wasn't a

21:08:57   23  lead case agent.

21:08:58   24     Q.   Who were you working with, what agency?

21:09:01   25     A.   I was attached to Homeland Security

1              T. MOZG - DX BY MR. HARRINGTON

21:09:04   2   Investigations.  I was working with Curtis Ryan at the

21:09:06   3   time, who is a special agent.

21:09:08   4       Q.   And who is he with?

21:09:10   5       A.   Homeland Security Investigations here in Buffalo,

21:09:14   6   New York.

21:09:16   7       Q.   Now, back on April the 23rd of 2019 -- well,

21:09:36   8   first of all, did you review anything to assist you in

21:09:39   9   testifying today?

21:09:40   10      A.   I met with the U.S. Attorney's Office prior to

21:09:44   11  recall events.

21:09:45   12      Q.   And who did you meet with?

21:09:49   13      A.   Joseph Tripi.

21:09:50   14      Q.   Was anybody else present?

21:09:52   15      A.   At the time, I believe it was Jack Gernatt.

21:09:55   16      Q.   Did you and Gernatt meet with Tripi together?

21:09:59   17      A.   Yes.

21:09:59   18      Q.   Did you review your testimony together and what

21:10:01   19  had happened?

21:10:02   20      A.   We reviewed the events and the exhibits.

21:10:04   21      Q.   What exhibits did you review?

21:10:06   22      A.   E-mails and a lookout record that I had placed.

21:10:12   23      Q.   And were some of those e-mails, were you either

21:10:15   24  an author or recipient or copied on those?

21:10:18   25              MR. TRIPI:  Just to clarify the record, we

```
                        T. MOZG - DX BY MR. HARRINGTON
```

1

21:10:20   2    met once separately, the agent and I.  And then once

21:10:25   3    together, just to make sure the record is clear.

21:10:28   4        Q.  When did you meet first with Mr. Tripi, do you

21:10:31   5    remember?

21:10:31   6        A.  I had just gotten back, it was, I believe it was

21:10:35   7    just after Christmas.

21:10:36   8        Q.  And was that with Gernatt or not?

21:10:40   9        A.  As Mr. Tripi said, we met once separately and

21:10:43   10   then once again together.

21:10:45   11       Q.  What was first, separate or together?

21:10:47   12       A.  I believe I met separately first.

21:13:18   13       Q.  You know Michael Millich?

21:13:20   14       A.  I have spoken to him.  I'm aware that he is in

21:13:24   15   management and Customs and Border Protection here in

21:13:27   16   Buffalo.

21:13:28   17       Q.  Back in April of 2019, did you know him then?

21:13:33   18       A.  Yes.

21:13:34   19       Q.  And you said you were aware of what he was.  Did

21:13:38   20   you know him personally?

21:13:39   21       A.  I didn't know him personally.

21:13:41   22       Q.  Now, I'm going to show you page 3 of Defense

21:13:53   23   Exhibit E, and ask you, you can look at it right on the

21:13:58   24   screen.  And direct your attention to an e-mail near the

21:14:06   25   bottom of the page.  It appears to be from you, is that

|         |    | T. MOZG - DX BY MR. HARRINGTON |
|---------|----|--------------------------------|

1              T. MOZG - DX BY MR. HARRINGTON

21:14:11   2   right?

21:14:11   3     A.   That's correct.

21:14:11   4     Q.   And Mr. Millich -- it's April 23, 2019 at 2:46,

21:14:16   5   is that right?

21:14:17   6     A.   That's correct.

21:14:17   7     Q.   And you are sending this to Mike Millich?

21:14:20   8     A.   Yes.

21:14:21   9     Q.   And you are requesting him to do certain things

21:14:25  10   with respect to Mr. Bongiovanni's anticipated arriving

21:14:31  11   in the United States at BWI Airport.  Is that right?

21:14:35  12     A.   That's correct.  We had information that he was

21:14:37  13   going to make entry into the United States at the

21:14:41  14   Baltimore Airport at a port of entry facility, which is

21:14:47  15   run by Customs and Border Protection.

21:15:02  16     Q.   Now, right above that, there is an e-mail from

21:15:09  17   Mr. Millich, but it doesn't appear who that is addressed

21:15:17  18   to.  Can you see what I'm talking about, right in the

21:15:20  19   middle, middle of the page says on April 23, 2019 at

21:15:25  20   4:25 p.m. Michael Millich wrote?

21:15:27  21     A.   Okay.

21:15:28  22     Q.   Do you know who he wrote that to?

21:15:31  23     A.   That is Christopher Candela.  I believe he is CBP

21:15:39  24   management in Baltimore.  And Curtis would be Curtis

21:15:42  25   Ryan, if I'm not mistaken.  And Thomas would be myself.

1        T. MOZG - DX BY MR. HARRINGTON

21:15:57   2      Q.   There is no -- there is no address on that

21:16:01   3   particular e-mail, though, is there?  It says it was

21:16:07   4   sent from the iPhone.  I don't know if that makes a

21:16:10   5   difference?

21:16:10   6      A.   I don't know what happens electronically with the

21:16:13   7   address stamp, but it looks like the recipients are

21:16:13   8   myself, Christopher Candela and Curtis Ryan and

21:16:13   9   obviously Mile Millich, who is the author.

21:16:13  10      Q.   It appears Mr. Millich is asking for advice from

21:21:54  11   either you or Mr. Ryan with respect to how this

21:21:57  12   interception of Mr. Bongiovanni was to take place.

21:22:02  13      A.   Well, it was for Mr. Bongiovanni, and that was to

21:22:06  14   be inspected when he enters the United States, so, yes,

21:22:08  15   then the instructions were the reason why we got Michael

21:22:14  16   Millich involved because he is CBP management, and

21:22:17  17   wanted to ensure everything was done professionally and

21:22:21  18   appropriately to be inspected at the border.

21:22:41  19      Q.   Is there some reason you think it wouldn't be if

21:22:46  20   he wasn't involved?

21:22:46  21      A.   No, it's just courtesy to be transparent because

21:22:58  22   sometimes someone could be referred for inspection, but

21:23:02  23   I'm not there on site to conduct the inspection.  It's

21:23:06  24   just officers saying, hey, can you please inspect this.

21:23:09  25   So out of courtesy and transparency, we like to provide

```
        1              T. MOZG - DX BY MR. HARRINGTON
21:23:13  2   some background information how they should handle and
21:23:16  3   use their discretion on how people make entry into the
21:23:22  4   United States.
21:23:23  5       Q.  And then a short time later above that, there is
21:23:35  6   an e-mail from you to Mr. Millich, and it appears to be
21:23:42  7   in response to his inquiry.  Is that right?
21:23:45  8       A.  Yes.
21:23:45  9       Q.  And you make some suggestions for how Mr.
21:23:48 10   Bongiovanni should be approached.  Is that right?
21:23:52 11       A.  Yes.
21:23:52 12       Q.  And how to talk to him, is that right?
21:23:56 13       A.  Yes.
21:23:56 14       Q.  And what was that based on?
21:23:58 15       A.  Considering Mr. Bongiovanni was a former law
21:24:03 16   enforcement officer, I mean, I wanted it to look like a
21:24:05 17   random inspection.  That is not my intention to
21:24:08 18   embarrass anybody, so, that is why I requested that.
21:24:12 19   It's out of courtesy and it makes it less awkward for
21:24:16 20   the officers conducting the inspection and for the
21:24:19 21   subject making entry.
21:24:20 22       Q.  So that the primary concern was courtesy for him
21:24:26 23   as a former officer as opposed to trying to get
21:24:30 24   information (inaudible)?
21:24:32 25       A.  Well, I didn't want to make it awkward for the
```

1          T. MOZG - DX BY MR. HARRINGTON

21:24:36   2   officers and Mr. Bongiovanni.  Like I said, I wasn't

21:24:39   3   there conducting the inspection personally.

21:24:51   4       Q.   Now, on page 2 of Defendant's Exhibit E, there is

21:24:57   5   an e-mail from Mr. Candela to you with copies to other

21:25:07   6   persons.  Is that right?

21:25:07   7       A.   That's correct.

21:25:07   8       Q.   And this appears to be an e-mail summary of what

21:25:10   9   happened with the encounter of Mr. Bongiovanni at the

21:25:13  10   Baltimore airport?

21:25:13  11       A.   Yes, it appears to be a basic update of how the

21:25:17  12   inspection occurred.

21:25:18  13       Q.   Did you know Mr. Candela before this?

21:25:20  14       A.   No.

21:25:20  15       Q.   And did you forward this information to anybody

21:25:25  16   else?

21:25:25  17       A.   I don't recall.  If I did, it should be time

21:25:30  18   stamped on there.

21:25:31  19       Q.   Now, one last thing, if I could.  I'd like to

21:25:46  20   show you Defendant's Exhibit F, which is a two-page

21:25:50  21   document, this is the first page.  Do you recognize this

21:25:56  22   document, the first page of it?

21:25:57  23       A.   Yes, I do.

21:25:58  24       Q.   Can you tell us what that is?

21:26:00  25       A.   Basically TECS is a law enforcement tool, and

1          T. MOZG - DX BY MR. HARRINGTON

21:26:05   2   that notifies local officers, in this example,

21:26:11   3   Baltimore, that Mr. Bongiovanni would be making entry

21:26:13   4   into the United States as a certain place and time.

21:26:16   5      Q.   And then it makes a request to refer for

21:26:22   6   secondary inspection, right?

21:26:24   7      A.   Yes.  I believe that is automated generated

21:26:28   8   remarks.  Those are drop down boxes and basically you

21:26:32   9   request that the passenger be referred to secondary

21:26:35   10  inspection.

21:26:36   11     Q.   But on Exhibit 1, either page one or the second

21:26:40   12  page, there is nothing in there that indicates any

21:26:44   13  reasoning why there would be a secondary inspection.  Is

21:26:47   14  that right?

21:26:47   15     A.   In the one-day lookout hit, I don't believe there

21:26:50   16  is room for comments.  However, I believe that Agent

21:26:54   17  Curtis Ryan did have a different lookout hit on Agent

21:26:59   18  Bongiovanni.

21:27:00   19     Q.   What does that mean?

21:27:01   20     A.   Basically, TECS is a law enforcement system and

21:27:04   21  you can flag that somebody is subject to investigation.

21:27:08   22  This lookout hit is merely highlighting the travel

21:27:22   23  itinerary of a passenger.

21:27:24   24          MAGISTRATE JUDGE ROEMER:  Mr. Harrington, if

21:27:26   25  I can interrupt for a second.  I don't have a page two

```
              1              T. MOZG - DX BY MR. HARRINGTON
21:27:29      2   for exhibit F and I think we said C, D, and E in
21:27:36      3   evidence, but I don't think I we mentioned F.
21:27:40      4              MR. TRIPI:  I was going to move it.
21:27:41      5              MAGISTRATE JUDGE ROEMER:  So exhibit F shall
21:27:43      6   be admitted into evidence.
21:27:43      7              (Whereupon, Exhibit F was received into
21:27:43      8   evidence.)
21:27:45      9              Go ahead, Mr. Harrington, and sorry to
21:27:48     10   interrupt you.
21:27:48     11              MR. HARRINGTON:  It was my error, sir.  Can
21:27:51     12   you.
21:27:51     13     Q.  Can you explain what you just said what Mr. Ryan
21:27:55     14   did.  You said he sent some other form?
21:27:57     15     A.  No, it's administrative in the electronic systems
21:28:02     16   that HSI utilizes.  If somebody is under investigation
21:28:06     17   and you have a case file, you basically put all of their
21:28:31     18   biographic information in there.  And it is viewable by
21:28:44     19   Customs and Border Protection.  The exhibit that you
21:28:48     20   showed me with the one-day hit that says "refer for
21:28:53     21   secondary inspection," I did that to basically highlight
21:28:57     22   Mr. Bongiovanni's travel itinerary so he would be
21:29:01     23   referred to for secondary inspection when he made entry
21:29:12     24   to the United States and Baltimore at a CBP port of
21:29:17     25   entry.
```

|       |    | T. MOZG - DX BY MR. HARRINGTON |
|-------|----|--------------------------------|

1          T. MOZG - DX BY MR. HARRINGTON

21:29:19   2    Q.   Have you seen the document that Ryan generated?

21:29:22   3    A.   It's not a document.  It's a case file, and when

21:29:25   4    you have a case file, you basically put a person's name

21:29:28   5    in there electronically, and it's no different than

21:29:33   6    having a paper case file, it's just electronic.

21:29:36   7    Q.   Well, was something different than the lookout

21:29:41   8    sent to the people in Baltimore?

21:29:42   9    A.   It that would be my e-mail.

21:29:44   10   Q.   That would be what?

21:29:45   11   A.   The previous email you had on the generator.

21:29:48   12   Q.   What Ryan generated you said was not sent?

21:29:59   13   A.   No, that is part of a case file that is separate

21:30:03   14   from this one day lookout hit that you just showed me.

21:30:06   15   Q.   My question is, whether it's a case file or

21:30:09   16   whatever else you call it, was that sent to Baltimore?

21:30:12   17   A.   No, the case file was not sent to Baltimore.

21:30:15   18   Q.   Was anything else sent other than what you've

21:30:18   19   shown us here, the lookout and exhibit F and the e-mail.

21:30:23   20   A.   The e-mail that I sent to Michael Millich was

21:30:25   21   sent to Baltimore, Mr. Candela was in Baltimore, that is

21:30:27   22   the only information I sent over as background

21:30:29   23   information for the anticipated entry of Joseph

21:30:33   24   Bongiovanni.

21:30:35   25        MR. HARRINGTON:  That's all I have.

```
              1                    T. MOZG - CX BY MR. TRIPI
21:30:37      2                    MAGISTRATE JUDGE ROEMER:  Thank you, sir.
21:30:37      3               Mr. Tripi.
21:32:35      4               MR. TRIPI:  Judge, before we get going, I
21:32:40      5     was mistaken.  I have an unredacted copy.  It's exhibit
21:32:44      6     E, but has that paragraph.
21:32:52      7                    MAGISTRATE JUDGE ROEMER:  Okay.  Want to
21:32:53      8     hand that up?
21:32:53      9               MR. TRIPI:  That is my only copy, if I could
21:32:55     10     get back that copy.
21:32:57     11                    MAGISTRATE JUDGE ROEMER:  Sure.
21:33:00     12     CROSS EXAMINATION BY MR. TRIPI:
21:33:00     13     Q.  Just to clarify, putting on Defense Exhibit E, at
21:33:10     14     the bottom there is what looks to be an automated e-mail
21:33:13     15     notification to Curtis Ryan on April 20th, correct?
21:33:17     16     A.  Yes.
21:33:17     17     Q.  And that is notifying of some flight manifest
21:33:23     18     information regarding Bongiovanni?
21:33:24     19     A.  Correct, and that was in April of 2019.
21:33:27     20     Q.  Is that like the text notification that you're
21:33:31     21     talking about that starts the process?
21:33:32     22     A.  Yes.
21:33:32     23     Q.  And then Defense Exhibit F, which is in evidence,
21:33:37     24     is you taking an additional step to highlight that
21:33:40     25     travel itinerary calling it a one-day lookout, correct?
```

|  |  |  |
|---|---|---|
|  | 1 | T. MOZG - CX BY MR. TRIPI |
| 21:33:44 | 2 | A.  Yes, correct. |
| 21:33:45 | 3 | Q.  And in there, your remarks are simply "refer for |
| 21:33:49 | 4 | secondary inspection"? |
| 21:33:50 | 5 | A.  Yes. |
| 21:33:52 | 6 | Q.  And I suppose, if they so decided, that the |
| 21:33:56 | 7 | people that worked in BWI could have ignored this and |
| 21:34:00 | 8 | not done a search? |
| 21:34:01 | 9 | A.  Yes. |
| 21:34:02 | 10 | Q.  And not done a secondary inspection? |
| 21:34:04 | 11 | A.  Correct, it's up to the local discretion on the |
| 21:34:18 | 12 | officers conducting the inspection. |
| 21:34:23 | 13 | Q.  And, this is Government's Exhibit 34, which I |
| 21:34:29 | 14 | believe is an e-mail that you were shown, is also |
| 21:34:34 | 15 | duplicated in Defense Exhibit E? |
| 21:34:37 | 16 | A.  Yes. |
| 21:34:37 | 17 | Q.  And I'll show it to you in Government's Exhibit |
| 21:34:40 | 18 | 34.  And in your e-mail, you said "discretionary |
| 21:34:45 | 19 | dissemination," correct? |
| 21:34:47 | 20 | A.  Yes. |
| 21:34:47 | 21 | Q.  What did you mean by that? |
| 21:34:48 | 22 | A.  I meant discretion, here is the background |
| 21:34:51 | 23 | information, we have a subject of investigation making |
| 21:34:55 | 24 | entry into the United States, we're requesting an |
| 21:34:58 | 25 | inspection, but based on this information, use your |

                    1                    T. MOZG - CX BY MR. TRIPI

21:35:01    2    discretion and conduct the inspection locally as you see

21:35:05    3    fit.

21:35:37    4        Q.   In your experience, are there any issues with

21:35:41    5    sharing that information between and among CBP officers

21:35:45    6    or Homeland Security agents?

21:35:47    7        A.   No.

21:35:47    8        Q.   How about information resulting from any

21:35:49    9    secondary inspection?

21:35:51   10        A.   No.   If it's within the Department of Homeland

21:35:54   11    Security, there are no third-party restrictions on

21:35:57   12    sharing information.   Everyone has common system access

21:36:01   13    and for liaison information.

21:36:14   14        Q.   And did you put in the one-day lookout, Defense

21:36:21   15    Exhibit F, in evidence prior to writing the e-mail that

21:36:25   16    was just up on the screen?

21:36:27   17        A.   Yes.

21:36:28   18        Q.   Which is Government's Exhibit 34?

21:36:31   19        A.   That's correct.

21:36:35   20        Q.   And was that based upon a request for discussions

21:37:26   21    you had with Special Agent Curtis Ryan after he became

21:37:31   22    involved in that process?

21:37:32   23        A.   Yes.

21:37:33   24        Q.   As it related to that, did you have any other

21:37:36   25    role other than the one-day lookout and the e-mails that

|         |    |                                                              |
|---------|----|--------------------------------------------------------------|
|         | 1  | USA VS. J. BONGIOVANNI                                        |
| 21:37:39 | 2  | we observed?                                                |
| 21:37:40 | 3  | A.  No.                                                      |
| 21:37:45 | 4  | MR. TRIPI:  Nothing further, Judge.  Thank                  |
| 21:37:45 | 5  | you.                                                         |
| 21:37:48 | 6  | MAGISTRATE JUDGE ROEMER:  Thank you, sir                     |
| 21:37:49 | 7  | MR. Harrington?                                              |
| 21:37:49 | 8  | MR. HARRINGTON:  No further questions.                       |
| 21:37:51 | 9  | MAGISTRATE JUDGE ROEMER:  You can step down.                 |
| 21:37:53 | 10 | Thank you.                                                   |
| 21:37:54 | 11 | MR. Harrington?                                              |
| 21:37:54 | 12 | MR. HARRINGTON:  We have no further                          |
| 21:37:56 | 13 | witnesses.                                                   |
| 21:37:57 | 14 | MAGISTRATE JUDGE ROEMER:  Mr. Tripi.                         |
| 21:37:58 | 15 | MR. TRIPI:  We rested, Judge.                                |
| 21:37:59 | 16 | MAGISTRATE JUDGE ROEMER:  Okay.  No                          |
| 21:38:00 | 17 | rebuttal?                                                    |
| 21:38:01 | 18 | MR. TRIPI:  No rebuttal.                                     |
| 21:38:03 | 19 | MAGISTRATE JUDGE ROEMER:  Okay.  We'll put a                 |
| 21:38:05 | 20 | scheduling order in place.  How long to get the              |
| 21:38:09 | 21 | transcript, Mr. Tripi?  Any idea?                            |
| 21:38:14 | 22 | MR. TRIPI:  Thirty days, usually.  I think                   |
| 21:38:15 | 23 | it's 30 days.                                                |
| 21:38:16 | 24 | THE CLERK:  Thirty days.                                     |
| 21:38:18 | 25 | MAGISTRATE JUDGE ROEMER:  Okay.                              |

                        USA VS. J. BONGIOVANNI

21:38:19   2        THE CLERK:  That will take us to

21:38:21   3   approximately February 7th.

21:38:25   4        THE COURT:  And how long would counsel like

21:38:26   5   to follow or we'll do simultaneous filings and then

21:38:30   6   simultaneous responses.

21:38:33   7        MR. HARRINGTON:  Maybe three weeks after

21:38:35   8   that, Judge?

21:38:35   9        MR. TRIPI:  I'm out of the district from

21:38:37  10   February 12th to the end of February.  Could we push

21:38:42  11   that a little bit.

21:38:43  12        MAGISTRATE JUDGE ROEMER:  Thirty days, does

21:38:45  13   that sound reasonable?  Thirty days from February.

21:38:49  14        THE CLERK:  March 7th.

21:38:50  15        MR. TRIPI:  That would be fine, thank you.

21:38:54  16        MAGISTRATE JUDGE ROEMER:  And how long to

21:38:56  17   respond?  Two weeks, is that enough?

21:38:57  18        MR. HARRINGTON:  Yes.

21:38:58  19        MR. TRIPI:  Yes, Judge.

21:38:59  20        THE CLERK:  March 21st.

21:39:02  21        MAGISTRATE JUDGE ROEMER:  And we'll schedule

21:39:03  22   a date for oral argument.

21:39:13  23        THE CLERK:  March 29th at 1 o'clock.

21:39:21  24        MR. TRIPI:  That's fine.  Judge, will that

21:39:29  25   oral argument, I'll ask a question.  That oral argument

1                    USA VS. J. BONGIOVANNI

21:39:32  2   will just be on this issue with these parties or are you

21:39:35  3   anticipating --

21:39:36  4              MAGISTRATE JUDGE ROEMER:  We've had oral

21:39:38  5   argument with Gerace already, right, and there was no

21:39:41  6   hearings in Gerace.

21:39:42  7              MR. TRIPI:  No hearings in Gerace.  There

21:39:44  8   were other motion issues that Mr. Harrington had in his

21:39:48  9   motions that I think --

21:39:49 10              MAGISTRATE JUDGE ROEMER:  I thought we

21:39:50 11   argued those before, but Mr. Harrington.

21:39:52 12              MR. HARRINGTON:  We deferred some of them.

21:39:54 13              MR. TRIPI:  I think some of them may still

21:39:56 14   need to be argued.

21:39:56 15              MAGISTRATE JUDGE ROEMER:  We'll open them on

21:39:58 16   that date, we'll argue anything anybody wants to argue.

21:40:01 17              MR. TRIPI:  Okay.  You don't really want to

21:40:05 18   have it that broad, Judge.

21:40:06 19              MAGISTRATE JUDGE ROEMER:  Okay.  Or whatever

21:40:08 20   motions that Mr. Harrington wants to continue to argue.

21:40:11 21              MR. TRIPI:  Mr. Harrington and I will speak

21:40:14 22   and discuss and see what still may be deferred from

21:40:17 23   previously.

21:40:18 24              MAGISTRATE JUDGE ROEMER:  But all of the

21:40:19 25   briefing is done on those.

1                    USA VS. J. BONGIOVANNI

21:40:21   2              MR. TRIPI:  Yes.

21:40:22   3              MAGISTRATE JUDGE ROEMER:  And the only

21:40:23   4    briefing we have left is this hearing.

21:40:25   5              MR. TRIPI:  That's correct.

21:40:26   6              MAGISTRATE JUDGE ROEMER:  Anything else, Mr.

21:40:27   7    Tripi?

21:40:27   8              MR. TRIPI:  Not from the government.

21:40:29   9              MAGISTRATE JUDGE ROEMER:  Mr. Harrington.

21:40:30   10             MR. HARRINGTON:  Can I explain about all my

21:40:32   11   complaints about the world?

21:40:33   12             MR. TRIPI:  That is why I said we might want

21:40:35   13   to limit it a little bit.

21:40:36   14             MAGISTRATE JUDGE ROEMER:  You can submit me

21:40:38   15   a list beforehand and we'll go down and check that.  All

21:40:42   16   right.  It's not St. Patrick's day, we're not having

21:40:46   17   anything on St. Patrick's day.  Okay.  Have a great day.

21:40:51   18   Stay safe.

21:40:53   19             MR. HARRINGTON:  You too, Judge.

21:40:55   20             MR. TRIPI:  Thank you.

21:41:01   21             THE CLERK:  Back on the record.

21:41:04   22             MR. TRIPI:  Judge, I may have put this on

21:41:06   23   the record earlier, but just so the record is clear.

22:13:05   24   When I transmitted the e-mail that you have unredacted,

22:13:10   25   which is a version that the Defense Exhibit E into

```
 1                    USA VS. J. BONGIOVANNI
 2  evidence.  In my transmittal e-mail to Mr. Harrington, I
 3  stated to him the redaction in the Gernatt e-mail dated
 4  April 26, 2019 at 10:22 a.m. three days after the border
 5  search generally relates to his view of the scope of the
 6  investigation and not the border search at issue and so
 7  that was my explanation of redaction, and I wanted the
 8  Court to have that context.
 9            MAGISTRATE JUDGE ROEMER:  Okay.  Thank you.
10            Anything further, Mr. Harrington, any
11  complaints?
12            MR. HARRINGTON:  I have many, but I'll defer
13  them to March.
14            MAGISTRATE JUDGE ROEMER:  Right.  Have a
15  great day.
16            MR. TRIPI:  You too.
17            MR. HARRINGTON:  Thank you.
18
19
20
21
22
23
24
25
```

1

2                          *    *    *

3                     CERTIFICATE OF REPORTER

4

5      I certify that the foregoing is a correct transcript

6   of the record to the best of my ability of proceedings

7   transcribed from the audio in the above-entitled matter.

8

9   S/ Karen J. Clark,  RPR

10  Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25