United States District Court
Western District of New York

United States of America,

*Plaintiff*

*vs*

JOSEPH BONGIOVANNI*,*

*Defendant*

**Defendant Joseph Bongiovanni's Post Hearing
Memorandum of Law**

19-cr-227

Dated: March 25, 2022

James P. Harrington, Esq.
HARRINGTON & MAHONEY
70 Niagara Street, 3rd Floor
Buffalo, NY   14202-3407
Ph: 716-853-3700 (fax)
Facs: 716-853-3710
*Attorneys for JOSEPH BIOGIOVANNI*

Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
     A.    Evidence obtained by CBP from Mr. Bongiovanni's mobile phone at the U.S.
          border in April, 2019 should be suppressed . . . . . . . . . . . . . . . . . . . . . . . 1
        *1.*   *The search fell outside the bounds of a "free border search"* . . . . . 2
            The background of "free" border searches . . . . . . . . . . . . . . . . . . . 2
            The Fourth Amendment's protections for mobile phones . . . . . . . . 3
            The problem with searching phones at the border: the free border
               search should not be used to further ongoing domestic
               investigations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
               Cases limiting the free border search . . . . . . . . . . . . . . . . . . . . 6
               The search was unjustified and impermissibly intrusive . . . 11
        *2.*   *The good faith exception is inapplicable* . . . . . . . . . . . . . . . . . . . . . 12

Targeting Mr. Bongiovanni's Cell Phone . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Uses of Border Search Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# Table of Authorities

## Cases

*United States v. Leon*, 468 U.S. 897 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Alasaad v. Nielsen,* 419 F.Supp.3d 142 (D. Mass. 2019) . . . . . . . . . . . . . . . . . . . . . . 9, 12

*Carroll v. United States*, 267 U.S. 132 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Chimel v. California,* 395 U.S. 752 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Aigbekaen,* 943 F.3d 713 (4th Cir. 2019) . . . . . . . . . . . . . . . 7, 8, 11, 12

*United States v. Cano,* 934 F.3d 1002 (9th Cir. 2019) . . . . . . . . . . . . . . . . . . . 6, 7, 11, 12

*United States v. Cotterman,* 709 F.3d 952 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Djibo,* 151 F.Supp.3d 297 (E.D.N.Y. 2015) *rev'd on other grounds,* 730 Fed.Appx. 52. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*United States v. Kirschenblatt,* 16 F. 2d 202, 203 (2d Cir.) . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Montoya de Hernandez,* 473 U.S. 531 (1985) . . . . . . . . . . . . . . . . . . 6, 7

*United States v. Ramsey,* 431 U.S. 606 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11-13

*United States v. Riley,* 573 U.S. 373 (2014) . . . . . . . . . . . . . . . . . . . . . . . . 3-5, 8, 9, 13, 15

*United States v. Smasal*, No. Crim. 15-85 JRT/BRT, 2015 U.S. Dist. LEXIS 105923, 2015 WL 4622246 (D. Minn. June 19, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Thirty-seven Photographs,* 402 U.S. 363 (1971) . . . . . . . . . . . . . . . . . . 3

*Wong Sun v. United States,* 371 U.S. 471 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Wyoming v. Houghton,* 526 U.S. 295 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

# Introduction

This Court conducted an evidentiary hearing on November 18, 2021 and January 5, 2022 regarding a search of Joseph Bongiovanni's cell phone at the Baltimore International (BWI) Airport following his return on a flight from the Dominican Republic on April 13, 2019. The search of the cell resulted in the seizure by Customs and Border Protection ("CBP") agents of personal information on that phone consisting of names, phone numbers, and texts. This information was used, in part, to obtain upon information and belief subsequent search warrants.[1]

In Mr. Bongiovanni's pretrial motion, he set forth his legal arguments for why the search and seizure of his cell phone was illegal. In review of this issue, he relies on the earlier motion that he filed. For the Court's convenience, his argument is copied here.

## A.    Evidence obtained by CBP from Mr. Bongiovanni's mobile phone at the U.S. border in April, 2019 should be suppressed

The government will likely argue that evidence obtained from Mr. Bongiovanni's cell phone when he re-entered the U.S. in April, 2019 will be admissible under the so-called "free border-search" exception to the Fourth Amendment's warrant requirement. This argument will be wrong. The "free" border search is a dragnet designed to prevent entry of contraband,

---

[1] The defense is hampered in making arguments regarding search warrant applications because of the government's application to the court and the court's granting of non-disclosure of the contents of the applications for search warrants. If the court finds that the search and seizure of Mr. Bongiovanni's cell at the BWI airport was improper, it must determine whether subsequent search warrants were the fruit of the poisonous tree in whole or in part.

1

specifically by foreign nationals entering the country. Like any other dragnet, it is not designed to provide a loophole to further previously existing law enforcement investigations, particularly if the target is a U.S. citizen re-entering the country. The report prepared by CBP states that agents decided to search Mr. Bongiovanni's phone *because* they knew he was a suspect in a federal criminal investigation. This rationale takes the seizure outside the established purpose and scope of warrantless border searches, and instead makes it a pretextual–and therefore unconstitutional–warrantless search.

1.    *The search fell outside the bounds of a "free border search"*

### The background of "free" border searches

The concept of a "free border search" was established by *United States v. Ramsey,* 431 U.S. 606 (1977). The Supreme Court endorsed the search of suspicious packages from Thailand by postal inspectors in New York City, insofar as the inspectors had "reasonable cause to suspect" that the packages contained narcotics. Citing the longstanding common law right of the sovereign to search incoming vessels and persons for contraband or smuggled goods, the Court held that "searches made at the border [. . .] are reasonable simply by virtue of the fact that they occur at the border," and that the framers of the Constitution had clearly intended some exception to the Fourth Amendment in this context. 431 U.S. at 616-17. The Court explained that

a port of entry is not a traveler's home. His right to be let alone neither

2

> prevents the search of his luggage nor the seizure of unprotected, but
> illegal, materials when his possession of them is discovered during
> such a search. Customs officials characteristically inspect luggage and
> their power to do so is not questioned in this case; it is an old practice
> and is intimately associated with excluding illegal articles from the
> country.

*Id.* at 618 (quoting *United States v. Thirty-seven Photographs,* 402 U.S. 363, 376 (1971)).

### The Fourth Amendment's protections for mobile phones

This doctrine would seem to be a "slam-dunk" for the government. The fatal problem, however, is that *Ramsey* and the precedent it relies upon vastly antedates modern mobile phones and more recent Fourth Amendment case law surrounding them.

In *United States v. Riley,* 573 U.S. 373 (2014), the Supreme Court held that the Fourth Amendment protects the contents of mobile phones because of their increasing sensitivity and ubiquity in modern American society. Riley's phone had been searched without a warrant by a police officer during a routine traffic stop because the officer found suggestions that Riley was a member of the "Bloods" street gang in his car, and wanted to find further evidence of gang-related activity on his mobile phone. 573 U.S. at 379. The officer justified this as a search incident to arrest. *See Chimel v. California,* 395 U.S. 752 (1969). The Supreme Court reasoned that this exception, designed to find physical evidence or weapons on a suspects person, was inapplicable. Mobile phones, unlike a defendant's pockets or wallet, contained too much personal, sensitive information to be treated as any other property, especially given its ubiquity in modern American life: "modern cell phones [. . .]

3

are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars

might conclude they were an important feature of human anatomy." 573 U.S. at 385. But it

is not merely their ubiquity which makes them so sensitive:

> Modern cell phones, as a category, implicate privacy concerns far
> beyond those implicated by the search of a cigarette pack, a wallet, or
> a purse. A conclusion that inspecting the contents of an arrestee's
> pockets works no substantial additional intrusion on privacy beyond
> the arrest itself may make sense as applied to physical items, but any
> extension of that reasoning to digital data has to rest on its own
> bottom.

*Id.* at 393. The Court observed that warrantless searches had generally been licensed under

the Constitution "by assessing, on the one hand, the degree to which [a search] intrudes upon

an individual's privacy and, on the other, the degree to which it is needed for the promotion

of legitimate government interests." *Id.* at 385 (quoting *Wyoming v. Houghton,* 526 U.S. 295,

300 (1999)). Given the extraordinary and unprecedented amount of personal information

contained in most cell phones ("[t]hey could just as easily be called cameras, video players,

rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or

newspapers," *id.* at 393), the Court reasoned that warrantless searches of phones are thus too

intrusive to fall into any exception to the Fourth Amendment's warrant requirement:

> In 1926, Learned Hand observed (in an opinion later quoted in
> *Chimel*) that it is "a totally different thing to search a man's pockets
> and use against him what they contain, from ransacking his house for
> everything which may incriminate him." *United States v.*
> *Kirschenblatt*, 16 F. 2d 202, 203 (CA2). If his pockets contain a cell
> phone, however, that is no longer true. Indeed, a cell phone search
> would typically expose to the government far more than the most
> exhaustive search of a house: A phone not only contains in digital
> form many sensitive records previously found in the home; it also
> contains a broad array of private information never found in a home

in any form—unless the phone is.

*Id.* at 396-97. Thus, a search of a mobile phone is not like merely looking through a person's pockets, or in loose papers next to them on a car seat; it is equivalent to conducting a thorough raid of their most sensitive papers and personal information.

### The problem with searching phones at the border: the free border search should not be used to further ongoing domestic investigations

It is unsurprising that the "free border search" doctrine and the recent doctrine on mobile phones from *Riley* have come into conflict. While some cases have generally affirmed the right of border agents to search phones, these cases hinge on the reasoning articulated in *Ramsey* that border searches are justified to hunt for contraband and any evidence of a crime *that a foreign national entering the U.S.* might be committing by entering the country. What separates Mr. Bongiovanni's case from that precedent is the fact that he, a U.S. citizen, was already a target of a domestic law enforcement investigation, and CBP agents admitted in their report of their search of his phone that they were investigating him because of his suspected involvement in criminal activity within the U.S., *not* to screen for contraband or prevent commission of a suspected crime during entry. A growing number of courts have rejected or limited the free search of phones at the border *per se* as an overreach neither contemplated nor justified by *Ramsey* or its progeny. Mr. Bongiovanni's case should follow the same pattern.

*Cases limiting the free border search*

There is currently a circuit split on whether free border searches should include thorough searches of cell phones. The Second Circuit has not yet taken a side on the issue, but the preponderance of decisions limiting such searches, and the soundness of their reasoning, should assure this Court that it has the power to find the search of Mr. Bongiovanni's phone to have been intrusive.

In *United States v. Cano,* 934 F.3d 1002 (9th Cir. 2019), a panel of the Ninth Circuit Court of Appeals reversed the denial of a suppression motion brought by a defendant whose phone had been searched at the border under the "free border search" doctrine. Cano was arrested crossing the U.S.-Mexico border at Tiajuana after several large, vacuum-sealed packages of cocaine were found hidden in his truck. After his arrest, agents began to search his phone without a warrant. They found messages suggestive of arrangements for a suspicious rendezvous. *Id.* Cano moved to suppress these messages, which was denied. He was convicted after a trial. *Id.*

Reversing this decision, the Ninth Circuit reasoned that any warrantless search must be constrained by the permitted scope of the search and by the inherent intrusiveness of the search. 934 F.3d at 1011. As to scope, the panel cited *Riley* in concluding that phones are perhaps inherently beyond the scope of what *Ramsey* and other cases had intended. As to intrusiveness, the panel compared Cano's case with that of the defendant in *United States v. Montoya de Hernandez,* 473 U.S. 531 (1985). Montoya had been stopped at the border and, on suspicion she had swallowed cocaine-filled balloons, was subjected to a rectal

examination. This was done pursuant to an order from a magistrate judge, but this order was *not* a warrant supported by probable cause. 473 U.S. at 533-40. The Supreme Court held that the search was far too intrusive to be warrantless, notwithstanding the fact it had happened at the border, and that the level of intrusion ought to have required a warrant with particularized probable cause. *Id.*

A third factor which the *Cano* panel had to consider was the body of case law allowing border agents to conduct *brief* searches of phones to both ensure the identity of the traveler and to prevent entry of "digital" contraband–which, in almost every case, means the presence of child pornography. *Id.* at 1013-14 (citing *Carroll v. United States*, 267 U.S. 132 (1925)(allowing search of border-entrants to verify identity and lawfulness of their possessions)). In situations where law enforcement had suspicion that a particular person's phone might have contained child pornography, more intrusive warrantless searches had been sanctioned. *Id.* (citing *United States v. Cotterman,* 709 F.3d 952 (9th Cir. 2013)(en banc)(brief searches for contraband are permissible, but forensic searches on suspicion of more particularized crimes are not)).

Reconciling these doctrines, the *Cano* panel reasoned that the search of Cano's phone was not the kind of generic, randomized search of a phone that any entrant to the U.S. border could reasonably expect. Beyond a brief look for the presence of *digital* contraband, the thorough search was actually targeted at finding further evidence of a suspected crime, but was not supported by a particularized warrant founded on probable cause.

In a similar case, *United States v. Aigbekaen,* 943 F.3d 713 (4th Cir. 2019), a panel

7

of the Fourth Circuit affirmed the conviction of a man suspected of sex trafficking whose electronic devices had been confiscated for over a month and forensically searched as part of a border crossing. The panel affirmed the conviction after ruling that these searches were unconstitutionally intrusive and beyond the scope of proper border searches, sustaining the search only under the "good faith" exception because the search, which happened in 2015, had preceded many of the opposing circuit decisions on the issue. The *Aigbekaen* panel did, however, make clear that the type of search to which Mr. Bongiovanni was subjected here would be deemed inappropriate moving forward:

> ***The Government may not invoke the border exception on behalf of its generalized interest in law enforcement and combatting crime.*** This restriction makes particularly good sense as applied to intrusive, nonroutine forensic searches of modern digital devices, which store vast quantities of uniquely sensitive and intimate personal information, yet cannot contain many forms of contraband, like drugs or firearms, the detection of which constitutes the strongest historic rationale for the border-search exception.
>
> To conduct an intrusive and nonroutine search under the border search exception (that is, without a warrant), ***the Government must have individualized suspicion of an offense that bears some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband***. If a nonroutine search becomes too "attenuated" from these historic rationales, it no longer will fall under the exception. In such circumstances, the search will be unconstitutional unless accompanied by a warrant or justified under a different exception to the warrant requirement.

943 F.3d at 721 (emphasis added). The panel added, rejecting a specific finding by the lower court that the government's border security interests "trump" all other considerations, that *Riley* and other cases clearly mandate a balancing of those interests against their level of

intrusiveness. *Id.* at 722. Also, Aigbekaen did not challenge routine border searching *per se,* only the type of intrusive, warrantless search to which he had been subjected. *Id.* "[T]he ultimate touchstone of the Fourth Amendment is reasonableness [. . .]. [T]he reasonableness of requiring law enforcement to secure a warrant before conducting an intrusive forensic search of a traveler's digital device, solely to seek evidence of crimes with no transnational component, is readily apparent." *Id.* (quoting *Riley,* 573 U.S. at 381)(internal quotation marks omitted).

In another case, *Alasaad v. Nielsen,* 419 F.Supp.3d 142 (D. Mass. 2019), a U.S. district court judge in Massachusetts entered summary judgments for plaintiffs who alleged that their Fourth Amendment rights had been violated by intrusive searches of their electronics at the U.S. border, including both "basic" and "advanced" searches. The court also rejected the government's urgent claims about its need to enforce criminal laws at the border, observing that

> To the extent that the government attempts to invoke "general law enforcement" purposes, that is not what gives rise to the border search exception, *Cano*, 934 F.3d at 1013, even as "the interdiction of contraband can serve both customs and law enforcement purposes." *United States v. Smasal*, No. Crim. 15-85 JRT/BRT, 2015 U.S. Dist. LEXIS 105923, 2015 WL 4622246, at *10 (D. Minn. June 19, 2015) (Report and Recommendation). "No doubt a text message or email may reveal evidence of crimes, but that is true both at and inside the border. But it is uncertain whether the evidence-gathering justification is so much stronger at the border that it supports warrantless and suspicionless searches of the phones of the millions crossing it." *United States v. Molina-Isidoro*, 884 F.3d 287, 295 (5th Cir. 2018) (Costa, J., specially concurring).

*Id.* at 156.

9

In yet another case, *United States v. Djibo,* 151 F.Supp.3d 297 (E.D.N.Y. 2015) *rev'd on other grounds,* 730 Fed.Appx. 52, an individual stopped at the border while entering from Morocco was found with heroin in his suitcase. Agents seized this man's phone and searched it, through which they discovered text messages with the defendant, Djibo, containing what they later alleged were coded conversations about smuggling the heroin. *Id.* at 298. Learning that Djibo was planning to leave JFK airport for London, agents arranged to intercept him there, where they told him he was being subjected to a "border enforcement exam" to search for "any money" or "contraband" he might have had. *Id.* Agents, taking Djibo aside, found a number of phones in his luggage, including an iPhone for which they asked Djibo for the passcode. Djibo was then arrested. There was considerable ambiguity about when the passcode was obtained and later used–whether before Djibo was arrested, when he invoked his *Miranda* rights, or after.  In either case, the agents claimed to have used the passcode at some point to conduct what they termed a "peek" at the phone, which yielded over 921 pages of material allegedly taken from the phone, "including hundreds of text messages, WhatsApp[2] messages, photographs, and emails." *Id.* at 303. The government later sought and obtained a search warrant for the phone, but later consistently represented that the 921 pages of material had been obtained just from the brief "peek," rendering the warrant essentially useless. *Id.* at 309.

In reviewing a motion to suppress the contents of the phone, the district court found that the search of the phone had been improper for a number of reasons. First, by stopping Djibo, asking him for a passcode, and likely searching his phone *before* arresting him and

---

[2]  A free, encrypted program for exchanging messages that can be used on mobile phones.

advising him of his *Miranda* rights, the agents had likely sought "to expand the definition of a 'border search' in a way this Court cannot abide and in a way that invokes *Wong Sun v. United States,* 371 U.S. 471 (1963)(suppressing drugs found following a warrantless search as 'fruit of the poisonous tree') and its progeny." *Id.* at 309. Second, though the Court (barely) credited agents' statements that there was plausible reason to search for contraband, "the search was undertaken to find contraband and currency and neither were found. There was no need to then seek out Djibo's passcode. It had nothing to do with national security at the airport on that day." *Id.*

### The search was unjustified and impermissibly intrusive

The facts of the cases above are, viewed together, similar to the facts alleged here. The government will claim that it had prior belief that Mr. Bongiovanni was engaged in "narcotics trafficking activity" (viz. *Cano, Aigbekan, Djibo*), though in fact it has not alleged that he personally trafficked narcotics, only that he conspired to help others do so. The government will argue this was sufficient reasonable suspicion to search, but the cases above clearly show evidence of prior ongoing crime is insufficient, even in *Cano* where the defendant was actually caught with large quantities of drugs. *Ramsey* makes clear that the government's search power must be reasonably connected to searches for contraband (i.e. drugs, or in digital terms, child pornography), or to ensure the subject's identity. Here, there was never any suspicion that Mr. Bongiovanni had contraband, or that he was not who he said he was. Indeed, the government says that it searched Mr. Bongiovanni *because* they

knew who he was.

Moreover, the government's disclosure of the contents of Mr. Bongiovanni's phone and those of his wife and stepson show the intrusive extent of even such a "basic" search. The contents include the phone's entire internet browsing history, every photo saved on all three phones, call logs, and messages. The unnecessary exposure of such private information–not just for Mr. Bongiovanni but also for his wife, who is not alleged to have any connection to his accused activities, or for his adolescent stepson–is manifest. This search was unduly intrusive to qualify as a "routine" border search.

## 2.    *The good faith exception is inapplicable*

The government may attempt to bypass the reasoning of *Cano* and other decisions above by arguing that border agents did not know about the limitations of the "free border search" and thus relied on their old, misused, and mis-named friend the "good faith exception" in effecting their search. *See, generally, United States v. Leon*, 468 U.S. 897 (1987)(establishing good faith exception to exclusionary rule). This argument, however, will not succeed.

Even when it established the border search concept in *Ramsey*, the Supreme Court did not claim that the "free border search" allows the depth and intrusiveness allowed in Mr. Bongiovanni's case, nor has it done so since. Such a claim would not square with the historic doctrine allowing such searches, as observed by the courts in *Cano, Aigbekaen,* and *Alasaad.*

12

After *Riley,* the government cannot continue to argue that *carte blanche* seizure and search of phones at the border is in any way a good faith national security measure, especially where, as here, government agents *admit* in writing that they conducted the search "because" the defendant was a target in an ongoing investigation. Not only was the search unreasonably intrusive under any rationale, it was obviously not connected to the kind of justifications for warrantless border searches articulated under *Ramsey*. Also, as noted in Mr. Bongiovanni's affidavit (Ex. C at ¶¶ 5, 6), agents lied to Mr. Bongiovanni and told him it was a "random" search in order to delay him and his family.

The precedent which creates these searches itself limits them. Thus, agents cannot claim in good faith that they did not know they could do warrantless border searches without also admitting they would know the intrinsic limitations on them. Nor can they claim that they effected such a search here, when their own memorandum of the encounter shows it was done deliberately because Mr. Bongiovanni was the target of an ongoing investigation.

# Targeting Mr. Bongiovanni's Cell Phone

Under the cases cited above, following *Riley,* the first factual issue which must be addressed is whether the government improperly targeted Mr. Bongiovanni's cell phone. Government witnesses all agree that referring Mr. Bongiovanni to the secondary inspection was a tool which would be used to obtain and search his cell phone.  The CBP agents also took his wife's, Lindsay's, cell phone, but that was apparently part of the pretense to make

it seem as if this seizure and search of cell phones was random. (Exhibit 34, Email of Thomas

Mozg, CBP, 4/23/19 at 5:06 p.m.)   Lindsay was even told it was a random search. (T 226,

L 6)   DHS Agent Ryan admitted she was not the target of a search and her phone was not

subjected to an attempted download from the DOMEW System. (T 207, L 9)   Agent Mozg

even made suggestions for how the CBP agents might treat Mr. Bongiovanni. (Exhibit 34)

While DHS Agent Ryan  and CBP Agent Gernatt testified that there was some interest

in a secondary search of Mr. Bongiovanni's luggage, personal possessions, etc., it was clear

that the target of this request was Mr. Bongiovanni's cell phone.   The important part of the

communications can be found in the email request from Agent Mozg to Michael Millich,

CBP, on April 23, 2019 at 2:46 p.m:

> "Subject: DOMEX REQUEST
>
> Mr. Millich:
> I'm contacting you per CBPO Jack Gernatt's instructions.   The
> following subject is part of an HSI Buffalo investigation (case:
> BU13ZA16BU0023) involving Transnational Organized Crime.   We
> are requesting discretionary dissemination of the request for a
> DOMEX extraction of the passenger's cell phone.   The subject is
> recently retired from Federal law enforcement.
>
> I entered a 1 Day Lookout for a referral (P3N00052300C96)-"

(Government Exhibit 34, pp 3 and 4)

This communication from CBP Buffalo Agents to CBP Baltimore Agents, although

limited, is the only one containing details of the investigation.   The official request forms had

no details.   This puts the search and seizure of Mr. Bongiovanni's cell phone into an area of

misuse of the border search exception recognized in *Riley*.

Even, however, if the Court finds it was a request for a complete secondary search, it does not end the argument.   The request for a complete secondary search of luggage, person, or other possessions of passengers at a port of entry is permissible.   The contents of the cell phone are still treated differently frm the other possessions.   This means that couching the cell phone search in a complete secondary search which is conducted will not alter the argument.  Part of the border search would be permissible and part not.  The cell phone search stands apart and the analysis above must be applied.  Whether the testimony regarding the complete secondary search is accurate, however,does not matter.

# Uses of Border Search Information

The information derived from the search of Mr. Bongiovanni's phone at the BWI Airport (Exhibit 1) was used in many ways in the investigation leading to his indictment. DEA Agent Ryan used it to find other records (T 187, L10) and used it to question Mr. Bongiovanni at his home on June 6, 2019. (T 173, L2)  CBP Agent Gernatt used it to investigate the persons named. (T 153, L23; T 287, L20,[Exhibit 13]). Upon information and belief, the information or information derived from it was used to obtain the following search warrants:

1.    19-m-5154 (MJ Roemer) May 31, 2019 for 85 Alder Place, Kenmore, NY (Exhibits 3 & 16);

15

2.      19-m-5209 (MJ Roemer), August 20, 2019 for unknown addresses (Exhibit 17);

3.      19-m-213 (MJ Schroeder), October 25, 2019 for Apple ID (Exhibit 25);

4.      19m-1065 (MJ Foschio), June 17, 2019 for electronic devices; and

5.      19-m-1056 (MJ McCarthy), June 4, 2019 for Joseph Bongiovanni.

And, the derivative information from it could have been, and most likely was, used by law enforcement agents in this multiple agency investigation to obtain other unknown evidence, information, and/or witnesses in this case. This information apparently did not result in any of the persons identified in Exhibit 1 being charged with crimes, but neither the Court nor Mr. Bongiovanni can know the other derivative uses and end products resulting from it including further witnesses and/or discovery of other evidence.

In the Court's protective order, the defense has been unable to review the applications for search warrants to make its own determination and arguments for the amount of taint from the use of Exhibit 1 and its derivatives toward the obtaining of those search warrants. In this situation, it now falls on the Court to have to make that analysis without the input from the defense and without complete background or information. During the hearing, the Court discussed this issue. (T p. 190, line 14 - 197) As imperfect and inadequate as that procedure is and recognizing it eliminates the defense from exercising Mr. Bongiovanni's constitutional rights under the 4th Amendment, the defense must make the request for the Court to do this analysis. A review of search warrant applications will, however, not be

sufficient because the tainted evidence in question goes far beyond the search warrants.

When CBP Agent Ryan began testifying, he stated that his questioning of Mr. Bongiovanni on June 6, 2019 at his home was "wholey independent" of information from the BWI Airport search.  (T 121, L 11)   He later, on multiple occasions, said that the names of the persons from that search, Exhibit 1, were used to question Mr. Bongiovanni at his home. (T 153, L 12; T 156, L 10)   He even told Mr. Bongiovanni that the names he was asking him about were from the BWI Airport search.  (T 173, L 2)   He did not have Exhibit 1 with him to question Mr. Bongiovanni, but used the analysis of CBP Gernatt, Exhibit 13, which was made from Exhibit 1.  (T 153, L 23; T 208, L 20)

Mr. Tripi asked numerous questions of DEA Agent Ryan using Exhibit 11, Agent Ryan's ROI which was made up of information which he had derived from Exhibits 1 and 13. (T 142-156)   Mr. Tripi went through many names of persons including those in Exhibit 1 and asked whether Agent Ryan had other sources from which he could ask questions about persons in Exhibit 1.  Based on the limitations imposed on the defense, it is impossible to question the veracity or correctness of Agent Ryan regarding his answers to these questions. The Court's analysis does not require an allegation of untruthfulness because there are other reasons why a person could believe something is correct where it is not in fact actually correct, either in whole or in part.  Unfortunately under these circumstances, the defense is constrained and restricted from doing an examination and challenge.

17

# Conclusion

Mr. Bongiovanni respectfully requests that the Court find that the border seizure of the contents of his cell phone at the BWI Airport was improper and unconstitutional; that any evidence derived from this search must be suppressed; that the Court direct the government to produce any and all evidence derived from this seizure; and that the Court, in the alternative, review the derivative evidence and search warrant applications to determine possible disclosure to the defense or make its own determination of evidence to be suppressed.

Dated:  March 25, 2022

Respectfully submitted,
/s/ James P. Harrington

James P. Harrington, Esq.
HARRINGTON & MAHONEY
70 Niagara Street, 3rd Floor
Buffalo, NY  14202-3093
(716) 853-3710 (*facsimile*)
(716) 853-3700 (*voice*)
jph@harringtonmahoney.com

18