IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     v.          19-CR-227-JLS

JOSEPH BONGIOVANNI, et al.

       Defendant.

## SUPPLEMENTAL POST-HEARING MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO SUPPRESS BORDER SEARCH OF A CELL PHONE

  The United States of America, by and through its attorneys, Trini E. Ross, United States Attorney for the Western District of New York, and Corey R. Amundson, Chief of the Public Integrity Section, Joseph M. Tripi, Brendan Cullinane, and David J. Rudroff, Assistant United States Attorneys and Jordan Dickson, Trial Attorney, Public Integrity Section, of counsel, hereby files this supplemental post-hearing brief as directed by the Court brief on the issue of whether the Court should, under Fourth Amendment principles, suppress evidence uncovered during a search of the defendant's cell phone performed at a port of entry to the United States.  For the reasons articulated below, and any other points and authorities articulated in prior briefings of this issue and at oral argument, the Court should deny the defendant's motion to suppress.

## INTRODUCTION

  The "touchstone of the Fourth Amendment is reasonableness," which is evaluated "by assessing, on the one hand, the degree to which [a search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate

governmental interests." *United States v. Knights*, 534 U.S. 112, 118–19 (2001) (internal quotation marks and citation omitted).   Searches at the international border, where "the [g]overnment's interest in preventing the entry of unwanted persons and effects is at its zenith," *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004), have long been held exempt from the warrant requirement. *Id.* at 152–53. This exception derives from "the longstanding right of the sovereign to protect itself," as well as its authority to collect duties from those entering the country. *Id.* (internal quotation marks and citation omitted).

"Routine searches of the persons and effects of entrants are [thus] not subject to any requirement of reasonable suspicion, probable cause, or warrant." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). Rather, routine "searches made at the border ... are reasonable simply by virtue of the fact that they occur at the border," *United States v. Ramsey*, 431 U.S. 606, 616 (1977), or its functional equivalent, *see Almeida-Sanchez v. United States*, 413 U.S. 266, 272–73 (1973) (noting that routine border searches "may in certain circumstances take place not only at the border itself, but at its functional equivalents as well"); *United States v. Levy*, 803 F.3d 120, 122 (2d Cir. 2015) ("It is well established that the Customs area of an international airport is the functional equivalent of a border for purposes of the border search doctrine.").

Here, law enforcement from different agencies and located in different parts of the country, coordinated with one another by proactively sharing information about an individual believed to be a corrupt and recently retired DEA agent.   The retired DEA agent, defendant Bongiovanni, was a target of a Transnational Organized Crime (TOC) investigation in the

Western District of New York.  This coordination was a common sense and prudent step by law enforcement, which led to the routine border search of defendant Bongiovanni's cell phone during a secondary inspection at BWI airport as Bongiovanni was entering the United States following travel to the Dominican Republic.  As the Second Circuit has held, this type of interagency coordination "is to be commended, not condemned." *United States v. Levy*, 803 F.3d 120, 123 (2d Cir. 2015)

## SUMMARY OF RELEVANT FACTS

In this case, Customs and Border Protection (CBP) officers at BWI airport were given advance notice that an individual under federal investigation was going to be traveling through their port of entry.  That individual was identified as Joseph Bongiovanni, and there was information placed into the TECS database indicating that, according to information developed by Homeland Security Investigations (HSI), Bongiovanni should be referred for secondary inspection.  In addition, prior to the search and Bongiovanni's arrival at BWI, there was an email sent from a CBP investigator working with HSI in Buffalo, New York specifically notifying CBP at BWI Airport that Bongiovanni was part of a Transnational Organized Crime (TOC) investigation.  As a result, as detailed *supra*, while a suspicionless search is permissible at the border, this was a situation where the requisite particularized suspicion of Bongiovanni was supplied directly by fellow members of law enforcement to CBP officers at BWI airport.

After Bongiovanni was referred to secondary inspection, he and his wife turned over their unlocked cell phones to CBP.  After obtaining Bongiovanni's phone, officers attempted

to hook it up to a tool which could forensically extract the entirety of the phone, but the forensic extraction tool did not work.  As a result, the officers resorted to manually scrolling through the contact and text message screens of the cell phone, and taking pictures of some of the contacts and the screen where the "to and from" portions of text messages were located. Notably, the photos of the text messages were not the full conversations, but consisted merely of some of the text message screens (not the fully opened text messages).  Fifteen minutes after the cell phone search began, Bongiovanni and his wife's phones were returned and they made their connecting flight from BWI to Buffalo, New York.

No content from Bongiovanni's cell phone was forensically extracted, duplicated, or analyzed.  Had any such extraction or duplication occurred, it would have resulted in the seizure of exponentially more information from Bongiovanni's phone.  As detailed *supra*, the fact that some photographs of the contacts and text messages screens of Bongiovanni's phone were taken did not transform a routine search (described as a cursory or manual search in CBP parlance) into a nonroutine (forensic) search.  Additional facts will be described as necessary below, and the government incorporates the facts set forth in its Post-Hearing Brief (*see* Doc. No. 263) by reference as though set forth fully herein.

Approximately two months after the border search, Bongiovanni's cell phone was seized by HSI and other agents executing a federal search warrant at his residence in this District.  The next day, the case agent obtained a search warrant to search Bongiovanni's cell phone.  After the phone was seized, it was searched pursuant to a search warrant when, for

the first time, it was forensically extracted (as opposed to the brief manual scroll through the phone at the border at BWI airport).

## ARGUMENT

### I.     The Manual Search of Bongiovanni's Cell Phone was Routine

As numerous courts have observed, the precise line between what is routine and what is not routine has not been clearly delineated.  On the one hand, it has been held that "[r]outine searches include those searches of outer clothing, luggage, a purse, wallet, pockets, or shoes which, unlike strip searches, do not substantially infringe on a traveler's privacy rights." *Tabbaa v. Chertoff,* 509 F.3d 89, 98 (2d Cir. 2007) (citing *United States v. Grotke,* 702 F.2d 49, 51–52 (2d Cir.1983)).  By contrast, "more invasive searches, like strip searches, require reasonable suspicion." *Id.* The Supreme Court has stated that "non-routine" searches include "strip, body cavity, or involuntary x-ray searches." *Montoya de Hernandez,* 473 U.S. at 541 n. 4.  The determining factor is not how ordinary or commonplace a search is, but rather "the level of intrusion into a person's privacy." *United States v. Irving,* 452 F.3d 110, 123 (2d Cir. 2006).

In this case, there was a minimal level of intrusion into Bongiovanni's privacy.  The cell phone search was conducted by manually scrolling through the phone while it was in airplane mode and unable to access the internet or any third-party provider.  Moreover, the search lasted only 15 minutes, and resulted in limited information consisting of a partial contact list and text-message contacts totaling 14 pages (*see* Govt. Ex. 1).   The search

conducted was brief, manual, and limited, that is, it was routine.  The search was not a full forensic search, which some courts have determined to be nonroutine.

The type of manual cell phone search conducted in this case is akin to the search conducted in this District as described in *United States v. Young*, No. 12-CR-00210-RJA-JJM, 2013 WL 885288 (W.D.N.Y. Jan. 16, 2013).  In *Young,* during a border investigation, "[t]he arresting officials seized three cell phones belonging to the defendant. One cell phone was removed from his person and two from inside his truck. Sometime thereafter, in the absence of consent, a search warrant or exigency, each of the cell phones was searched and evidence was recovered from them." *Id.*  Further in *Young*, approximately one month later, United States Magistrate Judge Jeremiah J. McCarthy signed search warrants authorizing the search of the three phones.  The agent stated, "that he found the first cellular telephone on defendant's person and he reviewed it, locating a text message." *Id.* at 1.  The opinion in *Young* did not elaborate upon the precise extent of the cell phone searches at the border, or how the searches were documented by law enforcement, but the government's response in opposition to the defendant's motion to suppress described the cell phone search as follows:

> CBP Officers seized and searched two cellular telephones (one from YOUNG's person and one from the glove compartment of the cab), and retrieved the text message referred to [ ], which stated: "Stegelski Ave, Dunkirk, NY 4/29 t: 7163363660Del to Jacksonville, FL 05/01- 1pm $1500." CB 954-295-6256 Apr 29, 9:12 am".

*See*, Case 1:12-cr-00210-RJA-JJM, Doc. No. 27.  Neither the opinion nor the government's filing stated whether or not the text message in *Young* was simply memorized by the agents and included in a written report, transcribed verbatim, and/or photographed.  However, the opinion cited several cases for the proposition that "searches of a person's luggage or personal

6

belongings are routine searches[,]" and that "[s]earches of computers and electronic devices are likewise considered routine searches that may be conducted in the absence of reasonable suspicion." *Young*, 2013 WL 885288, at *2 (collecting cases) (citations omitted).

The level of privacy intrusion in *Young*, which involved a HSI agent manually scrolling through cell phones at the border and documenting the text message contents in some way, is no different than the level of intrusion to which Bongiovanni was subjected.  Here, CBP officers manually scrolled through Bongiovanni's phone for about 15 minutes and photographically documented a limited amount of information from the phone before Bongiovanni and his family made their connecting flight to Buffalo, New York. *See*, *Irving*, 452 F.3d at 123 ("the level of intrusion into a person's privacy is what determines whether a border search is routine.").  The only difference between the search in *Young* and the search conducted in this case is that this Court knows with certainty that the agents manually looked at a very limited amount of Bongiovanni's cell phone because they took photos of exactly what they did.   In *Young*, Judge McCarthy, in a Report and Recommendation adopted by the District Court, denied the defendant's motion to suppress the border search of the cell phones without a hearing.  *See also, United States v. Jenkins*, No. 5:11-CR-0602 (GTS), 2013 WL 12204395, at *2 (N.D.N.Y. Dec. 12, 2013) (the court determined that the search of a defendant's non-password-protected laptop and thumb drive was both routine and cursory under the relevant law).

In *United States v. Hampe,* 2007 WL 1192365 (D.Me. Apr.18, 2007), the court found that a computer search at the border, which consisted of opening and perusing files with icons

located on the computer's desktop, was routine and did not require reasonable suspicion.  In *Hampe*, the officer "did not engage in any kind of sophisticated search but he did click open a couple of the icons he observed on the desktop." *Id.* at *4.  The court held that the search of the icons on the computer desktop was routine because it "did not implicate any of the serious concerns that would justify characterizing this particular search as 'non-routine.'" *Id.* at *4. The government submits that CBP officers scrolling through a limited amount of Bongiovanni's contacts, and some of the text message screens, in Bongiovanni's phone (and documenting what they did by taking photographs), is no more intrusive than searching an Apple/Macintosh computer for pictures by clicking on icons on the computer's desktop.

In *United States v. Bunty*, the defendant was referred for a secondary inspection after U.S. Customs and Border Protection agents compared the passenger manifest of his flight with National Crime Information Center ("NCIC") databases and determined that he had been arrested in Lancaster County, Pennsylvania on child sexual abuse charges and recently had pled guilty to corrupting the morals of a minor in that case.  617 F. Supp. 2d 359, 363 (E.D. Pa. 2008).  During the secondary border inspection at the airport, federal agents searched the defendant's luggage without his consent, and they discovered two laptop computers, a digital camera, a cell phone that appeared to be capable of taking and storing digital images, and a variety of compact electronic storage devices, including a floppy disk and several compact discs, movie DVDs, and flash drives. *Id.*  They also found a letter from [defendant's] Lancaster County Probation Officer giving him permission to travel to England and the Probation Officer's business card, which revealed that the Probation Officer was assigned to supervise sex offenders. *Id.*  With respect to the floppy disk, agents inserted the

disk into a government-owned computer, searched the six files contained on the disk, and each file contained a digital image the agents believed to be child pornography. *Id.* Agents allowed the defendant to leave the airport, but kept all of his computer equipment capable of storing digital images. *Id.* at 363-64. A subsequent "forensic examination" of a flash drive revealed the same six images the agents found on the floppy disk while searching at the airport. *Id.* The *Bunty* court determined that the search, including the search of the floppy disk and forensic search of the computer equipment, was a routine search and that reasonable suspicion was not required. *Id.* at 365.[1]

In *United States v. Ramirez*, No. EP-18-CR-3530-PRM, 2019 WL 3502913, at *1 (W.D. Tex. Aug. 1, 2019), in a case decided after the border search at issue here, the defendant presented his United States passport card who scanned it into the computer. At that point, the Treasury Enforcement Communication System (TECS)[1], a computerized database, generated a referral that alerted the officer that Defendant might have child pornography and was possibly associated with the purchase of child pornography. *Id.* Specifically, the TECS record indicated:

> SUBJ LINKED TO THE PURCHASE OF CHILD PORNOGRAPHY and
> IF ENCOUNTERED, REFER TO SECONDARY[2]

---

[1] The *Bunty* court went on to explain that there was also reasonable suspicion. *Id.*

[2] As detailed infra, the TECS record in this case requested Bongiovanni to be referred for secondary inspection, and an email sent from a member of the investigation specifically identified Bongiovanni as a subject in a Transnational Organized Crime investigation being conducted by Homeland Security Investigations in Buffalo, New York.

*Id.* The TECS entry did not provide any additional information, and at that point the searching officer was instructed to "go through" the cell phone, which the officer did and observed what he believed to be child pornography. *Id.* Later, another agent executed a search warrant on the phone and "performed a forensic examination of the cell phone, revealing approximately 1,400 files containing child pornography […] [t]he forensic examination involved plugging a device into the cell phone and applying forensic software." *Id.* at *4. Similar to this case, in *Ramirez* the government argued that the "cursory, manual" search of the defendant's phone at the border was a routine border search requiring no suspicion and/or, alternatively, that even if the search were not routine, the TECS referral provided the reasonable suspicion to manually search the phone. *Id.* at *5. After reviewing the current legal landscape, including cases from the Ninth, Fourth, and Eleventh Circuits, the court in *Ramirez* observed:

> In sum, though some courts have declined to decide the precise level of suspicion required for the search of an electronic device at the border, the courts that have addressed the issue have not yet required more than reasonable suspicion for *forensic searches* of electronic devices. Meanwhile, the Court is not aware of a case requiring any suspicion for the manual search of an electronic device at the border.

*Id.* at *14 (emphasis added). *Ramirez* further observed that a routine border search requires no justification, whereas a nonroutine search required particularized reasonable suspicion. *Id.* at *15-16. *Ramirez* further avoided characterizing the search conducted as either routine or nonroutine because, as will be discussed further *infra*, the TECS record, in part, provided reasonable suspicion for the search and, the agents relied upon pre-*Riley* caselaw in good faith. *Id.* ("because *Riley* left open the possibility that "other case-specific exceptions may still justify a warrantless search of a particular phone," it was reasonable for the agents to rely on the pre-

*Riley*[3] case law that allowed warrantless border searches of electronic devices. *Id.* at 292

(quoting *Riley*, 134 S. Ct. at 2494)").

In *United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018), the Fourth Circuit distinguished

between what is a routine and nonroutine search of a cell phone and held that reasonable

suspicion is required for a forensic search of a cell phone in the context of a border search.

Specifically, in *Kolsuz*, the defendant's cell phone was searched twice and the court

distinguished between the first and second search of the cell phone as a "manual search" and

a "forensic search", as follows:

> After transporting Kolsuz to a secondary inspection area, the officers
> conducted what would be the first of two searches of Kolsuz's iPhone 6 Plus.
> This search—often referred to as a "manual" search—involved using the
> iPhone's touch screen, which was not password protected, to scroll through
> Kolsuz's recent calls and text messages. The officers also confirmed through a
> records search that Kolsuz had no export license or pending application for a
> license. After an interview with a number of CBP officers, Kolsuz was arrested.
>
> At that point, CBP Special Agent Adam Coppolo initiated the second search
> of Kolsuz's phone, this one commonly known as a "forensic" search. Coppolo
> first transported the phone approximately four miles from Dulles to the
> Homeland Security Investigations office in Sterling, Virginia. There, Computer
> Forensic Agent Michael Del Vacchio attached the phone to a Cellebrite
> Physical Analyzer, which extracts data from electronic devices, and conducted
> an advanced logical file system extraction. The phone remained in airplane
> mode throughout, so the forensic examination did not reach data stored
> remotely—or "in the cloud"—and was instead limited to data stored on the
> phone itself. Even so, **the data extraction process lasted for a full month, and
> yielded an 896–page report that included Kolsuz's personal contact lists,
> emails, messenger conversations, photographs, videos, calendar, web
> browsing history, and call logs, along with a history of Kolsuz's physical
> location down to precise GPS coordinates.**

*Kolsuz*, 890 F.3d at 139 (emphasis added).  While the Court in *Kolsuz* did not decide (because

the defendant did not challenge) the initial manual search of the cell phone, the Fourth

---

[3] *Riley v. California*, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014).

Circuit's opinion did not take any issue with the District Court's decision characterizing a "manual" search as routine and the later "forensic" search as nonroutine.  *Id.* at 140-41.  Here, the search of Bongiovanni's phone consisted of manually scrolling through the phone totaling 14 pages of photos (*see* Govt. Ex 1; *see also* T 120) and did not result in any data extraction process whatsoever or, as in the second search in *Kolsuz*, did not result in "an 896–page report that included [] personal contact lists, emails, messenger conversations, photographs, videos, calendar, web browsing history, and call logs, along with a history of Kolsuz's physical location down to precise GPS coordinates."  When the search in this case is compared to the second "forensic" search of the phone in *Kolsuz*, the government submits that even the Fourth Circuit in *Kolsuz* would likely characterize the search of Bongiovanni's cell phone in this case as routine. Indeed, the search of Bongiovanni's phone, which involved scrolling through the contact and text message screens, was similar to the first "manual" search in *Kolsuz*, and was as rudimentary and basic as a search of a cell phone could be.[4]


In *United States v. Almadaoji*, No. 3:18-CR-158, 2021 WL 4786615 (S.D. Ohio Oct. 14, 2021), based upon [defendant's] travels and answers during a six minute interview, the officer gave [defendant] an "electronic tear sheet" which explained the Government's authority to obtain and search phones. The officer further informed [defendant] that, unless he voluntarily submitted to a search of his phone, the Government could detain it for a forensic examination. The officer manually scrolled through the phone and did not hook up the phone to any forensic evaluation equipment or download its contents. *Id.* at *2.  Following the secondary

---

[4] There is no dispute between the parties that Bongiovanni's Samsung cell phone at issue is a smartphone capable of storing large amounts of data and information.

screening, the officer returned the cell phone, permitted [defendant] to leave, prepared an incident report [documenting observations from the phone], and forwarded the incident report to the Joint Terrorism Task Force.  *Id.* at *2-3.  The Court held that "there is no doubt the search of the [defendant's] cell phone was a manual, routine search[,] […] [a]s such, no warrant, no probable cause and no reasonable suspicion was required. The search fell squarely within the scope of the Fourth Amendment's border search exception."  *Id.* at *5.  The Court continued:

> Even if the Court had found that the search of [the defendant's] cell phone violated his Fourth Amendment rights, there would be no legal basis to exclude the evidence. At the very least, [the officer] had an objectively good faith belief that he was authorized to conduct a manual search of Defendant's cell phone. At the time of the search, the Supreme Court had held that routine border searches of persons and their belongings did not require reasonable suspicion, probable cause or a warrant. *Montoya de Hernandez*, 473 U.S. at 538, 105 S.Ct. 3304. Moreover, even though the Supreme Court, in *Riley*, acknowledged the significant privacy interests associated with searches of cell phones and other electronic devices, that case did not limit the Government's authority to conduct manual searches of those devices at the border. *See Laynes*, 481 F. Supp. 3d at 665.[5] In addition, *Cano*, the Ninth Circuit case which limited a manual search of electronic devices to a search for digital contraband, had not yet been decided.[6]

*Almadaoji*, 2021 WL 4786615, at *6.

Unlike the Ninth Circuit's decision in *Cano*, discussed *infra*, which had not been decided at the time of the search in this case, the Eleventh Circuit's decision in *United States v. Touset*, 890 F.3d 1227 (11th Cir. 2018) was decided over one-year prior to the search in this case.  In *Touset*, the Eleventh Circuit held that the Fourth Amendment does not require any

---

[5] *United States v. Laynes*, 481 F. Supp. 3d 657, 659 (S.D. Ohio 2020), *appeal dismissed*, No. 20-3968, 2020 WL 7382061 (6th Cir. Dec. 14, 2020).

[6] Similarly, *Cano* was decided months after the search at issue in this case.

suspicion even for the forensic search of electronic devices at the border. "The Supreme Court has never required reasonable suspicion for a search of property at the border, however non-routine and intrusive[.]" *Touset*, 890 F.3d at 1233. *Touset* further stated, "we have isolated three factors which contribute to the personal indignity endured by the person searched: (1) physical contact between the searcher and the person searched; (2) exposure of intimate body parts; and (3) use of force. These factors are irrelevant to searches of electronic devices. A forensic search of an electronic device is not like a strip search or an x-ray; it does not require border agents to touch a traveler's body, to expose intimate body parts, or to use any physical force against him. Although it may intrude on the privacy of the owner, a forensic search of an electronic device is a search of property. And our precedents do not require suspicion for intrusive searches of any property at the border." *Touset*, 890 F.3d at 1234 (internal citation omitted). *Touset* continued, "[S]imply put, we must apply the law and leave the task of developing new rules for rapidly changing technologies to the branch most capable of weighing the costs and benefits of doing so." 890 F.3d at 1237. Here, the manual search of Bongiovanni's cell phone was routine. However, this Court should conclude, consistent with the rationale in *Touset*, that neither a routine manual search, nor a nonroutine forensic search, require any suspicion at the border. In the alternative, the Court should determine that a routine search occurred in this case such that no level of suspicion was required, and that merely taking photos of a limited amount of information did not convert a manual routine search into a forensic nonroutine search.

In *United States v. Kamaldoss*, Kamaldoss was directed to a secondary inspection upon entry into the country at JFK Airport. 2022 WL 1200776, at *5 (E.D.N.Y. April 22, 2022).

14

During the secondary inspection, he was directed to open his luggage and supply passwords for his cell phone and laptop, and the devices were turned over to an HSI Computer forensic agent who imaged them, using a forensic software program called Cellebrite, and data was extracted from his phone before the devices were returned to him and he and his family were permitted to leave. *Id.* In a footnote, the Court noted that imaging refers to the act of "creat[ing] a digital copy of the hard drive that is identical to the original in every relevant respect." *Id.* at *5, n. 5. The District Court avoided the issue of deciding whether or not the search was routine or not routine because "if reasonable suspicion of a border-related offense was necessary, that standard was clearly met, and under the good faith exception, the search was permissible even if more was required." *Id.* at *9. In reaching its conclusion, *Kamaldoss* noted that "[i]n the context of searches of electronic devices, this distinction between routine and nonroutine searches is an area of evolving jurisprudence[;]" that "[n]either the Supreme Court nor the Second Circuit has "addressed the issue of border searches of electronic devices"[;] and that "[o]f the circuits that have addressed the issue, the Fourth and Ninth Circuits stand alone in concluding that forensic searches of electronic devices, which generally entail[ ] the connection of external equipment and/or the use of specialized software, are nonroutine and thus require reasonable suspicion." *Id.* at *10 (internal citations and punctuation omitted). Here, it is undisputable that Bongiovanni's cell phone was not imaged at the border and, therefore, there is no binding or persuasive reason for this Court to conclude that taking photos of some of the screens viewed by agents who manually scrolled through the phone amounted to a nonroutine "forensic" search of the cell phone. The search of Bongiovanni's phone did not, as in *Kamaldoss*, create an image copy "identical to the original in every respect." *See*, *id.* at *5, n. 5. Indeed, both HSI SA Ryan and CBP Officer

Kiplin Carter testified that a forensic search of Bongiovanni's phone would have resulted in "exponentially" more information from Bongiovanni's cell phone than the 14 pages of photos comprising Govt. Ex. 1.  T 10, 17 (describing that an advanced search, as opposed to a manual search, can extract "hidden files"), 18, 20, 25, 108-110.  Accordingly, *Kamaldoss* supports the government's position that the defendant's motion to suppress should be denied.

Based upon the facts established at the hearing, the weight of the legal authority described above, and in the government's initial post-hearing briefing (*see* Doc. No. 263), this Court should determine that the manual search of Bongiovanni's cell phone was a routine search and that no suspicion was required to search the phone at the border.  Moreover, even if reasonable suspicion was required, as described *infra*, officers had reasonable suspicion. Furthermore, the officers relied in good faith upon the body of pre-*Riley* (and post-*Riley*) caselaw justifying suspicionless searches of electronic devices at the border.

## II.   Even if the Court Considers the Search of Bongiovanni's Cell Phone to be a Nonroutine Search Requiring Reasonable Suspicion- CBP Officers at BWI had Reasonable Suspicion

### A. Facts

HSI Special Agent (SA) Curtis Ryan is supervisor in charge of agents responsible for investigating Transnational Organized Crime and illegal exports. T 85.  SA Ryan defined "transnational organized crime" as "any organized group that is seeking to exploit the Customs or Immigration laws of the United States," namely the United States borders and

the domestic crimes that flow from the border.  T[7] 85.  Prior to becoming a supervisor, SA Ryan was part of the Border Enforcement Security Task Force (BEST) responsible for investigating drug smuggling.  T 86-87.  SA Ryan has extensive training and experience, including significant training and experience in border search authority.  T 87-90, 98-99.  The mission of HSI is to conduct criminal investigations involving illegal movement of people, money, or contraband over the U.S. border, and they investigate a variety of associated crimes.  T 91.  Transnational organized crime groups effect almost all of the programmatic areas HSI enforces through its mission, including drug trafficking and drug smuggling.  T 91-92.

U.S. Customs and Border Protection (CBP) is an agency within the Department of Homeland Security that works closely with HSI, and CBP and HSI share information.  T 99-100.  As of April 2019, SA Ryan had been involved investigating defendant Bongiovanni prior to Bongiovanni's [abrupt] retirement on January 31 or February 1, 2019. T 101.  Due to his active investigation, SA Ryan learned that Bongiovanni was scheduled for international travel and was due to reenter the United States from the Dominican Republic at Baltimore Washington International (BWI) Airport on April 23, 2019.  T 101.  Due to the ongoing investigation, SA Ryan made efforts to flag Bongiovanni for a border search at BWI by coordinating with CBP.  T 102.  Specifically, SA Ryan worked with CBP in Buffalo, New York to coordinate with their CBP counterparts at BWI Airport to place a "one-day lookout"

---

[7] "T" refers to the transcript of the evidentiary hearing November 18, 2021, and as continued on January 5, 2022, and is followed by the specific page number.  The pages for each transcript are numbered consecutively, and the transcripts were attached as **Exhibit A** to Doc. No. 263.

on Bongiovanni, which flagged him to be referred for secondary inspection in the TECS system.  T 103-104; *see also*, Def. Ex. F.

CBP Agent Thomas Mozg, who was working with HSI and SA Ryan, became involved in the investigation of Bongiovanni in "late 2018, early 2019."  T 286-287.  Agent Mozg generated the TECS entry requesting that Bongiovanni be referred for secondary inspection (*see* Def. Ex. F), and provided supplemental information to his CBP counterparts at BWI advising them via email:

> [Bongiovanni] is part of an HSI Buffalo investigation (case: [number entered]) involving Transnational Organized Crime.  We are requesting discretionary dissemination of the request for a DOMEX extraction of the passenger's cell phone.  The subject is recently retired from Federal law enforcement.

T 298; Govt. Ex 34.  The precise manner of the secondary inspection or search was left to the discretion of CBP at BWI Airport.  T 106, 297-298.  Ultimately, some of the contacts and the preview screen of some of the text messages  (i.e., "it's (sic) appears to just be a preview of the first few words in each text") was documented by CBP at BWI and emailed to HSI SA Ryan. T 112-113; Govt. Ex. 1.

The government submits that the reasonable inferences from the hearing testimony, exhibits, and Second Superseding Indictment, establish that SA Ryan was aware of a lot about Bongiovanni prior to the border search.  Indeed, just a short time after the border search at issue, in June 2019, SA Ryan asked Bongiovanni a bevy of questions based upon things knew through the investigation independent of the border search.  For example, SA Ryan asked Bongiovanni about, among other things:

(i)     Bongiovanni's DEA cell phone, which was wiped when he returned it to DEA upon retirement (*see* T 120-121, 149; *see also*, Count 1, Overt Act 54);

(ii)    DEA file materials located during the June 2019 search warrant at Bongiovanni's residence (*see* T 121; *see also*, Govt. Ex. 11, at page 7 ("Bongiovanni was asked why he had [....] Bongiovanni knew there was an investigation into [IOC] [...] that's why he kept the file.");

(iii)   Bongiovanni's relationship with Peter Gerace and about Gerace's family (*see* T 143-45; *see also*, Govt. Ex. 11, page 2);

(iv)    Pharaoh's Gentlemen's Club (*see* T 145; *see also*,  Govt. Ex. 11, page 2);

(v)     Bongiovanni's relationship with Anthony Gerace (who at the time was pending on an Indictment before this Court; *see* Criminal Complaint 19-mj-5007, and 19-CR-86) and others (*see* T 145-47; *see also*,  Govt. Ex. 11, page 3);

(vi)    Bongiovanni's attendance at a Pharaoh's golf tournament (*see* T 149; *see also*, Govt. Ex. 11, page 3);

(vii)   Peter Gerace's association with motorcycle gangs (*see* T 151; *see also*, Govt. Ex. 11, page 4);

(viii)  whether Gerace tried to cooperate with the DEA (*see* T 151-52; *see also*, Govt. Ex. 11, page 4);

(ix)    whether Gerace ever spoke to Bongiovanni about someone overdosing at Pharaoh's (*see* T 152; *see also*, Govt. Ex. 11, page 4; Second Superseding Indictment, Count 2, Overt Act 26);

(x)     Bongiovanni in a picture (acquired from a witness) with other males in Toronto, Canada (*see* T 174-76; *see also*, Govt. Ex. 11, page 6; Govt. Ex. 14);

(xi)    Bongiovanni and Gerace in a picture together at Lake Erie (*see* T 177-79; *see* also, Govt. Ex. 11, pages 6-7; Govt. Ex. 15);

(xii)   names on the DEA file found in Bongiovanni's basement, which is the file number referenced in the Second Superseding Indictment (*see* T 179-181; *see also*, Govt. Ex. 10; Govt. Ex. 11, page 7; Second Superseding Indictment, Count 1, Overt Act 33); and,

(xiii)   text messages between Bongiovanni and Gerace in internal DEA
memos submitted by Bongiovanni to the DEA, which memos form the
basis of Obstruction of Justice counts contained in the Second
Superseding Indictment (*see* T 181-82; *see also*, Second Superseding
Indictment, Count 1, Overt Act 29, 30, 31; and, Counts 6, 12, 13, and
14)[8].

The breadth and topics SA Ryan discussed with Bongiovanni on June 6, 2019,

regarding Peter Gerace, Pharaoh's Gentleman's Club, a drug overdose, motorcycle gangs,

individuals Bongiovanni was with in Toronto (CA), internal DEA memos, informants, etc.,

establishes that SA Ryan and others were in the midst of a robust investigation of Bongiovanni

and others before the border search at issue.  The interview also demonstrates that SA Ryan

made a legitimate and common sense request for CBP conduct a secondary inspection of

Bongiovanni upon his reentry into the United States from the Dominican Republic.  *See Levy*,

*supra*.  Moreover, the breadth and topics discussed during Bongiovanni's June 6, 2019,

interview are consistent with CBP Agent Thomas Mozg's April 23, 2019, email to his CBP

counterparts at BWI Airport wherein he stated:  **"[Bongiovanni] is part of an HSI Buffalo**

**investigation (case: [number entered]) involving Transnational Organized Crime**.  We are

requesting discretionary dissemination of the request for a DOMEX extraction of the

passenger's cell phone.  The subject is recently retired from Federal law enforcement."  T 298;

Govt. Ex 34 (emphasis added).  Furthermore, during oral argument on April 26, 2022, the

---

[8] The dates of the memos, as set forth in the Second Superseding Indictment, are in November
2018, December 2018, and January 2019- all of which pre-date the border search of
Bongiovanni's phone.

government proffered to the Court that the first witness(es) testified in the grand jury on March 7, 2019, well-over a month before the border search at BWI Airport. T2[9] 20.

## B. Analysis

CBP officers at BWI Airport had reasonable suspicion to conduct a border search of Bongiovanni because law enforcement officers investigating Bongiovanni specifically advised them that Bongiovanni was part of an HSI investigation involving Transnational Organized Crime. HSI SA Curtis Ryan defined Transnational Organized Crime during his testimony as "any organized group that is seeking to exploit the Customs or Immigration laws of the United States." T 85. Moreover, the "tear sheet" that CBP Officer Carter provided the defendant (*see* Govt. Ex. 33) advised the defendant that, "[T]his information may also be made available to assist in border security and intelligence activities. Domestic law enforcement and enforcement of other crimes of transnational nature[.]" T 16. Thus, CBP and HSI are fully familiar with the term "transnational" in the context of organized crime.[10] Accordingly, when CBP Officer Mozg notified CBP at BWI Airport that Bongiovanni was part of an HSI investigation involving Transnational Organized Crime, that information provided reasonable suspicion to conduct a search of Bongiovanni's cell phone.

---

[9] "T2" is a reference to the transcript of oral argument, which occurred before this Court on April 26, 2022, and the reference to T2 is followed by the specific page number of the transcript.

[10] Undefined terms are given their ordinary meaning. The Merriam-Webster dictionary defines "transnational" as "extending or going beyond national boundaries," and defines organized crime as "a group of professional criminals who work together as part of a powerful and secret organization." *See* www.merriam-webster.com/dictionary (visited May 10, 2022).

A reasonable suspicion inquiry simply considers, after taking into account all the facts of a particular case, 'whether the border official ha[d] a reasonable basis on which to conduct the search.' " *Irving,* 452 F.3d at 124 (quoting *United States v. Asbury,* 586 F.2d 973, 975–76 (2d Cir.1978)). Reasonable suspicion is a relatively low standard and border officials are afforded deference due to their training and experience. *See Montoya de Hernandez,* 473 U.S. at 542, 105 S.Ct. 3304.  The concept of reasonable suspicion is not "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Reasonable suspicion must be supported by more than a "mere hunch," but "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying the preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). A reviewing court considers the totality of the circumstances. *Arvizu, 534 U.S.* at 273.  In assessing the reasonableness of the suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.*  An agent's understanding of objective facts, even if mistaken, is the baseline for determining reasonable suspicion. *Cotterman*, 709 F.3d at 968.

In the border search context, courts have held that information contained in a law enforcement database, or provided by other members of law enforcement, can be sufficient to establish reasonable suspicion to conduct a border search.  *See*, *Ramirez*, 2019 WL 3502913, at *15 (W.D. Tex. Aug. 1, 2019) (finding reasonable suspicion to conduct a border search of a cell phone where TECS record entry stated, "Subj linked to the purchase of child pornography" and, "If encountered, refer to secondary, recommend media exam"); *see also*,

*Cotterman*, 709 F.3d 952, 957–58 (referring Cotterman for secondary inspection and search based upon a TECS hit indicating Cotterman had a 1992 conviction and indicating he was potentially involved in child sex tourism); *Bunty,* 617 F. Supp. 2d at 363 (information in NCIC database justified secondary inspection).[11]

In *United States v. Levy*, the Second Circuit upheld a border search, which involved photocopying a notebook containing 18 pages of Levy's handwritten notes on various topics based upon information supplied by the DEA. 803 F.3d 120 (2d Cir. 2015).  The Second Circuit avoided the issue of determining whether the copying of the notebook was routine, or not routine, because the search was supported by reasonable suspicion.  *Id.* at 123.  In particular, the Second Circuit stated "that the CBP officer was entitled to rely on information provided by the DEA task force to justify the border search in this case. Official interagency collaboration, even (and perhaps especially) at the border, is to be commended, not condemned. Whether a Customs official's reasonable suspicion arises entirely from her own investigation or is prompted by another federal agency is irrelevant to the validity of a border search, which we have held 'does not depend on whether it is prompted by a criminal investigative motive.'"  *Id.* (citing *United States v. Irving*, 452 F.3d 110, 123 (2d Cir.2006); *see United States v. Schoor,* 597 F.2d 1303, 1306 (9th Cir.1979) (Kennedy, J.) ("That the search was made at the request of the DEA officers does not detract from its legitimacy. Suspicion of customs officials is alone sufficient justification for a border search.").  Here,

---

[11]*But see, United States v. Laynes*, 481 F. Supp. 3d 657, 659 (S.D. Ohio 2020), *appeal dismissed*, No. 20-3968, 2020 WL 7382061 (6th Cir. Dec. 14, 2020) (evidence suppressed where TECS entry flagged defendant for secondary inspection, which led to officer search of cell phone ).

CBP relied upon information provided by HSI that Bongiovanni was part of a transnational organized crime investigation, and it is immaterial that CBP's reasonable suspicion was based upon a request and information emanating from HSI.

Generally, where the border search is related uncovering information about transnational organized crime and/or conspiracy, courts have found reasonable suspicion. *United States v. Aigbekaen*, 943 F.3d 713, 719 n.4 (4th Cir. 2019) ("law enforcement officers may conduct a warrantless forensic search of a cell phone under the border search exception where the officers possess sufficient individualized suspicion of transnational criminal activity."); *United States v. Kolsuz*, 890 F.3d 133, 144 (4th Cir. 2018), as amended (May 18, 2018) ("we agree with the government's bottom line: Because the forensic search of Kolsuz's phone was conducted at least in part to uncover information about an ongoing transnational crime—in particular, information about additional illegal firearms exports already underway, by freight or in the custody of a coconspirator, *see Kolsuz*, 185 F.Supp.3d at 860—it "fits within the core of the rationale" underlying the border search exception."); *United States v. Kamaldoss*, No. 19-CR-543 (ARR), 2022 WL 1200776, at *11 (E.D.N.Y. Apr. 22, 2022) (border agents had a reasonable basis to believe that he was involved in a transnational conspiracy: the government's investigation of this conspiracy had been ongoing for more than a year.).

Here, SA Ryan and CBP Officer Mozg, who were investigating Bongiovanni, worked together to place a TECS entry "one day lookout" on Bongiovanni requesting a secondary inspection, and further supplemented the TECS entry by specifically advising CBP at BWI Airport that Bongiovanni was a subject in a Transnational Organized Crime investigation.

Accordingly, even if the Court were to deem the search of Bongiovanni's phone to be "nonroutine", it was not based upon a mere hunch, but rather was based upon inter-agency collaboration which established reasonable suspicion . *See Levy, supra.*

### C. Conclusion

Based upon the foregoing, the search was routine and did not require any suspicion. However, even if this Court were to find the search was nonroutine, it was based upon reasonable suspicion. Specifically, CBP knew that Bongiovanni was being investigated by HSI as part of an ongoing Transnational Organized Crime investigation and, their decision to conduct a border search was warranted. Accordingly, the defendant's motion to suppress should be denied.

### III.     The Search was Conducted in Good Faith

The government previously briefed the good faith exception and inevitable discovery doctrine as it applies to this case, and the government reincorporates its previous arguments by reference as though set forth fully herein. *See* Doc. Nos. 87, 263. Even post-*Riley*, courts have continued to rely upon the "robust body of pre-Riley caselaw that allowed warrantless border searches of computers and cell phones." *United States v. Aguilar*, 973 F.3d 445, 450 (5th Cir. 2020), cert. denied, 141 S. Ct. 1102, 208 L. Ed. 2d 550 (2021) (citations omitted).

The principle case relied upon by the defendant in support of suppression, *United States v. Cano,* 934 F.3d 1002 (9th Cir. 2019), was not decided until several months after Bongiovanni's phone was subjected to a border search at BWI airport. On August 16, 2019,

the Ninth Circuit decided *Cano*, and the decision is an outlier in several respects.  First, it is the only case the government's research has identified wherein a court determined that a manual search of a cell phone, in which the agent recorded phone numbers found in the call log and photographed two messages received after [the defendant] reached the border, was determined to be unreasonable.  Second, it is the only case limiting the nonroutine search of a cell phone specifically to digital contraband.  As a result, this Court should reject the logic of *Cano* because it is not binding, unpersuasive, and because it was decided subsequent to the search of Bongiovanni's phone.  Therefore, *Cano* should not impact upon this Court's analysis of the officers' good faith actions in this case.

Moreover, even if this Court evaluates the facts of Bongiovanni's case in light of what was then the leading case in the Ninth Circuit at the time of the search at issue, this Court should have no hesitation finding that good faith existed.  In *United States v. Cotterman*, the Ninth Circuit considered a forensic search of a laptop at the border and stated: "the legitimacy of the initial search of Cotterman's electronic devices at the border is not in doubt. [The officer] turned on the devices and opened and viewed image files while the Cottermans waited to enter the country. It was, in principle, akin to the search in *Seljan,* where we concluded that a suspicionless cursory scan of a package in international transit was not unreasonable."  709 F.3d 952, 1004 (9th Cir. 2013).  Of import regarding the search in *Cotterman*, the Ninth Circuit stated:

> The present case illustrates this unique aspect of electronic data. Agents found incriminating files in the unallocated space of Cotterman's laptop, the space where the computer stores files that the user ostensibly deleted and maintains other "deleted" files retrieved from web sites the user has visited. Notwithstanding the attempted erasure of material or the transient nature of a visit to a web site, computer forensic examination was able to restore the files.

It is as if a search of a person's suitcase could reveal not only what the bag contained on the current trip, but everything it had ever carried.

709 F.3d at 965.  Here, the search of Bongiovanni's phone had no possibility of searching and seizing "unallocated space", "deleted files", or of restoring any such files and was more akin to the initial search in *Cotterman*, which the Ninth Circuit stated, "we would be inclined to conclude it was reasonable even without particularized suspicion."  709 F.3d at 960-61.

Based upon the foregoing and all prior arguments, the Court should find that the good faith exception applies, *see* Doc. No. 263.

## <u>CONCLUSION</u>

The defendant's motion to suppress should be denied.

DATED: Buffalo, New York, May 10, 2022.

COREY R. AMUNDSON                    TRINI E. ROSS
Chief                                United States Attorney

BY:   s/JORDAN DICKSON          BY:   s/JOSEPH M. TRIPI
      Trial Attorney                  Assistant United States Attorney
      Public Integrity Section        United States Attorney's Office
      U.S. Department of Justice       Western District of New York
      Criminal Division               138 Delaware Avenue
      1301 New York Ave. NW, Ste. 1000   Buffalo, New York 14202
      Washington, D.C. 20530          716-843-5839
      202-597-0508                    Joseph.Tripi@usdoj.gov
      Jordan.Dickson@usdoj.gov

BY:   s/BRENDAN T. CULLINANE     BY:   s/DAVID J. RUDROFF
      Assistant United States Attorney    Assistant United States Attorney
      United States Attorney's Office    United States Attorney's Office
      Western District of New York       Western District of New York
      138 Delaware Avenue             138 Delaware Avenue
      Buffalo, New York  14202         Buffalo, New York  14202
      716/843-5875                    716/843-5806
      Brendan.Cullinane@usdoj.gov      David.Rudroff@usdoj.gov