UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

                  v.

JOSEPH BONGIOVANNI,

                       Defendant.

1:19-CR-227 JLS (MJR)

REPORT, RECOMMENDATION
AND ORDER

This case has been referred to the undersigned by the Hon. John L. Sinatra, Jr.,
pursuant to 28 U.S.C. § 636(b)(1), for all pre-trial matters and to hear and report upon
dispositive motions. (Dkt. No. 4)

## BACKGROUND

On February 25, 2021, a federal grand jury in the Western District of New York
returned an 18-count indictment against defendants Joseph Bongiovanni and Peter
Gerace, Jr. (the "Indictment").[1] (Dkt. No. 89) Bongiovanni is charged with Conspiracy to
Defraud the United States, in violation of Section 371 of Title 18 of the United States Code
(Counts 1 and 2); Conspiracy to Distribute Controlled Substances, in violation of Section
846 of Title 21 of the United States Code (Counts 3 and 8); Public Official Accepting a
Bribe, in violation of Section 201(b)(2)(C) of Title 18 of the United States Code (Counts 4

---

[1] The February 25, 2021 indictment was the second superseding indictment filed in this case.
The initial indictment, filed on November 31, 2019, charged defendant Bongiovanni only. (Dkt.
No. 1) The first superseding indictment, filed on June 4, 2020, charged Bongiovanni as well as
Michael Masecchia. (Dkt. No. 46) Defendant Masecchia entered a plea agreement with the
Government on December 9, 2020. (Dkt. Nos. 68, 69) Thus, defendants Bongiovanni and
Gerace are the current defendants charged in this matter and the second superseding
indictment is the operative charging document.

and 5); Obstruction of Justice, in violation of Section 1519 of Title 18 of the United States Code (Counts 10-16); and False Statements to an Agency of the United States, in violation of Section 1001(a)(2) of Title 18 of the United States Code (Counts 17 and 18). (*Id.*)

*The Charges*[2]

From in or around 2001, until his retirement on or about February 1, 2019, Joseph Bongiovanni served as a Special Agent ("SA") for the Drug Enforcement Agency ("DEA") and was assigned to the Buffalo, New York, DEA Resident Office. The Government alleges that, during this time, Bongiovanni had friends and associates whom he knew to be involved in the possession, use, and distribution of controlled substances. The Government contends that it was Bongiovanni's belief that some of these friends and associates who were involved with narcotics distribution were also members of, or connected to, Italian Organized Crime ("IOC"). It is alleged that Michael Masecchia and Peter Gerace, Jr. were two such friends and associates of Bongiovanni.[3] The Government alleges that beginning in or about 2008 and continuing to in or about August 2019, Bongiovanni, Masecchia, and others conspired to distribute 1000 kilograms or more of a mixture and substance containing marijuana. It is similarly alleged that beginning in

---

[2] The information included in this section is taken from the Indictment. The Court has not included every allegation contained in the Indictment, but instead has provided a summary of the information and charges that are relevant to Bongiovanni's instant motions.

[3] Gerace is the owner and principal operator of Pharaoh's Gentlemen's Club, located at 999 Aero Drive, Cheektowaga, New York. Pharaoh's is a commercial business where patrons can purchase food, beverages, and dances with topless dancers or performers. Gerace is alleged to have been involved in narcotics distribution and to have utilized Pharaoh's for the use and distribution of controlled substances. Gerace is also alleged to have conspired to engage in sex trafficking. Masecchia is alleged to be a member or associate of IOC in the Western District of New York and elsewhere and is alleged to have been involved in the distribution of controlled substances for over twenty years.

or about 2009 and continuing to in or about February 2019, Bongiovanni, Gerace, and others conspired to distribute cocaine, cocaine base, methamphetamine, amphetamine (commonly known as Adderall), marijuana, and heroin.

The Government further charges that beginning in or around 2005 through in or around August 2019, Bongiovanni, Gerace, Masecchia, and others conspired to defraud the United States and the DEA, in that Bongiovanni routinely used his position as SA for the DEA to shield his friends and associates, including Masecchia and Gerace, from criminal prosecution for drug trafficking. The Indictment alleges that Bongiovanni accepted cash bribes from Gerace and Masecchia on a reoccurring basis over the course of the conspiracy. In return, Bongiovanni purportedly used his position with the DEA to ensure that Gerace, Masecchia, and others would not be investigated or prosecuted for narcotics distribution. The Government claims that Bongiovanni regularly provided information to his friends and associates about the existence and status of DEA investigations as well as advice and guidance regarding law enforcement techniques to help them avoid arrest and prosecution.

Bongiovanni allegedly made repeated false statements and false representations in official DEA documents and reports, and to other members of law enforcement, in order to protect Masecchia and Gerace, and those working with them, from prosecution for narcotics trafficking. For example, it is alleged that Bongiovanni initiated DEA case files and entered the names of his co-conspirators into state and DEA de-confliction databases to be alerted when his co-conspirators were being investigated.[4] The Government further claims that when Bongiovanni became aware of an individual who could provide

---

[4] De-confliction databases enable law enforcement officers investigating a specific individual to be alerted if another law enforcement officer has an investigative interest in the same individual.

cooperation against his co-conspirators, Bongiovanni signed the individual up as a DEA confidential source ("CS") with him as the handling agent. It is alleged that Bongiovanni went on to ensure that the CS provided no cooperation against Bongiovanni's co-conspirators, and that he later deactivated the CS. Likewise, it is alleged that Bongiovanni falsely advised an FBI agent that Gerace was acting as Bongiovanni's confidential informant, thereby inducing the agent to abandon a narcotics investigation into Gerace. Bongiovanni is alleged to have lied to members of the DEA about the true nature of his relationship with Gerace, as well as his connections with Masecchia and other individuals he believed to be associated with IOC.

The Government contends that Bongiovanni engaged in this criminal activity for the financial gain of at least $250,000, in the form of bribes paid or facilitated by Gerace and Masecchia. The Government also accuses Bongiovanni of engaging in this conduct to ingratiate himself with individuals Bongiovanni believed were members of, or associated with, IOC. The Government claims that on or about February 1, 2019, Bongiovanni removed, from the DEA Buffalo Resident Office, a DEA working file containing, *inter alia*, an Organized Crime Drug Enforcement Task Force investigation initiation form for "Operation Past Due." It is alleged that Bongiovanni removed this file without permission or authorization, and that he concealed it in the basement of his residence. It is also alleged that on or about February 1, 2019, Bongiovanni's last day as SA for the DEA before his retirement, Bongiovanni caused his DEA cell phone to be wiped clean of all data.

*Bongiovanni's Motions*

Bongiovanni has filed the following pretrial motions: (1) suppression of evidence obtained from a search of his cell phone on April 23, 2019, as well as suppression of all statements or evidence derived as a result of this search; (2) dismissal of the Indictment for selective prosecution; (3) dismissal of Count 18 of the Indictment; (4) production of a bill of particulars; (5) disclosure of Rule 16 discovery and expert discovery; (6) disclosure of Rule 404(b) and impeachment evidence; (7) disclosure of 3500 material; (8) severance; and (9) joinder.[5] (Dkt. Nos. 81, 149) The Government has filed responses and a request for reciprocal discovery (Dkt. Nos. 87, 177) and defendant has filed a reply (Dkt. No. 193).

## DISCUSSION

The Court finds, for the reasons set forth in detail below, that the April 23, 2019 cell phone search violated Bongiovanni's constitutional rights, but that the good faith doctrine counsels against suppression of this evidence. The Court then addresses Bongiovanni's motions for dismissal of the Indictment or certain counts of the Indictment, before turning to his non-dispositive motions and other omnibus discovery demands as well as the Government's request for reciprocal discovery.

---

[5] Defendant Gerace has also filed pretrial motions, including a motion to suppress evidence obtained pursuant to various search warrants. (Dkt. Nos. 147, 148) The Court will address Gerace's pretrial motions, including his request for suppression of evidence and all other dispositive and non-dispositive requests, in a separate Report, Recommendation and Order. The Court notes here, however, that Gerace's pretrial motions include a request to join in all pretrial motions made by co-defendant Bongiovanni. (*Id.*) Gerace's request for joinder is granted. Thus, to the extent applicable or relevant, any recommendations or decisions made by this Court herein as to Bongiovanni's motions shall also be deemed a finding and/or order as to defendant Gerace.

### *Motion to Suppress*[6]

### *Findings of Fact*

#### *Search of Bongiovanni's Cell Phone*

Curtis Ryan testified that he is a supervisory special agent for the Department of Homeland Security Investigations ("HSI"), in the area of transnational organized crime and illegal exports.[7] (Dkt. No. 237, pg. 85) HSI combats the illegal movement of people, money, or contraband in international commerce and over the United States' borders. (*Id.* at 91) To that end, HSI conducts investigations of, among other things, narcotics trafficking, human trafficking, child pornography, smuggling, money laundering, and other associated financial crimes. (*Id.*) From 2016 through October 2021, Agent Ryan was assigned to the Border Enforcement Security Task Force ("BEST"), which investigates primarily drug smuggling. (*Id.* at 86) Ryan testified that BEST officers often work in conjunction with individuals from other agencies, including Customs and Border Protection ("CBP") officers, border patrol agents, and state and local law enforcement officers. (*Id.* at 87) Ryan also served as a Drug Enforcement Agency ("DEA") task force officer in the Buffalo, New York office from early 2017 to early 2019. (*Id.* at 96-97)

---

[6] Defendant's initial suppression motion argued that statements made by Bongiovanni on June 6, 2019 to law enforcement must be suppressed because they were involuntary. (Dkt. No. 81) On January 6, 2022, defense counsel withdrew the motion to suppress statements based on involuntariness. (Dkt. No. 237, pg. 4) Bongiovanni continues to argue, however, that the statements he made on June 6, 2019 must be suppressed because they were the direct result of the unconstitutional search of his cell phone on April 23, 2019. Bongiovanni has also argued that to the extent any of the search warrants executed in this case relied on information from the April 23, 2019 search, the evidence obtained based on those warrants must also be suppressed. (Dkt. No. pgs. 15-18) These arguments will be addressed herein.
[7] Ryan defined transnational organized crime as "any organized group that is seeking to exploit the customs or immigration laws of the United States." (Dkt. No. 237, pg. 85)

Because HSI often works together with CBP on border enforcement issues, the two agencies regularly share information. (*Id.* at 98-100) As a result, Agent Ryan frequently receives notification when an individual he is investigating is scheduled for international travel. (*Id.* at 100-01) In April of 2019, Ryan was investigating the activities of Joseph Bongiovanni. (*Id.* at 101) Ryan testified that the investigation involved drug trafficking, bribery, obstruction of justice and conspiracy.[8] (*Id.* 129-30) Agent Ryan learned that Bongiovanni had a flight reservation to travel to the Dominican Republic, and that Bongiovanni was anticipated to return to the United States on April 23, 2019, arriving at Baltimore Washington International Airport ("BWI"). (*Id.* at 101) Based on that notification, Ryan asked CBP officers in Buffalo, New York to coordinate a border search of Bongiovanni by CBP officers in Baltimore, Maryland, upon Bongiovanni's return to the United States. (*Id.* 102) Ryan instructed CBP officers to place a "one-day lookout", meaning if Bongiovanni were to arrive on April 23, 2019 as scheduled, he would be referred to secondary inspection at the airport. (*Id.* at 102-103) Agent Ryan testified that he did not provide CBP officers with any information or details about his investigation of Bongiovanni nor did he provide any directions to the CBP officers as to how to conduct the inspection or what to look for. (*Id.* at 104-105) In April 2019, Thomas Mozg served as an intelligence agent for CBP and worked in connection with HSI and the FBI. (Dkt. No. 249, pgs. 285-87) To that end, Agent Mozg was assisting Agent Ryan with the investigation of Bongiovanni.[9] (*Id.*)

---

[8] Ryan did not testify about any specific details of the investigation during the hearing. Ryan did not testify as to what information was known about Bongiovanni's alleged criminal activities, or what evidence had been obtained against him, in April of 2019.

[9] Like Ryan, Mozg did not testify as to any details of the investigation of Bongiovanni nor did he testify about any information known to officers about Bongiovanni's alleged criminal activities in April of 2019, prior to the request for a border inspection.

Jack Gernatt testified that he has been employed as a U.S. Customs Officer with CBP in Buffalo, New York since 2004. (Dkt. No. 249, pgs. 249-50) In April of 2019, Officer Gernatt received a call from Agent Ryan and Agent Mozg inquiring if a border stop could be conducted of Bongiovanni at BWI. (Dkt. No. 250-51) Gernatt testified that it was his understanding that HSI wanted to conduct a secondary inspection of Bongiovanni, during which time his luggage would be searched and his electronic devices, including his cell phone, would be examined. (*Id.* at 251-52) Gernatt advised Ryan and Mozg to contact border security coordinator Mike Millich. (*Id.* at 251) Agent Ryan later emailed Millich and asked him to coordinate a "secondary inspection and phone dump." (Dkt. No. 249, Def. Exhs. C and D) Millich responded that he would contact a colleague in the Baltimore Field Office. (*Id.*) Likewise, Agent Mozg sent an email to Millich stating that Bongiovanni was "recently retired from federal law enforcement" and "part of an HSI Buffalo investigation involving Transnational Organized Crime." (Dkt. No. 249, pgs. 289-90; Def. Exh. E, pg. 3) The email requested "discretionary dissemination of the request for a DOMEX extraction of [Bongiovanni's] cell phone." (*Id.*) Millich responded that Watch Commander Christopher Candela would be "managing the encounter at BWI." (Dkt. No. 249, Def. Exh. E) At the time he helped coordinate the inspection, Officer Gernatt did not know any details about the case against Bongiovanni nor was he involved in the investigation. (*Id.* at 259-61, 276)

Kipplin Carter testified that he is employed as a CBP officer in Baltimore, Maryland. (Dkt. No. 237, pgs. 6-7) He is assigned to the Tactical Terrorism and Response Team ("TTRT") and works most often at BWI or the Baltimore seaport. (*Id.*) At BWI, Carter's duties include conducting secondary inspections of individuals arriving in the United

8

States, from outside of the country, to monitor for terrorism, narcotics, or other criminal activity. (*Id.* at 7-8) Officer Carter explained that individuals may be referred to secondary inspection for a number of different reasons, including when another law enforcement agency has placed a "lookout" on a traveler.[10] (*Id.* a 12-13) Carter described a secondary inspection as a more "intensive inspection" that may involve officers looking at the traveler's luggage or electronic media, including their cell phone. (*Id.* at 9) Carter was asked to give examples of instances where CBP officers may look at an individual's phone during secondary inspection. (*Id.* at 13-14) Carter explained that such circumstances could include suspected immigration violations and, with respect to United States citizens, it could include child pornography, narcotics, or terrorism. (*Id.*) Carter explained that officers would be looking for "any evidence of a crime in that phone at that time." (*Id.* at 14) Carter said they may also look at phones during secondary inspection when requested to do so by another law enforcement agency. (*Id.*) Carter further explained that if an officer is going to inspect an individual's phone or other electronic device, the individual is provided with an "electronic or paper tear sheet" which explains electronic media searches and CBP's authority to conduct them.[11] (*Id.* a 16-17; Exh. 33)

Officer Carter described two different types of electronic device searches performed by CBP officers at secondary inspection: a "basic search" and a "forensic search." (*Id.* at 10) Carter testified that a "basic search" of a cell phone is a "manual

---

[10] Carter explained that CBP officers use a computer system called "TECS", which is a law enforcement tool that allows different federal agencies to share information about specific individuals they might be investigating. (Dkt. No. 237, pg. 57)

[11] The document referred to by Carter during his testimony is entitled "Inspection of Electronic Devices." (Dkt. No. 237, Exh. 33) It states that "[a]ll persons, baggage and merchandise arriving in, or departing from, the United States are subject to inspection, search, and detention." (*Id.*) It further states that "[y]ou're receiving this sheet because your electronic device(s) has been detained for further examination, including copying." (*Id.*)

search", where the "phone is unlocked and placed in airplane mode and the officer doing the inspection [uses] their fingers to click on sections of the phone to expand on whatever information might be found in that section." (*Id*. at 17-18) Carter also explained that when a phone is locked, the only way to conduct this search is for the owner of the phone to provide their password to unlock the phone. (*Id*. at 18) Items viewed by officers during a basic search may include contact lists, text messages and photographs. (*Id*. at 10, 18-19) Carter explained that because the phone remains in airplane mode during a basic search, officers cannot pull information "off of clouds or other servers" and they are only looking for information "actually on the phone." (*Id*. at 19) Officer Carter testified that a basic search takes approximately 15 to 30 minutes, and that the phone is not connected to any other equipment during that time. (*Id*. at 21) Carter testified that he believed CBP officers have the authority to conduct a basic search of an individual's cell phone any time an individual enters or leaves the United States. (*Id*. at 19-20)

Carter further testified that "advanced searches" of electronic media entail using "equipment to extract information from the [device]." (*Id*. at 10) Carter explained that when conducting an advanced search, officers use a cable to attach the cell phone or other targeted electronic device to a separate computer, which allows officers to "pull off 100 percent of the data that is stored on that [device]." (*Id*. at 20) An advanced search can take several hours and results in the replication of all data from the device being transferred to a flash drive. (*Id*. at 21, 22)

Officer Carter testified that he was working as a CBP officer in the TTRT office of BWI on April 23, 2019. (*Id*. at 22-23) Carter's supervisor, Watch Commander Candela, informed him that an individual by the name of Joseph Bongiovanni would be arriving at

BWI that day, and that they needed to perform a "DOMEX" search on Bongiovanni's phone. (*Id.* at 24-25) According to Carter, DOMEX is "CBP terminology for actual advanced search." (*Id.*) Carter was informed that the request to perform a DOMEX search on Bongiovanni's phone came from the CBP office in Buffalo, New York. (*Id.* at 26) Carter was further informed that Bongiovanni was involved in a case and that the Buffalo officers were likely looking for information about contacts in his phone. (*Id.* at 26-27) Carter was not told what the case was about nor was he provided any other details about the investigation or reason for the search. (*Id.*) Carter testified that he then relayed this information to Officer Sadowski, who was one of the DOMEX-certified officers working at BWI that day. (*Id.* at 28)

Officer Carter next went to secondary inspection to assist with acquiring the phone and conducting the search. (*Id.* at 28) Bongiovanni and his family, which included his wife and stepson, were at secondary inspection when Carter arrived, having already been referred there. (*Id.* at 56) At that time, Bongiovanni and his family were returning from a six-day trip to Punta Cana, Dominican Republic. (*Id.* 48; Exh. 2) Officers asked Bongiovanni and his wife for their cell phones and informed them that the phones would be searched. (*Id.* at 28-29, 56, 64) They were given the "tear sheet" explaining electronic searches. (*Id.*) Bongiovanni and his wife asked some questions regarding why the phones were going to be searched, but eventually gave officers their phones. (*Id.* at 60, 63-64) Carter testified that Bongiovanni and his wife also unlocked their phones before giving them to the officers. (*Id.* at 29-31)

Officer Carter next took the phones to a secured location at BWI where the DOMEX machine is stored and gave them to Officer Sadoski. (*Id.* at 31) Sadowski then attempted

to perform an advanced search of Bongiovanni's phone using DOMEX, but the search was unsuccessful. (*Id.* at 32) Specifically, Sadowski hooked the phone up to the DOMEX machine, but nothing happened. (*Id.*) As a result, no information was taken from the phone using the DOMEX machine. (*Id.* at 32) Officer Carter and Commander Candela then performed what Carter described as a "basic search" of Bongiovanni's phone. (*Id.* at 33) Specifically, Carter and Candela scrolled through the text messages and contacts on Bongiovanni's phone while randomly taking pictures of the information they found. (*Id.* at 34-36, 66-67; Exh. 1) The search resulted in officers copying and retaining 14 pages of content/material from Bongiovanni's phone, including (1) a partial contact list and (2) numerous pages of text messages. (*Id.*; Exh. 1: Dkt. 284, pg. 5) Carter explained that because he knew nothing about the Buffalo investigation or what might be useful to the case, the pictures were all taken randomly. (*Id.* at 37) Carter also reviewed the text messages looking for "blatant criminal activity." (*Id.* at 38-39) When he did not see anything incriminating on its face, Carter proceeded to make a "random selection" of messages to photograph and save. (*Id.* at 38-39) Carter testified that he and the other officers had Bongiovanni's phone in their possession for approximately fifteen minutes. (*Id.* at 43)

Carter testified that typically when CBP officers are conducting a basic search of a cell phone, they are looking for "blatant criminal activity." (*Id.* at 37-38) Carter explained that officers found nothing in Bongiovanni's phone of a criminal nature that was actionable, meaning the officers observed nothing that would have justified an arrest or seizure at that time. (*Id.* at 41) Carter testified that other than receiving information from his supervisor that Bongiovanni would be referred to secondary inspection based on the

12

Buffalo officers' request, there was nothing about Bongiovanni and his travel companions that would have triggered Carter to request a secondary inspection. (*Id.* at 74) Carter testified that the circumstances of their travel were normal, that there were no odd behaviors, and that they seemed like a normal family. (*Id.*)

Following the April 23, 2019 search, Agent Ryan received a PDF containing the series of photographs, taken by Officer Carter and Commander Candela, of the text messages and contacts from Bongiovanni's phone. (*Id.* at 108; Exh. 1) Agent Ryan testified that, at the time of the search, he believed, based on his training and experience as well as his understanding of the Fourth Amendment, that it was lawful to conduct a basic search of someone's cell phone at the border. (*Id.* at 188) Thus, Ryan believed that he and the other officers were acting consistently with existing law and Fourth Amendment requirements. (*Id.*)

Lindsay Bongiovanni testified that she has been married to Joseph Bongiovanni since 2015. (*Id.* at 239) She traveled with her husband and son to Punta Cana from April 18, 2019 through April 23, 2019. (*Id.* at 223) They returned to the United States on a Southwest flight that landed at BWI. (*Id.* at 224) When they arrived at Unites States Customs, they were "pulled aside" and taken to a separate area that had conveyor belts for luggage (*Id.*) Mrs. Bongiovanni testified that officers looked through their bags and then took their phones. (*Id.* at 224-25) She testified that their phones were taken somewhere they could not see them and brought back approximately 45 minutes later. (*Id.* at 227) Mrs. Bongiovanni testified that when she and her husband provided their phones to the officers, the phones were locked. (*Id.* at 233) She further testified that she and Bongiovanni did not unlock them, nor did they provide their pass codes to the officers.

(*Id.*) Mrs. Bongiovanni testified that she believes what is happening to her husband is "not right" and that she blames the government for those circumstances. (*Id.* at 240-41)

Bongiovanni submitted an affidavit in support of his suppression motion. (Dkt. No. 81, Exh. C) Bongiovanni avers that at approximately 8:10 p.m. on April 23, 2019, he was returning to the United States from a family vacation in Punta Cana with his wife and stepson. (*Id.* at ¶3) They arrived at BWI and reported to United States Customs, at which time they were referred to a separate area for secondary inspection. (*Id.* at ¶¶3-4) An officer informed them that they had been singled out for a routine search and that their luggage would be examined (*Id.* at ¶5). The officer also requested their cell phones, which Bongiovanni and his wife provided to the officers. (*Id.*) Bongiovanni asked why officers needed their cell phones and the officer replied that it was a part of a routine practice and random search. (*Id.* at ¶6) According to Bongiovanni, the phones were taken to a separate office and returned approximately 45 to 50 minutes later. (*Id.* at ¶7)

*Federal Search Warrants for Bongiovanni and his Residence*

On May 31, 2019, a little over a month after the encounter at BWI, this Court authorized a warrant for the search of Bongiovanni's residence at 85 Alder Place, Kenmore, New York. (*See* 19-MJ-5154) The warrant application was supported by an affidavit from Curtis Ryan. (*Id.*) The warrant permitted law enforcement to enter 85 Adler Street without knocking and announcing their presence. (*Id.*) The warrant also authorized the seizure of, *inter alia*, "mobile phones, smart phones, and other communication devices." *Id.* On June 4, 2019, United States Magistrate Judge Jeremiah J. McCarthy authorized a warrant for the search of defendant Joseph Bongiovanni. (*See* 19-MJ-1056)

The warrant for a search of Bongiovanni's person was also supported by an affidavit by Agent Ryan.[12]

During the hearing, Agent Ryan was questioned as to whether information discovered during the April 23, 2019 search of Bongiovanni's cell phone was included in the warrant application for Bongiovanni's residence. (*Id.* at 186-87) Ryan noted that the warrant application did state that CBP officers conducted a border search of Bongiovanni's phone on April 23, 2019. (*Id.*; Exh. 16) Ryan explained that four names found in the contact list of Bongiovanni's phone at the time of the border search were listed in the warrant application, together with information Ryan was able to learn about those individuals from various law enforcement reports. (*Id.* at 186-87) Agent Ryan testified that the remainder of the warrant application did not rely upon any information learned during the border search of Bongiovanni's phone. (*Id.*)

*June 6, 2019 Search of Bongiovanni's Residence*

Agent Ryan testified that he was present when officers executed the federal search warrant at Bongiovanni's home in the early morning of June 6, 2019. (Dkt. No. 237, pg. 131) Ryan encountered Bongiovanni almost immediately upon entering 85 Alder Place.

---

[12] The warrant applications in this case have been filed under seal. On June 1, 2021, Bongiovanni moved to unseal the applications. (Dkt. No. 122) The issue was briefed and the Court heard oral argument on June 29, 2021, at which time the Court denied the request. (Dkt. No. 138) Bongiovanni appealed (Dkt. No. 180) and presiding District Court Judge Sinatra affirmed this Court's denial of the motion to unseal. (Dkt. No. 208) On November 5, 2021, co-defendant Gerace filed a motion before the District Court asking it for "adoption of a search warrant application disclosure order similar to that issued by the Court in *United States v. Hawit*, 2017 WL 3016794 (E.D.N.Y. 2017)." (Dkt. No. 210) *Hawit* permitted the deferred disclosure of search warrant applications three months before trial, and defendants in that case were permitted to file suppression motions following the deferred disclosure. Bongiovanni joined in his co-defendant's request. (Dkt. No. 212) On January 7, 2022, Judge Sinatra issued an order stating that the Court would hold defendants' request based on *Hawit* in abeyance, and that it would "revisit the basis for non-disclosure of the search warrant applications, *in camera*, after a trial date is set." (Dkt. 238)

(*Id.*) Bongiovanni was handcuffed and asked Agent Ryan if he was under arrest, and Ryan told Bongiovanni that he was not. (*Id.*) Ryan then removed Bongiovanni's handcuffs and asked Bongiovanni if he would be willing to speak with officers, and Bongiovanni indicated that he was willing to speak with them. (*Id.* at 137-38) Agent Ryan showed Bongiovanni a copy of the warrant and explained why the officers were there. (*Id.* at 137-38, 140) Ryan proceeded to interview Bongiovanni for approximately two and a half hours. (*Id.*)

During the interview, Agent Ryan asked Bongiovanni about topics such as (1) his relationship with Peter Gerace; (2) his knowledge about Pharaoh's Gentleman's Club and a Pharaoh's Golf tournament; (3) his relationships with and contacts with Anthony Gerace, David Gerace, Michael Sinatra, and Paul Puglise; (4) his deletion of information from his DEA-issued cell phone at the time of his retirement; (5) the presence of organized crime in Buffalo, New York; (6) Peter Gerace's connection to motorcycle gangs; (7) Peter Gerace's cooperation with DEA; (8) a photograph of a birthday party in Toronto, Canada; and (9) a DEA case file that was found in Bongiovanni's home. (*Id.* at 142-153, 174-82; Exhs. 11 and 12) Ryan testified that none of the questions he asked Bongiovanni regarding these topics were prompted by or based upon information obtained during the search of Bongiovanni's phone at BWI on April 23, 2019. (*Id.*) Ryan explained that each of these topics would have been discussed with Bongiovanni regardless of any information learned as a result of the border search. (*Id.*)

Also during the interview, Agent Ryan asked Bongiovanni about his relationship with certain individuals who were listed as contacts in his phone, at the time of the April 23, 2019 border search. (*Id.* at 153-156; Exh. 11) Agent Ryan testified that he asked

Bongiovanni about these individuals, in part, because their names were listed in his phone on April 23, 2019. (*Id.*) Ryan further testified that he would have asked Bongiovanni about many of these individuals regardless of the results of the border search. (*Id.*) Agent Ryan denied ever stating to Bongiovanni, during the interview, "tell me all about the mafia." (*Id.* at 172-73) He also denied having any animus toward Bongiovanni because Bongiovanni is Italian. (*Id.*) During the interview, one of the agents conducting a search of the residence brought a cell phone to the table and informed Agent Ryan that they believed the phone belonged to Bongiovanni. (*Id.* at 168) Ryan did not know, at that time, if the phone was the same cell phone searched at the border on April 23, 2019. (*Id.* at 168-69) Ryan informed Bongiovanni that the phone was within the scope of the search warrant and that they would be taking it. (*Id.*) Ryan testified that he did not scroll through the phone at that time and ask Bongiovanni about his contacts, nor did he otherwise search the phone at that time. (*Id.* at 169-70)[13]

---

[13] At the conclusion of Agent Ryan's testimony, defendant again sought unsealing of the warrant applications. Defendant contended that since he was arguing that both his June 6, 2019 statements and the warrant applications were the direct result of the unlawful border search, and since the Government was eliciting testimony that much of the information used as a basis for the June 6, 2019 interview and the warrant applications did not depend on the results of the border search, defendant had a right to see the warrant applications and question Ryan about any alternative basis for this information. The Court noted that since defendant was making a fruit of the poisonous tree argument, these issues would only become necessary to explore if the Court were to recommend suppression of the evidence recovered from the phone on April 23, 2019. Conversely, if the Court declined to suppress evidence from the border search, there would be no possible fruit of the poisonous tree argument and these issues would be irrelevant. It was then decided that, for efficiency's sake, the scope of the hearing would be confined to the validity of the cell phone border search and the Court would issue a decision on that issue only. The Court instructed that should it recommend suppression of the border search evidence, the record would be reopened at that time to decide what additional evidence and testimony was needed to determine whether the June 6, 2019 statements as well as evidence obtained pursuant to the warrants should also be suppressed as fruit of the poisonous tree. (Dkt. No. 237; pgs. 193-97)

In his affidavit, Bongiovanni avers that he was in bed in the early morning hours of June 6, 2019 when he heard "an extremely loud explosion" which caused him to fall out of bed. (Dkt. No. 81, ¶¶8-9) After hearing a loud crash downstairs, he went to the bottom of the stairs and encountered an individual with an assault rifle and full "ballistic gear," who aimed the rifle toward him. (*Id.* at ¶10) He then recognized that a group of law enforcement officers had made a "dynamic entry" into his home with a battering ram. (*Id.*) The officers did not identify themselves as police before or during entry. (*Id.*) Upon encountering law enforcement, Bongiovanni was handcuffed and taken outside as officers began to search his residence. (*Id.* at ¶¶11-12) He was later taken back inside where he was interviewed by Agent Ryan. (*Id.* at ¶¶20-22) Bongiovanni states that Ryan opened his phone, began scrolling through its contents and told Bongiovanni to "tell him all about the mafia." (*Id.* at ¶24) According to Bongiovanni, Ryan read names from the contact directory of Bongiovanni's phone, but only asked him about individuals with Italian last names. (*Id.*)

### *Federal Cell Phone Warrant*

On June 7, 2019, the day after execution of the search warrant at 85 Alder Place, agents sought a federal warrant for the cell phone and other electronic devices seized from the residence. (Dkt. No. 237, pg. 174) The warrant, which was support by an affidavit by Agent Ryan, was authorized by United States Magistrate Judge Leslie G. Foschio. (*See* 19-MJ-1065)

*Credibility*

After having the opportunity to listen to Agent Ryan, Agent Mozg, Officer Garnett, and Officer Carter and observe their demeanors during the hearing, the Court finds them to be wholly credible.

The Court does not credit Mrs. Bongiovanni's testimony that neither she nor her husband unlocked their cell phones before providing them to the officers. Officer Carter credibly testified that Bongiovanni and his wife unlocked their phones before surrendering them, which allowed the officers to manually retrieve certain information from Bongiovanni's phone, including contact lists and text messages. Carter also testified that officers would not have been able to conduct the search if the phones had been locked. The pictures taken by the officers of the contents of Bongiovanni's phone corroborate Carter's testimony. (Dkt. No. 237, Exh. 1) Moreover, it stands to reason that it would have been impossible for officers to retrieve the information at issue here if the phones were locked and they did not have access to the passcodes.

Finally, to the extent that the statements in Bongiovanni's affidavit contradicted the agents' or the officers' hearing testimony, the Court declines to credit defendant's assertions over testimony that was live, credible, and subject to cross-examination. *See DiMattina v. United States*, 949 F. Supp. 2d 387, 411 (E.D.N.Y. 2013) ("Without the threat of cross-examination, affidavits are viewed as self-serving and given little weight."); *United States v. Frank*, 8 F. Supp. 2d 284, 291 n.2 (S.D.N.Y. 1998) (crediting the testimony of witnesses over the allegations in an affidavit because the affidavit was not subject to cross-examination and the court found the testifying witnesses fully credible); *United States v. Thompson*, 10 Cr. 94, 2010 U.S. Dist. LEXIS 78694 (S.D.N.Y. July 29,

2010) (declining to credit the assertions in an affidavit which could "neither be tested by cross-examination nor corroborated by the Court's observation of the [affiant's] demeanor").

### *Conclusions of Law*

#### *April 23, 2019 Border Search*

The "touchstone of the Fourth Amendment is reasonableness," which is evaluated "by assessing, on the one hand, the degree to which [a search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate government interests." *United States v. Knights*, 534 U.S. 112, 118-19 (2001). When law enforcement undertakes a search to discover evidence of criminal wrongdoing, "reasonableness generally requires the obtaining of a judicial warrant." *Riley v. California*, 573 U.S. 373, 382 (2014). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Id*. One such long-held exception to the warrant requirement is a search at an international border, where "the [g]overnment's interest in preventing the entry of unwanted persons and effects is at its zenith." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). To that end, the Supreme Court has held that "[r]outine searches of persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). Instead, routine "searches at the border…are reasonable simply by virtue of the fact that they occur at the border." *United States v. Ramsey*, 431 U.S. 606, 616 (1977).

Bongiovanni contends that evidence obtained from the search of his cell phone on April 23, 2019 must be suppressed because the border search exception to the warrant

requirement does not apply here. Defendant reasons that because the purpose of a border search is to screen for contraband or to prevent the commission of border-related crimes, CBP officers were not permitted to search his phone for evidence of domestic criminal activity that had no connection to his international travel and reentry to the United States.[14] Defendant urges the Court to follow recent precedent from other courts, including the Fourth Circuit and the Ninth Circuit, which limit or prohibit the search of cell phones at international borders for reasons other than looking for contraband in the phone (often child pornography) or preventing the commission of a crime related to entry. *See United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019) (cell phone searches at the border, whether manual or forensic, must be limited in scope to whether the phone contains digital contraband, and a broader search for evidence of a crime cannot be justified by the purposes of the border exception to the Fourth Amendment warrant requirement); *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019) ("To conduct an intrusive and nonroutine search under the border search exception…the Government must have individualized suspicion of an offense that bears some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking entry of unwanted persons, or disrupting efforts to export or import contraband."); *United States*

---

[14] There is no evidence in the record that Bongiovanni was referred to secondary inspection because either HSI or CBP believed Bongiovanni was carrying contraband into the United States or engaging in some other type of border-related or immigration-related crime. Instead, the hearing testimony, and all reasonable inferences to be drawn from it, indicates that Agent Ryan was investigating Bongiovanni for the domestic crimes described in the Indictment and that Ryan wanted to look at the contents of Bongiovanni's phone for potential evidence of those crimes. While the "lookout" request referred to Bongiovanni's suspected involvement in a "transnational criminal organization," there are neither allegations nor evidence in the record that Bongiovanni was himself smuggling narcotics internationally or that his trip to Punta Cana with his family in April 2019 was taken in furtherance of the conspiracies and other crimes charged here. In fact, during oral argument, counsel for the Government admitted that the lookout placed on Bongiovanni had nothing to do with him traveling back and forth across the border. (Dkt. No. 278)

*v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018) (the government may not "invoke[] the border exception on behalf of its generalized interest in law enforcement and combatting crime.").

However, the Second Circuit has not joined the Fourth and Ninth Circuits in similarly narrowing the scope of a border search. In *United States v. Levy*, defendant, a target of a federal investigation into a series of stock manipulation schemes, was detained by CBP officers upon his return from a business trip to Puerto Rico, based solely on information CBP officers received from the DEA about the domestic criminal investigation. 803 F.3d 120 (2d Cir. 2015). During the detention, officers seized a notebook from defendant's luggage containing 18-pages of hand-written notes including personal information, business contacts, and bank account information. Officers photocopied these notes, which were later introduced as evidence against defendant at trial. On appeal, defendant argued that the notebook evidence was obtained in violation of his Fourth Amendment rights, in part, because border searches by CBP must be limited to crimes that a statute or regulation specifically authorizes CBP to investigate, "such as contraband, dutiable merchandise, immigration fraud and terrorism." *Id.* The Second Circuit disagreed, holding that because CBP officers are "neither expected nor required to ignore evidence of a federal crime," they have "the authority to search and review a traveler's documents and other items at the border when they reasonably suspect the traveler is engaged in criminal activity, even if the crime falls outside the primary scope of their duties." *Id.* at 120. *See also United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2004) (the validity of a border search "does not depend on whether it is prompted by a criminal investigation motive.") Here, the Court the applies the Second Circuit's reasoning in *Levy* and *Irving* and concludes that the officers' decision to search Bongiovanni's phone

because he was the subject of a domestic criminal investigation unrelated to his international travel did not take the search outside the scope of the border exception to the warrant requirement.

Determining that the April 23, 2019 search falls within the *scope* of the border exception does not end the inquiry here. *See Cano*, 934 F.3d at 1002 ("Any search conducted under an exception [to the warrant requirement] must be within the scope of the exception. Second, some searches, even when conducted within the scope of the exception are so intrusive that they require additional justification.") Indeed, while the border search exception to the warrant requirement is broad, it is not boundless. The Supreme Court has suggested that "in the case of highly intrusive searches" where salient "dignity and privacy interests" are at stake, "a requirement of suspicion" might be needed. *See Flores-Montano*, 541 U.S. at 152 (suggesting that some level of suspicion might be appropriate for destructive searches of property or searches carried out in a "particularly offensive" manner); *Montoya de Hernandez*, 473 U.S. at 541-42 (holding that the detention of a traveler beyond the scope of a routine search required reasonable suspicion that traveler was smuggling drugs in their alimentary canal). Likewise, the Second Circuit has held that while searches of a person's luggage or personal belongings are routine searches, "more invasive searches, like strip searches, require reasonable suspicion." *Irving*, 452 F.3d at 123. Whether a search is deemed so intrusive that it becomes nonroutine hinges on how "deeply [the search] intrudes into a person's privacy." *Kolsuz*, 890 F.3d at 138.

In the context of searches of electronic devices, including cell phones, the distinction between routine and nonroutine searches is an area of evolving, and

sometimes conflicting, jurisprudence. Moreover, neither the Supreme Court nor the Second Circuit have expressly ruled as to when the search of a cell phone at a border becomes nonroutine, and what is required by the Fourth Amendment when it does. Here, the Government urges that the search of Bongiovanni's cell phone on April 23, 2019 was a routine border search and therefore no warrant, probable cause or even reasonable suspicion was necessary. For the following reasons, the Court declines to conclude that the events of April 23, 2019 constituted a routine border search.

*Levy*, the Second Circuit case discussed above, involved CBP officers copying and retaining eighteen pages of a notebook found in defendant's luggage during the border search. 803 F.3d at 120-22. Defendant argued that the search of his notebook was a nonroutine border search that required additional justification. *Id.* at 120. The Second Circuit noted that "had the CBP officer merely skimmed the notebook and returned it to [defendant] without copying it, we have no doubt that the inspection would have been routine." *Id.* at 122. The *Levy* Court went on to note that "whether *searching and copying* the notebook here constitutes a 'routine' border search that could be conducted without reasonable suspicion is somewhat more debatable." *Id.* However, since the record demonstrated that, at the time of the inspection, CBP officers had reasonable suspicion to believe that defendant was engaged in a stock fraud conspiracy, the Second Circuit found that it need not determine whether the search was routine or nonroutine.[15] *See also*

---

[15] Notably, the District Court in *Levy* agreed with defendant that the search of his notebook was a nonroutine border search because "the close reading and photocopying of an entrant's documents goes beyond the general searching one expects at a point of entry" and "may greatly intrude on a person's privacy." *United States v. Levy*, 11-CR-62, 2013 U.S. Dist. LEXIS 25508 (S.D.N.Y. Feb. 25, 2013). However, like the Second Circuit, the District Court concluded that this fact did not matter since officers nevertheless had reasonable suspicion to search the notebook. (*Id.*)

*United States v. Irving*, 452 F.3d at 121-24 (because officers had reasonable suspicion to believe defendant was involved in child pornography before conducting border search of the contents of his camera and computer disks, they "need not determine whether [the searches] were routine or nonroutine."). Thus, *Levy* suggests that when officers not only search a traveler's possessions for contraband or obvious evidence of criminal activity, but also take pictures and/or copy information to retain for use in a future criminal investigation or proceeding, like CBP officers did here, a border search *may* become nonroutine.

Moreover, unlike the facts in *Levy* which involved the copying of notebook pages, this case involves the copying of information from defendant's cell phone. In *United States v. Reilly*, the Supreme Court held that police officers generally may not, without a warrant, search information on the cell phone of an arrestee. 573 U.S. 373 (2014). In reaching this unanimous conclusion, the Supreme Court recognized the paramount privacy interests people possess in their cell phones and concluded that "[m]odern cell phones, as a category, implicate privacy concerns *far beyond* those implicated by the search of a cigarette pack, a wallet, or a purse." *Id.* at 393 (emphasis added). The *Reilly* decision noted that as a result of the immense storage capacity of cell phones, the special sensitivity of information stored on them, and the pervasiveness with which people carry and use them, cell phones are fundamentally different "in both a quantitative and qualitative sense from other objects traditionally subject to government searches." *Id.* at 391. "It is no exaggeration to say that many of the more than 90% of American adults who own cell phones keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate." *Id.* at 393. For these reasons, the Supreme Court

concluded that, "[a]llowing the police to scrutinize such records *on a routine basis* is quite different from allowing them to search a personal item or two in the occasional case." *Id.* (emphasis added).

While the Supreme Court's decision in *Reilly* addressed a search incident to an arrest and not a border search, it nevertheless recognized the heightened privacy interests associated with cell phones and considered those heightened interests when evaluating an exception to the warrant requirement. Thus, the Court finds that in light of the Second Circuit's suggestion in *Levy*, that copying and retaining of personal information from a traveler's documents for use in a future prosecution may make a border search nonroutine, and the Supreme Court's decision in *Reilly*, that searches of cell phones are fundamentally different than searches of other types of personal possessions or property, the search here should be classified as nonroutine.[16]

The Government maintains that because the search of Bongiovanni's phone was manual, as opposed to forensic, it must be treated as a routine search. To that end, the Government cites several cases which classify a "manual" search of a cell phone as routine, and a "forensic" search of a cell phone as nonroutine. However, the Court does not find the facts here to be nearly as clear-cut as the Government maintains. The Government is correct that because the DOMEX machine did not work on April 23, 2019, officers were unable to download the entire contents of Bongiovanni's phone to a separate device or flash drive, and therefore could not complete a forensic search of the

---

[16] The Government points to a footnote in *Levy* where the Second Circuit states "[w]e question whether a Customs official's inspection, copying and subsequent return of a document in a traveler's luggage can be so "intrusive" that it becomes a "non-routine" search requiring reasonable suspicion. *See Levy*, 803 F.122, n. 3. The Court finds that because this case involved the copying of information from a cell phone, as opposed to a notebook, the search here did become so intrusive as to make it nonroutine.

phone as they initially intended. However, the fact that officers could not complete a forensic download does not necessarily mean that this search was routine. Indeed, if Officer Carter and Commander Candela had merely manually clicked through some of the phone's contents and stopped when they did not find contraband or obvious evidence of criminal activity, it is possible the Court would consider this to be a routine search. But that is not what happened here. The officers here manually searched through the phone's contents, including Bongiovanni's contact list and numerous pages of his text messages. They then went further. When they did not find contraband, or even clear evidence suggesting criminal activity, they proceeded to take numerous pictures of the phone's contents. They then preserved these photographs and provided them to other officers for use in furtherance of a future criminal investigation or proceeding against Bongiovanni. This scenario stretched beyond what a traveler would expect to encounter at the border and constituted a significant intrusion upon defendant's privacy.[17]

---

[17] Many of the cases cited by the Government in support of their argument that the search here was routine were decided before both *Levy* and *Reilly*. *See United States v. Young*, 12-CR-00210, 2013 U.S. Dist. LEXIS 33496 (W.D.N.Y. Jan. 16, 2013); *United States v. Jenkins*, 5:11-CR-0602, 2013 U.S. Dist. LEXIS 208134 (N.D.N.Y. 2013); *United states v. Hampe*, 07-3-B-W, 2007 WL 1192365 (D. Me. April 18, 2007); *United States v. Bunty*, 617 F. Supp. 2d 359, 363 (E.D. Pa. 2008). More recent cases relied on by the Government are distinguishable or non-persuasive since the "routine searches" discussed therein did not appear to include the copying or photographing of a defendant's personal information from the device for later use. *See Alasaad v. Mayorkas*, 988 F.3d 8 (1st Cir. 2021) (border searches which did not entail connecting a device to external equipment that allowed officers to "review, copy and/or analyze its contents", were routine searches); *United States v. Saboonchi*, 990 F. Supp. 2d 536 (D. Md. April 7, 2014) (noting that routine border searches may include a conventional inspection of electronic media, but not specifically addressing a manual search of files that also includes copying); *United States v. Ramirez*, 18-CR-3530, 2019 WL 3502913 (W.D. Tex. Aug. 1, 2019) (refrained from characterizing the cell phone search as routine or nonroutine since officers had reasonable suspicion of child pornography); *United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018) (holding that forensic search of cell phone at border required reasonable suspicion, but not deciding what was required for initial manual search, that included scrolling though calls and text messages); *United States v. Almadaoji*, 3:18-CR-158, 2021 WL 4786615 (S.D. Ohio Oct. 14, 2021) (routine search where officer manually scrolled through phone and did not hook the phone up to other equipment or download its contents).

Having determined that the April 23, 2019 border search was nonroutine, the Court must next decide what level of justification, if any, was needed. Indeed, post-*Reilly*, no court has required more than reasonable suspicion to justify even an intrusive border search. *Cano*, 934 F.3d at 1015. *United States v. Wanjiku*, 919 F.3d 472, 485 (7th Cir. 2019) (noting petitioner "concede[d] that no court has ever required a warrant for any border search or seizure...[s]ince the highest standard that has been applied by the Supreme Court at the border is reasonable suspicion."). Thus, the Court does not find that a warrant or probable cause was needed here. While the Second Circuit has not specifically ruled as to what level of justification is required for a nonroutine cell phone search, both *Levy* and *Irving* seem to suggest that when a border search becomes nonroutine, an additional level of justification is necessary. *See Irving*, 452 F.3d 110 ("A border search is valid under the Fourth Amendment, even if non-routine, if it supported by reasonable suspicion."). Moreover, the Court finds that the nonroutine nature of the search makes this case analogous to others where courts have required reasonable suspicion for searches that went beyond a brief manual search for contraband or obvious evidence of a crime. *See Aigbekaen*, 943 F.3d at 720 (intrusive, nonroutine searches of electronic device requires some level of individualized suspicion).[18] Lastly, the Court finds that a reasonable suspicion requirement strikes an appropriate balance between the wide breath afforded to the Government in conducting border searches, where its interest in protecting people and property is "at its zenith" and the significant privacy interest the

---

[18] As explained above, unlike the Fourth and Ninth Circuits, the Court does not find that officers here needed *reasonable suspicion of digital contraband or a border-related crime* to conduct a nonroutine examination of Bongiovanni's phone, since, according to *Levy*, CBP officers are not restricted to looking only for evidence of border-related crimes. However, for all the reasons just stated, the officers should have had *reasonable suspicion of some type of criminal activity* before copying information from the phone.

Supreme Court has found with respect to cell phones. *See Reilly*, 573 U.S. at 373 ("Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans "the privacies of life"…[t]he fact that technology allows an individual to carry such information in his hand does not make the information less worthy of protection[.]").[19]

The Government counters that even though reasonable suspicion was not required here, officers had it anyway. Reasonable suspicion demands "specific and articulable facts which, taken together with rational inferences from those facts…provide…officers with a particularized and objective basis for suspecting wrongdoing." *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014). The Court finds no evidence of reasonable suspicion in the record here. Agent Ryan and Agent Mozg testified generally that they placed a lookout on Bongiovanni because they were investigating him for criminal activity and wanted to search his phone and luggage. However, the Government elicited no testimony from either Ryan or Mozg regarding the details of that investigation or what specific and articulable facts were known to them about Bongiovanni's alleged criminal activities, at the time they asked CBP officers to conduct the search. While reasonable suspicion is a relatively low standard, *Montoya de Hernandez*, 473 U.S. at 542, the mere

---

[19] In *United States v. Touset*, the Eleventh Circuit held that no level of suspicion was needed to conduct a forensic search of a cell phone at a border. 890 F.3d 1227, 1234 (11th Cir. 2018). The Court does not find *Touset* to be persuasive and notes that both the facts and reasoning of the case are distinguishable from the matter at hand. The officers in *Touset* were looking for child pornography on the device and the Court emphasized that "if we were to require reasonable suspicion for searches of electronic devices, we would create special protection for the property most often used to store and disseminate child pornography." *Id.* Moreover, the *Touset* Court found there was reasonable suspicion for the forensic search regardless because defendant was carrying an inordinate number of devices and had made payments to an account associated with child pornography. *Id.*

fact that agents were investigating Bongiovanni at the time of search is insufficient to satisfy even this low bar.[20]

The Court rejects the Government's argument that the CBP officers had reasonable suspicion to conduct the search because HSI officers placed a lookout for Bongiovanni stating that he was part of an investigation into a "transnational criminal organization." The Government is correct that "[w]hether a Custom's official's reasonable suspicion arises entirely from her own investigation or is prompted by another federal agency is irrelevant to the validity of a border search." *Irving*, 803 F.3d at 123. However, this proposition assumes that there is actual evidence in the record of the reasonable suspicion held by at least one officer involved in either requesting or conducting the search. The record before this Court is devoid of any such evidence. Moreover, the cases relied on by the Government are distinguishable since they appear to involve not only an alert in a law enforcement database, but also additional facts in the record suggesting the traveler was involved in criminal activity. *See e.g., Ramirez*, 2019 WL 3502913 (reasonable suspicion where TECS record entry indicated defendant was linked to

---

[20] In their post-hearing brief, the Government proffered information known to law enforcement, about Bongiovanni's suspected criminal activities, on or before April 23, 2019. (Dkt. No. 263, pgs. 16-17) However, the Government provided no details as to who knew this information, how they knew this information, or when they knew it. (*Id.*) Even more importantly, no one testified as to any of these facts during the evidentiary hearing. *See Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) ("[M]ere conclusory allegations or denials in legal memoranda or oral argument are not evidence[.]"). Moreover, defendant had no opportunity to cross-examine the officers regarding this information or their basis of knowledge. The Court later asked for supplemental briefing from the Government that cited specific information *in the record* to support reasonable suspicion. In its brief, the Government referenced the June 6, 2019 interview of Bongiovanni at his home by Agent Ryan. (Dkt. No. 284, pgs. 18-19) The Government argued that the "breath of topics shows that [law enforcement] was in the midst of a robust investigation of Bongiovanni before the search." (*Id.*) However, the June 6, 2019 interview occurred *after* the May 23, 2019 cell phone search. Thus, even if this information was known independent of the border search, there is no evidence in the record to prove that any of this information was known to HSI or DEA investigators *at the time* they requested the search.

purchase of child pornography *and* initial consent search revealed suspected images of child pornography); *Cotterman*, 709 F.3d at 957-58 (reasonable suspicion based on TECS alert *as well as* agents' discovery of defendant's prior child-related related conviction, the fact that he was returning from a country associated with sex tourism, and his possession of multiple electronic devices); *United States v. Bunty*, 617 F. Supp. 2d 359, 363 (E.D. Pa. 2008) (inspection justified based on information in NCIC database including prior arrest for sex abuse *as well as* international travel, multiple devices, and items found during initial search including card for probation officer charged with supervising sex offenders). The Government has also cited cases for the theory that participation in transnational criminal activity gives rise to reasonable suspicion for a border search. However, unlike the scenario the Court is presented with here, the record before those courts appeared to contain specific facts giving rise to officers' suspicions at the time of the search. *See Kolsuz*, 890 F.3d at 144 (forensic border search upheld where officers had "good reason to believe, in the form of two suitcases filled with firearm parts— that [defendant] was attempting to export firearms illegally."); *Kamaldoss*, 2022 WL 120076 (reasonable suspicion of defendant's involvement in transnational conspiracy where investigation revealed controlled buys, information from a confidential informant,

and seized packages mailed by defendant containing contraband).[21]

In conclusion, the Court finds that the search of Bongiovanni's cell phone on April 23, 2019 was a nonroutine border search that required reasonable suspicion of some type of criminal activity, border-related or otherwise. The Court further finds that the Government has not met its burden of proof to show that officers had reasonable suspicion of any criminal activity at the time they conducted the search. Thus, the Court finds that the cell phone border search violated Bongiovanni's Fourth Amendment rights. However, for the following reasons, the Court does not recommend suppression of the evidence.

### Good Faith

"The fact that a Fourth Amendment violation occurred—*i.e.,* that a search or arrest was unreasonable—does not necessarily mean the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). "Indeed, exclusion has always been our last resort, not our first impulse." *Id*. Thus, the exclusionary rule is subject to a good-faith exception, which has been expanded to cases involving warrantless searches. *Davis v. United States*, 564 U.S. 229, 236-37 (2011); *see also United States v. Aguiar*, 737 F.3d 251, 259 (2d Cir. 2013). To that end, the Supreme Court has held that the exclusionary

---

[21] Throughout briefing and argument of these motions, the Government has adamantly maintained that by April of 2019, law enforcement had already conducted a lengthy investigation into Bongiovanni's criminal activities, which produced ample information and evidence of wrongdoing to justify the border search. During post-hearing argument, the Court asked the Government if, considering the relevant case law, the record as it stood, and the Government's position that the search was supported by reasonable suspicion, the Government would seek to reopen the evidentiary hearing to introduce evidence of reasonable suspicion. The Government indicated that they were not asking to reopen the hearing at that time. In its request for supplemental briefing, the Court again asked the Government to state its position on reopening the hearing, since it was the Court's opinion that there was no evidence in the record to support the Government's position that officers had reasonable suspicion at the time of the search. The Government's supplemental brief did not address reopening the hearing. (Dkt. No. 284)

rule does not apply when a search is conducted in good-faith, objectively reasonable reliance on binding judicial precedent. *Davis*, 131 S. Ct. at 2423-24. In such circumstances, "police conduct [is not] sufficiently deliberate that exclusion can deter it, and [is not] sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 141. In looking to appellate precedent, courts in the Second Circuit are to consider "the precedent of this circuit and the Supreme Court." *Aguilar*, 737 F.3d at 261.

At the time of the April 23, 2019 search, the Supreme Court generally held that routine border searches of persons and their belongings did not require reasonable suspicion. *See Montoya de Hernandez*, 473 U.S. at 538. Moreover, the Second Circuit had not, and in fact still has not, defined the parameters of what constitutes a nonroutine border search of cell phone. *Tabbaa v. Chertoff*, 509 F.3d 89, 98 (2d Cir. 2007) ("The precise line between what is routine and what is nonroutine…has not been clearly delineated."). Also, at the time of the April 23, 2019 border search, neither Supreme Court nor Second Circuit precedent expressly required reasonable suspicion for conducting a nonroutine border search of an electronic device. Even *Cano*, the Ninth Circuit case which held that both manual and forensic searches of electronic devices must be limited to a search for digital contraband, had not yet been decided.

The facts of the instant search are unique and this area of the law is evolving. This Court has found, based on its interpretation of Second Circuit case law and its reading of *Reilly*, that the search here was nonroutine and that the officers should have had reasonable suspicion of criminal activity before searching and copying portions of content from Bongiovanni's phone for use in a future criminal investigation or proceeding. Indeed,

33

this determination was a close call. Thus, given the facts here and the state of the law in this area on April 23, 2019, it cannot be said that officers were acting contrary to binding appellate precedent when they conducted the search of Bongiovanni's phone. *See Aigbekaen*, 943 F.3d at 725 ("Given the uniform body of precedent that permitted warrantless searches at the border in May of 2015, we cannot help but conclude that the good-faith exception applies here."); *United States v. Almadaoji*, 567 F. Supp. 3d 834, 840 (S.D. Ohio, Oct. 13, 2021) (holding that even if officer's manual border search of a cell phone violated the Fourth Amendment, the officer held an objectively good faith belief, based on existing precedent, that he was permitted to conduct the search); *United States v. Kamaldoss*, 19-CR-543, 2022 U.S. Dist. LEXIS 73897 (E.D.N.Y. April 22, 2022) ("Based on governing case law in this circuit [in April 2019], the border agents who searched [defendant's] devices had no reason to think that they could do so only if they had reasonable suspicion that the device contained digital contraband."); *United States v. Aguilar*, 973 F.3d 445, 450 (5th Cir. 2020) (Even post-*Riley*, courts have continued to rely on the "robust body of pre-*Riley* caselaw that allowed warrantless border searches of computers and cell phones.").

In *United States v. Julius*, the Second Circuit instructed courts to conduct a cost/benefit analysis when considering whether the deterrent effect of applying the exclusionary rule outweighs the cost of the rule's application. 610 F.3d 60, 66 (2d Cir. 2010) Likewise, in *Davis*, the Supreme Court stressed that the goal of deterrence must be balanced against the "substantial societal costs" generated by the exclusionary rule. *Id.* at 2427. Specifically, "[e]xclusion exacts a heavy toll on both the judicial system and society at large [since] [i]t almost always requires courts to ignore reliable, trustworthy

34

evidence bearing on guilt or innocence." *Id.* When law enforcement's conduct is deliberate, reckless, or grossly negligent, the "deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* at 2427-28. However, when the police act with an objectively reasonable good-faith belief that their conduct is lawful, the "deterrence rational loses much of its force," and exclusion cannot "pay its way." *Id.*

Officer Carter and Agent Ryan credibly testified that they believed the search of the phone comported with both the Fourth Amendment and longstanding CBP policy. As just noted, binding appellate precedent at the time of the search did not clearly prohibit the officers' actions here. Indeed, there is no evidence before the Court that the officers' conduct was deliberate, reckless, or grossly negligent. For these reasons, the Court finds that deterrence benefits of suppression here would not outweigh its heavy costs. Thus, the Court recommends denial of defendant's motion to suppress evidence obtained directly or indirectly from the border search of his cell phone on April 23, 2019.[22]

*Use of No-Knock Warrant on June 6, 2019*

Bongiovanni also moves for suppression of statements and evidence obtained during the search of his residence on June 6, 2019, on the grounds that the "no-knock"

---

[22] Because the Court is recommending denial of defendant's motion to suppress the evidence obtained as a result of the cell phone border search, it need not address defendant's arguments that his June 6, 2019 statements as well as evidence obtained as a result of certain search warrants must be suppressed because they were fruit of the poisonous tree from an unlawful search. Should the District Court disagree and grant the motion to suppress the evidence obtained on April 23, 2019, it is likely the record would need to be reopened to address defendant's fruit of the poisonous tree argument as it pertains to both his June 6, 2019 statements and search warrants in this case which relied, at least in part, upon information obtained as a result of the cell phone border search. The Court notes that to the extent defendant is arguing that Agent Ryan unlawfully searched his phone on June 6, 2019, that argument is rejected. The Court credits Agent Ryan's testimony that he did not search Bongiovanni's phone during the June 6, 2019 interview. Likewise, the record shows that the phone was validly seized pursuant to a federal search warrant, and that officers later applied for, and were granted, a federal warrant for the search of it contents.

warrant for his residence was "improvidently granted." (Dkt. No. 149, pgs. 2-40) He contends that the no-knock warrant was unjustified and resulted in a violation of his Fourth Amendment rights.[23]

Law enforcement officers are permitted to execute search warrants without knocking when there is reasonable suspicion that knocking and announcing their presence would be "dangerous or futile" or would inhibit the effective investigation of the crime. *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). To that end, the Second Circuit has held that magistrates may issue warrants which specifically authorize execution of a warrant without requiring police to knock. *United States v. Tisdale*, 195 F.3d 70, 72 (2d Cir. 1999).

Here, the warrant application for 85 Adler Street was supported by an affidaivt from Agent Ryan. (Dkt. No. 177, pg. 5) In his affidaivt, Ryan averred that "Bongiovanni served in law enforcement, has tactical training, and there is reason to conclude that he possesses firearms in his home." (*Id.*) Ryan further stated that "it appears [Bongiovanni] has been angry with others at times in this investigation" and that a confidential source reported observing Bongiovanni use cocaine, which could "skew his judgment." (*Id.*) Thus, Ryan "was concerned that providing any notice may give Bongiovanni the opportunity to utilize a firearm or other dangerous instrument in an attack against entering law enforcement." (*Id.*) Based on these statements, as well as the other information contained in the warrant application, this Court found that officers had a reasonable

---

[23] Defendant initially argued that use of the no-knock warrant here was both unconstitutional on its face and contributed to the coercive atmosphere that resulted in his involuntary statements on June 6, 2019. Because defendant has withdrawn his motion to suppress statements on grounds of voluntariness, the Court only addresses defendant's argument that use of the no-knock warrant was unconstitutional on its face.

suspicion to believe that knocking and announcing their presence would be dangerous, futile, or inhibit the investigation. This Court has again reviewed the statements in the "No-Knock Authority" portion of the warrant application, and again finds that the facts and circumstances of law enforcement entry to 85 Alder Street on June 6, 2019 justified dispensing with the knock and announce requirement. *See United States v. Harper*, 421 F. App'x 108, 110 (2d Cir. 2011) ("[N]o-knock provision included in the warrant was justified, as investigating officers reasonably believed that firearms were present in [defendant's] home and that announcing their presence would be dangerous.").

Moreover, even if the issuance and use of a no-knock warrant was improper, which it was not, suppression would not be the appropriate remedy here. In *Hudson v. Michigan*, the Supreme Court held that even where the government "conceded that the entry was a knock and announce violation", the appropriate remedy was not suppression of the evidence. 547 U.S. 586 (2006). The Supreme Court explained that "[w]hat the knock and announce rule has never protected, however, is one's interest in preventing the government from seeing or taking evidence described in a warrant...[s]ince the interests that were violated [in this case] have nothing to do with the seizure of evidence, the exclusionary rule is inapplicable." *Id.* at 593-96. *See also United States v. Acosta*, 502 F. 3d 54, 61 (2d Cir. 2007) (An alleged violation of the knock-and-announce rule--both under the Fourth Amendment and § 3109--did not trigger the exclusionary rule and could not form the basis for suppression of the evidence obtained in the ensuing search.).

For these reasons, the Court finds that use of the no-knock warrant was not unconstitutional on its face and did not violate defendant's Fourth Amendments rights,

and declines to recommend suppression of any evidence or statements obtained during the June 6, 2019 search of Alder Street on this basis.

### *Motion to Dismiss Indictment for Selective Prosecution*

Defendant moves to dismiss the Indictment on grounds of selective prosecution pursuant to Rule 12(b)(3)(A)(iv) of the Federal Rules of Criminal Procedure. (Dkt. No. 81, pg. 16) Specifically, Bongiovanni contends that he is being selectively prosecuted based upon his Italian-American heritage or perceived connection to Italian Organized Crime. (*Id.*)

A prosecution can be selective if predicated on a defendant's race. *See United States v. Armstrong*, 517 U.S. 456 (1996). The Second Circuit has explained that a prosecution is selective if it is undertaken with "intentional and purposeful discrimination" based upon such impermissible considerations as race, religion, or the desire to prevent [a defendant's] exercise of constitutional rights." *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974). For an indictment to be dismissed on selective prosecution grounds, a defendant must provide "clear evidence" that the prosecutorial decision had both a "discriminatory effect …and was motivated by a discriminatory purpose." *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003) (internal citations omitted). To establish discriminatory effect, a defendant "must show that similarly situated individuals of a different race were not prosecuted." *Armstrong*, 517 U.S. at 465. To prove discriminatory purpose, a defendant must show "the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based on impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *United States v. Sun Myung Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983); *citing Berrios*, 5-1 F.2d

at 1211. The standard to prove selective prosecution is a "demanding one." *Armstrong*, 517 U.S. at 463.

Bongiovanni submits no evidence to suggest that the decision to prosecute him had a discriminatory effect or was motivated by a discriminatory purpose. He has not set forth any facts to suggest that he was singled out for prosecution among others similarly situated, or that prosecutors had an invidious or improper motive in bringing the charges against him. Defendant posits that the Government's allegations regarding his connection to Italian Organized Crime constitute the introduction of a "racial/ethnic controversy." Here, the Government alleges that Bongiovanni accepted bribes from Gerace and Masecchia, in part, because he wanted to ingratiate himself with individuals he believed were connected to IOC. Thus, these allegations appear to be relevant to the Government's proof of motive and do not appear to be introduced for discriminatory or inflammatory purposes. To the extent that the Government seeks to introduce evidence about Italian Organized Crime at the time of trial, the District Judge will determine whether such evidence is relevant and, if relevant, whether it is unduly prejudicial. For these reasons, the Court recommends denial of defendant's motion to dismiss the Indictment for selective prosecution.[24]

### ***Motion to Dismiss Count 18***

Bongiovanni moves to dismiss Count 18 of the Indictment, charging him with False Statements to an Agency of the United States, in violation Section 1001(a)(2) of Title 18 of the United States Code. (Dkt. No. 81, pg. 17) Defendant contends that Count 18 must

---

[24] During oral argument, counsel for Bongiovanni acknowledged that his motion to dismiss for selective prosecution was likely premature since defendant was not yet in possession of all relevant 3500 materials. Thus, it is recommended that the motion be denied without prejudice subject to defendant's ability to put specific evidence before the Court to substantiate this claim.

be dismissed for "failure to state an offense" pursuant to Rule 12(b)(3)(B)(v) of the Federal Rules of Criminal Procedure.[25]

A count is properly pled if it: (1) contains the elements of the offense charged and (2) "enables [defendant] to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). *See also United States v. Khalil*, 13-CR-386, 2014 WL 1599943 (E.D.N.Y. Apr. 21, 2014) ("An indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."). A count charging a violation of Section 1001(a)(2) must sufficiently allege "that a defendant (1) knowingly and willfully, (2) made a materially false, fictitious or fraudulent statement, (3) in relation to a matter within the jurisdiction of the United States, (4) with knowledge that it was false, fictitious or fraudulent." *United States v. Litvak*, 808 F.3d 160, 170 (2d Cir. 2015). Here, Count 18 sets forth nine specific statements allegedly made by Bongiovanni to federal agents on June 6, 2019 in the Western District of New York. It alleges that the statements were materially false, fictitious or fraudulent and that defendant knew them to be false, fictitious or fraudulent at the time he made them. Thus, Count 18 of the Indictment adequately states an offense.

Defendant seems to contend that Count 18 must be dismissed because the alleged statements were not material. A statement is "material" if it has a tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed, or if it is capable of distracting the government investigators' attention

---

[25] Defendant previously moved to dismiss this Count on the additional ground that it was based on his statements to law enforcement on June 6, 2019 and those statements were involuntary. However, defendant has since withdrawn that argument.

away from a critical matter." *United States v. Coplan*, 703 F.3d 46, 79 (2d Cir. 2012).

Moreover, whether a false statement was material is generally a question of fact left for

the jury to decide. *United States v. Gaudin*, 515 U.S. 506, 511 (1995). Here, defendant

appears to argue that because officers already knew, or believed they knew, about the

nature of his relationship with Gerace and others at the time of the interview, the only

reason Agent Ryan asked him such questions was to prompt or produce a charge of false

statements. Defendant may certainly raise this argument, and others, at the time of trial.

However, this argument goes to the sufficiency of the Government's proof and is not a

proper basis for a motion to dismiss. *See Khalil*, 2014 WL 1599943 (denying motion to

dismiss false statements charge based on defendant's argument that statements were

not material since the government already knew the answers to the questions asked,

since materiality entails a factual determination and assessment of the sufficiency of the

government's proof); *United States v. Kurtz*, 98 CR. 733, 1999 WL 349374, at *4

(S.D.N.Y. May 28, 1999) (rejecting defendant's request to dismiss § 1001(a)(2) counts

against him on materiality grounds because "the Indictment *alleges* that the false

statements were material, which is sufficient to withstand a motion to dismiss the

charge.") (emphasis in original). For these reasons, the Court recommends denial of

defendant's motion to dismiss Count 18 of the Indictment.

### ***Omnibus Demands***

#### *Rule 16 and Expert Testimony*

Defendant moves for discovery and inspection pursuant to Federal Rule of

Criminal Procedure 16. (Dkt. No. 81, pgs. 37-41) Rule 16(a) requires the Government to

disclose certain evidence and information upon request of a defendant. While Rule 16

was intended to provide for liberal discovery, a defendant is not entitled to discovery of "the entirety of the Government's case against him." *United States v. Percevault*, 490 F.2d 126, 130 (2d Cir. 1974). Rule 16 provides that a defendant is entitled to the following: (1) a defendant's written, recorded or oral statements in the possession of the Government; (2) the defendant's prior record; (3) documents, objects, books, papers, photographs, etc. that will be used during the Government's case-in-chief; (4) reports of examinations or tests; (5) and information about expert witnesses in accordance with Fed. R. Evid. 702, 703 and 705. *See* Fed R. Crim. P. 16(a)(1). Rule 16 specifically exempts from disclosure "reports, memorandum, or other internal Government documents made by an attorney for the Government or other Government agent in connection with investigating or prosecuting the case." *See* Fed. R. Crim. P. 16(a)(2).

Defendant's Rule 16 requests include, *inter alia*, copies of any and all documents substantiating the alleged bribes; any discovery that establishes the existence of IOC; documents regarding "Operation Willamette Falls"; and a written summary of any testimony the Government plans to introduce as evidence pursuant to Rules 702, 703 or 705 of the Federal Rules of Evidence. (Dkt. No. 81, pgs. 37-41) Defendant also requests written notification, pursuant to Federal Rule of Criminal Procedure 12(b)(4), of any evidence the Government intends to introduce at trial during its case in chief. (*Id.*)

The Government responds that it has provided voluntary discovery and has complied with Rule 16 by producing or making available all items falling under the scope of Rule 16. (Dkt. No. 87, pgs. 5-7) The Government submits a comprehensive list of the apparently extensive and voluminous document discovery it has produced, along with a chart containing Bates ranges and a description of the production. (*Id.*) The Government

has further provided defendant with all statements under Rule 16(a)(1)(A); lab reports pertaining to seized controlled substances; a report of analysis of defendant's DEA-issued phone; and extraction reports from his personal cell phone (*Id.* at 9-16) The Government states that it intends to use all items of evidence that defendant has been provided with or made aware of in accordance with Federal Rule of Criminal Procedure 12(b)(4)(A). (*Id.* at 8) The Government also indicates that it will identify experts and provide expert summaries, if applicable, pursuant to Rule 16(a)(1)(G) and consistent with the timing of the District Court's pretrial order. (*Id.* at 17)

Based upon the representations made by the Government, defendant's request for discovery pursuant to Rule 16 is denied as moot. The Government is reminded that its disclosure obligations pursuant to Rule 16 and its notice obligations pursuant to Rule 12 continue up through and during trial. *See* Fed. R. Crim. P. 16(c) and 12(b)(4)(A). Finally, the Government is expected to comply with all requirements in Rule 16, Federal Rules of Evidence 702, 703, and 704, and Judge Sinatra's pretrial order as they apply to expert testimony.

### *Bill of Particulars*

Bongiovanni moves for a bill of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure. (Dkt. No. 81, pgs. 33-36) Defendant seeks particularization as to, *inter alia*, the identity, characteristics, and structure of the alleged IOC organization; the alleged role or membership co-conspirators played in IOC; whether Bongiovanni is alleged to be a member of IOC; what specific information Bongiovanni is alleged to have passed to co-conspirators; and details of who paid the cash bribes, the amounts, and how they were paid. (*Id.*) Defendant also seeks particularization as to the identities of co-

conspirators, specific locations of alleged criminal activity, and the dates, times, locations, and amounts related to the alleged distribution of controlled substances. (Dkt. No. 149, pgs. 5-7)

Federal Rule of Criminal Procedure 7(f) "permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). However, "[t]he Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendants committed the crimes charged, or a preview of the Government's evidence or legal theories." *United States v. Rittweger*, 259 F. Supp. 2d 275, 291 (S.D.N.Y. 2003). In determining whether a bill of particulars is warranted, a court is to consider "the complexity of the offense, the clarity of the indictment, and the degree of discovery otherwise afforded to defendants." *United States v. Shoher*, 555 F. Supp. 346, 349 (S.D.N.Y. 1983). It is well-settled that acquisition of evidentiary detail is not the purpose of a bill of particulars. *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990). Further, a defendant is not generally entitled to receive details of the government's conspiracy allegations through a bill of particulars. *United States v. Wilson*, 493 F. Supp. 2d 364, 372 (E.D.N.Y. 2006).

The Indictment here is 45-pages long and provides a thorough explanation of the charges, including a detailed explanation of how Bongiovanni, Gerace, Masecchia and others allegedly orchestrated a years-long scheme to defraud the United States and the DEA. The charges are not difficult to understand. The Government essentially claims that

Gerace and Masecchia paid or facilitated bribes to Bongiovanni, and that Bongiovanni used his position as SA for the DEA to shield his associates from investigation and prosecution for narcotics distribution. The Indictment also alleges that Bongiovanni conspired to distribute various controlled substances, obstructed justice by making false statements in DEA 6 reports, and made materially false statements to federal investigators. Further, the Government submits that it has provided extensive discovery that has exceeded the requirements of Rule 16. Indeed, the Government has apparently provided 96 gigabytes of discovery, consisting of 10,541 files. (Dkt. No. 81, pg. 36)

Considering the allegations in the Indictment in conjunction with the materials produced in discovery, the Court finds that defendant has been provided with sufficient information to inform him of the charges against him, prepare a defense, avoid surprise at trial, and ensure against double jeopardy. The additional details sought by Bongiovanni amount to an attempt to use a bill of particulars as a discovery device. Stated another way, defendant seeks information about the manner in which each violation occurred, but that would impermissibly demand evidentiary detail and unduly intrude upon the Government's theories. *See United States v. Sattar*, 272 F. Supp. 2d 348, 375 (S.D.N.Y. 2003) ("The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendants committed the crimes charged, or a preview of the Government's evidence or legal theories."); *United States v. Barret*, 824 F. Supp. 2d 419, 439 (E.D.N.Y. 2011) ("the nature of the wheres, when and with whoms of a conspiracy are frequently held to be beyond the scope of a bill of particulars); *United States v. Trippe*, 171 F. Supp. 2d 230,

240 (S.D.N.Y. 2001) (denying request for "names of all co-conspirators and/or aidors and abettors...of the defendant").

For these reasons, Bongiovanni's request for a bill of particulars is denied.

*Jencks Material*

Defendant requests disclosure of witness statements in advance of trial. The Government has no general duty to disclose the identities of its witnesses before trial. *United States v. Bejasa*, 904 F.2d 137, 139 (2d Cir. 1990). Section 3500 of Title 18 of the United States Code requires that the government, on motion of defendant, disclose a government witness's prior statements that are in the government's possession and relate to the subject matter of the witness's direct testimony ("*Jencks* material"). *See also Jencks v. United States*, 353 U.S. 657 (1957); Fed. R. Crim. P. 26.2 (procedure for producing a witness statement). A witness statement is defined as: (1) a written statement by a witness that is signed or otherwise adopted or approved by the witness; (2) a substantially verbatim recording or transcription of a witness's oral statement; or (3) any statement however taken or recorded made by the witness to the grand jury. 18 U.S.C. 3500(e). Statements are not required to be produced, by law, until after the witness has testified on direct examination, and the Court cannot mandate that they be produced sooner. *See* 18 U.S.C. §3500(a); Fed. R. Crim. P 26.2(a).

The Government indicates that it will produce *Jencks* material early and in accordance with the District Court's pretrial order. (Dkt. No. 87, pg. 65) In light of these representations, defendant's request for disclosure of witness statements is denied as moot.

*Brady Material*

Defendant moves for the disclosure of all *Brady* and *Giglio* material, including any DEA 6 forms completed during his tenure where agents signed or completed forms on behalf of other agents and were not criminally charged. (Dkt. No. 81, pgs. 36)

The Government has an obligation to disclose exculpatory material, or material favorable to an accused as to either guilt or punishment, even when no affirmative request has been made. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Material "favorable to an accused" includes not only evidence that affirmatively tends to exculpate the defendant, but also information that impeaches the credibility of Government witnesses. *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972). The test for materiality is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Evidence may be material for *Brady* purposes even if it is not admissible, as long as it could lead to the discovery of admissible evidence. *United States v. Gill*, 297 F.3d 93, 104 (2d Cir. 2002). "[A]s a general rule, *Brady* and its progeny do not require immediate disclosure of all exculpatory and impeachment material upon request by a defendant." *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001). "[A]s long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." *Id*. at 144.

The Government believes it has complied with its *Brady/Giglio* obligations, and acknowledges its affirmative continuing duty to provide defendant with exculpatory evidence, as well as evidence that the defense might use to impeach the Government's

witnesses at trial. (Dkt. No. 87, pg. 28-31) With respect to examples of documents where DEA agents signed forms on behalf of each other, the Government submits that if this material exists, it does not constitute *Brady* material. The Government states that defendant can access the signatures in all files he opened, managed, and maintained. To the extent defendant claims agents often signed forms for each other, "[e]vidence is not suppressed if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001). The Government notes that with respect to law enforcement agents who will testify that Bongiovanni signed forms on their behalf without their knowledge, *Jencks* material will be provided prior to rial. Finally, the Government submits that if Bongiovanni has a request for an identifiable document from a specific file, he may make such request to the Government.

Given the Government's representations and for the reasons just stated, defendant's motion to compel the production of *Brady/Giglio* material is denied as moot. The Government is reminded of its continuing *Brady* obligations and, consistent with *Coppa*, the Government shall timely disclose any *Brady* and *Giglio* material to defendant. *See United States v. Padovani*, 14-CR-00224, 2016 WL 5402696, at *4 (W.D.N.Y. Sept. 28, 2016).

### Rule 404(b) and Impeachment Evidence

Defendant moves for disclosure of any evidence of prior crimes or bad acts the Government intends to introduce at trial pursuant to Federal Rule of Evidence 404(b). (Dkt. No. 81, pg. 41) Defendant also moves for pretrial disclosure of impeachment evidence pursuant to Federal Rules of Evidence 608 and 609. (*Id.*) The Government

states that it will disclose any evidence in its possession which might fall under the ambits of Rules 404(b), 607, 608, and 609 in advance of trial and in accordance with the District Court's pretrial order. (Dkt. No. 87, pgs. 63-64)

The Government is required to provide "reasonable notice in advance of trial" of the general nature of prior uncharged crimes or bad acts it intends to introduce against a defendant. *See* Fed. R. Evid. 404(b). Based upon the Government's representation that it will disclose Rule 404(b) evidence and impeachment evidence in advance of trial when required to do so by the District Court, defendant's motion is denied as moot. The issue of admissibility of evidence pursuant to Federal Rules of Evidence 404(b), 608 and 609 is left to the determination of Judge Sinatra at the time of trial.

*Joinder*

Bongiovanni moves to join in all motions made by co-defendant Gerace. (Dkt. No. 149, pg.4) As noted above, the Court will address Gerace's pretrial motions in a separate Report, Recommendation and Order. Bongiovanni's motion for joinder is granted. Thus, to the extent relevant and applicable, the Court's decisions and findings with respect to co-defendant's motions will apply equally to Bongiovanni.

*Severance*

Bongiovanni moves for severance from co-defendant Gerace as to Counts 7 and 9, on the grounds that these counts are irrelevant as to Bongiovanni and highly prejudicial. (Dkt. No. 149, pg. 4) A request to sever either counts or defendants is best handled by the District Judge, who will ultimately preside over the trial. *See United States v. Mireles,* 08 CR 34, 2009 U.S. Dist. LEXIS 109176 (W.D.N.Y. Nov. 23, 2009) (Severance motions "are more appropriately heard and determined by the trial court, which is in the best

position to rule on the issues presented.") Thus, Bongiovanni's motion for severance is denied without prejudice to renew his request before Judge Sinatra.

### *Government's Request for Reciprocal Discovery*

The Government moves for reciprocal discovery pursuant to Rule 16(b) of the Federal Rules of Criminal Procedure including the opportunity to inspect, copy or photograph books, papers, documents, photographs, tangible objects or copies or portions thereof which are in the possession, custody or control of the defendant and which the defendant intends to introduce as evidence at trial, the results or reports of any physical or mental examinations or scientific tests or experiments made in connection with the case which the defendant has in his possession and intends to introduce at trial, and a written summary of any expert witness testimony. (Dkt. No 87, pgs. 66-67; Dkt. No. 177, pgs. 28-29) The Government also requests that defendant disclose any statements he intends to offer at trial pursuant to Rule 807 of the Federal Rules of Civil Procedure. (*Id.*) The Government's motion for reciprocal discovery is granted, and defendant is reminded that his disclosure obligations continue up through and during trial.   *See* Fed. R. Crim. P. 16(c).

### CONCLUSION

For the foregoing reasons, it is recommended that defendant Joseph Bongiovanni's motion to suppress evidence and statements be denied, and that his motions to dismiss the Indictment for selective prosecution and to dismiss Count 18 of the Indictment be denied as well. (Dkt. Nos. 87, 149) It is ordered that defendant Joseph Bongiovanni's omnibus discovery demands are decided in the manner detailed above

(Dkt. Nos. 87, 149) and the Government's request for reciprocal discovery is granted (Dkt. No. 87).

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ordered that this Report, Recommendation and Order be filed with the Clerk of Court.

Unless otherwise ordered by Judge Sinatra, any objections to the recommendation portion of this Report, Recommendation and Order must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 59(b), 45(a), and 45(c) of the Federal Rules of Criminal Procedure, and Local Rule of Criminal Procedure 59.  Any requests for an extension of this deadline must be made to Judge Sinatra.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report, Recommendation and Order WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.***  *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *Pursuant to Local Rule of Criminal Procedure 59(c)(2), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority."* ***Failure to comply with these provisions may result in the District Court's refusal to consider the objection.***

51

**SO ORDERED**.


Dated:  August 4, 2022
        Buffalo, New York


_____
MICHAEL J. ROEMER
United States Magistrate Judge