01:13PM

1
                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK
2
_____
3  UNITED STATES OF AMERICA,
                                   Case No. 1:19-cr-227
4                  Plaintiff,              (LJV)
   v.
5                                  February 21, 2024
   JOSEPH BONGIOVANNI,
6
_____Defendant._____
7

8    TRANSCRIPT EXCERPT - DIRECT TESTIMONY OF LOUIS SELVA - DAY 1
            BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                  UNITED STATES DISTRICT JUDGE

10
   APPEARANCES:          TRINI E. ROSS, UNITED STATES ATTORNEY
11                       BY: JOSEPH M. TRIPI, ESQ.
                            NICHOLAS T. COOPER, ESQ.
12                          CASEY L. CHALBECK, ESQ.
                         Assistant United States Attorneys
13                       Federal Centre
                         138 Delaware Avenue
14                       Buffalo, New York 14202
                            And
15                       UNITED STATES DEPARTMENT OF JUSTICE
                         BY: JORDAN ALAN DICKSON, ESQ.
16                       1301 New York Ave NW
                         Suite 1000
17                       Washington, DC 20530-0016
                         For the Plaintiff
18
                         SINGER LEGAL PLLC
19                       BY: ROBERT CHARLES SINGER, ESQ.
                         80 East Spring Street
20                       Williamsville, New York 14221
                            And
21                       LAW OFFICES OF PARKER ROY MacKAY
                         BY: PARKER ROY MacKAY, ESQ.
22                       3110 Delaware Avenue
                         Kenmore, New York  14217
23                       For the Defendant

24   PRESENT:            BRIAN A. BURNS, FBI Special Agent
                         MARILYN K. HALLIDAY, HSI Special Agent
25                       KAREN A. CHAMPOUX, USA Paralegal

| | |
|---|---|
| <u>LAW CLERK</u>: | **REBECCA FABIAN IZZO, ESQ.** |
| <u>COURT DEPUTY CLERK</u>: | **COLLEEN M. DEMMA** |
| <u>COURT REPORTER</u>: | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |

Robert H. Jackson Federal Courthouse
2 Niagara Square
Buffalo, New York  14202
Ann_Sawyer@nywd.uscourts.gov

\*     \*     \*     \*     \*     \*     \*     \*

(Excerpt commenced at 1:13)

01:13PM   (Jury seated at 1:13 p.m.)

01:13PM   **THE COURT:**  Welcome back.  The record will reflect

01:13PM   that all our jurors are present.  And the government can call

01:13PM   its next witness.

01:13PM   **MR. TRIPI:**  The government calls Louis Selva,

01:13PM   Your Honor.

01:14PM   **L O U I S    S E L V A,** having been duly called and sworn,

01:14PM   testified as follows:

01:14PM   **MR. TRIPI:**  You ready, Your Honor?

01:14PM   **THE COURT:**  You may.

01:14PM   **MR. TRIPI:**  Thank you.

01:14PM   **DIRECT EXAMINATION BY MR. TRIPI:**

01:14PM   Q.  Good afternoon, Mr. Selva.

01:14PM   A.  Good afternoon.

01:14PM   1   Q.  I'm going to ask you to keep your voice up to the best of

01:14PM   2   your ability to make sure we all hear you.

01:14PM   3   A.  Okay.

01:14PM   4   Q.  Mr. Selva, how old are you?

01:14PM   5   A.  59.

01:14PM   6   Q.  Where did you grow up?

01:14PM   7   A.  North Buffalo.

01:15PM   8   Q.  Do you know Joseph Bongiovanni?

01:15PM   9   A.  Yes.

01:15PM  10   Q.  How do you know him?

01:15PM  11   A.  We grew up together.

01:15PM  12   Q.  How long have you known him?

01:15PM  13   A.  Since grade school, sixth grade.

01:15PM  14   Q.  How many years is that?

01:15PM  15   A.  45.

01:15PM  16   Q.  Do you see Mr. Bongiovanni in court?

01:15PM  17   A.  I do.

01:15PM  18   Q.  Can you please point to him and describe something he's

01:15PM  19   wearing?

01:15PM  20   A.  He's wearing a suit and a tie, next to his attorneys.

01:15PM  21   Q.  What color tie does he have on?

01:15PM  22   A.  Gray or blue.

01:15PM  23   Q.  Is he sitting in the middle?

01:15PM  24   A.  Yeah, sitting in the middle.

01:15PM  25           MR. TRIPI:  Your Honor, may the record reflect that

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

4

01:15PM 1   the witness has identified the defendant.

01:15PM 2           **THE COURT:**  It does.

01:15PM 3           **BY MR. TRIPI:**

01:15PM 4   Q.  Can you describe or characterize your relationship with

01:15PM 5   Mr. Bongiovanni through most of your life?

01:15PM 6   A.  We grew up together, grammar school through high school.

01:15PM 7   Q.  How close were you?

01:15PM 8   A.  We were best friends.

01:15PM 9   Q.  How far have you gone in school, Mr. Selva?

01:15PM 10  A.  I did not graduate, I finished three years of college.

01:16PM 11  Q.  So you went to three years of college?

01:16PM 12  A.  Yes.

01:16PM 13  Q.  Where did you attend your three years of college?

01:16PM 14  A.  Buff State, and Mesa Community College in Arizona.

01:16PM 15  Q.  Okay.  What was first, Mesa Community College?

01:16PM 16  A.  No, Buff State, and then I went out to Arizona and I was

01:16PM 17  there for two years and went to Mesa Community.

01:16PM 18  Q.  You've indicated that you've known the defendant since

01:16PM 19  grammar school.  Where did you go to grammar school?

01:16PM 20  A.  P.S. 81.

01:16PM 21  Q.  Where is that?

01:16PM 22  A.  Tacoma.

01:16PM 23  Q.  And where is Tacoma?

01:16PM 24  A.  In North Buffalo.

01:16PM 25  Q.  Is North Buffalo a part of the City of Buffalo?

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

5

01:16PM  1   A.  Yes, sir.

01:16PM  2   Q.  What kind of neighborhood is that?

01:16PM  3   A.  At the time, it was predominantly an Italian

01:16PM  4   neighborhood.

01:16PM  5   Q.  And what -- which streets did you grow up on North

01:17PM  6   Buffalo?

01:17PM  7   A.  Commonwealth and Tennyson.

01:17PM  8   Q.  Those are two different streets?

01:17PM  9   A.  Yes.  First Commonwealth, then we had moved to Tennyson

01:17PM  10  when I was older.

01:17PM  11  Q.  And which street did the defendant grow up on in North

01:17PM  12  Buffalo?

01:17PM  13  A.  Lovering.

01:17PM  14  Q.  Where is Lovering in relation to Commonwealth?

01:17PM  15  A.  Right around the corner.

01:17PM  16  Q.  Where is Lovering in relation to Tennyson?

01:17PM  17  A.  A few streets down.  Four blocks away.  Three or four

01:17PM  18  blocks away, but in the same neighborhood.  Between Delaware

01:17PM  19  and Colvin.

01:17PM  20  Q.  So when you moved, you didn't move far?

01:17PM  21  A.  No.

01:17PM  22  Q.  And what grade was it that you said you met the defendant

01:17PM  23  in?

01:17PM  24  A.  Sixth.

01:17PM  25  Q.  Sixth grade?  How often did you spend together from the

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

6

01:17PM 1  time you met him in sixth grade?

01:17PM 2  A.  At school we'd see each other.  Together weekends,

01:17PM 3  summers.  You know, we'd hang out.

01:17PM 4  Q.  How many days a week did you hang out?

01:17PM 5  A.  Well, during school, we'd see each other at school.  And

01:17PM 6  then socially, you know, we were kids, so --

01:18PM 7  Q.  So did you see him every day in school and on weekends?

01:18PM 8  How did that work?  Explain it.

01:18PM 9  A.  Yes.  Every day in school and on the weekends.  After

01:18PM 10  school sometimes.

01:18PM 11  Q.  Now, where did you go to high school?

01:18PM 12  A.  I started at Saint Joe's.

01:18PM 13  Q.  Where did the defendant go to high school?

01:18PM 14  A.  Saint Joe's.

01:18PM 15  Q.  When you first were -- when you were first deciding where

01:18PM 16  to go to high school, did you discuss that with the

01:18PM 17  defendant?

01:18PM 18  A.  Briefly.  I mean, we took the entrance exam for

01:18PM 19  Saint Joe's.  Not together, but we took it.

01:18PM 20  Q.  You're the same year though?

01:18PM 21  A.  Yes.

01:18PM 22  Q.  And how long did you stay at Saint Joe's?

01:18PM 23  A.  Freshman year.

01:18PM 24  Q.  And was the defendant part of your freshman class?

01:18PM 25  A.  Yes.

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

01:18PM 1   Q.  How long did he stay at Saint Joe's?

01:18PM 2   A.  Freshman year.

01:18PM 3   Q.  Where did you go next for high school?

01:18PM 4   A.  Canisius.

01:18PM 5   Q.  So you went to the across-town rival?

01:19PM 6   A.  Yes.

01:19PM 7   Q.  What year were you there?

01:19PM 8   A.  For my sophomore year.

01:19PM 9   Q.  Where did the defendant go for his sophomore year?

01:19PM 10  A.  Canisius.

01:19PM 11  Q.  And did you stay at Canisius, or did you go somewhere

01:19PM 12  else after that?

01:19PM 13  A.  No, junior year, I transferred again to Cardinal O'Hara.

01:19PM 14  Q.  And where did the defendant go for his junior year?

01:19PM 15  A.  Cardinal O'Hara.

01:19PM 16  Q.  Did you graduate from Cardinal O'Hara?

01:19PM 17  A.  I left in January.  I was short, I think, a biology

01:19PM 18  course or something.  So I transferred to Bennett, and I got

01:19PM 19  my diploma from Bennett.

01:19PM 20  Q.  You graduated from Bennett?

01:19PM 21  A.  Yes.

01:19PM 22  Q.  And where did the defendant graduate from?

01:19PM 23  A.  I believe Cardinal O'Hara.

01:19PM 24  Q.  What year did you graduate?

01:19PM 25  A.  '82.

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

8

01:19PM  1   Q.  Was the defendant also class of '82, but at Cardinal

01:20PM  2   O'Hara?

01:20PM  3   A.  Yes.

01:20PM  4   Q.  How old were you when you graduated high school?

01:20PM  5   A.  17.

01:20PM  6   Q.  What did you do immediately after high school?

01:20PM  7   A.  I was in the Air Force.

01:20PM  8   Q.  How long were you in the Air Force?

01:20PM  9   A.  For a time, six months.

01:20PM  10  Q.  And were you discharged?

01:20PM  11  A.  They called it a general release.

01:20PM  12  Q.  Okay.  And describe what you did in the Air Force.

01:20PM  13  A.  Attended basic training, and then tech school.  The MOS

01:20PM  14  was an administrative position dealing with accounting.

01:20PM  15  Q.  What do you mean by MOS?

01:20PM  16  A.  The job you were training for.

01:20PM  17  Q.  And what was the job you were training for there?

01:20PM  18  A.  For accounting.

01:20PM  19  Q.  So to be an accountant in the Air Force?

01:20PM  20  A.  Yes, to deal with financial aspects of the Air Force.

01:20PM  21  Q.  And why did you leave the Air Force?

01:20PM  22  A.  It was something that -- I was having -- I didn't really

01:21PM  23  understand the realm of it, I wasn't doing well in the course

01:21PM  24  structure, and they gave me a general release.  They let me

01:21PM  25  part ways.

01:21PM   1   Q.  Did you do anything wrong in the Air Force?

01:21PM   2   A.  No.  No.  There was no dishonorable discharge or anything

01:21PM   3   like that, I was actually able to reenlist if I wanted to go

01:21PM   4   in the Army or Marine Corps or something like that, but I

01:21PM   5   didn't, I came back home.

01:21PM   6   Q.  And so after leaving the Air Force, you said you came

01:21PM   7   back home.  Where did you go?

01:21PM   8   A.  I enrolled in Buff State in the fall.

01:21PM   9   Q.  And what year does this bring you to?

01:21PM   10   A.  '83.

01:21PM   11   Q.  What did you study while you were at Buff State?

01:21PM   12   A.  Just general courses, I was not a full-time student.  I

01:21PM   13   was taking two or three courses, just to get matriculated.

01:21PM   14   Q.  Were you working also?

01:21PM   15   A.  I was, yes.

01:21PM   16   Q.  What was your job?

01:22PM   17   A.  When I came back, we had bought a -- I had bought a Jeep,

01:22PM   18   and I was doing snowplowing and just odd jobs at that time.

01:22PM   19   Q.  Who were you doing the snowplowing with?

01:22PM   20   A.  Myself.  My father would help me, but I did it primarily.

01:22PM   21   Q.  After doing that and going to Buff State and doing

01:22PM   22   snowplowing jobs, where did life take you next?

01:22PM   23   A.  After?  Well, then, I got into bartending.  I was tending

01:22PM   24   bar.  And then I moved out to Arizona.

01:22PM   25   Q.  What took you to Arizona?

01:22PM   1   A.  Opportunity.  Not much was going on for me in Buffalo.  I

01:22PM   2   wanted to get in -- try to get into Arizona State, so I went

01:22PM   3   to Mesa Junior College, and I was working out there.

01:22PM   4   Q.  Where is Mesa Junior College located?

01:22PM   5   A.  It's in Mesa, Arizona.

01:22PM   6   Q.  What years were you out there?

01:22PM   7   A.  '84 to '86.  Two years.

01:23PM   8   Q.  And you indicated you took classes there?

01:23PM   9   A.  I did.

01:23PM   10  Q.  What types of classes did you take?

01:23PM   11  A.  General business.

01:23PM   12  Q.  And what kind of job did you work?

01:23PM   13  A.  That's -- I was in the bar business as well to pay my

01:23PM   14  rent and support myself.

01:23PM   15  Q.  Now during that period of life, '84 to '86, sort of right

01:23PM   16  after high school there, were you still in touch with the

01:23PM   17  defendant?

01:23PM   18  A.  Yes.

01:23PM   19  Q.  How would you keep in touch with him?

01:23PM   20  A.  By phone, back then there was no cell phones.

01:23PM   21  Q.  So we're talking landline phones?

01:23PM   22  A.  Landline phones, yes.

01:23PM   23  Q.  And during that time of your life when you're out in

01:23PM   24  Arizona, where's the defendant living?

01:23PM   25  A.  I believe he was in -- he was in Boston for a while.

01:23PM   1   Q.  Do you know how long he spent in Boston?

01:23PM   2   A.  Six months, maybe, I'm not quite sure.

01:24PM   3   Q.  What's your understanding of what he was doing in Boston?

01:24PM   4   A.  School and work, was taking classes and working.

01:24PM   5   Q.  By 1986, are you back in Buffalo?

01:24PM   6   A.  Yes.

01:24PM   7   Q.  And at that point, when you get back to Buffalo around

01:24PM   8   1986, where's the defendant?

01:24PM   9   A.  He's in Buffalo, as well.

01:24PM   10  Q.  Did you spend time together when you were back in town

01:24PM   11  together?

01:24PM   12  A.  Yes.

01:24PM   13  Q.  From 1986 to about 1997, did you remain in Buffalo?

01:24PM   14  A.  Yes.

01:24PM   15  Q.  Did you work during that time?

01:24PM   16  A.  I did.

01:24PM   17  Q.  What type of jobs did you do?

01:24PM   18  A.  In '86, I got back into bartending.  And then I started a

01:24PM   19  career in sales.

01:24PM   20  Q.  Where were you tending bar?

01:24PM   21  A.  Well, I started at the Stuffed Mushroom on Main Street.

01:24PM   22  Q.  Tell the jury what jobs you did.

01:25PM   23  A.  I worked at the Stuffed Mushroom, and then I got a job in

01:25PM   24  sales at Ingram software, they were on Elmwood Avenue, as an

01:25PM   25  account rep, so I was doing both.

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

12

01:25PM    1          Then after that, I worked at Mickey Rats on Main

01:25PM    2    Street, that's another bar.  So, and then I pursued -- I was

01:25PM    3    still working in sales.

01:25PM    4    Q.  Please continue, tell the jury what other jobs you had in

01:25PM    5    sales and in bartending.

01:25PM    6    A.  From that, from 1990 to '96, I worked in the wireless

01:25PM    7    business.  I started off at NYNEX mobile which became

01:25PM    8    Frontier Cellular, which is Verizon Mobile today.  Spent just

01:25PM    9    about seven years there.  I worked on Walden Avenue as a

01:25PM   10    sales rep and a major account rep.

01:25PM   11      I was still tending bar on the side as well.

01:25PM   12    Q.  Where were some other places you tended bar?

01:26PM   13    A.  At that time, it was -- Stuffed Mushroom had closed, so I

01:26PM   14    would just kind of pick up banquets and periodically if

01:26PM   15    somebody needed help.

01:26PM   16    Q.  What was your next job after that?

01:26PM   17    A.  I moved to Las Vegas.

01:26PM   18    Q.  Now, what year did you move to Las Vegas?

01:26PM   19    A.  '97.  From the -- I was still in the wireless business.

01:26PM   20    Q.  Who were you working for?

01:26PM   21    A.  I went out there and took a job with AllTell, which was

01:26PM   22    360 Communications, which is Verizon Mobile today.

01:26PM   23    Q.  And before you went out to Las Vegas, did you get

01:26PM   24    married?

01:26PM   25    A.  Yes.

01:26PM   1   Q.  What year did you get married?

01:26PM   2   A.  '92.

01:26PM   3   Q.  And when you were in Las Vegas, how long were you there?

01:26PM   4   A.  Two years.

01:26PM   5   Q.  When you moved there, did you move with your wife?

01:27PM   6   A.  Yes, my wife and both my kids.

01:27PM   7   Q.  Okay.  So you had two kids?

01:27PM   8   A.  Two daughters, yes.

01:27PM   9   Q.  How old were they when you moved?

01:27PM  10   A.  My youngest was 18 months.  And my oldest, she went to

01:27PM  11   kindergarten out there, was starting first grade.

01:27PM  12   Q.  And what was your wife's name at the time?

01:27PM  13   A.  Carol.

01:27PM  14   Q.  And how long did you stay in Las Vegas?

01:27PM  15   A.  Two years.

01:27PM  16   Q.  When did you return to Buffalo?

01:27PM  17   A.  '99.  I believe 2000 -- '99, 2000, around that

01:27PM  18   time frame.

01:27PM  19   Q.  And have you been in Buffalo from approximately 1999,

01:27PM  20   2000, to current day?

01:27PM  21   A.  Yes.

01:27PM  22   Q.  When you were, that window of time, from 1986 to 1997,

01:27PM  23   when you were working in the telecommunications industry as

01:28PM  24   well as bartending at different places, what was the

01:28PM  25   defendant doing?  Where was he working?

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

14

| | | |
|---|---|---|
| 01:28PM | 1 | A. Can you repeat the time frame? |
| 01:28PM | 2 | Q. So from roughly '86 to '97, before you go out to |
| 01:28PM | 3 | Las Vegas, what jobs did you understand the defendant to have |
| 01:28PM | 4 | done during that window of time? |
| 01:28PM | 5 | A. City of Buffalo, and I believe he was bartending, too. |
| 01:28PM | 6 | Q. And where did he bar tend? |
| 01:28PM | 7 | A. Bubble. Ramada Bubble, it's since closed. And I believe |
| 01:28PM | 8 | a restaurant in Cheektowaga. |
| 01:28PM | 9 | Q. When you say Ramada Bubble, what do you mean? |
| 01:28PM | 10 | A. The Ramada Inn. The Bubble was a nightclub. |
| 01:28PM | 11 | Q. Where was that located, the Ramada Inn? |
| 01:28PM | 12 | A. It was on Transit. |
| 01:28PM | 13 | Q. Sort of near the airport? |
| 01:28PM | 14 | A. No, Transit and -- I forget, Transit and Main? That |
| 01:28PM | 15 | area. It's been a while. |
| 01:28PM | 16 | Q. Were you aware of any individual -- did you ever visit |
| 01:29PM | 17 | him when he bar tended there? |
| 01:29PM | 18 | A. Yes. |
| 01:29PM | 19 | Q. Were you aware of any friends that the defendant had who |
| 01:29PM | 20 | also bar tended there? |
| 01:29PM | 21 | A. Yes. |
| 01:29PM | 22 | Q. Who? |
| 01:29PM | 23 | A. I believe Peter Gerace. |
| 01:29PM | 24 | Q. I want to fast forward a little bit in time -- before I |
| 01:29PM | 25 | do that, let me ask you right up front here, Mr. Selva, is |

01:29PM  1  today an easy day for you?

01:29PM  2  A.  No.

01:29PM  3  Q.  Why not?

01:29PM  4  A.  It's very hard.

01:29PM  5  Q.  Explain for the jury why.

01:29PM  6  A.  We were lifelong friends.  You know, we were friends, and

01:29PM  7  I'm in this position now.  A lot of emotion.

01:29PM  8  Q.  Who put you in this position?

01:29PM  9  A.  I put myself in it.

01:29PM  10  Q.  I want to fast forward in time a little bit.  Did there

01:29PM  11  come a point in time when you obtained a job at the Erie

01:30PM  12  County Sheriff's Office as a deputy?

01:30PM  13  A.  Yes.

01:30PM  14  Q.  What year did you become an Erie County Sheriff Deputy,

01:30PM  15  excuse me?

01:30PM  16  A.  2019.

01:30PM  17  Q.  And what was your job there?

01:30PM  18  A.  I was a deputy in the holding center.

01:30PM  19  Q.  And what are your job -- what was your duty as a deputy

01:30PM  20  in the Erie County Holding Center?

01:30PM  21  A.  Transport prisoners, oversee a unit, make sure the unit's

01:30PM  22  secured, follow all security protocols, feed them their

01:30PM  23  meals, bring them their meals, if they have to go to a

01:30PM  24  medical appointment, you escort them.  So --

01:30PM  25  Q.  Essentially guarding inmates?

01:30PM  1    A.  Guarding inmates.  That's the short answer, yes.

01:30PM  2    Q.  In order to get that job, how old were you when you

01:30PM  3    started that job?

01:30PM  4    A.  There was no age limit to it.  I was 52.

01:30PM  5    Q.  52?  In order to get that job, did you have to provide,

01:30PM  6    during the application process, character references?

01:31PM  7    A.  Yes.

01:31PM  8         MR. TRIPI:  If we can just, for Mr. Selva only, if we

01:31PM  9    can publish for him -- there will be a screen next to you, you

01:31PM  10   can see a document, for Mr. Selva only Exhibit 215.

01:31PM  11        THE WITNESS:  Yes.

01:31PM  12        BY MR. TRIPI:

01:31PM  13   Q.  Do you see that?

01:31PM  14   A.  I do, yes.

01:31PM  15   Q.  Mr. Selva, do you recognize Exhibit 215, Government

01:31PM  16   Exhibit 215?

01:31PM  17   A.  I do.

01:31PM  18   Q.  What do you recognize that to be?

01:31PM  19   A.  Those are my references for the sheriff's department.

01:31PM  20   Q.  How do you recognize that to be the references you

01:31PM  21   provided in your application for the sheriff's office?

01:31PM  22   A.  That's my handwriting, and I initialed it.

01:31PM  23   Q.  Did you prepare that page of the application?

01:31PM  24   A.  I did.

01:31PM  25   Q.  Is that other -- is a part of that redacted that has

01:31PM  1   addresses and phone numbers for your references?

01:31PM  2   A.  Yes.

01:31PM  3   Q.  Other than that redaction, is that a fair and accurate

01:31PM  4   copy of the list of references that you provided when you

01:31PM  5   applied to become an Erie County Sheriff's Office member?

01:31PM  6   A.  Yes.

01:31PM  7           **MR. TRIPI:**  The government offers Exhibit 215,

01:31PM  8   Your Honor.

01:31PM  9           **MR. SINGER:**  No objection.

01:31PM  10          **THE COURT:**  It's received without objection.

01:31PM  11          **(GOV Exhibit 215 was received in evidence.)**

01:32PM  12          **MR. TRIPI:**  Please publish for the jury with the

01:32PM  13   Court's permission.

01:32PM  14          **THE COURT:**  Is it just this page?

01:32PM  15          **MR. TRIPI:**  Just this page, Judge.

01:32PM  16          **THE CLERK:**  You're all set.

01:32PM  17          **MR. TRIPI:**  Thank you.  Ms. Champoux, can you amplify

01:32PM  18   the bottom third, the boxes there?

01:32PM  19          **BY MR. TRIPI:**

01:32PM  20   Q.  How many references did you provide in your application

01:32PM  21   process, Mr. Selva?

01:32PM  22   A.  Three.

01:32PM  23   Q.  And who were the references you provided?

01:32PM  24   A.  Joseph Bongiovanni, Mark Grisanti, and Thomas Phillips.

01:32PM  25   Q.  And so the top name you provided is the defendant?

| | | |
|---|---|---|
| 01:32PM | 1 | A.  Yes. |
| 01:32PM | 2 | Q.  And what -- what did you list as his occupation? |
| 01:32PM | 3 | A.  Special Agent, United States Drug Enforcement, DEA. |
| 01:32PM | 4 | Q.  And that's where he worked at the time? |
| 01:32PM | 5 | A.  Yes. |
| 01:32PM | 6 | Q.  And under the box, that says years known.  How many years |
| 01:32PM | 7 | did you list as of the time of your application? |
| 01:32PM | 8 | A.  45. |
| 01:32PM | 9 | Q.  Okay.  And the two other references you have there, just |
| 01:33PM | 10 | generally who are they? |
| 01:33PM | 11 | A.  Mark Grisanti, and Thomas Phillips, one was a New York |
| 01:33PM | 12 | State Court of Claims judge, and the other one was chief of |
| 01:33PM | 13 | police of Kenmore. |
| 01:33PM | 14 | **MR. TRIPI:**  Okay.  We can take that down. |
| 01:33PM | 15 | **BY MR. TRIPI:** |
| 01:33PM | 16 | Q.  Out of those three references, who were you closest with? |
| 01:33PM | 17 | A.  Joseph, the defendant. |
| 01:33PM | 18 | Q.  This defendant?  Who knew you the best? |
| 01:33PM | 19 | A.  The defendant. |
| 01:33PM | 20 | Q.  Who had you spent the most time with? |
| 01:33PM | 21 | A.  The defendant. |
| 01:33PM | 22 | Q.  Who had you shared the most intimate details of your life |
| 01:33PM | 23 | with? |
| 01:33PM | 24 | A.  The defendant. |
| 01:33PM | 25 | Q.  Have you ever been a character reference for the |

01:33PM   1    defendant?

01:33PM   2    A.  Yes.

01:33PM   3    Q.  In what context?

01:33PM   4    A.  I believe his pistol permit.

01:33PM   5    Q.  I'm going to show you just Mr. Selva only, please, on

01:33PM   6    your screen, Government Exhibit 143A-1.

01:34PM   7        Mr. Selva, do you recognize Government Exhibit 143A-1?

01:34PM   8    A.  Yes.

01:34PM   9    Q.  What do you recognize that to be?

01:34PM   10   A.  It's the applicant's -- Joseph Bongiovanni, it's his

01:34PM   11   references.

01:34PM   12   Q.  And how do you recognize that?

01:34PM   13   A.  My handwriting's on one.

01:34PM   14   Q.  As one of what?

01:34PM   15   A.  One of the references, I'm sorry.

01:34PM   16   Q.  And you recognize your handwriting?

01:34PM   17   A.  Yes.

01:34PM   18   Q.  And is that a fair and accurate portion of where you

01:34PM   19   provided your name and information as a character reference

01:34PM   20   for Mr. Bongiovanni's pistol permit?

01:34PM   21   A.  Yes.

01:34PM   22       **MR. TRIPI:**  Government offers Exhibit 143A-1,

01:34PM   23   Your Honor, just this page.

01:34PM   24       **MR. SINGER:**  Object to hearsay, relevance,

01:34PM   25   authenticity.

01:34PM    1          MR. TRIPI:  The witness has personal knowledge under

01:34PM    2    901A, there are no an assertions, there is no hearsay, it is a

01:34PM    3    list of references.

01:34PM    4          MR. SINGER:  Your Honor, Mr. Selva can attest to

01:34PM    5    perhaps some of the writing that he --

01:35PM    6          MR. TRIPI:  Your Honor, if we're going to have

01:35PM    7    extended argument, I'd ask that we approach.

01:35PM    8          THE COURT:  Yeah, why don't we approach.

01:35PM    9          (Sidebar discussion held on the record.)

01:35PM   10          THE COURT:  So, a couple things concern me.  One is

01:35PM   11    unlike the last one, the phones numbers are on this one.  We

01:35PM   12    shouldn't file this, especially because these things are now

01:35PM   13    going to be public.

01:35PM   14          MR. TRIPI:  It could be redacted after.

01:35PM   15          THE COURT:  That's what I'm thinking.

01:35PM   16          MR. TRIPI:  Yeah.

01:35PM   17          THE COURT:  And then number two, do we need the other

01:35PM   18    names on it?

01:35PM   19          MR. TRIPI:  No, we don't.

01:35PM   20          THE COURT:  So why don't we redact everything other

01:35PM   21    than Mr. Selva's section, we can blow that up, and have the

01:35PM   22    jury see --

01:35PM   23          MR. TRIPI:  I don't think we can -- I have no problem

01:35PM   24    with that, but we can't redact on the fly in the program we

01:35PM   25    have, so if we can just do that later, that's fine.

01:35PM    1    **THE COURT:** Can't we just blow it up so that's all we

01:35PM    2    can see?

01:35PM    3    **MR. TRIPI:** Absolutely. We need to show the top so

01:35PM    4    he sees it's Joseph Bongiovanni.

01:35PM    5    **THE COURT:** Sure.

01:35PM    6    **MR. TRIPI:** And then just the middle section.

01:35PM    7    **THE COURT:** We can blow it up before the jury sees

01:35PM    8    it.

01:35PM    9    **MR. TRIPI:** That's fine. No problem with that Judge.

01:35PM   10    **THE COURT:** Any problem with that?

01:35PM   11    **MR. SINGER:** Beyond my objection, Judge, no.

01:36PM   12    **THE COURT:** Pardon me?

01:36PM   13    **MR. SINGER:** Beyond my objection, no.

01:36PM   14    **THE COURT:** Well, I'm not so sure the objection

01:36PM   15    was -- the objection was to the other people, I think.

01:36PM   16    **MR. SINGER:** Well, it was to other people, but within

01:36PM   17    the form itself, it appears like it's a business record. I

01:36PM   18    don't think Mr. Selva can lay the appropriate foundation for a

01:36PM   19    business record. He might be able to recognize his signature

01:36PM   20    on it, but that only solves one layer of the authenticity of

01:36PM   21    the document itself.

01:36PM   22    **THE COURT:** But I don't think it's coming in as a

01:36PM   23    business record. It's coming in that he was a reference.

01:36PM   24    It's corroboration of his testimony.

01:36PM   25    Is this the pistol permit?

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

01:36PM    1              **MR. TRIPI:**  Yeah.

01:36PM    2              **THE COURT:**  So it's his corroboration of his

01:36PM    3     testimony?

01:36PM    4              **MR. TRIPI:**  There's no assertion in the document,

01:36PM    5     Judge.  A name, a phone number, and a signature are not an

01:36PM    6     assertion of anything, it's just a list.  So, there's no

01:36PM    7     hearsay.

01:36PM    8              **MR. SINGER:**  I think it's also improper bolstering.

01:36PM    9     He testified to this, he hasn't been challenged on the --

01:36PM   10              **THE COURT:**  I'm going to let it in.  I'm going to let

01:36PM   11     it in.  I think it's pretty innocuous.  I'm not -- there may

01:37PM   12     be an objection there, Mr. Singer, but I think that it's

01:37PM   13     innocuous enough to let it in, and it is corroborative of what

01:37PM   14     you said, so I don't think it's a problem.  But I'm only going

01:37PM   15     to let in the portion that acknowledges Mr. Selva.  Okay?

01:37PM   16              **MR. TRIPI:**  We can do the top.

01:37PM   17              **THE COURT:**  You can do the top, and you can show them

01:37PM   18     his portion.

01:37PM   19              **MR. TRIPI:**  Okay.

01:37PM   20              **THE COURT:**  Fine.

01:37PM   21              (End of sidebar discussion.)

01:37PM   22              **THE COURT:**  So the objection is sustained in part and

01:37PM   23     overruled in part, you're gonna see what I'll allow you to

01:37PM   24     see.

01:37PM   25              **MR. TRIPI:**  Your Honor, subject to those limitations

01:38PM  1    and with the Court's permission, we will publish for the jury

01:38PM  2    just the top portion that's of the applicant's name.

01:38PM  3              No.  Yep.

01:38PM  4              **THE COURT:**  Okay.

01:38PM  5              **BY MR. TRIPI:**

01:38PM  6    Q.  Mr. Selva, do you see that portion of the exhibit?

01:38PM  7    A.  Yes.

01:38PM  8              **THE COURT:**  Is there way we can do that, or no?

01:38PM  9              **THE CLERK:**  You can see the background?  They can

01:38PM  10   still see it.

01:38PM  11             **MR. TRIPI:**  Does that work for now, Your Honor?

01:38PM  12             **THE COURT:**  Sure does.

01:38PM  13             **MR. TRIPI:**  Is that okay?

01:38PM  14             **THE COURT:**  Yeah.  Any problem based on my ruling.

01:38PM  15             **MR. SINGER:**  Can we move it down another quarter

01:38PM  16   inch.

01:38PM  17             **THE COURT:**  Oh, yeah.  Great.

01:38PM  18             **MR. SINGER:**  I think that probably works, Judge.

01:38PM  19             **MR. TRIPI:**  Your Honor, just for the record, we are

01:38PM  20   publishing 143A-1, we will redact other portions of it for the

01:38PM  21   Court record.  We are only publishing the header of the

01:38PM  22   document which states the applicant's name, and phone number,

01:38PM  23   address.  And the title of the document is character

01:39PM  24   references.  And then we are publishing the portion related to

01:39PM  25   Mr. Selva.

01:39PM 1        **BY MR. TRIPI:**

01:39PM 2    Q.  So now I'll pose to you, Mr. Selva, the question:  The

01:39PM 3    information that you listed there, is that where you lived at

01:39PM 4    the time and phone numbers you had at the time?

01:39PM 5    A.  Yeah, correct, yes.

01:39PM 6    Q.  And is that your signature?

01:39PM 7    A.  It is.

01:39PM 8    Q.  And that was so that you could be contacted as a

01:39PM 9    reference for Mr. Bongiovanni?

01:39PM 10   A.  Yes.

01:39PM 11   Q.  And in the course of that pistol permit application, were

01:39PM 12   you in fact contacted?

01:39PM 13   A.  I believe I was, yes.

01:39PM 14   Q.  And did you serve as a character reference?

01:39PM 15   A.  I did.

01:39PM 16        **MR. TRIPI:**  Great.  We can take that whole exhibit

01:39PM 17   down.  And, Judge, we'll marry that redaction up later.

01:39PM 18        **BY MR. TRIPI:**

01:39PM 19   Q.  Now, I'd like to fast forward from that point in time.

01:39PM 20   I'm -- how many years ago approximately was the reference,

01:39PM 21   the pistol permit reference?

01:39PM 22   A.  It was in the mid '90s, I believe.

01:40PM 23   Q.  Is that your best estimate?

01:40PM 24   A.  That's my best estimate.  I don't recall exactly.

01:40PM 25   Q.  Okay.  Fast forwarding from there to February of 2015,

01:40PM  1  did you attend Mr. Bongiovanni's wedding in February of 2015?

01:40PM  2  A.  Yes.

01:40PM  3  Q.  Where was that wedding?

01:40PM  4  A.  Cabo San Lucas.

01:40PM  5  Q.  Where?  What country?

01:40PM  6  A.  I'm sorry, Mexico.  Mexico, Cabo San Lucas.

01:40PM  7  Q.  Did you have a role in that wedding?

01:40PM  8  A.  Yes.

01:40PM  9  Q.  What was your role in that wedding?

01:40PM  10  A.  The best man.

01:40PM  11  Q.  Did you take pictures at the wedding?

01:40PM  12  A.  Yes.

01:40PM  13  Q.  At some point after the wedding, did you use your Twitter

01:40PM  14  feed and tweet pictures of yourself and Mr. Bongiovanni at

01:40PM  15  the wedding?

01:40PM  16  A.  Yes.

01:40PM  17  Q.  I'm going to hand you exhibits.  These will be exhibits

01:40PM  18  213-1 through 213-5.

01:40PM  19        **MR. TRIPI:**  One moment, please, Your Honor.

01:40PM  20        I'm going to show the defense counsel, and then I'll

01:41PM  21  hand them up.  Now handing the exhibits up to the witness.

01:41PM  22        **BY MR. TRIPI:**

01:41PM  23  Q.  Mr. Selva, take a moment, look at Exhibits 213-1 through

01:41PM  24  213-5, if you can flip through each one, take a look at

01:41PM  25  those, and when you're done, look up.

01:42PM   1        Do you recognize those exhibits, 213-1 to 213-5?

01:42PM   2   A.  Yes.

01:42PM   3   Q.  What do you recognize those to be?

01:42PM   4   A.  Pictures from the wedding.

01:42PM   5   Q.  And who took those pictures?

01:42PM   6   A.  I believe I did, or my -- with my phone.

01:42PM   7   Q.  And did you later tweet those pictures?

01:42PM   8   A.  Yes.

01:42PM   9   Q.  Do those fairly and accurately depict photographs of the

01:42PM  10   wedding that you tweeted after the wedding?

01:42PM  11   A.  Yes.

01:42PM  12        **MR. TRIPI:**  Your Honor, the government offers 213-1

01:42PM  13   through 213-5.

01:42PM  14        **MR. SINGER:**  No objection.

01:42PM  15        **THE COURT:**  Received without objection.

01:42PM  16        **MR. TRIPI:**  Thank you, Your Honor.

01:42PM  17        **(GOV Exhibits 213-1 to 5 were received in evidence.)**

01:42PM  18        **MR. TRIPI:**  Ms. Champoux, are we able to publish

01:42PM  19   those?  Can we zoom in on the top, please.  Top photo.

01:43PM  20        Your Honor, with the Court's permission, I'm going to

01:43PM  21   hand the hard copies to the jury.  The image looks a little

01:43PM  22   darker than the picture, so I'll pass those long.

01:43PM  23        **THE COURT:**  That's fine.

01:43PM  24        **MR. TRIPI:**  Thank you.

         25

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24                    27

01:43PM   1         **BY MR. TRIPI:**

01:43PM   2   Q.  Mr. Selva, understanding that there's a little shading on

01:43PM   3   the screen there, who's in that top photo?

01:43PM   4   A.  Myself and Mr. Bongiovanni.

01:43PM   5   Q.  And who's on the left, and who's on the right as we look

01:43PM   6   at the photo?

01:43PM   7   A.  I'm on the left, and Mr. Bongiovanni's on the right --

01:43PM   8   Q.  Okay.

01:43PM   9   A.  -- as I look at it.

01:43PM  10         **MR. TRIPI:**  Can we zoom out of there, Ms. Champoux.

01:43PM  11         **BY MR. TRIPI:**

01:43PM  12   Q.  And now there's a picture, it's a little clearer, there's

01:43PM  13   a photo on the bottom, is that a photo of you at the wedding?

01:43PM  14   A.  Yes.

01:43PM  15   Q.  And who else is in that photo?

01:43PM  16   A.  Mr. Bongiovanni's sisters and a friend, Ray Castiglione.

01:43PM  17   Q.  And you're wearing a suit in that photo?

01:44PM  18   A.  Yes.

01:44PM  19   Q.  Well, what, if anything, was significant about that suit?

01:44PM  20   A.  Significant?  Well, it was purchased by Mr. Bongiovanni

01:44PM  21   for the whole wedding party.

01:44PM  22   Q.  So did the men in the wedding party have matching suits?

01:44PM  23   A.  Yes.

01:44PM  24   Q.  Who purchased the suits?

01:44PM  25   A.  Mr. Bongiovanni.

01:44PM   1   Q.  Where did he purchase the suits from?

01:44PM   2   A.  Napoli's Men Shop.

01:44PM   3   Q.  What's your understanding of Napoli's Men Shop?

01:44PM   4   A.  It was his brother-in-law's place.

01:44PM   5   Q.  Is that a nice place?

01:44PM   6   A.  It's a nice place, it's a high-end men's shop.

01:44PM   7   Q.  And do you know how much your suit cost that you were

01:44PM   8   wearing that day?

01:44PM   9   A.  $600?  I don't know, $500.

01:44PM  10       MR. SINGER:  Your Honor, I'm going to object.  There

01:44PM  11   hasn't been a proper foundation laid.

01:44PM  12       THE COURT:  I'm sorry?

01:44PM  13       MR. SINGER:  There hasn't been a proper foundation

01:44PM  14   laid to Mr. Selva's opinion as to the value.

01:44PM  15       MR. TRIPI:  Do you know how much the suit cost?  How

01:45PM  16   else do you ask that question?

01:45PM  17       THE COURT:  No, overruled.

01:45PM  18       MR. SINGER:  Judge --

01:45PM  19       THE COURT:  Do you want to come up?

01:45PM  20       MR. SINGER:  I don't think we -- the testimony was

01:45PM  21   that Mr. Bongiovanni purchased the suit for Mr. Selva.

01:45PM  22       THE COURT:  Yes.

01:45PM  23       MR. SINGER:  So, there has to be some foundation laid

01:45PM  24   as to how Mr. Selva knows the price.

01:45PM  25       THE COURT:  Well, no, the question was, do you know.

01:45PM    1    And the answer was what it was.

01:45PM    2            Do you want to lay more of a foundation?

01:45PM    3            **MR. TRIPI:**  Sure.

01:45PM    4            **THE COURT:**  Go ahead, lay more of a foundation.

01:45PM    5            **BY MR. TRIPI:**

01:45PM    6    Q.  Mr. Selva, did you have to get fitted for the suit?

01:45PM    7    A.  Yes.

01:45PM    8    Q.  Who did you get fitted for the suit with?

01:45PM    9    A.  With the defendant, Mr. Bongiovanni.

01:45PM   10    Q.  Were you there when he purchased the suit for you?

01:45PM   11    A.  Yes.

01:45PM   12    Q.  Based upon your going and getting fitted, did you go to

01:45PM   13    Napoli's?

01:45PM   14    A.  Yes.

01:45PM   15    Q.  And you went there with the defendant?

01:45PM   16    A.  Yes.

01:45PM   17    Q.  Were you there when he cashed out?

01:45PM   18    A.  Yes.

01:45PM   19    Q.  Did you observe him pay by credit card, check, or cash?

01:45PM   20    A.  I believe it was credit card.

01:45PM   21    Q.  And did he tell you or did you develop an understanding

01:45PM   22    of how much the suit cost?

01:45PM   23    A.  He mentioned it.

01:45PM   24    Q.  What did he say?

01:46PM   25    A.  He said it was $600.

01:46PM   1    Q.  And how many people were in the wedding party?

01:46PM   2    A.  Myself -- there were four.  Four people.

01:46PM   3    Q.  Who else was in the wedding party?

01:46PM   4    A.  Tom, his -- Tom Napoli, his stepson, and obviously the

01:46PM   5    defendant.  So, four.

01:46PM   6    Q.  When you say his stepson, what's his name?

01:46PM   7    A.  Matt.

01:46PM   8    Q.  Okay.  Were all of you together getting the suits at the

01:46PM   9    same time?

01:46PM  10    A.  No.  No.

01:46PM  11           **MR. TRIPI:**  All right.  We can go to the next one,

01:46PM  12    Ms. Champoux.  213-1, please.

01:46PM  13           And let's go to 213-3.

01:46PM  14           **BY MR. TRIPI:**

01:46PM  15    Q.  We just talked about the wedding party, and you listed

01:46PM  16    that there were four people total, yourself, the defendant

01:46PM  17    and two others?

01:46PM  18    A.  That's correct.

01:47PM  19    Q.  Is that depicted in the photo, the top portion of 213-3?

01:47PM  20    A.  Correct.

01:47PM  21           **MR. TRIPI:**  Okay.  Can we zoom out?  Can we go to

01:47PM  22    213-4.  And 213-5.

01:47PM  23           **BY MR. TRIPI:**

01:47PM  24    Q.  And who's depicted in 213-5?

01:47PM  25    A.  Myself and the maid of honor.

01:47PM   1   Q.  And who's that?

01:47PM   2   A.  Lindsay sister's, Christie, I'm sorry.

01:47PM   3         **MR. TRIPI:**  We can take that exhibit down, thank you.

01:47PM   4         **BY MR. TRIPI:**

01:47PM   5   Q.  Now, Mr. Selva, are you here under the terms of a

01:47PM   6   cooperation agreement that you have?

01:47PM   7   A.  To cooperate, to tell the truth.

01:47PM   8   Q.  So is that answer yes?

01:47PM   9   A.  Yes.

01:47PM  10   Q.  Who's that agreement between?

01:47PM  11   A.  Myself and the government.

01:47PM  12   Q.  Generally speaking, what are the things that happened

01:47PM  13   prior to you entering that cooperation agreement?

01:48PM  14   A.  My house was raided on August 23rd, 2019.  I went down

01:48PM  15   the following Monday.  And meetings were set up with myself

01:48PM  16   and the government and my attorney.

01:48PM  17   Q.  That day that your house was, you said, raided, is that a

01:48PM  18   term you're using for a search warrant?

01:48PM  19   A.  I'll rephrase that.  The search warrant.

01:48PM  20   Q.  Is that yes?

01:48PM  21   A.  Yes.

01:48PM  22   Q.  Okay.  What happened to your position that day as an Erie

01:48PM  23   County Sheriff's Office Deputy?

01:48PM  24   A.  I was picked up, I was picked up by the head of the

01:48PM  25   narcotics department, drove down to internal affairs, and I

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24
32

01:48PM   1   resigned.

01:48PM   2   Q.   What day of the week was that?

01:49PM   3   A.   That was on a Monday I believe.  Monday or Tuesday.

01:49PM   4   Q.   August 23rd?

01:49PM   5   A.   August 23rd, I'm not familiar with the exact day, Monday,

01:49PM   6   but it's August 23rd is the date.

01:49PM   7   Q.   After that, did you get an attorney?

01:49PM   8   A.   Yes.

01:49PM   9   Q.   After that, within a couple of days, did you show up for

01:49PM   10   what's called a proffer meeting at the U.S. Attorney's

01:49PM   11   Office?

01:49PM   12   A.   Yes.

01:49PM   13   Q.   Generally speaking, I'm not asking you for all the names,

01:49PM   14   but who was at those -- the -- your first proffer?

01:49PM   15   A.   Myself, my attorney, Leonard Zaccagnino, and the

01:49PM   16   government.

01:49PM   17   Q.   By the government, you mean agents and prosecutors?

01:49PM   18   A.   Yes.

01:49PM   19   Q.   Now, the very first day that agents were at your house

01:49PM   20   executing a search warrant, did you give them an interview?

01:49PM   21   A.   Yes.

01:50PM   22   Q.   Were you completely truthful in that first interview at

01:50PM   23   your residence?

01:50PM   24   A.   No.

01:50PM   25   Q.   Did you withhold information?

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

33

01:50PM  1    A.  Yes.

01:50PM  2    Q.  A couple days later when you arrived at the U.S.

01:50PM  3    Attorney's Office, did you enter what's called a proffer

01:50PM  4    agreement?

01:50PM  5    A.  Yes.

01:50PM  6    Q.  And what's your understanding of a proffer agreement?

01:50PM  7    A.  It's an agreement to tell the truth.  There was -- I'm

01:50PM  8    going to be a cooperating witness.

01:50PM  9    Q.  Okay.  Under that letter, you agreed to provide

01:50PM  10   information and tell the truth?

01:50PM  11   A.  Yes.

01:50PM  12   Q.  During that first interview with your attorney and that

01:50PM  13   proffer letter being signed, did you tell the complete truth

01:50PM  14   in that interview?

01:50PM  15   A.  No.

01:50PM  16   Q.  As part of that proffer interview, that letter that you

01:51PM  17   signed, was there a provision where you agreed to take a

01:51PM  18   polygraph?

01:51PM  19   A.  Yes.

01:51PM  20   Q.  And were you asked to take a polygraph?

01:51PM  21   A.  I was.

01:51PM  22   Q.  I'm not going to ask you to get into the results of the

01:51PM  23   polygraph, but when you go to the polygraph, there's another

01:51PM  24   thing called a pre-test interview; is that right?

01:51PM  25   A.  That's correct.

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

01:51PM   1   Q.   And were you asked questions in that pre-test interview?

01:51PM   2   A.   I was.

01:51PM   3   Q.   Were you giving answers?

01:51PM   4   A.   Yes.

01:51PM   5   Q.   Were you truthful in that pre-test interview?

01:51PM   6   A.   No.

01:51PM   7   Q.   Then you took the polygraph, right?

01:51PM   8   A.   Yes.

01:51PM   9   Q.   And then there's something called a post-test interview,

01:51PM  10   right?

01:51PM  11   A.   That's correct.

01:51PM  12   Q.   Were you asked more questions?

01:51PM  13   A.   Yes.

01:51PM  14   Q.   Did you give more answers?

01:51PM  15   A.   Yes.

01:51PM  16   Q.   In the post-test interview, were you completely truthful?

01:51PM  17   A.   No.

01:51PM  18   Q.   As compared to the pre-test interview, how much -- were

01:51PM  19   you more truthful post-test?

01:51PM  20   A.   Yes.

01:51PM  21   Q.   Were you still withholding?

01:51PM  22   A.   Yes.

01:51PM  23   Q.   What information were you withholding in the post-test

01:52PM  24   interview?

01:52PM  25   A.   My involvement and relationship with the defendant.

01:52PM    1   Information pertaining to questions that were being asked

01:52PM    2   about the case.

01:52PM    3   Q.  After the polygraph, did you go to more proffer

01:52PM    4   interviews?

01:52PM    5   A.  Yes.

01:52PM    6   Q.  How many more, if you recall?

01:52PM    7   A.  There was a bunch, I don't recall.

01:52PM    8   Q.  During some of those additional proffer interviews, did

01:52PM    9   you withhold information?

01:52PM   10   A.  Yes.

01:52PM   11   Q.  Describe for the jury why you were -- withdrawn.

01:52PM   12       First describe for the jury what type of information you

01:52PM   13   were withholding in those interviews, explain it to them.

01:52PM   14   A.  Information regarding my relationship with the defendant.

01:53PM   15   Q.  In what context?  What type of relationship were you

01:53PM   16   withholding?

01:53PM   17   A.  Context to information if he accepted the bribes.

01:53PM   18   Q.  Okay.  You didn't -- you weren't withholding that you

01:53PM   19   were friends with him, right?

01:53PM   20   A.  No.

01:53PM   21          **MR. SINGER:**  Your Honor, object on bolstering

01:53PM   22   grounds.  Improper bolstering.

01:53PM   23          **MR. TRIPI:**  Judge, under Rule 607.

01:53PM   24          **THE COURT:**  Overruled.

          25

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 01:53PM  | 1  | **BY MR. TRIPI:**                                            |
| 01:53PM  | 2  | Q.  After a few more proffers, did you testify before a      |
| 01:53PM  | 3  | federal grand jury?                                          |
| 01:53PM  | 4  | A.  Yes.                                                     |
| 01:53PM  | 5  | Q.  How did the amount of information during each interview  |
| 01:53PM  | 6  | leading up to grand jury change over time in your view?      |
| 01:53PM  | 7  | A.  I started to be more truthful.  I just -- I became an    |
| 01:53PM  | 8  | open book, so to speak about it.  I started to give more     |
| 01:53PM  | 9  | information.                                                 |
| 01:54PM  | 10 | Q.  During the interviews where you did withhold information,|
| 01:54PM  | 11 | lie, why did you do that?                                    |
| 01:54PM  | 12 | A.  Scared.  Was torn.  Wasn't thinking clearly still.       |
| 01:54PM  | 13 | Q.  What do you mean by you were scared?                     |
| 01:54PM  | 14 | A.  You know, a lifelong -- there were questions regarding   |
| 01:54PM  | 15 | the defendant, lifelong relationship.  Wasn't totally being  |
| 01:54PM  | 16 | honest at that point with the questions.                     |
| 01:54PM  | 17 | Q.  Were you being asked questions about an individual also  |
| 01:54PM  | 18 | named Mike Masecchia?                                        |
| 01:54PM  | 19 | A.  Yes.                                                     |
| 01:54PM  | 20 | Q.  Was that a factor?                                       |
| 01:54PM  | 21 | A.  It was a factor, yes.                                    |
| 01:54PM  | 22 | Q.  Explain it for the jury.  How did that factor in?        |
| 01:54PM  | 23 | A.  Oh.  Mr. Masecchia had a reputation, he was an Organized |
| 01:54PM  | 24 | Crime figure.  Made man, as far as I knew.  Other people     |
| 01:55PM  | 25 | knew.                                                        |

01:55PM   1    Q.  How did that make you feel?

01:55PM   2    A.  Scared.

01:55PM   3    Q.  As you sit there today, do you feel that same way?

01:55PM   4    A.  Yes.

01:55PM   5    Q.  Ultimately on May 14th, 2020, did you enter that

01:55PM   6    cooperation agreement that we talked about?

01:55PM   7    A.  Yes.

01:55PM   8    Q.  What does that cooperation agreement that you signed

01:55PM   9    require of you?

01:55PM  10    A.  To come forward and tell the truth.

01:55PM  11    Q.  Prior to entering that cooperation agreement, were you

01:55PM  12    engaged in criminal activity for years prior to Homeland

01:55PM  13    Security executing that search warrant at your residence on

01:55PM  14    August 23rd, 2019?

01:55PM  15    A.  Yes.

01:55PM  16    Q.  Approximately how many years were you involved in

01:55PM  17    criminal activity?

01:55PM  18    A.  Approximately, well, from 2008 to about 2017, '18.  So --

01:56PM  19    what is that, that's eleven years.

01:56PM  20    Q.  And what crimes were you involved in during that

01:56PM  21    time frame?

01:56PM  22    A.  Cultivating and distributing marijuana.

01:56PM  23    Q.  What else?

01:56PM  24    A.  That that's -- that's it.  We were in involved in

01:56PM  25    cultivating marijuana and moving it.

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

38

| | | |
|---|---|---|
| 01:56PM | 1 | Q.  And what role did you play, if any, in the defendant |
| 01:56PM | 2 | joining that? |
| 01:56PM | 3 | A.  I reached out to him regarding getting information. |
| 01:56PM | 4 | Q.  Were you part of getting him to be -- withdrawn. |
| 01:56PM | 5 | Were bribes involved? |
| 01:56PM | 6 | A.  Yes. |
| 01:56PM | 7 | Q.  Were you part of negotiating that? |
| 01:56PM | 8 | A.  Yes. |
| 01:56PM | 9 | Q.  Who were the principal people you were involved with in |
| 01:56PM | 10 | the marijuana trafficking and the bribery? |
| 01:57PM | 11 | A.  Myself, Mike Masecchia, and Ron Serio. |
| 01:57PM | 12 | Q.  And who was the agent being bribed? |
| 01:57PM | 13 | A.  Joseph Bongiovanni. |
| 01:57PM | 14 | Q.  This defendant? |
| 01:57PM | 15 | A.  Yes. |
| 01:57PM | 16 | Q.  I'd like to take a step back and focus a little more on |
| 01:57PM | 17 | your relationship with the defendant. |
| 01:57PM | 18 | When you and the defendant grew up in that North Buffalo |
| 01:57PM | 19 | neighborhood, were -- did you have common friends? |
| 01:57PM | 20 | A.  Yes. |
| 01:57PM | 21 | Q.  Were your friends predominantly also of Italian descent |
| 01:57PM | 22 | from that neighborhood? |
| 01:57PM | 23 | A.  Yes. |
| 01:57PM | 24 | Q.  How many friends would you say you had in common with the |
| 01:57PM | 25 | defendant growing up? |

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

39

| | | |
|---|---|---|
| 01:57PM | 1 | A.   A whole neighborhood.  I mean, quite a few. |
| 01:57PM | 2 | Q.   Was Mike Masecchia a childhood friend? |
| 01:57PM | 3 | A.   Yes. |
| 01:57PM | 4 | Q.   Did you know him? |
| 01:57PM | 5 | A.   Yes. |
| 01:57PM | 6 | Q.   Did the defendant know him? |
| 01:58PM | 7 | A.   Yes. |
| 01:58PM | 8 | Q.   Who knew Masecchia first, if you know? |
| 01:58PM | 9 | A.   I don't know.  I mean, we were all from the same |
| 01:58PM | 10 | neighborhood. |
| 01:58PM | 11 | Q.   Where did Masecchia grow up? |
| 01:58PM | 12 | A.   On Colvin. |
| 01:58PM | 13 | Q.   Is that in North Buffalo? |
| 01:58PM | 14 | A.   That's in North Buffalo not far from where we lived. |
| 01:58PM | 15 | Q.   In relation to age, is Masecchia older or younger than |
| 01:58PM | 16 | you? |
| 01:58PM | 17 | A.   He's two years younger. |
| 01:58PM | 18 | Q.   And are you the same age as the defendant? |
| 01:58PM | 19 | A.   Yes. |
| 01:58PM | 20 | Q.   In addition to Masecchia, can you talk about any other |
| 01:58PM | 21 | common friends that you had with the defendant growing up |
| 01:58PM | 22 | into your high school, teenage years? |
| 01:58PM | 23 | A.   Common?  Good, God, there was a group of us. |
| 01:58PM | 24 | Q.   Let me ask you some names, okay? |
| 01:58PM | 25 | A.   Yes. |

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

40

| | | |
|---|---|---|
| 01:58PM | 1 | Q.  Who's Joe -- |
| 01:58PM | 2 | **MR. SINGER:**  Objection, leading. |
| 01:59PM | 3 | **THE COURT:**  What's the question?  Who's Joe? |
| 01:59PM | 4 | **MR. TRIPI:**  I didn't get the question out. |
| 01:59PM | 5 | **THE COURT:**  Go ahead ask the question. |
| 01:59PM | 6 | **MR. TRIPI:**  Who is Joe Tomasello? |
| 01:59PM | 7 | **THE COURT:**  That's leading? |
| 01:59PM | 8 | **MR. SINGER:**  Withdrawn. |
| 01:59PM | 9 | **THE WITNESS:**  He's a friend from the neighborhood |
| 01:59PM | 10 | that we all knew. |
| 01:59PM | 11 | **BY MR. TRIPI:** |
| 01:59PM | 12 | Q.  I'm asking you about you and the defendant right now. |
| 01:59PM | 13 | A.  Yes, we both knew him. |
| 01:59PM | 14 | Q.  When you say friend from the neighborhood, what |
| 01:59PM | 15 | neighborhood are you referring to? |
| 01:59PM | 16 | A.  Again, from North Buffalo, to be clear. |
| 01:59PM | 17 | Q.  How old were you and the defendant approximately when Joe |
| 01:59PM | 18 | Tomasello became a friend? |
| 01:59PM | 19 | A.  Late 20s, 30s.  Late 20s. |
| 01:59PM | 20 | Q.  Who is Sal Lima? |
| 01:59PM | 21 | A.  Sal Lima is a friend, but not from North Buffalo.  He |
| 01:59PM | 22 | grew up on the West Side, but he's a friend. |
| 01:59PM | 23 | Q.  Is he a friend of yours? |
| 01:59PM | 24 | A.  He's a friend of mine. |
| 01:59PM | 25 | Q.  Does he know the defendant? |

| | | |
|---|---|---|
| 01:59PM | 1 | A.  I don't believe so. |
| 01:59PM | 2 | Q.  Who is Dave Hersey? |
| 01:59PM | 3 | A.  He's a friend of ours, he knows myself and the defendant. |
| 01:59PM | 4 | Q.  How old were you when you met Dave Hersey? |
| 02:00PM | 5 | A.  Late 20s. |
| 02:00PM | 6 | Q.  How old was the defendant? |
| 02:00PM | 7 | A.  Same age. |
| 02:00PM | 8 | Q.  Who is Sal Volpe? |
| 02:00PM | 9 | A.  Sal Volpe is -- he's deceased, he's from North Buffalo. |
| 02:00PM | 10 | Q.  Was he a friend of yours? |
| 02:00PM | 11 | A.  Yes. |
| 02:00PM | 12 | Q.  Was he a friend of the defendant's? |
| 02:00PM | 13 | A.  I believe he knows him, yes. |
| 02:00PM | 14 | Q.  Who is Wayne Anderson? |
| 02:00PM | 15 | A.  A friend from the neighborhood. |
| 02:00PM | 16 | Q.  How long have you known Wayne Anderson? |
| 02:00PM | 17 | A.  Since our teen years. |
| 02:00PM | 18 | Q.  Does the defendant know Wayne Anderson? |
| 02:00PM | 19 | A.  Yes. |
| 02:00PM | 20 | Q.  How long has the defendant known Wayne Anderson? |
| 02:00PM | 21 | A.  Same time. |
| 02:00PM | 22 | Q.  So since teenage years? |
| 02:00PM | 23 | A.  Teenage, to be more specific, yes, sorry. |
| 02:00PM | 24 | Q.  Do you know Mark Suppa? |
| 02:00PM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 02:00PM | 1 | Q. Who is that? |
| 02:00PM | 2 | A. Lifelong friend from the neighborhood again. |
| 02:00PM | 3 | Q. Does the defendant know Mark Suppa? |
| 02:01PM | 4 | A. Yes. |
| 02:01PM | 5 | Q. Do you know John Suppa? |
| 02:01PM | 6 | A. Yes. |
| 02:01PM | 7 | Q. Who's that? |
| 02:01PM | 8 | A. It's Mark's older brother, again, a friend from the |
| 02:01PM | 9 | neighborhood. |
| 02:01PM | 10 | Q. How long have you known him? |
| 02:01PM | 11 | A. Since I was a kid.  13, 14.  He was a little older than |
| 02:01PM | 12 | me. |
| 02:01PM | 13 | Q. Has the defendant known him approximately the same amount |
| 02:01PM | 14 | of time? |
| 02:01PM | 15 | A. Yes. |
| 02:01PM | 16 | Q. Who is Matt Suppa? |
| 02:01PM | 17 | A. John's brother.  John and Mark's brother. |
| 02:01PM | 18 | Q. And who is he? |
| 02:01PM | 19 | A. Again, a friend from the neighborhood.  We all knew each |
| 02:01PM | 20 | other. |
| 02:01PM | 21 | Q. Is that someone the defendant also knows? |
| 02:01PM | 22 | A. Yeah. |
| 02:01PM | 23 | Q. Does Masecchia know all of those same people? |
| 02:01PM | 24 | A. Yes. |
| 02:01PM | 25 | Q. Is he friends with all those same people I mentioned? |

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

43

| | | |
|---|---|---|
| 02:01PM | 1 | A.   Yes. |
| 02:01PM | 2 | Q.   Who is Steve Brucato? |
| 02:01PM | 3 | A.   Steve is a friend from the neighborhood. |
| 02:01PM | 4 | Q.   How long have you known him? |
| 02:01PM | 5 | A.   Since teenage years. |
| 02:01PM | 6 | Q.   Does the defendant know him? |
| 02:01PM | 7 | A.   Yes. |
| 02:01PM | 8 | Q.   Did he later bar tend at a bar called Gabels? |
| 02:01PM | 9 | A.   Yes. |
| 02:01PM | 10 | Q.   Now, with the exception of Brucato -- Tomasello, Lima, |
| 02:02PM | 11 | Hersey, Volpe, and Anderson, the Suppas, and Masecchia, were |
| 02:02PM | 12 | those people that you were later involved in, in some aspects |
| 02:02PM | 13 | of a marijuana distribution regarding outdoor marijuana |
| 02:02PM | 14 | grows? |
| 02:02PM | 15 | A.   Yes. |
| 02:02PM | 16 | Q.   Okay.  That activity occurred over a period of years? |
| 02:02PM | 17 | A.   Yes. |
| 02:02PM | 18 | Q.   And the defendant knew all those same people? |
| 02:02PM | 19 | A.   Yes. |
| 02:02PM | 20 | Q.   And were all those same people at various points in time |
| 02:02PM | 21 | over that continue -- that 11-year continuum, working on |
| 02:02PM | 22 | those grow operations? |
| 02:02PM | 23 | A.   Yes. |
| 02:02PM | 24 | Q.   Did you knowingly Bart Mazzara from the neighborhood? |
| 02:02PM | 25 | A.   Yes. |

| | | |
|---|---|---|
| 02:02PM | 1 | Q.  Did you know Marty Mazzara from the neighborhood? |
| 02:02PM | 2 | A.  Yes. |
| 02:02PM | 3 | Q.  Did the defendant? |
| 02:02PM | 4 | A.  Yes. |
| 02:02PM | 5 | Q.  Is Mike Masecchia related to those individuals? |
| 02:02PM | 6 | A.  Bart Mazzara was his brother-in-law, and he's married to |
| 02:02PM | 7 | Marty Mazzara's cousin. |
| 02:02PM | 8 | Q.  As far as you understood it by reputation, were either of |
| 02:03PM | 9 | those two individuals, the Mazzaras, reputed to be connected |
| 02:03PM | 10 | to IOC, Italian Organized Crime? |
| 02:03PM | 11 | A.  Bart's father was known to be IOC. |
| 02:03PM | 12 | Q.  What was Bart's father's name? |
| 02:03PM | 13 | A.  He's deceased.  Bart Mazzara, Sr. |
| 02:03PM | 14 | Q.  Senior? |
| 02:03PM | 15 | A.  Yes. |
| 02:03PM | 16 | Q.  So the deceased Bart Mazzara was Masecchia's |
| 02:03PM | 17 | father-in-law? |
| 02:03PM | 18 | A.  Yes. |
| 02:03PM | 19 | Q.  Masecchia married who? |
| 02:03PM | 20 | A.  His daughter, Krista. |
| 02:03PM | 21 | Q.  Now, at some point in your life growing up, did you begin |
| 02:03PM | 22 | to experiment with drugs? |
| 02:03PM | 23 | A.  Yes. |
| 02:03PM | 24 | Q.  What was the first drug you experimented with? |
| 02:03PM | 25 | A.  Marijuana. |

02:03PM   1   Q.  When did you stat using marijuana?

02:03PM   2   A.  Teen years.

02:03PM   3   Q.  Were you in high school?

02:03PM   4   A.  Yes.

02:03PM   5   Q.  Which high school were you in, Joe's, Canisius, Cardinal

02:03PM   6   O'Hara?

02:03PM   7   A.  Saint Joe's.

02:03PM   8   Q.  Saint Joe's, when you started your freshman year?

02:04PM   9   A.  Freshman year.

02:04PM   10   Q.  In high school, did you smoke with friends?

02:04PM   11   A.  Yes.

02:04PM   12   Q.  Who were some of the friends you smoked marijuana with?

02:04PM   13   A.  The defendant, Mike Masecchia.  Who else.  Quite a few.

02:04PM   14   I mean, different individuals from North Buffalo.

02:04PM   15   Q.  Did you try any other drugs in high school, or was it

02:04PM   16   just marijuana?

02:04PM   17   A.  Marijuana.

02:04PM   18   Q.  After high school, did you experiment with other drugs?

02:04PM   19   A.  Yes.

02:04PM   20   Q.  What other drugs did you experiment with?

02:04PM   21   A.  Cocaine.

02:04PM   22   Q.  When did you first try cocaine?

02:04PM   23   A.  I believe when I got back from being in the Air Force,

02:04PM   24   19.  18, 19, that time frame.  I was a teenager.

02:05PM   25   Q.  When you did that, were you working in the bar scene?

02:05PM    1    A.   Not yet.  I was not old enough.  So I was working odd

02:05PM    2    jobs, I mentioned I had had a -- I bought a Jeep and I was

02:05PM    3    doing snowplowing.

02:05PM    4    Q.   So you were back in Buffalo going to school and working?

02:05PM    5    A.   Yes.

02:05PM    6    Q.   As time went on, did there come a time when you consumed

02:05PM    7    cocaine in your late teenage or -- or -- or in your 20s with

02:05PM    8    the defendant?

02:05PM    9    A.   Yes.

02:05PM   10    Q.   As you guys got into that age range, describe the

02:05PM   11    circumstances where you would use cocaine with the defendant.

02:05PM   12    A.   Being out, if there was a party, social setting, if it

02:05PM   13    was around.

02:05PM   14    Q.   Now was that before you started working in law

02:05PM   15    enforcement?

02:06PM   16    A.   Yes.

02:06PM   17    Q.   Prior to the defendant -- withdrawn.

02:06PM   18         As far as you understand it, what was first law

02:06PM   19    enforcement agency the defendant worked for?

02:06PM   20    A.   Erie County Sheriff's Department.

02:06PM   21    Q.   Do you remember approximately when he started working

02:06PM   22    there?

02:06PM   23    A.   Mid '90s, '95.  Around '94.

02:06PM   24    Q.   Was it around the time that you're coming in Arizona --

02:06PM   25    A.   Yes.

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

47

| | | |
|---|---|---|
| 02:06PM | 1 | Q.  -- or, excuse me, withdrawn, Las Vegas? |
| 02:06PM | 2 | A.  I was still in Buffalo. |
| 02:06PM | 3 | Q.  Okay. |
| 02:06PM | 4 | A.  But I was getting ready to leave. |
| 02:06PM | 5 | Q.  Okay.  Prior to the defendant joining law enforcement, |
| 02:06PM | 6 | how many times did you and he use cocaine together? |
| 02:06PM | 7 | A.  A handful.  Five, six, seven times. |
| 02:06PM | 8 | Q.  Prior to defendant joining law enforcement, how many |
| 02:06PM | 9 | times did you and he use marijuana together? |
| 02:07PM | 10 | A.  A little bit more, ten, 15 times. |
| 02:07PM | 11 | Q.  Now did you spend time at the defendant's house growing |
| 02:07PM | 12 | up, at his house on Lovering? |
| 02:07PM | 13 | A.  Yes. |
| 02:07PM | 14 | Q.  How frequently were you there growing up? |
| 02:07PM | 15 | A.  Periodically, you know, during the week, weekends. |
| 02:07PM | 16 | Q.  Did you meet members of his family? |
| 02:07PM | 17 | A.  Yes. |
| 02:07PM | 18 | Q.  Who are his mom and dad? |
| 02:07PM | 19 | A.  Fred and Maria Bongiovanni. |
| 02:07PM | 20 | Q.  Growing up, was there ever a time where you and the |
| 02:07PM | 21 | defendant would have conversations about Italian Organized |
| 02:07PM | 22 | Crime in the neighborhood? |
| 02:07PM | 23 | A.  Yes. |
| 02:07PM | 24 | Q.  Describe for the jury, what context would that topic come |
| 02:08PM | 25 | up? |

Case 1:19-cr-00227-LJV-MJR   Document 772   Filed 02/21/24   Page 48 of 152
USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

48

02:08PM 1   A.  If we were out, and we saw somebody, meaning someone that

02:08PM 2   would be a high-profile figure in Italian Organized Crime,

02:08PM 3   we'd mention it.  And we'd usually, if we knew him, we'd say

02:08PM 4   hello.  That type thing.

02:08PM 5   Q.  Why would you say hello?

02:08PM 6   A.  If -- just out of respect.

02:08PM 7   Q.  Do you remember that scenario happening with certain

02:08PM 8   specific individuals around town at various points?

02:08PM 9   A.  Yes.

02:08PM 10  Q.  Can you name some people who you and the defendant made a

02:08PM 11  point to say hello to when you saw them out, out of respect?

02:08PM 12  A.  Tom Machelli.

02:08PM 13  Q.  Did he have a nickname?

02:08PM 14  A.  Tom Chooch.  Joe Rosato.

02:08PM 15      Johnny Catanzaro, that's, you know, Butchie Bifocals.  If

02:09PM 16  we saw these individuals, Johnny Catanzaro, we would say

02:09PM 17  hello.

02:09PM 18  Q.  As you understood it at the time that you and the

02:09PM 19  defendant were saying hello to those people out of respect,

02:09PM 20  what was your understanding of their status as it relates to

02:09PM 21  Italian Organized Crime?

02:09PM 22  A.  They were made members.

02:09PM 23  Q.  Is that a topic of conversation that would come up from

02:09PM 24  time to time between you and the defendant?

02:09PM 25  A.  If we were out and saw, yes.

02:09PM   1    Q.  Did you respect people growing up over time, did you

02:09PM   2    respect people that you perceived to be connected to

02:09PM   3    Organized Crime in that way?

02:09PM   4    A.  I did.

02:09PM   5    Q.  Based upon your interactions and conversations with the

02:09PM   6    defendant, did you perceive him to respect people connected

02:10PM   7    to Italian Organized Crime?

02:10PM   8    A.  He did, yes.

02:10PM   9    Q.  When that topic would be discussed between the two of

02:10PM   10   you, how would the defendant talk about those types of

02:10PM   11   people -- withdrawn.

02:10PM   12      What would his demeanor be when he would talk about those

02:10PM   13   types of people?

02:10PM   14   A.  Casual conversation.  If their names came up, like we

02:10PM   15   knew them, we knew who they were.  Depending on the situation

02:10PM   16   if we said hello, that type of thing, if there was a party,

02:10PM   17   whatever it was.

02:10PM   18   Q.  Based upon your friendship with the defendant and your

02:10PM   19   conversations with him and your knowledge, did he have any

02:10PM   20   personal relationships with any individuals that had a

02:10PM   21   connection to Italian Organized Crime, or IOC for short?

02:10PM   22             **MR. SINGER:**  Object to form of the question.

02:10PM   23             **THE COURT:**  Yeah.  Sustained.

02:10PM   24             **BY MR. TRIPI:**

02:11PM   25   Q.  I understand.  Do you know an individual named Dana

02:11PM    1    Panepinto?

02:11PM    2    A.   Yes.

02:11PM    3    Q.   Who is Dana Panepinto?

02:11PM    4    A.   Mr. Bongiovanni's girlfriend from when he was younger.

02:11PM    5    Q.   And who was Dana Panepinto's father?

02:11PM    6    A.   Donnie Panepinto.

02:11PM    7    Q.   And what was his nickname?

02:11PM    8    A.   Turtle.

02:11PM    9    Q.   As you understood, Donnie Panepinto also known as Turtle,

02:11PM   10    what was your belief as to his connection to Italian

02:11PM   11    Organized Crime?

02:11PM   12    A.   He was a made member of Italian Organized Crime.

02:11PM   13    Q.   And how long did the defendant -- withdrawn.

02:11PM   14         What was the defendant's relationship with Turtle's

02:11PM   15    daughter, Dana?

02:11PM   16    A.   It was his girlfriend.

02:11PM   17    Q.   For how long?

02:11PM   18    A.   Four or five years.

02:11PM   19    Q.   During what period of life?

02:11PM   20    A.   During teen years, early 20s.

02:11PM   21    Q.   Can you give an estimate age range?

02:12PM   22    A.   18 to 22, somewhere in that time frame.

02:12PM   23    Q.   So we're talking end of high school into college?

02:12PM   24    A.   Yep.

02:12PM   25    Q.   Did the defendant attend college?

02:12PM   1   A.   Yes.

02:12PM   2   Q.   What, if anything, did the defendant ever tell you about

02:12PM   3   his father in regard to his father's friends as it relates to

02:12PM   4   IOC?

02:12PM   5   A.   His father had friends that were connected.

02:12PM   6   Q.   Did the defendant name his father's friends that were

02:12PM   7   connected?

02:12PM   8   A.   At times.

02:12PM   9   Q.   Who did he name to you?

02:12PM   10   A.   Well, he played cards on Hertel at the club, there was a

02:12PM   11   lot of associates there.   Tommy Chooch.   Joe Rosato.   He had

02:12PM   12   an uncle in Las Vegas he referred to as his Uncle Cheech.

02:13PM   13   Q.   What did he say about Uncle Cheech?

02:13PM   14   A.   He lived in Las Vegas, and was an uncle from a friend of

02:13PM   15   the family's, and believe he was connected.

02:13PM   16   Q.   Who was Gabby Cino?

02:13PM   17   A.   Gabby Cino was also one of the individuals at who would

02:13PM   18   attend the club on Hertel and play cards with his father.

02:13PM   19   Q.   When you say "his father," who are you talking about?

02:13PM   20   A.   Fred Bongiovanni.

02:13PM   21   Q.   The defendant's father?

02:13PM   22   A.   The defendant's father.

02:13PM   23   Q.   And when you say "the club on Hertel" what are you

02:13PM   24   referencing?

02:13PM   25   A.   There was a club on Hertel Avenue, Italian American Club,

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

| | | |
|---|---|---|
| 02:13PM | 1 | where older men would play cards. |
| 02:13PM | 2 | Q.  And by reputation -- withdrawn. |
| 02:13PM | 3 | What was the address of that club? |
| 02:13PM | 4 | A.  I don't recall the address. |
| 02:13PM | 5 | Q.  Where was it located on Hertel? |
| 02:13PM | 6 | A.  Between Commonwealth and Lovering. |
| 02:14PM | 7 | Q.  By reputation, what -- what was that club to you? |
| 02:14PM | 8 | A.  It was affiliated with -- it was a place where Organized |
| 02:14PM | 9 | Crime figures would be playing cards. |
| 02:14PM | 10 | Q.  Have you ever observed the defendant's father there? |
| 02:14PM | 11 | A.  I've driven by and seen his car there, I've never been in |
| 02:14PM | 12 | there when his father was there. |
| 02:14PM | 13 | Q.  Have you been in there? |
| 02:14PM | 14 | A.  I have. |
| 02:14PM | 15 | Q.  How many times? |
| 02:14PM | 16 | A.  A few. |
| 02:14PM | 17 | Q.  What age were you when you went in there? |
| 02:14PM | 18 | A.  20s, 30s, late 30s.  I had to go in there to see Tom |
| 02:14PM | 19 | Machelli who lived down the street from me. |
| 02:14PM | 20 | Q.  What did you have to see him about? |
| 02:15PM | 21 | A.  Just something regarding the neighborhood.  It was the |
| 02:15PM | 22 | development we lived in, he lived with his wife or his |
| 02:15PM | 23 | girlfriend at the time.  It was just an issue regarding the |
| 02:15PM | 24 | neighborhood, it was nothing serious.  We lived in -- it was |
| 02:15PM | 25 | called Rebecca Park, the association. |

02:15PM    1    Q.  Do you know whether or not the defendant has been into

02:15PM    2    that location called the club on Hertel?

02:15PM    3    A.  I don't know if he's been.

02:15PM    4    Q.  What did the defendant say about his father's association

02:15PM    5    to the club on Hertel?

02:15PM    6    A.  He played cards there regularly, he was a card player.

02:15PM    7    Q.  You referenced an Uncle Cheech that the defendant talked

02:15PM    8    about earlier.  Where did the defendant -- where did the

02:15PM    9    defendant tell you Uncle Cheech was located?

02:16PM   10    A.  Las Vegas.

02:16PM   11    Q.  What, if anything, else did the defendant say about Uncle

02:16PM   12    Cheech in Las Vegas to you?

02:16PM   13    A.  Really not much, just that he lived out there, and he was

02:16PM   14    close with his family, and that was really it.

02:16PM   15    Q.  What, if anything, did the defendant say that made you

02:16PM   16    conclude Uncle Cheech was connected to Organized Crime?

02:16PM   17    A.  He had mentioned it.

02:16PM   18    Q.  What did the defendant say in that regard?

02:16PM   19    A.  That he was connected, that's why he's out there.

02:16PM   20    Q.  What did the word "connected" mean to you when the

02:16PM   21    defendant used it?

02:16PM   22    A.  He was a made member of Organized Crime.

02:16PM   23    Q.  When the defendant was back from Boston and you were back

02:16PM   24    from Arizona, is that the right time frame?

02:16PM   25    A.  Yes.  Yes.

02:17PM    1    Q.  Did the defendant attend college locally?

02:17PM    2    A.  Yes.

02:17PM    3    Q.  Where did he go?

02:17PM    4    A.  I believe U.B. and then Medaille.

02:17PM    5    Q.  Who else that you would later become involved in criminal

02:17PM    6    activity went to U.B.?

02:17PM    7    A.  Michael Masecchia.

02:17PM    8    Q.  Were they associating with each other that time,

02:17PM    9    Bongiovanni and Masecchia?

02:17PM   10    A.  Yes.

02:17PM   11    Q.  How do you know that?

02:17PM   12    A.  They told me.

02:17PM   13    Q.  Who told you?

02:17PM   14    A.  Joe.  They were driving to school together.

02:17PM   15    Q.  To U.B.?

02:17PM   16    A.  To U.B.

02:17PM   17    Q.  During that time, were you socializing with the defendant

02:17PM   18    regularly?

02:17PM   19    A.  Yes.

02:17PM   20    Q.  Were you socializing with Masecchia?

02:17PM   21    A.  Yes, on occasion, yes.

02:17PM   22    Q.  Now you mentioned earlier sort of in your high school

02:18PM   23    years, and before he was in law enforcement, that you used

02:18PM   24    cocaine and marijuana with the defendant on occasion; do you

02:18PM   25    recall that?

02:18PM    1    A.   Yes.

02:18PM    2    Q.   I want to fast forward a moment to once the defendant is

02:18PM    3    a DEA agent, okay?   Okay?

02:18PM    4    A.   Okay.

02:18PM    5    Q.   During any conversations with you, did the defendant ever

02:18PM    6    express any views towards marijuana?

02:18PM    7    A.   That he liked it?   Or --

02:18PM    8    Q.   What did he say to you about marijuana as a DEA agent?

02:18PM    9    A.   He was waiting for him to retire so he could start

02:18PM   10    smoking it.

02:18PM   11    Q.   What, if any, opinions did he express to you about

02:18PM   12    enforcing marijuana laws?

02:18PM   13    A.   He wasn't very strong on them, thought they should be

02:19PM   14    legalized.

02:19PM   15    Q.   Fast forwarding a bit, but when the defendant was a DEA

02:19PM   16    agent, were there times when you used cocaine with him?

02:19PM   17    A.   Yes.

02:19PM   18    Q.   I'm going to get into the substance of those later on,

02:19PM   19    but did you have any conversations with the defendant about

02:19PM   20    his cocaine use as a DEA agent?

02:19PM   21    A.   Yes.

02:19PM   22    Q.   What did he say about that?

02:19PM   23    A.   Told me how it stayed in his system for 72 hours, to

02:19PM   24    flush it out, either working out and drinking a lot of water,

02:19PM   25    he was concerned about it.

| | | |
|---|---|---|
| 02:19PM | 1 | Q.  Did he ever discuss for you why he would use cocaine |
| 02:19PM | 2 | versus marijuana as an agent? |
| 02:19PM | 3 | A.  It was easier to flush out, because marijuana stayed in |
| 02:19PM | 4 | your system a little longer.  30 days as opposed to three. |
| 02:20PM | 5 | Q.  Are those conversations you had with the defendant? |
| 02:20PM | 6 | A.  Yes. |
| 02:20PM | 7 | Q.  Getting back to still the time period before the |
| 02:20PM | 8 | defendant is in law enforcement, okay, so college years, into |
| 02:20PM | 9 | the 20s, okay?  At times, when you would go out to bars, did |
| 02:20PM | 10 | you provide the cocaine at times? |
| 02:20PM | 11 | A.  Yes. |
| 02:20PM | 12 | Q.  Were you getting it from somebody? |
| 02:20PM | 13 | A.  Yes. |
| 02:20PM | 14 | Q.  Who were you getting from? |
| 02:20PM | 15 | A.  At that time, Mario Zanghi. |
| 02:20PM | 16 | Q.  Were there ever any occasions when it was the defendant |
| 02:20PM | 17 | who had it? |
| 02:20PM | 18 | A.  Yes. |
| 02:21PM | 19 | Q.  As between the two of you, who had it more? |
| 02:21PM | 20 | A.  I did. |
| 02:21PM | 21 | Q.  So you indicated earlier that you were in Las Vegas from |
| 02:21PM | 22 | '97 to '99.  And you were there with your wife and your two |
| 02:21PM | 23 | children, correct? |
| 02:21PM | 24 | A.  Correct. |
| 02:21PM | 25 | Q.  Just remind the jury, what were you doing out there at |

02:21PM   1   that time for work?

02:21PM   2   A.  I was in the wireless business, cell phone business, like

02:21PM   3   I was here.

02:21PM   4   Q.  And I think you said as you were getting ready to go, the

02:21PM   5   defendant was joining the Erie County Sheriff's Office?

02:21PM   6   A.  That's correct.

02:21PM   7   Q.  When he worked for the Erie County Sheriff's Office, what

02:22PM   8   was the defendant's job?

02:22PM   9   A.  He was a deputy in the holding center.

02:22PM  10   Q.  So he was he guarding inmates just like you did?

02:22PM  11   A.  Exactly, same position.

02:22PM  12   Q.  As the defendant was joining the Erie County Sheriff's

02:22PM  13   Office, were you aware of any life changes that he had, major

02:22PM  14   life events?

02:22PM  15   A.  He was married to his first wife.

02:22PM  16   Q.  What was her name?

02:22PM  17   A.  JoAnn.

02:22PM  18   Q.  Shortly after that, did he have a child?

02:22PM  19   A.  He did.

02:22PM  20   Q.  What was his child's name?

02:22PM  21   A.  He had a daughter, Chelsea.

02:22PM  22   Q.  When you were in Las Vegas, did you stay in touch with

02:22PM  23   the defendant?

02:23PM  24   A.  Yes.

02:23PM  25   Q.  From '97 to '99?

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

58

02:23PM   1   A.   Yes.

02:23PM   2   Q.   How did you keep in touch?

02:23PM   3   A.   Through phone.  I mean, there really -- wireless, well,

02:23PM   4   cell phones were different at that time.

02:23PM   5   Q.   Did there come a time where you learned the defendant had

02:23PM   6   applied to the DEA?

02:23PM   7   A.   Yes.

02:23PM   8   Q.   How did you learn about that?

02:23PM   9   A.   He had told me.

02:23PM   10   Q.   Was that in person or over the phone?

02:23PM   11   A.   Over the phone.

02:23PM   12   Q.   What, if anything, did he tell you about the process of

02:23PM   13   joining the DEA?

02:23PM   14   A.   A back -- severe background -- a very deep background

02:23PM   15   check, polygraph, and then he'd have to go away to training

02:23PM   16   to Quantico, Virginia.

02:23PM   17   Q.   Did he ever express any concerns to you about any of his

02:23PM   18   past connections?

02:23PM   19   A.   No.

02:23PM   20   Q.   Were you one of the references for his DEA application?

02:24PM   21   A.   No.

02:24PM   22   Q.   Do you know who was?

02:24PM   23   A.   I do not.

02:24PM   24   Q.   When he joined the DEA, do you know where his first duty

02:24PM   25   station was?

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

59

| 02:24PM | 1 | A.  Florida. |
| 02:24PM | 2 | Q.  Do you know where in Florida? |
| 02:24PM | 3 | A.  Miami?  Orlando?  I don't recall. |
| 02:24PM | 4 | Q.  Did you ever visit him there? |
| 02:24PM | 5 | A.  No. |
| 02:24PM | 6 | Q.  Who did he live there with? |
| 02:24PM | 7 | A.  His wife. |
| 02:24PM | 8 | Q.  Did you keep in touch? |
| 02:24PM | 9 | A.  Sporadically. |
| 02:24PM | 10 | Q.  When you did talk, was it over the phone? |
| 02:24PM | 11 | A.  Yeah, it was not that much. |
| 02:24PM | 12 | Q.  Did there come a point in time where you learned he was |
| 02:24PM | 13 | going to be leaving Florida? |
| 02:24PM | 14 | A.  Yes. |
| 02:24PM | 15 | Q.  What, if anything, did he say to you about that? |
| 02:24PM | 16 | A.  He was going to be transferring back to Buffalo.  His |
| 02:25PM | 17 | wife was going through, at the time, her sister was sick or |
| 02:25PM | 18 | passed away, I don't recall what had happened.  She had moved |
| 02:25PM | 19 | back first, and he was going to stay behind and sell the |
| 02:25PM | 20 | house and move back.  Try and take a transfer. |
| 02:25PM | 21 | Q.  What was that last part you said? |
| 02:25PM | 22 | A.  Take a transfer.  Transfer with the DEA. |
| 02:25PM | 23 | Q.  Back to Buffalo? |
| 02:25PM | 24 | A.  Back to Buffalo. |
| 02:25PM | 25 | Q.  So you got back to Buffalo around '99.  Did he return to |

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

60

| | | |
|---|---|---|
| 02:25PM | 1 | Buffalo a few years after that? |
| 02:25PM | 2 | A.  Within that time frame, yeah. |
| 02:25PM | 3 | Q.  When the defendant arrived back in Buffalo, shortly after |
| 02:25PM | 4 | that, was he separated from his wife, JoAnn? |
| 02:25PM | 5 | A.  Yeah, shortly after, yes. |
| 02:25PM | 6 | Q.  Do you know where he was living? |
| 02:25PM | 7 | A.  I believe he moved into Lovering. |
| 02:26PM | 8 | Q.  What do you mean by Lovering? |
| 02:26PM | 9 | A.  I'm sorry, his residence, his family's home on Lovering. |
| 02:26PM | 10 | Lovering Avenue in North Buffalo. |
| 02:26PM | 11 | Q.  And what's that address? |
| 02:26PM | 12 | A.  221. |
| 02:26PM | 13 | Q.  Lovering? |
| 02:26PM | 14 | A.  Yes. |
| 02:26PM | 15 | Q.  Is that a double? |
| 02:26PM | 16 | A.  It's a double. |
| 02:26PM | 17 | Q.  And I guess we should define that.  What's a double? |
| 02:26PM | 18 | A.  Two-story house, two-family house.  You could have a |
| 02:26PM | 19 | family live downstairs and upstairs. |
| 02:26PM | 20 | Q.  So basically one house with two apartments? |
| 02:26PM | 21 | A.  One house with two apartments, yes. |
| 02:26PM | 22 | Q.  And where did the defendant's parents live? |
| 02:26PM | 23 | A.  I believe downstairs. |
| 02:26PM | 24 | Q.  And where did the defendant live? |
| 02:26PM | 25 | A.  Upstairs. |

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

61

02:26PM   1   Q.  Do you know whether or not he had to pay rent to his

02:26PM   2   parents?

02:26PM   3   A.  I don't recall.  I think he did, I'm not quite sure.

02:26PM   4   Q.  Once the defendant was back in Buffalo, and you were in

02:26PM   5   Buffalo -- withdrawn.

02:26PM   6       What were you doing at that time career wise?

02:26PM   7   A.  In -- I was in sales in the wireless business.  I was

02:27PM   8   working for NEXTEL and tending bar at Harry's Harbor Place.

02:27PM   9   Q.  And where was Harry's Harbor Place?

02:27PM  10   A.  It was on the waterfront.

02:27PM  11   Q.  And you were a bartender there?

02:27PM  12   A.  On the weekends.

02:27PM  13   Q.  Weekends, being Friday-Saturday, or Saturday-Sunday?

02:27PM  14   A.  Friday-Saturday, and maybe pick -- I was working full

02:27PM  15   time during the day, so the weekends were a little bit

02:27PM  16   easier.

02:27PM  17   Q.  When the defendant got back in town, did you -- did you

02:27PM  18   and him start reconnecting more?

02:27PM  19   A.  Yes.

02:27PM  20   Q.  Can you describe how that transpired for the jury, just

02:27PM  21   explain it to them.

02:27PM  22   A.  He started coming in to Harry's Harbor when I was there,

02:27PM  23   and we reconnected again and reestablished our relationship,

02:27PM  24   so to speak.

02:27PM  25   Q.  How frequently was he coming in to Harry's Harbor Place?

02:28PM   1   A.  You know, he would frequent it.  Not every weekend, but

02:28PM   2   he would come in once in a while.  Whenever he had time.

02:28PM   3   Q.  Other than him visiting you at the bar, what else did you

02:28PM   4   start doing together, if anything?

02:28PM   5   A.  We -- we did cocaine together.

02:28PM   6   Q.  Okay.  Was that at the bar?

02:28PM   7   A.  No, but different occasions when we'd get together at

02:28PM   8   that time.

02:28PM   9   Q.  Okay.  Did you do anything else socially?  Were there

02:28PM  10   other places where you would see the defendant during the

02:28PM  11   week?

02:28PM  12   A.  No, not at that -- not during the week.  I was busy, he

02:28PM  13   was busy.

02:28PM  14   Q.  Were you someone who used to like to work out?

02:28PM  15   A.  Yes.

02:28PM  16   Q.  Did you join a gym?

02:28PM  17   A.  We did, we joined the gym.

02:28PM  18   Q.  What gym did you join?

02:28PM  19   A.  The Fitness Factory.

02:28PM  20   Q.  And where did the defendant work out?

02:28PM  21   A.  He worked out there, as well.

02:28PM  22   Q.  And were there times when you would work out together

02:29PM  23   during the day?

02:29PM  24   A.  Yes, if our schedule permitted, yes.

02:29PM  25   Q.  And socially, when you were not working, would you go to

02:29PM   1   bars together?

02:29PM   2   A.   Yes.   We'd get together, have drinks.

02:29PM   3   Q.   Now by 2001, what was the status of your marriage?

02:29PM   4   A.   I was going -- I just got through a divorce.   I was

02:29PM   5   divorced.

02:29PM   6   Q.   Was your divorce finalized by then?

02:29PM   7   A.   Yes.

02:29PM   8   Q.   What types of things did you have to pay as a result of

02:29PM   9   your divorce?

02:29PM   10   A.   Child support.   I split daycare costs with my ex-wife.

02:29PM   11   On top of providing, whenever I had my children, I was always

02:29PM   12   doing things with them.   If we went out to eat, whatever,

02:29PM   13   expenses for that.

02:29PM   14   Q.   Did you have to pay maintenance to your ex-wife?

02:29PM   15   A.   I did not.   Just child support and split daycare costs,

02:29PM   16   after-school costs.

02:29PM   17   Q.   What's your understanding of why you did not have to pay

02:29PM   18   maintenance?

02:29PM   19   A.   My ex-wife was working full time.

02:30PM   20   Q.   Did she make more money than you?

02:30PM   21   A.   No, it's just an agreement that we worked on.   She didn't

02:30PM   22   require maintenance.

02:30PM   23   Q.   Now you, at that time, was your divorced finalized?

02:30PM   24   A.   2001, it was, yes.

02:30PM   25   Q.   Now, what was the defendant's marital status at that

02:30PM  1  point?

02:30PM  2  A.  I believe he was going through a divorce, too.

02:30PM  3  Q.  Did you speak to one another about that?

02:30PM  4  A.  Yes.

02:30PM  5  Q.  Was that sort of a shared experience you were going

02:30PM  6  through around the same time?

02:30PM  7  A.  Yes.

02:30PM  8  Q.  What did the defendant tell you about his divorce

02:30PM  9  situation?

02:30PM  10  A.  It was expensive.  He'd be making maintenance to his

02:30PM  11  wife, his ex-wife, as well as child support.  So, additional

02:31PM  12  expenses, as well as emotionally, you know, being separated

02:31PM  13  from your child and going through a whole divorce.

02:31PM  14  Q.  When he would speak about the expenses related to his

02:31PM  15  divorce and that whole situation, what was his demeanor?

02:31PM  16  A.  We would just talk about it socially.  I mean, he was

02:31PM  17  upset, obviously.  No one wants to go through that.

02:31PM  18  Q.  What was his demeanor?

02:31PM  19  A.  Upset.

02:31PM  20  Q.  Were you upset when you went through your divorce?

02:31PM  21  A.  Very.

02:31PM  22  Q.  Was that stressful for you?

02:31PM  23  A.  It was very stressful.

02:31PM  24  Q.  Based upon your discussions and your observations of the

02:31PM  25  defendant, what was your opinion regarding whether or not he

02:31PM    1   was stressed?

02:31PM    2   A.  He was stressed.  I mean, the new financial obligation of

02:31PM    3   paying maintenance and child support, the financial stress

02:31PM    4   was getting to him.  As well as being separated from his

02:31PM    5   child, like I mentioned.

02:31PM    6   Q.  During that time, when you're -- you're both single at

02:32PM    7   that point?

02:32PM    8   A.  Yes.

02:32PM    9   Q.  Did you guys go out together?

02:32PM   10   A.  Yeah.  On occasion.  I mean, he was busy, I was busy, but

02:32PM   11   we'd get together.

02:32PM   12   Q.  So, when you would go out, did there come a point in time

02:32PM   13   where you disclosed to the defendant that you were using

02:32PM   14   cocaine?

02:32PM   15   A.  Yes.

02:32PM   16   Q.  Describe for the jury the first time that you had that

02:32PM   17   discussion with the defendant.

02:32PM   18   A.  We were out, and I had had cocaine on me, and asked him

02:32PM   19   if he wanted to do some.  And we did it together.

02:32PM   20   Q.  Is that something you had done earlier in life together?

02:32PM   21   A.  Yes.

02:32PM   22   Q.  Where were you on that occasion, if you recall?

02:32PM   23   A.  I don't recall.

02:32PM   24   Q.  Did you have certain bars that you liked to go to with

02:33PM   25   the defendant?

02:33PM   1    A.  Downtown, there was a variety of them.  Chippewa, SoHo,

02:33PM   2    Mother's.  Sometimes on Hertel, M.T. Pocket's, Gables,

02:33PM   3    neighborhood bars.

02:33PM   4    Q.  Now, did that happen right away, you reconnect and you

02:33PM   5    start using cocaine?  Or did that take a little bit of time?

02:33PM   6    A.  No, it took a little time.

02:33PM   7    Q.  Describe that process of getting to that point for the

02:33PM   8    jury.

02:33PM   9    A.  Just going out more.  The stress of it all.  Obviously,

02:33PM   10   alcohol, when you're drinking alcohol, that plays a factor in

02:33PM   11   it.  So, it evolved over time.

02:33PM   12   Q.  I mean, when you -- when you and the defendant were going

02:33PM   13   out, were you looking for girls?

02:33PM   14   A.  Yeah.  We were, yes.  We were socializing, talking to

02:34PM   15   people.  Yes.

02:34PM   16   Q.  Now, when the defendant was going through his divorce,

02:34PM   17   and you discussed the maintenance and the child support,

02:34PM   18   what, if any, other financial obligation did he discuss that

02:34PM   19   he had?

02:34PM   20        MR. SINGER:  Objection.  Asked and answered, Judge,

02:34PM   21   we went through this a couple times now.

02:34PM   22        MR. TRIPI:  I don't believe so, Your Honor.

02:34PM   23        THE COURT:  I'll give you a little more latitude,

02:34PM   24   Mr. Tripi, but I want you to move along.

02:34PM   25        MR. TRIPI:  I understand.

02:34PM  1       **THE COURT:**  Overruled, but go ahead.

02:34PM  2           **BY MR. TRIPI:**

02:34PM  3   Q.  During this time period, what else did you know him to be

02:34PM  4   paying for?

02:34PM  5   A.  His living expenses.  Obviously, he was paying his

02:34PM  6   maintenance, his child support.  He was good with that.  And

02:34PM  7   then his expenses.

02:34PM  8   Q.  What type of vehicle did he have?

02:35PM  9   A.  Cadillac Escalade.

02:35PM  10  Q.  Was that, in your view, an expensive vehicle?

02:35PM  11  A.  Yes.

02:35PM  12  Q.  Do you know whether or not his parents were retired?

02:35PM  13  A.  I don't know if they were at that point.

02:35PM  14  Q.  What, if anything, did he say about whether his wife

02:35PM  15  worked?  You indicated your wife worked.  What did he say

02:35PM  16  about his wife, or ex-wife?

02:35PM  17  A.  His ex-wife did not work.  She was a stay-at-home mom.

02:35PM  18  And I believe she pursued her master's degree, she has her

02:35PM  19  master's degree, but I don't believe she ever worked.

02:35PM  20  Q.  What, if anything, did he say about her not working?

02:35PM  21  A.  He was carrying the whole burden.

02:35PM  22           **MR. SINGER:**  Asked and answered.

02:35PM  23           **THE COURT:**  Yeah, sustained.

02:35PM  24           **BY MR. TRIPI:**

02:35PM  25  Q.  Was there a topic that would come up as it relates to his

02:35PM   1   wife's employment repeatedly?

02:35PM   2   A.  Yes.

02:35PM   3              **MR. SINGER:**  Objection.

02:35PM   4              **MR. TRIPI:**  How often?

02:35PM   5              **THE COURT:**  What's the basis of the objection.

02:35PM   6              **MR. SINGER:**  Asked and answered.

02:36PM   7              **THE COURT:**  No, overruled.

02:36PM   8              **BY MR. TRIPI:**

02:36PM   9   Q.  How often?

02:36PM  10   A.  It would come up quite a bit.

02:36PM  11   Q.  Describe that for the jury.

02:36PM  12   A.  She was not providing an income, so he was wishing that

02:36PM  13   she would get a job.  She had a master's degree, and he was

02:36PM  14   covering all the expenses at this time.  I believe they had

02:36PM  15   their child at this time, so it was becoming a burden.

02:36PM  16   Q.  As time went on, did he tell you about other things that

02:36PM  17   he was paying for that his ex-wife wasn't?

02:36PM  18   A.  Yes.  He was, like I mentioned --

02:36PM  19   Q.  Like what?

02:36PM  20   A.  Well, living expenses, I -- I -- I don't recall, sorry.

02:36PM  21   Q.  Do you know -- do you know where his daughter went to

02:36PM  22   school?

02:36PM  23   A.  Okay.  He was paying the tuition for his daughter's

02:36PM  24   school in Williamsville.  It was a Catholic school.

02:36PM  25   Q.  Do you know of any other expenses relating to his

02:36PM    1    daughter that he would talk about?

02:37PM    2    A.  Yes, he would pay additional expenses for his daughter,

02:37PM    3    whatever she needed.  Anything school related.  That type

02:37PM    4    thing.

02:37PM    5    Q.  By 2004, did the defendant start dating someone new?

02:37PM    6    A.  Yes.

02:37PM    7    Q.  And who was that?

02:37PM    8    A.  I believe Melissa -- I don't know her last name.

02:37PM    9    Q.  Do you know what she did for a living?

02:37PM   10    A.  I believe she was a -- worked in a salon when he met her,

02:37PM   11    but she got her nursing degree and ended up becoming a nurse.

02:37PM   12    Q.  So she went from working at a salon, to in school, then a

02:37PM   13    nurse?

02:37PM   14    A.  Yes, correct.

02:37PM   15    Q.  Was there an age difference between the two of them?

02:37PM   16    A.  Yes.

02:37PM   17    Q.  What was the approximate age difference?

02:38PM   18            MR. SINGER:  Objection, relevance.

02:38PM   19            THE COURT:  Sustained.

02:38PM   20            BY MR. TRIPI:

02:38PM   21    Q.  What types of activities did they engage in socially?

02:38PM   22    A.  They went out a lot.  Dinners.  Lot of bars.  Travel.

02:38PM   23    Q.  When the defendant was dating Melissa, was he still under

02:38PM   24    obligations related to his ex-wife?

02:38PM   25    A.  He was, yes.

02:38PM    1    Q.  When he went out with Melissa, what, if anything, did he

02:38PM    2    tell you about his spending habits on her?

02:38PM    3    A.  They were excessive.  He was always buying dinners,

02:38PM    4    drinks.

02:38PM    5             MR. SINGER:  Objection, Judge, it's nonresponsive to

02:38PM    6    the question.

02:38PM    7             MR. TRIPI:  Yes, it is.

02:38PM    8             MR. SINGER:  It's response --

02:38PM    9             THE COURT:  He -- no, I think it is responsive

02:38PM   10    Mr. Singer, overruled.

02:38PM   11             MR. SINGER:  But --

02:39PM   12             THE COURT:  Do you have something more you want to

02:39PM   13    say?

02:39PM   14             MR. SINGER:  Judge, the question was what did

02:39PM   15    Mr. Bongiovanni tell you about his spending habits regarding

02:39PM   16    Melissa?

02:39PM   17             THE COURT:  Right.

02:39PM   18             MR. SINGER:  And the witness began to answer offering

02:39PM   19    his opinion about what it was.  So, again, it's nonresponsive

02:39PM   20    to the question.

02:39PM   21             THE COURT:  I don't -- I disagree with that, so

02:39PM   22    overruled.

02:39PM   23             BY MR. TRIPI:

02:39PM   24    Q.  Do you know the approximate years he dated Melissa?

02:39PM   25    A.  2004 to 2009.

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

71

| 02:39PM | 1 | Q. About five years? |
|---|---|---|
| 02:39PM | 2 | A. About five years.  I don't know the exact dates. |
| 02:39PM | 3 | Q. What was their living situation, if you know? |
| 02:39PM | 4 | A. They didn't live together.  He was living at Lovering and |
| 02:39PM | 5 | she had an apartment. |
| 02:40PM | 6 | Q. I want to switch gears a little bit, okay? |
| 02:40PM | 7 | A. Sure. |
| 02:40PM | 8 | Q. I asked you earlier about an individual named Peter |
| 02:40PM | 9 | Gerace, do you know him? |
| 02:40PM | 10 | A. I do. |
| 02:40PM | 11 | Q. Who is Peter Gerace? |
| 02:40PM | 12 | A. Peter Gerace, well, he was the owner of Pharaoh's |
| 02:40PM | 13 | nightclub.  He knows both I and the defendant.  He was a |
| 02:40PM | 14 | lifelong -- he was a friend from the -- friend from our |
| 02:40PM | 15 | adolescent years. |
| 02:40PM | 16 | Q. What's the defendant's -- what's your understanding of |
| 02:40PM | 17 | the defendant's relationship with Mr. Gerace in terms of how |
| 02:40PM | 18 | close they are? |
| 02:40PM | 19 | A. They were good friends.  They hung out. |
| 02:40PM | 20 | Q. Now, you indicated Gerace owns a bar? |
| 02:40PM | 21 | A. He does now, yes. |
| 02:40PM | 22 | Q. What bar is that? |
| 02:40PM | 23 | A. Pharaoh's on -- near the airport. |
| 02:41PM | 24 | Q. And by family reputation, who is Peter Gerace related to? |
| 02:41PM | 25 | A. Joe Todaro was his grandfather. |

02:41PM   1   Q.   You're talking about Joe Todaro Sr.?

02:41PM   2   A.   Yeah, Joe Todaro Sr.

02:41PM   3   Q.   And by your understanding of relationship, what was his

02:41PM   4   relationship to Italian Organized Crime?

02:41PM   5   A.   By reputation, he was the boss.

02:41PM   6   Q.   Did you and Bongiovanni ever speak about him?

02:41PM   7   A.   Yes.

02:41PM   8   Q.   What did the defendant say about Todaro Sr.?

02:41PM   9   A.   He knew him.  He knew him.  Was nice man.  Again, if we

02:41PM   10   saw him out, we'd say hello to him, that type of thing.

02:41PM   11   Q.   Who is Peter Gerace's younger brother?

02:42PM   12   A.   He had two, Anthony and David.

02:42PM   13   Q.   Now I'd like to direct your attention to the defendant's

02:42PM   14   relationship with Peter Gerace as it relates to Pharaoh's

02:42PM   15   nightclub, okay?

02:42PM   16   A.   Okay.

02:42PM   17   Q.   What, if anything, did the defendant ever tell you about

02:42PM   18   Gerace, Pharaoh's nightclub, and a situation involving

02:42PM   19   U.S. Probation?

02:42PM   20   A.   He had told me that Peter had gotten violated, something

02:42PM   21   had happened at the club, and he had stepped in to help him

02:42PM   22   out.  He reached out, I believe, to probation.  And I believe

02:42PM   23   Peter was looking at going back to, he was released from

02:42PM   24   federal custody, I believe he did four months or whatever it

02:42PM   25   was, six months.  He stepped in, and he was wearing an ankle

02:43PM    1    brace.

02:43PM    2    Q.  Did the defendant tell you anything more about how he did

02:43PM    3    that or his role in that?

02:43PM    4    A.  No.

02:43PM    5    Q.  What, if anything, did the defendant ever tell you about

02:43PM    6    going to Pharaoh's?

02:43PM    7    A.  He's been there a few times.

02:43PM    8    Q.  What, if anything, did the defendant ever tell you about

02:43PM    9    golf outings related to Pharaoh's, Pharaoh's golf outings?

02:43PM   10    A.  I believe he golfed in the golf outing there, as well.

02:43PM   11    Q.  Have you ever golfed in the Pharaoh's golf outing?

02:43PM   12    A.  No.

02:43PM   13    Q.  Do you golf?

02:43PM   14    A.  I do, but I'm not very good.

02:43PM   15    Q.  Have you ever been to Pharaoh's with the defendant?

02:43PM   16    A.  Yes.

02:43PM   17    Q.  Approximately what time frame was that?

02:43PM   18    A.  Oh, God.  2000 -- again -- again, we were out, 2015, '16,

02:43PM   19    right when Peter had just taken it back over.

02:43PM   20    Q.  Do you know specifically?

02:44PM   21    A.  I don't, I don't recall.

02:44PM   22    Q.  I'm going to show you a document and see if I can refresh

02:44PM   23    your recollection, okay?

02:44PM   24    A.  Okay.

02:44PM   25          **MR. TRIPI:**  Counsel, I'm going to show Exhibit 3540U,

02:44PM  1    page 5, okay?  Handing up Government Exhibit 3540U, if you

02:44PM  2    could take a look at page 5, just read that to yourself,

02:44PM  3    Mr. Selva, and when you're done, look up.

02:44PM  4              Did that exhibit refresh your recollection as to

02:45PM  5    approximately when you were there with Mr. Bongiovanni?

02:45PM  6    A.  Yes.

02:45PM  7    Q.  And when was that?

02:45PM  8    A.  Between 2013, '14.

02:45PM  9    Q.  And you referenced that it was when Peter -- withdraw

02:45PM 10    that.

02:45PM 11         How many times were you there during that time frame?

02:45PM 12    A.  A few.

02:45PM 13    Q.  What, if any -- any interaction did you observe between

02:45PM 14    Defendant Bongiovanni and Peter Gerace while you were there

02:45PM 15    with Defendant Bongiovanni?

02:45PM 16    A.  We were at the bar.  Peter was there.  We said hello.

02:45PM 17    And then him and Joe stepped aside, they had a brief

02:46PM 18    conversation in the corner, and then -- two or three minutes,

02:46PM 19    and then came back to the bar.

02:46PM 20    Q.  Who stepped aside?

02:46PM 21    A.  Joe and Peter.

02:46PM 22    Q.  And what do you mean that they stepped aside?

02:46PM 23    A.  They walked away from me and had a conversation.

02:46PM 24    Q.  Were you part of that conversation?

02:46PM 25    A.  I was not.

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

75

| | | |
|---|---|---|
| 02:46PM | 1 | Q.  Was it far enough away where you couldn't hear? |
| 02:46PM | 2 | A.  Yes. |
| 02:46PM | 3 | Q.  Do you know what they talked about? |
| 02:46PM | 4 | A.  I don't. |
| 02:46PM | 5 | Q.  Did the defendant walk back over to you and tell you what |
| 02:46PM | 6 | him and Peter talked about? |
| 02:46PM | 7 | A.  No, he came back and finished his drink, and that was it. |
| 02:46PM | 8 | Q.  How long would you estimate they spoke? |
| 02:46PM | 9 | A.  Three to five minutes. |
| 02:46PM | 10 | Q.  Were you aware of another restaurant that Peter Gerace or |
| 02:47PM | 11 | his family was associated with? |
| 02:47PM | 12 | A.  Yes. |
| 02:47PM | 13 | Q.  What was that? |
| 02:47PM | 14 | A.  Pietro's. |
| 02:47PM | 15 | Q.  Now, you indicated that you were a bartender? |
| 02:47PM | 16 | A.  Yeah, I filled in a few times there.  I worked -- |
| 02:47PM | 17 | Q.  Let me ask the question.  Does Pietro's have a bar? |
| 02:47PM | 18 | A.  It does. |
| 02:47PM | 19 | Q.  Did you ever work at that bar? |
| 02:47PM | 20 | A.  I did. |
| 02:47PM | 21 | Q.  Who got you to work at that bar? |
| 02:47PM | 22 | A.  I believe I spoke to Peter and Anthony, both, his |
| 02:47PM | 23 | brother. |
| 02:47PM | 24 | Q.  And how did you meet Peter originally? |
| 02:47PM | 25 | A.  Met him growing up when we were younger. |

| | | |
|---|---|---|
| 02:47PM | 1 | Q.  Do you know through who? |
| 02:47PM | 2 | A.  No, just from -- we had a lot of common friends.  He was |
| 02:47PM | 3 | friends with my younger brother. |
| 02:47PM | 4 | Q.  Now you mentioned Anthony Gerace a few times.  Is that |
| 02:47PM | 5 | someone that you also know was associated or friends with Ron |
| 02:48PM | 6 | Serio? |
| 02:48PM | 7 | A.  Yes. |
| 02:48PM | 8 | Q.  As time went on, was Anthony Gerace involved in |
| 02:48PM | 9 | distributing marijuana with Ron Serio and others you were |
| 02:48PM | 10 | involved with? |
| 02:48PM | 11 | A.  Yes. |
| 02:48PM | 12 | MR. SINGER:  Objection, foundation. |
| 02:48PM | 13 | THE WITNESS:  He was. |
| 02:48PM | 14 | THE COURT:  Yeah, why don't you lay a foundation. |
| 02:48PM | 15 | MR. TRIPI:  Yes, Judge. |
| 02:48PM | 16 | THE COURT:  Sustained. |
| 02:48PM | 17 | BY MR. TRIPI: |
| 02:48PM | 18 | Q.  You indicated that you participated for approximately |
| 02:48PM | 19 | eleven years in marijuana distribution? |
| 02:48PM | 20 | A.  Yes. |
| 02:48PM | 21 | Q.  And that -- did that distribution evolve over time in |
| 02:48PM | 22 | terms of the different types of people involved, as well as |
| 02:48PM | 23 | the different methods of distribution? |
| 02:48PM | 24 | A.  It did. |
| 02:48PM | 25 | Q.  Were you aware of different people who became involved at |

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

77

02:48PM  1    various points in time?

02:48PM  2    A.   Yes.

02:48PM  3    Q.   Did you become aware of that through your participation

02:48PM  4    in the conspiracy?

02:48PM  5    A.   Yes.

02:48PM  6    Q.   And conversations you had with people?

02:48PM  7    A.   Yes.

02:48PM  8    Q.   At some point, did you become aware that Anthony Gerace

02:49PM  9    was involved?

02:49PM  10   A.   I did, yes.

02:49PM  11   Q.   And who was Anthony Gerace close with based upon your

02:49PM  12   participation in that conspiracy?

02:49PM  13   A.   He was close with Ron Serio.

02:49PM  14   Q.   And based upon your involvement and discussions you had,

02:49PM  15   what was your understanding of the nature of Anthony's role

02:49PM  16   with Ron Serio?

02:49PM  17   A.   Anthony was getting marijuana, large quantities, from

02:49PM  18   Ron, and he was distributing it.

02:50PM  19   Q.   Now, I asked you a moment ago about a situation with

02:50PM  20   Peter Gerace and U.S. Probation at Pharaoh's; do you recall

02:50PM  21   that?

02:50PM  22   A.   Yes.

02:50PM  23   Q.   Shifting to Anthony Gerace, did you ever have any

02:50PM  24   conversations with the defendant about any assistance he

02:50PM  25   provided to Anthony Gerace?

02:50PM   1   A.   Yes.

02:50PM   2   Q.   And approximately when were those conversations?

02:50PM   3   A.   Oh, approximate dates were late 2000s, like 2013, '14,

02:50PM   4   '15.

02:50PM   5   Q.   Can you describe that conversation that you had with the

02:50PM   6   defendant as it related to assistance he provided to Anthony

02:50PM   7   Gerace?

02:50PM   8   A.   Anthony had been -- he got arrested with possession of

02:50PM   9   cocaine, I believe it was.  The amount -- I think it was 2 or

02:50PM  10   3 ounces of cocaine.  And he had reached out to a contact --

02:51PM  11   Q.   Can you use names, please?

02:51PM  12   A.   I'm sorry.

02:51PM  13   Q.   When you use "he," it's hard to follow.

02:51PM  14   A.   I apologize.

02:51PM  15   Q.   You're okay.

02:51PM  16   A.   The defendant, Joseph Bongiovanni, reached out to

02:51PM  17   contacts he had in the Amherst Police Department to help him.

02:51PM  18   Q.   And this is based upon what the defendant told you?

02:51PM  19   A.   Yes.

02:51PM  20   Q.   Did he tell you anything more about that?

02:51PM  21   A.   No.

02:51PM  22            THE COURT:  Mr. Tripi, is this a good time to break?

02:51PM  23            MR. TRIPI:  Sure, Your Honor.

02:51PM  24            THE COURT:  Let's take our afternoon break now.

02:51PM  25            Please remember my instructions about not talking

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

| | | |
|---|---|---|
| 02:51PM | 1 | about the case with anyone, including each other, and not |
| 02:51PM | 2 | making up your minds. |
| 02:51PM | 3 | See you back here in 10 or 15 minutes. |
| 02:51PM | 4 | (Jury excused at 2:51 p.m.) |
| 02:52PM | 5 | **THE COURT:**  Anything we need to put on the record? |
| 02:52PM | 6 | **MR. TRIPI:**  No, Your Honor. |
| 02:52PM | 7 | **MR. SINGER:**  Just one moment, Judge. |
| 02:52PM | 8 | **THE COURT:**  Sure. |
| 02:52PM | 9 | **MR. SINGER:**  No, Judge, thank you. |
| 02:52PM | 10 | **THE COURT:**  Mr. Tripi, do you have a sense of how |
| 02:52PM | 11 | much longer you're going to be with this witness?  The rest of |
| 02:52PM | 12 | the day? |
| 02:52PM | 13 | **MR. TRIPI:**  I think so, Judge, I think I'll probably |
| 02:52PM | 14 | finish tomorrow morning.  We budgeted the rest of the day for |
| 02:52PM | 15 | him. |
| 02:52PM | 16 | **THE COURT:**  Okay. |
| 02:52PM | 17 | **MR. TRIPI:**  I think realistically, not to speak for |
| 02:52PM | 18 | the defense, I think this witness probably eats up today and |
| 02:53PM | 19 | most of tomorrow. |
| 02:53PM | 20 | **THE COURT:**  Yeah, that's what I figured from the |
| 02:53PM | 21 | witness list.  I just wanted to have a sense of how much |
| 02:53PM | 22 | longer you think. |
| 02:53PM | 23 | **MR. TRIPI:**  Yeah, my outline is like 39 pages.  I'm |
| 02:53PM | 24 | at page 17. |
| 02:53PM | 25 | **THE COURT:**  Okay.  Great.  We'll see you folks in |

| | | |
|---|---|---|
| 02:53PM | 1 | about 15 minutes. |
| 02:53PM | 2 | **THE CLERK:**  All rise. |
| 02:53PM | 3 | (Off the record at 2:53 p.m.) |
| 02:53PM | 4 | (Back on the record at 3:08 p.m.) |
| 03:08PM | 5 | (Jury not present.) |
| 03:08PM | 6 | **THE CLERK:**  All rise. |
| 03:08PM | 7 | **THE COURT:**  Please be seated. |
| 03:08PM | 8 | **THE CLERK:**  We are back on the record for the |
| 03:08PM | 9 | continuation of the jury trial in case number 19-cr-227, |
| 03:08PM | 10 | United States of America versus Joseph Bongiovanni. |
| 03:08PM | 11 | All counsel and parties are present. |
| 03:08PM | 12 | **THE COURT:**  Are we ready to resume? |
| 03:08PM | 13 | **MR. TRIPI:**  Yes, Judge. |
| 03:08PM | 14 | **MR. SINGER:**  Yes, Your Honor. |
| 03:08PM | 15 | **THE COURT:**  Let's bring them back, please, Pat. |
| 03:10PM | 16 | (Jury seated at 3:10 p.m.) |
| 03:10PM | 17 | **THE COURT:**  The record will reflect that all our |
| 03:10PM | 18 | jurors are present again. |
| 03:10PM | 19 | I remind the witness that he's still under oath. |
| 03:10PM | 20 | Mr. Tripi, you may continue. |
| 03:10PM | 21 | **MR. TRIPI:**  Thank you, Your Honor. |
| 03:10PM | 22 | **BY MR. TRIPI:** |
| 03:10PM | 23 | Q.  Mr. Selva, when we broke, I was asking you some questions |
| 03:10PM | 24 | about the defendant and a situation regarding Anthony Gerace. |
| 03:10PM | 25 | A.  Yes. |

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

81

03:10PM    1    Q.  Regarding -- regarding that assistance to Anthony Gerace

03:11PM    2    regarding that cocaine that you talked about, what, if

03:11PM    3    anything, did the defendant say to you about how he first got

03:11PM    4    involved or how he first was notified about Anthony's

03:11PM    5    situation?

03:11PM    6    A.  He had got a call from Peter.  Peter called him.  Peter

03:11PM    7    Gerace called.

03:11PM    8    Q.  Called who?

03:11PM    9    A.  The defendant.  And said that his brother got in trouble.

03:11PM   10    And if he can reach out to somebody in the Amherst Police

03:11PM   11    Department to help him.

03:11PM   12    Q.  When he was telling you this information, where were you

03:11PM   13    guys, do you recall?

03:11PM   14    A.  I don't recall.

03:11PM   15    Q.  When he was telling you the story about helping Anthony,

03:11PM   16    what was his demeanor?

03:11PM   17    A.  Casual.  I mean, just -- he was helping a friend.

03:12PM   18    Q.  Now, regarding the relationship between Bongiovanni and

03:12PM   19    Peter Gerace, did the defendant ever tell you about any trips

03:12PM   20    that he took with Peter Gerace?

03:12PM   21    A.  Yes.

03:12PM   22    Q.  What trips did he tell you about?

03:12PM   23    A.  Trip to Las Vegas.  I believe, maybe, New York.  Canada.

03:12PM   24    They traveled together.

03:12PM   25    Q.  Had you ever traveled with the defendant?

03:12PM    1    A.   Yes.

03:12PM    2    Q.   Where?

03:12PM    3    A.   Cabo San Lucas.  Gone to Florida with him.  Came out to

03:12PM    4    Arizona when I lived out there.

03:12PM    5    Q.   The defendant visited you in Arizona?

03:12PM    6    A.   Yes.

03:12PM    7    Q.   I'd like to direct your attention to about 2008, okay?

03:13PM    8    A.   Okay.

03:13PM    9    Q.   What was your financial situation like by 2008?

03:13PM   10    A.   It was -- it was bad.  I had -- trying to -- I filed

03:13PM   11    bankruptcy.  And I was paying child support.  And trying to

03:13PM   12    take care of my kids.  So, I was working two jobs again.

03:13PM   13    Q.   What jobs were you working?

03:13PM   14    A.   I was in sales again, and in the cell phone business, and

03:13PM   15    I was tending bar on the weekends.

03:13PM   16    Q.   And at that point in your life, did you pursue an

03:13PM   17    opportunity to make money through illegal means?

03:13PM   18    A.   Yes.

03:13PM   19    Q.   What did you do?

03:13PM   20    A.   I reached out to Michael Masecchia, and I knew what he

03:13PM   21    was involved in, with a marijuana operation.  And I wanted to

03:14PM   22    get involved in it.

03:14PM   23    Q.   Who did you first approach about becoming involved in

03:14PM   24    that marijuana grow operation?

03:14PM   25    A.   It was Mike.  Well, I talked to Joe Tomasello first, and

03:14PM   1    then Mike.

03:14PM   2    Q.  Was Joe Tomasello someone who was involved with it at the

03:14PM   3    time?

03:14PM   4    A.  Yes.

03:14PM   5    Q.  And was he one of those friends from childhood that

03:14PM   6    you've talked about earlier in your testimony?

03:14PM   7    A.  Yes.

03:14PM   8    Q.  Do you remember where you were when you first talked to

03:14PM   9    Joe Tomasello about getting involved in it?

03:14PM   10   A.  I believe it was Hertel, M.T. Pocket's or Gabels or

03:14PM   11   something.

03:14PM   12   Q.  Are those two bars that you guys would frequent?

03:14PM   13   A.  Yeah, those are bars in the North Buffalo area, correct.

03:14PM   14   Q.  Are those two of the bars that you would commonly go to

03:14PM   15   on Hertel?

03:14PM   16   A.  Yes.

03:14PM   17   Q.  And when you're discussing with Tomasello, do you express

03:15PM   18   your desire to become involved?

03:15PM   19   A.  I did.  Yes.

03:15PM   20   Q.  What did you say to him?

03:15PM   21   A.  I told him, I says, what can I do to get involved?  I

03:15PM   22   just came out of my bankruptcy, and I'm swimming in debt from

03:15PM   23   child support, and I have to keep -- take care of my kids and

03:15PM   24   pay my bills.

03:15PM   25       And he said well reach out to Mike and express to him

03:15PM  1    that you want to get involved.  He can tell you more about

03:15PM  2    it.

03:15PM  3        And I did.  I reached out to him.  And he told me what my

03:15PM  4    role in the operation would be if I wanted to get involved.

03:15PM  5    Q.  Okay.  So you first talked to Tomasello and he tells you

03:15PM  6    you have to talk to Mike?

03:15PM  7    A.  Correct.

03:15PM  8    Q.  What did Tomasello tell you about Mike's role?

03:15PM  9    A.  He was -- he was really calling the shots, so to speak.

03:15PM  10   You know, everything would go through him.

03:16PM  11   Q.  And, so, after that conversation with Tomasello, what did

03:16PM  12   you do as it relates to getting in touch with Mike Masecchia?

03:16PM  13   A.  I reached out to him.  Called him on the phone.  We met.

03:16PM  14   I believe we met, again, it was on Hertel, I think Gables or

03:16PM  15   M.T. Pocket's, one of the bars in the neighborhood.  And I

03:16PM  16   expressed my interest.  I wanted to get involved, told him my

03:16PM  17   situation again, coming out of bankruptcy, I'm experiencing a

03:16PM  18   lot of debt.  And I have to pay -- I need to keep up on my

03:16PM  19   child support for my kids.

03:16PM  20   Q.  And what did Masecchia tell -- what, if anything, did

03:16PM  21   Masecchia tell you at that time about what the operation was?

03:16PM  22   A.  It was an outdoor operation at that point.  They had

03:16PM  23   different places, Franklinville, Angelica, explained to me

03:16PM  24   how it worked.  You have get the plants ready on the indoor

03:17PM  25   side, and then you bring them out when they're ready to be --

| | | |
|---|---|---|
| 03:17PM | 1 | there's a certain stage.  And then you plant them in the |
| 03:17PM | 2 | ground.  And then there would be a lot of work involved |
| 03:17PM | 3 | taking care of them. |
| 03:17PM | 4 | Q.  Okay. |
| 03:17PM | 5 |           MR. SINGER:  Judge, I'm sorry can you ask Mr. Selva |
| 03:17PM | 6 | to pull his microphone -- |
| 03:17PM | 7 |           MR. TRIPI:  Yeah, we need you to keep your voice up a |
| 03:17PM | 8 | little bit. |
| 03:17PM | 9 |           THE WITNESS:  I'm sorry. |
| 03:17PM | 10 |           MR. TRIPI:  Yeah, and it's a little hard to hear you, |
| 03:17PM | 11 | okay. |
| 03:17PM | 12 |           THE WITNESS:  Sorry. |
| 03:17PM | 13 |           BY MR. TRIPI: |
| 03:17PM | 14 | Q.  So, for purposes of clarity, I'm going to repeat that |
| 03:17PM | 15 | question? |
| 03:17PM | 16 | A.  Sure. |
| 03:17PM | 17 | Q.  And I'm going to ask you to keep your voice up. |
| 03:17PM | 18 | A.  Okay. |
| 03:17PM | 19 | Q.  What did Masecchia tell you about what the operation, the |
| 03:17PM | 20 | marijuana grow operation involved? |
| 03:17PM | 21 | A.  It involved being outdoors.  There were different spots |
| 03:17PM | 22 | they had outside.  Two, at that point.  And the process |
| 03:17PM | 23 | involved, from getting the plants ready, on an indoor basis, |
| 03:17PM | 24 | and then bringing them outside to plant them, and then you'd |
| 03:18PM | 25 | have to take care of them.  So. |

03:18PM    1    Q.  All right.  Let's break that down.  What did Masecchia

03:18PM    2    tell you about getting the plants ready?

03:18PM    3    A.  You would need a space, you would need a place to do

03:18PM    4    that.  I offered up my basement.  There's a cloning

03:18PM    5    procedure, we would do that in my basement.  And then once

03:18PM    6    that was done, we would take them and transplant them and

03:18PM    7    plant them outside.

03:18PM    8    Q.  So you offered to clone the plants in your basement?

03:18PM    9    A.  Yes.

03:18PM   10    Q.  And describe for the jury what that involves.

03:18PM   11    A.  It's a -- you get a clone machine.  And there's what's

03:18PM   12    called a mother plant.  You clip a leaf off that, or a stem,

03:18PM   13    and you put it in the machine.  And then once it -- it shoots

03:18PM   14    water and there's chemicals you buy, it shoots water above or

03:18PM   15    into the -- the into the clone, and then once it roots, you

03:19PM   16    transplant it into a plant.  A plant case, small plant case,

03:19PM   17    and then you take it outside.

03:19PM   18    Q.  So you agreed to get help get the plants ready?

03:19PM   19    A.  Yes.

03:19PM   20    Q.  What, if anything, else did you agree to do based on your

03:19PM   21    conversation with Masecchia?

03:19PM   22    A.  I could reach out to Mr. Bongiovanni to see if we can get

03:19PM   23    some assistance.

03:19PM   24    Q.  Okay.  Before we get to that part of the conversation,

03:19PM   25    was there any part of the discussion that related to you

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

87

03:19PM   1    doing actual work at the site of the grows?

03:19PM   2    A.   Yes.

03:19PM   3    Q.   In Angelica and Franklinville?

03:19PM   4    A.   Yes.

03:19PM   5    Q.   What was that part of the conversation?

03:19PM   6    A.   Taking care of them.  Different times when we would go.

03:19PM   7    What's involved.  Watering, that type thing.

03:19PM   8    Q.   Tell the jury what is involved in the grow process on the

03:19PM   9    how?

03:19PM   10   A.   There's a lot of care, you have to water them regularly,

03:20PM   11   you have to make sure there's no animal, you get deer

03:20PM   12   repellant, and you put it around the bases to keep the deer

03:20PM   13   away, and you just take care of them.  With the hot summers

03:20PM   14   we have, so there was constantly a need to get out there.

03:20PM   15   You have to take time from work, you drive out there and you

03:20PM   16   water them and take care of them.

03:20PM   17   Q.   And what -- what is the marijuana grow season here in the

03:20PM   18   Buffalo area?

03:20PM   19   A.   Outdoor grow?

03:20PM   20   Q.   Outdoor.

03:20PM   21   A.   Usually you want to have them in the ground by Memorial

03:20PM   22   Day, but there's a process that leads up to that.  There's

03:20PM   23   like a month or so prior to that you got to get them ready.

03:20PM   24   And then you would take them out of the ground in October.

03:20PM   25   Q.   Okay.  So, just to break that down, the prepping the

03:20PM  1  plants is the indoor cloning part?

03:21PM  2  A.  Yes.  Cloning, and then once they get a root, you

03:21PM  3  transplant them into a little pot.  And then you take those

03:21PM  4  pots outside and you put them in the ground.

03:21PM  5  Q.  And that happens -- that part of the process happens in

03:21PM  6  March, April?

03:21PM  7  A.  Getting them ready, yeah, April, 'cuz it takes about six

03:21PM  8  weeks, so usually April, first two weeks in May.  And then

03:21PM  9  you want to get them out by Memorial Day.

03:21PM  10  Q.  And what, if anything, did Masecchia tell you was

03:21PM  11  involved in helping with the grow?

03:21PM  12  A.  He mentioned other guys that I knew from the

03:21PM  13  neighborhood.

03:21PM  14  Q.  Who?

03:21PM  15  A.  Anthony Martone, Sal Lima, Dave Hersey, himself, and Joe

03:21PM  16  Tomasello.

03:21PM  17  Q.  And I think you mentioned Sal Lima earlier.  With the

03:22PM  18  exception of Sal Lima, was the defendant friends growing up

03:22PM  19  with Hersey, Tomasello, Masecchia, and Martone?

03:22PM  20  A.  Yes.

03:22PM  21  Q.  I think -- I don't think we've mentioned the name Martone

03:22PM  22  before.  By that point in time in 2008, how long had you

03:22PM  23  known Martone?

03:22PM  24  A.  Most of my life.  I mean, since I was a kid.

03:22PM  25  Q.  How long had the defendant known Martone?

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

89

03:22PM   1   A.   About the same time.

03:22PM   2   Q.   And what, if anything, in your discussions with Masecchia

03:22PM   3   did he tell you about the cashing out part of the process or

03:22PM   4   the turning the plants into money?

03:22PM   5   A.   I'm sorry, who -- who said --

03:22PM   6   Q.   What, if anything, did you and Masecchia discuss about

03:22PM   7   once the grow was done?  I should phrase is that way.  Once

03:22PM   8   the grow was done, getting the plants and then distributing

03:22PM   9   them?

03:22PM   10  A.   We would reach out to Ron Serio for that.  There was a

03:22PM   11  process.  You'd have to cut them down, you hang them and you

03:23PM   12  dry them, and then you clip them and bag them.  And then once

03:23PM   13  that was done, Ron would be the guy who we would -- Mike

03:23PM   14  would reach out to and cash us out.

03:23PM   15  Q.   So, two grow locations.  How many plants at each grow?

03:23PM   16  A.   Outdoors?

03:23PM   17  Q.   Yes.

03:23PM   18  A.   50 plus.

03:23PM   19  Q.   And how many pounds of marijuana would you -- was the

03:23PM   20  hope for you to get per -- per plant?

03:23PM   21  A.   Hope was a pound a plant.  It never really worked out

03:23PM   22  that way.  You lost a lot through the elements.  So maybe it

03:23PM   23  was, like, a half a pound, three quarters of a pound.

03:23PM   24  Q.   Okay.  And, so if you had to estimate, how many pounds

03:23PM   25  for each grow you guys were getting?

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

90

| | | |
|---|---|---|
| 03:23PM | 1 | A.  Probably about -- with loss, probably 35, 40 pounds. |
| 03:24PM | 2 | Q.  So that's 35 to 40 pounds, times two, right? |
| 03:24PM | 3 | A.  Times two. |
| 03:24PM | 4 | Q.  Okay.  So 70 to 80 plants? |
| 03:24PM | 5 | A.  Yes. |
| 03:24PM | 6 | Q.  Or pounds? |
| 03:24PM | 7 | A.  Yes. |
| 03:24PM | 8 | Q.  And Ron Serio was taking all that marijuana from these |
| 03:24PM | 9 | grows? |
| 03:24PM | 10 | A.  Most of it.  We would keep some as well and just sell it, |
| 03:24PM | 11 | but the majority of it. |
| 03:24PM | 12 | Q.  And how much per pound was the going rate for the outdoor |
| 03:24PM | 13 | grow marijuana? |
| 03:24PM | 14 | A.  I believe 2,800 at that time. |
| 03:24PM | 15 | Q.  $2,800 per pound? |
| 03:24PM | 16 | A.  Yes, I'm sorry.  2,800 per pound. |
| 03:24PM | 17 | Q.  So, a crop would be $2,800 times 70 or 80 depending on |
| 03:24PM | 18 | how many pounds you got? |
| 03:24PM | 19 | A.  Depending what you got, yes. |
| 03:24PM | 20 | Q.  Okay. |
| 03:24PM | 21 | A.  It didn't always work out that way, but yes. |
| 03:24PM | 22 | Q.  Did you agree with Masecchia to take part in all of those |
| 03:25PM | 23 | parts of the operation? |
| 03:25PM | 24 | A.  I did. |
| 03:25PM | 25 | Q.  Did you also agree to transport marijuana from the grow |

03:25PM   1   sites to Masecchia to get ready for distribution to Serio?

03:25PM   2   A.  Yes.

03:25PM   3   Q.  And how would you do that?  How what was your plan of how

03:25PM   4   to transport the marijuana from those two grow sites back to

03:25PM   5   the Buffalo area?

03:25PM   6   A.  In my truck.  We would use two trucks.  We would all do

03:25PM   7   it during the day.  I had an SUV.  So once it was clipped and

03:25PM   8   bagged, we'd have to bring it into the city to get ready to

03:25PM   9   get it to Ron, or however much we were going to keep.

03:25PM  10   Q.  Did you do anything to conceal the marijuana in your

03:25PM  11   truck?  You're driving it from either Franklinville or

03:25PM  12   Angelica, a distance, right?

03:25PM  13   A.  Yes.

03:25PM  14   Q.  What did you do to conceal it in your vehicle?

03:25PM  15   A.  I had a -- in my SUV, there was a cover that I could --

03:26PM  16   Q.  Keep your voice up, please.

03:26PM  17   A.  I'm sorry.  In my SUV, in the back, there was a cover

03:26PM  18   that I pulled over like a sliding -- I don't know if you're

03:26PM  19   familiar with -- with any SUV, you put a rack up, and it was

03:26PM  20   like a shade.  So I would lay the pounds down there with the

03:26PM  21   blanket over it, and then pull the shade over it, then drive

03:26PM  22   during the day.

03:26PM  23   Q.  Why during the day?

03:26PM  24   A.  Try to -- well, let me scratch that.  It was actually

03:26PM  25   during -- we tried to move during rush hour and blend in.

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

92

03:26PM   1   Q.  Now, during this initial discussion with Masecchia, did

03:26PM   2   you also have a conversation with him regarding the

03:26PM   3   defendant?

03:26PM   4   A.  Yes.

03:26PM   5   Q.  Describe your conversation with Masecchia regarding the

03:26PM   6   defendant.

03:26PM   7   A.  He wanted me to reach out to him.

03:26PM   8   Q.  Please use names, okay?

03:26PM   9   A.  He wanted me to reach out to the defendant and see if he

03:27PM  10   could provide any information if there is an investigation

03:27PM  11   going on while we were doing this.

03:27PM  12   Q.  Is best you can, what were Masecchia's words to you when

03:27PM  13   he asked you to do that.

03:27PM  14   A.  He said, reach out to him, Ron's prepared to pay, and

03:27PM  15   myself, so I did.

03:27PM  16   Q.  Reach out to him for what?

03:27PM  17   A.  To participate.  To get involved and kind of like watch

03:27PM  18   over, if there's anything going on.  Any investigation that

03:27PM  19   type thing.

03:27PM  20   Q.  What did you understand Masecchia to be asking you to do?

03:27PM  21   A.  To bribe -- bribe a federal agent.

03:27PM  22   Q.  At that point, who was closer with the defendant, you or

03:27PM  23   Masecchia?

03:27PM  24   A.  Me.

03:27PM  25   Q.  When you were having your discussions with Masecchia for

03:28PM    1   the things that you agreed to do, to include talking to the

03:28PM    2   defendant, was there an agreement as to what you would be

03:28PM    3   paid?

03:28PM    4   A.   Yes.

03:28PM    5   Q.   What was your agreement with Masecchia as to your

03:28PM    6   benefit?

03:28PM    7   A.   To my benefit?  It was, well, you're talking about from

03:28PM    8   the -- from the --

03:28PM    9   Q.   What were you getting, what were you getting for your

03:28PM   10   role in this?

03:28PM   11   A.   25, 20 to 25 percent of the profit from the grow.

03:28PM   12   Q.   Now, between 2008 and 2017 or '18 as you indicated

03:28PM   13   before, was that 20 to 25 percent consistent?

03:28PM   14   A.   Yes.

03:29PM   15   Q.   Did the -- did the dollar amount vary each year depending

03:29PM   16   on the success of the grow?

03:29PM   17   A.   It did.

03:29PM   18   Q.   As an average, what would you estimate your share of the

03:29PM   19   unlawful proceeds from this marijuana distribution was per

03:29PM   20   year?

03:29PM   21   A.   15- to 20,000.

03:29PM   22   Q.   Some years, was it higher?

03:29PM   23   A.   Some years it was higher, depending on how much was

03:29PM   24   actually valid and good to take.

03:29PM   25   Q.   Now, to be clear, you didn't claim any of that illegal

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

94

| | | |
|---|---|---|
| 03:29PM | 1 | money on your taxes, right? |
| 03:29PM | 2 | A.  No. |
| 03:29PM | 3 | Q.  Why didn't do you that? |
| 03:29PM | 4 | A.  Why didn't I do that? |
| 03:29PM | 5 | Q.  Why didn't you claim your marijuana profits on your |
| 03:29PM | 6 | taxes? |
| 03:29PM | 7 | A.  I don't know, it was all cash. |
| 03:30PM | 8 | Q.  Would that be a quick way to get yourself in trouble? |
| 03:30PM | 9 | A.  Absolutely. |
| 03:30PM | 10 | Q.  When you agreed with Masecchia to approach the defendant, |
| 03:30PM | 11 | was that to give the group protection? |
| 03:30PM | 12 | A.  Yes. |
| 03:30PM | 13 | Q.  And at that point, what made you confident that you could |
| 03:30PM | 14 | approach this defendant about your involvement in this |
| 03:30PM | 15 | marijuana trafficking and requesting him to look out for the |
| 03:30PM | 16 | group? |
| 03:30PM | 17 | A.  My relationship with him.  We were close.  And I felt |
| 03:30PM | 18 | comfortable.  And I thought he would have my back. |
| 03:30PM | 19 | Q.  Did the defendant also have a relationship with |
| 03:30PM | 20 | Masecchia? |
| 03:30PM | 21 | A.  Yes. |
| 03:30PM | 22 | Q.  By that point in time, by 2008, how many times would you |
| 03:31PM | 23 | estimate you and the defendant did cocaine together while he |
| 03:31PM | 24 | was a DEA agent? |
| 03:31PM | 25 | A.  Five, ten. |

03:31PM   1   Q.   And that's an estimate?

03:31PM   2   A.   It's an estimate.

03:31PM   3   Q.   Was your participation with the defendant in that type of

03:31PM   4   activity while he was an agent, was that a factor that you

03:31PM   5   considered?

03:31PM   6   A.   Yes.

03:31PM   7   Q.   Why?  Why -- why did you factor that in?

03:31PM   8   A.   Because he felt comfortable doing it with me, so there's

03:31PM   9   a -- a bond.

03:31PM  10   Q.   When you're having this discussion with Masecchia

03:32PM  11   about -- in 2008 about approaching the defendant, where is it

03:32PM  12   in the grow process that you described?

03:32PM  13   A.   It was just starting.  So it was May -- June, May.

03:32PM  14   Q.   So the plants are just about to go in the ground?

03:32PM  15   A.   Exactly.

03:32PM  16   Q.   Are they already in your house being cloned?

03:32PM  17   A.   Yes.  They're transported -- they're transplanted at that

03:32PM  18   point.  They're out of the clone machine and little plants

03:32PM  19   waiting to go outside.

03:32PM  20   Q.   And during that window of time, as you're getting the

03:32PM  21   plants ready, is Masecchia coming over to your house to check

03:32PM  22   on them?

03:33PM  23   A.   Yes.

03:33PM  24   Q.   How much more time are you and he interacting?

03:33PM  25   A.   Quite a bit.

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24
96

03:33PM  1   Q.  How did your relationship with Masecchia evolve?

03:33PM  2   A.  It evolved through this, we became closer, we spent more

03:33PM  3   time together.  We'd go out frequently.

03:33PM  4   Q.  Now, when you were getting involved with it, what was

03:33PM  5   your understanding of his -- what was your understanding of

03:33PM  6   his reputation as it related to Italian Organized Crime?

03:33PM  7   A.  He was a -- a high-profile guy, and he was a made figure.

03:33PM  8   Q.  Now, as you're getting involved in this grow and getting

03:33PM  9   closer, did you have a conversation with Masecchia and you

03:33PM 10   specifically asked him?

03:33PM 11   A.  Yes.

03:33PM 12   Q.  Describe that conversation for the jury.

03:33PM 13   A.  I asked him, I says, I'm hearing you have a -- he has a

03:33PM 14   reputation of being a tough guy.  And I asked him, I says,

03:33PM 15   are you connected?  Are you a made guy?

03:33PM 16       And he acknowledged it.  He said yes.

03:33PM 17   Q.  So did he confirm what you had thought for a long time?

03:34PM 18   A.  Yes.

03:34PM 19   Q.  As time went on, did Masecchia ever make any comments to

03:34PM 20   you about what he -- what, if anything, he had to do with the

03:34PM 21   money that he was making as a result of his involvement in

03:34PM 22   the marijuana trafficking?

03:34PM 23   A.  He had to kick it up.  He had to kick it up to -- I

03:34PM 24   believe it was --

03:34PM 25           **MR. SINGER:**  Objection, speculation.

03:34PM    1    **THE COURT:**  Yeah, don't answer.  Don't answer.  He

03:34PM    2    looks like he's starting to speculate here.

03:34PM    3    **MR. TRIPI:**  Yeah, I'm going to --

03:34PM    4    **BY MR. TRIPI:**

03:35PM    5    Q.  He said he needed to kick it up?

03:35PM    6    A.  Yes, he needed to pay up --

03:35PM    7    Q.  Okay.

03:35PM    8    A.  -- to who he was underneath, speaking to.

03:35PM    9    Q.  Okay.  Now after you talked to Masecchia about

03:35PM   10    approaching Bongiovanni, how much time elapsed before you

03:35PM   11    actually first approached Bongiovanni before getting

03:35PM   12    involved?

03:35PM   13    A.  A few months.

03:35PM   14    Q.  Okay.  And where is it in the grow process?  Is this the

03:35PM   15    May process, the May part we talked about?

03:35PM   16    A.  Yeah, it's mid summer.  It's just starting to kick in.

03:35PM   17    It's starting to happen.  They're in the ground already.

03:35PM   18    It's happening.

03:35PM   19    Q.  How did you get in touch with the defendant, I should

03:35PM   20    say?

03:35PM   21    A.  I called him on the phone.

03:35PM   22    Q.  Did you have the defendant's phone number?

03:35PM   23    A.  Yes.

03:35PM   24    Q.  Do you know whether that was his work, his DEA work

03:36PM   25    number?

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

03:36PM  1   A.  I believe so, yes.

03:36PM  2   Q.  And did you have the same phone number for a long time?

03:36PM  3   A.  I did.

03:36PM  4   Q.  What was your phone number that you had for a long time?

03:36PM  5   A.  716-903-1654.

03:36PM  6   Q.  And was that a number the defendant had?

03:36PM  7   A.  Yes.

03:36PM  8   Q.  How many years would you estimate the defendant had

03:36PM  9   your -- that phone number for you?

03:36PM  10  A.  15, 16 years.  I think I got it in 2001, I changed it in

03:36PM  11  '17.

03:36PM  12  Q.  Okay.  So you had that phone number from 2001 until when?

03:36PM  13  A.  Until 2017, I changed it.

03:36PM  14  Q.  Describe your phone call with the defendant while you

03:36PM  15  were requesting to meet.

03:36PM  16  A.  I told him I wanted to talk to him about something.  We

03:37PM  17  met out for a beer.  Drank.  And I believe it was on Hertel

03:37PM  18  where we met.  M.T. Pocket's, I believe.

03:37PM  19  Q.  And was there a reason you didn't just meet at your house

03:37PM  20  or his house?

03:37PM  21  A.  Yeah.  It was just easier just to meet out and do it

03:37PM  22  socially.

03:37PM  23  Q.  Did you have family who stayed at your house?

03:37PM  24  A.  My kids and -- my younger daughter was actually living --

03:37PM  25  getting -- she was there quite a bit.  My kids were there

03:37PM  1   quite a bit.

03:37PM  2   Q.  Where was the defendant staying at this time?

03:37PM  3   A.  I believe on Lovering.

03:37PM  4   Q.  Were his parents living there below him?

03:37PM  5   A.  I believe so.

03:37PM  6   Q.  All right.  Describe your initial meeting with the

03:38PM  7   defendant at a bar on Hertel.

03:38PM  8   A.  Told him what we have going on.  We have an outdoor grow

03:38PM  9   operation, and these guys were prepared to offer a financial

03:38PM  10  obligation to him to help him if he was to provide assistance

03:38PM  11  with any investigations, kind of like a watchful eye, so to

03:38PM  12  speak.

03:38PM  13  Q.  Did you tell the defendant who asked you to ask him?

03:38PM  14  A.  I did.

03:38PM  15  Q.  What did you say?

03:38PM  16  A.  I told him Mike told me to reach out to you, and see if

03:38PM  17  you would be willing to participate.

03:38PM  18  Q.  What did the defendant say to that?

03:39PM  19  A.  First he got upset.  I could lose my career, that type

03:39PM  20  thing.

03:39PM  21  Q.  When you were talking to him, did you tell him who else

03:39PM  22  was involved?

03:39PM  23  A.  At, yes, I told him the outdoor operation, myself, Ron, I

03:39PM  24  explained to him how it worked, Ron was cashing everyone out,

03:39PM  25  Hersey, Martone, myself, Tomasello.

03:39PM  1    Q.  And what did the defendant say?

03:39PM  2    A.  He was hesitant at first.

03:39PM  3    Q.  Describe the conversation.

03:39PM  4    A.  He was hesitant.  He got upset because he could lose his

03:39PM  5    career, that type thing.  So, it didn't really go well.

03:39PM  6    Q.  When he said that, what did you say?

03:40PM  7    A.  I says, well, this can help you out because they're

03:40PM  8    willing to pay $2,000 a month, and it could help with your

03:40PM  9    issues with your divorce and your expenses.  So --

03:40PM  10   Q.  What happened next?

03:40PM  11   A.  It continued.  Arranged another meeting.  I reached out

03:40PM  12   to --

03:40PM  13   Q.  Let me ask you this.  How did you leave it at that first

03:40PM  14   meeting with the defendant?

03:40PM  15   A.  I left him -- I'll get back to you.  I wanted to talk to

03:40PM  16   Mike and Ron.

03:40PM  17   Q.  How did he leave it with you?  What did he say to you?

03:40PM  18   A.  He was upset, and he didn't want to -- he was upset that

03:40PM  19   he could possibly lose his career, like I mentioned, and

03:41PM  20   wasn't totally bought on it yet.

03:41PM  21   Q.  Wasn't totally bought on it yet?

03:41PM  22   A.  No.

03:41PM  23   Q.  Did he give you any reassurance that you would be okay?

03:41PM  24   A.  He did.

03:41PM  25   Q.  What did he say in that regard?

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

101

03:41PM    1   A.  He said I'll have your back.  But he wasn't really sold
03:41PM    2   on the whole idea as of yet.
03:41PM    3   Q.  So what did you do?
03:41PM    4   A.  I persuaded him.  Told him that --
03:41PM    5   Q.  Well, before that, did you go back and relay that to
03:41PM    6   Masecchia?
03:41PM    7   A.  I did.  I went back and relayed that to Masecchia and
03:41PM    8   Ron.
03:41PM    9   Q.  Where did you meet?  Let's -- where did you -- where did
03:41PM   10   you go, and where did you speak with Masecchia?
03:41PM   11   A.  I called Masecchia on the phone.  And I met him.  I think
03:41PM   12   it was M.T. Pocket's, we usually met again on Hertel, and I
03:41PM   13   explained to him what happened.
03:41PM   14       I says, I'll talk to him again.  And we'll set up another
03:42PM   15   meeting, and I'll see what -- where we can go with this.
03:42PM   16       I did.  I reached back out.
03:42PM   17   Q.  Wait.  Wait, wait, wait.  What exactly did you say to
03:42PM   18   Masecchia at the M.T. Pocket's meeting after your initial
03:42PM   19   conversation with Bongiovanni?
03:42PM   20   A.  I told him he was upset about it because he could lose
03:42PM   21   his career, and he wasn't totally bought in on it yet.
03:42PM   22   Q.  What did Masecchia say to you?
03:42PM   23   A.  He said, well, explain to him the benefit, how it can
03:42PM   24   help him.  Ron's willing to pay $2,000 a month.  So, reach
03:42PM   25   back out to him and talk to him about it.  Which I did.

03:42PM 1    Q.  How much time had elapsed from your conversation with

03:42PM 2    Joe, the defendant, to when you met with Masecchia at

03:42PM 3    M.T. Pocket's?

03:42PM 4    A.  A few weeks, a week.  It was a short time.

03:42PM 5    Q.  And when you left off your first conversation with the

03:43PM 6    defendant, the way that conversation ended, did you believe

03:43PM 7    that you would be able to convince the defendant to do it

03:43PM 8    with money?

03:43PM 9    A.  Yes.

03:43PM 10   Q.  What made you believe that you would be able to convince

03:43PM 11   the defendant to do it?

03:43PM 12   A.  Because of his situation, and just to get ahead, and my

03:43PM 13   relationship with him.  So --

03:43PM 14   Q.  After you spoke with Masecchia, and you gave him the

03:43PM 15   results of that conversation with Bongiovanni, and you

03:43PM 16   participated in the conversation that you just discussed for

03:43PM 17   the jury, what was the next thing you did in terms of meeting

03:43PM 18   up with the defendant to continue the conversation?

03:44PM 19   A.  Called him again.  We met again.  Again, it was on

03:44PM 20   Hertel, I think this time it was Gables.  Explained to him

03:44PM 21   that the offer's still there.  And persuaded him.  And he

03:44PM 22   agreed.

03:44PM 23   Q.  How did you persuade him?

03:44PM 24   A.  Kind of highlighted the benefit how it would help him

03:44PM 25   again.  It would help him get over his expenses with his

03:44PM   1   ex-wife and the situation he's in right now.

03:44PM   2   Q.  What do you mean by the situation he's in right now?

03:44PM   3   A.  Paying maintenance and child support and all that.

03:44PM   4   Q.  What did the defendant say?

03:44PM   5   A.  He agreed upon it.

03:44PM   6   Q.  What did he say?

03:44PM   7   A.  He said, okay, I'll do what I can, and I'll kind of keep

03:44PM   8   a watchful eye at that point where we were.

03:45PM   9   Q.  What was your understanding of "I'll do what I can" when

03:45PM   10  the defendant said it?

03:45PM   11  A.  Making sure that nothing happens, if there's any

03:45PM   12  investigation or anything going on, he'll make sure he relays

03:45PM   13  that to me.

03:45PM   14  Q.  At that point, did you go into any more of an explanation

03:45PM   15  about what was involved in the nature of the operation?

03:45PM   16  A.  No.  I explained to him how it worked.

03:45PM   17  Q.  That's what I mean.  You explained to him how it worked?

03:45PM   18  A.  Yes.

03:45PM   19  Q.  What did you say to the defendant?

03:45PM   20  A.  Told him it's an outdoor operation.  There's two

03:45PM   21  locations.  And we would need information regarding if

03:45PM   22  anything were to happen with investigations from different

03:45PM   23  agents, the area where it is.  So --

03:46PM   24  Q.  And what was -- what was the purpose of getting

03:46PM   25  information?  To do what?

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

104

03:46PM  1   A.  To feel protected, feel safe.  I mean, make sure we

03:46PM  2   didn't get busted.

03:46PM  3   Q.  And what was the plan if the defendant had notified you

03:46PM  4   there was an investigation, was there a plan in place that

03:46PM  5   you had with Masecchia?  What you would do?

03:46PM  6   A.  With Masecchia?

03:46PM  7   Q.  Yeah.

03:46PM  8   A.  Yeah.  We'd rip them out of the ground immediately and

03:46PM  9   destroy all evidence.

03:46PM  10  Q.  When you -- once the defendant was in agreement on the

03:46PM  11  $2,000, what was the agreement regarding the frequency of

03:46PM  12  those payments?

03:46PM  13  A.  Once a month.

03:46PM  14  Q.  Describe that part of the discussion for the jury.

03:46PM  15  A.  The payment will be $2,000 once a month.  That would come

03:47PM  16  from Mike.  Mike would meet him once a month.  He took care

03:47PM  17  of that because he would get that from Ron, so it would be a

03:47PM  18  cash payment of $2,000 per month.

03:47PM  19  Q.  What was the discussion relating to the frequency of his

03:47PM  20  providing information?

03:47PM  21  A.  We would meet regularly.  Call him, we'd meet out for a

03:47PM  22  drink.  What's going on?  How is everything?  We'll be

03:47PM  23  casual.  Anything happening?  No, everything's good.  And

03:47PM  24  then relay that back to Ron and Mike.

03:47PM  25  Q.  And how often were those meetings?

03:47PM 1   A.  Few times a month.

03:47PM 2   Q.  Do you know -- withdrawn.

03:47PM 3       During that discussion, did you also have a conversation

03:47PM 4   with the defendant regarding Masecchia's status with IOC?

03:48PM 5   A.  Yes.  Well, he --

03:48PM 6   Q.  What did you -- what was the conversation in that regard?

03:48PM 7   A.  Conversation was, well, he knew of Mike's status.  And I

03:48PM 8   told him that, yes, Mike had told me that he is a made guy,

03:48PM 9   and he's a high-profile guy, and he's running this thing.

03:48PM 10  Q.  What did the defendant say as about Mike's status as a

03:48PM 11  made guy?

03:48PM 12  A.  He was concerned about it.  He didn't really want to be

03:48PM 13  seen in public with him at all, that type thing.

03:48PM 14  Q.  Did that factor into why he would meet with you to

03:48PM 15  provide information?

03:48PM 16  A.  Yes.  He would meet with me and provide me that

03:48PM 17  information.

03:48PM 18      And then Ron would give Mike the money.  And he insisted

03:48PM 19  that he would just meet -- he had burner phones that he

03:48PM 20  worked with, so he would call him.  I gave him the

03:48PM 21  defendant's phone number, and he would call him and meet him

03:48PM 22  at a location to pay him the cash.

03:49PM 23  Q.  Again, you've got to use names because if you use "he"

03:49PM 24  people can't follow.  So just to unpack that a little bit.

03:49PM 25  Mike had burner phones?

03:49PM   1   A.   Yes.

03:49PM   2   Q.   What is a burner phone?

03:49PM   3   A.   It's a prepaid cell phone.   There's no name attached to

03:49PM   4   it or anything.   You can buy them, and when you're done,

03:49PM   5   throw them away.

03:49PM   6   Q.   Is that -- what's the purpose of a burner phone?

03:49PM   7   A.   To dissuade from any type of consistency in calling

03:49PM   8   patterns, that type thing.

03:49PM   9   Q.   Okay.   So it's to help not get caught?

03:49PM  10   A.   To help not get caught, yes.

03:49PM  11   Q.   And you provided Mike with Joe's number, or Joe with

03:49PM  12   Mike's number?

03:49PM  13   A.   Mike with Joe's number.

03:49PM  14   Q.   And how did Masecchia's status -- describe that part of

03:49PM  15   the conversation.   How did his status as a made guy factor

03:50PM  16   into the discussion regarding how payments would be made and

03:50PM  17   who would get information?

03:50PM  18   A.   I would get the information.

03:50PM  19       Mike would get the -- make the arrangements with Ron, and

03:50PM  20   then he would meet the defendant once a month to get the cash

03:50PM  21   to him.

03:50PM  22   Q.   Who knew where those meets for the cash exchange were?

03:50PM  23   A.   I don't know.   It was between them.

03:50PM  24   Q.   Between who?

03:50PM  25   A.   Between Joe and Mike.

03:50PM  1    **THE CLERK:**  Judge, I'm going to shut the blinds.

03:50PM  2    **THE COURT:**  Go ahead.

03:51PM  3    **BY MR. TRIPI:**

03:51PM  4  Q.  By the time this $2,000-a-month arrangement agreement is

03:51PM  5  in place, what -- what year is it?

03:51PM  6  A.  2008 to, like, 2010.  That time frame.

03:51PM  7  Q.  How long did the payments persist at the $2,000-per-month

03:51PM  8  level?

03:51PM  9  A.  Two, almost three years.

03:51PM  10  Q.  How frequently did Masecchia use burner phones?

03:51PM  11  A.  All the time.  Quite a bit.  I mean, he had a regular

03:51PM  12  phone, but when he was conducting things regarding this, he

03:52PM  13  would use a burner phone.

03:52PM  14  Q.  What do you mean by conducting things?

03:52PM  15  A.  Like if he had to make a specific phone call regarding

03:52PM  16  this operation, he would use a burner phone.

03:52PM  17  Q.  Were there any discussions about whether Bongiovanni, the

03:52PM  18  defendant, would meet Ron Serio?

03:52PM  19  A.  No.

03:52PM  20  Q.  Did they ever meet, as far as you know?

03:52PM  21  A.  No.

03:52PM  22  Q.  Was that intentional?

03:52PM  23  A.  I don't know.

03:52PM  24  Q.  Did the defendant ever express to you wanting to meet Ron

03:53PM  25  Serio?

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

108

03:53PM 1    A.  No.

03:53PM 2    Q.  After about, you said, three years, the payment lasted at

03:53PM 3    about the $2,000-a-month level?

03:53PM 4    A.  Yes.

03:53PM 5    Q.  After three years or so, what happened to the amount of

03:53PM 6    the payment?

03:53PM 7    A.  The amount, well, the operation had expanded.

03:53PM 8    Q.  Just -- what happened to the amount of the payment,

03:53PM 9    first?

03:53PM 10   A.  The amount stayed -- it stayed -- it stayed at 2,000 for

03:53PM 11   three years, and then it went up.

03:53PM 12   Q.  What did it go up to?

03:53PM 13   A.  $4,000.

03:53PM 14   Q.  Okay.  Now, for those three years, were you having

03:53PM 15   regular meetings with the defendant?

03:53PM 16   A.  Yes.

03:53PM 17   Q.  For those three years, did he give you any advice

03:53PM 18   regarding law enforcement techniques or tactics?

03:53PM 19   A.  Yes.

03:53PM 20   Q.  What advice did the defendant give you?

03:53PM 21   A.  Never speak over the phone.  Be careful of your

03:54PM 22   surroundings.  Watch for certain vehicles.  Tinted SUVs.  If

03:54PM 23   you're -- if you see a utility truck parked at the end of

03:54PM 24   your block for a long time, that could be a red flag, meaning

03:54PM 25   a few days, more than two or three days.

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

03:54PM  1   Q.  Describe the discussion about never talking over the

03:54PM  2   phone.  What did the defendant say?

03:54PM  3   A.  Never talk over the phone, always do it in person.  If

03:54PM  4   you make your phone call, be brief, just say you want to meet

03:54PM  5   him in a public place, and just talk, or however you arrange

03:54PM  6   that meeting, if it's at your house, whatever.

03:54PM  7   Q.  And what was the context of the defendant saying to be

03:54PM  8   aware of your surroundings?

03:54PM  9   A.  Be aware of if you're being followed.  Be aware if

03:54PM  10  there's suspicious vehicles around.  Just be aware.  Tinted

03:54PM  11  windows.  Like I said, SUVs.

03:55PM  12  Q.  Was the defendant describing surveillance vehicles?

03:55PM  13  A.  That's exactly, yes.

03:55PM  14  Q.  What did he describe about surveillance vehicles?

03:55PM  15  A.  He was describing what they look like.  Chargers, SUVs, I

03:55PM  16  keep saying that because that was the majority of what came

03:55PM  17  up.

03:55PM  18  Q.  What, if any, other tactics or methods did he talk about

03:55PM  19  with you other than phones and surveillance vehicles?

03:55PM  20  Anything else during that window of time?

03:55PM  21  A.  I don't recall.

03:55PM  22  Q.  What things did you express to the defendant that you and

03:55PM  23  Masecchia and any others were concerned about during that

03:55PM  24  time period?

03:55PM  25  A.  Again, if there's an investigation, if anybody was

03:55PM    1    informing, if there was an informant, that we might know of.

03:56PM    2    Q.  What do you mean by that?

03:56PM    3    A.  Anybody within our group who might -- being snitched out

03:56PM    4    from.

03:56PM    5    Q.  What do you mean by within our group?

03:56PM    6    A.  Within Ron, Mike, myself, the group that was

03:56PM    7    participating in this.

03:56PM    8    Q.  And for those three years, what reports were you getting

03:56PM    9    monthly from the defendant?

03:56PM   10    A.  Everything was good.  Everything was clear.

03:56PM   11    Q.  Now, you said after about three years, the amount of

03:56PM   12    payments went up to about $4,000.  Over that three-year

03:56PM   13    period, what was happening to the operations, the

03:56PM   14    distribution operations?

03:56PM   15    A.  It was expanding.  It was getting bigger.

03:56PM   16    Q.  Can you describe the ways in which it got bigger?

03:56PM   17    A.  Yes.  There were different venues they were getting it

03:56PM   18    from, from California, British Columbia, New York, it was

03:57PM   19    being transported by trucks over state lines, so it was

03:57PM   20    growing.

03:57PM   21    Q.  Was anybody beginning to make trips to New York City?

03:57PM   22    A.  Yes.

03:57PM   23    Q.  Who were you aware of that was traveling to New York City

03:57PM   24    for marijuana?

03:57PM   25    A.  Ron and Mike.

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

03:57PM   1   Q.  When they would get ready for trips to New York City,

03:57PM   2   that was to get marijuana?

03:57PM   3   A.  Yes.

03:57PM   4   Q.  When they would get ready for a trip, were there any

03:57PM   5   requests or instructions that you would receive to ask the

03:57PM   6   defendant about?

03:57PM   7   A.  Yes.

03:57PM   8   Q.  What was that?

03:57PM   9   A.  To reach out to him, tell them what they were doing, they

03:57PM  10   were going to New York.  They were going to be picking up and

03:57PM  11   transporting marijuana back from the City to Buffalo.

03:57PM  12   Q.  And what were you looking for the defendant to provide?

03:57PM  13   A.  Provide if there was any information regarding if an

03:58PM  14   investigation was going on.  If the all-clear was okay.

03:58PM  15   Q.  What do you mean by the all-clear?

03:58PM  16   A.  Meaning there was nothing going on, there was no

03:58PM  17   investigation, they were able to move freely up and down the

03:58PM  18   thruway.

03:58PM  19   Q.  So in other words, nobody was onto their travels?

03:58PM  20   A.  Exactly.

03:58PM  21   Q.  Who -- who expressed to you -- withdrawn.

03:58PM  22       After those three years when the dollar amount then gets

03:58PM  23   moved up to $4,000, how did that come about?  What --

03:58PM  24   withdrawn.

03:58PM  25       What was the request of you by Masecchia and/or Serio?

03:58PM    1    A.   You mean how it got --

03:58PM    2         **MR. SINGER:**  Objection.  Assumes facts not in

03:58PM    3    evidence.

03:58PM    4         **THE COURT:**  Yeah, I agree with that.  Sustained.

03:58PM    5         **BY MR. TRIPI:**

03:59PM    6    Q.   Okay.  Was there a request made of you by either Mike or

03:59PM    7    Ron as it relates to getting more protection?

03:59PM    8    A.   Yes.

03:59PM    9    Q.   Okay.  Let me just ask another question.

03:59PM   10         Who had the conversation with you about wanting more

03:59PM   11    protection?

03:59PM   12    A.   Mike.  He had discussed it with Ron.  He said the

03:59PM   13    operation is growing.  They're doing different things, like I

03:59PM   14    just mentioned, getting it from different areas through

03:59PM   15    transporting it through trucking.

03:59PM   16         Reach out to Joe and see if he could provide any

03:59PM   17    additional information.  And --

03:59PM   18    Q.   What do you mean by "additional information?"

03:59PM   19    A.   If there are different agencies involved because there

03:59PM   20    were different locations --

03:59PM   21    Q.   Okay.

03:59PM   22    A.   -- like I mentioned.

03:59PM   23    Q.   Now what do you mean by different agencies?

03:59PM   24    A.   Like if there was another agency having an investigation

04:00PM   25    because it was coming from California, British Columbia,

04:00PM    1    New York, if there are were any other agencies working, if

04:00PM    2    you could provide that information.

04:00PM    3    Q.  Did were any specific agencies mentioned as an example?

04:00PM    4    A.  No.

04:00PM    5    Q.  Did Masecchia mention ICE in any conversations?

04:00PM    6    A.  Masecchia did, yes.

04:00PM    7    Q.  What did he say about ICE?

04:00PM    8    A.  He mentioned ICE, because he was familiar with ICE.  He

04:00PM    9    knew what they did.  He said can you specifically ask if ICE

04:00PM   10    is involved.

04:00PM   11    Q.  What was your understanding of what ICE was, the

04:00PM   12    reference to ICE?

04:00PM   13    A.  I wasn't really familiar.  I didn't -- just part of

04:00PM   14    Homeland Security.  I'm not really quite sure.  I didn't have

04:00PM   15    a good understanding of it.

04:00PM   16    Q.  Now, during that time period leading up to the increased

04:01PM   17    dollar amount, what was -- what, if anything, was the

04:01PM   18    defendant saying about the amount of money that he was

04:01PM   19    getting, the $2,000 a month?  What, if anything, was he

04:01PM   20    expressing to you?

04:01PM   21    A.  He was expressing his situation changing, and he needed

04:01PM   22    to make more money.

04:01PM   23    Q.  What -- what do you mean by his situation changing?

04:01PM   24    A.  Meaning his expenses.  His expense.

04:01PM   25    Q.  Can you be more detailed for the jury?

04:01PM 1   A.  Yes.

04:01PM 2   Q.  Please explain it to them.

04:01PM 3   A.  Yes, at this point, he was still paying maintenance, he

04:01PM 4   was still paying child support.  I believe he was with -- had

04:01PM 5   just gotten with, I believe, his wife, and she was getting

04:01PM 6   ready to move in with him.  So there was additional expenses

04:01PM 7   that he would have.

04:01PM 8   Q.  Did he tell you about those additional expenses?

04:01PM 9   A.  Yes.

04:01PM 10  Q.  Who did he say?  What were they?

04:01PM 11  A.  Originally, she was his tenant, and then she moved in

04:02PM 12  with him.  And she was in nursing school, so he was paying

04:02PM 13  those expenses on top of his obligation to maintenance and

04:02PM 14  child support and living expenses.

04:02PM 15  Q.  So you're talking about his wife, Lindsay?

04:02PM 16  A.  Yes.

04:02PM 17  Q.  Did she move in with the defendant along with her son?

04:02PM 18  A.  Yes.

04:02PM 19  Q.  And she went from being a tenant to someone living with

04:02PM 20  him?

04:02PM 21  A.  Yes.

04:02PM 22  Q.  What happened to that rental income when she moved in

04:02PM 23  with him?

04:02PM 24  A.  He lost it.

04:02PM 25  Q.  And this is 221 Lovering?

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

115

04:02PM 1    A.  Yes.

04:02PM 2    Q.  Now you mentioned trucking over the -- from British

04:02PM 3    Columbia.  Is that Canada?

04:02PM 4    A.  Yes.

04:02PM 5    Q.  So, the operations now involved an international border

04:02PM 6    as time progressed?

04:02PM 7    A.  Correct.

04:02PM 8    Q.  All right.  Where did you meet with the defendant prior

04:03PM 9    to the $4,000 increase payment, where did you meet with the

04:03PM 10   defendant to discuss the request for more protection or more

04:03PM 11   coverage, essentially?

04:03PM 12   A.  We met at a bar downtown.

04:03PM 13   Q.  Okay.

04:03PM 14   A.  Either, I don't recall, either Mother's or somewhere on

04:03PM 15   Chippewa.

04:03PM 16   Q.  Is Mother's a bar on Virginia Street?

04:03PM 17   A.  Yes.

04:03PM 18   Q.  Was that another place you regularly went with the

04:03PM 19   defendant?

04:03PM 20   A.  Yes.

04:03PM 21   Q.  All right.  Describe this conversation that you had with

04:03PM 22   him at this point.

04:03PM 23   A.  Regarding, well, I explained to him that the operation

04:03PM 24   had expanded.  And they were looking for any information

04:03PM 25   while the movements are happening with different agencies.

04:03PM  1  And it would be -- they would be willing to -- Mike had

04:04PM  2  mentioned to me that, and Ron, that they were willing to pay

04:04PM  3  $4,000.

04:04PM  4  Q.  Continue describing the conversation, please.

04:04PM  5  A.  Then I says, additional information would be needed.  He

04:04PM  6  agreed.  And then we moved forward.

04:04PM  7  Q.  What do you mean by you moved forward?

04:04PM  8  A.  It was agreed upon that he would put a bigger, wider span

04:04PM  9  on it.  If anything were to happen, he would provide the

04:04PM  10 information.

04:04PM  11 Q.  Now, at that time, did you have an understanding of

04:04PM  12 Mr. Serio's gambling habits?

04:04PM  13 A.  Yes.

04:04PM  14 Q.  What were his gambling habits like?

04:04PM  15 A.  He was out of control.  He was gambling very heavy.

04:05PM  16 Consistently.  Winning, losing, up, and down.

04:05PM  17     He was banned from casinos, 'cuz then he would go on a

04:05PM  18 win streak.  And he got banned from, I believe, the Seneca

04:05PM  19 casino, the one in Canada, I think one or two in Las Vegas,

04:05PM  20 but he was gambling quite heavy.

04:05PM  21 Q.  Had he moved around that time into a large house?

04:05PM  22 A.  He did.

04:05PM  23 Q.  Where was that?

04:05PM  24 A.  On Lebrun.

04:05PM  25 Q.  Is that in Amherst, New York?

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

04:05PM   1   A.   Yes.

04:05PM   2   Q.   And have you been there?

04:05PM   3   A.   I was.

04:05PM   4   Q.   So you referenced it a moment ago, but you were talking

04:05PM   5   about over time, you know, the payments increased, but

04:05PM   6   Lindsay, the defendant's current wife, had moved in with him

04:05PM   7   on Lovering, correct?

04:06PM   8   A.   Correct.

04:06PM   9   Q.   Did that follow pretty closely that relationship with

04:06PM   10   Melissa that you had referenced earlier?

04:06PM   11   A.   Yes.

04:06PM   12   Q.   I'd like to just be a little more detailed about what

04:06PM   13   conversations you had with the defendant around the time

04:06PM   14   Lindsay moved in with him and what he told you about the

04:06PM   15   finances that he was taking care of.

04:06PM   16   A.   She went from tenant to they moved in, their relationship

04:06PM   17   evolved.  And she was going to school full time as a nursing

04:06PM   18   student.  He was taking care of all the expenses.  Everything

04:06PM   19   from rent, any living expenses.  He purchased her a car, I

04:06PM   20   believe a Jetta.  And he still had his obligation to paying

04:07PM   21   maintenance and child support as well.

04:07PM   22   Q.   What, if anything, did he tell you about who was paying

04:07PM   23   for her schooling?

04:07PM   24   A.   I believe he was paying for it.  Or she might have gotten

04:07PM   25   grant aid, I don't recall.

04:07PM    1    Q.  Was he paying for the day-to-day living?

04:07PM    2    A.  He was paying for the day-to-day expenses, any expenses

04:07PM    3    regarding books, that type thing.

04:07PM    4    Q.  What happened to the frequency with which the defendant

04:07PM    5    went out to bars after starting to date Lindsay and

04:07PM    6    progressing towards getting married?

04:07PM    7    A.  They went out quite a bit, dinners, bars.  Group of

04:07PM    8    friends.

04:07PM    9    Q.  Now, you had indicated earlier that you've used cocaine

04:07PM   10    with the defendant while he was an agent.  I want to put some

04:08PM   11    time frames on that, okay?

04:08PM   12    A.  Okay.

04:08PM   13    Q.  In the roughly 2003 to 2008 window of time, sort of

04:08PM   14    before you get involved with the marijuana distribution, in

04:08PM   15    that pocket of time, about how many times had you used

04:08PM   16    cocaine with the defendant?

04:08PM   17    A.  Can you repeat the time frame again?

04:08PM   18    Q.  About 2004 to about 2008.

04:08PM   19    A.  About five to ten.

04:08PM   20    Q.  Now, after that, from like 2008 to 2019, probably,

04:08PM   21    approximately how many times would you estimate?

04:08PM   22    A.  I'd say about the same, five to ten.

04:08PM   23    Q.  And -- and at what locations?

04:08PM   24    A.  In Buffalo.  The Curtiss Hotel, I believe, SoHo.

04:08PM   25           **MR. SINGER:**  Judge, I'm sorry.  What time frame are

| | | |
|---|---|---|
| 04:08PM | 1 | we talking about with these locations?  It's not clear on the |
| 04:08PM | 2 | question. |
| 04:09PM | 3 | **MR. TRIPI:**  I'll go one by one, Judge. |
| 04:09PM | 4 | **THE COURT:**  We're talking about 2008 to 2019, that |
| 04:09PM | 5 | was my understanding. |
| 04:09PM | 6 | **MR. TRIPI:**  Yeah, I'll break it down more, |
| 04:09PM | 7 | Your Honor. |
| 04:09PM | 8 | **THE COURT:**  Okay, go ahead. |
| 04:09PM | 9 | **BY MR. TRIPI:** |
| 04:09PM | 10 | Q.  Did you go to Mother's with the defendant? |
| 04:09PM | 11 | A.  Yes. |
| 04:09PM | 12 | Q.  In the -- did you go out more frequent with the defendant |
| 04:09PM | 13 | in the lead-up to his wedding in 2015? |
| 04:09PM | 14 | A.  Yes. |
| 04:09PM | 15 | Q.  So, if I can frame it in that context, so the year of |
| 04:09PM | 16 | 2014 -- |
| 04:09PM | 17 | A.  Okay. |
| 04:09PM | 18 | Q.  -- were there more events relating to people who were |
| 04:09PM | 19 | going to be going to the destination wedding, going out |
| 04:09PM | 20 | together? |
| 04:09PM | 21 | A.  Yes. |
| 04:09PM | 22 | Q.  Okay.  Was Mother's a location that you went to? |
| 04:09PM | 23 | A.  Yes, that was just with Joe and I. |
| 04:09PM | 24 | Q.  Okay. |
| 04:09PM | 25 | A.  Yes. |

04:09PM   1   Q.   And did you do cocaine with him there?

04:09PM   2   A.   Yes.

04:09PM   3   Q.   Describe that.

04:09PM   4   A.   We did it in the bathroom.  I had gotten it, and we went

04:09PM   5   in the bathroom and we did it.  We did a blast.

04:10PM   6   Q.   Who did you mean by "we did a blast?"

04:10PM   7   A.   A blast of cocaine.  Put a key in there, and put it up

04:10PM   8   your nose and snort it.

04:10PM   9   Q.   Just a little bit?

04:10PM  10   A.   Just a little bit.

04:10PM  11   Q.   Did you go to SoHo on Chippewa with a group who would

04:10PM  12   later go to the wedding --

04:10PM  13           **MR. SINGER:**  Objection, leading.

04:10PM  14           **THE COURT:**  I'm sorry?

04:10PM  15           **MR. SINGER:**  Leading.

04:10PM  16           **MR. TRIPI:**  Foundation, Judge.

04:10PM  17           **THE COURT:**  Overruled.

04:10PM  18           **BY MR. TRIPI:**

04:10PM  19   Q.   Just to place you at the location, did you go to SoHo

04:10PM  20   with the group of people who would later going to the

04:10PM  21   wedding?

04:10PM  22   A.   Yes.

04:10PM  23   Q.   Who went to SoHo?

04:10PM  24   A.   Myself -- well, I met them there.  It was Joe, Tom

04:10PM  25   Doctor, his wife, Lindsay, her friends.  There's a group of

04:10PM    1    people.

04:10PM    2    Q.  At the time, did Lindsay have a sister named Ashley?

04:10PM    3    A.  Yes.

04:10PM    4    Q.  Who was she with at the time?

04:10PM    5    A.  Tom Napoli.

04:11PM    6    Q.  Is that the Napoli related to the suit place?

04:11PM    7    A.  Yes.

04:11PM    8    Q.  And was he part of the group?

04:11PM    9    A.  Yes.

04:11PM   10    Q.  And you mentioned the name Tom Doctor.  Who was that?

04:11PM   11    A.  Tom had worked with Joe, he was a Buffalo police

04:11PM   12    detective who was assigned to DEA task force.

04:11PM   13    Q.  Were they friends?

04:11PM   14    A.  Yes.

04:11PM   15    Q.  And were these all people who were later going to go to

04:11PM   16    the wedding?

04:11PM   17    A.  Yes.

04:11PM   18    Q.  Was there cocaine use that night at SoHo?

04:11PM   19    A.  Yes.

04:11PM   20    Q.  Describe what you participated in and what you observed

04:11PM   21    the defendant do.

04:11PM   22    A.  Again, drinking.  I had gotten it, went in the bathroom,

04:11PM   23    and we did it again.

04:11PM   24    Q.  Who did?

04:11PM   25    A.  Myself and the defendant.

04:11PM  1   Q.  Were any of the others in that group involved in using

04:11PM  2   that cocaine?

04:11PM  3   A.  I don't remember.  This is what I had, what I had gotten.

04:12PM  4   But there was other -- other people who had it there as well.

04:12PM  5   Q.  Who else had it?

04:12PM  6   A.  I believe Tom Doctor.  I don't know if Tom Napoli had it.

04:12PM  7   Q.  In the summer of 2014, was there an occasion you were at

04:12PM  8   Mickey Rats with the defendant?

04:12PM  9   A.  Yes.

04:12PM  10  Q.  And where is Mickey Rats?

04:12PM  11  A.  That's Angola on the lake.

04:12PM  12       MR. SINGER:  Judge, can we have a sidebar?

04:12PM  13       THE COURT:  Sure.

04:12PM  14       (Sidebar discussion held on the record.)

04:12PM  15       MR. SINGER:  Again, I renew my objection.  This is

04:12PM  16  all leading.

04:12PM  17       THE COURT:  It's not a leading question.  A leading

04:12PM  18  question is a question that suggests the answer.  Did you go

04:12PM  19  to Mickey Rats with the defendant in the summer of 2014 is not

04:12PM  20  a leading question.

04:12PM  21       MR. SINGER:  The issue is, is that, if Mr. Tripi asks

04:13PM  22  the question as in when did you use cocaine with the

04:13PM  23  defendant, that's not a leading question.

04:13PM  24       And Mr. Selva can testify to the time that he

04:13PM  25  remembers those things.

04:13PM   1            And if he can't remember certain dates and times,

04:13PM   2   Mr. Tripi can refresh his recollection with those dates and

04:13PM   3   time if it's available to do that.

04:13PM   4            The problem is, here, Judge, is that we're going down

04:13PM   5   a road where you say do you remember doing this in 2018?  And

04:13PM   6   you know what the answer is going to be.  It's gonna be, oh,

04:13PM   7   yeah, I remember I was out with Joe and this is when we did

04:13PM   8   cocaine.  Right?  That's what's leading.

04:13PM   9            **THE COURT:**  I don't think it's leading.  I don't

04:13PM   10   think it's leading.

04:13PM   11            Now, we may be getting repetitive and into detail in

04:13PM   12   ways that -- but I don't think these questions are leading.  A

04:13PM   13   leading question is a question that suggests the answer.

04:13PM   14            Did you go, I don't think that's a leading question.

04:13PM   15   I don't think that's a leading question.

04:13PM   16            I understand what you're saying, but I don't think

04:13PM   17   that's a leading question.

04:13PM   18            **MR. TRIPI:**  And even if it were, Judge, with regard

04:14PM   19   to foundational setting the scene, a limited amount of leading

04:14PM   20   is generally permissible.

04:14PM   21            **THE COURT:**  Yeah.  But we are -- I mean, you've been

04:14PM   22   going on and on and on, you've sort of made your point, you've

04:14PM   23   got to move.

04:14PM   24            **MR. TRIPI:**  I'm trying.

04:14PM   25            **THE COURT:**  I know, I understand, I understand that,

04:14PM 1   but we don't need go into the kind of detail that you're

04:14PM 2   getting into.  And quite frankly, some repetition.

04:14PM 3             **MR. TRIPI:**  I understand.  I'll try to move it along.

04:14PM 4             **THE COURT:**  Please.

04:14PM 5             (End of sidebar discussion.)

04:14PM 6             **THE COURT:**  You may continue.

04:14PM 7             **MR. TRIPI:**  May I please have the last question read

04:14PM 8   back, Ms. Sawyer?

04:14PM 9             **(The requested question and answer were read by the**

04:14PM 10  **court reporter.)**

04:15PM 11            **BY MR. TRIPI:**

04:15PM 12  Q.  And in or about the summer of 2014, who were you there

04:15PM 13  with?

04:15PM 14  A.  Myself, Joe, Tom Doctor, I believe Dave Siwiec was there.

04:15PM 15  That's all I can remember at this point.

04:15PM 16  Q.  So you, Tom Doctor, Dave Siwiec, and what transpired

04:15PM 17  there as it relates to cocaine use?

04:15PM 18  A.  It was out there.  Somebody, I forget who, had it.

04:15PM 19  Somebody had it, and we all did it.

04:15PM 20  Q.  This is at the bar?

04:15PM 21  A.  This is down the street at Doctor's, he had a cottage,

04:15PM 22  and we were there, and then we went to the bar, yes.

04:15PM 23  Q.  Describe where you used the cocaine.

04:15PM 24  A.  It was at the bar.

04:15PM 25  Q.  And before going to the bar, where were you?

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

04:16PM 1    A.  At the cottage.

04:16PM 2    Q.  Whose cottage was that?

04:16PM 3    A.  Tom Doctor's.

04:16PM 4    Q.  Now directing your attention to the wedding in Cabo San

04:16PM 5    Lucas in Mexico in or about February of 2015, were you with a

04:16PM 6    group with the defendant there where cocaine was used?

04:16PM 7    A.  Yes.

04:16PM 8    Q.  Describe how that transpired, please.

04:16PM 9    A.  We were there, all partying.  Tom Napoli had gotten it.

04:16PM 10   I had gotten it from someone at the -- you're at a resort, so

04:16PM 11   we found out there was somebody there that could get it.  And

04:16PM 12   it was in Mexico.  And we got it.  And we all partied and

04:16PM 13   took -- we participated.

04:16PM 14   Q.  You said we all, but who's in that, that group?

04:16PM 15   A.  Meaning, the group.

04:16PM 16   Q.  Who?

04:16PM 17   A.  Myself, Joe, Tom Doctor, Tom Napoli, I don't think any of

04:17PM 18   the girls did.

04:17PM 19   Q.  What, if anything, did the defendant say about that event

04:17PM 20   happening, the cocaine usage happening at the wedding?

04:17PM 21   A.  He didn't say anything about it.  I mean, we were all

04:17PM 22   doing it together.

04:17PM 23   Q.  Were you doing it in the open, or were you being

04:17PM 24   discreet?

04:17PM 25   A.  We were being discreet.

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

126

04:17PM | 1 | Q.  Describe that for the jury.

04:17PM | 2 | A.  We were in one of the rooms, because we were at a resort.

04:17PM | 3 | So it had been broughten out, we did it, we were drinking,

04:17PM | 4 | and then we went downstairs.  There was a nightclub there, so

04:17PM | 5 | it was discreet and in private.

04:17PM | 6 | Q.  The last one I want to ask you about, you mentioned the

04:17PM | 7 | Curtiss Hotel.  Would that have been later in time?

04:17PM | 8 | A.  Later in time, 2017 I think.

04:17PM | 9 | Q.  And who was present on that occasion?

04:18PM | 10 | A.  Myself, Joe, I believe Gassan, his friend Gassan, that's

04:18PM | 11 | all I can remember.

04:18PM | 12 | Q.  And what happened as it relates to any drug use at

04:18PM | 13 | that -- at the Curtiss Hotel, describe that for the jury.

04:18PM | 14 | A.  I had gotten it again.  I believe, yes, I had gotten it,

04:18PM | 15 | and we did a blast in the bathroom there again.  A blast is

04:18PM | 16 | doing a key and snorting it.

04:18PM | 17 | Q.  Now, you mentioned Tom Doctor a couple of times --

04:18PM | 18 | A.  Yes.

04:18PM | 19 | Q.  -- is that right?

04:18PM | 20 | A.  Yes.

04:18PM | 21 | Q.  And that's someone who had worked with the defendant?

04:18PM | 22 | A.  Yes.

04:18PM | 23 | Q.  Did there come a point in time where you had a

04:18PM | 24 | conversation with the defendant about the circumstances of

04:18PM | 25 | Tom Doctor's retirement?

| 04:18PM | 1 | A.  It was done abruptly. |

04:18PM  2    **MR. SINGER:**  Objection relevance.

04:19PM  3    **BY MR. TRIPI:**

04:19PM  4  Q.  That's a yes or a no.

04:19PM  5  A.  Yes.

04:19PM  6    **THE COURT:**  Next question.  Overruled to that

04:19PM  7  question, but go ahead.

04:19PM  8    **BY MR. TRIPI:**

04:19PM  9  Q.  What was your discussion with the defendant about the

04:19PM  10  circumstances of Tom Doctor's retirement?

04:19PM  11    **MR. SINGER:**  Objection, relevance.

04:19PM  12    **THE COURT:**  Yeah, so what -- do you want to come up?

04:19PM  13  Come on up.

04:19PM  14    (Sidebar discussion held on the record.)

04:19PM  15    **THE COURT:**  So what's the relevance of Tom Doctor's

04:19PM  16  retirement?

04:19PM  17    **MR. TRIPI:**  Yes.  Your Honor, the defendant had a

04:19PM  18  conversation, I believe the testimony will demonstrate with

04:19PM  19  Lou Selva after Tom Doctor had come under some scrutiny

04:19PM  20  himself, at the tail end of his law enforcement career.  Tom

04:19PM  21  doctor was -- believed he was under investigation, and he

04:19PM  22  abruptly retired, and then was never pursued or prosecuted.

04:20PM  23    The defendant, I anticipate there will be testimony

04:20PM  24  from this witness, had a conversation with Selva about

04:20PM  25  basically the fact that Tom Doctor did that, and there was no

04:20PM   1   repercussions regarding his -- regarding Doctor's --

04:20PM   2           **THE COURT:**  As Doctor involved in this marijuana grow

04:20PM   3   operation?

04:20PM   4           **MR. TRIPI:**  No, it's the cocaine usage and stuff like

04:20PM   5   that that we've talked about, and there will be another

04:20PM   6   witness coming later who will lay out circumstances of cocaine

04:20PM   7   usage with Bongiovanni.  But the relevance is, the statements

04:20PM   8   establish that Bongiovanni knew that Doctor retired abruptly,

04:20PM   9   and then never got prosecuted.  And then later on, I want to

04:20PM  10   be able to -- I think that's relevant knowledge in the

04:20PM  11   defendant's brain, I want to be able to argue on summation,

04:20PM  12   that that is what the defendant did.  He abruptly tried to

04:20PM  13   retire.  There's a consciousness of guilt argument there.

04:21PM  14           **THE COURT:**  I don't think so.

04:21PM  15           **MR. TRIPI:**  Okay.  That's fine, Judge.  You

04:21PM  16   understand, I'm explaining my argument.

04:21PM  17           **THE COURT:**  Oh, no, no --

04:21PM  18           **MR. TRIPI:**  I wasn't trying to --

04:21PM  19           **THE COURT:**  -- I'm not saying it's in bad faith, I'm

04:21PM  20   saying it's too far afield.

04:21PM  21           **MR. TRIPI:**  I'll move on.

04:21PM  22           (End of sidebar discussion.)

04:21PM  23           **THE COURT:**  So the objection is sustained.  You can

04:21PM  24   ask another question.

          25

| | | |
|---|---|---|
| 04:21PM | 1 | **BY MR. TRIPI:** |
| 04:21PM | 2 | Q.  Okay.  Are you familiar with an individual named Robert |
| 04:21PM | 3 | Missana? |
| 04:21PM | 4 | A.  Yes. |
| 04:21PM | 5 | Q.  Who's Robert Missana? |
| 04:21PM | 6 | A.  Robert is a friend of ours, mine and Joe.  He's been a |
| 04:21PM | 7 | bartender for a long time.  He's worked in Mother's, and I |
| 04:21PM | 8 | believe right now he's working somewhere downtown. |
| 04:21PM | 9 | Q.  And how long had you known Robert Missana? |
| 04:21PM | 10 | A.  Since my teen years. |
| 04:21PM | 11 | Q.  And how long had the defendant known Robert Missana? |
| 04:21PM | 12 | A.  Same amount of time. |
| 04:21PM | 13 | Q.  And where was he a bartender? |
| 04:21PM | 14 | A.  He was a bartender at Mother's. |
| 04:21PM | 15 | Q.  Is that a place that you and the defendant went |
| 04:22PM | 16 | relatively frequently? |
| 04:22PM | 17 | A.  Yes. |
| 04:22PM | 18 | Q.  Was there ever an occasion where you were present at |
| 04:22PM | 19 | Mother's with the defendant when -- |
| 04:22PM | 20 | **MR. SINGER:**  Judge, again, I'm going to object to |
| 04:22PM | 21 | relevance. |
| 04:22PM | 22 | **THE COURT:**  He hasn't asked the question yet. |
| 04:22PM | 23 | **MR. SINGER:**  Well, with regard to Mr. Missana. |
| 04:22PM | 24 | **THE COURT:**  But he hasn't asked the question yet.  I |
| 04:22PM | 25 | don't know what the question is.  Ask the question. |

04:22PM      1              **BY MR. TRIPI:**

04:22PM      2    Q.  Have you ever been present in a situation at Mother's

04:22PM      3    where you and the defendant and observed Robert Missana

04:22PM      4    selling cocaine?

04:22PM      5    A.  Yes.  We were there one time.  Again, we frequented

04:22PM      6    there.

04:22PM      7    Q.  Who was there?

04:22PM      8    A.  Myself and the defendant.  And he made a handoff to

04:22PM      9    somebody that was making a purchase over the bar, like, a

04:22PM     10    handshake, and Joe and I were standing right there.

04:22PM     11    Q.  And what time of night was that?

04:22PM     12    A.  Late.  11:00, 12:00.  Maybe a little later.

04:22PM     13    Q.  And where did Missana handoff the cocaine in relation to

04:23PM     14    where you and the defendant were at the bar?

04:23PM     15    A.  We were from here to -- it was close.

04:23PM     16    Q.  How many feet?

04:23PM     17    A.  2 feet, 3 feet.

04:23PM     18    Q.  And was the defendant a DEA agent at the time?

04:23PM     19    A.  Yes.

04:23PM     20    Q.  All right.  Getting back to the marijuana distribution.

04:23PM     21    You had mentioned the operation expanding regarding trucking.

04:23PM     22    Did it also involve purchasing properties and setting up grow

04:23PM     23    operations on those properties?

04:23PM     24    A.  Yes.

04:23PM     25    Q.  Can you describe that part of the operation for the jury?

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

131

04:23PM  1   A.   Yes.  Ron had purchased -- Ron was a contractor, and he

04:23PM  2   owned real estate.  He would purchase homes, get them ready,

04:23PM  3   doubles, and while he was getting them ready, he'd set up a

04:23PM  4   grow op in the basement because he would control the movement

04:24PM  5   of what's -- whose coming in and out.

04:24PM  6   Q.   And did there come a point in time in 2013 or '14 when he

04:24PM  7   set up a grow operation in your house?

04:24PM  8   A.   Yes.

04:24PM  9   Q.   And who was present when that grow operation was set up

04:24PM  10  in your house?

04:24PM  11  A.   It was myself, Ron, and Mike.

04:24PM  12  Q.   Masecchia?

04:24PM  13  A.   Masecchia.

04:24PM  14  Q.   And is this different than the process for cloning the

04:24PM  15  plants?

04:24PM  16  A.   Yes.  This is a little bit more involved.  This is an

04:24PM  17  indoor grow, grow op.

04:24PM  18  Q.   And how many plants were you setting up to grow to

04:24PM  19  maturity in your house?

04:24PM  20  A.   We can get anywhere from 30 to 50.  Again, it wasn't a

04:24PM  21  big space.  You'd have to space them out.

04:24PM  22  Q.   And who was in charge of setting up the grow operation?

04:24PM  23  A.   Ron.  Ron set it up with me and Mike.

04:24PM  24  Q.   So, what was Ron Serio -- did he have a nickname at that

04:25PM  25  point?

04:25PM   1   A.   Yeah.   Greenie.

04:25PM   2   Q.   And what was the reason for the nickname?

04:25PM   3   A.   Because he was cashing -- he had the money.

04:25PM   4   Q.   And did Masecchia have a nickname he went by?

04:25PM   5   A.   He did.

04:25PM   6   Q.   What was his nickname?

04:25PM   7   A.   The gorilla.

04:25PM   8   Q.   And what was the genesis of that nickname?

04:25PM   9   A.   He's a tough guy, big, strong guy.

04:25PM   10   Q.   So describe the grow operation as it was structured in

04:25PM   11   your house.   Where was it within the house, that kind of

04:25PM   12   thing?

04:25PM   13   A.   It was in my basement.   Again, 40, 50 plants.   There was

04:25PM   14   a light on a retractor, it would go back and forth.   It was

04:25PM   15   set up on timers.   I had an ionizer to help with the smell.

04:25PM   16   Ron set that up so there was no smell, because my kids would

04:25PM   17   come over, and it deteriorated it.

04:25PM   18   Q.   And was this grow operation supplementing the outdoor

04:25PM   19   grows?

04:25PM   20   A.   Yes.

04:26PM   21   Q.   Was it supplementing the trucking of marijuana?

04:26PM   22   A.   Yes.

04:26PM   23   Q.   And were there other locations you were aware of where

04:26PM   24   this was occurring, generally aware of?

04:26PM   25   A.   Yes.

04:26PM  1  Q.  By this point in time when the marijuana grow operation

04:26PM  2  is set up in your house, had you provided names of Ron

04:26PM  3  Serio's inner circle to the defendant?

04:26PM  4  A.  I did.

04:26PM  5  Q.  And by this point in time, by the time the grow is set up

04:26PM  6  in your house, had Serio and Masecchia's partnership -- or,

04:26PM  7  withdrawn.

04:26PM  8      Had Serio and Masecchia's relationship evolved?

04:26PM  9  A.  Yes.

04:26PM  10  Q.  How did that evolve?

04:26PM  11  A.  It's, well, evolved by getting bigger.  They were doing

04:26PM  12  more, they had a big operation where -- I didn't know where

04:26PM  13  was, where they had a warehouse and they set up plants.  Ron

04:27PM  14  was continuing to buy and flip these houses as well, setting

04:27PM  15  up the grow ops.  And Mike was heavily involved with that.

04:27PM  16  And they also had distribution coming in from those three

04:27PM  17  areas I mentioned, California, British Columbia, and

04:27PM  18  New York.

04:27PM  19  Q.  Was Serio also moving other types of drugs by that point?

04:27PM  20  A.  I don't -- I don't know.

04:27PM  21  Q.  Okay.  Now, with respect to the outdoor grow, did

04:27PM  22  additional people become involved in that?

04:27PM  23  A.  In the outdoor grow?

04:27PM  24  Q.  Yes.

04:27PM  25  A.  No, it was the same crew.

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

134

04:27PM   1   Q.  Did there come a time when an individual named Sal Volpe

04:27PM   2   joined?

04:27PM   3   A.  Sal did.  Sal came in a little later.  He would help out.

04:27PM   4   Because when the process happened when it was taken from --

04:27PM   5   when it was being hung, when it was harvest time, so to

04:27PM   6   speak, Sal would come in and help with that.

04:28PM   7        He is since deceased.  He had passed away.

04:28PM   8   Q.  Describe this passing of information regarding the names

04:28PM   9   that were in Serio's inner circle to the defendant.

04:28PM   10  A.  Ron had given me a list of names.

04:28PM   11  Q.  Who handed you the list?

04:28PM   12  A.  Masecchia.  Excuse me, let me rephrase that.

04:28PM   13       Ron had given Mike a list of names.  Mike had given me

04:28PM   14  the list, which came from Ron.  And there were names on there

04:28PM   15  that he was concerned about.

04:28PM   16  Q.  What do you mean by concerned about?

04:28PM   17  A.  If they were informants, if there was an investigation

04:28PM   18  with them.

04:28PM   19  Q.  Before we get to that, those questions about informants,

04:28PM   20  I'm asking you were there -- was there a point in time where

04:28PM   21  you were requested to provide names of people who were close,

04:28PM   22  names and phones numbers of people who were close to Serio?

04:29PM   23  A.  Yes.  Ron had given me --

04:29PM   24  Q.  Okay.  That answer is yes.

04:29PM   25       What happened in that regard?

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

135

04:29PM    1    A.  Ron had given me a list of numbers and names that he

04:29PM    2    wanted to have checked.

04:29PM    3    Q.  Who handed you that list?

04:29PM    4    A.  Again, it came from Masecchia.

04:29PM    5    Q.  Okay.

04:29PM    6    A.  So it always went from Ron, to Mike, to me.  Because I

04:29PM    7    would see Mike a lot more.

04:29PM    8    Q.  Okay.  Did you get a list of names and phone numbers that

04:29PM    9    were people close to Serio?

04:29PM   10    A.  Yeah, I did.

04:29PM   11    Q.  What did you do with that list?

04:29PM   12    A.  I gave it to Joe.

04:29PM   13    Q.  Did you do anything to modify or change the list?

04:29PM   14    A.  No.

04:29PM   15    Q.  And -- did you rewrite the list?  Anything like that?

04:29PM   16    A.  I wrote it on a piece of paper for my record that I kept.

04:29PM   17    Q.  Explain it to the jury.

04:29PM   18    A.  Okay.  I wrote it down as I gave it to him on a piece of

04:29PM   19    paper that I had.  So, I just copied it in case something

04:30PM   20    happened to it.  Just to back it up.

04:30PM   21    Q.  When you were given the list, was it one size of paper?

04:30PM   22    A.  It was.  It was one size.

04:30PM   23    Q.  And what was the size of paper you wrote it on?

04:30PM   24    A.  He had given me a sheet, and I just used like a little

04:30PM   25    notepad, like a little yellow notepad to rewrite it.

04:30PM    1    Q.  And what did you do with -- with that list?

04:30PM    2    A.  I gave it to Joe.

04:30PM    3    Q.  And what did you do with the original list you were

04:30PM    4    given?

04:30PM    5    A.  That's what I gave to -- I kept -- I kept the list in

04:30PM    6    case something happened to it, and then I gave the other one

04:30PM    7    to Joe.

04:30PM    8    Q.  Do you still have the list today?

04:30PM    9    A.  No.

04:30PM   10    Q.  What did you do with it?

04:30PM   11    A.  I destroyed it.

04:30PM   12    Q.  How many names were on the list?

04:30PM   13    A.  Six.  Five.  Five or six.

04:30PM   14    Q.  Who were some of the people that you remember being on

04:30PM   15    the list that you passed along?

04:31PM   16    A.  Frank Burkhart, BK, Dave Micche, Sizetek or -- I can't

04:31PM   17    remember.

04:31PM   18            THE COURT:  Can you keep your voice up.

04:31PM   19            MR. SINGER:  I'm sorry, I couldn't hear.

04:31PM   20            THE WITNESS:  Sorry.  Frank Burkhart, BK, Dave

04:31PM   21    Micche, I can't pronounce the other guy's name, Sizetek, or

04:31PM   22    Siztek.

04:31PM   23            BY MR. TRIPI:

04:31PM   24    Q.  Who was Tom Serio?

04:31PM   25    A.  Tom was Ron's brother.

```
04:31PM    1    Q.  Were they close?

04:31PM    2    A.  They were.

04:31PM    3    Q.  At times, was Tom involved in Ron's operations?

04:31PM    4    A.  Never when I was around.  I don't know.

04:31PM    5    Q.  Who is Mario Vacanti?

04:31PM    6    A.  Mario was a close friend of Ron's.

04:31PM    7    Q.  Is he someone who would get marijuana?

04:31PM    8    A.  Yes, from Ron.

04:31PM    9    Q.  A lot of marijuana?

04:31PM   10    A.  Yes.

04:31PM   11    Q.  To distribute?

04:31PM   12    A.  Yes.

04:31PM   13    Q.  Who is TS?

04:31PM   14    A.  TS was again in Ron's circle, who Ron was distributing

04:32PM   15    marijuana to.

04:32PM   16    Q.  Who was Mark Falzone?

04:32PM   17    A.  Mark Falzone was a close friend of Ron's and, again, he

04:32PM   18    was in his inner circle.

04:32PM   19    Q.  Who was Chris Baker?

04:32PM   20    A.  I don't know Chris baker.

04:32PM   21    Q.  Now, did there come a time where you were provided a name

04:32PM   22    of BK or RK?

04:32PM   23    A.  Yes.

04:32PM   24    Q.  Who provided you that name?

04:32PM   25    A.  Ron had provided it to Mike, and Mike provided it to me.
```

04:32PM  1    Q.  And what were your instructions as it related to BK?

04:32PM  2    A.  Find out if he was an informant.

04:33PM  3    Q.  And what did -- so what did you do?

04:33PM  4    A.  I gave it to Joe.

04:33PM  5    Q.  Gave what to Joe?

04:33PM  6    A.  The name.

04:33PM  7    Q.  Did you say it verbally, or did you have to write that

04:33PM  8    down?

04:33PM  9    A.  No, I gave it to him.  We met, and I gave to him.  There

04:33PM  10   was no need to write that down.

04:33PM  11   Q.  So you expressed that name verbally?

04:33PM  12   A.  I expressed it verbally.

04:33PM  13   Q.  And describe your conversation with the defendant when

04:33PM  14   you met.

04:33PM  15   A.  I told him there's a concern, Ron works closely with this

04:33PM  16   guy, and he wants to know if -- there was a rumor that he got

04:33PM  17   busted, if he had turned and become an informant.

04:33PM  18   Q.  Who had told you that RK got busted?

04:33PM  19   A.  Again, I spoke a lot with Masecchia, so Masecchia was

04:33PM  20   concerned as well.

04:33PM  21   Q.  So Masecchia told you?

04:33PM  22   A.  Yes.

04:33PM  23   Q.  About RK getting busted?

04:33PM  24   A.  Yes.

04:33PM  25   Q.  And that Ron was concerned?

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

139

04:33PM   1   A.   Yes.

04:33PM   2   Q.   When you told Joe the name RK, describe your conversation

04:34PM   3   with the defendant.

04:34PM   4   A.   I told him there's concern -- Ron had given me this name,

04:34PM   5   BK, and he's concerned that -- that he had gotten busted and

04:34PM   6   he might have flipped, he might have become an informant, and

04:34PM   7   if he could check it out and verify that.

04:34PM   8   Q.   When you asked the defendant to check it out, what did he

04:34PM   9   say?

04:34PM  10   A.   He said okay, I'll get back to you.

04:34PM  11   Q.   And did the defendant get back to you regarding RK?

04:34PM  12   A.   Yes.

04:34PM  13   Q.   How much time went by before the defendant got back to

04:34PM  14   you regarding RK?

04:34PM  15   A.   Week, week and a half.

04:34PM  16   Q.   So there was some delay?

04:34PM  17   A.   There was a little delay, yes.

04:34PM  18   Q.   Describe your next conversation with the defendant about

04:35PM  19   RK.

04:35PM  20   A.   I met with him, and he had told me he was in fact an

04:35PM  21   informant.

04:35PM  22   Q.   And did the defendant elaborate at all?

04:35PM  23   A.   No, he just said that he had been arrested, and he didn't

04:35PM  24   say what agency or who he's working with, but he had been --

04:35PM  25   he's an informant.

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

140

04:35PM   1   Q.  And what did you do with that information?

04:35PM   2   A.  I relayed it to Mike.  I immediately called Mike, and met

04:35PM   3   him, and told him your speculation was right.  And then he

04:35PM   4   reached out to Ron.

04:35PM   5   Q.  How do you know Masecchia reached out to Ron?

04:35PM   6   A.  He said he was going to.

04:35PM   7   Q.  Okay.

04:35PM   8   A.  I mean, I don't know.  I didn't see it.  But he said he

04:35PM   9   would reach out to him.

04:35PM  10   Q.  Did there come a time when you -- when a request was made

04:35PM  11   of you regarding a TS?

04:36PM  12   A.  Yes.

04:36PM  13   Q.  When was that request in relation to the RK request?

04:36PM  14   A.  It was within the same time frame.  Gave me two names to

04:36PM  15   check out.  I did RK first, and then TS came not far after

04:36PM  16   that.

04:36PM  17   Q.  And who gave you the name TS?

04:36PM  18   A.  That came from Ron, to Mike, to me.

04:36PM  19   Q.  And what was -- what did Mike explain to you regarding

04:36PM  20   TS?

04:36PM  21   A.  Again, there was a concern if he was an informant, to

04:36PM  22   relay that to Joe and find out.

04:36PM  23   Q.  So what did you do?

04:36PM  24   A.  I did.  I met with him again.  Called him, and I says,

04:36PM  25   there's another name here that they're concerned about.  I

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

141

| | | |
|---|---|---|
| 04:36PM | 1 | gave him the name. |
| 04:36PM | 2 | Q.  Was that an in-person meeting? |
| 04:36PM | 3 | A.  Yes. |
| 04:36PM | 4 | Q.  Where did you meet? |
| 04:36PM | 5 | A.  I believe it was on -- it was it at a bar downtown, |
| 04:36PM | 6 | Chippewa. |
| 04:36PM | 7 | Q.  What did you tell the defendant about TS? |
| 04:37PM | 8 | A.  I told him Mike is -- Mike is concerned, Ron's concerned |
| 04:37PM | 9 | that this guy got busted, and he could be an informant, |
| 04:37PM | 10 | because Ron was doing a lot of businesses with him.  So, it |
| 04:37PM | 11 | was a big concern. |
| 04:37PM | 12 | Q.  What do you mean, Ron was doing a lot of business with |
| 04:37PM | 13 | Tom TS? |
| 04:37PM | 14 | A.  When Ron was getting the stuff from California and |
| 04:37PM | 15 | British Columbia and New York, it was a high grade hydro |
| 04:37PM | 16 | product, so these are the -- TS was one of his guys in his |
| 04:37PM | 17 | group that bought from him regularly. |
| 04:37PM | 18 | Q.  And what did the defendant agree to do regarding TS if |
| 04:37PM | 19 | anything? |
| 04:37PM | 20 | A.  He would -- he agreed to check it out and get back to me. |
| 04:37PM | 21 | Q.  And was there a time delay? |
| 04:37PM | 22 | A.  There was. |
| 04:37PM | 23 | Q.  Describe what happened next in that regard. |
| 04:37PM | 24 | A.  About the same time delay, about a week, week or so, |
| 04:37PM | 25 | reached back out to him, said did you find anything out with |

04:37PM  1   TS?  We met, again, always met out.  I believe that time it

04:38PM  2   was at Mother's.  And I says, what happened, what had

04:38PM  3   transpired.  And he had mentioned that he was an informant,

04:38PM  4   he got busted.

04:38PM  5   Q.  By 2013 into '14, moving forward, were you aware -- you

04:38PM  6   mentioned trucks from California, British Columbia.  Were you

04:38PM  7   aware of specific trucking routes and transfer locations?

04:38PM  8   A.  I was not.

04:38PM  9   Q.  When you provided the defendant with a list of names and

04:38PM 10   phone numbers that were in Serio's sort of inner circle, I

04:39PM 11   just want to circle back to that, what specifically did the

04:39PM 12   defendant say about that?

04:39PM 13   A.  He got back to me, and he ran those numbers through.  And

04:39PM 14   none of them were tapped or involved in any investigation or

04:39PM 15   showed up, from what he told me.

04:39PM 16   Q.  Did he tell you how he was going to check into the phone

04:39PM 17   numbers?

04:39PM 18   A.  No.

04:39PM 19   Q.  But essentially, the report back was all clear?

04:39PM 20   A.  All clear.

04:39PM 21   Q.  In or about 2015, a little bit further in time, did --

04:39PM 22   did you become aware of some information regarding Mario

04:39PM 23   Vacanti?

04:39PM 24   A.  Yes.

04:39PM 25   Q.  How did you become aware of information regarding Mario

| | | |
|---|---|---|
| 04:39PM | 1 | Vacanti? |
| 04:40PM | 2 | A.  Mario was good friends with Ron, and he was within Ron's |
| 04:40PM | 3 | inner circle.  So -- |
| 04:40PM | 4 | Q.  Was something brought to your attention about Vacanti? |
| 04:40PM | 5 | A.  Yes.  He had started moving more marijuana from whatever |
| 04:40PM | 6 | contact I believe he had in California.  He had also had a |
| 04:40PM | 7 | relationship with Ron. |
| 04:40PM | 8 | Q.  Did you have a conversation with the defendant about |
| 04:40PM | 9 | Mario Vacanti? |
| 04:40PM | 10 | A.  I did. |
| 04:40PM | 11 | Q.  Can you describe what that conversation consisted of? |
| 04:40PM | 12 | A.  This is -- this is another guy in Ron's inner circle, |
| 04:40PM | 13 | he's close with.  If he can provide any information to make |
| 04:40PM | 14 | sure he's okay.  And he said I'll get back to you. |
| 04:40PM | 15 | Q.  And when the defendant got back to you, did he get back |
| 04:40PM | 16 | to you? |
| 04:40PM | 17 | A.  Yes. |
| 04:40PM | 18 | Q.  What, if anything, did he tell you about Mario Vacanti? |
| 04:41PM | 19 | A.  There was nothing going on with him. |
| 04:41PM | 20 | Q.  What do you mean by there was nothing going on with him? |
| 04:41PM | 21 | A.  There was not -- there was no investigation or anything |
| 04:41PM | 22 | happening. |
| 04:41PM | 23 | Q.  Did there come a point at a different point in time where |
| 04:41PM | 24 | you learned Vacanti was under investigation? |
| 04:41PM | 25 | A.  No.  No. |

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

144

| | | |
|---|---|---|
| 04:41PM | 1 | Q.  Were you ever requested to look into whether Frank |
| 04:42PM | 2 | Burkhart was cooperating? |
| 04:42PM | 3 | A.  Yes. |
| 04:42PM | 4 | Q.  Who asked you to do that? |
| 04:42PM | 5 | A.  That came from Ron, to Mike, to me. |
| 04:42PM | 6 | Q.  And did you have a conversation with the defendant about |
| 04:42PM | 7 | that? |
| 04:42PM | 8 | A.  Yes. |
| 04:42PM | 9 | Q.  And what, if anything, did you learn? |
| 04:42PM | 10 | A.  He was not. |
| 04:42PM | 11 | Q.  Did you report that back? |
| 04:42PM | 12 | A.  I did. |
| 04:42PM | 13 | Q.  Did there come a point in time where you were provided -- |
| 04:42PM | 14 | you were made aware of an investigation into an Anthony |
| 04:42PM | 15 | Anastasia? |
| 04:42PM | 16 | A.  Yes. |
| 04:42PM | 17 | Q.  Okay.  Who was Anthony Anastasia? |
| 04:42PM | 18 | A.  He had bar tended at Gables.  And he had gotten busted |
| 04:42PM | 19 | for cocaine, and was somebody that I had boughten cocaine |
| 04:42PM | 20 | from. |
| 04:42PM | 21 | Q.  Okay.  You had boughten -- you had purchased cocaine from |
| 04:42PM | 22 | Anastasia in the past? |
| 04:42PM | 23 | A.  Yes. |
| 04:42PM | 24 | Q.  Cocaine for your personal use? |
| 04:43PM | 25 | A.  Just personal use. |

04:43PM    1    Q.  And before Anastasia was, you said, busted, do you mean

04:43PM    2    arrested?

04:43PM    3    A.  Let me rephrase that.  He was arrested, yes.

04:43PM    4    Q.  Did the defendant make you aware of an investigation into

04:43PM    5    Anastasia before Anastasia was arrested?

04:43PM    6    A.  Yes.  Because I believe he -- it was his investigation, I

04:43PM    7    believe.

04:43PM    8    Q.  Okay.  What did the defendant tell you about the

04:43PM    9    investigation?

04:43PM   10    A.  He said stay away from him, he's hot, there's an

04:43PM   11    investigation going on.

04:43PM   12    Q.  When the defendant told you stay away from him, he's hot,

04:43PM   13    what did you understand that to mean?

04:43PM   14    A.  Meaning not to buy cocaine for personal use from him.

04:43PM   15    Just stay away.  Leave him alone.

04:43PM   16    Q.  What was your perception as to why the defendant told you

04:44PM   17    to stay away from Anastasia?

04:44PM   18    A.  Because there was an investigation, and he wanted to make

04:44PM   19    sure that I was not involved or I was going to be okay.

04:44PM   20    Q.  Now you indicated before that you would work out from

04:44PM   21    time to time at a gym with the defendant?

04:44PM   22    A.  Yes.

04:44PM   23    Q.  The Fitness Factory?

04:44PM   24    A.  Fitness Factory, yes.

04:44PM   25    Q.  And that's on Delaware Avenue in Kenmore?

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

| | | |
|---|---|---|
| 04:44PM | 1 | A.  Yes. |
| 04:44PM | 2 | Q.  Was there another individual who would work out at that |
| 04:44PM | 3 | gym on occasion named JD? |
| 04:44PM | 4 | A.  Yes. |
| 04:44PM | 5 | Q.  Was there an interaction that you observed between the |
| 04:44PM | 6 | defendant and JD at Fitness Factory that led to a |
| 04:45PM | 7 | conversation about JD? |
| 04:45PM | 8 | A.  Yes. |
| 04:45PM | 9 | Q.  Describe what happened. |
| 04:45PM | 10 | A.  Joe would work out there. |
| 04:45PM | 11 | Q.  Can you use last names since they're both named Joe? |
| 04:45PM | 12 | A.  JD -- |
| 04:45PM | 13 | MR. SINGER:  Judge, I'm going to object.  Can we just |
| 04:45PM | 14 | approach quickly? |
| 04:45PM | 15 | THE COURT:  You sure can. |
| 04:45PM | 16 | (Sidebar discussion held on the record.) |
| 04:45PM | 17 | MR. SINGER:  We haven't made a link regarding JD to |
| 04:45PM | 18 | the current conspiracy, and so I don't know where we're going |
| 04:45PM | 19 | here. |
| 04:45PM | 20 | THE COURT:  Yeah, I don't either. |
| 04:45PM | 21 | MR. TRIPI:  We don't need to, he tells him that JD is |
| 04:45PM | 22 | an informant.  That's a breach of oath and duty.  He's not |
| 04:45PM | 23 | related to the marijuana conspiracy, it's just a separate |
| 04:45PM | 24 | thing that Joe did that -- |
| 04:45PM | 25 | THE COURT:  So, tell me here, if he's an informant, |

Case 1:19-cr-00227-LJV-MJR   Document 772   Filed 02/21/24   Page 147 of 152
USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

147

04:45PM    1    he's --

04:45PM    2            **MR. TRIPI:**  He's tipping off an informant.

04:45PM    3            **THE COURT:**  If he tries to sell to you --

04:46PM    4            **MR. TRIPI:**  He's just making Selva aware that JD is

04:46PM    5    another informant.  He worked out at the gym, that's how it

04:46PM    6    came up.

04:46PM    7            **MR. SINGER:**  How does this relate to the conspiracy

04:46PM    8    that Selva's in.

04:46PM    9            **THE COURT:**  He's protecting Selva.

04:46PM   10            **MR. SINGER:**  But the missing link on this, Judge, is

04:46PM   11    JD's connection to a conspiracy.  Like, I can understand what

04:46PM   12    you propose in your hypothetical if JD is a potential buyer in

04:46PM   13    the Serio conspiracy or player in the Serio conspiracy --

04:46PM   14            **THE COURT:**  He doesn't have to be.  If he can get

04:46PM   15    Selva in trouble, and Bongiovanni has inside information that

04:46PM   16    Selva can use to protect himself, that is, I can buy drugs

04:46PM   17    from Joe Smith, I can buy drugs from John Brown, but I can't

04:46PM   18    buy drugs from --

04:46PM   19            **MR. TRIPI:**  JD.

04:46PM   20            **THE COURT:** -- JD.

04:46PM   21            **MR. TRIPI:**  Or nobody that we're involved with should

04:46PM   22    sell drugs to JD.

04:46PM   23            **MR. SINGER:**  But what evidence is there that JD's

04:46PM   24    doing that?  Doing any type of sales?

04:46PM   25            **THE COURT:**  He's an informant.

04:46PM   1          **MR. TRIPI:**  He doesn't have to be, he's an informant.

04:47PM   2    And he's informing Selva and, by proxy, the rest of them to

04:47PM   3    stay away from JD.

04:47PM   4          **THE COURT:**  He's an informant in connection with

04:47PM   5    drugs.

04:47PM   6          **MR. TRIPI:**  JD was a signed up DEA informant, he's

04:47PM   7    going to testify.

04:47PM   8          **THE COURT:**  In connection with drugs?

04:47PM   9          **MR. TRIPI:**  Yes, he's made purchases before.

04:47PM   10         **THE COURT:**  Okay.  No, I think it's relevant.  The

04:47PM   11   objection is overruled.

04:47PM   12         (End of sidebar discussion.)

04:47PM   13         **THE COURT:**  The objection is overruled.

04:47PM   14         **MR. TRIPI:**  Proceed, Your Honor?

04:47PM   15         **THE COURT:**  You can.

04:47PM   16         **BY MR. TRIPI:**

04:47PM   17   Q.  That means you can answer, Mr. Selva.

04:47PM   18       What -- what happened at the gym that led to a

04:47PM   19   conversation between you and the defendant about Mr. JD?

04:47PM   20   A.  JD was at the gym a lot at the same times when we would

04:47PM   21   go.  And he had -- he had said hello to Joe.  And then he --

04:47PM   22   the defendant -- JD had said hello to the defendant.  And

04:47PM   23   then when he walked away, he had mentioned, he says, stay

04:47PM   24   away from him, he's a -- he's a paid informant.

04:48PM   25   Q.  And was there something that precipitated that comment by

USA v Bongiovanni - Selva - Tripi/Direct - 2/21/24

04:48PM  1   the defendant?  Did you -- did you --

04:48PM  2   A.  No.  No, we seen him -- we saw him all the time, just

04:48PM  3   stay away.

04:48PM  4   Q.  Do you remember what time frame this was?

04:48PM  5   A.  I don't recall.

04:48PM  6   Q.  I want to circle back to Mario Vacanti for a moment.  Was

04:48PM  7   there a point in time where you went to Serio's house and

04:48PM  8   notified him of something regarding Vacanti?

04:48PM  9   A.  When I went to Serio's house?  I -- I -- I -- I don't

04:49PM 10   remember.  Was there something that could refresh my memory?

04:49PM 11           **MR. TRIPI:**  Just a moment, please.

04:49PM 12           **THE COURT:**  Mr. Tripi, is this going to take a while?

04:49PM 13           **MR. TRIPI:**  I'm sorry, Your Honor?

04:49PM 14           **THE COURT:**  I'm thinking this may be a great time to

04:49PM 15   break for the day --

04:49PM 16           **MR. TRIPI:**  That would be great.

04:49PM 17           **THE COURT:**  -- instead of wasting the jury's time.

04:49PM 18           **MR. TRIPI:**  Okay.

04:49PM 19           **THE COURT:**  So let's do that, folks.  So we will now

04:50PM 20   break for the day.  So please remember the instructions that

04:50PM 21   I've given to you about not discussing this case with anyone,

04:50PM 22   including each other.  Don't do any research on your own.

04:50PM 23   Don't use any tools of technology to research the case or to

04:50PM 24   communicate about the case.

04:50PM 25           Don't read or listen to or watch any news coverage of

04:50PM   1   the case on TV, on the radio, in the paper, on the internet,

04:50PM   2   if there is any while this case is in progress.

04:50PM   3           And don't make up your mind about anything until the

04:50PM   4   case is presented to you.

04:50PM   5           Be back here tomorrow morning at 9:30.  Get a good

04:50PM   6   night's sleep.  Drive carefully.  Thank you, all.

04:50PM   7           (Jury excused at 4:50 p.m.)

04:50PM   8           **THE COURT:**  Okay.  Anything we need to do before I go

04:51PM   9   take a nap?

04:51PM  10           **MR. TRIPI:**  No, I apologize for the fumbling at the

04:51PM  11   end of the day, Your Honor.

04:51PM  12           **THE COURT:**  That's okay.

04:51PM  13           **MR. SINGER:**  I have one thing to raise, but outside

04:51PM  14   the presence of Mr. Selva.

04:51PM  15           **THE COURT:**  Okay.  So, Mr. Selva, can you step down

04:51PM  16   and leave, please?

04:51PM  17           (Witness excused at 4:51 p.m.)

         18           (Excerpt concluded at 4:51 p.m.)

         19           *     *     *     *     *     *     *

         20

         21

         22

         23

         24

         25

1

2                       **CERTIFICATE OF REPORTER**

3

4                  In accordance with 28, U.S.C., 753(b), I

5      certify that these original notes are a true and correct

6      record of proceedings in the United States District Court for

7      the Western District of New York on February 21, 2024.

8

9

10                              s/ Ann M. Sawyer
                               Ann M. Sawyer, FCRR, RPR, CRR
11                             Official Court Reporter
                               U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**TRANSCRIPT EXCERPT**

2

**TESTIMONY OF LOUIS SELVA - 2/21/24**

3

4

5       **W I T N E S S**                                    **P A G E**

6       **L O U I S    S E L V A**                            2

7            DIRECT EXAMINATION BY MR. TRIPI:          2

8

9

10      **E X H I B I T**                                    **P A G E**

11      GOV Exhibit 215                                    17

12      GOV Exhibits 213-1 to 5                            26

13

14

15

16

17

18

19

20

21

22

23

24

25