```
1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK
2
   _____
3  UNITED STATES OF AMERICA,
                                      Case No. 1:19-cr-227
4              Plaintiff,                      (LJV)
   v.
5                                     February 20, 2024
   JOSEPH BONGIOVANNI,
6
   _____
                      Defendant.
7


8       TRANSCRIPT EXCERPT - EXAMINATION OF THOMAS HERBST
           BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                  UNITED STATES DISTRICT JUDGE


10
   APPEARANCES:            TRINI E. ROSS, UNITED STATES ATTORNEY
11                         BY: JOSEPH M. TRIPI, ESQ.
                               NICHOLAS T. COOPER, ESQ.
12                             CASEY L. CHALBECK, ESQ.
                           Assistant United States Attorneys
13                         Federal Centre
                           138 Delaware Avenue
14                         Buffalo, New York 14202
                              And
15                         UNITED STATES DEPARTMENT OF JUSTICE
                           BY: JORDAN ALAN DICKSON, ESQ.
16                         1301 New York Ave NW
                           Suite 1000
17                         Washington, DC 20530-0016
                           For the Plaintiff
18
                           SINGER LEGAL PLLC
19                         BY: ROBERT CHARLES SINGER, ESQ.
                           80 East Spring Street
20                         Williamsville, New York 14221
                              And
21                         LAW OFFICES OF PARKER ROY MacKAY
                           BY: PARKER ROY MacKAY, ESQ.
22                         3110 Delaware Avenue
                           Kenmore, New York  14217
23                         For the Defendant

24 PRESENT:                BRIAN A. BURNS, FBI Special Agent
                           MARILYN K. HALLIDAY, HSI Special Agent
25                         KAREN A. CHAMPOUX, USA Paralegal
```

| | | |
|---|---|---|
| 1 | **LAW CLERK:** | **REBECCA FABIAN IZZO, ESQ.** |
| 2 | **COURT DEPUTY CLERK:** | **COLLEEN M. DEMMA** |
| 3 | **COURT REPORTER:** | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 4 | | Robert H. Jackson Federal Courthouse |
| | | 2 Niagara Square |
| | | Buffalo, New York  14202 |
| 5 | | Ann_Sawyer@nywd.uscourts.gov |

6

7                    *    *    *    *    *    *    *

09:58AM
09:58AM   8

09:58AM   9          (Excerpt commenced at 9:58 a.m.)

09:58AM  10          (Jury present.)

09:58AM  11          **THE COURT:**  Okay, are you ready to call your next

09:58AM  12  witness?

09:58AM  13          **MR. COOPER:**  Finally, Judge --

09:58AM  14          **THE COURT:**  Oh, I'm sorry.

09:58AM  15          **MR. COOPER:**  -- I am finally ready to call my next

09:58AM  16  witness.

09:58AM  17          **THE COURT:**  Oh, I thought there was another one.

09:58AM  18          **MR. COOPER:**  There's not, Judge.

09:58AM  19          Special Agent Thomas Herbst.

09:59AM  20

09:59AM  21  **T H O M A S   H E R B S T**, having been duly called and sworn,

10:00AM  22  testified as follows:

10:00AM  23          **MR. COOPER:**  May I inquire?

10:00AM  24          **THE COURT:**  You may.

10:00AM  25

| | | |
|---|---|---|
| 10:00AM | 1 | **DIRECT EXAMINATION BY MR. COOPER:** |
| 10:00AM | 2 | Q.  Good morning, sir, how are you? |
| 10:00AM | 3 | A.  Good sir, thank you. |
| 10:00AM | 4 | Q.  Will you please introduce yourself to our jury? |
| 10:00AM | 5 | A.  My name is Thomas Herbst, H-E-R-B-S-T.  I live in |
| 10:00AM | 6 | Florida.  And I previously worked for the FBI. |
| 10:00AM | 7 | Q.  Where did you grow up, Mr. Herbst? |
| 10:00AM | 8 | A.  I -- I was born in the City of Buffalo, I was raised in |
| 10:00AM | 9 | South Buffalo.  Graduated from Bishop Timon High School 50 |
| 10:00AM | 10 | years ago.  Graduated from the University of Buffalo four |
| 10:00AM | 11 | years after that.  Graduated from law school three years |
| 10:00AM | 12 | after that.  And eventually, applied for and was accepted |
| 10:00AM | 13 | into the FBI as a special agent. |
| 10:00AM | 14 | Q.  What sort of work did you do when you first graduated |
| 10:00AM | 15 | from law school? |
| 10:00AM | 16 | A.  I was a lawyer in Buffalo, New York. |
| 10:00AM | 17 | Q.  And you mentioned that eventually you applied for a |
| 10:00AM | 18 | position with the FBI? |
| 10:00AM | 19 | A.  I did. |
| 10:00AM | 20 | Q.  Okay.  Had this been a goal of yours for some time? |
| 10:00AM | 21 | A.  Yes, it was. |
| 10:00AM | 22 | Q.  When did you apply to become a FBI Special Agent |
| 10:01AM | 23 | approximately? |
| 10:01AM | 24 | A.  I started working as a special agent in June of 1986, so |
| 10:01AM | 25 | it probably would have been early 1985. |

10:01AM    1    Q.  Can you describe for the jury what sorts of training you

10:01AM    2    undergo to become a special agent with the FBI?

10:01AM    3    A.  Starting with -- you don't want the background process,

10:01AM    4    you just want the --

10:01AM    5    Q.  The training once you've made it through the background.

10:01AM    6    A.  All right.  So after you're accepted as an FBI Special

10:01AM    7    Agent, you're -- you go to the FBI Academy, which is in

10:01AM    8    Quantico, Virginia.  It's located on a Marine Corps base off

10:01AM    9    Interstate 95 approximately an hour south of Washington, D.C.

10:01AM   10    Q.  What sorts of training do you undergo at Quantico.

10:01AM   11    A.  All right.  I would say that the training is about three

10:01AM   12    parts, they're not three equal parts.  The biggest part would

10:01AM   13    be academics.  The second part would be physical fitness

10:01AM   14    training and defensive tactics, to include like tactics of

10:01AM   15    arrest.  And the last part would the firearms training.

10:02AM   16    Q.  And did you ultimately graduate from Quantico, Virginia?

10:02AM   17    A.  I did.

10:02AM   18    Q.  Okay.  While you're at this FBI Academy in Quantico, do

10:02AM   19    you receive training in how to conduct investigations?

10:02AM   20    A.  Yes, you do.  The academic portion, which is the largest

10:02AM   21    part of the FBI training, it's heavily weighted on the law,

10:02AM   22    legal procedure, substantive statutes like white collar

10:02AM   23    statutes.  And then you kind of get a block of training in

10:02AM   24    everything you might be exposed to, counterintelligence,

10:02AM   25    counterterrorism -- which I never worked, well, we all worked

10:02AM    1   counterterrorism after 9/11.  But, and then, you know, any

10:02AM    2   substance area of the law that you might come across in your

10:02AM    3   FBI career, you're introduced to that, and you receive a

10:02AM    4   block of training on that.

10:02AM    5   Q.  And then after you graduate from the FBI Academy at

10:02AM    6   Quantico, do you continue to undergo kind of on-the-job

10:02AM    7   training as a new agent?

10:02AM    8   A.  Well, you're assigned a training agent that's -- you have

10:03AM    9   a supervisor, obviously, but you're assigned a training agent

10:03AM   10   that kind of directs you on how to conduct investigations.

10:03AM   11   Q.  Where did you go first after you graduated from the

10:03AM   12   FBI --

10:03AM   13   A.  I was --

10:03AM   14   Q.  -- Academy?

10:03AM   15   A.  -- assigned to the FBI's Tampa division, but I was

10:03AM   16   physically located in the Orlando RA.  It's -- RA's for

10:03AM   17   resident agency.

10:03AM   18   Q.  What sorts of cases did you investigate as a special

10:03AM   19   agent in Orlando, Florida?

10:03AM   20   A.  Well, again, I was assigned to the Tampa division, but

10:03AM   21   this is kind of important, because the Orlando RA, so most of

10:03AM   22   the resources would be in Tampa, so the Orlando office would

10:03AM   23   be a much smaller office personnel-wise than the Tampa

10:03AM   24   office.  So at that time we only had ten criminal agents in

10:03AM   25   the Orlando office, and Orlando was obviously a large -- very

10:03AM  1   large metropolitan area.  So we kind of worked everything.

10:03AM  2   But primarily, initially I worked violent crimes, which would

10:03AM  3   be bank robberies, we had quite a few bank robberies down

10:04AM  4   there at the time, probably still do.  I worked a lot of

10:04AM  5   fugitives back then.  But really, anything that was a federal

10:04AM  6   violation that the FBI would investigate it, I would have

10:04AM  7   investigated at that time.

10:04AM  8       And then eventually I transitioned to working more white

10:04AM  9   collar crimes, which would have been bank fraud and -- and --

10:04AM  10  and general fraud type statutes, you know, people, like,

10:04AM  11  con-men, that kind of fraud.

10:04AM  12  Q.  How long were you in that Orlando office for?

10:04AM  13  A.  Four years.  From October of 1986 until October of 1990.

10:04AM  14  Q.  Where did you go next during your career?

10:04AM  15  A.  I was transferred to Washington, D.C.  And I spent the

10:04AM  16  next 17 years working in the Washington field office in

10:04AM  17  Washington, D.C.

10:04AM  18  Q.  During your 17 years in the Washington field office, did

10:04AM  19  you specialize in any type of investigation, or did you work

10:04AM  20  again all sorts of different cases?

10:04AM  21  A.  No, the Washington field office is the second largest FBI

10:04AM  22  office in the country.  New York is the largest.  So it's a

10:05AM  23  very specialized.

10:05AM  24      So, yes, I was -- I specialized in the Washington field

10:05AM  25  office.

| | | |
|---|---|---|
| 10:05AM | 1 | Q.  What sorts of cases did you specialize in in the -- |
| 10:05AM | 2 | A.  Well, when I -- |
| 10:05AM | 3 | Q.  -- Washington -- |
| 10:05AM | 4 | A.  -- when I -- |
| 10:05AM | 5 | Q.  -- field -- so just, Special Agent Herbst, when I'm |
| 10:05AM | 6 | asking you a question, if you could wait until I finish |
| 10:05AM | 7 | speaking and then answer, that way Ann can type everything |
| 10:05AM | 8 | down, okay? |
| 10:05AM | 9 | A.  Yep.  I'm sorry. |
| 10:05AM | 10 | Q.  That's okay.  Thank you.  So I'll ask the question again. |
| 10:05AM | 11 |     What sorts of cases did you specialize in in that |
| 10:05AM | 12 | Washington, D.C. field office? |
| 10:05AM | 13 | A.  Initially when I got there for a short period of time I |
| 10:05AM | 14 | was assigned to -- and they did this with a lot of new agents |
| 10:05AM | 15 | in the office so they can be familiar with the area -- I was |
| 10:05AM | 16 | assigned to an applicant squad.  So we did background |
| 10:05AM | 17 | investigations for Department of Justice employees. |
| 10:05AM | 18 |     Then I was asked to go over to work on an independent |
| 10:05AM | 19 | counsel investigation.  Back then, there was an independent |
| 10:05AM | 20 | counsel statute.  The Court actually would appoint an |
| 10:06AM | 21 | independent counsel, and he would hire his own staff.  So |
| 10:06AM | 22 | independent counsels were appointed when there was a |
| 10:06AM | 23 | possibility of a conflict with the Department of Justice, so |
| 10:06AM | 24 | they basically created a whole independent prosecutorial |
| 10:06AM | 25 | staff.  So I spent three years working -- probably about |

Case 1:19-cr-00227-LJV-MJR  Document 775  Filed 02/24/24  Page 8 of 78
USA v Bongiovanni - Herbst - Cooper/Direct - 2/20/24

8

10:06AM   1   three years working a major public corruption investigation.

10:06AM   2   Q.  After you finished your 17 years in the Washington, D.C.

10:06AM   3   office what was your next assignment?

10:06AM   4   A.  I was transferred back to Buffalo, New York, in late

10:06AM   5   2007, around Thanksgiving of 2007.

10:06AM   6   Q.  What brought you back to the Buffalo area?

10:06AM   7   A.  A family matter.

10:06AM   8   Q.  What was your first assignment in the Buffalo office?

10:06AM   9   A.  When I first got to Buffalo, I was assigned to the intel

10:06AM  10   squad for a very short period of time.  And then the ASAC

10:06AM  11   approached me, and I had a choice to work white collar or

10:07AM  12   violent crimes, and I chose to work violent crimes at that

10:07AM  13   time.

10:07AM  14   Q.  Are you familiar with the phrase Safe Streets Task Force?

10:07AM  15   A.  Yes, I was assigned to Squad 4 in the FBI office here in

10:07AM  16   Buffalo.  Post 9/11, smaller offices like Buffalo basically

10:07AM  17   had a white collar squad and a squad that did everything

10:07AM  18   else.  So I was assigned to Squad 4, which is everything

10:07AM  19   else.  But the largest component of Squad 4 was the FBI's

10:07AM  20   Safe Streets Task Force, which was an FBI initiative that

10:07AM  21   started probably in the early 1990s to combat violent street

10:07AM  22   gangs.

10:07AM  23   Q.  Was your work in Squad 4 solely limited to that violent

10:07AM  24   gang activity?

10:07AM  25   A.  No, it would have been -- this is an over -- this is an

| | | |
|---|---|---|
| 10:07AM | 1 | oversimplification, but we kind of worked everything other |
| 10:07AM | 2 | than white collar crimes. |
| 10:07AM | 3 | Q.  During the time that you were a member of Squad 4 in the |
| 10:07AM | 4 | FBI here in Buffalo, did you begin working on a project to |
| 10:08AM | 5 | attempt to solve cold case homicides? |
| 10:08AM | 6 | A.  Yes, I did.  I opened a case into organized crime that |
| 10:08AM | 7 | primarily focused on old unsolved LCN organized crime |
| 10:08AM | 8 | homicides in the City of Buffalo.  And I worked that in |
| 10:08AM | 9 | conjunction with the Buffalo Police Department Cold Case |
| 10:08AM | 10 | Squad. |
| 10:08AM | 11 | MR. COOPER:  Judge, may I just have one moment? |
| 10:08AM | 12 | THE COURT:  Sure. |
| 10:08AM | 13 | MR. COOPER:  Judge, may we approach with the parties |
| 10:08AM | 14 | briefly, just to get a clarification from the Court on a |
| 10:08AM | 15 | ruling? |
| 10:08AM | 16 | THE COURT:  Sure. |
| 10:08AM | 17 | MR. COOPER:  Thank you. |
| 10:08AM | 18 | (Sidebar discussion held on the record.) |
| 10:09AM | 19 | MR. COOPER:  I want to make sure that we abide by the |
| 10:09AM | 20 | Court's ruling on this IOC. |
| 10:09AM | 21 | THE COURT:  Yeah. |
| 10:09AM | 22 | MR. COOPER:  And I want to refresher from you. |
| 10:09AM | 23 | THE COURT:  Yeah. |
| 10:09AM | 24 | MR. COOPER:  LCN is fair game.  But to have him |
| 10:09AM | 25 | define what that term -- |

10:09AM 1        **THE COURT:**  Why don't you tell him that when you're

10:09AM 2    referring to IOC or Italian Organized Crime, ask him to use

10:09AM 3    that.  If he slips up, obviously, he's not -- there's nothing

10:09AM 4    we can do about it.

10:09AM 5        **MR. COOPER:**  Okay.

10:09AM 6        **THE COURT:**  The phrasing he's used to using, I'm sure

10:09AM 7    he's not going anything intentionally.

10:09AM 8        **MR. COOPER:**  Perfect.

10:09AM 9        **THE COURT:**  Why don't you tell him, you know, just so

10:09AM 10   you understand, we're using the term Italian Organized Crime,

10:09AM 11   IOC, to refer to that.

10:09AM 12       **MR. COOPER:**  Okay.

10:09AM 13       **THE COURT:**  And so would you please use that, too.

10:09AM 14   Something along those lines.

10:09AM 15       **MR. COOPER:**  Understood.

10:09AM 16       **THE COURT:**  Any problem with that?

10:09AM 17       **MR. SINGER:**  No, that's fine, Judge.

10:09AM 18       **MR. COOPER:**  Thanks.  I just want to make sure that

10:09AM 19   everybody --

10:09AM 20       **THE COURT:**  And -- and I knew exactly why you called

10:09AM 21   that time out --

10:09AM 22       **MR. COOPER:**  Yep.

10:09AM 23       **THE COURT:**  -- and I appreciate it.  But you haven't

10:09AM 24   done anything to not abide by it, and neither has the witness.

10:10AM 25       **MR. COOPER:**  Got it.  Thank you, Judge.

Case 1:19-cr-00227-LJV-MJR   Document 775   Filed 02/24/24   Page 11 of 78
USA v Bongiovanni - Herbst - Cooper/Direct - 2/20/24

11

10:10AM   1                  (End of sidebar discussion.)

10:10AM   2            **BY MR. COOPER:**

10:10AM   3   Q.  Special Agent Herbst, a moment ago you used the term

10:10AM   4   "LCN."  Would that be a term that's synonymous with Italian

10:10AM   5   Organized Crime?

10:10AM   6   A.  Yes, it is.

10:10AM   7   Q.  Okay.  And so what I'm going to ask you to do is during

10:10AM   8   the remainder of your testimony, if you're going to make

10:10AM   9   reference to that, just use the phrase Italian Organized

10:10AM  10   Crime; is that okay?

10:10AM  11   A.  That's fine.

10:10AM  12   Q.  Okay.  Thank you.

10:10AM  13        So you told us a moment ago that while you were with

10:10AM  14   Squad 4, you began working to attempt to solve cold case

10:10AM  15   homicides relating to Italian Organized Crime; is that

10:10AM  16   correct?

10:10AM  17   A.  That's correct.

10:10AM  18   Q.  As a part of that investigation, did you want to develop

10:10AM  19   an informant or a cooperator into Italian Organized Crime?

10:10AM  20   A.  Yes.  There's many different ways to investigate cases.

10:10AM  21   But in a case like that, you really ultimately are gonna need

10:10AM  22   an insider to -- or, multiple insiders to kind of direct you

10:11AM  23   and ultimately solve the case.

10:11AM  24   Q.  Okay.  Did you -- are there steps that you take to

10:11AM  25   attempt to identify a person who may be a valuable informant

10:11AM   1   in an investigation like that?

10:11AM   2   A.  Well, in this case, we were -- we went out and started

10:11AM   3   doing interviews.  But, you know, as you're doing interviews,

10:11AM   4   you're developing information.  And as you're developing

10:11AM   5   information, you get a -- a -- an indication of who might be

10:11AM   6   a person that was well placed to provide information of

10:11AM   7   value.

10:11AM   8       And I always had a -- because it was a cold case homicide

10:11AM   9   investigation, and some of these homicides went back quite a

10:11AM   10   long way, I always had, in my own mind, and there's different

10:11AM   11   ways to investigate cases, that I -- and because this is an

10:11AM   12   organization that has gone on historically for a very long

10:11AM   13   time, I always felt that there would be younger people that

10:11AM   14   were part of this organization that may be -- would have

10:12AM   15   information that would help me in my investigation.

10:12AM   16   Q.  Did you try focus in on a younger person, as you

10:12AM   17   described, who may have access to individuals in Italian

10:12AM   18   Organized Crime?

10:12AM   19   A.  I don't know that I focused on any one individual, but at

10:12AM   20   some point I became aware of Peter Gerace.

10:12AM   21   Q.  Okay.  Did Peter Gerace come up during the course of your

10:12AM   22   investigation?

10:12AM   23   A.  Well, I became aware that Mr. Gerace was involved in

10:12AM   24   narcotics trafficking, and I was aware of his familial

10:12AM   25   relationship to Italian Organized Crime.

Case 1:19-cr-00227-LJV-MJR   Document 775   Filed 02/24/24   Page 13 of 78
USA v Bongiovanni - Herbst - Cooper/Direct - 2/20/24

13

10:12AM   1   Q.  What was that familial relationship that you were aware

10:12AM   2   of?

10:12AM   3   A.  Mr. Gerace's grandfather was Joseph Todaro Jr., and he

10:12AM   4   was a longtime boss of the Italian Organized Crime family.

10:12AM   5       And the -- his uncle would have been the -- Joe

10:12AM   6   Todaro Jr. would have been the longtime underboss of the

10:12AM   7   Italian Organized Crime family.

10:13AM   8   Q.  I think a moment ago you said Joe Todaro Jr. was his

10:13AM   9   grandfather.  Would that be Joe Todaro Sr.?

10:13AM  10   A.  Joe Todaro Sr. was the grandfather.  Joe Todaro Jr. was

10:13AM  11   the underboss that would have been his uncle.

10:13AM  12   Q.  Understood.  In your mind -- in your mind, at that time,

10:13AM  13   did Peter Gerace constitute a person who may have had access

10:13AM  14   to Italian Organized Crime in a way that could further your

10:13AM  15   investigation?

10:13AM  16   A.  He did.

10:13AM  17   Q.  What did you do as a result of that?

10:13AM  18   A.  At some point, I became aware that Mr. Gerace was on

10:13AM  19   federal probation.  And I think that was actually in a --

10:13AM  20   conjunction with -- there was another person that actually

10:13AM  21   was a subject of my investigation that was on federal

10:13AM  22   probation at the time.

10:13AM  23       So, sometime back 15 years ago, whatever that was, I

10:13AM  24   contacted the probation officer and -- about the subject of

10:14AM  25   my LCN case -- or, Italian Organized Crime case.  And some --

10:14AM  1  during the course of those discussions, I became aware that

10:14AM  2  Mr. Gerace was also on federal probation.

10:14AM  3  Q.  So while pursuing another subject, you became aware that

10:14AM  4  Peter Gerace was on federal probation; is that --

10:14AM  5  A.  Yes.

10:14AM  6  Q.  -- what you're saying?

10:14AM  7  A.  Yes, that's correct.

10:14AM  8  Q.  And can you help the jury understand, what time frame are

10:14AM  9  we at?  What year was this going on?

10:14AM  10  A.  2009.

10:14AM  11  Q.  Okay.  Did there come a time when you spoke with somebody

10:14AM  12  who worked at federal probation regarding Peter Gerace?

10:14AM  13  A.  Yes.  I spoke to Peter Lepiane, who was his supervising

10:14AM  14  probation officer.  And I may have -- I probably did review

10:14AM  15  the file, but I certainly spoke to Peter.  And I just

10:14AM  16  remember that a lot of the information that Mr. Gerace had

10:14AM  17  provided to Mr. Lepiane was incorrect or inconsistent with

10:14AM  18  information that I had.

10:15AM  19  Q.  Can you tell the jury what you mean by that?  What

10:15AM  20  information was it that Lepiane had received from Gerace that

10:15AM  21  was inconsistent with your --

10:15AM  22  A.  Well, I --

10:15AM  23  Q.  -- investigation?

10:15AM  24  A.  -- remember specifically that Mr. Gerace had reported

10:15AM  25  that he was working at his mother's restaurant at the time.

10:15AM 1    And I knew that he in fact had -- was operating Pharaoh's

10:15AM 2    Gentlemen's Club in Cheektowaga.  I think he reported a

10:15AM 3    residential address, which may have been correct, but I also

10:15AM 4    knew that he had an apartment at Pharaoh's, so I knew he was

10:15AM 5    spending time there, too.

10:15AM 6        So I think the primary thing was there was -- probation

10:15AM 7    did not know of any connection between Mr. Gerace and

10:15AM 8    Pharaoh's.

10:15AM 9    Q.  Did you share the information that you had with Peter

10:15AM 10   Lepiane?

10:15AM 11   A.  I did.

10:15AM 12   Q.  As a result of that meeting where you shared information,

10:15AM 13   did you begin to work in concert with U.S. Probation?

10:16AM 14   A.  I did.

10:16AM 15   Q.  Did there come a time during your work with

10:16AM 16   U.S. Probation when you took a significant investigative step

10:16AM 17   along with them?

10:16AM 18   A.  Yes.  This is probably a couple months between my initial

10:16AM 19   consultation with Mr. Lepiane, and working with Mr. Lepiane

10:16AM 20   and his supervisors.  I remember having meetings at the

10:16AM 21   probation office.  They decided to do a search of Pharaoh's

10:16AM 22   based on information they had, and information that I had

10:16AM 23   provided.

10:16AM 24   Q.  Do you remember when that search occurred?

10:16AM 25   A.  I do remember that it was October 31st, because it was

10:16AM    1   Halloween.  And I do remember specifically that the probation

10:16AM    2   office, when we were deciding when to do the search, they

10:16AM    3   wanted to time it for Halloween because they thought there

10:16AM    4   might be -- a search was done early morning, but they were

10:16AM    5   thinking there might be a Halloween party that night, and it

10:17AM    6   might be more fruitful to do a search on that day.  So I

10:17AM    7   remember it was October 31st.  I remember it was a Saturday.

10:17AM    8       And now I recall that it was 2009.

10:17AM    9   Q.  Were you personally present for that search?

10:17AM   10   A.  I was.

10:17AM   11   Q.  Did you have a partner at the time?

10:17AM   12   A.  My primary partner was Detective Robert Cottrell.  Bob

10:17AM   13   was a detective at the Amherst, New York, Police Department.

10:17AM   14   And Bob was assigned as a task force officer to the FBI Safe

10:17AM   15   Streets Task Force.

10:17AM   16   Q.  Was Bob present with you on October 31st for the search

10:17AM   17   at Pharaoh's?

10:17AM   18   A.  He was.  Most of the personnel at the search were from

10:17AM   19   the probation officer.  I was there from the FBI.

10:17AM   20       Initially, Bob was sitting on Mr. Gerace's house, which

10:17AM   21   was out in Tonawanda.  So if, by chance, he was at the house

10:17AM   22   rather than at the -- Pharaoh's.  And, so, after we made

10:17AM   23   entry, Bob came from Tonawanda to Pharaoh's.

10:18AM   24   Q.  And just to explain the phrase that you used, when you

10:18AM   25   say "sitting on a house," can you just describe for the jury,

10:18AM   1   he's not physically sitting on top --

10:18AM   2   A.  No, he --

10:18AM   3   Q.  -- of the roof --

10:18AM   4   A.  -- he's doing --

10:18AM   5   Q.  -- right?

10:18AM   6   A.  -- a one-man covert surveillance just in the proximity of

10:18AM   7   Mr. Gerace's house just to see if he was there, rather than

10:18AM   8   where we were.

10:18AM   9   Q.  Okay.  And who was the primary agency leading that search

10:18AM  10   at Pharaoh's?

10:18AM  11   A.  Probation.

10:18AM  12   Q.  What was your purpose in participating in that search?

10:18AM  13   A.  Well, I had provided information to them that was

10:18AM  14   fruitful for them obtaining a warrant.  But my primary

10:18AM  15   purpose was I wanted an opportunity to speak to Mr. Gerace

10:18AM  16   and try to develop a rapport with him.

10:18AM  17   Q.  Can you describe for the jury how the search played out?

10:18AM  18   What happened when you got inside?

10:19AM  19   A.  I knew it took a long time to execute the search, because

10:19AM  20   they have a requirement where they have to physically see the

10:19AM  21   individual.

10:19AM  22       When we got inside, Mr. Gerace was in his office in

10:19AM  23   handcuffs.

10:19AM  24       I approached the supervisory probation officer, I think

10:19AM  25   his name was Brian Burns.  And I told Brian that I would --

10:19AM   1   somebody had to sit with Mr. Gerace during the course of the

10:19AM   2   search, so I told him that I would sit with Mr. Gerace so I

10:19AM   3   would have an opportunity to talk to him.

10:19AM   4       So I -- I sat with him.  And then if -- whenever Bob

10:19AM   5   showed up, Bob also came in.

10:19AM   6   Q.  Okay.  Just to clarify, you just said the name Brian

10:19AM   7   Burns as a supervisory probation officer.  That's not the

10:19AM   8   same Brian Burns that works for the FBI --

10:19AM   9   A.  No, I --

10:19AM   10   Q.  -- on this case --

10:19AM   11   A.  -- know that --

10:19AM   12   Q.  -- right?

10:19AM   13   A.  -- Brian Burns, but there -- I -- I -- I think I have the

10:19AM   14   name correct, I think there's two Brian Burns.

10:19AM   15   Q.  Okay.  But we're talking about different people --

10:19AM   16   A.  Yeah.

10:19AM   17   Q.  -- right?

10:19AM   18   A.  Yeah, we're talking about a supervisory at probation.

10:19AM   19   Q.  Okay.  On October 31st, 2009, while you're inside

10:20AM   20   Pharaoh's, the search is being conducted, what's your goal?

10:20AM   21   A.  Well, again, the -- I had the case into Italian Organized

10:20AM   22   Crime unsolved homicides, so my goal was to develop a

10:20AM   23   cooperator or cooperators into that investigation.  So my

10:20AM   24   goal at that time was to, you know, introduce myself to

10:20AM   25   Mr. Gerace, and to develop a relationship with him.

Case 1:19-cr-00227-LJV-MJR   Document 775   Filed 02/24/24   Page 19 of 78
USA v Bongiovanni - Herbst - Cooper/Direct - 2/20/24

19

10:20AM  1    Now, I didn't expect that Mr. Gerace was going to just

10:20AM  2  pour out everything he knew.  But, you know, there's a whole

10:20AM  3  process, and we've all gone through that in life in

10:20AM  4  developing a relationship, it's always basically just trying

10:20AM  5  to have a conversation with him and develop a rapport.

10:20AM  6  Q.  Did you have a conversation with him?

10:20AM  7  A.  Yeah, I did.

10:20AM  8  Q.  Describe for the jury how that conversation went.

10:20AM  9  A.  Well, again, when we got in there, he was in custody.

10:20AM  10  And he was a little down at first.  But he -- he picked up

10:20AM  11  pretty quick.  And we had a very pleasant conversation for

10:21AM  12  the duration of the search.

10:21AM  13  Q.  Did --

10:21AM  14  A.  It wasn't -- it wasn't substantive in any way.  But it

10:21AM  15  was just -- a lot of the conversation was based on, you know,

10:21AM  16  we were in Mr. Gerace's office, so there was documents on his

10:21AM  17  desk, and I would pick up a document, I would say -- ask him

10:21AM  18  questions about that.  You know.  But we had a very, you

10:21AM  19  know, pleasant conversation.

10:21AM  20  Q.  You said it was pleasant but not substantive.  What did

10:21AM  21  you mean when you said it was not substantive?

10:21AM  22  A.  Well, substantive in that I -- he -- he wasn't providing

10:21AM  23  information on a case.

10:21AM  24  Q.  Did Peter Gerace tell you during that conversation that

10:21AM  25  he knew about kilo-level cocaine traffickers?

10:21AM    1    A.  No.

10:21AM    2    Q.  Would that have stuck out in your memory if he would have

10:21AM    3    said that to you?

10:21AM    4    A.  I would have recalled that, yes.

10:21AM    5    Q.  After that pleasant but not substantive conversation with

10:21AM    6    Peter Gerace, can you describe for the grand jury what

10:22AM    7    happened, after the search is over, what's the next time you

10:22AM    8    hear about Peter Gerace?

10:22AM    9    A.  So that was a Saturday.  So, shortly after that, my

10:22AM   10    supervisor at the time was James Jancewicz.  So, Jim, or

10:22AM   11    Jimmy as we called him, Jim received a call from Dale

10:22AM   12    Kasprzyk from the DEA expressing that DEA had an interest,

10:22AM   13    and I'm paraphrasing, I wasn't -- I wasn't a party to Jim and

10:22AM   14    Dale's phone call, but Jim approached me after that phone

10:22AM   15    call, but the indication was that the DEA had an interest in

10:22AM   16    Mr. Gerace.

10:22AM   17    Q.  As a result of your conversation with your boss, Jim

10:22AM   18    Jancewicz, what, if anything, did you -- did you learn, or

10:23AM   19    what did you expect?

10:23AM   20    A.  Jim Jancewicz basically told me, and the one thing I do

10:23AM   21    recall from that conversation between me and Jim is that he

10:23AM   22    said that -- I guess this is a quote from Dale, but our guy,

10:23AM   23    meaning --

10:23AM   24            MR. SINGER:  Objection, hearsay.

10:23AM   25            THE COURT:  Hang on.

10:23AM    1          **MR. COOPER:**  Judge, I believe this is being offered

10:23AM    2    for the effect -- well, I know it's being offered for the

10:23AM    3    effect on the listener.

10:23AM    4          The question was as a result of the conversation that

10:23AM    5    you had, what did you expect in order to explain his actions.

10:23AM    6          **THE COURT:**  Hang on.  Yeah, overruled.

10:23AM    7          **BY MR. COOPER:**

10:23AM    8    Q.  You can answer the question?

10:23AM    9    A.  Can you ask the question again?

10:23AM   10    Q.  Absolutely.

10:23AM   11          As a result of the conversation that you had with your

10:23AM   12    boss, Jim Jancewicz, what did you expect to happen?

10:23AM   13    A.  Jim indicated that --

10:23AM   14          **THE COURT:**  No, no.  He said:  What did you expect to

10:24AM   15    happen?  Not what he said to you.

10:24AM   16          **THE WITNESS:**  Okay.

10:24AM   17          **THE COURT:**  But what did you expect to happen.

10:24AM   18          **THE WITNESS:**  Got it, Your Honor.

10:24AM   19          I expected to receive a call from -- from DEA.

10:24AM   20          **BY MR. COOPER:**

10:24AM   21    Q.  Okay.  Did you know who you were gonna receive a call

10:24AM   22    from at DEA?

10:24AM   23    A.  I probably did.

10:24AM   24    Q.  Do you have a recollection --

10:24AM   25    A.  Well, I --

10:24AM   1    Q. -- of that --

10:24AM   2    A. -- know now that it was Agent Bongiovanni, because he

10:24AM   3    called me. But Jim probably told me at the time that it was

10:24AM   4    Agent Bongiovanni that would be calling me.

10:24AM   5    Q. Okay.

10:24AM   6    A. That wasn't what it was said, but --

10:24AM   7    Q. Based on your experience as a special agent with the FBI,

10:24AM   8    was that common to have that kind of interagency

10:24AM   9    communication from agency to agency, putting different

10:24AM  10    agencies in touch with each other?

10:24AM  11    A. I wouldn't say it was uncommon.

10:24AM  12    Q. Okay. Did you ultimately receive a call from Special

10:24AM  13    Agent Bongiovanni?

10:24AM  14    A. I did.

10:24AM  15    Q. Before you received that phone call, was he a person that

10:24AM  16    you knew and had worked with before?

10:24AM  17    A. I did not know him well. I remember the first time I

10:25AM  18    ever saw him was he was at -- not the main FBI office, but I

10:25AM  19    was at an off site for the FBI Safe Streets Task Force, and

10:25AM  20    he was over there one day. I certainly had seen him maybe in

10:25AM  21    your office, maybe in and around the courthouse.

10:25AM  22    And we actually made an arrest together at one time on an

10:25AM  23    FBI case. And I believe that arrest, it was the

10:25AM  24    7th/10th Street initial gang roundup, so he would have been

10:25AM  25    part of my arrest team. And I think that was prior to our

Case 1:19-cr-00227-LJV-MJR   Document 775   Filed 02/24/24   Page 23 of 78
USA v Bongiovanni - Herbst - Cooper/Direct - 2/20/24

23

10:25AM  1  meeting.

10:25AM  2  Q.  So fair to say he wasn't a total stranger to you?

10:25AM  3  A.  He wasn't a total stranger, no, but we weren't -- we

10:25AM  4  still -- I didn't -- we didn't know each other well.

10:25AM  5  Q.  Okay.  Can you describe the phone call that you had with

10:25AM  6  Special Agent Bongiovanni?

10:25AM  7  A.  Very cordial phone call.  He called me, introduced

10:25AM  8  himself.  And basically indicated that he wanted to have a

10:26AM  9  meeting between me and him and Peter Gerace.

10:26AM 10  Q.  Did it surprise you that Bongiovanni wanted Peter Gerace

10:26AM 11  to be present for that meeting?

10:26AM 12  A.  I thought it was a little unusual that Mr. Gerace would

10:26AM 13  be there.

10:26AM 14  Q.  Was there any explanation offered as to why Special Agent

10:26AM 15  Bongiovanni was calling you on behalf of Peter Gerace?

10:26AM 16  A.  No.

10:26AM 17  Q.  Did you form a belief, based on your conversation with

10:26AM 18  Special Agent Bongiovanni, as to why he was calling you on

10:26AM 19  behalf of Peter Gerace?

10:26AM 20  A.  Yeah.  I --

10:26AM 21          **MR. SINGER:**  Objection, speculation.

10:26AM 22          **THE COURT:**  Yeah.

10:26AM 23          **MR. SINGER:**  Speculation, Judge.

10:26AM 24          **MR. COOPER:**  Judge, I'd like to approach to argue

10:26AM 25  that.

| | | |
|---|---|---|
| 10:26AM | 1 | **THE COURT:**  I want to think about it for a second. |
| 10:26AM | 2 | Okay, why don't you come up. |
| 10:26AM | 3 | (Sidebar discussion held on the record.) |
| 10:27AM | 4 | **THE COURT:**  So tell me what the problem -- so, he's |
| 10:27AM | 5 | asking him what he thought.  Why is that a problem? |
| 10:27AM | 6 | **MR. SINGER:**  So he's asking him, you know, based on |
| 10:27AM | 7 | this, what seems like a very short conversation, what he |
| 10:27AM | 8 | thought the purpose of -- |
| 10:27AM | 9 | **THE COURT:**  Yeah. |
| 10:27AM | 10 | **MR. SINGER:** -- the meeting was. |
| 10:27AM | 11 | **THE COURT:**  Yes. |
| 10:27AM | 12 | **MR. SINGER:**  But I don't think there's any foundation |
| 10:27AM | 13 | that's been laid right now to suggest that he has any facts to |
| 10:27AM | 14 | draw that type of conclusion. |
| 10:27AM | 15 | **THE COURT:**  Then why can't you cross-examine on that. |
| 10:27AM | 16 | **MR. SINGER:**  I mean, I can certainly cross-examine, |
| 10:27AM | 17 | but I think the other part of it, too, is that he's basing |
| 10:27AM | 18 | some of that on, you know, conversation that he had with his |
| 10:27AM | 19 | supervisor, you know, that -- it's a hearsay comment. |
| 10:27AM | 20 | **THE COURT:**  So what? |
| 10:27AM | 21 | **MR. SINGER:**  I think I see your point, Judge.  I |
| 10:27AM | 22 | mean, but I guess I'll renew my objection. |
| 10:27AM | 23 | **THE COURT:**  Okay.  That's fine. |
| 10:27AM | 24 | The objection is overruled. |
| 10:27AM | 25 | **MR. COOPER:**  Thank you, Judge. |

10:27AM    1          (End of sidebar discussion.)

10:27AM    2          **BY MR. COOPER:**

10:28AM    3    Q.   I'm going to ask you the question again, Special Agent

10:28AM    4    Herbst.  Did you form a belief, based on your conversation

10:28AM    5    with Special Agent Bongiovanni, as to why he was calling you

10:28AM    6    on behalf of Peter Gerace?

10:28AM    7    A.   I did.

10:28AM    8    Q.   What was that belief?

10:28AM    9    A.   That Mr. Gerace was an informant for the DEA.

10:28AM   10    Q.   During that phone call with Special Agent Bongiovanni,

10:28AM   11    did you discuss whether you were going to bring anyone with

10:28AM   12    you for that meeting with Peter Gerace?

10:28AM   13    A.   Well, there were a number of phone calls to set up a

10:28AM   14    meeting.  And I think the main stumbling block was Mr. Gerace

10:28AM   15    at the time was ill.  I think it was the swine flu that was

10:28AM   16    going around at that time, so he was ill.  So I wasn't in any

10:28AM   17    hurry to meet with Mr. Gerace.

10:29AM   18       But, so, there was -- it took a -- it took a -- it took

10:29AM   19    time to actually find a particular date.  But, I think the

10:29AM   20    answer to your question is, I had intended to bring my

10:29AM   21    partner with me, who would have been Detective Robert

10:29AM   22    Cottrell from the Amherst Police Department, but

10:29AM   23    Mr. Bongiovanni made it pretty clear that he did not want

10:29AM   24    anybody else at the meeting.

10:29AM   25    Q.   Okay.  So I'm going to ask you to listen carefully to the

10:29AM  1   question that I ask you, and just answer specifically what

10:29AM  2   I'm asking you, okay?

10:29AM  3       Did there come a point in your conversation with him, one

10:29AM  4   of your conversations with Bongiovanni, where he discussed

10:29AM  5   whether you were going to bring anyone with you to the

10:29AM  6   meeting?

10:29AM  7   A.  Yes.

10:29AM  8   Q.  Okay.  Did you intend to bring someone with you to the

10:29AM  9   meeting?

10:29AM  10  A.  Yes.

10:29AM  11  Q.  Who did you intend to bring with you to the meeting?

10:29AM  12  A.  Detective Robert Cottrell.

10:29AM  13  Q.  Okay.  Did Special Agent Bongiovanni respond when you

10:29AM  14  told him you wanted to bring Bob Cottrell to the meeting?

10:29AM  15  A.  Yes.

10:29AM  16  Q.  How did he respond?

10:29AM  17  A.  He did not want anybody else at the meeting.

10:29AM  18  Q.  Did that strike you as odd?

10:29AM  19  A.  Well, it kind of put me in a bad position, because this

10:30AM  20  is a guy that I work with every day, and so I had to kind of

10:30AM  21  find a way to close him out of this meeting.  So, it kind of

10:30AM  22  made me uncomfortable.

10:30AM  23  Q.  Did you ultimately agree to attend the meeting without

10:30AM  24  Special -- or, without your partner, Bob Cottrell?

10:30AM  25  A.  I did.

10:30AM   1   Q.  Is this all -- in terms of a time frame, is this all

10:30AM   2   occurring within several weeks after that search at

10:30AM   3   Pharaoh's?

10:30AM   4   A.  Yes.

10:30AM   5   Q.  Okay.  At some point, did you participate in a meeting

10:30AM   6   with someone from the U.S. Attorney's Office regarding Peter

10:30AM   7   Gerace?

10:30AM   8   A.  Yes.

10:30AM   9   Q.  Who did you meet with?

10:30AM   10  A.  Tony Bruce.

10:30AM   11  Q.  Okay.  And did you have any intention to build a case

10:30AM   12  into Gerace at that point when you met with Tony Bruce?

10:30AM   13  A.  Yes.  I had information that Mr. Gerace was involved in

10:30AM   14  narcotics trafficking, as we discussed earlier.  I wanted to

10:30AM   15  develop a case on Mr. Gerace so I would have leverage on him

10:31AM   16  so that he would cooperate in my bigger case.

10:31AM   17  Q.  Did you make Tony Bruce aware of your investigation into

10:31AM   18  Peter Gerace and the facts that you had learned?

10:31AM   19  A.  I did.

10:31AM   20  Q.  Did Tony Bruce from the U.S. Attorney's Office agree to

10:31AM   21  pursue a case against Peter Gerace for drugs?

10:31AM   22  A.  Yes, Tony Bruce indicated that he would prosecute that

10:31AM   23  case, meaning that he would prosecute Peter Gerace based on

10:31AM   24  the facts that I presented to him.

10:31AM   25  Q.  You described for us a few minutes ago the fact that you

10:31AM   1   set up a meeting with Bongiovanni and Peter Gerace, but that

10:31AM   2   that took some time.  Did that meeting ultimately occur?

10:31AM   3   A.  It did.

10:31AM   4   Q.  Where did the meeting occur?

10:31AM   5   A.  I initially went to the DEA office, which was located in

10:31AM   6   the Electric Tower.  And I went up to the main DEA office,

10:31AM   7   and met with Agent Bongiovanni.

10:32AM   8       And then the two of us went down to the mezzanine level.

10:32AM   9   So there's a lobby, and there's a level above that where you

10:32AM  10   can kind of oversee the activity in the lobby, so we went up

10:32AM  11   to that level.

10:32AM  12       And then ultimately Mr. Gerace came up there.  I think

10:32AM  13   there was a phone call between -- I don't know if Gerace

10:32AM  14   called Bongiovanni, or Bongiovanni called Gerace, but

10:32AM  15   ultimately there was, like, this is where we are, meet us

10:32AM  16   here.

10:32AM  17   Q.  Would -- is it fair to say that you had a portion of time

10:32AM  18   with Bongiovanni before Gerace arrived?

10:32AM  19   A.  Yeah, I did.  But it was a, you know, it was -- it

10:32AM  20   wasn't -- it wasn't a lot of time.  There was nothing

10:32AM  21   substantive really.

10:32AM  22   Q.  Okay.  Once Gerace arrived, did the three of you meet?

10:32AM  23   A.  We did.

10:32AM  24   Q.  Where did you meet?

10:32AM  25   A.  At the -- on the mezzanine level of the Electric Tower.

10:33AM  1   Q.  Describe that meeting.  What happened?

10:33AM  2   A.  There really was no substantive to the meeting at all.

10:33AM  3   And again, going back, I wasn't really sure why Mr. Gerace

10:33AM  4   was there, because I had already met him.  And it was a very

10:33AM  5   informal meeting, a very casual meeting.  It wasn't -- I'm

10:33AM  6   not sure what the word is, but it was kind of a -- three of

10:33AM  7   us getting together to talk.  But we didn't talk about

10:33AM  8   anything of substance.

10:33AM  9   Q.  Did Gerace provide you with information about ongoing

10:33AM  10  criminal activity?

10:33AM  11  A.  He did not.

10:33AM  12  Q.  Did he tell you, I know about kilo-level cocaine

10:33AM  13  traffickers?

10:33AM  14  A.  He did not.

10:33AM  15  Q.  What was the impression of that meeting that you had at

10:33AM  16  the time?

10:33AM  17  A.  I just thought it was a little odd because, again,

10:33AM  18  there's nothing substantive, you know, discussed at the

10:33AM  19  meeting, or nothing substantive came of that meeting.

10:34AM  20  Q.  Did there come a time where Gerace left, and you and

10:34AM  21  Bongiovanni remained together on that mezzanine level?

10:34AM  22  A.  Yes.

10:34AM  23  Q.  Did you have a further conversation with Bongiovanni at

10:34AM  24  that time?

10:34AM  25  A.  I did.

10:34AM   1   Q.  Can you tell the jury how that conversation went?

10:34AM   2   A.  I -- again, I certainly don't recall everything that

10:34AM   3   happened that long ago, but I do remember specifically that

10:34AM   4   we were -- we would have been talking about Mr. Gerace, and I

10:34AM   5   indicated that -- to Mr. Gerace -- or, I'm sorry, I indicated

10:34AM   6   to Agent Bongiovanni that Mr. Gerace had issues with

10:34AM   7   probation.  And he was kind of dismissive of that.

10:34AM   8       And then I further went on to say, well, I -- or, the

10:34AM   9   FBI, has a drug case on Mr. Gerace.  And he was kind of

10:34AM  10   dismissive of that initially, indicating that it wasn't a

10:34AM  11   very good drug case.

10:34AM  12       And -- do you want me to continue?  Or do you want to ask

10:35AM  13   a question.

10:35AM  14   Q.  So you mentioned that you told him you had a drug case

10:35AM  15   into Peter Gerace, and that Bongiovanni told you it wasn't a

10:35AM  16   very good drug case.  Did you bring up your conversation with

10:35AM  17   Tony Bruce?

10:35AM  18   A.  I did.  I told him at that time that Tony Bruce had

10:35AM  19   already committed to prosecution of Peter Gerace.

10:35AM  20   Q.  Did Bongiovanni react to that?

10:35AM  21   A.  Yeah.  He kind of changed completely.  And I think, as we

10:35AM  22   were discussing earlier, I think I told you it was kind of an

10:35AM  23   oh -- I said, oh, poop.  But I didn't tell you "oh, poop,"

10:35AM  24   but I said something else.

10:35AM  25       But it was that kind of a moment.  I could see that --

10:35AM   1   once I told him that Tony Bruce, who was a senior prosecutor

10:35AM   2   in the United States Attorney's Office, so he serves in the

10:35AM   3   same position that you and Mr. Tripi serve in, once I --

10:35AM   4      And Tony was a longtime organized crime prosecutor.  And

10:35AM   5   I believe he even started in the Strike Force, which was

10:35AM   6   started in Kennedy Administration.  Well, it started under

10:36AM   7   Bobby Kennedy, who was the attorney general.  But --

10:36AM   8      So at one time, I believe that Tony Bruce was

10:36AM   9   specifically focused on Organized Crime.  But he had a

10:36AM   10  reputation in the community as a federal prosecutor, and

10:36AM   11  particularly a federal prosecutor that was interested in

10:36AM   12  Organized Crime.

10:36AM   13  Q.  During that conversation you had with Bongiovanni after

10:36AM   14  Gerace has left, did Bongiovanni say anything to you about

10:36AM   15  how he knew Gerace?

10:36AM   16  A.  Yeah, he did.  He indicated -- well, I got the

10:36AM   17  impression, and I'm sure he indicated that they were longtime

10:36AM   18  family friends, and then he indicated that he was a good kid.

10:36AM   19  Q.  Did you leave that meeting believing that Gerace was

10:36AM   20  Bongiovanni's source?

10:36AM   21  A.  Yes.

10:36AM   22  Q.  Why?

10:36AM   23  A.  What else would he be?

10:36AM   24  Q.  Well, could he --

10:36AM   25  A.  He wasn't a subject of any investigation, and so you're

10:36AM   1   either a subject of an investigation or you're cooperating.

10:36AM   2   You're one or the other.  So, he might have never

10:37AM   3   specifically told me that he was his source.

10:37AM   4       But, again, I was a senior FBI agent.  He, assuming he

10:37AM   5   was a senior DEA agent, you know, we didn't -- he never had

10:37AM   6   to tell me he was his source.  I knew he was his source.

10:37AM   7   Q.  After that meeting, did you continue your investigation

10:37AM   8   into Peter Gerace?

10:37AM   9   A.  I'm sure a period of time passed, but just to be clear, I

10:37AM  10   never closed the investigation.  But in deference to DEA, I

10:37AM  11   didn't pursue that avenue of the investigation.

10:37AM  12   Q.  Okay.  So you said "in deference to DEA."  What was the

10:37AM  13   deference about?

10:37AM  14   A.  The DEA -- the DEA supervisor had called the FBI

10:37AM  15   supervisor, and then I met with Agent Bongiovanni, and they

10:37AM  16   were expressing an interest in this case.  So it's like, all

10:37AM  17   right, I can -- I can continue to make my case, I can go out

10:37AM  18   and find other people.  You know, they -- they have an

10:37AM  19   interest in Mr. Gerace that might be greater than the

10:38AM  20   interest that I had in him.

10:38AM  21   Q.  Did your meeting with Bongiovanni on that day deter you

10:38AM  22   from continuing to work into Peter Gerace and the drug case?

10:38AM  23   A.  Yeah.  I know I thought about it for a while, and I

10:38AM  24   stewed about it for a while, but I ultimately decided not to

10:38AM  25   pursue Mr. Gerace.

Case 1:19-cr-00227-LJV-MJR   Document 775   Filed 02/24/24   Page 33 of 78
USA v Bongiovanni - Herbst - Cooper/Direct - 2/20/24

33

10:38AM   1       MR. COOPER:  Okay.  I'd ask that we publish what's

10:38AM   2   already in evidence as Government Exhibit 30A.

10:38AM   3       BY MR. COOPER:

10:38AM   4   Q.  You should see on your screen in a moment here, Special

10:38AM   5   Agent Herbst, Government Exhibit 30A.  Are you drawing on it?

10:38AM   6   A.  No, I'm trying to blow it up.

10:38AM   7   Q.  Okay.

10:38AM   8   A.  You showed it to me before.

10:38AM   9   Q.  We can do that.  Hold on.  How do we erase that?

10:38AM  10       MR. COOPER:  Okay.  Thank you.

10:38AM  11       THE WITNESS:  I didn't mean to draw on it.

10:38AM  12       MR. COOPER:  That's okay.

10:38AM  13       BY MR. COOPER:

10:39AM  14   Q.  Special Agent Herbst, before today, did you ever see this

10:39AM  15   document?

10:39AM  16   A.  Before I testified today, you showed me this document in

10:39AM  17   the witness room.

10:39AM  18   Q.  Okay.  And before today, like, before you woke up this

10:39AM  19   morning, had you ever seen --

10:39AM  20   A.  No.

10:39AM  21   Q.  -- this before?

10:39AM  22   A.  I have not.

10:39AM  23   Q.  Okay.  Do you know what this document is generally?

10:39AM  24   A.  It's a -- it's called a DEA-6.  So it would be a -- in

10:39AM  25   the FBI, we call them FBI 302s.  So it's basically where they

Case 1:19-cr-00227-LJV-MJR   Document 775   Filed 02/24/24   Page 34 of 78
USA v Bongiovanni - Herbst - Cooper/Direct - 2/20/24

34

10:39AM    1    report the results of their investigation or interviews.

10:39AM    2            MR. COOPER:  And, Ms. Champoux, can we zoom in on box

10:39AM    3    number 5 at the top left?  Thank you.

10:39AM    4            BY MR. COOPER:

10:39AM    5    Q.  Can you see who this DEA-6 is drafted by?

10:39AM    6    A.  Yes, SA, meaning special agent, Joseph Bongiovanni.

10:39AM    7            MR. COOPER:  Okay.  And you can zoom out,

10:39AM    8    Ms. Champoux.  And can you move forward now to paragraph 4 on

10:39AM    9    page 2?

10:40AM   10            THE CLERK:  Let me check the monitors for the jury.

10:40AM   11            MR. COOPER:  Sure.

10:40AM   12            THE COURT:  And juror number 10, if you're having a

10:40AM   13    tough time seeing that monitor, you can move up to look.

10:40AM   14            MR. COOPER:  May I continue?

10:40AM   15            THE COURT:  You may.

10:40AM   16            MR. COOPER:  Thank you, Judge.

10:40AM   17            BY MR. COOPER:

10:40AM   18    Q.  Special Agent Herbst, we zoomed in on paragraph 4 of

10:40AM   19    Government Exhibit 30A.  Can you see that?

10:40AM   20    A.  I can.

10:40AM   21    Q.  Can you read the second sentence for the jury?

10:40AM   22    A.  Starting with Gerace?

10:41AM   23    Q.  Correct.

10:41AM   24    A.  Gerace stated that he would not offer additional

10:41AM   25    information until he received a good-faith commitment from

10:41AM 1   USPO, United States Probation Officer Lepiane, that he would

10:41AM 2   receive consideration on his violation in lieu of information

10:41AM 3   he is willing to provide.

10:41AM 4   Q.   Okay.  Now can we read the second sentence up at the top

10:41AM 5   here, starting Gerace stated that?

10:41AM 6   A.   Oh.  If I read the wrong sentence, an apologize.

10:41AM 7   Q.   That's okay.

10:41AM 8   A.   Gerace stated that he knew significant cocaine

10:41AM 9   traffickers capable of moving kilo quantities of cocaine out

10:41AM 10  of various distribution houses located in the North Buffalo

10:41AM 11  and South Buffalo areas.

10:41AM 12  Q.   During your meeting with Bongiovanni and Gerace, did

10:41AM 13  Gerace offer you information about significant cocaine

10:41AM 14  traffickers?

10:41AM 15  A.   No.

10:41AM 16  Q.   Did he talk to you about kilos of cocaine?

10:41AM 17  A.   No.

10:41AM 18       MR. COOPER:  You can take that down, Ms. Champoux.

10:42AM 19  Thank you.

10:42AM 20       BY MR. COOPER:

10:42AM 21  Q.   Was any of the information contained in that report ever

10:42AM 22  conveyed to you?

10:42AM 23  A.   No.

10:42AM 24  Q.   Did Special Agent Bongiovanni tell you during your phone

10:42AM 25  call, this guy knows about kilo coke dealers?

Case 1:19-cr-00227-LJV-MJR   Document 775   Filed 02/24/24   Page 36 of 78
USA v Bongiovanni - Herbst - Singer/Cross - 2/20/24

36

10:42AM   1   A.   No.

10:42AM   2   Q.   I just want to circle back for one moment about your

10:42AM   3   conversation with Bongiovanni on the mezzanine after Gerace

10:42AM   4   has left.  Did you provide Bongiovanni with some of the

10:42AM   5   specific details about your drug case into Gerace?

10:42AM   6   A.   I'm sure I did.

10:42AM   7           MR. COOPER:  Okay.  I have no further questions,

10:42AM   8   Judge.

10:42AM   9           THE COURT:  Cross?

10:42AM   10

10:42AM   11              CROSS-EXAMINATION BY MR. SINGER:

10:42AM   12   Q.   Good morning, Mr. Herbst.

10:42AM   13   A.   Good morning.

10:42AM   14   Q.   So how long have you been retired from the FBI?

10:43AM   15   A.   I retired in 2013, so ten years.  More than that.

10:43AM   16   Q.   Are you retired officially at this point, or do you still

10:43AM   17   work?

10:43AM   18   A.   I'm retired officially.

10:43AM   19   Q.   Okay.  I'm assuming the last time you took a look at any

10:43AM   20   of your files was in 2013 when you retired?

10:43AM   21   A.   Yes.

10:43AM   22   Q.   Okay.

10:43AM   23   A.   Unless it was shown to me, I -- I came back to Buffalo

10:43AM   24   this past September because I think that was a possible trial

10:43AM   25   date.  So at that time, I sat down with Agent Burns and

Case 1:19-cr-00227-LJV-MJR   Document 775   Filed 02/24/24   Page 37 of 78
USA v Bongiovanni - Herbst - Singer/Cross - 2/20/24

37

| | | |
|---|---|---|
| 10:43AM | 1 | reviewed my Jencks, so there were some documents in there. |
| 10:43AM | 2 | But other than that, I haven't seen my substantive files |
| 10:43AM | 3 | prior to the time I retired. |
| 10:43AM | 4 | Q.  Okay.  And you're aware of the fact that the FBI tried to |
| 10:43AM | 5 | perform a search to find files related to the 2009 |
| 10:43AM | 6 | interactions you had with U.S. Probation Officer Lepiane |
| 10:44AM | 7 | regarding Peter Gerace? |
| 10:44AM | 8 | A.  I'm not aware of that, no. |
| 10:44AM | 9 | Q.  And are you aware that FBI also performed a search to try |
| 10:44AM | 10 | to find files that you may have generated with regard to |
| 10:44AM | 11 | meeting with Joseph Bongiovanni and Peter Gerace in 2009? |
| 10:44AM | 12 | A.  I'm not aware of that. |
| 10:44AM | 13 | Q.  So you're not aware of any analyst looking for any type |
| 10:44AM | 14 | of paper you may have written on this? |
| 10:44AM | 15 | A.  I don't doubt that was done, but I'm not aware of it. |
| 10:44AM | 16 | Q.  Okay.  Do you recall writing any reports or FBI 302s on |
| 10:44AM | 17 | any of the meetings you had with either Lepiane -- |
| 10:44AM | 18 | A.  I wouldn't have written a 302, because 302 was |
| 10:44AM | 19 | testimonial. |
| 10:44AM | 20 | I did see in my Jencks material that I reviewed in |
| 10:44AM | 21 | September, I did see a memo that I authored about |
| 10:44AM | 22 | communications between me and Peter Lepiane. |
| 10:44AM | 23 | Q.  Correct.  So -- |
| 10:44AM | 24 | MR. SINGER:  Is it -- are the screens set to the |
| 10:44AM | 25 | jury, or are they just to the witness? |

10:44AM  1       THE CLERK:  There's no screen set.  Do you need --

10:45AM  2       MR. SINGER:  Yes, if we could just set it for the

10:45AM  3   witness at this point in time.

10:45AM  4       THE CLERK:  Okay.

10:45AM  5       MR. SINGER:  Ms. Champoux, will you mind bringing up

10:45AM  6   Government Exhibit 3502A, please.

10:45AM  7       BY MR. SINGER:

10:45AM  8   Q.  Do you see that document, Mr. Herbst?

10:45AM  9   A.  Can you blow it up for me, please?

10:45AM  10  Q.  So is this the document that you just referred to as one

10:45AM  11  of the things that you reviewed?

10:45AM  12  A.  Yeah, I haven't read the whole thing, but that appears to

10:45AM  13  be a document that I referred to.

10:45AM  14      MR. SINGER:  And you can take this down.

10:45AM  15      BY MR. SINGER:

10:45AM  16  Q.  So this would have been one of the pieces of paper you

10:45AM  17  generated regarding your meetings?

10:45AM  18  A.  Yes.

10:45AM  19  Q.  Okay.  So this isn't a FBI 302, this is a different type

10:45AM  20  of form the FBI uses?

10:45AM  21  A.  Yeah, I think it's an EC, so an FBI 302 would

10:45AM  22  generally -- it would be information that would become

10:45AM  23  testimonial, so this would be more administrative

10:46AM  24  information.

10:46AM  25  Q.  Okay.  And so if you can explain to the jury briefly,

10:46AM   1   what's the difference between an administrative entry versus

10:46AM   2   a testimonial entry?

10:46AM   3          **MR. COOPER:**  Judge, I object to the relevance of

10:46AM   4   this.

10:46AM   5          **THE COURT:**  Overruled.

10:46AM   6          **THE WITNESS:**  Test -- you know, going back to the

10:46AM   7   302, a testimonial would be information that you would

10:46AM   8   document that you would believe might have to be testified to.

10:46AM   9          So it's like when you interview a witness, if you go

10:46AM  10   to a bank robbery, and you interview the teller or the other

10:46AM  11   people in the bank, you know, you take notes on that, and then

10:46AM  12   you -- back in the day you dictated it, but after a while you

10:46AM  13   typed it, and those would be testimonial.

10:46AM  14          **BY MR. SINGER:**

10:46AM  15   Q.  Okay.  So that would be the 302?

10:46AM  16   A.  That would be the 302, yes.

10:46AM  17   Q.  And then the administrative notes, what are those?

10:46AM  18   A.  If you're going to document something administratively,

10:46AM  19   there's -- I was in the FBI for a long time, so it changed,

10:47AM  20   but you would document it -- towards the end, it would be

10:47AM  21   documented EC, which stood for electronic communication,

10:47AM  22   because everything became electronic.

10:47AM  23   Q.  Okay.  And, so, by documenting these things, it's a way

10:47AM  24   for you to help recall what happened during the various

10:47AM  25   meetings that you had going on?

10:47AM     1    A.  Yes.  Yes.

10:47AM     2    Q.  And it's something that you used to refresh your memory

10:47AM     3    on anything that's going on many years ago, correct?

10:47AM     4    A.  Sure.

10:47AM     5    Q.  So, I just showed you a copy of an electronic

10:47AM     6    communication entry, administrative entry that you made

10:47AM     7    regarding your meetings with Peter Lepiane back in August of

10:47AM     8    2009, correct?

10:47AM     9    A.  Yeah, I think it was -- I thought was September, but yes.

10:47AM    10    Q.  I can show it to you again.

10:47AM    11    A.  No, the date on the upper -- the date of the --

10:47AM    12    Q.  Sure, let me hand you a copy of --

10:47AM    13    A.  Okay.

10:47AM    14    Q.  -- 3502A.  And just take a look at that, see if it

10:47AM    15    refreshes your memory, and when you're ready, look up at me.

10:47AM    16    A.  Yeah, it's dated.

10:48AM    17    Q.  I just don't want you to read the information, because we

10:48AM    18    wouldn't be doing it properly.  But does that refresh your

10:48AM    19    recollection as to the conversations you had with

10:48AM    20    Mr. Lepiane?

10:48AM    21    A.  Yes.

10:48AM    22    Q.  Okay.  So let me take that away from you.

10:48AM    23        So, now that you've had a chance to take a look at that,

10:48AM    24    when do you recall that you made the entry regarding your

10:48AM    25    communication with Mr. Lepiane?

USA v Bongiovanni - Herbst - Singer/Cross - 2/20/24

41

10:48AM    1    A.  That communication was dated September 4th, 2009.

10:48AM    2    Q.  Correct.  And the communication that's documented in

10:48AM    3    there, does that occur in August of 2009?

10:48AM    4    A.  That, again, I didn't read it, but it probably -- it

10:48AM    5    would have been documenting information that obviously

10:48AM    6    occurred on that date or prior to that date.  Yes.

10:48AM    7    Q.  Now, and I know this is many, many, many years ago, so,

10:48AM    8    this is one way that we can help refresh your memory, okay?

10:48AM    9    A.  All right.

10:48AM   10    Q.  All right.  So you mentioned that when you got to the

10:48AM   11    Buffalo office, you were initially assigned to intelligence,

10:48AM   12    but then you moved to Squad 4; is that right?

10:48AM   13    A.  Yes.

10:48AM   14    Q.  And Squad 4, that was part of your -- I guess one of the

10:48AM   15    things that Squad 4 does was the Safe Streets Task Force; is

10:49AM   16    that right?

10:49AM   17    A.  Yes.

10:49AM   18    Q.  So Safe Streets Task Force, you mentioned it was

10:49AM   19    something that was related to gang or Organized Crime

10:49AM   20    prosecutions, investigations?

10:49AM   21    A.  Safe Streets Task Force would not be Organized Crime, it

10:49AM   22    would be specifically targeted towards gang.  Organized Crime

10:49AM   23    would have been a separate violation.

10:49AM   24        And again, we had -- primarily we had two squads.  We had

10:49AM   25    a white collar squad, and a squad that did everything else.

10:49AM    1   So we did Organized Crime as well as Safe Streets Task Force.

10:49AM    2   Q.  Okay.  So as far as the Organized Crime aspect, that's

10:49AM    3   the reason you would have inherited this file regarding the

10:49AM    4   old unsolved murders you talked about on direct?

10:49AM    5   A.  I didn't inherit it, I initiated it.

10:49AM    6   Q.  Okay.  So you initiated it?

10:49AM    7   A.  Yes.

10:49AM    8   Q.  All right.  So you initiated that, so it wasn't an

10:49AM    9   inherited filed.  You took proactive steps to open up new

10:49AM   10   investigation into these cold cases?

10:49AM   11   A.  That's correct.

10:49AM   12   Q.  Okay.  And I know we talked about the Safe Streets Task

10:49AM   13   Force that you were on, you had a partner that was assigned

10:50AM   14   to you, you mentioned Bob Cottrell?

10:50AM   15   A.  I did.

10:50AM   16   Q.  And he worked for the Amherst Police Department?

10:50AM   17   A.  He did.  But he was -- any task force officer on the FBI

10:50AM   18   is also deputized.  I'm not sure that's the correct word, but

10:50AM   19   they have -- they're deputized as federal agents.  So they

10:50AM   20   have the same powers that I would have as a FBI Special

10:50AM   21   Agent.  They actually more powers, because they have state

10:50AM   22   powers, state police powers.

10:50AM   23   Q.  Okay.  And he's somebody that helps assist you in your

10:50AM   24   investigations that you're running through the FBI on

10:50AM   25   Squad 4?

10:50AM   1   A.   Yes.

10:50AM   2   Q.   So, on the organized crime aspect of things, I realize

10:50AM   3   that was one thing in addition to the gang investigations you

10:50AM   4   talked about on direct.  But you also mentioned that you

10:50AM   5   investigated countless other crimes inside of the -- in

10:50AM   6   Squad 4?

10:50AM   7   A.   Yeah.  I -- Squad 4 did.  But I primarily did the

10:50AM   8   Organized Crime and the Safe Streets.  We had other agents

10:51AM   9   who did the bank robberies.  I don't remember any kidnappings

10:51AM  10   there, but, you know, if a kidnapping would come up, then

10:51AM  11   everybody would work it.

10:51AM  12   Q.   Understand.  So part of your days in Squad 4, given the

10:51AM  13   Safe Streets Task Force duties that you had, you'd

10:51AM  14   investigate drugs, correct?

10:51AM  15   A.   Yes.

10:51AM  16   Q.   So you conduct narcotics investigations into various

10:51AM  17   gangs that may have been operating within the city --

10:51AM  18   A.   Yes.

10:51AM  19   Q.   -- around the area?

10:51AM  20   A.   Yes.

10:51AM  21   Q.   And then you'd also investigate potentially crimes

10:51AM  22   involving guns, correct?

10:51AM  23   A.   Yes.

10:51AM  24   Q.   And, so -- so you talked about how you initiate this one

10:51AM  25   file into Organized Crime.  And I'm assuming that you opened

USA v Bongiovanni - Herbst - Singer/Cross - 2/20/24

44

10:51AM   1   it because you believed that Organized Crime may still exist

10:51AM   2   inside of Buffalo?

10:51AM   3   A.   Yes.

10:51AM   4   Q.   So you're familiar with, and you testified earlier on

10:51AM   5   direct about, some of the names.  So you were familiar with

10:51AM   6   Joseph Todaro Sr.?

10:51AM   7   A.   Yes.

10:51AM   8   Q.   And he was someone that you still believed was associated

10:52AM   9   with Italian Organized Crime?

10:52AM   10   A.   Yes.

10:52AM   11   Q.   And you mentioned another person, Joseph Todaro Jr.?

10:52AM   12   A.   Yes.

10:52AM   13   Q.   And he was someone who you still believed may be

10:52AM   14   associated with Italian Organized Crime?

10:52AM   15   A.   Yes.

10:52AM   16   Q.   And were you aware that he was connected to a business in

10:52AM   17   Buffalo?

10:52AM   18   A.   Yes.

10:52AM   19   Q.   And what business was that?

10:52AM   20   A.   LaNova Pizza.

10:52AM   21   Q.   Okay.  And, so, one of the things that piqued your

10:52AM   22   interest with regard to Peter Gerace was the fact that he was

10:52AM   23   relative to both Todaro Sr. and Todaro Jr.?

10:52AM   24   A.   Well, the -- yes.  I mean, initially, information I

10:52AM   25   developed was that he was involved in narcotics trafficking,

10:52AM   1   but I thought that he could help us in this investigation.

10:52AM   2       I just want to go back one second if I can, if that's all

10:52AM   3   right with you.

10:52AM   4       But just the -- we're talking about cold case homicides

10:52AM   5   that had occurred, you know, back -- I think the last one

10:52AM   6   occurred in the mid '80s, so that's kind of -- it's a cold

10:52AM   7   case, so it's not, you know, I'm on not talking about

10:53AM   8   Organized Crime in the 2009 time period, I'm talking about

10:53AM   9   Organized Crime back in the '80s.

10:53AM   10  Q.   Okay.  But your belief, as you testified on direct, is

10:53AM   11  that potentially if you could develop a source who may have

10:53AM   12  connections to some of the people who might have been

10:53AM   13  involved in something like a murder back then, that could

10:53AM   14  help you resurrect this cold case?

10:53AM   15  A.   Yes, that's correct.

10:53AM   16  Q.   Okay.  So, in 2009, Detective Cottrell, he's working with

10:53AM   17  you, and he raises information to your attention with regard

10:53AM   18  to Peter Gerace.  That's how you first found out about the

10:53AM   19  narcotics trafficking that was happening at Pharaoh's

10:53AM   20  Gentlemen's Club?

10:53AM   21  A.   Well, actually, I had a lot of different sources of

10:53AM   22  information.  But I think you're referring to a FBI 302 --

10:53AM   23  well, an FBI 302, but I -- the Amherst Police Department did

10:53AM   24  a car stop, and there were two individuals in that car stop

10:53AM   25  that provided information on Peter Gerace.  I think that's

10:54AM  1   what you're referring to.

10:54AM  2   Q.  Correct.

10:54AM  3   A.  I'm not sure that Detective Cottrell provided me that

10:54AM  4   information.  I think I knew -- I think I became aware of

10:54AM  5   that initially from the FBI agent that initially -- that

10:54AM  6   authored that FBI 302.

10:54AM  7       And I think another Amherst police officer might have

10:54AM  8   also been involved in that 302.

10:54AM  9   Q.  Okay.  So they brought information to your attention

10:54AM  10  about this traffic stop which led to information regarding

10:54AM  11  Peter Gerace?

10:54AM  12  A.  Yes.

10:54AM  13  Q.  Okay.  And that's what caused you to contact Officer

10:54AM  14  Lepiane at the probation office, correct?

10:54AM  15  A.  I don't think that's correct.  I think I was already in

10:54AM  16  contact with Peter Lepiane about somebody else that was a

10:54AM  17  longtime member of Italian Organized Crime that was also on

10:54AM  18  probation at that time.

10:54AM  19  Q.  Okay.  But when you started to look into things further

10:54AM  20  with regard to Peter Gerace, you learned that there was

10:55AM  21  potential distribution of cocaine occurring at Pharaoh's

10:55AM  22  Gentlemen's Club, correct?

10:55AM  23  A.  Yes.

10:55AM  24  Q.  And the confidential sources that you were getting

10:55AM  25  information from, they were talking about this to your fellow

10:55AM  1    task force officers?

10:55AM  2    A.  I don't know about fellow task force officers, but I -- I

10:55AM  3    remember there was multiple sources of information other than

10:55AM  4    the car stop you're talking about.  I do remember that there

10:55AM  5    was a, I think it's called an FD 71, but it was an FBI form

10:55AM  6    that documented complaint information.  So, as a regular part

10:55AM  7    of our duties, you know, if somebody walks into an FBI office

10:55AM  8    or somebody called into the FBI office, we would talk to them

10:55AM  9    and they would provide information.

10:55AM  10       But there was an FD 71, if that's the correct form, that

10:55AM  11   was very specific and very detailed, but I believe was

10:55AM  12   anonymous, into Mr. Gerace's narcotics activities.

10:56AM  13       But it was so detailed, that it had -- how can I say

10:56AM  14   it -- an indicia of credibility.

10:56AM  15   Q.  Okay.  And so you learned about there was cocaine

10:56AM  16   trafficking that could be traced back to Peter Gerace,

10:56AM  17   correct?

10:56AM  18   A.  Yes.

10:56AM  19   Q.  Okay.

10:56AM  20   A.  Narcotics traffic.  I'm not -- I'm not sure if it was

10:56AM  21   specific to cocaine.

10:56AM  22   Q.  Okay.  But it's narcotics trafficking, and that's one of

10:56AM  23   the crimes that you investigate in Squad 4?

10:56AM  24   A.  Yes.

10:56AM  25   Q.  Okay.  Did you learn about any type of prostitution

10:56AM   1   activities that may have been occurring at Pharaoh's

10:56AM   2   Gentlemen's Club as well?

10:56AM   3   A.  I did not.

10:56AM   4   Q.  Okay.  And the distribution of narcotics, that's a

10:56AM   5   federal offense?

10:56AM   6   A.  Yes.

10:56AM   7   Q.  So, you know who Peter Gerace is, I think we've

10:56AM   8   established that, correct?

10:56AM   9   A.  Yes, we did.

10:56AM  10   Q.  And you know that he's related in some way to the

10:56AM  11   Todaros, correct?

10:56AM  12   A.  That's correct.

10:56AM  13   Q.  And so one of the motivations for why you want to open up

10:56AM  14   a case on Peter Gerace is that you potentially could use him

10:57AM  15   after he's charged as a source, correct?

10:57AM  16   A.  Yes.  Well -- or, before he's charged.

10:57AM  17   Q.  Correct.  And you want to flip him, right?

10:57AM  18   A.  Sure.

10:57AM  19   Q.  And that potentially could open up this cold case

10:57AM  20   investigation that you want to get going?

10:57AM  21   A.  Yes.

10:57AM  22   Q.  So that's one of the reasons why you started to

10:57AM  23   coordinate with Officer Lepiane from the probation office

10:57AM  24   regarding surveillance at Pharaoh's?

10:57AM  25   A.  I don't recall any surveillance at Pharaoh's other than

10:57AM   1   the fact that, at the time, we had a Cheektowaga Police

10:57AM   2   Officer John Wanat was assigned to the Safe Streets Task

10:57AM   3   Force, and I did ask John on a number of occasions to go out

10:57AM   4   to Pharaoh's on, I think, Saturday morning to establish that

10:57AM   5   Mr. Gerace was actually residing there.  In other words, he

10:57AM   6   spent the night there.

10:57AM   7   Q.  Correct.

10:57AM   8   A.  And then he followed him to the bank and did different

10:57AM   9   things.  But when you say surveillance, it's -- I don't think

10:57AM   10  I ever told Lepiane to do a surveillance.

10:57AM   11  Q.  All right.  But you understood that the probation office

10:58AM   12  was doing their surveillance to establish that he had in some

10:58AM   13  way a connection to Pharaoh's Gentlemen's Club, right?

10:58AM   14  A.  It sounds like surveillance, like a physical

10:58AM   15  surveillance?  Like people following them?  I don't think

10:58AM   16  probation does that.  Maybe they do, I don't know.

10:58AM   17  Q.  I'm talking about people looking to see if Peter Gerace

10:58AM   18  was coming in or out of Pharaoh's Gentlemen's Club.

10:58AM   19  A.  Yeah, I don't know if probation did that or not.

10:58AM   20  Q.  Okay.  So you're not aware of those efforts?

10:58AM   21  A.  I'm not aware of that.

10:58AM   22  Q.  But you --

10:58AM   23  A.  If that happened, I might have been aware of it back

10:58AM   24  then, but I'm not aware of it now.

10:58AM   25  Q.  But you do recall at least talking to one of your task

10:58AM    1   force officers, or it was a Cheektowaga police officer, to

10:58AM    2   help establish this connection that Peter Gerace had to

10:58AM    3   Pharaoh's Gentlemen's Club?

10:58AM    4   A.   Yeah, I don't know if it was -- I don't know if it was in

10:58AM    5   conjunction with probation, but I do have an independent

10:58AM    6   recollection of asking John Wanat to go out there and to see

10:58AM    7   if Mr. Gerace had spent the night there.  And then to do any

10:58AM    8   follow-up surveillance.

10:59AM    9   Q.   Okay.  His whole purpose was to establish a way for

10:59AM   10   probation to conduct their search, correct?

10:59AM   11   A.   Yes.

10:59AM   12   Q.   And that would give you access to not just Pharaoh's

10:59AM   13   Gentlemen's Club, but also to a sit down with Peter Gerace,

10:59AM   14   correct?

10:59AM   15   A.   Yes.

10:59AM   16   Q.   And so that all culminates in the October 31st, 2009,

10:59AM   17   search that you participated in with the probation office,

10:59AM   18   correct?

10:59AM   19   A.   Yes.

10:59AM   20   Q.   All right.  So, you talked about the conversation you had

10:59AM   21   with Peter Gerace that morning, correct?

10:59AM   22   A.   I did.

10:59AM   23   Q.   And there wasn't much substance to that conversation,

10:59AM   24   right?

10:59AM   25   A.   There was not.

10:59AM  1   Q.  So he didn't say to you anything about, hey, I know about

10:59AM  2   all these murders that I want to talk to you about?

10:59AM  3   A.  No, and I didn't ask him specifically about that either.

10:59AM  4   Q.  Okay.  So you didn't ask him specific questions about

10:59AM  5   illegal activities?

10:59AM  6   A.  I don't think I did.  I think it was more of a building

10:59AM  7   rapport with him.  Having a conversation with him.

10:59AM  8       I think the only thing I recall specifically asking him

10:59AM  9   about is maybe documents that were on his desk, that type of

11:00AM  10  thing.

11:00AM  11  Q.  Okay.  But the main focus of what you were doing that

11:00AM  12  morning was not to investigate specific acts of crime, but

11:00AM  13  more so to build a rapport with Peter Gerace so that

11:00AM  14  potentially you could speak to him in the future about crimes

11:00AM  15  you wanted to solve?

11:00AM  16  A.  That's correct.

11:00AM  17  Q.  Okay.  So, two, three days later, you recall that you get

11:00AM  18  a call from your supervisory Special Agent Jim Jancewicz?

11:00AM  19  A.  It wasn't -- it wasn't a call.  He -- he got a call from

11:00AM  20  Dale Kasprzyk, the DEA supervisor.  Jim Jancewicz was my FBI

11:00AM  21  supervisor.  So after he got off the call, and actually,

11:00AM  22  where Jim and I sat in the office, I could kind of -- well, I

11:00AM  23  certainly knew Jim was on the phone, and I want to say I kind

11:00AM  24  of heard my name, so I wasn't surprised when he came to see

11:00AM  25  me afterwards.

11:00AM    1          THE COURT:  Mr. Singer, we've been at this for about

11:01AM    2    an hour and a half.  Is this a convenient time for a break?

11:01AM    3          MR. SINGER:  I don't want to hold anyone up from a

11:01AM    4    break, Judge, so I can stop.

11:01AM    5          THE COURT:  Okay.  Okay.  So let's take our morning

11:01AM    6    break.  Please remember my instructions about not talking to

11:01AM    7    anyone about this, including each other, not making up your

11:01AM    8    mind.  We'll see you back here in about ten minutes.

11:01AM    9          (Jury excused at 11:01 a.m..)

11:01AM   10          THE COURT:  Okay.  First of all, in the interest of

11:02AM   11    complete transparency, and this is gonna happen a number of

11:02AM   12    times during the course of this trial, I have known Mr. Herbst

11:02AM   13    for 50-some years.  We used to play softball together in

11:02AM   14    Canada.  He can probably tell you some stories about me that I

11:02AM   15    would rather you not hear.  But just, as I say, I haven't seen

11:02AM   16    him in probably 50 years, but I've known him for 58.

11:02AM   17          MR. COOPER:  Can Rob cross him about that, or no?

11:02AM   18          THE COURT:  Yeah.  So I just want people to know

11:02AM   19    that.  And as I say, I'm sure it's going happen a number of

11:02AM   20    times.  I did not realize that this was the same Herbst that I

11:02AM   21    knew from Canada, I knew his whole family, but one of the

11:02AM   22    Herbsts that I knew from Canada until last Friday, actually,

11:02AM   23    when Judge McCarthy told me that, because Judge McCarthy knows

11:02AM   24    him as well.  But I did not know that until then.  And I just

11:02AM   25    wanted to let you know.

| | | |
|---|---|---|
| 11:02AM | 1 | **MR. SINGER:**  That's fine, Judge.  There are two Brian |
| 11:02AM | 2 | Burns, there could be multiple Herbsts. |
| 11:03AM | 3 | **THE COURT:**  As I say, I'm sure -- I'm sure there are |
| 11:03AM | 4 | going to be several people who I know who are going to |
| 11:03AM | 5 | testify, and obviously it doesn't make any difference to me, |
| 11:03AM | 6 | but I just want to be completely transparent with everyone. |
| 11:03AM | 7 | **MR. COOPER:**  Thank you, Judge. |
| 11:03AM | 8 | **THE COURT:**  Okay.  Anything we need to put on the |
| 11:03AM | 9 | record? |
| 11:03AM | 10 | **MR. COOPER:**  Just that I'd asked the witness to be |
| 11:03AM | 11 | excused during the break in case he needs to use the restroom, |
| 11:03AM | 12 | and I'll tell him that we can't talk to him about the |
| 11:03AM | 13 | substance of his testimony on cross. |
| 11:03AM | 14 | **THE COURT:**  Great.  Anything else, Mr. Singer? |
| 11:03AM | 15 | **MR. SINGER:**  No. |
| 11:03AM | 16 | **THE COURT:**  Great.  Thanks, everybody. |
| 11:03AM | 17 | (Off the record.) |
| 11:03AM | 18 | (Back on the record.) |
| 11:14AM | 19 | (Jury not present.) |
| 11:14AM | 20 | **THE CLERK:**  All rise. |
| 11:14AM | 21 | **THE COURT:**  Please be seated. |
| 11:14AM | 22 | **THE CLERK:**  We are back on the record for the |
| 11:14AM | 23 | continuation of the jury trial in case number 19-cr-227, |
| 11:14AM | 24 | United States of America versus Joseph Bongiovanni. |
| 11:14AM | 25 | All counsel and parties are present. |

11:14AM    1        **THE COURT:**  Okay.  Anything we need to put on the

11:14AM    2    record before we continue?

11:14AM    3        **MR. COOPER:**  Nothing from the government, Judge.

11:14AM    4        **MR. SINGER:**  No, Your Honor.

11:14AM    5        **THE COURT:**  Okay.  Let's bring them back, please,

11:14AM    6    Pat.

11:16AM    7        (Jury seated at 11:16 a.m.)

11:16AM    8        **THE COURT:**  The record will reflect that all our

11:16AM    9    jurors, again, are present.

11:16AM   10        I mind the witness that he's still under oath.

11:16AM   11        And you may continue, Mr. Singer.

11:16AM   12        **MR. SINGER:**  Thank you.

11:16AM   13        **BY MR. SINGER:**

11:16AM   14    Q.  All right.  So let's get back to it.

11:16AM   15        So we left off before the break, we were talking about

11:16AM   16    how your supervisor, Special Agent Jancewicz, had not called

11:16AM   17    you, but at least yelled over to you, hey, you know, come on

11:16AM   18    over and speak to me, Herbst, I got some call from the DEA;

11:17AM   19    is that right?

11:17AM   20    A.  Yeah, he actually -- he approached me.  He came up to --

11:17AM   21    towards where I sat, and we had a face-to-face conversation.

11:17AM   22    Q.  Okay.  And Jimmy, as you called him, said, you know, DEA,

11:17AM   23    I may have some interest in Peter Gerace, so I'd like you to

11:17AM   24    coordinate a meeting with him, someone's gonna reach out to

11:17AM   25    you?

11:17AM  1   A.  Yeah, again, I don't remember exactly obviously what he

11:17AM  2   said.  But he did indicate that I would be getting a call,

11:17AM  3   and I don't know if he said it would be Agent Bongiovanni,

11:17AM  4   but I would be getting a call from the DEA.

11:17AM  5   Q.  And then eventually you do get a call from Agent

11:17AM  6   Bongiovanni, correct?

11:17AM  7   A.  I do, yes.

11:17AM  8   Q.  And he talked to you about getting this meeting

11:17AM  9   coordinated, correct?

11:17AM  10   A.  That's correct.

11:17AM  11   Q.  And you testified earlier that the meeting took a little

11:17AM  12   bit of time to coordinate because Peter Gerace at that time

11:17AM  13   had the flu or some type of illness?

11:17AM  14   A.  That's correct.

11:17AM  15   Q.  Okay.  So it didn't happen right off the bat, it took

11:18AM  16   some period of time to get the meeting established?

11:18AM  17   A.  It did.

11:18AM  18   Q.  And during that coordination call that you had with

11:18AM  19   Mr. Bongiovanni, I think you testified that he had indicated

11:18AM  20   to you to not bring your partner, Detective Cottrell, to the

11:18AM  21   meeting?

11:18AM  22   A.  I don't know if it was during that initial call, but

11:18AM  23   there was, you know, several calls between Agent Bongiovanni

11:18AM  24   and myself trying to, you know, I think there were a lot of

11:18AM  25   starts and stops, you know, like, we might have scheduled a

11:18AM  1   meeting and then maybe Mr. Gerace couldn't make the meeting

11:18AM  2   or whatever.  So it was during, you know, one conversation, I

11:18AM  3   don't know if it was during that initial call or not.

11:18AM  4   Q.  Did he indicate to you that it was Gerace's preference to

11:18AM  5   just meet with someone one on one?

11:18AM  6   A.  You know, I was only communicating obviously with Agent

11:18AM  7   Bongiovanni, so I couldn't answer that question.

11:18AM  8   Q.  Okay.  So you don't know the answer to that?

11:18AM  9   A.  I don't know that.

11:18AM  10  Q.  So, eventually you get this meeting scheduled.  Do you

11:18AM  11  remember it being scheduled for November 23rd, 2009?

11:19AM  12  A.  I don't recall the date.  But I -- I don't -- if that's

11:19AM  13  the date, that's the date.

11:19AM  14  Q.  Okay.  So you had this meeting over in the DEA

11:19AM  15  headquarters building, which is the Electric Tower at the

11:19AM  16  time?

11:19AM  17  A.  Yes.

11:19AM  18  Q.  And you first meet with Special Agent Bongiovanni in the,

11:19AM  19  I guess, the entrance of the building?

11:19AM  20  A.  Yeah, I went up to -- I don't recall what floor they were

11:19AM  21  on.  I had been to the DEA before once or twice, but -- so

11:19AM  22  whatever floor they were on, I went up there.  And I don't

11:19AM  23  even recall, there's probably some protocol to get in there.

11:19AM  24  But in any event, Agent Bongiovanni came and met me.

11:19AM  25  Q.  Okay.  And Peter Gerace wasn't there at the beginning

11:19AM   1   when you met Special Agent Bongiovanni in the building,

11:19AM   2   correct?

11:19AM   3   A.   He was not.

11:19AM   4   Q.   He was coming a little bit later?

11:19AM   5   A.   Yes.

11:19AM   6   Q.   So I think you said that Bongiovanni took you on a tour

11:19AM   7   or something like that of the building?

11:19AM   8   A.   He had offered to give me a tour of the DEA office, but I

11:19AM   9   had already been there.  And I do recall having a

11:20AM   10  conversation with him about had I been to this building, it

11:20AM   11  was kind of a cool building, so we had a conversation like

11:20AM   12  that.

11:20AM   13  Q.   Okay.  And then eventually --

11:20AM   14  A.   We went down in the mezzanine level.

11:20AM   15  Q.   Right.  And then eventually someone receives a call from

11:20AM   16  Peter Gerace; is that right?

11:20AM   17  A.   Yes.

11:20AM   18  Q.   And then Gerace, I presume, assumingly, communicates the

11:20AM   19  fact that he's coming, correct?

11:20AM   20  A.   Yeah.  I think it was more like I'm here, where are you,

11:20AM   21  that kind of thing.

11:20AM   22  Q.   Okay.  So eventually, you, Mr. Bongiovanni, and Peter

11:20AM   23  Gerace sit --

11:20AM   24  A.   Yes.

11:20AM   25  Q.   -- down --

11:20AM   1   A.   Yes.

11:20AM   2   Q.   -- to talk?

11:20AM   3   A.   Yes.

11:20AM   4   Q.   And the conversation that you had, I know you didn't take

11:20AM   5   notes of it, but approximately how long did it last?

11:20AM   6   A.   Less than a half hour.

11:20AM   7   Q.   Okay.  And fair to say that it's somewhat similar to the

11:20AM   8   conversation that you had with him in Pharaoh's a couple

11:20AM   9   weeks before?

11:20AM   10   A.   It wasn't a substantive conversation, so if that's what

11:21AM   11   you're looking for.

11:21AM   12   Q.   Yeah, I guess, there wasn't substance that came out of

11:21AM   13   the conversation, correct?

11:21AM   14   A.   That's correct.

11:21AM   15   Q.   And you had an opportunity to take a look at the DEA-6

11:21AM   16   that Agent Bongiovanni wrote about this meeting, right?

11:21AM   17   A.   I did.

11:21AM   18   Q.   And you saw that one paragraph, in paragraph 4, where it

11:21AM   19   talked about how Mr. Gerace wanted some type of assurance

11:21AM   20   about what would happen to him on his probation violation

11:21AM   21   before he would be willing to give information?

11:21AM   22   A.   I did see that.

11:21AM   23   Q.   Did you offer him any type of assurance about what would

11:21AM   24   happen with his probation violation at that meeting?

11:21AM   25   A.   Did I offer Mr. Gerace?

11:21AM  1  Q.  Correct.

11:21AM  2  A.  No, I wouldn't have any authority to offer that.

11:21AM  3  Q.  Okay.  So you didn't tell him, hey, Mr. Gerace, you know,

11:21AM  4  we're gonna do whatever we can to help you out on this

11:21AM  5  probation violation?

11:21AM  6  A.  First of all, I don't recall that ever coming up.  But as

11:21AM  7  an FBI agent, I wouldn't have any authority to tell probation

11:21AM  8  department what to do with their violation.

11:21AM  9  Q.  Okay.  So you didn't offer him any type of assurance --

11:21AM  10  A.  I --

11:21AM  11  Q.  -- on his --

11:21AM  12  A.  -- did --

11:21AM  13  Q.  -- probation?

11:21AM  14  A.  -- not.

11:22AM  15  Q.  Sorry?

11:22AM  16  A.  No.

11:22AM  17  Q.  Okay.  And, you know, I think at the end of the meeting,

11:22AM  18  you had concluded that you didn't believe that he had

11:22AM  19  information that was useful for you?

11:22AM  20  A.  There was -- there was no information of substance

11:22AM  21  discussed at the meeting.

11:22AM  22  Q.  Okay.  So none of the information that he talked about in

11:22AM  23  that meeting was useful for you, correct?

11:22AM  24  A.  I guess that's correct.

11:22AM  25  Q.  Okay.  And you'd been doing this a long time at that

11:22AM   1   point, right?

11:22AM   2   A.   I had.

11:22AM   3   Q.   Probably 20 years plus?

11:22AM   4   A.   Yes.

11:22AM   5   Q.   And how long was your FBI career again?

11:22AM   6   A.   I retired in my 28th year.

11:22AM   7   Q.   Okay.  So I'm sure you'd been to meetings where someone

11:22AM   8   says, hey, I want to cooperate.  And then when it comes down

11:22AM   9   to it, they don't really provide anything to you?

11:22AM   10   A.   That's true.

11:22AM   11   Q.   And after this meeting that you had, you made a call to

11:23AM   12   Officer Lepiane about what happened, correct?

11:23AM   13   A.   I'm sure during that time period, I was communicating

11:23AM   14   just like I had been communicating with Agent Bongiovanni

11:23AM   15   about coordinating the meeting, I'm sure I was talking to

11:23AM   16   Peter Lepiane about what was going on, too.

11:23AM   17   Q.   If Mr. Lepiane took some notes about a telephone call you

11:23AM   18   had with him, would that help refresh your memory as to what

11:23AM   19   conversations you may have had with him after the meeting?

11:23AM   20   A.   Would Mr. Lepiane's notes refresh my recollection?

11:23AM   21   Q.   Yes.

11:23AM   22   A.   No, I don't think so.  I'd be happy to look at them,

11:23AM   23   but --

11:23AM   24   Q.   Let's give it a shot.

11:23AM   25          **MR. COOPER:**  Well --

11:23AM  1          THE COURT:  Yes?

11:23AM  2          MR. COOPER:  -- Judge, the answer the witness said

11:23AM  3  was, no, I don't think they would refresh my recollection.

11:23AM  4          THE COURT:  But he doesn't know, Mr. Cooper, so he

11:23AM  5  can look at them.

11:23AM  6          MR. COOPER:  Okay.

11:23AM  7          BY MR. SINGER:

11:23AM  8  Q.  So I'm going to hand you a copy of something that's

11:24AM  9  marked as 3501B?

11:24AM 10  A.  Can you do me a favor?  Can you put it up and blow it up

11:24AM 11  so I can see it easier?

11:24AM 12          MR. SINGER:  Ms. Champoux, can you put 3501B onto the

11:24AM 13  witness's screen.

11:24AM 14          THE COURT:  Just for the witness, please.

11:24AM 15          MR. SINGER:  And it's going to be on the last page of

11:24AM 16  the exhibit, page 6 of 7.  And it if you can blow up the entry

11:24AM 17  on 11/23.  Actually, the one on top.  I'm sorry.

11:24AM 18          BY MR. SINGER:

11:24AM 19  Q.  So Mr. Herbst, can you please take a look at that.  Don't

11:24AM 20  repeat anything on the page, but when you're done, look at

11:24AM 21  me.

11:25AM 22  A.  Okay.

11:25AM 23  Q.  Are you all set?

11:25AM 24  A.  I am.

11:25AM 25          MR. SINGER:  Okay.  Ms. Champoux, can you put that

11:25AM   1   down, please?

11:25AM   2           BY MR. SINGER:

11:25AM   3   Q.  Did that help refresh your memory about the call you had

11:25AM   4   with Mr. Lepiane, sir?

11:25AM   5   A.  To me, the substance of that paragraph appears to be a

11:25AM   6   meeting between Peter Gerace and Mr. Lepiane and it's

11:25AM   7   discussing terms of his supervision.  There was a reference

11:25AM   8   to a call that I made to him, but the substance of the

11:25AM   9   paragraph doesn't seem to relate to my business at all.

11:25AM  10   Q.  So I guess what I'm getting at is did that help refresh

11:26AM  11   your memory, I know it was only two or three sentences, about

11:26AM  12   the call that you had with him, but did --

11:26AM  13   A.  I don't -- I don't -- I don't --

11:26AM  14   Q.  -- that refresh your memory --

11:26AM  15   A.  -- I don't doubt that I had a call based on that.

11:26AM  16   Q.  Okay.

11:26AM  17   A.  But the paragraph I just read doesn't seem to -- it

11:26AM  18   seemed to be --

11:26AM  19           THE COURT:  But here's the question.  Does that

11:26AM  20   refresh your memory about the telephone call?

11:26AM  21           THE WITNESS:  No.

11:26AM  22           BY MR. SINGER:

11:26AM  23   Q.  Okay.  So, you walk away with this -- from this meeting

11:26AM  24   with Gerace and Bongiovanni with the impression, I think you

11:26AM  25   said the assumption, that DEA was interested in using Peter

11:26AM   1   Gerace as a confidential informant, correct?

11:26AM   2   A.   Yes.

11:26AM   3   Q.   But Agent Bongiovanni never communicated that to you

11:26AM   4   directly, correct?

11:26AM   5   A.   He did not.  He never used the word.  He never -- he

11:26AM   6   never told me directly that Mr. Gerace was a source for him

11:26AM   7   or DEA, that's correct.

11:26AM   8   Q.   And as far as, I guess, your meeting, you talked earlier

11:26AM   9   about meeting with AUSA Anthony Bruce?

11:27AM  10   A.   Yes.

11:27AM  11   Q.   And you talked about he was somebody who had dealings in

11:27AM  12   the past with prosecutions of Italian Organized Crime

11:27AM  13   figures?

11:27AM  14   A.   Yes.

11:27AM  15   Q.   And one of the reasons why you'd met with him in this

11:27AM  16   case is that, you know, if you're gonna meet with a

11:27AM  17   prosecutor in the office, he was the guy who would have

11:27AM  18   potential interest in this case, right?

11:27AM  19   A.   No, that's not correct.  Actually my meeting with Tony

11:27AM  20   Bruce was in the context of the followup of the search that

11:27AM  21   probation did.

11:27AM  22        So probation and myself, maybe Detective Cottrell, post

11:27AM  23   the Pharaoh's search, we met with Tony Bruce.  And I think

11:27AM  24   that was probation protocol that following, just like if I

11:27AM  25   did a search, I would go to a magistrate and do the return.

USA v Bongiovanni - Herbst - Singer/Cross - 2/20/24

64

11:27AM  1   I think that's their protocol, they go to the U.S. Attorney's

11:27AM  2   Office.  I've been on a few probation searches, and that's

11:27AM  3   what happened is after that we would meet with them.

11:27AM  4       So, it was in that context that we were meeting with AUSA

11:28AM  5   Bruce.  And he just -- it just happened to be that, you know,

11:28AM  6   he was an experienced prosecutor, number 1, and an

11:28AM  7   experienced Organized Crime prosecutor, but it's not like I

11:28AM  8   sought him out.

11:28AM  9   Q.  Okay.

11:28AM  10  A.  I wish I had, but I didn't.

11:28AM  11  Q.  Okay.  But you mentioned this case regarding Gerace that

11:28AM  12  you believe you had, correct?

11:28AM  13  A.  Can you ask -- say the question again?

11:28AM  14  Q.  Certainly.  So you mentioned to AUSA Bruce the

11:28AM  15  investigation into Peter Gerace?

11:28AM  16  A.  Yes.

11:28AM  17  Q.  And you mentioned to him about the fact that you had two

11:28AM  18  confidential informants at that time that were talking about

11:28AM  19  the dealing of narcotics in Pharaoh's Gentlemen's Club?

11:28AM  20  A.  I don't remember the specific conversation I had with

11:28AM  21  AUSA Bruce, but I would have -- I think it was more in the

11:28AM  22  context of the car stop that the Amherst Police Department

11:28AM  23  had made.  I believe that was the substance of it.

11:28AM  24      And it was based on that, that Tony Bruce made a

11:28AM  25  representation that he would prosecute based on that.

11:29AM   1   Q.   Okay.  Well, I'm assuming that AUSA Bruce wouldn't choose

11:29AM   2   to prosecute a case against Peter Gerace just based on

11:29AM   3   something that someone did in Amherst, right?

11:29AM   4          MR. COOPER:  Objection, Judge.  Calls for speculation

11:29AM   5   as to what AUSA Bruce would do.

11:29AM   6          THE COURT:  Yeah, sustained.

11:29AM   7          You can ask on this topic, but rephrase the question,

11:29AM   8   please.

11:29AM   9          BY MR. SINGER:

11:29AM   10   Q.   So when you sat down with AUSA Bruce, Mr. Herbst, you

11:29AM   11   talked some facts about the investigation into Peter Gerace,

11:29AM   12   correct?

11:29AM   13   A.   Yes.

11:29AM   14   Q.   And you mentioned the fact that there were narcotics

11:29AM   15   involved in your investigation that tied back to Peter

11:29AM   16   Gerace, correct?

11:29AM   17   A.   Yes.

11:29AM   18   Q.   And you also talked about how Peter Gerace potentially

11:29AM   19   was distributing these narcotics, correct?

11:29AM   20   A.   I'm not sure about that.  But I don't remember the

11:29AM   21   details, I just remember talking to him that we had

11:29AM   22   information that Mr. Gerace was involved in narcotics

11:29AM   23   trafficking, probably specifically talked about the Amherst

11:29AM   24   car stop.

11:29AM   25          And then it was at that point that Mr. Gerace indicated

11:29AM    1    that he would prosecute that case.

11:30AM    2    Q.   And when Mr. Gerace -- you're referring to Mr. Bruce.

11:30AM    3    Mr. Bruce indicated to you that he was --

11:30AM    4    A.   Yes.

11:30AM    5    Q.   -- eventually going to prosecute that case?

11:30AM    6    A.   Yes.

11:30AM    7    Q.   Okay.  So, you walk away from the meeting on the 23rd of

11:30AM    8    November with the impression that DEA wanted to use Peter

11:30AM    9    Gerace as an informant, correct?

11:30AM   10    A.   That meeting with Agent Bongiovanni.

11:30AM   11    Q.   Correct.

11:30AM   12    A.   Yes.

11:30AM   13    Q.   And so since it was your impression that they were going

11:30AM   14    take over the case that you were starting to build against

11:30AM   15    him, you didn't transfer your files to the DEA, did you?

11:30AM   16    A.   Well, they weren't building a case on Mr. Gerace.  They

11:30AM   17    were building a case -- they were using Mr. Gerace to build

11:30AM   18    another case.  My case was on Mr. Gerace.

11:30AM   19    Q.   Okay.  So when did you follow up with DEA after this

11:30AM   20    meeting about the progress of the cooperation?

11:30AM   21    A.   I don't recall.

11:30AM   22    Q.   You don't recall making a call to the DEA, or you didn't

11:30AM   23    make a call to the DEA?

11:30AM   24    A.   I'm sure there was calls between Agent Bongiovanni and

11:31AM   25    myself post our initial meeting.  But at some point, I

11:31AM    1   decided not to pursue the Gerace angle, and again, my larger

11:31AM    2   case was into these uninvolved homicides.  And, so,

11:31AM    3   Mr. Gerace was just one avenue that I was pursuing.  And so

11:31AM    4   believing that he had a more significant interest in

11:31AM    5   Mr. Gerace, I decided not to pursue my investigation.

11:31AM    6   Not -- not -- not the larger investigation, but just the

11:31AM    7   investigation into Mr. Gerace.

11:31AM    8   Q.  So you just testified that you had electronic

11:31AM    9   communications with Agent Bongiovanni after this meeting on

11:31AM   10   November 23rd, 2009, correct?

11:31AM   11   A.  I'm sure I did, yes.

11:31AM   12   Q.  Okay.  I know you said you're sure you did, but you

11:31AM   13   testified to that.

11:31AM   14   A.  I did.

11:31AM   15   Q.  Where's the documentation on this, sir?

11:32AM   16   A.  You know, this was, again, it was a -- it was a short

11:32AM   17   administrative matter.  And, again, I haven't seen my files

11:32AM   18   since -- well, I retired in 2013.  But -- and you're telling

11:32AM   19   me that there was a search done for documents, you know, I

11:32AM   20   did see some documents back in September of this year, but,

11:32AM   21   you know --

11:32AM   22   Q.  Okay.  But the simple fact is, is that there's no

11:32AM   23   electronic communication that you documented talking about

11:32AM   24   any subsequent conversations with Agent Bongiovanni, correct?

11:32AM   25   A.  I think that's correct.  I haven't seen it if it exists.

11:32AM   1   Q.  So you can't definitively state to this jury today that

11:32AM   2   you had any conversations with him, right?

11:32AM   3   A.  That's correct.

11:33AM   4           MR. SINGER:  One moment, Judge.

11:33AM   5           Thank you, Agent Herbst.  I have no further

11:33AM   6   questions.

11:33AM   7           THE WITNESS:  Thank you, sir.

11:33AM   8           THE COURT:  Redirect, Mr. Cooper?

11:33AM   9           MR. COOPER:  Just briefly, Judge.  Thank you.

11:33AM  10

11:33AM  11               **REDIRECT EXAMINATION BY MR. COOPER:**

11:34AM  12   Q.  Special Agent Herbst, you were asked some questions on

11:34AM  13   cross-examination about whether Bongiovanni told you directly

11:34AM  14   that Gerace was a source of his; do you remember being asked

11:34AM  15   that question?

11:34AM  16   A.  Yes.

11:34AM  17   Q.  If he didn't tell you directly, what led you to believe

11:34AM  18   that Gerace was a source of his?

11:34AM  19   A.  Well, he didn't have to tell me.  You're either -- the

11:34AM  20   DEA calls the FBI, so a DEA supervisor calls my supervisor.

11:34AM  21   My supervisor tells me you're gonna have a meeting with DEA.

11:34AM  22   So either he's a subject of their investigation, or he's

11:34AM  23   cooperating in their investigation.

11:34AM  24       You don't have to -- you don't have to -- first of all,

11:34AM  25   you don't -- if -- the nature of a source is you don't tell

11:34AM  1   people he's a source, that kind of defeats the purpose of

11:35AM  2   being a source, right?  It's a confidentiality thing.  So I

11:35AM  3   was an experienced agent, Agent Bongiovanni was an

11:35AM  4   experienced agent.  He didn't have to tell me, I knew.

11:35AM  5   Q.  Okay.  And the fact that Gerace was present for the

11:35AM  6   meeting, did that weigh into your analysis of whether he was

11:35AM  7   a subject of a DEA investigation?

11:35AM  8   A.  He certainly wasn't a subject, no.

11:35AM  9   Q.  Was it common to bring subjects in for an interview to

11:35AM  10  discuss the case?

11:35AM  11  A.  Not -- not -- not in that context.  It's certainly common

11:35AM  12  to interview subjects and to have proffer agreements and that

11:35AM  13  kind of stuff, but --

11:35AM  14  Q.  Was that the sort of meeting you had with --

11:35AM  15  A.  No.

11:35AM  16  Q.  -- Gerace --

11:35AM  17  A.  No.

11:35AM  18  Q.  -- and Bongiovanni?

11:35AM  19  A.  No.  No.  No.

11:35AM  20  Q.  Okay.  Are you familiar with the phrase double-dealing?

11:35AM  21  A.  Yes.

11:35AM  22  Q.  Okay.  And have you, in the context of your lengthy

11:35AM  23  career as an FBI Special Agent, are you familiar with the

11:35AM  24  handling of informants or sources of information?

11:35AM  25  A.  Yes.

11:35AM  1  Q.  Okay.  Can you tell the members of the jury, what does

11:35AM  2  double-dealing refer to in the context of a contact or a

11:36AM  3  source?

11:36AM  4         MR. SINGER:  Objection.  Judge, can we approach?

11:36AM  5         THE COURT:  Yeah, come on up.

11:36AM  6         (Sidebar discussion held on the record.)

11:36AM  7         MR. SINGER:  Concern over relevance, Judge.  I don't

11:36AM  8  really understand where we're going here.

11:36AM  9         THE COURT:  It's beyond the scope, no?

11:36AM  10        MR. COOPER:  No, it's not beyond the scope, and it is

11:36AM  11  relevant, Judge.  The reason, it's the same line of

11:36AM  12  questioning that I was pursuing, why did Special Agent Herbst

11:36AM  13  take the action that he took, which was to back off and walk

11:36AM  14  away from Gerace.

11:36AM  15        I expect that his testimony on this topic is going to

11:36AM  16  be that his understanding, as a special agent, is that if you

11:36AM  17  have an informant, that's your informant; and they're

11:36AM  18  double-dealing, meaning they're committing crimes while

11:36AM  19  they're working for you as an informant; it's your job as the

11:36AM  20  handling agent to address that.

11:36AM  21        That weighed into his decision.  I anticipate he will

11:36AM  22  testify that weighed into his decision to let Bongiovanni

11:36AM  23  handle his own source --

11:36AM  24        THE COURT:  Why is the term "double-dealing"

11:36AM  25  relevant?

USA v Bongiovanni - Herbst - Cooper/Redirect - 2/20/24

11:36AM   1          **MR. COOPER:**  Well, it's just the term that's used.

11:36AM   2          **THE COURT:**  Yeah.

11:36AM   3          **MR. COOPER:**  I can just ask him about when an

11:37AM   4   informant commits crimes, I'm trying to get there, I'm not

11:37AM   5   trying to --

11:37AM   6          **THE COURT:**  No, no, no, and I'm not suggesting that

11:37AM   7   you are.  But I think that's what confused me, it is what

11:37AM   8   confused me, and perhaps is what triggered Mr. Singer's

11:37AM   9   objection.

11:37AM   10         **MR. COOPER:**  I think if he had let him answer the

11:37AM   11  question, it would have explained it.

11:37AM   12         **THE COURT:**  Well, I understand that.

11:37AM   13         **MR. COOPER:**  Okay.

11:37AM   14         **THE COURT:**  But neither one of us -- that's not how

11:37AM   15  it works.

11:37AM   16         **MR. COOPER:**  Okay.  Should I re-ask the same

11:37AM   17  question, I guess is my point?

11:37AM   18         **THE COURT:**  I think you should withdraw the question

11:37AM   19  and ask it a different way.

11:37AM   20         **MR. COOPER:**  Because --

11:37AM   21         **THE COURT:**  You can do it however you want.

11:37AM   22         **MR. COOPER:**  Okay.

11:37AM   23         **THE COURT:**  I'm just telling you I don't think that

11:37AM   24  the term "double-dealing" is a term that is particularly

11:37AM   25  relevant.  I think the concept is relevant, and I think you

11:37AM   1   can ask about the concept.

11:37AM   2           **MR. COOPER:**  Okay.

11:37AM   3           **THE COURT:**  So I would prefer you to do it that way.

11:37AM   4           **MR. COOPER:**  Understood.

11:37AM   5           **THE COURT:**  But if you don't want to do it that way,

11:37AM   6   the -- and if Mr. Singer objects again, I may sustain it.

11:37AM   7   But, you know, do it however you want.

11:37AM   8           **MR. COOPER:**  Understood, Judge.

11:37AM   9           (End of sidebar discussion.)

11:38AM  10           **BY MR. COOPER:**

11:38AM  11   Q.  I will withdraw that question, and rephrase it.

11:38AM  12       Have you handled an informant before during your career

11:38AM  13   as a FBI Special Agent?

11:38AM  14   A.  Many times.

11:38AM  15   Q.  Okay.  And as the agent responsible for handling an

11:38AM  16   informant, are you responsible for addressing a situation

11:38AM  17   where your informant is committing other criminal activity,

11:38AM  18   not what he's supposed to be doing?

11:38AM  19   A.  Yes.  There's an attorney general guidelines that would

11:38AM  20   apply to the FBI and other agencies under the Department of

11:38AM  21   Justice.  And it's very clear that you do not operate

11:38AM  22   criminal informants that are conducting criminal activity

11:38AM  23   without -- there's -- it happened a long time ago, but

11:38AM  24   without the authority of the Department of Justice,

11:38AM  25   basically.

11:38AM  1   Q.  Okay.  So if you were handling an informant and you found

11:38AM  2   out that your informant was committing other criminal

11:38AM  3   activity, would you, as the handling agent, be responsible

11:39AM  4   for dealing with that situation?

11:39AM  5   A.  Yes.

11:39AM  6   Q.  Okay.  Is it fair to say that responsibility wouldn't go

11:39AM  7   to some other agency if it was your informant?

11:39AM  8   A.  If it's my FBI informant, and he's involved in criminal

11:39AM  9   activity, then I would have to address it, yes.

11:39AM  10  Q.  Okay.  And so you've testified on cross-examination that

11:39AM  11  you ultimately chose to stop pursuing the drug investigation

11:39AM  12  into Peter Gerace; is that correct?

11:39AM  13  A.  Yes, that's correct.

11:39AM  14  Q.  Okay.  Did you believe at that time that Gerace was

11:39AM  15  Bongiovanni's informant?

11:39AM  16  A.  I did.

11:39AM  17  Q.  In your mind at that time, whose job did you think it was

11:39AM  18  to address Gerace's criminal activity?

11:39AM  19  A.  Well, Agent Bongiovanni.

11:39AM  20  Q.  Why?

11:39AM  21  A.  Because that's the way it's done.

11:39AM  22  Q.  Okay.  Next I want to ask you, on cross-examination you

11:39AM  23  were asked some questions about the last time that you looked

11:39AM  24  at your files; do you remember that?

11:39AM  25  A.  Yes.

| | | |
|---|---|---|
| 11:39AM | 1 | Q.  You were asked questions about what's in your files; do |
| 11:39AM | 2 | you remember that? |
| 11:39AM | 3 | A.  Yes. |
| 11:39AM | 4 | Q.  What year did you retire? |
| 11:39AM | 5 | A.  August of 2013. |
| 11:39AM | 6 | Q.  After you retired, did you bring a box home full of |
| 11:40AM | 7 | reports and put it in your basement? |
| 11:40AM | 8 | A.  No. |
| 11:40AM | 9 | **MR. SINGER:**  Objection. |
| 11:40AM | 10 | **THE COURT:**  Overruled. |
| 11:40AM | 11 | **BY MR. COOPER:** |
| 11:40AM | 12 | Q.  Did you bring a box home full of your reports and files |
| 11:40AM | 13 | and put it in your basement? |
| 11:40AM | 14 | A.  No. |
| 11:40AM | 15 | Q.  Why not? |
| 11:40AM | 16 | A.  Well, they're not -- they're not my files, they're the |
| 11:40AM | 17 | FBI's files. |
| 11:40AM | 18 | **MR. COOPER:**  Thank you. |
| 11:40AM | 19 | I have nothing further, Judge. |
| 11:40AM | 20 | |
| 11:40AM | 21 | **RECROSS-EXAMINATION BY MR. SINGER:** |
| 11:40AM | 22 | Q.  So, Mr. Herbst, you talked on redirect about how |
| 11:40AM | 23 | Mr. Gerace's presence at this meeting between you and |
| 11:40AM | 24 | Bongiovanni was something that was not common, correct? |
| 11:40AM | 25 | A.  That's correct. |

11:40AM    1    Q.  So, in other words, if an agent was calling you up to

11:40AM    2    basically tell you that I'm gonna use this person as a

11:40AM    3    confidential informant, the presence of the informant is not

11:40AM    4    necessary, right?

11:40AM    5    A.  That's correct.  Unless we were going to do something

11:40AM    6    operationally together, then that would be a situation where

11:40AM    7    they would introduce the source to the FBI.

11:41AM    8    Q.  Correct.  So -- so the purpose of bringing someone to the

11:41AM    9    meeting would make an introduction to you, right?

11:41AM    10    A.  Yes.  Yeah.

11:41AM    11    Q.  Okay.  And you say that you stopped pursuing this case

11:41AM    12    based on your assumption that Mr. Gerace was a source,

11:41AM    13    correct?

11:41AM    14    A.  Yes.

11:41AM    15    Q.  But you never --

11:41AM    16    A.  Well, based that -- based to the fact that he was a

11:41AM    17    source, that my interest in him was to cooperate on the

11:41AM    18    larger investigation that I had other avenues I could pursue

11:41AM    19    to perfect my case, and that I believe that, you know, based

11:41AM    20    on the fact the DEA called the FBI, that he might have -- his

11:41AM    21    inference -- his -- he might have been more significant to --

11:41AM    22    to the DEA than he was to the FBI.

11:41AM    23    Q.  But you weren't on the call that Agent Jancewicz received

11:41AM    24    from G.S. Kasprzyk, correct?

11:41AM    25    A.  I was not.

11:41AM   1   Q.  So you don't know what was communicated from Kasprzyk to

11:42AM   2   Jancewicz, correct?

11:42AM   3   A.  No, I'm sure that Jimmy would have said something to me,

11:42AM   4   but I don't -- other than what I've already testified to on

11:42AM   5   direct, and maybe on cross, you know, what I recall from that

11:42AM   6   is that I would be getting a call from the DEA.  I don't know

11:42AM   7   if it was specific Agent Bongiovanni, but I would be getting

11:42AM   8   a call to -- from the DEA, and that we should work it out.

11:42AM   9   Q.  All right.  And, again, Mr. Bongiovanni never indicated

11:42AM  10   to you that Peter Gerace was his confidential informant,

11:42AM  11   correct?

11:42AM  12   A.  He did not.

11:42AM  13           **MR. SINGER:**  Thank you.

11:42AM  14           **MR. COOPER:**  Nothing further, Judge.  Thank you.

11:42AM  15           **THE COURT:**  Okay.  You can step down, sir, thank you.

11:42AM  16           **THE WITNESS:**  Thank you.

11:42AM  17           (Witness excused at 11:42 a.m.)

         18           (Excerpt concluded at 11:42 a.m.)

         19           *     *     *     *     *     *     *

         20

         21

         22

         23

         24

         25

1

2                          **CERTIFICATE OF REPORTER**

3

4                  In accordance with 28, U.S.C., 753(b), I

5     certify that these original notes are a true and correct

6     record of proceedings in the United States District Court for

7     the Western District of New York on February 20, 2024.

8

9

10                              s/ Ann M. Sawyer
                                Ann M. Sawyer, FCRR, RPR, CRR
11                              Official Court Reporter
                                U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**INDEX**

**EXAMINATION OF THOMAS HERBST**

**FEBRUARY 20, 2024**

**W I T N E S S**                                           **P A G E**

**T H O M A S   H E R B S T**                                2

  DIRECT EXAMINATION BY MR. COOPER:                       3

  CROSS-EXAMINATION BY MR. SINGER:                       36

  REDIRECT EXAMINATION BY MR. COOPER:                    68

  RECROSS-EXAMINATION BY MR. SINGER:                     74