04:29PM

```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF NEW YORK
 2
      _____
 3    UNITED STATES OF AMERICA,
                                        Case No. 1:19-cr-227
 4                   Plaintiff,                    (LJV)
      v.
 5                                      February 20, 2024
      JOSEPH BONGIOVANNI,
 6
                      Defendant.
 7    _____

 8     TRANSCRIPT EXCERPT - EXAMINATION OF MICHAEL O'ROURKE - DAY 1
               BEFORE THE HONORABLE LAWRENCE J. VILARDO
 9                    UNITED STATES DISTRICT JUDGE

10
      APPEARANCES:          TRINI E. ROSS, UNITED STATES ATTORNEY
11                          BY: JOSEPH M. TRIPI, ESQ.
                               NICHOLAS T. COOPER, ESQ.
12                             CASEY L. CHALBECK, ESQ.
                            Assistant United States Attorneys
13                          Federal Centre
                            138 Delaware Avenue
14                          Buffalo, New York 14202
                              And
15                          UNITED STATES DEPARTMENT OF JUSTICE
                            BY: JORDAN ALAN DICKSON, ESQ.
16                          1301 New York Ave NW
                            Suite 1000
17                          Washington, DC 20530-0016
                            For the Plaintiff
18
                            SINGER LEGAL PLLC
19                          BY: ROBERT CHARLES SINGER, ESQ.
                            80 East Spring Street
20                          Williamsville, New York 14221
                              And
21                          LAW OFFICES OF PARKER ROY MacKAY
                            BY: PARKER ROY MacKAY, ESQ.
22                          3110 Delaware Avenue
                            Kenmore, New York  14217
23                          For the Defendant

24    PRESENT:              BRIAN A. BURNS, FBI Special Agent
                            MARILYN K. HALLIDAY, HSI Special Agent
25                          KAREN A. CHAMPOUX, USA Paralegal
```

| 1 | **LAW CLERK:** | **REBECCA FABIAN IZZO, ESQ.** |
| 2 | **COURT DEPUTY CLERK:** | **COLLEEN M. DEMMA** |
| 3 | **COURT REPORTER:** | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 4 | | Robert H. Jackson Federal Courthouse |
| | | 2 Niagara Square |
| | | Buffalo, New York  14202 |
| 5 | | Ann_Sawyer@nywd.uscourts.gov |

6

7                    *    *    *    *    *    *    *

8

9              (Excerpt commenced at 4:29 p.m.)

10              (Jury is present.)

04:29PM    11              **THE COURT:**  The government can call its next witness.

04:29PM    12              **MR. TRIPI:**  I hope we do better this time, Judge.

04:29PM    13    Mike O'Rourke.

04:29PM    14

04:29PM    15    **M I C H A E L   O ' R O U R K E,** having been duly called and

04:30PM    16    sworn, testified as follows:

04:30PM    17              **MR. TRIPI:**  May I inquire, Your Honor?

04:30PM    18              **THE COURT:**  You may.

04:30PM    19

04:30PM    20                    **DIRECT EXAMINATION BY MR. TRIPI:**

04:30PM    21    Q.  Good afternoon.  Mr. O'Rourke, are you presently retired

04:30PM    22    from law enforcement?

04:30PM    23    A.  Technically, no.  I'm employed by the Erie County

04:30PM    24    District Attorney's Office as a criminal investigator.

04:30PM    25    Q.  Prior to the -- how long have you been in that job?

04:30PM    1    A.  About a year and a half.

04:30PM    2    Q.  Prior to that, who was your employer?

04:31PM    3    A.  It was the New York State Police.

04:31PM    4    Q.  Did you retire from that agency?

04:31PM    5    A.  Yes, I did.

04:31PM    6    Q.  How long had you been a member of the New York State

04:31PM    7    Police?

04:31PM    8    A.  Approximately 29 and a half years.

04:31PM    9    Q.  And did you grow up in the Buffalo area?

04:31PM   10    A.  Yes, I did.

04:31PM   11    Q.  Can you tell us what your different -- well, what

04:31PM   12    different schools did you go to in the area?

04:31PM   13    A.  I started going to elementary school in Grand Island, but

04:31PM   14    then I went to Saint Mark's grammar school from second

04:31PM   15    through eighth grade.  Went to Canisius High School.  Went to

04:31PM   16    Sienna College for two years in Albany.  And then ultimately

04:31PM   17    graduated from the University of Buffalo.

04:31PM   18    Q.  And what was your degree when you graduated?

04:31PM   19    A.  Political science.

04:31PM   20    Q.  And, so, then you joined the New York State Police not

04:31PM   21    too long after that?

04:31PM   22    A.  I actually got my degree when I was on the New York State

04:32PM   23    Police.  I joined the State police in 1990.

04:32PM   24    Q.  What different positions have you held with the State

04:32PM   25    police?

04:32PM   1   A.  I was a uniform patrolman.  I was uniform sergeant.  I

04:32PM   2   became an investigator, assigned to Community Narcotics

04:32PM   3   Enforcement Team, and then I was a senior investigator, which

04:32PM   4   was a supervisor in the Community Narcotics Enforcement Team.

04:32PM   5   Q.  So your last two spots were involved with the Community

04:32PM   6   Narcotics Enforcement Team; is that right?

04:32PM   7   A.  That's correct.  Approximately, yeah, 16 years I was in

04:32PM   8   narcotics.

04:32PM   9   Q.  What type of cases did that unit work?

04:32PM   10  A.  When I first started, it entailed a lot of street-level

04:32PM   11  undercover work.  Approximately 250 low level -- from street

04:32PM   12  dealers, and then it kind of developed into where I was

04:32PM   13  handling the cases myself, other people were doing the

04:33PM   14  undercovers and I would commence the investigations, see them

04:33PM   15  through, through the prosecution.

04:33PM   16      We ultimately got into doing some wiretaps with the

04:33PM   17  Attorney General's Office and the Drug Enforcement

04:33PM   18  Administration.  And that kind of developed into a little bit

04:33PM   19  of some, a bigger, a little bigger high level cases.

04:33PM   20  Q.  Both as an investigator and a supervisor doing that type

04:33PM   21  of work, are you familiar with building cases from the street

04:33PM   22  level, up?

04:33PM   23  A.  Yes.

04:33PM   24  Q.  Among the ways you do that, are you familiar with

04:33PM   25  confidential informants?

04:33PM   1    A.   Yes.

04:33PM   2    Q.   And just generally speaking, how are confidential

04:33PM   3    informants used in building cases up?

04:33PM   4    A.   Well, a confidential informant comes to us either from an

04:33PM   5    arrest, from a uniform member or another agency.  We often

04:33PM   6    use them if they were caught buying drugs or they were

04:33PM   7    possessing drugs.  If they wanted to work, maybe help

04:33PM   8    themselves out, we would bring them in as a confidential

04:33PM   9    informant.

04:34PM  10        Often with us, we would have an informant maybe buy drugs

04:34PM  11    several times by himself.  If we could introduce an

04:34PM  12    undercover, we did.  And then we would kind of put the

04:34PM  13    informant off to the side and let our undercover do the work

04:34PM  14    after that.

04:34PM  15    Q.   Are informants important in your view in building larger

04:34PM  16    drug cases?

04:34PM  17    A.   They're critical, yes.

04:34PM  18    Q.   Other than people getting in trouble, are there other

04:34PM  19    ways that you're aware of that people become an informant?

04:34PM  20    For example, are sometimes people paid, things like that?

04:34PM  21    A.   There are various reasons.  Ours was usually because

04:34PM  22    someone was under arrest or was in trouble.  But there would

04:34PM  23    be people that would do it for payment.  And I know there are

04:34PM  24    people that would do it for other reasons, maybe out of spite

04:35PM  25    or to get back at somebody.  We generally wouldn't use those

6

04:35PM  1   type of people, we'd have to vet those.

04:35PM  2   Q.  Now, while you were -- the last 16 years of your career,

04:35PM  3   so investigator in Community Narcotics Enforcement Team and

04:35PM  4   then a supervisor of that team, did you -- did you often work

04:35PM  5   with other agencies on cases?

04:35PM  6   A.  We worked with many agencies all over Western New York

04:35PM  7   and Rochester.  Our unit kind of expanded out into Rochester

04:35PM  8   and the Southern Tier.

04:35PM  9   Q.  What local federal agencies did you interact with?

04:35PM  10  A.  Most often, it was the DEA, the Drug Enforcement

04:35PM  11  Administration, their task force.  They had an agents group

04:35PM  12  we worked with occasionally.

04:35PM  13      They had a tactical diversion squad that dealt with

04:36PM  14  prescription pills and doctors.

04:36PM  15      Occasionally, with the FBI, we worked with the Safe

04:36PM  16  Streets Task Force.

04:36PM  17      We also worked with HSI, Homeland Security, and their

04:36PM  18  investigations.

04:36PM  19  Q.  On occasion, did the New York State Police work with law

04:36PM  20  enforcement from other states?

04:36PM  21  A.  Yes, on occasion.

04:36PM  22  Q.  Can you give just a brief example of how that would work?

04:36PM  23  A.  Usually, if an investigation from an another state came

04:36PM  24  into New York for some reason, they would contact an agency

04:36PM  25  in New York, a lot of times it was the State police from

04:36PM    1    another state, they would contact State police here, whatever

04:36PM    2    regional area, Western New York.  It was often Community

04:36PM    3    Narcotics Enforcement Team for the State police.

04:36PM    4    Q.  Now, I'm going to direct your attention back to

04:36PM    5    November 25th, 2012.  At that point in your career, are you

04:37PM    6    an investigator in CNET, Community Narcotics Enforcement

04:37PM    7    Team, or are you the supervisor?

04:37PM    8    A.  I'm an investigator.

04:37PM    9    Q.  Okay.  As of that date, did you and your group

04:37PM   10    participate in something called a controlled delivery of

04:37PM   11    marijuana that resulted in the arrest of an individual named

04:37PM   12    Damien Abbate and Wayne Anderson that day?

04:37PM   13    A.  Yes.

04:37PM   14    Q.  And can you tell this jury how that came about?  Can you

04:37PM   15    explain what happened leading up to that?

04:37PM   16    A.  Well, the Illinois State Police had a policy where if

04:37PM   17    they did a drug interdiction on the road, stopped the car

04:37PM   18    with a quantity of narcotics or marijuana, they had a policy

04:37PM   19    with this one particular unit, they would like to see the

04:37PM   20    package or the -- or the narcotics go through to its ultimate

04:37PM   21    destination.

04:37PM   22         So in this case, this -- there was an arrest by the

04:37PM   23    Illinois State Police Drug Interdiction Unit.  And the

04:38PM   24    package was -- the delivery was destined for Western

04:38PM   25    New York, Buffalo area.  So they contacted the State police.

04:38PM    1    We had worked with them once before.  I was not present on

04:38PM    2    the previous one, but I was familiar with how they did

04:38PM    3    things.  So they contacted the State Police Community

04:38PM    4    Narcotics Enforcement Team, again, and wanted to see this

04:38PM    5    delivery through to its ultimate destination with a

04:38PM    6    controlled delivery.

04:38PM    7    Q.  And so you used the term there, controlled delivery.

04:38PM    8    Let's just define that for the jury.  What is a controlled

04:38PM    9    delivery?

04:38PM   10    A.  Controlled delivery is where we have a quantity of

04:38PM   11    narcotics, and it's going to a destination.  However,

04:38PM   12    everything about it is controlled.

04:38PM   13        We know where the package is.  In essence, the police are

04:38PM   14    delivering the package under the guise of either using an

04:39PM   15    informant or undercover officers.  Either way, the narcotics

04:39PM   16    end up at its ultimate destination.  And then once it's taken

04:39PM   17    possession of by the suspects, a search warrant is executed

04:39PM   18    and suspects are under arrest, placed under arrest, and the

04:39PM   19    narcotics are secured.

04:39PM   20    Q.  Were you working already, or were you called in to help

04:39PM   21    in this matter?

04:39PM   22    A.  I was called in, I believe, the night before and

04:39PM   23    requested to come in very early on that day, which was a

04:39PM   24    Sunday.

04:39PM   25    Q.  And when you came in, were you briefed up on the matter

04:39PM    1   by other members of the State police?

04:39PM    2   A.  Yes, there was a senior investigator at the time who was

04:39PM    3   working closely with the Illinois State Police and the

04:39PM    4   informants.  We didn't have direct contact with the

04:39PM    5   informants, they usually used to try and keep those separate

04:40PM    6   from any undercovers.

04:40PM    7       And all our officers, investigators at that time, were

04:40PM    8   undercover officers, but, we were given direct information

04:40PM    9   about what was going on, what we wanted to do, what our

04:40PM   10   ultimate goal was.

04:40PM   11   Q.  So as you understand it, did the Illinois State Police

04:40PM   12   keep the identity of that informant to themselves?

04:40PM   13   A.  This were two informants, a male and a female.  And they

04:40PM   14   were -- they kept the identities to themselves, and our

04:40PM   15   senior --

04:40PM   16       **MR. MacKAY:**  Judge, I'm going to object to the lack

04:40PM   17   of personal knowledge about what happened in Illinois to the

04:40PM   18   degree he can answer it or not.

04:40PM   19       **MR. TRIPI:**  I characterized it as his understanding

04:40PM   20   based on the briefing he attended, Your Honor.

04:40PM   21       **THE COURT:**  How would he know unless somebody told

04:40PM   22   him, so it's got to be hearsay in some way or another, doesn't

04:40PM   23   it?

04:40PM   24       **MR. TRIPI:**  Well, it explains his subsequent actions,

04:40PM   25   but if you want me to move on, Judge, that's fine.

04:40PM    1    **THE COURT:**  Yeah, please.

04:40PM    2    **MR. TRIPI:**  No problem.

04:40PM    3    **BY MR. TRIPI:**

04:40PM    4    Q.  In any event, I think I can ask you this, what was your

04:41PM    5    understanding of the amount of marijuana involved in the

04:41PM    6    controlled delivery that the State police was going assist

04:41PM    7    with?

04:41PM    8    A.  The amount was approximately 200 pounds.

04:41PM    9    Q.  Okay.  Based upon your training and experience at the

04:41PM    10    time, can you give an approximate value of that much

04:41PM    11    marijuana, 200 pounds?

04:41PM    12    A.  I'd have to think back.  But, it was easily several

04:41PM    13    hundred thousand pounds -- or, dollars, excuse me.

04:41PM    14    Q.  And what was the plan.  You mentioned control delivery.

04:41PM    15    Can you tell the jury what the plan was for this delivery?

04:41PM    16    A.  Well, with this delivery, the informants were cooperating

04:41PM    17    at this time, they went from defendants to informants.  And

04:41PM    18    they were going to deliver the marijuana with the vehicle

04:41PM    19    that they had traveled in from California, I believe.  Same

04:42PM    20    exact vehicle, the marijuana that was packaged the way they

04:42PM    21    packaged, that wasn't really touched at all other than to

04:42PM    22    just examine it to make sure it was marijuana and the

04:42PM    23    approximate amount.

04:42PM    24    So, that was -- they were gonna deliver it to an address

04:42PM    25    in Buffalo, and leave.  As soon as they left, a SWAT team was

04:42PM  1   gonna execute a search warrant for that residence.

04:42PM  2   Q.  And was this a search warrant that was already obtained?

04:42PM  3   A.  That's correct.

04:42PM  4   Q.  Okay.  And what was the target location of this

04:42PM  5   controlled delivery in the operation that you've just

04:42PM  6   explained?

04:42PM  7   A.  17 Elmview in the City of Buffalo.  It's off Elmwood near

04:42PM  8   McKinley High School.

04:42PM  9   Q.  Do you recall if it was an upper or a lower for the

04:42PM  10  delivery?

04:42PM  11  A.  I remember an upper.  I believe it was an upper.

04:42PM  12  Q.  And do you remember the individual associated with that

04:43PM  13  residence, the name?

04:43PM  14  A.  There was a -- who we believed to be an owner of the

04:43PM  15  residence before we delivered it.

04:43PM  16  Q.  Who was that?

04:43PM  17  A.  That was a Wayne Anderson.

04:43PM  18  Q.  And can you now take the jury to the moment of the

04:43PM  19  execution of that controlled delivery and the subsequent

04:43PM  20  search warrant?  Can you tell the jury what happened?

04:43PM  21  A.  Well, the informants leave in their vehicle.  The SWAT

04:43PM  22  team executes a search warrant that we had.  They secure two

04:43PM  23  individuals in the place, and the marijuana, of course.  Then

04:43PM  24  they call the investigators in.

04:43PM  25       And we do a search.  And we secure the defendants,

04:43PM    1    commence a search, interview the defendants.  And then

04:43PM    2    ultimately, the two defendants were transported downtown to

04:44PM    3    get booked.  I transported one of the defendants,

04:44PM    4    Mr. Anderson.

04:44PM    5    Q.  Before I get to your transporting Mr. Anderson, other

04:44PM    6    than the marijuana, do you remember what else was seized, if

04:44PM    7    anything?

04:44PM    8    A.  I believe some quantity of U.S. currency.  And other than

04:44PM    9    that, I don't recall.  Besides that.

04:44PM   10    Q.  What was your assignment at that scene?  What was your

04:44PM   11    job?

04:44PM   12    A.  I was told to search, like, the living room area, and

04:44PM   13    then kind of keep an eye on Mr. Anderson.  He was handcuffed.

04:44PM   14    And -- interview him, just the basics.  What's your name?  Do

04:44PM   15    you own the place?  Et cetera.  And then transport him

04:45PM   16    downtown.

04:45PM   17    Q.  And when you say "transport him downtown," where do you

04:45PM   18    mean?

04:45PM   19    A.  I mean at that time it was the Erie County Holding Center

04:45PM   20    where he was booked.  We fill out a booking sheet, what the

04:45PM   21    charges are.  And -- and then they'll take care of the

04:45PM   22    fingerprint and photograph.

04:45PM   23    Q.  And did you in fact transport Mr. Anderson?

04:45PM   24    A.  I did.

04:45PM   25    Q.  Were you alone or with a partner, if you recall?

USA v Bongiovanni - O'Rourke - Tripi/Direct - 2/20/24

04:45PM   1   A.  Definitely with a partner, I just can't recall who it

04:45PM   2   was.

04:45PM   3   Q.  In a situation where someone's in custody, would protocol

04:45PM   4   have been to have someone with you?

04:45PM   5   A.  Absolutely.

04:45PM   6   Q.  Okay.  So you're relying on that protocol for your

04:45PM   7   testimony?

04:45PM   8   A.  Yes.

04:45PM   9   Q.  Now, in that situation, did you have -- did you have any

04:45PM   10  objectives in mind regarding your interactions with

04:45PM   11  Mr. Anderson while you were transporting him?

04:45PM   12  A.  Pretty much the same objective we always have with a

04:46PM   13  defendant in that situation, which is to interview him and

04:46PM   14  see if he can provide any further information that would

04:46PM   15  further the investigation.  If there were any other

04:46PM   16  defendants, or other people that may have been involved that

04:46PM   17  weren't at the house.  Maybe who was the marijuana going to.

04:46PM   18  Was it just for him to sell, or was there actually some other

04:46PM   19  people involved.

04:46PM   20  Q.  So did you have a routine practice as it related to

04:46PM   21  attempting to secure cooperation from individuals who were

04:46PM   22  under arrest in significant cases?

04:46PM   23  A.  Yes.  Yes.

04:46PM   24  Q.  And was that, what you were just describing, part of your

04:46PM   25  routine practice?

04:46PM  1   A.   Yes.  And if he would have agreed or said he would be

04:46PM  2   interested in cooperating, we would have arranged to maybe

04:46PM  3   meet with him at a later date after he either bailed out, or

04:46PM  4   possibly interviewed him in jail, with an attorney, or set

04:47PM  5   something up where he would have been, you know, interviewed

04:47PM  6   again if he wanted to provide some knowledge and cooperate.

04:47PM  7   Q.   And describe your specific interaction with Mr. Anderson

04:47PM  8   regarding the topic of cooperation.

04:47PM  9   A.   I gave him the -- the usual questions about whether he

04:47PM  10  wanted to cooperate and help himself.  And he basically

04:47PM  11  declined right from the beginning and said he wanted to speak

04:47PM  12  to an attorney.  And so we kind of ended it right there.

04:47PM  13  Q.   By end it right there, you proceeded to book him?

04:47PM  14  A.   Took him right downtown.  I believe I gave him my phone

04:47PM  15  number, which I always do.

04:47PM  16  Q.   Do you remember what your number was at the time?

04:47PM  17  A.   I do.

04:47PM  18  Q.   Can you tell us?

04:47PM  19  A.   716-570-4548.

04:47PM  20  Q.   What this was last part?

04:47PM  21  A.   4548.

04:47PM  22  Q.   Thank you.  Now, following that day, by "that day" I mean

04:48PM  23  the day that Mr. Anderson is taken into custody and you

04:48PM  24  booked him, did anyone from another law enforcement agency

04:48PM  25  reach out to you?

| | | |
|---|---|---|
| 04:48PM | 1 | A.  Yes. |
| 04:48PM | 2 | Q.  Who did? |
| 04:48PM | 3 | A.  Agent Joseph Bongiovanni of the Drug Enforcement |
| 04:48PM | 4 | Administration. |
| 04:48PM | 5 | Q.  And do you see him in court today? |
| 04:48PM | 6 | A.  I do. |
| 04:48PM | 7 | Q.  Can you please point to him and describe something he's |
| 04:48PM | 8 | wearing? |
| 04:48PM | 9 | A.  He's in the middle of these three gentlemen at the |
| 04:48PM | 10 | defense table.  He has a maroon-color tie on. |
| 04:48PM | 11 | **MR. TRIPI:**  Your Honor, may the record reflect the |
| 04:48PM | 12 | witness has identified Mr. Bongiovanni. |
| 04:48PM | 13 | **THE COURT:**  Yes, it does. |
| 04:48PM | 14 | **MR. TRIPI:**  Thank you. |
| 04:48PM | 15 | **BY MR. TRIPI:** |
| 04:48PM | 16 | Q.  Mr. O'Rourke, how did Mr. Bongiovanni contact you? |
| 04:48PM | 17 | A.  I believe it was telephonically at first, and he wanted |
| 04:48PM | 18 | to meet regarding the arrest and come over to our office, |
| 04:48PM | 19 | which was at the Mahoney State Building, 65 Court Street. |
| 04:48PM | 20 | Q.  I'll ask you at about the conversation in just a moment, |
| 04:49PM | 21 | but before I ask but that telephonic contact, can you tell us |
| 04:49PM | 22 | how long after you booked Mr. Anderson, Mr. Bongiovanni |
| 04:49PM | 23 | called you? |
| 04:49PM | 24 | A.  I don't remember exactly, but I would say within 48 |
| 04:49PM | 25 | hours. |

04:49PM    1    Q.  And now can you tell the jury, as best you recall it,

04:49PM    2    what your conversation was with Mr. Bongiovanni when he

04:49PM    3    called you on the phone?

04:49PM    4    A.  I really don't recall.  But I can guess, because I've had

04:49PM    5    dozens of those calls with many different officers and

04:49PM    6    investigators from different agencies.

04:49PM    7    Q.  Do you recall testifying in the grand jury in this

04:49PM    8    matter?

04:49PM    9    A.  Yes.

04:49PM   10    Q.  Do you think looking at that might refresh your

04:49PM   11    recollection as to this phone call?

04:49PM   12    A.  Yes.

04:49PM   13    Q.  Okay.  I'm going to show you Government Exhibit 3510B.

04:50PM   14    I'm going to ask you to read page 9, and when you're done,

04:50PM   15    look up, okay?

04:50PM   16    A.  Yes.

04:50PM   17         **MR. TRIPI:**  May the record reflect I've handed that

04:50PM   18    exhibit up to the witness.

04:50PM   19         May the record reflect the witness has completed

04:51PM   20    reading the document, and I've removed it.

04:51PM   21         **BY MR. TRIPI:**

04:51PM   22    Q.  Mr. O'Rourke, did that refresh your recollection

04:51PM   23    regarding the conversation you had over the telephone with

04:51PM   24    Mr. Bongiovanni?

04:51PM   25    A.  Yes.

04:51PM 1   Q.  Please tell the jury what that conversation was.

04:51PM 2   A.  Well, he wanted to meet with me to discuss the Wayne

04:51PM 3   Anderson arrest and his cooper -- Wayne Anderson's

04:51PM 4   cooperation in the investigation, and he wanted to meet

04:51PM 5   relatively quickly.

04:51PM 6   Q.  And was that a short phone conversation?

04:51PM 7   A.  Yes.

04:51PM 8   Q.  Did you make arrangements to meet?

04:51PM 9   A.  Yes.

04:51PM 10  Q.  And did a meeting occur after that phone call?

04:51PM 11  A.  Yes, it did.

04:51PM 12  Q.  When in proximity to the phone call did the meeting occur

04:51PM 13  if you know?

04:51PM 14  A.  I would say within 24 hours.  It was quick.

04:51PM 15  Q.  Okay.  So the phone call and the meeting all occurred

04:51PM 16  within 72 hours?

04:51PM 17  A.  Yes.

04:51PM 18  Q.  Okay.  Can you describe that meeting that occurs

04:52PM 19  subsequent to the phone call?

04:52PM 20  A.  Yes.  Agent Bongiovanni and another task force officer,

04:52PM 21  Joe Palmieri, came over to our office at 65 Court Street, and

04:52PM 22  we had a meeting regarding the arrest.

04:52PM 23  Q.  Okay.  So you just said a couple of things there.  Just,

04:52PM 24  Task Force Officer Joe Palmieri, who is that?

04:52PM 25  A.  He was a detective from the Town of Tonawanda that was

04:52PM    1    assigned to the DEA task force as a TFO, or task force

04:52PM    2    officer.

04:52PM    3    Q.   At that time, who did Task Force Officer Palmieri

04:52PM    4    typically work with, as you understood it?

04:52PM    5    A.   Typically worked with Agent Bongiovanni.

04:52PM    6    Q.   Okay.  And I think you mentioned 64 Court Street.  What's

04:52PM    7    located there?

04:52PM    8    A.   65 Court Street.

04:53PM    9    Q.   Sorry.

04:53PM   10    A.   It's the old Mahoney State Office Building.

04:53PM   11    Q.   Did you have office space there?

04:53PM   12    A.   Yeah, we did, on the fifth floor.

04:53PM   13    Q.   Okay.  Describe what happens at that meeting, please.

04:53PM   14    A.   At the meeting, Agent Bongiovanni and Task Force Officer

04:53PM   15    Joe Palmieri asked about the arrest, and wanted to know if

04:53PM   16    they would be able to pursue the investigation, take it from

04:53PM   17    their end, and maybe take it up to a higher level federally.

04:53PM   18         They said they believed it to be tied to Organized Crime.

04:53PM   19    And as often is the case, we said of course, if you guys can

04:53PM   20    turn it into something bigger than -- at that time with the

04:53PM   21    New York State charges, it was a C felony no matter --

04:53PM   22    anything over 10 pounds, whether it was 10 or a thousand, it

04:54PM   23    was still a C felony.  So if they could take it to a --

04:54PM   24    something more significant federally, and see if there was

04:54PM   25    some other people involved, they said Organized Crime.

04:54PM    1          **MR. MacKAY:**  Judge, I'm going to object to the use of

04:54PM    2    "they" here.  It's hearsay.  It's not clear who is

04:54PM    3    specifically saying that --

04:54PM    4          **MR. TRIPI:**  I'll clear it up.

04:54PM    5          **MR. MacKAY:**  -- and whether that's admissible as to

04:54PM    6    both.

04:54PM    7          **THE COURT:**  Yeah, so -- so why don't you clear it up.

04:54PM    8          **MR. TRIPI:**  Yeah.

04:54PM    9          **BY MR. TRIPI:**

04:54PM   10    Q.  Who was doing the talking, Palmieri or Bongiovanni?

04:54PM   11    A.  My recollection is primarily Agent Bongiovanni.

04:54PM   12    Q.  Okay.  Now --

04:54PM   13          **THE COURT:**  So when you said "they," you were

04:54PM   14    referring to Agent Bongiovanni?

04:54PM   15          **THE WITNESS:**  I was referring to both of them, but

04:54PM   16    primarily it was Agent Bongiovanni doing the talking.

04:54PM   17          **BY MR. TRIPI:**

04:54PM   18    Q.  Okay.  And they were together, correct?

04:55PM   19    A.  Yes, they were.

04:55PM   20    Q.  And what, if anything, did Mr. Bongiovanni say about

04:55PM   21    wanting to use Mr. Anderson as an informant?

04:55PM   22    A.  I believe he wanted to sign him up, or he would be

04:55PM   23    looking to sign him up, was going to attempt to sign him up

04:55PM   24    as an informant.

04:55PM   25    Q.  Now, based on your experience, in order to attempt or to

04:55PM 1   sign someone up as an informant, do you have to generally

04:55PM 2   speak with that individual about doing that?

04:55PM 3   A.  Yes.

04:55PM 4   Q.  Based on your conversation with Bongiovanni and Palmieri,

04:55PM 5   what was your understanding of how Anderson would be utilized

04:55PM 6   by Special Agent Bongiovanni?

04:56PM 7   A.  I didn't know specifically how they would use him, but he

04:56PM 8   would be signed up as a confidential informant with the Drug

04:56PM 9   Enforcement Administration.  Typically, obviously, these

04:56PM 10  charges that he had pending --

04:56PM 11          **MR. MacKAY:**  Objection to speculation.

04:56PM 12          **THE COURT:**  Yeah, sustained.

04:56PM 13          **BY MR. TRIPI:**

04:56PM 14  Q.  Did you believe that DEA Special Agent Bongiovanni was

04:56PM 15  going to turn this into something larger?

04:56PM 16  A.  Yes.

04:56PM 17  Q.  At any point in your discussion, did Special Agent

04:56PM 18  Bongiovanni disclose to you any personal relationship he had

04:56PM 19  with Wayne Anderson?

04:56PM 20  A.  No.

04:56PM 21  Q.  In your experience working in the Buffalo area, if an

04:56PM 22  investigator has a personal relationship with someone, should

04:56PM 23  they be working on that person's case?

04:56PM 24          **MR. MacKAY:**  Objection to relevance, particularly to

04:56PM 25  agency.

| | | |
|---|---|---|
| 04:56PM | 1 | **THE COURT:**  Overruled. |
| 04:56PM | 2 | **THE WITNESS:**  No. |
| 04:56PM | 3 | **BY MR. TRIPI:** |
| 04:56PM | 4 | Q.  Did you ever have any further discussions with |
| 04:56PM | 5 | Bongiovanni about Anderson after that day? |
| 04:56PM | 6 | A.  I don't believe so. |
| 04:57PM | 7 | Q.  Did you have any further discussions with Palmieri about |
| 04:57PM | 8 | Anderson after that day? |
| 04:57PM | 9 | A.  I don't believe so. |
| 04:57PM | 10 | Q.  Did you ever tell Bongiovanni that you were waiting to |
| 04:57PM | 11 | proffer Anderson months later at the U.S. Attorney's Office? |
| 04:57PM | 12 | A.  No. |
| 04:57PM | 13 | Q.  Did you ever speak with a federal prosecutor named Mike |
| 04:57PM | 14 | McCabe about Wayne Anderson? |
| 04:57PM | 15 | A.  No. |
| 04:57PM | 16 | **MR. TRIPI:**  No further questions, Your Honor. |
| 04:57PM | 17 | **THE COURT:**  How long do you expect. |
| 04:57PM | 18 | **MR. MacKAY:**  It could be at least a little while, |
| 04:57PM | 19 | Judge. |
| 04:57PM | 20 | **THE COURT:**  Okay.  So I think we will break now for |
| 04:57PM | 21 | the day.  And I apologize to the witness, he's got to come |
| 04:57PM | 22 | back tomorrow -- |
| 04:57PM | 23 | **THE WITNESS:**  No problem. |
| 04:57PM | 24 | **THE COURT:**  -- but that's the way it works sometimes. |
| 04:57PM | 25 | So, ladies and gentlemen, we're going to take our |

Case 1:19-cr-00227-LJV-MJR   Document 776   Filed 02/24/24   Page 22 of 22
USA v Bongiovanni - O'Rourke - Tripi/Direct - 2/20/24

22

04:57PM   1   evening recess right now.  Please remember my instructions

04:57PM   2   about not discussing any aspect of the case with anyone.

04:57PM   3   Don't use tools of technology to research the case or to

04:57PM   4   communicate about the case.  Don't read, or watch, or listen

04:58PM   5   to any news coverage about the case if there is any while the

04:58PM   6   case is in progress.  And please remember not to make up your

04:58PM   7   mind until all the evidence has been submitted to you and you

04:58PM   8   begin your deliberations.

04:58PM   9           We'll see you at 9:30 tomorrow morning.  Everybody

04:58PM  10   get a good night's sleep, and drive carefully.  Thank you.

04:58PM  11           (Witness excused at 4:58 p.m.)

04:58PM  12           **THE COURT:**  Anything we need to put on the record

04:58PM  13   from the defendant?

04:58PM  14           **MR. MacKAY:**  No, Your Honor.

04:58PM  15           **THE COURT:**  From the government?

04:58PM  16           **MR. TRIPI:**  No, Your Honor.

04:58PM  17           **THE COURT:**  We'll see you folks tomorrow morning.

         18           (Excerpt concluded at 4:58 p.m.)

         19           *       *       *       *       *       *       *

         20                    **CERTIFICATE OF REPORTER**

         21           In accordance with 28, U.S.C., 753(b), I certify that
              these original notes are a true and correct record of
         22   proceedings in the United States District Court for the
              Western District of New York on February 20, 2024.

         23

         24                    s/ Ann M. Sawyer
              _____
              Ann M. Sawyer, FCRR, RPR, CRR
         25   Official Court Reporter
              U.S.D.C., W.D.N.Y.