03:52PM

1                   UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK
2

3   _____
    UNITED STATES OF AMERICA,
                                    Case No. 1:19-cr-227
4                 Plaintiff,                  (LJV)
    v.
5                                   February 29, 2024
    JOSEPH BONGIOVANNI,
6

7                   Defendant.
    _____

8       TRANSCRIPT EXCERPT - TESTIMONY OF MARK GENTILE - DAY 1
              BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                   UNITED STATES DISTRICT JUDGE

10

    **APPEARANCES:**          **TRINI E. ROSS, UNITED STATES ATTORNEY**
11                          **BY: JOSEPH M. TRIPI, ESQ.**
                              **NICHOLAS T. COOPER, ESQ.**
12                          **CASEY L. CHALBECK, ESQ.**
                          Assistant United States Attorneys
13                        Federal Centre
                          138 Delaware Avenue
14                        Buffalo, New York 14202
                              And
15                        **UNITED STATES DEPARTMENT OF JUSTICE**
                          **BY: JORDAN ALAN DICKSON, ESQ.**
16                        1301 New York Ave NW
                          Suite 1000
17                        Washington, DC 20530-0016
                          For the Plaintiff
18
                          **SINGER LEGAL PLLC**
19                        **BY: ROBERT CHARLES SINGER, ESQ.**
                          80 East Spring Street
20                        Williamsville, New York 14221
                              And
21                        **LAW OFFICES OF PARKER ROY MacKAY**
                          **BY: PARKER ROY MacKAY, ESQ.**
22                        3110 Delaware Avenue
                          Kenmore, New York  14217
23                        For the Defendant

24  **PRESENT:**           **BRIAN A. BURNS,** FBI Special Agent
                          **MARILYN K. HALLIDAY,** his Special Agent
25                        **KAREN A. CHAMPOUX,** USA Paralegal

Case 1:19-cr-00227-LJV-MJR   Document 792   Filed 03/01/24   Page 2 of 59
USA v Bongiovanni - Gentile - Tripi/Direct - 2/29/24

2

| | | |
|---|---|---|
| 1 | **LAW CLERK:** | **REBECCA FABIAN IZZO, ESQ.** |
| 2 | **COURT DEPUTY CLERK:** | **COLLEEN M. DEMMA** |
| 3 | **COURT REPORTER:** | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 4 | | Robert H. Jackson Federal Courthouse<br>2 Niagara Square |
| 5 | | Buffalo, New York  14202<br>Ann_Sawyer@nywd.uscourts.gov |

6                      *    *    *    *    *    *    *

7

8            (Excerpt commenced at 3:52 p.m.)

9            (Jury is present.)

03:52PM   10            **THE COURT:** The government can call its next witness.

03:52PM   11            **MR. TRIPI:** We call Mark Gentile, Your Honor.

03:52PM   12

03:53PM   13   **M A R K   G E N T I L E,** having been duly called and sworn,

03:53PM   14   testified as follows:

03:53PM   15            **MR. TRIPI:** May I, Your Honor?

03:53PM   16            **THE COURT:** You may.

03:53PM   17            **MR. TRIPI:**  Thank you.

03:53PM   18

03:53PM   19                 **DIRECT EXAMINATION BY MR. TRIPI:**

03:53PM   20   Q.  Good afternoon, Mr. Gentile.  How are you?

03:53PM   21   A.  Good thanks.

03:53PM   22   Q.  Mr. Gentile, by whom are you employed, sir?

03:53PM   23   A.  I'm currently a group supervisor with the Drug

03:54PM   24   Enforcement Administration here in Buffalo, New York.

03:54PM   25   Q.  And where are you from originally?

03:54PM    1    A.   I'm originally from the Syracuse area, specifically

03:54PM         Auburn, New York.

03:54PM    3    Q.   And how long have you been in the DEA in Buffalo?

03:54PM    4    A.   Just over 25 years now.

03:54PM    5    Q.   And what was your DEA graduating class number?

03:54PM    6    A.   I was graduating class number 130.

03:54PM    7    Q.   What year was that?

03:54PM    8    A.   That would have been April -- I'm sorry, yes, April of

03:54PM    9    1999.

03:54PM   10    Q.   And was Buffalo your first stop after graduating?

03:54PM   11    A.   I was actually hired out of the Riverside, California

03:54PM   12    office.  I was previously a border patrol agent in San Diego.

03:54PM   13    I reported back to Riverside for a few months, and ultimately

03:54PM   14    transferred to Buffalo.

03:54PM   15    Q.   Did you pick Buffalo, or did they send you to Buffalo?

03:54PM   16    A.   I chose it.

03:55PM   17    Q.   Okay.  So I guess I should ask you just a little bit

03:55PM   18    about your experience prior to the DEA.  What agency did you

03:55PM   19    work for?

03:55PM   20    A.   I was a border patrol agent from 1995 to 1999 assigned to

03:55PM   21    the San Diego sector, San Diego, California.

03:55PM   22    Q.   And just generally, what were your duties as a border

03:55PM   23    patrol agent for those four years?

03:55PM   24    A.   My duties included enforcing the immigration laws of the

03:55PM   25    United States.

03:55PM   1    Q.  And do you have some formational education, too?

03:55PM   2    A.  Yes, I do.

03:55PM   3    Q.  Can you describe that for the jury?

03:55PM   4    A.  I have my bachelor's degree in criminal justice.

03:55PM   5    Q.  From where?

03:55PM   6    A.  Rochester Institute of Technology.

03:55PM   7    Q.  And so you've been with the DEA about 25-plus years.  Can

03:55PM   8    you describe your progression through the Buffalo office?

03:55PM   9    A.  Yes.  When I was originally assigned to the Buffalo

03:55PM   10   office, I came on as a special agent, and I promoted to the

03:55PM   11   position of a group supervisor in June of 2019.

03:56PM   12   Q.  What year was it when you got to Buffalo?

03:56PM   13   A.  I reported to Buffalo in 1999.

03:56PM   14   Q.  Okay.  I think I asked you that, sorry about that.

03:56PM   15       Eventually, did -- well, withdrawn.

03:56PM   16       When you became a DEA agent, did you take an oath?

03:56PM   17   A.  Yes.

03:56PM   18   Q.  What was the oath that you took?

03:56PM   19   A.  To enforce the federal narcotics laws of the United

03:56PM   20   States Code.

03:56PM   21   Q.  And do you take that oath seriously?

03:56PM   22   A.  Yes.

03:56PM   23   Q.  Why do you take it seriously?

03:56PM   24   A.  I believe we have a very important job to do.

03:56PM   25   Q.  And when you're enforcing those federal drug laws, do you

Case 1:19-cr-00227-LJV-MJR   Document 792   Filed 03/01/24   Page 5 of 59
USA v Bongiovanni - Gentile - Tripi/Direct - 2/29/24

5

03:56PM 1   take things like a person's race into account?

03:56PM 2   A.  No.

03:56PM 3   Q.  Do you take personal relationships into account?

03:56PM 4   A.  No.

03:56PM 5   Q.  Do you take friendships into account?

03:57PM 6   A.  No.

03:57PM 7   Q.  Would it be improper to do those things?

03:57PM 8   A.  I believe so, yes.

03:57PM 9   Q.  Would it be a violation of the oath that you took?

03:57PM 10  A.  Yes.

03:57PM 11  Q.  So you said you've been a group supervisor since June of

03:57PM 12  2019, but prior to that you were a special agent; is that

03:57PM 13  correct?

03:57PM 14  A.  Yes.

03:57PM 15  Q.  What are your duties as a special agent?

03:57PM 16  A.  Ultimately, we enforce title 21 of United States Code.

03:57PM 17  And to do that, our main duties include surveillance work,

03:57PM 18  writing reports, meeting with confidential sources, wiretap,

03:57PM 19  whatever the case would entail.

03:57PM 20  Q.  What types of controlled substances does the DEA

03:57PM 21  investigate and arrest people and support prosecutions for?

03:57PM 22  A.  We arrest people for everything from heroin, marijuana,

03:58PM 23  cocaine, fentanyl, Ecstasy, methamphetamine.

03:58PM 24  Q.  Basically, all controlled substances, right?

03:58PM 25  A.  Yes.

03:58PM    1    Q.  And federally, marijuana is still a Schedule I controlled

03:58PM    2    substance, correct?

03:58PM    3    A.  Yes.

03:58PM    4    Q.  And in your experience, through your tenure at the DEA,

03:58PM    5    is a 1,000-plus kilogram marijuana conspiracy, is that a

03:58PM    6    significant case?

03:58PM    7    A.  Yes.

03:58PM    8    Q.  Has that always been true?

03:58PM    9    A.  Yes.

03:58PM   10    Q.  Now, eventually, during your time at the DEA, did you

03:58PM   11    begin working with a special agent named Joseph Bongiovanni?

03:58PM   12    A.  Yes.

03:58PM   13    Q.  And did he arrive in Buffalo sometime after you started

03:58PM   14    there?

03:58PM   15    A.  Yes, I believe he arrived a year or two after my arrival.

03:58PM   16    Q.  So that would put him around 2001?

03:58PM   17    A.  I think that's accurate, yes.

03:59PM   18    Q.  Do you see him in court today?

03:59PM   19    A.  I do.

03:59PM   20    Q.  Can you please point to him and describe something he's

03:59PM   21    wearing?

03:59PM   22    A.  Yes, he's sitting at the defense table, dark suit, white

03:59PM   23    shirt, gray tie.

03:59PM   24    Q.  Which chair is he in?

03:59PM   25    A.  The middle chair.

Case 1:19-cr-00227-LJV-MJR   Document 792   Filed 03/01/24   Page 7 of 59
USA v Bongiovanni - Gentile - Tripi/Direct - 2/29/24

7

03:59PM  1      **MR. TRIPI:**  Your Honor, may the record reflect the

03:59PM  2    identification of defendant.

03:59PM  3      **THE COURT:**  It does.

03:59PM  4      **MR. TRIPI:**  Thank you.

03:59PM  5      **BY MR. TRIPI:**

03:59PM  6  Q.  During your overlapping period in the Buffalo office, did

03:59PM  7  you work in the same group as Mr. Bongiovanni?

03:59PM  8  A.  Yes.  There was -- for multiple years there was some

03:59PM  9  movement there, but I was in his group at various times

03:59PM  10  throughout.

03:59PM  11  Q.  And maybe I should ask, the DEA has several groups; is

03:59PM  12  that right?

03:59PM  13  A.  Yes.  Our office, throughout the years, there's always

03:59PM  14  been at least two groups.

03:59PM  15  Q.  What would those two primary groups have been?

03:59PM  16  A.  One was considered what's called a task force group,

03:59PM  17  that's comprised of both special agents and local and state

04:00PM  18  law enforcement officers.

04:00PM  19      And the other group is what is referred to as an

04:00PM  20  enforcement group, and typically that contains more special

04:00PM  21  agents than task force officers.

04:00PM  22  Q.  Did those group have numbers?

04:00PM  23  A.  Yes.

04:00PM  24  Q.  What were the numbers?

04:00PM  25  A.  Again, those numbers have changed over the years.

04:00PM   1    Currently those numbers are what are referred to D-57 and

04:00PM   2    D-58.

04:00PM   3    Q.   Now with regard to Mr. Bongiovanni, in a one-on-one

04:00PM   4    setting, did you ever socialize with him outside of work?

04:00PM   5    A.   Office functions, Christmas parties, things like that.

04:00PM   6    Q.   So nothing just you and him?

04:00PM   7    A.   No.

04:00PM   8    Q.   Were you friendly with him at work?

04:00PM   9    A.   Yes.

04:00PM   10   Q.   Did you get to know him through the years?

04:00PM   11   A.   Yes, I did.

04:00PM   12   Q.   Do you have any -- anything personally against him as you

04:00PM   13   sit here today?

04:00PM   14   A.   I don't.

04:00PM   15   Q.   Would you prefer this circumstance not exist?

04:01PM   16   A.   Absolutely.

04:01PM   17   Q.   Now, during your tenure in the DEA with

04:01PM   18   Mr. Bongiovanni -- withdrawn.

04:01PM   19       Would it be fair to say his retirement from the DEA was

04:01PM   20   shortly before you became a group supervisor in 2019?

04:01PM   21   A.   Yes, I believe it was probably a few months prior to me

04:01PM   22   becoming a supervisor.

04:01PM   23   Q.   So for the bulk of -- for all of your tenure together,

04:01PM   24   you were both special agents, correct?

04:01PM   25   A.   Yes.

USA v Bongiovanni - Gentile - Tripi/Direct - 2/29/24

04:01PM 1  Q.  Have you ever -- what is a co-case agent?

04:01PM 2  A.  A co-case agent is somebody that would assist what we

04:01PM 3  call the lead case agent.  Often assisting with whatever the

04:01PM 4  case would require.  It can be, you know, assisting with

04:02PM 5  surveillance work, doing paperwork, things like that.

04:02PM 6  Q.  As far as you recall, have you ever been a co-case agent

04:02PM 7  on a case with Mr. Bongiovanni?

04:02PM 8  A.  I don't believe so, no.

04:02PM 9  Q.  Have you ever been what's considered a partner of

04:02PM 10  Mr. Bongiovanni?

04:02PM 11  A.  Not a partner, just would occasionally assist any

04:02PM 12  investigations he had going on.

04:02PM 13  Q.  That was my next question.  Have you assisted him from

04:02PM 14  time to time?

04:02PM 15  A.  Yes.

04:02PM 16  Q.  Has he assisted you?

04:02PM 17  A.  Yes.

04:02PM 18  Q.  And is it a relatively small office?

04:02PM 19  A.  I think everybody knows everybody, yes.

04:02PM 20  Q.  At some point, would it be fair to say that everyone has

04:02PM 21  assisted everybody else to some degree?

04:02PM 22  A.  Yes.

04:02PM 23  Q.  During your time working in the office with

04:02PM 24  Mr. Bongiovanni, did you know him to be someone in the office

04:02PM 25  who did many wiretaps?

04:03PM  1    A.  I do recall a federal wiretap that he did early in his

04:03PM  2    career.  And then I believe towards the end of his career, he

04:03PM  3    assisted on a New York State wiretap with the New York State

04:03PM  4    Attorney General's Office.

04:03PM  5    Q.  In your view, is two wiretaps in the spanning

04:03PM  6    approximately 20 years, is that a lot of wiretaps?

04:03PM  7    A.  It varies.  There's individuals that don't do any.

04:03PM  8    Q.  Do you think two is a high number?

04:03PM  9    A.  I'm going to say it's average.

04:03PM  10   Q.  Okay.  Did you know him to be someone who ran a lot of

04:03PM  11   pen registers?

04:03PM  12   A.  I don't.

04:03PM  13   Q.  Who did you understand to be individuals who would be

04:03PM  14   considered partners of Mr. Bongiovanni through the years?

04:03PM  15   A.  I believe he worked with a Task Force Officer Joseph

04:04PM  16   Palmieri.

04:04PM  17      Earlier, prior to that, I believe he worked with a Task

04:04PM  18   Force Officer Thomas Doctor.

04:04PM  19      And that's all that kind of comes to mind right now.

04:04PM  20      Maybe DEA Agent Michael Hill.

04:04PM  21   Q.  So, so you said the earlier part of his career, Thomas

04:04PM  22   Doctor.  What years would you estimate that to be?

04:04PM  23   A.  I can't recall exact years.  I can remember it is --

04:04PM  24   throughout my career, our office has moved to various

04:04PM  25   locations.  Our first office -- at least my first office when

04:04PM   1   I came here was in the Guaranty Building here in Buffalo.

04:04PM   2   And that had to be somewhere through 2002 through 2008 maybe.

04:04PM   3   Q.   So that's the estimated window of time where Mr. Doctor

04:05PM   4   was his partner, somewhere in there?

04:05PM   5   A.   I don't know if Mr. Doctor was there for the full six

04:05PM   6   years, but that would have been the time frame he was there.

04:05PM   7   Q.   Okay.  So, somewhere in that window of time, Doctor's his

04:05PM   8   partner?

04:05PM   9   A.   Yes.

04:05PM   10  Q.   And then after that, Palmieri becomes his partner at some

04:05PM   11  point?

04:05PM   12  A.   Yes.

04:05PM   13  Q.   And did that continue until Palmieri left the DEA?

04:05PM   14  A.   I believe so, yes.

04:05PM   15  Q.   And do you remember what approximate year that was that

04:05PM   16  Palmieri left?

04:05PM   17  A.   I don't remember the exact year.  I believe it was prior

04:05PM   18  to Mr. Bongiovanni's retirement.  And it was definitely prior

04:05PM   19  to my promotion, so --

04:05PM   20  Q.   Was there ever a time that, in terms of office space,

04:05PM   21  where you were physically positioned near Mr. Bongiovanni in

04:05PM   22  terms of seating within the office?

04:05PM   23  A.   At our -- and I'll call it our second office which was

04:06PM   24  the Electric Tower here in Buffalo, I believe there was a

04:06PM   25  time frame where myself and Mr. Bongiovanni, being assigned

04:06PM   1   to the same group, we sat next to each other, 10 or 15 feet

04:06PM   2   away from each other, same row.

04:06PM   3   Q.  Can you give us the approximation of the years that

04:06PM   4   seating arrangement existed?

04:06PM   5   A.  I believe we moved into the Electric Tower in 2008.  And

04:06PM   6   I think upon our -- once we first moved in there, it would

04:06PM   7   have been around that time frame.

04:06PM   8   Q.  For how many years?

04:06PM   9   A.  Again, it's a guess, I'm going to approximate, maybe

04:06PM   10  three or four years.

04:06PM   11  Q.  While you did sit in approximately in some proximity to

04:06PM   12  Mr. Bongiovanni in the Electric Tower, do you ever recall

04:06PM   13  seeing a particular file on his desk in his possession?

04:07PM   14  A.  Yes.

04:07PM   15  Q.  Was it a file that you observed in his possession

04:07PM   16  frequently on his desk?

04:07PM   17  A.  I did observe it on his desk, yes.

04:07PM   18  Q.  What did the file look like?

04:07PM   19  A.  It was a -- a brown folder.  It had a -- a name written

04:07PM   20  across the top of it.

04:07PM   21  Q.  What was the name you remember seeing?

04:07PM   22  A.  Serio.

04:07PM   23  Q.  Now, regarding a DEA case file C2-13-0026, file title

04:07PM   24  Wayne Anderson, as that file pertains to a Ron Serio, were

04:07PM   25  you ever a case agent or did you ever assist Joe Bongiovanni

04:07PM   1   the defendant in any way on that case?

04:07PM   2   A.   No.

04:07PM   3   Q.   Regarding that case file, did you ever sign any documents

04:08PM   4   in that case at Mr. Bongiovanni's request?

04:08PM   5   A.   No.

04:08PM   6   Q.   Regarding that DEA case file, did you have any awareness

04:08PM   7   of the facts pertaining to the confidential source that

04:08PM   8   Mr. Bongiovanni had activated and deactivated in that case?

04:08PM   9   A.   I did not.

04:08PM   10   Q.   And through the years of working at the DEA, prior to

04:08PM   11   becoming a group supervisor, were there times where you acted

04:08PM   12   as an acting group supervisor?

04:08PM   13   A.   Occasionally, yes.

04:08PM   14   Q.   And can you tell the jury what happens, like, when an

04:08PM   15   agent has to act as a group supervisor?

04:08PM   16   A.   Typically, if the actual group supervisor can't be in the

04:09PM   17   office for vacation or sickness, that person will delegate

04:09PM   18   somebody within the group to be the acting group supervisor.

04:09PM   19   Q.   And does an acting group supervisor, much like a group

04:09PM   20   supervisor, sign off on documents?

04:09PM   21   A.   Yes.

04:09PM   22   Q.   When you do that, as an acting group supervisor and now

04:09PM   23   as a group supervisor, do you individually reinvestigate all

04:09PM   24   of the information in the report that you're signing off on?

04:09PM   25   A.   I don't.

| | | |
|---|---|---|
| 04:09PM | 1 | Q.  Would that be practical to do? |
| 04:09PM | 2 | A.  I don't believe so, no. |
| 04:09PM | 3 | Q.  When you are submitted a document as a group supervisor |
| 04:09PM | 4 | or previously when you acted as group supervisor, do you |
| 04:09PM | 5 | trust the information that's documented in the report that's |
| 04:09PM | 6 | provided to you to sign off on? |
| 04:09PM | 7 | A.  Yes, I do. |
| 04:09PM | 8 | Q.  Is that trust something that's important when you're |
| 04:09PM | 9 | working in law enforcement generally and specifically in the |
| 04:10PM | 10 | DEA Buffalo office? |
| 04:10PM | 11 | A.  Yes. |
| 04:10PM | 12 | Q.  Why is that trust important? |
| 04:10PM | 13 | A.  It's important because the job we do, there's -- there's |
| 04:10PM | 14 | a danger aspect to it, and it's just -- it's very important. |
| 04:10PM | 15 | Q.  Are you required to act with integrity in your |
| 04:10PM | 16 | interpersonal dealings with fellow agents? |
| 04:10PM | 17 | A.  Yes. |
| 04:10PM | 18 | Q.  Are you required to be honest and accurate in the reports |
| 04:10PM | 19 | that are filed? |
| 04:10PM | 20 | A.  Yes. |
| 04:10PM | 21 | Q.  Are all agents under those same obligations? |
| 04:10PM | 22 | A.  Yes. |
| 04:10PM | 23 | Q.  Are there times when you're an investigator in a case and |
| 04:10PM | 24 | you -- where you make an application in support of a search |
| 04:10PM | 25 | warrant ultimately intended for a federal court where you |

04:10PM   1   have to sign and swear to the contents of an affidavit?

04:10PM   2   A.   Yes.

04:10PM   3   Q.   Are there times in your career that you're aware of where

04:10PM   4   some of the information in an affidavit that you're swearing

04:10PM   5   to was provided to you by other members of law enforcement?

04:10PM   6   A.   Yes.

04:10PM   7   Q.   And before you sign and take an oath that the information

04:11PM   8   is true, do you have to trust those other members of law

04:11PM   9   enforcement to do that?

04:11PM  10   A.   Yes.

04:11PM  11   Q.   To do that confidently?

04:11PM  12   A.   Yes.

04:11PM  13   Q.   To do that honestly before a judge, similar to the judge

04:11PM  14   that's sitting here?

04:11PM  15   A.   Yes.

04:11PM  16   Q.   When you put your signature on a line, whether it be a

04:11PM  17   search warrant or other report associated with your job, are

04:11PM  18   you taking ownership of that document?

04:11PM  19   A.   Yes.

04:11PM  20   Q.   And when you sign those documents in your capacity as a

04:11PM  21   group supervisor and a special agent, do you have an

04:11PM  22   awareness that untruths in those, documents whether a search

04:11PM  23   warrant or an affidavit, could ruin -- can end your career?

04:12PM  24   A.   Yes.

04:12PM  25   Q.   So do you take it seriously when you sign?

04:12PM      1    A.  I do.

04:12PM      2    Q.  Now, in your capacity as a group supervisor and

04:12PM      3    previously as an acting group supervisor, have other agents

04:12PM      4    in the DEA have an opportunity to see your signature?

04:12PM      5    A.  Yes.

04:12PM      6    Q.  Because you have to sign the reports, right?

04:12PM      7    A.  Yes.

04:12PM      8    Q.  During the course of working with defendant Bongiovanni,

04:12PM      9    has he had an opportunity to observation your signature on

04:12PM     10    documents?

04:12PM     11    A.  I would assume.

04:12PM     12    Q.  And you sat pretty much next to each other for a period

04:12PM     13    of time?

04:12PM     14    A.  Yes.

04:12PM     15    Q.  And in your career in the DEA office, have you signed

04:12PM     16    hundreds or thousands of documents around that office?

04:12PM     17    A.  Probably thousands.

04:12PM     18    Q.  In your view, is your signature simplistic?

04:13PM     19    A.  I think so.

04:13PM     20    Q.  Is it brief?

04:13PM     21    A.  Yes.

04:13PM     22    Q.  In your view, is your signature one that might be easy to

04:13PM     23    duplicate?

04:13PM     24    A.  Yes.

04:13PM     25    Q.  Now, DEA's a busy place, right?

04:13PM   1   A.  Yes.

04:13PM   2   Q.  Are there times when there are situations where you've

04:13PM   3   signed a document for another agent?

04:13PM   4   A.  Yes.

04:13PM   5   Q.  And do you have a standard routine practice that you

04:13PM   6   follow when you do that?

04:13PM   7   A.  Yes.

04:13PM   8   Q.  Can you describe your standard routine practice that you

04:13PM   9   engage in when you sign the document for another agent?

04:13PM  10   A.  I would sign my name, with a slash, and then the letters

04:13PM  11   F-O-R, for.

04:13PM  12   Q.  And why do you sign your name on the signature line and

04:13PM  13   then slash it and write the word F-O-R?

04:14PM  14   A.  To show that I'm signing for the name or the person whose

04:14PM  15   name is most likely typed into that that box or line there.

04:14PM  16       **MR. TRIPI:**  Now, I'd like to put up on the monitor

04:14PM  17   screen, this is in evidence already, Your Honor, Government

04:14PM  18   Exhibit 9E3.

04:14PM  19       **BY MR. TRIPI:**

04:14PM  20   Q.  Can you see that okay?  Or would you like it blown up

04:14PM  21   more?  The whole document, I don't know if we can get the

04:14PM  22   whole page blown up.

04:14PM  23   A.  I can see it.

04:14PM  24   Q.  Generally speaking, as it relates to the title of the

04:14PM  25   form and the form number, are you familiar with this

04:14PM    1    document, what this document is?

04:14PM    2    A.   Yes.

04:14PM    3    Q.   What is it?

04:14PM    4    A.   This is a DEA form 512D.  It's a confidential source

04:15PM    5    deactivation form.

04:15PM    6    Q.   Now, in box 1, there is -- well, let me back up for a

04:15PM    7    second.

04:15PM    8         **MR. TRIPI:**  We can X out of that.

04:15PM    9         **BY MR. TRIPI:**

04:15PM   10    Q.   Prior to testifying here today, you've reviewed that

04:15PM   11    exact form, correct?

04:15PM   12    A.   Yes.

04:15PM   13    Q.   Did you have any involvement in drafting that form?

04:15PM   14    A.   No.

04:15PM   15    Q.   Are you familiar with the content of that form in terms

04:15PM   16    of the veracity of the contents?

04:15PM   17    A.   I'm not, no.

04:15PM   18    Q.   Have you -- now, let's go to box 1.  Have you ever

04:15PM   19    interacted with C.S. 13-144841?

04:15PM   20    A.   Not to my knowledge, no.

04:15PM   21    Q.   Do you know as you sit here who that person is?

04:15PM   22    A.   No.

04:15PM   23    Q.   Was the first time you saw this specific form when you

04:16PM   24    were interviewed by the Department of Justice Office of

04:16PM   25    Inspector General?

Case 1:19-cr-00227-LJV-MJR   Document 792   Filed 03/01/24   Page 19 of 59
USA v Bongiovanni - Gentile - Tripi/Direct - 2/29/24

19

04:16PM   1   A.  Yes.

04:16PM   2   Q.  Prior to seeing that form during your interview with DOJ

04:16PM   3   OIG, have you ever seen this exact document before?

04:16PM   4   A.  No.

04:16PM   5          MR. TRIPI:  You can zoom out of that box, please.

04:16PM   6          If we could zoom in on the signature lines from box

04:16PM   7   11 down, please.

04:16PM   8          BY MR. TRIPI:

04:16PM   9   Q.  Now, in box 11, do you recognize the printed name there?

04:16PM   10  A.  Yes.

04:16PM   11  Q.  And whose printed name is there?

04:16PM   12  A.  Joseph Bongiovanni.

04:16PM   13  Q.  And what is box 11 depicting Joseph Bongiovanni's role is

04:16PM   14  as relates to this confidential source deactivation?

04:16PM   15  A.  It identifies him as being the controlling agent.

04:17PM   16  Q.  And in the box 11A, do you see where it says signature of

04:17PM   17  controlling agent?

04:17PM   18  A.  Yes.

04:17PM   19  Q.  Do you see a signature there?

04:17PM   20  A.  Yes.

04:17PM   21  Q.  Do you recognize that signature?

04:17PM   22  A.  I believe it's Joseph Bongiovanni's.

04:17PM   23  Q.  Does it look -- look like a signature you've seen for him

04:17PM   24  before?

04:17PM   25  A.  Yes.

04:17PM   1   Q.  And do you see the date of that document?

04:17PM   2   A.  September 9th of 2013.

04:17PM   3   Q.  Now, I'd like to move you down to box 13 for a moment.

04:17PM   4   Do you see whose name is typed and printed there?

04:17PM   5   A.  Yes.

04:17PM   6   Q.  And who is that?

04:17PM   7   A.  John Flickinger.

04:17PM   8   Q.  And at the time of September 9, 2013, was he a group

04:17PM   9   supervisor similar to what you are today?

04:17PM  10   A.  Yes.

04:17PM  11   Q.  And in box 13A, do you see a signature there?

04:17PM  12   A.  Yes.

04:17PM  13   Q.  Do you believe that to be John Flickinger's signature?

04:18PM  14   A.  I believe so.

04:18PM  15   Q.  Okay.  Now I'd like to direct your attention into box 12,

04:18PM  16   okay?  Under the box 12 for typed print name and title of

04:18PM  17   controlling agent, do you see a name there?

04:18PM  18   A.  Yes.

04:18PM  19   Q.  Whose name is that?

04:18PM  20   A.  Shane Nastoff.

04:18PM  21   Q.  And much like yourself, currently, Shane Nastoff is a

04:18PM  22   group supervisor in the DEA, correct?

04:18PM  23   A.  Yes.

04:18PM  24   Q.  As of September 9, 2013, he -- he had been in the Buffalo

04:18PM  25   office for about, what, four years?

04:18PM   1          MR. SINGER:  Objection, leading.

04:18PM   2          THE COURT:  I'm sorry?

04:18PM   3          MR. SINGER:  Leading.

04:18PM   4          MR. TRIPI:  All right.

04:18PM   5          THE COURT:  Sustained.

04:18PM   6          BY MR. TRIPI:

04:18PM   7   Q.  Do you know how long he'd been in the office by this

04:18PM   8   point?

04:18PM   9   A.  Yes, approximately four years, I believe.

04:18PM  10   Q.  Okay.  Thank you.

04:18PM  11        Now, do you see a date box 11B where that signature is?

04:18PM  12   A.  Yes, September 9 of 2013.

04:18PM  13   Q.  Now, do you see a signature in the middle there, do you

04:18PM  14   see a signature there?

04:18PM  15   A.  Yes.

04:19PM  16   Q.  Is that Shane Nastoff's signature?

04:19PM  17   A.  I don't believe so, no.

04:19PM  18   Q.  Okay.  Does that resemble a signature you're familiar

04:19PM  19   with?

04:19PM  20   A.  It resembles mine, yes.

04:19PM  21   Q.  Did you sign that document?

04:19PM  22   A.  No.

04:19PM  23   Q.  Do you believe that's a forgery of your signature?

04:19PM  24   A.  I did not sign it, I believe.

04:19PM  25   Q.  So what's the other option if you didn't sign it?

04:19PM  1   A.  Somebody else must have signed that.

04:19PM  2   Q.  Your signature.  Signed your name.

04:19PM  3   A.  Somebody must have signed my signature, and I say that

04:19PM  4   because the first thing that popped out at me was the fact

04:19PM  5   there wasn't a slash and F-O-R when I saw the document.

04:19PM  6   Q.  Okay.  And if you didn't sign it, and it's your name, is

04:19PM  7   another word for that forgery?

04:19PM  8        **MR. SINGER:**  Objection.

04:19PM  9        **THE COURT:**  Sustained.

04:19PM  10       **BY MR. TRIPI:**

04:20PM  11   Q.  Did you sign this document, yes or no?

04:20PM  12   A.  No.

04:20PM  13   Q.  Now, in September of 2013, do you know whether Agent

04:20PM  14   Nastoff was generally available around the DEA office?

04:20PM  15   A.  Yes, I believe he was.

04:20PM  16   Q.  Is a source deactivation form a time-sensitive form that

04:20PM  17   needs to be signed if someone's unavailable?

04:20PM  18   A.  I don't believe so.

04:20PM  19   Q.  At -- as of that time, about four years into Nastoff's

04:20PM  20   career, what was your opinion of him as an agent?

04:20PM  21       **MR. SINGER:**  Objection.

04:20PM  22       **THE COURT:**  Sustained.

04:20PM  23       **MR. TRIPI:**  701 opinion, Judge.

04:20PM  24       **THE COURT:**  Opinion of Shane Nastoff?

04:20PM  25       **MR. TRIPI:**  What is his opinion of Nastoff as an

Case 1:19-cr-00227-LJV-MJR   Document 792   Filed 03/01/24   Page 23 of 59
USA v Bongiovanni - Gentile - Tripi/Direct - 2/29/24

23

04:20PM   1   agent.

04:20PM   2          **THE COURT:**  What's the relevance of that?

04:20PM   3          **MR. TRIPI:**  I can explain if you want --

04:20PM   4          **THE COURT:**  Yeah.

04:20PM   5          **MR. TRIPI:**  -- if you'd let me come up.

04:20PM   6          **THE COURT:**  Yeah.

04:20PM   7          (Sidebar discussion held on the record.)

04:21PM   8          **MR. TRIPI:**  So, Judge, we've heard testimony that

04:21PM   9   from several witnesses now that certain forms have not been

04:21PM  10   signed by them, we've heard that from this witness.  There's

04:21PM  11   an inference to be drawn as to the certain names are being

04:21PM  12   names being used on forms.  If it's someone who has a good

04:21PM  13   reputation in the office, that is another layer where someone

04:21PM  14   could bolster a form and give it less scrutiny for a

04:21PM  15   supervisor to sign off on.

04:21PM  16          So I assume the defense is going to argue on

04:21PM  17   summation, well, a supervisor signed off on all of these

04:21PM  18   things, and I believe I'm allowed to generate facts in the

04:21PM  19   record to create the opposite inference which is if you put

04:21PM  20   certain names on it and those people have good reputations, a

04:21PM  21   supervisor might -- may likely give it less scrutiny.

04:21PM  22          That's where I'm going.

04:21PM  23          **THE COURT:**  Okay.  Why not?

04:21PM  24          **MR. SINGER:**  Number one, it's a bolstering objection.

04:21PM  25   That's the first thing, Judge.  He's trying to, without having

04:22PM  1   Mr. Nastoff character attacked, bolster by having this witness

04:22PM  2   testify that, oh, he's a great agent, he does X, Y, Z.  All

04:22PM  3   right?  So that's problem number 1.

04:22PM  4        Secondly, with regard to the proffer that's being

04:22PM  5   made here about what it's being offered for, there's acting

04:22PM  6   G.S.s in the office that sign off on forms.  I mean, that's

04:22PM  7   not in dispute.  That's one of the reasons why they're there.

04:22PM  8        And so to say, well, the reason why this particular

04:22PM  9   signature was used is because this person was an acting G.S.,

04:22PM  10  there's no link there.

04:22PM  11       **MR. TRIPI:**  It was because he was a respected agent,

04:22PM  12  not that Nastoff was an acting G.S.

04:22PM  13       **MR. SINGER:**  So the other part of it, Judge, is that

04:22PM  14  there's other people who signed these this forms, too.  We had

04:22PM  15  Agent Leary in this morning who was signing a form, he was not

04:22PM  16  an acting G.S., didn't have any type of particular

04:23PM  17  credibility.

04:23PM  18       **THE COURT:**  What does that have to do with anything?

04:23PM  19       **MR. SINGER:**  Well, that's what they're offering it

04:23PM  20  for.  They're trying to offer --

04:23PM  21       **THE COURT:**  No, I don't think so.  I don't think so.

04:23PM  22  The acting G.S. role, I haven't heard a thing about acting

04:23PM  23  G.S.

04:23PM  24       **MR. SINGER:**  So what came out in testimony was that

04:23PM  25  Mr. Gentile, in addition to having duties as a regular special

04:23PM    1    agent, at time periods --

04:23PM    2            **THE COURT:**  Right.

04:23PM    3            **MR. SINGER:** -- at this time --

04:23PM    4            **THE COURT:**  Right.

04:23PM    5            **MR. SINGER:** -- was also an acting G.S. at the time.

04:23PM    6    So what we expect to have come out in testimony is that his

04:23PM    7    signature was signed there because, well, I'm a well-respected

04:23PM    8    person in the office and I, you know, was an acting G.S. at

04:23PM    9    the time.

04:23PM    10            That's the basis for the testimony, that's why he's

04:23PM    11    saying this.  And again, it's basically putting forward

04:23PM    12    bolstering information which is improper.

04:23PM    13            **THE COURT:**  Yeah, I'm concerned about the bolstering.

04:23PM    14            **MR. TRIPI:**  I'm not bolstering anybody's credibility,

04:23PM    15    I'm --

04:23PM    16            **THE COURT:**  You're bolstering --

04:23PM    17            **MR. TRIPI:**  I didn't mean to interrupt you, Judge.

04:23PM    18    Sorry.

04:23PM    19            **THE COURT:**  You're not bolstering Mr. Nastoff's

04:23PM    20    credibility?

04:23PM    21            **MR. TRIPI:**  Not his credibility as a testifying

04:24PM    22    witness in this trial, which is the proper scope of a

04:24PM    23    bolstering objection.

04:24PM    24            **THE COURT:**  Okay.

04:24PM    25            **MR. TRIPI:**  It's going to the --

|          |    |                                                                   |
|----------|----|-------------------------------------------------------------------|
| 04:24PM  | 1  | **THE COURT:**  So, make your question very precise.              |
| 04:24PM  | 2  | **MR. TRIPI:**  Okay.                                             |
| 04:24PM  | 3  | **THE COURT:**  And I'll probably allow it.  But it's got         |
| 04:24PM  | 4  | to be a precise.  What's his reputation as, you know, a DEA       |
| 04:24PM  | 5  | agent, not what's his reputation for honesty and that.           |
| 04:24PM  | 6  | **MR. TRIPI:**  Okay.                                             |
| 04:24PM  | 7  | **THE COURT:**  What's his reputation as a DEA agent in           |
| 04:24PM  | 8  | that office.                                                      |
| 04:24PM  | 9  | **MR. TRIPI:**  Understand.                                       |
| 04:24PM  | 10 | **THE COURT:**  And I will allow that.                            |
| 04:24PM  | 11 | **MR. TRIPI:**  Thank you.                                        |
| 04:24PM  | 12 | (End of sidebar discussion.)                                      |
| 04:24PM  | 13 | **THE COURT:**  So the question is withdrawn.  Ask               |
| 04:24PM  | 14 | another question, please.                                         |
| 04:24PM  | 15 | **BY MR. TRIPI:**                                                 |
| 04:24PM  | 16 | Q.  As it relates to Shane Nastoff, as of the time of the        |
| 04:24PM  | 17 | signing of this document or the dates that are relevant to        |
| 04:24PM  | 18 | this document, did you have a high regard for Shane Nastoff       |
| 04:24PM  | 19 | in the office?                                                    |
| 04:24PM  | 20 | A.  Yes.                                                          |
| 04:24PM  | 21 | Q.  Do you believe others had a high regard for Shane Nastoff     |
| 04:24PM  | 22 | in the office?                                                    |
| 04:24PM  | 23 | A.  Yes.                                                          |
| 04:24PM  | 24 | Q.  Okay.  Now, as it relates to you, do you believe that you    |
| 04:25PM  | 25 | were well respected in the DEA Buffalo office at this time       |

Case 1:19-cr-00227-LJV-MJR   Document 792   Filed 03/01/24   Page 27 of 59
USA v Bongiovanni - Gentile - Tripi/Direct - 2/29/24

27

04:25PM  1  frame?

04:25PM  2          MR. SINGER:  Objection, speculation.

04:25PM  3          MR. TRIPI:  His own self belief of his --

04:25PM  4          THE COURT:  About himself?

04:25PM  5          MR. TRIPI:  For the same argument.

04:25PM  6          THE COURT:  Sustained, sustained, sustained.

04:25PM  7          BY MR. TRIPI:

04:25PM  8  Q.  Do you have an opinion about why your name would be

04:25PM  9  placed on that signature line?

04:25PM  10          MR. SINGER:  Objection, speculation.

04:25PM  11          THE COURT:  Sustained.  Sustained.

04:25PM  12          BY MR. TRIPI:

04:25PM  13  Q.  Okay.  What is the purpose of having a second person

04:25PM  14  other than the handling agent sign the deactivation form?

04:25PM  15          MR. SINGER:  Objection, asked and answered, Judge.

04:25PM  16          MR. TRIPI:  That was not.

04:25PM  17          THE COURT:  No, it wasn't.  Overruled.

04:25PM  18          THE WITNESS:  I'm sorry, could you repeat.

04:25PM  19          MR. TRIPI:  Ms. Sawyer, could you please repeat the

04:25PM  20  question?

04:25PM  21          (The above-requested question was then read by the

04:26PM  22  reporter.)

04:26PM  23          THE WITNESS:  I think just to make sure that both

04:26PM  24  agents that are the handlers are aware of the fact and maybe

04:26PM  25  communicate with each other that that individual is no longer

04:26PM   1   going to be signed up as a confidential source.

04:26PM   2           **BY MR. TRIPI:**

04:26PM   3   Q.  And you were not a handler of or a co-handler of this

04:26PM   4   source, correct?

04:26PM   5   A.  I was not.

04:26PM   6   Q.  So you wouldn't have any basis of knowledge to verify any

04:26PM   7   of the information, right?

04:26PM   8   A.  Correct.

04:26PM   9   Q.  As a group supervisor --

04:26PM  10           **MR. TRIPI:**  We can take that bold down, leave the

04:26PM  11   document up.

04:26PM  12           **BY MR. TRIPI:**

04:27PM  13   Q.  As a group supervisor, do you sign a lot of forms?

04:27PM  14   A.  Yes.

04:27PM  15   Q.  Do you have to sign off on a lot of reports?

04:27PM  16   A.  Yes, I do.

04:27PM  17   Q.  I imagine those include DEA-6s, deactivation forms for

04:27PM  18   services, all kinds of documents, right?

04:27PM  19   A.  Yes.

04:27PM  20   Q.  Do you conduct signature comparisons of agents when they

04:27PM  21   come hand you a form to sign off on?

04:27PM  22   A.  No.

04:27PM  23   Q.  Why don't you do that?

04:27PM  24   A.  Well, I don't have the time.  I think things are

04:27PM  25   different now because now everything is electronic, so I

04:27PM    1    don't know what time frame you're referring to.

04:27PM    2    Q.  Was there a time when there were hardcopy signatures that

04:27PM    3    you had to sign off on?

04:27PM    4    A.  Yes.

04:27PM    5    Q.  Were there hardcopy signatures in 2019?

04:27PM    6    A.  I believe so, yes.

04:27PM    7    Q.  2020?

04:27PM    8    A.  Yes.

04:27PM    9    Q.  2021?

04:27PM   10    A.  Yes.

04:27PM   11    Q.  Previously when you were an acting G.S.?

04:27PM   12    A.  Yes, there was.

04:27PM   13    Q.  Okay.  Did you ever conduct a handwriting comparison when

04:28PM   14    agents handed you a form for signoff?

04:28PM   15    A.  No.

04:28PM   16    Q.  Did you trust what they were handing you?

04:28PM   17    A.  Yes.

04:28PM   18    Q.  Do group supervisors get a lot of emails?

04:28PM   19    A.  Yes.

04:28PM   20    Q.  Are you cc'd on emails?

04:28PM   21    A.  I am.

04:28PM   22    Q.  As a group supervisor, when you're cc'd, in the cc line

04:28PM   23    of an email, do you independently investigate and verify

04:28PM   24    every sentence that an agent writes in an email?

04:28PM   25    A.  I don't.

04:28PM   1   Q.  How many emails do you estimate a G.S. gets a month?

04:28PM   2   A.  A few hundreds.

04:28PM   3   Q.  Would it be practical to reinvestigate every email?

04:28PM   4   A.  In my opinion, no.

04:28PM   5   Q.  Why don't you reinvestigate the things that agents write

04:28PM   6   in emails?

04:28PM   7   A.  I trust what's in the email, and time constraints.

04:28PM   8   Q.  In your -- in your experience as an agent and as a group

04:29PM   9   supervisor, if a confidential source had provided valuable

04:29PM  10   information and had performance that was very positive, is

04:29PM  11   that a source that you would close after approximately three

04:29PM  12   months if they had agreed to be a source for a year?

04:29PM  13   A.  Again, without knowing who the source is, my answer would

04:29PM  14   be no, I would have kept them open.

04:29PM  15   Q.  Okay.  Are -- are acquiring and having sources a key part

04:29PM  16   of being a DEA agent?

04:29PM  17   A.  Yes.

04:29PM  18   Q.  Do more sources being opened help investigations?

04:29PM  19   A.  Yes.

04:29PM  20   Q.  Are there times when sources may not have current

04:29PM  21   information, but in the future they acquire information

04:29PM  22   that's actionable?

04:30PM  23   A.  That's accurate, yes.

04:30PM  24   Q.  I'd like to direct your attention back to December 1st,

04:30PM  25   2005.  Back a while, okay?  But, were you involved in a

Case 1:19-cr-00227-LJV-MJR   Document 792   Filed 03/01/24   Page 31 of 59
USA v Bongiovanni - Gentile - Tripi/Direct - 2/29/24

31

| | | |
|---|---|---|
| 04:30PM | 1 | search of a residence associated with an individual named |
| 04:30PM | 2 | Craig Border? |
| 04:30PM | 3 | A.  Yes. |
| 04:30PM | 4 | MR. TRIPI:  Ms. Champoux, could we pull up Government |
| 04:30PM | 5 | Exhibit 11A.  I believe it is in evidence. |
| 04:30PM | 6 | THE COURT:  Hang on until you make sure. |
| 04:30PM | 7 | MR. TRIPI:  I believe it was put in evidence subject |
| 04:30PM | 8 | to connection the other day. |
| 04:30PM | 9 | THE CLERK:  Yes, it was. |
| 04:30PM | 10 | MR. SINGER:  That's correct. |
| 04:30PM | 11 | MR. TRIPI:  So could we display this warrant? |
| 04:31PM | 12 | THE CLERK:  To the jury. |
| 04:31PM | 13 | THE COURT:  Yes. |
| 04:31PM | 14 | MR. TRIPI:  Yes. |
| 04:31PM | 15 | THE CLERK:  Thank you. |
| 04:31PM | 16 | BY MR. TRIPI: |
| 04:31PM | 17 | Q.  And, Mr. Gentile, this is a DEA-6; is that right? |
| 04:31PM | 18 | A.  Yes. |
| 04:31PM | 19 | Q.  And if you look in the details, paragraph 1, does it -- |
| 04:31PM | 20 | I'm going to summarize it if that's okay, but does that |
| 04:31PM | 21 | generally relate to execution of a search warrant December |
| 04:31PM | 22 | 1st, 2005? |
| 04:31PM | 23 | A.  Yes. |
| 04:31PM | 24 | Q.  In the other officers line, does it relate to a search at |
| 04:31PM | 25 | 775 Main Street, Apartment 105, Buffalo, New York? |

04:31PM   1   A.   Yes, it does.

04:31PM   2   Q.   Actually that was box 10, I'm sorry, I read the wrong

04:31PM   3   box.   Box 9, the other officers line, are you among the

04:31PM   4   agents who participated in the warrant as documented in the

04:31PM   5   report?

04:31PM   6   A.   Yes, I am.

04:31PM   7   Q.   Is Mr. Bongiovanni another agent who participated in the

04:31PM   8   warrant as documented in the report?

04:31PM   9   A.   Yes.

04:31PM   10   Q.   And were a number of other agents and law enforcement

04:32PM   11   officers personnel involved as listed there?

04:32PM   12   A.   Yes, there were.

04:32PM   13   Q.   And when there's a search of a residence by the DEA, so a

04:32PM   14   physical search of a premises, a residential premises, can

04:32PM   15   you just generally describe for the jury how that's conducted

04:32PM   16   by the DEA?

04:32PM   17   A.   Yes.   Upon making entry into a residence, typically one

04:32PM   18   of the team members, referred to maybe as a team leader, will

04:32PM   19   oftentimes assign different individuals to go into different

04:32PM   20   rooms to begin searching the property.

04:32PM   21   Q.   And is -- does the searching personnel make entry after

04:32PM   22   there's an initial entry, and it's deemed to be safe for

04:32PM   23   searching?

04:32PM   24   A.   Yes.

04:32PM   25   Q.   And do agents generally spread out and search various

04:33PM    1   portions of the residence and premises consistent with what

04:33PM    2   they're authorized to look for in the warrant?

04:33PM    3   A.  Yes.

04:33PM    4   Q.  And do agents essentially have authority to search all

04:33PM    5   areas of the authorized premises consistent with the warrant?

04:33PM    6   A.  Yes, they do.

04:33PM    7   Q.  Typical a residential search warrant execution for drugs,

04:33PM    8   what types of areas of a residence, an apartment or a house

04:33PM    9   are you looking in?

04:33PM   10   A.  We would look in any area where we think that drugs may

04:33PM   11   be hidden.  It could be dresser drawers, it could be ceiling

04:33PM   12   tiles, floorboards --

04:33PM   13   Q.  Closets?

04:33PM   14   A.  -- closets, under the beds, under mattress.

04:33PM   15   Q.  Cabinets, desks, anything where you could find drugs?

04:33PM   16   A.  Correct.

04:33PM   17   Q.  Is a search warrant an invasive technique?

04:33PM   18   A.  Yes, sir.

04:33PM   19   Q.  Making entry someone's home?

04:33PM   20   A.  Yes.

04:33PM   21   Q.  When agents do that, they're authorized to make

04:34PM   22   observations, and then remove that which is authorized by the

04:34PM   23   warrant, correct?

04:34PM   24   A.  Yes.

04:34PM   25   Q.  When agents do that, when they conduct search warrants

04:34PM   1   like you did on December 1st, 2005, do agents have permission

04:34PM   2   to share what they see at a search warrant with members of

04:34PM   3   the general public?

04:34PM   4   A.  No.

04:34PM   5   Q.  What is the proper purpose of a search warrant?

04:34PM   6   A.  To obtain evidence.

04:34PM   7   Q.  Is what is observed and what is seized during the

04:34PM   8   execution of search warrant, is that law-enforcement-

04:34PM   9   sensitive information?

04:34PM   10  A.  Yes.

04:34PM   11  Q.  Is the information and observations made during a search

04:34PM   12  of someone's house, is that to be disclosed in a proper

04:35PM   13  format, for example, in criminal discovery in a criminal

04:35PM   14  case?

04:35PM   15  A.  Yes.

04:35PM   16  Q.  Would you or have you ever gone into a search warrant,

04:35PM   17  and then gone and told a friend what was seized, and what you

04:35PM   18  saw in a warrant?

04:35PM   19          **MR. SINGER:**  Objection, relevance.

04:35PM   20          **THE COURT:**  We're beating this horse pretty good,

04:35PM   21  Mr. Tripi, let's move on.

04:35PM   22          **MR. TRIPI:**  Okay.  Sounds good, Judge.  In 2004 -- we

04:35PM   23  can take can that down, please.

04:35PM   24          **BY MR. TRIPI:**

04:35PM   25  Q.  In 2004, are you aware that the DEA Buffalo office opened

04:35PM  1  a file, file titled Michael Masecchia in 2004?

04:35PM  2  A.  I'm aware of it now, yes.

04:36PM  3  Q.  Have you reviewed some documents that had you listed as

04:36PM  4  among the other officers on some of the documents in the

04:36PM  5  Buffalo file?

04:36PM  6  A.  Yes, I have.

04:36PM  7  Q.  Did you also review some -- and those same reports, was

04:36PM  8  Mr. Bongiovanni listed as another officer on the file?

04:36PM  9  A.  I believe he was, yes.

04:36PM  10  Q.  And this was a case based out of parallel case out of

04:36PM  11  Las Vegas?

04:36PM  12  A.  Yes.

04:36PM  13  Q.  And who was the case agent on the Las Vegas end of

04:36PM  14  things, if you recall?

04:36PM  15  A.  I believe it was Anthony Casullo.

04:36PM  16  Q.  And many years later, he would come and work in the

04:36PM  17  Buffalo office, correct?

04:36PM  18  A.  Yes.

04:36PM  19  Q.  And on the Buffalo side of that file, who was the listed

04:36PM  20  case agent?

04:36PM  21  A.  I believe it was Michael Hill.

04:36PM  22  Q.  And you had said he was someone who had partnered up with

04:36PM  23  Defendant Bongiovanni before?

04:36PM  24  A.  I believe so, yes.

04:37PM  25  Q.  Now do you remember conducting any specific investigation

04:37PM   1    yourself on that Masecchia file?

04:37PM   2    A.   I don't.

04:37PM   3    Q.   Do you remember anyone else telling you about specific

04:37PM   4    investigation that was conducted on the file?

04:37PM   5            MR. SINGER:  Objection, hearsay.

04:37PM   6            MR. TRIPI:  It's not for the truth.

04:37PM   7            THE COURT:  Yeah.  No, overruled.  Do you remember,

04:37PM   8    the question is.

04:37PM   9            THE WITNESS:  No.

04:37PM   10           THE COURT:  Read it back, Ann, please.

04:37PM   11        (The last question was read back by the reporter.)

04:37PM   12           BY MR. TRIPI:

04:37PM   13   Q.   Did the defendant ever disclose to you that he had a

04:37PM   14   personal relationship or friendship with Mike Masecchia?

04:37PM   15   A.   No.

04:37PM   16   Q.   Did the defendant ever tell you that he went to high

04:37PM   17   school with Mike Masecchia?

04:37PM   18   A.   No.

04:37PM   19   Q.   Did the defendant ever tell you he went to college or

04:37PM   20   drove to college with Mike Masecchia?

04:37PM   21   A.   No.

04:37PM   22   Q.   Did the defendant ever tell you that Mike Masecchia was

04:38PM   23   at the stag party of his before his marriage?

04:38PM   24   A.   No.

04:38PM   25           MR. TRIPI:  One moment please, Your Honor.

04:38PM  1          I don't have any further direct exam, Your Honor.

04:38PM  2          **THE COURT:**  Cross?

04:38PM  3          **MR. SINGER:**  I do, Judge.  I'm mindful of the time,

04:38PM  4  and I don't anticipate being done in 20 minutes.

04:38PM  5          **THE COURT:**  Well, we'll go until 5 at least, and then

04:38PM  6  decide what to do then.

04:39PM  7          **MR. SINGER:**  Very well.

04:39PM  8

04:39PM  9              **CROSS-EXAMINATION BY MR. SINGER:**

04:39PM  10  Q.  Hi, Mr. Gentile.

04:39PM  11  A.  Good afternoon.

04:39PM  12  Q.  So I know we're pressed for time here, so I'm going to

04:39PM  13  try to get through this as quick as I can, okay?

04:39PM  14  A.  No problem.

04:39PM  15  Q.  All right.  So you testified on direct you worked with

04:39PM  16  Mr. Bongiovanni for several years at the DEA, correct?

04:39PM  17  A.  Yes.

04:39PM  18  Q.  I think you said that you got to the office in 1999?

04:39PM  19  A.  Yes.

04:39PM  20  Q.  And he arrived in the office in 2001?

04:39PM  21  A.  I think, I'm not sure exactly, I believe 2001.

04:39PM  22  Q.  So right around that time --

04:39PM  23  A.  Yes.

04:39PM  24  Q.  -- shortly after you arrived at the DEA; fair statement?

04:39PM  25  A.  Yes.

04:39PM  1   Q.  And you two, you were never partners, correct?

04:39PM  2   A.  I'm sorry, I didn't hear what you said.

04:39PM  3   Q.  You were never partners, correct?

04:40PM  4   A.  Correct.

04:40PM  5   Q.  But you worked cases together, correct?

04:40PM  6   A.  Yes.

04:40PM  7   Q.  And I think you said that you also worked in the same

04:40PM  8   group as him at some points in time in your career?

04:40PM  9   A.  Yes.

04:40PM 10   Q.  And so just we can flesh that out again, because I'm not

04:40PM 11   sure if the jury has a total grasp of this yet.  But the

04:40PM 12   Buffalo DEA office is divided up into different groups of

04:40PM 13   agents, correct?

04:40PM 14   A.  Yes, it is.

04:40PM 15   Q.  So one of them is D-57, correct?

04:40PM 16   A.  Correct.

04:40PM 17   Q.  And they handle more localized narcotics infractions?

04:40PM 18   A.  They would handle both local -- something referred to as

04:40PM 19   targets of opportunity, and more long-term investigations

04:40PM 20   also.

04:40PM 21   Q.  Okay.  And then another one is D-58; is that right?

04:40PM 22   A.  Yes.

04:40PM 23   Q.  And D-58 does what again?

04:40PM 24   A.  That's what's considered the task force group, and again,

04:40PM 25   I think it's fair to say they would handle both smaller

04:40PM   1   cases, quick hits, or targets of opportunity, in addition to

04:40PM   2   long-term investigations.

04:40PM   3   Q.   And on top of that, there's also a tactical diversion

04:41PM   4   group; is that right?

04:41PM   5   A.   Yes, correct.

04:41PM   6   Q.   So what does tactical diversion do?  I don't know if that

04:41PM   7   ever came up yet.

04:41PM   8   A.   Tactical diversion, it's a relatively new group, few

04:41PM   9   years old.  They focus more on pharmaceuticals.

04:41PM  10   Q.   So I guess when they're investigating pharmaceuticals,

04:41PM  11   what is it that they're doing with regard to pharmaceuticals?

04:41PM  12   What do they do?

04:41PM  13          MR. TRIPI:  Objection to relevance as to what the

04:41PM  14   tactical diversion groups does as to pharmaceuticals.

04:41PM  15          MR. SINGER:  Judge, it's part of the office, I'm

04:41PM  16   trying to give the jury an understanding of what the DEA does

04:41PM  17   and what groups they have.

04:41PM  18          MR. TRIPI:  They investigate drug cases.

04:41PM  19          THE COURT:  No, I understand.  I'll give you a little

04:41PM  20   latitude, Mr. Singer.

04:41PM  21          MR. SINGER:  I appreciate it.

04:41PM  22          THE COURT:  We're not going too far with it.

04:41PM  23          MR. SINGER:  I'm not going too far with it, I just

04:41PM  24   want to give the jury a basic understanding.

04:41PM  25          THE COURT:  So the objection is overruled.  Go ahead.

04:41PM 1          **MR. SINGER:**  Thank you.

04:41PM 2          **THE WITNESS:**  Yeah, so the tactical diversion group

04:41PM 3     would focus on pharmaceuticals, with an emphasis on maybe

04:41PM 4     investigating pharmacists or doctors that prescribe them

04:41PM 5     different pharmaceuticals.

04:41PM 6          **BY MR. SINGER:**

04:41PM 7     Q.   Correct.  So in other words, if a CVS has someone who

04:42PM 8     might be stealing drugs from the pharmacy, they're gonna be

04:42PM 9     looking at that?

04:42PM 10    A.   Yes.

04:42PM 11    Q.   And they're gonna look at whether the pharmacy is

04:42PM 12    complying with federal laws or federal regulations with

04:42PM 13    regard to what they need to report on the pharmaceuticals

04:42PM 14    that are controlled that they have?

04:42PM 15    A.   Yes.

04:42PM 16    Q.   Okay.  So it's not really street work, correct?

04:42PM 17    A.   I think that's accurate, yes.

04:42PM 18    Q.   Okay.  So, let's get back to Mr. Bongiovanni.  So you

04:42PM 19    worked with him for many, many years, right?

04:42PM 20    A.   Yes.

04:42PM 21    Q.   And this is as a special agent, the same grade that he

04:42PM 22    is, correct?

04:42PM 23    A.   Yes.

04:42PM 24    Q.   And then at some point in your career, you get to fulfill

04:42PM 25    a role sometimes, when the group supervisor is no longer in

04:42PM    1   the office, to be an acting group supervisor; is that right?

04:42PM    2   A.   That's correct.

04:42PM    3   Q.   And so when did you start assuming those

04:42PM    4   responsibilities?

04:42PM    5   A.   That, I can't answer.   It's very sporadic.   As far as

04:42PM    6   being an acting group supervisor?

04:42PM    7   Q.   Correct.

04:42PM    8   A.   Again, that was a day or two a year, maybe, sometimes.

04:42PM    9   Because there would have been other individuals in the group

04:43PM   10   that are probably more senior to myself that would assume

04:43PM   11   that duty.

04:43PM   12   Q.   So not very often?

04:43PM   13   A.   I think that's fair.

04:43PM   14   Q.   Okay.   And when was it that you started to become in a

04:43PM   15   position where you were up for promotion?

04:43PM   16   A.   When did I become eligible for promotion?

04:43PM   17   Q.   Correct.

04:43PM   18   A.   The way it works in DEA is when somebody becomes what is

04:43PM   19   referred to as a GS-13, they become eligible to put in for

04:43PM   20   promotions.

04:43PM   21   Q.   Okay.   And that's how you got to your current role as a

04:43PM   22   group supervisor; is that correct?

04:43PM   23   A.   Yes.

04:43PM   24   Q.   And you've been a group supervisor since 2019?

04:43PM   25   A.   Yes.

04:43PM   1   Q.  Which group do you supervise in DEA Buffalo?

04:43PM   2   A.  D-57.

04:43PM   3   Q.  Okay.  So that's the old group you used to work with,

04:43PM   4   with Mr. Bongiovanni, right?

04:43PM   5   A.  Yes.

04:43PM   6   Q.  Okay.  So, I know that you were never Mr. Bongiovanni's

04:43PM   7   partner, but you did, as you testified on direct, have an

04:43PM   8   opportunity to observation him working in the office,

04:43PM   9   correct?

04:43PM  10   A.  Yes.

04:43PM  11   Q.  And sometimes you'd support on some of the cases that he

04:43PM  12   was investigating?

04:43PM  13   A.  Yes.

04:43PM  14   Q.  And it seems like that's what everyone did at DEA.  If

04:43PM  15   someone had something big going on at one point in time, they

04:44PM  16   would jump off their cases and help out the agent who needed

04:44PM  17   help?

04:44PM  18   A.  That's correct, that's what we do.

04:44PM  19   Q.  And that's what you had the opportunity then to observe

04:44PM  20   what Mr. Bongiovanni was doing on cases?

04:44PM  21   A.  Yes.

04:44PM  22   Q.  And you testified that the type of cases that he

04:44PM  23   generally was involved in were heroin cases?

04:44PM  24   A.  I know he did a lot of heroin cases, yes.

04:44PM  25   Q.  Okay.  And he did a lot of crack cases, as well?

04:44PM  1   A.  Yes.

04:44PM  2   Q.  And the cases that he was doing, were they kind of like

04:44PM  3   buy-bust operations?

04:44PM  4   A.  Yes.  I know he did a lot of those.

04:44PM  5   Q.  Okay.  You mentioned that he did two Title III wiretap

04:44PM  6   cases in his career?

04:44PM  7   A.  Off the top of my head, I know for sure he did an

04:44PM  8   investigation early in his career.  It was referred to as

04:44PM  9   Operation Déjà Vu.

04:44PM  10  Q.  Okay.

04:44PM  11  A.  It was a wiretap.

04:44PM  12  Q.  Okay.

04:44PM  13  A.  And then later in his career, I believe he did some

04:44PM  14  wiretaps with the New York State Attorney General's Office.

04:44PM  15  Q.  Okay.  And Mr. Tripi asked you whether that was low, or

04:45PM  16  high, or average, and you had remarked average on direct,

04:45PM  17  correct?

04:45PM  18  A.  Yes, sir.

04:45PM  19  Q.  And so it wasn't a type of case that he did all the time,

04:45PM  20  correct?

04:45PM  21  A.  That's correct.

04:45PM  22  Q.  Just kind of average for the office?

04:45PM  23  A.  Yes.

04:45PM  24  Q.  And I guess, you know, you had an opportunity to take a

04:45PM  25  look at Mr. Bongiovanni when he was working at the DEA,

04:45PM   1   right?

04:45PM   2   A.   Yes.

04:45PM   3   Q.   Is it fair to say that he didn't take on the most complex

04:45PM   4   cases that were investigated by the office?

04:45PM   5   A.   I agree with that.

04:45PM   6   Q.   Yeah.   It was more simple cases?

04:45PM   7   A.   Yes.

04:45PM   8   Q.   And you're a supervisor now at DEA, right?

04:45PM   9   A.   Yes, I am.

04:45PM   10   Q.   How many people work for you again?

04:45PM   11   A.   I believe I have maybe 12 to 14 people in my group.

04:45PM   12   Q.   And you kind of take stock of the abilities of each and

04:45PM   13   every one of those people under your command, correct?

04:45PM   14   A.   Yes.

04:45PM   15   Q.   And, you know, while I think all supervisors would love

04:45PM   16   to have, you know, everyone a ten-out-of-ten agent, that's

04:46PM   17   just not the fact of the case, right?

04:46PM   18   A.   That's correct.

04:46PM   19   Q.   And as a supervisor, sometimes you steer people to cases

04:46PM   20   that they're very good at, right?

04:46PM   21   A.   I do, yes.

04:46PM   22   Q.   And sometimes you may steer people away from cases they

04:46PM   23   might not necessarily excel at, correct?

04:46PM   24   A.   Yes.

04:46PM   25   Q.   Because that's what good supervisors do?

04:46PM   1   A.  I agree with that.

04:46PM   2   Q.  Okay.  So we talked a little bit about confidential

04:46PM   3   sources in your direct.  You testified that, generally

04:46PM   4   speaking, somebody gets signed up for one year; is that

04:46PM   5   right?

04:46PM   6   A.  Yeah.  And it needs to be explained there was a time when

04:46PM   7   the confidential source agreement with DEA was a one-year

04:46PM   8   term.  That agreement is now a 90-day term.

04:46PM   9   Q.  And when did that change, sir?

04:46PM  10   A.  I don't have the exact date.  I'm gonna say maybe three

04:47PM  11   or four years ago.

04:47PM  12   Q.  And you know from your training and experience one of the

04:47PM  13   reasons why that changed is because DEA has a policy that if

04:47PM  14   a confidential source can't really produce, or isn't working

04:47PM  15   out, after 90 days the policy is to deactivate that source,

04:47PM  16   right?

04:47PM  17   A.  Correct.

04:47PM  18   Q.  So, later on in time, the DEA's policy with regard to

04:47PM  19   performance of the confidential sources came more in line

04:47PM  20   with the contract; is that right?

04:47PM  21   A.  Yes.

04:47PM  22        MR. TRIPI:  Objection as to came more in line with

04:47PM  23   the contract.

04:47PM  24        THE COURT:  Yeah, I don't know what that means, so

04:47PM  25   I'm going to --

04:47PM    1    **MR. SINGER:** Sure.

04:47PM    2    **THE COURT:** -- sustain the objection.

04:47PM    3    **MR. SINGER:** Let me withdraw and rephrase, Judge.

04:47PM    4    **BY MR. SINGER:**

04:47PM    5    Q. So, currently, the policy is 90 days?

04:47PM    6    A. Yes, it is.

04:47PM    7    Q. And that's what you sign C.S.s up for in the agreements?

04:47PM    8    A. Yes.

04:47PM    9    Q. And in the past, it was one year?

04:47PM    10    A. Yes.

04:47PM    11    Q. And so you had a policy, too, at the time it was a year,

04:47PM    12    that the person would, if they were not performing,

04:47PM    13    potentially be deactivated after 90 days, correct?

04:47PM    14    A. Correct.

04:47PM    15    Q. So, fair to say that the policy started to match what the

04:48PM    16    contract expectations were later?

04:48PM    17    A. I'm not -- I'm not sure I understand.

04:48PM    18    Q. No, I'm just gonna move on. Don't worry about it.

04:48PM    19    So, if a C.S., back in the day, did not perform, it was

04:48PM    20    the DEA policy to deactivate that source after 90 days,

04:48PM    21    correct?

04:48PM    22    A. Yes.

04:48PM    23    Q. And I know that you said you didn't do any work, to your

04:48PM    24    knowledge, on the C2-13-0026 file, correct?

04:48PM    25    A. Correct.

Case 1:19-cr-00227-LJV-MJR   Document 792   Filed 03/01/24   Page 47 of 59
USA v Bongiovanni - Gentile - Singer/Cross - 2/29/24

47

04:48PM   1   Q.  And you also testified on direct you didn't do any

04:48PM   2   interactions with the confidential source that was mentioned

04:48PM   3   in that case file, correct?

04:48PM   4   A.  Correct.

04:48PM   5   Q.  So you don't have any basis of knowledge to say whether

04:48PM   6   that person who is the C.S. was performing or not, correct?

04:48PM   7   A.  I don't.

04:48PM   8   Q.  And you're aware of DEA policy with regard to that

04:48PM   9   confidential source agreement, it has a couple different

04:48PM  10   provisions in there that govern what the controlled -- what

04:49PM  11   the confidential source can and can't do, correct?

04:49PM  12   A.  Correct.

04:49PM  13   Q.  And you're familiar with the fact that if a confidential

04:49PM  14   source were to use narcotics during the time period they're

04:49PM  15   signed up as a C.S., that's a violation of the agreement,

04:49PM  16   correct?

04:49PM  17   A.  Yes.

04:49PM  18   Q.  And that can be grounds to deactivate that source,

04:49PM  19   correct?

04:49PM  20   A.  Absolutely, yes.

04:49PM  21   Q.  Now, on that form that we were looking at earlier --

04:49PM  22        MR. SINGER:  Ms. Champoux, will you mind bringing up

04:49PM  23   Government Exhibit 9E-3, please.

04:49PM  24        BY MR. SINGER:

04:49PM  25   Q.  So, Mr. Tripi asked you a couple of questions about some

04:49PM    1   of the blocks of information in there, correct?

04:49PM    2   A.  Yes.

04:49PM    3   Q.  Do you remember him asking one question about whether it

04:49PM    4   would be something in your training and experience if the

04:49PM    5   source was very good, that it would be odd to deactivate that

04:50PM    6   source?

04:50PM    7   A.  Yes.

04:50PM    8   Q.  But with regard to this particular source, you don't know

04:50PM    9   whether they were doing a good job or not, correct?

04:50PM   10   A.  I have no idea.

04:50PM   11   Q.  You only know what the form says, correct?

04:50PM   12   A.  Correct.

04:50PM   13        **MR. SINGER:**  So, Ms. Champoux, can you zoom in on the

04:50PM   14   bottom block, please?

04:50PM   15        **BY MR. SINGER:**

04:50PM   16   Q.  So you talked a little bit on direct about this block of

04:50PM   17   signatures, correct?

04:50PM   18   A.  Yes, I did.

04:50PM   19   Q.  And with regard to block 12A, you stated that you don't

04:50PM   20   recognize that as Special Agent Nastoff's signature, correct?

04:50PM   21   A.  Correct.

04:50PM   22   Q.  And that you stated that it also appeared to look like

04:51PM   23   your signature, correct?

04:51PM   24   A.  Yes.

04:51PM   25   Q.  But you don't believe it's your signature, correct?

04:51PM  1   A.  Correct.

04:51PM  2   Q.  And one of the reasons why you don't believe it's your

04:51PM  3   signature is because you don't recall ever being presented

04:51PM  4   this form?

04:51PM  5   A.  Correct.

04:51PM  6   Q.  So one of the questions you got asked on direct, sir, was

04:51PM  7   the amount of forms you sign as a group supervisor; do you

04:51PM  8   remember that question?

04:51PM  9   A.  Yes, I do.

04:51PM  10  Q.  And also the amount of forms you sign as a special agent

04:51PM  11  with the DEA; do you remember that question?

04:51PM  12  A.  Yes, I do.

04:51PM  13  Q.  And I think you testified that it's probably up in the

04:51PM  14  several thousands at this point in time?

04:51PM  15  A.  It's accurate.

04:51PM  16  Q.  And when you're a group supervisor, you tend to sign even

04:51PM  17  more forms than when you're a special agent, right?

04:51PM  18  A.  Yes.

04:51PM  19  Q.  Can you remember every single time you signed a form,

04:51PM  20  sir?

04:51PM  21  A.  No.

04:51PM  22  Q.  And what about forms that you signed one month ago, can

04:51PM  23  you remember every single form you signed?

04:51PM  24  A.  No.

04:51PM  25  Q.  And so we're talking about a form here that dates back to

04:51PM  1    September 9th, 2013, correct?

04:52PM  2    A.  Correct.

04:52PM  3    Q.  How many forms do you think you may have signed since

04:52PM  4    September of 2013 in your career as a DEA agent?

04:52PM  5    A.  Thousands.

04:52PM  6    Q.  Thousands?  And you don't have specific memory of every

04:52PM  7    single form you signed going back that far, correct?

04:52PM  8    A.  I don't.

04:52PM  9    Q.  And you could agree with me that a form from 2013, you

04:52PM  10   would even have less of a recollection of at this point in

04:52PM  11   time in 2023 than any other period, correct?

04:52PM  12   A.  Correct.

04:52PM  13   Q.  Because it's a long time ago, correct?

04:52PM  14   A.  Yes, it is.

04:52PM  15          **MR. SINGER:**  You can take that down, Ms. Champoux.

04:52PM  16          **BY MR. SINGER:**

04:52PM  17   Q.  So, Mr. Tripi asked you a little bit about the purpose of

04:52PM  18   emails -- strike that.

04:52PM  19       Mr. Tripi asked you about emails you receive as a group

04:52PM  20   supervisor, correct?

04:52PM  21   A.  Yes.

04:52PM  22   Q.  And you said that you receive many --

04:52PM  23   A.  Yes.

04:52PM  24   Q.  -- a week?

04:52PM  25   A.  Yes, I do.

USA v Bongiovanni - Gentile - Singer/Cross - 2/29/24

51

04:52PM    1    Q.  One of the reasons why you receive a lot is because you

04:52PM    2    have people cc'ing you on those emails, correct?

04:52PM    3    A.  Yes.

04:52PM    4    Q.  And the purpose of the carbon copy is to give you

04:53PM    5    awareness of what's going on, correct?

04:53PM    6    A.  Correct.

04:53PM    7    Q.  And I know that all of us, we have busy jobs, it's

04:53PM    8    difficult to cut through all of the emails, but when your

04:53PM    9    subordinates are cc'ing you on email traffic that they send,

04:53PM   10    you're gonna take a little more interest in those type of

04:53PM   11    emails than the other ones you're cc'd on, correct?

04:53PM   12    A.  The emails I get from the individuals I supervise?

04:53PM   13    Q.  Correct.

04:53PM   14    A.  Yes.  I'll take an interest in those, yes.

04:53PM   15    Q.  So what I'm getting at is, like, all of us get cc'd on

04:53PM   16    various emails, right?

04:53PM   17    A.  Yes, sir.

04:53PM   18    Q.  If you got cc'd on an email from your boss, you'd

04:53PM   19    probably pay more attention to that email than you would

04:53PM   20    other emails, correct?

04:53PM   21    A.  I would yes, sir.

04:53PM   22    Q.  And the same thing goes for subordinates under your

04:53PM   23    charge, you're responsible for them, right?

04:53PM   24    A.  Yes, I am.

04:53PM   25    Q.  Your duty is to look after them, correct?

Case 1:19-cr-00227-LJV-MJR   Document 792   Filed 03/01/24   Page 52 of 59
USA v Bongiovanni - Gentile - Singer/Cross - 2/29/24

52

04:53PM     1    A.  Yes.

04:53PM     2    Q.  And so sometimes, if they send an email and you're cc'd

04:53PM     3    on that, it's probably because they want to alert you to

04:53PM     4    something that's important, correct?

04:53PM     5    A.  Yes.

04:53PM     6    Q.  And you want to also keep tabs on what they're doing,

04:54PM     7    correct?

04:54PM     8    A.  I would.

04:54PM     9    Q.  And that's a way for all of you to communicate back and

04:54PM    10    forth about what's going on in particular cases, right?

04:54PM    11    A.  Yes, it is.

04:54PM    12    Q.  And what's going on in particular matters, correct?

04:54PM    13    A.  Yes.

04:54PM    14    Q.  So, I know you receive hundreds of emails a week.  But

04:54PM    15    for the ones that you receive from your subordinates, you

04:54PM    16    read those, right?

04:54PM    17    A.  I do.

04:54PM    18    Q.  And it's not just reading those emails, but you also have

04:54PM    19    conversations with your subordinates about the emails that

04:54PM    20    they send, right?

04:54PM    21    A.  I have, yes.

04:54PM    22    Q.  You bring them into your office sometimes?

04:54PM    23    A.  Yes, I do.

04:54PM    24    Q.  You also have meetings weekly or monthly with them?

04:54PM    25    A.  Probably every other month I have group meetings.

Case 1:19-cr-00227-LJV-MJR   Document 792   Filed 03/01/24   Page 53 of 59
USA v Bongiovanni - Gentile - Singer/Cross - 2/29/24

53

| | | |
|---|---|---|
| 04:54PM | 1 | Q.   Okay.  So every other month, you have a sit-down with |
| 04:54PM | 2 | your group? |
| 04:54PM | 3 | A.   Yes, I do. |
| 04:54PM | 4 | Q.   And the purpose is to coordinate and to talk about cases? |
| 04:54PM | 5 | A.   Yes. |
| 04:54PM | 6 | Q.   And fair to say that some of the information you're |
| 04:54PM | 7 | getting on these emails that you're cc'd on is coming up in |
| 04:54PM | 8 | those conversations? |
| 04:54PM | 9 | A.   Yes. |
| 04:54PM | 10 | Q.   Okay.  So it's not like you have total unawareness of |
| 04:55PM | 11 | emails that you're cc'd on, right? |
| 04:55PM | 12 | A.   That's accurate, yes. |
| 04:55PM | 13 | Q.   You talked a little bit about a case in, sorry, 2004 |
| 04:55PM | 14 | regarding a Michael Masecchia? |
| 04:55PM | 15 | A.   Yes. |
| 04:55PM | 16 | Q.   And you testified earlier that you didn't have any |
| 04:55PM | 17 | specific recollection of that case and your involvement in |
| 04:55PM | 18 | it, correct? |
| 04:55PM | 19 | A.   Correct. |
| 04:55PM | 20 | Q.   And you don't recall your -- you had to use documents |
| 04:55PM | 21 | from the DEA to refresh your memory as to what you did in |
| 04:55PM | 22 | that case? |
| 04:55PM | 23 | A.   Yes. |
| 04:55PM | 24 | Q.   And that case was a long time ago, correct? |
| 04:55PM | 25 | A.   Yes, it was. |

Case 1:19-cr-00227-LJV-MJR  Document 792  Filed 03/01/24  Page 54 of 59
USA v Bongiovanni - Gentile - Singer/Cross - 2/29/24

54

04:55PM   1   Q.  And it left your memory that you had any involvement in

04:55PM   2   the case, correct?

04:55PM   3   A.  Yes.

04:55PM   4   Q.  But then you took a look at the documents, and you're

04:55PM   5   able to refresh your memory as to what you may have did?

04:55PM   6   A.  They did, yes.

04:55PM   7   Q.  Okay.  So I'd like to direct your attention back to

04:56PM   8   Exhibit 9E-3.

04:56PM   9           **MR. SINGER:**  Ms. Champoux, would you mind bringing

04:56PM  10   that up?  And can you zoom in on the signature block down at

04:56PM  11   the bottom?

04:56PM  12           **BY MR. SINGER:**

04:56PM  13   Q.  So, again, block 12A, it's your testimony today that you

04:56PM  14   don't believe that signature's yours, right?

04:56PM  15   A.  Correct.

04:56PM  16   Q.  It looks like your signature though, right?

04:56PM  17   A.  Yes.

04:56PM  18   Q.  But you don't believe it's yours?

04:56PM  19   A.  Correct.

04:56PM  20   Q.  And one of the reasons is because there's no F-O-R marked

04:56PM  21   next to it?

04:56PM  22   A.  Yes.

04:56PM  23   Q.  And another reason is because you just don't recall

04:56PM  24   signing the form, correct?

04:56PM  25   A.  Correct.

04:56PM    1           **MR. SINGER:**  Thanks, Ms. Champoux.

04:56PM    2           **BY MR. SINGER:**

04:56PM    3   Q.  But this form was dated a long time ago, correct?

04:57PM    4   A.  Yes.

04:57PM    5   Q.  And so with regard to your signature, I think you said it

04:57PM    6   was somewhat simplistic on direct; is that right?

04:57PM    7   A.  Yes.

04:57PM    8   Q.  When you're signing documents at the rate you do, do you

04:57PM    9   tend to try to keep it simple, to make sure you get

04:57PM   10   everything signed on time?

04:57PM   11   A.  Yes.

04:57PM   12   Q.  And when you're signing documents like this, are you

04:57PM   13   trying to get through the document as quick as possible as

04:57PM   14   far as the signature?

04:57PM   15   A.  If I have a lot of them, yes.

04:57PM   16   Q.  Yeah, and I guess as a G.S., when people are dropping off

04:57PM   17   paper to you, and I realize it's all done electronically now,

04:57PM   18   but back in the day when they would drop off paper to you,

04:57PM   19   did you have an inbox on your desk?

04:57PM   20   A.  Back in the day I wouldn't, no.

04:57PM   21   Q.  Okay.  So how did people provide paper for you to sign?

04:57PM   22   A.  Back in the day, I would assume they would have walked it

04:57PM   23   over to me.

04:57PM   24   Q.  Okay.  And then hand you the document.  Would you sign

04:58PM   25   this the same way that you signed a credit card receipt?

04:58PM   1   A.  Yes.

04:58PM   2   Q.  Would you sign it the same way you would sign your will?

04:58PM   3   A.  I would assume, yes.

04:58PM   4   Q.  Would you sign it the same way that you'd sign letters

04:58PM   5   going out?

04:58PM   6   A.  Yes.

04:58PM   7   Q.  So, use the same signature all the time?

04:58PM   8   A.  I'm not gonna say all the time.  Most likely, yes.

04:58PM   9   Q.  Most likely?

04:58PM   10  A.  Yes.

04:58PM   11  Q.  Okay.  All right.  So, I want to bring your attention to

04:58PM   12  a couple different exhibits.

04:58PM   13        **MR. SINGER:**  Ms. Champoux, if you can bring that

04:58PM   14  down.  If you can bring up just on the witness's screen

04:58PM   15  because it's not in evidence defense Exhibit K.2.

04:59PM   16        I'm sorry, can you bring up K.1 first?  I'm sorry.

04:59PM   17        **BY MR. SINGER:**

04:59PM   18  Q.  So I'm going to show you a couple different exhibits

04:59PM   19  here.  I'd like you to take a look at them, okay?  When

04:59PM   20  you've had a chance to review these, it's seven pages, please

04:59PM   21  look up at me.

05:00PM   22     Have you had an opportunity to review all those forms,

05:00PM   23  sir?

05:00PM   24  A.  Yes.

05:00PM   25        **MR. SINGER:**  Okay.  Judge, I know it's 5:00 right

05:00PM    1    now, so --

05:00PM    2         **THE COURT:**  Yeah.  So how much -- how much longer do

05:00PM    3    you think --

05:00PM    4         **MR. SINGER:**  My guess is probably about another 15 or

05:00PM    5    so, and then I know there's going to be redirect.

05:00PM    6         **THE COURT:**  Okay.  So we will break.  We will break

05:00PM    7    now for the week.  It's been a long week.

05:00PM    8         So, folks, we'll take our weekend recess now.

05:00PM    9         Again, it's so important now more than ever that you

05:00PM   10    follow these instructions, because you're going to be away

05:00PM   11    from the case for a weekend, you're going to be with your

05:00PM   12    family, so please remember not to discuss any aspect of this

05:00PM   13    case with anyone.

05:00PM   14         Don't do any research on your own.  Don't use tools

05:00PM   15    of technology to research the case or to communicate about the

05:00PM   16    case with anyone.

05:00PM   17         Don't read or listen to or observe any newspaper or

05:00PM   18    TV or radio or internet coverage of the case, if there is any,

05:00PM   19    while the case is still on trial.

05:00PM   20         And please remember not to make up your mind about

05:00PM   21    anything until all the evidence has been presented, and the

05:01PM   22    case is finally submitted to you.

05:01PM   23         So we'll resume again on Monday morning at 9:30.

05:01PM   24    Again, my sincere thanks.

05:01PM   25         **JURORS:**  No, 11:00.

05:01PM  1    **THE COURT:**  Oh, 11:00.  Thank you very much.  Thank

05:01PM  2  you.  11:00 on Monday.  Thank you for reminding me of that.

05:01PM  3    And my sincere thanks, folks.  You've been a terrific

05:01PM  4  jury.  You've been attentive.  And I'm very, very grateful.  I

05:01PM  5  know the parties and the lawyers are grateful, as well.

05:01PM  6    Have a good weekend.  Get good night's sleep on

05:01PM  7  Sunday.  We'll see you at 11:00 on Monday.

05:02PM  8    (Jury excused at 5:02 p.m.)

9    (Excerpt concluded at 5:02 p.m.)

10    *    *    *    *    *    *    *

11

12    **CERTIFICATE OF REPORTER**

13

14    In accordance with 28, U.S.C., 753(b), I

15  certify that these original notes are a true and correct

16  record of proceedings in the United States District Court for

17  the Western District of New York on February 29, 2024.

18

19

20    s/ Ann M. Sawyer
     Ann M. Sawyer, FCRR, RPR, CRR
21    Official Court Reporter
     U.S.D.C., W.D.N.Y.

22

23

24

25

**TRANSCRIPT INDEX**
**USA v JOSEPH BONGIOVANNI**

**TESTIMONY OF MARK GENTILE - FEBRUARY 29, 2024**

**W I T N E S S**                                          **P A G E**

**M A R K   G E N T I L E**                                2

    DIRECT EXAMINATION BY MR. TRIPI:                      2

    CROSS-EXAMINATION BY MR. SINGER:                      37