<pre>
1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK
2
   _____
3  UNITED STATES OF AMERICA,
                                        Case No. 1:19-cr-227
4               Plaintiff,                         (LJV)
   v.
5                                       March 4, 2024
   JOSEPH BONGIOVANNI,
6
   _____
7                                          Defendant.

8       TRANSCRIPT EXCERPT - TESTIMONY OF MARK GENTILE - DAY 2
              BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                    UNITED STATES DISTRICT JUDGE

10
   APPEARANCES:            TRINI E. ROSS, UNITED STATES ATTORNEY
11                         BY: JOSEPH M. TRIPI, ESQ.
                               NICHOLAS T. COOPER, ESQ.
12                             CASEY L. CHALBECK, ESQ.
                           Assistant United States Attorneys
13                         Federal Centre
                           138 Delaware Avenue
14                         Buffalo, New York 14202
                              And
15                         UNITED STATES DEPARTMENT OF JUSTICE
                           BY: JORDAN ALAN DICKSON, ESQ.
16                         1301 New York Ave NW
                           Suite 1000
17                         Washington, DC 20530-0016
                           For the Plaintiff
18
                           SINGER LEGAL PLLC
19                         BY: ROBERT CHARLES SINGER, ESQ.
                           80 East Spring Street
20                         Williamsville, New York 14221
                              And
21                         LAW OFFICES OF PARKER ROY MacKAY
                           BY: PARKER ROY MacKAY, ESQ.
22                         3110 Delaware Avenue
                           Kenmore, New York  14217
23                         For the Defendant

24 PRESENT:                BRIAN A. BURNS, FBI Special Agent
                           MARILYN K. HALLIDAY, HSI Special Agent
25                         KAREN A. CHAMPOUX, USA Paralegal
</pre>

| | | |
|---|---|---|
| 1 | **LAW CLERK:** | **REBECCA FABIAN IZZO, ESQ.** |
| 2 | **COURT DEPUTY CLERK:** | **COLLEEN M. DEMMA** |
| 3 | **COURT REPORTER:** | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 4 | | Robert H. Jackson Federal Courthouse<br>2 Niagara Square |
| 5 | | Buffalo, New York  14202<br>Ann_Sawyer@nywd.uscourts.gov |

6

7                    *    *    *    *    *    *    *    *

8

9          (Excerpt commenced at 11:26 a.m.)

10          (Jury is present.)

11:26AM   11          **THE COURT:**  I remind the witness that he's still

11:26AM   12   under oath.

11:26AM   13          Mr. Singer, you may resume.

11:26AM   14          **MR. SINGER:** Thank you, Your Honor.

11:26AM   15

11:26AM   16   **M A R K   G E N T I L E**, having been previously duly called

11:26AM   17   and sworn, continued to testify as follows:

11:26AM   18

11:26AM   19               **CROSS-EXAMINATION BY MR. SINGER (CON'T):**

11:26AM   20   Q.  Good morning, Mr. Gentile.

11:26AM   21   A.  Good morning.

11:27AM   22   Q.  So, I know we were a little pressed for time when we

11:27AM   23   stopped on Friday afternoon regarding the exhibit regarding

11:27AM   24   your signatures.

11:27AM   25   A.  Yes.

11:27AM  1    Q.  So I will continue with that.  I just want to get into a

11:27AM  2    few things that I cut short on Friday.

11:27AM  3        So, remember speaking on cross-examination about the

11:27AM  4    cases that Mr. Bongiovanni tended to focus on when he was an

11:27AM  5    agent in the DEA in your experience?

11:27AM  6    A.  Yes.

11:27AM  7    Q.  And we talked about how those were controlled buy/bust

11:27AM  8    kind of cases?

11:27AM  9    A.  Yes, they were.

11:27AM  10   Q.  A little more simplistic than some of the other more

11:27AM  11   complex cases that other people did in the office?

11:27AM  12   A.  Yes.

11:27AM  13   Q.  And I think you testified that as a group supervisor, one

11:27AM  14   of your jobs is to set up the subordinates in your command

11:27AM  15   for success, right?

11:27AM  16   A.  Yes.

11:27AM  17   Q.  And so sometimes you're gonna train certain agents over

11:27AM  18   to certain types of cases; is that right?

11:27AM  19   A.  That's accurate, yes.

11:27AM  20   Q.  And you'll train other agents over to other types of

11:28AM  21   cases, correct?

11:28AM  22   A.  Yes.

11:28AM  23   Q.  So, one of the other things that the government talked to

11:28AM  24   you about last week on direct was an agent by the name of

11:28AM  25   Anthony Casullo; do you remember that?

11:28AM    1    A.  Yes.

11:28AM    2    Q.  And Special Agent Casullo, you had testified, was an

11:28AM    3    agent that you first learned about based on contact he had

11:28AM    4    with the office when he was in Las Vegas, Nevada at the DEA?

11:28AM    5    A.  Correct.

11:28AM    6    Q.  And that was around the 2004 time period; is that right?

11:28AM    7    A.  Yes.

11:28AM    8    Q.  I know you didn't have any specific type of recollection

11:28AM    9    about actions you took on that case in 2004, correct?

11:28AM   10    A.  Correct.

11:28AM   11    Q.  Did you have any recollection about any actions that

11:28AM   12    Mr. Bongiovanni took on that case in 2004?

11:28AM   13    A.  I don't.

11:28AM   14    Q.  Okay.  I think after you reviewed the paperwork, you

11:28AM   15    understood that Agent Casullo had a case in Las Vegas that

11:29AM   16    also involved a person by the name of Michael Masecchia who's

11:29AM   17    located in Buffalo; is that right?

11:29AM   18    A.  Yes.

11:29AM   19    Q.  And Mr. Masecchia, since he was living here, it wasn't

11:29AM   20    outside the ordinary for Agent Casullo to contact DEA Buffalo

11:29AM   21    to assist him in his Las Vegas investigation; is that right?

11:29AM   22    A.  That's right.

11:29AM   23    Q.  That's something that agents do from time to time when

11:29AM   24    they're not geographically located near where a subject is;

11:29AM   25    is that right?

11:29AM  1    A.  Yes.

11:29AM  2    Q.  And I don't know if you're aware, but did you know that

11:29AM  3    Special Agent Mike Hill, the person Special Agent Casullo

11:29AM  4    originally called, the two of them went to the academy

11:29AM  5    together?

11:29AM  6    A.  Yes, I learned that at some point while I was assigned to

11:29AM  7    the Buffalo office.

11:29AM  8    Q.  Okay.  And you've been through the academy before, right?

11:29AM  9    A.  Yes.

11:29AM  10   Q.  You've probably served with agents who are no longer

11:29AM  11   located in Buffalo; is that right?

11:29AM  12   A.  That's right, yes.

11:29AM  13   Q.  And if you knew that you had an investigative lead in a

11:29AM  14   certain office that one of your friends worked at, or one of

11:29AM  15   your academy classmates worked at, it wouldn't be out of the

11:30AM  16   ordinary for you to contact that academy classmate for help,

11:30AM  17   right?

11:30AM  18   A.  Correct.

11:30AM  19   Q.  Okay.  So, do you understand anything about Agent

11:30AM  20   Casullo's request to close the Buffalo file that Mike Hill

11:30AM  21   opened up?

11:30AM  22        **MR. TRIPI:**  Objection.  Facts not in evidence.  It

11:30AM  23   assumed the fact that Casullo requested the file to be closed.

11:30AM  24        **THE COURT:**  So I'll sustain the objection to the form

11:30AM  25   of the question.  You can ask it a different way, Mr. Singer.

| | | |
|---|---|---|
| 11:30AM | 1 | **BY MR. SINGER:** |
| 11:30AM | 2 | Q.  Did you have any conversations with Mr. Hill about why he |
| 11:30AM | 3 | closed the Mike Masecchia file in 2004, 2005? |
| 11:30AM | 4 | A.  No. |
| 11:30AM | 5 | Q.  Okay.  So you don't have any knowledge of why it was |
| 11:30AM | 6 | closed? |
| 11:30AM | 7 | A.  No, I don't. |
| 11:30AM | 8 | Q.  Okay.  And, so, Agent Casullo, while you first learned |
| 11:30AM | 9 | about his existence back in 2004, 2005 time period, you also |
| 11:30AM | 10 | get to meet him when he transfers to Buffalo; is that right? |
| 11:30AM | 11 | A.  Yes.  I don't recall if I knew him back in 2004 or '5, |
| 11:30AM | 12 | but I did obviously meet him when he reported to the Buffalo |
| 11:31AM | 13 | office. |
| 11:31AM | 14 | Q.  Okay.  And he reports to the Buffalo office in 2015? |
| 11:31AM | 15 | A.  I don't know the exact time, but it sounds about right, |
| 11:31AM | 16 | yes. |
| 11:31AM | 17 | Q.  Okay.  Right around that time period or so? |
| 11:31AM | 18 | A.  Yes. |
| 11:31AM | 19 | **MR. TRIPI:**  Objection, Your Honor.  This is beyond |
| 11:31AM | 20 | the scope.  My objection would be if the defense is going to |
| 11:31AM | 21 | adopt this witness for matters far beyond the scope of direct, |
| 11:31AM | 22 | hat -- and they don't want to recall the witness in their |
| 11:31AM | 23 | case, they need to go into those areas by non-leading |
| 11:31AM | 24 | questions. |
| 11:31AM | 25 | **THE COURT:**  Overruled.  Go ahead. |

USA v Bongiovanni - Gentile - Singer/Cross - 3/4/24

7

| | | |
|---|---|---|
| 11:31AM | 1 | **BY MR. SINGER:** |
| 11:31AM | 2 | Q.  So, Agent Casullo reports to the office, and he starts |
| 11:31AM | 3 | working in which group? |
| 11:31AM | 4 | A.  I believe when he reported to the office, I believe he |
| 11:31AM | 5 | was initially assigned to group D-57. |
| 11:31AM | 6 | Q.  So that's the same group that Mr. Bongiovanni was working |
| 11:31AM | 7 | in at that time period? |
| 11:31AM | 8 | A.  Yes. |
| 11:31AM | 9 | Q.  Okay.  And were you working in D-57 at the time?  I know |
| 11:32AM | 10 | you moved around a little bit. |
| 11:32AM | 11 | A.  I don't believe I was at that time. |
| 11:32AM | 12 | Q.  But you were at least in that capacity acting G.S. at |
| 11:32AM | 13 | some points in time? |
| 11:32AM | 14 | **MR. TRIPI:**  Objection.  In what capacity?  I'm |
| 11:32AM | 15 | confused. |
| 11:32AM | 16 | **THE COURT:**  Yeah, sustained to the, again, to the |
| 11:32AM | 17 | form of the question. |
| 11:32AM | 18 | **BY MR. SINGER:** |
| 11:32AM | 19 | Q.  During that period of time after Agent Casullo reported |
| 11:32AM | 20 | to the Buffalo office, did you at some points in time act as |
| 11:32AM | 21 | the group supervisor at some points? |
| 11:32AM | 22 | A.  There's been times throughout my career when I was |
| 11:32AM | 23 | acting, I don't recall if I was specifically acting while |
| 11:32AM | 24 | Agent Casullo was assigned to the group. |
| 11:32AM | 25 | Q.  Okay.  And were you aware of investigations that Agent |

11:32AM 1  Casullo opened after he arrived at the office into Peter

11:32AM 2  Gerace and others?

11:32AM 3  A.  I wasn't aware there was an open investigation, but I do

11:32AM 4  recall hearing the name Peter Gerace, yes.

11:32AM 5  Q.  All right.  Were you aware of any type of information

11:33AM 6  that Agent Casullo uncovered during his investigation that

11:33AM 7  Mr. Bongiovanni's cell phone number was found in a toll log

11:33AM 8  that he ran with regard to Mr. Gerace?

11:33AM 9  A.  I did hear about that, yes.

11:33AM 10  Q.  Okay.  And, I mean, is it fair to say that the fact that

11:33AM 11  that was communicated out in the office caused some friction

11:33AM 12  between Agent Casullo and Mr. Bongiovanni?

11:33AM 13  A.  Yes.

11:33AM 14  Q.  So as far as the friction -- there was some friction at

11:33AM 15  some point with regard to what Agent Casullo reported

11:33AM 16  regarding Mr. Bongiovanni's cell phone but --

11:33AM 17      So with regard to Agent Casullo, I know there was a

11:34AM 18  friction point that developed between Casullo and Bongiovanni

11:34AM 19  regarding what he found out about Peter Gerace's cell phone,

11:34AM 20  but there's another friction that occurred between

11:34AM 21  Mr. Casullo and Mr. Bongiovanni at that time as well,

11:34AM 22  correct?

11:34AM 23      **MR. TRIPI:**  Objection, compound question, and

11:34AM 24  friction point, I don't understand that term.

11:34AM 25      **THE COURT:**  No, I'm going to overrule it.  I think

11:34AM    1    it's a fair question.

11:34AM    2         **THE WITNESS:**  I'm sorry, can you repeat it?  I forgot

11:34AM    3    what you said.

11:34AM    4         **MR. SINGER:**  Yeah, sure.  Ann, can you read that

11:34AM    5    back.

11:34AM    6         (The above-requested question was then read by the

11:34AM    7    reporter.)

11:34AM    8         **THE COURT:**  So the question is, was there some other

11:35AM    9    friction between Agent Casullo and Bongiovanni at that point?

11:35AM   10         **THE WITNESS:**  I know there was tension between the

11:35AM   11    two of them.  As far as what actually caused it, I can't

11:35AM   12    recall what would have caused it.  I'm pretty sure it was

11:35AM   13    related to the toll information from Mr. Gerace's phone.

11:35AM   14         **BY MR. SINGER:**

11:35AM   15    Q.  Okay.  So you're aware that there was tension between

11:35AM   16    Casullo and Bongiovanni, right?

11:35AM   17    A.  Yes.

11:35AM   18    Q.  And you're aware that it related to the toll log that

11:35AM   19    Agent Casullo pulled, correct?

11:35AM   20    A.  Yes.

11:35AM   21    Q.  But you're not aware of any other tension that may have

11:35AM   22    existed between them?

11:35AM   23    A.  I had heard there was some statements made by Mr. --

11:35AM   24         **MR. TRIPI:**  Objection.  That answer is going to be

11:35AM   25    hearsay now, and it's for its truth.

| | | |
|---|---|---|
| 11:35AM | 1 | **THE COURT:**  Yeah, why don't we come up.  Let's come |
| 11:35AM | 2 | up for a second. |
| 11:35AM | 3 | (Sidebar discussion held on the record.) |
| 11:36AM | 4 | **THE COURT:**  So, where are we going with this and how |
| 11:36AM | 5 | is that cross-examination?  Mr. Tripi objected.  I overruled |
| 11:36AM | 6 | the objection.  But we may now be getting into an area that |
| 11:36AM | 7 | really is leading. |
| 11:36AM | 8 | **MR. SINGER:**  So, I mean, number one, is the |
| 11:36AM | 9 | government raised Agent Casullo on the stand originally. |
| 11:36AM | 10 | **THE COURT:**  Which is why I overruled the objection. |
| 11:36AM | 11 | **MR. SINGER:**  No, I understand that, Judge. |
| 11:36AM | 12 | So as far as the tension, so I wasn't expecting him |
| 11:36AM | 13 | to answer anything about what other people were communicating |
| 11:36AM | 14 | in the office.  I think what I was trying to get out is |
| 11:36AM | 15 | whether or not he was aware of other points of tension between |
| 11:36AM | 16 | Casullo and Bongiovanni that existed. |
| 11:36AM | 17 | **THE COURT:**  Well, you asked him, and he said no.  Do |
| 11:36AM | 18 | you want to try to refresh his recollection?  Is there -- |
| 11:36AM | 19 | **MR. SINGER:**  Yeah, I don't have anything to refresh |
| 11:36AM | 20 | his recollection on that point, Judge, so, I mean, if there's |
| 11:36AM | 21 | nothing out there -- |
| 11:36AM | 22 | **THE COURT:**  Can't you just ask the questions -- did |
| 11:36AM | 23 | you know about, those kinds of questions.  You can refresh a |
| 11:37AM | 24 | witness's recollection with a question, can't you? |
| 11:37AM | 25 | **MR. SINGER:**  I can do that, Judge. |

11:37AM  1          **MR. TRIPI:**  And, Judge, just moving forward to

11:37AM  2  contextualize how Casullo came up on direct, it was

11:37AM  3  specifically as to the Masecchia file.  So now we're into, for

11:37AM  4  lack of a better term, office drama --

11:37AM  5          **THE COURT:**  Yeah.

11:37AM  6          **MR. TRIPI:**  -- between the two.

11:37AM  7          **THE COURT:**  Yeah.

11:37AM  8          **MR. TRIPI:**  That's where my objection lies.

11:37AM  9          **THE COURT:**  And we're getting close to that point, so

11:37AM  10 I hope we're not going to be on this for a long time.

11:37AM  11         **MR. SINGER:**  No, I don't think we are, Judge.

11:37AM  12         **MR. TRIPI:**  Okay.  Thank you.

11:37AM  13         (End of sidebar discussion.)

11:37AM  14         **THE COURT:**  Okay, you can ask another question.

11:37AM  15         **BY MR. SINGER:**

11:37AM  16 Q.  So, Mr. Gentile, were you aware of any tension that

11:37AM  17 existed between them based on happenings in the field?

11:37AM  18 A.  No.

11:37AM  19 Q.  But with regard to what happened with the toll logs

11:37AM  20 involving Mr. Gerace's cell phone, you're under the

11:38AM  21 understanding that there needed to be some involvement with

11:38AM  22 the group supervisor to try to fan down the flames, so to

11:38AM  23 speak?

11:38AM  24 A.  I -- I was aware that the issue was brought up to the

11:38AM  25 group supervisor.

11:38AM    1    Q.   During this time period, I know you're not a partner of

11:38AM    2    Mr. Bongiovanni, but you're office an agent that works in the

11:38AM    3    office, right?

11:38AM    4    A.   Yes.

11:38AM    5    Q.   And you two have worked together for many, many years at

11:38AM    6    that point in time, right?

11:38AM    7    A.   Yes, we have.

11:38AM    8    Q.   You've gone on temporary duty details down in New York

11:38AM    9    City together?

11:38AM   10    A.   Yes.

11:38AM   11    Q.   You've gone to other locations to attend training?

11:38AM   12    A.   Yes.

11:38AM   13    Q.   And so you guys talk about life in general, correct?

11:38AM   14    A.   Yes.

11:38AM   15    Q.   And you also talk about the job and how it's affecting

11:38AM   16    each other, correct?

11:38AM   17    A.   Yes.

11:38AM   18    Q.   So, after the situation with Mr. Casullo develops, were

11:39AM   19    you aware of any type of request for transfer out of D-57

11:39AM   20    that Mr. Bongiovanni made to his superiors?

11:39AM   21    A.   Yes.

11:39AM   22    Q.   And, so, the request for transfer, to your understanding,

11:39AM   23    that was to go to a different unit than D-57; is that right?

11:39AM   24    A.   Correct.

11:39AM   25    Q.   That was to go to the tactical diversion squad?

11:39AM  1   A.  Yes, I don't recall if it was the tactical diversion

11:39AM  2   squad, but we also have a diversion squad.  Both separate

11:39AM  3   groups.

11:39AM  4   Q.  Okay.  So I know last week on Friday we talked about what

11:39AM  5   the tactical diversion squad was, correct?

11:39AM  6   A.  Yes.

11:39AM  7   Q.  And that's the one specific entity at DEA Buffalo that

11:39AM  8   deals with the pharmacies and compliance?

11:39AM  9   A.  Yes.

11:39AM  10  Q.  So you mentioned that there's another squad that's a

11:39AM  11  diversion squad; is that right?

11:39AM  12  A.  Yes.  And if I can explain that?

11:39AM  13  Q.  Absolutely.  If you can explain what the diversion squad

11:39AM  14  is, because I don't think that came up in the testimony.

11:40AM  15  A.  There's two separate groups.  There's the diversion squad

11:40AM  16  and the tactical diversion.

11:40AM  17      Diversion strictly deals with more of a compliance with

11:40AM  18  pharmaceutical, whereas tactical diversion, I didn't mention

11:40AM  19  this on Friday, they do have an enforcement aspect.  They do

11:40AM  20  some street work, but the majority of their stuff is

11:40AM  21  assisting with compliance and, I guess for lack of a better

11:40AM  22  term, is they would pursue individuals in the medical field

11:40AM  23  who offer or prescribe prescriptions, are pharmacists, nurse

11:40AM  24  practitioners, things along those lines.

11:40AM  25  Q.  Okay.  So, we're talking about more, I guess, fair to say

| | | |
|---|---|---|
| 11:40AM | 1 | white-collar cases as opposed to blue-collar cases? |
| 11:40AM | 2 | A.  I think that's accurate, yes. |
| 11:40AM | 3 | Q.  And, you know, with regard to the transfer, was there |
| 11:40AM | 4 | anything that you're aware of going on in Mr. Bongiovanni's |
| 11:41AM | 5 | life at that point in time which also made the transfer |
| 11:41AM | 6 | something that was advantageous to him? |
| 11:41AM | 7 | MR. TRIPI:  Objection.  It calls for hearsay, and |
| 11:41AM | 8 | implicates a pretrial ruling by the Court, if you'd like, I |
| 11:41AM | 9 | don't want to elaborate on that. |
| 11:41AM | 10 | THE COURT:  Yeah, no, no, I remember the ruling.  Do |
| 11:41AM | 11 | you want to come up. |
| 11:41AM | 12 | MR. SINGER:  I can rephrase the question, Judge. |
| 11:41AM | 13 | MR. TRIPI:  I'm going to keep objecting. |
| 11:41AM | 14 | THE COURT:  Don't decide you're going to keep |
| 11:41AM | 15 | objecting until you hear the next question. |
| 11:41AM | 16 | MR. TRIPI:  Fair enough.  Fair enough.  I withdraw. |
| 11:41AM | 17 | BY MR. SINGER: |
| 11:41AM | 18 | Q.  So with regard to the transfer request, were you aware of |
| 11:41AM | 19 | any reasons why Mr. Bongiovanni pursued a transfer at that |
| 11:41AM | 20 | time? |
| 11:41AM | 21 | MR. TRIPI:  Objection. |
| 11:41AM | 22 | THE COURT:  Were you aware, is the question. |
| 11:41AM | 23 | THE WITNESS:  I was aware of the tensions between him |
| 11:41AM | 24 | and Mr. Casullo were the reason behind requests. |
| | 25 | |

```
11:42AM    1           BY MR. SINGER:
11:42AM    2   Q.  Okay.  And with regard to either the tactical diversion
11:42AM    3   squad or the diversion squad, you'd agree with me that they
11:42AM    4   don't generally engage in the same type of street work as
11:42AM    5   D-57 or D-58 engage in, correct?
11:42AM    6   A.  That's accurate.
11:42AM    7   Q.  It's a little less dangerous type of work?
11:42AM    8   A.  I would think so, yes.
11:42AM    9   Q.  Okay.  Are you aware of any denials for transfer requests
11:42AM   10   that Mr. Bongiovanni put in at this time?
11:42AM   11           MR. TRIPI:  Objection.
11:42AM   12           THE COURT:  Overruled.
11:42AM   13           THE WITNESS:  I'm sorry, did you say am I aware of
11:42AM   14   any denials?
11:42AM   15           BY MR. SINGER:
11:42AM   16   Q.  Are you aware of any denials for these transfer requests
11:42AM   17   that Mr. Bongiovanni made at this time?
11:42AM   18   A.  I'm not aware of.
11:42AM   19   Q.  Okay.  And are you aware that any other transfer request
11:42AM   20   that Mr. Bongiovanni put in prior to this time period that
11:42AM   21   Mr. Casullo came to the office?
11:43AM   22   A.  I'm not.
11:43AM   23           MR. SINGER:  I want to get back to where we left off
11:43AM   24   on Friday, Ms. Champoux.  Will you mind bringing up
11:43AM   25   Exhibit K.1, which is not in evidence and just on the screen
```

11:43AM  1   of the witness.

11:44AM  2          **THE COURT:**  Did you forget how to do this while you

11:44AM  3   were on vacation?

11:44AM  4          **BY MR. SINGER:**

11:44AM  5   Q.  Do you see that up on your screen, sir?

11:44AM  6   A.  Yes, I do.

11:44AM  7   Q.  Do you recall going through this document and all the

11:44AM  8   pages of it before we broke on Friday afternoon last week,

11:44AM  9   I'm sorry, on Thursday afternoon?

11:44AM  10  A.  Yes.

11:44AM  11  Q.  And in all those documents that you reviewed, they all

11:44AM  12  appeared to be in fair and accurate condition of the document

11:44AM  13  that you signed to the best of your ability and knowledge?

11:44AM  14  A.  Yes.

11:44AM  15  Q.  And you believed that the document is authentic and your

11:44AM  16  signature is authentic; is that right?

11:44AM  17  A.  Yes.

11:44AM  18         **MR. SINGER:**  So Ms. Champoux, will you mind bringing

11:44AM  19  up K.2 not in evidence on the screen next to K.1.

11:44AM  20         **BY MR. SINGER:**

11:45AM  21  Q.  So what I'd like to do, Mr. Gentile, is I'd like to bring

11:45AM  22  you through page by page.  If you notice that the document on

11:45AM  23  the right, K.2, contains redactions, and the K.1 document

11:45AM  24  does not.  I'd like you to take a look and compare the two

11:45AM  25  pages, page by page, and see if what appears in K.2 is what

| | | |
|---|---|---|
| 11:45AM | 1 | appears in K.1 absent the redactions.  So let's start with |
| 11:45AM | 2 | the first page. |
| 11:45AM | 3 | A.  Yes. |
| 11:45AM | 4 |         **MR. SINGER:**  If we can move to page 2 of both |
| 11:45AM | 5 | documents, Ms. Champoux. |
| 11:45AM | 6 |         **BY MR. SINGER:** |
| 11:45AM | 7 | Q.  How about the second page? |
| 11:45AM | 8 | A.  Yes. |
| 11:45AM | 9 |         **MR. SINGER:**  If we can advance to the third page of |
| 11:45AM | 10 | each document, please? |
| 11:45AM | 11 |         **BY MR. SINGER:** |
| 11:45AM | 12 | Q.  How about the third page? |
| 11:45AM | 13 | A.  Yes. |
| 11:45AM | 14 |         **MR. SINGER:**  And if we can advance to page 4. |
| 11:45AM | 15 |         **BY MR. SINGER:** |
| 11:45AM | 16 | Q.  How about the fifth page, sir? |
| 11:45AM | 17 | A.  Yes. |
| 11:45AM | 18 | Q.  I'm sorry, fourth page.  My apologies. |
| 11:46AM | 19 |         **MR. SINGER:**  If we can advance to page 5. |
| 11:46AM | 20 |         **BY MR. SINGER:** |
| 11:46AM | 21 | Q.  Does that appear to be the same? |
| 11:46AM | 22 | A.  Yes. |
| 11:46AM | 23 |         **MR. SINGER:**  And if we can advance to page 6, please. |
| 11:46AM | 24 |         **BY MR. SINGER:** |
| 11:46AM | 25 | Q.  How about page 6, sir? |

| | | |
|---|---|---|
| 11:46AM | 1 | A.  Yes. |
| 11:46AM | 2 | **MR. SINGER:**  And the final page, page 7. |
| 11:46AM | 3 | **BY MR. SINGER:** |
| 11:46AM | 4 | Q.  Does that appear to be the same, sir? |
| 11:46AM | 5 | A.  Yes. |
| 11:46AM | 6 | **MR. SINGER:**  Okay.  Ms. Champoux, if you can bring |
| 11:46AM | 7 | down Exhibit K.1. |
| 11:46AM | 8 | And, Judge, at this time, the defense moves to enter |
| 11:46AM | 9 | defense Exhibit K.2 into evidence. |
| 11:46AM | 10 | **THE COURT:**  K.2? |
| 11:46AM | 11 | **MR. SINGER:**  Correct. |
| 11:46AM | 12 | **MR. TRIPI:**  No objection. |
| 11:46AM | 13 | **THE COURT:**  Okay.  Received without objection. |
| 11:46AM | 14 | **(DFT Exhibit K.2 was received in evidence.)** |
| 11:46AM | 15 | **MR. SINGER:**  If we can publish that to the jury. |
| 11:46AM | 16 | **THE CLERK:**  You're all set. |
| 11:46AM | 17 | **MR. SINGER:**  Thank you. |
| 11:46AM | 18 | **BY MR. SINGER:** |
| 11:46AM | 19 | Q.  So, Mr. Gentile, I'm focused on page 1 of Exhibit K.2. |
| 11:47AM | 20 | Does your signature appear in the bottom center of that |
| 11:47AM | 21 | page under the approval block, in block 14 of the document? |
| 11:47AM | 22 | A.  Yes. |
| 11:47AM | 23 | **MR. SINGER:**  Okay.  And if we can advance to page 2, |
| 11:47AM | 24 | Ms. Champoux. |
| | 25 | |

| | | |
|---|---|---|
| 11:47AM | 1 | BY MR. SINGER: |
| 11:47AM | 2 | Q.  And I'll direct your attention down to the center right |
| 11:47AM | 3 | part of K.2, page 2.  Does your signature appear under the |
| 11:47AM | 4 | employee's signature block in that document, sir? |
| 11:47AM | 5 | A.  Yes. |
| 11:47AM | 6 | Q.  And that was signed on the 3rd of June of 2020; is that |
| 11:47AM | 7 | right? |
| 11:47AM | 8 | A.  Yes. |
| 11:47AM | 9 | MR. SINGER:  If we can advance to page 3 of that |
| 11:47AM | 10 | document, Ms. Champoux, please? |
| 11:47AM | 11 | BY MR. SINGER: |
| 11:47AM | 12 | Q.  And on page 3, does your signature appear in the center |
| 11:47AM | 13 | right part of that page as well, sir? |
| 11:47AM | 14 | A.  Yes. |
| 11:47AM | 15 | Q.  And this was also signed on the 3rd of June of 2020; is |
| 11:47AM | 16 | that right? |
| 11:47AM | 17 | A.  Yes, it was. |
| 11:47AM | 18 | MR. SINGER:  If we could advance to page 4 of that |
| 11:47AM | 19 | document, Ms. Champoux? |
| 11:47AM | 20 | BY MR. SINGER: |
| 11:48AM | 21 | Q.  Again, does your signature appear on page 4 in the center |
| 11:48AM | 22 | right portion of that, Mr. Gentile? |
| 11:48AM | 23 | A.  Yes. |
| 11:48AM | 24 | Q.  And this was a signature you provided on the 9th of June |
| 11:48AM | 25 | of 2020; is that right? |

11:48AM    1    A.  Correct.

11:48AM    2            MR. SINGER:  If we can advance to page 5, please,

11:48AM    3    Ms. Champoux?

11:48AM    4            BY MR. SINGER:

11:48AM    5    Q.  And again I'll direct your attention to the center right

11:48AM    6    of page 5, your signature appears in the center right part,

11:48AM    7    Mr. Gentile?

11:48AM    8    A.  Yes.

11:48AM    9    Q.  And this was a signature you provided on the 9th of June

11:48AM   10    of 2020?

11:48AM   11    A.  Yes.

11:48AM   12    Q.  I'm sorry, looks like actually the 9th of August of 2020.

11:48AM   13    Take a little look closer.

11:48AM   14            MR. SINGER:  If we can enlarge that?

11:48AM   15            BY MR. SINGER:

11:48AM   16    Q.  Is that a 6 or a 9?

11:48AM   17    A.  I believe it's a 6, I don't recall speaking to IG in

11:48AM   18    August of 2020.

11:48AM   19            BY MR. SINGER:

11:48AM   20    Q.  How about page 6, Ms. Champoux, can you advance to that?

11:48AM   21            BY MR. SINGER:

11:48AM   22    Q.  Again, the center right part of that document, does your

11:49AM   23    signature appear in that signature block labeled employee

11:49AM   24    signature?

11:49AM   25    A.  Yes.

| | | |
|---|---|---|
| 11:49AM | 1 | Q.  That looks as though the signature was provided on |
| 11:49AM | 2 | April 19th of 2022; is that right, sir? |
| 11:49AM | 3 | A.  Yes. |
| 11:49AM | 4 | MR. SINGER:  And if we could advance to the last |
| 11:49AM | 5 | page, Ms. Champoux?  Again, center right. |
| 11:49AM | 6 | BY MR. SINGER: |
| 11:49AM | 7 | Q.  Mr. Gentile, is that your signature under the subject's |
| 11:49AM | 8 | signature? |
| 11:49AM | 9 | A.  Yes. |
| 11:49AM | 10 | Q.  It looks like you signed this form on April 19 of 2022; |
| 11:49AM | 11 | is that right? |
| 11:49AM | 12 | A.  Yes. |
| 11:49AM | 13 | MR. SINGER:  So I'm going to ask if we can restrict |
| 11:49AM | 14 | the view to only the witness's view screen at this time. |
| 11:49AM | 15 | THE CLERK:  You're all set. |
| 11:49AM | 16 | MR. SINGER:  And if we can bring up Exhibit K.3, |
| 11:49AM | 17 | Ms. Champoux, next to K.2. |
| 11:49AM | 18 | BY MR. SINGER: |
| 11:49AM | 19 | Q.  And, so, Mr. Gentile, Exhibit K.3, you see there are a |
| 11:49AM | 20 | number of signatures; is that right? |
| 11:49AM | 21 | A.  Yes. |
| 11:49AM | 22 | Q.  And they appear to be cutouts of signatures that were |
| 11:50AM | 23 | provided on some of the pages that we went through? |
| 11:50AM | 24 | A.  Yes. |
| 11:50AM | 25 | Q.  And that was in Exhibit K.2, the full documents that |

| | | |
|---|---|---|
| 11:50AM | 1 | they're in; is that right? |
| 11:50AM | 2 | A.   Correct. |
| 11:50AM | 3 | Q.   I want to bring you through page by page so you can take |
| 11:50AM | 4 | a look at the signatures.  If you can take a look at the |
| 11:50AM | 5 | signature in K.2, and take a look if that corresponds to the |
| 11:50AM | 6 | same signature that's on noted on this this Exhibit K.3. |
| 11:50AM | 7 | A.   Yes. |
| 11:50AM | 8 | Q.   That appears to be the same? |
| 11:50AM | 9 | A.   That appears to be, yes. |
| 11:50AM | 10 | Q.   Is that a fair and accurate depiction of your signature? |
| 11:50AM | 11 | A.   Yes. |
| 11:50AM | 12 | **MR. SINGER:**  If we could advance to page 2 of K.2. |
| 11:50AM | 13 | **BY MR. SINGER:** |
| 11:50AM | 14 | Q.   And again, I'll reference over to the document on the |
| 11:50AM | 15 | right.  The signatures on both of these documents appear to |
| 11:50AM | 16 | be -- sorry, the signature in K.3 appear to be a fair and |
| 11:50AM | 17 | accurate depiction of your signature on the K.2 document? |
| 11:50AM | 18 | A.   Yes. |
| 11:50AM | 19 | **MR. SINGER:**  And I'll advance to page 3 of that |
| 11:50AM | 20 | document, Ms. Champoux?  Thank you. |
| 11:50AM | 21 | **BY MR. SINGER:** |
| 11:50AM | 22 | Q.   And same thing, Mr. Gentile, does that signature on K.2 |
| 11:51AM | 23 | seem to correspond with K.3? |
| 11:51AM | 24 | **MR. TRIPI:**  I'm going to object insofar as K.3 has a |
| 11:51AM | 25 | number of different signatures, so I think we need to be |

11:51AM    1    specific as to which signature we're calling out.

11:51AM    2         THE COURT:  I agree.

11:51AM    3         MR. SINGER:  Okay.  I'll bring it through signature

11:51AM    4    by signature.

11:51AM    5         THE COURT:  I'm having a tough time following.

11:51AM    6         MR. SINGER:  Not problem at all, Judge.  No problem

11:51AM    7    at all.

11:51AM    8         So if we can go back to the first page, Ms. Champoux,

11:51AM    9    on K.2.

11:51AM   10         BY MR. SINGER:

11:51AM   11    Q.  So with regard to the signature that appears in the

11:51AM   12    bottom of that page, see that, Mr. Gentile?

11:51AM   13    A.  Yes.

11:51AM   14    Q.  I'd like you to take a look at the signature, the second

11:51AM   15    one down from the top on Exhibit K.3.

11:51AM   16    A.  Is it the one that was just expanded on my screen?

11:51AM   17    Q.  Correct.  It's just expanded on your screen.  And it's

11:51AM   18    the signature dated 12/20/2010.

11:51AM   19    A.  Yes.

11:51AM   20    Q.  And so, it a fair and accurate depiction in K.3 as the

11:51AM   21    signature that appears in K.2 page 1?

11:51AM   22    A.  Yes.

11:51AM   23         MR. SINGER:  And if we can take down that, and

11:52AM   24    advance to second page of K.2, Ms. Champoux.

          25

11:52AM    1    **BY MR. SINGER:**

11:52AM    2    Q.  So I'm going to direct your attention to the signature

11:52AM    3    that appears on the third line of Exhibit K.3 on the far

11:52AM    4    left; do you see that sir?

11:52AM    5    A.  Yes.

11:52AM    6    Q.  And does the signature on K.3 -- actually.

11:52AM    7         **MR. SINGER:**  I'm sorry, Ms. Champoux, that's correct.

11:52AM    8         **BY MR. SINGER:**

11:52AM    9    Q.  Do those two signatures on K point -- does the signature

11:52AM   10    on K.3 fairly and accurately depict the signature on K.2,

11:52AM   11    page 2?

11:52AM   12    A.  Yes.

11:52AM   13         **MR. SINGER:**  All right.  And if we can move on to the

11:52AM   14    third page of K.2, Ms. Champoux?

11:52AM   15         **BY MR. SINGER:**

11:52AM   16    Q.  And I'm going to direct your attention to the signature

11:52AM   17    on the third line of K.3 on the far right.  Does the

11:52AM   18    signature in K.2 fairly and accurately -- sorry.  Does the

11:52AM   19    signature on K.3 the far right on the third line fairly and

11:52AM   20    accurately depict the signature that appears on K.2, page 3?

11:52AM   21    A.  Yes.

11:52AM   22         **MR. SINGER:**  If we can question move on to page 4 of

11:53AM   23    K.2, Ms. Champoux.

11:53AM   24         **BY MR. SINGER:**

11:53AM   25    Q.  Now, I'll direct your attention, sir, to the signature

11:53AM 1  that appears in the fourth line on the far left of K.3.  Does

11:53AM 2  that signature in K.3 fairly and accurately depict the

11:53AM 3  signature that appears on page 4 of K.2?

11:53AM 4  A.  Yes.

11:53AM 5          MR. SINGER:  If we can move on to page 5 of K.2,

11:53AM 6  Ms. Champoux.

11:53AM 7          BY MR. SINGER:

11:53AM 8  Q.  Mr. Gentile, I direct your attention to the fourth line

11:53AM 9  on K.3 on the far right.  Does the signature that appears in

11:53AM 10 K.3 fairly and accurately depict the signature that appears

11:53AM 11 on K.2 page 5?

11:53AM 12 A.  Yes.

11:53AM 13         MR. SINGER:  If we move on to the sixth page of the

11:53AM 14 document, Ms. Champoux.

11:53AM 15         BY MR. SINGER:

11:53AM 16 Q.  So I'm going to direct your attention, Mr. Gentile, to

11:53AM 17 the fifth line down on Exhibit K.3, the signature that

11:53AM 18 appears in the middle there.  Does the signature on K.3

11:53AM 19 depicted there fairly and accurately represent the signature

11:54AM 20 that appears in K.2 page 6?

11:54AM 21 A.  Yes.

11:54AM 22         MR. SINGER:  And finally moving on to page 7 of K.2,

11:54AM 23 Ms. Champoux?

11:54AM 24         BY MR. SINGER:

11:54AM 25 Q.  Does the signature that appears in the bottom line of K.3

| | | |
|---|---|---|
| 11:54AM | 1 | fairly and accurately depict the signature that appears on |
| 11:54AM | 2 | page 7 of K.2, Mr. Gentile? |
| 11:54AM | 3 | A.  Yes. |
| 11:54AM | 4 | **MR. SINGER:**  Okay.  Your Honor, at this time, the |
| 11:54AM | 5 | defense moves K.3 into evidence. |
| 11:54AM | 6 | **MR. TRIPI:**  No objection. |
| 11:54AM | 7 | **THE COURT:**  Received without objection. |
| 11:54AM | 8 | **(DFT Exhibit K.3 was received in evidence.)** |
| 11:54AM | 9 | **MR. SINGER:**  All right.  And so, Ms. Champoux, if you |
| 11:54AM | 10 | could -- I'm sorry, Ms. Demma, can you please publish that to |
| 11:54AM | 11 | the jury? |
| 11:54AM | 12 | **THE COURT:**  Just K.3? |
| 11:54AM | 13 | **MR. SINGER:**  K.3 and K.2, Judge. |
| 11:54AM | 14 | **THE CLERK:**  You're all set. |
| 11:54AM | 15 | **MR. SINGER:**  Thank you. |
| 11:54AM | 16 | **BY MR. SINGER:** |
| 11:55AM | 17 | Q.  So, you've had an opportunity to review the signatures on |
| 11:55AM | 18 | these various pages on K.2 and K.3, correct? |
| 11:55AM | 19 | A.  Yes, I have. |
| 11:55AM | 20 | Q.  And taking a look at the signatures that exist, I want to |
| 11:55AM | 21 | also direct your attention to the top signature on K.3; do |
| 11:55AM | 22 | you see that, sir? |
| 11:55AM | 23 | A.  Yes, I do. |
| 11:55AM | 24 | Q.  And you recall being asked on direct testimony about a |
| 11:55AM | 25 | signature that appears on a deactivation form for a |

11:55AM    1    confidential source, R.K.?

11:55AM    2    A.   Yes.

11:55AM    3    Q.   And confidential source R.K., was a form that was

11:55AM    4    represented in Government Exhibit 9E-3; do you recall that,

11:55AM    5    sir?

11:55AM    6    A.   Yes.

11:55AM    7    Q.   And part of your direct testimony was that you don't

11:55AM    8    believe that the signature that's on Exhibit 9E-3 is your

11:55AM    9    signature; is that right?

11:55AM   10    A.   Correct.

11:55AM   11    Q.   And one of the reasons why is because you don't recall

11:55AM   12    signing the form; is that right, sir?

11:55AM   13    A.   Correct.

11:55AM   14    Q.   And another reason why is because you don't see the word

11:55AM   15    F-O-R appearing in the signature block that's represented in

11:56AM   16    9E-3; is that right?

11:56AM   17    A.   Correct.

11:56AM   18    Q.   So, we worked through this last week, you talked a little

11:56AM   19    bit about how you sign forms; is that right?

11:56AM   20    A.   Yes.

11:56AM   21    Q.   And you said that your signature is consistent when you

11:56AM   22    sign it on DEA forms that you would sign on a document such

11:56AM   23    as a will?

11:56AM   24    A.   I would think it is, yes.

11:56AM   25    Q.   Okay.  And you believe that you use the same type of

11:56AM    1    signature when you're signing a credit card receipt?

11:56AM    2    A.   I would think so, yes.

11:56AM    3    Q.   And you also use the same type of signature when you're

11:56AM    4    signing some type of official letter?

11:56AM    5    A.   Yes.

11:56AM    6    Q.   So that's the signature you use most of the time; is that

11:56AM    7    right?

11:56AM    8    A.   Most of the time, yes.

11:56AM    9    Q.   And you'll notice in Exhibit K.3, there are sometimes

11:56AM   10    variations in the signature; is that right sir?

11:56AM   11    A.   Yes, there is.

11:56AM   12    Q.   So, for instance, I'll direct your attention to the third

11:56AM   13    line of Exhibit K.3 over to the far right.  Do you see how

11:56AM   14    there is a loop on the left side?

11:57AM   15    A.   Yes.

11:57AM   16    Q.   And that's something that's not inconsistent with the way

11:57AM   17    you've seen yourself sign documents when reviewing

11:57AM   18    signatures, correct?

11:57AM   19    A.   Correct.

11:57AM   20    Q.   So sometimes there's a variation in the way that you

11:57AM   21    sign?

11:57AM   22    A.   That's fair, yes.

11:57AM   23    Q.   And when you're going through these forms, are you going

11:57AM   24    through them very slowly and deliberately, or are you going

11:57AM   25    through them sometimes quickly?

11:57AM   1   A.   Sometimes quickly.

11:57AM   2   Q.   Because you have a lot of things to sign as an agent,

11:57AM   3   like we talked about last week?  Correct?

11:57AM   4   A.   Yes.

11:57AM   5   Q.   But you'd agree with me that when you take a look at the

11:57AM   6   top of the form on K.3, the signature that appears at the

11:57AM   7   very top, which appeared on Exhibit 9E-3, that signature is

11:57AM   8   not inconsistent with the signatures that appear below it on

11:57AM   9   the other documents we looked at today; is that right?

11:57AM   10   A.   It clearly resembles it, yes.

11:57AM   11   Q.   Okay.  And I know how we talked about on direct this

11:57AM   12   happened many years ago as far as the signatures are

11:58AM   13   concerned on the document that appears at Government Exhibit

11:58AM   14   9E-3, right?

11:58AM   15   A.   Yes, from 2013.

11:58AM   16   Q.   And you've signed thousands of different DEA documents

11:58AM   17   since 2013, to the best of your recollection, right?

11:58AM   18   A.   Yes.

11:58AM   19   Q.   But you still maintain that you don't believe it's your

11:58AM   20   signature?

11:58AM   21   A.   And I'll go back to my initial OIG interview.  The first

11:58AM   22   thing that popped out at me was the fact that it wasn't the

11:58AM   23   signature, a slash, and the letters F-O-R.  That's why I

11:58AM   24   maintain that.

11:58AM   25   Q.   And that's the only reason why, sir?

USA v Bongiovanni - Gentile - Singer/Cross - 3/4/24

30

11:58AM  1   A.  Correct.

11:58AM  2   Q.  Because you can't specifically recall if you signed a

11:58AM  3   form at all, correct?

11:58AM  4   A.  I can't recall that, no.

11:58AM  5   Q.  It's too far along, too far ago?

11:58AM  6   A.  It's over ten years old.

11:58AM  7   Q.  So with regard to your interview, Mr. Gentile, you were

11:59AM  8   first interviewed about this signature on this one specific

11:59AM  9   document, Government Exhibit 9E-3, back in June of 2020?

11:59AM  10  A.  Yes.

11:59AM  11  Q.  And that was after Mr. Bongiovanni was charged in this

11:59AM  12  case, correct?

11:59AM  13  A.  Yes.

11:59AM  14  Q.  In fact, before this interview, you had been provided a

11:59AM  15  copy of the indictment in this case to review by your RAC at

11:59AM  16  the time, Ed Orgon?

11:59AM  17  A.  Yes.

11:59AM  18  Q.  And you also reviewed the indictment that was provided to

11:59AM  19  you by Mr. Orgen?

11:59AM  20  A.  Yes.

11:59AM  21  Q.  So you're aware of the nature of the charges that

11:59AM  22  Mr. Bongiovanni was facing at the time before you sat down

11:59AM  23  and had an interview at the OIG's office, right?

11:59AM  24  A.  Yes.

11:59AM  25  Q.  And you also did, I guess, a little investigation into

Case 1:19-cr-00227-LJV-MJR   Document 800   Filed 03/08/24   Page 31 of 54
USA v Bongiovanni - Gentile - Singer/Cross - 3/4/24

31

| | | |
|---|---|---|
| 11:59AM | 1 | the nature of the allegations; is that fair to say, sir? |
| 11:59AM | 2 | A.  Yes. |
| 11:59AM | 3 | Q.  One of the things you did was you reviewed the file |
| 12:00PM | 4 | involving Wayne Anderson; is that right? |
| 12:00PM | 5 | A.  Yes. |
| 12:00PM | 6 | Q.  That was something that I think you said was out of |
| 12:00PM | 7 | curiosity; is that right? |
| 12:00PM | 8 | A.  Correct. |
| 12:00PM | 9 | Q.  So you were aware of the indictment in the case, correct? |
| 12:00PM | 10 | A.  Yes. |
| 12:00PM | 11 | Q.  And you're aware of the nature of the allegations in the |
| 12:00PM | 12 | case, correct? |
| 12:00PM | 13 | A.  Yes. |
| 12:00PM | 14 | Q.  And then you sat down some period after your knowledge of |
| 12:00PM | 15 | this with the OIG's office, correct? |
| 12:00PM | 16 | A.  Yes. |
| 12:00PM | 17 | Q.  And you knew what the purpose of that interview was, |
| 12:00PM | 18 | Mr. Gentile, correct? |
| 12:00PM | 19 | A.  I do, yes. |
| 12:00PM | 20 | Q.  The purpose was to investigate whether Mr. Bongiovanni |
| 12:00PM | 21 | was guilty of a crime or not, correct? |
| 12:00PM | 22 | A.  Correct. |
| 12:00PM | 23 | Q.  And you went in with that mindset into the interview; is |
| 12:00PM | 24 | that right? |
| 12:00PM | 25 | A.  I think that's fair, yes. |

12:00PM   1   Q.  Okay.  And with regard to this investigation, is it a

12:00PM   2   fair statement that knowledge about what was happening with

12:00PM   3   Mr. Bongiovanni was something that was discussed in the

12:00PM   4   office at DEA?

12:00PM   5   A.  All the time.

12:01PM   6   Q.  And it didn't just relate to the allegations involving

12:01PM   7   potential involvement with Peter Gerace, right?

12:01PM   8          **MR. TRIPI:**  Objection.

12:01PM   9          **THE WITNESS:**  Correct.

12:01PM  10          **MR. TRIPI:**  As to time frame, Your Honor.

12:01PM  11          **THE COURT:**  Are you talking about at the time when he

12:01PM  12   had his interview?

12:01PM  13          **MR. SINGER:**  At the time he had his interview, Judge,

12:01PM  14   I can narrow down a little bit.

12:01PM  15          **THE COURT:**  Please, yeah.  So the objection is

12:01PM  16   sustained.  Why don't you give a time frame, please?

12:01PM  17          **BY MR. SINGER:**

12:01PM  18   Q.  So at the time that you sat down at the OIG's office in

12:01PM  19   June of 2020, there was conversation in the office about the

12:01PM  20   nature of the allegations involving Mr. Bongiovanni, correct?

12:01PM  21   A.  Yes, there was.

12:01PM  22   Q.  And it wasn't just limited to Peter Gerace; is that

12:01PM  23   right?

12:01PM  24   A.  That's accurate.

12:01PM  25   Q.  It also focused on the Serios; is that correct?

12:01PM   1   A.  I believe, yes.  Yes.

12:01PM   2   Q.  Okay.  And at the time the indictment came out, going

12:01PM   3   back now to 2019, there was conversation going on in the

12:01PM   4   office about the nature of the investigation involving

12:02PM   5   Mr. Bongiovanni at that time, too, correct?

12:02PM   6   A.  Yes, it was.

12:02PM   7   Q.  And it wasn't just limited to Peter Gerace, but it also

12:02PM   8   involved the Serios; is that right?

12:02PM   9   A.  Yes.

12:02PM   10   Q.  At the time before the indictment came out after

12:02PM   11   Mr. Bongiovanni retired from the DEA, there was conversation

12:02PM   12   ongoing about the nature of the investigation that was being

12:02PM   13   conducted in the office, correct?

12:02PM   14   A.  There was knowledge of an investigation.  So, yes, it was

12:02PM   15   discussed.

12:02PM   16   Q.  And people knew that it related to Peter Gerace, correct?

12:02PM   17   A.  Yes.

12:02PM   18   Q.  And people knew that it related to the Serios as well,

12:02PM   19   correct?

12:02PM   20   A.  Yes.

12:02PM   21   Q.  And even before the time when Mr. Bongiovanni retired,

12:02PM   22   there was conversation going on in the office about the

12:02PM   23   nature of the allegations against Mr. Bongiovanni; is that

12:02PM   24   right?

12:02PM   25   A.  Yes.

| | | |
|---|---|---|
| 12:02PM | 1 | Q.  It involved not just Peter Gerace, but the Serios as |
| 12:02PM | 2 | well, correct? |
| 12:02PM | 3 | A.  Correct. |
| 12:02PM | 4 | MR. SINGER:  Thank you, sir. |
| 12:02PM | 5 | THE WITNESS:  Thank you. |
| 12:02PM | 6 | MR. SINGER:  Just one moment. |
| 12:02PM | 7 | Thanks, Mr. Gentile, no further questions. |
| 12:03PM | 8 | THE WITNESS:  Thank you. |
| 12:03PM | 9 | THE COURT:  Redirect. |
| 12:03PM | 10 | MR. TRIPI:  Thank you, Your Honor. |
| 12:03PM | 11 | |
| 12:03PM | 12 | REDIRECT EXAMINATION BY MR. TRIPI: |
| 12:03PM | 13 | Q.  I'd actually like to pick up where Mr. Singer left off. |
| 12:03PM | 14 | So his last question was before Mr. Bongiovanni -- before |
| 12:03PM | 15 | Mr. Bongiovanni retired, he asked you about conversation |
| 12:03PM | 16 | relating to investigation of Bongiovanni regarding the |
| 12:03PM | 17 | Serios; do you recall that?  That's what he just asked you |
| 12:03PM | 18 | about, right? |
| 12:03PM | 19 | A.  Yes. |
| 12:03PM | 20 | Q.  Okay.  Now, you were a group supervisor in 2019 later on, |
| 12:03PM | 21 | correct? |
| 12:03PM | 22 | A.  Yes. |
| 12:03PM | 23 | Q.  You were -- were you in a position to know what the |
| 12:03PM | 24 | initial report was regarding an investigation of Bongiovanni? |
| 12:03PM | 25 | Yes or no? |

| | | |
|---|---|---|
| 12:03PM | 1 | A.  No. |
| 12:04PM | 2 | Q.  Okay.  Were you speculating when you answered |
| 12:04PM | 3 | Mr. Singer's last question? |
| 12:04PM | 4 | A.  There was a lot of theories within the office, yes. |
| 12:04PM | 5 | Q.  Okay.  Do you recall specific conversation before he |
| 12:04PM | 6 | retired about the Serios connecting Bongiovanni to that |
| 12:04PM | 7 | investigation?  Specific conversations. |
| 12:04PM | 8 | A.  No.  Nothing specific. |
| 12:04PM | 9 | Q.  So were you speculating on that last question he asked |
| 12:04PM | 10 | you? |
| 12:04PM | 11 | A.  I feel it was confusing, the question. |
| 12:04PM | 12 | Q.  The question was.  Okay.  We'll move on. |
| 12:04PM | 13 | On that last score, the person to whom a report of |
| 12:04PM | 14 | investigation would be made is the RAC of the office, |
| 12:04PM | 15 | correct? |
| 12:04PM | 16 | A.  I'm sorry, on the -- |
| 12:05PM | 17 | Q.  The proper person within the DEA who would be made aware |
| 12:05PM | 18 | of an investigation of an active agent is the RAC, correct? |
| 12:05PM | 19 | A.  Correct. |
| 12:05PM | 20 | Q.  And that was who? |
| 12:05PM | 21 | A.  Edward Orgon. |
| 12:05PM | 22 | Q.  That wasn't you? |
| 12:05PM | 23 | A.  No. |
| 12:05PM | 24 | **MR. TRIPI:**  Okay.  Ms. Champoux, can we pull up |
| 12:05PM | 25 | Government Exhibit 9E-3, please, in evidence.  And publish for |

12:05PM  1   the jury.

12:05PM  2              BY MR. TRIPI:

12:05PM  3   Q.  Now, you've seen this form, you've been asked some

12:05PM  4   questions about it, so we're not going to spend a lot of time

12:05PM  5   on it, but I do want to ask you a few questions, okay?

12:05PM  6       You were asked questions on cross about deactivating

12:05PM  7   sources, confidential sources relating to misconduct; do you

12:05PM  8   remember those questions on cross?

12:05PM  9   A.  Yes.

12:05PM 10   Q.  Now, in box 5, is -- on that form, is that the place or

12:06PM 11   the space on the form provided to list whether a source is

12:06PM 12   being deactivated for misconduct?

12:06PM 13   A.  No.

12:06PM 14   Q.  Where -- where would you explain that part?  What box?

12:06PM 15   A.  Box 9.

12:06PM 16              MR. TRIPI:  Okay.  Can we pull up that box?

12:06PM 17              BY MR. TRIPI:

12:06PM 18   Q.  So box 9 is the space to explain whether the source is

12:06PM 19   deactivated for misconduct, correct?

12:06PM 20   A.  Correct.

12:06PM 21   Q.  And misconduct, I think as you explained on Thursday, can

12:06PM 22   include violating the agreement by doing drugs?

12:06PM 23   A.  Yes.

12:06PM 24   Q.  And what does -- what the defendant wrote in box 9 say

12:06PM 25   about this source?

12:06PM  1  A.  It states the C.S.'s performance was very positive.

12:06PM  2  Q.  And is that box important, because if the source is ever

12:07PM  3  in the future closed, you would need, one, you would need to

12:07PM  4  know how the performance was if, for example, a reactivation

12:07PM  5  is considered?

12:07PM  6          MR. SINGER:  Objection to form.

12:07PM  7          THE COURT:  Yeah, sustained.

12:07PM  8          BY MR. TRIPI:

12:07PM  9  Q.  Why is that box important?

12:07PM  10  A.  It would notify any agents in the future if they were

12:07PM  11  interested in reactivating this particular C.S., if there was

12:07PM  12  any negative information associated with him or her.

12:07PM  13  Q.  Do you see any negative information in that box?

12:07PM  14  A.  I don't.

12:07PM  15          MR. TRIPI:  Can we go to Exhibit 9E-2, please?  Also

12:07PM  16  in evidence, Your Honor.  And can we go to the second page of

12:07PM  17  that exhibit?

12:07PM  18          BY MR. TRIPI:

12:07PM  19  Q.  Regarding this particular source, was the term the source

12:08PM  20  was signed up for one year?

12:08PM  21  A.  Yes.

12:08PM  22  Q.  And is that consistent with the standard term that

12:08PM  23  applied back in 2013 and 2014?

12:08PM  24  A.  Yes.

12:08PM  25  Q.  So if on cross-examination you were asked a question that

12:08PM  1  said so back in the day, if the C.S. did not perform, it was

12:08PM  2  DEA policy to deactivate a source in 90 days, were you

12:08PM  3  confused by that question?

12:08PM  4          MR. SINGER:  Object to the form.

12:08PM  5          THE COURT:  Yeah, sustained.

12:08PM  6          BY MR. TRIPI:

12:08PM  7  Q.  Do you remember being asked:  So back in the day, if a

12:08PM  8  C.S. did not form, was DEA policy to deactivate a source in

12:08PM  9  90 days?

12:08PM 10  A.  I do remember the question.

12:08PM 11  Q.  Okay.

12:08PM 12  A.  And it would depend on who the boss was, or the ASAC at

12:08PM 13  the time.

12:08PM 14  Q.  That was not the policy in 2013 and 2014, correct?

12:08PM 15  A.  I don't believe it was policy, it was preference.

12:08PM 16  Q.  Okay.  While you were being asked questions about DEA

12:09PM 17  policy on cross, correct?

12:09PM 18          MR. SINGER:  Objection to leading.

12:09PM 19          THE WITNESS:  Yes.

12:09PM 20          MR. TRIPI:  I'm framing it for him.

12:09PM 21          THE COURT:  Overruled.

12:09PM 22          BY MR. TRIPI:

12:09PM 23  Q.  Was there a policy in 2013, 2014, to deactivate a source

12:09PM 24  within 90 days?

12:09PM 25  A.  Not that I'm aware of, no.

| | | |
|---|---|---|
| 12:09PM | 1 | Q.   And the agreement you're looking at is for how long? |
| 12:09PM | 2 | A.   This agreement's for one year. |
| 12:09PM | 3 | MR. TRIPI:   Can we take that down? |
| 12:09PM | 4 | BY MR. TRIPI: |
| 12:09PM | 5 | Q.   Now, on cross-examination, I think both on Thursday and |
| 12:10PM | 6 | today, you were asked a question about your signature. |
| 12:10PM | 7 | MR. TRIPI:   If we can pull up Government Exhibit 9E-3 |
| 12:10PM | 8 | again.   And highlight the signature blocks, please. |
| 12:10PM | 9 | BY MR. TRIPI: |
| 12:10PM | 10 | Q.   You were asked a question, you don't believe it's yours |
| 12:10PM | 11 | because there's no F-O-R marked next to it, correct? |
| 12:10PM | 12 | A.   Correct. |
| 12:10PM | 13 | Q.   And you just -- and because you just don't recall signing |
| 12:10PM | 14 | the form; do you remember those questions? |
| 12:10PM | 15 | A.   Yes. |
| 12:10PM | 16 | Q.   And you gave an answer, correct? |
| 12:10PM | 17 | A.   Yes. |
| 12:10PM | 18 | Q.   And, but you testified in this grand jury under oath on |
| 12:10PM | 19 | June 4th, 2020, correct? |
| 12:10PM | 20 | A.   Yes. |
| 12:10PM | 21 | Q.   And this is page 10 at lines 22 to 23 of that exhibit, |
| 12:11PM | 22 | which is Government Exhibit 3525A. |
| 12:11PM | 23 | You were asked regarding that exact form, question:   Is |
| 12:11PM | 24 | that your signature? |
| 12:11PM | 25 | Answer:   It is not. |

Case 1:19-cr-00227-LJV-MJR   Document 800   Filed 03/08/24   Page 40 of 54
USA v Bongiovanni - Gentile - Tripi/Redirect - 3/4/24

40

| | | |
|---|---|---|
| 12:11PM | 1 | Were you asked that question, did you give that answer? |
| 12:11PM | 2 | A.  Yes. |
| 12:11PM | 3 | Q.  And then at page 17, line 17 through 19, you were asked |
| 12:11PM | 4 | sorry -- page 16, lines 17 through 19, you were asked this |
| 12:11PM | 5 | question:  Do you believe that to be a forgery of your |
| 12:11PM | 6 | signature? |
| 12:11PM | 7 | And your answer was:  I do. |
| 12:11PM | 8 | **MR. SINGER:**  Objection. |
| 12:11PM | 9 | **MR. TRIPI:**  This is 801 -- |
| 12:11PM | 10 | **THE COURT:**  I understand, I -- |
| 12:11PM | 11 | **MR. TRIPI:** -- D, Your Honor. |
| 12:11PM | 12 | **THE COURT:** -- I understand, I understand the rule |
| 12:11PM | 13 | under which you're offering it. |
| 12:12PM | 14 | Come on up.  Come on up. |
| 12:12PM | 15 | (Sidebar discussion held on the record.) |
| 12:12PM | 16 | **MR. SINGER:**  So we had a similar objection last week, |
| 12:12PM | 17 | Judge, where the government attempted to elicit testimony that |
| 12:12PM | 18 | Mr. Gentile believed it was a forgery, quote, unquote.  I |
| 12:12PM | 19 | believe that's where we're going now. |
| 12:12PM | 20 | **THE COURT:**  Yeah. |
| 12:12PM | 21 | **MR. SINGER:**  So it's the same basis of the objection. |
| 12:12PM | 22 | **THE COURT:**  I don't know what you're -- so you're |
| 12:12PM | 23 | trying to impeach your own witness, which is fine, but I don't |
| 12:12PM | 24 | know what the impeachment -- he has testified, now several |
| 12:12PM | 25 | times, that he doesn't think that's his signature, it's not |

12:12PM 1  his signature.

12:12PM 2          **MR. TRIPI:**  May I elaborate?

12:12PM 3          **THE COURT:**  Go ahead.

12:12PM 4          **MR. TRIPI:**  So, Your Honor, the -- obviously, as you

12:12PM 5  well know hearsay better than all of us here, under the rule

12:12PM 6  for inconsistent statements, it doesn't have to be on all

12:12PM 7  fours, right?  It could be more nuanced than like a perjury

12:13PM 8  case.

12:13PM 9          **THE COURT:**  Yeah.

12:13PM 10         **MR. TRIPI:**  So, obviously, today and Friday on cross,

12:13PM 11 he said -- he cabined his testimony, he cabined it by saying

12:13PM 12 it's not my signature because it doesn't say F-O-R.  And then

12:13PM 13 Mr. Singer elucidated the point, it's not my signature because

12:13PM 14 I have signed so money forms that I just don't remember.

12:13PM 15         But I have sworn testimony before the grand jury and

12:13PM 16 I submit that would have been appropriate still on direct, but

12:13PM 17 they chose to go there on cross again, you sustained the

12:13PM 18 objection on direct, they went there, and doubled down and

12:13PM 19 tripled down on it, and now I think the door is open to now

12:13PM 20 impeach the witness by his inconsistency.  Because

12:13PM 21 inconsistency is when shown that form in grand jury, in sworn

12:13PM 22 testimony, his opinion was it's forgery, it wasn't it's not

12:13PM 23 mine because it doesn't say F-O-R, and it's not mine because I

12:13PM 24 sign so many forms.  That wasn't the answer.

12:14PM 25         **THE COURT:**  So I think you can ask him do you believe

12:14PM  1  that somebody else signed your name?

12:14PM  2          And I think you can ask him did you give somebody

12:14PM  3  permission to sign your name there?

12:14PM  4          It's just the -- the -- the forgery --

12:14PM  5          What's the problem with that?

12:14PM  6          **MR. SINGER:**  So there's a couple of things.  Number 1

12:14PM  7  is that originally I thought that the government was asking

12:14PM  8  the question to elicit a prior consistent statement, which

12:14PM  9  would be the grand jury testimony.  It appears like they're

12:14PM  10  trying to elicit a prior inconsistent statement.  I don't

12:14PM  11  think it's inconsistent what he testified here versus what he

12:14PM  12  testified in the grand jury.  The import is the same thing,

12:14PM  13  which is he testified that he doesn't believe it's his

12:14PM  14  signature.  He testified that way on direct, on cross, and in

12:14PM  15  the grand jury on that point.

12:14PM  16          I asked him a question on cross whether or not he

12:14PM  17  recalled signing the form, he said he didn't.  So, he couldn't

12:14PM  18  remember whether he signed it or not on that basis of not

12:14PM  19  recalling what the form he signed was.

12:14PM  20          I also asked him whether, you know, if the signature

12:14PM  21  was in some way consistent with what his signature is, and he

12:15PM  22  testified to that.

12:15PM  23          So the government is attempting to impeach him for

12:15PM  24  making inconsistent statement.  There's nothing inconsistent

12:15PM  25  with what he testified here, Judge.  He testified that I don't

12:15PM  1    believe it's my signature.

12:15PM  2            **THE COURT:**  That's where we started this.

12:15PM  3            **MR. TRIPI:**  But he also testified I don't remember

12:15PM  4    it's my signature, because I sign a lot of documents -- they

12:15PM  5    elicited that testimony, and because I didn't write F-O-R.

12:15PM  6    They elucidated that testimony.

12:15PM  7            **THE COURT:**  You asked him, is that your signature?

12:15PM  8            **MR. SINGER:**  Yes.

12:15PM  9            **THE COURT:**  And he said no --

12:15PM  10           **MR. SINGER:**  Yes.

12:15PM  11           **THE COURT:** -- isn't that right?

12:15PM  12           **MR. TRIPI:**  That's consistent.

12:15PM  13           **THE COURT:**  So, I mean, I think we're splitting

12:15PM  14   hairs.  I think we really are splitting hairs.  I think you

12:15PM  15   can ask him -- I don't want you to use the word forgery.  You

12:15PM  16   can ask did somebody else sign your name and did you give

12:15PM  17   anyone permission to sign your name.

12:15PM  18           **MR. TRIPI:**  Okay, fair enough.

12:15PM  19           (End of sidebar discussion.)

12:15PM  20           **MR. TRIPI:**  Ms. Champoux, if it's okay with the

12:16PM  21   Court, can we pull that exhibit back up, 9E-3, please.

12:16PM  22           **THE COURT:**  Sure.

12:16PM  23           **MR. TRIPI:**  And can we zoom in on the signatures

12:16PM  24   again.

         25

12:16PM   1          **BY MR. TRIPI:**

12:16PM   2   Q.  As it relates to this document we've been looking at, do

12:16PM   3   you believe somebody else signed your name?

12:16PM   4   A.  Yes.

12:16PM   5   Q.  Did you give anyone else permission to sign your name on

12:16PM   6   that document?

12:16PM   7   A.  No.

12:16PM   8          **MR. TRIPI:**  Ms. Champoux, if we could please bring up

12:16PM   9   Defense Exhibit K.2, and keep it next to Government Exhibit

12:16PM  10   9E-3 briefly.

12:16PM  11          **BY MR. TRIPI:**

12:16PM  12   Q.  Now, as it relates to Exhibit K.2 on the rest of your

12:16PM  13   screen that was entered earlier today, do you remember those

12:16PM  14   questions on cross, correct?

12:16PM  15   A.  Yes.

12:16PM  16   Q.  Now, starting with the first page, the signature of K.2,

12:17PM  17   where you were acting G.S. in the Matthew Scalia file, do you

12:17PM  18   remember being the acting G.S. for some documents that were

12:17PM  19   signed in that file?

12:17PM  20   A.  I don't.

12:17PM  21   Q.  Okay.  How about let's go to the next page.

12:17PM  22       Now, this is the warnings and assurances to employee form

12:17PM  23   that OIG presented you before your interview on June 3rd,

12:17PM  24   correct?

12:17PM  25   A.  Yes.

12:17PM  1    Q.  Do you remember being presented that form?

12:17PM  2    A.  Yes.

12:17PM  3    Q.  Do you remember signing that form?

12:17PM  4    A.  Yes.

12:17PM  5    Q.  Okay.  As compared to the document on the right, do you

12:17PM  6    remember ever seeing the form on the right, Exhibit 9E-3,

12:17PM  7    before the OIG interview?

12:17PM  8    A.  No.

12:17PM  9         **MR. TRIPI:**  Okay.  Let's go to the next page of

12:17PM  10   Defense Exhibit K.2.

12:17PM  11        **BY MR. TRIPI:**

12:18PM  12   Q.  That's another signature page from the June 3rd, 2020

12:18PM  13   interview, correct?

12:18PM  14   A.  Correct.

12:18PM  15   Q.  And you're the witness in that interview?

12:18PM  16   A.  Yes.

12:18PM  17   Q.  So your title as it relates to that interview is

12:18PM  18   accurate, something you remember?

12:18PM  19   A.  Yes.

12:18PM  20   Q.  And do you remember signing that form, the second page of

12:18PM  21   Defense Exhibit K.2?

12:18PM  22   A.  Yes.

12:18PM  23   Q.  Now, comparing that to Government Exhibit 9E-3, are you

12:18PM  24   Shane Nastoff?

12:18PM  25   A.  No.

12:18PM    1    Q.  Were you the controlling agent for confidential source

12:18PM    2    13 -- or, the co-agent for confidential source 13-144841?

12:18PM    3    A.  No.

12:18PM    4         MR. TRIPI:  Okay.  Can we go to the third page of

12:18PM    5    K.2, please.  Is there a third page?

12:18PM    6         MR. COOPER:  We're on the third page.

12:19PM    7         MR. TRIPI:  Oh, I'm sorry, the fourth page.

12:19PM    8         BY MR. TRIPI:

12:19PM    9    Q.  Is this a -- another warning and assurances to employee

12:19PM   10    from June 9th, 2020 interview with the Department of Justice

12:19PM   11    OIG?

12:19PM   12    A.  Yes.

12:19PM   13    Q.  Were you the witness interviewed in that interview?

12:19PM   14    A.  Yes.

12:19PM   15    Q.  Do you remember signing that form?

12:19PM   16    A.  Yes.

12:19PM   17    Q.  And as it relates to that interview, your status as a

12:19PM   18    witness was something that was accurate, correct?

12:19PM   19    A.  Correct.

12:19PM   20    Q.  As compared to Exhibit 9E-3, were you ever a controlling

12:19PM   21    or handling agent for that source?

12:19PM   22    A.  No.

12:19PM   23         MR. TRIPI:  Can we go to page 5 of K.2, please.

12:19PM   24         BY MR. TRIPI:

12:19PM   25    Q.  Again, this is another signature regarding your status as

| | | |
|---|---|---|
| 12:19PM | 1 | a witness in that interview from June 9th, 2020, correct? |
| 12:20PM | 2 | A.  Correct. |
| 12:20PM | 3 | Q.  Is your title witness in that document accurate? |
| 12:20PM | 4 | A.  Yes. |
| 12:20PM | 5 | Q.  Do you remember signing that? |
| 12:20PM | 6 | A.  Yes. |
| 12:20PM | 7 | Q.  And now I notice you didn't write the letters F-O-R on |
| 12:20PM | 8 | that, right? |
| 12:20PM | 9 | A.  Correct. |
| 12:20PM | 10 | Q.  Is that because you were signing it for yourself? |
| 12:20PM | 11 | A.  Yes, I was. |
| 12:20PM | 12 | MR. TRIPI:  Can we go to page 6, please. |
| 12:20PM | 13 | BY MR. TRIPI: |
| 12:20PM | 14 | Q.  Again, this is an interview April 19th, 2022, and again |
| 12:20PM | 15 | with the DOJ OIG, and you were a witness; is that correct? |
| 12:20PM | 16 | A.  Yes. |
| 12:20PM | 17 | Q.  And you remember signing that form? |
| 12:20PM | 18 | A.  Yes. |
| 12:20PM | 19 | Q.  And you didn't write F-O-R on the signature line, |
| 12:20PM | 20 | correct? |
| 12:20PM | 21 | A.  Correct. |
| 12:20PM | 22 | Q.  Why didn't you write F-O-R? |
| 12:20PM | 23 | A.  Because I was signing for myself. |
| 12:20PM | 24 | Q.  And in Exhibit 9E-3, had you ever seen that form before |
| 12:21PM | 25 | it was presented to you by DOJ OIG? |

| | | |
|---|---|---|
| 12:21PM | 1 | A.  No. |
| 12:21PM | 2 | **MR. TRIPI:**  And can we go to the last page of K.2, |
| 12:21PM | 3 | please. |
| 12:21PM | 4 | **BY MR. TRIPI:** |
| 12:21PM | 5 | Q.  Again, do you remember signing that document on |
| 12:21PM | 6 | April 19th, 2022? |
| 12:21PM | 7 | A.  Yes. |
| 12:21PM | 8 | Q.  And you didn't write the letters F-O-R? |
| 12:21PM | 9 | A.  No. |
| 12:21PM | 10 | Q.  Why not? |
| 12:21PM | 11 | A.  I was signing for myself. |
| 12:21PM | 12 | **MR. TRIPI:**  One moment, please, Your Honor. |
| 12:21PM | 13 | No further redirect.  Thank you. |
| 12:21PM | 14 | **THE COURT:**  Anything more, Mr. Singer? |
| 12:21PM | 15 | **MR. SINGER:**  Briefly. |
| 12:22PM | 16 | |
| 12:22PM | 17 | **RECROSS-EXAMINATION BY MR. SINGER:** |
| 12:22PM | 18 | Q.  So, Mr. Gentile, do you recall being asked some questions |
| 12:22PM | 19 | about the rumors floating around the office -- |
| 12:22PM | 20 | **MR. TRIPI:**  Objection, beyond the scope of redirect. |
| 12:22PM | 21 | **MR. SINGER:**  Judge, they asked questions about what |
| 12:22PM | 22 | was floating around with regard to Serio at the time of |
| 12:22PM | 23 | Mr. Bongiovanni's retirement.  I'm asking questions to clarify |
| 12:22PM | 24 | the answer that they got. |
| 12:22PM | 25 | **MR. TRIPI:**  I didn't ask about rumors floating around |

| | | |
|---|---|---|
| 12:22PM | 1 | the office. |
| 12:22PM | 2 | **THE COURT:**  Overruled.  Go ahead. |
| 12:22PM | 3 | **BY MR. SINGER:** |
| 12:22PM | 4 | Q.  Do recall that, sir? |
| 12:22PM | 5 | A.  Can you repeat that? |
| 12:22PM | 6 | Q.  Do you recall conversations going on around the office at |
| 12:22PM | 7 | the time Mr. Bongiovanni retired regarding the Serio |
| 12:22PM | 8 | investigation, right? |
| 12:22PM | 9 | A.  Again there were many rumors, as far as specific names, |
| 12:22PM | 10 | the main name I remember is Peter Gerace. |
| 12:22PM | 11 | Q.  So there were many rumors going on, one of the names was |
| 12:22PM | 12 | involving Peter Gerace, to the best of your recall? |
| 12:22PM | 13 | **MR. TRIPI:**  Objection.  Asked and answered. |
| 12:23PM | 14 | **THE COURT:**  Overruled. |
| 12:23PM | 15 | **BY MR. SINGER:** |
| 12:23PM | 16 | Q.  But you can't recall all the names being floated around |
| 12:23PM | 17 | at that time, correct? |
| 12:23PM | 18 | **MR. TRIPI:**  Objection.  Assumes that were other |
| 12:23PM | 19 | names. |
| 12:23PM | 20 | **THE COURT:**  Overruled. |
| 12:23PM | 21 | **THE WITNESS:**  I'm sorry, one more time. |
| 12:23PM | 22 | **BY MR. SINGER:** |
| 12:23PM | 23 | Q.  But you can't recall any other names being floated around |
| 12:23PM | 24 | at that point in time, correct? |
| 12:23PM | 25 | A.  I don't recall, no. |

12:23PM   1   Q.  Okay.  And with regard to the deactivation form that you

12:23PM   2   were shown vis-à-vis Mr. R.K., Government Exhibit 9A-3?

12:23PM   3   A.  Yes.

12:23PM   4   Q.  So that form, on deactivation -- you're a G.S., right?

12:23PM   5   A.  Yes, I am.

12:23PM   6   Q.  The special agent in charge of the confidential source is

12:23PM   7   the person who's responsible for that confidential source,

12:23PM   8   correct?

12:23PM   9   A.  The main handler?

12:23PM   10  Q.  Yes.

12:23PM   11  A.  Yes.

12:23PM   12  Q.  But the group supervisor is the one who allows the

12:23PM   13  special agent under their command to open up the confidential

12:23PM   14  source file, correct?

12:23PM   15  A.  As far as allowing, I mean, yes.  I mean, they would

12:24PM   16  review the case, the C.S. file, absolutely.

12:24PM   17  Q.  You're the person who approves opening up someone as a

12:24PM   18  confidential source as a G.S., right?

12:24PM   19  A.  Yes.

12:24PM   20  Q.  And you're also the person who approves deactivating the

12:24PM   21  source as the G.S., right?

12:24PM   22  A.  Yes.

12:24PM   23  Q.  So, for instance, an agent under a group supervisor

12:24PM   24  cannot just deactivate a source on his or her own, correct?

12:24PM   25  A.  Correct.

12:24PM   1   Q.   That needs to be approved by the group supervisor,

12:24PM   2   correct?

12:24PM   3   A.   Yes.

12:24PM   4   Q.   And with regard to the forms that you were shown in

12:24PM   5   Exhibit K.2 from the government, the signature examples that

12:24PM   6   you were provided, you'll agree with me, the first page was

12:24PM   7   an older signature, right?

12:24PM   8   A.   Yes.

12:24PM   9   Q.   But the other pages, pages 2 through 7 of K.2, they were

12:24PM  10   newer signatures, correct?

12:24PM  11   A.   Yes.

12:24PM  12   Q.   They dated from -- anywhere from 2020 to 2022, correct?

12:24PM  13   A.   Yes.

12:24PM  14   Q.   And they involved an investigation that was ongoing in

12:24PM  15   the office that you were a part of, correct?

12:25PM  16   A.   Yes.

12:25PM  17   Q.   And, so, those forms were closer in time to this trial

12:25PM  18   than the 2013 form represented in Government Exhibit 9A-3,

12:25PM  19   correct?

12:25PM  20   A.   Yes.

12:25PM  21   Q.   So safe to say they were more fresh in your memory when

12:25PM  22   you signed those forms?

12:25PM  23   A.   Yes.

12:25PM  24   Q.   And, so, those forms also dealt with an investigation

12:25PM  25   ongoing in the office, correct?

12:25PM    1    A.  Yes.

12:25PM    2    Q.  It was an investigation that had some importance in the

12:25PM    3    office, correct?

12:25PM    4          MR. TRIPI:  Objection as to importance in the office.

12:25PM    5    This is well far afield now.

12:25PM    6          THE COURT:  Overruled.

12:25PM    7          THE WITNESS:  Yes.

12:25PM    8          BY MR. SINGER:

12:25PM    9    Q.  And it was an investigation that in some ways involved

12:25PM   10    you tangentially, correct?

12:25PM   11    A.  Yes.

12:25PM   12    Q.  So, safe to say that you put more import into your recall

12:25PM   13    of those forms than you would any other form you signed for

12:25PM   14    the DEA, correct?

12:25PM   15    A.  That's fair, yes.

12:25PM   16    Q.  Especially a form that could have been signed back in

12:25PM   17    2013, correct?

12:25PM   18    A.  Yes.

12:25PM   19          MR. SINGER:  Thank you, nothing further.

12:25PM   20          THE COURT:  Anything more?

12:25PM   21          MR. TRIPI:  One question.

12:26PM   22

12:26PM   23          **RE-REDIRECT EXAMINATION BY MR. TRIPI:**

12:26PM   24    Q.  Mr. Gentile, when you were you first shown that C.I.

12:26PM   25    deactivation form and you glanced that signature during your

| | | |
|---|---|---|
| 12:26PM | 1 | OIG interview, and you took a close look at your signature, |
| 12:26PM | 2 | what was your immediate gut reaction. |
| 12:26PM | 3 | **MR. SINGER:**  Object to the form. |
| 12:26PM | 4 | **THE COURT:**  Sustained. |
| 12:26PM | 5 | **BY MR. TRIPI:** |
| 12:26PM | 6 | Q.  What was your reaction to seeing that form, on that |
| 12:26PM | 7 | signature line? |
| 12:26PM | 8 | A.  It upset me. |
| 12:26PM | 9 | Q.  What? |
| 12:26PM | 10 | A.  It upset me. |
| 12:26PM | 11 | Q.  Why? |
| 12:26PM | 12 | A.  Because I didn't sign it. |
| 12:26PM | 13 | **MR. TRIPI:**  Nothing further. |
| 12:26PM | 14 | **THE COURT:**  Anything more, Mr. Singer? |
| 12:26PM | 15 | **MR. SINGER:**  No. |
| 12:26PM | 16 | **THE COURT:**  You can step down, sir, thank you. |
| 12:26PM | 17 | (Witness excused at 12:26 p.m.) |
| | 18 | (Excerpt concluded at 12:26 p.m.) |
| | 19 | *     *     *     *     *     *     * |
| | 20 | |
| | | **CERTIFICATE OF REPORTER** |
| | 21 | |
| | 22 | In accordance with 28, U.S.C., 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court for the |
| | 23 | Western District of New York on March 4, 2024. |
| | 24 | s/ Ann M. Sawyer |
| | | Ann M. Sawyer, FCRR, RPR, CRR |
| | 25 | Official Court Reporter |
| | | U.S.D.C., W.D.N.Y. |

**TRANSCRIPT INDEX**

**EXCERPT OF MARK GENTILE - DAY 2**

**MARCH 4, 2024**

**W I T N E S S**                                          **P A G E**

**M A R K   G E N T I L E**                                  2

   CROSS-EXAMINATION BY MR. SINGER (CON'T):        2

   REDIRECT EXAMINATION BY MR. TRIPI:             34

   RECROSS-EXAMINATION BY MR. SINGER:             48

   RE-REDIRECT EXAMINATION BY MR. TRIPI:          52


**E X H I B I T S**                                        **P A G E**

DFT Exhibit K.2                                            18

DFT Exhibit K.3                                            26