09:26AM

1
2

                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK

3  _____

   UNITED STATES OF AMERICA,

4                                     Case No. 1:19-cr-227
                    Plaintiff,                (LJV)

5  v.
                                      February 22, 2024
   JOSEPH BONGIOVANNI,
6
                    Defendant.
7  _____

8      TRANSCRIPT EXCERPT - TESTIMONY OF LOUIS SELVA - DAY 2
              BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                    UNITED STATES DISTRICT JUDGE

10

   APPEARANCES:          TRINI E. ROSS, UNITED STATES ATTORNEY
11                       BY: JOSEPH M. TRIPI, ESQ.
                             NICHOLAS T. COOPER, ESQ.
12                           CASEY L. CHALBECK, ESQ.
                         Assistant United States Attorneys
13                       Federal Centre
                         138 Delaware Avenue
14                       Buffalo, New York 14202
                             And
15                       UNITED STATES DEPARTMENT OF JUSTICE
                         BY: JORDAN ALAN DICKSON, ESQ.
16                       1301 New York Ave NW
                         Suite 1000
17                       Washington, DC 20530-0016
                         For the Plaintiff
18
                         SINGER LEGAL PLLC
19                       BY: ROBERT CHARLES SINGER, ESQ.
                         80 East Spring Street
20                       Williamsville, New York 14221
                             And
21                       LAW OFFICES OF PARKER ROY MacKAY
                         BY: PARKER ROY MacKAY, ESQ.
22                       3110 Delaware Avenue
                         Kenmore, New York  14217
23                           And
                         OSBORN REED & BURKE LLP
24                       BY: JOHN J. GILSENAN, ESQ.
                         120 Allens Creek Road, Suite 150
25                       Rochester, New York 14618
                         For the Defendant

```
 1    PRESENT:              BRIAN A. BURNS, FBI Special Agent
 2                          MARILYN K. HALLIDAY, HSI Special Agent
                            KAREN A. CHAMPOUX, USA Paralegal
 3
      LAW CLERK:            REBECCA FABIAN IZZO, ESQ.
 4
      COURT DEPUTY CLERK:   COLLEEN M. DEMMA
 5
      COURT REPORTER:       ANN MEISSNER SAWYER, FCRR, RPR, CRR
 6                          Robert H. Jackson Federal Courthouse
                            2 Niagara Square
 7                          Buffalo, New York  14202
                            Ann_Sawyer@nywd.uscourts.gov
 8
 9
10                          *    *    *    *    *    *
11
12
13            (Excerpt commenced at 9:49 a.m.)
14            (Jury is present.)
15       THE COURT:  Let's bring the witness back in.
16       MR. TRIPI:  Yes, we recall Lou Selva.
17       THE COURT:  And the record will reflect that all our
18  jurors are present.  I should have said that before I said the
19  question a minute ago, and I didn't, but the record will
20  reflect that all our jurors are present.
21            I remind the witness he's still under oath.
22            And you may continue, Mr. Tripi.
23       MR. TRIPI:  Thank you, Your Honor.
24
25
```

09:50AM   1   **L O U I S   S E L V A,** after being previously duly called and

09:50AM   2   sworn, continued to testify as follows:

09:50AM   3

09:50AM   4           **DIRECT EXAMINATION BY MR. TRIPI (CON'T):**

09:50AM   5   Q.   Mr. Selva, yesterday when we sort of ended off, I think

09:50AM   6   we had just asked you some questions about J.D.; do you

09:50AM   7   recall that?

09:50AM   8   A.   Yes.

09:50AM   9   Q.   When you had your conversations with Mr. Bongiovanni

09:50AM   10  about J.D. being an informant, were those conversations that

09:50AM   11  you had with the defendant sometime after 2008?

09:50AM   12  A.   Yes.

09:50AM   13  Q.   Can you help the jury, can you provide a tighter

09:51AM   14  time frame, estimated time frame for when those conversations

09:51AM   15  occurred?

09:51AM   16  A.   About 2012, '13.

09:51AM   17  Q.   Okay.  Now, yesterday towards the end of the day, I asked

09:51AM   18  you about Anthony Anastasia as well?

09:51AM   19  A.   Yes.

09:51AM   20  Q.   And what bar was Anthony Anastasia associated with?

09:51AM   21  A.   Gables.

09:51AM   22  Q.   Is that a bar on Hertel Avenue?

09:51AM   23  A.   It's a bar on Hertel Avenue.

09:51AM   24  Q.   Is there another individual that you and the defendant

09:51AM   25  grew up with named Steve who also works there, or worked

| 09:51AM | 1 | there? |
| 09:51AM | 2 | A.   Yes. |
| 09:51AM | 3 | Q.   And who was that again? |
| 09:51AM | 4 | A.   Steve Brucato. |
| 09:51AM | 5 | Q.   Now, at some point yesterday, I asked you about |
| 09:51AM | 6 | Mr. Serio's gambling habits, his casino habits; do you |
| 09:51AM | 7 | remember that? |
| 09:51AM | 8 | A.   Yes. |
| 09:51AM | 9 | Q.   As it relates to -- as it relates to Mr. Serio, what, if |
| 09:51AM | 10 | any, conversations did you have with the defendant, |
| 09:52AM | 11 | Mr. Bongiovanni, regarding the IRS and any role they had in |
| 09:52AM | 12 | an investigation? |
| 09:52AM | 13 | A.   He said the IRS was looking at him for his winnings at |
| 09:52AM | 14 | the casino.  He was winning quite a bit of money.  A lot of |
| 09:52AM | 15 | money. |
| 09:52AM | 16 | Q.   So just remember with the pronouns, right, can you use |
| 09:52AM | 17 | names?  He said he.  Can you repeat that answer? |
| 09:52AM | 18 | A.   Yes, I'm sorry. |
| 09:52AM | 19 | Q.   Yes names. |
| 09:52AM | 20 | A.   The defendant, Mr. Bongiovanni, said that Mr. Serio was |
| 09:52AM | 21 | winning a lot of money, and there was an investigation with |
| 09:52AM | 22 | the IRS. |
| 09:52AM | 23 | Q.   Did Mr. Bongiovanni give you any more details than that? |
| 09:52AM | 24 | A.   No. |
| 09:52AM | 25 | Q.   What did you do with that information? |

| | | |
|---|---|---|
| 09:52AM | 1 | A.  I told Mike. |
| 09:52AM | 2 | Q.  You told Masecchia? |
| 09:52AM | 3 | A.  Yes. |
| 09:52AM | 4 | Q.  In the context of any investigation of -- of -- of |
| 09:52AM | 5 | your -- your group, Masecchia, Serio, did you have any |
| 09:52AM | 6 | conversations regarding a technique called GPS trackers? |
| 09:53AM | 7 | A.  Yes. |
| 09:53AM | 8 | Q.  What conversation did you have with the defendant about |
| 09:53AM | 9 | GPS trackers? |
| 09:53AM | 10 | A.  They were used to put on vehicles to track movement of |
| 09:53AM | 11 | individuals that were being surveilled. |
| 09:53AM | 12 | Q.  And can you describe the context in which that |
| 09:53AM | 13 | conversation came up between you and the defendant? |
| 09:53AM | 14 | A.  He said that there were trackers being used on, I |
| 09:53AM | 15 | believe, Mike's truck. |
| 09:53AM | 16 | Q.  And when you say "Mike," you're referring to Masecchia? |
| 09:53AM | 17 | A.  Masecchia, yes. |
| 09:53AM | 18 | Q.  What did you do with the information you were provided? |
| 09:53AM | 19 | A.  I told Mike. |
| 09:53AM | 20 | Q.  What did Mike say when you provided him that information? |
| 09:53AM | 21 | A.  He said he was going to change his routine now.  He let |
| 09:54AM | 22 | Ron know, as well. |
| 09:54AM | 23 | Q.  And what was Mike's general routine as it related to his |
| 09:54AM | 24 | involvement in the operations? |
| 09:54AM | 25 | A.  He would go to different locations that he had for |

USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24

09:54AM   1   hydroponic operations.  Usually, after when he got out of

09:54AM   2   school, he was a school teacher, and he would take care of

09:54AM   3   them.  Take care of the plants.

09:54AM   4   Q.  Where was Masecchia a school teacher?

09:54AM   5   A.  I believe it was the old Grover Cleveland High School.

09:54AM   6   Q.  Is that --

09:54AM   7   A.  I don't know the new name.

09:54AM   8   Q.  Is that a school on the West Side of Buffalo?

09:54AM   9   A.  Yeah, it's on the West Side of Buffalo.

09:54AM   10  Q.  Is it a high school?

09:54AM   11  A.  It's a high school.

09:54AM   12  Q.  How long had he taught there?

09:54AM   13  A.  25 years.

09:54AM   14  Q.  Whose idea was it to install a marijuana grow operation

09:55AM   15  in your house to grow plants to maturity?

09:55AM   16  A.  I discussed that with Mike.  He had told me how it

09:55AM   17  happened, and what he had done in the past.  So I decided to

09:55AM   18  do it in my house.

09:55AM   19  Q.  And was there any conversation related to the defendant

09:55AM   20  as it -- in that, in the context of the grow operation at

09:55AM   21  your house, so when you discussed it with Mike?

09:55AM   22  A.  Yes.

09:55AM   23  Q.  What was that?

09:55AM   24  A.  He said make sure and let Joe know what's going on at

09:55AM   25  your house.

USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24

09:55AM   1   Q.  Why was that important?

09:55AM   2   A.  Again, if anything were to happen, I mean, I have

09:55AM   3   neighbors.  There was sometimes a smell, but we had an

09:55AM   4   ionizer.  The utility bills, if they were to go up, a lot of

09:55AM   5   red flags.

09:55AM   6   Q.  After you had the marijuana operation, I think yesterday

09:55AM   7   you said it was in your basement, right?

09:55AM   8   A.  Yes.

09:55AM   9   Q.  After you had that operation set up at your house, did

09:56AM  10   the defendant ever come over to your house?

09:56AM  11   A.  Yes.

09:56AM  12   Q.  Describe that for the jury.

09:56AM  13   A.  Stopped over, had a drink, just catching up.  And he

09:56AM  14   noticed the smell.

09:56AM  15   Q.  So what happened at that point?

09:56AM  16   A.  I told him what I had going on in my basement.

09:56AM  17   Q.  What, if anything, did the defendant say to that?

09:56AM  18   A.  Just be careful.  I'll keep -- I'll let you know if

09:56AM  19   something's going on, but be careful.

09:56AM  20   Q.  And how many plants did you have in there growing?

09:56AM  21   A.  I believe about 50.  40 to 50.

09:56AM  22   Q.  And who actually installed the equipment for you?

09:56AM  23   A.  Mike, and Ron Serio, and myself.  The three of us did it.

09:57AM  24   Q.  And how did it work -- withdrawn.

09:57AM  25       How long would a grow cycle be in your basement?

09:57AM 1  A.  Four months.  I mean, we would -- it was a little bit

09:57AM 2  different, because they were on timers.  We would, excuse me,

09:57AM 3  six months, because you'd have to get the clones ready, and

09:57AM 4  then you transplant them, and then you put them in littler

09:57AM 5  pots.  And then they would be in the room with the

09:57AM 6  retractable light on timers.

09:57AM 7  Q.  What -- describe some of the equipment that you used in

09:57AM 8  setting up an indoor grow like that.

09:57AM 9  A.  There was an ionizer.  There was a ventilation system

09:57AM 10  that we set up that sucked the air out of the room that went

09:57AM 11  through the vent to my -- right near my vent for my dryer.

09:57AM 12  Actually, it was tied into that.

09:57AM 13     There was a retractible grow light with timers.

09:58AM 14  Q.  And when the plants were mature, what would do you with

09:58AM 15  them at your house?

09:58AM 16  A.  We would cut them down, and then we would hang them in a

09:58AM 17  dark room with fans blowing to dry them.

09:58AM 18  Q.  And how long does that part take?

09:58AM 19  A.  Three days.

09:58AM 20  Q.  And were you ever -- did you ever discuss with the

09:58AM 21  defendant anything related to National Grid or the energy

09:58AM 22  that is used in the process of growing marijuana at your

09:58AM 23  house?

09:58AM 24  A.  Yes.  Well, I was aware of it, too, that to -- raise a

09:58AM 25  red flag.  But I asked him if there was ever a red flag

09:58AM    1   raised, to let me know.

09:58AM    2   Q.  What do you mean by it could raise a red flag?  Describe

09:58AM    3   it for the jury.

09:58AM    4   A.  You're using a lot more energy, and your bill is going to

09:58AM    5   go up, so it's going to show a big spike.  So that raises a

09:58AM    6   red flag.

09:58AM    7   Q.  And when you discussed that type of thing -- withdrawn.

09:59AM    8       When you discussed that with the defendant, what did he

09:59AM    9   say?

09:59AM   10   A.  He said, just, I'll keep an eye on it, and be careful.

09:59AM   11   Q.  And how many -- how many cycles, how many years of grows,

09:59AM   12   did you do at your house?

09:59AM   13       I'm not talking about the cloning from before when it was

09:59AM   14   just cloning and then moving the plants outdoors, I'm talking

09:59AM   15   about the full cycle from beginning to end at your house, how

09:59AM   16   many years did that persist?

09:59AM   17   A.  I believe five.

09:59AM   18   Q.  And was it 40 to 50 plants every cycle?

09:59AM   19   A.  Yes.  We always didn't get that, but you have some that

09:59AM   20   died, that type thing.

09:59AM   21   Q.  So on the low end, about 200 plants?

09:59AM   22   A.  Yes.

09:59AM   23   Q.  And how many pounds of marijuana did that equate to

09:59AM   24   roughly?

09:59AM   25   A.  Over the full year, or for a cycle?

USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24

| | | |
|---|---|---|
| 10:00AM | 1 | Q.  Average per cycle? |
| 10:00AM | 2 | A.  Per cycle?  Probably, again, they were smaller, they |
| 10:00AM | 3 | weren't as big as they are outdoor, so there was less weight |
| 10:00AM | 4 | that was involved.  It was probably about a half pound to a |
| 10:00AM | 5 | quarter pound. |
| 10:00AM | 6 | Q.  Per plant? |
| 10:00AM | 7 | A.  Per plant.  But it was a higher grade because it was a |
| 10:00AM | 8 | better grade. |
| 10:00AM | 9 | Q.  What do you mean by that? |
| 10:00AM | 10 | A.  Indoor, there were certain strains that are better than |
| 10:00AM | 11 | outdoor.  So it was a better strain where the quality was |
| 10:00AM | 12 | better. |
| 10:00AM | 13 | Q.  What was the strain you were growing? |
| 10:00AM | 14 | A.  I believe it was Bubba Kush, Mother's Finest.  Those are |
| 10:00AM | 15 | the two that I can remember. |
| 10:00AM | 16 | Q.  Who had the seeds? |
| 10:00AM | 17 | A.  Mike had gotten that. |
| 10:00AM | 18 | Q.  Do you know where he got the seeds? |
| 10:00AM | 19 | A.  I don't. |
| 10:00AM | 20 | Q.  So if you had to estimate just from your house the five |
| 10:01AM | 21 | years you did the grows, approximately how many pounds are we |
| 10:01AM | 22 | talking about? |
| 10:01AM | 23 | A.  That's a good question.  Well -- |
| 10:01AM | 24 | Q.  Overall. |
| 10:01AM | 25 | A.  Overall?  It may be 100 or less. |

10:01AM   1   Q.  So, 100 pounds on the high end.  How much on the low end?

10:01AM   2   A.  80.

10:01AM   3   Q.  So 80 to 100 pounds?

10:01AM   4   A.  Yes.

10:01AM   5   Q.  As an estimate?

10:01AM   6   A.  Yes.

10:01AM   7   Q.  And while those indoor grows are happening at your house,

10:01AM   8   those outdoor grows are still going?

10:01AM   9   A.  Yes.

10:01AM  10   Q.  Were there other locations where there were indoor grows

10:01AM  11   like was set up at your house?

10:01AM  12   A.  Yes, it was between -- I wasn't involved with those.

10:02AM  13   That was between Mike and Ron, they had other locations.

10:02AM  14   Q.  But you knew they existed?

10:02AM  15   A.  Yes.

10:02AM  16   Q.  Describe what happens after the plant grows to maturity

10:02AM  17   and they're dried in your basement.  What would you do next?

10:02AM  18   Is packaging the next step?

10:02AM  19   A.  It's clipping.  You have to -- now it's dried, you have

10:02AM  20   to trim all the leaves and take it off the bud.  And then you

10:02AM  21   put it in a bag.

10:02AM  22   Q.  What kind of bags?

10:02AM  23   A.  Ziploc bag.

10:02AM  24   Q.  What size?

10:02AM  25   A.  Quarter pound.  Half pound.

Case 1:19-cr-00227-LJV-MJR   Document 818   Filed 03/12/24   Page 12 of 267
USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24

12

10:02AM    1    Q.  And how much was the going rate for the marijuana you

10:02AM    2    grew?

10:02AM    3    A.  At that time?  I think it was $3,000 a pound.

10:02AM    4    Q.  And who was distributing it primarily?

10:02AM    5    A.  Ron.  We would sell to Ron.

10:02AM    6    Q.  Did Ron have a list of steady customers that were getting

10:03AM    7    that marijuana?

10:03AM    8    A.  Yes, he did.

10:03AM    9    Q.  And by "customers," these are not smokers, these are

10:03AM   10    other distributors?

10:03AM   11    A.  Yes.

10:03AM   12    Q.  Okay.  Now I want to fast forward a moment.  August 23,

10:03AM   13    2019, Homeland Security does a search warrant at your house?

10:03AM   14    A.  Yes.

10:03AM   15    Q.  Did they seize some of the equipment that was described

10:03AM   16    that was involved in the process?

10:03AM   17    A.  They did.

10:03AM   18    Q.  I'm going to show you what's marked as Exhibit 201A.

10:04AM   19    A.  Okay.

10:04AM   20         MR. TRIPI:  May the record reflect that I've handed

10:04AM   21    up Exhibit 201A.  It's sitting next to the witness at the

10:04AM   22    podium or at the stand.

10:04AM   23         BY MR. TRIPI:

10:04AM   24    Q.  Do you recognize Exhibit 201A?

10:04AM   25    A.  Yes.

USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24

13

10:04AM 1   Q.  What do you recognize that to be?

10:04AM 2   A.  It's a grow light and ballast that was in my basement.

10:04AM 3   Q.  And what is that grow light used for?

10:04AM 4   A.  For growing.  It was on a retractor growing the marijuana

10:04AM 5   plants.

10:04AM 6   Q.  Is that in the same or substantially same condition today

10:04AM 7   as when it was seized from your residence?

10:04AM 8   A.  This?

10:04AM 9   Q.  Yes.

10:04AM 10  A.  Yes.

10:04AM 11       **MR. TRIPI:**  The government offers exhibit -- I'm

10:04AM 12  sorry, that's Exhibit 201.  I couldn't see the sticker through

10:04AM 13  the cellophane.  The government offers Exhibit 201,

10:04AM 14  Your Honor.

10:04AM 15       **MR. SINGER:**  No objection.

10:04AM 16       **THE COURT:**  201 is received without objection.

10:04AM 17       **(GOV Exhibit 201 was received in evidence.)**

10:04AM 18       **MR. TRIPI:**  Thank you, Your Honor.

10:04AM 19       **BY MR. TRIPI:**

10:04AM 20  Q.  So, obviously, the way it's sitting there, it's upside

10:04AM 21  down.  Usually, is that a light that's hanging and the plants

10:05AM 22  are under it?

10:05AM 23  A.  Correct.

10:05AM 24       **MR. TRIPI:**  I'm going to hold it in a manner that the

10:05AM 25  jury can see it, Your Honor.

Case 1:19-cr-00227-LJV-MJR   Document 818   Filed 03/12/24   Page 14 of 267
USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24

14

| 10:06AM | 1 |         BY MR. TRIPI: |
|---|---|---|

10:06AM  1          BY MR. TRIPI:

10:06AM  2  Q.  Next I'm going to hand you up Government Exhibit 205,

10:06AM  3  okay?

10:06AM  4  A.  Yeah.

10:06AM  5  Q.  Do you recognize Government Exhibit 205?

10:06AM  6  A.  Yes.

10:06AM  7  Q.  What is that?

10:06AM  8  A.  That was the box for the grow lamp.

10:06AM  9  Q.  Can you repeat that again?

10:06AM  10  A.  It was the box for the grow lamp, the 1000 watt grow

10:06AM  11  lamp.

10:06AM  12  Q.  And is that another item that was seized from your

10:06AM  13  residence on August 23rd, 2019?

10:06AM  14  A.  It was.

10:06AM  15  Q.  Is it in the same -- is the box at least in the same, or

10:06AM  16  substantially same condition as when it was in your house?

10:06AM  17  A.  Yes.

10:07AM  18          MR. TRIPI:  The government offers Government

10:07AM  19  Exhibit 205, Your Honor.  I've shown it to counsel.

10:07AM  20          MR. SINGER:  No objection.

10:07AM  21          THE COURT:  Received without objection.

10:07AM  22          **(GOV Exhibit 205 was received in evidence.)**

10:07AM  23          BY MR. TRIPI:

10:07AM  24  Q.  Next I'm going to hand you up Government Exhibit 204.  Do

10:07AM  25  you recognize Government Exhibit 204?

| | | |
|---|---|---|
| 10:07AM | 1 | A.  I do. |
| 10:07AM | 2 | Q.  What is that? |
| 10:07AM | 3 | A.  It's an aqua pump for the cloning process.  It goes in |
| 10:07AM | 4 | the cloning machine.  And it pumps and helps the water spray |
| 10:08AM | 5 | up to the bottom so the plants could root. |
| 10:08AM | 6 | Q.  Is that pump, Government Exhibit 204, is that a pump that |
| 10:08AM | 7 | was seized from your residence by HSI on August 23rd, 2019? |
| 10:08AM | 8 | A.  Yes, it was. |
| 10:08AM | 9 | Q.  Is it in the same or substantially same condition today |
| 10:08AM | 10 | as when it was taken from your home? |
| 10:08AM | 11 | A.  Yes. |
| 10:08AM | 12 | MR. TRIPI:  Showing it to counsel, Your Honor. |
| 10:08AM | 13 | I've shown it to counsel. |
| 10:08AM | 14 | The government offers Exhibit 204, Your Honor. |
| 10:08AM | 15 | MR. SINGER:  No objection. |
| 10:08AM | 16 | THE COURT:  Received without objection. |
| 10:08AM | 17 | (GOV Exhibit 204 was received in evidence.) |
| 10:08AM | 18 | BY MR. TRIPI: |
| 10:08AM | 19 | Q.  Now I notice the pump is in the box, Mr. Selva, so I'm |
| 10:09AM | 20 | going to open it up so that the jury can see it out of the |
| 10:09AM | 21 | box, okay? |
| 10:09AM | 22 | A.  Sure. |
| 10:09AM | 23 | Q.  While 204 is being prepared for the jury to see it |
| 10:09AM | 24 | better, I'm going to continue. |
| 10:09AM | 25 | Next I'm going to hand you up Government Exhibit 203, |

| | | |
|---|---|---|
| 10:09AM | 1 | Mr. Selva. |
| 10:09AM | 2 | A.  Okay. |
| 10:09AM | 3 | Q.  Do you recognize Government Exhibit 203? |
| 10:09AM | 4 | A.  I do. |
| 10:09AM | 5 | Q.  What is Government Exhibit 203? |
| 10:09AM | 6 | A.  I believe this is a power supply to the ballast. |
| 10:10AM | 7 | Q.  Power supply -- |
| 10:10AM | 8 | A.  Power supply for the ballast where the bulb was. |
| 10:10AM | 9 | Q.  Okay.  Is that power supply in the same or substantially |
| 10:10AM | 10 | same condition today as when it was removed from your house |
| 10:10AM | 11 | by law enforcement? |
| 10:10AM | 12 | A.  It is. |
| 10:10AM | 13 | Q.  And I'm going to hand you up Government Exhibit 202, as |
| 10:10AM | 14 | well.  Please inspect Government Exhibit 202.  When you're |
| 10:10AM | 15 | done, look up. |
| 10:10AM | 16 | Do you recognize Exhibit 202? |
| 10:10AM | 17 | A.  I do. |
| 10:10AM | 18 | Q.  What do you recognize that to be? |
| 10:10AM | 19 | A.  That was a scale. |
| 10:10AM | 20 | Q.  What was that used for? |
| 10:10AM | 21 | A.  To weigh after it was cut down and ready to process. |
| 10:10AM | 22 | Q.  And is Government Exhibit 202 the scale, a scale that was |
| 10:10AM | 23 | removed from your home? |
| 10:10AM | 24 | A.  It was. |
| 10:10AM | 25 | Q.  Is it in the same or substantially same condition today |

| | | |
|---|---|---|
| 10:10AM | 1 | as when you last saw it when it was at your house? |
| 10:11AM | 2 | A.  Yes. |
| 10:11AM | 3 | **MR. TRIPI:**  I'm going to show Exhibits 202 and 203 to |
| 10:11AM | 4 | counsel, Your Honor. |
| 10:11AM | 5 | The government offers Exhibits 202 and 203, |
| 10:11AM | 6 | Your Honor.  I've shown them to counsel. |
| 10:11AM | 7 | **MR. SINGER:**  No objection to 202 or 203. |
| 10:11AM | 8 | **THE COURT:**  202 and 203 are received without |
| 10:11AM | 9 | objection. |
| 10:11AM | 10 | **(GOV Exhibits 202 and 203 were received in evidence.)** |
| 10:11AM | 11 | **MR. TRIPI:**  I'm now going to publish them for the |
| 10:11AM | 12 | jury.  Just hold them up for them. |
| 10:11AM | 13 | Your Honor, 202 is in my right hand, 203 is in my |
| 10:11AM | 14 | left hand. |
| 10:11AM | 15 | I'm now going to publish 204, Your Honor.  It's out |
| 10:12AM | 16 | of the box so they can see it. |
| 10:12AM | 17 | **BY MR. TRIPI:** |
| 10:12AM | 18 | Q.  Now, although not here, you also had firearms in your |
| 10:12AM | 19 | house that were seized by law enforcement; is that correct? |
| 10:12AM | 20 | A.  Yes. |
| 10:12AM | 21 | Q.  What firearms did you have seized that day? |
| 10:12AM | 22 | A.  A .22 rifle, and a Mossburg shotgun pistol grip, 12 gauge |
| 10:12AM | 23 | shotgun. |
| 10:12AM | 24 | Q.  Now, I'd like to switch gears, I'd like to go back to in |
| 10:13AM | 25 | or about 2014.  Okay? |

10:13AM     1        Did there come a point in time when you helped arrange a

10:13AM     2   stag party for the defendant before he married his wife,

10:13AM     3   Lindsay?

10:13AM     4   A.   Yes.

10:13AM     5   Q.   Describe for the jury, what was your role in organizing,

10:13AM     6   if any, what was your role in organizing the stag?

10:13AM     7   A.   Secure the location, we had it at the Iron Works

10:13AM     8   downtown.  And work the front door, and greet the people as

10:13AM     9   they came in.

10:13AM    10   Q.   Were tickets sold?

10:13AM    11   A.   Yes.

10:13AM    12   Q.   Who were the ticket sellers?

10:14AM    13   A.   Myself.  There were a lot of tickets out there.  I

10:14AM    14   believe members of Joe's family.  Two of my cousins.  That's

10:14AM    15   all I could recall.

10:14AM    16   Q.   Who secured the location at Buffalo Iron Works?

10:14AM    17   A.   I did.

10:14AM    18   Q.   How did you do that?

10:14AM    19   A.   I called the manager who I knew.

10:14AM    20   Q.   And who was that manager?

10:14AM    21   A.   Jeff Lang.

10:14AM    22   Q.   Repeat that name, please?

10:14AM    23   A.   Jeff Lang.

10:14AM    24   Q.   And do you remember what month the stag party was in

10:14AM    25   2014?

USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24

19

10:14AM   1   A.  It was before the wedding.  I think January, January or

10:14AM       December, I don't recall.

10:14AM   3   Q.  So it's either December or January before the wedding,

10:15AM   4   which is in February?

10:15AM   5   A.  Yes.

10:15AM   6   Q.  Okay.  And the wedding, just for time reference, was

10:15AM   7   February of 2015?

10:15AM   8   A.  Yes.

10:15AM   9   Q.  You said you collected tickets.  Did anyone help you

10:15AM   10  collect tickets at the door for the stag?

10:15AM   11  A.  Yes.

10:15AM   12  Q.  Who did?

10:15AM   13  A.  Myself.  I believe his brother-in-law at the time, Tom

10:15AM   14  Napoli.  And Victor Sorrento, a friend of ours.

10:15AM   15  Q.  Were any of the people that you've been talking about

10:15AM   16  during the course of your testimony between yesterday and

10:15AM   17  today, were any of those people at the stag?

10:15AM   18  A.  I believe so, yes.

10:15AM   19  Q.  Who was at the stag?

10:15AM   20  A.  Mike Masecchia was.  I believe Wayne Anderson.  Ron was

10:15AM   21  not.  Ron Serio was not there.

10:16AM   22  Q.  Do you know whether he bought a ticket?

10:16AM   23  A.  I don't.  I don't know if he bought or ticket or not.

10:16AM   24  Q.  Okay.  Who else?

10:16AM   25  A.  It was a long time ago.  I think J.D. was there, too.

| 10:16AM | 1 | Q. J.D., the person he told -- |

10:16AM  1  Q.  J.D., the person he told --

10:16AM  2  A.  Yes.

10:16AM  3  Q.  -- that he talked about as being an informant?

10:16AM  4  A.  Yes.

10:16AM  5  Q.  Were tickets sold at that Fitness Factory gym?

10:16AM  6  A.  Yes.

10:16AM  7  Q.  Do you recall any other names as you sit here today who

10:16AM  8  were at the stag party?

10:16AM  9  A.  I believe from the gym?

10:16AM  10  Q.  No, just generally.

10:16AM  11  A.  Friend Mike Piazza was there.  Like I mentioned, Victor

10:16AM  12  Sorrento.  Ray Castiglione.  That's all I can recall.

10:16AM  13  Q.  Would you like something to refresh your recollection?

10:17AM  14  A.  Yes, please.

10:17AM  15         **MR. TRIPI:**  One moment, please, Your Honor.

10:17AM  16         I'm going to show the witness Government

10:18AM  17  Exhibit 3540M at page 3.

10:18AM  18         **BY MR. TRIPI:**

10:18AM  19  Q.  Mr. Selva, if you can please read page 3 to yourself and

10:18AM  20  when you're done, please look up.

10:19AM  21  A.  Okay.

10:19AM  22  Q.  I've removed the document.  Did that refresh your

10:19AM  23  recollection as to any other names of people who were there?

10:19AM  24  A.  Yes.

10:19AM  25  Q.  Can you tell the jury any more names of people that you

| | | |
|---|---|---|
| 10:19AM | 1 | recall being there? |
| 10:19AM | 2 | A.  Tom Doctor.  Joe Palmieri.  Samir Rizek. |
| 10:19AM | 3 | Q.  Any other names? |
| 10:19AM | 4 | A.  Peter Gerace. |
| 10:19AM | 5 | Q.  Did you know who Joe Palmieri was? |
| 10:19AM | 6 | A.  Yes. |
| 10:19AM | 7 | Q.  Had you met him before? |
| 10:19AM | 8 | A.  Yes. |
| 10:19AM | 9 | Q.  Who was Joe Palmieri. |
| 10:19AM | 10 | A.  He worked with Joe at the DEA. |
| 10:19AM | 11 | Q.  Had you ever socialized with both of them before? |
| 10:20AM | 12 | A.  When I've met Joe out, Joe would be with him a lot of the |
| 10:20AM | 13 | times. |
| 10:20AM | 14 | Q.  Okay.  We've got two Joes, so let's use last names. |
| 10:20AM | 15 | A.  When I met the defendant Joseph Bongiovanni, he would be |
| 10:20AM | 16 | with Joe Palmieri a lot. |
| 10:20AM | 17 | Q.  Where have you met them out? |
| 10:20AM | 18 | A.  Different bars.  Mother's.  Anywhere downtown on |
| 10:20AM | 19 | Chippewa. |
| 10:20AM | 20 | Q.  So you've gone drinking with the defendant and with his |
| 10:20AM | 21 | partner? |
| 10:20AM | 22 | A.  Yes, after hours.  Late at night, yes. |
| 10:20AM | 23 | Q.  What did you understand the relationship between the two |
| 10:20AM | 24 | of them to be? |
| 10:20AM | 25 | A.  They worked together. |

| | | |
|---|---|---|
| 10:20AM | 1 | Q.  At the DEA? |
| 10:20AM | 2 | A.  Yes. |
| 10:20AM | 3 | Q.  Yesterday you talked about Tom Doctor and Mickey Rats; do |
| 10:21AM | 4 | you remember that testimony? |
| 10:21AM | 5 | A.  Yes. |
| 10:21AM | 6 | Q.  Was there -- when was that?  What month, what day, was |
| 10:21AM | 7 | there a date of significance? |
| 10:21AM | 8 | A.  July of, maybe, 2015 or '16, that time frame. |
| 10:21AM | 9 | Q.  As you understood it, did Mr. Doctor have, like, an |
| 10:21AM | 10 | annual party around the Fourth of July? |
| 10:21AM | 11 | A.  Yes, I've heard he did, yes. |
| 10:21AM | 12 | Q.  I'd like to direct your attention to January of 2019. |
| 10:22AM | 13 | Okay?  Did there come a time where you learned that Mike -- a |
| 10:22AM | 14 | person named Michael Sinatra's house had been searched by law |
| 10:22AM | 15 | enforcement? |
| 10:22AM | 16 | A.  Yes. |
| 10:22AM | 17 | Q.  Who did you learn that from? |
| 10:22AM | 18 | A.  From the defendant, Joe. |
| 10:22AM | 19 | Q.  And just a little context, do you know who Michael |
| 10:22AM | 20 | Sinatra is as it relates to the defendant? |
| 10:22AM | 21 | A.  Just a friend.  I didn't -- he did landscaping for him. |
| 10:22AM | 22 | Q.  How long had they known each other as you understood it? |
| 10:22AM | 23 | A.  I believe not long.  Maybe five years, four years, I'm |
| 10:23AM | 24 | not quite sure. |
| 10:23AM | 25 | Q.  Okay.  How did -- how did the topic of Sinatra's house |

10:23AM   1   being searched by law enforcement come up?

10:23AM   2   A.  He had just done some landscaping work for Joe at his

10:23AM   3   house prior to that.  This, yeah, it was -- he did some

10:23AM   4   landscaping work for him, that's how it came up.

10:23AM   5   Q.  Describe the conversation.

10:23AM   6   A.  He had said that --

10:23AM   7   Q.  Who?

10:23AM   8   A.  -- Mike Sinatra --

10:23AM   9   Q.  Yeah, if you can please use names.

10:23AM  10   A.  I apologize.  The defendant, Joe, had said that Mike

10:23AM  11   Sinatra had just done some landscaping work for him at his

10:23AM  12   house, and he was arrested.

10:23AM  13   Q.  Did he express any concerns as it related to that arrest?

10:23AM  14   A.  No.

10:25AM  15          **MR. TRIPI:**  Sorry for the delay, Your Honor.

10:25AM  16          **THE COURT:**  That's okay.

10:25AM  17          **BY MR. TRIPI:**

10:26AM  18   Q.  Mr. Selva, you proffered with the government on

10:26AM  19   October 1st, 2019?

10:26AM  20   A.  Correct.

10:26AM  21          **MR. TRIPI:**  Judge, I'm proceeding under Rule 607

10:26AM  22   right now.

10:26AM  23          **BY MR. TRIPI:**

10:26AM  24   Q.  On October 1st, 2019, you proffered with the government,

10:26AM  25   and you were asked questions about the search warrant

USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24

24

| | | |
|---|---|---|
| 10:26AM | 1 | executed at Michael Sinatra's residence, correct? |
| 10:26AM | 2 | A.  Correct. |
| 10:26AM | 3 | Q.  And during that proffer meeting, you make statements |
| 10:26AM | 4 | regarding what Bongiovanni had said about Michael Sinatra's |
| 10:26AM | 5 | raid, correct? |
| 10:26AM | 6 | A.  Correct. |
| 10:26AM | 7 | Q.  And on that date, did you say that Bongiovanni told you |
| 10:26AM | 8 | he was worried about Sinatra's home getting raided because it |
| 10:26AM | 9 | could come back on Bongiovanni, however Bongiovanni said you |
| 10:26AM | 10 | had nothing to worry about? |
| 10:26AM | 11 | A.  That's correct. |
| 10:26AM | 12 | Q.  Is that what you said? |
| 10:27AM | 13 | A.  That's what I said. |
| 10:27AM | 14 | Q.  Okay.  Did you just not recall that? |
| 10:27AM | 15 | A.  I did not recall it, yes. |
| 10:27AM | 16 | Q.  Okay.  Is that what happened? |
| 10:27AM | 17 | A.  It did, yes. |
| 10:27AM | 18 | Q.  Now can you describe that conversation for the jury, |
| 10:27AM | 19 | please? |
| 10:27AM | 20 | A.  Yes.  When Mike had gotten -- Sinatra had gotten raided, |
| 10:27AM | 21 | the defendant had said that he was hoping that nothing would |
| 10:27AM | 22 | come back on him, but it shouldn't concern me. |
| 10:27AM | 23 | Q.  And when you say raided in the context of Michael |
| 10:27AM | 24 | Sinatra, what's your understanding of what that entailed? |
| 10:27AM | 25 | A.  His house was -- what happened to my house with law |

| | | |
|---|---|---|
| 10:27AM | 1 | enforcement executing a search warrant and coming in. |
| 10:27AM | 2 | Q.  But your search warrant happened later? |
| 10:27AM | 3 | A.  It happened, yes.  I should have clarified that. |
| 10:28AM | 4 | Q.  Now, after the bribes that you testified started, did the |
| 10:28AM | 5 | defendant make some purchases? |
| 10:28AM | 6 | A.  Yes. |
| 10:28AM | 7 | Q.  What were some things you remember him purchasing after |
| 10:28AM | 8 | those bribes started? |
| 10:28AM | 9 | A.  He bought a classic car.  Did work on his home. |
| 10:28AM | 10 | Furniture for the house. |
| 10:28AM | 11 | Q.  Did he purchase a home? |
| 10:28AM | 12 | A.  He purchased a home in Tonawanda. |
| 10:28AM | 13 | Q.  Where? |
| 10:28AM | 14 | A.  On Alder Place. |
| 10:28AM | 15 | Q.  Are you saying Alder Place? |
| 10:28AM | 16 | A.  Alder Place. |
| 10:28AM | 17 | **MR. TRIPI:**  If we can show to Mr. Selva only |
| 10:28AM | 18 | Government Exhibit 109AB. |
| 10:28AM | 19 | **BY MR. TRIPI:** |
| 10:29AM | 20 | Q.  Do you recognize that? |
| 10:29AM | 21 | A.  Yes. |
| 10:29AM | 22 | Q.  What do you recognize that to be? |
| 10:29AM | 23 | A.  It's a classic Buick that Joe had purchased. |
| 10:29AM | 24 | Q.  And how do you recognize it to be a Buick that the |
| 10:29AM | 25 | defendant purchased? |

10:29AM  1   A.  He's in it, and I've been in it with him.  And that's

10:29AM  2   him.

10:29AM  3   Q.  Did you happen to take that picture?

10:29AM  4   A.  And I took the picture, yes.

10:29AM  5   Q.  Does that fairly and accurately depict the Buick that the

10:29AM  6   defendant bought after -- at some point after this monetary

10:29AM  7   arrangement started?

10:29AM  8   A.  Yes.

10:29AM  9          MR. TRIPI:  The government offers Exhibit 109AB,

10:29AM  10  Your Honor.

10:29AM  11         MR. SINGER:  No objection.

10:29AM  12         THE COURT:  Received without objection.

10:29AM  13         **(GOV Exhibit 109AB was received in evidence.)**

10:29AM  14         **BY MR. TRIPI:**

10:29AM  15  Q.  Now, after he -- when he first bought that vehicle, did

10:29AM  16  you have an opportunity to first see the vehicle?

10:29AM  17  A.  I did, yes.

10:29AM  18  Q.  Okay.  Was this a vehicle the defendant worked on?

10:30AM  19  A.  He had people work on it, yes.

10:30AM  20  Q.  As it compared to when he first bought it to how it

10:30AM  21  appears in this photo, were any changes or modifications made

10:30AM  22  to the vehicle?

10:30AM  23  A.  I believe paint, some chrome accessories on the exterior.

10:30AM  24  Some interior work, as well.

10:30AM  25  Q.  And what -- when you say he had people work on the

10:30AM   1   vehicle, what were you referencing?

10:30AM   2   A.   Meaning people that were restoring the vehicle, making it

10:30AM   3   look more pristine.

10:30AM   4   Q.   Look at the photo next to you.  What, if anything, can

10:30AM   5   you tell the jury about the bumper?

10:30AM   6   A.   The bumper, I believe, is new.  It is new.  Restored.

10:31AM   7   Q.   What, if anything, can you tell the jury about the paint?

10:31AM   8   A.   The paint is new, as well.  It was repainted.

10:31AM   9           **MR. TRIPI:**  Okay.  We can take that photo down,

10:31AM   10  Ms. Champoux.

10:31AM   11          For the witness only, can we bring up Government

10:31AM   12  Exhibit 103-2.

10:31AM   13          **BY MR. TRIPI:**

10:31AM   14  Q.   Do you see that on your screen next to you, Mr. Selva?

10:31AM   15  A.   I do.

10:31AM   16  Q.   Do you recognize Government Exhibit 103-2?

10:31AM   17  A.   Yes.

10:31AM   18  Q.   What do you recognize that to be?

10:31AM   19  A.   That's the inside of the defendant's house.

10:31AM   20  Q.   What portion of the inside of his house?

10:31AM   21  A.   When you -- the entrance when you walk in.  It's a wide

10:31AM   22  open area, the kitchen.

10:31AM   23  Q.   And which house is that?

10:31AM   24  A.   On Alder.

10:31AM   25  Q.   And when did -- approximately when did he purchase the

| | | |
|---|---|---|
| 10:31AM | 1 | Alder Place house in Tonawanda? |
| 10:31AM | 2 | A.  2012.  I'm not quite sure. |
| 10:32AM | 3 | Q.  Was it before or after he was married? |
| 10:32AM | 4 | A.  It was before. |
| 10:32AM | 5 | Q.  And did you observe the house when he first purchased it? |
| 10:32AM | 6 | A.  Yes. |
| 10:32AM | 7 | Q.  Did you observe the house over time? |
| 10:32AM | 8 | A.  Yes. |
| 10:32AM | 9 | Q.  Were there any changes you observed to that house over |
| 10:32AM | 10 | time? |
| 10:32AM | 11 | A.  Interior upgrades, paint, floor redone.  I believe he |
| 10:32AM | 12 | added an island in the middle of the house. |
| 10:32AM | 13 | Q.  Does this photograph regarding this portion of the house |
| 10:32AM | 14 | fairly and accurately depict how it appeared after work was |
| 10:32AM | 15 | done to it? |
| 10:32AM | 16 | A.  Yes. |
| 10:32AM | 17 | Q.  Okay. |
| 10:32AM | 18 | MR. TRIPI:  Judge, the government offers |
| 10:32AM | 19 | Exhibit 103-2. |
| 10:32AM | 20 | MR. SINGER:  No objection. |
| 10:32AM | 21 | THE COURT:  Received without objection. |
| 10:32AM | 22 | (GOV Exhibit 103-2 was received in evidence.) |
| 10:32AM | 23 | BY MR. TRIPI: |
| 10:32AM | 24 | Q.  In this photo, what can you tell the jury was new to the |
| 10:32AM | 25 | house after the defendant took over that property. |

10:32AM  1     And if you need to, it's like a tele strator, you can

10:32AM  2  circle things with your finger on the screen to help the jury

10:33AM  3  out.

10:33AM  4  A.  The paint.  The floors were redone.  The island.

10:33AM  5  Q.  When you say "the island" --

10:33AM  6  A.  The middle.

10:33AM  7  Q.  -- can you circle that for the jury?  That was added?

10:33AM  8  A.  I believe so, yes.

10:33AM  9        MR. TRIPI:  Judge, may the record reflect, although

10:33AM 10  this is not permanent marking, the witness made a circle

10:33AM 11  around the very center of the photo where there appears to be

10:33AM 12  an island in the kitchen area.

10:33AM 13        THE COURT:  Yeah, I think that's correct.

10:33AM 14        MR. TRIPI:  Okay.

10:33AM 15        THE CLERK:  I can clear it.

10:33AM 16        MR. TRIPI:  Thank you very much.

10:33AM 17        THE CLERK:  You're all set.

10:33AM 18        MR. TRIPI:  Now for the witness only, can we take

10:33AM 19  that one down, and Ms. Champoux can we show 103-3.

10:33AM 20        BY MR. TRIPI:

10:33AM 21  Q.  Do you see 103-3 on your screen, Mr. Selva?

10:34AM 22  A.  Yes.

10:34AM 23  Q.  What do you recognize that to be?

10:34AM 24  A.  That's the living room area of the defendant's house.

10:34AM 25  Q.  And is that the living room area before or after he took

USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24

30

| | | |
|---|---|---|
| 10:34AM | 1 | over that property? |
| 10:34AM | 2 | A.   After. |
| 10:34AM | 3 | Q.   And does that fairly and accurately depict how that |
| 10:34AM | 4 | living room area appeared after he obtained the property and |
| 10:34AM | 5 | started to improve it? |
| 10:34AM | 6 | A.   Yes. |
| 10:34AM | 7 | **MR. TRIPI:**  The government offers Exhibit 103-3, |
| 10:34AM | 8 | Your Honor. |
| 10:34AM | 9 | **MR. SINGER:**  No objection. |
| 10:34AM | 10 | **THE COURT:**  Received without objection. |
| 10:32AM | 11 | **(GOV Exhibit 103-3 was received in evidence.)** |
| 10:32AM | 12 | **MR. TRIPI:**  If we can publish that? |
| 10:34AM | 13 | **BY MR. TRIPI:** |
| 10:34AM | 14 | Q.   What years, and again if you can show the jury touching |
| 10:34AM | 15 | the screen, what areas were changed or modified after he |
| 10:34AM | 16 | bought the house? |
| 10:34AM | 17 | A.   The furniture.  The carpet.  Basically just cosmetics. |
| 10:35AM | 18 | The furniture and carpet, and that's it. |
| 10:35AM | 19 | Q.   Was that -- was that a hardwood floor? |
| 10:35AM | 20 | A.   That's a hardwood floor. |
| 10:35AM | 21 | Q.   Do you know whether or not that was redone? |
| 10:35AM | 22 | A.   The whole area was redone, because it was one big open |
| 10:35AM | 23 | area. |
| 10:35AM | 24 | **MR. TRIPI:**  Your Honor may the record reflect the |
| 10:35AM | 25 | witness has made several circles on pieces of furniture, as |

10:35AM  1   well as carpet area.

10:35AM  2          **THE COURT:**  He circled -- appears to be a television

10:35AM  3   set, carpet, a chair, and the table and some vases on the

10:35AM  4   table.

10:35AM  5          **MR. TRIPI:**  Thank you, Your Honor.

10:35AM  6          We can take that down, Ms. Champoux.  We can clear

10:35AM  7   that.

10:35AM  8          One moment, Your Honor.

10:36AM  9          For the witness only, can we show Government

10:36AM  10  Exhibit 523 and 524 next to each other?

10:37AM  11         **BY MR. TRIPI:**

10:37AM  12  Q.  Mr. Selva, starting with Exhibit 523, do you recognize

10:37AM  13  that?

10:37AM  14  A.  Yes.

10:37AM  15  Q.  What do you recognize that to be?

10:37AM  16  A.  It's the exterior of the Alder Place home.

10:37AM  17  Q.  Is that a photo of how it appeared before or after the

10:37AM  18  defendant took it over?

10:37AM  19  A.  I believe right when he took it over, so yes.

10:37AM  20  Q.  Okay.  And does that fairly and accurately depict to the

10:37AM  21  best of your ability how the outside of the property appeared

10:37AM  22  around when the defendant took it over?

10:37AM  23  A.  Yes.

10:37AM  24  Q.  Now looking at Exhibit 524, the image on the right, do

10:37AM  25  you recognize that?

| | | |
|---|---|---|
| 10:37AM | 1 | A.  Yes. |
| 10:37AM | 2 | Q.  And what is that? |
| 10:37AM | 3 | A.  Again, it's the exterior of the house on Aldridge Place |
| 10:37AM | 4 | (sic) with new garage door, some landscaping, and I believe a |
| 10:37AM | 5 | new front door as well. |
| 10:37AM | 6 | Q.  Is the image on the right, does it fairly and accurately |
| 10:37AM | 7 | depict how the front of the residence including the |
| 10:38AM | 8 | landscaping looked after the defendant started making |
| 10:38AM | 9 | improvements? |
| 10:38AM | 10 | A.  Yes. |
| 10:38AM | 11 | MR. TRIPI:  Okay.  The government offers Exhibit 523 |
| 10:38AM | 12 | and 524, Your Honor. |
| 10:38AM | 13 | MR. SINGER:  Just one moment, Judge.  No objection. |
| 10:38AM | 14 | THE COURT:  They are received without objection. |
| 10:38AM | 15 | **(GOV Exhibits 523 and 524 were received in evidence.)** |
| 10:38AM | 16 | MR. TRIPI:  Thank you.  Ms. Champoux, if we can |
| 10:38AM | 17 | publish them the way they appear on the screens. |
| 10:38AM | 18 | BY MR. TRIPI: |
| 10:38AM | 19 | Q.  And did you indicate there was a garage door that was |
| 10:38AM | 20 | updated? |
| 10:38AM | 21 | A.  Yes. |
| 10:38AM | 22 | Q.  And describe the landscaping changes. |
| 10:38AM | 23 | A.  New shrubs, flowers.  I believe the grass was resodded, |
| 10:38AM | 24 | as well. |
| 10:38AM | 25 | Q.  And do you know who the defendant's landscaper was for |

| | | |
|---|---|---|
| 10:38AM | 1 | that? |
| 10:38AM | 2 | A.  Yes. |
| 10:38AM | 3 | Q.  Who was that? |
| 10:38AM | 4 | A.  Mike Sinatra. |
| 10:38AM | 5 | Q.  So, did the defendant own two residences after he |
| 10:39AM | 6 | purchased this -- this address, this location? |
| 10:39AM | 7 | A.  He did.  I believe he still held on to Lovering. |
| 10:39AM | 8 | Q.  Is that 221 Lovering? |
| 10:39AM | 9 | A.  221 Lovering. |
| 10:39AM | 10 | Q.  After -- after he was married, did the defendant make any |
| 10:39AM | 11 | other purchases that were associated with the timing of |
| 10:39AM | 12 | moving into the Alder house? |
| 10:39AM | 13 | A.  Not that I recall. |
| 10:39AM | 14 | Q.  Did they buy a dog? |
| 10:39AM | 15 | A.  Yes, they had a dog. |
| 10:39AM | 16 | MR. TRIPI:  Can we take those down?  Thank you. |
| 10:39AM | 17 | BY MR. TRIPI: |
| 10:40AM | 18 | Q.  Now I'd like to bring you forward in time to |
| 10:40AM | 19 | approximately -- |
| 10:40AM | 20 | MR. TRIPI:  Judge, I'm moving to another area.  Do |
| 10:40AM | 21 | you want to take your break now, or do you want me to keep |
| 10:40AM | 22 | going? |
| 10:40AM | 23 | THE COURT:  How much longer do you think you have, |
| 10:40AM | 24 | Mr. Tripi? |
| 10:40AM | 25 | MR. TRIPI:  I'll probably be done in about an hour or |

| | | |
|---|---|---|
| 10:40AM | 1 | less, total. |
| 10:40AM | 2 | **THE COURT:**  Okay.  I'd like to wait, because I have a |
| 10:40AM | 3 | matter that I need to do at 1:00, so I'd like to break for |
| 10:40AM | 4 | lunch around 12:30. |
| 10:40AM | 5 | **MR. TRIPI:**  Okay. |
| 10:40AM | 6 | **THE COURT:**  Okay.  So, I'd like to go until about |
| 10:40AM | 7 | 11:00 now. |
| 10:40AM | 8 | **MR. TRIPI:**  That's fine. |
| 10:40AM | 9 | **THE COURT:**  Break then, and then we'll go until |
| 10:40AM | 10 | 12:30. |
| 10:40AM | 11 | **MR. TRIPI:**  No problem, Your Honor. |
| 10:40AM | 12 | **BY MR. TRIPI:** |
| 10:40AM | 13 | Q.  I'd like to direct your attention forward in time to |
| 10:40AM | 14 | about April 18th, 2017.  Okay? |
| 10:40AM | 15 | A.  Okay. |
| 10:40AM | 16 | Q.  Around that time, did you learn that Ron Serio had been |
| 10:40AM | 17 | arrested? |
| 10:40AM | 18 | A.  Yes. |
| 10:40AM | 19 | Q.  How did you learn Ron Serio had been arrested? |
| 10:40AM | 20 | A.  I was told by Mike, and then word got out that he been |
| 10:40AM | 21 | arrested. |
| 10:40AM | 22 | Q.  How did Masecchia tell you? |
| 10:40AM | 23 | A.  He said Greenie got arrested. |
| 10:41AM | 24 | Q.  Well, did he call you? |
| 10:41AM | 25 | A.  He called me.  He actually says I want to stop by.  And |

10:41AM    1    he stopped by my residence.  And he told me Ron, Greenie, had

10:41AM    2    been busted, arrested.

10:41AM    3    Q.  So Masecchia came over to your house?

10:41AM    4    A.  Yes.

10:41AM    5    Q.  And can you elaborate on the conversation other than

10:41AM    6    Greenie or Ron had been busted, what, if anything, did he

10:41AM    7    say?

10:41AM    8    A.  He just said that he was concerned now with the

10:41AM    9    arrangement with Joe that he had been arrested.

10:41AM   10    Q.  What did you say?

10:41AM   11    A.  I was concerned as well.  I says, I don't think we have

10:41AM   12    anything to worry about.

10:41AM   13    Q.  What made you say that?

10:41AM   14    A.  I was just confident.

10:41AM   15    Q.  In what?

10:41AM   16    A.  In that nothing would happen regarding us.

10:41AM   17    Q.  Why?

10:41AM   18    A.  Because I felt that Joe had our backs still.

10:42AM   19    Q.  So you felt Joe had your and Mike's backs still?

10:42AM   20    A.  Yes.

10:42AM   21    Q.  Did you have any discussions with Masecchia about finding

10:42AM   22    out more details?

10:42AM   23    A.  I did.

10:42AM   24    Q.  Describe that.

10:42AM   25    A.  I says I'll ask Joe if there are more details regarding

10:42AM   1   this investigation, what happened with Ron, if anyone has to

10:42AM   2   worry.

10:42AM   3   Q.  What did Mike say?

10:42AM   4   A.  He encouraged it.  So I said, all right, I'll reach out

10:42AM   5   to him.  The sooner you could find out, the better.

10:42AM   6   Q.  Now, were you still using the cell phone number you

10:42AM   7   provided yesterday, 716-903-1654?

10:42AM   8   A.  Yes.

10:42AM   9   Q.  And is that a number that you up until HSI searched your

10:42AM   10  house?

10:42AM   11  A.  It is.

10:42AM   12  Q.  So you owned that phone number until August 23rd, 2019?

10:43AM   13  A.  Correct.

10:43AM   14  Q.  And how did you get in touch with the defendant?

10:43AM   15  A.  I called him from that number.

10:43AM   16  Q.  Did you call him to the phone number you had for him for

10:43AM   17  a long time?

10:43AM   18  A.  Yes.

10:43AM   19  Q.  Do you remember that phone number offhand?

10:43AM   20  A.  716-818-0996.

10:43AM   21  Q.  Okay.  If I said 0966, would that ring a bell?

10:43AM   22  A.  Correct, I'm sorry, I mixed it up.

10:43AM   23  Q.  As you understood it, how long had the defendant had that

10:43AM   24  phone number?

10:43AM   25  A.  Since he had come back to Buffalo.  Relocated from

10:43AM   1   Florida with the DEA.

10:43AM   2          **MR. TRIPI:**  Okay.  Ms. Champoux, I'm going to ask you

10:43AM   3   to pull up in evidence pursuant to stipulation Government

10:43AM   4   Exhibit 358, phone records for 716-818-0966, I'm going to ask

10:44AM   5   you to go to the pdf at page 443, Ms. Champoux.

10:44AM   6          **THE COURT:**  So I have admitted this?

10:44AM   7          **MR. TRIPI:**  You have, during the stipulations --

10:44AM   8          **THE COURT:**  Okay.

10:44AM   9          **MR. TRIPI:** -- these came in.

10:44AM  10          **MR. COOPER:**  Court Exhibit 2.

10:44AM  11          **MR. TRIPI:**  But the substantive exhibit is 358.

10:44AM  12          And, Ms. Champoux, can you go down to April 19th, all

10:44AM  13   10:47 a.m., and highlight that for the jury.  10:47 a.m.,

10:44AM  14   right here.

10:44AM  15          **BY MR. TRIPI:**

10:44AM  16   Q.  Is -- do you see the -- do you see that on your screen,

10:44AM  17   Mr. Selva?

10:44AM  18   A.  Yes.

10:44AM  19   Q.  Is that your phone number?

10:44AM  20   A.  It is.

10:45AM  21   Q.  And did you call Mr. Bongiovanni within a day or so after

10:45AM  22   Serio's arrest?

10:45AM  23   A.  I did.

10:45AM  24   Q.  And would April 19th, 2017, be the day after you learned

10:45AM  25   of the arrest?

10:45AM    1    A.   Yes.

10:45AM    2    Q.   And when you got on the phone with the defendant, what

10:45AM    3    did you say?

10:45AM    4    A.   I said I wanted to talk to him, I wanted to meet him in

10:45AM    5    person.  It was a brief conversation.

10:45AM    6    Q.   And what did he say?

10:45AM    7    A.   He said okay.  He was busy, but, we'll reach out later

10:45AM    8    and get together.

10:45AM    9    Q.   And did you get together?

10:45AM   10    A.   We did.

10:45AM   11    Q.   Where did you get together?

10:45AM   12    A.   I believe I stopped by his house.

10:45AM   13    Q.   At where?

10:45AM   14    A.   On Alder.  On Alder Place.

10:45AM   15    Q.   Describe what happened at that point.

10:45AM   16    A.   We had the conversation about Ron Serio getting arrested.

10:45AM   17    Q.   Who was present for the conversation?

10:45AM   18    A.   Just myself and Joe.

10:45AM   19    Q.   Where in his house or where in proximity of his house was

10:46AM   20    the conversation?

10:46AM   21    A.   In his living room, right by the kitchen.

10:46AM   22    Q.   Was anyone else around?

10:46AM   23    A.   No, we were alone.

10:46AM   24    Q.   Was anyone else home?

10:46AM   25    A.   No.

10:46AM  1  Q.  Describe the conversation as best you can in your words

10:46AM  2  and in the defendant's words about Ron Serio being arrested.

10:46AM  3  A.  He had told me that Ron had been arrested.

10:46AM  4      I was -- Mike and myself were concerned.

10:46AM  5      He said, I'll keep my eye out, not to worry, I'll do the

10:46AM  6  best I can.

10:46AM  7  Q.  Was there more to it than that?

10:46AM  8  A.  There was, but I don't recall at this --

10:48AM  9          **MR. TRIPI:**  I'm going to show the witness Government

10:48AM  10  Exhibit 3540I.  Mr. Singer, page 5.

10:48AM  11          **MR. SINGER:**  I?

10:48AM  12          **MR. TRIPI:**  I.

10:48AM  13          **MR. SINGER:**  Thank you.

10:48AM  14          **MR. TRIPI:**  You're welcome.

10:48AM  15          The record will reflect that I handed up the

10:48AM  16  document, turned it to the relevant page and indicated the

10:48AM  17  area of the paper for the witness to read.

10:48AM  18          **BY MR. TRIPI:**

10:48AM  19  Q.  Take a moment, Mr. Selva, read that to yourself.

10:48AM  20  A.  Okay.

10:48AM  21  Q.  And when you're done, look up, and I'll take that back,

10:49AM  22  okay?

10:49AM  23  A.  Okay.  Okay.

10:50AM  24          **MR. TRIPI:**  May the record reflect I removed the

10:50AM  25  exhibit from the witness.

10:50AM   1          **BY MR. TRIPI:**

10:50AM   2   Q.  Mr. Selva, did that refresh your recollection as to an

10:50AM   3   additional conversation you had?

10:50AM   4   A.  Yes.

10:50AM   5   Q.  Can you describe that additional portion of the

10:50AM   6   conversation that you had with Defendant Bongiovanni after

10:50AM   7   Mr. Serio's arrest at 85 Alder Place, please?

10:50AM   8   A.  Yes.  He said, we rehearsed.  He said stick to the story

10:50AM   9   we had rehearsed.  He didn't want to have any tie with Ron.

10:50AM  10   Just stick to the story.  And he want -- he had mentioned

10:50AM  11   that the -- Ron was arrested by the Erie County Sheriffs by

10:50AM  12   mistake -- or, excuse me, by the Erie County Sheriffs.  And

10:50AM  13   just stick to the story.

10:50AM  14   Q.  What did you mean by mistake?  What did you mean by that?

10:50AM  15   A.  That, I -- I didn't mean to say that, that was -- I

10:51AM  16   retract that.

10:51AM  17   Q.  He said stick to the story we rehearsed.  What story had

10:51AM  18   you rehearsed?  Tell the jury that.

10:51AM  19   A.  His involvement.  If anything were to come about, he was

10:51AM  20   not involved.  Just, he wanted to distance himself right

10:51AM  21   away.

10:51AM  22   Q.  What, if anything, did Mr. Bongiovanni tell you about

10:51AM  23   what to say if you were approached by law enforcement?

10:51AM  24   A.  To call him immediately, and we would go over it.  He

10:51AM  25   would go over interviewing techniques with me, questions they

10:51AM    1    would ask me, that type thing.

10:51AM    2    Q.  What, if anything, did he say about you being his

10:51AM    3    informant?

10:51AM    4    A.  He had asked me at one point if I wanted to be an

10:51AM    5    informant.

10:51AM    6    Q.  Was that part of story that he wanted you to tell?

10:51AM    7    A.  It was.

10:51AM    8    Q.  That's what I'm asking you.  Can you explain that,

10:52AM    9    please?

10:52AM   10    A.  If anything were to come about, and names were to come

10:52AM   11    up, I would be portraying myself as his informant.

10:52AM   12    Q.  Was it your understanding that was part of the cover

10:52AM   13    story?

10:52AM   14    A.  Yes, it was.

10:52AM   15    Q.  In truth and in fact, you were not an informant?

10:52AM   16    A.  I was not.

10:52AM   17    Q.  What was the defendant's demeanor during that, during

10:52AM   18    that meeting that you had?

10:52AM   19    A.  Nervous.  Just wanted to make sure we were all in this,

10:52AM   20    him and I were on the same page.

10:52AM   21    Q.  How many times after that did you meet to go over what

10:53AM   22    you should say if you were approached by law enforcement?

10:53AM   23    A.  A few, three or four times.

10:53AM   24    Q.  And where did you have those meetings?

10:53AM   25    A.  His -- Joe's residence.

| | | |
|---|---|---|
| 10:53AM | 1 | Q.  And what did he -- describe those meetings for the jury. |
| 10:53AM | 2 | A.  Just prepping me, if I were to be approached or |
| 10:53AM | 3 | apprehended or arrested, what to say.  Types of questions |
| 10:53AM | 4 | they would ask.  And to say that I was informant for him, to |
| 10:53AM | 5 | stick to that story. |
| 10:53AM | 6 | Q.  Did you ask the defendant why that was the story to stick |
| 10:53AM | 7 | to? |
| 10:53AM | 8 | A.  Yes.  To distance -- he wanted to distance himself from |
| 10:54AM | 9 | any involvement if his name were to come up at all with Ron |
| 10:54AM | 10 | being arrested. |
| 10:54AM | 11 | Q.  Was there any discussion of anything that Ron said after |
| 10:54AM | 12 | Ron was arrested? |
| 10:54AM | 13 | A.  I believe when Ron got arrested, he asked for Joe in the |
| 10:54AM | 14 | interview room. |
| 10:54AM | 15 | Q.  Did Joe talk about that with you? |
| 10:54AM | 16 | A.  Yes. |
| 10:54AM | 17 | Q.  What was that part of the discussion? |
| 10:54AM | 18 | A.  He had mentioned that when Ron got arrested, he had asked |
| 10:54AM | 19 | for him in the interview room, and he was nervous about it. |
| 10:54AM | 20 | Q.  What did the defendant express to you about Ron asking |
| 10:54AM | 21 | for him? |
| 10:54AM | 22 | A.  He was upset.  And he, again, he just wanted to distance |
| 10:54AM | 23 | himself.  He didn't understand why Ron would ask for him in |
| 10:54AM | 24 | the interview room. |
| 10:54AM | 25 | Q.  Did you ask the defendant what he would do if anyone |

| | | |
|---|---|---|
| 10:54AM | 1 | asked him about Ron? |
| 10:54AM | 2 | A.  I did. |
| 10:54AM | 3 | Q.  What did he say? |
| 10:55AM | 4 | A.  He was gonna distance himself and say that he did not |
| 10:55AM | 5 | know him, and basically cover it up. |
| 10:55AM | 6 | Q.  Now, a few months after -- a few months after Mr. Serio's |
| 10:55AM | 7 | arrest, did you have open-heart surgery? |
| 10:55AM | 8 | A.  I did. |
| 10:55AM | 9 | Q.  Do you take some medications relating to that? |
| 10:55AM | 10 | A.  I do. |
| 10:55AM | 11 | Q.  Daily? |
| 10:55AM | 12 | A.  Yes. |
| 10:55AM | 13 | Q.  Have you -- on the stand here, do those medications |
| 10:55AM | 14 | affect you at all? |
| 10:55AM | 15 | A.  They do. |
| 10:55AM | 16 | Q.  How so? |
| 10:55AM | 17 | A.  Tired.  Fatigued.  Sometimes I get a little cloudy with |
| 10:55AM | 18 | my -- when I'm speaking.  That type thing. |
| 10:55AM | 19 | Q.  Are you here telling the truth? |
| 10:55AM | 20 | A.  I am, yes. |
| 10:55AM | 21 | Q.  Are you testifying from your memory to the best of your |
| 10:56AM | 22 | ability? |
| 10:56AM | 23 | A.  I am, yes. |
| 10:56AM | 24 | Q.  Now, did you have a benefit stemming from your open-heart |
| 10:56AM | 25 | surgery? |

USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24

44

10:56AM  1   A.  I did.

10:56AM  2   Q.  Where was your benefit?

10:56AM  3   A.  At the Knights of Columbus on Kenmore.

10:56AM  4   Q.  Is that Kenmore Avenue?

10:56AM  5   A.  Kenmore Avenue.

10:56AM  6   Q.  In the Village of Kenmore?

10:56AM  7   A.  In the Village of Kenmore.  It might be on the Buffalo

10:56AM  8   border, I'm not sure.

10:56AM  9   Q.  What was your benefit for?

10:56AM  10  A.  To help with the expenses I incurred when I was

10:56AM  11  rehabilitating from open-heart surgery.

10:56AM  12  Q.  Did you have friends of yours work the door at the

10:56AM  13  benefit?

10:56AM  14  A.  Yes.

10:56AM  15  Q.  Were tickets sold?

10:56AM  16  A.  Yes.

10:56AM  17  Q.  So at the door, tickets needed to be collected?

10:56AM  18  A.  Correct.

10:56AM  19  Q.  How many friends of yours did you have working the door?

10:56AM  20  A.  Well, there was Joe, Mike, Victor Sorrento.

10:56AM  21  Q.  Now, when you say Joe and Mike, who are you referring to?

10:57AM  22  A.  The defendant and Michael Masecchia.

10:57AM  23  Q.  So both of them worked the door to your benefit together?

10:57AM  24  A.  Yes.

10:57AM  25  Q.  Who were some other people that may be related to your

USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24

45

10:57AM    1    testimony that came to your benefit?

10:57AM    2    A.   Ron came.  Joe Tomasello.  There were quite a few people

10:57AM    3    there.  A lot of family.  A lot of friends.

10:57AM    4    Q.   Do you recall whether or not Wayne Anderson was there?

10:57AM    5    A.   I was just gonna mention, Wayne was there.

10:57AM    6    Q.   Now, Ron was arrested during that time.  Did you make a

10:57AM    7    mistake there?  You said Ron.  Was Ron at your benefit?

10:57AM    8    A.   I thought --

10:57AM    9    Q.   Two months after you were -- two months after he was

10:58AM   10    arrested --

10:58AM   11    A.   There were a lot of people there, I may have been

10:58AM   12    mistaken, I thought he was there.

10:58AM   13    Q.   Okay.

10:58AM   14    A.   There were a lot.  I mean, I was --

10:58AM   15    Q.   Do you remember seeing Ron after he was arrested in

10:58AM   16    April?

10:58AM   17    A.   No.

10:58AM   18    Q.   Okay.

10:58AM   19            **THE COURT:**  Is this a good spot to break?

10:58AM   20            **MR. TRIPI:**  It is, Your Honor.

10:58AM   21            **THE COURT:**  Okay.  So we will take our morning break

10:58AM   22    now.  Please remember the instructions about not talking about

10:58AM   23    the case, and not making up your mind.  See you back here at

10:58AM   24    about 11:15.  And then we'll go until about 12:30 or so.

10:58AM   25            (Jury excused at 10:58 a.m.)

USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24

46

| | | |
|---|---|---|
| 10:59AM | 1 | **THE COURT:**  Okay.  Anything we need to put on the |
| 10:59AM | 2 | record? |
| 10:59AM | 3 | **MR. TRIPI:**  Nothing from the government, Your Honor. |
| 10:59AM | 4 | **MR. SINGER:**  Nothing from the defense, Judge, thanks. |
| 10:59AM | 5 | **THE COURT:**  Okay.  We'll see you in about 15 minutes. |
| 10:59AM | 6 | **THE CLERK:**  All rise. |
| 10:59AM | 7 | (Off the record at 10:59 a.m.) |
| 11:19AM | 8 | (Back on the record at 11:19 a.m.) |
| 11:19AM | 9 | (Jury not present.) |
| 11:19AM | 10 | **THE CLERK:**  All rise. |
| 11:19AM | 11 | **THE COURT:**  Please be seated. |
| 11:19AM | 12 | **THE CLERK:**  We are back on the record for the |
| 11:19AM | 13 | continuation of the jury trial in case number 19-cr-227, |
| 11:19AM | 14 | United States of America versus Joseph Bongiovanni. |
| 11:19AM | 15 | All counsel and parties are present. |
| 11:19AM | 16 | **THE COURT:**  Okay.  Ready to resume? |
| 11:19AM | 17 | **MR. TRIPI:**  Yes, Judge. |
| 11:19AM | 18 | **MR. SINGER:**  Yes, Your Honor. |
| 11:19AM | 19 | **THE COURT:**  Okay.  Let's bring them in, please, Pat. |
| 11:19AM | 20 | Mr. Tripi, you anticipate finishing during this |
| 11:19AM | 21 | segment? |
| 11:19AM | 22 | **MR. TRIPI:**  I would hope so.  That's the goal. |
| 11:21AM | 23 | (Jury seated at 11:21 a.m.). |
| 11:22AM | 24 | **MR. TRIPI:**  The record will reflect all our jurors |
| 11:22AM | 25 | are present. |

11:22AM   1          I remind the witness that he's still under oath.

11:22AM   2          And, Mr. Tripi, you may continue.

11:22AM   3          **MR. TRIPI:**  Thank you, Your Honor.

11:22AM   4          **BY MR. TRIPI:**

11:22AM   5   Q.  Mr. Selva, earlier I had asked you about learning about

11:22AM   6   Michael Sinatra's search warrant; do you remember that?

11:22AM   7   A.  Yes.

11:22AM   8   Q.  Around that same time, did you also learn or hear about a

11:22AM   9   search warrant that was executed at Anthony Gerace's house?

11:22AM  10   A.  Yes.

11:22AM  11   Q.  How did you learn about that?

11:22AM  12   A.  I'd heard that through, well, actually through Masecchia

11:22AM  13   that a search warrant was issued at Anthony Gerace's house.

11:22AM  14   Q.  What did Masecchia say to you about that?

11:22AM  15   A.  He said that Anthony had gotten pulled over, coming out

11:22AM  16   of -- leaving Ron's house, by an Erie County Sheriff car.

11:23AM  17   And I believe he had drugs on him.  They held him.  They got

11:23AM  18   a search warrant executed while they held him, and they

11:23AM  19   searched his house.

11:23AM  20   Q.  Okay.  So, at some point did you learn that Anthony

11:23AM  21   Gerace in 2019 had federal charges pending?

11:23AM  22   A.  Yes.

11:23AM  23   Q.  Were you in communication with the defendant when he

11:23AM  24   retired from the DEA in early 2019?

11:23AM  25   A.  Yes.

11:23AM   1    Q.   What -- what did he tell you, if anything, about his

11:23AM   2    retirement?

11:23AM   3    A.   It happened abruptly.  He just said he wanted out.  He

11:23AM   4    wanted to distance himself from everything.  And just

11:23AM   5    start -- go down to Florida and start a new life.

11:24AM   6    Q.   Was -- did the defendant get into any details with you

11:24AM   7    about why he decided to retire when he did?

11:24AM   8             MR. SINGER:  Your Honor, can we have a quick sidebar?

11:24AM   9             THE COURT:  Sure.

11:24AM   10            (Sidebar discussion held on the record.)

11:24AM   11            MR. SINGER:  So my concern about some of the

11:24AM   12   testimony I think that's about to be offered is that it starts

11:24AM   13   to get on the outer edges of the conspiracy.  So, I guess one

11:24AM   14   of the concerns I have is that the statements that are being

11:24AM   15   made about retirement are not made in furtherance of the

11:24AM   16   conspiracy.

11:24AM   17            THE COURT:  But they're the defendant's own

11:24AM   18   statements.

11:24AM   19            MR. SINGER:  So, they are --

11:24AM   20            THE COURT:  So if they were coconspirator statements,

11:24AM   21   I would agree with you, what you're saying, but they're the

11:24AM   22   defendant's own statements.

11:24AM   23            MR. SINGER:  Yeah.  I guess -- I know what Mr. Tripi

11:24AM   24   is asking about, his statements.  I don't know what else we're

11:24AM   25   going to get into as far as other statements that were made by

| | | |
|---|---|---|
| 11:24AM | 1 | Masecchia, or Serio, or -- that's why I just want to -- |
| 11:25AM | 2 | **THE COURT:** Yeah, they've got to be in furtherance if |
| 11:25AM | 3 | it's a coconspirator. |
| 11:25AM | 4 | **MR. SINGER:** Correct. |
| 11:25AM | 5 | **THE COURT:** But I'm not so sure they do if it's the |
| 11:25AM | 6 | defendant. |
| 11:25AM | 7 | **MR. SINGER:** No, I agree. I just want to put the |
| 11:25AM | 8 | Court on notice. |
| 11:25AM | 9 | **THE COURT:** Yeah. Got it. Go ahead. |
| 11:25AM | 10 | (End of sidebar discussion.) |
| 11:25AM | 11 | **MR. TRIPI:** May I proceed, Your Honor? |
| 11:25AM | 12 | **THE COURT:** You may, yeah, sure. |
| 11:25AM | 13 | **BY MR. TRIPI:** |
| 11:25AM | 14 | Q. When you were having -- just to restate my question maybe |
| 11:25AM | 15 | a little differently. When you were discussing the |
| 11:25AM | 16 | defendant's retirement with him, what if any statements did |
| 11:25AM | 17 | he make to you about the situation at work? |
| 11:25AM | 18 | A. He was worried that there possibly could be an |
| 11:25AM | 19 | investigation looking at him, and he abruptly -- he wanted to |
| 11:25AM | 20 | retire, like I mentioned earlier, and distance himself and |
| 11:25AM | 21 | eventually move down to Florida. |
| 11:25AM | 22 | Q. When -- when -- when speaking with the defendant, did you |
| 11:25AM | 23 | ever hear him talk about a DEA special agent named Anthony |
| 11:26AM | 24 | Casullo? |
| 11:26AM | 25 | A. Yes. |

11:26AM 1 Q.  Okay.  I'd like to get to that conversation.  Where were

11:26AM 2 you when you discussed that with the defendant?

11:26AM 3 A.  At his house.

11:26AM 4 Q.  And describe that conversation for the jury, please.

11:26AM 5 A.  I believe Anthony Casullo worked with him.  He was a DEA

11:26AM 6 agent.  And he had made reference against Joe regarding some

11:26AM 7 things that he's done with the DEA, and he wanted to distance

11:26AM 8 himself before any investigation would happen.

11:26AM 9 Q.  As best you can, what were the defendant's words?  As

11:26AM 10 best you can, tell the jury what the defendant said.

11:26AM 11 A.  Well, he didn't -- he didn't care for Anthony Casullo.

11:26AM 12 He didn't like him.  And he wanted to -- he wanted to

11:26AM 13 distance himself.  He just wanted to retire and start over.

11:27AM 14 Q.  Based upon what the defendant said to you and your

11:27AM 15 observations of him, did you form any opinions about whether

11:27AM 16 he was concerned about Casullo?

11:27AM 17 A.  Yes.

11:27AM 18 Q.  What was that opinion?

11:27AM 19 A.  That Anthony Casullo had something over him, something

11:27AM 20 that could harm him in some way.

11:27AM 21 Q.  What did the defendant say about retiring and starting

11:27AM 22 over, as you explained it?

11:27AM 23 A.  He just wanted -- he wanted to retire, go down to Florida

11:27AM 24 eventually.  Keep both places, and do the six months, six --

11:27AM 25 six months, six thing.  Go down there for a while, and then

USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24

51

| | | |
|---|---|---|
| 11:27AM | 1 | come back to Buffalo. |
| 11:27AM | 2 | Q.  After the defendant retired, was he looking for other |
| 11:27AM | 3 | work? |
| 11:27AM | 4 | A.  Not that I know of. |
| 11:27AM | 5 | Q.  Well, where were you working at the time? |
| 11:27AM | 6 | A.  I was in sales, and I was also tending bar at Fanara's. |
| 11:28AM | 7 | Q.  Okay.  So you tended bar? |
| 11:28AM | 8 | A.  I tended bar, yes. |
| 11:28AM | 9 | Q.  Did you have any discussions with the defendant about |
| 11:28AM | 10 | getting him a job bartending? |
| 11:28AM | 11 | A.  Yes, at Fanara's. |
| 11:28AM | 12 | Q.  Describe those conversations for the jury. |
| 11:28AM | 13 | A.  Well, now that he was retired, I said I could -- I'll ask |
| 11:28AM | 14 | the owner, Joe Fanara, because he had expressed an interest |
| 11:28AM | 15 | in possibly doing something on a part-time basis. |
| 11:28AM | 16 | I says, let me reach out to the owner and see if he needs |
| 11:28AM | 17 | another bartender. |
| 11:28AM | 18 | Q.  As time went on, did there come a point in time where you |
| 11:28AM | 19 | learned that the defendant's house -- that a search warrant |
| 11:28AM | 20 | was executed at the defendant's house? |
| 11:28AM | 21 | A.  Yes. |
| 11:28AM | 22 | Q.  How did you learn that? |
| 11:28AM | 23 | A.  Actually, I heard through -- Joe didn't tell me, I heard |
| 11:28AM | 24 | that it was raided.  Actually, I believe Masecchia had |
| 11:29AM | 25 | mentioned that he heard it, as well, and we had a |

USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24

52

11:29AM    1   conversation about it.

11:29AM    2   Q.  And so this is still prior to the search warrant at your

11:29AM    3   house?

11:29AM    4   A.  Correct, it was before.

11:29AM    5   Q.  And did you later become aware that the same day that

11:29AM    6   your house was searched, Masecchia was searched?

11:29AM    7   A.  Yes.

11:29AM    8   Q.  And that wasn't until August 23rd, 2019, correct?

11:29AM    9   A.  That's correct.

11:29AM   10   Q.  And the defendant's house was searched before that,

11:29AM   11   correct?

11:29AM   12   A.  Correct.

11:29AM   13   Q.  So describe your conversation with Masecchia regarding

11:29AM   14   the defendant's house being searched.

11:29AM   15         **MR. SINGER:**  Objection.

11:29AM   16         **MR. TRIPI:**  I believe we're within, as per the

11:29AM   17   indictment and the time frame, the last overt act is

11:29AM   18   August 23rd, 2019, Your Honor, so we're within the time frame

11:29AM   19   of the indictment.

11:29AM   20         **THE COURT:**  I understand that.  Why don't we come up?

11:29AM   21         **MR. TRIPI:**  Sure.

11:30AM   22         (Sidebar discussion held on the record.)

11:30AM   23         **THE COURT:**  So I'd like a little proffer as to why

11:30AM   24   this is in furtherance of the conspiracy and not simply

11:30AM   25   talking about the crime.

11:30AM     1     **MR. TRIPI:**  Yes, Your Honor.  So I think that we've

11:30AM     2   established that Selva, Masecchia, and Bongiovanni are in a

11:30AM     3   conspiracy.

11:30AM     4     **THE COURT:**  I agree with that.  I think you've

11:30AM     5   established it well enough for purposes of coconspirator

11:30AM     6   statements to come in.

11:30AM     7     **MR. TRIPI:**  And I believe that statements made to --

11:30AM     8   as to the status of someone's investigation, or if

11:30AM     9   investigation is focused on one member of the conspiracy,

11:30AM   10   other members of the conspiracy meet to speak about it, that's

11:30AM   11   in furtherance of, because that involves planning,

11:30AM   12   coordinating, things of that nature.

11:30AM   13     As time unwinds, there may even be testimony if he

11:30AM   14   recalls it further explaining how him and Masecchia talked

11:30AM   15   about, much like Bongiovanni and Selva talked about, a cover

11:31AM   16   story, what their cover story would be.  It's a little bit

11:31AM   17   different.

11:31AM   18     **THE COURT:**  Mr. Singer?

11:31AM   19     **MR. TRIPI:**  And I'll proffer further that that cover

11:31AM   20   story, if he can relay it, is going to be that Masecchia and

11:31AM   21   Selva talked about blaming Mark Falzone, who was a Serio

11:31AM   22   associate for some of it.

11:31AM   23     **MR. SINGER:**  So I guess the second part, like, the

11:31AM   24   Falzone part of it, like, that's where I think we're starting

11:31AM   25   to get a little far afield, Judge.

| | | |
|---|---|---|
| 11:31AM | 1 | **THE COURT:**  Well, I think it's still part of the |
| 11:31AM | 2 | conspiracy.  So, we've got this conspiracy going on.  One of |
| 11:31AM | 3 | our guys just got arrested, or just had his house searched. |
| 11:31AM | 4 | Now, what are we gonna do in order to keep us clean vis-à-vis |
| 11:31AM | 5 | the guy whose house just got searched? |
| 11:31AM | 6 | I think that's -- I think that's fair game.  I think |
| 11:31AM | 7 | that's still in furtherance of the conspiracy. |
| 11:31AM | 8 | And if there's a -- and if there's a conversation |
| 11:32AM | 9 | about what they decided to do, that is blame somebody else, |
| 11:32AM | 10 | that's, I think, part of it. |
| 11:32AM | 11 | Tell me why that's not part of the conspiracy? |
| 11:32AM | 12 | **MR. SINGER:**  So I guess, like, what Mr. Selva is |
| 11:32AM | 13 | relaying in the first part that Mr. Tripi talked about are |
| 11:32AM | 14 | conversations that are occurring between Masecchia and Selva |
| 11:32AM | 15 | that have some involvement with Bongiovanni. |
| 11:32AM | 16 | **THE COURT:**  Yes. |
| 11:32AM | 17 | **MR. SINGER:**  And so, I mean, I agree, that's going to |
| 11:32AM | 18 | be in furtherance of a conspiracy in some ways. |
| 11:32AM | 19 | But when you start to get more and more divorced, and |
| 11:32AM | 20 | you start to get into conversations that other people may be |
| 11:32AM | 21 | having after search warrants occur -- |
| 11:32AM | 22 | **THE COURT:**  I don't think we're talking about |
| 11:32AM | 23 | conversations -- we're talking about Masecchia and Selva, |
| 11:32AM | 24 | right? |
| 11:32AM | 25 | **MR. TRIPI:**  Yes. |

| | | |
|---|---|---|
| 11:32AM | 1 | **THE COURT:**  And he's saying Masecchia and Selva came |
| 11:32AM | 2 | up with this plan as to here's what we're gonna say if they |
| 11:32AM | 3 | try to link us with Bongiovanni.  Right? |
| 11:32AM | 4 | **MR. TRIPI:**  Yeah, link him with Serio. |
| 11:32AM | 5 | **THE COURT:**  Link him with Serio. |
| 11:32AM | 6 | **MR. SINGER:**  Link -- so I'm not following.  So it's |
| 11:32AM | 7 | these are conversations that Masecchia and Selva are having -- |
| 11:33AM | 8 | **MR. TRIPI:**  First they discuss the search warrant at |
| 11:33AM | 9 | Joe' house -- |
| 11:33AM | 10 | **MR. SINGER:**  Yeah. |
| 11:33AM | 11 | **MR. TRIPI:**  -- and what happened.  That's where we're |
| 11:33AM | 12 | about to be. |
| 11:33AM | 13 | **MR. SINGER:**  Yeah. |
| 11:33AM | 14 | **MR. TRIPI:**  And then from there, I'll ask did you and |
| 11:33AM | 15 | Masecchia eventually come up with a plan as to what to say if |
| 11:33AM | 16 | approached. |
| 11:33AM | 17 | And I anticipate that's where the Mark Falzone case |
| 11:33AM | 18 | will come in. |
| 11:33AM | 19 | **MR. SINGER:**  Okay. |
| 11:33AM | 20 | **THE COURT:**  I think that's fair game, Mr. Singer. |
| 11:33AM | 21 | You have an objection for the record, but I think it comes in. |
| 11:33AM | 22 | **MR. SINGER:**  No, I understand Judge. |
| 11:33AM | 23 | (End of sidebar discussion.) |
| 11:33AM | 24 | **THE COURT:**  Why don't you ask another question, |
| 11:33AM | 25 | Mr. Tripi? |

11:33AM    1            **MR. TRIPI:**  Yes, Your Honor.

11:33AM    2            **BY MR. TRIPI:**

11:33AM    3   Q.  After Mr. Bongiovanni's house was searched, you indicated

11:33AM    4   a moment ago you learned that initially from Mike Masecchia?

11:34AM    5   A.  Yes, we had a discussion about it.

11:34AM    6   Q.  My next question is, where did you discuss that with

11:34AM    7   Masecchia?

11:34AM    8   A.  He had stopped by.

11:34AM    9   Q.  Stopped by where?

11:34AM   10   A.  He had come by my house.  He had just heard that the

11:34AM   11   defendant's house was executed a search warrant and raided.

11:34AM   12   Q.  And did and you Masecchia have a discussion about the

11:34AM   13   fact that now the defendant's house had been searched?

11:34AM   14   A.  Yes.

11:34AM   15   Q.  Describe that conversation, as much detail as you can for

11:34AM   16   the jury.

11:34AM   17   A.  Well, we had a conversation regarding the possibility of

11:34AM   18   everything being exposed and the whole operation coming out.

11:34AM   19   Everyone getting in trouble, myself, Mike, Ron, Joe,

11:34AM   20   everybody.

11:34AM   21   Q.  In that discussion, or any discussion with Masecchia

11:34AM   22   after that, did you -- did you have a conversation about how

11:35AM   23   to deal with the fact that now Bongiovanni is clearly under

11:35AM   24   investigation, his house has been searched?

11:35AM   25   A.  No, we were just gonna lay low between Mike and I, we

11:35AM    1    were gonna dismantle anything that was going on.  I had

11:35AM    2    nothing in my house growing at that point, but I still had

11:35AM    3    equipment.  But we were gonna lay low and distance ourselves.

11:35AM    4    Q.  As time went on, did you and Masecchia have a

11:35AM    5    conversation about placing blame on someone else?

11:35AM    6    A.  I don't recall that.

11:35AM    7    Q.  Did you discuss Mark Falzone with Masecchia?

11:35AM    8    A.  Yes.

11:35AM    9    Q.  All right.  What was the nature of that conversation?

11:35AM   10    A.  Mark Falzone was close with Ron, and he could possibly --

11:35AM   11    let me rephrase that.

11:35AM   12        We did have a conversation about possibly blaming someone

11:35AM   13    else.  It was Mark Falzone.

11:35AM   14    Q.  Describe that conversation.

11:36AM   15    A.  If anything were to happen, we were gonna involve Mark

11:36AM   16    Falzone as a coconspirator working with us, and kind of lay

11:36AM   17    some of the blame on him for that.

11:36AM   18    Q.  Blame for what?

11:36AM   19    A.  For what we were doing, for what was going on with us.

11:36AM   20    Q.  I just want to clarify it.  Was the plan to link Falzone

11:36AM   21    and Serio to the bribes?  What are you talking about?

11:36AM   22    A.  Well, that too.  But we were gonna try to blame Mark

11:36AM   23    Falzone for some of it as well.  But we were gonna try to

11:36AM   24    link him to the contact for the bribes.

11:36AM   25    Q.  Was Falzone in fact someone who was selling marijuana

USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24

58

| | | |
|---|---|---|
| 11:36AM | 1 | with Serio in your group? |
| 11:36AM | 2 | A.  He was.  He was getting it from Ron. |
| 11:36AM | 3 | Q.  But was he better friends with you and Mike?  Or was he |
| 11:36AM | 4 | better friends with Ron? |
| 11:36AM | 5 | A.  He was best friends -- he was lifelong friends with Ron. |
| 11:36AM | 6 | Q.  Okay.  So Falzone and Serio are closer than Serio and |
| 11:37AM | 7 | you, for example? |
| 11:37AM | 8 | A.  Correct. |
| 11:37AM | 9 | Q.  Falzone and Serio are closer personally than Masecchia |
| 11:37AM | 10 | and Serio? |
| 11:37AM | 11 | A.  Yes. |
| 11:37AM | 12 | Q.  Okay.  And, in fact, in some of your early proffers with |
| 11:37AM | 13 | the government, did you try to blame Mark Falzone for certain |
| 11:37AM | 14 | things that you were involved in? |
| 11:37AM | 15 | A.  I did.  I tried to blame him for my connection with Ron |
| 11:37AM | 16 | and other things. |
| 11:37AM | 17 | Q.  In some of your early proffers, did you attempt to tell |
| 11:37AM | 18 | the government that you were Bongiovanni's C.I.? |
| 11:37AM | 19 | A.  Yes. |
| 11:37AM | 20 | Q.  Was that true? |
| 11:37AM | 21 | A.  Yes. |
| 11:37AM | 22 | Q.  You tried do that, but was it in fact true? |
| 11:37AM | 23 | A.  It was not true.  I tried to, but it was not true. |
| 11:37AM | 24 | Q.  So in other words, when you started proffering with the |
| 11:37AM | 25 | government, did you attempt to execute on plans you had made |

| | | |
|---|---|---|
| 11:38AM | 1 | with Bongiovanni and Masecchia? |
| 11:38AM | 2 | A.   Yes. |
| 11:38AM | 3 | Q.   When your house was searched, did you provide your phone |
| 11:38AM | 4 | to Special Agent Marilyn Halliday? |
| 11:38AM | 5 | A.   I did. |
| 11:38AM | 6 | Q.   Did you permit HSI to take your phone and search it? |
| 11:38AM | 7 | A.   I did. |
| 11:38AM | 8 | Q.   And you consented to that? |
| 11:38AM | 9 | A.   I did. |
| 11:38AM | 10 | Q.   Did she take your phone and then return it to you? |
| 11:38AM | 11 | A.   She did. |
| 11:38AM | 12 | Q.   And is it your understanding that the information from |
| 11:38AM | 13 | your phone was extracted, like a copy of it was made? |
| 11:38AM | 14 | A.   Yes. |
| 11:38AM | 15 | Q.   Have you reviewed parts of that extraction prior to |
| 11:38AM | 16 | testifying here in court today? |
| 11:38AM | 17 | A.   Yes. |
| 11:38AM | 18 | Q.   And did you, for the parts that we're gonna show this |
| 11:38AM | 19 | jury, or we intend to show this jury subject to the Court's |
| 11:38AM | 20 | rulings, did you -- did you look at the contents of that |
| 11:38AM | 21 | extraction and verify that it was stuff that you had on your |
| 11:38AM | 22 | phone? |
| 11:38AM | 23 | A.   Yes. |
| 11:38AM | 24 | Q.   Does that include contacts? |
| 11:39AM | 25 | A.   Yes.   Contacts with numbers. |

USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24
60

| 11:39AM | 1 | Q.  Phone numbers? |

11:39AM    1    Q.  Phone numbers?

11:39AM    2    A.  Yes.

11:39AM    3    Q.  Some photos?

11:39AM    4    A.  Yes.

11:39AM    5    Q.  Does that include text messages?

11:39AM    6    A.  Yes, everything.

11:39AM    7    Q.  Call logs?

11:39AM    8    A.  Yes.

11:39AM    9         MR. TRIPI:  Okay.  If we could, just for the witness

11:39AM   10    for now --

11:39AM   11         BY MR. TRIPI:

11:39AM   12    Q.  I'd like to show you Government Exhibit 208D up on your

11:39AM   13    screen.  You can take a look at that Mr. Selva when it comes

11:39AM   14    up.

11:39AM   15         MR. TRIPI:  And, Ms. Champoux, can we just give it

11:39AM   16    five seconds, and then go each page so Mr. Selva can see each

11:39AM   17    page?

11:40AM   18         We can go back to page 1, please.

11:40AM   19         BY MR. TRIPI:

11:40AM   20    Q.  I'm going to hand you up 208D, same thing that's on the

11:40AM   21    screen.  The version on the screen does not have your

11:40AM   22    initials, correct?

11:40AM   23    A.  Correct.

11:40AM   24    Q.  But is that exact thing in front of you now in hard copy?

11:40AM   25    A.  Yes.

11:40AM   1   Q.  And did you initial a CD that had this pdf on it as well

11:40AM   2   as a paper copy?

11:40AM   3   A.  I did.

11:40AM   4   Q.  And did you verify that this was -- these were some of

11:40AM   5   the contacts in your phone for that -- that phone number that

11:40AM   6   you provided earlier?

11:40AM   7   A.  Yes.

11:40AM   8   Q.  Is it a fair and accurate copy of this portion of the

11:41AM   9   contacts on your phone?

11:41AM  10   A.  Yes.

11:41AM  11         **MR. TRIPI:**  The government will offer Exhibit 208D,

11:41AM  12   Your Honor.

11:41AM  13         **MR. SINGER:**  Just one moment, Judge.

11:42AM  14         We're going to object to the form of the exhibit

11:42AM  15   under the Rule of Completeness.  It's an excerpt, as I

11:42AM  16   understand it, and I reviewed it the other day, and it doesn't

11:42AM  17   display all the contacts that Mr. Selva has on his phone.

11:42AM  18         I think there's been a proper foundation and

11:42AM  19   authenticity laid for the purpose of admitting the exhibit,

11:42AM  20   but under its current form, I don't think it's admissible

11:42AM  21   because of the Rule of Completeness.

11:42AM  22         **THE COURT:**  So, well, the Rule of Completeness, you

11:42AM  23   can offer the rest of it, right?

11:42AM  24         **MR. SINGER:**  We could, Judge.  I think the problem

11:42AM  25   is, is that the extraction reports that we have are -- we're

| | | |
|---|---|---|
| 11:42AM | 1 | limited, we don't have a -- |
| 11:42AM | 2 | **THE COURT:**  Oh, you don't have the whole thing? |
| 11:42AM | 3 | **MR. TRIPI:**  No, they have the whole extraction, Your |
| 11:42AM | 4 | Honor.  The whole extraction is marked as Exhibit 208. |
| 11:42AM | 5 | **THE COURT:**  Let me ask this.  Is this the entire |
| 11:42AM | 6 | contact list from the phone? |
| 11:42AM | 7 | **MR. TRIPI:**  So, the complete extraction has the |
| 11:43AM | 8 | entire contact list.  These are the names relevant to his |
| 11:43AM | 9 | testimony as far as the government believes. |
| 11:43AM | 10 | If they want to put in other names, they can do that. |
| 11:43AM | 11 | But we've identified, and I don't think this is |
| 11:43AM | 12 | saying too much in front of the jury, Your Honor, 39 names out |
| 11:43AM | 13 | of all of his contacts to show that are relevant. |
| 11:43AM | 14 | **THE COURT:**  And this is a compilation of the names |
| 11:43AM | 15 | that you put together numbered 1 through 39? |
| 11:43AM | 16 | **MR. TRIPI:**  No, this is the extraction.  When you |
| 11:43AM | 17 | have a large extraction, Your Honor, you can -- you can -- |
| 11:43AM | 18 | it's just like when they execute a search warrant, you can |
| 11:43AM | 19 | carve certain parts of it that are relevant to, for example, |
| 11:43AM | 20 | Attachment B of a search warrant. |
| 11:43AM | 21 | This is the same thing for purposes of the jury |
| 11:43AM | 22 | trial.  We've identified certain text threads, not all text |
| 11:43AM | 23 | threads with, for example, Mr. Bongiovanni.  Contacts that are |
| 11:43AM | 24 | relevant to the testimony, stuff like that. |
| 11:43AM | 25 | We don't believe the whole phone, and every search |

| | | |
|---|---|---|
| 11:43AM | 1 | he's ever done, and every phone call he's ever made, is |
| 11:43AM | 2 | relevant to this trial.  So -- |
| 11:44AM | 3 | **THE COURT:**  Could you page through for me? |
| 11:44AM | 4 | **MR. TRIPI:**  Do you want the hard copy? |
| 11:44AM | 5 | **THE COURT:**  Yeah, give me the hard copy. |
| 11:44AM | 6 | **MR. TRIPI:**  There you go, Judge. |
| 11:44AM | 7 | **THE COURT:**  So what concerns me is these are |
| 11:44AM | 8 | consecutively numbered.  They're numbered 1, 2, 3, 4 through |
| 11:44AM | 9 | 39. |
| 11:44AM | 10 | **MR. TRIPI:**  Yes. |
| 11:44AM | 11 | **THE COURT:**  Those numbers weren't on the extraction, |
| 11:44AM | 12 | I'm sure.  They couldn't be.  If this is -- if these are |
| 11:44AM | 13 | excerpts. |
| 11:44AM | 14 | **MR. TRIPI:**  Well, when you run the report, you have a |
| 11:44AM | 15 | full extraction, and then you say, okay, you tag items, I want |
| 11:44AM | 16 | just these names.  And then you create a subreport.  That's |
| 11:44AM | 17 | what that is. |
| 11:44AM | 18 | **THE COURT:**  Okay. |
| 11:44AM | 19 | **MR. TRIPI:**  And that's how it comes out. |
| 11:44AM | 20 | **THE COURT:**  So, Mr. Singer, in light of that |
| 11:44AM | 21 | explanation, do you have a problem with this? |
| 11:45AM | 22 | I mean, the Rule of Completeness, I'll allow you to |
| 11:45AM | 23 | put all -- I'll allow you to put in the entire contact list if |
| 11:45AM | 24 | you want. |
| 11:45AM | 25 | **MR. SINGER:**  No, I understand that, Judge.  And so, I |

11:45AM  1   mean, I think it's been established that we can do that.  So

11:45AM  2   I'll withdraw the objection.

11:45AM  3           **THE COURT:**  Okay.  So it's then admitted without

11:45AM  4   objection.

11:45AM  5           **MR. TRIPI:**  Thank you, Your Honor.

11:45AM  6           **(GOV Exhibit 208D was received in evidence.)**

11:45AM  7           **MR. TRIPI:**  For record purposes, we'll admit the CD

11:45AM  8   and the hard copy.  But for ease of reference, we're going to

11:45AM  9   display it on the monitor.

11:45AM  10          Ms. Champoux, now that Exhibit 208D is in evidence,

11:45AM  11  can you, like, just cut it in half so we can see the names and

11:45AM  12  phone numbers?  But blow up those names for us?

11:45AM  13          Let's try it differently, Ms. Champoux.  Maybe exit

11:45AM  14  out of that.  It's still small.  Let's try the first three.  I

11:45AM  15  need the phone numbers, though.  You've got to go over one

11:46AM  16  more row.  There we go.  I think that's better.

11:46AM  17          **BY MR. TRIPI:**

11:46AM  18  Q.  Mr. Selva, did you have a contact in your name -- in your

11:46AM  19  phone for Anthony Gerace?

11:46AM  20  A.  I did.

11:46AM  21  Q.  And who is that?

11:46AM  22  A.  Peter Gerace's brother.

11:46AM  23  Q.  And what phone number did you have for him?

11:46AM  24  A.  7.  The one that in the entry is 716-799-7724.

11:46AM  25  Q.  And the next one down is a reference to a Baby Joe.  Who

11:46AM   1   was that?

11:46AM   2   A.   Baby Joe Mesi.

11:46AM   3   Q.   And do you have a reference to his phone number?

11:46AM   4   A.   716-359-8214.

11:46AM   5   Q.   And the next one down, there's a reference to a Gorilla

11:46AM   6   Ape Boy, who is that?

11:46AM   7   A.   That's Masecchia.  That was his nickname.

11:46AM   8   Q.   And you had a phone number for him?

11:46AM   9   A.   I did.

11:46AM   10   Q.   What was that?

11:46AM   11   A.   716-812-0664.

11:47AM   12        MR. TRIPI:  Can we show 4 through 7 now,

11:47AM   13   Ms. Champoux?

11:47AM   14        BY MR. TRIPI:

11:47AM   15   Q.   And did you have a -- number 4, there's Gorilla new

11:47AM   16   number; who is that?

11:47AM   17   A.   Again, that's Mike Masecchia.  He changed his number.

11:47AM   18   716-580-2897.

11:47AM   19   Q.   And next one down, you have an entry for Grover Gorilla;

11:47AM   20   who is that?

11:47AM   21   A.   Again, that's Mike Masecchia, his work number at Grover

11:47AM   22   Cleveland High School.

11:47AM   23   Q.   And that's 716 --

11:47AM   24   A.   Yes, I'm sorry, 716-816-4300.

11:47AM   25   Q.   The next one down, you have an entry for a Joe Bella?

| | | |
|---|---|---|
| 11:47AM | 1 | A.  Yes. |
| 11:47AM | 2 | Q.  Who is that? |
| 11:47AM | 3 | A.  Joe is a friend of mine.  The mobile number again is |
| 11:47AM | 4 | 716-310-6664. |
| 11:47AM | 5 | Q.  Is Joe Bella someone the defendant also knows? |
| 11:47AM | 6 | A.  Yes. |
| 11:47AM | 7 | Q.  Does Masecchia also know Bella? |
| 11:47AM | 8 | A.  Yes. |
| 11:48AM | 9 | Q.  Does Anthony Gerace? |
| 11:48AM | 10 | A.  Yes. |
| 11:48AM | 11 | Q.  Does Peter Gerace? |
| 11:48AM | 12 | A.  Yes. |
| 11:48AM | 13 | **MR. TRIPI:**  Can we go to the next page, Ms. Champoux? |
| 11:48AM | 14 | Can we just go to 8 and 9. |
| 11:48AM | 15 | **BY MR. TRIPI:** |
| 11:48AM | 16 | Q.  You had a Facebook for entry for Bella as well, Facebook |
| 11:48AM | 17 | friends? |
| 11:48AM | 18 | A.  At that time, yes. |
| 11:48AM | 19 | **MR. TRIPI:**  Okay.  Can we just highlight 8 and 9, |
| 11:48AM | 20 | please? |
| 11:48AM | 21 | **BY MR. TRIPI:** |
| 11:48AM | 22 | Q.  Who is -- who's Joe Bong? |
| 11:48AM | 23 | A.  Joe Bong, the defendant. |
| 11:48AM | 24 | Q.  Okay.  And did you have two numbers for him? |
| 11:48AM | 25 | A.  Yes. |

11:48AM   1   Q.  Were those new numbers after his retirement, or when did

11:48AM   2   you acquire those?

11:48AM   3   A.  After his -- I believe that was after.

11:48AM   4   Q.  Or did you have those before?

11:48AM   5   A.  No, those were new.  I can't recall if it was after the

11:48AM   6   retirement, or after his house had been -- I -- I don't

11:49AM   7   recall when I got them.

11:49AM   8   Q.  Okay.  Entry number 9, you see that?  Krista Masecchia.

11:49AM   9   Who's that?

11:49AM  10   A.  That's Mike Masecchia's wife.

11:49AM  11        **MR. TRIPI:**  Okay.  Ms. Champoux, if we can go to the

11:49AM  12   next set of entries, maybe the next three.

11:49AM  13        **BY MR. TRIPI:**

11:49AM  14   Q.  Who's the next entry, the 10 spot there?

11:49AM  15   A.  That's the defendant's wife, Lindsay Bongiovanni.

11:49AM  16   Q.  Okay.  The next one down, who's that?

11:49AM  17   A.  That's Lillo Brancato.

11:49AM  18   Q.  Who's that?

11:49AM  19   A.  He's a friend of a girl I was dating at the time.  He

11:49AM  20   actually is an actor.

11:49AM  21   Q.  Is that the former actor from, like, the movie Bronx

11:49AM  22   Tale?

11:49AM  23   A.  He was in the Bronx Tale, Crimson Tide, a bunch of

11:49AM  24   movies.

11:49AM  25   Q.  Is he a friend of anyone else you know?

| | | |
|---|---|---|
| 11:49AM | 1 | A.  Peter Gerace. |
| 11:49AM | 2 | Q.  Do you see Mike Buttita there? |
| 11:50AM | 3 | A.  Yes. |
| 11:50AM | 4 | Q.  Was Mike Buttita someone who was involved distributing |
| 11:50AM | 5 | marijuana with Serio? |
| 11:50AM | 6 | A.  He was a friend of Serio's.  I believe he was involved. |
| 11:50AM | 7 | I've never seen them do anything, but I knew of him and what |
| 11:50AM | 8 | was going on. |
| 11:50AM | 9 | Q.  And you had a number for number for Mike Buttita? |
| 11:50AM | 10 | A.  Yes. |
| 11:50AM | 11 | **MR. TRIPI:**  Can we go to the next page, Ms. Champoux? |
| 11:50AM | 12 | Maybe highlight the next three. |
| 11:50AM | 13 | **BY MR. TRIPI:** |
| 11:50AM | 14 | Q.  Is that top name there, who's that? |
| 11:50AM | 15 | A.  That's Mike Masecchia's home number, I believe.  Yes. |
| 11:50AM | 16 | 'Cuz he lived in -- yes, that's his home number I believe. |
| 11:50AM | 17 | Q.  So you had three entries for Masecchia under some moniker |
| 11:50AM | 18 | of Gorilla, and one entry where you said his first and last |
| 11:50AM | 19 | name with his landline? |
| 11:50AM | 20 | A.  Yes. |
| 11:50AM | 21 | Q.  Is there any that reason you distinguished between his |
| 11:51AM | 22 | nickname for certain phone numbers, and his true name for his |
| 11:51AM | 23 | landline? |
| 11:51AM | 24 | A.  So I knew which one was which.  Like, if I had it under |
| 11:51AM | 25 | his name, I knew that was his home phone.  The other ones |

11:51AM   1   were all cell phones or burner phones.

11:51AM   2   Q.  That's my question.  Were the other numbers, other than

11:51AM   3   the Grover High School number, were those burner numbers?

11:51AM   4   A.  Yes.

11:51AM   5   Q.  Okay.  Under Masecchia, you have a name Mike Sinatra.

11:51AM   6   Who's that?

11:51AM   7   A.  That's the landscaper.  That was a friend of the

11:51AM   8   defendant.

11:51AM   9   Q.  And below that, who's listed there?

11:51AM  10   A.  Peter Gerace.

11:51AM  11   Q.  And what phone number did he have?

11:51AM  12   A.  716-725-1931.

11:51AM  13   Q.  Okay.  If we can go to the next -- that's the same Peter

11:51AM  14   Gerace you've testified about?

11:51AM  15   A.  Yes.

11:51AM  16       MR. TRIPI:  Let's go to the next three.

11:51AM  17       BY MR. TRIPI:

11:51AM  18   Q.  Who's in entry number 16?

11:51AM  19   A.  Ron Serio.  716-830-3226.

11:52AM  20   Q.  And is that the Ron Serio, Greenie, you've been

11:52AM  21   testifying about?

11:52AM  22   A.  Yes.

11:52AM  23   Q.  And below that, who's the next entry?

11:52AM  24   A.  Tom Serio, Ron's brother.  561-801-0221.

11:52AM  25   Q.  And below that, there's a Wayne Anderson.  Who's that?

11:52AM    1    A.  Wayne's a friend.  It's 716-481-9511.

11:52AM    2    Q.  Is that the same Wayne Anderson you and the defendant

11:52AM    3    have known since you were teenagers?

11:52AM    4    A.  Yes.

11:52AM    5            MR. TRIPI:  Next page, please.  Or the next three or

11:52AM    6    two.  19 and 20.

11:52AM    7            BY MR. TRIPI:

11:52AM    8    Q.  We've talked about Wayne Anderson.  Who's that contact in

11:52AM    9    number 20?

11:52AM   10    A.  Frank Parisi.

11:52AM   11    Q.  And who is that?

11:52AM   12    A.  He is the former -- he's a lifelong friend, just a

11:53AM   13    friend, business owner.  Owner of the SoHo.

11:53AM   14    Q.  Is he also someone who's friends with the defendant?

11:53AM   15    A.  Yes.

11:53AM   16            MR. TRIPI:  Let's go to the next contact.  If you

11:53AM   17    could try that again, we cut off part of the name.

11:53AM   18            BY MR. TRIPI:

11:53AM   19    Q.  Okay.  Entry 21.  Who's that?

11:53AM   20    A.  Donnie Panepinto.

11:53AM   21    Q.  And who's that?

11:53AM   22    A.  He's an attorney.  It's -- you referenced before Dana

11:53AM   23    Panepinto, the defendant's girlfriend from when we were

11:53AM   24    growing up, it's her brother.

11:53AM   25    Q.  This would be Turtle's son?

USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24

11:53AM  1   A.  Turtle's son, yes.

11:53AM  2   Q.  And below that, there's an entry for a Frank Tripi?

11:53AM  3   A.  Yes, sir.

11:53AM  4   Q.  That's no relation to me, correct?

11:53AM  5   A.  Correct.

11:53AM  6   Q.  All right.  And who is that?

11:54AM  7   A.  Again, a friend.  And that is his work number for a

11:54AM  8   business he had owned.  That's what it says under

11:54AM  9   organization.  Then his mobile number.  I'm sorry, it's his

11:54AM  10  mobile number.

11:54AM  11  Q.  Is that someone you knew to be involved in debt

11:54AM  12  collection?

11:54AM  13  A.  Yes.

11:54AM  14  Q.  Did you -- did you know him to be involved in anything

11:54AM  15  related to drugs?

11:54AM  16  A.  No.

11:54AM  17  Q.  Is that someone who the defendant also knows?

11:54AM  18  A.  Yes.

11:54AM  19  Q.  Okay.  Let's go down to the next one, 23.  You were also

11:54AM  20  Facebook friends with this Frank Tripi?

11:54AM  21  A.  At the time, yes.

11:54AM  22       **MR. TRIPI:**  Okay.  Can we go to the next set of

11:54AM  23  contacts, please?  I think that's a continuation.  We can go

11:54AM  24  to the next one.

         25

11:54AM  1        **BY MR. TRIPI:**

11:54AM  2   Q.  Okay.  I think earlier you said you were friends with a

11:55AM  3   Mark Grisanti.  Is that a relative of that person?

11:55AM  4   A.  That's his wife, Maria.

11:55AM  5        **MR. TRIPI:**  If we can go to the next set of contacts,

11:55AM  6   please.  And let's go to the next two.

11:55AM  7        **BY MR. TRIPI:**

11:55AM  8   Q.  And who is Nancy Standish?

11:55AM  9   A.  She's an old friend.  Facebook friend.  I don't even know

11:55AM  10  why I have her number there.

11:55AM  11  Q.  Under organization, it says Crocodile Bar, Cabaret.  Is

11:55AM  12  that person a bartender?

11:55AM  13  A.  That's correct, she used to be a bartender.

11:55AM  14  Q.  Was the Crocodile Bar a bar on Chippewa?

11:55AM  15  A.  It was.

11:55AM  16  Q.  Was Cabaret a bar near Chippewa?

11:55AM  17  A.  It was.

11:55AM  18        **MR. TRIPI:**  Can we go to the next set of contacts

11:55AM  19  please.

11:55AM  20        **BY MR. TRIPI:**

11:56AM  21  Q.  We've talked about Mark Grisanti before.  And then who is

11:56AM  22  Skip Giambrone.

11:56AM  23  A.  He's a friend I've known for quite some time, and also he

11:56AM  24  was doing business with Ron as well.

11:56AM  25  Q.  What type of business?

11:56AM    1    A.  Purchasing marijuana from him.

11:56AM    2    Q.  Distributing it?

11:56AM    3    A.  Distributing it, yes.

11:56AM    4    Q.  Large amounts?

11:56AM    5    A.  Yes.

11:56AM    6    Q.  So he was part of the group that you were involved in

11:56AM    7    through Ron?

11:56AM    8    A.  Through Ron, yes.

11:56AM    9         MR. TRIPI:  Let's go to 32, 33.  Let's just go to 33,

11:56AM   10    I'm sorry, Ms. Champoux, we've talked about 32.

11:56AM   11         BY MR. TRIPI:

11:56AM   12    Q.  And who is entry 33 there?

11:56AM   13    A.  Tom Napoli.

11:56AM   14    Q.  Is that the Tom Napoli that you've been referencing in

11:57AM   15    certain parts of your testimony?

11:57AM   16    A.  Yes.

11:57AM   17    Q.  And that was a Facebook friend at the time?

11:57AM   18    A.  Yes.

11:57AM   19         MR. TRIPI:  Let's go to the next contacts, please.

11:57AM   20         And let's go 34, 35, and 36 if we could.

11:57AM   21         BY MR. TRIPI:

11:57AM   22    Q.  And 34, it's Bart's cell.  Who's Bart or who was Bart?

11:57AM   23    A.  It's Bart Mazzara, an old friend, he's since deceased.

11:57AM   24    That's his cell number at the time.  716-444-5680.

11:57AM   25    Q.  Was he a childhood friend?

USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24
74

11:57AM   1    A.   Yes.

11:57AM   2    Q.   Did he know the defendant, as well?

11:57AM   3    A.   Yes.

11:57AM   4    Q.   Was he also related through marriage to Masecchia?

11:57AM   5    A.   He was his brother-in-law.

11:57AM   6    Q.   Okay.   That contact, 36, Matt Suppa, who was that?

11:57AM   7    A.   Again, Matt is a lifelong friend.   Childhood friend.

11:57AM   8    That's his number, 716-553-0099.

11:58AM   9    Q.   And what was his role as it related to the outdoor grow

11:58AM   10   operations you've testified about?

11:58AM   11   A.   Matt really wasn't involved.

11:58AM   12   Q.   Who owned the land?

11:58AM   13   A.   His brother, Mark.

11:58AM   14   Q.   Okay.   My apologies.

11:58AM   15        **MR. TRIPI:**   Can we go to the next set of contacts, or

11:58AM   16   was that it?

11:58AM   17        **BY MR. TRIPI:**

11:58AM   18   Q.   We talked about Matt Suppa.   Then there's an entry for

11:58AM   19   Joe Tomasello?

11:58AM   20   A.   Yes.

11:58AM   21   Q.   Is that the Joe Tomasello you referenced earlier in your

11:58AM   22   testimony yesterday?

11:58AM   23   A.   Yes.

11:58AM   24        **MR. TRIPI:**   And can we go to contact 39, please.

          25

| | | |
|---|---|---|
| 11:58AM | 1 | **BY MR. TRIPI:** |
| 11:58AM | 2 | Q.  And was he, in addition to having Joseph Tomasello's |
| 11:58AM | 3 | phone number, was he also a Facebook friend? |
| 11:58AM | 4 | A.  Yes. |
| 11:58AM | 5 | Q.  Okay.  I think that's it, correct?  Okay.  Next I'd like |
| 11:59AM | 6 | to show you Exhibit 208K. |
| 11:59AM | 7 | **MR. TRIPI:**  Just the witness only at this point. |
| 11:59AM | 8 | **BY MR. TRIPI:** |
| 11:59AM | 9 | Q.  Mr. Selva, after Anthony Gerace was charged federally, |
| 11:59AM | 10 | did you use your phone to search the internet about his case? |
| 11:59AM | 11 | A.  I did. |
| 11:59AM | 12 | Q.  Did you look at Exhibit 208K, particularly the |
| 11:59AM | 13 | information on the second page? |
| 11:59AM | 14 | A.  Yes. |
| 12:00PM | 15 | Q.  Does that show the different dates and times you used |
| 12:00PM | 16 | your phone to search the internet about Anthony Gerace's |
| 12:00PM | 17 | case? |
| 12:00PM | 18 | A.  It does, yes. |
| 12:00PM | 19 | **MR. TRIPI:**  Your Honor, the government offers Exhibit |
| 12:00PM | 20 | 208K. |
| 12:00PM | 21 | **MR. SINGER:**  No objection. |
| 12:00PM | 22 | **THE COURT:**  Received without objection. |
| 12:00PM | 23 | **(GOV Exhibit 208K was received in evidence.)** |
| 12:00PM | 24 | **MR. TRIPI:**  If we can publish that for the jury. |
| | 25 | |

12:00PM   1          **BY MR. TRIPI:**

12:00PM   2     Q.  Would it be accurate to say that you searched the Buffalo

12:00PM   3     News articles for Anthony Gerace's case June 30th, July 8th,

12:00PM   4     and July 30th, 2019?

12:00PM   5     A.  Yes.

12:00PM   6     Q.  Explain for the jury why you were searching Anthony

12:00PM   7     Gerace's case on your phone.

12:00PM   8     A.  Because I had heard -- this is when he had got arrested,

12:00PM   9     and I just wanted to know updates, what was going on with it,

12:00PM   10    where it was, if there was any new information being

12:00PM   11    published about it.

12:00PM   12    Q.  Were you concerned that Anthony Gerace's case could link

12:00PM   13    back to you in some way?

12:01PM   14    A.  Yes.

12:01PM   15    Q.  How so?

12:01PM   16    A.  'Cuz his relationship with Ron.

12:01PM   17    Q.  Were you concerned as to whether or not Anthony would

12:01PM   18    cooperate?

12:01PM   19    A.  Yes.

12:01PM   20          **MR. TRIPI:**  I'd like to show just the witness exhibit

12:01PM   21    208E.  I'll hand it up, it might be easier.

12:01PM   22          **BY MR. TRIPI:**

12:01PM   23    Q.  Mr. Selva, I've handed you up a hard copy, a CD, as well

12:02PM   24    as several pages that you've initialed; is that correct?

12:02PM   25    A.  Correct.

| | | |
|---|---|---|
| 12:02PM | 1 | Q.  Are those documents -- does the CD, Exhibit 208E, and the |
| 12:02PM | 2 | hard copy pdf, are those photographs that you had on your |
| 12:02PM | 3 | phone that you verified came from your phone? |
| 12:02PM | 4 | A.  They are. |
| 12:02PM | 5 | Q.  And do you recognize your initials on the document, as |
| 12:02PM | 6 | well as the CD? |
| 12:02PM | 7 | A.  Yes. |
| 12:02PM | 8 | Q.  Do you recognize the phone number written on the face of |
| 12:02PM | 9 | the CD there? |
| 12:02PM | 10 | A.  Yes. |
| 12:02PM | 11 | **MR. TRIPI:**  The government offers Exhibit 208E, |
| 12:02PM | 12 | Your Honor. |
| 12:02PM | 13 | **MR. SINGER:**  No objection. |
| 12:02PM | 14 | **THE COURT:**  Received without objection. |
| 12:02PM | 15 | **(GOV Exhibit 208E was received in evidence.)** |
| 12:02PM | 16 | **MR. TRIPI:**  Ms. Champoux, can you publish the photos |
| 12:02PM | 17 | from his phone for the jury? |
| 12:03PM | 18 | Just one moment, Your Honor. |
| 12:03PM | 19 | I'm going to ask you to go to the next one down, |
| 12:03PM | 20 | Ms. Champoux. |
| 12:03PM | 21 | **BY MR. TRIPI:** |
| 12:03PM | 22 | Q.  It's a little grainy when we do it this way, but |
| 12:03PM | 23 | Mr. Selva, even though that's a little blurry, do you know |
| 12:03PM | 24 | what that photo is? |
| 12:03PM | 25 | A.  I do. |

| | | |
|---|---|---|
| 12:03PM | 1 | Q.  What is that photo? |
| 12:04PM | 2 | A.  It's my graduation from the Sheriff's Academy. |
| 12:04PM | 3 | Q.  And who's on -- to the left of the screen, who are you |
| 12:04PM | 4 | hugging? |
| 12:04PM | 5 | A.  The defendant, Joe.  And mutual friend, lifelong friend, |
| 12:04PM | 6 | Victor Sorrento. |
| 12:04PM | 7 | **MR. TRIPI:**  Okay.  We can zoom out of there. |
| 12:04PM | 8 | **BY MR. TRIPI:** |
| 12:04PM | 9 | Q.  Are several of these other photographs you and the |
| 12:04PM | 10 | defendant over time at various places? |
| 12:04PM | 11 | A.  Yes. |
| 12:04PM | 12 | **MR. TRIPI:**  Okay.  We can move on from there. |
| 12:04PM | 13 | **BY MR. TRIPI:** |
| 12:04PM | 14 | Q.  I'm going to ask you to look at Exhibit 208F.  It's also |
| 12:05PM | 15 | on the screen next to you.  What is Exhibit 208F? |
| 12:05PM | 16 | A.  It's text messages from -- between myself and the |
| 12:05PM | 17 | defendant, Joe. |
| 12:05PM | 18 | Q.  And how do you recognize it? |
| 12:05PM | 19 | A.  Just the -- the messages that transpired. |
| 12:05PM | 20 | Q.  And did you also review that before today and initial the |
| 12:05PM | 21 | CD and the page? |
| 12:05PM | 22 | A.  I did, yes. |
| 12:05PM | 23 | Q.  And do you remember sending and receiving texts with the |
| 12:05PM | 24 | defendant? |
| 12:05PM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 12:05PM | 1 | Q.  And are those specific texts in the month of August 2019 |
| 12:05PM | 2 | before the search warrant at your house? |
| 12:05PM | 3 | A.  Yes. |
| 12:05PM | 4 | MR. TRIPI:  Okay.  The government offers Exhibit |
| 12:05PM | 5 | 208F, Your Honor, texts in August 2019. |
| 12:05PM | 6 | MR. SINGER:  No objection. |
| 12:06PM | 7 | THE COURT:  Received without objection. |
| 12:06PM | 8 | **(GOV Exhibit 208F was received in evidence.)** |
| 12:06PM | 9 | MR. TRIPI:  Okay.  Ms. Champoux, if we could zoom in |
| 12:06PM | 10 | so we can see the content better, maybe go two at a time. |
| 12:06PM | 11 | Let's start from the bottom. |
| 12:06PM | 12 | **BY MR. TRIPI:** |
| 12:06PM | 13 | Q.  Actually, starting on August 20th, you sent a message to |
| 12:06PM | 14 | the defendant in that column, row 4 there? |
| 12:06PM | 15 | A.  Yes. |
| 12:06PM | 16 | Q.  That's August 20th? |
| 12:06PM | 17 | A.  Yes. |
| 12:06PM | 18 | Q.  What did you write? |
| 12:06PM | 19 | A.  Anything for -- anything for brother, I love you. |
| 12:06PM | 20 | Q.  And what did the defendant respond in the next row? |
| 12:06PM | 21 | A.  Love ya brother. |
| 12:06PM | 22 | MR. TRIPI:  And can we go to row 3? |
| 12:06PM | 23 | **BY MR. TRIPI:** |
| 12:07PM | 24 | Q.  And what were you guys talking about in this sequence; do |
| 12:07PM | 25 | you recall? |

| | | |
|---|---|---|
| 12:07PM | 1 | A.  I don't recall. |
| 12:07PM | 2 | **MR. TRIPI:**  And can we show 1 and 2? |
| 12:07PM | 3 | We can take that down.  May the record reflect we've |
| 12:07PM | 4 | published that exhibit to the jury. |
| 12:07PM | 5 | **BY MR. TRIPI:** |
| 12:07PM | 6 | Q.  I'm next going to hand you Government Exhibit 208G. |
| 12:07PM | 7 | Does Exhibit 208G, do you recognize that? |
| 12:07PM | 8 | A.  Yes. |
| 12:07PM | 9 | Q.  Are those more text messages from your cell phone that |
| 12:08PM | 10 | you had with the defendant? |
| 12:08PM | 11 | A.  They are, yes. |
| 12:08PM | 12 | Q.  Did you review those, the CD and the hard copy and |
| 12:08PM | 13 | initial it? |
| 12:08PM | 14 | A.  I did, yes. |
| 12:08PM | 15 | Q.  And were the text messages accurate? |
| 12:08PM | 16 | A.  Yes. |
| 12:08PM | 17 | **MR. TRIPI:**  The government offers 208G, Your Honor. |
| 12:08PM | 18 | **MR. SINGER:**  No objection. |
| 12:08PM | 19 | **THE COURT:**  Received without objection. |
| 12:08PM | 20 | **(GOV Exhibit 208G was received in evidence.)** |
| 12:08PM | 21 | **MR. TRIPI:**  Now, Ms. Champoux, if we can go to the |
| 12:08PM | 22 | bottom, they're in reverse order.  We can highlight those |
| 12:08PM | 23 | four. |
| 12:08PM | 24 | **BY MR. TRIPI:** |
| 12:08PM | 25 | Q.  So, beginning at row 53 there, is that a text from you to |

12:08PM   1   the defendant on March 1st, 2019 -- or, sorry, from the

12:09PM   2   defendant to you?

12:09PM   3   A.  Yes.

12:09PM   4   Q.  And what does the message read?

12:09PM   5   A.  Dude, I got a pass Saturday.  Lindsay and her friends are

12:09PM   6   going to Belsito.  You want to get out early about 7 for a

12:09PM   7   couple.

12:09PM   8   Q.  And what was the defendant asking you there?

12:09PM   9   A.  Just to meet for a couple of drinks.

12:09PM   10  Q.  On the next day, March 2nd, did you have a text where you

12:09PM   11  sent the defendant?

12:09PM   12  A.  Yes.

12:09PM   13  Q.  And what did you write?

12:09PM   14  A.  Bro, I'm here.  Are you on your way?

12:09PM   15  Q.  Were you at a bar waiting for him?

12:09PM   16  A.  Yes.

12:09PM   17  Q.  Was that the Saturday, the plans you made the day before?

12:09PM   18  A.  Yes.

12:09PM   19  Q.  Can you read the message from the defendant to you on

12:10PM   20  March 15th, 2019?

12:10PM   21  A.  Bro, will Fanara have an opening when you start the

12:10PM   22  sheriffs?  I'm interested.

12:10PM   23  Q.  What was that discussion about?

12:10PM   24  A.  About bartending at Fanara's where I mentioned.

12:10PM   25  Q.  So is this shortly after the defendant retired?

12:10PM   1   A.   Yes.

12:10PM   2   Q.   Is this shortly before you started at the sheriff's

12:10PM   3   office?

12:10PM   4   A.   It is, yes.

12:10PM   5   Q.   Okay.  And did you respond to that message in row number

12:10PM   6   50?

12:10PM   7   A.   I did.

12:10PM   8   Q.   What did you -- what did you say?

12:10PM   9   A.   I said yes, my last shift is this Monday.  You would be

12:10PM  10   perfect there, Bro.  I'll tell Joe Monday you are interested.

12:10PM  11   Just brush up on your martini, Manhattans, and mottled Old

12:10PM  12   Fashions.  What I do if I forget, go to the waitress station

12:10PM  13   out of sight and Google it.

12:10PM  14       Meaning I get in, you know, a recipe, sometimes you

12:11PM  15   forget it.  I would step aside and Google it.

12:11PM  16       You would do great there.  Very easy bar to work, and the

12:11PM  17   money is awesome.  You serve a lot of food at the bar.  Easy

12:11PM  18   Bro.

12:11PM  19              **MR. TRIPI:**  Ms. Champoux, can we show 49 through 45.

12:11PM  20              **BY MR. TRIPI:**

12:11PM  21   Q.   On March 15th, 2019, at about 3:08 p.m., is there a

12:11PM  22   message that you read from the defendant?

12:11PM  23   A.   Yes.  I'm sick.  I can't do it.

12:11PM  24   Q.   No, above that.  I'm sorry, I skipped that one.  Row 48?

12:11PM  25   A.   Yes.

USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24

83

| | | |
|---|---|---|
| 12:11PM | 1 | Q. Can you read that one? |
| 12:11PM | 2 | A. Lindsay is cool with it.  If you can swing it with Joe, |
| 12:11PM | 3 | that would be awesome.  I'll study my drinks all week.  LOL. |
| 12:12PM | 4 | Q. And above that, did you respond? |
| 12:12PM | 5 | A. Yes.  Come in Monday night and I'll introduce you to Joe. |
| 12:12PM | 6 | Q. So was the defendant looking for a job? |
| 12:12PM | 7 | A. Bartending. |
| 12:12PM | 8 | Q. And then there's a little more exchange about that, |
| 12:12PM | 9 | correct? |
| 12:12PM | 10 | A. Correct. |
| 12:12PM | 11 | **MR. TRIPI:**  Can we go and show the next set of |
| 12:12PM | 12 | messages, 44 through 40, maybe?  We'll let the jury review it |
| 12:12PM | 13 | for a moment, then we'll move on. |
| 12:13PM | 14 | Okay.  Let's try 39 through maybe 35, Ms. Champoux. |
| 12:13PM | 15 | **BY MR. TRIPI:** |
| 12:13PM | 16 | Q. In row 36 there, do you see that message that you sent? |
| 12:13PM | 17 | A. Yes. |
| 12:13PM | 18 | Q. What was that name and phone number for? |
| 12:13PM | 19 | A. I believe it was a contractor. |
| 12:13PM | 20 | Q. For what type of work? |
| 12:13PM | 21 | A. I don't -- I don't recall what type of work needed to be |
| 12:13PM | 22 | done. |
| 12:14PM | 23 | Q. Do you see the name there that you wrote? |
| 12:14PM | 24 | A. Yes. |
| 12:14PM | 25 | Q. What's it say? |

12:14PM   1    A.  Are you talking about line 36?

12:14PM   2    Q.  Yep.

12:14PM   3    A.  Robert Kelichner brick, and then the mobile number.

12:14PM   4    Q.  Was brick the person's name, or was brick the type of

12:14PM   5    contractor work?

12:14PM   6    A.  I believe it was the type of contracting work.  It was

12:14PM   7    something I put to reference.

12:14PM   8    Q.  Did the defendant ask you for a reference for brickwork?

12:14PM   9    A.  I believe, yes.

12:14PM   10          **MR. TRIPI:**  Can we go 34 through 30, Ms. Champoux?

12:14PM   11          **THE COURT:**  Mr. Tripi, how much more are we going to

12:14PM   12   be doing?

12:14PM   13          **MR. TRIPI:**  We're going to move this along, Judge.

12:15PM   14   I'm gonna get this done.  Give me one moment, Your Honor.

12:15PM   15          Can we go to 21, row 21, Ms. Champoux?

12:15PM   16          **BY MR. TRIPI:**

12:15PM   17   Q.  All right.  So, is this a message that the defendant sent

12:15PM   18   you April 10th, 2019?

12:15PM   19   A.  Yes.

12:15PM   20   Q.  Can you read it for the jury?

12:15PM   21   A.  Dude, I had something come up at 4 today.  Could you come

12:16PM   22   over at about 7 tonight?  Lindsay isn't home until 8:30 so

12:16PM   23   we'll have time.  Also, I'm good all day Friday.

12:16PM   24   Q.  During this time period, was the defendant at times

12:16PM   25   meeting with you and helping you study?

12:16PM 1   A.  Yes.

12:16PM 2   Q.  Would you go over there when no one else was home?

12:16PM 3   A.  Yes.

12:16PM 4   Q.  Is that also when you would talk about -- have some of

12:16PM 5   these conversations you've testified about?

12:16PM 6   A.  Yes.

12:16PM 7       MR. TRIPI:  Okay, we can move on from this exhibit,

12:16PM 8   Ms. Champoux.

12:16PM 9       BY MR. TRIPI:

12:17PM 10  Q.  I'm going to show you two more sets of texts, okay?

12:17PM 11      MR. SINGER:  I'm sorry, what was the witness handed?

12:17PM 12  I'm sorry.

12:17PM 13      MR. TRIPI:  We have Exhibit 208B and 208C handed up,

12:17PM 14  I'm sorry.

12:17PM 15      MR. SINGER:  Thank you.

12:17PM 16      BY MR. TRIPI:

12:17PM 17  Q.  Regarding Exhibit 208B, Mr. Selva, what is that?

12:17PM 18  A.  That's my correspondence with Wayne Anderson's texting.

12:17PM 19  Q.  And does 208B fairly and accurately depict texts that you

12:17PM 20  had with Wayne Anderson?

12:17PM 21  A.  It does.

12:17PM 22  Q.  And 208C, what is that?

12:18PM 23  A.  It's correspondence with myself and the defendant.

12:18PM 24  Q.  And does 208C fairly and accurately depict correspondence

12:18PM 25  text communications that you had with the defendant,

| | | |
|---|---|---|
| 12:18PM | 1 | additional ones from your phone? |
| 12:18PM | 2 | A.  Yes. |
| 12:18PM | 3 | **MR. TRIPI:**  The government offers 208B and 208C, |
| 12:18PM | 4 | Your Honor. |
| 12:18PM | 5 | **MR. SINGER:**  No objection. |
| 12:18PM | 6 | **THE COURT:**  208B and C are admitted -- |
| 12:18PM | 7 | **MR. SINGER:**  Judge, no objection to 208C.  With |
| 12:18PM | 8 | regard to 208B, I'll object on relevance. |
| 12:18PM | 9 | **THE COURT:**  Okay, so can I see 208B, please? |
| 12:18PM | 10 | **MR. TRIPI:**  Yes, Your Honor.  The relevance, I'll be |
| 12:18PM | 11 | very brief, the relevance is showing a continuing |
| 12:18PM | 12 | relationship, that's all.  Not necessarily the content. |
| 12:18PM | 13 | **THE COURT:**  I don't see any reason why 208 -- what is |
| 12:18PM | 14 | this B or C. |
| 12:19PM | 15 | **MR. TRIPI:**  B. |
| 12:19PM | 16 | **THE COURT:**  I don't see any reason why 208B should |
| 12:19PM | 17 | come in.  I'll admit 208C without objection, but sustain the |
| 12:19PM | 18 | objection to B.  You can ask him about -- |
| 12:19PM | 19 | **MR. TRIPI:**  Yeah, if I need to on redirect, I'll |
| 12:19PM | 20 | circle back, Judge.  That's fine. |
| 12:08PM | 21 | **(GOV Exhibit 208C was received in evidence.)** |
| 12:08PM | 22 | **BY MR. TRIPI:** |
| 12:19PM | 23 | Q.  Did you have ongoing communications with Wayne Anderson? |
| 12:19PM | 24 | A.  Yes. |
| 12:19PM | 25 | Q.  Okay.  Did you have ongoing communications with Mike |

| 12:19PM | 1 | Masecchia? |
| 12:19PM | 2 | A.  Yes. |
| 12:19PM | 3 | Q.  After the search warrant was executed at the defendant's |
| 12:19PM | 4 | house, did you reach out to him through his wife? |
| 12:19PM | 5 | A.  I did. |
| 12:19PM | 6 | Q.  Did you text communications with his wife, Lindsay? |
| 12:19PM | 7 | A.  Yes. |
| 12:19PM | 8 | Q.  I'm going to show you Government Exhibit 208J. |
| 12:20PM | 9 |     Is it your understanding that for a time the defendant |
| 12:20PM | 10 | wasn't talking? |
| 12:20PM | 11 | A.  Yes. |
| 12:20PM | 12 | Q.  Is that why you reached out to him through his wife? |
| 12:20PM | 13 | A.  Yes. |
| 12:20PM | 14 | Q.  And what is Exhibit 208J? |
| 12:20PM | 15 | A.  Correspondence with myself and the defendant's wife. |
| 12:20PM | 16 | Q.  By text message? |
| 12:20PM | 17 | A.  By text message. |
| 12:20PM | 18 | Q.  Does 208J fairly and accurately depict text messages you |
| 12:20PM | 19 | had with Lindsay Bongiovanni as depicted in your cell phone? |
| 12:20PM | 20 | A.  Yes. |
| 12:20PM | 21 |     **MR. TRIPI:**  The government offers Exhibit 208J, |
| 12:20PM | 22 | Your Honor. |
| 12:20PM | 23 |     **MR. SINGER:**  No objection. |
| 12:20PM | 24 |     **THE COURT:**  208J is admitted without objection. |
| 12:20PM | 25 |     **(GOV Exhibit 208J was received in evidence.)** |

12:20PM  1      **MR. TRIPI:**  Can we publish 208J, particularly row 5.

12:20PM  2   Row 4 and 5, I'm sorry.

12:20PM  3      **BY MR. TRIPI:**

12:21PM  4   Q.  Mr. Selva, are those particular text messages a couple of

12:21PM  5   days after the search warrant at the defendant's house?

12:21PM  6   A.  Yes.

12:21PM  7   Q.  And can you describe what was transpiring in those text

12:21PM  8   communications?

12:21PM  9   A.  I'm just reaching out to see how things are going.  Okay.

12:21PM 10   Thank you, Lindsay.  If you guys need anything at all, just

12:21PM 11   reach out.  Love you guys.

12:21PM 12      And then, Hi, Lou.  Just got your message.  Joe is fine.

12:21PM 13   We're good.  Just hanging out.  Love ya.

12:21PM 14   Q.  Okay.  Now, I'd like to fast forward a little bit.

12:21PM 15      Did there come a time where you and the defendant did

12:21PM 16   start speaking again?

12:21PM 17   A.  Yes.

12:21PM 18   Q.  I'm going to hand you up Government Exhibits 208N and M.

12:21PM 19      I'm going to ask, is 208N text communications that you

12:21PM 20   had with the defendant from your phone to his phone,

12:22PM 21   507-2784?

12:22PM 22   A.  Yes.

12:22PM 23   Q.  And is 208M text communications you had from your phone

12:22PM 24   to his phone at 716-416-1797?

12:22PM 25   A.  Yes.

12:22PM    1    Q.  Did you review those?

12:22PM    2    A.  Yes.

12:22PM    3    Q.  Did you initial them?

12:22PM    4    A.  I did.

12:22PM    5    Q.  Were the text communications accurate?

12:22PM    6    A.  They were.

12:22PM    7    **MR. TRIPI:**  The government offers 208M and 208N,

12:22PM    8    Your Honor.

12:22PM    9    **MR. SINGER:**  Judge, the only objection I have is

12:22PM    10    these don't appear to be text messages, they appear to be call

12:22PM    11    logs.

12:22PM    12    **MR. TRIPI:**  Oh, that's -- I -- I misspoke.

12:22PM    13    **BY MR. TRIPI:**

12:22PM    14    Q.  With that caveat, they are call logs, correct?

12:22PM    15    A.  Correct.

12:22PM    16    **MR. TRIPI:**  I misspoke.

12:22PM    17    **MR. SINGER:**  No objection.

12:22PM    18    **THE COURT:**  Received without objection.

12:22PM    19    **(GOV Exhibits 208M and N were received in evidence.)**

12:22PM    20    **BY MR. TRIPI:**

12:22PM    21    Q.  Okay.  And were you talking on the phone at various

12:22PM    22    times?

12:22PM    23    A.  We were, yes.

12:22PM    24    Q.  Now did there come a point in time after the search

12:22PM    25    warrant at the defendant's house that you met up with him?

USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24

12:23PM    1    A.   Yes.

12:23PM    2    Q.   Did you discuss the search warrant at his house?

12:23PM    3    A.   Yes.

12:23PM    4    Q.   Where did you discuss that search warrant?

12:23PM    5    A.   For his house?

12:23PM    6    Q.   Yes.

12:23PM    7    A.   It was -- I went over there and we talked, we went for a

12:23PM    8    walk.

12:23PM    9    Q.   Where did you walk?

12:23PM   10    A.   I don't know if that's the park we went to, or in his

12:23PM   11    neighborhood, I don't recall.

12:23PM   12    Q.   You referenced the park.  What are you thinking of?

12:23PM   13    A.   TTFA Park, Colvin Park.

12:23PM   14    Q.   Okay.  So after the warrant at his house, you remember

12:23PM   15    speaking in person with the defendant?

12:23PM   16    A.   Yes.

12:23PM   17    Q.   Describe -- did you discuss the warrant at his house?

12:23PM   18    A.   Yes.

12:23PM   19    Q.   Describe that conversation for the jury.

12:23PM   20    A.   I heard -- I asked what was -- what happened, what was

12:23PM   21    going on.  He said it happened abruptly.  They seized some of

12:23PM   22    his property, his guns, and he was very concerned.

12:23PM   23    Q.   What else did he say?

12:24PM   24    A.   I don't recall at that point, I don't recall.  Do you

12:24PM   25    have something to refresh my memory?

| | | |
|---|---|---|
| 12:25PM | 1 | Q.  Mr. Selva, I'm going to hand you up Government |
| 12:25PM | 2 | Exhibit 3540V as in Victor. |
| 12:25PM | 3 | **MR. SINGER:**  What's the letter. |
| 12:26PM | 4 | **MR. TRIPI:**  V as in Victor. |
| 12:26PM | 5 | That was my mistake.  I'm switching to 3540W, |
| 12:26PM | 6 | Mr. Singer.  3540W. |
| 12:26PM | 7 | **BY MR. TRIPI:** |
| 12:26PM | 8 | Q.  Mr. Selva, I'm handing that document up.  Please review |
| 12:26PM | 9 | it.  Take a moment to read it.  When you're done, look up and |
| 12:26PM | 10 | let me know if it refreshes your recollection to |
| 12:26PM | 11 | conversations that you had with the defendant after the |
| 12:26PM | 12 | search warrant at his house. |
| 12:27PM | 13 | **MR. TRIPI:**  Judge, I'm thinking 15 minutes I'll be |
| 12:27PM | 14 | done. |
| 12:27PM | 15 | **BY MR. TRIPI:** |
| 12:28PM | 16 | Q.  Have you reviewed the document -- I removed the document, |
| 12:28PM | 17 | excuse me. |
| 12:28PM | 18 | Mr. Selva, did that refresh your recollection as to any |
| 12:28PM | 19 | conversation you had with the defendant after the search |
| 12:28PM | 20 | warrant at his house? |
| 12:28PM | 21 | A.  It does, yes. |
| 12:28PM | 22 | Q.  Where was that discussion? |
| 12:28PM | 23 | A.  Delaware Park. |
| 12:28PM | 24 | Q.  What were you guys doing? |
| 12:28PM | 25 | A.  Walking and talking, walking around the park. |

12:28PM    1    Q.  And when you walked and talked, describe the conversation

12:28PM    2    you had for the jury.

12:28PM    3    A.  It was regarding Anthony Gerace.  He was concerned that

12:28PM    4    he would flip, because he had helped him, meaning be a

12:28PM    5    cooperative witness.  He had helped him before on a prior

12:28PM    6    arrest.  So, it was a concern.  Because Anthony was tied in

12:28PM    7    with Ron Serio and the whole thing that was going on.

12:29PM    8    Q.  Mr. Selva, did there come a point in time where you had a

12:29PM    9    conversation with the defendant after the search warrant at

12:29PM   10    his house where the cover story that you had previously

12:29PM   11    discussed came back up?

12:29PM   12    A.  Yes.

12:29PM   13    Q.  Describe that for the jury, please.

12:29PM   14    A.  After the search warrant was issued at his house, again,

12:29PM   15    if anything were to happen for questioning, I was gonna be

12:29PM   16    pulled in for anything, I would say I was a confidential

12:29PM   17    informant for the defendant.  Just going over it.  And he

12:30PM   18    would go over prepping me for the interviews if anything were

12:30PM   19    to happen.

12:30PM   20    Q.  Okay.  And did you have some contact over the phone

12:30PM   21    during the months that led up to the search warrant at your

12:30PM   22    house?

12:30PM   23    A.  Yes.

12:30PM   24    Q.  I have a few more exhibits to show you.  We're almost

12:30PM   25    done.

USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24

12:30PM   1       **MR. TRIPI:**  Government Exhibit 222G, if we can show

12:30PM   2   it just to the witness.

12:30PM   3       **BY MR. TRIPI:**

12:30PM   4   Q.  Do you recognize that person?

12:30PM   5   A.  Yes.

12:30PM   6   Q.  Who do you recognize that to be?

12:30PM   7   A.  Mike Masecchia.

12:30PM   8   Q.  How do you recognize that?

12:30PM   9   A.  I took the picture.

12:30PM  10   Q.  Where is that picture located?

12:30PM  11   A.  It's in the country in Franklinville.

12:30PM  12   Q.  Is that near where the marijuana grows are located?

12:30PM  13   A.  Yes, not far.

12:30PM  14       **MR. TRIPI:**  The government offers Government

12:30PM  15   Exhibit 222G, Your Honor.

12:31PM  16       **MR. SINGER:**  Just one moment, Judge, I'm sorry.

12:31PM  17       No objection, Judge.

12:31PM  18       **THE COURT:**  Received without objection.

12:31PM  19       **(GOV Exhibit 222G was received in evidence.)**

12:31PM  20       **MR. TRIPI:**  Please publish it, Ms. Champoux.

12:31PM  21       **BY MR. TRIPI:**

12:31PM  22   Q.  And what's Mr. Masecchia holding in the photo?

12:31PM  23   A.  He's holding a Kel-Tec rifle, and an axe.

12:31PM  24   Q.  Were you guys shooting guns that day?

12:31PM  25   A.  Yes.

12:31PM   1        **MR. TRIPI:**  If we can show the witness Government

12:31PM   2   Exhibit 222H?  Just the witness.

12:31PM   3        **BY MR. TRIPI:**

12:31PM   4   Q.  Do you recognize that?

12:31PM   5   A.  Yes.

12:31PM   6   Q.  Is that a photo from the same day?

12:31PM   7   A.  Yes.

12:31PM   8   Q.  Who's taking that photo?

12:31PM   9   A.  Michael Masecchia was.

12:32PM   10   Q.  Okay.  So now you're in the photo?

12:32PM   11   A.  It's me holding the gun and the axe.  We were target

12:32PM   12   shooting that day.

12:32PM   13   Q.  Does that fairly and accurately depict the photo of you

12:32PM   14   from that day?

12:32PM   15   A.  Yes.

12:32PM   16        **MR. TRIPI:**  The government offers Exhibit 222H,

12:32PM   17   Your Honor.

12:32PM   18        **MR. SINGER:**  No objection.

12:32PM   19        **THE COURT:**  Received without objection.

12:32PM   20        **(GOV Exhibit 222H was received in evidence.)**

12:32PM   21        **BY MR. TRIPI:**

12:32PM   22   Q.  And this is the same property associated with Masecchia

12:32PM   23   in Franklinville not far from where the marijuana grows are?

12:32PM   24   A.  Not far, yes.

12:32PM   25        **MR. TRIPI:**  And lastly, could we show the witness

USA v Bongiovanni - Selva - Tripi/Direct - 2/22/24

| | | |
|---|---|---|
| 12:32PM | 1 | Exhibit 222J, please, just the witness. |
| 12:32PM | 2 | **BY MR. TRIPI:** |
| 12:32PM | 3 | Q.  And do you recognize 222J? |
| 12:32PM | 4 | A.  I do. |
| 12:32PM | 5 | Q.  What do you recognize that to be? |
| 12:32PM | 6 | A.  That's a picture of myself, Michael Masecchia, and Sal |
| 12:32PM | 7 | Volpe, who is deceased.  We were in Florida. |
| 12:32PM | 8 | Q.  You went there together? |
| 12:32PM | 9 | A.  Yeah, I met them down there. |
| 12:32PM | 10 | Q.  What year was that from? |
| 12:32PM | 11 | A.  2015, '16. |
| 12:33PM | 12 | Q.  Does it fairly and accurately depict you, Masecchia, and |
| 12:33PM | 13 | Volpe in Florida at that time? |
| 12:33PM | 14 | A.  Yes. |
| 12:33PM | 15 | MR. TRIPI:  The government offers Exhibit 222J, |
| 12:33PM | 16 | Your Honor. |
| 12:33PM | 17 | MR. SINGER:  No objection. |
| 12:33PM | 18 | THE COURT:  Received without objection. |
| 12:33PM | 19 | **(GOV Exhibit 222J was received in evidence.)** |
| 12:33PM | 20 | MR. TRIPI:  And if we can publish that. |
| 12:33PM | 21 | **BY MR. TRIPI:** |
| 12:33PM | 22 | Q.  Who's in the middle? |
| 12:33PM | 23 | A.  That's Mike Masecchia. |
| 12:33PM | 24 | Q.  Who's at the far right? |
| 12:33PM | 25 | A.  That's myself -- well, the way I'm looking at it, Sal |

12:33PM | 1   Volpe, and then myself on the end.

12:33PM | 2   Q.  Is it not on your screen right next to you?

12:33PM | 3   A.  Oh, I'm sorry, it is.  I didn't see that.

12:33PM | 4   Q.  And on the far left, who's that?

12:33PM | 5   A.  On my left, it's Sal Volpe.

12:33PM | 6   Q.  In the gray shirt?

12:33PM | 7   A.  Yes.

12:33PM | 8   Q.  Was Volpe involved in the marijuana grow operations?

12:33PM | 9   A.  Yes.

12:33PM | 10            **MR. TRIPI:**  We can take that down.

12:33PM | 11            **BY MR. TRIPI:**

12:33PM | 12  Q.  After the warrants -- the warrant was executed at your

12:34PM | 13  house and the evidence we talked about earlier was seized,

12:34PM | 14  did you have any encounters with Defendant Bongiovanni?

12:34PM | 15  A.  After my -- after my --

12:34PM | 16  Q.  Now it's past August 23rd.  Did the defendant and you

12:34PM | 17  have -- have an interaction somewhere?

12:34PM | 18  A.  Yes, we did.

12:34PM | 19  Q.  Where?

12:34PM | 20  A.  That one was at -- I was coming out of the gym.  And he

12:34PM | 21  had pulled up behind me.  And we want for a walk, we went to

12:34PM | 22  a park.  That's TTFA Park in Tonawanda.

12:34PM | 23  Q.  What's located there?  Is there some type of pathway

12:34PM | 24  there?

12:34PM | 25  A.  There's a path, there's a football field there.

12:34PM    1    Q.  And what did you guys do?

12:34PM    2    A.  We took a walk.  We sat on the bench.  And told him what

12:35PM    3    had happened.  Well, he had heard what had happened at my

12:35PM    4    house.  And he had asked if they were asking questions about

12:35PM    5    him.  And I said no, nothing at this time.  So --

12:35PM    6    Q.  And did anything about that encounter strike you as odd?

12:35PM    7    A.  It was abrupt, yeah.  It did.

12:35PM    8    Q.  Describe it for the jury.

12:35PM    9    A.  First of all, it startled me.  I was walking out of the

12:35PM   10    gym, and then his car just pulled up.  And he just usually

12:35PM   11    would call me, but that wasn't the case.  So it would seem

12:35PM   12    like a sense of urgency.

12:35PM   13    Q.  By that point in time, had HSI set up a camera system at

12:35PM   14    your house because of concerns you had?

12:35PM   15    A.  Yes.

12:35PM   16    Q.  Did the defendant ask you about the cameras at your

12:36PM   17    house?

12:36PM   18    A.  He did.

12:36PM   19    Q.  Describe that conversation.

12:36PM   20    A.  He must have drove by my house after, and he had

12:36PM   21    mentioned, he says, oh, he goes, you got a camera set up now?

12:36PM   22        And I says, yeah.  I go, yeah, after the -- after the

12:36PM   23    search warrant, I went and set up a camera.

12:36PM   24        I didn't tell him it was HSI.

12:36PM   25    Q.  Did you form an opinion based upon how that -- how that

12:36PM   1   occurred and the content of your conversation as to what the

12:36PM   2   defendant was doing as it related to you?

12:36PM   3   A.   Yes.

12:36PM   4   Q.   What was your opinion?

12:36PM   5   A.   He was nervous everything was gonna start coming about.

12:36PM   6   And he just wanted to find out as much information as he can

12:36PM   7   from me, what I know.

12:36PM   8   Q.   As time went on, did you continue to try to avoid

12:36PM   9   speaking to anybody that you used to be friends with?

12:36PM  10   A.   I did at that point, yes.  It all ceased.

12:37PM  11   Q.   Directing your attention to October 25th, 2019, I'm going

12:37PM  12   to hand up Government Exhibit 209.  Do you recognize

12:37PM  13   Government Exhibit 209?

12:37PM  14   A.   Yes.

12:37PM  15   Q.   What is that?

12:37PM  16   A.   It's a pack -- it's a box that was left on my doorstep

12:37PM  17   from the defendant for my birthday.

12:37PM  18   Q.   What's in the box?

12:37PM  19   A.   A box of Crown Royal, a bottle.

12:37PM  20   Q.   By October 25th, 2019, had you ceased contact?

12:37PM  21   A.   Yes.  We just very, very -- maybe one or two

12:37PM  22   conversations, but there was fairly no contact.

12:37PM  23   Q.   Did that bottle -- what did you do when you got that

12:37PM  24   bottle?

12:37PM  25   A.   I just put it in my house.

| | | |
|---|---|---|
| 12:37PM | 1 | Q.  Did you turn it over to HSI? |
| 12:37PM | 2 | A.  I did. |
| 12:37PM | 3 | Q.  Were you concerned? |
| 12:37PM | 4 | A.  Yes. |
| 12:37PM | 5 | Q.  Why? |
| 12:37PM | 6 | A.  I don't know.  It was just abrupt.  I didn't understand |
| 12:38PM | 7 | why it would be left there, why wouldn't we get together and |
| 12:38PM | 8 | do it.  Just, it seemed odd. |
| 12:38PM | 9 | Q.  Is that box with a bottle in it in the same or |
| 12:38PM | 10 | substantially same condition as when you found it on your |
| 12:38PM | 11 | porch? |
| 12:38PM | 12 | A.  Yes. |
| 12:38PM | 13 | **MR. TRIPI:**  The government offers 209, Your Honor. |
| 12:38PM | 14 | **MR. SINGER:**  Can I just see it real quick? |
| 12:38PM | 15 | No objection, Judge. |
| 12:38PM | 16 | **THE COURT:**  Received without objection. |
| 12:38PM | 17 | **(GOV Exhibit 209 was received in evidence.)** |
| 12:38PM | 18 | **MR. TRIPI:**  May I publish, just pass it around for |
| 12:38PM | 19 | the jury? |
| 12:39PM | 20 | **BY MR. TRIPI:** |
| 12:39PM | 21 | Q.  Was there a little message written on the bag? |
| 12:39PM | 22 | A.  There was. |
| 12:39PM | 23 | Q.  Just a few more questions, Mr. Selva, and then I'm going |
| 12:39PM | 24 | to wrap up. |
| 12:39PM | 25 | Did the defendant ever tell you how the Serio |

USA v Bongiovanni - Proceedings - 2/22/24

12:39PM   1    investigation concluded in his office?

12:39PM   2    A.  No, he did not.

12:39PM   3    Q.  Has the last day and a half been hard for you, Mr. Selva?

12:39PM   4    A.  Very hard.

12:39PM   5    Q.  Have you been honest with this jury?

12:39PM   6    A.  Yes.

12:39PM   7    Q.  Are you proud of what you were a part of here?

12:39PM   8    A.  Not at all.

12:39PM   9    Q.  Are you happy to be testifying against your childhood

12:39PM  10    best friend?

12:39PM  11    A.  Not at all.

12:39PM  12              **MR. TRIPI:**  I have no further direct, Your Honor.

12:39PM  13              **THE COURT:**  Okay.  So we are going to break now for

12:40PM  14    lunch.  Please remember my instructions about not talking

12:40PM  15    about the case with anyone, including each other.

12:40PM  16              Don't do any research on your own.  Don't use tools

12:40PM  17    of technology to research about the case or to communicate

12:40PM  18    about the case.  Don't read, or listen to, or watch any news

12:40PM  19    coverage of the case, if there is any, while the case is still

12:40PM  20    on trial.

12:40PM  21              And don't make up your mind about any fact or issue

12:40PM  22    until all the evidence has been presented, and the case is

12:40PM  23    finally submitted to you.

12:40PM  24              Let's come back at 2:00.  I have a matter that I have

12:40PM  25    to handle at the lunch hour, so let's come back at 2:00.

| | | |
|---|---|---|
| 12:40PM | 1 | Okay?  We'll see you then. |
| 12:40PM | 2 | (Jury excused at 12:40 p.m.) |
| 12:41PM | 3 | **THE COURT:**  You can step down, Mr. Selva. |
| 12:41PM | 4 | Anything we need to put on the record from the |
| 12:41PM | 5 | government? |
| 12:41PM | 6 | **MR. TRIPI:**  Not from our perspective. |
| 12:41PM | 7 | **THE COURT:**  Anything from the defense? |
| 12:41PM | 8 | **MR. SINGER:**  I'll warn the witness not to talk to |
| 12:41PM | 9 | anyone over the lunch break. |
| 12:41PM | 10 | **THE COURT:**  Yeah.  So, Mr. Selva, you're not to talk |
| 12:41PM | 11 | with anyone on the lunch break, okay, about -- |
| 12:41PM | 12 | **THE WITNESS:**  Yes. |
| 12:41PM | 13 | **THE COURT:** -- about this case. |
| 12:41PM | 14 | **THE WITNESS:**  Yes. |
| 12:41PM | 15 | **THE COURT:**  In any way at all. |
| 12:41PM | 16 | **THE WITNESS:**  Yes. |
| 12:41PM | 17 | **THE COURT:**  Okay.  Thank you.  Anything else? |
| 12:41PM | 18 | **MR. SINGER:**  No. |
| 12:41PM | 19 | **MR. TRIPI:**  We didn't have to refrain on direct, but |
| 12:41PM | 20 | we didn't speak overnight either, Judge.  That won't be a |
| 12:41PM | 21 | problem. |
| 12:41PM | 22 | **THE COURT:**  Yeah, no, I wouldn't -- I wouldn't expect |
| 12:41PM | 23 | anything different. |
| 12:41PM | 24 | So, we'll see you folks at 2:00.  You'll have to |
| 12:41PM | 25 | clean up a little bit because we've got folks coming in. |

| | | |
|---|---|---|
| 12:42PM | 1 | **MR. TRIPI:** We will. |
| 12:42PM | 2 | **THE COURT:** They'll be from your office, actually. |
| 12:42PM | 3 | **MR. COOPER:** Maybe we'll leave them the mess. |
| 12:42PM | 4 | (Off the record at 12:42 p.m.) |
| 12:42PM | 5 | (Back on the record at 2:02 p.m.) |
| 02:02PM | 6 | (Jury not present.) |
| 02:02PM | 7 | **THE CLERK:** All rise. |
| 02:02PM | 8 | **THE COURT:** Please be seated. |
| 02:02PM | 9 | **THE CLERK:** We are back on the record for the |
| 02:02PM | 10 | continuation of the jury trial in case number 19-cr-227, |
| 02:02PM | 11 | United States of America versus Joseph Bongiovanni. |
| 02:02PM | 12 | All counsel and parties are present. |
| 02:02PM | 13 | **THE COURT:** Okay. So, some juror notes that I'd like |
| 02:02PM | 14 | to go over with you folks, juror notes to me. |
| 02:02PM | 15 | **MR. TRIPI:** Yes, Your Honor. |
| 02:02PM | 16 | **THE COURT:** So first of all, juror number 7 has -- |
| 02:02PM | 17 | **MR. DICKSON:** Judge, Mr. Selva is in the room. |
| 02:02PM | 18 | **THE COURT:** You should leave. There's no reason for |
| 02:02PM | 19 | you to be here for this. |
| 02:03PM | 20 | Good catch. Thank you, Mr. Dickson. |
| 02:03PM | 21 | I don't think it's a particularly big deal that he |
| 02:03PM | 22 | was here, but you're right, probably better that he be |
| 02:03PM | 23 | excused. |
| 02:03PM | 24 | So juror number 7 has two appointments that can't be |
| 02:03PM | 25 | changed on March 7th and March 19th, and he or she needs to |

02:03PM    1    leave by 4:30 on those days.  Not a big deal, obviously, we'll

02:03PM    2    just quit at 4:30 on those days.

02:03PM    3          Juror number 9 was informed by her employer that

02:03PM    4    she's only being compensated for four days, $40 per day.  She

02:03PM    5    wants to stay, but she's wondering if this is okay, if this is

02:03PM    6    proper.

02:03PM    7          I don't know the answer to that myself, but she does

02:03PM    8    want to stay and remain on the jury it says, so I don't know

02:03PM    9    if we should bring her in and talk to her about it and find

02:03PM   10    out if she's going to be distracted.  I don't know.

02:03PM   11          **MR. TRIPI:**  Yeah.  As to whether it's proper, Judge,

02:03PM   12    I do think that, just like the law firm didn't have to pay, I

02:03PM   13    think they don't have to pay.

02:03PM   14          **THE COURT:**  I think that's probably right.

02:04PM   15          **MR. TRIPI:**  But I defer to you if you want to talk to

02:04PM   16    her about it.

02:04PM   17          **THE COURT:**  Thoughts?

02:04PM   18          **MR. MacKAY:**  We'll defer to the Court if there's any

02:04PM   19    inquiry needed.  I mean, it sounds like she's expressed a

02:04PM   20    desire to stay.

02:04PM   21          **THE COURT:**  It says, wants to say.

02:04PM   22          **MR. MacKAY:**  So I assume that that means she can

02:04PM   23    overcome the financial hurdle.

02:04PM   24          **THE COURT:**  Yeah.  Okay.

02:04PM   25          And then number 3 is the more troubling -- or, not

USA v Bongiovanni - Proceedings - 2/22/24

104

02:04PM   1   troubling, but maybe troubling.  Number 12 says -- I'll read

02:04PM   2   it exactly as I have it here.

02:04PM   3           Juror was vague, so after request for more specific

02:04PM   4   information, he said his daughter is a health care aid for a

02:04PM   5   Buffalo attorney whose granddaughter might be connected to

02:04PM   6   someone on the prosecution side.

02:04PM   7           That's all the information he could provide.

02:04PM   8           And he also wants to know if he can make notes during

02:04PM   9   the breaks or at home in the evening.

02:04PM  10           As to the latter, I don't see any reason why he can't

02:05PM  11   make notes for himself.  I mean --

02:05PM  12           **MR. TRIPI:**  I wouldn't -- maybe not at home.

02:05PM  13           **MR. SINGER:**  Yeah.

02:05PM  14           **MR. TRIPI:**  I think that if you're okay with them

02:05PM  15   taking notes, they need to stay here.

02:05PM  16           **THE COURT:**  Yeah, well, I'm not okay with them taking

02:05PM  17   notes during the case, but I don't see why he can't do on his

02:05PM  18   own time what he wants to do on his own time.  If he wants to

02:05PM  19   go home and write down what he remembers from the day --

02:05PM  20           **MR. TRIPI:**  I've never had that come up, Judge.  My

02:05PM  21   gut reaction was that I've always had jurors who took notes

02:05PM  22   keep them here, so that was --

02:05PM  23           **THE COURT:**  No question, if they're taking notes

02:05PM  24   during the trial in the courtroom, yeah, absolutely, no

02:05PM  25   question.

02:05PM    1           MR. MacKAY:  Can we take a moment?

02:05PM    2           THE COURT:  Absolutely.  Take your time and talk

02:05PM    3   about it, yeah.  I've never had this come up either.

02:06PM    4           MR. TRIPI:  Mr. Cooper would like to address it,

02:06PM    5   Judge.

02:06PM    6           THE COURT:  Sure.

02:06PM    7           MR. COOPER:  Hi, Judge.

02:06PM    8           THE COURT:  Hi.

02:06PM    9           MR. COOPER:  I'm thinking through it for the first

02:06PM   10   time, as well.  But I guess my concern is if the juror's

02:06PM   11   taking notes and leaving them at home specifically, or outside

02:06PM   12   of the courthouse, other people can access them.  Which is --

02:06PM   13   our process is designed to prevent that, not just to have the

02:06PM   14   juror not impacted, but to have the juror's thoughts not

02:06PM   15   publicized.  And so while this juror is under an obligation to

02:06PM   16   this Court not do such things, family members, friends,

02:06PM   17   whoever comes and goes from the house, a cleaning lady or

02:06PM   18   cleaning man, that wouldn't necessarily be the case.

02:06PM   19           And so I'm -- the government would be opposed to

02:06PM   20   allowing a juror to keep notes outside of this building.

02:06PM   21           THE COURT:  That's a good observation.

02:06PM   22           Go ahead.

02:06PM   23           MR. MacKAY:  And, Judge, the other concern is

02:06PM   24   obviously recollection.  I know the Court's going to tell the

02:06PM   25   jurors what happens in here controls, the transcript can be

02:06PM    1    shown to you, and there's also beyond any sort of privacy

02:07PM    2    concern, there's the concern that this juror is going to go

02:07PM    3    home and sort of refresh himself in something that's one or

02:07PM    4    two hours removed, and come back and lecture the jury on what

02:07PM    5    they think happened.

02:07PM    6         **THE COURT:**  Exactly.  I was thinking the same thing

02:07PM    7    as Mr. Cooper was speaking, the flip side of that is the

02:07PM    8    problem if he brings the notes in, and now I've got notes, and

02:07PM    9    that's different.

02:07PM   10         So yeah, I think you're right.  I think we'll tell

02:07PM   11    him the answer to that is no.  Both sides are seeming to come

02:07PM   12    to that conclusion; it sounds like, correct?

02:07PM   13         **MR. MacKAY:**  Correct.

02:07PM   14         **MR. COOPER:**  Yes, Judge.

02:07PM   15         **THE COURT:**  Okay.

02:07PM   16         **MR. COOPER:**  And can you reread for us just the

02:07PM   17    portion of the note that related to his daughter is a

02:07PM   18    healthcare --

02:07PM   19         **THE COURT:**  He said his daughter is a healthcare aide

02:07PM   20    for a Buffalo attorney whose granddaughter might be connected

02:07PM   21    to someone on the prosecution side.

02:07PM   22         **MR. COOPER:**  Can we bring the juror in --

02:07PM   23         **THE COURT:**  Absolutely.

02:07PM   24         **MR. COOPER:**  -- and address that?

02:07PM   25         **THE COURT:**  That's exactly what I think.  Yeah,

02:07PM   1   that's exactly what I think.

02:07PM   2          And then before we bring him in, one last thing that

02:07PM   3   I want to tell you folks that I should have told you yesterday

02:07PM   4   that I forgot, but one of my law clerks, who is listening but

02:07PM   5   not working on this case, as she heard the testimony

02:08PM   6   yesterday, her name is Chelsea.  And when she heard the

02:08PM   7   testimony about the defendant's daughter, she believes that

02:08PM   8   she went to school with the defendant's daughter, and may have

02:08PM   9   been on the same basketball team.

02:08PM   10          Did your daughter play basketball?

02:08PM   11          **THE DEFENDANT:**  She did.

02:08PM   12          **THE COURT:**  They may have been on the same basketball

02:08PM   13   team.  She didn't know the Chelsea who she played basketball

02:08PM   14   with's last name, or didn't remember her last name.  But when

02:08PM   15   she heard the testimony yesterday, she said I think that's the

02:08PM   16   girl that I used to play basketball with.

02:08PM   17          So she confided -- not confided, she told me that,

02:08PM   18   and I said I would share it with the lawyers.  She's not

02:08PM   19   working on the case.  It's got nothing to do with anything,

02:08PM   20   but I just don't want any surprises to come up later on down

02:08PM   21   the road.

02:08PM   22          Any problem from the defense with that?

02:08PM   23          **MR. MacKAY:**  No, Your Honor.

02:08PM   24          **THE COURT:**  From the government?

02:08PM   25          **MR. TRIPI:**  No, Your Honor.

02:08PM   1         **THE COURT:**  And again, I wanted -- especially in a

02:08PM   2   case of this high a profile, I want to make sure that we are

02:08PM   3   being completely transparent about everything that seems

02:08PM   4   innocuous.  If my law clerk didn't tell me that, I wouldn't

02:08PM   5   have found fault with that, but she did, and so I share that

02:09PM   6   with you.

02:09PM   7         Let's bring in Juror Number 12, please.  Do we have a

02:09PM   8   microphone?

02:09PM   9         (Juror 12 entered the courtroom at 2:09 p.m.)

02:09PM   10        **JUROR 12:**  Do you want me to go there?

02:09PM   11        **THE COURT:**  No, stay right there.  Stay right there.

02:10PM   12        So, juror number 12, thank you for coming in.  I

02:10PM   13   received a note that you told our court security officer that

02:10PM   14   your daughter is a healthcare aide for a Buffalo attorney

02:10PM   15   whose granddaughter might be connected to someone on the

02:10PM   16   prosecution side.

02:10PM   17        **JUROR 12:**  Yeah, I don't know any names, I'm very

02:10PM   18   distant from it all.  I just know the attorney is an attorney

02:10PM   19   that used to work for the Buffalo Bills.

02:10PM   20        **THE COURT:**  And you don't know who the --

02:10PM   21        **JUROR 12:**  I don't know anything.

02:10PM   22        **THE COURT:**  You don't know the attorney's name?

02:10PM   23        **JUROR 12:**  No.

02:10PM   24        **THE COURT:**  Okay.  So I take it your daughter told

02:10PM   25   you that the attorney's granddaughter might be associated with

| | | |
|---|---|---|
| 02:10PM | 1 | someone on the prosecution side? |
| 02:10PM | 2 | **JUROR 12:**  Yeah. |
| 02:10PM | 3 | **THE COURT:**  Were you talking to your daughter about |
| 02:10PM | 4 | the case? |
| 02:10PM | 5 | **JUROR 12:**  No. |
| 02:10PM | 6 | **THE COURT:**  Okay.  She just volunteered that for you? |
| 02:10PM | 7 | **JUROR 12:**  Yeah. |
| 02:10PM | 8 | **THE COURT:**  Okay.  Anything about that that makes you |
| 02:10PM | 9 | feel as though you'd favor one side or the other? |
| 02:10PM | 10 | **JUROR 12:**  Not a bit. |
| 02:10PM | 11 | **THE COURT:**  Do you still think you can give the |
| 02:10PM | 12 | defendant a fair shake here? |
| 02:10PM | 13 | **JUROR 12:**  Yes. |
| 02:10PM | 14 | **THE COURT:**  And the government? |
| 02:11PM | 15 | **JUROR 12:**  Yes. |
| 02:11PM | 16 | **THE COURT:**  Anything that anybody wants to follow up? |
| 02:11PM | 17 | **MR. MacKAY:**  No, Judge. |
| 02:11PM | 18 | **MR. COOPER:**  We have nothing.  Thank you, Judge. |
| 02:11PM | 19 | **THE COURT:**  Great.  Thank you for bringing it to our |
| 02:11PM | 20 | attention. |
| 02:11PM | 21 | And then you've also asked if you can take notes -- |
| 02:11PM | 22 | **JUROR 12:**  At home. |
| 02:11PM | 23 | **THE COURT:**  -- during breaks or home, and the answer |
| 02:11PM | 24 | is no.  We don't want any -- and the reason is we don't want |
| 02:11PM | 25 | there to be the opportunity for somebody to get ahold of those |

USA v Bongiovanni - Proceedings - 2/22/24

110

02:11PM    1    notes, and we don't want you to bring them into the court

02:11PM    2    because they might unduly influence the other jurors.

02:11PM    3           We want all of you to be in the same position with

02:11PM    4    respect to remembering the evidence and the testimony that was

02:11PM    5    given during the course of the trial.

02:11PM    6           So the answer is no, we don't want you to make notes

02:11PM    7    at all.

02:11PM    8           **JUROR 12:**  Can I just bring up the reason why?

02:11PM    9           **THE COURT:**  Say that again?

02:11PM   10           **JUROR 12:**  Can I bring up my reason why?

02:11PM   11           **THE COURT:**  Sure.

02:11PM   12           **JUROR 12:**  It's like a chess game.  There are at

02:11PM   13    least 32 pieces on the game board, and each of them has their

02:11PM   14    own name, and their own background, and I'm just trying to

02:11PM   15    keep them straight.

02:11PM   16           **THE COURT:**  Yeah.  So we're going to have a photo

02:11PM   17    board for you to try to help you remember.

02:11PM   18           And you folks can ask for testimony to be read back

02:11PM   19    at the end, if you need it read back.

02:12PM   20           So, again, and I know it can be difficult trying to

02:12PM   21    keep everything straight, but that's what we want you to do.

02:12PM   22           **JUROR 12:**  Okay.

02:12PM   23           **THE COURT:**  Okay?  Thank you.

02:12PM   24           **JUROR 12:**  Yep.

02:12PM   25           (Juror 12 excused at 2:12 p.m.)

02:12PM    1              THE COURT:  Okay.  Any exceptions to the way I

02:12PM    2    handled that?

02:12PM    3              MR. TRIPI:  No, Your Honor.

02:12PM    4              MR. MacKAY:  No, Your Honor.

02:12PM    5              THE COURT:  Okay.  Great.  Are we ready to bring them

02:12PM    6    back?

02:12PM    7              MR. TRIPI:  Yes, Judge.  We'll get the witness up.

02:12PM    8              THE COURT:  Yeah, let's get the witness in.  Any --

02:12PM    9    are you treated start your cross?

02:12PM   10              MR. SINGER:  I'm ready, Judge.

02:12PM   11              THE COURT:  Okay.  Let's wait for the witness to come

02:12PM   12    in, then we'll bring the jurors back in, Pat, please.

02:12PM   13              Okay.  You can bring them in, please, Pat.

02:13PM   14              (Jury seated at 2:13 p.m.)

02:14PM   15              THE COURT:  Okay.  Welcome back, everyone.  The

02:14PM   16    record will reflect all our jurors are present.

02:14PM   17              Before we start the cross-examination, I understand

02:14PM   18    that one juror has indicated that there are appointments that

02:14PM   19    he or she has, and needs to leave by 4:30 p.m. on a couple of

02:14PM   20    dates.  We have marked those dates down, and you folks will be

02:14PM   21    able to leave at 4:30 on those dates.

02:14PM   22              And another juror has indicated that her compensation

02:14PM   23    from her -- I think her -- compensation from her employer is

02:14PM   24    less than she expected, and wants to know -- the note to me

02:14PM   25    says wants to stay, but wondering if this is proper.

02:14PM 1        The short answer is yes, unless there are, there

02:14PM 2  might be certain government employers or other employers who

02:14PM 3  are required to provide pay for jury duty.  But the short

02:15PM 4  answer is that most employers and private employers can do

02:15PM 5  that.  So, that's the long and the short of it.  That's why we

02:15PM 6  asked whether there was any big financial hardship for you

02:15PM 7  folks when we picked you.

02:15PM 8        So those are the two answers.  Okay?

02:15PM 9        I remind the witness that he's still under oath.

02:15PM 10       If I didn't say so already, I should have said that

02:15PM 11 all our jurors are present.

02:15PM 12       And, Mr. Singer, you can begin.

02:15PM 13       **MR. SINGER:**  Thank you very much, Judge.

02:15PM 14

02:15PM 15              **CROSS-EXAMINATION BY MR. SINGER:**

02:15PM 16 Q.  Good afternoon, Mr. Selva.

02:15PM 17 A.  Good afternoon.

02:15PM 18 Q.  You didn't speak to anybody during the lunch hour,

02:15PM 19 correct?

02:15PM 20 A.  No, sir.

02:15PM 21 Q.  Thank you.

02:15PM 22     So I think you testified on direct that you've known

02:15PM 23 Mr. Bongiovanni for a long time, correct?

02:15PM 24 A.  Correct.

02:15PM 25 Q.  And you guys grew up together, correct?

02:15PM    1    A.  Yes, sir.

02:15PM    2    Q.  You first met each other at P.S. 81?

02:15PM    3    A.  Yes, sir.

02:15PM    4    Q.  And that was in what grade again?

02:16PM    5    A.  I believe sixth.

02:16PM    6    Q.  Sixth grade.  And you guys have maintained a friendship

02:16PM    7    since that time?

02:16PM    8    A.  Yes.

02:16PM    9    Q.  So, elementary school?  I think you sometimes went to the

02:16PM   10    same high school -- elementary school, you went to the same

02:16PM   11    elementary school, right?

02:16PM   12    A.  Yes.

02:16PM   13    Q.  Middle school.  Did you go to the same middle school or

02:16PM   14    not?

02:16PM   15    A.  No, P.S. 81 was grade K through 8.

02:16PM   16    Q.  All the way through 8th.  And then when it got to high

02:16PM   17    school, you were together sometimes, and not together other

02:16PM   18    times; fair to say?

02:16PM   19    A.  Well, we went to freshman, junior -- excuse me.

02:16PM   20    Freshman, sophomore, and junior year, and half of senior

02:16PM   21    year.

02:16PM   22    Q.  Not senior year?

02:16PM   23    A.  Half.

02:16PM   24    Q.  When you guys weren't in the same school in high school,

02:16PM   25    did you still keep up?

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

114

| | | |
|---|---|---|
| 02:16PM | 1 | A.  Yes, sir. |
| 02:16PM | 2 | Q.  And that's because you lived in the same neighborhood? |
| 02:16PM | 3 | A.  Yes. |
| 02:16PM | 4 | Q.  All right.  And then I guess after high school |
| 02:16PM | 5 | graduation, Mr. Bongiovanni's attending college at that point |
| 02:16PM | 6 | in time, right? |
| 02:16PM | 7 | A.  Yes, he had moved to Boston, and I was in the Air Force. |
| 02:17PM | 8 | Q.  And you were in the Air Force for a little bit of time, |
| 02:17PM | 9 | and you were discharged; is that right? |
| 02:17PM | 10 | A.  Yes, six months.  Correct.  Separated, yes. |
| 02:17PM | 11 | Q.  You mentioned that you got a general discharge; is that |
| 02:17PM | 12 | right? |
| 02:17PM | 13 | A.  It was a separation.  A separation under general -- I'd |
| 02:17PM | 14 | have to look the DD 214, but it was a separation. |
| 02:17PM | 15 | Q.  So I know like sometimes if you're enlisted and things |
| 02:17PM | 16 | aren't working out in the beginning, you can get what's |
| 02:17PM | 17 | called an entry level separation, which is done pretty |
| 02:17PM | 18 | quickly within the first couple of months of your service |
| 02:17PM | 19 | after you get out of boot camp or while you're in boot camp. |
| 02:17PM | 20 | Did that happen in your situation? |
| 02:17PM | 21 | A.  No, it was after -- it was during tech school. |
| 02:17PM | 22 | Q.  Okay.  So when you're doing your apprenticeship school? |
| 02:17PM | 23 | A.  Yes. |
| 02:17PM | 24 | Q.  Learning what you're going to do -- |
| 02:17PM | 25 | A.  Yes. |

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

115

02:17PM   1   Q.   -- in your occupation in the military?

02:17PM   2   A.   Yes.

02:17PM   3   Q.   And -- and the reason why you were separated again is

02:17PM   4   things weren't working out?

02:17PM   5   A.   Yes.  It was the wrong position for me.

02:17PM   6   Q.   And I know you talked about it, you didn't go to court

02:17PM   7   martial or anything like that, correct?

02:17PM   8   A.   No.

02:17PM   9   Q.   So it was an administrative separation?

02:17PM   10  A.   It was an administrative separation, yes.

02:18PM   11  Q.   Okay.  And you characterize it as a general discharge?

02:18PM   12  A.   Just a separation.  It's not dishonorable, so I guess

02:18PM   13  that would be general.

02:18PM   14  Q.   Okay.  So, after that happens, you kind of get back in

02:18PM   15  town, and fair to say during the time you were in the Air

02:18PM   16  Force, where were you stationed, sir?

02:18PM   17  A.   Went from Lachland to Sheppard Air Force Base.

02:18PM   18  Q.   So that wasn't in the Buffalo area, correct?

02:18PM   19  A.   No, sir.  No.  When I was in back in Buffalo, I was out.

02:18PM   20  I was separated from the Air Force.

02:18PM   21  Q.   And while you're in the Air Force, you're in a training

02:18PM   22  environment, right?

02:18PM   23  A.   I'm sorry?

02:18PM   24  Q.   You're in a training environment when you're in the Air

02:18PM   25  Force?

02:18PM   1    A.  Yes.

02:18PM   2    Q.  So drill instructors and everybody else is controlling

02:18PM   3    when you can call home, right?

02:18PM   4    A.  Yes.

02:18PM   5    Q.  So you may have dropped off with your contact with

02:18PM   6    Mr. Bongiovanni during that point in your life?

02:18PM   7    A.  Yes, during that point, yes.

02:18PM   8    Q.  Okay.  And then eventually you make it back into town,

02:18PM   9    correct?

02:18PM  10    A.  Correct.

02:18PM  11    Q.  You guys talk on the phone at that point in time?

02:18PM  12    A.  Yes.  We're reconnecting.  He had came back from, I

02:19PM  13    believe, Boston at that time.

02:19PM  14    Q.  Were you still living back at your parents' house --

02:19PM  15    A.  Yes.

02:19PM  16    Q.  -- in North Buffalo?

02:19PM  17    A.  Yes.

02:19PM  18    Q.  And he was still living back with his parents on

02:19PM  19    Lovering?

02:19PM  20    A.  Yes.

02:19PM  21    Q.  All right.  And then eventually he gets into a

02:19PM  22    relationship, correct?

02:19PM  23    A.  Yes.

02:19PM  24    Q.  And he gets married, correct?

02:19PM  25    A.  Well, not right away.

02:19PM  1    Q.  Not right away?

02:19PM  2    A.  Not from that sequence of events, but eventually at that

02:19PM  3    point he had a girlfriend.

02:19PM  4    Q.  And so eventually his girlfriend relationship blossoms,

02:19PM  5    and they get married, right?

02:19PM  6    A.  Not with the girl he was with when we were younger, no.

02:19PM  7    Q.  So a couple different girlfriends, right?

02:19PM  8    A.  Yes.

02:19PM  9    Q.  All right.  And so towards the mid 1990s, he starts to

02:19PM  10   settle down and get married, right?

02:19PM  11   A.  Yes.

02:19PM  12   Q.  And same thing goes for you, correct?

02:19PM  13   A.  I got married in the -- '92.  Right around there.

02:19PM  14   Q.  Um-hum.

02:20PM  15   A.  Yes.

02:20PM  16   Q.  And, so, I know you're younger at that point in time, but

02:20PM  17   when you're married, probably tend to go out a little less

02:20PM  18   than you normally did, right?

02:20PM  19   A.  Yeah.

02:20PM  20   Q.  Okay.  And then at some point in time, Mr. Bongiovanni

02:20PM  21   decides to join the DEA, correct?

02:20PM  22   A.  Correct.

02:20PM  23   Q.  And to join the DEA, he has to go to his own type of

02:20PM  24   qualification school, training academy, right?

02:20PM  25   A.  Yes.

02:20PM    1    Q.  That's not located here in Buffalo, correct?

02:20PM    2    A.  No, sir.

02:20PM    3    Q.  And, so, fair to say probably didn't speak with him much

02:20PM    4    at that point in time in his life?

02:20PM    5    A.  No.  I was in Las Vegas living, and I believe that's when

02:20PM    6    he had applied to the DEA.

02:20PM    7    Q.  Um-hum.  And then after he completes his DEA training

02:20PM    8    pipeline, he gets sent down to Florida, right?

02:20PM    9    A.  Yes.

02:20PM   10    Q.  And he goes down there with his wife JoAnn at the time,

02:20PM   11    and they make their house down in Florida, correct?

02:20PM   12    A.  Yes.

02:20PM   13    Q.  And I think you testified yesterday that there weren't

02:21PM   14    any situations where you had visited him in Florida, correct?

02:21PM   15    A.  I'm sorry?

02:21PM   16    Q.  There weren't any situations where you went and visited

02:21PM   17    him in Florida?

02:21PM   18    A.  Correct, I did not.

02:21PM   19    Q.  Okay.  So your contact at that point in time was purely

02:21PM   20    by telephone?

02:21PM   21    A.  By telephone, yes.

02:21PM   22    Q.  And I think you testified yesterday that it was sporadic,

02:21PM   23    as a way to describe it?

02:21PM   24    A.  Yeah.  I mean, we both had lives at that point.

02:21PM   25    Q.  Um-hum.  And then after that, Mr. Bongiovanni, at some

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

02:21PM  1   point in 2001, moved back to Buffalo, correct?

02:21PM  2   A.  Correct.

02:21PM  3   Q.  And you're back in Buffalo at that point in time, right?

02:21PM  4   A.  Yes.

02:21PM  5   Q.  So, he, at that point in time, I think as you testified

02:21PM  6   and as we heard earlier, he had some marital difficulties,

02:21PM  7   correct?

02:21PM  8   A.  Correct.

02:21PM  9   Q.  And he and his wife separated, correct?

02:21PM  10  A.  Correct.

02:21PM  11  Q.  He started living back home again with his parents,

02:21PM  12  correct?

02:21PM  13  A.  Yes, correct.

02:21PM  14  Q.  And eventually got divorced about two years later,

02:21PM  15  correct?

02:22PM  16  A.  I believe so, yes.

02:22PM  17  Q.  So, when he get back into town, what's your marital

02:22PM  18  situation at that point?

02:22PM  19  A.  I was going through -- 2001 I was divorced.  So --

02:22PM  20  Q.  It was official at that point?

02:22PM  21  A.  It was official, yes.

02:22PM  22  Q.  So after the separation that Mr. Bongiovanni had from his

02:22PM  23  first wife, JoAnn, you guys start to get back together again,

02:22PM  24  correct?

02:22PM  25  A.  Correct.

02:22PM  1   Q.  And then after the divorce in 2003, for Mr. Bongiovanni,

02:22PM  2   you start hanging out at the bars again?

02:22PM  3   A.  Yeah, when it seemed fit, sure, yes.

02:22PM  4   Q.  And at that point in time, where are you living, sir?

02:22PM  5   A.  2003?

02:22PM  6   Q.  Correct.

02:22PM  7   A.  I was living in Rebecca Park.  128 Rebecca Park.

02:22PM  8   Q.  So you're over at Rebecca Park at that time?

02:22PM  9   A.  Yes.

02:22PM  10  Q.  And you guys would see each other out from time to time?

02:22PM  11  A.  Yes.

02:22PM  12  Q.  You wold talk on the phone from time to time?

02:22PM  13  A.  Yes.

02:22PM  14  Q.  It wasn't a situation like where you guys were talking

02:23PM  15  every single day, correct?

02:23PM  16  A.  No, just like normal friends did.  You reach out, that

02:23PM  17  type thing.

02:23PM  18  Q.  And, so, moving kind of forward into 2004, you remember

02:23PM  19  that Mr. Bongiovanni started dating another lady at that

02:23PM  20  point, correct?

02:23PM  21  A.  Yes.

02:23PM  22  Q.  And he eventually started moving that into a committed

02:23PM  23  relationship; is that right?

02:23PM  24  A.  Yes.

02:23PM  25  Q.  And I think you testified yesterday, they didn't live

02:23PM    1    together, right?

02:23PM    2    A.   No.

02:23PM    3    Q.   But they were still in a relationship together?

02:23PM    4    A.   Yes.

02:23PM    5    Q.   And so, during that period of time, you recall that he

02:23PM    6    dated this one woman from 2004 to roughly about 2008?

02:23PM    7    A.   Yes, around that time frame, that's correct.

02:23PM    8    Q.   Okay.  And since he was in a committed relationship at

02:23PM    9    that point in time, he's not going out on the town as a

02:23PM   10    single guy at that point in time with you, correct?

02:23PM   11    A.   Between -- no, we talked though.  We did still

02:23PM   12    communicate and go out, yes.

02:23PM   13    Q.   Yeah, I don't think there's any doubt that you guys

02:24PM   14    talked.

02:24PM   15    A.   That's right.  And we did connect, too.  We'd still talk

02:24PM   16    and meet out.

02:24PM   17    Q.   But it was kind of from time to time when you guys made

02:24PM   18    plans.

02:24PM   19    A.   We made time, yes.

02:24PM   20    Q.   And it wasn't something that was every day?

02:24PM   21    A.   No.

02:24PM   22    Q.   Because he had his own life, correct?

02:24PM   23    A.   Yes.

02:24PM   24    Q.   And you had yours, correct?

02:24PM   25    A.   Yes.

02:24PM   1   Q.  And so as far as, I guess, into 2008, so he eventually

02:24PM   2   breaks it off with that one lady, correct?

02:24PM   3   A.  With that relationship, right around that time frame.

02:24PM   4   2008, 2009.

02:24PM   5   Q.  Um-hum.  And then going into 2009, that's when he meets

02:24PM   6   his current wife, Lindsay, correct?

02:24PM   7   A.  Short after, yes, that time frame.  After that, yes.

02:24PM   8   Q.  Okay.  And I know they don't live together at first,

02:24PM   9   correct?

02:24PM  10   A.  No.

02:24PM  11   Q.  She's actually a tenant in the Lovering duplex that he

02:24PM  12   has?

02:24PM  13   A.  Yes.

02:24PM  14   Q.  But when they get into a committed relationship, she

02:24PM  15   eventually moves in in 2010, correct?

02:24PM  16   A.  That's correct.

02:24PM  17   Q.  And they live at that place on Lovering together for a

02:25PM  18   period of time, correct?

02:25PM  19   A.  Correct.

02:25PM  20   Q.  And then eventually, they purchase a house in Tonawanda;

02:25PM  21   is that right?

02:25PM  22   A.  Yes, before they were married.

02:25PM  23   Q.  Um-hum.  That's the 85 Alder Place house?

02:25PM  24   A.  Yes.

02:25PM  25   Q.  So, 85 Alder Place, your recollection is they move out

02:25PM   1   there sometime in 2012 time period?

02:25PM   2   A.   I believe so, yes.

02:25PM   3   Q.   Okay.

02:25PM   4   A.   Yes, they do.

02:25PM   5   Q.   They do.  And so they kind of make the transition out of

02:25PM   6   the old neighborhood and into the suburbs, right?

02:25PM   7   A.   Correct.

02:25PM   8   Q.   And Joe's committed to Lindsay at this point in time,

02:25PM   9   right?

02:25PM   10  A.   Yes.

02:25PM   11  Q.   And fair to say that, you know, now that he's not

02:25PM   12  downtown, and he's in this relationship in the suburbs,

02:25PM   13  you're seeing a little less of him at that point in time?

02:25PM   14  A.   Yes.  But we would still keep in touch and still get

02:25PM   15  together.

02:25PM   16  Q.   Yeah, and I don't think there's any dispute about that,

02:25PM   17  you guys have phone calls from time to time, right?

02:25PM   18  A.   Yeah.  Absolutely.

02:25PM   19  Q.   You guys, at that point, you know, this is 2012, 2013,

02:25PM   20  text messages are a thing, correct?

02:25PM   21  A.   Yes.

02:25PM   22  Q.   So you guys would text on the phone together?

02:26PM   23  A.   Yes.

02:26PM   24  Q.   And from time to time, guys night out, you'd go meet up

02:26PM   25  at a bar?

02:26PM   1   A.   Yes.

02:26PM   2   Q.   Have a couple drinks?

02:26PM   3   A.   Yes.

02:26PM   4   Q.   Catch up with each other?

02:26PM   5   A.   Yes.

02:26PM   6   Q.   Sometimes do it with other people?

02:26PM   7   A.   Yes.

02:26PM   8   Q.   Okay.  But it wasn't a situation where you talked to him

02:26PM   9   every single day, right?

02:26PM   10   A.   No.  A few times a week, three times a week.

02:26PM   11   Q.   So three times a week?

02:26PM   12   A.   Three, four times a week.  It really depended, but we

02:26PM   13   kept in touch.  We always kept in touch.

02:26PM   14   Q.   Yeah.  Your recollection is you talked to him three to

02:26PM   15   four times a week?

02:26PM   16   A.   On the phone, you know, we just -- as you call your

02:26PM   17   friend, three to four times a week.  Sometimes less,

02:26PM   18   sometimes more, it really depended.

02:26PM   19   Q.   How long were these conversations?

02:26PM   20   A.   What's going on?  How are you?  What's happening?  You

02:26PM   21   know, you catch up briefly, and you hang up.

02:26PM   22   Q.   So they're pretty brief conversations?

02:26PM   23   A.   Some were, some weren't.

02:26PM   24   Q.   Okay.  So, in 2013, and kind of moving forward after

02:27PM   25   that, once he moves out to Tonawanda, you guys are together

02:27PM  1  for certain special events; is that right?

02:27PM  2  A.   Yes.

02:27PM  3  Q.   So, like, for instance, he mentioned yesterday that you

02:27PM  4  were at the Bongiovanni's wedding in 2015 in Cabo San Lucas?

02:27PM  5  A.   Yes.

02:27PM  6  Q.   That's a special event, correct?

02:27PM  7  A.   Yes.

02:27PM  8  Q.   You know, and I guess you guys had mutual friends like

02:27PM  9  you testified on direct, correct?

02:27PM  10  A.   Yes.

02:27PM  11  Q.   And sometimes, unfortunately, those people may get ill or

02:27PM  12  they may pass away, correct?

02:27PM  13  A.   Correct.

02:27PM  14  Q.   Or their parents may get ill and pass away?

02:27PM  15  A.   Correct.

02:27PM  16  Q.   And so there were certain situations where you would find

02:27PM  17  yourself together with Mr. Bongiovanni in those situations,

02:27PM  18  right?

02:27PM  19  A.   Correct.  You're referencing like a wake or a funeral.

02:27PM  20  Q.   Yeah.  So for a wake, you'd see Mr. Bongiovanni --

02:27PM  21  A.   Yes.

02:27PM  22  Q.   -- if there was a wake for a friend or family member that

02:27PM  23  was close to one of you, correct?

02:27PM  24  A.   Yes.

02:27PM  25  Q.   And when you got sick in -- was it 2017 or 2016?

02:28PM   1   A.   When I got sick?

02:28PM   2   Q.   Correct.

02:28PM   3   A.   It was 2017.

02:28PM   4   Q.   2017.  You had a benefit back in June of 2017 for

02:28PM   5   yourself; is that right?

02:28PM   6   A.   Yeah.  June or July -- I believe it was -- yes, it was

02:28PM   7   June.  June.

02:28PM   8   Q.   And I think you mentioned that was at Knights of

02:28PM   9   Columbus?

02:28PM   10  A.   Correct.

02:28PM   11  Q.   And so that was something that people you know put on for

02:28PM   12  you just to help you without some medical expenses, right?

02:28PM   13  A.   Correct.  I just had open-heart surgery, and I had a lot

02:28PM   14  of expenses, correct.

02:28PM   15  Q.   So that was another event that Mr. Bongiovanni attended,

02:28PM   16  correct?

02:28PM   17  A.   Correct.

02:28PM   18  Q.   And you were there, correct?

02:28PM   19  A.   Correct.

02:28PM   20  Q.   You know, you graduated the Sheriff's Academy in 2019,

02:28PM   21  correct?

02:28PM   22  A.   Correct.

02:28PM   23  Q.   And that was another event we saw a picture of today

02:28PM   24  where you and Mr. Bongiovanni and I think it was Vic Sorrento

02:28PM   25  at that point in time --

02:28PM    1    A.  Yes.

02:28PM    2    Q.  -- you were both together, correct?

02:28PM    3    A.  Correct.

02:28PM    4    Q.  And you've known Vic for a long time like

02:28PM    5    Mr. Bongiovanni?

02:28PM    6    A.  Yes.

02:28PM    7    Q.  So that was one of those situations where you were

02:28PM    8    together, correct?

02:28PM    9    A.  Correct.

02:29PM   10    Q.  Now, in 2017 when you had your heart issue, you had

02:29PM   11    open-heart surgery, you had the benefit in June.  But safe to

02:29PM   12    say you kind of slowed down a little physically at that point

02:29PM   13    in time, right?

02:29PM   14    A.  Yeah, but I -- I did for a -- about, there was a rehab

02:29PM   15    period of like six months that --

02:29PM   16    Q.  Yeah.

02:29PM   17    A.  -- slowed me down.

02:29PM   18    Q.  I'm sure -- I'm sure there was --

02:29PM   19    A.  It was the most traumatic thing I ever went through.

02:29PM   20    Q.  And so in that six months, fair to say, like, you weren't

02:29PM   21    out and about on the town all the time, right?

02:29PM   22    A.  No, I was rehabbing and still -- still rehabbing,

02:29PM   23    correct.  I mean, I was on medication, and trying to get my

02:29PM   24    strength back, and just get my life back to normal.

02:29PM   25    Q.  And you and Mr. Bongiovanni, you'd talk from time to time

02:29PM   1   during this period?

02:29PM   2   A.  Correct.

02:29PM   3   Q.  Text from time to time during this period?

02:29PM   4   A.  Yes, correct.

02:29PM   5   Q.  But it wasn't like a situation where you guys are talking

02:29PM   6   every single day, right?

02:29PM   7   A.  No, it was actually -- actually, it was, because I was

02:30PM   8   rehabbing, and he was checking on me, seeing what's going on,

02:30PM   9   how are you.  So it was quite a bit.

02:30PM  10   Q.  Okay.  So, during the entirety of that six-month period

02:30PM  11   you guys were checking in with each other every single day?

02:30PM  12   A.  I got a lot of phone calls, yes, a lot of friends and

02:30PM  13   family talking.

02:30PM  14   Q.  What I'm talking about is Mr. Bongiovanni's contact?

02:30PM  15   A.  And, correct.  The answer is correct.

02:30PM  16   Q.  Correct.  So it's something that was pretty regular

02:30PM  17   during that period of time?

02:30PM  18   A.  Yes.

02:30PM  19   Q.  So you guys would speak on the phone, right?

02:30PM  20   A.  Correct.

02:30PM  21   Q.  But you wouldn't necessarily see each other out at

02:30PM  22   restaurants or bars or something along those lines?

02:30PM  23   A.  Not within that six-month period, I mean, you know, no.

02:30PM  24   Q.  Um-hum.  So, we went through -- or, Mr. Tripi went

02:30PM  25   through a couple of the text messages, remember those earlier

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

02:30PM   1   this morning?

02:30PM   2   A.   Yes.

02:30PM   3   Q.   Those are Exhibits 208C, and 208L, and others, correct?

02:30PM   4   A.   Yes.

02:30PM   5   Q.   And so those text messages, when I took a look through

02:30PM   6   them, I noticed that, you know, sometimes you would talk for

02:31PM   7   a day or so, or you'd text for a day or so; do you remember

02:31PM   8   seeing that?

02:31PM   9   A.   Yeah.

02:31PM  10   Q.   And there would be replies back and forth, right?

02:31PM  11   A.   Correct.

02:31PM  12   Q.   A lot of it seemed to be text message conversations or

02:31PM  13   text notes; do you remember that?

02:31PM  14   A.   At that time, yes.

02:31PM  15   Q.   Yeah, so you guys would text back and forth kind of?

02:31PM  16   A.   Yes.

02:31PM  17   Q.   But the phone calls, it looked like, there were a few

02:31PM  18   phone calls, but it wasn't like you guys were talking on the

02:31PM  19   phone on a regular basis, right?

02:31PM  20   A.   No.  We were communicating though.

02:31PM  21   Q.   No, I don't doubt that.  We all saw the text messages.

02:31PM  22   But, you know, sometimes there would be ten day or two-week

02:31PM  23   gap between the time that you text or called each other, and

02:31PM  24   then, you know, the next text and call; do you remember

02:31PM  25   seeing that?

02:31PM   1   A.   Yes.

02:31PM   2   Q.   And, so, is that a fair way to characterize the way that

02:31PM   3   you guys communicated?

02:31PM   4   A.   Through phone, cell phone, texting, sometimes just

02:31PM   5   stopping by your house, seeing if you're home, driving by, if

02:31PM   6   you see the car, get out and knock on the door.

02:32PM   7   Q.   And sometimes there would be gaps in time when you

02:32PM   8   wouldn't speak with each other?

02:32PM   9   A.   There would be, and sometimes there wouldn't be.

02:32PM   10  Q.   And sometimes in life, too, when people have things going

02:32PM   11  on, he was taking care of his parents at one point in time,

02:32PM   12  right?

02:32PM   13  A.   Correct.

02:32PM   14  Q.   They were getting older, and he had to attend to them,

02:32PM   15  right?

02:32PM   16  A.   Yes.

02:32PM   17  Q.   That's something that took away some of his time to do

02:32PM   18  things that he may have wanted to do, right?

02:32PM   19  A.   Yes.

02:32PM   20  Q.   And to socialize, right?

02:32PM   21  A.   Correct.

02:32PM   22  Q.   So you may not have seen him as much in that time period,

02:32PM   23  correct.

02:32PM   24  A.   I still saw him though.

02:32PM   25  Q.   Oh, I don't doubt you saw him.  But I guess as frequently

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

02:32PM  1    as you once did when his parents weren't sick?

02:32PM  2    A.  Correct.

02:32PM  3    Q.  Kind of similar situation when you were, you didn't see

02:32PM  4    him as frequently when you were sick, than when you were

02:32PM  5    okay, right?

02:32PM  6    A.  Correct.

02:32PM  7    Q.  So, one of the things that the government showed you was

02:32PM  8    Exhibit 209; do you remember that?  That was the bottle of

02:32PM  9    Crown Royal.

02:32PM  10   A.  Yes.

02:33PM  11        **MR. SINGER:**  Ms. Champoux, will you bring up --

02:33PM  12   actually do we have the physical exhibit?

02:33PM  13        **MR. TRIPI:**  It's here somewhere.

02:33PM  14        **BY MR. SINGER:**

02:33PM  15   Q.  So, again, I'm going show you what's been entered into

02:33PM  16   evidence as Exhibit 209.  Do you remember when Mr. Tripi

02:33PM  17   showed that to you, Mr. Selva?

02:33PM  18   A.  I do.

02:33PM  19   Q.  And so, what is the note that's on the front of that

02:33PM  20   bottle?

02:33PM  21   A.  It says happy birthday brother.  55, no jive.  Love you,

02:33PM  22   Bong.

02:33PM  23   Q.  So your birthday, sir, it's October 25th?

02:33PM  24   A.  October 23rd.

02:33PM  25   Q.  23rd, I'm sorry.  And, so that was a gift that

02:33PM    1   Mr. Bongiovanni left for you at your house?

02:33PM    2   A.  It was on my doorstep, yes.

02:33PM    3   Q.  The writing that's on the bottle -- or, sorry, on the bag

02:34PM    4   that you just spoke about, do you see that?

02:34PM    5   A.  I do.

02:34PM    6   Q.  That seems like his handwriting, correct?

02:34PM    7   A.  Correct.

02:34PM    8   Q.  And you're familiar with his handwriting, right?

02:34PM    9   A.  Yes.

02:34PM   10   Q.  You've known him for a long time?

02:34PM   11   A.  Yes.

02:34PM   12   Q.  So, if he was giving that to you for an event other than

02:34PM   13   your birthday, it would kind of seem a little silly, correct?

02:34PM   14   A.  Correct.

02:34PM   15   Q.  So it would be a fair characterization that this was a

02:34PM   16   birthday gift to you?

02:34PM   17   A.  Correct.  It was just, it shocked me that it wasn't given

02:34PM   18   in person, it was just on my doorstep.  So, it was different.

02:34PM   19   Q.  Okay.  So you're out that day?

02:34PM   20   A.  I was.

02:34PM   21   Q.  Okay.

02:34PM   22   A.  I came home, and it was on my doorstep.

02:34PM   23   Q.  What were you doing that day?

02:34PM   24   A.  I don't recall.

02:34PM   25   Q.  Okay.  But you weren't at home?

| | | |
|---|---|---|
| 02:34PM | 1 | A.  No. |
| 02:34PM | 2 | Q.  But Mr. Bongiovanni left that on your doorstep? |
| 02:34PM | 3 | A.  Yes. |
| 02:34PM | 4 | Q.  And it was right around your birthday, right? |
| 02:34PM | 5 | A.  It was after my birthday, yes. |
| 02:34PM | 6 | Q.  And he'd given you bottles of Crown Royal like that in |
| 02:34PM | 7 | the past for your birthday, right? |
| 02:34PM | 8 | A.  Correct. |
| 02:34PM | 9 | Q.  So this is something that was not outside the norm for |
| 02:35PM | 10 | him to leave a bottle of alcohol on your birthday for you? |
| 02:35PM | 11 | A.  No.  And I would give him a bottle.  We would just extend |
| 02:35PM | 12 | a gesture, correct.  On his birthday. |
| 02:35PM | 13 | Q.  Because you'd mentioned on your direct testimony that you |
| 02:35PM | 14 | felt like this was something that was very abrupt; do you |
| 02:35PM | 15 | remember saying that? |
| 02:35PM | 16 | A.  Yes. |
| 02:35PM | 17 | Q.  But you just testified about how this was something that |
| 02:35PM | 18 | you guys would do for your birthdays, right? |
| 02:35PM | 19 | A.  Yeah, but it was also right after the time frame that my |
| 02:35PM | 20 | house was raided, too.  So -- |
| 02:35PM | 21 | Q.  Okay. |
| 02:35PM | 22 | A.  -- it was just abrupt. |
| 02:35PM | 23 | Q.  So it's a couple months after your house was raided, |
| 02:35PM | 24 | right? |
| 02:35PM | 25 | A.  Yes. |

02:35PM    1   Q.   Yeah, because your house was raided in the middle part to

02:35PM    2   end part of August, right?

02:35PM    3   A.   August 23rd, 2019.

02:35PM    4   Q.   Okay.  So this was two months after --

02:35PM    5   A.   Yes.

02:35PM    6   Q.   -- your house was raided?

02:35PM    7   A.   Yes.

02:35PM    8   Q.   So, you would agree with me, that's not very abrupt?

02:35PM    9   A.   Well --

02:35PM   10   Q.   Like, it didn't happen, for instance, a couple days after

02:35PM   11   your house got raided, right?

02:35PM   12   A.   No.  Like I mentioned, a few months after.

02:35PM   13   Q.   Okay.  So two months after it happened, right?

02:35PM   14   A.   Correct.

02:36PM   15   Q.   It happened in relation to your birthday, right?

02:36PM   16   A.   This was for, yes.

02:36PM   17   Q.   And that's something that you guys would do regularly,

02:36PM   18   right?

02:36PM   19   A.   Yes.

02:36PM   20   Q.   I'm going to take away Exhibit 209.

02:36PM   21        So I don't think there's any dispute that you and Joe

02:36PM   22   spoke on the phone, you'd see each other out several times,

02:36PM   23   but it wasn't the same as when you were single guys in your

02:36PM   24   20s, right?

02:36PM   25   A.   Not as frequent, no, but we still saw each other and

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

135

02:36PM   1   spoke on the phone and text and --

02:36PM   2   Q.  And I think one of the reasons why is because we

02:36PM   3   mentioned that he was married, correct?

02:36PM   4   A.  Correct.

02:36PM   5   Q.  And he had a child at that point in time, right?

02:36PM   6   A.  Correct.

02:36PM   7   Q.  You have kids, as well?

02:36PM   8   A.  I have two children, and a granddaughter.

02:37PM   9   Q.  He had a job, correct?

02:37PM  10   A.  Correct.

02:37PM  11   Q.  And, you know, we talked about some of your employment,

02:37PM  12   you talked about being a cell phone salesman; is that right?

02:37PM  13   A.  Yes, I was in the wireless business, cell phone business

02:37PM  14   for a long time.

02:37PM  15   Q.  You were in that for a long time, and you were also in

02:37PM  16   the collections business, right?

02:37PM  17   A.  Yes.

02:37PM  18   Q.  I don't think you mentioned that yesterday.  There was

02:37PM  19   some type of settlement that you received at some point in

02:37PM  20   time; is that right?

02:37PM  21   A.  Yes, for an injury that I had at work.

02:37PM  22   Q.  And you used those settlement funds to start up a

02:37PM  23   collections agency; is that right?

02:37PM  24   A.  Not all of it, part of it, to try to start a business.

02:37PM  25   Q.  So part of it is seed money?

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

02:37PM 1  A.  Sorry?

02:37PM 2  Q.  I say, part of it is seed money to start up this business

02:37PM 3  in collections?

02:37PM 4  A.  Part of it was, yes.

02:37PM 5  Q.  I think you had a partner, Dave Hersey?

02:37PM 6  A.  Yes.

02:37PM 7  Q.  And he was also involved in some other things with you,

02:37PM 8  right?

02:37PM 9  A.  Yes.

02:37PM 10 Q.  Some of the illegal activities we talked about?

02:37PM 11 A.  Yes.

02:37PM 12 Q.  And so this collections business, was it successful?

02:37PM 13 A.  It was not successful.

02:37PM 14 Q.  Okay.  It failed?

02:37PM 15 A.  It failed.

02:38PM 16 Q.  Okay.  Did you try to resurrect it a number of times?

02:38PM 17 A.  Tried for a while.  Then enough was -- we stopped after

02:38PM 18 five, six months, because I kept -- it kept costing money

02:38PM 19 instead of making money, so it didn't make sense.

02:38PM 20 Q.  And this is something that puts you in a little bit of

02:38PM 21 financial distress, right?

02:38PM 22 A.  No.

02:38PM 23 Q.  No?

02:38PM 24 A.  No.  I mean, I was -- I was doing okay.  Just wanted to

02:38PM 25 cut my losses and just move forward.

02:38PM   1    Q.   Okay.  So you got back into the bartending business?

02:38PM   2    A.   Yes, I was bartending and --

02:38PM   3    Q.   And also the marijuana business?

02:38PM   4    A.   Right.  Correct.

02:38PM   5    Q.   Okay.  And that's what you used to support yourself?

02:38PM   6    A.   Correct.  And I was also in sales.  I've had different

02:38PM   7    sales jobs.

02:38PM   8    Q.   Okay.  Fair statement that you moved around jobs a little

02:38PM   9    bit?

02:38PM  10    A.   Yes.

02:38PM  11    Q.   Okay.  And that was actually one of the reasons why

02:38PM  12    Mr. Bongiovanni suggested that you pursue an opportunity at

02:39PM  13    the sheriff's department?

02:39PM  14    A.   Yes.  It was stable employment, yes.

02:39PM  15    Q.   Yeah, stable employment, stable paycheck, right?

02:39PM  16    A.   Yes.

02:39PM  17    Q.   It's got benefits?

02:39PM  18    A.   Yes.

02:39PM  19    Q.   It's got a pension at the end?

02:39PM  20    A.   Yes.

02:39PM  21    Q.   So, you talked a little bit about your cell phone, and

02:39PM  22    the government introduced an exhibit which identified 38

02:39PM  23    different people that it felt was important to the case; do

02:39PM  24    you remember that?

02:39PM  25    A.   I do.

02:39PM   1   Q.  But those were not all of the contacts in your phone,

02:39PM   2   correct?

02:39PM   3   A.  No, just the ones that were related to this case.

02:39PM   4   Q.  Correct.  So, you know, you have a lot of family and

02:39PM   5   friends; is that a fair statement?

02:39PM   6   A.  I do.

02:39PM   7   Q.  And you were involved in sales, right?

02:39PM   8   A.  Yes.

02:39PM   9   Q.  And as a salesman, you probably had a lot of contacts in

02:39PM   10  your phone related to that business, right?

02:39PM   11  A.  I did, yes.

02:39PM   12  Q.  As far as you're a bartender, correct?

02:39PM   13  A.  Correct.

02:39PM   14  Q.  And you had a lot of contacts in your phone related to

02:39PM   15  that, right?

02:39PM   16  A.  No, not as much.

02:40PM   17         **MR. TRIPI:**  There was a technical error, we

02:40PM   18  apologize.

02:40PM   19         **MR. SINGER:**  No, that's fine.

02:40PM   20         **BY MR. SINGER:**

02:40PM   21  Q.  Sorry, I lost my train of thought there.  So I was asking

02:40PM   22  you about your bartending businesses, right?

02:40PM   23  A.  Yes, there was always a second job on the side.

02:40PM   24  Q.  Yeah, I think you mentioned Nancy Standish was one of the

02:40PM   25  people that was on the list the government showed you,

02:40PM   1   correct?

02:40PM   2   A.   Yeah.   Nancy's an old friend.   I can't even remember why

02:40PM   3   I had her name in my contact, but yes.

02:40PM   4   Q.   I think a lot of people can relate to that.   So it

02:40PM   5   wouldn't surprise you to know that you had more than 600

02:40PM   6   contacts in your phone, right?

02:40PM   7   A.   Correct.   A lot of them were duplicate.

02:40PM   8   Q.   But it wasn't just those 38 that the government showed,

02:40PM   9   right?

02:40PM   10   A.   No.

02:40PM   11   Q.   So, I want to talk to you a little bit about the old

02:40PM   12   neighborhood.

02:40PM   13   A.   I'm sorry?   Can you repeat it?

02:40PM   14   Q.   I want to talk to you a little bit about the old

02:40PM   15   neighborhood.   So you grew up in North Buffalo?

02:40PM   16   A.   Correct.

02:40PM   17   Q.   Kind of a little bit off of Hertel?

02:41PM   18   A.   Correct.

02:41PM   19   Q.   And you claimed that the time that you were growing up

02:41PM   20   when you're a child, growing up in that neighborhood, you

02:41PM   21   knew a guy by the name of Joe Todaro Senior; is that right?

02:41PM   22   A.   Yes.

02:41PM   23   Q.   And you testified that you believed that he was a made

02:41PM   24   member of Italian Organized Crime, right?

02:41PM   25   A.   Allegedly, yes.

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

02:41PM 1   Q.  And, you know, you also included his son as one of those

02:41PM 2   people who is connected to Organized Crime; is that right?

02:41PM 3   A.  No, I didn't.  I did not include his son.

02:41PM 4   Q.  You didn't include his son?

02:41PM 5   A.  No.

02:41PM 6   Q.  Okay.  So he was separate?

02:41PM 7   A.  I don't recall mentioning his son.

02:41PM 8   Q.  All right.

02:41PM 9   A.  I thought it was -- are you talking about the -- maybe

02:41PM 10  I'm getting it confused.  It was Joe Senior, the question was

02:41PM 11  asked for.

02:41PM 12  Q.  Okay.

02:41PM 13  A.  And that's the only one I was referencing.  I did not

02:41PM 14  include his son.

02:41PM 15  Q.  And then were some other older Italian men that you

02:41PM 16  mentioned that also lived in the neighborhood, correct?

02:41PM 17  A.  Correct.

02:41PM 18  Q.  And I won't go through all of the names, but one of

02:41PM 19  people you spoke about was a guy by the name of Turtle

02:42PM 20  Panepinto, right?

02:42PM 21  A.  Correct.

02:42PM 22  Q.  Another person you mentioned was Uncle Cheech?

02:42PM 23  A.  Yes.  He lived in Las Vegas.  He wasn't in the

02:42PM 24  neighborhood.

02:42PM 25  Q.  Yeah, but he -- he wasn't from the neighborhood, but you

02:42PM     1    mentioned him yesterday, correct?

02:42PM     2    A.  Correct.

02:42PM     3    Q.  And there were some other older Italian guys who lived

02:42PM     4    around Hertel Avenue at the time, right?

02:42PM     5    A.  Correct.

02:42PM     6    Q.  And you believed they were potentially made members of

02:42PM     7    Italian Organized Crime at that time, right?

02:42PM     8    A.  Allegedly, yes.

02:42PM     9    Q.  Okay.  None of these people were contemporaries of yours,

02:42PM    10    right?

02:42PM    11    A.  No.

02:42PM    12    Q.  You were a kid, correct?

02:42PM    13    A.  Correct.

02:42PM    14    Q.  They were adults, correct?

02:42PM    15    A.  Correct.

02:42PM    16    Q.  And, so, a lot of the information about their association

02:42PM    17    with Organized Crime is something that you learned from

02:42PM    18    adults, right?

02:42PM    19    A.  Correct.

02:42PM    20    Q.  People kind of gossiping around the street?

02:42PM    21    A.  My family, friends, yes.

02:42PM    22    Q.  Um-hum.

02:42PM    23    A.  It was an Italian community.

02:42PM    24    Q.  You know what any of them had to do to become made

02:42PM    25    members of Italian Organized Crime?

02:43PM   1   A.   Do I know personally?

02:43PM   2   Q.   Yeah.

02:43PM   3   A.   No, I don't.

02:43PM   4   Q.   Do you know any type of qualifications they required for

02:43PM   5   admission into Organized Crime?

02:43PM   6   A.   You have to be 100 percent Italian.

02:43PM   7   Q.   All right.  That's one criteria.  Do you know of any

02:43PM   8   other criteria?

02:43PM   9   A.   I don't.

02:43PM   10   Q.   Did you go to any type of inductions into Italian

02:43PM   11   Organized Crime for any of these individuals you

02:43PM   12   considered --

02:43PM   13   A.   No.

02:43PM   14   Q.   -- to be made members?

02:43PM   15   A.   That would be privileged.  That would be something within

02:43PM   16   the organization.  No, I never did that.

02:43PM   17   Q.   Okay.  So you didn't see any type of swearing-in

02:43PM   18   ceremonies or anything like that, right?

02:43PM   19   A.   No.  No, sir.

02:43PM   20   Q.   So you really don't have any way of proving whether or

02:43PM   21   not they're connected to Organized Crime or not, right?

02:43PM   22   A.   No, like I had mentioned, it's -- we're growing up, and

02:43PM   23   they're figures in the neighborhood, and it was allegedly.

02:43PM   24   You go -- as you're growing up, you're seeing different

02:43PM   25   figures, and you see these individuals, and things were said.

02:43PM   1   And if we saw them, you'd say hello, just be respectful.

02:44PM   2   So --

02:44PM   3   Q.   And kind of the same is true with Mike Masecchia, right?

02:44PM   4   A.   I'm sorry?   No.

02:44PM   5   Q.   Well, so, you claim that Mike Masecchia is a made member

02:44PM   6   of Italian Organized Crime, right?

02:44PM   7   A.   He had told me.

02:44PM   8   Q.   Okay.   Yeah.   That's something that he told you, right?

02:44PM   9   A.   Right.

02:44PM  10   Q.   Did you go to any type of induction ceremony for him to

02:44PM  11   become a member of Organized Crime?

02:44PM  12   A.   No, I am not made.   I'm not privileged to that.   No.

02:44PM  13   Q.   Okay.   So you didn't see anything like that happen,

02:44PM  14   right?

02:44PM  15   A.   No.

02:44PM  16   Q.   It wasn't like he sent out invitation to a party

02:44PM  17   afterwards saying, hey, come to my party, I just got made?

02:44PM  18   A.   It's not like an open type party, no.

02:44PM  19   Q.   Okay.   And you described Mike Masecchia as a pretty

02:44PM  20   intimidating guy, correct?

02:44PM  21   A.   Correct.

02:44PM  22   Q.   We saw a little bit of that this morning.   You nicknamed

02:44PM  23   him Gorilla in your cell phone.

02:44PM  24   A.   I didn't nickname him Gorilla, that was his nickname.

02:45PM  25   But that's what he was listed in my cell phone.

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

02:45PM  1   Q.  And you knew that nickname, Gorilla, because he's a tough

02:45PM  2   guy, right?

02:45PM  3   A.  He's a tough guy.

02:45PM  4   Q.  That was part of his reputation, right?

02:45PM  5   A.  Correct.

02:45PM  6   Q.  And you would you agree with me that if he was a made guy

02:45PM  7   in Italian Organized Crime, that would make him tougher than

02:45PM  8   he already is, right?

02:45PM  9   A.  Correct.  His reputation preceded, too, as well.

02:45PM  10  Q.  And so you weren't necessarily gonna challenge Mike

02:45PM  11  Masecchia when he told you, hey, I'm in Organized Crime,

02:45PM  12  correct?

02:45PM  13  A.  No, it was a brief -- it's not like he was bragging about

02:45PM  14  it.  I had asked him, he had mentioned it, and that was it.

02:45PM  15  It's not an ongoing topic of conversation.  He answered my

02:45PM  16  question, I left it at that.

02:45PM  17  Q.  Yeah.  So you weren't gonna go ask him, hey, I don't

02:45PM  18  believe you, like, prove it to me.  You weren't going to say

02:45PM  19  that, right?

02:45PM  20  A.  That I did not, no.

02:45PM  21  Q.  Okay.  Because he was an intimidating guy?

02:45PM  22  A.  Correct.

02:45PM  23  Q.  And no one in your neighborhood said, hey, Mike

02:46PM  24  Masecchia, he's a made guy, right?

02:46PM  25  A.  No, that's not true.

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

02:46PM  1   Q.  Okay.

02:46PM  2   A.  There was people thinking and alleging that he was.

02:46PM  3   Q.  Okay.

02:46PM  4   A.  So there's --

02:46PM  5   Q.  And, again, let me break that down.  People thought that

02:46PM  6   he may be, right?

02:46PM  7   A.  What they know.  What they knew.

02:46PM  8   Q.  Okay.

02:46PM  9   A.  Yes.

02:46PM  10  Q.  And they told you about it?

02:46PM  11  A.  We were close at the time, yes.

02:46PM  12  Q.  Okay.

02:46PM  13  A.  It's a different type of situation.

02:46PM  14  Q.  Okay.  But you don't really know any of this for certain,

02:46PM  15  right?

02:46PM  16  A.  Again, it's what he had told me when I asked the

02:46PM  17  question, that's what me told me.

02:46PM  18  Q.  And it's the same thing like when you were a kid back on

02:46PM  19  Hertel Avenue, right?

02:46PM  20  A.  I don't understand, what do you --

02:46PM  21  Q.  People told you that, hey, we think person is involved in

02:46PM  22  Organized Crime, correct?

02:46PM  23  A.  No, this was different.  It came from him.  I asked him a

02:46PM  24  question, and he answered it.  So, he had told me directly.

02:46PM  25  Q.  Okay.

02:46PM 1   A.  Those individuals did not.  That question was never drawn

02:46PM 2   out.

02:46PM 3   Q.  But I guess what I'm getting at is that you weren't at

02:46PM 4   the induction ceremony, correct?

02:47PM 5   A.  Correct.  I -- no, sir.

02:47PM 6   Q.  And you weren't part of the organization, correct?

02:47PM 7   A.  Correct.

02:47PM 8   Q.  So, you really don't know one way for certain whether

02:47PM 9   he's telling the truth or not, right?

02:47PM 10  A.  Again, there are a lot of --

02:47PM 11  Q.  I want you to answer my question.  Okay?

02:47PM 12          **MR. TRIPI:**  Objection.  He's answering the question.

02:47PM 13          **THE WITNESS:**  I'm answering, sir.

02:47PM 14          **THE COURT:**  Overruled.

02:47PM 15          **THE WITNESS:**  I'm answering.  It's what he had told

02:47PM 16  me.

02:47PM 17          **BY MR. SINGER:**

02:47PM 18  Q.  Okay.

02:47PM 19  A.  We had a private conversation.  I asked him, and he gave

02:47PM 20  me a direct answer, yes.

02:47PM 21      I did not want to challenge him.  I believed him.  I left

02:47PM 22  it at that.

02:47PM 23      He was called the Gorilla for a reason.

02:47PM 24  Q.  So with regard to Mr. Bongiovanni, you talked a little

02:47PM 25  bit about Mr. Bongiovanni's father, correct?

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

02:47PM  1   A.  Correct.

02:47PM  2   Q.  And he was somebody who grew up outside the Hertel Avenue

02:47PM  3   neighborhood, right?

02:47PM  4   A.  Correct.

02:47PM  5   Q.  He's an adult when you're a kid, correct?

02:47PM  6   A.  Correct.

02:47PM  7   Q.  And every now and then, you'd see him out and about on

02:47PM  8   Hertel Avenue hanging out with some of these older Italian

02:48PM  9   men, right?

02:48PM  10  A.  Correct, the club on Hertel Avenue.

02:48PM  11  Q.  In fact, he had a business, he had a clam stand on Hertel

02:48PM  12  Avenue, correct?

02:48PM  13  A.  Not on Hertel, I believe it was on the West Side.

02:48PM  14  Q.  On the West Side?

02:48PM  15  A.  I believe.

02:48PM  16  Q.  Okay.

02:48PM  17  A.  I don't believe there was a clam stand on Hertel Avenue.

02:48PM  18  Q.  And so he was contemporaries, not like you, with a lot of

02:48PM  19  these gentlemen who were around the neighborhood?

02:48PM  20  A.  Correct.  A lot of them played cards and socialized and

02:48PM  21  they were elderly, they were older than me, so I would not,

02:48PM  22  obviously, socialize in that same group.  My father's age.

02:48PM  23  Q.  And there's nothing kind of out of the ordinary with guys

02:48PM  24  that age hanging around together playing cards, right?

02:48PM  25  A.  Again, this was at a social club on Hertel Avenue, and

02:48PM    1    everybody kind of knew what that club was.

02:48PM    2    Q.  Okay.  But there wasn't anything out of the ordinary with

02:48PM    3    people hanging out at that club playing cards; is that right?

02:48PM    4    A.  As far as I know.  I don't know what was going on behind

02:48PM    5    closed doors.  I was just telling you there was a club on

02:49PM    6    Hertel, and what was alleged.  People have said that it was a

02:49PM    7    known spot where elderly guys, some Organized Crime alleged

02:49PM    8    figures, would go there and hang out, play cards, whatever.

02:49PM    9        I don't know a lot about it, because I was there twice

02:49PM   10    but for totally completely different issues.

02:49PM   11    Q.  Yeah, so --

02:49PM   12    A.  I never played cards.  Or, I'm not a card player or

02:49PM   13    gambler.

02:49PM   14    Q.  Okay.  So you weren't playing cards?

02:49PM   15    A.  No, I never played cards there.

02:49PM   16    Q.  You're only in there once or twice?

02:49PM   17    A.  Yes.

02:49PM   18    Q.  You were a kid at the time, right?

02:49PM   19    A.  I was a kid, yes.

02:49PM   20    Q.  They were adults?

02:49PM   21    A.  Correct.

02:49PM   22    Q.  They're not gonna let some kid in the bar, right?

02:49PM   23    A.  Let me rephrase that.  When I was there, I was an adult.

02:49PM   24    Q.  Okay.

02:49PM   25    A.  And it was a short period.  It was -- I had a -- I think

02:49PM    1    I had spoke about Tom Machelli, he lived downtown street from

02:49PM    2    me.  I had to go in and speak to him about a matter because

02:49PM    3    he lived -- there was a matter going on in my association, so

02:49PM    4    it was a brief matter, and I left.

02:49PM    5    Q.  And then, you know, there was nobody who told you that

02:49PM    6    Mr. Bongiovanni's father was in any way associated with

02:50PM    7    Organized Crime, right?

02:50PM    8    A.  No.

02:50PM    9    Q.  Joe never told you that, too, right?

02:50PM   10    A.  No.

02:50PM   11    Q.  So, yesterday, Mr. Tripi went through a list of people

02:50PM   12    that were from the neighborhood.  I want go through some of

02:50PM   13    the people that you talked about.

02:50PM   14        Before we get there, though, you talked on direct about

02:50PM   15    people who are your friend, right?

02:50PM   16    A.  Correct.

02:50PM   17    Q.  What's your definition of a friend?

02:50PM   18    A.  It can go a couple different ways.  There's a casual

02:50PM   19    friend, a casual acquaintance.  Someone you speak to on a

02:50PM   20    regular basis.  Someone you're close with that you see and

02:50PM   21    socialize with.  Couple different categories of that.

02:50PM   22    Q.  So let's talk about first you mentioned a casual friend.

02:50PM   23    What's a casual friend to you?

02:50PM   24    A.  If you're out and you see somebody, say you're having

02:51PM   25    lunch or you're with your family and you, oh, I ran into

02:51PM   1   so-and-so, and you say hello to them and introduce him to

02:51PM   2   whoever you're with, I'm with my kids, whatever the situation

02:51PM   3   is, that's a casual friend.

02:51PM   4   Q.   Okay.   What about a casual acquaintance?

02:51PM   5   A.   That would be just somebody who you don't, I mean, my --

02:51PM   6   you're asking my definition?

02:51PM   7   Q.   I'm asking for your definition.

02:51PM   8   A.   Casual acquaintance can be -- either be from work or from

02:51PM   9   a gym, somebody you see casually, and you just give them a

02:51PM   10  quick hello, you acknowledge, and you keep it moving.

02:51PM   11  Q.   And I guess where does a friend fall in the spectrum?

02:51PM   12  A.   A friend is somebody you would know and feel comfortable

02:51PM   13  calling, socializing with, doing things with, making plans

02:51PM   14  with.

02:51PM   15  Q.   Yeah.   So I guess you see the difference between those

02:51PM   16  three categories you just laid out, right?

02:51PM   17  A.   Correct.

02:51PM   18  Q.   So the friend is somebody that you're talking to and

02:51PM   19  you're seeing, correct?

02:51PM   20  A.   Yes.   I mean, they're all technically friends, but just

02:52PM   21  different levels of a relationship, so to speak.

02:52PM   22  Q.   Yeah.   And I guess when you're talking about the casual

02:52PM   23  friends or the casual acquaintances, these are people that

02:52PM   24  you know, correct?

02:52PM   25  A.   Yes.   You're acknowledging them, you're saying hello, and

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

02:52PM 1  you're a casual, and you're keeping it moving, hey, how are

02:52PM 2  you, and you're keeping it moving.  Nice to see you,

02:52PM 3  something like that.  You exchange a pleasantry.

02:52PM 4  Q.  Yeah, so for instance, you've met the prosecutors in this

02:52PM 5  days, right?

02:52PM 6  A.  Correct.

02:52PM 7  Q.  You know who they are?

02:52PM 8  A.  Correct.

02:52PM 9  Q.  If you're walking down Delaware Avenue, and you saw one

02:52PM 10  of them on the street, you'd acknowledge who they were,

02:52PM 11  right?

02:52PM 12  A.  If eye contact was made and they acknowledged me, yes.

02:52PM 13  If not, I'm gonna keep it moving.

02:52PM 14  Q.  Yeah, you might wave your hand hello.

02:52PM 15  A.  If the acknowledgment is made, and they give me a direct

02:52PM 16  eye contact, yes, it would be a casual wave.  Hi, how are

02:52PM 17  you.  And keep it moving.

02:52PM 18  Q.  But they're not someone who you consider a friend, right?

02:53PM 19  A.  Correct.

02:53PM 20  Q.  'Cuz you're not gonna get on the phone with them and talk

02:53PM 21  about what you did last Saturday, right?

02:53PM 22  A.  No.

02:53PM 23  Q.  You're not gonna talk about family, right?

02:53PM 24  A.  No.

02:53PM 25  Q.  So, there's a difference between people you know, and

02:53PM     1    people who are your friends, right?

02:53PM     2    A.   Correct.

02:53PM     3    Q.   So, throughout life, would you agree with me that who

02:53PM     4    your friends are can change?

02:53PM     5    A.   Who my friends are?

02:53PM     6    Q.   Yes.

02:53PM     7    A.   Who my friends?

02:53PM     8    Q.   Yes.

02:53PM     9    A.   Yes.

02:53PM    10    Q.   So, for instance, you may have been friends with someone

02:53PM    11    back in grade school at P.S. 81, right?

02:53PM    12    A.   Correct.

02:53PM    13    Q.   Saw him every day?

02:53PM    14    A.   Yes.

02:53PM    15    Q.   Talked to him on the phone?

02:53PM    16    A.   Yes.

02:53PM    17    Q.   Talked about things of substance?

02:53PM    18    A.   Yes.

02:53PM    19    Q.   But when you got to high school, you may not see them

02:53PM    20    every day or anymore, right?

02:53PM    21    A.   It's a different stage.  You're seeing them in school

02:53PM    22    every day.  If you're involved in after-school activities

02:53PM    23    together, sports, then you're seeing them on the weekend.

02:54PM    24        And you might get together during the week depending on

02:54PM    25    what you have study-wise.  Homework.

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

```
02:54PM   1   Q.  You'd agree with me that someone who was your friend back
02:54PM   2   then may only fall into the casual acquaintance or casual
02:54PM   3   friend category right now?
02:54PM   4   A.  Yes.  I mean, yes.  I mean, it was high school and now
02:54PM   5   we're in a different -- I'm in a different phase of my life,
02:54PM   6   yes.
02:54PM   7   Q.  And the same thing is true of your 20s, correct?
02:54PM   8   A.  Correct.
02:54PM   9   Q.  Like, you may have been friends with someone in your 20s,
02:54PM  10   but in your 50s, you may only be casual acquaintances with
02:54PM  11   them, right?
02:54PM  12   A.  Correct.
02:54PM  13   Q.  Okay.  'Cuz things can change, life changes?
02:54PM  14   A.  Life changes, it takes you in a different direction,
02:54PM  15   correct.
02:54PM  16   Q.  Okay.  So, one of the people that Mr. Tripi asked you
02:54PM  17   about was a guy by the name of Joe Tomasello; do you remember
02:54PM  18   him?
02:54PM  19   A.  Yes.
02:54PM  20   Q.  So Joe Tomasello, he wasn't the same age as you or
02:54PM  21   Mr. Bongiovanni, right?
02:54PM  22   A.  He was a little bit younger.
02:54PM  23   Q.  Yeah, he was a younger brother of somebody, right?
02:54PM  24   A.  He came from a big family of seven.  So he had five
02:55PM  25   sisters and one brother.  He had a brother Angelo.
```

02:55PM    1   Q.  And so as far as I guess your connection with him, he's

02:55PM    2   someone that you considered a friend?

02:55PM    3   A.  Correct.

02:55PM    4   Q.  He's someone that you would see regularly?

02:55PM    5   A.  Yeah.  Correct.  Yes.

02:55PM    6   Q.  Speak to him on the phone regularly?

02:55PM    7   A.  Not all the time, but we would speak and we keep in

02:55PM    8   touch, yes.

02:55PM    9   Q.  You would have substance conversations about, not just

02:55PM   10   say, hey, how the weather, but something about family members

02:55PM   11   or work or something along those lines?

02:55PM   12   A.  On occasion, on occasion, yes.

02:55PM   13   Q.  You talk personal details about his life sometimes?

02:55PM   14   A.  If it called for that type of -- it depends what type of

02:55PM   15   conversation we're having, yes.

02:55PM   16   Q.  And you also testified that he was a friend of

02:55PM   17   Mr. Bongiovanni, remember that?

02:55PM   18   A.  Yes.

02:55PM   19   Q.  So, Mr. Bongiovanni first met him when?

02:55PM   20   A.  When we were kids.  I mean, his sister used to be best

02:55PM   21   friends with Joe's sister.  Tomasello's sister.  So,

02:56PM   22   everybody kind of knew each other, again in the neighborhood

02:56PM   23   setting.

02:56PM   24   Q.  So, when you're talking about kids, what age range are

02:56PM   25   you talking about.

02:56PM    1    A.  I should have said teenagers.

02:56PM    2    Q.  Okay.

02:56PM    3    A.  You know, 14, 15, 16.

02:56PM    4    Q.  Okay.

02:56PM    5    A.  That age.

02:56PM    6    Q.  But when we get to Mr. Bongiovanni's 30s, 40s, he's not

02:56PM    7    hanging around with Joe Tomasello every single day, right?

02:56PM    8    A.  No, but he knew him.

02:56PM    9    Q.  Yeah, I guess that's what I'm getting at, is that --

02:56PM   10    A.  They're still friends.

02:56PM   11    Q.  -- he knew Joe Tomasello --

02:56PM   12    A.  Right.

02:56PM   13    Q.  -- but he wasn't a friend of Joe Tomasello, right?

02:56PM   14    A.  I would consider that a friend.  Because, like I

02:56PM   15    mentioned, his sister and Joe's sister were close.  They were

02:56PM   16    best friends growing up.  And everybody knew each other in

02:56PM   17    the neighborhood.  So yes, they were friendly enough to have

02:56PM   18    conversations, say hi, what's going on, you run into each

02:56PM   19    other, that type thing.  So --

02:56PM   20    Q.  You're not aware of them speaking on the phone regularly,

02:56PM   21    right?

02:56PM   22    A.  I'm not aware of that, no.

02:57PM   23    Q.  And you're not aware of that them hanging out at bars

02:57PM   24    regularly, right?

02:57PM   25    A.  I'm not aware.  It could have happened.

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

02:57PM  1   Q.   But I'm asking you what you're aware of, sir.

02:57PM  2   A.   I'm not aware.

02:57PM  3   Q.   You're not aware of them getting together in situations

02:57PM  4   where you were there, right?

02:57PM  5   A.   Not that I recall.

02:57PM  6   Q.   Okay.  So under your definition of friends, you'd agree

02:57PM  7   with me that that doesn't meet the definition, right?

02:57PM  8   A.   How they knew -- I'm kind of confused.

02:57PM  9   Q.   Sure.  So, earlier you testified that a casual friend is

02:57PM  10  someone you kind of see and say hello to, correct?

02:57PM  11  A.   Correct.  But their relationship was a little more

02:57PM  12  involved because their family was very close, his sister and

02:57PM  13  Joe's sister.  So, that kind of maybe makes it a little bit

02:57PM  14  more intimate, so to speak, if somebody's friends with

02:57PM  15  somebody's sibling, so --

02:57PM  16  Q.   But, I guess I go back to you didn't see them regularly

02:58PM  17  hanging out together, right?

02:58PM  18  A.   I didn't, no.

02:58PM  19  Q.   And you didn't see them regularly talking together,

02:58PM  20  right?

02:58PM  21  A.   I didn't, no.

02:58PM  22  Q.   Okay.  So that's a guess that they're friends.

02:58PM  23  A.   I knew they were friends.

02:58PM  24  Q.   Again, I know what you -- you -- you I know what you

02:58PM  25  think you know.  But what I'm getting at is what you

02:58PM  1   observed.  And that wouldn't be friendly behavior that you

02:58PM  2   observed.

02:58PM  3          **MR. TRIPI:**  Objection.  The question was if they're

02:58PM  4   friends.  And then the question was what you saw.  That's two

02:58PM  5   questions.  So the objection is compound question.

02:58PM  6          **THE COURT:**  Sustained.  To the extent that the

02:58PM  7   statement you're making to him is a compound question, you can

02:58PM  8   break it down.

02:58PM  9          **BY MR. SINGER:**

02:58PM  10  Q.  So you classified Mr. Tomasello as a friend of

02:58PM  11  Mr. Bongiovanni, right?

02:59PM  12  A.  Yes.

02:59PM  13  Q.  But that does not meet the definition of a friend that

02:59PM  14  you just provided to us, right?

02:59PM  15  A.  They weren't as close, but they were friends.  That's --

02:59PM  16  Q.  Okay.

02:59PM  17  A.  They were friends.  Generically speaking, they were

02:59PM  18  friends.

02:59PM  19  Q.  Sal Lima was somebody else that you talked about with

02:59PM  20  Mr. Tripi yesterday, remember?

02:59PM  21  A.  Correct.

02:59PM  22  Q.  And Sal Lima, he wasn't from the neighborhood, right?

02:59PM  23  A.  No.

02:59PM  24  Q.  He's your friend, right?

02:59PM  25  A.  He's my friend.

02:59PM   1   Q.   But you testified that you don't believe that

02:59PM   2   Mr. Bongiovanni knows him, correct?

02:59PM   3   A.   I did, correct.

02:59PM   4   Q.   Okay.  So he's not a friend of Mr. Bongiovanni?

02:59PM   5   A.   Correct.

02:59PM   6   Q.   David Hersey, you talked about him yesterday, right?

02:59PM   7   A.   Yes.

02:59PM   8   Q.   And your testimony was that you think that

02:59PM   9   Mr. Bongiovanni knows him because he's a North Buffalo guy,

02:59PM  10   right?

02:59PM  11   A.   No, he -- he knew Dave from being around, again, when he

02:59PM  12   had moved back from Boston, and I was back in the area, I was

03:00PM  13   tending bar, Stuffed Mushroom, we were all younger, and Dave

03:00PM  14   was going Canisius College, played football there.  So, yes,

03:00PM  15   we all knew each other.

03:00PM  16   Q.   So in your 20s, you guys -- I'm saying that, let me break

03:00PM  17   it down.  In your 20s, you and Mr. Bongiovanni and David

03:00PM  18   Hersey would be at bars together potentially?

03:00PM  19   A.   We would see each other, Locker Room, I mean, it was a

03:00PM  20   different era.  I'm giving you an example.  The Locker Room,

03:00PM  21   the Stuffed Mushroom, maybe Mickey Rats.  Whatever was going

03:00PM  22   on, yeah, because Dave is -- he's within our age group.  He

03:00PM  23   grew up at the same time frame.

03:00PM  24   Q.   Okay.  And So that was in your 20s.  But when we

03:00PM  25   transition into Mr. Bongiovanni's 30s and 40s, fair statement

03:00PM    1   that he wasn't hanging around with Dave Hersey as much as he

03:00PM    2   did in his 20s, right?

03:00PM    3   A.  Correct.

03:00PM    4   Q.  Wasn't talking to him on the phone regularly?

03:00PM    5   A.  I don't know.  I mean --

03:00PM    6   Q.  You didn't hear that?

03:00PM    7   A.  -- I didn't hear a conversation, I don't know.

03:01PM    8   Q.  So you're not aware of him talking on the phone with him,

03:01PM    9   correct?

03:01PM   10   A.  Correct.

03:01PM   11   Q.  And you're not aware of him hanging out in social

03:01PM   12   situations with Dave Hersey?

03:01PM   13   A.  If I was out with him, we run into him, yeah, we would

03:01PM   14   socialize.

03:01PM   15   Q.  Okay.  When you say run into him, like --

03:01PM   16   A.  Being out.  Being out.  If I was out with

03:01PM   17   Mr. Bongiovanni --

03:01PM   18   Q.  So you and Mr. Bongiovanni would be out --

03:01PM   19           **THE COURT:**  One at a time, guys.

03:01PM   20           **THE WITNESS:**  I'm sorry.

03:01PM   21           **MR. SINGER:**  I'm sorry.

03:01PM   22           **THE WITNESS:**  A group of people were out,

03:01PM   23   Mr. Bongiovanni, if we were out and we saw Dave, yes, we'd

03:01PM   24   acknowledge, have a drink wherever we're at, and you're -- we

03:01PM   25   knew each other, so we would speak, be friends, be friendly.

03:01PM    1         **BY MR. SINGER:**

03:01PM    2    Q.   So it was kind of a situation where Mr. Bongiovanni and

03:01PM    3    you didn't make plans to hang without Dave Hersey, but if you

03:01PM    4    saw him, you'd say hello?

03:01PM    5    A.   Correct.  Yes.

03:01PM    6    Q.   Okay.  Sal Volpe was somebody else that you testified

03:01PM    7    about; do you remember that?

03:01PM    8    A.   Yes.

03:01PM    9    Q.   You testified that he was a friend of yours, correct?

03:01PM   10    A.   He was.

03:01PM   11    Q.   And you testified that you believed that Mr. Bongiovanni

03:02PM   12    knew him when he was alive, correct?

03:02PM   13    A.   Yes.

03:02PM   14    Q.   But you weren't sure?

03:02PM   15    A.   Correct.  Again, Sal was from the neighborhood.  He was a

03:02PM   16    friend from the neighborhood, so, I just -- I thought, again,

03:02PM   17    there are a lot of different people that we knew, we knew a

03:02PM   18    lot of the same people, and Sal was part of that group.  He

03:02PM   19    was part -- again, it was a heavily Italian neighborhood, and

03:02PM   20    I had known him, and I just assumed that he had known him.

03:02PM   21    Q.   Okay.  So, in the -- in Mr. Bongiovanni's 30s and 40s,

03:02PM   22    you didn't see him hanging out with Sal Volpe, right?

03:02PM   23    A.   No.

03:02PM   24    Q.   And you weren't aware of any type of phone calls that he

03:02PM   25    was making to Sal Volpe?

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

03:02PM   1   A.  No.

03:02PM   2   Q.  Okay.  Wayne Anderson was somebody else that you

03:02PM   3   mentioned; do you remember him?

03:02PM   4   A.  Yes.

03:02PM   5   Q.  So you testified that Mr. Bongiovanni knows him, right?

03:02PM   6   A.  Correct.

03:02PM   7   Q.  And that's based on everyone growing up in the same

03:02PM   8   neighborhood?

03:02PM   9   A.  Yeah.  I mean, there was summer where you'd hang out with

03:03PM   10  them at the beach back in the day when we were 19, 20 years

03:03PM   11  old.  Everyone would go to Canada, Bay Beach.  So, yeah.  Go

03:03PM   12  out to the bars.  Again, it was a different time.  We were

03:03PM   13  teenagers going into adults.

03:03PM   14  Q.  The Suppas.  You mentioned Mark, John, and Matt Suppa?

03:03PM   15  A.  Yes.

03:03PM   16  Q.  And you testified that you believed that Mr. Bongiovanni

03:03PM   17  knows who these people are, correct?

03:03PM   18  A.  He actually -- they lived in the same house for a little

03:03PM   19  while, the double on Colvin, so --

03:03PM   20  Q.  When was that when they lived together?

03:03PM   21  A.  Not together, they were tenants upstairs/downstairs.

03:03PM   22  Q.  Yeah.

03:03PM   23  A.  I don't recall.  I think -- I'm not quite sure, I don't

03:03PM   24  recall.

03:03PM   25  Q.  Okay.  But we're not talking within the last ten years,

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

03:03PM   1   right?

03:03PM   2   A.  No.  No, sir.

03:03PM   3   Q.  Or the last 20 for that matter?

03:03PM   4   A.  Right.  It was a long time ago.

03:03PM   5   Q.  Okay.  Joe Bella was somebody that you mentioned today;

03:04PM   6   remember Joe Bella being mentioned?

03:04PM   7   A.  Yes.

03:04PM   8   Q.  And he was not somebody who was from the neighborhood,

03:04PM   9   right?

03:04PM   10  A.  No, he was not.

03:04PM   11  Q.  He was more bar guy, correct?

03:04PM   12  A.  Correct.

03:04PM   13  Q.  He's someone that you knew through the bars, correct?

03:04PM   14  A.  Correct.

03:04PM   15  Q.  And but he's not someone who was a friend of Joseph

03:04PM   16  Bongiovanni, correct?

03:04PM   17  A.  I believe Joe did know him.

03:04PM   18  Q.  So, you believe that Mr. Bongiovanni knew him?

03:04PM   19  A.  Yes.  Because I remember being out and -- believe on

03:04PM   20  Chippewa or a bar downtown, and Joe Bella was there, and we

03:04PM   21  both said hello to him.

03:04PM   22  Q.  Okay.

03:04PM   23  A.  So that tells me that he knew him.  He acknowledged him.

03:04PM   24  Q.  So he knew him.

03:04PM   25  A.  Yes.

03:04PM  1   Q.  But you didn't see him speaking on the phone with him all

03:04PM  2   the time, right?

03:04PM  3   A.  No.

03:04PM  4   Q.  Didn't see them being out at the bars together, right?

03:04PM  5   A.  No.

03:04PM  6   Q.  Or hanging out?

03:04PM  7   A.  No.

03:04PM  8   Q.  Frank Tripi was somebody else that you mentioned?

03:05PM  9   A.  Yes.

03:05PM  10  Q.  So, was Frank Tripi a friend of yours?

03:05PM  11  A.  Yes.  He was a friend of mine and Joe's.  Again he was

03:05PM  12  from the neighborhood.

03:05PM  13  Q.  Same age as you guys?

03:05PM  14  A.  Younger.

03:05PM  15  Q.  Younger?

03:05PM  16  A.  Younger.

03:05PM  17  Q.  How much younger?

03:05PM  18  A.  A few years.  I think he's 57.  That range.  A little bit

03:05PM  19  younger.

03:05PM  20  Q.  When did you and Mr. Bongiovanni first meet Frank Tripi?

03:05PM  21  A.  When we were growing up in the neighborhood.

03:05PM  22  Q.  Okay.  Did you hang out together when you were in your

03:05PM  23  20s?

03:05PM  24  A.  Yeah, he was -- his cousin Frank Parisi and that group

03:05PM  25  were good friends with my younger brother.  So if we were all

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

03:05PM  1   out, we would hang out, yes.

03:05PM  2   Q.  But when we get to the 30s and 40s, again,

03:05PM  3   Mr. Bongiovanni is not hanging out on a regular basis with

03:05PM  4   Frank Tripi?

03:05PM  5   A.  No.  His life is evolving.  No.  But they know each

03:05PM  6   other.  Again, they all knew each other from growing up like

03:05PM  7   I mentioned.

03:06PM  8   Q.  And you also mentioned this morning Skip Giambrone?

03:06PM  9   A.  Yes.

03:06PM  10  Q.  And how old is Mr. Giambrone?

03:06PM  11  A.  I believe his -- he's older than me.  Maybe eight, nine

03:06PM  12  years older than me, so that would be make him 67, 68, I'm

03:06PM  13  not quite sure.

03:06PM  14  Q.  So he's a little older than both you and Mr. Bongiovanni?

03:06PM  15  A.  Yes.

03:06PM  16  Q.  And is he someone you socialized with when you guys were

03:06PM  17  in your 20s?

03:06PM  18  A.  No.  No, I met Skip later in life.

03:06PM  19  Q.  Okay.  You didn't see Mr. Bongiovanni hanging out with

03:06PM  20  Skip Giambrone, right?

03:06PM  21  A.  No.

03:06PM  22  Q.  Okay.  I want to talk to you a little bit about Peter

03:06PM  23  Gerace.  You testified that Mr. Bongiovanni knew Peter

03:06PM  24  Gerace, correct?

03:06PM  25  A.  Correct.

03:06PM   1   Q.  And you also testified that Mr. Bongiovanni knew his

03:06PM   2   brother, Anthony Gerace, right?

03:06PM   3   A.  Correct.

03:07PM   4   Q.  So just to review, so Peter is the older brother in that

03:07PM   5   situation?

03:07PM   6   A.  Peter's older, yes.

03:07PM   7   Q.  And Anthony is a younger brother?

03:07PM   8   A.  Yes.

03:07PM   9   Q.  And he's a couple years younger than Peter, correct?

03:07PM   10  A.  Yes.  I don't know his age, but he's younger.

03:07PM   11  Q.  Okay.  And Peter and Anthony, they did not grow up in

03:07PM   12  North Buffalo, right?

03:07PM   13  A.  No.

03:07PM   14  Q.  I think they're out from Amherst; is that right?

03:07PM   15  A.  I believe so.

03:07PM   16  Q.  Okay.  So they're not from the neighborhood that you grew

03:07PM   17  up in?

03:07PM   18  A.  No.

03:07PM   19  Q.  And they're not from the neighborhood that

03:07PM   20  Mr. Bongiovanni grew up in?

03:07PM   21  A.  No.

03:07PM   22  Q.  You testified that you saw Mr. Bongiovanni and Peter

03:07PM   23  Gerace bar tend together at the Ramada hotel bar.

03:07PM   24  A.  The Bubble, correct.

03:07PM   25  Q.  The Bubble.  And that was 30 years ago, right?

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

03:07PM 1   A.  Correct.

03:07PM 2   Q.  That was during your guys' college days?

03:07PM 3   A.  Yes, it was a different time, yes.

03:07PM 4   Q.  Okay.  And you're aware that Peter Gerace only worked at

03:07PM 5   that bar for a couple weeks, correct?

03:07PM 6   A.  I was not aware of that.  I thought it was a little

03:08PM 7   while.  But that -- I believe that's -- they might have met

03:08PM 8   before that, but they knew each other, and they became fast

03:08PM 9   good friends.

03:08PM 10  Q.  Okay.  How many times were you at the Ramada when

03:08PM 11  Mr. Bongiovanni and Mr. Gerace were working together?

03:08PM 12  A.  A few.

03:08PM 13  Q.  How many times?

03:08PM 14  A.  Two.

03:08PM 15  Q.  Two?  How spread apart were those times?

03:08PM 16  A.  A weekend, that's, probably Friday to Friday, or Saturday

03:08PM 17  to Saturday.

03:08PM 18  Q.  So over the course of the weekend, you witnessed the two

03:08PM 19  of them working at the bar?

03:08PM 20  A.  Yes.

03:08PM 21  Q.  But that was the only time you witnessed them working?

03:08PM 22  A.  That's correct, together there.

03:08PM 23  Q.  So you really can't say how long they worked together at

03:08PM 24  the Ramada, correct?

03:08PM 25  A.  Correct.

03:08PM   1   Q.  Now you testified that you and Mr. Bongiovanni went to

03:08PM   2   Pharaoh's Gentlemen's Club?

03:08PM   3   A.  Correct.

03:08PM   4   Q.  And that was during the 2013 to 2014 time period,

03:08PM   5   correct?

03:08PM   6   A.  Correct.

03:08PM   7   Q.  And you testified yesterday that you were there a few

03:08PM   8   times, correct?

03:08PM   9   A.  Correct.

03:09PM  10   Q.  I think Mr. Tripi had to refresh your memory about that,

03:09PM  11   right?

03:09PM  12   A.  He did.

03:09PM  13   Q.  How many times were you there together with

03:09PM  14   Mr. Bongiovanni?

03:09PM  15   A.  Two.

03:09PM  16   Q.  Two times?

03:09PM  17   A.  Two times.

03:09PM  18   Q.  Okay.  So it wasn't five or six times, you're talking

03:09PM  19   about two times?

03:09PM  20   A.  Two times.

03:09PM  21   Q.  Okay.  And one time you were there, you recall that it

03:09PM  22   was you and Mr. Bongiovanni, but Peter Gerace wasn't at the

03:09PM  23   club?

03:09PM  24   A.  Correct.

03:09PM  25   Q.  And in the second time, you testified that that time

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

03:09PM   1   Peter Gerace was at the club?

03:09PM   2   A.   He was.

03:09PM   3   Q.   And that Mr. Bongiovanni and he had a conversation,

03:09PM   4   correct?

03:09PM   5   A.   Yeah.   He said hello.   He was closer with Joe than I was.

03:09PM   6   And they talked, and then they stepped away and had a brief

03:09PM   7   conversation, and then they came back.

03:09PM   8   Q.   Okay.   You testified on direct that Peter Gerace told you

03:09PM   9   that Mr. Bongiovanni helped him with a probation violation?

03:10PM  10   A.   Not that he told me.

03:10PM  11   Q.   Okay.   So who told you about that?

03:10PM  12   A.   I had heard.   Joe had told me.   Joe had told me that he

03:10PM  13   had helped Peter with a probation violation.

03:10PM  14        Did you -- I'm sorry, can you rephrase the question?   I

03:10PM  15   think I misunderstood.

03:10PM  16   Q.   What do you recall about learning something about Peter

03:10PM  17   Gerace having a probation violation?

03:10PM  18   A.   Joe had mentioned it to me.

03:10PM  19   Q.   So Joe had mentioned something to you about a probation

03:10PM  20   violation?

03:10PM  21   A.   Yes.

03:10PM  22   Q.   And you believe that in some way, Mr. Bongiovanni stepped

03:10PM  23   in to help him?

03:10PM  24   A.   Yes.

03:10PM  25   Q.   Did Peter Gerace tell you that he was violated as a

03:10PM  1  result of his violation?

03:10PM  2  A.  He was vie -- I heard that he was violated.  And he had

03:10PM  3  just got out of doing four months in prison, and something

03:10PM  4  had happened, and they wanted to put him back into prison.

03:10PM  5  And he stepped in to get him, I believe he wore an ankle

03:10PM  6  bracelet instead of going back to jail.

03:10PM  7       MR. TRIPI:  Just to be clear, the "he."  Who is

03:11PM  8  speaking?  My objection is to the confusion.

03:11PM  9       THE WITNESS:  I apologize.

03:11PM  10       THE COURT:  Let's let Mr. Singer control the

03:11PM  11  examination, and you can do that on redirect if you want,

03:11PM  12  Mr. Tripi.

03:11PM  13       MR. TRIPI:  Understood, Judge.

03:11PM  14       THE COURT:  Next question.

03:11PM  15       BY MR. SINGER:

03:11PM  16  Q.  So, regarding Anthony Gerace, it was your testimony

03:11PM  17  yesterday that there was a time that Mr. Bongiovanni told you

03:11PM  18  that he helped Anthony Gerace?

03:11PM  19  A.  Yes.

03:11PM  20  Q.  And this was in regard to some type of arrest that

03:11PM  21  happened in the Town of Amherst?

03:11PM  22  A.  Correct.

03:11PM  23  Q.  And you testified that Anthony Gerace was caught with a

03:11PM  24  few ounces of cocaine?

03:11PM  25  A.  Correct.

03:11PM   1   Q.  And you testified that Peter Gerace called to ask

03:11PM   2   Mr. Bongiovanni for help, right?

03:11PM   3   A.  That's correct.

03:11PM   4   Q.  And you testified that Mr. Bongiovanni called Amherst

03:11PM   5   police, and the case went away?

03:11PM   6   A.  He made a -- he had a contact there, and he reached out.

03:12PM   7   Q.  When did this occur?

03:12PM   8   A.  I don't -- I don't recall the time frame.  It was maybe

03:12PM   9   early 2000s, right around there.

03:12PM   10  Q.  How did you find out about this again?

03:12PM   11  A.  I had heard, I had heard Anthony got arrested, and then I

03:12PM   12  asked Joe, and he reiterated and told me.

03:12PM   13  Q.  And you're sure about that?

03:12PM   14  A.  I'm sure.

03:12PM   15  Q.  You talked a little bit about the wedding yesterday.

03:12PM   16  More particularly, the suits for the wedding, right?

03:12PM   17  A.  Yes.

03:12PM   18  Q.  So, you claimed on direct examination that

03:12PM   19  Mr. Bongiovanni purchased you a $600 suit, right?

03:12PM   20  A.  Correct.

03:12PM   21  Q.  Do you remember saying that?

03:12PM   22  A.  Yes.

03:12PM   23  Q.  And he purchased that at Napoli's, correct?

03:12PM   24  A.  Correct.

03:12PM   25  Q.  Now, is the store owned by Thomas Napoli, correct?

03:12PM   1   A.   His family, Thomas's family.

03:12PM   2   Q.   Yeah.  And so Thomas Napoli at that point in time, he was

03:12PM   3   Mr. Bongiovanni's brother-in-law, correct?

03:12PM   4   A.   Correct.

03:12PM   5   Q.   And he was a co-owner of the store, correct?

03:12PM   6   A.   I believe it's his father and his uncle.  I don't know

03:13PM   7   the relationship.  The arrangement they have, if he has

03:13PM   8   ownership, I don't know that.

03:13PM   9   Q.   But it was a family business?

03:13PM   10   A.   It's a family business.

03:13PM   11   Q.   And, so, you said on direct that Mr. Bongiovanni

03:13PM   12   purchased suits for you, correct?

03:13PM   13   A.   Correct.

03:13PM   14   Q.   For Tom Napoli, correct?

03:13PM   15   A.   The wedding party, correct.

03:13PM   16   Q.   Okay.  For Matty, who was Mr. Bongiovanni's stepson?

03:13PM   17   A.   Yes.

03:13PM   18   Q.   And also for himself, correct?

03:13PM   19   A.   Correct.

03:13PM   20   Q.   And there were four different suits, correct?

03:13PM   21   A.   Correct.

03:13PM   22   Q.   So --

03:13PM   23   A.   I could have been -- it's -- Tom Napoli might not have

03:13PM   24   been part of that purchase because his family owned it.

03:13PM   25   Q.   Yeah, I guess that's what I'm getting at.

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

03:13PM   1   A.  It was the three of us.  It was myself, Joe, and his

03:13PM   2   stepson.

03:13PM   3   Q.  Like, you would agree with me, Tom Napoli, his family

03:13PM   4   owns the store.

03:13PM   5   A.  Yes.

03:13PM   6   Q.  And, you know, he's gonna do the best he can for his

03:13PM   7   brother-in-law, right?

03:13PM   8   A.  Correct.

03:13PM   9   Q.  And so he's probably not gonna charge his brother-in-law

03:14PM  10   the cost of a suit from his own store, right?

03:14PM  11   A.  I assumed that suit was higher, I assumed it was $1,200,

03:14PM  12   because it was a very nice suit.

03:14PM  13   Q.  Okay.  There's nothing illegal about a family member who

03:14PM  14   owns a business offering a break another family member,

03:14PM  15   right?

03:14PM  16   A.  No.  That's why I mentioned $600.  Not at all.

03:14PM  17   Q.  Do you recall that Mr. Bongiovanni paid by credit card,

03:14PM  18   correct?

03:14PM  19   A.  I believe so, yes.

03:14PM  20   Q.  And the total bill you recall was $600, right?

03:14PM  21   A.  For mine, yes.

03:14PM  22   Q.  Okay.  Just for yours?

03:14PM  23   A.  Yes, because I was with him, and it was a fitting.  So --

03:14PM  24   and I picked it up.

03:14PM  25   Q.  Okay.  So you saw $600 charged for just your suit?

03:14PM   1   A.   Yes.  He had cashed it out, and I had taken it.  So, yes.

03:14PM   2   Q.   Did you see a copy of the receipt?

03:14PM   3   A.   No.  I knew what it had cost.  I knew it had been

03:14PM   4   discounted, and it had been discounted down to $600.  The

03:14PM   5   retail associate that helped us had mentioned it.  He said

03:14PM   6   the amount.

03:14PM   7   Q.   But you told us yesterday that you didn't purchase the

03:15PM   8   suit yourself, right?

03:15PM   9   A.   I didn't, no.

03:15PM  10   Q.   You didn't use your credit card to buy the suit?

03:15PM  11   A.   I did not, no.

03:15PM  12   Q.   You have no idea what type of arrangements

03:15PM  13   Mr. Bongiovanni made with Napoli's, right?

03:15PM  14   A.   I don't.

03:15PM  15   Q.   Okay.  So it's 100 percent possible that when he paid, he

03:15PM  16   was paying for everybody, right?

03:15PM  17   A.   Not $600.  I mean, I thought was the cost of just -- at

03:15PM  18   that time, it was just my transaction for the suit.  So I

03:15PM  19   don't know if anything else was included in that.

03:15PM  20   Q.   But you don't know, because you never paid, right?

03:15PM  21   A.   I did not pay, no.

03:15PM  22   Q.   So you're speculating that the $600 that you think he

03:15PM  23   paid was just for your suit?

03:15PM  24   A.   Correct.

03:15PM  25   Q.   So you talked a little bit about today, about

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

03:15PM  1   improvements that Mr. Bongiovanni made to his house; do you

03:15PM  2   remember that?

03:15PM  3   A.  Yes.

03:15PM  4   Q.  And you also talked about purchase of a car, correct?

03:15PM  5   A.  Correct.

03:15PM  6   Q.  So, let's start off with this car.  So this car was a

03:15PM  7   classic car, Buick?

03:15PM  8   A.  Correct.

03:16PM  9   Q.  And it was something that he purchased, your

03:16PM  10  understanding, from an older gentleman?

03:16PM  11  A.  Correct, I believe in Batavia.

03:16PM  12  Q.  When Joseph Bongiovanni purchased this vehicle, were you

03:16PM  13  present?

03:16PM  14  A.  I was not, no.

03:16PM  15  Q.  So you don't know how he paid for it, correct?

03:16PM  16  A.  Correct.

03:16PM  17  Q.  And when he first purchased the car and brought it back

03:16PM  18  to his home, did you see it?

03:16PM  19  A.  Within a week, yes.

03:16PM  20  Q.  Okay.

03:16PM  21  A.  Pretty short time frame.

03:16PM  22  Q.  So within a week period of time, you saw it?

03:16PM  23  A.  Yes.

03:16PM  24  Q.  And you think that there were some renovations done to

03:16PM  25  the car?

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

03:16PM    1    A.  Not right away.  Over a period of time, yes.  Pointed out

03:16PM    2    what he wanted to do to it, and then the work was being done.

03:16PM    3    Q.  Okay.  So there's improvements that were made to the car?

03:16PM    4    A.  Yes.

03:16PM    5    Q.  Do you know how much those improvements cost?

03:16PM    6    A.  I don't.  There was a paint job, bumper, interior.  I

03:16PM    7    don't know what those costs.

03:16PM    8    Q.  Do you know that for certain?

03:17PM    9    A.  I believe it also may be -- there been -- I might have --

03:17PM   10    I do, because he told me.

03:17PM   11    Q.  Okay.  Did he talk to you about how he paid for these

03:17PM   12    things?

03:17PM   13    A.  No.

03:17PM   14    Q.  And you don't know how he paid for these things, right?

03:17PM   15    A.  I don't.

03:17PM   16    Q.  You don't know how he paid for the car?

03:17PM   17    A.  I was not present for that, no.

03:17PM   18    Q.  You don't know how he paid for the improvements of the

03:17PM   19    vehicle?

03:17PM   20    A.  I was not present for that, either, no.

03:17PM   21    Q.  Okay.  How about the home renovations?  So inside

03:17PM   22    the home.  I think you testified on direct that the house was

03:17PM   23    painted?

03:17PM   24    A.  The interior, what I was shown, yes.

03:17PM   25    Q.  Okay.  That there was furniture that was purchased for

03:17PM   1   the house?

03:17PM   2   A.   Correct.

03:17PM   3   Q.   That there was a kitchen island that was added to the

03:17PM   4   house?

03:17PM   5   A.   Correct.

03:17PM   6   Q.   And the pictures that you were shown, they were from

03:17PM   7   2019, right?

03:17PM   8   A.   I don't remember the date.

03:17PM   9   Q.   If I told you that those pictures were taken during the

03:17PM   10  search warrant that was executed on his house, you wouldn't

03:18PM   11  have any reason to disagree with me on that, right?

03:18PM   12  A.   No.

03:18PM   13  Q.   And you testified earlier Mr. Bongiovanni and his wife

03:18PM   14  Lindsay, they purchased this house in Tonawanda in 2012?

03:18PM   15  A.   That time frame, yes.

03:18PM   16  Q.   So 2012 to 2019, that's a period of seven years, correct?

03:18PM   17  A.   Yes.  I don't know the exact time frame.  Yes.  It might

03:18PM   18  have been 2011, 2012, '13.

03:18PM   19  Q.   But we're talking about a long period of time between

03:18PM   20  when the pictures were taken at the house that you were shown

03:18PM   21  versus when they purchased the house, correct?

03:18PM   22  A.   Correct.

03:18PM   23  Q.   And these improvements that were done as far as the

03:18PM   24  furniture and the paint and the island, those were things

03:18PM   25  that happened over time, right?

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

03:18PM  1    A.  I believe so, yes.

03:18PM  2    Q.  Well, you'd been over to his house, right?

03:18PM  3    A.  Yes.

03:18PM  4    Q.  And the day they moved in, you didn't see all this new

03:18PM  5    furniture and paint all over the house, right?

03:18PM  6    A.  No, but there was work that was gonna be done when they

03:18PM  7    first moved in that was planning to get done.

03:18PM  8    Q.  And the work that was being done there, do you know if

03:19PM  9    they were hiring a contractor to do this work?

03:19PM  10   A.  It was just cosmetics, doing the floor, painting.  That

03:19PM  11   type of thing.

03:19PM  12   Q.  The kind of thing?

03:19PM  13   A.  And putting the middle island in.

03:19PM  14   Q.  And so the sort of thing that homeowners do, right?

03:19PM  15   A.  Yeah.  The -- I guess the major one was putting a middle

03:19PM  16   island in.  I'm not a contractor, I don't know what's

03:19PM  17   involved with that.

03:19PM  18   Q.  So you don't now how that middle island got added, right?

03:19PM  19   A.  I don't.  I know it was added.

03:19PM  20   Q.  Okay.

03:19PM  21   A.  I wasn't there, so --

03:19PM  22   Q.  But you don't know if there was a custom kitchen designer

03:19PM  23   who came in and put the island in?

03:19PM  24   A.  I don't.

03:19PM  25   Q.  Or you don't know if the Bongiovannis just bought it off

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

178

03:19PM   1   the shelf, right?

03:19PM   2   A.   I don't.

03:19PM   3   Q.   Couldn't tell?

03:19PM   4   A.   I don't know.

03:19PM   5   Q.   And you don't know how they paid for any of these things,

03:19PM   6   right?

03:19PM   7   A.   I don't.

03:19PM   8   Q.   And you don't know whether they performed the work

03:19PM   9   themselves, right?

03:19PM   10   A.   I don't know.   I assumed that they hired a contractor.

03:19PM   11   Q.   Okay.   But you don't know, that's just an assumption?

03:19PM   12   A.   Well, it was the middle island, that was new, so that

03:19PM   13   took some craftsmanship.   And I don't believe Joe knew how to

03:20PM   14   do that.

03:20PM   15   Q.   So it's something they could have purchased, right?

03:20PM   16   A.   It could have been, yes.   But then you'd have to have it

03:20PM   17   installed and make it sound to the foundation.   I don't know

03:20PM   18   how to do that, like I said, I'm not a contractor.

03:20PM   19   Q.   And you're a homeowner yourself, right?

03:20PM   20   A.   Yes.

03:20PM   21   Q.   You've painted your own walls, right?

03:20PM   22   A.   Yes, just painted a room, yes.

03:20PM   23   Q.   Done basic home improvements to your own house, right?

03:20PM   24   A.   Yes.

03:20PM   25   Q.   That's something that homeowners do, right?

03:20PM   1          **MR. TRIPI:**  Objection as to what homeowners do.

03:20PM   2          **THE COURT:**  Overruled.

03:20PM   3          **BY MR. SINGER:**

03:20PM   4   Q.  As far as the outside of the house, so you talked a

03:20PM   5   little bit about things and improvements that are done to the

03:20PM   6   outside of the house; do you remember that?

03:20PM   7   A.  Yes.

03:20PM   8   Q.  So you were shown a picture of a house as it existed back

03:20PM   9   in 2012, right?

03:20PM   10   A.  I believe that was the time frame, yes.

03:20PM   11   Q.  And then you were shown another picture of the house as

03:20PM   12   it existed in 2022, correct?

03:20PM   13   A.  Yes.

03:21PM   14   Q.  Okay.  So that's a period of about ten years, right?

03:21PM   15   A.  Correct.

03:21PM   16   Q.  So you mentioned that there were upgrades that you

03:21PM   17   noticed on the exterior of the house, that included the new

03:21PM   18   garage door?

03:21PM   19   A.  Yes.

03:21PM   20   Q.  That included the new front door?

03:21PM   21   A.  Yes.

03:21PM   22   Q.  And that included some landscaping changes?

03:21PM   23   A.  Correct.

03:21PM   24   Q.  You're referring, when you're talking about the

03:21PM   25   landscaping, to the bushes that were in the front?

| | | |
|---|---|---|
| 03:21PM | 1 | A.  Bushes, the lawn, new shrubs. |
| 03:21PM | 2 | Q.  Yeah.  And so you don't have any idea how Mr. Bongiovanni |
| 03:21PM | 3 | and Mrs. Bongiovanni paid for those things, right? |
| 03:21PM | 4 | A.  I don't. |
| 03:21PM | 5 | Q.  And you don't have any idea of when those improvements |
| 03:21PM | 6 | were made, correct? |
| 03:21PM | 7 | A.  I don't. |
| 03:21PM | 8 | Q.  And you don't have any idea whether they were made |
| 03:21PM | 9 | sequentially, right? |
| 03:21PM | 10 | A.  I'm not sure, I don't know. |
| 03:21PM | 11 | Q.  And you don't have any idea about whether or not those |
| 03:21PM | 12 | improvements were completed by themselves? |
| 03:21PM | 13 | A.  No, they were -- they were completed by Mike Sinatra. |
| 03:21PM | 14 | Q.  Okay. |
| 03:21PM | 15 | A.  The landscaper. |
| 03:21PM | 16 | Q.  And you don't know how much Mr. Sinatra may have charged |
| 03:22PM | 17 | Mr. and Mrs. Bongiovanni for that? |
| 03:22PM | 18 | A.  I don't.  And also the garage door was done by a |
| 03:22PM | 19 | contractor, too. |
| 03:22PM | 20 | Q.  Okay.  Do you know that for a fact? |
| 03:22PM | 21 | A.  Yeah, he had mentioned -- |
| 03:22PM | 22 | Q.  Really?  How do you know that? |
| 03:22PM | 23 | A.  Joe told me he had to hire a contractor to put in the new |
| 03:22PM | 24 | door.  It's a big job. |
| 03:22PM | 25 | Q.  Have you ever had to replace your garage door, sir? |

03:22PM  1    A.  I did.  And I hired a contractor.

03:22PM  2    Q.  Okay.  And you know that's not $10,000 to go --

03:22PM  3              **MR. TRIPI:**  Objection.

03:22PM  4              **THE WITNESS:**  I didn't say a figure, I know it's

03:22PM  5    expensive.

03:22PM  6              **THE COURT:**  Hang on.

03:22PM  7              **MR. TRIPI:**  He said you know it's not 10,000.  Lacks

03:22PM  8    foundation.

03:22PM  9              **THE COURT:**  No, overruled.

03:22PM  10             **BY MR. SINGER:**

03:22PM  11   Q.  So you know it's not $10,000 to replace a garage door,

03:22PM  12   right?

03:22PM  13   A.  Yes.

03:22PM  14   Q.  Okay.  And you know it's not million of dollars to go

03:22PM  15   replace shrubs, right?

03:22PM  16   A.  Correct.

03:22PM  17   Q.  And this is -- you know this because you're a homeowner,

03:22PM  18   right?

03:22PM  19   A.  Correct.

03:22PM  20   Q.  Okay.  So you talked a little bit about Mr. Bongiovanni's

03:23PM  21   use of cocaine, remember that?

03:23PM  22   A.  Yes.

03:23PM  23   Q.  So, it's a fair statement that you did not tell law

03:23PM  24   enforcement about Mr. Bongiovanni's purported use of cocaine

03:23PM  25   at first, correct?

03:23PM   1   A.   I'm sorry, can you repeat that?

03:23PM   2   Q.   You did not tell law enforcement about Mr. Bongiovanni's

03:23PM   3   purported use of cocaine right at first, correct?

03:23PM   4   A.   No, it came out through interviews.

03:23PM   5   Q.   Okay.  So it came out over time?

03:23PM   6   A.   As I interviewed with them, yes.

03:23PM   7   Q.   Okay.  So, for instance, like, you remember on the date

03:23PM   8   of the search warrant at your house, you don't remember

03:23PM   9   telling them, telling law enforcement, anything about

03:23PM   10  Mr. Bongiovanni using cocaine?

03:23PM   11  A.   Not on that date, no.

03:23PM   12  Q.   Okay.  And you had a proffer meeting a couple days after

03:23PM   13  that on the 26th of August, 2019; do you remember that?

03:23PM   14  A.   Correct.

03:23PM   15  Q.   And you didn't tell law enforcement about

03:23PM   16  Mr. Bongiovanni's purported use of cocaine at that meeting

03:24PM   17  either?

03:24PM   18  A.   I don't believe so, no.  It did not come up at that

03:24PM   19  point.

03:24PM   20  Q.   The second proffer meeting that you had, which is

03:24PM   21  September 11th of 2019, that's when you first talk about

03:24PM   22  Mr. Bongiovanni using cocaine, correct?

03:24PM   23  A.   Correct.

03:24PM   24  Q.   And at that proffer meeting, you talked about him using

03:24PM   25  cocaine on five different occasions throughout the last ten

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

03:24PM 1   years; do you remember talking about that?

03:24PM 2   A.   Yes.

03:24PM 3   Q.   And you talked about how you observed Mr. Bongiovanni use

03:24PM 4   cocaine approximately one time a year; do you remember saying

03:24PM 5   that?

03:24PM 6   A.   Correct.  When we were out, yes.

03:24PM 7   Q.   Yeah.  And you remember talking about how he'd do that at

03:24PM 8   big parties, quote, unquote?

03:24PM 9   A.   That's where it transpired, yes.

03:24PM 10  Q.   Okay.  And you talked about how he used cocaine at his

03:24PM 11  wedding in Cabo San Lucas, right?

03:24PM 12  A.   Yes.

03:24PM 13  Q.   Okay.  But those were the times that you talked about

03:24PM 14  with the government at that point in time, correct?

03:24PM 15  A.   Correct.

03:25PM 16  Q.   Okay.  And you remember talking and testifying before the

03:25PM 17  grand jury on October 3rd of 2019, right?

03:25PM 18  A.   Yes.

03:25PM 19  Q.   And you remember talking about the cocaine use that we

03:25PM 20  just discussed, right?

03:25PM 21  A.   Correct.

03:25PM 22  Q.   But you also remember talking about different other times

03:25PM 23  than what you talked about in your second proffer, correct?

03:25PM 24  A.   Correct.

03:25PM 25  Q.   So, for example, you talked about how you remember

03:25PM  1   Mr. Bongiovanni using cocaine after he met Lindsay in 2009,

03:25PM  2   right?

03:25PM  3   A.  Yes.

03:25PM  4   Q.  And you remember talking about how Mr. Bongiovanni used

03:25PM  5   cocaine with you at Mother's?

03:25PM  6   A.  Correct.

03:25PM  7   Q.  And you remember talking about how he used it when you

03:25PM  8   guys were at Mickey Rats and at Tom Doctor's cottage?

03:25PM  9   A.  Correct.

03:25PM 10   Q.  And so that was a new revelation that didn't come to

03:25PM 11   light at your second proffer meeting, correct?

03:25PM 12   A.  Correct.  We had -- we were at the cottage, and then we

03:26PM 13   went down to the bar.  It took place at the bar.

03:26PM 14   Q.  Okay.

03:26PM 15   A.  We were at the cottage for a minute, and then we all went

03:26PM 16   down to the bar, and people went into the bathroom and did

03:26PM 17   get a bump, a blast, which is a blast of cocaine.

03:26PM 18   Q.  Okay.  So, yesterday, you went a little further, right?

03:26PM 19   A.  Yes.

03:26PM 20   Q.  So, you started talking about cocaine usage, not during

03:26PM 21   that time period of ten years or so, roughly, before your

03:26PM 22   arrest, but you're talking about other times, right?

03:26PM 23   A.  Correct.

03:26PM 24   Q.  So, you added to that that you observed Mr. Bongiovanni

03:26PM 25   use cocaine dating back before 2009, right?

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

03:26PM   1   A.  Yes.

03:26PM   2   Q.  Going back to the early 2000s, right?

03:26PM   3   A.  Yes.

03:26PM   4   Q.  Going back to even times before he joined the DEA?

03:26PM   5   A.  Yes.

03:26PM   6   Q.  And those were all new things, right?

03:26PM   7   A.  New things to -- to what?  To the -- what are you

03:27PM   8   referencing again?  I'm sorry.

03:27PM   9   Q.  So, again, the first time you talked to law enforcement

03:27PM  10   is back in 2019?

03:27PM  11   A.  Yes, okay.  I'm sorry, yes, they were new things, yes.

03:27PM  12   Q.  So, you'd agree with me that these things kept trickling

03:27PM  13   out more and more as time progressed, right?

03:27PM  14   A.  Yes, as questions were asked, yes, more came out.

03:27PM  15   Q.  And you'd agree with me that in these situations, a lot

03:27PM  16   of them that you talked about, you were the person in

03:27PM  17   possession of the cocaine, right?

03:27PM  18   A.  Correct.

03:27PM  19   Q.  And you were the person who purchased the cocaine,

03:27PM  20   correct?

03:27PM  21   A.  Correct.

03:27PM  22   Q.  And you were the person who was providing the cocaine,

03:27PM  23   correct?

03:27PM  24   A.  Yes.

03:27PM  25   Q.  And that's because you're a user of cocaine, right?

03:27PM   1   A.  I was.

03:27PM   2   Q.  And, so, these things that come to light, you have some

03:27PM   3   inconsistencies with what you told the government, right?

03:27PM   4          MR. TRIPI:  Objection.

03:27PM   5          THE COURT:  Hang on.

03:27PM   6          MR. TRIPI:  Form.

03:27PM   7          THE COURT:  Go ahead.  Yes.

03:27PM   8          MR. TRIPI:  He --

03:27PM   9          THE COURT:  The objection is sustained.

03:27PM  10          MR. SINGER:  I'll switch up the question, Judge.

03:28PM  11          BY MR. SINGER:

03:28PM  12   Q.  So you told us just right now, and yesterday, about

03:28PM  13   Mr. Bongiovanni purportedly using cocaine at Mother's, right?

03:28PM  14   A.  Yes.

03:28PM  15   Q.  But you told law enforcement something different about

03:28PM  16   never using at Mother's in the past, correct?

03:28PM  17   A.  I don't recall that.

03:28PM  18   Q.  Okay.  Well, let me help you refresh your recollection on

03:28PM  19   that.  I'm going to hand you a copy of what's been marked as

03:28PM  20   Government Exhibit 3540I.  I'm going to direct your attention

03:28PM  21   to page 6 of that exhibit.  It's the middle part of the page,

03:28PM  22   where that blue underlining is.  Can you please take a look

03:28PM  23   at that, sir, and when you're done look up at me?

03:29PM  24   A.  Okay.

03:29PM  25   Q.  I'm going to take that away from you now.

03:29PM    1    Does that help refresh your recollection as to what you

03:29PM    2    told law enforcement regarding not using at Mother's?

03:29PM    3    A.  I had used at Mother's.  I had -- when you were

03:29PM    4    referencing this, I was the one that used at Mother's.  I got

03:29PM    5    it, and I used it.

03:29PM    6    Q.  Okay.  So Mr. Bongiovanni didn't use cocaine at Mother's?

03:29PM    7    A.  Not at Mother's, I was the one who used it.

03:29PM    8    Q.  Okay.  So you were the one that used at Mother's?

03:29PM    9    A.  Yes.

03:29PM   10    Q.  Mr. Bongiovanni was not?

03:29PM   11    A.  No.  With that incident, I had used it, he did not use

03:29PM   12    it.

03:29PM   13    Q.  Okay.

03:29PM   14    A.  For that incident there.

03:29PM   15         **THE COURT:**  Mr. Singer, is this a good time to take

03:29PM   16    our afternoon break?

03:29PM   17         **MR. SINGER:**  Yeah, Judge.

03:29PM   18         **THE COURT:**  We don't have to, if you want to keep

03:29PM   19    going a little bit.

03:29PM   20         **MR. SINGER:**  As I said before, I don't want to hold

03:29PM   21    up any breaks, so this is fine.

03:29PM   22         **THE COURT:**  Let's take our afternoon break, folks.

03:30PM   23    Remember my instructions, about not talking about the case

03:30PM   24    with anyone, including each other, and not making up your

03:30PM   25    mind.  Be back here in ten or 15 minutes.  Thanks.

03:30PM    1              (Jury excused at 3:30 p.m.)

03:30PM    2         **THE COURT:**  Okay.  You can step out, Mr. Selva,

03:30PM    3    please.

03:30PM    4              (Witness excused at 3:30 p.m.)

03:30PM    5         **THE COURT:**  Anything we need to put on the record

03:31PM    6    from the government?

03:31PM    7         **MR. TRIPI:**  No, Your Honor.

03:31PM    8         **THE COURT:**  From the defense?

03:31PM    9         **MR. SINGER:**  No, Your Honor.

03:31PM   10         **THE COURT:**  Mr. Singer, are you going to finish

03:31PM   11    today, you think?

03:31PM   12         **MR. SINGER:**  Yeah, no, I don't anticipate going over

03:31PM   13    the time.

03:31PM   14         **THE COURT:**  Okay.  Good.  Great.  Thank you.

03:31PM   15         **MR. TRIPI:**  Thank you, Your Honor.

03:31PM   16         **THE CLERK:**  All rise.

03:31PM   17              (Off the record at 3:31 p.m.)

03:47PM   18              (Back on the record at 3:47 p.m.)

03:47PM   19              (Jury not present.)

03:47PM   20         **THE CLERK:**  All rise.

03:47PM   21         **THE COURT:**  Please be seated.

03:48PM   22         **THE CLERK:**  We are back on the record for the

03:48PM   23    continuation of the jury trial in case number 19-cr-227,

03:48PM   24    United States of America versus Joseph Bongiovanni.

03:48PM   25              All counsel and parties are present.

| | | |
|---|---|---|
| 03:48PM | 1 | **THE COURT:**  Anything we need to do before we resume? |
| 03:48PM | 2 | **MR. SINGER:**  No. |
| 03:48PM | 3 | **MR. TRIPI:**  No. |
| 03:48PM | 4 | **THE COURT:**  Let's bring them back, please. |
| 03:49PM | 5 | (Jury and witness seated at 3:49 p.m.) |
| 03:49PM | 6 | **THE COURT:**  The record will reflect that all our |
| 03:49PM | 7 | jurors are again in the courtroom. |
| 03:49PM | 8 | I remind the witness that he's still under oath. |
| 03:49PM | 9 | And, Mr. Singer, you may continue. |
| 03:49PM | 10 | **BY MR. SINGER:** |
| 03:49PM | 11 | Q.  Thank you.  So, Mr. Selva, we last talked about the |
| 03:49PM | 12 | allegations of drug abuse, and so I want to move on to the |
| 03:49PM | 13 | stag party for Mr. Bongiovanni.  So, you testified on direct |
| 03:49PM | 14 | that you were one of the people who helped organize it, |
| 03:49PM | 15 | right? |
| 03:49PM | 16 | A.  Correct. |
| 03:50PM | 17 | Q.  And there were tickets that were sold to the event, |
| 03:50PM | 18 | correct? |
| 03:50PM | 19 | A.  Yes. |
| 03:50PM | 20 | Q.  And that was to help fund the event? |
| 03:50PM | 21 | A.  Fund the event, and whatever proceeds were left usually |
| 03:50PM | 22 | went to the groom. |
| 03:50PM | 23 | Q.  Yeah.  So just kind of like a, hey, you're getting |
| 03:50PM | 24 | married gift kind of thing? |
| 03:50PM | 25 | A.  Correct. |

03:50PM    1    Q.  And so selling the tickets, that was something that you

03:50PM    2    didn't control exclusively, right?

03:50PM    3    A.  No.

03:50PM    4    Q.  So you were one of the people who sold the tickets for

03:50PM    5    the stag, right?

03:50PM    6    A.  Yes.

03:50PM    7    Q.  But there were also other people who sold ticket for the

03:50PM    8    stag?

03:50PM    9    A.  Yes.

03:50PM   10    Q.  So for instance, there were people at Joe's work at the

03:50PM   11    DEA who sold tickets, right?

03:50PM   12    A.  I'm not aware of that, I don't know.

03:50PM   13    Q.  Are you aware of any DEA agents from Joe's office who

03:50PM   14    attended the stag?

03:50PM   15    A.  I'm not aware of that, no.

03:50PM   16    Q.  You're not aware of any of those people?

03:50PM   17    A.  No.

03:50PM   18    Q.  All right.  And then when you were selling your tickets,

03:50PM   19    you were selling tickets to people who you know, right?

03:50PM   20    A.  Correct.

03:50PM   21    Q.  They were friends of yours, right?

03:50PM   22    A.  Correct.  And they knew Joe.

03:50PM   23    Q.  And they knew Joe, too, correct?

03:50PM   24    A.  Yes.

03:50PM   25    Q.  But Joe wasn't really having input on who attended the

03:51PM   1   event, correct?

03:51PM   2   A.  No.

03:51PM   3   Q.  Okay.  So, as far as the Ron Serio drug-trafficking

03:51PM   4   organization, we'll move on to that.

03:51PM   5       One thing that you've been consistent with, I think from

03:51PM   6   the very beginning, is that Mr. Bongiovanni never met Ron

03:51PM   7   Serio, right?

03:51PM   8   A.  No.

03:51PM   9   Q.  And never spoke to Ron Serio, right?

03:51PM   10  A.  As far as I know, no.

03:51PM   11  Q.  Okay.  So, going back to the beginning of this, your

03:51PM   12  knowledge before you got involved in this was that Ron Serio

03:51PM   13  and Mike Masecchia started to get together somewhere in the

03:51PM   14  2000s, correct?

03:51PM   15  A.  Correct.

03:51PM   16  Q.  And that Mike Masecchia had some type of grow operation

03:51PM   17  in Ellicottville, Franklinville area of New York, right?

03:51PM   18  A.  Correct.

03:51PM   19  Q.  And that Mike Masecchia at that beginning point in time

03:51PM   20  was supplying Ron Serio with marijuana, correct?

03:51PM   21  A.  Not supplying, he was cashing him out.

03:51PM   22  Q.  Cashing him out?

03:52PM   23  A.  Yes.  He would -- whatever he would take from a grow, he

03:52PM   24  would cash it out with Ron --

03:52PM   25  Q.  Okay.

03:52PM      1    A.   -- in the beginning.

03:52PM      2    Q.   Okay.  So, kind of in a purchase situation?

03:52PM      3    A.   For Ron.

03:52PM      4    Q.   Okay.  I got you.  And so this relationship started to

03:52PM      5    grow over time as you testified yesterday, right?

03:52PM      6    A.   Correct.

03:52PM      7    Q.   And eventually, you get involved in the Ron Serio

03:52PM      8    organization, correct?

03:52PM      9    A.   Yes.

03:52PM     10    Q.   And you had roles like you were delivering plants for

03:52PM     11    marijuana, correct?

03:52PM     12    A.   I worked mostly with Masecchia.

03:52PM     13    Q.   Okay.

03:52PM     14    A.   Mike Masecchia.

03:52PM     15    Q.   You testified yesterday you were talking about making

03:52PM     16    deliveries in cars, right?

03:52PM     17    A.   Yes.  Well, when it was harvested, we would move it back

03:52PM     18    from the country into the city.

03:52PM     19    Q.   Correct, because you had to sell it, right?

03:52PM     20    A.   We brought it to Ron.  Yes, we brought it to Ron,

03:52PM     21    correct.

03:52PM     22    Q.   Okay.  So you're driving marijuana in your car, right?

03:52PM     23    A.   Correct.

03:52PM     24    Q.   You're also taking care of plants, correct?

03:52PM     25    A.   Correct.

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

03:53PM   1   Q.  That was both before they were planted in the ground at

03:53PM   2   the grow site in Franklinville, correct?

03:53PM   3   A.  Correct.

03:53PM   4   Q.  And it was also after, correct?

03:53PM   5   A.  Correct.

03:53PM   6   Q.  And so there was also times where you testified that you

03:53PM   7   grew marijuana in your basement?

03:53PM   8   A.  Correct.

03:53PM   9   Q.  And you also stored and processed marijuana in your

03:53PM  10   basement, right?

03:53PM  11   A.  Not stored -- well, whatever was taken, yes.  Whatever

03:53PM  12   was taken from the -- the crop was in my basement at times.

03:53PM  13   Q.  So you take the crop back to your house, right?

03:53PM  14   A.  If it was in my house, yes.

03:53PM  15   Q.  Okay.

03:53PM  16   A.  If it was in the country, no.

03:53PM  17   Q.  Okay.  So, the marijuana that you're growing in your

03:53PM  18   house, when you dry it out to process it, correct?

03:53PM  19   A.  Correct.

03:53PM  20   Q.  You process it down in your basement, correct?

03:53PM  21   A.  Correct.

03:53PM  22   Q.  And after you broke it down, you moved it out of there,

03:53PM  23   correct?

03:53PM  24   A.  Then it would be out of there, correct.

03:53PM  25   Q.  And you also claimed that one of your reasons for getting

03:53PM 1  involved here was also to provide information to Ron Serio,

03:54PM 2  correct?

03:54PM 3  A.  Correct.

03:54PM 4  Q.  And it was protection information that was provided by

03:54PM 5  Mr. Bongiovanni, correct?

03:54PM 6  A.  Correct.

03:54PM 7  Q.  But it's also fair to say, sir, that you haven't been

03:54PM 8  consistent with the government about your role in this -- in

03:54PM 9  this operation, right?

03:54PM 10 A.  That's correct.

03:54PM 11 Q.  So, like, for instance, your statements have changed over

03:54PM 12 time on a couple different things, right?

03:54PM 13 A.  The beginning, yes.

03:54PM 14 Q.  Okay.  So, for instance, how you found out about Ron

03:54PM 15 Serio and Mike Masecchia being involved in the marijuana

03:54PM 16 business, that's changed over time, right?

03:54PM 17 A.  What, what, I don't understand, what do you mean changed

03:54PM 18 like how?

03:54PM 19 Q.  Sure.  So you remember meeting in your initial proffer

03:54PM 20 interview with the government, correct?

03:54PM 21 A.  Correct.

03:54PM 22 Q.  And you remember talking about how to get into the Ron

03:54PM 23 Serio-Mike Masecchia organization, you first had a

03:54PM 24 conversation with Joe Tomasello, correct?

03:54PM 25 A.  Correct.

03:54PM 1   Q.   And he was someone that you understood was involved in

03:54PM 2   the operation in some capacity?

03:54PM 3   A.   Correct.

03:54PM 4   Q.   And that after talking with Mr. Tomasello, you talked to

03:55PM 5   another individual, Larry Falzone, correct?

03:55PM 6   A.   I, yes, I spoke to Larry, yes.

03:55PM 7   Q.   And then after that conversation with first Tomasello and

03:55PM 8   then second Falzone, you called Mike Masecchia about getting

03:55PM 9   involved, correct?

03:55PM 10  A.   Correct.

03:55PM 11  Q.   And you told the government in that first meeting that

03:55PM 12  you got involved in the Ron Serio organization in 2012 or

03:55PM 13  2013, right?

03:55PM 14  A.   Correct.

03:55PM 15  Q.   Okay.  But that changed in the second proffer interview

03:55PM 16  you met with the government, right?

03:55PM 17  A.   Correct.

03:55PM 18  Q.   So roughly a month later, you talk about the Mike

03:55PM 19  Masecchia connection, right?

03:55PM 20  A.   Correct.

03:55PM 21  Q.   And you start to talk about how it wasn't 2012 or 2013,

03:55PM 22  but more like be 2010, 2011 when you first got involved,

03:55PM 23  right?

03:55PM 24  A.   2008, actually.

03:55PM 25  Q.   You don't remember talking about 2010 or 2011?

03:55PM   1   A.  I do.  But you asked when I first got involved, it was --

03:55PM   2   Q.  I was asking you what you said to the government in your

03:55PM   3   second proffer interview.  Okay?

03:56PM   4   A.  Yes.

03:56PM   5   Q.  Okay.  So, let's confine it to that second proffer

03:56PM   6   interview.  You remember tell them not 2008 in that second

03:56PM   7   interview, correct?

03:56PM   8   A.  That's correct.

03:56PM   9   Q.  You told them 2010 and 2011, correct?

03:56PM   10   A.  Correct.

03:56PM   11   Q.  So it creeped backwards, correct, in your second

03:56PM   12   interview?

03:56PM   13   A.  Yes.

03:56PM   14   Q.  And then in the grand jury, you walk in in October,

03:56PM   15   roughly another month later, and that's when you start

03:56PM   16   talking about 2008, correct?

03:56PM   17   A.  Correct.

03:56PM   18   Q.  And you talk about Joe Tomasello, correct?

03:56PM   19   A.  Correct.

03:56PM   20   Q.  But the conversation with Larry Falzone is not mentioned

03:56PM   21   in the grand jury, correct?

03:56PM   22   A.  I don't -- I don't recall.

03:56PM   23   Q.  Okay.  Would taking a look at your grand jury testimony

03:56PM   24   refresh your recollection?

03:56PM   25   A.  Yes.

03:56PM    1          **MR. SINGER:**  Ms. Champoux, would you mind bringing up

03:56PM    2    Exhibit 3540N on Mr. Selva's screen.

03:56PM    3          **THE COURT:**  Just for the witness?

03:56PM    4          **MR. TRIPI:**  For the witness?

03:56PM    5          **MR. SINGER:**  Just the witness, yes.  And to page 34,

03:57PM    6    please.

03:57PM    7          **BY MR. SINGER:**

03:57PM    8    Q.  I'm going to direct your attention, sir, to line 16 on

03:57PM    9    that page.

03:57PM   10    A.  Okay.

03:57PM   11          **MR. SINGER:**  And then, Ms. Champoux, can you advance

03:57PM   12    to page 35 please?  Thank you.

03:57PM   13          **THE WITNESS:**  Okay.

03:57PM   14          **MR. SINGER:**  And 36.

03:57PM   15          **BY MR. SINGER:**

03:58PM   16    Q.  Once you get to line 12, sir, I think it's all done at

03:58PM   17    that point.

03:58PM   18    A.  Okay.

03:58PM   19          **MR. SINGER:**  You can take that down, Ms. Champoux,

03:58PM   20    thank you.

03:58PM   21          **BY MR. SINGER:**

03:58PM   22    Q.  And so you'd agree with me that Joe Tomasello came up in

03:58PM   23    the grand jury testimony, correct?

03:58PM   24    A.  Joe Tomasello did.

03:58PM   25    Q.  Yeah, so Larry Falzone didn't come up in the grand jury

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

198

03:58PM  1   testimony, correct?

03:58PM  2   A.  No.

03:58PM  3   Q.  Okay.  And then, so, as far as the start of your

03:58PM  4   involvement in the conspiracy, you talked yesterday and today

03:58PM  5   about it being 2008 was the starting point, correct?

03:58PM  6   A.  Correct.

03:58PM  7   Q.  But you've also told the authorities different times,

03:59PM  8   correct?

03:59PM  9   A.  Correct.

03:59PM  10  Q.  So, we went over, you know, some of them just a second

03:59PM  11  ago, but you remember when you first talked to law

03:59PM  12  enforcement was the day that your house got raided, correct?

03:59PM  13  A.  Correct.

03:59PM  14  Q.  And you remember talking to them about the grow operation

03:59PM  15  they witnessed down in your basement?

03:59PM  16  A.  Yes.

03:59PM  17  Q.  And you remember talking to them about when it was that

03:59PM  18  you got involved in growing marijuana in your basement,

03:59PM  19  correct?

03:59PM  20  A.  Correct.

03:59PM  21  Q.  And that time period was -- was not going back to 2008,

03:59PM  22  correct?

03:59PM  23  A.  Not at that time, no.

03:59PM  24  Q.  Yeah, you told them something to the effect of somewhere

03:59PM  25  between six and seven years ago, or five years ago?

03:59PM   1   A.  Correct.

03:59PM   2   Q.  Okay.  And then in your first proffer meeting that you

03:59PM   3   had after the search warrant was executed at your house, that

03:59PM   4   changed, right?

03:59PM   5   A.  Correct.

03:59PM   6   Q.  You remember talking to the government and talking to

03:59PM   7   them about five years as being your entry into the

03:59PM   8   conspiracy, correct?

03:59PM   9   A.  Correct.  Each time I was telling a little bit more.  I

03:59PM   10  was torn.  It was very -- it was very hard.

04:00PM   11  Q.  Okay.  So, then you kind of fast forward to your grand

04:00PM   12  jury testimony, and again it's 2008, right?

04:00PM   13  A.  Correct.

04:00PM   14  Q.  All right.  And so as far as the grow equipment in your

04:00PM   15  basement, that's something that's also changed, correct?

04:00PM   16  A.  Changed how?

04:00PM   17  Q.  Well, so, the first time that the authorities talk to you

04:00PM   18  about it like we just discussed was at the time the search

04:00PM   19  warrant was executed at your house, right?

04:00PM   20  A.  Yes.  It was taken.

04:00PM   21  Q.  Correct.  And you talked to them about how it was about

04:00PM   22  five years ago that you started growing marijuana at your

04:00PM   23  house?

04:00PM   24  A.  I -- I don't recall --

04:00PM   25  Q.  You don't recall?

04:00PM     1    A.  -- that.

04:00PM     2    Q.  Let me try to refresh your recollection, sir.

04:00PM     3    A.  Thank you.

04:00PM     4    Q.  Going to direct your attention to Government

04:00PM     5    Exhibit 3540G as in golf.

04:00PM     6         **MR. TRIPI:**  Thank you.

04:00PM     7         **BY MR. SINGER:**

04:00PM     8    Q.  I'll direct your attention to the bottom paragraph on the

04:00PM     9    first page, flowing into the top paragraph on the next page.

04:01PM    10    Take a look at that sir and look up at me when you're done.

04:01PM    11    A.  Okay.

04:01PM    12    Q.  So I'm going to take that away from you.

04:01PM    13         Does that refresh your recollection as to what you recall

04:01PM    14    talking to the police about the first time you spoke to them

04:01PM    15    about this?

04:01PM    16    A.  Yes.

04:01PM    17    Q.  And, so, you'd agree with me, it wasn't five years?

04:01PM    18    A.  Correct, it was more.

04:01PM    19    Q.  Yeah.  You were talking about six and seven years, right?

04:01PM    20    A.  Correct.  Each time I gave up a little, I became more

04:01PM    21    truthful and with them.

04:01PM    22    Q.  Okay.  So, as far as the incident regarding

04:02PM    23    Mr. Bongiovanni allegedly smelling marijuana in your

04:02PM    24    basement, you weren't consistent about when that happened

04:02PM    25    either, right?

04:02PM  1   A.   No, it was the time that he stopped over and there was

04:02PM  2   plants in the basement, and he noticed the smell.

04:02PM  3   Q.   And you recall talking to the government about that in

04:02PM  4   your first proffer meeting, correct?

04:02PM  5   A.   I believe so, yes.

04:02PM  6   Q.   And when you talked to him in your first proffer meeting,

04:02PM  7   you talked to them about how it was in 2016 that

04:02PM  8   Mr. Bongiovanni came into your house and smelled the

04:02PM  9   marijuana, correct?

04:02PM  10  A.   He's been to my house many times.

04:02PM  11  Q.   Well, what I'm asking, sir, is whether in that first

04:02PM  12  proffer interview you remember telling the government 2016

04:02PM  13  was the date where Mr. Bongiovanni walked into your house and

04:02PM  14  smelled the marijuana grow in your basement?

04:02PM  15  A.   I don't recall.  I mean, I'd need something to refresh my

04:02PM  16  memory on that.  I don't remember the time frame.

04:02PM  17  Q.   Sure.  So I'm going to direct your attention to

04:03PM  18  Government Exhibit 3540H as in hotel, to page 5.  And to the

04:03PM  19  top bullet in that.  Take a look at that, and look up at me

04:03PM  20  when you're done.

04:03PM  21  A.   Okay.

04:03PM  22  Q.   So, Mr. Selva, does that refresh your recollection as to

04:03PM  23  what you told the government in your first proffer interview?

04:03PM  24  A.   Yes.

04:03PM  25  Q.   And you told them 2016 correct, sir?

04:03PM  1   A.  Correct.

04:03PM  2   Q.  But that changed in your second proffer interview,

04:03PM  3   correct?

04:03PM  4   A.  Correct.

04:03PM  5   Q.  In that second proffer interview, you told the government

04:03PM  6   that it was in 2013 that this occurred, correct?

04:03PM  7   A.  Correct.  Each time, I came forward with a little bit

04:03PM  8   more information as we discussed it.

04:03PM  9   Q.  So it continues to trickle out, correct?

04:03PM  10  A.  Correct.

04:03PM  11  Q.  More and more facts, correct?

04:04PM  12  A.  Correct.

04:04PM  13  Q.  As you continue to talk with the government, correct?

04:04PM  14  A.  Correct.

04:04PM  15  Q.  And your attorney's there, correct?

04:04PM  16  A.  Correct.

04:04PM  17  Q.  So, the information that Mr. Bongiovanni purportedly gave

04:04PM  18  you, and the negotiations about his payments, so you

04:04PM  19  testified that these negotiations started up, according to

04:04PM  20  your testimony yesterday, in 2008; do you remember that?

04:04PM  21  A.  Yes.

04:04PM  22  Q.  Do you remember talking about how you initially met

04:04PM  23  Mr. Bongiovanni out at M.T. Pocket's bar on Hertel?

04:04PM  24  A.  Correct.

04:04PM  25  Q.  And you made this proposal to him about providing

04:04PM    1    information, correct?

04:04PM    2    A.  Correct.

04:04PM    3    Q.  And he got upset about that, correct?

04:04PM    4    A.  Correct.

04:04PM    5    Q.  In fact, he rejected the proposal, correct?

04:04PM    6    A.  Correct.

04:04PM    7    Q.  And then you say that after that unsuccessful attempt to

04:04PM    8    solicit him, you then met with Ron Serio and Mike Masecchia,

04:04PM    9    correct?

04:04PM   10    A.  Correct.

04:04PM   11    Q.  And you met them up at M.T. Pocket's, correct?

04:04PM   12    A.  No.  Not at M.T. Pocket's.  It was -- I believe it was a

04:04PM   13    different place.  I met with Mike first.  I usually met with

04:05PM   14    Mike.  So I -- I met with Mike.  I believe he came over my

04:05PM   15    house.

04:05PM   16    Q.  So you don't recall yesterday testifying to the jury that

04:05PM   17    you met up with Ron Serio and Mike Masecchia at

04:05PM   18    M.T. Pocket's?

04:05PM   19    A.  Not -- not initially, but I had met up with them at

04:05PM   20    M.T. Pocket's, but the first -- the first meeting regarding

04:05PM   21    this was at my house, Mike had stopped by.

04:05PM   22    Q.  So it was at your house, it wasn't as a bar at all?

04:05PM   23    A.  Then another time, I met them out.  I mean, there's --

04:05PM   24    I'm kind of confused what --

04:05PM   25    Q.  Okay.  So -- so -- so you then testified yesterday that

04:05PM  1   you also met Mr. Bongiovanni for a second time at Gables bar

04:05PM  2   on Hertel; do you remember that?

04:05PM  3   A.   Correct.

04:05PM  4   Q.   And you talked about proposing $2,000 to him, correct?

04:05PM  5   A.   Correct.

04:05PM  6   Q.   And you're stating in your testimony yesterday that he

04:05PM  7   agreed to that figure, correct --

04:05PM  8   A.   Correct.

04:05PM  9   Q.   -- to provide protection?

04:05PM 10   A.   Correct.

04:05PM 11   Q.   And so you testified that for three years this

04:05PM 12   arrangement remained, correct?

04:06PM 13   A.   That's correct.

04:06PM 14   Q.   The $2,000 a month figure?

04:06PM 15   A.   Correct.

04:06PM 16   Q.   But then later, after three years, it changed, correct?

04:06PM 17   A.   Correct.

04:06PM 18   Q.   It was increased from $2,000 to $4,000, correct?

04:06PM 19   A.   Correct.

04:06PM 20   Q.   And you testified yesterday that you consummated the

04:06PM 21   $4,000 a month transaction at Mother's bar, or some type of

04:06PM 22   Chippewa bar, correct?

04:06PM 23   A.   Correct.

04:06PM 24   Q.   And then that remained in place until 2017, correct?

04:06PM 25   A.   Correct.

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

04:06PM   1   Q.  So, you'd agree with me that when initially the police

04:06PM   2   raided your house at the end of August in 2019, you never

04:06PM   3   told them anything about this, correct?

04:06PM   4   A.  Initially, no.

04:06PM   5   Q.  And then at your first proffer interview, there was

04:06PM   6   nothing that you talked about as far as you talked about Ron

04:06PM   7   Serio, and you talk about Mike Masecchia asking you to find

04:06PM   8   out if Mr. Bongiovanni was willing to talk and see if

04:06PM   9   Mr. Serio was under investigation, correct?

04:06PM  10   A.  Correct.

04:06PM  11   Q.  And you know this proposal for paying information -- for

04:07PM  12   paying for information, the bribes, right, do you remember

04:07PM  13   talking to the government about how that occurred at Mother's

04:07PM  14   bar?

04:07PM  15   A.  I do.

04:07PM  16   Q.  Okay.  But that was different than what you testified to

04:07PM  17   yesterday about the initial conversation, correct?

04:07PM  18   A.  I don't recall.  Can I have something to refresh my

04:07PM  19   memory?  I'm not --

04:07PM  20   Q.  Well, I'm asking you about your testimony, sir, okay?

04:07PM  21   A.  Okay.

04:07PM  22   Q.  So do you remember talking to the jury yesterday about

04:07PM  23   this starting up, and having a conversation

04:07PM  24   Mr. Bongiovanni --

04:07PM  25   A.  Yes.

04:07PM 1   Q.  -- at a bar on Hertel?

04:07PM 2   A.  Yes.

04:07PM 3   Q.  Okay.  And then do you remember talking to the government

04:07PM 4   when you first started raising this back in August of 2019

04:07PM 5   about having this meeting at Mother's?

04:07PM 6          MR. TRIPI:  Objection as to date/time, I think we

04:07PM 7   need to be a little more specific.

04:07PM 8          THE COURT:  Overruled.  You can -- you can -- it was

04:07PM 9   specific enough for me.  But if the witness understands it, he

04:07PM 10  can answer it.  If he doesn't, he can tell you.

04:08PM 11         THE WITNESS:  The meeting at Mother's?  Yes, we did

04:08PM 12  meet at Mother's.

04:08PM 13         BY MR. SINGER:

04:08PM 14  Q.  Okay.  And that's different than a Hertel bar, you'd

04:08PM 15  agree with me on that?

04:08PM 16  A.  We met at Hertel, and we also met at Mother's.  I mean,

04:08PM 17  like I mentioned, there were bars and locations that we met

04:08PM 18  at.

04:08PM 19         THE COURT:  So maybe he doesn't -- didn't understand

04:08PM 20  it the way I did, Mr. Singer.  Re-ask.

04:08PM 21         MR. SINGER:  It's okay, Judge.

04:08PM 22         BY MR. SINGER:

04:08PM 23  Q.  So as far as the meeting with Ron Serio and Mike

04:08PM 24  Masecchia, so, you'd agree with me that you said in your

04:08PM 25  testimony yesterday that you met up with Ron Serio and you

04:08PM    1    met up with Mike Masecchia to talk about Bongiovanni's

04:08PM    2    initial rejection of this at M.T. Pocket's, correct?

04:08PM    3    A.  Correct.

04:08PM    4    Q.  But do you remember when you talked with the government

04:08PM    5    in your first proffer interview that you talked about meeting

04:08PM    6    up with Ron Serio and Mike Masecchia at the Western Door

04:08PM    7    restaurant?

04:08PM    8    A.  We had dinner there, yes.

04:08PM    9    Q.  Okay.  So, you would agree with me that the Western Door

04:08PM   10    restaurant is different than M.T. Pocket's, right?

04:08PM   11    A.  Correct.  But that was a different meeting.  It was -- we

04:08PM   12    met there, but we met at M.T. Pocket's, we met at different

04:09PM   13    bars usually to talk about what we had to talk about.

04:09PM   14    Q.  Okay.

04:09PM   15    A.  The Western Door was just dinner and just conversation.

04:09PM   16    Q.  Just dinner and conversation.  So you don't recall

04:09PM   17    telling the government about how the meeting at Western Door

04:09PM   18    was talking about the $4,000 month figure?

04:09PM   19    A.  Yes, it was.  That's what I meant by conversation

04:09PM   20    regarding what we had going on.

04:09PM   21    Q.  Okay.  So, as far as your second proffer meeting, do you

04:09PM   22    remember not really giving a specific date as to when

04:09PM   23    Mr. Bongiovanni purportedly agreed to this $4,000 a month

04:09PM   24    bribe?

04:09PM   25    A.  I remember that, yes.

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

208

| | | |
|---|---|---|
| 04:09PM | 1 | Q.  Okay.  And as far as the third proffer meeting, things |
| 04:09PM | 2 | changed a little in that, as well, right? |
| 04:09PM | 3 | A.  Correct. |
| 04:09PM | 4 | Q.  So in the third proffer meeting, you start to talk about |
| 04:09PM | 5 | how $2,000 was the initial proposal, right? |
| 04:09PM | 6 | A.  Correct. |
| 04:09PM | 7 | Q.  And then that was rejected, correct? |
| 04:09PM | 8 | A.  Correct. |
| 04:09PM | 9 | Q.  But then $4,000 was proposed, correct? |
| 04:09PM | 10 | A.  Correct. |
| 04:09PM | 11 | Q.  And that was accepted, correct? |
| 04:09PM | 12 | A.  Correct. |
| 04:09PM | 13 | Q.  And then later in your grand jury testimony, you talk |
| 04:09PM | 14 | about a structured transaction, correct? |
| 04:09PM | 15 | A.  Correct. |
| 04:10PM | 16 | Q.  That's very similar to the testimony you provided to the |
| 04:10PM | 17 | jury yesterday, today, correct? |
| 04:10PM | 18 | A.  Yes. |
| 04:10PM | 19 | Q.  Where you talked about how it wasn't that $4,000 was from |
| 04:10PM | 20 | the beginning, correct? |
| 04:10PM | 21 | A.  Correct. |
| 04:10PM | 22 | Q.  It was, it started out at $2,000, correct? |
| 04:10PM | 23 | A.  Correct. |
| 04:10PM | 24 | Q.  And then it was increased to $4,000 over time? |
| 04:10PM | 25 | A.  Correct. |

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

209

04:10PM 1    Q.  So you'd agree with me that this is all changing over the

04:10PM 2    course of time you're talking with the government, right?

04:10PM 3    A.  It's changing.  The operation is changing, too.  Correct.

04:10PM 4    Q.  Well, I know that's what you talked to us about.  But

04:10PM 5    what I'm talking about is what you told the government

04:10PM 6    initially.

04:10PM 7    A.  Yes.

04:10PM 8    Q.  You would agree with me that you changed your story with

04:10PM 9    the government as time progressed?

04:10PM 10   A.  Changed it as it progressed, I told them more how the

04:10PM 11   operation advanced.  So --

04:10PM 12   Q.  And your attorney were at part of these meetings, right?

04:10PM 13   A.  Yes.

04:10PM 14   Q.  You hired an attorney, 'cuz you realized that you're

04:10PM 15   facing federal charges, right?

04:10PM 16   A.  Correct.

04:10PM 17   Q.  You just can't grow marijuana in this capacity and expect

04:10PM 18   nothing to happen, right?

04:10PM 19   A.  No.

04:10PM 20   Q.  And Mr. Zaccagnino was someone you trusted, right?

04:11PM 21   A.  Yes.

04:11PM 22   Q.  He's someone who's helped you out in the past?

04:11PM 23   A.  No, not before.

04:11PM 24   Q.  He's helped out friends of yours in the past, right?

04:11PM 25   A.  Yes.

04:11PM   1          **MR. TRIPI:**  Objection, relevance.

04:11PM   2          **THE COURT:**  Overruled.  Cross-examination, overruled.

04:11PM   3          **BY MR. SINGER:**

04:11PM   4   Q.  And you respected him, correct?

04:11PM   5   A.  Correct.

04:11PM   6   Q.  You trusted his advice, correct?

04:11PM   7   A.  Yes.

04:11PM   8   Q.  And he talked to you about some of the penalties you

04:11PM   9   might be facing in this case, right?

04:11PM   10  A.  Yes.

04:11PM   11  Q.  He talked to you about how you were involved in a

04:11PM   12  marijuana conspiracy, correct?

04:11PM   13  A.  Yes.

04:11PM   14  Q.  And he talked to you about how there's a potential for a

04:11PM   15  five-year mandatory minimum attached to that?

04:11PM   16  A.  Correct.

04:11PM   17  Q.  Or potentially more, if even more marijuana can be

04:11PM   18  brought into the equation, correct?

04:11PM   19  A.  Correct.

04:11PM   20  Q.  He talked to you about the firearms?

04:11PM   21          **MR. TRIPI:**  Objection, privileged.  Attorney-client

04:11PM   22  privilege.

04:11PM   23          **MR. SINGER:**  Your Honor, this goes to the motive to

04:11PM   24  fabricate.  And it's 100 percent relevant.

04:11PM   25          **THE COURT:**  Why don't we come up?

| | | |
|---|---|---|
| 04:11PM | 1 | (Sidebar discussion held on the record.) |
| 04:12PM | 2 | **MR. TRIPI:**  Judge, my objection is privilege. |
| 04:12PM | 3 | There's a proper way to ask what he's facing without asking |
| 04:12PM | 4 | about the conversations with the attorney.  So he can simply |
| 04:12PM | 5 | ask weren't you facing X, correct?  Weren't you facing Y, |
| 04:12PM | 6 | correct?  Weren't you facing Z, correct?  Without delving into |
| 04:12PM | 7 | discussions he had with his attorney. |
| 04:12PM | 8 | So I'm not going to object if it's framed the right |
| 04:12PM | 9 | way, but I don't want him to delve into conversations that are |
| 04:12PM | 10 | attorney-client privileged. |
| 04:12PM | 11 | **MR. SINGER:**  Judge, the conversations, number one, |
| 04:12PM | 12 | the government doesn't have to the ability to assert a |
| 04:12PM | 13 | privilege -- sorry. |
| 04:12PM | 14 | **THE COURT:**  You're right.  The government doesn't |
| 04:12PM | 15 | have the ability.  And I'm concerned about the witness |
| 04:12PM | 16 | waiving.  I'm concerned about the witness waiving privilege. |
| 04:12PM | 17 | He doesn't know any better.  And you're asking him these |
| 04:12PM | 18 | questions about conversations with his lawyer, I'm a little |
| 04:13PM | 19 | troubled by that. |
| 04:13PM | 20 | **MR. TRIPI:**  I think you can get to the same |
| 04:13PM | 21 | information, Rob, without asking him about conversations with |
| 04:13PM | 22 | his lawyer, that's all I'm saying. |
| 04:13PM | 23 | **MR. SINGER:**  I'll just ask it the way -- |
| 04:13PM | 24 | **THE COURT:**  You can ask the way Mr. Tripi is |
| 04:13PM | 25 | suggesting, and can say and your lawyer was present with you |

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

04:13PM    1   at these meetings and these things were discussed, you can do

04:13PM    2   that, right?

04:13PM    3              (End of sidebar discussion.)

04:13PM    4              **THE COURT:**  Go ahead.

04:13PM    5              **BY MR. SINGER:**

04:13PM    6   Q.  Thank you.  So, Mr. Selva, you also knew that there were

04:13PM    7   firearms that were located inside your house during the

04:13PM    8   search, right?

04:13PM    9   A.  Correct.

04:13PM   10   Q.  You mentioned them today, one of them was a Mossburg

04:13PM   11   shotgun, right?

04:13PM   12   A.  Yes, sir.

04:13PM   13   Q.  And one of them was a .22 caliber rifle?

04:13PM   14   A.  Yes, sir.

04:13PM   15   Q.  And there was marijuana that was also located in your

04:13PM   16   house during that search, correct?

04:13PM   17   A.  Correct.

04:13PM   18   Q.  And so you understood that possession of a firearm, when

04:13PM   19   you're involved in a narcotics conspiracy, is a problem for

04:13PM   20   you, correct?

04:13PM   21   A.  Correct.

04:13PM   22   Q.  Because that exposes you to additional liability,

04:14PM   23   correct?

04:14PM   24   A.  Correct.

04:14PM   25   Q.  So the federal law for possession of a firearm in

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

04:14PM  1  furtherance of drug trafficking carries a five-year mandatory

04:14PM  2  minimum consecutive penalty, correct?

04:14PM  3  A.  Correct.

04:14PM  4  Q.  And that would run on top of whatever sentence you got

04:14PM  5  for the marijuana part of this conspiracy, right?

04:14PM  6  A.  Correct.

04:14PM  7  Q.  So that was something that concerned you as well, right?

04:14PM  8  A.  Correct.

04:14PM  9  Q.  And your attorney was part of these conversations that

04:14PM  10  you had with the government, correct?

04:14PM  11  A.  Yes.

04:14PM  12  Q.  He was also giving you advice about potential penalties

04:14PM  13  that you'll face, correct?

04:14PM  14  A.  Correct.

04:14PM  15  Q.  So, regarding these grows, you talked about the structure

04:14PM  16  and I want to talk to you about that for a second.

04:14PM  17      So, in 2008, you mentioned these grows are happening,

04:14PM  18  this is where you first approached Mr. Bongiovanni, correct?

04:14PM  19  A.  Correct.

04:14PM  20  Q.  And you stated that as part of your entry into this

04:15PM  21  conspiracy, one of the things you promised was I'm gonna help

04:15PM  22  you, but I'm also gonna help provide information to protect

04:15PM  23  you, correct?

04:15PM  24  A.  Who had said that?  I'm sorry.

04:15PM  25  Q.  I'm asking you.  Your entry into the conspiracy, one of

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

214

04:15PM   1   the reasons why you joined it, was to help in the --

04:15PM   2       I'm sorry, Ann.

04:15PM   3       I'm asking you, when you entered the conspiracy, one of

04:15PM   4   the jobs you had was to help grow and cultivate the

04:15PM   5   marijuana, correct?

04:15PM   6   A.  Correct.

04:15PM   7   Q.  And the other job that you offered, the value that you

04:15PM   8   offered to Mr. Masecchia, was that based on your relationship

04:15PM   9   with Mr. Bongiovanni, you would be able to get information to

04:15PM  10   help protect the conspiracy, correct?

04:15PM  11   A.  Correct.

04:15PM  12   Q.  And so in exchange for that value that you offered,

04:15PM  13   Mr. Masecchia and Mr. Serio agreed to provide you 20 to 25

04:15PM  14   percent of the profits, correct?

04:15PM  15   A.  No.  That was before.  That -- that arrangement was made

04:15PM  16   before.

04:15PM  17   Q.  That arrangement was made when?

04:15PM  18   A.  When Mike and I had originally spoken, he explained to me

04:15PM  19   how it worked, and how the percentage worked.

04:16PM  20   Q.  And so in 2008, the percentage that you were getting

04:16PM  21   based on your involvement was 20 to 25 percent, correct?

04:16PM  22   A.  Correct.

04:16PM  23   Q.  That's what you negotiated for, correct?

04:16PM  24   A.  Correct.

04:16PM  25   Q.  And I think you testified yesterday, you talked about

04:16PM    1    what the average profits of this for a year for your grow,

04:16PM    2    correct?

04:16PM    3    A.   Correct.   That fluctuated.

04:16PM    4    Q.   And it was in roughly the $100,000 to $80,000 range,

04:16PM    5    correct?

04:16PM    6    A.   It could be, yes.

04:16PM    7    Q.   So you mentioned that when Mr. Bongiovanni first started

04:16PM    8    taking bribes, you were paying him $2,000 a month, correct?

04:16PM    9    A.   Correct.

04:16PM   10    Q.   And you'd agree with me that $2,000 a month times 12,

04:16PM   11    that's $24,000 a year, correct?

04:16PM   12    A.   Correct.

04:16PM   13    Q.   So, on a $100,000 operation, right --

04:16PM   14    A.   Correct.

04:16PM   15    Q.   -- let's say it's a good year, you're making a

04:16PM   16    $100,000 --

04:16PM   17    A.   Yes.

04:16PM   18    Q.   -- the conspiracy agreed to pay you 20 to 25 percent of

04:16PM   19    that, correct?

04:16PM   20    A.   Correct.

04:16PM   21    Q.   And then Mr. Bongiovanni was being paid $26,000 a year,

04:16PM   22    correct?

04:16PM   23    A.   Correct.

04:16PM   24    Q.   And you'd agree with me that that represents roughly 50

04:17PM   25    percent of the profits?

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

04:17PM   1   A.  Correct.  We would split whatever -- whatever total there

04:17PM   2   was, it would be split after the expense of was paid off the

04:17PM   3   top.

04:17PM   4   Q.  So the 50 percent, all right, that was left over?

04:17PM   5   A.  Yes.

04:17PM   6   Q.  All right.  That's something that would be divided up

04:17PM   7   between the other remaining parts of the conspiracy?

04:17PM   8   A.  Correct.  I was referencing the gross profits, what it

04:17PM   9   made.  And then it was paid off the top, and then the rest

04:17PM   10  was split.

04:17PM   11  Q.  So, paid off the top, and then the rest was split, right?

04:17PM   12  A.  Correct.

04:17PM   13  Q.  So, under that theory, you'd agree with me that the

04:17PM   14  payment for protection here is roughly taking a quarter of

04:17PM   15  whatever profits anyone's gonna be making, correct?

04:17PM   16  A.  Correct.

04:17PM   17  Q.  That's a large chunk of the percentage, correct?

04:17PM   18  A.  Correct.

04:17PM   19  Q.  And your conspirators agreed to this, correct?

04:17PM   20  A.  Correct.

04:17PM   21  Q.  So, you testified that you believe that Mr. Bongiovanni

04:17PM   22  took these bribes because he was in financial distress; do

04:17PM   23  you remember that?

04:17PM   24  A.  Yes.

04:17PM   25  Q.  He didn't declare bankruptcy like you did in 2008, right?

04:18PM     1    A.  No.

04:18PM     2    Q.  He didn't have multiple children like you did, correct?

04:18PM     3    A.  No.  He had just gone through a divorce, and he had one

04:18PM     4    child.

04:18PM     5    Q.  Okay.  And I know you talked about that.  You said that

04:18PM     6    you two talked about some of his complaints about making

04:18PM     7    maintenance payments to his ex-spouse JoAnn, correct?

04:18PM     8    A.  Correct.

04:18PM     9    Q.  Were you aware that the maintenance payments ceased in

04:18PM    10    2005, sir?

04:18PM    11    A.  I was not.

04:18PM    12    Q.  Okay.

04:18PM    13    A.  But he would talk about expenses relating to the divorce.

04:18PM    14    And I was just -- assuming that the maintenance payments were

04:18PM    15    still part of that.

04:18PM    16    Q.  And like we talked about earlier, this divorce was

04:18PM    17    finalized in 2003, correct?

04:18PM    18    A.  Correct.  But then he still had to pay child support and

04:18PM    19    other expenses.

04:18PM    20    Q.  Okay.  And you had this conversation in 2008, as you

04:18PM    21    allege, correct?

04:18PM    22    A.  Correct.

04:18PM    23    Q.  And that's several years after the divorce, correct?

04:18PM    24    A.  Correct.

04:18PM    25    Q.  Maintenance payments stopped in 2005, that's several

04:18PM    1    years after the maintenance payments stopped?

04:19PM    2           **MR. TRIPI:**  Objection, assumes facts not entered

04:19PM    3    through this witness.  He said he didn't know when the

04:19PM    4    maintenance payments stopped.

04:19PM    5           **THE COURT:**  No, overruled.  He's asking you to assume

04:19PM    6    if the maintenance payments stopped in 2005, that would be

04:19PM    7    several years after that.

04:19PM    8           **THE WITNESS:**  Correct.  Yes.

04:19PM    9           **BY MR. SINGER:**

04:19PM   10    Q.  And Mr. Bongiovanni, to your understanding, he had a

04:19PM   11    steady job with the government, correct?

04:19PM   12    A.  Correct.

04:19PM   13    Q.  And he was getting paid pretty well, correct?

04:19PM   14    A.  Correct.

04:19PM   15    Q.  He was able to afford different things, correct.

04:19PM   16    A.  Correct.

04:19PM   17    Q.  He's able to afford to send his child to private school,

04:19PM   18    correct?

04:19PM   19    A.  Yes.

04:19PM   20    Q.  He was able to afford various medical things that she

04:19PM   21    needed, correct?

04:19PM   22    A.  Correct.

04:19PM   23    Q.  And I know he complained about those things, correct?

04:19PM   24    A.  Correct.

04:19PM   25    Q.  But he still paid those things, correct?

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

04:19PM 1 A. Correct.

04:19PM 2 Q. And he's in a much different financial position than you

04:19PM 3 are, correct?

04:19PM 4 A. Yes.

04:19PM 5 Q. As far as the rental apartment and his property, you

04:19PM 6 testified yesterday that you believe that when Lindsay

04:19PM 7 Bongiovanni and he moved in together, correct?

04:20PM 8 A. Correct.

04:20PM 9 Q. That the rental apartment remained vacant, correct?

04:20PM 10 A. Correct. She lived upstairs, and then she moved

04:20PM 11 downstairs with him.

04:20PM 12 Q. And if you were to know that that rental apartment was

04:20PM 13 not vacant, that would change things, correct?

04:20PM 14 A. Correct. But I believe it was. I've been there, and

04:20PM 15 there was no tenant in there. She moved downstairs.

04:20PM 16 Q. When were you in there, sir?

04:20PM 17 A. Right after she moved downstairs.

04:20PM 18 Q. When was that?

04:20PM 19 A. The time frame, the 2009, 2010, whenever it was.

04:20PM 20 Q. And when was it that you were in that apartment?

04:20PM 21 A. I was Joe's house at 221 Lovering, and it was vacant

04:20PM 22 upstairs.

04:20PM 23 Q. And how long was it vacant for?

04:20PM 24 A. From the time Lindsay moved downstairs, it was still

04:20PM 25 vacant.

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

220

| | | |
|---|---|---|
| 04:20PM | 1 | Q.  How long was that period, sir? |
| 04:20PM | 2 | A.  That had to be at least five months, six months. |
| 04:20PM | 3 | Q.  At least five or six months? |
| 04:20PM | 4 | A.  Yes. |
| 04:20PM | 5 | Q.  So, regarding the information setup.  So the setup of the |
| 04:20PM | 6 | conspiracy you testified was that you were the person who |
| 04:21PM | 7 | would be gathering the information and providing the |
| 04:21PM | 8 | information, correct? |
| 04:21PM | 9 | A.  Correct. |
| 04:21PM | 10 | Q.  And Mr. Masecchia's role in this was that he was the |
| 04:21PM | 11 | person who would be getting money and providing money to |
| 04:21PM | 12 | Mr. Bongiovanni, right? |
| 04:21PM | 13 | A.  Correct.  He would get it from Ron, and then provide it. |
| 04:21PM | 14 | Q.  Fair to say you never saw Mr. Masecchia pay any money to |
| 04:21PM | 15 | Mr. Bongiovanni, right? |
| 04:21PM | 16 | A.  No, because they arranged the meeting. |
| 04:21PM | 17 | Q.  So they arranged those things on their own, you weren't |
| 04:21PM | 18 | part of those? |
| 04:21PM | 19 | A.  Correct. |
| 04:21PM | 20 | Q.  So you never saw what happened with the money, correct? |
| 04:21PM | 21 | A.  No, because it was handled through Mike, which he got |
| 04:21PM | 22 | from Ron. |
| 04:21PM | 23 | Q.  And you testified that Joseph Bongiovanni had comfort |
| 04:21PM | 24 | with you, correct? |
| 04:21PM | 25 | A.  Correct. |

04:21PM   1   Q.  He was somebody that you knew, correct?

04:21PM   2   A.  Yes.

04:21PM   3   Q.  He was somebody -- sorry, I should say you were someone

04:21PM   4   he knew, correct?

04:21PM   5   A.  Yes.

04:21PM   6   Q.  And you guys had been friends for a long period of time,

04:21PM   7   correct?

04:21PM   8   A.  Yes.

04:21PM   9   Q.  Mike Masecchia's a little different, correct?

04:21PM  10   A.  Correct.  But he's known him for the same -- he's known

04:22PM  11   him for a long period of time.

04:22PM  12   Q.  He's known him for a long period of time, but he's not

04:22PM  13   someone who converses on the phone with him every day or

04:22PM  14   every other day like you two, sometimes, correct?

04:22PM  15   A.  Correct.

04:22PM  16   Q.  Not someone who goes out to dinner all the time with

04:22PM  17   Mr. Bongiovanni, correct?

04:22PM  18   A.  Correct.  And neither was I.

04:22PM  19   Q.  Little different situation, correct?

04:22PM  20   A.  Correct.

04:22PM  21   Q.  So -- so, one of the reasons that you said in your direct

04:22PM  22   testimony that Mr. Masecchia was providing the money is that

04:22PM  23   Mr. Bongiovanni was apprehensive about meeting you for the

04:22PM  24   money?

04:22PM  25   A.  Yes.

04:22PM    1    Q.  But he'd still meet you for the information, correct?

04:22PM    2    A.  Correct.  We'd meet for a drink, it would be brief, get

04:22PM    3    an update, and I'd leave.  We'd hang out and be social, then

04:22PM    4    at the end of the night, I'd leave.

04:22PM    5    Q.  And these meetings, when they occurred, they occurred in

04:22PM    6    bars?

04:22PM    7    A.  Usually.

04:22PM    8    Q.  They occurred in public places, correct?

04:22PM    9    A.  Correct.

04:22PM   10    Q.  There were people around you when you had these

04:22PM   11    conversations?

04:22PM   12    A.  Correct, but we were alone.  We were standing at the bar,

04:23PM   13    nobody could hear our conversation.

04:23PM   14    Q.  How do you know that, sir?

04:23PM   15    A.  Because I know.  It was loud, and I'd talk in his ear,

04:23PM   16    he'd talk in my ear.  It was just a conversation.

04:23PM   17    Q.  You've been a bartender before, correct?

04:23PM   18    A.  Correct.

04:23PM   19    Q.  How many years?

04:23PM   20    A.  Long time.

04:23PM   21    Q.  Long time, right?  Like 30-plus years?

04:23PM   22    A.  Worked a lot of loud bars, too, and I haven't heard any

04:23PM   23    conversations.  You can hear scattered voices, but you don't

04:23PM   24    get the context of it.

04:23PM   25    Q.  I've been a bartender, too, myself.  You've listened in

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

223

04:23PM   1   on conversations that people are having, right?

04:23PM   2   A.   I mean, I don't --

04:23PM   3   Q.   Yes or no.

04:23PM   4   A.   Do I listen in purposely?  No.  If I --

04:23PM   5   Q.   But you overhear those conversations sometimes, right,

04:23PM   6   sir?

04:23PM   7   A.   I hear people talking, I don't know the context of a

04:23PM   8   conversation.

04:23PM   9   Q.   And so you're talking about involvement in a narcotics

04:23PM   10   conspiracy in a bar --

04:23PM   11   A.   Correct.

04:23PM   12   Q.   -- in the open?

04:23PM   13   A.   No, not in the open.  I just mentioned, I told you, I was

04:23PM   14   close with him and talk in his ear.

04:23PM   15   Q.   You said you were close to him, right?

04:23PM   16   A.   When I talked to him, I would lean forward and I would

04:23PM   17   mention -- we would talk in our -- whatever context was

04:24PM   18   talked about regarding this, it was done in a close

04:24PM   19   proximity.

04:24PM   20   Q.   So you were whispering in each other's ear in a bar?

04:24PM   21   A.   Correct.

04:24PM   22   Q.   And this occurred on a Friday night?

04:24PM   23   A.   I don't remember what night, it was whatever night during

04:24PM   24   the week whenever we met.

04:24PM   25   Q.   Now, that's in contrast with some of the other

04:24PM  1    conversations you testified to today, right?

04:24PM  2    A.  Contest?  I'm sorry --

04:24PM  3    Q.  So in the later parts of this conspiracy that you talk

04:24PM  4    about, you weren't meeting Mr. Bongiovanni out at a bar or a

04:24PM  5    restaurant, right?  You were meeting him at his house?

04:24PM  6    A.  Met at his house, met at a bar/restaurant, we met at

04:24PM  7    different locations.

04:24PM  8    Q.  You were meeting at his house for some of these

04:24PM  9    conversations, correct?

04:24PM  10   A.  Correct.

04:24PM  11   Q.  You were meeting him at parks for some of these

04:24PM  12   conversations, correct?

04:24PM  13   A.  Not for these conversations.  I mean, when I met him at a

04:24PM  14   park --

04:24PM  15   Q.  For conversations regarding this conspiracy, later in the

04:24PM  16   conspiracy, you're talking about meeting him at his house,

04:24PM  17   right?

04:24PM  18   A.  Yes.

04:24PM  19   Q.  Talking about meeting him at a park?

04:24PM  20   A.  Correct, yes.

04:25PM  21   Q.  Sitting down at a bench?

04:25PM  22   A.  Yes, correct.

04:25PM  23   Q.  And those areas are where people really aren't present,

04:25PM  24   correct?

04:25PM  25   A.  Correct.

04:25PM  1    Q.  Not like a bar?

04:25PM  2    A.  Correct.

04:25PM  3    Q.  A little more clandestine, correct?

04:25PM  4    A.  Very isolated, yes.

04:25PM  5    Q.  All right.  So it's a difference, correct?

04:25PM  6    A.  It's a big difference, yes.

04:25PM  7    Q.  So, as far as this plan that you talked about, you said

04:25PM  8    that if you were ever caught, Mr. Bongiovanni suggested to

04:25PM  9    you that you claim that you were his confidential informant,

04:25PM 10    correct?

04:25PM 11    A.  Correct.

04:25PM 12    Q.  But you never said that when the government raided your

04:25PM 13    house in August 2019, correct?

04:25PM 14    A.  Correct.

04:25PM 15    Q.  You never said, hey, I'm Mr. Bongiovanni's C.I., you need

04:25PM 16    to call him, correct?

04:25PM 17    A.  He was referencing if anything happened regarding and

04:25PM 18    involving him, and then they pulled me in, and they

04:25PM 19    questioned me regarding his involvement to say I was a C.I.

04:25PM 20    Q.  Well, let's talk about that.  So your first proffer

04:25PM 21    meeting, you have a couple days after the search, right?

04:25PM 22    A.  Yes.

04:26PM 23    Q.  And in that meeting when prosecutors start asking you

04:26PM 24    questions, you don't say, hey, I'm Mr. Bongiovanni's C.I.,

04:26PM 25    can we talk to him?

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

04:26PM   1    A.   No.

04:26PM   2    Q.   So you didn't follow the plan.

04:26PM   3    A.   No, I didn't know it was -- it was not regarding -- it

04:26PM   4    was regarding what they just raided in my basement.  This

04:26PM   5    came out over a course of time, all this information.

04:26PM   6    Q.   So you don't recall talking to them about Mr. Bongiovanni

04:26PM   7    in your first proffer meeting, sir?

04:26PM   8    A.   I did.  But I'm just saying what was coming out was what

04:26PM   9    had just transpired in my base -- they just raided my --

04:26PM  10    there was a search warrant executed in my house, so that's

04:26PM  11    what I was talking about.

04:26PM  12    Q.   Mr. Selva, you knew why they raided your house, right?

04:26PM  13    A.   I do, yes.

04:26PM  14    Q.   You did at that time, too, back in August of 2019, right?

04:26PM  15    A.   Yes.

04:26PM  16    Q.   You had concerns, correct?

04:26PM  17    A.   Correct.  It was August of -- yes, '19, correct.

04:26PM  18    Q.   So, you knew what it was about when they walked into your

04:26PM  19    house, correct?

04:26PM  20    A.   Did I know what it was about?

04:26PM  21    Q.   Correct.

04:26PM  22    A.   No, not really.

04:27PM  23    Q.   You didn't know?

04:27PM  24    A.   I mean, they said it was a search warrant.  And then I

04:27PM  25    didn't know at that moment.  They knocked my door down, and

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

227

04:27PM    1    they searched my house.  And then later on through the day,

04:27PM    2    yes.

04:27PM    3    Q.  Mr. Selva, they talked to you about marijuana being found

04:27PM    4    in your house, correct?

04:27PM    5    A.  Yes.  I knew that day, yes.

04:27PM    6    Q.  And they talked to you about when you started this

04:27PM    7    operation, correct?

04:27PM    8    A.  Correct.

04:27PM    9    Q.  So you clearly know at that point in time what the

04:27PM   10    purpose of their investigation is, right?

04:27PM   11    A.  Correct.

04:27PM   12    Q.  And you had concerns about the fact that, oh, my God,

04:27PM   13    this might be involving every one of my conspirators,

04:27PM   14    correct?

04:27PM   15    A.  Correct.

04:27PM   16    Q.  And, so, at that time, knowing all that, you didn't say,

04:27PM   17    I'm Mr. Bongiovanni's C.I.?  You didn't say that, right?

04:27PM   18    A.  No.  No.  Because he was involved.

04:27PM   19    Q.  So as far as the information that was provided, you

04:27PM   20    talked about names, Dave Mitchkay, I think was the name

04:28PM   21    yesterday?

04:28PM   22    A.  Yes.

04:28PM   23    Q.  You also talked about a Siwiec or a Siwiec?

04:28PM   24    A.  Yes, but Dave Siwiec was not involved.

04:28PM   25    Q.  Okay.  But you mentioned those names yesterday, correct?

04:28PM   1    A.   Dave Siwiec was at a --

04:28PM   2            **MR. TRIPI:**  Objection.

04:28PM   3            **THE WITNESS:**  He had nothing to do with it.

04:28PM   4            **MR. TRIPI:**  Mixing --

04:28PM   5            **THE COURT:**  Stop, stop, stop.

04:28PM   6            **MR. TRIPI:**  In which context?

04:28PM   7            **THE COURT:**  Stop.

04:28PM   8            **MR. TRIPI:**  It's confusing.  That's the objection.

04:28PM   9            **THE COURT:**  No.  Over -- the question is, did you

04:28PM  10    talk about Dave Siwiec.  That's the question.  Did you talk

04:28PM  11    about a Dave Siwiec yesterday, right?

04:28PM  12            **MR. SINGER:**  Correct.

04:28PM  13            **THE COURT:**  Okay.  That -- that's fine -- that's a

04:28PM  14    fine question.

04:28PM  15            **MR. TRIPI:**  Okay.

04:28PM  16            **THE COURT:**  Overruled.

04:28PM  17            **BY MR. SINGER:**

04:28PM  18    Q.   You talked about Dave Siwiec yesterday, correct?

04:28PM  19    A.   Yes.

04:28PM  20    Q.   And you talked about Mitchkay, and wanting

04:28PM  21    Mr. Bongiovanni to check if he was in some way under

04:28PM  22    investigation, correct?

04:28PM  23    A.   Mitchkay, I believe, yes.

04:28PM  24    Q.   And you recall testifying that Mr. Bongiovanni said that

04:28PM  25    he was all clear after checking; is that right?

04:28PM    1    **MR. TRIPI:** Objection. Assumes facts not in

04:29PM    2    evidence. Misstates the evidence.

04:29PM    3    **THE COURT:** I don't recall, it's the jury's

04:29PM    4    recollection that will -- that will control and so I'm going

04:29PM    5    to overrule the objection because I don't recall.

04:29PM    6    **BY MR. SINGER:**

04:29PM    7    Q. Do you remember Mr. Bongiovanni telling you that it was

04:29PM    8    all clear after Mitchkay?

04:29PM    9    A. I do, yes.

04:29PM    10    Q. And Mark Falzone was somebody that you also mentioned

04:29PM    11    needed to be checked?

04:29PM    12    A. No. Mark was not on that list.

04:29PM    13    Q. Not on that list?

04:29PM    14    A. No.

04:29PM    15    Q. Frank Burkhart, was he someone that you mentioned?

04:29PM    16    A. Yes.

04:29PM    17    Q. And you do you recall Mr. Bongiovanni say that he was all

04:29PM    18    clear after a check?

04:29PM    19    A. Yes.

04:29PM    20    Q. You also talked about R.K.

04:29PM    21    A. Yes.

04:29PM    22    Q. When was it that you requested that Mr. Bongiovanni check

04:29PM    23    into R.K.?

04:29PM    24    A. The time frame when Ron gave me the list. It was -- I

04:29PM    25    don't recall the exact date. Do you have something that can

04:29PM   1   recollect my memory?

04:29PM   2   Q.  I'm asking you, sir.  Do you know?

04:29PM   3   A.  Yes.  It was, 2011, '12.

04:30PM   4   Q.  2011 or '12?

04:30PM   5   A.  Yes.

04:30PM   6   Q.  And you knew R.K. in some capacity, correct?

04:30PM   7   A.  I knew of him.

04:30PM   8   Q.  You knew of him through the Sirianni family, correct?

04:30PM   9   A.  Correct.

04:30PM  10   Q.  Sirianni were -- I think it was -- who was it that you

04:30PM  11   lived with who was a Sirianni?

04:30PM  12   A.  Anthony had lived with me for a little while.

04:30PM  13   Q.  Anthony Sirianni, you knew, you knew him because he was a

04:30PM  14   roommate of yours?

04:30PM  15   A.  Yes.  He'd gone through a divorce, too, yes.

04:30PM  16   Q.  And he was someone that was familiar with R.K. through

04:30PM  17   the connection through Robert Runfola, correct?

04:30PM  18   A.  Yes.  I believe it was -- he was friends with his

04:30PM  19   brother, Robert.

04:30PM  20   Q.  Correct.  And Robert Runfola was the person who overdosed

04:30PM  21   and died?

04:30PM  22   A.  I believe so, yes.

04:30PM  23   Q.  And Peter Militello was the person who caused that

04:30PM  24   overdose as a dealer?

04:30PM  25          **MR. TRIPI:**  Objection.  Personal knowledge.

04:30PM  1          **MR. SINGER:**  I'm asking him, Judge.

04:30PM  2          **MR. TRIPI:**  He has to have personal knowledge.

04:30PM  3          **THE COURT:**  Hang on.  Hang on.

04:31PM  4          Overruled.  You can ask the question, the witness can

04:31PM  5  answer to the best of his knowledge.

04:31PM  6          **THE WITNESS:**  From what I recall, yes.

04:31PM  7          **BY MR. SINGER:**

04:31PM  8  Q.  And Anthony Sirianni was somebody who knew R.K., correct?

04:31PM  9  A.  Correct.

04:31PM  10  Q.  And you knew R.K., correct?

04:31PM  11  A.  I told you I knew of him, I didn't know him.

04:31PM  12  Q.  Okay.  And as far as that time period you're talking

04:31PM  13  about, you were aware, or Mike Masecchia or Ron Serio were

04:31PM  14  aware, that Mr. R.K. was facing criminal charges, correct?

04:31PM  15  A.  Correct.

04:31PM  16  Q.  And that was one of the reasons why it was asked or you

04:31PM  17  asked, reportedly, Mr. Bongiovanni to go check him out,

04:31PM  18  correct?

04:31PM  19  A.  Correct.

04:31PM  20  Q.  Because all of you were aware that he had a burglary

04:31PM  21  charge?

04:31PM  22  A.  He been arrested, correct.

04:31PM  23  Q.  It was a pretty public burglary charge?

04:31PM  24  A.  Yeah, and he had priors, and there was a concern that he

04:31PM  25  could possibly become an informant.

04:31PM   1   Q.  Correct.  And he was a junkie, fair to say?

04:32PM   2   A.  Correct.

04:32PM   3   Q.  Had a lot of problems with crack cocaine?

04:32PM   4   A.  Yes.

04:32PM   5   Q.  And it was well known about all these things to your

04:32PM   6   conspirators, correct?

04:32PM   7   A.  Yes.

04:32PM   8   Q.  And you know about those things, too, correct?

04:32PM   9   A.  Correct.  That's why Ron raised speculation, wanted to

04:32PM  10   have him checked out.  He was worried he was going to be

04:32PM  11   become an informant.

04:32PM  12   Q.  And another person you mentioned that Mr. Bongiovanni

04:32PM  13   purportedly provided information was Mario Vacanti, correct?

04:32PM  14   A.  Yeah.

04:32PM  15   Q.  So when did Ron Serio ask about Mario Vacanti?

04:32PM  16   A.  Time frame was 2011, '12, right around there.

04:32PM  17   Q.  Okay.  You're aware of the fact that Mario Vacanti is

04:32PM  18   related to Sammy Vacanti, correct?

04:32PM  19   A.  Correct, it's his brother.

04:32PM  20   Q.  And you're aware that Sammy Vacanti was convicted of

04:32PM  21   murder, correct?

04:32PM  22   A.  Yes.

04:32PM  23   Q.  And you're aware that Mario Vacanti was indicted in a

04:32PM  24   federal indictment for drug conspiracy in 2011, correct?

04:33PM  25   A.  I had heard, yes.

04:33PM    1    Q.  You'd heard that?

04:33PM    2    A.  Yes.

04:33PM    3    Q.  And you're aware that he pleaded guilty to that drug

04:33PM    4    conspiracy in federal court, correct?

04:33PM    5    A.  I'm not aware that he pleaded guilty, no.

04:33PM    6    Q.  Are you aware of the fact that he was placed on probation

04:33PM    7    as a result of that?

04:33PM    8              **MR. TRIPI:**  Objection.  Calls for hearsay.  Are you

04:33PM    9    aware, are you aware.  Calls for hearsay, Judge.

04:33PM   10              **THE WITNESS:**  I am not.

04:33PM   11              **THE COURT:**  Well, what's the reason it's being

04:33PM   12    offered.

04:33PM   13              **MR. SINGER:**  Judge, if we can approach.

04:33PM   14              **THE COURT:**  Come on up.

04:33PM   15              (Sidebar discussion held on the record.)

04:33PM   16              **THE COURT:**  You're offering it for the witness's

04:33PM   17    state of mind, not for the --

04:33PM   18              **MR. SINGER:**  Exactly.

04:33PM   19              **THE COURT:**  You're offering it for the witness's

04:33PM   20    state of mind, not for the truth.

04:33PM   21              **MR. SINGER:**  Not for the truth.  But I'm also

04:33PM   22    offering it for the fact to rebut his allegation of he needs

04:33PM   23    information on this person, if this person was convicted of a

04:33PM   24    federal charge and on probation, why does he need information

04:33PM   25    to know whether he was an informant or not, Judge.  It doesn't

04:33PM  1    make any sense.

04:33PM  2           MR. TRIPI:  How would he know what his sentence was?

04:33PM  3    He said he didn't know he was convicted.  He didn't know those

04:34PM  4    answers to those questions.

04:34PM  5           THE COURT:  Overruled.  It's not being offered for

04:34PM  6    the truth of the matter asserted, it's being offered for the

04:34PM  7    witness's state of mind.  That is not hearsay.  Overruled.

04:34PM  8           MR. TRIPI:  No, but if the witness says he doesn't

04:34PM  9    know what the sentence was, I think that's what Mr. Singer

04:34PM 10    just said.  He's talking about probation.  The witness said he

04:34PM 11    didn't know that, Judge.  That's the issue.

04:34PM 12           THE COURT:  Well, then he can say he doesn't know.

04:34PM 13    But the hearsay objection, so if you've got another objection

04:34PM 14    other than hearsay, I'll listen to it.  But the hearsay

04:34PM 15    objection is overruled because it's being offered for the

04:34PM 16    witness's state of mind.  Let's go.

04:34PM 17           (Sidebar discussion ended.)

04:34PM 18           THE COURT:  Objection is overruled.

04:34PM 19           BY MR. SINGER:

04:34PM 20    Q.  So, I'll ask you again.  Were you aware that he was

04:34PM 21    placed on probation after he pled guilty in federal court?

04:34PM 22    A.  I was not.

04:34PM 23    Q.  And you'd agreeing with me that getting involved with

04:34PM 24    someone who has pending federal charges is not the smartest

04:34PM 25    thing as a criminal?

04:34PM     1    A.  Correct.  But Ron knew him quite a long time.

04:35PM     2    Q.  T.S. was someone else you mentioned, do you remember

04:35PM     3    that?

04:35PM     4    A.  Correct.

04:35PM     5    Q.  And he was somebody that Mr. Bongiovanni purportedly

04:35PM     6    provided information about, correct?

04:35PM     7    A.  Correct.

04:35PM     8    Q.  When was that request made?

04:35PM     9    A.  Same time for R.K.

04:35PM    10    Q.  And you related yesterday to the jury that it was done

04:35PM    11    because Mr. T.S. was the subject of some type of arrest

04:35PM    12    recently?

04:35PM    13    A.  At that time, again, this came from Ron to give to Mike

04:35PM    14    and have me reach out to Joe.

04:35PM    15    Q.  What time period was that arrest?

04:35PM    16    A.  I believe 2012, '13.

04:35PM    17    Q.  So, these three people, fair to say, fair statement

04:35PM    18    that -- that you were aware of the fact that they had some

04:35PM    19    type of criminal records, correct?

04:35PM    20    A.  From what I -- yes.

04:35PM    21    Q.  And was it a fair statement that Mike Masecchia was aware

04:35PM    22    that these people had some type of criminal records?

04:36PM    23    A.  I don't know.  I don't know what Mike thought about it or

04:36PM    24    if he knew.

04:36PM    25    Q.  Did anyone ever ask you to check up on whether one of the

04:36PM    1    Suppas was under investigation?

04:36PM    2    A.  No.

04:36PM    3    Q.  And Mr. Bongiovanni never mentioned to you anything about

04:36PM    4    the Suppas being under investigation, correct?

04:36PM    5    A.  No.

04:36PM    6    Q.  So you talked a little bit about information that

04:36PM    7    Mr. Bongiovanni purportedly provided you about law

04:36PM    8    enforcement tactics; do you remember that?

04:36PM    9    A.  Yes.

04:36PM   10    Q.  So one of the things that you stated -- actually, let me

04:36PM   11    ask you this first.  Where did this conversation happen?

04:36PM   12    A.  Regarding that?

04:36PM   13    Q.  Yes.

04:36PM   14    A.  Either -- I believe that was at -- I believe we were out

04:36PM   15    probably on Hertel Avenue, M.T. Pocket's, Gables.

04:36PM   16    Q.  When?

04:36PM   17    A.  2013, '14.

04:37PM   18    Q.  So one of the things that you talked about he related to

04:37PM   19    you is to never speak on the phone?

04:37PM   20    A.  Correct.

04:37PM   21    Q.  So, you know that's a good idea, because Mike Masecchia

04:37PM   22    doesn't do that unless he has a burner, right?

04:37PM   23    A.  Correct.

04:37PM   24    Q.  And you know, based on your experience in the cell phone

04:37PM   25    business, that calls, when you make them on a cell phone, are

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

04:37PM   1   logged, correct?

04:37PM   2   A.  They're logged, correct.

04:37PM   3   Q.  So, walking into it, you know that it's not a good idea

04:37PM   4   to transact criminal business on a phone, right?

04:37PM   5   A.  Right.

04:37PM   6   Q.  Because it leaves a record?

04:37PM   7   A.  Correct.

04:37PM   8   Q.  So you agree with me that Mr. Bongiovanni is not really

04:37PM   9   telling you anything that's groundbreaking here, right?

04:37PM   10   A.  Over, what?  I mean --

04:37PM   11   Q.  Over not using the phone to conduct criminal business?

04:37PM   12   A.  Right.  He was relaying from his experience, you know,

04:37PM   13   just giving me advice to be safe, don't ever talk of anything

04:38PM   14   of any significance over the phone.

04:38PM   15   Q.  So another thing you said he related to you is to be

04:38PM   16   aware of your surroundings and look out for the police,

04:38PM   17   correct?

04:38PM   18   A.  Correct.

04:38PM   19   Q.  You'd agree with me, that's something pretty basic if

04:38PM   20   you're going to engage in criminal activity, right?

04:38PM   21   A.  But he told me what to look for.

04:38PM   22   Q.  Well, yeah, so he talked to you about another thing that

04:38PM   23   you mentioned yesterday, about look out for certain types of

04:38PM   24   cars with tinted windows, correct?

04:38PM   25   A.  Cars, Verizon trucks, National Grid, if they're parked

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

04:38PM   1   down the end of the street for a while, could raise a red

04:38PM   2   flag, something could be going on.

04:38PM   3   Q.  So let's focus on the cars first.  So he talked to you

04:38PM   4   about SUVs, correct?

04:38PM   5   A.  SUVs, Chargers, correct.

04:38PM   6   Q.  And those are pretty common police vehicles, correct?

04:38PM   7   A.  Correct, with tinted windows, correct.

04:38PM   8   Q.  You see them on the street all the time, correct?

04:38PM   9   A.  Correct.

04:38PM   10  Q.  And when you see them on the street sometimes, you

04:38PM   11  probably let off the gas a little bit like everybody else,

04:38PM   12  right?

04:38PM   13  A.  Correct.

04:38PM   14  Q.  So he's not telling you anything you don't already know,

04:39PM   15  correct?

04:39PM   16  A.  Well, it was referencing if see it around, you know, if

04:39PM   17  something was going on, for example, if they were around your

04:39PM   18  house, or if you were transporting something, and you see

04:39PM   19  those type of vehicles, when the activity was occurring.

04:39PM   20  Q.  Okay.

04:39PM   21  A.  Beyond that, be on the lookout for them.  Just be aware

04:39PM   22  of your surroundings.

04:39PM   23  Q.  So he talked to you about the use of GPS trackers, right?

04:39PM   24  A.  Correct.

04:39PM   25  Q.  And he actually, according to your testimony, warned you

04:39PM  1   that Mike Masecchia was someone who was being tracked by GPS,

04:39PM  2   correct?

04:39PM  3   A.  Correct.

04:39PM  4   Q.  And you say you related this to Mr. Masecchia, correct?

04:39PM  5   A.  Correct.

04:39PM  6   Q.  And you say that he changed his routine?

04:39PM  7   A.  Correct.

04:39PM  8   Q.  He didn't change his car though, right?

04:39PM  9   A.  No.  He -- he changed his routine.  And I know that was

04:39PM  10  true because Joe told me that they couldn't find a location

04:39PM  11  where he was -- he had another operation with Ron, a

04:39PM  12  warehouse, and they never found it, because Mike changed his

04:39PM  13  routine.

04:40PM  14  Q.  And you'd agree with me that changing your routine is not

04:40PM  15  changing the locations of where you go, right?

04:40PM  16  A.  If somebody's tracking you?  Yes.  I mean, he stopped

04:40PM  17  going -- I don't know if he used that particular vehicle to

04:40PM  18  go to the grow house.  He probably used his wife's truck, or

04:40PM  19  whatever, but he changed his routine.

04:40PM  20  Q.  But you don't know.  You just testified you don't what he

04:40PM  21  did?

04:40PM  22  A.  I know -- Mike told me he changed his routine.

04:40PM  23  Q.  Okay.  So that's all you know?

04:40PM  24  A.  We broke it down, I told him about it, and he changed his

04:40PM  25  routine regarding what I just mentioned.

04:40PM  1   Q.  So, Ron Serio, let's talk a little bit about him.  He was

04:40PM  2   a gambler, you testified yesterday, right?

04:40PM  3   A.  Yes.

04:40PM  4   Q.  Kind of a degenerate gambler, right?

04:40PM  5   A.  He was a heavy gambler, yes.

04:40PM  6   Q.  He was at the casino all the time?

04:40PM  7   A.  Yes.

04:40PM  8   Q.  And it wasn't just because he was gambling away money,

04:40PM  9   right?

04:40PM  10  A.  I don't know, that's what I assumed.  I don't know what

04:40PM  11  else he did.

04:40PM  12  Q.  He conducted some money-laundering activity in the casino

04:40PM  13  to help out the organization, correct?

04:41PM  14  A.  He gambled -- probably gambled with the proceeds, I -- I

04:41PM  15  don't know that.

04:41PM  16  Q.  You don't know how he cleaned money at casinos?

04:41PM  17  A.  He gambled quite a bit.

04:41PM  18  Q.  Ron Serio also used drugs during the time frame of this

04:41PM  19  conspiracy, correct?

04:41PM  20  A.  Yes.

04:41PM  21  Q.  And he wasn't just using marijuana, correct?

04:41PM  22  A.  I believe so, yes.

04:41PM  23  Q.  He was involved in opiates?

04:41PM  24  A.  Yes.

04:41PM  25  Q.  He was involved in heroin?

04:41PM    1    A.  I don't know.

04:41PM    2    Q.  You don't know?

04:41PM    3    A.  I don't know if he was involved in heroin.

04:41PM    4    Q.  But you know he was involved in opiates, right?

04:41PM    5    A.  OxyContin, Lortab, I don't know about heroin.

04:41PM    6    Q.  And he was a big user, right?

04:41PM    7    A.  Of what?

04:41PM    8    Q.  Of opiates?

04:41PM    9    A.  He abused it.

04:41PM   10    Q.  It was something that you had concerns with and

04:41PM   11    Mr. Masecchia had concerns with, correct?

04:41PM   12    A.  About Ron's abuse?

04:41PM   13    Q.  Correct.

04:41PM   14    A.  No.

04:42PM   15    Q.  You didn't have any concerns about him keeping it

04:42PM   16    together?

04:42PM   17    A.  You always wanted him to keep it together.  But that I

04:42PM   18    wasn't really aware of how severe it was getting with him.  I

04:42PM   19    didn't see Ron that much.

04:42PM   20    Q.  Did Mr. Masecchia ever talk to you about him being

04:42PM   21    concerned about it?

04:42PM   22    A.  He said that Ron would party, but he wouldn't elaborate

04:42PM   23    and tell me that it was, in depth, a concern, or he's out of

04:42PM   24    control.  He would not elaborate on that.

04:42PM   25    Q.  So Ron Serio also had a lot of money?

04:42PM   1   A.  He did.

04:42PM   2   Q.  You were at his mansion on Lebrun, correct?

04:42PM   3   A.  Yes.

04:42PM   4   Q.  Pretty opulent place, right?

04:42PM   5   A.  Yes.

04:42PM   6   Q.  He drove a luxury car, correct?

04:42PM   7   A.  Yes.

04:42PM   8   Q.  You were aware of multiple properties that he owns?

04:42PM   9   A.  Yes.

04:42PM  10   Q.  Cause there were grow operations that were conducted at

04:42PM  11   some of those properties, right?

04:42PM  12   A.  Yes.

04:42PM  13   Q.  And you were inside of some of those properties?

04:42PM  14   A.  I was never inside, but I was aware.

04:42PM  15   Q.  And he was in a much better financial situation than you,

04:42PM  16   correct?

04:42PM  17   A.  Yes.

04:42PM  18   Q.  Because when it came down to it, your role in this

04:43PM  19   organization was pretty limited, right?

04:43PM  20   A.  Well, no, I was involved in the grow, transportation, and

04:43PM  21   meeting with Joe.  So I had a pretty big role in it.

04:43PM  22   Q.  You testified yesterday that your profits that you're

04:43PM  23   making off of this were roughly $15- to $20,000 a year,

04:43PM  24   right?

04:43PM  25   A.  Correct.

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

04:43PM  1   Q.  And Ron Serio was making far more than that?

04:43PM  2   A.  Ron had far more going on.  Like, the distribution from

04:43PM  3   the trucking operation when he was getting it from California

04:43PM  4   and British Columbia, those areas.  I was not involved in

04:43PM  5   that.

04:43PM  6   Q.  Yeah, and I guess that's what I'm getting at, sir, is you

04:43PM  7   weren't involved in the larger conspiracy to a very large

04:43PM  8   degree, correct?

04:43PM  9   A.  No.  That was much more profitable for them, and I was

04:43PM  10  not involved in that.

04:43PM  11  Q.  So, they would help out sometimes with your rent payments

04:43PM  12  or electric bills, right?

04:43PM  13  A.  For whatever was done on my house, yes.

04:43PM  14  Q.  And you got paid based on your activities with the

04:44PM  15  marijuana that you stored or processed or grew, correct?

04:44PM  16  A.  Correct.

04:44PM  17  Q.  And you were sometimes paid for help with distribution,

04:44PM  18  correct?

04:44PM  19  A.  It was all based on the gross profit.  So whatever the

04:44PM  20  percentage was, I would get a percentage of that minus the

04:44PM  21  expenses of whatever, that was always taken off the top.

04:44PM  22  Q.  And you weren't a large seller of marijuana yourself,

04:44PM  23  correct?

04:44PM  24  A.  No.

04:44PM  25  Q.  Because you were still working your same jobs right?

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

04:44PM  1   A.  Correct.

04:44PM  2   Q.  You were still working tending bar?

04:44PM  3   A.  At that time, yes.

04:44PM  4   Q.  Still doing sales?

04:44PM  5   A.  Yes.

04:44PM  6   Q.  But you still had money problems at that time, correct?

04:44PM  7   A.  Correct.

04:44PM  8   Q.  Like, you couldn't even afford to buy your suit for

04:44PM  9   Mr. Bongiovanni's wedding in 2015, right?

04:44PM  10  A.  I could afford to buy that.

04:44PM  11  Q.  But he bought it for you anyway?

04:44PM  12  A.  It was a gesture he made.

04:44PM  13  Q.  You couldn't afford to buy your plane ticket?

04:44PM  14  A.  I bought my plane ticket.

04:44PM  15  Q.  You bought your plane ticket?

04:44PM  16  A.  I bought my plane ticket, yes, I did.

04:44PM  17  Q.  You paid for the hotel?

04:45PM  18  A.  Yes, I did.

04:45PM  19  Q.  During all this time, safe to say that Ron Serio didn't

04:45PM  20  compensate you 100 percent to the degree that you devoted to

04:45PM  21  the organization?

04:45PM  22  A.  No.  No.  I felt it was fair.

04:45PM  23  Q.  So, the money payments that Ron Serio made, they were

04:45PM  24  made by Mike Masecchia to Joe Bongiovanni, according to your

04:45PM  25  testimony, right?

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

04:45PM   1    A.  Yes.

04:45PM   2    Q.  You testified earlier Ron Serio never met with Joe

04:45PM   3    Bongiovanni to your knowledge, right?

04:45PM   4    A.  No.

04:45PM   5    Q.  Ron Serio never paid Joseph Bongiovanni directly,

04:45PM   6    correct?

04:45PM   7    A.  Correct.

04:45PM   8    Q.  Mike Masecchia was the one who handled all the payments,

04:45PM   9    right?

04:45PM   10   A.  Yes.  Ron would pay Mike, and Mike would take care of it.

04:45PM   11   Q.  And Mike was kind of like you, like, he wasn't living a

04:45PM   12   high life in a mansion like Ron Serio, right?

04:45PM   13   A.  Mike was living better than me.

04:45PM   14   Q.  But he wasn't living like Ron Serio?

04:45PM   15   A.  No.  Ron was in a different category.  Mike was living

04:45PM   16   much better than me.

04:45PM   17   Q.  And Ron Serio, when he gives this money to Mike

04:46PM   18   Masecchia, he doesn't have any firsthand knowledge of where

04:46PM   19   the money goes after that, right?

04:46PM   20   A.  When Ron gives it to Mike?  No, he knows where it's

04:46PM   21   going.

04:46PM   22   Q.  He knows what Mike Masecchia is telling him, right?

04:46PM   23   A.  He knows where it's going, yes.

04:46PM   24   Q.  And he knows what you're telling him, right?

04:46PM   25   A.  Yes.

04:46PM 1    Q.  And he knows what Mike Masecchia is telling him about the

04:46PM 2    money, correct?

04:46PM 3    A.  Yes.

04:46PM 4    Q.  And Ron Serio is aware of your relationship with Joseph

04:46PM 5    Bongiovanni, correct?

04:46PM 6    A.  Correct.

04:46PM 7    Q.  Ron Serio believed that you had a tight relationship,

04:46PM 8    based on your conversations with him, right?

04:46PM 9    A.  Yes.

04:46PM 10   Q.  And Ron Serio was also told by Mike Masecchia that he

04:46PM 11   knew Joseph Bongiovanni to some degree, correct?

04:46PM 12   A.  Mike knew Joe?

04:46PM 13   Q.  Mike knew Joe.

04:46PM 14   A.  Yes.  We all grew up, and they've known each other a long

04:46PM 15   time.

04:46PM 16   Q.  And these conversations helped develop trust with Serio

04:46PM 17   about what was happening, correct?

04:46PM 18   A.  Correct.

04:46PM 19   Q.  And, I mean, when it comes down to it, that's the main

04:47PM 20   reason why you were brought into this conspiracy, right?

04:47PM 21   A.  Correct.

04:47PM 22   Q.  Was, was that you could help potentially protect Ron

04:47PM 23   Serio, correct?

04:47PM 24   A.  No, I again, I was brought, again, I approached them

04:47PM 25   because I wanted -- I was having financial difficulties, and

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

04:47PM   1   then through the course of time, it evolved the way it's

04:47PM   2   evolved.  So, yes.

04:47PM   3   Q.  So, you're involved in this marijuana conspiracy for more

04:47PM   4   than a decade right?

04:47PM   5   A.  10, 11 years.

04:47PM   6   Q.  2017, Ron Serio is arrested, correct?

04:47PM   7   A.  Correct.

04:47PM   8   Q.  2019, Mike Masecchia is arrested?

04:47PM   9   A.  Yes.  He was, yes.

04:47PM  10   Q.  2019, your house is searched, correct?

04:47PM  11   A.  Yes.  My house and Mike's house was searched the same

04:47PM  12   day.

04:47PM  13   Q.  And like we talked about earlier, you were concerned

04:47PM  14   about the possibility of spending time in jail as a result of

04:47PM  15   what you got involved in, right?

04:47PM  16   A.  Correct.

04:47PM  17   Q.  That's why you hired a lawyer, correct?

04:47PM  18   A.  Correct.

04:47PM  19   Q.  And that's why you chose to sit down with the government

04:47PM  20   as part of a proffer agreement, correct?

04:47PM  21   A.  Correct.

04:47PM  22   Q.  So, you were also a corrections officer at the time that

04:48PM  23   this all went down in 2019, right?

04:48PM  24   A.  Correct.  I was at the holding center, correct.

04:48PM  25   Q.  You were working there for several months, right?

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

248

04:48PM   1   A.   Yes.

04:48PM   2   Q.   And your job was as a jailer, correct?

04:48PM   3   A.   Correct.

04:48PM   4   Q.   You'd spend time inside the pods, correct?

04:48PM   5   A.   Correct.

04:48PM   6   Q.   And you saw the conditions in there, correct?

04:48PM   7   A.   Correct.

04:48PM   8   Q.   They weren't the best?

04:48PM   9   A.   No.

04:48PM   10   Q.   They were dangerous?

04:48PM   11   A.   At times, yes.

04:48PM   12   Q.   You have any altercations that happened while you were a

04:48PM   13   corrections officer?

04:48PM   14   A.   No.   I mean, none that I can recall.   It was pretty,

04:48PM   15   just, routine.   Everything was a routine in there.

04:48PM   16   Q.   So that gave you a pretty interesting perspective in what

04:48PM   17   jail looks like, correct?

04:48PM   18   A.   Yes.

04:48PM   19   Q.   More so than the average person, correct?

04:48PM   20   A.   Yes.

04:48PM   21   Q.   And you also, at that point in time, were a law

04:48PM   22   enforcement officer, right?

04:48PM   23   A.   I was a deputy sheriff, yes.

04:48PM   24   Q.   And so you understood that the only thing worse than

04:49PM   25   being in jail is being a cop in jail, correct?

04:49PM    1   A.  Correct.

04:49PM    2         **MR. TRIPI:**  Objection.  Objection.  403.

04:49PM    3         **THE COURT:**  Overruled.

04:49PM    4         **MR. TRIPI:**  I'm making an argument here.

04:49PM    5         **THE COURT:**  Overruled.

04:49PM    6         **MR. TRIPI:**  Okay.

04:49PM    7         **BY MR. SINGER:**

04:49PM    8   Q.  So you understood that?

04:49PM    9   A.  Yes.

04:49PM   10   Q.  So, it's with all that context that you decide to

04:49PM   11   cooperate with the government, right?

04:49PM   12   A.  Yes.  And I also wanted to come forward and be truthful.

04:49PM   13   Q.  So, when you tell law enforcement about Ron Serio, and

04:49PM   14   Mike Masecchia, and your involvement, you leave out these

04:49PM   15   bribes to Joe Bongiovanni first, right?

04:49PM   16   A.  Correct.

04:49PM   17   Q.  And law enforcement, at some point in time, tells you

04:49PM   18   that they don't think you're being straight with them, right?

04:49PM   19   A.  Correct.

04:49PM   20   Q.  So your attorney, I'm sure, you know, talked to you about

04:49PM   21   what the government controls, right?

04:49PM   22   A.  Yes.

04:49PM   23   Q.  They control consideration on any type of pleas or

04:50PM   24   charges, right?

04:50PM   25   A.  Correct.

04:50PM    1    Q.  And you're also aware of the fact that, you know, Ron

04:50PM    2    Serio's arrested, right?

04:50PM    3    A.  Yes.

04:50PM    4    Q.  And he's been arrested at that point for more than two

04:50PM    5    years, right?

04:50PM    6    A.  Yes.

04:50PM    7    Q.  And he's out of custody at that time, right?

04:50PM    8    A.  Yes.

04:50PM    9    Q.  And he's probably facing charges as well, right?

04:50PM   10    A.  Yes.

04:50PM   11    Q.  So, after all that, you start to talk about

04:50PM   12    Mr. Bongiovanni's involvement, right?

04:50PM   13    A.  Yes.  As time -- as I met more with law enforcement, my

04:50PM   14    attorney advised just be truthful, come forward, there was no

04:50PM   15    immunity, nothing processed like that.  So --

04:50PM   16    Q.  And these prosecutors, you know, at that point in time,

04:50PM   17    they believed that you're telling the truth, right?

04:50PM   18    A.  Yes.

04:50PM   19         **MR. TRIPI:**  Objection as to what prosecutors

04:50PM   20    believed.

04:50PM   21         **THE COURT:**  Sustained.  Sustained.  Jury will strike

04:50PM   22    that.

04:50PM   23         **BY MR. SINGER:**

04:50PM   24    Q.  And your lawyer tells you that if you continue to talk

04:51PM   25    about Mr. Bongiovanni's involvement, as well as others'

04:51PM   1   involvement in this case, you know, potentially the

04:51PM   2   government's going to give you consideration for that, right?

04:51PM   3   A.   No.   He -- he didn't -- he said just be truthful, and

04:51PM   4   whatever happens at the end, we'll deal with it then.   So

04:51PM   5   there was no immunity, there was no deal in place.

04:51PM   6   Q.   Mr. Selva, I guess that's true.   Like, you're not

04:51PM   7   charged, as you sit here today, with anything, right?

04:51PM   8   A.   Correct.

04:51PM   9   Q.   You don't know what's going to happen to you?

04:51PM  10   A.   No.

04:51PM  11   Q.   No one's made any commitments?

04:51PM  12   A.   Correct.

04:51PM  13   Q.   But your lawyer is a good one, right?

04:51PM  14   A.   Yes.

04:51PM  15   Q.   And I'm sure that you're here today because you have the

04:51PM  16   expectation that you'll get some benefit out of this, right?

04:51PM  17   A.   I'm here today to tell the truth, be forward.

04:51PM  18   Q.   But you also want to help yourself, right, sir?

04:51PM  19   A.   I'm here today to tell the truth.   I'm being forward.

04:51PM  20   Q.   And you're not here to help yourself?

04:51PM  21   A.   I'm hoping at the end it all works out, but I'm here.

04:52PM  22   Q.   Because you hope not to go to jail for a longer period of

04:52PM  23   time, right?

04:52PM  24   A.   Correct.

04:52PM  25   Q.   But your hope is that if you testify here today --

04:52PM   1   A.  But that's not guaranteed --

04:52PM   2   Q.  It's not guaranteed that --

04:52PM   3          **THE COURT:**  One at a time, guys.

04:52PM   4          **BY MR. SINGER:**

04:52PM   5   Q.  It's not guaranteed, but it's an expectation that you

04:52PM   6   have, right?

04:52PM   7   A.  It's not an expectation.  I don't know what's gonna

04:52PM   8   happen.

04:52PM   9   Q.  You testified earlier on direct that you don't want to be

04:52PM  10   here, right?

04:52PM  11   A.  No.

04:52PM  12   Q.  Not something that's fun?

04:52PM  13   A.  No.

04:52PM  14   Q.  Not something you want to do?

04:52PM  15   A.  No.

04:52PM  16   Q.  So you're here for a reason, right?

04:52PM  17   A.  I'm here to tell the truth.

04:52PM  18   Q.  And that's the only reason why you're here, sir?

04:52PM  19   A.  I'm here to tell the truth.  There was no deal promised.

04:52PM  20   There's nothing like that.  That's it.

04:52PM  21   Q.  So, there's something you're still hiding, right?

04:52PM  22   A.  I'm sorry?

04:52PM  23   Q.  There's something you're still hiding, right?

04:52PM  24   A.  No.

04:52PM  25   Q.  Throughout the years, you've always told Ron Serio that

04:52PM    1    his money was being paid to Joseph Bongiovanni, right?

04:52PM    2    A.  I didn't tell Ron that, Mike did.

04:53PM    3    Q.  Mike said it?

04:53PM    4    A.  Yes.

04:53PM    5    Q.  And you've also told Ron Serio that you're providing

04:53PM    6    information that Mr. Bongiovanni purportedly tells you,

04:53PM    7    correct?

04:53PM    8    A.  Correct.

04:53PM    9    Q.  And this involves information regarding R.K., correct?

04:53PM   10    A.  Correct.

04:53PM   11    Q.  Involves information regarding Mario Vacanti?

04:53PM   12    A.  Correct.

04:53PM   13    Q.  T.S.?

04:53PM   14    A.  Correct.

04:53PM   15    Q.  And of those other people we talked about, right?

04:53PM   16    A.  Correct.

04:53PM   17    Q.  People that you know, correct?

04:53PM   18    A.  Yes.

04:53PM   19    Q.  People that you know from the neighborhood?

04:53PM   20    A.  Yes.

04:53PM   21    Q.  People that you know through your personal associations?

04:53PM   22    A.  No, I just know them from a -- I don't know them on a

04:53PM   23    personal level, but I know of them, yes.

04:53PM   24    Q.  People you know through some of your friends, correct?

04:53PM   25    A.  Yes.

04:53PM   1   Q.  People that you know just from general public news,

04:53PM   2   correct?

04:53PM   3   A.  If they're in the news and I read it, yeah.  But I knew

04:53PM   4   who they were, they're from the neighborhood.

04:53PM   5   Q.  And you communicated those things up to Mr. Serio,

04:53PM   6   correct?

04:53PM   7   A.  Correct.

04:53PM   8   Q.  And he had the belief that you were providing him

04:53PM   9   information that you got from Joseph Bongiovanni, correct?

04:53PM  10   A.  No.  If it was specific.  If it was specific.  Specific

04:54PM  11   information.

04:54PM  12   Q.  But that's --

04:54PM  13   A.  That's what I provided.

04:54PM  14   Q.  But he had that belief, otherwise he wouldn't continue to

04:54PM  15   pay, correct?

04:54PM  16   A.  Ron did, yes, he did.

04:54PM  17   Q.  Mr. Selva, isn't it true that you pocketed the money with

04:54PM  18   Mike Masecchia?

04:54PM  19   A.  No.

04:54PM  20   Q.  You didn't pocket the money?

04:54PM  21   A.  No, I did not.

04:54PM  22   Q.  You didn't keep it yourself?

04:54PM  23   A.  I did not, no.

04:54PM  24   Q.  You didn't do that because of the trust you gained with

04:54PM  25   Ron Serio?

04:54PM   1   A.   No, I did not.

04:54PM   2   Q.   You didn't do that based on his drug addiction?

04:54PM   3   A.   I did not, no.

04:54PM   4   Q.   You did not try to take advantage of him with Mike

04:54PM   5   Masecchia?

04:54PM   6   A.   No, I did not.

04:54PM   7   Q.   Mr. Selva, you testified earlier that Mike Masecchia is

04:54PM   8   someone you referred to, or others referred to, as Gorilla,

04:54PM   9   correct?

04:54PM  10   A.   Correct.

04:54PM  11   Q.   And he's someone that didn't just get that name out of

04:54PM  12   nowhere, right?

04:54PM  13   A.   That's correct.

04:54PM  14   Q.   He's somebody who's a tough guy, right?

04:54PM  15   A.   Correct.

04:54PM  16   Q.   He has a bad reputation, correct?

04:54PM  17   A.   He does.

04:54PM  18   Q.   He has something that you fear, right?

04:55PM  19   A.   Yes.

04:55PM  20   Q.   You fear him, correct?

04:55PM  21   A.   I wouldn't want to have a problem with him, no.

04:55PM  22   Q.   And so if Mike Masecchia is taking that money, you'd have

04:55PM  23   concerns about saying otherwise, right?

04:55PM  24   A.   No.

04:55PM  25        **MR. TRIPI:**  Objection.  Speculative.

04:55PM    1          **THE COURT:**  Overruled.

04:55PM    2          **BY MR. SINGER:**

04:55PM    3    Q.  No?

04:55PM    4    A.  If, can you repeat the question.

04:55PM    5    Q.  If Mike Masecchia was taking that money, you would have

04:55PM    6    concerns about outing Mike Masecchia's ruse to Ron Serio,

04:55PM    7    correct?

04:55PM    8    A.  I would -- if Mike was not paying, I would tell Ron, if I

04:55PM    9    knew that.

04:55PM   10    Q.  You would tell Ron?

04:55PM   11    A.  I would tell him, yes.

04:55PM   12    Q.  Even though you might face repercussions?

04:55PM   13    A.  I -- I wouldn't care.

04:55PM   14    Q.  Mr. Selva, when you applied to the sheriff's office --

04:55PM   15    A.  Yes.

04:55PM   16    Q.  -- you got references, correct?

04:55PM   17    A.  Yes.

04:55PM   18    Q.  One of them was Mr. Bongiovanni, correct?

04:55PM   19    A.  Yes.

04:55PM   20    Q.  Another person was Judge Mark Grisanti, correct?

04:56PM   21    A.  Correct.

04:56PM   22    Q.  Another person was Thomas Phillips, correct?

04:56PM   23    A.  Correct.

04:56PM   24    Q.  Thomas Phillips was the chief of police?

04:56PM   25    A.  In Kenmore, yes.

USA v Bongiovanni - Selva - Singer/Cross - 2/22/24

04:56PM  1    Q.  These people wouldn't have endorsed you if they knew

04:56PM  2    about what you were doing in your drug conspiracy days,

04:56PM  3    correct?

04:56PM  4    A.  That's correct.

04:56PM  5    Q.  But you hid this from them, correct?

04:56PM  6    A.  Correct.

04:56PM  7    Q.  They didn't know anything?

04:56PM  8    A.  No.

04:56PM  9    Q.  And on your application to the sheriff's office, one of

04:56PM  10   those questions, do you remember, asked you whether or not

04:56PM  11   there was anything that you should raise to them during your

04:56PM  12   application process that may potentially disqualify you for

04:56PM  13   being a sheriff, correct?

04:56PM  14   A.  Correct.

04:56PM  15   Q.  And you didn't tell them anything about this, correct?

04:56PM  16   A.  No.

04:56PM  17   Q.  So you're capable of not saying truthful things to

04:56PM  18   people, correct?

04:56PM  19   A.  For that pos -- for that particular incident, yes.

04:56PM  20          **MR. SINGER:**  I have no further questions, Judge.

04:56PM  21          **MR. TRIPI:**  Redirect, Your Honor.

04:57PM  22          **THE COURT:**  Yes.

04:57PM  23          **MR. TRIPI:**  I'll try to keep it quick.

04:57PM  24

04:57PM  25

04:57PM    1          **REDIRECT EXAMINATION BY MR. TRIPI:**

04:57PM    2    Q.  On that last note, that application, you didn't hide

04:57PM    3    anything from the defendant because you were involved with

04:57PM    4    him, correct?

04:57PM    5    A.  Correct.

04:57PM    6    Q.  Explain for this jury how you know, in fact, the money

04:57PM    7    Ron was paying was making its way to Bongiovanni.  Tell them.

04:57PM    8    A.  When -- I'm sorry.  That would come from Mike direct.

04:57PM    9    Mike would meet with him once a month, and call him, I gave

04:57PM   10    him his cell phone.  Mike had five or six different burner

04:57PM   11    phones.  They'd set a location, and they would meet.  It was

04:57PM   12    real quick.

04:57PM   13    Q.  Did confidential information get passed to you by the

04:57PM   14    defendant?

04:57PM   15    A.  Yes.

04:57PM   16    Q.  Did you pass that to a made man named Mike Masecchia?

04:57PM   17    A.  Yes.

04:57PM   18    Q.  Now you were asked about some time frames.  I just want

04:57PM   19    to go through those really quickly.

04:57PM   20       At times when Mr. Singer was asking you questions, were

04:57PM   21    you estimating time frames?

04:58PM   22    A.  I was estimating, yes, sir.

04:58PM   23    Q.  With regard to R.K., just to be clear about when that

04:58PM   24    information got passed from the defendant to you, to

04:58PM   25    Masecchia, and Serio, was that after R.K. got in trouble?

04:58PM     1   A.  Yes.

04:58PM     2   Q.  Okay.  And then in relation to R.K., was T.S.'s

04:58PM     3   information passed in close proximity to that?

04:58PM     4   A.  Yes.  Same time frame.

04:58PM     5   Q.  Okay.  And was the information regarding Mario Vacanti

04:58PM     6   after that?

04:58PM     7   A.  It was after that, yes.

04:58PM     8   Q.  So they weren't all in the same time frame?

04:58PM     9   A.  No.

04:58PM    10   Q.  Vacanti was different?

04:58PM    11   A.  Yeah.  Completely different.  Yes.

04:58PM    12   Q.  Okay.  Now, Mr. Singer asked you a question, he said,

04:58PM    13   well on September 11th, you didn't tell the government that,

04:58PM    14   you know, you were Defendant's C.I.; do you remember that

04:58PM    15   question?

04:58PM    16   A.  Yes.

04:58PM    17   Q.  But on September 5th you had a polygraph, correct?

04:58PM    18   A.  Correct.

04:58PM    19   Q.  What did you say in the polygraph about whether you -- in

04:58PM    20   the pre-test interview about whether you were his C.I.?

04:58PM    21   A.  I told them I wasn't.

04:58PM    22   Q.  In the pre-test interview?

04:58PM    23   A.  Oh, I'm sorry.  In the pre-test, I was.

04:59PM    24   Q.  Okay.  And then you failed your polygraph?

04:59PM    25   A.  And I failed my polygraph.

04:59PM    1    Q.   And then what did you tell them?   That was a cover story?

04:59PM    2    A.   That was a cover story, correct.

04:59PM    3    Q.   Why did Mike want to handle the payments with

04:59PM    4    Bongiovanni?

04:59PM    5    A.   That was the arrangement that was made.   He said he'll

04:59PM    6    take care of him directly.

04:59PM    7    Q.   Did you question the made man that's nicknamed the

04:59PM    8    Gorilla when he said he'll handle the payments?

04:59PM    9    A.   No.

04:59PM   10    Q.   Now, when Mr. Singer was questioning you, at one point he

04:59PM   11    said you were making 20 to 25 percent of the profits.   I

04:59PM   12    think on direct you said 20- to $25,000, which was 14 to 15

04:59PM   13    percent.   Which is correct?

04:59PM   14    A.   It was a percentage of the profit.   14 -- usually it was

04:59PM   15    14- to 15,000.

04:59PM   16    Q.   So what you said on direct was accurate?

04:59PM   17    A.   Yes, it was.

04:59PM   18    Q.   What you said on cross was inaccurate?

04:59PM   19    A.   It was inaccurate, yes.

05:00PM   20    Q.   Now, the plants at each grow, the outdoor grow, that was

05:00PM   21    the money that you were participating in?

05:00PM   22    A.   Correct.

05:00PM   23    Q.   The conspiracy was much larger than just the outdoor

05:00PM   24    grow?

05:00PM   25    A.   It was, yes.

05:00PM   1   Q.  Now, the 50 plants, 40 to 50 plants or whatever it was at

05:00PM   2   each grow, you were hoping to get a pound per plant, right?

05:00PM   3            MR. SINGER:  Objection, leading.

05:00PM   4            THE WITNESS:  Yes.

05:00PM   5            THE COURT:  Hang on.  He's just summarizing what he's

05:00PM   6   already testified to, so overruled.  Go ahead.

05:00PM   7            BY MR. TRIPI:

05:00PM   8   Q.  So to do some the math --

05:00PM   9            THE COURT:  Let's not lead.

05:00PM  10            MR. TRIPI:  Yes.

05:00PM  11            BY MR. TRIPI:

05:00PM  12   Q.  Remind the jury how much you were selling it for per

05:00PM  13   pound.

05:00PM  14   A.  For the indoor or for the outdoor?

05:00PM  15   Q.  The outdoor grows.

05:00PM  16   A.  Outdoors was 2,800, sometimes 3,000.  But on the average

05:00PM  17   $2,800 a pound.

05:00PM  18   Q.  Let's use the low end.

05:00PM  19   A.  2,800.

05:00PM  20   Q.  You've got 50 plants at one, 50 at another.  That's 100,

05:00PM  21   correct?

05:00PM  22   A.  Correct.

05:00PM  23   Q.  The goal is 100 pounds, right?

05:00PM  24   A.  Correct.

05:00PM  25   Q.  100 times 2,800 is $280,000, correct?

05:01PM    1    A.  Correct.

05:01PM    2    Q.  And -- and that's just for the outdoor grow?

05:01PM    3    A.  Correct.

05:01PM    4    Q.  And that was every year?

05:01PM    5    A.  Correct.

05:01PM    6    Q.  Now, there was a meeting at Western Door; do you remember

05:01PM    7    you were asked questions about that?

05:01PM    8    A.  Yes.

05:01PM    9    Q.  I think on your cross, you stated that meeting was a

05:01PM   10    different meeting though; is that right?

05:01PM   11    A.  But it was still regarding the operation.

05:01PM   12    Q.  Okay.  Regarding the operation, but not the original

05:01PM   13    negotiation?

05:01PM   14    A.  Correct.

05:01PM   15    Q.  What was the meeting at Western Door about?  Tell the

05:01PM   16    jury.

05:01PM   17    A.  The meeting at the Western Door was to talk about a

05:01PM   18    proposal they wanted to make, $4,000.

05:01PM   19    Q.  Was there information about a bust that was discussed

05:01PM   20    there?  Giving Joe a bust?

05:01PM   21    A.  Yes.

05:01PM   22    Q.  Describe that conversation.

05:02PM   23    A.  Ron had mentioned that he can feed information for Joe,

05:02PM   24    through Mike or through myself, that something was going on

05:02PM   25    to kind of deteriorate things a little bit.

05:02PM   1   Q.  Did the defendant ask you anything about helping him out?

05:02PM   2   A.  Helping, yes, he did.

05:02PM   3   Q.  What did the defendant ask you?

05:02PM   4   A.  He asked me if Ron could provide somebody that he knows

05:02PM   5   that is of a less significance to help push the trail off a

05:02PM   6   little bit, so to speak, give him a bust, give him something.

05:02PM   7   Q.  Ultimately, that was not agreed to, correct?

05:02PM   8   A.  Correct, it was not.

05:02PM   9   Q.  Was that discussed at the meeting at the Western Door as

05:02PM   10  far as you recall it?

05:02PM   11  A.  As far as I recall, yes.

05:02PM   12  Q.  You were asked questions about cocaine usage.  Would it

05:02PM   13  be fair to say that you initially withheld information about

05:03PM   14  your own drug use and the defendant's?

05:03PM   15  A.  Yes.

05:03PM   16  Q.  You were asked information about landscapers and

05:03PM   17  contractors.  In your life experience, do those people take

05:03PM   18  cash payment?

05:03PM   19  A.  Yes.

05:03PM   20  Q.  On cross, I think Mr. Singer said it was Peter Gerace who

05:03PM   21  told you about the probation situation.  I just want to

05:03PM   22  clarify.  Who told you about this defendant helping Peter

05:03PM   23  Gerace out regarding federal probation?

05:03PM   24  A.  Joe.

05:03PM   25  Q.  The defendant told you?

05:03PM   1    A.  The defendant.

05:03PM   2    Q.  And there was one more question, I think.  Oh, the last

05:03PM   3    one I wanted to ask you was:  You were asked by Mr. Singer

05:03PM   4    about Fred Bongiovanni, the defendant's father's clam stand,

05:03PM   5    right?

05:03PM   6    A.  Yes.

05:03PM   7    Q.  What restaurant was the defendant's father's clam stand

05:03PM   8    in front of on the West Side of Buffalo?

05:04PM   9    A.  It was Scottie's.  It was in front of the Turf Club.  It

05:04PM  10    was on Busti Avenue.

05:04PM  11    Q.  Where was LaNova?

05:04PM  12    A.  LaNova's on West Ferry.

05:04PM  13    Q.  Was his clam stand in front of LaNova?

05:04PM  14    A.  Not as far as I know.

05:04PM  15         **MR. TRIPI:**  I have nothing more.

05:04PM  16         **THE COURT:**  Anything more, Mr. Singer?

05:04PM  17         **MR. SINGER:**  Just one moment, Judge.

05:04PM  18         It's been a long day, Judge, so no further questions.

05:04PM  19         **THE COURT:**  Okay.  You can step down, Mr. Selva.

05:04PM  20         (Witness excused at 5:04 p.m.)

         21         (Excerpt concluded at 5:04 p.m.)

         22              *     *     *     *     *     *     *

         23

         24

         25

1

2                    <u>**CERTIFICATE OF REPORTER**</u>

3

4              In accordance with 28, U.S.C., 753(b), I

5   certify that these original notes are a true and correct

6   record of proceedings in the United States District Court for

7   the Western District of New York on February 22, 2024.

8

9

10                         <u>s/ Ann M. Sawyer</u>
                          Ann M. Sawyer, FCRR, RPR, CRR
11                        Official Court Reporter
                          U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

**TRANSCRIPT INDEX**

**EXCERPT OF TESTIMONY OF LOUIS SELVA - DAY 2**

3

**FEBRUARY 22, 2024**

4

5

**W I T N E S S**                                    **P A G E**

6

**L O U I S   S E L V A**                              3

7

   DIRECT EXAMINATION BY MR. TRIPI (CON'T):     3

8

   CROSS-EXAMINATION BY MR. SINGER:            112

9

   REDIRECT EXAMINATION BY MR. TRIPI:          258

10

11

12

**E X H I B I T S**                                  **P A G E**

13

GOV Exhibit 201                                 13

14

GOV Exhibit 205                                 14

15

GOV Exhibit 204                                 15

16

GOV Exhibits 202 and 203                        17

17

GOV Exhibit 109AB                               26

18

GOV Exhibit 103-2                               28

19

GOV Exhibit 103-3                               30

20

GOV Exhibits 523 and 524                        32

21

GOV Exhibit 208D                                64

22

GOV Exhibit 208K                                75

23

GOV Exhibit 208E                                77

24

GOV Exhibit 208F                                79

25

GOV Exhibit 208G                                80

1     GOV Exhibit 208C                              86

2     GOV Exhibit 208J                              87

3     GOV Exhibits 208M and N                       89

4     GOV Exhibit 222G                              93

5     GOV Exhibit 222H                              94

6     GOV Exhibit 222J                              95

7     GOV Exhibit 209                               99

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25