1      **UNITED STATES DISTRICT COURT**
      **WESTERN DISTRICT OF NEW YORK**

2

  _____
3 **UNITED STATES OF AMERICA,**

          Case No. 1:19-cr-227
4     Plaintiff,     (LJV)

 v.
5          March 5, 2024

 **JOSEPH BONGIOVANNI,**
6

     Defendant.
7 _____

8 **TRANSCRIPT EXCERPT - DIRECT and REDIRECT EXAM OF MARK FALZONE**
    **BEFORE THE HONORABLE LAWRENCE J. VILARDO**
9      **UNITED STATES DISTRICT JUDGE**

10

 <u>**APPEARANCES:**</u>    **TRINI E. ROSS, UNITED STATES ATTORNEY**
11       **BY: JOSEPH M. TRIPI, ESQ.**
         **NICHOLAS T. COOPER, ESQ.**
12        **CASEY L. CHALBECK, ESQ.**
       Assistant United States Attorneys
13       Federal Centre
       138 Delaware Avenue
14       Buffalo, New York 14202
        And
15       **UNITED STATES DEPARTMENT OF JUSTICE**
       **BY: JORDAN ALAN DICKSON, ESQ.**
16       1301 New York Ave NW
       Suite 1000
17       Washington, DC 20530-0016
       For the Plaintiff
18

       **SINGER LEGAL PLLC**
19       **BY: ROBERT CHARLES SINGER, ESQ.**
       80 East Spring Street
20       Williamsville, New York 14221
        And
21       **LAW OFFICES OF PARKER ROY MacKAY**
       **BY: PARKER ROY MacKAY, ESQ.**
22       3110 Delaware Avenue
       Kenmore, New York  14217
23       For the Defendant

24 <u>**PRESENT:**</u>    **BRIAN A. BURNS,** FBI Special Agent
       **MARILYN K. HALLIDAY,** HSI Special Agent
25       **KAREN A. CHAMPOUX,** USA Paralegal

| | | |
|---|---|---|
| 1 | **LAW CLERK:** | **REBECCA FABIAN IZZO, ESQ.** |
| 2 | **COURT DEPUTY CLERK:** | **COLLEEN M. DEMMA** |
| 3 | **COURT REPORTER:** | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 4 | | Robert H. Jackson Federal Courthouse<br>2 Niagara Square |
| 5 | | Buffalo, New York  14202<br>Ann_Sawyer@nywd.uscourts.gov |

6

7                    *     *     *     *     *     *     *

8

9              (Excerpt commenced at 9:43 a.m.)

09:43AM  10              (Jury seated at 9:43 a.m.)

09:43AM  11              **THE COURT:**  Good morning, everyone.

09:43AM  12              **ALL PARTIES:**  Good morning.

09:43AM  13              **THE COURT:**  Welcome back.  The record will reflect

09:43AM  14    that all our jurors are present.

09:43AM  15              I remind the witness he's still under oath.

09:43AM  16              And you may continue, Mr. Tripi.

09:43AM  17              **MR. TRIPI:**  Thank you very much, Your Honor.

09:43AM  18

09:43AM  19    **M A R K   F A L Z O N E**, having been previously duly called

09:43AM  20    and sworn, continued to testify as follows:

09:43AM  21

09:43AM  22                    **DIRECT EXAMINATION BY MR. TRIPI (CONT'D):**

09:43AM  23    Q.  Mr. Falzone, just to orient you from where we left off

09:43AM  24    yesterday, I'm going to pick it up from there.  But I think

09:43AM  25    what you said as we broke yesterday, around 2014 or 2015, you

09:43AM  1  had a conversation where you agreed to help Mr. Serio and his

09:43AM  2  operations because your house was in foreclosure?

09:43AM  3  A.  Yes, sir.

09:43AM  4  Q.  Okay.  For this jury, can you describe your conversation

09:44AM  5  that you had with Mr. Serio about coming -- becoming involved

09:44AM  6  in his drug organization?

09:44AM  7  A.  Well, I was just basically complaining that my house was

09:44AM  8  in foreclosure.  And he said he could help me if I helped him

09:44AM  9  unload packages.

09:44AM  10  Q.  And where did you guys have this conversation?

09:44AM  11  A.  At his house.

09:44AM  12  Q.  Which house is that?

09:44AM  13  A.  On Lebrun.

09:44AM  14  Q.  Is that the big --

09:44AM  15  A.  Yes.

09:44AM  16  Q.  -- house on 697 Lebrun?

09:44AM  17  A.  Yes.

09:44AM  18  Q.  And when he said if you help me unload packages, did the

09:44AM  19  conversation continue from there?  Did you ask him what do

09:44AM  20  you mean?  Or --

09:44AM  21  A.  He said he'd give me $500 to help him basically dig

09:44AM  22  out -- the weed out of the packages.

09:44AM  23  Q.  As best you can, can you explain the conversation as

09:44AM  24  close you remember it for the jury?  The whole thing?

09:45AM  25  A.  Well, I was -- he said, I have packages coming in that

09:45AM    1    need -- I need help with to get the marijuana out of, and

09:45AM    2    I'll pay you $500 if you help me each time.

09:45AM    3         And I agreed.  And then, I did it.

09:45AM    4    Q.  Okay.  During that conversation, did he tell you how the

09:45AM    5    marijuana would be coming into town?

09:45AM    6    A.  No, he didn't, because he didn't know until it got there

09:45AM    7    what -- 'cuz it was different every time.

09:45AM    8    Q.  Did he tell you where the marijuana was coming from?

09:45AM    9    A.  Yes.

09:45AM   10    Q.  What did he tell you in that regard?

09:45AM   11    A.  He told me it was coming from Canada.

09:45AM   12    Q.  Okay.  And generally, did he tell you how the marijuana

09:45AM   13    was getting from Canada to Buffalo, New York?

09:45AM   14    A.  It was being transported I know in trucks.  He told me up

09:45AM   15    north, in New York State.

09:45AM   16    Q.  So, was your job to unload the trucks?

09:46AM   17    A.  No.  Somebody -- somebody would -- the trucks would come

09:46AM   18    in, the packages would be stored in an air cooled facility,

09:46AM   19    and one of the Canadians would pick it up from there, and

09:46AM   20    then bring it to Ron.

09:46AM   21    Q.  Okay.  And at what point did you become involved in the

09:46AM   22    process?

09:46AM   23    A.  When he told me where it was gonna go.  And that's where

09:46AM   24    I would meet him.

09:46AM   25    Q.  Okay.  So, who was gonna be the one to tell you where to

USA v Bongiovanni - Falzone - Tripi/Direct - 3/5/24

5

| | | |
|---|---|---|
| 09:46AM | 1 | meet? |
| 09:46AM | 2 | A.   Ron. |
| 09:46AM | 3 | Q.   And how much notice were you going to have to get ready |
| 09:46AM | 4 | to unload this? |
| 09:46AM | 5 | A.   Very little.  Same day, probably. |
| 09:46AM | 6 | Q.   Did Ron tell you how the -- how the marijuana would be |
| 09:46AM | 7 | concealed in the trucks that were coming? |
| 09:46AM | 8 | A.   It was either mulch or wood pellets. |
| 09:47AM | 9 | Q.   What do you mean by that?  Explain it for the jury. |
| 09:47AM | 10 | A.   Well, picture a 5 foot by 5 foot box filled with mulch. |
| 09:47AM | 11 | And in the dead center of it, there would be weed stacked |
| 09:47AM | 12 | like a brick house.  And it was all covered in mulch. |
| 09:47AM | 13 | And then we'd have to open the box and dig all the |
| 09:47AM | 14 | packages of weed out from the mulch. |
| 09:47AM | 15 | Q.   So, is it your understanding the mulch or the wood |
| 09:47AM | 16 | pellets were like a cover load? |
| 09:47AM | 17 | A.   Yes. |
| 09:47AM | 18 | Q.   Very shortly or within proximity to that discussion about |
| 09:47AM | 19 | helping unload the marijuana, did you also have a discussion |
| 09:47AM | 20 | about being supplied marijuana by Mr. Serio for you to sell? |
| 09:47AM | 21 | A.   Yes. |
| 09:47AM | 22 | Q.   Describe that conversation to the jury. |
| 09:47AM | 23 | A.   He said he could front me, you know, some weed if I found |
| 09:47AM | 24 | people to sell it to. |
| 09:47AM | 25 | Q.   So you were gonna get $500 to help unload marijuana when |

09:48AM  1   it arrived in Buffalo; is that right?

09:48AM  2   A.   Yes.

09:48AM  3   Q.   And then he offered you marijuana to distribute?

09:48AM  4   A.   Yes.

09:48AM  5   Q.   And what did you say?

09:48AM  6   A.   I said, okay, I'll start looking for people.

09:48AM  7   Q.   And what was the -- what was the amount of marijuana that

09:48AM  8   you were looking to sell for Mr. Serio?

09:48AM  9   A.   5 pounds.

09:48AM  10  Q.   How frequently?

09:48AM  11  A.   I did it probably three or four times.

09:48AM  12  Q.   In the matter of weeks, months?

09:48AM  13  A.   No, months.

09:48AM  14  Q.   And would Mr. Serio make you pay for the marijuana before

09:48AM  15  he gave it to you to sell?  Or would he give it to on credit?

09:48AM  16  A.   He would give it to me on credit.

09:48AM  17  Q.   What's that called?

09:48AM  18  A.   It's called a front.

09:48AM  19  Q.   And describe fronting for the jury.

09:48AM  20  A.   He would give me the weed, and then when I got the money

09:48AM  21  from the person that I was bringing it to, then I would just

09:48AM  22  bring him back the money.

09:48AM  23  Q.   And how much per pound was Mr. Serio charging you?

09:48AM  24  A.   How much per pound?

09:49AM  25  Q.   Um-hum?

09:49AM  1   A.  Anywhere from $2,000 to $2,400.

09:49AM  2   Q.  Did that depend on the strain of marijuana it was?

09:49AM  3   A.  Depending on how much he got it for and the strain, yes.

09:49AM  4   Q.  And what were you selling it for per pound?

09:49AM  5   A.  I would try to make at least $100 to $200 per pound.

09:49AM  6   Q.  So between 500 and $1,000 per every 5 pounds?

09:49AM  7   A.  I would get about $500, yes, to $1,000 per 5 pounds.

09:49AM  8   Q.  And how many times did he front you 5 pounds?

09:49AM  9   A.  Like three or four.

09:49AM  10  Q.  So we're talking about 15 to 20 pounds?

09:49AM  11  A.  Yes.

09:49AM  12  Q.  Did you ever distribute any other drugs that he supplied?

09:49AM  13  A.  Negative.

09:49AM  14  Q.  As time went on, did Mr. Serio ever ask you to travel

09:50AM  15  with him to assist in the acquisition of marijuana?

09:50AM  16  A.  Yes.

09:50AM  17  Q.  Before I ask you about that conversation, where did he

09:50AM  18  ask you to travel to?

09:50AM  19  A.  New York City.

09:50AM  20  Q.  Describe that conversation where he asked you to travel

09:50AM  21  to New York City to obtain marijuana.

09:50AM  22  A.  He told me he would pay me $1,000 if I followed him in my

09:50AM  23  car while he was driving his car.

09:50AM  24  Q.  And did you agree to do that?

09:50AM  25  A.  Yes, I did.

| | | |
|---|---|---|
| 09:50AM | 1 | Q. Did he explain to you why he wanted you to follow him in |
| 09:50AM | 2 | your car while he drove his? |
| 09:50AM | 3 | A. Yes. |
| 09:50AM | 4 | Q. What was that part of the discussion? |
| 09:50AM | 5 | A. That if he was -- in case a trooper got behind him, I |
| 09:50AM | 6 | would basically -- they would end up getting behind me, and I |
| 09:50AM | 7 | could act erratically so they would pull me over and he could |
| 09:50AM | 8 | keep going. |
| 09:50AM | 9 | Q. And did you ultimately make that trip to New York City? |
| 09:50AM | 10 | A. Yes I did. |
| 09:50AM | 11 | Q. Did you drive your vehicle? |
| 09:51AM | 12 | A. Yes, I did. |
| 09:51AM | 13 | Q. Did Ron drive his vehicle? |
| 09:51AM | 14 | A. Yes, he did. |
| 09:51AM | 15 | Q. Who else drove with him? |
| 09:51AM | 16 | A. Anthony Gerace. |
| 09:51AM | 17 | Q. Is that Peter Gerace's younger brother? |
| 09:51AM | 18 | A. Yes, it is. |
| 09:51AM | 19 | Q. Describe that trip for the jury. |
| 09:51AM | 20 | A. Well, we were at Ron's, and they were -- there was no |
| 09:51AM | 21 | weed left, and they needed to get weed. So Ron called one of |
| 09:51AM | 22 | his connections, one of the Canadians that were in New York |
| 09:51AM | 23 | City. And Ron didn't have the money, so Anthony ended up |
| 09:51AM | 24 | borrowing him $80,000 to go pick up the weed. |
| 09:51AM | 25 | Q. Now you said Anthony borrowed Ron the $8,000. Did you |

09:51AM  1   mean Anthony loaned Ron $80,000, he gave him the money?

09:51AM  2   A.  He borrowed him the money to get the weed, yes.

09:51AM  3   Q.  So Anthony gave Ron $80,000?

09:51AM  4   A.  Yes.

09:51AM  5   Q.  So that Ron could an afford the marijuana --

09:51AM  6   A.  Yes.

09:51AM  7   Q.  -- from the New York supply?

09:51AM  8   A.  Yes.  As long as Anthony got it at cost when he got back.

09:51AM  9   Q.  And what do you mean by that?  Explain that for the jury.

09:52AM  10  A.  So Ron would not make any money off of Anthony for

09:52AM  11  lending him the money, he would give it to him what he paid

09:52AM  12  for it.

09:52AM  13  Q.  And you were present for that discussion?

09:52AM  14  A.  Yes, I was.

09:52AM  15  Q.  Ron agreed to that?

09:52AM  16  A.  Yes.

09:52AM  17  Q.  And what time of day did you guys leave for New York

09:52AM  18  City?

09:52AM  19  A.  I think it was at nighttime.

09:52AM  20  Q.  So you left at night?

09:52AM  21  A.  Yes.

09:52AM  22  Q.  Describe that trip.  What happened?

09:52AM  23  A.  It was snowing.  I started having car problems.  That's

09:52AM  24  basically all I --

09:52AM  25  Q.  Where did you go?

09:52AM   1   A.  We went -- oh, we stopped at the casino.

09:52AM   2   Q.  Where's that?

09:52AM   3   A.  I forgot which casino it was.  It was my first time.

09:52AM   4   Q.  What part of New York City did you go to?

09:52AM   5   A.  They left me at the hotel.

09:52AM   6   Q.  What hotel?

09:52AM   7   A.  I think it was a Holiday Inn.  It was outside of New York

09:53AM   8   City.  And then them two went to the city to go do whatever

09:53AM   9   transaction they had to do.

09:53AM   10  Q.  Do you know, did they come back to the hotel?

09:53AM   11  A.  Yes, they did.

09:53AM   12  Q.  Did you see what they had acquired?

09:53AM   13  A.  Yes.

09:53AM   14  Q.  What did they acquire?

09:53AM   15  A.  30 pounds and about 100 Moonrock sticks.

09:53AM   16  Q.  30 pounds -- 30 pounds of what?

09:53AM   17  A.  Marijuana.

09:53AM   18  Q.  And you said 100 Moonrock sticks?

09:53AM   19  A.  Yes.

09:53AM   20  Q.  What are Moonrock sticks?

09:53AM   21  A.  It's a pre-rolled joint rolled with hash, dipped in oil,

09:53AM   22  and then rolled in kief.

09:53AM   23  Q.  If that something to sell that people smoke?

09:53AM   24  A.  Yes.

09:53AM   25  Q.  It includes marijuana?

USA v Bongiovanni - Falzone - Tripi/Direct - 3/5/24

| | | |
|---|---|---|
| 09:53AM | 1 | A.  Yes. |
| 09:53AM | 2 | Q.  And so on the ride back, what was your job? |
| 09:54AM | 3 | A.  Just to follow it up. |
| 09:54AM | 4 | Q.  And, again, remind the jury, what was your task?  What |
| 09:54AM | 5 | were you supposed to do? |
| 09:54AM | 6 | A.  Was to follow him closely, so that no troopers could get |
| 09:54AM | 7 | behind him.  And if a trooper did come around, for me to |
| 09:54AM | 8 | drive erratically so that I would get pulled over and not |
| 09:54AM | 9 | him. |
| 09:54AM | 10 | Q.  Okay.  So you're like a decoy? |
| 09:54AM | 11 | A.  A decoy, yes, sir. |
| 09:54AM | 12 | Q.  And how much did you get paid for that trip? |
| 09:54AM | 13 | A.  Thousand dollars. |
| 09:54AM | 14 | Q.  Now, as you were becoming involved, agreeing to unload |
| 09:54AM | 15 | packages, traveling to New York, selling marijuana, did you |
| 09:54AM | 16 | become aware there were other people in Serio's organization |
| 09:54AM | 17 | who were also involved helping unload marijuana, selling |
| 09:54AM | 18 | marijuana, and also making trips to New York City with him? |
| 09:54AM | 19 | A.  Yes. |
| 09:54AM | 20 | Q.  Who were some of those other people? |
| 09:54AM | 21 | A.  Mike Masecchia, Anthony Gerace, and I wasn't aware of |
| 09:55AM | 22 | anybody -- well, he didn't really tell me about anybody else. |
| 09:55AM | 23 | Q.  Was Mario Vacanti another person? |
| 09:55AM | 24 | A.  Oh, yes, Mario Vacanti was, yes, also.  Sorry. |
| 09:55AM | 25 | Q.  Were there also people who hung out around Ron's house |

09:55AM  1  and helped him unload packages from time to time?

09:55AM  2  A.  Yes.

09:55AM  3  Q.  Who were some of those people?

09:55AM  4  A.  I wasn't told who, but I'm -- I know there was other

09:55AM  5  people.

09:55AM  6  Q.  Did you have a friend named Mike Moynihan?

09:55AM  7  A.  Yes.

09:55AM  8  Q.  Did he stay at Ron's house?

09:55AM  9  A.  Yes, he did.

09:55AM  10  Q.  Was he involved helping?

09:55AM  11  A.  As far as I know, I'm sure he was, but I don't know for

09:55AM  12  sure.

09:55AM  13  Q.  You never saw it?

09:55AM  14  A.  I never saw it.

09:55AM  15  Q.  Did you form a belief that Moynihan was helping?

09:55AM  16  A.  I just kind of figured because he lived there.

09:55AM  17  Q.  So is that a yes?

09:55AM  18  A.  Yes.

09:55AM  19  Q.  Now, getting back to the truckloads, how many truckloads

09:55AM  20  of marijuana did you help Mr. Serio unload in the Buffalo

09:56AM  21  area?

09:56AM  22  A.  Three.

09:56AM  23  Q.  And can you estimate how much marijuana was involved in

09:56AM  24  each load?

09:56AM  25  A.  100 pounds on each load.

USA v Bongiovanni - Falzone - Tripi/Direct - 3/5/24

13

09:56AM    1    Q.  On any of those loads that you helped unload, were there

09:56AM    2    any other types of drugs in the -- in the -- in the

09:56AM    3    concealed -- in the cover load?  Sorry, couldn't find the

09:56AM    4    words.

09:56AM    5    A.  Yes.

09:56AM    6    Q.  What other kinds of drugs were in the cover load?

09:56AM    7    A.  Fake OxyContin pills, they were fentanyl.

09:56AM    8    Q.  How many of the cover loads had those fake OxyContin

09:56AM    9    pills that were fentanyl?

09:56AM    10   A.  From the three I did, one.

09:56AM    11   Q.  What color were those pills?

09:56AM    12   A.  Bluish green.

09:56AM    13   Q.  What did they look like?

09:56AM    14   A.  A circle.

09:56AM    15   Q.  Are they small and round?

09:56AM    16   A.  Small and round, yes, sir.

09:56AM    17   Q.  And blueish green in color?

09:56AM    18   A.  Yeah.  And they had the fake imprints of the real

09:57AM    19   OxyContin.

09:57AM    20   Q.  Were those pills that Mr. Serio used and also

09:57AM    21   distributed?

09:57AM    22   A.  Oh, yeah.

09:57AM    23   Q.  Yes?

09:57AM    24   A.  Yes, sir.

09:57AM    25   Q.  Now, with respect to the three times you helped unload,

USA v Bongiovanni - Falzone - Tripi/Direct - 3/5/24

09:57AM   1   I'd like you to tell the jury what locations you unloaded the

09:57AM   2   marijuana at on each occasion, then I'm going ask you

09:57AM   3   specifically about each one.

09:57AM   4       So starting with -- what were the three locations where

09:57AM   5   you were unloading?

09:57AM   6   A.   First one was at my house.   The second one was Ron's

09:57AM   7   warehouse.   And the last one was at Ron's house on Lebrun.

09:57AM   8   Q.   Starting with your house, where -- what was your address

09:57AM   9   at the time?

09:57AM   10  A.   377 Englewood.

09:57AM   11  Q.   Describe what happened on that occasion, how you became

09:57AM   12  aware that the load was coming, and what transpired.

09:57AM   13  A.   Ron called me and said there was a guy coming with a

09:57AM   14  U-Haul truck.   Ron came over to my house.   A guy pulled up in

09:58AM   15  a U-Haul, he backed into my driveway into my backyard, and he

09:58AM   16  got out.   And him and Ron talked.   And us three starting

09:58AM   17  unloading the packages.

09:58AM   18  Q.   Did anybody else arrive at that time?

09:58AM   19  A.   In the beginning, Mike Masecchia arrived, but he was

09:58AM   20  there for about five or ten minutes, because -- my neighbor

09:58AM   21  was a convicted cocaine dealer, and I guess Mike knew him.

09:58AM   22  And Mike said that he couldn't be here in case he was seen .

09:58AM   23  Q.   Who was your neighbor?

09:58AM   24  A.   Remus Nowak.

09:58AM   25  Q.   Now, was that a person that was part of Ron's

09:58AM  1   organization as far as you know?

09:58AM  2   A.  Negative.

09:58AM  3   Q.  And when Masecchia realized that you lived near Nowak, he

09:58AM  4   decided to leave?

09:58AM  5   A.  He decided to leave, yes, sir.

09:58AM  6   Q.  Did you interact at all with the driver of the truck?

09:59AM  7   A.  Yes, I did.

09:59AM  8   Q.  Where did you -- what, if anything, did you learn about

09:59AM  9   the driver of your interactions?

09:59AM  10  A.  He told us -- he was an Asian guy.  He told us that he

09:59AM  11  was from Philadelphia.  And out of the 100 pounds, I think 30

09:59AM  12  of them were his, and he was taking those back to

09:59AM  13  Philadelphia with him.

09:59AM  14  Q.  Describe how you uncovered the load at your house.

09:59AM  15  A.  There was giant bags of wood pellets that are used for

09:59AM  16  wooden stoves.  And when you sliced open the bag and poured

09:59AM  17  the wood pellets out, concealed in the wood pellets would be

09:59AM  18  1 pound of marijuana.

09:59AM  19  Q.  And were there a lot of bags?

09:59AM  20  A.  Yes, there was about 100.

09:59AM  21  Q.  Where were you dumping the wood pellets?

09:59AM  22  A.  In my -- I have -- I used to have an ice rink in my

10:00AM  23  backyard, and there's like a sinkhole.  And so we just threw

10:00AM  24  them on the ground, and they eventually sunk into the earth.

10:00AM  25  Q.  So you filled in the hole in your backyard sort of?

| | | |
|---|---|---|
| 10:00AM | 1 | A.  Yes, basically. |
| 10:00AM | 2 | Q.  And you got paid for using your house and helping unload? |
| 10:00AM | 3 | A.  Yes, I did. |
| 10:00AM | 4 | Q.  I think you said the next location was Ron's warehouse? |
| 10:00AM | 5 | A.  Yes, sir. |
| 10:00AM | 6 | Q.  Let me show you a photo, this is marked as Government |
| 10:00AM | 7 | Exhibit 51A-7.  This is not in evidence yet. |
| 10:00AM | 8 | A.  That's the warehouse. |
| 10:00AM | 9 | Q.  Do you -- I'm sorry, do you recognize that photo? |
| 10:00AM | 10 | A.  Yes, I do. |
| 10:00AM | 11 | Q.  What do you recognize that to be of? |
| 10:00AM | 12 | A.  That's Ron's warehouse. |
| 10:00AM | 13 | Q.  Is that the warehouse where you unloaded marijuana? |
| 10:01AM | 14 | A.  Yes, sir. |
| 10:01AM | 15 | Q.  Does it fairly and accurately depict Ron's warehouse |
| 10:01AM | 16 | where you unloaded marijuana? |
| 10:01AM | 17 | A.  Yes, sir. |
| 10:01AM | 18 | Q.  And this was the second load that came into town? |
| 10:01AM | 19 | A.  Yes. |
| 10:01AM | 20 | **MR. TRIPI:**  The government offers 51A-7, Your Honor. |
| 10:01AM | 21 | **MR. MacKAY:**  No objection, Your Honor. |
| 10:01AM | 22 | **THE COURT:**  Received without objection. |
| 10:01AM | 23 | **MR. TRIPI:**  Thank you. |
| 10:01AM | 24 | **(GOV Exhibit 51A-7 was received in evidence.)** |
| 10:01AM | 25 | **MR. TRIPI:**  With the Court's permission, we'll |

10:01AM  1  publish this for the jury.

10:02AM  2          I'm super patient with technology, I'm sorry.

10:02AM  3          **BY MR. TRIPI:**

10:02AM  4  Q.  All right.  Do you recognize this location?

10:02AM  5  A.  Yes, I do.

10:02AM  6  Q.  What corner does this warehouse sit on?

10:02AM  7  A.  I think Michigan.

10:02AM  8  Q.  And we see a street sign there that says Sycamore?

10:02AM  9  A.  Yes, sir.

10:02AM  10  Q.  All right.  And that other street that we don't see a

10:02AM  11  sign for, you believe to be Michigan?

10:02AM  12  A.  Yes, I'm almost positive.

10:02AM  13  Q.  Okay.  Where -- where did you unload the marijuana?  How

10:02AM  14  did it go?

10:02AM  15  A.  Ron picked up a U-Haul truck, and he backed it in to

10:02AM  16  where the garage door is right there.

10:02AM  17  Q.  So that door opens up?

10:02AM  18  A.  Yes, sir.

10:02AM  19  Q.  And once that door opened up and he backed the U-Haul in,

10:02AM  20  what did you guys do next?

10:02AM  21  A.  The U-Haul was too big to be all the way backed in, so he

10:03AM  22  just backed it right to the face of the building.  And he

10:03AM  23  opened up the back of it.  And we cut open the box and

10:03AM  24  started taking all the mulch out with shovels and pics and --

10:03AM  25  to get to the middle of the load.

10:03AM  1   Q.  And when you got to the middle of the load, again how

10:03AM  2   much marijuana was there approximately?

10:03AM  3   A.  100 pounds.

10:03AM  4   Q.  And those were 1-pound bags?

10:03AM  5   A.  Yes, sir.

10:03AM  6   Q.  And is this the trip where there was also the fentanyl

10:03AM  7   pills, or do you recall?

10:03AM  8   A.  I don't recall.  I think the fentanyl pills were on the

10:03AM  9   last one --

10:03AM  10  Q.  Okay.

10:03AM  11  A.  -- if I'm not mistaken.

10:03AM  12  Q.  Okay.

10:03AM  13        **MR. TRIPI:**  Ms. Champoux, will you take this photo

10:03AM  14  down.  And if we could, bring up Government Exhibit 8A at page

10:04AM  15  172.  And I'm just going to clear this real quick.

10:04AM  16        **BY MR. TRIPI:**

10:04AM  17  Q.  Mr. Falzone, do you see the address two addresses written

10:04AM  18  there?

10:04AM  19  A.  I do.

10:04AM  20  Q.  Can you read those addresses?

10:04AM  21  A.  608 Michigan Avenue, Buffalo, New York, 82 Sycamore

10:04AM  22  Street, Buffalo, New York.

10:04AM  23  Q.  Is that the location of the warehouse we just looked at

10:04AM  24  in Exhibit 51A-7?

10:04AM  25  A.  Yes, it is.

10:04AM   1   Q.  And now you indicated earlier you became involved in 2014

10:04AM       or 2015?

10:04AM   3   A.  Yes, sir.

10:04AM   4   Q.  And then moved forward, correct?

10:04AM   5   A.  Yes, sir.

10:04AM   6   Q.  Do you see the bottom left-hand corner it says that that

10:04AM   7   document, that subpoena was issued on a particular day, can

10:04AM   8   you read that?

10:04AM   9              **MR. TRIPI:**  Can you blow that up Ms. Champoux?

10:05AM  10              **THE WITNESS:**  June 2013.

10:05AM  11              **MR. TRIPI:**  Hang on one second.

10:05AM  12              **THE CLERK:**  I'll clear it for you, Joe.

10:05AM  13              **THE WITNESS:**  I see it.  I see it.

10:05AM  14              **BY MR. TRIPI:**

10:05AM  15   Q.  All right.

10:05AM  16   A.  June 2013.

10:05AM  17   Q.  4th day of June, 2013?

10:05AM  18   A.  Yes, sir.

10:05AM  19   Q.  So, that document has a date prior to your involvement

10:05AM  20   with that warehouse and Mr. Serio, correct?

10:05AM  21   A.  It does.

10:05AM  22   Q.  So, in other words, Mr. Serio had that warehouse for a

10:05AM  23   long time, didn't he?

10:05AM  24   A.  Yes, sir.

10:05AM  25   Q.  Do you know how long he had that warehouse for?

10:05AM   1    A.   I think, like, maybe before -- before this.

10:05AM   2            **MR. MacKAY:**  Objection to speculation.

10:05AM   3            **MR. TRIPI:**  He's --

10:05AM   4            **BY MR. TRIPI:**

10:05AM   5    Q.   Think to yourself, and then answer out loud.  Do you know

10:05AM   6    approximately how long Mr. Serio had?

10:05AM   7    A.   Five to ten years before the date on this right here.

10:05AM   8    Q.   So he had that warehouse five or ten -- going back even

10:05AM   9    five or ten years before the date you see on this screen?

10:06AM   10   A.   Yes.

10:06AM   11   Q.   And he had that all the way through when you were

10:06AM   12   unloading it with him, after you became involved?

10:06AM   13   A.   Yes, sir.

10:06AM   14           **MR. TRIPI:**  Okay.  We can take that down,

10:06AM   15   Ms. Champoux.

10:06AM   16           One moment, please, Your Honor.

10:06AM   17           **BY MR. TRIPI:**

10:06AM   18   Q.   So the third unloading was at, you said, his house on

10:06AM   19   Lebrun?

10:06AM   20   A.   Yes, sir.

10:06AM   21   Q.   Describe -- can you describe in detail what happens on

10:06AM   22   that trip and how you came to be unloading the marijuana at

10:06AM   23   Mr. Serio's house?

10:06AM   24   A.   Ron and I met -- he got a phone call, we met two Canadian

10:07AM   25   guys at Denny's on Main Street.

10:07AM    1    Q.   Is that Main and Harlem?

10:07AM    2    A.   Yes, it is.

10:07AM    3    Q.   And there was a Denny's that was there?

10:07AM    4    A.   Yes.

10:07AM    5    Q.   And did you and Ron go meet them?

10:07AM    6    A.   Yes, we did.

10:07AM    7    Q.   Describe the meeting.

10:07AM    8    A.   I was in the car.  Ron went in.

10:07AM    9    Q.   Hang on, whose car were you in?

10:07AM   10    A.   I was in Ronald Serio's car.

10:07AM   11    Q.   So you and Ron met up, and then went to Denny's together?

10:07AM   12    A.   Yes.

10:07AM   13    Q.   Okay.  Where did you meet up before you and he went to

10:07AM   14    Denny's?

10:07AM   15    A.   At his house.

10:07AM   16    Q.   That's 697 Lebrun?

10:07AM   17    A.   Yes, sir.

10:07AM   18    Q.   Okay.  I'm going to just put that picture up on the

10:07AM   19    screen that orients you to Lebrun.

10:07AM   20        **MR. TRIPI:**  Can we please publish 42A-33 in evidence

10:07AM   21    already?  And can we zoom in on the photo?

10:07AM   22        **BY MR. TRIPI:**

10:07AM   23    Q.   So is that Mr. -- a picture of what Mr. Serio's house

10:07AM   24    used to be?

10:07AM   25    A.   Yes, sir.

10:07AM   1   Q.   Okay.  So you met with him there?

10:08AM   2   A.   Yes.

10:08AM   3   Q.   And then you and he have a discussion about going to

10:08AM   4   Denny's?

10:08AM   5   A.   Yes, sir.

10:08AM   6   Q.   Describe what happens from there.

10:08AM   7   A.   We went to Denny's.  Ron went inside, got the keys for a

10:08AM   8   U-Haul truck that was parked on the side street by Denny's.

10:08AM   9   Q.   Let me stop you there.  Did you go into Denny's and meet

10:08AM  10   the two Canadian guys?

10:08AM  11   A.   Not until I dropped the keys back off.

10:08AM  12   Q.   So you and Ron parked on a side street next to Denny's?

10:08AM  13   A.   No, Ron parked in the parking lot.

10:08AM  14   Q.   And then you waited in his vehicle?

10:08AM  15   A.   Yes.

10:08AM  16   Q.   What type of vehicle was Ron driving?

10:08AM  17   A.   A Range Rover.

10:08AM  18   Q.   Is that an expensive vehicle?

10:08AM  19   A.   Yes.

10:08AM  20   Q.   So Ron goes into the Denny's, and what happens next?

10:08AM  21   A.   He told me he gave the keys to the Range Rover to the

10:08AM  22   Canadian guys, and then he got the keys to the U-Haul truck.

10:08AM  23   Q.   Okay.  Let me stop you there.  Was there a U-Haul truck?

10:08AM  24   A.   Yes.

10:08AM  25   Q.   Where was the U-Haul truck?

| | | |
|---|---|---|
| 10:08AM | 1 | A.  On the side street next to Denny's. |
| 10:08AM | 2 | Q.  Okay.  So there's a side street right there? |
| 10:09AM | 3 | A.  Yes, sir. |
| 10:09AM | 4 | Q.  Okay.  And when Ron came out with the keys to the U-Haul |
| 10:09AM | 5 | truck, what did he tell you? |
| 10:09AM | 6 | A.  He told me let's go. |
| 10:09AM | 7 | Q.  And what did you and Ron then do? |
| 10:09AM | 8 | A.  Jumped in the U-Haul truck. |
| 10:09AM | 9 | Q.  So you exited the Range Rover? |
| 10:09AM | 10 | A.  Yes. |
| 10:09AM | 11 | Q.  And you went into the U-Haul truck? |
| 10:09AM | 12 | A.  Yes. |
| 10:09AM | 13 | **MR. MacKAY:**  Judge, I'm going to object to some of |
| 10:09AM | 14 | the leading. |
| 10:09AM | 15 | **MR. TRIPI:**  Judge, it's just foundational.  I'm just |
| 10:09AM | 16 | trying to develop the witness. |
| 10:09AM | 17 | **THE COURT:**  Yeah, it's -- |
| 10:09AM | 18 | **MR. TRIPI:**  We can do it all day, or I can -- |
| 10:09AM | 19 | **THE COURT:**  No, no, no, I understand.  So I think |
| 10:09AM | 20 | this is foundational, and so the objection is overruled.  You |
| 10:09AM | 21 | can continue. |
| 10:09AM | 22 | You can continue your objections, though, Mr. MacKay, |
| 10:09AM | 23 | when there's leading that you think is problematic. |
| 10:09AM | 24 | **MR. TRIPI:**  Okay. |
| | 25 | |

10:09AM   1        **BY MR. TRIPI:**

10:09AM   2   Q.  Once you and Mr. Serio got into the U-Haul with the keys

10:09AM   3   that Mr. Serio had, what happened next?

10:09AM   4   A.  We drove back to Lebrun.

10:09AM   5   Q.  To this house?

10:09AM   6   A.  Yes, sir.

10:09AM   7   Q.  That's depicted in 42A-33 for the record?

10:09AM   8        And describe what happened when you and Ron drove the

10:09AM   9   U-Haul to Mr. Serio's house?

10:09AM  10   A.  We drove to the back where the garage is.

10:09AM  11        **MR. TRIPI:**  Could we go to one 42A-34.  How about

10:10AM  12   42A-35.  Okay.

10:10AM  13        **BY MR. TRIPI:**

10:10AM  14   Q.  Does this overview show you the aerial view of that house

10:10AM  15   on Lebrun?

10:10AM  16   A.  Yes.

10:10AM  17   Q.  And is there a garage set back?

10:10AM  18   A.  Yes.

10:10AM  19   Q.  Is that sort of next to the pool?

10:10AM  20   A.  No.  That is the garage, the garage is right there.

10:10AM  21   Q.  Can you circle the pool -- I'm sorry, circle the garage

10:10AM  22   for the jury?  Okay.  So, describe what happened when you

10:10AM  23   guys got back there with the U-Haul.

10:10AM  24   A.  We -- first Ron crashed into the side of the house trying

10:11AM  25   to go to the back.

10:11AM    1    Q.  Why, was the truck too big or something?

10:11AM    2    A.  The truck was way too big.

10:11AM    3    Q.  Okay.

10:11AM    4    A.  So then he pulled forward, and then he ended up squeezing

10:11AM    5    it in, in reverse, to right directly in front of the garage.

10:11AM    6        Then he opened it up, and the box was so far set back,

10:11AM    7    that we had to take, like, pics and shovels and try to inch

10:11AM    8    the box towards the back of the truck until it actually fell

10:11AM    9    off the truck so that he could return the U-Haul truck.

10:11AM   10    Q.  And how long did that take to get to that load off the

10:11AM   11    back of the truck?

10:11AM   12    A.  Oh, at least an hour.

10:11AM   13    Q.  So after inching the load until the point where it fell,

10:12AM   14    what did you do next?

10:12AM   15    A.  Ron told me to drive the U-Haul truck back to Denny's.  I

10:12AM   16    parked it in the same spot on the side street.  I went

10:12AM   17    inside, I gave them their U-Haul keys and some money that Ron

10:12AM   18    gave me to give to them.  And then I took the Range Rover

10:12AM   19    keys and I drove back.

10:12AM   20    Q.  Okay.  And do you recall how much money Ron provided you

10:12AM   21    to give to those Canadian guys?

10:12AM   22    A.  It was around $2,000.

10:12AM   23    Q.  Do you know what that was for?

10:12AM   24    A.  I think that was their cut for dropping off the U-Haul

10:12AM   25    truck.

USA v Bongiovanni - Falzone - Tripi/Direct - 3/5/24

26

10:12AM   1   Q.  When -- when you got the Range Rover keys, did you drive

10:12AM   2   it back to Lebrun?

10:12AM   3   A.  Yes, I did.

10:12AM   4   Q.  Describe what and you Ron did next.

10:12AM   5   A.  We opened up the box and started digging all the mulch

10:13AM   6   out.  I particularly was putting the mulch in places around

10:13AM   7   his property.  And we were -- as we got to the pounds of

10:13AM   8   marijuana, we were throwing them in his garage.

10:13AM   9   Q.  Are there plenty of places to spread mulch around on

10:13AM  10   Mr. Serio's property at the time?

10:13AM  11   A.  Yes, sir.

10:13AM  12   Q.  Was this happening during the daytime or the nighttime?

10:13AM  13   A.  This was during the day.

10:13AM  14   Q.  How long did it take you in total, that whole process of

10:13AM  15   unloading the marijuana, spreading around the mulch?

10:13AM  16   A.  At least five, six hours, if not longer.

10:13AM  17   Q.  And did you get paid?

10:13AM  18   A.  Yes, I did.

10:13AM  19   Q.  How much did you get paid for that?

10:13AM  20   A.  $500.

10:13AM  21   Q.  Now, where were the areas that you were aware of, based

10:14AM  22   on your participation and your discussions with Mr. Serio,

10:14AM  23   where he would store marijuana before he would sell it?

10:14AM  24   A.  At one point he stored the -- we unloaded the box at the

10:14AM  25   warehouse.  He stored those ones there.

10:14AM   1         The ones from my house, he brought to Lebrun.

10:14AM   2    Q.   So this house, when you say Lebrun, okay?

10:14AM   3    A.   Yes.  And the ones that we unloaded on Lebrun, he brought

10:14AM   4    to the basement on Lebrun.

10:14AM   5    Q.   After marijuana was stored on Lebrun, have you seen other

10:14AM   6    members of the organization arrive to pick up marijuana to

10:14AM   7    redistribute?

10:14AM   8    A.   Yes, sir.

10:14AM   9    Q.   Who have you seen come to marijuana -- to acquire bulk

10:15AM   10   quantities of marijuana to distribute?

10:15AM   11   A.   The two people I saw that day were Mike Masecchia and

10:15AM   12   Mario Vacanti.

10:15AM   13   Q.   And describe what Masecchia brought with him to obtain

10:15AM   14   the marijuana?

10:15AM   15   A.   He brought a Home Depot box.

10:15AM   16   Q.   Describe that box.

10:15AM   17   A.   It was probably maybe 2 by 2 or 3 by 3 foot box.

10:15AM   18   Q.   And approximately how many pounds did he take?

10:15AM   19   A.   Around 20.

10:15AM   20   Q.   And then you saw -- you said you saw Mario Vacanti come?

10:15AM   21   A.   Yes.

10:15AM   22   Q.   And what did, what, if anything, did he bring with him to

10:15AM   23   transport the marijuana from Serio's property to take with

10:15AM   24   him?

10:15AM   25   A.   Suitcases, about this high and about this wide that had

10:16AM 1   wheels on the bottom.  And he had two of them, and they were

10:16AM 2   stuffed, both.

10:16AM 3   Q.  Now you're sitting there, so for the record I just want

10:16AM 4   to describe what you did.  You held your hand out to your

10:16AM 5   side.  Were you indicating about, like, waist high?

10:16AM 6   A.  Around waist high, if not taller.

10:16AM 7   Q.  Okay.  And how wide were the bags?

10:16AM 8   A.  About this wide.  2 feet.

10:16AM 9   Q.  2 feet?  Okay.

10:16AM 10      MR. TRIPI:  May the record reflect the witness

10:16AM 11  demonstrated the approximate size of the suitcases, a height

10:16AM 12  approximately or a little more than waist height, and 2 feet

10:16AM 13  wide.

10:16AM 14      BY MR. TRIPI:

10:16AM 15  Q.  Do you know how much marijuana Vacanti took?

10:16AM 16  A.  Not -- not in total.

10:16AM 17  Q.  Okay.  Were there ever times when you observed Anthony

10:16AM 18  Gerace arrive at 697 Lebrun to obtain bulk quantities of

10:16AM 19  marijuana?

10:16AM 20  A.  Yes.

10:16AM 21  Q.  When you made those observations, what, if anything, did

10:16AM 22  Mr. Gerace, Anthony Gerace, have with him to help him

10:17AM 23  transport the marijuana from the premises?

10:17AM 24  A.  He had duffle bags or a box.  Anything that he -- he

10:17AM 25  could use to transport the marijuana.

USA v Bongiovanni - Falzone - Tripi/Direct - 3/5/24

29

| | | |
|---|---|---|
| 10:17AM | 1 | Q.  Have you seen duffle bags in the past? |
| 10:17AM | 2 | A.  Yes. |
| 10:17AM | 3 | Q.  When you would see Anthony picking up marijuana or around |
| 10:17AM | 4 | Mr. Serio's residence, have you ever seen him with a firearm? |
| 10:17AM | 5 | A.  Yes, sir. |
| 10:17AM | 6 | Q.  Do you recall what type of firearm you have seen him |
| 10:17AM | 7 | with? |
| 10:17AM | 8 | A.  If I'm not mistaken, it was a .40 caliber. |
| 10:17AM | 9 | Q.  Is that a pistol? |
| 10:17AM | 10 | A.  Pistol, yes. |
| 10:17AM | 11 | Q.  Did Mr. Serio -- did Ron Serio ever tell you about other |
| 10:17AM | 12 | trips he took to New York City to acquire marijuana for |
| 10:17AM | 13 | distribution? |
| 10:17AM | 14 | A.  He told me about one. |
| 10:17AM | 15 | Q.  What did he say about that? |
| 10:17AM | 16 | A.  He said he went to New York with Mike one time to pick up |
| 10:18AM | 17 | weed from the Canadians. |
| 10:18AM | 18 | Q.  When you say "Mike," who are you referring to? |
| 10:18AM | 19 | A.  Mike Masecchia. |
| 10:18AM | 20 | Q.  Did Mr. Serio ever tell you about other drugs that the |
| 10:18AM | 21 | Canadians sent him? |
| 10:18AM | 22 | A.  Yes. |
| 10:18AM | 23 | Q.  What did he tell you? |
| 10:18AM | 24 | A.  He told me that they sent him some Susna, which is MDMA. |
| 10:18AM | 25 | Q.  MDMA? |

10:18AM   1   A.  Yes.

10:18AM   2   Q.  Is Susna like a slang term for it?

10:18AM   3   A.  I think that's what they call it in Canada.

10:18AM   4   Q.  Okay.  And what did Mr. Serio tell you about the MDMA?

10:18AM   5   A.  Oh, well, he was just complaining, like -- I don't know

10:18AM   6   if I'm allowed to use swear words.

10:18AM   7   Q.  Go ahead.  Say it how he said it.

10:18AM   8   A.  He said, these fucking jerk-offs sent me all this MDMA

10:18AM   9   and want me to get rid of it, and I don't want it, and I

10:18AM  10   don't have any anybody to get rid of it to.

10:18AM  11   Q.  So did he tell you what he did with it?

10:19AM  12   A.  I think he stored it at the warehouse.

10:19AM  13   Q.  Is that the warehouse in Exhibit 51A-7 we talked about

10:19AM  14   earlier?

10:19AM  15   A.  Yes, sir.

10:19AM  16   Q.  The one on Sycamore?

10:19AM  17   A.  Yes.

10:19AM  18   Q.  So, in terms of finding sources of supply for bulk

10:19AM  19   distribution of marijuana, was Mr. Serio the focal point of

10:19AM  20   that part of the operation?

10:19AM  21   A.  Yes.

10:19AM  22   Q.  If he were to get in trouble, do you believe it risked

10:19AM  23   everyone getting in trouble?

10:19AM  24          **MR. MacKAY:**  Objection.

10:19AM  25          **MR. TRIPI:**  Do you believe it risked everyone getting

10:19AM    1    in trouble.

10:19AM    2         **MR. MacKAY:**  I guess it calls for speculation on the

10:19AM    3    parts of others.

10:19AM    4         **THE COURT:**  Overruled.

10:19AM    5         **BY MR. TRIPI:**

10:19AM    6    Q.  You can answer.  That means you can answer.

10:19AM    7    A.  Do I believe everybody else would also get in trouble?

10:19AM    8    Q.  Do you believe his arrest would risk other people getting

10:19AM    9    in trouble in the organization?

10:20AM   10    A.  Yes.

10:20AM   11    Q.  Now, along the way, did Mr. Serio tell you anything about

10:20AM   12    law enforcement protection that he had for the organization?

10:20AM   13    A.  Yes, he did.

10:20AM   14    Q.  What did Mr. Serio tell you?

10:20AM   15    A.  He told me that we were protected because he was paying

10:20AM   16    Mike Masecchia every month to pay off Mr. Bongiovanni.

10:20AM   17    Q.  And what did Mr. Bongiovanni do for a living?

10:20AM   18    A.  He was a DEA agent.

10:20AM   19    Q.  And do you know him?

10:20AM   20    A.  No, I do not.

10:20AM   21    Q.  Have you ever met him?

10:20AM   22    A.  Negative.

10:20AM   23    Q.  Do you know what he looks like?

10:20AM   24    A.  Yes, sir.

10:20AM   25    Q.  How do you know what he looks like?

10:20AM   1   A.  Because I've seen him before.

10:20AM   2   Q.  Okay.  Do you see him in court?

10:20AM   3   A.  Yes, I do.

10:20AM   4   Q.  Can you point to him and describe something he's wearing?

10:20AM   5   A.  Burgundy tie.

10:20AM   6        **MR. TRIPI:**  May the record reflect that the witness

10:20AM   7   looked over and identified Mr. Bongiovanni by his tie.

10:21AM   8        **THE COURT:**  It does.

10:21AM   9        **BY MR. TRIPI:**

10:21AM  10   Q.  And you've seen him before?

10:21AM  11   A.  Yes.

10:21AM  12   Q.  Is that out in public?

10:21AM  13   A.  Yeah, I've seen him in public, and I've also seen -- I

10:21AM  14   saw him at Lou Selva's benefit party.

10:21AM  15   Q.  When was that benefit party?

10:21AM  16   A.  I don't recall.

10:21AM  17   Q.  What was the benefit party for?

10:21AM  18   A.  Lou had open-heart surgery.

10:21AM  19   Q.  Getting back to the conversation, we'll get to the

10:21AM  20   benefit party in a bit, what did -- what did Mr. Serio tell

10:21AM  21   you Bongiovanni would do in exchange for those payments?

10:21AM  22   A.  He would let us know who to stay away from and who was

10:21AM  23   being investigated.

10:21AM  24   Q.  Were you, in your conversations with Mr. Serio, Ron

10:22AM  25   Serio, were you ever given any examples of how

10:22AM    1   Mr. Bongiovanni helped other people that were involved with

10:22AM    2   Ron and this drug-trafficking organization?

10:22AM    3   A.  Yeah.  One time I was at Ron's house, and he got a phone

10:22AM    4   call I guess from Mike Masecchia, that Lou Selva told Mike

10:22AM    5   Masecchia that Mario Vacanti, that was living in Ron's

10:22AM    6   brother's carriage house, was being investigated by the DEA.

10:22AM    7   Q.  So you learned that Mario Vacanti was under

10:22AM    8   investigation?

10:22AM    9   A.  Yes, sir.

10:22AM   10   Q.  Did Mr. Serio ever tell you about anything that

10:22AM   11   Bongiovanni did for Anthony Gerace?

10:22AM   12   A.  Yes, sir.

10:22AM   13   Q.  What did he tell you about that?

10:22AM   14   A.  He told me that Anthony told him that he got caught

10:22AM   15   selling cocaine.  And his brother called Bongiovanni to help

10:23AM   16   Anthony get out of trouble.  And that's how basically Anthony

10:23AM   17   never got in trouble for being arrested for selling cocaine.

10:23AM   18   Q.  And you, in that answer, you referenced Anthony's

10:23AM   19   brother.  Who is that?

10:23AM   20   A.  Peter Gerace.

10:23AM   21   Q.  Now there comes a point in time in or about April of 2017

10:23AM   22   where you learn that Mr. Serio is arrested; is that correct?

10:23AM   23   A.  Yes, sir.

10:23AM   24   Q.  Okay.  Using that as a frame of reference for a moment,

10:23AM   25   do you recall whether or not Mr. Selva's benefit for his

10:23AM   1   heart attack was before Mr. Serio was arrested or after?

10:23AM   2   A.  It was before.

10:23AM   3   Q.  Okay.  Do you remember who you went to the benefit with?

10:23AM   4   A.  I don't recall.

10:23AM   5   Q.  Do you remember where the benefit was?

10:24AM   6   A.  It was at the Knights of Columbus on Kenmore Avenue.

10:24AM   7   Q.  Is that on the Buffalo/Kenmore border?

10:24AM   8   A.  Yes.

10:24AM   9   Q.  Do you remember anyone else who was there other than the

10:24AM   10  defendant?

10:24AM   11  A.  Basically everybody from North Buffalo.

10:24AM   12  Q.  Was Mike Masecchia there?

10:24AM   13  A.  Yes.

10:24AM   14  Q.  Okay.  Now, I referenced it a moment ago, but Mr. Serio

10:24AM   15  was arrested in April of 2013; do you recall learning that?

10:24AM   16  A.  Yes.

10:24AM   17  Q.  After Mr. Serio was arrested, did you have a meeting

10:24AM   18  somewhere with Mr. Masecchia?

10:24AM   19  A.  Yes, I did.

10:24AM   20  Q.  Where did you meet with Mr. Masecchia?

10:24AM   21  A.  Tim Horton's in the Tony Walker Plaza.

10:24AM   22  Q.  Is that in Williamsville?

10:24AM   23  A.  Yes, it is.

10:24AM   24  Q.  How did you -- how did that meeting come about?  Was it a

10:25AM   25  chance encounter?  Or did you plan to meet there?

10:25AM    1    A.  Mike called me and told me to meet him there.

10:25AM    2    Q.  And did you do so?

10:25AM    3    A.  Yes, I did.

10:25AM    4    Q.  Describe what happened when you arrived at Tim Horton's

10:25AM    5    in the Walker Plaza after Mr. Serio's arrest?

10:25AM    6    A.  Mike came up to me and he said, I don't know how this

10:25AM    7    happened.  I talked to my guy, and Ron wasn't on any radars.

10:25AM    8    Q.  How did that -- how did you get to that point of the

10:25AM    9    discussion?  Were you sitting down having coffee.

10:25AM   10    A.  No, we were in the parking lot.

10:25AM   11    Q.  So you didn't go in?

10:25AM   12    A.  We didn't go in.

10:25AM   13    Q.  And what did you say?

10:25AM   14    A.  I didn't say anything.  I was just, like, oh.

10:25AM   15    Q.  When you -- how did you first hear that Mr. Serio was

10:25AM   16    arrested?

10:25AM   17    A.  His brother called me.

10:25AM   18    Q.  Who's that?

10:25AM   19    A.  His brother, Tom.

10:25AM   20    Q.  When you learned it, did you become concerned about

10:25AM   21    Mr. Serio's arrest?

10:25AM   22    A.  Yes, I did.

10:25AM   23    Q.  When Mr. Masecchia said, I talked to my guy -- withdrawn.

10:26AM   24        When he said, I don't understand how this happened.  I

10:26AM   25    talked to my guy, and Ron wasn't on any radars.  In the

Case 1:19-cr-00227-LJV-MJR   Document 843   Filed 03/30/24   Page 36 of 51
USA v Bongiovanni - Falzone - Tripi/Direct - 3/5/24

36

10:26AM   1   context of that conversation, did you form a belief as to who

10:26AM   2   Masecchia was referring to when he said "my guy?"

10:26AM   3   A.  Yes, I did.

10:26AM   4   Q.  And who did you believe Mr. Masecchia was referring to

10:26AM   5   when he referred to "my guy?"

10:26AM   6   A.  Mr. Bongiovanni.

10:26AM   7   Q.  Several -- without getting into what was said, several

10:26AM   8   weeks later, did you have a meeting with Masecchia and Tom

10:26AM   9   Serio at your house?

10:26AM   10  A.  Yes, I did.

10:26AM   11  Q.  Is that the same house we talked about earlier, 377

10:26AM   12  Englewood?

10:26AM   13  A.  Yes, sir.

10:27AM   14  Q.  Without getting into that discussion, as time went on,

10:27AM   15  after that, did Masecchia eventually ask you to do anything

10:27AM   16  as it related to distributing bulk marijuana?

10:27AM   17  A.  Yes.

10:27AM   18  Q.  How long after the meeting at your house did Masecchia

10:27AM   19  ask you to sell or distribute marijuana?

10:27AM   20  A.  A couple days.

10:27AM   21  Q.  How much marijuana did Masecchia ask you to see if you

10:27AM   22  could distribute?

10:27AM   23  A.  He told me to try to get Ron's old guys, and to tell

10:27AM   24  them -- he brought 5 pounds to show me, to see if I could

10:27AM   25  bring it to Ron's old customers, and tell them that he can

10:28AM 1   get whatever they want.

10:28AM 2   Q.  And who -- who was he asking you to approach about

10:28AM 3   further distributing the marijuana?

10:28AM 4   A.  Anthony Gerace and Mario Vacanti.

10:28AM 5   Q.  The same two people you've been discussing?

10:28AM 6   A.  Yes.

10:28AM 7   Q.  Did you agree to do that, or no?

10:28AM 8   A.  No.

10:28AM 9   Q.  Why not?

10:28AM 10  A.  I -- my best friend just got in trouble.  I wasn't trying

10:28AM 11  to get in trouble.

10:28AM 12  Q.  Was there anything about -- let me withdraw it.  And I'm

10:28AM 13  going to do ask you a very specific question.  Try to limit

10:28AM 14  your answer to my question, okay?

10:28AM 15      By that point in time, did you believe you had any

10:28AM 16  protection anymore?

10:28AM 17          **MR. MacKAY:**  Objection.  Leading, Judge.  And this

10:28AM 18  evokes the prior ruling.

10:28AM 19          **THE COURT:**  Sustained.

10:28AM 20          **MR. TRIPI:**  I'm trying to adhere to the Court's prior

10:29AM 21  ruling.

10:29AM 22          **THE COURT:**  No, I understand.  Sustained.

10:29AM 23          **BY MR. TRIPI:**

10:29AM 24  Q.  Following the meeting at your house with Tom and Mike

10:29AM 25  Masecchia, did that meeting factor into you declining to

10:29AM   1   distribute the marijuana?

10:29AM   2   A.  Yes, sir.

10:29AM   3   Q.  Why?

10:29AM   4   A.  Because I -- Mike told us that Ron --

10:29AM   5   Q.  Without getting into fully what was said, something was

10:29AM   6   discussed there?

10:29AM   7   A.  Yes, that I wasn't one of the ones that were being

10:29AM   8   protected.

10:29AM   9   Q.  So, after Ron's arrested, you didn't believe you were

10:29AM  10   protected anymore?

10:29AM  11   A.  Yes, sir.

10:29AM  12   Q.  Okay.  I'm just going to ask you about a few other people

10:30AM  13   who were close with Ron.  I think you referenced earlier,

10:30AM  14   Mike Moynihan actually lived on the premises at 697 Lebrun?

10:30AM  15   A.  Yes, sir.

10:30AM  16   Q.  Is he someone that both you and Ron have both known for a

10:30AM  17   while?

10:30AM  18   A.  Mike's been one of our best friends for more than 30

10:30AM  19   years.

10:30AM  20   Q.  Do you know Mike Buttita?

10:30AM  21   A.  Yes, I do.

10:30AM  22   Q.  Who was that in the context of Ron's dealings, do you

10:30AM  23   know?

10:30AM  24   A.  Just a minor person.

10:30AM  25   Q.  Is he someone who would get marijuana?

| | | |
|---|---|---|
| 10:30AM | 1 | A.  Yes, once in a while. |
| 10:30AM | 2 | Q.  And who's Chris Baker? |
| 10:30AM | 3 | A.  Chris Baker is one of Tom's friends, Ron's brother's. |
| 10:30AM | 4 | Q.  Has he been around Ron and Tom Serio for a long time? |
| 10:30AM | 5 | A.  Yes, I've known Baker as long as I've known Ron and Tom. |
| 10:31AM | 6 | Q.  Is that 30 years or more? |
| 10:31AM | 7 | A.  Yes, sir. |
| 10:31AM | 8 | Q.  Now, during the time frame of some of these events that |
| 10:31AM | 9 | we're discussing, did you have a phone number, 716-208-5678? |
| 10:31AM | 10 | A.  Yes, I did. |
| 10:31AM | 11 | **MR. TRIPI:**  Ms. Champoux, can we pull up -- you can |
| 10:31AM | 12 | take this one down.  Could we pull up Exhibit 8A and go to |
| 10:31AM | 13 | page 325. |
| 10:31AM | 14 | **BY MR. TRIPI:** |
| 10:31AM | 15 | Q.  Can you see that there? |
| 10:31AM | 16 | A.  Yes, sir. |
| 10:31AM | 17 | Q.  Do you see the document, what it says below account |
| 10:31AM | 18 | billing address? |
| 10:31AM | 19 | A.  Account billing, yes. |
| 10:31AM | 20 | Q.  Does your name appear there? |
| 10:32AM | 21 | A.  Yes, it does. |
| 10:32AM | 22 | Q.  Does your address appear there? |
| 10:32AM | 23 | A.  Yes, sir. |
| 10:32AM | 24 | Q.  Is there a phone number associated with that? |
| 10:32AM | 25 | A.  Yes, sir. |

10:32AM   1   Q.  What's that phone number there?

10:32AM   2   A.  716-836-0583.

10:32AM   3   Q.  Is that another phone number you had?

10:32AM   4   A.  Yeah, that was my house phone.

10:32AM   5   Q.  And was 377 Englewood Avenue your house at the time of

10:32AM   6   these events?

10:32AM   7   A.  Yes, it was.

10:32AM   8   Q.  At any point, did Mr. Bongiovanni ever approach you and

10:32AM   9   ask you questions about your dealings with Mr. Masecchia?

10:32AM   10   A.  Negative.

10:32AM   11   Q.  At any point, did Mr. Bongiovanni approach you and ask

10:32AM   12   you about your dealings with Mr. Selva?

10:32AM   13   A.  Negative.

10:32AM   14   Q.  Did he ever ask you about your dealings with Ron Serio?

10:32AM   15   A.  Negative.

10:32AM   16   Q.  Did he ever ask you about marijuana trafficking at all?

10:32AM   17   A.  Negative.

10:32AM   18   Q.  Did he ever ask you any questions in his capacity as a

10:32AM   19   DEA agent about any drug activity?

10:32AM   20   A.  Negative.

10:32AM   21   Q.  Was the first time law enforcement approached you about

10:33AM   22   any of these events late 2019 when HSI, Homeland Security

10:33AM   23   Investigation, served you a target letter?

10:33AM   24   A.  Can you repeat that, please?

10:33AM   25   Q.  Was the first time any law enforcement approached you

| | | |
|---|---|---|
| 10:33AM | 1 | about these events, was that when HSI agents approached you |
| 10:33AM | 2 | late 2019 and gave you a target letter from the U.S. |
| 10:33AM | 3 | Attorney's Office? |
| 10:33AM | 4 | A.  Yes, sir, that was the first time. |
| 10:33AM | 5 | MR. TRIPI:  One moment, please, Your Honor. |
| 10:33AM | 6 | I don't have any further direct exam, Your Honor. |
| 10:33AM | 7 | THE COURT:  Cross? |
| 10:33AM | 8 | MR. MacKAY:  Yes, Your Honor.  Thank you. |
| 11:22AM | 9 | (Cross-examination from 10:33 a.m. to 11:22 a.m.) |
| 11:22AM | 10 | THE COURT:  Okay.  Redirect? |
| 11:22AM | 11 | MR. TRIPI:  Thank you, Your Honor. |
| 11:22AM | 12 | |
| 11:22AM | 13 | **REDIRECT EXAMINATION BY MR. TRIPI:** |
| 11:22AM | 14 | Q.  Mr. Falzone, on cross-examination, you were asked a |
| 11:22AM | 15 | little bit about sort of time frames, so I just want to go |
| 11:22AM | 16 | back to some time frames.  Okay? |
| 11:22AM | 17 | A.  Yes, sir. |
| 11:22AM | 18 | Q.  And I think you indicated when you first became involved |
| 11:22AM | 19 | it was approximately 2014 or 2015? |
| 11:22AM | 20 | A.  Yes. |
| 11:22AM | 21 | Q.  And was the first thing you did, agree to unload |
| 11:23AM | 22 | packages? |
| 11:23AM | 23 | A.  Yes. |
| 11:23AM | 24 | Q.  Was the first delivery to your house at 337 Englewood, |
| 11:23AM | 25 | was that the first thing you did? |

11:23AM   1   A.  That was the first thing I did, yes.

11:23AM   2   Q.  Okay.  In proximity to when you first had the discussion

11:23AM   3   with Ron about wanting to get involved, how much time went by

11:23AM   4   before you had that first delivery to your house?

11:23AM   5   A.  About a month.

11:23AM   6   Q.  Okay.  So, we're still in that 2014-2015 time frame?

11:23AM   7   A.  Yes.

11:23AM   8   Q.  Okay.  Now, as I understand your testimony, the next

11:23AM   9   delivery was at the warehouse at 82 Sycamore, that photo we

11:23AM  10   saw?

11:23AM  11   A.  Yes.

11:23AM  12   Q.  How long after the delivery that you accepted at your

11:23AM  13   house at 337 Englewood was the instance when you helped Ron

11:23AM  14   unload the U-Haul at the warehouse?

11:24AM  15   A.  Probably a month to two months.

11:24AM  16   Q.  A month to two months later?

11:24AM  17   A.  Yes.

11:24AM  18   Q.  So was that still the 2014-2015 --

11:24AM  19   A.  '15.

11:24AM  20   Q.  -- time frame?

11:24AM  21   A.  Yes.

11:24AM  22   Q.  Okay.  And then the third delivery that you talked about

11:24AM  23   where you went to the Denny's and back to Lebrun, what

11:24AM  24   approximate year -- or, withdrawn.

11:24AM  25       How long after the warehouse delivery was that delivery?

11:24AM   1   A.  Another couple months maybe.

11:24AM   2   Q.  Okay.  So what year is it approximately?

11:24AM   3   A.  I can't recall which year.

11:24AM   4   Q.  It started in 2014-'15?

11:24AM   5   A.  So, let's say maybe four months, maybe, later.  Three

11:24AM   6   months.  2015 maybe.  I -- I honestly don't remember.

11:25AM   7   Q.  Okay.  Were the three deliveries before you drove to

11:25AM   8   New York City?

11:25AM   9   A.  Yes.

11:25AM  10   Q.  Okay.  So the three deliveries happen, and then the drive

11:25AM  11   with Anthony and Ron happened to New York City?

11:25AM  12   A.  Yes.

11:25AM  13   Q.  How long after the last delivery was the travel, the road

11:25AM  14   trip to New York City for the marijuana?

11:25AM  15   A.  Well, it was summer on the last delivery to Ron's house.

11:25AM  16   And then it was winter when we went to New York City.  So six

11:25AM  17   months maybe, five months.

11:25AM  18   Q.  What approximate year?

11:25AM  19   A.  Could have been 2016 maybe.

11:25AM  20   Q.  Okay.  So your best estimate is the road trip is 2016?

11:25AM  21   A.  Yes.

11:25AM  22   Q.  And all those things happened before Ron's arrest in

11:26AM  23   April of 2017?

11:26AM  24   A.  Yes, sir.

11:26AM  25   Q.  Okay.  Now, you were asked some questions about

Case 1:19-cr-00227-LJV-MJR   Document 843   Filed 03/30/24   Page 44 of 51
USA v Bongiovanni - Falzone - Tripi/Redirect - 3/5/24

44

| 11:26AM | 1 | Exhibit 3541B-1, do you remember that? |
| 11:26AM | 2 | A.  Yes. |
| 11:26AM | 3 | Q.  That was an interview you gave to HSI -- |
| 11:26AM | 4 | A.  Yes. |
| 11:26AM | 5 | Q.  -- on October 28th, 2019. |
| 11:26AM | 6 | To complete the question, or to complete what you said |
| 11:26AM | 7 | about Masecchia paying, did you also say that Masecchia would |
| 11:26AM | 8 | pay Bongiovanni directly -- |
| 11:26AM | 9 | A.  Yes. |
| 11:26AM | 10 | Q.  -- during that interview? |
| 11:26AM | 11 | A.  I also did say that, yes, correct. |
| 11:26AM | 12 | Q.  Now, when you became involved with Serio and you got |
| 11:27AM | 13 | involved in these operations, was it important for you to not |
| 11:27AM | 14 | get caught? |
| 11:27AM | 15 | A.  Yes. |
| 11:27AM | 16 | Q.  Why was it important for you to not get caught? |
| 11:27AM | 17 | A.  Because I would lose everything. |
| 11:27AM | 18 | Q.  Your family, your kids, all of it? |
| 11:27AM | 19 | A.  Yes. |
| 11:27AM | 20 | Q.  When you had your discussions with Serio about the |
| 11:27AM | 21 | protection that the defendant was providing, was there any |
| 11:27AM | 22 | reason that you knew of for Mr. Serio to lie to you about the |
| 11:27AM | 23 | fact that you had paid protection? |
| 11:27AM | 24 | **MR. MacKAY:**  Objection, speculation. |
| 11:27AM | 25 | **THE COURT:**  Yeah, sustained. |

11:27AM    1              **BY MR. TRIPI:**

11:27AM    2   Q.  Did you believe Mr. Serio, when he told you that he had

11:27AM    3   the defendant protecting them?

11:27AM    4   A.  Yes, I did.

11:27AM    5   Q.  Was Mike Masecchia, as far as you understood it, making a

11:28AM    6   lot of money with Ron Serio?

11:28AM    7   A.  To be honest with you, I don't know how much money he was

11:28AM    8   making.

11:28AM    9   Q.  Was Mike Masecchia staying in a house also owned by Ron

11:28AM   10   Serio?

11:28AM   11   A.  Yes, he was.

11:28AM   12   Q.  Where?

11:28AM   13   A.  On Huntington in Williamsville.

11:28AM   14   Q.  So they were selling drugs together, and he was staying

11:28AM   15   in a house owned by Mr. Serio?

11:28AM   16   A.  Correct.

11:28AM   17   Q.  In your view, was Mr. Serio an important part of the

11:28AM   18   organization so that everyone can make money?

11:29AM   19   A.  Yes, sir.

11:29AM   20   Q.  Now, you said on your -- during cross-examination in

11:29AM   21   response to a question from Mr. MacKay regarding Mike

11:29AM   22   Masecchia and Ron Serio, that they both needed each other to

11:29AM   23   be honest with you; do you remember saying that?

11:29AM   24   A.  Yes, I did.

11:29AM   25   Q.  Can you elaborate on that?  Why did Ron Serio and Mike

11:29AM   1   Masecchia both need each other?

11:29AM   2   A.  Well, Ron was the supplier, and Mike was one of the

11:29AM   3   sellers.  So Mike couldn't make money without Ron, and Ron

11:29AM   4   couldn't make money without Mike.

11:29AM   5   Q.  As time went on, did you believe that Bongiovanni was

11:30AM   6   protecting everyone?

11:30AM   7   A.  After what was told about Mario, I did believe it.

11:30AM   8   Q.  Which was what?

11:30AM   9   A.  That Mario was being investigated by the DEA.

11:30AM   10  Q.  And was that information provided before Ron learned of

11:30AM   11  this affair between Mario and his wife Lauren?

11:30AM   12  A.  Yes.

11:30AM   13  Q.  That's when everyone was still getting along?

11:30AM   14  A.  Correct.

11:30AM   15  Q.  That's when Mario was still selling a lot of marijuana

11:30AM   16  for Ron?

11:30AM   17  A.  Yes.

11:30AM   18  Q.  Now, during examination by Mr. MacKay, you indicated that

11:31AM   19  after Ron's arrest, that you had confronted Lou about the

11:31AM   20  fact that the defendant was providing protection, and Lou

11:31AM   21  turned red as an apple; do you recall that?

11:31AM   22  A.  Yes.

11:31AM   23  Q.  Explain, what was your understanding of why Lou Selva

11:31AM   24  turned red as an apple when you told him what you knew about

11:31AM   25  Bongiovanni's protection?

11:31AM   1   A.   I -- I -- I took it as I wasn't supposed to know.   And

11:31AM   2   when I told him that I knew, that's why he turned red.

11:31AM   3   Q.   Because you were Ron's friend, right?

11:31AM   4   A.   Yes.

11:31AM   5   Q.   Was the defendant's protection supposed to be a closely

11:31AM   6   held secret?

11:31AM   7   A.   Yes.

11:32AM   8   Q.   Is that why you think Lou turned red?

11:32AM   9   A.   Yes.

11:32AM  10   Q.   When you met Masecchia at Tim Horton's after Ron's

11:32AM  11   arrest, and he said -- I just want to get it right -- I don't

11:32AM  12   understand how this happened.   I talked to my guy, and Ron

11:32AM  13   wasn't on any radars.   Did you believe Masecchia?

11:32AM  14          **MR. MacKAY:**   Objection, beyond the scope at this

11:32AM  15   point.

11:32AM  16          **THE COURT:**   Sustained.

11:32AM  17          **MR. TRIPI:**   Your Honor, before I move to my next

11:32AM  18   question, can we come up briefly?

11:32AM  19          **THE COURT:**   Sure.

11:33AM  20          (Sidebar discussion held on the record.)

11:33AM  21          **MR. TRIPI:**   Your Honor, the cross-examination, I

11:33AM  22   believe, opened the door to the full panoply of the discussion

11:33AM  23   regarding the no-fly list.   The cross-examination created the

11:33AM  24   perception because initially they -- they elicited his

11:33AM  25   speculation that there might not have actually been any

11:33AM    1    protection.  The discussion at his dining room table with Tom

11:33AM    2    Serio and Mike Masecchia confirms that in fact there was

11:33AM    3    protection, the discussion of no-fly list, and he was going to

11:33AM    4    be continued to be protected.

11:33AM    5          And so they didn't have to go as deeply as they went,

11:33AM    6    but they went there.  And I believe that door is open now.

11:33AM    7          **MR. MacKAY:**  Judge, I don't recall it being opened

11:33AM    8    that way.  We didn't talk about the whole scope of what was --

11:33AM    9          **MR. TRIPI:**  They tried, but there was no protection,

11:33AM    10   and he didn't believe there was protection.  And then there

11:33AM    11   was a specific discussion at his dining room table about

11:33AM    12   whether he's protected or not.  The jury deserves to know

11:33AM    13   that.

11:33AM    14         **THE COURT:**  The witness says that he was protected --

11:34AM    15         **MR. TRIPI:**  Judge, that sanitizes it in a way, and I

11:34AM    16   mean this respectfully, in a way that in the context of that

11:34AM    17   cross, it's not one affair.  They didn't go as deeply as they

11:34AM    18   did to create that impression.  They did a nice job on cross,

11:34AM    19   but I'm allowed to do a nice job on redirect to try to

11:34AM    20   rehabilitate it.

11:34AM    21         **THE COURT:**  So you're saying that these questions

11:34AM    22   about Masecchia and Selva being thieves opened the door?

11:34AM    23         **MR. TRIPI:**  That, in conjunction with eliciting his

11:34AM    24   speculation that at an earlier point there might not have been

11:34AM    25   any protection while later on --

11:34AM   1          THE COURT:  But haven't you already gotten this in

11:34AM   2    the direct.

11:34AM   3          MR. TRIPI:  I've gotten the bare minimum out, Judge,

11:34AM   4    but I don't believe that with the burden of proof the

11:34AM   5    government's entitled to just the bare minimum, and that's

11:34AM   6    where my argument lies.

11:34AM   7          THE COURT:  So what do you want to ask him?

11:34AM   8          MR. TRIPI:  I want to ask him about the discussion.

11:34AM   9    He's told what the no-fly list is, and who's still protected,

11:34AM   10   and who's not, and his understanding of that.

11:34AM   11         THE COURT:  No, I think you've gotten out of him -- I

11:35AM   12   don't think that changes the fact that that discussion was not

11:35AM   13   in furtherance of the conspiracy, and I don't think that that

11:35AM   14   they opened the door in some way to that.

11:35AM   15         You've gotten out what he thought, and the fact that

11:35AM   16   he recognized that there was protection.  And I think that

11:35AM   17   that's the end of discussion, so that's it.

11:35AM   18         MR. TRIPI:  Thank you.  Thanks for letting me come

11:35AM   19   up.

11:35AM   20         THE COURT:  Of course.

11:36AM   21         (Sidebar discussion held on the record.)

11:36AM   22         BY MR. TRIPI:

11:36AM   23   Q.  In -- by the time HSI approached you in October of 2019

11:36AM   24   with a target letter --

11:36AM   25         MR. TRIPI:  Actually, Judge, I'm going to withdraw

11:36AM   1   that question.  I have no further redirect.

11:36AM   2              THE COURT:  Okay.  Anything more, Mr. MacKay?

11:36AM   3              MR. MacKAY:  No, Your Honor.

11:36AM   4              THE COURT:  You can step down, sir.  Thank you.

11:36AM   5              THE WITNESS:  Thank you.

11:36AM   6              (Witness excused at 11:36 a.m.)

          7              (Excerpt concluded at 11:36 a.m.)

          8              *     *     *     *     *     *     *

          9

         10

         11

         12              **CERTIFICATE OF REPORTER**

         13

         14              In accordance with 28, U.S.C., 753(b), I

         15   certify that these original notes are a true and correct

         16   record of proceedings in the United States District Court for

         17   the Western District of New York on March 5, 2024.

         18

         19

         20              s/ Ann M. Sawyer
                         _____
                         Ann M. Sawyer, FCRR, RPR, CRR
         21              Official Court Reporter
                         U.S.D.C., W.D.N.Y.

         22

         23

         24

         25

**INDEX**

**EXCERPT OF DIRECT EXAMINATION AND RE-DIRECT EXAMINATION**

**OF**

**MARK FALZONE - MARCH 5, 2024**

**W I T N E S S**                                              **P A G E**

**M A R K   F A L Z O N E**                                    2

   DIRECT EXAMINATION BY MR. TRIPI (CONT'D):       2

   REDIRECT EXAMINATION BY MR. TRIPI:              41


**E X H I B I T**                                              **P A G E**

GOV Exhibit 51A-7                                              16