09:08AM

1

                     UNITED STATES DISTRICT COURT
2                    WESTERN DISTRICT OF NEW YORK

3  _____
   UNITED STATES OF AMERICA,
4                                      Case No. 1:19-cr-227
                    Plaintiff,                  (LJV)
5  v.
                                       March 5, 2024
6  JOSEPH BONGIOVANNI,

7  _____Defendant._____

8

       TRANSCRIPT EXCERPT - CROSS-EXAMINATION OF MARK FALZONE
9            BEFORE THE HONORABLE LAWRENCE J. VILARDO
                  UNITED STATES DISTRICT JUDGE
10

11 **APPEARANCES:**          **TRINI E. ROSS, UNITED STATES ATTORNEY**
                          **BY: JOSEPH M. TRIPI, ESQ.**
12                            **NICHOLAS T. COOPER, ESQ.**
                              **CASEY L. CHALBECK, ESQ.**
13                        Assistant United States Attorneys
                          Federal Centre
14                        138 Delaware Avenue
                          Buffalo, New York 14202
15                          And
                          **UNITED STATES DEPARTMENT OF JUSTICE**
16                        **BY: JORDAN ALAN DICKSON, ESQ.**
                          1301 New York Ave NW
17                        Suite 1000
                          Washington, DC 20530-0016
18                        For the Plaintiff

19                        **SINGER LEGAL PLLC**
                          **BY: ROBERT CHARLES SINGER, ESQ.**
20                        80 East Spring Street
                          Williamsville, New York 14221
21                          And
                          **LAW OFFICES OF PARKER ROY MacKAY**
22                        **BY: PARKER ROY MacKAY, ESQ.**
                          3110 Delaware Avenue
23                        Kenmore, New York  14217
                          For the Defendant
24

25 **PRESENT:**            **BRIAN A. BURNS,** FBI Special Agent
                          **MARILYN K. HALLIDAY,** HSI Special Agent
                          **KAREN A. CHAMPOUX,** USA Paralegal

<u>**LAW CLERK:**</u>          **REBECCA FABIAN IZZO, ESQ.**

<u>**COURT DEPUTY CLERK:**</u>  **COLLEEN M. DEMMA**

<u>**COURT REPORTER:**</u>     **ANN MEISSNER SAWYER, FCRR, RPR, CRR**
                        Robert H. Jackson Federal Courthouse
                        2 Niagara Square
                        Buffalo, New York  14202
                        Ann_Sawyer@nywd.uscourts.gov


                *      *      *      *      *      *      *


          (Excerpt commenced at 10:33 a.m.)

          (Jury present.)

**M A R K   F A L Z O N E**, having been previously duly called

and sworn, continued to testify as follows:

          (Direct examination from 9:43 a.m. to 10:33 a.m.)

          **THE COURT:**  Cross?

          **MR. MacKAY:**  Yes, Your Honor.  Thank you.


                    **CROSS-EXAMINATION BY MR. MacKAY:**

Q.  Good morning, Mr. Falzone.

A.  Good morning.

Q.  How are you?

A.  All right under the circumstances.

Q.  All right.  So, you've known Ron Serio for well over 30

years, correct?

A.  Yes, sir.

Q.  He's one of your best friends, correct?

10:34AM   1    A.  Yes, he is.

10:34AM   2    Q.  You told us that around 2008, you sort of reconnected

10:34AM   3    with him after the Air Force and after school, correct?

10:34AM   4    A.  Yes, sir.

10:34AM   5    Q.  So 2008 is really the time you link back up with him

10:34AM   6    despite being friends with him for a long time, correct?

10:34AM   7    A.  Yes, sir.

10:34AM   8    Q.  And that time in 2008, you knew he was dealing marijuana

10:34AM   9    in some capacity, correct?

10:34AM   10   A.  Yes.

10:34AM   11   Q.  But you weren't involved in his operation at that point

10:34AM   12   in time, correct?

10:34AM   13   A.  No, I was not.

10:34AM   14   Q.  You didn't know anybody who was around him, assisting him

10:34AM   15   in any sales of marijuana, correct?

10:34AM   16   A.  Correct.

10:35AM   17   Q.  Okay.  Now, for as long as you've known Ron Serio, you've

10:35AM   18   known him to be a drug user, correct?

10:35AM   19   A.  Yes.

10:35AM   20   Q.  And that's just we can pinpoint on age, we're talking --

10:35AM   21   is that high school or so, and on?

10:35AM   22   A.  Yes.

10:35AM   23   Q.  Okay.  Just to be clear, you've known him from about high

10:35AM   24   school and later?

10:35AM   25   A.  I've known him since grammar school.

USA v Bongiovanni - Falzone - MacKay/Cross - 3/5/24

4

| | | |
|---|---|---|
| 10:35AM | 1 | Q.  Grammar school and later. |
| 10:35AM | 2 | A.  Yes. |
| 10:35AM | 3 | Q.  And maybe not grammar school, but high school and later, |
| 10:35AM | 4 | you've seen him use drugs? |
| 10:35AM | 5 | A.  Yes, sir. |
| 10:35AM | 6 | Q.  Continuously from the time you've seen him? |
| 10:35AM | 7 | A.  Yes. |
| 10:35AM | 8 | Q.  You knew him to do marijuana, correct? |
| 10:35AM | 9 | A.  Yes. |
| 10:35AM | 10 | Q.  You knew him to do cocaine, correct? |
| 10:35AM | 11 | A.  Yes. |
| 10:35AM | 12 | Q.  You knew him to do pills, correct? |
| 10:35AM | 13 | A.  Yes. |
| 10:35AM | 14 | Q.  What kind of pills? |
| 10:35AM | 15 | A.  Lortabs.  And then from the Lortabs, it went to the |
| 10:35AM | 16 | OxyContins, to the fentanyl pills. |
| 10:35AM | 17 | Q.  Okay.  Did you know him to use heroin as well? |
| 10:35AM | 18 | A.  Yes. |
| 10:35AM | 19 | Q.  Sniff or inject? |
| 10:35AM | 20 | A.  Sniff. |
| 10:35AM | 21 | Q.  Is it fair to say that after you reconnected with him in |
| 10:36AM | 22 | 2008 moving forward, you see his drug use get worse? |
| 10:36AM | 23 | A.  Yes. |
| 10:36AM | 24 | Q.  Okay.  How much worse? |
| 10:36AM | 25 | A.  A lot worse. |

10:36AM   1   Q.  Okay.  Can you try to, for that jury, you know, he starts

10:36AM   2   out in 2008.  How bad is it at that point?

10:36AM   3   A.  Couple Lortabs a day.

10:36AM   4   Q.  Okay.  And then by the time you reconnect with him in

10:36AM   5   2014, what does his habit look like with Lortabs and other

10:36AM   6   drugs?

10:36AM   7   A.  20 OxyContins a day.

10:36AM   8   Q.  In conjunction with other drugs as well?

10:36AM   9   A.  Yes.  If he couldn't get pills, he would sniff heroin.

10:36AM   10  Q.  But if he could get pills, was he doing other drugs on

10:36AM   11  top of the pills that -- on any one day?

10:36AM   12  A.  Yes, he would also do coke.

10:36AM   13  Q.  Okay.  So I'm just trying to give this jury an idea.  On

10:36AM   14  any one day when you saw Mr. Serio after 2014, he would

10:36AM   15  definitely be on pills, correct?

10:36AM   16  A.  Yes, sir.

10:36AM   17  Q.  Likely on marijuana as well, too?

10:36AM   18  A.  No.

10:36AM   19  Q.  Okay.  Cocaine?

10:36AM   20  A.  Yes.

10:37AM   21  Q.  Heroin, if he couldn't get pills?

10:37AM   22  A.  Yes.

10:37AM   23  Q.  And did you know Mr. Serio to drink as well, too?

10:37AM   24  A.  Negative.

10:37AM   25  Q.  Okay.  All right.  So, is it fair to say that when you

10:37AM   1   see him -- well, let's backtrack to 2008.

10:37AM   2       You said he was doing several Lortabs a day?

10:37AM   3   A.  Yes.

10:37AM   4   Q.  Okay.  Would you -- would you notice he was visibly under

10:37AM   5   the influence of Lortabs at that point in time?

10:37AM   6   A.  I couldn't tell visibly.  But I just knew because he

10:37AM   7   would take them in front of me, or he would tell me about it.

10:37AM   8   Q.  Okay.  And when you said you saw him take them in front

10:37AM   9   of you, you're talking about you've seen at least -- let me

10:37AM  10   reword that.

10:37AM  11       How many Lortabs per day in 2008 would you see Mr. Serio

10:37AM  12   take in front of you?

10:37AM  13   A.  In front of me?  Let's say in an eight-hour day of

10:37AM  14   working with him?  Maybe four or five.

10:37AM  15   Q.  This is in 2008, correct?

10:37AM  16   A.  Yes.

10:37AM  17   Q.  And that's just what you saw in front of you, correct?

10:38AM  18   A.  Yes.

10:38AM  19   Q.  Did you form an opinion on whether he was taking any more

10:38AM  20   beyond those four a day or so that you would see?

10:38AM  21   A.  I didn't form an opinion.  I didn't care, because I

10:38AM  22   wasn't doing it.

10:38AM  23   Q.  Okay.  Well, so moving forward, then we get into the 2014

10:38AM  24   time frame and on.  Again, are you around him eight hours a

10:38AM  25   day?

10:38AM    1    A.  I'm around him a lot, yes.

10:38AM    2    Q.  How many Lortabs were you seeing him do at that point in

10:38AM    3    time?

10:38AM    4    A.  He was on to OxyContins at that time.

10:38AM    5    Q.  How many OxyContins at that time did you see him do?

10:38AM    6    A.  I would see him sniff a pill every couple minutes.

10:38AM    7    Q.  Okay.  And that was what you saw with your own eyes,

10:38AM    8    correct?

10:38AM    9    A.  Yes.

10:38AM   10    Q.  Okay.  Now I think you told us 2014 is about the

10:38AM   11    time frame you become more involved in this marijuana

10:38AM   12    operation, correct?

10:38AM   13    A.  Yes.

10:38AM   14    Q.  And what spurs that is that is you're going through a

10:38AM   15    foreclosure, correct?

10:38AM   16    A.  Yes, sir.

10:38AM   17    Q.  Okay.  And you eventually learn that this marijuana that

10:39AM   18    Mr. Serio was receiving, it's coming from Canadians, correct?

10:39AM   19    A.  Yes, sir.

10:39AM   20    Q.  It's coming via New York City, correct?

10:39AM   21    A.  As far as I knew, yes.

10:39AM   22    Q.  Okay.  And then, you told us there were three packages

10:39AM   23    you unloaded for him, correct?

10:39AM   24    A.  Yes.

10:39AM   25    Q.  Now, if you started in 2014 or so, and Mr. Serio gets

10:39AM   1   arrested in April of 2017, about how long were those three

10:39AM   2   incidents spaced out if you can estimate?

10:39AM   3   A.   Anywhere from four to six months.

10:39AM   4   Q.   Okay.  Well, so let's try to pinpoint that, because you

10:39AM   5   would agree with me, 2014 to 2017 is three years, correct?

10:39AM   6   A.   Yes.

10:39AM   7   Q.   So, these three times you unloaded, were they spaced kind

10:39AM   8   of close together in one period of time?  Were they spaced

10:39AM   9   out for that entire period of time?

10:39AM  10   A.   They were spaced together in one period of time, because

10:39AM  11   he had other people doing that for him also.

10:40AM  12   Q.   Okay.  But your involvement with Mr. Serio, these

10:40AM  13   unloadings, occurs when?  Is it closer to 2014, or is it

10:40AM  14   closer to 2017?

10:40AM  15   A.   Closer to 2017, I would say.

10:40AM  16   Q.   Okay.  Now, you also told us that you got involved with

10:40AM  17   distributing for Mr. Serio, correct?

10:40AM  18   A.   Yes.

10:40AM  19   Q.   And I think I was doing the calculations here, but you

10:40AM  20   said you took about 5 pounds on three occasions; is that your

10:40AM  21   testimony?

10:40AM  22   A.   Three or four occasions, yes.

10:40AM  23   Q.   So three or four occasions of 5 pounds apiece, correct?

10:40AM  24   A.   Yes.

10:40AM  25   Q.   And I think you told us you'd make about 500 to $1,000

10:40AM    1    per 5 pounds, per time?

10:40AM    2    A.   Yes.

10:40AM    3    Q.   Okay.  So, is that fair to say, then, that in the span of

10:40AM    4    your taking these 5-pound loads, you made 3- to $4,000?

10:40AM    5    A.   Yes.

10:40AM    6    Q.   Okay.  And that's over how long a period of time?

10:41AM    7    A.   I'd say six months.

10:41AM    8    Q.   Okay.  And, again, is this closer to 2014 or closer to

10:41AM    9    2017?

10:41AM   10    A.   Right in the middle.

10:41AM   11    Q.   Okay.  All right.  Now, you told us that there comes a

10:41AM   12    point in time where you talk to Mr. Serio about protection of

10:41AM   13    the organization, correct?

10:41AM   14    A.   Yes.

10:41AM   15    Q.   Okay.  And Mr. Serio relates some information to you

10:41AM   16    about what he's doing to secure the operation, correct?

10:41AM   17    A.   Yes, sir.

10:41AM   18    Q.   Okay.  And he tells you that he pays Mike Masecchia, who

10:41AM   19    then pays Joe Bongiovanni; is that your understanding?

10:41AM   20    A.   Yes, sir.

10:41AM   21    Q.   Now, and then in return, Mr. Serio gets information back

10:41AM   22    on the other end, correct?

10:41AM   23    A.   Yes.

10:41AM   24    Q.   Okay.  Both on who to stay away from, correct?

10:41AM   25    A.   Yes, sir.

10:41AM  1   Q.  And on who's being investigated, correct?

10:41AM  2   A.  Yes.

10:41AM  3   Q.  Now, do you recall Mr. Serio also explaining to you that

10:41AM  4   the money didn't just go directly from Mike Masecchia to Joe

10:42AM  5   Bongiovanni, correct?

10:42AM  6   A.  He didn't tell me any --

10:42AM  7   Q.  Let me reword the question.

10:42AM  8          MR. TRIPI:  Objection.  Let him answer the question.

10:42AM  9          MR. MacKAY:  I'm going to withdraw the question and

10:42AM  10  ask it a different way.

10:42AM  11         THE COURT:  Go ahead.

10:42AM  12         BY MR. MacKAY:

10:42AM  13  Q.  Do you recall Mr. Serio, in that same conversation,

10:42AM  14  asking or telling you that he would also pay Mike Masecchia,

10:42AM  15  who would pay Lou Selva, who would pay Joe Bongiovanni?

10:42AM  16         MR. TRIPI:  Objection.  My objection is, he didn't

10:42AM  17  let him answer the question, and then he assumed a fact in the

10:42AM  18  next question.

10:42AM  19         THE COURT:  He's withdrawn the prior question.

10:42AM  20  Overruled.

10:42AM  21         BY MR. MacKAY:

10:42AM  22  Q.  Do you need me to repeat that?

10:42AM  23  A.  Negative.

10:42AM  24      Ron said -- all I know is Ron told me that he would pay

10:42AM  25  Mike Masecchia, to pay Joseph Bongiovanni.  He didn't say

10:42AM   1   anything about Lou Selva.

10:42AM   2   Q.   Okay.   Do you recall telling HSI on October 28, 2019,

10:42AM   3   when you met with them, that one of the ways would be that

10:42AM   4   Ron Serio paid Mike Masecchia, who paid Lou Selva, who paid

10:43AM   5   Joseph Bongiovanni?   Do you recall telling Homeland Security

10:43AM   6   on that date?

10:43AM   7   A.   I do not recall.

10:43AM   8   Q.   Okay.   Help refresh your recollection if I show you

10:43AM   9   something?

10:43AM  10   A.   Yeah, that's fine.

10:43AM  11        **MR. MacKAY:**   Ms. Champoux, can we show the witness

10:43AM  12   only Government Exhibit 3541B-1, it's going to be page 7.

10:43AM  13        **BY MR. MacKAY:**

10:43AM  14   Q.   All right.   So Mr. Falzone, I'm going to direct you to

10:43AM  15   the eighth bullet point down.   If you would take a look at

10:43AM  16   that and see if that refreshes your recollection what you

10:43AM  17   told Homeland Security?

10:44AM  18   A.   Okay.

10:44AM  19   Q.   Just look back up at me.

10:44AM  20        **MR. MacKAY:**   Can we take that down, Ms. Champoux?

10:44AM  21        **BY MR. MacKAY:**

10:44AM  22   Q.   Do you recall now telling that to Homeland Security back

10:44AM  23   in October of 2019?

10:44AM  24   A.   I do.

10:44AM  25   Q.   Okay.   Just so we're clear, Ron Serio told you two

10:44AM   1   things:  One, is that he pays Mike Masecchia, who pays Joe

10:44AM   2   Bongiovanni, correct?

10:44AM   3   A.  Yes.

10:44AM   4   Q.  And another way is he pays Mike Masecchia, who pays Lou

10:44AM   5   Selva, who pays Joe Bongiovanni, correct?

10:44AM   6   A.  Yes.

10:44AM   7   Q.  Okay.  So you understood that there were actually two

10:44AM   8   routes that money was going to Joe Bongiovanni from that

10:44AM   9   conversation, correct?

10:44AM   10  A.  Yes.

10:44AM   11  Q.  Okay.  Now, you were skeptical when you heard this plan

10:44AM   12  the first time, correct?

10:44AM   13  A.  I was.

10:44AM   14  Q.  And why is that?

10:44AM   15  A.  'Cuz I didn't trust any of them guys.

10:45AM   16  Q.  Okay.  Fair to say you thought it was -- you were

10:45AM   17  skeptical why a DEA agent -- DEA agent would risk his job to

10:45AM   18  protect Mr. Serio and Mr. Masecchia?

10:45AM   19  A.  Yes.

10:45AM   20  Q.  Okay.  Now, later, you formed a belief on what may have

10:45AM   21  happened with the money, correct?

10:45AM   22       **MR. TRIPI:**  Objection.  Formed a belief, what may

10:45AM   23  have happened?  It's speculative.

10:45AM   24       **THE COURT:**  Overruled.  Overruled.  Overruled.

10:45AM   25       You can answer the question.

USA v Bongiovanni - Falzone - MacKay/Cross - 3/5/24

13

|          |    |                                                         |
|----------|----|---------------------------------------------------------|
| 10:45AM  | 1  | **BY MR. MacKAY:**                                      |
| 10:45AM  | 2  | Q.  You formed a belief on what you think could have happened |
| 10:45AM  | 3  | here with the money, correct?                           |
| 10:45AM  | 4  | A.  I did, yes.                                         |
| 10:45AM  | 5  | Q.  What was that belief?                               |
| 10:45AM  | 6  | A.  That Ron was getting robbed.                        |
| 10:45AM  | 7  | Q.  How so?                                             |
| 10:45AM  | 8  | A.  That Mike and Lou were just pocketing the money.    |
| 10:45AM  | 9  | Q.  What caused you to form that belief?                |
| 10:45AM  | 10 | A.  Just because of their backgrounds.                  |
| 10:45AM  | 11 | Q.  What -- what about their backgrounds?               |
| 10:45AM  | 12 | A.  That they're thieves.                               |
| 10:45AM  | 13 | Q.  How do you know them to be thieves?                 |
| 10:46AM  | 14 | A.  Because I grew up with them in the neighborhood.    |
| 10:46AM  | 15 | Q.  And more specifically, how do you know -- I mean, you |
| 10:46AM  | 16 | grew up with lots of people, fair to say?               |
| 10:46AM  | 17 | A.  Yes.                                                |
| 10:46AM  | 18 | Q.  How did you know them to be thieves?                |
| 10:46AM  | 19 | A.  Because I've known Mike to rob people.              |
| 10:46AM  | 20 | Q.  How so?                                             |
| 10:46AM  | 21 | A.  Rob them for money, for drugs.                      |
| 10:46AM  | 22 | Q.  Okay.                                               |
| 10:46AM  | 23 | A.  I've known Mike since I was a child.                |
| 10:46AM  | 24 | Q.  And can you elaborate on what you just said about how you |
| 10:46AM  | 25 | knew him to rob drugs and people?                       |

10:46AM    1    A.  I would hear things that would go on in the neighborhood.

10:46AM    2    Q.  Did you come to learn about an incident involving Mike

10:46AM    3    Masecchia and an individual name Sal Albert?

10:46AM    4    A.  Yes, I did.

10:46AM    5         **MR. TRIPI:**  Objection.  We're into hearsay now.

10:46AM    6         **THE COURT:**  We don't know yet.  Next question.

10:46AM    7         **BY MR. MacKAY:**

10:46AM    8    Q.  Okay.  Did your understanding of any incident between --

10:46AM    9    with Mike Masecchia and Sal Albert inform your belief about

10:47AM   10    this opinion you testified?

10:47AM   11         **MR. TRIPI:**  Objection.  Any -- same objection they

10:47AM   12    had earlier, any opinion would be based on hearsay,

10:47AM   13    Your Honor.

10:47AM   14         **THE COURT:**  Yeah, sustained.  Sustained.

10:47AM   15         **BY MR. MacKAY:**

10:47AM   16    Q.  Okay.  All right.  Let me move on to Lou Selva.  You

10:47AM   17    talked about Mike Masecchia.

10:47AM   18       Well, let me go back.  Let's talk about Mike Masecchia a

10:47AM   19    bit.  You said -- how long have you known him?

10:47AM   20    A.  That was my oldest brother's best friend from when they

10:47AM   21    were kids.

10:47AM   22    Q.  So how long does that take you back to knowing

10:47AM   23    Mr. Masecchia for?

10:47AM   24    A.  Since I was four or five years old.

10:47AM   25    Q.  Is he your age, older, younger?

| | | |
|---|---|---|
| 10:47AM | 1 | A.  He is older. |
| 10:47AM | 2 | Q.  Intimidating guy, correct? |
| 10:47AM | 3 | A.  Correct. |
| 10:47AM | 4 | Q.  Physically intimidating? |
| 10:47AM | 5 | A.  Yes. |
| 10:47AM | 6 | Q.  He's large, correct? |
| 10:47AM | 7 | A.  Correct. |
| 10:47AM | 8 | Q.  He's physically bulky built? |
| 10:47AM | 9 | A.  Correct. |
| 10:47AM | 10 | Q.  Does he exhibit -- do you know him to exhibit anger |
| 10:47AM | 11 | frequently?  Does he get angry? |
| 10:47AM | 12 | A.  No, but I've heard stories. |
| 10:47AM | 13 | Q.  Did you know him to use steroids? |
| 10:48AM | 14 | A.  Yes. |
| 10:48AM | 15 | Q.  Did you know him to have some reputation pertaining to |
| 10:48AM | 16 | Italian Organized Crime? |
| 10:48AM | 17 | A.  Negative. |
| 10:48AM | 18 | Q.  Okay.  Did you ever see -- did you know him to carry a |
| 10:48AM | 19 | shiny chrome pistol? |
| 10:48AM | 20 | A.  Yes. |
| 10:48AM | 21 | Q.  And just to be clear, you don't like Mike Masecchia, |
| 10:48AM | 22 | correct? |
| 10:48AM | 23 | A.  I never said I didn't like Mike at all. |
| 10:48AM | 24 | Q.  Okay.  Do you believe him to be a bully? |
| 10:48AM | 25 | A.  Yes, I do. |

10:48AM    1    Q.  You -- is it fair to say that when he would come around

10:48AM    2    with Ron Serio or places you would be, you would try to

10:48AM    3    leave?

10:48AM    4    A.  Pretty much.

10:48AM    5    Q.  Is it because -- would you leave because of the things

10:48AM    6    you just told us about what you knew about Mike Masecchia?

10:48AM    7    A.  Basically.

10:48AM    8    Q.  Now, there comes a point in time where -- I think you

10:48AM    9    told us it's the first load that's being unloaded at your

10:48AM   10    house at 377 Englewood?

10:48AM   11    A.  Yes, sir.

10:48AM   12    Q.  And you said Mike Masecchia was not there, but that he

10:49AM   13    got there to help with the load, correct?

10:49AM   14    A.  Yes.

10:49AM   15    Q.  Okay.  And, ultimately, he leaves the scene because of

10:49AM   16    something to do with Remus Nowak, correct?

10:49AM   17    A.  Correct.

10:49AM   18    Q.  Was Remus Nowak currently living next to you at that

10:49AM   19    point in time?

10:49AM   20    A.  From what Mike said.

10:49AM   21    Q.  Okay.  I mean, based on this interaction and what

10:49AM   22    Mr. Masecchia does in leaving the scene, did you understand

10:49AM   23    Mr. Masecchia and Mr. Nowak to know each other in some

10:49AM   24    fashion?

10:49AM   25    A.  Yes.

10:49AM  1   Q.  But it sounds like the connection with them was not good

10:49AM  2   in some fashion?

10:49AM  3   A.  That was the gist of it, that's how I took it.

10:49AM  4   Q.  Okay.  He didn't want to be around him though, correct?

10:49AM  5   A.  Correct.

10:49AM  6   Q.  But, from what you could tell, he knew who he was --

10:49AM  7   A.  Yes.

10:49AM  8   Q.  -- when coming to your house?

10:49AM  9   A.  Yes.

10:49AM  10  Q.  Okay.  Now, let's jump back for a second to Mr. Selva.

10:50AM  11  You expressed an opinion about him, do you recall that?

10:50AM  12  A.  Excuse me?

10:50AM  13  Q.  Mr. Selva, Lou Selva?

10:50AM  14  A.  Yes.

10:50AM  15  Q.  You expressed an opinion about him.  How long have you

10:50AM  16  known Mr. Selva?

10:50AM  17  A.  A very long time.

10:50AM  18  Q.  Okay.  In what capacity did you first meet him?

10:50AM  19  A.  Just around the neighborhood, he was another friend of my

10:50AM  20  brother's.

10:50AM  21  Q.  And you described him as a thief earlier, correct?

10:50AM  22  A.  I wouldn't say consider Lou a thief as much as Mike.

10:50AM  23  Q.  Okay.

10:50AM  24  A.  I never -- I've never heard stories of Lou being a thief.

10:50AM  25  Q.  Now, well -- strike that.  Once you get involved with

10:50AM    1    Mr. Serio around 2014, did you -- from that point until the

10:50AM    2    time Mr. Serio's arrested in 2017, did you see Mr. Selva in

10:50AM    3    contact with Mr. Serio at all?

10:50AM    4    A.  Negative.

10:50AM    5    Q.  So as you sit here today, you don't recall Mr. Selva

10:50AM    6    ever, like, physically being present around Mr. Serio,

10:51AM    7    correct?

10:51AM    8    A.  Correct.

10:51AM    9    Q.  But do you remember Mr. Masecchia being around?

10:51AM   10    A.  Yes.

10:51AM   11    Q.  And did you believe Mr. Masecchia to be Mr. Serio's

10:51AM   12    muscle?

10:51AM   13    A.  I think he thought that.

10:51AM   14    Q.  Who thought that?

10:51AM   15    A.  Mike.

10:51AM   16    Q.  Okay.  You think Mike thought that he was Ron Serio's

10:51AM   17    muscle?

10:51AM   18    A.  Yes.

10:51AM   19          **MR. TRIPI:**  Objection.  You think he thought.  We've

10:51AM   20    got two layers of --

10:51AM   21          **THE COURT:**  He was trying to clarify -- he was trying

10:51AM   22    to clarify what he said.  Are you objecting to the use of

10:51AM   23    "he?"

10:51AM   24          **MR. TRIPI:**  I'm objecting to two layers of

10:51AM   25    speculation.

10:51AM  1        **THE COURT:**  Well, no, because he's just trying to

10:51AM  2   clarify what the witness said, so that's overruled.

10:51AM  3        **BY MR. MacKAY:**

10:51AM  4   Q.  Do you understand what my question was?

10:51AM  5   A.  Yes.

10:51AM  6   Q.  Which person thought which person was whose muscle?  Does

10:51AM  7   that make sense?

10:51AM  8   A.  I guess Mike thought that he was Ron's muscle.

10:51AM  9        Maybe Ron thought Mike was his muscle.

10:51AM 10        I really don't know.

10:51AM 11   Q.  Did you see Mr. Serio express admiration of

10:52AM 12   Mr. Masecchia?

10:52AM 13   A.  Admiration pertaining to -- just, like, look up to him?

10:52AM 14   Q.  Yeah.  Yeah.  That's a way to say it.  Did you think that

10:52AM 15   Mr. Serio looked up to Mr. Masecchia in some fashion?

10:52AM 16   A.  Sure.  Why not?

10:52AM 17   Q.  Well, I don't know.  You --

10:52AM 18   A.  I don't know what you're getting at, that's what I'm

10:52AM 19   trying to understand.

10:52AM 20   Q.  I'm trying to --

10:52AM 21        **THE COURT:**  Don't worry about what he's getting at,

10:52AM 22   just answer the question.

10:52AM 23        **THE WITNESS:**  I don't know.

10:52AM 24        **BY MR. MacKAY:**

10:52AM 25   Q.  I'm trying to explain here the relationship between

10:52AM   1   Masecchia and Serio.

10:52AM   2   A.   They were close.

10:52AM   3   Q.   They were close?  When they were close, do you think that

10:52AM   4   they acted as equals to one another?  Do you know what I'm

10:52AM   5   saying?

10:52AM   6   A.   I -- I think Mike thinks that he's over everybody.

10:52AM   7   Q.   Okay.  Did you -- did you see Mr. Masecchia behave in

10:52AM   8   ways that showed he was controlling or demonstrated he was

10:53AM   9   controlling Mr. Serio in some fashion?

10:53AM   10   A.   Not really.

10:53AM   11   Q.   Did you see it the other way around?  Did you see

10:53AM   12   Mr. Serio take actions that suggested he was controlling

10:53AM   13   Mr. Masecchia?

10:53AM   14   A.   Negative.  I think they both needed each other, to be

10:53AM   15   honest with you.

10:53AM   16   Q.   Now, again, I'm gonna -- we got a little bit off track.

10:53AM   17   We talked about Lou Selva.  You said you never saw him around

10:53AM   18   Mr. Serio, correct?

10:53AM   19   A.   Correct.

10:53AM   20   Q.   Were you separately in contact with Mr. Selva during the

10:53AM   21   same time period of 2014 to 2017?

10:53AM   22   A.   Was I in --

10:53AM   23   Q.   Did you have contact with Mr. Selva separately around

10:53AM   24   that time?

10:53AM   25   A.   I don't know, maybe.

10:53AM 1    Q.  Okay.  I mean, I want to be very clear what we're talking

10:53AM 2    about.  2014, when you get reinvolved with Mr. Masecchia

10:53AM 3    until the time period of April 2017 when Ron Serio's

10:53AM 4    arrested.

10:54AM 5    A.  Did I talk to Lou Selva anywhere in that time?

10:54AM 6    Q.  Yes.

10:54AM 7    A.  I'm sure I did.

10:54AM 8    Q.  Okay.  But you never saw him around some of these folks

10:54AM 9    that you've mentioned before as being close to Mr. Serio?

10:54AM 10        **MR. TRIPI:**  Objection as to specificity.  Some of

10:54AM 11   these folks, it's very vague.

10:54AM 12        **THE COURT:**  Yeah, agree.  Sustained.

10:54AM 13        **BY MR. MacKAY:**

10:54AM 14   Q.  Do you recall going through a list of people?  Mike

10:54AM 15   Moynihan; do you remember that?

10:54AM 16   A.  Yes.

10:54AM 17   Q.  Mike Buttita, correct?

10:54AM 18   A.  Yes.

10:54AM 19   Q.  You remember Chris Baker, correct?

10:54AM 20   A.  Yes.

10:54AM 21   Q.  So of those folks, you testified that they were all sort

10:54AM 22   of around Mr. Serio, correct?

10:54AM 23   A.  Yes.

10:54AM 24   Q.  Okay.  Do you recall seeing Mr. Selva around any of those

10:54AM 25   folks that you mentioned?

10:54AM  1   A.  No.

10:54AM  2   Q.  Okay.  Did you ever have any discussions with Mr. Selva

10:54AM  3   about this supposed protection that was running between Serio

10:54AM  4   and Bongiovanni?

10:54AM  5   A.  No, I never had a discussion about it.

10:54AM  6   Q.  So, Mr. Selva never told you anything to the effect of --

10:54AM  7   that this sort of scheme was in place, correct?

10:55AM  8   A.  Correct.

10:55AM  9   Q.  He never confirmed it, correct?

10:55AM  10  A.  Correct.

10:55AM  11  Q.  He never confirmed it before Mr. Serio was arrested,

10:55AM  12  correct?

10:55AM  13  A.  Correct.

10:55AM  14  Q.  And he never confirmed it after Mr. Serio was arrested,

10:55AM  15  correct?

10:55AM  16  A.  Correct.

10:55AM  17  Q.  Okay.  And as a matter of fact, you did have some

10:55AM  18  discussions with Mr. Serio at some -- I'm sorry, with

10:55AM  19  Mr. Selva at some point in time after Ron's arrested,

10:55AM  20  correct?

10:55AM  21  A.  I'm sure I did.

10:55AM  22  Q.  Okay.  Well, isn't it true that you told him your theory

10:55AM  23  about how Masecchia -- you thought Masecchia stole the money?

10:55AM  24       **MR. TRIPI:**  Objection.  Hearsay.  Asked and answered.

10:55AM  25  It's being offered for its truth, and it's a theory.

10:55AM    1              THE COURT:  No, overruled.

10:55AM    2              BY MR. MacKAY:

10:55AM    3    Q.  Do you recall having a conversation on that subject with

10:55AM    4    Mr. Selva?

10:55AM    5    A.  Yes.

10:55AM    6    Q.  Do you recall him being surprised when you said that?

10:56AM    7    A.  Yes.

10:56AM    8    Q.  Do you recall what Mr. Selva's reaction to that

10:56AM    9    conversation was?

10:56AM   10    A.  He looked -- he turned red as an apple.

10:56AM   11    Q.  Okay.  He turned red?

10:56AM   12    A.  Yes.

10:56AM   13    Q.  What did you take that to mean?

10:56AM   14    A.  Like, I took it to be, like, oh, shit, how did he know?

10:56AM   15    How did I know?

10:56AM   16    Q.  Okay.  Let's talk a little bit about Mario Vacanti.

10:56AM   17         You knew Mario Vacanti as somebody who would occasionally

10:56AM   18    come around Mr. Serio, correct?

10:56AM   19    A.  Yes.

10:56AM   20    Q.  I think you testified you saw an occasion where

10:56AM   21    Mr. Vacanti picked up marijuana from Mr. Serio, correct?

10:56AM   22    A.  Yes.

10:56AM   23    Q.  Did you know him to frequently be around Mr. Serio

10:57AM   24    though?

10:57AM   25    A.  Yes.

USA v Bongiovanni - Falzone - MacKay/Cross - 3/5/24

24

10:57AM  1   Q.  Because you were there at the house and saw it?

10:57AM  2   A.  Yes.

10:57AM  3   Q.  Okay.  But you would generally keep away from

10:57AM  4   Mr. Vacanti, correct?

10:57AM  5   A.  Correct.

10:57AM  6   Q.  You didn't really like him, correct?

10:57AM  7   A.  Correct.

10:57AM  8   Q.  Okay.  And does that come -- does that -- is that

10:57AM  9   basis -- let me reword that.

10:57AM  10      Is that feeling based on things you've known about some

10:57AM  11   of his family's background?

10:57AM  12   A.  No, I just never trusted the kid.

10:57AM  13   Q.  Okay.

10:57AM  14   A.  Intuition.

10:57AM  15   Q.  Okay.  And then I think you told us on direct, one of the

10:57AM  16   things that Mr. Serio communicated to you, well, remember you

10:57AM  17   talked on direct about Mario Vacanti and a phone call?

10:57AM  18   A.  Excuse me?

10:57AM  19   Q.  Do you remember talking on direct about being present for

10:57AM  20   some sort of phone call regarding Mario Vacanti?

10:57AM  21   A.  Yes.

10:57AM  22   Q.  Okay.  So, where did that phone call occur?

10:58AM  23   A.  That occurred at Ron's house on Lebrun.

10:58AM  24   Q.  And so Ron's on the phone with who?

10:58AM  25   A.  Mike Masecchia.

10:58AM    1    Q.  How do you know it to be Mike Masecchia?

10:58AM    2    A.  Because he told me.

10:58AM    3    Q.  Okay.  And -- and it's as part of that conversation, that

10:58AM    4    you understood that Mr. Vacanti's name was coming up?

10:58AM    5    A.  When it came up, it was -- it came up as the kid -- from

10:58AM    6    what Mike told Ron, and Ron told me, was that the kid named

10:58AM    7    Mario, and they used Mario's mother's maiden name, that was

10:58AM    8    living in Tom's Serio's carriage house, was being

10:58AM    9    investigated by the DEA.  And we all knew that it was Mario

10:58AM   10    Vacanti, because Ron knew his mother's maiden name.

10:58AM   11    Q.  Well, and Ron and Tom Serio live in close proximity to

10:58AM   12    each other, too, correct?

10:59AM   13    A.  Yes.

10:59AM   14    Q.  They're on the same street, correct?

10:59AM   15    A.  Yes, sir.

10:59AM   16    Q.  Now can you pinpoint, was this -- did this phone call

10:59AM   17    occur closer to 2017?

10:59AM   18    A.  I can't recall.  Maybe somewhere in there, I really don't

10:59AM   19    remember.  It was towards the end.

10:59AM   20    Q.  It was towards the end.  That's what I'm focusing on.

10:59AM   21    A.  Yes, towards the end.

10:59AM   22    Q.  So that would mean it's closer to April of 2017?

10:59AM   23    A.  Yes.

10:59AM   24    Q.  Okay.  Now -- now, as part of that, did Mr. Serio cease

10:59AM   25    dealing with Mario Vacanti in any fashion?

10:59AM   1    A.   Yes.

10:59AM   2    Q.   Okay.  How so?

10:59AM   3    A.   Mario, he found out Mario was having an affair with his

10:59AM   4    wife.

10:59AM   5    Q.   That's what I'm getting to.  So separately and apart, you

10:59AM   6    learned that Mario Vacanti is having an affair with Lauren

10:59AM   7    Serio, correct?

10:59AM   8    A.   Correct.

10:59AM   9    Q.   And ultimately, did you come to learn that Mario Vacanti

10:59AM   10   and the former Mrs. Serio got married?

10:59AM   11   A.   Yeah.  I know that now.

11:00AM   12   Q.   Okay.  But is it your understanding that what drove them

11:00AM   13   apart was the dynamic of an affair?

11:00AM   14   A.   Yes.

11:00AM   15   Q.   Okay.

11:00AM   16        THE COURT:  Mr. MacKay, how much more do you think

11:00AM   17   you have?

11:00AM   18        MR. MacKAY:  I just want to check with my client and

11:00AM   19   cocounsel, this might be a good time for a break.

11:00AM   20        THE COURT:  Do you want to break now?

11:00AM   21        MR. MacKAY:  Yes, Judge.

11:00AM   22        THE COURT:  Just so you folks know, we're going to go

11:00AM   23   until probably just about 12:30, and we're going to break

11:00AM   24   until about a quarter to 2.

11:00AM   25        So remember my instructions about not talking with

| | | |
|---|---|---|
| 11:00AM | 1 | each other, and not making up your mind. |
| 11:00AM | 2 | And we'll see you back here in about ten or 15 |
| 11:00AM | 3 | minutes.  Thanks. |
| 11:00AM | 4 | (Jury excused at 11:00 a.m.) |
| 11:01AM | 5 | **THE COURT:**  Okay, anything we need to put on the |
| 11:01AM | 6 | record before we break? |
| 11:01AM | 7 | **MR. TRIPI:**  No, Your Honor. |
| 11:01AM | 8 | **MR. MacKAY:**  No, Your Honor. |
| 11:01AM | 9 | **THE COURT:**  Mr. Singer, I know you have a meeting |
| 11:01AM | 10 | with Chief Judge Wolford at 12:30. |
| 11:01AM | 11 | **MR. SINGER:**  Yes, Judge. |
| 11:01AM | 12 | **THE COURT:**  And I have a meeting with her right |
| 11:01AM | 13 | afterwards.  So we'll break a few minutes before 12:30, and if |
| 11:01AM | 14 | you're a few minutes late, it's not going to be a problem. |
| 11:01AM | 15 | **MR. SINGER:**  She's not going to hold it against me? |
| 11:01AM | 16 | **THE COURT:**  No, I know she won't. |
| 11:01AM | 17 | **MR. TRIPI:**  She'll hold it against you, Judge? |
| 11:01AM | 18 | **THE COURT:**  She'll hold it against me, that's right. |
| 11:01AM | 19 | Okay.  Thanks, everybody. |
| 11:01AM | 20 | **THE CLERK:**  All rise. |
| 11:01AM | 21 | (Off the record at 11:01 a.m.) |
| 11:19AM | 22 | (Back on the record at 11:19 a.m.) |
| 11:19AM | 23 | (Jury not present.) |
| 11:19AM | 24 | **THE CLERK:**  All rise. |
| 11:19AM | 25 | **THE COURT:**  Please be seated. |

USA v Bongiovanni - Falzone - MacKay/Cross - 3/5/24

28

11:19AM    1              THE CLERK:  We are back on the record for the

11:19AM    2    continuation of the jury trial in case number 19-cr-227,

11:19AM    3    United States of America versus Joseph Bongiovanni.

11:19AM    4              All counsel and parties are present.

11:19AM    5              THE COURT:  Okay.  Are we ready to resume?

11:19AM    6              MR. MacKAY:  We are, Your Honor.

11:19AM    7              MR. TRIPI:  Yes, Your Honor.

11:19AM    8              THE COURT:  Okay.  Let's bring them back in, please,

11:19AM    9    Pat.

11:22AM   10              (Jury seated at 11:22 a.m.)

11:22AM   11              THE COURT:  The record will reflect that all our.

11:22AM   12              Jurors again are present.

11:22AM   13              I remind the witness that he's still under oath.

11:22AM   14              And you may continue, Mr. MacKay.

11:22AM   15              MR. MacKAY:  I have no further questions, Your Honor.

11:22AM   16              THE COURT:  Okay.  Redirect?

11:22AM   17              MR. TRIPI:  Thank you, Your Honor.

11:36AM   18              (Redirect examination from 11:22 a.m. to 11:36 a.m.)

11:36AM   19              THE COURT:  Okay.  Anything more, Mr. MacKay?

11:36AM   20              MR. MacKAY:  No, Your Honor.

11:36AM   21              THE COURT:  You can step down, sir.  Thank you.

11:36AM   22              THE WITNESS:  Thank you.

11:36AM   23              (Witness excused at 11:36 a.m.)

          24              (Excerpt concluded at 11:36 a.m.)

          25                  *     *     *     *     *     *     *

1

2                       **CERTIFICATE OF REPORTER**

3

4                 In accordance with 28, U.S.C., 753(b), I

5    certify that these original notes are a true and correct

6    record of proceedings in the United States District Court for

7    the Western District of New York on March 5, 2024.

8

9

10                          s/ Ann M. Sawyer
                            Ann M. Sawyer, FCRR, RPR, CRR
11                          Official Court Reporter
                            U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25