03:45PM

1
                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK

2

      _____
3     UNITED STATES OF AMERICA,

                                       Case No. 1:19-cr-227
4                    Plaintiff,                  (LJV)
      v.
5                                      February 15, 2024

      JOSEPH BONGIOVANNI,
6

                     Defendant.
      _____
7


8      TRANSCRIPT EXCERPT - DIRECT & REDIRECT EXAMS OF DALE KASPRZYK
                BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                       UNITED STATES DISTRICT JUDGE


10

      APPEARANCES:            TRINI E. ROSS, UNITED STATES ATTORNEY
11                            BY: JOSEPH M. TRIPI, ESQ.
                                  NICHOLAS T. COOPER, ESQ.
12                                CASEY L. CHALBECK, ESQ.
                              Assistant United States Attorneys
13                            Federal Centre
                              138 Delaware Avenue
14                            Buffalo, New York 14202
                                And
15                            UNITED STATES DEPARTMENT OF JUSTICE
                              BY: JORDAN ALAN DICKSON, ESQ.
16                            1301 New York Ave NW
                              Suite 1000
17                            Washington, DC 20530-0016
                              For the Plaintiff
18
                              SINGER LEGAL PLLC
19                            BY: ROBERT CHARLES SINGER, ESQ.
                              80 East Spring Street
20                            Williamsville, New York 14221
                                And
21                            LAW OFFICES OF PARKER ROY MacKAY
                              BY: PARKER ROY MacKAY, ESQ.
22                            3110 Delaware Avenue
                              Kenmore, New York  14217
23                            For the Defendant

24     PRESENT:               BRIAN A. BURNS, FBI Special Agent
                              MARILYN K. HALLIDAY, HSI Special Agent
25                            KAREN A. CHAMPOUX, USA Paralegal

| | | |
|---|---|---|
| 1 | **LAW CLERK:** | **REBECCA FABIAN IZZO, ESQ.** |
| 2 | **COURT DEPUTY CLERK:** | **COLLEEN M. DEMMA** |
| 3 | **COURT REPORTER:** | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 4 | | Robert H. Jackson Federal Courthouse |
| | | 2 Niagara Square |
| | | Buffalo, New York  14202 |
| 5 | | Ann_Sawyer@nywd.uscourts.gov |

6

7                    *     *     *     *     *     *     *

8

9            (Excerpt commenced at 3:45 p.m.)

10            (Jury is present.)

03:45PM   11            **THE COURT:**  You can call your next witness, please.

03:45PM   12            **MR. DICKSON:**  The government calls Dale Kasprzyk.

03:45PM   13

03:46PM   14   **D A L E   K A S P R Z Y K,** having been duly called and sworn,

03:46PM   15   testified as follows:

03:46PM   16            **MR. DICKSON:**  May I proceed, Judge?

03:46PM   17            **THE COURT:**  You may.

03:46PM   18

03:46PM   19                    **DIRECT EXAMINATION BY MR. DICKSON:**

03:46PM   20   Q.  Good afternoon, sir.

03:46PM   21   A.  Good afternoon.

03:46PM   22   Q.  Will you please introduce yourself to the members of the

03:46PM   23   jury?

03:46PM   24   A.  Hi.  My name is Dale Kasprzyk.

03:46PM   25   Q.  Where do you live?

03:46PM   1   A.  I currently live in Estero, Florida.

03:46PM   2   Q.  How long have you lived there?

03:47PM   3   A.  Three and a half months.

03:47PM   4   Q.  Prior to living in Florida, where did you live?

03:47PM   5   A.  I spent most of my life here in Western New York.  Most

03:47PM   6   recently, I lived in Orchard Park, New York.

03:47PM   7   Q.  What do you do for a living, Mr. Kasprzyk?

03:47PM   8   A.  Currently, I'm the head of the financial investigations

03:47PM   9   unit for M&T Bank.

03:47PM   10  Q.  How long have you been doing that?

03:47PM   11  A.  Approximately ten years.

03:47PM   12  Q.  I want to take you back to 2009, Mr. Kasprzyk.  Where

03:47PM   13  were you working in 2009?

03:47PM   14  A.  I was working for the Drug Enforcement Administration

03:47PM   15  assigned to the Buffalo resident office.

03:47PM   16  Q.  And if I call the Drug Enforcement Administration the

03:47PM   17  DEA, will you understand what I'm talking about?

03:47PM   18  A.  Yes, sir.

03:47PM   19  Q.  Okay.  Back in 2009, while you were with the DEA, what

03:47PM   20  was your job?

03:47PM   21  A.  At that time, I was a group supervisor.

03:47PM   22  Q.  What's a group supervisor?

03:47PM   23  A.  A group supervisor works as a manager for a team of

03:48PM   24  agents and task force agents.

03:48PM   25  Q.  What kinds of responsibilities does a group supervisor

4

03:48PM    1    have?

03:48PM    2    A.   I work with the agents, I ensure that they're conducting

03:48PM    3    investigations, that they're developing informants,

03:48PM    4    developing cases, cases that would target drug traffickers

03:48PM    5    who are violating the Controlled Substances Act.

03:48PM    6    Q.   How many special agents were you responsible for

03:48PM    7    supervising back in 2009?

03:48PM    8    A.   I would say the -- the overall size of the group was

03:48PM    9    around 12 or 13, but that included a combination of both

03:48PM   10    agents and task force agents.  I -- I -- I'm thinking back, I

03:48PM   11    would say probably five or six of that group were agents.

03:48PM   12    Q.   Did that particular group that you supervised, did it

03:48PM   13    have a number associated with it?

03:48PM   14    A.   I believe it was D-57, Delta 57.

03:49PM   15    Q.   Okay.  Now, back in 2009, Mr. Kasprzyk, did the DEA have

03:49PM   16    particular drugs that it was interested in investigating?

03:49PM   17    A.   I would say our focus in 2009 was predominantly cocaine,

03:49PM   18    crack cocaine, heroin.  That was our general focus then.

03:49PM   19    Q.   Would the DEA also investigate certain marijuana cases?

03:49PM   20    A.   Yes, sir.

03:49PM   21    Q.   Mr. Kasprzyk, do you know somebody named Joseph

03:49PM   22    Bongiovanni?

03:49PM   23    A.   Yes.

03:49PM   24    Q.   How do you know him?

03:49PM   25    A.   At the time, in 2009, Joe was working for me as a special

| | | |
|---|---|---|
| 03:49PM | 1 | agent. |
| 03:49PM | 2 | Q.  Do you remember when you first met the defendant? |
| 03:49PM | 3 | A.  I met Joe when he came to Buffalo.  I had been in Buffalo |
| 03:49PM | 4 | working as an agent.  It was my understanding that Joe had |
| 03:50PM | 5 | initially, after leaving agent school, Joe was down in |
| 03:50PM | 6 | Florida, I believe Miami, and then came back up to Buffalo. |
| 03:50PM | 7 | And that's when I first met Joe, when he came to Buffalo. |
| 03:50PM | 8 | Q.  At that point in time, do you remember how long you had |
| 03:50PM | 9 | been in the Buffalo office? |
| 03:50PM | 10 | A.  I would say eight or nine years, arrived in Buffalo in |
| 03:50PM | 11 | 1989. |
| 03:50PM | 12 | Q.  Now you mentioned that you were the defendant's |
| 03:50PM | 13 | supervisor at some point in time.  Can you tell the jury, |
| 03:50PM | 14 | when were you the defendant's supervisor? |
| 03:50PM | 15 | A.  I was the -- the -- his direct supervisor when I -- when |
| 03:50PM | 16 | I was promoted as a group supervisor in the agent's group, |
| 03:50PM | 17 | the Delta 57 group. |
| 03:50PM | 18 | I was also, after -- after being a group supervisor for a |
| 03:50PM | 19 | couple years, I was then promoted to the resident agent in |
| 03:50PM | 20 | charge of the office.  And at that point, I didn't directly |
| 03:50PM | 21 | supervise Joe, but I managed the entire office. |
| 03:51PM | 22 | Q.  Can you describe for the jury, back in 2009, what was |
| 03:51PM | 23 | your relationship with the defendant like? |
| 03:51PM | 24 | A.  It was a professional relationship.  We -- we worked |
| 03:51PM | 25 | together.  I saw Joe frequently, every day.  I would see Joe |

Case 1:19-cr-00227-LJV-MJR   Document 846   Filed 03/31/24   Page 6 of 30
USA v Bongiovanni - Kasprzyk - Dickson/Direct - 2/15/24

6

03:51PM  1  as part of our day-to-day job working in DEA.

03:51PM  2  Q.  Was he one of your personal friends?

03:51PM  3  A.  No.

03:51PM  4  Q.  Mr. Kasprzyk, around that time, was it typical for DEA

03:51PM  5  special agents to work with partners?

03:51PM  6  A.  Yes.

03:51PM  7  Q.  Do you recall anybody who was a partner with the

03:51PM  8  defendant?

03:51PM  9  A.  Over the years, I mean, in that time period of 2009, I

03:51PM  10  believe he was working with a task force agent by the name of

03:51PM  11  Joe Palmieri.

03:51PM  12  Q.  Mr. Kasprzyk, I want to move on and talk to you about

03:51PM  13  some of the duties and policies that DEA special agents were

03:52PM  14  expected to follow back in 2009.

03:52PM  15      Were there rules or policies about DEA special agents

03:52PM  16  signing people up to work as confidential sources?

03:52PM  17  A.  Yes, sir.

03:52PM  18  Q.  Can you describe for the jury what a confidential source

03:52PM  19  is?

03:52PM  20  A.  A confidential source is someone that comes to the DEA

03:52PM  21  and works for the DEA as a cooperating individual, someone

03:52PM  22  that would actually be able to provide information on

03:52PM  23  drug-trafficking activities, or someone that you could use to

03:52PM  24  assist the DEA in purchasing narcotics as part of an

03:52PM  25  undercover operation to support a drug investigation.

03:52PM   1   Q.   Were confidential sources an important part of DEA

03:52PM   2   casework?

03:52PM   3   A.   Yes.

03:52PM   4   Q.   Why?

03:52PM   5   A.   Well, it's essential to get information about

03:52PM   6   drug-trafficking organizations.  And in my time at the DEA,

03:52PM   7   the people who could best provide that information about a

03:53PM   8   drug-trafficking organization were often the people that were

03:53PM   9   involved with those drug-trafficking organizations.  And so

03:53PM   10  confidential informants usually had that type of information,

03:53PM   11  and it was critical to the success of our mission at the DEA.

03:53PM   12  Q.   Now, Mr. Kasprzyk, is a confidential source different

03:53PM   13  than a source of information as those terms are used at the

03:53PM   14  DEA?

03:53PM   15  A.   There's a slight difference, yes.

03:53PM   16  Q.   Can you describe that slight difference to the jury,

03:53PM   17  please?

03:53PM   18  A.   A confidential informant is someone that is registered

03:53PM   19  with the DEA.  So, we would get information from him, we

03:53PM   20  would actually have to give that individual a number so that

03:53PM   21  when we wrote a report and we would talk about that -- that

03:53PM   22  informant's information, we would refer to that person by

03:53PM   23  number only, not by his name or her name.

03:53PM   24       There's a vetting process that the DEA has to go

03:54PM   25  through when they sign up a confidential informant.  So you

03:54PM   1   take your pictures, you take your fingerprints, you do a

03:54PM   2   debriefing form, and you have them sign various DEA documents

03:54PM   3   to ensure that they understand exactly what they're going to

03:54PM   4   be doing for the DEA.

03:54PM   5   Q.   So let's focus in a little bit on some of the rules and

03:54PM   6   policies about signing somebody up to be a source.

03:54PM   7        First, can you just tell us, were there rules or policies

03:54PM   8   about signing somebody up to work as a confidential source?

03:54PM   9   A.   Yes, there's DEA policy on signing up informants.

03:54PM  10   Q.   Can you describe that policy for the jury?

03:54PM  11   A.   Well, as I mentioned, you have to meet with them, you

03:54PM  12   have to take fingerprints, photographs.  There are forms that

03:54PM  13   you have to complete, to include a DEA 473, that's a

03:54PM  14   cooperating individual form that they have to sign.  There's

03:54PM  15   also a DEA 512, I believe, that would be another form that's

03:55PM  16   done to help establish that informant.

03:55PM  17   Q.   Were there also forms that would need to be filled out if

03:55PM  18   you interacted with somebody who was a source of information

03:55PM  19   as opposed to a confidential source?

03:55PM  20   A.   No.  A source of information is treated differently.  A

03:55PM  21   source of information may provide information about

03:55PM  22   drug-trafficking activities, but that person is not a

03:55PM  23   registered informant.  That person cannot go out and act in

03:55PM  24   an undercover capacity for you or for the DEA.

03:55PM  25   Q.   But if a source of information is providing information

03:55PM  1  about drug-trafficking activities like you just said, would

03:55PM  2  that kind of an interaction need to be documented by the DEA

03:55PM  3  special agent?

03:55PM  4  A.  Yes, sir, it would.

03:55PM  5  Q.  Was it important to document interactions that

03:55PM  6  somebody -- that a special agent had with a source of

03:56PM  7  information?

03:56PM  8  A.  Yes.

03:56PM  9  Q.  Why?

03:56PM  10  A.  It's important to help document information so that we

03:56PM  11  could take that data and put that data into our case

03:56PM  12  management system, the DEA case management system, to -- to

03:56PM  13  just be able to use it for other investigations, or maybe the

03:56PM  14  investigation that was being started as a result of the

03:56PM  15  source's information.

03:56PM  16  Q.  You told us that it's important to document interactions

03:56PM  17  with sources of information.  Is it also important for DEA

03:56PM  18  special agents to document interactions with confidential

03:56PM  19  sources?

03:56PM  20  A.  Yes, sir.

03:56PM  21  Q.  Why?

03:56PM  22  A.  In the DEA, when you meet with an informant, there are

03:56PM  23  rules on how those meetings go.  You have to meet with them

03:56PM  24  with another agent.  And afterwards, you have to record and

03:56PM  25  write down everything that the informant tells you.

03:56PM   1   Q.   And why is that important?

03:56PM   2   A.   Again, to -- to preserve the integrity of the

03:56PM   3   investigation, and to make sure that you're keeping an

03:57PM   4   accurate record of the conversations that you're having with

03:57PM   5   the informant.

03:57PM   6   Q.   In one of your earlier answers, you told us that it was

03:57PM   7   protocol to identify a confidential source by a number as

03:57PM   8   opposed to their name.  Why was that the protocol as you

03:57PM   9   understood it?

03:57PM  10   A.   There -- there are DEA policy rules, as it relates to the

03:57PM  11   confidentiality of informants.  And, so, those rules -- to

03:57PM  12   follow those rules, it's important that we number the

03:57PM  13   informant and refer to that informant only by number to

03:57PM  14   ensure confidentiality.

03:57PM  15   Q.   Mr. Kasprzyk, were there policies or rules that at the

03:57PM  16   DEA about using personal friends as confidential sources?

03:57PM  17   A.   Yes.

03:57PM  18   Q.   What were those rules?

03:57PM  19   A.   The rules were you should not sign up friends as

03:57PM  20   confidential informants.

03:57PM  21   Q.   As you understood it, why was that the policy?

03:57PM  22   A.   That was the policy because it would create a conflict of

03:58PM  23   interest between the agent and the friend.

03:58PM  24   Q.   If you learned that a special agent had signed up a

03:58PM  25   personal friend as a confidential source, as the supervisor,

03:58PM  1   what would you do?

03:58PM  2   A.  I would not allow that to happen.  I would move the

03:58PM  3   informant, you know, the control of the informant, I would

03:58PM  4   move the control of the informant to another agent in the

03:58PM  5   office.

03:58PM  6   Q.  Mr. Kasprzyk, I want to move on and talk about a

03:58PM  7   particular incident that occurred in 2009.

03:58PM  8         MR. DICKSON:  I'd like to show the witness only

03:58PM  9   Government Exhibit 30A, please.

03:58PM  10        BY MR. DICKSON:

03:58PM  11   Q.  Can you see that okay, sir?

03:58PM  12   A.  I can now, yes.

03:58PM  13   Q.  Great.  Do you recognize this document that you see on

03:58PM  14   your screen?

03:58PM  15   A.  Yes, sir.

03:58PM  16   Q.  Generally, what is it?

03:59PM  17   A.  This is a DEA-6, which is a report of investigation.

03:59PM  18   That's what we call reports in the DEA, we call them a DEA-6.

03:59PM  19   They're put on a DEA-6 form.

03:59PM  20   Q.  We'll talk more about what's in the form in just a

03:59PM  21   second, Mr. Kasprzyk.

03:59PM  22   A.  Yes, sir.

03:59PM  23   Q.  Can you just tell us who's the author of this form?

03:59PM  24   A.  It was written by Special Agent Joseph Bongiovanni.

03:59PM  25   Q.  And have you seen this form before?

03:59PM  1   A.  Yes.

03:59PM  2   Q.  Is it a fair and accurate copy of this DEA-6 as you've

03:59PM  3   seen it originally?

03:59PM  4   A.  Yes, sir.

03:59PM  5          MR. DICKSON:  Your Honor, at this time, the

03:59PM  6   government moves 30A into evidence.

03:59PM  7          MR. SINGER:  No objection.

03:59PM  8          THE COURT:  Received without objection.

03:59PM  9          **(GOV Exhibit 30A was received in evidence.)**

03:59PM  10         MR. DICKSON:  Can we publish to the jury, please?

03:59PM  11         THE COURT:  You may.

03:59PM  12         MR. DICKSON:  Thank you.

03:59PM  13         THE CLERK:  You're all set.

03:59PM  14         MR. DICKSON:  Thank you.

03:59PM  15         **BY MR. DICKSON:**

03:59PM  16  Q.  Mr. Kasprzyk, as the jury is looking at Government

03:59PM  17  Exhibit 30A, can you explain generally what this form is?

03:59PM  18  A.  Yes, sir.  This is a report of investigation form,

04:00PM  19  commonly known as the DEA-6 within the DEA agency.  This form

04:00PM  20  is used when agents need to document and record the results

04:00PM  21  of an interview or maybe some sort of investigative activity

04:00PM  22  that they need to add to their case file.

04:00PM  23  Q.  Is this kind of form made all the time by DEA special

04:00PM  24  agents?

04:00PM  25  A.  Yes, sir.

04:00PM  1  Q.  Now you told us that the defendant was the author of this

04:00PM  2  document.  If you look in box number 8 there, what was the

04:00PM  3  date that this form was prepared?

04:00PM  4  A.  November 6th, 2009.

04:00PM  5  Q.  And then if we look in box number 9, it says other

04:00PM  6  officers.  Who are the other officers listed there?

04:00PM  7  A.  G.S. Kasprzyk, FBI G.S. James Jancewicz, and USPO Peter

04:01PM  8  Lepiane.

04:01PM  9  Q.  Why do other officers get listed on DEA-6 forms like

04:01PM  10  this?

04:01PM  11  A.  Typically, other officers are listed when they have some

04:01PM  12  involvement with the investigation.

04:01PM  13  Q.  Let's look at the form -- or, excuse me, the box that

04:01PM  14  says file number up at the top.  File number, box 3.

04:01PM  15  A.  Yes, sir.

04:01PM  16  Q.  What does a file number indicate?

04:01PM  17  A.  That is the particular case investigation that is

04:01PM  18  referenced for the 6.

04:01PM  19  Q.  And is that file number or is a file number listed on

04:01PM  20  every DEA-6 form that gets filled out?

04:01PM  21  A.  Yes, sir.

04:01PM  22  Q.  And then let's look at box number 4, please.

04:01PM  23     So Mr. Kasprzyk, can you tell the jury what box number 4

04:02PM  24  says and what that means?

04:02PM  25  A.  That's a G-DEP identifier.

04:02PM   1   Q.  What is a G-DEP identifier?

04:02PM   2   A.  That is an classification, internal classification system

04:02PM   3   that DEA uses to classify and code every investigation that's

04:02PM   4   being conducted.

04:02PM   5   Q.  Let's go to box number 6, please.

04:02PM   6       Box number 6 says file title.  What's the name that's

04:02PM   7   listed there?

04:02PM   8   A.  It's Matthew Scalia.

04:02PM   9   Q.  Mr. Kasprzyk, is the name that is listed as the file

04:02PM  10   title, is that always the main target of the investigation?

04:02PM  11   A.  Typically, yes.

04:02PM  12   Q.  But is it always the main target?

04:02PM  13   A.  Yes.

04:02PM  14       MR. DICKSON:  We can go down to the bottom of the

04:03PM  15   page there.  Let's zoom in on boxes 12, 13, 14, and 15,

04:03PM  16   please.

04:03PM  17       BY MR. DICKSON:

04:03PM  18   Q.  So at the bottom of this page here, Mr. Kasprzyk, whose

04:03PM  19   name is listed in the box 12, the signature box?

04:03PM  20   A.  Special Agent Joseph Bongiovanni.

04:03PM  21   Q.  What does it indicate to you that Mr. Bongiovanni's name

04:03PM  22   is listed in that box number 12 there?

04:03PM  23   A.  That he would have prepared that DEA-6.

04:03PM  24   Q.  Below that, in the box below, whose name is listed?

04:03PM  25   A.  Dale Kasprzyk, group supervisor.

04:03PM  1   Q.  And that's you, right?

04:03PM  2   A.  Yes, sir.

04:03PM  3   Q.  Okay.  Why is your name in that box?

04:03PM  4   A.  I would have been the supervisor that would have reviewed

04:03PM  5   the report and signed it.

04:03PM  6   Q.  Is that your signature there?

04:03PM  7   A.  Yes, sir.

04:03PM  8   Q.  Why does a supervisor have to sign off on a DEA-6?

04:03PM  9   A.  It is DEA policy for the DEA supervisor to review every

04:04PM  10  report of investigation that's submitted by agents.

04:04PM  11          **MR. DICKSON:**  We can take the zoom off, please.

04:04PM  12          **BY MR. DICKSON:**

04:04PM  13  Q.  Now, Mr. Kasprzyk, when you sign a form like this, are

04:04PM  14  you --

04:04PM  15          **MR. DICKSON:**  Oh, I'm sorry, can we leave the exhibit

04:04PM  16  up, please?  Thank you.

04:04PM  17          **BY MR. DICKSON:**

04:04PM  18  Q.  When you sign a form like this, are you as the supervisor

04:04PM  19  independently verifying every single fact that is in this

04:04PM  20  form?

04:04PM  21  A.  No, sir.

04:04PM  22  Q.  Why not?

04:04PM  23  A.  Well, it would be impossible for me to do that.  I'm

04:04PM  24  relying upon the agent's report to provide me the information

04:04PM  25  that I need to look at and to review.  I wouldn't be able to

04:04PM   1   go out and independently verify everything that every agent

04:04PM   2   or task force agent does in the office.

04:04PM   3   Q.  Whose job was it to make sure that the details included

04:04PM   4   in this report were accurate and truthful?

04:04PM   5   A.  The author of the report, S.A. Bongiovanni.

04:05PM   6   Q.  I want to move now to the details section of the report,

04:05PM   7   Mr. Kasprzyk.  Do you see that there?

04:05PM   8   A.  Yes, sir.

04:05PM   9   Q.  I want to start with paragraph 2, please.

04:05PM   10      Can you please read the first three sentences of

04:05PM   11   paragraph 2 for the jury?

04:05PM   12   A.  On November 1st, 2009, S.A. Joseph Bongiovanni received a

04:05PM   13   telephone call from Peter G. Gerace.  Gerace has acted as a

04:05PM   14   confidential source, and has been able to provide information

04:05PM   15   regarding individuals in this case file and other narcotic

04:05PM   16   investigation in the past.  It should be known that Gerace is

04:05PM   17   presently on federal parole and supervised release.

04:05PM   18   Q.  Mr. Kasprzyk, who did the defendant identify as a former

04:05PM   19   DEA confidential source in that paragraph?

04:05PM   20   A.  Peter G. Gerace.

04:06PM   21   Q.  Earlier you said that it was DEA policy to identify

04:06PM   22   confidential sources by number as opposed to by name.  Was

04:06PM   23   Mr. Gerace identified by number or by name in this report?

04:06PM   24   A.  By name.

04:06PM   25   Q.  Can you go ahead and read the rest of the paragraph,

Case 1:19-cr-00227-LJV-MJR  Document 846  Filed 03/31/24  Page 17 of 30
USA v Bongiovanni - Kasprzyk - Dickson/Direct - 2/15/24

17

04:06PM   1   please?

04:06PM   2   A.  At this time, Gerace advised S.A. Bongiovanni that United

04:06PM   3   States Probation Officer Peter Lepiane and agents of the FBI

04:06PM   4   initiated a search of Pharaoh's Gentlemen's Club located at

04:06PM   5   23 Aero Drive in Cheektowaga, New York on or about

04:06PM   6   October 31st, 2009.  It should be known that Gerace is

04:06PM   7   associated with Pharaoh's Gentlemen's Club.

04:06PM   8   Q.  At the time of this report, Mr. Kasprzyk, did you know

04:06PM   9   what Pharaoh's Gentlemen's Club was?

04:06PM  10   A.  I did.

04:07PM  11   Q.  In that last sentence with the parenthesis there, the

04:07PM  12   defendant talks about Peter Gerace being associated with

04:07PM  13   Pharaoh's Gentlemen's Club.  Do you know how the defendant

04:07PM  14   knew that Peter Gerace was associated with Pharaoh's

04:07PM  15   Gentlemen's Club?

04:07PM  16   A.  I'm not sure how he knew about Gerace's relationship with

04:07PM  17   Pharaoh's.  I -- I'm not sure.

04:07PM  18   Q.  Was there ever a point, Mr. Kasprzyk, when the defendant

04:07PM  19   disclosed to you whether he was personal friends with Peter

04:07PM  20   Gerace?

04:07PM  21   A.  He told me that he knew Gerace from years past in the

04:07PM  22   neighborhood, but did not disclose with me that he was

04:07PM  23   personal friends with Gerace.

04:07PM  24   Q.  Let's go to paragraph 3, please.  Can you read

04:07PM  25   paragraph 3 for the jury, please, Mr. Kasprzyk?

04:07PM    1    A.   Gerace advised S.A. Bongiovanni that he was administered

04:08PM    2    a urine test to detect the presence of narcotics in his

04:08PM    3    urine.

04:08PM    4         Gerace advised S.A. Bongiovanni that he failed the urine

04:08PM    5    test due to the presence of trace amounts of cocaine detected

04:08PM    6    in his urine.

04:08PM    7         Gerace advised S.A. Bongiovanni that he believed he had

04:08PM    8    now violated his term of supervised release.

04:08PM    9         Gerace stated that he was prepared to offer information

04:08PM   10    regarding individuals who are trafficking in narcotics in the

04:08PM   11    Buffalo area.

04:08PM   12         Gerace stated he wanted to offer this information in lieu

04:08PM   13    of consideration on this pending supervised release violation

04:08PM   14    due to the failed urine test.

04:08PM   15    Q.   Mr. Kasprzyk, the sentence that says Gerace stated that

04:08PM   16    he was prepared to offer information regarding individuals

04:08PM   17    who are trafficking in narcotics, what did you understand

04:08PM   18    that statement to mean?

04:08PM   19    A.   It was my impression that Gerace wanted to become a

04:09PM   20    confidential informant, work for the DEA, in exchange for

04:09PM   21    some sort of consideration for his supervised release

04:09PM   22    violation.

04:09PM   23    Q.   Was information about individuals who are trafficking in

04:09PM   24    narcotics in the Buffalo area something that the DEA would

04:09PM   25    have been interested in investigating in 2009?

Case 1:19-cr-00227-LJV-MJR  Document 846  Filed 03/31/24  Page 19 of 30
USA v Bongiovanni - Kasprzyk - Dickson/Direct - 2/15/24

19

04:09PM    1    A.  Yes, sir.

04:09PM    2         MR. DICKSON:  Let's go to the second page, please, of

04:09PM    3    this exhibit.  And if we can zoom in on paragraph 4.

04:09PM    4         BY MR. DICKSON:

04:09PM    5    Q.  Can you read that paragraph for the jury?

04:09PM    6    A.  On November 2nd, 2009, Gerace arrived at the DEA Buffalo

04:09PM    7    resident office and spoke briefly to S.A. Bongiovanni.

04:09PM    8    Gerace stated that he knew significant cocaine

04:09PM    9    traffickers capable of moving kilo quantities of cocaine out

04:09PM   10    of various distribution houses located in the North Buffalo

04:10PM   11    and South Buffalo areas.

04:10PM   12    Gerace stated that he would not offer additional

04:10PM   13    information until he received a good-faith commitment 0from

04:10PM   14    USPO Lepiane that he would receive consideration on his

04:10PM   15    violation in lieu of information he is willing to provide.

04:10PM   16    Q.  First, Mr. Kasprzyk, where it said that Gerace knew

04:10PM   17    significant cocaine traffickers capable of moving kilo

04:10PM   18    quantities of cocaine, what does "kilo quantities" mean?

04:10PM   19    A.  A kilo is a kilogram of cocaine, 2.2 pounds.

04:10PM   20    Q.  Earlier you mentioned that back in 2009, the DEA was

04:10PM   21    interested in investigating cases involving cocaine.  Based

04:10PM   22    on what you read and reviewed in this paragraph, would

04:10PM   23    Mr. Gerace have been somebody who could have provided

04:10PM   24    valuable information in a drug investigation?

04:10PM   25    A.  Yes.

04:10PM   1   Q.  Mr. Kasprzyk, did you ever get any indication from the

04:11PM   2   defendant about how he knew -- or, excuse me, any indication

04:11PM   3   from the defendant that he had asked Peter Gerace how he knew

04:11PM   4   these significant cocaine traffickers?

04:11PM   5   A.  No, not -- not that I'm aware of, no.

04:11PM   6        **MR. DICKSON:**  Let's go to paragraph 5, please.

04:11PM   7        **BY MR. DICKSON:**

04:11PM   8   Q.  Can you read that for the jury?

04:11PM   9   A.  Later on that same date, S.A. Bongiovanni reported this

04:11PM  10   information to G.S. Kasprzyk of the Buffalo resident office.

04:11PM  11     G.S. Kasprzyk contacted FBI G.S. James Jancewicz to

04:11PM  12   better understanding the FBI's interest in Gerace, as well as

04:11PM  13   their participation in the search at the Pharaoh's club.

04:11PM  14     FBI G.S. Jancewicz said that the FBI was very interested

04:11PM  15   in interviewing Gerace on various issues regarding the

04:11PM  16   Pharaoh's club and other FBI investigations.

04:12PM  17   Q.  Who is G.S. Jancewicz?

04:12PM  18   A.  G.S. Jancewicz is Jim Jancewicz.  He is the group

04:12PM  19   supervisor, or was the group supervisor of the FBI drug task

04:12PM  20   force.

04:12PM  21   Q.  Why did you call G.S. Jancewicz after the defendant

04:12PM  22   shared this information with you?

04:12PM  23   A.  Well, it was clear from my conversations with Joe

04:12PM  24   Bongiovanni that -- that the FBI was involved in the

04:12PM  25   investigation of Pharaoh's, and that under those

04:12PM    1    circumstances, with the FBI having significant interest in

04:12PM    2    that -- that location as well as Mr. Gerace, it was important

04:12PM    3    for us as an agency to work cooperatively with the FBI and

04:12PM    4    share with them what we -- what we potentially knew from

04:12PM    5    Mr. Gerace.

04:12PM    6    Q.  Why was it important for agencies to share information?

04:12PM    7    A.  Because in -- in drug investigations, it's important to

04:13PM    8    share and deconflict so that we are all working in the same

04:13PM    9    direction when it comes to case investigations.

04:13PM   10    Q.  Can you explain to the jury what it means to deconflict?

04:13PM   11    A.  Yes, sir.  Deconfliction is the process by which all

04:13PM   12    federal agencies work towards ensuring that we are not

04:13PM   13    targeting individuals and working on the same individuals,

04:13PM   14    same targets of investigation, without each other's

04:13PM   15    knowledge.

04:13PM   16        That's important when you're conducting undercover

04:13PM   17    operations.  If we all have similar targets, we want to make

04:13PM   18    sure that we're not creating a blue-on-blue situation when

04:13PM   19    we're out there doing undercover operations.

04:13PM   20        So we create a deconfliction process to ensure that

04:13PM   21    everyone understands what each other is doing.

04:13PM   22    Q.  Mr. Kasprzyk, after you spoke to G.S. Jancewicz, what, if

04:13PM   23    anything, did you say to the defendant about that

04:14PM   24    conversation?

04:14PM   25    A.  I explained to Joe that the FBI is interested in working

04:14PM  1   with Gerace, and would like to talk with him, and that Joe

04:14PM  2   should follow up with the FBI and ensure that that occurs.

04:14PM  3   Q.  If the FBI had not been interested in working with Peter

04:14PM  4   Gerace, what would you as the supervisor have expected the

04:14PM  5   defendant to do with Peter Gerace?

04:14PM  6   A.  So, this particular individual was on federal parole or

04:14PM  7   supervised release.  And to be able to work with that

04:14PM  8   individual as a confidential informant, we would have to

04:14PM  9   receive appropriate -- appropriate approvals from the Court

04:14PM  10  to be able to make that happen.

04:14PM  11  Q.  So are you saying that you would have expected the

04:14PM  12  defendant to try to work with Peter Gerace as a confidential

04:15PM  13  source or informant?

04:15PM  14  A.  If that was something that we could work out with the

04:15PM  15  United States Probation Office, as well as the U.S.

04:15PM  16  Attorney's Office, as well as the judge that was responsible

04:15PM  17  for his supervised release.

04:15PM  18  Q.  And even if it wasn't possible to do that, Mr. Kasprzyk,

04:15PM  19  would the DEA have been interested in investigating Peter

04:15PM  20  Gerace or Pharaoh's Gentlemen's Club?

04:15PM  21  A.  Yes, sir.

04:15PM  22       MR. DICKSON:  Can we move to paragraph 6, please?

04:15PM  23       BY MR. DICKSON:

04:15PM  24  Q.  Can you go ahead and read that, please, sir?

04:15PM  25  A.  G.S. Kasprzyk instructed S.A. Bongiovanni to set up an

04:15PM   1   interview with Gerace and FBI agents in the near future.

04:15PM   2       S.A. Bongiovanni has contacted the FBI Buffalo office,

04:15PM   3   and plans are being formulated for this meeting.

04:15PM   4       S.A. Bongiovanni has contacted USPO Lepiane, and informed

04:15PM   5   him of Gerace's willingness to cooperate with DEA and FBI in

04:16PM   6   lieu of consideration on penalties pending due to his

04:16PM   7   violation of supervised release.

04:16PM   8       USPO Lepiane stated that he would discuss this issue with

04:16PM   9   AUSA Anthony Bruce, and would later advise.

04:16PM   10   Q.  Mr. Kasprzyk, did the defendant ever tell you that he had

04:16PM   11   set up an interview between Mr. Gerace and the FBI?

04:16PM   12   A.  He did not.

04:16PM   13   Q.  Do you know whether that interview ever happened?

04:16PM   14   A.  I do not --

04:16PM   15   Q.  I'm sorry, go ahead.

04:16PM   16   A.  -- I do not know if that happened.

04:16PM   17   Q.  Did the defendant ever ask you, as his supervisor, to

04:16PM   18   sign off on a DEA-6 about any kind of meeting that the

04:16PM   19   defendant had between Mr. Gerace and the FBI?

04:16PM   20   A.  Not that I can recall.

04:16PM   21   Q.  As far as you're aware, Mr. Kasprzyk, did the defendant

04:16PM   22   ever recuse himself from any kind of investigation or work

04:16PM   23   involving Mr. Gerace?

04:16PM   24   A.  No, sir.

04:16PM   25   Q.  Anywhere in this document that we just looked at,

04:17PM   1   Mr. Kasprzyk, did the defendant include a way for others to

04:17PM   2   contact Mr. Gerace if they needed to in the future?

04:17PM   3   A.   No.

04:17PM   4   Q.   During this time, 2009, did the DEA special agents in

04:17PM   5   your group have weekly meetings with each other?

04:17PM   6   A.   Yes, sir.

04:17PM   7   Q.   Why?

04:17PM   8   A.   That was a meeting that was conducted at my direction.

04:17PM   9   And the purpose of that meeting was for me to get together

04:17PM   10   with all of the agents and task force agents on a weekly

04:17PM   11   basis and have them talk amongst themselves and with me on

04:17PM   12   the status of their current investigations and any new

04:17PM   13   investigations that they might have forthcoming.

04:17PM   14   Q.   And why did you think that it was important for agents to

04:17PM   15   share investigations that they were working on?

04:17PM   16   A.   We talked about deconfliction earlier.  Deconfliction

04:17PM   17   also occurs within the DEA office.  There needs to be some

04:18PM   18   level of assurance that everyone within my group, within the

04:18PM   19   group Delta 57, as well as other agents in the office, knew

04:18PM   20   what each other were doing.  So it was an opportunity for us

04:18PM   21   to talk and share notes about cases, and see if there's ways

04:18PM   22   that we could work with each other to make the case go

04:18PM   23   better.

04:18PM   24   Q.   Around this time, Mr. Kasprzyk, from this report, do you

04:18PM   25   recall the defendant ever mentioning any meeting that he had

04:18PM   1   with Peter Gerace and the FBI?

04:18PM   2   A.  Not that I recall, no.

04:18PM   3   Q.  Do you recall the defendant ever mentioning that he had

04:18PM   4   passed Peter Gerace off to the FBI for them to work as a

04:18PM   5   source?

04:18PM   6   A.  No, sir.

04:18PM   7   Q.  Mr. Kasprzyk, as far as you're aware, was Peter Gerace

04:18PM   8   ever signed up as an official confidential source for the

04:18PM   9   DEA?

04:18PM  10   A.  Not that I'm aware of, no.

04:18PM  11   Q.  As far as you're aware, Mr. Kasprzyk, did the defendant

04:18PM  12   ever use Peter Gerace as a confidential source?

04:19PM  13   A.  Not that I'm aware of, no, sir.

04:19PM  14   Q.  Mr. Kasprzyk, when was the last time that you spoke to

04:19PM  15   the defendant?

04:19PM  16   A.  It would have been right after he retired.  And I'm gonna

04:19PM  17   say maybe 2019.  About five years ago.

04:19PM  18   Q.  Was that a telephone call?

04:19PM  19   A.  Yes.

04:19PM  20   Q.  Can you describe what the defendant said to you on that

04:19PM  21   telephone call?

04:19PM  22   A.  Joe was looking for a job.  And we talked about him

04:19PM  23   potentially working at M&T Bank.  And I referred him to a

04:19PM  24   contractor that I knew that was hiring retired law

04:19PM  25   enforcement officials.  And I referred him to that agency to

04:19PM    1    apply for and see if he could get a job with them.

04:19PM    2    Q.  During that conversation, Mr. Kasprzyk, did the defendant

04:19PM    3    bring up the criminal investigation into himself?

04:20PM    4    A.  He did.

04:20PM    5    Q.  What did he say?

04:20PM    6    A.  He seemed very concerned and, you know, said to me that

04:20PM    7    that, you know, he didn't do anything wrong and he felt, you

04:20PM    8    know, unfairly targeted, and he -- he seemed concerned.

04:20PM    9    Q.  Did he name anybody in particular during that piece of

04:20PM   10    the conversation?

04:20PM   11    A.  He talked about an agent from Buffalo, Tony Casullo.  He

04:20PM   12    mentioned Tony Casullo.

04:20PM   13    Q.  What did he say about Mr. Casullo?

04:20PM   14    A.  He felt like Tony Casullo had it out for him, and had

04:20PM   15    targeted him, and that might be, you know, causing him

04:20PM   16    problems.

04:20PM   17    Q.  How did you respond?

04:20PM   18    A.  I listened.  I was sympathetic.  I don't really know Tony

04:20PM   19    Casullo all that well.  He came to Buffalo after I had

04:21PM   20    retired, so I don't have a lot of background on Tony.

04:21PM   21              **MR. DICKSON:**  Just a moment, sir.

04:21PM   22              Judge, I have no more questions.

04:21PM   23              **THE COURT:**  Cross-examination?

05:00PM   24              (Cross-examination from 4:21 p.m. to 5:00 p.m.)

05:00PM   25              **THE COURT:**  Okay.  Redirect?

Case 1:19-cr-00227-LJV-MJR   Document 846   Filed 03/31/24   Page 27 of 30
USA v Bongiovanni - Kasprzyk - Dickson/Redirect - 2/15/24

27

05:00PM   1        **MR. DICKSON:**  Yes, Judge.  I promise just a couple

05:01PM   2   more minutes, sir.

05:01PM   3        May I proceed?

05:01PM   4        **THE COURT:**  You may, yeah.

05:01PM   5

05:01PM   6        **REDIRECT EXAMINATION BY MR. DICKSON:**

05:01PM   7   Q.  Mr. Kasprzyk, Mr. Singer asked you some questions about,

05:01PM   8   I think, drug investigation priorities during his

05:01PM   9   cross-examination; do you remember that?

05:01PM   10  A.  I do, sir.

05:01PM   11  Q.  Were 1,000 kilogram marijuana conspiracies a priority for

05:01PM   12  the DEA back in -- between 2009 and 2013 when you left?

05:01PM   13  A.  Yes, that would be a priority.

05:01PM   14  Q.  What about if there was a 100-plant marijuana grow

05:01PM   15  somewhere in the Buffalo area, would that have been a

05:01PM   16  priority?

05:01PM   17  A.  It wouldn't rise to the level of a priority, but it would

05:01PM   18  be something that we would take a look at, yes.

05:01PM   19  Q.  What about kilogram-level dealers of cocaine?

05:01PM   20  A.  That's a priority for sure.

05:01PM   21  Q.  Mr. Singer also asked you that when you review DEA-6s,

05:01PM   22  whether you're reviewing things in the report to make sure

05:01PM   23  they're accurate; do you remember him asking you that?

05:02PM   24  A.  I do.

05:02PM   25  Q.  Did you independently verify the accuracy of every single

05:02PM    1    fact included in every single DEA-6 that you reviewed?

05:02PM    2    A.  I did not, and I do not, no.

05:02PM    3    Q.  Why not?

05:02PM    4    A.  Sir, because I need to trust that the agents who are

05:02PM    5    preparing those 6s are providing me accurate information.

05:02PM    6    Accurate and honest information.

05:02PM    7    **MR. DICKSON:**  Ms. Champoux, can we pull up Government

05:02PM    8    Exhibit 30A, please?  It's already in evidence.  And if we can

05:02PM    9    zoom in to paragraph 2.

05:02PM    10    **BY MR. DICKSON:**

05:02PM    11    Q.  Mr. Kasprzyk, Mr. Singer also asked you after you read

05:02PM    12    this, this paragraph again, that if Mr. Gerace had presently

05:02PM    13    been a confidential source as far as you knew, that you would

05:03PM    14    have sent this report back to the defendant; do you remember

05:03PM    15    that?

05:03PM    16    A.  Correct.

05:03PM    17    Q.  That sentence says Gerace --

05:03PM    18    **MR. SINGER:**  Judge, I'm going to object to the last

05:03PM    19    question, it just misstated and mischaracterized the

05:03PM    20    testimony.

05:03PM    21    **THE COURT:**  Yeah, sustained.

05:03PM    22    **MR. DICKSON:**  Understood.

05:03PM    23    **BY MR. DICKSON:**

05:03PM    24    Q.  Mr. Kasprzyk, that sentence that says Gerace has acted as

05:03PM    25    a confidential source; do you see that sentence there?

05:03PM  1   A.  Yes, sir.

05:03PM  2   Q.  Now did you verify whether or not Mr. Gerace had ever

05:03PM  3   acted as a DEA source independently?

05:03PM  4   A.  No, sir.

05:03PM  5   Q.  Why not?

05:03PM  6   A.  Again, because I was trusting what Joe was writing to be

05:03PM  7   true and accurate when I read it.

05:03PM  8           **MR. DICKSON:**  Thank you, sir.

05:03PM  9           Your Honor, I have no questions.

05:03PM  10          **THE COURT:**  Anything more?

05:03PM  11          **MR. SINGER:**  Yes.

05:05PM  12          (Recross examination from 5:03 p.m. to 5:05 p.m.)

05:05PM  13          **MR. DICKSON:**  Nothing further, Judge.

05:05PM  14          **THE COURT:**  Okay.  You can step down, sir.

05:05PM  15          **THE WITNESS:**  Thank you.

05:05PM  16          (Witness excused at 5:05 p.m.)

         17          (Excerpt concluded at 5:05 p.m.)

         18              *     *     *     *     *     *     *

         19

         20

         21

         22

         23

         24

         25

1

2                    **CERTIFICATE OF REPORTER**

3

4                    In accordance with 28, U.S.C., 753(b), I

5    certify that these original notes are a true and correct

6    record of proceedings in the United States District Court for

7    the Western District of New York on February 15, 2024.

8

9

10                              s/ Ann M. Sawyer
                                Ann M. Sawyer, FCRR, RPR, CRR
11                              Official Court Reporter
                                U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25