03:45PM

1                           UNITED STATES DISTRICT COURT
                            WESTERN DISTRICT OF NEW YORK
2

     _____
3    UNITED STATES OF AMERICA,

                                             Case No. 1:19-cr-227
4                       Plaintiff,                      (LJV)
     v.
5                                            February 15, 2024

     JOSEPH BONGIOVANNI,
6

                        Defendant.
7    _____


8     TRANSCRIPT EXCERPT - CROSS & RECROSS EXAMS OF DALE KASPRZYK
                 BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                      UNITED STATES DISTRICT JUDGE


10

     APPEARANCES:               TRINI E. ROSS, UNITED STATES ATTORNEY
11                              BY: JOSEPH M. TRIPI, ESQ.
                                    NICHOLAS T. COOPER, ESQ.
12                                  CASEY L. CHALBECK, ESQ.
                                Assistant United States Attorneys
13                              Federal Centre
                                138 Delaware Avenue
14                              Buffalo, New York 14202
                                    And
15                              UNITED STATES DEPARTMENT OF JUSTICE
                                BY: JORDAN ALAN DICKSON, ESQ.
16                              1301 New York Ave NW
                                Suite 1000
17                              Washington, DC 20530-0016
                                For the Plaintiff
18
                                SINGER LEGAL PLLC
19                              BY: ROBERT CHARLES SINGER, ESQ.
                                80 East Spring Street
20                              Williamsville, New York 14221
                                    And
21                              LAW OFFICES OF PARKER ROY MacKAY
                                BY: PARKER ROY MacKAY, ESQ.
22                              3110 Delaware Avenue
                                Kenmore, New York  14217
23                              For the Defendant

24   PRESENT:                   BRIAN A. BURNS, FBI Special Agent
                                MARILYN K. HALLIDAY, HSI Special Agent
25                              KAREN A. CHAMPOUX, USA Paralegal

| | |
|---|---|
| 1 | **LAW CLERK:**           **REBECCA FABIAN IZZO, ESQ.** |
| 2 | **COURT DEPUTY CLERK:**  **COLLEEN M. DEMMA** |
| 3 | **COURT REPORTER:**      **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |

3   **COURT REPORTER:**      **ANN MEISSNER SAWYER, FCRR, RPR, CRR**
                         Robert H. Jackson Federal Courthouse
4                        2 Niagara Square
                         Buffalo, New York  14202
5                        Ann_Sawyer@nywd.uscourts.gov

6

7                        *     *     *     *     *     *     *

8

9          (Excerpt commenced at 3:46 p.m.)

10         (Jury is present.)

11

03:46PM   12   **D A L E   K A S P R Z Y K**, having been duly called and sworn,

03:46PM   13   testified as follows:

04:21PM   14         (Direct examination from 3:46 p.m. to 4:21 p.m.)

04:21PM   15         **THE COURT:**  Cross-examination?

04:21PM   16

04:21PM   17                   **CROSS-EXAMINATION BY MR. SINGER:**

04:21PM   18   Q.  So a little bit of a change from Estero, huh, Mr. Kasprzyk?

04:21PM   19   A.  Yes, for sure.

04:21PM   20   Q.  So, you mentioned that you were the group supervisor for

04:21PM   21   D-57 at DEA Buffalo in 2009; is that right?

04:21PM   22   A.  Yes, sir.

04:21PM   23   Q.  And Mr. Bongiovanni is assigned to D-57 that you

04:21PM   24   supervised?

04:22PM   25   A.  Yes, sir.

04:22PM  1   Q.   And there were a number of other agents that were

04:22PM  2   assigned to that group, correct?

04:22PM  3   A.   Correct.

04:22PM  4   Q.   And as the G.S., the group supervisor, your job was

04:22PM  5   essentially the frontline supervisor for all those people who

04:22PM  6   worked under you?

04:22PM  7   A.   Correct.

04:22PM  8   Q.   They were your subordinates, correct?

04:22PM  9   A.   Yes.

04:22PM  10  Q.   And, you know, part of your job as a supervisor was to

04:22PM  11  mentor them, correct?

04:22PM  12  A.   Yes, sir.

04:22PM  13  Q.   Part of your job was to review their work product,

04:22PM  14  correct?

04:22PM  15  A.   Yes.

04:22PM  16  Q.   Part of your job was to give them direction, correct?

04:22PM  17  A.   Yes, sir.

04:22PM  18  Q.   Part of your job was to review their progress on cases,

04:22PM  19  correct?

04:22PM  20  A.   Correct.

04:22PM  21  Q.   Part of the job that you had as a supervisor was to

04:22PM  22  approve cases opening up?

04:22PM  23  A.   Yes, sir.

04:22PM  24  Q.   Also, any new cases that were opened up regarding a

04:22PM  25  target, right?

04:22PM 1    A.  Yes, sir.

04:22PM 2    Q.  And, you know, other parts of your job were if there was

04:22PM 3    a confidential source, a CS, you were part of the process to

04:22PM 4    trigger approval on that, right?

04:23PM 5    A.  Correct.

04:23PM 6    Q.  If there any type of controlled buys that wanted to be

04:23PM 7    conducted by an agent in D-57 under you, you would have been

04:23PM 8    part of the approval process for that, correct?

04:23PM 9    A.  I missed part of your question, controlled --

04:23PM 10   Q.  Sure, I can restate it.

04:23PM 11       So if there was a controlled buy that an agent in D-57

04:23PM 12   wanted to do --

04:23PM 13   A.  Oh, controlled buy.

04:23PM 14   Q.  -- you would have been part of the approval process on

04:23PM 15   that, right?

04:23PM 16   A.  Yes, sir.

04:23PM 17   Q.  You would have had to sign off to appropriate any type of

04:23PM 18   funds that may be used for the buy?

04:23PM 19   A.  Yes.

04:23PM 20   Q.  Okay.  And you mentioned that you had a professional

04:23PM 21   relationship with Agent Bongiovanni; is that right?

04:23PM 22   A.  Yes, sir.

04:23PM 23   Q.  It wasn't anything outside the office, correct?

04:23PM 24   A.  How -- how would you describe outside of the office?

04:23PM 25   Q.  Sure.  So did you ever associate after working hours with

Case 1:19-cr-00227-LJV-MJR   Document 847   Filed 03/31/24   Page 5 of 40
USA v Bongiovanni - Kasprzyk - Singer/Cross - 2/15/24

5

04:23PM  1   Mr. Bongiovanni?

04:23PM  2   A.  We -- if there was an occasion where the agents were

04:23PM  3   going out after work, I would go out and Joe would be there

04:23PM  4   and we'd talk, yes.

04:23PM  5   Q.  So if it was going out for, like, an impromptu happy

04:24PM  6   hour, that's something you would have been a part of and

04:24PM  7   spoke to Mr. Bongiovanni?

04:24PM  8   A.  Yes, sir.

04:24PM  9   Q.  Or if it was something a little more formal, like a DEA

04:24PM  10  Christmas party, you would have attended that along with

04:24PM  11  Mr. Bongiovanni and other people?

04:24PM  12  A.  That's right.

04:24PM  13  Q.  Okay.  So you talked a little bit about DEA.  I want to

04:24PM  14  get into that a little bit.

04:24PM  15      The type of drugs that DEA are charged with

04:24PM  16  investigating, they can run any one of the different

04:24PM  17  schedules under federal law; is that right?

04:24PM  18  A.  Correct.

04:24PM  19  Q.  And that would include things like cocaine?

04:24PM  20  A.  Yes.

04:24PM  21  Q.  That would include things like crack cocaine or cocaine

04:24PM  22  base?

04:24PM  23  A.  Yes.

04:24PM  24  Q.  It would include heroin?

04:24PM  25  A.  Yes.

Case 1:19-cr-00227-LJV-MJR   Document 847   Filed 03/31/24   Page 6 of 40
USA v Bongiovanni - Kasprzyk - Singer/Cross - 2/15/24

6

04:24PM   1    Q.  It would include fentanyl?

04:24PM   2    A.  Yes.

04:24PM   3    Q.  And it would include marijuana, true?

04:24PM   4    A.  Correct.

04:24PM   5    Q.  So there are certain drugs in your experience, and

04:24PM   6    forgive me, how long did you work as a DEA agent before you

04:24PM   7    left to your current job in the civilian sector?

04:24PM   8    A.  I began in 1989, and I retired in 2013.

04:24PM   9    Q.  Okay.  So quite a number of years as an agent?

04:25PM  10    A.  About 25 years.

04:25PM  11    Q.  So you'd agree with me that there are certain drugs that

04:25PM  12    are on the street, illegal narcotics, that are more dangerous

04:25PM  13    than others, right?

04:25PM  14    A.  I think each of the drugs has their own level of danger,

04:25PM  15    yes, I think that's fair to say.

04:25PM  16    Q.  Okay.  So in other words, there are certain drugs out

04:25PM  17    there where if someone took them, it might cause them to

04:25PM  18    overdose, correct?

04:25PM  19    A.  Yes, sir.

04:25PM  20    Q.  And there are other drugs on the street where if someone

04:25PM  21    took them, it might not always cause an overdose, right?

04:25PM  22    A.  Correct.

04:25PM  23    Q.  So an overdose drug might be more dangerous than another

04:25PM  24    one, correct?

04:25PM  25    A.  Yes, sir.

04:25PM      1    Q.   Okay.  And there certain drugs that carry greater

04:25PM      2    penalties based on the dangerousness, correct?

04:25PM      3    A.   Correct.

04:25PM      4    Q.   Okay.  So, based on all of that, you were the group

04:25PM      5    supervisor at the DEA, correct?

04:25PM      6    A.   Correct.

04:25PM      7    Q.   You're also the resident agent in charge, in other words

04:25PM      8    it was one step higher than the G.S. level, you were in

04:25PM      9    charge of the whole Buffalo office, right?

04:25PM     10    A.   Correct.

04:26PM     11    Q.   So as the RAC, you would have been responsible for the

04:26PM     12    G.S.s in the different groups in the Buffalo office, right?

04:26PM     13    A.   Yes, sir.

04:26PM     14    Q.   And there were four different groups in the Buffalo

04:26PM     15    office at that time?

04:26PM     16    A.   There were three.

04:26PM     17    Q.   There were three, yeah, the --

04:26PM     18    A.   Three.

04:26PM     19    Q.   -- D-57 that you were the former G.S. of, correct?

04:26PM     20    A.   Correct.

04:26PM     21    Q.   There was D-58, a different group, right?

04:26PM     22    A.   Correct.

04:26PM     23    Q.   And then there was the tactical diversion group, correct?

04:26PM     24    A.   Correct.

04:26PM     25    Q.   And that was a group that dealt with prescription drugs

04:26PM   1   and making sure pharmacies were abiding by all the rules and

04:26PM   2   regulations, correct?

04:26PM   3   A.  Pharmaceuticals, yes.

04:26PM   4   Q.  Pharmaceuticals, correct.

04:26PM   5       So, you would have been charged, as the RAC, responsible

04:26PM   6   for all those different groups, right?

04:26PM   7   A.  Yes, sir.

04:26PM   8   Q.  And all the different people under them, right?

04:26PM   9   A.  Correct.

04:26PM   10  Q.  Now I know we love to live in a land with unlimited

04:26PM   11  resources, but that's not the reality of the world we live

04:26PM   12  in, right?

04:26PM   13  A.  That's correct.

04:26PM   14  Q.  So, as the RAC, you would prioritize certain

04:27PM   15  investigations, correct?

04:27PM   16  A.  At times, I would.  Depending upon the circumstances of

04:27PM   17  the case.

04:27PM   18  Q.  Correct.  Because investigations cost money, correct?

04:27PM   19  A.  Correct.

04:27PM   20  Q.  And they cost resources?

04:27PM   21  A.  Correct.

04:27PM   22  Q.  And so you want to make sure that you're devoting your

04:27PM   23  personnel and your resources to things that are important and

04:27PM   24  priorities, correct?

04:27PM   25  A.  Correct.

04:27PM   1   Q.   And there are priorities to both you as the RAC in that

04:27PM   2   particular office in Buffalo, right?

04:27PM   3   A.   Correct.

04:27PM   4   Q.   There are also priorities that are sent over to you in

04:27PM   5   Buffalo from the special agent in charge of your entire

04:27PM   6   division down in New York City, correct?

04:27PM   7   A.   Correct.

04:27PM   8   Q.   And also, you work with prosecutors as part of your job,

04:27PM   9   right?

04:27PM   10   A.   Yes, sir.

04:27PM   11   Q.   So, in Buffalo, you're working with attorneys from the

04:27PM   12   United States Attorney's Office for the Western District of

04:27PM   13   New York, correct?

04:27PM   14   A.   Yes.

04:27PM   15   Q.   And those prosecutors would have certain priorities that

04:27PM   16   they wanted to concentrate on as far as law enforcement in

04:27PM   17   the area, correct?

04:28PM   18   A.   Not necessarily.  The prosecutors don't often weigh in on

04:28PM   19   the priorities of the DEA office.

04:28PM   20   Q.   Okay.  So they don't control any of the decisions that

04:28PM   21   you make as an officer as far as cases?

04:28PM   22   A.   They control decisions about the prosecution of

04:28PM   23   defendants, but as far as the case initiation itself, that's

04:28PM   24   typically done at the agency level.

04:28PM   25   Q.   Okay.  So as far as prosecutors' role in the process,

04:28PM    1   they bring certain cases to trial; is that a fair statement?

04:28PM    2   A.  Correct.

04:28PM    3   Q.  But they don't bring other cases to trial; is that

04:28PM    4   another fair statement?

04:28PM    5   A.  Correct.

04:28PM    6   Q.  And sometimes that's based on limitations they have in

04:28PM    7   their own office based on resources, right?

04:28PM    8   A.  I can't speak for how the U.S. Attorney's Office makes

04:28PM    9   those decisions.

04:28PM   10   Q.  Okay.  But they did make decisions about certain type of

04:28PM   11   cases, like, look, you know, we don't have the resources to

04:28PM   12   prosecute this type of case, right?

04:28PM   13   A.  It's been a long time since I've had a conversation with

04:28PM   14   a prosecutor about a case.

04:28PM   15   Q.  Okay.  So you don't remember anything back when you were

04:28PM   16   the G.S.?

04:29PM   17   A.  I remember lots of conversations, but not often talking

04:29PM   18   about them not having the resources to do the job.  That's

04:29PM   19   not a conversation that I ever heard from the U.S. Attorney's

04:29PM   20   Office.

04:29PM   21   Q.  Okay.  All right.  So you don't remember any of those

04:29PM   22   conversations?

04:29PM   23   A.  No, that's not what I said.  I said I remember the

04:29PM   24   conversations, but I don't remember a prosecutor telling me

04:29PM   25   that that they don't have enough resources to do the work

04:29PM   1   that we're bringing them, that was not something I heard from

04:29PM   2   the prosecutors back when I was bringing cases to them.

04:29PM   3   Q.  Okay.  Like, so for instance, let's say someone crossed

04:29PM   4   the border, right?

04:29PM   5   A.  Crossed the border?

04:29PM   6   Q.  Crossed the border.

04:29PM   7   A.  Yes, sir.

04:29PM   8   Q.  And let's say they had a dime bag of marijuana on them.

04:29PM   9   Was that something that you would investigate?

04:29PM   10   A.  No.  That would be handled by Homeland Security.

04:29PM   11   Q.  Okay.  And Homeland Security at that point in time in

04:29PM   12   2009 didn't exist, because that agency wasn't created at that

04:29PM   13   time, would the DEA get a phone call and say, hey, we have

04:29PM   14   this one person at the border with a dime bag of marijuana,

04:29PM   15   can you please investigate?

04:30PM   16   A.  Border interceptions were typically not handled by the

04:30PM   17   DEA, they were handled by customs who are the border

04:30PM   18   enforcement personnel.  It was rare that we would get a call

04:30PM   19   on a border interdiction.

04:30PM   20   Q.  Okay.  So another agency would handle those type of

04:30PM   21   cases, right?

04:30PM   22   A.  Typically, yes.

04:30PM   23   Q.  But you would be focused on other things, right?

04:30PM   24   A.  Yes, sir.

04:30PM   25   Q.  Okay.  Let's say that somebody called up the confidential

Case 1:19-cr-00227-LJV-MJR   Document 847   Filed 03/31/24   Page 12 of 40
USA v Bongiovanni - Kasprzyk - Singer/Cross - 2/15/24

12

04:30PM  1  tip line that DEA established in Buffalo.  You would maintain

04:30PM  2  a confidential tip line in Buffalo?

04:30PM  3  A.  We do not, no.

04:30PM  4  Q.  Okay.  Didn't have anything, like, people calling in to

04:30PM  5  the DEA and giving tips?

04:30PM  6  A.  People would call in and provide tips, and we would take

04:30PM  7  those calls and -- and follow up when appropriate.

04:30PM  8  Q.  And so if somebody called up the DEA and requested that

04:30PM  9  you investigate a case involving something like a dime bag of

04:30PM  10  marijuana, would you send resources to investigate that type

04:30PM  11  of case?

04:30PM  12  A.  It would depend upon the individual that was selling the

04:30PM  13  marijuana.

04:30PM  14  Q.  And in your experience, did it more often than not result

04:31PM  15  in you not taking action but referring that to another agency

04:31PM  16  to do?

04:31PM  17  A.  Again, sir, it would depend upon who it was that -- that

04:31PM  18  they were identifying as the target of the investigation.

04:31PM  19  Q.  Okay.

04:31PM  20  A.  I would then make a decision, or the agent would make a

04:31PM  21  decision about what to do with the case depending on who it

04:31PM  22  was that was identified.

04:31PM  23  Q.  So, getting back to 2009.  So November of 2009,

04:31PM  24  Mr. Bongiovanni, he was working under you, and you were the

04:31PM  25  G.S. at D-57 at the time, right?

04:31PM 1   A.  Yes, sir.

04:31PM 2   Q.  And he indicated to you in an office meeting that he was

04:31PM 3   contacted by a person by the name of Peter Gerace, correct?

04:31PM 4   A.  Correct.

04:31PM 5   Q.  And at that time, did you know who Peter Gerace was?

04:31PM 6   A.  I knew of him, yes.

04:31PM 7   Q.  What did you know of him exactly?

04:31PM 8   A.  That he was the owner of Pharaoh's.

04:31PM 9   Q.  Okay.  So, he was the owner of Pharaoh's.  Was that

04:31PM 10  something that you learned throughout the course of your

04:31PM 11  professional life in the DEA?

04:32PM 12  A.  Yes, sir.

04:32PM 13  Q.  All right.  And was that something that you learned as a

04:32PM 14  result of investigations being done by certain members of

04:32PM 15  your office?

04:32PM 16  A.  No, sir.

04:32PM 17  Q.  Okay.  How did you learn it?

04:32PM 18  A.  I knew that from my conversations with Jim Jancewicz of

04:32PM 19  the FBI.

04:32PM 20  Q.  Okay.  So you learned that through Jim Jancewicz of the

04:32PM 21  FBI?

04:32PM 22  A.  Correct.

04:32PM 23  Q.  All right.  So, as far as Mr. Bongiovanni, you said that

04:32PM 24  he walked into your office and he indicated that Mr. Gerace

04:32PM 25  gave him a telephone call, correct?

04:32PM    1    A.  Yes, sir.

04:32PM    2    Q.  And he communicated in that telephone call that he

04:32PM    3    potentially wanted to act as some type of source for the DEA

04:32PM    4    for the purpose of lessening his punishment on a parole

04:32PM    5    violation, correct?

04:32PM    6    A.  Correct.

04:32PM    7    Q.  And so Mr. Bongiovanni communicated this to you.  And you

04:32PM    8    testified earlier, like you did a second ago, that you were

04:32PM    9    familiar with the fact that FBI was investigating Peter

04:32PM   10    Gerace and Pharaoh's Gentlemen's Club at the time, correct?

04:32PM   11    A.  Yes, sir.

04:32PM   12    Q.  And, so, Mr. Bongiovanni, during that conversation, also

04:32PM   13    indicated to you that he had some type of a relationship with

04:33PM   14    Mr. Gerace, correct?

04:33PM   15    A.  That he knew him, yes.

04:33PM   16    Q.  Correct.  Grew up with him in the neighborhood?

04:33PM   17    A.  Yes, he mentioned that.  Knew him from the neighborhood.

04:33PM   18    Q.  Okay.  So he knew him.  And you've had a situation --

04:33PM   19    Buffalo's a small town, Buffalo DEA is a small office, where

04:33PM   20    agents may have known potential targets of investigations

04:33PM   21    before, correct?

04:33PM   22    A.  Yes.

04:33PM   23    Q.  And so the normal course was that when that occurred, you

04:33PM   24    wanted your agents to raise that to the attention of their

04:33PM   25    group supervisor, correct?

04:33PM  1    A.  Let me just make sure I understand your question.

04:33PM  2    Q.  Certainly.

04:33PM  3    A.  You're asking me if -- if when that's known, they should

04:33PM  4    bring that to me and explain that to me?

04:33PM  5    Q.  Correct.

04:33PM  6    A.  Yes.

04:33PM  7    Q.  Okay.  So, you put it out to your subordinates in D-57

04:33PM  8    that, hey, if you have a situation where you know a target of

04:33PM  9    the investigation, please raise that to my attention?

04:33PM 10    A.  Yes.

04:33PM 11    Q.  Okay.  And, so, in this situation, Mr. Bongiovanni knew

04:33PM 12    Peter Gerace, correct?

04:33PM 13    A.  Correct.

04:33PM 14    Q.  And he raised that fact to your attention, correct?

04:34PM 15    A.  Correct.

04:34PM 16    Q.  So, he raised it to your attention.  And did he also

04:34PM 17    indicate to you that he was uncomfortable with conducting

04:34PM 18    this investigation since he knew Mr. Gerace, right?

04:34PM 19    A.  No, he did not raise that.

04:34PM 20    Q.  Didn't raise that to you at all?

04:34PM 21    A.  No.

04:34PM 22    Q.  Okay.  Well, if Mr. Bongiovanni raised the fact that he

04:34PM 23    knew Peter Gerace to you, would you have allowed him to

04:34PM 24    remain on the case?

04:34PM 25    A.  The fact that he knew him?

04:34PM   1   Q.   Yes.

04:34PM   2   A.   Yes.

04:34PM   3   Q.   You would allow him to remain on the case even though he

04:34PM   4   had a personal relationship he brought to your attention?

04:34PM   5   A.   He didn't say to me that he had a personal relationship

04:34PM   6   with him, he said he knew him from the neighborhood.

04:34PM   7   Q.   Okay.  So your testimony is that he didn't raise the fact

04:34PM   8   that he had any type of with relationship him, just that he

04:34PM   9   knew him?

04:34PM   10  A.   Correct.

04:34PM   11  Q.   All right.  So, the fact that he knew him, you don't

04:34PM   12  recall Agent Bongiovanni talking to you about how it was a

04:34PM   13  little awkward because he knew him?

04:34PM   14  A.   No, sir.

04:34PM   15  Q.   Okay.  So you don't remember that as part of your

04:34PM   16  conversation, right?

04:34PM   17  A.   Nope.  No, I do not.

04:35PM   18  Q.   Okay.  So the next step that you take after Agent

04:35PM   19  Bongiovanni raises this to your attention is that you make a

04:35PM   20  suggestion to Agent Bongiovanni that he should contact the

04:35PM   21  FBI office in Buffalo, right?

04:35PM   22  A.   Sir, it wasn't a suggestion, it was -- I directed him to

04:35PM   23  call group supervisor, Jim Jancewicz, and explain to Jim what

04:35PM   24  it was that Gerace was telling him, and work with the FBI on

04:35PM   25  this case.

04:35PM 1   Q.  And thank you for correcting me, because I think that's

04:35PM 2   an important thing.  So you're his G.S., right?

04:35PM 3   A.  Correct.

04:35PM 4   Q.  And he's a special agent that works for you, correct?

04:35PM 5   A.  Correct.

04:35PM 6   Q.  There's a chain of command that operates within the DEA,

04:35PM 7   correct?

04:35PM 8   A.  Correct.

04:35PM 9   Q.  And you ordered him to go contact the FBI office in

04:35PM 10  Buffalo, correct?

04:35PM 11  A.  Correct.

04:35PM 12  Q.  All right.  And to your understanding, he did that,

04:35PM 13  correct?

04:35PM 14  A.  I don't know if he did that.

04:35PM 15  Q.  You don't know if he did that?

04:35PM 16  A.  I don't know if he did that.

04:35PM 17  Q.  You never followed up with him about that?

04:35PM 18  A.  I do not.

04:35PM 19  Q.  Okay.  So, you direct Agent Bongiovanni to contact FBI

04:35PM 20  Buffalo, and more specifically, your counterpart over there,

04:36PM 21  Special Agent Jancewicz?

04:36PM 22  A.  Yes, sir.

04:36PM 23  Q.  Okay.  So, Agent Jancewicz, he had an open investigation

04:36PM 24  because one of the things that he oversaw was the Safe

04:36PM 25  Streets Task Force; is that right?

04:36PM    1    A.   That's correct.

04:36PM    2    Q.   Okay.  And Safe Streets -- sorry, a little bit of a

04:36PM    3    tongue twister.  Safe Streets Task Force, one of their

04:36PM    4    responsibilities was to investigate drug crimes just like the

04:36PM    5    DEA, correct?

04:36PM    6    A.   Correct.

04:36PM    7    Q.   They had to focus on sometimes gang activity?

04:36PM    8    A.   Yes, sir.

04:36PM    9    Q.   And sometimes organizational activity?

04:36PM   10    A.   Correct.

04:36PM   11    Q.   But they had the same power to arrest people for drug

04:36PM   12    crimes committed under federal law, correct?

04:36PM   13    A.   That's correct.

04:36PM   14    Q.   And they had the same power to recommend to the United

04:36PM   15    States Attorney's Office that people should be prosecuted for

04:36PM   16    drug crimes that they committed that they had evidence of,

04:36PM   17    correct?

04:36PM   18    A.   Yes.

04:36PM   19    Q.   Okay.  And there wasn't any type of open case on Peter

04:37PM   20    Gerace in the 2009 time period that Agent Bongiovanni came to

04:37PM   21    you and brought this to your attention, right?

04:37PM   22    A.   You're asking me if the FBI had an open case?

04:37PM   23    Q.   No, I'm asking you if DEA had an open case.

04:37PM   24    A.   No.

04:37PM   25    Q.   And, so, one of the reasons why you asked -- or, sorry,

04:37PM   1   ordered Agent Bongiovanni to contact FBI was because they had

04:37PM   2   an open case and you didn't, correct?

04:37PM   3   A.  Correct.

04:37PM   4   Q.  And they could prosecute drug crimes just as much as the

04:37PM   5   DEA, right?

04:37PM   6   A.  Correct.

04:37PM   7          MR. SINGER:  Ms. Champoux, can you bring up

04:37PM   8   Government Exhibit 30A on the screen, please?

04:37PM   9          THE COURT:  Just for the witness?

04:37PM   10          THE CLERK:  It's in evidence.

04:37PM   11          MR. SINGER:  It's in evidence.  Is it published to

04:37PM   12   the jury?

04:37PM   13          THE CLERK:  Yes.

04:37PM   14          THE COURT:  Yep.

04:37PM   15          MR. SINGER:  Perfect.

04:37PM   16          BY MR. SINGER:

04:37PM   17   Q.  So I want to talk a little bit more about this DEA-6.

04:37PM   18       So DEA-6s were something that agents regularly wrote in

04:38PM   19   your office, correct?

04:38PM   20   A.  Correct.

04:38PM   21   Q.  It's a way to document some type of activity on a case;

04:38PM   22   is that right?

04:38PM   23   A.  That's right.

04:38PM   24   Q.  And it's a way that if agents need to know what they did

04:38PM   25   in a particular circumstance on a day in the past, they can

04:38PM   1   go back to the report and find out what they did, right?

04:38PM   2   A.  That's correct.

04:38PM   3   Q.  And it's also a tool that you use as a supervisor to

04:38PM   4   track what the agents under your command are doing, correct?

04:38PM   5   A.  Yes, sir.

04:38PM   6   Q.  So, for instance, one of the things that we talked about

04:38PM   7   was on the bottom of that form down in block 14, do you see

04:38PM   8   that at the bottom of the page, sir?

04:38PM   9   A.  Yes, sir.

04:38PM   10  Q.  So that's your signature as the group supervisor, right?

04:38PM   11  A.  Yes.

04:38PM   12  Q.  And you testified on direct that one of the

04:38PM   13  responsibilities you have as a group supervisor, as a

04:38PM   14  supervisor of the special agents in D-57, is to take a look

04:38PM   15  at the reports they're producing and review them, right?

04:38PM   16  A.  Yes.

04:38PM   17  Q.  And you're reviewing the report to make sure that it's

04:38PM   18  complete, correct?

04:38PM   19  A.  Correct.

04:38PM   20  Q.  You're reviewing the report to make sure that there are

04:39PM   21  no mistakes in it, correct?

04:39PM   22  A.  Correct.

04:39PM   23  Q.  You're reviewing the report so that you can make sure

04:39PM   24  that things are accurate in the report, correct?

04:39PM   25  A.  Correct.

Case 1:19-cr-00227-LJV-MJR  Document 847  Filed 03/31/24  Page 21 of 40
USA v Bongiovanni - Kasprzyk - Singer/Cross - 2/15/24

21

04:39PM    1    Q.  You're reviewing the report to make sure that it's

04:39PM    2    complying with DEA protocols, correct?

04:39PM    3    A.  Yes.

04:39PM    4    Q.  And as a supervisor, I can imagine that there are some

04:39PM    5    instances where a subordinate submitted a report to you that

04:39PM    6    was un-sat, and you sent it back to them with some

04:39PM    7    corrections, right?

04:39PM    8    A.  On occasion, yes.

04:39PM    9    Q.  On occasion you would do that, and that was part of your

04:39PM   10    job, right?

04:39PM   11    A.  Yes.

04:39PM   12    Q.  Okay.  And that's one of the reasons why you bottom-lined

04:39PM   13    the report in block 14 after it's submitted to you, correct?

04:39PM   14    A.  Correct.

04:39PM   15    Q.  So one of the other reasons that you also bottom-line

04:39PM   16    this is just a way to keep abreast of what's happening in

04:39PM   17    cases that your agents are working on, correct?

04:39PM   18    A.  Yes, sir.

04:39PM   19    Q.  Okay.  So, with regard to paragraph 2, I want to direct

04:40PM   20    your attention to that.

04:40PM   21         **MR. SINGER:**  And, Ms. Champoux, can you zoom in on

04:40PM   22    that one paragraph?  Thank you.

04:40PM   23         **BY MR. SINGER:**

04:40PM   24    Q.  So with regard to paragraph 2, the first three lines that

04:40PM   25    talk about Peter G. Gerace, do you see that?

04:40PM   1   A.  Yes, sir.

04:40PM   2   Q.  And it talks about how Gerace has acted as a confidential

04:40PM   3   source, has been able to provide information regarding

04:40PM   4   individuals in this case file and other narcotics

04:40PM   5   investigations in the past.

04:40PM   6       You as a supervisor know the rules, as you testified on

04:40PM   7   direct, about confidential sources, correct?

04:40PM   8   A.  Correct.

04:40PM   9   Q.  And, so, confidential sources, as you went through on

04:40PM   10  direct, are individuals who have to go through certain

04:40PM   11  protocols, right?

04:40PM   12  A.  Correct.

04:40PM   13  Q.  So, part of the protocols they have to go through is that

04:40PM   14  they have to have a sit-down with not just the agent who

04:40PM   15  wants them to become a C.S. or confidential source, but also

04:40PM   16  with a group supervisor, yourself, correct?

04:41PM   17  A.  Correct.

04:41PM   18  Q.  And you mentioned that there's a vetting process that

04:41PM   19  goes on along with DEA protocols and procedures, right?

04:41PM   20  A.  Correct.

04:41PM   21  Q.  There's an agreement that also has to be signed as part

04:41PM   22  of that protocol?

04:41PM   23  A.  Correct.

04:41PM   24  Q.  And there's also approvals that have to happen both at

04:41PM   25  your level and above your level, correct?

04:41PM   1   A.  Correct.  But -- but I just want to clarify here.  This

04:41PM   2   is -- he's suggesting this person's a confidential source and

04:41PM   3   not a confidential informant.  There is a distinction between

04:41PM   4   the two.

04:41PM   5   Q.  Okay.  So confidential informants are a little bit

04:41PM   6   different?

04:41PM   7   A.  Confidential informants, by DEA policy, need to be

04:41PM   8   registered.

04:41PM   9   Q.  Okay.  And, so, when you say "confidential informant,"

04:41PM  10   when someone is registered as a confidential informant,

04:41PM  11   they're given what's called a C.S. number, correct?

04:41PM  12   A.  Correct.

04:41PM  13   Q.  Because in DEA nomenclature, a C.S., confidential source,

04:41PM  14   is a confidential informant, correct?

04:41PM  15   A.  It could be.  But I -- when I was working for DEA, a

04:42PM  16   confidential informant is a confidential informant.

04:42PM  17       I see more of it as a confidential informant, not

04:42PM  18   necessarily confidential source.  I see a bit of a

04:42PM  19   distinction there.

04:42PM  20   Q.  Okay.  So let's talk about that for a second.

04:42PM  21       So, if a person is a confidential informant, as you say,

04:42PM  22   that person is not identified by names in reports, correct?

04:42PM  23   A.  Correct.

04:42PM  24   Q.  They're provided a C.S. number, or I guess a C.I. number,

04:42PM  25   as you would have it, with regard to that's a way to protect

04:42PM   1   their identity, right?

04:42PM   2   A.  Correct.

04:42PM   3   Q.  So I'll direct your attention back to paragraph 2.  So it

04:42PM   4   talks about how Peter G. Gerace is a confidential source,

04:42PM   5   right?

04:42PM   6   A.  Correct.

04:42PM   7   Q.  He's identified by name in that paragraph, right?

04:42PM   8   A.  Correct.

04:42PM   9   Q.  So this is the type of person that would not be given

04:42PM  10   some type of confidential source agreement, would not go

04:42PM  11   through the same protocols, right?

04:43PM  12   A.  Correct.

04:43PM  13   Q.  Okay.  Otherwise, you, as the supervisor, if you got a

04:43PM  14   report like this, you would have corrected Agent Bongiovanni,

04:43PM  15   correct?

04:43PM  16   A.  Correct.

04:43PM  17   Q.  So, if Peter Gerace had some type of agreement going on

04:43PM  18   at that point in time, you would have sent this back to Joe

04:43PM  19   and said, hey, you got the name on this report, you've gotta

04:43PM  20   take that off, right?

04:43PM  21   A.  Correct.

04:43PM  22   Q.  Otherwise, you wouldn't be doing your job as a

04:43PM  23   supervisor, right?

04:43PM  24   A.  Correct.

04:43PM  25   Q.  Okay.

Case 1:19-cr-00227-LJV-MJR   Document 847   Filed 03/31/24   Page 25 of 40
USA v Bongiovanni - Kasprzyk - Singer/Cross - 2/15/24

25

| | | |
|---|---|---|
| 04:43PM | 1 | **MR. SINGER:**  Ms. Champoux, can you please zoom in on |
| 04:43PM | 2 | paragraph 3, please? |
| 04:43PM | 3 | **BY MR. SINGER:** |
| 04:43PM | 4 | Q.  All right.  Can you see that up on the screen -- |
| 04:43PM | 5 | A.  Yes, sir. |
| 04:43PM | 6 | Q.  -- Mr. Kasprzyk? |
| 04:43PM | 7 | A.  Yep. |
| 04:43PM | 8 | Q.  So, in this paragraph, you mentioned on direct that the |
| 04:43PM | 9 | information in Peter Gerace's possession at that point in |
| 04:43PM | 10 | time would have been useful to the DEA in 2009; is that |
| 04:43PM | 11 | right? |
| 04:43PM | 12 | A.  Yes. |
| 04:43PM | 13 | Q.  Because it involves something involving drug trafficking, |
| 04:44PM | 14 | correct? |
| 04:44PM | 15 | A.  Correct. |
| 04:44PM | 16 | Q.  So, you had a conversation with Mr. Bongiovanni in your |
| 04:44PM | 17 | office about Peter Gerace calling him up, correct? |
| 04:44PM | 18 | A.  Yes, sir. |
| 04:44PM | 19 | Q.  And Mr. Bongiovanni mentioned that he wanted to be some |
| 04:44PM | 20 | type of confidential source or informant at that point in |
| 04:44PM | 21 | time, right? |
| 04:44PM | 22 | A.  Correct. |
| 04:44PM | 23 | Q.  But since the FBI had an open case regarding Gerace at |
| 04:44PM | 24 | that point in time -- |
| 04:44PM | 25 | **MR. DICKSON:**  Objection to asked and answered. |

04:44PM   1    **THE COURT:**  Overruled.

04:44PM   2    **BY MR. SINGER:**

04:44PM   3    Q.  Because the FBI had an open investigation at that point

04:44PM   4    in time, you told Mr. Bongiovanni to contact FBI, right?

04:44PM   5    A.  Yes, sir.

04:44PM   6    Q.  And then after you told him to do that, you get a copy of

04:44PM   7    this DEA-6 put on your desk for approval, correct?

04:44PM   8    A.  Correct.

04:44PM   9    Q.  And like any good supervisor or manager, you reviewed

04:44PM   10   what was the content of these files, correct?

04:44PM   11   A.  Correct.

04:44PM   12   Q.  So you would have read this paragraph 3, which talked

04:45PM   13   about these different things, and you would have read the

04:45PM   14   entire DEA-6, which talked about information in Peter

04:45PM   15   Gerace's possession regarding drug trafficking, correct?

04:45PM   16   A.  Sir, he didn't offer any information in the 6 about the

04:45PM   17   drug trafficking other than the potential to offer

04:45PM   18   information.

04:45PM   19   Q.  So the potential to offer information about

04:45PM   20   kilogram-quantity drug traffickers, correct?

04:45PM   21   A.  Correct.

04:45PM   22   Q.  Involving cocaine, correct?

04:45PM   23   A.  Correct.

04:45PM   24   Q.  And you would have read this as a result of being a

04:45PM   25   supervisor and bottom-lining the report, correct?

04:45PM    1    A.  Yes.

04:45PM    2    Q.  So, when you read this, you said this was important

04:45PM    3    information, or would have been useful to the DEA.  But when

04:45PM    4    you read this, though, you didn't ask Agent Bongiovanni to

04:45PM    5    open up a file, right?

04:45PM    6    A.  Correct.

04:45PM    7    Q.  You didn't ask Agent Bongiovanni to bring Peter Gerace

04:45PM    8    in, correct?

04:45PM    9    A.  Correct.

04:45PM   10    Q.  You didn't sit him down and say, hey, Joe, like, it seems

04:45PM   11    like this guy would be fantastic for us to use in our

04:45PM   12    investigations, bring him into our office, correct?

04:45PM   13    A.  Correct.

04:46PM   14    Q.  'Cuz you were confident that FBI would be able to use

04:46PM   15    that information, correct?

04:46PM   16    A.  Correct.

04:46PM   17         **MR. SINGER:**  You can take that down, thank you.

04:46PM   18         **BY MR. SINGER:**

04:46PM   19    Q.  So, the file title on Exhibit 30A, that was entitled the

04:46PM   20    Matthew Scalia file or Scalia file?

04:46PM   21    A.  Yes, sir.

04:46PM   22    Q.  Okay.  And that involved an individual who was under DEA

04:46PM   23    investigation at that time, correct?

04:46PM   24    A.  Correct.

04:46PM   25    Q.  Okay.  So, you've had investigations opened in files with

Case 1:19-cr-00227-LJV-MJR   Document 847   Filed 03/31/24   Page 28 of 40
USA v Bongiovanni - Kasprzyk - Singer/Cross - 2/15/24

28

04:47PM   1   a file title name different than who the target of the

04:47PM   2   investigation is in the past, correct?

04:47PM   3      Maybe I asked that question poorly.  Let me ask that

04:47PM   4   again.  All right?

04:47PM   5   A.  Thank you.

04:47PM   6   Q.  Okay.  So this file was opened on Matthew Scalia,

04:47PM   7   correct?

04:47PM   8   A.  Correct.

04:47PM   9   Q.  He was the target of that investigation, correct?

04:47PM  10   A.  Correct.

04:47PM  11   Q.  And there were other names that were also targets of

04:47PM  12   investigation in the Matthew Scalia file, correct?

04:47PM  13   A.  I would assume so, yes, potentially.

04:47PM  14   Q.  So it wasn't the practice of the DEA, like, let's say

04:47PM  15   that Matthew Scalia gets one file, but then the next target

04:47PM  16   gets a whole new file open again, right?

04:47PM  17   A.  Typically, to write a 6 to a file, under a particular

04:47PM  18   target name, the information presented in that 6 would have

04:47PM  19   to have some connection to that primary target.

04:47PM  20   Q.  Okay.  And the connection could be the type of drug that

04:47PM  21   was being distributed on the original file title's report,

04:48PM  22   correct?

04:48PM  23   A.  A connection would have to be stronger than just the type

04:48PM  24   of drug.

04:48PM  25   Q.  Okay.

04:48PM   1   A.  Typically, the connection would have to show some sort of

04:48PM   2   organizational link to that individual.

04:48PM   3   Q.  Okay.  And, so, in the DEA-6 that was submitted here, it

04:48PM   4   mentions that Peter Gerace had been a source of information

04:48PM   5   for certain things related to this file and other narcotics

04:48PM   6   investigations, right?

04:48PM   7   A.  Correct.

04:48PM   8   Q.  So, if Peter Gerace was giving information to Agent

04:48PM   9   Bongiovanni that was being used by the office to prosecute

04:48PM  10   matters in the Scalia file, it would be natural to put this

04:48PM  11   DEA-6 into the Scalia file, correct?

04:48PM  12   A.  Correct.

04:48PM  13   Q.  And you remember the Matthew Scalia file, right?

04:49PM  14   A.  I do not remember that file.

04:49PM  15   Q.  You don't remember anything in particular about it at

04:49PM  16   all?

04:49PM  17   A.  No, sir.

04:49PM  18   Q.  Too many years ago?

04:49PM  19   A.  It's been a long time, sir, about 15 years.

04:49PM  20   Q.  Okay.  You don't remember about any successful

04:49PM  21   prosecutions that came out of that file?

04:49PM  22   A.  I do not.

04:49PM  23   Q.  Okay.  But you're confident that Bongiovanni worked at

04:49PM  24   some point in time on the file?

04:49PM  25   A.  I'm confident that he wrote a 6 documenting his

04:49PM  1   discussions with Peter Gerace to that file.

04:49PM  2   Q.  Okay.  And in that 6, he mentions how Peter Gerace

04:49PM  3   provided some information that was useful in the Scalia

04:49PM  4   investigation, correct?

04:49PM  5   A.  He didn't specifically say it was useful in the Scalia

04:49PM  6   investigation.

04:49PM  7          MR. SINGER:  Ms. Champoux, can you please bring up

04:49PM  8   Government Exhibit 30A again?

04:50PM  9          And can you zoom in on paragraph 2 again?

04:50PM  10          Thank you.

04:50PM  11          BY MR. SINGER:

04:50PM  12   Q.  So I want to direct your attention, Mr. Kasprzyk, to that

04:50PM  13   middle part of the paragraph.  Can you read that, please?

04:50PM  14   A.  Gerace has acted as a confidential source, and has been

04:50PM  15   able to provide information regarding individuals in this

04:50PM  16   case file and other narcotic investigation in the past.

04:50PM  17   Q.  So, when it says "in this case file," it's referring to

04:50PM  18   the Matthew Scalia file, right?

04:50PM  19   A.  Yes, sir.

04:50PM  20   Q.  Okay.

04:50PM  21          MR. SINGER:  You can bring that down.  Thank you,

04:50PM  22   ma'am.

04:50PM  23          BY MR. SINGER:

04:50PM  24   Q.  So, after you bottom-line the DEA-6 that we're just

04:50PM  25   talking about, that's something that is then forwarded to

04:51PM    1    someone else in the office to enter into the DEA's database

04:51PM    2    for all these reports, correct?

04:51PM    3    A.  Yes, sir.

04:51PM    4    Q.  And that's something that then would exist in perpetuity

04:51PM    5    until it's destroyed by the DEA, correct?

04:51PM    6    A.  Yes, sir.

04:51PM    7    Q.  And this is something you would have directed

04:51PM    8    Mr. Bongiovanni to do since he was your subordinate?

04:51PM    9    A.  Preparing the 6, sir?

04:51PM   10    Q.  Correct.

04:51PM   11    A.  Yes.

04:51PM   12    Q.  So, as far as the FBI was concerned, you don't control

04:51PM   13    anything the Safe Streets Task Force does at FBI, correct?

04:51PM   14    A.  I did not.

04:51PM   15    Q.  Okay.  You don't have any input into what they do,

04:52PM   16    correct?

04:52PM   17    A.  No, sir.

04:52PM   18    Q.  They operate independently of the DEA?

04:52PM   19    A.  Correct.

04:52PM   20    Q.  You were aware that the FBI had interest in Peter Gerace;

04:52PM   21    is that right?

04:52PM   22    A.  Yes, sir.

04:52PM   23    Q.  And that's the reason why you directed Agent Bongiovanni

04:52PM   24    to contact them about Peter Gerace, correct?

04:52PM   25    A.  That's correct.

32

04:52PM    1    Q.  Was there any time that Agent Jancewicz or anybody else

04:52PM    2    from FBI reached out to you to say, hey, how is the

04:52PM    3    cooperation with Peter Gerace going?

04:52PM    4    A.  No, sir, not that I can recall.

04:52PM    5    Q.  And you never told FBI, after you directed Agent

04:52PM    6    Bongiovanni to contact the FBI about Peter Gerace, that, hey,

04:52PM    7    we're gonna move forward with our own investigation into

04:52PM    8    Peter Gerace, correct?

04:52PM    9    A.  Correct, we did not.

04:52PM   10    Q.  So as part of the social part of the office, DEA would

04:53PM   11    hold Christmas parties; that right?

04:53PM   12    A.  Correct.

04:53PM   13    Q.  And when you were the G.S. at D-57, people would help

04:53PM   14    organize those Christmas parties for you, correct?

04:53PM   15    A.  Correct.

04:53PM   16    Q.  And Agent Bongiovanni was one of those individuals?

04:53PM   17             **MR. DICKSON:**  Objection, relevance.

04:53PM   18             **THE COURT:**  Yeah, where are we going with this?

04:53PM   19             **MR. SINGER:**  Can we approach, Judge?

04:53PM   20             **THE COURT:**  Sure.

04:53PM   21             (Sidebar discussion held on the record.)

04:53PM   22             **MR. SINGER:**  So, during this time, DEA would have

04:53PM   23    Christmas parties, they held them over at SoHo Bar.  SoHo Bar

04:53PM   24    was a bar that was identified by Agent Casullo many years ago

04:53PM   25    as a place that was owned and operated by people who had

Case 1:19-cr-00227-LJV-MJR   Document 847   Filed 03/31/24   Page 33 of 40
USA v Bongiovanni - Kasprzyk - Singer/Cross - 2/15/24

33

04:54PM    1    Italian Organized Crime connections.

04:54PM    2         Mr. Bongiovanni was directed to organize a party.

04:54PM    3    One of the things he did was organize it over at SoHo, because

04:54PM    4    he knew people there, including people who were identified as

04:54PM    5    IOC targets in DEA and other investigations.

04:54PM    6         He presented the plan to -- to his RAC, as well as

04:54PM    7    his G.S.  And his G.S. said, sure, sounds like a great time.

04:54PM    8         On top of that, these parties also had attendance

04:54PM    9    from other federal agents, as well as AUSAs from the U.S.

04:54PM   10    Attorney's Office, as well as people like Judge Skretny who

04:54PM   11    would come on over.

04:54PM   12         So we have a situation where the G.S. and the RAC

04:54PM   13    signed off on a party at a location that the government's

04:54PM   14    going to claim was run by IOC, and he found nothing wrong with

04:54PM   15    it.

04:54PM   16         So we believe it's relevant to show that what he --

04:54PM   17    investigation was ongoing as far as IOC was not something that

04:54PM   18    was necessarily as important as what the government may claim

04:55PM   19    later.

04:55PM   20         **MR. DICKSON:**  Judge, I still don't see the relevance

04:55PM   21    of asking this witness whether or not he signed off on

04:55PM   22    throwing a party at this particular restaurant.

04:55PM   23         **THE COURT:**  I guess the question is whether he knew

04:55PM   24    that that was a place that had been labeled an IOC place,

04:55PM   25    right?

04:55PM  1      **MR. SINGER:**  So, I mean, do we want to have a

04:55PM  2  conversation with him outside the presence of the jury to find

04:55PM  3  that out?  Because obviously, we don't want to taint the room

04:55PM  4  here.  Because I don't know --

04:55PM  5      **MR. COOPER:**  I don't believe it taints the pool to

04:55PM  6  ask the question.  I think he's afraid to ask it because he's

04:55PM  7  not gonna like the answer.

04:55PM  8      **THE COURT:**  Yeah, I think you've got to ask the

04:55PM  9  question.  Whether -- whether he -- the government doesn't

04:55PM  10  have any objection to it, sounds like, so why wouldn't you

04:55PM  11  want to answer ask the question to lay the foundation for --

04:55PM  12      **MR. SINGER:**  I get you.

04:55PM  13      **THE COURT:**  How much longer do you have?

04:55PM  14      **MR. SINGER:**  I think I'm almost done, probably five

04:55PM  15  minutes or less.

04:55PM  16      **MR. DICKSON:**  Can I just take like five minutes for

04:56PM  17  redirect?

04:56PM  18      **THE COURT:**  Yeah.

04:56PM  19      (End of sidebar discussion.)

04:56PM  20      **THE COURT:**  So, the objection is sustained.  But you

04:56PM  21  can lay a foundation for what we discussed.

04:56PM  22      **MR. SINGER:**  Just one moment.

04:56PM  23      **THE COURT:**  Yep.

04:56PM  24      **BY MR. SINGER:**

04:57PM  25  Q.  I want to move on from the Christmas party, Mr. Kasprzyk.

04:57PM   1   One of the things that agents who work at the DEA, in your

04:57PM   2   experience as a G.S. and a RAC, is that agents need to

04:57PM   3   possess some type of security clearance; is that right?

04:57PM   4   A.  Correct.

04:57PM   5   Q.  And as far as a security clearance, you're aware, as a

04:57PM   6   former RAC and as a former G.S., that individuals who have

04:57PM   7   financial problems are sometimes flagged, correct?

04:57PM   8   A.  Yes, sir, that occasionally happens during the periodic

04:57PM   9   reinvestigation.

04:57PM  10   Q.  Okay.  So one of the reasons, in your experience, about

04:57PM  11   why that happens is that if a person's in a very dire

04:57PM  12   financial situation, it's -- there's a potential for them to

04:57PM  13   potentially get exploited; is that right?

04:57PM  14   A.  Correct.

04:57PM  15   Q.  And the reason for the reinvestigation or continual

04:57PM  16   investigation of someone's finances is to identify someone

04:57PM  17   who might fall into that category, correct?

04:57PM  18   A.  Yes, sir.

04:57PM  19   Q.  When you were the RAC as well as the G.S. of D-57 at

04:58PM  20   Buffalo, did you ever receive any reports from a security

04:58PM  21   manager, or the security agency that runs the security

04:58PM  22   clearances at DEA, that flagged Mr. Bongiovanni in any way

04:58PM  23   for financial distress?

04:58PM  24        **MR. DICKSON:**  Objection, Your Honor.  Rule 403.  Can

04:58PM  25   we approach, please?

04:58PM    1          **THE COURT:**  Okay.

04:58PM    2          (Sidebar discussion held on the record.)

04:58PM    3          **MR. DICKSON:**  Judge, first of all, this is beyond the

04:58PM    4    scope of what we covered in direct.

04:58PM    5          Secondly, if we're going to be opening up a

04:58PM    6    conversation into the entirety of Mr. Bongiovanni's background

04:58PM    7    check and security clearance, that's an entirely different

04:58PM    8    matter that's gonna take days and days to suss out, because

04:58PM    9    we're going to have to go through piece by piece everything

04:58PM   10    that was included in the background check.

04:58PM   11          **THE COURT:**  Yeah, so what's the point?  That he

04:58PM   12    didn't know that Bongiovanni was having financial problems?

04:58PM   13          **MR. SINGER:**  No, the relevance of it is that he was

04:59PM   14    never put on report for having the financial distress the

04:59PM   15    government's claiming he had.

04:59PM   16          **THE COURT:**  Therefore.

04:59PM   17          **MR. SINGER:**  So therefore he was not in the financial

04:59PM   18    distress or dire financial distress that would potentially

04:59PM   19    raise a --

04:59PM   20          **THE COURT:**  That's a non sequitur.  The fact that he

04:59PM   21    wasn't put on a report doesn't mean he wasn't in financial

04:59PM   22    straits.  It means the people who were looking at it at the

04:59PM   23    time didn't know he was in financial straits.

04:59PM   24          So the fact that he's not on a report for having

04:59PM   25    financial problems, doesn't mean that he doesn't have

04:59PM    1    financial problems.

04:59PM    2          Now, and I think Mr. Dickson is right, it's beyond

04:59PM    3    the scope.  So if you want to recall him or you want to try to

04:59PM    4    put on this testimony through somebody else, you can do that.

04:59PM    5    But I don't think that it comes in because -- so, do we know

04:59PM    6    whether there was an investigation into his financial --

05:00PM    7          **MR. SINGER:**  There were continual investigations and

05:00PM    8    reinvestigations into Agent Bongiovanni when he was a DEA

05:00PM    9    agent, as he was a federal employee with a security clearance.

05:00PM   10       **THE COURT:**  Were there continuing investigations into

05:00PM   11    his financial situation?

05:00PM   12       **MR. SINGER:**  So --

05:00PM   13       **THE COURT:**  Maybe you can put that on.  Maybe you can

05:00PM   14    put that on in your case.  I don't think it's appropriate

05:00PM   15    now --

05:00PM   16       **MR. SINGER:**  Okay.

05:00PM   17       **THE COURT:** -- for this witness.

05:00PM   18       **MR. SINGER:**  Fair enough, Judge.

05:00PM   19       **THE COURT:**  Maybe you can put that on either through

05:00PM   20    this witness or through someone else.  We can get him back,

05:00PM   21    yeah.

05:00PM   22       **MR. SINGER:**  No, I mean, I can recall, so --

05:00PM   23       **THE COURT:**  Yeah.

05:00PM   24       (End of sidebar discussion.)

05:00PM   25       **THE COURT:**  The objection is sustained.  Next

| | | |
|---|---|---|
| 05:00PM | 1 | question, please. |
| 05:00PM | 2 | **MR. SINGER:**  I have nothing further, Judge.  Thank |
| 05:00PM | 3 | you. |
| 05:03PM | 4 | (Redirect examination from 5:00 p.m. to 5:03 p.m.) |
| 05:03PM | 5 | **THE COURT:**  Anything more? |
| 05:03PM | 6 | **MR. SINGER:**  Yes. |
| 05:03PM | 7 | |
| 05:03PM | 8 | **RECROSS-EXAMINATION BY MR. SINGER:** |
| 05:03PM | 9 | Q.  So by your testimony on the last question, Mr. Kasprzyk, |
| 05:04PM | 10 | you never verified whether or not Peter Gerace was any type of |
| 05:04PM | 11 | source, correct? |
| 05:04PM | 12 | A.  A source, or an informant? |
| 05:04PM | 13 | Q.  A source or an informant? |
| 05:04PM | 14 | A.  I did not personally verify that, no. |
| 05:04PM | 15 | Q.  So let's break that down.  You never verified that he was |
| 05:04PM | 16 | a confidential source, correct? |
| 05:04PM | 17 | A.  Correct. |
| 05:04PM | 18 | Q.  You never verified that he was a confidential informant, |
| 05:04PM | 19 | correct? |
| 05:04PM | 20 | A.  Correct. |
| 05:04PM | 21 | Q.  So you have no way of stating one way or another whether |
| 05:04PM | 22 | he was a source or an informant, correct? |
| 05:04PM | 23 | A.  I trusted that what Joe -- |
| 05:04PM | 24 | Q.  That wasn't my question, sir.  Do you need me to restate |
| 05:04PM | 25 | the question again? |

05:04PM   1   A.  Yes, sir.

05:04PM   2   Q.  If you never verified that he was a source, correct --

05:04PM   3   A.  I did not independently verify it.

05:04PM   4   Q.  -- and you never independently verified that he was an

05:04PM   5   informant, correct --

05:04PM   6   A.  Correct.

05:04PM   7   Q.  -- you have no way of telling this jury whether he was or

05:04PM   8   not?

05:04PM   9   A.  Other than what was told to me by the agent through

05:04PM  10   the 6, I did not independently verify it.

05:04PM  11   Q.  So the answer is no?

05:04PM  12   A.  I did not independently verify it.

05:04PM  13   Q.  So the answer is no?

05:05PM  14   A.  Your question, again, sir?

05:05PM  15   Q.  The question is, again:  If you never verified that he

05:05PM  16   was a source, correct --

05:05PM  17   A.  Correct.

05:05PM  18   Q.  -- you never verified that he was an informant,

05:05PM  19   correct --

05:05PM  20   A.  Correct.

05:05PM  21   Q.  -- you had no way of knowing whether he was or not?

05:05PM  22   A.  I didn't know at the time, yes.

05:05PM  23             **MR. SINGER:**  Thank you.

05:05PM  24             **MR. DICKSON:**  Nothing further, Judge.

05:05PM  25             **THE COURT:**  Okay.  You can step down, sir.

05:05PM  1            **THE WITNESS:**  Thank you.

05:05PM  2            (Witness excused at 5:05 p.m.)

      3            (Excerpt concluded at 5:05 p.m.)

      4        *     *     *     *     *     *     *

      5

      6

      7

      8              **CERTIFICATE OF REPORTER**

      9

     10            In accordance with 28, U.S.C., 753(b), I

     11    certify that these original notes are a true and correct

     12    record of proceedings in the United States District Court for

     13    the Western District of New York on February 15, 2024.

     14

     15

     16              s/ Ann M. Sawyer
                     Ann M. Sawyer, FCRR, RPR, CRR
     17              Official Court Reporter
                     U.S.D.C., W.D.N.Y.
     18

     19

     20

     21

     22

     23

     24

     25