```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK
 2
   _____
 3 UNITED STATES OF AMERICA,
                                      Case No. 1:19-cr-227
 4              Plaintiff,                     (LJV)
   v.
 5                                    March 21, 2024
   JOSEPH BONGIOVANNI,
 6
   _____
 7              Defendant.


 8      TRANSCRIPT EXCERPT - EXAMINATION OF DAVID CARPENTER
               BEFORE THE HONORABLE LAWRENCE J. VILARDO
 9                  UNITED STATES DISTRICT JUDGE


10
   APPEARANCES:          TRINI E. ROSS, UNITED STATES ATTORNEY
11                       BY: JOSEPH M. TRIPI, ESQ.
                             NICHOLAS T. COOPER, ESQ.
12                           CASEY L. CHALBECK, ESQ.
                         Assistant United States Attorneys
13                       Federal Centre
                         138 Delaware Avenue
14                       Buffalo, New York 14202
                           And
15                       UNITED STATES DEPARTMENT OF JUSTICE
                         BY: JORDAN ALAN DICKSON, ESQ.
16                       1301 New York Ave NW
                         Suite 1000
17                       Washington, DC 20530-0016
                         For the Plaintiff
18
                         SINGER LEGAL PLLC
19                       BY: ROBERT CHARLES SINGER, ESQ.
                         80 East Spring Street
20                       Williamsville, New York 14221
                           And
21                       LAW OFFICES OF PARKER ROY MacKAY
                         BY: PARKER ROY MacKAY, ESQ.
22                       3110 Delaware Avenue
                         Kenmore, New York  14217
23                       For the Defendant

24 PRESENT:              BRIAN A. BURNS, FBI Special Agent
                         MARILYN K. HALLIDAY, HSI Special Agent
25                       KAREN A. CHAMPOUX, USA Paralegal
```

| | |
|---|---|
| 1 | **LAW CLERK:** | **REBECCA FABIAN IZZO, ESQ.** |

1    **LAW CLERK:**            **REBECCA FABIAN IZZO, ESQ.**

2    **COURT DEPUTY CLERK:**   **COLLEEN M. DEMMA**

3    **COURT REPORTER:**       **ANN MEISSNER SAWYER, FCRR, RPR, CRR**
                              Robert H. Jackson Federal Courthouse
4                             2 Niagara Square
                              Buffalo, New York  14202
5                             Ann_Sawyer@nywd.uscourts.gov

6

7                    *     *     *     *     *     *     *

8

9           (Excerpt commenced at 1:38 p.m.)

01:39PM   10           **THE COURT:**  Welcome back, everyone.  The record will

01:39PM   11   reflect that all our jurors are present.

01:39PM   12           The government can call its next witness.

01:39PM   13           **MR. DICKSON:**  Thank you, Judge.  The government calls

01:39PM   14   David Carpenter.

01:39PM   15

01:39PM   16   **D A V I D   C A R P E N T E R**, having been duly called and

01:39PM   17   sworn, testified as follows:

01:39PM   18           **MR. DICKSON:**  May I proceed?

01:39PM   19           **THE COURT:**  You may.

01:39PM   20

01:39PM   21                   **DIRECT EXAMINATION BY MR. DICKSON:**

01:39PM   22   Q.  Good afternoon, sir.

01:39PM   23   A.  Good afternoon.

01:39PM   24   Q.  Can you introduce yourself to the jury please?

01:39PM   25   A.  Hi, my name is David Carpenter.

01:39PM 1  Q.  Where do you work, Mr. Carpenter?

01:39PM 2  A.  I currently work for the Treasury Inspector General For

01:39PM 3  Tax Administration, known as TIGTA.  I'm a special agent.

01:40PM 4  Q.  How long have you worked for TIGTA?

01:40PM 5  A.  Three and a half years.

01:40PM 6  Q.  What do you do there?

01:40PM 7  A.  I'm a special agent there.  We investigate allegations of

01:40PM 8  fraud, waste, abuse, committed against the IRS, to include

01:40PM 9  theft of IRS funds, threats of harms against IRS employees,

01:40PM 10  and threats of harm against taxpayers in accordance with

01:40PM 11  trying to get IRS funds.

01:40PM 12  Q.  Prior to working at TIGTA, where did you work?

01:40PM 13  A.  I was a special agent with the Department of Justice

01:40PM 14  Office of Inspector General's office.

01:40PM 15  Q.  Feel free to move that mic a little closer to you if you

01:40PM 16  need to.  How long were you with DOJ OIG?

01:40PM 17  A.  Little bit more than two years.

01:40PM 18  Q.  From when to when?

01:40PM 19  A.  Late May of 2018 to September of 2020.

01:40PM 20  Q.  What did you do there?

01:40PM 21  A.  I was a special agent there charged with investigating

01:40PM 22  allegations of fraud, waste, and abuse, both criminal and

01:41PM 23  administrative, of employees of the Department of Justice.

01:41PM 24  Q.  Was DOJ OIG empowered to conduct investigations of

01:41PM 25  employees of the DEA?

01:41PM  1   A.  Yes.

01:41PM  2   Q.  And then prior to the Office of Inspector General, where

01:41PM  3   did you work?

01:41PM  4   A.  I was a special agent with the United States Secret

01:41PM  5   Service for eight and a half years from January of 2010 till

01:41PM  6   May of 2018.

01:41PM  7   Q.  I want to focus on one particular investigation that you

01:41PM  8   did while you were with -- while you were with the Department

01:41PM  9   of Justice Office of Inspector General.  Did you investigate

01:41PM  10  somebody named Joseph Bongiovanni?

01:41PM  11  A.  I did.

01:41PM  12  Q.  Did you meet Joseph Bongiovanni?

01:41PM  13  A.  I did.

01:41PM  14  Q.  Do you see him in court today?

01:41PM  15  A.  I do.

01:41PM  16  Q.  Can you point to where he's sitting, and tell us

01:41PM  17  something he's wearing, please?

01:41PM  18  A.  He's wearing a red and blue tie.

01:41PM  19       **MR. DICKSON:**  The record will reflect the witness

01:41PM  20  identified the defendant?

01:41PM  21       **THE COURT:**  It does.

01:41PM  22       **BY MR. DICKSON:**

01:41PM  23  Q.  Did this investigation start, Mr. Carpenter, in around

01:42PM  24  August of 2018 for you?

01:42PM  25  A.  Yes.

01:42PM  1    Q.  Now at the time you started investigating the defendant,

01:42PM  2    what was his job?

01:42PM  3    A.  At the time, he was a special agent with the Drug

01:42PM  4    Enforcement Administration.

01:42PM  5    Q.  Were you the only agent investigating the defendant at

01:42PM  6    that time, or were there other agencies involved?

01:42PM  7    A.  Other agencies were involved.

01:42PM  8    Q.  What other agencies?

01:42PM  9    A.  HSI was involved.  I was working with Special Agent

01:42PM  10   Curtis Ryan.

01:42PM  11   Q.  Eventually later on did the FBI get involved, too?

01:42PM  12   A.  Yes.

01:42PM  13   Q.  Now, was anybody from the DEA a part of the investigative

01:42PM  14   team investigating the defendant?

01:42PM  15   A.  No.

01:42PM  16   Q.  Were DEA personnel viewed as subjects of the

01:42PM  17   investigation, some of them?

01:42PM  18   A.  Some DEA employees were viewed -- subjects?  I'm sorry,

01:42PM  19   can you --

01:42PM  20   Q.  Did you deliver a subject letter to somebody named Joseph

01:43PM  21   Palmieri?

01:43PM  22   A.  I did, yes.

01:43PM  23   Q.  What's a subject letter?

01:43PM  24   A.  A subject letter is notifying an individual that they are

01:43PM  25   a subject of a criminal investigation.

01:43PM  1  Q.  What's a subject of a criminal investigation?

01:43PM  2  A.  A person of interest that is -- we're investigating to --

01:43PM  3  pursuant to the belief that they have committed a federal

01:43PM  4  crime.

01:43PM  5  Q.  Now were there different categories of allegations that

01:43PM  6  the investigative team was looking into in investigating the

01:43PM  7  defendant?

01:43PM  8  A.  Yes.

01:43PM  9  Q.  Was one of those categories the defendant's relationship

01:43PM  10  with Peter Gerace?

01:43PM  11  A.  Yes.

01:43PM  12  Q.  Was another category racial comments that he made to

01:43PM  13  Anthony Casullo?

01:43PM  14  A.  Yes.

01:43PM  15  Q.  Was another category related to allegations that Ron

01:43PM  16  Serio made about the defendant?

01:43PM  17  A.  Yes.

01:43PM  18  Q.  Now, you said you started, or you became involved in the

01:43PM  19  investigation in August of 2018.  Were you still involved in

01:43PM  20  the investigation in March of 2019?

01:43PM  21  A.  Yes.

01:43PM  22  Q.  All right.  I want to talk about that time frame.  What

01:43PM  23  was the status of the investigation as of March 2019?

01:44PM  24  A.  The investigation was ongoing and active.  We were still

01:44PM  25  pursuing allegations furthering allegations of racial

01:44PM   1   language that was used in the DEA office, as well as

01:44PM   2   allegations him providing inform -- Mr. Bongiovanni providing

01:44PM   3   information to targets of investigations.

01:44PM   4   Q.  And that was the whole investigative team looking into

01:44PM   5   that, right?

01:44PM   6   A.  Correct.

01:44PM   7   Q.  Were you still investigating the defendant's relationship

01:44PM   8   with Peter Gerace?

01:44PM   9   A.  Yes.

01:44PM   10  Q.  Now, prior to March of 2019, had you spoken to the

01:44PM   11  defendant?

01:44PM   12  A.  No.

01:44PM   13  Q.  In an investigation into allegations of wrongdoing, is it

01:44PM   14  valuable in an investigation to talk to the person accused of

01:44PM   15  wrongdoing?

01:44PM   16  A.  Yes.

01:44PM   17  Q.  Why is that valuable?

01:44PM   18  A.  It allows the individual the opportunity to explain their

01:44PM   19  side of the story.  It allows them to be heard.  It allows

01:44PM   20  them to explain the situation as they saw it.  It allows them

01:45PM   21  to bring information to us that may be new to us that may

01:45PM   22  further the investigation, point the investigation in a

01:45PM   23  different direction, or may provide information to ultimately

01:45PM   24  ending the investigation.

01:45PM   25  Q.  Is it important for the person being interviewed to tell

01:45PM  1    the truth?

01:45PM  2    A.   Yes.

01:45PM  3    Q.   Why is that important to your investigation?

01:45PM  4    A.   Truth telling to the investigation is very important

01:45PM  5    because it allows us to further spend time digging into leads

01:45PM  6    that they may have provided us, may allow us to interview new

01:45PM  7    witnesses, allows us to corroborate evidence that we already

01:45PM  8    have, it allows us to maybe produce new leads as well.

01:45PM  9    Q.   In your experience, Mr. Carpenter, can you learn things

01:45PM  10   by interviewing a target of an investigation that you can't

01:45PM  11   learn from anybody else?

01:45PM  12   A.   Yes.

01:45PM  13   Q.   Like what?

01:45PM  14   A.   We can learn specifically information that only they

01:45PM  15   would know, specific details of events, locations, hear

01:46PM  16   things directly from them that only people involved in it

01:46PM  17   intimately would know.

01:46PM  18   Q.   So in the course of this investigation, did you want to

01:46PM  19   interview the defendant?

01:46PM  20   A.   Yes.

01:46PM  21   Q.   Did you ask the defendant whether he was willing to sit

01:46PM  22   down for an interview?

01:46PM  23   A.   Yes.

01:46PM  24   Q.   What did he say?

01:46PM  25   A.   He agreed to.

01:46PM    1    Q.  So, let's talk about the interview, did the interview of

01:46PM    2    the defendant eventually take place?

01:46PM    3    A.  It did.

01:46PM    4    Q.  When?

01:46PM    5    A.  March 29th of 2019.

01:46PM    6    Q.  Mr. Carpenter, going into this interview, did you have a

01:46PM    7    specific plan for what topics you were going to cover during

01:46PM    8    that interview?

01:46PM    9    A.  Yes.

01:46PM   10    Q.  What topic specifically were you going to cover?

01:46PM   11    A.  The topics that we wanted to cover or I wanted to cover

01:46PM   12    are the allegations of him using racial words, as well as his

01:46PM   13    relationship with Peter Gerace.

01:46PM   14    Q.  Now, just a moment ago you told us that those were two

01:46PM   15    categories of investigation that the team was looking at in

01:46PM   16    terms of what the defendant was being investigated for.  But

01:47PM   17    you also said that the team was looking at allegations that

01:47PM   18    Ron Serio made.

01:47PM   19         Did the -- did you have a plan about whether to cover the

01:47PM   20    allegations that Ron Serio made in that March interview?

01:47PM   21    A.  There was -- the discussion of the racial allegations and

01:47PM   22    his relationship with Peter Gerace were the only topics that

01:47PM   23    I was interested in talking about.  It was -- discussing Ron

01:47PM   24    Serio was not an area of topic that I wanted to bring up or

01:47PM   25    discuss with him.

01:47PM    1    Q.   Why?

01:47PM    2    A.   At that point, we were focused -- I was only focused on

01:47PM    3    those relationships with Peter Gerace and the racial

01:47PM    4    allegations.  It was determined that talking about Ron Serio

01:47PM    5    at that time would have -- wouldn't be appropriate based on

01:47PM    6    where the investigation was.

01:47PM    7    Q.   So other agents on the team were still investigating

01:47PM    8    those allegations, you just didn't want to talk to the

01:47PM    9    defendant about those in this particular interview?

01:47PM   10    A.   Correct.

01:47PM   11    Q.   Was the goal of this interview to gather information from

01:48PM   12    the defendant?

01:48PM   13    A.   Yes.

01:48PM   14    Q.   You said the interview took place on March 29th of 2019.

01:48PM   15    Where did it happen?

01:48PM   16    A.   The U.S. Attorney's Office`in Buffalo, New York.

01:48PM   17    Q.   Who was there?

01:48PM   18    A.   It was myself, another Department of Justice Office of

01:48PM   19    Inspector General Special Agent David Fusco, and

01:48PM   20    Mr. Bongiovanni.

01:48PM   21    Q.   Was Mr. Bongiovanni under arrest during this interview?

01:48PM   22    A.   No.

01:48PM   23    Q.   Did he come in of his own free will?

01:48PM   24    A.   Yes.

01:48PM   25    Q.   Wasn't in handcuffs, was he?

01:48PM  1    A.  Yes, this was a totally voluntary interview.  When I was

01:48PM  2    setting up the interview I explained to him it was voluntary,

01:48PM  3    that he was free to come in, he didn't have to come in, that

01:48PM  4    there was no penalties against him for declining.

01:48PM  5    Q.  And what did the defendant say when you told him that

01:48PM  6    those were his rights?

01:48PM  7    A.  When he came in to meet with me, I reiterated his rights

01:48PM  8    to -- that this was a voluntary interview.

01:48PM  9        He said he was a law enforcement veteran of over 20 years

01:48PM 10    and he knew his rights.

01:49PM 11    Q.  Now, Mr. Carpenter, did you record this interview with

01:49PM 12    the defendant?

01:49PM 13    A.  We did not record the interview, no.

01:49PM 14    Q.  Why not?

01:49PM 15    A.  I felt that taking -- I felt that recording the interview

01:49PM 16    wasn't necessary, that it might have hindered his ability to

01:49PM 17    speak freely.  So I decided to take notes as -- during the

01:49PM 18    meeting as it was occurring.

01:49PM 19    Q.  And is that a normal thing to do, to record an interview

01:49PM 20    by taking notes as opposed to having a recording device?

01:49PM 21    A.  Yes.

01:49PM 22    Q.  Something that you did all the time as a special agent --

01:49PM 23    A.  Yes.

01:49PM 24    Q.  -- with OIG?

01:49PM 25        Now, at the beginning of the interview, did you tell the

01:49PM    1   defendant what the interview was about?

01:49PM    2   A.   Yes.

01:49PM    3   Q.   What did you tell him?

01:49PM    4   A.   I explained to him the topics of the interview I wanted

01:49PM    5   to discuss with him involved allegations of him using racial

01:49PM    6   words in the presence of Anthony Tony Casullo, and his

01:49PM    7   relationship with Peter Gerace.

01:49PM    8   Q.   Why did you tell him the topics at the beginning?

01:49PM    9   A.   I felt that it was important to let him know up front why

01:50PM   10   he was there, let him know what we were going to discuss as a

01:50PM   11   way of building trust and rapport with him.

01:50PM   12   Q.   And when that interview started, did you tell him that

01:50PM   13   you were investigating Ron Serio?

01:50PM   14   A.   No.

01:50PM   15   Q.   Now, before you started asking about those topics that

01:50PM   16   you mentioned, did you ask the defendant about his

01:50PM   17   background?

01:50PM   18   A.   Yes.

01:50PM   19   Q.   What did he say?

01:50PM   20   A.   I asked him about his professional background.  He stated

01:50PM   21   that he started his law enforcement career in the mid '90s as

01:50PM   22   an Erie County Sheriff New York deputy.

01:50PM   23        After three years, he was hired by the DEA where, after

01:50PM   24   completing the academy at the DEA he was stationed in

01:50PM   25   Orlando, Florida for about three years.  And then after three

01:50PM   1   years, he transferred back to Buffalo, New York, where he was

01:50PM   2   from, and finished his entire career back here in Buffalo.

01:50PM   3   Q.   Now you said just a minute ago that one of the topics you

01:50PM   4   wanted to cover was the defendant's relationship with Peter

01:50PM   5   Gerace, so that's what I want to talk about with you now.

01:50PM   6       Why were you interested in asking the defendant about his

01:51PM   7   relationship with Peter Gerace?

01:51PM   8   A.   Prior to leaving -- prior to his to his retirement from

01:51PM   9   the DEA, Mr. Bongiovanni wrote -- had written three memos to

01:51PM  10   his chain of command at the DEA explaining his relationship

01:51PM  11   with Peter Gerace, some text message exchanges that they had

01:51PM  12   had.

01:51PM  13       So because of that, I felt that he had -- he brought

01:51PM  14   forward the -- his relationship with Mr. Gerace, that it was

01:51PM  15   something that had value that we'd want to learn more about.

01:51PM  16   Q.   And just to be clear, Mr. Carpenter, were only two of

01:51PM  17   those memos about the defendant's relationship with Peter

01:51PM  18   Gerace, two of the three?

01:51PM  19   A.   Yes.

01:51PM  20   Q.   And then the third one was about Anthony Casullo's

01:51PM  21   relationship with Peter Gerace?

01:51PM  22   A.   That's correct.

01:51PM  23   Q.   Okay.  Was understanding the defendant's relationship to

01:51PM  24   Peter Gerace important to the investigation?

01:51PM  25   A.   Yes.

USA v Bongiovanni - Carpenter - Dickson/Direct - 3/21/24

14

01:51PM   1   Q.  Why?

01:51PM   2   A.  As the larger investigation was unfolding, we became

01:51PM   3   aware of Mr. Bongiovanni's relationship with Peter Gerace,

01:52PM   4   and the coordination of efforts between Mr. Bongiovanni and

01:52PM   5   Gerace and wanted to learn more about their relationship.

01:52PM   6   Q.  Was understanding the types of contact that the defendant

01:52PM   7   had with Peter Gerace important to the investigation?

01:52PM   8   A.  Yes.

01:52PM   9   Q.  Why?

01:52PM  10   A.  We wanted to develop and learn if they spoke in person,

01:52PM  11   over the phone, via text message, as a way of gaining

01:52PM  12   evidence, possible witnesses to discussions, furthering our

01:52PM  13   investigation.

01:52PM  14   Q.  And was understanding specific conversations that the

01:52PM  15   defendant and Peter Gerace had important to the

01:52PM  16   investigation?

01:52PM  17   A.  Yes.

01:52PM  18   Q.  Why?

01:52PM  19   A.  Some discussions regarded -- regarded specific activities

01:52PM  20   from activities that we believed occurred, that we believed

01:52PM  21   his relationship with him, his relationship with Mr. Gerace,

01:52PM  22   while some conversations Mr. Gerace would be irrelevant to

01:52PM  23   that conversation but the building of a friendship and their

01:52PM  24   relationship history was important.

01:52PM  25   Q.  Now, during your discussion with the defendant about his

01:53PM    1    relationship with Peter Gerace, did the defendant say

01:53PM    2    anything about keeping Peter Gerace at arms length?

01:53PM    3    A.  Yes.

01:53PM    4    Q.  What did he say?

01:53PM    5    A.  He stated that Mr. Gerace was not in his close circle of

01:53PM    6    friends, and that he tried to keep him at arms length

01:53PM    7    especially after his arrest.

01:53PM    8    Q.  What did you understand the defendant to mean when he

01:53PM    9    said he wanted to keep Peter Gerace at arms length?

01:53PM   10    A.  I understood that to mean that that was somebody that he

01:53PM   11    socialized with, but not on -- but was not part of his inner

01:53PM   12    circle.

01:53PM   13    Q.  Did you document in your notes that the defendant said he

01:53PM   14    wanted to keep Peter Gerace at arms length?

01:53PM   15    A.  Yes.

01:53PM   16    Q.  I'm going to show you Government Exhibit 310D, which is

01:53PM   17    already in evidence.

01:53PM   18         **MR. DICKSON:**  If we can do that, Ms. Champoux,

01:53PM   19    please.  And if we can go to page 12.  And then blow up just

01:54PM   20    the -- yeah, that text message is fine.

01:54PM   21         **BY MR. DICKSON:**

01:54PM   22    Q.  Mr. Carpenter, do you know whose phone number this is?

01:54PM   23    A.  Yes.

01:54PM   24    Q.  Whose is it?

01:54PM   25    A.  That's the phone number that was assigned to

01:54PM  1   Mr. Bongiovanni while he was employed with the DEA.

01:54PM  2   Q.  When the defendant told you he wanted to keep Peter

01:54PM  3   Gerace at arms length, did he tell you about this text

01:54PM  4   message where he says we are meeting at my house for drinks,

01:54PM  5   then to Boss or Scinta's if it don't rain at the festival.

01:54PM  6   Come over, Bro.  Did he tell you about that message?

01:54PM  7   A.  No.

01:54PM  8        MR. SINGER:  Your Honor, can we approach real quick?

01:54PM  9        THE COURT:  Sure.

01:54PM  10       (Sidebar discussion held on the record.)

01:54PM  11       MR. SINGER:  So the issue is, is that these text

01:54PM  12   messages never came into possession of Agent Carpenter at the

01:54PM  13   time that he conducted this interview, they came into

01:54PM  14   possession of investigators well after.  So asking him

01:55PM  15   questions about these text messages, whether he asked specific

01:55PM  16   questions that are embodied in the texts is misleading to the

01:55PM  17   jury.

01:55PM  18       THE COURT:  I don't think that that was the question

01:55PM  19   that was asked.  He asked if Mr. Bongiovanni told him about

01:55PM  20   this encounter.

01:55PM  21       MR. SINGER:  And so, and so, again, the relevance of

01:55PM  22   it would be if Mr. Carpenter asked Mr. Bongiovanni about any

01:55PM  23   particular or specific meeting, and then Mr. Bongiovanni

01:55PM  24   denied it, and then these things showed something else.

01:55PM  25       But the problem is, is that he didn't ask specific

01:55PM   1   questions about any of the things that are embodied in these

01:55PM   2   text messages.

01:55PM   3           **THE COURT:**  But that's not what the question was.

01:55PM   4   The question was did Mr. Bongiovanni tell -- right?

01:55PM   5           **MR. DICKSON:**  Yes, Judge.

01:55PM   6           **THE COURT:**  The question is did he tell you about

01:55PM   7   this.  So the relevance is, he says, he's not -- I'm gonna

01:55PM   8   keep him at arms length, but he's inviting him over to his

01:56PM   9   house during the Italian Festival.  That's the argument.

01:56PM  10           Now, in cross, you can get up and say you didn't even

01:56PM  11   have these text messages until afterwards, right?  So you

01:56PM  12   didn't even know anything about this.  So you can cross on

01:56PM  13   that.

01:56PM  14           But the government can try its case the way the

01:56PM  15   government wants to try its case.  And I don't think that

01:56PM  16   there's a relevance objection, because I think what the text

01:56PM  17   message has some -- is some indicia of proof that what

01:56PM  18   Mr. Bongiovanni said to him is not true.

01:56PM  19           **MR. SINGER:**  I stand by the misleading objection

01:56PM  20   then.  It sounds like it's going to get overruled, so --

01:56PM  21           **THE COURT:**  Well, how is it misleading?

01:56PM  22           **MR. SINGER:**  Because, again, I go back to the

01:56PM  23   original point of it's casting the impression that

01:56PM  24   Mr. Carpenter asked specific questions about these events that

01:56PM  25   are documented in a text.

Case 1:19-cr-00227-LJV-MJR   Document 848   Filed 04/01/24   Page 18 of 107
USA v Bongiovanni - Carpenter - Dickson/Direct - 3/21/24

18

| | | |
|---|---|---|
| 01:56PM | 1 | **THE COURT:**  Hang on. |
| 01:57PM | 2 | Overruled. |
| 01:57PM | 3 | (Sidebar discussion held on the record.) |
| 01:57PM | 4 | **MR. DICKSON:**  May I continue, Judge? |
| 01:57PM | 5 | **THE COURT:**  You may. |
| 01:57PM | 6 | **BY MR. DICKSON:** |
| 01:57PM | 7 | Q.  When the defendant told you he wanted to keep Peter |
| 01:57PM | 8 | Gerace at arms length, did he tell you about this text |
| 01:57PM | 9 | message? |
| 01:57PM | 10 | A.  He did not. |
| 01:57PM | 11 | Q.  Did he tell you he invited Peter Gerace over to his house |
| 01:57PM | 12 | for drinks? |
| 01:57PM | 13 | A.  He did not. |
| 01:57PM | 14 | **MR. DICKSON:**  You can take down that zoom, |
| 01:57PM | 15 | Ms. Champoux, please.  Can we go to page 22. |
| 01:57PM | 16 | **BY MR. DICKSON:** |
| 01:57PM | 17 | Q.  Mr. Carpenter, when the defendant told you he wanted to |
| 01:57PM | 18 | keep Peter Gerace at arms length, did he tell you that he |
| 01:57PM | 19 | gave Peter Gerace his home address? |
| 01:57PM | 20 | A.  He did not. |
| 01:57PM | 21 | **MR. DICKSON:**  Can we go to page 30, please.  And can |
| 01:57PM | 22 | we zoom in on the bottom text message there. |
| 01:57PM | 23 | **BY MR. DICKSON:** |
| 01:58PM | 24 | Q.  When the defendant told you he wanted to keep Peter |
| 01:58PM | 25 | Gerace at arms length, did he tell you that he sent this text |

01:58PM   1    message to Mr. Gerace?

01:58PM   2    A.  He did not.

01:58PM   3            MR. DICKSON:  Take that down Ms. Champoux, please,

01:58PM   4    thank you.

01:58PM   5            BY MR. DICKSON:

01:58PM   6    Q.  Mr. Carpenter, can you tell the jury how the defendant

01:58PM   7    went on to describe his relationship with Mr. Gerace?

01:58PM   8    A.  He stated his relationship with Mr. Gerace, that

01:58PM   9    Mr. Gerace was not part of his inner circle of friends.  He

01:58PM  10    stated that the -- he started off -- his history with the

01:58PM  11    Gerace family started a long time ago.  He stated that

01:58PM  12    growing up, the Bongiovanni family and the Gerace family were

01:58PM  13    longtime family friends, that they grew up together.  That in

01:58PM  14    their early teens, late teens, early 20s, Mr. Bongiovanni

01:58PM  15    taught Mr. Gerace how to bar tend.  That after he went to --

01:58PM  16    Mr. Bongiovanni went to Florida for the DEA, they fell out of

01:58PM  17    contact.  When he came back, they reconnected.  That he,

01:59PM  18    again, he did not consider him part of his friends.  He did

01:59PM  19    not celebrate birthdays with him.  Mr. Gerace was not invited

01:59PM  20    to weddings.  He stated that he tried to keep him at arms

01:59PM  21    length.  He stated that he went on to say that contact with

01:59PM  22    him, he tried to -- the contact with him was trying to keep

01:59PM  23    Mr. Gerace on a short leash in the hopes of using him to

01:59PM  24    secure information to further criminal investigations in his

01:59PM  25    role at the DEA.

01:59PM   1   Q.  Did the defendant deny being close friends with Peter

01:59PM   2   Gerace?

01:59PM   3   A.  Yes.  He also --

01:59PM   4   Q.  Go ahead.

01:59PM   5   A.  He also denied initiated any contact with Mr. Gerace.

01:59PM   6   Q.  We'll talk about that in just a second, Mr. Carpenter.

01:59PM   7         **MR. DICKSON:**  But, Ms. Champoux, can you pull up

01:59PM   8   Government Exhibit 98 which is already in evidence.  And if we

01:59PM   9   can scroll to page 3, please.  Maybe the next one down.  Thank

02:00PM   10  you.  Is -- oh, I'm sorry.  Ms. Champoux, can we go back up to

02:00PM   11  page 3?  Right there is good.  Okay.

02:00PM   12         **BY MR. DICKSON:**

02:00PM   13  Q.  So, when the defendant told you this, what was the date

02:00PM   14  of the interview when he told you that he and Peter Gerace

02:00PM   15  weren't close friends?

02:00PM   16  A.  March 29th of 2019.

02:00PM   17  Q.  Do you see the date listed next to this text message

02:00PM   18  here?

02:00PM   19  A.  I do.

02:00PM   20  Q.  What's that date?

02:00PM   21  A.  December 7th of 2018.

02:00PM   22  Q.  Just a few months before your interview; is that right?

02:00PM   23  A.  Correct.

02:00PM   24  Q.  What does that text message say right there,

02:00PM   25  Mr. Carpenter?

02:00PM 1   A.  Hey, Brother.  I know we haven't talked in a while, but

02:00PM 2   you'll always be one of my best friends, and you know I

02:00PM 3   always have your back.

02:00PM 4   Q.  When the defendant told you he and Peter Gerace weren't

02:00PM 5   close friends, did he tell you about this text message from

02:00PM 6   Peter Gerace?

02:00PM 7   A.  No.

02:00PM 8       MR. DICKSON:  Ms. Champoux, can we scroll down the

02:01PM 9   next page, please?

02:01PM 10      BY MR. DICKSON:

02:01PM 11  Q.  When the defendant told you and Peter Gerace weren't

02:01PM 12  close friends, did he tell you how he responded there?

02:01PM 13  A.  He did not.

02:01PM 14  Q.  What does that say?

02:01PM 15  A.  We have been friends for 25 years, bud, all good.

02:01PM 16      MR. DICKSON:  And take that down, Ms. Champoux,

02:01PM 17  please, thank you.

02:01PM 18      BY MR. DICKSON:

02:01PM 19  Q.  During the same part of this interview, Mr. Carpenter,

02:01PM 20  did the defendant describe a trip that he took to Las Vegas?

02:01PM 21  A.  He did.

02:01PM 22  Q.  What did he say about that?

02:01PM 23  A.  He stated that he took a personal trip to Las Vegas, and

02:01PM 24  while out there he coincidentally ran into Peter Gerace.

02:01PM 25  Q.  Did you continue asking the defendant questions about

02:01PM    1    Peter Gerace after he said he coincidentally ran into

02:01PM    2    Mr. Gerace in Las Vegas?  Did the interview continue?

02:01PM    3    A.  Yes, the interviewed.

02:01PM    4    Q.  And did you ask the defendant about Mr. Gerace's use of

02:01PM    5    illegal drugs?

02:01PM    6    A.  I did.

02:01PM    7    Q.  Why did you ask him about that?

02:02PM    8    A.  As an employee of the DEA, I wanted to know if he

02:02PM    9    associated with drug users, and to know if Peter Gerace was a

02:02PM   10    drug user that he was associating with.

02:02PM   11    Q.  Was that important to the investigation?

02:02PM   12    A.  It was.

02:02PM   13    Q.  How so?

02:02PM   14    A.  It was -- we have -- we had information of drug use by

02:02PM   15    Mr. Gerace.

02:02PM   16    Q.  What did you ask the defendant about his knowledge of

02:02PM   17    whether Peter Gerace used illegal drugs?

02:02PM   18    A.  I asked him if you've ever seen Peter Gerace use drugs.

02:02PM   19    Q.  What did he say?

02:02PM   20    A.  He denied seeing him use drugs.

02:02PM   21    Q.  And when you say "he" --

02:02PM   22    A.  Mr. Bongiovanni denied seeing Mr. Gerace use drugs.

02:02PM   23    Q.  Was it important to the investigation that the defendant

02:02PM   24    denied seeing Peter Gerace ever use illegal drugs?

02:02PM   25    A.  It was important to the investigation that

02:02PM 1  Mr. Bongiovanni answer truthfully.

02:02PM 2  Q.  Did you eventually ask the defendant if he knew what

02:02PM 3  Peter Gerace did for a living?

02:02PM 4  A.  I did.

02:02PM 5  Q.  What did he say?

02:02PM 6  A.  He said that Mr. Gerace was the owner of Pharaoh's

02:03PM 7  Gentlemen's Club.

02:03PM 8  Q.  Did the defendant say anything about whether he tried to

02:03PM 9  work with Peter Gerace in furtherance of some DEA

02:03PM 10  investigation?

02:03PM 11  A.  He said at one point in time Mr. Gerace came down to the

02:03PM 12  DEA to be a -- to see if he could be a source of information

02:03PM 13  in furtherance of an investigation.  It was determined that

02:03PM 14  Mr. Gerace would be better suited to work for the Federal

02:03PM 15  Bureau of Investigation, and that he was referred to the FBI.

02:03PM 16  Q.  Now you said he referred to Mr. Gerace coming down to the

02:03PM 17  DEA about whether he was going to a source of information?

02:03PM 18  A.  Correct.

02:03PM 19  Q.  Was it a source of information, or something else?

02:03PM 20  A.  I -- I can't recall if it's a source or a cooperator, but

02:03PM 21  to work with the DEA.

02:03PM 22  Q.  That's okay.  You say you can't recall.  So if I showed

02:03PM 23  you your report of the interview, would that help you

02:03PM 24  remember --

02:03PM 25  A.  Yes.

02:03PM   1   Q.  -- how the defendant referred to Mr. Gerace?

02:03PM   2   A.  Yes.

02:04PM   3   Q.  I'm going to show the Defense 3595BV on the second page

02:04PM   4   under the header Peter Gerace.

02:04PM   5      And so, Mr. Carpenter, what I'm going to do is I'm going

02:04PM   6   to hand you this document, I want you to read the piece under

02:04PM   7   Peter Gerace.  And then before you say anything, just look

02:04PM   8   back up at me, and I'll ask you if it refreshed your memory,

02:04PM   9   okay?

02:04PM  10   A.  Thank you.

02:04PM  11   Q.  Did that help you refresh your memory?

02:04PM  12   A.  Yes.

02:04PM  13   Q.  When the defendant was talking to you about his meeting

02:04PM  14   with Peter Gerace at the DEA, tell the jury what he said.

02:05PM  15   A.  He stated that Mr. Gerace came down to be a possible

02:05PM  16   informant for the DEA.

02:05PM  17   Q.  And is an informant different than a source of

02:05PM  18   information in your experience?

02:05PM  19   A.  Yes.

02:05PM  20   Q.  Did you ask the defendant about whether Peter Gerace had

02:05PM  21   ever called him while somebody at Pharaoh's was overdosing?

02:05PM  22   A.  I did.

02:05PM  23   Q.  Why did you ask him that question?

02:05PM  24   A.  We had information that Mr. Gerace had in fact called

02:05PM  25   Mr. Bongiovanni while somebody at Pharaoh's was overdosing,

02:05PM   1   and wanted to confirm whether or not that phone call

02:05PM   2   occurred.

02:05PM   3   Q.  Was the defendant's answer to that question important to

02:05PM   4   your investigation?

02:05PM   5   A.  Yes.

02:05PM   6   Q.  What did the defendant say when you asked him whether

02:05PM   7   Peter Gerace had ever called him while somebody was

02:05PM   8   overdosing at Pharaoh's Gentlemen's Club?

02:05PM   9   A.  He denied that phone call occurred.

02:05PM   10  Q.  Now you mentioned a minute ago, Mr. Carpenter, that the

02:05PM   11  defendant said something about trying to keep Peter Gerace on

02:06PM   12  a short leash; is that right?

02:06PM   13  A.  Yes.

02:06PM   14  Q.  What did you understand the defendant to mean when he

02:06PM   15  said he was trying to keep Peter Gerace on a short leash?

02:06PM   16  A.  He explained it to me as meaning that he wanted to

02:06PM   17  maintain a relationship with him to possibly gain information

02:06PM   18  regarding illegal activity to further criminal cases.

02:06PM   19  Q.  Did the defendant tell you that he was trying to keep

02:06PM   20  Peter Gerace on a short leash before or after he told you he

02:06PM   21  was trying to keep Peter Gerace at arms length?

02:06PM   22  A.  After.

02:06PM   23  Q.  And, Mr. Carpenter, did you go on to ask the defendant

02:06PM   24  whether he ever initiated contact with Peter Gerace?

02:06PM   25  A.  I did.

| | | |
|---|---|---|
| 02:06PM | 1 | Q.  Why did you ask the defendant if he had ever initiated |
| 02:06PM | 2 | contact with Peter Gerace? |
| 02:06PM | 3 | A.  I wanted to understand their relationship dynamic. |
| 02:06PM | 4 | Friends con -- in a friendship, it's been my experience that |
| 02:06PM | 5 | both friends contact each other.  That's a mutual give and |
| 02:07PM | 6 | take. |
| 02:07PM | 7 | I wanted to know if Mr. Bongiovanni contacted Mr. Gerace, |
| 02:07PM | 8 | if he would initiate contact with -- if Mr. Gerace was |
| 02:07PM | 9 | somebody he, Mr. Bongiovanni, would initiate contact with. |
| 02:07PM | 10 | Q.  So was it important to the investigation whether the |
| 02:07PM | 11 | defendant had initiated contact with Mr. Gerace? |
| 02:07PM | 12 | A.  Yes. |
| 02:07PM | 13 | Q.  What did the defendant say when you asked him if he had |
| 02:07PM | 14 | ever initiated contact with Peter Gerace? |
| 02:07PM | 15 | A.  He denied that. |
| 02:07PM | 16 | **MR. DICKSON:**  Ms. Champoux can we please pull up |
| 02:07PM | 17 | Government Exhibit 310D already in evidence.  Sorry, |
| 02:07PM | 18 | Ms. Champoux, if we can go to page 4.  I think is page 4, |
| 02:07PM | 19 | right? |
| 02:07PM | 20 | **BY MR. DICKSON:** |
| 02:07PM | 21 | Q.  Mr. Carpenter, can you see the date on the last text |
| 02:07PM | 22 | message on page 4?  What does that say?  Do you see the date |
| 02:07PM | 23 | there? |
| 02:07PM | 24 | A.  Yes. |
| 02:07PM | 25 | Q.  What's that day? |

02:07PM   1    A.  March 1st of 2015.

02:07PM   2         **MR. DICKSON:**  Okay.  We can take the zoom off, and

02:07PM   3    can we go scroll down just to the next page?

02:08PM   4         So on this -- the immediate next text message,

02:08PM   5    Mr. Champoux, if we can blow that up.

02:08PM   6         **BY MR. DICKSON:**

02:08PM   7    Q.  What's the date of this text message?

02:08PM   8    A.  March 10, 2015.

02:08PM   9    Q.  Is this the first text message from March 10th, 2015?

02:08PM   10   A.  Yes.

02:08PM   11   Q.  Who is initiating contact by text message on March 10th,

02:08PM   12   2015?

02:08PM   13   A.  Mr. Bongiovanni.

02:08PM   14   Q.  And what does it say?

02:08PM   15   A.  Peter, you and Katrina are invited Sunday, March 15th at

02:08PM   16   11 a.m., Saint Patrick's Day party at my house.  About 40

02:08PM   17   people will be there.  I hope you guys can make it.

02:08PM   18        **MR. DICKSON:**  Take that off, Ms. Champoux, please.

02:08PM   19   Can we go to page 11 of the same document?

02:08PM   20        **BY MR. DICKSON:**

02:08PM   21   Q.  Mr. Carpenter, do you see any text messages from

02:08PM   22   July 15th, 2015?

02:08PM   23   A.  I do.

02:08PM   24   Q.  Who is sending the first text message on July 15th, 2015

02:09PM   25   in this text thread?

02:09PM   1   A.  Mr. Bongiovanni.

02:09PM   2   Q.  And what does say?

02:09PM   3   A.  Going up to Boss tonight.  What day is your golf

02:09PM   4   tournament again?

02:09PM   5        **MR. DICKSON:**  Can we go to page 28 of the same

02:09PM   6   exhibit, please?

02:09PM   7        **BY MR. DICKSON:**

02:09PM   8   Q.  Mr. Carpenter, what's the date of the last text message

02:09PM   9   on page 28?

02:09PM  10   A.  June 17th, 2016.

02:09PM  11        **MR. DICKSON:**  And can we go to the immediate next

02:09PM  12   page, Ms. Champoux, page 29.  And can we blow up the first

02:09PM  13   text message there?

02:09PM  14        **BY MR. DICKSON:**

02:09PM  15   Q.  Mr. Carpenter, is this the first text message in this

02:09PM  16   text thread on June 18th, 2016?

02:09PM  17   A.  It is.

02:09PM  18   Q.  Who was initiating contact by text message on June 18,

02:09PM  19   2016?

02:10PM  20   A.  Mr. Bongiovanni.

02:10PM  21   Q.  What does it say?

02:10PM  22   A.  Great time last night.  It was great to see your parents.

02:10PM  23   Thanks again for the invitation.

02:10PM  24        **MR. DICKSON:**  Can you take that down, please,

02:10PM  25   Ms. Champoux?  Thank you.

|          |    |                                                             |
|----------|----|-------------------------------------------------------------|
| 02:10PM  | 1  | **BY MR. DICKSON:**                                          |
| 02:10PM  | 2  | Q.  Now Mr. Carpenter after that March 2019 interview with  |
| 02:10PM  | 3  | the defendant, did the investigation continue?              |
| 02:10PM  | 4  | A.  It did.                                                  |
| 02:10PM  | 5  | Q.  Did the team continue investigating the allegations     |
| 02:10PM  | 6  | regarding Ron Serio?                                         |
| 02:10PM  | 7  | A.  Yes.                                                     |
| 02:10PM  | 8  | Q.  Did the team continue investigating the defendant's     |
| 02:10PM  | 9  | relationship with Peter Gerace?                             |
| 02:10PM  | 10 | A.  Yes.                                                     |
| 02:10PM  | 11 | Q.  And did the investigation lead ultimately to a search   |
| 02:10PM  | 12 | warrant being executed at the defendant's house?            |
| 02:10PM  | 13 | A.  Yes.                                                     |
| 02:10PM  | 14 | Q.  When was that?                                           |
| 02:10PM  | 15 | A.  June 6th of 2019.                                        |
| 02:10PM  | 16 | Q.  During the execution of that search warrant, did the    |
| 02:10PM  | 17 | defendant agree to be interviewed?                          |
| 02:10PM  | 18 | A.  Yes.                                                     |
| 02:10PM  | 19 | Q.  Who was leading the interview of the defendant on       |
| 02:10PM  | 20 | June 6th, 2019?                                              |
| 02:10PM  | 21 | A.  HSI Special Agent Curtis Ryan.                          |
| 02:10PM  | 22 | Q.  Were you there, too?                                     |
| 02:10PM  | 23 | A.  I was.                                                   |
| 02:10PM  | 24 | Q.  What was your role?                                      |
| 02:10PM  | 25 | A.  I was, what we refer to as second chair.  I was -- my   |

02:11PM      1    responsibility was to listen to the investigation, help Agent

02:11PM      2    Ryan stay on track, interject with any followup questions,

02:11PM      3    make sure the material is being covered.

02:11PM      4    Q.  Now the jury already heard from Special Agent Ryan, so

02:11PM      5    I'm not going to go through all this again.  There's just a

02:11PM      6    few questions that I want to ask you about this interview.

02:11PM      7         During this interview, did Special Agent Ryan ask the

02:11PM      8    defendant questions about somebody named Frank Parisi?

02:11PM      9    A.  He did.

02:11PM     10    Q.  Did the defendant answer those questions?

02:11PM     11    A.  He did.

02:11PM     12    Q.  During the conversation about Frank Parisi, did the

02:11PM     13    defendant's wife interject herself into the conversation?

02:11PM     14    A.  She did.

02:11PM     15    Q.  Did you observe where the defendant looked when his wife

02:11PM     16    interjected?

02:11PM     17    A.  I did.

02:11PM     18    Q.  Where did he look?

02:11PM     19    A.  He looked directly towards her.

02:11PM     20    Q.  What about Special Agent Ryan?  Did you see where Special

02:12PM     21    Agent Ryan looked when the defendant's wife interjected

02:12PM     22    herself into the conversation?

02:12PM     23    A.  Special Agent Ryan also looked towards her.

02:12PM     24    Q.  Towards Mr. Bongiovanni's wife?

02:12PM     25    A.  Correct.

02:12PM    1    Q.  Where did you look?

02:12PM    2    A.  I looked towards Mr. Bongiovanni.

02:12PM    3    Q.  What did you see the defendant do when the

02:12PM    4    conversation -- when the defendant's wife interjected herself

02:12PM    5    into this conversation about Frank Parisi?

02:12PM    6    A.  During that part of the answer, she -- while she was

02:12PM    7    answering, he was shaking his head in a left to right fashion

02:12PM    8    giving the universal no indication.

02:12PM    9    Q.  Was he shaking his head side to side in the direction of

02:12PM   10    his wife while she was talking?

02:12PM   11    A.  Yes, he was looking at her.

02:12PM   12    Q.  Now at some point during this June 6, 2019 interview,

02:12PM   13    Mr. Carpenter, was there a box of DEA file materials

02:12PM   14    discovered in the defendant's basement?

02:12PM   15    A.  Yes.

02:12PM   16    Q.  I'm going to grab Government Exhibit 100.

02:12PM   17        I'm holding Government Exhibit 100A.  Do you recall

02:13PM   18    Special Agent Ryan asking the defendant why he had a box and

02:13PM   19    a file of materials related to Ron Serio in his basement?

02:13PM   20    A.  Yes.

02:13PM   21    Q.  Did Special Agent Ryan ask the defendant to explain why

02:13PM   22    he had these materials two separate times?

02:13PM   23    A.  Yes.

02:13PM   24    Q.  The first time, what did the defendant say as his

02:13PM   25    explanation for why he had this Ron Serio file in his

02:14PM     1   basement?

02:14PM     2   A.   The -- he provided an answer that he knew that HSI was

02:14PM     3   investigating Italian Organized Crime, and that the name Ron

02:14PM     4   Serio came up in that investigation, and he wanted to hold

02:14PM     5   onto his case file to make sure everything was on the up and

02:14PM     6   up in the event something in the future arose.

02:14PM     7   Q.   Did the defendant explain how he knew there was an

02:14PM     8   Organized Crime investigation being conducted by HSI?

02:14PM     9   A.   When asked about that, he said that I, David Carpenter,

02:14PM    10   mentioned that name during our March interview.

02:14PM    11   Q.   And was that part of the defendant's second explanation

02:14PM    12   for why he had this file?

02:14PM    13   A.   Yes.

02:14PM    14   Q.   Did he tell you and Special Agent Ryan when he took this

02:14PM    15   file home?

02:14PM    16   A.   Yes.

02:14PM    17   Q.   When did he say he took the file home?

02:14PM    18   A.   He stated he took that file home when he retired from the

02:14PM    19   DEA.

02:14PM    20   Q.   When did he retire from the DEA?

02:14PM    21   A.   His official retirement date was January 31st, 2019,

02:14PM    22   however the office was closed due to weather, so he turned in

02:15PM    23   all of his DEA gear on February 1st, was his last day -- last

02:15PM    24   day there.

02:15PM    25   Q.   So when he tells you that he takes this file home with

USA v Bongiovanni - Carpenter - Dickson/Direct - 3/21/24
33

02:15PM   1   him on February 1 of 2019, during that second time he was

02:15PM   2   explaining why he took it home, what did he say?

02:15PM   3   A.   I'm sorry?

02:15PM   4   Q.   During your June interview, you said there were two times

02:15PM   5   the defendant tried to explain why he had this file; is that

02:15PM   6   right?

02:15PM   7   A.   Yes.

02:15PM   8   Q.   During the second time he was explaining why he had the

02:15PM   9   file, what did he say?

02:15PM   10   A.   He said that I brought the file name up during my March

02:15PM   11   interview with him.

02:15PM   12   Q.   Mr. Carpenter, during your March 29, 2019 interview, did

02:15PM   13   you ever bring up the name Ron Serio?

02:15PM   14   A.   No.

02:15PM   15   Q.   Did you ever say you were investigating Ron Serio's

02:15PM   16   drug-trafficking organization?

02:15PM   17   A.   No.

02:15PM   18   Q.   Did you tell the defendant that you were investigating

02:16PM   19   Organized Crime?

02:16PM   20   A.   No.

02:16PM   21   Q.   There are some other names on the front of Government

02:16PM   22   Exhibit 100A.  Did you tell the defendant during your March

02:16PM   23   interview that you were investigating Tom Serio?

02:16PM   24   A.   No.

02:16PM   25   Q.   What about David Oddo?

02:16PM    1    A.  No.

02:16PM    2    Q.  What about T.S.?

02:16PM    3    A.  There were some names that I did mentioned to him during

02:16PM    4    my first interview with him, I can't recall all of them

02:16PM    5    offhand.

02:16PM    6    Q.  But was Ron Serio one of those names?

02:16PM    7    A.  No.

02:16PM    8    Q.  And in June, is that what the defendant said --

02:16PM    9    A.  Yes.

02:16PM   10    Q.  -- that you said you were investigating Ron Serio?

02:16PM   11    A.  Yes.

02:16PM   12         MR. DICKSON:  Just a moment, please, Judge.

02:16PM   13         Judge, I don't have any more questions.  Thank you.

02:16PM   14         THE COURT:  Cross?

02:16PM   15

02:16PM   16         CROSS-EXAMINATION BY MR. SINGER:

02:17PM   17    Q.  Hi, Mr. Carpenter.

02:17PM   18    A.  Hi.

02:17PM   19    Q.  So, I want to go through a couple of different things.

02:17PM   20         So, there was the topic of subject letters being served

02:17PM   21    on people in the DEA during the course of your investigation;

02:17PM   22    do you remember that coming up on direct?

02:17PM   23    A.  Yes.

02:17PM   24    Q.  And so you had mentioned one person you served a subject

02:17PM   25    letter to was a person by the name of Joseph Palmieri; is

USA v Bongiovanni - Carpenter - Singer/Cross - 3/21/24

35

02:17PM   1   that right?

02:17PM   2   A.   Yes, sir.

02:17PM   3   Q.   But that wasn't the only subject letter you served on a

02:17PM   4   DEA agent, correct?

02:17PM   5   A.   That's the only one I recall directly serving.

02:17PM   6   Q.   There were other -- you may not have served them

02:17PM   7   directly, but there were other subject letters provided to

02:17PM   8   DEA Buffalo agents, correct?

02:17PM   9   A.   I can't recall offhand, I'm sorry.  As it relates to who

02:17PM   10   I served, that's the one I served.

02:17PM   11   Q.   So one of the people that you investigated was a person

02:18PM   12   by the name of Special Agent Brian Chella; do you remember

02:18PM   13   that?

02:18PM   14   A.   Yes.

02:18PM   15   Q.   And Mr. Chella, you remember interviewing him, correct?

02:18PM   16   A.   Yes.

02:18PM   17   Q.   Was he someone you served a subject letter on?

02:18PM   18   A.   I don't believe so?

02:18PM   19   Q.   How about any other people, like Greg Yensan in the

02:18PM   20   office.  Do you remember serving a subject letter on him?

02:18PM   21   A.   I don't recall.  I don't recall that.

02:18PM   22   Q.   You just don't recall?

02:18PM   23   A.   No.

02:18PM   24   Q.   But you would agree with me that other subject letters

02:18PM   25   were served as the course -- during the course of your

02:18PM  1   investigation, correct?

02:18PM  2   A.   The only one that I recall serving was on Joseph

02:18PM  3   Palmieri.

02:18PM  4   Q.   Okay.   That's the only one that you remember about?

02:18PM  5   A.   Yes.

02:18PM  6   Q.   Okay.   So, when you met with Mr. Bongiovanni, you didn't

02:18PM  7   walk into the interview blind, correct?

02:18PM  8   A.   I did not, no.

02:18PM  9   Q.   You prepared before you went to the interview, correct?

02:18PM  10   A.   I prepared, or he -- I'm sorry, what was the question?

02:18PM  11   Q.   You prepared before you went to the interview --

02:18PM  12   A.   Yes.

02:18PM  13   Q.   -- in March of 2019, correct?

02:18PM  14        So you went through a number of different things, because

02:18PM  15   your investigation, you wanted to ask him about several

02:18PM  16   things that were potentially important pieces of information

02:18PM  17   for your investigation, right?

02:19PM  18   A.   Correct.

02:19PM  19   Q.   So, for instance, one of the things you looked at was

02:19PM  20   whether or not Mr. Bongiovanni's DEA cell phone may have

02:19PM  21   contained information relevant to your investigation,

02:19PM  22   correct?

02:19PM  23   A.   On the initial interview in March?

02:19PM  24   Q.   In the March interview, to prepare for that interview, is

02:19PM  25   one of the steps you took as part of your investigation to

02:19PM    1    look into whether his DEA cell phone was available for

02:19PM    2    analysis?

02:19PM    3    A.   Yes.

02:19PM    4    Q.   And you reached out on February 11th of 2019 to determine

02:19PM    5    whether or not his DEA cell phone was available at that time,

02:19PM    6    correct?

02:19PM    7    A.   I do recall reaching out and asking, I don't recall the

02:19PM    8    date.

02:19PM    9    Q.   But you may not recall the date, but it was after

02:19PM   10    Mr. Bongiovanni retired, correct?

02:19PM   11    A.   Correct.

02:19PM   12    Q.   And he was under investigation prior to retirement,

02:19PM   13    correct?

02:19PM   14    A.   Correct.

02:19PM   15    Q.   The DEA cell phone was not his personal cell phone,

02:19PM   16    correct?

02:19PM   17    A.   He stated to me that he used --

02:19PM   18    Q.   I'm not asking you what Mr. Bongiovanni stated.  I'm

02:19PM   19    asking you whether or not the cell phone that Mr. Bongiovanni

02:20PM   20    used prior to his retirement was his cell phone or the DEA's

02:20PM   21    cell phone?

02:20PM   22    A.   DEA.

02:20PM   23    Q.   So that was their property --

02:20PM   24    A.   Correct.

02:20PM   25    Q.   -- correct?  So your understanding is that it doesn't

02:20PM    1    require a search warrant to look through that phone, correct?

02:20PM    2    A.   Correct.

02:20PM    3    Q.   You could have just seized it, told him to turn it over,

02:20PM    4    and could have looked at it, correct?

02:20PM    5    A.   Yes, correct.

02:20PM    6    Q.   But you never took the investigative step to do that,

02:20PM    7    correct?

02:20PM    8    A.   We did not.

02:20PM    9    Q.   With regard to other steps you took, one of the things

02:20PM   10    you looked into was whether or not there were drug testing

02:20PM   11    results available for Mr. Bongiovanni, correct?

02:20PM   12    A.   Correct.

02:20PM   13    Q.   Because your understanding was that DEA randomly tests

02:20PM   14    agents throughout the year as to whether or not they test

02:20PM   15    positive for drugs, correct?

02:20PM   16    A.   Correct.

02:20PM   17    Q.   And your understanding was that DEA keeps records of

02:20PM   18    positive results, correct?

02:20PM   19    A.   Correct.

02:20PM   20    Q.   So when someone pops a positive for having a narcotic in

02:20PM   21    their system, right?

02:20PM   22    A.   It's my understanding they keep records, yes.

02:20PM   23    Q.   But when there are negative results, they do not retain

02:20PM   24    those records, correct?

02:21PM   25    A.   I don't recall specifically what the DEA policy is on

Case 1:19-cr-00227-LJV-MJR   Document 848   Filed 04/01/24   Page 39 of 107
USA v Bongiovanni - Carpenter - Singer/Cross - 3/21/24

39

02:21PM     1    retaining drug records.

02:21PM     2    Q.  Okay.  But you did do a search to determine whether or

02:21PM     3    not Mr. Bongiovanni tested positive for any controlled

02:21PM     4    substances, correct?

02:21PM     5    A.  We asked for his test results, yes.

02:21PM     6    Q.  And those test results, there were none that were found

02:21PM     7    that indicated any positive --

02:21PM     8         MR. DICKSON:  Objection, Judge.  Relevance and 403.

02:21PM     9    Can we approach if --

02:21PM    10         THE COURT:  Sure, yeah, come on up.

02:21PM    11         (Sidebar discussion held on the record.)

02:21PM    12         THE COURT:  Talk to me.

02:21PM    13         MR. DICKSON:  Judge --

02:21PM    14         THE COURT:  I think I understand where you're coming

02:21PM    15    from.

02:21PM    16         MR. DICKSON:  -- the 2nd Circuit in United States

02:21PM    17    versus Scarpa said that certain days or instances of innocent

02:21PM    18    activity during a conspiracy is not relevant to whether, on

02:21PM    19    other occasions, the individual engaged in illegal conduct.

02:21PM    20    So just because Mr. Bongiovanni didn't test positive at some

02:21PM    21    points during his DEA career, really doesn't have any bearing

02:21PM    22    on whether on other instances he used illegal substances.  I

02:21PM    23    mean, that's just what the 2nd Circuit said.

02:22PM    24         THE COURT:  I understand that.  But why wouldn't the

02:22PM    25    absence of any positive drug test be relevant to this case?

02:22PM    1    You folks have been arguing through the whole trial that it's

02:22PM    2    a low bar, relevance is a low bar, relevance is a low bar.

02:22PM    3            **MR. TRIPI:**  May I?

02:22PM    4            **MR. DICKSON:**  Feel free.

02:22PM    5            **MR. TRIPI:**  I'm sorry.  There no evidence that he was

02:22PM    6    ever tested, so it assumes a fact not in evidence.  Sorry.

02:22PM    7            **THE COURT:**  Do you know whether he was tested?

02:22PM    8            **MR. SINGER:**  We heard from Agent Kasprzyk I think

02:22PM    9    early on in the trial that there were DEA testing tests that

02:22PM   10    went on, that was something that was there.

02:22PM   11            We heard from Louie Selva, talked about how

02:22PM   12    Mr. Bongiovanni talked about being randomly tested.

02:22PM   13            So it's in evidence.  And what I'm trying to

02:22PM   14    determine is whether or not they were able to capture any type

02:22PM   15    of positive results.  And I think the testimony is going to be

02:22PM   16    that it's not.  And it's relevant to whether or not he used

02:22PM   17    drugs, as the government's a proponent of, or whether he did

02:22PM   18    not use drugs as we are.

02:22PM   19            **MR. DICKSON:**  And the 2nd Circuit has said that the

02:23PM   20    absence of criminal activity on certain days during a criminal

02:23PM   21    conspiracy is not relevant to whether the person did in fact

02:23PM   22    engage in criminal activity on other days.

02:23PM   23            **THE COURT:**  But -- but -- it's not just an absence --

02:23PM   24            I'm thinking out loud, Ann, I'm sorry.

02:23PM   25            **MR. TRIPI:**  While you're thinking, under Rule 104, by

02:23PM    1    way of further proffer, we have not been able to ascertain any

02:23PM    2    information that anyone in DEA Buffalo in the last -- has

02:23PM    3    actually been tested, because although that testimony didn't

02:23PM    4    come out, they certainly had Francis DiCarlo on the stand

02:23PM    5    early and chose not to ask those questions, he would have been

02:23PM    6    the person to have personal knowledge of whether or not there

02:24PM    7    was actual testing.

02:24PM    8            And what Special Agent DiCarlo at least informed me,

02:24PM    9    I didn't get into it because I didn't anticipate necessarily

02:24PM   10    these questions through this witness later on, as the now ASAC

02:24PM   11    as I understand it, they do the testing in New York City.

02:24PM   12            So to test someone in Buffalo, as he understands it,

02:24PM   13    he was gonna actually look into this, look into a policy

02:24PM   14    change after this trial.  You would have to notify someone,

02:24PM   15    they do the testing in New York City, which is ridiculous.

02:24PM   16            So that dynamic makes it almost impossible to test

02:24PM   17    someone because they don't have a mechanism here.

02:24PM   18            **THE COURT:**  So if you ask do you know of any positive

02:24PM   19    drug tests for Mr. Bongiovanni and he says no, I'm going to

02:24PM   20    let the government put this proof on that they don't have

02:24PM   21    testing equipment.

02:24PM   22            **MR. SINGER:**  Well, first of all, what Mr. Tripi just

02:24PM   23    reported was information that Mr. DiCarlo communicated to them

02:24PM   24    as an associate SAC as he understands the policy in existence

02:25PM   25    at DEA for testing today, not as he understood it way back

02:25PM    1    when these testing results were occurring and they become

02:25PM    2    relevant.

02:25PM    3         So I don't think that the proffer the government's

02:25PM    4    offered here, Judge, is indicative of what was happening back

02:25PM    5    in the relevant time period.

02:25PM    6         THE COURT:  We don't have any evidence that he was

02:25PM    7    ever tested.

02:25PM    8         MR. SINGER:  Judge, I can present evidence that he's

02:25PM    9    tested.  Of course, I don't have situations where I want to

02:25PM   10    put documents in the government's case in chief at this point

02:25PM   11    in time.

02:25PM   12         THE COURT:  Do you have a good-faith basis he was

02:25PM   13    tested?

02:25PM   14         MR. SINGER:  He was tested, Judge.  Every single one

02:25PM   15    of these guys was tested.  I think it is completely ridiculous

02:25PM   16    to say --

02:25PM   17         MR. TRIPI:  I'm not saying he doesn't have a

02:25PM   18    good-faith basis, Judge, but I'm saying I am unaware of

02:25PM   19    testing.

02:25PM   20         THE COURT:  Okay.  I'm going to allow you to ask the

02:25PM   21    question as to whether he knows of any positive test results,

02:25PM   22    and then I'm going to allow the government either on redirect

02:25PM   23    to ask whether he knows whether he was ever tested.  And if

02:26PM   24    Mr. Tripi has evidence that people just didn't get tested,

02:26PM   25    that can be put in.

02:26PM    1          **MR. SINGER:**  Understood.

02:26PM    2          (Sidebar discussion ended.)

02:26PM    3          **BY MR. SINGER:**

02:26PM    4   Q.   Okay.  So again, Agent Carpenter, when you prepared for

02:26PM    5   your interview in March of 2019 of Mr. Bongiovanni, did you

02:26PM    6   look and determine whether or not any positive test results

02:26PM    7   for drug tests existed within the DEA regarding

02:26PM    8   Mr. Bongiovanni?

02:26PM    9   A.   I believe we looked for his test results, yes.

02:26PM   10   Q.   And there wasn't any positive result that you could

02:26PM   11   locate as part of your investigation, correct?

02:26PM   12   A.   I don't recall any positive drug tests.

02:26PM   13   Q.   So as far as your investigation, you also looked at --

02:26PM   14   you mentioned a person by the name of T.S.; is that right?

02:26PM   15   In your direct testimony a couple minutes ago, you mentioned

02:26PM   16   a person by the name of T.S.?

02:26PM   17   A.   I believe so, yes.

02:26PM   18   Q.   And you understood him to be at one point in time a

02:27PM   19   possible DEA confidential informant, correct?

02:27PM   20   A.   I believe it was his role, yes.

02:27PM   21   Q.   And the relevance of Mr. T.S. was that he was somebody

02:27PM   22   who Mr. Serio had indicated Mr. Bongiovanni provided

02:27PM   23   information to Ron Serio about being a C.I. at one point,

02:27PM   24   correct?

02:27PM   25   A.   I don't recall the direct connection there.

02:27PM  1  Q.  Okay.  But you did look at T.S., and determine whether he

02:27PM  2  not he was a DEA confidential --

02:27PM  3  A.  Correct.

02:27PM  4  Q.  -- informant, correct?

02:27PM  5     And you discovered that he was a DEA confidential

02:27PM  6  informant at one point in time, correct?

02:27PM  7  A.  I believe so yes.

02:27PM  8  Q.  And the dates that he was a confidential informant were

02:27PM  9  from January 30th, 2009 until September of 2009, correct?

02:27PM  10  A.  I can't recall specific dates.

02:27PM  11  Q.  Let's see if we can refresh your recollection.

02:27PM  12     **MR. SINGER:**  Ms. Champoux, for the witness only,

02:27PM  13  would you mind bringing up Government Exhibit 3595 BB, B as in

02:27PM  14  boy, B as in boy.

02:27PM  15     **BY MR. SINGER:**

02:27PM  16  Q.  You can just take a look at that document, sir?

02:27PM  17  A.  Okay.

02:28PM  18     **MR. SINGER:**  Sorry, you can take that down,

02:28PM  19  Ms. Champoux.

02:28PM  20     **BY MR. SINGER:**

02:28PM  21  Q.  So, as far as Mr. T.S. is concerned, did you ever have

02:28PM  22  any type of information that Mr. T.S. was signed up by Joseph

02:28PM  23  Bongiovanni as a DEA C.I.?

02:28PM  24  A.  I don't recall anything specific about him signing him

02:28PM  25  up.

USA v Bongiovanni - Carpenter - Singer/Cross - 3/21/24

45

02:28PM   1   Q.  You don't recall -- sorry, go ahead.  Sorry to cut you

02:28PM   2   off.

02:28PM   3   A.  I don't recall much information on Mr. T.S.

02:28PM   4   Q.  And you don't remember Mr. Bongiovanni being a handling

02:28PM   5   agent for Mr. T.S. when he was a C.I. for Buffalo, correct?

02:28PM   6   A.  I don't recall that, no.

02:28PM   7   Q.  You don't recall Mr. T.S. being signed up with

02:28PM   8   Mr. Bongiovanni for the purpose of investigating Ron Serio,

02:28PM   9   correct?

02:28PM   10   A.  I don't.

02:28PM   11   Q.  Okay.  You also performed a couple different searches in

02:28PM   12   DEA systems.  Do you remember performing a search in

02:29PM   13   Concorde?

02:29PM   14   A.  I performed a lot of searches, yes.

02:29PM   15   Q.  So Concorde, can you explain what type of database that

02:29PM   16   is for the jury?

02:29PM   17   A.  I -- to the best -- I'm not really familiar with the --

02:29PM   18   Concorde at this point.  It's been many years since I thought

02:29PM   19   about that system.  You would really have to refresh my

02:29PM   20   memory on it.

02:29PM   21   Q.  Are you familiar with the fact that Concorde is a system

02:29PM   22   that exists within the DEA?

02:29PM   23   A.  Yes.

02:29PM   24   Q.  And you're familiar that it's a computer-based system,

02:29PM   25   correct?

02:29PM    1    A.   Yes.

02:29PM    2    Q.   And you're familiar with the fact that it's a

02:29PM    3    computer-based system in which agents can perform searches

02:29PM    4    for people who are associated with investigations DEA is

02:29PM    5    conducting?

02:29PM    6    A.   Yes.

02:29PM    7    Q.   And you looked at Concorde for whether there were any

02:29PM    8    type of data entries for searches for people associated with

02:29PM    9    the Ron Serio investigation, correct?

02:29PM   10    A.   I believe so, yes.

02:29PM   11    Q.   And you remember looking up a particular person by the

02:29PM   12    name of Michael Sinatra?

02:29PM   13    A.   That name sounds familiar, yes.

02:29PM   14    Q.   And do you recall doing a search and performing a search

02:30PM   15    to see whether or not Mr. Bongiovanni ever did a search of

02:30PM   16    Mr. Sinatra?

02:30PM   17    A.   I believe so yes, sir.

02:30PM   18    Q.   And you recall when you performed that search there

02:30PM   19    weren't any types of hits that came back regarding

02:30PM   20    Mr. Bongiovanni?

02:30PM   21         **MR. DICKSON:**  Judge, object.  Outside the scope, and

02:30PM   22    Michael Sinatra.

02:30PM   23         **THE COURT:**  No, overruled.

02:30PM   24         **BY MR. SINGER:**

02:30PM   25    Q.   You recall after you did that search that it didn't come

02:30PM  1  up with Mr. Bongiovanni's search for Michael Sinatra inside

02:30PM  2  the Concorde system, correct?

02:30PM  3  A.  I don't recall the results of that specific search.

02:30PM  4         MR. SINGER:  Ms. Champoux, if we can bring up for the

02:30PM  5  witness only 3595CQ, as in queen, please.

02:30PM  6         BY MR. SINGER:

02:32PM  7  Q.  So if you can take a look at that submission, if you need

02:32PM  8  us to move it over a little bit to the right, I can assist

02:32PM  9  you with that.

02:32PM  10  A.  Okay.

02:32PM  11  Q.  Does that refresh your recollection?

02:32PM  12         MR. SINGER:  Okay, Ms. Champoux, if you can take that

02:32PM  13  down for us.  Thank you very much.

02:32PM  14         BY MR. SINGER:

02:32PM  15  Q.  Does that refresh your recollection as to whether or not

02:32PM  16  Mr. Bongiovanni conducted any searches for Michael Sinatra?

02:32PM  17  A.  Can I have that one more time?  I just want to confirm --

02:33PM  18  I apologize, there was a lot of information on that last one.

02:33PM  19  Q.  I want to make sure we get it right.

02:33PM  20  A.  Can you go back to the column A.

02:33PM  21  Q.  Back to column A?

02:33PM  22  A.  Yes, please.  Okay.  Thank you.

02:33PM  23         MR. SINGER:  You can take that down, Ms. Champoux.

02:33PM  24         BY MR. SINGER:

02:33PM  25  Q.  Did Mr. Bongiovanni conduct any searches for Michael

02:33PM   1   Sinatra?

02:33PM   2   A.   Those records don't indicate that.

02:33PM   3   Q.   You also took a look at DARTS entries, correct?

02:33PM   4   A.   Correct.

02:33PM   5   Q.   And you performed the search to determine whether or not

02:33PM   6   Mr. Bongiovanni searched the DARTS database for names of

02:33PM   7   people associated with Ron Serio drug-trafficking

02:33PM   8   organization, correct?

02:33PM   9   A.   I believe so, yes.

02:34PM   10  Q.   And during those searches, you did not see

02:34PM   11  Mr. Bongiovanni conduct such searches, correct?

02:34PM   12  A.   I don't recall the exact results of that search.

02:34PM   13          **MR. SINGER:**  Ms. Champoux, if we can bring up

02:34PM   14  Government Exhibit 3595AS for the witness.

02:34PM   15          **THE WITNESS:**  Thank you.

02:34PM   16          **MR. SINGER:**  And if you can bring that down,

02:34PM   17  Ms. Champoux.

02:34PM   18          **BY MR. SINGER:**

02:34PM   19  Q.   Does that refresh your recollection --

02:34PM   20  A.   Yes.

02:34PM   21  Q.   -- as to whether or not --

02:34PM   22  A.   Oh.

02:34PM   23  Q.   -- Mr. Bongiovanni performed any such searches?

02:34PM   24  A.   Yes, it does.

02:34PM   25  Q.   And he didn't perform any such searches for the Ron Serio

02:34PM   1   people, correct?

02:34PM   2   A.  No searches were conducted.

02:34PM   3   Q.  And how about with regard to Peter Gerace?  Again, you

02:34PM   4   did the same type of search for Peter Gerace, correct?

02:34PM   5   A.  Correct.

02:34PM   6   Q.  And you didn't determine that Mr. Bongiovanni conducted

02:34PM   7   any such searches in the DARTS system regarding Peter Gerace,

02:35PM   8   correct?

02:35PM   9   A.  Again, the results, I can't recall.  But --

02:35PM   10  Q.  Okay.  You remember a person by the name of John Ermin?

02:35PM   11  A.  I do not.

02:35PM   12       **MR. SINGER:**  Ms. Champoux, if we can bring up 3595BQ.

02:35PM   13  Just for the witness.

02:35PM   14       **THE WITNESS:**  Thank you.

02:35PM   15       **MR. SINGER:**  And you can bring that down.

02:35PM   16       **BY MR. SINGER:**

02:35PM   17  Q.  So you remember John Ermin coming up as a potential

02:35PM   18  person who associated with Mr. Gerace?

02:35PM   19  A.  Yes.

02:35PM   20  Q.  And you remember doing particular searches for whether or

02:35PM   21  not Mr. Bongiovanni had any contact with Mr. Ermin, right?

02:35PM   22  A.  Yes.

02:35PM   23  Q.  And he did not, right?

02:35PM   24  A.  Correct.

02:35PM   25  Q.  So, let's move on to your voluntary interview.

02:35PM   1       So after doing this preparation, you conducted the

02:35PM   2    voluntary interview after Mr. Bongiovanni retired, correct?

02:36PM   3    A.  Correct.

02:36PM   4    Q.  And so that -- he retired on the 1st of February of 2019

02:36PM   5    as you testified?

02:36PM   6    A.  Yes.

02:36PM   7    Q.  And to get the interview accomplished in March, you

02:36PM   8    called him up on the phone?

02:36PM   9    A.  Yes.

02:36PM   10   Q.  And at that point in time, he was no longer a DEA

02:36PM   11   employee, correct?

02:36PM   12   A.  Correct, he was retired.

02:36PM   13   Q.  So the DEA doesn't have any authority over him at that

02:36PM   14   point, right?

02:36PM   15   A.  Correct.

02:36PM   16   Q.  And so as a result, he could have said I'm sorry,

02:36PM   17   Mr. Carpenter, but I just don't feel like talking to you,

02:36PM   18   right?

02:36PM   19   A.  Absolutely.

02:36PM   20   Q.  But he didn't say that, right?

02:36PM   21   A.  Correct.

02:36PM   22   Q.  He agreed to speak with you?

02:36PM   23   A.  Correct.

02:36PM   24   Q.  And the circumstances of the March 29, 2019 interview,

02:36PM   25   fair to say that they are a little different than the June 6,

02:36PM   1   2019 interview you conducted?

02:36PM   2   A.  Yes.

02:36PM   3   Q.  So in the interview in March, you invited Mr. Bongiovanni

02:36PM   4   to come down to meet you, correct?

02:36PM   5   A.  Correct.

02:36PM   6   Q.  And that was conducted in an office environment, correct?

02:36PM   7   A.  Yes.

02:36PM   8   Q.  You didn't knock down his front door to get him to go to

02:37PM   9   the interview, correct?

02:37PM   10   A.  Correct.

02:37PM   11   Q.  You didn't use any type of flash bang grenade during the

02:37PM   12   interview, correct?

02:37PM   13   A.  Correct.

02:37PM   14   Q.  You never used any type of handcuffs as you just

02:37PM   15   testified, correct?

02:37PM   16   A.  Correct.

02:37PM   17   Q.  You were accompanied by one other agent; is that right?

02:37PM   18   A.  Yes.

02:37PM   19   Q.  Mr. Bongiovanni was in his clothes at the time, correct?

02:37PM   20   A.  Correct.

02:37PM   21   Q.  You don't recall him being in his underwear and

02:37PM   22   undershirt, correct?

02:37PM   23   A.  He was fully dressed.

02:37PM   24   Q.  And he wasn't handcuffed at any point in time, correct?

02:37PM   25   A.  Correct.

| 02:37PM | 1 | **MR. DICKSON:**  Objection, asked and answered. |
| 02:37PM | 2 | **THE COURT:**  Overruled.  It's the one time thing. |
| 02:37PM | 3 | Let's not -- let's not repeat that. |
| 02:37PM | 4 | **MR. SINGER:**  Understand. |
| 02:37PM | 5 | **BY MR. SINGER:** |
| 02:37PM | 6 | Q.  There was no use of a SWAT team to get him to come down |
| 02:37PM | 7 | to the U.S. Attorney's Office, correct? |
| 02:37PM | 8 | A.  Correct. |
| 02:37PM | 9 | Q.  So the atmosphere was much different than the meeting |
| 02:37PM | 10 | that you had on June 6th of 2019? |
| 02:37PM | 11 | A.  The circumstances were different, yes. |
| 02:37PM | 12 | Q.  Now you testified on direct that you did suspect |
| 02:37PM | 13 | Mr. Bongiovanni of some type of wrongdoing at the time you |
| 02:38PM | 14 | conducted the March 29, 2019 interview, correct? |
| 02:38PM | 15 | A.  I said there were allegations, yes. |
| 02:38PM | 16 | Q.  And since there were allegations, was it your desire to |
| 02:38PM | 17 | clear things up, right? |
| 02:38PM | 18 | A.  Yes. |
| 02:38PM | 19 | Q.  Or to potentially gain incriminating evidence, correct? |
| 02:38PM | 20 | A.  Correct. |
| 02:38PM | 21 | Q.  So, you chose the U.S. Attorney's Office as the meeting |
| 02:38PM | 22 | spot, correct? |
| 02:38PM | 23 | A.  Correct. |
| 02:38PM | 24 | Q.  Now, the U.S. Attorney's Office is not like a police |
| 02:38PM | 25 | station, right? |

02:38PM  1    A.  How so?

02:38PM  2    Q.  Well --

02:38PM  3    A.  I mean, it is not a police station.

02:38PM  4    Q.  Well, have you interviewed suspects in your

02:38PM  5    investigations where you've done in a police station?

02:38PM  6    A.  Yes, I believe so.

02:38PM  7    Q.  And police stations are equipped with interview rooms,

02:38PM  8    correct?

02:38PM  9    A.  Correct.

02:38PM  10   Q.  And those interview rooms are usually equipped with audio

02:38PM  11   or audiovisual and recording equipment, correct?

02:38PM  12   A.  Some of them, yes.

02:38PM  13   Q.  As a result of that, there are recordings that can be

02:38PM  14   produced, both audio and video, of the interviews in those

02:39PM  15   rooms, correct?

02:39PM  16   A.  If it's used.

02:39PM  17   Q.  You were federal agents at that point in time, right?

02:39PM  18   A.  Yes.

02:39PM  19   Q.  But you weren't required to wear a body cam of any type,

02:39PM  20   correct?

02:39PM  21   A.  Correct.

02:39PM  22   Q.  So as a result, there wasn't going to be something in

02:39PM  23   this interview that was going to be recorded off a body

02:39PM  24   camera device on your person, correct?

02:39PM  25   A.  Correct.

02:39PM 1  Q.  And you also talked about how you did not obtain

02:39PM 2  recording equipment at the time; is that right?

02:39PM 3  A.  Correct, we did not utilize it.

02:39PM 4  Q.  But you had the ability to obtain recording equipment if

02:39PM 5  you wanted, correct?

02:39PM 6  A.  Correct.

02:39PM 7  Q.  So, for instance, you're familiar that federal agents

02:39PM 8  often use something called a KEL recording device?

02:39PM 9  A.  I -- they use recording devices, yes.

02:39PM 10  Q.  Yeah.  And so it's a way that they can record people,

02:39PM 11  even in clandestine situations, correct?

02:39PM 12  A.  I believe so, yeah.

02:39PM 13  Q.  You never asked anyone to obtain a recording device like

02:39PM 14  that, correct?

02:39PM 15  A.  Correct.

02:39PM 16  Q.  You didn't obtain any other type of other type of

02:39PM 17  nonclandestine recording device, correct?

02:40PM 18  A.  Correct.

02:40PM 19  Q.  And you had a cell phone, a government issued cell phone,

02:40PM 20  at that point in time?

02:40PM 21  A.  Correct.

02:40PM 22  Q.  What type of phone was it, iPhone?  Android?

02:40PM 23  A.  I believe it was an iPhone.

02:40PM 24  Q.  So the iPhone that you had had the ability to record

02:40PM 25  things, correct?

USA v Bongiovanni - Carpenter - Singer/Cross - 3/21/24

02:40PM    1   A.  I believe so.

02:40PM    2   Q.  Both audio and video?

02:40PM    3   A.  I believe so.  I don't recall specifically what the

02:40PM    4   function of that one was.

02:40PM    5   Q.  Okay.  So you could have recorded the interview if you

02:40PM    6   chose to, right?

02:40PM    7   A.  Correct.

02:40PM    8   Q.  But you chose not to, correct?

02:40PM    9   A.  Correct.

02:40PM   10   Q.  And you said that you wanted to keep the free flow of

02:40PM   11   information going on in the interview, and that's why you

02:40PM   12   didn't record this instance?

02:40PM   13   A.  Sometimes people feel that recording interviews, they

02:40PM   14   get -- I feel like not recording an interview bring more free

02:40PM   15   flow of information yes, sir.

02:40PM   16   Q.  But you recorded other interviews in your investigation

02:40PM   17   of this case, right?

02:40PM   18   A.  Yes.

02:40PM   19   Q.  So, for instance, Mr. Chella, we talked about him

02:40PM   20   earlier.  When you had an interview with him at one occasion,

02:40PM   21   you did record the interview?

02:40PM   22   A.  Yes.

02:41PM   23   Q.  And what did you use at that point in time when you met

02:41PM   24   with Mr. Chella?

02:41PM   25   A.  To record it?

02:41PM   1   Q.   Yes.

02:41PM   2   A.   A tape cassette recording device I believe.

02:41PM   3   Q.   So was that something that was easily obtained by you,

02:41PM   4   correct?

02:41PM   5   A.   Yes.

02:41PM   6   Q.   But you didn't obtain anything for Mr. Bongiovanni's

02:41PM   7   interview, correct?

02:41PM   8   A.   His interview was not recorded.

02:41PM   9   Q.   Okay.  So during this interview, instead of recording it,

02:41PM   10   on 3/29/2019, you decided to take handwritten notes, right?

02:41PM   11   A.   Correct.

02:41PM   12   Q.   And so fair to say that the handwritten notes that you

02:41PM   13   took are not a verbatim record of your interview, correct?

02:41PM   14   A.   Correct.

02:41PM   15   Q.   It's not like a transcript that Miss Ann is typing up

02:41PM   16   right here right now?

02:41PM   17   A.   Correct.

02:41PM   18   Q.   And, so, the interview notes that you took that day, they

02:41PM   19   contain points that you raised with Mr. Bongiovanni, right?

02:41PM   20   A.   Correct.

02:41PM   21   Q.   And they also contain a summary of what you recall

02:41PM   22   Mr. Bongiovanni saying, and what you said to him, correct?

02:41PM   23   A.   They were taken as he was speaking.  So it wouldn't

02:41PM   24   necessarily be someone writing down what he was saying and

02:41PM   25   responding, correct.  So it would be not a summary, but an

02:42PM    1    actual -- what he was saying.

02:42PM    2    Q.  Okay.  So, when he was saying words, you were writing

02:42PM    3    down in your notepad?

02:42PM    4    A.  Correct.

02:42PM    5    Q.  And when you were asking questions, were you also writing

02:42PM    6    down in your notepad?

02:42PM    7    A.  No.

02:42PM    8    Q.  So, how were you indicating what you asked

02:42PM    9    Mr. Bongiovanni in your notes?

02:42PM   10    A.  They would -- when I was done asking, I would indicate

02:42PM   11    what the topic of conversation was, and then go from there.

02:42PM   12        And then as I was rereading my notes, I would have known

02:42PM   13    what the topic of conversation was.  So, yes.

02:42PM   14    Q.  All right.  So fair to say that what you communicated to

02:42PM   15    Mr. Bongiovanni is not really reflected 100 percent in your

02:42PM   16    notes, correct?

02:42PM   17    A.  It is a -- it is as close -- it is a -- the notes are not

02:42PM   18    100 percent recorded of everything that was said.

02:42PM   19    Q.  Yeah.  So when you decided to shift to a certain topic,

02:42PM   20    you wrote down in your notes the topic that you --

02:43PM   21    A.  Correct.

02:43PM   22    Q.  -- were you discussing?

02:43PM   23        But you didn't write down the specific questions you

02:43PM   24    asked Mr. Bongiovanni?

02:43PM   25    A.  All the questions, correct.

02:43PM   1   Q.   Okay.  You were just mainly recording what you recall to

02:43PM   2   be his responses to certain questions you were asking?

02:43PM   3   A.   Yes.

02:43PM   4   Q.   Okay.  And with regard to the notes, I know that several

02:43PM   5   agents have a practice of including quotation marks on words

02:43PM   6   that the person they're interviewing specifically said.  Do

02:43PM   7   you have the same practice?

02:43PM   8   A.   Some of the notes I would put in quotes exactly what he

02:43PM   9   said, so I would know that that was a verbatim what he said.

02:43PM  10   Q.   Yeah, I guess that's what I'm getting at.

02:43PM  11        So if your notes reflected quotation marks, that would be

02:43PM  12   something that you recall exactly was said by Mr. Bongiovanni

02:43PM  13   in response to a question you asked?

02:43PM  14   A.   Correct.

02:43PM  15   Q.   But if the quotation marks were not part of your notes,

02:43PM  16   it's not something that was exactly said, it was more of a

02:43PM  17   summary of what you remember?

02:43PM  18   A.   It may have been exactly what he said, but the quotes

02:44PM  19   would have indicated to me that for some reason I thought was

02:44PM  20   important to key in on and to exemplify in my report.

02:44PM  21   Q.   So the quotation marks are not always directly what

02:44PM  22   Mr. Bongiovanni said in response to you?

02:44PM  23   A.   No, the quotes are.  But just because it not in quotes

02:44PM  24   does not mean it is not an accurate -- is not a direct answer

02:44PM  25   that he gave.

USA v Bongiovanni - Carpenter - Singer/Cross - 3/21/24

59

02:44PM 1  Q.  Okay.  So, you also after the interview produced a

02:44PM 2  memorandum of investigation about the interview; is that

02:44PM 3  right?

02:44PM 4  A.  Yes.

02:44PM 5  Q.  And this is an MOI -- MOI is the shorthand for a

02:44PM 6  memorandum of investigation?

02:44PM 7  A.  Yes.

02:44PM 8  Q.  So this MOI is something that you do after interviews

02:44PM 9  occur, right?

02:44PM 10 A.  Correct.

02:44PM 11 Q.  And that's the official paperwork?

02:44PM 12 A.  Correct.

02:44PM 13 Q.  So that's something that you submit to a supervisor for

02:44PM 14 approval?

02:44PM 15 A.  Correct.

02:44PM 16 Q.  And the MOI in this case, do you recall it being produced

02:44PM 17 almost 60 days after your March 29, 2019 interview?

02:44PM 18 A.  I recall it being approved.  I remember there was a delay

02:45PM 19 in the approval of it.  But the actual report was written

02:45PM 20 within five days.

02:45PM 21 Q.  Within five days?

02:45PM 22 A.  Yes.

02:45PM 23 Q.  And --

02:45PM 24 A.  I recall there was a delay in getting it approved with

02:45PM 25 our supervisors.

02:45PM 1   Q.  So you recall signing the document, correct?

02:45PM 2   A.  Yes.

02:45PM 3   Q.  And you prepared the document, and then you sign it?

02:45PM 4   A.  It was -- going back to, you know, the supervisor -- if I

02:45PM 5   recall correctly, the supervisor would approve the report

02:45PM 6   first, and then send it back for signature.  I believe -- I

02:45PM 7   believe that's how it occurred at the DOJ.  It's been three

02:45PM 8   and a half years since I've submitted a report there.

02:45PM 9   Q.  So you do your interview, and you have your written

02:45PM 10  notes, correct?

02:45PM 11  A.  Correct.

02:45PM 12  Q.  And then you produce an MOI after --

02:45PM 13  A.  Correct.

02:45PM 14  Q.  -- that, correct?

02:45PM 15      And then the MOI goes to your supervisor for approval?

02:45PM 16  A.  Yes.

02:45PM 17  Q.  And then your supervisor approves it and sends it back to

02:46PM 18  you without signing it?

02:46PM 19  A.  I don't recall the exact process at the Department of

02:46PM 20  Justice, it's been three years since I've done that.  But I

02:46PM 21  recall that it would have to be approved by the supervisor.

02:46PM 22  Q.  Before it was finalized?

02:46PM 23  A.  He was -- his signature was the finalization.  And I

02:46PM 24  don't recall if I would sign it first, or after he approved

02:46PM 25  it.

02:46PM  1          **MR. SINGER:**  So, Ms. Champoux, would you mind

02:46PM  2   bringing up 3595BV onto the witness's screen only.

02:46PM  3          **MR. COOPER:**  What were the letters?

02:46PM  4          **MR. SINGER:**  B as boy, V as in Victor.

02:46PM  5          **BY MR. SINGER:**

02:46PM  6   Q.  So do you recognize this to be a copy of the MOI you

02:46PM  7   prepared --

02:46PM  8   A.  Yes.

02:46PM  9   Q.  -- regarding --

02:46PM  10      Okay.  So what I'd like you to do is direct your

02:46PM  11   attention down to the --

02:46PM  12   A.  Okay.

02:46PM  13   Q.  -- bottom half of the document.

02:46PM  14   A.  Yep.

02:46PM  15   Q.  When you've had an opportunity to take a look at that,

02:46PM  16   look up.

02:46PM  17   A.  Yes.

02:46PM  18          **MR. SINGER:**  You can take that down, Ms. Champoux.

02:46PM  19          **BY MR. SINGER:**

02:46PM  20   Q.  So, by looking at a document, you understand that you

02:46PM  21   signed the document first?

02:46PM  22   A.  Correct.

02:47PM  23   Q.  Right?

02:47PM  24   A.  Yes.

02:47PM  25   Q.  And then it was sent over to your supervisor, Frank

USA v Bongiovanni - Carpenter - Singer/Cross - 3/21/24

62

02:47PM    1    Adamo, second?

02:47PM    2    A.   He approved it, correct.

02:47PM    3    Q.   And then he approves it from there?

02:47PM    4    A.   Yes.

02:47PM    5    Q.   And those are digital signatures, correct?

02:47PM    6    A.   Correct.

02:47PM    7    Q.   So I'm assuming you have a card that you insert into your

02:47PM    8    computer that allows you to digitally sign documents?

02:47PM    9    A.   Yes.

02:47PM    10   Q.   The so dates and times that are reflected on the

02:47PM    11   document, that's something that is input by the computer when

02:47PM    12   you sign it with your card?

02:47PM    13   A.   Correct.

02:47PM    14   Q.   And so what you're saying is that you recall producing

02:47PM    15   this MOI at some point prior to the date that it's signed,

02:47PM    16   right?

02:47PM    17   A.   Correct.

02:47PM    18   Q.   And then submitting to your supervisor for approval,

02:47PM    19   correct?

02:47PM    20   A.   Correct.

02:47PM    21   Q.   And then he took 60 days or so to send it back to you for

02:47PM    22   finalization?

02:47PM    23   A.   I recall there was a delay in the process of getting this

02:47PM    24   approved.  I don't recall exactly what it was and why it took

02:47PM    25   so long.

USA v Bongiovanni - Carpenter - Singer/Cross - 3/21/24

63

02:47PM   1   Q.   But you're saying that you recall writing your MOI

02:47PM   2   shortly after the interview?

02:47PM   3   A.   Yes.

02:47PM   4   Q.   Okay.  So, the statements that are made inside the MOI,

02:48PM   5   those are ones that you used to help prepare your testimony

02:48PM   6   today, correct?

02:48PM   7   A.   Correct.

02:48PM   8   Q.   Because this happened a while ago with the interview back

02:48PM   9   in March 29, 2019?

02:48PM   10   A.   Yes.

02:48PM   11   Q.   And I think you expressed it's been three and a half

02:48PM   12   years since you worked in the office at the DOJ OIG, correct?

02:48PM   13   A.   Correct.

02:48PM   14   Q.   So, back then, things were fresher in your mind than they

02:48PM   15   are today?

02:48PM   16   A.   Yes.

02:48PM   17   Q.   So you relied on the notes that you kept, as well as the

02:48PM   18   MOI to help prepare yourself for your testimony?

02:48PM   19   A.   Correct.

02:48PM   20   Q.   If there are differences in the MOI versus your notes,

02:48PM   21   you would agree with me that your notes are probably the more

02:48PM   22   accurate source of information, correct?

02:48PM   23   A.   The notes, by completing the report within five days of

02:48PM   24   the interview, it allows me to have -- using notes as

02:48PM   25   refreshing my memory as the interview is still fresh in my

02:49PM   1   mind.  So just something isn't reflected the notes doesn't

02:49PM   2   mean that it wasn't said.  And just because isn't wasn't

02:49PM   3   documented in the notes doesn't mean it wasn't said, so it

02:49PM   4   could be in the report and not in the notes.

02:49PM   5   Q.  Okay.  But I'll ask you again.  You'd agree with me that

02:49PM   6   the notes, since they were taken contemporaneously as you

02:49PM   7   said, are going to be more reflective of what was said in the

02:49PM   8   interview on March 29, 2019, than the MOI you wrote days

02:49PM   9   later?

02:49PM  10   A.  Correct.

02:49PM  11   Q.  So, you talked a little bit on direct about asking

02:49PM  12   Mr. Bongiovanni questions about his relationship with Peter

02:49PM  13   Gerace, right?

02:49PM  14   A.  Correct.

02:49PM  15   Q.  And you talked about how it started off with

02:49PM  16   Mr. Bongiovanni explaining to you how they got to know each

02:49PM  17   other, right?

02:49PM  18   A.  Correct.

02:49PM  19   Q.  Like, he related to you that they knew each other because

02:49PM  20   their families knew each other when they were growing up?

02:49PM  21   A.  Correct.

02:49PM  22   Q.  And then at some point in their earlier lives, they bar

02:49PM  23   tended together for a period of time in their late 20s?

02:50PM  24   A.  Correct.

02:50PM  25   Q.  And you recall that after Mr. Bongiovanni joined the DEA,

02:50PM  1  he indicated to you about how they lost contact for some

02:50PM  2  period?

02:50PM  3          **MR. DICKSON:**  Objection, hearsay.  These are

02:50PM  4  statements by his own client, Judge.

02:50PM  5          **THE COURT:**  I think he's -- he's just recounting what

02:50PM  6  he testified to on direct as a foundation for his questions;

02:50PM  7  is that correct, Mr. Singer?

02:50PM  8          **MR. SINGER:**  That's correct.

02:50PM  9          **THE COURT:**  Yeah.  So, overruled.  He's simply

02:50PM  10  recounting what his direct testimony was as a foundation for

02:50PM  11  the next question, so -- and I recall him testifying to that,

02:50PM  12  so overruled.

02:50PM  13          Go ahead.

02:50PM  14          **BY MR. SINGER:**

02:50PM  15  Q.  So he talked to you about how they lost touch over a

02:50PM  16  period of time when he was with the DEA originally?

02:50PM  17  A.  Yes, correct.

02:50PM  18  Q.  And about how it wasn't until he moved back to Buffalo

02:50PM  19  that they became reacquainted, correct?

02:50PM  20  A.  Correct.

02:50PM  21  Q.  And, so, according to your MOI, your MOI -- you recall

02:50PM  22  writing down in the MOI about how Mr. Bongiovanni denied that

02:51PM  23  he and Peter Gerace were close friends?

02:51PM  24  A.  Correct.

02:51PM  25  Q.  So, close friends, that's not a direct quote from

02:51PM   1   Mr. Bongiovanni, correct?

02:51PM   2   A.  I can't recall if he specifically said close friends or

02:51PM   3   not.

02:51PM   4   Q.  If your notes didn't reflect "close friends" in quotation

02:51PM   5   marks, you would agree with me that that's not what was said

02:51PM   6   directly by Mr. Bongiovanni, correct?

02:51PM   7   A.  No, I would not agree with that.

02:51PM   8   Q.  And, so, that's something, I guess, that you used to

02:51PM   9   describe the nature of their relationship, correct?

02:51PM   10   A.  When I wrote the reported, the interview was fresh in my

02:51PM   11   mind.  So he may have said -- used that word during the

02:51PM   12   interview, and it may not have been reflected in my notes.

02:51PM   13   Q.  But you talked earlier about how Mr. Bongiovanni stated

02:51PM   14   to you that Peter Gerace was not in his inner circle of

02:51PM   15   friends; do you remember saying that on direct?

02:51PM   16   A.  Yes.

02:51PM   17   Q.  And inner circle of friends, that you recall was

02:52PM   18   something that was said by --

02:52PM   19   A.  Correct.

02:52PM   20   Q.  -- Mr. Bongiovanni, because you remember that was

02:52PM   21   something that was quoted --

02:52PM   22   A.  Yes.

02:52PM   23   Q.  -- inside of your report, right?

02:52PM   24   A.  Yes.

02:52PM   25   Q.  So the inner circle of friends was something that

02:52PM   1   Mr. Bongiovanni used in his interview with you, right?

02:52PM   2   A.  Yes.

02:52PM   3   Q.  And "close friends" is not something he used directly in

02:52PM   4   his interview with you, correct?

02:52PM   5   A.  I can't recall him using it or not.

02:52PM   6   Q.  Okay.  But it's not reflected your notes --

02:52PM   7   A.  Correct.

02:52PM   8   Q.  -- that they were close friends.  But your MOI reflects

02:52PM   9   it?

02:52PM   10   A.  Yes.

02:52PM   11   Q.  So there's a difference in there; would you agree with me

02:52PM   12   on that?

02:52PM   13   A.  Yes.

02:52PM   14   Q.  So a definition of close friends.  What's your definition

02:52PM   15   of close friends?

02:52PM   16   A.  Someone that I'm in contact with regularly.  Someone that

02:52PM   17   I celebrate things with.  Someone that if I -- if I see out.

02:52PM   18   Someone that I see on vacation and I'm happy to see.  Someone

02:52PM   19   I'm in contact with regularly.  Someone I invite over to my

02:52PM   20   house.

02:53PM   21   Q.  So that's your definition.  You understand that another

02:53PM   22   person's definition of what a close friend is or is not may

02:53PM   23   differ from yours, correct?

02:53PM   24   A.  Sure.

02:53PM   25   Q.  And so, like, one of the things Mr. Bongiovanni talked to

USA v Bongiovanni - Carpenter - Singer/Cross - 3/21/24

68

02:53PM    1    you about, about Mr. Gerace not being in his inner circle, as

02:53PM    2    he said, was that he said that, you know, hey, if I see him

02:53PM    3    out and/or socializing, I'll go have a drink with him.

02:53PM    4            **MR. DICKSON:**  Objection, hearsay.

02:53PM    5            **THE COURT:**  Yes.  Well, hang on.

02:53PM    6            No, overruled.

02:53PM    7            **BY MR. SINGER:**

02:53PM    8    Q.  So, do you recall Mr. Bongiovanni relating about how if

02:53PM    9    he saw Mr. Gerace out when he was out, he would go have a

02:53PM   10    drink with him?

02:53PM   11    A.  That's how he described it, yes.

02:53PM   12    Q.  And do you recall about how he talked about the nature of

02:54PM   13    the closeness or inner circle of their friendship about how

02:54PM   14    Mr. Gerace wasn't invited to any of the weddings that he had,

02:54PM   15    correct?

02:54PM   16    A.  Correct.

02:54PM   17    Q.  And about how he never went over to Mr. Gerace's house,

02:54PM   18    correct?

02:54PM   19    A.  Correct.

02:54PM   20    Q.  So, I mean, you would agree with me that a person who, as

02:54PM   21    you termed it in your report, close friend, may be someone

02:54PM   22    that someone would invite to their wedding, correct?

02:54PM   23    A.  Wedding guests are personal and vary by person to person.

02:54PM   24    Q.  I mean, you would agree with me that someone that they

02:54PM   25    socialize with out at bars are someone that they might

02:54PM    1    consider a friend, correct?

02:54PM    2    A.  They might.

02:54PM    3    Q.  But not always someone that they're 100 percent close

02:54PM    4    with, correct?

02:54PM    5    A.  Well, friendship varies.

02:54PM    6    Q.  You were asked a couple different questions about

02:54PM    7    meetings between Mr. Gerace and Mr. Bongiovanni on direct; do

02:54PM    8    you remember that?

02:54PM    9    A.  Yes.

02:54PM   10    Q.  And those related to the text messages, correct?

02:55PM   11    A.  Um-hum.

02:55PM   12    Q.  So, when you were asking Mr. Bongiovanni questions about

02:55PM   13    what it meant for Peter Gerace to be in Mr. Bongiovanni's

02:55PM   14    inner circle, as the term he used, or close friends as the

02:55PM   15    term you used, did you ask him about every time that he met

02:55PM   16    out Mr. Gerace?

02:55PM   17    A.  Not every time, no.

02:55PM   18    Q.  Did you ask him about when specifically he met out with

02:55PM   19    Mr. Gerace?

02:55PM   20    A.  I asked him about situations, yes.

02:55PM   21    Q.  How many situations did you ask him about?

02:55PM   22    A.  I don't recall him providing any answers to that, I don't

02:55PM   23    recall.

02:55PM   24    Q.  Do you recall about asking him about whether or not he

02:55PM   25    shared his home address with Mr. Gerace?

USA v Bongiovanni - Carpenter - Singer/Cross - 3/21/24

02:55PM  1   A.  I did not ask him about that.

02:55PM  2   Q.  Do you recall asking him about whether he attended any

02:55PM  3   sporting events with Mr. Gerace?

02:55PM  4   A.  I did not ask him about that.

02:55PM  5   Q.  Did you ask him about going to any type of Bills games

02:55PM  6   with Mr. Gerace?

02:55PM  7   A.  I did not ask.

02:55PM  8   Q.  Did you drill down at all about what it meant to be in or

02:55PM  9   out of an inner circle?

02:55PM  10  A.  I did not ask that.

02:55PM  11  Q.  So, you've been doing investigations for, by my count,

02:56PM  12  about more than 15 years, correct, Mr. Carpenter?

02:56PM  13  A.  At this point.  A little less.

02:56PM  14  Q.  How many interviews do you think you've done in that time

02:56PM  15  period?

02:56PM  16  A.  Since then?  Or prior to then?

02:56PM  17  Q.  I guess -- I guess, prior to that time, when you sat down

02:56PM  18  with Mr. Bongiovanni in 2019.

02:56PM  19  A.  My prior experience in federal law enforcement, I had

02:56PM  20  limited interview experience due to my role in the Secret

02:56PM  21  Service, different missions.  I probably conducted about 20

02:56PM  22  or 25 at that point when I was with the Secret Service, and

02:56PM  23  less than that with the Department of Justice.

02:56PM  24  Q.  Did you go through any type of specific trainings that

02:56PM  25  talked about the necessity of sometimes asking clarifying

USA v Bongiovanni - Carpenter - Singer/Cross - 3/21/24
71

02:56PM    1    questions to answers you're given by suspects?

02:56PM    2    A.   Yes.

02:56PM    3    Q.   And you'd agree with me that that's good police practice,

02:56PM    4    that's good police work?

02:56PM    5    A.   Asking follow-up questions is sometimes beneficial, yes.

02:56PM    6    Q.   But you didn't do that in this situation?

02:57PM    7    A.   I asked follow-up questions.  I tried to keep the

02:57PM    8    conversation as a conversation, not an interview, to allow

02:57PM    9    him the opportunity to explain his relationship the best he

02:57PM   10    wanted to.

02:57PM   11    Q.   Okay.  And another reason that Mr. Bongiovanni offered as

02:57PM   12    to why Mr. Gerace was not in his, quote, unquote, inner

02:57PM   13    circle, was that he believed that Mr. Gerace was a police

02:57PM   14    groupie; do you remember that?

02:57PM   15            **MR. DICKSON:**  Objection, hearsay.

02:57PM   16            **THE COURT:**  Yes.  That's -- that's not something I

02:57PM   17    think he testified to on.

02:57PM   18            **MR. SINGER:**  If we can approach, Judge.

02:57PM   19            **THE COURT:**  Yeah, come on up.

02:57PM   20            (Sidebar discussion held on the record.)

02:57PM   21            **THE COURT:**  Maybe I'm wrong.  So the reason I

02:57PM   22    overruled the objection on hearsay is because the stuff came

02:57PM   23    out on direct examination.  I think he's entitled to inquire

02:57PM   24    into it on cross.  And that's why.  This one, I don't remember

02:57PM   25    coming out on direct, so why isn't this --

02:58PM  1          **MR. SINGER:**  So under the Rule of Completeness,

02:58PM  2   Judge, I'm allowed to introduce statements that

02:58PM  3   Mr. Bongiovanni made that help clarify and give proper context

02:58PM  4   to the answers he gave to Mr. Carpenter.

02:58PM  5          The government in many situations during direct

02:58PM  6   intentionally omitted context for these answers.  And as a

02:58PM  7   result, of the jury is left with misimpression about what

02:58PM  8   these answers mean.

02:58PM  9          I should be allowed, under the Rule of Completeness,

02:58PM  10  to provide the proper context.

02:58PM  11         **THE COURT:**  Yeah, why not.

02:58PM  12         **MR. DICKSON:**  The Rule of Completeness does not

02:58PM  13  permit defendants to introduce self-serving hearsay just to

02:58PM  14  provide context.  The Rule of Completeness permits the defense

02:58PM  15  to introduce hearsay statements to correct misimpressions

02:58PM  16  about the statement.

02:58PM  17         **THE COURT:**  That's exactly what he saying.

02:58PM  18         **MR. DICKSON:**  But he hasn't identified what statement

02:58PM  19  there was a misimpression about.  I mean, saying that Peter

02:58PM  20  Gerace is a police groupie, that's an entirely different

02:58PM  21  statement than anything else.

02:58PM  22         **THE COURT:**  So how is this context necessary for the

02:58PM  23  jury to understand?

02:58PM  24         **MR. SINGER:**  He's defining what the nature of his

02:58PM  25  relationship is.  And so the government's trying to paint, as

02:59PM    1   you've heard throughout this entire trial, that Mr. Gerace

02:59PM    2   Mr. Bongiovanni are very, very, very close.  That's why

02:59PM    3   Mr. Carpenter asked these questions.  He testified on direct

02:59PM    4   that was the purpose and that was something that was important

02:59PM    5   to his investigation, quote, unquote.

02:59PM    6          I am providing the context of what Mr. Bongiovanni's

02:59PM    7   answer is.

02:59PM    8          I mean, this is the same discussion we had with

02:59PM    9   regard to Exhibit 99, Judge, where the government wanted to

02:59PM   10   get in the comment which made Mr. Bongiovanni look bad without

02:59PM   11   providing the proper context as to how he made that, and you

02:59PM   12   rightfully overruled their objection, their objection or their

02:59PM   13   wanting to redact that.

02:59PM   14       **THE COURT:**  And so your point -- let me make sure I

02:59PM   15   understand what you're saying.

02:59PM   16          Your point is that while Mr. Bongiovanni said to him

02:59PM   17   we're not close friends, and the text messages that

02:59PM   18   Mr. Dickson showed him may suggest that they were in close

02:59PM   19   contact, that the reason that they were in close contact was

02:59PM   20   because he's a cop, and Gerace is a police groupie.

03:00PM   21       **MR. SINGER:**  This is one of the reasons why

03:00PM   22   Mr. Bongiovanni did not include him in his inner circle.  It

03:00PM   23   goes to explain exactly that, Judge.  That's why we're

03:00PM   24   gonna -- it's not a big, you know, part of the testimony, but

03:00PM   25   it's something that provides that context, Judge.

03:00PM   1           THE COURT:  Why aren't they right?

03:00PM   2           MR. DICKSON:  Because the Rule of Completeness does

03:00PM   3   not permit introduction of hearsay to allow a different take

03:00PM   4   on the evidence.  What the Rule of Completeness is designed to

03:00PM   5   do is to allow additional statements to be entered to correct

03:00PM   6   misimpressions about the statement that was made.

03:00PM   7           And so Mr. Singer is asking to introduce additional

03:00PM   8   self-serving hearsay statements to correct an impression that

03:00PM   9   he doesn't like about the evidence.

03:00PM  10           THE COURT:  No, no.  It's not an impression that he

03:00PM  11   doesn't like about the evidence, it's to -- it's to explain

03:00PM  12   what Mr. Bongiovanni meant when he said he's not in my inner

03:01PM  13   circle.  It's to -- it's to give context to that statement and

03:01PM  14   to correct a misimpression of what that statement might mean.

03:01PM  15           The jury might think that "inner circle" means that,

03:01PM  16   you know, I text a lot, I am in close contact with him, and he

03:01PM  17   and I were close compatriots.  When, in fact, the reason for

03:01PM  18   that might be, and what he meant by not in the inner circle,

03:01PM  19   is that he was interested in me because I was a cop and for no

03:01PM  20   other good reason, not because we were friends.  That's the

03:01PM  21   misimpression.

03:01PM  22           So I think it's exactly what you're telling me the

03:01PM  23   Rule of Completeness is designed to do.  Tell me why that's

03:01PM  24   not right.

03:01PM  25           MR. DICKSON:  Judge, I'll stand on my argument.  I

03:01PM  1  think it's clear that I -- I don't think that the defense

03:01PM  2  should be able to walk through piece by piece every single

03:01PM  3  statement that's self serving that Mr. Bongiovanni made during

03:01PM  4  this interview, and that's what we've been doing so far during

03:02PM  5  this presentation.

03:02PM  6       THE COURT:  No, I don't think so.  I don't think so.

03:02PM  7  I think it comes in.

03:02PM  8       MR. DICKSON:  Okay.

03:02PM  9       (End of sidebar discussion.)

03:02PM  10      THE COURT:  Mr. Singer, is this a good time for our

03:02PM  11 afternoon break?

03:02PM  12      MR. SINGER:  If we could just finish this one part,

03:02PM  13 Judge, and then we can take a break within a minute or so?

03:02PM  14      THE COURT:  Go ahead.

03:02PM  15      BY MR. SINGER:

03:02PM  16 Q.  So, you recall, again, Mr. Carpenter, that

03:02PM  17 Mr. Bongiovanni talked about why Peter Gerace was not in his

03:02PM  18 inner circle.  And one of the reasons that he gave you is he

03:02PM  19 believed Mr. Gerace was a police groupie, correct?

03:02PM  20 A.  He described Mr. Gerace as a police groupie.

03:02PM  21 Q.  And that's something that was consistent with your

03:02PM  22 investigation into Peter Gerace, and his contact with other

03:02PM  23 people in law enforcement, correct?

03:02PM  24 A.  Yes.

03:02PM  25      MR. SINGER:  Ready for a break, Judge.

USA v Bongiovanni - Carpenter - Singer/Cross - 3/21/24

76

03:02PM  1      **THE COURT:**  Okay.  So let's take our afternoon break.

03:03PM  2  Remember my instructions about not talking about the case with

03:03PM  3  anyone, including each other, and not making up your mind.

03:03PM  4  See you back here in about 15 minutes.

03:03PM  5           (Jury excused at 3:03 p.m.)

03:03PM  6      **THE COURT:**  Okay.  Anything we want to put on the

03:03PM  7  record?

03:03PM  8      **MR. TRIPI:**  Just very briefly, Your Honor.  So at the

03:03PM  9  bench during one of the last --

03:03PM  10     **THE COURT:**  Should we excuse the --

03:03PM  11     **MR. TRIPI:**  Oh, yeah, yeah, yeah.  I'm sorry.

03:03PM  12          (Witness excused at 3:03 p.m.)

03:03PM  13     **MR. TRIPI:**  So up at the bench during one of the last

03:04PM  14  times we were up there when the issue arose regarding drug

03:04PM  15  testing, I had indicated that before Francis DiCarlo tested, I

03:04PM  16  had asked him as the ASAC what the testing related to, and at

03:04PM  17  that time it was his belief the testing was done out of

03:04PM  18  New York City.  But we didn't get into that testimony at trial

03:04PM  19  during the direct or anything like that, and so I never

03:04PM  20  followed up after that point honestly.

03:04PM  21          So when it came up, I caused a message to be pushed

03:04PM  22  back, and what I've learned is the testing is not done out of

03:04PM  23  New York City.  If someone were to be tested, say, in Buffalo,

03:04PM  24  they would have gotten an alert or an email indicating that

03:04PM  25  they should go and report to be tested somewhere here.

03:04PM   1           But the New York City office as of right now has no

03:04PM   2    record, can't say one way or the other, whether

03:04PM   3    Mr. Bongiovanni was subject to such testing.  There may be

03:04PM   4    deeper looks that can be made out of DEA HQ, which candidly I

03:05PM   5    hadn't caused to be done.  But I just wanted to complete the

03:05PM   6    record to make sure my representations to Your Honor were

03:05PM   7    accurate.

03:05PM   8           **THE COURT:**  No, I appreciate that.  And as I said, if

03:05PM   9    you folks want to get into that, you can.  If there's proof,

03:05PM   10   you want to call another witness, or on rebuttal, or whatever,

03:05PM   11   you can do that.  I'm not precluding you from doing that.

03:05PM   12          But I appreciate you completing the record.

03:05PM   13          **MR. TRIPI:**  Understood.  Thank you, Your Honor.

03:05PM   14          **THE COURT:**  Okay.  Anything else from anybody else?

03:05PM   15          **MR. SINGER:**  Not from us, Judge.

03:05PM   16          **THE COURT:**  Okay, thanks.

03:05PM   17          **THE CLERK:**  All rise.

03:05PM   18          (Off the record at 3:05 p.m.)

03:22PM   19          (Back on the record at 3:22 p.m.)

03:22PM   20          (Jury not present.)

03:22PM   21          **THE CLERK:**  All rise.

03:22PM   22          **THE COURT:**  Please be seated.

03:22PM   23          **THE CLERK:**  We are back on the record for than

03:22PM   24   continuation of the jury trial in case number 19-cr-227,

03:22PM   25   United States of America versus Joseph Bongiovanni.

03:22PM   1            All counsel and parties are present.

03:22PM   2            **THE COURT:**  How much longer do you have?

03:22PM   3            **MR. SINGER:**  My guess is probably about a half hour,

03:22PM   4    Judge.

03:22PM   5            **THE COURT:**  Okay.  And then next witness is how long?

03:22PM   6            **MR. COOPER:**  Judge, I think my direct of Special

03:22PM   7    Agent Burns is probably between 30 and 45 minutes, and that's

03:22PM   8    depending on -- Parker and I discussed some of the testimony,

03:22PM   9    like the contours of it, and I think we'll probably address it

03:22PM  10    with Your Honor briefly before we start it.

03:22PM  11            **THE COURT:**  Okay.  We're going to spill over until

03:22PM  12    Tuesday, certainly.

03:22PM  13            **MR. TRIPI:**  Yeah, it doesn't look like even if we

03:22PM  14    wanted to we'll be done with witness today.

03:22PM  15            **THE COURT:**  Right.

03:23PM  16            **MR. TRIPI:**  We'll probably have one left.

03:23PM  17            **THE COURT:**  Okay.  Well, we'll do what we have to do.

03:23PM  18    We still have some room next week, I think, right?

03:23PM  19            **MR. SINGER:**  We have a four-day holiday, Judge.

03:23PM  20            **THE COURT:**  Yeah, we're not going to tell the jury to

03:23PM  21    come in on Monday now after telling them we're not.

03:23PM  22            **MR. COOPER:**  I don't know what the Court's thoughts

03:23PM  23    are on this, or counsel's, I think we would be willing to stay

03:23PM  24    a half hour tonight if that would make the -- if we're there,

03:23PM  25    if we're close.

03:23PM    1        **THE COURT:**  Let's see where we are.  I don't want to

03:23PM    2   keep them later than necessary unless we're sure we're

03:23PM    3   finished.

03:23PM    4        **MR. COOPER:**  Well, I think the last witness would be

03:23PM    5   very quick.  And so if we're close to finish with Brian, it

03:23PM    6   might be worth consideration.  That's all.

03:23PM    7        **THE COURT:**  Okay.  We'll think about it.

03:23PM    8        **MR. SINGER:**  That's fine, Judge.

03:23PM    9        **THE COURT:**  Okay.  Anything else before we bring them

03:23PM   10   back, please?

03:23PM   11        **MR. TRIPI:**  No, Your Honor.

03:23PM   12        **MR. SINGER:**  No, Your Honor.

03:23PM   13        **THE COURT:**  Okay.  Let's bring them back, please,

03:23PM   14   Pat.

03:24PM   15        (Jury seated at 3:24 p.m.)

03:25PM   16        **THE COURT:**  The record will reflect that our jurors,

03:25PM   17   again, are present.

03:25PM   18        We may go a little late tonight, again, depending on

03:25PM   19   where we are and whether we can finish witnesses or not.

03:25PM   20        Just to let you know, again, we'll be down on Monday,

03:25PM   21   so four days when you don't have to listen to me anymore.

03:25PM   22        I remind the witness that he's still under oath.

03:25PM   23        And you may continue, Mr. Singer.

03:25PM   24        **MR. SINGER:**  Thank you, Your Honor.

          25

|  |  |  |
|---|---|---|
| 03:25PM | 1 | **BY MR. SINGER:** |
| 03:25PM | 2 | Q.  So, Mr. Carpenter, so we left off on the inner circle |
| 03:25PM | 3 | friends topic, and I want to revert back to something you |
| 03:25PM | 4 | were asked on direct. |
| 03:25PM | 5 | **MR. SINGER:**  So, Ms. Champoux, would you mind |
| 03:25PM | 6 | bringing up Exhibit 98, please.  And that's in evidence on all |
| 03:25PM | 7 | the screens.  And so if we can advance to page 4, |
| 03:25PM | 8 | Ms. Champoux. |
| 03:25PM | 9 | **BY MR. SINGER:** |
| 03:25PM | 10 | Q.  And you remember this being asked about this text on your |
| 03:25PM | 11 | direct testimony, Mr. Carpenter? |
| 03:25PM | 12 | A.  Yes. |
| 03:25PM | 13 | Q.  And this is a text that Mr. Bongiovanni sent back to |
| 03:26PM | 14 | Mr. Gerace, correct? |
| 03:26PM | 15 | A.  Yes, sir. |
| 03:26PM | 16 | Q.  And if we go to the preceding page, page 3, it's in |
| 03:26PM | 17 | response to that, hey, brother, we haven't talked in a while |
| 03:26PM | 18 | text, correct? |
| 03:26PM | 19 | A.  Yes. |
| 03:26PM | 20 | Q.  And you remember being asked about it as a response back |
| 03:26PM | 21 | from Mr. Bongiovanni indicating the nature of their |
| 03:26PM | 22 | friendship, correct? |
| 03:26PM | 23 | A.  Yes. |
| 03:26PM | 24 | Q.  And so, you know, you've read -- you've read this |
| 03:26PM | 25 | memorandum, correct? |

03:26PM    1    A.   Yes.

03:26PM    2    Q.   And you understand that the response back from

03:26PM    3    Mr. Bongiovanni on that date wasn't necessarily him just

03:26PM    4    speaking his mind, right?

03:26PM    5    A.   I don't know what his intention of responding was.

03:26PM    6    Q.   Well, let's go take a look at what his intention was.

03:26PM    7         **MR. SINGER:**  If we can look at page 2 of the

03:26PM    8    memorandum, Ms. Champoux, please.  And if we can zoom in on

03:26PM    9    the second paragraph right there.  Thank you.

03:26PM   10         **BY MR. SINGER:**

03:26PM   11    Q.   So, again, you talked about how you reviewed this

03:26PM   12    memorandum as part of your investigation in preparation for

03:27PM   13    the interview in March '19, correct?

03:27PM   14    A.   Correct.

03:27PM   15    Q.   And, so, safe to say that after reviewing the memorandum

03:27PM   16    you understood that what Mr. Bongiovanni responded with on

03:27PM   17    that date what a somewhat contrived response?

03:27PM   18    A.   His response speaks for itself.

03:27PM   19    Q.   Well, that's what he says here.  So you've read the

03:27PM   20    memorandum, right?

03:27PM   21    A.   Yes.

03:27PM   22    Q.   And you see where it says that as a continued effort to

03:27PM   23    maintain a sense of normal activity, I texted Gerace back.

03:27PM   24    We've been friends for 25 years, bud, all good.

03:27PM   25    A.   Yes.

03:27PM    1          **MR. SINGER:**  And you can take that down,

03:27PM    2    Ms. Champoux.

03:27PM    3          **BY MR. SINGER:**

03:27PM    4    Q.  And, again, that goes to the purpose of why he was

03:27PM    5    writing this memorandum to DEA, right?

03:27PM    6    A.  To explain his relationship, yes.

03:27PM    7    Q.  To explain --

03:27PM    8    A.  Those memos, those text messages, yes.

03:27PM    9    Q.  -- he was trying explain and document the text messages

03:27PM   10    he received from Peter Gerace, correct?

03:27PM   11    A.  Correct.

03:27PM   12    Q.  And what he responded with, correct?

03:27PM   13    A.  Correct.

03:27PM   14    Q.  And why he responded in that fashion, correct?

03:27PM   15    A.  He explained it.

03:28PM   16    Q.  Yeah, because he didn't want to tip off Mr. Gerace that

03:28PM   17    he was under investigation at that time, correct?

03:28PM   18    A.  I don't know what he meant by normalcy.

03:28PM   19    Q.  Did you review the memorandum?

03:28PM   20    A.  Yes.  He said that -- he stated that in a sense to

03:28PM   21    maintain normalcy.  I don't know what context he meant

03:28PM   22    normalcy.  As it relates to their friendship, or what

03:28PM   23    context?  But that's what he said.

03:28PM   24    Q.  Okay.  Another thing that you talked about on direct was

03:28PM   25    you were talking about how Mr. Bongiovanni, you talked to him

03:28PM   1   about Peter Gerace becoming a potential informant; is that

03:28PM   2   right?

03:28PM   3   A.   I asked about that, yes.

03:28PM   4   Q.   And you asked him -- and the way you phrase it in your

03:28PM   5   testimony is that the question was asked about

03:28PM   6   Mr. Bongiovanni relating to you that Mr. Gerace was being

03:28PM   7   considered as an informant for the DEA; do you remember

03:28PM   8   testifying to that on direct?

03:28PM   9   A.   Yes.

03:28PM   10  Q.   But that was not, in fact, what Mr. Bongiovanni related

03:28PM   11  to you.  Do you recall him talking about how Mr. Gerace was

03:28PM   12  not gonna become a DEA informant but, in fact, he was

03:29PM   13  referred to the FBI to become an informant?

03:29PM   14  A.   As I recall it, he was brought into the DEA office to be

03:29PM   15  vetted, and it was decided that he would be referred to the

03:29PM   16  FBI.

03:29PM   17  Q.   Correct.  So he was never gonna become a DEA informant,

03:29PM   18  right?

03:29PM   19  A.   It was decided to refer him to the FBI.

03:29PM   20  Q.   Correct.  And he was referred to the FBI to become an

03:29PM   21  informant, correct?

03:29PM   22  A.   Correct.

03:29PM   23  Q.   And your understanding was that Mr. Gerace was never

03:29PM   24  signed up to become a DEA informant based on the records you

03:29PM   25  reviewed, correct?

| | | |
|---|---|---|
| 03:29PM | 1 | A.  Correct. |
| 03:29PM | 2 | Q.  So, another thing that you guys talked about on March 29, |
| 03:29PM | 3 | 2019, was -- was the vacations with Peter Gerace; do you |
| 03:29PM | 4 | remember that? |
| 03:29PM | 5 | A.  Yes. |
| 03:29PM | 6 | Q.  Do you remember asking about whether they -- they -- they |
| 03:29PM | 7 | did anything to coordinate trips together? |
| 03:29PM | 8 | A.  Correct. |
| 03:29PM | 9 | Q.  Flights together? |
| 03:29PM | 10 | A.  Yes. |
| 03:29PM | 11 | Q.  And the only thing that really came up was this trip to |
| 03:29PM | 12 | Las Vegas, correct? |
| 03:29PM | 13 | A.  Correct. |
| 03:29PM | 14 | Q.  And that trip occurred, to your knowledge, back in 2011? |
| 03:30PM | 15 | A.  Sounds about right. |
| 03:30PM | 16 | Q.  That was well before any type of investigation into Peter |
| 03:30PM | 17 | Gerace existed, correct? |
| 03:30PM | 18 | A.  It was before ours, yes. |
| 03:30PM | 19 | Q.  And so with regard to the Vegas vacation, this trip was |
| 03:30PM | 20 | not something that was preplanned where Mr. Gerace was going |
| 03:30PM | 21 | to go with Mr. Bongiovanni, right? |
| 03:30PM | 22 | **MR. DICKSON:**  Objection.  Lack of personal knowledge. |
| 03:30PM | 23 | **THE COURT:**  Yeah. |
| 03:30PM | 24 | **MR. SINGER:**  Let me rephrase the question. |
| 03:30PM | 25 | **THE COURT:**  Sustained.  Go ahead. |

**BY MR. SINGER:**

Q.  When you asked Mr. Bongiovanni about that trip, he explained to you how he did not coordinate reservations for airlines with Mr. Gerace, correct?

A.  Correct.

Q.  And he talked to you how he did not plan for Mr. Gerace to be out there, correct?

A.  Correct.

Q.  He talked to you about how the nature of the trip to Vegas back in 2011 was regarding another travel that he had booked with somebody else?

A.  Correct.

Q.  And that when Peter Gerace arrived in Vegas, same place, while he saw him, it was not something that was preplanned?

A.  He described it as coincidental, yes.

Q.  Okay.  And there was nothing in your investigation which suggested that there was preplanning going on between the flights of Mr. Gerace and Mr. Bongiovanni, correct?

A.  Correct.

Q.  So, one of the things that you talked about on direct is that Mr. Bongiovanni, in your interview on March 29th of 2019, denied initiating contact with Peter Gerace; do you remember that?

A.  Yes.

Q.  And so I don't think we talked about it before,

03:31PM  1   initiating contact.  That was not something that was directly

03:31PM  2   quoted in your notes, correct?

03:31PM  3   A.  Correct.

03:31PM  4   Q.  It wasn't something that was directly quoted in your MOI,

03:31PM  5   correct?

03:31PM  6   A.  Correct.

03:31PM  7   Q.  So that's not Mr. Bongiovanni's words, correct?

03:31PM  8   A.  In -- it would have been in response to a question that I

03:31PM  9   asked him.

03:31PM 10   Q.  Okay.  So, safe to say that your words are "initiating

03:32PM 11   contact?"

03:32PM 12   A.  I would have phrased it, did you ever initiate contact

03:32PM 13   with Peter Gerace?

03:32PM 14   Q.  Okay.  I know we don't have a recording of exactly what

03:32PM 15   was said, but as far as initiating contact is concerned, do

03:32PM 16   you recall asking any type of clarifying questions as to what

03:32PM 17   you meant by that statement?

03:32PM 18   A.  No.

03:32PM 19   Q.  So, you didn't ask Mr. Bongiovanni to clarify the

03:32PM 20   time frame about when you were talking about he initiated

03:32PM 21   contact or did not initiate contact with Mr. Gerace?

03:32PM 22   A.  Correct.

03:32PM 23   Q.  And kind of like we were talking about before, you didn't

03:32PM 24   go through every single time that they spoke since they first

03:32PM 25   met, going all the way back to the old neighborhood with

03:32PM   1   their parents?

03:32PM   2   A.  Correct.

03:32PM   3   Q.  You didn't speak about every single time they may have

03:32PM   4   met back in the early 2000s?

03:32PM   5   A.  Correct.

03:32PM   6   Q.  You didn't speak about every single time they may have

03:32PM   7   met after Mr. Bongiovanni moved back to the Buffalo in 2001?

03:33PM   8   A.  It wasn't specified, correct.

03:33PM   9   Q.  You didn't specify about any time period in the 2010s and

03:33PM   10  moving forward to your investigation, correct?

03:33PM   11  A.  Yes, it was not specific.

03:33PM   12  Q.  So, you're aware of the fact that since the fall of 2018,

03:33PM   13  Mr. Bongiovanni was instructed by his superiors at DEA not to

03:33PM   14  contact Peter Gerace, because at that point in time Peter

03:33PM   15  Gerace was under an active investigation at the DEA?

03:33PM   16  A.  Correct.

03:33PM   17  Q.  And you're aware of the fact that that directive is what

03:33PM   18  prompted Mr. Bongiovanni to produce those two memorandums,

03:33PM   19  one on November 1st of 2018, the other one on December 10th

03:33PM   20  of 2018, that we've reviewed, correct?

03:33PM   21  A.  Yes.

03:33PM   22  Q.  And that you reviewed prior to your investigation,

03:33PM   23  correct?

03:33PM   24  A.  Yes.

03:33PM   25  Q.  And those memorandums were something that came up in your

USA v Bongiovanni - Carpenter - Singer/Cross - 3/21/24

88

03:33PM    1   interview on March 29, 2019?

03:34PM    2   A.  I'm sorry, can you repeat that last part?

03:34PM    3   Q.  Certainly.  The discussion of those memorandum was

03:34PM    4   something that came up during your discussion on March 29,

03:34PM    5   2019, correct?

03:34PM    6   A.  Correct.

03:34PM    7   Q.  So, as far as the text messages that you saw in

03:34PM    8   Exhibit 310D, you'd agree with me that the conversations that

03:34PM    9   you saw between Mr. Gerace and Mr. Bongiovanni at that point

03:34PM   10   in time, those were occurring years before your interview,

03:34PM   11   correct?

03:34PM   12   A.  Correct.

03:34PM   13   Q.  Those occurred years before Mr. Bongiovanni was directed

03:34PM   14   by his superiors not to contact Mr. Gerace?

03:34PM   15   A.  Correct.

03:34PM   16   Q.  They occurred, based on what I was looking at, back in

03:34PM   17   2015 and 2016?

03:34PM   18   A.  Correct.

03:34PM   19   Q.  And that was all before any type of directive was told to

03:34PM   20   Mr. Bongiovanni do not contact Gerace, correct?

03:34PM   21   A.  That was before, correct.

03:34PM   22   Q.  And you didn't specify any type of time frame with regard

03:34PM   23   to that answer about not initiating contact?

03:34PM   24   A.  Correct.

03:35PM   25   Q.  So, you spoke to Mr. Gerace -- sorry, you spoke to

03:35PM  1   Mr. Bongiovanni about Peter Gerace contacting him when

03:35PM  2   someone may have overdosed at Pharaoh's Gentlemen's Club,

03:35PM  3   correct?

03:35PM  4   A.  Yes.

03:35PM  5   Q.  And he talked to you about how Mr. Gerace had reached out

03:35PM  6   to him on multiple different occasions concerning employees

03:35PM  7   overdosing at Pharaoh's Gentlemen's Club?

03:35PM  8   A.  Correct.

03:35PM  9   Q.  And as far as those discussions were concerned,

03:35PM  10  Mr. Bongiovanni didn't talk to you about any type of time

03:35PM  11  where Peter Gerace contacted him when a stripper, an

03:35PM  12  employee, was overdosing, saying, what do I do?  Correct?

03:35PM  13  A.  That's correct.

03:35PM  14  Q.  He stated that Mr. Gerace had contacted him with concerns

03:35PM  15  on a few occasions saying what do I do if someone overdoses

03:35PM  16  at the club?

03:35PM  17  A.  Correct.

03:35PM  18  Q.  And you recall that Mr. Bongiovanni talked to you about

03:36PM  19  how he advised Mr. Gerace that you should be Narcan

03:36PM  20  certified, correct?

03:36PM  21  A.  Correct.

03:36PM  22  Q.  And you were aware at the time that Mr. Casullo had

03:36PM  23  accused Mr. Bongiovanni of advising Mr. Gerace to get a

03:36PM  24  person who was -- sorry, who was overdosing, to get them out

03:36PM  25  of the club, correct?  You're aware of that?

USA v Bongiovanni - Carpenter - Singer/Cross - 3/21/24

90

03:36PM  1   A.  I'm sorry, can you --

03:36PM  2   Q.  Yeah, that was a bad question.  I'm sorry, I got tongue

03:36PM  3   tied.

03:36PM  4       So do you remember when you conducted this interview in

03:36PM  5   March of 2019, that Mr. Casullo had made an allegation that

03:36PM  6   Mr. Bongiovanni advised Mr. Gerace when someone was

03:36PM  7   overdosing to get them out of the club; do you remember that?

03:36PM  8   A.  Yes.

03:36PM  9   Q.  And that was your purpose of drilling down questions on

03:36PM  10  that topic of conversation, correct?

03:36PM  11  A.  Correct.

03:36PM  12  Q.  But Mr. Bongiovanni denied ever having a conversation

03:37PM  13  with Mr. Gerace when someone was actively overdosing at the

03:37PM  14  club, correct?

03:37PM  15  A.  Correct.

03:37PM  16  Q.  And he also denied that what Casullo related to

03:37PM  17  investigators was something that was accurate, correct?

03:37PM  18          **MR. DICKSON:**  Objection, hearsay.

03:37PM  19          **THE COURT:**  Overruled.

03:37PM  20          **THE WITNESS:**  Correct.

03:37PM  21          **BY MR. SINGER:**

03:37PM  22  Q.  So, one of the things you also talked about is that

03:37PM  23  Mr. Bongiovanni during your interview denied ever witnessing

03:37PM  24  Peter Gerace consume narcotics, remember that?

03:37PM  25  A.  Yes.

03:37PM    1    Q.  And that was something you reflected in your MOI,

03:37PM    2    correct?

03:37PM    3    A.  Um-hum.

03:37PM    4    Q.  But, the entry in your MOI, that's not consistent with

03:37PM    5    what was said at the interview, right?

03:37PM    6    A.  I believe that he denied seeing him -- I believe that he

03:38PM    7    denied -- stated he denied seeing him consume narcotics.

03:38PM    8    Q.  So you remember that you took notes when you were

03:38PM    9    interviewing Mr. Bongiovanni, correct?

03:38PM   10    A.  Yes.

03:38PM   11    Q.  And those notes were contemporaneous as we talked before

03:38PM   12    about?

03:38PM   13    A.  Yes.

03:38PM   14         MR. SINGER:  Ms. Champoux, if you can bring up

03:38PM   15    Government Exhibit 3595 Bravo Victor only for the witness.

03:38PM   16    And if you can just advance --

03:38PM   17         MR. COOPER:  That's up for everybody, I think.

03:38PM   18         MR. SINGER:  Sorry.  Are we all good?

03:38PM   19         THE CLERK:  Yep.

03:38PM   20         BY MR. SINGER:

03:38PM   21    Q.  I want to get to advance to page 6 of your notes.  So

03:38PM   22    I'll direct your attention, sir, to the first third of that

03:38PM   23    document just above where it mentions Pharaoh's.

03:39PM   24    A.  Yes.

03:39PM   25    Q.  And if could you review that, and see if that refreshes

03:39PM   1   your recollection about what was discussed.

03:39PM   2           MR. SINGER:  If you can bring that down,

03:39PM   3   Ms. Champoux?

03:39PM   4           BY MR. SINGER:

03:39PM   5   Q.  So, you'd agree with me that use of drugs was not

03:39PM   6   something that came up in your conversation with

03:39PM   7   Mr. Bongiovanni, but whether Mr. Bongiovanni saw Mr. Gerace

03:39PM   8   with drugs is what came up in your conversation?

03:39PM   9   A.  That's what the notes reflect.

03:39PM  10   Q.  And you'd agree with me that asking someone about whether

03:39PM  11   they saw someone with drugs is different than asking someone

03:40PM  12   about whether they saw someone use drugs, correct?

03:40PM  13   A.  Correct.

03:40PM  14   Q.  Now you talked about on direct how Mr. Bongiovanni

03:40PM  15   related to you about keeping Peter Gerace on a short leash;

03:40PM  16   do you remember that?

03:40PM  17   A.  Yes.

03:40PM  18   Q.  And that was something that you believe was a direct

03:40PM  19   quote from Mr. Bongiovanni?

03:40PM  20   A.  Yes.

03:40PM  21   Q.  And that was something -- "short leash" was a term that

03:40PM  22   you used in your MOI, that you wrote --

03:40PM  23   A.  Correct.

03:40PM  24   Q.  -- after the interview?

03:40PM  25           But would you be surprised that your notes don't reflect

03:40PM   1   that?

03:40PM   2   A.   I recall my notes reflect on that topic, yes.

03:40PM   3   Q.   You don't recall that your notes actually reflect that it

03:40PM   4   wasn't "short leash" but "leash" that was reflected by

03:40PM   5   Mr. Bongiovanni?

03:40PM   6   A.   The notes reflect as I was writing the report, I recall

03:40PM   7   him saying short prior, so the leash part was accurate and

03:41PM   8   reflected in the notes.  And as I was typing the report to

03:41PM   9   refresh my memory, I remember him saying that part of it.

03:41PM   10  Q.   Yeah.   This was the MOI that we're talking about, that

03:41PM   11  was approved almost 60 days later?

03:41PM   12  A.   Yes.

03:41PM   13  Q.   And so with regard to this comment, kind of like before,

03:41PM   14  did you ask any type of clarifying questions about what time

03:41PM   15  period Mr. Bongiovanni was referring to when he talked about

03:41PM   16  keeping Mr. Gerace on a leash or short leash?

03:41PM   17  A.   I do not.

03:41PM   18         **MR. SINGER:**   Judge, can we approach quickly?

03:41PM   19         **THE COURT:**   Sure.

03:41PM   20         (Sidebar discussion held on the record.)

03:41PM   21         **MR. SINGER:**   I just wanted to bring this up to the

03:41PM   22  bench before I asked this line of questioning.  So one of the

03:41PM   23  things that came up in direct questions of the witness was

03:42PM   24  that he had the conversation with Mr. Bongiovanni during that

03:42PM   25  interview about what was related regarding the racial

03:42PM  1    comments.

03:42PM  2           And so Mr. Bongiovanni, as testified on direct,

03:42PM  3    indicated that he denied -- denied making that comment to

03:42PM  4    Mr. Casullo.

03:42PM  5           But was not testified on direct was the reasons given

03:42PM  6    as to why he believed that he did not make that statement to

03:42PM  7    Mr. Casullo.  And, so I'd like to ask questions to give proper

03:42PM  8    context as to his response about why Mr. Casullo didn't get

03:42PM  9    things right.

03:42PM  10          **THE COURT:**  Tell me, what's the story?

03:42PM  11          **MR. SINGER:**  So what I believe is that the witness is

03:42PM  12    going to be able to testify about things that Mr. Cas --

03:42PM  13    things that Mr. Bongiovanni related about Mr. Casullo, and why

03:42PM  14    he believed that this was something that was made up, and

03:42PM  15    why -- and he gives context as to why he denied making the

03:42PM  16    statement.

03:42PM  17          So, for instance, he would talk about problems that

03:42PM  18    Mr. Casullo and he had at work.  He would talk about different

03:43PM  19    things that would happen with regard to G.S. Yensan.  He

03:43PM  20    talked about various concerns about Mr. Casullo not having his

03:43PM  21    back.  And so it provides context, like Exhibit 99.

03:43PM  22          **THE COURT:**  I think -- so, you know, I disagree with

03:43PM  23    Mr. Dickson on the Rule of Completeness right along because

03:43PM  24    I'm applying fundamentally unfair texts.

03:43PM  25          This one seems to go beyond that.  I don't think it's

03:43PM   1   out of context, you're now giving self-serving testimony

03:43PM   2   that's hearsay.  And you can prove that in other ways, but I

03:43PM   3   don't think you can include that through this, because I think

03:43PM   4   that is not giving context for what was said or not clarifying

03:43PM   5   what was said.

03:43PM   6           All you're -- you're giving reasons for what was

03:43PM   7   said, not -- not clarifying, okay?

03:43PM   8           **MR. SINGER:**  I understand, Judge.

03:43PM   9           **THE COURT:**  That's a difference.

03:43PM   10          **MR. SINGER:**  I wanted to bring it up.

03:44PM   11          **THE COURT:**  No, I appreciate you doing it.

03:44PM   12          So you won one, Mr. Dickson, without opening your

03:44PM   13   mouth.

03:44PM   14          (Sidebar discussion ended.)

03:44PM   15          **MR. SINGER:**

03:44PM   16   Q.  And, so, Mr. Carpenter, so another thing that you talked

03:44PM   17   about during direct testimony was that as you remember, back

03:44PM   18   on March 29th of 2019, you did not bring up the name Ron

03:44PM   19   Serio to Mr. Bongiovanni during the interview that you had at

03:44PM   20   the U.S. Attorney's Office, right?

03:44PM   21   A.  Correct.

03:44PM   22   Q.  But it would be fair to say that you did discuss people

03:44PM   23   associated with the Ron Serio case during the March 29, 2019,

03:44PM   24   interview, correct?

03:44PM   25   A.  Correct.

03:44PM   1   Q.  So, I know -- you didn't note those discussions inside

03:44PM   2   your MOI; is that right?

03:44PM   3   A.  That's correct.

03:44PM   4   Q.  But you did note those discussions inside your notes,

03:44PM   5   correct?

03:44PM   6   A.  Correct.

03:44PM   7   Q.  Was there a reason you left it out of your MOI?

03:44PM   8   A.  No, there was not.  It was -- it probably should have

03:45PM   9   been included.

03:45PM   10   Q.  Yeah, because, I mean, the purpose of the MOI is to

03:45PM   11   document all parts of your interview with Mr. Bongiovanni,

03:45PM   12   correct?

03:45PM   13   A.  Correct.

03:45PM   14   Q.  And by excluding those details about the interview, it's

03:45PM   15   not a complete and accurate report, correct?

03:45PM   16   A.  It leaves out that section of the interview, yes.

03:45PM   17   Q.  So, one of the names that you discussed back on March 29,

03:45PM   18   2019, was a person by the name of T.S., correct?

03:45PM   19   A.  Yes.

03:45PM   20   Q.  And we talked about that name a while back when we first

03:45PM   21   started cross-examination, correct?

03:45PM   22   A.  Yes.

03:45PM   23   Q.  He was somebody who was associated with the Ron Serio

03:45PM   24   investigation because there were allegations made by Ron

03:45PM   25   Serio that T.S.'s name was provided to him by

USA v Bongiovanni - Carpenter - Singer/Cross - 3/21/24

03:45PM  1   Mr. Bongiovanni, correct?

03:45PM  2   A.  Yes, I believe so.

03:45PM  3   Q.  And so that was one of the reasons why you raised that

03:45PM  4   name, correct?

03:45PM  5   A.  Yes.

03:45PM  6   Q.  You wanted to get some background and understanding about

03:45PM  7   whether Mr. Bongiovanni ever had him as a confidential

03:45PM  8   informant, correct?

03:45PM  9   A.  I just want to know what his reaction -- what his

03:46PM  10  response would be to that name.

03:46PM  11  Q.  Okay.  And his response was, is that he knew that that

03:46PM  12  person was someone associated with someone they were trying

03:46PM  13  to buy drugs from when they had R.K. as a source, correct?

03:46PM  14  A.  Yes, I believe so.

03:46PM  15  Q.  But other than that, he didn't know who T.S. was?

03:46PM  16  A.  I don't recall, I don't believe so.

03:46PM  17  Q.  Okay.  And another person you had brought up was a person

03:46PM  18  by the name of Charles Newkirk?

03:46PM  19  A.  Yes.

03:46PM  20  Q.  And those are things -- that was another person that was

03:46PM  21  associated with the Ron Serio investigation, correct?

03:46PM  22  A.  I believe so, yes.

03:46PM  23  Q.  And so in talking about these names, you don't remember

03:46PM  24  ever mentioning the names Ron Serio?

03:46PM  25  A.  No, I did not.

03:46PM  1    Q.  Because, I mean, all these people are associated with the

03:46PM  2    Ron Serio investigation; you'd agree with me on that, right?

03:46PM  3    A.  Yes.

03:46PM  4    Q.  And the purpose of you asking questions about those

03:46PM  5    individuals was to further the investigation into the Ron

03:47PM  6    Serio part of the case, right?

03:47PM  7    A.  Correct.

03:47PM  8    Q.  But you still don't recall ever mentioning anything of

03:47PM  9    Ron Serio?

03:47PM  10   A.  I did not mention the name Ron Serio.

03:47PM  11   Q.  I know the name doesn't appear in your MOI, right?

03:47PM  12   A.  Correct.

03:47PM  13   Q.  It doesn't appear in your notes?

03:47PM  14   A.  Correct.

03:47PM  15   Q.  Did you ever fail to note it?

03:47PM  16   A.  It didn't need to be noted because it wasn't said.

03:47PM  17   Q.  But, I mean, there were a couple things we went through

03:47PM  18   today where they may not necessarily be reflected in your

03:47PM  19   report, but sometimes they're reflected in your notes and

03:47PM  20   sometimes they're not, right?

03:47PM  21   A.  Correct.

03:47PM  22   Q.  So, you'd agree with me that as far as the Ron Serio

03:47PM  23   investigation was concerned, Mr. Bongiovanni has knowledge

03:47PM  24   about who Ron Serio is, right?

03:47PM  25   A.  Yes.

03:47PM   1   Q.  And he has knowledge about different buys that he wanted

03:47PM   2   to conduct with R.K., correct?

03:47PM   3   A.  Correct.

03:47PM   4   Q.  And that's what T.S. comes into play with, correct?

03:47PM   5   A.  I believe so, yes.

03:47PM   6   Q.  And so by asking these questions, you're giving him

03:47PM   7   context into an investigative angle that you and your team

03:47PM   8   are taking, correct?

03:47PM   9   A.  I'm asking about -- I'm asking about names.  If he wants

03:48PM  10   to make leaps, he can.

03:48PM  11   Q.  But you're asking about these names, correct?

03:48PM  12   A.  Correct.

03:48PM  13   Q.  And these names aren't associated with Peter Gerace in

03:48PM  14   any way, right?

03:48PM  15   A.  Yes.

03:48PM  16   Q.  So, on June 6th, 2019, you conduct another interview in

03:48PM  17   Mr. Bongiovanni's living room, correct?

03:48PM  18   A.  Yes.

03:48PM  19   Q.  And at that point in time, the topic of Ron Serio comes

03:48PM  20   up, right?

03:48PM  21   A.  Correct.

03:48PM  22   Q.  And one of the things that you testified on direct was

03:48PM  23   that you didn't understand why this happened, correct?

03:48PM  24   A.  I'm sorry?

03:48PM  25   Q.  I said one of the things that you testified to on direct

03:48PM  1   is you didn't understand why Mr. Bongiovanni would say that

03:48PM  2   you referred to Ron Serio during your March 29, 2019

03:48PM  3   interview, when you don't believe you raised that name,

03:48PM  4   correct?

03:48PM  5   A.  Correct.

03:48PM  6   Q.  But you did raise people associated with the Ron Serio

03:48PM  7   investigation on March 29, 2019 correct?

03:48PM  8   A.  Correct.

03:48PM  9          MR. DICKSON:  Objection, asked and answered.

03:49PM  10          THE COURT:  No, overruled.

03:49PM  11          BY MR. SINGER:

03:49PM  12   Q.  So, it's possible Mr. Bongiovanni may have mistaken

03:49PM  13   whether or not you've raised Ron Serio, correct?

03:49PM  14   A.  I'm not -- I don't know.  I don't know what -- he said I

03:49PM  15   brought it up, and I didn't.  I don't know what his was.

03:49PM  16          MR. SINGER:  Okay.  Thank you very much.

03:49PM  17          I have no further questions, Judge.

03:49PM  18          THE COURT:  Any redirect?

03:49PM  19          MR. DICKSON:  Yes, Judge, I'll be quick.

03:49PM  20          THE COURT:  Go ahead.

03:49PM  21

03:49PM  22          REDIRECT EXAMINATION BY MR. DICKSON:

03:49PM  23   Q.  Mr. Carpenter, I want to start by asking you about

03:49PM  24   Mr. Bongiovanni's DEA issued cell phone.

03:49PM  25   A.  Yes.

03:49PM    1    Q.  Do you remember Mr. Singer asking you about that?  Do you

03:49PM    2    remember Mr. Singer asking you about that?

03:49PM    3    A.  Yes.

03:49PM    4    Q.  Did the defendant say anything to you about how or what

03:49PM    5    he used his DEA issued cell phone for?

03:49PM    6    A.  He stated that his DEA issued cell phone he used both for

03:50PM    7    his professional DEA use as well as personal use.

03:50PM    8    Q.  Did you understand through the course of your

03:50PM    9    investigation that the defendant wiped his DEA cell phone?

03:50PM   10    A.  Correct.

03:50PM   11    Q.  Do you remember Mr. Singer asking you questions about

03:50PM   12    recording the March 29th interview?

03:50PM   13    A.  Correct.

03:50PM   14    Q.  Is documenting an interview with handwritten notes a

03:50PM   15    normal part of what federal agents do?

03:50PM   16    A.  Yes.

03:50PM   17    Q.  Is that something you've done a lot throughout your

03:50PM   18    career?

03:50PM   19    A.  Yes.

03:50PM   20    Q.  Is it normal to not write down the questions that you

03:50PM   21    ask?

03:50PM   22    A.  Yes.

03:50PM   23    Q.  And when you draft your report from your interview, does

03:50PM   24    your report reflect both a combination of your memory and the

03:50PM   25    notes that you took?

03:50PM   1   A.  Yes.

03:50PM   2   Q.  Mr. Singer also asked you about a delay in the process of

03:50PM   3   getting your report approved; is that right?

03:50PM   4   A.  Correct.

03:50PM   5   Q.  You mentioned, I think, that you wrote the MOI within

03:50PM   6   five days of doing the interview; is that right?

03:51PM   7   A.  Yes.

03:51PM   8   Q.  Why do you remember that you wrote it within five days?

03:51PM   9   A.  The DOJ OIG policy is to write reports, and best practice

03:51PM  10   is to write reports, within five days.  So that memory and

03:51PM  11   notes are both fresh.  So that anything that is missing from

03:51PM  12   the notes is still fresh in your memory.

03:51PM  13       So I wrote the report within five days to follow policy

03:51PM  14   and make sure that it is accurate.

03:51PM  15   Q.  Mr. Singer also asked you some questions about the Vegas

03:51PM  16   trip; is that right?

03:51PM  17   A.  Yes.

03:51PM  18   Q.  Mr. Carpenter, in the course of your investigation, did

03:51PM  19   you personally interview somebody named Tara Ostrowski?

03:51PM  20   A.  I don't recall.  I'm sorry.

03:51PM  21   Q.  Do you remember or believe whether you interviewed

03:51PM  22   somebody named Tara Ostrowski?

03:51PM  23   A.  I believe so, but --

03:51PM  24   Q.  You personally did?

03:51PM  25   A.  I don't believe I ever did, no.

03:51PM   1    Q.  Do you know whether later on, other members of the team

03:52PM   2    interviewed somebody named Tara Ostrowski?

03:52PM   3    A.  I believe so, yes.

03:52PM   4    Q.  Mr. Singer also asked you about those memos; do you

03:52PM   5    remember that?

03:52PM   6    A.  Yes.

03:52PM   7    Q.  Were you already investigating the defendant and his

03:52PM   8    relationship to Peter Gerace at the time the defendant sent

03:52PM   9    those memos to his leadership?

03:52PM  10    A.  Yes.

03:52PM  11    Q.  Now Mr. Singer also asked you about whether the name Ron

03:52PM  12    Serio or other names came up in your March 29, 2019 interview

03:52PM  13    of the defendant; is that right?

03:52PM  14    A.  Yes.

03:52PM  15    Q.  Now as of March 29, 2019, Mr. Carpenter, you hadn't

03:52PM  16    searched the defendant's house; is that right?

03:52PM  17    A.  Correct.

03:52PM  18    Q.  Had you obtained the Serio file at that time?

03:52PM  19    A.  No.

03:52PM  20    Q.  Did you know all of the different people who might or

03:52PM  21    might not be associated with Ron Serio?

03:52PM  22    A.  No.

03:52PM  23    Q.  But do you remember clearly whether you said to the

03:53PM  24    defendant in March 29, 2019, whether you clearly said to the

03:53PM  25    defendant anything about the name Ron Serio?

03:53PM     1   A.  I did not mention the name Ron Serio during the March

03:53PM     2   meeting.

03:53PM     3   Q.  Mr. Singer also asked you about the -- whether you

03:53PM     4   clarified the time frame when you asked the defendant about

03:53PM     5   initiating contact with Peter Gerace; do you remember those

03:53PM     6   questions?

03:53PM     7   A.  Yes.

03:53PM     8   Q.  What was the question you asked the defendant when you

03:53PM     9   asked about initiating contact?

03:53PM    10   A.  Have you ever initiated contact with Peter Gerace?

03:53PM    11   Q.  What did he say?

03:53PM    12   A.  He denied it.  He denied initiating contact.

03:53PM    13   Q.  He denied -- did he deny ever initiating contact?

03:53PM    14   A.  That was the question that was asked.

03:53PM    15          **MR. SINGER:**  Objection.

03:53PM    16          **THE COURT:**  I'm sorry?

03:53PM    17          **MR. SINGER:**  Can we approach, Judge?

03:53PM    18          **THE COURT:**  Sure.

03:53PM    19          (Sidebar discussion held on the record.)

03:53PM    20          **MR. SINGER:**  So Mr. Dickson:  Asked what was the

03:54PM    21   question you asked of Mr. Bongiovanni?

03:54PM    22          And the response to that given was:  Did you ever

03:54PM    23   initiate contact with Mr. Gerace?

03:54PM    24          Then the next question was:  Did you ask him did you

03:54PM    25   ever, you know, initiate contact.

03:54PM  1        That wasn't the response back that he got.  I think

03:54PM  2   at this point in time, number 1, you know, the question's

03:54PM  3   asked and answered.  And number 2, as far as the response, of

03:54PM  4   ever, like, we have clearly what the question was at this

03:54PM  5   point in time.  And whether counsel wants to phrase it

03:54PM  6   differently, it's improper, it's an improper question.

03:54PM  7        **THE COURT:**  What was the question?

03:54PM  8        **MR. SINGER:**  What was the -- it was an open-ended

03:54PM  9   question --

03:54PM  10       **THE COURT:**  So what was the question that you asked

03:54PM  11  about initiating contact?

03:54PM  12       Have you ever initiated contacted with Peter Gerace.

03:54PM  13       What did he say?

03:54PM  14       He denied it.  He denied initiating contact.

03:54PM  15       He denied -- did he deny ever initiating contact?

03:55PM  16       So that's asked -- that's asked and answered, right?

03:55PM  17  I mean, you've gotten it in.  He said no, he never initiated

03:55PM  18  contact.

03:55PM  19       **MR. DICKSON:**  Okay, Judge.

03:55PM  20       (Sidebar discussion ended.)

03:55PM  21       **THE COURT:**  Next question.  That objection is

03:55PM  22  sustained.

03:55PM  23       **MR. DICKSON:**  That's fine, Judge.  I'm all done.

03:55PM  24       Thank you, Mr. Carpenter.

03:55PM  25       **THE COURT:**  Anything more, Mr. Singer?

03:55PM      1              **MR. SINGER:**  No, Your Honor.  Thank you.

03:55PM      2              **THE COURT:**  You can step down, sir.  Thank you.

03:55PM      3              (Witness excused at 3:55 p.m.)

             4              (Excerpt concluded at 3:55 p.m.)

             5                *     *     *     *     *     *     *

             6

             7

             8

             9                    **CERTIFICATE OF REPORTER**

            10

            11              In accordance with 28, U.S.C., 753(b), I

            12  certify that these original notes are a true and correct

            13  record of proceedings in the United States District Court for

            14  the Western District of New York on March 21, 2024.

            15

            16

            17                    s/ Ann M. Sawyer
                                  _____
            18                    Ann M. Sawyer, FCRR, RPR, CRR
                                  Official Court Reporter
            19                    U.S.D.C., W.D.N.Y.

            20

            21

            22

            23

            24

            25

**TRANSCRIPT INDEX**

**EXCERPT OF DAVID CARPENTER**

**MARCH 21, 2024**

**W I T N E S S**                                          **P A G E**

**D A V I D   C A R P E N T E R**                          2

  DIRECT EXAMINATION BY MR. DICKSON:            2

  CROSS-EXAMINATION BY MR. SINGER:             34

  REDIRECT EXAMINATION BY MR. DICKSON:         100