09:23AM

1               **UNITED STATES DISTRICT COURT**
               **WESTERN DISTRICT OF NEW YORK**

2

_____

3   **UNITED STATES OF AMERICA,**

                       Case No. 1:19-cr-227

4           Plaintiff,           (LJV)

   v.

5                       March 28, 2024

   **JOSEPH BONGIOVANNI,**

6

             Defendant.

7   _____

8               **TRANSCRIPT OF JURY TRIAL**
         **BEFORE THE HONORABLE LAWRENCE J. VILARDO**

9             **UNITED STATES DISTRICT JUDGE**

10

   **APPEARANCES:**       **TRINI E. ROSS, UNITED STATES ATTORNEY**

11              **BY: JOSEPH M. TRIPI, ESQ.**
                 **NICHOLAS T. COOPER, ESQ.**

12                 **CASEY L. CHALBECK, ESQ.**
              Assistant United States Attorneys

13              Federal Centre
              138 Delaware Avenue

14              Buffalo, New York 14202
                And

15              **UNITED STATES DEPARTMENT OF JUSTICE**
              **BY: JORDAN ALAN DICKSON, ESQ.**

16              1301 New York Ave NW
              Suite 1000

17              Washington, DC 20530-0016
              For the Plaintiff

18

              **SINGER LEGAL PLLC**

19              **BY: ROBERT CHARLES SINGER, ESQ.**
              80 East Spring Street

20              Williamsville, New York 14221
                And

21              **LAW OFFICES OF PARKER ROY MacKAY**
              **BY: PARKER ROY MacKAY, ESQ.**

22              3110 Delaware Avenue
              Kenmore, New York  14217

23              For the Defendant

24   **PRESENT:**         **BRIAN A. BURNS,** FBI Special Agent
              **MARILYN K. HALLIDAY,** HSI Special Agent

25              **KAREN A. CHAMPOUX,** USA Paralegal

| | | |
|---|---|---|
| 1 | **LAW CLERK:** | **REBECCA FABIAN IZZO, ESQ.** |
| 2 | **COURT DEPUTY CLERK:** | **COLLEEN M. DEMMA** |
| 3 | **COURT REPORTER:** | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 4 | | Robert H. Jackson Federal Courthouse<br>2 Niagara Square<br>Buffalo, New York  14202 |
| 5 | | Ann_Sawyer@nywd.uscourts.gov |

6

7                    *    *    *    *    *    *    *

8

9

10          (Proceedings commenced at 9:36 a.m.)

09:36AM  11          (Jury not present.)

09:36AM  12          **THE CLERK:**  All rise.  United States District Court

09:36AM  13   for the Western District of New York is now in session, the

09:36AM  14   Honorable Lawrence J. Vilardo presiding.

09:36AM  15          **THE COURT:**  Please be seated.

09:36AM  16          **THE CLERK:**  19-cr-227, United States of America

09:36AM  17   versus Joseph Bongiovanni.

09:36AM  18          Assistant United States Attorneys Joseph Tripi,

09:36AM  19   Nicholas Cooper, Casey Chalbeck, and DOJ Trial Attorney Jordan

09:36AM  20   Dickson, and paralegal Karen Champoux ON an behalf of the

09:36AM  21   government.  Also present is HSI Special Agent Marilyn

09:36AM  22   Halliday and FBI Special Agent Brian Burns.

09:36AM  23          Attorneys Parker MacKay and Robert Singer appearing

09:36AM  24   with defendant.  Defendant is present.

09:36AM  25          This is the date set for the continuation of a jury

| | | |
|---|---|---|
| 09:36AM | 1 | trial. |
| 09:36AM | 2 | **THE COURT:**  Okay.  Good morning, everybody. |
| 09:36AM | 3 | **ALL PARTIES:**  Good morning, Judge. |
| 09:36AM | 4 | **THE COURT:**  So a couple things I'd like to do before |
| 09:36AM | 5 | we begin with today's testimony.  We received a note, first of |
| 09:37AM | 6 | all, that juror number 2 knows someone named Mike Macaluso, |
| 09:37AM | 7 | friend of a friend, does not think it's the same person. |
| 09:37AM | 8 | Anything we need to do about that? |
| 09:37AM | 9 | **MR. MacKAY:**  Judge, I don't think so if he's not |
| 09:37AM | 10 | indicating he knows who he is. |
| 09:37AM | 11 | **THE COURT:**  Yeah.  And he didn't testify.  It was a |
| 09:37AM | 12 | stipulation, so -- |
| 09:37AM | 13 | **MR. COOPER:**  And I think by expressing that they |
| 09:37AM | 14 | don't think it's the same person, it infers that there's not |
| 09:37AM | 15 | going to be any bias or partiality, so I have nothing, Judge. |
| 09:37AM | 16 | **THE COURT:**  Yeah, I mean, we can bring the juror in |
| 09:37AM | 17 | if the defense thinks that there's reason to do that. |
| 09:37AM | 18 | Mr. Singer, any thought about that?  In an abundance of |
| 09:37AM | 19 | caution, do you want to? |
| 09:37AM | 20 | **MR. SINGER:**  I think, I mean, we made it clear that |
| 09:37AM | 21 | the person works at -- I guess if you want to bring him in and |
| 09:37AM | 22 | ask him do you have a negative opinion, you know, I -- I guess |
| 09:37AM | 23 | that would be the only question. |
| 09:37AM | 24 | **THE COURT:**  Yeah, look it, I don't think it's |
| 09:38AM | 25 | necessary, but look, I'm a belt-and-suspenders guy, so let's |

USA v Bongiovanni - Proceedings - 3/28/24

4

| | | |
|---|---|---|
| 09:38AM | 1 | bring juror number 2 in. |
| 09:38AM | 2 | **MR. COOPER:**  He says boots-and-suspenders all the |
| 09:38AM | 3 | time, and we give him a hard time about it.  I'm just making |
| 09:38AM | 4 | fun of him. |
| 09:38AM | 5 | **MR. TRIPI:**  I say boots. |
| 09:38AM | 6 | **THE COURT:**  Why would you think boots and suspenders? |
| 09:38AM | 7 | **MR. COOPER:**  It makes no sense. |
| 09:38AM | 8 | **THE COURT:**  Yeah. |
| 09:38AM | 9 | **MR. TRIPI:**  I don't know where I heard it from, but I |
| 09:38AM | 10 | clearly heard wrong the first time in my brain. |
| 09:38AM | 11 | **THE COURT:**  Saint Joe's.  Saint Joe's. |
| 09:38AM | 12 | (Juror 2 entered courtroom at 9:38 a.m.) |
| 09:38AM | 13 | **THE COURT:**  Good morning.  So we have Juror Number 2 |
| 09:38AM | 14 | here.  You know a Mike Macaluso you who don't think is the |
| 09:38AM | 15 | same person? |
| 09:38AM | 16 | **JUROR 2:**  I do, Your Honor. |
| 09:38AM | 17 | **THE COURT:**  Anything about that at all that makes you |
| 09:38AM | 18 | feel as though you couldn't be fair here? |
| 09:38AM | 19 | **JUROR 2:**  No, sir. |
| 09:38AM | 20 | **THE COURT:**  If it turns out to be the same person, do |
| 09:38AM | 21 | you have a positive or a negative opinion of that person that |
| 09:38AM | 22 | would make you feel as though couldn't judge the stipulation |
| 09:39AM | 23 | fairly? |
| 09:39AM | 24 | **JUROR 2:**  No, Your Honor. |
| 09:39AM | 25 | **THE COURT:**  Anything anybody wants to ask? |

09:39AM      1              **MR. MacKAY:**  No, Your Honor.

09:39AM      2              **MR. COOPER:**  Thank you, no.

09:39AM      3              **THE COURT:**  Thank you, appreciate it.

09:39AM      4              (Juror 2 exited the courtroom at 9:39 a.m.)

09:39AM      5              **THE COURT:**  Okay.  Now second, I understand that

09:39AM      6   Mr. Bongiovanni has decided not to testify, and I just want to

09:39AM      7   address that with him.

09:39AM      8              **MR. SINGER:**  Yes, Your Honor.

09:39AM      9              **THE COURT:**  You've had a -- and I know you know this,

09:39AM     10   but I just feel an obligation to do.

09:39AM     11              You can sit.

09:39AM     12              I just feel an obligation to go over this with you.

09:39AM     13              You've talked with your lawyers about your right to

09:39AM     14   testify, Mr. Bongiovanni?

09:39AM     15              **THE DEFENDANT:**  Yes, Your Honor.

09:39AM     16              **THE COURT:**  And you understand that you have that

09:39AM     17   right to testify?

09:39AM     18              **THE DEFENDANT:**  I do.

09:39AM     19              **THE COURT:**  Do you understand that if you don't

09:39AM     20   testify, that can't be used against you.  But we don't know

09:39AM     21   what the jurors are going to be thinking, right?  So you have

09:39AM     22   to make that decision in conjunction with your lawyers whether

09:39AM     23   or not it's in your best interest to testify or not to

09:39AM     24   testify; do you understand that?

09:39AM     25              **THE DEFENDANT:**  I do.

09:39AM    1            **THE COURT:**  Okay.  And you've had a conversation with

09:39AM    2    your lawyers?

09:39AM    3            **THE DEFENDANT:**  I have.

09:39AM    4            **THE COURT:**  You're satisfied with their

09:40AM    5    representation of you?

09:40AM    6            **THE DEFENDANT:**  Supremely.

09:40AM    7            **THE COURT:**  And you and they have made that decision

09:40AM    8    jointly?

09:40AM    9            **THE DEFENDANT:**  We have.

09:40AM   10            **THE COURT:**  And it's your personal decision not to

09:40AM   11    testify; is that correct?

09:40AM   12            **THE DEFENDANT:**  That's correct.

09:40AM   13            **THE COURT:**  Okay.  Does the government think there's

09:40AM   14    anything more that I need do in that regard?

09:40AM   15            **MR. COOPER:**  No, thank you, Judge.

09:40AM   16            **THE COURT:**  Okay.  Great.  That's all I have.  Is

09:40AM   17    there anything that either side wants to do before we resume?

09:40AM   18            **MR. DICKSON:**  No, Your Honor.

09:40AM   19            **MR. SINGER:**  Ms. Champoux is downloading some

09:40AM   20    exhibits, and my computer is currently 53 percent through an

09:40AM   21    update.  So if we can just hold fast for a couple of moments

09:40AM   22    while this happens, Judge.

09:40AM   23            I'm up to 80 percent now.  Sorry.

09:40AM   24            **THE COURT:**  That's fine.  I hate -- I hate computers.

09:40AM   25    I hate computers.

| | | |
|---|---|---|
| 09:40AM | 1 | **MS. CHAMPOUX:**  I'm good, so whenever you're ready. |
| 09:40AM | 2 | **THE COURT:**  You let me know, Mr. Singer, when your |
| 09:41AM | 3 | little bar is all the way full. |
| 09:41AM | 4 | **MR. SINGER:**  We're still working. |
| 09:41AM | 5 | **THE COURT:**  Off the record. |
| 09:41AM | 6 | (Off the record at 9:41 a.m.) |
| 09:41AM | 7 | (Back on the record at 9:43 a.m.) |
| 09:43AM | 8 | (Jury not present.) |
| 09:43AM | 9 | **MR. SINGER:**  I'm good, Judge, thank you. |
| 09:43AM | 10 | **THE COURT:**  And, Ms. Champoux, you said you're ready? |
| 09:43AM | 11 | **MS. CHAMPOUX:**  Yes. |
| 09:43AM | 12 | **THE COURT:**  Okay.  Let's bring them in, please, Pat. |
| 09:44AM | 13 | (Jury seated at 9:44 a.m.) |
| 09:44AM | 14 | **THE COURT:**  Good morning, everyone. |
| 09:44AM | 15 | **ALL JURORS:**  Good morning. |
| 09:44AM | 16 | **THE COURT:**  The record will reflect that all our |
| 09:44AM | 17 | jurors are present.  We've fixed the little computer issues we |
| 09:44AM | 18 | had, and we're ready to go. |
| 09:45AM | 19 | So, Mr. Singer, you may call your next witness. |
| 09:45AM | 20 | **MR. SINGER:**  Yes, Your Honor.  The defense calls Tom |
| 09:45AM | 21 | Devereaux. |
| 09:45AM | 22 | |
| 09:45AM | 23 | **T H O M A S   D E V E R E A U X,** having been duly called and |
| 09:46AM | 24 | sworn, testified as follows: |
| 09:46AM | 25 | **MR. SINGER:**  May I proceed, Your Honor? |

09:46AM 1          **THE COURT:**  You may.

09:46AM 2          **MR. SINGER:**  Thank you.

09:46AM 3

09:46AM 4              **DIRECT EXAMINATION BY MR. SINGER:**

09:46AM 5     Q.  Good morning, Mr. Devereaux.

09:46AM 6     A.  Good morning.

09:46AM 7     Q.  Where did you grow up, sir?

09:46AM 8     A.  In Barker, New York.  In Niagara County.

09:46AM 9     Q.  And where do you live now?

09:46AM 10    A.  I live in Lockport, New York.

09:46AM 11    Q.  Where did you go to school?

09:46AM 12    A.  Niagara Community College and Niagara University.

09:46AM 13    Q.  And when you went to Niagara University, did you graduate

09:46AM 14    with a particular degree?

09:46AM 15    A.  I did.  Business degree with an emphasis in accounting.

09:46AM 16    Q.  What year did you graduate, sir?

09:46AM 17    A.  1999.

09:46AM 18    Q.  Do you do any other type of further education?

09:46AM 19    A.  No.

09:46AM 20    Q.  How about do you hold any type of professional licenses

09:46AM 21    or certifications?

09:46AM 22    A.  I'm a certified public accountant in the State of

09:46AM 23    New York, and a certified fraud examiner.

09:46AM 24    Q.  So let's start with certified public accountant, it's a

09:47AM 25    CPA?

9

| | | |
|---|---|---|
| 09:47AM | 1 | A.   CPA. |
| 09:47AM | 2 | Q.   So what is a CPA? |
| 09:47AM | 3 | A.   You -- we practice accounting.  We provide audit |
| 09:47AM | 4 | services, tax services, consulting services, to various |
| 09:47AM | 5 | businesses and individuals.  We're licensed in the State of |
| 09:47AM | 6 | New York, which means we have to, you know, meet certain |
| 09:47AM | 7 | education requirements every year.  There's a test that we |
| 09:47AM | 8 | have to pass to become certified. |
| 09:47AM | 9 | Q.   What type of documents and records do you review as a |
| 09:47AM | 10 | CPA? |
| 09:47AM | 11 | A.   Any kind of -- all different kinds of financial records. |
| 09:47AM | 12 | Financial statements of corporations, bank statements, credit |
| 09:47AM | 13 | card statements, all -- yeah. |
| 09:47AM | 14 | Q.   How long have you been a CPA for, sir? |
| 09:47AM | 15 | A.   20 years. |
| 09:47AM | 16 | Q.   And as far as the licensure requirements or |
| 09:47AM | 17 | certifications, are there yearly trainings that you have to |
| 09:48AM | 18 | attend or go through to maintain your certification? |
| 09:48AM | 19 | A.   Correct.  40 hours of continuing professional education |
| 09:48AM | 20 | per year. |
| 09:48AM | 21 | Q.   You also mentioned that you're a certified fraud |
| 09:48AM | 22 | examiner; is that right? |
| 09:48AM | 23 | A.   Yes. |
| 09:48AM | 24 | Q.   That's known as a CFE? |
| 09:48AM | 25 | A.   That's a CFE. |

09:48AM   1   Q.  So what is a CFE?

09:48AM   2   A.  A certified fraud examiner, you know, specialize in, you

09:48AM   3   know, fraud and forensic examinations.  You get that

09:48AM   4   certification, there's certain experience requirements that

09:48AM   5   have to be met.  You know, as a CPA, those were already met,

09:48AM   6   so there is a test that you need to pass in order to get your

09:48AM   7   CFE certification.

09:48AM   8   Q.  And similar to being a CPA, do you have to go through

09:48AM   9   certain training requirements year by year to maintain the

09:48AM   10   certification?

09:48AM   11   A.  Correct.  20 hours of continuing education for that, ten

09:49AM   12   of -- ten of those hours have to be specific to fraud, and

09:49AM   13   two have to be specific to ethics each year.

09:49AM   14   Q.  How about the documents and records that you review, are

09:49AM   15   they the same as you would as a --

09:49AM   16   A.  In many --

09:49AM   17   Q.  -- CPA that --

09:49AM   18   A.  -- instances.

09:49AM   19   Q.  -- you would review as a CFE?

09:49AM   20   A.  Correct.  In many instances, that's true.

09:49AM   21   Q.  So just so you know, Ann is taking a typed record of our

09:49AM   22   words back and forth, so if we talk over each other, it

09:49AM   23   doesn't --

09:49AM   24   A.  Sorry.

09:49AM   25   Q.  -- make her job any easier, so, just --

USA v Bongiovanni - Devereaux - Singer/Direct - 3/28/24

| | | |
|---|---|---|
| 09:49AM | 1 | A.  Sorry. |
| 09:49AM | 2 | Q.  -- wait for the end of my question.  It's not a problem. |
| 09:49AM | 3 | So how long have you been a CFE, sir? |
| 09:49AM | 4 | A.  14 years. |
| 09:49AM | 5 | Q.  And do you belong to any type of professional |
| 09:49AM | 6 | organizations? |
| 09:49AM | 7 | A.  I do.  The American Institute of Certified Public |
| 09:49AM | 8 | Accountants, that's the AICPA.  And New York State Certified |
| 09:50AM | 9 | Public Accountants. |
| 09:50AM | 10 | Q.  What is the American Institute of CPAs?  What type of |
| 09:50AM | 11 | organization is that? |
| 09:50AM | 12 | A.  It's an organization of CPAs across the country.  You |
| 09:50AM | 13 | know, specific to a lot of what I do.  They regulate the |
| 09:50AM | 14 | rules that we have to follow for auditing procedures.  You're |
| 09:50AM | 15 | auditing companies. |
| 09:50AM | 16 | Q.  How does one become a member of the AICPA? |
| 09:50AM | 17 | A.  There's different levels of membership.  It's, you know, |
| 09:50AM | 18 | you're a CPA, once you are a CPA, to get that all you really |
| 09:50AM | 19 | need to do is pay your annual dues. |
| 09:50AM | 20 | Q.  And what type of level of membership do you have in that |
| 09:50AM | 21 | organization? |
| 09:50AM | 22 | A.  As a CPA member. |
| 09:50AM | 23 | Q.  How about the New York Society of CPAs, what's involved |
| 09:50AM | 24 | in becoming a member of that organization? |
| 09:50AM | 25 | A.  It's similar to the AICPA, it's different -- with |

09:51AM  1  New York CPAs specifically.

09:51AM  2  Q.  And do membership in these organizations help you with

09:51AM  3  your yearly training requirements to maintain certifications?

09:51AM  4  A.  Yeah, there's different classes we can use through them.

09:51AM  5  But there's also, you know, CPA require -- CPE requirements,

09:51AM  6  education requirements, that you have to meet to be able to

09:51AM  7  say in the AICPA.

09:51AM  8  Q.  So I, as an attorney, I belong to the Bar Association of

09:51AM  9  the State of New York, and they are the ones who license me

09:51AM  10  to do my work.  So is the CPA Association of New York State

09:51AM  11  somewhat similar?

09:51AM  12  A.  Similar, yes.

09:51AM  13  Q.  Okay.  And then as far as being a CFE, do you belong to

09:51AM  14  any type of organizations that are specific to CFEs?

09:51AM  15  A.  I do not.  Just ACFE.  It's American -- sorry --

09:51AM  16  Certified Fraud Examiners.

09:51AM  17  Q.  Okay.  So what's the American Association of Certified --

09:51AM  18  A.  It's the Association of Certified Fraud Examiners, ACFE.

09:51AM  19  Q.  Sorry to get that wrong.  So what is the Association of

09:52AM  20  CFEs?

09:52AM  21  A.  They're the ones who certified you as a CFE.  Once again,

09:52AM  22  the education requirements that I talked about to maintain

09:52AM  23  your CFE certification are through the ACFE.

09:52AM  24  Q.  Okay.  What is it that do you for work now,

09:52AM  25  Mr. Devereaux?

USA v Bongiovanni - Devereaux - Singer/Direct - 3/28/24

09:52AM 1  A.  I'm in the audit insurance practice.  I'm a director at

09:52AM 2  Freed, Maxick CPAs.

09:52AM 3  Q.  What is Freed, Maxick?

09:52AM 4  A.  Certified public accountants.

09:52AM 5  Q.  And what type of -- I'm sorry, how long have you worked

09:52AM 6  at Freed, Maxick for?

09:52AM 7  A.  About nine and a half years.

09:52AM 8  Q.  How long have you been a director at Freed, Maxick?

09:52AM 9  A.  About three months.

09:52AM 10  Q.  Prior to becoming a member at Freed, Maxick, did you work

09:52AM 11  at any other type of accounting firms?

09:52AM 12  A.  I did.  I worked at two other accounting firms.  I worked

09:52AM 13  for five years at Tronconi Segarra & Associates.

09:53AM 14  Q.  And after you left Tronconi Segarra & Associates, where

09:53AM 15  did you go from there?

09:53AM 16  A.  That's where I went to, Freed, prior to Tronconi

09:53AM 17  Segarra & Associates, I was at Dopkins & Company.

09:53AM 18  Q.  So what kind of financial investigations do you perform

09:53AM 19  in your current role at Freed, Maxick?

09:53AM 20  A.  You know, our audits are certainly investigations of a

09:53AM 21  company's books and records.  I've done several different

09:53AM 22  engagements that were, you know, specific to, like, contract

09:53AM 23  law, for instance -- or, I'm sorry, not contract law,

09:53AM 24  contract disputes.  That's mainly the focus of where our

09:54AM 25  forensic is at this point.

USA v Bongiovanni - Devereaux - Singer/Direct - 3/28/24

09:54AM   1   Q.  When you talk about forensics, what are you referring to
09:54AM   2   when you talk about that?
09:54AM   3   A.  At certain times it's, you know, we're looking for
09:54AM   4   possibly, you know, missing income or missing assets.  Other
09:54AM   5   times it's, you know, were the payments that were supposed to
09:54AM   6   be made to people that weren't made.  Things of that nature.
09:54AM   7   Q.  Prior to joining Freed, Maxick when you were working at
09:54AM   8   Tronconi Segarra & Associates, and Dopkins, were you engaged
09:54AM   9   in a similar type of work?
09:54AM  10   A.  At Tronconi Segarra & Associates, I was.  We did work in
09:54AM  11   the bankruptcy realm where we would -- did small audits where
09:54AM  12   the audits really were specifically looking at debtors and
09:54AM  13   whether or not they had reported any missing income or
09:54AM  14   missing assets on their bankruptcy forms.
09:55AM  15       There's also some projects, you know, similar to what
09:55AM  16   I've done at Freed, Maxick with contract disputes.
09:55AM  17   Q.  When you're doing your type of work for corporations,
09:55AM  18   what is it that you're looking at to determine where
09:55AM  19   particular funds are?
09:55AM  20   A.  It would depend on the project.  You know, there's
09:55AM  21   another one that we're currently working on where it's just
09:55AM  22   specific to banking records, trying to track down where money
09:55AM  23   that shouldn't have left someone's account left, and where it
09:55AM  24   ended up.
09:55AM  25       There's other times where we're -- you know, we would

09:55AM   1    look at money that came into a company and determine, you

09:55AM   2    know, is that in line with contract and whatever contract,

09:55AM   3    you know, we have between two parties, you know, should --

09:56AM   4    were the proper payments made based on the funds that came in

09:56AM   5    to the parties.

09:56AM   6    Q.   Okay.  Besides corporations, have you looked into the

09:56AM   7    financial records of private individuals, people?

09:56AM   8    A.   I have.  The debtor audits that I referred to at Tronconi

09:56AM   9    Segarra & Associates were all individuals.

09:56AM   10   Q.   Have you done anything involving Internal Revenue Service

09:56AM   11   inquiries?

09:56AM   12   A.   I have not personally.

09:56AM   13   Q.   And how about criminal investigations?  Have you done any

09:56AM   14   work in criminal investigations when people are looking at

09:56AM   15   finances?

09:56AM   16   A.   I did.  When I was at Tronconi Segarra & Associates, it

09:56AM   17   started out as a contract dispute, and ended up turning over

09:56AM   18   to the authorities for criminal investigation, but at that

09:56AM   19   point we were no longer involved.

09:56AM   20   Q.   How many of these financial audits or investigations do

09:57AM   21   you think you've conducted or participated in during your

09:57AM   22   time as a CPA and CFE for the last 20 years?

09:57AM   23   A.   From the time going back to Tronconi Segarra &

09:57AM   24   Associates, over a hundred.

09:57AM   25   Q.   And what type of approach do you undertake when you

09:57AM   1   conduct these investigations?

09:57AM   2   A.  It's gonna be specific to the project.  You know, you

09:57AM   3   need to look at what documents you have available to you,

09:57AM   4   what you're -- what is, you know, what's the dispute at hand,

09:57AM   5   or what's the question at hand.  So we're gonna tailor our

09:57AM   6   procedures to those things.

09:57AM   7   Q.  Do you use people to assist you when you conduct these

09:57AM   8   types of audits?

09:57AM   9   A.  Yeah, we do.  I have staff that work with us.

09:57AM  10   Q.  And what kinds of software or tools do you use to

09:57AM  11   decipher or to look at the financial information that you're

09:57AM  12   trying to audit?

09:57AM  13   A.  We're very heavy with Excel and some of its add-ons.  We

09:58AM  14   built some add-ons internally.  There's also a feature that

09:58AM  15   we have now, it's an Excel add-on, it's called Data Snipper,

09:58AM  16   so we can import pdf records such as bank statements and

09:58AM  17   cancelled checks, is what we really -- deposit slips, which

09:58AM  18   we used extensively in this matter.

09:58AM  19       And, you know, that helps us summarize data, and put it

09:58AM  20   into a format that's more useable.

09:58AM  21   Q.  So I want to turn your attention to your involvement in

09:58AM  22   this case.  So at some point in 2023, you were appointed by

09:58AM  23   the Court to assist Mr. Bongiovanni with his defense in this

09:58AM  24   case; is that correct?

09:58AM  25   A.  Correct.

USA v Bongiovanni - Devereaux - Singer/Direct - 3/28/24

17

| | | |
|---|---|---|
| 09:58AM | 1 | Q.  And fair to say it's a paid assignment, correct? |
| 09:58AM | 2 | A.  Correct. |
| 09:58AM | 3 | Q.  You're not gonna do it for free, right? |
| 09:58AM | 4 | A.  Correct. |
| 09:58AM | 5 | Q.  So, what types of documents did you review to come to |
| 09:58AM | 6 | some type of conclusions about the financials of Mr. and |
| 09:58AM | 7 | Mrs. Bongiovanni in this case? |
| 09:58AM | 8 | A.  There was extensive documentation provided.  We looked at |
| 09:59AM | 9 | bank statements, we looked at deposit slips, cancelled |
| 09:59AM | 10 | checks, we looked at credit card statements, retirement plan |
| 09:59AM | 11 | statements, loan applications, tax returns. |
| 09:59AM | 12 | Q.  So, I want to break that down a little bit, because you |
| 09:59AM | 13 | mentioned a bunch of documents. |
| 09:59AM | 14 | So you mentioned tax records.  Were these tax records for |
| 09:59AM | 15 | both Joseph Bongiovanni and Lindsay Bongiovanni between -- |
| 09:59AM | 16 | A.  Correct. |
| 09:59AM | 17 | Q.  -- 2012 and 2018? |
| 09:59AM | 18 | A.  Correct. |
| 09:59AM | 19 | Q.  You talked about wages, or salary, or income.  Did you |
| 09:59AM | 20 | look at things like W-2s for Lindsay and Joseph Bongiovanni |
| 09:59AM | 21 | between that period? |
| 09:59AM | 22 | A.  Correct. |
| 09:59AM | 23 | Q.  You mentioned banking statements.  So when we talk about |
| 09:59AM | 24 | banking statements, let's start off with Joseph Bongiovanni |
| 09:59AM | 25 | first. |

09:59AM  1    What type of statements were you looking at as far as

09:59AM  2    accounts?  Are we talking about savings, checking account,

09:59AM  3    money market?

09:59AM  4    A.  Yeah, correct.  Checking statements, savings statements.

10:00AM  5    There was a holiday account that he had at his credit union.

10:00AM  6    Q.  How about Lindsay Bongiovanni, were you looking at

10:00AM  7    similar --

10:00AM  8    A.  Yeah.

10:00AM  9    Q.  -- things as far as banking?

10:00AM  10   A.  Similar, yep.

10:00AM  11   Q.  And with regard to credit cards, did you look at credit

10:00AM  12   card statements between 2012 and 2018 for both Lindsay and

10:00AM  13   Joseph Bongiovanni?

10:00AM  14   A.  We did, yes.

10:00AM  15   Q.  And you mentioned mortgages.  So, I guess, as far as

10:00AM  16   loans, and leases, and mortgage documents that you looked at,

10:00AM  17   did you look at any type of mortgage documents or loan

10:00AM  18   documents for a property at 221 Lovering?

10:00AM  19   A.  Yes, we did.

10:00AM  20   Q.  How about for 85 Alder Place?

10:00AM  21   A.  We did.

10:00AM  22   Q.  Did you look at any type of lease or loan documents for

10:00AM  23   vehicles that were purchased or sold and leased by Joseph and

10:00AM  24   Lindsay during the 2012-2018 time period?

10:00AM  25   A.  We did.

USA v Bongiovanni - Devereaux - Singer/Direct - 3/28/24

10:00AM   1   Q.  Did you look at any type of refinancing or HELOC

10:00AM   2   documents during that time period?

10:00AM   3   A.  Yes.

10:00AM   4   Q.  And you mentioned retirement documents.  Did you take a

10:00AM   5   look at any documents relating to Joseph Bongiovanni's Thrift

10:01AM   6   Savings Plan, or TSP?

10:01AM   7   A.  Yes, we did.

10:01AM   8   Q.  Did you look at any type of child support payments that

10:01AM   9   Lindsay Bongiovanni was receiving during that time period?

10:01AM  10   A.  We did.

10:01AM  11   Q.  How about, are you aware of whether the 221 Lovering

10:01AM  12   property was a rental property during that time period?

10:01AM  13   A.  Yes, we did review records.

10:01AM  14   Q.  What type of records did you review regarding the 221

10:01AM  15   Lovering property?

10:01AM  16   A.  There were signed lease agreements with tenants.  There

10:01AM  17   was Accurint report and National Grid reports.

10:01AM  18   Q.  Wee had a number of pieces of evidence laid out during

10:01AM  19   the course of the testimony in this trial regarding tenants

10:01AM  20   at the property.  Did you include information in your

10:01AM  21   analysis regarding testimony delivered by Maria Bongiovanni?

10:01AM  22   A.  Yes.

10:01AM  23   Q.  How about from any type of previous tenants, did you take

10:01AM  24   a look at either statements that were made by these tenants,

10:02AM  25   or testimony delivered about what they did and didn't do?

10:02AM   1   A.  Yes.

10:02AM   2   Q.  Were you made aware of any type of cash gifts that were

10:02AM   3   received by the Bongiovannis during this time period?

10:02AM   4   A.  Yes.

10:02AM   5   Q.  And you also were here for the testimony of Stephanie

10:02AM   6   Bifano, the government's FBI expert; is that right?

10:02AM   7   A.  I was.

10:02AM   8   Q.  Did you review her analysis into the documents in

10:02AM   9   evidence in this case?

10:02AM   10   A.  I did.

10:02AM   11   Q.  So how many documents do you think you reviewed as part

10:02AM   12   of your financial investigation or audit into the

10:02AM   13   Bongiovannis to prepare yourself today?

10:02AM   14   A.  There were thousands of pages of documents.

10:02AM   15   Q.  And did you use the computer software that you talked

10:02AM   16   about, or the team that you had at Freed, Maxick to help you

10:02AM   17   synthesize all this information?

10:02AM   18   A.  I did, yes.

10:02AM   19   Q.  How was it that you synthesized all this information?

10:03AM   20   A.  Does that -- so the software, you know, will enable you

10:03AM   21   to link things into the spreadsheet so that you can use Excel

10:03AM   22   to, you know, sort data, analyze data, just makes it in a

10:03AM   23   more user friendly, readable format.

10:03AM   24   Q.  So, I want to move on to a couple of, I guess, what you

10:03AM   25   saw inside these documents.  But before we do that, you said

10:03AM    1    that you had an opportunity to listen to the testimony of

10:03AM    2    Ms. Bifano, correct?

10:03AM    3    A.   Correct.

10:03AM    4    Q.   And overall, generally speaking, how many of the numbers

10:03AM    5    that you came to in your audit matched the numbers that she

10:03AM    6    came to in hers?

10:03AM    7    A.   Some of the numbers matched exactly.  Some of the

10:03AM    8    numbers, I mean, if we were off, the differences were very

10:03AM    9    minor, you know, $100 here or $200 there.  So, you know,

10:04AM   10    we -- we did not have any issue with the calculations that

10:04AM   11    she made.

10:04AM   12    Q.   Okay.  After reviewing all of these thousands of

10:04AM   13    documents and conducting an analysis, would you agree that

10:04AM   14    the Bongiovannis were using credit to maintain a certain

10:04AM   15    lifestyle?

10:04AM   16    A.   Yes.

10:04AM   17    Q.   How was it that you drew a conclusion like that?

10:04AM   18    A.   We saw increasing balances in the credit card statements

10:04AM   19    from 2012 to 2018.

10:04AM   20    Q.   In your review of these documents, did you notice that

10:04AM   21    the Bongiovannis, during the 2012 to 2018 time period, were

10:04AM   22    using loans to pay off other loans?

10:04AM   23    A.   Yes.

10:04AM   24    Q.   How many loans did you see during that time period that

10:04AM   25    were used for that purpose?

USA v Bongiovanni - Devereaux - Singer/Direct - 3/28/24

22

| | | |
|---|---|---|
| 10:04AM | 1 | A.  I honestly don't remember the number. |
| 10:04AM | 2 | Q.  I'm sorry, I didn't hear you. |
| 10:04AM | 3 | A.  I honestly don't remember the number of loans. |
| 10:04AM | 4 | Q.  Was it more than one? |
| 10:04AM | 5 | A.  It was more than one. |
| 10:04AM | 6 | Q.  Was it more than five? |
| 10:05AM | 7 | A.  It was probably close to 10 or 11. |
| 10:05AM | 8 | Q.  Okay.  And how about you mentioned that you saw |
| 10:05AM | 9 | accumulating debt on the Bongiovanni's credit cards; is that |
| 10:05AM | 10 | right? |
| 10:05AM | 11 | A.  Correct. |
| 10:05AM | 12 | Q.  Did the Bongiovannis use mortgages to purchase properties |
| 10:05AM | 13 | that they owned? |
| 10:05AM | 14 | A.  Yes. |
| 10:05AM | 15 | Q.  Which properties did they use mortgages? |
| 10:05AM | 16 | A.  Both properties, 221 Lovering and Alder. |
| 10:05AM | 17 | Q.  So you're talking about the Lovering and Alder addresses? |
| 10:05AM | 18 | A.  Yes. |
| 10:05AM | 19 | Q.  Did you see any type of loans or advances when you're |
| 10:05AM | 20 | reviewing the documents that Joseph Bongiovanni used from his |
| 10:05AM | 21 | TSP account to provide down payments on those mortgages? |
| 10:05AM | 22 | A.  Correct, he was taking loans from his Thrift Savings |
| 10:05AM | 23 | Plan. |
| 10:05AM | 24 | Q.  Did you notice any type of purchases that were made from |
| 10:05AM | 25 | Jared's jewelry store in your review of the documents? |

10:05AM 1  A.  We did not see the purchases, but we saw payments being

10:05AM 2  made to Jared.

10:05AM 3  Q.  And how about any type of lease and loan documents

10:06AM 4  regarding vehicles?  Did you observe those documents in your

10:06AM 5  review?

10:06AM 6  A.  We did, yes.

10:06AM 7  Q.  When you reviewed the credit card and the banking

10:06AM 8  statements for the documents you took a look at regarding the

10:06AM 9  Bongiovannis, did you see everyday transactions reflected on

10:06AM 10  those type of documents?

10:06AM 11  A.  Yes.  There would be, you know, grocery stores, gas --

10:06AM 12  gas charges, you know, home -- home good stores, clothing

10:06AM 13  stores.

10:06AM 14  Q.  So just to review, so you saw groceries being paid for on

10:06AM 15  credit cards?

10:06AM 16  A.  Yes.

10:06AM 17  Q.  You saw gasoline being paid for on credit cards?

10:06AM 18  A.  Yes.

10:06AM 19  Q.  You saw things for home items being paid for on credit

10:06AM 20  cards?

10:06AM 21  A.  Yeah.

10:06AM 22  Q.  How about clothing, did you see clothing purchases

10:06AM 23  reflected on credit cards?

10:06AM 24  A.  Yes.

10:06AM 25  Q.  Sorry?

10:06AM    1    A.  Yes.

10:06AM    2    Q.  Did you see any type of purchases for airline tickets or

10:06AM    3    airfare?

10:07AM    4    A.  Yes.

10:07AM    5    Q.  How about for any type of hotels or restaurants, did you

10:07AM    6    see anything like that on credit cards?

10:07AM    7    A.  We did, yes.

10:07AM    8    Q.  When you were reviewing the debts that the Bongiovannis

10:07AM    9    accumulated over time, did you see any debts that were

10:07AM   10    suddenly paid off without any type of traceable funding

10:07AM   11    source?

10:07AM   12    A.  No.

10:07AM   13    Q.  When you were looking at payments that related to credit

10:07AM   14    cards, what did you see as far as checks being cut or

10:07AM   15    transfers being made to pay those type of bills?

10:07AM   16    A.  Typically they were making, like, the minimum monthly

10:07AM   17    payments.

10:07AM   18    Q.  And as far as the payments, how would they affect the

10:07AM   19    payments?  Would that be something where they would use bill

10:07AM   20    pay, would they use a check, would they use some type of

10:07AM   21    transfer?  What did you see?

10:07AM   22    A.  Checks.

10:07AM   23    Q.  How about for loans?  So, let's first start off with

10:08AM   24    mortgage loans.  What type of things did you see about how

10:08AM   25    those payments were made over the course of time?

10:08AM  1  A.  They typically, excuse me, typically withdrawals from

10:08AM  2  their checking accounts.

10:08AM  3  Q.  And how about for loans on vehicles or leases on

10:08AM  4  vehicles?  How were those type of expenses paid for?

10:08AM  5  A.  I don't remember specifically if it was through checks or

10:08AM  6  just transfers.

10:08AM  7  Q.  But do you remember seeing some type of paper instrument

10:08AM  8  or something on a --

10:08AM  9  A.  Yeah --

10:08AM  10  Q.  -- on a certain --

10:08AM  11  A.  -- we saw --

10:08AM  12  Q.  -- statement --

10:08AM  13  A.  -- withdrawals.

10:08AM  14  Q.  -- statement that would reflect the way that it was paid?

10:08AM  15  A.  Yes, we would see withdrawals in the checking account.

10:08AM  16  Q.  Were you made aware of any type of suspicious activity

10:08AM  17  reports logged by banks or anything regarding currency

10:08AM  18  transaction reports filed by banks regarding the Bongiovannis

10:08AM  19  during the time period?

10:08AM  20  A.  I'm not aware of any.

10:09AM  21  Q.  We heard a lot of testimony in this case about a classic

10:09AM  22  car, a Buick, that Mr. Bongiovanni purchased back in 2012.

10:09AM  23  What type of documents did you see with regard to how that

10:09AM  24  car was obtained and paid for?

10:09AM  25  A.  There was a loan taken out.

| | | |
|---|---|---|
| 10:09AM | 1 | Q.  Was there any type of cash that was used to pay for that |
| 10:09AM | 2 | car? |
| 10:09AM | 3 | A.  There was a receipt that said he paid $100 in cash. |
| 10:09AM | 4 | Q.  But, to the documents that you received, the remainder of |
| 10:09AM | 5 | the car was paid through a loan? |
| 10:09AM | 6 | A.  Yes. |
| 10:09AM | 7 | Q.  How about for payment of that loan, we talked about how |
| 10:09AM | 8 | loans would get paid down over time with a mortgage and with |
| 10:09AM | 9 | car loans and other things like that.  This particular loan |
| 10:09AM | 10 | for the classic car, what did you see in the records |
| 10:09AM | 11 | reflecting how things were paid for? |
| 10:09AM | 12 | A.  He was making monthly payments from his checking account. |
| 10:09AM | 13 | Q.  When the government executed a search warrant at the |
| 10:10AM | 14 | Bongiovanni's home, did you receive any type of information |
| 10:10AM | 15 | about high value items that were located inside the house? |
| 10:10AM | 16 | A.  I did not. |
| 10:10AM | 17 | Q.  So, for instance, were you made aware of any type of cash |
| 10:10AM | 18 | that was found in a safe of a large quantity? |
| 10:10AM | 19 | A.  I'm not aware of any. |
| 10:10AM | 20 | Q.  Were you made aware of any type of gold bars or gold |
| 10:10AM | 21 | coins that were found on the property during the search? |
| 10:10AM | 22 | A.  I'm not aware of any. |
| 10:10AM | 23 | Q.  How about expensive artwork or jewelry?  Was there |
| 10:10AM | 24 | anything along those lines that you were made aware of? |
| 10:10AM | 25 | A.  I'm not aware of. |

10:10AM 1   Q.  How about any type of expensive electronics or furniture

10:10AM 2   located in the house during the search?

10:10AM 3   A.  I'm not aware of any.

10:10AM 4   Q.  So you talked a little bit about your analysis and

10:10AM 5   Ms. Bifano's analysis, when it came down to the money in and

10:10AM 6   the money out and what was reflected on the statements, did

10:10AM 7   not differ in too many respects; is that a fair statement?

10:11AM 8   A.  That's a fair statement.

10:11AM 9   Q.  So, how is it that your analysis differs from hers?

10:11AM 10  A.  Her analysis had cash receipts that were stated that -- I

10:11AM 11  don't remember the exact terminology, but they were unknown

10:11AM 12  source.

10:11AM 13          **MR. SINGER:**  So, Ms. Champoux, would you mind

10:11AM 14  bringing up Government Exhibit 337-3, please?

10:11AM 15          **BY MR. SINGER:**

10:11AM 16  Q.  So, Mr. Devereaux, you've had an opportunity to take a

10:11AM 17  look at this before you came into court today, right?

10:11AM 18  A.  Yes, I have.

10:11AM 19  Q.  And so as far as the cash deposits that you just

10:11AM 20  referenced inside of your testimony, is that what you're

10:11AM 21  talking about, sir?

10:11AM 22  A.  This is what I'm talking about.

10:11AM 23  Q.  And would that reflect -- that would be reflected in this

10:11AM 24  chart in those light green bars at the top?

10:11AM 25  A.  Correct.

10:11AM   1   Q.  So what was your understanding of why those were not

10:11AM   2   counted?

10:11AM   3   A.  That they couldn't be traced to the Schedule E of the tax

10:12AM   4   return.

10:12AM   5   Q.  But in your analysis, did you find cash payments or cash

10:12AM   6   deposits that were reflective of potentially a source of

10:12AM   7   income?

10:12AM   8   A.  We did.

10:12AM   9   Q.  So, how was it -- and I guess let's break that down.

10:12AM  10       How was it you came to a conclusion that some of the cash

10:12AM  11   deposits that are being made may be reflective of some source

10:12AM  12   of income?

10:12AM  13   A.  We saw rental agreements between Mr. Bongiovanni and

10:12AM  14   tenants.  They were during certain periods of time.  There

10:12AM  15   were no checks received from those tenants that represented

10:12AM  16   rental income, but we did see cash deposits that were, you

10:13AM  17   know, within the first five business days of the month.

10:13AM  18   Q.  So, beyond the documentary evidence that you took a look

10:13AM  19   at, you're aware of the witness testimony from several

10:13AM  20   tenants in this case; is that right?

10:13AM  21   A.  Correct.

10:13AM  22   Q.  And you're aware of evidence they provided that they were

10:13AM  23   making rental payments during that time?

10:13AM  24   A.  Yes.

10:13AM  25           **MR. DICKSON:**  Objection.  Judge, can we approach on

10:13AM  1    this, please?

10:13AM  2            **THE COURT:**  Sure.

10:13AM  3            (Sidebar discussion held on the record.)

10:13AM  4            **MR. DICKSON:**  Judge, this is getting into, I think,

10:13AM  5    an improper expert opinion land here.  I let it slide with the

10:13AM  6    debt piece because I think that was consistent with what

10:13AM  7    Ms. Bifano testified to.  But if this person is relying on

10:13AM  8    statements by other people to form his analysis, that is

10:13AM  9    something an expert can do, but it's not something that a fact

10:14AM  10   witness can do.

10:14AM  11           And so, right now, we're getting into what other

10:14AM  12   people told him that led him to the conclusion that these

10:14AM  13   particular payments were or were not consistent with rent or

10:14AM  14   consistent with another source of income, I think is how

10:14AM  15   Mr. Singer reported it.

10:14AM  16           **THE COURT:**  Well, the testimony he's given is similar

10:14AM  17   to the testimony that Ms. Bifano gave.  I'm not sure it's fact

10:14AM  18   testimony or expert testimony, there's a gray area between the

10:14AM  19   two where they are saying there's no source, there's no -- no

10:14AM  20   traceable source of the income.  He's suggesting that there

10:14AM  21   may be.  And, so, I'm not sure what the problem is.

10:14AM  22           **MS. CHALBECK:**  Judge, can I respond to just that for

10:14AM  23   a second, Judge, as to the nature of Ms. Bifano's testimony?

10:15AM  24           **THE COURT:**  Sure.

10:15AM  25           **MS. CHALBECK:**  Ms. Bifano made it very clear that the

10:15AM  1  source of the cash could be rental income, it could be from a

10:15AM  2  home equity line of credit, it could be from gifts, it could

10:15AM  3  be from any number of things.  But the fundamental part of her

10:15AM  4  testimony is that you can't trace cash.  And she wasn't going

10:15AM  5  to make any assumptions, because she was testifying as a fact

10:15AM  6  witness and not as an expert, as to what that source could be.

10:15AM  7          By contrast here, and I think this goes to

10:15AM  8  Mr. Dickson's point, we're getting into the territory that we

10:15AM  9  litigated yesterday where Mr. Devereaux is formulating an

10:15AM  10  assumption that these checks from the tenants were cashed by

10:15AM  11  the defendant, and that the defendant deposited the proceeds

10:15AM  12  into his account.

10:15AM  13          THE COURT:  I'm not hearing --

10:15AM  14          MR. DICKSON:  But -- I'm sorry, Judge.

10:15AM  15          The important thing here is that he has just

10:15AM  16  testified that part of his analysis relied on hearsay.  It

10:15AM  17  relied on statements from the tenants.  It relied on

10:15AM  18  statements from Maria Bongiovanni.  It relied on --

10:16AM  19          THE COURT:  Testimony.  Testimony given in this

10:16AM  20  trial.

10:16AM  21          MR. DICKSON:  That he was not here for.  So the only

10:16AM  22  way that he can know about that testimony --

10:16AM  23          THE COURT:  Is by reading the transcript.

10:16AM  24          MR. DICKSON:  Which is hearsay.  He's getting that

10:16AM  25  from somebody else.

10:16AM   1          And the problem is that experts are allowed to rely

10:16AM   2   on hearsay, this witness is not an expert.  So if his analysis

10:16AM   3   is reliant on hearsay, that's where we're getting into

10:16AM   4   improper expert opinion testimony.

10:16AM   5          **THE COURT:**  Talk to me.

10:16AM   6          **MR. SINGER:**  The only thing that I'm recounting is

10:16AM   7   the evidence that's been produced in this trial, which I think

10:16AM   8   is uncontroverted.  I mean, the government, not us, brought in

10:16AM   9   multiple tenants who testified about the way they paid for

10:16AM   10  things.  They introduced checks and other devices that proved

10:16AM   11  that these people were renting there.  Ms. Bifano testified

10:16AM   12  about how she looked at utility records, Accurint records, and

10:16AM   13  all those things pointed to the fact that someone else was

10:16AM   14  renting those things.

10:16AM   15         This is no different than Agent Burns getting on the

10:17AM   16  stand and recounting the testimony that was already in

10:17AM   17  evidence.  You know?  And we --

10:17AM   18         **MR. DICKSON:**  It is different because Special Agent

10:17AM   19  Burns was in court and heard the evidence.  And this witness

10:17AM   20  is not a summary witness for the defense, he's an accountant.

10:17AM   21  He's forming conclusions that he is basing on hearsay which,

10:17AM   22  if he were an expert, he could do no problem.

10:17AM   23         **THE COURT:**  Tell me the problem with him giving

10:17AM   24  expert testimony.

10:17AM   25         **MR. DICKSON:**  We litigated this yesterday, Judge.

10:17AM   1    The problem is that he didn't -- first of all, the defense

10:17AM   2    didn't give us notice.  Right?  And there are specific

10:17AM   3    requirements under Rule 16 for notice of expert testimony.

10:17AM   4    They need to tell us what his conclusions are in advance, they

10:17AM   5    need to tell us his methodology, they need to tell us the

10:17AM   6    facts and data that he relied on.  We don't have any of that.

10:17AM   7         And particularly where there's a dispute about the

10:17AM   8    reliability of the methodology, I mean, I would have wanted to

10:17AM   9    do a Daubert hearing if this witness was going to testify to

10:17AM   10   expert opinions when his methodology, as we established and

10:18AM   11   talked about yesterday, is different.

10:18AM   12        THE COURT:  All he's saying -- as I understand it, we

10:18AM   13   haven't heard what he's going to say, as I understand it all

10:18AM   14   he's going to say is that these deposits may be consistent

10:18AM   15   with his parents' cash rent payments and with rent payments

10:18AM   16   from tenants that we don't have the checks for.

10:18AM   17        MR. DICKSON:  Which requires him to have heard

10:18AM   18   hearsay, out-of-court statements by witness.

10:18AM   19        THE COURT:  Why?

10:18AM   20        MR. DICKSON:  Because he can't --

10:18AM   21        THE COURT:  He knows --

10:18AM   22        MR. DICKSON:  I'm sorry.

10:18AM   23        THE COURT:  -- he knows that there are -- he knows

10:18AM   24   that rent was supposed to be paid because he's got the leases.

10:18AM   25        He's got a lease with Mr. and Mrs. Bongiovanni, he's

10:18AM     1    got -- and he can't find any checks paying those rent

10:18AM     2    payments.

10:18AM     3         He sees deposits in the approximate amount of the

10:19AM     4    rent payments being made in the first five days of the month.

10:19AM     5         Why can't he -- I mean, I can conclude from that that

10:19AM     6    they may have been rent payments that were made in cash, maybe

10:19AM     7    they weren't, you can cross-examine on that.  But why is that,

10:19AM     8    that just seems to me to be a basic simple conclusion that he

10:19AM     9    can reach as an accountant.

10:19AM    10         I don't see checks going into the account.  I know

10:19AM    11    there was rent that was supposed to have been paid.  I don't

10:19AM    12    see that rent.

10:19AM    13         So, and I -- but I do see the deposit of $1,400

10:19AM    14    every -- on the third day of every month for six months in a

10:19AM    15    row.

10:19AM    16         **MR. DICKSON:**  Sure.  And yesterday, Judge, like we

10:19AM    17    argued that, and if that was what the testimony was cabined

10:19AM    18    to, fine.  Let the Court decide.

10:19AM    19         **THE COURT:**  But that's not what's happening?

10:19AM    20         **MR. DICKSON:**  Because he's now testified, this

10:19AM    21    witness has testified that he reviewed statements by Maria

10:19AM    22    Bongiovanni, he reviewed statements I think about gifts or

10:19AM    23    something that Mr. Bongiovanni received, he reviewed

10:20AM    24    statements by the tenants.  That's not just looking at bank

10:20AM    25    records and looking at leases.  That's not just looking and

10:20AM    1    reviewing the documents.

10:20AM    2        **THE COURT:**  Why -- why -- why can't he simply correct

10:20AM    3    that mistake by asking hypotheticals?  Let me give you a

10:20AM    4    hypothetical, and have him base his testimony on that?

10:20AM    5        **MR. DICKSON:**  Because he's not an expert, and he's

10:20AM    6    being asked a hypothetical.  I mean, hypotheticals are sort of

10:20AM    7    heartland of expert testimony, right?  They can do that.

10:20AM    8        **THE COURT:**  But you can ask fact witnesses

10:20AM    9    hypotheticals as well.

10:20AM   10        **MR. DICKSON:**  But not when those hypotheticals

10:20AM   11    require a set of assumptions that are reliant on testimony.

10:20AM   12        **THE COURT:**  But this jury -- the hypotheticals would

10:20AM   13    rely on the testimony that the jury heard.  I don't see a

10:20AM   14    problem with this.

10:20AM   15        So, look it.  Let's -- the hearsay objection probably

10:20AM   16    is a good objection, so I'll sustain that objection.

10:20AM   17        Stay away from the hearsay.  I think you can do what

10:20AM   18    you want to do without the hearsay.  Okay?

10:20AM   19        **MR. DICKSON:**  Thanks, Judge.

10:20AM   20        **MR. MacKAY:**  Judge, I just wanted to flag a

10:21AM   21    logistical issue, because I'm watching Mr. Bongiovanni.  He

10:21AM   22    gave me a note that he needs to use the bathroom.

10:21AM   23        **THE COURT:**  Say it again?

10:21AM   24        **MR. MacKAY:**  Mr. Bongiovanni gave me a note that he's

10:21AM   25    going to need to use the bathroom.

USA v Bongiovanni - Devereaux - Singer/Direct - 3/28/24

35

10:21AM    1          THE COURT:  Do you want to break right now?

10:21AM    2          MR. MacKAY:  I think we can go a little bit longer,

10:21AM    3   but I think the direct, you've probably got --

10:21AM    4          MR. SINGER:  Yeah, I guess I've some time.  Half an

10:21AM    5   hour?

10:21AM    6          THE COURT:  You tell me when you want a break.

10:21AM    7          MR. MacKAY:  I'll signal.

10:21AM    8          THE COURT:  Signal Mr. Singer.

10:21AM    9          (End of sidebar discussion.)

10:21AM   10          THE COURT:  Okay.  So the objection to the hearsay is

10:21AM   11   sustained.  Next question.

10:21AM   12          BY MR. SINGER:

10:21AM   13   Q.  So, we talked a little bit about you're aware of lease

10:21AM   14   agreements that were signed during this period; is that

10:21AM   15   right?

10:21AM   16   A.  Correct.

10:21AM   17   Q.  And you heard Ms. Bifano talk about various utility

10:21AM   18   records that she had pulled; is that right?

10:21AM   19   A.  Correct.

10:21AM   20   Q.  She also pulled something called Accurint records; is

10:21AM   21   that right?

10:21AM   22   A.  Correct.

10:21AM   23   Q.  And that evidence suggested to you that were tenants

10:22AM   24   living at 221 Lovering for multiple periods of time; is that

10:22AM   25   right?

10:22AM  1   A.  It did.

10:22AM  2   Q.  You had a chance to take a look at cancelled checks from

10:22AM  3   tenants; is that right?

10:22AM  4   A.  I did.

10:22AM  5   Q.  And what did that show you, Mr. Devereaux?

10:22AM  6   A.  There were certain tenants that -- his parents, for

10:22AM  7   example, there were no cancelled checks being deposited in

10:22AM  8   thinks account.

10:22AM  9       There was another tenant, Whalen, that we were only able

10:22AM  10  to identify one check.  He was a tenant for about two years,

10:22AM  11  two-and-a-half years.  And we only saw one rent check from

10:22AM  12  him in that time frame.

10:22AM  13  Q.  Did you see checks and money orders deposited into

10:22AM  14  Mr. Bongiovanni's -- sorry, Bongiovanni's account during the

10:22AM  15  rental periods for other tenants?

10:22AM  16  A.  We did.

10:22AM  17  Q.  And, so, you're aware of the fact that Mr. and

10:23AM  18  Mrs. Bongiovanni, Mr. Bongiovanni's parents, Fred and Maria,

10:23AM  19  they didn't pay by check as you just testified, right?

10:23AM  20  A.  Correct.

10:23AM  21  Q.  And you're aware of the fact that they were paying $750 a

10:23AM  22  month in rent?

10:23AM  23  A.  Yes, they had a lease agreement for $750 a month.

10:23AM  24  Q.  So, how was it that you determined that $750 a month in

10:23AM  25  rent was being paid by Fred and Maria Bongiovanni during that

10:23AM   1   2012 to 2018 time period?

10:23AM   2   A.  We saw deposits in cash going into Mr. Bongiovanni's bank

10:23AM   3   account during that period.

10:23AM   4   Q.  How about with Frederick and Maria Bongiovanni, did you

10:23AM   5   take a look at their bank accounts?

10:23AM   6   A.  I did.

10:23AM   7   Q.  Did you see corresponding withdrawals towards the first

10:23AM   8   part of the month to suggest that withdrawals were being made

10:23AM   9   for those cash payments?

10:23AM  10   A.  Yes, typically he would withdraw cash right at the end of

10:24AM  11   the month.

10:24AM  12        MR. SINGER:  So, Ms. Champoux, if you can bring down

10:24AM  13   Government Exhibit 337-3.  And I'd ask you to bring up

10:24AM  14   Government Exhibit 335, please.

10:24AM  15        THE COURT:  This is in evidence?

10:24AM  16        MR. SINGER:  This is in evidence, yes, Judge.

10:24AM  17        If we can open up the Fred folder, please.  And open

10:24AM  18   up the combined pdf please.

10:24AM  19        BY MR. SINGER:

10:24AM  20   Q.  So, what I'd like to do is just go through -- I'll take

10:24AM  21   one year.  So they started renting, from your understanding,

10:24AM  22   in December of 2013; is that right?

10:24AM  23   A.  Correct.

10:24AM  24   Q.  And they continuously rented throughout that entire time

10:24AM  25   period of, after, until 2018?

10:24AM   1    A.   Correct.

10:24AM   2    Q.   So let's take a middle year, 2016.

10:24AM   3         MR. SINGER:   So, Ms. Champoux, if you can advance to

10:24AM   4    page 130 of this document, please.   And if you can scroll

10:25AM   5    down -- sorry, if you can scroll down.   Sorry, if you can go

10:25AM   6    up a little.

10:25AM   7         Is there a way to expand this to one page,

10:25AM   8    Ms. Champoux?   Thank you.   If we could go up one page, please?

10:25AM   9    Thank you.

10:25AM  10         BY MR. SINGER:

10:25AM  11    Q.   So, with regard to your review, there are a couple of

10:25AM  12    different documents you took a look at.   Did you look at

10:25AM  13    Frederick Bongiovanni's summary of accounts?

10:25AM  14    A.   We did.

10:25AM  15    Q.   And what was that to your understanding, sir?

10:25AM  16    A.   Statements from his credit union account.

10:25AM  17    Q.   And so on these statements, does it reflect withdrawal

10:25AM  18    and deposit information for Frederick Bongiovanni?

10:25AM  19    A.   It does.

10:25AM  20         MR. SINGER:   And so if we can advance forward,

10:25AM  21    Ms. Champoux, to the next page.   Actually next down.

10:26AM  22         BY MR. SINGER:

10:26AM  23    Q.   So as far as the different accounts that you're looking

10:26AM  24    at, which ones were you looking at?

10:26AM  25    A.   Oh, all of these accounts.

10:26AM  1   Q.  And for four of these accounts, would you go and be able

10:26AM  2   to look at them month by month?

10:26AM  3   A.  Yes.

10:26AM  4        MR. SINGER:  And if we can advance to page 167,

10:26AM  5   Ms. Champoux.  And scroll down a little bit.  And stop there.

10:26AM  6        BY MR. SINGER:

10:26AM  7   Q.  So, I'm going to direct your attention, sir, down to the

10:26AM  8   bottom of the page.  Do you see a cash withdrawal reflected

10:26AM  9   for $1,000 on 1/29/2016?

10:26AM  10  A.  Yes.

10:26AM  11  Q.  And, so, when you saw a cash withdrawal for this amount

10:26AM  12  on that, what did you interpret?  What -- how did that enter

10:26AM  13  your analysis of whether or not rent was being paid?

10:26AM  14  A.  Well, I -- Mr. Bongiovanni withdrew cash from his account

10:26AM  15  at the end of the month.  We would look to see, you know,

10:27AM  16  if -- there were no checks written for rent at that time that

10:27AM  17  we saw clear, Mr. Bongiovanni's account -- I'm sorry, Joe

10:27AM  18  Bongiovanni's account, when we saw the cash coming out of

10:27AM  19  Fred Bongiovanni's account, we -- we would see a deposit.

10:27AM  20  They weren't typically, you know, exact.  Like, if Fred

10:27AM  21  withdrew $1,000, Joe, you know, deposited $1,000.  But we did

10:27AM  22  see corresponding deposits.

10:27AM  23        MR. SINGER:  So, Ms. Champoux, if we could advance to

10:27AM  24  page 170 of the exhibit, please.  And we can scroll down just

10:27AM  25  a little bit.  And stop there.

10:27AM  1          **BY MR. SINGER:**

10:27AM  2  Q.  So, I'm going to direct your attention again down to the

10:27AM  3  bottom of the page, the 2/29/2016 cash withdrawal for $750.

10:27AM  4  Was it your understanding that $750 was the rent that

10:28AM  5  Frederick and Maria were paying?

10:28AM  6  A.  Yes.

10:28AM  7  Q.  And when you saw a withdrawal like that on the last day

10:28AM  8  of the month in February, how did that aid your analysis

10:28AM  9  about whether rent was being paid?

10:28AM  10  A.  We made a determination that that was probably to cover

10:28AM  11  the rent.

10:28AM  12          **MR. SINGER:**  If we can advance to page 174,

10:28AM  13  Ms. Champoux.  Actually go up one page.  Thank you.

10:28AM  14          And if we can go down one page?  I'm sorry.  Thank

10:28AM  15  you.

10:28AM  16          **BY MR. SINGER:**

10:28AM  17  Q.  So, I'm going to direct your attention to the top of the

10:28AM  18  page, sir.  Do you see a second transaction marked cash

10:28AM  19  withdrawal on 3/13 of 2016, at the top of the page?

10:29AM  20  A.  Yes.

10:29AM  21  Q.  Was that something that was consistent with some of the

10:29AM  22  rent withdrawals that you believed occurred here?

10:29AM  23  A.  Yes.

10:29AM  24          **MR. SINGER:**  If we could advance to page 176,

10:29AM  25  Ms. Champoux.

10:29AM   1          **BY MR. SINGER:**

10:29AM   2   Q.  And I'll direct your attention down to the bottom of the

10:29AM   3   page, the 4/29/2016 transaction and withdrawal of cash for

10:29AM   4   $750.  Was that another example of something that you saw in

10:29AM   5   the records?

10:29AM   6   A.  Yes.

10:29AM   7          **MR. SINGER:**  If we could advance to page -- sorry, if

10:29AM   8   we can go back to page 146, Ms. Champoux.  My apologies.  The

10:29AM   9   records are a little bit out of order.

10:29AM   10          **BY MR. SINGER:**

10:29AM   11   Q.  I'm directing your attention to page 146 for a withdrawal

10:29AM   12   on 6/1/2016.  Do you see that's the second transaction

10:29AM   13   reflected on the page, sir?

10:29AM   14   A.  Yes.

10:29AM   15   Q.  That's for $750?

10:29AM   16   A.  It is.

10:29AM   17          **MR. SINGER:**  How about if we can advance to page 150,

10:29AM   18   Ms. Champoux.

10:30AM   19          **BY MR. SINGER:**

10:30AM   20   Q.  And I'll direct your attention to the second transaction

10:30AM   21   on the top of that page, Mr. Devereaux, the cash withdrawal

10:30AM   22   for $750 on the 1st of July.  Was that another thing that

10:30AM   23   aided your analysis?

10:30AM   24   A.  Yes.

10:30AM   25          **MR. SINGER:**  If we could go back to page 149,

| | | |
|---|---|---|
| 10:30AM | 1 | Ms. Champoux. |
| 10:30AM | 2 | **BY MR. SINGER:** |
| 10:30AM | 3 | Q.  And I'll direct your attention down to the bottom of that |
| 10:30AM | 4 | page, sir.  Do you see a cash withdrawal for $750 on |
| 10:30AM | 5 | 7/29/2016? |
| 10:30AM | 6 | A.  Yes. |
| 10:30AM | 7 | Q.  That was for $750 consistent with the rent payments you |
| 10:30AM | 8 | understood were being made? |
| 10:30AM | 9 | A.  Correct. |
| 10:30AM | 10 | **MR. SINGER:**  If we could advance to page 152, |
| 10:30AM | 11 | Ms. Champoux.  And scroll down a little.  And right there. |
| 10:30AM | 12 | **BY MR. SINGER:** |
| 10:30AM | 13 | Q.  The one transaction, cash withdrawal on 8/31/2016, do you |
| 10:30AM | 14 | see that for $900, sir? |
| 10:30AM | 15 | A.  I do. |
| 10:30AM | 16 | Q.  I know that's not $750, but was that something that |
| 10:30AM | 17 | helped aid in the analysis about whether cash was withdrew |
| 10:31AM | 18 | for a particular purpose? |
| 10:31AM | 19 | A.  Yes. |
| 10:31AM | 20 | **MR. SINGER:**  If we could advance to page 155, |
| 10:31AM | 21 | Ms. Champoux.  And stop there. |
| 10:31AM | 22 | **BY MR. SINGER:** |
| 10:31AM | 23 | Q.  And so I'll direct your attention down to the bottom of |
| 10:31AM | 24 | the page, Mr. Devereaux.  The cash withdrawal for a little |
| 10:31AM | 25 | more than $1,000 on 9/30/2016.  Was that something that |

10:31AM   1   helped inform your analysis?

10:31AM   2   A.   Yes.

10:31AM   3        **MR. SINGER:**   If we can advance to page 158,

10:31AM   4   Ms. Champoux.

10:31AM   5        **BY MR. SINGER:**

10:31AM   6   Q.   And I'll direct your attention, again, down to the bottom

10:31AM   7   of the page, Mr. Devereaux, the cash withdrawal on 10/31/2016

10:31AM   8   for $900.  Was that something that you factored into your

10:31AM   9   analysis?

10:31AM  10   A.   Yes.

10:31AM  11        **MR. SINGER:**   If we could advance to page 161,

10:31AM  12   Ms. Champoux.  And stop there.

10:31AM  13        **BY MR. SINGER:**

10:31AM  14   Q.   I'll direct, again, your attention down to the bottom of

10:31AM  15   the page, Mr. Devereaux.  The cash withdrawal for $911 made

10:31AM  16   on November 30th, 2016.  Was this something you factored into

10:32AM  17   your analysis?

10:32AM  18   A.   Yes.

10:32AM  19        **MR. SINGER:**   And, Ms. Champoux, if you can advance to

10:32AM  20   page 164, please.  And scroll down a little bit.  Stop there.

10:32AM  21        **BY MR. SINGER:**

10:32AM  22   Q.   That cash withdrawal in the bottom of the page for $810

10:32AM  23   on December 30th, 2016, this was something you factored into

10:32AM  24   your analysis?

10:32AM  25   A.   Yes.

10:32AM   1   Q.   Okay.  So I'm not going to go through every single year

10:32AM   2   because we'll be here for a long time, and I think a lot

10:32AM   3   more, but when you reviewed the records, did you see these

10:32AM   4   type of consistent transactions occur right around the end of

10:32AM   5   the month or the beginning of the month as far as cash

10:32AM   6   withdrawals?

10:32AM   7   A.   Yes, we did.

10:32AM   8   Q.   And that was consistent throughout that time period the

10:32AM   9   Bongiovannis --

10:32AM  10   A.   Yes.

10:32AM  11   Q.   -- lived in --

10:32AM  12   A.   Yes.

10:32AM  13   Q.   -- the residence?

10:32AM  14   A.   Sorry, yes, it was.

10:32AM  15           **MR. SINGER:**  If we can take down that exhibit,

10:32AM  16   Ms. Champoux.  Thank you.

10:32AM  17           **BY MR. SINGER:**

10:32AM  18   Q.   So is it your understanding that these withdrawals

10:32AM  19   generally corroborate the fact that some type of rent was

10:33AM  20   being paid by the Bongiovannis?

10:33AM  21           **MR. DICKSON:**  Objection, improper opinion.

10:33AM  22           **THE COURT:**  Yeah, sustained.

10:33AM  23           **BY MR. SINGER:**

10:33AM  24   Q.   So, if Mr. Bongiovanni's parents, Fred and Maria, were

10:33AM  25   paying 750 a month during the time period they lived at 221

USA v Bongiovanni - Devereaux - Singer/Direct - 3/28/24

45

10:33AM 1    Lovering between 2012 and 2013, is it your understanding that

10:33AM 2    would constitute 61 payments of rent?

10:33AM 3    A.   Yes.

10:33AM 4    Q.   And if 61 payments of rent were made at $750 each, we're

10:33AM 5    talking about $45,750 of rent?

10:33AM 6    A.   I'm going to trust your math on that, yes.

10:33AM 7    Q.   I know we've had some issues with lawyer math sometimes,

10:33AM 8    I got my calculator out on that one.

10:33AM 9        So we talked a little bit earlier about how you saw other

10:33AM 10   tenants occupying the upper apartment at 221 Lovering; is

10:33AM 11   that right?

10:33AM 12   A.   Yes.

10:33AM 13   Q.   And most of the time, what you saw inside the records

10:33AM 14   that you reviewed was that a lot of them were paying rent by

10:34AM 15   check or money orders?

10:34AM 16   A.   That's correct.

10:34AM 17   Q.   But you mentioned the Whalens, you saw some exceptions to

10:34AM 18   that; is that right?

10:34AM 19   A.   That's right.

10:34AM 20   Q.   What did you notice about the Whalens' rent check

10:34AM 21   deposits?

10:34AM 22   A.   We were only able to identify one rent deposit, one check

10:34AM 23   that was deposited that said rent from the Whalens.  And it

10:34AM 24   was for $700.

10:34AM 25   Q.   But you were here for Ms. Bifano's testimony, right?

10:34AM 1  A.  Yes.

10:34AM 2  Q.  And you heard her talk about how there was evidence based

10:34AM 3  on utility records and Accurint searches about the Whalens

10:34AM 4  living in that property from the summer of 2012 to summer of

10:34AM 5  2015?

10:34AM 6  A.  Yes.

10:34AM 7  Q.  And you also observed lease documents entered into

10:34AM 8  evidence in this case, correct?

10:34AM 9  A.  Yes.

10:34AM 10  Q.  And they reflected the same thing?

10:34AM 11  A.  Yes.

10:34AM 12  Q.  Was there any evidence that the Whalens were living there

10:34AM 13  for free?

10:34AM 14  A.  Not that I'm aware of.

10:34AM 15  Q.  So, if the Whalens were paying $700 a month for the first

10:35AM 16  two years of the lease, and 750 for the last year they were

10:35AM 17  there, between 2012 and 2014, if they were paying $700 a

10:35AM 18  month, that's 24 months, would you agree with me on that?

10:35AM 19  A.  Yes.

10:35AM 20  Q.  The math on that would be $16,800 in rent payments?

10:35AM 21  A.  Yes.

10:35AM 22  Q.  And if it was 750 a month for that last year, at 12

10:35AM 23  months, that would be $9,000?

10:35AM 24  A.  Yes.

10:35AM 25  Q.  So, we're talking about $25,800 worth of rent?

10:35AM    1    A.  Yes.

10:35AM    2    Q.  But you only found one payment for $700?

10:35AM    3    A.  Correct.

10:35AM    4    Q.  So, when you were looking at Mr. Bongiovanni, not Fred

10:35AM    5    and Maria, but Joseph Bongiovanni's bank records, and trying

10:35AM    6    to determine what cash deposits were being made during that

10:35AM    7    time period, what did you see?

10:36AM    8    A.  We saw that there were deposits being made within the

10:36AM    9    first five business days of the month on either side.  Either

10:36AM   10    the end of the previous month, or the beginning of that

10:36AM   11    month.  That were, you know, typically round dollar amounts

10:36AM   12    of, you know, 6- or $700.

10:36AM   13    Q.  So I want to talk to you a little bit about your analysis

10:36AM   14    of the criteria that you used.  So you mentioned five

10:36AM   15    business days.  What was the importance of attaching that to

10:36AM   16    part of your analysis of determining or taking a look at cash

10:36AM   17    deposits being made during that period?

10:36AM   18    A.  The lease agreements of both the Whalens and Fred

10:36AM   19    Bongiovanni had a clause in there that there was a late fee

10:36AM   20    due at five days.

10:36AM   21    Q.  And as far as business days are concerned, why was it --

10:37AM   22    why was it limited by five business days?

10:37AM   23    A.  I mean, typically, people would pay the rent, you know,

10:37AM   24    to try and not have to pay an extra -- extra late fee, that's

10:37AM   25    what our expectation would be.

10:37AM  1   Q.  Was there a reason why you chose business days over

10:37AM  2   calendar days?

10:37AM  3   A.  If a payment was made on a Saturday, it was likely that

10:37AM  4   Mr. Bongiovanni would not be able to deposit those funds.

10:37AM  5   Q.  Is that something that's kind of standard in the

10:37AM  6   accounting field of your attaching business days as opposed

10:37AM  7   to calendar days for -- for looking for payments like that?

10:37AM  8   A.  Yes, we do it for a lot of things.

10:37AM  9   Q.  And as far as, I guess, the cash deposits during that

10:37AM  10  period of time, was there a certain criteria used to exclude

10:37AM  11  payments that, in your professional judgment, didn't take a

10:37AM  12  look at, didn't look like rent payments?

10:37AM  13  A.  Yeah.  If there were payments that were, you know, say,

10:38AM  14  $100 that fell, you know, in a -- in a time period where we

10:38AM  15  have a -- a rent deposit that we thought was -- or, we had a

10:38AM  16  deposit that we thought was probably for rent, we would

10:38AM  17  exclude that.

10:38AM  18      There were other -- some other small, you know, like a $5

10:38AM  19  charge -- $5 deposit that we excluded.

10:38AM  20      **MR. SINGER:**  So, Ms. Champoux, if you can bring up

10:38AM  21  Government Exhibit 330A which is in evidence.

10:38AM  22      **BY MR. SINGER:**

10:38AM  23  Q.  So, these are various money orders that were deposited by

10:38AM  24  the Ms. Papierski and Mr. Heinz when they were renting the

10:38AM  25  unit; do you understand that, Mr. Devereaux?

10:38AM  1   A.  Yes.

10:38AM  2   Q.  And do you recognize them?

10:38AM  3   A.  I do.

10:38AM  4   Q.  So, I just want to direct your attention to page 1.  So

10:38AM  5   is this a payment that was made for rent by Ms. Papierski?

10:39AM  6   A.  Yes.

10:39AM  7   Q.  And it looks like it's a payment that was made on

10:39AM  8   3/1/2017 for rent?

10:39AM  9   A.  Correct.

10:39AM  10  Q.  Do you see up at the top left corner about information

10:39AM  11  about when it was deposited into the account?

10:39AM  12  A.  Yes.

10:39AM  13  Q.  And is it reflective of -- looks like the same day?

10:39AM  14  A.  It does.

10:39AM  15          **MR. SINGER:**  And advance to the next page,

10:39AM  16  Ms. Champoux, to page 2.

10:39AM  17          **BY MR. SINGER:**

10:39AM  18  Q.  So the Papierskis were paying a little bit more than the

10:39AM  19  750, to your understanding, based on the review of the

10:39AM  20  documents; is that right, sir?

10:39AM  21  A.  Yes.

10:39AM  22  Q.  So this was another money order made on that same

10:39AM  23  deposit?

10:39AM  24  A.  It was.

10:39AM  25  Q.  And so is this an example of something being deposited

| | | |
|---|---|---|
| 10:39AM | 1 | within that five business day period? |
| 10:39AM | 2 | A.  Yes. |
| 10:39AM | 3 | **MR. SINGER:**  Ms. Champoux if we could advance to the |
| 10:39AM | 4 | next page, page 3. |
| 10:39AM | 5 | **BY MR. SINGER:** |
| 10:39AM | 6 | Q.  So does this appear to be another money order that was |
| 10:39AM | 7 | made for rent by Ms. Papierski? |
| 10:39AM | 8 | A.  Yes. |
| 10:39AM | 9 | Q.  And the deposit date up in the top left corner, do you |
| 10:40AM | 10 | see that there, Mr. Devereaux? |
| 10:40AM | 11 | A.  Yes. |
| 10:40AM | 12 | Q.  So this was 6/6 of 2016? |
| 10:40AM | 13 | A.  Correct. |
| 10:40AM | 14 | Q.  So, I looked at a calendar, I know you don't have one in |
| 10:40AM | 15 | front of you, but 6/1/2016 fell on a Wednesday, which meant |
| 10:40AM | 16 | that 6/3 was a Friday, and 6/6 was the following Monday after |
| 10:40AM | 17 | the weekend. |
| 10:40AM | 18 | So, as far as the business day example that you talked |
| 10:40AM | 19 | about in your criteria when you're reviewing these documents, |
| 10:40AM | 20 | is this an example of something that was not deposited right |
| 10:40AM | 21 | away, but was deposited within that five business day period? |
| 10:40AM | 22 | A.  Yes. |
| 10:40AM | 23 | Q.  Because I guess if you were counting business days, how |
| 10:40AM | 24 | would you count out the business days on this particular |
| 10:40AM | 25 | deposit? |

| | | |
|---|---|---|
| 10:40AM | 1 | A.  The 1st was a Wednesday? |
| 10:40AM | 2 | Q.  The 1st was a Wednesday, yes, sir. |
| 10:40AM | 3 | A.  This would be the fourth business day. |
| 10:40AM | 4 | Q.  Okay.  And so if this was a cash deposit that you saw, |
| 10:40AM | 5 | this would be an example of something you would include? |
| 10:40AM | 6 | A.  Yes. |
| 10:40AM | 7 | **MR. SINGER:**  Okay.  Ms. Champoux, if you could |
| 10:40AM | 8 | advance to page 21 of the exhibit, please. |
| 10:41AM | 9 | **BY MR. SINGER:** |
| 10:41AM | 10 | Q.  So, this looks like a money order that was deposited on |
| 10:41AM | 11 | 8/19/2016; is that right? |
| 10:41AM | 12 | A.  Correct. |
| 10:41AM | 13 | Q.  And I note in the -- down in the memo section, it's |
| 10:41AM | 14 | noting how it's September rent; is that right? |
| 10:41AM | 15 | A.  Yes. |
| 10:41AM | 16 | Q.  So, I guess based on the document, does it appear like |
| 10:41AM | 17 | Ms. Papierski paid her September month -- rent early that |
| 10:41AM | 18 | month? |
| 10:41AM | 19 | **MR. DICKSON:**  Objection.  Improper opinion, whether |
| 10:41AM | 20 | she paid her rent early. |
| 10:41AM | 21 | **THE COURT:**  Overruled.  Overruled. |
| 10:41AM | 22 | **THE WITNESS:**  Yes. |
| 10:41AM | 23 | **BY MR. SINGER:** |
| 10:41AM | 24 | Q.  So, let's take the example of the five business day rule. |
| 10:41AM | 25 | If you saw a cash deposit occurring in the middle of the |

10:41AM 1  month for something that appeared to be a rent payment, would

10:41AM 2  you include it or not include it?

10:41AM 3  A.  We did not include it.

10:41AM 4  Q.  And so this would be an example of something that you

10:42AM 5  wouldn't include if you saw it as far as a cash deposit?

10:42AM 6  A.  If it was a cash deposit, yes.

10:42AM 7        **MR. SINGER:**  Okay.  And if you can advance to page

10:42AM 8  26, Ms. Champoux.

10:42AM 9        **BY MR. SINGER:**

10:42AM 10 Q.  And, so, as far as this one particular payment is made,

10:42AM 11 it looks like based on the deposit information it was made on

10:42AM 12 2/10/2017?

10:42AM 13 A.  Yes.

10:42AM 14 Q.  Does this look like a -- one of those legitimate rent

10:42AM 15 deposits that Ms. Papierski made during her tenancy?

10:42AM 16 A.  Yes.

10:42AM 17 Q.  So, as far as the draw, I'm going to direct your

10:42AM 18 attention to the top of the money order in the middle.  Do

10:42AM 19 you see the one notation there, sir, in the middle which

10:42AM 20 notes 020917?

10:42AM 21 A.  Yes.

10:42AM 22 Q.  In your experience, does that normally reflect when the

10:42AM 23 money order is produced?

10:42AM 24 A.  Yes.

10:42AM 25 Q.  So it appears in this situation, if this was for rent for

10:43AM  1  that month, Ms. Papierski may have paid a little late?

10:43AM  2  A.  Yes.

10:43AM  3  Q.  If this was a cash deposit, is this an example of

10:43AM  4  something that you wouldn't include in your analysis based on

10:43AM  5  the fact that it was beyond the five business days?

10:43AM  6  A.  Correct.  If this was a cash deposit, we would not have

10:43AM  7  included this.

10:43AM  8      MR. SINGER:  Okay.  And you can take that exhibit

10:43AM  9  down, Ms. Champoux, thank you.

10:43AM  10      BY MR. SINGER:

10:43AM  11  Q.  So, is it fair to say that you took a little bit of a

10:43AM  12  conservative approach when you were doing your analysis?

10:43AM  13  A.  Yes.

10:43AM  14  Q.  And is it also fair to say that your approach may not

10:43AM  15  account for every deposit that was made on rent?

10:43AM  16  A.  It does not.

10:43AM  17  Q.  So, when you reviewed Mr. Bongiovanni's banking records,

10:43AM  18  explain for the jury what it is that you saw regarding rent

10:43AM  19  payments -- or, sorry, what you saw regarding cash deposits

10:43AM  20  in the beginning part or end of a month?

10:43AM  21  A.  In his --

10:44AM  22  Q.  Yeah, that was a bad question.  Let me ask that again,

10:44AM  23  I'm sorry.  So when you were reviewing Mr. Bongiovanni's

10:44AM  24  banking records and you were looking for cash deposits made

10:44AM  25  in the beginning part of a month within five business days of

10:44AM   1    when rent's due, or a little bit before that, within five

10:44AM   2    days of the rent coming due, what did you notice?

10:44AM   3    A.  Most months had a deposit made in them.  Not every month,

10:44AM   4    but most months, especially once the parents moved in.

10:44AM   5    Q.  And when you take a look at what you saw in the deposit

10:44AM   6    information, did these deposits change in any way some of the

10:44AM   7    conclusions Ms. Bifano reached in her one exhibit, 337-3,

10:44AM   8    that you saw earlier?

10:44AM   9    A.  Yes.

10:44AM   10   Q.  How so?

10:44AM   11   A.  It would have --

10:44AM   12       **MR. DICKSON:**  Objection.  Improper opinion --

10:45AM   13       **THE COURT:**  Overruled.

10:45AM   14       **MR. DICKSON:**  -- to Ms. Bifano's testimony.

10:45AM   15       **THE COURT:**  No.

10:45AM   16       **THE WITNESS:**  It decreased the bottom number, that

10:45AM   17   $73,000 shortfall.

10:45AM   18       **BY MR. SINGER:**

10:45AM   19   Q.  Did you prepare some charts and graphs to help --

10:45AM   20       **THE COURT:**  Let's take a break right now.

10:45AM   21       **MR. SINGER:**  Sure, Judge.  Absolutely.

10:45AM   22       **THE COURT:**  We're going take our morning break, so

10:45AM   23   please remember my instructions not to talk about the case,

10:45AM   24   even with each other, and not to make up your mind.  See you

10:45AM   25   back here in about 15 minutes.

10:45AM     1                    (Jury excused at 10:45 a.m.)

10:45AM     2          **THE COURT:**  Let's excuse the witness.

10:45AM     3          (Witness excused at 10:45 a.m.)

10:46AM     4          **THE COURT:**  So Ms. Bifano testifies not as an expert

10:46AM     5   that there are these large cash deposits that are

10:46AM     6   unconnectable to anything that you're gonna ask the jury to

10:46AM     7   infer came from bribes.

10:46AM     8          This witness is testifying not as an expert that

10:46AM     9   there is a possible explanation for those cash deposits

10:46AM    10   contrary to Ms. Bifano's testimony.

10:46AM    11          Tell me why it would -- it's just so fundamentally

10:46AM    12   unfair to me to allow you to put on Ms. Bifano to testify to

10:46AM    13   that and not to allow the defense to say, you know what?

10:46AM    14   There is a flaw or, in my opinion, there is a possible

10:47AM    15   explanation of where that money came from.

10:47AM    16          Tell me why it's fair to let you put that in, and to

10:47AM    17   stop the defense from putting in their counter explanation?

10:47AM    18          **MR. DICKSON:**  Because respectfully, Judge, there are

10:47AM    19   Rules of Evidence and Rules of Criminal Procedure that govern

10:47AM    20   what is and is not fair in terms of the proof here.

10:47AM    21          **THE COURT:**  And you tell me what's -- and you tell me

10:47AM    22   what's fair about the way you want me to do this.

10:47AM    23          **MR. DICKSON:**  What I'm asking the Court to do is to

10:47AM    24   follow what the government's interpretation is of Rule 702,

10:47AM    25   701, and Rule 16 of the Federal Rules of Criminal Procedure.

10:47AM   1          THE COURT:  But you don't to -- just as we had the

10:47AM   2   argument before, you don't want to tell me what's fair about

10:47AM   3   that, do you?

10:47AM   4          MR. DICKSON:  Judge, I can't tell you what's fair

10:47AM   5   about it because you get to be the arbiter of the facts --

10:47AM   6          THE COURT:  I understand that, but I want to hear

10:47AM   7   what you think -- I want to hear what you think is fair about

10:47AM   8   this.  I want to --

10:47AM   9          MR. DICKSON:  And I'm trying.

10:47AM  10          THE COURT:  -- hear what you think is fair about

10:47AM  11   letting the government put on someone to testify that these

10:47AM  12   things are likely bribes, and not allow --

10:48AM  13          MR. DICKSON:  That's not what she said.

10:48AM  14          THE COURT:  Well, she said that there's -- that

10:48AM  15   they're untraceable.  And you're going to argue that they came

10:48AM  16   from bribes.

10:48AM  17          MR. DICKSON:  Exactly.  Which is the proper --

10:48AM  18          THE COURT:  And he's going to say that they're

10:48AM  19   untraceable, but that there's a possible other explanation for

10:48AM  20   that.

10:48AM  21          MR. DICKSON:  Exactly.

10:48AM  22          THE COURT:  What's wrong with that?

10:48AM  23          MR. DICKSON:  That's perfectly fine for both parties

10:48AM  24   to do in summation.  The issue is when a witness draws the

10:48AM  25   conclusion.

| | | |
|---|---|---|
| 10:48AM | 1 | Ms. Bifano did not draw any conclusions about the |
| 10:48AM | 2 | source of cash.  She did not tell this jury that that cash was |
| 10:48AM | 3 | bribe money.  The difference is -- |
| 10:48AM | 4 | **THE COURT:**  She said that there was -- she -- she did |
| 10:48AM | 5 | draw a conclusion there was no way to make an assumption about |
| 10:48AM | 6 | where that money came from. |
| 10:48AM | 7 | **MR. DICKSON:**  She said there was no way to trace |
| 10:48AM | 8 | cash.  That's not a conclusion.  And it's not different from |
| 10:48AM | 9 | what this witness said. |
| 10:48AM | 10 | This witness is doing exactly what Ms. Bifano did |
| 10:48AM | 11 | not.  He is drawing a conclusion about the source of cash |
| 10:48AM | 12 | deposits. |
| 10:48AM | 13 | **THE COURT:**  He's not. |
| 10:48AM | 14 | **MR. DICKSON:**  That is an expert conclusion, and -- |
| 10:48AM | 15 | **THE COURT:**  He's not. |
| 10:49AM | 16 | **MR. DICKSON:**  -- it is based on improper expert |
| 10:49AM | 17 | opinion, it is based on hearsay, and it is based on if he's |
| 10:49AM | 18 | offering the opinion, the Court has not required the defense |
| 10:49AM | 19 | to meet the notice requirements of Rule 16. |
| 10:49AM | 20 | This isn't about what I think is fair or not, this is |
| 10:49AM | 21 | about what the Rules of Evidence and the Rules of Criminal |
| 10:49AM | 22 | Procedure require.  The defense hasn't followed those rules in |
| 10:49AM | 23 | order to have this witness testify today. |
| 10:49AM | 24 | **THE COURT:**  Did you not know that this witness was |
| 10:49AM | 25 | going to testify that -- to exactly what he's testifying to? |

10:49AM   1              MR. DICKSON:  No, Judge, we got --

10:49AM   2              THE COURT:  You didn't know that?

10:49AM   3              MR. DICKSON:  -- these charts --

10:49AM   4              THE COURT:  You honestly didn't know that?  When he

10:49AM   5      took the stand this morning, you honestly didn't know that?

10:49AM   6              MR. DICKSON:  That I didn't know that he was going to

10:49AM   7      testify that these were rent?  That the --

10:49AM   8              THE COURT:  He's --

10:49AM   9              MR. DICKSON:  -- cash --

10:49AM   10             THE COURT:  -- he's not --

10:49AM   11             MR. DICKSON:  -- deposits were --

10:49AM   12             THE COURT:  -- I have not --

10:49AM   13             MR. DICKSON:  -- rent?

10:49AM   14             THE COURT:  -- heard him say once that these were

10:49AM   15     rent.  I have not heard him say once --

10:49AM   16             MR. DICKSON:  He's said that throughout his

10:49AM   17     testimony, Your Honor --

10:49AM   18             THE COURT:  No, he's not.

10:49AM   19             MR. DICKSON:  -- respectfully.

10:49AM   20             THE COURT:  He's saying -- he's saying he sees

10:49AM   21     withdrawals from the parents' account in the amount --

10:49AM   22     approximate amount of rent payments.  And he's saying that he

10:50AM   23     sees deposits, cash deposits, in Mr. Bongiovanni's account at

10:50AM   24     about the same -- he hasn't said this explicitly, but I assume

10:50AM   25     he's going to say this -- in approximately the same amount.

10:50AM   1          And you're telling me that when he took the stand

10:50AM   2   this morning, this comes as a complete surprise to you?

10:50AM   3          Because if it is, if you can tell me that, we will at

10:50AM   4   the conclusion of his direct adjourn, and you can have as much

10:50AM   5   time as you want to come up with an effective way to

10:50AM   6   cross-examine him.  If you didn't know that, you tell me, and

10:50AM   7   we will give you enough time that -- as much time as you

10:50AM   8   need --

10:50AM   9          **MR. DICKSON:**  I'm not --

10:50AM   10          **THE COURT:**  -- to prepare to cross --

10:50AM   11          **MR. DICKSON:**  -- asking for more --

10:50AM   12          **THE COURT:**  -- examine him.

10:50AM   13          **MR. DICKSON:**  -- I'm not asking for more time, Judge.

10:50AM   14          What I'm asking is that the Court require the defense

10:50AM   15   to follow the Rules of Criminal Procedure and the Rules of

10:50AM   16   Evidence.

10:50AM   17          The witness has not testified and cabined his

10:50AM   18   testimony in the way that the Court just cabined it.

10:50AM   19          What the Court said, I don't have any problem with,

10:50AM   20   with the caveat of what we argued yesterday.

10:50AM   21          What the Court said seems like something he could

10:50AM   22   testify to.

10:51AM   23          He, Fred Bongiovanni, took a deposit out on this

10:51AM   24   date, Joe Bongiovanni deposited cash on this date.  If that's

10:51AM   25   what the --

| | | |
|---|---|---|
| 10:51AM | 1 | **THE COURT:**  And -- |
| 10:51AM | 2 | **MR. DICKSON:** -- testimony -- |
| 10:51AM | 3 | **THE COURT:** -- and -- |
| 10:51AM | 4 | **MR. DICKSON:** -- was cabined to -- |
| 10:51AM | 5 | **THE COURT:** -- and -- |
| 10:51AM | 6 | **MR. DICKSON:** -- fine. |
| 10:51AM | 7 | **THE COURT:** -- there was a rent -- and there was a |
| 10:51AM | 8 | rent payment of that approximate amount due at the same time. |
| 10:51AM | 9 | **MR. DICKSON:**  If that was what the testimony was |
| 10:51AM | 10 | cabined to, then fine.  Okay. |
| 10:51AM | 11 | **THE COURT:**  So you just don't want -- |
| 10:51AM | 12 | **MR. DICKSON:**  But that's not what it's been. |
| 10:51AM | 13 | **THE COURT:** -- you don't want him to do the math and |
| 10:51AM | 14 | then say that that those -- those deposits would result in |
| 10:51AM | 15 | 47,000 plus 17,000. |
| 10:51AM | 16 | **MR. DICKSON:**  Judge, as an example, you just let |
| 10:51AM | 17 | Mr. -- I objected, but you let Mr. Singer ask the question, so |
| 10:51AM | 18 | did it look like Amanda Papierski paid rent late or something |
| 10:51AM | 19 | like that.  That's a conclusion that he is drawing about when |
| 10:51AM | 20 | Ms. Papierski is paying rent.  That's our problem with this. |
| 10:51AM | 21 | It is the -- it is the classification of all of these |
| 10:51AM | 22 | payments as rent payments.  We don't -- |
| 10:51AM | 23 | **THE COURT:**  You don't think -- |
| 10:51AM | 24 | **MR. DICKSON:** -- have a problem -- |
| 10:51AM | 25 | **THE COURT:** -- you don't think -- |

USA v Bongiovanni - Devereaux - Singer/Direct - 3/28/24

| | | |
|---|---|---|
| 10:51AM | 1 | **MR. DICKSON:** -- if he's -- |
| 10:51AM | 2 | **THE COURT:** -- you don't think that an accountant can |
| 10:52AM | 3 | draw -- if -- if someone is making rent payments by money |
| 10:52AM | 4 | orders on the 1st of the month for seven months in a row, and |
| 10:52AM | 5 | then on the eighth month there is a money order from that |
| 10:52AM | 6 | person that comes in on the 10th of the month, you don't think |
| 10:52AM | 7 | that an accountant can say, yeah, it looks like she paid her |
| 10:52AM | 8 | rent ten days late.  You think there's something wrong with |
| 10:52AM | 9 | that? |
| 10:52AM | 10 | **MR. DICKSON:**  I absolutely think an accountant could |
| 10:52AM | 11 | do that if that accountant was an expert witness who was |
| 10:52AM | 12 | qualified to do so -- |
| 10:52AM | 13 | **THE COURT:**  No. |
| 10:52AM | 14 | **MR. DICKSON:**  -- and used appropriate methodology |
| 10:52AM | 15 | that we could test at a Daubert hearing. |
| 10:52AM | 16 | **THE COURT:**  No.  I think what you're suggesting is so |
| 10:52AM | 17 | fundamentally unfair that -- and consistent with an argument |
| 10:52AM | 18 | that you made earlier, and I understand, I understand, you -- |
| 10:52AM | 19 | you -- you're -- you don't want to address the fundamental |
| 10:52AM | 20 | fairness, you want to rely on what the rules say. |
| 10:52AM | 21 | And you're right, you're right, the rules say what |
| 10:53AM | 22 | the rules say. |
| 10:53AM | 23 | But I think in this case, the defense has given you |
| 10:53AM | 24 | plenty of notice as to what this witness is gonna testify to. |
| 10:53AM | 25 | And I think that you knew very well what he was gonna testify |

10:53AM   1    to, as I said.  If you needed more, I mean, I don't know why

10:53AM   2    there would be a Daubert hearing on this as to -- as to, I

10:53AM   3    mean, he's testifying to -- Daubert would mean that he's not

10:53AM   4    qualified to give the opinions that he's giving.

10:53AM   5            MR. DICKSON:  No, a Daubert hearing could be both

10:53AM   6    about his qualification and about the methodology or facts and

10:53AM   7    data that he used to form his opinion.

10:53AM   8            THE COURT:  Okay.  And we know --

10:53AM   9            MR. DICKSON:  Our issue is that yesterday, he had a

10:53AM   10   different methodology than he suddenly has today.  We would

10:53AM   11   have been allowed --

10:53AM   12           THE COURT:  You mean -- you mean the five days versus

10:53AM   13   the ten days?

10:53AM   14           MR. DICKSON:  The five days versus whatever he was

10:53AM   15   testifying to yesterday where sometimes it was one way, and

10:53AM   16   sometimes it was another way.

10:53AM   17           If this was an expert who came up here, Judge, in a

10:53AM   18   Daubert hearing and said my methodology is that sometimes I

10:53AM   19   included cash deposits from the 1st, sometimes I didn't.

10:53AM   20   Sometimes I included cash deposits from the end of the month,

10:54AM   21   sometimes I didn't.  I think we would have a very real Daubert

10:54AM   22   hearing and Rule 702 inquiry into whether that methodology was

10:54AM   23   reliable.

10:54AM   24           THE COURT:  I don't.  I don't think it's even close.

10:54AM   25   I don't think it's even close.

10:54AM   1       I think to say that he used within five business days

10:54AM   2   of the end of the month, five business days at the beginning

10:54AM   3   of the month.  If it's $100 deposit, I don't count it.  If

10:54AM   4   it's 750 or close to it, I do.  That's -- that is plenty good

10:54AM   5   enough for me.

10:54AM   6       This -- this is something -- this is something I

10:54AM   7   understand, and I am a mental midget when it comes to numbers.

10:54AM   8   This is something that I get.

10:54AM   9       And so I would think that the government would get

10:54AM  10   it, and I think the defense has given plenty of notice.

10:54AM  11       And while I have sustained hearsay objections, and

10:54AM  12   I'll continue to sustain those, and while -- if he goes beyond

10:54AM  13   what I understand his testimony to be, I will sustain your

10:55AM  14   objections.

10:55AM  15       I -- I -- I couldn't disagree with you more, and I

10:55AM  16   think it would be fundamentally unfair to preclude the

10:55AM  17   defendant from putting on this kind of proof.

10:55AM  18       **MR. DICKSON:**  I understand, Judge.

10:55AM  19       I will just say for record purposes, I think the

10:55AM  20   notice point that the Court is making is not -- is not an

10:55AM  21   appropriate point to make in this regard.  We got the

10:55AM  22   underlying data that this witness is using at 7:30 p.m. last

10:55AM  23   night.  I'm not asking --

10:55AM  24       **THE COURT:**  Do you want to --

10:55AM  25       **MR. DICKSON:**  -- for more time.  I'm not asking for

10:55AM   1   more time.  But if the Court is premising some of its decision

10:55AM   2   off of us having plenty of notice, I think it is worth noting

10:55AM   3   that the notice we got of this underlying data was at

10:55AM   4   7:30 p.m. last night, and it was different data that we got at

10:55AM   5   8:30 p.m. the night before.

10:55AM   6         THE COURT:  Okay.  And I want to make it clear that

10:55AM   7   you can have as much -- as far as that notice goes, you can

10:55AM   8   have as much time as you want to prepare your cross.  As much

10:56AM   9   time as you want.  Do you want a week?  We'll go off for a

10:56AM   10  week.  Okay?

10:56AM   11        MR. DICKSON:  Understood.

10:56AM   12        THE COURT:  Anything else?

10:56AM   13        MR. SINGER:  No, Your Honor.

10:56AM   14        THE COURT:  Okay.  Thank you.  See you in about 15

10:56AM   15  minutes.

10:56AM   16        THE CLERK:  All rise.

10:56AM   17        (Off the record at 10:56 a.m.)

11:13AM   18        (Back on the record at 11:13 a.m.)

11:13AM   19        (Jury not present.)

11:13AM   20        THE CLERK:  All rise.

11:13AM   21        THE COURT:  Please be seated.

11:13AM   22        THE CLERK:  We are back on the record for the

11:13AM   23  continuation of the jury trial in case number 19-cr-227,

11:13AM   24  United States of America versus Joseph Bongiovanni.

11:13AM   25        All counsel and parties are present.

USA v Bongiovanni - Devereaux - Singer/Direct - 3/28/24

11:13AM   1        **THE COURT:**   Okay.   Sometimes judges wake up on the

11:13AM   2   wrong side of the bed, and evidently I did this morning,

11:13AM   3   although I didn't realize it until about a half hour ago.   I

11:14AM   4   apologize, Mr. Dickson, for the abrupt manner in which I

11:14AM   5   handled myself.   So let me try to explain a little bit -- in a

11:14AM   6   little bit more dispassionate way what my finding is.

11:14AM   7        So I do not believe that this witness is testifying

11:14AM   8   to an expert opinion under Rule 702 because I don't believe

11:14AM   9   that his testimony requires any special knowledge, skill,

11:14AM  10   experience, training, or education.

11:14AM  11        I think what he's testifying to is an -- so, for

11:14AM  12   instance, the opinion or the -- the opinion that the rent

11:14AM  13   payment, or the money order payment that came in on the 15th

11:14AM  14   of the month was a late rent payment.   I think that is an

11:14AM  15   opinion of a lay witness.   I think it's rationally based on

11:15AM  16   his perception.   I think it's helpful to understanding his

11:15AM  17   testimony, he's using that as a reason for what he's going to

11:15AM  18   testify to with respect to the cash, and it's not based on

11:15AM  19   scientific, technical, or other specialized knowledge.

11:15AM  20        As I said, I think I can reach that conclusion that

11:15AM  21   if somebody's paying by money order the 1st of the month every

11:15AM  22   month, and then there's a money order one month that comes in

11:15AM  23   on the 15th, that that's a late rent payment.   So I think

11:15AM  24   that's why that comes in.

11:15AM  25        I think that with respect to the cash payments, he's

11:15AM   1   really doing nothing different.

11:15AM   2        So, Ms. Bifano testified that there's no way to know

11:15AM   3   where those cash payments came -- cash deposits came from.  He

11:15AM   4   is suggesting that there may be a way to find or to -- to

11:15AM   5   surmise where those cash deposits came from.  And I think that

11:15AM   6   is, again, a lay opinion.

11:16AM   7        I think all he's doing is crunching numbers, the same

11:16AM   8   way Ms. Bifano crunched numbers to come up with her chart.

11:16AM   9   He's doing the same thing here.

11:16AM  10        If he expresses an opinion that these are rent

11:16AM  11   payments, I think that that would be improper.  And maybe

11:16AM  12   there's where your Daubert motion comes in, because he's got

11:16AM  13   no basis to express that opinion that these are rent payments.

11:16AM  14        But he can say that there is a -- not based on

11:16AM  15   scientific, technical, or other specialized knowledge, reason

11:16AM  16   to conclude that when Mr. and Mrs. Bongiovanni Sr. withdraw

11:16AM  17   deposits -- or, cash from their account on June 1st, they owe

11:16AM  18   "X" number of dollars for rent on June 1st, and then we see a

11:16AM  19   deposit in the defendant's account, that that might be that

11:17AM  20   money going through from their account into his account.

11:17AM  21        I don't think that is expert opinion.  I think that's

11:17AM  22   a lay observation.  And I think that, as an accountant, he can

11:17AM  23   then crunch the numbers.

11:17AM  24        So that's the reason that I am ruling the way I'm

11:17AM  25   ruling.  And I should not have been as passionate about my

USA v Bongiovanni - Devereaux - Singer/Direct - 3/28/24

| | | |
|---|---|---|
| 11:17AM | 1 | analysis as I was, and I'm very sorry for that.  It was |
| 11:17AM | 2 | uncalled for. |
| 11:17AM | 3 | **MR. DICKSON:**  No worries, Judge. |
| 11:17AM | 4 | **THE COURT:**  And, as I say, sometimes judges wake up |
| 11:17AM | 5 | on the wrong side of the bed, and I guess I did. |
| 11:17AM | 6 | **MR. DICKSON:**  No worries, Judge, thank you. |
| 11:17AM | 7 | **THE COURT:**  Thank you.  Appreciate it. |
| 11:17AM | 8 | **MR. DICKSON:**  No problem. |
| 11:17AM | 9 | **THE COURT:**  Anything else we need to do before we |
| 11:17AM | 10 | bring the jury back in? |
| 11:17AM | 11 | **MR. SINGER:**  No, Judge.  We can get our witness if |
| 11:17AM | 12 | you want us to bring him back in. |
| 11:17AM | 13 | **THE COURT:**  Anything from the government? |
| 11:17AM | 14 | **MR. DICKSON:**  No, Your Honor. |
| 11:17AM | 15 | **THE COURT:**  Okay.  So let's get the witness back in, |
| 11:17AM | 16 | and let's bring the jury in.  Thank you. |
| 11:18AM | 17 | I hate it when I do that, too.  I -- |
| 11:18AM | 18 | **MR. TRIPI:**  It happens. |
| 11:18AM | 19 | **THE COURT:**  You know, Mr. Tripi, right?  Been there, |
| 11:18AM | 20 | done that? |
| 11:18AM | 21 | **MR. TRIPI:**  Plenty of times. |
| 11:18AM | 22 | **MR. SINGER:**  I'm guilty of that as well. |
| 11:18AM | 23 | (Jury seated at 11:18 a.m.) |
| 11:18AM | 24 | **THE COURT:**  The record will reflect that all our |
| 11:19AM | 25 | jurors are present again. |

| | | |
|---|---|---|
| 11:19AM | 1 | I remind the witness that he's still under oath. |
| 11:19AM | 2 | And, Mr. Singer, you can continue. |
| 11:19AM | 3 | **MR. SINGER:**  Thank you, Judge. |
| 11:19AM | 4 | **BY MR. SINGER:** |
| 11:19AM | 5 | Q.  So, Mr. Devereaux, so we left off before the break |
| 11:19AM | 6 | talking about charts that you had prepared to in some ways |
| 11:19AM | 7 | reflect about these cash deposits that are going in towards |
| 11:19AM | 8 | the end or the beginning of the month.  And so I want to turn |
| 11:19AM | 9 | to that. |
| 11:19AM | 10 | Did you prepare certain charts to track what you observed |
| 11:19AM | 11 | in the accounts and the numbers and the thousands of pages of |
| 11:19AM | 12 | stuff that you looked at? |
| 11:19AM | 13 | A.  I did. |
| 11:19AM | 14 | **MR. SINGER:**  And so, Ms. Champoux, if you could bring |
| 11:19AM | 15 | up on the witness's screen only, because it's not in evidence, |
| 11:19AM | 16 | Defense Exhibit O.1, please. |
| 11:19AM | 17 | **BY MR. SINGER:** |
| 11:19AM | 18 | Q.  Do you recognize that, sir? |
| 11:19AM | 19 | A.  I do. |
| 11:19AM | 20 | Q.  What does that appear to be? |
| 11:19AM | 21 | A.  This is a chart of -- I was comparing expected rent |
| 11:20AM | 22 | income.  So, based on the -- the rental agreements, how much |
| 11:20AM | 23 | they were a month, how much you would expect to see in rental |
| 11:20AM | 24 | income each month -- I'm sorry, each year compared to the |
| 11:20AM | 25 | amount of checks that were deposited for rent in those years, |

11:20AM 1   and then the cash that we -- the cash deposits that we've

11:20AM 2   been discussing.

11:20AM 3   Q.  And was this produced using the various account

11:20AM 4   statements and data that we talked about earlier in your

11:20AM 5   testimony?

11:20AM 6   A.  Correct.

11:20AM 7   Q.  And it's a fair and accurate depiction of your

11:20AM 8   calculations?

11:20AM 9   A.  Yes.

11:20AM 10          **MR. SINGER:**  Your Honor, at this time, the defense

11:20AM 11  moves to enter Exhibit O.1 into evidence.

11:20AM 12          **MR. DICKSON:**  Other than what we've already objected

11:20AM 13  to, no objection.

11:20AM 14          **THE COURT:**  Okay.  So it's admitted over the

11:20AM 15  government's objection.

11:20AM 16          **(DFT Exhibit O.1 was received in evidence.)**

11:20AM 17          **MR. SINGER:**  And, Colleen, if we can publish that to

11:20AM 18  the jury.

11:21AM 19          **BY MR. SINGER:**

11:21AM 20  Q.  This is the chart that we were talking about, right,

11:21AM 21  Mr. Devereaux?

11:21AM 22  A.  Right.

11:21AM 23  Q.  Let's start off with the colors.  So what is this purple

11:21AM 24  bar over on the right side of each of the years represented?

11:21AM 25  A.  So the purple bar is the rental income that we would

11:21AM  1    expect to see based on the rental agreements that he had with

11:21AM  2    the tenants.  So each monthly, you know, each -- 12 months

11:21AM  3    times how much rental income per those agreements per month.

11:21AM  4    Q.  Okay.  So, for instance, like if we were talking about

11:21AM  5    year 2014, we're talking about Frederick and Maria

11:21AM  6    Bongiovanni living in the downstairs apartment?

11:21AM  7    A.  Correct.

11:21AM  8    Q.  And we're talking about the Whalen brothers living in the

11:21AM  9    upstairs apartment?

11:21AM  10   A.  Yes.

11:21AM  11   Q.  And then you're basically adding up the two figures for

11:21AM  12   the rent that you expect to see, and that's how you get to

11:21AM  13   the purple bar?

11:21AM  14   A.  Correct.

11:21AM  15   Q.  And as far as on the left side of the purple is the

11:21AM  16   chart.  Let's talk about the blue areas on that bar.  What

11:21AM  17   are those reflecting?

11:22AM  18   A.  Those are deposits made by check or money order.

11:22AM  19   Q.  And so how did you determine what was a check by your

11:22AM  20   analysis of the documents and looking through them?

11:22AM  21   A.  I would say -- most of the time the check said rent, or

11:22AM  22   it was from a person that, you know, you could identify as

11:22AM  23   living in one of the -- living in the upper apartment.

11:22AM  24   Q.  I think all of us have experience in looking at our bank

11:22AM  25   statements from time to time, so I'm not going to belabor the

11:22AM   1   point.  But when you pull banking records, does that include

11:22AM   2   the information like we were looking at from Frederick

11:22AM   3   Bongiovanni's statements?

11:22AM   4   A.  Yes.

11:22AM   5   Q.  And does it also sometimes include if you -- if you have

11:22AM   6   checks that you write, cancelled checks, or deposited checks

11:22AM   7   with endorsements on them?

11:22AM   8   A.  Correct.

11:22AM   9   Q.  And so that's --

11:22AM   10  A.  Yes.

11:22AM   11  Q.  -- what you're looking --

11:22AM   12  A.  Yes.

11:22AM   13  Q.  -- at when you're reviewing the documents?

11:22AM   14  A.  Yes.

11:22AM   15  Q.  And as far as the green shaded areas on those bars, what

11:22AM   16  is that representing?

11:22AM   17  A.  These represent the cash deposits that we've been

11:22AM   18  discussing.

11:22AM   19  Q.  Okay.  So the cash deposits, you're talking about that

11:23AM   20  happened within the five business days before the 1st --

11:23AM   21  A.  Yes.

11:23AM   22  Q.  -- or after the 1st of the month?

11:23AM   23  A.  Sorry, yes.

11:23AM   24  Q.  And that's got to be, you know, at some larger amount

11:23AM   25  that's more reflective of a deposit, correct?

USA v Bongiovanni - Devereaux - Singer/Direct - 3/28/24

11:23AM   1   A.  Yes.

11:23AM   2   Q.  Okay.  And so I notice that you stack those two blue and

11:23AM   3   green bars on top of each other in certain years; is that

11:23AM   4   right?

11:23AM   5   A.  That's correct.

11:23AM   6   Q.  Why do you do that?

11:23AM   7   A.  To show total amount the that was the check deposit and

11:23AM   8   deposited by cash, be able to compare that to the expected

11:23AM   9   rent.

11:23AM   10  Q.  Okay.  And so in a perfect scenario, the purple bar is

11:23AM   11  going to match the blue and green bars in height; is that

11:23AM   12  right?

11:23AM   13  A.  That's correct.

11:23AM   14  Q.  And the heights equal the amounts of expected rent that

11:23AM   15  you would potentially see on the purple side for the year?

11:23AM   16  A.  Yes, that's correct.

11:23AM   17  Q.  So the numbers on the left side of that axis, those are

11:24AM   18  representing the numbers of total rent that was expected to

11:24AM   19  be received for a calendar year?

11:24AM   20  A.  Could you repeat that?

11:24AM   21  Q.  Sure.  No problem.

11:24AM   22      So on the left side of the axis, the circle right there,

11:24AM   23  what do those numbers reflect?

11:24AM   24  A.  Yeah, the dollar amount.  So as related to the purple

11:24AM   25  bars, it would be the total of -- total dollars we would

11:24AM  1    expect on to see as rental income.

11:24AM  2    Q.  Okay.  And then you see down on the bottom axis, there's

11:24AM  3    2012 through 2018, those are the years that we're talking

11:24AM  4    about?

11:24AM  5    A.  Correct.

11:24AM  6         MR. SINGER:  Okay.  If we could take that down,

11:24AM  7    Ms. Champoux.  If we can bring up Government Exhibit 337-3.

11:24AM  8         BY MR. SINGER:

11:24AM  9    Q.  So we talked about this a little bit earlier in your

11:24AM 10    testimony.  This is an exhibit that Ms. Bifano produced; is

11:24AM 11    that right?

11:24AM 12    A.  Yes.

11:24AM 13    Q.  And so it's your understanding by your review of the

11:25AM 14    chart and also listening to her testimony, that the dark

11:25AM 15    green bars on this chart for each calendar year, those are

11:25AM 16    representing documentary items of some source of income; is

11:25AM 17    that right?

11:25AM 18    A.  That's right.

11:25AM 19    Q.  So we're talking about W-2s, as an example?

11:25AM 20    A.  Correct.

11:25AM 21    Q.  And what else would we be talking about, about those

11:25AM 22    things?

11:25AM 23    A.  Tax -- tax refunds, included in there was rent -- I'm

11:25AM 24    sorry, loan -- loan receipts.

11:25AM 25    Q.  If they received a check for rent during that year, would

11:25AM   1   that be included inside of the green bar?

11:25AM   2   A.   Sorry, yes, that was included as well.

11:25AM   3   Q.   Okay.  And your understanding also is the light green

11:25AM   4   shaded areas in 337-3, that's referring to cash deposits made

11:25AM   5   into the accounts of Mr. Bongiovanni?

11:25AM   6   A.   Correct.

11:25AM   7   Q.   And so it's your understanding based on Ms. Bifano's

11:26AM   8   testimony that -- that if there was any type of cash deposits

11:26AM   9   that were not in some way papered, in other words supported

11:26AM   10  by something written on a piece of paper, that represents

11:26AM   11  that light green shade of -- of unaccounted for cash

11:26AM   12  deposits; is that right?

11:26AM   13  A.   Yes, that's my understanding.

11:26AM   14  Q.   So -- so you looked at leasing documents; is that right?

11:26AM   15  A.   Yes.

11:26AM   16  Q.   Is it your understanding that Ms. Bifano did not consider

11:26AM   17  those in her analysis?

11:26AM   18  A.   Correct.

11:26AM   19  Q.   And as far as the dark green bars are concerned, would

11:26AM   20  you understand the analysis not to include any type of cash

11:26AM   21  payments that may have been made for rent by Frederick and

11:26AM   22  Mr. -- sorry, Frederick and Maria Bongiovanni?

11:26AM   23  A.   Yes.

11:26AM   24  Q.   And that's because there's nothing on paper to suggest

11:26AM   25  those?

11:26AM    1    A.  Yes.

11:26AM    2    Q.  So, if you were to include the deposits of a larger value

11:27AM    3    close to or in the beginning of the months that you

11:27AM    4    considered, within that five-day business period, do those

11:27AM    5    dark green bars on Ms. Bifano's chart change in any way?

11:27AM    6    A.  They would.

11:27AM    7    Q.  How do they change, sir?

11:27AM    8    A.  The green bars, the dark green bars, would be taller.

11:27AM    9    And the short green, the light green bars, would be shorter.

11:27AM    10    **MR. SINGER:**  So, I'm gonna ask, Ms. Champoux, if you

11:27AM    11    can bring down Exhibit 337-3, and if you can bring up for the

11:27AM    12    witness only Defense Exhibit O.2.

11:27AM    13    **BY MR. SINGER:**

11:27AM    14    Q.  So, prior to coming into court, Mr. Devereaux, did I ask

11:27AM    15    you to perform, sorry, produce some type of exhibit to

11:27AM    16    reflect the changes when you include these cash deposits

11:27AM    17    being made at the beginning and end of the month?

11:28AM    18    A.  Yes.

11:28AM    19    Q.  And what do you recognize up on the screen right now as

11:28AM    20    Exhibit O.2?

11:28AM    21    A.  This is the chart that I prepared.

11:28AM    22    Q.  And how did you go about preparing this chart?

11:28AM    23    A.  Took the numbers that Ms. Bifano had reflected in her

11:28AM    24    chart.  We added the cash deposits that we had been

11:28AM    25    discussing that were within five days of the beginning --

11:28AM   1   within five days, five business days of the 1st of the month.

11:28AM   2   And we added those to the dark green section.

11:28AM   3   Q.  And is this a fair and accurate depiction of the data

11:28AM   4   that you produced?

11:28AM   5   A.  It is.

11:28AM   6   Q.  It's all in substantially the same condition?

11:28AM   7   A.  Yes.

11:28AM   8       **MR. SINGER:**  Your Honor, at this time, the defense

11:28AM   9   moves to enter Exhibit O.2 into evidence.

11:28AM  10       **MR. DICKSON:**  With the same caveat, no objection.

11:28AM  11       **THE COURT:**  Okay.  So, again, it's admitted over the

11:28AM  12   government's objection.

11:28AM  13       **(DFT Exhibit O.2 was received in evidence.)**

11:28AM  14       **MR. SINGER:**  If we can publish that to the jury,

11:29AM  15   Ms. Demma.

11:29AM  16       All right.  So, Ms. Champoux, if we can expand out

11:29AM  17   the chart, I know this is a little small here on the full

11:29AM  18   chart.  Thank you.

11:29AM  19       **BY MR. SINGER:**

11:29AM  20   Q.  It's a little easier to see?

11:29AM  21   A.  Yes.

11:29AM  22   Q.  Perfect.  I want to go through and kind of explain

11:29AM  23   things, have you explain things to the jury.

11:29AM  24       So, when we're talking about the yellow bars in the right

11:29AM  25   of each of the years represented in this chart, what are we

11:29AM  1   talking about there, Mr. Devereaux?

11:29AM  2   A.  Those are the uses or the cash outflows of the Bifanos

11:29AM  3   for those years.  Of the Bongiovanni's.

11:29AM  4   Q.  Is -- those yellow bars are on the right side, and as far

11:29AM  5   as the green bars are concerned, they -- they represent what?

11:29AM  6   A.  The dark green bars represent the cash inflows to the

11:30AM  7   Bongiovannis, which include the cash that was documented --

11:30AM  8   considered documented with paper by Ms. Bifano, and also

11:30AM  9   includes the cash that's within five days of the 1st, five

11:30AM  10  business days within the 1st of the month that we considered

11:30AM  11  cash received for rent.

11:30AM  12  Q.  So with regard to the light green shaded areas, are there

11:30AM  13  still certain years where there's unknown cash deposits that

11:30AM  14  exist inside the account?

11:30AM  15  A.  Yes, there are.

11:30AM  16  Q.  And those were cash deposits when you went through your

11:30AM  17  analysis that didn't occur within the five business days of

11:30AM  18  the beginning of the month or just -- sorry, five business

11:30AM  19  days before the beginning of the month or five business days

11:30AM  20  after the beginning of the month?

11:30AM  21  A.  Correct.

11:31AM  22  Q.  And I want to direct your attention down to the bottom of

11:31AM  23  the chart.  So when we talk about the bottom numbers, what

11:31AM  24  are we talking about there again?  Let's start first with the

11:31AM  25  excess or shortfall numbers.

11:31AM    1    A.   So the excess and the shortfall numbers were, excuse me,

11:31AM    2    were would be the difference between the combination of the

11:31AM    3    dark green and light green bars versus the yellow bars.

11:31AM    4    Q.   So, I'll direct your attention to the year 2012.  So for

11:31AM    5    instance, so in that year, you'd agree with me the yellow bar

11:31AM    6    is taller than the green bars on the left side?

11:31AM    7    A.   Correct.  So there were more uses or outflows of cash

11:31AM    8    than there were inflows.

11:31AM    9    Q.   So, I know you're a CPA, and I know I am not.  So when we

11:31AM   10    have numbers in that chart that are in parentheses and in the

11:31AM   11    red, what does that mean?

11:31AM   12    A.   Parentheses, it would be a negative.

11:32AM   13    Q.   And I'll direct your attention to 2013 on the other side

11:32AM   14    of the chart.  So when we're looking at there, the numbers

11:32AM   15    are in black and they're not in parentheses.  What does that

11:32AM   16    mean?

11:32AM   17    A.   That would mean that there was more cash coming in than

11:32AM   18    there was uses going out.

11:32AM   19    Q.   So is this a, I guess, where the term being "in the

11:32AM   20    black" comes from --

11:32AM   21    A.   It is.

11:32AM   22    Q.   -- for a business?

11:32AM   23    A.   Yes, it is.

11:32AM   24    Q.   Okay.  Thank you.

11:32AM   25         So, with regard to the lower part, the excess or

11:32AM   1    shortfall including the end/beginning of the month cash

11:32AM   2    deposits, what does that reflecting, sir?

11:32AM   3    A.  So that would be the difference between the dark green

11:32AM   4    bars and the yellow bar.  So it would exclude the -- those

11:32AM   5    light green amounts that was cash that we haven't identified

11:32AM   6    the source of.

11:32AM   7             **MR. SINGER:**  So if we could unexpand that,

11:32AM   8    Ms. Champoux.  And if we can bring up, side by side, this

11:32AM   9    exhibit as well as 337-3.

11:33AM   10            So as far as the data on these charts.  When you're

11:33AM   11   looking at the cash deposits that are made in the beginning

11:33AM   12   and end of the month, how does that affect the shortfall

11:33AM   13   numbers that Ms. Bifano presented in 337-3 versus the chart

11:33AM   14   produced by you in Defendant's Exhibit O.2?

11:33AM   15   A.  Which shortfall numbers?  The top line or the --

11:33AM   16   Q.  Sure, and I guess I'll direct your attention down to the

11:33AM   17   bottom right of each chart that's produced.

11:33AM   18   A.  So it decreases the shortfall over the period of 2012 to

11:33AM   19   2018 to $16,633.

11:33AM   20   Q.  So if that 16,633 figure, if that's averaged out over the

11:34AM   21   eight-year period between 2012 and 2018, you'd agree with me

11:34AM   22   that we're talking about an, on average, about $2,000 a year

11:34AM   23   that is unaccounted for?

11:34AM   24   A.  Yes.

11:34AM   25   Q.  And if we further divide that by 12, we're talking about

| | | |
|---|---|---|
| 11:34AM | 1 | roughly 175 bucks a month that's unaccounted for? |
| 11:34AM | 2 | A.  Correct. |
| 11:34AM | 3 | **MR. SINGER:**  May I just have a moment, Judge? |
| 11:34AM | 4 | Thank you very much, sir. |
| 11:34AM | 5 | I have no further questions, Judge. |
| 11:34AM | 6 | **THE COURT:**  Are you ready to cross, Mr. Dickson? |
| 11:34AM | 7 | **MR. DICKSON:**  Judge, I'd like to speak with these two |
| 11:34AM | 8 | women behind me, our forensic accountants, if I can.  So if |
| 11:34AM | 9 | could maybe we can give our jury a long lunch and come back at |
| 11:35AM | 10 | 1:00? |
| 11:35AM | 11 | **THE COURT:**  Absolutely. |
| 11:35AM | 12 | **MR. DICKSON:**  Thank you. |
| 11:35AM | 13 | **THE COURT:**  So let's do that, folks.  We will take |
| 11:35AM | 14 | our lunch break.  You should remember my instructions about |
| 11:35AM | 15 | not communicating about the case, including with each other. |
| 11:35AM | 16 | Please don't use tools of technology to communicate about the |
| 11:35AM | 17 | case or to research anything about the case.  Don't watch, or |
| 11:35AM | 18 | read, or listen to, any news coverage if there is any while |
| 11:35AM | 19 | the case is still in progress.  And don't make up your mind |
| 11:35AM | 20 | until you start deliberating. |
| 11:35AM | 21 | We'll see you back here at 1:00, Mr. Dickson, do you |
| 11:35AM | 22 | think?  Is that good enough? |
| 11:35AM | 23 | **MR. DICKSON:**  Yes, Judge. |
| 11:35AM | 24 | **MS. IZZO:**  Judge, we have another proceeding at 1:00. |
| 11:35AM | 25 | **THE COURT:**  We have -- |

| | | |
|---|---|---|
| 11:35AM | 1 | **MS. IZZO:**  You have an oral argument.  Maybe 1:30? |
| 11:35AM | 2 | **THE COURT:**  Let's come back at 1. |
| 11:35AM | 3 | Get them either earlier or later. |
| 11:35AM | 4 | Let's come back at 1.  Thanks. |
| 11:35AM | 5 | **MS. IZZO:**  Okay. |
| 11:35AM | 6 | (Jury excused at 11:35 a.m.) |
| 11:36AM | 7 | **THE COURT:**  Okay.  Let me instruct the witness not to |
| 11:36AM | 8 | talk to anybody during the break about this case.  Thank you. |
| 11:36AM | 9 | (Witness excused at 11:36 a.m.) |
| 11:36AM | 10 | **THE COURT:**  Anything we need to put on the record |
| 11:36AM | 11 | from the government? |
| 11:36AM | 12 | **MR. DICKSON:**  No, Your Honor. |
| 11:36AM | 13 | **THE COURT:**  Anything from the defense? |
| 11:36AM | 14 | **MR. SINGER:**  No, Your Honor. |
| 11:36AM | 15 | **THE COURT:**  Okay.  We'll see you folks at 1.  If we |
| 11:36AM | 16 | have to wait a little bit because my other matter can't get |
| 11:36AM | 17 | changed, we'll just wait a minute. |
| 11:36AM | 18 | **MR. TRIPI:**  Judge, if it's not complex and you can't |
| 11:36AM | 19 | find another AUSA, I'm happy to stand in for -- |
| 11:36AM | 20 | **THE COURT:**  It's an oral argument. |
| 11:36AM | 21 | **MR. TRIPI:**  Oh, it is?  Okay.  I'll see my way out of |
| 11:36AM | 22 | that. |
| 11:36AM | 23 | **MR. SINGER:**  Does that qualify as complex? |
| 11:36AM | 24 | **MS. IZZO:**  We'll tell Mr. Mango that you would have |
| 11:36AM | 25 | subbed for him. |

| | | |
|---|---|---|
| 11:36AM | 1 | (Off the record at 11:36 a.m.) |
| 11:36AM | 2 | (Back on the record at 1:05 a.m.) |
| 01:05PM | 3 | (Jury not present.) |
| 01:05PM | 4 | **THE CLERK:**  All rise. |
| 01:05PM | 5 | **THE COURT:**  Please be seated. |
| 01:05PM | 6 | **THE CLERK:**  We are back on the record for the |
| 01:05PM | 7 | continuation of the jury trial in case number 19-cr-227, |
| 01:05PM | 8 | United States of America versus Joseph Bongiovanni. |
| 01:05PM | 9 | All counsel and parties are present. |
| 01:05PM | 10 | **THE COURT:**  Okay.  Good afternoon.  Mr. Cotter was in |
| 01:05PM | 11 | the courtroom again today, and one of the jurors remarked that |
| 01:05PM | 12 | she knows Mr. Cotter. He was, I think, just watching because |
| 01:05PM | 13 | he had another matter here before me earlier.  We've already |
| 01:05PM | 14 | vetted this. |
| 01:05PM | 15 | **MR. SINGER:**  I don't think there's any reason for |
| 01:05PM | 16 | inquiry Judge, no. |
| 01:05PM | 17 | **MR. COOPER:**  I agree, I spoke to Dave in the back. |
| 01:05PM | 18 | He said he was popping in to watch, and we already spoke to |
| 01:05PM | 19 | the juror about the issue. |
| 01:05PM | 20 | **THE COURT:**  We did.  I appreciate them telling us |
| 01:05PM | 21 | again, but -- |
| 01:05PM | 22 | **MR. COOPER:**  Agreed. |
| 01:05PM | 23 | **THE COURT:**  Are you ready, Mr. Dickson? |
| 01:05PM | 24 | **MR. DICKSON:**  Yes, Judge. |
| 01:05PM | 25 | **THE COURT:**  Okay.  Anything we need to put on the |

01:05PM    1    record before we begin the cross?

01:05PM    2            MR. SINGER:  No, Your Honor.

01:05PM    3            THE COURT:  Anything from the government?

01:05PM    4            MR. DICKSON:  No, Your Honor.

01:05PM    5            MR. TRIPI:  No, Your Honor.

01:05PM    6            THE COURT:  Let's bring them back, please, Pat.

01:07PM    7            (Jury seated at 1:07 p.m.)

01:07PM    8            THE COURT:  Okay.  Welcome back, everybody.

01:07PM    9            One of you noted that a lawyer who you had previously

01:07PM   10    told us you knew was in the courtroom again today, and we

01:07PM   11    appreciate that, that's wonderful that you are following my

01:07PM   12    instructions to tell us if anybody you know is in the

01:07PM   13    courtroom.  But we've already vetted that, so there's no

01:07PM   14    reason to revisit it now.  The lawyer was simply watching,

01:07PM   15    actually, as a lot of people have been doing over the last six

01:07PM   16    or seven weeks.

01:07PM   17            So the record will reflect that all our jurors are

01:07PM   18    again present.

01:07PM   19            I remind the witness that he's still under oath.

01:07PM   20            And, Mr. Dickson, you may begin.

01:07PM   21            MR. DICKSON:  Thank you, Judge.

01:07PM   22

01:07PM   23            CROSS-EXAMINATION BY MR. DICKSON:

01:08PM   24    Q.  Mr. Devereaux, let's just get this straight right off the

01:08PM   25    bad bat.  You have absolutely no idea whether Joe Bongiovanni

01:08PM    1    took bribes, do you?

01:08PM    2    A.  I do not.

01:08PM    3    Q.  You're an accountant, right?

01:08PM    4    A.  Correct.

01:08PM    5    Q.  You work for an accounting firm; is that correct?

01:08PM    6    A.  Yes.

01:08PM    7    Q.  Primarily, Mr. Devereaux, you get hired by companies; is

01:08PM    8    that right?

01:08PM    9    A.  Correct.

01:08PM    10   Q.  And I think you told us a little bit on direct

01:08PM    11   examination that you do audits for those companies?

01:08PM    12   A.  Yes.

01:08PM    13   Q.  Meaning you review the company's books; is that right?

01:08PM    14   A.  Yes.

01:08PM    15   Q.  You look at, maybe, their profit and loss statements; is

01:08PM    16   that right?

01:08PM    17   A.  Yes.

01:08PM    18   Q.  So ensure that things within the company's finances are

01:08PM    19   whatever they want the finances to look like; is that

01:08PM    20   correct?

01:08PM    21   A.  Right.

01:08PM    22   Q.  Now, as an accountant, Mr. Devereaux, you developed some

01:09PM    23   specialties; is that fair to say?

01:09PM    24   A.  Yes.

01:09PM    25   Q.  You, for example, specialize in working with companies in

01:09PM   1   the construction business, right?  That's one of your

01:09PM   2   specialties?

01:09PM   3   A.   Yes.

01:09PM   4   Q.   You specialize in working with companies that are in the

01:09PM   5   manufacturing business, right?

01:09PM   6   A.   Yes.

01:09PM   7   Q.   You specialize in working with companies for their

01:09PM   8   employees benefit plans; is that right?

01:09PM   9   A.   Yes.

01:09PM   10  Q.   Now you would agree with me, Mr. Devereaux, that this

01:09PM   11  case is not a case about construction companies, right?

01:09PM   12  A.   No, it's not.

01:09PM   13  Q.   This case, Mr. Devereaux, is not a case about

01:09PM   14  manufacturing companies, right?

01:09PM   15  A.   Correct.

01:09PM   16  Q.   This case is not a case about employee benefit programs,

01:09PM   17  right?

01:09PM   18  A.   Right.

01:09PM   19  Q.   This is a criminal matter, correct?

01:09PM   20  A.   Yes, sir.

01:09PM   21  Q.   And you told us, Mr. Devereaux, that you have never

01:09PM   22  actually worked on a criminal investigation before; is that

01:09PM   23  right?

01:09PM   24  A.   That's correct.

01:09PM   25  Q.   You have never testified in a criminal case; is that

01:09PM   1   fair?

01:09PM   2   A.  Yes.

01:09PM   3   Q.  You also told us that you specialize in I think you said,

01:09PM   4   bankruptcy; is that right?

01:09PM   5   A.  When I worked at a prior firm, we did.  I don't -- I no

01:10PM   6   longer do that.

01:10PM   7   Q.  You did bankruptcy work previously?

01:10PM   8   A.  Correct.

01:10PM   9   Q.  This isn't a bankruptcy case, right?

01:10PM  10   A.  No.

01:10PM  11   Q.  You told us -- I think Mr. Singer asked you whether

01:10PM  12   you've ever looked at an individual's financial records

01:10PM  13   outside of this case; is that right?

01:10PM  14   A.  Yes.

01:10PM  15   Q.  And you said that you had, but that it was for a debtor

01:10PM  16   in a bankruptcy proceeding, right?

01:10PM  17   A.  Correct.

01:10PM  18   Q.  And this again is not a bankruptcy proceeding, true?

01:10PM  19   A.  True.

01:10PM  20   Q.  Mr. Bongiovanni is not a debtor in a bankruptcy

01:10PM  21   proceeding, right?

01:10PM  22   A.  Correct.

01:10PM  23   Q.  But in this case, nonetheless, you were hired to work on

01:10PM  24   behalf of Mr. Bongiovanni, true?

01:10PM  25   A.  Yes.

01:10PM    1    Q.  And you're getting paid for your work on behalf of

01:10PM    2    Mr. Bongiovanni, right?

01:10PM    3    A.  Yes.

01:10PM    4    Q.  Mr. Devereaux, you are charging $315 an hour for your

01:10PM    5    work for Mr. Bongiovanni, aren't you?

01:10PM    6    A.  Yes.

01:10PM    7    Q.  You have another partner at your firm who's helped you

01:11PM    8    with this case, right?

01:11PM    9    A.  Correct.

01:11PM   10    Q.  He's also charging $315 an hour for his work for

01:11PM   11    Mr. Bongiovanni, right?

01:11PM   12    A.  Yes.

01:11PM   13    Q.  And you have an associate also working for

01:11PM   14    Mr. Bongiovanni, right?

01:11PM   15    A.  Yes.

01:11PM   16    Q.  And he's charging $163 an hour, true?

01:11PM   17    A.  Yes.

01:11PM   18    Q.  Is that right?

01:11PM   19    A.  Yes.

01:11PM   20    Q.  I don't have the latest receipts, Mr. Devereaux, but as

01:11PM   21    of March 2nd, so about a month ago, your firm has charged

01:11PM   22    $33,000 for your work for Mr. Bongiovanni; is that right?

01:11PM   23    A.  That sounds correct, yes.

01:11PM   24    Q.  And that was before Stephanie Bifano ever testified,

01:11PM   25    right?

USA v Bongiovanni - Devereaux - Dickson/Cross - 3/28/24

01:11PM 1    A.  Yes.

01:11PM 2    Q.  You sat during Ms. Bifano's testimony at this table right

01:11PM 3    back here, right?

01:11PM 4    A.  Yes.

01:11PM 5    Q.  You listened to her whole entire testimony, right?

01:11PM 6    A.  Yes.

01:11PM 7    Q.  She was on the stand for a few hours, right?

01:11PM 8    A.  Correct.

01:11PM 9    Q.  And you charged $315 an hour to listen to Ms. Bifano

01:12PM 10   testify; is that true?

01:12PM 11   A.  That's true.

01:12PM 12   Q.  Sitting here today, Mr. Devereaux, still charging money,

01:12PM 13   right?

01:12PM 14   A.  Yes.

01:12PM 15   Q.  For your testimony here today, you're still charging $315

01:12PM 16   an hour?

01:12PM 17   A.  Yes.

01:12PM 18   Q.  Now, you sat through Ms. Bifano's financial presentation

01:12PM 19   before she ever testified in court; is that right?

01:12PM 20   A.  Correct.

01:12PM 21   Q.  When was that?

01:12PM 22   A.  Middle of December, I believe.  I don't remember the

01:12PM 23   exact date.

01:12PM 24   Q.  And you charged for your time sitting through her

01:12PM 25   presentation then, right?

01:12PM    1    A.  Yes.

01:12PM    2    Q.  And, Mr. Devereaux, you believed that if you just simply

01:12PM    3    agreed with everything Ms. Bifano said, you might not be able

01:12PM    4    to keep charging money, right?

01:12PM    5    A.  Can you repeat that question?

01:12PM    6    Q.  I'm asking about your belief.  If you went into that

01:12PM    7    meeting with Ms. Bifano, you looked at her analysis and you

01:12PM    8    just said, I agree, she's right, you thought you might not be

01:12PM    9    able to continue charging money to work for Mr. Bongiovanni;

01:13PM   10    is that right?

01:13PM   11            **MR. SINGER:**  Objection to the form of the question.

01:13PM   12            **THE COURT:**  No, overruled.

01:13PM   13            **BY MR. DICKSON:**

01:13PM   14    Q.  I'll ask it again, Mr. Devereaux.

01:13PM   15        You believed that if you sat through Ms. Bifano's

01:13PM   16    testimony or her presentation, and you just simply agreed

01:13PM   17    with everything she said, you might not be able to keep

01:13PM   18    charging money by working for Mr. Bongiovanni?

01:13PM   19    A.  If there's anything else that the defense team didn't

01:13PM   20    want us to look into, yeah, we probably wouldn't be able to.

01:13PM   21    Q.  Let's talk about what else you offered to do for

01:13PM   22    Mr. Bongiovanni.

01:13PM   23        Now as an accountant, you told us that your job really is

01:13PM   24    to review financial records, correct?

01:13PM   25    A.  Correct.

01:13PM   1   Q.   But you, Mr. Devereaux, offered to do more than that for

01:13PM   2   Mr. Bongiovanni, didn't you?

01:13PM   3   A.   I don't know what -- I'm not following you.

01:13PM   4   Q.   Okay.  Let me ask this.  You actually offered this

01:13PM   5   defense team to help track down a witness, right?

01:13PM   6   A.   I did, yes.

01:13PM   7   Q.   You offered to help track down one of Mr. Bongiovanni's

01:14PM   8   tenants, right?

01:14PM   9   A.   Correct.

01:14PM   10   Q.   Because you thought that doing that would be helpful to

01:14PM   11   Mr. Bongiovanni?

01:14PM   12   A.   Yes.

01:14PM   13   Q.   Now, let's talk about your data and some of your analysis

01:14PM   14   for a second.

01:14PM   15        You would agree with me, Mr. Devereaux, that as an

01:14PM   16   accountant, it's important to be accurate, right?

01:14PM   17   A.   Yes.

01:14PM   18   Q.   It's important to be thorough, right?

01:14PM   19   A.   Yes.

01:14PM   20   Q.   It's important to review all of the pertinent data,

01:14PM   21   right?

01:14PM   22   A.   Yep.

01:14PM   23   Q.   And it's important to draw conclusions only based off of

01:14PM   24   what the data and the records say, true?

01:14PM   25   A.   Yes.

USA v Bongiovanni - Devereaux - Dickson/Cross - 3/28/24

91

01:14PM   1   Q.  Now, you were in this courthouse yesterday, too, right?

01:14PM   2   A.  Yes.

01:14PM   3   Q.  And you were ready to testify, true?

01:14PM   4   A.  Yes.

01:14PM   5   Q.  And while the jury was in their back room over there, you

01:14PM   6   actually did come in, right?

01:14PM   7   A.  I did.

01:14PM   8   Q.  And you sat right there?

01:15PM   9   A.  Yes.

01:15PM  10   Q.  And I stood right here, right?

01:15PM  11   A.  Yes.

01:15PM  12   Q.  And I asked you some questions?

01:15PM  13   A.  You did.

01:15PM  14   Q.  And yesterday, Mr. Devereaux, we looked at some charts

01:15PM  15   that you had prepared, right?

01:15PM  16   A.  We did.

01:15PM  17   Q.  And your charts were wrong?

01:15PM  18   A.  They were.

01:15PM  19   Q.  There were errors in your data?

01:15PM  20   A.  Yes.

01:15PM  21   Q.  There were errors in your charts?

01:15PM  22   A.  Yes.  We made last-minute changes to some wording and --

01:15PM  23   Q.  So that wasn't my question, Mr. Devereaux.  My question

01:15PM  24   was:  There were errors in your charts yesterday, right?

01:15PM  25   A.  Yes.

01:15PM    1   Q.  And after we pointed out those errors, Mr. Devereaux,

01:15PM    2   then you went back last night and you changed your charts,

01:15PM    3   right?

01:15PM    4   A.  We did.

01:15PM    5   Q.  You changed the data that you used, right?

01:15PM    6   A.  Yes.

01:15PM    7   Q.  You also changed the methodology that you used to create

01:15PM    8   those charts, right?

01:15PM    9   A.  Yes.

01:15PM   10   Q.  You changed the methodology that you used in your

01:15PM   11   analysis, true?

01:15PM   12   A.  Yes.

01:15PM   13   Q.  Because today, you told this jury that you only

01:16PM   14   considered cash deposits that happened I think you said

01:16PM   15   within five business days of the beginning or the end of the

01:16PM   16   month, right?

01:16PM   17   A.  Correct.

01:16PM   18   Q.  You considered those payments to be rent?

01:16PM   19   A.  Yes.

01:16PM   20   Q.  But yesterday, that wasn't gonna be your testimony, was

01:16PM   21   it?

01:16PM   22   A.  No, it was not.

01:16PM   23   Q.  Right.  Yesterday you actually had a different

01:16PM   24   methodology, correct?

01:16PM   25   A.  Yes.

01:16PM    1    Q.  Sometimes you accounted deposits that were within the

01:16PM    2    first five days, right?

01:16PM    3    A.  Correct.

01:16PM    4    Q.  Sometimes you didn't?

01:16PM    5    A.  Yes.

01:16PM    6    Q.  Sometimes you counted deposits that were in the middle of

01:16PM    7    the month, right?

01:16PM    8    A.  We did.

01:16PM    9    Q.  Sometimes you didn't?

01:16PM   10    A.  Right.

01:16PM   11    Q.  Sometimes you accounted deposits that were made within

01:16PM   12    five business days of the end of the month, right?

01:16PM   13    A.  Yes.

01:16PM   14    Q.  And sometimes you didn't?

01:16PM   15    A.  Yes.

01:16PM   16    Q.  So you changed your methodology?

01:16PM   17    A.  Yes.

01:16PM   18    Q.  But you were ready to present those findings to this jury

01:16PM   19    yesterday, true?

01:16PM   20    A.  True.

01:16PM   21    Q.  Now, you told us already that you watched Ms. Bifano

01:17PM   22    testify, right?

01:17PM   23    A.  Yes.

01:17PM   24    Q.  You heard her testify about the Bongiovanni's finances

01:17PM   25    between 2012 to 2018, right?

01:17PM   1   A.   Yes.

01:17PM   2           MR. DICKSON:   I'm going to show Government

01:17PM   3   Exhibit 337-5, please, Ms. Champoux, which is already in

01:17PM   4   evidence.

01:17PM   5           BY MR. DICKSON:

01:17PM   6   Q.   You saw this chart during Ms. Bifano's testimony, right?

01:17PM   7   A.   Yes.

01:17PM   8   Q.   You agree with it, right?

01:17PM   9   A.   Yes.

01:17PM  10   Q.   It's accurate, right?

01:17PM  11   A.   Yes.

01:17PM  12   Q.   It shows that the Bongiovanni's credit card debt

01:17PM  13   continued to rise between 2012 and 2018, right?

01:17PM  14   A.   Yes.

01:17PM  15   Q.   You'd agree with me that it looks like they were under

01:17PM  16   some financial pressure, right?

01:17PM  17   A.   Yes.

01:17PM  18   Q.   Financial stress, true?

01:17PM  19   A.   Yes, true.

01:17PM  20   Q.   You'd also agree with me, Mr. Devereaux, that in the

01:17PM  21   course of your analysis or the course of your review of the

01:18PM  22   records, despite the financial stress, you saw evidence that

01:18PM  23   the Bongiovannis continued to travel and take trips, right?

01:18PM  24   A.   We did.

01:18PM  25   Q.   Trips to Las Vegas?

| | | |
|---|---|---|
| 01:18PM | 1 | A.  Yes. |
| 01:18PM | 2 | Q.  Trips to Denver, right? |
| 01:18PM | 3 | A.  Yes. |
| 01:18PM | 4 | Q.  Trips to Florida? |
| 01:18PM | 5 | A.  I'm sorry? |
| 01:18PM | 6 | Q.  To Florida? |
| 01:18PM | 7 | A.  Yes. |
| 01:18PM | 8 | Q.  To California? |
| 01:18PM | 9 | A.  Yes. |
| 01:18PM | 10 | Q.  To Toronto? |
| 01:18PM | 11 | A.  Yes. |
| 01:18PM | 12 | Q.  To Saint Martin? |
| 01:18PM | 13 | A.  Yes. |
| 01:18PM | 14 | Q.  To Chicago? |
| 01:18PM | 15 | A.  Yes. |
| 01:18PM | 16 | Q.  To New York City? |
| 01:18PM | 17 | A.  Yes. |
| 01:18PM | 18 | Q.  To Scottsdale, Arizona? |
| 01:18PM | 19 | A.  Yes. |
| 01:18PM | 20 | Q.  You saw all those trips in the records, right? |
| 01:18PM | 21 | A.  I did. |
| 01:18PM | 22 | Q.  Let's talk about what else was in the records, |
| 01:18PM | 23 | Mr. Devereaux. |
| 01:18PM | 24 | **MR. DICKSON:**  We can take this one down, |
| 01:18PM | 25 | Ms. Champoux, please. |

| | | |
|---|---|---|
| 01:18PM | 1 | **BY MR. DICKSON:** |
| 01:18PM | 2 | Q.  Now, on direct examination with Mr. Singer, you told the |
| 01:18PM | 3 | jury that you saw evidence -- I think you called them |
| 01:18PM | 4 | everyday purchases that the Bongiovannis made with their |
| 01:18PM | 5 | credit cards, right? |
| 01:18PM | 6 | A.  Yes. |
| 01:18PM | 7 | Q.  To be clear, Mr. Devereaux, you didn't see records of |
| 01:19PM | 8 | things that they purchased with cash necessarily, right? |
| 01:19PM | 9 | A.  No, we saw what -- what retailers they were buying things |
| 01:19PM | 10 | from. |
| 01:19PM | 11 | Q.  My question is about cash though, right? |
| 01:19PM | 12 | A.  Oh, I'm sorry. |
| 01:19PM | 13 | Q.  You wouldn't be able to see if -- |
| 01:19PM | 14 | A.  Oh. |
| 01:19PM | 15 | Q.  -- they bought something with cash? |
| 01:19PM | 16 | A.  I'm sorry. |
| 01:19PM | 17 | Q.  So let's talk about the some of the stuff that the |
| 01:19PM | 18 | Bongiovannis said that they bought. |
| 01:19PM | 19 | **MR. DICKSON:**  Ms. Champoux, can we please pull up |
| 01:19PM | 20 | Government Exhibit 338A. |
| 01:19PM | 21 | Judge, this is already in evidence as Government |
| 01:19PM | 22 | Exhibit 338.  We just marked it for ease as 338A.  It's the |
| 01:19PM | 23 | 1040 from 2016. |
| 01:19PM | 24 | **THE COURT:**  Any objection to that being used this |
| 01:19PM | 25 | way? |

01:19PM  1          MR. SINGER:  Just one moment, Judge?

01:19PM  2          THE COURT:  Sure.  This is simply an excerpt from

01:19PM  3  338, which is in evidence?

01:19PM  4          MR. DICKSON:  Yes, Judge.  It's -- 338, all of this

01:19PM  5  is already in evidence, we've just tried to make it a little

01:19PM  6  easier to access.

01:19PM  7          MR. SINGER:  No objection, Judge.

01:19PM  8          THE COURT:  Okay.  So you can use this 338A that's

01:20PM  9  already in evidence.

01:20PM  10          MR. DICKSON:  Ms. Champoux, can we please go to

01:20PM  11  page 11.  Could we highlight the middle section there where it

01:20PM  12  says note?

01:20PM  13          BY MR. DICKSON:

01:20PM  14  Q.  Mr. Devereaux, do you see this here?

01:20PM  15  A.  Yes.

01:20PM  16  Q.  This is one of the Bongiovanni's tax returns, right?

01:20PM  17  A.  Yes.

01:20PM  18  Q.  You saw -- you see on there, it says they purchased

01:20PM  19  $3,000 worth of luggage?

01:20PM  20  A.  I see $3,000 purchase.

01:20PM  21  Q.  That's my question.  You see a $3,000 purchase, right?

01:20PM  22  A.  I don't see that it's for luggage.

01:20PM  23          MR. DICKSON:  I apologize.  We'll zoom out for you.

01:20PM  24          BY MR. DICKSON:

01:20PM  25  Q.  You see up there at the top you see that it says in

01:20PM  1   row A, it says luggage?

01:20PM  2   A.   Yes.

01:20PM  3   Q.   Did you see a $3,000 credit card receipt for luggage?

01:20PM  4   A.   Not specifically for luggage, no.

01:20PM  5   Q.   So they could have bought that in cash, right?

01:21PM  6   A.   They could have.

01:21PM  7   Q.   You wouldn't know?

01:21PM  8   A.   I wouldn't know.

01:21PM  9        **MR. DICKSON:**   Can we go to page 13?   Zoom in again,

01:21PM  10  please.   Can we get the top part, too, Ms. Champoux, please,

01:21PM  11  where it says what it is?   Thank you.

01:21PM  12       **BY MR. DICKSON:**

01:21PM  13  Q.   See this here, Mr. Devereaux?

01:21PM  14  A.   Yes.

01:21PM  15  Q.   See $5,200 worth of shoes, right?

01:21PM  16  A.   Yes.

01:21PM  17  Q.   See where it says the Bongiovannis purchased those shoes?

01:21PM  18  A.   Yes.

01:21PM  19  Q.   Do you see credit card receipts totaling $5,200 for 26

01:21PM  20  pairs of shoes?

01:21PM  21  A.   I don't know where they bought the shoes from, so I would

01:21PM  22  say that no, I was not able to determine a receipt for $5,200

01:21PM  23  in shoes.

01:21PM  24  Q.   They could have purchase those with cash, right?

01:21PM  25  A.   They could have.

01:21PM    1    Q.  You wouldn't know?

01:21PM    2    A.  I wouldn't know.

01:21PM    3              MR. DICKSON:  Can we go to page 16?  And zoom in

01:21PM    4    again, please?

01:21PM    5              BY MR. DICKSON:

01:22PM    6    Q.  See here, Mr. Devereaux, where it says the Bongiovannis

01:22PM    7    had eight bags of clothes that they purchased for $11,450?

01:22PM    8    A.  Yes.

01:22PM    9    Q.  Did you see credit card receipts totaling -- for clothing

01:22PM   10    totaling $11,450 before 2016?

01:22PM   11    A.  Once again, without knowing the retailers that they

01:22PM   12    purchase these from, I would say no, that I did not see

01:22PM   13    these.

01:22PM   14    Q.  Why do you have to know the retailer that they purchased

01:22PM   15    them from?

01:22PM   16    A.  You asked if I saw a receipt for those clothes.  But

01:22PM   17    without knowing where they bought them from, I don't know

01:22PM   18    which credit card purchase that could be from.

01:22PM   19    Q.  I'm asking in total, before 2016, in all of the credit

01:22PM   20    card receipts that you reviewed, do you see $11,450 worth of

01:22PM   21    clothes bought on credit card?

01:22PM   22    A.  Once again, I don't know what they're buying at the

01:22PM   23    retailers.  We just see the retailer.  We don't see, like, an

01:22PM   24    itemized receipt of what they purchased.

01:23PM   25    Q.  I see.  So you can't tell us whether they purchased these

01:23PM  1  clothes, $11,450 worth of clothes --

01:23PM  2  A.  Correct.

01:23PM  3  Q.  -- by credit card?

01:23PM  4  A.  Correct.

01:23PM  5  Q.  You can't tell us if they bought them in cash?

01:23PM  6  A.  Right.

01:23PM  7  Q.  You just don't know, right?

01:23PM  8  A.  Yes.

01:23PM  9        **MR. DICKSON:**  Could we go to, let's see, Government

01:23PM  10  Exhibit 338B, please.

01:23PM  11        Same thing here, Judge, this is just a different tax

01:23PM  12  return for 2017.

01:23PM  13        **THE COURT:**  And same, you don't have a problem with

01:23PM  14  it, do you?

01:23PM  15        **MR. SINGER:**  No objection, Judge.

01:23PM  16        **THE COURT:**  Great.

01:23PM  17        **MR. DICKSON:**  Can we go to page 8, please.  And zoom

01:23PM  18  in for me if you don't mind.

01:23PM  19        **BY MR. DICKSON:**

01:23PM  20  Q.  All right.  You see here the Bongiovannis said in 2014

01:23PM  21  they purchased a large canvas painting for $799?

01:23PM  22  A.  Yes.

01:23PM  23  Q.  Did you see a credit card receipt for that?

01:23PM  24  A.  I don't recall one, no.

01:23PM  25  Q.  So they could have bought that in cash, right?

01:23PM    1   A.  Yes.

01:23PM    2   Q.  You don't know?

01:23PM    3   A.  No, I don't know.

01:23PM    4   Q.  You see the third item down, it says clothing, 12 large

01:24PM    5   bags, right?

01:24PM    6   A.  Yes.

01:24PM    7   Q.  See the Bongiovannis put they bought $1,200 or $4,500 --

01:24PM    8   excuse me, $4,500 worth of clothing?

01:24PM    9   A.  Yes.

01:24PM   10   Q.  Can't tell us whether there are credit card receipts for

01:24PM   11   that, right?

01:24PM   12   A.  Correct.

01:24PM   13   Q.  Could have bought it in cash, right?

01:24PM   14   A.  Yes.

01:24PM   15   Q.  You don't know?

01:24PM   16   A.  I don't know.

01:24PM   17           **MR. DICKSON:**  Could we go to page 11, please?

01:24PM   18           **BY MR. DICKSON:**

01:24PM   19   Q.  See here some furniture listed, right --

01:24PM   20   A.  Yep.

01:24PM   21   Q.  -- for $17,000, right?

01:24PM   22   A.  Yes.

01:24PM   23   Q.  Do you see credit card receipts totaling $17,000 at

01:24PM   24   furniture stores?

01:24PM   25   A.  I do not recall seeing a receipt for them.

USA v Bongiovanni - Devereaux - Dickson/Cross - 3/28/24

102

01:24PM  1  Q.  Okay.  So they could have bought that in cash, right?

01:24PM  2  A.  Yes.

01:24PM  3  Q.  You don't know?

01:24PM  4  A.  I don't know.

01:25PM  5       **MR. DICKSON:**  Can we go to page 23?

01:25PM  6       **BY MR. DICKSON:**

01:25PM  7  Q.  I'm not gonna belabor this point, Mr. Devereaux, but same

01:25PM  8  question here.  You see that they purchased all of this stuff

01:25PM  9  that we zoomed in on here on page 23?

01:25PM  10  A.  Yes.

01:25PM  11  Q.  And you don't remember or can't tell us whether there are

01:25PM  12  credit card receipts in those totals for any of that stuff,

01:25PM  13  right?

01:25PM  14  A.  Correct.

01:25PM  15  Q.  You don't know whether they bought any of that stuff in

01:25PM  16  cash?

01:25PM  17  A.  Right.

01:25PM  18  Q.  You just don't know, right?

01:25PM  19  A.  Yes.

01:25PM  20       **MR. DICKSON:**  Can we go to 338C?  Same thing, Judge,

01:25PM  21  1040 for 2018.

01:25PM  22       **THE COURT:**  I assume it's still the same position

01:25PM  23  you're taking, Mr. Singer?

01:25PM  24       **MR. SINGER:**  Yes.

01:25PM  25       **THE COURT:**  Thank you.

| | | |
|---|---|---|
| 01:25PM | 1 | MR. DICKSON:  Can we go to page 10, please? |
| 01:25PM | 2 | BY MR. DICKSON: |
| 01:26PM | 3 | Q.  What about any of this stuff, Mr. Devereaux, credit card |
| 01:26PM | 4 | receipts for that? |
| 01:26PM | 5 | A.  I don't recall seeing specific receipts for those. |
| 01:26PM | 6 | Q.  Okay.  So they could have bought any of that stuff in |
| 01:26PM | 7 | cash, right? |
| 01:26PM | 8 | A.  Yes. |
| 01:26PM | 9 | MR. DICKSON:  Could we go to page 13? |
| 01:26PM | 10 | BY MR. DICKSON: |
| 01:26PM | 11 | Q.  Mr. Devereaux, this is another -- looks like $12,000 |
| 01:26PM | 12 | worth of clothes that the Bongiovannis said they bought, |
| 01:26PM | 13 | right? |
| 01:26PM | 14 | A.  Yes. |
| 01:26PM | 15 | Q.  Credit card receipts that add up to $12,000 for more |
| 01:26PM | 16 | clothes? |
| 01:26PM | 17 | A.  No. |
| 01:26PM | 18 | Q.  Could have bought that in cash, right? |
| 01:26PM | 19 | A.  Could have, yep. |
| 01:26PM | 20 | MR. DICKSON:  And then could we go to page 15, |
| 01:26PM | 21 | please? |
| 01:26PM | 22 | BY MR. DICKSON: |
| 01:26PM | 23 | Q.  Same question here, Mr. Devereaux.  Looks like a little |
| 01:26PM | 24 | more than $10,000 worth of stuff the Bongiovannis bought; is |
| 01:26PM | 25 | that right? |

01:26PM    1    A.  Yes.

01:26PM    2    Q.  Can't tell us that there are credit card receipts for any

01:27PM    3    of that stuff, right?

01:27PM    4    A.  I cannot.

01:27PM    5    Q.  Could have bought it in cash?

01:27PM    6    A.  Yes.

01:27PM    7    Q.  You don't know?

01:27PM    8    A.  I don't.

01:27PM    9         **MR. DICKSON:**  You can take that down, Ms. Champoux.

01:27PM   10         **BY MR. DICKSON:**

01:27PM   11    Q.  Now you told us, Mr. Devereaux, as an accountant, it's

01:27PM   12    important to be accurate and thorough in your work, right?

01:27PM   13    A.  Yes.

01:27PM   14    Q.  I want to talk about cash deposits for a little bit,

01:27PM   15    okay?  When a person deposits cash into a bank account,

01:27PM   16    there's no way of telling necessarily where the source of

01:27PM   17    that -- or, what the source of that cash is, right?

01:27PM   18    A.  No, not unless you have some firsthand knowledge, you

01:27PM   19    know --

01:27PM   20    Q.  Right.

01:27PM   21    A.  -- that I saw it.

01:27PM   22    Q.  So if you're just looking at bank records, the bank

01:27PM   23    records will say, for example, $10 deposit of cash, right?

01:27PM   24    A.  Yeah.

01:27PM   25    Q.  It doesn't say $10 deposit of cash for rent, right?

01:27PM   1   A.  Correct.

01:27PM   2   Q.  If my grandma gives me $10 bucks for my birthday, and I

01:28PM   3   go put it in the bank, the teller doesn't ask me, hey,

01:28PM   4   where'd you get the $10, right?

01:28PM   5   A.  Right.

01:28PM   6   Q.  You put cash in your bank account, right?

01:28PM   7   A.  Yes.

01:28PM   8   Q.  And there's no record of the source of that cash, right?

01:28PM   9   A.  No.

01:28PM   10   Q.  Now, in performing your analysis, you decided to conclude

01:28PM   11   that cash deposits made within the first five days of the

01:28PM   12   month were for rent, right?

01:28PM   13   A.  Yes.

01:28PM   14   Q.  That was your conclusion, correct?

01:28PM   15   A.  Yes.

01:28PM   16   Q.  Now you found those cash deposits in Mr. Bongiovanni's

01:28PM   17   bank records, right?

01:28PM   18   A.  Correct.

01:28PM   19   Q.  Those bank records, Mr. Devereaux, they didn't say the

01:28PM   20   source of those cash deposits, did they?

01:28PM   21   A.  They did not.

01:28PM   22   Q.  The bank records didn't say that those cash deposits were

01:28PM   23   for rent, right?

01:28PM   24   A.  No, they don't.

01:28PM   25   Q.  You don't interview the tenants yourself, did you?

01:28PM    1    A.  I did not.

01:28PM    2    Q.  You didn't ask them if those cash deposits matched the

01:29PM    3    amount of cash that they gave, right?

01:29PM    4    A.  I did not.

01:29PM    5    Q.  So, let's talk about this assumption then.

01:29PM    6         If you concluded that any cash deposit within the first

01:29PM    7    five days of the month was for rent, if even $1 of that

01:29PM    8    wasn't from rent, your conclusion would be wrong, right?

01:29PM    9    A.  Yes.

01:29PM   10    Q.  So, if Mr. Bongiovanni's mom, for example, gave him a

01:29PM   11    $100 for his birthday, and he deposited it within the first

01:29PM   12    five days of the month, your conclusion that all those cash

01:29PM   13    deposits were rent would be wrong, right?

01:29PM   14         **MR. SINGER:**  Object to form of the question.

01:30PM   15         **THE COURT:**  No, overruled.

01:30PM   16         **BY MR. DICKSON:**

01:30PM   17    Q.  If Mr. Bongiovanni's mom gave him $100 for his birthday,

01:30PM   18    and he deposited it within the first five days of the month,

01:30PM   19    your conclusion would be wrong?

01:30PM   20    A.  We would be off by $100.

01:30PM   21    Q.  Your conclusion would be wrong.  I see you looking over

01:30PM   22    at Mr. Singer, Mr. Devereaux.

01:30PM   23         I'm asking you:  Your conclusion would be wrong, wouldn't

01:30PM   24    it?

01:30PM   25    A.  Yes.

01:30PM   1   Q.  If somebody else who wasn't a tenant gave Mr. Bongiovanni

01:30PM   2   cash and he put it into his bank account at the beginning of

01:30PM   3   the month, your conclusion would be wrong?

01:30PM   4   A.  Yes.

01:30PM   5            MR. DICKSON:  Ms. Champoux, can we please pull up

01:30PM   6   Government Exhibit 337-3 on the left, and Defense Exhibit O.2

01:30PM   7   on the right, please.

01:31PM   8            BY MR. DICKSON:

01:31PM   9   Q.  All right.  Mr. Devereaux, this chart on the right here,

01:31PM  10   that's the one that you made, right?

01:31PM  11   A.  Correct.

01:31PM  12   Q.  But to get to that chart, you took Ms. Bifano's chart

01:31PM  13   that's on the left here, correct?

01:31PM  14   A.  Yep.

01:31PM  15   Q.  Now, you listened to Ms. Bifano testify, right?

01:31PM  16   A.  Yes.

01:31PM  17   Q.  You heard her say that she couldn't attribute a source to

01:31PM  18   any of the cash deposits, right?

01:31PM  19   A.  Yes.

01:31PM  20   Q.  And you understood that she was saying she couldn't

01:31PM  21   attribute a source to the cash deposits, because cash

01:31PM  22   deposits don't come with receipts explaining what -- where

01:31PM  23   they're from, right?

01:31PM  24   A.  Yes.

01:31PM  25   Q.  But you did attribute a source to cash deposits?

01:31PM    1    A.  We did.

01:31PM    2    Q.  So you changed Ms. Bifano's chart based off of your

01:31PM    3    assumption, right?

01:31PM    4    A.  Yes.

01:31PM    5    Q.  Based off of your assumption about the source of cash

01:32PM    6    deposits?

01:32PM    7    A.  Yes.

01:32PM    8        MR. DICKSON:  Could we take Ms. Bifano's chart down,

01:32PM    9    please, Ms. Champoux, and just put up defense Exhibit O.2.

01:32PM    10        BY MR. DICKSON:

01:32PM    11    Q.  I just want to make sure I'm understanding this chart

01:32PM    12    correctly, Mr. Devereaux, because I think I wasn't quite

01:32PM    13    following what the green bar is.

01:32PM    14      So can you tell me how are you defining what is included

01:32PM    15    in this green -- the dark green bar?

01:32PM    16    A.  The dark green bar would be all of the income sources

01:32PM    17    that Ms. Bifano also included in hers.  But we also included

01:32PM    18    the cash deposits that we attributed to rent.  And we added

01:32PM    19    our -- our cash deposits for rent, we added them to her

01:32PM    20    income bar.

01:32PM    21    Q.  Okay.  And then what about the light green bar?

01:32PM    22    A.  The light green bar would be the cash deposits that we

01:32PM    23    did not attribute to rent.

01:32PM    24    Q.  Okay.  So I'm going to ask this question about this

01:33PM    25    chart, Mr. Devereaux.  You said that the dark green bar

01:33PM   1   includes any cash deposit that you assumed came from rent,

01:33PM   2   right?

01:33PM   3   A.  Yes.

01:33PM   4   Q.  So if your assumption was wrong, this chart's wrong,

01:33PM   5   right?

01:33PM   6   A.  Yes.

01:33PM   7   Q.  If Mr. Bongiovanni deposited some dollar amount at the

01:33PM   8   beginning of the month that wasn't from rent, this chart's

01:33PM   9   wrong, right?

01:33PM  10   A.  Correct.  It should be in the light green as opposed to

01:33PM  11   the dark green.

01:33PM  12   Q.  Right.  Like Ms. Bifano's chart, right?

01:33PM  13   A.  Yes.

01:33PM  14        MR. DICKSON:  Let's go to Defense Exhibit O.1,

01:33PM  15   please.  Actually, I'm sorry Ms. Champoux, can we go back just

01:33PM  16   a second?  Sorry to do that to you.

01:33PM  17        BY MR. DICKSON:

01:33PM  18   Q.  Mr. Devereaux, I think at the end of your direct

01:34PM  19   examination, Mr. Singer asked you to do some math, right?

01:34PM  20   And he asked you to calculate, I think, sort of the per-year

01:34PM  21   excess or shortfall; do you remember that?

01:34PM  22   A.  Yeah.

01:34PM  23   Q.  And I think when you did that, you said that you were

01:34PM  24   dividing it by eight; is that right?

01:34PM  25   A.  It should be divided by seven.

01:34PM   1   Q.  Okay.  So when you divided it by eight, that wasn't the

01:34PM   2   right math?

01:34PM   3   A.  No.

01:34PM   4   Q.  You should have divided it by seven?

01:34PM   5   A.  By seven.

01:34PM   6       MR. DICKSON:  We can take that down, and can we go to

01:34PM   7   O.1, please.

01:34PM   8       BY MR. DICKSON:

01:34PM   9   Q.  The same question about this, Mr. Devereaux.  What's the

01:34PM  10   green bar here supposed to represent?

01:34PM  11   A.  The green bar represents the cash deposits that we

01:34PM  12   attributed to rent.

01:34PM  13   Q.  Okay.  And again, if your assumption is wrong about any

01:34PM  14   of those cash deposits, this chart's wrong too?

01:34PM  15   A.  Yes.

01:34PM  16       MR. DICKSON:  You can take that down, please,

01:35PM  17   Ms. Champoux.

01:35PM  18       BY MR. DICKSON:

01:35PM  19   Q.  All right.  Now I want to talk to you for a moment about

01:35PM  20   Mr. Bongiovanni's parents.  You told us a second ago or an

01:35PM  21   hour ago that you assumed that Mr. and Mrs. Bongiovanni were

01:35PM  22   paying rent every month, right?

01:35PM  23   A.  Yes.

01:35PM  24   Q.  Based off the cash deposits that were in

01:35PM  25   Mr. Bongiovanni's bank account?

01:35PM   1   A.  And the cash withdrawals from his father's account.

01:35PM   2   Q.  And you base that off of a lease that you saw; is that

01:35PM   3   right?

01:35PM   4   A.  Yes.

01:35PM   5   Q.  A lease between Joe Bongiovanni and his parents, right?

01:35PM   6   A.  Yes.

01:35PM   7   Q.  Now, on that lease, Mr. Devereaux, you saw that the

01:35PM   8   parents were, according to that lease, supposed to pay 750

01:36PM   9   every month, right?

01:36PM  10   A.  Correct.

01:36PM  11         **MR. DICKSON:**  Ms. Champoux, can we please pull up

01:36PM  12   Government Exhibit 335 which is in evidence.  And I think this

01:36PM  13   is in the Fred folder.  And then go to --

01:36PM  14         **BY MR. DICKSON:**

01:36PM  15   Q.  Well, I'm not sure which year you talked about on direct

01:36PM  16   examination, Mr. Devereaux.  Do you remember what year you

01:36PM  17   and Mr. Singer were looking at cash deposits for, or cash

01:36PM  18   withdrawals for, for Mr. Bongiovanni?

01:36PM  19   A.  I don't remember.

01:36PM  20   Q.  Let me ask you it this way, then.  You looked at a cash

01:36PM  21   withdrawal from Fred Bongiovanni on direct examination that

01:36PM  22   was worth $900, right?

01:36PM  23   A.  Yes.

01:36PM  24         **MR. DICKSON:**  Okay.  I'm being told that it was 2016,

01:36PM  25   so let's just look at those real quick.  Thank you.

01:36PM    1    **BY MR. DICKSON:**

01:37PM    2    Q.  Now in this 2016 year, Mr. Devereaux, you looked at a

01:37PM    3    cash withdrawal that was for $900; is that right?

01:37PM    4    A.  Yes.

01:37PM    5    Q.  That's more than the lease said Mr. Bongiovanni's parents

01:37PM    6    had to pay for rent, right?

01:37PM    7    A.  Yes.

01:37PM    8    Q.  But you included all $900 in your calculation, right?

01:37PM    9    A.  If the deposit went into -- into -- into Joe

01:37PM    10    Bongiovanni's account, we would have, yes.

01:37PM    11    Q.  The whole deposit?

01:37PM    12    A.  Yes.

01:37PM    13    Q.  Even though it was more than the rent that was owed,

01:37PM    14    right?

01:37PM    15    A.  Yes.

01:37PM    16    Q.  All right.  Now, in order to build those charts that we

01:37PM    17    looked at, you had to have underlying data, right?

01:38PM    18    A.  Um-hum.

01:38PM    19    Q.  Is that right?

01:38PM    20    A.  Yes.

01:38PM    21    Q.  Because those charts just don't create themselves, right?

01:38PM    22    There's data that goes into those charts?

01:38PM    23    A.  They do not just create themselves.

01:38PM    24    Q.  You did that in Excel, right?

01:38PM    25    A.  Yes.

01:38PM  1   Q.  And to create a chart like that in Excel, you have to put

01:38PM  2   in data, correct?

01:38PM  3   A.  Yes, you do.

01:38PM  4   Q.  And so it's incredibly important that that underlying

01:38PM  5   data is accurate, right?

01:38PM  6   A.  Yes.

01:38PM  7   Q.  Who, Mr. Devereaux, created the underlying data that you

01:38PM  8   used for those charts?

01:38PM  9   A.  We had -- one of the people that you had mentioned who

01:38PM  10  works for my firm, they imported all of the -- all of the

01:38PM  11  data we received, cash deposits slips, everything.  And he

01:38PM  12  organized it using a tool that we have to create the data

01:38PM  13  that we then analyzed and put into the chart.

01:39PM  14  Q.  So, which person at your firm?  Your partner or the

01:39PM  15  associate?

01:39PM  16  A.  The associate.

01:39PM  17  Q.  So the associate puts all of the underlying data into

01:39PM  18  that Excel spreadsheet, right?

01:39PM  19  A.  Yep.  Yes.

01:39PM  20  Q.  And that underlying data, that's supposed to be from the

01:39PM  21  bank records, right?

01:39PM  22  A.  Yes.

01:39PM  23  Q.  Did you go back and double check the bank records to make

01:39PM  24  sure they matched what the associate put in there?

01:39PM  25  A.  There's tags that the thing -- that it runs and tells you

114

01:39PM   1   that you imported all of the pages.

01:39PM   2   Q.  So you checked the tags?

01:39PM   3   A.  Yeah.

01:39PM   4   Q.  Did you go back and look at the bank records to make sure

01:39PM   5   that all of your data was accurate before you showed this

01:39PM   6   data to the jury?

01:39PM   7   A.  Not on every occasion, no.

01:39PM   8   Q.  So are you sitting here right now 100 percent confident

01:39PM   9   that all of those numbers in your underlying data sheet are

01:39PM  10   correct?

01:39PM  11   A.  We saw deposit slips for all of those cash deposits that

01:39PM  12   we considered rent.

01:40PM  13   Q.  That wasn't my question.

01:40PM  14   A.  Oh.  I'm sorry.  Rent -- I'm sorry, what was the --

01:40PM  15   Q.  My question is:  Are you a 100 percent confident sitting

01:40PM  16   here today that all of the underlying data you used to build

01:40PM  17   those charts is accurate?

01:40PM  18   A.  I would not say that every -- there is no possibility

01:40PM  19   that a transaction got missed, that is certainly a

01:40PM  20   possibility.

01:40PM  21   Q.  So there is a possibility that your underlying data is

01:40PM  22   wrong?

01:40PM  23   A.  Yes.

01:40PM  24   Q.  And if your underlying data is wrong, your charts are

01:40PM  25   wrong, right?  Those same charts that you just showed the

01:40PM  1   jury a couple hours ago, right?

01:40PM  2   A.  Yes.

01:40PM  3        MR. DICKSON:  I want to talk about the underlying

01:40PM  4   data.  So I'm going to show you what we've marked as

01:41PM  5   Government Exhibit OA-2.  This is not in evidence yet, Judge.

01:41PM  6        Ms. Champoux, can we pull it up for the witness, do

01:41PM  7   you have that?

01:41PM  8        BY MR. DICKSON:

01:41PM  9   Q.  Mr. Devereaux, is this the underlying data that you used

01:41PM  10  to build your charts?

01:41PM  11  A.  Yeah.  So this is a -- yes, we -- we used this to create

01:41PM  12  the charts.

01:41PM  13  Q.  Okay.  Is does it look like a fair and accurate copy of

01:41PM  14  the underlying data that you used?

01:41PM  15  A.  Yes.

01:41PM  16        MR. DICKSON:  Judge, I'm going to offer Government

01:41PM  17  Exhibit OA-2 into evidence.

01:41PM  18        MR. SINGER:  No objection.

01:41PM  19        THE COURT:  Received without objection.

01:41PM  20        **(GOV Exhibit OA-2 was received in evidence.)**

01:41PM  21        MR. DICKSON:  And can we publish that, please?

01:41PM  22        THE CLERK:  You're all set.

01:41PM  23        MR. DICKSON:  Thank you.

01:41PM  24        BY MR. DICKSON:

01:42PM  25  Q.  I want to start, Mr. Devereaux, with March of 2012.  Do

01:42PM    1   you see that column there?

01:42PM    2   A.  Yes.

01:42PM    3   Q.  Okay.  Now, right here where I'm circling -- no, maybe

01:42PM    4   I'm not circling.  All right.  I can't seem to figure out how

01:42PM    5   to get this to work, but that's okay.

01:42PM    6      You see there where it says one of your column is check

01:42PM    7   deposits, right?

01:42PM    8   A.  Yes.

01:42PM    9   Q.  You see that that's blank, right?

01:42PM   10   A.  Yes.

01:42PM   11   Q.  So that means that in your analysis, Mr. Devereaux, you

01:42PM   12   said there were no check deposits for March of 2012 that you

01:42PM   13   counted as rent, right?

01:42PM   14   A.  Yes.

01:42PM   15   Q.  Okay.

01:42PM   16          MR. DICKSON:  Ms. Champoux, can we please pull up

01:42PM   17   Government Exhibit 330.  Could we please go to 2012 receipts.

01:43PM   18   And can we go to 3/3/2012.  Zoom that out.  All right.

01:43PM   19          BY MR. DICKSON:

01:43PM   20   Q.  So, Mr. Devereaux, you see this here?

01:43PM   21   A.  Yes.

01:43PM   22   Q.  You see that this is a receipt from a transaction for

01:43PM   23   Joseph Bongiovanni's account?

01:43PM   24   A.  Yes.

01:43PM   25   Q.  Do you see the date there, March of 2012?

01:43PM   1   A.   Yep.

01:43PM   2   Q.   You see where it says checks in, $700?

01:43PM   3   A.   Yes.

01:43PM   4   Q.   So that didn't match on your underlying data, right?

01:43PM   5   A.   That did not.

01:43PM   6   Q.   So your underlying data is wrong?

01:43PM   7   A.   In this instance, yes.

01:43PM   8   Q.   Your charts are wrong then too, right?

01:43PM   9   A.   For this amount, yes.

01:43PM  10        **MR. DICKSON:**   You can take that down for a second,

01:43PM  11   Ms. Champoux.  And can we pull back up OA-2.  Thank you.

01:43PM  12   Let's go to January of 2013.

01:43PM  13        **BY MR. DICKSON:**

01:44PM  14   Q.   Do you see that there, Mr. Devereaux?

01:44PM  15   A.   Yes.

01:44PM  16   Q.   What does it say that your analysis included for cash

01:44PM  17   deposits?

01:44PM  18   A.   Zero.

01:44PM  19        **MR. DICKSON:**   Okay.  Can we take that down,

01:44PM  20   Ms. Champoux, and show Government Exhibit 330 again?  Could we

01:44PM  21   please go to saving receipts.  And 2012 receipts, I think.

01:44PM  22   One more in there.  Can we scroll to the bottom.

01:44PM  23        Oh, I might have messed that up, I'm sorry, 2013

01:44PM  24   receipts in the saving receipts folder.  All right.  Can we

01:44PM  25   click on 1/2/2013.  Can we scroll to the top, please.

01:45PM   1          **BY MR. DICKSON:**

01:45PM   2   Q.  You see here, Mr. Devereaux, this is another receipt for

01:45PM   3   another transaction in Joseph Bongiovanni's account?

01:45PM   4   A.  Yes.

01:45PM   5   Q.  Do you see the date there as January of 2013?

01:45PM   6   A.  Yes.

01:45PM   7          **MR. DICKSON:**  Can we scroll to the bottom, please?

01:45PM   8          **BY MR. DICKSON:**

01:45PM   9   Q.  Do you see where it says cash in $700?

01:45PM  10   A.  Yep.

01:45PM  11   Q.  That didn't match your chart?

01:45PM  12   A.  That did not match the chart.

01:45PM  13   Q.  So your underlying data is wrong?

01:45PM  14   A.  Yes.

01:45PM  15   Q.  Your charts are wrong, too?

01:45PM  16   A.  For this $700, correct.

01:45PM  17   Q.  I'm sorry?

01:45PM  18   A.  For this $700, correct.

01:45PM  19   Q.  Okay.

01:45PM  20          **MR. DICKSON:**  Can we please go to November of 2013 on

01:45PM  21   Government Exhibit OA-2?  If we can highlight that.

01:45PM  22          **BY MR. DICKSON:**

01:45PM  23   Q.  What does that say there, Mr. Devereaux, for cash

01:45PM  24   deposits for November of 2013?

01:45PM  25   A.  Zero.  Zero.

01:46PM   1          **MR. DICKSON:**  Could we go back to Government

01:46PM   2   Exhibit 330?  Can we go to saving receipts, that same folder.

01:46PM   3   Go to 2013 to 11/4/2013.

01:46PM   4          **BY MR. DICKSON:**

01:46PM   5   Q.  So this is another receipt from Mr. Bongiovanni's

01:46PM   6   accounts, right?

01:46PM   7   A.  Yes.

01:46PM   8   Q.  This is in November of 2013?

01:46PM   9   A.  Yes.

01:46PM   10         **MR. DICKSON:**  Can we scroll down.

01:46PM   11         **BY MR. DICKSON:**

01:46PM   12   Q.  Do you see where it says cash in $700?

01:46PM   13   A.  Yes.

01:46PM   14   Q.  Your underlying data didn't reflect that, did it?

01:46PM   15   A.  It did not.

01:46PM   16   Q.  Your underlying data is wrong?

01:46PM   17   A.  Yes, sir.

01:46PM   18   Q.  Meaning your charts are wrong, too?

01:46PM   19   A.  Yes.

01:46PM   20   Q.  Correct?

01:46PM   21   A.  Yes, sorry.

01:46PM   22         **MR. DICKSON:**  Can we go back to Government

01:46PM   23   Exhibit OA-2, and go to October of 2014?

01:46PM   24         **BY MR. DICKSON:**

01:46PM   25   Q.  What does it say there for cash deposits there,

01:47PM   1   Mr. Devereaux?

01:47PM   2   A.  I'm sorry, which column is the column header?

01:47PM   3   Q.  I'm sorry?

01:47PM   4   A.  The column headers are on the previous page.

01:47PM   5   Q.  Yeah, I'm sorry about that.  I think would you agree that

01:47PM   6   it's the column right under where it says 1,100?  Is that the

01:47PM   7   cash receipts column?  Do you want to go back to the --

01:47PM   8   A.  Can we just go back to the first -- yep.  Yeah.  Okay.

01:47PM   9           **MR. DICKSON:**  All right.  Can we go back to October

01:47PM   10  2014?

01:47PM   11          **BY MR. DICKSON:**

01:47PM   12  Q.  All right.  So what does it say there for cash deposits?

01:47PM   13  A.  Zero.

01:47PM   14  Q.  It says zero?

01:47PM   15  A.  Yes.

01:47PM   16          **MR. DICKSON:**  Okay.  Could we go back to Government

01:47PM   17  Exhibit 330?  Could we go to saving receipts.  2014 receipts.

01:47PM   18  Can we go to 10/2/2014?

01:47PM   19          **BY MR. DICKSON:**

01:47PM   20  Q.  All right.  Now, Mr. Devereaux, this is another deposit

01:47PM   21  in Mr. Bongiovanni's accounts, right?

01:47PM   22  A.  Correct.

01:47PM   23  Q.  This is from October of 2014, right?

01:48PM   24  A.  Yes.

01:48PM   25  Q.  It's within that five-day window that you talked about,

01:48PM  1  right?

01:48PM  2  A.  It is, yes.

01:48PM  3  Q.  What does it say for cash in on this receipt?

01:48PM  4  A.  700.

01:48PM  5  Q.  That's not reflected in your underlying data, is it?

01:48PM  6  A.  It's not.

01:48PM  7  Q.  So your underlying data is wrong?

01:48PM  8  A.  Yes.

01:48PM  9  Q.  So your charts are also wrong, right?

01:48PM  10  A.  Sorry, yes.

01:48PM  11        MR. DICKSON:  Could we go to back to OA-2, please.

01:48PM  12  Could we scroll down to March of 2015.  All right.

01:48PM  13        BY MR. DICKSON:

01:48PM  14  Q.  So now it looks like in March of 2015, you said there

01:48PM  15  were -- that there was a $750 deposit, cash deposit, right?

01:48PM  16  A.  Yes.

01:48PM  17  Q.  What does it say for check deposits?

01:48PM  18  A.  Zero.

01:48PM  19        MR. DICKSON:  Okay.  Could we go to Government

01:49PM  20  Exhibit 330, please.  And could we back out of that, back out

01:49PM  21  of savings receipts.  And could we go to deposits 1, the pdf

01:49PM  22  there.  All right.  And go to page 23.

01:49PM  23        BY MR. DICKSON:

01:49PM  24  Q.  Is that a check, Mr. Devereaux?

01:49PM  25  A.  It is.

01:49PM   1   Q.  The capture date, what's that, July 2015 right?

01:49PM   2   A.  Yes.

01:49PM   3   Q.  That's within that five-day window, right?

01:49PM   4   A.  It is.

01:49PM   5   Q.  That check's not reflected in your underlying data, is

01:49PM   6   it?

01:49PM   7   A.  It is not.

01:49PM   8   Q.  So your underlying data is wrong?

01:49PM   9   A.  Yes.

01:49PM  10   Q.  So your charts are wrong, too, right?

01:49PM  11   A.  Yes.

01:50PM  12           MR. DICKSON:  All right.  We can take this down,

01:50PM  13   Ms. Champoux.  Ms. Champoux, can we please pull up Government

01:50PM  14   Exhibit OA-2 again?  All right.

01:50PM  15           BY MR. DICKSON:

01:50PM  16   Q.  So, Mr. Devereaux, on this underlying data that we've

01:50PM  17   talked about, you've agreed that there are errors in this

01:50PM  18   underlying data, right?

01:50PM  19   A.  Yes.

01:50PM  20   Q.  That it doesn't accurately reflect the records that

01:50PM  21   Ms. Bifano reviewed, right?

01:50PM  22   A.  Yes.

01:50PM  23   Q.  That it doesn't accurately review the records that you

01:50PM  24   reviewed, right?

01:50PM  25   A.  Yes.

01:50PM   1   Q.  It doesn't accurately reflect what you told this jury

01:50PM   2   earlier, right?

01:50PM   3   A.  Correct.

01:50PM   4   Q.  Now, on this underlying data, you put in one of the

01:50PM   5   columns expected rent total, right?

01:50PM   6   A.  Um-hum.  Yes.

01:51PM   7   Q.  Yes?

01:51PM   8   A.  Yes.

01:51PM   9   Q.  And you got that figure from the leases that you

01:51PM  10   reviewed, correct?

01:51PM  11   A.  Yes.

01:51PM  12   Q.  Okay.  Now, when you were looking at the cash deposits,

01:51PM  13   you told this jury that you took cash deposits that were

01:51PM  14   within five days of the start of the month, and you included

01:51PM  15   those cash deposits here, right?

01:51PM  16   A.  Yes.

01:51PM  17   Q.  Now with the caveat of the ones that we just went over

01:51PM  18   that were missing, that's what you tried to reflect in this

01:51PM  19   cash deposits column, right?

01:51PM  20   A.  Yes.

01:51PM  21   Q.  Let's just, as an example, start in August of 2012.

01:51PM  22        **MR. DICKSON:**  Ms. Champoux, can we highlight that for

01:51PM  23   just a second?

01:51PM  24        **BY MR. DICKSON:**

01:51PM  25   Q.  Now, in that column marked cash deposits, Mr. Devereaux,

01:51PM   1    you included a 600 -- or, $600 worth of cash deposits, right?

01:51PM   2    A.   Yes.

01:51PM   3    Q.   Now, the rent that you listed right next to it, what you

01:51PM   4    used to build your charts, the rent wasn't $600, right?

01:52PM   5    A.   Correct.

01:52PM   6    Q.   The rent was $700?

01:52PM   7    A.   Yes.

01:52PM   8    Q.   But you included a $600 deposit anyway?

01:52PM   9    A.   Yes.

01:52PM   10   Q.   And you don't know the source of that $600, right?

01:52PM   11   A.   We do not.

01:52PM   12   Q.   You don't actually know if that was from rent, right?

01:52PM   13   A.   Correct.

01:52PM   14   Q.   You don't know if it's from a bribe, right?

01:52PM   15   A.   I do not.

01:52PM   16        **MR. DICKSON:**  Let's go to April of 2013.  Could we

01:52PM   17   highlight that?

01:52PM   18        **BY MR. DICKSON:**

01:52PM   19   Q.   And here, Mr. Devereaux, you're doing the same thing

01:52PM   20   right?  You've got the expect rent, $700, right?

01:52PM   21   A.   Yes.

01:52PM   22   Q.   And then right next to it you list $1,060 in cash

01:52PM   23   deposits, correct?

01:52PM   24   A.   Yes.

01:52PM   25   Q.   Now, you would agree with me that $1,060 is more than

01:52PM    1    $700, right?

01:52PM    2    A.   Yes.

01:52PM    3    Q.   Would you grassy agree with me that I don't know

01:52PM    4    typically people don't pay their landlords more /THARPB

01:52PM    5    they're required to?

01:52PM    6    A.   Correct.

01:52PM    7    Q.   But nonetheless, Mr. Devereaux you included ^ awful ^ all

01:53PM    8    of $1,060 in your charts?

01:53PM    9    A.   We did.

01:53PM   10    Q.   Even though that didn't match the $700 of rent, right?

01:53PM   11    A.   Correct.

01:53PM   12    Q.   So that means that your charts included an extra $360 in

01:53PM   13    your attribution to rent payments, right?

01:53PM   14    A.   Yes.

01:53PM   15         **MR. DICKSON:**  Can we please highlight May of 2013?

01:53PM   16         **BY MR. DICKSON:**

01:53PM   17    Q.   And here, Mr. Devereaux, you did the same thing, right?

01:53PM   18    A.   I did, yes.

01:53PM   19    Q.   You included an extra $400 above and beyond what the rent

01:53PM   20    payment was, right?

01:53PM   21    A.   Yes.

01:53PM   22    Q.   You included that in your analysis or your conclusion

01:53PM   23    about cash deposits that were rent payments?

01:53PM   24    A.   Yes.

01:53PM   25    Q.   Even though it didn't match what was the expected rent

01:53PM   1   total?

01:53PM   2   A.  It did, correct.

01:53PM   3           MR. DICKSON:  Can we highlight August of 2013?

01:53PM   4           BY MR. DICKSON:

01:54PM   5   Q.  Same thing here, Mr. Devereaux.  This time, though, you

01:54PM   6   included an extra $520 in cash, you attributed that extra

01:54PM   7   $520 in cash to rent, right?

01:54PM   8   A.  Yes.

01:54PM   9   Q.  But that's not what the expected rent was, right?

01:54PM   10  A.  It was not the expected rent.

01:54PM   11  Q.  Okay.  And, again, you don't know the source of that

01:54PM   12  $1,220, right?

01:54PM   13  A.  Right.

01:54PM   14  Q.  You don't know if it's rent?

01:54PM   15  A.  Correct.

01:54PM   16  Q.  You don't know if it's a bribe?

01:54PM   17  A.  Correct.

01:54PM   18          MR. DICKSON:  Can we scroll down, Ms. Champoux, can

01:54PM   19  we highlight January of 2014?

01:54PM   20          BY MR. DICKSON:

01:54PM   21  Q.  So on January of 2014, Mr. Devereaux, you say the expect

01:54PM   22  rented is $1,450, right?

01:54PM   23  A.  Yes.

01:54PM   24  Q.  But you included an extra $1,000 bump in there, right?

01:54PM   25  A.  Yes.

01:54PM   1   Q.  Meaning that your charts and your underlying data

01:54PM   2   overrepresent the amount of rent that Mr. Bongiovanni

01:54PM   3   received, would you agree with me on that?

01:55PM   4   A.  Yeah.

01:55PM   5   Q.  And, again, you don't know where the $2,450 comes from,

01:55PM   6   right?

01:55PM   7   A.  I do not.

01:55PM   8   Q.  You don't know if it's, rent?

01:55PM   9   A.  Correct.

01:55PM  10   Q.  You don't know if it's a bribe?

01:55PM  11   A.  Correct.

01:55PM  12   Q.  What about February of 2015, Mr. Devereaux?  Same thing

01:55PM  13   there?

01:55PM  14   A.  Same thing.

01:55PM  15   Q.  Extra $600, right?

01:55PM  16   A.  Yes.

01:55PM  17   Q.  That you included as expected -- or, that you included

01:55PM  18   as -- concluded was rent money, right?

01:55PM  19   A.  Yes.

01:55PM  20   Q.  Even though that didn't match the expected rent amount?

01:55PM  21   A.  It did not.

01:55PM  22        MR. DICKSON:  You can take that down for me,

01:55PM  23   Ms. Champoux.

01:55PM  24        BY MR. DICKSON:

01:56PM  25   Q.  All right.  Mr. Devereaux, I'm going to hand you what

01:56PM    1    I've marked as Government Exhibit OA-1.

01:56PM    2           **MR. DICKSON:**  Ms. Champoux, can we pull that up for

01:56PM    3    the witness actually?

01:56PM    4           **THE COURT:**  This is just for the witness now?

01:56PM    5           **MR. DICKSON:**  Just for the witness, I'm sorry.

01:56PM    6           **BY MR. DICKSON:**

01:56PM    7    Q.  This is more of your underlying data, Mr. Devereaux,

01:56PM    8    right?

01:56PM    9    A.  Yes.

01:56PM   10    Q.  And aside from the caveats of sort of the missing

01:56PM   11    deposits that we've talked about, you would say this is

01:56PM   12    fairly and accurately representative of the data that you

01:56PM   13    used to make your charts, right?

01:56PM   14    A.  Yes.

01:56PM   15           **MR. DICKSON:**  Judge I'd offer Government Exhibit

01:56PM   16    OA-1.

01:56PM   17           **MR. SINGER:**  No objection.

01:56PM   18           **THE COURT:**  Received without objection.

01:57PM   19           **(GOV Exhibit OA-1 was received in evidence.)**

01:57PM   20           **BY MR. DICKSON:**

01:57PM   21    Q.  So I'm going to ask you to do some math.  I've got a

01:57PM   22    calculator if you want.  But for 2012 there, what's the total

01:57PM   23    amount that you concluded was rent money in building your

01:57PM   24    charts?

01:57PM   25    A.  Cash only, or --

01:57PM  1  Q.  Both.  Checks and rent and cash.

01:57PM  2  A.  5,860.

01:57PM  3  Q.  Okay.  And that includes $1,500 of cash, right?

01:57PM  4  A.  Yes.

01:57PM  5  Q.  $1,500 that you don't know the source of?

01:57PM  6  A.  Yes.

01:57PM  7  Q.  Now, you said in the course of your review you reviewed

01:57PM  8  the defendant's mortgage applications; is that right?

01:57PM  9  A.  Yes.

01:57PM  10  Q.  Now you know, Mr. Devereaux, that in 2012, the defendant

01:57PM  11  didn't list that he got $5,860 in rent on his mortgage

01:57PM  12  applications, did he?

01:57PM  13  A.  No.

01:57PM  14  Q.  But you included it as rent here?

01:58PM  15  A.  Yes.

01:58PM  16  Q.  What about for 2013, Mr. Devereaux?  What's the amount

01:58PM  17  that you are attributing to rent in 2013?

01:58PM  18  A.  5,180.

01:58PM  19  Q.  Okay.  And, again, that includes some cash, right?

01:58PM  20  A.  Yes.

01:58PM  21  Q.  Cash that you don't know the source of?

01:58PM  22  A.  Correct.

01:58PM  23  Q.  You know that in 2013, the defendant took out a personal

01:58PM  24  loan, right?

01:58PM  25  A.  Yes.

USA v Bongiovanni - Devereaux - Dickson/Cross - 3/28/24

130

01:58PM   1   Q.  And you reviewed those records?

01:58PM   2   A.  Yes.

01:58PM   3   Q.  You would agree with me that the defendant didn't list on

01:58PM   4   that personal loan that he took out 5 -- or, that he got

01:58PM   5   $5,180 in rent?

01:58PM   6   A.  He did not.

01:58PM   7   Q.  He did not?

01:58PM   8   A.  He did not.

01:58PM   9   Q.  But you included it here anyway?

01:58PM   10  A.  Yes.

01:58PM   11  Q.  What about in 2016, Mr. Devereaux?  What's the total that

01:58PM   12  you concluded was from rent in 2016?

01:59PM   13  A.  17,715.

01:59PM   14  Q.  And that includes $8,215 cash right?

01:59PM   15  A.  Correct.

01:59PM   16  Q.  Cash that you don't know the source of?

01:59PM   17  A.  Correct.

01:59PM   18  Q.  In the course of your review, you reviewed the

01:59PM   19  defendant's tax forms, right?

01:59PM   20  A.  Yes.

01:59PM   21  Q.  You know on tax forms, landlords are supposed to list how

01:59PM   22  much rent they receive, right?

01:59PM   23  A.  Yes.

01:59PM   24  Q.  And you would agree with me that in 2016, the defendant

01:59PM   25  didn't list that he got $17,715 in rent on his taxes?

131

01:59PM   1   A.   Yes.

01:59PM   2   Q.   But you included it here anyway?

01:59PM   3   A.   I did.

01:59PM   4   Q.   What about 2017, what's math there?  What did you

01:59PM   5   conclude was rent?

01:59PM   6   A.   16 -- excuse me, 16,425.

01:59PM   7   Q.   And that includes $7,400 of cash, right?

01:59PM   8   A.   Yes.

01:59PM   9   Q.   That you don't know the source of?

01:59PM   10   A.   Yes.

01:59PM   11   Q.   But you concluded that, what was it, $16,425 was rent?

02:00PM   12   A.   Yes.

02:00PM   13   Q.   Do you know the defendant and his wife filled out tax

02:00PM   14   forms in 2017, right?

02:00PM   15   A.   Yes, sir.

02:00PM   16   Q.   Submitted those taxes to the IRS?

02:00PM   17   A.   Yes.

02:00PM   18   Q.   You know that on those tax forms, they didn't list

02:00PM   19   $16,425 in rent on their taxes, did they?

02:00PM   20   A.   They did not.

02:00PM   21   Q.   But you put it here?

02:00PM   22   A.   Yes.

02:00PM   23   Q.   What about in 2018, what's the total?

02:00PM   24   A.   17,950.

02:00PM   25   Q.   And that includes 8 grand worth of cash?

02:00PM    1    A.   Yes.

02:00PM    2    Q.   8 grand worth of cash that you don't know the source of?

02:00PM    3    A.   Yes.

02:00PM    4    Q.   You know the defendant and his wife filled out taxes in

02:00PM    5    2018?

02:00PM    6    A.   Yes.

02:00PM    7    Q.   You looked at those records?

02:00PM    8    A.   Yes.

02:00PM    9    Q.   You know that they did not list $17,950 of rental income

02:00PM   10    on their 2018 taxes?

02:00PM   11    A.   Yes.

02:00PM   12    Q.   But you included it here?

02:00PM   13    A.   Yes.

02:01PM   14         **MR. DICKSON:**  You can take that down, Ms. Champoux.

02:01PM   15         **BY MR. DICKSON:**

02:01PM   16    Q.   Mr. Devereaux, I want to just be clear about this.  You

02:01PM   17    don't know whether the defendant ever got cash from somebody

02:01PM   18    named Ron Serio, do you?

02:01PM   19    A.   I do not.

02:01PM   20    Q.   You don't know whether the defendant ever got cash from

02:01PM   21    somebody named Michael Masecchia, do you?

02:01PM   22    A.   I do not.

02:01PM   23    Q.   You don't know whether the defendant ever got cash from

02:01PM   24    someone named Peter Gerace, do you?

02:01PM   25    A.   I do not.

| | | |
|---|---|---|
| 02:01PM | 1 | Q.  You don't know whether the defendant ever got cash from |
| 02:01PM | 2 | somebody named Katrina Nigro, do you? |
| 02:01PM | 3 | A.  I do not. |
| 02:01PM | 4 | **MR. DICKSON:**  Just a moment, please, sir. |
| 02:01PM | 5 | I have no more questions, Judge. |
| 02:01PM | 6 | **THE COURT:**  Redirect, Mr. Singer? |
| 02:01PM | 7 | **MR. SINGER:**  Yes, Your Honor. |
| 02:01PM | 8 | |
| 02:01PM | 9 | **REDIRECT EXAMINATION BY MR. SINGER:** |
| 02:02PM | 10 | Q.  So, Mr. Devereaux, it looks like we have some math errors |
| 02:02PM | 11 | in some of these things you prepared; is that a fair |
| 02:02PM | 12 | statement? |
| 02:02PM | 13 | A.  Yes. |
| 02:02PM | 14 | Q.  All right.  Well, so let's go through some of those math |
| 02:02PM | 15 | errors, all right? |
| 02:02PM | 16 | **MR. SINGER:**  Ms. Champoux, can you bring up |
| 02:02PM | 17 | Government Exhibit -- sorry, Exhibit OA-2, please? |
| 02:02PM | 18 | **BY MR. SINGER:** |
| 02:02PM | 19 | Q.  Sir, a couple things that I want to go with you on this |
| 02:02PM | 20 | chart that the government identified during your |
| 02:02PM | 21 | cross-examination.  So, I want to direct your attention first |
| 02:02PM | 22 | to this March 2012 figure. |
| 02:02PM | 23 | **MR. SINGER:**  We can't write on the screen? |
| 02:02PM | 24 | **THE CLERK:**  Try it again, Mr. Singer? |
| 02:02PM | 25 | **MR. SINGER:**  Sure. |

02:02PM    1              THE CLERK:  I think it needs to be calibrated, I have

02:02PM    2    to shut the system down to do that.

02:02PM    3              MR. TRIPI:  Do you want us to highlight it?

02:02PM    4              MR. SINGER:  Yeah.  Appreciate it, Ms. Champoux.

02:02PM    5              BY MR. SINGER:

02:02PM    6    Q.  With regard to one particular figure, Mr. Dickson asked

02:03PM    7    you about whether or not the payment for $700 was something

02:03PM    8    that was reflected in your charts; is that right?

02:03PM    9    A.  Yes.

02:03PM   10    Q.  So based on the data that you take a look at here, is

02:03PM   11    that $700 figure not counted, or counted?

02:03PM   12    A.  Not counted.

02:03PM   13    Q.  All right.  So in other words, that's not part of the

02:03PM   14    data that was reflected on the bars?

02:03PM   15    A.  Yes.

02:03PM   16    Q.  And that's something, based on the accounting principles

02:03PM   17    that we talked about earlier, should have been counted,

02:03PM   18    right?

02:03PM   19    A.  Yes.

02:03PM   20    Q.  So that's $700 that was not counted.

02:03PM   21        I want to direct your attention to January of 2013.

02:03PM   22              MR. SINGER:  Ms. Champoux, if you can highlight that?

02:03PM   23    Thank you.

02:03PM   24              BY MR. SINGER:

02:03PM   25    Q.  So was this another example of $700 that should have been

02:03PM  1  counted but was not counted?

02:03PM  2  A.  Yeah.  Yes.

02:03PM  3  Q.  So we're up to $1,400, you'd agree me, that at this point

02:03PM  4  has not been counted?

02:03PM  5  A.  Yes.

02:03PM  6  Q.  Another example that the government showed you --

02:03PM  7       **MR. SINGER:**  It's on the next page, Ms. Champoux,

02:04PM  8  November 2013.

02:04PM  9       **BY MR. SINGER:**

02:04PM  10 Q.  So this was a $700 payment.  Was this counted or not

02:04PM  11 counted, sir?

02:04PM  12 A.  Not counted.

02:04PM  13 Q.  So that would be another $700 that was not counted.  So

02:04PM  14 we're up to $2,100 that wasn't counted?

02:04PM  15 A.  Correct.

02:04PM  16 Q.  October of '14, which is a little bit lower in the

02:04PM  17 middle.

02:04PM  18      **MR. SINGER:**  Thank you, Ms. Champoux.

02:04PM  19      **BY MR. SINGER:**

02:04PM  20 Q.  So this is a situation where there was both a cash and a

02:04PM  21 check deposited; is that right, sir?

02:04PM  22 A.  Yes.

02:04PM  23 Q.  And it would have been for $1,500?

02:04PM  24 A.  Yeah.

02:04PM  25 Q.  But it looks like on the data, that $1,500 wasn't

02:04PM    1    counted; is that right?

02:04PM    2    A.  Yep.

02:04PM    3    Q.  And you'd agree with me that at this point, we're up to

02:04PM    4    $3,600 that's not counted?

02:04PM    5    A.  Yes.

02:04PM    6    Q.  March of '15, which is just under that, so this is a

02:04PM    7    situation where it looks like there was a check and a cash

02:05PM    8    deposit for 750 -- or, I'm sorry, for expected rent of 1,500?

02:05PM    9    A.  Yes.

02:05PM   10    Q.  And it looks like on the data, what -- what exactly was

02:05PM   11    counted there?

02:05PM   12        Sure.  So on -- for March 15, based on the chart data

02:05PM   13    that you see before you, what was counted as far as a

02:05PM   14    deposit?

02:05PM   15    A.  Can you scroll up?

02:05PM   16            MR. SINGER:  Sure.  If we can go back to the first

02:05PM   17    page just so we can see the --

02:05PM   18            BY MR. SINGER:

02:05PM   19    Q.  So what appears to be counted, sir?

02:05PM   20    A.  750.

02:05PM   21    Q.  Is there anything missing in that entry?

02:05PM   22    A.  Sorry, what?

02:05PM   23    Q.  Is there anything missing that should have been counted

02:05PM   24    there?

02:05PM   25    A.  Can you scroll back up and --

| | | |
|---|---|---|
| 02:05PM | 1 | Q.  Certainly. |
| 02:05PM | 2 | A.  The cash deposit -- yeah, I'm not -- I'm not following |
| 02:05PM | 3 | the question. |
| 02:05PM | 4 | Q.  Sure.  So go back to March 15.  So would you agree with |
| 02:06PM | 5 | me that it looks like there's an expected cash -- there's an |
| 02:06PM | 6 | expected deposit for 750 for the upper unit? |
| 02:06PM | 7 | A.  750 for what? |
| 02:06PM | 8 | Q.  For the upper unit at 221 Lovering? |
| 02:06PM | 9 | A.  Yes. |
| 02:06PM | 10 | Q.  And over to the right of that 750 figure, there's another |
| 02:06PM | 11 | 750 figure, because that's another expected rent figure for |
| 02:06PM | 12 | the lower unit? |
| 02:06PM | 13 | A.  Yes. |
| 02:06PM | 14 | Q.  And then as far as the $1,500 figure there in the middle, |
| 02:06PM | 15 | what does that reflect? |
| 02:06PM | 16 | A.  The expected rent. |
| 02:06PM | 17 | Q.  The total expected rent? |
| 02:06PM | 18 | A.  Yeah. |
| 02:06PM | 19 | Q.  And then as far as the next figure, the 750 on there, |
| 02:06PM | 20 | what does that reflect, sir? |
| 02:06PM | 21 | A.  The -- |
| 02:06PM | 22 | Q.  If you need to, we can scroll up to the top of the chart |
| 02:06PM | 23 | again. |
| 02:06PM | 24 | A.  The total deposits. |
| 02:06PM | 25 | Q.  So that represents a cash deposit that was made? |

02:06PM    1   A.  Yes.

02:06PM    2              MR. SINGER:  If we can scroll back down to that

02:06PM    3   second page.

02:06PM    4              BY MR. SINGER:

02:06PM    5   Q.  As far as a check deposit, does it appear like a check

02:06PM    6   may not have been counted in that situation?

02:07PM    7   A.  Say that again, please?

02:07PM    8   Q.  Certainly.  So I noted that the data figure for the

02:07PM    9   deposits for checks for that month in March of 2015, there's

02:07PM   10   a dash next to it?

02:07PM   11   A.  Yes.

02:07PM   12   Q.  Is that missing data?

02:07PM   13   A.  Yes.

02:07PM   14   Q.  Should there have been a check reflected in there?

02:07PM   15   A.  Yes.

02:07PM   16   Q.  So it's missing 750?

02:07PM   17   A.  Yes.

02:07PM   18   Q.  So if we can add that to the $3,600 that we've just been

02:07PM   19   talking about, that brings us up to 4,350 that hasn't been

02:07PM   20   counted at this point?

02:07PM   21   A.  Yes.

02:07PM   22   Q.  So there are a couple of different things the government

02:07PM   23   raised that they believe you overcounted; is that a fair

02:07PM   24   statement?

02:07PM   25   A.  Can you say that again?

02:07PM   1   Q.   Sure.   There were some entries in the chart data that the

02:07PM   2   government reflected were overcounted; fair statement?

02:07PM   3   A.   Yes.

02:07PM   4        **MR. SINGER:**   So if we can go back to the second page

02:07PM   5   which I think -- are we up, yes, thank you, Ms. Champoux.

02:07PM   6        **BY MR. SINGER:**

02:08PM   7   Q.   So one of those entries related to April of 2013; is that

02:08PM   8   right?

02:08PM   9        **MR. SINGER:**   Actually, I'm sorry, Ms. Champoux.   If

02:08PM   10  we can scroll back up to the first page and highlight April of

02:08PM   11  '13.

02:08PM   12       **THE WITNESS:**   Yes.

02:08PM   13       **BY MR. SINGER:**

02:08PM   14  Q.   So, notice that there's an entry for an expected rent in

02:08PM   15  the upper; is that right?

02:08PM   16  A.   Yes.

02:08PM   17  Q.   That was 700?

02:08PM   18  A.   Yes.

02:08PM   19  Q.   And then as far as expected rent in the lower, that was

02:08PM   20  left blank, and that was intentional, right?

02:08PM   21  A.   Right.

02:08PM   22  Q.   Because at that point in time, Joseph Bongiovanni was

02:08PM   23  living in the lower with Lindsay?

02:08PM   24  A.   Yes.

02:08PM   25  Q.   So I noted that the next column over, there's a cash

02:08PM  1   deposit for 1,060; is that right?

02:08PM  2   A.   Yes.

02:08PM  3   Q.   And so that's an example of something that was

02:08PM  4   overcounted?

02:08PM  5   A.   Well, there's no rent in March of 2013, so there could

02:08PM  6   have been a catchup payment or, you know, they deposited,

02:08PM  7   like, a first and last check.   You know, like, say a deposit

02:09PM  8   on the 1st of the month and 31st of the month.

02:09PM  9   Q.   So --

02:09PM  10  A.   There were instances of that.   I honestly don't recall if

02:09PM  11  that is one of them, but that did certainly happen.

02:09PM  12  Q.   So, let's assume that that was calculated incorrectly.   A

02:09PM  13  correct figure on that, you would agree with me, would be

02:09PM  14  700, right?

02:09PM  15  A.   Yes.

02:09PM  16  Q.   So, if we're subtracting 700 from that 1,060 entry, you

02:09PM  17  would agree with me that would be a $960 overage?

02:09PM  18  A.   Should be $360 over.

02:09PM  19  Q.   360, I'm sorry.   That's the lawyer math coming out right

02:09PM  20  there.   So 360 over on that one entry; is that right?

02:09PM  21  A.   Yes.

02:09PM  22  Q.   The government also asked you about the August 2013 entry

02:09PM  23  that's just below it; is that right?

02:09PM  24  A.   Yes.

02:09PM  25  Q.   So in August of 2013, there was the expectation of a rent

| | | |
|---|---|---|
| 02:09PM | 1 | payment for the upper unit, right? |
| 02:10PM | 2 | A.   Yes. |
| 02:10PM | 3 | Q.   And that's reflected on the far left? |
| 02:10PM | 4 | A.   Yes. |
| 02:10PM | 5 | Q.   And they expected a rent total of 700, correct? |
| 02:10PM | 6 | A.   Yes. |
| 02:10PM | 7 | Q.   So as far as the cash deposits that were recorded at that |
| 02:10PM | 8 | point, that was $1,220 on the chart? |
| 02:10PM | 9 | A.   Yes. |
| 02:10PM | 10 | Q.   And I think you testified on cross-examination that |
| 02:10PM | 11 | that's incorrect, right? |
| 02:10PM | 12 | A.   Yeah. |
| 02:10PM | 13 | Q.   Is that an instance of overcounting? |
| 02:10PM | 14 | A.   Yes. |
| 02:10PM | 15 | Q.   So if we subtracted $700 from that 1,220 figure, would |
| 02:10PM | 16 | you agree with me that that's an overage of $520? |
| 02:10PM | 17 | A.   Yes. |
| 02:10PM | 18 | Q.   So if we add the 520 to the 360 we just talked about, |
| 02:10PM | 19 | we're talking about $880 in overcounting in that situation? |
| 02:10PM | 20 | A.   Yes. |
| 02:10PM | 21 | **MR. SINGER:**  Okay.  The government also -- if we can |
| 02:10PM | 22 | scroll to the next page, Ms. Champoux. |
| 02:10PM | 23 | **BY MR. SINGER:** |
| 02:10PM | 24 | Q.   They talked about January of 2014 as being an example of |
| 02:10PM | 25 | an overage; is that right? |

02:11PM    1    A.   Yes.

02:11PM    2    Q.   So in this situation, you're aware this is after the --

02:11PM    3    Fred and Maria Bongiovanni move into the lower apartment,

02:11PM    4    right?

02:11PM    5    A.   Correct.

02:11PM    6    Q.   So there would be an expectation of receiving rent from

02:11PM    7    both the upper and lower apartments?

02:11PM    8    A.   Yes.

02:11PM    9    Q.   So as far as the calculation on that, the expectation was

02:11PM   10    that 1,450 --

02:11PM   11    A.   Yes.

02:11PM   12    Q.   -- would have been deposited at that point?

02:11PM   13         But it was counted as 2,450 in the chart?

02:11PM   14    A.   Yeah.

02:11PM   15    Q.   So, what is the overage on that, sir?

02:11PM   16    A.   1,000.

02:11PM   17    Q.   So if we add that to the 880 we just talked about, we're

02:11PM   18    talking about 1,880 in overages at this point?

02:11PM   19    A.   Yes.

02:11PM   20    Q.   So, if we subtract that 1,880 in overages that we just

02:11PM   21    spoke about from the 4,350 that we were talking about that

02:11PM   22    should have been counted but wasn't -- I'm going to get a

02:12PM   23    calculator here because I've reached the max capacity.

02:12PM   24         So let me see if I can do this.  4,350 minus 1,880.

02:12PM   25         Would you agree with me that that would be still a figure

Case 1:19-cr-00227-LJV-MJR   Document 853   Filed 04/05/24   Page 143 of 158
USA v Bongiovanni - Devereaux - Singer/Redirect - 3/28/24

143

02:12PM   1   of $2,470 that should have been count, but wasn't?

02:12PM   2   A.   Yes.

02:12PM   3   Q.   And just so that we're all clear, that would actually

02:12PM   4   inure to Mr. Bongiovanni's benefit, not his detriment, right?

02:12PM   5           **MR. DICKSON:**  Objection, improper opinion.

02:12PM   6           **THE COURT:**  Sustained.

02:12PM   7           **BY MR. SINGER:**

02:13PM   8   Q.   So you were asked a couple of other questions on

02:13PM   9   direct -- I'm sorry, on cross-examination.  So Jennifer

02:13PM   10  Jackson, she was somebody that you learned was a tenant,

02:13PM   11  correct?

02:13PM   12  A.   Correct.

02:13PM   13  Q.   And she was someone you also personally knew?

02:13PM   14  A.   She was my neighbor at one point.

02:13PM   15  Q.   Okay.  I know the government asked you, you know, if you

02:13PM   16  were helping Mr. Bongiovanni with something else other than

02:13PM   17  accounting by offering your assistance in tracking her down;

02:13PM   18  is that right?

02:13PM   19  A.   Yeah.

02:13PM   20  Q.   Would it have been helpful to your analysis if you spoke

02:13PM   21  to her and learned about what her rent payment techniques

02:13PM   22  were?

02:13PM   23  A.   Yes.

02:13PM   24  Q.   The government talked to you about some tax returns; do

02:13PM   25  you remember those?

02:13PM 1   A.  Yeah.

02:13PM 2   Q.  So, there were a couple different questions they asked

02:13PM 3   regarding charitable contributions; is that right?

02:13PM 4   A.  Correct.

02:13PM 5   Q.  And you recall on some of those contributions, the dates

02:14PM 6   that were listed for when the purchases were -- were -- were

02:14PM 7   made was various; is that right?

02:14PM 8   A.  Yes.

02:14PM 9   Q.  So, you've helped people do their taxes before, right?

02:14PM 10  A.  Yes.

02:14PM 11  Q.  Why would someone put down various in a column like that

02:14PM 12  instead of listing a particular date?

02:14PM 13          MR. DICKSON:  Objection, improper opinion.

02:14PM 14          MR. SINGER:  I wasn't the one who raised it, Judge.

02:14PM 15          MR. DICKSON:  That doesn't make it not an improper

02:14PM 16  opinion.

02:14PM 17          THE COURT:  I'll sustain the objection to the form of

02:14PM 18  the question.

02:14PM 19          BY MR. SINGER:

02:14PM 20  Q.  So, as far as the various dates, can you determine by

02:14PM 21  looking in the form when the purchases were made on any of

02:14PM 22  those charitable contribution claims?

02:14PM 23  A.  No.

02:14PM 24  Q.  So it could be something that happened 20 years ago?

02:14PM 25  A.  Correct.

02:14PM   1    Q.   Could it happen ten years ago?

02:14PM   2    A.   Correct.

02:14PM   3    Q.   It could happen five years ago?

02:14PM   4    A.   Yes.

02:14PM   5    Q.   But you really can't tell, similar to Ms. Bifano, about

02:15PM   6    when those purchases were made, correct?

02:15PM   7    A.   That's correct.

02:15PM   8    Q.   And I know that Mr. Dickson asked you about purchases

02:15PM   9    with cash.  You couldn't tell whether those were purchased,

02:15PM  10    like, with cash just like Ms. Bifano couldn't, right?

02:15PM  11    A.   That's true.

02:15PM  12    Q.   And the government also asked you some questions about

02:15PM  13    the purchases.  The data that you possessed was the same as

02:15PM  14    Ms. Bifano; is that right?

02:15PM  15    A.   Yes.

02:15PM  16    Q.   But there were some limitations in the data that you had

02:15PM  17    as far as deciphering transactions, specific --

02:15PM  18         **MR. DICKSON:**  Judge, I'm going to object to leading

02:15PM  19    at this point.

02:15PM  20         **THE COURT:**  Yeah, sustained.

02:15PM  21         **BY MR. SINGER:**

02:15PM  22    Q.   Were there any limitations inside the data that you

02:15PM  23    possessed, like Ms. Bifano possessed, about specific

02:15PM  24    transaction data?

02:15PM  25    A.   I don't know the answer to that.

USA v Bongiovanni - Devereaux - Singer/Redirect - 3/28/24

02:15PM  1    Q.  Yeah, so, when you were talking -- when we're talking

02:16PM  2    about purchases, the forms and documents and records that you

02:16PM  3    reviewed, what was it that those listed?

02:16PM  4    A.  The credit card?

02:16PM  5    Q.  Credit cards.  What was it they listed?

02:16PM  6    A.  It would list the retailer that, you know, they went and

02:16PM  7    made a purchase at.

02:16PM  8    Q.  Was any of the data that you possessed something that

02:16PM  9    listed specific purchases, like you get in an itemized

02:16PM  10   receipt?

02:16PM  11   A.  Right.  No.

02:16PM  12   Q.  And Ms. Bifano didn't have access to that type of data

02:16PM  13   based on your review of the documents?

02:16PM  14   A.  Not that I'm aware of.

02:16PM  15   Q.  So did that have any type of limitation on how you could

02:16PM  16   discern whether things were purchased and what was purchased?

02:16PM  17   A.  Yes.

02:16PM  18   Q.  But kind of like how we talked about on direct, were

02:16PM  19   there payments that you saw going to particular retailers

02:16PM  20   based on the review of the documents you took a look at?

02:16PM  21   A.  Yes.

02:16PM  22   Q.  And they were still, the Bongiovannis, based on your

02:17PM  23   review of everything, they're still accruing debt as time

02:17PM  24   went on?

02:17PM  25   A.  Yes.

02:17PM 1    Q.  Mr. Dickson started talking to you about the cash

02:17PM 2    deposits that were happening towards the later end of the

02:17PM 3    month or beginning of a month.  And he asked you, you know,

02:17PM 4    how is it possible to attribute those to particular things.

02:17PM 5        And I guess when you were looking at the cash deposits

02:17PM 6    going into Mr. Bongiovanni's account, were you comparing them

02:17PM 7    to other transactions?

02:17PM 8    A.  Yeah.  We were.  So, for example, if we saw a rent check

02:17PM 9    going in that month, then we would not expect to see two,

02:17PM 10   like, so if there were people living in the upper and the

02:18PM 11   lower, one point if we saw, like, the upper paying rent with

02:18PM 12   a check, then we would not expect to see, you know, two

02:18PM 13   months of cash in that month.

02:18PM 14   Q.  Okay.  And we talked about it a little bit, we went

02:18PM 15   through it and I'm not going to go through it again, but were

02:18PM 16   you looking at Frederick Bongiovanni's account data to see --

02:18PM 17   A.  Yes.

02:18PM 18   Q.  -- whether cash withdrawals were being made?

02:18PM 19   A.  Yeah, we were looking at his data.

02:18PM 20   Q.  And how did that help you as far as your determination of

02:18PM 21   whether or not there were cash payments being made for rent?

02:18PM 22   A.  We saw him, Mr. -- Fred Bongiovanni withdrawing cash near

02:18PM 23   the end of the month or the very beginning of the following

02:18PM 24   month that would be enough to cover his rent payments.

02:18PM 25   Q.  And one of the examples that Mr. Dickson brought up, he

02:18PM    1    brought up this $100 birthday gift example; do you remember

02:18PM    2    that?

02:18PM    3    A.  Yes.

02:19PM    4    Q.  So, what we discussed on direct, would that be an example

02:19PM    5    of something that you would include in your data, $100

02:19PM    6    deposit of cash?

02:19PM    7    A.  I think we did include some $100 cash deposits, but I

02:19PM    8    know that we did exclude a couple $100 deposits.  The ones

02:19PM    9    that fell outside of the five-day, you know, five-day window

02:19PM   10    that we discussed.

02:19PM   11              **MR. SINGER:**  Just a moment, Judge.

02:19PM   12              Ms. Champoux, can you take that exhibit down, and

02:20PM   13    bring back Exhibit zero point -- sorry, O.2, please.

02:20PM   14              **BY MR. SINGER:**

02:20PM   15    Q.  All right.  So we talked a little bit about this chart in

02:20PM   16    your underlying data; is that right?

02:20PM   17    A.  Yes.

02:20PM   18    Q.  So one of the things we -- we went through the math.  And

02:20PM   19    when we started to go through the math, we came to a little

02:20PM   20    bit of a different figure; is that correct?

02:20PM   21    A.  Correct.

02:20PM   22    Q.  And what we're talking about is that when you subtract

02:20PM   23    all of the overcounting from the undercounting, we get to

02:20PM   24    that $2,470 figure.

02:20PM   25    A.  Yes.

02:20PM  1   Q.  So, I want to direct your attention down to that lower

02:20PM  2   right portion of the chart.

02:20PM  3   A.  Correct.

02:20PM  4   Q.  See that number there in red, in parentheses, the $16,633

02:21PM  5   figure there, sir?

02:21PM  6   A.  Yes.

02:21PM  7   Q.  So, how would that $2,470 figure affect that?

02:21PM  8   A.  The balance on the far right in the red, $16,633 would

02:21PM  9   decrease by 2,470.

02:21PM  10  Q.  So it would be less --

02:21PM  11  A.  Less of a shortage, of a shortfall.

02:21PM  12          MR. SINGER:  Thank you.  I have no further questions,

02:21PM  13  Judge.

02:21PM  14          THE COURT:  Recross, Mr. Dickson?

02:21PM  15          MR. DICKSON:  No, Judge.  Thank you.

02:21PM  16          THE COURT:  You may step down, sir.  Thank you.

02:21PM  17          (Witness excused at 2:21 p.m.)

02:21PM  18          THE COURT:  Anything more from the defense?

02:21PM  19          MR. SINGER:  Just one moment, Judge.

02:22PM  20          Thank you, Your Honor.  At this time, the defense

02:22PM  21  rests.

02:22PM  22                          **DEFENDANT RESTS**

02:22PM  23          THE COURT:  Okay.  Any rebuttal from the government?

02:22PM  24          MR. COOPER:  Can we just have a minute to --

02:22PM  25          THE COURT:  Absolutely.

02:22PM   1          **MR. COOPER:**  Thank you, Judge.  We should have known

02:22PM   2   that question is coming.

02:22PM   3          No, thank you, Judge.

02:22PM   4          **THE COURT:**  Okay.  So, folks, as expected our proof

02:22PM   5   is ended, which means that we are on track for what I said

02:23PM   6   earlier this week.  That means be back on Tuesday for the

02:23PM   7   lawyers' summations.  And then Wednesday, my charge to you and

02:23PM   8   deliberations will begin.  Okay?

02:23PM   9          So we're going to discharge you now for the weekend.

02:23PM   10  And, again, it's the weekend, it's a holiday weekend for some

02:23PM   11  of us, so please, please, please, do not discuss any aspect of

02:23PM   12  this case with anyone -- any of your relatives, anybody who

02:23PM   13  you have Easter dinner with, or if you're not celebrating

02:23PM   14  Easter, a nice weekend dinner -- don't talk to anybody about

02:23PM   15  this case.

02:23PM   16         Don't use tools of technology in your spare time to

02:23PM   17  do any research about the case, or to communicate about the

02:23PM   18  case.

02:23PM   19         Don't read, or listen to, or watch any news coverage

02:23PM   20  of the case, if there is any, while the trial is in progress.

02:23PM   21  And don't make up your mind about anything until you're

02:23PM   22  finally instructed, that would be next week, the end is in

02:23PM   23  sight, so that will be next week.

02:24PM   24         We're very close to the end now, so please, please,

02:24PM   25  please, don't violate any of these instructions I've been

USA v Bongiovanni - Proceedings - 3/28/24

151

02:24PM    1    giving you.  We've been doing well so far, and we hate to have

02:24PM    2    the trial jeopardized by somebody, and it only takes one of

02:24PM    3    you jeopardize it.

02:24PM    4         So, we'd hate to have the trial jeopardized by

02:24PM    5    somebody doing something that he or she shouldn't.

02:24PM    6         Okay?  Have a wonderful weekend.  Those who are

02:24PM    7    celebrating Easter, Happy Easter.  Those who are not, Happy

02:24PM    8    Weekend.

02:24PM    9         And we'll see you back on Tuesday morning.  Thank you

02:24PM   10    all very much.

02:24PM   11         (Jury excused at 2:24 p.m.)

02:24PM   12         **THE COURT:**  Okay.  Anything we need to put on the

02:25PM   13    record before we break?

02:25PM   14         **MR. TRIPI:**  Nothing from the government.

02:25PM   15         **MR. SINGER:**  What time Monday do you expect us?

02:25PM   16         **THE COURT:**  That was going to be my question to you

02:25PM   17    folks.  What time do you want to do the charge conference?

02:25PM   18         It turns out that the funeral is not on Monday, it's

02:25PM   19    on Tuesday, so I'm just not going to be able to go.  Well, so

02:25PM   20    be it.  So, what time -- what time do you folks think?

02:25PM   21         **MR. TRIPI:**  How's 10:00 sound?

02:25PM   22         **MR. SINGER:**  It sounds good to me, Judge.

02:25PM   23         **THE COURT:**  Yeah.  Sounds good to me, too.  So let's

02:25PM   24    do it.  I don't -- I mean, you folks will know how long it's

02:25PM   25    going to take.  I usually don't take more than an hour or two.

| | | |
|---|---|---|
| 02:25PM | 1 | Have you submitted any requested charges? |
| 02:25PM | 2 | **MR. SINGER:**  We did not, Judge.  We took a look over |
| 02:25PM | 3 | the weekend, and we didn't -- I know we were talking about a |
| 02:25PM | 4 | missing witness charge, we decided not to submit that. |
| 02:26PM | 5 | **THE COURT:**  The government submitted a couple |
| 02:26PM | 6 | additional charges which I thought were okay.  Did we send |
| 02:26PM | 7 | those out? |
| 02:26PM | 8 | **MS. IZZO:**  We did. |
| 02:26PM | 9 | **THE COURT:**  Okay.  So you folks have the new charges |
| 02:26PM | 10 | the government has requested. |
| 02:26PM | 11 | **MR. SINGER:**  I think Mr. MacKay and I, we have |
| 02:26PM | 12 | Mr. Gilsenan taking a look at the draft charge that we just |
| 02:26PM | 13 | got from Ms. Izzo the other day, so we'll do our best. |
| 02:26PM | 14 | **THE COURT:**  Yeah.  And we'll go over it, as I said, |
| 02:26PM | 15 | not quite page by page, but at least chunk of pages by chunk |
| 02:26PM | 16 | of pages.  And as I say, we'll then hear whether folks have -- |
| 02:26PM | 17 | I'm sure there will be exceptions, and when you have them, |
| 02:26PM | 18 | we'll talk them through. |
| 02:26PM | 19 | **MR. TRIPI:**  May I make I quick request of Ms. Izzo? |
| 02:26PM | 20 | I'm sorry.  I think I accidentally deleted your new email with |
| 02:26PM | 21 | the charges, so can you resend that one?  Thank you. |
| 02:26PM | 22 | **MR. SINGER:**  Judge, this is my first trial with you, |
| 02:26PM | 23 | and I think it's Mr. MacKay's first trial with you, as well. |
| 02:26PM | 24 | But in the past, if we had suggestions, I found it easy to |
| 02:26PM | 25 | just do track changes on the Word document that your chambers |

02:26PM    1    sent out.  Is that something that you like to do?

02:26PM    2           THE COURT:  I'd prefer to do it orally at the

02:27PM    3    conference rather than getting something in writing.

02:27PM    4           MR. SINGER:  Okay.

02:27PM    5           THE COURT:  So if you have something -- I mean, if

02:27PM    6    you want to submit something in writing, go ahead.  It might

02:27PM    7    be easier for my law clerk.  But for me, it just has worked

02:27PM    8    very well, I say, you know, my first set of -- my question is

02:27PM    9    on page 17, does anybody have one before that?  And then, you

02:27PM   10    know, Mr. Cooper says yeah, I've got something on page 15, the

02:27PM   11    first paragraph I think should be cut.  I like to do it that

02:27PM   12    way.

02:27PM   13           MR. SINGER:  Okay.

02:27PM   14           THE COURT:  But if you want to submit something in

02:27PM   15    writing, feel free.  Okay?  Okay.  Anything else?

02:27PM   16           MS. IZZO:  Judge, it just occurred to me that we

02:27PM   17    haven't gotten any proposed charges on the forfeiture, if that

02:27PM   18    is still --

02:27PM   19           MR. SINGER:  It's OB, right?  Based on the email I

02:27PM   20    got from asset forfeiture, the way it's -- I think the way

02:27PM   21    it's charged is there's no right that Mr. Bongiovanni has to a

02:27PM   22    proceeding before the jury?  Correct me if I'm wrong.

02:28PM   23           MR. TRIPI:  Yeah, that's what -- I can go circle back

02:28PM   24    to our forfeiture attorney, but I think that that's -- that's

02:28PM   25    correct.

02:28PM 1      **THE COURT:**  So there is not going to be a forfeiture

02:28PM 2  charge?

02:28PM 3      **MR. SINGER:**  So I think the way -- the way it was

02:28PM 4  brought up, I think just it goes solely to you, Judge.

02:28PM 5      **THE COURT:**  Okay.

02:28PM 6      **MR. SINGER:**  I haven't looked at it in two months, so

02:28PM 7  I apologize, the way I understood it at the time was that I

02:28PM 8  was in agreement that the way --

02:28PM 9      **THE COURT:**  Okay.  So take a look over the weekend,

02:28PM 10  if you have any objection, raise it next week, obviously.

02:28PM 11      **MR. TRIPI:**  Judge, I can read what we were

02:28PM 12  referencing into the record.  It's an email to you.  Is that

02:28PM 13  okay?  It's from our office, explaining our position on it.  I

02:28PM 14  think that's what Mr. Singer and I were both trying to recall.

02:28PM 15      **MR. SINGER:**  Correct.

02:28PM 16      **MR. TRIPI:**  I'll skip the introductory part.

02:28PM 17      As set forth in the second superseding indictment,

02:28PM 18  the government notified the defendant that upon conviction of

02:28PM 19  the violations, the United States will seek to impose a

02:28PM 20  forfeiture money judgment of $250,000 which represents the

02:28PM 21  proceeds obtained as a result of such offenses.

02:29PM 22      Additionally, the superseding indictment also

02:29PM 23  included a forfeiture allegation for firearms and ammunition

02:29PM 24  seized from the defendant.  Four items specified in that

02:29PM 25  allegation were administratively forfeited in 2021 and 2020

02:29PM 1   respectively.  Therefore, the government is not seeking to

02:29PM 2   forfeiture these items through this criminal case.

02:29PM 3        Since the government is only seeking a forfeiture

02:29PM 4   money judgment, a jury determination is neither necessary nor

02:29PM 5   warranted by law.  Rule 32.2B1A provides that, quote, if the

02:29PM 6   government seeks a personal money judgment against the

02:29PM 7   defendant, the Court must determine the amount of the money

02:29PM 8   that the defendant will be ordered to pay.

02:29PM 9        Attached is a trial document filed in this case which

02:29PM 10  sets forth legal authority supporting this position.

02:29PM 11       The government respectfully requests that the Court

02:29PM 12  make any forfeiture determination in the event the defendant

02:29PM 13  is convicted.

02:29PM 14       And that filing, Judge, that was attached is at

02:29PM 15  ECF 555.

02:29PM 16       **THE COURT:**  Great.

02:29PM 17       **MR. SINGER:**  My understanding, and I spoke to

02:30PM 18  Mr. Harrington about this a long, long time ago, so I will not

02:30PM 19  trust my memory 100 percent.  But I don't believe an

02:30PM 20  administrative claim was made back when he was representing

02:30PM 21  Mr. Bongiovanni.  And I agree that at that point the

02:30PM 22  forfeiture happened administratively.  So, the physical items

02:30PM 23  are totally OB at this point.

02:30PM 24       And then as far as the money judgment, I think --

02:30PM 25  Mr. MacKay and I discussed it, and we're in agreement that

02:30PM   1   there's probably not a jury question there.  But we'll take

02:30PM   2   another look, Judge.  If there's anything that we object to,

02:30PM   3   we'll --

02:30PM   4           THE COURT:  Okay.  Great.  Terrific.  Good.

02:30PM   5           Anything else from the government?

02:30PM   6       MR. TRIPI:  No, Your Honor.

02:30PM   7           THE COURT:  Anything else from the defense?

02:30PM   8       MR. SINGER:  No, Your Honor.

02:30PM   9           THE COURT:  Okay.  So we'll see you folk at 10:00 on

02:30PM  10   Monday morning, right?  That works for us, for our schedule?

02:30PM  11           MS. IZZO:  Yes, Judge.

02:30PM  12           THE COURT:  Okay.  See you at 10:00 Monday.  Thanks,

02:30PM  13   everybody, have a good weekend.

02:30PM  14       MR. TRIPI:  Have a good weekend everybody, have a

02:30PM  15   good Easter.

02:30PM  16           (Proceedings concluded at 2:30 p.m.)

         17           *    *    *    *    *    *    *

         18

         19

         20

         21

         22

         23

         24

         25

1

2                    **CERTIFICATE OF REPORTER**

3

4              In accordance with 28, U.S.C., 753(b), I

5    certify that these original notes are a true and correct

6    record of proceedings in the United States District Court for

7    the Western District of New York on March 28, 2024.

8

9

10                         s/ Ann M. Sawyer
                          Ann M. Sawyer, FCRR, RPR, CRR
11                        Official Court Reporter
                          U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**TRANSCRIPT INDEX**

2

**FULL DAY OF JURY TRIAL**

3

**MARCH 28, 2024**

4

5

**W I T N E S S**                                      **P A G E**

6

**T H O M A S   D E V E R E A U X**              7

7

  DIRECT EXAMINATION BY MR. SINGER:              8

8

  CROSS-EXAMINATION BY MR. DICKSON:              83

9

  REDIRECT EXAMINATION BY MR. SINGER:           133

10

11

12

**E X H I B I T S**                                   **P A G E**

13

DFT Exhibit O.1                                  69

14

DFT Exhibit O.2                                  76

15

GOV Exhibit OA-2                                115

16

GOV Exhibit OA-1                                128

17

18

19

DEFENDANT RESTS                                 149

20

21

22

23

24

25