09:42AM

```
 1                   UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK
 2
 3   _____
     UNITED STATES OF AMERICA,
 4                                      Case No. 1:19-cr-227
                    Plaintiff,                  (LJV)
 5   v.
                                        March 19, 2024
 6   JOSEPH BONGIOVANNI,

 7   _____Defendant._____

 8

          TRANSCRIPT EXCERPT - EXAMINATION OF KATRINA NIGRO
 9          BEFORE THE HONORABLE LAWRENCE J. VILARDO
                   UNITED STATES DISTRICT JUDGE
10

11   APPEARANCES:            TRINI E. ROSS, UNITED STATES ATTORNEY
                             BY: JOSEPH M. TRIPI, ESQ.
12                               NICHOLAS T. COOPER, ESQ.
                                 CASEY L. CHALBECK, ESQ.
13                           Assistant United States Attorneys
                             Federal Centre
14                           138 Delaware Avenue
                             Buffalo, New York 14202
15                             And
                             UNITED STATES DEPARTMENT OF JUSTICE
16                           BY: JORDAN ALAN DICKSON, ESQ.
                             1301 New York Ave NW
17                           Suite 1000
                             Washington, DC 20530-0016
18                           For the Plaintiff

19                           SINGER LEGAL PLLC
                             BY: ROBERT CHARLES SINGER, ESQ.
20                           80 East Spring Street
                             Williamsville, New York 14221
21                             And
                             LAW OFFICES OF PARKER ROY MacKAY
22                           BY: PARKER ROY MacKAY, ESQ.
                             3110 Delaware Avenue
23                           Kenmore, New York  14217
                             For the Defendant
24
     PRESENT:                BRIAN A. BURNS, F.B.I. Special Agent
25                           MARILYN K. HALLIDAY, H.S.I. Special Agent
                             KAREN A. CHAMPOUX, U.S.A. Paralegal
```

```
 1   LAW CLERK:            REBECCA FABIAN IZZO, ESQ.

 2   COURT DEPUTY CLERK:   COLLEEN M. DEMMA

 3
     COURT REPORTER:       ANN MEISSNER SAWYER, FCRR, RPR, CRR
 4                         Robert H. Jackson Federal Courthouse
                           2 Niagara Square
 5                         Buffalo, New York  14202
                           Ann_Sawyer@nywd.uscourts.gov
 6

 7               *    *    *    *    *    *    *

 8

 9        (Excerpt commenced at 9:42 a.m.)

10        (Jury is present.)
```

09:42AM  11        **THE COURT:**  And the government may call its next

09:43AM  12   witness.

09:43AM  13        **MR. TRIPI:**  Thank you, Your Honor.  We call Katrina

09:43AM  14   Nigro, who's present in the courtroom.

09:43AM  15

09:43AM  16   **K A T R I N A   N I G R O**, having been duly called and sworn,

09:43AM  17   testified as follows:

09:43AM  18        **MR. TRIPI:**  May I inquire, Your Honor?

09:43AM  19        **THE COURT:**  You may.

09:43AM  20        **MR. TRIPI:**  Thank you, Your Honor.

09:43AM  21

09:43AM  22             **DIRECT EXAMINATION BY MR. TRIPI:**

09:43AM  23   Q.  Good morning, Ms. Nigro, how are you?

09:43AM  24   A.  Good.

09:43AM  25   Q.  Ms. Nigro, how old are you?

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

3

| 09:43AM | 1  | A.  41. |
| 09:43AM | 2  | Q.  And where did you grow up? |
| 09:43AM | 3  | A.  Holland, New York. |
| 09:43AM | 4  | Q.  Is that a suburb of Buffalo?  Where is that? |
| 09:44AM | 5  | A.  It's on the outskirts, Southtowns.  Borders on Genesee |
| 09:44AM | 6  | County and Erie County. |
| 09:44AM | 7  | Q.  Okay.  How far have you gone in school, Miss? |
| 09:44AM | 8  | A.  I graduated high school, and then I continued on to |
| 09:44AM | 9  | college classes in multiple schools.  And I finished with |
| 09:44AM | 10 | a -- a certificate from Cornell in women and leadership and |
| 09:44AM | 11 | women in products. |
| 09:44AM | 12 | Q.  Where did you go to high school? |
| 09:44AM | 13 | A.  I went to Holland, then I got some tutoring from Nardin. |
| 09:44AM | 14 | Q.  Did you graduate high school? |
| 09:44AM | 15 | A.  Yes. |
| 09:44AM | 16 | Q.  What colleges have you attended? |
| 09:44AM | 17 | A.  University of Buffalo.  Flagler College, it's in Saint |
| 09:44AM | 18 | Augustine.  And Genesee Community College for merchandising. |
| 09:44AM | 19 | Q.  That's in Florida. |
| 09:44AM | 20 | And what different types of jobs have you worked during |
| 09:44AM | 21 | your adult life? |
| 09:44AM | 22 | A.  Retail kind of service, restaurants.  I worked on a farm |
| 09:44AM | 23 | when I was younger.  And I owned my own stores, I used to |
| 09:45AM | 24 | sell clothing, eBay power seller, and then I opened stores |
| 09:45AM | 25 | that were inside strip clubs.  Like, I used to bring a |

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

4

09:45AM 1   suitcase in and sell the dancers clothes.

09:45AM 2   Q.  Okay.  How old were you when you worked on a farm?

09:45AM 3   A.  I was 14.

09:45AM 4   Q.  What did you do on a farm?

09:45AM 5   A.  Milk cows.  I used to hose down the ground and pull worms

09:45AM 6   out.

09:45AM 7   Q.  Are you currently employed?

09:45AM 8   A.  Yes.

09:45AM 9   Q.  You don't have to say where, but what do you do for a

09:45AM 10  living?  What type of job do you work?

09:45AM 11  A.  I work as a server in a diner.

09:45AM 12  Q.  At a diner?

09:45AM 13  A.  Yeah.

09:45AM 14  Q.  Okay.  I think you referenced it in your answer, I heard

09:45AM 15  you talk about selling merchandise in strip clubs.  But for a

09:45AM 16  time in your life, were you involved in the strip club

09:45AM 17  industry?

09:45AM 18  A.  I feel I always was.  While I was selling clothes, I was

09:45AM 19  in the strip club industry.

09:45AM 20  Q.  Did you have, like, a little store that you would sell --

09:46AM 21  A.  Yes, I had stores inside the club, like little closets

09:46AM 22  and things.

09:46AM 23  Q.  What type of items would you sell?  What type of

09:46AM 24  merchandise did you sell in the context of strip clubs?

09:46AM 25  A.  Vibrators, lube, costumes, underwear, Halloween costumes,

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

5

09:46AM  1  stockings, jewelry.

09:46AM  2  Q.  Fair to say they were adult products?

09:46AM  3  A.  They were all adult products.

09:46AM  4  Q.  Did you also sell condoms and things like that?

09:46AM  5  A.  I sold condoms, but the State Liquor Authority told me I

09:46AM  6  couldn't have them in my store.  And the same with pipes for

09:46AM  7  marijuana.

09:46AM  8  Q.  So you did sell condoms though?

09:46AM  9  A.  Yes.

09:46AM  10  Q.  Okay.  What age were you when you started working in the

09:46AM  11  strip club industry?

09:46AM  12  A.  21.

09:46AM  13  Q.  And are you out of that industry now?

09:47AM  14  A.  100 percent, it's been years.

09:47AM  15  Q.  How old were you, would you estimate, when you stopped

09:47AM  16  working in some capacity in that industry?  So you're 41 now,

09:47AM  17  how old do you think you were when you got out of the

09:47AM  18  industry?

09:47AM  19  A.  100 percent by 2018.  I closed my stores, whatever was

09:47AM  20  left, and sold it off.

09:47AM  21  Q.  Okay.  So that's about roughly six years ago?

09:47AM  22  A.  Um-hum.  I'm sorry, yes.  Yes, roughly six years ago.

09:47AM  23  Q.  As you got into the strip club industry, age 21 and

09:47AM  24  moving on, did -- did -- were there times in your life where

09:47AM  25  you drank a lot?

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

6

| | | |
|---|---|---|
| 09:47AM | 1 | A.  Yes. |
| 09:47AM | 2 | Q.  Did you try drugs at certain times? |
| 09:48AM | 3 | A.  I tried cocaine, like, twice.  It wasn't for me.  And |
| 09:48AM | 4 | then I smoked marijuana. |
| 09:48AM | 5 | Q.  Okay. |
| 09:48AM | 6 | A.  But I smoked marijuana before being in the club. |
| 09:48AM | 7 | Q.  Okay.  And would it be fair to say that the largest |
| 09:48AM | 8 | struggle you've had as an adult would be with alcohol? |
| 09:48AM | 9 | A.  Yes. |
| 09:48AM | 10 | Q.  How are you doing with that today? |
| 09:48AM | 11 | A.  I'm doing great.  I have a solid -- I'm doing great with |
| 09:48AM | 12 | my probation officer, I have no problems.  It's been over two |
| 09:48AM | 13 | years, and I graduated out of rehab, and I haven't had any |
| 09:48AM | 14 | issues.  I go to counseling at PATH, too, so they keep me |
| 09:48AM | 15 | onboard.  People Against Trafficking Humans. |
| 09:48AM | 16 | Q.  And do you -- do you still smoke marijuana? |
| 09:48AM | 17 | A.  Yes. |
| 09:48AM | 18 | Q.  When's the last time you smoked marijuana? |
| 09:49AM | 19 | A.  Three days ago. |
| 09:49AM | 20 | Q.  Eventually, did you become familiar with a local strip |
| 09:49AM | 21 | club called Pharaoh's Gentlemen's Club? |
| 09:49AM | 22 | A.  Yes. |
| 09:49AM | 23 | Q.  When you -- what year was it approximately when you first |
| 09:49AM | 24 | started becoming familiar with that club? |
| 09:49AM | 25 | A.  2010. |

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

7

09:49AM   1   Q.  Did you meet somebody who was in an ownership position at

09:49AM   2   Pharaoh's?

09:49AM   3   A.  Yes.

09:49AM   4   Q.  Who did you meet?

09:49AM   5   A.  I met Donnie Parrino, and also Peter Gerace.

09:49AM   6   Q.  At that time, were they sort of both co-owners of

09:50AM   7   Pharaoh's?

09:50AM   8   A.  Yes.

09:50AM   9   Q.  As the years went on, just to fast forward for a moment,

09:50AM  10   did there become a power struggle between the two of them

09:50AM  11   where then Peter Gerace became the sole owner?

09:50AM  12   A.  Donnie became the sole owner.  There was a power struggle

09:50AM  13   that Peter went to court to try to fight him back for the

09:50AM  14   ownership.

09:50AM  15   Q.  Ultimately, Peter won the Court's case?

09:50AM  16   A.  Well, Peter's parents did, but yes, Peter.

09:50AM  17   Q.  Okay.  Just to summarize it, Peter ultimately got control

09:50AM  18   of the club?

09:50AM  19   A.  Yes.

09:50AM  20   Q.  Okay.  Did -- in or about 2010, when you first started

09:50AM  21   becoming acquainted with Pharaoh's -- or, withdrawn -- with

09:50AM  22   Mr. Gerace, did you engage in an intimate relationship with

09:50AM  23   him at times?

09:50AM  24   A.  Yes.

09:50AM  25   Q.  Going back to that time period, how often would you

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

8

```
09:50AM    1   estimate you were in and around Pharaoh's?
09:51AM    2   A.  I was around Pharaoh's quite a bit working in my store,
09:51AM    3   so I was around it, but it wasn't always sexual activities or
09:51AM    4   anything involved.
09:51AM    5   Q.  So did you open a store in Pharaoh's?
09:51AM    6   A.  Yes.
09:51AM    7   Q.  Did they give you space to sell adult products?
09:51AM    8   A.  Yeah, I did all the social media work for them.
09:51AM    9   Q.  One second, okay?
09:51AM   10   A.  Okay.
09:51AM   11   Q.  So describe the space within Pharaoh's where you got
09:51AM   12   space to sell your adult products.
09:51AM   13   A.  It started as, like, a box that was in the corner you
09:51AM   14   could see from the front area where you entered.  It had a
09:51AM   15   whole pyramid thing.  It was small.
09:51AM   16   Q.  And then eventually did you --
09:51AM   17   A.  Then I --
09:51AM   18   Q.  -- let me just finish my question -- did that move into a
09:51AM   19   room within the club where you were able to --
09:51AM   20   A.  Yes.
09:51AM   21   Q.  -- sell your --
09:51AM   22   A.  Yes.
09:51AM   23   Q.  -- products?
09:51AM   24   A.  Yes.
09:51AM   25   Q.  Was that room, like, on the front -- the first floor?
```

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

9

| | | |
|---|---|---|
| 09:51AM | 1 | A.  Yes. |
| 09:51AM | 2 | Q.  And in that store, among other things, did you sell |
| 09:52AM | 3 | condoms? |
| 09:52AM | 4 | A.  No. |
| 09:52AM | 5 | Q.  Did you sell those other adult products that you |
| 09:52AM | 6 | talked -- |
| 09:52AM | 7 | A.  Yes -- |
| 09:52AM | 8 | Q.  -- about earlier? |
| 09:52AM | 9 | By approximately 2013 -- withdrawn.  In that 2010 |
| 09:52AM | 10 | time frame that you had your store in Pharaoh's and you |
| 09:52AM | 11 | started having some type of a relationship with Peter, would |
| 09:52AM | 12 | it be fair to characterize your intimate relationship with |
| 09:52AM | 13 | him as on and off for a period of time? |
| 09:52AM | 14 | A.  Yes. |
| 09:52AM | 15 | Q.  By 2013 or so, were you and him exclusive? |
| 09:52AM | 16 | A.  I was under the assumption we were exclusive, but there |
| 09:52AM | 17 | were other parties going on. |
| 09:52AM | 18 | Q.  Okay.  In your mind, though, you were boyfriend and |
| 09:53AM | 19 | girlfriend by 2013? |
| 09:53AM | 20 | A.  Yes. |
| 09:53AM | 21 | Q.  At some point, did you start living with Peter Gerace? |
| 09:53AM | 22 | A.  He actually moved in with me. |
| 09:53AM | 23 | Q.  What year was that? |
| 09:53AM | 24 | A.  2014, 2013, we stayed there for six months. |
| 09:53AM | 25 | Q.  Where did he live with you? |

09:53AM 1 A. Overlook Drive in Williamsville.

09:53AM 2 Q. Did you have some type of apartment there?

09:53AM 3 A. No, I had a house.

09:53AM 4 Q. You had a house?  By that point in time, were you working

09:53AM 5 at Pharaoh's almost every day?

09:53AM 6 A. No, I wasn't allowed in the building, because Peter was

09:53AM 7 not allowed in the building at the time.

09:53AM 8 Q. That was during the dispute with Parrino?

09:53AM 9 A. Yes.

09:53AM 10 Q. By 2014, that dispute was over, Peter was back in charge?

09:53AM 11 A. Yes.

09:53AM 12 Q. So that dispute flared up in 2013; is that fair to say?

09:54AM 13 A. Yes.

09:54AM 14 Q. By 2014, Peter's family has full control, and he's

09:54AM 15 running the club --

09:54AM 16 A. Yes.

09:54AM 17 Q. -- is that fair?

09:54AM 18 A. Yeah, they were paying him checks every month.

09:54AM 19 Q. Just -- by 2014, he's got full control.

09:54AM 20 A. Okay.

09:54AM 21 Q. Is that right?

09:54AM 22 A. Yes.

09:54AM 23 Q. Were there times at that juncture, how frequently were

09:54AM 24 you there?

09:54AM 25 A. Maybe three times a week.

09:54AM  1   Q.   Now, was there an upstairs part of Pharaoh's that you

09:54AM  2   were familiar with?

09:54AM  3   A.   Yes.

09:54AM  4   Q.   Describe for the jury how that was set up at that time.

09:54AM  5   A.   You walk up the stairs.  There would be a lock on the

09:54AM  6   bottom.  And you go up.  And then the room changed through

09:54AM  7   the years, there used to be a whole -- the stuff that was in

09:54AM  8   the rooms changed over the years.  So the first room you

09:54AM  9   walked in had a big billiard/poker table, and it was really

09:55AM  10  nice, and it was there.  And they used to have cameras, but

09:55AM  11  those got removed.

09:55AM  12      And it changed to different things.  So, like, at one

09:55AM  13  point I had my college books up all on the shelves, so they

09:55AM  14  were there because I, like, sometimes referenced them.

09:55AM  15      Then you'd go down a hallway.  And then there's a bunch

09:55AM  16  of closets that they would open, like, two big, like, pullout

09:55AM  17  closets.  There's a room to the left that had -- that was the

09:55AM  18  one partners thing, and it had a couch and it had, like,

09:55AM  19  lights and a fancy table, stuff like that.  Obviously, a

09:55AM  20  garbage can.  And it had an ashtray and a plate.

09:55AM  21      And then you would go down the other side, one's like an

09:55AM  22  equipment thing.  There's another door, and it was a full

09:55AM  23  bathroom.  Then it had, like, toothpaste and all that stuff.

09:55AM  24  And multiple toothpaste and toothbrushes that were prepasted

09:55AM  25  for other girls to use, and all different body washes and

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

```
09:56AM    1    brand new razors.

09:56AM    2        And then you went into the other room in the back, and

09:56AM    3    what it had was -- one point it had a hot tub, and then it

09:56AM    4    had, like, a bed and a couch.

09:56AM    5        And then towards the end when there's always

09:56AM    6    complications and fighting about him constantly up there, it

09:56AM    7    turned into the paperwork.  So it was files and files of

09:56AM    8    papers that were up there.

09:56AM    9    Q.  So over time, the decor in there changed, but at various

09:56AM   10    times was it set up as an apartment almost?

09:56AM   11    A.  Yes.

09:56AM   12    Q.  And I think you indicated at one point there was, like, a

09:56AM   13    poker table up there?

09:56AM   14    A.  Yep.

09:56AM   15    Q.  And at another point there was a hot tub up there?

09:56AM   16    A.  Yes.

09:56AM   17    Q.  Was there always, like, a couch and a --

09:56AM   18    A.  Always couches, several.  Always chairs.  And, like, the

09:56AM   19    lounge chairs that you, like, lay on more that you see in a

09:56AM   20    strip club.

09:56AM   21    Q.  Over time, did you become familiar with Peter Gerace's

09:56AM   22    friends?

09:56AM   23    A.  Yes.

09:56AM   24    Q.  On or about September 18th, 2014, did a friend of his

09:57AM   25    perform a purported wedding ceremony between you and
```

09:57AM   1   Mr. Gerace after a long night of drinking at Pharaoh's?

09:57AM   2   A.   Yes.

09:57AM   3   Q.   Who was that friend that performed the purported wedding

09:57AM   4   ceremony?

09:57AM   5   A.   State Supreme Court Justice John Michalski.

09:57AM   6   Q.   And was there any significance assigned by Mr. Gerace to

09:57AM   7   getting married that day, September 18th, 2014?

09:57AM   8           **MR. MacKAY:**  Objection to the relevance.

09:57AM   9           **MR. TRIPI:**  It's highly relevant, Your Honor.  We've

09:57AM  10   argued about this in the pretrial context.  If you need a

09:57AM  11   reminder, we can come up.

09:57AM  12           **THE COURT:**  Yeah, I'll overrule the objection.

09:57AM  13           **BY MR. TRIPI:**

09:57AM  14   Q.   Was there significance on getting married that date?

09:57AM  15   A.   Yes.

09:57AM  16   Q.   What was the significance of September 18th?

09:57AM  17   A.   It was his lucky number.  It was his grandpa's lucky

09:57AM  18   number.  His grandfather lived at number 18 on a property in

09:58AM  19   Sicily.  And it's his grandfather's birthday.

09:58AM  20   Q.   Who was his grandfather?

09:58AM  21   A.   Joseph Todaro.

09:58AM  22   Q.   Senior?

09:58AM  23   A.   Yes.  And then his birthday was September 18th.

09:58AM  24   Q.   Mr. Todaro's birthday was September 18th?

09:58AM  25   A.   Yes.  Papa Joe, he called him.

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

09:58AM  1    Q.  So would it be fair to say between 2010 and 2014, you

09:58AM  2    were at Pharaoh's a few times a week, but from 2014 to the

09:58AM  3    end of your relationship with Mr. Gerace, you were there

09:58AM  4    pretty much every day?

09:58AM  5    A.  Yes, I was the office manager.  But I was allowed in the

09:58AM  6    building after 12.

09:59AM  7    Q.  Okay.  Were you there every day?

09:59AM  8    A.  Yes.

09:59AM  9    Q.  That was -- stick to the question, okay?

09:59AM  10       Now, Ms. Nigro, just in terms of the way you're answering

09:59AM  11   some questions, have you had some -- I don't want to get into

09:59AM  12   too much detail, but have you had some injuries over the

09:59AM  13   years that have affected you physically?

09:59AM  14   A.  Yes.

09:59AM  15   Q.  Does that affect some of your speech sometimes, too?

09:59AM  16   A.  Yes.

09:59AM  17   Q.  All right.  Were there times that you were at Pharaoh's

09:59AM  18   during the day and at night?

09:59AM  19   A.  Yes.

09:59AM  20   Q.  Now, you indicated you were an office -- some type of

09:59AM  21   office manager.  Did that occur after you had that wedding

09:59AM  22   ceremony?  You were involved --

09:59AM  23   A.  No, I started doing it prior.

09:59AM  24   Q.  What did you do?

09:59AM  25   A.  I was office manager.

10:00AM    1    Q.  What did that entail.  Tell the jury.

10:00AM    2    A.  I did hiring.  I did paperwork.  I did the -- they had

10:00AM    3    sheets for -- on the dancers where you counted all the dances

10:00AM    4    they did, and then you made them say how much they had in

10:00AM    5    tips.  And I collected those every day, and I put it in

10:00AM    6    folders so they could set up their 1099s and the information

10:00AM    7    and sent it to them.

10:00AM    8    Q.  What is a 1099?

10:00AM    9    A.  It's a -- it's -- these girls don't get paid per the hour

10:00AM   10    or anything.  So a lot of them were getting, like, free

10:00AM   11    welfare.  So they got a 1099 so that they could haul, and

10:00AM   12    we'd start showing that they were making income.

10:00AM   13      They changed the laws for the state --

10:00AM   14      **MR. MacKAY:**  Judge, I'm going to object as

10:00AM   15    nonresponsive at this point in time.

10:00AM   16      **MR. TRIPI:**  Judge, the question was:  You're an

10:00AM   17    office manager, what did you do?

10:00AM   18      **THE COURT:**  No, actually the question was what's a

10:01AM   19    1099?

10:01AM   20      **MR. TRIPI:**  Well, actually yeah, that was the next

10:01AM   21    question.

10:01AM   22      **THE COURT:**  That's the question.

10:01AM   23      **MR. TRIPI:**  Yeah.

10:01AM   24      **THE COURT:**  Is a 1099 a tax form?

10:01AM   25      **THE WITNESS:**  Yes.

| | | |
|---|---|---|
| 10:01AM | 1 | **THE COURT:**  Next question. |
| 10:01AM | 2 | **MR. TRIPI:**  Thank you, Judge. |
| 10:01AM | 3 | **BY MR. TRIPI:** |
| 10:01AM | 4 | Q.  Where would you do your work, so where within the |
| 10:01AM | 5 | building would you do your work as an office manager? |
| 10:01AM | 6 | A.  In the office. |
| 10:01AM | 7 | Q.  Where was the office? |
| 10:01AM | 8 | A.  It was right when you come in. |
| 10:01AM | 9 | Q.  So it's downstairs? |
| 10:01AM | 10 | A.  Yeah, the upstairs really wasn't used, it was mostly |
| 10:01AM | 11 | everything downstairs. |
| 10:01AM | 12 | Q.  So there's a downstairs office? |
| 10:01AM | 13 | A.  Um-hum. |
| 10:01AM | 14 | Q.  And would there be cash in that downstairs office? |
| 10:01AM | 15 | A.  A lot of cash. |
| 10:01AM | 16 | Q.  And in terms of the business, the business of Pharaoh's, |
| 10:01AM | 17 | Pharaoh's sold alcohol; is that right? |
| 10:01AM | 18 | A.  Yes. |
| 10:01AM | 19 | Q.  Pharaoh's sold food? |
| 10:02AM | 20 | A.  Yes. |
| 10:02AM | 21 | Q.  Pharaoh's charged people to walk in the door? |
| 10:02AM | 22 | A.  Yes. |
| 10:02AM | 23 | Q.  Those are all places where cash can be -- can be used; is |
| 10:02AM | 24 | that correct?  A patron could -- |
| 10:02AM | 25 | A.  As a patron, yes. |

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

17

10:02AM  1   Q.  -- pay by cash, right?

10:02AM  2       Pharaoh's sold dances with dancers; is that right?

10:02AM  3   A.  Yes.

10:02AM  4   Q.  And those different things generated cash; is that

10:02AM  5   accurate?

10:02AM  6   A.  Along with renting lockers.

10:02AM  7   Q.  Okay.  Explain, what did you mean by that.

10:02AM  8   A.  Well, when I was there at the time, the prices may have

10:02AM  9   changed, we rented the small lockers for $5 a day for girls

10:02AM  10  who came out of town.  If you get a regular locker size you

10:02AM  11  see in school, then that was gonna be $50 a month.  And then

10:02AM  12  they had bigger ones, and that was $100 a month.

10:02AM  13  Q.  Now, you indicated dancers from out of town.  Did

10:03AM  14  Pharaoh's bring, at times, dancers in from other states?

10:03AM  15  A.  Yes.

10:03AM  16  Q.  What other states did dancers come from?

10:03AM  17  A.  Erie, Pennsylvania.  Ohio.  Sometimes you get traveling

10:03AM  18  dancers who came from somewhere else.

10:03AM  19  Q.  In the downstairs, was there sort of a private room

10:03AM  20  called the VIP room?

10:03AM  21  A.  Yes.

10:03AM  22  Q.  And the champagne room?  Is that a yes?

10:03AM  23  A.  Yes.

10:03AM  24  Q.  And what -- what happened down there?

10:03AM  25  A.  Nothing legally's supposed to be happening.  So the

| | | |
|---|---|---|
| 10:03AM | 1 | regular rooms are $25.  You pay for your house dance to even |
| 10:03AM | 2 | start working there.  So your first dance goes to the club. |
| 10:03AM | 3 | And then they start doing the dances, and you get $15 out of |
| 10:03AM | 4 | it, the club gets $10. |
| 10:03AM | 5 |       **MR. MacKAY:**  Judge, I'm going to object again as |
| 10:03AM | 6 | responsive.  I think the question was what happens in the |
| 10:03AM | 7 | rooms, not -- |
| 10:03AM | 8 |       **THE WITNESS:**  That's -- |
| 10:03AM | 9 |       **THE COURT:**  Yeah, so try just to answer the question |
| 10:03AM | 10 | that he's asking. |
| 10:03AM | 11 |       The question is:  What happens in the room? |
| 10:03AM | 12 |       **THE WITNESS:**  All different stuff.  I mean, there are |
| 10:04AM | 13 | lap dances.  Some girls cross the line and they're letting |
| 10:04AM | 14 | more happen.  I guess simulated grinding. |
| 10:04AM | 15 |       **BY MR. TRIPI:** |
| 10:04AM | 16 | Q.  Does the club take a cut of the money generated from the |
| 10:04AM | 17 | dancers who go in VIP? |
| 10:04AM | 18 | A.  Yes. |
| 10:04AM | 19 | Q.  Okay.  And I think you were starting to explain that the |
| 10:04AM | 20 | very first dance goes entirely to the club? |
| 10:04AM | 21 | A.  Yes. |
| 10:04AM | 22 | Q.  Okay.  Then after that, it depends on how much money the |
| 10:04AM | 23 | dancer makes; is that right? |
| 10:04AM | 24 | A.  Well, every dance, the club takes $10 out.  Every dance. |
| 10:04AM | 25 | Q.  So a portion goes to the club? |

10:04AM    1    A.  Um-hum.

10:04AM    2    Q.  And a portion goes to the dancer?

10:04AM    3    A.  Yes.

10:04AM    4    Q.  When you were working there and while you were at

10:04AM    5    Pharaoh's, was there -- was there drug use that you observed

10:04AM    6    at Pharaoh's?

10:04AM    7    A.  Everywhere.

10:04AM    8    Q.  What was your answer?

10:04AM    9    A.  Almost everywhere.

10:05AM   10    Q.  In your life experience and working at Pharaoh's, have

10:05AM   11    you observed people under the influence of cocaine?

10:05AM   12    A.  Yes.

10:05AM   13    Q.  And now you indicated it's a drug that you've used

10:05AM   14    several times in your life in the past, correct?

10:05AM   15    A.  Twice, yep.

10:05AM   16    Q.  And so you understand the physical effect that cocaine

10:05AM   17    has on people?

10:05AM   18    A.  Um-hum.

10:05AM   19    Q.  Is that a yes?

10:05AM   20    A.  Yes.

10:05AM   21    Q.  It just has to be yes or no, okay?

10:05AM   22        What type of physical characteristics do you observe when

10:05AM   23    people use cocaine?

10:05AM   24    A.  Their eyes dilate.  They talk really fast.  They start to

10:05AM   25    sweat more.  They're distracted, so they're not making as

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

20

| | | |
|---|---|---|
| 10:05AM | 1 | much money on the floor doing dances.  And most of the time |
| 10:05AM | 2 | when they get on the stage you can see white glowing cocaine |
| 10:05AM | 3 | in their nose, so I'd have to go up and do, like, nose taps, |
| 10:05AM | 4 | so they need to clean themselves up. |
| 10:05AM | 5 | Q.  And are there black lights in Pharaoh's? |
| 10:05AM | 6 | A.  All over. |
| 10:05AM | 7 | Q.  And under that type of lighting, was it easier to see? |
| 10:05AM | 8 | A.  Easier.  It glows.  And the girls don't know it, so they |
| 10:06AM | 9 | get on the stage and it's too late. |
| 10:06AM | 10 | Q.  Have you observed people under the influence of opiates |
| 10:06AM | 11 | or heroin inside Pharaoh's? |
| 10:06AM | 12 | A.  Yes. |
| 10:06AM | 13 | Q.  Can you describe your observations in that regard? |
| 10:06AM | 14 | A.  I've seen girls grinding heroin, taking pills, but I |
| 10:06AM | 15 | never personally seen a girl shooting up.  I knew it was |
| 10:06AM | 16 | going on in the bathroom. |
| 10:06AM | 17 | **MR. MacKAY:**  Objection, calls for hearsay. |
| 10:06AM | 18 | **THE COURT:**  Yeah, so -- |
| 10:06AM | 19 | **MR. TRIPI:**  Judge, she answered what she observed. |
| 10:06AM | 20 | She's observed people grinding up heroin. |
| 10:06AM | 21 | **THE COURT:**  Yeah. |
| 10:06AM | 22 | **MR. TRIPI:**  She's being responsive. |
| 10:06AM | 23 | **THE COURT:**  And then she moved to something that she |
| 10:06AM | 24 | said she didn't see, and that is likely hearsay.  So I think |
| 10:06AM | 25 | the objection is well taken at the point that he objected. |

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

21

| | | |
|---|---|---|
| 10:06AM | 1 | Next question. |
| 10:06AM | 2 | **BY MR. TRIPI:** |
| 10:06AM | 3 | Q.  Sticking to what you saw first -- |
| 10:06AM | 4 | A.  Okay. |
| 10:06AM | 5 | Q.  -- with respect to heroin and opiates, what did you |
| 10:06AM | 6 | observe personally in terms of -- |
| 10:06AM | 7 | A.  It really wasn't discreet, most of the girls would do it |
| 10:07AM | 8 | at the same time 'cuz they'd all walk in the bathroom, more |
| 10:07AM | 9 | they just do it right on the counter. |
| 10:07AM | 10 | Q.  I think you began to say you didn't observe intravenous |
| 10:07AM | 11 | use, but -- |
| 10:07AM | 12 | A.  Yeah. |
| 10:07AM | 13 | Q.  -- you observed sniffing it? |
| 10:07AM | 14 | A.  Sniffing and taking pills, but not intravenous. |
| 10:07AM | 15 | Q.  And so what physical characteristics, based on your |
| 10:07AM | 16 | observations and life experience at Pharaoh's, do you |
| 10:07AM | 17 | associate with people under the influence of opiates and |
| 10:07AM | 18 | heroin? |
| 10:07AM | 19 | A.  Nodding off.  Falling asleep.  Overdosing on the floor. |
| 10:07AM | 20 | Needing help.  Just slurring.  Unable to walk.  Being taken |
| 10:07AM | 21 | advantage of.  Track marks. |
| 10:07AM | 22 | Q.  You made those observations with respect to Pharaoh's |
| 10:07AM | 23 | dancers? |
| 10:07AM | 24 | A.  Yes, we tried not to hire the girls with the track marks. |
| 10:08AM | 25 | **MR. MacKAY:**  Objection, nonresponsive. |

10:08AM    1          **THE COURT:**  Sustained.  The jury will strike that

10:08AM    2    last remark.

10:08AM    3          So again, ma'am, just try to answer the question, not

10:08AM    4    volunteer things.  Okay?

10:08AM    5          **BY MR. TRIPI:**

10:08AM    6    Q.  What did you -- what did you -- when dancers would have

10:08AM    7    track marks, would you try to remedy that --

10:08AM    8    A.  Yeah.

10:08AM    9    Q.  -- or hide it?

10:08AM   10    A.  Yep.

10:08AM   11    Q.  How did you do that?

10:08AM   12    A.  I sold dancer clothing, and I gave them sleeves that

10:08AM   13    covered them up.  And then they wore stocking so you couldn't

10:08AM   14    see them.

10:08AM   15    Q.  And what are track marks?

10:08AM   16    A.  They're lines from the veins collapsing from the needles.

10:08AM   17    Q.  At Pharaoh's, have you used marijuana there?

10:08AM   18    A.  Yes.

10:08AM   19    Q.  Are you familiar with the location where other people who

10:08AM   20    work there will go to use marijuana?

10:08AM   21    A.  Yes.

10:08AM   22    Q.  Where is that?  Describe it.

10:08AM   23    A.  Outside in the smoking area.

10:08AM   24    Q.  And where is that outside employee smoking area?

10:08AM   25    A.  If you go between the dressing room entrance and then you

10:08AM  1   head towards the VIP bathrooms, it's that door right there.

10:09AM  2   Q.  At various times, have you observed Pharaoh's dancers,

10:09AM  3   staff, and employees, under the influence of those various

10:09AM  4   types of drugs we've just covered: Cocaine, heroin and

10:09AM  5   marijuana?

10:09AM  6   A.  Yes.

10:09AM  7   Q.  How frequent was that -- were those drugs being used at

10:09AM  8   Pharaoh's?

10:09AM  9   A.  Daily.

10:09AM  10  Q.  Now, different question.  I've asked you about drug usage

10:09AM  11  at Pharaoh's, now I'm going to ask you about drug

10:09AM  12  distribution, okay?  So that could be an exchange for money,

10:09AM  13  or just giving it out when I say distribution, okay?

10:09AM  14  A.  Okay.

10:09AM  15  Q.  All right.  Have you observed Peter Gerace both use and

10:09AM  16  distribute drugs at Pharaoh's?

10:09AM  17  A.  Yes.

10:09AM  18  Q.  Starting with drug use, what areas of Pharaoh's have you

10:10AM  19  observed Peter -- what drug did he typically use?

10:10AM  20  A.  What drug?

10:10AM  21  Q.  What drug did Peter Gerace typically use?

10:10AM  22  A.  He used Lortabs and cocaine.

10:10AM  23  Q.  Okay.  What locations within Pharaoh's, so my first

10:10AM  24  question is where within Pharaoh's would he typically use

10:10AM  25  Lortabs and cocaine?

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

24

10:10AM  1    A.  Offer -- office, liquor room, upstairs.

10:10AM  2    Q.  And the office is on the first floor?

10:10AM  3    A.  Yeah.

10:10AM  4    Q.  And the liquor room, where's that?

10:10AM  5    A.  It's right next to it.  At one point, it was connected

10:10AM  6    and you could walk through, and then it was more shut off.

10:10AM  7    Q.  Okay.  But the office and the liquor room are both on the

10:10AM  8    first floor?

10:10AM  9    A.  Yes.

10:10AM  10   Q.  And then upstairs is that area you've already described?

10:10AM  11   A.  Yes.

10:10AM  12   Q.  Who controlled access to that upstairs?

10:10AM  13   A.  Peter and Chris Chudy.

10:11AM  14   Q.  So they had the keys?  Is that a yes?

10:11AM  15   A.  Yes.

10:11AM  16   Q.  And is Chris Chudy, was he some type of daytime manager?

10:11AM  17   A.  Yes, he was the basically the primary manager, he did all

10:11AM  18   of the paperwork, all that good stuff too.  Orders.

10:11AM  19   Q.  Did -- did Peter Gerace supply employees at Pharaoh's

10:11AM  20   with cocaine?

10:11AM  21   A.  Yes.

10:11AM  22   Q.  Did he supply them with Lortabs?

10:11AM  23   A.  Yes.

10:11AM  24   Q.  Specifically, a subset of employees, I want to talk about

10:11AM  25   dancers.  Did Peter supply dancers with drugs?

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24
25

| 10:11AM | 1 | A.  Yes. |
| 10:11AM | 2 | Q.  What type of drugs? |
| 10:11AM | 3 | A.  Cocaine and Lortabs. |
| 10:11AM | 4 | Q.  Were you aware of other employees that helped Peter sell |
| 10:11AM | 5 | cocaine and Lortabs or distribute them in Pharaoh's? |
| 10:11AM | 6 | A.  Yes. |
| 10:11AM | 7 | Q.  Who were those people? |
| 10:12AM | 8 | A.  The girls who didn't go on stage really.  They didn't do |
| 10:12AM | 9 | lap dances.  They just were there. |
| 10:12AM | 10 | Q.  By name, who were they? |
| 10:12AM | 11 | A.  Destiny.  God, there's a couple. |
| 10:12AM | 12 | Q.  I'm going to ask you about some specific names so that -- |
| 10:12AM | 13 | A.  Yeah, that would help. |
| 10:12AM | 14 | Q.  Do you know Charm? |
| 10:12AM | 15 | A.  Yes.  Oh, yeah. |
| 10:12AM | 16 | Q.  Okay.  Who was Charm? |
| 10:12AM | 17 | A.  Charm is Jessica Leyland. |
| 10:12AM | 18 | Q.  Okay.  Did Jessica Leyland, did she sell cocaine inside |
| 10:12AM | 19 | Pharaoh's? |
| 10:12AM | 20 | A.  100 percent. |
| 10:12AM | 21 | Q.  Did she work with Peter Gerace selling cocaine inside |
| 10:12AM | 22 | Pharaoh's? |
| 10:12AM | 23 | A.  Yes. |
| 10:12AM | 24 | Q.  What observations did you make in that regard? |
| 10:12AM | 25 | A.  He hovered around her all the time, and she gave him |

| | | |
|---|---|---|
| 10:12AM | 1 | drugs. |
| 10:12AM | 2 | Q.  How about Autumn Asher, also known as Cherry? |
| 10:12AM | 3 | A.  Yeah. |
| 10:12AM | 4 | Q.  Did she help Peter sell drugs? |
| 10:12AM | 5 | A.  Yes. |
| 10:12AM | 6 | Q.  What kind of drugs? |
| 10:12AM | 7 | A.  Cocaine.  She used to sell marijuana a little bit, but -- |
| 10:12AM | 8 | **MR. MacKAY:**  Objection, nonresponsive. |
| 10:12AM | 9 | **THE COURT:**  I'm sorry, I didn't hear what the last |
| 10:12AM | 10 | thing was. |
| 10:12AM | 11 | **MR. TRIPI:**  She used to sell marijuana a little bit. |
| 10:13AM | 12 | How on the planet is that objectionable? |
| 10:13AM | 13 | **THE COURT:**  It's not.  Overruled. |
| 10:13AM | 14 | **MR. TRIPI:**  So -- |
| 10:13AM | 15 | **THE COURT:**  Mr. Tripi, let's keep the remarks -- |
| 10:13AM | 16 | **MR. TRIPI:**  I apologize, I withdraw. |
| 10:13AM | 17 | **THE COURT:**  Okay.  Let's keep the characterization to |
| 10:13AM | 18 | a minimum please.  Yeah, thank you. |
| 10:13AM | 19 | **MR. TRIPI:**  Yeah. |
| 10:13AM | 20 | **THE COURT:**  Okay. |
| 10:13AM | 21 | **MR. TRIPI:**  Judge, can we just come up very briefly |
| 10:13AM | 22 | on that? |
| 10:13AM | 23 | **THE COURT:**  Absolutely. |
| 10:13AM | 24 | (Sidebar discussion held on the record.) |
| 10:13AM | 25 | **MR. TRIPI:**  Firstly, I apologize for the frustration. |

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24                27

| | | |
|---|---|---|
| 10:13AM | 1 | But secondly, what I'd like to explain about this witness, and |
| 10:13AM | 2 | perhaps I should have before she came in, she's very highly |
| 10:13AM | 3 | traumatized. |
| 10:13AM | 4 | **THE COURT:**  Yep. |
| 10:13AM | 5 | **MR. TRIPI:**  And sometimes in those situations, the |
| 10:13AM | 6 | government's allowed to lead.  I'm trying not to lead.  But if |
| 10:13AM | 7 | the Court would give me some leeway in that area, then I can |
| 10:13AM | 8 | probably control this a little bit better. |
| 10:13AM | 9 | **THE COURT:**  Yeah, I -- |
| 10:13AM | 10 | **MR. TRIPI:**  I do take my witnesses as they come, and |
| 10:13AM | 11 | I've tried and tried, and I've prepped a lot, and this is the |
| 10:14AM | 12 | best it's ever been. |
| 10:14AM | 13 | **THE COURT:**  Yeah. |
| 10:14AM | 14 | **MR. TRIPI:**  Okay?  But, you know, she has trauma. |
| 10:14AM | 15 | And she's not making it up.  And I'm sure they don't want to |
| 10:14AM | 16 | open the door to the physical abuse and the emotional abuse |
| 10:14AM | 17 | that that trauma is manifesting itself in this trial. |
| 10:14AM | 18 | So I just wanted to make you aware.  I'm doing my |
| 10:14AM | 19 | best. |
| 10:14AM | 20 | **THE COURT:**  And I almost expected you to start |
| 10:14AM | 21 | leading a little bit, and I also would have expected not a |
| 10:14AM | 22 | whole lot of objection unless there was a real problem with |
| 10:14AM | 23 | the leading; is that correct? |
| 10:14AM | 24 | **MR. MacKAY:**  Judge, yeah, I don't have much problem |
| 10:14AM | 25 | with the leading, I've let a lot of that go.  It's more when |

10:14AM  1    she starts to stray into like what sounds like she's hearing

10:14AM  2    from other places, like her last answer she talked about what

10:14AM  3    she saw Autumn Asher do, it sounded like -- when she talked

10:14AM  4    about marijuana, that's what she knew in the past, to be

10:14AM  5    hearsay.  And that's where I'm trying to cut it off, that's

10:14AM  6    all.

10:14AM  7            THE COURT:  I understand, but --

10:14AM  8            MR. TRIPI:  Under U.S. versus Yannotti, okay, so

10:14AM  9    clearly this woman, wittingly or unwittingly, was involved in

10:14AM 10    both of these conspiracies, and we'll develop that in a

10:14AM 11    moment.  Under U.S. versus Yannotti, the 2nd Circuit has said

10:15AM 12    where a witness's perceptions form their opinions in a

10:15AM 13    conspiracy in which they participated, that's a proper 701

10:15AM 14    opinion.  So to the extent, it's not hearsay, because she's a

10:15AM 15    participant in the events.

10:15AM 16            THE COURT:  And it may be or it may not be.  I didn't

10:15AM 17    think the marijuana comment was a problem, I think some of the

10:15AM 18    other comments have been.  But why don't you try leading a

10:15AM 19    little bit.

10:15AM 20            MR. TRIPI:  I will.

10:15AM 21            THE COURT:  I'm not precluding you from objecting.

10:15AM 22    Obviously, you object when you think the leading has gone too

10:15AM 23    far.  But I think that leading may be a good solution to the

10:15AM 24    problem that we have.

10:15AM 25            MR. TRIPI:  And I'm sorry I didn't flag this in the

10:15AM  1   beginning, that might have cut through some of this.

10:15AM  2            THE COURT:  Not a problem.  That's okay.

10:15AM  3            MR. TRIPI:  Understood.

10:15AM  4            THE COURT:  Thank you.

10:15AM  5            (End of sidebar discussion.)

10:15AM  6            BY MR. TRIPI:

10:15AM  7   Q.  Did you observe Autumn Asher supplying cocaine at various

10:15AM  8   points around Pharaoh's?

10:15AM  9   A.  Yes.

10:15AM  10  Q.  Did you know, based on your observations and your

10:15AM  11  association with Mr. Gerace, that at times she was selling

10:16AM  12  cocaine at his behest?

10:16AM  13  A.  Yes.

10:16AM  14  Q.  Was Melissa Meyers another employee who worked there?

10:16AM  15  A.  Yes.

10:16AM  16  Q.  What was her job?

10:16AM  17  A.  She's a bartender.

10:16AM  18  Q.  Did you observe her sell cocaine there?

10:16AM  19  A.  Yes.

10:16AM  20  Q.  Is she someone who was also close with Mr. Gerace?

10:16AM  21  A.  Yes, very.

10:16AM  22  Q.  Has she been a long time employee of Pharaoh's?

10:16AM  23  A.  Yes.

10:16AM  24  Q.  Did you observe her making transactions of cocaine at

10:16AM  25  various points in time?

| | | |
|---|---|---|
| 10:16AM | 1 | A.  Yes. |
| 10:16AM | 2 | Q.  Do you know an individual who would frequent Pharaoh's |
| 10:16AM | 3 | named Marcus Black? |
| 10:16AM | 4 | A.  Yes. |
| 10:16AM | 5 | Q.  What is his relationship with Mr. Gerace, as far as you |
| 10:16AM | 6 | know it? |
| 10:16AM | 7 | A.  Long time party guy, drug dealer. |
| 10:16AM | 8 | Q.  Was he a -- were they friends? |
| 10:16AM | 9 | A.  Yes. |
| 10:16AM | 10 | Q.  Was Marcus Black someone who would frequent Pharaoh's? |
| 10:17AM | 11 | A.  Frequently. |
| 10:17AM | 12 | Q.  Is Marcus Black someone who would distribute cocaine, |
| 10:17AM | 13 | based upon your observations and understanding, to |
| 10:17AM | 14 | Mr. Gerace? |
| 10:17AM | 15 | A.  Yes. |
| 10:17AM | 16 | Q.  Did Marcus Black supply others, as well, at Pharaoh's? |
| 10:17AM | 17 | A.  Yes. |
| 10:17AM | 18 | Q.  Who's Matthew Leinert, do you know him? |
| 10:17AM | 19 | A.  Who? |
| 10:17AM | 20 | Q.  Matthew Leinert. |
| 10:17AM | 21 | A.  Oh, Matthew Leinert? |
| 10:17AM | 22 | Q.  Did he work there, or was he a patron? |
| 10:17AM | 23 | A.  He was a patron, but Peter might have given an odd job |
| 10:17AM | 24 | for extra money. |
| 10:17AM | 25 | Q.  Were they friendly? |

10:17AM  1    A.  They were best friends.  They used to meet up at bars all

10:17AM        the time.

10:17AM  3    Q.  Is Mr. Leinert someone who would distribute cocaine at

10:17AM  4    Pharaoh's?

10:17AM  5    A.  Yes.

10:17AM  6    Q.  Do you know Chris -- did you know Crystal Quinn?

10:17AM  7    A.  Yes.

10:17AM  8    Q.  Is she someone who would get cocaine from Mr. Gerace and

10:18AM  9    also help him move it at times in the club?

10:18AM  10   A.  Along with other people.

10:18AM  11   Q.  Is that --

10:18AM  12   A.  Yes.

10:18AM  13   Q.  When you say along with other people, Ms. Quinn was

10:18AM  14   helping other people?  Or Ms. Quinn was helping Gerace help

10:18AM  15   other people?  Just to clarify that.

10:18AM  16   A.  Ms. Quinn was also helping other people.

10:18AM  17   Q.  Okay.  Now was there a written or a public policy that

10:18AM  18   Pharaoh's had that said no drug use or distribution was

10:18AM  19   allowed?  Like, the stated policy was no drugs; is that

10:18AM  20   correct?

10:18AM  21   A.  I don't remember that.

10:18AM  22   Q.  No?  Okay.  Did Mr. Gerace have a policy regarding

10:18AM  23   calling the police?

10:19AM  24   A.  Yes.

10:19AM  25   Q.  And was that a written or unwritten rule?

10:19AM   1   A.  Unwritten rule.

10:19AM   2   Q.  What was the unwritten rule?

10:19AM   3   A.  You were absolutely not to call -- supposed to call the

10:19AM   4   police because it was a strike against your liquor license.

10:19AM   5   Q.  How did Mr. Gerace communicate that policy to others?

10:19AM   6   A.  Well, if there was an issue, everyone went to him first,

10:19AM   7   and then he told us.

10:19AM   8   Q.  How to proceed?

10:19AM   9   A.  Yeah.  Or took it into matters into management's hands.

10:19AM   10  Q.  Now, there were a lot of -- we talked about this a little

10:19AM   11  bit earlier.  There were a lot of female dancers who worked

10:19AM   12  at Pharaoh's; is that right?

10:19AM   13  A.  Yes.

10:19AM   14  Q.  Did many of them go by aliases?

10:19AM   15  A.  Yes.

10:19AM   16  Q.  Did many of them have names that you didn't know what

10:19AM   17  their true name was?

10:19AM   18  A.  Yes.

10:19AM   19  Q.  Is that fair to say?

10:19AM   20  A.  Yep.

10:19AM   21  Q.  How many Pharaoh's dancers would be working on a typical

10:19AM   22  weekend, let's say, from Friday to Sunday?

10:19AM   23  A.  50.

10:19AM   24  Q.  And during the workweek, so like Monday through Thursday,

10:20AM   25  how many dancers worked per day and night roughly?

| | | |
|---|---|---|
| 10:20AM | 1 | A.  Maybe 20. |
| 10:20AM | 2 | Q.  Okay. |
| 10:20AM | 3 | A.  Two shifts. |
| 10:20AM | 4 | Q.  And there's two shifts, what are the shifts? |
| 10:20AM | 5 | A.  11 to 7 and then 7 to, like, I don't know if they're open |
| 10:20AM | 6 | to 4 anymore since COVID, but -- |
| 10:20AM | 7 | Q.  Okay.  So, 11 to 7, and then 7 to close? |
| 10:20AM | 8 | A.  Yes.  And then you could always do a split if you wanted. |
| 10:20AM | 9 | Q.  Split meaning you worked part of the day shift, and part |
| 10:20AM | 10 | of the night shift? |
| 10:20AM | 11 | A.  Yeah.  Like, you came in at 4, and stayed until -- |
| 10:20AM | 12 | Q.  While working or being present inside Pharaoh's, have you |
| 10:20AM | 13 | had occasion to observe Pharaoh's dancers overdose on drugs? |
| 10:20AM | 14 | A.  Yes. |
| 10:20AM | 15 | Q.  How many overdose situations did you personally observe? |
| 10:21AM | 16 | A.  Two in Pharaoh's. |
| 10:21AM | 17 | Q.  What approximate year were those overdoses? |
| 10:21AM | 18 | A.  It was -- I had to use Narcan. |
| 10:21AM | 19 | Q.  What approximate year were the overdoses? |
| 10:21AM | 20 | A.  Oh, what year?  2015. |
| 10:21AM | 21 | Q.  Was Peter Gerace made aware of the overdosing dancers in |
| 10:21AM | 22 | each situation? |
| 10:21AM | 23 | A.  Yeah. |
| 10:21AM | 24 | Q.  How did he become aware of it? |
| 10:21AM | 25 | A.  I told him, or other people told him. |

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

34

10:21AM   1   Q.   In those situations that you were present for, did you

10:21AM   2   form an opinion as to what type of drug the dancer was

10:21AM   3   over -- actively overdosing on?

10:21AM   4   A.   Heroin.

10:21AM   5   Q.   While you were there at Pharaoh's, and while you were

10:22AM   6   with Mr. Gerace, was there prostitution activity at

10:22AM   7   Pharaoh's?

10:22AM   8   A.   Yes.

10:22AM   9   Q.   Did Mr. Gerace have any role directing dancers to work as

10:22AM  10   prostitutes?

10:22AM  11   A.   Yes.

10:22AM  12   Q.   Can you please explain that for the jury?

10:22AM  13   A.   He set the girls up for his friends.  And then he took

10:22AM  14   tips from big spenders and looked the other way.  If you were

10:22AM  15   a celebrity or someone, like, of status, he let you go

10:22AM  16   upstairs in the private area.

10:22AM  17   Q.   And that's the private area that you talked about that he

10:22AM  18   controlled that at times had a hot tub and couches and stuff

10:22AM  19   like that?

10:22AM  20   A.   Um-hum.  Yeah, it always had couches.

10:22AM  21   Q.   Was one celebrity that Mr. Gerace would have come into

10:22AM  22   town that he would allow to go upstairs with dancers for

10:22AM  23   sexual activity, was that an actor named Lillo Brancato?

10:23AM  24   A.   Yes.

10:23AM  25   Q.   And is that someone who was in movies like Bronx Tale and

10:23AM 1 the Sopranos?

10:23AM 2 A.   Yes.

10:23AM 3 Q.   Was another person that Mr. Gerace would allow to go

10:23AM 4 upstairs with Pharaoh's dancers, was that New York State

10:23AM 5 Supreme Court Judge John Michalski?

10:23AM 6 A.   Yes.

10:23AM 7 Q.   On an occasion, did you actually unlock the, at Peter's

10:23AM 8 direction, unlock the downstairs door for Mr. Michalski to go

10:23AM 9 upstairs with a dancer?

10:23AM 10 A.   Yes, I did.

10:23AM 11 Q.   Were there other -- without getting into names, were

10:23AM 12 there other people who you understood to be political figures

10:23AM 13 from this area?

10:23AM 14 A.   Yes.

10:23AM 15 Q.   Were there other people who you understood to be

10:23AM 16 attorneys in this area?

10:23AM 17 A.   Yes.

10:23AM 18 Q.   Were there other people who you understood to be

10:24AM 19 professional athletes in this area?

10:24AM 20 A.   Yes.

10:24AM 21 Q.   Particularly from -- older former members of the Buffalo

10:24AM 22 Sabres?

10:24AM 23 A.   Yes.

10:24AM 24 Q.   Now, were there situations where if you weren't one of

10:24AM 25 those higher-profile people that Peter allowed upstairs,

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

36

10:24AM  1   where -- where you were aware of individuals being able to go

10:24AM  2   in the downstairs VIP area to engage in sex acts with

10:24AM  3   Pharaoh's dancers?

10:24AM  4   A.   Yes.

10:24AM  5   Q.   Can you describe how that situation played out for the

10:24AM  6   jury?  Describe how the non-upstairs people can still go

10:24AM  7   downstairs into the VIP area to engage in sex acts with

10:24AM  8   Pharaoh's dancers.

10:24AM  9   A.   It wasn't obvious.  The girls would just switch their

10:24AM  10  underwear over and slide it in.  Or they would try to, like,

10:25AM  11  drop down like they're shaking their boobs on a customer, and

10:25AM  12  then --

10:25AM  13  Q.   Let me ask you another question.

10:25AM  14  A.   Yeah.

10:25AM  15  Q.   So you're explaining sort of how it went down in the

10:25AM  16  room.  But were -- were -- is there someone called a VIP

10:25AM  17  attendant who is supposed to watch --

10:25AM  18  A.   Yeah.

10:25AM  19  Q.   -- and stop that activity?

10:25AM  20  A.   Yes.

10:25AM  21  Q.   Did the -- did the activity involve paying that person

10:25AM  22  off to not intercede?

10:25AM  23  A.   Yes.

10:25AM  24  Q.   Explain that --

10:25AM  25  A.   And the girls -- okay.

| | | |
|---|---|---|
| 10:25AM | 1 | Q.  -- explain that part for the jury. |
| 10:25AM | 2 | A.  Okay.  So a lot of times, the customers would tip the VIP |
| 10:25AM | 3 | guy to look the other way.  And then the girls would tip, if |
| 10:25AM | 4 | they knew it was an extra trip, the guy also.  So he would be |
| 10:25AM | 5 | getting tipped twice. |
| 10:25AM | 6 | Q.  And how did Peter benefit from that activity? |
| 10:25AM | 7 | A.  I'm not positive how well he benefitted from that.  'Cuz |
| 10:25AM | 8 | there -- |
| 10:25AM | 9 | **THE COURT:**  No. |
| 10:25AM | 10 | **BY MR. TRIPI:** |
| 10:25AM | 11 | Q.  But you were aware that that was occurring? |
| 10:25AM | 12 | A.  Yes. |
| 10:25AM | 13 | Q.  In your view, based upon your participation at Pharaoh's, |
| 10:26AM | 14 | was that a widely known fact within the Pharaoh's community, |
| 10:26AM | 15 | the employees, bouncers, the management, yourself, |
| 10:26AM | 16 | Mr. Gerace, that that's how it went down with big tippers in |
| 10:26AM | 17 | the VIP area? |
| 10:26AM | 18 | A.  Yeah. |
| 10:26AM | 19 | **MR. MacKAY:**  Objection, calls for speculation. |
| 10:26AM | 20 | **MR. TRIPI:**  That's U.S. versus Yannotti. |
| 10:26AM | 21 | **THE COURT:**  That's overruled.  Go ahead. |
| 10:26AM | 22 | **THE WITNESS:**  Yeah. |
| 10:26AM | 23 | **BY MR. TRIPI:** |
| 10:26AM | 24 | Q.  Okay.  Was there a term that Peter used for big spenders |
| 10:26AM | 25 | called a "whale?" |

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

38

10:26AM 1  A.  Yes.

10:26AM 2  Q.  What directives would Peter give out, how to treat

10:26AM 3  whales.  Withdrawn.  What was a whale?

10:26AM 4  A.  It was a person who spent a lot.

10:26AM 5  Q.  And did Peter give directives out to staff as to how to

10:26AM 6  treat the whales or the big spenders at Pharaoh's?

10:26AM 7  A.  Yeah, he did, the big ones.  That's when they got to go

10:26AM 8  upstairs or there were favors and stuff like that.

10:27AM 9  Q.  When you say favors, are you talking about sexual favors?

10:27AM 10  A.  Peter favors.  Like, Peter owed them something for doing

10:27AM 11  something for him, so he would hook them up with a reward.

10:27AM 12  Q.  And in your experience, the reward was going upstairs

10:27AM 13  with a Pharaoh's dancer?

10:27AM 14  A.  Yes.

10:27AM 15  Q.  Over time, over your time when you were sort of

10:27AM 16  intimately involved with Peter Gerace and the day-to-day

10:27AM 17  activities of Pharaoh's, approximately how many dancers over

10:27AM 18  time worked in some capacity as prostitutes under Mr. Gerace

10:27AM 19  at Pharaoh's?

10:27AM 20  A.  It started to seem like everyone, probably 50.

10:27AM 21  Q.  And that's over a period of time though, right?

10:27AM 22  A.  Yeah.

10:27AM 23  Q.  In one particular situation, actually, did you have

10:28AM 24  someone who was a defense attorney for you named Matthew

10:28AM 25  Albert?

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

39

10:28AM  1   A.  Yes.

10:28AM  2   Q.  Was he an attorney that was helping you in a trial where

10:28AM  3   you were on trial for a DWI?

10:28AM  4   A.  Yes.

10:28AM  5   Q.  And where was that DWI trial?

10:28AM  6   A.  Fredonia.

10:28AM  7   Q.  And did Mr. Albert win the trial in some way?

10:28AM  8   A.  Yes.

10:28AM  9   Q.  You were not convicted?

10:28AM  10  A.  I wasn't convicted.

10:28AM  11  Q.  And was Peter there for that part of your trial when you

10:28AM  12  were --

10:28AM  13  A.  Yes.

10:28AM  14  Q.  -- not convicted?

10:28AM  15      Did Mr. Albert get invited by Mr. Gerace back to

10:28AM  16  Pharaoh's?

10:28AM  17  A.  Yes.

10:28AM  18  Q.  And did you also invite him to come to Pharaoh's to sort

10:28AM  19  of celebrate?

10:28AM  20  A.  Yeah.

10:28AM  21  Q.  After that, did Mr. Albert in fact go to Pharaoh's?

10:29AM  22  A.  Yes.

10:29AM  23  Q.  As you understand that evening, did Mr. Gerace provide or

10:29AM  24  arrange to provide Mr. Albert with cocaine?

10:29AM  25  A.  Yes.

| | | |
|---|---|---|
| 10:29AM | 1 | Q.  And did they continue having a relationship for some time |
| 10:29AM | 2 | where Mr. Gerace would provide Mr. Albert -- |
| 10:29AM | 3 | A.  Yes. |
| 10:29AM | 4 | Q.  -- with cocaine? |
| 10:29AM | 5 | A.  Yes. |
| 10:29AM | 6 | Q.  And that night, based upon your observations and |
| 10:29AM | 7 | understanding, did Mr. Gerace also set Mr. Albert up with a |
| 10:29AM | 8 | dancer that ultimately engaged in sex acts with Mr. Albert? |
| 10:29AM | 9 | A.  Yes. |
| 10:29AM | 10 | Q.  Were there times when you would hear complaints from |
| 10:29AM | 11 | dancers about having to have sex with people at Peter's -- |
| 10:29AM | 12 | with Peter's friends? |
| 10:29AM | 13 | A.  Yes. |
| 10:29AM | 14 | **MR. MacKAY:**  Objection. |
| 10:29AM | 15 | **THE COURT:**  Basis? |
| 10:29AM | 16 | **MR. MacKAY:**  Judge, can we approach on this one? |
| 10:29AM | 17 | **THE COURT:**  Yeah, come on up. |
| 10:30AM | 18 | (Sidebar discussion held on the record.) |
| 10:30AM | 19 | **THE COURT:**  What's the basis of the objection? |
| 10:30AM | 20 | **MR. MacKAY:**  I think it's gonna be relevance if it's |
| 10:30AM | 21 | gonna deal with -- I think we're hitting that issue of whether |
| 10:30AM | 22 | it's consensual, or the difference between what |
| 10:30AM | 23 | prostitution -- |
| 10:30AM | 24 | **MR. TRIPI:**  That was my last question in that area. |
| 10:30AM | 25 | **MR. MacKAY:**  So earlier in the trial, the Court |

10:30AM 1    recognized the difference between nonconsensual sex --

10:30AM 2            THE COURT:  Yes.

10:30AM 3            MR. MacKAY:  -- versus prostitution activities quid

10:30AM 4    pro quo, and --

10:30AM 5            THE COURT:  Yes.

10:30AM 6            MR. MacKAY:  -- I'm not sure if it' -- how she's going

10:30AM 7    to answer is going to blur those two.

10:30AM 8            MR. TRIPI:  Complaining about having sex with Peter's

10:30AM 9    friends, that goes to the heart of the motive, and it goes to

10:30AM 10   how widely known --

10:30AM 11           THE COURT:  Yeah.

10:30AM 12           MR. TRIPI:  -- the activities were.

10:30AM 13           THE COURT:  I don't see -- yeah, I don't see that as

10:30AM 14   being objectionable, so the objection is overruled.

10:30AM 15           MR. TRIPI:  And I'm not going very far.

10:30AM 16           THE COURT:  Yeah, great.

10:30AM 17           (Sidebar discussion ended.)

10:30AM 18           THE COURT:  The objection is overruled.  Next

10:30AM 19   question.

10:31AM 20           MR. TRIPI:  Thanks, Your Honor.

10:31AM 21           BY MR. TRIPI:

10:31AM 22   Q.  As time went on, did some members of the Outlaws start

10:31AM 23   working and managing at Pharaoh's?

10:31AM 24   A.  Yes.

10:31AM 25   Q.  Was there a guy named Tommy O who sort of started as a

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

10:31AM 1  cleaner and then --

10:31AM 2  A.  Yes.

10:31AM 3  Q.  -- sort of by the end of your time there had become the

10:31AM 4  general manager?

10:31AM 5  A.  He was still cleaner when I left --

10:31AM 6  Q.  Oh, okay.

10:31AM 7  A.  -- so he was never a general manager when I was there.

10:31AM 8  Q.  So he was a member of the Outlaws, though?

10:31AM 9  A.  Yeah.

10:31AM 10  Q.  Was there another person who was a cook named PJ?

10:31AM 11  A.  Yes.

10:31AM 12  Q.  Did other members of the Outlaws hang out there at times?

10:31AM 13  A.  Every Wednesday.  It was like their church day.

10:31AM 14  Q.  Is that like a meeting day for bikers?

10:31AM 15  A.  Yeah, it's like a meeting for them, at least the Outlaws,

10:31AM 16  I don't know about all bikers.

10:31AM 17  Q.  And did other members of motorcycle clubs --

10:31AM 18  A.  Yes.

10:31AM 19  Q.  -- frequent there as well when the Outlaws were there?

10:32AM 20  A.  Rare Breed and Chosen Few.

10:32AM 21  Q.  Do you know Mr. Gerace's brother, Anthony?

10:32AM 22  A.  Yes.

10:32AM 23  Q.  At times, would he frequent the club or socialize at the

10:32AM 24  club?

10:32AM 25  A.  All the time.

10:32AM    1    Q.  Have you witnessed him sell marijuana before?

10:32AM    2    A.  No.

10:32AM    3    Q.  Has he sold you marijuana?

10:32AM    4    A.  No.

10:32AM    5    Q.  Now I'd like to ask you about Joseph Bongiovanni.

10:32AM    6    A.  Um-hum.

10:32AM    7    Q.  Do you know him?

10:32AM    8    A.  Yes.

10:32AM    9    Q.  Do you see him in court?

10:32AM   10    A.  Yep.

10:32AM   11    Q.  Can you point to him and describe an article of clothing

10:32AM   12    he's wearing?

10:32AM   13    A.  He's wearing a purple tie.

10:32AM   14         **MR. TRIPI:**  May the record reflect that the witness

10:32AM   15    identified the defendant.

10:32AM   16         **THE COURT:**  Yes.

10:32AM   17         **BY MR. TRIPI:**

10:32AM   18    Q.  Do you know the defendant's wife?

10:32AM   19    A.  Yes.

10:32AM   20    Q.  What's her name?

10:32AM   21    A.  Lindsay.

10:32AM   22    Q.  Do you know the defendant's wife's sister?

10:32AM   23    A.  Ashley.

10:32AM   24    Q.  Can you describe the relationship between the defendant

10:33AM   25    and Peter Gerace?

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

44

10:33AM  1    A.  With them?

10:33AM  2    Q.  The relationship between the defendant and Peter Gerace,

10:33AM  3    what was their relationship?

10:33AM  4    A.  Okay.  The defendant's known them for a long time.

10:33AM  5    They're long-term friends.

10:33AM  6    Q.  Now, while you were married with Mr. -- to Mr. Gerace,

10:33AM  7    did there come a point in time where you and Mr. Gerace were

10:33AM  8    invited and attended a birthday dinner for the defendant at

10:33AM  9    Boss restaurant on Hertel Avenue?

10:33AM  10   A.  Yes.

10:33AM  11   Q.  Was the defendant there?

10:33AM  12   A.  Yes.

10:33AM  13   Q.  Was Mr. Gerace there?

10:33AM  14   A.  Yes.

10:33AM  15   Q.  Did they socialize that night?

10:33AM  16   A.  Yes.

10:33AM  17   Q.  Based on your life experience -- were there a lot of

10:33AM  18   people, a decent amount of people at the birthday dinner?

10:34AM  19   A.  Yes.

10:34AM  20   Q.  If you had to estimate, how many people were there in the

10:34AM  21   group that was part of the birthday?

10:34AM  22   A.  Like, 40 members of high society.

10:34AM  23   Q.  And was there -- did you make any observations that led

10:34AM  24   you to conclude, based on your life experience, that there

10:34AM  25   was -- there were individuals in the group who were using

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

45

```
10:34AM    1   cocaine?

10:34AM    2   A.  Yes.

10:34AM    3   Q.  Describe for the jury what observations you made that led

10:34AM    4   you to conclude that.

10:34AM    5   A.  They were frequently going inside and outside of the

10:34AM    6   bathroom, like constant recycling, like five times, every

10:34AM    7   five minutes or whatever.

10:34AM    8   Q.  And then did you observe any physical characteristics on

10:34AM    9   any of the individuals that you recall?

10:34AM   10   A.  Their eyes started dilating, and they started speaking

10:34AM   11   really fast, they start sweating, and their face turns more

10:34AM   12   red.

10:34AM   13   Q.  Was Mr. Gerace engaging in that activity?

10:35AM   14   A.  He was going into the bathroom, so I did not witness.

10:35AM   15   Q.  Did you form the conclusion that Mr. Gerace --

10:35AM   16   A.  Yes.

10:35AM   17   Q.  -- was high on cocaine?

10:35AM   18   A.  Yes.

10:35AM   19   Q.  Was Mr. Gerace interacting with the defendant after he

10:35AM   20   would come in and out of the bathroom?

10:35AM   21   A.  Yes.

10:35AM   22   Q.  Did you make any observations of the defendant going in

10:35AM   23   and out of that bathroom with Mr. Gerace or others?

10:35AM   24   A.  No.

10:35AM   25   Q.  As you sit here today, do you remember any other members
```

| | | |
|---|---|---|
| 10:35AM | 1 | of the group who were displaying those physical |
| 10:35AM | 2 | characteristics either by name or description. |
| 10:35AM | 3 | A.  Not that great, no. |
| 10:35AM | 4 | Q.  Now, you indicated at points in time you worked in the |
| 10:36AM | 5 | office at Pharaoh's where there would be money? |
| 10:36AM | 6 | A.  Um-hum. |
| 10:36AM | 7 | Q.  Is that a yes? |
| 10:36AM | 8 | A.  Yeah. |
| 10:36AM | 9 | Q.  And one way Mr. Gerace would pay people, would that |
| 10:36AM | 10 | involve putting cash in envelopes? |
| 10:36AM | 11 | A.  Yes. |
| 10:36AM | 12 | Q.  Were there times when you paid dancers in that way? |
| 10:36AM | 13 | A.  Yes. |
| 10:36AM | 14 | Q.  Were there times when you paid vendors in -- |
| 10:36AM | 15 | A.  Yeah. |
| 10:36AM | 16 | Q.  -- with cash in envelopes? |
| 10:36AM | 17 | A.  Yes. |
| 10:36AM | 18 | Q.  Now, the defendant never had any official role working at |
| 10:36AM | 19 | Pharaoh's; is that correct?  Defendant Bongiovanni didn't |
| 10:36AM | 20 | work -- |
| 10:36AM | 21 | A.  Oh, Bongiovanni?  Yeah, no, never. |
| 10:36AM | 22 | Q.  Okay.  Were there times, at Mr. Gerace's direction, that |
| 10:36AM | 23 | he told you the defendant would be stopping by and to give |
| 10:36AM | 24 | the defendant an envelope of cash? |
| 10:36AM | 25 | A.  He did stop by, yeah.  Yep. |

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

47

10:36AM    1   Q.  Did you give this defendant envelopes of cash at

10:36AM    2   Mr. Gerace's direction?

10:36AM    3   A.  Yes.

10:36AM    4   Q.  Approximately how many times?

10:36AM    5   A.  I don't know if we included the birthday one, but two and

10:37AM    6   then the birthday card.

10:37AM    7   Q.  So let's start -- I'll go back to the birthday card in a

10:37AM    8   moment.  But the two occasions that you recall handing the

10:37AM    9   defendant envelopes of cash, how did you know they were

10:37AM   10   envelopes of cash?

10:37AM   11   A.  You could just feel it.

10:37AM   12   Q.  And from your life experience in paying other people in

10:37AM   13   cash envelopes, you knew it was cash?

10:37AM   14   A.  Um-hum.

10:37AM   15   Q.  Yes?

10:37AM   16   A.  Yes.

10:37AM   17   Q.  Did the envelopes seem thin, or did it seem thick?

10:37AM   18   A.  Thick.

10:37AM   19   Q.  Did you know how much cash was in the envelope?

10:37AM   20   A.  No.

10:37AM   21   Q.  And the area of Pharaoh's that the defendant entered,

10:37AM   22   where did you actually hand him the envelopes?

10:37AM   23   A.  Office.

10:37AM   24   Q.  First floor office?  Yes?

10:37AM   25   A.  Yep.

| | | |
|---|---|---|
| 10:37AM | 1 | Q.  Did the defendant enter a part of Pharaoh's where there |
| 10:38AM | 2 | was no cameras at that time? |
| 10:38AM | 3 | A.  Yes. |
| 10:38AM | 4 | Q.  Do you remember what approximate year it was where the |
| 10:38AM | 5 | defendant came and you gave him envelopes of cash at |
| 10:38AM | 6 | Pharaoh's? |
| 10:38AM | 7 | A.  2015. |
| 10:38AM | 8 | Q.  Is that the same year, I think earlier you said that was |
| 10:38AM | 9 | the same year that two dancers had overdosed in there? |
| 10:38AM | 10 | A.  Yes. |
| 10:38AM | 11 | Q.  Now, I'd like to go back to the birthday at Boss, okay? |
| 10:38AM | 12 | A.  Okay. |
| 10:38AM | 13 | Q.  You referenced a birthday card.  Did Mr. Gerace give |
| 10:38AM | 14 | Defendant Bongiovanni a birthday card that day? |
| 10:38AM | 15 | A.  Yes. |
| 10:38AM | 16 | Q.  When you were getting ready to go that evening to the |
| 10:39AM | 17 | birthday party, were you home getting ready with Mr. Gerace? |
| 10:39AM | 18 | A.  Yes. |
| 10:39AM | 19 | Q.  Did you see what he put in the birthday card? |
| 10:39AM | 20 | A.  He said he was giving him 5,000. |
| 10:39AM | 21 | **MR. MacKAY:**  Objection.  Withdrawn. |
| 10:39AM | 22 | **BY MR. TRIPI:** |
| 10:39AM | 23 | Q.  5,000? |
| 10:39AM | 24 | A.  Um-hum. |
| 10:39AM | 25 | Q.  Is that a yes? |

USA v Bongiovanni - Nigro - Tripi/Direct - 3/19/24

49

10:39AM   1   A.   Yes.

10:39AM   2   Q.   She just can't take down anything other than yeses and

10:39AM   3   nos, okay?

10:39AM   4   A.   I'm sorry.

10:39AM   5   Q.   And did you see him put cash in the card?

10:39AM   6   A.   I knew he was putting money in the card, I didn't

10:39AM   7   personally count it though.

10:39AM   8   Q.   Okay.  So you see him putting money in a card, and he

10:39AM   9   said -- Gerace said when he's doing that, I'm gonna give him

10:39AM  10   $5,000?

10:39AM  11   A.   Um-hum.

10:39AM  12   Q.   Yes?

10:39AM  13   A.   Yes.

10:39AM  14   Q.   Okay.

10:39AM  15   A.   For his 50th birthday.

10:39AM  16   Q.   That was the defendant's 50th birthday?

10:39AM  17   A.   Um-hum.

10:39AM  18   Q.   Yes?

10:39AM  19   A.   Yes.

10:39AM  20   Q.   Okay.  And when you were at the dinner, did you observe

10:39AM  21   Defendant Gerace hand that birthday card with what you

10:39AM  22   understood to be $5,000 cash in it to the defendant?

10:40AM  23   A.   I did.

10:40AM  24   Q.   Did that seem like an overly generous birthday gift to

10:40AM  25   you?

| | | |
|---|---|---|
| 10:40AM | 1 | A.  Over the top.  I never got a gift like that. |
| 10:40AM | 2 | **MR. TRIPI:**  One moment, please, Your Honor. |
| 10:40AM | 3 | No further direct, Your Honor. |
| 10:41AM | 4 | **MR. MacKAY:**  Judge, can we just approach about |
| 10:41AM | 5 | scheduling with cross? |
| 10:41AM | 6 | **THE COURT:**  Sure. |
| 10:41AM | 7 | (Sidebar discussion held on the record.) |
| 10:41AM | 8 | **MR. MacKAY:**  Judge, I'm wondering if the Court's open |
| 10:41AM | 9 | to take a break right now. |
| 10:41AM | 10 | **THE COURT:**  Say it again? |
| 10:41AM | 11 | **MR. MacKAY:**  I'm wondering if the Court is open to |
| 10:41AM | 12 | taking a morning break.  What happened is I prepared this |
| 10:41AM | 13 | witness to be an eight-hour cross -- or eight-hour direct and |
| 10:41AM | 14 | carved a lot out.  I think it will go a lot smoother if I can |
| 10:41AM | 15 | just kind of look over and -- |
| 10:41AM | 16 | **THE COURT:**  Oh, sure. |
| 10:41AM | 17 | **MR. MacKAY:**  -- excise some areas. |
| 10:41AM | 18 | **THE COURT:**  Do you have any problem with that? |
| 10:41AM | 19 | **MR. TRIPI:**  If he's trimming down the amount we're |
| 10:41AM | 20 | going to be here, I'd like to give him a reward if I could, |
| 10:41AM | 21 | maybe a fat birthday card. |
| 10:41AM | 22 | **THE COURT:**  So -- yeah, exactly -- so take 15 or 20 |
| 10:41AM | 23 | minutes. |
| 10:41AM | 24 | **MR. MacKAY:**  Yeah, thank you. |
| 10:41AM | 25 | **MR. TRIPI:**  Thanks. |

| | | |
|---|---|---|
| 10:41AM | 1 | (Sidebar discussion ended.) |
| 10:41AM | 2 | **THE COURT:**  Okay.  Folks, we're going to take our |
| 10:41AM | 3 | morning break now, and so remember my instructions about not |
| 10:41AM | 4 | talking about the case even with each other, and not making up |
| 10:41AM | 5 | your mind. |
| 10:41AM | 6 | We'll see you back here in about 15 or 20 minutes. |
| 10:42AM | 7 | Thanks. |
| 10:42AM | 8 | (Off the record at 10:42 a.m.) |
| 10:42AM | 9 | **THE COURT:**  Anything for the record before we break? |
| 10:42AM | 10 | **MR. TRIPI:**  No, Your Honor, thank you. |
| 10:42AM | 11 | **MR. MacKAY:**  No, Your Honor. |
| 10:42AM | 12 | **THE COURT:**  Great.  We'll see you in 15 or 20 |
| 10:42AM | 13 | minutes. |
| 10:42AM | 14 | **THE CLERK:**  All rise. |
| 10:52AM | 15 | (Off the record at 10:42 a.m.) |
| 11:13AM | 16 | (Back on the record at 11:13 a.m.). |
| 11:13AM | 17 | (Jury not present.) |
| 11:13AM | 18 | **THE CLERK:**  All rise. |
| 11:13AM | 19 | **THE COURT:**  Please be seated. |
| 11:13AM | 20 | **THE CLERK:**  We are back on the record for the |
| 11:13AM | 21 | continuation of the jury trial in case number 19-cr-227, |
| 11:13AM | 22 | United States of America versus Joseph Bongiovanni. |
| 11:14AM | 23 | All counsel and parties are present. |
| 11:14AM | 24 | **THE COURT:**  Are we ready to go? |
| 11:14AM | 25 | **MR. MacKAY:**  I'm ready to go on cross.  Judge, I |

11:14AM  1   think Mr. Singer just has some logistical issues about our

11:14AM  2   witness and may have a particular request.

11:14AM  3            **MR. SINGER:**  Yeah, so I just want to give you a

11:14AM  4   heads-up, Judge.  So Mr. Devereaux is sitting behind me right

11:14AM  5   now.  He's the financial expert that we retained.  He's going

11:14AM  6   to be sitting at counsel table, I talked to Mr. Tripi, the

11:14AM  7   government doesn't have an objection with him doing that for

11:14AM  8   the next witness.  But I set him up on his computer so we're

11:14AM  9   ready to go for the next witness.  And I'll excuse him from

11:14AM  10  the courtroom now, and when we bring in Ms. Bifano, we'll

11:14AM  11  bring him back.

11:14AM  12           **THE COURT:**  Great.  Any problem with that?

11:14AM  13           **MR. TRIPI:**  Not at all.

11:14AM  14           **THE COURT:**  Okay.  Anything the government wants to

11:14AM  15  put on the record?

11:14AM  16           **MR. TRIPI:**  No, Your Honor.

11:14AM  17           **THE COURT:**  Okay.  So let's bring the jury in.

11:15AM  18           (Jury seated at 11:15 a.m.)

11:15AM  19           **THE COURT:**  Welcome back, everyone.  I apologize that

11:16AM  20  the delay was a little longer than we expected, but we did a

11:16AM  21  couple of things that I hope is gonna save time.  So that's

11:16AM  22  why it was a little bit longer.

11:16AM  23           The record will reflect that all of our jurors are

11:16AM  24  present.

11:16AM  25           I remind the witness that she's still under oath.

| | | |
|---|---|---|
| 11:16AM | 1 | And, Mr. MacKay, you may begin. |
| 11:16AM | 2 | **MR. MacKAY:**  Thank you, Your Honor. |
| 11:16AM | 3 | |
| 11:16AM | 4 | **CROSS-EXAMINATION BY MR. MacKAY:** |
| 11:16AM | 5 | Q.  All right.  Ms. Nigro, I've got a mask on here.  I'm still |
| 11:16AM | 6 | getting over something, so I'm going to try to keep my voice |
| 11:16AM | 7 | up.  Okay? |
| 11:16AM | 8 | A.  Okay. |
| 11:16AM | 9 | Q.  All right.  I want to start with your education.  As I |
| 11:16AM | 10 | understand it, you never fully graduated from any college, |
| 11:16AM | 11 | correct? |
| 11:16AM | 12 | A.  I finished actually at Cornell with a certificate |
| 11:16AM | 13 | program. |
| 11:16AM | 14 | Q.  Okay.  But you don't have, like, a bachelor's |
| 11:16AM | 15 | undergraduate degree -- |
| 11:17AM | 16 | A.  No. |
| 11:17AM | 17 | Q.  -- correct?  Okay.  You do have a podcast that you run |
| 11:17AM | 18 | from time to time, correct? |
| 11:17AM | 19 | A.  Yes. |
| 11:17AM | 20 | Q.  Okay.  Do you recall telling people on your podcast back |
| 11:17AM | 21 | in April 2017 that you had a master's degree? |
| 11:17AM | 22 | A.  I was working on it actually.  I'm not completed.  I |
| 11:17AM | 23 | actually re-signed up for UB. |
| 11:17AM | 24 | Q.  Okay.  But at that time, even though you told people you |
| 11:17AM | 25 | had a masters, you didn't have it at that time, correct? |

USA v Bongiovanni - Nigro - MacKay/Cross - 3/19/24

54

11:17AM  1   A.  Yeah.

11:17AM  2   Q.  Okay.  Now, you talked about a marriage to Peter Gerace.

11:17AM  3   When did that occur?

11:17AM  4   A.  How did it occur?

11:17AM  5   Q.  When did it occur?

11:17AM  6   A.  Oh, September 18th.

11:17AM  7   Q.  I'm sorry?

11:17AM  8   A.  September 18th.

11:17AM  9   Q.  What year?

11:17AM  10  A.  2014.

11:17AM  11  Q.  And that preceded a prior marriage, correct?

11:17AM  12  A.  Yes.

11:17AM  13  Q.  Who was that to?

11:17AM  14  A.  Wasyl Fedorchuk.

11:17AM  15  Q.  When did you marry him?

11:17AM  16  A.  Married in 2006.

11:17AM  17  Q.  Okay.  And what year did you finally get divorced from

11:17AM  18  Mr. Fedorchuk?

11:17AM  19      What year did you finally get divorced from

11:17AM  20  Mr. Fedorchuk?

11:17AM  21  A.  I honestly don't know offhand.

11:17AM  22  Q.  Okay.  And was it around -- was it close in time to the

11:17AM  23  time you married Peter Gerace?

11:17AM  24  A.  Yes.

11:17AM  25  Q.  Okay.  Now, so you were married to Mr. Fedorchuk all the

USA v Bongiovanni - Nigro - MacKay/Cross - 3/19/24

55

11:18AM   1   way from 2006 right up to about the time you married Peter

11:18AM   2   Gerace?

11:18AM   3   A.   Give or take two years, yes.

11:18AM   4   Q.   Okay.  And in the meantime in 2008 or 2009, you also

11:18AM   5   married a gentleman named Allan Villar; do you recall that?

11:18AM   6   A.   Yes.

11:18AM   7   Q.   Even though you were still married to Mr. Fedorchuk,

11:18AM   8   correct?

11:18AM   9   A.   It was a falsified marriage.  It's kind of a mess.

11:18AM   10  There's a lot more involved with it.

11:18AM   11  Q.   Okay.  And that falsified marriage dealt with you

11:18AM   12  potentially being able to get a piece of the ownership in the

11:18AM   13  Mademoiselle strip club, correct?

11:18AM   14  A.   I was working towards The Sundowner with Allan.

11:18AM   15  Q.   Okay.  So my question was, though, you were married Allan

11:18AM   16  because you were promised a piece of the Mademoiselle night

11:18AM   17  club, correct?

11:18AM   18  A.   Along with Bill, yeah.

11:18AM   19  Q.   Okay.

11:18AM   20  A.   Bill Wasyl Fedorchuk.

11:18AM   21  Q.   And you understood at that time when you marred Allan

11:18AM   22  that it's legal to be married to two people, yes?

11:18AM   23  A.   Yes.

11:19AM   24  Q.   Okay.  Now, you said you're familiar with Joseph

11:19AM   25  Bongiovanni, correct?

11:19AM  1   A.  Yes.

11:19AM  2   Q.  And you know him because you've seen him in the news,

11:19AM  3   correct?

11:19AM  4   A.  Yes.

11:19AM  5   Q.  Okay.  And you've seen the news articles that have come

11:19AM  6   out since he was arrested, correct?

11:19AM  7   A.  Yes.

11:19AM  8   Q.  And you told the jury about -- you said it was a 50th

11:19AM  9   birthday party at Boss restaurant; do you remember that?

11:19AM  10  A.  Yes.

11:19AM  11  Q.  Okay.  And it's your testimony that it was a 50th

11:19AM  12  birthday party, correct?

11:19AM  13  A.  Yes.

11:19AM  14  Q.  Okay.  So you, and I assume it was Peter, went to Boss

11:19AM  15  and saw Mr. Bongiovanni there?

11:19AM  16  A.  Yeah.

11:19AM  17  Q.  Okay.  And you understood it to be Mr. Bongiovanni's 50th

11:19AM  18  birthday party?

11:19AM  19  A.  Yes.

11:19AM  20  Q.  Okay.  And that's the incident where you said that

11:19AM  21  Mr. Gerace may have exchanged an envelope with

11:19AM  22  Mr. Bongiovanni?

11:19AM  23  A.  Yes.

11:19AM  24  Q.  Okay.  And it's your testimony that you saw that envelope

11:20AM  25  prepared before you went to Boss?

11:20AM  1   A.  Yes.

11:20AM  2   Q.  Okay.  And you don't know how much money was put in there

11:20AM  3   based on what you saw, correct?

11:20AM  4   A.  Yes.

11:20AM  5   Q.  You've had occasion to handle cash before, correct?

11:20AM  6   A.  Yes.

11:20AM  7   Q.  Okay.  Can you estimate for the jury approximately how

11:20AM  8   thick $5,000 is if it's in hundreds?  How thick is a stack?

11:20AM  9   A.  About this much, because you'd usually rubber band them

11:20AM  10  or have a paper clip, so it makes it thicker.

11:20AM  11  Q.  Okay.  And that's your estimation if it's in hundreds,

11:20AM  12  correct?

11:20AM  13  A.  Yes.

11:20AM  14      MR. TRIPI:  Your Honor, I just want the record to

11:20AM  15  reflect the witness held her pointer finger and thumb maybe

11:20AM  16  about an inch apart.

11:20AM  17      THE COURT:  I think about an inch is about an

11:20AM  18  accurate description, yes.

11:20AM  19      BY MR. MacKAY:

11:20AM  20  Q.  Okay.  And you didn't see that much money put in the

11:20AM  21  envelope, correct?

11:20AM  22  A.  What?

11:20AM  23  Q.  When you saw this envelope being prepared, you didn't see

11:20AM  24  that much money being put in there, correct?

11:20AM  25  A.  No, I didn't.

USA v Bongiovanni - Nigro - MacKay/Cross - 3/19/24

58

11:21AM  1   Q.  Okay.  You didn't know if it was just a couple bills,

11:21AM  2   correct?

11:21AM  3   A.  No, he said he was giving him $5,000, but I don't know --

11:21AM  4   Q.  My question is what you saw Peter do.

11:21AM  5   A.  Yes.

11:21AM  6   Q.  Could have been a couple bills?

11:21AM  7   A.  It could have been.

11:21AM  8   Q.  Okay.  And as far as you understood, this was -- it's a

11:21AM  9   birthday present, correct?

11:21AM  10  A.  Yes.

11:21AM  11  Q.  Okay.  And you saw the birthday card?

11:21AM  12  A.  Yes.

11:21AM  13  Q.  So you know it was a birthday card.

11:21AM  14  A.  It was a birthday card.

11:21AM  15  Q.  Okay.  And you know that Mr. Bongiovanni and Mr. Gerace

11:21AM  16  have been friends since childhood, correct?

11:21AM  17  A.  Yes.

11:21AM  18  Q.  Now, you talked about some struggles with alcohol over

11:21AM  19  the years; do you recall telling us that on direct?

11:21AM  20  A.  Yes.

11:21AM  21  Q.  And we don't need to get too deep into this, but I think

11:21AM  22  if I understood you, you're sober now, correct?

11:21AM  23  A.  Yes.

11:21AM  24  Q.  But prior to that, is it fair to say your troubles with

11:21AM  25  alcohol were pretty substantial?

USA v Bongiovanni - Nigro - MacKay/Cross - 3/19/24

59

| | | |
|---|---|---|
| 11:21AM | 1 | A.  It became substantial because everything was out of |
| 11:22AM | 2 | control. |
| 11:22AM | 3 | Q.  Let me -- I'm just trying to put a severity on it.  Let's |
| 11:22AM | 4 | talk about in 2015.  The middle of the 20-teens.  Pretty bad |
| 11:22AM | 5 | at that time, yes? |
| 11:22AM | 6 | A.  In 2015 I was sober.  I was actually in rehab. |
| 11:22AM | 7 | Q.  Okay. |
| 11:22AM | 8 | A.  And I was doing very well at BryLin. |
| 11:22AM | 9 | Q.  Okay.  So when did it go downhill?  When, not what |
| 11:22AM | 10 | prompted it. |
| 11:22AM | 11 | A.  It started around 2016. |
| 11:22AM | 12 | Q.  Okay.  Now, throughout that time you're using marijuana, |
| 11:22AM | 13 | correct? |
| 11:22AM | 14 | A.  Yes. |
| 11:22AM | 15 | Q.  On a daily basis, correct? |
| 11:22AM | 16 | A.  Not always. |
| 11:22AM | 17 | Q.  Okay.  Are you using any other substances at that time? |
| 11:22AM | 18 | A.  No. |
| 11:22AM | 19 | Q.  All right.  Now, you estimated -- strike that. |
| 11:22AM | 20 | You said on two occasions, you gave Mr. Bongiovanni |
| 11:22AM | 21 | envelopes, correct? |
| 11:22AM | 22 | A.  Yes. |
| 11:22AM | 23 | Q.  Now, you don't know what was in the envelopes because you |
| 11:22AM | 24 | didn't see what went in there, correct? |
| 11:22AM | 25 | A.  Yes. |

USA v Bongiovanni - Nigro - MacKay/Cross - 3/19/24

60

11:23AM   1    Q.  You didn't -- you didn't prepare whatever went in the

11:23AM   2    envelope, correct?

11:23AM   3    A.  Yes.

11:23AM   4    Q.  You -- the envelopes were sealed, correct?

11:23AM   5    A.  Yes.

11:23AM   6    Q.  There was no writing on them for what they were, correct?

11:23AM   7    A.  Yes.

11:23AM   8    Q.  And these were handed to you by Peter?

11:23AM   9    A.  Yeah, he told me to just grab it and hand it to him.

11:23AM  10    Q.  Okay.

11:23AM  11    A.  At times he wasn't there.  At times that Peter wasn't in

11:23AM  12    the building.

11:23AM  13    Q.  Okay.  So these two times he handed you these envelopes,

11:23AM  14    correct?

11:23AM  15    A.  What?

11:23AM  16    Q.  These two times, Peter handed you these envelopes?

11:23AM  17    A.  Yes.

11:23AM  18    Q.  Okay.  And you said you exchanged these envelopes with

11:23AM  19    Mr. Bongiovanni in the downstairs office, correct?

11:23AM  20    A.  Yes.

11:23AM  21    Q.  Okay.  And you've told us, though, that there's no

11:23AM  22    cameras at Pharaoh's, correct?

11:23AM  23    A.  At the time, there's no cameras in the whole building.

11:23AM  24    Q.  In the whole building?

11:23AM  25    A.  The whole building.

| | | |
|---|---|---|
| 11:23AM | 1 | Q.  What do you mean by that? |
| 11:24AM | 2 | A.  He removed the cameras. |
| 11:24AM | 3 | Q.  Okay.  So at that point in time, there's no cameras |
| 11:24AM | 4 | whatsoever at Pharaoh's?, that's what I'm asking. |
| 11:24AM | 5 | A.  None.  In the whole building. |
| 11:24AM | 6 | Q.  Okay.  Now, is -- you also testified Peter had a lot of |
| 11:24AM | 7 | different -- well, strike that. |
| 11:24AM | 8 | Dancers got paid with envelopes, correct? |
| 11:24AM | 9 | A.  Yes. |
| 11:24AM | 10 | Q.  Vendors got paid with envelopes, correct? |
| 11:24AM | 11 | A.  Yes. |
| 11:24AM | 12 | Q.  Did Peter have personal debts that he had to settle that |
| 11:24AM | 13 | you know of that he paid with envelopes? |
| 11:24AM | 14 | A.  Some gambling debts. |
| 11:24AM | 15 | Q.  Okay.  So Peter paid -- so to your knowledge, Peter paid |
| 11:24AM | 16 | gambling debts in envelopes? |
| 11:24AM | 17 | A.  Yeah. |
| 11:24AM | 18 | Q.  Okay.  And were there, like, for example, food |
| 11:24AM | 19 | distributors, were they paid with envelopes? |
| 11:24AM | 20 | A.  Most of the time they were checks. |
| 11:24AM | 21 | Q.  Okay.  How about liquor distributors, those were |
| 11:24AM | 22 | envelopes? |
| 11:24AM | 23 | A.  Yeah, with a check in it. |
| 11:25AM | 24 | Q.  Okay.  And how about the linen services? |
| 11:25AM | 25 | A.  I actually have no idea. |

USA v Bongiovanni - Nigro - MacKay/Cross - 3/19/24

62

11:25AM   1    Q.   Okay.  I mean, well, you were the office manager, you

11:25AM   2    testified at some point in time, correct?

11:25AM   3    A.   Um-hum.

11:25AM   4    Q.   I mean, approximately, if you had to estimate, how many

11:25AM   5    different vendors would Pharaoh's need at any one point in

11:25AM   6    time?

11:25AM   7    A.   I primarily dealt with all the dancers and all the dance

11:25AM   8    count sheets and what they did every day as office manager.

11:25AM   9    Q.   Okay.  But did --

11:25AM   10   A.   Peter did more of the financial stuff.

11:25AM   11   Q.   Okay.  But I'm just asking if you know, how many vendors

11:25AM   12   Pharaoh's had to deal with at any one point in time, counting

11:25AM   13   up things like the liquor distributor, the food distributor,

11:25AM   14   the linen --

11:25AM   15   A.   Maybe ten.

11:25AM   16   Q.   -- cleaners.  Okay.

11:25AM   17        And you think many of those were paid in envelopes?  A

11:25AM   18   majority were paid in envelopes?

11:25AM   19   A.   Well, some of the checks and things, insurance stuff

11:25AM   20   were.

11:25AM   21   Q.   Okay.

11:25AM   22   A.   And if some payment for repairs, like if electrical

11:25AM   23   happened, were paid in envelopes.

11:25AM   24   Q.   Okay.  So did you recall there being, like, repairs that

11:25AM   25   had to be done with the electrical in the parking lot?

11:26AM   1   A.   Um-hum.

11:26AM   2   Q.   Okay.  And the vendor came, and he accepted that in an

11:26AM   3   envelope?

11:26AM   4   A.   Yeah.

11:26AM   5   Q.   Did -- you've got to speak out loud.

11:26AM   6   A.   Yes.  I'm sorry, yes.

11:26AM   7   Q.   Okay.  And were you tasked on that occasion with giving

11:26AM   8   the envelope to the electric person?

11:26AM   9   A.   I'm sorry, what?

11:26AM   10   Q.   When this electrical repair occurred, were you tasked

11:26AM   11   with giving the envelope to the repair person?

11:26AM   12   A.   Yes, I gave it to JRK Electric.

11:26AM   13   Q.   And -- all right.  Can you think of any other vendors you

11:26AM   14   had to pay in similar manners?

11:26AM   15   A.   The person -- like, septic, who had to clean out the

11:26AM   16   toilets and stuff.

11:26AM   17   Q.   Okay.  Same way.  You paid the septic --

11:26AM   18   A.   Yeah, because it was on the spot, like not a regular

11:26AM   19   thing, but they were for an emergency problem we had with the

11:26AM   20   plumbing.

11:26AM   21   Q.   Okay.  But my question is, the same way, you had to give

11:26AM   22   him an envelope?

11:27AM   23   A.   Yep.

11:27AM   24   Q.   Okay.  The same way Peter handed you the envelope, and

11:27AM   25   you handed that to the vendor?

USA v Bongiovanni - Nigro - MacKay/Cross - 3/19/24

64

11:27AM  1   A.   Um-hum.

11:27AM  2   Q.   Okay.  And this would be occurring how often over your

11:27AM  3   time at Pharaoh's that you would have to pay vendors?

11:27AM  4   A.   Almost every day.

11:27AM  5   Q.   Okay.  So almost every day.  But you told us here that --

11:27AM  6   so, let's back up.  Let me strike that.

11:27AM  7        So you were there almost every day from when to when?

11:27AM  8   A.   From when I woke up, give or take eight.  And I wasn't

11:27AM  9   allowed in the --

11:27AM  10  Q.   That was a bad question.  Let me reword it.  I'm looking

11:27AM  11  for the years.

11:27AM  12  A.   Oh.

11:27AM  13  Q.   What -- when did you start being there almost every day?

11:27AM  14  A.   I started at Pharaoh's in 2009, and then I stopped in

11:27AM  15  2016.

11:27AM  16  Q.   Okay.  But my question is, there comes a point in time

11:27AM  17  when you're there almost every day?

11:27AM  18  A.   Um-hum.

11:27AM  19  Q.   What year is that?

11:27AM  20  A.   2009, probably.  I had a business inside, and I liked to

11:27AM  21  stop in and see what happened and operate it properly.

11:28AM  22  Q.   Okay.  So it's your testimony from 2009 up until -- till

11:28AM  23  when you're there every day?

11:28AM  24  A.   Till 2016.

11:28AM  25  Q.   And after 2016, you're no longer at Pharaoh's, correct?

USA v Bongiovanni - Nigro - MacKay/Cross - 3/19/24

65

11:28AM  1   A.  Not at all.

11:28AM  2   Q.  Okay.  You left that scene, you're out of it completely,

11:28AM  3   correct?

11:28AM  4   A.  Um-hum.

11:28AM  5   Q.  So, now, you've told us, though, for at least part of the

11:28AM  6   time you're not there every day because you can't be in the

11:28AM  7   building, correct?

11:28AM  8   A.  Yeah.  In 2016.  We had a hostile divorce ending.

11:28AM  9   Q.  So, talking about prior to that.  Is there a point with

11:28AM  10  an ownership dispute where you were not present every day?

11:28AM  11  A.  Yes.

11:28AM  12  Q.  Okay.  When was that?

11:28AM  13  A.  Let's say 2012 to 2013.

11:28AM  14  Q.  Okay.  And then from 2013 on to 2016, it's your testimony

11:29AM  15  you're there basically every day?

11:29AM  16  A.  Yep.

11:29AM  17  Q.  And it's your testimony that basically every single day,

11:29AM  18  you're paying vendors with envelopes, correct?

11:29AM  19  A.  Yes.

11:29AM  20  Q.  Okay.  Those include dancers, correct?

11:29AM  21  A.  Yes.

11:29AM  22  Q.  And those include outside vendors who are coming to the

11:29AM  23  club to pick something up, correct?

11:29AM  24  A.  Yes.

11:29AM  25  Q.  But -- and it's your testimony that of all those days,

11:29AM  1   you remember two occasions where you gave an envelope to

11:29AM  2   Mr. Bongiovanni?

11:29AM  3   A.   Yep.

11:29AM  4   Q.   Okay.  Are you sure you remember if it was

11:29AM  5   Mr. Bongiovanni, or are you putting that together after the

11:29AM  6   fact from what you saw in the news?

11:29AM  7   A.   No, I remember him coming in.

11:29AM  8        And I hung out with them before, so it's not coming off

11:29AM  9   the news, this is coming from prior.

11:29AM  10  Q.   Okay.  So did this occur then after the Boss dinner?

11:29AM  11  A.   One was before, and one was after.

11:29AM  12  Q.   Okay.

11:29AM  13  A.   'Cuz after the Boss dinner, we went to somewhere on the

11:29AM  14  harbor.

11:29AM  15  Q.   So, what I'm asking is, you remember the Boss dinner is

11:29AM  16  somewhere you were present with Mr. Bongiovanni, correct?

11:30AM  17  A.   Yes.

11:30AM  18  Q.   Okay.  This first exchange of envelopes, when did it

11:30AM  19  occur in proximity to this meeting when you were at Boss?

11:30AM  20  How long before you went to Boss?

11:30AM  21  A.   Maybe three months before.

11:30AM  22  Q.   Maybe three months before?  And why do you say three

11:30AM  23  months before?

11:30AM  24  A.   'Cuz that's around when I started getting my hair done at

11:30AM  25  the salon that his sister -- that Lindsay's sister worked at.

11:30AM    1   Q.  Okay.  Which salon is that?

11:30AM    2   A.  It was Good to Glow at the time.

11:30AM    3   Q.  Okay.  Where is that located?

11:30AM    4   A.  It was on Hertel.

11:30AM    5   Q.  Okay.  And who did your hair there?

11:30AM    6   A.  Samantha Ferratolo, who was dating Anthony Gerace.

11:30AM    7   Q.  Okay.  And you're 100 percent sure it's Good to Glow,

11:30AM    8   correct?

11:30AM    9   A.  What?

11:30AM   10   Q.  You're 100 percent sure the salon's name is Good to Glow?

11:30AM   11   A.  Yes.  They switched to another one at some point, and I

11:30AM   12   followed them.  But at the time, like, Ashley was doing

11:31AM   13   eyebrows upstairs, and all the rest were downstairs.

11:31AM   14   Q.  Okay.  So it's your testimony Good to Glow is located on

11:31AM   15   Hertel Avenue?

11:31AM   16   A.  Yes.

11:31AM   17   Q.  All right.  So let's talk --

11:31AM   18         **MR. TRIPI:**  I'm objecting to the word "is."  He said

11:31AM   19   is.  We're in 2024, so I'd just like the time period --

11:31AM   20         **BY MR. MacKAY:**

11:31AM   21   Q.  When was the last time you were at Good to Glow?

11:31AM   22   A.  2018, when Bongiovanni got arrested.

11:31AM   23   Q.  Okay.

11:31AM   24   A.  I felt uncomfortable going there with the whole family

11:31AM   25   there.

USA v Bongiovanni - Nigro - MacKay/Cross - 3/19/24

11:31AM  1   Q.  And it's your testimony you believe Mr. Bongiovanni was

11:31AM  2   arrested in 2018?

11:31AM  3   A.  I think it was, yeah.

11:31AM  4   Q.  Okay.  And when you said the whole family was at Good to

11:31AM  5   Glow, what do you mean by that?

11:31AM  6   A.  Well, almost all his -- his sister-in-law, his wife,

11:31AM  7   his -- their close friends, they were a tight-knit group, all

11:31AM  8   worked there.

11:31AM  9       And then my ex mother-in-law, Linda Gerace, was also

11:32AM  10  going to the same salon, and I just didn't think it was a

11:32AM  11  good idea.

11:32AM  12  Q.  Okay.  Did you tell the jury at one point that -- I'm

11:32AM  13  sorry, did you tell the grand jury at one point in time that

11:32AM  14  you actually got your hair done by Mr. Bongiovanni's wife,

11:32AM  15  Lindsay?

11:32AM  16  A.  No.

11:32AM  17  Q.  Okay.  So you've never had your hair done?

11:32AM  18  A.  No, she was there all the time, but she would sit and

11:32AM  19  talk, but she never did my hair.  Maria or Samantha Ferratolo

11:32AM  20  did it.

11:32AM  21  Q.  All right.  Now let's talk about this incident where

11:32AM  22  there's an exchange of envelopes.  You said a second one

11:32AM  23  occurred after the Boss dinner, correct?

11:32AM  24  A.  Um-hum.

11:32AM  25  Q.  Okay.  How long after the Boss dinner was that?

11:32AM   1    A.   Maybe three months.

11:32AM   2    Q.   Okay.  And why do you say three months?

11:32AM   3    A.   About -- I mean, it's give and take.  It wasn't like a

11:32AM   4    week after, so usually the span to meet up with someone was

11:32AM   5    about three months, to maintain and keep up a relationship.

11:33AM   6    Q.   Okay.  So it's your testimony that Mr. Gerace and

11:33AM   7    Mr. Bongiovanni would meet up every three months?

11:33AM   8    A.   I know that that's when it occurred with meeting up with

11:33AM   9    his wife and doing something together as a couple.

11:33AM   10   Q.   Okay.  So I'm trying to understand what you're saying

11:33AM   11   here.  You're saying you met up with Mr. Bongiovanni's wife

11:33AM   12   every three months?

11:33AM   13   A.   About, yeah.

11:33AM   14   Q.   Okay.  About how many times over the span of, say, 2013

11:33AM   15   to 2016 did you meet up with Mr. Bongiovanni's wife?

11:33AM   16   A.   Well, she'd be at the salon, so I don't want to count

11:33AM   17   that.  But specifically three times.

11:33AM   18   Q.   Okay.

11:33AM   19   A.   I really liked her.  She was nice.

11:33AM   20   Q.   All right.  So, but going back to these envelopes, you

11:33AM   21   have -- as you sit here today, you have no idea what the

11:33AM   22   purpose of these envelopes were, correct?

11:33AM   23   A.   Yes.

11:33AM   24   Q.   Okay.  And you don't know whether it was, for example,

11:33AM   25   folded papers in the envelope, correct?

11:33AM 1  A.  I'm sorry, what?

11:33AM 2  Q.  You don't know what was in the envelope, correct?

11:33AM 3  A.  I knew it was, like, money, not papers.  But just from

11:34AM 4  feeling it.

11:34AM 5  Q.  Okay.  But you didn't look in the envelope, correct?

11:34AM 6  A.  No, I didn't open the envelope.

11:34AM 7          MR. MacKAY:  Judge, can I just have one moment,

11:34AM 8  please?

11:34AM 9          THE COURT:  Sure.

11:34AM 10          BY MR. MacKAY:

11:34AM 11  Q.  Tell me about these two exchanges of envelopes.  What was

11:34AM 12  Mr. Bongiovanni wearing when he came into the club?

11:34AM 13  A.  I'm not positive.  A suit?  Like, he always dressed very

11:34AM 14  nice.  Anywhere we went, he dressed very nice.

11:34AM 15  Q.  Okay.  And you testified that he came -- which way did he

11:35AM 16  come into the club?

11:35AM 17  A.  The side door.

11:35AM 18  Q.  Where is the side door located?

11:35AM 19  A.  Okay.  If you went by and looked at Pharaoh's, it's the

11:35AM 20  first thing you see when you look in.

11:35AM 21  Q.  Okay.  And how does somebody come in the side door?  Do

11:35AM 22  you have to let somebody in?

11:35AM 23  A.  No, Peter just let him walk in the door.

11:35AM 24  Q.  Okay.  So it's your testimony the side door is open at

11:35AM 25  any one point in time?

USA v Bongiovanni - Nigro - MacKay/Cross - 3/19/24

71

| | | |
|---|---|---|
| 11:35AM | 1 | A.  Yes, it's always open. |
| 11:35AM | 2 | Q.  Okay.  Let's circle back a little bit to a different |
| 11:35AM | 3 | subject.  You talked about some people going upstairs? |
| 11:35AM | 4 | A.  Um-hum. |
| 11:35AM | 5 | Q.  Do you recall that? |
| 11:35AM | 6 |     Now, as you sit here today, you don't know what happened |
| 11:35AM | 7 | upstairs, correct?  From what you saw with your own eyes.  Do |
| 11:35AM | 8 | you understand what I'm asking? |
| 11:35AM | 9 | A.  I know what happened to me upstairs. |
| 11:35AM | 10 | Q.  I'm not asking what happened to you.  I'm asking when you |
| 11:35AM | 11 | saw dancers, for example, go upstairs, you don't know what |
| 11:35AM | 12 | happened, correct? |
| 11:35AM | 13 | A.  I didn't see it, but the girls told me afterwards. |
| 11:36AM | 14 | Q.  I'm not asking what they told you.  I'm asking, you never |
| 11:36AM | 15 | saw any of the activity upstairs -- |
| 11:36AM | 16 | A.  No. |
| 11:36AM | 17 | Q.  -- correct?  Okay. |
| 11:36AM | 18 |     And I think you testified on one occasion that you had to |
| 11:36AM | 19 | unlock the door for John Michalski, correct? |
| 11:36AM | 20 | A.  Yes. |
| 11:36AM | 21 | Q.  Okay.  And after you unlocked the door for him, you don't |
| 11:36AM | 22 | know what happened up there because you didn't see it, |
| 11:36AM | 23 | correct? |
| 11:36AM | 24 | A.  No. |
| 11:36AM | 25 | Q.  Okay.  Now I want to talk about what you told law |

USA v Bongiovanni - Nigro - MacKay/Cross - 3/19/24

72

11:36AM   1   enforcement over the years.  The first time you brought

11:36AM   2   Mr. Bongiovanni's name up to law enforcement is

11:36AM   3   December 13th, 2019; do you remember that?

11:36AM   4   A.   Yes.

11:36AM   5   Q.   Okay.  That's when you called the FBI National Threat

11:36AM   6   Center, correct?

11:36AM   7   A.   Yes.

11:36AM   8   Q.   Okay.  Now, you had brought his name up before on

11:36AM   9   November 22nd when you mentioned it in a podcast, correct?

11:36AM   10   A.   I honestly don't remember.

11:36AM   11   Q.   Okay.  But prior to November -- I'm sorry, prior to

11:37AM   12   December 13th of 2019, you never stated on any podcast or

11:37AM   13   made any report about Mr. Bongiovanni receiving any

11:37AM   14   envelopes, correct?

11:37AM   15   A.   I didn't put stuff like that on my podcast at all.

11:37AM   16   Q.   Okay.  I'm asking you didn't make any reports to any law

11:37AM   17   enforcement prior to that date, correct, prior to

11:37AM   18   December 13th, 2019, correct?

11:37AM   19   A.   When I testified, I talked to them.  Yes, I did.

11:37AM   20   Q.   Okay.  That occurred after law enforcement got in touch

11:37AM   21   with you, correct?

11:37AM   22   A.   Yes.

11:37AM   23   Q.   Okay.  What I'm asking for is the first time you

11:37AM   24   mentioned Mr. Bongiovanni's name is this December 13th, 2019

11:37AM   25   phone call to the FBI, yes?

| | | |
|---|---|---|
| 11:37AM | 1 | A.  I don't remember prioritizing, it was all about Peter |
| 11:37AM | | Gerace. |
| 11:37AM | 3 | Q.  Okay. |
| 11:37AM | 4 | A.  So for me, like, Bongiovanni wasn't important at the |
| 11:37AM | | time.  I didn't know the level of involvement. |
| 11:38AM | 6 | Q.  Okay.  But it was important enough for you to bring it up |
| 11:38AM | | at that point in time, correct? |
| 11:38AM | 8 | A.  Along an other people, yes. |
| 11:38AM | 9 | Q.  Along with other people.  Now, in your podcast and other |
| 11:38AM | | capacities, you had discussed before that date other specific |
| 11:38AM | | names; do you recall that? |
| 11:38AM | 12 | A.  Yes. |
| 11:38AM | 13 | Q.  You mentioned names like Dan Derenda, correct? |
| 11:38AM | 14 | A.  Yes. |
| 11:38AM | 15 | Q.  You mentioned names like Greg Trotter, correct? |
| 11:38AM | 16 | A.  Absolutely. |
| 11:38AM | 17 | Q.  And by the way you're starting to answer, I'm guessing |
| 11:38AM | | you had a lot to say about them, correct? |
| 11:38AM | 19 | A.  I will. |
| 11:38AM | 20 | Q.  No, I'm saying -- |
| 11:38AM | 21 | A.  Yes. |
| 11:38AM | 22 | Q.  -- when you talked about it before, correct? |
| 11:38AM | 23 | A.  Yes. |
| 11:38AM | 24 | Q.  You considered these individuals to be corrupt, correct? |
| 11:38AM | 25 | **MR. TRIPI:**  Objection, beyond the scope of direct. |

| | | |
|---|---|---|
| 11:38AM | 1 | **THE COURT:**  Overruled.  The objection is overruled. |
| 11:38AM | 2 | **BY MR. MacKAY:** |
| 11:38AM | 3 | Q.  You considered, in your opinion, these individuals to be |
| 11:38AM | 4 | corrupt, correct? |
| 11:38AM | 5 | A.  Yes. |
| 11:38AM | 6 | Q.  But when you mentioned these other individuals, you did |
| 11:38AM | 7 | not mention Joseph Bongiovanni, correct? |
| 11:38AM | 8 | A.  No. |
| 11:38AM | 9 | Q.  Okay.  Now, I want to go back a little bit further.  I |
| 11:38AM | 10 | don't want to get into the details of it, but your divorce |
| 11:39AM | 11 | with Peter was quite acrimonious; is that fair to say? |
| 11:39AM | 12 | A.  Yes. |
| 11:39AM | 13 | Q.  It did not go well; fair to say? |
| 11:39AM | 14 | A.  Yes. |
| 11:39AM | 15 | Q.  There was a lot of fighting, yes? |
| 11:39AM | 16 | A.  Yes. |
| 11:39AM | 17 | Q.  Okay.  And at that point in time, you had it out for |
| 11:39AM | 18 | Peter; is that a fair way of saying it? |
| 11:39AM | 19 | A.  Yes. |
| 11:39AM | 20 | Q.  Okay.  But you didn't mention in any of the divorce |
| 11:39AM | 21 | proceedings or anything like that anything about Joseph |
| 11:39AM | 22 | Bongiovanni, correct? |
| 11:39AM | 23 | A.  No, he wasn't really involved in it. |
| 11:39AM | 24 | Q.  Okay.  But you did mention around the time of your -- the |
| 11:39AM | 25 | time you started to separate from Peter a lot of other things |

USA v Bongiovanni - Nigro - MacKay/Cross - 3/19/24

75

11:39AM    1    Peter had done wrong, correct?

11:39AM    2    A.   Yes.

11:39AM    3    Q.   Now, in August of 2016, for example, you reached out to

11:39AM    4    the State Liquor Authority; do you remember that?

11:39AM    5    A.   Yes.

11:39AM    6    Q.   And you tried to alert them about a lot of behavior that

11:39AM    7    you believed Mr. Gerace was involved in; do you remember

11:39AM    8    that?

11:39AM    9    A.   Yes.

11:39AM   10    Q.   Okay.  You wrote that you were contacted by email by an

11:40AM   11    investigator; do you remember that?

11:40AM   12    A.   Yes.

11:40AM   13    Q.   And you wrote back a very long email listing all of the

11:40AM   14    things you thought Mr. Gerace was doing wrong; do you

11:40AM   15    remember that?

11:40AM   16    A.   Yes.

11:40AM   17    Q.   Okay.  And in that, you didn't mention Mr. Bongiovanni,

11:40AM   18    did you?

11:40AM   19    A.   No.

11:40AM   20    Q.   Okay.  Now, fast forward a little bit in time, you end up

11:40AM   21    working with the FBI, correct?

11:40AM   22    A.   Um-hum.

11:40AM   23    Q.   You -- we don't need to go into the details, but you were

11:40AM   24    doing some work about illegal activity at other strip clubs

11:40AM   25    in the area; do you remember that?

USA v Bongiovanni - Nigro - MacKay/Cross - 3/19/24

76

| | | |
|---|---|---|
| 11:40AM | 1 | **MR. TRIPI:**  Objection as to time frame, Your Honor. |
| 11:40AM | 2 | **THE COURT:**  Yeah, why don't you -- let's put a |
| 11:40AM | 3 | time frame on it, please, Mr. MacKay. |
| 11:40AM | 4 | **BY MR. MacKAY:** |
| 11:40AM | 5 | Q.  So after your work with the State Liquor Authority, do |
| 11:40AM | 6 | you remember that's roughly summer of 2016? |
| 11:40AM | 7 | A.  Okay. |
| 11:40AM | 8 | Q.  Well I'm asking you, do you remember that's when it was? |
| 11:40AM | 9 | A.  Yes. |
| 11:40AM | 10 | Q.  Okay.  Do you remember doing some work in the next nine |
| 11:40AM | 11 | months or so with the FBI? |
| 11:40AM | 12 | A.  Yes, I've worked with them since 2008. |
| 11:41AM | 13 | Q.  Okay.  Now, in that time frame we're talking about, 2016, |
| 11:41AM | 14 | 2017, you had a specific handler at the FBI, correct? |
| 11:41AM | 15 | A.  Yes. |
| 11:41AM | 16 | Q.  You had somebody who you could very directly go to, |
| 11:41AM | 17 | correct? |
| 11:41AM | 18 | A.  Yes. |
| 11:41AM | 19 | Q.  Somebody could you tell everything confidentially to, |
| 11:41AM | 20 | correct? |
| 11:41AM | 21 | A.  Yes. |
| 11:41AM | 22 | Q.  And you're -- the purpose of that was that so you could |
| 11:41AM | 23 | provide information about illegal activities in the area, |
| 11:41AM | 24 | correct? |
| 11:41AM | 25 | A.  Yes. |

11:41AM   1   Q.  Some of those illegal activities concerned other strip

11:41AM   2   clubs in the area, correct?

11:41AM   3   A.  Yes.

11:41AM   4   Q.  Some of those you even told the agent about activities

11:41AM   5   that were going on at Pharaoh's itself, correct?

11:41AM   6   A.  Yes.

11:41AM   7   Q.  Now in any of those discussions with that FBI agent, you

11:41AM   8   did not mention anything about Mr. Bongiovanni, correct?

11:41AM   9   A.  Correct.

11:41AM   10  Q.  Okay.  And as you sit here today, is that because you

11:41AM   11  have no idea any envelopes you gave to Mr. Bongiovanni, what

11:41AM   12  their purpose was, correct?

11:41AM   13  A.  No.

11:41AM   14  Q.  Okay.  Now you, after you contact the FBI's threat

11:42AM   15  center, you sat down with an agent at a Tim Horton's; do you

11:42AM   16  remember that?

11:42AM   17  A.  Three agents.

11:42AM   18  Q.  Okay.  You sat down with a few agents.  And you tell them

11:42AM   19  a little bit about these envelopes to Mr. Bongiovanni,

11:42AM   20  correct?

11:42AM   21      I'm asking, do you recall telling the agent about any

11:42AM   22  envelopes that went to Mr. Bongiovanni at that point in time?

11:42AM   23          **MR. TRIPI:**  Objection, the witness looks like she's

11:42AM   24  thinking.  If she's thinking, she can take a moment.

11:42AM   25          **THE WITNESS:**  I've got to think about it, because

11:42AM   1   there was so many people with envelopes and so much going on.

11:42AM   2   I honestly don't remember.

11:42AM   3          **BY MR. MacKAY:**

11:42AM   4   Q.  Okay.  Now you just told us, though, there's so many

11:42AM   5   people with envelopes.  That's in reference to all the people

11:42AM   6   who had to pick up money at the club, correct?

11:42AM   7   A.  Well, and other ones that we dropped off to sheriffs and

11:43AM   8   troopers.

11:43AM   9   Q.  Okay.  So as you're sitting here today, you're saying

11:43AM  10   that there were envelopes often dropped off to sheriffs and

11:43AM  11   troopers?

11:43AM  12   A.  Yes.

11:43AM  13   Q.  Okay.  Did that occur at Pharaoh's Gentlemen's Club?

11:43AM  14   A.  Yes.

11:43AM  15   Q.  Okay.  Do you recall telling the grand jury that at one

11:43AM  16   point in time, you actually had to go to the Clarence trooper

11:43AM  17   barracks to drop off envelopes?

11:43AM  18   A.  Yes.

11:43AM  19   Q.  So you're telling the jury here that Mr. Gerace dropped

11:43AM  20   off envelopes at an actual police station?

11:43AM  21   A.  Yes.

11:43AM  22   Q.  Okay.  And in your experience -- you would expect police

11:43AM  23   stations to have cameras, correct?

11:43AM  24   A.  Yes, it is was in the parking lot though.

11:43AM  25   Q.  So you're saying he's giving envelopes to uniform --

11:43AM   1   strike that.

11:43AM   2       The people he gives these envelopes to are in their

11:43AM   3   police uniforms?

11:43AM   4   A.  He was in his uniform, and he was on the duty.

11:43AM   5   Q.  Okay.  Okay.  Now, but other than that when you're

11:43AM   6   talking about these envelopes, it's your testimony as you sit

11:43AM   7   here today though that it's two times that it happened at

11:44AM   8   Pharaoh's Gentlemen's Club, correct?

11:44AM   9   A.  Yes.

11:44AM   10  Q.  Okay.  And you're absolutely sure as you sit here today

11:44AM   11  that it's Mr. Bongiovanni you handed those envelopes to?

11:44AM   12  A.  Yes, for the two times.

11:44AM   13  Q.  For the two times.  And you're absolutely certain as you

11:44AM   14  sit here today that the party you went -- that the birthday

11:44AM   15  party card was Mr. Bongiovanni's 50th birthday party,

11:44AM   16  correct?

11:44AM   17  A.  Yes.

11:44AM   18  Q.  And you're absolutely certain that as you sit here that

11:44AM   19  50th birthday party you did not see Mr. Bongiovanni use any

11:44AM   20  substances, correct?

11:44AM   21  A.  Yes.

11:44AM   22       **MR. MacKAY:**  I have no further questions, Your Honor.

11:44AM   23       **THE COURT:**  Any redirect?

11:44AM   24       **MR. TRIPI:**  Yes, Judge.

11:44AM   25

11:44AM    1    **REDIRECT EXAMINATION BY MR. TRIPI:**

11:44AM    2    Q.  All right.  Ms. Nigro, when counsel was asking you a

11:44AM    3    moment ago about time frames where you handed Mr. Bongiovanni

11:45AM    4    envelopes, were you -- were you doing your best to estimate?

11:45AM    5    A.  Yeah.

11:45AM    6    Q.  Okay.  You didn't have a person like Ms. Sawyer typing

11:45AM    7    down every word that was said and date and time, right?  You

11:45AM    8    didn't have a little personal assistant typing everything

11:45AM    9    down, did you?

11:45AM    10    A.  No.

11:45AM    11    Q.  Okay.  Now, you were asked about what happened in the

11:45AM    12    upstairs.  Do you have two eyes?

11:45AM    13    A.  Yes.

11:45AM    14    Q.  Do you have two ears?

11:45AM    15    A.  Yes.

11:45AM    16    Q.  You've worked in the strip club industry a long time?

11:45AM    17    A.  Yes.

11:45AM    18    Q.  When Judge Michalski -- when Mr. Gerace asked you to

11:45AM    19    unlock the bottom door for Judge Michalski, was he with a

11:45AM    20    dancer?

11:45AM    21    A.  Yes.

11:45AM    22    Q.  Did he have a particular dancer that he liked?

11:45AM    23    A.  Shelby.

11:45AM    24    Q.  And -- and have you also gone upstairs after dancers and

11:46AM    25    friends of Peter have come downstairs?

11:46AM    1    A.  Yes.

11:46AM    2    Q.  Have you observed what the upstairs looked like after

11:46AM    3    that activity?

11:46AM    4    A.  Yes.

11:46AM    5    Q.  What did it look like?

11:46AM    6    A.  Cocaine residue.  Sheets all miss messed up.  Usually a

11:46AM    7    lot of tissue in the garbage can from blowing their nose and

11:46AM    8    stuff like that.  Lube open.

11:46AM    9    Q.  Did you make a -- did you -- were you able to infer and

11:46AM   10    deduce that sex acts had occurred upstairs?

11:46AM   11    A.  Yes.

11:46AM   12    Q.  Now, you were asked about reporting information at

11:46AM   13    various times; is that right?

11:46AM   14    A.  Yes.

11:46AM   15    Q.  I don't want to get into too much detail, but just to

11:46AM   16    follow up what Mr. MacKay said.  Initially were you trying to

11:47AM   17    report to the FBI about situations where you believe women

11:47AM   18    were being trafficked?

11:47AM   19    A.  Yes.

11:47AM   20    Q.  And were those different FBI agents than you're dealing

11:47AM   21    with in this case?

11:47AM   22    A.  Yes.

11:47AM   23    Q.  Okay.  And some of that information, after you reported

11:47AM   24    it, you don't know what happened; is that fair?

11:47AM   25    A.  Yes, sir.

11:47AM   1   Q.  Okay.  Now, in those contexts, were you intent upon

11:47AM   2   taking on every powerful person in the City of Buffalo?

11:47AM   3   A.  Absolutely not.

11:47AM   4   Q.  Were you a little scared about some of the information

11:47AM   5   you knew?

11:47AM   6   A.  Absolutely.

11:47AM   7   Q.  As you sit there right now, are you nervous what you're

11:47AM   8   doing?

11:47AM   9   A.  I am.

11:47AM   10  Q.  Do you feel brave though?

11:47AM   11  A.  I feel brave.

11:47AM   12  Q.  Did Dan Derenda use cocaine with Peter Gerace?

11:47AM   13  A.  I am not positive.

11:47AM   14  Q.  Were you at Dan Derenda's house in the basement for his

11:47AM   15  daughter's birthday party?

11:47AM   16  A.  Yes.  And Peter's the godfather.

11:47AM   17  Q.  And what's his daughter's name?

11:48AM   18  A.  Mia, and she was turning eight.

11:48AM   19  Q.  And you know when Peter got in trouble before in federal

11:48AM   20  court that Dan Derenda wrote him a letter to try to help get

11:48AM   21  him out of trouble?

11:48AM   22  A.  Yeah, especially for domestic abuse.  It's kind of gross

11:48AM   23  that he would have his daughter as --

11:48AM   24  Q.  Stop there.  I asked you about the letter.  You're aware

11:48AM   25  of that, right?

| | | |
|---|---|---|
| 11:48AM | 1 | A.  Yes. |
| 11:48AM | 2 | Q.  Derenda wrote a letter to a federal judge to help get |
| 11:48AM | 3 | Peter a lesser sentence? |
| 11:48AM | 4 | A.  Yes. |
| 11:48AM | 5 | Q.  Are you making that up? |
| 11:48AM | 6 | A.  Nope. |
| 11:48AM | 7 | Q.  The letter was publicly filed, wasn't it? |
| 11:48AM | 8 | A.  Yes. |
| 11:48AM | 9 | Q.  Okay.  Now, you were asked about not mentioning |
| 11:48AM | 10 | Bongiovanni's name during your divorce proceedings.  You |
| 11:48AM | 11 | weren't married to Bongiovanni, right? |
| 11:48AM | 12 | A.  No. |
| 11:48AM | 13 | Q.  You were married to Peter Gerace? |
| 11:48AM | 14 | A.  Yes. |
| 11:48AM | 15 | Q.  Were the divorce proceedings focused on that? |
| 11:48AM | 16 | A.  Yeah. |
| 11:48AM | 17 | Q.  Now, you were asked questions about the first time that |
| 11:49AM | 18 | you were in contact with law enforcement as it relates to |
| 11:49AM | 19 | this case; do you remember that? |
| 11:49AM | 20 | A.  Um-hum. |
| 11:49AM | 21 | Q.  Do you remember that on or about December 12th, 2019, |
| 11:49AM | 22 | there was a very publicized search warrant at Pharaoh's? |
| 11:49AM | 23 | A.  Yes. |
| 11:49AM | 24 | Q.  Within a day of that, did Mr. Gerace call you from some |
| 11:49AM | 25 | phone number that you don't know? |

| | | |
|---|---|---|
| 11:49AM | 1 | A.  Yep. |
| 11:49AM | 2 | Q.  And threaten you? |
| 11:49AM | 3 | A.  Yes. |
| 11:49AM | 4 | Q.  Is that why you started talking? |
| 11:49AM | 5 | A.  Yes. |
| 11:49AM | 6 | Q.  Now, you hadn't said anything about Mr. Gerace to the FBI |
| 11:49AM | 7 | Agent Burns or anyone else prior to December 12th, 2019; is |
| 11:49AM | 8 | that right? |
| 11:49AM | 9 | A.  Not those FBI agents. |
| 11:49AM | 10 | Q.  Okay.  Was Peter threatening you over that search warrant |
| 11:50AM | 11 | something that factored into -- |
| 11:50AM | 12 |         MR. MacKAY:  Objection. |
| 11:50AM | 13 |         MR. TRIPI:  Let me finish the question. |
| 11:50AM | 14 |         BY MR. TRIPI: |
| 11:50AM | 15 | Q.  -- something that factored into your decision to talk? |
| 11:50AM | 16 | A.  Yes. |
| 11:50AM | 17 |         MR. MacKAY:  I'm going to object as beyond the scope |
| 11:50AM | 18 | of recross -- |
| 11:50AM | 19 |         MR. TRIPI:  Oh, no it's not. |
| 11:50AM | 20 |         MR. MacKAY:  -- I believe at this point. |
| 11:50AM | 21 |         MR. TRIPI:  It's not beyond the scope. |
| 11:50AM | 22 |         THE COURT:  Why don't you guys come up. |
| 11:50AM | 23 |         (Sidebar discussion held on the record.) |
| 11:50AM | 24 |         THE COURT:  So what on cross gives you the ability to |
| 11:50AM | 25 | get into this?  And I'm not being facetious. |

| | | |
|---|---|---|
| 11:50AM | 1 | **MR. TRIPI:**  No, no, no.  On cross, Mr. MacKay asked |
| 11:50AM | 2 | questions about the first time she spoke to law enforcement, |
| 11:50AM | 3 | and he laid out a timeline of not talking about Defendant |
| 11:50AM | 4 | Bongiovanni, and in large part Peter Gerace. |
| 11:50AM | 5 | And so she's threatened, and then she starts talking. |
| 11:50AM | 6 | We had -- we never spoke to her before that. |
| 11:50AM | 7 | **THE COURT:**  How is it beyond the scope? |
| 11:50AM | 8 | **MR. MacKAY:**  It's also established that she's also |
| 11:51AM | 9 | talked about other folks already about that. |
| 11:51AM | 10 | **MR. TRIPI:**  No, not about that. |
| 11:51AM | 11 | **MR. MacKAY:**  About general public corruption. |
| 11:51AM | 12 | **MR. TRIPI:**  No, not about that. |
| 11:51AM | 13 | **THE COURT:**  You can get back to it on recross.  I'm |
| 11:51AM | 14 | going to overrule the objection. |
| 11:51AM | 15 | (End of sidebar discussion.) |
| 11:51AM | 16 | **THE COURT:**  The objection is overruled. |
| 11:51AM | 17 | **BY MR. TRIPI:** |
| 11:51AM | 18 | Q.  When Peter Gerace calls you and threatened you after the |
| 11:51AM | 19 | search warrant at Pharaoh's, what did he say to you during |
| 11:51AM | 20 | that call that made you decide to reach out to law |
| 11:51AM | 21 | enforcement? |
| 11:51AM | 22 | A.  He said he's gonna cut all my toes and fingers off. |
| 11:51AM | 23 | Q.  What was his demeanor during the call? |
| 11:51AM | 24 | A.  Very angry. |
| 11:51AM | 25 | Q.  Did you feel threatened? |

USA v Bongiovanni - Nigro - Tripi/Redirect - 3/19/24

86

11:51AM   1   A.   Yes, absolutely.  That's why I called.

11:51AM   2   Q.   But you didn't actually play any role in helping the FBI

11:51AM   3   get a search warrant, or his getting a search warrant?

11:51AM   4   A.   I didn't even know it was going on.

11:51AM   5   Q.   Now you were asked some questions about the first time

11:52AM   6   you brought up Mr. Bongiovanni's name, and was that in

11:52AM   7   response to questions that were asked after you reached out

11:52AM   8   to law enforcement?

11:52AM   9   A.   Yes.

11:52AM   10  Q.   Okay.  But back in 2017, you were in jail at the Erie

11:52AM   11  County Holding Center?

11:52AM   12  A.   Um-hum.

11:52AM   13  Q.   Do you remember that?

11:52AM   14  A.   Yes.

11:52AM   15  Q.   Particularly on January 4th, 2017, you were in jail at

11:52AM   16  the holding center, and do you remember having a phone call

11:52AM   17  with your mom?

11:52AM   18  A.   Yes.

11:52AM   19  Q.   And during that phone call, did you say back then, prior

11:52AM   20  to any of this, years prior, about Mr. Gerace, quote, I know

11:52AM   21  he knows all these shady officers, I used to enjoy all the

11:52AM   22  benefits of knowing all these corrupt police officers.

11:52AM   23       Did you say that two years before you ever reached out to

11:53AM   24  the FBI as it relates to these events?

11:53AM   25  A.   Yes.

11:53AM  1   Q.  Were you lying to your mom in 2017?

11:53AM  2   A.  No.

11:53AM  3   Q.  In a jail call the next day speaking with your mom, did

11:53AM  4   you say he, regarding Mr. Gerace, is the actual criminal.

11:53AM  5   He's the felon.  He's lying and paying police officers off,

11:53AM  6   and they took the money or whatever.

11:53AM  7       Did you say that to your mom in 2017 --

11:53AM  8   A.  Yes.

11:53AM  9   Q.  -- in a recorded jail call?

11:53AM  10  A.  Yes.

11:53AM  11  Q.  Were you lying to your mom?

11:53AM  12  A.  Absolutely not.

11:53AM  13  Q.  Are you lying to this jury?

11:53AM  14  A.  No.

11:53AM  15       MR. MacKAY:  Judge, I'm going to object.  Can we

11:53AM  16  approach again on this?

11:53AM  17       THE COURT:  Sure, come on up.

11:53AM  18       (Sidebar discussion held on the record.)

11:53AM  19       MR. TRIPI:  Those are the transcripts where she said

11:53AM  20  that.  I did it in a shortened version.

11:53AM  21       THE COURT:  No, I get it.  How is it not hearsay?

11:53AM  22       MR. TRIPI:  It's a prior consistent statement after a

11:54AM  23  motive to fabricated has been alleged and established through

11:54AM  24  their cross.  So those are prior consistent statements.

11:54AM  25       If the motive to fabricate --

11:54AM   1          I'm answering the judge's questions.

11:54AM   2          -- if the motive to fabricate, they've alleged, is

11:54AM   3   the first time she mentioned these events, they set it up for

11:54AM   4   a Tim Horton's, and she sits with agents, it's the first time

11:54AM   5   she's talking about corruption.  Two years earlier prior to

11:54AM   6   meeting with the FBI about any of this, she's telling her

11:54AM   7   mother that Peter bribes people.

11:54AM   8          **THE COURT:**  Well, there was no objection raised to it

11:54AM   9   anyways, so that's why I didn't say anything.  I thought -- is

11:54AM  10   that the hearsay?

11:54AM  11          **MR. MacKAY:**  We were circling around with

11:54AM  12   fabricating.

11:54AM  13          **MR. TRIPI:**  We did brief this.

11:54AM  14          **MR. SINGER:**  We believe that it exists in time, that

11:54AM  15   the divorce is triggering, because at that time things become

11:54AM  16   acrimonious which she testified on her cross --

11:54AM  17          **THE COURT:**  Yes.

11:54AM  18          **MR. SINGER:**  -- which dates back to 2016, which is

11:54AM  19   prior to those calls.

11:54AM  20          **THE COURT:**  Well, there was no objection raised.  So

11:54AM  21   I don't know what you want me to do about it.

11:54AM  22          I told you guys, I'm not going to raise objections

11:54AM  23   that I see unless you raise them because you may -- I can

11:55AM  24   remember cases that I tried and did administrative hearings

11:55AM  25   that I did where judges would think they were doing me a favor

11:55AM    1    and they were screwing up my strategy, and I won't do it.

11:55AM    2            MR. TRIPI:  And, Judge --

11:55AM    3            THE COURT:  We've got good lawyers here on both

11:55AM    4    sides, and I'm not going to raise objections for you.

11:55AM    5            MR. TRIPI:  I will say we did brief this, so this was

11:55AM    6    flagged on the pretrial.  You did a lot, I'm not saying you

11:55AM    7    should remember everything that we briefed, but it shouldn't

11:55AM    8    have been a surprise is what I'm saying, because I flagged

11:55AM    9    these exact jail calls for them.

11:55AM    10           THE COURT:  Okay.  I'm not going to strike it.  I'm

11:55AM    11   not going to strike it if that's what you're asking because

11:55AM    12   there was no objection raised, so let's move on.

11:55AM    13           MR. TRIPI:  Okay.

11:55AM    14           (End of sidebar discussion.)

11:55AM    15           MR. TRIPI:  I have no further redirect, Your Honor.

11:55AM    16   Thank you.

11:55AM    17           THE COURT:  Anything more, Mr. MacKay?

11:55AM    18           MR. MacKAY:  Yes, Your Honor.

11:56AM    19

11:56AM    20           **RECROSS-EXAMINATION BY MR. MacKAY:**

11:56AM    21   Q.  All right.  Ms. Nigro, I wanted to talk a little bit about

11:56AM    22   this podcast and what you said to people over the years.

11:56AM    23   Now --

11:56AM    24   A.  For one thing, I want to just correct it.  It's not

11:56AM    25   podcast, it's actually a radio show.

11:56AM    1    Q.   Okay.  Radio show.  Let's use that term.

11:56AM    2         In that capacity when you did that radio show, you did

11:56AM    3    have an interest in exposing public corruption, correct?

11:56AM    4    A.   Yet.

11:56AM    5    Q.   Because you did name very specific people, correct?

11:56AM    6    A.   Yes.

11:56AM    7    Q.   You named Greg Trotter, correct?

11:56AM    8    A.   Yes.

11:56AM    9    Q.   You named Dan Derenda, correct?

11:56AM   10    A.   Yes.

11:56AM   11    Q.   You named John Michalski, correct?

11:56AM   12    A.   Correct.

11:56AM   13    Q.   But at no point in time did you name Joe Bongiovanni,

11:56AM   14    correct?

11:56AM   15    A.   Correct.

11:56AM   16    Q.   The first time Joe Bongiovanni's name comes up is on

11:56AM   17    December 13th, 2019, correct?

11:56AM   18    A.   Um-hum.

11:56AM   19    Q.   And that's after he's already been arrested in the news,

11:56AM   20    correct?

11:56AM   21    A.   Correct.

11:56AM   22         **MR. MacKAY:**  Okay.  No further questions, Your Honor.

11:57AM   23         **MR. TRIPI:**  Just one, Judge.

11:57AM   24

          25

Case 1:19-cr-00227-LJV-MJR   Document 856   Filed 04/08/24   Page 91 of 92
USA v Bongiovanni - Nigro - Tripi/Re-Redirect - 3/19/24

91

11:57AM   1                **RE-REDIRECT EXAMINATION BY MR. TRIPI:**

11:57AM   2    Q.  Did you get your hair done at the family-owned salon that

11:57AM   3    Mr. Michalski and his family worked at, or Mr. Derenda?  Or

11:57AM   4    did you go to the hair salon where Mr. Bongiovanni's wife and

11:57AM   5    sister worked?

11:57AM   6    A.  Mr. Bongiovanni.

11:57AM   7            **MR. MacKAY:**  Objection.  Outside the scope.

11:57AM   8            **THE COURT:**  No.  That's overruled.  Okay.

11:57AM   9            **MR. TRIPI:**  That's it.

11:57AM  10            **THE COURT:**  Anything more?

11:57AM  11            **MR. TRIPI:**  No.

11:57AM  12            **THE COURT:**  Anything more, Mr. MacKay?

11:57AM  13            **MR. MacKAY:**  No.

11:57AM  14            **THE COURT:**  Thank you.  You may step down.

11:57AM  15            (Witness excused at 11:57 a.m.)

         16            (Excerpt concluded at 11:57 a.m.)

         17            *     *     *     *     *     *     *

         18                  **CERTIFICATE OF REPORTER**

         19            In accordance with 28, U.S.C., 753(b), I certify that

         20    these original notes are a true and correct record of

         21    proceedings in the United States District Court for the

         22    Western District of New York on March 19, 2024.

         23                         s/ Ann M. Sawyer
                                     _____
                                     Ann M. Sawyer, FCRR, RPR, CRR
         24                          Official Court Reporter
                                     U.S.D.C., W.D.N.Y.
         25

**TRANSCRIPT INDEX**

**EXAMINATION OF KATRINA NIGRO**

**MARCH 19, 2024**

**W I T N E S S**                                                        **P A G E**

**K A T R I N A   N I G R O**                                    2

  DIRECT EXAMINATION BY MR. TRIPI:                 2

  CROSS-EXAMINATION BY MR. MacKAY:                53

  REDIRECT EXAMINATION BY MR. TRIPI:              80

  RECROSS-EXAMINATION BY MR. MacKAY:              89

  RE-REDIRECT EXAMINATION BY MR. TRIPI:           91