02:47PM

1
                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK
2
_____
3  UNITED STATES OF AMERICA,
                                    Case No. 1:19-cr-227
4               Plaintiff,                    (LJV)
   v.
5                                   February 15, 2024
   JOSEPH BONGIOVANNI,
6
_____Defendant._____
7

8   **TRANSCRIPT EXCERPT - EXAMINATION OF S.U.S.P.O. PETER LEPIANE**
              **BEFORE THE HONORABLE LAWRENCE J. VILARDO**
9                   **UNITED STATES DISTRICT JUDGE**

10

<u>**APPEARANCES:**</u>            **TRINI E. ROSS, UNITED STATES ATTORNEY**
11                          **BY: JOSEPH M. TRIPI, ESQ.**
                                **NICHOLAS T. COOPER, ESQ.**
12                               **CASEY L. CHALBECK, ESQ.**
                            Assistant United States Attorneys
13                          Federal Centre
                            138 Delaware Avenue
14                          Buffalo, New York 14202
                               And
15                          **UNITED STATES DEPARTMENT OF JUSTICE**
                            **BY: JORDAN ALAN DICKSON, ESQ.**
16                          1301 New York Ave NW
                            Suite 1000
17                          Washington, DC 20530-0016
                            For the Plaintiff
18
                            **SINGER LEGAL PLLC**
19                          **BY: ROBERT CHARLES SINGER, ESQ.**
                            80 East Spring Street
20                          Williamsville, New York 14221
                               And
21                          **LAW OFFICES OF PARKER ROY MacKAY**
                            **BY: PARKER ROY MacKAY, ESQ.**
22                          3110 Delaware Avenue
                            Kenmore, New York  14217
23                          For the Defendant

24  <u>**PRESENT:**</u>             **BRIAN A. BURNS,** FBI Special Agent
                            **MARILYN K. HALLIDAY,** HSI Special Agent
25                          **KAREN A. CHAMPOUX,** USA Paralegal

Case 1:19-cr-00227-LJV-MJR  Document 909  Filed 05/04/24  Page 2 of 41
USA v Bongiovanni - Lepiane - Cooper/Direct - 2/15/24

2

| | | |
|---|---|---|
| 1 | **LAW CLERK:** | **REBECCA FABIAN IZZO, ESQ.** |
| 2 | **COURT DEPUTY CLERK:** | **COLLEEN M. DEMMA** |
| 3 | **COURT REPORTER:** | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 4 | | Robert H. Jackson Federal Courthouse |
| | | 2 Niagara Square |
| | | Buffalo, New York  14202 |
| 5 | | Ann_Sawyer@nywd.uscourts.gov |

6

7                    *    *    *    *    *    *    *

8

9              (Excerpt commenced at 2:47 p.m.)

10             (Jury is present.)

02:47PM   11             **THE COURT:**  Okay.  The government can call its first

02:47PM   12   witness.  And I want to make sure both sides have all

02:47PM   13   potential witnesses excluded from the courtroom now.

02:47PM   14             You can call your first witness.

02:48PM   15             **MR. COOPER:**  Thank you, Your Honor.  The government

02:48PM   16   calls Peter Lepiane.

02:49PM   17

02:49PM   18   **P E T E R   L E P I A N E**, having been duly called and sworn,

02:49PM   19   testified as follows:

02:49PM   20             **MR. COOPER:**  May I inquire, Judge?

02:49PM   21             **THE COURT:**  You may.

02:49PM   22

02:49PM   23                    **DIRECT EXAMINATION BY MR. COOPER:**

02:49PM   24   Q.  Good afternoon, sir.

02:49PM   25   A.  Good afternoon.

USA v Bongiovanni - Lepiane - Cooper/Direct - 2/15/24

3

02:49PM 1  Q.  Would you please introduce yourself to the jury, and let

02:49PM 2  them know what you do for work?

02:49PM 3  A.  Sure.  My name is Peter Lepiane, I'm a supervising United

02:49PM 4  States probation officer.

02:49PM 5  Q.  And where are you a supervising United States probation

02:49PM 6  officer?

02:49PM 7  A.  For the Western District of New York, I actually work in

02:49PM 8  this building, so --

02:49PM 9  Q.  Can you tell the jury a little bit about your education,

02:49PM 10 Mr. Lepiane?

02:49PM 11 A.  Yes.  I have a master's degree from Niagara University in

02:49PM 12 criminal justice administration, undergrad in political

02:50PM 13 science.

02:50PM 14 Q.  When you graduated, what sort of work did you get into

02:50PM 15 right after school?

02:50PM 16 A.  Right away, I got into this work.  I started as an intern

02:50PM 17 with our office here, and then became a probation officer

02:50PM 18 assistant, and worked my way up.

02:50PM 19 Q.  Can you tell the jury a little bit about what your

02:50PM 20 responsibilities were as a probation officer assistant?

02:50PM 21 A.  Yes.  So I supervised individuals that were released on

02:50PM 22 supervision, probation or supervised release in the

02:50PM 23 community, and then monitored their compliance with certain

02:50PM 24 conditions.

02:50PM 25 Q.  Okay.  And we're going to talk a little bit more in

02:50PM   1    detail about that in a moment, but can you describe first

02:50PM   2    your progression from an assistant probation officer, kind of

02:50PM   3    through the ranks in U.S. Probation?

02:50PM   4    A.   Yes.  So I was hired in September of 2006 as a probation

02:50PM   5    officer assistant.

02:50PM   6         2007, I was promoted to a U.S. probation officer.

02:51PM   7         2014, I was promoted to the location monitoring

02:51PM   8    specialist that dealt with ankle-bracelet individuals.

02:51PM   9         And in 2018, was promoted to a supervising U.S. probation

02:51PM  10    officer.

02:51PM  11    Q.   And can you tell the jury about how your responsibilities

02:51PM  12    are different now as a supervising United States probation

02:51PM  13    officer?

02:51PM  14    A.   Yes.  So, now I supervise a group of officers that

02:51PM  15    supervise individuals that are released to the community.

02:51PM  16    Q.   I'd like for you to educate us a little bit on sentencing

02:51PM  17    in federal court.  How does a person end up getting sentenced

02:51PM  18    in the context of a criminal case?

02:51PM  19    A.   So when someone is convicted of a federal crime that then

02:51PM  20    are subject to a sentence by a federal judge, the judge will

02:51PM  21    issue sentence, and then the judgment will be prepared

02:51PM  22    detailing that sentence.

02:51PM  23    Q.   Is one of the available sentences a period of

02:51PM  24    incarceration?

02:51PM  25    A.   Yes.

02:51PM  1    Q.   Okay.  And if somebody is sentenced to a period of

02:51PM  2    incarceration, is probation involved in monitoring them while

02:52PM  3    they're incarcerated?

02:52PM  4    A.   No.

02:52PM  5    Q.   Does probation become involved after that person is no

02:52PM  6    longer incarcerated?

02:52PM  7    A.   Yes.

02:52PM  8    Q.   Can you describe that to our jury?

02:52PM  9    A.   Sure.  As they're transitioning from their incarceration,

02:52PM  10   there's a -- there's a period of time for that transition

02:52PM  11   period where a probation officer will be assigned to then

02:52PM  12   start prerelease activities and transition planning.  Once

02:52PM  13   they've completed their time, incarceration time, we will

02:52PM  14   then -- our authority will kick in to start supervising the

02:52PM  15   individual.

02:52PM  16   Q.   Okay.  And what's that called, that period of time when

02:52PM  17   you, as a probation officer, are supervising the individual

02:52PM  18   after a period of incarceration?

02:52PM  19   A.   It's called supervised release.

02:52PM  20   Q.   And are there terms and conditions that a person has to

02:52PM  21   follow on supervised release?

02:52PM  22   A.   Yes.

02:52PM  23   Q.   Who sets those terms and conditions?

02:52PM  24   A.   The sentencing judge.

02:52PM  25   Q.   Do you, as a probation officer, make recommendations to

Case 1:19-cr-00227-LJV-MJR   Document 909   Filed 05/04/24   Page 6 of 41
USA v Bongiovanni - Lepiane - Cooper/Direct - 2/15/24

6

| | | |
|---|---|---|
| 02:52PM | 1 | the sentencing judge? |
| 02:52PM | 2 | A.   Yes. |
| 02:52PM | 3 | Q.   Are there standard conditions that most cases have? |
| 02:53PM | 4 | A.   Yes.  There's standard conditions that defendants are all |
| 02:53PM | 5 | subject to, yes.  And then there's special conditions that |
| 02:53PM | 6 | are tailored specifically by the Court for those individual |
| 02:53PM | 7 | defendants. |
| 02:53PM | 8 | Q.   Okay.  Now, is it also possible that a person receives a |
| 02:53PM | 9 | sentence where they're monitored by probation, but they're |
| 02:53PM | 10 | never incarcerated before that? |
| 02:53PM | 11 | A.   Yes.  That's called a term of probation.  There's no |
| 02:53PM | 12 | incarceration associated with that. |
| 02:53PM | 13 | Q.   And other than that distinction, is a term of probation |
| 02:53PM | 14 | very similar to a term of supervised release? |
| 02:53PM | 15 | A.   Yes. |
| 02:53PM | 16 | Q.   Would it be fair to say supervised release is basically |
| 02:53PM | 17 | post-incarceration probation? |
| 02:53PM | 18 | A.   Yes. |
| 02:53PM | 19 | Q.   Okay.  Who's responsible for ensuring that a defendant or |
| 02:53PM | 20 | individual under probation's supervision is complying with |
| 02:53PM | 21 | those conditions? |
| 02:53PM | 22 | A.   The assigned U.S. probation officer. |
| 02:53PM | 23 | Q.   And during the course of your career, have you been the |
| 02:54PM | 24 | assigned U.S. probation officer responsible for doing that? |
| 02:54PM | 25 | A.   Yes. |

USA v Bongiovanni - Lepiane - Cooper/Direct - 2/15/24

7

02:54PM  1   Q.  Has that happened once or more than once?

02:54PM  2   A.  It's happened a lot.

02:54PM  3   Q.  Okay.  About how many people do you think you've

02:54PM  4   supervised throughout the course of your career?

02:54PM  5   A.  Hundreds.

02:54PM  6   Q.  Okay.  What happens if someone violates conditions of

02:54PM  7   supervised release?

02:54PM  8   A.  So, if someone violates a condition, we'll take steps to

02:54PM  9   bring them back into compliance.  There's different things we

02:54PM  10  can do.  We can ask the Court for modifications.  It depends

02:54PM  11  on the severity of the violation.  Sometimes we'll ask for

02:54PM  12  revocation of their release or probation, sometimes we'll try

02:54PM  13  to address it before we get to that stage.

02:54PM  14  Q.  Does your office have the ability and the authority to

02:54PM  15  investigate suspected violations of conditions of release?

02:54PM  16  A.  Yes.  We're actually required by law, when we swear in as

02:54PM  17  U.S. probation officers, we're required by law to stay

02:54PM  18  informed how a person under supervision is complying with

02:54PM  19  their conditions, so we're required to.

02:54PM  20  Q.  Let's talk a little bit about how you stay informed.

02:55PM  21     Do you work in conjunction with other law enforcement

02:55PM  22  agencies?

02:55PM  23  A.  Yes.

02:55PM  24  Q.  Okay.  And is that something that happens, like, rarely,

02:55PM  25  once in a blue moon, during the course of your job?

Case 1:19-cr-00227-LJV-MJR   Document 909   Filed 05/04/24   Page 8 of 41
USA v Bongiovanni - Lepiane - Cooper/Direct - 2/15/24

8

02:55PM      1    A.   It's regularly.

02:55PM      2    Q.   Regularly?

02:55PM      3    A.   Yes, regularly.

02:55PM      4    Q.   What sorts of law enforcement agencies do you work with?

02:55PM      5    A.   We've worked with local law enforcement agencies, state

02:55PM      6    law enforcement agencies, federal law enforcement agencies,

02:55PM      7    all different levels, that are in the community, the same

02:55PM      8    community as we're working in.

02:55PM      9    Q.   Have you worked with the Buffalo Police Department

02:55PM     10    before?

02:55PM     11    A.   Yes.

02:55PM     12    Q.   Have you worked with the Erie County Sheriffs before?

02:55PM     13    A.   Yes.

02:55PM     14    Q.   Have you worked with federal law enforcement, like the

02:55PM     15    FBI?

02:55PM     16    A.   Yes.

02:55PM     17    Q.   Have you worked with the DEA before?

02:55PM     18    A.   Yes.

02:55PM     19    Q.   Are you required to interface and cooperate with those

02:55PM     20    law enforcement agencies in order to effectively do your job?

02:55PM     21    A.   Yes.

02:55PM     22    Q.   Are there times when your office provides information

02:55PM     23    that you've learned during the course of your duties to

02:56PM     24    another law enforcement agency?

02:56PM     25    A.   Yes.

02:56PM  1   Q.  Can you give an example of when that would happen?

02:56PM  2   A.  Sure.  When we have information that can be helpful to

02:56PM  3   them, or vice versa, for protecting the community.

02:56PM  4       For example, our agency is small.  We need the resources

02:56PM  5   that law enforcement have out there.  We have a common

02:56PM  6   objective of community protection, so we work with them in

02:56PM  7   sharing this information.

02:56PM  8   Q.  Are there times when your office receives information

02:56PM  9   from other law enforcement agencies?

02:56PM  10  A.  Yes.

02:56PM  11  Q.  Hypothetically, if you're supervising John Smith, would

02:56PM  12  it be common for a law enforcement agency to come to you and

02:56PM  13  say, hey, I think John Smith is selling drugs?

02:56PM  14  A.  It -- it would be -- not common, but it would happen,

02:56PM  15  yes.  If they had information that John Smith was selling

02:56PM  16  drugs, and they found out he was on supervision with us, they

02:56PM  17  hopefully would call us up and let us know, yes.

02:56PM  18  Q.  Would it be your expectation that they would come and let

02:56PM  19  you know?

02:56PM  20  A.  Yes.

02:56PM  21  Q.  So you just described for us the manner in which

02:57PM  22  U.S. Probation interacts with and works in concert with other

02:57PM  23  law enforcement agencies.  Do you assume, as a matter of

02:57PM  24  course, that information you're receiving from federal agents

02:57PM  25  is accurate information?

02:57PM  1  A.  Yes.

02:57PM  2  Q.  Is that trust inherent in your job?

02:57PM  3  A.  Yeah, it's necessary.

02:57PM  4  Q.  Is it your common practice to doubt information that you

02:57PM  5  learn from a sworn federal agent?

02:57PM  6  A.  No.

02:57PM  7  Q.  Are you familiar with a person by the name of Joseph

02:57PM  8  Bongiovanni?

02:57PM  9  A.  Yes.

02:57PM  10  Q.  How do you know that person?

02:57PM  11  A.  I worked with Joseph Bongiovanni on a couple cases during

02:57PM  12  my career.

02:57PM  13  Q.  Do you know what agency he worked for?

02:57PM  14  A.  Yes, the DEA.

02:57PM  15  Q.  Have you interacted with him in person before?

02:57PM  16  A.  Yes.

02:57PM  17  Q.  Are you familiar with what he looks like?

02:57PM  18  A.  Yes.

02:57PM  19  Q.  About how many cases have you worked on in your career

02:58PM  20  with Joseph Bongiovanni?

02:58PM  21  A.  Probably a handful, four or five cases.

02:58PM  22  Q.  Is Joseph Bongiovanni in the courtroom today?

02:58PM  23  A.  Yes.

02:58PM  24  Q.  Would you point him out for the jury, and identify him by

02:58PM  25  an article of his clothing?

02:58PM   1   A.   Sure.  He's sitting at the table there.  He's got a blue

02:58PM   2   tie on and a dark blue coat.

02:58PM   3            **MR. COOPER:**  Judge, for the record, the witness

02:58PM   4   identified the defendant.

02:58PM   5            **THE COURT:**  Yes, he did.

02:58PM   6            **BY MR. COOPER:**

02:58PM   7   Q.   Are you familiar with an individual by the name of Peter

02:58PM   8   Gerace?

02:58PM   9   A.   Yes.

02:58PM  10   Q.   How do you know that person?

02:58PM  11   A.   I supervised him during a period of time in 2009.

02:58PM  12   Q.   Can you just describe for the jury how it is that you

02:58PM  13   became assigned to supervise Peter Gerace?

02:58PM  14   A.   I was -- we have in our office every day what's called a

02:58PM  15   duty officer, it rotates, to make sure someone's in the

02:58PM  16   office to take phone calls.

02:58PM  17       I happened to be the duty officer on August 31, 2009.  I

02:58PM  18   received a phone call regarding Peter Gerace, and then was

02:59PM  19   assigned to his case.

02:59PM  20   Q.   Okay.  Before August 31st of 2009, were you the assigned

02:59PM  21   officer for Peter Gerace?

02:59PM  22   A.   No.

02:59PM  23   Q.   Do you know who was?

02:59PM  24   A.   Yes.  We had a probation officer assistant who had just

02:59PM  25   recently left the agency that was assigned.

Case 1:19-cr-00227-LJV-MJR   Document 909   Filed 05/04/24   Page 12 of 41
USA v Bongiovanni - Lepiane - Cooper/Direct - 2/15/24

12

02:59PM    1    Q.   Okay.  So by the time you received that phone call as the

02:59PM    2    duty probation officer, the person who had been supervising

02:59PM    3    Peter Gerace was gone or on his way out; is that fair to say?

02:59PM    4    A.   Correct, yes.

02:59PM    5    Q.   And did you take over supervising Peter Gerace?

02:59PM    6    A.   I did, yes.

02:59PM    7    Q.   Okay.  When you supervise an individual who's on

02:59PM    8    supervised release, are you familiar with the underlying

02:59PM    9    charges that resulted in their sentence?

02:59PM   10    A.   Yes.

02:59PM   11    Q.   Okay.  Did you know what agency Peter Gerace had been

02:59PM   12    investigated by and prosecuted by previously?

02:59PM   13    A.   Yes.

02:59PM   14    Q.   Was it the DEA?

02:59PM   15    A.   No.

02:59PM   16    Q.   Okay.  Does United States Probation keep and maintain

02:59PM   17    records that document their supervision of an individual?

03:00PM   18    A.   Yes.

03:00PM   19    Q.   Is that in the regular course of your job to keep those

03:00PM   20    records?

03:00PM   21    A.   Yes.

03:00PM   22    Q.   What are those records called?

03:00PM   23    A.   They're called chronological records, or referred to as

03:00PM   24    chronos.

03:00PM   25    Q.   Okay.  You give them a shorthand of chronos?

Case 1:19-cr-00227-LJV-MJR   Document 909   Filed 05/04/24   Page 13 of 41
USA v Bongiovanni - Lepiane - Cooper/Direct - 2/15/24

13

03:00PM   1   A.   Yeah.   A lot of us can't spell chronological, so chronos

03:00PM   2   is a better way of spelling it.

03:00PM   3   Q.   Are those chrono logs kept and made in the ordinary

03:00PM   4   course of your duties as a probation officer?

03:00PM   5   A.   Yes.

03:00PM   6   Q.   Okay.   Did you create chrono logs related to your

03:00PM   7   supervision of Peter Gerace?

03:00PM   8   A.   Yes.

03:00PM   9   Q.   Now, the next questions I'm going to ask you are going to

03:00PM   10   be questions about back in 2009, so if at any point you don't

03:00PM   11   remember a specific answer, I don't want you to guess, I want

03:00PM   12   you to tell me.   And if you need to look at your

03:00PM   13   chronological records, let me know, and we can handle that

03:00PM   14   with the Court.   Okay?

03:00PM   15   A.   Okay.

03:00PM   16   Q.   You told the jury a moment ago that on August 31st, 2009,

03:01PM   17   an incident happened that caused you to take over the

03:01PM   18   supervision of Peter Gerace; is that correct?

03:01PM   19   A.   Yes.

03:01PM   20   Q.   Okay.   Can you tell the jury what that incident was?

03:01PM   21   A.   Sure.   I received a phone call from FBI Agent Tom Herbst

03:01PM   22   who indicated he'd like to meet with me regarding Mr. Gerace

03:01PM   23   and possible illegal activity at Pharaoh's Gentlemen's Club.

03:01PM   24   Q.   As a result of the phone call that you had from Special

03:01PM   25   Agent Tom Herbst, did you take official action in your job?

Case 1:19-cr-00227-LJV-MJR   Document 909   Filed 05/04/24   Page 14 of 41
USA v Bongiovanni - Lepiane - Cooper/Direct - 2/15/24

14

03:01PM   1   A.   Yeah.  I then met that same day with Special Agent Tom

03:01PM   2   Herbst in my office, and we discussed the information that he

03:01PM   3   had.

03:01PM   4   Q.   Did you familiarize yourself with the conditions of

03:01PM   5   Gerace's post-release supervision?

03:01PM   6   A.   Yes.

03:01PM   7   Q.   Okay.  Based on the information that Special Agent Herbst

03:01PM   8   provided you, did you take certain follow-up actions?

03:01PM   9   A.   Yes.  So, we received information that Mr. Gerace was

03:01PM   10   possibly operating -- owned and operated Pharaoh's

03:01PM   11   Gentlemen's Club.  That was a violation of his conditions to

03:02PM   12   do that.  He had been told by the State Liquor Authority that

03:02PM   13   he couldn't work there, and also by our office.

03:02PM   14        So when we received that information, we took steps to

03:02PM   15   then investigate whether or not that was the case.  And we

03:02PM   16   did that in a variety of different ways.

03:02PM   17   Q.   Okay.  Now a little earlier in your direct examination, I

03:02PM   18   asked you about probation's role in investigating suspected

03:02PM   19   violations of conditions of release; do you remember that?

03:02PM   20   A.   Yes.

03:02PM   21   Q.   In that course, or in that part of your job, when you're

03:02PM   22   investigating a suspected violation, is probation authorized

03:02PM   23   or able to search?

03:02PM   24   A.   Yes, if it's -- if it's a special condition of the

03:02PM   25   person's release, we are able to search.

03:02PM    1    Q.   Okay.  And do you need to obtain a search warrant signed

03:02PM    2    by a judge in order to conduct that search?

03:02PM    3    A.   No.  The search condition is part of the sentence that's

03:02PM    4    given, it's one of their conditions of probation or

03:02PM    5    supervised release.  And it's the search authority the Court

03:02PM    6    gives us to then do that.

03:03PM    7    Q.   Did Peter Gerace have a search condition?

03:03PM    8    A.   He did, yes.

03:03PM    9    Q.   Now you told us a little bit about the information that

03:03PM   10    you learned from Special Agent Herbst that Gerace was working

03:03PM   11    at Pharaoh's Gentlemen's Club; is that correct?

03:03PM   12    A.   That he owned and operated, yes.

03:03PM   13    Q.   Okay.  Was there information related to drugs that

03:03PM   14    Special Agent Herbst provided you?

03:03PM   15    A.   Yes, he said he was also using and distributing drugs at

03:03PM   16    the club.

03:03PM   17    Q.   And when you say "he" in that sentence, who is that?

03:03PM   18    A.   Peter Gerace.

03:03PM   19    Q.   Okay.  Did you conduct surveillance after you had this

03:03PM   20    meeting with Special Agent Herbst?

03:03PM   21    A.   Yes.  Myself, several other officers within our probation

03:03PM   22    office, and other law enforcement agencies conducted

03:03PM   23    surveillance of the club, different days, different times, to

03:03PM   24    try to establish a pattern of when Mr. Gerace was there.

03:03PM   25    Q.   Did that investigation progress over a period of weeks

03:03PM   1   into Gerace?

03:04PM   2   A.   Yeah, it was about a two-month period of time of an

03:04PM   3   investigation, and then we decided to execute a search on

03:04PM   4   October 31st, 2009.

03:04PM   5   Q.   You told us a little earlier in your direct examination

03:04PM   6   that probation has limited personnel and resources, and you

03:04PM   7   often work with other law enforcement agencies.  Did any

03:04PM   8   other law enforcement agencies support your investigation

03:04PM   9   into this Peter Gerace?

03:04PM  10   A.   Yes.  We worked with the FBI, and we also worked with

03:04PM  11   Cheektowaga police.

03:04PM  12   Q.   As a result of that two-month investigation into Gerace,

03:04PM  13   including surveillance and other work, did it culminate in

03:04PM  14   another activity -- another investigative activity?

03:04PM  15   A.   After the search, are you saying?

03:04PM  16   Q.   After the surveillance.

03:04PM  17   A.   After the surveillance, then we did a search on that

03:04PM  18   date.

03:04PM  19   Q.   Okay.  Do you remember the date of the search?

03:04PM  20   A.   Yeah, October 31st, 2009.

03:04PM  21   Q.   Okay.  And where were you searching?

03:04PM  22   A.   We searched Pharaoh's Gentlemen's Club in Cheektowaga.

03:04PM  23   Q.   Were you personally present for that search?

03:05PM  24   A.   Yes, sir.

03:05PM  25   Q.   Who else was present?

Case 1:19-cr-00227-LJV-MJR   Document 909   Filed 05/04/24   Page 17 of 41
USA v Bongiovanni - Lepiane - Cooper/Direct - 2/15/24

17

03:05PM   1   A.  Several members of our U.S. Probation Office search team,

03:05PM   2   Cheektowaga police, and FBI.

03:05PM   3   Q.  When you say FBI, do you recall who was there from the

03:05PM   4   FBI?

03:05PM   5   A.  Yeah, Special Agent Tom Herbst was there.

03:05PM   6   Q.  Can you describe for the jury how that search of

03:05PM   7   Pharaoh's Gentlemen's Club played out on October 31st of

03:05PM   8   2009?

03:05PM   9   A.  Yes.  So that morning, we went to the club, set up there.

03:05PM   10  The hope was that Mr. Gerace would just answer the phone or

03:05PM   11  the door.  His vehicle was in the parking lot there.

03:05PM   12      Eventually, Cheektowaga police went to the door to do

03:05PM   13  what's called a welfare check to make sure everything was

03:05PM   14  okay inside.

03:05PM   15      He opened the door, and then let us into the building.

03:05PM   16  Q.  On that date, October 31st, 2009, was Peter Gerace

03:05PM   17  administered a drug test?

03:05PM   18  A.  He was.

03:05PM   19  Q.  Okay.  Did Gerace say anything to you when you

03:05PM   20  administered him the drug test?

03:05PM   21  A.  He admitted to using cocaine the previous evening.

03:06PM   22  Q.  Is that a violation of his conditions of supervision?

03:06PM   23  A.  Yes.

03:06PM   24  Q.  What was the result of the presumptive test?

03:06PM   25  A.  It was positive for cocaine.

03:06PM  1   Q.  As a result of the search at Pharaoh's Gentlemen's Club,

03:06PM  2   other than the drug test, what were you looking for inside of

03:06PM  3   the club?

03:06PM  4   A.  Any evidence that he was -- had owned and operated the

03:06PM  5   club.  Like, our purpose was to verify the statements that

03:06PM  6   were being made from the FBI, the information that they were

03:06PM  7   gathering that he was owning and operating.  So we were

03:06PM  8   looking for documentation in his name, anything that would

03:06PM  9   tie him to the club.

03:06PM  10  Q.  Okay.  Did you arrest Gerace that day and bring him back

03:06PM  11  to this courthouse?

03:06PM  12  A.  No, sir.

03:06PM  13  Q.  What happened after the search?

03:06PM  14  A.  So we did find the documents tying him to the -- that he

03:06PM  15  was owning and operating the club, bank statements, credit

03:07PM  16  cards in his name, in his wallet.

03:07PM  17      We told him we would follow up with him after --

03:07PM  18  actually, I -- we told him to report to the office the next

03:07PM  19  business day, and we left.

03:07PM  20  Q.  Is that a common activity?  Or were you cutting him a

03:07PM  21  break?  What happened there?

03:07PM  22  A.  It's common.  It all depends on the severity.  What we

03:07PM  23  had there in front of us wasn't a violation of law or a risk

03:07PM  24  to the community at that point.  Had it been, we would have

03:07PM  25  asked the Court for a warrant, taken him into custody, or had

03:07PM   1   the locals charge him with something.

03:07PM   2       But what we had was information of noncompliance, not to

03:07PM   3   the level of risk at that moment that we needed to arrest

03:07PM   4   him.

03:07PM   5   Q.   And is it fair to say that information informed how you

03:07PM   6   proceeded forward?

03:07PM   7   A.   Yes.

03:07PM   8   Q.   Okay.  Did you determine, based on what you had found at

03:07PM   9   the search at Pharaoh's, that Peter Gerace had violated the

03:07PM  10   terms of his supervised release?

03:07PM  11   A.   Yes.

03:07PM  12   Q.   What did you do as a result of that?

03:07PM  13   A.   So, I then -- you know, later on, I talked to my

03:07PM  14   supervisor.  I actually reached out to the U.S. Attorney's

03:08PM  15   Office, spoke to Tony Bruce, who I think was assigned Peter

03:08PM  16   Gerace's case at that time.  But that's -- we usually work

03:08PM  17   with the U.S. Attorney, when we bring violations, that's who

03:08PM  18   represents us on the violations in court.  And I had

03:08PM  19   follow-up meetings with Tom Herbst, as well.

03:08PM  20   Q.   Is it fair to say that violations of supervised release

03:08PM  21   or suspected violations of supervised release do not get

03:08PM  22   resolved overnight?

03:08PM  23   A.   Yes.

03:08PM  24   Q.   Do they tend to take some time to play out in court?

03:08PM  25   A.   Yes.

USA v Bongiovanni - Lepiane - Cooper/Direct - 2/15/24

20

03:08PM   1   Q.  Do you have discretion as the probation officer

03:08PM   2   supervising an individual to determine how to play it or how

03:08PM   3   to handle the result, the resolution of that supervision?

03:08PM   4   A.  Yes.  The Court gives us discretion based on the severity

03:08PM   5   of the violation.  Like I said a little earlier, had it been

03:08PM   6   a risk of danger to the community, it would have been an

03:08PM   7   immediate notification to the Court.

03:09PM   8       Some different -- may call technical violations, we'll

03:09PM   9   then gather more information and try to maybe come up with

03:09PM  10   some alternatives to a revocation.

03:09PM  11   Q.  Okay.  So the day of the search, did you have a decision

03:09PM  12   already about how that was going to resolve?

03:09PM  13   A.  No.

03:09PM  14   Q.  It was still up in the air?

03:09PM  15   A.  Yes.

03:09PM  16   Q.  Was DEA present for that search at Pharaoh's?

03:09PM  17   A.  No.

03:09PM  18   Q.  I want to speak with you about the aftermath from the

03:09PM  19   search at Pharaoh's.  After that search, did you receive

03:09PM  20   contact from someone at DEA about Peter Gerace?

03:09PM  21   A.  Yes.

03:09PM  22   Q.  Who contacted you?

03:09PM  23   A.  So on November 3rd, I received a phone call from Special

03:09PM  24   Agent Joe Bongiovanni.

03:09PM  25   Q.  What was the nature of that phone call?

03:09PM 1  A.  So he called and said that Mr. Gerace had reached out to

03:09PM 2  him about potentially cooperating to lessen his violation

03:09PM 3  sentence.

03:09PM 4  Q.  Did Bongiovanni make any statements to you about whether

03:09PM 5  Gerace had any status with him as a cooperating source?

03:10PM 6  A.  Yeah.  He said that in the past, he had been a

03:10PM 7  confidential source of information, and wanted to do that

03:10PM 8  again.  He wanted to meet with the DEA.

03:10PM 9  Q.  Did you believe that information when he told it to you?

03:10PM 10  A.  Yes.

03:10PM 11  Q.  Did you log that conversation in your chronos?

03:10PM 12  A.  Yes.

03:10PM 13  Q.  Have you reviewed your chronos before you testified here

03:10PM 14  today?

03:10PM 15  A.  Yes.

03:10PM 16  Q.  After the search at Pharaoh's, did you stay in touch with

03:10PM 17  Special Agent Herbst from the FBI?

03:10PM 18  A.  Yes.  He actually called me the day before Agent

03:10PM 19  Bongiovanni called me to say that Gerace had reached out to

03:10PM 20  them about cooperating to lessen the sentence.

03:10PM 21      And then I also talked to Herbst several times to follow

03:10PM 22  up as to whether or not that meeting was taking place.

03:10PM 23  Q.  Was it your understanding that Special Agent Herbst was

03:10PM 24  interested in developing a case to charge Peter Gerace with

03:11PM 25  new violations of federal law?

03:11PM    1    A.  I just knew he was investigating him.  I didn't know the

03:11PM    2    status of their case at all.

03:11PM    3    Q.  Did you understand that Herbst was pursuing an interview

03:11PM    4    with Gerace as a potential source of information?

03:11PM    5    A.  Yes.

03:11PM    6    Q.  Did that meeting happen right away between Herbst and

03:11PM    7    Gerace?

03:11PM    8    A.  No.

03:11PM    9    Q.  Can you tell us what you know about that?

03:11PM   10    A.  I know it was approximately -- it would be in the

03:11PM   11    chronos, but approximately -- didn't take place for two weeks

03:11PM   12    after the initial phone call.

03:11PM   13        I got the phone call from Tom Herbst on November 2nd, and

03:11PM   14    from Agent Bongiovanni on November 3rd.

03:11PM   15        And then it was at least two weeks after that before they

03:11PM   16    actually met.  It actually got to the point where, during our

03:11PM   17    investigation, we had confirmed with the State Liquor

03:11PM   18    Authority and through other means that he was in fact in

03:12PM   19    violation of his conditions for several reasons, so we had

03:12PM   20    decided we were going to move forward with what's called a

03:12PM   21    modification for location monitoring.

03:12PM   22    Q.  Okay.  Can you put that in layperson's terms?  Was that a

03:12PM   23    good thing, or a bad thing for Peter?

03:12PM   24    A.  He was gonna get modified to wear an ankle bracelet for

03:12PM   25    the remainder of his term, so I guess it's better than jail,

03:12PM  1  but I wouldn't want an ankle bracelet on.

03:12PM  2  Q.  So it was a step up on the supervision that he was gonna

03:12PM  3  be receiving; is that fair?

03:12PM  4  A.  Correct.  It was a sanction.  It was a response to his

03:12PM  5  noncompliance in hopes to bring him back into compliance.

03:12PM  6  Q.  Did you ever have a conversation with Special Agent

03:12PM  7  Herbst about how his meeting with Peter Gerace went?

03:12PM  8  A.  Yes.  Special Agent Herbst told me that he met with

03:12PM  9  Mr. Gerace, and he did not feel he had any information to

03:12PM  10  offer him.

03:12PM  11  Q.  Okay.  Did the resolution that you just described, the

03:12PM  12  sanction of -- of location monitoring, did that occur after

03:12PM  13  you heard from Special Agent Herbst that Gerace had nothing

03:13PM  14  to offer?

03:13PM  15  A.  I think it was -- I -- I know it was submitted to the

03:13PM  16  Court and signed after, but we had already made the decision

03:13PM  17  before.

03:13PM  18  Q.  Did you provide any preferential treatment to Peter

03:13PM  19  Gerace as a result of the phone call that you got from Joe

03:13PM  20  Bongiovanni?

03:13PM  21  A.  No.

03:13PM  22          MR. COOPER:  Okay.  Just one moment, please, Judge.

03:13PM  23          I have no further questions, Judge.  Thank you.

03:13PM  24          THE COURT:  Okay.  So let's take our afternoon break

03:13PM  25  now.  I remind you not to make up your mind about anything,

03:13PM   1   and not to communicate with anyone including each other about

03:13PM   2   the case.  See you back here at about 3:25, 3:30.

03:13PM   3           (Jury excused at 3:13 p.m.)

03:14PM   4           THE COURT:  Anything we need to put on the record

03:14PM   5   from the defense?

03:14PM   6           MR. SINGER:  Judge, just one brief legal issue.

03:14PM   7           So on one of the last questions that Mr. Cooper asked

03:14PM   8   Mr. Lepiane --

03:14PM   9           THE COURT:  Do you want Mr. Lepiane to be excused?

03:14PM  10           MR. SINGER:  I mean, I don't think he has to be, no.

03:14PM  11           THE COURT:  Okay, fine.

03:14PM  12           MR. SINGER:  It deals with his chrono notes.

03:14PM  13           THE COURT:  Fine.

03:14PM  14           MR. SINGER:  So -- so the government asked

03:14PM  15   Mr. Lepiane what it was that Special Agent Herbst communicated

03:14PM  16   to him about how the cooperation issue went with Gerace.  The

03:14PM  17   government introduced the first half of the statement that

03:14PM  18   Mr. Herbst gave to Mr. Lepiane, but it omitted the second half

03:15PM  19   of that statement.

03:15PM  20           So under the Rule of Completeness, I'm going to ask

03:15PM  21   Mr. Lepiane on the cross-examination about the other half of

03:15PM  22   that and enter that statement in, because as of right now, the

03:15PM  23   government's left an incorrect impression.

03:15PM  24           THE COURT:  And that was one of those excerpts that

03:15PM  25   we talked about earlier today?

03:15PM    1          MR. SINGER:  Correct.

03:15PM    2          MR. COOPER:  Judge, first of all, I don't believe the

03:15PM    3    government left an incorrect impression.  The witness

03:15PM    4    testified to his recollection.  Counsel can cross-examine him,

03:15PM    5    ask him whatever questions he wants.

03:15PM    6          There's nothing improper about the way the government

03:15PM    7    left its direct examination.  And that's the sense I'm getting

03:15PM    8    from counsel.

03:15PM    9          THE COURT:  Yeah, you can ask about the rest of it,

03:15PM   10    and if, in fact, the testimony is inconsistent with the

03:15PM   11    report, we can deal with it.

03:15PM   12          MR. SINGER:  Yeah, but I guess, you know, one of the

03:15PM   13    concerns I have is that this Court's prior ruling was that the

03:15PM   14    second half of that statement about Herbst saying "but I'm

03:15PM   15    going to continue to cooperate with him," that's what I intend

03:15PM   16    to get into on cross-examination, just to complete the loop on

03:16PM   17    that under Rule of Completeness.  Because right now --

03:16PM   18          THE COURT:  I think -- I think I said that that was

03:16PM   19    not hearsay, didn't I?

03:16PM   20          MR. COOPER:  Judge, I think we should -- I don't

03:16PM   21    think it makes sense to have the argument where Mr. Singer

03:16PM   22    talks about what he wants the witness to --

03:16PM   23          THE COURT:  Yeah.

03:16PM   24          MR. COOPER:  -- say in front --

03:16PM   25          THE COURT:  Yeah.

03:16PM   1           **MR. COOPER:** -- of the witness.

03:16PM   2           **THE COURT:**  Yeah, I think that's right.  Okay.

03:16PM   3           So, Mr. Lepiane, will you please leave the courtroom?

03:16PM   4           (Mr. Lepiane exited the courtroom at 3:16 p.m.)

03:16PM   5           **THE COURT:**  So, Mr. Singer, I think you're correct.

03:16PM   6   I think you can -- I think Mr. Cooper's correct, that you can

03:16PM   7   cross-examine him, that you can ask questions about did

03:16PM   8   Special Agent Herbst say thus-and-so and thus-and-so, and if

03:16PM   9   he says he doesn't remember, you can show him the report to

03:17PM  10   refresh his recollection.

03:17PM  11           If he says no, he never said that, and it's different

03:17PM  12   in the report, then I think the report may come in to impeach

03:17PM  13   him.  Especially because it's a business record.

03:17PM  14           We've already decided it's a business record.  And

03:17PM  15   what you're talking about in the business record I don't think

03:17PM  16   is hearsay.

03:17PM  17           So, if I understand what you're saying, I think you

03:17PM  18   can do what you're asking to do, but I -- I, if you're gonna

03:17PM  19   offer the statement in as a business record, I guess you can.

03:17PM  20           **MR. SINGER:**  It wasn't my intention, Judge, I just --

03:17PM  21           **THE COURT:**  You can get --

03:17PM  22           **MR. SINGER:**  Maybe I'm wrong on this from the

03:17PM  23   morning, but I thought that if this was gonna come up as an

03:17PM  24   issue, you wanted me to alert the Court as well as government

03:17PM  25   counsel to it before I asked the question, so --

03:17PM  1          **THE COURT:**  And the question is --

03:17PM  2          **MR. SINGER:**  -- my apologies.

03:17PM  3          **THE COURT:**  -- his intent, the question is Herbst's

03:17PM  4  intent to continue to work with --

03:17PM  5          **MR. SINGER:**  Correct.

03:17PM  6          **THE COURT:**  -- whether he -- whether he intended to

03:17PM  7  continue to work with Gerace?

03:17PM  8          **MR. SINGER:**  Correct.

03:17PM  9          **THE COURT:**  I don't see that as a problem.

03:17PM  10          **MR. COOPER:**  I agree that a statement of intent is

03:17PM  11  not hearsay.  I've expressed my issues with the typographical

03:18PM  12  error.

03:18PM  13          The one thing I would ask the Court is in the future,

03:18PM  14  I'm not going to assume that it was intentional, but in the

03:18PM  15  future, if we're going to discuss what the parties want a

03:18PM  16  witness to testify to, that we do ask the witness to be

03:18PM  17  excused before we get into it, because I don't think it's

03:18PM  18  proper.

03:18PM  19          **THE COURT:**  Well, I agree with that, which is why I

03:18PM  20  asked Mr. Singer at the very beginning of our discussion

03:18PM  21  whether he wanted the witness to be excused, and he said no.

03:18PM  22          But I think Mr. Cooper is right.  I think that given

03:18PM  23  what we did discuss, the witness should have been excused.

03:18PM  24          And I will expect both sides to do that.  If we're

03:18PM  25  going to discuss something that may color the witness's

03:18PM    1    testimony, I think that should be done outside the presence of

03:18PM    2    the witness.  Okay?

03:18PM    3            But just as I didn't think Mr. Tripi did anything

03:18PM    4    that was wrong this morning, I don't think Mr. Singer did

03:18PM    5    anything that was wrong now.  I just want to make sure both

03:18PM    6    sides understand that we're all on the same page.

03:18PM    7            **MR. SINGER:**  And I would say, Judge, I think that

03:19PM    8    makes the tally 5 to 3?

03:19PM    9            **MR. COOPER:**  Yeah.  Unlike this morning, I'm not

03:19PM   10    accusing Rob of any --

03:19PM   11            **THE COURT:**  I know you're not.  I know you're not.  I

03:19PM   12    just want to make it clear that I don't think anyone's done

03:19PM   13    anything inappropriate, at least intentionally inappropriate.

03:19PM   14    And we'll deal with these issues as they come up.

03:19PM   15            But I think you're right, witnesses should be excused

03:19PM   16    if there's any discussion that may color the witness's

03:19PM   17    testimony.  Okay?

03:19PM   18            **MR. TRIPI:**  Understood.

03:19PM   19            **THE COURT:**  Thanks, everyone.

03:19PM   20            **MR. SINGER:**  Yes, Judge, thank you.

03:19PM   21            **THE CLERK:**  All rise.

03:19PM   22            (Off the record at 3:19 p.m.)

03:31PM   23            (Back on the record at 3:31 p.m.)

03:31PM   24            (Jury not present.)

03:31PM   25            **THE CLERK:**  Back on the record.

| | | |
|---|---|---|
| 03:31PM | 1 | **THE COURT:**  Please be seated. |
| 03:32PM | 2 | **THE CLERK:**  We are back on the record for the |
| 03:32PM | 3 | continuation of the jury trial in case number 19-cr-227, |
| 08:48AM | 4 | United States of America versus Joseph Bongiovanni. |
| 03:32PM | 5 | All counsel and parties are present. |
| 03:32PM | 6 | **THE COURT:**  Are you ready to go, Mr. Singer? |
| 03:32PM | 7 | **MR. SINGER:**  Yes, Judge. |
| 03:32PM | 8 | **THE COURT:**  And you'll be doing the cross? |
| 03:32PM | 9 | **MR. SINGER:**  Yes, Judge. |
| 03:32PM | 10 | **THE COURT:**  Okay.  Anything from the government? |
| 03:32PM | 11 | **MR. TRIPI:**  No, Your Honor. |
| 03:32PM | 12 | **THE COURT:**  Let's bring them in, Pat. |
| 03:32PM | 13 | Let's get the witness back in. |
| 03:33PM | 14 | (Mr. Lepiane seated at 3:32 p.m.) |
| 03:33PM | 15 | (Jury seated at 3:33 p.m.) |
| 03:33PM | 16 | **THE COURT:**  Okay.  The record will reflect that all |
| 03:33PM | 17 | our jurors are present again. |
| 03:33PM | 18 | Mr. Lepiane, I remind you that you're still under |
| 03:33PM | 19 | oath. |
| 03:33PM | 20 | And, Mr. Singer, you may begin cross-examination. |
| 03:33PM | 21 | **MR. SINGER:**  Thank you, Your Honor. |
| 03:34PM | 22 | |
| 03:34PM | 23 | **CROSS-EXAMINATION BY MR. SINGER:** |
| 03:34PM | 24 | Q.  How are you doing, Officer Lepiane? |
| 03:34PM | 25 | A.  Good afternoon. |

03:34PM   1   Q.  Good to see you.  So as you testified, you were

03:34PM   2   supervising Peter Gerace as his supervision officer?

03:34PM   3   A.  Correct.

03:34PM   4   Q.  And he had a condition of his employment that he had to

03:34PM   5   work in a particular place that wasn't Pharaoh's?

03:34PM   6   A.  He had a standard condition that he had to work at an

03:34PM   7   employment.  Due to the fact that the State Liquor Authority

03:34PM   8   had denied him the ability to work there, we had to instruct

03:34PM   9   him that he could not work there.

03:34PM   10  Q.  Okay.  So on 8/31 of 2009, so August 31st of 2009, that's

03:34PM   11  when you first received a call from Special Agent Tom Herbst

03:34PM   12  from the FBI?

03:34PM   13  A.  Correct.

03:34PM   14  Q.  And Special Agent Herbst called you because he wanted to

03:34PM   15  make a report about certain things he learned as part of his

03:34PM   16  investigation, correct?

03:34PM   17  A.  Yes.

03:34PM   18  Q.  And they were things that he suspected were violations of

03:35PM   19  Mr. Gerace's supervision?

03:35PM   20  A.  Yes.

03:35PM   21  Q.  So the things that he reported to you, that he talked

03:35PM   22  about, use of cocaine?

03:35PM   23  A.  Yes.

03:35PM   24  Q.  And he also talked about distribution of cocaine?

03:35PM   25  A.  Yes.

03:35PM  1   Q.  And one of the reasons why he asked for your help was

03:35PM  2   that he believed that there was a search condition that

03:35PM  3   Mr. Gerace was subject to; is that right?

03:35PM  4   A.  He was just providing me the information.  He never asked

03:35PM  5   us if we would do a search, he provided the information and

03:35PM  6   then we went from there.

03:35PM  7   Q.  So he never asked you about any type of search of

03:35PM  8   Pharaoh's that could be conducted?

03:35PM  9   A.  I mean, he may have asked if there was a search

03:35PM  10  condition, I don't recall that --

03:35PM  11  Q.  Okay.

03:35PM  12  A.  -- but he didn't specifically ask us to search anywhere.

03:35PM  13  Q.  But eventually there came a time where you wanted to

03:35PM  14  perform a search at Pharaoh's; is that correct?

03:35PM  15  A.  Yes, sir.

03:35PM  16  Q.  And in that regard, did you enlist the help of FBI to

03:35PM  17  help you establish that Peter Gerace had a connection to

03:36PM  18  Pharaoh's Gentlemen's Club?

03:36PM  19  A.  We -- yes, we asked local law enforcement to help us with

03:36PM  20  that, yes.

03:36PM  21  Q.  And one of those local law enforcement actors was also

03:36PM  22  the FBI?

03:36PM  23  A.  Correct.

03:36PM  24  Q.  Okay.  And that's when you engaged in roughly about eight

03:36PM  25  weeks or so, two months or so, of surveillance of Pharaoh's?

03:36PM  1    A.  Yes.

03:36PM  2    Q.  And the purpose of that was to establish whether Peter

03:36PM  3    Gerace had contact with there?

03:36PM  4    A.  Try to establish the frequency of his being there.

03:36PM  5    Q.  And that was done because one of the purposes of the

03:36PM  6    search conditions is search a place that someone has either

03:36PM  7    as a residence or business; is that right?

03:36PM  8    A.  Any property under their control.

03:36PM  9    Q.  Right.  And so you had to establish there was some

03:36PM  10   control before you could execute the search condition, right?

03:36PM  11   A.  Correct.

03:36PM  12   Q.  Okay.  So you and Agent Herbst and others are

03:36PM  13   coordinating your efforts over the course of about eight

03:36PM  14   weeks or so?

03:36PM  15   A.  Yes.

03:36PM  16   Q.  And then on Halloween, so October 31st, 2009, that's when

03:36PM  17   you decide to use your probation search condition to get into

03:37PM  18   Pharaoh's and search it, right?

03:37PM  19   A.  We planned the search for that day, yes.

03:37PM  20   Q.  Okay.  Now Special Agent Herbst, he was with you on that

03:37PM  21   search, on the Halloween search?

03:37PM  22   A.  He was, yes.

03:37PM  23   Q.  And there were other probation officers with you on that

03:37PM  24   search?

03:37PM  25   A.  Yes, sir.

03:37PM   1   Q.   And there were also other local law enforcement officers

03:37PM   2   on that search?

03:37PM   3   A.   Yes.

03:37PM   4   Q.   Do you remember Agent Herbst, that time he worked with a

03:37PM   5   Task Force Officer Bob Cottrell from the Amherst Police

03:37PM   6   Department?

03:37PM   7   A.   Yes.

03:37PM   8   Q.   Do you remember if Officer Cottrell was there?

03:37PM   9   A.   I don't remember off the top of my head if he was there.

03:37PM   10   Q.   Okay.  So, you go in to conduct this search into

03:37PM   11   Pharaoh's, correct?

03:37PM   12   A.   Yes.

03:37PM   13   Q.   And at that time, Agent Herbst asks Mr. Gerace questions?

03:37PM   14   A.   Agent -- at that time, I would talk to Peter Gerace, so I

03:37PM   15   asked him questions.  I don't know if Agent Herbst talked to

03:37PM   16   him or not.

03:37PM   17   Q.   Okay.  So you can't recall whether or not Agent Herbst

03:37PM   18   had any conversations with him that day?

03:38PM   19   A.   Not that I remember.

03:38PM   20   Q.   Okay.  In your coordination meetings, did Agent Herbst

03:38PM   21   talk to you about his desire to potentially open up a case or

03:38PM   22   further investigation into Mr. Gerace?

03:38PM   23   A.   He -- the understanding was he was bringing me this

03:38PM   24   information because he was going to investigate Mr. Gerace

03:38PM   25   for drug dealing, yes.

03:38PM    1    Q.  Okay.  All right.  So after the October 31st, 2009 search

03:38PM    2    of Pharaoh's, you receive a call from Special Agent Herbst

03:38PM    3    from the FBI indicating that Peter Gerace may want to

03:38PM    4    cooperate with the federal authorities to lessen his

03:38PM    5    violation?

03:38PM    6    A.  Yes.

03:38PM    7    Q.  Okay.  And Agent Herbst made a call to you first about

03:38PM    8    that?

03:38PM    9    A.  Yes.

03:38PM   10    Q.  Okay.  And then you said that a day or so later, Special

03:38PM   11    Agent Bongiovanni at that point in time gives you a call from

03:38PM   12    the DEA; is that right?

03:38PM   13    A.  The next day, yes.

03:38PM   14    Q.  Okay.  So the next day Agent Bongiovanni calls you up and

03:38PM   15    communicates roughly the same thing?

03:39PM   16    A.  Roughly, yes.

03:39PM   17    Q.  Okay.  He indicates that Mr. Gerace potentially is going

03:39PM   18    to become some type of source information to lessen his

03:39PM   19    violation?

03:39PM   20    A.  He says that Mr. Gerace would like to talk and provide

03:39PM   21    information to lessen it.  And that he was a prior source for

03:39PM   22    the DEA.

03:39PM   23    Q.  Okay.  And so you testified on direct that he was a

03:39PM   24    source of information for the DEA in the past?

03:39PM   25    A.  That's what I was told, yes.

03:39PM    1    Q.   Okay.  All right.  So you mentioned that there was

03:39PM    2    roughly a two-week delay between the time that you had the

03:39PM    3    calls with Agent Herbst and Agent Bongiovanni and the

03:39PM    4    sit-down that they had with Gerace; is that right?

03:39PM    5    A.   Yes.

03:39PM    6    Q.   Do you recall whether or not Mr. Gerace was ill during

03:39PM    7    that time period, and that contributed to the delay in the

03:39PM    8    meeting?

03:39PM    9    A.   The -- the day that I actually received the phone call

03:39PM   10    from Agent Bongiovanni, he also spoke with Mr. Gerace, and he

03:39PM   11    said he had the swine flu or something, so, yes.

03:39PM   12    Q.   Okay.  And do you recall having any conversations with

03:39PM   13    Agent Herbst when you followed up with him to check out how

03:39PM   14    are things going, whether he indicated that an illness may

03:40PM   15    have delayed things?

03:40PM   16    A.   I just remember him saying he was still trying to set the

03:40PM   17    meeting up, I don't remember the reason why.

03:40PM   18    Q.   Okay.  All right.  But you do remember Mr. Gerace at

03:40PM   19    least communicating to you that he some type of illness?

03:40PM   20    A.   Yes.

03:40PM   21    Q.   Okay.  So at some point in time, Mr. Gerace does meet

03:40PM   22    with the DEA and the FBI; is that right?

03:40PM   23    A.   Yes.

03:40PM   24    Q.   And you find out about that not because Agent Bongiovanni

03:40PM   25    called you, but because Agent Herbst called you, correct?

03:40PM   1    A.   Yes.

03:40PM   2    Q.   And Agent Herbst, he telephoned you after that meeting?

03:40PM   3    A.   Yes.

03:40PM   4    Q.   And you testified that Agent Herbst, in sum and

03:40PM   5    substance, said something to the effect of he didn't believe

03:40PM   6    that Mr. Gerace had any information that he could work with

03:40PM   7    at FBI?

03:40PM   8    A.   Yes.

03:40PM   9    Q.   But do you recall him also talking about how he would

03:41PM  10    continue to work with Peter Gerace nonetheless?

03:41PM  11    A.   Yes, he said that he would do that.

03:41PM  12    Q.   Okay.  So he continued to work with Mr. Gerace?

03:41PM  13    A.   I don't know if he continued to work, he said that he

03:41PM  14    didn't think he had any information, but he would continue to

03:41PM  15    work with him.

03:41PM  16    Q.   Understand.

03:41PM  17    A.   Yes.

03:41PM  18    Q.   So the phone calls that you received in this situation,

03:41PM  19    is it fair to say that Agent Herbst called you about Peter

03:41PM  20    Gerace and his cooperation more than Agent Bongiovanni did?

03:41PM  21    A.   Yes, I only spoke to Agent Bongiovanni that one time.

03:41PM  22    Q.   So you only spoke to Agent Bongiovanni once?

03:41PM  23    A.   Yes.

03:41PM  24    Q.   And you testified on direct that the conversations that

03:41PM  25    you had didn't affect in any way what you were prepared to do

03:41PM  1   as a probation officer with responding to the violations

03:41PM  2   Mr. Gerace committed?

03:41PM  3   A.  Correct.

03:42PM  4        **MR. SINGER:**  Okay.  Just one moment, Judge.

03:42PM  5        **BY MR. SINGER:**

03:42PM  6   Q.  So before -- sorry, let me preface that again.

03:42PM  7        So after the search occurred, but before the sit-down

03:42PM  8   between Mr. Gerace and the FBI and DEA, you had meetings

03:42PM  9   internally that included Agent Herbst, correct?

03:42PM  10  A.  After the search, before they met?

03:42PM  11  Q.  Correct.

03:42PM  12  A.  I had phone conversations with Mr. Herbst, yes.

03:42PM  13  Q.  And do you remember also meeting with Assistant United

03:42PM  14  States Attorney Tony Bruce about Peter Gerace and his

03:42PM  15  violation?

03:42PM  16  A.  Yes.

03:42PM  17  Q.  And Agent Herbst was a member of that meeting that you

03:42PM  18  had with AUSA Bruce?

03:42PM  19  A.  I don't know if that was after the search or before

03:43PM  20  without looking at my chronos, it would be in there though.

03:43PM  21  Q.  Would looking at your chronos help refresh your

03:43PM  22  recollection as to that?

03:43PM  23  A.  Yes, sir.

03:43PM  24        **MR. SINGER:**  Okay.  So I'm going to hand you a copy

03:43PM  25  of what's been marked as Government Exhibit 3501B, as in beta.

| | | |
|---|---|---|
| 03:43PM | 1 | **BY MR. SINGER:** |
| 03:43PM | 2 | Q.  Could you take a look through those, Officer Lepiane, and |
| 03:43PM | 3 | when you're done, look up at me. |
| 03:43PM | 4 | And I'll take those away from you, sir. |
| 03:43PM | 5 | A.  Yep. |
| 03:43PM | 6 | Q.  Did looking at that document help refresh your memory as |
| 03:43PM | 7 | to whether a meeting occurred or not? |
| 03:43PM | 8 | A.  Yes, it did occur. |
| 03:43PM | 9 | Q.  Okay.  And what do you recall now that your memory's been |
| 03:43PM | 10 | refreshed about that meeting, when it occurred? |
| 03:44PM | 11 | A.  We met following the search to outline all the |
| 03:44PM | 12 | noncompliance, and discuss what plan of action we would take. |
| 03:44PM | 13 | Q.  And AUSA Bruce, he works over at the U.S. Attorney's |
| 03:44PM | 14 | Office at that point in time? |
| 03:44PM | 15 | A.  Yes. |
| 03:44PM | 16 | Q.  And you understood him to be the individual who was |
| 03:44PM | 17 | interested in Organized Crime prosecutions? |
| 03:44PM | 18 | A.  Yes. |
| 03:44PM | 19 | **MR. SINGER:**  Okay.  I don't have any further |
| 03:44PM | 20 | questions, Judge. |
| 03:44PM | 21 | **THE COURT:**  Any redirect? |
| 03:44PM | 22 | **MR. COOPER:**  Just very briefly, Judge. |
| 03:44PM | 23 | |
| 03:44PM | 24 | **REDIRECT EXAMINATION BY MR. COOPER:** |
| 03:44PM | 25 | Q.  Mr. Lepiane, on cross-examination, you were just asked a |

03:44PM   1   question about whether Special Agent Herbst of the FBI called

03:44PM   2   you more times than this defendant; do you remember being

03:44PM   3   asked that question?

03:44PM   4   A.   Yes.

03:44PM   5   Q.   Was it your impression from your communications with

03:44PM   6   Special Agent Herbst that he was interested in investigating

03:44PM   7   Peter Gerace?

03:44PM   8   A.   Yes.

03:44PM   9   Q.   Was it your impression, from your single conversation

03:44PM   10  with this defendant, that he was interested in investigating

03:44PM   11  Peter Gerace?

03:44PM   12  A.   That's not what he said, no.

03:45PM   13           **MR. COOPER:**  Thank you.

03:45PM   14           **THE COURT:**  Mr. Singer?

03:45PM   15           **MR. SINGER:**  No redirect, Judge.

03:45PM   16           **THE COURT:**  You can step down, sir.

03:45PM   17           **THE WITNESS:**  Thank you.

          18           (Witness excused at 3:45 p.m.)

          19           (Excerpt concluded at 3:45 p.m.)

          20              *     *     *     *     *     *     *

          21

          22

          23

          24

          25

1

2                    **CERTIFICATE OF REPORTER**

3

4              In accordance with 28, U.S.C., 753(b), I

5    certify that these original notes are a true and correct

6    record of proceedings in the United States District Court for

7    the Western District of New York on February 15, 2024.

8

9

10                            s/ Ann M. Sawyer
                              Ann M. Sawyer, FCRR, RPR, CRR
11                            Official Court Reporter
                              U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    **TRANSCRIPT INDEX**

3       **EXCERPT - EXAMINATION OF S.U.S.P.O. PETER LEPIANE**

4                    **FEBRUARY 15, 2024**

5

6

7    **W I T N E S S**                              **P A G E**

8    **P E T E R   L E P I A N E**                      2

9      DIRECT EXAMINATION BY MR. COOPER:            2

10     CROSS-EXAMINATION BY MR. SINGER:            29

11     REDIRECT EXAMINATION BY MR. COOPER:         38

12

13

14

15

16

17

18

19

20

21

22

23

24

25