1                     UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF NEW YORK
2
   _____
3  UNITED STATES OF AMERICA,
                                        Case No. 1:19-cr-227
4                  Plaintiff,                    (LJV)
   v.
5                                       February 20, 2024
   JOSEPH BONGIOVANNI,
6
   _____
                   Defendant.
7

8     TRANSCRIPT EXCERPT - EXAMINATION OF T.F.O. ROBERT COTTRELL
              BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                   UNITED STATES DISTRICT JUDGE

10
   APPEARANCES:           TRINI E. ROSS, UNITED STATES ATTORNEY
11                        BY: JOSEPH M. TRIPI, ESQ.
                             NICHOLAS T. COOPER, ESQ.
12                           CASEY L. CHALBECK, ESQ.
                          Assistant United States Attorneys
13                        Federal Centre
                          138 Delaware Avenue
14                        Buffalo, New York 14202
                             And
15                        UNITED STATES DEPARTMENT OF JUSTICE
                          BY: JORDAN ALAN DICKSON, ESQ.
16                        1301 New York Ave NW
                          Suite 1000
17                        Washington, DC 20530-0016
                          For the Plaintiff
18
                          SINGER LEGAL PLLC
19                        BY: ROBERT CHARLES SINGER, ESQ.
                          80 East Spring Street
20                        Williamsville, New York 14221
                             And
21                        LAW OFFICES OF PARKER ROY MacKAY
                          BY: PARKER ROY MacKAY, ESQ.
22                        3110 Delaware Avenue
                          Kenmore, New York  14217
23                        For the Defendant

24  PRESENT:              BRIAN A. BURNS, FBI Special Agent
                          MARILYN K. HALLIDAY, HSI Special Agent
25                        KAREN A. CHAMPOUX, USA Paralegal

| | | |
|---|---|---|
| 1 | **LAW CLERK:** | **REBECCA FABIAN IZZO, ESQ.** |
| 2 | **COURT DEPUTY CLERK:** | **COLLEEN M. DEMMA** |
| 3 | **COURT REPORTER:** | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 4 | | Robert H. Jackson Federal Courthouse |
| | | 2 Niagara Square |
| | | Buffalo, New York  14202 |
| 5 | | Ann_Sawyer@nywd.uscourts.gov |

6

7                    *    *    *    *    *    *    *    *

8

9          (Excerpt commenced at 11:42 a.m.)

10          (Jury is present.)

11:42AM   11          **THE COURT:**  And the government can call its next

11:42AM   12  witness.

11:42AM   13          **MR. COOPER:**  Thank you, Judge, the government calls

11:42AM   14  Detective Robert Cottrell.

11:42AM   15

11:43AM   16  **R O B E R T   C O T T R E L L**, having been duly called and

11:43AM   17  sworn, testified as follows:

11:43AM   18

11:43AM   19                  **DIRECT EXAMINATION BY MR. COOPER:**

11:44AM   20  Q.  Good morning.

11:44AM   21  A.  Good morning.

11:44AM   22  Q.  Would you please introduce yourself to the jury?

11:44AM   23  A.  Bob Cottrell.  I'm a --

11:44AM   24  Q.  Where did you grow up?

11:44AM   25  A.  Auburn, New York.

11:44AM  1   Q.  Can you tell the jury about your education?

11:44AM  2   A.  I graduated from Oswego College with a bachelor's in

11:44AM  3   public justice in 1980.

11:44AM  4   Q.  And what sort of work did you do when you finished

11:44AM  5   school?

11:44AM  6   A.  I started my career in Western New York as a corrections

11:44AM  7   officer for Erie County Correctional Facility out in Wende.

11:44AM  8   Q.  How long were you there for?

11:44AM  9   A.  About four and a half years.

11:44AM  10  Q.  What did you do next?

11:44AM  11  A.  I then took a civil service appointment as a police

11:44AM  12  officer for the Town of Amherst.

11:44AM  13  Q.  What year did you take a civil service appointment as a

11:44AM  14  police --

11:44AM  15  A.  January.

11:44AM  16  Q.  -- officer?

11:44AM  17  A.  January of 1987, I started with Amherst.

11:44AM  18  Q.  Okay.  And are you still working there?

11:44AM  19  A.  I retired six years ago.

11:44AM  20  Q.  So approximately how many years did you work as a Town of

11:44AM  21  Amherst Police Department --

11:44AM  22  A.  32 years.

11:44AM  23  Q.  Can you describe for the jury your career progression in

11:45AM  24  the Amherst Police Department?

11:45AM  25  A.  Started out as a patrol officer.  Worked my way up to an

11:45AM    1    accident investigation officer.  Got appointed to detective

11:45AM    2    in 2001.  In early 2007 I was appointed to the narcotics

11:45AM    3    unit.  And then about a year after that, I was appointed to

11:45AM    4    the Safe Streets Task Force, it's a federal task force that

11:45AM    5    the FBI runs, and I did that until the end of my career for

11:45AM    6    about ten years.

11:45AM    7    Q.  I want to focus first about your time as a detective in

11:45AM    8    the narcotics unit.

11:45AM    9        Is there a difference between proactive and reactive

11:45AM   10    investigations as a detective?

11:45AM   11    A.  There is.  Proactive, we're looking ahead to try to stop

11:45AM   12    things, where reactive, you just answer the call and go from

11:45AM   13    there.

11:45AM   14    Q.  Are narcotics investigations more one than the other?

11:45AM   15    A.  They would be proactive.

11:45AM   16    Q.  Why are narcotics investigations proactive?

11:45AM   17    A.  Well, if it's reactive, they've already been arrested,

11:45AM   18    there's not much that we can do about something like that.

11:46AM   19    Q.  What sorts of proactive investigation work do you do as a

11:46AM   20    narcotics detective?

11:46AM   21    A.  A big part of it is we talk to individuals, especially

11:46AM   22    people who got jammed up in the criminal justice system.

11:46AM   23    Anybody who got arrested, we would talk to to see if they

11:46AM   24    have any information that could help out in any of our

11:46AM   25    investigations.

11:46AM    1    Q.   Is that a large part of your work as a narcotics

11:46AM    2    detective?

11:46AM    3    A.   It was, yes.  Yes.

11:46AM    4    Q.   Did you also participate in controlled buys?

11:46AM    5    A.   We did.

11:46AM    6    Q.   Did you execute search warrants?

11:46AM    7    A.   I did.

11:46AM    8    Q.   During your work as a narcotics detective with the

11:46AM    9    Amherst Police Department, did you collaborate with other

11:46AM   10    local state and federal law enforcement agencies?

11:46AM   11    A.   Constantly.

11:46AM   12    Q.   Are you familiar with a law enforcement tool called

11:46AM   13    SafetyNet?

11:46AM   14    A.   I am.

11:46AM   15    Q.   Can you describe for the jury how you would use SafetyNet

11:46AM   16    as a detective?

11:46AM   17    A.   If we developed information on an individual or an

11:46AM   18    organization, we -- and we thought we were going follow up on

11:46AM   19    that, we would submit that name into a program that was run

11:47AM   20    by the state, New York State Police.  And that's was mostly

11:47AM   21    for deconfliction.  We wouldn't want to be jumping on anybody

11:47AM   22    else's cases for safety purposes or stuff like that.

11:47AM   23        So any time we had a decent case that we wanted to follow

11:47AM   24    it up, we'd put that name into the SafetyNet system.

11:47AM   25    Q.   And if you had a name in SafetyNet, and somebody else ran

11:47AM   1   that name or input that name, what would happen?

11:47AM   2   A.  It would show that there's an organization that was

11:47AM   3   already investigating that person.  And we would call that

11:47AM   4   organization to see what's up, and let them know that this is

11:47AM   5   the information that we have.  If they had an ongoing

11:47AM   6   investigation, chances are we would just turn over what had

11:47AM   7   to them.

11:47AM   8   Q.  Next I'd like to discuss with you your work on the Safe

11:47AM   9   Streets Task Force.

11:47AM  10      Can you describe what kind of work you did on the Safe

11:47AM  11   Streets Task Force?

11:47AM  12   A.  It was a violent gang task force that we basically

11:47AM  13   targeted neighborhood-based gangs in Western New York.  Most

11:47AM  14   of the work was in Buffalo itself though.

11:47AM  15   Q.  When did you become a member?

11:48AM  16   A.  Middle of 2007, I believe, for Safe Streets.

11:48AM  17   Q.  And when you're a local police officer or police

11:48AM  18   detective, and you join a federal task force, do you have a

11:48AM  19   title?

11:48AM  20   A.  They call us task force officers.  We'd assist the agents

11:48AM  21   in their investigations.

11:48AM  22   Q.  Did you work primarily with a partner or a specific

11:48AM  23   agent?

11:48AM  24   A.  We would jump around, but early on I was hooked up a lot

11:48AM  25   with Agent Tom Herbst.

11:48AM 1  Q.  Are you familiar with an individual named Peter Gerace?

11:48AM 2  A.  I am.

11:48AM 3  Q.  Did there come a time in 2009 when you participated in an

11:48AM 4  investigation into Peter Gerace?

11:48AM 5  A.  I did.

11:48AM 6  Q.  Were you present for a search that was conducted at the

11:48AM 7  Pharaoh's Gentlemen's Club on Halloween in 2009?

11:48AM 8  A.  Yeah, I believe it was an if-come.

11:48AM 9     That was a federal probation case that we were assisting

11:48AM 10 on.  We must have got information that they were going to try

11:49AM 11 to talk to Mr. Gerace to see if he had anything to do with

11:49AM 12 Pharaoh's Night Club.

11:49AM 13    And since it was a Halloween weekend, I don't believe I

11:49AM 14 was there early, unless we knew that he was there for sure,

11:49AM 15 and that we would conduct the interview and the search.

11:49AM 16 Q.  Did you ultimately enter Pharaoh's on October 31st?

11:49AM 17 A.  I did.

11:49AM 18 Q.  Can you describe for the jury what you did when you

11:49AM 19 entered Pharaoh's that day?

11:49AM 20 A.  As I recall, I think I just went right up to the office

11:49AM 21 where Tom Herbst was with Peter Gerace interviewing him

11:49AM 22 already.

11:49AM 23 Q.  And since Tom was already interviewing Peter Gerace, what

11:49AM 24 did you do?

11:49AM 25 A.  I sat down, listened to the interview, and noticed that

11:49AM  1   there was a Rolodex with names and telephone numbers on the

11:49AM  2   desk.  So I was thumbing through that when Tom Herbst was

11:49AM  3   talking to Peter.

11:49AM  4   Q.  Did anything catch your attention as you thumbed through

11:49AM  5   the Rolodex on the desk?

11:49AM  6   A.  We were hoping to get some names of an investigation that

11:49AM  7   we were interested in.  We really didn't see anything there,

11:49AM  8   but I did notice quite a few law enforcement business cards.

11:50AM  9   Q.  Do you remember approximately how many law enforcement

11:50AM  10  business cards you saw?

11:50AM  11  A.  If I had to guess, it would be like a dozen or 15.

11:50AM  12  Q.  After the search of Pharaoh's Gentlemen's Club, did you

11:50AM  13  attend a meeting with Special Agent Tom Herbst, Joseph

11:50AM  14  Bongiovanni, and Peter Gerace?

11:50AM  15  A.  I did not.

11:50AM  16  Q.  Did you learn about that meeting after it took place?

11:50AM  17  A.  I'm sure I would have talked to Tom about that

11:50AM  18  afterwards, but I don't recall, because nothing came out of

11:50AM  19  it as far as I know.

11:50AM  20  Q.  I want to fast forward now to 2013, okay?

11:50AM  21  A.  Um-hum.

11:50AM  22  Q.  In 2013, did you become aware of an individual by the

11:50AM  23  name of R.K.?

11:50AM  24  A.  I did.

11:50AM  25  Q.  How did you become aware of that individual?

| | | |
|---|---|---|
| 11:50AM | 1 | A.  I was tasked to go along with another agent, Jason Beck. |
| 11:50AM | 2 | He wanted to interview a person who had information, and I |
| 11:51AM | 3 | don't recall what that information was at the time, but they |
| 11:51AM | 4 | wanted another officer to go with him.  So I tagged along. |
| 11:51AM | 5 | Q.  Did you ultimately go and conduct an interview of R.K.? |
| 11:51AM | 6 | A.  I did. |
| 11:51AM | 7 | Q.  Do you remember when that was? |
| 11:51AM | 8 | A.  It was in April of '13, I believe, 2013. |
| 11:51AM | 9 | Q.  Did R.K. provide information to you about specific |
| 11:51AM | 10 | individuals? |
| 11:51AM | 11 | A.  He did. |
| 11:51AM | 12 | Q.  Who did he provide information about? |
| 11:51AM | 13 | A.  He gave two names that were associated with Amherst.  One |
| 11:51AM | 14 | was T.S., and the other one was Rob Serio. |
| 11:51AM | 15 | Q.  When you said those individuals were associated with |
| 11:51AM | 16 | Amherst, what do you mean by that? |
| 11:51AM | 17 | A.  I believe they both resided in our town. |
| 11:51AM | 18 | Q.  Were those people who were kind of on your proverbial |
| 11:51AM | 19 | radar before you heard the names? |
| 11:51AM | 20 | A.  I know T.S. was.  And I can't say if Serio was before |
| 11:51AM | 21 | that time or not. |
| 11:51AM | 22 | Q.  What sort of information was related from R.K. to you |
| 11:52AM | 23 | regarding Serio? |
| 11:52AM | 24 | **MR. MacKAY:**  Objection.  Calls for hearsay. |
| 11:52AM | 25 | **MR. COOPER:**  Generally the sort of information, not |

| | | |
|---|---|---|
| 11:52AM | 1 | the words he said, Judge. |
| 11:52AM | 2 | **THE COURT:**  No sustained. |
| 11:52AM | 3 | **MR. COOPER:**  Okay. |
| 11:52AM | 4 | **BY MR. COOPER:** |
| 11:52AM | 5 | Q.  Based on the conversation that you had with R.K., did you |
| 11:52AM | 6 | take further investigative action or police action? |
| 11:52AM | 7 | A.  I did. |
| 11:52AM | 8 | Q.  Okay.  Did the information that R.K. provided to you |
| 11:52AM | 9 | inform how you were going proceed next? |
| 11:52AM | 10 | A.  Yes. |
| 11:52AM | 11 | Q.  Okay.  What information did R.K. provide to you? |
| 11:52AM | 12 | A.  It was drug information on those two individuals I |
| 11:52AM | 13 | mentioned. |
| 11:52AM | 14 | Q.  When you say "drug information," what do you mean by |
| 11:52AM | 15 | that? |
| 11:52AM | 16 | A.  It was dealing.  Dealing a large amount of marijuana, I |
| 11:52AM | 17 | believe it was. |
| 11:52AM | 18 | Q.  Okay.  Based on that interview, did the FBI Safe Streets |
| 11:52AM | 19 | Task Force decide to move forward investigating Serio and |
| 11:52AM | 20 | T.S. for trafficking marijuana? |
| 11:52AM | 21 | A.  I would have forwarded that information both back to the |
| 11:52AM | 22 | Safe Streets Task Force intel analyst, who would have been |
| 11:52AM | 23 | Tom Camizzi.  And I would have forwarded it to my boss who at |
| 11:52AM | 24 | the time was Detective Lieutenant JoAnn DiNoto. |
| 11:53AM | 25 | Q.  When you say your boss, is JoAnn DiNoto employed by the |

11:53AM    1    FBI, or by the Amherst Police Department?

11:53AM    2    A.   She's employed by Amherst narcotics.

11:53AM    3    Q.   Why did you send that information to the Amherst Police

11:53AM    4    Department?

11:53AM    5    A.   It was relevant to our town.  I wanted to see if we could

11:53AM    6    follow up on that.

11:53AM    7    Q.   Did the Safe Streets Task Force pursue that investigation

11:53AM    8    into Serio on its own?

11:53AM    9    A.   I am not sure if they did.  I'm sure they would have

11:53AM   10    followed it up because it was good information, but I don't

11:53AM   11    know exactly what they did after that.

11:53AM   12    Q.   Other than providing that information to Camizzi and to

11:53AM   13    JoAnn DiNoto, did the FBI Safe Streets Task Force pass R.K.

11:53AM   14    along to anyone else?

11:53AM   15    A.   We did, ultimately did.  Yes.

11:53AM   16    Q.   Who did you pass R.K. along to?

11:53AM   17    A.   The DEA.

11:53AM   18    Q.   Do you remember who at the DEA?

11:53AM   19    A.   Joe Bongiovanni.

11:54AM   20    Q.   Did you ultimately have a discussion or discussions with

11:54AM   21    Bongiovanni regarding R.K.?

11:54AM   22    A.   I can't recall if I did or not.  But I know I would have

11:54AM   23    personally turned over the informant R.K. to Joe Bongiovanni.

11:54AM   24    Q.   When you say "personally turned over," is that an

11:54AM   25    in-person meeting?

11:54AM   1   A.  Yes.

11:54AM   2   Q.  Do you recall that meeting?

11:54AM   3   A.  I had to refer to my notes.  I have a day book that I

11:54AM   4   refer to, and it was at Forest and Richmond, so that would

11:54AM   5   have been the Psych Center.  So I would have dropped him off

11:54AM   6   there and turned him over to him, only because I had a couple

11:54AM   7   of dealings with R.K., and I wanted to him make him familiar

11:54AM   8   with the officer who was handling him, the agent.

11:54AM   9   Q.  Okay.  As you dropped him off as you described, would

11:54AM  10   Bongiovanni have been present for that meeting?

11:54AM  11   A.  Yes, he would have.

11:54AM  12   Q.  Okay.  And did you develop an impression as to what

11:54AM  13   Bongiovanni was going to do with R.K.?

11:54AM  14   A.  I -- I can't say yes.  I assumed it was one of the

11:54AM  15   targets that he mentioned, T.S. or Serio, but I can't say in

11:55AM  16   that regard.

11:55AM  17   Q.  Okay.  Well, what was R.K.'s role going to be for

11:55AM  18   Bongiovanni, in your mind, when you turned him over?

11:55AM  19         **MR. MacKAY:**  Objection, speculation.

11:55AM  20         **MR. COOPER:**  I'm asking about his impression.

11:55AM  21         **THE COURT:**  Overruled.  Go ahead.

11:55AM  22         **THE WITNESS:**  He had relevant information on a couple

11:55AM  23   of targets that I could have used, so --

11:55AM  24         **BY MR. COOPER:**

11:55AM  25   Q.  Was the information about selling drugs?

| | | |
|---|---|---|
| 11:55AM | 1 | A.  Yes. |
| 11:55AM | 2 | Q.  Did you expect the DEA to pursue that investigation? |
| 11:55AM | 3 | A.  Absolutely. |
| 11:55AM | 4 | Q.  Okay. |
| 11:55AM | 5 | **MR. COOPER:**  Just one second, please. |
| 11:55AM | 6 | I have no further questions, Judge. |
| 11:55AM | 7 | **THE COURT:**  Cross? |
| 11:55AM | 8 | **MR. MacKAY:**  Thank you, Your Honor. |
| 11:55AM | 9 | |
| 11:55AM | 10 | **CROSS-EXAMINATION BY MR. MacKAY:** |
| 11:55AM | 11 | Q.  Good morning, Mr. Cottrell. |
| 11:55AM | 12 | A.  Good morning, Parker. |
| 11:55AM | 13 | Q.  How are you? |
| 11:55AM | 14 | A.  I'm doing fine, thank you. |
| 11:55AM | 15 | Q.  So you began your police career with Amherst police, |
| 11:56AM | 16 | correct? |
| 11:56AM | 17 | A.  I'd like to say I started as an Erie County correctional |
| 11:56AM | 18 | officer back in 1982.  But the police, I started in 1987 with |
| 11:56AM | 19 | Amherst, yes. |
| 11:56AM | 20 | Q.  Okay.  And then eventually, you rise to the ranks to |
| 11:56AM | 21 | become a detective, correct? |
| 11:56AM | 22 | A.  Correct. |
| 11:56AM | 23 | Q.  And you ultimately go over to do a detail with the FBI |
| 11:56AM | 24 | with the Safe Streets Task Force, correct? |
| 11:56AM | 25 | A.  Yes. |

11:56AM    1    Q.   Okay.  And in that capacity, you're what's known as a

11:56AM    2    task force officer, correct?

11:56AM    3    A.   Correct.

11:56AM    4    Q.   And I think you told us on direct that your job was to

11:56AM    5    assist agents, correct?

11:56AM    6    A.   Yes.

11:56AM    7    Q.   And by agents, you mean people who hold the singular role

11:56AM    8    of FBI agent, correct?

11:56AM    9    A.   Yes.

11:56AM    10   Q.   You, as a TFO, a task force officer, sort of hold dual

11:56AM    11   roles; is that fair to say?

11:56AM    12   A.   I don't know what you're getting at, but --

11:56AM    13   Q.   Well, I'm just trying to flush this out.  Essentially

11:57AM    14   you're still an Amherst police detective --

11:57AM    15   A.   Yep.

11:57AM    16   Q.   -- at the time --

11:57AM    17   A.   Yep.

11:57AM    18   Q.   -- correct.

11:57AM    19   A.   Assigned to -- assigned to the FBI and the Safe Streets

11:57AM    20   Task Force --

11:57AM    21   Q.   Okay.

11:57AM    22   A.   -- as a TFO.

11:57AM    23   Q.   So you do, in some part, FBI duties, correct?

11:57AM    24   A.   Yes.

11:57AM    25   Q.   And then, in some part, Amherst police duties, correct?

11:57AM 1    A.  Yes.

11:57AM 2    Q.  But your paycheck is still coming from Amherst police,

11:57AM 3    correct?

11:57AM 4    A.  Correct.

11:57AM 5    Q.  But you still have to learn all of the FBI operating

11:57AM 6    procedure, correct?

11:57AM 7    A.  I tried my left.

11:57AM 8    Q.  Because you, as a TFO with the FBI, are going to be

11:57AM 9    required to document things that are going stay solely with

11:57AM 10   the FBI, correct?

11:57AM 11   A.  Correct.

11:57AM 12   Q.  But sometimes your job as a TFO is to create that linkage

11:57AM 13   between Amherst, the local agency, and the federal agency,

11:57AM 14   the FBI, right?

11:57AM 15   A.  Okay.

11:57AM 16   Q.  Well, you tell me; is that -- is that a fair statement?

11:57AM 17   A.  Yes.

11:57AM 18   Q.  And I think you kind of told us about a situation

11:57AM 19   already, you might take information from the local agency

11:57AM 20   like Amherst, and then bring it over to FBI, correct?

11:57AM 21   A.  Correct.

11:57AM 22   Q.  All right.  So, let's go to the Safe Streets Task Force

11:58AM 23   work.  I think you told us on direct, near the beginning of

11:58AM 24   your time there, your main partner is Special Agent Tom

11:58AM 25   Herbst, correct?

11:58AM    1    A.  Yes, I could say that.

11:58AM    2    Q.  Well, it looks like there's a little bit of a hesitation.

11:58AM    3    Do you work with --

11:58AM    4    A.  I would work with other agents on other cases.  We had

11:58AM    5    multiple cases going on at the same time.

11:58AM    6        So if I'm assisting somebody on a different gang, I'm

11:58AM    7    usually with another agent who's a case agent on that one.

11:58AM    8    Q.  Okay.  So your role as a TFO could have you jumping

11:58AM    9    around to a couple different agents?

11:58AM   10    A.  Yes.

11:58AM   11    Q.  If you had to ballpark it, could you give us a figure of

11:58AM   12    how much you worked with Tom Herbst compared to the others?

11:58AM   13    A.  25 percent, maybe.

11:58AM   14    Q.  Okay.  Now, were you aware that Agent Herbst had

11:58AM   15    initiated a file regarding Italian Organized Crime?

11:58AM   16    A.  Yes.

11:58AM   17    Q.  Okay.  Did you know that to be sort of shortly after he

11:59AM   18    came back to the office, the Buffalo office of the FBI?

11:59AM   19    A.  Yes.  Correct.

11:59AM   20    Q.  Okay.  And it's your understanding he started that file,

11:59AM   21    correct?

11:59AM   22    A.  I believe it was, yeah.

11:59AM   23    Q.  But that file inherited old information, or I should say

11:59AM   24    information regarding some potential old unsolved homicides,

11:59AM   25    correct?

Case 1:19-cr-00227-LJV-MJR   Document 910   Filed 05/05/24   Page 17 of 45
USA v Bongiovanni - Cottrell - MacKay/Cross - 2/20/24

17

| | | |
|---|---|---|
| 11:59AM | 1 | A.  Correct. |
| 11:59AM | 2 | Q.  Is it fair to say the name linkage from the that file to |
| 11:59AM | 3 | the U.S. Attorney's Office was AUSA Tony Bruce? |
| 11:59AM | 4 | A.  No, I would think would be Charlie Wydysh. |
| 11:59AM | 5 | Q.  Okay.  Did you have dealings with AUSA Tony Bruce in |
| 11:59AM | 6 | connection with Tom Herbst's file? |
| 11:59AM | 7 | A.  I did not have much interaction at all with Tony Bruce. |
| 11:59AM | 8 | Q.  Okay.  Now, and just to be clear, you're working as a TFO |
| 11:59AM | 9 | agent in this -- was it something called Squad 4? |
| 11:59AM | 10 | A.  Safe Streets. |
| 11:59AM | 11 | Q.  Okay.  I guess I'm just trying to make sure that we |
| 12:00PM | 12 | understand that Safe Streets Task Force is part of Squad 4? |
| 12:00PM | 13 | A.  Yes. |
| 12:00PM | 14 | Q.  But you're just with the Safe Streets Task Force? |
| 12:00PM | 15 | A.  Correct. |
| 12:00PM | 16 | Q.  And how many agents are just with the Safe Streets Task |
| 12:00PM | 17 | Force? |
| 12:00PM | 18 | A.  At that time, we had ten agents and maybe half a dozen |
| 12:00PM | 19 | TFOs. |
| 12:00PM | 20 | Q.  Okay.  And it's fair to say that the Safe Streets Task |
| 12:00PM | 21 | Force at that time is focusing on a lot more things other |
| 12:00PM | 22 | than just this -- |
| 12:00PM | 23 | A.  Correct. |
| 12:00PM | 24 | Q.  -- Italian Organized Crime file? |
| 12:00PM | 25 | A.  Yes. |

12:00PM   1   Q.   Okay.  And even Agent Herbst is focusing on a lot of

12:00PM   2   other things besides just this one file, correct?

12:00PM   3   A.   Yes.

12:00PM   4   Q.   Okay.  Now, I'm going to, when you come over to the FBI,

12:00PM   5   you've got to learn a lot of forms that the FBI uses,

12:00PM   6   correct?

12:00PM   7   A.   Correct.

12:00PM   8   Q.   And one of them is called a 302; do you recall that one?

12:00PM   9   A.   Yes.

12:00PM   10   Q.   Fair to say that's called a form for reporting

12:00PM   11   information that may become testimony?

12:00PM   12   A.   Um-hum.

12:00PM   13   Q.   And the purpose of that form is to document in substance

12:00PM   14   what -- what happened in an interview if there's an

12:00PM   15   expectation that that could later be used as testimony?

12:01PM   16   A.   Okay.  Yes.

12:01PM   17   Q.   That's what I'm asking, is that an accurate

12:01PM   18   representation of what that form does?

12:01PM   19   A.   Yes.

12:01PM   20   Q.   Okay.  Are you familiar with an FD 209 form?

12:01PM   21   A.   No.

12:01PM   22   Q.   Okay.  Anything -- any type of form used to record

12:01PM   23   contact with unofficial informants?

12:01PM   24   A.   No.

12:01PM   25   Q.   Okay.  Are you familiar with an FD 356 form?

| | | |
|---|---|---|
| 12:01PM | 1 | A.  302 is the main form that we would use. |
| 12:01PM | 2 | Q.  Okay. |
| 12:01PM | 3 | A.  If there's another form, I'd pass it off to the agent. |
| 12:01PM | 4 | Q.  I'm sorry? |
| 12:01PM | 5 | A.  If there was another form that was needed, I would pass |
| 12:01PM | 6 | it off to the agent who I was working with at that time. |
| 12:01PM | 7 | Q.  Okay.  So if there were specific requests for |
| 12:01PM | 8 | information, for example, you would tell the agent I need |
| 12:01PM | 9 | this done, can you go do it? |
| 12:01PM | 10 | A.  No, I might assist him, but he would do the paperwork on |
| 12:01PM | 11 | it. |
| 12:01PM | 12 | Q.  Okay.  So really, I just want to make sure we're clear on |
| 12:01PM | 13 | this, you would do FD 302 forms.  But if there was something |
| 12:01PM | 14 | else, that would get left to the primary federal agents? |
| 12:01PM | 15 | A.  Generally, yes. |
| 12:01PM | 16 | Q.  Okay.  All right.  So, this Italian Organized Crime |
| 12:02PM | 17 | investigation, I'm using that term, but really it's an |
| 12:02PM | 18 | investigation into cold case homicides, correct? |
| 12:02PM | 19 | A.  Yes. |
| 12:02PM | 20 | Q.  All right.  That's really ultimately what the Safe |
| 12:02PM | 21 | Streets Task Force is attempting to build a prosecution |
| 12:02PM | 22 | about, correct? |
| 12:02PM | 23 | A.  Yes. |
| 12:02PM | 24 | Q.  At the end of the day, they're looking for old murder |
| 12:02PM | 25 | charges, correct? |

12:02PM  1   A.  Correct.

12:02PM  2   Q.  But yours and Tom Herbst's interest becomes trying to

12:02PM  3   develop some routes to folks who might have information on

12:02PM  4   those old homicides, correct?

12:02PM  5   A.  Yes.

12:02PM  6   Q.  Essentially, you're looking to find people who might

12:02PM  7   provide information about those old homicides?

12:02PM  8   A.  Yes.

12:02PM  9   Q.  And in particular, you're looking for folks who are

12:02PM  10  embedded within these potential Italian Organized Crime

12:02PM  11  organizations, who might flip and tell you information,

12:02PM  12  correct?

12:02PM  13  A.  Yes.

12:02PM  14  Q.  Okay.  And one target that was identified was Peter

12:03PM  15  Gerace Jr., correct?

12:03PM  16  A.  Yes.

12:03PM  17  Q.  And he was identified because, in your office, there was

12:03PM  18  some importance about who he was related to, correct?

12:03PM  19  A.  Yes.

12:03PM  20  Q.  Now, at the same time, is it fair to say that there were

12:03PM  21  also some other sources developed into Peter Gerace and his

12:03PM  22  dealings at Pharaoh's?

12:03PM  23  A.  I'm sure there was, but nothing that I would be pertinent

12:03PM  24  to.

12:03PM  25  Q.  Okay.  Do you recall any specific individuals giving up

12:03PM   1   information as a result of an Amherst Police Department

12:03PM   2   traffic stop about Pharaoh's?

12:03PM   3   A.  I think we talked to a couple of dancers who got arrested

12:03PM   4   for a DWI, but I don't recall what happened to that.

12:03PM   5   Q.  Okay.  So two dancers from Pharaoh's, correct?

12:03PM   6   A.  I believe so.

12:03PM   7   Q.  Okay.  Do you recall if there was, at the time, any other

12:04PM   8   individuals that you and Mr. Herbst were already working that

12:04PM   9   were inside Pharaoh's?

12:04PM  10   A.  I don't recall.

12:04PM  11   Q.  Okay.  But to your knowledge, there are these two

12:04PM  12   dancers.  And they're giving up what you would characterize

12:04PM  13   as viable information, correct?

12:04PM  14   A.  As I recall, I don't think we got much information out of

12:04PM  15   them at all.

12:04PM  16   Q.  Okay.

12:04PM  17   A.  If that's the incident that you're talking about, but I'm

12:04PM  18   not sure.

12:04PM  19   Q.  Okay.  But there was information to follow up on,

12:04PM  20   correct?

12:04PM  21   A.  If there was, we would have followed it up.

12:04PM  22   Q.  Okay.  Did you conduct any surveillance of either

12:04PM  23   Mr. Gerace or the Pharaoh's Gentlemen's Club in the summer of

12:04PM  24   2009?

12:04PM  25   A.  I don't know if I did that or not.  I can't recall.

12:04PM      1    Q.  Do you recall if it was done generally by the FBI?

12:04PM      2    A.  I would assume so, but I don't know.

12:04PM      3    Q.  Okay.  Well, you never personally worked on anything like

12:05PM      4    that?

12:05PM      5    A.  I don't recall that, no.

12:05PM      6    Q.  Okay.  But ultimately that culminates in a Halloween

12:05PM      7    search in 2009 of Pharaoh's, correct?

12:05PM      8    A.  Yes.

12:05PM      9    Q.  And you're there at the search?

12:05PM     10    A.  I was there.

12:05PM     11    Q.  But you did -- you did not participate in the interview

12:05PM     12    of Mr. Gerace, correct?

12:05PM     13    A.  I believe I got there late, but I did not, I don't think

12:05PM     14    I even asked him any questions.

12:05PM     15    Q.  I'm sorry, can you speak up?

12:05PM     16    A.  I got there late, and I don't think I even asked him any

12:05PM     17    questions, or just generic questions at all.  I think it was

12:05PM     18    Agent Herbst who was talking to him.

12:05PM     19    Q.  Okay.  I just want to narrow that down, though.  Do you

12:05PM     20    recall actually being part of the interview in any fashion?

12:05PM     21    A.  I would have been in the office with him when it was

12:05PM     22    happening.

12:05PM     23    Q.  Okay.  Do you recall Mr. Gerace being resistant to

12:05PM     24    answering any questions?

12:05PM     25    A.  I don't think he gave us any information to be helpful

12:05PM  1   for our investigation, but I don't think he was resistant to

12:05PM  2   it.

12:05PM  3   Q.  And at that point in time, is it fair to say there's a

12:05PM  4   lot of police activity going on in Pharaoh's, you know, in

12:05PM  5   the course of the search --

12:05PM  6   A.  The other --

12:06PM  7   Q.  -- warrant --

12:06PM  8   A.  -- people --

12:06PM  9   Q.  -- being executed?

12:06PM  10  A.  -- there -- the other people there are searching, you

12:06PM  11  know, for --

12:06PM  12  Q.  Right.

12:06PM  13  A.  -- whatever they're looking for.

12:06PM  14  Q.  I mean, people are looking through records, correct?

12:06PM  15  A.  Yes.

12:06PM  16  Q.  And you testified you were looking through a -- through a

12:06PM  17  Rolodex, right?

12:06PM  18  A.  Yes.

12:06PM  19  Q.  Obviously, there's people -- there's law enforcement

12:06PM  20  officials securing the scene, correct?

12:06PM  21  A.  Yes.

12:06PM  22  Q.  There's a lot of things going on when there's a search

12:06PM  23  warrant execution, correct?

12:06PM  24  A.  Yes.

12:06PM  25  Q.  Okay.  It's not exactly a confidential environment for

12:06PM  1  somebody to turn over confidential information; fair to say?

12:06PM  2  A.  Yes.

12:06PM  3  Q.  Okay.  But at that point in time, to your knowledge, when

12:06PM  4  you and Agent Herbst go into that interview discussion, the

12:06PM  5  intention is to start building some sort of rapport to

12:06PM  6  gain --

12:06PM  7  A.  Yes.

12:06PM  8  Q.  -- a relationship with Mr. Gerace?

12:06PM  9  A.  Yes.

12:06PM  10  Q.  And you're not gonna flip him in a single conversation

12:06PM  11  there; fair to say?

12:06PM  12  A.  Correct.

12:06PM  13  Q.  But, you know, plant the seeds, and perhaps continue the

12:06PM  14  conversation down the road, correct?

12:07PM  15  A.  Yes.

12:07PM  16  Q.  Ultimately with the goal of getting him to give up what

12:07PM  17  you could see as valuable information about individuals who

12:07PM  18  could help you solve the cold case crimes, correct?

12:07PM  19  A.  Yes.

12:07PM  20  Q.  I mean, so, the main focus here is not necessarily on

12:07PM  21  Mr. Gerace's connection to narcotics, correct?

12:07PM  22  A.  Yes.

12:07PM  23  Q.  The main focus is how can we build some trust so we can

12:07PM  24  get some more information out of him later, correct?

12:07PM  25  A.  Correct.

| 12:07PM | 1 | Q.  Okay.  A couple days later, do you recall whether you had |
| 12:07PM | 2 | a meeting with a federal probation officer and your partner |
| 12:07PM | 3 | at the United States Attorney's Office? |
| 12:07PM | 4 | A.  I don't recall. |
| 12:07PM | 5 | Q.  Okay.  Do you recall ever having any meetings with the |
| 12:07PM | 6 | federal prosecutor associated with this Gerace activity? |
| 12:07PM | 7 | A.  With that search?  I don't believe I did. |
| 12:07PM | 8 | Q.  Okay. |
| 12:07PM | 9 | A.  I may have, but I don't recall it. |
| 12:07PM | 10 | Q.  Okay.  Now, you told us that you did not attend a meeting |
| 12:08PM | 11 | with Agent Herbst and Mr. Bongiovanni and Mr. Gerace, |
| 12:08PM | 12 | correct? |
| 12:08PM | 13 | A.  Correct. |
| 12:08PM | 14 | Q.  Okay.  Around, I mean, as you sit here today, you're |
| 12:08PM | 15 | aware that a meeting did occur, correct? |
| 12:08PM | 16 | A.  I was told, yes. |
| 12:08PM | 17 | Q.  Okay.  And it's true that in fact you weren't told until |
| 12:08PM | 18 | about a decade later after the investigation went public, |
| 12:08PM | 19 | correct? |
| 12:08PM | 20 | A.  Correct. |
| 12:08PM | 21 | Q.  Okay.  But between -- so, the first time you really heard |
| 12:08PM | 22 | about that is about several years ago, correct? |
| 12:08PM | 23 | A.  I don't know when it would have been -- |
| 12:08PM | 24 | Q.  Okay. |
| 12:08PM | 25 | A.  -- to tell you the truth. |

12:08PM   1   Q.  Closer in time to now than back then, correct?

12:08PM   2   A.  Yes.

12:08PM   3   Q.  Okay.  And following the search of Pharaoh's, Agent

12:08PM   4   Herbst never told you anything about abandoning the Gerace

12:08PM   5   avenue to the cold cases did he?

12:08PM   6   A.  I don't recall if he did.

12:08PM   7   Q.  So you just kind of moved on to other things; fair to

12:08PM   8   say?

12:08PM   9   A.  Yes.

12:08PM   10  Q.  And that happens in investigations, correct?  Some

12:08PM   11  avenues just shut down, and you go in other directions,

12:08PM   12  correct?

12:08PM   13  A.  Yes.

12:08PM   14  Q.  I think we covered this, but there's also a lot of other

12:09PM   15  things going on with the Safe Streets Task Force at that

12:09PM   16  time, correct?

12:09PM   17  A.  Yes.

12:09PM   18  Q.  And to your recollection, was the IOC, the Italian

12:09PM   19  Organized Crime cold case homicide file ever really revived

12:09PM   20  at any point in time?

12:09PM   21  A.  We'd still work on it, but it -- it went nowhere.  We

12:09PM   22  didn't get any information to --

12:09PM   23  Q.  Okay.

12:09PM   24  A.  -- pursue it further.

12:09PM   25  Q.  Okay.  And to your knowledge, as you sit here today, you

12:09PM  1   have nothing to suggest that that had anything to do with

12:09PM  2   Mr. Gerace, correct?

12:09PM  3   A.   Correct.

12:09PM  4   Q.   I mean, you, Agent Herbst, and other individuals in the

12:09PM  5   Safe Streets Task Force, were out there pursuing whatever

12:09PM  6   leads you could, correct?

12:09PM  7   A.   Yes.

12:09PM  8   Q.   I mean, you still had the contact information at this

12:09PM  9   time for the two dancers at Pharaoh's, correct?

12:09PM  10  A.   I believe we would have, yes.

12:09PM  11  Q.   Okay.  And ultimately, I think what you're telling us

12:09PM  12  here is they were viable, but it didn't really pan out,

12:09PM  13  correct?

12:09PM  14  A.   As far as I can recall, yes.

12:09PM  15  Q.   Okay.

12:09PM  16  A.   I don't recall it going anywhere.

12:09PM  17  Q.   Do you -- and ultimately, other sources of information

12:10PM  18  don't pan out into enough of an investigation to form a

12:10PM  19  prosecution, correct?

12:10PM  20  A.   Correct.

12:10PM  21  Q.   Fair to say in colloquial terms, this is sort of like a

12:10PM  22  back-burner project?

12:10PM  23  A.   I would say that, yes.

12:10PM  24  Q.   Okay.  It's one that's really because it's so old

12:10PM  25  heavily -- strike that.

12:10PM   1    Because it's so old, is it fair to say that it's an

12:10PM   2    investigation that really needs informants in some fashion,

12:10PM   3    correct?

12:10PM   4    A.  Yes.

12:10PM   5    Q.  Okay.  And you really need, in order to solve those cold

12:10PM   6    case crimes, individuals who were there back in the '70s or

12:10PM   7    '80s or whatever was happening there, correct?

12:10PM   8    A.  Yes.

12:10PM   9    Q.  And to your knowledge, do you recall trying to work some

12:10PM   10   other sources to get folks like that?

12:10PM   11   A.  We talked to many individuals.

12:10PM   12   Q.  Okay.  And ultimately, it just doesn't go anywhere?

12:10PM   13   A.  Correct.

12:10PM   14   Q.  All right.  Now, you never saw a FBI 302 form about any

12:10PM   15   meeting between Agent Herbst and Mr. Gerace, correct?

12:11PM   16   A.  I may have.  I don't recall.

12:11PM   17   Q.  But as you sit here today --

12:11PM   18   A.  I don't recall.

12:11PM   19   Q.  -- you don't recall ever seeing one?

12:11PM   20   A.  No.

12:11PM   21   Q.  And I think you told us you didn't hear about it for many

12:11PM   22   years later, correct?

12:11PM   23   A.  Yes.

12:11PM   24   Q.  Okay.  And you don't recall any other chatter about the

12:11PM   25   office about any sort of meeting occurred, correct?

| 12:11PM | 1 | A.  Not that I recall, no.  I wouldn't think it was anything. |
| 12:11PM | 2 | Q.  All right.  So, let's fast forward to 2013.  At this time |
| 12:11PM | 3 | you're still an Amherst police detective, correct? |
| 12:11PM | 4 | A.  Yep. |
| 12:11PM | 5 | Q.  And you're still on the FBI Safe Streets Task Force, |
| 12:11PM | 6 | correct? |
| 12:11PM | 7 | A.  Yes. |
| 12:11PM | 8 | Q.  And you get linked up with an individual named R.K., |
| 12:11PM | 9 | correct? |
| 12:11PM | 10 | A.  Yes. |
| 12:11PM | 11 | Q.  Okay.  Now, R.K. comes into the Amherst Police Department |
| 12:11PM | 12 | because -- not because of you, correct?  Is that fair to say? |
| 12:11PM | 13 | A.  It would have been for me. |
| 12:11PM | 14 | Q.  Well, let me ask it this way.  You didn't make an arrest |
| 12:11PM | 15 | of R.K., did you? |
| 12:11PM | 16 | A.  No, he was already arrested, I believe. |
| 12:12PM | 17 | Q.  Okay.  And to your knowledge, maybe he gave up some |
| 12:12PM | 18 | information or was intending to speak with somebody? |
| 12:12PM | 19 | A.  That's why he talked, wanted to talk to somebody from the |
| 12:12PM | 20 | Feds. |
| 12:12PM | 21 | Q.  Okay.  But to your knowledge, somebody from Amherst |
| 12:12PM | 22 | police had already spoken to him? |
| 12:12PM | 23 | A.  I don't know if they did or not. |
| 12:12PM | 24 | Q.  Okay.  But eventually, there comes a point in time where |
| 12:12PM | 25 | you talked to R.K.? |

12:12PM    1    A.  Yes.

12:12PM    2    Q.  Okay.  On or about April 8th, 2013?

12:12PM    3    A.  Yes.

12:12PM    4    Q.  Okay.  And, you know, I just want to walk through how we

12:12PM    5    get there.

12:12PM    6        Are you assigned a task, is somebody telling you go out

12:12PM    7    and meet with this guy?

12:12PM    8    A.  It would have been Agent Jason Beck.  And I was tasked

12:12PM    9    from our office to go along with Jason Beck to talk to an

12:12PM   10    individual who might have information.

12:12PM   11    Q.  Okay.  So, as you sit here today, is what you're telling

12:12PM   12    us that sort of Officer Beck was sort of the primary contact

12:12PM   13    with Mr. R.K.?

12:12PM   14    A.  It could have been, yes.

12:12PM   15    Q.  Okay.

12:13PM   16    A.  It wasn't me.  I was just tasked to go along with Jason

12:13PM   17    Beck.

12:13PM   18    Q.  Okay.  So you start your interactions with Mr. R.K. in

12:13PM   19    sort of a support role, correct?

12:13PM   20    A.  Yes.

12:13PM   21    Q.  Okay.  And Officer Beck is not associated with the Safe

12:13PM   22    Streets Task Force, correct?

12:13PM   23    A.  I don't think Agent Beck was on our squad, he might have

12:13PM   24    been on the intel squad or something, but he was an FBI agent

12:13PM   25    at the time.

12:13PM  1    Q.  He was an FBI agent?

12:13PM  2    A.  I believe he was, yes.

12:13PM  3    Q.  Right.  But just so we're really clear on this, the

12:13PM  4    information from Mr. R.K., his initial appearance, how he

12:13PM  5    sort of bubbles up in the system, comes from Amherst,

12:13PM  6    correct?

12:13PM  7    A.  I don't know where he came from.  We were just -- I was

12:13PM  8    tasked with the information to go talk to an individual who

12:13PM  9    might have information on something that can help us out.

12:13PM  10   Q.  Okay.  So, irrespective of whether it's in your role as

12:13PM  11   an FBI TFO, or as Amherst, you meet with him though, correct?

12:13PM  12   A.  I did.

12:13PM  13   Q.  Is it your recollection that it was sort of difficult to

12:13PM  14   get ahold of him?

12:13PM  15   A.  Not the first time.

12:13PM  16   Q.  Okay.  So you meet with him relatively soon after you

12:14PM  17   learn there's gonna be a meeting?

12:14PM  18   A.  I would have been tasked probably that hour, I would say,

12:14PM  19   we're going to meet with this individual.

12:14PM  20   Q.  Okay.

12:14PM  21   A.  I don't know if that's how it worked, but --

12:14PM  22   Q.  Do you recall that generally being in the Military Avenue

12:14PM  23   of Kenmore?

12:14PM  24   A.  Yes.

12:14PM  25   Q.  Okay.  And then you attempt to talk with him about a week

USA v Bongiovanni - Cottrell - MacKay/Cross - 2/20/24

32

| | | |
|---|---|---|
| 12:14PM | 1 | later in the vicinity of Kenmore and Colvin Avenues; is that |
| 12:14PM | 2 | fair to say? |
| 12:14PM | 3 | A.  Yes. |
| 12:14PM | 4 | Q.  But that meeting never panned out, correct? |
| 12:14PM | 5 | A.  He never showed up. |
| 12:14PM | 6 | Q.  He never showed up.  Now, do you understand that to be |
| 12:14PM | 7 | generally around where his mother lives? |
| 12:14PM | 8 | A.  Yes. |
| 12:14PM | 9 | Q.  Okay.  But, in sum and substance, Mr. R.K. doesn't show |
| 12:14PM | 10 | for the meeting? |
| 12:14PM | 11 | A.  It's not uncommon, yes. |
| 12:14PM | 12 | Q.  Okay.  But I'm just being clear, he doesn't show that |
| 12:14PM | 13 | time? |
| 12:14PM | 14 | A.  Right. |
| 12:14PM | 15 | Q.  Okay.  After you had already had one meeting with him, |
| 12:14PM | 16 | correct? |
| 12:14PM | 17 | A.  Yes. |
| 12:14PM | 18 | Q.  Now, you make a -- I think you told us you pass |
| 12:15PM | 19 | information both back to your boss at Amherst, that's |
| 12:15PM | 20 | Lieutenant JoAnn DiNoto, correct? |
| 12:15PM | 21 | A.  Correct. |
| 12:15PM | 22 | Q.  Okay.  And what would be the purpose of giving it back to |
| 12:15PM | 23 | Amherst? |
| 12:15PM | 24 | A.  Because the two individuals that information was given to |
| 12:15PM | 25 | resided in our town. |

12:15PM  1   Q.  Okay.  But you weren't handing the case back off to

12:15PM      Amherst, correct?

12:15PM  2

12:15PM  3   A.  No.

12:15PM  4   Q.  Okay.

12:15PM  5   A.  I just gave them the information.

12:15PM  6   Q.  Because you also handed the information off to the FBI

12:15PM  7   with the Safe Streets Task Force, correct?

12:15PM  8   A.  I would have brought it back to our intel guy and gave it

12:15PM  9   to him, too, yes.

12:15PM  10  Q.  And then third, you decide -- you made a decision to take

12:15PM  11  the information over to DEA, correct?

12:15PM  12  A.  I did not make that decision.

12:15PM  13  Q.  But that is ultimately what --

12:15PM  14  A.  Correct.

12:15PM  15  Q.  -- happens here, correct?

12:15PM  16      To your recollection do you know who make that decision?

12:15PM  17  A.  It could have been Amherst, if they put that name in and

12:15PM  18  it came up with a SafetyNet through the DEA, or it could have

12:16PM  19  been the FBI, I do not know.

12:16PM  20  Q.  Okay.  Well, let me ask it this way.  Were you directed

12:16PM  21  to take the information to the DEA?

12:16PM  22  A.  I'm directed to turn over the informant to the DEA.

12:16PM  23  Q.  Okay.  But you don't know who directed you to do that?

12:16PM  24  A.  No.

12:16PM  25  Q.  And you don't know whether that was at the DEA's request,

12:16PM    1    correct?

12:16PM    2    A.  Correct.

12:16PM    3    Q.  Or you don't know if that was Amherst Police Department

12:16PM    4    saying you turn him over to DEA, correct?

12:16PM    5    A.  Correct.

12:16PM    6    Q.  But you received the order to do that, correct?

12:16PM    7    A.  We couldn't work with him for whatever reason, and I

12:16PM    8    don't know what that reason was.

12:16PM    9    Q.  I'm sorry, can you speak up?

12:16PM   10    A.  We could not work with the informant, for whatever

12:16PM   11    reason.  I do not know what that reason was.

12:16PM   12    Q.  So I just want to explore that.  You're saying you cannot

12:16PM   13    work with a DEA informant?

12:16PM   14    A.  As an informant, my assumption was that we would have

12:16PM   15    liked to have worked with him, but he might have been working

12:16PM   16    with somebody else prior to that.  That's my assumption.

12:16PM   17       I did not know if that was true or not.  I was just

12:16PM   18    instructed to turn him over to the DEA.

12:16PM   19       I just assumed that they had an ongoing investigation

12:16PM   20    regarding one of the people that the informant talked about.

12:16PM   21    That's all I know.

12:17PM   22    Q.  But you had no records about what any investigation was

12:17PM   23    or anything like that --

12:17PM   24    A.  No.

12:17PM   25    Q.  -- correct?

12:17PM   1   A.   Nope.

12:17PM   2   Q.   All right.  So, that turnover happens in the vicinity of

12:17PM   3   Richmond and Forest in the City of Buffalo, correct?

12:17PM   4   A.   Correct.

12:17PM   5   Q.   Over near the city -- over near the Psych Center?

12:17PM   6   A.   Yes.

12:17PM   7   Q.   And that's on or about the 25th of April of 2013,

12:17PM   8   correct?

12:17PM   9   A.   Okay.  If that's written there, it's the day.  I don't

12:17PM  10   know what the date is.

12:17PM  11   Q.   Okay.

12:17PM  12   A.   It was a couple weeks after we initially talked to him.

12:17PM  13   Q.   Okay.  A couple weeks after you initially talked with

12:17PM  14   him.  So let's do the timeline.  You meet with him on the

12:17PM  15   8th, correct?

12:17PM  16   A.   Yep.

12:17PM  17   Q.   He misses an appointment on the 16th, correct?

12:17PM  18   A.   Correct.  Yep.

12:17PM  19   Q.   Do you recall on or about the 24th, the day before you

12:17PM  20   turn him over, you did get in touch with him?

12:17PM  21   A.   Yes.

12:17PM  22   Q.   Okay.  So, you essentially had two meetings, one that was

12:17PM  23   blown off, correct?

12:17PM  24   A.   Yes.

12:17PM  25   Q.   But then you do the turnover on the 25th; fair to say?

12:17PM   1   A.  Yes.

12:17PM   2   Q.  Okay.  Now, you -- so you had two interactions with

12:18PM   3   Mr. R.K. prior to turning him over to the DEA, correct?

12:18PM   4   A.  Yes.

12:18PM   5   Q.  So you had a full observation to observe him when you're

12:18PM   6   talking to him, correct?

12:18PM   7   A.  Yes.

12:18PM   8   Q.  I mean, you had conversations, and there was an exchange

12:18PM   9   of information, correct?

12:18PM   10  A.  Yes.

12:18PM   11  Q.  It was face to face, correct?

12:18PM   12  A.  Yes.

12:18PM   13  Q.  And you, in your long career as a patrol officer, as a

12:18PM   14  detective, as a Safe Streets Task Force TFO, you've dealt

12:18PM   15  with informants before, correct?

12:18PM   16  A.  Yes.

12:18PM   17  Q.  You've had the opportunity to see folks who may or may

12:18PM   18  not be under the influence of narcotics, correct?

12:18PM   19  A.  Yes.

12:18PM   20  Q.  Okay.  From your observations of Mr. R.K., did it appear

12:18PM   21  he had any narcotics issues himself going on in the

12:18PM   22  background?

12:18PM   23  A.  I don't recall.

12:18PM   24  Q.  Okay.  Do you recall, based on your observations and

12:18PM   25  based on at least one no show, were there any issues with him

12:19PM   1   being transient at the time?

12:19PM   2   A.  I don't recall.

12:19PM   3   Q.  Okay.  Do you recall, other than him missing a meeting,

12:19PM   4   him being somewhat difficult to get ahold of?

12:19PM   5   A.  I don't recall.

12:19PM   6   Q.  Okay.

12:19PM   7           MR. MacKAY:  Judge, if I could just have a moment?

12:19PM   8           THE COURT:  Sure.

12:20PM   9           MR. MacKAY:  Thank you for that moment, Your Honor.

12:20PM  10           BY MR. MacKAY:

12:20PM  11   Q.  Mr. Cottrell, some of the information that Mr. R.K.

12:20PM  12   provided to you concerned one individual named T.S., correct?

12:20PM  13   A.  T.S.?

12:20PM  14   Q.  Yes.

12:20PM  15   A.  Yes.

12:20PM  16   Q.  And another was an individual named Ron Serio, correct?

12:20PM  17   A.  Yes.

12:20PM  18   Q.  Now T.S.'s been known by the Amherst Police Department

12:20PM  19   going back to 2005?

12:20PM  20   A.  He was a frequent flyer for Amherst.  He's a person who

12:20PM  21   would get a lot of contacts with the police department, so we

12:20PM  22   were aware of him.

12:20PM  23   Q.  Okay.  Fair to say those were -- a lot of them were drug

12:20PM  24   related?

12:20PM  25   A.  Some of them were.  Most of them were non-drug related,

| | | |
|---|---|---|
| 12:20PM | 1 | yes. |
| 12:20PM | 2 | Q.  Okay.  And not just drug use, but potential drug |
| 12:20PM | 3 | distribution; fair to say? |
| 12:20PM | 4 | A.  Yes. |
| 12:20PM | 5 | Q.  Now Ron Serio, you had not had any dealings with him |
| 12:21PM | 6 | before, correct? |
| 12:21PM | 7 | A.  I wasn't aware of him. |
| 12:21PM | 8 | Q.  Were you aware as to whether there any was any |
| 12:21PM | 9 | connection -- strike that. |
| 12:21PM | 10 | You knew he lived on Lebrun in Amherst? |
| 12:21PM | 11 | A.  I did not.  I was told that afterwards that he lived |
| 12:21PM | 12 | in -- on Lebrun. |
| 12:21PM | 13 | Q.  Okay.  Who told you that? |
| 12:21PM | 14 | A.  It might have been R.K., it might have been just us |
| 12:21PM | 15 | following up on the information.  I'm not sure. |
| 12:21PM | 16 | Q.  Okay.  Are you -- were you aware around that point in |
| 12:21PM | 17 | time whether there was any connection between the Lebrun |
| 12:21PM | 18 | house and your boss, Lieutenant JoAnn DiNoto? |
| 12:21PM | 19 | A.  I was not -- |
| 12:21PM | 20 | Q.  Okay. |
| 12:21PM | 21 | A.  -- aware. |
| 12:21PM | 22 | Q.  All right.  And just lastly, I want to go to this |
| 12:21PM | 23 | April 25th, 2013 handoff meeting. |
| 12:21PM | 24 | I just want to walk through what actually happens in a |
| 12:21PM | 25 | handoff meeting, because this does not occur inside an |

| | | |
|---|---|---|
| 12:21PM | 1 | office, correct? |
| 12:21PM | 2 | A.  Correct. |
| 12:21PM | 3 | Q.  I mean, we're on the corner here of Richmond and Forest |
| 12:21PM | 4 | in the City of Buffalo outside the Psych Center, correct? |
| 12:21PM | 5 | A.  Correct. |
| 12:21PM | 6 | Q.  This happens in a vehicle? |
| 12:21PM | 7 | A.  I don't recall.  I don't know.  I assume I met the |
| 12:22PM | 8 | informant in that area. |
| 12:22PM | 9 | Q.  Okay. |
| 12:22PM | 10 | A.  'Cuz he was familiar with me.  And then I would have |
| 12:22PM | 11 | turned him over to the DEA.  But I don't recall that at all. |
| 12:22PM | 12 | Q.  Okay.  So, I mean, a turnover involves what? |
| 12:22PM | 13 | A.  Introducing him to Agent Bongiovanni, and said this guy's |
| 12:22PM | 14 | gonna be working with you, take your information, and follow |
| 12:22PM | 15 | it up. |
| 12:22PM | 16 | Q.  Okay.  No discussions about what's gonna be done with |
| 12:22PM | 17 | DEA -- |
| 12:22PM | 18 | A.  I don't -- |
| 12:22PM | 19 | Q.  -- DEA, correct? |
| 12:22PM | 20 | A.  -- remember that.  I don't recall that.  I don't recall |
| 12:22PM | 21 | anything about that meeting. |
| 12:22PM | 22 | Q.  Okay.  But you do recall there was a meeting? |
| 12:22PM | 23 | A.  I had to look in my notes to actually make sure I turned |
| 12:22PM | 24 | it over to.  And in my notes was to Joe Bongiovanni with R.K. |
| 12:22PM | 25 | That's all I can remember. |

| | | |
|---|---|---|
| 12:22PM | 1 | **MR. MacKAY:**  I have no further questions, Your Honor. |
| 12:22PM | 2 | **THE COURT:**  Any redirect? |
| 12:22PM | 3 | **MR. COOPER:**  Just briefly, Judge. |
| 12:22PM | 4 | |
| 12:22PM | 5 | **REDIRECT EXAMINATION BY MR. COOPER:** |
| 12:23PM | 6 | Q.  Detective Cottrell, you were just asked some questions |
| 12:23PM | 7 | about the meeting that you had turning over R.K. to |
| 12:23PM | 8 | Bongiovanni and DEA; do you remember those questions? |
| 12:23PM | 9 | A.  Yes. |
| 12:23PM | 10 | Q.  Okay.  And I think you testified that you don't have a |
| 12:23PM | 11 | specific memory of that, but that you reviewed some notes |
| 12:23PM | 12 | that refreshed your memory; is that correct? |
| 12:23PM | 13 | A.  That's correct. |
| 12:23PM | 14 | Q.  While you were working as a DEA or FBI task force |
| 12:23PM | 15 | officer, did you keep a notebook? |
| 12:23PM | 16 | A.  I did. |
| 12:23PM | 17 | Q.  Did you keep a notebook where you kind of |
| 12:23PM | 18 | contemporaneously wrote down the different activities that |
| 12:23PM | 19 | you were doing? |
| 12:23PM | 20 | A.  I did. |
| 12:23PM | 21 | Q.  Did that help you remember things that you did back in |
| 12:23PM | 22 | 2013? |
| 12:23PM | 23 | A.  I wouldn't have remembered it or recalled it if I didn't |
| 12:23PM | 24 | refer to those notes. |
| 12:23PM | 25 | Q.  Okay.  You were asked some questions on cross-examination |

12:23PM    1    about who made the decision to turn R.K. over to the DEA; is

12:23PM    2    that correct?

12:23PM    3    A.   Correct.  Yes.

12:23PM    4    Q.   As you sit here today, 2024, do you remember who made the

12:23PM    5    decision to turn R.K. over?

12:23PM    6    A.   I did not then, and I do not know now who turned him

12:24PM    7    over.

12:24PM    8    Q.   Before you testified, did you turn over certain portions

12:24PM    9    of your handwritten notes from back in 2013 to the parties in

12:24PM   10    this case?

12:24PM   11    A.   To -- to who?

12:24PM   12    Q.   To the government.

12:24PM   13    A.   Yes.

12:24PM   14    Q.   Okay.  And would looking at those entries that you wrote

12:24PM   15    refresh your memory about some of the specific details of

12:24PM   16    turning over the source to Bongiovanni?

12:24PM   17    A.   Yes.

12:24PM   18    Q.   Okay.

12:24PM   19         **MR. COOPER:**  Judge, I'm holding what's marked for

12:24PM   20    identification as 3504B as in bravo.  I'm gonna show it to

12:24PM   21    just the witness.

12:24PM   22         Ms. Champoux, we pull up 3504B as in boy,

12:24PM   23    specifically page 2.  And can you zoom in, Ms. Champoux, on

12:24PM   24    the top highlighted portion?

          25

| | | |
|---|---|---|
| 12:24PM | 1 | **BY MR. COOPER:** |
| 12:24PM | 2 | Q.  I don't want you to read this out loud, I just want you |
| 12:24PM | 3 | to look at it, okay, sir? |
| 12:24PM | 4 | A.  Okay. |
| 12:24PM | 5 | Q.  Can you read that chicken scratch? |
| 12:25PM | 6 | A.  I can. |
| 12:25PM | 7 | Q.  Okay. |
| 12:25PM | 8 | A.  That's me. |
| 12:25PM | 9 | Q.  I want you to read the highlighted portion.  To yourself. |
| 12:25PM | 10 | A.  Okay. |
| 12:25PM | 11 | Q.  Sorry.  Have you had an opportunity to read that? |
| 12:25PM | 12 | A.  I have. |
| 12:25PM | 13 | Q.  Does that refresh your memory about who informed you to |
| 12:25PM | 14 | turn R.K. over to the DEA? |
| 12:25PM | 15 | A.  It would have been my boss, Jimmy Jancewicz, who was the |
| 12:25PM | 16 | boss of the Safe Streets Task Force. |
| 12:25PM | 17 | **MR. COOPER:**  Okay.  You can take that portion down, |
| 12:25PM | 18 | just leave the exhibit up for now.  Thank you. |
| 12:25PM | 19 | And, Ms. Champoux, can you zoom in, I think I'm on |
| 12:25PM | 20 | page 3 of the exhibit, can you zoom in on the entry with the |
| 12:25PM | 21 | two highlighted portions, that whole entry? |
| 12:25PM | 22 | **BY MR. COOPER:** |
| 12:25PM | 23 | Q.  Detective Cottrell, will you read the two portions to |
| 12:25PM | 24 | yourself and look up at me when you're finished. |
| 12:26PM | 25 | A.  Okay. |

12:26PM   1   Q.  You were asked some questions on cross-examination about

12:26PM   2   what date you turned over R.K. to the DEA; do you remember

12:26PM   3   those questions?

12:26PM   4   A.  I do.

12:26PM   5   Q.  Did looking at 3504B refresh your memory about the date

12:26PM   6   that you turned R.K. over to the DEA?

12:26PM   7   A.  I have down written Thursday, April 25th.

12:26PM   8   Q.  Okay.  And would that have been 2013?

12:26PM   9   A.  Yes.

12:26PM  10   Q.  Okay.  And after you turned R.K. over to the DEA, did you

12:26PM  11   leave that meeting with an understanding about what R.K.'s

12:26PM  12   status would be with the DEA?

12:26PM  13   A.  I would believe he would be an informant working for the

12:26PM  14   DEA under Agent Bongiovanni.

12:26PM  15         **MR. COOPER:**  Okay.  I have no further questions,

12:26PM  16   Judge.

12:26PM  17         **MR. MacKAY:**  Very briefly, Your Honor.

12:26PM  18

12:26PM  19              **RECROSS-EXAMINATION BY MR. MacKAY:**

12:26PM  20   Q.  So Mr. Cottrell, you had a chance to refresh your

12:26PM  21   recollection with your notes.  So to be clear, it's Jimmy

12:26PM  22   Jancewicz who tells you turn R.K. over to the DEA, correct?

12:27PM  23   A.  Yes.

12:27PM  24   Q.  And then your impression when you turned R.K. over to DEA

12:27PM  25   was that he would become a source, but wasn't currently a

12:27PM  1  source; is that fair to say?

12:27PM  2  A.  Yes.

12:27PM  3        **MR. MacKAY:**  Okay.  Nothing further, Your Honor.

12:27PM  4  Thank you.

12:27PM  5        **MR. COOPER:**  Nothing further, Judge.  Thank you.

12:27PM  6        **THE COURT:**  Okay.  You can step down, sir, thank you.

12:27PM  7        (Witness excused at 12:27 p.m.)

8        (Excerpt concluded at 12:27 p.m.)

9           *     *     *     *     *     *     *

10

11                    **CERTIFICATE OF REPORTER**

12

13        In accordance with 28, U.S.C., 753(b), I

14  certify that these original notes are a true and correct

15  record of proceedings in the United States District Court for

16  the Western District of New York on February 20, 2024.

17

18                         s/ Ann M. Sawyer
                         _____
                         Ann M. Sawyer, FCRR, RPR, CRR
19                       Official Court Reporter
                         U.S.D.C., W.D.N.Y.

20

21

22

23

24

25

1

2                        **TRANSCRIPT INDEX**

3 **EXCERPT - EXAMINATION OF TASK FORCE OFFICER ROBERT COTTRELL**

4                          **FEBRUARY 20, 2024**

5

6

7 **W I T N E S S**                                  **P A G E**

8 **R O B E R T   C O T T R E L L**       2

9   DIRECT EXAMINATION BY MR. COOPER:     2

10   CROSS-EXAMINATION BY MR. MacKAY:     13

11   REDIRECT EXAMINATION BY MR. COOPER:   40

12   RECROSS-EXAMINATION BY MR. MacKAY:   43

13

14

15

16

17

18

19

20

21

22

23

24

25