12:12PM

```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF NEW YORK
 2
   _____
 3 UNITED STATES OF AMERICA,
                                        Case No. 1:19-cr-227
 4              Plaintiff,                        (LJV)
   v.
 5                                      February 20, 2024
   JOSEPH BONGIOVANNI,
 6
   _____
 7

 8           TRANSCRIPT EXCERPT - EXAMINATION OF R.K.
              BEFORE THE HONORABLE LAWRENCE J. VILARDO
 9                 UNITED STATES DISTRICT JUDGE

10
   APPEARANCES:              TRINI E. ROSS, UNITED STATES ATTORNEY
11                           BY: JOSEPH M. TRIPI, ESQ.
                                 NICHOLAS T. COOPER, ESQ.
12                               CASEY L. CHALBECK, ESQ.
                             Assistant United States Attorneys
13                           Federal Centre
                             138 Delaware Avenue
14                           Buffalo, New York 14202
                                And
15                           UNITED STATES DEPARTMENT OF JUSTICE
                             BY: JORDAN ALAN DICKSON, ESQ.
16                           1301 New York Ave NW
                             Suite 1000
17                           Washington, DC 20530-0016
                             For the Plaintiff
18
                             SINGER LEGAL PLLC
19                           BY: ROBERT CHARLES SINGER, ESQ.
                             80 East Spring Street
20                           Williamsville, New York 14221
                                And
21                           LAW OFFICES OF PARKER ROY MacKAY
                             BY: PARKER ROY MacKAY, ESQ.
22                           3110 Delaware Avenue
                             Kenmore, New York  14217
23                           For the Defendant

24 PRESENT:                  BRIAN A. BURNS, FBI Special Agent
                             MARILYN K. HALLIDAY, HSI Special Agent
25                           KAREN A. CHAMPOUX, USA Paralegal
```

| | | |
|---|---|---|
| 1 | **LAW CLERK:** | **REBECCA FABIAN IZZO, ESQ.** |
| 2 | **COURT DEPUTY CLERK:** | **COLLEEN M. DEMMA** |
| 3 | **COURT REPORTER:** | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 4 | | Robert H. Jackson Federal Courthouse<br>2 Niagara Square<br>Buffalo, New York  14202 |
| 5 | | Ann_Sawyer@nywd.uscourts.gov |
| 6 | | |
| 7 | | *   *   *   *   *   *   * |

8

9          (Excerpt commenced at 1:40 p.m.)

10          (Jury is not present.)

01:40PM  11          **THE COURT:**  So, yeah.  Okay.  So let's bring him in,

01:40PM  12  please.

01:40PM  13          (Mr. R.K. seated in the witness box at 1:41 p.m.)

01:41PM  14          **THE COURT:**  Okay, Pat.

01:42PM  15          (Jury seated at 1:42 p.m.)

01:42PM  16          **THE COURT:**  Welcome back, everyone.  The record will

01:42PM  17  reflect that all our jurors are present.  Let's swear in the

01:42PM  18  next witness.

01:42PM  19

01:42PM  20  **R.K.,** having been duly called and sworn, testified as follows:

01:43PM  21

01:43PM  22          **MR. TRIPI:**  May I inquire, Your Honor?

01:43PM  23          **THE COURT:**  You may.

01:43PM  24          **MR. TRIPI:**  Thank you, Your Honor.

01:43PM  25

| | | |
|---|---|---|
| 01:43PM | 1 | **DIRECT EXAMINATION BY MR. TRIPI:** |
| 01:43PM | 2 | Q.  Good afternoon, Mr. R.K. |
| 01:43PM | 3 | A.  Good afternoon. |
| 01:43PM | 4 | Q.  Mr. R.K., how old are you, sir? |
| 01:43PM | 5 | A.  50. |
| 01:43PM | 6 | Q.  And where are you from generally? |
| 01:43PM | 7 | A.  Buffalo, New York. |
| 01:43PM | 8 | Q.  And did you grow up in the Buffalo area? |
| 01:43PM | 9 | A.  Yes, sir. |
| 01:43PM | 10 | Q.  How far have you gone in school? |
| 01:43PM | 11 | A.  About eleven. |
| 01:43PM | 12 | Q.  Eleventh grade? |
| 01:43PM | 13 | A.  Yeah. |
| 01:43PM | 14 | Q.  What school did you attend up till eleventh grade? |
| 01:43PM | 15 | A.  Buffalo Alternative. |
| 01:43PM | 16 | Q.  Buffalo Alternative?  Is that a high school? |
| 01:43PM | 17 | A.  Yeah. |
| 01:43PM | 18 | Q.  Okay.  Now, Mr. R.K., I just want to address something |
| 01:43PM | 19 | right out of the gate.  Is it fair to say that you didn't |
| 01:43PM | 20 | want to come here to court today? |
| 01:43PM | 21 | A.  I didn't want to -- what? |
| 01:43PM | 22 | Q.  That you didn't want to come here to testify? |
| 01:43PM | 23 | A.  Yeah. |
| 01:43PM | 24 | Q.  Okay.  And as a result of that, did you actually get |
| 01:43PM | 25 | arrested under what's called a material witness warrant and |

01:44PM    1    brought to court to testify?

01:44PM    2    A.   Yes.

01:44PM    3    Q.   Okay.  And fair to say that you previously testified in a

01:44PM    4    federal grand jury in this matter?

01:44PM    5    A.   Yes, sir.

01:44PM    6    Q.   Okay.

01:44PM    7             **THE COURT:**  I want you to speak right into the

01:44PM    8    microphone, please.

01:44PM    9             **THE WITNESS:**  Yes, sir.

01:44PM   10             **THE COURT:**  Nice and loud.

01:44PM   11             **THE WITNESS:**  Yes, sir.

01:44PM   12             **BY MR. TRIPI:**

01:44PM   13    Q.   And that was some years ago; is that right?

01:44PM   14    A.   Yes, sir.

01:44PM   15    Q.   Other than that, and a brief few-minute meeting earlier

01:44PM   16    today, we haven't spoken prior to your testimony today, other

01:44PM   17    than your grand jury, and briefly on the lunch break; is that

01:44PM   18    correct?

01:44PM   19    A.   Yes, sir.

01:44PM   20    Q.   Okay.  Now, would it be fair to say that you -- you have

01:44PM   21    a criminal record, right?

01:44PM   22    A.   Yes, sir.

01:44PM   23    Q.   And generally, that record includes several felony

01:44PM   24    convictions; is that right?

01:44PM   25    A.   Yes, sir.

01:45PM   1        **MR. SINGER:**  Judge, we object to the leading at this

01:45PM   2   time.

01:45PM   3        **THE COURT:**  Yeah, sustained.  Let's not lead, please,

01:45PM   4   Mr. Tripi.

01:45PM   5        **MR. TRIPI:**  Okay, Judge.  For future reference, just

01:45PM   6   611C, if you'll keep it under advisement, that's all.  Okay?

01:45PM   7        **BY MR. TRIPI:**

01:45PM   8   Q.  What types of convictions do you have?

01:45PM   9   A.  Burglaries.

01:45PM  10   Q.  Okay.  Now, directing your attention to -- back to April

01:45PM  11   2013, do you remember that general time frame of your life?

01:45PM  12   A.  Yes, sir.

01:45PM  13   Q.  Around that time were you interviewed -- without telling

01:45PM  14   us what the interview was about -- were you interviewed by

01:45PM  15   the Amherst Police Department?

01:45PM  16   A.  Yes, sir.

01:45PM  17   Q.  And can you tell the jury what the circumstances were,

01:45PM  18   had you gotten in some trouble?

01:45PM  19   A.  Yes.

01:45PM  20   Q.  Can you tell the jury what that was?  Just generally.

01:45PM  21   A.  It was a burglary.

01:45PM  22   Q.  Okay.  Do you remember what law enforcement agency

01:45PM  23   investigated that burglary?

01:45PM  24   A.  No.

01:45PM  25   Q.  Okay.  What police agency do you remember speaking with

USA v Bongiovanni - R.K. - Tripi/Direct - 2/20/24

6

| | | |
|---|---|---|
| 01:46PM | 1 | after the burglary? |
| 01:46PM | 2 | A.  Buffalo. |
| 01:46PM | 3 | Q.  Okay.  Eventually, did you get referred to an Amherst |
| 01:46PM | 4 | Police Department detective? |
| 01:46PM | 5 | A.  Yes. |
| 01:46PM | 6 | Q.  Okay.  Do you remember that person's name? |
| 01:46PM | 7 | A.  No, I don't. |
| 01:46PM | 8 | Q.  Did that Amherst Police Department detective refer you to |
| 01:46PM | 9 | the DEA? |
| 01:46PM | 10 | A.  Yes. |
| 01:46PM | 11 | Q.  Okay.  Who were you referred to at the DEA? |
| 01:46PM | 12 | A.  Well, who did I speak with?  Or who -- |
| 01:46PM | 13 | Q.  Yeah, who were you put in touch with at -- let me |
| 01:46PM | 14 | withdraw. |
| 01:46PM | 15 | Were you put in touch with a DEA agent? |
| 01:46PM | 16 | A.  Yes. |
| 01:46PM | 17 | Q.  Do you remember that person's name? |
| 01:47PM | 18 | A.  Yes. |
| 01:47PM | 19 | Q.  What was that person's name? |
| 01:47PM | 20 | A.  Oh, I don't know how to say it.  Joseph. |
| 01:47PM | 21 | Q.  Can you do the best to say? |
| 01:47PM | 22 | A.  Bonajonavie.  Bonjonnie.  I don't know. |
| 01:47PM | 23 | Q.  Do you see that person in court today? |
| 01:47PM | 24 | A.  Yes. |
| 01:47PM | 25 | Q.  Can you please point to him and describe something he's |

01:47PM    1    wearing?

01:47PM    2    A.   Burgundy tie.

01:47PM    3    Q.   In which chair over there?

01:47PM    4    A.   Sitting right in the middle.

01:47PM    5         **MR. TRIPI:**   Your Honor, may the record reflect that

01:47PM    6    the witness has identified Mr. Bongiovanni.

01:47PM    7         **THE COURT:**   It does.

01:47PM    8         **MR. TRIPI:**   Thank you, Your Honor.

01:47PM    9         **BY MR. TRIPI:**

01:47PM   10    Q.   And what -- what was the circumstances under which you

01:47PM   11    were put in touch with Mr. Bongiovanni, can you tell the

01:47PM   12    jury?

01:47PM   13    A.   There was -- because I knew a kid named T.S. who was a,

01:47PM   14    you know, doing a lot of things.  So they, you know, if I

01:47PM   15    helped them get him, I'd get some help on my case.

01:48PM   16    Q.   And at that time, who was T.S. connected to as far as you

01:48PM   17    knew doing those things?

01:48PM   18    A.   Ron Serio.

01:48PM   19    Q.   And when you say "doing things," what are you referring

01:48PM   20    to?

01:48PM   21    A.   Marijuana, cocaine.

01:48PM   22    Q.   What about marijuana and cocaine?

01:48PM   23    A.   Just had a lot of it, transported it.

01:48PM   24    Q.   So transporting, as in distribution?

01:48PM   25    A.   Yeah.

01:48PM  1   Q.  Okay.  Do you remember what happened when you first met

01:48PM  2   with Special Agent Bongiovanni?

01:48PM  3   A.  I -- I was told to, you know, get more friendly with him

01:48PM  4   and try to buy, you know, at least an ounce or so from him.

01:48PM  5   And to try to find out where his warehouse was.

01:48PM  6   Q.  Okay.  When you first met with Bongiovanni, were you

01:49PM  7   interviewed by him?

01:49PM  8   A.  Yes, him and a couple other agents.

01:49PM  9   Q.  Okay.  Where was that?

01:49PM  10  A.  At the DEA agent, on I believe it's Swan.

01:49PM  11  Q.  Okay.

01:49PM  12  A.  I'm not sure.

01:49PM  13  Q.  Was it at their office space?

01:49PM  14  A.  Yeah, the office space, yes.

01:49PM  15  Q.  And in that setting, with how many other agents other

01:49PM  16  than Mr. Bongiovanni did you meet with?

01:49PM  17  A.  Probably four.

01:49PM  18  Q.  Okay.  And were they asking you questions?

01:49PM  19  A.  Yes.

01:49PM  20  Q.  Were you giving answers?

01:49PM  21  A.  Yes.

01:49PM  22  Q.  And who were you telling them about in that meeting?

01:49PM  23  A.  T.S.

01:49PM  24  Q.  Did you mention Ron Serio as well?

01:49PM  25  A.  I mentioned that I was in a room where, you know, I seen

01:49PM 1   Ron Serio and somebody else do some business.  But other than

01:50PM 2   that, the main focus was T.S.

01:50PM 3   Q.  Okay.  How long was that meeting, that debriefing, that

01:50PM 4   interview?

01:50PM 5   A.  I don't know.  Maybe 30 minutes.

01:50PM 6   Q.  After that, did you agree to sign up with Special Agent

01:50PM 7   Bongiovanni to be a confidential source?

01:50PM 8   A.  Yes.

01:50PM 9   Q.  And were you advised of the series of rules that there

01:50PM 10  were?

01:50PM 11  A.  I basically was just told get ahold of T.S., try to

01:50PM 12  befriend him.  Try to, you know, make buys from him.  And

01:50PM 13  then the one time he had told me he had had a warehouse, and

01:50PM 14  so I told them.  And they wanted me to find out where his

01:50PM 15  warehouse was.

01:51PM 16  Q.  I'm not there yet, I'm still talking about getting signed

01:51PM 17  up.  So if you can focus back on that.

01:51PM 18  A.  Oh, okay.

01:51PM 19  Q.  Did you have to sign a document --

01:51PM 20  A.  Yes.  Yes.  Yes.

01:51PM 21  Q.  Okay.  Did that document have essentially the parameters

01:51PM 22  of your agreement with the DEA?

01:51PM 23  A.  Yes.  They gave me a number and everything.

01:51PM 24  Q.  I'm going to hand you up a document, it's marked

01:51PM 25  Government Exhibit 9E-2.  I'm going to ask you to look at

01:51PM    1   this two-page document.  And when you're done, look up, okay?

01:51PM    2   A.   Yeah.

01:51PM    3   Q.   Can you look at the second page?  There's a second page

01:51PM    4   there.

01:52PM    5   A.   Yes.

01:52PM    6   Q.   Okay.  Do you see -- do you see -- do you recognize that

01:52PM    7   two-page document?

01:52PM    8   A.   Yes.

01:52PM    9   Q.   What is that two-page document?

01:52PM   10   A.   That's what they give you when you sign up, that's what

01:52PM   11   they give you when you sign up to be a confidential

01:52PM   12   informant.

01:52PM   13   Q.   And is that your agreement?

01:52PM   14   A.   Yes.  My initials, my signature.

01:52PM   15   Q.   Okay.  So you recognize it?

01:52PM   16   A.   Yes.

01:52PM   17   Q.   Is that an accurate copy of what you signed?

01:52PM   18   A.   Yes.

01:52PM   19           **MR. TRIPI:**  Your Honor, the government offers

01:52PM   20   Exhibit 9E-2.

01:52PM   21           **MR. SINGER:**  No objection.

01:52PM   22           **THE COURT:**  Received without objection.

01:52PM   23           **(GOV Exhibit 9E-2 was received in evidence.)**

01:52PM   24           **MR. TRIPI:**  Thank you, Your Honor.

01:52PM   25           It's going to be shown on the screen next to you in

01:52PM    1    just a moment, okay?

01:52PM    2            Ms. Champoux, can we publish the document, please,

01:53PM    3    now that it is in evidence?  And can we just blow up the top

01:53PM    4    half of the page for the jury to be able to read it?

01:53PM    5    Subsection I.

01:53PM    6            May the record reflect we've blown up the top half of

01:53PM    7    the document, Your Honor, and I'm publishing it for the jury.

01:53PM    8    I'm not going to ask the witness to read it aloud.

01:53PM    9            **BY MR. TRIPI:**

01:53PM   10    Q.  Mr. R.K., I know that's up on the monitor, but as you

01:53PM   11    understand it as part of your agreement, did you agree to

01:53PM   12    consensual recording and the wearing of what's commonly

01:53PM   13    referred to as a wire, if necessary?

01:54PM   14    A.  Yes.

01:54PM   15            **MR. TRIPI:**  Okay.  If we can unbold that, and can we

01:54PM   16    bold the second part?

01:54PM   17            **BY MR. TRIPI:**

01:54PM   18    Q.  Mr. R.K., what was your understanding about when you

01:54PM   19    signed up about how your identity would be treated?

01:54PM   20    A.  I was understood -- it was understood that my identity

01:55PM   21    would be, you know, unknown.  That nobody would know what I

01:55PM   22    did.  But that was false.

01:55PM   23    Q.  And as part of the agreement, did you agree to provide

01:55PM   24    truthful information?

01:55PM   25    A.  Yes.

01:55PM  1          **MR. TRIPI:**  Okay.  We can unhighlight that.

01:55PM  2          I'm going to ask Ms. Champoux to move to page 2 of

01:55PM  3  this document.  And if we can just bold the top paragraphs

01:55PM  4  there.  Provide a moment for the Court and the jury to read

01:55PM  5  it.

01:56PM  6          **BY MR. TRIPI:**

01:56PM  7  Q.  Now, how long did you agree to serve as a confidential

01:56PM  8  source for the DEA?  What was the term of your agreement?

01:56PM  9  A.  I figured that --

01:56PM 10  Q.  I'm going to ask you, look at paragraph 13.  Are those

01:56PM 11  the dates filled in there that you agreed to?

01:56PM 12  A.  Yes.  Yes.

01:56PM 13  Q.  Is that April 29th, 2013 to April 29, 2014?

01:56PM 14  A.  Yes.  Yes.

01:56PM 15  Q.  And in the column, we see a bunch of initials.  Have all

01:56PM 16  of those initials been yours?

01:56PM 17  A.  Yes.

01:56PM 18  Q.  R.K., R.K.?

01:56PM 19  A.  Yes.

01:56PM 20          **MR. TRIPI:**  Ms. Champoux, if we can look at the

01:56PM 21  signature page, please.

01:56PM 22          **BY MR. TRIPI:**

01:56PM 23  Q.  And that top line there, is that your signature under the

01:56PM 24  label confidential source?

01:56PM 25  A.  Yes.

01:56PM   1   Q.  And then under your name, there's a number there; is that

01:56PM   2   right?

01:57PM   3   A.  Yes.

01:57PM   4   Q.  Can you read that, please?

01:57PM   5   A.  C.S.-13-144841.

01:57PM   6   Q.  And who signed below your name as the handling agent or

01:57PM   7   controlling investigator?  Sorry.

01:57PM   8   A.  Bongiovanni.

01:57PM   9   Q.  And do you know who's name appears on the bottom line

01:57PM  10   there?  Do you remember who that was?

01:57PM  11   A.  No, I don't.

01:57PM  12   Q.  Okay.  After you signed this document and reached this

01:57PM  13   agreement --

01:57PM  14        **MR. TRIPI:**  We can take that down, now.

01:57PM  15        **BY MR. TRIPI:**

01:57PM  16   Q.  -- who was your handling agent?

01:57PM  17   A.  Bongiovanni.

01:57PM  18   Q.  Did he have contact information for you?

01:57PM  19   A.  Yes.

01:57PM  20   Q.  Who type of contact information did you provide him for

01:57PM  21   yourself?

01:57PM  22   A.  I was to call T.S.

01:57PM  23   Q.  No.  Contact information for you.

01:58PM  24   A.  For me?

01:58PM  25   Q.  How was Bongiovanni supposed to get ahold of you?

USA v Bongiovanni - R.K. - Tripi/Direct - 2/20/24

14

| | | |
|---|---|---|
| 01:58PM | 1 | A.  Oh.  I would call him at the -- at the office. |
| 01:58PM | 2 | Q.  Okay.  Did you have a phone number? |
| 01:58PM | 3 | A.  Yes. |
| 01:58PM | 4 | Q.  Did you provide that to him? |
| 01:58PM | 5 | A.  Yes. |
| 01:58PM | 6 | Q.  Did you have family in the area? |
| 01:58PM | 7 | A.  Yes. |
| 01:58PM | 8 | Q.  Did you provide their addresses? |
| 01:58PM | 9 | A.  No. |
| 01:58PM | 10 | Q.  Okay.  Do you know whether or not he knew where your |
| 01:58PM | 11 | mother lived? |
| 01:58PM | 12 | A.  Yes. |
| 01:58PM | 13 | Q.  Now, by the time you signed up as a confidential source, |
| 01:58PM | 14 | how long had you known T.S.? |
| 01:58PM | 15 | A.  About eight months. |
| 01:58PM | 16 | Q.  How long had you known Ron Serio? |
| 01:58PM | 17 | A.  Two years. |
| 01:58PM | 18 | Q.  How long had you known Ron's brother, Tom Serio? |
| 01:58PM | 19 | A.  Since 1994. |
| 01:58PM | 20 | Q.  Did you know an individual named David Oddo?  Oddo? |
| 01:59PM | 21 | O-D-D-O? |
| 01:59PM | 22 | A.  Yes. |
| 01:59PM | 23 | Q.  How long had you known him? |
| 01:59PM | 24 | A.  Forty years. |
| 01:59PM | 25 | Q.  Did you know an individual named Chris Baker? |

01:59PM    1    A.  Yes.

01:59PM    2    Q.  How long had you known him?

01:59PM    3    A.  Thirty years.

01:59PM    4    Q.  Are those names, names that you discussed during your

01:59PM    5    initial interview with the defendant?

01:59PM    6    A.  Yes.

01:59PM    7    Q.  Are those people that you believed you could have bought

01:59PM    8    drugs from during that time frame?

01:59PM    9    A.  Yes.

01:59PM   10    Q.  What type of drugs do you believe you could have bought

01:59PM   11    from Ron Serio at that time?

01:59PM   12    A.  Cocaine or marijuana.

01:59PM   13    Q.  In your mind, was there any limit to the amount of

01:59PM   14    cocaine you could have bought from Ron Serio?

01:59PM   15    A.  No.

02:00PM   16    Q.  What would be the limiting factor?  Your amount of money?

02:00PM   17    A.  Amount of money, yeah.

02:00PM   18    Q.  Do you believe there was any limit to the amount of

02:00PM   19    marijuana you could have purchased from Ron Serio?

02:00PM   20    A.  No.

02:00PM   21    Q.  What drugs at that time do you believe you could have

02:00PM   22    purchased from Tom Serio?

02:00PM   23    A.  Whatever money I had, I could get.

02:00PM   24    Q.  What type of drugs?

02:00PM   25    A.  Cocaine or marijuana.

USA v Bongiovanni - R.K. - Tripi/Direct - 2/20/24

16

02:00PM  1   Q.  What type of drugs do you believe you could have

02:00PM  2   purchased from T.S.?

02:00PM  3   A.  Cocaine and marijuana.

02:00PM  4   Q.  What type of drugs do you believe you could have

02:00PM  5   purchased from David Oddo?

02:00PM  6   A.  Cocaine and marijuana.

02:00PM  7   Q.  What type of drugs do you believe you could have

02:00PM  8   purchased from Chris Baker?

02:00PM  9   A.  Cocaine and marijuana.

02:00PM  10  Q.  Are each of those individuals, at that time at least,

02:00PM  11  were each of those individuals associated with one another?

02:00PM  12  A.  Yes.

02:00PM  13  Q.  As the handling agent for you as a DEA confidential

02:01PM  14  source, did the defendant ever ask you to buy marijuana or

02:01PM  15  cocaine from Ron Serio?

02:01PM  16  A.  No.  No.

02:01PM  17  Q.  Did the defendant ever ask you to make a purchase of

02:01PM  18  cocaine or marijuana from Tom Serio?

02:01PM  19  A.  No.

02:01PM  20  Q.  Did the defendant ever ask you to purchased cocaine or

02:01PM  21  marijuana or any other drug from T.S.?

02:01PM  22  A.  Yes.

02:01PM  23  Q.  What did he ask you to purchase from T.S.?

02:01PM  24  A.  He told me to, you know, just gain his confidence, try to

02:01PM  25  get an ounce from him at first, and then go from there.  And

| | | |
|---|---|---|
| 02:01PM | 1 | if I could find out where, you know, like I said, the kid |
| 02:01PM | 2 | said he had a warehouse, where the warehouse was. |
| 02:01PM | 3 | Q.  Did you ever make any purchases from T.S.? |
| 02:01PM | 4 | A.  No.  Something else happened. |
| 02:01PM | 5 | **MR. TRIPI:**  Let me just -- just a moment, please, |
| 02:02PM | 6 | Your Honor. |
| 02:02PM | 7 | **BY MR. TRIPI:** |
| 02:02PM | 8 | Q.  I want to circle back to that in just a moment. |
| 02:02PM | 9 | Were you asked to make any purchases from David Oddo? |
| 02:02PM | 10 | A.  No. |
| 02:02PM | 11 | Q.  Were you ever asked to make any purchases from |
| 02:02PM | 12 | Christopher Baker? |
| 02:02PM | 13 | A.  No. |
| 02:02PM | 14 | Q.  What, if any, premises or houses -- when I say |
| 02:02PM | 15 | "premises," I'm referring to houses or premises, what if any |
| 02:02PM | 16 | premises associated with Ron Serio had you been to during |
| 02:02PM | 17 | that time frame? |
| 02:02PM | 18 | A.  The house on Lebrun. |
| 02:02PM | 19 | Q.  Was that a big house on Lebrun? |
| 02:02PM | 20 | A.  Yes. |
| 02:02PM | 21 | Q.  How many times had you been there? |
| 02:02PM | 22 | A.  Well, six times.  Five, six times. |
| 02:03PM | 23 | Q.  Had you ever gotten drugs there from Mr. Serio? |
| 02:03PM | 24 | A.  Yes. |
| 02:03PM | 25 | Q.  What had you purchased from him previously in your own |

02:03PM  1   individual capacity?

02:03PM  2   A.  Marijuana.

02:03PM  3   Q.  And how much marijuana when you would purchase from

02:03PM  4   Mr. Serio would you typically get?

02:03PM  5   A.  5 pounds.

02:03PM  6   Q.  And how much was he charging you per pound?

02:03PM  7   A.  3,200.

02:03PM  8   Q.  And then you were getting it and selling it?

02:03PM  9   A.  Yes.

02:03PM  10  Q.  Was that transpiring before you became a confidential

02:03PM  11  source for the DEA?

02:03PM  12  A.  Yes.

02:03PM  13  Q.  Prior to signing up with the DEA, did you ever store any

02:03PM  14  marijuana for any members of Serio's group, the members I

02:03PM  15  just talked about?

02:04PM  16  A.  No.

02:04PM  17  Q.  Based on what you were purchasing and what you observed,

02:04PM  18  what was your understanding of how much marijuana was being

02:04PM  19  trafficked by Mr. Serio and others?

02:04PM  20  A.  Hundreds of pounds.

02:04PM  21  Q.  Were you generally able to find out when loads were

02:05PM  22  coming into town?

02:05PM  23  A.  No.

02:05PM  24  Q.  Were you ever asked to wear a wire and speak to Mr. Serio

02:05PM  25  about that?

| | | |
|---|---|---|
| 02:05PM | 1 | A.  No. |
| 02:05PM | 2 | Q.  According to your agreement that we just went through, if |
| 02:05PM | 3 | you were asked to do that, would you have tried do that? |
| 02:05PM | 4 | A.  Yes. |
| 02:05PM | 5 | Q.  Now, did you start making controlled buys -- withdrawn. |
| 02:05PM | 6 | Did you start making buys for Mr. Bongiovanni into |
| 02:06PM | 7 | someone else not associated with Mr. Serio? |
| 02:06PM | 8 | A.  Yes. |
| 02:06PM | 9 | Q.  Who was that individual? |
| 02:06PM | 10 | A.  Peter Militello. |
| 02:06PM | 11 | Q.  Do you remember how many buys you made into |
| 02:06PM | 12 | Mr. Militello? |
| 02:06PM | 13 | A.  I made one buy of 6 to 8 bags. |
| 02:06PM | 14 | Q.  Of what? |
| 02:06PM | 15 | A.  Heroin. |
| 02:06PM | 16 | Q.  After that, what happened to your status as a |
| 02:06PM | 17 | confidential source with the DEA? |
| 02:06PM | 18 | A.  It was over. |
| 02:06PM | 19 | Q.  Who told you it was over? |
| 02:06PM | 20 | A.  They said that they -- he did.  Mr. Bonavetti said |
| 02:06PM | 21 | they -- now they got Peter Militello, they didn't need me no |
| 02:07PM | 22 | more, they didn't need me or anybody else. |
| 02:07PM | 23 | Q.  How were you advised that you were done being a |
| 02:07PM | 24 | confidential source? |
| 02:07PM | 25 | A.  He stopped contacting me. |

02:07PM   1   Q.  Did you have a conversation before that?

02:07PM   2   A.  No.  They just told me that, you know, we got Peter

02:07PM   3   Militello at his brother's hospital.  He had so many bags on

02:07PM   4   him.  And, you know, he confessed to giving the heroin that

02:07PM   5   killed Bobby.  And that was it.

02:07PM   6   Q.  Okay.  So there was someone who died of heroin?

02:07PM   7   A.  Yeah.

02:07PM   8   Q.  And after that person was arrested, Mr. Militello, what

02:07PM   9   were you advised?  I want to be clear, what were you advised

02:07PM   10   by Mr. Bongiovanni as to your status as a confidential

02:07PM   11   source?

02:07PM   12   A.  Nothing.  I wasn't asked to do anything else.

02:07PM   13   Q.  At any point, were you asked to go back and talk to

02:08PM   14   anybody related to Ron Serio or T.S.?

02:08PM   15   A.  No.

02:08PM   16   Q.  So once Militello's arrest was done, you were done?

02:08PM   17   A.  Yes.

02:08PM   18   Q.  This was your decision or the defendant's decision?

02:08PM   19   A.  It was their decision.

02:08PM   20   Q.  "Theirs," meaning the DEA?

02:08PM   21   A.  DEA, yeah.

02:08PM   22   Q.  Did you work with the defendant for a long time or a

02:08PM   23   short time?

02:08PM   24   A.  Not a long time.

02:08PM   25   Q.  Do you remember how long it was?

| | | |
|---|---|---|
| 02:08PM | 1 | A.  Three weeks, maybe. |
| 02:08PM | 2 | Q.  But you had agreed to work for a year? |
| 02:08PM | 3 | A.  Yeah. |
| 02:08PM | 4 | **MR. TRIPI:**  One moment, please, Your Honor. |
| 02:08PM | 5 | **BY MR. TRIPI:** |
| 02:09PM | 6 | Q.  Just one thing I wanted to clarify.  As far as you |
| 02:09PM | 7 | understood, based upon your knowledge of the streets at that |
| 02:09PM | 8 | time, did Peter Militello have anything to do with Serio's |
| 02:09PM | 9 | organization? |
| 02:09PM | 10 | A.  No. |
| 02:09PM | 11 | **MR. TRIPI:**  Okay.  No further questions, Your Honor. |
| 02:09PM | 12 | **THE COURT:**  Cross? |
| 02:09PM | 13 | |
| 02:09PM | 14 | **CROSS-EXAMINATION BY MR. SINGER:** |
| 02:09PM | 15 | Q.  Hi, Mr. R.K. |
| 02:09PM | 16 | A.  How are you doing? |
| 02:09PM | 17 | Q.  Doing pretty good. |
| 02:09PM | 18 | So, you didn't want to come today; is that right? |
| 02:09PM | 19 | A.  No.  No, I didn't. |
| 02:09PM | 20 | Q.  Were you using any drugs, sir? |
| 02:09PM | 21 | A.  Was I? |
| 02:09PM | 22 | Q.  Yes. |
| 02:10PM | 23 | A.  No. |
| 02:10PM | 24 | Q.  No? |
| 02:10PM | 25 | A.  No. |

02:10PM  1  Q.  You've had a problem with abusing substances over the

02:10PM  2  course of your life; is that a fair statement?

02:10PM  3  A.  I'd say my whole life.

02:10PM  4  Q.  Yeah.  Like, so, is it pretty much your whole adult life

02:10PM  5  that you've been using some type of substances?

02:10PM  6  A.  As a child, yeah, too.

02:10PM  7  Q.  And that included alcohol?

02:10PM  8  A.  Everything.

02:10PM  9  Q.  That included drugs?

02:10PM  10  A.  Yeah.

02:10PM  11  Q.  Crack cocaine?

02:10PM  12  A.  Yes.

02:10PM  13  Q.  Heroin?

02:10PM  14  A.  Yes.

02:10PM  15  Q.  Anything else?

02:10PM  16  A.  Pills.

02:10PM  17  Q.  When you were in the throes of addiction, how often would

02:10PM  18  use these substances?

02:10PM  19  A.  Any times I could get my hands on them.

02:10PM  20  Q.  And I think you'd agree with me that using substances

02:10PM  21  like that continuously sometimes may affect your memory?

02:10PM  22  A.  No.

02:10PM  23  Q.  You don't think so?

02:10PM  24  A.  No.

02:10PM  25  Q.  So you think that when you use substances like crack

02:10PM    1    cocaine, or heroin, or alcohol, other things like pills --

02:10PM    2    A.  When you're -- when you're using them, per se, yeah.

02:10PM    3        But when you're doing something for some people, you're

02:11PM    4    not -- those -- those people don't have you on drugs going

02:11PM    5    door to door to make buys or stuff on drugs.

02:11PM    6        So, no, I wasn't on drugs when I was dealing with him.

02:11PM    7    No.

02:11PM    8    Q.  Okay.  So you weren't on drugs at any time you were

02:11PM    9    dealing with --

02:11PM   10    A.  No.

02:11PM   11    Q.  -- Agent Bongiovanni?

02:11PM   12    A.  No.

02:11PM   13    Q.  Okay.  April 2013, you were first contacted by members of

02:11PM   14    the Amherst Police Department; is that right?

02:11PM   15    A.  Yes.

02:11PM   16    Q.  And they contacted you because someone referred you to

02:11PM   17    them?

02:11PM   18    A.  Yes.

02:11PM   19    Q.  And that was because you had pending charges in county

02:11PM   20    court at that point in time?

02:11PM   21    A.  Yes.

02:11PM   22    Q.  There was a burglary third charge at that point in time?

02:11PM   23    A.  Yes.

02:11PM   24    Q.  And that's something you had been arrested for and

02:11PM   25    charged with in February of 2013, roughly?

02:11PM    1    A.  Yes.

02:11PM    2    Q.  And so one of the reasons why you agreed to meet with

02:11PM    3    Amherst Police Department was that you wanted to do something

02:12PM    4    to help yourself out on that potential charge and conviction,

02:12PM    5    correct?

02:12PM    6    A.  Yes.

02:12PM    7    Q.  Because you knew that you were potentially going to be

02:12PM    8    serving some time in state prison as a result of the conduct

02:12PM    9    you engaged in in February, correct?

02:12PM    10    A.  Yes.

02:12PM    11    Q.  So Amherst Police Department, a representative from their

02:12PM    12    organization, do you remember who you met with?

02:12PM    13    A.  No.

02:12PM    14    Q.  Was it a man or a woman?

02:12PM    15    A.  It was a woman.

02:12PM    16    Q.  You met with a woman?

02:12PM    17    A.  Yeah.

02:12PM    18    Q.  And they spoke to you about information you might have on

02:12PM    19    investigations of interest to them?

02:12PM    20    A.  Yes.

02:12PM    21    Q.  And so when you met with them, you talked about Ron

02:12PM    22    Serio, correct?

02:12PM    23    A.  Not at first, no.

02:12PM    24    Q.  Not at first?

02:12PM    25    A.  No.

02:12PM 1  Q.  So the first person you spoke about was T.S.?

02:12PM 2  A.  Yes.

02:12PM 3  Q.  And you knew Mr. T.S. because he was somebody that you

02:12PM 4  were dealing with presently at that point in time, right?

02:12PM 5  A.  Yes, in the streets, yes.

02:12PM 6  Q.  Over the last couple of months, correct?

02:12PM 7  A.  Yes.

02:12PM 8  Q.  And Mr. T.S., did they indicate to you whether he was a

02:13PM 9  person of interest at the Amherst Police Department?

02:13PM 10  A.  No.

02:13PM 11  Q.  But you talked to the Amherst Police Department about

02:13PM 12  T.S., correct?

02:13PM 13  A.  Yes.

02:13PM 14  Q.  And you talked to him -- talked about Mr. T.S. being

02:13PM 15  involved in marijuana dealing?

02:13PM 16  A.  And cocaine, yes.

02:13PM 17  Q.  And cocaine?  So marijuana and cocaine?

02:13PM 18  A.  Yeah.

02:13PM 19  Q.  And you mentioned that you might be able to help out in

02:13PM 20  an investigation regarding T.S.?

02:13PM 21  A.  Yes.

02:13PM 22  Q.  And, so, as far as Ron Serio's concerned, he comes up

02:13PM 23  later in this discussion?

02:13PM 24  A.  In the discussion with --

02:13PM 25  Q.  With Amherst PD, correct?

02:13PM   1   A.   No, not with Amherst PD, with DEA.

02:13PM   2   Q.   So there was no discussion about Ron Serio that you can

02:13PM   3   recall occurring with Amherst PD at all?

02:13PM   4   A.   No.  The DEA is the one that bring up Ron Serio.

02:13PM   5   Q.   Okay.  All right.  So -- so, after you meet up with

02:13PM   6   Amherst, at some point in time the person who met with you at

02:13PM   7   Amherst said, hey, we're gonna connect you with the DEA,

02:14PM   8   because we believe they might want to talk to you, right?

02:14PM   9   A.   Yeah.

02:14PM   10   Q.   And that person was trying to get in touch with you, and

02:14PM   11   I guess had a meeting sometime in mid April; is that right?

02:14PM   12   A.   Yeah.

02:14PM   13   Q.   So, let me just go backwards.  So when you met up with

02:14PM   14   Amherst, that was in early April of 2013, correct?

02:14PM   15   A.   Yeah.

02:14PM   16   Q.   And when you got contacted about a follow-on meeting with

02:14PM   17   Amherst Police Department, that was in mid April of 2013?

02:14PM   18   A.   Yeah.

02:14PM   19   Q.   Okay.  And when you were supposed to have that meeting

02:14PM   20   with the person from Amherst Police Department, you didn't

02:14PM   21   attend that meeting, right?

02:14PM   22   A.   No.

02:14PM   23   Q.   Blew off the officer?

02:14PM   24   A.   Yeah.

02:14PM   25   Q.   So they had to make some investigative steps to find you

02:14PM 1    again; is that right?

02:14PM 2    A.  Yes.

02:14PM 3    Q.  And then I think they contacted your mother to try to

02:14PM 4    find out where you might be?

02:14PM 5    A.  Yeah.

02:14PM 6    Q.  Because you didn't have any type of established address

02:14PM 7    at that time?

02:14PM 8    A.  Correct, yeah.

02:14PM 9    Q.  Were you living on the streets, sir?

02:14PM 10   A.  No, with friends.

02:14PM 11   Q.  Okay.  But Amherst police didn't know where you were

02:14PM 12   located at that time, correct?

02:15PM 13   A.  Correct.

02:15PM 14   Q.  And your mother, did she know where you were located at

02:15PM 15   that time?

02:15PM 16   A.  Yes.

02:15PM 17   Q.  So she told the officers where to potentially find you,

02:15PM 18   and eventually the detectives found you again?

02:15PM 19   A.  Yes.

02:15PM 20   Q.  And at that point in time, Amherst Police Department

02:15PM 21   tells you that they want to put you in connection with the

02:15PM 22   DEA?

02:15PM 23   A.  Yes.

02:15PM 24   Q.  And then later that month in April, finally a meeting

02:15PM 25   occurs between you, Amherst Police Department, and the DEA;

USA v Bongiovanni - R.K. - Singer/Cross - 2/20/24

28

| | | |
|---|---|---|
| 02:15PM | 1 | is that right? |
| 02:15PM | 2 | A.  Yes. |
| 02:15PM | 3 | Q.  And you testified earlier that Mr. Bongiovanni was one of |
| 02:15PM | 4 | the people from the DEA at that meeting? |
| 02:15PM | 5 | A.  Yes. |
| 02:15PM | 6 | Q.  Did he introduce himself to you? |
| 02:15PM | 7 | A.  Yes. |
| 02:15PM | 8 | Q.  Shake your hand? |
| 02:15PM | 9 | A.  No. |
| 02:15PM | 10 | Q.  What generally did you talk about with him? |
| 02:15PM | 11 | A.  At first, we talked -- at first we talked about me doing |
| 02:15PM | 12 | knock to knocks, going to doors, making buys, bringing them |
| 02:15PM | 13 | to the DEA.  And then they would do what they do, raid the |
| 02:16PM | 14 | houses, whatever.  Then T.S.'s name came up. |
| 02:16PM | 15 | Q.  Okay. |
| 02:16PM | 16 | A.  And then I was asked to, you know, get him on the phone, |
| 02:16PM | 17 | get him rolling. |
| 02:16PM | 18 |     And as all this happened, a friend of mine had died. |
| 02:16PM | 19 | Q.  Yeah, but -- |
| 02:16PM | 20 | A.  And, so -- |
| 02:16PM | 21 | Q.  I'll stop you right there, we'll get to all that. |
| 02:16PM | 22 | A.  Okay. |
| 02:16PM | 23 | Q.  But I want to take this sequentially. |
| 02:16PM | 24 | A.  Yeah, go ahead. |
| 02:16PM | 25 | Q.  And so the first meeting you had with Agent Bongiovanni |

02:16PM   1   and Amherst Police Department, you don't meet over at the

02:16PM   2   office, you're meeting out somewhere in town, correct?

02:16PM   3   A.  Yeah.

02:16PM   4   Q.  And then they mentioned that they want to sign you up as

02:16PM   5   a confidential informant, correct?

02:16PM   6   A.  Yeah.

02:16PM   7   Q.  So then you have a follow-on meeting a couple days later

02:16PM   8   in April where you actually go into the office with the DEA,

02:16PM   9   correct?

02:16PM  10   A.  Yeah.

02:16PM  11   Q.  And that's when you sign that confidential source

02:16PM  12   agreement; is that right?

02:16PM  13   A.  Yes.

02:16PM  14   Q.  So that was the exhibit that Mr. Tripi showed you

02:16PM  15   earlier?

02:16PM  16   A.  Yes.

02:16PM  17   Q.  The 9A-2 exhibit?

02:16PM  18   A.  Yes.

02:16PM  19   Q.  And so you signed that agreement indicating, hey, I want

02:16PM  20   to be a confidential informant for you, for the DEA, correct?

02:17PM  21   A.  Correct.

02:17PM  22   Q.  All right.  So, after that meeting you had with

02:17PM  23   Mr. Bongiovanni, and a couple of his DEA counterparts, to

02:17PM  24   sign that agreement, you have another meeting where you get

02:17PM  25   into what is the information you know about, correct?

02:17PM    1   A.  Correct.

02:17PM    2   Q.  And at that point in time, you testified earlier that

02:17PM    3   T.S. is someone you who started talking to the DEA about,

02:17PM    4   correct?

02:17PM    5   A.  Correct.

02:17PM    6   Q.  Just like you did with Amherst Police Department before,

02:17PM    7   correct?

02:17PM    8   A.  Correct.

02:17PM    9   Q.  Because he was the person that you knew very well at that

02:17PM   10   point in time, right?

02:17PM   11   A.  Correct.

02:17PM   12   Q.  Somebody that you dealt with very recently, correct?

02:17PM   13   A.  Correct.

02:17PM   14   Q.  And so you had mentioned T.S. to them.  And they asked

02:17PM   15   you whether or not you'd be willing to do some type of

02:17PM   16   controlled buys with Mr. T.S.?

02:17PM   17   A.  Correct.

02:17PM   18   Q.  And they talked to you about generally about how that

02:17PM   19   would work, correct?

02:17PM   20   A.  Correct.

02:17PM   21   Q.  And at that meeting, that's when the topic of Ron Serio

02:17PM   22   comes up, you said?

02:17PM   23   A.  Not at that meeting, no.

02:17PM   24   Q.  Okay.  So when did Ron Serio come up in conversation with

02:18PM   25   the DEA?

02:18PM    1    A.  He came up maybe a week later.

02:18PM    2    Q.  So a week later, you had a conversation with the DEA?

02:18PM    3    A.  Because -- because T.S. was close with Ron Serio.  So

02:18PM    4    when Tom said to me, I gotta wait, I can't do anything until

02:18PM    5    I talk to Ron, that's what I told them.

02:18PM    6        So that's when the two combined.

02:18PM    7    Q.  Okay.  And that's when you first alerted DEA to Ron

02:18PM    8    Serio?

02:18PM    9    A.  Yeah.

02:18PM   10    Q.  How about Tom Serio?

02:18PM   11    A.  Tom Serio?

02:18PM   12    Q.  When did you first talk to DEA about Tom Serio?

02:18PM   13    A.  Tom Serio, I've known since '94.  The first time I talked

02:18PM   14    to him was when they had me here maybe 5 years ago.

02:18PM   15    Q.  No, and so I guess that's -- that's the basis of my

02:18PM   16    question.  When did Tom Serio come up in your discussions

02:18PM   17    with the DEA?

02:18PM   18    A.  Well, Tom Serio came up again because they're all, you

02:18PM   19    know, Tom, Ron, they're all together.  They're all hanging

02:18PM   20    together.  They're all -- so they all came up together.

02:18PM   21    Q.  So Tom Serio you know is the brother of Ron Serio,

02:19PM   22    correct?

02:19PM   23    A.  Correct, yeah.

02:19PM   24    Q.  And so when you mentioned Ron Serio to the DEA, as you

02:19PM   25    testified earlier about a week after --

| | | |
|---|---|---|
| 02:19PM | 1 | A.  I didn't mention Ron Serio, they did. |
| 02:19PM | 2 | Q.  Okay.  So they brought up Ron Serio to you? |
| 02:19PM | 3 | A.  Yeah. |
| 02:19PM | 4 | Q.  And then when they asked you about Ron Serio, that's when |
| 02:19PM | 5 | you brought up Tom Serio? |
| 02:19PM | 6 | A.  I said I know his brother, yes. |
| 02:19PM | 7 | Q.  Okay.  And what do you remember telling the DEA about Ron |
| 02:19PM | 8 | Serio in that meeting? |
| 02:19PM | 9 | A.  Just that I could get whatever I want. |
| 02:19PM | 10 | Q.  Okay.  You could get whatever you wanted from him? |
| 02:19PM | 11 | A.  Yeah. |
| 02:19PM | 12 | Q.  And you testified earlier that you had mentioned a couple |
| 02:19PM | 13 | of different drug transactions you may have been involved |
| 02:19PM | 14 | with him; is that right? |
| 02:19PM | 15 | A.  Yeah. |
| 02:19PM | 16 | Q.  What kind of buys were you doing with Ron Serio at that |
| 02:19PM | 17 | time? |
| 02:19PM | 18 | A.  Just marijuana. |
| 02:19PM | 19 | Q.  Just marijuana? |
| 02:19PM | 20 | A.  Yeah. |
| 02:19PM | 21 | Q.  How many pounds of marijuana were you purchasing? |
| 02:19PM | 22 | A.  4 or 5. |
| 02:19PM | 23 | Q.  4 or 5 pounds? |
| 02:19PM | 24 | A.  Yeah. |
| 02:19PM | 25 | Q.  And he was charging you somewhere in the neighborhood |

| | | |
|---|---|---|
| 02:19PM | 1 | $3,000 a pound for that? |
| 02:19PM | 2 | A.  Yeah. |
| 02:19PM | 3 | Q.  What would you use to purchase the marijuana from Ron |
| 02:20PM | 4 | Serio? |
| 02:20PM | 5 | A.  Cash. |
| 02:20PM | 6 | Q.  Cash? |
| 02:20PM | 7 | A.  Um-hum. |
| 02:20PM | 8 | Q.  So 5 pounds of marijuana, so you had roughly $15,000 to |
| 02:20PM | 9 | go front to Mr. Serio to buy that marijuana? |
| 02:20PM | 10 | A.  Yes. |
| 02:20PM | 11 | Q.  And what were you doing for work at that point in time, |
| 02:20PM | 12 | sir? |
| 02:20PM | 13 | A.  I was working in a pizzeria. |
| 02:20PM | 14 | Q.  All right.  How much did you make an hour in the |
| 02:20PM | 15 | pizzeria? |
| 02:20PM | 16 | A.  I made about $18 an hour. |
| 02:20PM | 17 | Q.  $18 an hour?  What year was this again? |
| 02:20PM | 18 | A.  2013. |
| 02:20PM | 19 | Q.  2013. |
| 02:20PM | 20 | A.  Yeah. |
| 02:20PM | 21 | Q.  Do you know what the minimum wage was back then, sir? |
| 02:20PM | 22 | A.  No. |
| 02:20PM | 23 | Q.  Okay.  But you said you were making $18 an hour at the |
| 02:20PM | 24 | pizzeria? |
| 02:20PM | 25 | A.  Yeah. |

USA v Bongiovanni - R.K. - Singer/Cross - 2/20/24

| | | |
|---|---|---|
| 02:20PM | 1 | Q.  What were you doing at the pizzeria? |
| 02:20PM | 2 | A.  Making pizzas. |
| 02:20PM | 3 | Q.  All right.  So you were just there making pizzas, putting |
| 02:20PM | 4 | them in the oven, taking them out of the oven? |
| 02:20PM | 5 | A.  Yep. |
| 02:20PM | 6 | Q.  So you had purchased this marijuana from Ron Serio, |
| 02:20PM | 7 | according to your testimony today? |
| 02:21PM | 8 | A.  Yeah. |
| 02:21PM | 9 | Q.  How many purchases do you think you made from Ron Serio |
| 02:21PM | 10 | at this time period? |
| 02:21PM | 11 | A.  One. |
| 02:21PM | 12 | Q.  You made one purchase? |
| 02:21PM | 13 | A.  Yeah. |
| 02:21PM | 14 | Q.  So that's it? |
| 02:21PM | 15 | A.  That's it. |
| 02:21PM | 16 | Q.  You testified earlier that you knew him for two years, |
| 02:21PM | 17 | right? |
| 02:21PM | 18 | A.  True. |
| 02:21PM | 19 | Q.  But you purchased one time from him? |
| 02:21PM | 20 | A.  Yeah.  It doesn't mean I wasn't there on mutual times, |
| 02:21PM | 21 | when somebody else was purchasing, but I purchased one time. |
| 02:21PM | 22 | Q.  Again, I'd just ask you to just listen to my question. |
| 02:21PM | 23 | A.  One time.  One time. |
| 02:21PM | 24 | Q.  So one time you purchased with Ron Serio.  What year was |
| 02:21PM | 25 | that? |

02:21PM   1   A.   2012.

02:21PM   2   Q.   2012 you purchased him?

02:21PM   3   A.   Yeah.

02:21PM   4   Q.   And where did you sell the marijuana?

02:21PM   5   A.   What's that?

02:21PM   6   Q.   Where did you sell the marijuana?

02:21PM   7   A.   Where did I --

02:21PM   8   Q.   Correct.  Where did you sell it that you purchased from

02:21PM   9   Ron Serio in 2012?

02:21PM   10   A.   I just put it in the street.

02:21PM   11   Q.   Where?

02:21PM   12   A.   Friends.

02:21PM   13   Q.   Who?

02:21PM   14          **MR. TRIPI:**  Objection.

02:21PM   15          **THE COURT:**  Hang on.

02:21PM   16          **MR. TRIPI:**  Objection as to relevance.

02:21PM   17          **THE COURT:**  Yeah.

02:21PM   18          **MR. SINGER:**  Judge, I'm testing the witness's memory.

02:21PM   19   And I think I should have some latitude to ask some basic

02:22PM   20   questions about who he consummated his drugs transactions

02:22PM   21   with.

02:22PM   22          **THE COURT:**  Okay.  Yeah, I'll allow it.  Go ahead.

02:22PM   23          **BY MR. SINGER:**

02:22PM   24   Q.   So who did you sell to?

02:22PM   25   A.   Ron, John, and Jerry.

| | | |
|---|---|---|
| 02:22PM | 1 | Q.  Ron, John, and Jerry?  What are their last names? |
| 02:22PM | 2 | A.  I don't ask last names. |
| 02:22PM | 3 | Q.  What do they look like?  Let's start with Ron. |
| 02:22PM | 4 | A.  Like me. |
| 02:22PM | 5 | Q.  Were they white?  Were they black? |
| 02:22PM | 6 | A.  Like me.  White. |
| 02:22PM | 7 | Q.  John, same thing? |
| 02:22PM | 8 | A.  Yes. |
| 02:22PM | 9 | Q.  Jerry, the same thing? |
| 02:22PM | 10 | A.  Yes. |
| 02:22PM | 11 | Q.  How old was Ron? |
| 02:22PM | 12 | A.  About 30. |
| 02:22PM | 13 | Q.  How about John? |
| 02:22PM | 14 | A.  40. |
| 02:22PM | 15 | Q.  Jerry? |
| 02:22PM | 16 | A.  35. |
| 02:22PM | 17 | Q.  And how long had you known these three individuals for? |
| 02:22PM | 18 | A.  Ten years. |
| 02:22PM | 19 | Q.  So did you talk about this marijuana purchase from Ron |
| 02:22PM | 20 | Serio when you met with the DEA? |
| 02:22PM | 21 | A.  No. |
| 02:22PM | 22 | Q.  You didn't mention that at all? |
| 02:22PM | 23 | A.  No. |
| 02:22PM | 24 | Q.  And you'd agree with me that that would be pertinent |
| 02:22PM | 25 | information if you were trying to talk with them about Ron |

02:23PM    1    Serio being a supplier.

02:23PM    2    A.  Again, I wasn't trying to talk to them about Mr. Serio,

02:23PM    3    they were.

02:23PM    4             MR. TRIPI:  Objection as to what's pertinent.

02:23PM    5             THE COURT:  No, overruled.

02:23PM    6             BY MR. SINGER:

02:23PM    7    Q.  Do you need me to repeat the question, sir?

02:23PM    8    A.  No.  I mean, again, wasn't trying to talk, they were

02:23PM    9    trying to talk about him.  I wasn't.  I never mentioned Ron

02:23PM   10    Serio, they did.

02:23PM   11    Q.  That's what I'm getting at.  Is that DEA asked you a

02:23PM   12    question about Ron Serio, correct?

02:23PM   13    A.  And all's I said was I can buy from Ron Serio.  That was

02:23PM   14    it.

02:23PM   15    Q.  That's all you said?

02:23PM   16    A.  That was it.  End of questioning, that was it.

02:23PM   17    Q.  They didn't ask you any specifics --

02:23PM   18    A.  No.

02:23PM   19    Q.  -- about it whatsoever?

02:23PM   20    A.  No.

02:23PM   21    Q.  Okay.  So DEA asks you to make some buys from T.S.; is

02:23PM   22    that right?

02:23PM   23    A.  Yes.

02:23PM   24    Q.  And you have a little bit of a problem at that point in

02:23PM   25    time to make these buys, right?

02:23PM    1    A.  Yes.

02:23PM    2    Q.  Because you ow T.S. a drug debt, correct?

02:23PM    3    A.  Yes.

02:23PM    4    Q.  And until that's settled up, T.S. is not gonna deal with

02:23PM    5    you, correct?

02:23PM    6    A.  Correct.

02:23PM    7    Q.  So part of the plan to get you back in with T.S. that the

02:24PM    8    DEA proposed to you is that they would potentially provide

02:24PM    9    you some money, and that you would use that money to pay down

02:24PM   10    the drug debt, and then get back in and make some purchases

02:24PM   11    with T.S., correct?

02:24PM   12    A.  Correct.

02:24PM   13    Q.  But when you reached out to T.S., you don't make contact

02:24PM   14    with him, right?

02:24PM   15    A.  No, he got nervous.

02:24PM   16    Q.  He got nervous?

02:24PM   17    A.  Yeah.

02:24PM   18    Q.  So, he didn't want to meet with you?

02:24PM   19    A.  No.

02:24PM   20    Q.  So, DEA proposes a plan to try to get you back in with

02:24PM   21    T.S., right?

02:24PM   22    A.  Yeah.

02:24PM   23    Q.  You call T.S., correct?

02:24PM   24    A.  Yep.

02:24PM   25    Q.  And T.S. doesn't agree to meet with you anymore, correct?

02:24PM    1   A.   Correct.

02:24PM    2   Q.   And you said because he was nervous?

02:24PM    3   A.   I guess.

02:24PM    4   Q.   Was that because he knew that you were pending a felony

02:24PM    5   charge for burglary?

02:24PM    6        **MR. TRIPI:**  Objection as to what someone else knew,

02:24PM    7   Your Honor.

02:24PM    8        **THE WITNESS:**  Or that he was gonna get robbed.

02:24PM    9        **THE COURT:**  When there's an objection, please don't

02:24PM   10   answer.

02:24PM   11        **THE WITNESS:**  Oh, I'm sorry.

02:24PM   12        **THE COURT:**  No, that's okay.  You don't need to

02:24PM   13   apologize.

02:24PM   14        **THE WITNESS:**  Okay.

02:24PM   15        **THE COURT:**  Sustained.  You can rephrase the

02:24PM   16   question.  But the objection to the form of the question is

02:24PM   17   sustained.

02:25PM   18        **BY MR. SINGER:**

02:25PM   19   Q.   Was Mr. T.S. aware of your arrest and charge for felony

02:25PM   20   burglary at that point in time in 2013?

02:25PM   21   A.   Everybody was aware.

02:25PM   22   Q.   Okay.  So you would agree with me, if you were pending a

02:25PM   23   charge, that may have been one of the reasons why T.S. was

02:25PM   24   nervous, correct?

02:25PM   25   A.   Could have been.

02:25PM   1   Q.   Okay.  So he refuses in any way deal with you at that

02:25PM   2   point in time, right?

02:25PM   3   A.   Correct.

02:25PM   4   Q.   As far as Ron Serio is concerned, now, you never drove

02:25PM   5   anywhere and delivered drugs for Ron Serio; is that right?

02:25PM   6   A.   Correct.

02:25PM   7   Q.   You never drove to New York City or anything like that to

02:25PM   8   try to get any type of money for Ron Serio, correct?

02:25PM   9   A.   Correct.

02:25PM   10   Q.   And you I know you think you know Ron Serio.  You said

02:25PM   11   you've known him for two years, correct?

02:25PM   12   A.   Um-hum.

02:25PM   13   Q.   You testified earlier on direct that you've been over to

02:25PM   14   Ron Serio's house on Lebrun; is that right?

02:25PM   15   A.   Correct.

02:25PM   16   Q.   And that's the house in Amherst on Lebrun?

02:25PM   17   A.   I don't know where it is, I just know it was on Lebrun.

02:26PM   18   Q.   But you remember it was a big house, right?

02:26PM   19   A.   Yeah.

02:26PM   20   Q.   And you said earlier that you'd been there roughly five

02:26PM   21   to six times, right?

02:26PM   22   A.   About that, yeah.

02:26PM   23   Q.   Do you remember testifying before a grand jury, sir?

02:26PM   24   A.   Yeah.

02:26PM   25   Q.   Yeah.  And it was connected to this case before you came

02:26PM    1   into court today, correct?

02:26PM    2   A.  Before I came into this court?

02:26PM    3   Q.  Before you came into this court, did you testify before a

02:26PM    4   grand jury?

02:26PM    5   A.  No.

02:26PM    6   Q.  You didn't testify before a grand jury?

02:26PM    7   A.  No.

02:26PM    8        **THE COURT:**  I don't think he understands the

02:26PM    9   question.

02:26PM   10        **MR. SINGER:**  Certainly.  Let me work back a little.

02:26PM   11        **BY MR. SINGER:**

02:26PM   12   Q.  So, when you were first contacted by authorities about

02:26PM   13   this case --

02:26PM   14   A.  Yes.

02:26PM   15   Q.  -- you met with the prosecutors in this case, correct?

02:26PM   16   A.  Yes.

02:26PM   17   Q.  And they asked to you testify before a grand jury,

02:26PM   18   correct?

02:26PM   19   A.  Yes.

02:26PM   20   Q.  And that was in this building here?

02:26PM   21   A.  Yes.

02:26PM   22   Q.  And the grand jury was not as similar like this, it was

02:26PM   23   just a room where several people were located, and you and

02:26PM   24   the prosecutor, and he was asking you questions, right?

02:26PM   25   A.  Um-hum.

02:26PM    1    Q.   And you remember testifying before them about the facts

02:27PM    2    of this case, right?

02:27PM    3    A.   Correct.

02:27PM    4    Q.   And do you remember testifying at that point in time when

02:27PM    5    you got asked the question about how many times you'd been

02:27PM    6    over to Ron Serio's house on Lebrun; do you remember that?

02:27PM    7    A.   Yes.

02:27PM    8    Q.   And do you recall stating at that point in time that you

02:27PM    9    were over there four occasions?

02:27PM   10    A.   Four occasions?

02:27PM   11    Q.   Yes.

02:27PM   12    A.   Oh, what did I say now?

02:27PM   13    Q.   Is that -- do you have any reason to disagree with me

02:27PM   14    about --

02:27PM   15    A.   No.

02:27PM   16    Q.   -- the grand jury testimony?

02:27PM   17    A.   No.

02:27PM   18    Q.   So if that's what it says, that's what it says?

02:27PM   19    A.   If that's what it says, that's what it says.

02:27PM   20    Q.   Okay.  All right.  So as far as the five or six times

02:27PM   21    that you testified today, do you agree with me that when you

02:27PM   22    testified before the grand jury, the facts of this case were

02:27PM   23    more fresh in your mind back then than they are now?

02:27PM   24    A.   I don't know.  Four, five, I don't know.  It's --

02:27PM   25    Q.   You don't know?

02:27PM  1   A.  I mean, I don't keep track.  Everybody's house I go to, I

02:27PM  2   don't keep track every time I go to their houses.  You know,

02:27PM  3   you asked me a question, I say four.  If you ask me about two

02:27PM  4   months later, it might have been five.  I don't know.  I

02:28PM  5   don't -- you know.

02:28PM  6   Q.  So it's back and forth?

02:28PM  7   A.  Not back and forth, just reality I'm sure.  Everybody has

02:28PM  8   a little, you know.

02:28PM  9   Q.  So I guess the reality is is you can't really sit here

02:28PM  10  today and say how many times you're over at Ron Serio's house

02:28PM  11  at that point in time back in 2013, right?

02:28PM  12  A.  No.  Well, I know what the house is.  I know how big it

02:28PM  13  is.  I know what's on the doors.  I know everything, what's

02:28PM  14  inside.  So I might have to -- maybe it was four maybe, maybe

02:28PM  15  it was five.  It was my mistake if I said five, six.  My

02:28PM  16  mistake, I apologize.

02:28PM  17  Q.  Okay.  So at the time that you're going over to the Serio

02:28PM  18  house, you're going over there because you're friends with

02:28PM  19  Frank Burkhardt, right?

02:28PM  20  A.  Yeah.

02:28PM  21  Q.  Yeah.  You know Mr. Burkhardt going back how many years?

02:28PM  22  A.  45 years.

02:28PM  23  Q.  I mean, you've known him practically all your life,

02:28PM  24  right?

02:28PM  25  A.  Correct.

02:28PM     1   Q.  And he was a friend of yours, correct?

02:28PM     2   A.  Correct.

02:28PM     3   Q.  And he's hanging out with Ron Serio; is that right?

02:28PM     4   A.  Correct.

02:28PM     5   Q.  Okay.  So, you know Burkhardt better than Ron Serio; fair

02:29PM     6   statement?

02:29PM     7   A.  Correct.

02:29PM     8   Q.  Do you remember talking to Amherst PD --

02:29PM     9             **MR. TRIPI:**  Objection, beyond the scope.

02:29PM    10             **THE COURT:**  Overruled.

02:29PM    11             **BY MR. SINGER:**

02:29PM    12   Q.  Do you remember talking to Amherst Police Department when

02:29PM    13   you first met up with agents regarding cooperation in this

02:29PM    14   case?

02:29PM    15   A.  Do I remember talking to Amherst Police Department?

02:29PM    16   Q.  Yes.

02:29PM    17   A.  Yes.

02:29PM    18   Q.  And do you remember talking to them about how you'd like

02:29PM    19   to try to get closer to Ron Serio?

02:29PM    20   A.  No.

02:29PM    21   Q.  You don't remember that?

02:29PM    22   A.  No.

02:29PM    23   Q.  Do you remember testifying earlier that when DEA asked

02:29PM    24   you what you knew about Ron Serio, that you would like to try

02:29PM    25   to get closer to him in some way?

USA v Bongiovanni - R.K. - Singer/Cross - 2/20/24

45

02:29PM    1    A.   Not I would, they want me to.

02:29PM    2    Q.   Okay.

02:29PM    3    A.   Yeah.

02:29PM    4    Q.   And the reason for that was that you weren't very close

02:29PM    5    with Ron Serio at that point in time, correct?

02:29PM    6    A.   No, I wasn't.  It's not like we're hand in hand, but I

02:29PM    7    knew him.

02:29PM    8    Q.   You knew him?

02:29PM    9    A.   And I talked to him, yeah, but we weren't --

02:29PM   10    Q.   I guess that's what I'm getting at.  You knew Ron Serio,

02:30PM   11    right?

02:30PM   12    A.   Yeah.

02:30PM   13    Q.   But you didn't know him for 45 likes you knew Frank

02:30PM   14    Burkhardt, right?

02:30PM   15    A.   No.

02:30PM   16    Q.   You didn't interact with him on a narcotics basis like

02:30PM   17    T.S. for eight months prior to that, right?

02:30PM   18    A.   No.

02:30PM   19    Q.   So your connection is a little different with Ron Serio

02:30PM   20    than it was with other people, correct?

02:30PM   21    A.   Correct.

02:30PM   22    Q.   And you said that everybody knew about your burglary case

02:30PM   23    that was in existence at that time, right?

02:30PM   24    A.   My burglary case?

02:30PM   25    Q.   Correct.

02:30PM     1   A.  Sure.

02:30PM     2   Q.  That was something that was common knowledge amongst your

02:30PM     3   friends?

02:30PM     4   A.  Well, I mean, I was -- I think I was on the news for it,

02:30PM     5   so, yeah.

02:30PM     6   Q.  Okay.  So it was widely known?

02:30PM     7   A.  Yeah.

02:30PM     8   Q.  And what did you try to do to get in contact with Ron

02:30PM     9   Serio at that time when the DEA asked you to?

02:30PM    10   A.  They didn't ask me to get in -- they didn't ask me to

02:30PM    11   call him or anything.  They asked me to call T.S..

02:30PM    12   Q.  Okay.  They never asked you to make any contact with Ron

02:30PM    13   Serio?

02:30PM    14   A.  No.  They just mentioned his name.

02:31PM    15   Q.  Okay.  They just mentioned his name?

02:31PM    16   A.  If you hear -- yeah, if you hear anything about him, let

02:31PM    17   us know.

02:31PM    18   Q.  Okay.  So your cooperation or attempted cooperation to

02:31PM    19   try to talk with T.S., that pretty much went nowhere by the

02:31PM    20   middle of May, correct?

02:31PM    21   A.  Correct.

02:31PM    22   Q.  And at one point in time, the DEA contacts you, Special

02:31PM    23   Agent Bongiovanni contacts you to call you into the office,

02:31PM    24   correct?

02:31PM    25   A.  Correct.

USA v Bongiovanni - R.K. - Singer/Cross - 2/20/24

02:31PM 1 Q. And the purpose of that conversation was to talk to you

02:31PM 2 about cooperation and whether this is working or not,

02:31PM 3 correct?

02:31PM 4 A. I'm sorry, say that again?

02:31PM 5 Q. And the purpose of that conversation was to talk to you

02:31PM 6 about whether your cooperation would be necessary or not,

02:31PM 7 correct?

02:31PM 8 A. Yes.

02:31PM 9 Q. And so at that point in time, you also have this court

02:31PM 10 case in county court, right?

02:31PM 11 A. Yes.

02:31PM 12 Q. And you know that you're facing a felony burglary charge,

02:32PM 13 correct?

02:32PM 14 A. Yes.

02:32PM 15 Q. And you know that as a second time felony offender,

02:32PM 16 you're looking at some hard time Upstate, correct?

02:32PM 17 A. Two years.

02:32PM 18 Q. Two years?  Two to four years?

02:32PM 19 A. Two to four, yeah.

02:32PM 20 Q. Two to four, yeah.  Two to four, undetermined, right?

02:32PM 21 A. Hard time.  Hard time.

02:32PM 22 Q. And, yeah, I mean, it's hard time.  I mean, so state

02:32PM 23 prison is not a fun place, right?

02:32PM 24 A. No, it's not.

02:32PM 25 Q. Food sucks?

02:32PM 1   A.  Food sucks.

02:32PM 2   Q.  It's dangerous?

02:32PM 3   A.  Very dangerous.

02:32PM 4   Q.  You don't have any contact with --

02:32PM 5   A.  Unless you're a dangerous person, then you ain't gotta

02:32PM 6   worry about it.

02:32PM 7   Q.  You don't have any contact with family members or

02:32PM 8   anything like that?

02:32PM 9   A.  Excuse me?

02:32PM 10  Q.  You don't have any contact with any family members when

02:32PM 11  you're in state prison?

02:32PM 12  A.  Sure.

02:32PM 13  Q.  Sometimes, but not the same as if you're back home,

02:32PM 14  right?

02:32PM 15  A.  Sure.

02:32PM 16  Q.  Sometimes it can get a little lonely in there, right?

02:32PM 17  A.  Nah.

02:32PM 18  Q.  So this meeting was supposed to happen at the end of May,

02:32PM 19  correct?

02:32PM 20  A.  Yeah.

02:32PM 21  Q.  And then you hinted at this earlier.  Before that

02:32PM 22  meeting, something happens to one of your friends, right?

02:32PM 23  A.  Yes.

02:33PM 24  Q.  And that friend is Robert Runfola?

02:33PM 25  A.  Yes.

02:33PM   1   Q.  So, Robert Runfola, he's an individual that you know how

02:33PM   2   long?

02:33PM   3   A.  45 years.

02:33PM   4   Q.  So it goes all the way back, correct?

02:33PM   5   A.  Yeah.

02:33PM   6   Q.  And Robert Runfola, he, at some point in time, purchased

02:33PM   7   heroin, correct?

02:33PM   8   A.  Correct.

02:33PM   9   Q.  And he was a user of heroin, right?

02:33PM   10   A.  Correct.

02:33PM   11   Q.  And you were a user of heroin, right?

02:33PM   12   A.  Correct.

02:33PM   13   Q.  So Robert Runfola, before this meeting that you were

02:33PM   14   supposed to have with Special Agent Bongiovanni, he took some

02:33PM   15   heroin, correct?

02:33PM   16   A.  Correct.

02:33PM   17   Q.  And he eventually overdosed on that heroin, correct?

02:33PM   18   A.  Correct.

02:33PM   19   Q.  And you remember that he picked this up from a dealer

02:33PM   20   named Peter Militello, correct?

02:33PM   21   A.  Correct.

02:33PM   22   Q.  And you were with Mr. Runfola the day that he picked up

02:33PM   23   the heroin from Mr. Militello, correct?

02:33PM   24   A.  Correct.

02:33PM   25   Q.  It was outside the Buffalo City Court building?

02:33PM   1   A.   Correct.

02:33PM   2   Q.   I think, was Mr. Runfola supposed to report in for court

02:34PM   3   that morning?

02:34PM   4   A.   Yes.

02:34PM   5   Q.   And you were in car where Mr. Militello picked him up

02:34PM   6   outside the Buffalo City Court building, drove the two of you

02:34PM   7   around, to consummate the transaction?

02:34PM   8   A.   Correct.

02:34PM   9   Q.   And so you departed ways at that point in time, correct?

02:34PM   10  A.   Who did?

02:34PM   11  Q.   And you Runfola?

02:34PM   12  A.   No, we went into the courtroom.

02:34PM   13  Q.   You went into the courtroom?  And after you got out of

02:34PM   14  court, did you use the heroin that you purchased?

02:34PM   15  A.   We used it before we went into the courtroom.

02:34PM   16  Q.   You used it before you went into court?

02:34PM   17  A.   Yes.

02:34PM   18  Q.   And then Mr. Runfola later passed away that day about it,

02:34PM   19  correct?

02:34PM   20  A.   Mr. Runfola had more heroin on him that I didn't know

02:34PM   21  about.

02:34PM   22  Q.   Okay.  And he took that heroin?

02:34PM   23  A.   And then he went home and shot it, and passed away.

02:34PM   24  Q.   Okay.  So he overdosed?

02:34PM   25  A.   Yes.

02:34PM   1   Q.  So when Mr. Bongiovanni contacted you, you reported this

02:34PM   2   to him, correct?

02:34PM   3   A.  I just -- I let him know that -- I let him know that my

02:34PM   4   friend died, and how he died, and I was in the car.  And then

02:34PM   5   light bulbs went off with all of them, and they dropped

02:35PM   6   everything, and Mr. Militello was the case now.

02:35PM   7   Q.  Um-hum.  And that was something that was important to the

02:35PM   8   agents to investigate, right?

02:35PM   9   A.  Correct.

02:35PM   10   Q.  And Robert Runfola, he's your friend, correct?

02:35PM   11   A.  Correct.

02:35PM   12   Q.  He passed away from doing drugs that someone else dealt

02:35PM   13   to him, right?

02:35PM   14   A.  Correct.

02:35PM   15   Q.  So you wanted to see some justice served in this matter

02:35PM   16   just as much, right?

02:35PM   17   A.  Correct.

02:35PM   18   Q.  And if Mr. Militello was the one that sold him that fatal

02:35PM   19   dose, you wanted to see Mr. Militello held accountable,

02:35PM   20   correct?

02:35PM   21   A.  Correct.

02:35PM   22   Q.  And you also knew that you had this case happening in

02:35PM   23   county court with the burglary charge that you were looking

02:35PM   24   at two to four years on, and you also wanted to help

02:35PM   25   yourself, right?

| | | |
|---|---|---|
| 02:35PM | 1 | A.  Correct. |
| 02:35PM | 2 | Q.  So that's when the DEA asked you to engage in undercover |
| 02:35PM | 3 | buys with Peter Militello, correct? |
| 02:35PM | 4 | A.  Correct. |
| 02:35PM | 5 | Q.  And you eventually make a buy from Mr. Militello, |
| 02:35PM | 6 | correct? |
| 02:35PM | 7 | A.  Correct. |
| 02:35PM | 8 | Q.  And it happens quickly, correct? |
| 02:35PM | 9 | A.  Correct. |
| 02:35PM | 10 | Q.  And later, Mr. Militello is arrested for what happened as |
| 02:36PM | 11 | far as the dealing to Robert Runfola, correct? |
| 02:36PM | 12 | A.  Correct. |
| 02:36PM | 13 | Q.  And do you recall his arrest happened shortly after your |
| 02:36PM | 14 | buy? |
| 02:36PM | 15 | A.  Correct. |
| 02:36PM | 16 | Q.  So, I know that the buy was towards the end of May.  Do |
| 02:36PM | 17 | you have any reason to disagree with me that Mr. Militello |
| 02:36PM | 18 | was arrested in June? |
| 02:36PM | 19 | A.  June, I believe, yeah. |
| 02:36PM | 20 | Q.  Okay. |
| 02:36PM | 21 | A.  Um-hum. |
| 02:36PM | 22 | Q.  And so, June, you have this successful case that the DEA |
| 02:36PM | 23 | has now as a result of your cooperation, correct? |
| 02:36PM | 24 | A.  Correct. |
| 02:36PM | 25 | Q.  But you're also going back into court on your pending |

02:36PM   1   burglary charge, correct?

02:36PM   2   A.   Correct.

02:36PM   3   Q.   And you're looking at potentially being sentenced two to

02:36PM   4   four years, correct?

02:36PM   5   A.   Correct.

02:36PM   6   Q.   And you go in on July 3rd of 2013, and you plead guilty

02:36PM   7   to the burglary felony that you're pending, correct?

02:36PM   8   A.   Correct.

02:36PM   9   Q.   And sentencing at that point in time was deferred?

02:36PM   10  A.   Correct.

02:36PM   11  Q.   Because of the cooperation you engaged in, you had the

02:36PM   12  opportunity to enter into the judicial diversion program,

02:37PM   13  correct?

02:37PM   14  A.   Correct.

02:37PM   15  Q.   So that's drug court?

02:37PM   16  A.   Yeah.   But after he told them I wore a wire, I was

02:37PM   17  labeled as a rat, so it didn't really matter.   You know.

02:37PM   18  Q.   I'm sorry, I didn't hear you.

02:37PM   19  A.   After he said I wore a wire to the kid, I was labeled as

02:37PM   20  a rat.   So being in a drug court program, or anywhere in this

02:37PM   21  city didn't matter, because he told them I wore a wire.

02:37PM   22  Q.   Okay.   So you wore a wire with regard to the Militello

02:37PM   23  investigation?

02:37PM   24  A.   Yeah.

02:37PM   25  Q.   Okay.   And that's something that the drug court

USA v Bongiovanni - R.K. - Singer/Cross - 2/20/24

54

02:37PM   1   communicated back to you, or to other people?

02:37PM   2   A.   No.  By him telling Mr. Militello that I wore a wire, it

02:37PM   3   got to the neighborhood that I wore a wire.  So everywhere I

02:37PM   4   went, drug court, streets, I'm fighting for my life.  People

02:37PM   5   trying to stab me, everything.  Because he told them I wore a

02:37PM   6   wire.

02:37PM   7   Q.   All right.  So, I mean, safe to say at that point in time

02:37PM   8   then you were burned as a confidential informant?

02:37PM   9   A.   Yeah, because I thought C meant confidential informant,

02:37PM  10   not we tell everything and we just put the person on the

02:38PM  11   street to die.  But you see I'm still here, I'm still walking

02:38PM  12   the streets.

02:38PM  13   Q.   Okay.  So, I mean, you didn't feel comfortable acting as

02:38PM  14   a confidential informant after the Militello case?

02:38PM  15   A.   No.

02:38PM  16   Q.   So you have a situation where you don't feel comfortable

02:38PM  17   being a confidential informant yourself anymore, correct?

02:38PM  18   A.   Correct.

02:38PM  19   Q.   You have a situation where you're currently in drug

02:38PM  20   court, correct?

02:38PM  21   A.   Yes.

02:38PM  22   Q.   And people know about your case, you testified about that

02:38PM  23   earlier, correct?

02:38PM  24   A.   Correct.

02:38PM  25   Q.   And then you also have the issue that at the time you're

02:38PM    1    acting as a confidential informant for DEA, you purchased

02:38PM    2    heroin, correct?

02:38PM    3    A.   Correct.

02:38PM    4    Q.   And you didn't purchase it from Mr. Militello at

02:38PM    5    Mr. Bongiovanni's direction, you purchased it outside of

02:38PM    6    Mr. Bongiovanni's direction, correct?

02:38PM    7    A.   No.   I purchased it at his direction.   He gave me the

02:38PM    8    money.   He gave me the money to buy it.

02:38PM    9    Q.   So let's unpack that.   I know that you made the

02:39PM   10    controlled buy from Mr. Militello.

02:39PM   11    A.   Yeah.

02:39PM   12    Q.   Correct?

02:39PM   13    A.   Um-hum.

02:39PM   14    Q.   But when you purchased the heroin with Robert Runfola

02:39PM   15    before you --

02:39PM   16    A.   I didn't purchase no heroin with Robert Runfola.

02:39PM   17    Q.   Well, you testified to that earlier, sir.

02:39PM   18    A.   Robert Runfola gave me heroin.

02:39PM   19    Q.   So he gave you heroin?

02:39PM   20    A.   Yeah.   I didn't purchase it.

02:39PM   21    Q.   So you didn't purchase it, but Mr. Runfola gave it to

02:39PM   22    you?

02:39PM   23    A.   Yes.

02:39PM   24    Q.   And you used it?

02:39PM   25    A.   Yes.

02:39PM  1   Q.  And you know that that's a violation of your confidential

02:39PM  2   informant/confidential source agreement with the DEA, right?

02:39PM  3   A.  Well, no, because this was before they knew Militello,

02:39PM  4   before Bobby died.

02:39PM  5        MR. SINGER:  Ms. Champoux, would you mind bringing up

02:39PM  6   Government Exhibit 9E-2.

02:39PM  7        THE COURT:  In evidence?

02:39PM  8        MR. SINGER:  In evidence.

02:39PM  9        And if you can scroll to the second page.  And if you

02:39PM  10   can enlarge paragraph 6 at the top, please.

02:39PM  11        BY MR. SINGER:

02:40PM  12   Q.  So, sir, Mr. Tripi went through this agreement with you,

02:40PM  13   correct?

02:40PM  14   A.  Correct.

02:40PM  15   Q.  Remember going through that earlier?

02:40PM  16   A.  Yes.

02:40PM  17   Q.  And this was what your responsibilities were to act as a

02:40PM  18   confidential informant with the DEA, correct?

02:40PM  19   A.  Correct.

02:40PM  20   Q.  And so paragraph 6 talks about one of your

02:40PM  21   responsibilities, is that you're not authorized to

02:40PM  22   participate in any criminal activity except that specifically

02:40PM  23   authorized in writing by a prosecutor and/or my controlling

02:40PM  24   investigator, do you see that?

02:40PM  25   A.  Yeah.

02:40PM 1  Q.  And when you took the heroin from Robert Runfola, and

02:40PM 2  used it --

02:40PM 3  A.  Yes.

02:40PM 4  Q.  -- you engaged in a criminal act, correct?

02:40PM 5  A.  I guess I did, yes.

02:40PM 6  Q.  Yeah.  Illegal use of heroin, correct?

02:40PM 7  A.  Um-hum.

02:40PM 8  Q.  And that violated your agreement, correct?

02:40PM 9  A.  Um-hum.

02:40PM 10 Q.  And I'm sure DEA told you at the time that if you violate

02:40PM 11 this agreement --

02:40PM 12        MR. SINGER:  You can take that down, Ms. Champoux.

02:40PM 13 Thank you.

02:40PM 14        BY MR. SINGER:

02:40PM 15 Q.  -- at the time if you violate that agreement, that pretty

02:40PM 16 much ends your ability to act as a confidential informant,

02:40PM 17 correct?

02:40PM 18 A.  Correct.  But if I told them that Peter Militello wanted

02:41PM 19 me to sniff the bag so he can make sure that I'm a good dude,

02:41PM 20 they would tell me to sniff the bag.  So, you know, you gotta

02:41PM 21 do what you gotta do to get what you want, right?  So if they

02:41PM 22 want him, and he says sniff the bag, that line that you just

02:41PM 23 read doesn't mean nothing.  I'm gonna sniff the bag for them

02:41PM 24 to show him that I'm okay.  Bottom line.

02:41PM 25        MR. SINGER:  Just one moment, Judge.

02:41PM  1          **BY MR. SINGER:**

02:41PM  2   Q.  So one of the things you have testified to when I was

02:42PM  3   asking you questions a few moments ago is that you believe it

02:42PM  4   was Mr. Bongiovanni who outed you to Mr. Militello?

02:42PM  5   A.  I know it was.

02:42PM  6   Q.  You know it was?

02:42PM  7   A.  Yeah.

02:42PM  8   Q.  Were you in the room when Mr. Bongiovanni did this?

02:42PM  9   A.  No.  But the person he told, told somebody else.

02:42PM  10  Q.  So the person that he told, told somebody else?

02:42PM  11  A.  It was just me and him in the car when he gave it to me.

02:42PM  12  It was just me and him in the car when he gave it to me.

02:42PM  13  Q.  When you're talking about when he gave it to me, what are

02:42PM  14  you referring to?

02:42PM  15  A.  The camera, the phone, the wire, everything.  To use,

02:42PM  16  showed me how to use it and everything.  It was just me and

02:42PM  17  him in the car.

02:42PM  18  Q.  Okay.  Do you remember having conversations with Peter

02:42PM  19  Militello after the controlled purchase that you consummated

02:42PM  20  with him?

02:42PM  21  A.  After?

02:42PM  22  Q.  Correct.  So, let me back up.  Let me ask that a

02:42PM  23  different way.  All right?

02:42PM  24       So you tell Mr. Bongiovanni about Robert Runfola

02:42PM  25  overdosing, correct?

02:42PM 1    A.  Yes.

02:42PM 2    Q.  And you tell him that Peter Militello was the source of

02:43PM 3    the heroin that Robert Runfola overdosed on, correct?

02:43PM 4    A.  Correct.

02:43PM 5    Q.  You consummate a controlled purchase of heroin from Peter

02:43PM 6    Militello, correct?

02:43PM 7    A.  Correct.

02:43PM 8    Q.  And then after that was done, Mr. Runfola has a funeral

02:43PM 9    going on?

02:43PM 10   A.  Yes.

02:43PM 11          **MR. TRIPI:**  Objection, 403.  Judge, if we may be

02:43PM 12   heard --

02:43PM 13          **THE COURT:**  Yeah, I suppose.  Come on up if you want

02:43PM 14   to argue.

02:43PM 15          (Sidebar discussion held on the record.)

02:43PM 16          **MR. TRIPI:**  Your Honor, my objection is under

02:43PM 17   Rule 403.  I have let quite a bit of questioning go without

02:43PM 18   any objection regarding probing the relationship between

02:43PM 19   Mr. Bongiovanni and this informant vis-à-vis the Militello

02:43PM 20   investigation.

02:43PM 21          But now, we're talking about something beyond the

02:43PM 22   Militello arrest.  We're talking about the Runfola funeral.

02:44PM 23          Now we're getting into, like, confusing of the issues

02:44PM 24   under Rule 403.  We're a little far afield, in other words.

02:44PM 25          **THE COURT:**  No, hang on.

02:44PM   1          **MR. SINGER:**  So the reason why I'm asking these

02:44PM   2   questions, Judge, is that the witness testified that my client

02:44PM   3   outed him as a source.

02:44PM   4          **THE COURT:**  Right.

02:44PM   5          **MR. SINGER:**  That's his belief.  And he says that the

02:44PM   6   reason why was because he wore a wire.

02:44PM   7          There are DEA-6s that we provided in discovery which

02:44PM   8   talk about how Mr. Militello was -- I'm sorry, Mr. R.K. was

02:44PM   9   involve in controlled phone calls with Mr. Militello,

02:44PM  10   postdating the sale of the heroin on the controlled buy that

02:44PM  11   Mr. Bongiovanni essentially used to prosecute Militello.  So

02:44PM  12   the only thing I'm getting into right here is that there

02:44PM  13   wasn't a wire involved here, it was a controlled phone call

02:44PM  14   that happened.

02:44PM  15          And the only reason why I brought up the funeral is

02:44PM  16   the controlled phone call that happens, happens after the day

02:44PM  17   of the funeral.  And we talk about how Runfola's family is

02:45PM  18   pissed off at Militello, because they think he's the person

02:45PM  19   who sold it.

02:45PM  20          And Militello basically says, hey, we gotta stick to

02:45PM  21   our stories that I wasn't the guy.

02:45PM  22          **THE COURT:**  So there wasn't a wire?

02:45PM  23          **MR. SINGER:**  There wasn't a wire, Judge, it's just a

02:45PM  24   controlled phone call.

02:45PM  25          **THE COURT:**  So why can't he explore that?

02:45PM    1          **MR. TRIPI:**  I think the explanation proves the 403

02:45PM    2   objection, because it's convoluted and confusing, and it's

02:45PM    3   quite far afield.

02:45PM    4          **THE COURT:**  I don't think it is at all.  I don't

02:45PM    5   think so at all.  He wants to impeach the statement that he

02:45PM    6   wore a wire, and that Bongiovanni outed him for wearing a

02:45PM    7   wire.

02:45PM    8          And that, according to Mr. Singer, he's got evidence

02:45PM    9   that that's not true.  Why can't he -- why can't he do that?

02:45PM   10   Of course he can.

02:45PM   11          **MR. TRIPI:**  I don't see how that testimony addresses

02:45PM   12   that concern.  But if you disagree, that's okay, Judge.

02:45PM   13          **THE COURT:**  He didn't wear a wire?

02:45PM   14          **MR. TRIPI:**  How the story about the funeral tying

02:45PM   15   into the --

02:45PM   16          **THE COURT:**  I don't think the funeral has any type

02:45PM   17   of --

02:45PM   18          **MR. TRIPI:**  Okay.

02:45PM   19          **THE COURT:**  The funeral is just for context.

02:45PM   20          You're not going to get into the funeral?

02:46PM   21          **MR. SINGER:**  No, I just don't know how much he

02:46PM   22   remembers.  I'm just trying to give him a marker.

02:46PM   23          **THE COURT:**  The objection is overruled.  Go ahead.

02:46PM   24   You're not going to get into the funeral --

02:46PM   25          **MR. SINGER:**  I won't get into that, Judge.

02:46PM    1              **MR. TRIPI:**  I objected about the funeral.

02:46PM    2              (End of sidebar discussion.)

02:46PM    3              **BY MR. SINGER:**

02:46PM    4     Q.  So let me restate the question, Mr. R.K..

02:46PM    5         So -- so after the controlled purchase, correct, you end

02:46PM    6     up making a telephone call to Peter Militello; is that right?

02:46PM    7     Do you remember that?

02:46PM    8     A.  Yeah.  They wanted me to, like, scare him.

02:46PM    9     Q.  And, so, when you're mentioning a wire, you weren't

02:46PM   10     speaking to Mr. Militello face to face, correct?

02:46PM   11     A.  No.

02:46PM   12     Q.  They recorded the phone call that you made to

02:46PM   13     Mr. Militello?

02:46PM   14     A.  No, no, no, no, no.  I got in a car with Mr. Militello to

02:46PM   15     make the buy, is when I had the -- I had the little camera.

02:46PM   16     And he said point it at him, make sure you point it at his

02:46PM   17     face.  I had the phone, he said make sure you hold it here so

02:47PM   18     it gets him there.  All that inside the car.

02:47PM   19     Q.  Okay.  So you're talking about the controlled purchase

02:47PM   20     you made from Militello?

02:47PM   21     A.  Correct.

02:47PM   22     Q.  But later you make a phone call, correct?

02:47PM   23     A.  Yes.  They told me to tell him that the family is looking

02:47PM   24     for him to get him all scared up.

02:47PM   25     Q.  That phone call was recorded, correct?

| | | |
|---|---|---|
| 02:47PM | 1 | A.  Correct. |
| 02:47PM | 2 | Q.  Okay.  And then you said you heard from somebody, you |
| 02:47PM | 3 | told somebody else, that Agent Bongiovanni outed you? |
| 02:47PM | 4 | A.  Yes. |
| 02:47PM | 5 | Q.  Okay.  But who was that person? |
| 02:47PM | 6 | A.  Who, what?  The person who Peter told over the phone from |
| 02:47PM | 7 | jail? |
| 02:47PM | 8 | Q.  Who was the person who Mr. Bongiovanni allegedly told you |
| 02:47PM | 9 | were using a wire? |
| 02:47PM | 10 | A.  Peter Militello.  When he arrested him. |
| 02:47PM | 11 | Q.  Peter Militello? |
| 02:47PM | 12 | A.  Yeah. |
| 02:47PM | 13 | Q.  And then Peter Militello told somebody else? |
| 02:47PM | 14 | A.  Yeah. |
| 02:47PM | 15 | Q.  And then at that point in time, that was already out in |
| 02:47PM | 16 | the street based on your knowledge? |
| 02:47PM | 17 | A.  Yeah. |
| 02:47PM | 18 | Q.  Okay. |
| 02:47PM | 19 | **MR. SINGER:**  I have no further questions, Judge. |
| 02:47PM | 20 | **THE COURT:**  Redirect? |
| 02:47PM | 21 | **MR. TRIPI:**  Very brief, Judge, thank you. |
| 02:48PM | 22 | |
| 02:48PM | 23 | **REDIRECT EXAMINATION BY MR. TRIPI:** |
| 02:48PM | 24 | Q.  Mr. R.K., I think I have about three questions for you, |
| 02:48PM | 25 | okay?  Just to clarify something, just the marijuana that you |

02:48PM   1   were purchasing from Mr. Serio, or any drugs that you were

02:48PM   2   purchasing, it was to resell it to make money; is that right?

02:48PM   3   A.   Correct.

02:48PM   4   Q.   Okay.  So you weren't limited in your pizza income?

02:48PM   5   A.   No.

02:48PM   6   Q.   Okay.  Now, I asked you about your initial meeting with

02:48PM   7   the DEA and who was in the room.  And you indicated the

02:48PM   8   defendant and several other people; do you remember that?

02:48PM   9   A.   Correct.

02:48PM   10   Q.   In subsequent meetings after you signed that agreement,

02:48PM   11   and the defendant was your handling agent, was it you and the

02:48PM   12   defendant one on one interacting with each other?

02:48PM   13   A.   Yes.

02:48PM   14   Q.   And I'm not talking about later from jail with

02:48PM   15   Mr. Militello in a jail call, but I'm talking about at the

02:48PM   16   time the defendant told you you were no longer going to be a

02:49PM   17   confidential source, could you have gotten into people in the

02:49PM   18   Serio organization and made buys?

02:49PM   19   A.   I could have gotten to anybody.

02:49PM   20   Q.   In that organization specifically?

02:49PM   21   A.   Yeah.

02:49PM   22        MR. TRIPI:  Okay, nothing further.

02:49PM   23        THE COURT:  Anything more, Mr. Singer?

02:49PM   24        MR. SINGER:  No, Judge.

02:49PM   25        THE COURT:  You can step down, sir.  Thank you.

02:49PM

1            (Witness excused at 2:49 p.m.)

2            (Excerpt concluded at 2:49 p.m.)

3               *    *    *    *    *    *    *

4

5

6

7                    **CERTIFICATE OF REPORTER**

8

9            In accordance with 28, U.S.C., 753(b), I

10   certify that these original notes are a true and correct

11   record of proceedings in the United States District Court for

12   the Western District of New York on February 20, 2024.

13

14

15                    s/ Ann M. Sawyer
                     Ann M. Sawyer, FCRR, RPR, CRR
16                   Official Court Reporter
                     U.S.D.C., W.D.N.Y.

17

18

19

20

21

22

23

24

25

```
 1
 2                    TRANSCRIPT INDEX
 3              EXCERPT - EXAMINATION OF R.K.
 4                    FEBRUARY 20, 2024
 5
 6
 7     W I T N E S S                        P A G E
 8     R. K.                                  2
 9        DIRECT EXAMINATION BY MR. TRIPI:     3
10        CROSS-EXAMINATION BY MR. SINGER:    21
11        REDIRECT EXAMINATION BY MR. TRIPI:  63
12
13
14
15     E X H I B I T                         P A G E
16     GOV Exhibit 9E-2                       10
17
18
19
20
21
22
23
24
25
```