12:12PM

1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK
2
   _____
3  UNITED STATES OF AMERICA,
                                        Case No. 1:19-cr-227
4               Plaintiff,                      (LJV)
   v.
5                                       February 26, 2024
   JOSEPH BONGIOVANNI,
6
                Defendant.
7  _____

8       TRANSCRIPT EXCERPT - EXAMINATION OF LAWRENCE JAY
             BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                  UNITED STATES DISTRICT JUDGE

10
   APPEARANCES:          TRINI E. ROSS, UNITED STATES ATTORNEY
11                       BY: JOSEPH M. TRIPI, ESQ.
                            NICHOLAS T. COOPER, ESQ.
12                          CASEY L. CHALBECK, ESQ.
                         Assistant United States Attorneys
13                       Federal Centre
                         138 Delaware Avenue
14                       Buffalo, New York 14202
                            And
15                       UNITED STATES DEPARTMENT OF JUSTICE
                         BY: JORDAN ALAN DICKSON, ESQ.
16                       1301 New York Ave NW
                         Suite 1000
17                       Washington, DC 20530-0016
                         For the Plaintiff
18
                         SINGER LEGAL PLLC
19                       BY: ROBERT CHARLES SINGER, ESQ.
                         80 East Spring Street
20                       Williamsville, New York 14221
                            And
21                       LAW OFFICES OF PARKER ROY MacKAY
                         BY: PARKER ROY MacKAY, ESQ.
22                       3110 Delaware Avenue
                         Kenmore, New York  14217
23                       For the Defendant

24  PRESENT:             BRIAN A. BURNS, FBI Special Agent
                         MARILYN K. HALLIDAY, HSI Special Agent
25                       KAREN A. CHAMPOUX, USA Paralegal

| | | |
|---|---|---|
| 1 | **LAW CLERK:** | **REBECCA FABIAN IZZO, ESQ.** |
| 2 | **COURT DEPUTY CLERK:** | **COLLEEN M. DEMMA** |
| 3 | **COURT REPORTER:** | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 4 | | Robert H. Jackson Federal Courthouse<br>2 Niagara Square |
| 5 | | Buffalo, New York  14202<br>Ann_Sawyer@nywd.uscourts.gov |
| 6 | | |
| 7 | | *    *    *    *    *    *    * |
| 8 | | |

9        (Excerpt commenced at 10:47 a.m.)

10        (Jury is present.)

10:47AM  11        **THE COURT:**  The government can call its next witness.

10:47AM  12        **MR. COOPER:**  The government calls Lawrence Jay.

10:47AM  13

10:47AM  14  **L A W R E N C E   J A Y,** having been duly called and sworn,

10:47AM  15  testified as follows:

10:47AM  16        **MR. COOPER:**  May I inquire, Judge?

10:47AM  17        **THE COURT:**  You may.

10:47AM  18

10:47AM  19                **DIRECT EXAMINATION BY MR. COOPER:**

10:47AM  20  Q.  Good morning, Mr. Jay, how are you?

10:48AM  21  A.  Good morning, sir, how are you?

10:48AM  22  Q.  Well, thank you.  Can you tell the jury a little bit

10:48AM  23  about your background and your education?

10:48AM  24  A.  Yes.  So, spent a little bit of time in the Air Force,

10:48AM  25  went to the U.S. Air Force Security Police Academy.

10:48AM     1          Graduated from Saint John Fisher College with a

10:48AM     2     bachelor's degree in English.

10:48AM     3          Spent 25 years with the U.S. Border Patrol.  Went through

10:48AM     4     the 311 session with the U.S. Border Patrol.

10:48AM     5          And I'm also a graduate of the FBI National Academy,

10:48AM     6     249th session.

10:48AM     7          And I retired in November of 2020 from the U.S. Border

10:48AM     8     Patrol out of headquarters in D.C.  I had spent several years

10:48AM     9     on the southwest border, in addition to the northern border

10:48AM    10     here.

10:48AM    11          And I also worked as a task force officer with the Joint

10:48AM    12     Terrorism Task Force with the FBI office here in Buffalo.

10:48AM    13     Q.  Thank you.  I want to speak specifically about your time

10:48AM    14     with the United States Border Patrol.  You mentioned that you

10:49AM    15     worked there for 25 years?

10:49AM    16     A.  That's correct.

10:49AM    17     Q.  Okay.  Can you tell the jury a little bit about where you

10:49AM    18     started working in the U.S. Border Patrol?

10:49AM    19     A.  So I went through the Federal Law Enforcement Training

10:49AM    20     Center in New Brunswick, Georgia, in 1996.  That was a

10:49AM    21     six-month academy.  And my initial duty station out of

10:49AM    22     academy was in the San Diego sector, specifically El Cajon

10:49AM    23     Station.

10:49AM    24          So that's a primarily a roving patrol, a line watch,

10:49AM    25     meaning border enforcement right on the line with the

USA v Bongiovanni - Jay - Cooper/Direct - 2/26/24

4

10:49AM   1   international border with Mexico, and some checkpoint duties

10:49AM   2   as well.

10:49AM   3   Q.  Got it.  And can you tell the jury a little bit about,

10:49AM   4   like, your actual day-to-day responsibilities when you were

10:49AM   5   working in San Diego and Arizona?

10:49AM   6   A.  So day-to-day involvement when I first started out was a

10:49AM   7   lot of roving patrol duties, as I mentioned.  When you're out

10:49AM   8   in the vehicle patrolling looking for smuggling loads with

10:50AM   9   people crossing the border getting into vehicles.

10:50AM   10      You did a lot of tactical tracking in the mountains when

10:50AM   11   a ground sensor would go off, you would have your list, you

10:50AM   12   would respond to the area accordingly.  And then you would

10:50AM   13   conduct tracking operations and work that in conjunction with

10:50AM   14   your counterparts in the field to try and apprehend the

10:50AM   15   illegal border crossers.

10:50AM   16   Q.  Thank you.  Did there come a time when your work took you

10:50AM   17   to the northern border?

10:50AM   18   A.  It did.  I ended up receiving a promotion, and I

10:50AM   19   transferred to the Buffalo sector to -- it's a senior patrol

10:50AM   20   agent position from a border patrol agent position.  And I

10:50AM   21   came back to with the northern border around the winter of

10:50AM   22   2002.

10:50AM   23   Q.  So would it be fair to say that was about six years after

10:50AM   24   you started in border patrol?

10:50AM   25   A.  That's correct.

10:50AM  1  Q.  Okay.  As a senior agent, how did your responsibilities

10:50AM  2  change if at all?

10:50AM  3  A.  Just a little bit different dynamics here up in Buffalo.

10:51AM  4  You work a lot with your federal, state, and local partners.

10:51AM  5  You work a lot of -- it's not so much you're out in the field

10:51AM  6  working in that rigorous terrain, it's more other agency

10:51AM  7  calls for assistance from local law enforcement.  It's

10:51AM  8  immigration enforcement at the bus station.  Assisting the

10:51AM  9  transit police at the airport.  And just, you know,

10:51AM  10  patrolling the areas in between the ports of entry.  So you

10:51AM  11  would -- we would cover the areas here in Buffalo sector, we

10:51AM  12  have six stations that go -- start at Erie, Pennsylvania, and

10:51AM  13  they head all the way out east to Watertown, Wellesley Island

10:51AM  14  Station.

10:51AM  15      So any of the area in between those ports of entry, we're

10:51AM  16  tasked with doing -- conducting line watch and border

10:51AM  17  enforcement operations.

10:51AM  18  Q.  Is there an intelligence position or intelligence agent

10:51AM  19  position within the Border Patrol?

10:51AM  20  A.  Yes, sir, there is.  So there's 20 sectors throughout the

10:51AM  21  United States Border Patrol.  Every sector has agents

10:52AM  22  assigned to the intelligence unit.

10:52AM  23  Q.  Did there come a time in your career when you became

10:52AM  24  assigned to the intelligence unit?

10:52AM  25  A.  I did.  I was promoted from senior patrol agent to lead

USA v Bongiovanni - Jay - Cooper/Direct - 2/26/24

6

10:52AM  1  border patrol agent in -- for intelligence purposes.  And so

10:52AM  2  I started actually working in the intel realm, and taking on

10:52AM  3  the commensurate amount of training as far as working with

10:52AM  4  sources and, you know, working with other task force

10:52AM  5  officers.

10:52AM  6  Q.  Approximately when did you take on that role as an intel

10:52AM  7  agent?

10:52AM  8  A.  I want to say a couple years after that, so about 2005.

10:52AM  9  Q.  You described for us a moment ago the sorts of

10:52AM  10  responsibilities that you would have in that position.  Can

10:52AM  11  you tell the jury if you received any either educational

10:52AM  12  training, or on-the-job training, with respect to handling

10:52AM  13  sources or informants?

10:52AM  14  A.  Yes.  So, there's different -- I mean, obviously, there's

10:52AM  15  on-the-job training, you learn from your mentors and your

10:53AM  16  peers, more seasoned agents.  But they have a national

10:53AM  17  collaboration course that you go to, and they run you

10:53AM  18  through, they teach you surveillance techniques.

10:53AM  19      I, in fact, that intel role was unique.  Members of my

10:53AM  20  team and I, we were actually -- we worked very close with the

10:53AM  21  border enforcement teams in Canada, in the Niagara region,

10:53AM  22  and in Toronto.

10:53AM  23      We had actually been invited to go to their source

10:53AM  24  training as well, and we actually went through their source

10:53AM  25  class, about ten of us, just to -- for them to teach us how

USA v Bongiovanni - Jay - Cooper/Direct - 2/26/24

7

10:53AM   1   they do business and just share information.

10:53AM   2   Q.  On that subject of other law enforcement agencies, was it

10:53AM   3   a part of your job as an intel agent to interface with other

10:53AM   4   law enforcement agencies?

10:53AM   5   A.  Every single day.  Whether it's, like I said, federal,

10:53AM   6   state, local, tribal, and also on both sides of the border.

10:53AM   7   I mean, our mantra was kind of push the border out strategy,

10:53AM   8   to try and figure out what -- what Canada's being affected

10:54AM   9   with, or what Mexico is being affected with for the intel

10:54AM  10   guys down south, and then work in conjunction with your

10:54AM  11   counterparts to try and make the community a lot safer.

10:54AM  12   Q.  And during the course of your career, did you, in fact,

10:54AM  13   interface with federal law enforcement agents?

10:54AM  14   A.  All the time.

10:54AM  15   Q.  Okay.  Did you work with people from the FBI?

10:54AM  16   A.  Yes.

10:54AM  17   Q.  Did you work with people from the DEA?

10:54AM  18   A.  Yes.

10:54AM  19   Q.  Okay.  And during the course of your career interfacing

10:54AM  20   with those other law enforcement agencies, would it be fair

10:54AM  21   to say that some inherent trust develops between yourself and

10:54AM  22   those members of other law enforcement agencies.

10:54AM  23   A.  Absolutely.  It's almost like an unspoken etiquette or

10:54AM  24   unspoken -- not -- not so much a code, but you have

10:54AM  25   counterparts in these other federal agencies.  And you take

10:54AM   1   what they're telling you at face value, and you believe their

10:54AM   2   credibility.

10:54AM   3   Q.   In order to effectively do your job, did you have to rely

10:54AM   4   on information provided to you by other law enforcement

10:54AM   5   agencies?

10:54AM   6   A.   Absolutely.

10:54AM   7   Q.   Okay.  Without getting into any specific cases, generally

10:55AM   8   though, when you were working as an intel agent, did you work

10:55AM   9   on drug cases?

10:55AM   10  A.   Yes.  There was a nexus to the -- if there was a

10:55AM   11  cross-border event, we had some events on the lower river, we

10:55AM   12  had some events on the upper river where there may have been

10:55AM   13  aliens that have been smuggling, by being -- getting smuggled

10:55AM   14  by alien smuggling organizations operating in and out of

10:55AM   15  Toronto.  Sometimes they would comingle their loads with

10:55AM   16  narcotics as well.

10:55AM   17       So you would have not only illegal aliens transiting

10:55AM   18  across the lower river coming to make entry into the U.S.,

10:55AM   19  but they also may be bringing some narcotics with them as

10:55AM   20  well.

10:55AM   21  Q.   You told us a little earlier about the education and

10:55AM   22  training that you received in working with sources of

10:55AM   23  information.  During your time as an intel agent, did you

10:55AM   24  actually participate by handling or obtaining information

10:55AM   25  from sources?

10:55AM   1   A.   Yeah.  We would work with sources that were reporting

10:56AM   2   whether they were fishermen, average citizens.  We'd just

10:56AM   3   handle them as, you know, confidential sources of

10:56AM   4   information, and they would provide us with some information.

10:56AM   5   And then we would try to conduct our due diligence and follow

10:56AM   6   up investigation, and see if it -- where it would take us.

10:56AM   7   Q.   Okay.  I'd like to direct your attention now to the

10:56AM   8   summer of 2008.  Okay?  Were you working as an intel agent at

10:56AM   9   that time?

10:56AM   10   A.   I was.

10:56AM   11   Q.   Okay.  And are you familiar with the name J.D.?

10:56AM   12   A.   Yes, I am.

10:56AM   13   Q.   Okay.  Can you tell the jury how you know that

10:56AM   14   individual?

10:56AM   15   A.   So, in working with some of our local counterparts in the

10:56AM   16   area, specifically Buffalo PD, we were members of their intel

10:56AM   17   working group that we would attend their meetings monthly.

10:56AM   18   And the gentleman that was running that meeting, his name was

10:56AM   19   Detective Kevin Maloney, who has since passed.

10:57AM   20      But Kevin reached out to me one day and said, listen, we

10:57AM   21   have an individual who's been beneficial for us in the past,

10:57AM   22   he's helped us on some cases.  He's speaking to me about some

10:57AM   23   information here that may have a nexus to your line of work.

10:57AM   24   Would you want to meet him?  And I said absolutely.

10:57AM   25   Q.   So I'm not going to get into the details of the

| | | |
|---|---|---|
| 10:57AM | 1 | information that you were informed J.D. might have, but is it |
| 10:57AM | 2 | fair to say that you were introduced to J.D. by this |
| 10:57AM | 3 | Detective Maloney? |
| 10:57AM | 4 | A.  Yes. |
| 10:57AM | 5 | Q.  Did you agree to meet with J.D.? |
| 10:57AM | 6 | A.  Yes, I met with the detective and Mr. J.D. |
| 10:57AM | 7 | Q.  So that's yourself, Detective Maloney, and J.D. in a |
| 10:57AM | 8 | meeting together? |
| 10:57AM | 9 | A.  Yes. |
| 10:57AM | 10 | Q.  Okay.  Again, without getting into the details of what |
| 10:57AM | 11 | was said, did J.D. provide information to you? |
| 10:57AM | 12 | A.  He did provide information.  And based on the fact that I |
| 10:57AM | 13 | had a relationship with Kevin, I was understanding what Kevin |
| 10:58AM | 14 | was saying to have some veracity. |
| 10:58AM | 15 | Q.  And did the information that J.D. provided to you seem |
| 10:58AM | 16 | detailed?  Yes or no? |
| 10:58AM | 17 | A.  It seemed detailed. |
| 10:58AM | 18 | Q.  Okay.  And based on your training and experience, did you |
| 10:58AM | 19 | believe it at the time to be information worth following up |
| 10:58AM | 20 | on? |
| 10:58AM | 21 | A.  I mean, obviously, trust but verify. |
| 10:58AM | 22 | Q.  Did you intend to follow up on it after meeting with |
| 10:58AM | 23 | J.D.? |
| 10:58AM | 24 | A.  I did.  And I did follow up on it. |
| 10:58AM | 25 | Q.  Okay.  Tell the jury, after that first meeting that you |

| | | |
|---|---|---|
| 10:58AM | 1 | have with J.D., what's the next step that you take? |
| 10:58AM | 2 | A.  So, in order to, you know, obviously trust and verify, |
| 10:58AM | 3 | you want to conduct some deconfliction. |
| 10:58AM | 4 | Q.  What is deconfliction? |
| 10:58AM | 5 | A.  So we're trying to ascertain whether or not this |
| 10:58AM | 6 | individual is being -- is a source for any other agent, a |
| 10:58AM | 7 | state trooper, local PD.  Is this gentleman working with |
| 10:58AM | 8 | another law enforcement agency out there? |
| 10:59AM | 9 | So I had actually asked Mr. J.D. if he was working or |
| 10:59AM | 10 | affiliated with another law enforcement member. |
| 10:59AM | 11 | Q.  Okay.  And when you asked Mr. J.D. if he was working or |
| 10:59AM | 12 | affiliated with another law enforcement member, what did he |
| 10:59AM | 13 | tell you? |
| 10:59AM | 14 | A.  He did say he had done some work, but we had to ask him a |
| 10:59AM | 15 | couple more times.  I said, well, can we specifically, you |
| 10:59AM | 16 | know, have a name from you?  Because I would like to talk |
| 10:59AM | 17 | with the individual at hand. |
| 10:59AM | 18 | Q.  And did J.D. tell you the name of the individual that he |
| 10:59AM | 19 | had done work with in the past? |
| 10:59AM | 20 | A.  Yeah.  He mentioned that he had done some work with the |
| 10:59AM | 21 | DEA and Agent Bongiovanni. |
| 10:59AM | 22 | Q.  What, if anything, did you decide to do with that |
| 10:59AM | 23 | information? |
| 10:59AM | 24 | A.  Well, I had some contacts at the DEA, and I reached out |
| 10:59AM | 25 | and I was able to obtain Joe's number.  And I made a phone |

| | | |
|---|---|---|
| 10:59AM | 1 | call, trying to conduct due diligence, asking if Joe would |
| 10:59AM | 2 | come and meet with us at the Buffalo station unbeknownst to |
| 11:00AM | 3 | Mr. J.D. because I wanted to make sure that he was there so |
| 11:00AM | 4 | that we could figure out if he was actually a bona fide |
| 11:00AM | 5 | informant or, you know, what was transpiring. |
| 11:00AM | 6 | Q.  So is it fair to say that you set up a meeting with J.D.? |
| 11:00AM | 7 | A.  I did. |
| 11:00AM | 8 | Q.  And is it fair to say that you invited Bongiovanni to |
| 11:00AM | 9 | come to that meeting as well? |
| 11:00AM | 10 | A.  I did.  I did invite Joe. |
| 11:00AM | 11 | Q.  Okay.  Do you recall that meeting as you sit here today? |
| 11:00AM | 12 | A.  I do recall it. |
| 11:00AM | 13 | Q.  Okay.  Who arrived first, Mr. J.D. or Mr. Bongiovanni? |
| 11:00AM | 14 | A.  We had Mr. J.D. in the back -- back room at the station |
| 11:00AM | 15 | in Tonawanda. |
| 11:00AM | 16 | And then we had met Joe at front door, let him in. |
| 11:00AM | 17 | And then he came into the back area in a K-9 room where |
| 11:00AM | 18 | we had a meeting where it was out of sight from people.  And |
| 11:00AM | 19 | we just started to have a conversation there. |
| 11:01AM | 20 | Q.  Can you describe for the jury what happened when Special |
| 11:01AM | 21 | Agent Bongiovanni showed up to that meeting? |
| 11:01AM | 22 | A.  Well, when Joe showed up into the room, I think Mr. J.D. |
| 11:01AM | 23 | was very surprised to see him. |
| 11:01AM | 24 | As I was kind of surprised at, you know, his reaction, |
| 11:01AM | 25 | too, you could tell that he was a bit uncomfortable. |

11:01AM   1   And, you know, we started to have a conversation about

11:01AM   2   where this was headed, if you -- are you working with the

11:01AM   3   DEA, you know, something to that effect.  We were just trying

11:01AM   4   to have a conversation to see where -- what the next steps

11:01AM   5   were and what the path forward was with respect to some of

11:01AM   6   the info that was gleaned.

11:01AM   7   Q.  Now, you mentioned that J.D. appeared nervous during that

11:01AM   8   meeting when Bongiovanni arrived.  What was Bongiovanni's

11:01AM   9   demeanor like during that meeting?

11:01AM  10   A.  Well, after we started talking, I mean, Joe was obviously

11:01AM  11   very upset.  Basically, you know, wondering, if I remember

11:01AM  12   correctly, you know, he -- you're here at the Border Patrol

11:01AM  13   station.  Why are you here?  You work in conjunction with me

11:02AM  14   and with the DEA.  You know, what are you doing here?

11:02AM  15   And he dressed him down pretty good.  He was pretty upset

11:02AM  16   about that fact.

11:02AM  17   Q.  When you say "dressed him down," what do you mean by

11:02AM  18   that?

11:02AM  19   A.  He just, you know, was angry at the fact that J.D. was

11:02AM  20   physically present at the Border Patrol station, and was

11:02AM  21   possibly going to work with us from what my -- from my best

11:02AM  22   hypothesis.

11:02AM  23   Q.  Did that interaction between Bongiovanni and J.D. stick

11:02AM  24   out in your mind after it happened?

11:02AM  25   A.  It did.  And I, you know, I always try to -- whenever we

11:02AM   1   have meetings with other agencies, I always write a synopsis

11:02AM   2   for a file just to keep notes and retain notes of what

11:02AM   3   transpired in the meeting because it may have some relevance

11:02AM   4   to -- or a nexus to another case.  So I try to keep decent

11:02AM   5   notes about what was said and what was transpired.

11:02AM   6   Q.  Do you remember any specifics of what Bongiovanni was

11:03AM   7   saying to J.D. during that dressing down, as you described

11:03AM   8   it?

11:03AM   9   A.  Just the overall demeanor.  You know, he was not very

11:03AM   10  happy.  He was angry.  And he just says, hey, you know, you

11:03AM   11  deal with the DEA, you deal with me.  And that was the gist

11:03AM   12  of it all.

11:03AM   13  Q.  During that meeting after Bongiovanni dresses down J.D.,

11:03AM   14  did the meeting progress where you continued to debrief J.D.

11:03AM   15  about the information that he had?

11:03AM   16  A.  We were at the point where, you know, I'm gonna take

11:03AM   17  Joe's word at face value that he's working with him and has

11:03AM   18  rapport with him.

11:03AM   19      So at that point in time, we were basically done.  We

11:03AM   20  severed our relationship and -- not that we had a

11:03AM   21  relationship, we severed moving forward with Mr. J.D..

11:03AM   22  Q.  Did you ask Special Agent Bongiovanni specifically

11:03AM   23  whether J.D. was an officially signed up source?

11:03AM   24  A.  I don't recall.  I don't recall asking that.

11:04AM   25  Q.  Okay.  Why wouldn't you ask that?  Why not?

11:04AM   1   A.  I just wasn't at the point right then and there.  We

11:04AM   2   weren't gonna get involved in any kind of drama moving

11:04AM   3   forward and what have you.  His word was good enough for me.

11:04AM   4   And we decided to move on.

11:04AM   5   Q.  Did you walk away from that meeting with the impression

11:04AM   6   that J.D. was an officially signed up source with

11:04AM   7   Bongiovanni?

11:04AM   8   A.  It could have been.  I -- I don't know if he was

11:04AM   9   officially signed, but I walked away knowing that they had

11:04AM   10   conducted business in the past, or that they were, you know,

11:04AM   11   they had some type of rapport.

11:04AM   12   Q.  Did Special Agent Bongiovanni ever reach out to you

11:04AM   13   afterwards to provide you access to that source to further

11:04AM   14   your investigation?

11:04AM   15   A.  Not that I recall.

11:04AM   16   Q.  Okay.  Without getting into the details again of what

11:04AM   17   J.D. had told you during your first meeting with him, did

11:04AM   18   your investigation into that information progress any further

11:04AM   19   after your meeting with Bongiovanni?

11:04AM   20   A.  We -- we were able to conduct some additional checks, and

11:05AM   21   ascertain if there was an individual where a --

11:05AM   22   Q.  I'm going to cut you off right there.

11:05AM   23   A.  Okay.

11:05AM   24        MR. COOPER:  Judge, if we can just approach briefly?

11:05AM   25        THE COURT:  Sure.

11:05AM    1              **MR. COOPER:**  Thanks.

11:05AM    2              (Sidebar discussion held on the record.)

11:05AM    3              **MR. COOPER:**  Just so you know, that's not the -- I

11:05AM    4    didn't anticipate that answer running into where I think he

11:05AM    5    was going, so that's why I cut him off.  I'm going to ask him

11:05AM    6    a more specific question to I think cabin the testimony, but I

11:05AM    7    didn't want that to bleed into where.

11:05AM    8              **MR. SINGER:**  Yeah.

11:05AM    9              **THE COURT:**  I don't think anything harmful came out

11:05AM   10    of that.  We were going there.

11:05AM   11              **MR. COOPER:**  Yeah.  So I'm just going to ask a more

11:05AM   12    specific question, and maybe direct him to a yes-or-no answer,

11:05AM   13    okay?

11:05AM   14              **THE COURT:**  That's fine.

11:05AM   15              **MR. COOPER:**  Thank you.

11:05AM   16              (End of sidebar discussion.)

11:05AM   17              **BY MR. COOPER:**

11:06AM   18    Q.  So I'm going to ask you a specific question, and I'd ask

11:06AM   19    you to just answer "yes" or "no" to the specific question,

11:06AM   20    okay?

11:06AM   21         After that meeting that you had with Special Agent

11:06AM   22    Bongiovanni, did you ever use J.D. as a source to further

11:06AM   23    your investigation?  Yes or no?

11:06AM   24    A.  No.

11:06AM   25    Q.  Okay.

11:06AM 1    MR. COOPER:  Just one second, please, Your Honor.

11:06AM 2    BY MR. COOPER:

11:06AM 3 Q.  Other than that meeting that you described with us, with

11:06AM 4 J.D. and Bongiovanni, had you ever interacted personally with

11:06AM 5 Bongiovanni before?

11:06AM 6 A.  I had not.  I may have met him in passing, but nothing

11:06AM 7 official as part of business or what have you.

11:06AM 8 Q.  Are you familiar with what he looks like?

11:06AM 9 A.  Yes.

11:06AM 10 Q.  Okay.  Do you see him in the courtroom today?

11:06AM 11 A.  Yes.

11:06AM 12 Q.  Would you point him out and identify an article of his

11:07AM 13 clothing?

11:07AM 14 A.  He's right there with the glasses.

11:07AM 15    MR. COOPER:  Indicating the defendant, Judge.

11:07AM 16    THE WITNESS:  In the middle.

11:07AM 17    THE COURT:  Yes, it does, yes.

11:07AM 18    MR. COOPER:  I have no further questions.  Thank you.

11:07AM 19    THE COURT:  Cross?

11:07AM 20    MR. SINGER:  Yes, Judge.

11:07AM 21

11:07AM 22         CROSS-EXAMINATION BY MR. SINGER:

11:07AM 23 Q.  Good morning Mr. Jay.

11:07AM 24 A.  Good morning, sir.

11:07AM 25 Q.  So, this meeting happened in the summer of 2008?

11:07AM   1   A.   Yes, to my best recollection.

11:07AM   2   Q.   That was between yourself, Mr. Bongiovanni, and Mr. J.D.?

11:07AM   3   A.   And there were -- there were a couple other agents in

11:07AM       there as well, I just can't recall who they were.

11:07AM   5   Q.   Okay.  And so those were agents from your office, Customs

11:07AM   6   and Border Protection?

11:07AM   7   A.   That's right.  U.S. Border Patrol at the time, yeah.

11:07AM   8   Q.   And there were also agents from the DEA as well?

11:07AM   9   A.   I believe so.

11:07AM  10   Q.   Okay.  And so the purpose was to go through the

11:07AM  11   deconfliction process, correct?

11:07AM  12   A.   Exactly.

11:07AM  13   Q.   Because you had located information that indicated that

11:08AM  14   Mr. J.D. was cooperating with another law enforcement agency,

11:08AM  15   correct?

11:08AM  16   A.   Yeah.  We were contacted by Buffalo PD, that's correct.

11:08AM  17   Q.   Okay.  And that's just common practice, right?

11:08AM  18   A.   Yes, it is.

11:08AM  19   Q.   And you find conflict that someone else has a source that

11:08AM  20   you're talking to, as a matter professional courtesy, you're

11:08AM  21   gonna contact that agency, right?

11:08AM  22   A.   That's right.  You're gonna stay in your lane.

11:08AM  23   Q.   Um-hum.  And you'd expect the same thing out of DEA if it

11:08AM  24   was one of your sources who they were talking to, correct?

11:08AM  25   A.   That is correct.

11:08AM   1   Q.  And so I know you've been doing this for a while.  You've

11:08AM   2   developed C.I.s before, correct?

11:08AM   3   A.  We have.  We've developed confidential sources, yes.

11:08AM   4   Q.  Okay.  And those confidential sources, when you sign them

11:08AM   5   up, they're somebody that you want to provide information to

11:08AM   6   you, correct?

11:08AM   7   A.  That's correct.

11:08AM   8   Q.  And I think part of the expectation as an officer is that

11:08AM   9   if they have information, they're gonna come to you first,

11:08AM  10   correct?

11:08AM  11   A.  You would think so.

11:08AM  12   Q.  Yeah, you would think so.  I mean, I know it doesn't

11:08AM  13   happen all the time, right?

11:09AM  14   A.  Absolutely.

11:09AM  15   Q.  But your expectation is if you sign them you up, they're

11:09AM  16   gonna come to you first, right?

11:09AM  17   A.  That's correct.

11:09AM  18   Q.  And one of the reasons for that is just, not to get into

11:09AM  19   the bean counting part of the business, but when you sign up

11:09AM  20   a source, that's something that gets tracked by your agency,

11:09AM  21   correct?

11:09AM  22   A.  Yes.

11:09AM  23   Q.  So it's a statistic, a stat, that you get tracked for,

11:09AM  24   right?

11:09AM  25   A.  Yes.

USA v Bongiovanni - Jay - Singer/Cross - 2/26/24

20

11:09AM  1    Q.  Just like opening a case is another stat that you get

11:09AM  2    tracked for, correct?

11:09AM  3    A.  Yes.

11:09AM  4    Q.  And if you develop a case from a source, that's another

11:09AM  5    stat that gets tracked, correct?

11:09AM  6    A.  A lot of tracking, a lot of measurables.

11:09AM  7    Q.  Yeah.  And so this is something I realize that, you know,

11:09AM  8    has an influence on your own evaluations, correct?

11:09AM  9    A.  Possible.

11:09AM  10   Q.  Yeah.  So, like, for instance your supervisors, when

11:09AM  11   they're doing your annual review, they're taking a look at

11:09AM  12   how many different stats you may have collected throughout

11:09AM  13   the year, right?

11:09AM  14   A.  Yes.

11:09AM  15   Q.  And this is something that's also passed up to higher

11:09AM  16   headquarters, right?

11:09AM  17   A.  Headquarters does have oversight depending on the scope

11:09AM  18   of the case.

11:09AM  19   Q.  And I know, I mean, you've been a senior border patrol

11:09AM  20   agent, I think you testified early to, correct?

11:10AM  21   A.  That's correct.

11:10AM  22   Q.  So you've been in the management of Customs and Border

11:10AM  23   Protection agency?

11:10AM  24   A.  I have.

11:10AM  25   Q.  And so part of the reasons why agencies keep stats is

11:10AM   1   because that also drives resources and funding decisions in

11:10AM   2   the future, right?

11:10AM   3   A.   Sure.  To an extent, yes.

11:10AM   4   Q.   Yeah.  You know, so for instance, if one agency at a

11:10AM   5   location is collecting a certain number of stats, they might

11:10AM   6   receive further resources or -- or manpower if they need it,

11:10AM   7   right?

11:10AM   8   A.   Possible.

11:10AM   9   Q.   Okay.  And so Mr. Bongiovanni, you mentioned, was upset,

11:10AM   10   right?

11:10AM   11   A.   Yes.

11:10AM   12   Q.   And in your reading of the situation, he's upset at the

11:10AM   13   fact that J.D., who was working with him, went to Customs and

11:10AM   14   Border Protection with this information instead of himself,

11:10AM   15   correct?

11:10AM   16   A.   That would be the hypothesis there.  Mr. J.D. was talking

11:10AM   17   with the Buffalo PD, whatever they're discussing I didn't

11:11AM   18   delve into that, I didn't discuss how many times they've

11:11AM   19   worked and operated before.

11:11AM   20       I was just contacted, hey, can you come in here and hear

11:11AM   21   what he has to say?  It has a nexus to your authority.

11:11AM   22       So I said sure, I'll come down and listen.

11:11AM   23   Q.   Um-hum.  And I realize that, you know, you did that

11:11AM   24   because you thought that there was nothing to worry about.

11:11AM   25   But when you ran the deconfliction, you realized that he was

11:11AM 1 working with some other agency, right?

11:11AM 2 A.  Exactly.

11:11AM 3 Q.  And that's why you made the call to Mr. Bongiovanni?

11:11AM 4 A.  Yes, correct.

11:11AM 5 Q.  And you had the meeting, and you mentioned that

11:11AM 6 Mr. Bongiovanni was upset that that information that was

11:11AM 7 provided to you, it didn't come to him first, correct?

11:11AM 8 A.  I'm guessing that's the case.

11:11AM 9 Q.  Okay.  And, you know, sometimes officers get a little

11:11AM 10 territorial with C.I.s, correct?

11:11AM 11 A.  That is totally correct.

11:11AM 12 Q.  That's not something that's out of the ordinary in your

11:11AM 13 job, correct?

11:11AM 14 A.  Not out of the ordinary.

11:11AM 15          **MR. SINGER:**  Okay.  No further questions.

11:11AM 16          **MR. COOPER:**  Just briefly, Judge.

11:11AM 17

11:11AM 18          **REDIRECT EXAMINATION BY MR. COOPER:**

11:11AM 19 Q.  You were just asked some questions about whether it's the

11:12AM 20 out of the ordinary for special agents to get territorial

11:12AM 21 over C.I.s; do you remember being asked that question?

11:12AM 22 A.  Yes.

11:12AM 23 Q.  Was Defendant Bongiovanni's reaction, his emotional

11:12AM 24 reaction unusual in your experience?

11:12AM 25 A.  I mean, I -- I've never seen it.  I've always praise in

11:12AM 1   public, criticize in private, so to speak.  And that's how

11:12AM 2   I -- my -- my scope, that's how I lead, that's how I operate.

11:12AM 3   It was just kind of awkward to me that he -- that Mr. J.D.

11:12AM 4   was getting dressed down.

11:12AM 5       But, like I said, I don't know what the rapport was.  I

11:12AM 6   don't know what they were working on.  So --

11:12AM 7   Q.  That's okay.  So my specific question to you is not about

11:12AM 8   how you handle informants, but what you've observed during

11:12AM 9   your career in law enforcement.

11:12AM 10      Was it unusual, based on your 25-year career in Border

11:12AM 11  Protection, to watch a special agent dress down a C.I. for

11:12AM 12  bringing information to law enforcement?

11:12AM 13  A.  Yeah.  I thought it was a little -- a little off, off the

11:12AM 14  charts, so to speak.

11:13AM 15  Q.  You'd agree with me that getting off the chart and

11:13AM 16  dressing someone down is different than being territorial,

11:13AM 17  right?

11:13AM 18  A.  I would say so.

11:13AM 19  Q.  Okay.  Without getting into any of the details of

11:13AM 20  information that J.D. provided, I want to ask you a general

11:13AM 21  question.

11:13AM 22      Is there a difference in terms of jurisdiction, between

11:13AM 23  cross-border drug trafficking and domestic drug trafficking?

11:13AM 24  A.  There's definitely a difference.

11:13AM 25  Q.  Okay.  You work for Border Protection, right?

| 11:13AM | 1 | A.  Yes. |
| 11:13AM | 2 | Q.  Do you have jurisdiction to investigate cross-border drug |
| 11:13AM | 3 | trafficking? |
| 11:13AM | 4 | A.  Yes, we do. |
| 11:13AM | 5 | Q.  What's your understanding of -- |
| 11:13AM | 6 | **MR. SINGER:**  Objection.  This goes outside the scope. |
| 11:13AM | 7 | **THE COURT:**  Yeah. |
| 11:13AM | 8 | **MR. COOPER:**  Judge, I'd like to be heard on that. |
| 11:13AM | 9 | Maybe we can approach? |
| 11:13AM | 10 | **THE COURT:**  Come on up. |
| 11:13AM | 11 | (Sidebar discussion held on the record.) |
| 11:13AM | 12 | **MR. COOPER:**  Judge, the cross-examination pointed to |
| 11:13AM | 13 | the fact that this is merely territorial dispute between CBP |
| 11:13AM | 14 | and DEA.  I'm now redirecting to point out that they have |
| 11:14AM | 15 | separate territories.  That's absolutely within the scope of |
| 11:14AM | 16 | cross-examination. |
| 11:14AM | 17 | **THE COURT:**  They have separate territories? |
| 11:14AM | 18 | **MR. COOPER:**  Correct. |
| 11:14AM | 19 | **THE COURT:**  I thought he just said that he -- that |
| 11:14AM | 20 | there was an overlap. |
| 11:14AM | 21 | **MR. COOPER:**  No, he -- so I asked him what CBP's |
| 11:14AM | 22 | jurisdiction was if they did cross-border drug trafficking, |
| 11:14AM | 23 | and he said yes. |
| 11:14AM | 24 | And then I asked if DEA handled domestic drug |
| 11:14AM | 25 | trafficking, and there was an objection. |

11:14AM   1          But I'm drawing the distinction between territories,

11:14AM   2   which is well within the scope of the cross-examination, that

11:14AM   3   this was a territorial dispute.

11:14AM   4          They have different territories.

11:14AM   5          **MR. SINGER:**  Two things.  Number one is that when we

11:14AM   6   talked about territorial, we talked about being territorial

11:14AM   7   with a C.I.  We didn't talk about what territory DEA covers,

11:14AM   8   and what territory Customs and Border Protection covers.

11:14AM   9   That's why it's outside the scope.

11:14AM   10          That's the answer that we got, was that he felt like

11:14AM   11   agents weren't always, you know, like, they sometimes would

11:14AM   12   get territorial with their C.I.'s, meaning that, hey, that's

11:14AM   13   my C.I.

11:14AM   14          **THE COURT:**  Yeah.  No, no, I think he's right.  I

11:14AM   15   think he's right.  I think this is beyond the scope.  I don't

11:14AM   16   think that this advances what you're saying now, and the fact

11:15AM   17   that he used the word territorial had nothing to do with

11:15AM   18   territory that DEA covers, and territory that Customs and

11:15AM   19   Border Protection covers.  So, no.

11:15AM   20          **MR. COOPER:**  Judge, without the testimony coming in,

11:15AM   21   it furthers the inference that was led on cross-examination

11:15AM   22   that it's just a C.I. that they're fighting over.

11:15AM   23          Redirect is to point out the C.I. had information

11:15AM   24   that could be acted upon by CBP that could not have been acted

11:15AM   25   upon by DEA.

11:15AM   1          THE COURT:  Yeah, but he still wants the informant to

11:15AM   2   go to him first, and that doesn't change that at all.  So, no,

11:15AM   3   you're not getting into that.

11:15AM   4          MR. COOPER:  Okay.

11:15AM   5          (End of sidebar discussion.)

11:15AM   6          THE COURT:  The objection is sustained.

11:15AM   7          Anything else?

11:15AM   8          MR. COOPER:  Yes, Judge.

11:15AM   9          BY MR. COOPER:

11:15AM  10   Q.  You were asked questions about whether this was an

11:15AM  11   territorial dispute between agencies over an informant; do

11:15AM  12   you remember being asked those questions?

11:15AM  13   A.  Yes, sir.

11:15AM  14   Q.  Okay.  Was this information that J.D. had information

11:15AM  15   that you could have collaborated with DEA on to investigate?

11:16AM  16   A.  Oh, absolutely.  We have a great rapport with members of

11:16AM  17   the DEA, HSI, et cetera.  We could have done something

11:16AM  18   jointly, but we just left it.

11:16AM  19          MR. COOPER:  I have no further questions, Judge.

11:16AM  20          THE COURT:  Anything else?

11:16AM  21          MR. SINGER:  Just one moment, Judge.

11:16AM  22

11:16AM  23              RECROSS-EXAMINATION BY MR. SINGER:

11:16AM  24   Q.  Mr. Jay, the deconfliction that you talked about, that was

11:16AM  25   through Mr. J.D., correct?

11:17AM  1   A.  What do you mean the deconfliction?  I'm not following

11:17AM  2   you.

11:17AM  3   Q.  When you found out about Mr. J.D. working with another

11:17AM  4   agency, Mr. J.D. told you that?

11:17AM  5   A.  That's correct.

11:17AM  6   Q.  Okay.

11:17AM  7           **MR. SINGER:**  Thank you.  I have no further questions.

11:17AM  8           **THE WITNESS:**  You're welcome.

11:17AM  9           **MR. COOPER:**  Nothing further, Judge.

11:17AM  10          **THE COURT:**  You can step down, sir.  Thank you.

11:17AM  11          (Witness excused at 11:17 a.m.)

        12          (Excerpt concluded at 11:17 a.m.)

        13          *     *     *     *     *     *     *

        14

        15              **CERTIFICATE OF REPORTER**

        16      In accordance with 28, U.S.C., 753(b), I certify that
            these original notes are a true and correct record of
        17  proceedings in the United States District Court for the
            Western District of New York on February 26, 2024.
        18
                              s/ Ann M. Sawyer
        19                    _____
                              Ann M. Sawyer, FCRR, RPR, CRR
                              Official Court Reporter
        20                    U.S.D.C., W.D.N.Y.

        21

        22

        23

        24

        25

1              **TRANSCRIPT INDEX**

2        **EXCERPT - EXAMINATION OF LAWRENCE JAY**

3              **FEBRUARY 26, 2024**

4

5    **W I T N E S S**                          **P A G E**

6    **L A W R E N C E   J A Y**                 2

7      DIRECT EXAMINATION BY MR. COOPER:         2

8      CROSS-EXAMINATION BY MR. SINGER:          17

9      REDIRECT EXAMINATION BY MR. COOPER:       22

10     RECROSS-EXAMINATION BY MR. SINGER:        26

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25