03:07PM

1                   UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK
2
    _____
3   UNITED STATES OF AMERICA,
                                        Case No. 1:19-cr-227
4                   Plaintiff,                  (LJV)
    v.
5                                       February 29, 2024
    JOSEPH BONGIOVANNI,
6
                    Defendant.
7   _____

8        TRANSCRIPT EXCERPT - EXAMINATION OF DJ GRANVILLE
            BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                   UNITED STATES DISTRICT JUDGE

10
    APPEARANCES:           TRINI E. ROSS, UNITED STATES ATTORNEY
11                         BY: JOSEPH M. TRIPI, ESQ.
                                NICHOLAS T. COOPER, ESQ.
12                              CASEY L. CHALBECK, ESQ.
                           Assistant United States Attorneys
13                         Federal Centre
                           138 Delaware Avenue
14                         Buffalo, New York 14202
                             And
15                         UNITED STATES DEPARTMENT OF JUSTICE
                           BY: JORDAN ALAN DICKSON, ESQ.
16                         1301 New York Ave NW
                           Suite 1000
17                         Washington, DC 20530-0016
                           For the Plaintiff
18
                           SINGER LEGAL PLLC
19                         BY: ROBERT CHARLES SINGER, ESQ.
                           80 East Spring Street
20                         Williamsville, New York 14221
                             And
21                         LAW OFFICES OF PARKER ROY MacKAY
                           BY: PARKER ROY MacKAY, ESQ.
22                         3110 Delaware Avenue
                           Kenmore, New York  14217
23                         For the Defendant

24  PRESENT:               BRIAN A. BURNS, FBI Special Agent
                           MARILYN K. HALLIDAY, HIS Special Agent
25                         KAREN A. CHAMPOUX, USA Paralegal

| | | |
|---|---|---|
| 1 | **LAW CLERK:** | **REBECCA FABIAN IZZO, ESQ.** |
| 2 | **COURT DEPUTY CLERK:** | **JANE D. KELLOGG** |
| 3 | **COURT REPORTER:** | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 4 | | Robert H. Jackson Federal Courthouse<br>2 Niagara Square |
| 5 | | Buffalo, New York  14202<br>Ann_Sawyer@nywd.uscourts.gov |

7        *     *     *     *     *     *     *

9        (Excerpt commenced at 3:07 p.m.)

10        (Jury is present.)

03:07PM   11        **THE COURT:**  The government can call its next witness.

03:07PM   12        **MR. COOPER:**  Thank you, Judge.  The government calls

03:07PM   13 DJ Granville.

03:08PM   14

03:08PM   15 **D J   G R A N V I L L E**, having been duly called and sworn,

03:08PM   16 testified as follows:

03:08PM   17        **MR. COOPER:**  Judge, may I inquire?

03:08PM   18        **THE COURT:**  You may.

03:08PM   19

03:08PM   20        **DIRECT EXAMINATION BY MR. COOPER:**

03:08PM   21 Q.  Good afternoon, Mr. Granville, how are you?

03:08PM   22 A.  Good, how are you?

03:08PM   23 Q.  Well, thank you.  Can you tell the jury a little bit

03:08PM   24 about your background, where you grew up?

03:08PM   25 A.  I grew up in the City of Buffalo.  I started the police

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

3

03:08PM  1    academy in August of 1998.  I spent approximately seven years

03:08PM  2    with the Buffalo Housing Police.  The majority of my time

03:08PM  3    there was spent -- at the time, it's now the FBI Safe Streets

03:08PM  4    Task Force, it was called the Career Criminal Task Force.

03:09PM  5    And then I -- they closed up shop there, and I went to the

03:09PM  6    NFTA police for three years.  And then caught on with the

03:09PM  7    Sheriff's Office in about 2008.

03:09PM  8    Q.  Is it fair to say that since you began working in law

03:09PM  9    enforcement in the Housing Authority, that you've continued a

03:09PM  10   career in law enforcement that whole time?

03:09PM  11   A.  Yes.

03:09PM  12   Q.  Okay.  And you said you started in the Sheriff's Office

03:09PM  13   in Erie County in 2008?

03:09PM  14   A.  That's correct.

03:09PM  15   Q.  Can you describe for the jury your progression through

03:09PM  16   the Sheriff's Office from 2008 through 2024?

03:09PM  17   A.  I started as a deputy, and ultimately was promoted to

03:09PM  18   detective around -- around 2010.

03:09PM  19       From there, I was promoted to senior detective.

03:09PM  20       And ultimately to the position which I hold now, which is

03:09PM  21   the chief of narcotics and intelligence with the Erie County

03:09PM  22   Sheriff's Office.

03:09PM  23   Q.  Generally, as a detective in the narcotics unit, and I

03:09PM  24   guess let's cover your time as a detective first.  Did you

03:10PM  25   work on a variety of different types of narcotics

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

4

| | | |
|---|---|---|
| 03:10PM | 1 | investigations? |
| 03:10PM | 2 | A.  Yes. |
| 03:10PM | 3 | Q.  Did you work on marijuana cases? |
| 03:10PM | 4 | A.  Yes. |
| 03:10PM | 5 | Q.  Did you work on cocaine cases? |
| 03:10PM | 6 | A.  Yes. |
| 03:10PM | 7 | Q.  Okay.  Heroin? |
| 03:10PM | 8 | A.  Yes. |
| 03:10PM | 9 | Q.  Did you obtain search warrants? |
| 03:10PM | 10 | A.  Yes. |
| 03:10PM | 11 | Q.  Okay.  And did you also participate in execution of |
| 03:10PM | 12 | search warrants? |
| 03:10PM | 13 | A.  Yes. |
| 03:10PM | 14 | Q.  Did you handle confidential informants or confidential |
| 03:10PM | 15 | sources? |
| 03:10PM | 16 | A.  Yes. |
| 03:10PM | 17 | Q.  What is the term that, in the Erie County Sheriff's |
| 03:10PM | 18 | Office, is used to refer to a confidential source or |
| 03:10PM | 19 | informant? |
| 03:10PM | 20 | A.  It's -- it's either confidential source, confidential |
| 03:10PM | 21 | informant, or the nontechnical term, a snitch. |
| 03:10PM | 22 | Q.  Okay.  And have you participated in the handling of |
| 03:10PM | 23 | confidential sources? |
| 03:10PM | 24 | A.  Yes. |
| 03:10PM | 25 | Q.  Are confidential sources an important part of building a |

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

5

03:10PM    1    drug investigation?

03:10PM    2    A.   Yes.

03:10PM    3    Q.   During the course of your career, have you had a

03:10PM    4    confidential source where they don't presently have any

03:11PM    5    information, but you leave them open?  Has that ever happened

03:11PM    6    before?

03:11PM    7    A.   Yes.

03:11PM    8    Q.   Why do you leave them open if they don't presently have

03:11PM    9    any information?

03:11PM   10    A.   Well, it would depend what the confidential source was

03:11PM   11    cooperating for.  Whether it was a working off charges, for

03:11PM   12    money, potentially working off charges for somebody else, or

03:11PM   13    just a concerned citizen.  So it would depend on -- it would

03:11PM   14    vary in each particular case.

03:11PM   15    Q.   Is it fair to say that over time, an informant could gain

03:11PM   16    new information or new knowledge?

03:11PM   17    A.   Yes.

03:11PM   18    Q.   Okay.  And would that be helpful in your work as a

03:11PM   19    narcotics detective?

03:11PM   20    A.   Yes.

03:11PM   21    Q.   You told -- you told the jury that after working as a

03:11PM   22    detective, you became a senior detective; is that correct?

03:11PM   23    A.   That's correct.

03:11PM   24    Q.   How did your responsibilities change when you became

03:11PM   25    senior detective?

03:11PM    1    A.  I then supervised a group of detectives and deputies that

03:11PM    2    were assigned to the narcotics and intelligence unit.

03:11PM    3    Q.  Okay.  And what was the period of years that you were a

03:11PM    4    senior detective, approximately?

03:11PM    5    A.  Maybe four or five years.

03:12PM    6    Q.  Okay.  And after being a senior detective, were you

03:12PM    7    promoted again to your current role?

03:12PM    8    A.  That's correct.

03:12PM    9    Q.  Okay.  And how do your responsibilities differ now as the

03:12PM   10    chief of the narcotics and intelligence unit?

03:12PM   11    A.  I still participate generally on a day-to-day level with

03:12PM   12    our narcotics unit, but I've also taken on more

03:12PM   13    administrative responsibilities which tie up a lot of my

03:12PM   14    time.

03:12PM   15    Q.  Is that less fun?

03:12PM   16    A.  Less fun.

03:12PM   17    Q.  Have you -- during the course of your whole career

03:12PM   18    working in law enforcement, can you estimate for the jury how

03:12PM   19    many search warrants you've been a part of?

03:12PM   20    A.  More than a thousand.

03:12PM   21    Q.  Have you participated in drafting search warrants?

03:12PM   22    A.  Yes.

03:12PM   23    Q.  Are you aware -- are you aware of the different sorts of

03:12PM   24    investigative techniques that can be used to obtain a search

03:12PM   25    warrant?

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

03:12PM    1    A.  Yes.

03:12PM    2    Q.  Would surveillance on a target be one sort of

03:12PM    3    investigative technique?

03:12PM    4    A.  Yes.

03:12PM    5    Q.  And just to frame this, I'm talking specifically about

03:13PM    6    narcotics investigations.  In addition to surveillance, is

03:13PM    7    the use of a confidential source a helpful tool in getting a

03:13PM    8    search warrant?

03:13PM    9    A.  Yes.

03:13PM   10    Q.  Is it fair to say that narcotics investigations vary in

03:13PM   11    length, how long they go for?

03:13PM   12    A.  Yes.

03:13PM   13    Q.  Okay.  Can you describe just for the jury in your own

03:13PM   14    words what the difference is in how some investigations vary

03:13PM   15    in length?

03:13PM   16    A.  It depends on each investigation.  There are some

03:13PM   17    investigations where you need to conduct, you know,

03:13PM   18    controlled purchases or maybe some meet and greets with the

03:13PM   19    target to obtain certain information.  There's a lot of

03:13PM   20    physical surveillance that is involved in it.

03:13PM   21        If the source is reliable, we're able to take that

03:13PM   22    source, if he has very credible and very recent information

03:13PM   23    pertaining to the target or residence or storage facility or

03:13PM   24    a vehicle, and obtain search warrants that way.

03:14PM   25        On a state level, we utilize the term what's called

03:14PM  1   "in camera."  We'll make an appointment with the judge --

03:14PM  2   whether on site in his chambers or her chambers, or off site

03:14PM  3   in a vehicle in a restaurant, whatever it may be -- and that

03:14PM  4   informant will testify to the judge under oath to his or her

03:14PM  5   knowledge relating to the drug activities of a certain

03:14PM  6   individual.

03:14PM  7       And then a judge decides if there's probable cause for a

03:14PM  8   search warrant.  And if so, he'll sign that warrant, and then

03:14PM  9   we'll plan around when we're executing those warrants.

03:14PM 10   Q.  During the course of your lengthy career as a narcotics

03:14PM 11   investigator, have you been a part of narcotics cases that

03:14PM 12   develop and resolve very quickly?

03:14PM 13   A.  Yes.

03:14PM 14   Q.  What's "very quickly" to you?

03:14PM 15   A.  One day.

03:14PM 16   Q.  Okay.  Have you been a part of longer-term narcotics

03:14PM 17   investigations?

03:14PM 18   A.  Yes.

03:14PM 19   Q.  In your experience, is there sometimes a nexus working as

03:14PM 20   a narcotics investigator with violent crimes?

03:15PM 21   A.  Yes.

03:15PM 22   Q.  Okay.  And are there times when information that comes in

03:15PM 23   about a violent crime is also information that's pertinent in

03:15PM 24   a narcotics investigation?

03:15PM 25   A.  Yes.

| | | |
|---|---|---|
| 03:15PM | 1 | Q.  Okay.  Are drug dealers known to have lots of cash? |
| 03:15PM | 2 | A.  Yes, some. |
| 03:15PM | 3 | Q.  Okay.  And are some drug dealers known to have a lot of |
| 03:15PM | 4 | product that has expensive value -- |
| 03:15PM | 5 | A.  Yes. |
| 03:15PM | 6 | Q.  -- or a high value? |
| 03:15PM | 7 | In your experience working as a narcotics investigator, |
| 03:15PM | 8 | are narcotics traffickers or large-scale narcotics |
| 03:15PM | 9 | traffickers, specifically, targets of armed robbery? |
| 03:15PM | 10 | A.  They are. |
| 03:15PM | 11 | Q.  Okay.  Has that come up during the course of your career? |
| 03:15PM | 12 | A.  Yes. |
| 03:15PM | 13 | Q.  Once, or more than once? |
| 03:15PM | 14 | A.  More than once. |
| 03:15PM | 15 | Q.  Do you cooperate with other law enforcement agencies in |
| 03:15PM | 16 | your work as a narcotics investigator? |
| 03:15PM | 17 | A.  Yes. |
| 03:15PM | 18 | Q.  Okay.  And is that something that happens frequently or |
| 03:15PM | 19 | infrequently? |
| 03:15PM | 20 | A.  Almost on a daily basis. |
| 03:15PM | 21 | Q.  Okay.  What other law enforcement agencies do you work |
| 03:15PM | 22 | with frequently? |
| 03:15PM | 23 | A.  We work with the Buffalo Police Department almost on a |
| 03:16PM | 24 | daily basis.  We work with the FBI Safe Streets Task Force |
| 03:16PM | 25 | frequently.  We work with the DEA.  We also work with his and |

03:16PM    1   any local town, or village, suburban police department.

03:16PM    2   Q.  Do you share information with those other law enforcement

03:16PM    3   agencies during the course of your regular duties?

03:16PM    4   A.  Yes.

03:16PM    5   Q.  Okay.  And do they share information with you, as well?

03:16PM    6   A.  Yeah, they do.

03:16PM    7   Q.  Okay.  Do you trust information that's provided to you by

03:16PM    8   law enforcement officers from other agencies?

03:16PM    9   A.  Yes.

03:16PM   10   Q.  Is that trust necessary in order to effectively do your

03:16PM   11   job?

03:16PM   12   A.  It is.

03:16PM   13   Q.  We talked a little bit a moment ago about confidential

03:16PM   14   informants, and I just want to speak with you about your

03:16PM   15   experience handling informants.

03:16PM   16       Is it important in your experience to keep a confidential

03:16PM   17   informant's identity secured?

03:16PM   18   A.  Yes.

03:16PM   19   Q.  How important?

03:16PM   20   A.  It's extremely important.

03:17PM   21   Q.  Why?

03:17PM   22   A.  We're talking -- we're putting -- you know, whether you

03:17PM   23   agree or disagree with some of the life choices that some of

03:17PM   24   these informants have made, you know, it's a life-or-death

03:17PM   25   situation for -- for most of them.  Because if their

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

03:17PM  1   identities are revealed to other drug suspects, or drug

03:17PM  2   dealers, or other members of -- that are involved in violent

03:17PM  3   crime, it could cost them their life.

03:17PM  4   Q.  Are you married?

03:17PM  5   A.  I am.

03:17PM  6   Q.  If you're out to lunch with your wife and you saw an

03:17PM  7   informant walk by, would you tell her, hey, that guy's an

03:17PM  8   informant?

03:17PM  9   A.  No.

03:17PM  10  Q.  Is that the sort of information that keep within your

03:17PM  11  team and law enforcement sensitive?

03:17PM  12  A.  Yes.

03:17PM  13  Q.  Where did you go to high school, DJ?

03:17PM  14  A.  Bishop Timon.

03:17PM  15  Q.  What's that?

03:17PM  16  A.  Bishop Timon.

03:17PM  17  Q.  Okay.  And if you, in your role as a narcotics detective

03:17PM  18  before you became a boss, if you had a person come in that

03:17PM  19  wanted to become a confidential source, and it was someone

03:18PM  20  that you were friends with in high school, would you sign

03:18PM  21  that person up?

03:18PM  22  A.  Me, personally?

03:18PM  23  Q.  Correct.

03:18PM  24  A.  No.

03:18PM  25  Q.  Would you be their handling agent?

03:18PM  1  A.  No.

03:18PM  2  Q.  Why not?

03:18PM  3      **MR. MacKAY:**  Judge, I'm going to object to this line

03:18PM  4  about the C.I.s.  I think we're talking only about Sheriff's

03:18PM  5  Office procedure, and there's a question of whether it's

03:18PM  6  relevant to the DEA procedure, if that's where we're going.

03:18PM  7      **MR. COOPER:**  Judge, I think we're talking about the

03:18PM  8  proper handling of C.I.s in law-enforcement community

03:18PM  9  generally, not DEA specific.

03:18PM  10      **THE COURT:**  I'll allow it.  Overruled.

03:18PM  11      **BY MR. COOPER:**

03:18PM  12  Q.  Go ahead.

03:18PM  13  A.  If we were to have a -- if I were to have a person or

03:18PM  14  someone that I work with were to have a person that had --

03:18PM  15  they had a personal relationship with come in and want to be

03:18PM  16  a C.I. for one reason or another, it -- it would -- it would

03:18PM  17  be our regular practice to toss that C.I. to somebody that

03:18PM  18  doesn't have a history with that person.

03:18PM  19  Q.  And I want to again focus this question during your time

03:18PM  20  as a narcotics detective, not as a supervisor.

03:18PM  21      If you were a narcotics detective investigating a

03:19PM  22  drug-trafficking group, and during that investigation a close

03:19PM  23  personal friend of yours came up as a target in that

03:19PM  24  investigation, what would you do?

03:19PM  25  A.  It would just check myself out of the investigation.

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

13

03:19PM    1    Q.  Why?

03:19PM    2    A.  It's -- that's, first off, it's -- it would hurt, hurt

03:19PM    3    for me as a friend of that person for them to come up,

03:19PM    4    number 1.

03:19PM    5        And number 2, I wouldn't want to have any involvement.

03:19PM    6    Q.  We talked before a little bit about the nexus between

03:19PM    7    narcotics offenses and violent crimes.  Did there come a time

03:19PM    8    in April of 2017 when you were contacted by the FBI Safe

03:19PM    9    Streets Task Force to work jointly on an investigation?

03:19PM    10   A.  Yes.

03:19PM    11   Q.  Can you tell the jury who contacted you?

03:19PM    12   A.  It was Special Agent Jason Galle.

03:19PM    13   Q.  Okay.  And what was the nature of that joint

03:19PM    14   investigation that was brought to you by Special Agent Galle?

03:19PM    15   A.  Special Agent Galle advised us, or advised me that there

03:19PM    16   was a group of individuals that were looking to rob Ron

03:20PM    17   Serio.

03:20PM    18   Q.  Did you learn, during the course of your conversation

03:20PM    19   with Special Agent Galle, why Ron Serio was the target of a

03:20PM    20   robbery from a group of individuals?

03:20PM    21   A.  Yes.

03:20PM    22   Q.  Why?

03:20PM    23   A.  It was said from these individuals that Mr. Serio was in

03:20PM    24   possession of a large amount of marijuana and drugs, and a

03:20PM    25   large amount of U.S. currency.

03:20PM    1    Q.  Was that the first time in your career that that sort of

03:20PM    2    scenario had played out, where you learned about a home

03:20PM    3    invasion before it happened?

03:20PM    4    A.  No.

03:20PM    5    Q.  Okay.  And was law enforcement's plan at that point to

03:20PM    6    sit and wait and catch them in the act of the home invasion?

03:20PM    7    A.  Absolutely not.

03:20PM    8    Q.  Can you tell the jury why that wasn't the plan?

03:20PM    9    A.  It's -- it's very dangerous on many levels.  It's

03:20PM   10    dangerous for us.  It's dangerous for the suspects.  It's

03:20PM   11    certainly dangerous for the target of the home invasion.

03:20PM   12      There's been many times in my career where we've come

03:21PM   13    across information where the target -- there was a target of

03:21PM   14    a home invasion, and there was nothing there really we could

03:21PM   15    do criminally, and we would make notification to that

03:21PM   16    individual.  Like, hey, listen, we get you're a drug dealer,

03:21PM   17    but there's another drug dealer and dangerous people out here

03:21PM   18    looking to rob you and do bad things to you.

03:21PM   19    Q.  With respect to Ron Serio, how did you and the FBI Safe

03:21PM   20    Streets Task Force decide to pursue that situation?

03:21PM   21    A.  We decided to target Ron Serio.

03:21PM   22    Q.  And would this have been sometime in early April of 2017?

03:21PM   23    A.  Yes.

03:21PM   24    Q.  Okay.  At the time, you say you decided to target Ron

03:21PM   25    Serio.  Did you have buys into Ron Serio?

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

15

03:21PM    1    A.  No.

03:21PM    2    Q.  Did the FBI have buys into Ron Serio?

03:21PM    3    A.  Not to my knowledge.

03:21PM    4    Q.  Had you been investigating him for months before that?

03:21PM    5    A.  No.

03:21PM    6    Q.  Had you been investigating him for years before that?

03:21PM    7    A.  No.

03:21PM    8    Q.  Did you have an open file on your desk with Ron Serio's

03:21PM    9    name written on it?

03:21PM    10   A.  No.

03:21PM    11   Q.  Okay.  So was it fair to say this was kind of the first

03:22PM    12   you'd heard of Ron Serio?

03:22PM    13   A.  Yes.

03:22PM    14   Q.  Okay.  From the first time you heard of Ron Serio, did

03:22PM    15   there come a time after that when you executed search

03:22PM    16   warrants at his house?

03:22PM    17   A.  Yes.

03:22PM    18   Q.  How much time passed from the first time you heard Ron

03:22PM    19   Serio's name to you executing warrants at his house?

03:22PM    20   A.  It was less than two weeks.

03:22PM    21   Q.  Can you tell the jury about how that investigation

03:22PM    22   progressed from beginning to end?

03:22PM    23   A.  We had identified someone that Ron Serio was supplying

03:22PM    24   over on Huntington Avenue in North Buffalo.

03:22PM    25       We were able to develop some probable cause for a search

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24
16

03:22PM   1   warrant of this Huntington Avenue address.  We set up some

03:22PM   2   surveillance, some stationary surveillance on this Huntington

03:22PM   3   address, and also on Mr. Serio's address on Lebrun.  And

03:22PM   4   things kind of progressed from there.

03:22PM   5   Q.  Was this being worked at this time only by the Erie

03:23PM   6   County Sheriff's Office?

03:23PM   7   A.  No.

03:23PM   8   Q.  Was the Safe Streets Task Force involved, as well?

03:23PM   9   A.  Yes.

03:23PM  10   Q.  Now you mentioned that there was surveillance set up at

03:23PM  11   two different locations; is that correct?

03:23PM  12   A.  That's correct.

03:23PM  13   Q.  Do you remember what day this was?

03:23PM  14   A.  That I don't recall the exact day.

03:23PM  15   Q.  Okay.  Was it a couple weeks after you first learned of

03:23PM  16   the Serio name?

03:23PM  17   A.  Roughly two weeks or less.

03:23PM  18   Q.  Okay.  Now, was that surveillance at the house on Lebrun

03:23PM  19   and the house on Huntington happening simultaneously?

03:23PM  20   A.  It was.

03:23PM  21   Q.  Were you at one of those locations?

03:23PM  22   A.  I was.

03:23PM  23   Q.  Which location?

03:23PM  24   A.  I was on Lebrun.

03:23PM  25   Q.  Okay.  And at any point, did you observe Serio leave the

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

03:23PM  1    residence on Lebrun?

03:23PM  2    A.   No.  We had -- we had arrived on Lebrun, and another crew

03:23PM  3    of guys arrived on Huntington.  A short time later we were

03:24PM  4    advised that Mr. Serio had showed up at the address on

03:24PM  5    Huntington.

03:24PM  6    Q.   What did you do at that point?

03:24PM  7    A.   At that point, we were -- maintained our surveillance.

03:24PM  8    Mr. Serio had left the address on Huntington, shot back to

03:24PM  9    his place on Lebrun, and then ultimately went back to this

03:24PM  10   place on Huntington.

03:24PM  11   Q.   Okay.  So let's break that down.  You didn't see him

03:24PM  12   leave Lebrun, but did you see him arrive back at Lebrun?

03:24PM  13   A.   We did.

03:24PM  14   Q.   Okay.  And did you see what vehicle he was in?

03:24PM  15   A.   I recall it was a Range Rover.

03:24PM  16   Q.   Okay.  Is that expensive?

03:24PM  17   A.   Yeah.

03:24PM  18   Q.   Okay.  And how long, approximately, you know, estimate

03:24PM  19   for us, how long was Serio at the Lebrun residence before he

03:24PM  20   left again?

03:24PM  21   A.   It was a very brief period.

03:24PM  22   Q.   Okay.  And when he left, what happened?  What did you do?

03:24PM  23   A.   We surveilled him to the vicinity of 370 Huntington, not

03:24PM  24   myself, other guys that were working that day.  And he

03:25PM  25   ultimately arrived at the Huntington address, met with

03:25PM    1    another individual in the rear driveway.  This was all

03:25PM    2    reported back to us.

03:25PM    3        And there appeared to be some duffle bags in and around a

03:25PM    4    garage that were being exchanged.  And at that point, the

03:25PM    5    decision was made to execute the warrant on Huntington.

03:25PM    6    Q.  Okay.  Now at this time in 2017, were you in your role as

03:25PM    7    senior detective?

03:25PM    8    A.  I was.

03:25PM    9    Q.  Were you kind of orchestrating this operation?

03:25PM   10    A.  Trying to, yes.

03:25PM   11    Q.  Okay.  And were you in communication with the other

03:25PM   12    detectives and agents that were working with you?

03:25PM   13    A.  Yes.

03:25PM   14    Q.  And so did you learn at some point that Serio arrived at

03:25PM   15    Huntington a second time?

03:25PM   16    A.  I did.

03:25PM   17    Q.  Okay.  And did other agents that you were working with

03:25PM   18    inform you what they observed happen?

03:25PM   19    A.  Yes.

03:25PM   20    Q.  Okay.  As a result of that, was the search warrant at

03:25PM   21    370 Huntington executed?

03:25PM   22    A.  Yes.

03:25PM   23    Q.  Was Serio arrested?

03:25PM   24    A.  He was.

03:25PM   25    Q.  Okay.  Was the other individual at that house also

| | | |
|---|---|---|
| 03:25PM | 1 | arrested? |
| 03:25PM | 2 | A.   Yes. |
| 03:25PM | 3 | Q.   Were drugs recovered? |
| 03:25PM | 4 | A.   Yes. |
| 03:25PM | 5 | Q.   What kind of drugs? |
| 03:25PM | 6 | A.   Marijuana.  I know there was a large quantity of |
| 03:26PM | 7 | marijuana, some cocaine, some U.S. currency. |
| 03:26PM | 8 | Q.   Now at that moment when Ron Serio was arrested at |
| 03:26PM | 9 | Huntington, did you already have a search warrant for the |
| 03:26PM | 10 | house on Lebrun? |
| 03:26PM | 11 | A.   No. |
| 03:26PM | 12 | Q.   Did you get one? |
| 03:26PM | 13 | A.   We did. |
| 03:26PM | 14 | Q.   Did you get one for a separate property in addition to |
| 03:26PM | 15 | Lebrun? |
| 03:26PM | 16 | A.   Yes. |
| 03:26PM | 17 | Q.   Was that 91 West Grimsby? |
| 03:26PM | 18 | A.   Yes. |
| 03:26PM | 19 | Q.   Is that an address that was also believed, based upon |
| 03:26PM | 20 | your investigation, to be associated with Ron Serio? |
| 03:26PM | 21 | A.   Yes. |
| 03:26PM | 22 | Q.   Were those warrants at 697 Lebrun and 91 West Grimsby |
| 03:26PM | 23 | executed that very same day? |
| 03:26PM | 24 | A.   They were. |
| 03:26PM | 25 | Q.   Were you present for one of those? |

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

20

03:26PM   1   A.  I was.

03:26PM   2   Q.  Were they happening simultaneously?

03:26PM   3   A.  Yes.

03:26PM   4   Q.  Okay.  And which one were you present for?

03:26PM   5   A.  I was at Lebrun.

03:26PM   6   Q.  I'm holding what's marked for identification as

03:27PM   7   Government Exhibit 42A-33, 34, and 35.

03:27PM   8           MR. COOPER:  May I approach the witness?

03:27PM   9           THE COURT:  You may.

03:27PM  10           BY MR. COOPER:

03:27PM  11   Q.  Take a moment and look at those, and look back up at me

03:27PM  12   when you're finished.

03:27PM  13       You've been to 697 Lebrun before, right?

03:27PM  14   A.  Yes.

03:27PM  15   Q.  You've seen the outside?

03:27PM  16   A.  I have.

03:27PM  17   Q.  Have you seen the inside?

03:27PM  18   A.  Yes.

03:27PM  19   Q.  Have you seen the property surrounding it?

03:27PM  20   A.  Yes, sir.

03:27PM  21   Q.  Does Government Exhibit 42A-33, 34, and 35, fairly and

03:27PM  22   accurately depict the appearance of 697 Lebrun as it appeared

03:27PM  23   when you were there in 2017?

03:27PM  24   A.  Yes.

03:27PM  25           MR. COOPER:  Judge, with that foundation, I'd offer

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

21

| | | |
|---|---|---|
| 03:27PM | 1 | 42A-33, 34, and 35 into evidence. |
| 03:28PM | 2 | **MR. MacKAY:** Can I just see them quickly? |
| 03:28PM | 3 | **MR. COOPER:** Thank you. |
| 03:28PM | 4 | **MR. MacKAY:** No objection. |
| 03:28PM | 5 | **THE COURT:** So 42A-33, 34, and 35 are admitted |
| 03:28PM | 6 | without objection. |
| 03:28PM | 7 | **(GOV Exhibits 42A-33, 34 & 35 were received in evidence.)** |
| 03:28PM | 8 | **MR. COOPER:** Ms. Champoux, can you pull up 42A-33. |
| 03:28PM | 9 | And can you zoom in on the picture? Yeah. |
| 03:28PM | 10 | **THE COURT:** I think I said 42. These are actually |
| 03:28PM | 11 | 42A? |
| 03:28PM | 12 | **MR. COOPER:** These are 42A-33, 34, and 35. |
| 03:28PM | 13 | **THE COURT:** And those are what have been admitted. I |
| 03:28PM | 14 | did not say A. I apologize. |
| 03:28PM | 15 | **MR. COOPER:** Thank you, Judge. |
| 03:28PM | 16 | **BY MR. COOPER:** |
| 03:28PM | 17 | Q. Do you see what's on the screen there? |
| 03:28PM | 18 | A. I do. |
| 03:28PM | 19 | Q. And the jury can -- okay. You said that you've executed, |
| 03:28PM | 20 | I think, over a thousand search warrants, right? |
| 03:29PM | 21 | A. Yes. |
| 03:29PM | 22 | Q. Was this the first mansion you've ever executed a search |
| 03:29PM | 23 | warrant at? |
| 03:29PM | 24 | A. This is by far about the nicest property we've ever |
| 03:29PM | 25 | executed a search warrant on. |

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

03:29PM  1   Q.  Is this common in your experience for a house to search

03:29PM  2   in a narcotics investigation?

03:29PM  3   A.  No.

03:29PM  4   Q.  What's different about it?

03:29PM  5   A.  Its -- its location, its size.  It was a gorgeous home.

03:29PM  6   Very gaudy.  We were kind of unsure when we were making entry

03:29PM  7   into the residence on how to breach the door.

03:29PM  8   Q.  Why were you unsure of how to breach the door?

03:29PM  9   A.  Because we don't normally see doors like that.  They were

03:29PM  10  gorgeous.

03:29PM  11          **MR. COOPER:**  Okay.  And can you zoom out of that,

03:29PM  12  Ms. Champoux.  And can you go to -- I'm sorry 42A-34.  Can we

03:29PM  13  zoom in on the photo again?  Thank you, ma'am.

03:29PM  14          **BY MR. COOPER:**

03:29PM  15  Q.  Is this that same house?

03:29PM  16  A.  Yes.

03:29PM  17  Q.  Just a different angle?

03:29PM  18  A.  Yes.

03:30PM  19          **MR. COOPER:**  And, Ms. Champoux, can we go to 42A-35.

03:30PM  20  Okay.  And you don't have to zoom in on it.

03:30PM  21          **BY MR. COOPER:**

03:30PM  22  Q.  Chief Granville, can you see the property at 697 Lebrun

03:30PM  23  in this photograph?

03:30PM  24  A.  I can.

03:30PM  25  Q.  Is it the one with the red dot on it?

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

23

03:30PM    1    A.  Yes.

03:30PM    2    Q.  Okay.  What's that above the property in the photograph?

03:30PM    3    A.  Above is a tennis court, and to the rear is a pool.

03:30PM    4    Q.  Was there a tennis court at Ron Serio's house when you

03:30PM    5    searched it in 2013?

03:30PM    6    A.  Yes.

03:30PM    7    Q.  Okay.  And what about that pool to the right of the

03:30PM    8    property, or to the right of the house?  Was that there, as

03:30PM    9    well?

03:30PM   10    A.  It was.

03:30PM   11    Q.  Were there drugs seized at 697 Lebrun?

03:30PM   12    A.  There were.

03:30PM   13    Q.  You mentioned before that Serio had driven a Range Rover

03:30PM   14    to bring marijuana to 370 Huntington; do you remember

03:31PM   15    testifying about that?

03:31PM   16    A.  Yes.

03:31PM   17    Q.  Did there come a time where law enforcement searched the

03:31PM   18    Range Rover?

03:31PM   19    A.  Yes.

03:31PM   20    Q.  And as the senior detective involved in that

03:31PM   21    investigation, did you personally search the Range Rover?

03:31PM   22    A.  I did not.

03:31PM   23    Q.  Okay.  Are you aware that a large amount of U.S. currency

03:31PM   24    was recovered from the Range Rover?

03:31PM   25    A.  Yes.

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

24

| 03:31PM | 1 | **MR. COOPER:** Ms. Champoux, you can take down 42A-35, |
| 03:31PM | 2 | thank you. |
| 03:31PM | 3 | **BY MR. COOPER:** |
| 03:31PM | 4 | Q. During the course of your career in law enforcement, have |
| 03:31PM | 5 | you worked on narcotics investigations into targets that are |
| 03:31PM | 6 | difficult to find evidence on? |
| 03:31PM | 7 | A. Yes. |
| 03:31PM | 8 | Q. Okay. Have you had a situation where you're -- you |
| 03:31PM | 9 | suspect someone of narcotics trafficking, but it never |
| 03:31PM | 10 | develops into anything? |
| 03:31PM | 11 | A. Yes. |
| 03:31PM | 12 | Q. Did you have difficulty obtaining search warrants to |
| 03:32PM | 13 | search Ron Serio's properties? |
| 03:32PM | 14 | A. No, the -- the -- the knowledge that we were provided |
| 03:32PM | 15 | with, with the people that we're going to rob him, among |
| 03:32PM | 16 | other things, to include our surveillance did not make it |
| 03:32PM | 17 | difficult at all. |
| 03:32PM | 18 | Q. Okay. And how many days of surveillance do you think it |
| 03:32PM | 19 | took before you got search warrants? |
| 03:32PM | 20 | A. It was a few days. We didn't spend much time out there. |
| 03:32PM | 21 | Q. Okay. Did that investigation take up a lot of the |
| 03:32PM | 22 | financial resources of the Erie County Sheriff's Office? |
| 03:32PM | 23 | A. No. |
| 03:32PM | 24 | Q. Did it take up a lot of your time in your job? |
| 03:32PM | 25 | A. No, it did not. |

Case 1:19-cr-00227-LJV-MJR    Document 932    Filed 05/12/24    Page 25 of 45
USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

25

03:32PM  1    Q.  Okay.  Do you know an individual by the name of Anthony

03:32PM  2    Gerace?

03:32PM  3    A.  I do.

03:32PM  4    Q.  Have you heard that name before?

03:32PM  5    A.  Yes.

03:32PM  6    Q.  Have you ever met that person before?

03:32PM  7    A.  Yes.

03:32PM  8    Q.  When did you meet that person?

03:32PM  9    A.  The day we executed the search warrants on Lebrun and

03:32PM  10   Grimsby and Huntington.

03:32PM  11   Q.  Can you tell the jury, how did Anthony Gerace factor into

03:32PM  12   this day in April of 2017?

03:33PM  13   A.  Anthony Gerace was present at the address on Lebrun.  He

03:33PM  14   ultimately departed the address, and we had him traffic

03:33PM  15   stopped by some marked units a very long distance away from

03:33PM  16   the Lebrun residence into the Town of Amherst.  And

03:33PM  17   Mr. Gerace was found in possession of a very small quantity

03:33PM  18   of drugs.

03:33PM  19   Q.  Okay.  I want to just try to tighten up the timeline

03:33PM  20   there.  Did Anthony Gerace arrive at the Lebrun address

03:33PM  21   before or after the warrant was executed?

03:33PM  22   A.  Prior to the warrant being executed.

03:33PM  23   Q.  Okay.  And so it's while you're in surveillance waiting

03:33PM  24   to kind of let the day's activities unfold?

03:33PM  25   A.  That's correct.

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24          26

03:33PM    1    Q.  Okay.  And did you personally traffic stop Anthony

03:33PM    2    Gerace?

03:33PM    3    A.  No.

03:33PM    4    Q.  Did you personally arrest him?

03:33PM    5    A.  No.

03:33PM    6    Q.  How did you become involved with Anthony Gerace in April

03:33PM    7    of 2017?

03:33PM    8    A.  While being interviewed back at our office, Mr. Gerace

03:34PM    9    advised a couple deputies that him and his family were

03:34PM   10    friendly with Dan Derenda who, at the time, was the

03:34PM   11    commissioner of the Buffalo Police Department.

03:34PM   12    Q.  Was that information conveyed to you as the senior

03:34PM   13    detective?

03:34PM   14    A.  It was.

03:34PM   15    Q.  Did you know Dan Derenda personally?

03:34PM   16    A.  I did.

03:34PM   17    Q.  Had you interacted with him before?

03:34PM   18    A.  Yes.

03:34PM   19    Q.  And what was his position?

03:34PM   20    A.  He was the commissioner of the police for the Buffalo

03:34PM   21    Police Department.

03:34PM   22    Q.  During the course of your lengthy law enforcement career,

03:34PM   23    have you had someone's who's under arrest who tries to drop a

03:34PM   24    name?

03:34PM   25    A.  Yes.

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

03:34PM    1    Q.  Have you had someone drop the name of a police

03:34PM    2    commissioner before?

03:34PM    3    A.  No.

03:34PM    4    Q.  Okay.  Now, ultimately, what was the decision that was

03:34PM    5    made with respect to Mr. Gerace by the Erie County Sheriff's

03:34PM    6    Office?

03:34PM    7    A.  Mr. Gerace was released from our custody, and -- with

03:34PM    8    pending drug charges.

03:34PM    9    Q.  Okay.  And why was he released from your custody with

03:34PM   10    pending drug charges as opposed to held?

03:34PM   11    A.  We -- we were extremely short on manpower that day, as

03:35PM   12    far as the Erie County Sheriff's Office were concerned.

03:35PM   13        This individual was found with a very small amount of

03:35PM   14    drugs.  We didn't believe he had any real information to

03:35PM   15    provide us, and he was kicked loose.

03:35PM   16    Q.  Did you follow up in any way with respect to that

03:35PM   17    information that you learned that he said his family was

03:35PM   18    friends with Dan Derenda?

03:35PM   19    A.  Yes.

03:35PM   20    Q.  What did you do?

03:35PM   21    A.  I contacted my supervisor, who ultimately gained contact

03:35PM   22    with Mr. Derenda.

03:35PM   23    Q.  I'm sorry, who gained contact with --

03:35PM   24    A.  Mr. Derenda.

03:35PM   25    Q.  Okay.  And was information conveyed back to you as a

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

28

03:35PM    1   result of that communication?

03:35PM    2   A.   There was.

03:35PM    3   Q.   Okay.   And what was the information that was conveyed

03:35PM    4   back to you?

03:35PM    5         **MR. MacKAY:**   Objection to hearsay.

03:35PM    6         **MR. COOPER:**   Judge, I'm not offering it for its truth

03:35PM    7   at all, I just want to show the effect or lack of effect that

03:35PM    8   it had on the listener.

03:35PM    9         **MR. MacKAY:**   I'll leave it to the Court's discretion.

03:35PM   10         **THE COURT:**   Yeah, overruled.

03:35PM   11         **MR. COOPER:**   Yeah, okay.

03:35PM   12         **BY MR. COOPER:**

03:35PM   13   Q.   What was the information that was conveyed back to you?

03:35PM   14   A.   To not do the kid any favors on behalf of Mr. Derenda.

03:36PM   15   Q.   Okay.   And regardless of what that information was that

03:36PM   16   came back to you, would you have done anything differently

03:36PM   17   with respect to Mr. Gerace?

03:36PM   18   A.   No.

03:36PM   19   Q.   You told us that this Serio investigation involved the

03:36PM   20   FBI Safe Streets Task Force; is that correct?

03:36PM   21   A.   That is.

03:36PM   22   Q.   Did you notify the DEA that you were looking into Serio?

03:36PM   23   A.   No.

03:36PM   24   Q.   Did you know if the DEA had previously had an

03:36PM   25   investigation into him?

03:36PM    1    A.  I did not.

03:36PM    2    Q.  If you had known that, would you have done anything

03:36PM    3    differently?

03:36PM    4    A.  I would have probably contacted the DEA or discussed it

03:36PM    5    with the FBI that day that, hey, maybe we should contact the

03:36PM    6    DEA.

03:36PM    7    Q.  Okay.  Did you ultimately discuss it with anybody at DEA?

03:36PM    8    A.  No.

03:36PM    9    Q.  Okay.

03:36PM   10         **MR. COOPER:**  Judge, just one second, please.

03:36PM   11         **THE COURT:**  Sure.

03:36PM   12         **MR. COOPER:**  No further direct.  Thank you, Judge.

03:36PM   13         **THE COURT:**  Cross-examination.

03:37PM   14

03:37PM   15              **CROSS-EXAMINATION BY MR. MacKAY:**

03:37PM   16    Q.  Good afternoon, Chief Granville.  How are you?

03:37PM   17    A.  Good.  How are you?

03:37PM   18    Q.  Okay.  So this investigation began, as far as you know,

03:37PM   19    because a source came into FBI, correct?

03:37PM   20    A.  That's correct.

03:37PM   21    Q.  The source did not come to the Sheriff's Office, correct?

03:37PM   22    A.  No, sir.

03:37PM   23    Q.  Okay.  But you eventually get contacted by the FBI

03:37PM   24    because of whatever the source brought into the FBI, correct?

03:37PM   25    A.  That's correct.

03:37PM  1    Q.  Okay.  And from there, both you and the FBI Safe Streets

03:37PM  2    Task Force team up to do this investigation, you've spent

03:37PM  3    this time talking about, correct?

03:37PM  4    A.  That's correct.

03:37PM  5    Q.  Okay.  And in sum and substance, the information you

03:37PM  6    learned from -- that was communicated to you was fairly

03:37PM  7    specific; is that fair to say?

03:37PM  8    A.  It was.

03:37PM  9    Q.  Okay.  So in your experience, you've had confidential

03:38PM  10   informants who might say something as simple as I know

03:38PM  11   so-and-so deals drugs, correct?

03:38PM  12   A.  That's correct.

03:38PM  13   Q.  They might say I've heard such-and-such a location, there

03:38PM  14   might be drugs there, correct?

03:38PM  15   A.  That's correct.

03:38PM  16   Q.  Okay.  Fair to say this is nothing like that, correct?

03:38PM  17   A.  This was not.

03:38PM  18   Q.  This was something far more specific that provided

03:38PM  19   specific addresses, correct?

03:38PM  20   A.  That's correct.

03:38PM  21   Q.  Provided specific targets, specifically Ron Serio,

03:38PM  22   correct?

03:38PM  23   A.  That's correct.

03:38PM  24   Q.  It provided one of the people he supplied to, correct?

03:38PM  25   A.  Yes.

03:38PM    1    Q.  We don't have to get into the names, but that person

03:38PM    2    lived on Huntington, correct?

03:38PM    3    A.  That's correct.

03:38PM    4    Q.  It provided information about what the dealings between

03:38PM    5    that person who was being supplied by Ron Serio and Ron Serio

03:38PM    6    were, correct?

03:38PM    7    A.  Can you --

03:38PM    8    Q.  It talked about the relationship between those two

03:38PM    9    people, Mr. Serio and this person who lived on Huntington,

03:39PM   10    correct?

03:39PM   11    A.  That's correct.

03:39PM   12    Q.  And it also talked about another person who, along with

03:39PM   13    this person on Huntington, was planning on rob Mr. Serio,

03:39PM   14    correct?

03:39PM   15    A.  That's correct.

03:39PM   16    Q.  So from the information you received, you knew the

03:39PM   17    addresses, correct?

03:39PM   18    A.  That's correct.

03:39PM   19    Q.  You had a pretty accurate sense of when drugs were going

03:39PM   20    to be at those addresses, correct?

03:39PM   21    A.  That's correct.

03:39PM   22    Q.  Because you knew that there was going to be a robbery

03:39PM   23    taking place that required the drugs to be taken from one of

03:39PM   24    the addresses, correct?

03:39PM   25        Well, strike that.  Let me withdraw that question.

USA v Bongiovanni - Granville - MacKay/Cross - 2/29/24

32

03:39PM    1        The robbery involved -- the planned robbery, as you came

03:39PM    2    to learn, was that Mr. Serio was going to be distracted with

03:39PM    3    one location while drugs were taken from another location; is

03:39PM    4    that fair to say?

03:39PM    5    A.   No.  The information given to us was very specific to the

03:39PM    6    Lebrun address and the West Grimsby address.  It was believed

03:39PM    7    that they were going to conduct a home burglary while

03:40PM    8    Mr. Serio was present, and keep him detained while they

03:40PM    9    robbed both addresses.

03:40PM   10    Q.   Okay.  So -- so it was that they were going to rob both

03:40PM   11    addresses is what you're saying?

03:40PM   12    A.   That's correct.

03:40PM   13    Q.   Okay.  It's not that he was going to be at the Lebrun

03:40PM   14    address, and while he wasn't at the Grimsby address, they

03:40PM   15    were gonna take things from the Grimsby address?

03:40PM   16    A.   No.  They were going to, for lack of a better term, take

03:40PM   17    Mr. Serio into custody and rob both addresses.

03:40PM   18    Q.   Okay.  And you knew then to a fairly specific time frame

03:40PM   19    when Mr. Serio was going to be potentially traveling between

03:40PM   20    addresses, correct?

03:40PM   21    A.   No, we did not.  We just -- we had the information that

03:40PM   22    was given to us, based upon that they were gonna rob him and

03:40PM   23    the addresses involved.  And we conducted surveillance on

03:40PM   24    those addresses.  And, you know, as had previously stated,

03:41PM   25    things kind of shook out very quickly in one day.

03:41PM    1        We were able to arrest not only Mr. Serio, but another

03:41PM    2   individual.

03:41PM    3   Q.   And to your understanding, the robbery that was to occur

03:41PM    4   was not gonna be just for money, it was gonna be for drugs as

03:41PM    5   well, too, correct?

03:41PM    6   A.   That's correct.

03:41PM    7   Q.   So the source had come into FBI, and you learned as a

03:41PM    8   result of that that there were going to be drugs in one of

03:41PM    9   these locations in a fairly short period of time, correct?

03:41PM   10   A.   There were gonna be drugs at both locations.

03:41PM   11   Q.   Okay.  At least one of them if not both.

03:41PM   12   A.   Correct.

03:41PM   13   Q.   Now in the time leading up to the actual search warrant

03:41PM   14   execution, you said you were contacted by -- was it FBI Agent

03:41PM   15   Jason Galle, correct?

03:41PM   16   A.   That's correct.

03:41PM   17   Q.   Okay.  Did you take any step to reach out to any other

03:41PM   18   law enforcement agencies?

03:41PM   19   A.   I did not.

03:41PM   20   Q.   Okay.  Did you personally do any sort of entries into any

03:41PM   21   deconfliction databases to see whether Mr. Serio was a target

03:41PM   22   for any other law enforcement agencies?

03:42PM   23   A.   I personally did not.

03:42PM   24   Q.   Okay.  But there are deconfliction databases that the

03:42PM   25   Sheriff's Office uses, correct?

03:42PM   1   A.  That's correct.

03:42PM   2   Q.  Okay.  And again, to your knowledge, do you know why FBI

03:42PM   3   contacted the Sheriff's Office in this specific case when

03:42PM   4   they already had the source come into their office?

03:42PM   5   A.  The federal agencies, through their own admission,

03:42PM   6   sometimes take an extended period of time to resolve criminal

03:42PM   7   matters.  We're able to act very quickly by taking people in

03:42PM   8   front of a judge to apply for search warrants.

03:42PM   9       We have a very outstanding crew that does great

03:42PM  10   surveillance.  We're able to execute warrants at a very fast

03:42PM  11   pace.

03:42PM  12   Q.  Okay.  So sometimes, obviously, you do collaborate with

03:42PM  13   other law enforcement agencies as you said, correct?

03:42PM  14   A.  We do.

03:42PM  15   Q.  But fair to say there's also competition among the

03:43PM  16   agencies as to who gets the collar on any one arrest,

03:43PM  17   correct?

03:43PM  18   A.  With some agencies, not ours.

03:43PM  19   Q.  Okay.  But there is, for example, sometimes there's

03:43PM  20   funding or resources that are tied to the number of arrests

03:43PM  21   an agency makes, correct?

03:43PM  22   A.  That's correct.

03:43PM  23   Q.  Or to the amount of drugs or contraband seized, correct?

03:43PM  24   A.  That's correct.

03:43PM  25   Q.  So it is in your interest to make arrests, to put them

03:43PM  1   under the Sheriff's Office's mantle if you can, correct?

03:43PM  2   A.  It would be fair to say that it's important for the

03:43PM  3   Sheriff's Office to work with all agencies simply because,

03:43PM  4   you know, we're -- we're not, we're a small group of guys.

03:43PM  5   And when we get together with the DEA or the FBI or his, you

03:43PM  6   know, they have more funding than we do, and more tools to

03:43PM  7   the trade than we do.

03:43PM  8   Q.  Oh, speaking of tools of the trade, one of the tools your

03:43PM  9   office specifically has is an aerial helicopter to do

03:44PM 10   surveillance, correct?

03:44PM 11   A.  That's correct.

03:44PM 12   Q.  And is it my understanding that that's the only one in

03:44PM 13   the area that can do that?

03:44PM 14   A.  I believe there are other helicopters in the area, but we

03:44PM 15   stick with our own, we utilize our own aircraft.

03:44PM 16   Q.  Okay.  And as part of the Sheriff's duties in using that

03:44PM 17   helicopter, that is often is used to assist other law

03:44PM 18   enforcement agencies, correct?

03:44PM 19   A.  That's correct.

03:44PM 20   Q.  Oftentimes there's formal requests to use that helicopter

03:44PM 21   as part of an operation, correct?

03:44PM 22   A.  Correct.

03:44PM 23   Q.  And sometimes there's informal requests about can you be

03:44PM 24   on the lookout for something while you're up in the air,

03:44PM 25   correct?

03:44PM    1    A.  That's correct.

03:44PM    2    Q.  So oftentimes, your office, you know, wouldn't be roped

03:44PM    3    into a formal investigation, but there might be informal

03:44PM    4    things like keep an eye on this address, for example, when

03:44PM    5    you're up in the air, correct?

03:44PM    6    A.  That's correct.

03:44PM    7    Q.  Okay.  So lastly, let's talk about Anthony Gerace.

03:44PM    8         He is arrested leaving the Lebrun Road place, correct?

03:44PM    9    A.  That's correct.

03:44PM   10    Q.  And you didn't participate in the arrest, but ultimately

03:45PM   11    you come to be involved in an interview in some fashion with

03:45PM   12    him, correct?

03:45PM   13    A.  That's correct.

03:45PM   14    Q.  And to your knowledge, he has a small amount of drugs on

03:45PM   15    him, correct?

03:45PM   16    A.  That's correct.

03:45PM   17    Q.  Do you recall those to be fentanyl pills?

03:45PM   18    A.  I later learned that, yes.

03:45PM   19    Q.  Okay.  Consistent with a user quantity rather than a

03:45PM   20    dealer quantity?

03:45PM   21    A.  Yes.

03:45PM   22    Q.  Okay.  And you used the term "pending charges," correct?

03:45PM   23    A.  Yes.

03:45PM   24    Q.  Fair to say, though, you didn't actually formally file

03:45PM   25    charges at that time, correct?

03:45PM  1   A.  That's correct.

03:45PM  2   Q.  Okay.  What you actually did is said you're free go with

03:45PM  3   the understanding that if this comes back as a controlled

03:45PM  4   substance, we may charge you, correct?

03:45PM  5   A.  That's correct.

03:45PM  6   Q.  And that's not an uncommon scenario in your office,

03:45PM  7   correct?

03:45PM  8   A.  Not at all.

03:45PM  9   Q.  Because you can do some tests on drugs right there in the

03:45PM  10  field, correct?

03:45PM  11  A.  Correct.

03:45PM  12  Q.  But to sustain a prosecution, generally, you know that

03:45PM  13  you have to go send those drugs off to a lab to take the

03:45PM  14  prosecution further, correct?

03:45PM  15  A.  That's correct.

03:45PM  16  Q.  Okay.  And in this case, did you come to learn that the

03:46PM  17  drugs were not -- were never even sent out to the lab?

03:46PM  18  A.  I don't recall.

03:46PM  19  Q.  Okay.  But ultimately, to your knowledge, Anthony Gerace

03:46PM  20  was never charged, correct?

03:46PM  21  A.  Never charged by us, no.

03:46PM  22  Q.  That's what I mean.  He was never charged by your office

03:46PM  23  in connection with those drugs that your office recovered,

03:46PM  24  correct?

03:46PM  25  A.  That's correct.

03:46PM     1    Q.  And you said that he dropped Dan Derenda's name in this

03:46PM     2    interview, correct?

03:46PM     3    A.  That's correct.

03:46PM     4    Q.  And you said it that's a fairly common thing?  It's not

03:46PM     5    uncommon that people will do that during an arrest?

03:46PM     6    A.  It's common.

03:46PM     7    Q.  It's actually common?  Okay.

03:46PM     8        But he didn't drop any other names other than Dan

03:46PM     9    Derenda's though, correct?

03:46PM    10    A.  Not that I'm aware of.

03:46PM    11    Q.  Okay.  And you never had anybody reach out to you

03:46PM    12    directly about Mr. Gerace's situation, correct?

03:46PM    13        Let me withdraw the question.

03:46PM    14        Mr. Bongiovanni never reached out to you about Anthony

03:46PM    15    Gerace's arrest by the sheriffs, correct?

03:46PM    16    A.  Correct.

03:46PM    17            **MR. MacKAY:**  I have nothing further, Your Honor.

03:47PM    18

03:47PM    19                **REDIRECT EXAMINATION BY MR. COOPER:**

03:47PM    20    Q.  Chief Granville, you were just asked some questions about

03:47PM    21    whether Anthony Gerace was ever charged; do you remember

03:47PM    22    those questions?

03:47PM    23    A.  I do.

03:47PM    24    Q.  Are you aware of whether those fentanyl pills later

03:47PM    25    formed part of a federal prosecution of Anthony Gerace?

USA v Bongiovanni - Granville - Cooper/Redirect - 2/29/24

| 03:47PM | 1 | A.  Yes. |
| 03:47PM | 2 | Q.  You are aware of that? |
| 03:47PM | 3 | A.  Yes. |
| 03:47PM | 4 | Q.  Okay.  So was Anthony Gerace ever charged? |
| 03:47PM | 5 | A.  He was. |
| 03:47PM | 6 | Q.  Okay.  Let's talk about the difference between cases |
| 03:47PM | 7 | charged in state court and federal court.  Are you aware of |
| 03:47PM | 8 | the differences? |
| 03:47PM | 9 | A.  I am. |
| 03:47PM | 10 | Q.  Have you ever heard of the term "federal adoption" |
| 03:47PM | 11 | before? |
| 03:47PM | 12 | A.  Yes. |
| 03:47PM | 13 | Q.  Can you describe what that term means to the jury? |
| 03:47PM | 14 | A.  Oftentimes, there's adoption of cases, whether it's -- we |
| 03:47PM | 15 | execute a search warrant hypothetically at 123 Main Street, |
| 03:47PM | 16 | we recover a large amount of narcotics, and solely the |
| 03:48PM | 17 | Sheriff's Office is involved. |
| 03:48PM | 18 | We bring that individual back to our office, and we |
| 03:48PM | 19 | contact one of our federal partners.  And they may, in fact, |
| 03:48PM | 20 | take our information, whether it's a search warrant, police |
| 03:48PM | 21 | report, any interviews that were conducted, and charge that |
| 03:48PM | 22 | person individually.  That's one scenario. |
| 03:48PM | 23 | There's other scenarios where we charge that person that |
| 03:48PM | 24 | night.  They're housed at the holding center, and then the |
| 03:48PM | 25 | following day the arraignment. |

03:48PM   1    Or, a little further down the line, those charges are

03:48PM   2    dismissed and that person is ultimately charged federally

03:48PM   3    with the results of what had occurred in the original

03:48PM   4    incident.

03:48PM   5    Q.  Are there benefits to you as a narcotics investigator of

03:48PM   6    having a case taken federally in terms of progressing an

03:48PM   7    investigation?

03:48PM   8    A.  Yes.

03:48PM   9    Q.  Why?

03:48PM  10    A.  The -- the penalties certainly outweigh -- the penalties

03:48PM  11    in the federal system certainly outweigh those in the state

03:48PM  12    system.  The mere mention of that sometimes causes a person

03:48PM  13    to cooperate.

03:49PM  14    Q.  You were asked some questions on cross-examination about

03:49PM  15    helicopter surveillance; do you remember that?

03:49PM  16    A.  I do.

03:49PM  17    Q.  Did that have anything to do with your Serio operation?

03:49PM  18    A.  No.

03:49PM  19    Q.  Do you have anything to do with flying helicopters?

03:49PM  20    A.  I do not.

03:49PM  21    Q.  Do you have any idea whether this defendant ever asked

03:49PM  22    for helicopters to be flown ever in life?

03:49PM  23    A.  I do.

03:49PM  24    Q.  Okay.  What do you know?

03:49PM  25    A.  I know previously Mr. Bongiovanni had asked our office

03:49PM  1    to -- or, asked to utilize our helicopter for surveillance.

03:49PM  2    Q.  Okay.  And what case was that a part of?

03:49PM  3    A.  I don't recall.  I just -- that was brought to my

03:49PM  4    attention over the course of this -- this -- the briefing

03:49PM  5    that we've had prior to all this testimony.

03:49PM  6    Q.  Okay.  And so when you say it was brought to your

03:49PM  7    attention, do you have personal knowledge of it?

03:49PM  8    A.  I don't.

03:49PM  9    Q.  Have you heard other people talk about helicopter

03:50PM  10   surveillance?

03:50PM  11   A.  Yes.

03:50PM  12   Q.  Do you have any idea whether the defendant ever asked for

03:50PM  13   helicopter surveillance, your personal knowledge?

03:50PM  14   A.  No.

03:50PM  15   Q.  Okay.  You don't work in the helicopter, right?

03:50PM  16   A.  No.

03:50PM  17   Q.  Do you keep the helicopter logbook?

03:50PM  18   A.  No.

03:50PM  19   Q.  Okay.  You were asked about deconfliction databases on

03:50PM  20   cross-examination; do you remember that?

03:50PM  21   A.  Yes.

03:50PM  22   Q.  Do you use those?

03:50PM  23   A.  We -- we have access to them.

03:50PM  24   Q.  Do you use those?

03:50PM  25   A.  It's something that I -- I have used in the past.  I do

03:50PM    1    not like using.

03:50PM    2    Q.   Why don't you like using them?

03:50PM    3    A.   Oftentimes we've found, specifically federal agencies,

03:50PM    4    every federal agency would pump a name into the deconfliction

03:50PM    5    database simply to, you know, maybe that person's name was

03:50PM    6    mentioned in a proffer, and they put it in the database, and

03:50PM    7    then three months from then, we'll knock them in a search

03:50PM    8    warrant or some local agency will have a good case on them,

03:50PM    9    and it, you know, they would kind of ride our coattails on

03:51PM   10    that caper and not really have much invested.

03:51PM   11    Q.   Let me ask you this.  Are deconfliction databases

03:51PM   12    sometimes used by law enforcement to essentially mark a

03:51PM   13    target as their territory?

03:51PM   14    A.   That's what it is.

03:51PM   15    Q.   Okay.  And can that sometimes prevent you from furthering

03:51PM   16    your own investigations?

03:51PM   17    A.   Yes.

03:51PM   18    Q.   Is that why you don't use them?  Or you generally prefer

03:51PM   19    not to use them?

03:51PM   20    A.   I prefer not to use them.  And we have guys assigned to

03:51PM   21    various federal agencies as task force officers, and we

03:51PM   22    generally try to keep everybody in the loop.

03:51PM   23    Q.   Got it.  And finally, you were asked some questions on

03:51PM   24    cross-examination about the specificity of the information

03:51PM   25    that led to the search at Serio's properties, do you remember

03:51PM   1   being asked those questions?

03:51PM   2   A.  I do.

03:51PM   3   Q.  Okay.  If you had never conducted any surveillance, would

03:51PM   4   you have been able to arrest Ron Serio?

03:51PM   5   A.  No.

03:51PM   6   Q.  Okay.  Did Ron Serio drop off a duffle bag of marijuana

03:51PM   7   by himself?

03:51PM   8   A.  Yes.

03:51PM   9   Q.  Was that hard to detect when you conducted surveillance?

03:52PM   10   A.  No.

03:52PM   11         **MR. COOPER:**  I have no further questions, Judge.

03:52PM   12         **MR. MacKAY:**  Very briefly, Judge.

03:52PM   13

03:52PM   14               **RECROSS-EXAMINATION BY MR. MacKAY:**

03:52PM   15   Q.  But the location that there was surveillance where the

03:52PM   16   marijuana was dropped off, you only knew about that because

03:52PM   17   the C.S. came to the FBI, and gave that very specific location

03:52PM   18   to the FBI which came to you, correct?

03:52PM   19   A.  That's correct.

03:52PM   20         **MR. MacKAY:**  No further questions, Your Honor.

03:52PM   21         **MR. COOPER:**  Just one.

03:52PM   22

03:52PM   23               **RE-REDIRECT EXAMINATION BY MR. COOPER:**

03:52PM   24   Q.  You followed Serio's car from his house to that location,

03:52PM   25   right?

03:52PM    1   A.   That's correct.

03:52PM    2   Q.   Was that hard to do?

03:52PM    3   A.   No.

03:52PM    4           **MR. COOPER:**  Okay.

03:52PM    5           **MR. MacKAY:**  Nothing further, Your Honor.

03:52PM    6           **THE COURT:**  Okay.  You can step down, sir.  Thanks.

03:52PM    7           (Witness excused at 3:52 p.m.)

           8           (Excerpt concluded at 3:52 p.m.)

           9              *     *     *     *     *     *     *

          10

          11

          12

          13

          14                  **CERTIFICATE OF REPORTER**

          15

          16           In accordance with 28, U.S.C., 753(b), I

          17   certify that these original notes are a true and correct

          18   record of proceedings in the United States District Court for

          19   the Western District of New York on February 29, 2024.

          20

          21                  s/ Ann M. Sawyer
                              Ann M. Sawyer, FCRR, RPR, CRR
          22                  Official Court Reporter
                              U.S.D.C., W.D.N.Y.

          23

          24

          25

**TRANSCRIPT INDEX**

**EXCERPT - EXAMINATION OF DJ GRANVILLE**

**FEBRUARY 29, 2024**

| **W I T N E S S** | **P A G E** |
|---|---|
| **D J   G R A N V I L L E** | 2 |
| DIRECT EXAMINATION BY MR. COOPER: | 2 |
| CROSS-EXAMINATION BY MR. MacKAY: | 29 |
| REDIRECT EXAMINATION BY MR. COOPER: | 38 |
| RECROSS-EXAMINATION BY MR. MacKAY: | 43 |
| RE-REDIRECT EXAMINATION BY MR. COOPER: | 43 |

| **E X H I B I T S** | **P A G E** |
|---|---|
| GOV Exhibits 42A-33, 34 & 35 | 21 |