03:55PM

1                  UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF NEW YORK
2
   _____
3  UNITED STATES OF AMERICA,

                                     Case No. 1:19-cr-227
4               Plaintiff,                    (LJV)
   v.
5                                    March 21, 2024
   JOSEPH BONGIOVANNI,
6
                Defendant.
7  _____

8       TRANSCRIPT EXCERPT - TESTIMONY OF BRIAN A. BURNS
           BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                  UNITED STATES DISTRICT JUDGE

10

   **APPEARANCES:**         **TRINI E. ROSS, UNITED STATES ATTORNEY**
11                          **BY: JOSEPH M. TRIPI, ESQ.**
                               **NICHOLAS T. COOPER, ESQ.**
12                             **CASEY L. CHALBECK, ESQ.**
                            Assistant United States Attorneys
13                          Federal Centre
                            138 Delaware Avenue
14                          Buffalo, New York 14202
                               And
15                          **UNITED STATES DEPARTMENT OF JUSTICE**
                            **BY: JORDAN ALAN DICKSON, ESQ.**
16                          1301 New York Ave NW
                            Suite 1000
17                          Washington, DC 20530-0016
                            For the Plaintiff
18
                            **SINGER LEGAL PLLC**
19                          **BY: ROBERT CHARLES SINGER, ESQ.**
                            80 East Spring Street
20                          Williamsville, New York 14221
                               And
21                          **LAW OFFICES OF PARKER ROY MacKAY**
                            **BY: PARKER ROY MacKAY, ESQ.**
22                          3110 Delaware Avenue
                            Kenmore, New York  14217
23                          For the Defendant

24 **PRESENT:**            **MARILYN K. HALLIDAY,** HSI Special Agent
                           **KAREN A. CHAMPOUX,** USA Paralegal
25
   **LAW CLERK:**          **REBECCA FABIAN IZZO, ESQ.**

| | | |
|---|---|---|
| 1 | **COURT DEPUTY CLERK:** | **COLLEEN M. DEMMA** |
| 2 | | |
| | **COURT REPORTER:** | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 3 | | Robert H. Jackson Federal Courthouse |
| | | 2 Niagara Square |
| 4 | | Buffalo, New York  14202 |
| | | Ann_Sawyer@nywd.uscourts.gov |
| 5 | | |
| 6 | | |
| 7 | | *     *     *     *     *     *     * |
| 8 | | |

9          (Excerpt commenced at 3:55 p.m.)

10          (Jury present.)

03:55PM   11          **THE COURT:**  The government can call its next witness.

03:55PM   12          **MR. COOPER:**  Judge, the government calls Special

03:55PM   13   Agent Brian Burns.

03:55PM   14

03:55PM   15   **B R I A N   A.   B U R N S**, having been duly called and sworn,

03:56PM   16   testified as follows:

03:56PM   17          **MR. COOPER:**  May I inquire, Judge?

03:56PM   18          **THE COURT:**  You may.

03:56PM   19

03:56PM   20                    **DIRECT EXAMINATION BY MR. COOPER:**

03:56PM   21   Q.  Good afternoon, Special Agent Burns.

03:56PM   22   A.  Good afternoon, Mr. Cooper.

03:56PM   23   Q.  Would you please tell the jury a little bit about where

03:56PM   24   you grew up?

03:56PM   25   A.  I grew up -- I was born in Buffalo, raised predominantly

03:56PM    1   in the Tonawanda area, and moved back to Buffalo and stayed

03:56PM    2   there until I left the area.

03:56PM    3   Q.  Okay.  How far did you go in school?

03:56PM    4   A.  I got a masters.

03:56PM    5   Q.  And what's your educational background like generally?

03:56PM    6   A.  Yeah.  I went to University of Buffalo, got a BS in

03:56PM    7   pharmacy.  And then I got a masters in business

03:56PM    8   administration.

03:56PM    9   Q.  After you graduated from pharmacy school, did you work as

03:56PM   10   a pharmacist?

03:56PM   11   A.  Yes, I was a --

03:56PM   12   Q.  How -- sorry, go ahead.

03:56PM   13   A.  -- I was a licensed pharmacist for three years.

03:56PM   14   Q.  How did you like working as a pharmacist?

03:57PM   15   A.  It was nice.  It wasn't overly interesting some days.  A

03:57PM   16   little repetitive.

03:57PM   17   Q.  Did you decide to try a different career?

03:57PM   18   A.  Yes, I did.

03:57PM   19   Q.  What did you do?

03:57PM   20   A.  I joined the FBI.

03:57PM   21   Q.  Was that more interesting?

03:57PM   22   A.  Definitely interesting most days.

03:57PM   23   Q.  Okay.  Can you describe for the jury a little bit about

03:57PM   24   the training you received as a special agent with the FBI?

03:57PM   25   A.  Sure.  I entered the academy in October of 1998.  I was

03:57PM   1   there for approximately four months.  You learn

03:57PM   2   constitutional law, federal criminal law, you learn, kind of,

03:57PM   3   tactics so you can effectuate a search warrant, execute

03:57PM   4   search warrants, arrests safely, you learn firearms, you

03:57PM   5   learn interviews, interviews, interrogations, policies

03:57PM   6   procedures, tactical surveillance, tactical driving,

03:57PM   7   policy -- that covers just about most of it.

03:57PM   8   Q.  And after you received that initial training, is that at

03:57PM   9   Quantico?

03:57PM  10   A.  That's at Quantico, yes.

03:57PM  11   Q.  Okay.  And then were you transferred to a specific field

03:58PM  12   office?

03:58PM  13   A.  Yes, I was assigned the Memphis, Tennessee office of the

03:58PM  14   FBI.

03:58PM  15   Q.  And what years were you at the Memphis, Tennessee office?

03:58PM  16   A.  '99 to 2008.

03:58PM  17   Q.  What kinds of work did you do at the Memphis, Tennessee

03:58PM  18   office?

03:58PM  19   A.  Initially, I did predominantly narcotics investigations.

03:58PM  20   Q.  Did you handle a bunch of those?

03:58PM  21   A.  Yes, quite a few.

03:58PM  22   Q.  Okay.  After handling a bunch of narcotics

03:58PM  23   investigations, did you transition into a different type of

03:58PM  24   work?

03:58PM  25   A.  Yeah, I started doing more public corruption, kind of law

03:58PM    1    enforcement corruption.  It aligned itself with the drug

03:58PM    2    aspect, so law enforcement corruption, narcotics nexus, and

03:58PM    3    then I eventually kind of segued to public officials and

03:58PM    4    elected officials, things like that.

03:58PM    5    Q.  And in 2008, you described that as kind of the end of

03:58PM    6    your time in the Tennessee office.  Where did you go after

03:58PM    7    that?

03:58PM    8    A.  Yes, I was able to get back to the Western New York area,

03:58PM    9    and I was initially assigned to the Niagara Falls resident

03:58PM   10    agency.  We had a small office there, and I was there for a

03:59PM   11    couple of years.  And they shut that office down, and I was

03:59PM   12    transferred to Buffalo.

03:59PM   13    Q.  What group did you work in at the Buffalo office?

03:59PM   14    A.  White collar crime.

03:59PM   15    Q.  And does that white collar crime group also cover public

03:59PM   16    corruption cases?

03:59PM   17    A.  They do.  That's the responsibilities of the white collar

03:59PM   18    crime squad.

03:59PM   19    Q.  And has that been your focus since 2008?

03:59PM   20    A.  Predominantly.  I've had a couple civil rights and a few

03:59PM   21    fraud cases here and there.

03:59PM   22         MR. COOPER:  Okay.  Judge, I think the next topic

03:59PM   23    that I have to get into is something we just want to come up

03:59PM   24    on briefly.

03:59PM   25         THE COURT:  Sure.

03:59PM    1              (Sidebar discussion held on the record.)

03:59PM    2         **MR. COOPER:**  By way of background for the Court,

03:59PM    3    there was some testimony from Shane Nastoff about an

03:59PM    4    investigation that he conduct into an individual named Anthony

03:59PM    5    Anastasia.

03:59PM    6         **THE COURT:**  Yeah.

03:59PM    7         **MR. COOPER:**  And then some comments that the

03:59PM    8    defendant made to Nastoff about, I think, pardon my French,

04:00PM    9    about getting shit for the Anthony Anastasia arrest.

04:00PM   10         Special Agent Burns and the FBI had a

04:00PM   11    semi-contemporaneous investigation into Gables, Joe Mesi, that

04:00PM   12    involved Anthony Anastasia.

04:00PM   13         So I outlined, I think, about three questions for

04:00PM   14    counsel a week or two ago that I intended to cover with

04:00PM   15    Special Agent Burns, and I gave them what I intended to ask

04:00PM   16    and what I intended to elicit.  And Mr. MacKay indicated he

04:00PM   17    wanted to come up and address it, so now I'll turn it over to

04:00PM   18    him.

04:00PM   19         **MR. MacKAY:**  So there's three points.  To lay the

04:00PM   20    timeline out, my understanding is investigation by FBI is '09

04:00PM   21    into end of 2010, they execute some search warrants at the

04:00PM   22    Gables bartender's house, Steve Brucato, Anthony Anastasia,

04:00PM   23    and they interviewed Joe Mesi.

04:00PM   24         **THE COURT:**  Okay.

04:00PM   25         **MR. MacKAY:**  That's when they get Joe Mesi as a

04:00PM   1   confidential human source.

04:00PM   2         Now, fast forward to 2011, you recall Shane Nastoff

04:01PM   3   testifying that's when Anthony Anastasia's arrested by the

04:01PM   4   DEA.

04:01PM   5         **THE COURT:**  That's when --

04:01PM   6         **MR. MacKAY:**  That's when Anthony Anastasia's arrested

04:01PM   7   by DEA.

04:01PM   8         **THE COURT:**  Okay.

04:01PM   9         **MR. MacKAY:**  And it arises based on a fast-moving tip

04:01PM  10   on the Richard Himbury case.  That's the one where Nastoff is

04:01PM  11   tracking Himbury.  Himbury gives off his -- somebody owes him

04:01PM  12   money, and they kind of act that same day and arrest Anthony

04:01PM  13   Anastasia.

04:01PM  14         The DEA doesn't charge Anthony Anastasia until

04:01PM  15   several years later, I think it's '14 or '15.  He pleads

04:01PM  16   guilty and is sentenced.

04:01PM  17         I'm not -- one of the points is that Agent Burns, as

04:01PM  18   an FBI agent, in this capacity is aware of the DEA arrest of

04:01PM  19   Anthony Anastasia.  I guess I don't really have an issue with

04:01PM  20   that.  But the 2009-2010 investigation of -- surrounding

04:01PM  21   Gables, to me the objection is to relevance, I guess, because

04:02PM  22   it doesn't -- I'm not sure how it connects to DEA activity.

04:02PM  23         **THE COURT:**  So you're going to ask about the

04:02PM  24   defendant saying that he had a hard time when Anthony

04:02PM  25   Anastasia was arrested; is that the point?

04:02PM  1       **MR. COOPER:**  Well, no, that came out through Nastoff.

04:02PM  2   What I intend to ask Special Agent Burns about is the

04:02PM  3   existence of this FBI investigation, and then the coordination

04:02PM  4   that occurred between FBI and DEA, which ultimately, it's the

04:02PM  5   government's position, leads to the defendant tipping off

04:02PM  6   Selva and then Serio to stay away from Gables and Anthony

04:02PM  7   Anastasia because there was an investigation going on there.

04:02PM  8   Serio testified about it.

04:02PM  9       **THE COURT:**  Why isn't that -- why doesn't the fact

04:02PM  10  that there was an investigation in 2009 and 2010 to which the

04:02PM  11  defendant might have been privy leading to his knowledge, why

04:02PM  12  isn't that relevant regardless of when it was?

04:02PM  13      **MR. MacKAY:**  So from everything I've reviewed, it's

04:02PM  14  not clear the DEA knows all about the '09, '10 investigation,

04:03PM  15  because that's an FBI Safe Streets Task Force.  It's entirely

04:03PM  16  on that side, it doesn't involve the DEA.

04:03PM  17      DEA, they're sort of proceeding on one track, and

04:03PM  18  suddenly DEA comes in and sort of cuts that investigation off,

04:03PM  19  as far as I understand, by way of the sudden Richard Himbury

04:03PM  20  tip.  So it's my understanding there's no, really,

04:03PM  21  knowledge --

04:03PM  22      **THE COURT:**  There's no connection between the 2009

04:03PM  23  and 2010 investigation and what happened in --

04:03PM  24      **MR. MacKAY:**  In 2011 a year later.

04:03PM  25      **MR. COOPER:**  I think I can relay that foundation

| | | |
|---|---|---|
| 04:03PM | 1 | without getting into the substance too much.  And so if you |
| 04:03PM | 2 | let me ask the witness about whether there was an FBI |
| 04:03PM | 3 | investigation in 2009 that dovetailed and involved |
| 04:03PM | 4 | coordination with DEA later into the same target, I expect the |
| 04:03PM | 5 | answer is going to be yes.  And so that will lay the |
| 04:03PM | 6 | foundation of what they're objecting to. |
| 04:03PM | 7 | **MR. MacKAY:**  I'm not sure how it goes back to |
| 04:03PM | 8 | Bongiovanni's knowledge.  As I understand it, once DEA swoops |
| 04:03PM | 9 | in, and everybody knows in DEA, then the FBI backs off and |
| 04:03PM | 10 | says we can't go any further with this because now DEA took it |
| 04:04PM | 11 | over and it's going to compromise -- |
| 04:04PM | 12 | **THE COURT:**  That happens when? |
| 04:04PM | 13 | **MR. MacKAY:**  That happens in 2011 after -- |
| 04:04PM | 14 | **THE COURT:**  Okay, so -- |
| 04:04PM | 15 | **MR. COOPER:**  And, so, I think that the testimony |
| 04:04PM | 16 | involved from Serio was that he was tipped off about Gables |
| 04:04PM | 17 | and Mesi. |
| 04:04PM | 18 | Mesi wasn't a part of the DEA investigation, he was |
| 04:04PM | 19 | part of the FBI investigation.  And if the defendant passed |
| 04:04PM | 20 | that information, he had to have known about the FBI |
| 04:04PM | 21 | investigation, that's why it's relevant.  Essentially |
| 04:04PM | 22 | corroborating what Selva said that Mesi was a source, or that |
| 04:04PM | 23 | Mesi was someone you should stay away from. |
| 04:04PM | 24 | I'm not getting deep into it. |
| 04:04PM | 25 | **THE COURT:**  I think he can establish that the FBI -- |

04:04PM    1    that the DEA and the FBI investigation were cross pollinated,

04:04PM    2    or the DEA took over the FBI investigation, which would have

04:04PM    3    given Bongiovanni the opportunity to find out about that.

04:04PM    4    That that's -- I think that's fair game.

04:04PM    5           MR. MacKAY:  Right.  And I just want to make a record

04:04PM    6    that as far as all the documents I've reviewed, I don't

04:04PM    7    believe that DEA was privy to who the confidential human

04:05PM    8    sources were on the FBI side of things.  And then Serio's

04:05PM    9    testimony is --

04:05PM   10           THE COURT:  Can't you cross-examine him?

04:05PM   11           MR. MacKAY:  I guess I can, but I guess if that link

04:05PM   12    is never made, it becomes confusing to the jury of how do they

04:05PM   13    know.

04:05PM   14           THE COURT:  But -- but -- but he's going to make

04:05PM   15    that --

04:05PM   16           MR. COOPER:  I expect to make a link that there was

04:05PM   17    deconfliction and discussion between the two agencies, and I

04:05PM   18    think it's a very reasonable inference for the jury to draw

04:05PM   19    that the defendant somehow becomes aware of it because he tips

04:05PM   20    off Lou Selva.  Stay away from Gables and Mesi.

04:05PM   21           THE COURT:  And there is testimony that he tipped off

04:05PM   22    Lou Selva to stay away from Gables and Mesi.

04:05PM   23           MR. MacKAY:  Two years -- at least two to four years

04:05PM   24    later.

04:05PM   25           MR. COOPER:  But it came out of this FBI

04:05PM   1    investigation.  DEA didn't have Mesi as a source.

04:05PM   2              **MR. TRIPI:**  I would also add that Serio also

04:05PM   3    testified that he heard from -- I believe it was Masecchia,

04:05PM   4    but don't quote me on that, but Serio definitely testified he

04:05PM   5    said he learned that Gables and Mesi were under investigation.

04:05PM   6    So, this goes right to the people who were the core of the

04:05PM   7    conspiracy.

04:05PM   8              **THE COURT:**  Yeah, I think that's fair game.

04:05PM   9              **MR. MacKAY:**  I note my objection.

04:05PM   10             **THE COURT:**  Yeah, you did.  And you did a good job

04:05PM   11   arguing.

04:06PM   12             (End of sidebar discussion.)

04:06PM   13             **BY MR. COOPER:**

04:06PM   14   Q.  Special Agent Burns, did you hear testimony from Lou

04:06PM   15   Selva during the course of this trial that he was tipped off

04:06PM   16   that Baby Joe Mesi and Gables Bar were the subject of an

04:06PM   17   ongoing investigation by federal law enforcement?

04:06PM   18   A.  Yes.

04:06PM   19   Q.  Did you hear testimony from Ron Serio that he was tipped

04:06PM   20   off that Baby Joe Mesi and Gables Bar were the subject of an

04:06PM   21   ongoing investigation by federal law enforcement?

04:06PM   22   A.  Yes.

04:06PM   23   Q.  Do you know who Baby Joe Mesi is?

04:06PM   24   A.  Yes, I do.

04:06PM   25   Q.  Who is he?

| | | |
|---|---|---|
| 04:06PM | 1 | A.  He was a professional boxer from the Western New York |
| 04:06PM | 2 | area, and rose pretty high into the boxing ranks. |
| 04:06PM | 3 | Q.  Okay.  And what's Gables? |
| 04:06PM | 4 | A.  It was a bar located on Hertel Avenue in proximity to |
| 04:06PM | 5 | Crestwood and Colvin. |
| 04:06PM | 6 | Q.  Is Gables known to be frequented by any specific type of |
| 04:06PM | 7 | group of people? |
| 04:06PM | 8 | A.  It's a North Buffalo bar.  I mean, based on our |
| 04:06PM | 9 | investigation, there was some Italian Organized Crime figures |
| 04:06PM | 10 | that operated out of there. |
| 04:07PM | 11 | Q.  Was it known to be a bar that law enforcement frequented? |
| 04:07PM | 12 | A.  Some law enforcement. |
| 04:07PM | 13 | Q.  Did you hear Special Agent Nastoff testify that the |
| 04:07PM | 14 | defendant at one point made a comment to him referencing that |
| 04:07PM | 15 | Anastasia said Bongo had screwed him over? |
| 04:07PM | 16 | A.  Yes, I did. |
| 04:07PM | 17 | Q.  Special Agent Burns, in 2009, were you involved in an FBI |
| 04:07PM | 18 | investigation into IOC and public corruption? |
| 04:07PM | 19 | A.  Yes, I was. |
| 04:07PM | 20 | Q.  Was Gables bar a part of that investigation? |
| 04:07PM | 21 | A.  Yes. |
| 04:07PM | 22 | Q.  Was it the focus of that investigation? |
| 04:07PM | 23 | A.  Gables, specifically there was -- the investigation |
| 04:07PM | 24 | centered on two individuals that worked there, Anthony |
| 04:07PM | 25 | Anastasia, Steven Brucato, that were distributing cocaine |

04:07PM   1   from the bar, in proximity of the bar.

04:07PM   2       Additionally, there was a public corruption aspect

04:08PM   3   related to some law enforcement officers that frequented

04:08PM   4   there that appeared to be users of cocaine, and were possibly

04:08PM   5   providing information about law enforcement activities to

04:08PM   6   individuals that hung out there including, Anastasia and

04:08PM   7   Brucato.

04:08PM   8   Q.  Was Tom Doctor one of those law enforcement officers that

04:08PM   9   came up as a subject of your investigation?

04:08PM  10   A.  Yes, he was one of them.

04:08PM  11   Q.  Did FBI ultimately arrest Anthony Anastasia related to

04:08PM  12   that investigation?

04:08PM  13   A.  FBI did arrest him briefly.  And then he ended up waiving

04:08PM  14   and agreeing to cooperate, but he did not.

04:08PM  15   Q.  Okay.  Did there come a time when you became aware of a

04:08PM  16   DEA investigation occurring semi-contemporaneously with that

04:08PM  17   FBI investigation?

04:08PM  18   A.  Yeah, it's kind of shortly thereafter.  Anastasia does

04:09PM  19   not continue cooperating, and he's distributing narcotics

04:09PM  20   again.  And we ultimately end up -- well, the investigation

04:09PM  21   advances, Anastasia ultimately becomes the target of a DEA

04:09PM  22   investigation, and the two investigations kind of conclude

04:09PM  23   with a prosecution of Anastasia.

04:09PM  24   Q.  Was there cross pollination, so to speak, between the FBI

04:09PM  25   investigation and the DEA investigation?

04:09PM   1    A.   Eventually.

04:09PM   2    Q.   Okay.  And was there some deconfliction or meetings that

04:09PM   3    occurred between the FBI and the DEA about those

04:09PM   4    investigations?

04:09PM   5    A.   There was, with the U.S. Attorney's Office on a decision

04:09PM   6    to prosecute -- just to clarify, I mean, the FBI one was

04:09PM   7    separate and apart initially.  The DEA developed their own.

04:09PM   8    And then they kind of merged with a resolution of the

04:09PM   9    investigation.

04:09PM   10   Q.   And so when you say they merged, was there a meeting that

04:09PM   11   discussed information that the FBI had developed, as well as

04:09PM   12   information that the DEA had developed?

04:09PM   13   A.   There was, yeah, coordination with the U.S. Attorney's

04:10PM   14   Office on how to resolve the investigation.

04:10PM   15   Q.   Okay.  And did that ultimately conclude with the DEA

04:10PM   16   keeping the -- the -- I don't want to say stat, but keeping

04:10PM   17   the case?

04:10PM   18   A.   And charging the -- finished the prosecution of the

04:10PM   19   Anastasia part of it.

04:10PM   20   Q.   Okay.  Was Mesi -- you mentioned Mesi before.  Did Mesi

04:10PM   21   become a source during that FBI investigation?

04:10PM   22   A.   Yes, that's what I was trying to -- I thought that's what

04:10PM   23   you were going with earlier, but, yes.

04:10PM   24        Mesi, as part of Brucato's cooperation, he was consuming

04:10PM   25   some narcotics, some cocaine at Brucato's house.  And we

04:10PM    1    ended up basically detaining him, speaking with him, and he

04:10PM    2    agreed to cooperate going forward.  And that was kind of a

04:10PM    3    focus that I particularly had related to the -- because of

04:10PM    4    the public corruption aspect of it.

04:10PM    5    Q.  Got it.  I'd like to move on now.  I want to speak with

04:10PM    6    you about January of 2019.  Were you working in the white

04:10PM    7    collar unit of the FBI at that time?

04:10PM    8    A.  Yes, I was.

04:11PM    9    Q.  Okay.  And did there come a time when you received a

04:11PM   10    brief on the investigation into Joseph Bongiovanni?

04:11PM   11    A.  In January of 2019.

04:11PM   12    Q.  Okay.  And who was at that brief?  Like, what agencies

04:11PM   13    participated in that?

04:11PM   14    A.  HSI.  Along with -- HSI, FBI, a senior management at my

04:11PM   15    office.  Some senior management from HSI.  And high-ranking

04:11PM   16    members of the U.S. Attorney's Office.

04:11PM   17    Q.  And was that the first time you became aware of the

04:11PM   18    investigation into Joseph Bongiovanni?

04:11PM   19    A.  I had become aware of it just earlier either on that day

04:11PM   20    or the -- or the day before.  Because I had spoken with then

04:11PM   21    U.S. Attorney J.P. Kennedy, and he had asked me about the

04:11PM   22    FBI's involvement in this case.

04:11PM   23            **MR. MacKAY:**  Objection, hearsay.

04:11PM   24            **THE COURT:**  Sustained.

          25

04:11PM    1          **BY MR. COOPER:**

04:11PM    2    Q.  Yeah, I'm not asking you about a conversation you had

04:11PM    3    with J.P. Kennedy.  But generally, it was January 2019 when

04:11PM    4    you became aware of or involved with the Bongiovanni

04:11PM    5    investigation?

04:11PM    6    A.  Yes, January of 2019.

04:11PM    7    Q.  Okay.  Were you the lead case agent at that time?

04:12PM    8    A.  Yes, I was.

04:12PM    9    Q.  Okay.  From the FBI?

04:12PM   10    A.  From the FBI's part.

04:12PM   11    Q.  Okay.  And do you know Curtis Ryan?

04:12PM   12    A.  Yes.

04:12PM   13    Q.  Was he involved in the investigation at that time?

04:12PM   14    A.  Yeah, he was at the meeting.

04:12PM   15    Q.  By June of 2019, had you become increasingly more

04:12PM   16    involved in the investigation?

04:12PM   17    A.  Yes.

04:12PM   18    Q.  Since 2019, have you and the FBI continued to work on the

04:12PM   19    investigation?

04:12PM   20    A.  Yes, we have.

04:12PM   21    Q.  And would you describe that as a shared investigation

04:12PM   22    with Homeland Security Investigations?

04:12PM   23    A.  Yes, definitely.

04:12PM   24    Q.  Are you familiar with the different witnesses involved in

04:12PM   25    the case?

Case 1:19-cr-00227-LJV-MJR   Document 986   Filed 05/31/24   Page 17 of 68
USA v Bongiovanni - Burns - Cooper/Direct - 3/21/24

17

04:12PM   1   A.   Intimately familiar.

04:12PM   2   Q.   Are you familiar with the evidence in the case?

04:12PM   3   A.   Intimately familiar with the evidence in this case.

04:12PM   4   Q.   Were you present for the search warrant that was executed

04:12PM   5   at Joseph Bongiovanni's residence?

04:12PM   6   A.   Yes.

04:12PM   7   Q.   Okay.  And just for the record, are you familiar with

04:12PM   8   what Joe Bongiovanni looks like?

04:12PM   9   A.   Yes, I am.

04:12PM   10   Q.   Is he in court?

04:12PM   11   A.   Yes, he is.

04:12PM   12   Q.   Can you point him out and identify an article of his

04:12PM   13   clothing?

04:12PM   14   A.   With the defense counsel, wearing the red and blue

04:12PM   15   striped tie, in the center.

04:12PM   16        **MR. COOPER:**  Judge, for the record, indicating the

04:13PM   17   defendant?

04:13PM   18        **THE COURT:**  Yes.

04:13PM   19        **MR. COOPER:**  Thank you.

04:13PM   20        I believe Exhibit 103-36 is already in evidence but I

04:13PM   21   just want to confirm with counsel before I ask to pull it up.

04:13PM   22   It's the --

04:13PM   23        Judge, I'd ask to pull up for everybody what I

04:13PM   24   believe is already in evidence, Government Exhibit 103-36.

04:13PM   25        **THE COURT:**  Have you confirmed it's already in

04:13PM 1    evidence?

04:13PM 2            **MR. MacKAY:**  It is, Judge.

04:13PM 3            **MR. SINGER:**  This is the one that was subject to

04:13PM 4    connection, so that was satisfied.

04:13PM 5            **BY MR. COOPER:**

04:13PM 6    Q.  Do you recognize this photograph?

04:13PM 7    A.  Yes, I do.

04:13PM 8    Q.  Do you recognize what's depicted in the photograph?

04:13PM 9    A.  Yes.

04:13PM 10   Q.  Is this a box that was in the defendant's residence?

04:13PM 11   A.  Yes, in the basement on the day of the search warrant.

04:13PM 12   June 6th, 2019, at 85 Alder Place.

04:13PM 13   Q.  Okay.  And does this fairly and accurately depict the box

04:13PM 14   that was in the defendant's basement when his house was

04:13PM 15   searched in June of 2019?

04:14PM 16   A.  Yes, it does.

04:14PM 17           **MR. COOPER:**  Okay.  You can take that down

04:14PM 18   Ms. Champoux, thank you.

04:14PM 19           **BY MR. COOPER:**

04:14PM 20   Q.  Were you also present for a search warrant at Pharaoh's

04:14PM 21   Gentlemen's Club?

04:14PM 22   A.  Yes, I was.

04:14PM 23   Q.  And are you aware of whether DVRs or recording equipment

04:14PM 24   were recovered from Pharaoh's Gentlemen's Club?

04:14PM 25   A.  Yes, I am.

04:14PM   1   Q.  How many of them were recovered?

04:14PM   2   A.  There were -- three DVRs were recovered, and each DVR

04:14PM   3   recorded from numerous cameras.

04:14PM   4   Q.  Okay.  And is it fair to say that this isn't a one-agent

04:14PM   5   case?

04:14PM   6   A.  I'm sorry?

04:14PM   7   Q.  Is this a one-agent case?

04:14PM   8   A.  No.  Absolutely not.

04:14PM   9   Q.  Okay.  This is a pretty large investigative team?

04:14PM  10   A.  Yes.

04:14PM  11   Q.  Are you aware of whether these DVRs were reviewed by the

04:14PM  12   investigative team?

04:14PM  13   A.  Yes, they were.

04:14PM  14   Q.  Okay.  And are you aware of how long the DVRs stored

04:14PM  15   footage for?

04:14PM  16   A.  Those three DVRs seized from there?  Yes, I am.

04:14PM  17   Q.  How long did they store footage for?

04:14PM  18   A.  Two of the DVRs stored footage for approximately two

04:14PM  19   weeks.  One of the DVRs stored footage for approximately

04:14PM  20   seven weeks.

04:15PM  21   Q.  So if the DVR stored, at a maximum, seven weeks of

04:15PM  22   footage, would they have contained footage from 2013?

04:15PM  23   A.  Would not.

04:15PM  24   Q.  Would they have contained footage from 2014?

04:15PM  25   A.  No.

04:15PM    1    Q.  2015?

04:15PM    2    A.  No.

04:15PM    3    Q.  2016?

04:15PM    4    A.  No.

04:15PM    5    Q.  2017?

04:15PM    6    A.  No.

04:15PM    7    Q.  2018?

04:15PM    8    A.  No.

04:15PM    9    Q.  What year were they seized in?

04:15PM   10    A.  They were seized on December 12, 2019.

04:15PM   11    Q.  I'm not going to do math, we're gonna move on.

04:15PM   12        Are you aware of whether Peter Gerace's phone was seized

04:15PM   13    during a border crossing?

04:15PM   14    A.  Yes, there was a seizure of a border crossing.

04:15PM   15    Q.  Okay.  Have you reviewed the extraction from his cell

04:15PM   16    phone?

04:15PM   17    A.  Yes, I have.

04:15PM   18    Q.  Have you reviewed a report containing some of the

04:15PM   19    contacts contained in Peter Gerace's cell phone?

04:15PM   20    A.  Yes, I have.

04:15PM   21    Q.  And did you compare that report to the cell phone

04:15PM   22    extraction itself?

04:15PM   23    A.  Yes, I did.

04:15PM   24            **MR. COOPER:**  Judge may I approach the witness?

04:16PM   25            **THE COURT:**  You may.

04:16PM    1          **BY MR. COOPER:**

04:16PM    2    Q.  I'm going to show you what's been marked for

04:16PM    3    identification as Government Exhibit 310.  Do you recognize

04:16PM    4    that?

04:16PM    5    A.  Yes, I do.

04:16PM    6    Q.  What do you recognize that to be?

04:16PM    7    A.  That's an extraction of the Peter Gerace's telephone that

04:16PM    8    was seized -- I believe it was 4/27/2019 when he entered at

04:16PM    9    Newark.

04:16PM   10    Q.  Okay.  And have you reviewed the contents of that

04:16PM   11    extraction?

04:16PM   12    A.  Yes, I have.

04:16PM   13    Q.  How do you know that what's on that little white

04:16PM   14    rectangle is the extraction from Peter's cell phone?

04:16PM   15    A.  From the initials on it, as well as my putting it into a

04:16PM   16    computer and viewing it.

04:16PM   17    Q.  So you looked at what's on that disk yourself?

04:16PM   18    A.  Yes, I have.

04:16PM   19    Q.  And then you wrote your initials on it?

04:16PM   20    A.  Yes, I did -- well, I did not initial on this one.

04:16PM   21    Q.  Okay.

04:16PM   22    A.  But I did review this earlier, well, many times

04:16PM   23    throughout the course of this investigation.

04:16PM   24    Q.  I'm holding what's marked for identification now as

04:16PM   25    Government Exhibit 310A as in apples, T as in tomatoes.

04:17PM  1      MR. COOPER:  May I approach the witness?

04:17PM  2      THE COURT:  Sure.

04:17PM  3      MR. COOPER:  Thank you.

04:17PM  4      BY MR. COOPER:

04:17PM  5  Q.  Do you recognize Government Exhibit 310AT for

04:17PM  6  identification?

04:17PM  7  A.  Yes, I do.

04:17PM  8  Q.  What do you recognize that to be?

04:17PM  9  A.  These are some selected contacts out of the image of the

04:17PM  10  Gerace telephone.

04:17PM  11  Q.  Have you reviewed that before you sat in that chair

04:17PM  12  today?

04:17PM  13  A.  Yes, numerous times.

04:17PM  14  Q.  And does 310AT for identification fairly and accurately

04:17PM  15  depict some of the contacts contained in Peter Gerace's

04:17PM  16  iPhone from the 2019 extraction?

04:17PM  17  A.  Yes, it does.

04:17PM  18      MR. COOPER:  Judge, with that foundation I would

04:17PM  19  offer 310AT into evidence.

04:17PM  20      MR. MacKAY:  No objection, Your Honor.

04:17PM  21      THE COURT:  Received without objection.

04:17PM  22      (GOV Exhibit 310AT was received in evidence.)

04:17PM  23      MR. COOPER:  May I approach the witness?

04:17PM  24      THE COURT:  You may.

25

04:17PM  1          **BY MR. COOPER:**

04:17PM  2  Q.  Special Agent Burns, I'm going to ask you about a number

04:18PM  3  of different people now and whether they were contacts in

04:18PM  4  Peter Gerace's cell phone.  And if you need to, you can

04:18PM  5  review what's already in evidence as 310AT.  Okay?

04:18PM  6  A.  Yep.

04:18PM  7  Q.  Was Jeff Anzelone a contact in Peter Gerace's phone?

04:18PM  8  A.  Yes, he was.

04:18PM  9  Q.  How about Wayne Anderson?

04:18PM 10  A.  Yes, he was.

04:18PM 11  Q.  How about Joe Bella?

04:18PM 12  A.  Yes, he was.

04:18PM 13  Q.  How about Frank Burkhardt?

04:18PM 14  A.  Yes, he was.

04:18PM 15  Q.  Was there a contact called Jessica, Charm?

04:18PM 16  A.  Yes, there is.

04:18PM 17  Q.  Do you know an individual in this investigation who goes

04:18PM 18  by the alias Charm?

04:18PM 19  A.  Yes, Jessica Leyland.  That's her dancer name, Charm.

04:18PM 20  Q.  Was there a contact in Gerace's phone with the name Dan

04:18PM 21  Derenda?

04:18PM 22  A.  Yes, there is.

04:18PM 23  Q.  Who's that?

04:18PM 24  A.  Dan Derenda was the former Buffalo Police Commissioner

04:18PM 25  for the City of Buffalo, and then he's a close associate of

USA v Bongiovanni - Burns - Cooper/Direct - 3/21/24

24

04:18PM    1    Peter Gerace.

04:18PM    2    Q.  And are you aware of whether Dan Derenda wrote a letter

04:18PM    3    on behalf of Peter Gerace for his prior felony conviction?

04:18PM    4    A.  Yes, I've reviewed that letter.

04:18PM    5    Q.  Is there an entry in Peter Gerace's contact section with

04:19PM    6    the name Paulie, Hot Dog?

04:19PM    7    A.  Yes, there is.

04:19PM    8    Q.  Who is that?

04:19PM    9    A.  Paul Francoforte.  He goes by the name Hot Dog.

04:19PM   10    Q.  Is there an entry with the name Marcus?

04:19PM   11    A.  Yes, there is.

04:19PM   12    Q.  Has that name come up during the course of the Pharaoh's

04:19PM   13    and Peter Gerace investigation?

04:19PM   14    A.  Numerous times.

04:19PM   15    Q.  And what's Marcus's full name?

04:19PM   16    A.  His true name is Marcus Hatten, but he goes by Marcus

04:19PM   17    Black, or Black.  Two aliases.

04:19PM   18    Q.  Is there an entry for Michael Masecchia?

04:19PM   19    A.  Yes.

04:19PM   20    Q.  Heard that name before?

04:19PM   21    A.  Many times.

04:19PM   22    Q.  Is there an entry for Joseph or Joe Palmieri?

04:19PM   23    A.  Yes, I have.

04:19PM   24    Q.  Who is Joe Palmieri?

04:19PM   25    A.  He's a now currently retired Town of Tonawanda Police

04:19PM 1   Department officer who was a partner, or in the same group

04:19PM 2   with Joseph Bongiovanni at the DEA.

04:19PM 3   Q.  Is there an entry for an individual named Derek Roy?

04:19PM 4   A.  Yes, there is.

04:19PM 5   Q.  Who's that person?

04:19PM 6   A.  He was a -- now retired Buffalo Sabres player.

04:19PM 7   Q.  How about is there a Matt Barnaby?

04:19PM 8   A.  Yes, there is.

04:19PM 9   Q.  Who is that person?

04:19PM 10  A.  He is also a now retired professional hockey player that

04:20PM 11  played for the Buffalo Sabres for a number of years.

04:20PM 12  Q.  Is there an individual named K.L.?

04:20PM 13  A.  Yes, there was.

04:20PM 14  Q.  How about an individual named Lindsay Schuh?

04:20PM 15  A.  Yes, there is.

04:20PM 16  Q.  How about Tom Napoli?

04:20PM 17  A.  Yes, there is.

04:20PM 18  Q.  How about Tom Doctor?

04:20PM 19  A.  Yes.  It's under Doctor, but it's Tom Doctor's telephone

04:20PM 20  number.

04:20PM 21  Q.  Is there an individual named Greg Trotter?

04:20PM 22  A.  Yes, there is.

04:20PM 23  Q.  Who's Greg Trotter?

04:20PM 24  A.  Greg Trotter is a detective -- detective sergeant or

04:20PM 25  detective with the Amherst Police Department.

| | | |
|---|---|---|
| 04:20PM | 1 | Q.  Did you hear Katrina Nigro testify on Tuesday that Greg |
| 04:20PM | 2 | Trotter was a corrupt law enforcement officer? |
| 04:20PM | 3 | A.  Yes, I did. |
| 04:20PM | 4 | Q.  Are you aware of whether Greg Trotter is actually a law |
| 04:20PM | 5 | enforcement officer? |
| 04:20PM | 6 | A.  He's with the -- a detective with the Amherst Police |
| 04:20PM | 7 | Department. |
| 04:20PM | 8 | Q.  Is he currently charged with making false -- |
| 04:20PM | 9 | **MR. MacKAY:**  Objection.  Objection, Your Honor, |
| 04:20PM | 10 | relevance. |
| 04:20PM | 11 | **MR. COOPER:**  I can come up and explain it. |
| 04:20PM | 12 | **THE COURT:**  Okay. |
| 04:21PM | 13 | (Sidebar discussion held on the record.) |
| 04:21PM | 14 | **MR. COOPER:**  Judge, the -- I think we've come up |
| 04:21PM | 15 | several times on this same topic with respect to explaining |
| 04:21PM | 16 | why certain individuals are not being called as government |
| 04:21PM | 17 | witnesses.  He's unavailable to us, he's charged. |
| 04:21PM | 18 | **MR. MacKAY:**  A couple things.  Number one, Judge, |
| 04:21PM | 19 | it's an allegation.  Number 2, it's essentially bolstering |
| 04:21PM | 20 | Ms. Nigro's testimony. |
| 04:21PM | 21 | **THE COURT:**  Yeah, and if -- you're gonna argue that |
| 04:21PM | 22 | this guy shouldn't be called as a witness -- |
| 04:21PM | 23 | **MR. MacKAY:**  No, not Trotter. |
| 04:21PM | 24 | **MR. COOPER:**  Okay, sorry.  I felt on notice with the |
| 04:21PM | 25 | missing witness comments, and so -- |

Case 1:19-cr-00227-LJV-MJR   Document 986   Filed 05/31/24   Page 27 of 68
USA v Bongiovanni - Burns - Cooper/Direct - 3/21/24

27

| | | |
|---|---|---|
| 04:21PM | 1 | **THE COURT:**  I understand. |
| 04:21PM | 2 | **MR. COOPER:** -- but I'll move on from that.  I'll |
| 04:21PM | 3 | withdraw the question. |
| 04:21PM | 4 | **THE COURT:**  Fine.  Okay.  Great. |
| 04:21PM | 5 | (End of sidebar discussion.) |
| 04:21PM | 6 | **MR. COOPER:**  Judge, I'll withdraw that question and |
| 04:21PM | 7 | move on. |
| 04:21PM | 8 | **BY MR. COOPER:** |
| 04:21PM | 9 | Q.  Was there a contact under the name Tommy O? |
| 04:22PM | 10 | A.  Yes. |
| 04:22PM | 11 | Q.  Is that an alias for an individual you're familiar with? |
| 04:22PM | 12 | A.  Yes, very familiar.  It's John Ermin, he's the general |
| 04:22PM | 13 | manager of Pharaoh's, and he was present and I interviewed on |
| 04:22PM | 14 | the day of the search warrant at Pharaoh's Gentlemen's Club |
| 04:22PM | 15 | on December 12, 2019. |
| 04:22PM | 16 | Q.  Was there an entry for an individual name Frank Tripi? |
| 04:22PM | 17 | A.  Yes, there was. |
| 04:22PM | 18 | Q.  Was there an entry for an individual named Joe Tomasello? |
| 04:22PM | 19 | A.  Yes, there was. |
| 04:22PM | 20 | Q.  Was there an entry for an individual named Phlycia Ray? |
| 04:22PM | 21 | A.  Yes, there was. |
| 04:22PM | 22 | Q.  Do you know Phlycia Ray to be the maiden name for another |
| 04:22PM | 23 | individual? |
| 04:22PM | 24 | A.  Yes. |
| 04:22PM | 25 | Q.  Okay.  What's the other individual -- or, what's that |

| | | |
|---|---|---|
| 04:22PM | 1 | individual's current name? |
| 04:22PM | 2 | A.  Phlycia Hunt. |
| 04:22PM | 3 | Q.  Phlycia Hunt? |
| 04:22PM | 4 | A.  Yes, her maiden name was Phlycia Ray. |
| 04:22PM | 5 | Q.  Was there a contact stored as Anthony, bro, B-R-O? |
| 04:22PM | 6 | A.  Yes. |
| 04:22PM | 7 | Q.  Do you know Peter Gerace to have a bro named Anthony? |
| 04:22PM | 8 | A.  Yes, Anthony Gerace was his brother. |
| 04:22PM | 9 | Q.  Is the defendant's work cell phone number 716-818-0966? |
| 04:23PM | 10 | A.  Stored as a contact? |
| 04:23PM | 11 | Q.  I'm just asking if that's his work cell phone number. |
| 04:23PM | 12 | A.  That is his work cell. |
| 04:23PM | 13 | Q.  Or, was. |
| 04:23PM | 14 | A.  Yes, was, that's was the one he turned in. |
| 04:23PM | 15 | Q.  Was that stored in Peter Gerace's phone as a contact? |
| 04:23PM | 16 | A.  It was not stored as a contact. |
| 04:23PM | 17 | Q.  Are you aware that the defendant's post-retirement phone |
| 04:23PM | 18 | number was 716-507-2784? |
| 04:23PM | 19 | A.  Yes, I'm aware. |
| 04:23PM | 20 | Q.  Was that stored in Gerace's 2019 phone extraction as a |
| 04:23PM | 21 | contact? |
| 04:23PM | 22 | A.  That was not stored as a contact. |
| 04:23PM | 23 | Q.  Special Agent Burns, have you reviewed the Ron Serio |
| 04:23PM | 24 | contacts report which is already in evidence as Government |
| 04:23PM | 25 | Exhibit 46? |

04:23PM    1    A.  Yes, I have.

04:23PM    2    Q.  Have you reviewed Bongiovanni's contacts report contained

04:23PM    3    in Government Exhibit 109F?

04:23PM    4    A.  Yes, I have.

04:23PM    5    Q.  Have you reviewed -- and let me ask a clarifying question

04:23PM    6    first.  In 109F, is that the contacts report from

04:23PM    7    Bongiovanni's post-retirement phone?

04:23PM    8    A.  Yes, the post-retirement phone.

04:24PM    9    Q.  Okay.  And the preretirement phone was the DEA phone,

04:24PM   10    right?

04:24PM   11    A.  That was the one that was wiped.

04:24PM   12    Q.  Okay.  Have you reviewed Selva's contacts report

04:24PM   13    contained in Government Exhibit 208D?

04:24PM   14    A.  Yes, I have.

04:24PM   15    Q.  And we just discussed that you reviewed Gerace's contacts

04:24PM   16    which is in Government Exhibit 310AT, right?

04:24PM   17    A.  Correct.

04:24PM   18    Q.  Have you reviewed Bella's contacts contained in

04:24PM   19    Government Exhibit 312-E?

04:24PM   20    A.  Yes, I have.

04:24PM   21    Q.  I'm going hand you what's marked for identification as

04:24PM   22    Government Exhibit 367.

04:24PM   23            **MR. COOPER:**  Judge, can I approach?

04:24PM   24            **THE COURT:**  Sure.

04:24PM   25            **MR. COOPER:**  Thank you.

04:24PM    1            **BY MR. COOPER:**

04:24PM    2    Q.   Take a moment and look at that, and I'll be right back.

04:24PM    3    A.   Certainly.

04:24PM    4    Q.   Do you recognize that document?

04:24PM    5    A.   Yes, I do.

04:24PM    6    Q.   What do you recognize that to be?

04:24PM    7    A.   It's a chart that was created utilizing the contacts from

04:24PM    8    the individuals you just mentioned, Ron Serio, Bongiovanni,

04:25PM    9    Selva, Gerace, and Bella.

04:25PM   10         And then on the left-hand side of the chart is various

04:25PM   11    names of individuals whose -- are relevant to this

04:25PM   12    investigation, there's names that come up in the course of

04:25PM   13    this trial.

04:25PM   14    Q.   And does that chart fairly and accurately depict some of

04:25PM   15    the overlapping contacts that were found in the different

04:25PM   16    contacts sections that we just discussed?

04:25PM   17    A.   Yes, it does.

04:25PM   18            **MR. COOPER:**  Judge, I would offer Government

04:25PM   19    Exhibit 367 into evidence.

04:25PM   20            **MR. MacKAY:**  No objection, Your Honor.

04:25PM   21            **THE COURT:**  Received without objection.

04:25PM   22            **(GOV Exhibit 367 was received in evidence.)**

04:25PM   23            **MR. COOPER:**  Can we publish Government Exhibit 367

04:25PM   24    for everybody, please?

          25

04:25PM   1          **BY MR. COOPER:**

04:25PM   2   Q.  All right.  So Special Agent Burns, on the left side of

04:25PM   3   this document where we have all these names, are these the

04:25PM   4   individuals whose names show up as stored contacts in the

04:25PM   5   phones listed on the top?

04:25PM   6   A.  That's correct.

04:25PM   7   Q.  Okay.  Do you see that name Paul Francoforte that we

04:26PM   8   spoke about earlier?

04:26PM   9   A.  Yes, I do.

04:26PM  10   Q.  Is that also known as Hot Dog?

04:26PM  11   A.  That's Hot Dog.

04:26PM  12   Q.  And who is -- is Hot Dog in Ron Serio's phone?

04:26PM  13   A.  Hot Dog is in, yes, Ron Serio's phone.

04:26PM  14   Q.  Is he in the defendant's phone?

04:26PM  15   A.  Bongiovanni, yes, that's.

04:26PM  16   Q.  Is he in Peter Gerace's phone?

04:26PM  17   A.  Yes, he is.

04:26PM  18   Q.  How about -- let's go down to Frank Parisi.  Do you see

04:26PM  19   that line?

04:26PM  20   A.  Parisi?  Yes, I do.

04:26PM  21          **MR. COOPER:**  Can we highlight that one, Ms. Champoux?

04:26PM  22   Thank you, ma'am.

04:26PM  23          **BY MR. COOPER:**

04:26PM  24   Q.  Is he in Ron Serio's phone?

04:26PM  25   A.  Yes, he's in all of them.

04:26PM   1    Q.  He's in all of them?

04:26PM   2    A.  Yes, he is.

04:26PM   3    Q.  Okay.  And all of them would be Serio, Bongiovanni,

04:26PM   4    Selva, Gerace, and Bella; is that correct?

04:26PM   5    A.  That's correct.

04:26PM   6    Q.  How about Lou Selva, is his name down there on the left?

04:27PM   7    A.  I see it.

04:27PM   8    Q.  Is he in the Serio phone?

04:27PM   9    A.  Yes.

04:27PM  10    Q.  Is he in the defendant's phone?

04:27PM  11    A.  Yes.

04:27PM  12         MR. COOPER:  You can take that down, Ms. Champoux,

04:27PM  13    thank you.

04:27PM  14         BY MR. COOPER:

04:27PM  15    Q.  Are you familiar with the name Frank Tripi?

04:27PM  16    A.  Yes, I am.

04:27PM  17    Q.  Okay.  Are you familiar with Frank Tripi's phone number?

04:27PM  18    A.  Yes, I am.

04:27PM  19    Q.  Special Agent Burns, did you see Frank Tripi stored as a

04:27PM  20    contact in Ron Serio's phone extraction?

04:27PM  21    A.  Yes.

04:27PM  22    Q.  Was the phone number associated with Frank Tripi

04:27PM  23    716-429-6445?

04:27PM  24    A.  Yes, it is.

04:27PM  25    Q.  Okay.  And did you review Government Exhibit 358,

Case 1:19-cr-00227-LJV-MJR  Document 986  Filed 05/31/24  Page 33 of 68
USA v Bongiovanni - Burns - Cooper/Direct - 3/21/24

33

04:27PM   1   Defendant Bongiovanni's phone records, for his work cell

04:27PM   2   phone ending in 0966?

04:27PM   3   A.  Yes, the toll records, not the extraction.  The actual --

04:27PM   4   Q.  Okay.  And to be clear, the extraction had nothing on it,

04:27PM   5   right?

04:27PM   6   A.  Right, because the phone was wiped.  But I just wanted to

04:28PM   7   clarify, it was the toll records, unlike this exhibit which

04:28PM   8   is extractions, it was cell phone records.

04:28PM   9   Q.  Okay.  And when you say phone records, you mean records

04:28PM  10   that show incoming and outgoing calls?

04:28PM  11   A.  That's correct.

04:28PM  12   Q.  Calls that a person receives, right?

04:28PM  13   A.  And sends.

04:28PM  14   Q.  And calls --

04:28PM  15   A.  Made, I should say send.

04:28PM  16   Q.  Did you check Government Exhibit 358, the call records

04:28PM  17   for the defendant's work cell phone, to see if he had any

04:28PM  18   phone contact with Frank Tripi at the phone number ending in

04:28PM  19   6445?

04:28PM  20   A.  Yes, I did.

04:28PM  21   Q.  Did they have any phone contact?

04:28PM  22   A.  In October of 2018, they had phone contact.

04:28PM  23   Q.  Okay.  Did they have one phone call, or multiple phone

04:28PM  24   calls?

04:28PM  25   A.  It was three phone calls.

04:28PM    1    Q.  Okay.  And about how long was the longest call, if you

04:28PM    2    remember?

04:28PM    3    A.  Approximately six minutes.

04:28PM    4    Q.  Special Agent Burns, are you aware of whether Peter

04:28PM    5    Gerace has a prior felony conviction?

04:28PM    6    A.  Yes, I am familiar.

04:28PM    7    Q.  And did that occur on or -- or, did the conviction occur

04:28PM    8    on or around 2006?

04:29PM    9    A.  Approximately.

04:29PM   10    Q.  Was Gerace a convicted felon before the 2011 trip to Las

04:29PM   11    Vegas that he went on?

04:29PM   12    A.  Absolutely.

04:29PM   13    Q.  Special Agent Burns, were you present in the courtroom

04:29PM   14    when Katrina Nigro testified that Lillo Brancato would go

04:29PM   15    upstairs with dancers at Pharaoh's Gentlemen's Club?

04:29PM   16    A.  Yes, I was.

04:29PM   17    Q.  Do you know who Lillo Brancato is?

04:29PM   18    A.  I do.

04:29PM   19    Q.  Who is he?

04:29PM   20    A.  He's an actor out of New York City -- or, I'm sorry,

04:29PM   21    residing down in New York City, and he acted in the Bronx

04:29PM   22    Tale?

04:29PM   23    Q.  Have you ever seen A Bronx Tale?

04:29PM   24    A.  I have not, Mr. Cooper.

04:29PM   25    Q.  Have you -- have you familiarized yourself what Lillo

04:29PM    1    Brancato looks like?

04:29PM    2    A.   Yes, I have.

04:29PM    3    Q.   And I'd like to bring up for the jury Government

04:29PM    4    Exhibit 310D already in evidence.   And Government

04:29PM    5    Exhibit 310D text messages between Peter Gerace and the

04:30PM    6    defendant?

04:30PM    7    A.   Yes, they are.

04:30PM    8         **MR. COOPER:**   Ms. Champoux, can we pull up page 75.

04:30PM    9    And can you zoom in on the photo there?   Just get the people

04:30PM   10    at the table, do you want have to get the whole thing.   Thank

04:30PM   11    you, ma'am.

04:30PM   12         **BY MR. COOPER:**

04:30PM   13    Q.   Is Peter Gerace in that picture?

04:30PM   14    A.   Yes, he is.

04:30PM   15    Q.   Can you circle his head?   Is Lillo Brancato in that

04:30PM   16    picture?

04:30PM   17    A.   He is.

04:30PM   18    Q.   Is there anybody else in that picture that you recognize?

04:30PM   19    A.   I do.

04:30PM   20    Q.   Okay.   Who do you recognize?

04:30PM   21    A.   Fred Roach, he's a boxing trainer.

04:30PM   22    Q.   As far as you know, is he a celebrity?

04:30PM   23    A.   If you consider a very prominent boxing -- I mean, he

04:30PM   24    coached heavyweight champions.   So, yes, I would say he's a

04:30PM   25    celebrity.

| | | |
|---|---|---|
| 04:30PM | 1 | Q.  Okay. |
| 04:30PM | 2 | A.  Depends on your definition of celebrity, Mr. Cooper, I |
| 04:30PM | 3 | guess. |
| 04:30PM | 4 | MR. COOPER:  Ms. Champoux, can you unzoom from that |
| 04:30PM | 5 | and go to page 21.  There you go.  Perfect.  Thank you. |
| 04:30PM | 6 | BY MR. COOPER: |
| 04:31PM | 7 | Q.  Do you recognize the individuals in this photo? |
| 04:31PM | 8 | A.  Yes, I do. |
| 04:31PM | 9 | Q.  Who's on the left? |
| 04:31PM | 10 | A.  Lillo Brancato. |
| 04:31PM | 11 | Q.  Who's on the right? |
| 04:31PM | 12 | A.  Peter Gerace. |
| 04:31PM | 13 | Q.  Do you recognize the background of that photograph? |
| 04:31PM | 14 | A.  It appears to be Pharaoh's. |
| 04:31PM | 15 | MR. COOPER:  You can take that down, Ms. Champoux. |
| 04:31PM | 16 | Thank you, ma'am. |
| 04:31PM | 17 | BY MR. COOPER: |
| 04:31PM | 18 | Q.  I want to talk to you a little bit more about Hot Dog, |
| 04:31PM | 19 | okay? |
| 04:31PM | 20 | A.  Certainly. |
| 04:31PM | 21 | Q.  In the law enforcement community, is he believed be an |
| 04:31PM | 22 | associate of Italian Organized Crime? |
| 04:31PM | 23 | A.  Yes, he is. |
| 04:31PM | 24 | MR. COOPER:  Ms. Champoux, can you on the left side |
| 04:31PM | 25 | of the screen please pull up Government Exhibit 8A.  Thank |

04:31PM   1   you.  And move forward to -- move forward to page 347.  This

04:31PM   2   is already in evidence.

04:31PM   3           And on the right side of the screen, can you pull up

04:32PM   4   Government Exhibit 26-D, and can you go to page 4 of that

04:32PM   5   document.

04:32PM   6           **BY MR. COOPER:**

04:32PM   7   Q.  Special Agent Burns, have you reviewed both of these

04:32PM   8   documents?

04:32PM   9   A.  Yes, I have.

04:32PM  10   Q.  On the left side of the screen, is this a subpoena for

04:32PM  11   subscriber information from the defendant's case file

04:32PM  12   C2-13-0026?

04:32PM  13   A.  Yes, I observed that within that file.

04:32PM  14   Q.  Okay.  And who is the subscriber that's being searched in

04:32PM  15   C2-13-0026?

04:32PM  16   A.  Paul Francoforte, a/k/a Hot Dog.

04:32PM  17   Q.  Okay.  On the right side of the screen, is this a DARTS

04:32PM  18   notification from February of 2019 which would have provided

04:32PM  19   notification to the defendant of Special Agent Casullo's

04:32PM  20   DARTS entry of Paul Francoforte's phone number had the

04:32PM  21   defendant not already retired?

04:32PM  22   A.  Yes, if he had not retired, it would have notified him.

04:32PM  23           **MR. COOPER:**  Okay.  Ms. Champoux, you can take those

04:32PM  24   two down, please.  And now on the left side of the screen if

04:33PM  25   you will pull up Government Exhibit 393.  And on the right

04:33PM   1   side of the screen, if you can pull up Government

04:33PM   2   Exhibit 3713A, which is in evidence.

04:33PM   3        **BY MR. COOPER:**

04:33PM   4   Q.  Okay.  On the left side screen, Special Agent Burns, can

04:33PM   5   you circle Hot Dog for the jury?

04:33PM   6        And can you circle the reputed former Boss of Italian

04:33PM   7   Organized Crime in Buffalo?

04:33PM   8        **MR. COOPER:**  And, Ms. Champoux, can we zoom in on the

04:33PM   9   names of the two individuals that were traveling together on

04:33PM  10   the right side of the screen?

04:33PM  11        **BY MR. COOPER:**

04:33PM  12   Q.  Who are the two individuals that traveled together in

04:33PM  13   2012 in Government Exhibit 3713A?

04:33PM  14   A.  Paul Francoforte a/k/a Hot Dog and Joseph Bongiovanni.

04:33PM  15        **MR. COOPER:**  All right.  You can take those down,

04:33PM  16   Ms. Champoux.

04:34PM  17        **BY MR. COOPER:**

04:34PM  18   Q.  Special Agent Burns, are you familiar with DEA case

04:34PM  19   number C2-13-0026?

04:34PM  20   A.  Yes, extremely familiar.

04:34PM  21   Q.  Have you reviewed the official file?

04:34PM  22   A.  The official file of both the paper portion of it and the

04:34PM  23   digital portion, I have.

04:34PM  24   Q.  Okay.  And have you reviewed the working file that the

04:34PM  25   defendant brought home and had in his basement?

04:34PM    1    A.   Yes, I have.

04:34PM    2    Q.   I'd like to direct your attention to Government

04:34PM    3    Exhibit 8M in evidence.

04:34PM    4         MR. COOPER:   Can we pull that up?

04:34PM    5         BY MR. COOPER:

04:34PM    6    Q.   Have you reviewed this document?

04:34PM    7    A.   Yes, I have.

04:34PM    8    Q.   Is it your understanding that this is a DEA-6 summary

04:34PM    9    report?

04:34PM   10    A.   That's what it is.

04:34PM   11    Q.   Okay.  And is this the first -- essentially the first

04:34PM   12    DEA-6 filed in case number C2-13-0026?

04:34PM   13    A.   Yes, it is.

04:34PM   14         MR. COOPER:   Ms. Champoux, I'm sorry, to do this.

04:35PM   15    Can we take this down.  And on the left side of the screen,

04:35PM   16    can you pull up Government Exhibit 8A-6 which is a submarked

04:35PM   17    exhibit of page 3 from Government Exhibit 8A.  Can we put that

04:35PM   18    on the left?  And then I'm going to have you bring up 8M on

04:35PM   19    the right.

04:35PM   20         BY MR. COOPER:

04:35PM   21    Q.   Special Agent Burns, if you need, we'll zoom in, just let

04:35PM   22    me know.  What was the date of Government Exhibit 8M?  What

04:35PM   23    date was it prepared?

04:35PM   24    A.   11/28/2012.

04:35PM   25    Q.   Are you able to see it okay?

04:35PM    1    A.   Yes, I don't need this.

04:35PM    2    Q.   Okay.  Does the summary report mention Ron Serio at all?

04:35PM    3    A.   It does not.

04:35PM    4    Q.   Does it mention the Serio DTO at all?

04:35PM    5    A.   It does not reference the Serio drug-trafficking

04:35PM    6    organization.

04:35PM    7    Q.   Okay.  Now you mentioned that you reviewed the entire

04:35PM    8    file of C2-13-0026, as well as the working file from the

04:36PM    9    defendant's basement.  Is there any explanation at all in any

04:36PM   10    of the materials that you reviewed indicating a factual basis

04:36PM   11    in the file linking Ron Serio to Wayne Anderson's arrest?

04:36PM   12    A.   Nothing in the file.

04:36PM   13    Q.   Can you please draw a line through the -- on the left

04:36PM   14    side of the screen, on 8A-6, through the indication for a

04:36PM   15    summary report from November 28, 2012?

04:36PM   16    A.   I'm sorry?

04:36PM   17    Q.   Can you please draw a line through the summary report

04:36PM   18    that we're looking at on the right.  Just mark that one off.

04:36PM   19    Thank you.  Okay.

04:36PM   20         Is it your understanding that Anderson was caught by the

04:36PM   21    New York State Police receiving hundreds of pounds of

04:36PM   22    marijuana?

04:36PM   23    A.   It was approximately 269 pounds of marijuana.

04:36PM   24    Q.   Okay.  And is it your understanding that currency was

04:36PM   25    seized?

04:36PM   1   A.   Yes, approximately -- or not approximately, $27,000 worth

04:37PM   2   of currency was seized.

04:37PM   3   Q.   Have you reviewed Wayne Anderson's criminal history?

04:37PM   4   A.   Yes, I have.

04:37PM   5   Q.   Was he ever convicted of any criminal offense related to

04:37PM   6   the 2012 marijuana arrest?

04:37PM   7   A.   I reviewed the criminal history.  There's a notation of

04:37PM   8   an arrest, and there was no indication of any conviction or

04:37PM   9   any resolution to that case.

04:37PM  10   Q.   Okay.

04:37PM  11        **MR. COOPER:**  Ms. Champoux, can we leave up 8A-6 on

04:37PM  12   the left, and just take down 8M on the right.

04:37PM  13        That's okay.  Can we bring up 8A-6 on the left again?

04:37PM  14   And then on the right, bring up 8A and go to page 72.

04:37PM  15        **BY MR. COOPER:**

04:37PM  16   Q.   Special Agent Burns do you recognize what this is on the

04:37PM  17   right side of the screen, page 72 of Exhibit 8A?

04:37PM  18        **MR. MacKAY:**  Judge, I'm going to object at this point

04:37PM  19   on cumulative grounds.  If we're going to go through most of

04:37PM  20   these documents again that we did at the beginning of the case

04:37PM  21   when we covered the actual witnesses who dealt with them.

04:38PM  22        **MR. COOPER:**  Judge, I haven't even asked a question

04:38PM  23   about the document yet, so I don't know how counsel can

04:38PM  24   predict whether it's cumulative or not.

04:38PM  25        **THE COURT:**  Okay.  Next question.  Overruled, next

04:38PM  1   question.

04:38PM  2          **BY MR. COOPER:**

04:38PM  3   Q.  Did the defendant report that Anderson pled guilty in

04:38PM  4   New York State Court?

04:38PM  5   A.  In this document, which was located --

04:38PM  6          **MR. MacKAY:**  Objection, Judge.  Now I'm raising the

04:38PM  7   objection again that we've dealt with it before.

04:38PM  8          **MR. COOPER:**  Judge, I'm developing the witness while

04:38PM  9   I worked through the case file, and so I can come up and

04:38PM  10  proffer about how this is going to differ from --

04:38PM  11         **THE COURT:**  No, overruled.

04:38PM  12         **BY MR. COOPER:**

04:38PM  13  Q.  Did the defendant report that Wayne Anderson was

04:38PM  14  convicted?

04:38PM  15  A.  Yes, in this document located in that file, I located

04:38PM  16  this document, and it stated that on January 4th, 2015,

04:38PM  17  Anderson pled in New York State Court and sentenced to

04:38PM  18  36 months probation.

04:38PM  19         **MR. COOPER:**  Ms. Champoux, can you zoom in on

04:38PM  20  paragraph 23 at the bottom of the right -- the document on the

04:38PM  21  right?  Yep.

04:38PM  22         **BY MR. COOPER:**

04:39PM  23  Q.  Is that what you're talking about?

04:39PM  24  A.  It's easier to read now.

04:39PM  25  Q.  I should have done that first, I'm sorry.  Is that

Case 1:19-cr-00227-LJV-MJR   Document 986   Filed 05/31/24   Page 43 of 68
USA v Bongiovanni - Burns - Cooper/Direct - 3/21/24

43

04:39PM 1   consistent with Wayne Anderson's criminal history?

04:39PM 2   A.   That is not consistent with his criminal history.

04:39PM 3            MR. COOPER:   Okay.   Can you zoom out of that,

04:39PM 4   Ms. Champoux?   And now on the right, can we go to page 19?

04:39PM 5            BY MR. COOPER:

04:39PM 6   Q.   Is this a DEA-6 summary report for acquisition of U.S.

04:39PM 7   currency seized from Wayne Anderson?

04:39PM 8   A.   Yes.

04:39PM 9   Q.   What's the date that this report was prepared?

04:39PM 10  A.   Prepared on January 17th, 2013.

04:39PM 11  Q.   Does it mention Ron Serio at all?

04:39PM 12  A.   It does not mention Ron Serio.

04:39PM 13  Q.   Did the defendant author this document?

04:39PM 14  A.   No, this was authored by Clint Calloway, or TFO Clint

04:39PM 15  Calloway.

04:39PM 16  Q.   Is this document authored on January 17th, 2013,

04:39PM 17  documented on the case status checklist on the left side of

04:39PM 18  your screen?

04:39PM 19  A.   Yes, it is.

04:39PM 20  Q.   Can you cross it off?

04:39PM 21  A.   Certainly.

04:39PM 22           MR. COOPER:   Ms. Champoux, can we keep 8A-6 up on the

04:40PM 23  left, and on the right pull up Exhibit 8K.

04:40PM 24           BY MR. COOPER:

04:40PM 25  Q.   Do you recognize Exhibit 8K?

| | | |
|---|---|---|
| 04:40PM | 1 | A. Yes, I do. |
| 04:40PM | 2 | Q. Is this a DEA-6 report of an investigation? |
| 04:40PM | 3 | A. Yes, it's a DEA-6. |
| 04:40PM | 4 | Q. What was the date that this DEA-6 was submitted? |
| 04:40PM | 5 | A. The day prepared is 2/7 of 2013. |
| 04:40PM | 6 | Q. Okay. Were you present for the testimony of New York |
| 04:40PM | 7 | State Police Investigator O'Rourke? |
| 04:40PM | 8 | A. Yes, I was. |
| 04:40PM | 9 | Q. Did he testify that he was trying to set up a proffer |
| 04:40PM | 10 | interview with Wayne Anderson? |
| 04:40PM | 11 | A. He did not. |
| 04:40PM | 12 | Q. Did O'Rourke testify about whether the defendant ever |
| 04:40PM | 13 | called him to discuss a proffer interview with Anderson? |
| 04:40PM | 14 | A. Not to discuss a proffer. |
| 04:40PM | 15 | Q. Can you cross off the February 7, 2013 case status report |
| 04:40PM | 16 | on the left? Thank you. |
| 04:40PM | 17 | **MR. COOPER:** Ms. Champoux, on the right, can you pull |
| 04:40PM | 18 | up Government Exhibit 8I. |
| 04:40PM | 19 | **BY MR. COOPER:** |
| 04:41PM | 20 | Q. Before we move on to 8I, Special Agent Burns, just take a |
| 04:41PM | 21 | look on the left side of your screen. Is there an entry on |
| 04:41PM | 22 | February 22nd, 2013? |
| 04:41PM | 23 | A. There is. |
| 04:41PM | 24 | Q. Okay. And what's it say there? |
| 04:41PM | 25 | A. Cross file from C2-12-0090. |

04:41PM  1   Q.  Did you review that report?

04:41PM  2   A.  Yes, I have.

04:41PM  3   Q.  Did the defendant draft it?

04:41PM  4   A.  He did not.

04:41PM  5   Q.  Who drafted it?

04:41PM  6   A.  Shane Nastoff.

04:41PM  7   Q.  Did it have anything to do with the defendant's

04:41PM  8   investigative activity into Ron Serio?

04:41PM  9   A.  Not the defendant's investigative activity.

04:41PM  10  Q.  Was it Shane Nastoff's investigative activity?

04:41PM  11  A.  Yes, it was.

04:41PM  12  Q.  Can you cross it off on the left there.

04:41PM  13      Now in 8I, what are we looking at there?

04:41PM  14  A.  8I is the initial debriefing of the confidential source,

04:41PM  15  R.K.

04:41PM  16  Q.  Have you reviewed that document?

04:41PM  17  A.  Yes, I have.

04:41PM  18  Q.  Who drafted that report?

04:41PM  19  A.  Joseph Bongiovanni did.

04:41PM  20  Q.  What was the date that R.K. was interviewed?

04:42PM  21  A.  April 30th, 2013.

04:42PM  22  Q.  And what was the date the report was prepared?

04:42PM  23  A.  The date prepared is 5/2 of 2013.

04:42PM  24  Q.  Who does the defendant list as other people involved in

04:42PM  25  the interview of R.K.?

04:42PM   1   A.  Special Agent Shane Nastoff, and Group Supervisor

04:42PM   2   Flickinger.

04:42PM   3   Q.  Does Government Exhibit 8I indicate that R.K. had access

04:42PM   4   to leadership of the Ron Serio DTO?

04:42PM   5   A.  Yes, it's outlined in there.

04:42PM   6   Q.  Does it indicate that R.K. had access to other members

04:42PM   7   and associates of the Serio DTO?

04:42PM   8   A.  Yes, it does.

04:42PM   9   Q.  Is that reflected on Government Exhibit 8A-6?

04:42PM   10   A.  Yes, it is.

04:42PM   11   Q.  Okay.  Is that the entry for May 2nd, 2013?

04:42PM   12   A.  Yes, it is.

04:42PM   13   Q.  Okay.  Can you cross that one off?

04:42PM   14   A.  Yep.

04:42PM   15           **MR. MacKAY:**  Judge, can we approach on this, please?

04:42PM   16           **THE COURT:**  Sure.

04:43PM   17           (Sidebar discussion on the record.)

04:43PM   18           **MR. MacKAY:**  I have to object again, particularly if

04:43PM   19   we're going to continue to go to through the rest of the file

04:43PM   20   as cumulative.  Essentially making a closing argument here of

04:43PM   21   rehashing of everything that was said in the beginning.

04:43PM   22           **THE COURT:**  No, he's summarizing it, and he's

04:43PM   23   summarizing it in what would be an effective way, but I'm not

04:43PM   24   going to stop him from doing that.  That's just good

04:43PM   25   lawyering, I'm not gonna stop good lawyering.  But I think

04:43PM   1   it's a summary of stuff that's already in evidence.

04:43PM   2          **MR. MacKAY:**  Understood.

04:43PM   3          (Sidebar discussion ended.)

04:43PM   4          **MR. COOPER:**  Ms. Champoux, can you pull down 8I on

04:43PM   5   the right, and pull up Government Exhibit 8H.

04:43PM   6          **BY MR. COOPER:**

04:43PM   7   Q.  Special Agent Burns, after that May 2nd, 2013, entry, the

04:43PM   8   initial debriefing of R.K., what's the next entry on

04:44PM   9   Government Exhibit 8A-6?

04:44PM  10   A.  The June 18th, 2013 surveillance of 82 Sycamore.

04:44PM  11   Q.  Okay.  And we're looking at 8H on the right side of the

04:44PM  12   screen; do you see that?

04:44PM  13   A.  That's correct.

04:44PM  14   Q.  Okay.  And who drafted that report?

04:44PM  15   A.  Special Agent Bongiovanni drafted it.

04:44PM  16   Q.  Okay.  And who's listed as another officer?

04:44PM  17   A.  Special Agent David Leary.

04:44PM  18   Q.  Were you present for the testimony of Special Agent Leary

04:44PM  19   regarding his surveillance efforts on June 3rd, 2013 at 82

04:44PM  20   Sycamore Street?

04:44PM  21   A.  Yes, I was.

04:44PM  22   Q.  Was he the person who was conducting the surveillance

04:44PM  23   that's reported in the report of investigation?

04:44PM  24   A.  Yes.

04:44PM  25   Q.  Does the report of investigation indicate that the

USA v Bongiovanni - Burns - Cooper/Direct - 3/21/24

48

04:44PM   1    defendant participated in the surveillance?

04:44PM   2    A.  It does not.

04:44PM   3    Q.  Do you have any professional experience conducting

04:44PM   4    surveillance in criminal investigations?

04:44PM   5    A.  Quite a bit.

04:44PM   6    Q.  Quite a bit?

04:44PM   7    A.  Right.  It's a little dated, but I used to do it a lot

04:44PM   8    more in my -- when I worked narcotics predominantly.

04:45PM   9    Q.  Is surveillance generally a solo activity, or is that

04:45PM   10   something agents generally do in groups?

04:45PM   11   A.  Well, I mean, if I'm going by an address just to grab

04:45PM   12   tags, like, collect license plates, see if somebody's home,

04:45PM   13   things like that, I mean, I'll do -- I would do activities

04:45PM   14   like that by myself.

04:45PM   15       But it I was doing a true surveillance where we want to

04:45PM   16   sit on it, follow vehicles, maybe pick somebody off, then

04:45PM   17   that would be done with a number of agents --

04:45PM   18   Q.  Based on your training --

04:45PM   19   A.  -- or officers, as well.  I'm sorry, acts and officers.

04:45PM   20   Q.  That's okay.  Based on your training and experience, is

04:45PM   21   surveillance more effective on a narcotics target when it's

04:45PM   22   involving a group of agents and officers?

04:45PM   23   A.  Absolutely.

04:45PM   24   Q.  Are you aware of the risk associated with doing

04:45PM   25   surveillance, sometimes referred to as getting made?

USA v Bongiovanni - Burns - Cooper/Direct - 3/21/24

04:45PM 1   A.  Yeah, there's always a risk in surveillance of getting

04:45PM 2   burned.

04:45PM 3   Q.  What does it mean to get burned or get made?

04:45PM 4   A.  That means the target just figured out that people are

04:46PM 5   surveilling or individuals are surveilling them.

04:46PM 6   Q.  Is that something you try to avoid as a law enforcement

04:46PM 7   officer?

04:46PM 8   A.  You try, yes.  You absolutely try.

04:46PM 9   Q.  Is it essentially always a risk when conducting

04:46PM 10  surveillance?

04:46PM 11  A.  Absolutely.

04:46PM 12  Q.  Can you mitigate the risk of getting burned, as you put

04:46PM 13  it, by using multiple agents to conduct a surveillance?

04:46PM 14  A.  Yes, that mitigates it quite a bit, the more vehicles you

04:46PM 15  have on the street.

04:46PM 16  Q.  Based on your training and experience, does using

04:46PM 17  multiple agents to get involved in a surveillance assist in

04:46PM 18  avoiding detection by the target?

04:46PM 19  A.  Absolutely.  There's different techniques you can use.

04:46PM 20  You put people on a paralegal, side streets.

04:46PM 21  Q.  Based your training and experience, does the risk of

04:46PM 22  getting made prevent law enforcement from utilizing

04:46PM 23  surveillance as a technique?

04:46PM 24  A.  No, I mean, sometimes you get made, and they're gonna be

04:46PM 25  more savvy to it and next time, and maybe you'll change your

04:46PM   1   tactics, but they usually keep -- they'll keep their criminal

04:46PM   2   activity ongoing.

04:46PM   3   Q.  Now you said you used to work a lot of narcotics

04:46PM   4   investigations when you were in Memphis, right?

04:46PM   5   A.  That's right.

04:46PM   6   Q.  Based on your experience conducting narcotics

04:47PM   7   investigations, is surveillance a big part of what you do?

04:47PM   8   A.  It's an extremely important part of narcotics

04:47PM   9   investigations.

04:47PM  10   Q.  If you were conducting a narcotics investigation, and one

04:47PM  11   of your teammates was out on a solo surveillance, and

04:47PM  12   identified the targets at a warehouse, would that be a

04:47PM  13   situation where you could move the investigation forward

04:47PM  14   rapidly?

04:47PM  15   A.  Yes.  That happens from time to time, and you get bodies

04:47PM  16   on the streets.

04:47PM  17   Q.  Have you worked on investigations before where

04:47PM  18   surveillance led to a break in the case?

04:47PM  19   A.  Yes, many times.

04:47PM  20   Q.  Is that pretty common?

04:47PM  21   A.  In narcotics investigations, absolutely.

04:47PM  22   Q.  Are you familiar with a technique in narcotics

04:47PM  23   investigations to set up surveillance on a potential or

04:47PM  24   suspected drug dealer's residence?

04:47PM  25   A.  Yes.

04:47PM   1   Q.  Is that something that's done?

04:47PM   2   A.  Yes, very common.

04:48PM   3   Q.  Okay.  And have you heard of the term picking off

04:48PM   4   customers before?

04:48PM   5   A.  Yeah.

04:48PM   6   Q.  What does it mean to pick off customers?

04:48PM   7   A.  It means to do a traffic stop.  You try to see somebody

04:48PM   8   leaving, you don't know if they purchased narcotics or not.

04:48PM   9   But what you do is create a traffic stop, oftentimes with a

04:48PM  10   marked unit, so it looks as if they were maybe conducting a

04:48PM  11   traffic infraction or something.  If do you it far enough

04:48PM  12   away, even if they're carrying narcotics, then likely they'll

04:48PM  13   believe it was just a regular traffic stop, so you really

04:48PM  14   haven't burned yourself.

04:48PM  15   Q.  Can you -- if you catch an individual leaving with

04:48PM  16   narcotics, could you charge that individual?

04:48PM  17   A.  Oh, absolutely.  Flip them.

04:48PM  18   Q.  What do you mean by flip them?

04:48PM  19   A.  I mean getting their cooperation, because now they have

04:48PM  20   drugs in their hands, and you've got leverage over them.

04:48PM  21   Q.  Can that help you work your way up towards the target?

04:48PM  22   A.  Yeah.  I mean, most narcotics investigations, that's the

04:48PM  23   goal of the investigation is to work your way up.

04:48PM  24   Q.  So Government Exhibit 8H, that's Dave Leary's

04:49PM  25   surveillance, right?

04:49PM   1   A.   Yes.

04:49PM   2   Q.   Can you cross off Dave Leary's surveillance on Government

04:49PM   3   Exhibit 8A-6?

04:49PM   4        Other than Government Exhibit 8H which you just crossed

04:49PM   5   off there, are there any DEA-6 reports contained in

04:49PM   6   C2-13-0026 documenting investigative activity?

04:49PM   7   A.   Any more investigative activity, or case status?

04:49PM   8   Q.   Any investigative activity that's being substantively

04:49PM   9   documented after that Dave Leary surveillance report.

04:49PM  10   A.   After that, there's strictly the case status updates.

04:49PM  11   Q.   Okay.  And based on your review of the file, is there a

04:49PM  12   difference between a case status update, and a substantive

04:49PM  13   report of investigation like Government Exhibit 8H?

04:49PM  14   A.   Yes.

04:49PM  15        **MR. COOPER:**  Ms. Champoux, on the right side of the

04:50PM  16   screen, can you take down 8H, and can you bring up 22I in

04:50PM  17   evidence?

04:50PM  18        **BY MR. COOPER:**

04:50PM  19   Q.   Do you recognize this?

04:50PM  20   A.   Yes, I do.

04:50PM  21        **MR. COOPER:**  Ms. Champoux, can we zoom in on this

04:50PM  22   middle email here?

04:50PM  23        **BY MR. COOPER:**

04:50PM  24   Q.   Do you see the defendant's email to Scott Deming?

04:50PM  25   A.   Yes, I do.

04:50PM    1    Q.  Can you read it for the jury?

04:50PM    2    A.  Thank you, Scott.  We are making strides on the street,

04:50PM    3    so we will report soon.

04:50PM    4    Q.  What's the date the defendant sent that email?

04:50PM    5    A.  May 23rd, 2013.

04:50PM    6    Q.  Okay.  Is that about three weeks after the initial

04:50PM    7    debriefing of R.K.?

04:50PM    8    A.  Yes.

04:50PM    9    Q.  That was in late April, right?

04:50PM   10    A.  That's correct.

04:50PM   11    Q.  Okay.  And is it before Dave Leary's surveillance?

04:50PM   12    A.  Yes, it is.

04:50PM   13    Q.  Okay.  After the initial debriefing of R.K. and before

04:50PM   14    Dave Leary's surveillance, were there any documented DEA-6

04:50PM   15    reports of substantive investigative activity?

04:50PM   16    A.  There was not.

04:50PM   17            MR. COOPER:  Ms. Champoux, can you zoom out of that,

04:51PM   18    and take down 22I.  Now, Special Agent Burns -- can we bring

04:51PM   19    up 8A-6 on the left again?  Thank you.

04:51PM   20            BY MR. COOPER:

04:51PM   21    Q.  Special Agent Burns, are you aware of some documentation

04:51PM   22    in the file for C2-13-0026 regarding attempts to obtain funds

04:51PM   23    for a buy?

04:51PM   24    A.  Yes, I saw I think two separate documents that appear to

04:51PM   25    be requesting funding for undercover purchases.

04:51PM    1    Q.   Okay.   Is there any documentation in the file that a buy

04:51PM    2    was ever actually attempted?

04:51PM    3    A.   There was no DEA-6 or document indicating that any buys

04:51PM    4    were attempted.

04:51PM    5    Q.   Is there any documentation or DEA-6 indicating that the

04:51PM    6    defendant used R.K. to make a controlled call into Ron Serio?

04:51PM    7    A.   There was no DEA-6 or any items I saw in there that

04:51PM    8    indicated that there was an attempt.

04:51PM    9    Q.   Okay.   Is there any DEA-6 indicating that the defendant

04:52PM   10    used R.K., the C.S. in this case, to attempt to make a

04:52PM   11    controlled phone call into Frank Burkhardt?

04:52PM   12    A.   There was not.

04:52PM   13    Q.   How about T.S.?

04:52PM   14    A.   There is not.

04:52PM   15    Q.   Any reports in the file documenting the location and

04:52PM   16    identification of marijuana grow locations?

04:52PM   17    A.   No.

04:52PM   18    Q.   Are there any reports between April 30th, 2013, and

04:52PM   19    May 23rd, 2013, documenting specific acts of investigation

04:52PM   20    that actually took place or happened?

04:52PM   21    A.   No, there's not.

04:52PM   22         **MR. COOPER:**   Ms. Champoux, on the right side of the

04:52PM   23    screen, can you pull up what's in evidence as Government

04:52PM   24    Exhibit 8G.   Okay.

          25

04:52PM    1          **BY MR. COOPER:**

04:52PM    2    Q.   What's the date that this report was prepared?

04:52PM    3    A.   September 11th, 2013.

04:52PM    4    Q.   And in box 10 what's the report subject?

04:52PM    5    A.   Box 10.  Case status.

04:53PM    6    Q.   Okay.  And is that case status reflected on the left on

04:53PM    7    that checklist we've got going?

04:53PM    8    A.   Yes, it is.

04:53PM    9          **MR. COOPER:**  Ms. Champoux, on the right, can you zoom

04:53PM   10    in on paragraph 2?  All right.

04:53PM   11          **BY MR. COOPER:**

04:53PM   12    Q.   We're not going to read the whole thing, but do you see

04:53PM   13    reference to several surveillances?

04:53PM   14    A.   Yes, I do.

04:53PM   15    Q.   How many DEA-6 reports documenting surveillance exist in

04:53PM   16    the file for C2-13-0026?

04:53PM   17    A.   Just the one from June 18th.

04:53PM   18    Q.   Who did that surveillance?

04:53PM   19    A.   That was Special Agent David Leary.

04:53PM   20    Q.   Okay.  Now did you see some pictures in the electronic

04:53PM   21    file?

04:53PM   22    A.   I saw, I believe, three.

04:53PM   23    Q.   Okay.  And was there a picture that appeared to be a

04:53PM   24    white BMW?

04:53PM   25    A.   Yes, it was.

04:53PM   1   Q.  Did you believe that to be associated with Tom Serio?

04:53PM   2   A.  It appeared to be, it indicated it was on Lebrun.

04:53PM   3   Q.  Okay.  Any DEA-6 report documenting that activity?

04:53PM   4   A.  There was not.

04:53PM   5   Q.  Do you see in paragraph 2 the reference to agents

04:54PM   6   utilizing air surveillance with the ECSO chopper?

04:54PM   7   A.  Yes, I do.

04:54PM   8   Q.  Is there a DEA-6 report of investigation in the file

04:54PM   9   documenting any air surveillance at all used in the

04:54PM   10  investigation of this case?

04:54PM   11  A.  There is not.

04:54PM   12  Q.  Were you present for the testimony of Kevin Caffery, the

04:54PM   13  air pilot for the Erie County Sheriff's Office?

04:54PM   14  A.  Yes, I was.

04:54PM   15  Q.  Did he testify that he'd ever met the defendant?

04:54PM   16  A.  He never met the defendant.

04:54PM   17  Q.  Did he say he conducted surveillance on the defendant's

04:54PM   18  behalf?

04:54PM   19  A.  He said he did not conduct surveillance on the

04:54PM   20  defendant's behalf.

04:54PM   21       **MR. COOPER:**  Okay.  You can zoom out of there,

04:54PM   22  Ms. Champoux.  Can we cross off that September 11, 2013 case

04:54PM   23  status report?  Thank you.

04:54PM   24       Can you take down 8G and now bring up 8F.

         25

04:54PM    1          **BY MR. COOPER:**

04:54PM    2    Q.  What's the date that this report was prepared?

04:54PM    3    A.  December 31st, 2013.

04:54PM    4    Q.  And in box 10, what's this report about?

04:54PM    5    A.  Another case status.

04:55PM    6    Q.  Okay.  So to be clear, this isn't a substantive

04:55PM    7    investigative DEA-6; is that fair?

04:55PM    8    A.  That's fair.

04:55PM    9    Q.  It's a status update?

04:55PM   10    A.  Correct.

04:55PM   11    Q.  Okay.  Is this the very next DEA-6 chronologically

04:55PM   12    contained in the file after the September 11th 6 that we just

04:55PM   13    looked at?

04:55PM   14    A.  Yes, it is.

04:55PM   15    Q.  Is this December 31st, 2013 case status report the first

04:55PM   16    time that we see the mention of Remus Nowak mentioned in a

04:55PM   17    case state report, or a 6?

04:55PM   18    A.  Yes, it is the first time.

04:55PM   19    Q.  Is there any explanation in the case status report as to

04:55PM   20    how Nowak was identified as a supposed member of the Serio

04:55PM   21    DTO?

04:55PM   22    A.  There was nothing in the file related to Remus Nowak or

04:55PM   23    how they got there.

04:55PM   24    Q.  Does the report explain it?

04:55PM   25    A.  It does not.

04:55PM    1    Q.  Is there any other report in the file that explained how

04:55PM    2    Nowak was identified as a member of the Serio DTO?

04:56PM    3    A.  I reviewed the work -- the file from the basement, I

04:56PM    4    reviewed the other file, and I found no -- any kind of

04:56PM    5    information that -- how Remus Nowak came to be.

04:56PM    6    Q.  Special Agent Burns, up until this point, we're up to

04:56PM    7    December 31st, 2013.  In the reports that you reviewed so

04:56PM    8    far, is the major drug organization that's being investigated

04:56PM    9    still called the Serio DTO?

04:56PM   10    A.  Yes, the Ron Serio DTO.

04:56PM   11    Q.  Can you see a sentence in that report in paragraph 2

04:56PM   12    regarding Duncan Motor Sales?

04:56PM   13    A.  Yes, concerning Remus Nowak.  Nowak is an owner of Duncan

04:56PM   14    Motor Sales, Motor Car Sales located at 2030 Delaware Avenue,

04:56PM   15    Buffalo, New York.

04:56PM   16    Q.  Can you read the next sentence?

04:56PM   17    A.  Agents have initiated in-depth financial analysis of

04:56PM   18    money lawn -- or, of financial records of Duncan Motor Car

04:57PM   19    Sales in efforts to exposed money laundering and structuring

04:57PM   20    practices.

04:57PM   21    Q.  Okay.  Was there anything in the file, electronically, in

04:57PM   22    the paper file, or in the working file, that indicated that

04:57PM   23    agents had initiated indepth financial analysis into Duncan

04:57PM   24    Motor Sales?

04:57PM   25    A.  None at all.

04:57PM    1    Q.  Can you cross off that December 31st, 2013, case status?

04:57PM    2         MR. COOPER:  And on the right, Ms. Champoux, can we

04:57PM    3    pull up Exhibit 8E.

04:57PM    4         BY MR. COOPER:

04:57PM    5    Q.  Special Agent Burns, after that December 31st report we

04:57PM    6    just looked at, is the next report in the file

04:57PM    7    chronologically April 7th of 2014?

04:57PM    8    A.  Yes, it is.

04:57PM    9    Q.  Is this a substantive investigative DEA-6?

04:57PM   10    A.  That's, again, a case status, not a substantive

04:57PM   11    investigative DEA-6.

04:57PM   12    Q.  Okay.  Were there any DEA-6s that are in the file but not

04:57PM   13    listed on the checklist here that you found when you looked?

04:57PM   14    A.  Not that I saw.

04:57PM   15    Q.  Okay.  So is it fair to say it's been about four months

04:58PM   16    since the last case status?

04:58PM   17    A.  That's fair.

04:58PM   18    Q.  Or three months and change?

04:58PM   19    A.  Yeah, three and a half.

04:58PM   20    Q.  It's the math again.

04:58PM   21         MR. COOPER:  In paragraph 2, Ms. Champoux, can you

04:58PM   22    zoom in on paragraph 2?

04:58PM   23         THE WITNESS:  Thank you.

04:58PM   24         BY MR. COOPER:

04:58PM   25    Q.  Can read that?

04:58PM  1   A.   Yes.  Agents are in the processed of securing a FLIR

04:58PM  2   warrant for the aerial surveillance of 42 Norwalk Avenue,

04:58PM  3   Buffalo, New York.  A possible grow operation is believed to

04:58PM  4   be in operation at the address in reference to Remus Nowak.

04:58PM  5   Q.   Any mention of Serio at all there?

04:58PM  6   A.   No mention of Serio.

04:58PM  7        MR. COOPER:  Okay.  And can you zoom out of that,

04:58PM  8   Ms. Champoux.

04:58PM  9        BY MR. COOPER:

04:58PM 10   Q.   Is paragraph 3 essentially repeating information from the

04:58PM 11   December 31st case status report?

04:58PM 12   A.   Yes.  It's not verbatim, but it's sum and substance the

04:58PM 13   same.

04:58PM 14   Q.   Okay.  So is it fair to say the only new information

04:58PM 15   there is information about Remus Nowak?

04:59PM 16   A.   Correct.  And the FLIR warrant we just mentioned.

04:59PM 17   Q.   Are there any reports or any information contained in the

04:59PM 18   file that explains the source of the statement that Remus

04:59PM 19   Nowak is a major money laundering source for the Serio DTO?

04:59PM 20   A.   No, none at all.

04:59PM 21        THE COURT:  Mr. Cooper, it's 5:00.  We're obviously

04:59PM 22   not going to finish today.  How much more do you have?

04:59PM 23        MR. COOPER:  Honestly, like 10-ish minutes, maybe

04:59PM 24   less.

04:59PM 25        THE COURT:  Okay.  So let's finish the direct.

04:59PM    1            MR. COOPER:   Okay.  Thank you, Judge.

04:59PM    2               BY MR. COOPER:

04:59PM    3    Q.  Special Agent Burns, if you look at paragraph 2, are we

04:59PM    4    still calling it the Serio DTO here?  I'm sorry, paragraph 3,

04:59PM    5    I apologize.  Are we still calling it the Serio DTO?

04:59PM    6    A.  It says agents have identified Remus Nowak, a/k/a Remus.

05:00PM    7    And Nowak is believe to be a major marijuana distributor and

05:00PM    8    money laundering source for the Serio DTO.  So we're still

05:00PM    9    talking about the Serio DTO.

05:00PM   10            MR. COOPER:   Okay.  And can you zoom out that

05:00PM   11    Ms. Champoux?

05:00PM   12            Special Agent Burns, can we cross off the April 7,

05:00PM   13    2014 report?

05:00PM   14            And now, Ms. Champoux, on the right, if you can pull

05:00PM   15    up 8D as in David.

05:00PM   16               BY MR. COOPER:

05:00PM   17    Q.  Is this the very next chronological report in the file?

05:00PM   18    A.  Yes, it is.

05:00PM   19    Q.  Is this one a substantive 6?

05:00PM   20    A.  No.  Again, it's a case status, not a substantive

05:00PM   21    investigative 6.

05:00PM   22    Q.  Okay.  And are there any DEA-6 reports that you found in

05:00PM   23    the file kind of in between April and July of 2014?

05:00PM   24    A.  None.

05:00PM   25    Q.  Nothing that we just forgot to put on the checklist?

Case 1:19-cr-00227-LJV-MJR   Document 986   Filed 05/31/24   Page 62 of 68
USA v Bongiovanni - Burns - Cooper/Direct - 3/21/24

62

05:00PM   1    A.   No, none that I observed.

05:00PM   2    Q.   Okay.

05:00PM   3    A.   In my review.

05:00PM   4         **MR. COOPER:**   Can we zoom in on paragraph 2,

05:00PM   5    Ms. Champoux.  Can you move that to the top, or the bottom?

05:00PM   6    Whatever.  There you go.

05:00PM   7         **BY MR. COOPER:**

05:00PM   8    Q.   Can you read that for the jury?

05:01PM   9    A.   Agents continue to work with Amherst PD in an effort to

05:01PM   10   infiltrate the Remus Nowak DTO.

05:01PM   11   Q.   We renamed the DTO?

05:01PM   12   A.   It states the Remus Nowak DTO.  That's the first time

05:01PM   13   I've seen it in the file.

05:01PM   14   Q.   It's not the Serio DTO anymore?

05:01PM   15   A.   There's not a -- there's a reference to Remus Nowak DTO.

05:01PM   16        **MR. COOPER:**   Okay.  Can you zoom out of that,

05:01PM   17   Ms. Champoux, and zoom in on paragraph 3.

05:01PM   18        **BY MR. COOPER:**

05:01PM   19   Q.   Is paragraph 3 essentially repeating information from the

05:01PM   20   prior three case status reports?

05:01PM   21   A.   Yes, very similar.

05:01PM   22   Q.   Okay.  There, it's still the Serio DTO, right?

05:01PM   23   A.   Yes, Nowak's part of it.

05:01PM   24        **MR. COOPER:**   Can you zoom out of that, please?  Just

05:01PM   25   leave it up for a second.  Thank you.

05:01PM     1          BY MR. COOPER:

05:01PM     2     Q.  In paragraph 2, do you see the defendant report that he's

05:01PM     3     working now with the Amherst Police Department in an effort

05:01PM     4     to infiltrate the Nowak DTO?

05:01PM     5     A.  Yes, I see that.

05:01PM     6     Q.  Were you present for the testimony of JoAnn DiNoto?

05:02PM     7     A.  Yes, I was.

05:02PM     8     Q.  Did she offer to help the defendant investigate the Serio

05:02PM     9     DTO?

05:02PM    10     A.  The Serio DTO, yes.

05:02PM    11     Q.  Was there any indication that that offer was taken up on?

05:02PM    12     A.  No, there was no indication.

05:02PM    13     Q.  Okay.  Can you cross off that July 7, 2014 status report?

05:02PM    14          MR. COOPER:  And now, Ms. Champoux, on the right, if

05:02PM    15     you can you pull up Exhibit 8C.

05:02PM    16          BY MR. COOPER:

05:02PM    17     Q.  Is this the very next report in the file after July 7th?

05:02PM    18     A.  Yes, it is.

05:02PM    19     Q.  Is this one a substantive 6 of investigation?

05:02PM    20     A.  No, it's a case status again.

05:02PM    21     Q.  Okay.  And how is the status going at this point?

05:02PM    22     A.  Well, the investigation is pending closure.  The

05:02PM    23     confidential informant associated with the case file is no

05:02PM    24     longer viable, and cannot provide credible information in

05:02PM    25     furtherance of this investigation.  The agent will not -- it

05:02PM    1    says not prepare this case for closure, but I think that's a

05:02PM    2    typo, will now prepare this case for closure.

05:02PM    3        And then line 3 is the investigation is pending closure.

05:02PM    4    Q.  And what's the date this report was prepared?

05:03PM    5    A.  November 4, 2014.

05:03PM    6    Q.  Are you familiar with when the defendant actually closed

05:03PM    7    out R.K. as a source?

05:03PM    8    A.  It was quite a while previously.

05:03PM    9    Q.  Does September 9, 2013 sound correct?

05:03PM   10    A.  Yes, that sounds accurate.

05:03PM   11    Q.  So we're about 14 months past that?

05:03PM   12    A.  Correct.

05:03PM   13    Q.  Were you present for the testimony of Ron Serio when he

05:03PM   14    said that he would have sold any amount of marijuana to R.K.

05:03PM   15    in the presence of Frank Burkhardt?

05:03PM   16    A.  Yes, I was.

05:03PM   17    Q.  Can you cross off that November 4, 2014 case status

05:03PM   18    report.

05:03PM   19            MR. COOPER:  And, Ms. Champoux, on the right can you

05:03PM   20    pull up 8B as in boy.

05:03PM   21            BY MR. COOPER:

05:03PM   22    Q.  What's the date this report's prepared?

05:03PM   23    A.  January 28th, 2015.

05:04PM   24    Q.  Can you read paragraph 3?

05:04PM   25    A.  This case is now closed.

05:04PM    1    Q.   Who's indexed?

05:04PM    2    A.   Wayne Anderson and Damien Abbate.

05:04PM    3    Q.   Any mention of Ron Serio at all in that report?

05:04PM    4    A.   There is no mention of Ron Serio.

05:04PM    5    Q.   Okay.  And that's from January 28th of 2015?

05:04PM    6    A.   That is correct.

05:04PM    7    Q.   Can you cross off that January 28, 2015?  Okay.

05:04PM    8         Does that cover all the DEA-6s that were contained in

05:04PM    9    C2-13-0026?

05:04PM   10    A.   That I observed in there, in my review.

05:04PM   11    Q.   Okay.  Other than the initial debriefing of R.K., and the

05:04PM   12    surveillance at 82 Sycamore, are there any 6s documenting

05:04PM   13    substantive investigative activity?

05:04PM   14    A.   There was not.

05:04PM   15         **MR. COOPER:**  Ms. Champoux, can you pull those two

05:04PM   16    down for us.  Thank you.  And then on the left, can you bring

05:05PM   17    up 8B as in boy.  And on the right, can you pull up 22Q.

05:05PM   18         **BY MR. COOPER:**

05:05PM   19    Q.   How many months after the defendant closed his file in

05:05PM   20    C2-13-0026 did he send an email to Scott Deming telling him

05:05PM   21    that they were still working the case?  How many months

05:05PM   22    later?

05:05PM   23    A.   Six months -- or, seven months, I'm sorry.  No, six is

05:05PM   24    right.

05:05PM   25    Q.   Take your time.

05:05PM    1    A.  It's late.

05:05PM    2    Q.  Okay.  Special Agent Burns, during the course of your

05:05PM    3    career, have you received correspondence from other law

05:05PM    4    enforcement agencies asking you about a target that you've

05:05PM    5    closed an investigation on?

05:05PM    6    A.  Occasionally it's happened.

05:05PM    7    Q.  Okay.  And what's your response been in those situations?

05:05PM    8    A.  I was enthusiastically supported whoever wanted to look

05:05PM    9    at one of my old targets.  It's usually I closed the

05:06PM   10    investigation because I wasn't able to develop enough

05:06PM   11    information, so I would -- my practice is to extend whatever

05:06PM   12    help I can, pull up old reports, provide any background, and

05:06PM   13    in some cases maybe rejoin their investigation if it makes

05:06PM   14    sense.

05:06PM   15    Q.  Has it been your experience that that's common in the law

05:06PM   16    enforcement community?

05:06PM   17    A.  Very common.

05:06PM   18        MR. COOPER:  Judge, may I just have one moment.

05:06PM   19        THE COURT:  Sure.

05:06PM   20        BY MR. COOPER:

05:06PM   21    Q.  Special Agent Burns, have you heard the name Peter

05:06PM   22    Militello come up during the course of the trial?

05:06PM   23    A.  I have.

05:06PM   24    Q.  Is there any reference in the file materials that you

05:06PM   25    reviewed that Peter Militello was a source in the

Case 1:19-cr-00227-LJV-MJR   Document 986   Filed 05/31/24   Page 67 of 68
USA v Bongiovanni - Burns - Cooper/Direct - 3/21/24

67

05:07PM  1   investigation into Ron Serio?

05:07PM  2   A.  I saw no reference in the files to that.

05:07PM  3          **MR. COOPER:**  Okay.  I have no further direct, Judge.

05:07PM  4          **THE COURT:**  Okay.

         5          (Excerpt concluded at 5:07 p.m.)

         6            *      *      *      *      *      *      *

         7

         8

         9

        10                    <u>**CERTIFICATE OF REPORTER**</u>

        11

        12             In accordance with 28, U.S.C., 753(b), I

        13   certify that these original notes are a true and correct

        14   record of proceedings in the United States District Court for

        15   the Western District of New York on March 21, 2024.

        16

        17

        18                    s/ Ann M. Sawyer
                              _____
                              Ann M. Sawyer, FCRR, RPR, CRR
        19                    Official Court Reporter
                              U.S.D.C., W.D.N.Y.
        20

        21

        22

        23

        24

        25

**TRANSCRIPT INDEX**

**EXCERPT OF TESTIMONY OF BRIAN A. BURNS**

**MARCH 21, 2024**

**W I T N E S S**                                    **P A G E**

**B R I A N   A.   B U R N S**                        2

    DIRECT EXAMINATION BY MR. COOPER:                2


**E X H I B I T S**                                  **P A G E**

GOV Exhibit 310AT                                    22

GOV Exhibit 367                                      30