12:12PM

1
              **UNITED STATES DISTRICT COURT**
            **WESTERN DISTRICT OF NEW YORK**

2

3
_____
**UNITED STATES OF AMERICA,**
                     Case No. 1:19-cr-227

4
         Plaintiff,          (LJV)
v.

5
                   March 26, 2024
**JOSEPH BONGIOVANNI,**

6
          Defendant.

7
_____

8
  **TRANSCRIPT EXCERPT – EXAMINATION OF BRIAN A. BURNS (DAY 2)**
      **BEFORE THE HONORABLE LAWRENCE J. VILARDO**

9
        **UNITED STATES DISTRICT JUDGE**

10

11
**APPEARANCES:**       **TRINI E. ROSS, UNITED STATES ATTORNEY**
                **BY: JOSEPH M. TRIPI, ESQ.**
                   **NICHOLAS T. COOPER, ESQ.**

12
                   **CASEY L. CHALBECK, ESQ.**
                Assistant United States Attorneys

13
                Federal Centre

14
                138 Delaware Avenue
                Buffalo, New York 14202
                  And

15
                **UNITED STATES DEPARTMENT OF JUSTICE**
                **BY: JORDAN ALAN DICKSON, ESQ.**

16
                1301 New York Ave NW
                Suite 1000

17
                Washington, DC 20530-0016
                For the Plaintiff

18

19
                **SINGER LEGAL PLLC**
                **BY: ROBERT CHARLES SINGER, ESQ.**

20
                80 East Spring Street
                Williamsville, New York 14221
                  And

21
                **LAW OFFICES OF PARKER ROY MacKAY**
                **BY: PARKER ROY MacKAY, ESQ.**

22
                3110 Delaware Avenue
                Kenmore, New York  14217

23
                For the Defendant

24
**PRESENT:**        **BRIAN A. BURNS,** FBI Special Agent
                **MARILYN K. HALLIDAY,** HSI Special Agent

25
                **KAREN A. CHAMPOUX,** USA Paralegal

| | | |
|---|---|---|
| 1 | <u>LAW CLERK</u>: | **REBECCA FABIAN IZZO, ESQ.** |
| 2 | <u>COURT DEPUTY CLERK</u>: | **COLLEEN M. DEMMA** |
| 3 | <u>COURT REPORTER</u>: | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 4 | | Robert H. Jackson Federal Courthouse<br>2 Niagara Square |
| 5 | | Buffalo, New York  14202<br>Ann_Sawyer@nywd.uscourts.gov |
| 6 | | |
| 7 | | |
| 8 | | *   *   *   *   *   *   * |
| 9 | | |

10          (Excerpt commenced at 9:42 a.m.)

11          (Jury is present.)

09:42AM   12          **THE COURT:**  I remind the witness that he's still

09:42AM   13   under oath, and you may begin your cross.

09:42AM   14          And the record should reflect that all our jurors are

09:42AM   15   present.

09:42AM   16

09:42AM   17   **B R I A N   A.   B U R N S**, having been previously duly called

09:42AM   18   and sworn, continued to testify as follows:

09:42AM   19

09:42AM   20                  **CROSS-EXAMINATION BY MR. MacKAY:**

09:43AM   21   Q.  Good morning, Special Agent Burns.  How are you?

09:43AM   22   A.  Good, Mr. MacKay.  Good morning to you.

09:43AM   23   Q.  How was your long weekend?

09:43AM   24   A.  It was quiet this weekend.

09:43AM   25   Q.  All right.  So I want to take you back to your testimony

09:43AM   1   on Thursday.  You talked a little bit about an investigation

09:43AM   2   you did into public corruption in 2009 and 2010; do you

09:43AM   3   recall that?

09:43AM   4   A.  Yes.

09:43AM   5   Q.  That was an investigation into people associated with

09:43AM   6   Gables bar, correct?

09:43AM   7   A.  That's accurate.

09:43AM   8   Q.  And I think we've0 heard it already, but Gables bar is a

09:43AM   9   bar on Hertel Avenue?

09:43AM   10   A.  It was, it's closed now.

09:43AM   11   Q.  So, but just to orient the jury, is it fair to say Hertel

09:43AM   12   Avenue is a main thoroughfare in North Buffalo?

09:43AM   13   A.  Yes, a number of businesses.

09:43AM   14   Q.  East-west thoroughfare off of which run a bunch of side

09:43AM   15   streets that comprise the heart of North Buffalo?

09:43AM   16   A.  That's accurate.

09:43AM   17   Q.  Fair to say that Gables bar, when it was open, was

09:44AM   18   something of a neighborhood haunt for a lot of people?

09:44AM   19   A.  North Buffalo folks.

09:44AM   20   Q.  North Buffalo folks.  And I think you also said it was

09:44AM   21   believed to be frequented by a number of members believed to

09:44AM   22   be associated with IOC?

09:44AM   23   A.  Some, yes.

09:44AM   24   Q.  Okay.  Now, this investigation ultimately leads to raids

09:44AM   25   of two people's houses, correct?

09:44AM   1   A.  Yes, that's correct.

09:44AM   2   Q.  One is Steven Brucato, correct?

09:44AM   3   A.  That's accurate.

09:44AM   4   Q.  One is Anthony Anastasia, correct?

09:44AM   5   A.  Accurate.

09:44AM   6   Q.  One's on Avery, one's on Lovering, correct?

09:44AM   7   A.  That's right.

09:44AM   8   Q.  Okay.  And Brucato is believed to be the general manager

09:44AM   9   at Gables?

09:44AM   10  A.  I believe he was.  They were both employed there in some

09:44AM   11  capacity.  Brucato, I believe, was a manager, and Anastasia

09:44AM   12  was a bartender --

09:44AM   13  Q.  Okay.

09:44AM   14  A.  -- possibly.

09:44AM   15  Q.  But they both had some employment connection to Gables,

09:44AM   16  correct?

09:44AM   17  A.  That's correct.

09:44AM   18  Q.  And then in the process of raiding Brucato's house, the

09:44AM   19  FBI encounters Baby Joe Mesi, correct?

09:45AM   20  A.  That's accurate.

09:45AM   21  Q.  And he's found in proximity to some drugs, correct?

09:45AM   22  A.  Cocaine, yes.

09:45AM   23  Q.  And the FBI talks to him, and he immediately becomes an

09:45AM   24  informant, correct?

09:45AM   25  A.  That's accurate.

09:45AM   1   Q.   Now these -- these raids occur simultaneously, and they

09:45AM   2   occur in November of 2010, correct?

09:45AM   3   A.   Well, I think they previously in '09 had conducted raids

09:45AM   4   on Brucato, Anastasia.   And Brucato was cooperating

09:45AM   5   throughout the 2009 -- or, I'm sorry, in December of 2009,

09:45AM   6   approximately, there's an approach, Brucato cooperates into

09:45AM   7   '10, and it culminates -- his cooperation culminates with a

09:45AM   8   November 24th incident where we go into his residence.   And

09:45AM   9   then Mr. Mesi is there with the cocaine.   And he begins to

09:45AM   10   cooperate.

09:45AM   11   Q.   Yeah, and I think what I was getting to is that's the

09:45AM   12   same day I think Anastasia's house is raided as well, too?

09:45AM   13   A.   I believe it was earlier than that.

09:45AM   14   Q.   Okay.

09:46AM   15   A.   But Anastasia, there was an arrest warrant for him.   He

09:46AM   16   waived his appearance.   And then he ultimately ends up not

09:46AM   17   cooperating and continues to sell narcotics.

09:46AM   18   Q.   So I'm going to get that.

09:46AM   19   A.   Okay.

09:46AM   20   Q.   So what happens is that after these raids of these folks,

09:46AM   21   they're all given waivers so that they're released from the

09:46AM   22   scene, correct?

09:46AM   23   A.   That's correct.

09:46AM   24   Q.   So, you know, for the jury to understand, it means that

09:46AM   25   you go in and you handcuff these folks, correct?

09:46AM   1   A.  That's accurate.

09:46AM   2   Q.  You sit them down and basically tell them if you don't

09:46AM   3   want to be an informant, you can leave, but we're gonna

09:46AM   4   charge you, correct?

09:46AM   5   A.  That's correct.  Or if they're -- at that point they may

09:46AM   6   be transported to the marshals, if they -- if you have

09:46AM   7   pending charges already.

09:46AM   8   Q.  But if they agree to cooperate, they leave from the

09:46AM   9   scene --

09:46AM   10  A.  Some --

09:46AM   11  Q.  -- correct?

09:46AM   12  A.  -- sometimes, not all.  It's situation dependent.

09:46AM   13  Q.  But in this situation, all three did, correct?

09:46AM   14  A.  That's correct.

09:46AM   15  Q.  Okay.  And they're not formally charged at that point in

09:46AM   16  time, correct?

09:46AM   17  A.  I think they waive their appearance.  Mr. Mesi was not

09:46AM   18  charged.

09:46AM   19  Q.  Right.  So, ultimately, they're free go back into the

09:47AM   20  community, correct?

09:47AM   21  A.  That's correct.

09:47AM   22  Q.  Now, fast forward to November of 2011.  DEA separately

09:47AM   23  arrests Anthony Anastasia, correct?

09:47AM   24  A.  I don't know the exact -- I know that they arrested him,

09:47AM   25  I can't be certain on the date, but that -- that sounds

09:47AM   1   correct.

09:47AM   2   Q.  You recall sitting here for Special Agent Nastoff's

09:47AM   3   testimony?

09:47AM   4   A.  Yes.

09:47AM   5   Q.  And that's what he was referring to --

09:47AM   6   A.  Okay.  If that --

09:47AM   7   Q.  -- that date?

09:47AM   8   A.  -- was the date he used, then I would -- he would be more

09:47AM   9   knowledgeable.

09:47AM  10   Q.  Fair to say what he was referring to was the DEA arrest

09:47AM  11   of --

09:47AM  12   A.  That's correct.

09:47AM  13   Q.  -- Anthony Anastasia?

09:47AM  14   A.  That's correct.

09:47AM  15   Q.  And that comes sometime after the initial encounter with

09:47AM  16   Mesi that we talked about just now, correct?

09:47AM  17   A.  That is correct.

09:47AM  18   Q.  Now basically, as you recall, Nastoff is investigating an

09:47AM  19   individual named Richard Himbury, correct?

09:47AM  20   A.  I believe he was the source of it, yes.

09:47AM  21   Q.  And that they --

09:47AM  22   A.  I'm sorry, I don't want to misstate that.  I don't know

09:47AM  23   who his source was into it.  That name sounds accurate.

09:48AM  24   Q.  But ultimately, they flip that source fairly quickly and

09:48AM  25   arrest Anthony --

09:48AM   1   A.   That's what --

09:48AM   2   Q.   -- Anastasia, correct?

09:48AM   3   A.   -- I recall.

09:48AM   4   Q.   And for lack of a better term, that kind of mucks up the

09:48AM   5   FBI's investigation; fair to say?

09:48AM   6   A.   I don't know if it mucks up, but I think it ultimately

09:48AM   7   resulted in some coordination determining.

09:48AM   8   Q.   But when the DEA arrest occurs, there really hadn't been

09:48AM   9   any deconfliction done, correct?

09:48AM   10   A.   Not prior to that.

09:48AM   11   Q.   So DEA kind of swooped in and made an arrest on somebody

09:48AM   12   that FBI was already looking into, correct?

09:48AM   13   A.   Correct.

09:48AM   14   Q.   Okay.

09:48AM   15   A.   And the case agent had left, so that caused a little

09:48AM   16   continuity issue, too.

09:48AM   17   Q.   And then the way that's sorted out is by deconfliction

09:48AM   18   done through the United States Attorney's Office, correct?

09:48AM   19   A.   That's accurate.

09:48AM   20   Q.   I think is it Special Agent Dan Bradley who's kind of in

09:48AM   21   charge of that --

09:48AM   22   A.   Yeah.

09:48AM   23   Q.   -- investigation --

09:48AM   24   A.   He followed up --

09:48AM   25           **THE WITNESS:**  I'm sorry.

09:48AM    1              **THE COURT:**  One at a time.

09:48AM    2              **THE WITNESS:**  Oh, I'm sorry.

09:48AM    3              **THE COURT:**  You need to wait until he finishes.

09:48AM    4              **THE WITNESS:**  Yeah, no, my bad.  Sorry.

09:49AM    5              (Testimony was then read back by the court reporter.)

09:49AM    6              **BY MR. MacKAY:**

09:49AM    7    Q.  -- in charge of this investigation --

09:49AM    8    A.  Yes.

09:49AM    9    Q.  -- for the FBI?

09:49AM   10    A.  He's in charge of the Safe Streets Task Force portion,

09:49AM   11    and I'm operating basically as a source.

09:49AM   12    Q.  Okay.  So he attempts to do some deconfliction after this

09:49AM   13    DEA arrest with Joe Guerra and Tim Lynch at the U.S.

09:49AM   14    Attorney's Office, correct?

09:49AM   15    A.  That's my understanding.

09:49AM   16    Q.  And he talks to Shane Nastoff at the DEA, correct?

09:49AM   17    A.  That's accurate.

09:49AM   18    Q.  Because that's his contact on the Anastasia arrest,

09:49AM   19    correct?

09:49AM   20    A.  Yes.

09:49AM   21    Q.  And it's determined ultimately a little bit further down

09:49AM   22    the road in March of 2014 that charging Anthony Anastasia

09:49AM   23    from an investigation by the FBI would compromise FBI

09:49AM   24    informants, correct?

09:49AM   25    A.  Yes.  And the charges that DEA had, I believe, were

09:49AM    1   stronger.

09:49AM    2   Q.  That was my next question.  The determination was made

09:49AM    3   that the evidence the DEA had at the time was stronger to

09:50AM    4   pursue charges against Anastasia, correct?

09:50AM    5   A.  I would think that if it did get indicted, they would

09:50AM    6   have added the FBI charges if it had gotten that far.

09:50AM    7   Q.  So, but ultimately, it leads to Anastasia is charged,

09:50AM    8   indicted by charges coming out of the DEA investigation,

09:50AM    9   correct?

09:50AM   10   A.  Right.  And he's convicted, yes.

09:50AM   11   Q.  I'm sorry?

09:50AM   12   A.  He's convicted --

09:50AM   13   Q.  Yes.

09:50AM   14   A.  -- ultimately.

09:50AM   15   Q.  So his -- his charge, his indictment, his plea, his

09:50AM   16   conviction, that all stems from DEA activity, correct?

09:50AM   17   A.  I wasn't privy to some of those meetings, but it sounds

09:50AM   18   accurate.

09:50AM   19   Q.  Okay.  And Brucato's not charged ultimately, correct?

09:50AM   20   A.  Ultimately he's not charged.

09:50AM   21   Q.  Decision is made through the U.S. Attorney's Office and

09:50AM   22   all the coordination through the office is not to charge

09:50AM   23   Brucato, correct?

09:50AM   24   A.  Correct.

09:50AM   25   Q.  Same thing with Baby Joe Mesi, correct?

09:50AM  1   A.  Mesi was really a state misdemeanor possession.  Maybe it

09:50AM  2   could have been federal, he was not charged.

09:51AM  3   Q.  Correct.  Okay.  Now, when this deconfliction is done, as

09:51AM  4   you sit here today, you have no acknowledge that any of the

09:51AM  5   specific names of the FBI confidential informants were passed

09:51AM  6   between the agencies, correct?

09:51AM  7   A.  I wasn't present for those meetings, so you're accurate.

09:51AM  8   Q.  And generally speaking, though, agencies are very

09:51AM  9   protective of their C.I.s, correct?

09:51AM  10  A.  They can be, and depending on -- I don't -- I mean --

09:51AM  11  Q.  So my question to you, let me just put it back out there,

09:51AM  12  is that you have no knowledge that any of these names of

09:51AM  13  confidential informants like Baby Joe Mesi were passed from

09:51AM  14  FBI to DEA, correct?

09:51AM  15  A.  I'm not sure of those discussions.  I might have shared

09:51AM  16  it with Dave Turri, and he worked with Shane Nastoff.  I know

09:51AM  17  Dave Turri was familiar with Mesi's cooperation.

09:51AM  18  Q.  Okay.  But as you sit here today, you don't recall

09:51AM  19  anything specifically being passed?

09:51AM  20  A.  I don't recall specifically, no.

09:51AM  21  Q.  Okay.  Now, you're also aware that Mike Masecchia has

09:52AM  22  been associated with IOC in the North Buffalo area from 2004

09:52AM  23  and on, correct?

09:52AM  24  A.  Yes, probably even earlier.

09:52AM  25  Q.  Mid 2000s at least?

| | | |
|---|---|---|
| 09:52AM | 1 | A.  That's fair. |
| 09:52AM | 2 | Q.  Okay.  And he's known to be a North Buffalo guy, correct? |
| 09:52AM | 3 | A.  Definitely. |
| 09:52AM | 4 | Q.  Known to frequent Gables, correct? |
| 09:52AM | 5 | A.  Yes, that's correct. |
| 09:52AM | 6 | Q.  You kind of laugh, like, you know, that's -- do you want |
| 09:52AM | 7 | to expand on that?  How is it known that he frequents Gables? |
| 09:52AM | 8 | A.  I think based the source reporting that he was a regular |
| 09:52AM | 9 | over there, that and Kelly's Korner. |
| 09:52AM | 10 | Q.  Yeah.  So he's a guy that's frequently physically at |
| 09:52AM | 11 | Gables bar, correct? |
| 09:52AM | 12 | A.  That's my understanding from the reporting. |
| 09:52AM | 13 | Q.  Okay.  And as you sit here today, you can't say what Mike |
| 09:52AM | 14 | Masecchia knew about any investigation just from his presence |
| 09:52AM | 15 | of being at Gables, correct? |
| 09:52AM | 16 | A.  That's accurate. |
| 09:52AM | 17 | Q.  Okay.  And, you know, we're talking with people who were |
| 09:52AM | 18 | associated with Gables, correct? |
| 09:52AM | 19 | A.  That's correct. |
| 09:52AM | 20 | Q.  You don't know whether he was privy to any gossip in the |
| 09:52AM | 21 | North Buffalo area about this whole investigation, correct? |
| 09:53AM | 22 | A.  That is correct. |
| 09:53AM | 23 | Q.  You don't know whether Baby Joe Mesi disclosed his status |
| 09:53AM | 24 | as an informant to anyone, correct? |
| 09:53AM | 25 | A.  I'd be shocked if he did.  It was very -- we kept it very |

| | | |
|---|---|---|
| 09:53AM | 1 | tight up until this trial. |
| 09:53AM | 2 | Q.  Okay.  But in your experience, it's -- it does happen |
| 09:53AM | 3 | that informants have leaked their status -- |
| 09:53AM | 4 | A.  Occasionally. |
| 09:53AM | 5 | Q.  -- is that correct? |
| 09:53AM | 6 | A.  Occasionally.  It's not a good idea. |
| 09:53AM | 7 | Q.  Now, these search warrant executions that took place at |
| 09:53AM | 8 | Brucato's and Anastasia's homes, those are pretty extensive |
| 09:53AM | 9 | investigations that involve a lot of manpower, correct? |
| 09:53AM | 10 | A.  That's accurate.  It can, like, I guess what -- what do |
| 09:53AM | 11 | you consider a substantial amount of manpower? |
| 09:53AM | 12 | Q.  Like, there's a whole entry team.  There's, you know, |
| 09:53AM | 13 | more than five agents at a house, correct? |
| 09:53AM | 14 | A.  Yeah, there was mainly five.  We try to do that low key. |
| 09:53AM | 15 | Q.  Okay. |
| 09:53AM | 16 | A.  Because our goal was to keep it -- |
| 09:53AM | 17 | Q.  And has it -- |
| 09:53AM | 18 | A.  -- low key. |
| 09:53AM | 19 | Q.  -- been your experience that when search warrants are |
| 09:54AM | 20 | executed, particularly given some of the methods that are |
| 09:54AM | 21 | used, neighbors in the neighborhood tend to take notice when |
| 09:54AM | 22 | that happens? |
| 09:54AM | 23 | A.  Depends how do you them.  Try do them low key, but some |
| 09:54AM | 24 | are -- depends on the neighborhood, things like that. |
| 09:54AM | 25 | Q.  Again, it happens? |

USA v Bongiovanni - Burns - MacKay/Cross - 3/26/24

14

09:54AM    1    A.  It happens, certainly.

09:54AM    2    Q.  You see people come out of their houses or watch from

09:54AM    3    their windows when these executions are going down, correct?

09:54AM    4    A.  Yes, it happens.

09:54AM    5    Q.  Okay.  And because, I mean, as you sit here today, you

09:54AM    6    don't know what the general neighborhood understanding of

09:54AM    7    Steven Brucato -- bad question.

09:54AM    8        Brucato was known as a manager of Gables, correct?  In

09:54AM    9    some capacity?

09:54AM   10    A.  Known by whom?

09:54AM   11    Q.  I mean, he had been a manager at Gables for quite some

09:54AM   12    time, correct?

09:54AM   13    A.  That's my understanding.

09:54AM   14    Q.  Okay.  So, when do you the search warrant execution, Baby

09:54AM   15    Joe Mesi leaves from the house, correct?

09:54AM   16    A.  Yeah, I think we -- this is going back, we left him

09:55AM   17    behind.  And then we all kind of discreetly exited, and then

09:55AM   18    eventually he left.  He didn't leave with us, if that's what

09:55AM   19    you're asking.

09:55AM   20    Q.  Yeah, I think I'm trying to form a time frame that after

09:55AM   21    the FBI goes in and executes the search warrant, Baby Joe

09:55AM   22    Mesi is allowed to walk out of the house on his own, correct?

09:55AM   23    A.  Yes, he absolutely is.

09:55AM   24    Q.  Okay.  And you learned in the course of your

09:55AM   25    investigation also that he would often go to Brucato's home

09:55AM   1   to prepare cocaine, correct?

09:55AM   2   A.   Yes.

09:55AM   3   Q.   Okay.  So, you know, being the recognizable person that

09:55AM   4   he was, you don't know that somebody who didn't see the

09:55AM   5   search warrant execution can see him leave freely after the

09:55AM   6   FBI was there, didn't start a rumor, correct?

09:55AM   7        **MR. COOPER:**  Objection.  Calls for speculation as to

09:55AM   8   what somebody else might have seen?

09:55AM   9        **THE COURT:**  Yeah, sustained.

09:55AM   10        **BY MR. MacKAY:**

09:55AM   11   Q.   All right.  You were here present through Lou Selva's

09:56AM   12   testimony, correct?

09:56AM   13   A.   That's correct.

09:56AM   14   Q.   Do you recall him testifying that he had Baby Joe Mesi's

09:56AM   15   phone number in his phone, correct?

09:56AM   16   A.   I believe he did.  I'd have to see the contacts, but I

09:56AM   17   believe he did.

09:56AM   18   Q.   Okay.

09:56AM   19   A.   I know a number of the people that I referenced in that

09:56AM   20   chart had it, and I just can't say specifically --

09:56AM   21   Q.   Okay.

09:56AM   22   A.   -- that Mr. Selva did.

09:56AM   23   Q.   So we'll talk about the phone contacts.  So what you went

09:56AM   24   through on Thursday, it's in evidence as Government

09:56AM   25   Exhibit 310AT is some contacts from Peter Gerace's phone,

USA v Bongiovanni - Burns - MacKay/Cross - 3/26/24

09:56AM   1   correct?

09:56AM   2   A.  That's correct.

09:56AM   3   Q.  Okay.  What 310AT is, is a report that's prepared from

09:56AM   4   the extraction of the phone, correct?

09:56AM   5   A.  That's accurate.

09:56AM   6   Q.  What's in 310AT is not all of the contacts from Peter

09:56AM   7   Gerace's phone, correct?

09:56AM   8   A.  No, just certain ones.

09:56AM   9   Q.  Right.  There's many, many more that what's just in that

09:56AM   10   list, correct?

09:56AM   11   A.  Absolutely.

09:56AM   12   Q.  Yeah, there's 56 records in this report.  That's not all

09:57AM   13   the contacts in his phone --

09:57AM   14   A.  That --

09:57AM   15   Q.  -- correct?

09:57AM   16   A.  -- is not.

09:57AM   17   Q.  And you've worked with these cell phone extraction

09:57AM   18   reports before, correct?

09:57AM   19   A.  Yes, I have.

09:57AM   20   Q.  And you understand that the way they're made is somebody

09:57AM   21   has to go in after the extraction and manually put this

09:57AM   22   record together, correct?

09:57AM   23   A.  Yeah, if you want a carve out a portion of the contacts,

09:57AM   24   that's how you do it.

09:57AM   25   Q.  That's exactly what I'm saying.  Is that somebody has to

09:57AM    1   go in and manually make the decision on what goes in the

09:57AM    2   report, correct?

09:57AM    3   A.   That's correct.

09:57AM    4   Q.   Okay.  So, there's somebody who decides which contacts go

09:57AM    5   in the report, and which contacts do not, correct?

09:57AM    6   A.   Correct.

09:57AM    7   Q.   Okay.  All right.

09:57AM    8        **MR. MacKAY:**  So, Ms. Champoux can we pull up

09:57AM    9   Government Exhibit 310AT in evidence.  Can we go to page 4,

09:57AM   10   please?

09:57AM   11        **BY MR. MacKAY:**

09:57AM   12   Q.   Can you see that, or is that too blurry?

09:57AM   13   A.   I think I -- yeah, I can city.

09:57AM   14        **MR. MacKAY:**  In fact, can we blow up record number 1,

09:58AM   15   please, Ms. Champoux?  Okay.

09:58AM   16        **BY MR. MacKAY:**

09:58AM   17   Q.   That's an individual contact named Mark Anthony.  Do you

09:58AM   18   recall him being a Buffalo police officer?

09:58AM   19   A.   Yes.

09:58AM   20   Q.   Okay.

09:58AM   21        **MR. MacKAY:**  Ms. Champoux, can we take that down.

09:58AM   22   Can we go to page 5, please?  Can we blow up record number 5,

09:58AM   23   please?

09:58AM   24        **BY MR. MacKAY:**

09:58AM   25   Q.   So that entry says Jill Berkeley, W Seneca Police.  Do

09:58AM      1    you see that?

09:58AM      2    A.  Yes, I do.

09:58AM      3    Q.  Looks like that's referring to a policewoman from the

09:58AM      4    West Seneca Police Department?

09:58AM      5    A.  Yeah, I don't know if there is a Ms. Berkeley with the

09:58AM      6    West Seneca police, I don't know.  I just --

09:58AM      7    Q.  You just know from the record that that's what it appears

09:58AM      8    to be?

09:58AM      9    A.  That's how it's stored on Mr. Gerace's phone.

09:58AM     10          MR. MacKAY:  Okay.  Let's take that down,

09:58AM     11    Ms. Champoux.  Can we go to page 7?  Can we blow up record 12?

09:58AM     12          BY MR. MacKAY:

09:58AM     13    Q.  So that's Dan Derenda, correct?

09:59AM     14    A.  That's correct.

09:59AM     15    Q.  You know him to be the former chief of police, City of

09:59AM     16    Buffalo, correct?

09:59AM     17    A.  Yes, I do.

09:59AM     18          MR. MacKAY:  Can we take that down, Ms. Champoux?

09:59AM     19          Go to page 11.  Can we blow up record 23, please?

09:59AM     20          BY MR. MacKAY:

09:59AM     21    Q.  Okay.  That's -- can you see it's stored in the phone as

09:59AM     22    Mario NFTA?

09:59AM     23    A.  Yes, I see that.

09:59AM     24    Q.  But the name appears to be Mario Capozzi?

09:59AM     25    A.  Yes.

09:59AM   1    Q.  And NFTA, that stands for Niagara Frontier Transportation

09:59AM   2    Authority, do you know what that acronym --

09:59AM   3    A.  I know that acronym can mean Niagara Falls Transportation

09:59AM   4    Authority.

09:59AM   5    Q.  So that's somebody associated with a governmental entity,

09:59AM   6    correct?

09:59AM   7    A.  Possibly.

09:59AM   8            MR. MacKAY:  Okay.  Can we take that down, please,

09:59AM   9    Ms. Champoux?  Can we go to page 13.  Can we blow up record

09:59AM  10    30, please?

09:59AM  11            BY MR. MacKAY:

09:59AM  12    Q.  This one's in the phone as Pete T., correct?

10:00AM  13    A.  That's correct.

10:00AM  14    Q.  If you look at the address a few lines below, it shows

10:00AM  15    Peter Todoro?

10:00AM  16    A.  That's correct.

10:00AM  17    Q.  Do you know why this was put in the report as you sit

10:00AM  18    here today?

10:00AM  19    A.  I wasn't the one who did the initial carve up.  I believe

10:00AM  20    Mr. Todoro is an attorney, I believe.

10:00AM  21    Q.  That's what I was gonna say.  Do you know him to be a

10:00AM  22    state court DWI practitioner?

10:00AM  23    A.  I know him to be an attorney.  I don't know what sort of

10:00AM  24    practice he does.  I know he does defense work.

10:00AM  25            MR. MacKAY:  Okay.  Can we take that down, please,

| | | |
|---|---|---|
| 10:00AM | 1 | Ms. Champoux?  Can we pull up page 17, please?  Can we blow up |
| 10:00AM | 2 | record 43, please? |
| 10:00AM | 3 | **BY MR. MacKAY:** |
| 10:00AM | 4 | Q.  Do you see this one says Dawn, Cheek PD; do you see that? |
| 10:00AM | 5 | A.  I do. |
| 10:00AM | 6 | Q.  Looks like it could be somebody associated with the |
| 10:00AM | 7 | Cheektowaga Police Department? |
| 10:00AM | 8 | A.  Possibly.  I don't know. |
| 10:00AM | 9 | Q.  And that is the -- Cheektowaga is the jurisdiction in |
| 10:00AM | 10 | which Pharaoh's falls, correct? |
| 10:01AM | 11 | A.  That's accurate. |
| 10:01AM | 12 | **MR. MacKAY:**  Let's take that down.  And last but not |
| 10:01AM | 13 | least, could we pull up record 45? |
| 10:01AM | 14 | **BY MR. MacKAY:** |
| 10:01AM | 15 | Q.  And that one is Greg Trotter; do you see that? |
| 10:01AM | 16 | A.  Yes. |
| 10:01AM | 17 | Q.  And he's an Amherst police detective, correct? |
| 10:01AM | 18 | A.  That's correct. |
| 10:01AM | 19 | Q.  Okay. |
| 10:01AM | 20 | **MR. MacKAY:**  So we can take that down, Ms. Champoux. |
| 10:01AM | 21 | **BY MR. MacKAY:** |
| 10:01AM | 22 | Q.  So just in the 56 records we've been through, there's, |
| 10:01AM | 23 | you would agree with me, a number of these records that are |
| 10:01AM | 24 | associated with law enforcement in some fashion, correct? |
| 10:01AM | 25 | A.  Some of them, yes. |

10:01AM   1    Q.  All right.  And that's, of course, we're not even delving

10:01AM   2    into the full list of contacts that's on Gerace's phone,

10:01AM   3    correct?

10:01AM   4    A.  That's correct.

10:01AM   5    Q.  Because this is only a subset of them, correct?

10:01AM   6    A.  That's accurate.

10:01AM   7    Q.  All right.  So next, I want to talk to you about your

10:01AM   8    participation in a search warrant execution at Pharaoh's.

10:01AM   9    You were part of that in December --

10:01AM  10    A.  Yep.

10:01AM  11    Q.  -- of 2019?

10:01AM  12    A.  Yes, I was.

10:01AM  13    Q.  And I think you told us on direct that you seized the DVR

10:02AM  14    from the location?

10:02AM  15    A.  DVRs were seized.  I didn't physically -- I was present

10:02AM  16    when they were seized, but it wasn't -- I was not the seizing

10:02AM  17    agent.

10:02AM  18    Q.  Okay.

10:02AM  19    A.  I remember them being recovered.

10:02AM  20    Q.  And so just the jury's clear, DVR, that's the hard drive

10:02AM  21    recording for a CCTV security footage camera system?

10:02AM  22    A.  Yeah, there were three DVRs, and they contained an

10:02AM  23    extensive number of cameras.

10:02AM  24    Q.  Did you observe the cameras actually working when you

10:02AM  25    were there?

10:02AM  1   A.  Well, they were shut off I think when we -- well, when

10:02AM  2   the team made entry.  I came shortly thereafter.  But they

10:02AM  3   were reviewed, and they did operate, as I mentioned on my

10:02AM  4   direct.  One of them was seven weeks -- or, one DVR had

10:02AM  5   storage for seven weeks.  And the other two were stored for

10:02AM  6   two weeks.

10:02AM  7   Q.  But my question is, you -- you learned that they were

10:02AM  8   operating cameras, correct?

10:02AM  9   A.  Yes.

10:02AM  10  Q.  And in your experience, you've done investigations where

10:03AM  11  you have to obtain security camera footage, correct?

10:03AM  12  A.  Yes.

10:03AM  13  Q.  And the norm with most of these cameras is they rewrite

10:03AM  14  over themselves after a specific period of time, correct?

10:03AM  15  A.  Yes.

10:03AM  16  Q.  So, you know, whether it's 30 days, two weeks, that's

10:03AM  17  something in the order of what you usually see when you do --

10:03AM  18  when you see security cameras?

10:03AM  19  A.  Yeah.  They have a limited time frame, and they loop over

10:03AM  20  just for storage reasons.

10:03AM  21  Q.  Okay.  All right.  So lastly, I want to talk about the

10:03AM  22  Wayne Anderson file.  That's the C2-13-0026 file, correct?

10:03AM  23  A.  That's correct.

10:03AM  24  Q.  We'll call it the Wayne Anderson file.  If we call it the

10:03AM  25  Ron Serio file, same thing, we can agree?

| | | |
|---|---|---|
| 10:03AM | 1 | A.  Essentially, yes. |
| 10:03AM | 2 | Q.  Yeah, okay.  So you testified on direct about your |
| 10:03AM | 3 | observations of that file, correct? |
| 10:03AM | 4 | A.  Yes, I did. |
| 10:03AM | 5 | Q.  You initially first encountered it when it was found in |
| 10:03AM | 6 | Mr. Bongiovanni's residence, correct? |
| 10:03AM | 7 | A.  I'm sorry?  Would you repeat that question? |
| 10:03AM | 8 | Q.  Initially -- you initially first encountered this file |
| 10:03AM | 9 | when it was found in Mr. Bongiovanni's basement, correct? |
| 10:04AM | 10 | A.  The -- the -- the work file that was in his basement |
| 10:04AM | 11 | versus the -- I'm sorry, versus the -- I guess I'm -- are you |
| 10:04AM | 12 | trying to make a distinction between the case file, the DEA |
| 10:04AM | 13 | case file from the office, or -- and the one in the basement? |
| 10:04AM | 14 | Q.  Yeah, let's clear that up. |
| 10:04AM | 15 | A.  Okay. |
| 10:04AM | 16 | Q.  So there's two different files.  Why don't you explain |
| 10:04AM | 17 | for the jury the difference -- |
| 10:04AM | 18 | A.  Okay. |
| 10:04AM | 19 | Q.  -- between which ones were which, and how you reviewed |
| 10:04AM | 20 | both? |
| 10:04AM | 21 | A.  Okay.  So from the DEA, we received the official case |
| 10:04AM | 22 | file from the their records.  And that included paper |
| 10:04AM | 23 | records, and then as they were transitioning, there's also a |
| 10:04AM | 24 | digital portion of that file.  So I reviewed the digital |
| 10:04AM | 25 | portion and the paper file of the official file maintained by |

10:04AM   1   DEA.  And I additionally reviewed all the pages of the file

10:04AM   2   that we've seen in the Redweld from the basement.

10:04AM   3   Q.  Okay.  We'll call it the Redweld.  That's the working

10:04AM   4   file, correct?

10:04AM   5   A.  That's what I believe everyone's been calling it.  The

10:04AM   6   file found in Mr. Bongiovanni's basement.

10:05AM   7   Q.  Now, just to be clear, I think you established this on

10:05AM   8   the direct, but you've never been employed by DEA, right?

10:05AM   9   A.  I have not.

10:05AM   10  Q.  You've never served in a TFO capacity at DEA, correct?

10:05AM   11  A.  No, I've worked quite a number of cases -- not a quite a

10:05AM   12  number -- a number of cases with the DEA both in Memphis and

10:05AM   13  in Buffalo.

10:05AM   14  Q.  You worked cases in conjunction, but you were never sent

10:05AM   15  over as a TFO the way we've heard with some of these folks

10:05AM   16  who testified in this trial, correct?

10:05AM   17  A.  Yes, I was never a signed TFO with DEA.

10:05AM   18  Q.  So long story short, you did not for example have a desk

10:05AM   19  at the Buffalo resident office of the DEA, correct?

10:05AM   20  A.  I did not.

10:05AM   21  Q.  Okay.  So when you reviewed the file, and when I talk

10:05AM   22  about the file going forward, I mean both the working file,

10:05AM   23  the case file you obtained, everything regarding C2-13-0026,

10:05AM   24  you reviewed the entire file, correct?

10:05AM   25  A.  That's correct.

USA v Bongiovanni - Burns - MacKay/Cross - 3/26/24

25

10:05AM  1   Q.  And when you did so, at that point in time you had

10:05AM  2   already become aware of allegations about -- that allegations

10:06AM  3   that had been made against Mr. Bongiovanni, correct?

10:06AM  4   A.  That's accurate.

10:06AM  5   Q.  Okay.  And you were viewing the file with an

10:06AM  6   understanding of those allegations, correct?

10:06AM  7   A.  Yes, I was reviewing the file having known those

10:06AM  8   allegations.

10:06AM  9   Q.  Right.  I mean, you knew what Joe Bongiovanni was accused

10:06AM  10  of doing by the time you actually went and looked in the

10:06AM  11  file, correct?

10:06AM  12  A.  That's correct.

10:06AM  13  Q.  And you looked through the file with an eye toward

10:06AM  14  whether what you saw in that file supported or disproved

10:06AM  15  those allegations that you understood, correct?

10:06AM  16  A.  Can you repeat that?

10:06AM  17  Q.  When you looked through the file, you looked through it

10:06AM  18  with an eye toward whether what you saw in the file either

10:06AM  19  supported or disapproved the allegations you knew about,

10:06AM  20  correct?

10:06AM  21  A.  I reviewed the file with the understanding of what he had

10:06AM  22  been accused of.  So, yeah, that's how I reviewed the file.

10:06AM  23  Q.  Okay.  So, in the file, you saw a lot of subpoenas,

10:06AM  24  correct?

10:06AM  25  A.  Quite a few.

10:07AM     1    Q.   Hundreds of pages worth, correct?

10:07AM     2    A.   Absolutely.

10:07AM     3    Q.   There were utility records run for a number of different

10:07AM     4    addresses, correct?

10:07AM     5    A.   That's correct.

10:07AM     6    Q.   There were toll logs run for a number of different phone

10:07AM     7    numbers, correct?

10:07AM     8    A.   That's correct.

10:07AM     9    Q.   There were hot lists made off of those toll logs for a

10:07AM    10    number of phone numbers, correct?

10:07AM    11    A.   That's correct.

10:07AM    12    Q.   There were surveillance photos of some sort, correct?

10:07AM    13    A.   There were three.  Two of a location on Hertel Avenue,

10:07AM    14    and one of -- appears to be a BMW in front of a residence.

10:07AM    15    Q.   Okay.

10:07AM    16    A.   Those were three photos that I can recall seeing.

10:07AM    17    Q.   And all those things we just talked about, hot lists,

10:07AM    18    toll logs, subpoenas, utility records, those were all

10:07AM    19    investigative steps in a narcotics investigation, correct?

10:07AM    20    A.   Yes, they are.

10:07AM    21    Q.   And you reviewed the file and saw that there were

10:08AM    22    operations plans to conduct controlled buys from an

10:08AM    23    individual named T.S., correct?

10:08AM    24    A.   I saw two operations plans that were not finally signed

10:08AM    25    off by the -- their -- I think they have a -- the final

10:08AM   1    signing authority which I believe is their RAC, or they have

10:08AM   2    different designations for their --

10:08AM   3    Q.  So you saw --

10:08AM   4    A.  -- managers than we do.

10:08AM   5    Q.  -- these operation plans that had sign offs from group

10:08AM   6    supervisors and the RACs, correct?

10:08AM   7    A.  I --

10:08AM   8    Q.  But they were missing the ASAC's?

10:08AM   9    A.  That's right.  If that's what -- I'd have to see them to

10:08AM   10   say that definitively, but they -- they were definitely not

10:08AM   11   finalized --

10:08AM   12   Q.  Right, so --

10:08AM   13   A.  -- is my point.

10:08AM   14   Q.  -- they went up to a certain point, but they were missing

10:08AM   15   sort of a file signature to complete approval of the

10:08AM   16   operation; fair to say?

10:08AM   17   A.  That's correct.

10:08AM   18   Q.  Okay.  And you didn't see signatures memorialized on the

10:08AM   19   plans indicating that funds were paid out, correct?

10:08AM   20   A.  Yes.  It did not appear that funds were received by

10:09AM   21   Mr. Bongiovanni for the buy.

10:09AM   22   Q.  Okay.  But from looking at the plans, you do see

10:09AM   23   documentation that plans were set up, they just weren't

10:09AM   24   ultimately approved at some level; fair to say?

10:09AM   25   A.  Yeah, they were not signed off on by the final step.

USA v Bongiovanni - Burns - MacKay/Cross - 3/26/24

28

10:09AM    1    Whether -- I wouldn't want to speculate on whether they

10:09AM    2    weren't approved or whether they weren't advanced, I don't

10:09AM    3    know how that want.  I just know that they, in the file, they

10:09AM    4    were not signed off with a final authority, so --

10:09AM    5    Q.  Well, they lacked some level of approval somewhere down

10:09AM    6    the line, correct?

10:09AM    7    A.  Yeah, the signoff.

10:09AM    8    Q.  All right.  You also saw, I think you told us, the

10:09AM    9    surveillance photo of a car believed to be driven by Tom

10:09AM   10    Serio, correct?

10:09AM   11    A.  That's correct.

10:09AM   12    Q.  That's the white BMW photo?

10:09AM   13    A.  That's correct.

10:09AM   14    Q.  There were NADDIS reports for various names, correct?

10:09AM   15    A.  Yes, there were some NADDIS reports.

10:09AM   16    Q.  And you saw names in the file of people we heard that are

10:10AM   17    connected here to Ron Serio, correct?

10:10AM   18    A.  Yes, I saw names connected --

10:10AM   19    Q.  You saw --

10:10AM   20    A.  -- to the Ron Serio DTO.

10:10AM   21    Q.  Yeah, you saw names like Mark Falzone, correct?

10:10AM   22    A.  Yes.

10:10AM   23    Q.  You saw Chris Baker?

10:10AM   24    A.  Yes.

10:10AM   25    Q.  Is that correct?

10:10AM  1   A.  Yes.

10:10AM  2   Q.  You saw Mike Moynihan, correct?

10:10AM  3   A.  Yes.

10:10AM  4   Q.  But, in your review of the file, you also didn't see

10:10AM  5   certain names that Mr. Serio associated with his DTO,

10:10AM  6   correct?  Let me give you an example.

10:10AM  7   A.  Yeah, give me an example.

10:10AM  8   Q.  You didn't see Jacob Martinez's name anywhere in the

10:10AM  9   file, correct?

10:10AM  10  A.  I saw a lot of names.  I don't know if I recall seeing

10:10AM  11  the -- the Martinez one.

10:10AM  12  Q.  How about Anthony Greco?  You didn't see his name, did

10:10AM  13  you?

10:10AM  14  A.  I possibly did in the tolls.

10:10AM  15  Q.  Okay.  How about Matt LoTempio?  You didn't see his name,

10:10AM  16  did you?

10:10AM  17  A.  Possibly saw that in the tolls, as well.

10:10AM  18  Q.  But if they're in the file, that would be in there?

10:10AM  19  A.  Yeah, I guess there's -- it's probably a few thousand

10:10AM  20  pages.  And if you get into the tolls, I went through each

10:11AM  21  subscriber.

10:11AM  22  Q.  Okay.

10:11AM  23  A.  So I saw a lot of names, but I -- to recall all of them

10:11AM  24  without going page by page would be pretty difficult.

10:11AM  25  Q.  Sure.  And you saw other names in the file who were most

10:11AM   1    definitely not connected to Ron Serio, like Dave Oddo,

10:11AM   2    correct?

10:11AM   3    A.   Dave Oddo was -- I can't recall if -- Oddo was in there,

10:11AM   4    I'm just trying to recall the link to Serio.

10:11AM   5         MR. MacKAY:   Yeah.   Ms. Champoux, can we pull up

10:11AM   6    Government Exhibit 100A.1 in evidence.   Pull that up, and I'll

10:11AM   7    list the file to pull up.

10:11AM   8         So, down in the images section, can we pull up the

10:11AM   9    image ending in 483.

10:11AM   10        BY MR. MacKAY:

10:11AM   11   Q.   Okay.   That's the -- so we don't have to actually

10:11AM   12   physically get it out, that's the picture of the front of the

10:11AM   13   Redweld, correct?

10:12AM   14   A.   That's correct.

10:12AM   15   Q.   That's the one that's found in Mr. Bongiovanni's house,

10:12AM   16   correct?

10:12AM   17   A.   That's correct.

10:12AM   18   Q.   And you see three names there, sort of bigger bold

10:12AM   19   letters, correct?

10:12AM   20   A.   You mean in the -- with the Sharpie?

10:12AM   21   Q.   Yes.

10:12AM   22   A.   Yes.

10:12AM   23   Q.   You see Ron and Tom Serio, and then you see Dave Oddo,

10:12AM   24   correct?

10:12AM   25   A.   Right.   That's correct.

10:12AM  1   Q.  And you recall Ron Serio testifying that he hated Dave

10:12AM  2   Oddo, correct?

10:12AM  3   A.  I believe that was Remus Nowak that he hated.

10:12AM  4   Q.  Okay.

10:12AM  5   A.  I mean, if he said that, I don't recall that.

10:12AM  6   Q.  All right.  Or that he didn't trust Dave Oddo?

10:12AM  7   A.  I can't recall him saying that one way or the other.

10:12AM  8   Q.  Okay.  We also see the names sort of on the right side

10:12AM  9   not in Sharpie, Fred and Bill Weir?

10:12AM  10   A.  That's correct.

10:12AM  11   Q.  Okay.  And neither of those names were known to be

10:12AM  12   associates of Ron Serio, correct?

10:12AM  13   A.  That's correct.  I did not recall Mr. Serio discussing

10:12AM  14   them.

10:12AM  15        MR. MacKAY:  So, Ms. Champoux, I'm going to ask you

10:12AM  16   to jump between a few things.  Can you pull up Government

10:13AM  17   Exhibit 8A, and go to page 420.

10:13AM  18        BY MR. MacKAY:

10:13AM  19   Q.  Okay.  Do you see what you're looking at is a -- a -- a

10:13AM  20   subpoena in front of you?

10:13AM  21   A.  I do.

10:13AM  22   Q.  In the file, and that's been signed in the lower

10:13AM  23   right-hand corner by the RAC, Dale Kasprzyk?

10:13AM  24   A.  Yeah, it appears to be an admin subpoena to Cricket

10:13AM  25   Communications.

| | | |
|---|---|---|
| 10:13AM | 1 | **MR. MacKAY:**  Okay.  Ms. Champoux, can we go to next |
| 10:13AM | 2 | page, page 421? |
| 10:13AM | 3 | **BY MR. MacKAY:** |
| 10:13AM | 4 | Q.  Okay.  And do you see the name there Fred Weir on the |
| 10:13AM | 5 | bottom half? |
| 10:13AM | 6 | A.  Yes, I do. |
| 10:13AM | 7 | Q.  If you need to, we can flip back to the other page.  But |
| 10:13AM | 8 | do you see that it corresponds to the number that was |
| 10:13AM | 9 | subpoenaed from the last page? |
| 10:13AM | 10 | A.  On the -- are you talking about the front cover? |
| 10:13AM | 11 | Q.  I'm saying -- so, do you see the line between -- see the |
| 10:13AM | 12 | line at the top of each section where it says target details |
| 10:13AM | 13 | and gives -- |
| 10:13AM | 14 | A.  Correct. |
| 10:13AM | 15 | Q.  -- phone numbers? |
| 10:13AM | 16 | A.  Yes. |
| 10:13AM | 17 | Q.  If we flip back to page 420 -- |
| 10:14AM | 18 | A.  They were the subpoenaed numbers, I'm sorry. |
| 10:14AM | 19 | Q.  So you see here a subpoena, and a subpoena return that |
| 10:14AM | 20 | involves Fred Weir, correct? |
| 10:14AM | 21 | A.  That's accurate. |
| 10:14AM | 22 | Q.  And he wasn't known to be involved with Ron Serio, |
| 10:14AM | 23 | correct? |
| 10:14AM | 24 | A.  I don't recall him being affiliated with Ron Serio's |
| 10:14AM | 25 | organization.  Possibly with the Remus Nowak. |

10:14AM     1    Q.  Okay.  Do you recall the name Charles Butera coming up in

10:14AM     2    the file?

10:14AM     3    A.  Yes, I saw a number of things about Charles Butera.

10:14AM     4          MR. MacKAY:  Ms. Champoux, can we go to page 382 of

10:14AM     5    this exhibit?

10:14AM     6          BY MR. MacKAY:

10:14AM     7    Q.  And that's, for example, looks like a billing account

10:14AM     8    record for Mr. Butera?

10:14AM     9    A.  A subscriber from -- pursuant to that subpoena number.

10:14AM    10    Q.  Subscriber details, correct?

10:14AM    11    A.  That's correct.

10:14AM    12    Q.  Okay.  And you recall hearing that Ron Serio did not have

10:15AM    13    any connection with Charles Butera, correct?

10:15AM    14    A.  He possibly said that.

10:15AM    15          MR. MacKAY:  Ms. Champoux, can we go back to

10:15AM    16    Government Exhibit 100A.1?

10:15AM    17          Can we go to the document listed Marciniak pdf.

10:15AM    18          BY MR. MacKAY:

10:15AM    19    Q.  Okay.  Here in the file, we're looking at subscriber

10:15AM    20    information for an individual named Brian Marciniak, correct?

10:15AM    21    A.  Yes, I saw a number of references to him.

10:15AM    22    Q.  And ultimately, no -- no connection is established

10:15AM    23    between Mr. Marciniak and Ron Serio, correct?

10:15AM    24    A.  I didn't investigate the Ron Serio organization, so I

10:15AM    25    don't know --

10:15AM  1   Q.  Well, let me ask it to you this way.  As you looked in

10:15AM  2   the file, you didn't see any further connection between Brian

10:15AM  3   Marciniak and Ron Serio, correct?

10:15AM  4   A.  It was hard, based on that file, to see any connections

10:15AM  5   between these numbers.  There was a lack of documentation

10:16AM  6   indicating how these were -- names were tied to the

10:16AM  7   investigation.

10:16AM  8   Q.  Right.  So there's no documentation in the file that

10:16AM  9   memorializes how all these are connected, correct?

10:16AM  10  A.  That's correct.

10:16AM  11  Q.  Now you, in your capacity as an FBI special agent, is it

10:16AM  12  your experience that different investigators do things

10:16AM  13  different ways in how they memorialize things inside a file?

10:16AM  14  A.  Yes, I would say some people do it differently than other

10:16AM  15  people.

10:16AM  16  Q.  You know, in your career, you've taken over files from

10:16AM  17  other agents, correct?

10:16AM  18  A.  I have.

10:16AM  19  Q.  Like when people retire or change offices, correct?

10:16AM  20  A.  Occasionally.

10:16AM  21  Q.  And sometimes you have to sort through a prior file or

10:16AM  22  investigation, correct?

10:16AM  23  A.  I usually try to get with the agent.  I've only done it a

10:16AM  24  few times.

10:16AM  25  Q.  Okay.

10:16AM    1    A.  But I get with the agent and attempt to learn about the

10:16AM    2    case, and then look in the file before they are no longer --

10:16AM    3    Q.  Right.  And it's usually in your experience most helpful

10:17AM    4    if the agent explains to you what the connection is, correct?

10:17AM    5    A.  It can help, and you need supporting documentation. So --

10:17AM    6    Q.  Right.  Because what I was saying is when you look

10:17AM    7    through a file, it's not always obvious how things are tied

10:17AM    8    together, correct?

10:17AM    9    A.  It depends on the file and how it was memorialized.

10:17AM   10    Q.  Sure.  And in the file, you also saw a name Robert

10:17AM   11    Mettal, correct?

10:17AM   12    A.  Yes, I did.

10:17AM   13    Q.  And you remember Robert Mettal historically goes back to

10:17AM   14    an old arrest of Tom Serio, correct?

10:17AM   15    A.  I believe that was -- I need to see that report to say

10:17AM   16    that.  There was a, I think, a 1998 cocaine charge.

10:17AM   17    Q.  Okay.  So all in all, when you're reviewing this file, I

10:17AM   18    think like you were trying to tell us, some things you can

10:17AM   19    see connections between the names and how they fit in the

10:17AM   20    file, correct?

10:17AM   21    A.  There was very little in that file that connected

10:17AM   22    anything.  It was mostly subscriber records, it was the

10:18AM   23    utility records we discussed, the DEA-6s that I outlined on

10:18AM   24    my direct, and then the case status, those three surveillance

10:18AM   25    photos.  And other than that, there was not a lot of

10:18AM  1  substance in that file.

10:18AM  2  Q.  Okay.  But my question is, when you look through the

10:18AM  3  file, I'm talking about the working file, the file you

10:18AM  4  received, you're able to make some connections between some

10:18AM  5  of the materials; is that fair to say?

10:18AM  6  A.  Very few, based on the documents in that file.

10:18AM  7  Q.  I'll ask one more time.

10:18AM  8  A.  Okay.

10:18AM  9  Q.  You can make some connections at least between some of

10:18AM  10  the names and some of the material that's in the file,

10:18AM  11  correct?

10:18AM  12  A.  Some connections, yes.

10:18AM  13  Q.  Other times, you were unable from what you saw to make

10:18AM  14  the connection between names and material in the file,

10:18AM  15  correct?

10:18AM  16  A.  That's accurate.

10:18AM  17  Q.  Because it lacked any supporting documentation, correct?

10:18AM  18  A.  Any DEA-6s, the investigative steps to document that.

10:18AM  19  Q.  So you were sort of left on your own as you reviewed this

10:19AM  20  file to see whether you could connect anything if it wasn't

10:19AM  21  material that memorialized otherwise, correct?

10:19AM  22  A.  I don't know if I was looking for connections, I was more

10:19AM  23  assessing what was in that file.

10:19AM  24  Q.  Okay.  Now going back to your experience as an FBI

10:19AM  25  special agent.  When you're doing investigations, is it fair

10:19AM   1   to characterize that when you're doing an investigation,

10:19AM   2   you're often trying to make connections between people,

10:19AM   3   between phone numbers, between addresses?

10:19AM   4   A.   Definitely.

10:19AM   5   Q.   Okay.  And in your experience, sometimes you're able to

10:19AM   6   make those connections, correct?

10:19AM   7   A.   Yes.

10:19AM   8   Q.   And then sometimes, has it been your experience that you

10:19AM   9   find that there's a connection that down the road really

10:19AM   10   isn't a connection?

10:19AM   11   A.   Sometimes.

10:19AM   12   Q.   For example, you find the name of somebody who lived in a

10:19AM   13   residence, and you ultimately find out that was just a past

10:20AM   14   tenant or resident?

10:20AM   15   A.   That happens sometimes.

10:20AM   16   Q.   Right.  And so that's an example of somebody's name who

10:20AM   17   might end up in a file and a connection is believed to be

10:20AM   18   established, but ultimately is not in the long run, correct?

10:20AM   19   A.   That happens.

10:20AM   20   Q.   Okay.  Now looking to the rest of the file and some of

10:20AM   21   the DEA-6s and DEA documents, you saw evidence of supervisors

10:20AM   22   being involved in this investigation in some capacity,

10:20AM   23   correct?

10:20AM   24   A.   The supervisors did the debrief.  I saw a supervisor on

10:20AM   25   the debrief of R.K.  I saw supervisors signing the subpoenas,

USA v Bongiovanni - Burns - MacKay/Cross - 3/26/24

| | | |
|---|---|---|
| 10:20AM | 1 | the administrative subpoenas.  I saw -- |
| 10:20AM | 2 | Q.  Yeah, let's take it step by step. |
| 10:20AM | 3 | A.  Okay. |
| 10:20AM | 4 | Q.  You saw DEA -- I'm sorry, you saw DEA-6s signed off by |
| 10:20AM | 5 | supervisors, correct? |
| 10:20AM | 6 | A.  The few that were in there, yes. |
| 10:20AM | 7 | Q.  You saw subpoenas that were signed off by supervisors |
| 10:20AM | 8 | including the resident agent in charge of the office, |
| 10:21AM | 9 | correct? |
| 10:21AM | 10 | A.  Yes, all -- I think admin subpoenas need to be signed off |
| 10:21AM | 11 | by the -- |
| 10:21AM | 12 | Q.  Okay. |
| 10:21AM | 13 | A.  -- RAC. |
| 10:21AM | 14 | Q.  You saw both in the reports and in other places in the |
| 10:21AM | 15 | file memorialization of group supervisors being involved in |
| 10:21AM | 16 | some fashion, correct? |
| 10:21AM | 17 | A.  Can you repeat that question? |
| 10:21AM | 18 | Q.  Bad question.  You reviewed the contents of the DEA-6s, |
| 10:21AM | 19 | correct? |
| 10:21AM | 20 | A.  The -- yes, the five or six that we outlined, yes, I did. |
| 10:21AM | 21 | Q.  And in some of those DEA-6s, you saw evidence of group |
| 10:21AM | 22 | supervisors being involved in things like, for example, the |
| 10:21AM | 23 | debrief of R.K., correct? |
| 10:21AM | 24 | A.  R.K. was the only one I saw the, like, involvement -- |
| 10:21AM | 25 | involvement, I understand involvement to be supervisors |

USA v Bongiovanni - Burns - MacKay/Cross - 3/26/24

39

10:21AM    1    sitting there debriefing the source, sort of -- if that's the

10:21AM    2    involvement, then there's just the one with R.K. where the

10:21AM    3    supervisor Flickinger is present.

10:21AM    4    Q.  Okay.  But let me just ask you more broadly.  You did see

10:22AM    5    supervisors names and signatures in the file, correct?

10:22AM    6    A.  I did.

10:22AM    7    Q.  Okay.  And, you know, we'll go back to those operations

10:22AM    8    plans.  You saw names and signatures of supervisors in those

10:22AM    9    plans, correct?

10:22AM    10   A.  Yes, I did.

10:22AM    11   Q.  Now, the working file that you recovered that we showed

10:22AM    12   in the one picture, that was recovered -- to your knowledge

10:22AM    13   it was in a bigger box, correct?

10:22AM    14   A.  Yes, the box in the basement.

10:22AM    15   Q.  I think we've had the box out here in court, but that

10:22AM    16   contained other things than just that working file, correct?

10:22AM    17   A.  Yes, there was a number of other items in there.

10:22AM    18   Q.  It included some other DEA items, looked like they could

10:22AM    19   have been accumulated over a career; fair to say?

10:22AM    20   A.  Fair to say.  I'd have to really -- I want to look to see

10:22AM    21   what those other items were to say definitively.

10:22AM    22   Q.  Sure.  Do you recall, like, for example, there's some

10:22AM    23   patches of DEA operations or task forces?

10:22AM    24   A.  I do remember the patches.

10:22AM    25   Q.  Okay.

| | | |
|---|---|---|
| 10:22AM | 1 | **MR. MacKAY:**  Ms. Champoux, can we pull up Government |
| 10:23AM | 2 | Exhibit 100A.1 in evidence.  And go to exhibit -- the image |
| 10:23AM | 3 | ending in 486. |
| 10:23AM | 4 | **BY MR. MacKAY:** |
| 10:23AM | 5 | Q.  While she's looking that up, one of the things that you |
| 10:23AM | 6 | found was a CD from an old operation called Operation Mouse |
| 10:23AM | 7 | Trap? |
| 10:23AM | 8 | A.  I don't recall that CD. |
| 10:23AM | 9 | Q.  Okay. |
| 10:23AM | 10 | A.  I'd have to look at the evidence again. |
| 10:24AM | 11 | **MR. MacKAY:**  I'm sorry, Judge, we're working on |
| 10:24AM | 12 | logistical things. |
| 10:24AM | 13 | **THE COURT:**  I get it. |
| 10:24AM | 14 | **MR. MacKAY:**  This goes back to what was in the box |
| 10:24AM | 15 | and what was not.  I've got my trustee co-counsel and the |
| 10:25AM | 16 | technical assistant here hooking it up to the ELMO.  I think |
| 10:25AM | 17 | the government's okay with us showing it. |
| 10:25AM | 18 | **THE COURT:**  This is something from the box that's |
| 10:25AM | 19 | been admitted into evidence? |
| 10:25AM | 20 | **MR. MacKAY:**  Yes. |
| 10:25AM | 21 | **MR. TRIPI:**  No.  Can we just. |
| 10:25AM | 22 | **THE COURT:**  Yeah, come on up. |
| 10:25AM | 23 | (Sidebar discussion held on the record.) |
| 10:25AM | 24 | **MR. TRIPI:**  So when we turned over their copy of |
| 10:25AM | 25 | 100A.1, it had everything that was in the box scanned, of |

10:25AM    1    documents --

10:25AM    2            **THE COURT:**  Okay.

10:25AM    3            **MR. TRIPI:**  -- as well as photos of other things that

10:25AM    4    had been taken out of the box.  So when we admitted it, we

10:25AM    5    admitted it only as a duplicate of the paper copies and the

10:25AM    6    face of the file.  So in other words, the only thing that

10:25AM    7    100A.1 is, is the working file and a picture of the face sheet

10:25AM    8    of the working file.

10:25AM    9            **THE COURT:**  Okay.

10:25AM   10            **MR. TRIPI:**  So we don't have those other photos on

10:25AM   11    100A.1, so those are not in evidence.

10:25AM   12            **THE COURT:**  So we --

10:25AM   13            **MR. TRIPI:**  So there were other things that were

10:25AM   14    photographed after they were taken out of the box that aren't

10:26AM   15    part of the scan, do you know what I mean?

10:26AM   16            **THE COURT:**  I do.  But in order to have a record,

10:26AM   17    we've got to mark them somehow.

10:26AM   18            **MR. TRIPI:**  Yeah.  I mean --

10:26AM   19            **THE COURT:**  Right.

10:26AM   20            **MR. TRIPI:**  -- that wasn't our exhibit though.

10:26AM   21            **THE COURT:**  I understand.

10:26AM   22            **MR. MacKAY:**  We can generate a new defense exhibit

10:26AM   23    for it.  We got 100A.1, it shows all the images in there, so

10:26AM   24    we can pull it out, we can print it.

10:26AM   25            **THE COURT:**  So it's on your version of 108.1, but not

USA v Bongiovanni - Burns - MacKay/Cross - 3/26/24

42

10:26AM  1   on the version that was admitted?

10:26AM  2          **MR. COOPER:**  100A.1.

10:26AM  3          **THE COURT:**  100A.1.

10:26AM  4          **MR. TRIPI:**  Because like the run up to trial, realize

10:26AM  5   there were other images on the disk that weren't part of the

10:26AM  6   file, that is the paper working file.

10:26AM  7          **THE COURT:**  I got it.

10:26AM  8          **MR. TRIPI:**  So they had a version that had more stuff

10:26AM  9   than they should have.

10:26AM  10          **THE COURT:**  Okay.  So we should make that, maybe

10:26AM  11   during a break, we should make that clear for the record of

10:26AM  12   what's going on.

10:26AM  13          **MR. TRIPI:**  I think that when it came in, it was

10:26AM  14   clear at that time.  But I think over the length of trial, we

10:27AM  15   kind of --

10:27AM  16          **THE COURT:**  Okay.  So what we need to do is carve

10:27AM  17   these photos out, whatever you want to admit.

10:27AM  18          **MR. MacKAY:**  It's just going to be one.

10:27AM  19          **THE COURT:**  Okay.  And mark it as a separate exhibit.

10:27AM  20          **MR. SINGER:**  I should have that done in a second,

10:27AM  21   Judge.

10:27AM  22          **MR. TRIPI:**  Yeah, sorry for any confusion that I

10:27AM  23   caused.

10:27AM  24          **MR. SINGER:**  I have it.  I can mark it.  It's going

10:27AM  25   to take a minute.

10:27AM     1          **MR. COOPER:**  Do you want to deem it marked, I'm fine

10:27AM     2   with that, and let's keep it moving?

10:27AM     3          **THE COURT:**  100 --

10:27AM     4          **MR. SINGER:**  It's going to be Defense Exhibit P.

10:27AM     5          **THE COURT:**  P?

10:27AM     6          **MR. COOPER:**  I'll make a note in my notebook and we

10:27AM     7   can revisit it later.

10:27AM     8          **MR. MacKAY:**  We can generate the sticker later.

10:27AM     9          **THE COURT:**  Great.

10:27AM    10          **MR. COOPER:**  Defense Exhibit P.

10:27AM    11          **THE COURT:**  So show it to the witness first, just the

10:27AM    12   witness.

10:28AM    13          **MR. MacKAY:**  Yeah.

10:28AM    14          **MR. SINGER:**  Just for the witness.

10:28AM    15          (Sidebar discussion ended.)

10:28AM    16          **MR. MacKAY:**  All right.  Bear with me, Special Agent,

10:28AM    17   we're going to try show you a photo of what was in the box.

10:28AM    18          **BY MR. MacKAY:**

10:28AM    19   Q.  I'm going to show you what's been marked for

10:28AM    20   identification as Defendant's Exhibit P.  We've deemed it

10:28AM    21   marked, and we'll mark it at a later time.

10:28AM    22      Do you recognize that to be a CD that was found in the

10:28AM    23   box and taken out of the house?

10:28AM    24   A.  I remember the box.  I remember binders and some other

10:28AM    25   items, the patches.  I don't recall that -- I don't recall

10:29AM  1   that CD.  It's definitely possible it was in there, I just

10:29AM  2   don't remember the box.  I was focused on the binder and the

10:29AM  3   file.

10:29AM  4          MR. MacKAY:  All right.  Ms. Champoux, can we take

10:29AM  5   that down, please?

10:29AM  6          BY MR. MacKAY:

10:29AM  7   Q.  Okay.  So when you did -- you did have an opportunity to

10:29AM  8   look through the whole box though, correct?

10:29AM  9   A.  I looked in there, it's just been a while.

10:30AM  10  Q.  And fair to say there's items other than just the Redweld

10:30AM  11  Ron Serio --

10:30AM  12  A.  Yes.

10:30AM  13  Q.  -- file, correct?

10:30AM  14  A.  Yes.  Definitely.

10:30AM  15  Q.  There are -- there's DEA personal effects, correct?

10:30AM  16  A.  If you would describe what --

10:30AM  17  Q.  Like the patches?

10:30AM  18  A.  Correct.

10:30AM  19  Q.  There's -- do you recall an old gun holster being found?

10:30AM  20  A.  I recall some older tactical equipment, yes.

10:30AM  21  Q.  And do you recall, like I said, papers from other files

10:30AM  22  not being -- not related to Ron Serio being found in the

10:30AM  23  file?

10:30AM  24  A.  I recall photographs of what looked to be other DEA

10:30AM  25  cases.  I don't recall documents.  There is the OCDETF file

10:30AM    1    in there.  I don't recall anything beyond the OCDETF file and

10:30AM    2    the -- in the Redweld file.  And, again, I didn't -- those

10:30AM    3    are my kind of focus in preparing for my testimony, and my

10:31AM    4    earlier portion of the investigation was the binder and then

10:31AM    5    the Redweld, but I do remember the patches.

10:31AM    6    Q.  Long story short, though, there's other items in the box

10:31AM    7    other than just the file, correct?

10:31AM    8    A.  That's correct.

10:31AM    9    Q.  Okay.

10:31AM   10          MR. MacKAY:  I have nothing further, Your Honor.

10:31AM   11          THE COURT:  Redirect?

10:31AM   12          MR. COOPER:  Yes, please, Judge.

10:31AM   13

10:31AM   14              REDIRECT EXAMINATION BY MR. COOPER:

10:31AM   15    Q.  Special Agent Burns, just at the end there, you were

10:31AM   16    asked a question about other things that were in the box not

10:31AM   17    related to the Ron Serio file; do you remember being asked

10:31AM   18    that question?

10:31AM   19    A.  Yes.

10:31AM   20    Q.  Something you mentioned was an OCDETF file report; do you

10:31AM   21    remember seeing that inside the box?

10:31AM   22    A.  Yes, I do remember that.

10:31AM   23    Q.  Would you describe that sort of OCDETF application packet

10:31AM   24    as one of the most sensitive law enforcement documents that

10:31AM   25    you handle as a special agent?

| | | |
|---|---|---|
| 10:31AM | 1 | A.  I don't know if I would say "most sensitive."  It's a |
| 10:31AM | 2 | very sensitive law enforcement document. |
| 10:32AM | 3 | Q.  Is it something that you plan to bring home when you |
| 10:32AM | 4 | retire? |
| 10:32AM | 5 | A.  Absolutely not. |
| 10:32AM | 6 | Q.  You were asked some questions on cross-examination about |
| 10:32AM | 7 | whether Joe Mesi might have identified himself as a |
| 10:32AM | 8 | confidential informant; do you remember that question? |
| 10:32AM | 9 | A.  Yes, I do. |
| 10:32AM | 10 | Q.  How many years have you been a special agent? |
| 10:32AM | 11 | A.  25. |
| 10:32AM | 12 | Q.  Have you worked with a lot of confidential informants? |
| 10:32AM | 13 | A.  Quite a number of them. |
| 10:32AM | 14 | Q.  Is it your experience generally that they have a very |
| 10:32AM | 15 | strong motivation not to out themselves as confidential |
| 10:32AM | 16 | informants? |
| 10:32AM | 17 | A.  Yes.  I can't think of any that, in my career, that have |
| 10:32AM | 18 | done it.  Maybe inadvertently to a spouse or -- |
| 10:32AM | 19 | Q.  Yep. |
| 10:32AM | 20 | A.  -- a close friend. |
| 10:32AM | 21 | Q.  It wouldn't make any sense, right? |
| 10:32AM | 22 | A.  No, it's very dangerous, and no one wants to be exposed. |
| 10:32AM | 23 | Q.  You remember being asked some questions about Michael |
| 10:32AM | 24 | Masecchia? |
| 10:32AM | 25 | A.  Yes. |

10:32AM   1   Q.  What was the defendant's relationship with Mike Masecchia

10:32AM   2   as you understand it?

10:32AM   3   A.  They appeared to be lifelong friends.

10:32AM   4   Q.  Do you remember being asked some questions about the

10:32AM   5   different contacts contained in Peter Gerace's phone?

10:32AM   6   A.  Yes.

10:32AM   7   Q.  You weren't the person who selected which contacts would

10:33AM   8   go in that report, right?

10:33AM   9   A.  That's correct.

10:33AM   10  Q.  But did you review the contacts in the report?

10:33AM   11  A.  Yes.

10:33AM   12  Q.  Have you heard some, I guess, testimony in this trial

10:33AM   13  about Gerace being described as a police groupie?

10:33AM   14  A.  Yes, I've heard that testimony.

10:33AM   15  Q.  Okay.  As you sit here, are you entirely sure what the

10:33AM   16  definition of "police groupie" is?

10:33AM   17  A.  No, I'm not sure.

10:33AM   18  Q.  Okay.  Let's talk about Dan Derenda.  Dan Derenda was a

10:33AM   19  contact in Gerace's phone, right?

10:33AM   20  A.  That's correct.

10:33AM   21  Q.  Was there evidence in the case supporting the fact that

10:33AM   22  Dan Derenda and Peter Gerace knew each other?

10:33AM   23  A.  Yes.

10:33AM   24  Q.  Is there evidence in the case during your investigation

10:33AM   25  indicating that Derenda and Gerace had a personal

| | | |
|---|---|---|
| 10:33AM | 1 | relationship? |
| 10:33AM | 2 | A.  Definitely. |
| 10:33AM | 3 | Q.  Can you describe that to the jury? |
| 10:33AM | 4 | A.  They socialized, and I can't recall as I sit here, it's |
| 10:33AM | 5 | either Gerace is the godfather of his child, or vice versa. |
| 10:33AM | 6 | But they were very close.  He wrote the letter in support of |
| 10:33AM | 7 | him back in the -- Gerace's 2006 sentencing.  Additionally, |
| 10:34AM | 8 | they exchanged holiday cards, or at least we saw -- we |
| 10:34AM | 9 | recovered one holiday card. |
| 10:34AM | 10 | Q.  And you described that Derenda wrote a letter on behalf |
| 10:34AM | 11 | of Gerace for his sentencing? |
| 10:34AM | 12 | A.  Yes, he did. |
| 10:34AM | 13 | Q.  There were some other police officials or names in the |
| 10:34AM | 14 | contacts list that appear to be names of people in law |
| 10:34AM | 15 | enforcement that you were asked about by Mr. MacKay; do you |
| 10:34AM | 16 | remember that? |
| 10:34AM | 17 | A.  Yes. |
| 10:34AM | 18 | Q.  During the course of your investigation, did you find |
| 10:34AM | 19 | photos of the defendant in Las Vegas with any of those |
| 10:34AM | 20 | individuals? |
| 10:34AM | 21 | A.  I did not. |
| 10:34AM | 22 | Q.  Okay.  Did you find any witnesses who told you that |
| 10:34AM | 23 | they -- the defendant -- or, I'm sorry, that those other |
| 10:34AM | 24 | police officers frequently went to dinner with Gerace? |
| 10:34AM | 25 | A.  I didn't.  Yeah, we did not determine other -- repeat the |

| | | |
|---|---|---|
| 10:34AM | 1 | question, please. |
| 10:34AM | 2 | Q.  Sure.  There were some other police officials that were |
| 10:35AM | 3 | mentioned to you in the contacts list; do you remember that? |
| 10:35AM | 4 | A.  Yes. |
| 10:35AM | 5 | Q.  Like, one person from Cheektowaga, right? |
| 10:35AM | 6 | A.  Correct. |
| 10:35AM | 7 | Q.  Another person from NFTA, right? |
| 10:35AM | 8 | A.  That's correct. |
| 10:35AM | 9 | Q.  During the course of your investigation, did you learn of |
| 10:35AM | 10 | Peter Gerace frequently going to dinner with those |
| 10:35AM | 11 | individuals? |
| 10:35AM | 12 | A.  No. |
| 10:35AM | 13 | MR. MacKAY:  Objection to form.  Assumes a fact not |
| 10:35AM | 14 | in evidence with "frequently." |
| 10:35AM | 15 | THE COURT:  No.  Overruled. |
| 10:35AM | 16 | BY MR. COOPER: |
| 10:35AM | 17 | Q.  Did you learn that, or no? |
| 10:35AM | 18 | A.  No, I did not learn that.  Trotter went to -- stopped at |
| 10:35AM | 19 | Pharaoh's for food one time.  I think that's the extent, from |
| 10:35AM | 20 | the list that Mr. MacKay went through. |
| 10:35AM | 21 | Q.  During the course of your investigation, did you learn |
| 10:35AM | 22 | that the defendant went to dinner with Peter Gerace on more |
| 10:35AM | 23 | than one occasion? |
| 10:35AM | 24 | A.  Yes. |
| 10:35AM | 25 | Q.  Did you learn that they traveled to Las Vegas together? |

10:35AM  1   A.  Yes.

10:35AM  2   Q.  Did you learn that they socialized outside of Pharaoh's

10:35AM  3   Gentlemen's Club?

10:35AM  4   A.  Yes.

10:35AM  5   Q.  Did you learn that they socialized with each other's

10:35AM  6   spouses or significant others?

10:35AM  7   A.  Yes.  Dinners, parties, travel.

10:35AM  8   Q.  Now you were asked some questions on cross-examination

10:36AM  9   about the different material you reviewed vis-à-vis

10:36AM  10   C2-13-0026; do you remember that question?

10:36AM  11   A.  Yes.

10:36AM  12   Q.  And you described a working file that was found in the

10:36AM  13   defendant's basement, right?

10:36AM  14   A.  Yes.

10:36AM  15   Q.  And then an official file, right?

10:36AM  16   A.  Correct.

10:36AM  17   Q.  That official file was both an electronic copy of a file,

10:36AM  18   right?

10:36AM  19   A.  Correct.

10:36AM  20   Q.  And also, like, the scanned paper file from DEA, right?

10:36AM  21   A.  Correct, yes.

10:36AM  22   Q.  Would it be fair to say that there were differences in

10:36AM  23   the contents contained in the official file that DEA was able

10:36AM  24   to provide, and the stuff the defendant brought home and put

10:36AM  25   in his basement?

10:36AM    1    A.  Yes.

10:36AM    2    Q.  There were things in the defendant's basement file that

10:36AM    3    were not contained in the official DEA file, right?

10:36AM    4    A.  Definitely.

10:36AM    5    Q.  You were asked some questions about having difficulty

10:36AM    6    drawing connections between individuals and names in the

10:36AM    7    file, right?

10:36AM    8    A.  Yes.

10:36AM    9    Q.  In the official file, were there toll analysis hot sheets

10:36AM   10    in the DEA official file?

10:36AM   11    A.  Not that I recall.

10:37AM   12    Q.  Were those hidden in the file in the defendant's

10:37AM   13    basement?

10:37AM   14    A.  Yes, they were.

10:37AM   15    Q.  He -- withdrawn.

10:37AM   16        You were asked some questions about whether supervisors

10:37AM   17    were involved in some of the paperwork in that file, right?

10:37AM   18    A.  Yes.

10:37AM   19    Q.  You saw -- you testified on cross-examination that

10:37AM   20    supervisors were involved in the R.K. debriefing, right?

10:37AM   21    A.  That's correct.

10:37AM   22    Q.  Are you referring to the initial R.K. debriefing?

10:37AM   23    A.  Yeah, the R.K. --

10:37AM   24    Q.  Is that the one where R.K. provides information about

10:37AM   25    Serio and drug trafficking?

10:37AM 1   A.   Yes.

10:37AM 2   Q.   After that debriefing where supervisors are present, are

10:37AM 3   there any other DEA-6s that you found in either the official

10:37AM 4   file or the one in the defendant's basement documenting

10:37AM 5   subsequent interviews of R.K.?

10:37AM 6   A.   None.

10:37AM 7   Q.   You were asked some questions about people that were

10:37AM 8   contained in the file that were not related to Ron Serio; do

10:37AM 9   you remember that question?

10:37AM 10  A.   That's correct.

10:37AM 11  Q.   Does the name Remus Nowak come up in C2-13-0026?

10:38AM 12  A.   From everything I looked at, it came up more in the

10:38AM 13  context of those case status updates.

10:38AM 14  Q.   Okay.  But the name is introduced into the file in case

10:38AM 15  status updates, right?

10:38AM 16  A.   That's accurate.

10:38AM 17  Q.   Okay.  During the course of your investigation, and

10:38AM 18  sitting here listening to the testimony at this trial, do you

10:38AM 19  know whether Remus Nowak was aligned with Mike Masecchia or

10:38AM 20  not?

10:38AM 21  A.   He was not.  They were enemies.

10:38AM 22  Q.   What was that?

10:38AM 23  A.   They were enemies, according to the Serio testimony.

10:38AM 24  Q.   You were also asked some questions about the name Dave

10:38AM 25  Oddo on the front of the file, right?

10:38AM   1   A.   Correct.

10:38AM   2   Q.   Is that person a person that, through the investigation,

10:38AM   3   was believed to be Anthony Gerace's cocaine supplier?

10:38AM   4   A.   That's correct.

10:38AM   5   Q.   Is Anthony Gerace the person who went to the Canada

10:38AM   6   vacation or dinner birthday party with the defendant?

10:38AM   7   A.   Yes, in Toronto.

10:38AM   8   Q.   You were asked some questions about whether or not you

10:39AM   9   were able to determine how certain names were linked to

10:39AM   10   individuals in the investigation based on what was in the

10:39AM   11   file; do you remember that?

10:39AM   12   A.   Yes.

10:39AM   13   Q.   Okay.  The work that was done on phone numbers, based on

10:39AM   14   what you reviewed, was that work that was done by Special

10:39AM   15   Agent Bongiovanni or by analysts at the DEA?

10:39AM   16   A.   Yeah.  The documents I looked at predominantly were all

10:39AM   17   from the analysts, by Bevilacqua -- Mr. Bevilacqua and

10:39AM   18   Mr. Borst.  And they consisted of mostly just toll records

10:39AM   19   and subscriber records and subpoenaed records.

10:39AM   20   Q.   Is there a way as a federal agent at a federal law

10:39AM   21   enforcement agency to take what's contained in an analyst's

10:39AM   22   work product, like a hot list, and document it in an official

10:39AM   23   report of investigation?

10:39AM   24   A.   Yes.

10:39AM   25   Q.   You can do that?

10:40AM    1    A.   Yes.

10:40AM    2              **MR. COOPER:**  I have no further questions, Judge.

10:40AM    3              **THE WITNESS:**  Okay.

10:40AM    4              **THE COURT:**  Anything more?

10:40AM    5              **MR. SINGER:**  No.

10:40AM    6              **THE COURT:**  Okay.  You can step down, sir.

10:40AM    7              (Witness excused at 10:40 a.m.)

           8              (Excerpt concluded at 10:40 a.m.)

           9                 *     *     *     *     *     *     *

          10

          11

          12

          13                  **CERTIFICATE OF REPORTER**

          14

          15              In accordance with 28, U.S.C., 753(b), I

          16    certify that these original notes are a true and correct

          17    record of proceedings in the United States District Court for

          18    the Western District of New York on March 26, 2024.

          19

          20

          21              s/ Ann M. Sawyer
                          _____
          22              Ann M. Sawyer, FCRR, RPR, CRR
                          Official Court Reporter
          23              U.S.D.C., W.D.N.Y.

          24

          25

**TRANSCRIPT INDEX**

**EXCERPT - EXAMINATION OF BRIAN A. BURNS (DAY 2)**

**MARCH 26, 2024**

**W I T N E S S**                                    **P A G E**

**B R I A N   A .   B U R N S**                       2

  CROSS-EXAMINATION BY MR. MacKAY:                    2

  REDIRECT EXAMINATION BY MR. COOPER:                45