1             **UNITED STATES DISTRICT COURT**
             **WESTERN DISTRICT OF NEW YORK**

2

    _____

3    **UNITED STATES OF AMERICA,**

                       Case No. 1:19-cr-227

4          Plaintiff,         (LJV)

    v.

5                       March 18, 2024

    **JOSEPH BONGIOVANNI,**

6

          Defendant.

7    _____

8    **TRANSCRIPT EXCERPT - EXAMINATION OF CURTIS RYAN - DAY 3**
         **BEFORE THE HONORABLE LAWRENCE J. VILARDO**

9             **UNITED STATES DISTRICT JUDGE**

10

11   **APPEARANCES:**        **TRINI E. ROSS, UNITED STATES ATTORNEY**
                 **BY: JOSEPH M. TRIPI, ESQ.**

12                   **NICHOLAS T. COOPER, ESQ.**
                   **CASEY L. CHALBECK, ESQ.**

13               Assistant United States Attorneys
               Federal Centre

14               138 Delaware Avenue
               Buffalo, New York 14202

15                 And
               **UNITED STATES DEPARTMENT OF JUSTICE**

16               **BY: JORDAN ALAN DICKSON, ESQ.**
               1301 New York Ave NW

17               Suite 1000
               Washington, DC 20530-0016

18               For the Plaintiff

19               **SINGER LEGAL PLLC**
               **BY: ROBERT CHARLES SINGER, ESQ.**

20               80 East Spring Street
               Williamsville, New York 14221

21                 And
               **LAW OFFICES OF PARKER ROY MacKAY**

22               **BY: PARKER ROY MacKAY, ESQ.**
               3110 Delaware Avenue

23               Kenmore, New York  14217
               For the Defendant

24   **PRESENT:**          **BRIAN A. BURNS,** FBI Special Agent
               **MARILYN K. HALLIDAY,** HSI Special Agent

25               **KAREN A. CHAMPOUX,** USA Paralegal

| | | |
|---|---|---|
| 1 | **LAW CLERK:** | **REBECCA FABIAN IZZO, ESQ.** |
| 2 | **COURT DEPUTY CLERK:** | **COLLEEN M. DEMMA** |
| 3 | **COURT REPORTER:** | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 4 | | Robert H. Jackson Federal Courthouse |
| | | 2 Niagara Square |
| | | Buffalo, New York  14202 |
| 5 | | Ann_Sawyer@nywd.uscourts.gov |

09:28AM
09:28AM
09:28AM   7          *    *    *    *    *    *

09:28AM   8

09:34AM   9          (Excerpt commenced at 9:44 a.m.)

09:44AM  10          (Jury seated at 9:44 a.m.)

09:44AM  11          **THE COURT:**  Good morning and welcome back, everyone.

09:44AM  12          **JURORS:**  Good morning.

09:44AM  13          **THE COURT:**  The record will reflect that all our

09:44AM  14  jurors are present.

09:44AM  15          I remind the witness that he's still under oath.

09:44AM  16          **THE WITNESS:**  I understand.

09:44AM  17          **THE COURT:**  And, Mr. Tripi, you may continue.

09:44AM  18          **MR. TRIPI:**  Thank you, Your Honor.

09:44AM  19

09:45AM  20  **C U R T I S   R Y A N**, having been previously duly called and

09:45AM  21  sworn, testified further as follows:

09:45AM  22

09:45AM  23          **DIRECT EXAMINATION BY MR. TRIPI (CONT'D):**

09:45AM  24  Q.  When we broke Friday, I'd asked you some questions about

09:45AM  25  your interview at 85 Alder Place with the defendant, as well

09:45AM  1   as the search that occurred there; do you recall that?

09:45AM  2   A.  Yes.

09:45AM  3   Q.  And one of the things that was entered into evidence was

09:45AM  4   the box of materials that had been recovered from the

09:45AM  5   basement; do you recall that, as well?

09:45AM  6   A.  I do.

09:45AM  7   Q.  Now, did you and Special Agent Halliday also work to scan

09:45AM  8   those items that were contained, the paper documents, in that

09:45AM  9   box to make a CD of what was in the box?

09:45AM  10  A.  Yes.

09:45AM  11  Q.  Okay.  And I think that CD also came into evidence on

09:45AM  12  Friday; is that right?

09:45AM  13  A.  Yes.

09:45AM  14  Q.  Now, there were a couple documents that also got utilized

09:45AM  15  in the investigation that were marked separately; is that

09:45AM  16  correct?  Documents that were shown to other witnesses,

09:46AM  17  things like that?

09:46AM  18  A.  Yes.

09:46AM  19  Q.  I'm going to hand you up a couple things.  I'm going to

09:46AM  20  hand you up two exhibits, just for record purposes I have

09:46AM  21  shown them to counsel, they are 100E-1 and 100F-1.

09:46AM  22      Beginning with 100E-1, do you recognize that?

09:46AM  23  A.  Yes, I do.

09:46AM  24  Q.  Is that a document in its original form that was part of

09:46AM  25  that file that had the name Serio on it?

USA v Bongiovanni - Ryan - Tripi/Direct - 3/18/24

4

| | | |
|---|---|---|
| 09:46AM | 1 | A.  Yes. |
| 09:47AM | 2 | Q.  Is it in the same, or substantially the same, condition |
| 09:47AM | 3 | today other than the fact that now it's in its own evidence |
| 09:47AM | 4 | bag as when it was recovered? |
| 09:47AM | 5 | A.  Yes. |
| 09:47AM | 6 | Q.  And looking at 100F-1, do you recognize that document? |
| 09:47AM | 7 | A.  Yes, I do. |
| 09:47AM | 8 | Q.  And what do you recognize that to be? |
| 09:47AM | 9 | A.  That's a document that was found in the file, it's a PLX |
| 09:47AM | 10 | report for telephone tolls. |
| 09:47AM | 11 | Q.  Does that -- is that basically an analysis, analysis of |
| 09:47AM | 12 | telephone tolls? |
| 09:47AM | 13 | A.  Yes, PLX is a software that helps you analyze telephone |
| 09:47AM | 14 | records. |
| 09:47AM | 15 | Q.  In the DEA world, what's that called? |
| 09:47AM | 16 | A.  It's commonly referred to as a hot sheet. |
| 09:47AM | 17 | Q.  Okay.  Is that a document for -- appear to be a document |
| 09:47AM | 18 | relating to analysis of Mark Vitale's toll phone tolls? |
| 09:47AM | 19 | A.  Yes.  Based off of handwritten information at the top. |
| 09:47AM | 20 | Q.  Okay.  Is Government Exhibit 100F-1 also a document that |
| 09:48AM | 21 | was in that file labelled Ron Serio that's in evidence, and |
| 09:48AM | 22 | did you take it out and put it in its own separate evidence |
| 09:48AM | 23 | bag? |
| 09:48AM | 24 | A.  Yes. |
| 09:48AM | 25 | **MR. TRIPI:**  Your Honor, the government moves to offer |

09:48AM  1  into evidence Exhibits 100E-1 and 100F-1.

09:48AM  2          **MR. MacKAY:**  No objection, Your Honor.

09:48AM  3          **THE COURT:**  They're received without objection.

09:48AM  4    **(GOV Exhibits 100E-1 and 100F-1 were received in evidence.)**

09:48AM  5          **MR. TRIPI:**  Thank you, Your Honor.

09:48AM  6          **THE COURT:**  Are these already in as part of the box?

09:48AM  7          **MR. TRIPI:**  Probably.  But they were put back and --

09:48AM  8  they have been put back in a folder.

09:48AM  9          **THE COURT:**  Yeah, thanks.

09:48AM  10         **MR. TRIPI:**  Thank you, Your Honor.  Okay.  I'll take

09:48AM  11  those back.

09:48AM  12         Your Honor, permission to publish the file, not to

09:48AM  13  have the jury go through the documents, but to publish the

09:49AM  14  file and let the jury see the file --

09:49AM  15         **THE COURT:**  Sure.

09:49AM  16         **MR. TRIPI:** -- and to hand it around to one another if

09:49AM  17  they so desire.

09:49AM  18         **THE COURT:**  Mr. Tripi?

09:49AM  19         **MR. TRIPI:**  So I'm handing Government Exhibit 100A,

09:49AM  20  100E-1 as contained in the folder, and 100F-1.

09:49AM  21         And I'll continue asking questions while this

09:49AM  22  happens, Your Honor.

09:49AM  23         **THE COURT:**  Sure.

09:49AM  24         **BY MR. TRIPI:**

09:49AM  25  Q.  Now, once all of the -- the search was completed at 85

| | | |
|---|---|---|
| 09:49AM | 1 | Alder Place on June 6, 2019, were you part of going back to |
| 09:49AM | 2 | the his office and reviewing everything that had been |
| 09:49AM | 3 | recovered and ensuring that items were logged into evidence? |
| 09:49AM | 4 | A.  Yes, I was. |
| 09:49AM | 5 | Q.  Were among the items recovered from -- from 85 Alder |
| 09:49AM | 6 | Place, did it include several wedding cards that -- apparent |
| 09:50AM | 7 | wedding cards directed from certain individuals to |
| 09:50AM | 8 | Mr. Bongiovanni? |
| 09:50AM | 9 | A.  Yes. |
| 09:50AM | 10 | Q.  Was one of the wedding cards signed by an individual |
| 09:50AM | 11 | named Hot Dog? |
| 09:50AM | 12 | A.  Yes. |
| 09:50AM | 13 | Q.  I'm going to hand you up Government Exhibit 100D.  And |
| 09:50AM | 14 | after you look at that, I'm going to direct your attention to |
| 09:50AM | 15 | 100D-2 as contained in the exhibit.  Okay? |
| 09:51AM | 16 | Okay.  I'm going to hand you up an Exhibit 100D, and then |
| 09:51AM | 17 | I'm also going to ask you to look in, at individual -- we |
| 09:52AM | 18 | marked parts of that exhibit, 100D-1, 2, and 3, okay? |
| 09:52AM | 19 | A.  Yes. |
| 09:52AM | 20 | Q.  Do you recognize 100D generally? |
| 09:52AM | 21 | A.  Yes. |
| 09:52AM | 22 | Q.  What do you recognize Exhibit 100D to be? |
| 09:52AM | 23 | A.  So it's line number 18 from the seizure at 85 Alder Place |
| 09:52AM | 24 | for our evidence report.  And it's -- the outside of the bag |
| 09:52AM | 25 | identifies it as the cards. |

USA v Bongiovanni - Ryan - Tripi/Direct - 3/18/24

09:52AM  1   Q.  And within there, were there various cards that were

09:52AM  2   submarked 100D-1, D-2, and D-3?

09:52AM  3   A.  Yes, I see them.

09:52AM  4   Q.  Are those in the same or substan -- with respect to

09:53AM  5   100D-1, 2, and 3, are those in the same or substantially same

09:53AM  6   condition today as when they were recovered on June 6th,

09:53AM  7   2019?

09:53AM  8   A.  Yes.

09:53AM  9          MR. TRIPI:  Your Honor, the government offers

09:53AM  10  Exhibit 100D-1, 100D-2 and 100D-3.

09:53AM  11         MR. MacKAY:  Can I just --

09:53AM  12         MR. TRIPI:  Yeah.

09:53AM  13         THE WITNESS:  1, 2, and 3?

09:53AM  14         MR. MacKAY:  Judge, I have no objection to D-1 and

09:54AM  15  D-2.  D-3 is actually from the Napoli parents, not from Tom

09:54AM  16  Napoli, so the objection would be to relevance.

09:54AM  17         MR. TRIPI:  I'll withdraw the D-3.

09:54AM  18         THE COURT:  Okay.  So D-1 and D 2 are admitted

09:54AM  19  without objection.

09:54AM  20         MR. MacKAY:  Yes.

09:54AM  21         THE COURT:  Okay.

09:54AM  22   **(GOV Exhibits 100D-1 and 100D-2 were received in evidence.)**

09:54AM  23         MR. TRIPI:  I'm going to leave 100D-1 and D-2 up with

09:54AM  24  the witness, and I'll remove everything else.

         25

| | | |
|---|---|---|
| 09:54AM | 1 | **BY MR. TRIPI:** |
| 09:54AM | 2 | Q.  Special Agent Ryan, can you tell the jury, looking |
| 09:54AM | 3 | inside, those are both the apparent wedding cards; is that |
| 09:54AM | 4 | correct? |
| 09:54AM | 5 | A.  Yes. |
| 09:54AM | 6 | Q.  Can you tell the jury who 100D-1 is from, who it's signed |
| 09:54AM | 7 | by? |
| 09:55AM | 8 | A.  It's signed by Lou Selva. |
| 09:55AM | 9 | Q.  And with respect to 100D-2, can tell the jury who that's |
| 09:55AM | 10 | from, who it's signed by? |
| 09:55AM | 11 | A.  Hot Dog and Lynn. |
| 09:55AM | 12 | Q.  Okay.  I'll take those back, thank you. |
| 09:55AM | 13 | **MR. TRIPI:**  Now, Ms. Champoux, can we pull up |
| 09:55AM | 14 | Exhibit 46?  It would be the list of contacts from Mr. Serio's |
| 09:55AM | 15 | phone. |
| 09:55AM | 16 | And can we put that next to Exhibit 109F, these are |
| 09:55AM | 17 | all in evidence, Your Honor, 109F, the list of contacts that |
| 09:55AM | 18 | were stipulated in from Mr. Bongiovanni's phone. |
| 09:55AM | 19 | And on Exhibit 46, can you highlight rows 21 and 22 |
| 09:55AM | 20 | for the jury -- or zoom in, I keep saying highlight -- |
| 09:56AM | 21 | Exhibit 46 on the left, rows 21 and 22. |
| 09:56AM | 22 | And move that to the top of the screen.  And then go |
| 09:56AM | 23 | to 109F, entry number 49, please, and zoom in on that. |
| 09:56AM | 24 | **BY MR. TRIPI:** |
| 09:56AM | 25 | Q.  Special Agent Ryan, can you, using Government Exhibit 46 |

USA v Bongiovanni - Ryan - Tripi/Direct - 3/18/24

09:56AM     1    in evidence on the top, the Serio contact, can you read row

09:56AM     2    21, the name of the contact and the number associated with

09:56AM     3    the mobile phone?

09:56AM     4    A.  Yes.  The name is Hot Dog, created May 20, 2016, and the

09:56AM     5    mobile number is 716-866-2687.

09:56AM     6    Q.  And is that the -- does that appear to be the same entry

09:57AM     7    in row 22 of that exhibit?

09:57AM     8    A.  Yes.

09:57AM     9    Q.  Hot Dog, same phone number?

09:57AM    10    A.  Same name, same phone number, yes.

09:57AM    11    Q.  Now, with respect to 109F, Mr. Bongiovanni's contact from

09:57AM    12    his phone, can you read entry number 49, the name, and then

09:57AM    13    the mobile number?

09:57AM    14    A.  Yes, the name is Dog, Hot.  And then the mobile number is

09:57AM    15    716-866-2687.

09:57AM    16    Q.  Is it the same phone number in both the Serio phone and

09:57AM    17    the Bongiovanni phone?

09:57AM    18    A.  Yes.

09:57AM    19    Q.  Is it the same name of contact other than in the

09:57AM    20    Bongiovanni phone it's last name Dog, first name Hot?

09:57AM    21    A.  Yes.

09:57AM    22    Q.  Now, with regard to that person, Hot Dog, was that the

09:58AM    23    same person who signed Government Exhibit 100D-2, the card we

09:58AM    24    just showed you?

09:58AM    25    A.  Yes.

09:58AM   1    Q.  And that was for Mr. Bongiovanni's wedding?

09:58AM   2    A.  Yes.

09:58AM   3    Q.  I'm going to hand that card back up.  And could you read

09:58AM   4    the -- just read the handwritten part of the card.  You don't

09:58AM   5    have to read the preprinted part of the card.

09:58AM   6    A.  It says love Hot Dog and Lynn.  Honored to be your

09:58AM   7    friends.  Many years of happiness.

09:58AM   8    Q.  Thank you.  Now, with regard to the contact, Hot Dog, did

09:58AM   9    you and Special Agent Halliday review an online funeral

09:58AM   10   memorial, and screenshot a photograph from that memorial

09:59AM   11   regarding the online funeral of the reputed former Buffalo

09:59AM   12   IOC leader, Joseph Todaro Sr.?

09:59AM   13   A.  Yes.

09:59AM   14   Q.  And was the date of death associated with the funeral

09:59AM   15   video December 26th, 2012?

09:59AM   16   A.  Yes.

09:59AM   17   Q.  Among the photos contained in the memorial, you could see

09:59AM   18   Hot Dog?

09:59AM   19   A.  Yes.

09:59AM   20   Q.  I'm going to hand you up Exhibit 393.

09:59AM   21       Do you recognize Government Exhibit 393?

09:59AM   22   A.  Yes.  It's a photo from a memorial page.

09:59AM   23   Q.  And does that fairly and accurately depict the photo from

09:59AM   24   the memorial page that you observed and was memorialized as

09:59AM   25   part of this investigation?

09:59AM   1    A.  Yes.

09:59AM   2           MR. TRIPI:  The government offers Exhibit 393,

09:59AM   3    Your Honor.

09:59AM   4           MR. MacKAY:  No objection, Your Honor.

09:59AM   5           THE COURT:  Received without objection.

10:00AM   6           **(GOV Exhibit 393 was received in evidence.)**

10:00AM   7           MR. TRIPI:  Ms. Champoux, can we keep this exhibit on

10:00AM   8    the screen, and also pull up Exhibit 393 for the jury?

10:00AM   9           **BY MR. TRIPI:**

10:00AM  10    Q.  Can you see those images well enough, Special Agent Ryan?

10:00AM  11    A.  It's difficult to read the font, if you need me to --

10:00AM  12    Q.  Focusing on the photograph, Exhibit 393, is that clear

10:00AM  13    enough, large enough?

10:00AM  14    A.  Yes.

10:00AM  15    Q.  Can you just tap the screen for the jury and point out

10:00AM  16    Joseph Todaro Sr. in that image?

10:00AM  17           MR. TRIPI:  May the record reflect he placed a mark

10:00AM  18    on the person in the center of the photo, front row, wearing a

10:01AM  19    light green shirt.

10:01AM  20           **BY MR. TRIPI:**

10:01AM  21    Q.  Next, can you place a mark on the individual who is

10:01AM  22    Hot Dog.

10:01AM  23           MR. TRIPI:  May the record reflect he placed a mark

10:01AM  24    on the individual with the tan shirt whose left hand is on the

10:01AM  25    left shoulder of Mr. Todaro Sr., also near the center of the

| | | |
|---|---|---|
| 10:01AM | 1 | photo, but this one is in the second row. |
| 10:01AM | 2 | **BY MR. TRIPI:** |
| 10:01AM | 3 | Q.  Can you tell the jury Hot Dog's true name? |
| 10:01AM | 4 | A.  It's Paul Francoforte. |
| 10:01AM | 5 | Q.  And the person on the other shoulder of Mr. Todaro Sr., |
| 10:01AM | 6 | do you know who that person is? |
| 10:01AM | 7 | A.  I do. |
| 10:01AM | 8 | Q.  Who is that? |
| 10:01AM | 9 | A.  Victor Sansonise. |
| 10:01AM | 10 | Q.  Can you put a mark on Mr. Sansonise?  By reputation in |
| 10:01AM | 11 | the law enforcement community, is Mr. Sansonise associated |
| 10:02AM | 12 | with Italian Organized Crime? |
| 10:02AM | 13 | A.  Yes. |
| 10:02AM | 14 | Q.  Is he believed to have a high-up position in the Italian |
| 10:02AM | 15 | Organized Crime in Buffalo, New York? |
| 10:02AM | 16 | A.  Yes. |
| 10:02AM | 17 | Q.  At the time of this photo, was Todaro Sr. believed to be |
| 10:02AM | 18 | the boss? |
| 10:02AM | 19 | A.  Yes. |
| 10:02AM | 20 | **MR. TRIPI:**  May the record reflect the witness also |
| 10:02AM | 21 | placed a mark on the person who has their left hand on |
| 10:02AM | 22 | Todaro Sr.'s right shoulder, this person is also in the second |
| 10:02AM | 23 | row near the center of the photo. |
| 10:02AM | 24 | Okay.  Ms. Champoux, we can take down Exhibit 393. |
| 10:02AM | 25 | And can you leave up Exhibits 46 and 109, please. |

10:02AM   1          Ms. Champoux, with respect to Exhibit 46 which is on

10:02AM   2   the left of the screen, the Serio contacts, can you -- can you

10:03AM   3   please zoom in on entry number 50 and move that to the top of

10:03AM   4   the screen, and highlight Exhibit 109.

10:03AM   5          **BY MR. TRIPI:**

10:03AM   6   Q.  With respect to entry number 50 in the Serio contacts,

10:03AM   7   Exhibit 46 at the top of the screen, can you say the name for

10:03AM   8   the jury, Special Agent Ryan?

10:03AM   9   A.  It's Lou Selva.

10:03AM  10   Q.  And can you -- is it spelled wrong, the last name?

10:03AM  11   A.  It appears to be, yes.

10:03AM  12   Q.  And can you -- can you place into the record the phone

10:03AM  13   number of the mobile phone number?

10:03AM  14   A.  From the top, is 716-903-1654.

10:03AM  15   Q.  Now looking at Exhibit 109F, which is zoomed in below

10:03AM  16   entry number 1, is there a name associated with that entry in

10:03AM  17   Mr. Bongiovanni's contacts?

10:03AM  18   A.  Yes, Louie.

10:03AM  19   Q.  And what's the phone number associated with that entry?

10:03AM  20   A.  716-903-1654.

10:04AM  21   Q.  Is that the same phone number that appears in the Serio

10:04AM  22   contacts, Exhibit 46?

10:04AM  23   A.  Yes.

10:04AM  24          **MR. TRIPI:**  Ms. Champoux, we can zoom out of those

10:04AM  25   two highlights or zooms.

Case 1:19-cr-00227-LJV-MJR  Document 1017  Filed 06/18/24  Page 14 of 239
USA v Bongiovanni - Ryan - Tripi/Direct - 3/18/24

14

| | | |
|---|---|---|
| 10:04AM | 1 | With respect to 46, Ms. Champoux, can you zoom in on |
| 10:04AM | 2 | number 17, the exhibit on the left? |
| 10:04AM | 3 | And, Ms. Champoux, the exhibit on the right, Exhibit |
| 10:04AM | 4 | 109F, can you zoom in on entry number 72? |
| 10:04AM | 5 | **BY MR. TRIPI:** |
| 10:04AM | 6 | Q.  Special Agent Ryan, beginning with the Exhibit 46 at the |
| 10:04AM | 7 | top of the screen, the Serio contacts, can you tell the jury |
| 10:05AM | 8 | the name associated with entry number 17 and the phone |
| 10:05AM | 9 | number? |
| 10:05AM | 10 | A.  Yes.  The name is Frank Parisi, and the telephone number |
| 10:05AM | 11 | is 716-481-8111. |
| 10:05AM | 12 | Q.  And now directing your attention to Exhibit 109F, entry |
| 10:05AM | 13 | number 72, the contact in Mr. Bongiovanni's phone, can you |
| 10:05AM | 14 | state the name for the jury? |
| 10:05AM | 15 | A.  Parisi. |
| 10:05AM | 16 | Q.  And can you say the mobile number? |
| 10:05AM | 17 | A.  716-481-8111. |
| 10:05AM | 18 | Q.  Is that the same entry -- phone number entry in both |
| 10:05AM | 19 | phones, the Serio phone and the Bongiovanni phone? |
| 10:05AM | 20 | A.  Yes. |
| 10:05AM | 21 | **MR. TRIPI:**  You can zoom out of those, Ms. Champoux. |
| 10:05AM | 22 | Ms. Champoux, with respect to Exhibit 46, can you |
| 10:05AM | 23 | zoom in on entry number 5, please.  And move that to the top |
| 10:05AM | 24 | of the screen. |
| 10:05AM | 25 | And on Exhibit 109F, can you zoom in on entry |

10:06AM   1   number 6, please.

10:06AM   2              BY MR. TRIPI:

10:06AM   3   Q.  Looking at Exhibit 46 at the top of the screen, entry

10:06AM   4   number 5, can you read the name for the jury?

10:06AM   5   A.  It says Ash, and then initial S.

10:06AM   6   Q.  And can you read the phone number?

10:06AM   7   A.  716-603-0831.

10:06AM   8   Q.  And with respect to Exhibit 109F, can you read entry

10:06AM   9   number 6, the name?

10:06AM  10   A.  Ashley.

10:06AM  11   Q.  And can you read the mobile number?

10:06AM  12   A.  716-603-0831.

10:06AM  13   Q.  Are those the same phone number?

10:06AM  14   A.  Yes.

10:06AM  15   Q.  Is that the same first name?

10:06AM  16   A.  Yes.

10:06AM  17   Q.  Do you know Defendant Bongiovanni's wife to have a sister

10:06AM  18   named Ashley Schuh?

10:06AM  19   A.  Yes.

10:06AM  20   Q.  And does Schuh begin with the letter S?

10:06AM  21   A.  Yes.

10:06AM  22   Q.  So those numbers and the entries appear to be the same in

10:06AM  23   Mr. Serio and Mr. Bongiovanni's phones?

10:06AM  24   A.  Yes.

10:07AM  25              MR. TRIPI:  Ms. Champoux, can we go to Exhibit --

10:07AM    1    zoom out of those, Exhibit 46.  Can you go to entry number 1

10:07AM    2    in the Serio phone.  Move that to the top of the screen.  And

10:07AM    3    entry number 5 on the Bongiovanni phone, 109F.

10:07AM    4           **BY MR. TRIPI:**

10:07AM    5    Q.  Special Agent Ryan, starting with Exhibit 46 at the top

10:07AM    6    of the screen, entry number 1, can you read the name for the

10:07AM    7    jury?

10:07AM    8    A.  Angelo Natali.

10:07AM    9    Q.  Can you read the phone number?

10:07AM    10    A.  716-907-4663.

10:07AM    11    Q.  Now going to 109F can you read the name?

10:07AM    12    A.  Angelo.

10:07AM    13    Q.  Can you read the mobile number?

10:07AM    14    A.  716-907-4663.

10:07AM    15    Q.  And is that the same number that Serio had for Angelo

10:07AM    16    Natali in his phone?

10:07AM    17    A.  Yes.

10:08AM    18           **MR. TRIPI:**  Okay.  We can bring -- we can bring that

10:08AM    19    exhibit down, Ms. Champoux.  We're going to keep 109F up

10:08AM    20    though.  And can you zoom in on entry number 68 in

10:08AM    21    Mr. Bongiovanni's phone, 109F.

10:08AM    22           **BY MR. TRIPI:**

10:08AM    23    Q.  And could you read the name associated with that entry,

10:08AM    24    Special Agent Ryan?

10:08AM    25    A.  Sinatra, Mike.

10:08AM  1    Q.   And can you read the phone number?

10:08AM  2    A.   716-946-8906.

10:08AM  3    Q.   Is that name and phone number associated with Michael

10:08AM  4    Sinatra consistent with the Michael Sinatra that his executed

10:08AM  5    a search warrant on January of 2019?

10:08AM  6    A.   Yes.

10:08AM  7         **MR. TRIPI:**  Could we zoom out of that, and zoom in on

10:08AM  8    entry number 82, please.

10:08AM  9         **BY MR. TRIPI:**

10:09AM  10   Q.   And can you read the name and phone number in that entry?

10:09AM  11   A.   It's Napoli.  And then it looks like Thomas is misspelled

10:09AM  12   with a D in place of the last letter.  And the phone number

10:09AM  13   is 716-348-0606.

10:09AM  14        **MR. TRIPI:**  Can you zoom out of that and highlight

10:09AM  15   entry number 83, please.

10:09AM  16        **BY MR. TRIPI:**

10:09AM  17   Q.   And can you read that for the jury?

10:09AM  18   A.   Doctor, Tommy.  716-697-8021.

10:09AM  19   Q.   And is that the same name of the person that was in the

10:09AM  20   photo that we've seen several times now, I won't show it

10:09AM  21   again, Government Exhibit 127 with respect to that cottage?

10:09AM  22   A.   Yes.

10:09AM  23        **MR. TRIPI:**  We can zoom out of that, Ms. Champoux.

10:10AM  24   And can we go to 111.

         25

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
| 10:10AM | 1  | **BY MR. TRIPI:**                                          |
| 10:10AM | 2  | Q.  And can you read that name?                           |
| 10:10AM | 3  | A.  Yep, Massi, Joe.                                       |
| 10:10AM | 4  | Q.  And the number?                                       |
| 10:10AM | 5  | A.  716-260-6361.                                         |
| 10:10AM | 6  | Q.  Now, a different spelling, but are you familiar with an |
| 10:10AM | 7  | individual named Joe Mesi who was a boxer in this area?   |
| 10:10AM | 8  | A.  Yes.                                                  |
| 10:10AM | 9  | **MR. TRIPI:**  You can zoom out of that, please.        |
| 10:10AM | 10 | Now, with respect to the investigation -- you can        |
| 10:10AM | 11 | zoom out of that exhibit altogether, Ms. Champoux.       |
| 10:10AM | 12 | **BY MR. TRIPI:**                                          |
| 10:10AM | 13 | Q.  With respect to this, excuse me, with respect to this |
| 10:10AM | 14 | overall investigation, did his and Department of Justice OIG |
| 10:10AM | 15 | make efforts to interview and complete interviews of     |
| 10:10AM | 16 | Bongiovanni's former partner, Joseph Palmieri, at the point |
| 10:11AM | 17 | in time where he was a retired DEA TFO?                   |
| 10:11AM | 18 | A.  Yes.                                                  |
| 10:11AM | 19 | Q.  Did those interviews occur after Palmieri was served a |
| 10:11AM | 20 | subject letter from the U.S. Attorney's Office?          |
| 10:11AM | 21 | A.  Yes.                                                  |
| 10:11AM | 22 | Q.  In a series of interviews with Mr. Palmieri, did he   |
| 10:11AM | 23 | appear to be withholding information related to          |
| 10:11AM | 24 | Mr. Bongiovanni and the investigation --                 |
| 10:11AM | 25 | **MR. MacKAY:**  Objection.                              |

USA v Bongiovanni - Ryan - Tripi/Direct - 3/18/24

19

| | | |
|---|---|---|
| 10:11AM | 1 | **BY MR. TRIPI:** |
| 10:11AM | 2 | Q.  -- and the investigation of Wayne Anderson? |
| 10:11AM | 3 | **THE COURT:**  Basis? |
| 10:11AM | 4 | **MR. MacKAY:**  Judge, this invokes I think to some |
| 10:11AM | 5 | degree the pretrial ruling.  Can we approach on this? |
| 10:11AM | 6 | **THE COURT:**  Yeah, come on up. |
| 10:11AM | 7 | (Sidebar discussion held on the record.) |
| 10:11AM | 8 | **MR. TRIPI:**  I'm not going to get into the polygraph, |
| 10:11AM | 9 | if that's the question. |
| 10:11AM | 10 | **MR. MacKAY:**  Judge, if the Court will recall, we did |
| 10:11AM | 11 | a pretrial motion about excluding polygraph results, and then |
| 10:12AM | 12 | the component of it was, is the government going to try to |
| 10:12AM | 13 | backdoor in credibility assessments about these folks.  And I |
| 10:12AM | 14 | think that's sort of what his question evokes, did they |
| 10:12AM | 15 | believe Palmier is withholding information. |
| 10:12AM | 16 | **MR. TRIPI:**  I think that's separate and distinct from |
| 10:12AM | 17 | entering polygraph results that were a series of proffers that |
| 10:12AM | 18 | preceded a polygraph.  Now ultimately -- |
| 10:12AM | 19 | **THE COURT:**  And he's going to testify that he didn't |
| 10:12AM | 20 | believe Palmieri, or that he thought Palmieri was being |
| 10:12AM | 21 | disingenuous in what he said? |
| 10:12AM | 22 | **MR. TRIPI:**  That was -- that was gonna be my last |
| 10:12AM | 23 | question, Your Honor, because it's not getting into the |
| 10:12AM | 24 | substance of anything he said.  They just this morning, I was |
| 10:12AM | 25 | going to skip over this, but just this morning they've |

10:12AM     1    referenced that they're probably going to make applications

10:12AM     2    for missing witnesses, so this provides some context of why

10:12AM     3    the government is not calling Palmieri.  So I have the case

10:12AM     4    agent --

10:12AM     5              THE COURT:  The question is whether he believed

10:12AM     6    Palmieri, unless -- unless it influenced his investigations.

10:12AM     7              MR. TRIPI:  Well, I think -- here's why.  I think the

10:13AM     8    relevance is if they're going to make missing witness charges,

10:13AM     9    we now have -- we have evidence in the record to suggest why

10:13AM    10    the government didn't call Palmieri.  So that should knock out

10:13AM    11    some witness, but it also --

10:13AM    12              THE COURT:  Well, you can argue that to me.

10:13AM    13              MR. TRIPI:  But there's also a -- for the jury's

10:13AM    14    purposes, there's a chronological or a conceptual gap.  One

10:13AM    15    would think that the jury may be wondering why we didn't hear

10:13AM    16    from his partner on the Wayne Anderson file.  We've heard

10:13AM    17    Palmieri's name several times.  Here's the lead case agent.

10:13AM    18              Regardless of the polygraph, he makes an assessment

10:13AM    19    this is not someone who's on team America, we're not putting

10:13AM    20    any stock in what he says, we're moving on with our

10:13AM    21    investigation.

10:13AM    22              Now, we didn't charge Palmieri yet, but in our

10:13AM    23    pretrial memo, we say that's still out there.  I'm happy to

10:13AM    24    carve it, but I --

10:13AM    25              THE COURT:  Yeah, but so I don't think it's -- you --

10:13AM   1   if it colors what he did in his investigation -- so I think

10:14AM   2   you can ask it, did you follow up with Palmieri, or why didn't

10:14AM   3   you call Palmieri.  I think that's okay.

10:14AM   4          And if he says 'cuz he wasn't being honest with us, I

10:14AM   5   think that's fine.

10:14AM   6          But I don't think you can ask him what his opinion is

10:14AM   7   on Palmieri's credibility because --

10:14AM   8          **MR. TRIPI:**  I can do it a different way.

10:14AM   9          **THE COURT:**  Right.

10:14AM  10          **MR. SINGER:**  There's no foundation for it.

10:14AM  11          **THE COURT:**  But do you have a problem with him asking

10:14AM  12   what I'm suggesting?  To him saying why didn't you follow up

10:14AM  13   with Palmieri?

10:14AM  14          **MR. MacKAY:**  I mean, again, to us, it's our position

10:14AM  15   it's not relevant.  I mean --

10:14AM  16          **THE COURT:**  But it's his investigation.  It's the

10:14AM  17   investigation.  Why wouldn't -- why wouldn't that have some

10:14AM  18   relevance?

10:14AM  19          **MR. TRIPI:**  And, Judge, just for your edification, I

10:14AM  20   think where we're going, the way I'll do it is he applied for

10:14AM  21   and got a search warrant for Palmieri's residence.  So,

10:14AM  22   clearly, he didn't believe him.

10:14AM  23          **THE COURT:**  Fine.

10:15AM  24          **MR. MacKAY:**  I didn't hear that.

10:15AM  25          **MR. TRIPI:**  He got a search warrant for Palmieri's

10:15AM  1    residence.  And they have that search warrant.

10:15AM  2             MR. MacKAY:  I think what it amounts to is trying to

10:15AM  3    backdoor in Palmieri without having to call him and dirty him

10:15AM  4    up.  That's where our concern lies.

10:15AM  5             MR. TRIPI:  We don't have to call anyone.  We don't

10:15AM  6    have to call Palmieri, he's got a lawyer.

10:15AM  7             THE COURT:  Yeah, I think that he can -- I think that

10:15AM  8    he can talk about what the investigation was, and why certain

10:15AM  9    steps were taken or not taken, but I don't think it can go

10:15AM  10   beyond that.

10:15AM  11            MR. MacKAY:  If the objection is sustained, then can

10:15AM  12   we move to strike what came before?

10:15AM  13            MR. TRIPI:  I don't think I got an answer to the

10:15AM  14   question you objected to.

10:15AM  15            THE COURT:  Hang on.

10:15AM  16            MR. MacKAY:  I thought he said --

10:15AM  17            MR. TRIPI:  What came before --

10:16AM  18            THE COURT:  I don't think so.

10:16AM  19            (End of sidebar discussion.)

10:16AM  20            THE COURT:  So the objection is sustained.

10:16AM  21            Ask your next question, please.

10:16AM  22            BY MR. TRIPI:

10:16AM  23   Q.  Special Agent Ryan, after Palmieri was served a subject

10:16AM  24   letter and after a series of proffer interviews that included

10:16AM  25   yourself, did you -- did you thereafter apply for and receive

| | | |
|---|---|---|
| 10:16AM | 1 | a search warrant for Mr. Palmieri's residence? |
| 10:17AM | 2 | A.  Yes. |
| 10:17AM | 3 | Q.  Does, in your view, does he remain a subject or target of |
| 10:17AM | 4 | investigation today? |
| 10:17AM | 5 | A.  Yes. |
| 10:17AM | 6 | Q.  In conjunction with DOJ OIG, was another former partner |
| 10:17AM | 7 | of Mr. Bongiovanni's interviewed named Mike Hill? |
| 10:17AM | 8 | A.  Yes. |
| 10:17AM | 9 | Q.  Did he receive a subject letter from the U.S. Attorney's |
| 10:17AM | 10 | Office upon his retirement from the DEA? |
| 10:17AM | 11 | A.  He did. |
| 10:17AM | 12 | Q.  Based upon the investigation, do you view him as a |
| 10:17AM | 13 | subject or a target of the investigation -- |
| 10:17AM | 14 | A.  Yes. |
| 10:17AM | 15 | Q.  -- today? |
| 10:17AM | 16 | Was there another DEA special agent named Greg Yensan who |
| 10:17AM | 17 | was served a subject letter who had worked with Bongiovanni |
| 10:17AM | 18 | on parts of these cases? |
| 10:17AM | 19 | A.  Yes. |
| 10:17AM | 20 | Q.  Did he give a series of interviews? |
| 10:17AM | 21 | **MR. MacKAY:**  Objection, Judge.  Can we approach again |
| 10:17AM | 22 | on this? |
| 10:17AM | 23 | **THE COURT:**  Sure. |
| 10:17AM | 24 | (Sidebar discussion held on the record.) |
| 10:18AM | 25 | **MR. MacKAY:**  So, Judge, again, this is sort of more |

10:18AM 1    of the same thing where, I mean, the Palmieri connection to

10:18AM 2    Bongiovanni are arguably closer, they're partners.  But Hill

10:18AM 3    doesn't, rarely, if I recall, come up in the testimony so far.

10:18AM 4    Yensan is sporadically there, he's a supervisor.  So we're

10:18AM 5    getting -- it feels like we're getting a little far afield

10:18AM 6    from the original connection between the partners who worked

10:18AM 7    together at the time.

10:18AM 8            **THE COURT:**  Yeah.

10:18AM 9            **MR. TRIPI:**  No.  Hill was -- Hill was on the -- it's

10:18AM 10   been a while, so --

10:18AM 11           **THE COURT:**  Well, Hill, there was no objection to.

10:18AM 12   Talk to me about Yensan.

10:18AM 13           **MR. TRIPI:**  Yensan is in the Wayne Anderson file, as

10:18AM 14   well.  He signs one of the openings.

10:18AM 15           **THE COURT:**  Oh, right.

10:18AM 16           **MR. TRIPI:**  He initials that.  He's also the name on

10:18AM 17   the draft GPS affidavit that never gets sent to the U.S.

10:18AM 18   Attorney's Office.  He also is in the meeting with Mr. Lynch

10:18AM 19   where they're talking about GPS tracker warrants, even though

10:19AM 20   there's representations in the file, the supervisor, that they

10:19AM 21   had already submitted them.  Mr. Lynch's testimony was clear,

10:19AM 22   we never got GPS tracker warrants.

10:19AM 23           And so Mr. Yensan -- and I think it's significant

10:19AM 24   that the three people he worked closely with are subjects of

10:19AM 25   or the targets of the investigation currently.

| | | |
|---|---|---|
| 10:19AM | 1 | **MR. MacKAY:**  But with Palmieri, I at least understand |
| 10:19AM | 2 | it to be that there's some sort of credibility finding about |
| 10:19AM | 3 | Palmieri that -- because there's these polygraphs and they |
| 10:19AM | 4 | don't believe Palmieri. |
| 10:19AM | 5 | But with Yensan, I don't know that we've ever had a |
| 10:19AM | 6 | reason why he's not called.  I believe -- |
| 10:19AM | 7 | **MR. TRIPI:**  He's got a subject letter. |
| 10:19AM | 8 | **MR. MacKAY:**  He's got a subject letter -- |
| 10:19AM | 9 | **MR. TRIPI:**  He's represented by Cheryl Meyers-Buth. |
| 10:19AM | 10 | **MR. MacKAY:**  But there's a number of witnesses |
| 10:19AM | 11 | represented here. |
| 10:19AM | 12 | **THE COURT:**  Go ahead. |
| 10:19AM | 13 | **MR. SINGER:**  So, essentially, are we commenting on |
| 10:19AM | 14 | the right to silence?  Because if someone invokes the Fifth |
| 10:19AM | 15 | Amendment privilege or right to counsel -- |
| 10:19AM | 16 | **MR. TRIPI:**  No, he spoke.  They lied.  That's what |
| 10:19AM | 17 | happened. |
| 10:19AM | 18 | **THE COURT:**  Hang on.  Well, they lied, but that's |
| 10:19AM | 19 | somebody's opinion that they lied.  So I'm not so sure that |
| 10:20AM | 20 | that's relevant. |
| 10:20AM | 21 | **MR. TRIPI:**  But their status is what's relevant, |
| 10:20AM | 22 | Judge.  That's what I brought out.  The status is relevant, a |
| 10:20AM | 23 | former partner -- |
| 10:20AM | 24 | **THE COURT:**  Why isn't the status relevant?  Why isn't |
| 10:20AM | 25 | the fact that there's a pending investigation relevant? |

10:20AM   1           MR. SINGER:  Can we talk about this real quick,

10:20AM   2    Judge?

10:20AM   3           THE COURT:  Sure.  Of course.  Yeah.

10:21AM   4           MR. MacKAY:  Judge, I think we're going to withdraw

10:21AM   5    the objection to Yensan as far as relevance, just keeping an

10:21AM   6    eye out of how far this is going to go.

10:22AM   7           MR. TRIPI:  I'm done.

10:22AM   8           THE COURT:  I don't think it's going to go any

10:22AM   9    further.

10:22AM  10           (Sidebar discussion concluded.)

10:22AM  11           THE COURT:  The objection is withdrawn; is that

10:22AM  12    right?

10:22AM  13           MR. MacKAY:  It is, Your Honor.

10:22AM  14           MR. TRIPI:  Judge, I'm just not sure to the last

10:22AM  15    question, and I'm moving on after this, if I got an answer to

10:22AM  16    that.

10:22AM  17           Can -- Ms. Sawyer, can you just read the last

10:22AM  18    question, and if I got an answer?

10:22AM  19           (The above-requested question was then read by the

10:22AM  20    reporter.)

10:22AM  21           BY MR. TRIPI:

10:22AM  22    Q.  I guess the last question then would be:  Does his status

10:22AM  23    remain as a subject of the investigation?

10:22AM  24    A.  Mr. Yensan?

10:22AM  25    Q.  Yes.

10:22AM   1   A.  Yes.

10:22AM   2            MR. TRIPI:  Okay.  Moving on, Your Honor.  I'm going

10:23AM   3   to hand up Government Exhibit 209 which is in evidence.

10:23AM   4            BY MR. TRIPI:

10:23AM   5   Q.  Special Agent Ryan, do you recall the circumstances under

10:23AM   6   which that item of evidence came into possession of his?

10:23AM   7   A.  Yes.

10:23AM   8   Q.  Can you describe the circumstances under which that came

10:23AM   9   into the possession of you and Special Agent Halliday in this

10:23AM  10   investigation?

10:23AM  11   A.  We were meeting with Lou Selva, and he gave this to us.

10:23AM  12   Q.  And can you read what the front of the paper bag says?

10:23AM  13   A.  It says happy birthday, Brother.  55, no jive.  Love ya,

10:23AM  14   Bonj.

10:23AM  15   Q.  And where did Mr. Selva turn that over to you?

10:23AM  16   A.  At the U.S. Attorney's Office.

10:23AM  17   Q.  And what was his demeanor when delivering that to you?

10:24AM  18   A.  He was a little bit nervous about it.

10:24AM  19   Q.  During the interviews with Mr. Selva that you were in,

10:24AM  20   was that nervousness common?

10:24AM  21   A.  Yes, throughout.

10:24AM  22   Q.  Did he appear scared at times?

10:24AM  23   A.  Yes, he told me he was.

10:24AM  24   Q.  Okay.  Now, we've referenced that box a couple of times.

10:24AM  25   And the Government Exhibit 100A.1 is the CD that's in

10:24AM    1    evidence regarding the scanned items that were in that file;

10:24AM    2    is that correct?

10:24AM    3    A.  Yes.

10:25AM    4         MR. TRIPI:  Okay.  Ms. Champoux, can we pull up

10:25AM    5    Government Exhibit 100A.1, which is in evidence.

10:25AM    6         BY MR. TRIPI:

10:25AM    7    Q.  Now I'd like to work through some of the documents with

10:25AM    8    you, Special Agent Ryan, okay?

10:25AM    9    A.  Okay.

10:25AM   10         MR. TRIPI:  Ms. Champoux, can we open -- withdrawn

10:25AM   11    for a moment.

10:25AM   12         BY MR. TRIPI:

10:25AM   13    Q.  Now, you and Special Agent Halliday worked together to

10:25AM   14    scan the documents and create the CD, correct?

10:25AM   15    A.  Correct.

10:25AM   16    Q.  The things that each pdf has labeled, were those labels

10:25AM   17    that you and Special Agent Halliday assigned them?

10:25AM   18    A.  Yes, they were assigned by us as we made the scans.

10:25AM   19    Q.  Okay.  And that was based upon reviewing the document and

10:25AM   20    scanning it?

10:25AM   21    A.  Right.  Trying to come up with a name that would help us

10:25AM   22    come back to it when we needed to.

10:26AM   23    Q.  Okay.  As it was in the file, it was just a whole bunch

10:26AM   24    of papers, correct?

10:26AM   25    A.  Correct.

10:26AM   1   Q.  Okay.  So, this was some attempt to organize the

10:26AM   2   documents, but it was your attempt, not the way the file was

10:26AM   3   organized; is that fair?

10:26AM   4   A.  Yes.

10:26AM   5        **MR. TRIPI:**  Okay.  Can we click on this first pdf

10:26AM   6   labeled 4/19/13, subscriber list.  And can we rotate it so

10:26AM   7   that it reads.  Thank you.  Can we scroll to the top.

10:26AM   8        **BY MR. TRIPI:**

10:26AM   9   Q.  Okay.  Now, Special Agent Ryan, before I get into this

10:26AM   10  document, you worked at DEA, correct?

10:26AM   11  A.  Yes.

10:26AM   12  Q.  And you're familiar with deconfliction, and deconfliction

10:26AM   13  of phone numbers?

10:26AM   14  A.  Yes.

10:26AM   15  Q.  In the context of DEA, how are intel analysts utilized

10:26AM   16  when subpoenaing phone numbers from DARTS at the DEA?

10:26AM   17  A.  Often they did all of the DARTS entries, they would

10:27AM   18  receive the DARTS returns, then they would analyze the

10:27AM   19  returns with PLX.

10:27AM   20  Q.  And so the DARTS, that's the system for issuing the

10:27AM   21  subpoenas?

10:27AM   22  A.  It issues the subpoenas, and then it also checks the

10:27AM   23  numbers that you're issuing the subpoenas for against

10:27AM   24  previous subpoenas to see if anyone else has subpoenaed the

10:27AM   25  same number.

USA v Bongiovanni - Ryan - Tripi/Direct - 3/18/24

30

10:27AM   1   Q.   Is it common -- is it common for agents and task force

10:27AM   2   officers to use the intel analysts to do the DARTS phone

10:27AM   3   number subpoenas?

10:27AM   4   A.   Yes.

10:27AM   5   Q.   And do the analysts also get the responses and conduct

10:27AM   6   analysis for the agents?

10:27AM   7   A.   Yes.

10:27AM   8   Q.   Sometimes did they do that analysis without being asked,

10:27AM   9   they get the return and they start generating lists?

10:27AM   10   A.   Yes.

10:27AM   11   Q.   What are the different types of lists that the intel

10:27AM   12   analysts create typically from DARTS subpoena returns, phone

10:27AM   13   number returns?

10:27AM   14   A.   One is the hot sheet.

10:27AM   15   Q.   What is a hot sheet?

10:27AM   16   A.   It's a nickname for -- it's called the most dialed number

10:28AM   17   report.  So it goes -- it's analyzing 60 days of toll data.

10:28AM   18   It will tell you the most dialed number, and then how many

10:28AM   19   times it was called, the date range of the calls.  And then

10:28AM   20   it goes from the most dialed to the least dialed with that

10:28AM   21   information.

10:28AM   22   Q.   Other lists that they can create, do those include

10:28AM   23   subscriber lists?

10:28AM   24   A.   Yes.

10:28AM   25   Q.   And is that identifying subscribers of various phones --

| | | |
|---|---|---|
| 10:28AM | 1 | phone numbers that are subpoenaed? |
| 10:28AM | 2 | A.  Yes. |
| 10:28AM | 3 | Q.  Do they also create common call lists? |
| 10:28AM | 4 | A.  Yes. |
| 10:28AM | 5 | Q.  And would that be taking two numbers that are -- that are |
| 10:28AM | 6 | known, and seeing who those two numbers call that are the |
| 10:28AM | 7 | same or common? |
| 10:28AM | 8 | A.  Yes, that's exactly what it is. |
| 10:28AM | 9 | Q.  And are all those things, all those -- withdrawn. |
| 10:28AM | 10 | Things, it's a bad word.  Are all of those lists, are all of |
| 10:28AM | 11 | those items, that type of work product, is that law |
| 10:29AM | 12 | enforcement sensitive information? |
| 10:29AM | 13 | A.  Yes. |
| 10:29AM | 14 | Q.  Is that information, is that the type of information you |
| 10:29AM | 15 | intend to bring home when you retire from his? |
| 10:29AM | 16 | A.  No. |
| 10:29AM | 17 | Q.  Okay.  So now looking at the pdf labeled 4/19/13 |
| 10:29AM | 18 | subscriber list -- |
| 10:29AM | 19 | **MR. TRIPI:**  Can we open that back up, please. |
| 10:29AM | 20 | **BY MR. TRIPI:** |
| 10:29AM | 21 | Q.  Can you just orient the jury to what this is? |
| 10:29AM | 22 | A.  So this is subscriber list.  And I'm not sure how the |
| 10:29AM | 23 | analyst runs it, but it would be -- it includes all the |
| 10:29AM | 24 | identified subscribers for that batch of data in PLX. |
| 10:29AM | 25 | **MR. TRIPI:**  Ms. Champoux, can we just scroll down and |

10:29AM   1   show the jury how many pages there are?

10:30AM   2           **BY MR. TRIPI:**

10:30AM   3   Q.  And at times, do you see handwriting on there?

10:30AM   4   A.  Yes.

10:30AM   5           **MR. TRIPI:**  Scroll up to the top.  Let's X out of

10:30AM   6   that.  We'll go to the next document.  The next one that I

10:30AM   7   want to open up is labeled 467 Tacoma ELEC sub.  Ms. Champoux,

10:30AM   8   can you scroll so Special Agent Ryan can see the whole page?

10:30AM   9   Okay.  That's good enough.  Can we make it a little larger,

10:30AM  10   maybe one larger?  Thank you.

10:30AM  11           **BY MR. TRIPI:**

10:30AM  12   Q.  Now looking at the first page of this pdf, page 1 of that

10:30AM  13   pdf, can you tell the jury what they're looking at?

10:30AM  14   A.  Yes.  It's a DEA administrative subpoena.

10:30AM  15   Q.  And an administrative subpoena to what company?

10:31AM  16   A.  National Grid.

10:31AM  17   Q.  And what is National Grid?

10:31AM  18   A.  An electric supplier in Western New York.

10:31AM  19   Q.  I'm sorry, what is it?

10:31AM  20   A.  It's an electric utility in Western New York.

10:31AM  21   Q.  And who does it say in the greeting line the subpoena was

10:31AM  22   authorized by or issued by?

10:31AM  23   A.  Special Agent Bongiovanni.

10:31AM  24   Q.  And does it request information associated with several

10:31AM  25   addresses?

USA v Bongiovanni - Ryan - Tripi/Direct - 3/18/24

33

10:31AM   1   A.  Yes, two.  467 Tacoma Avenue in Buffalo, and 469 Tacoma

10:31AM   2   Avenue in Buffalo.

10:31AM   3   Q.  And near the bottom of the page, there's a sentence that

10:31AM   4   says please direct questions concerning the subpoena and/or

10:31AM   5   response to IA Steven P. Bevilacqua with a phone number; do

10:31AM   6   you see that?

10:31AM   7   A.  Yes, I do.

10:31AM   8   Q.  What does IA mean?

10:31AM   9   A.  Investigative analyst.

10:31AM   10  Q.  Is that what we've been talking about, the people who

10:32AM   11  help with DARTS and who help the agent and task force

10:32AM   12  officers with their subpoenas?

10:32AM   13  A.  Yes.

10:32AM   14  Q.  And do you know who Steven Bevilacqua is?

10:32AM   15  A.  I do.

10:32AM   16  Q.  Who is that?

10:32AM   17  A.  He was an analyst who worked at the DEA office when I was

10:32AM   18  there.

10:32AM   19  Q.  Okay.  So someone who helps agents and task force

10:32AM   20  officers?

10:32AM   21  A.  Yes.

10:32AM   22  Q.  Is this type of administrative subpoena law enforcement

10:32AM   23  sensitive and relative to an investigation?

10:32AM   24  A.  Yes.

10:32AM   25  Q.  Is it the type of document you plan to bring home when

10:32AM  1   you retire?

10:32AM  2   A.  No.

10:32AM  3   Q.  Would you ever bring it home?

10:32AM  4   A.  No.

10:32AM  5        **MR. TRIPI:**  Let's scroll down to the next page of

10:32AM  6   this pdf.  And keep going.

10:32AM  7        **BY MR. TRIPI:**

10:32AM  8   Q.  Now we're on page 3.  Are you familiar with what that is,

10:32AM  9   just generally?

10:32AM  10  A.  It's a return from National Grid.

10:32AM  11  Q.  So, this is a National Grid subpoena, then we saw a

10:32AM  12  Google image, and then the third page is the subpoena

10:32AM  13  response?

10:32AM  14  A.  Yes.

10:32AM  15        **MR. TRIPI:**  Okay.  Can we keep scrolling down,

10:32AM  16  Ms. Champoux?

10:32AM  17        **BY MR. TRIPI:**

10:32AM  18  Q.  And do you recognize generally what page 4 is?

10:33AM  19  A.  Yes, it's more of the same.

10:33AM  20  Q.  More of the response --

10:33AM  21  A.  Yes.

10:33AM  22  Q.  -- from the company; is that correct?

10:33AM  23  A.  Yes.

10:33AM  24        **MR. TRIPI:**  Keep scrolling down, Ms. Champoux.

         25

10:33AM    1              BY MR. TRIPI:

10:33AM    2    Q.  Now we're at page 5 of this particular pdf.  Is this more

10:33AM    3    of the response from the company?

10:33AM    4    A.  Yes.

10:33AM    5              MR. TRIPI:  Keep scrolling down, Ms. Champoux.  We're

10:33AM    6    gonna keep scrolling.  So page 6, page 7, 8, 9, 10, 11, 12,

10:33AM    7    13.  Stop.

10:33AM    8              BY MR. TRIPI:

10:33AM    9    Q.  So through page 13, were those all part of the subpoena

10:33AM   10    response --

10:33AM   11    A.  Yes.

10:33AM   12    Q.  -- from National Grid; is that right?

10:33AM   13    A.  Yes.

10:33AM   14    Q.  Now we get to page 14.  Can you tell us what this is?

10:34AM   15    A.  That's a Kenmore Police Department police report from

10:34AM   16    June 2nd, 2013.

10:34AM   17              MR. TRIPI:  And can we scroll down to page 15.

10:34AM   18              BY MR. TRIPI:

10:34AM   19    Q.  Is that the second page of the Kenmore Police Department

10:34AM   20    police report?

10:34AM   21    A.  Yes.

10:34AM   22              MR. TRIPI:  All right.  Ms. Champoux, I'd like to go

10:34AM   23    to a different document.  Can we go to the pdf labeled

10:34AM   24    56393JX.  Should be the next one down.

          25

| | | |
|---|---|---|
| 10:34AM | 1 | **BY MR. TRIPI:** |
| 10:34AM | 2 | Q.  Can you tell the jury what this document is? |
| 10:34AM | 3 | A.  It's an NCIC NLETS return for -- |
| 10:34AM | 4 | Q.  To who? |
| 10:34AM | 5 | A.  It's to David Leary. |
| 10:34AM | 6 | Q.  And what is NCIC NLETS? |
| 10:35AM | 7 | A.  So NCIC is the National Crime Information Center.  And |
| 10:35AM | 8 | then NLETS is the teletype system, or it was originally a |
| 10:35AM | 9 | teletype system where you check driver's licenses, vehicle |
| 10:35AM | 10 | registrations, the houses, that type of information. |
| 10:35AM | 11 | Q.  And does this appear to be associated with a Thomas |
| 10:35AM | 12 | Serio? |
| 10:35AM | 13 | A.  Yes.  It looks like vehicle registration query return for |
| 10:35AM | 14 | Thomas Serio, or for a vehicle registered to Thomas Serio, I |
| 10:35AM | 15 | should say. |
| 10:35AM | 16 | Q.  Is this a response from a law enforcement database? |
| 10:35AM | 17 | A.  Yes, it is. |
| 10:35AM | 18 | Q.  And this was located also in the defendant's house in his |
| 10:35AM | 19 | basement, in that box in that file? |
| 10:35AM | 20 | A.  Yes. |
| 10:35AM | 21 | **MR. TRIPI:**  We can get out of that.  Can we go to the |
| 10:35AM | 22 | next document, it's labeled 39612013. |
| 10:35AM | 23 | **BY MR. TRIPI:** |
| 10:35AM | 24 | Q.  And generally, can you tell the jury what this is? |
| 10:35AM | 25 | A.  Criminal history report. |

| | | |
|---|---|---|
| 10:35AM | 1 | Q.  Are those things that are part of criminal investigation |
| 10:36AM | 2 | generally? |
| 10:36AM | 3 | A.  Yes. |
| 10:36AM | 4 | Q.  Are criminal histories supposed to be handled with care? |
| 10:36AM | 5 | A.  Yes. |
| 10:36AM | 6 | Q.  And this one's an FBI criminal history check? |
| 10:36AM | 7 | A.  Well, they're all housed by the FBI, Criminal Justice |
| 10:36AM | 8 | Information Services Division. |
| 10:36AM | 9 | Q.  And can you -- |
| 10:36AM | 10 | A.  So this one -- |
| 10:36AM | 11 | **MR. TRIPI:**  Can we scroll down a little bit.  Let's |
| 10:36AM | 12 | go to page 2. |
| 10:36AM | 13 | **BY MR. TRIPI:** |
| 10:36AM | 14 | Q.  And whose criminal history is this? |
| 10:36AM | 15 | A.  Damien Abbate. |
| 10:36AM | 16 | Q.  Are criminal histories of individuals things you plan to |
| 10:36AM | 17 | take home when you retire? |
| 10:36AM | 18 | A.  No. |
| 10:37AM | 19 | Q.  Is this a law enforcement sensitive document? |
| 10:37AM | 20 | A.  Yes. |
| 10:37AM | 21 | **MR. TRIPI:**  You can zoom out of that. |
| 10:37AM | 22 | I'd like to go to 561801221 Serio T toll analysis. |
| 10:37AM | 23 | Okay. |
| 10:37AM | 24 | **BY MR. TRIPI:** |
| 10:37AM | 25 | Q.  Generally, Special Agent Ryan, can you tell the jury what |

USA v Bongiovanni - Ryan - Tripi/Direct - 3/18/24

38

| | | |
|---|---|---|
| 10:37AM | 1 | this is? |
| 10:37AM | 2 | A.  This is a hot number list for telephone number |
| 10:37AM | 3 | 561-801-0221. |
| 10:37AM | 4 | Q.  And do you see some handwriting next to that phone |
| 10:37AM | 5 | number? |
| 10:37AM | 6 | A.  Yes. |
| 10:37AM | 7 | Q.  What's the name that there's handwriting on? |
| 10:37AM | 8 | A.  Thomas Serio.  And then there's several addresses. |
| 10:37AM | 9 | Q.  And in the upper right-hand corner, do you see a nickname |
| 10:37AM | 10 | associated with the defendant written there? |
| 10:37AM | 11 | A.  Yes. |
| 10:37AM | 12 | Q.  What do you see? |
| 10:37AM | 13 | A.  Bongo. |
| 10:37AM | 14 | Q.  Is this -- is this, in your experience, consistent with |
| 10:37AM | 15 | an analyst running a hot number list for an agent? |
| 10:37AM | 16 | A.  Yes. |
| 10:38AM | 17 | Q.  And then labelling who the work was for? |
| 10:38AM | 18 | A.  Yes. |
| 10:38AM | 19 | Q.  Do you see some highlighting and handwriting on entry |
| 10:38AM | 20 | number 15 there? |
| 10:38AM | 21 | A.  Yes, I do. |
| 10:38AM | 22 | Q.  Can you read that telephone number and then the |
| 10:38AM | 23 | handwritten information? |
| 10:38AM | 24 | A.  The -- can we zoom in on it just a little bit? |
| 10:38AM | 25 | Q.  We can do row 15, or that's fine? |

10:38AM  1   A.  That's fine.  Like that.  So the telephone number is

10:38AM  2   716-481-8002.  And then the system listed as no subscriber,

10:38AM  3   but someone has handwritten in the name John Robinson.

10:38AM  4   Q.  And is there an address written next to John Robinson's

10:38AM  5   name?

10:38AM  6   A.  248 Euclid Ave.

10:38AM  7   Q.  And going to the far end, is there a date range?

10:38AM  8   A.  Yes.  The highlighted line is October 24th, 2012 to

10:38AM  9   November 16th, 2012.

10:38AM  10  Q.  And in your experience, is that the date range associated

10:39AM  11  with the phone records?

10:39AM  12  A.  It's the date range for the 88 calls that are listed in

10:39AM  13  the second column from the left.

10:39AM  14  Q.  Using your finger, can you circle -- can you show the

10:39AM  15  jury where you're referencing 88 calls?

10:39AM  16  A.  Yes.

10:39AM  17       MR. TRIPI:  May the record reflect that the witness

10:39AM  18  did so, indicated where the 88 calls are coming from.

10:39AM  19       BY MR. TRIPI:

10:39AM  20  Q.  So does that indicate there's 88 calls, if we're using

10:39AM  21  the handwritten name John Robinson, during that time period

10:39AM  22  with the number highlighted in pink above for Thomas Serio?

10:39AM  23  A.  Yes.

10:39AM  24       MR. TRIPI:  And if you scroll through, Ms. Champoux,

10:39AM  25  can we scroll down to the next page?

| | | |
|---|---|---|
| 10:39AM | 1 | **BY MR. TRIPI:** |
| 10:39AM | 2 | Q.  Do you see a lot of no subscribers on this hot list? |
| 10:39AM | 3 | A.  Yes. |
| 10:39AM | 4 | Q.  In your experience, are no subscriber phones generally |
| 10:39AM | 5 | indicative of prepaid or burner phones? |
| 10:39AM | 6 | A.  It could be that, or it could be just another round of |
| 10:39AM | 7 | subpoenas needs to be done for those phone numbers to try to |
| 10:40AM | 8 | identify those subscribers. |
| 10:40AM | 9 | **MR. TRIPI:**  Okay.  Keep scrolling down.  Keep |
| 10:40AM | 10 | scrolling down.  Keep scrolling down.  In terms of the |
| 10:40AM | 11 | subscriber, we see a whole bunch of no subscribers listed, |
| 10:40AM | 12 | correct? |
| 10:40AM | 13 | A.  Yes. |
| 10:40AM | 14 | **MR. TRIPI:**  Keep going.  May the record reflect, |
| 10:40AM | 15 | Judge, this is a nine-page pdf, and we're scrolling through |
| 10:40AM | 16 | all the of the pages.  Okay?  And go back to the first page of |
| 10:40AM | 17 | this, Ms. Champoux. |
| 10:40AM | 18 | And does this have a run date at the top? |
| 10:40AM | 19 | The very top, Ms. Champoux. |
| 10:40AM | 20 | **BY MR. TRIPI:** |
| 10:40AM | 21 | Q.  Run date? |
| 10:40AM | 22 | A.  Yes, November 30th, 2012. |
| 10:41AM | 23 | Q.  And what is a run date? |
| 10:41AM | 24 | A.  It's the date the report was generated. |
| 10:41AM | 25 | Q.  And next to there, there's a run time? |

10:41AM   1   A.  Yes.

10:41AM   2   Q.  So it appears as of November 30th, 2012, based upon the

10:41AM   3   phone number and the frequency, there was an association

10:41AM   4   between Thomas Serio and John Robinson; is that how you read

10:41AM   5   this?

10:41AM   6   A.  Yes.

10:41AM   7   Q.  Is it your understanding that John Robinson was never

10:41AM   8   interviewed until you interviewed him during the COVID

10:41AM   9   pandemic many years later?

10:41AM  10   A.  Yes.

10:41AM  11        **MR. TRIPI:**  Can we zoom out of this and go to the

10:41AM  12   next pdf which should say 716-481-8002.  Toll analysis.

10:42AM  13        **BY MR. TRIPI:**

10:42AM  14   Q.  And, so, if we relate this back to the pdf we just looked

10:42AM  15   at, this was the highlighted number that was associated with

10:42AM  16   John Robinson; is that right?

10:42AM  17   A.  Yes.

10:42AM  18   Q.  And generally, what is this document?

10:42AM  19   A.  Numerical listing.  So this is all the numbers called for

10:42AM  20   the time frame of the records.

10:42AM  21   Q.  For that 716 --

10:42AM  22   A.  For that number.

10:42AM  23   Q.  Okay.  And do you see the name about midway down for

10:42AM  24   Thomas Serio on that list?

10:42AM  25   A.  Yes.

| | | |
|---|---|---|
| 10:42AM | 1 | MR. TRIPI:  Can we go to the next page, page 2 of |
| 10:42AM | 2 | this and rotate it. |
| 10:42AM | 3 | BY MR. TRIPI: |
| 10:42AM | 4 | Q.  Do you see the name Mark Falzone on page 2. |
| 10:42AM | 5 | A.  Yes, it's the third line down. |
| 10:42AM | 6 | Q.  Do you see the name Thomas Sibick? |
| 10:43AM | 7 | A.  Yes. |
| 10:43AM | 8 | Q.  Do you see the name Charles Butera? |
| 10:43AM | 9 | A.  Yes. |
| 10:43AM | 10 | Q.  Do you see the name Ronald Serio? |
| 10:43AM | 11 | A.  Yes. |
| 10:43AM | 12 | Q.  Do you see the name Thomas Serio? |
| 10:43AM | 13 | A.  Yes. |
| 10:43AM | 14 | Q.  Do you see the name Core Tattoo Studio? |
| 10:43AM | 15 | A.  Yes. |
| 10:43AM | 16 | Q.  Do you see the name Adrian Fina? |
| 10:43AM | 17 | A.  Yes. |
| 10:43AM | 18 | MR. TRIPI:  Can we go to the next page. |
| 10:43AM | 19 | BY MR. TRIPI: |
| 10:43AM | 20 | Q.  On page 3, do you see the name Michael Masecchia? |
| 10:43AM | 21 | A.  Yes. |
| 10:43AM | 22 | Q.  Do you see the name Michael Mazzara? |
| 10:43AM | 23 | A.  Yes, it's the next one under Masecchia. |
| 10:43AM | 24 | Q.  Do you see the name Chris Baker? |
| 10:43AM | 25 | A.  It's the next one down, yes. |

10:43AM   1   Q.  Do you see the name Paul Francoforte?

10:43AM   2   A.  Yes.

10:43AM   3   Q.  Is that Hot Dog?

10:43AM   4   A.  Yes.

10:43AM   5   Q.  Do you see the name Christopher Baker again, different

10:43AM   6   phone numbers than the other ones?

10:43AM   7   A.  There are at least two Christopher Bakers.

10:44AM   8   Q.  Down further on the page?

10:44AM   9   A.  I see a third one towards the bottom.

10:44AM  10   Q.  All different phone numbers, correct?

10:44AM  11   A.  Yes, that's why it shows up more than one time.

10:44AM  12   Q.  Do you see the name Michael Buttita?

10:44AM  13   A.  Yes.

10:44AM  14        **MR. TRIPI:**  Can we go to page 4.

10:44AM  15        **BY MR. TRIPI:**

10:44AM  16   Q.  Do you see the name Mark Kagan?

10:44AM  17   A.  Yes.

10:44AM  18   Q.  Do you see a phone number there?

10:44AM  19   A.  Yes.

10:44AM  20   Q.  And do we have a run date of April 19th, 2013 for this?

10:44AM  21   A.  Yes.

10:44AM  22   Q.  The names that I've asked you about, do you know those to

10:44AM  23   be associates of Ron Serio?

10:44AM  24   A.  Yes.

10:44AM  25   Q.  Based upon this and through the analysis of

10:44AM    1    Mr. Robinson's phone, does it appear that as of April 19,

10:44AM    2    2013, many of Mr. Serio's associates in his drug organization

10:44AM    3    were readily identifiable?

10:44AM    4    A.  Yes.

10:44AM    5    Q.  In your review of DEA file C2-13-0026, did you see

10:45AM    6    interviews, DEA-6s of interviews with any of those people

10:45AM    7    that I've asked you about?

10:45AM    8    A.  No.

10:45AM    9    Q.  And who was the case agent on C2-13-0026?

10:45AM   10    A.  The defendant.

10:45AM   11         **MR. TRIPI:**  Okay.  We can X out of that document.

10:45AM   12         **BY MR. TRIPI:**

10:45AM   13    Q.  And before we move on, that document, that hot sheet

10:45AM   14    generated by intel analysts, is law enforcement sensitive DEA

10:45AM   15    property, correct?

10:45AM   16    A.  Yes, it's a DEA record.

10:45AM   17         **MR. TRIPI:**  Can we go to the next one labeled

10:45AM   18    716-830-3226 DARTS.

10:45AM   19         **BY MR. TRIPI:**

10:45AM   20    Q.  Okay.  I'd like to ask you what this document is.  Are

10:46AM   21    you familiar with what this document is?

10:46AM   22    A.  Yes.

10:46AM   23    Q.  What is this?  Generally, I should say.

10:46AM   24    A.  So, this is what it looks like when you're in DARTS,

10:46AM   25    which is a web-based system.

USA v Bongiovanni - Ryan - Tripi/Direct - 3/18/24

45

| 10:46AM | 1 | Q.  Okay. |
| 10:46AM | 2 | A.  This is one of the screens that you would see. |
| 10:46AM | 3 | Q.  So, in order to get a paper copy of a DARTS hit when |
| 10:46AM | 4 | you're a DEA task force officer or a special agent, what |
| 10:46AM | 5 | steps need to be taken for an individual to create a paper |
| 10:46AM | 6 | copy of a DARTS entry, a DARTS record like this? |
| 10:46AM | 7 | A.  To make this, you would have to be logged into DARTS. |
| 10:46AM | 8 | And then into this -- he's in -- whoever did this is in |
| 10:46AM | 9 | C2-13-0026.  It looks like this might have been part of |
| 10:46AM | 10 | entering a subpoena because of the language that appears |
| 10:46AM | 11 | underneath there. |
| 10:46AM | 12 | Q.  Does this require someone to intentionally print it? |
| 10:46AM | 13 | A.  Yes.  This is not, I mean, you could print this, but you |
| 10:47AM | 14 | don't need to print this to make the system work. |
| 10:47AM | 15 | Q.  And do DARTS hits come to agents and task force officers |
| 10:47AM | 16 | by email? |
| 10:47AM | 17 | A.  Yes. |
| 10:47AM | 18 | Q.  So I've justified ask you about C2-13-0026; is that |
| 10:47AM | 19 | right? |
| 10:47AM | 20 | A.  Yes. |
| 10:47AM | 21 | Q.  And there are comments under there; is that correct? |
| 10:47AM | 22 | A.  Yes. |
| 10:47AM | 23 | Q.  And in your experience, are the comments usually put in |
| 10:47AM | 24 | there by the person who ran the DARTS, an intel analyst? |
| 10:47AM | 25 | A.  Yep.  These comments looks like whoever put this in is |

10:47AM   1   entering an updated subpoena, or entering a subpoena for

10:47AM   2   telephone number 716-830-3226.

10:47AM   3   Q.   Is that work typically done by an intel analyst?

10:47AM   4   A.   Yes.

10:47AM   5   Q.   Can you read what was written there, number part of?

10:47AM   6   Please read that for the jury.

10:47AM   7   A.   Number part of ongoing narcotics investigation in contact

10:47AM   8   with target number 716-830-3226 per S.A. Bongiovanni.

10:48AM   9   Q.   And below, there's a handwritten name under the

10:48AM  10   highlighted phone number.  What's that name?

10:48AM  11   A.   Ron Serio.

10:48AM  12   Q.   And now orient the jury to how this DARTS hit is read.

10:48AM  13   A.   So, whatever number this is about that is in contact with

10:48AM  14   716-830-3226 has been subpoenaed before.  And it's been in

10:48AM  15   the results of subpoenas that were issued before.  And that's

10:48AM  16   what these subsequent entries are.

10:48AM  17   Q.   So, let's use the first -- the first one as an example.

10:48AM  18   Explain that for the jury, the first row.

10:48AM  19   A.   So the -- there are three different DEA case numbers

10:48AM  20   there.  I'm not sure what those codes mean, but those first

10:49AM  21   two characters in the code identify the office.  So three

10:49AM  22   different offices are involved.  And there was a request by

10:49AM  23   Heather Hodge in case GC-12-0189.  And she entered the

10:49AM  24   comments in that request that the numbers in contact with

10:49AM  25   Kerem Dayi, head of a large scale marijuana trafficking DTO.

10:49AM    1    Q.  So, I'm going to ask you a more straight-forward

10:49AM    2    question.  So the box that says M1 and then CA and then GC,

10:49AM    3    those are three different DEA case files --

10:49AM    4    A.  Yes.

10:49AM    5    Q.  -- from other parts of the country?

10:49AM    6    A.  Yes.

10:49AM    7    Q.  Okay.  And then in the far left, is there a phone number

10:49AM    8    there, 312-314-9055?

10:49AM    9    A.  Yes.

10:49AM   10    Q.  And is that the phone number that was at issue in those

10:49AM   11    three other DEA cases?

10:49AM   12    A.  Yes.

10:49AM   13    Q.  And somewhere in the subpoena of that phone number, it

10:50AM   14    connected to that highlighted phone number for Ron Serio in

10:50AM   15    some way?

10:50AM   16    A.  Well, the way this was done, the numbers that were

10:50AM   17    entered in DARTS, whoever entered this, they knew that those

10:50AM   18    numbers were in contact with Serio as they're entering this.

10:50AM   19        And then this report shows you that that number was also

10:50AM   20    involved in these other cases.

10:50AM   21    Q.  So if you're conducting legitimate investigation of

10:50AM   22    Mr. Serio, this would be information that would allow you to

10:50AM   23    make contact with other agents around the country; is that --

10:50AM   24            **MR. MacKAY:**  Object to the form.

10:50AM   25            **MR. TRIPI:**  Judge, I'm trying to develop the

10:50AM  1  testimony and explain the record.  There was nothing

10:50AM  2  accusatory in my question.

10:50AM  3         **THE COURT:**  Yeah, no, I think that's right.

10:50AM  4  Overruled.

10:50AM  5         **BY MR. TRIPI:**

10:50AM  6  Q.  So if you're a task force officer conducting legitimate

10:50AM  7  investigation of Mr. Serio, you could use this information to

10:50AM  8  contact Heather Hodge and find out about other cases --

10:51AM  9  A.  Yes.

10:51AM  10  Q.  -- that link somehow to Serio?

10:51AM  11  A.  Potentially, yes.

10:51AM  12  Q.  Is that information that you should take home?

10:51AM  13  A.  No.

10:51AM  14         **MR. TRIPI:**  Let's scroll down.

10:51AM  15         **BY MR. TRIPI:**

10:51AM  16  Q.  And does this DARTS hit for all of the different cases

10:51AM  17  generally, the example that you went through in the top, it

10:51AM  18  applies to all these other DARTS hits; is that fair to say?

10:51AM  19  A.  Yes.  So DARTS, you could enter up to 25 numbers at a

10:51AM  20  time.  So for each number that hits, you would get another

10:51AM  21  block of information like this, for each number that's been

10:51AM  22  in there before.

10:51AM  23  Q.  And so let's go back up to the top just real quick.

10:51AM  24  Where it says zero intercepts, zero subpoenas, zero pertinent

10:51AM  25  calls, does that provide relevant information?

10:52AM    1   A.   Yes.

10:52AM    2   Q.   Does that mean that Mr. Serio's phone number has not been

10:52AM    3   intercepted on any wiretaps?

10:52AM    4   A.   I think it -- I think that relates to the 312 number.

10:52AM    5   Q.   Okay.  So the 312 number is not on any wiretap

10:52AM    6   intercepts?

10:52AM    7   A.   Right.

10:52AM    8   Q.   So there's no pertinent calls?

10:52AM    9   A.   Right.

10:52AM   10   Q.   And what does subpoenas zero mean?

10:52AM   11   A.   That it has not been subpoenaed before.

10:52AM   12   Q.   Okay.  And, so, would you be able to infer that if that

10:52AM   13   phone number is not being intercepted, then Mr. Serio's

10:52AM   14   number would not have been on a wiretap associated with that

10:52AM   15   number?

10:52AM   16   A.   Yes.

10:52AM   17   Q.   Okay.  Would that apply as we continue to go down the

10:52AM   18   DARTS list --

10:52AM   19   A.   Yes.

10:52AM   20   Q.   -- same concept?

10:52AM   21            **MR. TRIPI:**  Scroll to the next number.

10:52AM   22            **BY MR. TRIPI:**

10:52AM   23   Q.   So with respect to this number, you as a task force

10:53AM   24   officer looking at that, you can infer that Mr. Serio's

10:53AM   25   number is not being intercepted on any wire associated with

10:53AM 1    314-492-4906?

10:53AM 2    A.  Yes.  And that may include pen registers, too.  But it

10:53AM 3    hasn't been intercepted by either of those.

10:53AM 4    Q.  Pen register is usually a step that happens before

10:53AM 5    there's a wiretap, correct?

10:53AM 6    A.  Right.

10:53AM 7    Q.  Pen register is like a realtime phone record?

10:53AM 8    A.  Pen registers and trap and trace are just phone tolls in

10:53AM 9    real time.

10:53AM 10   Q.  Okay.  Phone records in real time, in layman's words?

10:53AM 11   A.  Yes, specific to dialed or received telephone calls.

10:53AM 12   Q.  Okay.  Let's go down to the next one.  So now we have

10:53AM 13   another number we're on page 2 of this pdf, 412-768-0664.  We

10:54AM 14   have again zero intercepts, zero pertinent calls; is that

10:54AM 15   correct?

10:54AM 16   A.  Correct.

10:54AM 17   Q.  So does that tell you that 412-768-0662 is not being

10:54AM 18   intercepted on a wiretap or a pen register?

10:54AM 19   A.  Yes.

10:54AM 20   Q.  Therefore, as a trained investigator, you can infer that

10:54AM 21   that Serio phone number at the top is also not being

10:54AM 22   intercepted as being in contact with that phone?

10:54AM 23   A.  Correct.

10:54AM 24            **MR. TRIPI:**  Okay.  Let's go down to the next one,

10:54AM 25   Ms. Champoux.

|          |    |                                                                  |
|----------|----|------------------------------------------------------------------|
| 10:54AM  | 1  | **BY MR. TRIPI:** |
| 10:54AM  | 2  | Q.  Next we have 1-585-442-9450.  That looks to be a |
| 10:54AM  | 3  | Rochester phone number, correct? |
| 10:54AM  | 4  | A.  Yes. |
| 10:54AM  | 5  | Q.  And C2, these are Buffalo -- that's the DEA Buffalo |
| 10:54AM  | 6  | office, correct? |
| 10:54AM  | 7  | A.  That's correct. |
| 10:54AM  | 8  | Q.  As a trained TFO and narcotics investigator, does this |
| 10:54AM  | 9  | tell you that this 585 number is not being intercepted on a |
| 10:55AM  | 10 | pen register and, therefore, Mr. Serio's phone would not be |
| 10:55AM  | 11 | on any pen registers or wiretaps associated with that 585 |
| 10:55AM  | 12 | number? |
| 10:55AM  | 13 | A.  Correct. |
| 10:55AM  | 14 | Q.  So, so far, this record tells you Mr. Serio's phone is |
| 10:55AM  | 15 | all clear as it relates to these numbers in these DARTS hits? |
| 10:55AM  | 16 | A.  Yes. |
| 10:55AM  | 17 | Q.  Let's go down the next one, see that number |
| 10:55AM  | 18 | 1-609-335-4452? |
| 10:55AM  | 19 | A.  I do. |
| 10:55AM  | 20 | Q.  Again zero intercepts, zero pertinent calls, correct? |
| 10:55AM  | 21 | A.  Correct. |
| 10:55AM  | 22 | Q.  Does that tell you that Mr. Serio's number as reflected |
| 10:55AM  | 23 | at the top of the record is not on any pen registers or |
| 10:55AM  | 24 | wiretaps associated with this 609 number? |
| 10:55AM  | 25 | A.  Correct. |

10:55AM  1   Q.  Another 609 number appears below that.  Same information,

10:55AM  2   correct?

10:55AM  3   A.  Yes.

10:55AM  4        MR. TRIPI:  Scroll down to the fourth page of this

10:56AM  5   document.

10:56AM  6        BY MR. TRIPI:

10:56AM  7   Q.  Here we have a 702 number; is that correct?

10:56AM  8   A.  Yes.

10:56AM  9   Q.  And do you know 702 to be a Las Vegas based number?

10:56AM  10  A.  Yes.

10:56AM  11  Q.  And does this tell us that there are no pen registers or

10:56AM  12  wiretaps in which the Serio phone number was in contact with

10:56AM  13  this phone?

10:56AM  14  A.  Correct.

10:56AM  15  Q.  The next one down is 716 Buffalo area number, right?

10:56AM  16  A.  I see it.

10:56AM  17  Q.  626-1900?

10:56AM  18  A.  Yes.

10:56AM  19  Q.  Does this information tell you that there are no pen

10:56AM  20  registers or wiretaps associated intercepting that 716 number

10:56AM  21  and the number related to Mr. Serio at the top of the page?

10:56AM  22  A.  Correct.

10:56AM  23        MR. TRIPI:  Scroll to the next one down.

10:56AM  24        BY MR. TRIPI:

10:56AM  25  Q.  We have another 716, this one 716-715-2698; is that

10:57AM    1    correct?

10:57AM    2    A.  Yes.

10:57AM    3    Q.  And does this also tell you that there are no pen

10:57AM    4    register or wiretap intercepts involving that number and

10:57AM    5    Mr. Serio's phone number?

10:57AM    6    A.  Yes.

10:57AM    7    Q.  There's another 716 number below that; do you see that?

10:57AM    8    A.  I do.  All 9s.

10:57AM    9    Q.  Again, does that information tell you there's no pen

10:57AM    10    register or wiretap intercepts between that number

10:57AM    11    Mr. Serio's phone?

10:57AM    12    A.  Yes.

10:57AM    13         **MR. TRIPI:**  Let's go down to the next one, please.

10:57AM    14         **BY MR. TRIPI:**

10:57AM    15    Q.  We're at page 6 of the pdf, this one's an 818 number; is

10:57AM    16    that correct?

10:57AM    17    A.  Yes.

10:57AM    18    Q.  Same question.  Does that information establish that

10:57AM    19    there are no pen register or wiretap intercepts between that

10:57AM    20    phone number that's in DARTS and Mr. Serio's phone number as

10:57AM    21    referenced at the top of the page?

10:57AM    22    A.  Yes.

10:57AM    23         **MR. TRIPI:**  Scroll to the bottom.

10:58AM    24         **BY MR. TRIPI:**

10:58AM    25    Q.  And there's one more entry, is that correct, for 905

10:58AM   1   number?

10:58AM   2   A.   Yes.

10:58AM   3   Q.   And does that tell you that there are no intercepts or

10:58AM   4   calls relating to pen registers or wiretaps between that

10:58AM   5   DARTS number and the number identified for Mr. Serio at the

10:58AM   6   top of the document?

10:58AM   7   A.   Yes.  And then as I look at the remarks, it says this

10:58AM   8   number came from pen registers, or came from a pen register.

10:58AM   9   Q.   So this number was on some other phone number's pen

10:58AM   10  register?

10:58AM   11  A.   Yes.  So intercepts are -- must be specific to Title III

10:58AM   12  for a wiretap.

10:58AM   13         **MR. TRIPI:**  We can clear out of that document,

10:58AM   14  Ms. Champoux.  I'd like to go to the next one down, that's the

10:58AM   15  830-8226 hot sheet.

10:59AM   16         **BY MR. TRIPI:**

10:59AM   17  Q.   And you've explained to us what a hot number list is

10:59AM   18  before; is that right?

10:59AM   19  A.   Yes.

10:59AM   20  Q.   And does this list relate to the same phone number that

10:59AM   21  was on the prior DARTS that was associated with Mr. Serio?

10:59AM   22  A.   Yes.

10:59AM   23  Q.   And do you see around the third line, the fourth line

10:59AM   24  down, Christopher Baker?

10:59AM   25  A.   Yes.

| | | |
|---|---|---|
| 10:59AM | 1 | Q.  Do you see Thomas Serio? |
| 10:59AM | 2 | A.  I do. |
| 10:59AM | 3 | Q.  Do you see Michael Buttita? |
| 10:59AM | 4 | A.  Yes, with a star next to it written in. |
| 10:59AM | 5 | Q.  Do you see Thomas Sibick? |
| 10:59AM | 6 | A.  Yes. |
| 10:59AM | 7 | Q.  Do you see another number for Christopher Baker? |
| 10:59AM | 8 | A.  Yes, at the bottom. |
| 10:59AM | 9 | Q.  And it's giving you the frequency of all those |
| 10:59AM | 10 | communications, correct? |
| 10:59AM | 11 | A.  Yes. |
| 10:59AM | 12 | Q.  And that's a good starting point for an investigation, |
| 10:59AM | 13 | right? |
| 10:59AM | 14 | A.  Yes. |
| 10:59AM | 15 | Q.  Someone who's in frequent contact with a target, you can |
| 10:59AM | 16 | interview them, correct? |
| 10:59AM | 17 | A.  Yes, could. |
| 10:59AM | 18 | Q.  Let's go to the next page.  At the top of page 2, do you |
| 11:00AM | 19 | see a number for Michael Masecchia? |
| 11:00AM | 20 | A.  Yes. |
| 11:00AM | 21 | Q.  And that shows you 37 contacts with that Serio phone |
| 11:00AM | 22 | number we've -- that's been identified in that one-month |
| 11:00AM | 23 | period? |
| 11:00AM | 24 | A.  Yes. |
| 11:00AM | 25 | Q.  Further down we see Mark Kagan, 20 contacts during an |

11:00AM    1    approximate 14-day period?

11:00AM    2    A.   Yes.

11:00AM    3    Q.   And then we see that 481-8002 number that previously a

11:00AM    4    document had John Robinson's name written next to it; is that

11:00AM    5    right?

11:00AM    6    A.   Yes.

11:00AM    7    Q.   So that's a number that was in contact with both Thomas

11:00AM    8    Serio and Ron Serio; is that right?

11:00AM    9    A.   Yes.

11:00AM   10    Q.   In your experience, would that be a good person to

11:00AM   11    interview in an investigation?

11:00AM   12    A.   Yes.

11:01AM   13    Q.   Right below that, do we see Hot Dog?

11:01AM   14    A.   Yes, Paul Francoforte.

11:01AM   15    Q.   Further down, do we see Mark Falzone?

11:01AM   16    A.   Yes.

11:01AM   17         **MR. TRIPI:**  Can we go to page 3 of this hot list?

11:01AM   18         **BY MR. TRIPI:**

11:01AM   19    Q.   Do we see a Core Tattoo Studio?

11:01AM   20    A.   Yes.

11:01AM   21    Q.   Do you know Hardcore Tattoo Studio to be associated with

11:01AM   22    a Frank Burkhart?

11:01AM   23    A.   Yes.

11:01AM   24         **MR. TRIPI:**  Can we go to page 4, please.

          25

11:01AM    1          **BY MR. TRIPI:**

11:01AM    2    Q.  And the frequency is becoming less and less as you go

11:01AM    3    down each page; is that correct?

11:01AM    4    A.  Yes.

11:01AM    5          **MR. TRIPI:**  And let's go to page 5.  Okay.  And we

11:01AM    6    can X out of there.  Right below that, can you open Amherst PD

11:01AM    7    report T Serio.

11:01AM    8          **BY MR. TRIPI:**

11:02AM    9    Q.  And what does this appear to be?

11:02AM   10    A.  It's an Amherst Police Department report for a driving

11:02AM   11    while intoxicated stop from 2/23/2015.

11:02AM   12    Q.  And does it show various things that -- a description of

11:02AM   13    charges further down the document relating to a Thomas Serio,

11:02AM   14    Ron Serio's brother?

11:02AM   15    A.  Yes.

11:02AM   16    Q.  And do agents and task force officers have an ability to

11:02AM   17    acquire local police reports when they work at DEA?

11:02AM   18    A.  Yes.

11:02AM   19    Q.  Like, for example, when you were there, if you needed to

11:02AM   20    acquire an Amherst Police Department report, can you do it?

11:02AM   21    A.  Yes.

11:02AM   22    Q.  Now, are local police reports that are acquired or

11:02AM   23    obtained during the course of a DEA case, are those law

11:02AM   24    enforcement sensitive?

11:02AM   25    A.  Yes.

11:02AM   1    Q.  Do you plan to bring any local police reports home with

11:03AM   2    you when you retire?

11:03AM   3    A.  No.

11:03AM   4        MR. TRIPI:  Let's scroll through all these pages and

11:03AM   5    make sure there's not something else there.  Stop there.

11:03AM   6    Let's scroll up a little bit.

11:03AM   7        BY MR. TRIPI:

11:03AM   8    Q.  Now, there's some information, and then there's something

11:03AM   9    written, Steve, Joe, is this the guy you're interested in?

11:03AM   10       MR. TRIPI:  Scroll further down.

11:03AM   11       BY MR. TRIPI:

11:03AM   12   Q.  And do you know who Daniel Rinaldo is?

11:03AM   13   A.  Yes.

11:03AM   14   Q.  Who's that?

11:03AM   15   A.  At this time, he was an intelligence officer for the

11:03AM   16   New York/New Jersey HIDTA.

11:03AM   17   Q.  And does this indicate Dan Rinaldo endeavored to make

11:04AM   18   Mr. Bongiovanni aware of information regarding Thomas Serio?

11:04AM   19   A.  Yes.

11:04AM   20       MR. TRIPI:  Let's scroll down further.

11:04AM   21       BY MR. TRIPI:

11:04AM   22   Q.  And we see what happens to be an email from

11:04AM   23   Mr. Bongiovanni to Mr. Flickinger?

11:04AM   24   A.  It's -- looks like it was printed by a Mr. Bongiovanni

11:04AM   25   and it's from Mr. Flickinger.

11:04AM   1    Q.  I'm sorry, I misspoke.  So, at that time, Flickinger was

11:04AM        Bongiovanni's supervisor?

11:04AM   2

11:04AM   3    A.  Yes, I think so.

11:04AM   4    Q.  And you've worked with John Flickinger before for a

11:04AM   5    period of time?

11:04AM   6    A.  I did.

11:04AM   7    Q.  So does it look like his supervisors in this email are

11:04AM   8    trying to make Bongiovanni aware that Serio had a local

11:04AM   9    arrest?

11:04AM   10   A.  Yes.

11:04AM   11   Q.  And it says -- can you read what Flickinger apparently

11:04AM   12   wrote in this email to Mr. Bongiovanni?

11:04AM   13   A.  Looks like Serio was arrested for DWI by Amherst.

11:05AM   14   Probably should contact them regarding pending charges.

11:05AM   15   Q.  Now, after a target of an investigation is arrested by a

11:05AM   16   local police department, is that often a good time to try to

11:05AM   17   interview them when they have other charges pending?

11:05AM   18   A.  You could try to interview them, contact the police

11:05AM   19   department, and see what evidence they found, if they found

11:05AM   20   any evidence beyond the controlled substances that were

11:05AM   21   listed above.  Any statements that Mr. Serio made.

11:05AM   22           MR. TRIPI:  So, if we go back up to the report that

11:05AM   23   was forwarded?  Further up, please.  Stop there.  Scroll down

11:05AM   24   a little bit further.  All right.  Stop there.

          25

| | | |
|---|---|---|
| 11:05AM | 1 | **BY MR. TRIPI:** |
| 11:05AM | 2 | Q.  Now, fair to say it appears this was some type of car |
| 11:06AM | 3 | stop where Tom Serio was arrested? |
| 11:06AM | 4 | A.  Yes. |
| 11:06AM | 5 | Q.  Can you read the bottom paragraph there of the Amherst |
| 11:06AM | 6 | police report that was in this box, the file that was at |
| 11:06AM | 7 | Mr. Bongiovanni's house? |
| 11:06AM | 8 | A.  Yes.  So it says while RO, which means reporting officer, |
| 11:06AM | 9 | was conducting a vehicle inventory at 0130 hours, Serio |
| 11:06AM | 10 | ingested two Klonopins while in the back seat of car 102. |
| 11:06AM | 11 | And then is says see 710.30 and audio from car 102. |
| 11:06AM | 12 | Serio was returned to headquarters.  While in booking, a |
| 11:06AM | 13 | search revealed one Klonopin in the defendant's wallet, one |
| 11:06AM | 14 | Adderall in the front right jean pocket, and one Cialis in |
| 11:06AM | 15 | the small jean pants pocket.  A small plastic baggie was also |
| 11:06AM | 16 | located in his sweater pocket that was empty, and appeared to |
| 11:06AM | 17 | have the bottom ripped off.  When asked about the bag, Serio |
| 11:07AM | 18 | admitted to ingesting the contents of the bag while in the |
| 11:07AM | 19 | rear seat of car 102.  Serio stated the contents were two |
| 11:07AM | 20 | Klonopins. |
| 11:07AM | 21 | Q.  Now, based on your review of file C2-13-0026, this arrest |
| 11:07AM | 22 | is about a month after Mr. Bongiovanni closed file C2-13-0026 |
| 11:07AM | 23 | on January 28th, 2015, correct? |
| 11:07AM | 24 | A.  Yes. |
| 11:07AM | 25 | Q.  Could this have been a basis to reopen that file, a drug |

| | | |
|---|---|---|
| 11:07AM | 1 | arrest involving Tom Serio? |
| 11:07AM | 2 | A.   Sure. |
| 11:07AM | 3 | Q.   In your experience, could information where someone has |
| 11:07AM | 4 | drugs on them, on their person, or during a car stop, could |
| 11:07AM | 5 | that information be included in a search warrant? |
| 11:07AM | 6 | A.   Yes. |
| 11:07AM | 7 | Q.   In your experience, do people involved in drug possession |
| 11:07AM | 8 | and drug trafficking often keep evidence of their drug |
| 11:07AM | 9 | trafficking in their homes and residences? |
| 11:07AM | 10 | A.   Yes. |
| 11:07AM | 11 | Q.   Is that because people keep things important to them |
| 11:07AM | 12 | usually near them? |
| 11:07AM | 13 | A.   Yes. |
| 11:07AM | 14 | Q.   Is that some of the same type of information just |
| 11:07AM | 15 | generally that you included in search warrant affidavits |
| 11:08AM | 16 | regarding Anthony Gerace, Michael Masecchia, things like |
| 11:08AM | 17 | that? |
| 11:08AM | 18 | A.   Yes. |
| 11:08AM | 19 | **MR. TRIPI:**   Okay.   We can X out of that document. |
| 11:08AM | 20 | And can we just open -- |
| 11:08AM | 21 | **BY MR. TRIPI:** |
| 11:08AM | 22 | Q.   I'm not going to open it up, but do you see Baker C |
| 11:08AM | 23 | rap sheet, is that a criminal history associated with Chris |
| 11:08AM | 24 | Baker? |
| 11:08AM | 25 | A.   Yes. |

11:08AM  1   Q.  Again, is that a document that should not leave DEA's

11:08AM  2   property and secure space?

11:08AM  3   A.  Yes.

11:08AM  4   Q.  See Baker C toll analysis?

11:08AM  5          **MR. TRIPI:**  Can we open that one, Ms. Champoux?

11:08AM  6          **BY MR. TRIPI:**

11:08AM  7   Q.  Now, before we get into this, I'm going to hand you up

11:08AM  8   Government Exhibit 100E-1 from that file in evidence.  And

11:08AM  9   I'm going to ask you to read this for the jury.

11:09AM  10         **THE COURT:**  When do you want to take a break?

11:09AM  11         **MR. TRIPI:**  I was just going -- we could do it after

11:09AM  12  he reads this list, maybe, Judge.  I'm about halfway through

11:09AM  13  the pdf, and then we're done.  The list of pdfs that we see on

11:09AM  14  the screen.

11:09AM  15         **THE COURT:**  Yep.

11:09AM  16         **THE WITNESS:**  Names and numbers?

11:09AM  17         **BY MR. TRIPI:**

11:09AM  18  Q.  Yes, please.

11:09AM  19  A.  It's a list of names and numbers.  The first one is --

11:09AM  20  Q.  First off, hold it up for them so they can see it.

11:09AM  21      And on the back page, can you tell what's on the back

11:09AM  22  page?

11:09AM  23  A.  I have looked at it when it's not in the bag, and it's

11:09AM  24  easier to see.

11:09AM  25  Q.  Would you like to open the bag up?

11:09AM    1    A.  No, I remember.  It's a DEA duty roster.

11:09AM    2    Q.  So does it look like --

11:09AM    3    A.  Duty agent roster from February 2016.  January and

11:10AM    4    February.

11:10AM    5    Q.  So, the list of names are written on the back of a

11:10AM    6    different DEA document, you said duty roster, what is that?

11:10AM    7    A.  It's the name and phone number and dates that -- for the

11:10AM    8    on-call agent for a period of time in January and February

11:10AM    9    and March of 2016.

11:10AM   10    Q.  Okay.  Now can you read the names and the phone numbers

11:10AM   11    on that list?

11:10AM   12    A.  Yes.  The first name is Mark Vitale, and the phone number

11:10AM   13    listed is 716-908-8559.

11:10AM   14        The next name is Tom Serio, 716-913-3652.

11:10AM   15        Then Ron Serio, 716-830-3226.

11:10AM   16        Mike Moynihan, 716-573-2174.

11:11AM   17        Mark Falzone, 716-208-5678.

11:11AM   18        Mike Buttita, 716-931-2974.

11:11AM   19        Chris Baker with three phone numbers, 716-818-6849,

11:11AM   20    716-907-5225, and then 716-830-3226.

11:11AM   21        And then the last name is Charles Butera is 716-400-2004.

11:11AM   22    Q.  Does that appear to be a handwritten list of names that

11:11AM   23    was in the Redweld file that was in Bongiovanni's basement?

11:11AM   24    A.  Yes.  So it looks like it was handwritten with a Sharpie

11:11AM   25    marker or something similar.

| | | |
|---|---|---|
| 11:11AM | 1 | **MR. TRIPI:** Okay. Judge, that might be a good spot |
| 11:11AM | 2 | to take our bathroom break. |
| 11:11AM | 3 | **THE COURT:** Okay. So we will take our morning break |
| 11:11AM | 4 | now. Please remember my instructions about not taking about |
| 11:12AM | 5 | the case with anyone, including each other, and not making up |
| 11:12AM | 6 | your mind. We'll see you back here in about 15 minutes. |
| 11:12AM | 7 | (Jury excused at 11:12 a.m.) |
| 11:12AM | 8 | **THE COURT:** Okay. Anything we need to put on the |
| 11:12AM | 9 | record? |
| 11:12AM | 10 | **MR. TRIPI:** Not from the government. |
| 11:12AM | 11 | **MR. SINGER:** No, Your Honor. |
| 11:12AM | 12 | **THE COURT:** See you in a few minutes. |
| 11:12AM | 13 | **MR. TRIPI:** Thank you. |
| 11:12AM | 14 | **THE CLERK:** All rise. |
| 11:12AM | 15 | (Off the record at 11:12 a.m.) |
| 11:25AM | 16 | (Back on the record at 11:25 a.m.) |
| 11:25AM | 17 | (Jury not present.) |
| 11:25AM | 18 | **THE CLERK:** All rise. |
| 11:25AM | 19 | **THE COURT:** Please be seated. |
| 11:25AM | 20 | **THE CLERK:** We are back on the record for the |
| 11:25AM | 21 | continuation of the jury trial in case number 19-cr-227, |
| 11:25AM | 22 | United States of America versus Joseph Bongiovanni. |
| 11:25AM | 23 | All counsel and parties are present. |
| 11:25AM | 24 | **THE COURT:** Anything we need to put on the record? |
| 11:25AM | 25 | **MR. TRIPI:** No, Your Honor. |

11:25AM   1          **MR. MacKAY:**  No, Your Honor.

11:25AM   2          **THE COURT:**  Okay.  Let's bring them back, please,

11:25AM   3   Pat.

11:27AM   4          (Jury seated at 11:27 a.m.)

11:27AM   5          **THE COURT:**  The record will reflect that all our

11:27AM   6   jurors, again, are present.

11:27AM   7          I remind the witness he's still under oath.

11:27AM   8          And, Mr. Tripi, you may continue.

11:27AM   9          **MR. TRIPI:**  Thank you, Your Honor.

11:27AM   10         Ms. Champoux, can you pull up where we left off?

11:27AM   11   Okay.  The pdf, and the exhibit labeled Baker C toll analysis.

11:27AM   12         **BY MR. TRIPI:**

11:27AM   13   Q.  Special Agent Ryan, can you orient the jury to the first

11:27AM   14   page of this document?

11:27AM   15   A.  Yes.  So, it says the subscriber information is for

11:27AM   16   Christopher Baker, case number C2-13-0026.

11:27AM   17       The other highlighted information is the C2-13-453516 was

11:28AM   18   the subpoena number, what the records are from.

11:28AM   19       And then telephone number 716-830-3226.

11:28AM   20   Q.  And in the upper right-hand corner, did someone write the

11:28AM   21   name of the agent to whom these records were obtained for?

11:28AM   22   A.  Yes, it says Bongiovanni.

11:28AM   23   Q.  And is that C2-13-0026 case file, was that the Wayne

11:28AM   24   Anderson file title?

11:28AM   25   A.  Yes.

| | | |
|---|---|---|
| 11:28AM | 1 | Q.  And in reviewing both the hard copy and the shared drive |
| 11:28AM | 2 | file, were any of these records maintained in the file, that |
| 11:28AM | 3 | C2-13-0026, that you were able to review after it was |
| 11:28AM | 4 | provided by DEA during this investigation? |
| 11:28AM | 5 | A.  No. |
| 11:28AM | 6 | Q.  So the only place you've seen these hot lists and the |
| 11:29AM | 7 | subscriber records are in the documents recovered from the |
| 11:29AM | 8 | defendant's basement, correct? |
| 11:29AM | 9 | A.  Yes. |
| 11:29AM | 10 | MR. TRIPI:  Ms. Champoux, can we go to page 2 of this |
| 11:29AM | 11 | pdf. |
| 11:29AM | 12 | BY MR. TRIPI: |
| 11:29AM | 13 | Q.  And at line item number 3, we have another phone number |
| 11:29AM | 14 | for Chris Baker? |
| 11:29AM | 15 | A.  Yes. |
| 11:29AM | 16 | Q.  And line item number 7, do we have a number for Tom |
| 11:29AM | 17 | Serio? |
| 11:29AM | 18 | A.  Yes. |
| 11:29AM | 19 | Q.  Line item 17, do we have a number for Thomas Sibick? |
| 11:29AM | 20 | A.  Yes. |
| 11:29AM | 21 | Q.  Line item 22, do we have another phone number related to |
| 11:29AM | 22 | Christopher Baker? |
| 11:29AM | 23 | A.  Yes. |
| 11:29AM | 24 | MR. TRIPI:  Let's go to the next page, Ms. Champoux. |
| 11:29AM | 25 | And rotate it, please. |

|          |    |                                                                      |
|----------|----|----------------------------------------------------------------------|
| 11:29AM  | 1  | **BY MR. TRIPI:**                                                     |
| 11:29AM  | 2  | Q.  Line item 34, do we have a number associated with Mark           |
| 11:29AM  | 3  | Kagan?                                                                |
| 11:29AM  | 4  | A.  Yes.                                                              |
| 11:29AM  | 5  | Q.  Line item 42, do we have a number associated with Core           |
| 11:30AM  | 6  | Tattoo Studio or Hardcore Tattoo Studio?                             |
| 11:30AM  | 7  | A.  Yes.                                                              |
| 11:30AM  | 8  | **MR. TRIPI:**  Can we go to page 4, please.  And page 5.            |
| 11:30AM  | 9  | And page 6.  Okay.  We can clear out of that.                        |
| 11:30AM  | 10 | Can you open up the pdf labeled Boinski J.  Can you                  |
| 11:30AM  | 11 | scroll down, Ms. Champoux, to the related subjects section.          |
| 11:30AM  | 12 | And can we go down to the -- I'm sorry, keep it there.               |
| 11:30AM  | 13 | **BY MR. TRIPI:**                                                     |
| 11:30AM  | 14 | Q.  We're on page 1 of this pdf.  Under this related                 |
| 11:30AM  | 15 | subjects, do you see entry for person number 8?                      |
| 11:31AM  | 16 | A.  Yes.  Robert Mettal, or Mattal.                                  |
| 11:31AM  | 17 | Q.  And entry number 10?                                             |
| 11:31AM  | 18 | A.  Ronald Serio.                                                     |
| 11:31AM  | 19 | **MR. TRIPI:**  Okay.  Keep scrolling down, Ms. Champoux.            |
| 11:31AM  | 20 | **BY MR. TRIPI:**                                                     |
| 11:31AM  | 21 | Q.  And do we see record status information for this                  |
| 11:31AM  | 22 | document?                                                             |
| 11:31AM  | 23 | A.  Yes.                                                              |
| 11:31AM  | 24 | Q.  Is there a record origination date there?                        |
| 11:31AM  | 25 | A.  12/18/1997.                                                       |

11:31AM   1   Q.  And then is there a last update date for the information?

11:31AM   2   A.  5/23/2007.

11:31AM   3   Q.  And at the bottom, is this a document based upon software

11:31AM   4   licensed by the New York State Office of the Attorney

11:31AM   5   General?

11:31AM   6   A.  Yes.

11:31AM   7   Q.  And do you see here, an initial and a last name that you

11:31AM   8   recognize?

11:31AM   9   A.  Yes, P Talty.

11:31AM  10   Q.  Who is P Talty?

11:32AM  11   A.  Peter Talty.

11:32AM  12   Q.  Is he -- who is he with?  Is he with the State Attorney

11:32AM  13   General's Office?

11:32AM  14   A.  He might be retired now --

11:32AM  15   Q.  Previously?

11:32AM  16   A.  -- but he was at that time.

11:32AM  17   Q.  And do you see a date there of an acquisition -- or,

11:32AM  18   withdrawn, a date related to the document's production?

11:32AM  19   A.  August 9th, 2011.

11:32AM  20   Q.  So does it appear that based upon this document being

11:32AM  21   located in the defendant's basement, the defendant acquired

11:32AM  22   New York State Attorney General intelligence report that

11:32AM  23   listed Mr. Serio as a related subject and kept it in his

11:32AM  24   basement?

11:32AM  25   A.  Yes.

| | | |
|---|---|---|
| 11:32AM | 1 | MR. TRIPI:  We can clear out of there. |
| 11:32AM | 2 | BY MR. TRIPI: |
| 11:32AM | 3 | Q.  I won't ask you to open it, but do you see the label |
| 11:32AM | 4 | entered Buttita M rap sheet? |
| 11:32AM | 5 | A.  Yes, I do. |
| 11:33AM | 6 | Q.  Is that another criminal history for Mike Buttita? |
| 11:33AM | 7 | A.  Yes. |
| 11:33AM | 8 | Q.  Is Mike Buttita another one of the names on Government |
| 11:33AM | 9 | Exhibit 100E-1? |
| 11:33AM | 10 | A.  Yes. |
| 11:33AM | 11 | Q.  And I should have asked you this, is Chris Baker also one |
| 11:33AM | 12 | of the names listed on that handwritten list? |
| 11:33AM | 13 | A.  Yes. |
| 11:33AM | 14 | Q.  Okay. |
| 11:33AM | 15 | MR. TRIPI:  Can we open up the pdf that says Cino K. |
| 11:33AM | 16 | BY MR. TRIPI: |
| 11:33AM | 17 | Q.  And does it appear to be another Attorney General's |
| 11:33AM | 18 | intelligence report. |
| 11:33AM | 19 | A.  Yes. |
| 11:33AM | 20 | MR. TRIPI:  Can you scroll down, Ms. Champoux. |
| 11:33AM | 21 | BY MR. TRIPI: |
| 11:33AM | 22 | Q.  Do you see the related subjects list there? |
| 11:33AM | 23 | A.  Yes. |
| 11:33AM | 24 | Q.  Who are the names 2 and 3. |
| 11:33AM | 25 | A.  Robert Mettal and Ronald Serio. |

| | | |
|---|---|---|
| 11:33AM | 1 | **MR. TRIPI:** Scroll down, Ms. Champoux. And up a |
| 11:33AM | 2 | little bit higher, I'm sorry, we need that last full box |
| 11:33AM | 3 | there. Okay. |
| 11:33AM | 4 | **BY MR. TRIPI:** |
| 11:33AM | 5 | Q. Does have a record origination date of October 7th, 1998? |
| 11:34AM | 6 | A. Yes. |
| 11:34AM | 7 | Q. And a last updated date of May 23rd, 2007? |
| 11:34AM | 8 | A. Yes. |
| 11:34AM | 9 | Q. And when does it appear that Mr. Talty prepared this |
| 11:34AM | 10 | report? |
| 11:34AM | 11 | A. October 31st, 2012. |
| 11:34AM | 12 | Q. So does it appear that the defendant acquired an |
| 11:34AM | 13 | intelligence report that, again, listed Mr. Serio as a |
| 11:34AM | 14 | related subject acquired and kept it in his basement? |
| 11:34AM | 15 | A. Yes. |
| 11:34AM | 16 | Q. And this investigation from the Attorney General's Office |
| 11:34AM | 17 | dates back to origination date of 1998? |
| 11:34AM | 18 | A. Yes. |
| 11:34AM | 19 | **MR. TRIPI:** Okay. X out of there, Ms. Champoux. |
| 11:34AM | 20 | Can we open the pdf label CKA 2804? |
| 11:34AM | 21 | **BY MR. TRIPI:** |
| 11:34AM | 22 | Q. At the very top, do we see who ran this response detail |
| 11:34AM | 23 | record? |
| 11:34AM | 24 | A. Yes. |
| 11:34AM | 25 | Q. Who did? |

11:34AM  1   A.  Joseph Bongiovanni.

11:34AM  2   Q.  And what is this type of record request?

11:35AM  3   A.  Registration details for a vehicle.

11:35AM  4   Q.  And who's the registration details associated with?

11:35AM  5   A.  The registered owner is Krista Masecchia.

11:35AM  6   Q.  Is that Mike Masecchia's wife?

11:35AM  7   A.  Yes.

11:35AM  8   Q.  Does it also have a listed address for her?

11:35AM  9   A.  125 Huntington Court, Williamsville.

11:35AM  10  Q.  Do you know that to be a property that at the time was

11:35AM  11  owned by Ronald Serio?

11:35AM  12  A.  Yes.

11:35AM  13          MR. TRIPI:  Okay.  We can clear out of there.

11:35AM  14          Can we open the pdf labeled common calls, and has

11:35AM  15  those two numbers listed?  And rotate it.

11:35AM  16          BY MR. TRIPI:

11:35AM  17  Q.  And so are the two target numbers 716-578-5296 on this

11:35AM  18  common call break down?  And 716-830-8226?

11:35AM  19  A.  Yes.

11:35AM  20  Q.  Were those numbers in the other pdfs we've seen on Tom

11:36AM  21  Serio and Ronald Serio on the bottom?

11:36AM  22  A.  Yes.

11:36AM  23  Q.  So this document shows people that they were each in

11:36AM  24  phone contact with, or phone numbers at least, they were each

11:36AM  25  in phone contact with?

| | | |
|---|---|---|
| 11:36AM | 1 | A.  Yes. |
| 11:36AM | 2 | Q.  And when was this record run date? |
| 11:36AM | 3 | A.  March 20th, 2013. |
| 11:36AM | 4 | Q.  And in review of the file, did you see any pen registers |
| 11:36AM | 5 | for either of these numbers? |
| 11:36AM | 6 | A.  No. |
| 11:36AM | 7 | **MR. TRIPI:**  All right.  We can clear out of there. |
| 11:36AM | 8 | Let's go to below that, there's a DARTS email, 1/7/2019. |
| 11:36AM | 9 | **BY MR. TRIPI:** |
| 11:36AM | 10 | Q.  Now, 1/7/2019, is that about three weeks before |
| 11:36AM | 11 | Mr. Bongiovanni retired? |
| 11:36AM | 12 | A.  Yes. |
| 11:36AM | 13 | Q.  And do DARTS deconfliction emails often come to agents by |
| 11:37AM | 14 | email? |
| 11:37AM | 15 | A.  Yes. |
| 11:37AM | 16 | Q.  And do you see the from, so, at the very top it says |
| 11:37AM | 17 | Bongiovanni, Joseph S, does that mean this was printed from |
| 11:37AM | 18 | his email? |
| 11:37AM | 19 | A.  Yes. |
| 11:37AM | 20 | Q.  On the from line, who's this from? |
| 11:37AM | 21 | A.  Sean Hoerner. |
| 11:37AM | 22 | Q.  Do you know who Sean Hoerner was at the time? |
| 11:37AM | 23 | A.  He was an analyst at the office at the time.  The DEA |
| 11:37AM | 24 | office. |
| 11:37AM | 25 | Q.  Do you see who's on the to line? |

| | | |
|---|---|---|
| 11:37AM | 1 | A.  Yes. |
| 11:37AM | 2 | Q.  Do you see the name Anthony Casullo? |
| 11:37AM | 3 | A.  I do. |
| 11:37AM | 4 | Q.  Do you see your name? |
| 11:37AM | 5 | A.  I do. |
| 11:37AM | 6 | Q.  By this point in time, were you investigating certain |
| 11:37AM | 7 | people like Mike Sinatra? |
| 11:37AM | 8 | A.  Yes. |
| 11:37AM | 9 | Q.  Were you about three weeks out from doing a search |
| 11:37AM | 10 | warrant that involved people like Mike Sinatra? |
| 11:37AM | 11 | A.  Yes. |
| 11:37AM | 12 | Q.  Do you see Mr. Bongiovanni on this DARTS deconfliction |
| 11:37AM | 13 | email? |
| 11:38AM | 14 | A.  Yes. |
| 11:38AM | 15 | **MR. TRIPI:**  If we scroll down a little bit further. |
| 11:38AM | 16 | **BY MR. TRIPI:** |
| 11:38AM | 17 | Q.  Do you see priority 3, date request, case number, request |
| 11:38AM | 18 | ran by, and remarks? |
| 11:38AM | 19 | A.  Yes. |
| 11:38AM | 20 | Q.  Can you read that information for the jury? |
| 11:38AM | 21 | A.  So, it's dated 1/7/2019.  Case number C2-17-0001. |
| 11:38AM | 22 | Request ran by Anthony J. Casullo.  And it's -- the remarks |
| 11:38AM | 23 | are phone numbers in contact with Mike Sinatra related to a |
| 11:38AM | 24 | burglary and drug trafficking in Buffalo and Niagara County. |
| 11:38AM | 25 | Q.  Now, at some point after this date, were you -- were you |

11:38AM   1   made aware of information that ultimately caused you to

11:38AM   2   interview Town of Tonawanda Police Department Detective

11:38AM   3   Thomas Oswald --

11:38AM   4   A.  Yes.

11:38AM   5   Q.  -- without getting into what he said to you?

11:38AM   6   A.  Yes.

11:38AM   7   Q.  That was after this date, correct?

11:39AM   8   A.  Yes.

11:39AM   9   Q.  Can you read the bottom one, priority 2?

11:39AM   10  A.  Yes.  January 3rd, 2019 was the request date.  Case

11:39AM   11  number, C2-17-0001.  Requested by Anthony J. Casullo.  And

11:39AM   12  the remarks are numbers related to ongoing investigation in

11:39AM   13  Tonawanda, New York and Buffalo, jointly with his Buffalo,

11:39AM   14  information provided by TTPD Detective Campanella.

11:39AM   15  Q.  Was Detective Campanella the detective investigating

11:39AM   16  Michael Sinatra's burglary?

11:39AM   17  A.  Yes.

11:39AM   18         MR. TRIPI:  Can we scroll down further.  Now let me

11:39AM   19  stop you there.

11:39AM   20         BY MR. TRIPI:

11:39AM   21  Q.  Was Special Agent Bongiovanni in any way involved in your

11:39AM   22  investigation of Michael Sinatra or the burglary

11:40AM   23  investigation of Michael Sinatra's residence in the Town of

11:40AM   24  Tonawanda?

11:40AM   25  A.  No.

11:40AM 1   Q.  In order to have this piece of paper that is the DARTS

11:40AM 2   deconfliction email, would one have needed to print it, put

11:40AM 3   it in a file folder, and then bring it home with them?  Are

11:40AM 4   those the steps that needed to happen before this was found

11:40AM 5   in the defendant's basement?

11:40AM 6   A.  Yes.

11:40AM 7           MR. TRIPI:  Scroll down, Ms. Champoux.

11:40AM 8           BY MR. TRIPI:

11:40AM 9   Q.  So are there several phone numbers that associate to

11:40AM 10  Michael Sinatra as it relates to this DARTS deconfliction; is

11:40AM 11  that what you're seeing?

11:40AM 12  A.  Yes.

11:40AM 13  Q.  In summary form?

11:40AM 14  A.  Yes.  Phone numbers that associate to Mike Sinatra or

11:40AM 15  were in contact with Michael Sinatra.

11:40AM 16  Q.  And that are listed in some other DEA subpoena?

11:41AM 17  A.  Yes.  If you go up, there's one that's from C2-13-26.

11:41AM 18  The number above this one, I think.

11:41AM 19  Q.  So this phone number is from the Wayne Anderson file that

11:41AM 20  was also the Serio file --

11:41AM 21  A.  Yes.

11:41AM 22  Q.  -- as it became known?

11:41AM 23      And are there remarks from the initial DARTS entry for

11:41AM 24  that phone number?

11:41AM 25  A.  Yes.  Number part of ongoing narcotics investigation in

11:41AM   1   contact with target number 716-830-3226.

11:41AM   2   Q.  And is that number, 830-3226, is that the number we had

11:41AM   3   seen for Ron Serio?

11:41AM   4   A.  Yes.

11:41AM   5   Q.  And who was that request ran by for Special Agent

11:41AM   6   Bongiovanni?

11:41AM   7   A.  By Justin Borst.

11:41AM   8   Q.  And who was that?

11:41AM   9   A.  He was a National Guard analyst I think at the time --

11:41AM  10   Q.  Assigned to the DEA?

11:41AM  11   A.  -- in the DEA office.

11:42AM  12   Q.  Assigned to DEA?

11:42AM  13   A.  Yes.

11:42AM  14          MR. TRIPI:  I'll clear those markings.

11:42AM  15          Ms. Champoux, can you continue to scroll down.  Keep

11:42AM  16   scrolling.

11:42AM  17          BY MR. TRIPI:

11:42AM  18   Q.  What does no DICE overlap mean?

11:42AM  19   A.  DICE and DARTS talk to the same database.  If you're

11:42AM  20   outside of DEA, you use DICE to interface with the data.

11:42AM  21   Q.  Does his use DICE?

11:42AM  22   A.  His, FBI, for sure use DICE.

11:42AM  23   Q.  So if those numbers were in FBI or his systems that use

11:42AM  24   DICE, there would have been an additional notification?

11:42AM  25   A.  It's the same system.  It's a different interface to the

| | | |
|---|---|---|
| 11:42AM | 1 | same system.  So DICE is the outside of DEA interface that |
| 11:42AM | 2 | puts the numbers in the same place.  So no DICE users, nobody |
| 11:42AM | 3 | who's using DICE had an overlap with those numbers. |
| 11:43AM | 4 | Q.  So, for example, no his agents and no FBI agents? |
| 11:43AM | 5 | A.  Right. |
| 11:43AM | 6 | Q.  As it relates to Special Agent Casullo, as the Michael |
| 11:43AM | 7 | Sinatra piece of the investigation started to connect, did he |
| 11:43AM | 8 | also get walled off from that part of it as well? |
| 11:43AM | 9 | A.  Yes. |
| 11:43AM | 10 | Q.  Did your investigation expand over time? |
| 11:43AM | 11 | A.  Yes. |
| 11:43AM | 12 | Q.  Did you know where you were gonna end up when you |
| 11:43AM | 13 | started? |
| 11:43AM | 14 | A.  No. |
| 11:43AM | 15 |      **MR. TRIPI:**  Keep scrolling down.  I'll stop you |
| 11:43AM | 16 | there. |
| 11:43AM | 17 |      **BY MR. TRIPI:** |
| 11:44AM | 18 | Q.  We're dealing with a phone number here, and some comments |
| 11:44AM | 19 | that reference Mark Vitale; is that right? |
| 11:44AM | 20 | A.  Yes. |
| 11:44AM | 21 | Q.  And can you explain this entry for the jury? |
| 11:44AM | 22 | A.  Yes.  So, 716-583-3349 was entered by Special Agent |
| 11:44AM | 23 | Casullo on 12/15/2015 as part of case C2-15-0065.  And on |
| 11:44AM | 24 | that entry, the remark he made was frequently called numbers |
| 11:44AM | 25 | of Buffalo-based cocaine and marijuana trafficker Mark |

11:44AM   1   Vitale.

11:44AM   2   Q.  And is Mark Vitale's name on the list you have in front

11:44AM   3   of you, Exhibit 100E-1.

11:44AM   4   A.  Yes.

11:44AM   5   Q.  Right below that, is there another entry that has remarks

11:45AM   6   relating to Anthony Gerace?

11:45AM   7   A.  Yes.  So this number was also in a list of numbers in

11:45AM   8   contact with, the way it's written here, oxycodone trafficker

11:45AM   9   Anthony Gerace.

11:45AM  10   Q.  And those remarks were put in by Anthony Casullo, right?

11:45AM  11   A.  Correct.

11:45AM  12        MR. TRIPI:  Keep scrolling down.  Okay.  So we've

11:45AM  13   looked at all seven pages.  Can we go back up to page 2 for a

11:46AM  14   moment, Ms. Champoux, page 2 of the pdf.  So, let's keep it

11:46AM  15   there.

11:46AM  16        BY MR. TRIPI:

11:46AM  17   Q.  To summarize, based on your experience and understanding

11:46AM  18   of the DARTS entries, is the reason that Bongiovanni received

11:46AM  19   a notification of the work that Casullo was doing on those

11:46AM  20   phone numbers related to Michael Sinatra because one of the

11:46AM  21   phone numbers had previously been in contact with that Ron

11:46AM  22   Serio phone?

11:46AM  23   A.  Yes.

11:46AM  24   Q.  And then going back up to the top, this is an email that

11:46AM  25   Bongiovanni printed and ended up in his basement, correct?

11:46AM    1    A.  Yes.

11:46AM    2            MR. TRIPI:  Okay.  We can move on from this.  X out

11:47AM    3    of there.  Can you open the pdf that says draft tracker

11:47AM    4    warrant, and scroll down to the first line there.

11:47AM    5            BY MR. TRIPI:

11:47AM    6    Q.  Do you see where it says Shane Nastoff?

11:47AM    7    A.  Yes.

11:47AM    8    Q.  Special Agent Nastoff was interviewed in the course of

11:47AM    9    this investigation; is that correct?

11:47AM   10    A.  Yes.

11:47AM   11    Q.  Did your -- did you find any completed GPS tracker

11:47AM   12    warrants in file C2-13-0026?

11:47AM   13    A.  No.

11:47AM   14            MR. TRIPI:  Okay.  We can X out of there.

11:47AM   15            BY MR. TRIPI:

11:47AM   16    Q.  Is a GPS tracker warrant, either a draft or a completed

11:47AM   17    warrant, something that you were gonna bring home at

11:47AM   18    retirement and put in your basement?

11:48AM   19    A.  No.

11:48AM   20    Q.  Is that law enforcement sensitive information?

11:48AM   21    A.  Yes.

11:48AM   22            MR. TRIPI:  Can you open the pdf that says financial

11:48AM   23    spreadsheet?

11:48AM   24            BY MR. TRIPI:

11:48AM   25    Q.  Now, I'm not gonna go through the whole thing, but it's

| | | |
|---|---|---|
| 11:48AM | 1 | 158 pages.  But through the investigation, are you familiar |
| 11:48AM | 2 | with the fact that Scott Deming of the U.S. Attorney's Office |
| 11:48AM | 3 | did financial investigation as it related to the Serio case? |
| 11:48AM | 4 | A.  Yes. |
| 11:48AM | 5 | Q.  Is financial analysis through subpoenas law enforcement |
| 11:48AM | 6 | sensitive information? |
| 11:48AM | 7 | A.  Yes. |
| 11:48AM | 8 | Q.  Is that work that you intend to bring home when you go |
| 11:48AM | 9 | into retirement? |
| 11:48AM | 10 | A.  No. |
| 11:49AM | 11 | **MR. TRIPI:**  We can clear out of there. |
| 11:49AM | 12 | Can we open the document that says FTR 2117.  Scroll |
| 11:49AM | 13 | down. |
| 11:49AM | 14 | **BY MR. TRIPI:** |
| 11:49AM | 15 | Q.  At the top, can you see who queried this database? |
| 11:49AM | 16 | A.  Yes, it says Joseph Bongiovanni. |
| 11:49AM | 17 | **MR. TRIPI:**  Can we go down a little bit. |
| 11:49AM | 18 | **BY MR. TRIPI:** |
| 11:49AM | 19 | Q.  And could we see, tell the jury what -- what |
| 11:49AM | 20 | Mr. Bongiovanni queried? |
| 11:49AM | 21 | A.  So it's the vehicle registration data for Chevy pickup |
| 11:49AM | 22 | truck. |
| 11:49AM | 23 | Q.  Do you see who it's registered to? |
| 11:49AM | 24 | A.  Yes, registered to Louis Selva. |
| 11:49AM | 25 | **MR. TRIPI:**  Okay.  We can clear out of there.  Can we |

| | | |
|---|---|---|
| 11:49AM | 1 | open up FGY 1790.  Yeah, that one. |
| 11:50AM | 2 | **BY MR. TRIPI:** |
| 11:50AM | 3 | Q.  And can we -- can you tell us at the top who queried this |
| 11:50AM | 4 | database? |
| 11:50AM | 5 | A.  Joseph Bongiovanni. |
| 11:50AM | 6 | **MR. TRIPI:**  And can we scroll down just a little bit |
| 11:50AM | 7 | to the highlighting, up a little bit? |
| 11:50AM | 8 | **BY MR. TRIPI:** |
| 11:50AM | 9 | Q.  Whose vehicle was he inquiring about? |
| 11:50AM | 10 | A.  Thomas Serio. |
| 11:50AM | 11 | **MR. TRIPI:**  Okay.  Can we clear out of that, and next |
| 11:50AM | 12 | open a pdf labeled handwritten notes. |
| 11:50AM | 13 | **BY MR. TRIPI:** |
| 11:50AM | 14 | Q.  Do you see some handwritten notes there? |
| 11:50AM | 15 | A.  Yes. |
| 11:50AM | 16 | Q.  Do you know whose notes these are? |
| 11:50AM | 17 | A.  They were from the file, but -- |
| 11:50AM | 18 | Q.  So no? |
| 11:50AM | 19 | A.  No. |
| 11:50AM | 20 | Q.  Don't know whose writing it is? |
| 11:50AM | 21 | A.  No, I don't know who wrote it. |
| 11:50AM | 22 | Q.  Do you see some notations next to a name Ron Serio? |
| 11:51AM | 23 | A.  Yes. |
| 11:51AM | 24 | Q.  What does it say there? |
| 11:51AM | 25 | A.  At the top, it says Ron Serio, and then a dash, and then |

| 11:51AM | 1 | it says weed plus NYC coke. |
| 11:51AM | 2 | Q.  Do you understand that to be New York City coke? |
| 11:51AM | 3 | A.  New York City cocaine, most likely. |
| 11:51AM | 4 | Q.  And do you see a parenthetical for a name David Oddo? |
| 11:51AM | 5 | A.  Yes. |
| 11:51AM | 6 | Q.  Is there a similar name on the front of the file that was |
| 11:51AM | 7 | in the defendant's basement? |
| 11:51AM | 8 | A.  Yes.  Just, it's spelled with Ds on the notes and Ts on |
| 11:51AM | 9 | the outside of the file, but it's the same name. |
| 11:51AM | 10 | Q.  Do you see a reference to a Gables? |
| 11:51AM | 11 | A.  Yes. |
| 11:51AM | 12 | Q.  Do you understand that there was a bar called Gables on |
| 11:51AM | 13 | Hertel Avenue in North Buffalo? |
| 11:51AM | 14 | A.  Yes. |
| 11:51AM | 15 | **MR. TRIPI:**  Can we scroll down a little further on |
| 11:52AM | 16 | these notes?  Keep scrolling, please.  Okay.  We can actually |
| 11:52AM | 17 | clear out of this document now.  And there's an IMG 0491. |
| 11:52AM | 18 | **BY MR. TRIPI:** |
| 11:52AM | 19 | Q.  Is that the handwritten list that is in evidence that was |
| 11:52AM | 20 | in that folder? |
| 11:52AM | 21 | A.  Yes. |
| 11:52AM | 22 | **MR. TRIPI:**  We can clear out of there.  Ms. Champoux, |
| 11:52AM | 23 | can you scroll down a little bit?  There's one that says |
| 11:52AM | 24 | Masecchia M phone info. |
|  | 25 |  |

| | | |
|---|---|---|
| 11:52AM | 1 | **BY MR. TRIPI:** |
| 11:52AM | 2 | Q.  Describe for the jury what they're looking at here. |
| 11:52AM | 3 | A.  Subscriber information for phone number 716-812-0664, |
| 11:52AM | 4 | then -- it's for Michael Masecchia. |
| 11:52AM | 5 | Q.  And is that C2-13-0026, is that the file title Wayne |
| 11:53AM | 6 | Anderson file? |
| 11:53AM | 7 | A.  Yes. |
| 11:53AM | 8 | Q.  And is the phone number 716-812-0664? |
| 11:53AM | 9 | A.  Yes. |
| 11:53AM | 10 | Q.  And does it have two addresses associated with |
| 11:53AM | 11 | Mr. Masecchia? |
| 11:53AM | 12 | A.  Yes.  407 Colvin Avenue, and 1195 Hertel Avenue. |
| 11:53AM | 13 | Q.  And is there a notation in the upper right-hand corner of |
| 11:53AM | 14 | the document from an intel analyst as to which agent these |
| 11:53AM | 15 | records relate to? |
| 11:53AM | 16 | A.  Yes, it says Bongo. |
| 11:53AM | 17 | Q.  And is that something that the defendant was called |
| 11:53AM | 18 | around the DEA office? |
| 11:53AM | 19 | A.  Yes. |
| 11:53AM | 20 | **MR. TRIPI:**  Can we scroll to the next page, please. |
| 11:53AM | 21 | Can we make this a little larger.  Okay. |
| 11:53AM | 22 | **BY MR. TRIPI:** |
| 11:53AM | 23 | Q.  Can you tell the jury what this is? |
| 11:53AM | 24 | A.  It's a screen print of DARTS entry. |
| 11:54AM | 25 | Q.  Does this indicate that the subscriber subpoena record |

11:54AM  1   information for Mike Masecchia was put into DARTS?

11:54AM  2   A.   Yes.

11:54AM  3   Q.   Once it's in DARTS, it's set up for deconfliction

11:54AM  4   notifications?

11:54AM  5   A.   Correct.

11:54AM  6        **MR. TRIPI:**  Can we go to the next page.  And can

11:54AM  7   we --

11:54AM  8        **BY MR. TRIPI:**

11:54AM  9   Q.   And now is this is the hot number list for that Masecchia

11:54AM  10  phone number; is that right?

11:54AM  11  A.   Yes.

11:54AM  12  Q.   And 1 through 22, the dialed name is a bunch of no

11:54AM  13  subscribers, correct?

11:54AM  14  A.   Correct.

11:54AM  15  Q.   And so either -- I think based on what you explained

11:54AM  16  earlier, either that means it's a prepaid phone with no

11:54AM  17  subscriber, or more subpoenas would need to be issued for

11:55AM  18  find out who those subscribers are; is that right?

11:55AM  19  A.   That's correct.

11:55AM  20  Q.   So those are the two options?

11:55AM  21  A.   Yes.

11:55AM  22  Q.   Let's go to the next page.

11:55AM  23       But item number 23 does have a dialed name; is that

11:55AM  24  right?

11:55AM  25  A.   Yes.

11:55AM  1    Q.  Who's the dialed name?

11:55AM  2    A.  Thomas Serio.

11:55AM  3    Q.  And you have a date range there?

11:55AM  4    A.  Yes.  March 20, 2013 to April 5th, 2013.

11:55AM  5    Q.  And is Tom Serio, is that phone number on the handwritten

11:55AM  6    list that you have in front of you there?  Or is a different

11:55AM  7    number listed?

11:55AM  8    A.  It's a different number.

11:55AM  9    Q.  Okay.  Let's go to 32.  Is there a name Chris Baker?

11:55AM  10   A.  Yes.

11:55AM  11   Q.  What's that phone number?

11:55AM  12   A.  716-830-3226.

11:55AM  13   Q.  Is Baker listed on Government Exhibit 100E-1 in front of

11:55AM  14   you which you just also referenced a moment ago?

11:56AM  15   A.  Yes.

11:56AM  16   Q.  Is that phone number referenced there?

11:56AM  17   A.  Yes.

11:56AM  18   Q.  For 24 through 31 though, we have no subscriber listed,

11:56AM  19   right?

11:56AM  20   A.  Yes.

11:56AM  21        **MR. TRIPI:**  Go to the next page.

11:56AM  22        **BY MR. TRIPI:**

11:56AM  23   Q.  I'm sorry 33 through 50, no subscribers.

11:56AM  24   A.  Correct.

11:56AM  25        **MR. TRIPI:**  Let's go to the next page.

11:56AM   1        **BY MR. TRIPI:**

11:56AM   2   Q.  51 through 60, no subscribers?

11:56AM   3   A.  Correct.

11:56AM   4   Q.  61 is -- who's that?

11:56AM   5   A.  Michael Mazzara.

11:56AM   6   Q.  Do you know Mr. Masecchia's wife's maiden name?

11:56AM   7   A.  Mazzara.

11:56AM   8   Q.  62 through 78, no subscribers?

11:56AM   9   A.  Correct.

11:56AM  10   Q.  78 through 96, no subscribers?

11:56AM  11   A.  Correct.

11:56AM  12        **MR. TRIPI:**  We can clear out of there.

11:57AM  13        Can we go to the pdf labeled Mettal docs.

11:57AM  14        **BY MR. TRIPI:**

11:57AM  15   Q.  Is this more subscriber information done for Bongo in

11:57AM  16   file C2-13-0026?

11:57AM  17   A.  Yes, for phone number 516-398-7192.

11:57AM  18   Q.  So this is another document that was located in his

11:57AM  19   basement in that file, correct?

11:57AM  20   A.  Yes.

11:57AM  21        **MR. TRIPI:**  Clear out of there.  Can we go to

11:57AM  22   Moynihan E-L-E-C sub.  Can you spin that around.

11:57AM  23        **BY MR. TRIPI:**

11:57AM  24   Q.  And can you tell the jury what they're looking at here?

11:57AM  25   A.  It's the National Grid return for Michael Moynihan.

11:58AM   1    Q.  And so it's a subpoena response?

11:58AM   2    A.  A subpoena response, yes.

11:58AM   3    Q.  Is that information that's supposed to remain in the DEA

11:58AM   4    secure space?

11:58AM   5    A.  Yes.

11:58AM   6    Q.  And it was located in the defendant's basement?

11:58AM   7    A.  Yes.

11:58AM   8    Q.  Is Michael Moynihan an associate of Ron Serio's?

11:58AM   9    A.  Yes.

11:58AM   10          MR. TRIPI:  Can we go to the second page of this

11:58AM   11   document?

11:58AM   12          BY MR. TRIPI:

11:58AM   13   Q.  More information from the subpoena?

11:58AM   14   A.  Yes.

11:58AM   15          MR. TRIPI:  Okay.  We can clear out of there.  Can we

11:58AM   16   open the pdf that says Moynihan phone info.

11:58AM   17          BY MR. TRIPI:

11:58AM   18   Q.  Tell the jury what they're looking at here.

11:58AM   19   A.  It's another subscriber information report for Michael

11:58AM   20   Moynihan, 716-573-2174 is the number, done for Bongo.

11:58AM   21   Q.  So the intel analysts had identified numbers for Baker,

11:58AM   22   Moynihan, Masecchia, through their subpoena work, correct?

11:58AM   23   A.  Yes.

11:58AM   24   Q.  The subpoena for Masecchia was subpoenaed directly; is

11:59AM   25   that correct?

11:59AM    1    A.  Yes.

11:59AM    2    Q.  Is the phone number for Masecchia written on that list

11:59AM    3    anywhere, Government Exhibit 100E-1?

11:59AM    4    A.  No.

11:59AM    5         **MR. TRIPI:**  Okay.  We can clear out of this one.

11:59AM    6    Actually, open that one again, I'm sorry.  Same one, Moynihan

11:59AM    7    phone info.  And go to page 2 for me.  And can we make that

11:59AM    8    larger.

11:59AM    9         **BY MR. TRIPI:**

11:59AM    10   Q.  Is this a -- tell the jury what this is.

11:59AM    11   A.  It's the screen print of the DARTS entry identifying

11:59AM    12   716-573-2174 as belonging to Moynihan.

12:00PM    13   Q.  Can you read the Trinity remarks?

12:00PM    14   A.  Number part of on going narcotics investigation belonging

12:00PM    15   to Michael Moynihan per S.A. Bongiovanni.

12:00PM    16   Q.  Is Michael Moynihan's name on that list?

12:00PM    17   A.  Yes.

12:00PM    18   Q.  So, based on this information here, does it appear

12:00PM    19   Bongiovanni knew who Moynihan was?

12:00PM    20   A.  Yes.

12:00PM    21        **MR. TRIPI:**  Okay.  Now we can clear out of there.

12:00PM    22   Can we open NYAG intel report 6/2/98 please.  And can we

12:00PM    23   scroll down.  Straighten out on the next page.  Okay.  Stop

12:00PM    24   there.

           25

12:00PM  1          **BY MR. TRIPI:**

12:00PM  2     Q.   In the related subjects category, do you see the names

12:01PM  3     for Robert Mettal, Ronald Serio, and Thomas Serio?

12:01PM  4     A.   It's at the section at the top, I see that.

12:01PM  5     Q.   Are you at page 3 of 3, do you see that?

12:01PM  6     A.   3 of 3, but I don't have the header for the section.

12:01PM  7     Q.   Oh, I understand.  Sorry about that.

12:01PM  8          **MR. TRIPI:**  Ms. Champoux, go to the top of the

12:01PM  9     document again.  Just the previous page.  Spin it for him,

12:01PM  10    please.  Page 2 needs to be oriented properly when he gets

12:01PM  11    there.  Thank you.

12:01PM  12         **THE WITNESS:**  Okay.  Yes, related subjects, and I see

12:01PM  13    it.

12:01PM  14         **BY MR. TRIPI:**

12:01PM  15    Q.   Did you see Mettal and both Serio brothers on the list?

12:01PM  16    A.   Mettal?  Yes.

12:01PM  17         **MR. TRIPI:**  Okay.  We can clear out of there.

12:01PM  18         **BY MR. TRIPI:**

12:01PM  19    Q.   So Mr. Bongiovanni had several New York State Attorney

12:02PM  20    General intelligence reports in his basement upon retirement;

12:02PM  21    is that right?

12:02PM  22    A.   Yes.

12:02PM  23         **MR. TRIPI:**  Can we open the pdf that says Oddo NADDIS

12:02PM  24    record.  And this is a three-page pdf.  Can we scroll down.

         25

| | | |
|---|---|---|
| 12:02PM | 1 | **BY MR. TRIPI:** |
| 12:02PM | 2 | Q.  Does this appear to be a mugshot? |
| 12:02PM | 3 | A.  Yes. |
| 12:02PM | 4 | Q.  And what's the name associated with that mug? |
| 12:02PM | 5 | A.  David C. Oddo. |
| 12:02PM | 6 | Q.  Okay.  And page 2 of this pdf, what is that? |
| 12:02PM | 7 | A.  It's the -- it's the NADDIS full record run by subject |
| 12:02PM | 8 | name. |
| 12:02PM | 9 | Q.  And do you see a handwritten phone number? |
| 12:02PM | 10 | A.  716-261-2995. |
| 12:02PM | 11 | Q.  Are NADDIS records something that's supposed to leave the |
| 12:02PM | 12 | DEA office secure space? |
| 12:02PM | 13 | A.  No. |
| 12:02PM | 14 | Q.  Is that -- are those the type of records you're gonna |
| 12:02PM | 15 | bring home at retirement? |
| 12:02PM | 16 | A.  No. |
| 12:02PM | 17 | **MR. TRIPI:**  We can clear out of there.  Next can we |
| 12:03PM | 18 | open Robert Mettal M-I-S-C. |
| 12:03PM | 19 | **BY MR. TRIPI:** |
| 12:03PM | 20 | Q.  And does this include a mugshot? |
| 12:03PM | 21 | A.  Yes. |
| 12:03PM | 22 | **MR. TRIPI:**  And scroll down, Ms. Champoux. |
| 12:03PM | 23 | **BY MR. TRIPI:** |
| 12:03PM | 24 | Q.  Whose name is under the mug? |
| 12:03PM | 25 | A.  Robert Mettal. |

12:03PM    1    Q.  Does there appear to be a phone number associated in

12:03PM    2    handwritten ink there?

12:03PM    3    A.  Yes.

12:03PM    4         MR. TRIPI:  Can we scroll to the next page.

12:03PM    5         BY MR. TRIPI:

12:03PM    6    Q.  Is that a Buffalo Police Department booking data sheet

12:03PM    7    for Robert Mettal?

12:03PM    8    A.  Yes.

12:03PM    9    Q.  And does it tell you who ran the report and when?

12:03PM   10    A.  Yes.  It says the date of the report is 5/6/2013.  Run by

12:03PM   11    Joseph Palmieri.

12:03PM   12    Q.  Do local TFOs have access to local police department

12:03PM   13    arrest booking documents?

12:03PM   14    A.  Yes.

12:03PM   15    Q.  Is that one of the functions that local police agency

12:03PM   16    TFOs serve at DEA?

12:03PM   17    A.  Yes.

12:03PM   18         MR. TRIPI:  Let's scroll down.  And stop there.

12:03PM   19         BY MR. TRIPI:

12:04PM   20    Q.  When was that arrest and booking from for this Buffalo

12:04PM   21    Police Department arrest?

12:04PM   22    A.  December 17th, 1998.

12:04PM   23    Q.  So, in 2013, Palmieri is running a report from 1998?

12:04PM   24    A.  Yes.

12:04PM   25         MR. TRIPI:  Please scroll down.

USA v Bongiovanni - Ryan - Tripi/Direct - 3/18/24

92

| | | |
|---|---|---|
| 12:04PM | 1 | **BY MR. TRIPI:** |
| 12:04PM | 2 | Q.  Look at page 3 of this.  What does page 3 of this show? |
| 12:04PM | 3 | A.  It's the first page of a DEA report of investigation, |
| 12:04PM | 4 | it's DEA-6. |
| 12:04PM | 5 | Q.  And this is from a special agent in Albuquerque, New |
| 12:04PM | 6 | Mexico? |
| 12:04PM | 7 | A.  Yes. |
| 12:04PM | 8 | Q.  Date prepared 11/17/98? |
| 12:04PM | 9 | A.  Yes. |
| 12:04PM | 10 | Q.  And there's other officers listed, do you see who the |
| 12:04PM | 11 | agency referenced there? |
| 12:04PM | 12 | A.  Quay County Sheriff's Deputy Greg Greenly. |
| 12:04PM | 13 | Q.  Is this a document that's supposed to be brought home at |
| 12:05PM | 14 | retirement? |
| 12:05PM | 15 | A.  No. |
| 12:05PM | 16 | MR. TRIPI:  Can you scroll down to the next page? |
| 12:05PM | 17 | Stop there. |
| 12:05PM | 18 | **BY MR. TRIPI:** |
| 12:05PM | 19 | Q.  Do you see another DEA-6? |
| 12:05PM | 20 | A.  Yes. |
| 12:05PM | 21 | Q.  And what -- what agency -- what DEA branch is that one |
| 12:05PM | 22 | from? |
| 12:05PM | 23 | A.  Long Island, group D13. |
| 12:05PM | 24 | Q.  And does that reference an arrest of Robert Mettal? |
| 12:05PM | 25 | A.  Yes. |

12:05PM    1   Q.   Is a DEA-6 from Long Island something that is supposed to

12:05PM    2   be removed from the DEA office and brought home and stored in

12:05PM    3   a basement?

12:05PM    4   A.   No.

12:05PM    5            **MR. TRIPI:**  We can scroll down further.

12:05PM    6            **BY MR. TRIPI:**

12:05PM    7   Q.   Is there a DEA 202?

12:05PM    8   A.   Yes.

12:05PM    9   Q.   Is that another DEA sensitive document?

12:05PM   10   A.   Yes.

12:05PM   11   Q.   Is that something that's supposed to be removed from DEA

12:05PM   12   and brought down and stored in a basement?

12:05PM   13   A.   No.

12:05PM   14            **MR. TRIPI:**  Scroll down, please.  That was page 5 of

12:05PM   15   the pdf.  Keep going.

12:05PM   16            **BY MR. TRIPI:**

12:06PM   17   Q.   Is this a continuation of the same 202?

12:06PM   18   A.   Yes.

12:06PM   19            **MR. TRIPI:**  That's page 6 of the pdf.  Scroll through

12:06PM   20   it slowly, Ms. Champoux.  Next page.  Okay, we can clear out

12:06PM   21   of there.

12:06PM   22            Next, can you open the pdf that says Ron Serio

12:06PM   23   M-I-S-C.

12:06PM   24            This is a 12 page pdf.

          25

| | | |
|---|---|---|
| 12:06PM | 1 | **BY MR. TRIPI:** |
| 12:06PM | 2 | Q.  Does page 1 show a mugshot of Mr. Serio when he was |
| 12:06PM | 3 | younger? |
| 12:06PM | 4 | A.  Yes. |
| 12:06PM | 5 | **MR. TRIPI:**  Can you scroll down the bottom? |
| 12:06PM | 6 | **BY MR. TRIPI:** |
| 12:07PM | 7 | Q.  What does page 2 say? |
| 12:07PM | 8 | A.  DARTS check of Ronald Serio's number 716-830-3226 was in |
| 12:07PM | 9 | contact with Thomas Serio, parenthetical brother, |
| 12:07PM | 10 | number 716-578-5296 in case C2-12-0090 on 186 occasions from |
| 12:07PM | 11 | June 12 to July 12. |
| 12:07PM | 12 | Q.  Is that sensitive DARTS information regarding the Serio |
| 12:07PM | 13 | brothers? |
| 12:07PM | 14 | A.  Yes. |
| 12:07PM | 15 | Q.  Is that information that's supposed to be removed and |
| 12:07PM | 16 | stored in a basement at retirement? |
| 12:07PM | 17 | A.  No. |
| 12:07PM | 18 | **MR. TRIPI:**  Can we scroll down, Ms. Champoux.  Can we |
| 12:07PM | 19 | rotate this. |
| 12:07PM | 20 | **BY MR. TRIPI:** |
| 12:07PM | 21 | Q.  We're at page 3 now of the pdf.  What is that? |
| 12:07PM | 22 | A.  This looks like a subpoena return again from National |
| 12:07PM | 23 | Grid for customer Ronald Serio for premises 469 Tacoma |
| 12:08PM | 24 | Avenue. |
| 12:08PM | 25 | **MR. TRIPI:**  Please scroll to page 4, please. |

USA v Bongiovanni - Ryan - Tripi/Direct - 3/18/24

95

|          |    |                                                                    |
|----------|----|--------------------------------------------------------------------|
| 12:08PM  | 1  | **BY MR. TRIPI:**                                                   |
| 12:08PM  | 2  | Q.  This is part of the same subpoena response?                    |
| 12:08PM  | 3  | A.  More of the same.                                              |
| 12:08PM  | 4  | **MR. TRIPI:**  Let's go to page 5.  And can we rotate            |
| 12:08PM  | 5  | that, please.                                                      |
| 12:08PM  | 6  | **BY MR. TRIPI:**                                                   |
| 12:08PM  | 7  | Q.  More response information for Mr. Serio and that               |
| 12:08PM  | 8  | associated address?                                                |
| 12:08PM  | 9  | A.  Yes.                                                            |
| 12:08PM  | 10 | **MR. TRIPI:**  Let's go to page 6.                                |
| 12:08PM  | 11 | **BY MR. TRIPI:**                                                   |
| 12:08PM  | 12 | Q.  And now we have more subpoena information related to 469       |
| 12:08PM  | 13 | Tacoma Avenue with a customer name of Jillian Baker; is that       |
| 12:08PM  | 14 | right?                                                              |
| 12:08PM  | 15 | A.  Yes.                                                            |
| 12:08PM  | 16 | Q.  And this links back to a subpoena for that address?           |
| 12:09PM  | 17 | A.  Yes.                                                            |
| 12:09PM  | 18 | **MR. TRIPI:**  Scroll down.  Keep scrolling.  Keep               |
| 12:09PM  | 19 | going.  And we can keep scrolling down.                            |
| 12:09PM  | 20 | **BY MR. TRIPI:**                                                   |
| 12:09PM  | 21 | Q.  Do the rest of these pages appear to be more subpoena         |
| 12:09PM  | 22 | responses for that address?                                       |
| 12:09PM  | 23 | A.  Yes.                                                            |
| 12:09PM  | 24 | Q.  The initial one was -- had the name Ron Serio, and the        |
| 12:09PM  | 25 | rest of them sort of the name changed?                            |

12:09PM    1   A.  Yes.

12:09PM    2        MR. TRIPI:  May the record reflect we've published

12:09PM    3   all 12 pages of that document for the jury, Your Honor.

12:09PM    4        We can clear out of there, Ms. Champoux.  All right.

12:09PM    5   Can you click on the one that says SafetyNet submission and go

12:10PM    6   to page 2.  At the very top -- stop, Ms. Champoux.

12:10PM    7        BY MR. TRIPI:

12:10PM    8   Q.  Can you, at the very top, can you read the job status

12:10PM    9   report and the as-of date?

12:10PM   10   A.  Job status report as of January 4th, 2013.

12:10PM   11   Q.  And does it say page 1?

12:10PM   12   A.  Page 1.

12:10PM   13   Q.  So, this is back when fax machines were used; is that

12:10PM   14   right?

12:10PM   15   A.  Yes.

12:10PM   16   Q.  And in that time period, you would fax SafetyNet

12:10PM   17   submissions to SafetyNet; is that right?

12:10PM   18   A.  Yes.

12:10PM   19        MR. TRIPI:  And let's scroll down on this document.

12:10PM   20        BY MR. TRIPI:

12:10PM   21   Q.  And under the investigator portion, can you read the

12:10PM   22   information there for the jury?  We don't need to read the

12:10PM   23   Social Security Number, but begin with rank and go across.

12:10PM   24   A.  Special Agent, DEA, Buffalo D-58, last name Bongiovanni,

12:10PM   25   first name Joseph.

12:11PM  1   Q.  Keep going.  Telephone number?

12:11PM  2   A.  Telephone 716-846-4000.  Pager/cell, 716-818-0966.

12:11PM  3   Q.  Is that the cell phone number you know to be associated

12:11PM  4   with Bongiovanni while he was a DEA agent?

12:11PM  5   A.  Yes.  Fax number 716-854-3520.  Email

12:11PM  6   joseph.s.bongiovanni@us.doj.gov.

12:11PM  7   Q.  Okay.  Now I'd like to go over a case number, C2-12-0026.

12:11PM  8   Do you know the file associated with the 202s for Ron and Tom

12:11PM  9   Serio to actually be C2-13-0026?

12:11PM  10  A.  Yes.

12:11PM  11      **MR. TRIPI:**  And let's scroll down a little bit so we

12:11PM  12  can read the subject information.  Right there.

12:11PM  13      **BY MR. TRIPI:**

12:11PM  14  Q.  Can you read that for the jury?

12:11PM  15  A.  Last name, Serio.  First name, Thomas.  Middle, R.

12:12PM  16      Gang member, no.  Gender, male.  Race white.

12:12PM  17  Q.  You don't have to read -- you can skip the social.

12:12PM  18  What's the location or the address?

12:12PM  19  A.  Private residence.  26 Chapel Road, Kenmore, New York

12:12PM  20  14217.

12:12PM  21  Q.  So is that a SafetyNet submission from January 4th, 2013,

12:12PM  22  for Thomas Serio?

12:12PM  23  A.  Yes.

12:12PM  24  Q.  And then we go to the next page down -- is that a

12:12PM  25  SafetyNet submission --

| | | |
|---|---|---|
| 12:12PM | 1 | **MR. TRIPI:**  Scroll down a little further.  Go down to |
| 12:12PM | 2 | the subject. |
| 12:12PM | 3 | **BY MR. TRIPI:** |
| 12:12PM | 4 | Q.  -- for David Oddo? |
| 12:12PM | 5 | A.  Yes. |
| 12:12PM | 6 | **MR. TRIPI:**  And can we scroll to the next one |
| 12:12PM | 7 | Ms. Champoux? |
| 12:12PM | 8 | **BY MR. TRIPI:** |
| 12:12PM | 9 | Q.  The next one for the subject, Ronald Serio? |
| 12:12PM | 10 | A.  Yes. |
| 12:12PM | 11 | Q.  And what's the address there? |
| 12:12PM | 12 | A.  697 Lebrun Road, Buffalo, 14226. |
| 12:13PM | 13 | Q.  And is there vehicle information there as well? |
| 12:13PM | 14 | A.  Yes.  License plate FHH4905 from New York for a 2007 |
| 12:13PM | 15 | Maserati. |
| 12:13PM | 16 | **MR. TRIPI:**  And scroll down to the next one.  Go down |
| 12:13PM | 17 | to the subject for the next one. |
| 12:13PM | 18 | **BY MR. TRIPI:** |
| 12:13PM | 19 | Q.  Is the subject -- is it the same C2-12-0026 you believe |
| 12:13PM | 20 | should be 13-0026? |
| 12:13PM | 21 | A.  Yes. |
| 12:13PM | 22 | Q.  And is this an entry for an Jeremy Jones? |
| 12:13PM | 23 | A.  Jeremy Jones, 50 Tuxedo Place, Buffalo. |
| 12:13PM | 24 | Q.  And SafetyNet is a deconfliction tool for local law |
| 12:13PM | 25 | enforcement; is that correct? |

12:13PM    1    A.  Yes.

12:13PM    2    Q.  Utilized also federally?

12:13PM    3    A.  Yes, for New York State.

12:14PM    4         **MR. TRIPI:**  Okay.  We can clear out of that,

12:14PM    5    Ms. Champoux.  I'd like to next go to the one labeled Serio T

12:14PM    6    DARTS hits.

12:14PM    7         **BY MR. TRIPI:**

12:14PM    8    Q.  So this -- is this similar to what we saw earlier for Ron

12:14PM    9    Serio but this one is for handwritten Thomas Serio with

12:14PM   10    particular phone number in file C2-13-0026?

12:14PM   11    A.  Yes.

12:14PM   12    Q.  Can you read the comments from the intel analyst at the

12:14PM   13    top?

12:14PM   14    A.  Number of part of ongoing narcotics investigation.  In

12:14PM   15    contact with target number 716-578-5296 per S.A. Bongiovanni.

12:14PM   16    Q.  Okay.  I'm not going to spend quite as much time as I did

12:14PM   17    with the Ron Serio one, but is the concept the same as when

12:14PM   18    you see zero intercepts or pertinent calls, does this mean

12:14PM   19    that this phone number for Mr. Serio has not been caught on a

12:14PM   20    wire with the phone number in the column to the left?

12:15PM   21    A.  Right.

12:15PM   22         **MR. TRIPI:**  Ms. Champoux, can you scroll down.

12:15PM   23         **BY MR. TRIPI:**

12:15PM   24    Q.  Okay.  So fair to say with respect to that phone number,

12:15PM   25    we saw three other phone numbers, and there were no

12:15PM    1    intercepts or pertinent calls?

12:15PM    2    A.  Right.

12:15PM    3    Q.  Okay.

12:15PM    4         **MR. TRIPI:**  We can clear out of there.  Open the

12:15PM    5    T Serio toll analysis pdf.

12:15PM    6         **BY MR. TRIPI:**

12:15PM    7    Q.  And, again, this is a similar document that the jury's

12:15PM    8    seen before, but this one is for Thomas Serio under

12:15PM    9    C2-13-0026, and the same number 578-5296; is that right?

12:15PM   10    A.  Yes.

12:15PM   11    Q.  And what name did the intel analyst write in the upper

12:15PM   12    corner with the associated agent?

12:15PM   13    A.  Bongiovanni.

12:15PM   14         **MR. TRIPI:**  And can we scroll down, Ms. Champoux.

12:15PM   15         **BY MR. TRIPI:**

12:16PM   16    Q.  And for entries 1 through 22, all no subscriber hits,

12:16PM   17    correct?

12:16PM   18    A.  Correct.

12:16PM   19         **MR. TRIPI:**  Go to the next page.

12:16PM   20         **BY MR. TRIPI:**

12:16PM   21    Q.  23 through 38, all no subscriber, correct?

12:16PM   22    A.  Correct.

12:16PM   23    Q.  And to find out who those people were, either more

12:16PM   24    subpoenas would need to be issued, or they were burner

12:16PM   25    phones, correct?

Case 1:19-cr-00227-LJV-MJR   Document 1017   Filed 06/18/24   Page 101 of 239
USA v Bongiovanni - Ryan - Tripi/Direct - 3/18/24

101

12:16PM   1   A.   Correct.

12:16PM   2           **MR. TRIPI:**  Okay.  We can clear out of there.

12:16PM   3           **BY MR. TRIPI:**

12:16PM   4   Q.   And there's a Suppa J electric sub response.  And does

12:16PM   5   this associate John Suppa with 1195 Hertel Avenue in Buffalo,

12:16PM   6   New York?

12:16PM   7   A.   Yes.

12:16PM   8   Q.   And is that also an address that was associated on some

12:16PM   9   of the records we've seen for Michael Masecchia?

12:16PM  10   A.   Yes.

12:17PM  11           **MR. TRIPI:**  Scroll down to the next page, page 2.

12:17PM  12   This is a nine page pdf, for the record.  Can we go to page 4

12:17PM  13   of this, please.

12:17PM  14           **BY MR. TRIPI:**

12:17PM  15   Q.   And so the -- is that a copy of an administrative

12:17PM  16   subpoena that was issued to National Grid?

12:17PM  17   A.   Yes.

12:17PM  18   Q.   And who did the administrative subpoena for that address?

12:17PM  19   A.   Stephen Bevilacqua.

12:17PM  20   Q.   And he's an intel analyst?

12:17PM  21   A.   Yes.

12:17PM  22           **MR. TRIPI:**  And please scroll down.

12:17PM  23           All right.  We can clear out of this one.

12:17PM  24           Let's go to Tom Serio M-I-S-C.

         25

12:17PM   1        **BY MR. TRIPI:**

12:17PM   2   Q.  All these documents were found in the defendant's

12:18PM   3   basement, correct?

12:18PM   4   A.  Yes.

12:18PM   5   Q.  Would this information, when you were beginning your

12:18PM   6   investigation, would it have been helpful to you to have all

12:18PM   7   this information in one place?

12:18PM   8   A.  Yes.

12:18PM   9   Q.  If someone had walked up to you and handed you this file,

12:18PM  10   would that have been helpful to you?

12:18PM  11   A.  Yes.

12:18PM  12        **MR. TRIPI:**  Okay.  Can we scroll down.

12:18PM  13        **BY MR. TRIPI:**

12:18PM  14   Q.  Is that a mugshot of Thomas Serio?

12:18PM  15   A.  Yes.

12:18PM  16   Q.  Is that a Buffalo Police Department booking data sheet

12:18PM  17   that was run on March 15th, 2013, by Joseph Palmieri?

12:18PM  18   A.  Yes.

12:18PM  19   Q.  And he's the task force officer that was the defendant's

12:18PM  20   partner, correct?

12:18PM  21   A.  Correct.

12:18PM  22        **MR. TRIPI:**  Scroll down, Ms. Champoux.

12:18PM  23        **BY MR. TRIPI:**

12:18PM  24   Q.  Now were these -- was this booking back on October 9th,

12:19PM  25   2009?

12:19PM    1    A.  Yes.

12:19PM    2             MR. TRIPI:  Scroll down, please.

12:19PM    3             BY MR. TRIPI:

12:19PM    4    Q.  And then I'm not going to go through the whole

12:19PM    5    Lexis/Nexis report, but tell the jury what that is.

12:19PM    6    A.  It's a service that we get access to as investigators or

12:19PM    7    analysts.  It aggregates public records.

12:19PM    8    Q.  So property --

12:19PM    9    A.  Addresses, phone numbers sometimes, depending on the

12:19PM   10    state, maybe vehicles associated with the person you're

12:19PM   11    searching for.

12:19PM   12             MR. TRIPI:  Okay.  We can clear out of there,

12:19PM   13    Ms. Champoux.  And can we go to Vitale Sprint subpoena info.

12:19PM   14             BY MR. TRIPI:

12:19PM   15    Q.  And, so, that's dated December 14th, 2015; is that right?

12:19PM   16    A.  Yes.

12:19PM   17    Q.  Is that the month that you know that DEA did a search

12:19PM   18    warrant -- withdrawn, that Tonawanda Police did a search

12:20PM   19    warrant related to Mark Vitale?

12:20PM   20    A.  Yes.

12:20PM   21    Q.  And does it appear Special Agent Casullo issued a

12:20PM   22    subpoena in relation to Mark Vitale?

12:20PM   23    A.  Yes.

12:20PM   24             MR. TRIPI:  Let's scroll down.

          25

USA v Bongiovanni - Ryan - Tripi/Direct - 3/18/24

| | | |
|---|---|---|
| 12:20PM | 1 | **BY MR. TRIPI:** |
| 12:20PM | 2 | Q.  Does it look like the information related to a date range |
| 12:20PM | 3 | that began prior to when the search warrant happened? |
| 12:20PM | 4 | A.  Yes. |
| 12:20PM | 5 | Q.  And is the actual account billing in the name of a |
| 12:20PM | 6 | Michele Vitale? |
| 12:20PM | 7 | A.  Yes. |
| 12:20PM | 8 | **MR. TRIPI:**  Please keep scrolling down. |
| 12:20PM | 9 | I'm looking for a DARTS Trinity entry, Ms. Champoux. |
| 12:20PM | 10 | We can go a little quicker, it will be okay.  Okay.  Right |
| 12:21PM | 11 | here. |
| 12:21PM | 12 | **BY MR. TRIPI:** |
| 12:21PM | 13 | Q.  Now this doesn't have a header at the top as to whose |
| 12:21PM | 14 | email this came in on, does it? |
| 12:21PM | 15 | A.  No.  This -- but this could have also been printed from |
| 12:21PM | 16 | the DARTS system. |
| 12:21PM | 17 | Q.  Okay.  So we don't have an email header? |
| 12:21PM | 18 | A.  No. |
| 12:21PM | 19 | Q.  And when you said printed from the DARTS system, what do |
| 12:21PM | 20 | you mean by that? |
| 12:21PM | 21 | A.  So, you it's your -- in the website entering the phone |
| 12:21PM | 22 | numbers, you put in the numbers and hit next.  And then it |
| 12:21PM | 23 | tells you which of the phone numbers you entered have -- do |
| 12:21PM | 24 | or don't have a previous entry. |
| 12:21PM | 25 | Q.  So the defendant had in his basement DARTS and subpoena |

| | | |
|---|---|---|
| 12:21PM | 1 | information related to Mark Vitale, correct? |
| 12:21PM | 2 | A.  Yes. |
| 12:21PM | 3 | Q.  Looking at Government Exhibit 100E-1, is Mark Vitale the |
| 12:21PM | 4 | name at the top of the list? |
| 12:21PM | 5 | A.  Yes. |
| 12:21PM | 6 | Q.  Is it right above Thomas Serio's name? |
| 12:21PM | 7 | A.  Yes. |
| 12:21PM | 8 | Q.  And right below that is Ron Serio's name? |
| 12:21PM | 9 | A.  Yes. |
| 12:21PM | 10 | **MR. TRIPI:**  We can clear out of there, Ms. Champoux. |
| 12:22PM | 11 | Next go to Vitale M toll analysis. |
| 12:22PM | 12 | **BY MR. TRIPI:** |
| 12:22PM | 13 | Q.  And what are we looking at here, or what is the jury |
| 12:22PM | 14 | looking at? |
| 12:22PM | 15 | A.  So, it looks like it's in the form of a hot number list |
| 12:22PM | 16 | or a hot sheet, because the -- for example, calls is |
| 12:22PM | 17 | descending and decreasing in order as you descend on the |
| 12:22PM | 18 | sheet for Mark Vitale. |
| 12:22PM | 19 | Q.  And, based upon the phone number 481-8002 and the |
| 12:22PM | 20 | handwritten name John Robinson, does it appear the name John |
| 12:22PM | 21 | Robinson was associated with Mark Vitale? |
| 12:22PM | 22 | A.  Yes. |
| 12:22PM | 23 | **MR. TRIPI:**  Okay.  We can clear out of there. |
| 12:22PM | 24 | **BY MR. TRIPI:** |
| 12:22PM | 25 | Q.  And that toll analysis was in the defendant's basement |

12:22PM    1    also; is that right?

12:22PM    2    A.   Yes.

12:22PM    3    Q.   Now do you know what an OCDETF case is?

12:23PM    4    A.   Yes.

12:23PM    5    Q.   Do you know how an OCDETF case is started?

12:23PM    6    A.   The process of approval are you asking?

12:23PM    7    Q.   Withdrawn.   What is an OCDETF case?

12:23PM    8    A.   So, OCDETF stands for Organized Crime Drug Enforcement

12:23PM    9    Task Force, and it's generally a multi-defendant,

12:23PM    10    multidistrict drug distribution case.

12:23PM    11    Q.   The first two letters in the acronym stand for Organized

12:23PM    12    Crime; is that right?

12:23PM    13    A.   Yes.

12:23PM    14    Q.   And is there an approval process that involves an agent

12:23PM    15    or a task force officer writing up basically the parameters

12:23PM    16    of what the organization is believed to be, and what they

12:23PM    17    believe they can accomplish through investigation?

12:23PM    18    A.   Yes.

12:23PM    19    Q.   And is there an approval process in place that has to go

12:23PM    20    through both the U.S. Attorney's Office and higher up in the

12:23PM    21    department?

12:23PM    22    A.   Yes, there's a local board at the U.S. Attorney's Office

12:23PM    23    here, if you're proposing a case in Buffalo.   And then the

12:24PM    24    next level of review is for the region, it's in New York

12:24PM    25    City.

USA v Bongiovanni - Ryan - Tripi/Direct - 3/18/24

12:24PM   1   Q.   Are OCDETF proposals and the information written in them

12:24PM   2   highly sensitive documents in the law enforcement community?

12:24PM   3   A.   Yes.

12:24PM   4   Q.   Are OCDETF investigations, as it relates to narcotics, in

12:24PM   5   your view, some of the most important investigations that are

12:24PM   6   happening in narcotics investigations in a district at a

12:24PM   7   given time?

12:24PM   8   A.   Yes.

12:24PM   9   Q.   Let's open the Tripi OCDETF proposal pdf.  And so let's

12:24PM  10   start here.  That's the acronym we've been talking about,

12:24PM  11   Organized Crime Drug Enforcement Task Force; is that right?

12:24PM  12   A.   Yes.

12:24PM  13   Q.   And there's some blank boxes there; is that right?

12:24PM  14   A.   Yes.

12:24PM  15   Q.   Now a completed proposal would have the numbers fully

12:24PM  16   written in; is that right?

12:24PM  17   A.   Once the review's done and the case is approved by the

12:24PM  18   regional board in New York City or the -- then, yes, that

12:24PM  19   gets assigned an OCDETF case number, the four digits that

12:24PM  20   would be in those box.

12:24PM  21   Q.   And NYNYW, does that mean essentially the Western

12:25PM  22   District of New York?

12:25PM  23   A.   Yes.

12:25PM  24   Q.   If we scroll down to the operation name, does every

12:25PM  25   OCDETF operation name get a name?

USA v Bongiovanni - Ryan - Tripi/Direct - 3/18/24

12:25PM   1    A.  Yes.

12:25PM   2    Q.  And what was the name of this proposal?

12:25PM   3    A.  Past Due.

12:25PM   4    Q.  Now I'm going to fast forward for just a moment.  Does

12:25PM   5    this appear to be a draft of what was later a complete

12:25PM   6    proposal?

12:25PM   7    A.  Yes.  And the way to know for sure would be to look at

12:25PM   8    the signature section to see if it's spelled out.

12:25PM   9    Q.  We'll get there.

12:25PM  10    A.  Okay.

12:25PM  11    Q.  But you've seen and scanned this document before?

12:25PM  12    A.  Yes.

12:25PM  13    Q.  Now, the case attorney at the time, do you know that Tim

12:25PM  14    Lynch was the OCDETF program administrator in the Western

12:25PM  15    District of New York?

12:25PM  16    A.  Yes.

12:25PM  17    Q.  And at one point, was he the section chief in the

12:25PM  18    narcotics and organized crime section?

12:25PM  19    A.  Yes.

12:25PM  20    Q.  Now you see case agents, and you see some names there?

12:25PM  21    A.  Yes.

12:25PM  22    Q.  Do you know who TFA Chris Clark is with the DEA?

12:25PM  23    A.  Yes.

12:26PM  24    Q.  Who is that?

12:26PM  25    A.  He's a detective from the Niagara Falls Police

12:26PM   1   Department, and then he's a task force officer in group D-58.

12:26PM   2   Q.  Do you know who Dave Turri is?

12:26PM   3   A.  An IRS special agent.

12:26PM   4   Q.  And do you know who Jason Bernhard is?

12:26PM   5   A.  I'm not familiar with Jason Bernhard.

12:26PM   6   Q.  Do you know the agency ATF here in Buffalo?

12:26PM   7   A.  Yes.

12:26PM   8   Q.  Okay.  And do you know that Michelle Spahn was a prior

12:26PM   9   group supervisor at DEA?

12:26PM  10   A.  Yes.

12:26PM  11   Q.  Let's scroll down a little bit.  What does it say in

12:26PM  12   black lettering there, can you read that for us?

12:26PM  13   A.  Law enforcement sensitive.

12:26PM  14   Q.  What does that mean?

12:26PM  15   A.  That if the information's exposed, it could compromise an

12:26PM  16   ongoing investigation.

12:26PM  17   Q.  And do you see several stamps there underneath that,

12:26PM  18   Department of Treasury, Department of Justice, and Department

12:26PM  19   of Homeland Security?

12:26PM  20   A.  Yes.

12:26PM  21   Q.  Is this an important document --

12:26PM  22   A.  Yes.

12:26PM  23   Q.  -- from a law enforcement perspective?

12:26PM  24   A.  Yes.

12:26PM  25          **MR. TRIPI:**  Scroll to the next page, please.  Go to

USA v Bongiovanni - Ryan - Tripi/Direct - 3/18/24

12:27PM 1   page 2.

12:27PM 2          **BY MR. TRIPI:**

12:27PM 3   Q.  What does it say in the box at the very top of the page?

12:27PM 4   A.  Law enforcement sensitive.

12:27PM 5   Q.  Does it say federal judicial district initiating this

12:27PM 6   investigation?

12:27PM 7   A.  Yes.

12:27PM 8   Q.  What does it say?

12:27PM 9   A.  It says it's the Western District of New York.

12:27PM 10  Q.  And that's where we are right now?

12:27PM 11  A.  Yes.

12:27PM 12  Q.  Does it say special operations division coordination?

12:27PM 13  A.  Yes.

12:27PM 14  Q.  What is SOD?

12:27PM 15  A.  That's in Northern Virginia.  It's a -- a -- not an

12:27PM 16  agency, it's a cooperative endeavor between FBI, his, DEA,

12:27PM 17  other law enforcement agencies, to coordinate investigations

12:27PM 18  especially investigations that go beyond the originating

12:27PM 19  district.

12:27PM 20  Q.  And then there's an SOD staff coordinator, Tim Foley?

12:27PM 21  A.  Yes.

12:27PM 22  Q.  Is he someone who works in the Department of Justice

12:27PM 23  coordinating these types of cases?

12:27PM 24  A.  Yes.

12:27PM 25  Q.  Skip down a little bit, there's a list of perspective

USA v Bongiovanni - Ryan - Tripi/Direct - 3/18/24

12:28PM  1  defendants; do you see that?

12:28PM  2  A.  Yes.

12:28PM  3  Q.  Let's go with that name at the very top, Frank Tripi.

12:28PM  4  First of all, that's no relation of mine, correct?

12:28PM  5  A.  Correct.

12:28PM  6  Q.  All right.  Next one down, Lawrence Panaro?

12:28PM  7  A.  Yes.

12:28PM  8  Q.  Bonita Pugliese?

12:28PM  9  A.  Yes.

12:28PM  10  Q.  Mark and Sam Zito?

12:28PM  11  A.  Yes.

12:28PM  12  Q.  Matthew Pallaci?

12:28PM  13  A.  Yes.

12:28PM  14  Q.  Ray Gordner?

12:28PM  15  A.  Yes.

12:28PM  16  Q.  Michael Crumpton?

12:28PM  17  A.  Yes.

12:28PM  18  Q.  Patricia Davis?

12:28PM  19  A.  Yes.

12:28PM  20  Q.  Shawn Finitz?

12:28PM  21  A.  Yes.

12:28PM  22  Q.  And Emmanuael Soothran; is that right?

12:28PM  23  A.  Yes.

12:28PM  24  Q.  Is this information you would ever take out of a secure

12:28PM  25  space in a law enforcement environment and put it in your

| | | |
|---|---|---|
| 12:28PM | 1 | basement? |
| 12:28PM | 2 | A.  No. |
| 12:28PM | 3 | Q.  Based upon your knowledge, during the course of this |
| 12:28PM | 4 | investigation, are some of those names believed to be |
| 12:28PM | 5 | associates of Italian Organized Crime? |
| 12:28PM | 6 | A.  Yes. |
| 12:28PM | 7 | Q.  Here in Buffalo, New York? |
| 12:29PM | 8 | A.  Yes. |
| 12:29PM | 9 | **MR. TRIPI:**  Scroll down to the next page, page 3. |
| 12:29PM | 10 | **BY MR. TRIPI:** |
| 12:29PM | 11 | Q.  What does it say at the very top? |
| 12:29PM | 12 | A.  Law enforcement sensitive. |
| 12:29PM | 13 | Q.  And then on the agency involvement, are there various |
| 12:29PM | 14 | checked boxes for the different agencies involved? |
| 12:29PM | 15 | A.  Yes. |
| 12:29PM | 16 | Q.  And we see ATF, DEA, IRS, state and local agencies |
| 12:29PM | 17 | including the Niagara Falls Police Department? |
| 12:29PM | 18 | A.  Yes. |
| 12:29PM | 19 | Q.  And it has list of number of personnel involved from each |
| 12:29PM | 20 | agency? |
| 12:29PM | 21 | A.  Yes. |
| 12:29PM | 22 | **MR. TRIPI:**  Scroll down. |
| 12:29PM | 23 | **BY MR. TRIPI:** |
| 12:29PM | 24 | Q.  At the top of page 4, what does that box say? |
| 12:29PM | 25 | A.  Law enforcement sensitive. |

| | | |
|---|---|---|
| 12:29PM | 1 | Q.   And are there boxes to check for whether this has |
| 12:29PM | 2 | international ties potentially? |
| 12:29PM | 3 | A.   Oh, yes.  I see it now. |
| 12:30PM | 4 | Q.   Is the box for internationally checked? |
| 12:30PM | 5 | A.   Yes. |
| 12:30PM | 6 | Q.   Is a country specified? |
| 12:30PM | 7 | A.   Canada. |
| 12:30PM | 8 | Q.   Is a box for multiple states checked? |
| 12:30PM | 9 | A.   Yes. |
| 12:30PM | 10 | Q.   What states are listed? |
| 12:30PM | 11 | A.   California and Nevada. |
| 12:30PM | 12 | Q.   Is the box for multiple districts checked? |
| 12:30PM | 13 | A.   Yes. |
| 12:30PM | 14 | Q.   What's the other district specified? |
| 12:30PM | 15 | A.   Northern District of California. |
| 12:30PM | 16 | Q.   And the box for drugs under investigations, what boxes |
| 12:30PM | 17 | were checked for the drugs under investigation in this case? |
| 12:30PM | 18 | A.   Cocaine, heroin, marijuana. |
| 12:30PM | 19 | Q.   In the middle section, organization description under the |
| 12:30PM | 20 | money laundering movement methods identified, were there |
| 12:30PM | 21 | boxes for potential money laundering methods checked? |
| 12:30PM | 22 | A.   Yes. |
| 12:30PM | 23 | Q.   What boxes were checked? |
| 12:30PM | 24 | A.   Bulk cash movement by air, wire transfer, business |
| 12:30PM | 25 | fronts, casinos, and property investments. |

12:30PM   1   Q.  And in the far right side --

12:31PM   2           **MR. TRIPI:**  Go back up a little bit, please.

12:31PM   3           **BY MR. TRIPI:**

12:31PM   4   Q.  Primary activity of organization in your area, there's a

12:31PM   5   box for money laundering; is that right?

12:31PM   6   A.  Yes, the box for money laundering is checked.

12:31PM   7   Q.  And then other drug activity of organization, what boxes

12:31PM   8   are checked?

12:31PM   9   A.  Source of supply, transportation, distribution, and money

12:31PM  10   laundering.

12:31PM  11   Q.  And this document was in this Redweld in that box in the

12:31PM  12   defendant's basement?

12:31PM  13   A.  Yes.

12:31PM  14   Q.  The box being Exhibit 100A?

12:31PM  15   A.  Yes.

12:31PM  16           **MR. TRIPI:**  Scroll down.

12:31PM  17           **BY MR. TRIPI:**

12:31PM  18   Q.  On the bottom of the page, what does it say?

12:31PM  19   A.  Law enforcement sensitive.

12:31PM  20   Q.  At the top of the next page, page 5, what does it say?

12:31PM  21   A.  Law enforcement sensitive.

12:31PM  22           **MR. TRIPI:**  Keep scrolling, Ms. Champoux.

12:31PM  23           **BY MR. TRIPI:**

12:31PM  24   Q.  Does it have a box checked for informant under the

12:31PM  25   general investigative techniques?

USA v Bongiovanni - Ryan - Tripi/Direct - 3/18/24          115

12:31PM    1    A.  Yes.

12:32PM    2              MR. TRIPI:  Keep scrolling, Ms. Champoux.

12:32PM    3              BY MR. TRIPI:

12:32PM    4    Q.  At the top of page 6, what does it say in the box, bold

12:32PM    5    box there?

12:32PM    6    A.  Law enforcement sensitive.

12:32PM    7    Q.  And is there a box for date requested, of the date of OFC

12:32PM    8    product?

12:32PM    9    A.  Yes.

12:32PM   10    Q.  What's the date there?

12:32PM   11    A.  March 11, 2013.

12:32PM   12    Q.  As of March 11, 2013, was the Wayne Anderson file and

12:32PM   13    C2-13-0026 also open?

12:32PM   14    A.  Yes.

12:32PM   15              MR. TRIPI:  Scroll down.  Keep scrolling.

12:32PM   16              BY MR. TRIPI:

12:32PM   17    Q.  Top of page 7, does it again say law enforcement

12:32PM   18    sensitive?

12:32PM   19    A.  Yes.

12:32PM   20    Q.  And then, you know this one wasn't the completed copy

12:33PM   21    because all of these signature boxes or many of them would be

12:33PM   22    filled in, correct?

12:33PM   23    A.  That's correct.

12:33PM   24              MR. TRIPI:  Keep scrolling down, Ms. Champoux.

          25

12:33PM   1          **BY MR. TRIPI:**

12:33PM   2   Q.  At the bottom, I'm sorry, the OCDETF executive office

12:33PM   3   would have initialed and dated it as well?

12:33PM   4   A.  Yes.

12:33PM   5          **MR. TRIPI:**  Keep scrolling down.

12:33PM   6          **BY MR. TRIPI:**

12:33PM   7   Q.  Now, we're at page 8.  Is this the narrative for

12:33PM   8   Operation Past Due that the task force officer or the lead

12:33PM   9   agent, in this case, Chris Clark, would have written

12:33PM   10  regarding the case?

12:33PM   11  A.  Yes.

12:33PM   12  Q.  In terms of A1, background about the case, can you just

12:33PM   13  read that paragraph?

12:33PM   14  A.  Subparagraph A?

12:33PM   15  Q.  A, number 1 under A.

12:34PM   16  A.  Niagara Falls Police, NFPD, narcotics detectives

12:34PM   17  contacted the Buffalo DEA task force regarding drug activity

12:34PM   18  involving a collection agency, Direct Mediators, located at

12:34PM   19  1615 Pine Avenue, Niagara Falls, New York.

12:34PM   20     NFPD narcotics detectives interviewed an employee that

12:34PM   21  quit after one week of employment at the collection agency

12:34PM   22  that remained anonymous.  He/she observed illegal activity

12:34PM   23  such as cocaine, heroin, prescription drugs, and marijuana

12:34PM   24  being sold out of the collection agency.  He/she stated that

12:34PM   25  Frank Tripi, the owner of the agency, stayed in the back

12:34PM    1    office which was off limits to the employees.

12:34PM    2            **MR. TRIPI:**  Ms. Champoux, can we hold that for a

12:34PM    3    moment.  And can we pull up Government Exhibit 46 please.

12:34PM    4    Mr. Serio's list of contacts.

12:34PM    5            And can you locate for the jury the name Frank Tripi,

12:35PM    6    please?  I don't have the number for you.

12:35PM    7            **BY MR. TRIPI:**

12:35PM    8    Q.  Is that the Frank Tripi who was the target of Operation

12:35PM    9    Past Due, Special Agent Ryan?

12:35PM   10    A.  Yes, it is.

12:35PM   11            **MR. TRIPI:**  Okay.  We can go back to 100A.1, continue

12:35PM   12    with the pdf.

12:35PM   13            Okay.  We can scroll down a little bit further, we

12:35PM   14    don't need to read all of that detail right now.  I'd like to

12:35PM   15    go to the last paragraph.  All right, stop there.  Sorry, go

12:36PM   16    to the next page, page 10.

12:36PM   17            **BY MR. TRIPI:**

12:36PM   18    Q.  And can we read under 5, targeted organization.  And just

12:36PM   19    read A through F please.

12:36PM   20    A.  Yes.  The Frank Tripi Drug-Trafficking Organization.

12:36PM   21        The geographic scope of this organization has currently

12:36PM   22    been identified as being Santa Cruz, California and the

12:36PM   23    Western New York area, specifically Niagara Falls, New York,

12:36PM   24    and Buffalo, New York.

12:36PM   25        The total number of participants in this organization has

12:36PM  1   yet to be fully identified.  However, it is believed that the

12:36PM  2   organization consists of at least eleven identified members,

12:36PM  3   and likely many more who have yet to be identified.

12:36PM  4       It is believed that this organization is currently

12:36PM  5   engaged in the distribution of cocaine, heroin, marijuana,

12:36PM  6   and various prescription drugs.

12:36PM  7       It is currently believed, based on confidential source

12:36PM  8   information, that this organization is distributing in excess

12:36PM  9   of at least 2 kilograms of cocaine and multiple ounce

12:36PM 10   quantities of heroin, multiple pounds of marijuana, and

12:37PM 11   unknown quantities of prescription drugs per month in the

12:37PM 12   Western New York area.

12:37PM 13       Tripi is obtaining his heroin from Ohio and driving it

12:37PM 14   back to the Western New York area in vehicles with hidden

12:37PM 15   compartments.

12:37PM 16       Tripi himself is also involved with the coordination of

12:37PM 17   trafficking of cocaine, marijuana, and prescription drugs.

12:37PM 18       It is unknown at the present time how the cocaine and

12:37PM 19   prescription drugs are delivered to Tripi.

12:37PM 20           **MR. TRIPI:**  Can we scroll down the next section.

12:37PM 21           **BY MR. TRIPI:**

12:37PM 22   Q.  Just read the first sentence of B-1, please.

12:37PM 23   A.  The overall goals of this investigation are to identify

12:37PM 24   the totality of this drug-trafficking organization, including

12:37PM 25   but not limited to the commanding and control elements,

12:37PM  1  smuggling routes and methods, distribution networks, methods

12:37PM  2  utilized to avoid apprehension by law enforcement, and money

12:37PM  3  laundering methods.

12:38PM  4      **MR. TRIPI:**  Okay.  We can clear out of there,

12:38PM  5  Ms. Champoux.

12:38PM  6          Just a moment, Your Honor.

12:38PM  7          No further direct, Your Honor.

12:38PM  8      **THE COURT:**  Okay.  So we're going to take our lunch

12:38PM  9  break now.

12:38PM  10         Please remember my instructions about not discussing

12:38PM  11  any aspect of the case with anyone.  Don't do any research on

12:39PM  12  your own.  Don't use tools of technology to either research

12:39PM  13  the case or to communicate about the case.  Don't read, listen

12:39PM  14  to, or watch any news coverage if there is any while the case

12:39PM  15  in on trial.  Don't make up your mind about anything until the

12:39PM  16  case has been finally given to you for deliberations.

12:39PM  17         Let's come back at 2:00.  We'll resume then.  Thank

12:39PM  18  you very much.

12:39PM  19         (Jury excused at 12:39 p.m.)

12:39PM  20      **THE COURT:**  Anything that needs to go on the record

12:39PM  21  before we break?

12:39PM  22      **MR. TRIPI:**  Not from the government, Your Honor.

12:39PM  23      **MR. MacKAY:**  No, Your Honor.

12:39PM  24      **THE COURT:**  Okay.  We'll see you at 2.

12:40PM  25      **THE CLERK:**  All rise.

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

| | | |
|---|---|---|
| 12:40PM | 1 | (Off the record at 12:40 p.m.) |
| 02:04PM | 2 | (Back on the record at 2:04 p.m.) |
| 02:04PM | 3 | (Jury not present.) |
| 02:04PM | 4 | **THE CLERK:**  All rise. |
| 02:04PM | 5 | **THE COURT:**  Please be seated. |
| 02:04PM | 6 | **THE CLERK:**  We are back on the record for the |
| 02:04PM | 7 | continuation of the jury trial in case number 19-cr-227, |
| 02:04PM | 8 | United States of America versus Joseph Bongiovanni. |
| 02:04PM | 9 | All counsel and parties are present. |
| 02:04PM | 10 | **THE COURT:**  Okay.  Anything we need to put on the |
| 02:04PM | 11 | record before we resume? |
| 02:04PM | 12 | **MR. TRIPI:**  No, Your Honor. |
| 02:04PM | 13 | **MR. MacKAY:**  No, Your Honor. |
| 02:04PM | 14 | **THE COURT:**  Okay.  Let's bring them back in, please, |
| 02:04PM | 15 | Pat.  And let's get the witness in, please. |
| 02:06PM | 16 | (Jury and witness seated at 2:06 p.m.) |
| 02:06PM | 17 | **THE COURT:**  The record will reflect that all our |
| 02:06PM | 18 | jurors are present again. |
| 02:06PM | 19 | The witness is still under oath. |
| 02:06PM | 20 | And, Mr. MacKay, you're going to cross? |
| 02:06PM | 21 | **MR. MacKAY:**  I am, Your Honor. |
| 02:06PM | 22 | **THE COURT:**  You may begin. |
| 02:06PM | 23 | |
| 02:06PM | 24 | **CROSS-EXAMINATION BY MR. MacKAY:** |
| 02:06PM | 25 | Q. Agent Ryan, bear with me a second so I can get my legal |

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

121

02:06PM    1   work set up and my cold medication.

02:06PM    2   A.   Certainly.

02:06PM    3   Q.   I'm losing my voice here, so bear with me.  All right.

02:06PM    4        So, in the physical file we saw, Government Exhibit 100,

02:07PM    5   that's known as a working file, correct?

02:07PM    6   A.   Yes.

02:07PM    7   Q.   Now, I think your testimony was you came over to DEA

02:07PM    8   about April of 2017?

02:07PM    9   A.   Sometime around there.

02:07PM   10   Q.   I mean, you were with his in 2012, but eventually you

02:07PM   11   make the leap over to DEA some years later?

02:07PM   12   A.   Only as a task force officer, so on loan to DEA.

02:07PM   13   Q.   Right, that's what I meant.

02:07PM   14   A.   Yes.

02:07PM   15   Q.   By the time you come over to DEA, were there still paper

02:07PM   16   working files at that time?

02:07PM   17   A.   Yes.

02:07PM   18   Q.   Okay.  And by the time you left?

02:07PM   19   A.   Yes.

02:07PM   20   Q.   Okay.  But over time, to your knowledge, it was

02:07PM   21   transitioned to some -- to a computer system as well, too,

02:07PM   22   right?

02:07PM   23   A.   Yes, that was happening while I was there.

02:07PM   24   Q.   Okay.  Right, it's not a -- it's not an instantaneous

02:07PM   25   transfer, it happens over time, correct?

02:07PM   1    A.  Yes.

02:07PM   2    Q.  Okay.

02:08PM   3              MR. MacKAY:  All right.  Ms. Champoux, can we pull up

02:08PM   4    Government Exhibit 100A.1?  Can you go to the -- I guess I'd

02:08PM   5    call it, like, the -- a file selection list.

02:08PM   6              THE CLERK:  All set.

02:08PM   7              MR. MacKAY:  Okay.  Thank you.

02:08PM   8              BY MR. MacKAY:

02:08PM   9    Q.  All right.  Agent Ryan, I'm going to take you through

02:08PM   10   some of the files we looked at on your direct.

02:08PM   11             MR. MacKAY:  Ms. Champoux, can we go down to the

02:08PM   12   bottom.  All right.  Actually, why don't we start with the

02:09PM   13   handwritten note, if we can open that file.  Can we zoom out

02:09PM   14   on that a little bit?

02:09PM   15             BY MR. MacKAY:

02:09PM   16   Q.  Do you recall seeing this note on your direct?

02:09PM   17   A.  Yes.

02:09PM   18   Q.  This is a scan of what looks to be a handwritten note

02:09PM   19   here?

02:09PM   20   A.  Yes.

02:09PM   21   Q.  As you sit here today, do you know if that's even Joe

02:09PM   22   Bongiovanni's handwriting?

02:09PM   23   A.  No, I don't.

02:09PM   24   Q.  Now it's common for, as a DEA agent or task force

02:09PM   25   officer, you need to get sort of tips off the street about

02:09PM    1    information about drug dealers, correct?

02:09PM    2    A.   Sometimes.

02:09PM    3    Q.   What I'm saying is sometimes you get people calling in

02:09PM    4    with information about drug activity, correct?

02:09PM    5    A.   Yes.

02:09PM    6    Q.   You also take notes during proffers of informants,

02:09PM    7    correct?

02:09PM    8    A.   Yes.

02:09PM    9    Q.   There can also be meetings taken -- or, notes taken

02:09PM   10    during group meetings, correct?

02:10PM   11    A.   Yes.

02:10PM   12    Q.   All right.  Let's look at some of the stuff that's

02:10PM   13    embodied in this note.  Mr. Tripi led you through some of it.

02:10PM   14    At the top we see Ron Serio's name, correct?

02:10PM   15    A.   Yes.

02:10PM   16    Q.   A little below that, we see Dave Oddo's name, correct?

02:10PM   17    A.   Yes.

02:10PM   18    Q.   A little below that to the right side, we see Tom Serio's

02:10PM   19    name?

02:10PM   20    A.   Yes.

02:10PM   21    Q.   Right next to that, do you see where it says CREME BEAME?

02:10PM   22    A.   I do.

02:10PM   23    Q.   Any idea what that means?

02:10PM   24    A.   No.

02:10PM   25    Q.   Possible it referred to a white BMW 650I?

02:10PM    1    A.  It could be.

02:10PM    2    Q.  And below that, do you recognize that to be one of Tom

02:10PM    3    Serio's numbers?

02:10PM    4    A.  I would need the list to confirm it, but yes, I think so.

02:10PM    5    Q.  So fair to say, looking at this, what this may possibly

02:10PM    6    be is a collection of notes from some sort of source

02:10PM    7    interview?

02:10PM    8    A.  It could be.

02:11PM    9            **MR. MacKAY:**  Okay.  Ms. Champoux, can we take that

02:11PM   10    down, and go out to the main list.

02:11PM   11            Can we go to the OCDETF document that's near the end.

02:11PM   12    Yes, that one, thank you.

02:11PM   13            **BY MR. MacKAY:**

02:11PM   14    Q.  All right.  Now, for the record, we're on page 1 here.

02:11PM   15    This, you led us through, this was a draft OCDETF initiation

02:11PM   16    form, correct?

02:11PM   17    A.  This first part is the initiation form, and then the

02:11PM   18    narrative is a separate form, but it's attached to this, yes,

02:11PM   19    sir.

02:11PM   20    Q.  Yeah.  So in sum and substance, what this does, this is a

02:11PM   21    proposal to set up an OCDETF case, correct?

02:11PM   22    A.  Yes.

02:11PM   23            **MR. MacKAY:**  Ms. Champoux, can we jump down to the

02:11PM   24    page that starts the narrative?  Okay.  Right here.

          25

02:12PM  1          **BY MR. MacKAY:**

02:12PM  2  Q.  All right.  So for the record we're on page 8 of 11.  And

02:12PM  3  this is the narrative portion you were referring to, correct?

02:12PM  4  A.  Yes.

02:12PM  5  Q.  This kind of gives us some background about what

02:12PM  6  Operation Past Due is about, correct?

02:12PM  7  A.  It does.

02:12PM  8  Q.  From reading this narrative and from your investigation,

02:12PM  9  you know that one of the targets here was Frank Tripi,

02:12PM  10  correct?

02:12PM  11  A.  Yes.

02:12PM  12  Q.  Now Frank Tripi was connected to debt collection in

02:12PM  13  Niagara Falls, correct?

02:12PM  14  A.  He was.

02:12PM  15  Q.  And he was also a connection developed regarding possible

02:12PM  16  marijuana trafficking, correct?

02:12PM  17  A.  Among other things, yes.

02:12PM  18  Q.  Well, one those things was he had a connection in

02:12PM  19  Northern California to some sort of land he had, correct?  Or

02:12PM  20  somebody connected to him had?

02:12PM  21  A.  There was some connection to Northern California that

02:13PM  22  brought the Northern District of California in.

02:13PM  23  Q.  Okay.  So from this narrative, we know that Frank Tripi

02:13PM  24  is involved in marijuana, correct?

02:13PM  25  A.  Yes.

02:13PM     1    Q.  And we know that he's involved in collection agencies,

02:13PM     2    correct?

02:13PM     3    A.  Yes.

02:13PM     4    Q.  And in your investigation, you came to learn that Ron

02:13PM     5    Serio was also involved in collection activities, correct?

02:13PM     6    A.  Yes.

02:13PM     7    Q.  Okay.  And I think we went through this ad nauseam, but

02:13PM     8    this is just -- this is a draft proposal at this stage,

02:13PM     9    correct?

02:13PM    10    A.  At this stage, yes.

02:13PM    11    Q.  Because we don't see initials or signatures on it,

02:13PM    12    correct?

02:13PM    13    A.  Correct.

02:13PM    14    Q.  All right.

02:13PM    15          **MR. MacKAY:**  Ms. Champoux, you can close that out.

02:13PM    16    You can close all the tabs, I just want to say.

02:13PM    17          Can we go to the Oddo NADDIS file.  That one, yes.

02:13PM    18    If we can zoom out a little bit.

02:13PM    19          **BY MR. MacKAY:**

02:13PM    20    Q.  All right.  So this was, you testified, the NADDIS record

02:14PM    21    for Dave Oddo, correct?

02:14PM    22    A.  Yes.

02:14PM    23          **MR. MacKAY:**  Okay.  Can we go to page 2, please,

02:14PM    24    Ms. Champoux?  All right.  Can we blow up the top header line,

02:14PM    25    please?  Okay.

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

127

02:14PM   1          **BY MR. MacKAY:**

02:14PM   2    Q.  Now can you see reading at the top it appears this NADDIS

02:14PM   3    report was run on July 2nd, 2012?

02:14PM   4    A.  Yes.

02:14PM   5    Q.  And it appears that the agent who ran it was Shane

02:14PM   6    Nastoff, correct?

02:14PM   7    A.  That's correct.

02:14PM   8    Q.  Okay.  And then in sum and substance, what a NADDIS

02:14PM   9    report that shows below that is the prior entries for this

02:14PM  10    specific individual, correct?

02:14PM  11    A.  Of remarks/entries usually made at the end of the DEA-6

02:14PM  12    or sometimes on a DEA 202, in my experience, but yes, it's a

02:14PM  13    roll up of those remarks.

02:14PM  14    Q.  Fair to say that what it is is a way of looking at what

02:14PM  15    investigations have involved were targeted, the specific

02:14PM  16    subject, correct?

02:14PM  17    A.  That's one way to use it, yes.

02:14PM  18    Q.  DEA investigations?

02:14PM  19    A.  DEA investigations.

02:15PM  20    Q.  All right.  But from this header as we can see, this is

02:15PM  21    being done in the summer of 2012, fair to say?

02:15PM  22    A.  Yes.

02:15PM  23    Q.  Okay.  And your understanding and the documents reviewed

02:15PM  24    showed that the Ron Serio file was opened months later near

02:15PM  25    the end of 2012, correct?

02:15PM   1   A.  November, December 2012.

02:15PM   2   Q.  Okay.

02:15PM   3        **MR. MacKAY:**  Okay.  Ms. Champoux, you can close that

02:15PM   4   one out.

02:15PM   5        Can we go to the one listed Mettal docs?  Can we

02:15PM   6   scroll -- I think it's the second page.  Actually, can we

02:15PM   7   close this one out?  I think there's other Robert Mettal

02:15PM   8   document.

02:16PM   9        I'm sorry, I think it's down under Robert.  Robert

02:16PM  10   Mettal M-I-S-C.  We can zoom out.

02:16PM  11        **BY MR. MacKAY:**

02:16PM  12   Q.  Again, this is sort of the same thing for Robert Mettal,

02:16PM  13   correct?

02:16PM  14   A.  Yes.

02:16PM  15        **MR. MacKAY:**  Ms. Champoux, can we go to the next

02:16PM  16   page, please?  Okay.  So for the record, we're looking at

02:16PM  17   page 2.  Can we zoom in on the top of that.

02:16PM  18        Okay.  Actually, can we zoom out one level, please?

02:16PM  19        **BY MR. MacKAY:**

02:16PM  20   Q.  And so you told us on direct that looking at this report,

02:16PM  21   you can see this references a booking date back in 1998,

02:16PM  22   correct?

02:16PM  23   A.  Yes, on December 17th.

02:16PM  24   Q.  Yeah.  But in the upper right-hand corner, we can see the

02:16PM  25   report is run by Agent Palmieri on May 6th, of 2013, correct?

| | | |
|---|---|---|
| 02:16PM | 1 | A.  Yes. |
| 02:16PM | 2 | Q.  Now, did you come to learn in your investigation that |
| 02:16PM | 3 | Robert Mettal and Thomas Serio were connected in some |
| 02:17PM | 4 | fashion? |
| 02:17PM | 5 | A.  Yes. |
| 02:17PM | 6 | Q.  Okay.  And they were connected because in the late '90s, |
| 02:17PM | 7 | they were prosecuted by the State Attorney General's Office |
| 02:17PM | 8 | for bulk cocaine trafficking, correct? |
| 02:17PM | 9 | A.  I don't remember the time frame, but I remember it was a |
| 02:17PM | 10 | cocaine distribution. |
| 02:17PM | 11 | Q.  And do you recall it being a State Attorney General case? |
| 02:17PM | 12 | A.  I don't know if I knew who did the case, but -- |
| 02:17PM | 13 | Q.  Well, so when you're investigating a subject, one of the |
| 02:17PM | 14 | things you look up is what past investigations or |
| 02:17PM | 15 | prosecutions that subject has, correct? |
| 02:17PM | 16 | A.  Yes. |
| 02:17PM | 17 | Q.  Because you want to know if there were law enforcement |
| 02:17PM | 18 | agencies that had looked into a specific subject before, |
| 02:17PM | 19 | correct? |
| 02:17PM | 20 | A.  Yes. |
| 02:17PM | 21 | Q.  And you want to see if those materialized into |
| 02:17PM | 22 | prosecutions or convictions, correct? |
| 02:17PM | 23 | A.  Yes. |
| 02:17PM | 24 | Q.  Okay.  Now, you told us here from this report you can |
| 02:17PM | 25 | tell that it's being run May 6th of 2013, correct? |

02:17PM  1    A.  Yes.

02:17PM  2         MR. MacKAY:  Now, Ms. Champoux, can we close this

02:18PM  3    out?  Can we go to the government Exhibit 8A in evidence,

02:18PM  4    page 15.

02:18PM  5         BY MR. MacKAY:

02:18PM  6    Q.  While she's pulling that up, did you come to learn in

02:18PM  7    your investigation that one of the informants Mr. Bongiovanni

02:18PM  8    met with was a gentleman named Robert Kaiser?

02:18PM  9    A.  Yes.

02:18PM 10    Q.  Okay.  And did you understand that he met with Kaiser --

02:18PM 11         MR. MacKAY:  Can we go to the next page,

02:18PM 12    Ms. Champoux?  Let's go up two pages.  One more page, please.

02:18PM 13    Okay.  All right.  For the record, what page are we on?

02:18PM 14         MS. CHAMPOUX:  We're at page 13.

02:18PM 15         MR. MacKAY:  So for the record, we're on page 13

02:18PM 16    here.  Can we blow up the first paragraph, please?  Okay.

02:18PM 17         BY MR. MacKAY:

02:18PM 18    Q.  We don't have to go through all of the paragraph here,

02:18PM 19    but is this consistent with what you learned in your

02:19PM 20    investigation that DEA met with Robert Kaiser at the end of

02:19PM 21    April of 2013?

02:19PM 22    A.  Yes.

02:19PM 23    Q.  Well, and I mean, you look at the first sentence, does

02:19PM 24    that reference a date of April 30th, 2013, and a C.S. number

02:19PM 25    that you know to be associated with Robert Kaiser?

02:19PM    1    A.   Yes.

02:19PM    2    Q.   Okay.  And then I'll direct you to the fourth line from

02:19PM    3    the bottom, start -- the sentence starting at the fifth line

02:19PM    4    of the bottom.  So the agents have identified several

02:19PM    5    persons?

02:19PM    6    A.   Yes, I see it.

02:19PM    7    Q.   And one of those listed is Robert Mettal, correct?

02:19PM    8    A.   Yes.

02:19PM    9    Q.   Okay.  So the report we saw back in Government Exhibit

02:19PM   10    100A.1 was run by Agent Palmieri occurs after this meeting

02:19PM   11    with Robert Kaiser, correct?

02:19PM   12    A.   It does.

02:19PM   13    Q.   Okay.  So, is it -- can you -- can you -- strike that.

02:20PM   14         MR. MacKAY:  All right.  We can take this down.

02:20PM   15         All right.  Can we go back to Government Exhibit

02:20PM   16    100A.1?  I think it's a NYAG report.  Let's pull up the one

02:20PM   17    without the date first.

02:20PM   18         BY MR. MacKAY:

02:20PM   19    Q.   Again this is, for the record, a report regarding

02:20PM   20    New York State Attorney General investigation, correct?

02:20PM   21    A.   Or looks like it originated from the Erie County Sheriff

02:20PM   22    and the Buffalo Police Department.

02:20PM   23    Q.   Okay.

02:20PM   24    A.   So some combination of the three probably.

02:20PM   25    Q.   Okay.  So you -- do you see where it says, for example,

Case 1:19-cr-00227-LJV-MJR   Document 1017   Filed 06/18/24   Page 132 of 239
USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

132

02:21PM   1   the report number, case number, intelligence report, it all

02:21PM   2   says OCTF in front of the number?

02:21PM   3   A.  Yes.

02:21PM   4   Q.  Do you know that to be the Attorney General's Organized

02:21PM   5   Crime Task Force?

02:21PM   6   A.  Yes.

02:21PM   7         **MR. MacKAY:**  Can we scroll down on this page, please?

02:21PM   8   Little further, please.  And on to the next page.  And we can

02:21PM   9   stop there.  Thanks.

02:21PM   10        **BY MR. MacKAY:**

02:21PM   11  Q.  So for the record, we're on page 2 now.  See number 25 is

02:21PM   12  circled, Robert Mettal?

02:21PM   13  A.  Yes.

02:21PM   14  Q.  This is, again, an Attorney General document

02:21PM   15  memorializing something to do with Robert Mettal, correct?

02:21PM   16  A.  Yes.

02:21PM   17        **MR. MacKAY:**  You can close that out, Ms. Champoux.

02:21PM   18  Can we open SafetyNet document?

02:22PM   19        **BY MR. MacKAY:**

02:22PM   20  Q.  Okay.  So, you're familiar with SafetyNet, correct?

02:22PM   21  A.  Yes.

02:22PM   22  Q.  I think you described it as being both a state and

02:22PM   23  federal law enforcement database for deconfliction in

02:22PM   24  New York State, correct?

02:22PM   25  A.  It's run by the New York State Intelligence Center, yes.

02:22PM  1   Q.  Meaning that it's supposed to prevent law enforcement

02:22PM  2   agencies in New York from getting in the way of each other;

02:22PM  3   is that a fair way to describe it?

02:22PM  4   A.  Yes, that's one way it's used.

02:22PM  5   Q.  Okay.  I mean, it's one of the deconfliction databases,

02:22PM  6   correct?

02:22PM  7   A.  Yes.

02:22PM  8   Q.  Okay.  Now, so I want to direct your attention to this

02:22PM  9   first page.  You said that when you created these documents

02:22PM  10  in electronic form, what you did was scan in the hard copies

02:22PM  11  that you found in Exhibit 100, the physical file, correct?

02:22PM  12  A.  Yes.

02:22PM  13       **MR. MacKAY:**  All right.  So can we zoom out on that a

02:22PM  14  little bit, Ms. Champoux?

02:22PM  15       **BY MR. MacKAY:**

02:22PM  16  Q.  So, fair to say that what we're looking at here is the

02:23PM  17  cover sheet, and it's dated from the top October 31st, 2012?

02:23PM  18  A.  Yes.

02:23PM  19  Q.  That's the old line of the fax machines that tells when

02:23PM  20  the transmission goes through, correct?

02:23PM  21  A.  Yes.

02:23PM  22  Q.  And the fax transmission cover sheet appears to suggest,

02:23PM  23  does it not, that this is a fax going from Pete Talty to Joe

02:23PM  24  Bongiovanni?

02:23PM  25  A.  Yes.

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

134

02:23PM    1    Q.  Okay.

02:23PM    2         MR. MacKAY:  All right, Ms. Champoux, can we go to

02:23PM    3    the second page, please?

02:23PM    4         BY MR. MacKAY:

02:23PM    5    Q.  Okay.  Now, on this page, though, you look at the job fax

02:23PM    6    completion, it's called job status report here at the top,

02:23PM    7    that's a different date, correct?

02:23PM    8    A.  It says January 4th.

02:23PM    9    Q.  Okay.  So fair to say that probably the fax cover sheet

02:23PM   10    on page 1 doesn't really apply here to this second page,

02:23PM   11    correct?

02:23PM   12    A.  Probably.

02:23PM   13    Q.  Could have been a mix up, correct?

02:24PM   14    A.  So we tried to keep the documents that were together,

02:24PM   15    together in the file as best we could when we created the

02:24PM   16    pdfs, but that doesn't mean that they necessarily went

02:24PM   17    together.

02:24PM   18    Q.  Okay.  And sometimes it just doesn't come out exactly the

02:24PM   19    way we hope, correct?

02:24PM   20    A.  Well, I mean, they were together, maybe they just don't

02:24PM   21    go together.

02:24PM   22    Q.  Okay.  But what the sum and substance of the remainder of

02:24PM   23    this document is, is these are the submissions somebody makes

02:24PM   24    to the SafetyNet database to put the names in, correct?

02:24PM   25    A.  Yes.

02:24PM   1    Q.  And this is occurring back in early 2013, you were not at

02:24PM   2    the DEA at that time, correct?

02:24PM   3    A.  I was not.

02:24PM   4    Q.  Did you -- by the time you joined DEA in 2017, is it

02:24PM   5    still being done by fax?

02:24PM   6    A.  No.

02:24PM   7    Q.  Okay.  Now, I mean, so, at that point in time, how do you

02:24PM   8    have to do it in 2017?

02:24PM   9    A.  There was an online tool.

02:24PM   10   Q.  Okay.  Now, are you familiar with the fact that a

02:25PM   11   SafetyNet submission is only good for one year?

02:25PM   12   A.  I don't remember that.

02:25PM   13   Q.  Okay.  But these were the only SafetyNet submissions that

02:25PM   14   you saw that you recovered in this file, correct?

02:25PM   15   A.  Yes.

02:25PM   16   Q.  Okay.

02:25PM   17        **MR. MacKAY:**  All right.  You can take that down,

02:25PM   18   Ms. Champoux.  Can we go to the -- what's gonna be the DARTS

02:25PM   19   document, DARTS email 1/7/2019.  Can we zoom in on that first

02:25PM   20   page of it?

02:25PM   21        **BY MR. MacKAY:**

02:25PM   22   Q.  We've gone through a number of different DARTS reports,

02:25PM   23   and what we're looking at now is sort of one way you might

02:25PM   24   see that, correct?

02:25PM   25   A.  Yes.

02:25PM    1    Q.   This, for example, is in the format of an email occurring

02:26PM    2    in 2019, correct?

02:26PM    3    A.   Yes.

02:26PM    4    Q.   Some of the other formats we looked at are sort of

02:26PM    5    printouts of what you would see on the computer screen,

02:26PM    6    correct?

02:26PM    7    A.   Yes, if you were reviewing the web page.

02:26PM    8    Q.   And you went through, I think -- I think -- I don't

02:26PM    9    remember if it was this one, or there were some others, and I

02:26PM   10    think --

02:26PM   11         **MR. MacKAY:**   Can we scroll down a little bit,

02:26PM   12    Ms. Champoux?   This might not have been the one.

02:26PM   13         **BY MR. MacKAY:**

02:26PM   14    Q.   But do you recall the one document that we looked at and

02:26PM   15    it showed whether there was any intercept on a specific phone

02:26PM   16    number?

02:26PM   17    A.   Yes.

02:26PM   18    Q.   Okay.   I'm not sure which one that was specifically, but

02:26PM   19    I think at the very end, you told us that the intercept -- if

02:26PM   20    there's no intercepts noted for a document, it's going to

02:26PM   21    show -- you understand that to mean there's no Title III

02:26PM   22    wiretaps on the phone number, correct?

02:26PM   23    A.   Correct.

02:26PM   24    Q.   But you interpreted one of the entries to mean, though,

02:27PM   25    that the number could still be captured with a pen register,

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

137

02:27PM   1   correct?

02:27PM   2   A.   Yes, I think it was the last entry said the numbers were

02:27PM   3   captured from a pen.

02:27PM   4   Q.   Yes.  So, again, just to describe a pen register for the

02:27PM   5   jury, that's not a full intercept of the contents of a phone

02:27PM   6   conversation, correct?

02:27PM   7   A.   It is not.

02:27PM   8   Q.   It's sort of like a realtime capturing of what numbers

02:27PM   9   the phone is dialing, correct?

02:27PM  10   A.   Dialing or receiving calls -- well, the defendant

02:27PM  11   dialing --

02:27PM  12   Q.   Yeah, it's a realtime toll analysis, or toll log,

02:27PM  13   correct?

02:27PM  14   A.   Yes, as the calls are happening.

02:27PM  15   Q.   And as you told us by looking at that one document of the

02:27PM  16   last entry, the numbers in there could still be captured by

02:27PM  17   pen register, correct?

02:27PM  18   A.   Yes.

02:27PM  19   Q.   And to your knowledge and your understanding of the

02:27PM  20   investigation, Ron Serio never changed his cell phone number

02:28PM  21   throughout until he was arrested, correct?

02:28PM  22   A.   No, I think he had more than one phone when he was

02:28PM  23   arrested.

02:28PM  24   Q.   But the main phone number that he's associated with, I

02:28PM  25   had it written down, I think it's the one that starts with 8,

02:28PM    1   he had that number all the way up to his arrest, correct?

02:28PM    2   A.  I think so.

02:28PM    3   Q.  It's 830-3226?

02:28PM    4   A.  I would have to look at some records to know that for

02:28PM    5   sure.

02:28PM    6   Q.  But you recall that number coming up quite a bit in the

02:28PM    7   investigation, correct?

02:28PM    8   A.  Yes.

02:28PM    9         **MR. MacKAY:**  Okay.  All right.  Now Ms. Champoux, can

02:28PM   10   we take that down?

02:28PM   11         Can we pull up T Serio DWI report?  It could be that

02:29PM   12   one, intel report.  No, it's not that one.  All right.

02:29PM   13         **BY MR. MacKAY:**

02:29PM   14   Q.  Do you recall looking at an Amherst police report for DWI

02:29PM   15   arrest for Tom Serio?

02:29PM   16   A.  Yes.

02:29PM   17   Q.  And that's a standard local police department police

02:29PM   18   report, correct?

02:29PM   19   A.  Yes.

02:29PM   20   Q.  And you know that those police reports can be obtained by

02:29PM   21   any citizen through a FOIL request, correct?

02:29PM   22   A.  Yes, I think so.

02:29PM   23   Q.  And -- and in sum and substance, it reports, you read the

02:29PM   24   contents of it to the jury, that he's caught with a few pills

02:30PM   25   in this DWI arrest; do you remember that?

02:30PM  1   A.  Yes.

02:30PM  2   Q.  Now you also told the jury this DWI arrest appeared to

02:30PM  3   have occurred after Mr. Bongiovanni had closed the Serio

02:30PM  4   file, correct?

02:30PM  5   A.  Yes.

02:30PM  6   Q.  In your experience, an individual being arrested for a

02:30PM  7   misdemeanor DWI in possession of a couple pills, that's

02:30PM  8   generally not going to be enough information in total to, in

02:30PM  9   your experience, make out a full search warrant for like a

02:30PM  10  house, for example, correct?

02:30PM  11  A.  That information alone?  No.  But it's a starting point

02:30PM  12  that could lead you to that.

02:30PM  13  Q.  It could.  But, for example, because we don't need to go

02:30PM  14  into the law about it, but in order to get a search warrant

02:30PM  15  for a house, you essentially need it to connect to activity

02:30PM  16  that happens at the house, correct?

02:30PM  17  A.  Yes.

02:30PM  18  Q.  So an individual found with a couple pills in a car, in

02:31PM  19  your experience, is probably not something, like you said,

02:31PM  20  alone that they're gonna be able to make out a full search

02:31PM  21  warrant to get a house search, correct?

02:31PM  22  A.  Again, I think it could be characterized as a starting

02:31PM  23  point.  I think if you leave it as a standalone, then your

02:31PM  24  statement is correct.

02:31PM  25  Q.  Well, we're talking about starting points.  You reviewed

02:31PM   1  all of Exhibit 100A, correct?

02:31PM   2  A.  Yes.

02:31PM   3  Q.  And, obviously, you reviewed that in the context of

02:31PM   4  making Exhibit A -- 100A.1, correct?

02:31PM   5  A.  Yes.

02:31PM   6  Q.  What you see in there in total are a number of documents

02:31PM   7  that are important in your experience and investigation when

02:31PM   8  looking into somebody, correct?

02:31PM   9  A.  Yes.

02:31PM  10  Q.  All of these reflect investigative steps that an agent

02:31PM  11  would take when looking into somebody, correct?

02:31PM  12  A.  They're the kind of documents you would accumulate, yes.

02:31PM  13  Q.  Right.  So within an investigation within the DEA, most

02:31PM  14  of these documents reflect some sort of investigative step

02:32PM  15  taken in a general investigation of somebody, correct?

02:32PM  16  A.  Most of them do, yes.

02:32PM  17  Q.  Okay.

02:32PM  18  A.  They're not all from the same investigation.  But --

02:32PM  19          **MR. MacKAY:**  All right.  You can close that out,

02:32PM  20  Ms. Champoux.  All right.

02:32PM  21          **BY MR. MacKAY:**

02:32PM  22  Q.  All right.  So I want to turn your attention to Anthony

02:32PM  23  Gerace.  You were essentially the one who directed the search

02:32PM  24  of his Clarence Center house, correct?

02:32PM  25  A.  Yes.

02:32PM    1    Q.  And this occurs in January of 2018, correct?

02:32PM    2    A.  Yes.

02:32PM    3    Q.  I hope you're not coming down with same thing I have.

02:32PM    4    A.  No, it might be a little springtime cold, but I think it

02:32PM    5    was just the water.

02:32PM    6    Q.  I'm hoping it's the same thing.

02:32PM    7        So you testified that approximately $103,000 in cash was

02:32PM    8    found; do you remember that?

02:32PM    9    A.  How much?

02:32PM   10    Q.  About -- I'm ballparking it, but $103,000 of cash.

02:33PM   11    A.  Oh, I'm sorry, I thought you said 150-.  So it was about

02:33PM   12    103,000.

02:33PM   13    Q.  103,000.

02:33PM   14        MR. MacKAY:  And, Ms. Champoux, can we pull up

02:33PM   15    Government Exhibit 72A-55?

02:33PM   16        BY MR. MacKAY:

02:33PM   17    Q.  And this is what we looked at, I think, on Friday.  This

02:33PM   18    is the Super Bowl pool ledger as you know it to be, correct?

02:33PM   19    A.  Yes.

02:33PM   20    Q.  You understood that to be essentially a listing of

02:33PM   21    individuals in a Super Bowl pool, correct?

02:33PM   22    A.  Yes.

02:33PM   23    Q.  You don't know when this was produced, correct?

02:33PM   24    A.  Only around that Super Bowl.

02:33PM   25    Q.  Okay.  So you'd agree with me it contains various

02:33PM   1   business names, correct?  Like, I'll direct your attention to

02:33PM   2   number 34 on the list.

02:33PM   3               MR. MacKAY:  Can we blow that one up if we can,

02:33PM   4   Ms. Champoux?

02:33PM   5               BY MR. MacKAY:

02:34PM   6   Q.  See, it says 34, it says 67 West, paid?

02:34PM   7   A.  Yes.

02:34PM   8   Q.  Circled?

02:34PM   9   A.  I see that.

02:34PM  10   Q.  For your time here in Buffalo, do you know 67 West to be

02:34PM  11   a bar on Chippewa Street?

02:34PM  12   A.  I can't picture it, but I don't know that it's not there

02:34PM  13   either.

02:34PM  14               MR. MacKAY:  Okay.  Can we blow up number 40,

02:34PM  15   Ms. Champoux?

02:34PM  16               BY MR. MacKAY:

02:34PM  17   Q.  Same thing.  Do you see 40, and it says Wing Kings?  It

02:34PM  18   looks like it's in parenthesis, it says fee.

02:34PM  19   A.  I see that.

02:34PM  20   Q.  Okay.  And Wing Kings, do you know that to be a

02:34PM  21   restaurant on Elmwood Avenue in Buffalo?

02:34PM  22   A.  I don't know that, no.

02:34PM  23   Q.  Okay.  Now, number 37, if you look from there, you see

02:34PM  24   Ron Serio, correct?

02:34PM  25   A.  I do.

02:34PM  1    Q.  And as you know from your investigation, he was arrested

02:34PM  2    in April of 2017, correct?

02:34PM  3    A.  Yes.

02:34PM  4    Q.  And he's subject to -- he's taken into custody in April

02:35PM  5    of 2017, correct?

02:35PM  6    A.  He was.

02:35PM  7    Q.  Did you understand him to then go to some various

02:35PM  8    rehab -- drug rehab facilities?

02:35PM  9    A.  Yes.

02:35PM  10   Q.  And ultimately he is released into the community on some

02:35PM  11   sort of supervision, correct?

02:35PM  12   A.  Yes.

02:35PM  13   Q.  And did you understand him to actually have conditions

02:35PM  14   that prevented him from gambling in any fashion?

02:35PM  15   A.  I didn't know what his conditions were, no.

02:35PM  16   Q.  Okay.

02:35PM  17        **MR. MacKAY:**  All right.  Can we unzoom out, and zoom

02:35PM  18   in on the upper corner of that page, please, Ms. Champoux?

02:35PM  19        Oh, I should have said upper left corner.

02:35PM  20        **BY MR. MacKAY:**

02:35PM  21   Q.  Maybe you'll be able to see it without the zoom, but do

02:35PM  22   you see it says $105,000 there?

02:35PM  23   A.  I can see it, yes.

02:35PM  24   Q.  Fair to say looking at the context of this that's

02:35PM  25   probably what this -- it reflects what this Super Bowl pool

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

02:35PM 1 was supposed to have collected?

02:35PM 2 A.  Possibly, yes.

02:35PM 3 Q.  Okay.  And the way Super Bowl pools generally work, as

02:36PM 4 you understand it, is that the operator takes in money, runs

02:36PM 5 the pool, and then a portion of those proceeds are paid out

02:36PM 6 to the members of the pool, correct?

02:36PM 7 A.  Well, they're supposed to all be paid out.

02:36PM 8 Q.  But in your experience, sometimes the operator will take

02:36PM 9 a cut to run the pool?

02:36PM 10 A.  They can, but that violates New York's gambling laws.

02:36PM 11 Q.  In your experience, even when it violates the laws, have

02:36PM 12 you seen it happen before?

02:36PM 13 A.  I don't have a lot of experience with Super Bowl squares

02:36PM 14 other than knowing they exist, so --

02:36PM 15 Q.  Okay.

02:36PM 16 A.  -- I don't think I can answer that in my experience.

02:36PM 17 Q.  And you don't know how long Anthony Gerace had been

02:36PM 18 operating Super Bowl pools, had you?

02:36PM 19 A.  No.

02:36PM 20      **MR. MacKAY:**  Okay.  Ms. Champoux, can we take that

02:36PM 21 down and go to Government Exhibit 72A-56?

02:36PM 22      **BY MR. MacKAY:**

02:36PM 23 Q.  All right.  That's the actual square that you recovered,

02:37PM 24 correct?

02:37PM 25 A.  Yes.

02:37PM  1   Q.  And you can see by the writing on the vertical and

02:37PM  2   horizontal axis, it's the Philly Eagles and New England

02:37PM  3   Patriots; is that fair to say?

02:37PM  4   A.  Yes.

02:37PM  5   Q.  Now, again, this is recovered in January of 2019,

02:37PM  6   correct?

02:37PM  7   A.  Yes.

02:37PM  8   Q.  And did you understand that or come to learn that the

02:37PM  9   Philly Eagles and the New England Patriots played in the

02:37PM  10  Super Bowl held in 2018?

02:37PM  11  A.  I remember that it was a previous Super Bowl, a year or

02:37PM  12  two previous.

02:37PM  13  Q.  So that's what I'm asking.  Is this square that you see

02:37PM  14  here in 72A-56, that is not for the Super Bowl that was going

02:37PM  15  to be held in February of 2019, correct?

02:37PM  16  A.  Right.

02:37PM  17  Q.  Okay.  So, at least -- well, almost a year before when

02:37PM  18  the search warrant was executed, correct?

02:37PM  19  A.  Yes.

02:37PM  20  Q.  And in your review of the square, Ron Serio's name or

02:38PM  21  initials or anything suggesting he's part of the square

02:38PM  22  doesn't appear anywhere on this, correct?

02:38PM  23  A.  No, I don't remember seeing that then, and I don't see it

02:38PM  24  now.

02:38PM  25  Q.  Okay.  Now were you made aware in your context of the

02:38PM   1   investigation handling different aspects of it that Anthony

02:38PM   2   Gerace later made a claim for the money that was seized at

02:38PM   3   his house?

02:38PM   4   A.   Yes.

02:38PM   5   Q.   Okay.  And did you understand that he was claiming it

02:38PM   6   was, in fact, the proceeds of a Super Bowl pool?

02:38PM   7   A.   Yes, that's what he claimed.

02:38PM   8   Q.   Okay.  And in your experience with dealing with federal

02:38PM   9   forfeiture claims, in order for somebody to make a claim,

10:01PM   10   they have to fill out a form, correct?  Or submit a claim of

02:37PM   11   some sort?

02:37PM   12          MR. TRIPI:  Judge, objection.  401 and 403 regarding

02:37PM   13   federal forfeiture procedures and Anthony Gerace's claims.  I

02:38PM   14   don't see how that's relevant.

02:38PM   15          THE COURT:  No, overruled.

02:38PM   16          BY MR. MacKAY:

02:38PM   17   Q.   Do you understand in sum and substance that somebody has

02:38PM   18   to make a written claim for the money?

02:38PM   19   A.   Yes.

02:38PM   20   Q.   And that claim is made under oath?

02:38PM   21   A.   Yes.

02:38PM   22   Q.   And as you understood it, the claim Anthony Gerace made

02:38PM   23   was that the money that was taken came from the Super Bowl

02:38PM   24   pool, correct?

02:38PM   25   A.   That's the claim he made, yes.

02:38PM    1    **MR. MacKAY:** Okay. All right. So we can take that

02:38PM    2    down, Ms. Champoux. Thank you.

02:38PM    3    **BY MR. MacKAY:**

02:38PM    4    Q. So I'm going to talk about this investigation regarding

02:38PM    5    Ron Serio.

02:38PM    6    Now you testified on direct that you were present for

02:38PM    7    both February and July 2018 proffers with Ron Serio, right?

02:38PM    8    A. Yes.

02:38PM    9    Q. Now, the -- in sum and substance, the July 2018 proffer

02:38PM    10    is really where the investigation takes off against Joe

02:38PM    11    Bongiovanni based on something that Ron Serio says in that

02:38PM    12    proffer, correct?

02:38PM    13    A. Yes.

02:38PM    14    Q. Prior to that, there was no indication of anything

02:39PM    15    connected to Joseph Bongiovanni, correct?

02:39PM    16    A. Correct.

02:39PM    17    Q. Now, now, in the July 2018 proffer, Special Agent Casullo

02:40PM    18    is present for that, correct?

02:40PM    19    A. He was.

02:40PM    20    Q. He's not present for the February proffer, correct?

02:40PM    21    A. He was not.

02:40PM    22    Q. And if you can recall who again was present for the

02:40PM    23    February proffer?

02:40PM    24    A. DEA Special Agent David Walters and his Special Agent

02:40PM    25    Matthew Infante.

02:40PM  1    Q.  Anybody else present?

02:40PM  2    A.  And myself.

02:40PM  3    Q.  I'm sorry?

02:40PM  4    A.  And me.  And the Assistant United States Attorney.

02:40PM  5    Q.  Who was who at that time?

02:40PM  6    A.  That was Paul Parisi in February.

02:40PM  7    Q.  Okay.  Now you get to the July proffer, who's present for

02:40PM  8    that proffer?

02:40PM  9    A.  Myself, Special Agent Casullo, Special Agent Greg Mango

02:40PM  10   from his, FBI TFO Mike Maiola, and the AUSAs.

02:40PM  11   Q.  And who were the AUSAs?

02:40PM  12   A.  Brendan Cullinane and Mr. Tripi.

02:40PM  13   Q.  Okay.  So Paul Parisi is no longer there as an AUSA,

02:41PM  14   correct?

02:41PM  15   A.  Well, he was in still in the office as an AUSA, but he

02:41PM  16   wasn't in that --

02:41PM  17   Q.  He was not at the proffer, that's what I'm asking.

02:41PM  18   A.  Yes.

02:41PM  19   Q.  Now I think you told us on direct that Greg Mango was

02:41PM  20   present, and his presence had to do something with the fact

02:41PM  21   that he had just completed the Kingsmen trial?

02:41PM  22   A.  Yes.

02:41PM  23   Q.  Okay.  And, again, he was not present for the February

02:41PM  24   proffer, correct?

02:41PM  25   A.  He was not.

02:41PM    1    Q.  And we don't have to go into all the details, but the

02:41PM    2    Kingsmen trial and that investigation had some connection to

02:41PM    3    Organized Crime, correct?

02:41PM    4    A.  I don't know.

02:41PM    5    Q.  Okay.

02:41PM    6    A.  I mean, Organized Crime in the sense that if you want to

02:41PM    7    call the Kingsmen Organized Crime?

02:41PM    8    Q.  Well, did you understand it to include some link between

02:41PM    9    bikers and Pharaoh's Gentlemen's Club?

02:41PM   10    A.  I understand that -- I understood that there was some

02:41PM   11    connection to Pharaoh's Gentlemen's Club.

02:41PM   12    Q.  Okay.  Now when you go into a proffer, that's something

02:41PM   13    you don't head into blind, correct?

02:41PM   14    A.  Correct.

02:41PM   15    Q.  I mean, you talk with the individuals who are going to be

02:41PM   16    present about what subjects are going to be covered, correct?

02:42PM   17    A.  Yes, sir.

02:42PM   18    Q.  And what questions are going to be asked, correct?

02:42PM   19    A.  Yes.

02:42PM   20    Q.  Now at that point in time, you're in DEA group D-58,

02:42PM   21    right?

02:42PM   22    A.  Yes.

02:42PM   23    Q.  That is the task force group, correct?

02:42PM   24    A.  Yes.

02:42PM   25    Q.  And Joe Bongiovanni's in D-57, correct?

02:42PM    1    A.  Yes.

02:42PM    2    Q.  You understood that at least at some point in time

02:42PM    3    between February 2018 and July 2018, Special Agent Casullo

02:42PM    4    was moved into D-58?

02:42PM    5    A.  Yes.

02:42PM    6    Q.  And you understood that that was not necessarily a move

02:42PM    7    by Agent Casullo's choice, correct?

02:42PM    8    A.  No, I didn't know that.

02:42PM    9    Q.  Okay.  Did you understand that the move was prompted in

02:42PM   10    any way by tensions in the DEA office?

02:42PM   11    A.  No.

02:42PM   12    Q.  Okay.  Did you have any indication on why Agent Casullo

02:42PM   13    was moved over to D-58?

02:43PM   14    A.  No.

02:43PM   15    Q.  Okay.  But once -- did you have any indication on whether

02:43PM   16    there was any direction for him to work on certain projects

02:43PM   17    over in D-58 or not?  Do you understand what I'm asking?

02:43PM   18    A.  No.

02:43PM   19    Q.  When he comes over to D-58, did you know if he had to

02:43PM   20    change work on any projects?

02:43PM   21    A.  No.

02:43PM   22    Q.  Okay.  Did he take -- I guess what I'm saying is did you

02:43PM   23    see him pick up new investigations over in D-58 once he's

02:43PM   24    there?

02:43PM   25    A.  I don't know if he brought cases with him or not.

02:43PM    1    Q.  That was actually a better way of asking what I was
02:43PM    2    looking for.  Did he bring any of his D-57 cases over to
02:43PM    3    D-58?
02:43PM    4    A.  I don't know.
02:43PM    5    Q.  Okay.  But once he comes over to D-58, you do begin to
02:43PM    6    work with him in some capacity, correct?
02:43PM    7    A.  Yes.
02:43PM    8    Q.  I mean, obviously, you both wind up in this July 2018
02:43PM    9    proffer together, correct?
02:43PM   10    A.  We did.
02:43PM   11    Q.  And fair to assume that that meant until the Joe
02:43PM   12    Bongiovanni revelation, you were -- you and Agent Casullo
02:43PM   13    were going to be working this Ron Serio case together?
02:44PM   14    A.  Well, I mean, I don't know if I would call it the Ron
02:44PM   15    Serio case, but we were trying to see if we could make
02:44PM   16    something more out of the Ron Serio case that had already
02:44PM   17    hand.
02:44PM   18    Q.  All right.  But you and Agent Casullo, I guess what I'm
02:44PM   19    asking, is were you going to be teaming up on that?
02:44PM   20    A.  Yes.
02:44PM   21    Q.  Okay.  Now in February of 2018, there is no Italian
02:44PM   22    Organized Crime focus in the proffer, correct?
02:44PM   23    A.  Correct.
02:44PM   24    Q.  But by July of 2018, there is a focus, correct?
02:44PM   25    A.  Yes.

02:44PM   1    Q.  There's an intent to ask Mr. Serio some questions about

02:44PM   2    IOC, correct?

02:44PM   3    A.  Yes.

02:44PM   4    Q.  You went in -- you and the other agents went into that

02:44PM   5    proffer with the intent of asking him questions about that

02:44PM   6    subject, correct?

02:44PM   7    A.  Yes.

02:44PM   8    Q.  You wanted some -- you wanted him to give some answers on

02:44PM   9    that subject, correct?

02:44PM   10   A.  Yes.

02:44PM   11   Q.  So what prompted between February and July of 2018, the

02:44PM   12   move from not being about IOC to being about IOC?

02:45PM   13   A.  Not just about IOC, but I'm trying to remember how I

02:45PM   14   became aware.  But I began to learn more things specifically

02:45PM   15   about Peter and Anthony Gerace and their family and

02:45PM   16   understanding some more of the significance to that

02:45PM   17   relationship.

02:45PM   18   Q.  Okay.  So I want to drill down on that a little bit.

02:45PM   19       The way I'm hearing the words come out, it kind of sounds

02:45PM   20   like you were the one who made the decision to look into that

02:45PM   21   subject?

02:45PM   22   A.  I don't know that it was me alone, no.  I don't recall

02:45PM   23   that.

02:45PM   24   Q.  Do you recall whether, for example, Agent Casullo brought

02:45PM   25   you any information that prompted this new subject to be

02:45PM  1   looked into?

02:45PM  2   A.  No, I don't.

02:45PM  3   Q.  Okay.  Do you recall if there was any direction from the

02:45PM  4   U.S. Attorney's Office to focus on that subject?

02:45PM  5   A.  There was.

02:45PM  6   Q.  What sort of direction?

02:45PM  7   A.  Just that we wanted to focus more on the Buffalo

02:45PM  8   distribution network than had been focused on in the previous

02:46PM  9   proffers.

02:46PM  10  Q.  Okay.  And in that direction being given, was there any

02:46PM  11  indication of why that was?

02:46PM  12  A.  Because of the intersection of the Outlaws motorcycle

02:46PM  13  gang and Pharaoh's and Peter Gerace.

02:46PM  14  Q.  Okay.  And then how was the link made that Ronald Serio

02:46PM  15  would have any information to provide on this subject?

02:46PM  16  A.  I don't recall.

02:46PM  17  Q.  Do you recall Agent Casullo telling you anything about

02:46PM  18  him having reviewed Mr. Bongiovanni's Serio file?

02:46PM  19  A.  No.

02:46PM  20  Q.  Okay.  And did Agent Casullo make you aware prior to that

02:46PM  21  July 2018 proffer of any of his connection to -- or his

02:46PM  22  relationship to an individual named Phil Domiano?

02:47PM  23  A.  I don't know if it was before or after that, but I'm

02:47PM  24  aware of that relationship.

02:47PM  25  Q.  Okay.  Are you aware both of the family relationship as

02:47PM    1    well as the relationship Mr. Domiano to Pharaoh's Gentlemen's

02:47PM    2    Club?

02:47PM    3    A.  Yes.

02:47PM    4    Q.  Okay.  Do you recall if that information, again, all of

02:47PM    5    that information, was brought to you before you headed into

02:47PM    6    this July 2018 proffer?

02:47PM    7    A.  No, I think that came after.

02:47PM    8    Q.  Okay.  Now, so after this event, after this proffer, it's

02:47PM    9    determined at some point that Agent Casullo is going to be

02:47PM   10    deemed a fact witness in the investigation, correct?

02:47PM   11    A.  A combination of that.  And then it's probably -- you

02:47PM   12    can't have -- DEA agents don't investigate DEA agents, or

02:47PM   13    potential wrongdoing by DEA agents.

02:47PM   14    Q.  But I think you told us on direct, and I don't want to

02:47PM   15    misquote you, but he becomes a fact witness in relation to

02:47PM   16    the race-related comments, correct?

02:47PM   17    A.  Yes.  I was trying to say there was a combination of

02:47PM   18    those two things.

02:47PM   19    Q.  Okay.  But when the decision is made to sort of wall him

02:48PM   20    off and make him a fact witness, that really comes from the

02:48PM   21    race-related allegations, correct?

02:48PM   22    A.  No.  I think it was a combination of the two things.

02:48PM   23    Q.  Okay.  And just to be clear, a fact witness -- just to

02:48PM   24    remind the jury -- is somebody who might be eventually called

02:48PM   25    to testify in a proceeding about what they saw rather than

02:48PM  1   just what they investigated, correct?

02:48PM  2   A.  Yes.

02:48PM  3   Q.  Okay.  And once somebody becomes a fact witness, it's

02:48PM  4   important to remove them from the investigation, correct?

02:48PM  5   A.  Yes.

02:48PM  6   Q.  Because that -- you don't want what they saw to shape how

02:48PM  7   they investigate the case, correct?

02:48PM  8   A.  Yes.

02:48PM  9   Q.  Okay.  Another subject you covered on Friday -- I

02:49PM  10  apologize here --

02:49PM  11         **MR. MacKAY:**  Ms. Champoux, can we pull up Government

02:49PM  12  Exhibit 310D in evidence?

02:49PM  13         **BY MR. MacKAY:**

02:49PM  14  Q.  -- were these text messages between Peter Gerace and

02:49PM  15  Mr. Bongiovanni; do you remember that?

02:49PM  16  A.  I do.

02:49PM  17         **MR. MacKAY:**  Okay.  Ms. Champoux, can we go to page

02:49PM  18  76, please?

02:49PM  19         **BY MR. MacKAY:**

02:49PM  20  Q.  Can you see that clear enough?  Or do you need to blow

02:49PM  21  them up a little bit?

02:49PM  22  A.  No, I'm able to read everything.

02:49PM  23  Q.  Okay.  So we talked quite a bit, or you talked quite a

02:49PM  24  bit on Friday, about these text messages.  And then you

02:49PM  25  became aware of Mr. Bongiovanni sending a memo to his RAC on

02:49PM    1   December 10th, 2018; do you remember that?

02:49PM    2   A.   I think that's the date, yeah.

02:49PM    3   Q.   Okay.  And then I think you pointed out for the jury

02:49PM    4   after he sends that text message -- well, withdrawn.

02:50PM    5       The -- in terms of when the memo comes out, the last text

02:50PM    6   message you recall that would have -- that Mr. Bongiovanni

02:50PM    7   would have received before the memo was this text message

02:50PM    8   second from the bottom where it says you mean 36 years,

02:50PM    9   correct?

02:50PM   10   A.   Yes.

02:50PM   11   Q.   And then any text message after that point in time was

02:50PM   12   after Mr. Bongiovanni sent the memo; do you remember that?

02:50PM   13   A.   Yes.

02:50PM   14           MR. MacKAY:   Okay.  So, Ms. Champoux, I hate to do

02:50PM   15   this to you, but can we switch to Government Exhibit 99,

02:50PM   16   please?

02:50PM   17           THE COURT:   In evidence?

02:50PM   18           MR. MacKAY:   In evidence, yes.

02:50PM   19           BY MR. MacKAY:

02:50PM   20   Q.   Okay.  And then you were asked some questions about

02:50PM   21   Mr. Tripi about a further memo that Mr. Bongiovanni sent on

02:50PM   22   January 28th of 2019; do you see that here?

02:50PM   23   A.   I do.

02:50PM   24   Q.   Okay.  And so that's the memo that happens after the

02:50PM   25   December 10th, 2018 memo, correct?

02:50PM   1   A.  Yes.

02:50PM   2   Q.  But I direct your attention to the subject line; do you

02:50PM   3   see that?

02:50PM   4   A.  Yes.

02:51PM   5   Q.  And subject line reads:  Communication with Peter Gerace

02:51PM   6   by Special Agent Anthony Casullo and Phil Domiano, correct?

02:51PM   7   A.  I see that.

02:51PM   8   Q.  So the subject of this memo line, unlike the one on

02:51PM   9   December 10th of 2018, is not about communication that Joe

02:51PM  10   Bongiovanni is receiving from Peter Gerace, correct?

02:51PM  11   A.  No, it's not.

02:51PM  12   Q.  Okay.  So, given that title, any further -- given the

02:51PM  13   title you see in Government Exhibit 99, any text messages

02:51PM  14   received after December 10th, 2018, would not be relevant to

02:51PM  15   this memo title, correct?

02:51PM  16   A.  No, not necessarily to this memo title.  But I think the

02:51PM  17   earlier memo said -- had language like have and will always

02:51PM  18   report all communications.  So --

02:51PM  19   Q.  Okay.  But this memo, you understood to be the third memo

02:51PM  20   he sent, and final memo he sent, correct?

02:51PM  21   A.  Yes.

02:51PM  22   Q.  Okay.  And in sum and substance, it's not about his

02:51PM  23   contact with Peter Gerace, correct?

02:51PM  24   A.  It is not.

02:52PM  25            **MR. MacKAY:**  Okay.  All right, Ms. Champoux, can we

02:52PM    1    go back to 310D, page 76, in evidence.

02:52PM    2             All right.  Can we blow up the last -- is that a half

02:52PM    3    text message at the bottom, the picture?

02:52PM    4             **BY MR. MacKAY:**

02:52PM    5    Q.  All right.  So that's the photo that you recovered from

02:52PM    6    Mr. Gerace's phone, correct?

02:52PM    7    A.  Yes.

02:52PM    8    Q.  And we've seen it, and you've talked to us about it in

02:52PM    9    the form of Government Exhibit 127, that's the one where

02:52PM   10    Ms. Hunt had circled some figures in it, correct?

02:52PM   11    A.  Yes.

02:52PM   12    Q.  Okay.  This one, fair to say, actually looks a little bit

02:52PM   13    clearer as a shot than 127 does?  It's not as grainy?

02:52PM   14    A.  I don't know.

02:52PM   15    Q.  Okay.  All right.  But this one, fair to say this one

02:52PM   16    doesn't have the circles on it, correct?

02:52PM   17    A.  This one does not.

02:52PM   18    Q.  Because you printed it out in some capacity, showed it to

02:53PM   19    Ms. Hunt, and then she circles who she understood -- or, who

02:53PM   20    she remembered doing cocaine with at a cottage, correct?

02:53PM   21    A.  Yes.

02:53PM   22    Q.  Okay.  Now, at that time when you met with Ms. Hunt, you

02:53PM   23    understood that she had had some significant struggles with

02:53PM   24    substances, correct?

02:53PM   25    A.  I feel like -- I feel like that came later.  I don't know

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

159

02:53PM   1   about before.

02:53PM   2   Q.  Okay.  But you knew, you know, Ms. Hunt at some point in

02:53PM   3   time that there were drug issues surrounding her, correct?

02:53PM   4   A.  Yes.

02:53PM   5   Q.  You knew her to be a drug user, correct?

02:53PM   6   A.  Yes.

02:53PM   7   Q.  Now, she tells you some pretty specific things when she

02:53PM   8   circles these two individuals in this photo, correct?

02:53PM   9   A.  Yes.

02:53PM  10   Q.  She circles who you understand to be Tommy Doctor,

02:53PM  11   correct?

02:53PM  12   A.  Yes.

02:53PM  13   Q.  And she circles who you understand to be Joe Bongiovanni,

02:54PM  14   correct?

02:54PM  15   A.  Yes.

02:54PM  16   Q.  And she tells you that they want upstairs at the cottage

02:54PM  17   and did cocaine upstairs, correct?

02:54PM  18   A.  Yes.

02:54PM  19   Q.  What, if anything, did you do to verify that claim she

02:54PM  20   made?

02:54PM  21       Let me withdraw the question and ask first.  That's a

02:54PM  22   pretty important revelation she made in the investigation,

02:54PM  23   correct?

02:54PM  24   A.  It was.

02:54PM  25   Q.  I mean, because she's saying here's a DEA agent who's

02:54PM   1   under investigation, and I witnessed him do cocaine, correct?

02:54PM   2   A.   Yes.

02:54PM   3   Q.   That's what you understood her to be saying, correct?

02:54PM   4   A.   Yes.

02:54PM   5   Q.   So following her revelation and her circling the photos,

02:54PM   6   what, if anything, did you do to confirm her story?

02:54PM   7   A.   We continued to investigate.

02:54PM   8   Q.   Okay.  All right.  I'm going to circle the gentleman in

02:54PM   9   the second row, second from the right; do you see him?

02:54PM   10   A.   I do.

02:54PM   11   Q.   Do you understand that to be Chris Floreale, an attorney?

02:55PM   12   A.   No.

02:55PM   13   Q.   Okay.  Did you attempt to identify and talk to that

02:55PM   14   gentleman?

02:55PM   15   A.   No.

02:55PM   16   Q.   Now I circle the gentleman in the white, six individuals

02:55PM   17   over from the left.  Do you understand that to be Pat Jerge?

02:55PM   18   A.   No.

02:55PM   19   Q.   Did you attempt to identify and talk to him?

02:55PM   20   A.   No.

02:55PM   21   Q.   Did you know that both Pat Jerge and Chris Floreale are

02:55PM   22   friends with DEA Group Supervisor Shane Nastoff?

02:55PM   23   A.   No.

02:55PM   24   Q.   Okay.  Did you attempt to locate Tommy Doctor's cottage?

02:55PM   25   A.   No.

02:55PM  1   Q.  Did you attempt to do any sort of search for where the

02:55PM  2   cottage and Mr. Doctor's name could be located?

02:55PM  3   A.  No.

02:55PM  4   Q.  Okay.  So you never came up with the address of 928 Post

02:55PM  5   Road in Irving, New York, did you?

02:55PM  6   A.  No.

02:55PM  7   Q.  Okay.  So you never looked at the cottage in Google

02:56PM  8   street view, did you?

02:56PM  9   A.  I don't think so, no.

02:56PM  10  Q.  Okay.  And you never pulled any of the old photos on

02:56PM  11  Google street view, did you?

02:56PM  12  A.  No.

02:56PM  13  Q.  Okay.  So as you sit here today, you don't know that in

02:56PM  14  2018 the cottage was actually only one story, correct?

02:56PM  15  A.  No.

02:56PM  16  Q.  And you didn't talk to the building inspector to find out

02:56PM  17  that an addition putting in a second floor to the cottage

02:56PM  18  wasn't granted a certificate of occupancy until 2022, did

02:56PM  19  you?

02:56PM  20  A.  No.

02:56PM  21      MR. MacKAY:  Okay.  We can take that zoom portion

02:56PM  22  down, Ms. Champoux.  Thank you.  All right.

02:56PM  23      So, Ms. Champoux, can we go all the way -- can we go

02:56PM  24  to the first page of Government Exhibit 310D.

         25

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

162

| | |
|---|---|
| 02:56PM | 1 |
| 02:56PM | 2 |
| 02:56PM | 3 |
| 02:57PM | 4 |

**BY MR. MacKAY:**

Q.  I think you told us on direct, and you can see from here, this begins -- this text message string begins on January 6th of 2015, correct?

02:57PM  5   A.  Yes.

02:57PM  6   Q.  And it starts with a text from Peter to Joe saying we
02:57PM  7   need to get together soon, correct?

02:57PM  8   A.  Yes.

02:57PM  9   Q.  Fair interpretation of that is that they haven't seen
02:57PM  10  each other in a while?  I think based on what you read?

02:57PM  11  A.  Maybe.  It's hard to know.

02:57PM  12  Q.  All right.

02:57PM  13          **MR. MacKAY:**  Can we go down to page 3, please,
02:57PM  14  Ms. Champoux?

02:57PM  15          **BY MR. MacKAY:**

02:57PM  16  Q.  Reading these text messages, does it look in sum and
02:57PM  17  substance like they're attempting to set up some sort of
02:57PM  18  meeting, but that it doesn't fall through -- or, that it
02:57PM  19  falls through?

02:57PM  20  A.  Yes.

02:57PM  21  Q.  Because in the text message, third from the bottom,
02:57PM  22  Mr. Bongiovanni is saying stuck at his job, correct?

02:58PM  23  A.  Yes.

02:58PM  24  Q.  All right.

02:58PM  25          **MR. MacKAY:**  Ms. Champoux, can we go to page 5?

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

02:58PM    1          **BY MR. MacKAY:**

02:58PM    2    Q.  Top text message, you can see, appears to be Joe inviting

02:58PM    3    Peter Gerace and his wife, Katrina, to a Saint Patrick's Day

02:58PM    4    party, correct?

02:58PM    5    A.  Yes.

02:58PM    6    Q.  But working through the rest of the text messages here,

02:58PM    7    that appears to fall apart because Mr. Gerace takes ill,

02:58PM    8    correct?

02:58PM    9    A.  Mr. Gerace or his son.  Oh, yeah, he says -- now I got

02:58PM   10    it.  So, yes, they were both sick.

02:58PM   11          **MR. MacKAY:**  All right.  Ms. Champoux, can we advance

02:58PM   12    to page 16?

02:58PM   13          **BY MR. MacKAY:**

02:58PM   14    Q.  Okay.  Now, I'll try to take you through --

02:59PM   15          **MR. MacKAY:**  Let's go back to page 12, it's easier to

02:59PM   16    start there.

02:59PM   17          **BY MR. MacKAY:**

02:59PM   18    Q.  All right.  Do you understand this to be Mr. Bongiovanni

02:59PM   19    inviting Peter Gerace to meet up with him at the Boss

02:59PM   20    restaurant around July 15th of 2015?

02:59PM   21    A.  Yes.

02:59PM   22    Q.  Okay.

02:59PM   23          **MR. MacKAY:**  Can we go to the next page, Ms. Champoux?

02:59PM   24          **BY MR. MacKAY:**

02:59PM   25    Q.  Okay.  It looks like in these text messages they're still

02:59PM   1   arranging plans, correct?

02:59PM   2   A.   Yes.

02:59PM   3   Q.   Mr. Gerace asks what's the plan, correct?

02:59PM   4   A.   Yes.

02:59PM   5   Q.   And he asks him what Mr. Bongiovanni's home address is,

02:59PM   6   correct?

02:59PM   7   A.   Yes.

02:59PM   8   Q.   And then Mr. Bongiovanni provides that at the bottom,

02:59PM   9   correct?

02:59PM   10   A.   He does.

02:59PM   11   Q.   And that's the address you know Mr. Bongiovanni to have,

02:59PM   12   correct?

02:59PM   13   A.   It is.

02:59PM   14        MR. MacKAY:   If we can go to the next page,

03:00PM   15   Ms. Champoux?

03:00PM   16        BY MR. MacKAY:

03:00PM   17   Q.   It looks like there's some further plans to try to meet

03:00PM   18   up for the party, correct, at the beginning?

03:00PM   19   A.   Yes.

03:00PM   20   Q.   But then Mr. Gerace texts and says I just woke up.  See

03:00PM   21   that in the middle?

03:00PM   22   A.   Yes.

03:00PM   23   Q.   And then appears to be -- they're now talking about plans

03:00PM   24   for dinner that same night, correct?

03:00PM   25   A.   I think that was the original plan.

03:00PM 1    Q.  Right.

03:00PM 2    A.  He just missed the meet-up at the house.

03:00PM 3    Q.  Do you understand that to mean he missed going to the

03:00PM 4    house, and he's now going to meet him for dinner?

03:00PM 5    A.  Yes.

03:00PM 6         MR. MacKAY:  Okay.  Can we advance to the next page,

03:00PM 7    Ms. Champoux?

03:00PM 8         BY MR. MacKAY:

03:00PM 9    Q.  And do you understand that -- these text messages on here

03:00PM 10   to refer to Mr. Gerace actually meeting up with Joe at this

03:01PM 11   restaurant?

03:01PM 12   A.  Yes.

03:01PM 13   Q.  And from the whole context of this text message string,

03:01PM 14   do you recall he references the festival?

03:01PM 15   A.  Yes.

03:01PM 16   Q.  Just so the jury's aware, this is around the middle of

03:01PM 17   July, this is the Italian Festival?

03:01PM 18   A.  Yes.

03:01PM 19   Q.  Do you recall, and it doesn't take place there now, but

03:01PM 20   it used to take place on Hertel Avenue, correct?

03:01PM 21   A.  I went one time when it was on Hertel Avenue, yes.

03:01PM 22   Q.  And Boss restaurant used to be located on Starin and

03:01PM 23   Hertel, correct?

03:01PM 24   A.  I think that's the closest cross street, yes.

03:01PM 25   Q.  Kind of by the new Deep South Taco?

03:01PM   1   A.  Yes.

03:01PM   2   Q.  So it's kind of at the far end down the --

03:01PM   3   A.  The Main Street end.

03:01PM   4   Q.  -- yep, down the street from where the Italian Festival

03:01PM   5   would be, correct?

03:01PM   6   A.  Yes.

03:01PM   7           **MR. MacKAY:**  All right.  Can we go to page 17,

03:01PM   8   please, Ms. Champoux?

03:01PM   9           **BY MR. MacKAY:**

03:01PM  10   Q.  And do you see there's a reference to Stockman's

03:02PM  11   tavern --

03:02PM  12   A.  Yes.

03:02PM  13   Q.  -- by Mr. Gerace?

03:02PM  14       And as you read these text messages, do you understand

03:02PM  15   there -- can you tell whether they met up or not from this

03:02PM  16   string of text messages?

03:02PM  17   A.  At which place?

03:02PM  18   Q.  Anywhere?

03:02PM  19   A.  I mean, so the last one on July 18th is Peter Gerace

03:02PM  20   saying I'm on my way.

03:02PM  21   Q.  So you understood that was the meaning for Boss, correct?

03:02PM  22   A.  Yes.

03:02PM  23   Q.  Then the next one down is on the 21st where he's writing

03:02PM  24   Stockman's Tavern correct?

03:02PM  25   A.  Right.

03:02PM  1  Q.  It sounds like it's an invitation for Joe to meet him at

03:02PM  2  Stockman's Tavern based on the next text message that says

03:02PM  3  let's do it, call me?

03:02PM  4  A.  Yes, I think so.

03:02PM  5  Q.  But based on the remainder of texts from that page,

03:03PM  6  nothing to indicate they actually ever got together, correct?

03:03PM  7  A.  Nothing that indicates that they did or that they didn't.

03:03PM  8  Q.  Okay.

03:03PM  9  A.  I mean, one way to interpret the lack of additional text

03:03PM  10  messages is that they did.

03:03PM  11  Q.  Okay.  All right.  So in sum and substance, we've just

03:03PM  12  gone through is 2015 to this point in time, and it appears

03:03PM  13  there's one meeting, maybe two, about Stockman's Tavern,

03:03PM  14  correct?

03:03PM  15  A.  Yes.

03:03PM  16  Q.  We've got Boss, and we've got Stockman's Tavern.  But

03:03PM  17  it's not clear whether Stockman's Tavern ever happened,

03:03PM  18  correct?

03:03PM  19  A.  Correct.

03:03PM  20      MR. MacKAY:  Okay.  Now can we go to -- can we scroll

03:03PM  21  down in some fashion, we're going to end up at page 24.

03:03PM  22      BY MR. MacKAY:

03:03PM  23  Q.  What I want to direct your attention to while you're

03:04PM  24  looking at these, Agent Ryan, is, is there's no meet-ups

03:04PM  25  between that date and the date of May 29th, 2016, are there?

03:04PM   1    A.  I'd have to review the content in between.

03:04PM   2    Q.  We'll allow you to do that.

03:04PM   3         MR. MacKAY:  You can go a little faster, please,

03:04PM   4    Ms. Champoux.

03:05PM   5         BY MR. MacKAY:

03:05PM   6    Q.  Are we on page 24?  I can't see what page we're on?

03:05PM   7    A.  Okay.

03:05PM   8    Q.  Okay.  It appears on that text in the middle, in gray

03:05PM   9    one, Mr. Bongiovanni says I'm glad you're home safe.  He

03:05PM  10    mistypes, it's H-9-M-E.  Do you see that?

03:05PM  11    A.  Yes.

03:05PM  12    Q.  Okay.  So that appears to reference some sort of meet-up

03:05PM  13    that they had around that date, correct?

03:05PM  14    A.  Yes.

03:05PM  15    Q.  But from your review of the text messages we went

03:05PM  16    through, there was no text message that indicated an

03:05PM  17    in-person meeting between July -- late July of '15, and now

03:05PM  18    late May of '16, correct?

03:06PM  19    A.  Correct.

03:06PM  20         MR. MacKAY:  All right.  Can we scroll down to -- in

03:06PM  21    the same fashion, to page 27.

03:06PM  22         BY MR. MacKAY:

03:06PM  23    Q.  Looks like he's showing him some fishing pictures in

03:06PM  24    here.  All right.  So starting at page -- if you go to the

03:06PM  25    bottom of page 27, you see a text to Joe, it says yes, Bro,

03:06PM  1   it's just me.  My wife works tonight.

03:06PM  2   A.  I do.

03:06PM  3          MR. MacKAY:  Can we advance that to the next page?

03:06PM  4          BY MR. MacKAY:

03:06PM  5   Q.  Okay.  Mr. Gerace says bring Tommy?

03:07PM  6   A.  I see that.

03:07PM  7   Q.  Okay.  Don't know whether we're talking about Tom Napoli

03:07PM  8   or Tom Doctor, correct?

03:07PM  9   A.  Correct.

03:07PM 10   Q.  Do you see Mr. Bongiovanni says on my way.  What are

03:07PM 11   people wearing.  Suit, question mark?

03:07PM 12   A.  I see that.

03:07PM 13          MR. MacKAY:  Can we go to the next page,

03:07PM 14   Ms. Champoux?

03:07PM 15          BY MR. MacKAY:

03:07PM 16   Q.  And you see at the top of that page, it was a great time

03:07PM 17   last night.  It was great to see your parents.  Thanks again

03:07PM 18   for the invitation.  Do you see that one?

03:07PM 19   A.  I do.

03:07PM 20   Q.  Okay.  Did you understand this to be a party for

03:07PM 21   Mr. Gerace's parents, based on what you see here?

03:07PM 22   A.  Yep, it seems like it, yes.

03:07PM 23   Q.  Okay.  Okay.  Now, we can go through the text messages,

03:07PM 24   you can see them.  But fair to say there's no more contact,

03:08PM 25   no more -- there's nothing in text messages for the remainder

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

03:08PM   1   of 2016 that shows any contact?

03:08PM   2   A.  I'm --

03:08PM   3   Q.  We can scroll through.

03:08PM   4   A.  Yep.

03:08PM   5           MR. MacKAY:  Ms. Champoux, I think we're going to end

03:08PM   6   on page 51.  Okay.  Can we just pause there for a sec,

03:10PM   7   Ms. Champoux?

03:10PM   8           BY MR. MacKAY:

03:10PM   9   Q.  As we scroll through 2016, no more text messages to

03:10PM  10   suggest any in-person contact, correct?

03:10PM  11   A.  Some proposed stuff, but nothing that seems to come to

03:10PM  12   fruition.

03:10PM  13   Q.  Looks like they tried to get together, it didn't happen,

03:11PM  14   correct?

03:11PM  15   A.  Yes.

03:11PM  16           MR. MacKAY:  Okay.  Let's keep going through 2017, up

03:11PM  17   to page 51, please.

03:11PM  18           BY MR. MacKAY:

03:12PM  19   Q.  Okay.  So we're up to February of 2018.  So nothing in

03:12PM  20   2017 again that indicates that the met up, correct?

03:12PM  21   A.  Not in the text messages, no.

03:12PM  22   Q.  Peter appears to be suggesting -- well, they both appear

03:12PM  23   to be suggesting to try to get together, and nothing happens,

03:13PM  24   correct?

03:13PM  25   A.  Yes.

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

03:13PM    1    Q.  And in February 22nd, 2018, Peter's texting Joe, still

03:13PM    2    waiting to grab lunch together, LOL, correct?

03:13PM    3    A.  Yes.

03:13PM    4    Q.  So based on what we saw in the text messages here, they

03:13PM    5    haven't -- they haven't seen each other in person since May

03:13PM    6    of 2016, correct?

03:13PM    7    A.  I mean --

03:13PM    8            MR. TRIPI:  Objection.

03:13PM    9            THE WITNESS:  -- I don't know if that's true.

03:13PM   10            MR. MacKAY:  Based on what you saw in the texts.

03:13PM   11            MR. TRIPI:  Okay, withdrawn.

03:13PM   12            THE WITNESS:  There's no confirmation that they've

03:13PM   13    seen each other in the texts, no.

03:13PM   14            MR. MacKAY:  All right.  Can we scroll now to page

03:13PM   15    66, please, Ms. Champoux?

03:15PM   16            BY MR. MacKAY:

03:15PM   17    Q.  Is this page 66.  Saw a lot of text messages, looks like

03:15PM   18    they were going back and forth on April 21st, 2018?

03:15PM   19    A.  Yes.

03:15PM   20    Q.  At the bottom there on April 24th, 2018, Peter Gerace is

03:15PM   21    saying, is texting, am I ever gonna see you again, correct?

03:15PM   22    A.  Yes.

03:15PM   23    Q.  Now, you know after that date, they appear to have seen

03:15PM   24    each other at Tommy Doctor's cottage on June 30th, 2018,

03:15PM   25    correct?

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

03:15PM      1     A.   Yes.

03:15PM      2     Q.   And then no contact after that that you know of, correct?

03:15PM      3     A.   There's the reference to the meeting at Canal Side or

03:16PM      4     something --

03:16PM      5     Q.   Okay.  But it --

03:16PM      6     A.   -- it was reference to a meeting that had happened

03:16PM      7     before.

03:16PM      8     Q.   Okay.  Now, fair to say you reviewed these text messages,

03:16PM      9     most of the time it's Peter Gerace attempting to initiate

03:16PM     10     contact?

03:16PM     11     A.   I would say there's some like that.

03:16PM     12     Q.   They're going back and forth though, fair to say?

03:16PM     13     A.   I think they're going back and forth, yes.

03:16PM     14     Q.   But a lot of times, a lot of the contents Mr. Gerace is

03:16PM     15     making Mr. Bongiovanni aware, for example, of events that are

03:16PM     16     going on connected to Pharaoh's, correct?

03:16PM     17     A.   There's some of that.  I mean the collectibles, the golf

03:16PM     18     tournaments.

03:16PM     19     Q.   Invitations to events associated with Pharaoh's, correct?

03:16PM     20     A.   Some of them, yes.

03:16PM     21     Q.   Okay.  And you see Mr. Gerace also expresses a lot of

03:16PM     22     frustration in these text messages that they're not meeting

03:16PM     23     up, correct?

03:16PM     24          MR. TRIPI:  Objection as to -- that's argument, it

03:16PM     25     expresses a lot of frustrations.

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

03:17PM    1          **THE COURT:**  Overruled.

03:17PM    2          **THE WITNESS:**  He does seem to send text messages like

03:17PM    3    that, yes.

03:17PM    4          **BY MR. MacKAY:**

03:17PM    5    Q.  Like, I mean, from the content you can read here, they

03:17PM    6    appear to suggest that he wants to meet up more than they

03:17PM    7    actually do appear to be meeting up, correct?

03:17PM    8    A.  I think that's fair.

03:17PM    9    Q.  Okay.  Now what you don't see in any of the text messages

03:17PM   10    are any references to meeting up at Pharaoh's Gentlemen's

03:17PM   11    Club, correct?

03:17PM   12    A.  No, that's not correct.

03:17PM   13    Q.  Other than -- other than one incident regarding a golf

03:17PM   14    tournament, correct?

03:17PM   15    A.  There's at least one other one that says I'll come see

03:17PM   16    you at Pharaoh's, that we just scrolled past.

03:17PM   17    Q.  Right.  But other than that text message, there's no

03:17PM   18    context from the messages whether they actually ever met up,

03:17PM   19    correct?

03:17PM   20    A.  I don't know -- yeah, if you could say --

03:17PM   21    Q.  From what you can see in the text messages, that's what

03:17PM   22    I'm asking from what you can see?

03:17PM   23    A.  I'm not sure what you would see after that in the text

03:18PM   24    message that would confirm -- I would say that the absence of

03:18PM   25    a message that says where are you, or something to that

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

03:18PM   1   effect, can serve as a confirmation that the proposed meeting

03:18PM   2   happened.

03:18PM   3   Q.  Okay.  Well, let me ask it to you this way.  You don't

03:18PM   4   see a lot of text messages when one of them is saying hey,

03:18PM   5   good to have seen you, correct?

03:18PM   6   A.  The few we talked about.

03:18PM   7   Q.  Other than the ones that are tied to what appear to be

03:18PM   8   concrete plans materializing, you don't see other text

03:18PM   9   messages that would suggest there was a meeting that was not

03:18PM  10   set up through text, correct?  Does that make sense?

03:18PM  11   A.  Well, no.  I don't think that does make sense.

03:18PM  12   Q.  Okay.  So, as you reviewed these text messages, you see

03:18PM  13   that they're making plans to meet up through the text

03:18PM  14   messages, correct?

03:18PM  15   A.  I do.

03:18PM  16   Q.  Okay.  And a couple that we've highlighted a few times

03:18PM  17   here where they did meet up, correct?

03:18PM  18   A.  Yes.

03:18PM  19   Q.  And I should say it's very clear from the context of the

03:19PM  20   context of the messages that they did, in fact, meet up,

03:19PM  21   correct?

03:19PM  22   A.  Yes.

03:19PM  23   Q.  But what you don't see are a lot of text messages that

03:19PM  24   suggest there was a meet-up where there's no other discussion

03:19PM  25   about any sort of plans; do you understand what I'm saying?

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

175

03:19PM  1   A.  I do.  I'm stuck on the -- the past tense conversation

03:19PM  2   that they have via text about meeting up and having to help

03:19PM  3   Lindsay to the car.

03:19PM  4   Q.  Okay.

03:19PM  5   A.  And then there was at least one other message that I read

03:19PM  6   similarly to that.

03:19PM  7   Q.  But my question is, from the beginning of January 2015,

03:19PM  8   to the end of 2018, you don't see a lot of references in

03:19PM  9   these text messages suggesting that there's a meet-up that's

03:19PM  10  not documented in the text messages, do you?

03:19PM  11  A.  I don't know how I can answer that.  I mean, I -- there's

03:19PM  12  the references to the meeting that they had, they're arranged

03:19PM  13  by text.

03:19PM  14      There's one or two references to meetings that aren't

03:20PM  15  arranged by text.

03:20PM  16      And then I would --

03:20PM  17  Q.  One could --

03:20PM  18  A.  -- be taking a wild guess of any --

03:20PM  19  Q.  One or two references though, correct?

03:20PM  20  A.  Yes, but they're there.

03:20PM  21  Q.  The text message string is not replete with messages of,

03:20PM  22  hey, stopping at the club, are you gonna be there, correct?

03:20PM  23  A.  That's correct.

03:20PM  24  Q.  Hey, was good to see you at the club the other day,

03:20PM  25  correct?

03:20PM    1    A.  That's correct.

03:20PM    2    Q.  Hey, it was good to see you at my house the other day,

03:20PM    3    correct?

03:20PM    4    A.  Correct.

03:20PM    5    Q.  So, from what you can see from these text messages,

03:20PM    6    there's nothing to suggest in the messages that

03:20PM    7    Mr. Bongiovanni is going to Pharaoh's Gentlemen's Club

03:20PM    8    frequently, correct?

03:20PM    9    A.  Not frequently, no.

03:20PM   10    Q.  All right.  So as we read through all the messages here,

03:21PM   11    probably going to get the number wrong, but it appears

03:21PM   12    there's about three meetings in 2015 all around July,

03:21PM   13    correct, something to do with the golf tournament, correct?

03:21PM   14    A.  The golf tournament --

03:21PM   15    Q.  Boss?

03:21PM   16    A.  -- birthday, and Stockman's.

03:21PM   17    Q.  And we're not quite sure whether there actually was a

03:21PM   18    meeting at Stockman's, correct?

03:21PM   19    A.  Correct.

03:21PM   20    Q.  Okay.  There's no messages that you see in there

03:21PM   21    referencing Joe or Peter's spouses meeting up, correct?

03:21PM   22    A.  No.  I don't see anything about that.

03:21PM   23    Q.  No messages like, hey, Katrina said it was good to see

03:21PM   24    Lindsay the other night, correct?

03:21PM   25    A.  Correct.

03:21PM   1    Q.  Okay.  Now, you became aware of your investigation --

03:21PM   2    during your investigation that Mr. Bongiovanni's informed by

03:22PM   3    his G.S., Greg Yensan, in October of 2018 that Gerace is a

03:22PM   4    target of an investigation and stopped contact, correct?

03:22PM   5    A.  I don't know that I knew it at that level of detail, no.

03:22PM   6    Q.  Okay.  I think --

03:22PM   7         **MR. MacKAY:**  Ms. Champoux, can we pull up -- I think

03:22PM   8    it's Government Exhibit 97 in evidence.

03:22PM   9         **THE WITNESS:**  Oh, I -- okay.  From the memo.

03:22PM   10        **BY MR. MacKAY:**

03:22PM   11   Q.  So what we're looking at now is Mr. Bongiovanni's

03:22PM   12   November 1st, 2018 memo, correct?

03:22PM   13   A.  I see it in the lead-in to his memo.

03:22PM   14   Q.  Right.  So after that point in time, you would agree,

03:22PM   15   he's not initiating any contact with Mr. Gerace, correct?

03:22PM   16   A.  After November?  I would have to go back and look at the

03:22PM   17   text messages to crosscheck it, but --

03:22PM   18   Q.  But generally speaking from what you can remember, we can

03:22PM   19   pull them back up, but -- yeah.

03:22PM   20        **MR. MacKAY:**  Let's go back to 310D and work back to

03:23PM   21   page 56, I'm sorry, 76.  So scrolling back, if you can scroll

03:23PM   22   up, Ms. Champoux.  We can stop there.

03:23PM   23        **BY MR. MacKAY:**

03:23PM   24   Q.  So, looks like the last text message there is

03:23PM   25   October 27th, 2018 from Mr. Bongiovanni, hope all is well.

03:23PM   1   You're not the only one mad at me, LOL?

03:23PM   2   A.  Yes, I see that.

03:23PM   3   Q.  So generally he's complying with the direction that is

03:23PM   4   embodied that he expresses in Exhibit 97, correct?

03:23PM   5            MR. TRIPI:  Objection whether Mr. Bongiovanni.  How

03:23PM   6   can this witness testify that Mr. Bongiovanni's complying with

03:23PM   7   a directive from his boss?

03:23PM   8            MR. MacKAY:  Let me withdraw and reword.

03:23PM   9            BY MR. MacKAY:

03:23PM   10  Q.  The lack of Mr. Bongiovanni initiating a text message

03:23PM   11  after that date is consistent with his representation in

03:24PM   12  Exhibit 97, correct?

03:24PM   13  A.  Can we scroll?

03:24PM   14            MR. MacKAY:  We can go down, Ms. Champoux, thank you.

03:24PM   15            THE WITNESS:  And then can you repeat your question,

03:24PM   16  please?

03:24PM   17            BY MR. MacKAY:

03:24PM   18  Q.  So, you see that there's one text message that he sends

03:24PM   19  on December of 2018, correct?

03:24PM   20  A.  Yes.

03:24PM   21  Q.  Other than that, it appears to be Mr. Gerace initiating

03:24PM   22  all contact after October 27th of 2018, correct?

03:24PM   23  A.  In the text messages, yes.

03:24PM   24  Q.  Okay.  All right.

03:24PM   25            MR. MacKAY:  I'm at a good break to move on to a

03:24PM    1    different subject, Judge, if you want to take a break.

03:24PM    2              THE COURT:  Yeah, so let's take our afternoon break

03:24PM    3    now.  Please remember my instructions about not talking about

03:24PM    4    the case with anyone including each other and not making up

03:24PM    5    your mind.  See you back here in about 15 minutes.

03:24PM    6              (Jury excused at 3:24 p.m.)

03:25PM    7              THE COURT:  Okay.  Anything we need to put on the

03:25PM    8    record before we break?

03:25PM    9              MR. MacKAY:  No, Your Honor.

03:25PM   10              THE COURT:  Mr. Tripi, anything?

03:25PM   11              MR. TRIPI:  Oh, no.  Sorry, Judge.

03:25PM   12              THE COURT:  And, Mr. MacKay, how much longer?

03:25PM   13              MR. MacKAY:  I'm probably two thirds of the way

03:25PM   14    through cross.

03:25PM   15              THE COURT:  Okay.

03:25PM   16              MR. MacKAY:  More than two thirds of the way through.

03:25PM   17              THE COURT:  Okay.  So we'll finish this guy today?

03:25PM   18              MR. MacKAY:  Yes.  I told them to keep the next

03:25PM   19    witness around.

03:25PM   20              THE COURT:  Okay.  Good.  Great.  We'll see you in a

03:25PM   21    few minutes.

03:25PM   22              MR. COOPER:  Judge, do you think we're going to go

03:25PM   23    through all the way through the end of the day?

03:26PM   24              THE COURT:  I'm thinking so, yes, because we have an

03:26PM   25    early break tomorrow for one of the jurors.

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

180

03:26PM   1        **MR. COOPER:**  I would hope to get on -- we have two

03:26PM   2   witnesses, one's very quick, outside, another tenant.  And

03:26PM   3   then we have a witness who's maybe a 30-minute direct who's

03:26PM   4   been waiting all day, and we'd like to get him on.

03:26PM   5        **THE COURT:**  If we can, absolutely.

03:26PM   6        **MR. COOPER:**  Thank you, Judge.

03:40PM   7        (Off the record at 3:26 p.m.)

03:40PM   8        (Back on the record at 3:40 p.m.)

03:40PM   9        (Jury not present.)

03:40PM   10        **THE CLERK:**  All rise.

03:40PM   11        **THE COURT:**  Please be seated.

03:40PM   12        **THE CLERK:**  We are back on the record for the

03:40PM   13   continuation of the jury trial in case number 19-cr-227,

03:40PM   14   United States of America versus Joseph Bongiovanni.

03:40PM   15        All counsel and parties are present.

03:40PM   16        **THE COURT:**  Okay.  Anything before we break -- or,

03:40PM   17   bring them back, rather?

03:40PM   18        **MR. COOPER:**  Judge, just one thing, and I'll

03:40PM   19   obviously defer to the Court your preference as to how to

03:40PM   20   handle that.  This morning when you brought up housekeeping

03:41PM   21   matters, I think there's one thing that we should have flagged

03:41PM   22   for you.

03:41PM   23        There was a defense motion in limine with respect to

03:41PM   24   Mr. Augustyniak who's anticipated to testify this afternoon.

03:41PM   25   It's a rather simple issue, we briefed it in response.  We

03:41PM   1    still have to argue it.  And Mr. MacKay and I spoke, we both

03:41PM   2    think it's a pretty short argument.  I don't know if the Court

03:41PM   3    would rather do that now before bringing the jury back in so

03:41PM   4    we don't bring them in and out twice.

03:41PM   5              **THE COURT:**  Yes.

03:41PM   6              **MR. COOPER:**  Is that okay?

03:41PM   7              **THE COURT:**  Yes.

03:41PM   8              **MR. COOPER:**  Parker, are you okay?

03:41PM   9              **MR. MacKAY:**  I'm okay.

03:41PM  10              **MR. COOPER:**  Okay.  So, Judge, the motion by defense

03:41PM  11    counsel was to preclude testimony from Doug Augustyniak

03:41PM  12    regarding handing out envelopes with cash in them to three

03:41PM  13    individuals while he was employed at Pharaoh's.

03:41PM  14              **THE COURT:**  He doesn't know there's cash in them.

03:41PM  15              **MR. COOPER:**  He testified in grand jury that he

03:41PM  16    believed there to be cash in them based on handling them, and

03:41PM  17    that's inconsistent -- or, he has other grand jury testimony

03:41PM  18    where he basically says I didn't see inside the envelopes, so

03:41PM  19    I didn't know there was cash in them.  But there's testimony

03:41PM  20    in the grand jury that he said he handled it, and he believed

03:42PM  21    it to be cash.

03:42PM  22              **THE COURT:**  But how would he know it's cash and not

03:42PM  23    other kind of paper?

03:42PM  24              **MR. COOPER:**  Well, Judge, it's context based upon his

03:42PM  25    employment there, the context of the envelope being handed to

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

182

03:42PM    1    him by his boss and saying, you know, so-and-so's gonna come

03:42PM    2    in to pick this up and get it.

03:42PM    3         I expect I can develop the testimony on direct

03:42PM    4    examination that working at a strip club, a largely cash

03:42PM    5    business, he's handled cash in envelopes numerous times

03:42PM    6    before, he's familiar with what it feels like, and that the

03:42PM    7    instructions that were given to him lent credence to the

03:42PM    8    belief that it was cash inside the envelopes.  There's almost

03:42PM    9    no other reasonable supposition for what would be in them.

03:42PM   10    The size of the -- I would submit to the Court that a person

03:42PM   11    could make that determination based upon the contours and the

03:42PM   12    size of the imprint, so to speak, of the material inside the

03:42PM   13    envelope.  It's a commonsense life experience and

03:42PM   14    determination.  You don't need x-ray vision to know that

03:42PM   15    you're handing an envelope of cash to someone.

03:43PM   16         **THE COURT:**  Okay.  And then what is the relevance of

03:43PM   17    the cash?

03:43PM   18         **MR. COOPER:**  Well, Judge, first of all, I would

03:43PM   19    submit that it's corroborative of testimony that the

03:43PM   20    government intends to elicit from Katrina Nigro, which is

03:43PM   21    going to be specifically that she provided envelopes with cash

03:43PM   22    in them to this defendant.

03:43PM   23         I expect she's going to be subjected to rigorous

03:43PM   24    cross-examination about that testimony from defense counsel.

03:43PM   25         So to the extent similar to Matt Albert's testimony,

03:43PM   1    that this testimony from Mr. Augustyniak is corroborative of

03:43PM   2    testimony that will be offered by Ms. Nigro, it's relevant.

03:43PM   3         **MR. TRIPI:**  Judge, if I can just add by way of

03:43PM   4    reminder, when there was the cross-examination of Phlycia

03:43PM   5    Hunt, I think it was Mr. MacKay who handled the cross, I

03:43PM   6    apologize if I'm wrong, Mr. Singer, they asked her

03:43PM   7    specifically, Katrina Nigro, she didn't work in the office.

03:43PM   8    To create the inference that she wouldn't have handled cash

03:43PM   9    and wouldn't have been able -- in a position to hand

03:43PM  10    Mr. Bongiovanni cash.

03:43PM  11         So here is someone who wasn't married to Mr. Gerace,

03:43PM  12    was a bouncer, and has handed out envelopes of what he

03:44PM  13    believed to be cash to other people.

03:44PM  14         **THE COURT:**  And I'm not following what the relevance

03:44PM  15    is.  So who are the people he gives the cash to?

03:44PM  16         **MR. COOPER:**  So, Judge, he's able to give generic

03:44PM  17    physical descriptions, but he's not able to identify an

03:44PM  18    individual.  Now, the generic --

03:44PM  19         **THE COURT:**  Do we know the categories of people, who

03:44PM  20    they are?

03:44PM  21         **MR. COOPER:**  Sure.  They're males.  He describes them

03:44PM  22    all as males.  He describes them all as white males.  And he

03:44PM  23    describes at least one as a white male approximately in their

03:44PM  24    40s at the time.

03:44PM  25         And again, Judge, I mean, they can cross-examine as

03:44PM     1    to the weight to be given to that testimony, but it's

03:44PM     2    testimony that corroborates what Katrina Nigro will testify to

03:44PM     3    that she was tasked by Peter Gerace with handing envelopes of

03:44PM     4    cash to individuals including the defendant.  She's gonna be

03:44PM     5    cross-examined rigorously on that subject.  And if you

03:44PM     6    preclude this testimony, it keeps her on an island when, in

03:44PM     7    reality, there is some corroboration of that testimony.

03:44PM     8         Now you may -- the defense can argue that it's

03:45PM     9    minimal corroboration, but the government isn't -- I would

03:45PM    10    submit the government's entitled to corroborate that

03:45PM    11    testimony.  There's certainly no 403 prejudice to the evidence

03:45PM    12    coming in.

03:45PM    13         **MR. MacKAY:**  Judge, there's no connection on two

03:45PM    14    grounds.  Number 1, it's not clear it's cash.  It can be

03:45PM    15    folded up papers or whatever.

03:45PM    16         Number 2, he says this happens three times.  He has

03:45PM    17    trouble pinning down the dates.  He says he never sees any of

03:45PM    18    the three people again.  And he's not able to specifically

03:45PM    19    identify them.

03:45PM    20         In a cash business like this, as Mr. Cooper said, you

03:45PM    21    can have any number of suppliers coming in during the day:

03:45PM    22    The liquor distributor, the food distributor, the linen

03:45PM    23    service, Peter Gerace's personal debts.

03:45PM    24         I mean, it's just here's an envelope, give it to this

03:45PM    25    person.

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

03:45PM  1          **MR. COOPER:**  Those are all arguments as to weight,

03:45PM  2    not admissibility though, Judge.

03:45PM  3          **THE COURT:**  But you've got to have some connection

03:45PM  4    between -- so, because Katrina Nigro says that she gave

03:45PM  5    envelopes with money in them to some folks who she shouldn't

03:46PM  6    be giving envelopes with money in to --

03:46PM  7          **MR. COOPER:**  To this defendant specifically.

03:46PM  8          **THE COURT:**  Pardon me?

03:46PM  9          **MR. COOPER:**  To the defendant specifically she'll

03:46PM  10   testify.

03:46PM  11         **THE COURT:**  Okay.  So you've got her saying that.

03:46PM  12   The fact that other people -- I mean, so, I'm honestly not

03:46PM  13   following the connection.  That -- that it's his modus

03:46PM  14   operandi to put money in envelopes and pay people with the

03:46PM  15   money in envelopes?  Is that --

03:46PM  16         **MR. COOPER:**  So, Judge, if the testimony is precluded

03:46PM  17   on relevance grounds, which as the Court knows has an

03:46PM  18   extremely low bar, on summation I expect --

03:46PM  19         **THE COURT:**  It's a low bar sometimes, Mr. Cooper, not

03:46PM  20   other times.

03:46PM  21         **MR. COOPER:**  Defense counsel -- well, I think the law

03:46PM  22   regarding relevance is that it is an extremely low bar.

03:46PM  23         **THE COURT:**  It's a little different argument than you

03:46PM  24   guys gave me last Friday, but we'll that where it is.  But go

03:46PM  25   ahead.

| | | |
|---|---|---|
| 03:46PM | 1 | **MR. COOPER:**  I'm confounded.  I don't -- I'm not |
| 03:46PM | 2 | following.  I'm sorry, Judge. |
| 03:46PM | 3 | **THE COURT:**  That's okay.  That's okay. |
| 03:46PM | 4 | **MR. COOPER:**  Okay.  Federal Rule of Evidence 401 -- |
| 03:46PM | 5 | **THE COURT:**  I know.  I'm well aware of it. |
| 03:46PM | 6 | **MR. COOPER:**  -- regarding relevance is that it is -- |
| 03:47PM | 7 | the 2nd Circuit caselaw surrounding that rule is that it's an |
| 03:47PM | 8 | extremely low bar. |
| 03:47PM | 9 | **THE COURT:**  Right.  It's gotta make something more |
| 03:47PM | 10 | likely than not.  So what does this make -- what does this |
| 03:47PM | 11 | make something more likely than not? |
| 03:47PM | 12 | **MR. COOPER:**  That Katrina Nigro paid the defendant |
| 03:47PM | 13 | envelopes of cash.  There's going to be cross-examination on |
| 03:47PM | 14 | that subject.  And if this testimony is precluded, despite it |
| 03:47PM | 15 | having essentially no prejudicial nature, counsel will argue |
| 03:47PM | 16 | the only person you heard that from is Mr. Katrina Nigro, and |
| 03:47PM | 17 | you can't trust her. |
| 03:47PM | 18 | And we have corroboration here that another employee |
| 03:47PM | 19 | of Gerace was tasked with handing envelopes of what he |
| 03:47PM | 20 | believed to be cash in envelopes. |
| 03:47PM | 21 | **THE COURT:**  No, no, no.  Not coming in. |
| 03:47PM | 22 | Okay.  Are we ready? |
| 03:47PM | 23 | **MR. MacKAY:**  We are, Judge. |
| 03:47PM | 24 | **THE COURT:**  Let's bring them in. |
| 03:48PM | 25 | (Jury seated at 3:48 p.m.) |

03:49PM    1              **THE COURT:**  Well, the record will reflect that all

03:49PM    2       our jurors are present again.

03:49PM    3              I remind the witness that he's still under oath.

03:49PM    4              Before you resume, Mr. MacKay --

03:49PM    5              We may go a little late today because tomorrow,

03:49PM    6       remember, we have a hard stop at 4:15, and I'm going to try to

03:49PM    7       break somewhere between 4 and 4:15.  I think one of you has an

03:49PM    8       appointment, and you need to leave by 4:20, I think you said.

03:49PM    9       But I'm going to make sure that we leave by 4:20, we're gonna

03:49PM   10       have a hard stop at 4:15 tomorrow.  So we may go a few minutes

03:49PM   11       late today.

03:49PM   12              You may continue, Mr. MacKay.

03:49PM   13              **MR. MacKAY:**  Thank you.

03:49PM   14              **BY MR. MacKAY:**

03:49PM   15       Q.  All right.  So just to summarize the stuff we did with

03:49PM   16       the text messages, there's a couple of meetings in July of

03:49PM   17       2015, correct?

03:49PM   18       A.  Yes.

03:49PM   19       Q.  One or two meetings in 2016, correct?

03:49PM   20       A.  Yes.

03:49PM   21       Q.  Nothing in 2017, correct?

03:49PM   22       A.  Not in the text, no.

03:50PM   23       Q.  I'm sorry?

03:50PM   24       A.  Not in the text, no.

03:50PM   25       Q.  Not in the text.  And then the Tommy Doctor cottage

Case 1:19-cr-00227-LJV-MJR   Document 1017   Filed 06/18/24   Page 188 of 239
USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

188

03:50PM    1    rendezvous in 2018, correct?

03:50PM    2    A.   July, I think.   June or July.

03:50PM    3    Q.   June or July of 2018?

03:50PM    4    A.   Yes.

03:50PM    5    Q.   And then no apparent meet-up after that, correct, from

03:50PM    6    the texts?

03:50PM    7    A.   From the texts.

03:50PM    8    Q.   Okay.   All right.   So, I want to talk about the search of

03:50PM    9    Mr. Bongiovanni's house.

03:50PM   10       So the warrant, that's executed about 6 in the morning,

03:50PM   11    correct?

03:50PM   12    A.   Yes.

03:50PM   13    Q.   And the way a warrant of this nature is executed is

03:50PM   14    street's blocked off, correct?

03:50PM   15    A.   Yes, I'm sure it was.

03:50PM   16    Q.   Okay.   There's a large, sort of, specialty truck that

03:50PM   17    Homeland Security uses?

03:50PM   18    A.   I don't think we had that yet.

03:50PM   19    Q.   I'm thinking of like a gun truck.   You don't know if you

03:50PM   20    used that?

03:50PM   21    A.   Yeah.   We have one now, I don't think we had it then.

03:50PM   22    Q.   Okay.

03:50PM   23    A.   So SUVs, probably.

03:50PM   24    Q.   Okay.   And so, a number of them, though, correct?

03:51PM   25    A.   A couple.

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

03:51PM    1    Q.  Okay.

03:51PM    2    A.  Two or three.

03:51PM    3    Q.  And a SWAT team or SORT team has got to be used from out

03:51PM    4    of town in this operation, correct?

03:51PM    5    A.  No.

03:51PM    6    Q.  Okay.  You did use a local one?

03:51PM    7    A.  Our -- the his --

03:51PM    8    Q.  Okay.

03:51PM    9    A.  -- Buffalo team.

03:51PM   10    Q.  All right.  A flash-bang grenade is used, correct?

03:51PM   11    A.  Yes.

03:51PM   12    Q.  And you might have seen it in the movies, but just so

03:51PM   13    that the jury understands, that's a percussion device that

03:51PM   14    you throw and it emits a loud percussion wave and flash?

03:51PM   15    A.  Yes, it's a distraction device.

03:51PM   16    Q.  Distraction?

03:51PM   17    A.  A lot of noise, bright flash.

03:51PM   18    Q.  Okay.

03:51PM   19    A.  It was used in the backyard.

03:51PM   20    Q.  Underneath the bed -- what was believed to be the bedroom

03:51PM   21    window, correct?

03:51PM   22    A.  I'm not sure.

03:51PM   23    Q.  Okay.  In your training, you're taught that -- and

03:51PM   24    there's rare circumstances where these can actually injure

03:51PM   25    somebody?

| | | |
|---|---|---|
| 03:51PM | 1 | A.  A flash bang? |
| 03:52PM | 2 | Q.  Yes. |
| 03:52PM | 3 | A.  It could. |
| 03:52PM | 4 | Q.  Okay.  A battering ram is used to break down the door, |
| 03:52PM | 5 | correct? |
| 03:52PM | 6 | A.  Yes. |
| 03:52PM | 7 | Q.  Okay.  And the his team that's about, what, nine to 12 |
| 03:52PM | 8 | agents? |
| 03:52PM | 9 | A.  12.  Right around 12. |
| 03:52PM | 10 | Q.  And there they're armed with M-4 rifles, correct? |
| 03:52PM | 11 | A.  Yeah, or a submachine gun. |
| 03:52PM | 12 | Q.  Okay.  Now, Mr. Bongiovanni's encountered fairly close to |
| 03:52PM | 13 | the door, correct? |
| 03:52PM | 14 | A.  I think so, but I was a distance away when he was first |
| 03:52PM | 15 | encountered.  Unless you're asking me about when I first |
| 03:52PM | 16 | encountered him. |
| 03:52PM | 17 | Q.  From what you could see when the tea, m entered. |
| 03:52PM | 18 | A.  I couldn't. |
| 03:52PM | 19 | Q.  Did you understand that he was fairly close to the door? |
| 03:52PM | 20 | A.  I think on that main level of the house, but -- |
| 03:52PM | 21 | Q.  He was -- let me ask you this way.  He was secured rather |
| 03:52PM | 22 | quickly, correct? |
| 03:52PM | 23 | A.  I think so, yes. |
| 03:52PM | 24 | Q.  And the way a team works, I think you led us through in |
| 03:53PM | 25 | detail, but they go in, they secure anybody first, correct? |

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

191

03:53PM 1   A.  Yes.

03:53PM 2   Q.  So there's no threats to the situation, correct?

03:53PM 3   A.  Well, they secure people as they encounter them.

03:53PM 4   Q.  And then they clear the house, correct?

03:53PM 5   A.  Yes.

03:53PM 6   Q.  And clearing means that they search to make sure that

03:53PM 7   there's nobody else around, that they didn't find or could be

03:53PM 8   hiding, correct?

03:53PM 9   A.  Right.

03:53PM 10  Q.  And while the house is being cleared, Mr. Bongiovanni's

03:53PM 11  taken outside, correct?

03:53PM 12  A.  I think he was, yes.

03:53PM 13  Q.  Okay.  And at that time, he's in his boxers, correct?

03:53PM 14  A.  I don't know.

03:53PM 15  Q.  Okay.  Now you had known in this investigation that

03:53PM 16  Mr. Bongiovanni had voluntarily come in to give a statement

03:53PM 17  to OIG inspectors back in March of 2019, correct?

03:53PM 18  A.  He did agree to meet with them in March, yes.

03:53PM 19  Q.  Right.  So what I'm saying with that interaction is he

03:53PM 20  was notified to come in, I think it was the U.S. Attorney's

03:53PM 21  Office, correct?

03:53PM 22  A.  I don't know where the interview took place.

03:54PM 23  Q.  But he received a notice, and he walked in the front door

03:54PM 24  of somewhere to give that interview voluntarily, correct?

03:54PM 25  A.  Yes.

03:54PM  1  Q.  Okay.  Now in executing the search warrant, you had no

03:54PM  2  indication that -- well, let me ask you this way.  You knew

03:54PM  3  he still had a service weapon, correct?

03:54PM  4  A.  Yes.

03:54PM  5  Q.  Okay.  No information, though, that he had a dangerous

03:54PM  6  dog or anything like that on premises, correct?

03:54PM  7  A.  No.

03:54PM  8  Q.  Okay.  Did you meet his old sick dog, the Golden

03:54PM  9  Retriever, Buddy, at the time?

03:54PM  10  A.  Yes.

03:54PM  11  Q.  And nevertheless, you used all these tactics to enter and

03:54PM  12  secure the house that we've talked about, correct?

03:54PM  13  A.  Yes.

03:54PM  14  Q.  And you know in your experience that these tactics can

03:54PM  15  often startle or frighten individuals, correct?

03:54PM  16  A.  In the heat of the moment, sure.

03:54PM  17  Q.  I mean --

03:54PM  18  A.  I mean, that's part of the tactic --

03:54PM  19  Q.  Right --

03:54PM  20  A.  -- to be honest.

03:55PM  21  Q.  -- that's what I'm getting at.  So the purpose of this

03:55PM  22  tactic is that it sort of unnerves people; fair to say,

03:55PM  23  correct?

03:55PM  24  A.  Yes.  But it's not -- it's not fast, like, it used to be

03:55PM  25  or you would see portrayed in the movies.

03:55PM    1    Q.   Okay.

03:55PM    2    A.   It's a very slow, deliberate process.

03:55PM    3    Q.   But fair to say part of the intent of doing this is it

03:55PM    4    does create a stressful environment in the situation,

03:55PM    5    correct?

03:55PM    6    A.   I mean, it can create a stressful environment, but that's

03:55PM    7    not the intent.

03:55PM    8    Q.   Have you ever had your house raided?

03:55PM    9    A.   No.

03:55PM   10    Q.   Okay.  Now, it also -- doing search warrants in this

03:55PM   11    manner also works to your benefit because sometimes people

03:55PM   12    can be flustered, correct?

03:55PM   13    A.   We do search warrants in this benefit to safely clear

03:55PM   14    houses, and that's the only reason why we do them this way.

03:55PM   15    Q.   Okay.  And --

03:55PM   16    A.   And those are decisions that are made at levels above the

03:55PM   17    case agents investigating the case.

03:55PM   18    Q.   Okay.  And in your experience, in the heat of the moment,

03:56PM   19    I think the term is you used, people can have their guard

03:56PM   20    down, correct?

03:56PM   21            MR. TRIPI:   Objection as to what emotions people

03:56PM   22    have.

03:56PM   23            BY MR. MacKAY:

03:56PM   24    Q.   Let me reword it.  When you encounter subjects, has it

03:56PM   25    been your experience that sometimes these folks are

03:56PM   1   distracted?

03:56PM   2           **MR. TRIPI:**  Objection.  Why is that relevant in this

03:56PM   3   case?

03:56PM   4           **THE COURT:**  Overruled.

03:56PM   5           **THE WITNESS:**  Well, I mean, distracted from what?  I

03:56PM   6   guess is -- I would need to understand.

03:56PM   7           **BY MR. MacKAY:**

03:56PM   8   Q.  Going about their business otherwise, until agents enter

03:56PM   9   their home?

03:56PM  10   A.  Well, of course, yes, they're distracted from that.

03:56PM  11   Q.  Okay.  All right.  So then after the house is cleared,

03:56PM  12   you participate in interview with Mr. Bongiovanni at his

03:56PM  13   dining room table, correct?

03:56PM  14   A.  I didn't hear the whole thing.

03:56PM  15   Q.  I'm sorry, my voice is failing here.

03:56PM  16       After the house is cleared, you participate in an

03:56PM  17   interview with Mr. Bongiovanni at a table, correct?

03:57PM  18   A.  Yes, in the dining room.

03:57PM  19   Q.  Dining room table.

03:57PM  20   A.  Eat-in kitchen, dining room.

03:57PM  21   Q.  He's still in whatever clothes he's encountered in,

03:57PM  22   correct?

03:57PM  23   A.  I mean, if -- if he was in boxer shorts, he wasn't in

03:57PM  24   them anymore.  He was in basketball-style shorts and a

03:57PM  25   T-shirt.

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

03:57PM    1    Q.  Okay.  I mean, to your knowledge, he wasn't told, like,

03:57PM    2    why don't you go upstairs and get dressed or anything,

03:57PM    3    correct?

03:57PM    4    A.  No, we would never do that.  But we bring people clothes.

03:57PM    5    Q.  Okay.

03:57PM    6    A.  We ask them what they want, and then bring them those

03:57PM    7    clothes.

03:57PM    8    Q.  Now you showed us a photo on direct, and you made some

03:57PM    9    markings of who was sitting at the table; do you remember

03:57PM   10    that?

03:57PM   11    A.  I do.

03:57PM   12    Q.  Mr. Bongiovanni's occupying one spot, correct?

03:57PM   13    A.  Yes.

03:57PM   14    Q.  And then you and other agents are occupying the remaining

03:57PM   15    chairs at the table, correct?

03:57PM   16    A.  Yes.

03:57PM   17    Q.  At the same time, you've got the remaining his team going

03:57PM   18    about, doing their business in the house, correct?

03:57PM   19    A.  That's correct.

03:57PM   20    Q.  Okay.  And at that point in time, he's asked a number of

03:58PM   21    questions, correct?

03:58PM   22    A.  Yes, he was.

03:58PM   23    Q.  That's -- that's the interview we've talked about,

03:58PM   24    correct?

03:58PM   25    A.  Yes.

03:58PM  1   Q.  Now you didn't record the interview and in audio or video

03:58PM  2   format, correct?

03:58PM  3   A.  No.

03:58PM  4   Q.  You had an iPhone or Smartphone on you, correct?

03:58PM  5   A.  I did.

03:58PM  6   Q.  Okay.  As you would assume other agents did as well, too?

03:58PM  7   A.  Yes.

03:58PM  8   Q.  Okay.  And those, in your experience, can be used to

03:58PM  9   record interviews, correct?

03:58PM  10  A.  They can.  But I would never use one to do that.

03:58PM  11  Q.  Okay.  But I guess I'm asking in this case, though, you

03:58PM  12  didn't use a phone to record the interview, correct?

03:58PM  13  A.  I did not, no.

03:58PM  14  Q.  Okay.  You didn't remove Mr. Bongiovanni to a location

03:58PM  15  like a law enforcement headquarters where there's a room with

03:58PM  16  audio or video recording, correct?

03:58PM  17  A.  No.

03:58PM  18  Q.  You -- and obviously when you sit down to talk with

03:59PM  19  Mr. Bongiovanni, it's your intention to elicit statements

03:59PM  20  from him, correct?

03:59PM  21  A.  Yes.

03:59PM  22  Q.  I mean, you're hoping, in sum and substance, that he's

03:59PM  23  gonna talk with you, correct?

03:59PM  24  A.  Yes.

03:59PM  25  Q.  And those statements will have value, you hope, to your

03:59PM   1   investigation, correct?

03:59PM   2   A.   That's -- yes.

03:59PM   3   Q.   I mean, that's why you're talking with him, correct?

03:59PM   4   A.   Right.   That's the purpose of attempting the interview.

03:59PM   5   Q.   I mean, you entered that conversation with specific

03:59PM   6   topics you wanted to talk about, correct?

03:59PM   7   A.   There were specific things we wanted to cover, yes.

03:59PM   8   Q.   Okay.   Specific topics you wanted to obtain answers about

03:59PM   9   from him, correct?

03:59PM   10   A.   Yes.

03:59PM   11   Q.   All right.   And you've been an agent since, I think,

03:59PM   12   what, February of 2012, you said?

04:00PM   13   A.   No, April of 1999.

04:00PM   14   Q.   April of '99, okay.   But you've been with his I think you

04:00PM   15   said --

04:00PM   16   A.   Since February of '12.

04:00PM   17   Q.   -- since August -- I'm sorry?

04:00PM   18   A.   February '12 for his.

04:00PM   19   Q.   That's when you started your training?

04:00PM   20   A.   Yep.

04:00PM   21   Q.   And then you were deployed in or about August of 2012, I

04:00PM   22   guess, when you finished training and you --

04:00PM   23   A.   And came here?

04:00PM   24   Q.   -- began on the street, yep.

04:00PM   25   A.   Yes.

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

198

| | | |
|---|---|---|
| 04:00PM | 1 | Q.  And you've conducted a number of interviews since that |
| 04:00PM | 2 | time, correct? |
| 04:00PM | 3 | A.  And before, yes. |
| 04:00PM | 4 | Q.  Okay.  Can you ballpark for the jury how many interviews |
| 04:00PM | 5 | you've done over your career? |
| 04:00PM | 6 | A.  Hundreds. |
| 04:00PM | 7 | Q.  Okay. |
| 04:00PM | 8 | A.  I don't know, more than a thousand, maybe. |
| 04:00PM | 9 | Q.  You've interviewed witnesses to situations, correct? |
| 04:00PM | 10 | A.  Yes. |
| 04:00PM | 11 | Q.  You've interviewed subjects of an investigation, correct? |
| 04:00PM | 12 | A.  I have. |
| 04:00PM | 13 | Q.  And you've interviewed the actual targets of |
| 04:00PM | 14 | investigations, correct? |
| 04:00PM | 15 | A.  Yes. |
| 04:00PM | 16 | Q.  And in your experience, body language is important when |
| 04:01PM | 17 | interpreting statements to some degree, correct? |
| 04:01PM | 18 | A.  To some degree. |
| 04:01PM | 19 | Q.  Okay.  Helps in your experience for you to judge the |
| 04:01PM | 20 | meaning of words in an interview, correct? |
| 04:01PM | 21 | A.  The body language -- |
| 04:01PM | 22 | Q.  Yes. |
| 04:01PM | 23 | A.  -- that you're saying -- |
| 04:01PM | 24 | Q.  Yes. |
| 04:01PM | 25 | A.  -- to judge the meaning of words?  I'm not sure I'm -- |

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

04:01PM      1    Q.  I guess --

04:01PM      2    A.  -- following that.

04:01PM      3    Q.  -- I'm asking, do you use body language to interpret what

04:01PM      4    somebody's saying in an interview?

04:01PM      5    A.  Well, sure, it's part of communication.

04:01PM      6    Q.  Right.  Same goes with voice tone.  You use that, of

04:01PM      7    course, to interpret what somebody's saying, right?

04:01PM      8    A.  Yep.

04:01PM      9    Q.  Because two -- somebody can say something -- say the same

04:01PM     10    words very differently and could have a very different

04:01PM     11    meaning, correct?

04:01PM     12    A.  Sure.  You could make -- say the same words as a

04:01PM     13    statement or a question --

04:01PM     14    Q.  Okay.

04:01PM     15    A.  -- depending on the tone.

04:01PM     16    Q.  Likewise, facial expressions can help you understand what

04:01PM     17    somebody's trying to communicate, correct?

04:01PM     18    A.  Yes.

04:01PM     19    Q.  Because all of these sort of give you some insight of

04:02PM     20    what a witness -- or, I'm sorry, a subject of an interview

04:02PM     21    may be trying to communicate, right?

04:02PM     22    A.  Yes.

04:02PM     23    Q.  Might indicate, for example, whether the subject is

04:02PM     24    confused, for example, right?

04:02PM     25    A.  Sure.

04:02PM  1  Q.  Okay.  Now the way you recorded or memorialized this

04:02PM  2  interview was to take some handwritten notes, correct?

04:02PM  3  A.  I did.

04:02PM  4  Q.  And then at a later point in time you reduced those to a

04:02PM  5  written report, correct?

04:02PM  6  A.  A few days later, yes.

04:02PM  7  Q.  Okay.  And is that what you reviewed to testify here

04:02PM  8  today?  Is the typewritten report, is that what you reviewed

04:02PM  9  here now as you sit here on the stand in preparation for

04:02PM  10  testimony?

04:02PM  11  A.  Yes.

04:02PM  12  Q.  Okay.  I think you told us on direct you defined a

04:02PM  13  difference between an interrogation and an interview; do you

04:02PM  14  remember that?

04:02PM  15  A.  I think I got through the definition of interview, and

04:03PM  16  then we went off and continued doing questions.  I don't --

04:03PM  17  Q.  Okay.  So --

04:03PM  18  A.  -- think I --

04:03PM  19  Q.  -- I recall --

04:03PM  20  A.  -- ever talked about --

04:03PM  21  Q.  -- I recall you talking a little bit about how one of the

04:03PM  22  formats is open-ended questions, one of them is closed-ended

04:03PM  23  questions, correct?

04:03PM  24  A.  Yes.

04:03PM  25  Q.  Will you tell the jury again why you use one versus the

04:03PM    1    other?

04:03PM    2    A.  Well, normal -- in many instances, you would use both.

04:03PM    3    Open-ended questions to elicit responses.  Many times you

04:03PM    4    learn things that you wouldn't learn from a close-ended

04:03PM    5    question, doing it that way.

04:03PM    6        And then in an interrogation, it shifts where the person

04:03PM    7    asking the questions does much more talking.  And then you

04:03PM    8    ask more direct accusatory questions.

04:03PM    9    Q.  Okay.  And when you move -- and why, in your experience,

04:03PM   10    do you move to that accusatory question format?

04:03PM   11    A.  You do it when it's appropriate.

04:03PM   12    Q.  And why would it be appropriate?

04:04PM   13    A.  There's lots of reasons.  You know, I mean, I guess if

04:04PM   14    you're gonna get to the point where you're just gonna start

04:04PM   15    interrogating somebody, you just -- I don't understand -- I

04:04PM   16    guess I really don't understand the distinction.

04:04PM   17    Q.  I mean, the way you're talking, it sounds like you've got

04:04PM   18    some definite reasons why you choose to ask open-ended versus

04:04PM   19    closed-ended questions.  I'm trying to get the jury to

04:04PM   20    understand, it sounds like when you move to close-ended

04:04PM   21    questions, you have a specific reason for doing that, that's

04:04PM   22    what I'm trying to get the jury to understand.

04:04PM   23    A.  Yes.  But that's also setting dependant.  I don't think

04:04PM   24    if -- so it's not a transition that I would have made at that

04:04PM   25    dining room table.

04:04PM    1         But I mean, at some point, you know, in the interview

04:04PM    2    room environment that you described, that's probably the most

04:05PM    3    advantageous place to move to questions, you know, that are

04:05PM    4    all around did you do it?  The did-you-do-it question.

04:05PM    5    Q.  And why would you move to that format?

04:05PM    6    A.  To try to elicit that answer.

04:05PM    7    Q.  Okay.  So it's in a, again, I'm just trying to drill down

04:05PM    8    a little bit deeper.  It seems like you're trying to tell us

04:05PM    9    that format was not appropriate for the kitchen table, and

04:05PM   10    I'm trying to get the jury to understand, well, why is that,

04:05PM   11    in your opinion, not to use that format of discussion.

04:05PM   12    A.  I just don't -- I don't think it would -- it's not

04:05PM   13    advantageous in that setting.

04:05PM   14    Q.  Advantageous to what?

04:05PM   15    A.  To what we're trying to accomplish with the

04:05PM   16    investigators.

04:05PM   17    Q.  Which is what at that point in time?

04:05PM   18    A.  To elicit information.

04:05PM   19    Q.  Okay.  And what is the purpose of eliciting information

04:05PM   20    at that point in time when you've got Mr. Bongiovanni at the

04:05PM   21    kitchen table?

04:05PM   22    A.  We're trying to get answers to questions.  We hadn't

04:05PM   23    encountered any resistance to answering questions, so there

04:06PM   24    was -- we never felt the need to transition to more direct

04:06PM   25    questions.

04:06PM  1   Q.  Okay.  So one of the things you asked him about was his

04:06PM  2   relationship with Mr. Gerace, correct?

04:06PM  3   A.  Yes.

04:06PM  4   Q.  And the term "close relationship" comes up, correct?

04:06PM  5   A.  Yes.

04:06PM  6   Q.  Was that the exact -- was that your phrase?  Or was that

04:06PM  7   Mr. Bongiovanni's phrase?

04:06PM  8   A.  I would have to -- if I reviewed the reports and saw

04:06PM  9   where the quotes are I would know.

04:06PM  10      I put the quotes round the exact phrases.  I can't

04:06PM  11  remember if that one's quoted or not.

04:06PM  12  Q.  I'm going to show you what's been marked for

04:06PM  13  identification as Government Exhibit 3594BJ-1.

04:06PM  14          **MR. MacKAY:**  For the government's reference, I think

04:06PM  15  the topic is covered on page 2.

04:06PM  16          **BY MR. MacKAY:**

04:07PM  17  Q.  So I'll hand that to you.  If you want to look that over,

04:07PM  18  Mr. Ryan, to yourself.

04:07PM  19      I'll take that back from you.

04:07PM  20      So in the context of the discussion you were having with

04:07PM  21  Mr. Bongiovanni at the table, was close relationship a term

04:07PM  22  that he used, or was it a term -- was it a term that was

04:07PM  23  quoted?

04:07PM  24  A.  It's not a term that was quoted, no.

04:07PM  25  Q.  Okay.  So what does it mean to you when you wrote a

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

204

04:07PM  1   report and the term doesn't appear in quotes?

04:07PM  2   A.  So that's a summary and a characterization of that part

04:07PM  3   of the conversation.

04:07PM  4   Q.  Okay.  So, close -- so, as you understand it from reading

04:07PM  5   the report, close relationship is not a word or phrase that

04:08PM  6   Mr. -- that came out of Mr. Bongiovanni's mouth, correct?

04:08PM  7   A.  It's -- it's not quoted in the report.  And it's been a

04:08PM  8   long time.  And I don't remember if he said --

04:08PM  9   Q.  Okay.

04:08PM  10  A.  -- those exact words or not.

04:08PM  11  Q.  So, I think what I'm understanding here is close

04:08PM  12  relationship is your characterization of what Mr. Bongiovanni

04:08PM  13  said, correct?

04:08PM  14  A.  Yes.

04:08PM  15  Q.  You also asked him about whether he'd spoken with

04:08PM  16  Mr. Gerace in over a year; do you remember that?

04:08PM  17  A.  Yes.  Well, I asked -- we were both asking questions.  So

04:08PM  18  Special Agent Carpenter's also asking questions.  And I was

04:08PM  19  taking all the notes.

04:08PM  20      Between the two of us, we asked him when the last time he

04:08PM  21  had contact or had spoken to Peter Gerace was.

04:08PM  22  Q.  Okay.  And you said --

04:08PM  23  A.  So we didn't introduce the time frame.

04:08PM  24  Q.  Okay.  But I just want to be clear.

04:08PM  25      When I'm talking about questions being posed to

04:09PM   1   Mr. Bongiovanni, I might have referred to you.  But you're

04:09PM   2   saying sometimes it's you, sometimes it's Agent Carpenter?

04:09PM   3   A.  Yes.

04:09PM   4   Q.  Okay.  But be that as it may, whoever asked him, he was

04:09PM   5   asked about having spoken with Mr. Gerace, correct?

04:09PM   6   A.  Right.

04:09PM   7   Q.  Okay.  And I just want to get, again, the terminology.

04:09PM   8   Do you recall that's how the question was phrased?  Or do you

04:09PM   9   remember what he was asked specifically?

04:09PM   10  A.  He was asked about contact with Mr. Gerace.

04:09PM   11  Q.  And it's your testimony that he's -- he responds that he

04:09PM   12  hasn't spoken to him in over a year?

04:09PM   13  A.  Yes.

04:09PM   14  Q.  Okay.  So you ask him about contact.  And he responds

04:09PM   15  with when he's spoken to Mr. Gerace last, correct?

04:09PM   16  A.  Yes.

04:09PM   17  Q.  Okay.  Did you follow that up to figure out what format

04:09PM   18  he had spoken to him?  Whether it was in person?  On the

04:09PM   19  phone?  Anything like that?

04:09PM   20  A.  He said he hadn't spoken to him.

04:10PM   21  Q.  Okay.  Did the topic of discussion move on to whether

04:10PM   22  they were ever present together, Mr. Gerace and

04:10PM   23  Mr. Bongiovanni?

04:10PM   24  A.  I mean, we talked about that, yes.

04:10PM   25  Q.  Would that be referring to this June 2017 -- 2018 party

04:10PM    1    at the cottage?

04:10PM    2    A.  Yes, among other things.

04:10PM    3    Q.  Okay.  And this is going to sound silly, but obviously

04:10PM    4    you were not present at that party, correct?

04:10PM    5    A.  No.

04:10PM    6    Q.  You don't have any information as you sit here today how

04:10PM    7    long both of them were present at that party together,

04:10PM    8    correct?

04:10PM    9    A.  No.

04:10PM   10    Q.  And Mr. Bongiovanni didn't talk about any substantial

04:10PM   11    interaction he had at that party with Mr. Gerace, correct?

04:10PM   12    A.  No, he just said that they were at the cottage together.

04:10PM   13    Q.  Okay.  And you had in your possession the photo that

04:11PM   14    shows them in the same photo, correct?

04:11PM   15    A.  Yes.

04:11PM   16    Q.  But other than the time necessary to take a photo

04:11PM   17    together, you have no other information on how much

04:11PM   18    interaction they otherwise had at that party, correct?

04:11PM   19    A.  Not at that time, we didn't know.

04:11PM   20    Q.  You asked him about Anthony Gerace, correct?

04:11PM   21    A.  Yes.

04:11PM   22    Q.  And about whether he was at a party with him in 2016,

04:11PM   23    correct?

04:11PM   24    A.  Talking about the Toronto --

04:11PM   25    Q.  Toronto party.

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

04:11PM  1   A.  Yes, sir.  I think -- no, I think we asked him if he

04:11PM  2   ever, and then later asked him about the photograph, and that

04:11PM  3   was when the party came up.

04:11PM  4   Q.  Okay.  And you recall in the photograph, Anthony Gerace

04:11PM  5   is not present in that photograph, correct?

04:11PM  6   A.  No, he's not.

04:11PM  7   Q.  Okay.  Now, did you come to learn that what was -- what

04:11PM  8   the photo pertains to is a birthday party for

04:11PM  9   Mr. Bongiovanni's sister-in-law in Toronto?

04:11PM  10  A.  Yes.

04:12PM  11  Q.  Okay.  And do you understand that there was a restaurant

04:12PM  12  that party occurred at?

04:12PM  13  A.  Yes.  I mean, just from the context of the photograph.

04:12PM  14  Q.  So did you come to learn that there was a birthday party

04:12PM  15  on a Friday night, and sort of going out to bars separately

04:12PM  16  on Saturday night was the timeline of what happened?

04:12PM  17  A.  No.

04:12PM  18  Q.  Okay.  But Mr. Bongiovanni maintained, well, I wasn't at

04:12PM  19  a party with Mr. Gerace, correct?

04:12PM  20          MR. TRIPI:  Objection as to what Mr. Bongiovanni

04:12PM  21  maintained.  His statements are hearsay when offered through

04:12PM  22  the --

04:12PM  23          THE COURT:  I think he's asking about what he

04:12PM  24  testified to on direct.

04:12PM  25          MR. TRIPI:  I didn't hear that as part of the

04:12PM   1    question, I apologize.

04:12PM   2              **THE COURT:**  Okay.  Well, why don't you rephrase.

04:12PM   3              **BY MR. MacKAY:**

04:12PM   4    Q.  What was your test -- what did Mr. Bongiovanni say

04:12PM   5    regarding interactions with Anthony Gerace?

04:12PM   6    A.  That he didn't have social interactions with Anthony

04:12PM   7    Gerace.

04:12PM   8    Q.  Okay.  And you also covered the topic of Michael Sinatra,

04:13PM   9    correct?

04:13PM   10   A.  Yes.

04:13PM   11   Q.  And Michael Sinatra is present in that photo, to your

04:13PM   12   understanding, at the Toronto party, correct?

04:13PM   13   A.  Yes.

04:13PM   14   Q.  And in your investigations, did you review border

04:13PM   15   crossings?

04:13PM   16   A.  Yes.

04:13PM   17   Q.  Okay.  And you're aware from your investigation that a

04:13PM   18   number of different people met up on this trip in Toronto,

04:13PM   19   correct?

04:13PM   20   A.  Yes.

04:13PM   21   Q.  And they went up at different points in time, correct?

04:13PM   22   A.  Yes.

04:13PM   23   Q.  Okay.

04:13PM   24   A.  They didn't all travel together, is my understanding.

04:13PM   25   Q.  That's what I'm asking.  You're not aware of any

| | | |
|---|---|---|
| 04:13PM | 1 | information that Mr. Bongiovanni traveled to or from Toronto |
| 04:13PM | 2 | with Mr. Sinatra, correct? |
| 04:13PM | 3 | A.  I'm not. |
| 04:13PM | 4 | Q.  Okay.  And there was discussion as well about whether |
| 04:13PM | 5 | Mr. Bongiovanni -- Mr. Sinatra was -- how they were |
| 04:14PM | 6 | connected -- I'm sorry, withdraw the question. |
| 04:14PM | 7 | There was discussion about Mr. Sinatra's connection to |
| 04:14PM | 8 | Mr. Bongiovanni, correct -- |
| 04:14PM | 9 | A.  Yes. |
| 04:14PM | 10 | Q.  -- in the context of Sinatra being a landscaper, correct? |
| 04:14PM | 11 | A.  Yes. |
| 04:14PM | 12 | Q.  And did you come to do any investigation to learn whether |
| 04:14PM | 13 | in fact Mr. Sinatra had done landscaping work at |
| 04:14PM | 14 | Mr. Bongiovanni's Alder Place house? |
| 04:14PM | 15 | A.  No.  Well, I mean, there was no reason to doubt that at |
| 04:14PM | 16 | that point. |
| 04:14PM | 17 | Q.  And did your investigation otherwise reveal that |
| 04:14PM | 18 | Mr. Sinatra's business is the landscaping business? |
| 04:14PM | 19 | A.  He does have a landscaping business, yes. |
| 04:14PM | 20 | Q.  And the topic at some point in time turns to Mr. Gerace |
| 04:14PM | 21 | and past cooperation with the DEA, correct? |
| 04:14PM | 22 | A.  Yes. |
| 04:14PM | 23 | Q.  And what does -- what is said on that topic?  What did |
| 04:14PM | 24 | Mr. Bongiovanni say about that? |
| 04:15PM | 25 | A.  He said that Peter Gerace tried to cooperate with the |

04:15PM 1    Buffalo DEA office one time.  He said he recused himself.

04:15PM 2    Mr. Bongiovanni recused himself because of their personal

04:15PM 3    relationship.  He referred the matter to his supervisor, and

04:15PM 4    the supervisor referred it to the FBI.

04:15PM 5        I can't remember if it was me or Special Agent Carpenter,

04:15PM 6    but I think it was me, asked if he knew if Peter Gerace had

04:15PM 7    ever been signed up as a source by anyone, and he said he

04:15PM 8    didn't know.

04:15PM 9    Q.  Okay.  So did your investigation come to reveal that

04:15PM 10   there was some form of coordination at the group supervisor

04:15PM 11   level between the DEA and the FBI?

04:15PM 12   A.  Yes.

04:15PM 13   Q.  Did you understand that basically the DEA and FBI group

04:15PM 14   supervisors arranged some sort of contact?

04:15PM 15       **MR. TRIPI:**  Objection.  Lack of personal knowledge.

04:15PM 16   It would be hearsay.

04:15PM 17       **THE COURT:**  He's asking if he knows that, if his

04:15PM 18   investigation revealed that.

04:15PM 19       No, this is cross-examination, overruled.

04:15PM 20       **BY MR. MacKAY:**

04:16PM 21   Q.  Did your investigation reveal whether there was any sort

04:16PM 22   of meeting set up at the group supervisor level?

04:16PM 23   A.  I don't remember the exact details of who set the meeting

04:16PM 24   up.  I learned that a meeting eventually happened between

04:16PM 25   Mr. Bongiovanni and Tom Herbst from FBI.

04:16PM   1   Q.  But you did confirm information that Mr. Bongiovanni had

04:16PM   2   referred the matter up to his group supervisor, correct?

04:16PM   3   A.  Yes.

04:16PM   4   Q.  Okay.  And I think we covered this already with your

04:16PM   5   dates, but you were not a member of the DEA at that point in

04:16PM   6   time in 2009, correct?

04:16PM   7   A.  I was not.

04:16PM   8   Q.  Okay.  And then the topic turns to this C2-13-0026 case

04:16PM   9   file, correct?

04:16PM  10   A.  Yes.

04:16PM  11   Q.  And I think what I understood from your direct testimony

04:16PM  12   is the topic turns there because the file's physically

04:16PM  13   discovered at the house, correct?

04:16PM  14   A.  Correct.

04:17PM  15   Q.  We went through the contents both on direct and cross.

04:17PM  16   But what did Mr. Bongiovanni say about that file again, why

04:17PM  17   it was there?

04:17PM  18   A.  Well, we have two different answers about why it was

04:17PM  19   there.

04:17PM  20   Q.  Want to go through the first?

04:17PM  21   A.  That he wanted to show -- he wanted to prove that his

04:17PM  22   investigation was on the up and up.

04:17PM  23   Q.  Okay.  And when you use the words "up and up," were those

04:17PM  24   your words?  Or were those -- I'm sorry, were they your

04:17PM  25   words?  Were those Mr. Bongiovanni's words?  Or was that a

USA v Bongiovanni - Ryan - MacKay/Cross - 3/18/24

04:17PM   1   summary of what you can remember?

04:17PM   2   A.  I don't remember if he used the exact phrase, up and up.

04:17PM   3       But the meaning of what he said was that his

04:17PM   4   investigation was legitimate.

04:17PM   5   Q.  Okay.  So as you sit here today, you can't recall whether

04:17PM   6   the words or the phrase "up and up" was uttered by

04:17PM   7   Mr. Bongiovanni; is that fair to say?

04:17PM   8   A.  No.

04:17PM   9   Q.  It's not fair to say?  Or you just don't remember?

04:18PM   10  A.  I'm -- I don't remember.  If I reviewed my notes and

04:18PM   11  wrote "up and up" with quotes around it, that would be the

04:18PM   12  one way that I would know for sure.

04:18PM   13  Q.  I'll hand you again 3594BJ-1.  Review that again.  Having

04:18PM   14  trouble finding it specifically, but you see that mentioned.

04:18PM   15      You're looking back up.  Did you find it?

04:19PM   16  A.  I did.

04:19PM   17  Q.  Okay.  I'll take it back from you.

04:19PM   18      Having reviewed that, does that refresh your recollection

04:19PM   19  about whether "on the up and up" is -- is a phrase

04:19PM   20  Mr. Bongiovanni used, or you were using as a summary?

04:19PM   21  A.  As a summary.

04:19PM   22  Q.  And that would be because reviewing your report you don't

04:19PM   23  see quotes in that, correct?

04:19PM   24  A.  That's correct.

04:19PM   25  Q.  So those are your words, not his?

04:19PM   1   A.   It's my words to characterize what -- his message that he

04:19PM   2   wanted to show that the investigation was legitimate, yes.

04:19PM   3   Q.   Okay.  Now, what was his second explanation?

04:19PM   4   A.   That he had become aware of the investigation of the

04:19PM   5   Serio drug-trafficking organization that I was part of from

04:19PM   6   Special Agent Carpenter.

04:19PM   7   Q.   Now, back in late 2018, 2019, you're working on this

04:20PM   8   Bongiovanni investigation, we'll call it, but you still

04:20PM   9   maintain regular duties at the DEA office in Buffalo,

04:20PM   10  correct?

04:20PM   11  A.   I would say irregular duties at the DEA office in

04:20PM   12  Buffalo.

04:20PM   13  Q.   I guess what I'm asking --

04:20PM   14  A.   So, I went from being there five days a week to much less

04:20PM   15  frequently --

04:20PM   16  Q.   That's what I'm asking --

04:20PM   17  A.   -- for the --

04:20PM   18  Q.   -- you still --

04:20PM   19  A.   -- balance of '18 --

04:20PM   20          THE COURT:  One at a time, guys.

04:20PM   21          THE WITNESS:  Sorry.

04:20PM   22          BY MR. MacKAY:

04:20PM   23  Q.   My question was:  You still reported in some fashion to

04:20PM   24  that office?

04:20PM   25  A.   Yes.

04:20PM  1  Q.  Okay.  And but at that point in time, you're in a

04:20PM  2  different group than Mr. Bongiovanni, correct?

04:20PM  3  A.  For the entire time that I was there, I was in a

04:20PM  4  different group.

04:20PM  5  Q.  Right.  But specifically directing your attention to --

04:20PM  6  to late 2018 to 2019, you sat in an entirely different group,

04:20PM  7  correct?

04:20PM  8  A.  Yes.

04:20PM  9  Q.  So as you sit here today, fair to say you don't know all

04:20PM  10  of the office gossip and rumors that are circulating around

04:21PM  11  the office?

04:21PM  12          MR. TRIPI:  Objection as to office gossip and rumors.

04:21PM  13  What is that relevant to?

04:21PM  14          THE COURT:  Overruled.

04:21PM  15          THE WITNESS:  No.

04:21PM  16          BY MR. MacKAY:

04:21PM  17  Q.  All right.  So the subject turns to Peter Militello in

04:21PM  18  some fashion, correct?

04:21PM  19  A.  The second time I asked him about the Serio investigation

04:21PM  20  in the file.

04:21PM  21  Q.  How does that come up?

04:21PM  22  A.  I asked him what happened with his Serio investigation,

04:21PM  23  if he ever made an arrest?  What happened?  What was the

04:21PM  24  outcome of the case?

04:21PM  25  Q.  And what did he tell you?

04:21PM    1    A.  He said that the case died when his source was arrested.

04:21PM    2    Q.  Okay.  And you --

04:21PM    3    A.  And then he identified the source as Peter Militello.

04:21PM    4    Q.  And you understood in your investigation, or formed the

04:21PM    5    belief, Peter Militello was not a confidential source in that

04:21PM    6    file, correct?

04:21PM    7    A.  He was not.

04:21PM    8    Q.  Okay.  The confidential source you associate with Ron

04:22PM    9    Serio, the Ron Serio file, the C2-13-0026, that was Robert

04:22PM   10    Kaiser, correct?

04:22PM   11    A.  I think there were others also, but --

04:22PM   12    Q.  Okay.

04:22PM   13    A.  -- yes.

04:22PM   14    Q.  But at least Robert Kaiser?

04:22PM   15    A.  But at least Robert Kaiser, he certainly was, yes.

04:22PM   16    Q.  Okay.  Now at that point in time when you're sitting with

04:22PM   17    Mr. Bongiovanni at the kitchen table, are you aware of Robert

04:22PM   18    Kaiser being the source in that file?

04:22PM   19    A.  I knew that there was more than one source.  I knew that

04:22PM   20    there were names that Mr. Serio had told us that he had

04:22PM   21    become aware of were sources.  One of them was Kaiser.

04:22PM   22        I don't remember if there were sources that we didn't

04:22PM   23    know the names to yet, or not.

04:22PM   24    Q.  Okay.

04:22PM   25    A.  Because there was a period of time where we didn't know.

04:23PM    1    Q.  But the only name Mr. Bongiovanni provides you with is

04:23PM    2    Peter Militello, correct?

04:23PM    3    A.  Yes.

04:23PM    4    Q.  And you didn't push back on that representation at that

04:23PM    5    point in time, correct?

04:23PM    6    A.  I did not.

04:23PM    7    Q.  Okay.  So there were no further questions asked to

04:23PM    8    clarify what Mr. Bongiovanni meant by "source," correct?

04:23PM    9    A.  No.  I -- I -- I mean, that can -- only has one meaning,

04:23PM    10   so I didn't really --

04:23PM    11   Q.  What do you understand, well --

04:23PM    12   A.  Source --

04:23PM    13   Q.  We're talking over each other a little bit.

04:23PM    14       What do you understand the term "source" to mean?

04:23PM    15   A.  In this law enforcement context like this?

04:23PM    16   Q.  Yes.

04:23PM    17   A.  Someone who's cooperating and providing information.

04:23PM    18   Q.  And that's the understanding you entered the conversation

04:23PM    19   with, correct?

04:23PM    20   A.  Of what a source is?

04:23PM    21   Q.  Yes.

04:23PM    22   A.  Yes.  And then also sources can proactively cooperate,

04:23PM    23   too.  Do things like a controlled buy, or a controlled

04:23PM    24   meeting.

04:23PM    25   Q.  Well, and fair to say, though, that in drug

04:24PM   1    investigations, the term "source" can also mean a source of

04:24PM   2    supply, correct?

04:24PM   3    A.  That's not the context of that conversation.

04:24PM   4    Q.  Why not?

04:24PM   5    A.  Because it wasn't.

04:24PM   6    Q.  I guess I'm trying to ask, why wasn't that the context of

04:24PM   7    the conversation?

04:24PM   8    A.  Well, when he said -- he said my source was arrested.

04:24PM   9    Not Ron Serio's source was arrested.

04:24PM   10       So if it's Ron Serio's source of supply, that's one

04:24PM   11   thing.

04:24PM   12       My source -- if I'm talking about my source as a law

04:24PM   13   enforcement officer, I'm not talking about a source of

04:24PM   14   supply.

04:24PM   15   Q.  Okay.  But I think what you just talked about here is you

04:24PM   16   interpreted it to mean I was talking about my source, Joe

04:24PM   17   Bongiovanni's source, correct?

04:24PM   18   A.  No, I'm saying that's what -- that's what we were talking

04:24PM   19   about.

04:24PM   20   Q.  Okay.  Did Mr. Bongiovanni ever use the term

04:24PM   21   "confidential source" in this conversation?

04:24PM   22   A.  No, he said "my source."

04:24PM   23   Q.  Okay.  And you understood that when he said "my source,"

04:24PM   24   that he wasn't referring to Ron Serio's source of supply,

04:25PM   25   correct?

04:25PM    1    A.  Correct.

04:25PM    2    Q.  Okay.  But in your job as an his agent, also working with

04:25PM    3    the DEA, you've also heard the term "source of supply" in --

04:25PM    4    in your work, correct?

04:25PM    5    A.  Yes.

04:25PM    6    Q.  And you separate source of supply from the term

04:25PM    7    "confidential source," correct?

04:25PM    8    A.  Yes.

04:25PM    9    Q.  One's somebody who's supplying drugs, correct?

04:25PM   10    A.  The source of supply.

04:25PM   11    Q.  And one is somebody who is, in effect, an informant

04:25PM   12    correct?

04:25PM   13    A.  Yes.

04:25PM   14    Q.  So did you come to learn in your investigation that Peter

04:25PM   15    Militello's role, ultimately, is that he's deemed to be a

04:25PM   16    source of supply?

04:25PM   17            **MR. TRIPI:**  Objection.  In what?

04:25PM   18            **THE COURT:**  Yeah.

04:25PM   19            **MR. TRIPI:**  In what file?  In what context?

04:25PM   20            **THE COURT:**  Sustained, yes.

04:25PM   21            **MR. TRIPI:**  Okay.

04:25PM   22            **BY MR. MacKAY:**

04:25PM   23    Q.  All right.  Did you -- did you come in your investigation

04:25PM   24    to learn more about Peter Militello and who he was?

04:25PM   25    A.  Yes.

04:25PM  1    Q.   Okay.  Who did you understand him to be as a result of

04:25PM  2    your investigation?

04:26PM  3    A.   He was a drug distributor who went to prison for selling

04:26PM  4    an opiate that killed someone with an overdose.

04:26PM  5    Q.   Okay.  And did your investigation reveal that Robert

04:26PM  6    Kaiser was the source, the confidential source, who led to

04:26PM  7    Peter Militello's arrest?

04:26PM  8    A.   Yes.

04:26PM  9    Q.   Okay.  We've already determined Robert Kaiser is

04:26PM  10   connected with the C2-13-0026 file, correct?

04:26PM  11   A.   Yes.

04:26PM  12   Q.   And then Robert Kaiser connects to Peter Militello in

04:26PM  13   some fashion, correct?

04:26PM  14        **MR. TRIPI:**  Objection as to "in some fashion."  Let's

04:26PM  15   define how.

04:26PM  16        **THE COURT:**  No, overruled.

04:26PM  17        **THE WITNESS:**  He connects to Robert Militello --

04:26PM  18        **BY MR. MacKAY:**

04:26PM  19   Q.   Robert Mili -- Robert Kaiser connects in some fashion --

04:26PM  20   A.   So I'm sorry, to Peter Militello.

04:26PM  21   Q.   To Peter Militello.

04:26PM  22   A.   In a separate DEA file, there's an investigation

04:26PM  23   documented where Robert Kaiser's the source, 0and Peter

04:27PM  24   Militello is the target.

04:27PM  25        **MR. MacKAY:**  Okay.  Judge, can I just have one moment

04:27PM  1   to check something?

04:27PM  2                   **THE COURT:**  Sure.

04:27PM  3                   **MR. MacKAY:**  I have no further questions, Your Honor.

04:27PM  4                   **THE COURT:**  Redirect, Mr. Tripi?

04:27PM  5                   **MR. TRIPI:**  Yes, Your Honor, thank you.

04:27PM  6

04:27PM  7                   **REDIRECT EXAMINATION BY MR. TRIPI:**

04:27PM  8   Q.  Just briefly, back sort of near the beginning of the

04:27PM  9   cross-examination, you were asked about -- I won't pull it up

04:27PM  10  unless you need it, but Exhibit 100A.1 and some of those --

04:28PM  11  particularly the OCDETF draft of Operation Past Due regarding

04:28PM  12  Frank Tripi; do you recall that?

04:28PM  13  A.  I recall.

04:28PM  14  Q.  Was Frank Tripi also an associate of Anthony Gerace as

04:28PM  15  far as you understand?

04:28PM  16  A.  Yes.

04:28PM  17  Q.  Was he also an associate of Michael Masecchia?

04:28PM  18  A.  Yes.

04:28PM  19  Q.  You were asked other questions about Exhibit 100A.1.

04:28PM  20  While that file had documents regarding the Serio

04:28PM  21  investigation, did it also have information from other

04:28PM  22  investigations?

04:28PM  23  A.  Yes, it did.

04:28PM  24  Q.  You were asked questions about Anthony Gerace's money

04:28PM  25  that was seized, and his claim that he put in relating to

USA v Bongiovanni - Ryan - Tripi/Redirect - 3/18/24

221

| | | |
|---|---|---|
| 04:28PM | 1 | that forfeiture of the $103,000; is that correct? |
| 04:29PM | 2 | A.  I was. |
| 04:29PM | 3 | Q.  Ultimately, pursuant to your investigation and search |
| 04:29PM | 4 | warrant, did Anthony Gerace plead guilty and also forfeit |
| 04:29PM | 5 | that money? |
| 04:29PM | 6 | A.  He did. |
| 04:29PM | 7 | Q.  So regardless of what his claim was, the money was taken |
| 04:29PM | 8 | by the government, and he pled guilty? |
| 04:29PM | 9 | A.  Yes. |
| 04:29PM | 10 | Q.  Okay.  You were asked about people who were in the |
| 04:29PM | 11 | proffer, the initial proffer July 20th, 2018, regarding |
| 04:29PM | 12 | Mr. Serio; do you recall those questions? |
| 04:29PM | 13 | A.  I do. |
| 04:29PM | 14 | Q.  And you were asked about Special Agent Casullo's presence |
| 04:29PM | 15 | in that proffer; is that correct? |
| 04:29PM | 16 | A.  Yes, I was. |
| 04:29PM | 17 | Q.  Who's the -- who invited the individuals to sit in that |
| 04:29PM | 18 | proffer?  You, or the U.S. Attorney's Office? |
| 04:29PM | 19 | A.  The U.S. Attorney's Office. |
| 04:29PM | 20 | Q.  And is it your understanding that Special Agent Casullo |
| 04:29PM | 21 | had, by that point in time, led an investigation that |
| 04:29PM | 22 | resulted in the arrest of Kevin Myszka? |
| 04:30PM | 23 | A.  Yes. |
| 04:30PM | 24 | Q.  Is it your understanding by that point in time Kevin |
| 04:30PM | 25 | Myszka had proffered with Special Agent Casullo? |

04:30PM 1    A.  Yes.

04:30PM 2    Q.  And is it your understanding that Myszka had information

04:30PM 3    about activity at Pharaoh's?

04:30PM 4    A.  Yes.

04:30PM 5    Q.  Okay.  You were asked questions about Ms. Phlycia Hunt;

04:30PM 6    do you recall that?

04:30PM 7    A.  I do.

04:30PM 8    Q.  Particularly, you were asked questions about her

04:30PM 9    substance abuse; do you remember that?

04:30PM 10   A.  Yes.

04:30PM 11   Q.  When you met her, was she -- was she in the depths of her

04:30PM 12   addiction at that point?

04:30PM 13   A.  Oh --

04:30PM 14   Q.  When you first met her, Ms. Hunt.

04:30PM 15   A.  No.

04:30PM 16   Q.  Was she cordial?

04:30PM 17   A.  Yes.

04:30PM 18   Q.  Was she responsive?

04:30PM 19   A.  Yes.

04:30PM 20   Q.  Did her answers make sense in the context of the

04:30PM 21   questions being posed?

04:30PM 22   A.  Yes, they did.

04:30PM 23   Q.  Was she polite?

04:30PM 24   A.  She was.

04:30PM 25   Q.  When you showed her the photo that's Exhibit 127, that

04:31PM   1   we've seen a few times in different contexts, did she answer

04:31PM   2   your question and indicate who she knew and why?

04:31PM   3   A.   Yes.

04:31PM   4   Q.   Based on her information, did you ask other witnesses

04:31PM   5   about the defendant's 0cocaine use?

04:31PM   6   A.   Yes.

04:31PM   7   Q.   Did other witnesses corroborate Ms. Hunt's information?

04:31PM   8   A.   Yes.

04:31PM   9   Q.   Did you ask other witnesses about Tom Doctor's cocaine

04:31PM   10   use?

04:31PM   11   A.   Yes.

04:31PM   12   Q.   Did other witnesses corroborate Ms. Hunt's information?

04:31PM   13   A.   Yes.

04:31PM   14   Q.   Through those interviews, did you learn of other

04:31PM   15   instances where the defendant used cocaine with Tom Doctor?

04:31PM   16   A.   Yes.

04:31PM   17   Q.   You went through the text messages Exhibit 310D, I

04:31PM   18   believe it is, between Mr. Bongiovanni and Mr. Gerace.  I

04:31PM   19   won't pull them up again, but you recall those for a couple

04:31PM   20   of days now?

04:31PM   21   A.   I do.

04:31PM   22   Q.   Do you provide confidential informants or even sources of

04:32PM   23   information with your home address, where your family lives?

04:32PM   24   A.   No.

04:32PM   25   Q.   You were asked -- you went through the text messages, and

04:32PM  1    you were asked questions about how many meetings there were

04:32PM  2    over a period of years based on only the text messages; do

04:32PM  3    you recall that?

04:32PM  4    A.   I do.

04:32PM  5    Q.   Were there more phone calls than text messages?

04:32PM  6    A.   Yes.

04:32PM  7         **MR. TRIPI:**   Ms. Champoux, can we pull up 368B and

04:32PM  8    368I next to one another, please?

04:32PM  9         **BY MR. TRIPI:**

04:32PM  10   Q.   Do you see these charts where it has on the left

04:32PM  11   Mr. Gerace's phone number and Mr. Bongiovanni's, and on the

04:32PM  12   right at the top Mr. Bongiovanni's phone number and then

04:32PM  13   Mr. Gerace's?

04:32PM  14   A.   Yes.

04:32PM  15   Q.   If you look at these, do these show phone calls over a

04:33PM  16   period of years from 2012 all the way through 2017?  You

04:33PM  17   start on the one on the right, and work your way through to

04:33PM  18   the one on the left?

04:33PM  19   A.   Yes.

04:33PM  20   Q.   Are phone calls another way where people can make plans

04:33PM  21   with one another?

04:33PM  22   A.   Yes.

04:33PM  23   Q.   Did Peter Gerace own a big building on Aero Drive that

04:33PM  24   had a sign called Pharaoh's that people could drive to?

04:33PM  25   A.   Yes.

04:33PM   1   Q.  Okay.  During the text thread, did you see

04:33PM   2   Mr. Bongiovanni give Mr. Gerace his address?

04:33PM   3   A.  Mr. --

04:33PM   4   Q.  Did Mr. Bongiovanni give Mr. Gerace his home address?

04:33PM   5   A.  His home address, yes.

04:33PM   6   Q.  Can people visit one another at their homes?

04:33PM   7   A.  Yes.

04:33PM   8   Q.  Can people visit one another at work?

04:33PM   9   A.  Yes.

04:33PM   10  Q.  Are there people that you see every day of your life?

04:33PM   11  A.  Yes.

04:33PM   12  Q.  Do you text them a follow-up text every time and say,

04:34PM   13  hey, it was great to see you?

04:34PM   14  A.  No.

04:34PM   15          **MR. TRIPI:**  Can we pull up -- we can take these down,

04:34PM   16  pull up Exhibit 97, please, Ms. Champoux.

04:34PM   17          **BY MR. TRIPI:**

04:34PM   18  Q.  Now my question -- my question for Exhibits 97, 98, and

04:34PM   19  99, those would be the three memos are generally going to be

04:34PM   20  the same, okay, so I'm not going to pull them all up; is that

04:34PM   21  okay?

04:34PM   22  A.  Yes.

04:34PM   23  Q.  Who authored the memos?

04:34PM   24  A.  Mr. Bongiovanni.

04:34PM   25  Q.  Who picked the subject of the memos, the subject header?

04:34PM   1    A.   Presumably Mr. Bongiovanni.

04:34PM   2    Q.   Who provided the attachments for the memos?

04:34PM   3    A.   Mr. Bongiovanni.

04:34PM   4    Q.   Who selected what would be the attachment?

04:34PM   5    A.   Mr. Bongiovanni.

04:34PM   6    Q.   Okay.  Look at Exhibit 97, page -- paragraph number 3.

04:34PM   7         Can you read the first sentence just up to the second

04:35PM   8    line where the comma is?

04:35PM   9    A.   In an effort to maintain a sense of normal activity and

04:35PM   10   with hopes of not alerting Gerace that something may be

04:35PM   11   wrong.

04:35PM   12   Q.   Okay.  When you read that, when you said -- when it read

04:35PM   13   in a sense to maintain a sense of normal activity, was that

04:35PM   14   something that stood out to you when you read that memo?

04:35PM   15   A.   It tells me there is a pattern of normal activity.

04:35PM   16   Q.   Of doing what?

04:35PM   17   A.   Of being in contact.

04:35PM   18   Q.   So that, the inverse of that is it would be abnormal to

04:35PM   19   not have contact; is that right?

04:35PM   20   A.   Yes.

04:35PM   21            **MR. TRIPI:**  We can take that down.

04:35PM   22            **BY MR. TRIPI:**

04:35PM   23   Q.   You were asked questions about your interview with

04:35PM   24   Mr. Bongiovanni; do you recall that?

04:35PM   25   A.   Yes.

04:35PM   1   Q.  And you've worked for DOD, NCIS.  You've done interviews

04:36PM   2   throughout your law enforcement career going back to 1999; is

04:36PM   3   that fair?

04:36PM   4   A.  To -- back to 1997.

04:36PM   5   Q.  And you characterized it as maybe thousands of

04:36PM   6   interviews?

04:36PM   7   A.  Yeah, I have no idea.

04:36PM   8   Q.  Okay.  Do you feel like you have some experience in that

04:36PM   9   regard?

04:36PM   10  A.  Yes.  It's been a routine part of my job for 25, 27

04:36PM   11  years, whatever it is.

04:36PM   12  Q.  Now, in terms of recording audio or video, at the time of

04:36PM   13  your interview with Mr. Bongiovanni in June of 2019, was

04:36PM   14  there any his policy regarding that?

04:36PM   15  A.  There is an interview recording policy.  It does -- it

04:36PM   16  requires recording in a custodial setting.

04:36PM   17  Q.  Okay.  Now, was Mr. Bongiovanni in custody?

04:36PM   18  A.  No.

04:36PM   19  Q.  If he decided, you know, Special Agent Ryan, I don't want

04:36PM   20  to talk to you, but obviously -- I'm gonna leave.  You would

04:36PM   21  have let him leave, correct?

04:36PM   22  A.  Yes.

04:36PM   23  Q.  Okay.  And, so, based on your experience going back to

04:36PM   24  1997, explain for the jury why that setting was a bad

04:36PM   25  environment for trying to audio or video record the

04:36PM   1   interview.

04:37PM   2   A.  It's because of the sensitivity of --

04:37PM   3   Q.  Tell them.

04:37PM   4   A.  Oh, sorry.

04:37PM   5       It's because of the sensitivity of the microphones, of --

04:37PM   6   it's not even modern digital recorders.  Even a good old

04:37PM   7   reel-to-reel recorder has a really good microphone, and then

04:37PM   8   there's a lot of stuff happening in a relatively open

04:37PM   9   environment, and somebody bangs a water bottle, knocks

04:37PM  10   something over, two people not part of the interview are

04:37PM  11   talking to each about something, it can wash out what you're

04:37PM  12   trying to record at the table.

04:37PM  13   Q.  So when you're making your assessments of what would be

04:37PM  14   appropriate, did you decide to take contemporaneous notes?

04:37PM  15   A.  Yes.

04:37PM  16   Q.  And then did you decide that you would take those notes,

04:37PM  17   and then reduce it to a formal report?

04:37PM  18   A.  Yes.

04:37PM  19   Q.  Is that what you did in close proximity to the interview?

04:37PM  20   A.  Yes.

04:37PM  21   Q.  Do you think that was more appropriate, based on your

04:37PM  22   training and experience as an investigator since 1997?

04:37PM  23   A.  Yes.

04:37PM  24   Q.  If you had not taken notes and relied solely on a

04:37PM  25   recording, and the equipment malfunctioned, would you have

04:38PM   1   any record of what was said during that interview?

04:38PM   2   A.  None.

04:38PM   3   Q.  While you were speaking to Mr. Bongiovanni, by the time

04:38PM   4   you got in there and started discussing the material, was he

04:38PM   5   calming down from the initial entry?

04:38PM   6   A.  That's hard for me to gauge.  I think he -- he calmed

04:38PM   7   down steadily in my first ten minutes with him.

04:38PM   8   Q.  That's what I was trying to ask.  As -- as you sat down,

04:38PM   9   you're at his table, did -- did he have --

04:38PM   10  A.  Yes.

04:38PM   11  Q.  -- normal conversation with you?

04:38PM   12  A.  Yes.  Yes.

04:38PM   13  Q.  Was your tone of voice elevated?

04:38PM   14  A.  No.

04:38PM   15  Q.  Was his tone of voice elevated?

04:38PM   16  A.  No.

04:38PM   17  Q.  Okay.  Did his answers make sense in the context of the

04:38PM   18  questions you were asking?

04:38PM   19  A.  Yes, they did.

04:38PM   20  Q.  Did you understand them?

04:38PM   21  A.  Yes.

04:38PM   22  Q.  Did you take notes and record it accurately and testify

04:38PM   23  accurately to this jury?

04:38PM   24  A.  Yes.

04:38PM   25  Q.  Did he ever tell you, hey, I don't understand your

USA v Bongiovanni - Ryan - Tripi/Redirect - 3/18/24

230

| | | |
|---|---|---|
| 04:38PM | 1 | question, can you rephrase it? |
| 04:38PM | 2 | A.  I don't know if he did.  But if he had, I would have. |
| 04:39PM | 3 | Q.  So as you sit here today, you don't recall that ever |
| 04:39PM | 4 | happening? |
| 04:39PM | 5 | A.  No. |
| 04:39PM | 6 | Q.  Okay.  Now you were asked about the entry on the warrant, |
| 04:39PM | 7 | and this thing with the flash bang and all that. |
| 04:39PM | 8 | So I'm going to ask you, during the execution of the |
| 04:39PM | 9 | search warrant, do you make application for a federal judge |
| 04:39PM | 10 | to determine whether no-knock entry is permitted?  Did you |
| 04:39PM | 11 | make -- |
| 04:39PM | 12 | A.  In that application? |
| 04:39PM | 13 | Q.  Yeah.  Did you make an application regarding no-knock |
| 04:39PM | 14 | entry? |
| 04:39PM | 15 | A.  Yes. |
| 04:39PM | 16 | Q.  And was it authorized? |
| 04:39PM | 17 | A.  It was. |
| 04:39PM | 18 | Q.  And is that based on facts you need to present to a |
| 04:39PM | 19 | judge? |
| 04:39PM | 20 | A.  Yes. |
| 04:39PM | 21 | Q.  So a judge determined that that was an authorized type of |
| 04:39PM | 22 | entry, no-knock? |
| 04:39PM | 23 | A.  Yes. |
| 04:39PM | 24 | Q.  Based on your knowledge of Special Agent Bongiovanni, |
| 04:39PM | 25 | unlike a normal citizen, had he been a 20-year special agent? |

USA v Bongiovanni - Ryan - Tripi/Redirect - 3/18/24

04:39PM     1    A.  Yes.

04:39PM     2    Q.  Had he participated in search warrants?

04:40PM     3    A.  Yes.

04:40PM     4    Q.  Was he more, in your view, more well versed than a normal

04:40PM     5    citizen for what was happening around him?

04:40PM     6    A.  Yes.

04:40PM     7    Q.  Because of his training and experience?

04:40PM     8    A.  Yes.

04:40PM     9    Q.  Now you were asked about Exhibit 3594BJ-1, and that's the

04:40PM    10    report you generated after you -- you looked at that earlier;

04:40PM    11    is that correct?

04:40PM    12    A.  Yes.

04:40PM    13    Q.  Now, Mr. MacKay asked you about a specific sentence where

04:40PM    14    you wrote Bongiovanni denied he was in a close relationship

04:40PM    15    with Peter Gerace, right?

04:40PM    16    A.  Yes.

04:40PM    17    Q.  Do you remember that question and those answers?

04:40PM    18        Was there a second half to that sentence that you wrote

04:40PM    19    in your report?  Do you recall?  Would you like to look at

04:40PM    20    your report?

04:40PM    21    A.  Yeah, please.

04:40PM    22    Q.  I'm going to show you exhibit -- just for the witness

04:40PM    23    only 3594BJ-1, page 2.  It will be the third paragraph down.

04:41PM    24        Do you remember looking at that?

04:41PM    25    A.  Yes.

04:41PM     1     Q.  Do you see the part where you wrote "and said?"

04:41PM     2     A.  Yes.

04:41PM     3     Q.  Those words that follow, the rest of that sentence, were

04:41PM     4     those words that Mr. Bongiovanni said?

04:41PM     5     A.  Yes.

04:41PM     6     Q.  What were they?

04:41PM     7     A.  That there was --

04:41PM     8              MR. MacKAY:  Judge, I'm going to object at this

04:41PM     9     point.  He's just reading from something not in evidence.

04:41PM    10              MR. TRIPI:  It's the Rule of Completeness.  He

04:41PM    11     brought out the first half of this particular statement, and

04:41PM    12     so there's a second half of the statement, Your Honor.

04:41PM    13              MR. MacKAY:  He can refresh his recollection.

04:41PM    14              THE COURT:  Exactly.

04:41PM    15              MR. TRIPI:  Okay.  We'll do that.  I apologize.

04:41PM    16     We'll take it down.

04:41PM    17              BY MR. TRIPI:

04:41PM    18     Q.  Does it refresh your recollection as to the second half

04:41PM    19     of that sentence?

04:41PM    20     A.  Yes.

04:41PM    21     Q.  What did Mr. Bongiovanni say?

04:41PM    22     A.  That there were a lot of times that he saw Peter Gerace

04:41PM    23     and went the other way.

04:41PM    24     Q.  And did he also say Peter Gerace was a pain in the ass?

04:41PM    25     A.  Yes.

04:42PM   1   Q.  Did you also write that word for word in your notes?

04:42PM   2   A.  Yes.

04:42PM   3   Q.  Now, you were also asked questions about -- do you

04:42PM   4   remember later on when you were asking him about why -- the

04:42PM   5   first time when you asked him about why he took the Serio

04:42PM   6   file home?

04:42PM   7   A.  Yes.

04:42PM   8   Q.  And Mr. MacKay asked you about the phrase "up and up,"

04:42PM   9   and whose words those were, correct?

04:42PM  10   A.  Yes.

04:42PM  11   Q.  When you wrote it in your notes, if you wrote it in your

04:42PM  12   notes contemporaneous, would those be the defendant's words?

04:42PM  13   A.  It could be.  But it's also possible that that's me using

04:42PM  14   a version or --

04:42PM  15   Q.  Okay.

04:42PM  16   A.  -- a version of shorthand to keep up.

04:42PM  17   Q.  I'm going to show you 3594BJ-2, page 8, it's at the

04:42PM  18   bottom.  I'm going to show you this to refresh your

04:42PM  19   recollection as to whose words up and up were.  Take a

04:42PM  20   minute, read it to yourself, and when you're done, look up.

04:43PM  21       Does seeing your actual notes refresh your recollection

04:43PM  22   at all?

04:43PM  23   A.  It does, but it would still -- it's too difficult for me

04:43PM  24   to say that's an exact quote.

04:43PM  25   Q.  Okay.  What did you mean by "keep up?"  When you're

USA v Bongiovanni - Ryan - Tripi/Redirect - 3/18/24

234

04:43PM    1    writing notes about keeping up?

04:43PM    2    A.  Keeping notes, and keeping up with the conversation.

04:43PM    3    Q.  When the defendant said that Peter Militello was his

04:43PM    4    source, is there any doubt in your mind he was telling you

04:43PM    5    Militello was his C.I. in the Serio case?

04:43PM    6    A.  No.

04:43PM    7    Q.  Now during the interview, once you became aware of the

04:44PM    8    Serio file, did you have a chance to go through every page

04:44PM    9    and every document that was in there while you sat in

04:44PM   10    Mr. Bongiovanni's living room?

04:44PM   11    A.  No.

04:44PM   12    Q.  If you had known everything that was in that file, would

04:44PM   13    you have had a lot more questions for Mr. Bongiovanni that

04:44PM   14    day back in June?

04:44PM   15    A.  Yes.

04:44PM   16        MR. TRIPI:  Just one moment, please, Your Honor.

04:44PM   17        Nothing further, Judge.

04:44PM   18        THE COURT:  Mr. MacKay?

04:44PM   19        MR. MacKAY:  I should be able to be very short,

04:44PM   20    Judge.

04:44PM   21        THE COURT:  Okay.

04:44PM   22        MR. MacKAY:  Ms. Champoux, can we pull up side by

04:44PM   23    side Government Exhibit 368B and I.

04:44PM   24

04:44PM   25

04:44PM 1        **RECROSS-EXAMINATION BY MR. MacKAY:**

04:44PM 2    Q.  Okay.  Agent Ryan, showing you again, those are the phone

04:45PM 3    charts you saw on redirect, correct?

04:45PM 4    A.  Yes.

04:45PM 5    Q.  Okay.  You understand, as you sit here today, that these

04:45PM 6    don't necessarily represent connected phone calls on each

04:45PM 7    end, correct?

04:45PM 8    A.  I don't think it shows up in the call detail record if

04:45PM 9    it's not connected.  It would have at least connected to

04:45PM 10   voicemail I think.

04:45PM 11   Q.  Okay.  But, again, you don't know whether these calls

04:45PM 12   that are reflected here are ones that go to voicemail,

04:45PM 13   correct?

04:45PM 14   A.  You'd have to look at the records behind this --

04:45PM 15   Q.  Right.

04:45PM 16   A.  -- to find --

04:45PM 17   Q.  And if --

04:45PM 18   A.  -- the duration of the call.

04:45PM 19   Q.  -- somebody came in and prepared those records, they'd be

04:45PM 20   the one to speak to that, correct?

04:45PM 21   A.  It --

04:45PM 22   Q.  If somebody prepared those two exhibits here, they would

04:45PM 23   be the one who would know about those, correct?

04:45PM 24   A.  You're talking about a different person?

04:45PM 25   Q.  Yes.

04:45PM   1   A.  Yes.

04:45PM   2          MR. MacKAY:  Okay.  You can take those down,

04:45PM   3   Ms. Champoux.  Thank you.

04:45PM   4          BY MR. MacKAY:

04:45PM   5   Q.  You talked about how -- well, you were asked questions by

04:46PM   6   Mr. Tripi about what would happen if you had just recorded an

04:46PM   7   interview, and the equipment malfunctioned; do you remember

04:46PM   8   that?

04:46PM   9   A.  Yes.

04:46PM  10   Q.  You'd have no way of accessing that recording again,

04:46PM  11   correct?

04:46PM  12   A.  If it malfunctions, then there is no recording, so yes.

04:46PM  13   Q.  So, but nothing here precluded you from doing a rough

04:46PM  14   recording and taking notes at the same time, correct?

04:46PM  15   A.  You could.

04:46PM  16   Q.  And finally, you talked a little bit about how -- well,

04:46PM  17   before I ask that.

04:46PM  18       As you sit here today, fair to say you don't remember the

04:46PM  19   conversation word for word, correct?

04:46PM  20   A.  No.

04:46PM  21   Q.  I mean, it was four and a half years ago or so, correct?

04:46PM  22   A.  That's correct.

04:46PM  23   Q.  And finally, you were asked about, you know, that there

04:46PM  24   were other materials, there were materials from other

04:46PM  25   investigations present in the Redweld file; do you remember

04:46PM    1    that?

04:46PM    2    A.    Yes.

04:46PM    3    Q.    In your experience as a DEA agent, there's coordination

04:47PM    4    in the office between different ongoing investigations,

04:47PM    5    correct?

04:47PM    6    A.    Sometimes, yeah.

04:47PM    7    Q.    Well, for example, people in the same group share

04:47PM    8    information about different ongoing investigations, correct?

04:47PM    9    A.    They could.

04:47PM   10    Q.    There's an attempt to, in your experience, see how one

04:47PM   11    agent's investigation might affect another's, correct?

04:47PM   12    A.    Sure.

04:47PM   13    Q.    And in that capacity, information is exchanged between

04:47PM   14    agents, correct?

04:47PM   15    A.    Sure.

04:47PM   16            **MR. MacKAY:**  Okay.  No further questions, Your Honor.

04:47PM   17            **THE COURT:**  Anything more, Mr. Tripi?

04:47PM   18            **MR. TRIPI:**  May I have just one question, Judge?

04:47PM   19            **THE COURT:**  Of course.

04:47PM   20

04:47PM   21            **RE-REDIRECT EXAMINATION BY MR. TRIPI:**

04:47PM   22    Q.    The statements that the defendant made to you on

04:47PM   23    June 6th, 2019, do you remember those -- those words being

04:47PM   24    uttered as documented in your report and as you've testified

04:47PM   25    to this jury?

04:47PM 1    A.   I remember the interview, yes.

04:47PM 2    Q.   And what you've told this jury the defendant said, did he

04:47PM 3    say it, and have you relayed it accurately?

04:47PM 4    A.   Yes, I have, and yes, I do.

04:47PM 5                **MR. TRIPI:**  Nothing further, Your Honor.

04:48PM 6                **MR. MacKAY:**  Nothing further, Your Honor.

04:48PM 7                **THE COURT:**  Okay.  You can step down, sir, thank you.

04:48PM 8                **THE WITNESS:**  Thank you, Judge.

04:48PM 9                (Witness excused at 4:48 p.m.)

10                (Excerpt concluded at 4:47 p.m.)

11                  *      *      *      *      *      *      *

12

13                    <u>**CERTIFICATE OF REPORTER**</u>

14

15                    In accordance with 28, U.S.C., 753(b), I

16    certify that these original notes are a true and correct

17    record of proceedings in the United States District Court for

18    the Western District of New York on March 18, 2024.

19

20

21                    s/ Ann M. Sawyer
                      _____
                      Ann M. Sawyer, FCRR, RPR, CRR
22                    Official Court Reporter
                      U.S.D.C., W.D.N.Y.

23

24

25

**EXCERPT INDEX**

**EXAMINATION OF CURTIS RYAN - DAY 3**

**MARCH 18, 2024**

**W I T N E S S**                                                        **P A G E**

**C U R T I S   R Y A N**                                                2

  DIRECT EXAMINATION BY MR. TRIPI (CONT'D):          2

  CROSS-EXAMINATION BY MR. MacKAY:                     120

  REDIRECT EXAMINATION BY MR. TRIPI:                   220

  RECROSS-EXAMINATION BY MR. MacKAY:                   235

  RE-REDIRECT EXAMINATION BY MR. TRIPI:                237


**E X H I B I T S**                                                     **P A G E**

GOV Exhibits 100E-1 and 100F-1                          5

GOV Exhibits 100D-1 and 100D-2                          7

GOV Exhibit 393                                                    11