09:25AM

```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK
 2
   _____
 3 UNITED STATES OF AMERICA,
                                    Case No. 1:19-cr-227
 4            Plaintiff,                      (LJV)
   v.
 5                                  March 12, 2024
   JOSEPH BONGIOVANNI,
 6
   _____
 7                            Defendant.


 8      TRANSCRIPT EXCERPT - TESTIMONY OF RONALD SERIO - DAY 2
               BEFORE THE HONORABLE LAWRENCE J. VILARDO
 9                    UNITED STATES DISTRICT JUDGE


10
   APPEARANCES:          TRINI E. ROSS, UNITED STATES ATTORNEY
11                       BY: JOSEPH M. TRIPI, ESQ.
                             NICHOLAS T. COOPER, ESQ.
12                           CASEY L. CHALBECK, ESQ.
                         Assistant United States Attorneys
13                       Federal Centre
                         138 Delaware Avenue
14                       Buffalo, New York 14202
                           And
15                       UNITED STATES DEPARTMENT OF JUSTICE
                         BY: JORDAN ALAN DICKSON, ESQ.
16                       1301 New York Ave NW
                         Suite 1000
17                       Washington, DC 20530-0016
                         For the Plaintiff
18
                         SINGER LEGAL PLLC
19                       BY: ROBERT CHARLES SINGER, ESQ.
                         80 East Spring Street
20                       Williamsville, New York 14221
                           And
21                       LAW OFFICES OF PARKER ROY MacKAY
                         BY: PARKER ROY MacKAY, ESQ.
22                       3110 Delaware Avenue
                         Kenmore, New York  14217
23                       For the Defendant

24 PRESENT:              BRIAN A. BURNS, FBI Special Agent
                         MARILYN K. HALLIDAY, HSI Special Agent
25                       KAREN A. CHAMPOUX, USA Paralegal
```

| | | |
|---|---|---|
| 1 | **LAW CLERK:** | **REBECCA FABIAN IZZO, ESQ.** |
| 2 | **COURT DEPUTY CLERK:** | **COLLEEN M. DEMMA** |
| 3 | **COURT REPORTER:** | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 4 | | Robert H. Jackson Federal Courthouse
2 Niagara Square |
| 5 | | Buffalo, New York  14202
Ann_Sawyer@nywd.uscourts.gov |

09:27AM  5
09:27AM
09:27AM  6

09:27AM  7                    *    *    *    *    *    *    *

09:27AM  8

09:41AM  9          (Excerpt commenced at 9:41 a.m.)

09:41AM  10         (Jury seated at 9:41 a.m.)

09:41AM  11          **THE COURT:**  Good morning, everyone.

09:41AM  12          **JURORS:**  Good morning.

09:41AM  13          **THE COURT:**  The record will reflect that all our

09:41AM  14  jurors are present again.

09:41AM  15          I remind the witness that he's still under oath.

09:41AM  16          And, Mr. Tripi, you may continue.

09:41AM  17          **MR. TRIPI:**  Thank you, Your Honor.

09:41AM  18

09:41AM  19  **R O N A L D   S E R I O**, having been previously duly called

09:41AM  20  and sworn, testified further as follows:

09:41AM  21

09:41AM  22              **DIRECT EXAMINATION BY MR. TRIPI (CON'T):**

09:41AM  23  Q.  Good morning, Mr. Serio.

09:41AM  24  A.  Good morning.

09:41AM  25  Q.  Mr. Serio, when we left off yesterday, one of the last

09:41AM   1   things we covered was when you were moving from Santiago Gale

09:41AM   2   as a supplier to Jarrett Guy?

09:41AM   3   A.  Yes.

09:41AM   4   Q.  Okay?  Just by way of brief reminder, remind the jury who

09:41AM   5   Jarrett Guy is or was.

09:41AM   6   A.  Jarrett Guy was who I got my marijuana from, from

09:41AM   7   Vancouver, Canada.

09:41AM   8   Q.  Okay.  And how did you meet him?

09:41AM   9   A.  Through Mark Keegan.

09:41AM  10        **THE COURT:**  Speak right into the microphone please.

09:41AM  11        **THE WITNESS:**  Through Mark Keegan.

09:41AM  12        **BY MR. TRIPI:**

09:41AM  13   Q.  And Mark Keegan is someone who you mentioned or talked

09:42AM  14   about yesterday who you had been getting supply from in the

09:42AM  15   '08, '09 --

09:42AM  16   A.  Yes.

09:42AM  17   Q.  -- 2010 time frame?

09:42AM  18   A.  Yes.

09:42AM  19   Q.  Okay.  Describe your initial meeting with Jarrett Guy.

09:42AM  20   A.  It was in New York City, and we just discussed the amount

09:42AM  21   that I could take of marijuana and the price.

09:42AM  22   Q.  And what amounts did you discuss obtaining from him?

09:42AM  23   A.  Just whatever he can bring to me.

09:42AM  24   Q.  So you didn't place any limits?

09:42AM  25   A.  No.

USA v Bongiovanni - Serio - Tripi/Direct - 3/12/24

4

09:42AM  1    Q.  And what did he indicate to you he could supply?

09:42AM  2    A.  It's basically supply whatever I want.

09:42AM  3    Q.  And did you discuss pricing?

09:42AM  4    A.  Yes.

09:42AM  5    Q.  Who were you in New York City with?

09:42AM  6    A.  I was with Frank Burkhart.

09:42AM  7    Q.  Frank Burkhart is the person who was friends with R.K.?

09:42AM  8    A.  Correct.

09:42AM  9    Q.  And what approximate year is it that you're in New York

09:43AM  10   City meeting Jarrett Guy discussing him becoming your

09:43AM  11   supplier.

09:43AM  12   A.  It was 2013.

09:43AM  13   Q.  And what arrangements did you and Jarrett Guy work out,

09:43AM  14   in other words, was there a discussion regarding how the

09:43AM  15   marijuana would make it to you?  All of that?

09:43AM  16   A.  At that time, it was coming from New York City to

09:43AM  17   Buffalo.

09:43AM  18   Q.  So describe what was happening at that time.

09:43AM  19   A.  That they would just have a courier bring it to me in

09:43AM  20   Buffalo.

09:43AM  21   Q.  What do you mean by a courier?

09:43AM  22   A.  Someone that would drive the marijuana, not them

09:43AM  23   specifically, not Jarrett.

09:43AM  24   Q.  And what type of transportation would the courier be

09:43AM  25   driving?

| | | |
|---|---|---|
| 09:43AM | 1 | A.  Just a regular vehicle at the time. |
| 09:43AM | 2 | Q.  Did all of the people that you were in operations with on |
| 09:44AM | 3 | the Buffalo end of it, were those consistent throughout, did |
| 09:44AM | 4 | they remain the same as we discussed yesterday? |
| 09:44AM | 5 | A.  Yes. |
| 09:44AM | 6 | Q.  How did you leave it after that initial meeting with |
| 09:44AM | 7 | Jarrett Guy? |
| 09:44AM | 8 | A.  Just as soon as they could bring me something, let me |
| 09:44AM | 9 | know. |
| 09:44AM | 10 | Q.  And did you discuss how you would communicate with one |
| 09:44AM | 11 | another? |
| 09:44AM | 12 | A.  We had burner phones. |
| 09:44AM | 13 | Q.  And yesterday you described what a burner phone is, |
| 09:44AM | 14 | correct? |
| 09:44AM | 15 | A.  Correct. |
| 09:44AM | 16 | Q.  When I got back from that trip, did you discuss your |
| 09:44AM | 17 | meeting with Jarrett Guy with Mike Masecchia? |
| 09:44AM | 18 | A.  Yes. |
| 09:44AM | 19 | Q.  Describe -- describe that discussion for the jury. |
| 09:44AM | 20 | A.  Well, I just said that I met the new connection in |
| 09:44AM | 21 | New York City, and I'd be getting marijuana from him. |
| 09:44AM | 22 | Q.  What did Masecchia say? |
| 09:44AM | 23 | A.  He said good. |
| 09:44AM | 24 | Q.  Describe in proximity to that when initial meeting did |
| 09:45AM | 25 | marijuana start getting transported to you in Buffalo? |

USA v Bongiovanni - Serio - Tripi/Direct - 3/12/24

6

| | | |
|---|---|---|
| 09:45AM | 1 | A.  Within two weeks. |
| 09:45AM | 2 | Q.  Do you remember how much the initial shipment was? |
| 09:45AM | 3 | A.  I think it was a hundred pounds. |
| 09:45AM | 4 | Q.  Do you remember what the pricing was? |
| 09:45AM | 5 | A.  I believe at that time it was 2,800. |
| 09:45AM | 6 | Q.  Per pound? |
| 09:45AM | 7 | A.  Correct. |
| 09:45AM | 8 | Q.  And that's your cost? |
| 09:45AM | 9 | A.  Yes. |
| 09:45AM | 10 | Q.  Was it being fronted or were you paying? |
| 09:45AM | 11 | A.  That was being fronted. |
| 09:45AM | 12 | Q.  All right.  And how would you get the money back to |
| 09:45AM | 13 | Jarrett Guy? |
| 09:45AM | 14 | A.  They would usually have a courier come pick up the money |
| 09:45AM | 15 | from me, occasionally I'd bring it to New York City. |
| 09:45AM | 16 | Q.  So a separate courier would come pick up the money? |
| 09:45AM | 17 | A.  Correct. |
| 09:45AM | 18 | Q.  How much time did you have to move your supply? |
| 09:45AM | 19 | A.  It never really took me long, so there really wasn't a |
| 09:45AM | 20 | set time limit. |
| 09:45AM | 21 | Q.  How would you let Jarrett Guy know when you were ready to |
| 09:45AM | 22 | make payment? |
| 09:45AM | 23 | A.  I would call him. |
| 09:45AM | 24 | Q.  Using a burner phone? |
| 09:45AM | 25 | A.  Correct. |

| | | |
|---|---|---|
| 09:45AM | 1 | Q.  How long did the methodology, the transport methodology |
| 09:46AM | 2 | continue like that where he was currying -- having a courier |
| 09:46AM | 3 | take the marijuana from New York City to you? |
| 09:46AM | 4 | A.  That continued, but there also, they brought in where |
| 09:46AM | 5 | they would shipments of mulch or, forget what they're called, |
| 09:46AM | 6 | pellets, like burning pellets, fuel pellets and they would |
| 09:46AM | 7 | put the marijuana in the packaging, and they would send it to |
| 09:46AM | 8 | a warehouse in Kean, New Jersey I believe it was. |
| 09:46AM | 9 | And then they would take a U-Haul truck and bring it to |
| 09:46AM | 10 | me.  And then eventually they would bring it in |
| 09:46AM | 11 | tractor-trailers over the border. |
| 09:46AM | 12 | Q.  Okay.  When did the -- so the New York City transports |
| 09:46AM | 13 | continued? |
| 09:46AM | 14 | A.  Yeah.  Like it was intermediate, where if that shipment |
| 09:46AM | 15 | wasn't in, they could get something else from someone else in |
| 09:46AM | 16 | New York City, they would bring that to me through just a |
| 09:47AM | 17 | regular courier. |
| 09:47AM | 18 | Q.  So describe in detail for the jury the Kean, New Jersey |
| 09:47AM | 19 | part of it.  I know you just mentioned it, but describe that |
| 09:47AM | 20 | portion. |
| 09:47AM | 21 | A.  So in Vancouver, they would package it in, like, big |
| 09:47AM | 22 | bales of mulch or fuel pellets.  And then it would come in |
| 09:47AM | 23 | boxes that were probably four feet by four feet, four feet |
| 09:47AM | 24 | high.  And then I'd have to unload them and take it out of |
| 09:47AM | 25 | the mulch and the pellets. |

USA v Bongiovanni - Serio - Tripi/Direct - 3/12/24

8

| | | |
|---|---|---|
| 09:47AM | 1 | Q.  Would you travel to New Jersey to pick up that truck? |
| 09:47AM | 2 | A.  No, they would drive it to me in a U-Haul. |
| 09:47AM | 3 | Q.  Were there times when Mark Falzone helped you unload the |
| 09:47AM | 4 | U-Haul trucks? |
| 09:47AM | 5 | A.  Yes. |
| 09:47AM | 6 | Q.  Who were some other people who helped you unload the |
| 09:47AM | 7 | U-Haul trucks of mulch or the pellets? |
| 09:48AM | 8 | A.  Mike Masecchia, Mike Moynihan, Jacob Martinez. |
| 09:48AM | 9 | Q.  And the U-Haul trucks, what different locations would you |
| 09:48AM | 10 | use to unload those, whether it be the mulch or the wood |
| 09:48AM | 11 | pellets? |
| 09:48AM | 12 | A.  Sometimes it would be at 82 Sycamore, or Mark's house at |
| 09:48AM | 13 | 377 Englewood, and my house at 697 Lebrun a few times. |
| 09:48AM | 14 | Q.  And describe how the -- with regard to the U-Haul trucks, |
| 09:48AM | 15 | describe how the marijuana would be -- the drugs would be |
| 09:48AM | 16 | secreted in those loads. |
| 09:48AM | 17 | A.  It would be wrapped in -- so you would cut the -- take |
| 09:48AM | 18 | the box off and then cut the plastic wrap, and the mulch |
| 09:48AM | 19 | would just fall apart. |
| 09:48AM | 20 | Q.  And what would be in the middle of the mulch? |
| 09:49AM | 21 | A.  It would be packages of marijuana. |
| 09:49AM | 22 | Q.  Now, describe the transport methodology when Jarrett Guy |
| 09:49AM | 23 | would send it from Vancouver using large tractor-trailer |
| 09:49AM | 24 | trucks. |
| 09:49AM | 25 | A.  They would, it would come over in a tractor-trailer.  And |

09:49AM    1    the back of the trailer would be empty, and they would take

09:49AM    2    off the back plate and hook a battery up to it, and the floor

09:49AM    3    would move up.  And it was under the floor boards.

09:49AM    4    Q.   Would those trucks come directly to Buffalo?

09:49AM    5    A.   Yes.

09:49AM    6    Q.   So there was like a hydraulic lift in the trailer of the

09:49AM    7    truck bed --

09:49AM    8    A.   Correct.

09:49AM    9    Q.   -- where the marijuana was secreted?

09:49AM   10    A.   Yes.

09:49AM   11    Q.   Was that, in your view, a tactic designed to avoid

09:49AM   12    detection at the border?

09:49AM   13    A.   Yeah, they said there was an anomaly with the x-ray

09:49AM   14    machine that they couldn't detect it.

09:49AM   15    Q.   How many of those large tractor-trailer trucks did you

09:49AM   16    have come in?

09:49AM   17    A.   Four.

09:49AM   18    Q.   How much marijuana was on each tractor-trailer truck?

09:49AM   19    A.   Between 2- and 300 pounds.

09:50AM   20    Q.   Each time?

09:50AM   21    A.   Each time.

09:50AM   22    Q.   On the U-Haul trucks, how much marijuana was in those

09:50AM   23    trucks?

09:50AM   24    A.   About 200 pounds.

09:50AM   25    Q.   Okay.  So the lowest amount for a shipment you ever got

09:50AM    1    from Jarrett Guy was the first 100-pound shipment; is that
09:50AM    2    right?
09:50AM    3    A.  There would be -- sometimes there would be just 50, but
09:50AM    4    that was here and there just to hold me over.
09:50AM    5    Q.  With regard to the tractor-trailer trucks that would come
09:50AM    6    in?
09:50AM    7    A.  Yes.
09:50AM    8    Q.  So, with the hydraulic lift, did Anthony Gerace ever help
09:50AM    9    you unload any of those?
09:50AM   10    A.  Yes, three times.
09:50AM   11    Q.  You said three occasions?
09:50AM   12    A.  Correct.
09:50AM   13    Q.  Describe how that came about, the first occasion.  If you
09:50AM   14    can just tell the jury what your conversation with Anthony
09:50AM   15    was and how he came to help you with those.
09:50AM   16    A.  Well, I told him that I needed a bay for the
09:50AM   17    tractor-trailer to back into.  And he had a kitchen cabinet
09:50AM   18    business where they had bays so we used his bay.
09:51AM   19    Q.  Where was his kitchen cabinet business?
09:51AM   20    A.  I believe it was on Aero Drive.
09:51AM   21    Q.  Is that like down the street from where his brother's
09:51AM   22    strip club, Pharaoh's, was?
09:51AM   23    A.  Yes.
09:51AM   24    Q.  Aero Drive is in Cheektowaga?
09:51AM   25    A.  Correct.

09:51AM    1    Q.  So describe that first truckload, what you and Anthony

09:51AM    2    did to unload it.

09:51AM    3    A.  Well, they did the hydraulic, and you put all the

09:51AM    4    marijuana in garbage bags and brought it to my house.

09:51AM    5    Q.  Back it up a little bit.  So how do you know that the

09:51AM    6    driver's coming on the truckload, how do you contact Anthony,

09:51AM    7    start from the beginning.

09:51AM    8    A.  Well, they would tell me that the truck was coming in, so

09:51AM    9    I was to be on call.  And then as soon as the truck got over

09:51AM   10    the border, Jarrett Guy would call me, and then I'd give him

09:51AM   11    the address, where to go.

09:51AM   12    Q.  You gave the address to Jarrett Guy?

09:51AM   13    A.  Yes.

09:51AM   14    Q.  And it's your understanding that he communicated the

09:51AM   15    address where you wanted delivery to the driver?

09:51AM   16    A.  Correct.

09:52AM   17    Q.  And with respect to the three Anthony helped up with, you

09:52AM   18    gave the address of his kitchen cabinet business?

09:52AM   19    A.  Correct.

09:52AM   20    Q.  So describe what happened after the truck arrived and

09:52AM   21    made it to that location on Aero Drive?

09:52AM   22    A.  They would back it up into the bay.  He would take the

09:52AM   23    back plate off, raise the floor, and then we'd take garbage

09:52AM   24    bags and take the marijuana out and put them in the garbage

09:52AM   25    bags, and then we'd transport it to my house.

| | | |
|---|---|---|
| 09:52AM | 1 | Q.  So how many vehicles did you have to fill with those |
| 09:52AM | 2 | garbage bags to transport to your house? |
| 09:52AM | 3 | A.  Two. |
| 09:52AM | 4 | Q.  Whose vehicles were they? |
| 09:52AM | 5 | A.  One was mine, one was Anthony's. |
| 09:52AM | 6 | Q.  And what vehicle were you driving? |
| 09:52AM | 7 | A.  Sometimes it would be a pickup truck or my Range Rover. |
| 09:52AM | 8 | And Anthony had I believe an Avalanche or a Tahoe. |
| 09:52AM | 9 | Q.  Between those two vehicles, you were able to transport |
| 09:52AM | 10 | all of the marijuana? |
| 09:52AM | 11 | A.  Yes. |
| 09:52AM | 12 | MR. TRIPI:  One moment, Your Honor. |
| 09:53AM | 13 | BY MR. TRIPI: |
| 09:53AM | 14 | Q.  What year do you think was the first time Anthony Gerace |
| 09:53AM | 15 | helped you unload? |
| 09:53AM | 16 | A.  I believe it was late 2015. |
| 09:53AM | 17 | Q.  And did the second and third times work the same way? |
| 09:53AM | 18 | A.  Yes. |
| 09:53AM | 19 | Q.  Did you use Anthony's business on Aero Drive again? |
| 09:53AM | 20 | A.  Correct. |
| 09:53AM | 21 | Q.  Did anyone else help the two of you unload the marijuana? |
| 09:53AM | 22 | A.  No. |
| 09:53AM | 23 | Q.  Now, during -- during this time period -- |
| 09:54AM | 24 | MR. TRIPI:  Just one moment, Your Honor. |
| | 25 | |

| | | |
|---|---|---|
| 09:54AM | 1 | **BY MR. TRIPI:** |
| 09:54AM | 2 | Q.  I'm going to hand up two exhibits, the first one is |
| 09:54AM | 3 | marked Government Exhibit 489A, the next is marked 489B, I'm |
| 09:54AM | 4 | going to ask you to look at those and look up at me when |
| 09:54AM | 5 | you're done. |
| 09:54AM | 6 | A.  Thank you. |
| 09:54AM | 7 | Q.  You're welcome. |
| 09:54AM | 8 |     Do you recognize exhibits 489A and B? |
| 09:54AM | 9 | A.  Yes. |
| 09:54AM | 10 | Q.  What do you recognize that to be? |
| 09:55AM | 11 | A.  That is the building that Anthony had his business at |
| 09:55AM | 12 | where we unloaded the marijuana. |
| 09:55AM | 13 | Q.  So that's the location that had the bays on Aero Drive? |
| 09:55AM | 14 | A.  Yes. |
| 09:55AM | 15 | Q.  Where you unloaded marijuana with Mr. Gerace three times? |
| 09:55AM | 16 | A.  Yes. |
| 09:55AM | 17 |     **MR. TRIPI:**  The government offers 489A and 489B, |
| 09:55AM | 18 | Your Honor. |
| 09:55AM | 19 |     **MR. MacKAY:**  No objection, Your Honor. |
| 09:55AM | 20 |     **THE COURT:**  They're received without objection. |
| 09:55AM | 21 |     **(GOV Exhibits 489A and B were received in evidence.)** |
| 09:55AM | 22 |     **MR. TRIPI:**  Ms. Champoux, if you could publish for |
| 09:55AM | 23 | the jury, first 489B. |
| 09:55AM | 24 |     Can we zoom in on just the photo part. |
| | 25 | |

USA v Bongiovanni - Serio - Tripi/Direct - 3/12/24

14

| | | |
|---|---|---|
| 09:55AM | 1 | **BY MR. TRIPI:** |
| 09:55AM | 2 | Q.  And describe for the jury what they're looking at there? |
| 09:55AM | 3 | A.  That is the building that Anthony Gerace had his business |
| 09:55AM | 4 | in. |
| 09:55AM | 5 | Q.  And that's a building on Aero Drive? |
| 09:55AM | 6 | A.  That is the front of it. |
| 09:55AM | 7 | Q.  Okay. |
| 09:55AM | 8 | **MR. TRIPI:**  And can we put up 489A.  Can we zoom in |
| 09:55AM | 9 | on the photo part. |
| 09:55AM | 10 | **BY MR. TRIPI:** |
| 09:56AM | 11 | Q.  Is this sort of an aerial view of that same business? |
| 09:56AM | 12 | A.  Yes. |
| 09:56AM | 13 | Q.  And using your finger, can you circle sort of where the |
| 09:56AM | 14 | loading docks are that the truck would back into. |
| 09:56AM | 15 | A.  It would be this one. |
| 09:56AM | 16 | **MR. TRIPI:**  Your Honor, may the record reflect the |
| 09:56AM | 17 | witness made a mark on the screen, there's what appears to be |
| 09:56AM | 18 | like a loading dock behind the building, closest to the grass |
| 09:56AM | 19 | part. |
| 09:56AM | 20 | **THE COURT:**  Yeah, just about dead center maybe a |
| 09:56AM | 21 | little bit towards the bottom a little bit towards the right, |
| 09:56AM | 22 | but pretty close to the center. |
| 09:56AM | 23 | **MR. TRIPI:**  Yes, thank you, Your Honor.  That's |
| 09:56AM | 24 | better. |
| 09:56AM | 25 | Ms. Champoux can we put those up next to one another |

09:56AM    1   briefly?  Okay.  We can take those down, thank you.

09:57AM    2          **BY MR. TRIPI:**

09:57AM    3   Q.  Speaking of Anthony Gerace, how did you first meet him?

09:57AM    4   A.  I started processing debt for him, he had a debt

09:57AM    5   collection agency.

09:57AM    6   Q.  What year was that?

09:57AM    7   A.  That was 2015, late, maybe 2014, '15, I'm not sure.

09:57AM    8   Q.  Obviously before he started letting you use his --

09:57AM    9   A.  Correct.

09:57AM   10   Q.  -- facility, correct?

09:57AM   11   A.  Yes.

09:57AM   12   Q.  And do you know Anthony Gerace's brother?

09:57AM   13   A.  I know of him.  I don't know him personally.

09:57AM   14   Q.  Have you ever met him?

09:57AM   15   A.  I met him once in a restaurant, and I was in a business

09:57AM   16   meeting and someone that I knew knew him.  And they just

09:57AM   17   introduced me, and I said how are you doing, and we went our

09:57AM   18   separate ways.

09:57AM   19   Q.  Who's Anthony's brother that you were introduced to?

09:57AM   20   A.  Peter Gerace.

09:57AM   21   Q.  After you started, after you met Anthony and you started

09:57AM   22   working with him in the debt collection part of your

09:58AM   23   business, did you go, did you negotiate with him to become

09:58AM   24   part of the marijuana distribution activities you were

09:58AM   25   involved in?

| | | |
|---|---|---|
| 09:58AM | 1 | A.  Yes. |
| 09:58AM | 2 | Q.  Is that in about 2015 you said? |
| 09:58AM | 3 | A.  Yes. |
| 09:58AM | 4 | Q.  Describe that initial negotiation to have him become part |
| 09:58AM | | of what you were involved in? |
| 09:58AM | 5 | |
| 09:58AM | 6 | A.  Basically, he also got marijuana and it was just if I |
| 09:58AM | 7 | needed something or he needed something, we helped each other |
| 09:58AM | 8 | out. |
| 09:58AM | 9 | Q.  Does that mean you would supply each other back and |
| 09:58AM | 10 | forth? |
| 09:58AM | 11 | A.  Correct. |
| 09:58AM | 12 | Q.  And you indicated that Anthony helped you unload on three |
| 09:58AM | 13 | occasions marijuana when you were getting in, what were you |
| 09:58AM | 14 | giving him in exchange for that service? |
| 09:58AM | 15 | A.  The first choice of whatever he wanted. |
| 09:58AM | 16 | Q.  What do you mean by that? |
| 09:58AM | 17 | A.  Because with marijuana you get different kinds and some |
| 09:58AM | 18 | people -- some are better than others.  So, when you get it, |
| 09:58AM | 19 | a lot of people like to see what's first so they have first |
| 09:58AM | 20 | choice of getting the better marijuana. |
| 09:58AM | 21 | Q.  And were you giving him any monetary compensation? |
| 09:58AM | 22 | A.  Well, I mean I was giving him $100 over cost, so I gave |
| 09:59AM | 23 | him a discounted price. |
| 09:59AM | 24 | Q.  So he got the better price for the marijuana? |
| 09:59AM | 25 | A.  Correct. |

USA v Bongiovanni - Serio - Tripi/Direct - 3/12/24

17

| | | |
|---|---|---|
| 09:59AM | 1 | Q. How many pounds was he taking of what you would get |
| 09:59AM | 2 | delivered? |
| 09:59AM | 3 | A. Would depend. Anywhere from ten to 30. Multiple times. |
| 09:59AM | 4 | Q. Okay. On times when you were in between shipments, were |
| 09:59AM | 5 | there times when you purchased pounds of marijuana from |
| 09:59AM | 6 | Anthony Gerace? |
| 09:59AM | 7 | A. Yes. |
| 09:59AM | 8 | Q. How many times do you think you did that? |
| 09:59AM | 9 | A. At least ten times. |
| 09:59AM | 10 | Q. And what was an average amount that you would get from |
| 09:59AM | 11 | him? |
| 09:59AM | 12 | A. Same thing. Probably 30 -- well, probably more, 30, 40 |
| 09:59AM | 13 | pounds at a time. |
| 09:59AM | 14 | Q. And did he tell you where his source of supply was from? |
| 09:59AM | 15 | A. It was coming from New York City. |
| 09:59AM | 16 | Q. Now, you also in the beginning indicated there were times |
| 10:00AM | 17 | when you were still traveling back and forth to New York City |
| 10:00AM | 18 | to obtain marijuana? |
| 10:00AM | 19 | A. Yes. |
| 10:00AM | 20 | Q. Did different people go with you at different times? |
| 10:00AM | 21 | A. Yes. |
| 10:00AM | 22 | Q. Give the jury the roster of different people who would |
| 10:00AM | 23 | travel with you to New York City to obtain marijuana. |
| 10:00AM | 24 | A. Mike Masecchia, Matt LoTempio, John Robinson, Mario |
| 10:00AM | 25 | Vacanti, Matt LoTempio, Mark Falzone and Anthony. |

USA v Bongiovanni - Serio - Tripi/Direct - 3/12/24

18

| | | |
|---|---|---|
| 10:00AM | 1 | Q.  And on the initial road trip, did Lauren Fina and Adrian |
| 10:01AM | 2 | Fina go? |
| 10:01AM | 3 | A.  Yes. |
| 10:01AM | 4 | Q.  And you mentioned Anthony Gerace? |
| 10:01AM | 5 | A.  Yes. |
| 10:01AM | 6 | Q.  How many times did Mike Masecchia go with you to New York |
| 10:01AM | 7 | City? |
| 10:01AM | 8 | A.  I don't know exact number, but more than five. |
| 10:01AM | 9 | Q.  As an estimate? |
| 10:01AM | 10 | A.  Yes. |
| 10:01AM | 11 | Q.  How many times did Falzone go with you? |
| 10:01AM | 12 | A.  I think he didn't go often, so less than five. |
| 10:01AM | 13 | Q.  How many times would you estimate Mike Moynihan went with |
| 10:01AM | 14 | you? |
| 10:01AM | 15 | A.  Probably ten times. |
| 10:01AM | 16 | Q.  How many times would you estimate John Robinson went with |
| 10:01AM | 17 | you? |
| 10:01AM | 18 | A.  Less than five. |
| 10:01AM | 19 | Q.  How many times would you estimate your wife, Lauren, and |
| 10:01AM | 20 | her sister, Adrian, went with you? |
| 10:01AM | 21 | A.  Well, Adrian only a couple times, but sometimes if I had |
| 10:01AM | 22 | to go talk to somewhere or drop money, she would come with |
| 10:02AM | 23 | me, I never had her driving the car with the drugs in it. |
| 10:02AM | 24 | Q.  Who is the she? |
| 10:02AM | 25 | A.  Lauren Fina. |

10:02AM   1   Q.   How many times did she go with you?

10:02AM   2   A.   She went twice.

10:02AM   3   Q.   How many times did Mario Vacanti go with you?

10:02AM   4   A.   More than five times.

10:02AM   5   Q.   Was there a -- was there a strategy or a -- a plan for

10:02AM   6   how you would travel there and back when you would go with

10:02AM   7   other people?

10:02AM   8   A.   Yes, whoever was driving, someone would drive behind so

10:02AM   9   if there was a cop to kind of distract the cop if you were

10:02AM   10   about to get pulled over.

10:02AM   11   Q.   What do you mean by that, can you describe that in a

10:02AM   12   little more clarity for the jury?

10:02AM   13   A.   Say I'm driving the marijuana, there's a car that's gonna

10:02AM   14   follow right behind me, so if there is a cop, the cop can't

10:02AM   15   get behind and then if it looks like, you know, they might

10:02AM   16   just do something purposely to get pulled over to distract

10:02AM   17   the cop.

10:02AM   18   Q.   And that was discussed and agreed upon before these

10:03AM   19   trips, people understood --

10:03AM   20   A.   Correct.

10:03AM   21   Q.   -- what their role was?

10:03AM   22   A.   Yes.

10:03AM   23   Q.   Now at some point, I think you referenced it near the

10:03AM   24   beginning of your testimony, but in the shipments of the

10:03AM   25   mulch and the wood pellets, so that would be we're talking

USA v Bongiovanni - Serio - Tripi/Direct - 3/12/24

20

| 10:03AM | 1 | about the U-Haul trucks, right? |
| 10:03AM | 2 | A.   Yes. |
| 10:03AM | 3 | Q.   In those shipments, eventually did Jarrett Guy start |
| 10:03AM | 4 | supplying you with additional drugs other than the marijuana? |
| 10:03AM | 5 | A.   Fentanyl pills. |
| 10:03AM | 6 | Q.   And what did those look like? |
| 10:03AM | 7 | A.   They were little round green pills that had the Oxy 80 |
| 10:03AM | 8 | stamp on it because they were fake.  They were supposed to |
| 10:03AM | 9 | look like Oxy 80s. |
| 10:03AM | 10 | Q.   And how did it come to be where you started getting those |
| 10:03AM | 11 | from him? |
| 10:03AM | 12 | A.   He sent and shipment of it to see if I could get rid of |
| 10:03AM | 13 | that.  And I did that.  I mean, I used those drugs, so I |
| 10:04AM | 14 | wound up getting them because I was using a lot of them. |
| 10:04AM | 15 | Q.   Okay, so what year did you start getting the fentanyl |
| 10:04AM | 16 | pills? |
| 10:04AM | 17 | A.   It was around 2015.  But it wasn't consistent with that |
| 10:04AM | 18 | though. |
| 10:04AM | 19 | Q.   Okay.  And I think yesterday you said you used a lot of |
| 10:04AM | 20 | them or most of them and maybe sold 25 percent of them? |
| 10:04AM | 21 | A.   Correct, yes. |
| 10:04AM | 22 | Q.   Who were some of the people who would take those to |
| 10:04AM | 23 | redistribute from you? |
| 10:04AM | 24 | A.   Well, they're more users. |
| 10:04AM | 25 | Q.   Who are some of the people? |

USA v Bongiovanni - Serio - Tripi/Direct - 3/12/24

10:04AM   1   A.   Jake Martinez and Anthony Greco, and -- well, Anthony

10:04AM   2   Gerace, too, he was a user.

10:04AM   3   Q.   Now, this is a name that was mentioned yesterday but I'd

10:04AM   4   like to go into more detail today.

10:04AM   5        Are you familiar with a person Mark Vitale?

10:05AM   6   A.   Yes.

10:05AM   7   Q.   And who was that?

10:05AM   8   A.   That was Adrian's -- Adrian Fina's friend's brother.

10:05AM   9   Q.   And were you supplying him marijuana?

10:05AM  10   A.   Through Adrian and then eventually John Robinson was.

10:05AM  11   Q.   Okay.  And did there come a point in time in 2015 when

10:05AM  12   you learned that the Town of Tonawanda Police Department

10:05AM  13   executed a search warrant at Mark Vitale's residence and he

10:05AM  14   was arrested?

10:05AM  15   A.   Yes.

10:05AM  16   Q.   How did you learn about that information?

10:05AM  17   A.   I believe through Adrian Fina.

10:05AM  18   Q.   And Adrian Fina was connected to who at the time?

10:05AM  19   A.   John Robinson.

10:05AM  20   Q.   Were they dating?

10:05AM  21   A.   Yes.

10:05AM  22   Q.   Were they living together?

10:06AM  23   A.   Yes.

10:06AM  24   Q.   After Adrian Fina brought it to your attention, did

10:06AM  25   you -- did you look into the matter at all?

10:06AM    1    A.  Well, I talked to Mike about it and he said everything's

10:06AM    2    fine.

10:06AM    3    Q.  Okay.  Let's break that down a little bit.

10:06AM    4    A.  Okay.

10:06AM    5    Q.  When you said you talked to Mike, who's the Mike you're

10:06AM    6    referencing?

10:06AM    7    A.  Mike Masecchia.

10:06AM    8    Q.  And did you talk to Masecchia in person or over the

10:06AM    9    phone?

10:06AM   10    A.  In person.

10:06AM   11    Q.  Where was that discussion?

10:06AM   12    A.  I believe that was at his house.

10:06AM   13    Q.  Where is that?

10:06AM   14    A.  125 Huntington Court.

10:06AM   15    Q.  And describe that discussion to the jury and to the best

10:06AM   16    of your recollection.

10:06AM   17    A.  Well I just said that someone that I dealt with -- well,

10:06AM   18    not specifically dealt with, someone that I dealt with that

10:06AM   19    dealt with the person got arrested, and for him to check out

10:06AM   20    to see if everything's okay.

10:06AM   21    Q.  When were you asking Masecchia to check it out, what was

10:06AM   22    your intent?

10:06AM   23    A.  Just to see if Mark Vitale mentioned my name.

10:07AM   24    Q.  And what was your understanding about how Masecchia would

10:07AM   25    find out?

10:07AM   1   A.   He would talk to Lou Selva, that would talk to Joseph

10:07AM   2   Bongiovanni.

10:07AM   3   Q.   And after you had that conversation with Masecchia, did

10:07AM   4   some time go by?

10:07AM   5   A.   Yes.

10:07AM   6   Q.   How much time went by?

10:07AM   7   A.   Couple days.

10:07AM   8   Q.   After that, did you follow up with Masecchia on the topic

10:07AM   9   of Vitale?

10:07AM   10   A.   Yes.

10:07AM   11   Q.   Describe that for the jury.

10:07AM   12   A.   He just said everything's fine.

10:07AM   13   Q.   Masecchia told you that?

10:07AM   14   A.   Yes.

10:07AM   15   Q.   Now, while you and Anthony Gerace were involved supplying

10:08AM   16   each other with marijuana and he was helping you in the ways

10:08AM   17   that you've already described, did you also go out together?

10:08AM   18   A.   Yes.

10:08AM   19   Q.   Did you use those fentanyl pills together at times?

10:08AM   20   A.   Yes.

10:08AM   21   Q.   Did you use cocaine together at times?

10:08AM   22   A.   Yes.

10:08AM   23   Q.   On an occasion when you -- when you were using cocaine

10:08AM   24   with him, did Anthony Gerace mention the name David Oddo to

10:08AM   25   you?

USA v Bongiovanni - Serio - Tripi/Direct - 3/12/24

24

10:08AM   1   A.   Yes.

10:08AM   2   Q.   What did he say about David Oddo when you used cocaine?

10:08AM   3   A.   He said he's got the best cocaine around.

10:08AM   4   Q.   And based on that, what was your understanding of David

10:08AM   5   Oddo's relationship with Anthony Gerace?

10:08AM   6   A.   That he would sell Anthony cocaine.

10:08AM   7   Q.   Is that Oddo or Oddo, O-D-D-O, the last name?

10:08AM   8   A.   Yes, I believe so.

10:08AM   9   Q.   Was there an occasion where you went to Pharaoh's with

10:09AM  10   Anthony Gerace?

10:09AM  11   A.   Yes, one time.

10:09AM  12   Q.   One time?

10:09AM  13   A.   Yes.

10:09AM  14   Q.   What were you and he doing that night?

10:09AM  15   A.   Just hanging out when we were doing drugs.

10:09AM  16   Q.   What drugs did you use that night?

10:09AM  17   A.   I believe it was heroin.

10:09AM  18   Q.   And where did you use the heroin?

10:09AM  19   A.   In the bathroom.

10:09AM  20   Q.   At where?

10:09AM  21   A.   At Pharaoh's.

10:09AM  22   Q.   Did you and Anthony both use?

10:09AM  23   A.   Yes, sir.

10:09AM  24   Q.   How were you using the heroin, was it intravenously or

10:09AM  25   was it being sniffed?

USA v Bongiovanni - Serio - Tripi/Direct - 3/12/24

25

10:09AM   1   A.   Sniffed.

10:09AM   2   Q.   So, heroin was a drug that eventually the opiate use, you

10:09AM   3   moved into using heroin?

10:09AM   4   A.   Yes.

10:09AM   5   Q.   Now, was that a drug that you also sold?

10:09AM   6   A.   To people if I had it, and someone wanted it, I would

10:09AM   7   sell it.

10:09AM   8   Q.   Is that a drug that you advertised selling?

10:09AM   9   A.   No.

10:09AM   10   Q.   Okay.  So, if you knew somebody who wanted heroin, you

10:10AM   11   could hook it up, but it wasn't something you were looking to

10:10AM   12   do; is that a fair summary?

10:10AM   13   A.   Yes.

10:10AM   14   Q.   As time went on, did Anthony Gerace have a key code to

10:10AM   15   your house on Lebrun?

10:10AM   16   A.   Yes, he did.

10:10AM   17   Q.   For people who are close to you, did you give that, the

10:10AM   18   door codes out?

10:10AM   19   A.   Yes.

10:10AM   20   Q.   Why did you do that?

10:10AM   21   A.   It was more towards 2016 where I was using a lot of

10:10AM   22   drugs, and I was also gambling a lot, so sometimes I wouldn't

10:10AM   23   be around.  And if someone wanted something, I'd just go say

10:10AM   24   go in my house and get it.

10:10AM   25   Q.   And those would be people close to you?

USA v Bongiovanni - Serio - Tripi/Direct - 3/12/24

26

10:10AM   1   A.   Yes, very close.

10:10AM   2   Q.   And those people, like Anthony Gerace, would know where

10:10AM   3   to go in your house to get the drugs they wanted?

10:11AM   4   A.   Yes.

10:11AM   5   Q.   Did you know whether or not Anthony Gerace was friends

10:11AM   6   with the defendant, Bongiovanni?

10:11AM   7   A.   He never specifically told me, but eventually I heard

10:11AM   8   that he was.

10:11AM   9   Q.   What about -- what about Anthony Gerace's brother?  Did

10:11AM   10  you have an understanding of whether he was friends with the

10:11AM   11  defendant?

10:11AM   12  A.   That, I didn't know.

10:11AM   13  Q.   When you were in social situations or when you would be

10:11AM   14  out and around, did you ever hear Anthony brag about his

10:11AM   15  family connections?

10:11AM   16  A.   Yes.

10:11AM   17  Q.   When he would brag about that, what did you understand

10:11AM   18  him to be referencing?

10:11AM   19  A.   To his uncle, Joe Todaro.

10:11AM   20  Q.   Is that a reference to his family being some sort of

10:11AM   21  Organized Crime?

10:11AM   22  A.   Yes.

10:12AM   23  Q.   I'd like to direct your attention to the day of your

10:12AM   24  arrest now?

10:12AM   25  A.   Yes.

10:12AM    1    Q.  April 18th, 2017, okay?

10:12AM    2        I think earlier in your testimony yesterday, you

10:12AM    3    indicated that you -- that day you went to Kelly Brace's

10:12AM    4    house at 370 Huntington?

10:12AM    5    A.  Yes.

10:12AM    6    Q.  To commence a drug deal?

10:12AM    7    A.  Yes.

10:12AM    8    Q.  Kelly Brace was someone you had been selling marijuana to

10:12AM    9    for a while?

10:12AM   10    A.  Yes.

10:12AM   11    Q.  And that's the morning that you were arrested in his

10:12AM   12    kitchen, correct?

10:12AM   13    A.  Correct.

10:12AM   14    Q.  Later that day, were several of your residences searched?

10:12AM   15    A.  Yes.

10:12AM   16    Q.  That included 697 Lebrun, 91 Grimsby?

10:12AM   17    A.  Correct.

10:12AM   18    Q.  Your Range Rover was searched?

10:12AM   19    A.  Correct.

10:13AM   20        **MR. TRIPI:**  Just a moment, please, Your Honor.

10:13AM   21        **BY MR. TRIPI:**

10:13AM   22    Q.  I'm going to hand you up exhibits that have been marked,

10:13AM   23    Exhibits 41A-1 through 41A-13.  Inclusive, okay?

10:13AM   24    A.  Okay.

10:13AM   25    Q.  Take a moment and look through these.

| | | |
|---|---|---|
| 10:14AM | 1 | Do you recognize Government Exhibit 41A-1 through 41A-13 |
| 10:14AM | 2 | inclusive? |
| 10:14AM | 3 | A.  I know it was Kelly Brace's house, I recognize the |
| 10:14AM | 4 | marijuana.  Some of the other stuff, it wasn't my house so I |
| 10:14AM | 5 | don't know. |
| 10:15AM | 6 | Q.  Let's try 41A-1, 2, 3, and 13.  Just look at those.  Do |
| 10:15AM | 7 | you recognize those? |
| 10:15AM | 8 | A.  Yes. |
| 10:15AM | 9 | Q.  Do 41A-1, 2, 3 and 13 all fairly and accurately depict |
| 10:15AM | 10 | marijuana as well as your vehicle at Kelly Brace's house on |
| 10:15AM | 11 | the morning or the afternoon of April 18th, 2017, prior to |
| 10:15AM | 12 | your arrest? |
| 10:15AM | 13 | A.  Yes. |
| 10:15AM | 14 | MR. TRIPI:  Your Honor, the government offers |
| 10:15AM | 15 | Exhibit 41A-1, 2, 3 and 13 into evidence. |
| 10:15AM | 16 | MR. MacKAY:  Joe, can I see those. |
| 10:15AM | 17 | MR. TRIPI:  Yeah, sure. |
| 10:16AM | 18 | MR. MacKAY:  No objection, Your Honor. |
| 10:16AM | 19 | THE COURT:  They're received without objection. |
| 10:16AM | 20 | **(GOV Exhibits 41A-1, 2, 3 and 13 were received in evidence.)** |
| 10:16AM | 21 | MR. TRIPI:  Thank you. |
| 10:16AM | 22 | Ms. Champoux, can we publish 41A-1, please. |
| 10:16AM | 23 | BY MR. TRIPI: |
| 10:16AM | 24 | Q.  And can you tell the jury what we're looking at here, |
| 10:16AM | 25 | Mr. Serio? |

10:16AM   1    A.   It is the backyard of Kelly Brace's house and on the left

10:16AM   2    Kelly Brace's vehicle and on the right my vehicle.

10:16AM   3    Q.   So yours is the black Range Rover on the right?

10:16AM   4    A.   Correct.

10:16AM   5    Q.   And in the background, we see Kelly Brace's garage?

10:16AM   6    A.   Correct.

10:16AM   7    Q.   And can you, before we move to the next photo, can you

10:16AM   8    describe how you had the marijuana packaged that you brought

10:17AM   9    over to Mr. Brace?

10:17AM  10    A.   In vacuumed-sealed bags, all the vacuumed-sealed bags in

10:17AM  11    a garbage bag.

10:17AM  12    Q.   Was it a black garbage bag?

10:17AM  13    A.   Yes.

10:17AM  14         MR. TRIPI:   Can we publish Exhibit 41A-2.

10:17AM  15         BY MR. TRIPI:

10:17AM  16    Q.   And can you tell the jury what they're looking at there?

10:17AM  17    A.   Garbage bag full of marijuana.

10:17AM  18    Q.   Is that situated in Mr. Brace's garage?

10:17AM  19    A.   Yes.

10:17AM  20    Q.   Is that the marijuana that you brought over that day?

10:17AM  21    A.   Yes.

10:17AM  22         MR. TRIPI:   And can we publish Exhibit 41A-3.

10:17AM  23         BY MR. TRIPI:

10:17AM  24    Q.   And is that a look inside that black bag of marijuana?

10:17AM  25    A.   Yes.

| | | |
|---|---|---|
| 10:17AM | 1 | Q.  So these are -- each of those are pre-packaged one-pound |
| 10:17AM | 2 | packages? |
| 10:17AM | 3 | A.  Correct. |
| 10:17AM | 4 | **MR. TRIPI:**  And can we show -- just put up next to |
| 10:17AM | 5 | that 41A-13. |
| 10:18AM | 6 | **BY MR. TRIPI:** |
| 10:18AM | 7 | Q.  So a couple of views of looking inside the bag? |
| 10:18AM | 8 | A.  Yes. |
| 10:18AM | 9 | Q.  Okay.  Now next, there were searches that occurred at |
| 10:18AM | 10 | your house at 697 Lebrun; is that correct? |
| 10:18AM | 11 | **MR. TRIPI:**  You can take those down Ms. Champoux. |
| 10:18AM | 12 | **THE WITNESS:**  Correct. |
| 10:18AM | 13 | **MR. TRIPI:**  One moment, Your Honor. |
| 10:18AM | 14 | **BY MR. TRIPI:** |
| 10:19AM | 15 | Q.  Mr. Serio, I'm going to hand you up next Government |
| 10:19AM | 16 | Exhibit 42A-1 through 42A-32.  I'll hand them over to the |
| 10:19AM | 17 | defense before I do that. |
| 10:21AM | 18 | **MR. TRIPI:**  Okay.  I'm handing up Exhibits 41A-1 |
| 10:21AM | 19 | through 32 to Mr. Serio. |
| 10:21AM | 20 | **BY MR. TRIPI:** |
| 10:22AM | 21 | Q.  Did you review each of those exhibits, Mr. Serio? |
| 10:23AM | 22 | A.  Yes. |
| 10:23AM | 23 | Q.  Did you recognize them? |
| 10:23AM | 24 | A.  Yes. |
| 10:23AM | 25 | Q.  What do you recognize them to be? |

USA v Bongiovanni - Serio - Tripi/Direct - 3/12/24

10:23AM    1    A.  Various drugs inside my house.

10:23AM    2    Q.  So they're photographs from inside your house the day of

10:23AM    3    the search?

10:23AM    4    A.  Correct.

10:23AM    5    Q.  And did they all fairly and accurately depict portions of

10:23AM    6    the inside of your residence and items that you had inside

10:23AM    7    your residence --

10:23AM    8    A.  Yeah.

10:23AM    9    Q.  -- that day?

10:23AM   10    A.  Yes.

10:23AM   11         MR. TRIPI:  The government offers Exhibits 42A-1

10:23AM   12    through 42A-32 inclusive, Your Honor.

10:23AM   13         MR. MacKAY:  No objection to that batch, Your Honor.

10:23AM   14         THE COURT:  They are all received without objection.

10:23AM   15         MR. TRIPI:  Thank you, Your Honor.

10:23AM   16    **(GOV Exhibits 42A-1 through 42A-32 were received in evidence.)**

10:23AM   17         MR. TRIPI:  Ms. Champoux, can we publish those for

10:24AM   18    the jury beginning with 42A-1, please.

10:24AM   19         BY MR. TRIPI:

10:24AM   20    Q.  Is this some ammunition that you had in your house?

10:24AM   21    A.  Yes.

10:24AM   22    Q.  Let's go to 42A-2.  Tell the jury what we're looking at

10:24AM   23    here?

10:24AM   24    A.  My foyer closet with looks to be a bag with probably

10:24AM   25    marijuana in it.

10:24AM   1   Q.  And those black bags, those black garbage bags you see in

10:24AM   2   that photo, is that what you typically used to put pounds of

10:24AM   3   marijuana in?

10:24AM   4   A.  Correct.

10:24AM   5        MR. TRIPI:  Let's go to 42A-3.

10:24AM   6        BY MR. TRIPI:

10:24AM   7   Q.  What's that?

10:24AM   8   A.  That's an AR-15 rifle.

10:24AM   9   Q.  And is that something you had under your mattress?

10:24AM   10  A.  Yes.

10:24AM   11  Q.  Is that loaded?

10:24AM   12  A.  That was.  I had a -- there's a clip in it.  I don't

10:24AM   13  think there was bullets in it, though.  I'm not sure.

10:25AM   14  Q.  That firearm formed part of your guilty plea?

10:25AM   15  A.  Yes.

10:25AM   16        MR. TRIPI:  Go to 42A-4, please.

10:25AM   17        BY MR. TRIPI:

10:25AM   18  Q.  Is that a close-up of some of the particulars of the

10:25AM   19  firearm?

10:25AM   20  A.  Yes.

10:25AM   21        MR. TRIPI:  Let's go to 42A-5, please.

10:25AM   22        BY MR. TRIPI:

10:25AM   23  Q.  Tell the jury what they're looking at in that photo?

10:25AM   24  A.  Bag of marijuana in my laundry room.

10:25AM   25        MR. TRIPI:  Let's go to 42A-6, please.

10:25AM  1          **BY MR. TRIPI:**

10:25AM  2   Q.  And is that a look inside that bag?

10:25AM  3   A.  Marijuana.

10:25AM  4          **MR. TRIPI:**  Let's go to 42A-7, please.

10:25AM  5          **BY MR. TRIPI:**

10:25AM  6   Q.  Is this another view inside that front foyer room?

10:25AM  7   A.  Correct.

10:25AM  8          **MR. TRIPI:**  Let's go to 42A-8, please.

10:25AM  9          **BY MR. TRIPI:**

10:25AM  10  Q.  Is this a look inside one of the bags in that front foyer

10:25AM  11  room?

10:25AM  12  A.  Correct.

10:25AM  13  Q.  What's in there?

10:25AM  14  A.  Marijuana.

10:25AM  15         **MR. TRIPI:**  Let's go to 42A-9, please.

10:26AM  16         **BY MR. TRIPI:**

10:26AM  17  Q.  Tell the jury what they're looking at there?

10:26AM  18  A.  Empty marijuana bags.

10:26AM  19  Q.  How would you get those empty marijuana bags, tell the

10:26AM  20  jury what you would do?

10:26AM  21  A.  Sometimes I would have to repackage a marijuana bag, if I

10:26AM  22  had to add a lesser-grade marijuana in it, I would put it in

10:26AM  23  there to kind of get rid of something I couldn't get rid of.

10:26AM  24         **MR. TRIPI:**  Let's go to 42A-10, please.  That looks

10:26AM  25  like a blurry photo.  So we'll go over to 42A-11.

| | | |
|---|---|---|
| 10:26AM | 1 | **BY MR. TRIPI:** |
| 10:26AM | 2 | Q.  Tell the jury what they're looking at there. |
| 10:26AM | 3 | A.  Packages of marijuana in my kitchen. |
| 10:26AM | 4 | Q.  And the marijuana, are those -- those tan brick-looking |
| 10:26AM | 5 | packages? |
| 10:26AM | 6 | A.  Correct. |
| 10:26AM | 7 | Q.  Let's go to 42A-12, please.  Tell the jury what they're |
| 10:26AM | 8 | looking at there? |
| 10:26AM | 9 | A.  Looks like ammunition. |
| 10:26AM | 10 | **MR. TRIPI:**  Let's go to 42A-13. |
| 10:26AM | 11 | **BY MR. TRIPI:** |
| 10:26AM | 12 | Q.  What's the jury looking at there? |
| 10:26AM | 13 | A.  A scale. |
| 10:26AM | 14 | Q.  What would you use the scales for? |
| 10:26AM | 15 | A.  To measure marijuana. |
| 10:27AM | 16 | Q.  With regard to the firearm, is generally drug dealing a |
| 10:27AM | 17 | dangerous business? |
| 10:27AM | 18 | A.  Yes. |
| 10:27AM | 19 | Q.  Is that why you had a firearm? |
| 10:27AM | 20 | A.  Yes. |
| 10:27AM | 21 | **MR. TRIPI:**  Let's go to 42A-14, please. |
| 10:27AM | 22 | **BY MR. TRIPI:** |
| 10:27AM | 23 | Q.  And tell the jury what they're looking at there? |
| 10:27AM | 24 | A.  Money counter. |
| 10:27AM | 25 | Q.  And where did you have that inside your house? |

| | | |
|---|---|---|
| 10:27AM | 1 | A.  Probably my kitchen cabinet. |
| 10:27AM | 2 | Q.  Okay.  And what did you need a money counter for? |
| 10:27AM | 3 | A.  To count money. |
| 10:27AM | 4 | MR. TRIPI:  Let's go to 42A-15, please. |
| 10:27AM | 5 | BY MR. TRIPI: |
| 10:27AM | 6 | Q.  Tell the jury what they're looking at there. |
| 10:27AM | 7 | A.  Various pills. |
| 10:27AM | 8 | Q.  Let's start from left to right, go across.  So I just |
| 10:27AM | 9 | orient you where we're starting, okay, tell the jury what |
| 10:27AM | 10 | those are. |
| 10:27AM | 11 | A.  By looking at them, I really can't tell, but they're -- I |
| 10:27AM | 12 | know they're various types of opiates.  The only ones that I |
| 10:27AM | 13 | can recognize are all the way to the right in the package and |
| 10:28AM | 14 | in the pill bottle, those are methadone, I can tell by the |
| 10:28AM | 15 | shape.  And I had a lot of those, because if I didn't have |
| 10:28AM | 16 | opiates, I always had a lot of that on hand. |
| 10:28AM | 17 | Q.  Are these different types of pills that you had on hand |
| 10:28AM | 18 | for your use because you were using opiates? |
| 10:28AM | 19 | A.  Yes. |
| 10:28AM | 20 | Q.  We'll go back to that in a moment. |
| 10:28AM | 21 | MR. TRIPI:  Let's go to 42A-16, please. |
| 10:28AM | 22 | BY MR. TRIPI: |
| 10:28AM | 23 | Q.  Tell the jury what they're looking at in this photo. |
| 10:28AM | 24 | A.  Looks like bags of marijuana, it's hard to tell. |
| 10:28AM | 25 | Q.  What's liveGfree?  What is that product? |

10:28AM    1    A.  Some kind of food, probably.

10:28AM    2    Q.  Okay.  Plant food?

10:28AM    3    A.  No, like eating food.

10:28AM    4    Q.  Oh, okay.

10:28AM    5            **MR. TRIPI:**  Let's go to 42A-17.

10:28AM    6            **BY MR. TRIPI:**

10:28AM    7    Q.  Tell the jury what they're looking at there.

10:29AM    8    A.  It looks like various pills.

10:29AM    9    Q.  And what were the various types of pills you had in your

10:29AM   10    house?

10:29AM   11    A.  Morphine, OxyContin, oxycodone, fentanyl pills,

10:29AM   12    methadone, I would have Suboxone sometimes, Adderall.

10:29AM   13            **MR. TRIPI:**  Let's go to 42A-18.

10:29AM   14            **BY MR. TRIPI:**

10:29AM   15    Q.  Does that depict more ammunition?

10:29AM   16    A.  Correct.

10:29AM   17            **MR. TRIPI:**  Let's go to 42A-19, please.

10:29AM   18            **BY MR. TRIPI:**

10:29AM   19    Q.  More ammunition?

10:29AM   20    A.  Correct.

10:29AM   21            **MR. TRIPI:**  Let's go to 42A-20, please.

10:29AM   22            **BY MR. TRIPI:**

10:29AM   23    Q.  Tell the jury what they're looking at there.

10:29AM   24    A.  Empty bags of marijuana.

10:29AM   25    Q.  So after you would cut into marijuana, those are the

| | | |
|---|---|---|
| 10:29AM | 1 | garbage basically? |
| 10:29AM | 2 | A.  Correct. |
| 10:29AM | 3 | Q.  Packaging the marijuana was in, is that right? |
| 10:29AM | 4 | A.  Yes. |
| 10:29AM | 5 | Q.  Okay. |
| 10:29AM | 6 | MR. TRIPI:  Let's go to 42A-21, please. |
| 10:29AM | 7 | BY MR. TRIPI: |
| 10:30AM | 8 | Q.  Tell the jury what they're looking at there. |
| 10:30AM | 9 | A.  A plate with cocaine and marijuana residue on it. |
| 10:30AM | 10 | Q.  Okay.  And before you used the cocaine, would you put it |
| 10:30AM | 11 | out on a plate like that? |
| 10:30AM | 12 | A.  Yes. |
| 10:30AM | 13 | Q.  And why would there also be marijuana on that residue on |
| 10:30AM | 14 | that plate? |
| 10:30AM | 15 | A.  It was messy.  They didn't clean it, maybe rolled a |
| 10:30AM | 16 | joint. |
| 10:30AM | 17 | Q.  So on occasion, you still smoked marijuana? |
| 10:30AM | 18 | A.  Very rarely, but I did. |
| 10:30AM | 19 | MR. TRIPI:  Let's go to 42A-22. |
| 10:30AM | 20 | BY MR. TRIPI: |
| 10:30AM | 21 | Q.  Are those more empty packages from the marijuana |
| 10:30AM | 22 | packaging? |
| 10:30AM | 23 | A.  Correct. |
| 10:30AM | 24 | MR. TRIPI:  Let's go to 42A-23. |
| | 25 | |

10:30AM 1        **BY MR. TRIPI:**

10:30AM 2   Q.  And tell the jury what they're looking at there.

10:30AM 3   A.  Ammunition and a scope for the rifle.

10:30AM 4   Q.  And your Seneca Niagara casino card?

10:31AM 5   A.  Correct.

10:31AM 6        **MR. TRIPI:**  Let's go to 42A-24.

10:31AM 7        **BY MR. TRIPI:**

10:31AM 8   Q.  Tell the jury what they're looking at here.

10:31AM 9   A.  Looks like marijuana maybe on the bottom, empty bags on

10:31AM 10  the top.

10:31AM 11  Q.  And is this in a different part of your house?

10:31AM 12  A.  My basement.

10:31AM 13  Q.  Is that where you would store much of the marijuana at

10:31AM 14  your house?

10:31AM 15  A.  Yes.

10:31AM 16       **MR. TRIPI:**  Let's go to 42A-25.

10:31AM 17       **BY MR. TRIPI:**

10:31AM 18  Q.  Tell the jury what they're looking at here.

10:31AM 19  A.  That's an air filter.

10:31AM 20  Q.  And at a certain point, did you have a marijuana grow

10:31AM 21  actually in your own basement there?

10:31AM 22  A.  Yeah, one time.

10:31AM 23  Q.  And what year was that?

10:31AM 24  A.  I would say 2015.

10:31AM 25  Q.  And describe what the air -- what that -- describe the

10:31AM   1    setup that you had and what everything was for.

10:31AM   2    A.  Well, the air filter would keep the smell from going

10:31AM   3    throughout the house.

10:31AM   4    Q.  Okay.  And how did you have it set up down there?

10:32AM   5    A.  I had lights hanging from the rafters.

10:32AM   6    Q.  How many plants did you have growing?

10:32AM   7    A.  I think I had six lights, there were 12 plants per light.

10:32AM   8    So 86, so 76.

10:32AM   9    Q.  So you kept it under a hundred?

10:32AM   10   A.  Because you couldn't fit that much down there.

10:32AM   11          **MR. TRIPI:**  Okay.  Let's go to 42A-26.

10:32AM   12          **BY MR. TRIPI:**

10:32AM   13   Q.  Tell the jury what they're looking at there.

10:32AM   14   A.  That's the -- what you plug the lights into.

10:32AM   15   Q.  So this piece of equipment --

10:32AM   16   A.  It's a timer.

10:32AM   17   Q.  This was part of the grow operation?

10:32AM   18   A.  Correct.

10:32AM   19   Q.  And what do you mean, that's a timer?

10:32AM   20   A.  Well, when you grow marijuana, you've gotta have either

10:32AM   21   18 hours on, six hours off.  And then during budding, 12

10:32AM   22   hours on, 12 hours off.  That was the timer that would

10:32AM   23   regulate the lights.

10:32AM   24   Q.  So you didn't have to go and switch the lights on and

10:32AM   25   off, you had it on a timer?

| | | |
|---|---|---|
| 10:33AM | 1 | A.  Correct. |
| 10:33AM | 2 | MR. TRIPI:  Let's go to 42A-27. |
| 10:33AM | 3 | BY MR. TRIPI: |
| 10:33AM | 4 | Q.  And what is this? |
| 10:33AM | 5 | A.  That's my basement.  And that's the room that I had the |
| 10:33AM | 6 | marijuana grow in. |
| 10:33AM | 7 | Q.  So you'd go through that opening through the door, and in |
| 10:33AM | 8 | that part is where the plants were? |
| 10:33AM | 9 | A.  Correct. |
| 10:33AM | 10 | MR. TRIPI:  Okay.  Let's go to 42A-28. |
| 10:33AM | 11 | BY MR. TRIPI: |
| 10:33AM | 12 | Q.  Is this more empty packaging that marijuana was in? |
| 10:33AM | 13 | A.  Yes. |
| 10:33AM | 14 | MR. TRIPI:  All right.  Let's go to 42A-29. |
| 10:33AM | 15 | BY MR. TRIPI: |
| 10:33AM | 16 | Q.  Is that a round of shotgun ammunition? |
| 10:33AM | 17 | A.  Correct. |
| 10:33AM | 18 | MR. TRIPI:  Let's go to 42A-30. |
| 10:33AM | 19 | BY MR. TRIPI: |
| 10:33AM | 20 | Q.  Tell the jury what they're looking at there. |
| 10:33AM | 21 | A.  It was a key holder for properties that I owned, or once |
| 10:33AM | 22 | owned. |
| 10:33AM | 23 | MR. TRIPI:  Okay.  Let's go to 42A-31. |
| 10:34AM | 24 | BY MR. TRIPI: |
| 10:34AM | 25 | Q.  More marijuana packaging material? |

| | | |
|---|---|---|
| 10:34AM | 1 | A.  Yes. |
| 10:34AM | 2 | Q.  I should say empty? |
| 10:34AM | 3 | A.  Yes. |
| 10:34AM | 4 | **MR. TRIPI:**  Let's go to 42A-32, please. |
| 10:34AM | 5 | **BY MR. TRIPI:** |
| 10:34AM | 6 | Q.  Is this another picture of that same key holder that we |
| 10:34AM | 7 | saw a moment ago? |
| 10:34AM | 8 | A.  Correct. |
| 10:34AM | 9 | Q.  Okay. |
| 10:34AM | 10 | **MR. TRIPI:**  Ms. Champoux, if you can bring back up |
| 10:34AM | 11 | 42A-15, please. |
| 10:36AM | 12 | Judge, I don't think we have an objection, but I'll |
| 10:36AM | 13 | show these to the witness. |
| 10:36AM | 14 | **BY MR. TRIPI:** |
| 10:36AM | 15 | Q.  Handing up Government Exhibit 55, 56, 57, and 58.  Take a |
| 10:36AM | 16 | look at these for a moment. |
| 10:37AM | 17 | I think I handed up 54, 55, 56, 57, and 58. |
| 10:37AM | 18 | Mr. Serio, did you recognize what was in each of those |
| 10:37AM | 19 | bags, Exhibit 54, 55, 56, 57, and 58? |
| 10:37AM | 20 | A.  Mostly, the pink ones.  I'm not sure.  They're some form |
| 10:37AM | 21 | of opiate, and one of the other little baggies some -- |
| 10:37AM | 22 | Q.  I'm not asking you exactly what type of drug they are -- |
| 10:37AM | 23 | A.  Oh, okay. |
| 10:38AM | 24 | Q.  -- I'm asking you if they're the drugs from your house. |
| 10:38AM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 10:38AM | 1 | Q.  Each one of those exhibits? |
| 10:38AM | 2 | A.  Yes. |
| 10:38AM | 3 | Q.  Sorry if I was unclear. |
| 10:38AM | 4 | **MR. TRIPI:**  So, Judge, with that, we offer Exhibits |
| 10:38AM | 5 | 54 through 58 into evidence. |
| 10:38AM | 6 | **MR. MacKAY:**  No objection, Your Honor. |
| 10:38AM | 7 | **THE COURT:**  Received without objection. |
| 10:38AM | 8 | **(GOV Exhibits 54 - 58 were received in evidence.)** |
| 10:38AM | 9 | **MR. TRIPI:**  I'll hold them up as best I can for the |
| 10:38AM | 10 | jury, Your Honor. |
| 10:39AM | 11 | May the record reflect I've published Exhibits 54 |
| 10:39AM | 12 | through 58 for the jury. |
| 10:39AM | 13 | Ms. Champoux, can we pull up Exhibit 42A-2, I |
| 10:39AM | 14 | believe. |
| 10:40AM | 15 | **BY MR. TRIPI:** |
| 10:40AM | 16 | Q.  Mr. Serio, I'm handing you up Exhibit 53. |
| 10:40AM | 17 | A.  Yes. |
| 10:40AM | 18 | Q.  Mr. Serio, did you have a chance to look at Exhibit 53? |
| 10:40AM | 19 | A.  Yes. |
| 10:40AM | 20 | Q.  And does that consist of marijuana and a black garbage |
| 10:40AM | 21 | bag that's consistent with the photo in 42A-2? |
| 10:40AM | 22 | A.  Yes. |
| 10:40AM | 23 | Q.  This is items that were recovered from your house? |
| 10:40AM | 24 | A.  Correct. |
| 10:40AM | 25 | **MR. TRIPI:**  The government offers Exhibit 53, |

10:40AM   1   Your Honor.

10:40AM   2           **MR. MacKAY:**  No objection, Your Honor.

10:40AM   3           **THE COURT:**  Received without objection.

10:40AM   4           **(GOV Exhibit 53 was received in evidence.)**

10:40AM   5           **MR. TRIPI:**  I'll publish it for the jury as best I

10:40AM   6   can.

10:41AM   7           Ms. Champoux, can we go to 42A-7 and A-8, side by

10:41AM   8   side.

10:41AM   9           **BY MR. TRIPI:**

10:41AM   10  Q.  That's that same front closet that we looked at where

10:41AM   11  that marijuana was located?

10:41AM   12  A.  Correct.

10:41AM   13  Q.  Now, another location of yours that was searched that day

10:42AM   14  was at your property at Grimsby; is that correct?

10:42AM   15  A.  Correct.

10:42AM   16  Q.  Now, at this point in time, you were also spending time

10:42AM   17  sleeping at 91 Grimsby?

10:42AM   18  A.  Yes.

10:42AM   19  Q.  Tell the jury why you were sort of splitting time?

10:42AM   20  A.  Because me and my wife broke up, and the guy she was with

10:42AM   21  was someone that I dealt with, and I didn't trust them, so I

10:42AM   22  started staying there also.

10:42AM   23  Q.  Did you start keeping some of your drugs and --

10:42AM   24  A.  Yes.

10:42AM   25  Q.  -- other valuables at Grimsby?

| | | |
|---|---|---|
| 10:42AM | 1 | A.  Yes. |
| 10:42AM | 2 | Q.  Now, and I'm sorry to bring it up, but just for clarity's |
| 10:42AM | 3 | sake, was the person who your wife was with someone who used |
| 10:42AM | 4 | to be part of your organization? |
| 10:42AM | 5 | A.  Yes. |
| 10:42AM | 6 | Q.  Who was that? |
| 10:42AM | 7 | A.  Mario Vacanti. |
| 10:42AM | 8 | Q.  Okay.  So when did you split up with your wife, and when |
| 10:42AM | 9 | did they get together, just in terms of the timeline. |
| 10:42AM | 10 | A.  June 2016. |
| 10:42AM | 11 | Q.  So this is probably into the following year after you had |
| 10:42AM | 12 | alerted Mario to the fact that he was being investigated? |
| 10:43AM | 13 | A.  Correct. |
| 10:43AM | 14 | Q.  All right.  We're going to move on to the Grimsby |
| 10:43AM | 15 | property now. |
| 10:43AM | 16 | **MR. TRIPI:**  This is going to take a moment, |
| 10:43AM | 17 | Your Honor, but it's 43A-1 through 99.  It's up to you if you |
| 10:43AM | 18 | want to take a bathroom break while he flips through these, we |
| 10:43AM | 19 | can do that, it's up to you Judge, or we can keep going. |
| 10:43AM | 20 | **THE COURT:**  Yeah, why don't we do that. |
| 10:43AM | 21 | **MR. TRIPI:**  I can have him look through these during |
| 10:43AM | 22 | the break. |
| 10:43AM | 23 | **THE COURT:**  Yeah, why don't we take a break rather |
| 10:43AM | 24 | than waste the jury's time. |
| 10:43AM | 25 | Remember my instructions about not talking to anyone |

| | | |
|---|---|---|
| 10:43AM | 1 | including each other about the case, and not making up your |
| 10:43AM | 2 | mind. |
| 10:43AM | 3 | We'll see you back here in ten or 15 minutes. |
| 10:43AM | 4 | (Jury excused at 10:43 a.m.) |
| 10:44AM | 5 | **THE COURT:**  Okay.  Anything we need to put on the |
| 10:44AM | 6 | record? |
| 10:44AM | 7 | **MR. TRIPI:**  No, with the Court's permission, unless |
| 10:44AM | 8 | he needs a bathroom break, I'd like the witness to just look |
| 10:44AM | 9 | through the photo during the break. |
| 10:44AM | 10 | **THE COURT:**  Yeah, I think even if he does need a |
| 10:44AM | 11 | bathroom break, he can still look through them. |
| 10:44AM | 12 | **MR. TRIPI:**  That's right. |
| 10:44AM | 13 | **THE COURT:**  Anything else? |
| 10:44AM | 14 | **MR. MacKAY:**  Nothing from us, Judge. |
| 10:44AM | 15 | **THE COURT:**  Okay.  Great.  We'll see you folks in a |
| 10:44AM | 16 | few minutes. |
| 10:44AM | 17 | **THE CLERK:**  All rise. |
| 10:44AM | 18 | (Off the record at 10:44 a.m.) |
| 10:57AM | 19 | (Back on the record at 10:57 a.m.) |
| 10:57AM | 20 | (Jury not present.) |
| 10:57AM | 21 | **THE CLERK:**  We are back on the record for the |
| 10:57AM | 22 | continuation of the jury trial in case number 19-cr-227, |
| 10:57AM | 23 | United States of America versus Joseph Bongiovanni. |
| 10:57AM | 24 | All counsel and parties are present. |
| 10:57AM | 25 | **THE COURT:**  Are we ready to go? |

| | | |
|---|---|---|
| 10:57AM | 1 | **MR. TRIPI:**  Yes, Judge, thank you. |
| 10:57AM | 2 | **MR. MacKAY:**  We are, Your Honor. |
| 10:57AM | 3 | **THE COURT:**  And how much longer do you think you |
| 10:58AM | 4 | have, Mr. Tripi? |
| 10:58AM | 5 | **MR. TRIPI:**  I want to be accurate here, Judge, as |
| 10:58AM | 6 | best I can.  I have to go through Grimsby, a little bit of |
| 10:58AM | 7 | stuff with his phone.  I probably have another 30 to 40 |
| 10:58AM | 8 | minutes. |
| 10:58AM | 9 | **THE COURT:**  Okay. |
| 10:58AM | 10 | **MR. TRIPI:**  Yeah. |
| 10:58AM | 11 | **THE COURT:**  Okay.  We'll go right into the cross, and |
| 10:58AM | 12 | break whenever you want to break.  Who's gonna cross? |
| 10:58AM | 13 | **MR. MacKAY:**  I am. |
| 10:58AM | 14 | **THE COURT:**  So we'll break whenever you want to |
| 10:58AM | 15 | break.  Okay?  Let's bring them back, Pat, please. |
| 10:59AM | 16 | (Jury seated at 10:59 a.m.) |
| 10:59AM | 17 | **THE COURT:**  The record will reflect that all our |
| 10:59AM | 18 | jurors, again, are present. |
| 10:59AM | 19 | I remind the witness that he's still under oath. |
| 10:59AM | 20 | Mr. Tripi you may continue. |
| 10:59AM | 21 | **MR. TRIPI:**  Thank you, Your Honor. |
| 10:59AM | 22 | **BY MR. TRIPI:** |
| 10:59AM | 23 | Q.  Mr. Serio, have you had an opportunity to review |
| 11:00AM | 24 | Government Exhibits marked 43A-1 through 43A-99 for |
| 11:00AM | 25 | identification? |

| | | |
|---|---|---|
| 11:00AM | 1 | A.  Yes. |
| 11:00AM | 2 | Q.  Do those all fairly and accurately depict your residence |
| 11:00AM | 3 | and the items you had inside the residence at 91 Grimsby, |
| 11:00AM | 4 | Kenmore, New York, on April 18th, 2017? |
| 11:00AM | 5 | A.  Yes. |
| 11:00AM | 6 | Q.  As well as your black Range Rover that was impounded that |
| 11:00AM | 7 | day? |
| 11:00AM | 8 | A.  Yes. |
| 11:00AM | 9 | **MR. TRIPI:**  The government offers Exhibits 43A-1 |
| 11:00AM | 10 | through 43A-99, Your Honor. |
| 11:00AM | 11 | **MR. MacKAY:**  No objection, Your Honor. |
| 11:00AM | 12 | **THE COURT:**  They are received without objection. |
| 11:00AM | 13 | **(GOV Exhibits 43A-1 - 43A-99 were received in evidence.)** |
| 11:00AM | 14 | **MR. TRIPI:**  Ms. Champoux, can we begin at 43A-1, |
| 11:00AM | 15 | please. |
| 11:00AM | 16 | **BY MR. TRIPI:** |
| 11:00AM | 17 | Q.  And Mr. Serio, can you tell the jury what they're looking |
| 11:00AM | 18 | at in this photo? |
| 11:00AM | 19 | A.  Packaged marijuana. |
| 11:00AM | 20 | Q.  And the marijuana is that tan package underneath the gray |
| 11:00AM | 21 | bag there? |
| 11:00AM | 22 | A.  Correct. |
| 11:00AM | 23 | **MR. TRIPI:**  Can we go to 43A-2, please? |
| 11:01AM | 24 | **BY MR. TRIPI:** |
| 11:01AM | 25 | Q.  Tell the jury what they're looking at in that photo. |

| | | |
|---|---|---|
| 11:01AM | 1 | A.  Packaged marijuana. |
| 11:01AM | 2 | **MR. TRIPI:**  Can we go to 42 -- 43A-3, please. |
| 11:01AM | 3 | **BY MR. TRIPI:** |
| 11:01AM | 4 | Q.  Tell the jury what they're looking at there. |
| 11:01AM | 5 | A.  Sandwich bags. |
| 11:01AM | 6 | Q.  Would you use those at all in the dealing? |
| 11:01AM | 7 | A.  Nah, I think that's just for food. |
| 11:01AM | 8 | Q.  Okay.  Sometimes you can use them for dealing, right? |
| 11:01AM | 9 | A.  Yeah. |
| 11:01AM | 10 | **MR. TRIPI:**  Okay.  43A-4, can we show that one? |
| 11:01AM | 11 | **BY MR. TRIPI:** |
| 11:01AM | 12 | Q.  More food bags? |
| 11:01AM | 13 | A.  Correct. |
| 11:01AM | 14 | **MR. TRIPI:**  All right.  43A-5, please.  We'll go to |
| 11:01AM | 15 | 43A-6. |
| 11:01AM | 16 | **BY MR. TRIPI:** |
| 11:01AM | 17 | Q.  And can you tell the jury what's depicted there? |
| 11:01AM | 18 | A.  Cleaning supplies, and it looks like maybe a scale in |
| 11:01AM | 19 | that bucket. |
| 11:01AM | 20 | Q.  And the scale in the bucket, what's that used for? |
| 11:01AM | 21 | A.  To weigh marijuana. |
| 11:02AM | 22 | Q.  Would you weigh other drugs, too? |
| 11:02AM | 23 | A.  Yeah, cocaine and heroin. |
| 11:02AM | 24 | **MR. TRIPI:**  Will you go to 43A-7, please? |
| | 25 | |

| | | |
|---|---|---|
| 11:02AM | 1 | **BY MR. TRIPI:** |
| 11:02AM | 2 | Q.  And what is that? |
| 11:02AM | 3 | A.  Empty package of marijuana. |
| 11:02AM | 4 | **MR. TRIPI:**  Can we go to 43A-8, please? |
| 11:02AM | 5 | **BY MR. TRIPI:** |
| 11:02AM | 6 | Q.  Is that a closer view of the scale that was inside the |
| 11:02AM | 7 | bucket under the sink? |
| 11:02AM | 8 | A.  Correct. |
| 11:02AM | 9 | **MR. TRIPI:**  Can we go to 43A-9, please? |
| 11:02AM | 10 | **BY MR. TRIPI:** |
| 11:02AM | 11 | Q.  Tell the jury what they're looking at there. |
| 11:02AM | 12 | A.  A vacuum sealer. |
| 11:02AM | 13 | Q.  And it says FoodSaver on that.  Would you use that for |
| 11:02AM | 14 | food?  Or would you use that to package drugs? |
| 11:02AM | 15 | A.  Package marijuana. |
| 11:02AM | 16 | **MR. TRIPI:**  Okay.  Go to 43A-10, please. |
| 11:02AM | 17 | **BY MR. TRIPI:** |
| 11:02AM | 18 | Q.  Tell the jury what they're looking at there. |
| 11:02AM | 19 | A.  Adderall and cocaine. |
| 11:02AM | 20 | Q.  Circle on the screen, if you could, the cocaine for the |
| 11:02AM | 21 | jury. |
| 11:02AM | 22 | And is that a distribution amount of cocaine? |
| 11:02AM | 23 | A.  Yep. |
| 11:02AM | 24 | Q.  Approximately how much is there? |
| 11:02AM | 25 | A.  I think it was, like, 5 ounces. |

11:03AM    1   Q.  And the Adderall are those orange-looking pills?

11:03AM    2   A.  Correct.

11:03AM    3           **THE COURT:**  The record should reflect that he circled

11:03AM    4   a white substance toward the left side of the photo, I'm

11:03AM    5   sorry, the right side of the photo.

11:03AM    6           **MR. TRIPI:**  Thank you, Your Honor.

11:03AM    7           Can we go to 43A-11, Ms. Champoux?

11:03AM    8           **BY MR. TRIPI:**

11:03AM    9   Q.  And we're looking at that same shelf, but now there's

11:03AM   10   another prescription there?

11:03AM   11   A.  Yes.

11:03AM   12   Q.  What is that one?

11:03AM   13   A.  Also Adderall.

11:03AM   14   Q.  Okay.  Just different looking pills in there?

11:03AM   15   A.  Yes.

11:03AM   16           **MR. TRIPI:**  43A-12, please.

11:03AM   17           **BY MR. TRIPI:**

11:03AM   18   Q.  Is that a close-up of the Adderall pills we saw a moment

11:03AM   19   ago?

11:03AM   20   A.  Correct.

11:03AM   21           **MR. TRIPI:**  Let's go to 43A-13, please.

11:03AM   22           And we'll go to 43A-14.

11:04AM   23           **BY MR. TRIPI:**

11:04AM   24   Q.  Is this one a close-up photo of the cocaine that you

11:04AM   25   circled a moment ago?

| | | |
|---|---|---|
| 11:04AM | 1 | A.  Correct. |
| 11:04AM | 2 | **MR. TRIPI:**  Let's go to 43A-15. |
| 11:04AM | 3 | **BY MR. TRIPI:** |
| 11:04AM | 4 | Q.  Describe for the jury what's in there, principally, on |
| 11:04AM | 5 | that second shelf. |
| 11:04AM | 6 | A.  Vacuum sealer for marijuana, and marijuana in the |
| 11:04AM | 7 | package. |
| 11:04AM | 8 | **MR. TRIPI:**  Let's go to 43A-16, please. |
| 11:04AM | 9 | 43A-17 please. |
| 11:04AM | 10 | **BY MR. TRIPI:** |
| 11:04AM | 11 | Q.  And can you tell the jury what they're looking at there? |
| 11:04AM | 12 | A.  It looks like marijuana. |
| 11:04AM | 13 | **MR. TRIPI:**  Can we go to 43A-18, please? |
| 11:04AM | 14 | **BY MR. TRIPI:** |
| 11:04AM | 15 | Q.  Is that a close-up of the marijuana that we saw a moment |
| 11:04AM | 16 | ago? |
| 11:04AM | 17 | A.  Correct. |
| 11:04AM | 18 | **MR. TRIPI:**  Let's go to 43A-19, please. |
| 11:05AM | 19 | **BY MR. TRIPI:** |
| 11:05AM | 20 | Q.  Is that Mark Falzone's address? |
| 11:05AM | 21 | A.  Correct. |
| 11:05AM | 22 | Q.  That's the address where you had one of the deliveries |
| 11:05AM | 23 | from Jarrett Guy? |
| 11:05AM | 24 | A.  Yes. |
| 11:05AM | 25 | **MR. TRIPI:**  Let's go to 43A-20. |

| | | |
|---|---|---|
| 11:05AM | 1 | **BY MR. TRIPI:** |
| 11:05AM | 2 | Q.  And is this a look inside one of the bags of marijuana? |
| 11:05AM | 3 | A.  Correct. |
| 11:05AM | 4 | **MR. TRIPI:**  Let's go to 43A-21, please. |
| 11:05AM | 5 | We'll go to 43A-22. |
| 11:05AM | 6 | **BY MR. TRIPI:** |
| 11:05AM | 7 | Q.  Tell the jury what that is. |
| 11:05AM | 8 | A.  Those are the fentanyl pills. |
| 11:05AM | 9 | **MR. TRIPI:**  Could you zoom in on those, just the pill |
| 11:05AM | 10 | portion? |
| 11:05AM | 11 | **BY MR. TRIPI:** |
| 11:05AM | 12 | Q.  So are those green round pills that are made to look like |
| 11:05AM | 13 | OxyContin? |
| 11:05AM | 14 | A.  Correct. |
| 11:05AM | 15 | Q.  Those are fentanyl? |
| 11:05AM | 16 | A.  Yes. |
| 11:05AM | 17 | **MR. TRIPI:**  Go to 43A-23. |
| 11:06AM | 18 | **BY MR. TRIPI:** |
| 11:06AM | 19 | Q.  Are those just documents that link you to the residence? |
| 11:06AM | 20 | A.  Yes. |
| 11:06AM | 21 | **MR. TRIPI:**  Let's go to 43A-24. |
| 11:06AM | 22 | Let's go to 43A-25. |
| 11:06AM | 23 | **BY MR. TRIPI:** |
| 11:06AM | 24 | Q.  Who was Sheila Anderson, do you know? |
| 11:06AM | 25 | A.  That's my brother's girlfriend. |

| | | |
|---|---|---|
| 11:06AM | 1 | Q.  So she had some National Grid in her name? |
| 11:06AM | 2 | A.  Correct. |
| 11:06AM | 3 | **MR. TRIPI:**  Let's go to 43A-26. |
| 11:06AM | 4 | Let's go to 43A-27. |
| 11:06AM | 5 | **BY MR. TRIPI:** |
| 11:06AM | 6 | Q.  Another document has your address -- your name and |
| 11:06AM | 7 | address at 697 Lebrun, but this was located in 91 Grimsby? |
| 11:06AM | 8 | A.  Correct. |
| 11:06AM | 9 | **MR. TRIPI:**  Let's go to 43A-28. |
| 11:06AM | 10 | **BY MR. TRIPI:** |
| 11:07AM | 11 | Q.  What's the jury looking at there? |
| 11:07AM | 12 | A.  More bills in my name. |
| 11:07AM | 13 | Q.  And those bills have your address at 697 Lebrun? |
| 11:07AM | 14 | A.  Correct. |
| 11:07AM | 15 | Q.  So were you taking your mail over to Grimsby? |
| 11:07AM | 16 | A.  Yes. |
| 11:07AM | 17 | **MR. TRIPI:**  Let's go to 43A-29. |
| 11:07AM | 18 | Let's go to 43A-30. |
| 11:07AM | 19 | **BY MR. TRIPI:** |
| 11:07AM | 20 | Q.  You had an account at Northwest Bank in your name? |
| 11:07AM | 21 | A.  Yes. |
| 11:07AM | 22 | **MR. TRIPI:**  Let's go to 43A-31. |
| 11:07AM | 23 | 43A-32. |
| 11:07AM | 24 | Let's go to 43A-33. |
| | 25 | |

11:07AM   1          **BY MR. TRIPI:**

11:07AM   2   Q.  Is this some kind of receipt for payment?

11:07AM   3   A.  Yes.

11:07AM   4   Q.  Do you know what that is for?

11:07AM   5   A.  I believe that's land I bought in Franklinville.

11:08AM   6   Q.  So you purchased some property in Franklinville?

11:08AM   7   A.  Correct.

11:08AM   8   Q.  What were you going to do with that property?

11:08AM   9   A.  I was going to grow marijuana there.

11:08AM   10  Q.  Did you ever get that up and running?

11:08AM   11  A.  I did once.

11:08AM   12  Q.  What season?

11:08AM   13  A.  2015, I believe.  Oh, actually it was 2016.

11:08AM   14  Q.  2016?

11:08AM   15  A.  Yeah, summer of 2016.

11:08AM   16  Q.  And this receipt is dated May 9, 2016?

11:08AM   17  A.  Yes, I was making payments to the guy.

11:08AM   18          **MR. TRIPI:**  Let's go to 43A-34.

11:08AM   19          **BY MR. TRIPI:**

11:08AM   20  Q.  More paperwork in your name?

11:08AM   21  A.  Yes.

11:08AM   22          **MR. TRIPI:**  Let's go to 43A-35.

11:08AM   23          43A-36.

11:08AM   24          **BY MR. TRIPI:**

11:08AM   25  Q.  What's that a photo of?

11:08AM    1    A.  Of people that owed me money.

11:09AM    2    Q.  Keeping track?

11:09AM    3    A.  Yes.

11:09AM    4          MR. TRIPI:  Let's go to 43A-37.

11:09AM    5          Sometimes the government's like an old lawnmower,

11:09AM    6    Judge, they don't start.

11:09AM    7          THE CLERK:  What's going on?

11:09AM    8          MR. TRIPI:  We unplugged, and we're plugging back in.

11:09AM    9          THE CLERK:  Okay.

11:10AM   10          MR. TRIPI:  I can switch to the lamp.

11:10AM   11          THE COURT:  In the old days we'd just whack things

11:10AM   12    when they didn't work, now we plug them and unplug them.

11:10AM   13          MR. TRIPI:  I'm not much more advanced than that,

11:10AM   14    Judge.

11:10AM   15          All right.  We're back up and running.  43A-37.

11:10AM   16          BY MR. TRIPI:

11:10AM   17    Q.  Is this part of your tax information?

11:10AM   18    A.  Correct.

11:10AM   19    Q.  Did you file jointly for that year?

11:10AM   20    A.  Yes.

11:10AM   21          MR. TRIPI:  Just zoom in on the upper right-hand part

11:10AM   22    with the dollar amount.

11:10AM   23          BY MR. TRIPI:

11:11AM   24    Q.  What were you claiming as your adjusted gross income for

11:11AM   25    that tax year?

| | | |
|---|---|---|
| 11:11AM | 1 | A.  It was 1.2 million. |
| 11:11AM | 2 | **MR. TRIPI:**  Can we go to 43A-38? |
| 11:11AM | 3 | **BY MR. TRIPI:** |
| 11:11AM | 4 | Q.  Now that 1.2 million, that didn't include any money you |
| 11:11AM | 5 | made selling drugs, right? |
| 11:11AM | 6 | A.  No. |
| 11:11AM | 7 | **MR. TRIPI:**  Let's go to 43A-38. |
| 11:11AM | 8 | **BY MR. TRIPI:** |
| 11:11AM | 9 | Q.  Is this a close-up view of the cocaine we saw earlier? |
| 11:11AM | 10 | A.  Yes. |
| 11:11AM | 11 | **MR. TRIPI:**  Let's go to 43A-39, please. |
| 11:11AM | 12 | **BY MR. TRIPI:** |
| 11:11AM | 13 | Q.  Is that a drawer in the house that had another scale? |
| 11:11AM | 14 | A.  Yes. |
| 11:11AM | 15 | **MR. TRIPI:**  Let's go to 43A-40, please. |
| 11:11AM | 16 | **BY MR. TRIPI:** |
| 11:11AM | 17 | Q.  Tell the jury what they're looking at in this photo. |
| 11:11AM | 18 | A.  Marijuana seeds. |
| 11:11AM | 19 | Q.  And where would -- where -- what kind of seeds are those? |
| 11:11AM | 20 | A.  They're auto seeds. |
| 11:12AM | 21 | Q.  Where do you get them from? |
| 11:12AM | 22 | A.  Canada. |
| 11:12AM | 23 | Q.  How do you use those seeds? |
| 11:12AM | 24 | A.  You just plant them in the ground and you grow them. |
| 11:12AM | 25 | Q.  What do you mean by auto seeds, I guess? |

11:12AM   1    A.  'Cuz typically, growing marijuana, you gotta plant it in

11:12AM   2    June, and then it matures at the end of October, beginning to

11:12AM   3    end of October.  But what this does, it doesn't need the

11:12AM   4    light cycle.  So you plant it, and then by August it's

11:12AM   5    finished.

11:12AM   6    Q.  So this is a type of seed that allows you to grow faster?

11:12AM   7    A.  Faster, correct.

11:12AM   8    Q.  Could you get more grows out of a grow season with those

11:12AM   9    seeds?

11:12AM  10    A.  Not really.  It's just more so, I mean, you get less

11:12AM  11    marijuana, but it's just the longer it goes, the better

11:12AM  12    opportunity you have to get caught.  And the longer it goes

11:12AM  13    in the season, it becomes moldy and dark.  So you get less

11:12AM  14    money for it.

11:12AM  15    Q.  Did you use those auto seeds outdoors or indoors or both?

11:12AM  16    A.  Outdoors only.

11:12AM  17    Q.  Only?

11:12AM  18    A.  Yes.

11:12AM  19         **MR. TRIPI:**  Let's go to 43A-41, please.

11:13AM  20         **BY MR. TRIPI:**

11:13AM  21    Q.  Is that a photo of some baking soda?

11:13AM  22    A.  Yes.

11:13AM  23    Q.  Now sometimes that's used by people to cut drugs; is that

11:13AM  24    right?

11:13AM  25    A.  Only if you cook cocaine.  Because if you snort that,

| | | |
|---|---|---|
| 11:13AM | 1 | you'd throw up. |
| 11:13AM | 2 | Q.  So you weren't using -- you weren't selling crack, were |
| 11:13AM | 3 | you? |
| 11:13AM | 4 | A.  No. |
| 11:13AM | 5 | **MR. TRIPI:**  Let's go to 43A-42. |
| 11:13AM | 6 | 43A-43. |
| 11:13AM | 7 | **BY MR. TRIPI:** |
| 11:13AM | 8 | Q.  Is this a photo of some ammunition that was in one of the |
| 11:13AM | 9 | drawers? |
| 11:13AM | 10 | A.  Yes. |
| 11:13AM | 11 | **MR. TRIPI:**  Let's go to 43A-44. |
| 11:13AM | 12 | **BY MR. TRIPI:** |
| 11:13AM | 13 | Q.  And a little hard to see, but what's the jury looking at |
| 11:13AM | 14 | there? |
| 11:13AM | 15 | A.  A black garbage bag. |
| 11:13AM | 16 | Q.  Is there any marijuana in that, do you recall? |
| 11:13AM | 17 | A.  I would imagine so.  That's the only reason I would have |
| 11:13AM | 18 | a black bag hanging around. |
| 11:13AM | 19 | **MR. TRIPI:**  Okay.  Let's go to 43A-45. |
| 11:13AM | 20 | **BY MR. TRIPI:** |
| 11:14AM | 21 | Q.  Is that a better look inside that bag? |
| 11:14AM | 22 | A.  Yes. |
| 11:14AM | 23 | **MR. TRIPI:**  Let's go to 43A-46. |
| 11:14AM | 24 | **BY MR. TRIPI:** |
| 11:14AM | 25 | Q.  Is that a further look inside the black bag? |

11:14AM      1    A.   Yes.

11:14AM      2    Q.   Are those 1-pound packages of marijuana?

11:14AM      3    A.   I believe those ones might be 2 pounds, I'm not sure

11:14AM      4    though.

11:14AM      5          **MR. TRIPI:**  Let's go to 43A-dash -- withdrawn.

11:14AM      6          **BY MR. TRIPI:**

11:14AM      7    Q.   When you would get the 2-pound packages, you would break

11:14AM      8    them back down into 1-pound packages?

11:14AM      9    A.   Correct.

11:14AM     10    Q.   Is that why you had some of the packaging material and

11:14AM     11    the FoodSaver to reseal?

11:14AM     12    A.   Yes, one of the reasons.

11:14AM     13    Q.   Okay.

11:14AM     14          **MR. TRIPI:**  Let's go to 43A-47.

11:14AM     15          **BY MR. TRIPI:**

11:14AM     16    Q.   What part of the residence is this now?

11:14AM     17    A.   That's the garage.

11:14AM     18    Q.   Did you have more marijuana in the garage area?

11:14AM     19    A.   Yes.

11:14AM     20          **MR. TRIPI:**  Let's go to 43A-48, please.

11:14AM     21          **BY MR. TRIPI:**

11:14AM     22    Q.   Now, this house you weren't fully moved in, were you?

11:14AM     23    A.   No.

11:15AM     24          **MR. TRIPI:**  Let's go to 43A- -- I guess I can't see

11:15AM     25    that number, Ms. Champoux.  Let's go to the next one in the

| | | |
|---|---|---|
| 11:15AM | 1 | sequence. |
| 11:15AM | 2 |     Okay.  That's 43A-48. |
| 11:15AM | 3 |     Let's go to 43A-49, please. |
| 11:15AM | 4 | **BY MR. TRIPI:** |
| 11:15AM | 5 | Q.  Now, that's -- that's a U-Haul box? |
| 11:15AM | 6 | A.  Correct. |
| 11:15AM | 7 | Q.  Describe how those -- just remind the jury how U-Haul |
| 11:15AM | 8 | boxes were used in the context of the operation? |
| 11:15AM | 9 | A.  I would put the marijuana in there instead of -- it was |
| 11:15AM | 10 | cheaper than duffle bags.  And you can't really walk outside |
| 11:15AM | 11 | with a black garbage bag all the time. |
| 11:15AM | 12 | Q.  Did other people that you were working with use U-Haul |
| 11:15AM | 13 | boxes like that, too? |
| 11:15AM | 14 | A.  Yes. |
| 11:15AM | 15 | Q.  Who else did? |
| 11:15AM | 16 | A.  Anthony Gerace. |
| 11:15AM | 17 | **MR. TRIPI:**  Let's go to 43A-50. |
| 11:16AM | 18 |     Let's go to 43A-51, please. |
| 11:16AM | 19 |     Let's go to 43A-52, please. |
| 11:16AM | 20 | **BY MR. TRIPI:** |
| 11:16AM | 21 | Q.  Is this basically just showing some of your clothes that |
| 11:16AM | 22 | were in the closet -- |
| 11:16AM | 23 | A.  Correct. |
| 11:16AM | 24 | Q.  -- demonstrating that you were staying there? |
| 11:16AM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 11:16AM | 1 | **MR. TRIPI:**  Let's go to 43A-53. |
| 11:16AM | 2 | 43A-54. |
| 11:16AM | 3 | Let's go to 43A-55, please. |
| 11:16AM | 4 | **BY MR. TRIPI:** |
| 11:16AM | 5 | Q.  Most of the house was unfurnished? |
| 11:16AM | 6 | A.  Yes. |
| 11:16AM | 7 | **MR. TRIPI:**  Let's go to 43A-56, please. |
| 11:16AM | 8 | 43A-57, please. |
| 11:17AM | 9 | **BY MR. TRIPI:** |
| 11:17AM | 10 | Q.  What is that contraption? |
| 11:17AM | 11 | A.  For my back.  I've got a bad back. |
| 11:17AM | 12 | **MR. TRIPI:**  Let's go to 43A-58. |
| 11:17AM | 13 | And 43A-59. |
| 11:17AM | 14 | 43A-60, please. |
| 11:17AM | 15 | 43A-61, please. |
| 11:17AM | 16 | **BY MR. TRIPI:** |
| 11:17AM | 17 | Q.  Is this basically the one bedroom you were sleeping in? |
| 11:17AM | 18 | A.  Yes. |
| 11:17AM | 19 | **MR. TRIPI:**  Let's go to 43A-62, please. |
| 11:17AM | 20 | Let's go to 43A-63, please. |
| 11:17AM | 21 | Let's go to 43A-64, please. |
| 11:17AM | 22 | 43A-65, please. |
| 11:17AM | 23 | 43A-66, please. |
| 11:18AM | 24 | 43A-67, please. |
| 11:18AM | 25 | Let's go to 43A-68, please. |

11:18AM   1                 43A-69, please.

11:18AM   2                 **BY MR. TRIPI:**

11:18AM   3    Q.  These are your clothes, right?

11:18AM   4    A.  Yes.

11:18AM   5                 **MR. TRIPI:**  Let's go to 43A-70, please.

11:18AM   6                 43A-71, please.

11:18AM   7                 43A-72, please.

11:18AM   8                 **BY MR. TRIPI:**

11:18AM   9    Q.  Is that another scale?

11:18AM  10    A.  Yes.

11:18AM  11    Q.  Again, used to weigh drugs?

11:18AM  12    A.  Yes.

11:18AM  13                 **MR. TRIPI:**  Let's go to 43A-73, please.

11:18AM  14                 **BY MR. TRIPI:**

11:18AM  15    Q.  Is that a picture of the scale outside of the boxes?

11:18AM  16    A.  Correct.

11:18AM  17                 **MR. TRIPI:**  Let's go to 43A-74, please.

11:19AM  18                 43A-75, please.

11:19AM  19                 43A-76, please.

11:19AM  20                 43A-77, please.

11:19AM  21                 Let's go to 43A-78, please.

11:19AM  22                 **BY MR. TRIPI:**

11:19AM  23    Q.  This is an exterior front of the residence?

11:19AM  24    A.  Correct.

11:19AM  25                 **MR. TRIPI:**  Let's go to 43A-79, please.

| 11:19AM | 1 | And 43A-80, please. |
| 11:19AM | 2 | **BY MR. TRIPI:** |
| 11:19AM | 3 | Q.  Is this some of the marijuana that you had stored in the |
| 11:19AM | 4 | residence? |
| 11:19AM | 5 | A.  Yes. |
| 11:19AM | 6 | **MR. TRIPI:**  Let's go to 43A-81, please. |
| 11:19AM | 7 | **BY MR. TRIPI:** |
| 11:19AM | 8 | Q.  Another picture of some of the marijuana? |
| 11:19AM | 9 | A.  Yes. |
| 11:19AM | 10 | **MR. TRIPI:**  43A-82, please. |
| 11:19AM | 11 | **BY MR. TRIPI:** |
| 11:19AM | 12 | Q.  Is that more marijuana in those -- what you estimated to |
| 11:19AM | 13 | be the 2-pound bricks? |
| 11:20AM | 14 | A.  Correct. |
| 11:20AM | 15 | **MR. TRIPI:**  Let's go to 43A-83, please. |
| 11:20AM | 16 | And 43A-84, please. |
| 11:20AM | 17 | **BY MR. TRIPI:** |
| 11:20AM | 18 | Q.  And what is the jury seeing there? |
| 11:20AM | 19 | A.  A box of marijuana. |
| 11:20AM | 20 | Q.  Multiple packages? |
| 11:20AM | 21 | A.  Correct. |
| 11:20AM | 22 | Q.  And what size packages are those? |
| 11:20AM | 23 | A.  It's hard to tell, but probably pound packages. |
| 11:20AM | 24 | **MR. TRIPI:**  Let's go to 43A-85, please. |
|  | 25 |  |

| | | |
|---|---|---|
| 11:20AM | 1 | **BY MR. TRIPI:** |
| 11:20AM | 2 | Q.  Is that another bag that was in the exterior or the |
| 11:20AM | 3 | garage area? |
| 11:20AM | 4 | A.  Yes. |
| 11:20AM | 5 | **MR. TRIPI:**  Let's go to 43A-86, please. |
| 11:20AM | 6 | **BY MR. TRIPI:** |
| 11:20AM | 7 | Q.  Okay.  And we've seen those before.  We have a couple |
| 11:20AM | 8 | more. |
| 11:20AM | 9 | **MR. TRIPI:**  Let's go to 43A-87. |
| 11:21AM | 10 | **BY MR. TRIPI:** |
| 11:21AM | 11 | Q.  What's in that box there? |
| 11:21AM | 12 | A.  It looks to be a scale. |
| 11:21AM | 13 | Q.  About the fourth scale in that house? |
| 11:21AM | 14 | A.  Yes. |
| 11:21AM | 15 | **MR. TRIPI:**  Let's go to 43A-88. |
| 11:21AM | 16 | **BY MR. TRIPI:** |
| 11:21AM | 17 | Q.  Is that a round of ammunition there? |
| 11:21AM | 18 | A.  Yes. |
| 11:21AM | 19 | **MR. TRIPI:**  Let's go to 43A-89. |
| 11:21AM | 20 | Let's go to 43A-90. |
| 11:21AM | 21 | **BY MR. TRIPI:** |
| 11:21AM | 22 | Q.  And in 89, was there a few more burner phones there? |
| 11:21AM | 23 | A.  Correct. |
| 11:21AM | 24 | **MR. TRIPI:**  Let's go to 43A-91. |
| | 25 | |

| | | |
|---|---|---|
| 11:21AM | 1 | **BY MR. TRIPI:** |
| 11:21AM | 2 | Q.  Is that more Adderall? |
| 11:21AM | 3 | A.  Yes. |
| 11:21AM | 4 | Q.  And is this now in the kitchen, or the bathroom? |
| 11:21AM | 5 | A.  Bathroom. |
| 11:21AM | 6 | Q.  Cabinet. |
| 11:21AM | 7 | **MR. TRIPI:**  Let's go to 43A-92. |
| 11:21AM | 8 | 43A-93. |
| 11:21AM | 9 | **BY MR. TRIPI:** |
| 11:22AM | 10 | Q.  Okay.  Now we're getting to pictures of your Range Rover; |
| 11:22AM | 11 | is that right? |
| 11:22AM | 12 | A.  Correct. |
| 11:22AM | 13 | Q.  Let's pause there for a moment. |
| 11:22AM | 14 | **MR. TRIPI:**  Ms. Champoux, let's go back to 43A-39. |
| 11:22AM | 15 | I'll take Exhibit 270. |
| 11:23AM | 16 | **BY MR. TRIPI:** |
| 11:23AM | 17 | Q.  Mr. Serio, I'm going to hand you up Government |
| 11:23AM | 18 | Exhibit 270.  Do you recognize Exhibit 270? |
| 11:23AM | 19 | A.  Yes. |
| 11:23AM | 20 | Q.  Are those scales that were inside the residence at |
| 11:23AM | 21 | 91 Grimsby? |
| 11:23AM | 22 | A.  Yes. |
| 11:23AM | 23 | **MR. TRIPI:**  The government offers Exhibit 270, |
| 11:24AM | 24 | Your Honor. |
| 11:24AM | 25 | **MR. MacKAY:**  No objection. |

| | | |
|---|---|---|
| 11:24AM | 1 | **THE COURT:**  Received without objection. |
| 11:24AM | 2 | **(GOV Exhibit 270 was received in evidence.)** |
| 11:24AM | 3 | **MR. TRIPI:**  Can we put up Exhibit 43-40, please? |
| 11:24AM | 4 | I'll take Exhibit 268. |
| 11:24AM | 5 | **BY MR. TRIPI:** |
| 11:24AM | 6 | Q.  Do you recognize Exhibit 268? |
| 11:24AM | 7 | A.  Yes. |
| 11:24AM | 8 | Q.  What are those? |
| 11:24AM | 9 | A.  The marijuana seeds. |
| 11:24AM | 10 | Q.  Are those the photos depicted in Government Exhibit |
| 11:24AM | 11 | 43A-40? |
| 11:24AM | 12 | A.  Yes. |
| 11:24AM | 13 | **MR. TRIPI:**  The government offers Exhibit 268. |
| 11:25AM | 14 | **MR. MacKAY:**  No objection. |
| 11:25AM | 15 | **THE COURT:**  Received without objection. |
| 11:25AM | 16 | **(GOV Exhibit 268 was received in evidence.)** |
| 11:25AM | 17 | **MR. TRIPI:**  I'm going to publish Exhibits 268 and 270 |
| 11:25AM | 18 | for the jury, Your Honor. |
| 11:25AM | 19 | Ms. Champoux, if we can pull up Government Exhibit |
| 11:25AM | 20 | 43A-45 and split the screen with 43A-73. |
| 11:25AM | 21 | 43A-45 and 43A-73. |
| 11:26AM | 22 | **BY MR. TRIPI:** |
| 11:26AM | 23 | Q.  Handing up, Mr. Serio, Exhibit 269 and Exhibit 265. |
| 11:26AM | 24 | A.  Yes. |
| 11:26AM | 25 | Q.  Do you recognize those items? |

| | | |
|---|---|---|
| 11:26AM | 1 | A.  I do. |
| 11:26AM | 2 | Q.  What do you recognize them to be? |
| 11:26AM | 3 | A.  Furniture that was in Grimsby. |
| 11:26AM | 4 |      MR. TRIPI:  The government offers Exhibit 265 and |
| 11:26AM | 5 | 269, Your Honor. |
| 11:26AM | 6 |      MR. MacKAY:  No objection, Your Honor. |
| 11:26AM | 7 |      THE COURT:  Received without objection. |
| 11:26AM | 8 |    **(GOV Exhibits 265 and 269 were received in evidence.)** |
| 11:26AM | 9 |      MR. TRIPI:  I'm going to publish them for the jury. |
| 11:27AM | 10 |      Now we can go to 43A-73. |
| 11:27AM | 11 |      And I'll need number Exhibit Number 275.  Handing up |
| 11:27AM | 12 | Exhibit 275. |
| 11:27AM | 13 |      **BY MR. TRIPI:** |
| 11:27AM | 14 | Q.  Do you recognize Exhibit 275? |
| 11:27AM | 15 | A.  Yes. |
| 11:27AM | 16 | Q.  Do you recognize that to be the scale depicted in |
| 11:27AM | 17 | Exhibit 43A-73? |
| 11:28AM | 18 | A.  Yes. |
| 11:28AM | 19 |      MR. TRIPI:  The government offers Exhibit 275, |
| 11:28AM | 20 | Your Honor. |
| 11:28AM | 21 |      MR. MacKAY:  No objection, Your Honor. |
| 11:28AM | 22 |      THE COURT:  Received without objection. |
| 11:28AM | 23 |    **(GOV Exhibit 275 was received in evidence.)** |
| 11:28AM | 24 |      MR. TRIPI:  Publishing it for the jury. |
| 11:28AM | 25 |      Can we pull up Exhibit 43A-81, please? |

| 11:28AM | 1 | I'll take Exhibit 279. |
| 11:28AM | 2 | **BY MR. TRIPI:** |
| 11:28AM | 3 | Q.  Handing up now Exhibit 279.  Mr. Serio, do you recognize |
| 11:29AM | 4 | Exhibit 279 to be more of the marijuana seized from Grimsby |
| 11:29AM | 5 | as depicted in Exhibit 43A-81? |
| 11:29AM | 6 | A.  Yes. |
| 11:29AM | 7 | **MR. TRIPI:**  The government offers Exhibit 279, |
| 11:29AM | 8 | Your Honor. |
| 11:29AM | 9 | **MR. MacKAY:**  No objection. |
| 11:29AM | 10 | **THE COURT:**  Received without objection. |
| 11:29AM | 11 | **(GOV Exhibit 279 was received in evidence.)** |
| 11:29AM | 12 | **MR. TRIPI:**  Publishing it for the jury. |
| 11:29AM | 13 | Can we put up on the screen, Ms. Champoux, 43A-82. |
| 11:29AM | 14 | And I'll take Government Exhibit 280. |
| 11:29AM | 15 | **BY MR. TRIPI:** |
| 11:30AM | 16 | Q.  Handing up Government Exhibit 280. |
| 11:30AM | 17 | A.  Yes. |
| 11:30AM | 18 | Q.  Mr. Serio, is physical exhibit Government Exhibit 280, is |
| 11:30AM | 19 | that marijuana that's depicted in the photo that's in |
| 11:30AM | 20 | evidence as Government Exhibit 43A-82? |
| 11:30AM | 21 | A.  Yes. |
| 11:30AM | 22 | **MR. TRIPI:**  The government offers Exhibit 280, |
| 11:30AM | 23 | Your Honor. |
| 11:30AM | 24 | **MR. MacKAY:**  No objection, Your Honor. |
| 11:30AM | 25 | **THE COURT:**  Received without objection. |

11:30AM    1          **(GOV Exhibit 280 was received in evidence.)**

11:30AM    2          **MR. TRIPI:**  Thank you.  Handing up 281A.

11:31AM    3          **THE COURT:**  218A?

11:31AM    4          **MR. TRIPI:**  A, Your Honor.

11:31AM    5          **THE WITNESS:**  Yes.

11:31AM    6          **BY MR. TRIPI:**

11:31AM    7    Q.  Mr. Serio, I'm showing you Government Exhibit 281.  Is

11:31AM    8    that packaging material that was associated with some of the

11:31AM    9    marijuana in 91 Grimsby?

11:31AM   10    A.  Yes.

11:31AM   11          **MR. TRIPI:**  The government offers Exhibit 281A,

11:31AM   12    Your Honor.

11:31AM   13          **MR. MacKAY:**  No objection.

11:31AM   14          **THE COURT:**  Received without objection.

11:32AM   15          **(GOV Exhibit 281A was received in evidence.)**

11:32AM   16          **BY MR. TRIPI:**

11:32AM   17    Q.  Now showing you, Mr. Serio, Exhibit 281B.

11:32AM   18    A.  Yes.

11:32AM   19    Q.  Mr. Serio, is Exhibit 281B more of the tan-packaged

11:32AM   20    marijuana that's depicted in Exhibit 43A-82?

11:32AM   21    A.  Yes.

11:32AM   22          **MR. TRIPI:**  The government offers Exhibit 281B,

11:32AM   23    Your Honor.

11:32AM   24          **MR. MacKAY:**  No objection, Your Honor.

11:32AM   25          **THE COURT:**  Received without objection.

```
11:32AM    1          (GOV Exhibit 281B was received in evidence.)

11:32AM    2               BY MR. TRIPI:

11:32AM    3    Q.  Mr. Serio, now that you can take a look at these, are

11:32AM    4    these 1- or 2-pound bricks?

11:32AM    5    A.  I believe those were 2-pound.

11:32AM    6          MR. TRIPI:   Okay.  Now publishing for the jury.

11:33AM    7    Ms. Champoux, if we can go to 43A-84.

11:33AM    8               BY MR. TRIPI:

11:33AM    9    Q.  Mr. Serio, do you see that box on the screen?

11:33AM   10    A.  Yes.

11:33AM   11    Q.  Do you see Government Exhibit 276 here?

11:33AM   12    A.  Yes.

11:33AM   13          MR. TRIPI:   Mr. MacKay, do you need me to carry this

11:33AM   14    over?

11:33AM   15          MR. MacKAY:   No.

11:33AM   16               BY MR. TRIPI:

11:33AM   17    Q.  Okay.  Does Exhibit 276 both depict the box and the

11:33AM   18    marijuana recovered in the box in 43A-84?

11:33AM   19    A.  Yes.

11:33AM   20          MR. TRIPI:   The government offers Exhibit 276,

11:33AM   21    Your Honor.

11:33AM   22          MR. MacKAY:   No objection.

11:33AM   23          THE COURT:   Received without objection.

11:33AM   24          (GOV Exhibit 276 was received in evidence.)

11:33AM   25          MR. TRIPI:   I'm now going to publish it for the jury.
```

| | | |
|---|---|---|
| 11:34AM | 1 | I'm going to break it. |
| 11:34AM | 2 | Ms. Champoux, can we pull up Exhibit 43A-86, please? |
| 11:34AM | 3 | **BY MR. TRIPI:** |
| 11:34AM | 4 | Q. Mr. Serio, I'm going to hand up Exhibit 271. |
| 11:34AM | 5 | A. Yes. |
| 11:34AM | 6 | Q. Do you recognize Exhibit 271? |
| 11:34AM | 7 | A. Yes, I do. |
| 11:34AM | 8 | Q. What do you recognize it to be? |
| 11:35AM | 9 | A. Adderall. |
| 11:35AM | 10 | Q. Are those the Adderall pills depicted in the prescription |
| 11:35AM | 11 | containers on the shelf as depicted in Exhibit 43A-86? |
| 11:35AM | 12 | A. Yes. |
| 11:35AM | 13 | MR. TRIPI: The government offers Exhibit 271, |
| 11:35AM | 14 | Your Honor. |
| 11:35AM | 15 | MR. MacKAY: No objection, Your Honor. |
| 11:35AM | 16 | THE COURT: Received without objection. |
| 11:35AM | 17 | **(GOV Exhibit 271 was received in evidence.)** |
| 11:35AM | 18 | MR. TRIPI: Publishing it for the jury. |
| 11:35AM | 19 | Can we get 43A-38 on the screen, Ms. Champoux? |
| 11:35AM | 20 | And I'll take Exhibit 273. |
| 11:35AM | 21 | **BY MR. TRIPI:** |
| 11:36AM | 22 | Q. Now handing up Government Exhibit 266. |
| 11:36AM | 23 | A. Yeah. |
| 11:36AM | 24 | Q. Mr. Serio, do you recognize Government Exhibit 266? |
| 11:36AM | 25 | A. Yes. |

11:36AM  1   Q.  Is that the cocaine depicted in 43A-38?

11:36AM  2   A.  Yes.

11:36AM  3   Q.  Other than being taken out of the original packaging for

11:36AM  4   testing, is it in the same or substantially same condition?

11:37AM  5   A.  Yes.

11:37AM  6        MR. TRIPI:  The government offers Exhibit 266,

11:37AM  7   Your Honor.

11:37AM  8        MR. MacKAY:  No objection, Your Honor.

11:37AM  9        THE COURT:  Received without objection.

11:37AM  10       **(GOV Exhibit 266 was received in evidence.)**

11:37AM  11       **BY MR. TRIPI:**

11:37AM  12  Q.  Now, Mr. Serio, I'm going to ask you, and answer this

11:37AM  13  only if you know, that the cocaine in this packaging now

11:37AM  14  looks to be less white than the photo?

11:37AM  15  A.  Yes.

11:37AM  16  Q.  Do you know why that happens?

11:37AM  17  A.  Because when they cut it, I believe it's -- they compress

11:37AM  18  it back with acetone.  And over time, the acetone will turn

11:37AM  19  it yellow.

11:37AM  20       MR. TRIPI:  266 is in evidence.  Now publishing it

11:37AM  21  for the jury, Your Honor.

11:37AM  22       Ms. Champoux, can we pull up Government Exhibit

11:38AM  23  43A-90?

11:38AM  24       Could you also, side by side, put up 43A-91,

11:38AM  25  Ms. Champoux?

| | | |
|---|---|---|
| 11:38AM | 1 | **BY MR. TRIPI:** |
| 11:38AM | 2 | Q.  Does Exhibit 274, which I just showed you, contain |
| 11:38AM | 3 | Adderall as well as another prescription bottle removed from |
| 11:38AM | 4 | the bathroom cabinet? |
| 11:38AM | 5 | A.  Yes. |
| 11:38AM | 6 | MR. TRIPI:  The government offers Exhibit 274, |
| 11:38AM | 7 | Your Honor. |
| 11:38AM | 8 | MR. MacKAY:  No objection, Your Honor. |
| 11:38AM | 9 | THE COURT:  Received without objection. |
| 11:38AM | 10 | **(GOV Exhibit 274 was received in evidence.)** |
| 11:38AM | 11 | MR. TRIPI:  Could we pull up Exhibit 43A-17 next to |
| 11:39AM | 12 | 43A-20, Ms. Champoux? |
| 11:39AM | 13 | **BY MR. TRIPI:** |
| 11:39AM | 14 | Q.  I'm now showing you, Mr. Serio, Government Exhibit 272. |
| 11:39AM | 15 | A.  Yes. |
| 11:39AM | 16 | Q.  Mr. Serio, is Government Exhibit 272 additional marijuana |
| 11:40AM | 17 | seized from 91 Grimsby, as depicted in the photos in evidence |
| 11:40AM | 18 | as Government Exhibit 43A-17 and 43A-20?  You see a Dash's |
| 11:40AM | 19 | grocery bag there? |
| 11:40AM | 20 | A.  Yes. |
| 11:40AM | 21 | MR. TRIPI:  The government offers Exhibit 272, |
| 11:40AM | 22 | Your Honor. |
| 11:40AM | 23 | MR. MacKAY:  No objection, Your Honor. |
| 11:40AM | 24 | THE COURT:  Received without objection. |
| 11:40AM | 25 | **(GOV Exhibit 272 was received in evidence.)** |

Case 1:19-cr-00227-LJV-MJR   Document 1037   Filed 07/01/24   Page 74 of 202
USA v Bongiovanni - Serio - Tripi/Direct - 3/12/24

74

| | | |
|---|---|---|
| 11:40AM | 1 | **MR. TRIPI:**  Ms. Champoux, can we pull up Government |
| 11:40AM | 2 | Exhibit 43A-22. |
| 11:40AM | 3 | I'm now showing Mr. Serio Government Exhibit 267, |
| 11:40AM | 4 | Your Honor. |
| 11:40AM | 5 | **THE WITNESS:**  Yes. |
| 11:41AM | 6 | **BY MR. TRIPI:** |
| 11:41AM | 7 | Q.  Mr. Serio, do you recognize Government Exhibit 267? |
| 11:41AM | 8 | A.  Yes. |
| 11:41AM | 9 | Q.  What do you recognize it to be? |
| 11:41AM | 10 | A.  Fentanyl pills. |
| 11:41AM | 11 | Q.  Are those the green fentanyl pills that were made to look |
| 11:41AM | 12 | like oxycodone that you described earlier, also as depicted |
| 11:41AM | 13 | in 43A-22 in evidence? |
| 11:41AM | 14 | A.  Correct. |
| 11:41AM | 15 | **MR. TRIPI:**  The government offers Exhibit 267, |
| 11:41AM | 16 | Your Honor. |
| 11:41AM | 17 | **MR. MacKAY:**  No objection, Your Honor. |
| 11:41AM | 18 | **THE COURT:**  Received without objection. |
| 11:41AM | 19 | **(GOV Exhibit 267 was received in evidence.)** |
| 11:41AM | 20 | **MR. TRIPI:**  Publishing for the jury, Your Honor. |
| 11:41AM | 21 | Now, Ms. Champoux, if we can pick up with 43A-93. |
| 11:42AM | 22 | **BY MR. TRIPI:** |
| 11:42AM | 23 | Q.  Mr. Serio, just to reorient the jury, is this a |
| 11:42AM | 24 | photograph of your Range Rover after it was taken from Kelly |
| 11:42AM | 25 | Brace's house? |

| | | |
|---|---|---|
| 11:42AM | 1 | A.  Yes. |
| 11:42AM | 2 | **MR. TRIPI:**  Okay.  Can we go to 43A-94. |
| 11:42AM | 3 | **BY MR. TRIPI:** |
| 11:42AM | 4 | Q.  Now, did you have marijuana and drug evidence also in |
| 11:42AM | 5 | your Range Rover? |
| 11:42AM | 6 | A.  Yes. |
| 11:42AM | 7 | Q.  And 43A-94, what's the jury looking at there? |
| 11:42AM | 8 | A.  Marijuana. |
| 11:42AM | 9 | Q.  And how would you secrete it in your vehicle when you |
| 11:42AM | 10 | drove around? |
| 11:42AM | 11 | A.  There was a -- just in the factory, the way it's made, |
| 11:42AM | 12 | you could pull up the back seat, like, fold it over.  And I |
| 11:42AM | 13 | put it in there, put it in the seat back. |
| 11:42AM | 14 | **MR. TRIPI:**  Okay.  Let's go to 43A-94 -- or, 95, I'm |
| 11:42AM | 15 | sorry. |
| 11:42AM | 16 | **BY MR. TRIPI:** |
| 11:42AM | 17 | Q.  And could you tell the jury, there's -- that looks like |
| 11:42AM | 18 | some items on the floor of the back seat there.  Can you tell |
| 11:42AM | 19 | the jury what's depicted there? |
| 11:42AM | 20 | A.  A box of money. |
| 11:43AM | 21 | Q.  Is that money in that box that says Pro Bar? |
| 11:43AM | 22 | A.  Yes. |
| 11:43AM | 23 | **MR. TRIPI:**  Let's go to 43A-96. |
| 11:43AM | 24 | Ms. Champoux, can we zoom in on the box so it pops |
| 11:43AM | 25 | out a little more for the jury?  Okay. |

| | | |
|---|---|---|
| 11:43AM | 1 | You can zoom out of there and go to 43A-97, please. |
| 11:43AM | 2 | **BY MR. TRIPI:** |
| 11:43AM | 3 | Q.  Is that that same box? |
| 11:43AM | 4 | A.  Yes. |
| 11:43AM | 5 | **MR. TRIPI:**  Let's go to 43A-98, please. |
| 11:43AM | 6 | **BY MR. TRIPI:** |
| 11:43AM | 7 | Q.  Are those several phones that you had? |
| 11:43AM | 8 | A.  Yes. |
| 11:43AM | 9 | Q.  What kind of phones are they? |
| 11:43AM | 10 | A.  Two iPhones and one burner phone. |
| 11:43AM | 11 | Q.  And is the Samsung the burner phone -- |
| 11:43AM | 12 | A.  Yes. |
| 11:43AM | 13 | Q.  -- as you're describing it? |
| 11:43AM | 14 | **MR. TRIPI:**  Can we bring up 43A-99 next to that? |
| 11:44AM | 15 | Okay.  Hold that up for just a moment. |
| 11:45AM | 16 | Your Honor, I'm handing up Government Exhibit 44, |
| 11:45AM | 17 | just for record purposes, agents have just cut into this |
| 11:45AM | 18 | envelope to open it.  There's an iPhone inside. |
| 11:45AM | 19 | **THE WITNESS:**  Yes. |
| 11:46AM | 20 | **BY MR. TRIPI:** |
| 11:46AM | 21 | Q.  Mr. Serio, do you recognize Government Exhibit 44? |
| 11:46AM | 22 | A.  Yes. |
| 11:46AM | 23 | Q.  Is that the Apple iPhone that's depicted at the top of |
| 11:46AM | 24 | the photo in Exhibit 43A-98? |
| 11:46AM | 25 | A.  Yes. |

11:46AM    1    Q.  With the cracked screen in the upper right-hand corner?

11:46AM    2    A.  Yes.

11:46AM    3            **MR. TRIPI:**  Publishing Exhibit 44.

11:46AM    4            **THE COURT:**  Is it admitted?

11:46AM    5            **MR. TRIPI:**  Oh, sorry.  I offer it, Judge.  I guess I

11:46AM    6    jumped the gun.

11:46AM    7            **MR. MacKAY:**  No objection to admission of the phone,

11:46AM    8    Your Honor.

11:46AM    9            **THE COURT:**  It's admitted without objection.

11:46AM   10            **MR. TRIPI:**  Sorry about that, Your Honor.

11:46AM   11            **THE COURT:**  That's okay.

11:46AM   12            **(GOV Exhibit 44 was received in evidence.)**

11:46AM   13            **THE COURT:**  Just shows you I'm paying attention.

11:46AM   14            **MR. TRIPI:**  That's right.  I was checking you, Judge.

11:46AM   15            **BY MR. TRIPI:**

11:46AM   16    Q.  Now, as to that iPhone, I'm just going to skip ahead.

11:46AM   17    Eventually, did you give the FBI permission, consent, to

11:47AM   18    search that phone?

11:47AM   19    A.  Yes.

11:47AM   20    Q.  And did they do what's called an extraction of your

11:47AM   21    phone?

11:47AM   22    A.  Yes.

11:47AM   23    Q.  And did you review that extraction to look at to see if

11:47AM   24    the content of what they took off the phone was what you had

11:47AM   25    on that phone?

11:47AM    1    A.  Yes.

11:47AM    2    Q.  And you reviewed contacts and communications that you had

11:47AM    3    in the phone?

11:47AM    4    A.  Correct.

11:48AM    5            **MR. TRIPI:**  Handing up Government Exhibit 45.

11:48AM    6            **BY MR. TRIPI:**

11:48AM    7    Q.  Now, Mr. Serio, prior to your testifying here today, you

11:48AM    8    reviewed the extraction for that iPhone that we just looked

11:48AM    9    at, Government Exhibit 44?

11:48AM   10    A.  Correct.

11:48AM   11    Q.  And the contents of that phone are on a CD, right?

11:48AM   12    A.  Yes.

11:48AM   13    Q.  A disk?  Did you, after you looked at the contents of the

11:49AM   14    phone, did you initial the disk to verify that that was the

11:49AM   15    content of your Apple iPhone?

11:49AM   16    A.  Yes, I did.

11:49AM   17    Q.  Do you recognize that CD?

11:49AM   18    A.  Yes, I do.

11:49AM   19    Q.  Do you see your initials on there?

11:49AM   20    A.  I do.

11:49AM   21    Q.  Did you place your initials on that CD after you verified

11:49AM   22    that the contents of Exhibit 44 were on that CD?

11:49AM   23    A.  Yes.

11:49AM   24    Q.  And did that include contacts, text messages, whatever

11:49AM   25    the FBI was able to extract off the phone?

| 11:49AM | 1 | A.  Yes. |

11:49AM    2        **MR. TRIPI:**  45, Judge, is for identification only.

11:50AM    3            **BY MR. TRIPI:**

11:50AM    4    Q.  Mr. Serio, I'm going to hand you up Government

11:50AM    5    Exhibit 46.  I'm going to ask you to look at these pages and

11:50AM    6    I'm going to ask you questions.

11:50AM    7    A.  Okay.

11:50AM    8            **THE COURT:**  46?

11:50AM    9        **MR. TRIPI:**  46 I'm going to hand up, identification

11:50AM   10    only, Your Honor.

11:50AM   11            **BY MR. TRIPI:**

11:50AM   12    Q.  Take a moment, look through those pages.  When you're

11:50AM   13    done, please look up.

11:51AM   14        Mr. Serio, did you review Government Exhibit 46?

11:51AM   15    A.  Yes.

11:51AM   16    Q.  Is Government Exhibit 46 a portion of the contacts that

11:51AM   17    were stored in the Apple iPhone depicted at the top of the

11:51AM   18    screen in Exhibit 43A-98, as well as the actual cell phone

11:52AM   19    extraction that I had showed you a moment ago, that CD which

11:52AM   20    is Government Exhibit 45?

11:52AM   21    A.  Yes.

11:52AM   22            **THE COURT:**  Hang on.  I think the CD was 44, I

11:52AM   23    thought.

11:52AM   24        **MR. TRIPI:**  I believe the phone itself is 44,

11:52AM   25    Your Honor.

| | | |
|---|---|---|
| 11:52AM | 1 | **THE COURT:**  Okay. |
| 11:52AM | 2 | **MR. TRIPI:**  The CD is 45. |
| 11:52AM | 3 | **THE COURT:**  Okay. |
| 11:52AM | 4 | **MR. TRIPI:**  And this extraction, this contact, is 46. |
| 11:52AM | 5 | **THE COURT:**  46, okay. |
| 11:52AM | 6 | **BY MR. TRIPI:** |
| 11:52AM | 7 | Q.  So Mr. Serio, with that, is the Exhibit 46, is this an |
| 11:52AM | 8 | accurate portion of the contacts you had in your Apple |
| 11:52AM | 9 | iPhone? |
| 11:52AM | 10 | A.  Yes. |
| 11:52AM | 11 | **MR. TRIPI:**  The government offers Exhibit 46, |
| 11:52AM | 12 | Your Honor. |
| 11:52AM | 13 | **MR. MacKAY:**  Judge, just one voir dire question for |
| 11:52AM | 14 | Mr. Serio. |
| 11:52AM | 15 | |
| 11:52AM | 16 | **VOIR DIRE EXAMINATION BY MR. MacKAY:** |
| 11:52AM | 17 | Q.  Mr. Serio, you were shown Exhibit 46.  That's not all the |
| 11:52AM | 18 | contacts in your phone, correct? |
| 11:52AM | 19 | A.  Correct. |
| 11:52AM | 20 | **MR. MacKAY:**  With that, no objection, Your Honor, to |
| 11:52AM | 21 | 46 coming in. |
| 11:52AM | 22 | **THE COURT:**  It's received without objection. |
| 11:52AM | 23 | **(GOV Exhibit 46 was received in evidence.)** |
| 11:52AM | 24 | **MR. TRIPI:**  Thank you, Your Honor. |
| 11:54AM | 25 | Your Honor, I'm going to hand up the next exhibits in |

| | | |
|---|---|---|
| 11:54AM | 1 | tandem, Government Exhibit 48 and 49, and for the record the |
| 11:54AM | 2 | agents just opened up in the courtroom Exhibit 48 so the |
| 11:54AM | 3 | witness can see what's inside the envelope. |
| 11:54AM | 4 | |
| 11:54AM | 5 | **DIRECT EXAMINATION BY MR. TRIPI:** |
| 11:54AM | 6 | Q.  Now, Mr. Serio, up before you is Government Exhibit 48; |
| 11:54AM | 7 | do you recognize that? |
| 11:54AM | 8 | A.  Yes. |
| 11:54AM | 9 | Q.  Do you recognize Exhibit 48 to be that Samsung phone |
| 11:54AM | 10 | depicted in Government Exhibit 43A-98? |
| 11:54AM | 11 | A.  Yes. |
| 11:54AM | 12 | Q.  And is it -- does it appear to be in the same or |
| 11:54AM | 13 | substantially same condition today as when it was taken from |
| 11:54AM | 14 | your vehicle, the day of your arrest? |
| 11:54AM | 15 | A.  Yes, it does. |
| 11:54AM | 16 | Q.  Now, if you could turn your attention to Government |
| 11:54AM | 17 | Exhibit 49.  Do you recognize that CD? |
| 11:54AM | 18 | A.  I do. |
| 11:54AM | 19 | Q.  Is that a CD, the contents of which you reviewed prior to |
| 11:55AM | 20 | your testimony that include the content of what was on that |
| 11:55AM | 21 | Samsung phone? |
| 11:55AM | 22 | A.  Yes. |
| 11:55AM | 23 | Q.  And is the content accurate from what your recollection |
| 11:55AM | 24 | of what it was you had in your phone? |
| 11:55AM | 25 | A.  Yes. |

11:55AM    1      **MR. TRIPI:**  The government offers Exhibits 48 and 49,

11:55AM    2   Your Honor.

11:55AM    3      **MR. MacKAY:**  No objection, Your Honor.

11:55AM    4      **THE COURT:**  Received without objection.

11:55AM    5      **(GOV Exhibits 48 and 49 were received in evidence.)**

11:55AM    6      **BY MR. TRIPI:**

11:55AM    7   Q.  Now as it relates to that Samsung phone, is that what you

11:55AM    8   call a burner phone?

11:55AM    9   A.  Correct.

11:55AM   10   Q.  Is there a limited amount of information on that phone?

11:55AM   11   A.  Yes.

11:55AM   12   Q.  Are there almost no actual names in the phone?

11:55AM   13   A.  I believe there would be no actual names.

11:55AM   14   Q.  Is it just basically call logs and coordination of drugs

11:55AM   15   in cryptic messaging?

11:55AM   16   A.  Yes.

11:56AM   17      **MR. TRIPI:**  I'd like to turn -- take this down,

11:56AM   18   Ms. Champoux.  I'd like to turn to Exhibit 46 for a moment.

11:56AM   19      And can we zoom in to the contacts 1 through 12 just

11:56AM   20   to make it larger?  I guess that's not going to work.

11:56AM   21      Let's go 1 through 5, please.

11:56AM   22      **BY MR. TRIPI:**

11:56AM   23   Q.  In line 2 and 3 there, do you have contact information

11:57AM   24   for Anthony Gerace?

11:57AM   25   A.  Correct.

| 11:57AM | 1 | Q.  Is that the Anthony Gerace you've been talking about? |
| 11:57AM | 2 | A.  Yes. |
| 11:57AM | 3 | Q.  And now, here, we're going through your personal phone, |
| 11:57AM | 4 | the contacts, right -- |
| 11:57AM | 5 | A.  Yes. |
| 11:57AM | 6 | Q.  -- in that iPhone? |
| 11:57AM | 7 |     And number 4, that's Anthony Mayo.  Is that someone you |
| 11:57AM | 8 | testified about getting drugs from you? |
| 11:57AM | 9 | A.  Correct. |
| 11:57AM | 10 | Q.  Who is the entry number 5? |
| 11:57AM | 11 | A.  I believe Ashley Schuh. |
| 11:57AM | 12 | Q.  Okay.  Is that the defendant's wife's sister? |
| 11:57AM | 13 | A.  Yes. |
| 11:57AM | 14 |     MR. TRIPI:  Let's X out of that, and go 6 through 10. |
| 11:57AM | 15 | All right. |
| 11:57AM | 16 |     BY MR. TRIPI: |
| 11:57AM | 17 | Q.  6 is Ash S.  Ashley Schuh again? |
| 11:57AM | 18 | A.  It could be.  Because it's also my wife's contacts.  For |
| 11:58AM | 19 | some reason, our contacts were on the same phone, so I'm not |
| 11:58AM | 20 | sure. |
| 11:58AM | 21 | Q.  But is that entry for Ash S, do you believe to be Ashley |
| 11:58AM | 22 | Schuh? |
| 11:58AM | 23 | A.  I believe so. |
| 11:58AM | 24 | Q.  7, who's that? |
| 11:58AM | 25 | A.  My friend, Chris Baker. |

11:58AM   1   Q.  And he's someone you talked about already?

11:58AM   2   A.  Yes.

11:58AM   3   Q.  And he's someone who would get drugs?

11:58AM   4   A.  Yes.

11:58AM   5   Q.  Number 9, that's -- who's that?

11:58AM   6   A.  R.K.

11:58AM   7   Q.  Is that the person you informed was a confidential

11:58AM   8   informant?

11:58AM   9   A.  Correct.

11:58AM  10   Q.  The associate of Frank Burkhart?

11:58AM  11   A.  Yes.

11:58AM  12   Q.  Number 10, who's that entry for, Butch?

11:58AM  13   A.  I believe Butch Bifocal.

11:58AM  14   Q.  He's someone you talked about already?

11:58AM  15   A.  Yes.

11:58AM  16   Q.  He was Italian Organized Crime figure you who sat down

11:58AM  17   with as arranged by Mike Masecchia?

11:58AM  18   A.  Yes.

11:58AM  19         **MR. TRIPI:**  Let's X out of that.  Let's go to 11 and

11:58AM  20   12.

11:58AM  21         **BY MR. TRIPI:**

11:58AM  22   Q.  Who is the person in your phone as Buttita?

11:58AM  23   A.  Mike Buttita.

11:58AM  24   Q.  He's someone you talked about in your testimony

11:58AM  25   yesterday?

11:58AM   1   A.  Yes.

11:59AM   2              MR. TRIPI:  Let's go to 13 through 17.

11:59AM   3              BY MR. TRIPI:

11:59AM   4   Q.  And 13, 14, is one number for Frank Burkhart; is that

11:59AM   5   right?

11:59AM   6   A.  Correct.

11:59AM   7   Q.  Entry 15 is a separate number for Frank Burkhart?

11:59AM   8   A.  Yes.

11:59AM   9   Q.  So you had two different numbers in this phone for him?

11:59AM  10   A.  I might have had a different number and I just didn't

11:59AM  11   erase it, I'm not sure.

11:59AM  12   Q.  Is he someone who had different phone numbers over time?

11:59AM  13   A.  Yes.

11:59AM  14   Q.  And number 16 and 17 is Frank Parisi?

11:59AM  15   A.  Yes.

11:59AM  16   Q.  And who is that again?

11:59AM  17   A.  Someone that I dealt with in debt collections.

11:59AM  18              MR. TRIPI:  Okay.  Let's go to 18 through 21.  18,

11:59AM  19   19, and 20.

11:59AM  20              BY MR. TRIPI:

11:59AM  21   Q.  18 and 19 look to be the same phone number; is that

12:00PM  22   right?

12:00PM  23   A.  Yes.

12:00PM  24   Q.  And who is Frank Tripi?

12:00PM  25   A.  Frank Tripi is someone I dealt with in collections, and

| | | |
|---|---|---|
| 12:00PM | 1 | also talked about marijuana with. |
| 12:00PM | 2 | Q.  And he someone who is also associated with Anthony |
| 12:00PM | 3 | Gerace? |
| 12:00PM | 4 | A.  That, I'm not sure. |
| 12:00PM | 5 | Q.  How about Mike Masecchia? |
| 12:00PM | 6 | A.  Yes. |
| 12:00PM | 7 | Q.  Is entry number 20 just a different phone number for |
| 12:00PM | 8 | Frank Tripi? |
| 12:00PM | 9 | A.  It must be. |
| 12:00PM | 10 | Q.  Okay.  21, who's Hot Dog? |
| 12:00PM | 11 | A.  Hot Dog is Paul Francoforte. |
| 12:00PM | 12 | Q.  Is that the person you talked about yesterday traveling |
| 12:00PM | 13 | to the Poconos with and gambling? |
| 12:00PM | 14 | A.  Yeah, just gambling. |
| 12:00PM | 15 | **MR. TRIPI:**  Let's go 23 through 26. |
| 12:00PM | 16 | **BY MR. TRIPI:** |
| 12:00PM | 17 | Q.  Are those various numbers you had for Jacob Martinez at |
| 12:00PM | 18 | various points? |
| 12:00PM | 19 | A.  Yes. |
| 12:00PM | 20 | Q.  Some of those numbers look like duplicate entries? |
| 12:01PM | 21 | A.  Yes. |
| 12:01PM | 22 | Q.  That's someone who you talked about yesterday who you |
| 12:01PM | 23 | would distribute marijuana to and he would sell you cocaine? |
| 12:01PM | 24 | A.  Yes. |
| 12:01PM | 25 | Q.  The cocaine we saw a moment ago from 91 Grimsby, who did |

| | | |
|---|---|---|
| 12:01PM | 1 | that come from? |
| 12:01PM | 2 | A.  That was from Jimmy Rivera. |
| 12:01PM | 3 | Q.  Okay.  Jimmy Rivera was another person who you sold |
| 12:01PM | 4 | marijuana to and he sold you cocaine? |
| 12:01PM | 5 | A.  Correct. |
| 12:01PM | 6 | **MR. TRIPI:**  Let's go to entry 27. |
| 12:01PM | 7 | **BY MR. TRIPI:** |
| 12:01PM | 8 | Q.  Who's that entry in your call log? |
| 12:01PM | 9 | A.  That's Jarrett Guy, the guy from Vancouver that I got |
| 12:01PM | 10 | marijuana from. |
| 12:01PM | 11 | Q.  Now you have a phone number for him, is that a phone that |
| 12:01PM | 12 | was stable for him? |
| 12:01PM | 13 | A.  Yeah, that was his personal phone number. |
| 12:01PM | 14 | Q.  Would you talk drug business over the personal phones? |
| 12:01PM | 15 | A.  No. |
| 12:01PM | 16 | Q.  How would you use the personal phone to -- |
| 12:01PM | 17 | A.  That was just in case if -- say I lost the burner phone, |
| 12:01PM | 18 | a way to get ahold of him. |
| 12:01PM | 19 | **MR. TRIPI:**  Let's go to 28 through 34. |
| 12:01PM | 20 | **BY MR. TRIPI:** |
| 12:02PM | 21 | Q.  28 through 30, looks like two different numbers for Jimmy |
| 12:02PM | 22 | Rivera? |
| 12:02PM | 23 | A.  Yes. |
| 12:02PM | 24 | Q.  And you spelled the last name different ways, but is it |
| 12:02PM | 25 | the same person? |

12:02PM    1    A.  Same person.

12:02PM    2    Q.  And you just talked about him a moment ago as someone who

12:02PM    3    provided you cocaine, and you also sold marijuana to?

12:02PM    4    A.  Correct.

12:02PM    5    Q.  31 through 34 are various entries for John Robinson.

12:02PM    6    Looks like a phone number and an email address?

12:02PM    7    A.  Yes.

12:02PM    8    Q.  And that's someone who you distributed marijuana with?

12:02PM    9    A.  Yep.  Yes.

12:02PM   10    Q.  And who traveled with you to New York?

12:02PM   11    A.  Correct.

12:02PM   12    Q.  Also worked at your collection agency?

12:02PM   13    A.  Correct.

12:02PM   14         MR. TRIPI:  Let's go 35 to 39, please, or 40.

12:03PM   15         BY MR. TRIPI:

12:03PM   16    Q.  35 and 36, those appear to be duplicate phone number

12:03PM   17    entries for John Suppa?

12:03PM   18    A.  Yes.

12:03PM   19    Q.  And we've talked about him yesterday?

12:03PM   20    A.  Yes.

12:03PM   21    Q.  And 37 through 40 are various entries for Kelly Brace?

12:03PM   22    A.  Correct.

12:03PM   23    Q.  And that's the person you were delivering marijuana to

12:03PM   24    when you got arrested?

12:03PM   25    A.  Yes.

| | | |
|---|---|---|
| 12:03PM | 1 | MR. TRIPI:  Let's go to 41 and 42, please. |
| 12:03PM | 2 | BY MR. TRIPI: |
| 12:03PM | 3 | Q.  Looks like an email and a phone number for Krista |
| 12:03PM | 4 | Masecchia? |
| 12:03PM | 5 | A.  Yes. |
| 12:03PM | 6 | Q.  Who is that? |
| 12:03PM | 7 | A.  Mike Masecchia's wife. |
| 12:03PM | 8 | MR. TRIPI:  Okay.  Let's go 43 through 48, please. |
| 12:03PM | 9 | BY MR. TRIPI: |
| 12:03PM | 10 | Q.  So is 43 another entry for Mike Masecchia's wife? |
| 12:04PM | 11 | A.  Yes. |
| 12:04PM | 12 | Q.  And then is 44 through 47 various entries for your wife, |
| 12:04PM | 13 | Lauren Serio? |
| 12:04PM | 14 | A.  Yes. |
| 12:04PM | 15 | Q.  Her maiden name was Lauren Fina? |
| 12:04PM | 16 | A.  Correct. |
| 12:04PM | 17 | Q.  Who's entry 48 there? |
| 12:04PM | 18 | A.  That's Mark Falzone's girlfriend, Leah Rossi. |
| 12:04PM | 19 | Q.  You have a phone number for her? |
| 12:04PM | 20 | A.  Yes. |
| 12:04PM | 21 | MR. TRIPI:  Let's go 49 through 54 if we could. |
| 12:04PM | 22 | BY MR. TRIPI: |
| 12:04PM | 23 | Q.  49, again, is Mark Falzone's girlfriend? |
| 12:04PM | 24 | A.  Correct. |
| 12:04PM | 25 | Q.  Who is entry 50? |

12:04PM   1   A.   Lou Selva.

12:04PM   2   Q.   That's the Lou Selva you've been discussing who was

12:04PM   3   Bongiovanni's best friend?

12:04PM   4   A.   Correct.

12:04PM   5   Q.   Who's number -- who's entry 51 and 52 and 53 and 54?

12:04PM   6   A.   Mario Vacanti.

12:04PM   7   Q.   And it looks like you had two different numbers for Mario

12:04PM   8   Vacanti?

12:04PM   9   A.   Correct.

12:04PM   10  Q.   And one is them is Mario new, and one of them says Mario

12:05PM   11  Vacanti.   Why does one say Mario new with a bunch of Ws?

12:05PM   12  A.   Because that was a new number, instead of erasing it I

12:05PM   13  just put "new."

12:05PM   14  Q.   Is he someone who changed numbers frequently over time?

12:05PM   15  A.   Yes.

12:05PM   16          **MR. TRIPI:**   Let's go 55 through 57.

12:05PM   17          **BY MR. TRIPI:**

12:05PM   18  Q.   Entry 56 and 57, are those phone number entries for Mark

12:05PM   19  Falzone?

12:05PM   20  A.   Yes.

12:05PM   21  Q.   Who's the entry at 57?

12:05PM   22  A.   Mark Grisanti.

12:05PM   23  Q.   Who's that?

12:05PM   24  A.   That was my friend Santo Campanella's lawyer.   Because

12:05PM   25  Santo loaned me money, and I was supposed to put a lien on

12:05PM    1    one of my properties, and I was supposed to be in contact

12:05PM    2    with him.

12:05PM    3    Q.   Is that person a judge now, do you know?

12:05PM    4    A.   Yeah, I believe so.

12:05PM    5         **MR. TRIPI:**  Let's go 58 through 62.

12:05PM    6         **BY MR. TRIPI:**

12:06PM    7    Q.   So, 58 and 59, is that the Mark Keegan that you've

12:06PM    8    testified was one of your suppliers?

12:06PM    9    A.   Yes.

12:06PM   10    Q.   And you have a phone number for him?

12:06PM   11    A.   Correct.

12:06PM   12    Q.   Who's entry number 60?

12:06PM   13    A.   Marty Mazzara.

12:06PM   14    Q.   Who's that?

12:06PM   15    A.   That was a friend of Vegas.  Mike's wife's cousin.

12:06PM   16    Q.   Mike Masecchia's wife's cousin?

12:06PM   17    A.   Yes.

12:06PM   18    Q.   And is that 702 number a Las Vegas based number?

12:06PM   19    A.   Correct.

12:06PM   20    Q.   Who's entry number 61 and 62?

12:06PM   21    A.   Matt Maglietto.

12:06PM   22    Q.   And is that -- the last name is spelled differently, but

12:06PM   23    is that the same person each time?

12:06PM   24    A.   Yes.

12:06PM   25    Q.   And he's someone that worked for you?

| | | |
|---|---|---|
| 12:06PM | 1 | A.  Yes. |
| 12:06PM | 2 | Q.  He's deceased now? |
| 12:06PM | 3 | A.  Yes. |
| 12:06PM | 4 | Q.  And he had a son with the defendant's wife? |
| 12:06PM | 5 | A.  Correct. |
| 12:06PM | 6 | MR. TRIPI:  Let's go 63 through 66. |
| 12:07PM | 7 | BY MR. TRIPI: |
| 12:07PM | 8 | Q.  63, another entry for Matt Maglietto? |
| 12:07PM | 9 | A.  Correct. |
| 12:07PM | 10 | Q.  And then 64 through 66 are -- looks like the same number |
| 12:07PM | 11 | three times for Matt Suppa? |
| 12:07PM | 12 | A.  Yes. |
| 12:07PM | 13 | Q.  And you talked about him already yesterday? |
| 12:07PM | 14 | A.  Yes. |
| 12:07PM | 15 | MR. TRIPI:  Let's go 67 through 70, please. |
| 12:07PM | 16 | BY MR. TRIPI: |
| 12:07PM | 17 | Q.  67 and 68 are more entries for Mike Buttita? |
| 12:07PM | 18 | A.  Correct. |
| 12:07PM | 19 | Q.  And then 69 and 70, who's Mike Mechica? |
| 12:07PM | 20 | A.  Masecchia. |
| 12:07PM | 21 | Q.  So that's the Mike Masecchia you've been talking about |
| 12:07PM | 22 | yesterday and today? |
| 12:07PM | 23 | A.  Yes. |
| 12:07PM | 24 | Q.  Is that a personal number or a burner phone number? |
| 12:07PM | 25 | A.  Personal number. |

| | | |
|---|---|---|
| 12:07PM | 1 | Q.  You wouldn't keep a burner phone in this phone? |
| 12:07PM | 2 | A.  No. |
| 12:07PM | 3 | **MR. TRIPI:**  Let's go to entry 71 and 72. |
| 12:07PM | 4 | **BY MR. TRIPI:** |
| 12:08PM | 5 | Q.  Is that a phone number for Mike Moynihan? |
| 12:08PM | 6 | A.  Correct. |
| 12:08PM | 7 | Q.  Is that your long-time friend who would help unload |
| 12:08PM | 8 | marijuana as well as trip with you to New York City? |
| 12:08PM | 9 | A.  Yes. |
| 12:08PM | 10 | **MR. TRIPI:**  Let's go 73 to 76. |
| 12:08PM | 11 | **BY MR. TRIPI:** |
| 12:08PM | 12 | Q.  Who is the entry in 73 and 74? |
| 12:08PM | 13 | A.  Rob Rhine. |
| 12:08PM | 14 | Q.  What was your with relationship him? |
| 12:08PM | 15 | A.  He was a friend of mine. |
| 12:08PM | 16 | Q.  Did you sell him drugs? |
| 12:08PM | 17 | A.  We did drugs together. |
| 12:08PM | 18 | Q.  Okay.  Who's the entry in 75 and 76? |
| 12:08PM | 19 | A.  Sal Volpe. |
| 12:08PM | 20 | Q.  Who is that? |
| 12:08PM | 21 | A.  We grew marijuana together with Mike Masecchia. |
| 12:08PM | 22 | Q.  Is Sal Volpe also friends with Masecchia? |
| 12:08PM | 23 | A.  Yes. |
| 12:08PM | 24 | Q.  Is he friends with Lou Selva, if you know? |
| 12:08PM | 25 | A.  Yes. |

| 12:08PM | 1 | Q.  Do you know what, if any, relationship Sal Volpe has to |
| 12:09PM | 2 | Joseph Bongiovanni? |
| 12:09PM | 3 | A.  I believe they were friends. |
| 12:09PM | 4 | Q.  What do you base that on? |
| 12:09PM | 5 | A.  Sam mentioned him before. |
| 12:09PM | 6 | MR. TRIPI:  Okay.  Let's go to 77 to 80. |
| 12:09PM | 7 | BY MR. TRIPI: |
| 12:09PM | 8 | Q.  In 77 and 78, you have an entry Skip Giambrone.  Who's |
| 12:09PM | 9 | that? |
| 12:09PM | 10 | A.  Someone I dealt with, marijuana with. |
| 12:09PM | 11 | Q.  Do you know that person's first name? |
| 12:09PM | 12 | A.  I forgot. |
| 12:09PM | 13 | Q.  Is Skip a nickname? |
| 12:09PM | 14 | A.  Yes, it is. |
| 12:09PM | 15 | Q.  And you have that person's phone number? |
| 12:09PM | 16 | A.  Correct. |
| 12:09PM | 17 | Q.  And then you have 79 and 80, entries for Suppa.  Which |
| 12:09PM | 18 | Suppa is that? |
| 12:09PM | 19 | A.  That, I couldn't tell you. |
| 12:09PM | 20 | Q.  One of the Suppa brothers? |
| 12:09PM | 21 | A.  Yeah. |
| 12:09PM | 22 | Q.  Are there three of them? |
| 12:09PM | 23 | A.  Yes. |
| 12:09PM | 24 | Q.  So the options are Mark, Matt, or John? |
| 12:09PM | 25 | A.  I never really talked to Mark, so it's got to be John or |

12:09PM    1    Matt.

12:09PM    2            MR. TRIPI:  Okay.  And let's go 81 and 82.

12:09PM    3            BY MR. TRIPI:

12:10PM    4    Q.  Are those phone numbers and emails for your brother, Tom,

12:10PM    5    who the jury's heard you talk about?

12:10PM    6    A.  Yes.

12:10PM    7    Q.  Mr. Serio, I'm going to hand you up --

12:10PM    8            MR. TRIPI:  We can take that exhibit down,

12:10PM    9    Ms. Champoux.

12:10PM   10            BY MR. TRIPI:

12:10PM   11    Q.  I'm going to hand you up Government Exhibit 100E-1.

12:11PM   12        Mr. Serio, have you seen that Government Exhibit, that

12:11PM   13    100E-1 before?

12:11PM   14    A.  I don't believe so.

12:11PM   15    Q.  Do you understand the names of the people on the list?

12:11PM   16    A.  I do.

12:11PM   17    Q.  Do you know all of the people on the list?

12:11PM   18    A.  Yes, I do.

12:11PM   19    Q.  Are all of the people on that list people that have dealt

12:11PM   20    with you or been part of your drug operation at one time or

12:11PM   21    another?

12:11PM   22    A.  Yes.

12:11PM   23    Q.  Yes?

12:11PM   24    A.  Yes, sir.

12:11PM   25    Q.  And the phone numbers on that list, are those phone

12:11PM   1   numbers that, at one point or another, were with people

12:11PM   2   dealing with you?

12:11PM   3   A.  I don't know, because I don't remember phone numbers.

12:11PM   4   But the last guy, I don't know who that is.

12:11PM   5   Q.  And who don't you know?

12:11PM   6   A.  Charles Butera.

12:11PM   7   Q.  Everybody else on the list you know?

12:11PM   8   A.  Yes.

12:11PM   9   Q.  So Mr. Serio, did you work closely with Mike Masecchia

12:12PM  10   from that meeting at the O Restaurant in 2007 all the way

12:12PM  11   through your arrest April 18th, 2017?

12:12PM  12   A.  Yes.

12:12PM  13   Q.  And at certain points, were you partners?

12:12PM  14   A.  Yes.

12:12PM  15   Q.  How was your relationship?

12:12PM  16   A.  How was our relationship?

12:12PM  17   Q.  How was your relationship during that time?

12:13PM  18   A.  It was good.

12:13PM  19   Q.  And during large portion of that time, beginning shortly

12:13PM  20   after that in '07, were you also working with Lou Selva?

12:13PM  21   A.  What do you mean by that?

12:13PM  22   Q.  Well, through Masecchia --

12:13PM  23   A.  Yes.

12:13PM  24   Q.  -- was Selva part of --

12:13PM  25   A.  Yes.

12:13PM    1    Q.  -- how you were communicating with Bongiovanni?

12:13PM    2    A.  Correct.

12:13PM    3    Q.  Did you work with him uninterrupted for about a decade?

12:13PM    4    A.  Yes.

12:13PM    5    Q.  What's your understanding and belief as to why you were

12:13PM    6    able to operate uninterrupted until April 18th, 2017?

12:13PM    7    A.  Because --

12:13PM    8            **MR. MacKAY:**  Objection.  Speculation.

12:13PM    9            **MR. TRIPI:**  It's his own personal understanding.

12:13PM   10            **THE COURT:**  Overruled.

12:13PM   11            **THE WITNESS:**  Because of the protection from Joe

12:13PM   12    Bongiovanni.

12:13PM   13            **MR. TRIPI:**  Just one moment, please, Your Honor.

12:14PM   14            No further direct now, Your Honor, thank you.

12:14PM   15            **THE COURT:**  We're going to take our lunch hour now.

12:14PM   16            Please remember my instructions about not discussing

12:14PM   17    any aspect of this case with anyone.  Don't do research on

12:14PM   18    your own.  Don't use tools of technology to research the case

12:14PM   19    or to communicate about the case.

12:14PM   20            Don't read, or watch, or listen to any news coverage

12:14PM   21    of the case, if there is any, while we're still on trial.  And

12:14PM   22    please don't make up your mind until all the evidence has been

12:14PM   23    presented and you begin your deliberations.

12:14PM   24            Let's come back at 1:30.  We'll continue then.

12:14PM   25            Thanks very much.

| | | |
|---|---|---|
| 12:15PM | 1 | (Jury excused at 12:15 p.m.) |
| 12:15PM | 2 | **THE COURT:**  Anything we need to put on the record |
| 12:15PM | 3 | before we break from the government? |
| 12:15PM | 4 | **MR. TRIPI:**  No, Your Honor. |
| 12:15PM | 5 | **THE COURT:**  Anything from the defense? |
| 12:15PM | 6 | **MR. MacKAY:**  I think we can deal with it later, |
| 12:15PM | 7 | Judge.  I saw a couple 43A exhibits probably need to be |
| 12:15PM | 8 | redacted because they include some personal information, but |
| 12:15PM | 9 | we can probably do that at the end of the day. |
| 12:15PM | 10 | **MR. TRIPI:**  Yeah, I agree.  There was a Social |
| 12:15PM | 11 | Security Number or something like that. |
| 12:15PM | 12 | **THE COURT:**  Okay.  That's fine.  Great. |
| 12:15PM | 13 | Thanks, everybody. |
| 12:15PM | 14 | **MR. TRIPI:**  Thank you, Your Honor. |
| 12:15PM | 15 | **THE CLERK:**  All rise. |
| 12:15PM | 16 | (Off the record at 12:15 p.m.) |
| 01:35PM | 17 | (Back on the record at 1:35 p.m.) |
| 01:35PM | 18 | (Jury not present.) |
| 01:35PM | 19 | **THE CLERK:**  All rise. |
| 01:35PM | 20 | **THE COURT:**  Please be seated. |
| 01:35PM | 21 | **THE CLERK:**  We are back on the record for the |
| 01:35PM | 22 | continuation of the jury trial in case number 19-cr-227, |
| 01:35PM | 23 | United States of America versus Joseph Bongiovanni. |
| 01:35PM | 24 | All counsel and parties are present. |
| 01:35PM | 25 | **THE COURT:**  Okay.  It looks like we're going to lose |

01:35PM  1   a juror.  Juror number 9 has been hurting, I don't know if

01:35PM  2   you've noticed, she's been limping in and out.  Colleen just

01:35PM  3   told me she just went down -- she's on the second floor now,

01:35PM  4   and she can barely move.  Colleen said she's virtually in

01:35PM  5   tears because she's hurting so badly and has asked to be

01:35PM  6   excused.  I made the executive decision to let her stay on the

01:35PM  7   second floor, but not to discharge her until I talk with you

01:35PM  8   folks.  But it seems like a forgone conclusion to me.

01:35PM  9           **MR. TRIPI:**  Did something -- did she fall?

01:35PM 10           **THE COURT:**  I don't know, if you've seen but she's

01:35PM 11   been limping.

01:35PM 12           **THE CLERK:**  I think she has a medical issue.

01:35PM 13           **OFFICER CORONA:**  A back issue like sciatica.

01:36PM 14           **THE COURT:**  A back issue with sciatica.  And I

01:36PM 15   suffered from that 30 something years ago, I actually had

01:36PM 16   surgery for my back, so I know how intense that pain can be

01:36PM 17   especially when you're sitting.

01:36PM 18           **MR. TRIPI:**  Yeah.

01:36PM 19           **THE COURT:**  It's unbearable.  So any objection to

01:36PM 20   excusing her?

01:36PM 21           **MR. MacKAY:**  No, Your Honor.

01:36PM 22           **MR. TRIPI:**  No, Your Honor.

01:36PM 23           **THE COURT:**  Any reason that we should bring her up

01:36PM 24   here?  Just let her go from the second floor, right?

01:36PM 25           **MR. TRIPI:**  I defer to the defense on that.

01:36PM   1      **MR. MacKAY:**  No, I don't think we need to -- I assume

01:36PM   2   she'll be released with some sort of instruction not to talk

01:36PM   3   about the case or something.

01:36PM   4      **THE COURT:**  Pardon me?

01:36PM   5      **THE CLERK:**  I can run down.

01:36PM   6      **THE COURT:**  Do you want me to go down and talk to

01:36PM   7   her?

01:36PM   8      **MR. MacKAY:**  We'll defer to the Court.  I don't know

01:36PM   9   if that's necessary.

01:36PM  10      **THE COURT:**  Yeah, why don't I let --

01:36PM  11      Rebecca, why don't you go down and just make sure she

01:36PM  12   understands that she's not to talk to anybody still, certainly

01:36PM  13   not to talk to any of the jurors, not to talk to anybody about

01:36PM  14   the case until the case has finally been decided.  She's not

01:37PM  15   to give her view of what should happen or anything like that.

01:37PM  16   So please tell her that.  Okay?

01:37PM  17      Is everybody satisfied?  I want to make sure

01:37PM  18   everybody's satisfied with that.

01:37PM  19      **MR. MacKAY:**  Yes, Your Honor.

01:37PM  20      **MR. TRIPI:**  Yes, Your Honor.

01:37PM  21      **THE COURT:**  I think that's safe enough.  And under

01:37PM  22   the circumstances, rather than delay everybody now or have her

01:37PM  23   suffer the pain that she would have to have to come up here, I

01:37PM  24   think that's a reasonable compromise.  And I'm glad the

01:37PM  25   lawyers agree with that as well.  So thank you.

01:37PM  1          **MR. TRIPI:**  We agree.

01:37PM  2          **MR. COOPER:**  And, Judge, you're going to move

01:37PM  3  alternate 1 into seat number 9, is that how it works?

01:37PM  4          **THE COURT:**  I would just move everyone down one.

01:37PM  5          **MR. COOPER:**  Move everybody down one?

01:37PM  6          **THE COURT:**  Yeah.  We'll move 10 into 9's seat, and

01:37PM  7  then move everybody down.

01:37PM  8          **MR. COOPER:**  Understood.

01:37PM  9          **THE COURT:**  Okay?  Make sense?  In fact, we won't

01:37PM  10  even move everybody down, we'll just move that chair out of

01:37PM  11  the way since 10 has sort of been out of the -- really the

01:37PM  12  only one out of the jury box, okay?

01:37PM  13          **MR. TRIPI:**  Okay.

01:37PM  14          **THE COURT:**  Make sense?  Okay.  Let's do it.

01:37PM  15          Let's bring them in.

01:37PM  16          Anything that we need to put on the record from your

01:37PM  17  perspectives?

01:37PM  18          **MR. TRIPI:**  No, Your Honor.

01:38PM  19          **MR. MacKAY:**  No, Your Honor.

01:38PM  20          **THE COURT:**  Okay, let's bring them back, please, Pat.

01:40PM  21          (Jury seated at 1:40 p.m.)

01:40PM  22          **THE COURT:**  Welcome back, everyone all our jurors

01:40PM  23  except number 9 are present.

01:40PM  24          Juror number 9, as you folks know, has a back problem

01:40PM  25  that caused her pretty bad pain, and I guess the pain got so

01:40PM 1   bad that she could no longer continue.  We've excused her.

01:41PM 2          I just want to impress on you folks it's important

01:41PM 3   not to talk to her at all about anything.  No one talk until

01:41PM 4   after the case is over.  Once the case is over, you folks can

01:41PM 5   call her, talk to her about it, about the jury service and the

01:41PM 6   case.  But until the case is over, do not talk to her.

01:41PM 7          We're asking her not to call any of you.  But if she

01:41PM 8   does, just please politely say you can't talk about it.

01:41PM 9   Because I'm not giving her that instruction myself, someone

01:41PM 10  else is.  But I'm giving the instruction to you folks, and I

01:41PM 11  know you folks pay attention to what I tell you.

01:41PM 12         So, please, if she calls you, do not talk to her at

01:41PM 13  all.  Okay?  Tell her, you know, we'll talk to you after the

01:41PM 14  trial is over, and then we'll talk about anything you want.

01:41PM 15  Okay?  Great.

01:41PM 16         All our jurors are present now.

01:41PM 17         And I remind the witness that he's still under oath.

01:41PM 18         And cross-examination can begin.

01:41PM 19         **MR. MacKAY:**  Thank you, Your Honor.

01:41PM 20

01:41PM 21              **CROSS-EXAMINATION BY MR. MacKAY:**

01:42PM 22  Q.  Good afternoon, Mr. Serio.  How are you?

01:42PM 23  A.  Good, how are you?

01:42PM 24  Q.  Well.  You are looking well yourself.

01:42PM 25      It's now been almost seven years ago next month that you

USA v Bongiovanni - Serio - MacKay/Cross - 3/12/24

103

| | | |
|---|---|---|
| 01:42PM | 1 | were arrested, correct? |
| 01:42PM | 2 | A.  Correct. |
| 01:42PM | 3 | Q.  And by your own description, at that time you were near |
| 01:42PM | 4 | death; fair to say? |
| 01:42PM | 5 | A.  Correct. |
| 01:42PM | 6 | Q.  Now, you described yourself using the term "high |
| 01:42PM | 7 | functioning," correct? |
| 01:42PM | 8 | A.  Correct. |
| 01:42PM | 9 | Q.  But at the time you were arrested and the time leading up |
| 01:42PM | 10 | to that, we're going to go through some of the drugs you were |
| 01:42PM | 11 | using.  You were using as much as, was it 2 to 3 grams of |
| 01:42PM | 12 | heroin per day? |
| 01:42PM | 13 | A.  Correct. |
| 01:42PM | 14 | Q.  You -- how many oxycodone pills a day were you using? |
| 01:43PM | 15 | A.  If I wasn't using heroin, I'd be using 40 of those a day. |
| 01:43PM | 16 | Q.  And you said if you're not using heroin, it's 40 Oxys? |
| 01:43PM | 17 | A.  Yes. |
| 01:43PM | 18 | Q.  Okay.  And I think you told us, in total, you got as many |
| 01:43PM | 19 | as 16,000 pills from Jarrett Guy, and you used three quarters |
| 01:43PM | 20 | of those? |
| 01:43PM | 21 | A.  Correct. |
| 01:43PM | 22 | Q.  Okay.  And then you were doing cocaine on top of that at |
| 01:43PM | 23 | times to level yourself out, correct? |
| 01:43PM | 24 | A.  Correct. |
| 01:43PM | 25 | Q.  And Adderall, as well, on a daily basis? |

USA v Bongiovanni - Serio - MacKay/Cross - 3/12/24

104

01:43PM  1    A.  Correct.

01:43PM  2    Q.  Did you drink alcohol as well during that time?

01:43PM  3    A.  I never drank alcohol.

01:43PM  4    Q.  Okay.  And to give the jury an idea of what some of these

01:43PM  5    drugs are like, I think we've heard some adjectives, but I'm

01:43PM  6    gonna put it in perspective.

01:43PM  7        But understanding is that Oxys, oxycodone is about one

01:43PM  8    and a half times the strength of morphine; is that something

01:43PM  9    you understand?

01:43PM  10   A.  I'm not sure of the dynamic of it, but it's strong.

01:44PM  11   Q.  It's strong?

01:44PM  12   A.  Yes.

01:44PM  13   Q.  And then fentanyl, do you know to be much, much stronger

01:44PM  14   than Oxys?

01:44PM  15   A.  Yes.

01:44PM  16   Q.  Okay.  So, you know, my understanding it's approximately

01:44PM  17   100 times more than morphine.  Does that sound like a rough

01:44PM  18   estimate of how much more powerful it is just than Oxys?

01:44PM  19   A.  Probably.

01:44PM  20   Q.  Okay.  Now let's talk about heroin.

01:44PM  21       I've been told an example of what it's like to be on

01:44PM  22   heroin, and I want to give you the example and see if can you

01:44PM  23   tell me if it's the same comparative example.

01:44PM  24       Have you ever had your teeth out and been put under for

01:44PM  25   anesthesia?

01:44PM    1    A.   No.

01:44PM    2    Q.   Have you ever been put under for anesthesia at any point

01:44PM    3    in time?

01:44PM    4    A.   No.

01:44PM    5    Q.   Okay.  Then the example is not gonna work, I guess.

01:44PM    6         But the drugs, when you're on them, they dull your

01:44PM    7    senses, correct?

01:44PM    8    A.   That's correct.

01:44PM    9    Q.   You don't think clearly at all, correct?

01:44PM   10    A.   Correct.

01:44PM   11    Q.   But at times, you said you would use cocaine to sort of

01:44PM   12    pull yourself back out of that?

01:44PM   13    A.   Correct.

01:44PM   14    Q.   But certainly by the time you were arrested, you were

01:45PM   15    heavily addicted, correct?

01:45PM   16    A.   Correct.

01:45PM   17    Q.   You needed these kind of drugs to get through the day

01:45PM   18    from waking hour until you fell asleep, correct?

01:45PM   19    A.   Correct.

01:45PM   20    Q.   All right.  Let's talk about Mike Masecchia.

01:45PM   21    A.   Yes.

01:45PM   22    Q.   Now, he's somebody you knew from when you were young

01:45PM   23    around approximately age 18, correct?

01:45PM   24    A.   Correct.

01:45PM   25    Q.   And this, just so we're getting all the dates right, this

01:45PM   1   is like late '90s, early 2000s?

01:45PM   2   A.  Yes.

01:45PM   3   Q.  You bought marijuana from him at that point in time,

01:45PM   4   correct?

01:45PM   5   A.  It -- not directly at that point.

01:45PM   6   Q.  Okay.  Marijuana was coming through somebody else to you

01:45PM   7   at that point in time?

01:45PM   8   A.  Correct.

01:45PM   9   Q.  And this -- and at that point in time, we're talking

01:45PM   10  fairly small, like in eighths and quarters --

01:45PM   11  A.  It was --

01:45PM   12  Q.  -- and stuff --

01:45PM   13  A.  -- quarter --

01:45PM   14  Q.  -- like that --

01:45PM   15  A.  -- yeah.

01:45PM   16         **THE COURT:**  One at a time, please.

01:46PM   17         **BY MR. MacKAY:**

01:46PM   18  Q.  What was the quantity you were getting at that time?

01:46PM   19  A.  Like quarter pounds, half pounds.  Occasionally a pound.

01:46PM   20  Q.  Okay.  And then you were splitting it -- a pound is

01:46PM   21  16 ounces, correct?

01:46PM   22  A.  Correct.

01:46PM   23  Q.  And you're splitting it up into much smaller amounts at

01:46PM   24  that time to sell, correct?

01:46PM   25  A.  Correct.

01:46PM  1   Q.   Okay.   At that point in time, you knew that he was

01:46PM  2   growing marijuana out in Franklinville with Joe Tomasello,

01:46PM  3   correct?

01:46PM  4   A.   Correct.

01:46PM  5   Q.   Now, fast forward, I think if I've got the timeline

01:46PM  6   correct, about fall 2007, you hook up again with Mike

01:46PM  7   Masecchia, correct?

01:46PM  8   A.   Correct.

01:46PM  9   Q.   That's this meeting at O Restaurant on Sheridan you

01:46PM  10  talked about, correct?

01:46PM  11  A.   Correct.

01:46PM  12  Q.   Now the relationship is going to become a little bit

01:46PM  13  different, more of a -- potential partners at this time,

01:46PM  14  correct?

01:46PM  15  A.   Correct.

01:46PM  16  Q.   And at that time, though, he's still supplying you to

01:46PM  17  some degree, correct?

01:46PM  18  A.   Correct.

01:46PM  19  Q.   Still has this grow operation out in the Southern Tier

01:46PM  20  somewhere, correct?

01:47PM  21  A.   Correct.

01:47PM  22  Q.   But he's also getting marijuana from other places,

01:47PM  23  correct?   Do you know of?

01:47PM  24  A.   I'm not sure of.

01:47PM  25  Q.   Did you know him to attempt to arrange a purchase through

01:47PM    1    Remus Nowak?

01:47PM    2    A.  At this time, no.

01:47PM    3    Q.  Did you know at a later time?

01:47PM    4    A.  Yeah, later on he did.

01:47PM    5    Q.  I -- I might be getting the dates wrong, we'll circle

01:47PM    6    back to that.

01:47PM    7    A.  All right.

01:47PM    8    Q.  Let's talk about who Mike Masecchia is.  Do you know him

01:47PM    9    to be an intimidating guy?

01:47PM   10    A.  He is.

01:47PM   11    Q.  How -- why would you say that?

01:47PM   12    A.  Just from hearing things on the streets, he got in a lot

01:47PM   13    of fights, and people feared him.

01:47PM   14    Q.  Okay.  Was he a physically intimidating guy?

01:47PM   15    A.  Yeah, physically he was intimidating.

01:47PM   16    Q.  How so?

01:47PM   17    A.  He's just big, and he has an intimidating look.

01:47PM   18    Q.  Known to do steroids?

01:47PM   19    A.  Yes.

01:47PM   20    Q.  Known to have issues with anger?

01:47PM   21    A.  Yes.

01:47PM   22    Q.  I mean, he can kind of fly off the handle at any moment;

01:47PM   23    fair to say?

01:47PM   24    A.  Yes.

01:47PM   25    Q.  I think you've described it, you had him in like a phone

USA v Bongiovanni - Serio - MacKay/Cross - 3/12/24

109

01:48PM   1   or somewhere and had a nickname for him of Gorilla, remember

01:48PM   2   that?

01:48PM   3   A.  Yes.

01:48PM   4   Q.  And you knew you that because you had learned something

01:48PM   5   about him doing robberies in the past wearing a Gorilla mask?

01:48PM   6   A.  Yes.

01:48PM   7   Q.  Did you ever see him carry a firearm?

01:48PM   8   A.  No.

01:48PM   9   Q.  And I think you've told us he had some reputation of

01:48PM  10   being connected to Italian Organized Crime, correct?

01:48PM  11   A.  Correct.

01:48PM  12   Q.  In fact, your understanding, he actually introduced you

01:48PM  13   to some other individual, Frank Bifulco, that you knew

01:48PM  14   through Masecchia to have IOC connections, correct?

01:48PM  15   A.  Correct.

01:48PM  16   Q.  All right.  So you knew him to at least have some

01:48PM  17   familial connection to somebody associated with Italian

01:48PM  18   Organized Crime, correct?

01:48PM  19   A.  Correct.

01:48PM  20   Q.  Okay.  Long story short, you believed him -- he's a guy

01:48PM  21   you don't mess with; fair to say?

01:48PM  22   A.  Yes.

01:48PM  23   Q.  And he's, what, about a decade or so older than you?

01:48PM  24   A.  I believe so.

01:48PM  25   Q.  Do you also know him to be involved in high interest

USA v Bongiovanni - Serio - MacKay/Cross - 3/12/24

01:49PM    1   street loans?

01:49PM    2   A.  That?  No.

01:49PM    3   Q.  Okay.  Do you recall telling the government that, that

01:49PM    4   you did -- scratch that.

01:49PM    5      Now, aside from your business with marijuana, you had

01:49PM    6   done a rent-to-own plan with him for your house you left to

01:49PM    7   move into Lebrun, correct?

01:49PM    8   A.  Correct.

01:49PM    9   Q.  He actually didn't pay on that for several years,

01:49PM   10   correct?

01:49PM   11   A.  Yes, at the end, he did not pay.

01:49PM   12   Q.  Okay.  And you actually had to have him evicted, correct?

01:49PM   13   A.  Correct.

01:49PM   14   Q.  And I think you ended your direct examination, Mr. Tripi

01:49PM   15   asked you about, you know, what was your relationship with

01:49PM   16   Mike Masecchia; do you remember that question?

01:49PM   17   A.  Yes.

01:49PM   18   Q.  So I'm going to ask you:  What is your relationship like

01:49PM   19   with Mike Masecchia now?

01:49PM   20   A.  Not good.

01:49PM   21   Q.  Why is that?

01:49PM   22   A.  Because I am cooperating against him.

01:50PM   23   Q.  All right.  And why do you think that makes the

01:50PM   24   relationship not good?

01:50PM   25   A.  Because anybody would not like that.

01:50PM   1   Q.  Okay.  Now I want to talk a little bit about the

01:50PM   2   time frame --

01:50PM   3   A.  Okay.

01:50PM   4   Q.  -- of your marijuana supply.

01:50PM   5       So I think you told us in about 2008 to 2010, you have

01:50PM   6   some grow attempts at the 608 Michigan, 82 Sycamore property?

01:50PM   7   A.  Between 2005, 2010.

01:50PM   8   Q.  2005 to 2010.  But that's done by 2010, correct?

01:50PM   9   A.  Correct.

01:50PM   10  Q.  And we keep using the warehouse addresses

01:50PM   11  interchangeably, but they're two different addresses on that

01:50PM   12  same property, correct?

01:50PM   13  A.  Correct.

01:50PM   14  Q.  If there were grows, would they only ever happen in one

01:50PM   15  of the locations, or --

01:50PM   16  A.  Yes, 608 Michigan.

01:50PM   17  Q.  So 608 Michigan is where you're doing the grows, and

01:50PM   18  that's up to 2010 with your brother?

01:50PM   19  A.  Correct.

01:50PM   20  Q.  Now at that point in time, you were also getting

01:50PM   21  marijuana from Mark Keegan, correct?

01:50PM   22  A.  Correct.

01:50PM   23  Q.  Now after 2010, after you stopped growing at 608

01:51PM   24  Michigan, you primarily use those warehouses as storage for

01:51PM   25  your real estate companies, correct?

01:51PM  1    A.  Correct.

01:51PM  2    Q.  Okay.  So no more drug activity at those locations other

01:51PM  3    than what you've testified to about a couple tractor-trailers

01:51PM  4    being unloaded, correct?

01:51PM  5    A.  Not -- U-Haul trucks.

01:51PM  6    Q.  U-Haul trucks.

01:51PM  7    A.  That's later on.

01:51PM  8    Q.  Okay.  So the U-Haul trucks a couple times get unloaded?

01:51PM  9    A.  It was more than a couple times.

01:51PM  10   Q.  Okay.  But you're not -- there's no grow operation there

01:51PM  11   in 2010 at those warehouses, correct?

01:51PM  12   A.  Correct.

01:51PM  13   Q.  So, again, getting to 2010, you go to Mark Keegan for

01:51PM  14   your supply, correct?

01:51PM  15   A.  2008.

01:51PM  16   Q.  Well, yeah, that's what -- I guess, I mean, so it starts

01:51PM  17   in 2008 --

01:51PM  18   A.  Yes, sir.

01:51PM  19   Q.  -- but after you're no longer able to grow yourself, you

01:51PM  20   continue to get from Mark Keegan, correct?

01:51PM  21   A.  Right.

01:51PM  22   Q.  And at some point in time, you move to going through

01:51PM  23   T.S., correct?

01:52PM  24   A.  Correct.

01:52PM  25   Q.  And T.S. is essentially a middleman for a gentleman named

01:52PM      1    Santiago Gale, right?

01:52PM      2    A.  Correct.

01:52PM      3    Q.  You never dealt with them separately, correct?

01:52PM      4    A.  Correct.

01:52PM      5    Q.  It was only -- if you were dealing with T.S., it was

01:52PM      6    because you were getting your stuff from Santiago Gale,

01:52PM      7    correct?

01:52PM      8    A.  Correct.

01:52PM      9    Q.  And you never dealt with Santiago Gale without going

01:52PM     10    through T.S., correct?

01:52PM     11    A.  Correct.

01:52PM     12    Q.  Now, did you come to learn that Santiago Gale was

01:52PM     13    arrested here in federal court in the Western District of

01:52PM     14    New York?

01:52PM     15    A.  Yes.

01:52PM     16    Q.  Okay.  If I told you he was charged on or about

01:52PM     17    January 24th of 2012, you'd have no reason to disagree with

01:52PM     18    me, would you?

01:52PM     19    A.  I don't know the exact date, but I didn't know until

01:52PM     20    later on that he got arrested.

01:52PM     21    Q.  Okay.  But if I told you he's arrested in January of

01:52PM     22    2012, I'm not trying to trick you here, does that sound about

01:52PM     23    approximately when --

01:52PM     24    A.  If I answered that yes, I'd be lying.

01:53PM     25    Q.  Okay.

USA v Bongiovanni - Serio - MacKay/Cross - 3/12/24

01:53PM  1   A.  I have no idea.

01:53PM  2   Q.  I guess what I'm trying to get at next is after Santiago

01:53PM  3   Gale is arrested, you no longer deal with him, correct?

01:53PM  4   A.  Correct.

01:53PM  5   Q.  Because he's not able to supply you anymore, correct?

01:53PM  6   A.  It was more so I stopped going to him after Wayne

01:53PM  7   Anderson -- so, I was supposed to get it from Santiago Gale.

01:53PM  8   And then in late 2012, Wayne Anderson got arrested.  And then

01:53PM  9   I kind of stopped for a little bit.

01:53PM  10  Q.  Okay.  Well, let me back up a little before 2012.

01:53PM  11      You talked a little bit on direct about the robbery of

01:53PM  12  T.S.?

01:53PM  13  A.  Yes.

01:53PM  14  Q.  Do you remember that?

01:53PM  15  A.  That was in 2013.

01:53PM  16  Q.  Okay.  Do you recall actually testifying before the grand

01:53PM  17  jury that you believed that was in 2011?

01:53PM  18  A.  No.

01:53PM  19  Q.  Okay.  Let me help you refresh your recollection here.

01:53PM  20      MR. MacKAY:  Ms. Champoux, can we put for the witness

01:54PM  21  only Government Exhibit 3536N, and go to the second half of

01:54PM  22  page 15.

01:54PM  23      BY MR. MacKAY:

01:54PM  24  Q.  So I'd like you to read -- let met start, like, line 15.

01:54PM  25  Would you read that to yourself, at the end of the page, let

01:54PM    1   me know, and we'll go to the next page.

01:54PM    2            MR. MacKAY:  Ms. Champoux, can we advance that to

01:54PM    3   page 16.

01:54PM    4            BY MR. MacKAY:

01:54PM    5   Q.  Okay.  And will you continue to read down to about the

01:54PM    6   middle of the page.

01:54PM    7   A.  I had it incorrect with that, because in 2011, I didn't

01:54PM    8   even know T.S..

01:54PM    9   Q.  Okay.  So it's your testimony that the robbery with T.S.

01:55PM   10   occurs in 2013?

01:55PM   11   A.  2013.

01:55PM   12            MR. MacKAY:  Okay.  You can take that down,

01:55PM   13   Ms. Champoux, thank you.

01:55PM   14            BY MR. MacKAY:

01:55PM   15   Q.  But at the time you were dealing with T.S. and that

01:55PM   16   robbery --

01:55PM   17   A.  Yes.

01:55PM   18   Q.  -- that marijuana was coming from Santiago Gale, correct?

01:55PM   19   A.  I assumed it, I didn't know 100 percent though.

01:55PM   20   Q.  Okay.  Now, speaking of Santiago Gale, when you wanted to

01:55PM   21   start dealing with him, you vouched for your organization by

01:55PM   22   telling Mr. Gale that you had a DEA agent on the payroll

01:55PM   23   correct?

01:55PM   24   A.  Correct.

01:55PM   25   Q.  All right.  And that was somewhat of the same thing, it

01:55PM   1   was similar to what Mike Masecchia told you back in 2007,

01:55PM   2   2008, when you first started dealing with him, correct?

01:55PM   3   A.  Correct.

01:55PM   4   Q.  It wasn't necessarily that Mike Masecchia had anybody on

01:55PM   5   the payroll, it was that Joe Bongiovanni was looking out for

01:55PM   6   us, correct?

01:55PM   7   A.  Correct.

01:55PM   8   Q.  So at that point in time in 2007, 2008, you didn't

01:56PM   9   understand Mr. Masecchia to be paying you any money though,

01:56PM  10   right?

01:56PM  11   A.  No.

01:56PM  12   Q.  I'm sorry, to be paying Joe Bongiovanni any money,

01:56PM  13   correct?

01:56PM  14   A.  Correct.

01:56PM  15   Q.  Okay.  But with both you talking to Santiago Gale, and

01:56PM  16   Mike Masecchia talking to you, both of these relationships

01:56PM  17   are furthered by discussion about Joe Bongiovanni, correct?

01:56PM  18   A.  Correct.

01:56PM  19   Q.  Now, after, sometime after Santiago Gale, you go back to

01:56PM  20   Mark Keegan, correct?

01:56PM  21   A.  Yes, sir.

01:56PM  22   Q.  As a supply?

01:56PM  23   A.  Yes.

01:56PM  24   Q.  All right.  You're done dealing with T.S. after the

01:56PM  25   robbery, correct?

USA v Bongiovanni - Serio - MacKay/Cross - 3/12/24

01:56PM  1   A.  Yes.

01:56PM  2   Q.  You were very unhappy about what happened that he was

01:56PM  3   storing marijuana at your warehouse, correct?

01:56PM  4   A.  Correct.

01:56PM  5   Q.  He also had a machine gun there without your knowledge,

01:56PM  6   in your warehouse, correct?

01:56PM  7   A.  Correct.

01:56PM  8   Q.  So you were completely done with him, correct?

01:56PM  9   A.  Correct.

01:56PM  10  Q.  And so Mark Keegan then introduces you to an individual

01:56PM  11  in New York City that's from Vancouver named Jarrett Guy,

01:57PM  12  correct?

01:57PM  13  A.  Correct.

01:57PM  14  Q.  This would be in the approximate 2013 to 2014 time frame?

01:57PM  15  A.  2013.

01:57PM  16  Q.  Okay.  Beginning or end of 2013, if you can recall?

01:57PM  17  A.  More towards the end.

01:57PM  18  Q.  All right.  Now in those same years, do you also recall

01:57PM  19  trying to arrange some alternate sources -- strike that, let

01:57PM  20  me back up.

01:57PM  21      You don't go immediately with Jarrett Guy, you still have

01:57PM  22  both Mark Keegan and Jarrett Guy for a little bit of the time

01:57PM  23  period, correct?

01:57PM  24  A.  Correct.

01:57PM  25  Q.  But then after six months, you cut Mark Keegan out

01:57PM     1   because he's no longer able to supply you, correct?

01:57PM     2   A.  Well, more so, he introduces me to Jarrett Guy, and he

01:57PM     3   was getting a cut, kind of, out of it.  And sometimes he

01:57PM     4   would have an alternate supply, but because I didn't want --

01:57PM     5   I wanted to save money, I cut Mark Keegan out.

01:57PM     6   Q.  So, right, eventually there comes a point in time where

01:57PM     7   Mark Keegan is no longer around, correct?

01:57PM     8   A.  Right.

01:57PM     9   Q.  Now, in those same years, do you also recall trying to

01:57PM    10   arrange some alternate sources from other parts of Canada?

01:58PM    11   A.  Yes.

01:58PM    12   Q.  One was a gentleman named Percy Regimbal, do you remember

01:58PM    13   him?

01:58PM    14   A.  Sorry?

01:58PM    15   Q.  Percy?

01:58PM    16   A.  Yes, Percy.

01:58PM    17   Q.  And Percy is somebody you met over the Rainbow Bridge in

01:58PM    18   Niagara Falls for a single occasion, correct?

01:58PM    19   A.  Correct.

01:58PM    20   Q.  And basically he tried to sell you a lesser quality

01:58PM    21   marijuana for the same price you were already getting from

01:58PM    22   Jarrett, correct?

01:58PM    23   A.  Yes.

01:58PM    24   Q.  And he wanted you to either pay to get it over the

01:58PM    25   border, or get it over the border yourself, correct?

01:58PM  1    A.  He wanted me to pay for it in Canada, and also I had to

01:58PM  2    be responsible for bringing it over.  Which I didn't have --

01:58PM  3    Q.  Long story short, Mr. Guy, you get more for the same

01:58PM  4    price?

01:58PM  5    A.  Correct.

01:58PM  6    Q.  You get it delivered at home, same price, better quality,

01:58PM  7    correct?

01:58PM  8    A.  Correct.

01:58PM  9    Q.  So you didn't go with Percy, correct?

01:58PM  10   A.  No.

01:58PM  11   Q.  And then do you recall another occasion where you're put

01:58PM  12   in touch with a guy in Montreal to see if there's a supply

01:58PM  13   source there?

01:58PM  14   A.  Correct.

01:58PM  15   Q.  And you go up there to Montreal and you meet a guy at the

01:59PM  16   casino, correct?

01:59PM  17   A.  Correct.

01:59PM  18   Q.  But you ended up spending the $50,000 that you brought up

01:59PM  19   there, and weren't able to consummate the deal, correct?

01:59PM  20   A.  Yes.

01:59PM  21   Q.  So that one didn't work out, correct?

01:59PM  22   A.  No, correct.

01:59PM  23   Q.  And you testified at times you were good at making money,

01:59PM  24   but had a hard time with managing the money, correct?

01:59PM  25   A.  Correct.

01:59PM   1      **MR. MacKAY:**  Ms. Champoux, can we put up for the jury

01:59PM   2   and witness Government Exhibit 43A-36.

01:59PM   3      **BY MR. MacKAY:**

01:59PM   4   Q.  So on this screen, do you recall that to be one of your

01:59PM   5   ledgers?

01:59PM   6   A.  Yes.

01:59PM   7   Q.  So this is, in sum and substance, how you managed your

01:59PM   8   money?

01:59PM   9   A.  Correct.

01:59PM  10   Q.  Okay.  I mean, just to look at this, for example, in the

01:59PM  11   upper left corner it says JC 9500; does that mean anything to

01:59PM  12   you?

01:59PM  13   A.  Yes.  Jay Campbell owed me $9,500.

02:00PM  14   Q.  Okay.  So the people here are all -- now, is this

02:00PM  15   legitimate money?  Or is this illegitimate money reflected in

02:00PM  16   this ledger?

02:00PM  17   A.  Illegitimate.

02:00PM  18   Q.  Okay.  Is it drug money?  Or is it debt collection money

02:00PM  19   in any fashion?

02:00PM  20   A.  Drug money.

02:00PM  21   Q.  Okay.  So you maintained separate ledgers for the drug

02:00PM  22   activity that would record both -- well, what did they record

02:00PM  23   in total?  Was it just who owed you what?  Or did you also

02:00PM  24   itemize your expenses in here?

02:00PM  25   A.  Sometimes I'd itemize my personal expenses in some of my

02:00PM    1   ledgers.

02:00PM    2   Q.  Now if were to look through these ledgers, we wouldn't

02:00PM    3   find any line items for the Mike Masecchia to Joseph

02:00PM    4   Bongiovanni payments, would we?

02:00PM    5   A.  No.

02:00PM    6   Q.  Those were kept off your ledgers?

02:00PM    7   A.  Because those were a set costs every month, so there was

02:00PM    8   no need for me to write it down.

02:00PM    9   Q.  But in any event, in managing your money, you didn't

02:00PM    10   write it in any of your ledgers?

02:00PM    11   A.  Correct.

02:00PM    12        **MR. MacKAY:**  You can take that down, Ms. Champoux.

02:01PM    13   Okay.  Thank you.

02:01PM    14        **BY MR. MacKAY:**

02:01PM    15   Q.  All right.  So -- so after I think you said late 2013,

02:01PM    16   it's now pretty much exclusively Jarrett Guy, correct?

02:01PM    17   A.  Correct.

02:01PM    18   Q.  And that supply chain starts -- did it start through the

02:01PM    19   mail?  Or was it always just couriers from the beginning?

02:01PM    20   A.  At some point it was also through the mail.  They would

02:01PM    21   have a courier in Buffalo, and he would mail it to a hotel.

02:01PM    22   Q.  Okay.

02:01PM    23   A.  It was a combination of things.

02:01PM    24   Q.  Okay.  So I'm understanding it starts with the mail and

02:01PM    25   couriers, correct?

USA v Bongiovanni - Serio - MacKay/Cross - 3/12/24

122

| | | |
|---|---|---|
| 02:01PM | 1 | A.  Correct. |
| 02:01PM | 2 | Q.  And then ultimately it moves to the tractor-trailers with |
| 02:01PM | 3 | fill-ins of the couriers if you need enough supply, correct? |
| 02:01PM | 4 | A.  Correct. |
| 02:01PM | 5 | Q.  And you recall that at times some of the packages in the |
| 02:01PM | 6 | mail, they wouldn't come through, correct? |
| 02:01PM | 7 | A.  Correct. |
| 02:01PM | 8 | Q.  And do you recall at times there was at least one time |
| 02:01PM | 9 | where one of the couriers was arrested in Niagara Falls? |
| 02:01PM | 10 | A.  I believe it was at the Millennium Hotel, I think. |
| 02:01PM | 11 | Q.  Okay. |
| 02:02PM | 12 | A.  Something -- |
| 02:02PM | 13 | Q.  Is that in Niagara Falls? |
| 02:02PM | 14 | A.  No. |
| 02:02PM | 15 | Q.  Okay. |
| 02:02PM | 16 | A.  It's by the airport.  Because something -- the package |
| 02:02PM | 17 | came, and then they sent somebody in to pick up the package |
| 02:02PM | 18 | that was taken at the hotel, and that guy got arrested. |
| 02:02PM | 19 | Q.  So you recall at least one occasion where the package or |
| 02:02PM | 20 | a courier were arrested, correct? |
| 02:02PM | 21 | A.  Yes, correct. |
| 02:02PM | 22 | Q.  And then like we talked about, ultimately it ramps up to |
| 02:02PM | 23 | these tractor-trailers with the hydraulic beds, correct? |
| 02:02PM | 24 | A.  Correct. |
| 02:02PM | 25 | Q.  And that's when there's the most amount of marijuana |

02:02PM   1   coming in, right?

02:02PM   2   A.  Correct.

02:02PM   3   Q.  That's up to 300 pounds per load, correct?

02:02PM   4   A.  Correct.

02:02PM   5   Q.  All right.  So, let's talk a little bit about this

02:02PM   6   payment scheme to Mr. Bongiovanni.

02:02PM   7       Your testimony, I think on direct, was that you started

02:02PM   8   these payments around fall of 2010, correct?

02:02PM   9   A.  Correct.

02:02PM  10   Q.  Okay.  And by that time, you had been dealing with Mike

02:02PM  11   Masecchia for about three years, if we're working back to

02:03PM  12   fall of 2007?

02:03PM  13   A.  Yes.

02:03PM  14   Q.  Okay.  And like you said, he had previously made some

02:03PM  15   statements about Mr. Bongiovanni looking out for people,

02:03PM  16   correct?

02:03PM  17   A.  Correct.

02:03PM  18   Q.  But there had been no discussion about any sort of

02:03PM  19   payments, correct?

02:03PM  20   A.  Correct.

02:03PM  21   Q.  So the first time that's raised is in fall of 2010,

02:03PM  22   correct?

02:03PM  23   A.  Correct.

02:03PM  24   Q.  And then shortly after, when you start dealing with

02:03PM  25   Mr. Gale, Mike Masecchia proposes those payments go up to

USA v Bongiovanni - Serio - MacKay/Cross - 3/12/24

124

| 02:03PM | 1 | $4,000 a month, correct? |
| 02:03PM | 2 | A.  Correct. |
| 02:03PM | 3 | Q.  Can you remember in the time frame about how long it is |
| 02:03PM | 4 | between 2,000 and 4,000 a month? |
| 02:03PM | 5 | A.  That was -- the 4,000 was in spring of 2012. |
| 02:03PM | 6 | Q.  Okay.  So by spring of 2012, it's up to 4,000 a month, |
| 02:03PM | 7 | correct? |
| 02:03PM | 8 | A.  Correct. |
| 02:03PM | 9 | Q.  And you're dealing with Santiago Gale, because now the |
| 02:03PM | 10 | transport stream is different, correct? |
| 02:03PM | 11 | A.  Correct. |
| 02:03PM | 12 | Q.  Okay.  And then ultimately, as we know, you separate from |
| 02:04PM | 13 | Santiago Gale and move on to Mark Keegan, and then Jarrett |
| 02:04PM | 14 | Guy, correct? |
| 02:04PM | 15 | A.  Correct. |
| 02:04PM | 16 | Q.  But the payments to Mike Masecchia still continue at |
| 02:04PM | 17 | 4,000 a month, correct? |
| 02:04PM | 18 | A.  Correct. |
| 02:04PM | 19 | Q.  Okay.  Now, when you're first told about this plan in |
| 02:04PM | 20 | fall of 2010, it's Mike Masecchia who brings you the plan, |
| 02:04PM | 21 | correct? |
| 02:04PM | 22 | A.  Correct. |
| 02:04PM | 23 | Q.  And fair to say you didn't wake up one day and say, you |
| 02:04PM | 24 | know, today's the day I'm gonna buy a federal agent, correct? |
| 02:04PM | 25 | A.  Correct. |

02:04PM  1   Q.  That was Mike Masecchia told you the details about how it

02:04PM  2   would work, correct?

02:04PM  3   A.  I'm sorry, can you repeat that?

02:04PM  4   Q.  Mike Masecchia presented this plan to you with how it

02:04PM  5   would work, correct?

02:04PM  6   A.  Correct.

02:04PM  7   Q.  I mean, he's the one telling you give the money to me,

02:04PM  8   and that will get to Joe Bongiovanni, correct?

02:04PM  9   A.  Correct.

02:04PM  10  Q.  Now at that point in time, $2,000 a month, based on what

02:04PM  11  you're trafficking in is not a lot of money, correct?

02:04PM  12  A.  Correct.

02:04PM  13  Q.  So, at that point in time, you didn't raise a lot of

02:04PM  14  questions on what the details were, correct?

02:05PM  15  A.  Correct.

02:05PM  16  Q.  I mean, give me an estimate in fall of 2010, you know, is

02:05PM  17  $2,000 a month a drop in the bucket for you at this point by

02:05PM  18  then?

02:05PM  19  A.  Yes.

02:05PM  20  Q.  Okay.  So it's a small overhead cost at that point in

02:05PM  21  time; fair to say?

02:05PM  22  A.  Yes.

02:05PM  23  Q.  Okay.  And even when it goes up to $4,000 a month, that's

02:05PM  24  still a relatively small drop in the bucket for what you're

02:05PM  25  moving every month, correct?

USA v Bongiovanni - Serio - MacKay/Cross - 3/12/24

126

| | | |
|---|---|---|
| 02:05PM | 1 | A.  Correct. |
| 02:05PM | 2 | Q.  I think I did some math, and I'm probably going to be way |
| 02:05PM | 3 | off, but -- so I calculated at your peak, if you're moving |
| 02:05PM | 4 | about 300 pounds a month, I think you said you got it at |
| 02:05PM | 5 | 18,000 a pound? |
| 02:05PM | 6 | A.  Well, at different time frames, the prices were |
| 02:05PM | 7 | different. |
| 02:05PM | 8 | Q.  Okay.  Approximately though -- |
| 02:05PM | 9 | A.  Yeah, between 1,800 and 2,000. |
| 02:05PM | 10 | Q.  All right.  So just to give the jury an idea, when you're |
| 02:05PM | 11 | at the point you're dealing with these tractor-trailers, |
| 02:05PM | 12 | that's about $540,000 a month in product you're moving, |
| 02:05PM | 13 | correct? |
| 02:05PM | 14 | A.  As in product, yes.  That's not what I was profiting. |
| 02:06PM | 15 | Q.  Correct.  I mean, what would you profit a month at that |
| 02:06PM | 16 | point in time? |
| 02:06PM | 17 | A.  300 pounds?  Anywhere from 75- to $150,000. |
| 02:06PM | 18 | Q.  Okay.  And from that, $4,000 a month at that point in |
| 02:06PM | 19 | time is still a small amount to pay out, correct? |
| 02:06PM | 20 | A.  Correct. |
| 02:06PM | 21 | Q.  And you have separate income streams from both payment |
| 02:06PM | 22 | processing and debt collection on top of that, correct? |
| 02:06PM | 23 | A.  Correct. |
| 02:06PM | 24 | Q.  Okay.  And I think you may have said it on direct, but |
| 02:06PM | 25 | did you comingle a lot of the money from the different income |

02:06PM    1    streams?

02:06PM    2    A.  I spent it.  What do you mean by "comingle?"

02:06PM    3    Q.  I guess did -- did you keep all the money separate from

02:06PM    4    all the different places they came from?

02:06PM    5    A.  The collections, I -- it's money in, money out.  So it

02:06PM    6    was kind of separate.

02:06PM    7        But one thing I did is sometimes I wrote checks out of

02:06PM    8    there.

02:06PM    9    Q.  Okay.  I think you told at least on one occasion, there

02:06PM   10    was an individual named Joe Plevniak, it's drug money in, and

02:07PM   11    you wrote him debt collection checks back out?

02:07PM   12    A.  Yes, that's the one time I did that.

02:07PM   13    Q.  Okay.  Now, so when Mike Masecchia brings you this plan

02:07PM   14    in fall of 2010, you knew Mike Masecchia had had, by his

02:07PM   15    description, some connection with Joe Bongiovanni for quite a

02:07PM   16    lot of time?

02:07PM   17    A.  Correct.

02:07PM   18    Q.  And you had been dealing with Mike Masecchia for at

02:07PM   19    least, sounds like, about a decade in some fashion, correct?

02:07PM   20    A.  Yeah, indirectly.

02:07PM   21    Q.  You've known him for at least a while?

02:07PM   22    A.  Correct.

02:07PM   23    Q.  And you trusted him, correct?

02:07PM   24    A.  Correct.

02:07PM   25    Q.  Okay.  And it's described as what would happen would be

02:07PM    1    you pay Mike Masecchia, correct?

02:07PM    2    A.   Correct.

02:07PM    3    Q.   And then somehow the money gets to Joe Bongiovanni,

02:07PM    4    correct?

02:07PM    5    A.   Correct.

02:07PM    6    Q.   But you don't know how that happens at all, correct?

02:07PM    7    A.   Correct.

02:07PM    8    Q.   You were never provided with any of those details,

02:07PM    9    correct?

02:07PM   10    A.   Correct.

02:07PM   11    Q.   You don't know how Mr. Masecchia was supposed to contact

02:07PM   12    Joe Bongiovanni, correct?

02:07PM   13    A.   Correct.

02:07PM   14    Q.   You don't know when he was supposed to do that, correct?

02:07PM   15    A.   Correct.

02:07PM   16    Q.   And you don't know where he was supposed to meet up or do

02:08PM   17    any sort of transfer of money, correct?

02:08PM   18    A.   Correct.

02:08PM   19    Q.   All right.   That's all beyond what was ever presented to

02:08PM   20    you, correct?

02:08PM   21    A.   Correct.

02:08PM   22    Q.   I think, as we talked about, the $2,000 a month, you

02:08PM   23    don't have any questions on this because it's not a lot of

02:08PM   24    money, correct?

02:08PM   25    A.   Correct.

02:08PM    1    Q.  All right.  Now, at that point in time, did Mike

02:08PM    2    Masecchia talk to you about Lou Selva getting information

02:08PM    3    back?  Or did he present it as Mike Masecchia getting the

02:08PM    4    information back?

02:08PM    5    A.  At first, I really didn't know about Lou.  But then later

02:08PM    6    on, he told me that because Lou is such good friends with

02:08PM    7    Joe, it was less conspicuous than Mike being around him all

02:08PM    8    the time.

02:08PM    9    Q.  Okay.  So did you understand it to be, at least in the

02:08PM   10    beginning, to be -- until it was conspicuous that Mike

02:08PM   11    Masecchia made direct contact for information with Joseph

02:08PM   12    Bongiovanni?

02:08PM   13    A.  Yes.

02:08PM   14    Q.  Okay.  Now, at any point in time, did Mike Masecchia say

02:08PM   15    sometimes you'll need to give the money Lou Selva?

02:08PM   16    A.  No.

02:08PM   17    Q.  Okay.  So is it your testimony that you never paid any

02:09PM   18    money out to Lou Selva?

02:09PM   19    A.  I mean, I did later on at some point when I was storing

02:09PM   20    marijuana at his house, I gave him money.

02:09PM   21    Q.  Okay.  But as far as this plan of getting information

02:09PM   22    back from Joe Bongiovanni did you ever pay Lou Selva any

02:09PM   23    money?

02:09PM   24    A.  No.

02:09PM   25    Q.  Okay.  Every payment went directly through Mike

02:09PM    1    Masecchia, correct?

02:09PM    2    A.   Correct.

02:09PM    3    Q.   And fair to assume that's a cash payment every month?

02:09PM    4    A.   Yes.

02:09PM    5    Q.   Okay.  And did you have a set schedule of when it was

02:09PM    6    supposed to be done in a month?

02:09PM    7    A.   I mean, it was usually the first week of the month, but

02:09PM    8    it wasn't like a specific date.  But I seen Mike so much that

02:09PM    9    it really wasn't an issue.

02:09PM   10    Q.   Okay.  And then is it always -- it's always Mike

02:09PM   11    Masecchia who's bringing you the information back, correct?

02:09PM   12    A.   Correct.

02:09PM   13    Q.   And what I mean by that is, the person you're hearing any

02:09PM   14    supposed information from is always Mike Masecchia, correct?

02:09PM   15    A.   Correct.

02:09PM   16    Q.   You never heard any information back indirectly through

02:09PM   17    Lou Selva, correct?

02:09PM   18    A.   Correct.

02:09PM   19    Q.   Okay.  Whether Mike Masecchia and Lou Selva were dealing

02:10PM   20    with each other, it was something completely beyond what you

02:10PM   21    knew, correct?

02:10PM   22    A.   Correct.

02:10PM   23    Q.   You had been told by Mike Masecchia that Lou Selva may be

02:10PM   24    a go-between, but that was beyond what you knew, correct?

02:10PM   25    A.   Correct.  But later on when I was storing marijuana at

02:10PM   1    Lou's house, he mentioned Joe.  So at that point, Lou

02:10PM   2    mentioned to Joe to me.

02:10PM   3    Q.  But he mentioned Joe, but what I'm getting at is every

02:10PM   4    time there's a flow of information back from Joe Bongiovanni,

02:10PM   5    that's going all the way through Mike Masecchia, correct?

02:10PM   6    A.  Correct.

02:10PM   7    Q.  And to your knowledge, only through Mike Masecchia,

02:10PM   8    correct?

02:10PM   9    A.  Correct.

02:10PM   10   Q.  Okay.  Now what's going out on the other side is requests

02:10PM   11   for, we'll call it, protection; is that fair to say?

02:10PM   12   A.  Yes.

02:10PM   13   Q.  You're getting information in on one end, correct?

02:10PM   14   A.  Correct.

02:10PM   15   Q.  Your understanding of this plan is that Joe Bongiovanni

02:10PM   16   is supposed to be providing you with information, number 1,

02:11PM   17   whether anybody's under investigation, correct?

02:11PM   18   A.  Correct.

02:11PM   19   Q.  And number 2, whether there's any informants you should

02:11PM   20   know about, correct?

02:11PM   21   A.  Correct.

02:11PM   22   Q.  So that's the flow of information from Joe Bongiovanni to

02:11PM   23   Mike Masecchia to Ron Serio, correct?

02:11PM   24   A.  Correct.

02:11PM   25   Q.  But the other flow of information from Ron Serio to Mike

Case 1:19-cr-00227-LJV-MJR   Document 1037   Filed 07/01/24   Page 132 of 202
USA v Bongiovanni - Serio - MacKay/Cross - 3/12/24

132

02:11PM   1   Masecchia to Joe Bongiovanni is people you wanted to be on

02:11PM   2   the -- people you wanted to be protected, correct?

02:11PM   3   A.  Correct.

02:11PM   4   Q.  And the way you'd do that is give names to Mike

02:11PM   5   Masecchia, and numbers, so he can relay those Joe

02:11PM   6   Bongiovanni, correct?

02:11PM   7   A.  Correct.

02:11PM   8   Q.  So that those people would receive substantially the same

02:11PM   9   protection that you thought you were receiving, correct?

02:11PM   10  A.  Correct.

02:11PM   11  Q.  And we've gone through a few people here.

02:11PM   12      Jacob Martinez, he was one you wanted -- that you would

02:11PM   13  include in that group of people you wanted Joe Bongiovanni to

02:11PM   14  be aware of, correct?

02:11PM   15  A.  Correct.

02:11PM   16  Q.  Anthony Greco, how about that?

02:11PM   17  A.  Correct.

02:11PM   18  Q.  Matt LoTempio?

02:12PM   19  A.  Correct.

02:12PM   20  Q.  Mark Falzone?

02:12PM   21  A.  Correct.

02:12PM   22      **MR. MacKAY:**  I just have to retrieve an exhibit,

02:12PM   23  Judge.

02:12PM   24      **BY MR. MacKAY:**

02:12PM   25  Q.  Mr. Serio, I'm going to hand you Government

02:12PM     1    Exhibit 100B-1; do you recall seeing that earlier?

02:12PM     2    A.  Yes.

02:12PM     3    Q.  And if we could talk about it, you recognized all of the

02:12PM     4    names on there except one, correct?

02:12PM     5    A.  Correct.

02:12PM     6    Q.  It was Charles Butera, correct?

02:12PM     7    A.  Correct.

02:12PM     8    Q.  You have no idea who that person is?

02:12PM     9    A.  No idea.

02:12PM    10    Q.  The remainder of the names are all folks you have some

02:12PM    11    connection to in your drug business, correct?

02:12PM    12    A.  Correct.

02:12PM    13    Q.  Either direct or indirect?

02:12PM    14    A.  Yes.

02:12PM    15    Q.  But fair to say, though, with the exception of Charles

02:13PM    16    Butera, the remaining names aren't necessarily your inner

02:13PM    17    circle, correct?

02:13PM    18    A.  Correct.

02:13PM    19    Q.  Because if you were to tell this jury your inner circle,

02:13PM    20    it's going to include some different names that we've already

02:13PM    21    just discussed, correct?

02:13PM    22    A.  Correct.

02:13PM    23    Q.  That would be Jacob Martinez, Anthony Greco, Matt

02:13PM    24    LoTempio, correct?

02:13PM    25    A.  Correct.

| | | |
|---|---|---|
| 02:13PM | 1 | Q. Okay. So that's -- so what you're looking at is not a |
| 02:13PM | 2 | fair and accurate description of your inner circle as you |
| 02:13PM | 3 | know it to be, correct? |
| 02:13PM | 4 | A. Correct. |
| 02:13PM | 5 | Q. Okay. I'll take that back from you. Thank you. |
| 02:13PM | 6 | Now at the same time, over these years from fall of 2010 |
| 02:13PM | 7 | until your arrest in April of 2017, you did tell some people |
| 02:13PM | 8 | about this Mike Masecchia/Joe Bongiovanni plan, correct? |
| 02:13PM | 9 | A. Correct. |
| 02:13PM | 10 | Q. I mean, you had many dealings with many people in your |
| 02:13PM | 11 | inner circle over all those years daily, correct? |
| 02:13PM | 12 | A. Correct. |
| 02:13PM | 13 | Q. I mean, obviously Mike Masecchia knew, correct? |
| 02:14PM | 14 | A. Correct. |
| 02:14PM | 15 | Q. Your wife, your now ex-wife, she knew? |
| 02:14PM | 16 | A. She knew of him, but she didn't know the dynamic of it. |
| 02:14PM | 17 | Q. Okay. Mark Falzone knew? |
| 02:14PM | 18 | A. Well, nobody really knew -- I didn't advertise that I was |
| 02:14PM | 19 | paying Mike money. |
| 02:14PM | 20 | Q. Um-hum. |
| 02:14PM | 21 | A. So it was, they kind of know Joe was giving information, |
| 02:14PM | 22 | but not a full scope of it. |
| 02:14PM | 23 | Q. Okay. But in order for them to form an opinion, that's |
| 02:14PM | 24 | from them all being close to you and seeing how you operate, |
| 02:14PM | 25 | correct? |

02:14PM     1    A.  Correct.

02:14PM     2    Q.  And you don't know who, if anybody, Mike Masecchia told

02:14PM     3    on top of who you know, correct?

02:14PM     4    A.  Correct.

02:14PM     5    Q.  All right.  Let's talk about some other members who may

02:14PM     6    or may not have been part of your inner circle.

02:14PM     7        Dave Oddo, he was never part of your inner circle?

02:14PM     8    A.  I don't personally know him.

02:14PM     9    Q.  You don't personally know him, correct?

02:14PM    10    A.  Correct.

02:14PM    11    Q.  Fair to say, I think you didn't even really like him,

02:14PM    12    correct?

02:14PM    13    A.  Correct.

02:15PM    14    Q.  You had heard he had actually ripped some people off

02:15PM    15    before, correct?

02:15PM    16    A.  Yeah, that he just wasn't a good person.

02:15PM    17    Q.  Okay.  Who else haven't I mentioned that would be on that

02:15PM    18    inner-circle list?

02:15PM    19    A.  Mario Vacanti.

02:15PM    20    Q.  Jimmy Rivera?

02:15PM    21    A.  Jimmy Rivera.

02:15PM    22    Q.  Okay.  What about Jay Molecki?

02:15PM    23    A.  Jay Molecki.

02:15PM    24    Q.  Mark Hardick?

02:15PM    25    A.  No, he just worked for me.

USA v Bongiovanni - Serio - MacKay/Cross - 3/12/24

136

02:15PM  1   Q.   Now, the way you believe this information scheme would

02:15PM  2   work was that, we talked about this already, is one of the

02:15PM  3   things you'd get back in return is some names of informants,

02:15PM  4   correct?

02:15PM  5   A.   Correct.

02:15PM  6   Q.   And when this was originally being contemplated, Mike

02:15PM  7   Masecchia told you the way this can happen is because Joe

02:16PM  8   Bongiovanni can just go to a computer, punch in some names,

02:16PM  9   and it will figure it out, correct?

02:16PM  10  A.   Correct.

02:16PM  11  Q.   So the way you understood it was that I can really give

02:16PM  12  any name to him, he can punch it right in, and I'll get an

02:16PM  13  answer back, correct?

02:16PM  14  A.   Yeah, I really didn't know the dynamic, but it was very

02:16PM  15  vague when he just said something on the computer.  So --

02:16PM  16  Q.   So you understood it to be a type of arrangement where if

02:16PM  17  you feed him a name, he can look it up and you'll get an

02:16PM  18  answer back, correct?

02:16PM  19  A.   Correct.

02:16PM  20  Q.   Okay.  Now, as you sat here and testified, you provided

02:16PM  21  basically three names that you got back that were either

02:16PM  22  informants or under some sort of investigation, correct?

02:16PM  23  A.   Correct.

02:16PM  24  Q.   That would be T.S., correct?

02:16PM  25  A.   Correct.

| | | |
|---|---|---|
| 02:16PM | 1 | Q.  R.K., correct? |
| 02:16PM | 2 | A.  Correct. |
| 02:16PM | 3 | Q.  And Mario Vacanti, correct? |
| 02:16PM | 4 | A.  Correct. |
| 02:16PM | 5 | Q.  So I want to go through those in order. |
| 02:16PM | 6 | T.S..  you learn he's supposedly an informant, correct? |
| 02:16PM | 7 | A.  Correct. |
| 02:16PM | 8 | Q.  And this is about the same point in time you learn R.K. |
| 02:16PM | 9 | is an informant? |
| 02:16PM | 10 | A.  Correct. |
| 02:17PM | 11 | Q.  And again, if Santiago Gale were to be -- would have been |
| 02:17PM | 12 | arrested in January of 2012, I'm trying to pinpoint when this |
| 02:17PM | 13 | was. |
| 02:17PM | 14 | A.  I know it was after 2012. |
| 02:17PM | 15 | Q.  Okay.  And it's obviously after you have done the robbery |
| 02:17PM | 16 | against him, correct? |
| 02:17PM | 17 | A.  Correct. |
| 02:17PM | 18 | Q.  So this is a point in time you're no longer dealing with |
| 02:17PM | 19 | T.S., correct? |
| 02:17PM | 20 | A.  That's correct. |
| 02:17PM | 21 | Q.  So by this time you get this information, he's long out |
| 02:17PM | 22 | of the picture by then? |
| 02:17PM | 23 | A.  Correct. |
| 02:17PM | 24 | Q.  Okay.  Now, R.K., next one.  You never dealt directly |
| 02:17PM | 25 | with him, correct? |

02:17PM   1    A.   Correct.

02:17PM   2    Q.   He was just somebody who would sometimes appear with

02:17PM   3    Frank Burkhart, correct?

02:17PM   4    A.   Correct.

02:17PM   5    Q.   And back up.  Would you put Frank Burkhart on the list of

02:17PM   6    your inner circle?

02:17PM   7    A.   Yes.

02:17PM   8    Q.   So, again, just to repeat the question.  You would deal

02:18PM   9    with Frank Burkhart, but sometimes R.K. would be around,

02:18PM  10    correct?

02:18PM  11    A.   Correct.

02:18PM  12    Q.   Do you recall him ever being at your house?

02:18PM  13    A.   Yes.

02:18PM  14    Q.   On how many occasions?

02:18PM  15    A.   I don't know.  At most, five times.

02:18PM  16    Q.   And it was always in the company of Frank Burkhart,

02:18PM  17    correct?

02:18PM  18    A.   Correct.

02:18PM  19    Q.   Did you know R.K. to have a severe addiction problem?

02:18PM  20    A.   Yeah, in and out.

02:18PM  21    Q.   Problems with crack cocaine?

02:18PM  22    A.   Yes.

02:18PM  23    Q.   I mean, fair to say, he was wasn't somebody you trusted,

02:18PM  24    correct?

02:18PM  25    A.   Correct.

02:18PM   1    Q.  I mean, if Frank Burkhart had not been around, you would

02:18PM   2    not let R.K. run around your 9,000 square foot mansion, would

02:18PM   3    you?

02:18PM   4    A.  I wouldn't let him in my house.  But if he money, I'd

02:18PM   5    take the money.

02:18PM   6    Q.  But you never saw him have money, though, correct?

02:18PM   7    A.  Correct, well he never gave me any money.

02:18PM   8    Q.  So he never approached you with any money trying to buy

02:18PM   9    from you, though, correct?

02:18PM   10   A.  Correct.

02:18PM   11   Q.  And, again, you always saw him in Frank Burkhart's

02:18PM   12   presence, correct?

02:18PM   13   A.  Correct.

02:18PM   14   Q.  Did you ever know R.K. to buy from anybody connected to

02:18PM   15   you?

02:18PM   16   A.  Well, besides Frank Burkhart?

02:18PM   17   Q.  Let's leave Frank out of that, yeah.

02:19PM   18   A.  No.

02:19PM   19   Q.  Okay.  Now, would this have been -- so when you're --

02:19PM   20   strike that.

02:19PM   21       When you're seeing R.K. around your house, the time frame

02:19PM   22   is what, 2013?

02:19PM   23   A.  2012.

02:19PM   24   Q.  Okay.  Do you recall him being arrested for a string of

02:19PM   25   burglaries?

USA v Bongiovanni - Serio - MacKay/Cross - 3/12/24

140

02:19PM    1   A.  I remember -- I don't know what the time frame, but it

02:19PM    2   was after he stopped coming around was something with Poster

02:19PM    3   Art on Elmwood.  I seen him on the news.

02:19PM    4   Q.  That's what I'm trying to narrow down.  Do you recall

02:19PM    5   receiving -- strike that.

02:19PM    6       Did you learn that he was arrested for a bunch of

02:19PM    7   burglaries?

02:19PM    8   A.  Yes, sir.

02:19PM    9   Q.  Was that fairly well known in the community --

02:19PM   10   A.  Yes.

02:19PM   11   Q.  -- that he was facing charges?

02:19PM   12   A.  Correct.

02:19PM   13   Q.  Okay.  And because of that, you certainly would not have

02:19PM   14   dealt with him at that point in time, correct?

02:19PM   15   A.  Correct.

02:19PM   16   Q.  Because people who are facing charges often can find

02:19PM   17   themselves cooperating against others, correct?

02:19PM   18   A.  Correct.

02:19PM   19   Q.  So, is that about the time period you find out he's an

02:20PM   20   informant?

02:20PM   21   A.  A little after that.

02:20PM   22   Q.  Okay.  So after he's been -- after you know he's been

02:20PM   23   arrested is when you find out he's an informant, correct?

02:20PM   24   A.  Yes, that's correct.

02:20PM   25   Q.  Okay.  And do you recall telling federal agents in 2019

02:20PM    1    that Frank Burkhart actually knew R.K. was an informant?

02:20PM    2    A.  I don't remember saying that.

02:20PM    3    Q.  Okay.  All right.  Let me try to refresh your

02:20PM    4    recollection.

02:20PM    5            MR. MacKAY:  Ms. Champoux, can we put 3536Z, as in

02:20PM    6    zebra, dash 1, for the witness only.  Page 3.

02:20PM    7            BY MR. MacKAY:

02:20PM    8    Q.  I'm going to direct your attention to the fourth -- it's

02:21PM    9    gonna be the fifth paragraph down.

02:21PM   10    A.  Okay.

02:21PM   11    Q.  Yep.  Take a look at that for a moment to yourself, let

02:21PM   12    me know if that refreshes your recollection about what Frank

02:21PM   13    Burkhart may have told you about R.K..

02:21PM   14        Looks like you already reviewed it?

02:21PM   15    A.  Yes.

02:21PM   16            MR. MacKAY:  Ms. Champoux, can you take that down?

02:21PM   17            BY MR. MacKAY:

02:21PM   18    Q.  Do you recall at some point in time R.K. -- Frank

02:21PM   19    Burkhart telling you R.K. was an informant?

02:21PM   20    A.  I don't remember Frank Burkhart saying it, but I know in

02:21PM   21    2015 I ran into R.K., and he told me he was an informant.  I

02:21PM   22    was driving down Kenmore Avenue, and right where Tops is

02:21PM   23    there's a light.  And I was stuck at the light, and he was at

02:22PM   24    the bus stop, and he jumped in my car.

02:22PM   25        And he was saying something about -- I think he was

02:22PM   1   trying to get money from me saying that he was an, you know,

02:22PM   2   I just want to tell you because I always liked you that I'm

02:22PM   3   an informant, and I do drug buys.  They pay me $300 at a

02:22PM   4   time.  And, you know, if you want me to call the detective,

02:22PM   5   I'll see if you're under investigation.

02:22PM   6       And at that time I said no.  And I gave him $200, and

02:22PM   7   that was it.

02:22PM   8   Q.  Okay.  Did he ever identify who he was working with?

02:22PM   9   A.  No.

02:22PM  10   Q.  All right.  Now, third you've got Mario Vacanti.  He's

02:22PM  11   the third one you want to know about information, correct?

02:22PM  12   A.  Right.

02:22PM  13   Q.  And you learn that he was supposedly under investigation

02:22PM  14   for money laundering, correct?

02:22PM  15   A.  Correct.

02:22PM  16   Q.  And sum and substance, you learn that somebody named Paul

02:22PM  17   Humphrey gave up his name, correct?

02:22PM  18   A.  Correct.

02:22PM  19   Q.  And you confront Mario Vacanti with this, and he

02:22PM  20   basically confirms it with -- Paul Humphrey owes me money?

02:23PM  21   A.  Yes.

02:23PM  22   Q.  And you believe that occurred in 2015, correct?

02:23PM  23   A.  Correct.

02:23PM  24   Q.  So that -- that piece of information is significantly

02:23PM  25   separated in time from the others with R.K. and T.S.,

USA v Bongiovanni - Serio - MacKay/Cross - 3/12/24

| 02:23PM | 1 | correct? |
| 02:23PM | 2 | A.  Correct. |

02:23PM  3   Q.  Now, again, this information with Mario Vacanti, it comes

02:23PM  4   through Mike Masecchia, correct?

02:23PM  5   A.  Correct.

02:23PM  6   Q.  And Mike Masecchia and Mario Vacanti, were they often

02:23PM  7   together around you in the same locations?

02:23PM  8   A.  Occasionally.

02:23PM  9   Q.  I mean, I guess what I'm asking is at your Lebrun

02:23PM  10  property, would they come and go --

02:23PM  11  A.  Yes.

02:23PM  12  Q.  -- and see each other?

02:23PM  13  A.  Yes.

02:23PM  14  Q.  Okay.  Fair to assume that Mike Masecchia was aware of

02:23PM  15  your business dealings with Mario Vacanti, correct?

02:23PM  16  A.  Right.

02:23PM  17  Q.  Not just your drug dealings, but also your property

02:23PM  18  dealings, correct?

02:23PM  19  A.  Correct.

02:23PM  20  Q.  Okay.  And as you said, the Mario Vacanti information

02:23PM  21  happens in 2015, correct?

02:23PM  22  A.  Correct.

02:23PM  23  Q.  And the way that you launder money with Mario Vacanti is

02:23PM  24  by flipping houses, correct?

02:23PM  25  A.  Correct.

02:23PM   1   Q.  We won't get into all the details, but basically you move

02:24PM   2   drug money in, buy a house, and then sell it off in one of

02:24PM   3   the names, correct?

02:24PM   4   A.  Correct.

02:24PM   5   Q.  Now do you recall that Mario Vacanti was on federal

02:24PM   6   probation until the end of 2014?

02:24PM   7   A.  Correct.

02:24PM   8   Q.  Okay.  So is it your testimony that you were dealing with

02:24PM   9   him with both drugs and money laundering while he was on

02:24PM  10   federal probation, or did that start afterwards?

02:24PM  11   A.  I believe it started afterwards.

02:24PM  12   Q.  Okay.  So, again, not trying to trick you, but if we know

02:24PM  13   and if I tell you that Mario Vacanti's probation was extended

02:24PM  14   until December 2014, you'd have no reason to disagree with me

02:24PM  15   on that, correct?

02:24PM  16   A.  I didn't know the dynamics of it.

02:24PM  17   Q.  Okay.  But if we use that as one bookend, do you think

02:24PM  18   you probably weren't doing any drug activity with Mario

02:24PM  19   Vacanti prior to that, correct?

02:24PM  20   A.  What time frame?

02:24PM  21   Q.  Prior to end of 2014.

02:24PM  22   A.  End of 2014?  I couldn't say for sure.

02:24PM  23   Q.  Because you, I mean, were you aware around that time that

02:25PM  24   he was on federal probation?

02:25PM  25   A.  I thought he was off federal probation.

02:25PM    1    Q.  Ut you did know he was arrested and charged and convicted

02:25PM    2    in federal court?

02:25PM    3    A.  Yes, correct.

02:25PM    4    Q.  Now, not withstanding that, going forward, you continue

02:25PM    5    to work money laundering with Mario Vacanti into 2015 and

02:25PM    6    2016, correct?

02:25PM    7    A.  We stopped for a while.  He's already in the -- I think

02:25PM    8    it's 163 Wardman with him.

02:25PM    9    Q.  Yep.  I'm gonna get into two properties with him.

02:25PM   10    A.  Okay.

02:25PM   11    Q.  Do you remember 180 North Park?

02:25PM   12    A.  Yes.

02:25PM   13    Q.  Okay.  That one you bought in about January 2015,

02:25PM   14    correct?

02:25PM   15    A.  Correct.

02:25PM   16    Q.  And then you sold it to him and his mother in December of

02:25PM   17    2016, correct?

02:25PM   18    A.  Correct.

02:25PM   19    Q.  And it's the whole cycle of buying a house and then

02:25PM   20    selling it off, it cleans the money, correct?

02:25PM   21    A.  Correct.

02:25PM   22    Q.  And then similarly, it's 165 Wardman, does that sound

02:25PM   23    familiar?

02:25PM   24    A.  Correct.

02:25PM   25    Q.  That's one in Kenmore, right?

USA v Bongiovanni - Serio - MacKay/Cross - 3/12/24

146

| | | |
|---|---|---|
| 02:25PM | 1 | A.  Yes. |
| 02:25PM | 2 | Q.  You buy that with him in December of 2014, correct? |
| 02:26PM | 3 | A.  Yes. |
| 02:26PM | 4 | Q.  And then you sell it off in October of 2015, correct? |
| 02:26PM | 5 | A.  Correct. |
| 02:26PM | 6 | Q.  So, those two properties, though, and as you sit here |
| 02:26PM | 7 | today, those were laundered properties, correct? |
| 02:26PM | 8 | A.  Correct. |
| 02:26PM | 9 | Q.  Okay.  Now, notwithstanding that, you continue to do that |
| 02:26PM | 10 | even though you had heard that Mario Vacanti was under |
| 02:26PM | 11 | investigation for money laundering in some fashion, correct? |
| 02:26PM | 12 | A.  Correct. |
| 02:26PM | 13 | Q.  Now, and you continue to be in close contact with Mario |
| 02:26PM | 14 | Vacanti all through 2016, correct? |
| 02:26PM | 15 | A.  Well, we separated for a little bit in 2015.  He stopped |
| 02:26PM | 16 | coming around for a while.  And the only reason I transferred |
| 02:26PM | 17 | it to him in 2016 was because he -- my wife wound up leaving |
| 02:26PM | 18 | me for him, and I didn't want any problems, so I just |
| 02:26PM | 19 | transferred the house in his name. |
| 02:26PM | 20 | Q.  Okay.  And you were aware that this sort of property |
| 02:26PM | 21 | transfer could raise red flags? |
| 02:26PM | 22 | A.  When it happened, I told them that it was a bad idea to |
| 02:26PM | 23 | do it this way, but -- |
| 02:27PM | 24 | Q.  But you never -- you went ahead and did it knowing that |
| 02:27PM | 25 | there could be potential red flags for money laundering, |

02:27PM   1    correct?

02:27PM   2    A.  Yes, correct.

02:27PM   3    Q.  I guess that's what I'm getting at.

02:27PM   4    A.  Yes.

02:27PM   5    Q.  Now, would you have any reason to doubt me that your

02:27PM   6    phone logs show that between November of 2015 and September

02:27PM   7    2016, you corresponded by phone call with Mario Vacanti

02:27PM   8    165 times?

02:27PM   9    A.  Probably right.

02:27PM  10    Q.  So you were continuing to have contact with Mario Vacanti

02:27PM  11    all the way through end of 2016?

02:27PM  12    A.  Correct.

02:27PM  13    Q.  Now, did you understand that Mike Masecchia may not have

02:27PM  14    liked some of the younger folks who were around you?

02:27PM  15    A.  I did not get that impression.

02:27PM  16    Q.  Do you know what his opinion of Anthony Gerace was?

02:27PM  17    A.  He didn't like him.

02:27PM  18    Q.  Didn't like him.  That's what I'm getting at.  Mario

02:27PM  19    Vacanti and Anthony Gerace are about how old?

02:27PM  20    A.  Well, Mario was much younger than me.  When I met him, I

02:27PM  21    think he was in his mid 20s.

02:27PM  22        And Anthony, I feel, is like my age.

02:27PM  23    Q.  Okay.  So if we can put some numbers on those

02:28PM  24    approximately.  You're 47?

02:28PM  25    A.  I'm 47.  At the time, I want to say Mario was probably 30

02:28PM  1   now?  Maybe early 30s.  And Anthony is, I think, maybe four

02:28PM  2   years younger than me.

02:28PM  3   Q.  Okay.  And then as we've established, Mike Masecchia is a

02:28PM  4   bit older than you, about a decade?

02:28PM  5   A.  Yes.

02:28PM  6   Q.  Okay.  So you told us Mike Masecchia didn't like Anthony

02:28PM  7   Gerace, correct?

02:28PM  8   A.  Correct.

02:28PM  9   Q.  And any indication he wanted to cut him out of the

02:28PM  10  business?

02:28PM  11  A.  He did.

02:28PM  12  Q.  Okay.

02:28PM  13  A.  He wanted me to stay away from him.

02:28PM  14  Q.  And Mario Vacanti, did you see any hostility from Mike

02:28PM  15  Masecchia toward him?

02:28PM  16  A.  No.

02:28PM  17  Q.  Now, you testified on direct that Mike Masecchia also

02:28PM  18  provided some other names to you, but you really couldn't

02:28PM  19  recall who they were, correct?

02:28PM  20  A.  Yeah.

02:28PM  21  Q.  That they didn't mean anything to you, correct?

02:28PM  22  A.  Correct.

02:28PM  23  Q.  Because they weren't people you were dealing with,

02:28PM  24  correct?

02:28PM  25  A.  Correct.

02:28PM   1    Q.   I think you told us about the name of a possible

02:29PM   2    bartender at Gables on Hertel Avenue?

02:29PM   3    A.   Correct.

02:29PM   4    Q.   And now you knew that Mike Masecchia was sort of a North

02:29PM   5    Buffalo guy, correct?

02:29PM   6    A.   Correct.

02:29PM   7    Q.   He had grown up there, correct?

02:29PM   8    A.   Correct.

02:29PM   9    Q.   Long time connections in that neighborhood, right?

02:29PM   10   A.   Yes.

02:29PM   11   Q.   And he was also known as frequenting a lot of the bars in

02:29PM   12   the neighborhood, correct?

02:29PM   13   A.   Correct.

02:29PM   14   Q.   He was sort of tied in with the neighborhood gossip,

02:29PM   15   correct?

02:29PM   16   A.   Correct.

02:29PM   17   Q.   I mean, he was a guy that totally a part from anything

02:29PM   18   you might have been doing with Joe Bongiovanni, he was also a

02:29PM   19   good source of information about what was going on in North

02:29PM   20   Buffalo, correct?

02:29PM   21   A.   I mean, it's hard for me to say.  I mean, he knew a lot

02:29PM   22   of people.

02:29PM   23   Q.   And that's what I'm getting at.  He knew a lot of people

02:29PM   24   that there, correct?

02:29PM   25   A.   Correct.

02:29PM   1    Q.  He knew people both from the drug business and the bar

02:29PM   2    businesses, correct?

02:29PM   3    A.  Correct.

02:29PM   4    Q.  So in many ways, he knew what people were talking about

02:29PM   5    when he would go out, correct?

02:29PM   6    A.  Correct.

02:29PM   7    Q.  So he was also a teacher in the City of Buffalo, correct?

02:29PM   8    A.  Correct.

02:29PM   9    Q.  Now, when you were provided this information from Mike

02:30PM   10   Masecchia, even -- we've established already it only ever

02:30PM   11   comes through Mike Masecchia, correct?

02:30PM   12   A.  Correct.

02:30PM   13   Q.  You have no way of verifying this information

02:30PM   14   independently, correct?

02:30PM   15   A.  Correct.

02:30PM   16   Q.  You had to sort of take Mike Masecchia at his word on it

02:30PM   17   when you get this information, correct?

02:30PM   18   A.  Correct.

02:30PM   19   Q.  So, for example, you don't know whether the information

02:30PM   20   was coming from somewhere like street gossip, correct?

02:30PM   21   A.  Correct.

02:30PM   22   Q.  You don't know whether the information was coming from

02:30PM   23   bar gossip, correct?

02:30PM   24   A.  Correct.

02:30PM   25   Q.  You don't know whether the information was something Mike

02:30PM   1   Masecchia had concocted with a greater plan in mind, correct?

02:30PM   2   A.  Correct.

02:30PM   3   Q.  I mean, for example, you told us here that Anthony

02:30PM   4   Gerace -- he didn't like him, correct?

02:30PM   5   A.  Correct.

02:30PM   6   Q.  And fair to say there were other people he didn't like?

02:30PM   7   A.  Not that I can think of.

02:30PM   8   Q.  Okay.  But, again, you don't know everybody he does and

02:30PM   9   doesn't, correct?

02:30PM  10   A.  Yeah.

02:30PM  11   Q.  So you can't rule out that he would be providing you

02:30PM  12   information to steer you way from people, correct?

02:31PM  13   A.  Correct.

02:31PM  14   Q.  Because -- is it fair to say the more marijuana you

02:31PM  15   dealt, the more opportunity he had to deal through you?

02:31PM  16   A.  Correct.

02:31PM  17   Q.  So the more you can corner the market, the more he can

02:31PM  18   increase his profit, correct?

02:31PM  19   A.  I mean, I guess.

02:31PM  20   Q.  Well, I mean, he's friends with you, and he's working

02:31PM  21   with you, correct?

02:31PM  22   A.  Correct.

02:31PM  23   Q.  And if you're going to ultimately corner the market, and

02:31PM  24   he's your partner, that's gonna increase his share of what he

02:31PM  25   gets, correct?

02:31PM    1    A.  Correct.

02:31PM    2    Q.  Okay.  Now, another part of this information flow you

02:31PM    3    talked about is the hope that you would send information out

02:31PM    4    through Mike Masecchia to Joe Bongiovanni, for

02:31PM    5    Mr. Bongiovanni to be on the lookout, for example, when

02:31PM    6    supply loads were coming in, correct?

02:31PM    7    A.  Correct.

02:31PM    8    Q.  So it was your understanding, the way the scheme would

02:31PM    9    work, was that when loads of marijuana would were coming in,

02:31PM   10    you would receive a tip if there was anything raising

02:31PM   11    something sort of red flag, correct?

02:32PM   12    A.  Correct.  Like, if there was word that there was a

02:32PM   13    shipment coming in from Utah or -- that's supposed to end up

02:32PM   14    in Boston, or it's coming over the border.

02:32PM   15    Q.  So you expected that your supply routes were -- were

02:32PM   16    being looked after, correct?

02:32PM   17    A.  Correct.

02:32PM   18    Q.  We don't have to go through them all, but we're talking

02:32PM   19    mail, U-Haul, truck, courier, all that, correct?

02:32PM   20    A.  It's basically the trucks.  Because, I mean, how would

02:32PM   21    you do the mail?

02:32PM   22    Q.  Well, that's what I'm asking you.  What you knew.

02:32PM   23    A.  Yes.

02:32PM   24    Q.  Okay.  And again, this is information -- did you -- let

02:32PM   25    me phrase it this way.

02:32PM   1     Is this something you asked on your own for Mr. Masecchia

02:32PM   2   to pass to Mr. Bongiovanni?

02:32PM   3     Or is this something that Mr. Masecchia proposed could be

02:32PM   4   part of the plan?

02:32PM   5     Do you understand what I'm asking?

02:32PM   6   A.  Well, in 2012 when the payments got upped, I'm the one

02:32PM   7   that said, you know, could you take a look at it -- have him

02:32PM   8   look out for anything coming from out West from Utah or

02:33PM   9   Vegas.

02:33PM  10     And he said he would talk to him.  And that's when he

02:33PM  11   came back with $2,000 more a month.

02:33PM  12   Q.  Okay.  So what you're saying is I want a little bit more

02:33PM  13   for my money that the point in time, correct?

02:33PM  14   A.  Correct.

02:33PM  15   Q.  And what that little bit more is, I want a look-out of

02:33PM  16   what's coming from out West, correct?

02:33PM  17   A.  Correct.

02:33PM  18   Q.  But as we talked about, there were packages that didn't

02:33PM  19   get there, correct?

02:33PM  20   A.  Correct.

02:33PM  21   Q.  And there was a courier, at least once, who was arrested,

02:33PM  22   correct?

02:33PM  23   A.  Correct.

02:33PM  24   Q.  And you never, to your recollection, as you testified

02:33PM  25   here, ever got any tip-off about there being any other

02:33PM    1    problems about any of the supply loads coming in, correct?

02:33PM    2    A.  Correct.

02:33PM    3    Q.  Meaning that in all this time, you never got any

02:33PM    4    indication, hey, be aware, don't take this load, it's hot,

02:33PM    5    correct?

02:33PM    6    A.  Correct.

02:33PM    7    Q.  Okay.  You were also never told lay low, don't take a

02:33PM    8    shipment from a specific source, because that source is under

02:33PM    9    surveillance, correct?

02:33PM   10    A.  Correct.

02:34PM   11    Q.  Now, you told us on direct that you gambled a lot,

02:34PM   12    correct?

02:34PM   13    A.  Correct.

02:34PM   14    Q.  Gambled at a number of different casinos here in the

02:34PM   15    States and up in Canada, correct?

02:34PM   16    A.  Correct.

02:34PM   17    Q.  By 2015, you were being pulled over a lot at the border

02:34PM   18    for secondary inspection, correct?

02:34PM   19    A.  Correct.

02:34PM   20    Q.  And just so the jury understands, secondary inspection is

02:34PM   21    we don't pass at the first gate, and they pull you over and

02:34PM   22    ask you furtherer questions and further searches and things

02:34PM   23    like that, correct?

02:34PM   24    A.  Correct.

02:34PM   25    Q.  So you were getting a lot of that around 2015; do you

USA v Bongiovanni - Serio - MacKay/Cross - 3/12/24

02:34PM   1   recall that?

02:34PM   2   A.   Yes.

02:34PM   3   Q.   You have an estimation for this jury about how many times

02:34PM   4   you remember being had pulled over at secondary?

02:34PM   5   A.   A lot.  I mean, more than -- in 2015, at least maybe 20,

02:34PM   6   30 times.

02:34PM   7   Q.   Okay.  And from what you're being told from law

02:34PM   8   enforcement officers, it's your understanding this has

02:34PM   9   something to do with your casino activity?

02:34PM   10  A.   Yes.

02:34PM   11  Q.   Okay.  Because you're frequently visiting the casinos,

02:35PM   12  correct?

02:35PM   13  A.   Correct.

02:35PM   14  Q.   Were you bringing money back and forth over the border at

02:35PM   15  that time?

02:35PM   16  A.   Occasionally.  Sometimes I'd take checks though.

02:35PM   17  Q.   So whether it's cash or check, I mean, you're

02:35PM   18  transporting large amounts of money over the border, correct?

02:35PM   19  A.   Correct.

02:35PM   20  Q.   You never received any information back in return about

02:35PM   21  any investigations at the border of you, correct?

02:35PM   22  A.   Correct.

02:35PM   23  Q.   You never received any information from Mike Masecchia

02:35PM   24  that was supposedly coming from Joseph Bongiovanni about how

02:35PM   25  to better navigate these border crossings to avoid the

USA v Bongiovanni - Serio - MacKay/Cross - 3/12/24

02:35PM    1   secondary inspections, did you?

02:35PM    2   A.   No.

02:35PM    3   Q.   Okay.   And you were never told that your casino

02:35PM    4   activities in general were being investigated around that

02:35PM    5   time, were you?

02:35PM    6   A.   No.

02:35PM    7   Q.   Nor were your general finances being investigated,

02:35PM    8   correct?

02:35PM    9   A.   Correct.

02:35PM   10   Q.   Okay.   So, what I'm saying by that is in 2015 you

02:35PM   11   received no tip-off that you were being investigated

02:35PM   12   personally for your finances?

02:35PM   13   A.   No.

02:35PM   14   Q.   All right.   So while we're on the time frame of 2015,

02:36PM   15   let's go to the end, to December of 2015.   You talked a

02:36PM   16   little bit about Mark Vitale.

02:36PM   17   A.   Correct.

02:36PM   18   Q.   Mark Vitale was not somebody who would ever deal directly

02:36PM   19   with you, correct?

02:36PM   20   A.   Correct.

02:36PM   21   Q.   He was somebody who would go through Adrian Fina or John

02:36PM   22   Robinson, correct?

02:36PM   23   A.   Correct.

02:36PM   24   Q.   And you come to learn that he's been arrested, correct?

02:36PM   25   A.   Correct?

02:36PM    1    Q.  And you learned about that from -- is that Adrian, I

02:36PM    2    think you said on direct?

02:36PM    3    A.  I believe so, yes.

02:36PM    4    Q.  Now you -- you did not receive any tip-off that that

02:36PM    5    arrest was about to happen from Mike Masecchia prior to it

02:36PM    6    happening, correct?

02:36PM    7    A.  Correct.

02:36PM    8    Q.  And I think you told us you made some outreach to Mike

02:36PM    9    Masecchia after the arrest, and he just told you everything's

02:36PM   10    fine, correct?

02:36PM   11    A.  Correct.

02:36PM   12    Q.  Do you recall how long after the arrest and your outreach

02:36PM   13    to Mike Masecchia was?

02:36PM   14    A.  I mean, fairly right after the arrest.  I don't have an

02:36PM   15    exact date, maybe a couple days.

02:37PM   16    Q.  Okay.  And did you come to learn the DEA was actually

02:37PM   17    present at the scene of Mark Vitale's arrest at his house?

02:37PM   18    A.  Not until later.

02:37PM   19    Q.  And how'd you learned later, through viewing materials in

02:37PM   20    this case?

02:37PM   21    A.  Excuse me?

02:37PM   22    Q.  How did you learn about that later?

02:37PM   23    A.  Actually, my wife texted me, like, I don't know, maybe

02:37PM   24    six months or a year later.

02:37PM   25    Q.  And what did she tell you?

02:37PM  1  A.  She said, do you know that Joe was the arresting officer

02:37PM  2  with Mark Vitale in a text message.

02:37PM  3  Q.  Okay.  And by "Joe," you mean Joe Bongiovanni was the

02:37PM  4  arresting officer?

02:37PM  5  A.  Correct.

02:37PM  6  Q.  Okay.  But Joe Bongiovanni, you never received any

02:37PM  7  information prior to that that Joe Bongiovanni was the

02:37PM  8  arresting officer, correct?

02:37PM  9  A.  Correct.

02:37PM  10  Q.  Mike Masecchia never showed you any DEA paperwork

02:37PM  11  pertaining to this arrest, correct?

02:37PM  12  A.  Correct.

02:37PM  13  Q.  And you never received any information about Mark Vitale

02:37PM  14  being an informant in any capacity, did you, correct?

02:37PM  15  A.  Correct.

02:37PM  16  Q.  Now, Wayne Anderson.  We're gonna go back a little bit.

02:38PM  17  This is the end of 2012.

02:38PM  18      You recall learning from Mike Masecchia that he's

02:38PM  19  arrested, correct?

02:38PM  20  A.  Correct.

02:38PM  21  Q.  And do you recall that the way Mike Masecchia learned

02:38PM  22  about that is he was driving by his house and he saw cops

02:38PM  23  there, correct?

02:38PM  24  A.  Correct.

02:38PM  25  Q.  Okay.  So Mike Masecchia, to your understanding, did not

02:38PM   1   get this information from Joe Bongiovanni, he saw it with his

02:38PM   2   own two eyes, correct?

02:38PM   3   A.  Correct.

02:38PM   4   Q.  And do you recall Frank Burkhart actually telling you

02:38PM   5   about this arrest as well, too?

02:38PM   6   A.  Correct.

02:38PM   7   Q.  And Frank Burkhart has an ownership in a tattoo studio

02:38PM   8   not far down the street on Elmwood from where Wayne Anderson

02:38PM   9   lives, correct?

02:38PM   10  A.  Correct.

02:38PM   11  Q.  Okay.  So these two people who were bringing you the

02:38PM   12  information were telling you basically because they had

02:38PM   13  personal knowledge of the arrest, correct?

02:38PM   14  A.  Correct.

02:38PM   15  Q.  You did not, around this time in 2012, receive any

02:38PM   16  tip-offs from Joe Bongiovanni, correct?

02:38PM   17  A.  Correct.

02:38PM   18  Q.  And you did not receive any information that -- to the

02:39PM   19  effect, well, Joe Bongiovanni's got this under control with

02:39PM   20  Wayne Anderson, correct?

02:39PM   21  A.  I'm sorry, could you repeat that?

02:39PM   22  Q.  Bad question.  Bad wording.

02:39PM   23      After Mr. Anderson's arrested, you never got any word

02:39PM   24  back from Mike Masecchia that Joe Bongiovanni is taking care

02:39PM   25  of this, correct?

02:39PM 1   A.  Well, Mike said there's nothing to worry about.

02:39PM 2   Q.  And that's what he said with a couple different

02:39PM 3   situations, correct?

02:39PM 4   A.  Correct.

02:39PM 5   Q.  You said, with Mark Vitale he said that, correct?

02:39PM 6   A.  Correct.

02:39PM 7   Q.  And so with this Wayne Anderson --

02:39PM 8   A.  Correct.

02:39PM 9   Q.  -- arrest, all you hear from Mike Masecchia is nothing to

02:39PM 10  worry about, correct?

02:39PM 11  A.  Correct.

02:39PM 12  Q.  About you didn't receive any sort of details about what

02:39PM 13  that meant in either situation, correct?

02:39PM 14  A.  Correct.

02:39PM 15  Q.  You received no details about what supposedly you had to

02:39PM 16  worry about, correct?

02:39PM 17  A.  Correct.

02:39PM 18  Q.  You received no details about what sort of actions were

02:39PM 19  being done to dissuade investigation into your organization,

02:39PM 20  correct?

02:39PM 21  A.  Correct.

02:39PM 22  Q.  And just to be clear by 2012, you're several years into

02:40PM 23  now paying Joe Bongiovanni through Mike Masecchia several

02:40PM 24  thousand dollars a month, correct?

02:40PM 25  A.  Correct.  But I also hadn't been getting arrested, too,

02:40PM  1   though, so --

02:40PM  2   Q.  Well, so, but my point is, the information that's coming

02:40PM  3   back from you, back to you, you don't hear anything about the

02:40PM  4   Wayne Anderson arrest that tracks back to Joe Bongiovanni,

02:40PM  5   correct?

02:40PM  6   A.  Correct.

02:40PM  7   Q.  Because it only comes from Mike Masecchia from what he

02:40PM  8   saw, and Frank Burkhart from what he saw, correct?

02:40PM  9   A.  Correct.

02:40PM  10  Q.  Now, were you also connected to Anthony Gerace.

02:40PM  11  A.  Correct.

02:40PM  12  Q.  That seems to come later though, correct?

02:40PM  13  A.  Correct.

02:40PM  14  Q.  Did you pinpoint that about 2015 or so?

02:40PM  15  A.  Yes.

02:40PM  16  Q.  Okay.  Now, you ended up dealing fairly closely with him,

02:40PM  17  correct?

02:40PM  18  A.  Correct.

02:40PM  19  Q.  I mean, close enough that you were unloading 300-pound

02:40PM  20  hauls of marijuana with him, correct?

02:40PM  21  A.  Correct.

02:40PM  22  Q.  And there was also a buyer-seller relationship between

02:40PM  23  both -- that ran both ways, correct?

02:40PM  24  A.  Correct.

02:40PM  25  Q.  So, would it be fair to say he goes in your inner circle?

| 02:40PM | 1 | A.  Yes. |

02:41PM  2  Q.  Now, in 2016, you never received any information to be on

02:41PM  3  the lookout for Anthony Gerace in any fashion, correct?

02:41PM  4  A.  Mike didn't want me being around him because he said that

02:41PM  5  he was an informant for Bongiovanni.

02:41PM  6  Q.  Okay.  So I think -- because we didn't hear about this on

02:41PM  7  direct, you're telling me that Masecchia tells you Anthony

02:41PM  8  Gerace is an informant for Joe Bongiovanni?

02:41PM  9  A.  Correct.  And then I'm kind of in a position where, what

02:41PM  10  am I supposed to do now?

02:41PM  11  Q.  So let me ask the question here.

02:41PM  12  A.  Okay.

02:41PM  13  Q.  So what time frame is that?

02:41PM  14  A.  2016.

02:41PM  15  Q.  Okay.  And you've indicated, though, that Mike Masecchia

02:41PM  16  does not like Anthony Gerace, correct?

02:41PM  17  A.  Right.

02:41PM  18  Q.  You never heard any information that Anthony Gerace had

02:41PM  19  been approached back in 2010 by Homeland Security, correct?

02:41PM  20  A.  Correct.

02:41PM  21  Q.  You never saw any Homeland Security documents or any

02:41PM  22  information regarding how he had come in to law enforcement

02:41PM  23  and talked to law enforcement back in 2010, correct?

02:42PM  24  A.  He eventually told me --

02:42PM  25  Q.  Well, so my question was, you never received any

| | | |
|---|---|---|
| 02:42PM | 1 | information -- |
| 02:42PM | 2 |         **MR. TRIPI:**  Objection.  He was being responsive. |
| 02:42PM | 3 |         **MR. MacKAY:**  It sounded like he was going to be |
| 02:42PM | 4 | nonresponsive, Judge. |
| 02:42PM | 5 |         **THE COURT:**  No, it's nonresponsive.  Overruled. |
| 02:42PM | 6 |         **MR. MacKAY:**  Overruled. |
| 02:42PM | 7 |         **BY MR. MacKAY:** |
| 02:42PM | 8 | Q.  Okay.  So, let me ask the question again. |
| 02:42PM | 9 |     In 2010 -- sorry, strike that. |
| 02:42PM | 10 |     When you're dealing with Mike Masecchia, and he's telling |
| 02:42PM | 11 | you about Anthony Gerace, did you ever receive any |
| 02:42PM | 12 | information that Anthony Gerace had talked to law enforcement |
| 02:42PM | 13 | back in 2010? |
| 02:42PM | 14 | A.  No, not specifically. |
| 02:42PM | 15 | Q.  Okay.  Nothing specific like that?  That's what I'm |
| 02:42PM | 16 | getting toward. |
| 02:42PM | 17 | A.  Right. |
| 02:42PM | 18 | Q.  All right.  So you were never provided with the |
| 02:42PM | 19 | information that Anthony Gerace had proffered to the United |
| 02:42PM | 20 | States Attorney -- |
| 02:42PM | 21 |         **MR. TRIPI:**  Objection.  Witness said he didn't know. |
| 02:42PM | 22 | He's asking it another way.  Counsel testifying. |
| 02:43PM | 23 |         **THE COURT:**  Overruled. |
| 02:43PM | 24 |         **BY MR. MacKAY:** |
| 02:43PM | 25 | Q.  You never received any information that in 2010 he talked |

02:43PM    1    with U.S. Attorney's Office, did you?

02:43PM    2    A.  No.

02:43PM    3    Q.  Okay.  You were never provided any information that he

02:43PM    4    was the subject of a September 2016 seizure of pills that had

02:43PM    5    come potentially from Jarrett Guy, did you?

02:43PM    6    A.  Yes, Anthony told me that.

02:43PM    7    Q.  Anthony told you, but not Mike Masecchia.

02:43PM    8    A.  Correct.

02:43PM    9    Q.  I just want to make sure you get my question.

02:43PM   10        My question is:  You never received any tip-off from Mike

02:43PM   11    Masecchia about that, correct?

02:43PM   12    A.  Correct.

02:43PM   13    Q.  Okay.  Now, with Mike Masecchia, Mike Masecchia never

02:43PM   14    told you that he was the subject of a DEA investigation back

02:43PM   15    in 2004, did he?

02:43PM   16    A.  That Mike was?

02:43PM   17    Q.  Correct.

02:43PM   18    A.  Correct.

02:43PM   19    Q.  He didn't tell you about either a Buffalo or Las Vegas

02:44PM   20    investigation into him back in 2004, correct?

02:44PM   21    A.  Correct.

02:44PM   22    Q.  And he didn't tell you about investigation that might

02:44PM   23    have concerned him in 2009, 2010, did he?

02:44PM   24    A.  No.

02:44PM   25    Q.  Okay.  Now, the Suppas.  You had significant dealings

02:44PM  1   with at least two of them, correct?

02:44PM  2   A.  Correct.

02:44PM  3   Q.  I think that would be John and Matt, correct?

02:44PM  4   A.  Yes.

02:44PM  5   Q.  And some of those to deal with the outdoor grow

02:44PM  6   operations down in Franklinville, correct?

02:44PM  7   A.  No.  That was -- John Suppa was at the grow house on his

02:44PM  8   house on Hertel Avenue.

02:44PM  9   Q.  Okay.  So John is solely a grow house on Hertel.  But did

02:44PM  10  you know any of the Suppas to be associated with outdoor

02:44PM  11  grows down in Cattaraugus County?

02:44PM  12  A.  Well, Mark was part owner of that, but he lives in

02:44PM  13  Chicago, so he wasn't personally involved in the growing of

02:44PM  14  it.

02:44PM  15  Q.  Right.  They were using his land, correct?

02:44PM  16  A.  Correct.

02:44PM  17  Q.  Okay.  So he was involved in some fashion in an outdoor

02:44PM  18  grow, correct?

02:44PM  19  A.  Correct.

02:44PM  20  Q.  And you never received any information around 2009 or

02:45PM  21  2010 that he was the subject of DEA investigation, correct?

02:45PM  22  A.  Correct.

02:45PM  23  Q.  All right.  Santiago Gale.  When he was arrested, you

02:45PM  24  didn't receive any information prior to his arrest that he

02:45PM  25  was under investigation by the DEA, correct?

02:45PM   1    A.   Correct.

02:45PM   2    Q.   And after he's arrested, you didn't receive any

02:45PM   3    information through Mike Masecchia that he had to be on the

02:45PM   4    lookout because he been arrested, correct?

02:45PM   5    A.   Correct.

02:45PM   6    Q.   And did you come to learn later at any point in time that

02:45PM   7    it was actually an agent in the very same group as Joe

02:45PM   8    Bongiovanni who arrested Santiago Gale?

02:45PM   9    A.   I did not know that.

02:45PM  10    Q.   But obviously, you expected a portion of your money that

02:45PM  11    you're paying out to Mike Masecchia to warn you about

02:45PM  12    anything going on not just with your inner circle but with

02:45PM  13    your sources of supply as well, too?

02:45PM  14    A.   Correct.

02:45PM  15    Q.   Correct.  You expected anything coming from Mark Keegan

02:46PM  16    to be looked out for, correct?

02:46PM  17    A.   Correct.

02:46PM  18    Q.   And you didn't get any tip-offs or anything from Mike

02:46PM  19    Masecchia that you should be aware of regarding Mark Keegan,

02:46PM  20    correct?

02:46PM  21    A.   Correct.

02:46PM  22    Q.   And you've been through Santiago Gale.  How about Jarrett

02:46PM  23    Guy?  You never got any information to be on the lookout with

02:46PM  24    anything for him, correct?

02:46PM  25    A.   Correct.

02:46PM   1   Q.   Okay.  Now by 2012, the summer of 2012, you've now been

02:46PM   2   paying Mike Masecchia at least for about a year and a half,

02:46PM   3   almost two years, correct?

02:46PM   4   A.   Correct.

02:46PM   5   Q.   And at that point in time, you received no information

02:46PM   6   that your name and your brother's name were starting to

02:46PM   7   circulate around the Buffalo DEA office, did you?

02:46PM   8   A.   No.

02:46PM   9   Q.   There was no indication that DEA agents other than

02:46PM   10  Mr. Bongiovanni were looking at your names at that point in

02:46PM   11  time, correct?

02:46PM   12  A.   Correct.

02:46PM   13  Q.   You received no information that there were meetings

02:47PM   14  going into 2013 involving DEA group supervisors, correct?

02:47PM   15  A.   Correct.

02:47PM   16  Q.   Never received any information that there were IRS

02:47PM   17  investigations into your finances, correct?

02:47PM   18  A.   Correct.

02:47PM   19  Q.   Never involved -- never received any information that the

02:47PM   20  U.S. Attorney's Office had become involved in investigating

02:47PM   21  you, correct?

02:47PM   22  A.   Correct.

02:47PM   23  Q.   Those were all things you would have expected to be aware

02:47PM   24  of for this money you're paying out, correct?

02:47PM   25  A.   Correct.

02:47PM   1   Q.  The way you understood it from the way that Mike

02:47PM   2   Masecchia presented it is that would have been information

02:47PM   3   Mr. Bongiovanni would have access to, correct?

02:47PM   4   A.  Correct.

02:47PM   5   Q.  It was information that you were supposed to be getting

02:47PM   6   back for your money, correct?

02:47PM   7   A.  Correct.

02:47PM   8   Q.  At the same time, you never heard anything back from --

02:47PM   9   through Mike Masecchia that, well, don't worry about this,

02:47PM   10  everything's being taken care of by Mr. Bongiovanni, correct?

02:47PM   11  A.  Correct.

02:47PM   12  Q.  You were never provided with the name of an individual

02:48PM   13  named J.D. being an informant, correct?

02:48PM   14  A.  Correct.

02:48PM   15  Q.  You testified you had a friend named Mike Piazza; do you

02:48PM   16  remember him?

02:48PM   17  A.  Yes.

02:48PM   18  Q.  He was actually the one who, I think you said, introduced

02:48PM   19  you to Mark Keegan?

02:48PM   20  A.  Correct.

02:48PM   21  Q.  And you were never informed in 2010 that Mike Piazza had

02:48PM   22  done a controlled buy for the DEA at any point in time,

02:48PM   23  correct?

02:48PM   24  A.  Correct.

02:48PM   25  Q.  So you didn't receive any information that DEA was buying

| | | |
|---|---|---|
| 02:48PM | 1 | from Mike Piazza, correct? |
| 02:48PM | 2 | A.  Correct. |
| 02:48PM | 3 | Q.  And Mike Piazza, would you put him in your inner circle? |
| 02:48PM | 4 | A.  At that time, yes. |
| 02:48PM | 5 | Q.  Okay.  How about the two Canadian connections we talked |
| 02:48PM | 6 | about, Percy in Niagara Falls, and the gentleman from |
| 02:48PM | 7 | Montreal, those two guys; do you remember them? |
| 02:48PM | 8 | A.  Yes. |
| 02:48PM | 9 | Q.  You never received any information prior to or after |
| 02:48PM | 10 | meeting with them that you needed to be on the lookout for |
| 02:48PM | 11 | them, correct? |
| 02:48PM | 12 | A.  I didn't give their names. |
| 02:48PM | 13 | Q.  Okay.  But did you, I mean, Mike Masecchia was aware that |
| 02:49PM | 14 | you were going to be crossing the border at least twice to go |
| 02:49PM | 15 | meet with potential sources of supply in Canada, correct? |
| 02:49PM | 16 | A.  Correct. |
| 02:49PM | 17 | Q.  And you received no information that any of these folks |
| 02:49PM | 18 | you needed to look out for, correct? |
| 02:49PM | 19 | A.  Correct. |
| 02:49PM | 20 | Q.  Okay.  How about an individual named Joe Bella?  Did you |
| 02:49PM | 21 | ever receive any information about him? |
| 02:49PM | 22 | A.  No, I don't know Joe Bella.  I mean, I know of him, but I |
| 02:49PM | 23 | don't know him personally. |
| 02:49PM | 24 | Q.  Okay.  But, you know, as you testified here, you said you |
| 02:49PM | 25 | received at times information, and you didn't know whether it |

02:49PM   1   related to you at all, correct?

02:49PM   2   A.  Correct.

02:49PM   3   Q.  So, again, Joe Bella was never a name that came up as

02:49PM   4   being under investigation that you heard about through Mike

02:49PM   5   Masecchia, correct?

02:49PM   6   A.  Correct.

02:49PM   7   Q.  You never were told whether Homeland Security was looking

02:49PM   8   into him in 2016, correct?

02:49PM   9   A.  Correct.

02:49PM  10   Q.  Did you understand him to be involved in drug activity

02:49PM  11   from what you knew about him?

02:49PM  12   A.  Correct.

02:49PM  13   Q.  And, obviously, information on other drug dealers and

02:49PM  14   whether they would be under investigation was important to

02:50PM  15   you, correct?

02:50PM  16   A.  Correct.

02:50PM  17   Q.  Because that helps structure your organization, correct?

02:50PM  18   A.  Correct.

02:50PM  19   Q.  It helps you understand who you need avoid with the

02:50PM  20   people you deal with, correct?

02:50PM  21   A.  Correct.

02:50PM  22   Q.  All right.  Let's talk about Lou Selva.

02:50PM  23       You, I believe you described him as a cokehead, correct?

02:50PM  24   A.  Correct.

02:50PM  25   Q.  What do you mean by that term?

02:50PM    1    A.  Well, I just mean he did a lot of coke.

02:50PM    2    Q.  Have you seen him do a lot of coke in your presence?

02:50PM    3    A.  I was never really around him that much, so.

02:50PM    4    Q.  Okay.  So when you say you're really not around him that

02:50PM    5    much, how much in general from fall of 2010 to your arrest in

02:50PM    6    2017 were you ever around Lou Selva?

02:50PM    7    A.  Maybe -- when I started storing that stuff at his house,

02:50PM    8    occasionally.  Sometimes Mike would go there, and very rarely

02:50PM    9    would I go there.

02:50PM    10       And then when I built the grow room in his house.  So

02:50PM    11    maybe ten, 15 times.

02:50PM    12    Q.  Okay.  So ten, 15 times in all of those years that you

02:50PM    13    had personal interactions with Lou Selva; fair to say?

02:51PM    14    A.  Right.

02:51PM    15    Q.  Okay.  Now, you only knew Lou Selva through Mike

02:51PM    16    Masecchia, correct?

02:51PM    17    A.  Correct.

02:51PM    18    Q.  He's a bit older than you, correct?

02:51PM    19    A.  Correct.

02:51PM    20    Q.  And you understood he'd been friends with Mike Masecchia

02:51PM    21    before you ever really got involved with Mike Masecchia,

02:51PM    22    correct?

02:51PM    23    A.  Correct.

02:51PM    24    Q.  And your interactions that you saw, did it ever appear

02:51PM    25    like -- that Mr. Selva appeared to sort of suck up to Mike

02:51PM 1   Masecchia?

02:51PM 2   A.  I wouldn't say that.

02:51PM 3   Q.  Okay.  But, again, you only have limited personal

02:51PM 4   interactions, ten to 15 times, you said?

02:51PM 5   A.  Right.

02:51PM 6   Q.  Did you know him to be involved in a grow operation down

02:51PM 7   in the Cattaraugus County at all?

02:51PM 8   A.  Yes.

02:51PM 9   Q.  Okay.  But that was only based on what Mike Masecchia had

02:51PM 10  relayed to you?

02:51PM 11  A.  Correct.

02:51PM 12  Q.  Okay.  You did not -- if I think I recall your testimony,

02:51PM 13  you did help him setting up one of the grow operations up

02:51PM 14  there, correct?

02:51PM 15  A.  Yes.  He wasn't involved in that one I set up.

02:52PM 16  Q.  Yeah, let me just go in order.

02:52PM 17      The outdoor grow operations in Franklinville, one of

02:52PM 18  those you invested an initial $20,000 --

02:52PM 19  A.  Correct.

02:52PM 20  Q.  -- into.  Do you recall Lou Selva being involved in that

02:52PM 21  one at that time?

02:52PM 22  A.  No, he was not.

02:52PM 23  Q.  Okay.  And that was with you, Mike Masecchia, Sal Volpe,

02:52PM 24  and Mike Moynihan; am I getting those correct?

02:52PM 25  A.  Correct.

02:52PM 1 Q. And what time frame is that?

02:52PM 2 A. It was 2015.

02:52PM 3 Q. Okay. And prior to that, though, I think what you're

02:52PM 4 telling us is you had some knowledge that Lou Selva might be

02:52PM 5 involved in a grow operation down there outside, correct?

02:52PM 6 A. Correct.

02:52PM 7 Q. But you weren't involved in that grow operation, correct?

02:52PM 8 A. Correct.

02:52PM 9 Q. Okay. Now, at one point in time, you ended up storing

02:52PM 10 about 100 pounds of marijuana at his house in late 2016; do

02:52PM 11 you recall that?

02:52PM 12 A. Yes.

02:52PM 13 Q. So this is not growing at his house, this is just storing

02:53PM 14 bulk marijuana, correct?

02:53PM 15 A. Correct.

02:53PM 16 Q. And -- and he was supposed to get about $5,000 for doing

02:53PM 17 that; do you recall?

02:53PM 18 A. Yes.

02:53PM 19 Q. It's about $500 a pound, times 100, is what his cut was

02:53PM 20 supposed to be?

02:53PM 21 A. $50 a pound.

02:53PM 22 Q. $50 a pound. All the lawyers have had trouble with math

02:53PM 23 at some point in time in this case.

02:53PM 24    But you never did it again after that one point in time,

02:53PM 25 correct?

02:53PM   1   A.  I did it prior to that, but that was the last time

02:53PM   2   because 15 pounds was missing.

02:53PM   3   Q.  That was going to be my next question.  15 pounds came up

02:53PM   4   missing, correct?

02:53PM   5   A.  Correct.

02:53PM   6   Q.  And by street value, if we're using that $1,800 a pound

02:53PM   7   figure, that's about $27,000 of weed went missing?

02:53PM   8   A.  Correct.

02:53PM   9   Q.  And have you been ripped off before in your experience as

02:53PM  10   a drug dealer?

02:53PM  11   A.  I wouldn't say -- I mean, I've had people stiff me on

02:53PM  12   money, people that I've fronted.  Not necessarily -- like,

02:53PM  13   what do you mean, ripped off?

02:53PM  14   Q.  Well, I guess, do you understand in the drug business, in

02:53PM  15   your long experience with that, when stuff goes missing, it's

02:54PM  16   because people took it?

02:54PM  17   A.  Correct.

02:54PM  18   Q.  Okay.  And that's the opinion you formed because you

02:54PM  19   wouldn't deal with Lou Selva after that, correct?

02:54PM  20   A.  Correct.

02:54PM  21   Q.  Okay.  And do you remember at the same point in time,

02:54PM  22   Mike Masecchia trying to propose that he would take care of

02:54PM  23   some of your marijuana customers?

02:54PM  24   A.  Correct.

02:54PM  25   Q.  And what I think I understand that to mean is that Mike

02:54PM  1   Masecchia would come in, and he would sell direct to some of

02:54PM  2   the people you were selling direct to, correct?

02:54PM  3   A.  Correct.

02:54PM  4   Q.  So now he's actually taking some of your customers,

02:54PM  5   correct?

02:54PM  6   A.  Correct.

02:54PM  7   Q.  Kind of cutting you out in a way?

02:54PM  8   A.  No, he'd be getting it from me, more so that I didn't

02:54PM  9   have to do it.

02:54PM  10  Q.  Right.  But at that point in time, you're getting a bit

02:54PM  11  of a lesser profit, and you've got somebody in between,

02:54PM  12  correct?

02:54PM  13  A.  Correct.

02:54PM  14  Q.  All right.  Now, I think you testified on direct that you

02:54PM  15  thought you might have been paying Mike Masecchia right up to

02:55PM  16  your arrest in 2017; is that what you told us?

02:55PM  17  A.  I believe so.

02:55PM  18  Q.  Do you recall telling federal agents on March 4th, 2019,

02:55PM  19  your last actual payment to Mike Masecchia was back in

02:55PM  20  December 2016?

02:55PM  21  A.  Quite possibly.  I don't remember though.

02:55PM  22  Q.  Okay.  Let me refresh your recollection quickly.

02:55PM  23      MR. MacKAY:  Ms. Champoux, can we show the witness

02:55PM  24  only Government Exhibit 3536Z-1, page 3, please.

         25

| | | |
|---|---|---|
| 02:55PM | 1 | **BY MR. MacKAY:** |
| 02:55PM | 2 | Q.  All right.  It's going to be the second paragraph from |
| 02:56PM | 3 | the bottom.  Would you take a look at that?  Refresh your |
| 02:56PM | 4 | recollection whether you told federal agents at that time |
| 02:56PM | 5 | that your last payment intended for Mr. Bongiovanni was in |
| 02:56PM | 6 | December 2016.  Just look up to me when you're done. |
| 02:56PM | 7 | A.  Second from the bottom? |
| 02:56PM | 8 | Q.  Second-last page. |
| 02:56PM | 9 | **MR. MacKAY:**  Ms. Champoux, can we blow up that |
| 02:56PM | 10 | second-to-last paragraph? |
| 02:56PM | 11 | **BY MR. MacKAY:** |
| 02:56PM | 12 | Q.  Let me know when you've reviewed that. |
| 02:56PM | 13 | A.  I reviewed it. |
| 02:56PM | 14 | **MR. MacKAY:**  Okay.  You can that down, Ms. Champoux, |
| 02:56PM | 15 | thank you. |
| 02:56PM | 16 | **BY MR. MacKAY:** |
| 02:56PM | 17 | Q.  Does that refresh your recollection about whether the |
| 02:56PM | 18 | last payment may have actually been at the end of 2016? |
| 02:56PM | 19 | A.  Honestly, I'm not sure. |
| 02:56PM | 20 | Q.  And by that point in time, you're fairly heavy into your |
| 02:56PM | 21 | addiction, correct? |
| 02:56PM | 22 | A.  Correct. |
| 02:56PM | 23 | Q.  All right.  But by 2019, when you're talking to federal |
| 02:57PM | 24 | agents, you've now had almost two years to sober up, correct? |
| 02:57PM | 25 | A.  Correct. |

02:57PM  1   Q.  You get arrested on April 18, 2017, correct?

02:57PM  2   A.  Correct.

02:57PM  3   Q.  At that point in time, you ask one of the officers if

02:57PM  4   they know Joe Bongiovanni, correct?

02:57PM  5   A.  Correct.

02:57PM  6   Q.  And they basically ask you something to the effect of,

02:57PM  7   why, are you an informant for him?

02:57PM  8   A.  Correct.

02:57PM  9   Q.  And you don't answer that question, correct?

02:57PM  10  A.  Correct.

02:57PM  11  Q.  And is that because, well, that's because you were never

02:57PM  12  provided with any sort of cover story of what would happen if

02:57PM  13  you were asked about this sort of situation, correct?

02:57PM  14  A.  Correct.

02:57PM  15  Q.  So despite paying all the money out, Mr. Masecchia never

02:57PM  16  provided you with any sort of cover story of what was gonna

02:57PM  17  happen -- what would happen or what you should do if you were

02:57PM  18  confronted, correct?

02:57PM  19  A.  Correct.

02:57PM  20  Q.  Now, again, you got sober after your arrest, correct?

02:57PM  21  A.  Correct.

02:57PM  22  Q.  Took some time, but you went through a few rehabs,

02:57PM  23  correct?

02:57PM  24  A.  Correct.

02:57PM  25  Q.  And obviously, as you sit here today, you're sober.

USA v Bongiovanni - Serio - MacKay/Cross - 3/12/24

02:58PM   1   A.  Yes.

02:58PM   2   Q.  And I do mean to congratulations, it is not something

02:58PM   3   that we see --

02:58PM   4   A.  Thank you.

02:58PM   5   Q.  -- in this line of work, that all --

02:58PM   6   A.  Thanks.

02:58PM   7   Q.  -- the six attorneys here see.  But you are clearheaded

02:58PM   8   as you sit here today, correct?

02:58PM   9   A.  Correct.

02:58PM  10   Q.  And you've had almost seven years to contemplate

02:58PM  11   everything that's brought you to this point as you sit here

02:58PM  12   in this courtroom, today?

02:58PM  13   A.  Correct.

02:58PM  14   Q.  Okay.  And you were initially upset at the time of your

02:58PM  15   arrest because you believed the protection money had been

02:58PM  16   stolen from you, correct?

02:58PM  17   A.  I didn't think it was stolen, I just thought that I

02:58PM  18   didn't -- I don't know.  I was high at the time, and I was

02:58PM  19   pissed off that I got arrested.

02:58PM  20   Q.  Well, because you expected that money to have bought a

02:58PM  21   federal agent, correct?

02:58PM  22   A.  Correct.

02:58PM  23   Q.  You expected to not have been arrested for that money,

02:58PM  24   correct?

02:58PM  25   A.  Correct.

| | | |
|---|---|---|
| 02:58PM | 1 | Q.  You thought you immune from arrest, correct? |
| 02:58PM | 2 | A.  Correct. |
| 02:58PM | 3 | Q.  You thought that ultimately, this can't have happened, |
| 02:58PM | 4 | because Joe Bongiovanni never got the money, correct? |
| 02:58PM | 5 | A.  Well, not that I thought I could never get arrested, but |
| 02:58PM | 6 | I just thought I would have the heads-up to -- that I was |
| 02:59PM | 7 | gonna get arrested. |
| 02:59PM | 8 | Q.  Okay.  But ultimately, as you sit here today, you have no |
| 02:59PM | 9 | way of telling this jury whether any money ever got to Joe |
| 02:59PM | 10 | Bongiovanni, correct? |
| 02:59PM | 11 | A.  Correct. |
| 02:59PM | 12 | Q.  Because in all your years of doing this, from fall of |
| 02:59PM | 13 | 2010 to April of 2017, the only person you ever dealt with |
| 02:59PM | 14 | was Mike Masecchia, correct? |
| 02:59PM | 15 | A.  Correct. |
| 02:59PM | 16 | Q.  And you only ever paid money out to Mike Masecchia, |
| 02:59PM | 17 | correct? |
| 02:59PM | 18 | A.  Correct. |
| 02:59PM | 19 | Q.  And you only ever received information back from Mike |
| 02:59PM | 20 | Masecchia, correct? |
| 02:59PM | 21 | A.  Correct. |
| 02:59PM | 22 | Q.  And you don't know what happened to that money after you |
| 02:59PM | 23 | paid it out, correct? |
| 02:59PM | 24 | A.  Correct. |
| 02:59PM | 25 | Q.  Silly as it sounds, you never got a receipt initialed by |

USA v Bongiovanni - Serio - MacKay/Cross - 3/12/24

02:59PM    1    Joe Bongiovanni, correct?

02:59PM    2    A.  Correct.

02:59PM    3    Q.  You never met Joe Bongiovanni once, correct?

02:59PM    4    A.  Correct.

02:59PM    5    Q.  You never had any phone calls or text message

02:59PM    6    conversations with Joe Bongiovanni, correct?

02:59PM    7    A.  Correct.

02:59PM    8    Q.  You never received any confidential DEA paperwork

02:59PM    9    verifying any of the information that you were supposedly

02:59PM    10    sent, correct?

02:59PM    11    A.  Correct.

02:59PM    12    Q.  All you know is that you paid money to Mike Masecchia,

02:59PM    13    right?

02:59PM    14    A.  Correct.

02:59PM    15    Q.  And he told you things in return, correct?

02:59PM    16    A.  Correct.

02:59PM    17    **MR. MacKAY:**  Your Honor, can I just have one moment

03:00PM    18    to check?

03:00PM    19    **THE COURT:**  Sure.

03:00PM    20    **MR. MacKAY:**  I have no further questions, Your Honor.

03:00PM    21    **THE COURT:**  Redirect, Mr. Tripi.

03:00PM    22    **MR. TRIPI:**  Yes, Your Honor.  Do you want your break

03:00PM    23    now?

03:00PM    24    **THE COURT:**  No.

03:00PM    25    **MR. TRIPI:**  Okay.

| | | |
|---|---|---|
| 03:00PM | 1 | **REDIRECT EXAMINATION BY MR. TRIPI:** |
| 03:00PM | 2 | Q.  Let's pick up where Mr. MacKay left off. |
| 03:00PM | 3 | When you saw, after you were arrested, that it was Erie |
| 03:01PM | 4 | County Sheriffs and the FBI that arrested you and charged you |
| 03:01PM | 5 | in federal court, did your arrest start to make more sense |
| 03:01PM | 6 | then? |
| 03:01PM | 7 | A.  I was so messed up, honestly, it really -- it really |
| 03:01PM | 8 | didn't make sense.  I mean, I didn't -- |
| 03:01PM | 9 | Q.  I'm saying later on -- |
| 03:01PM | 10 | A.  Oh, later on, yes. |
| 03:01PM | 11 | Q.  -- when you learned what agencies were involved, did it |
| 03:01PM | 12 | start to make more sense to you? |
| 03:01PM | 13 | A.  Yes, correct. |
| 03:01PM | 14 | Q.  Is that because the DEA had no involvement? |
| 03:01PM | 15 | A.  Correct. |
| 03:01PM | 16 | Q.  Okay.  And you were shown an exhibit a few moments ago, |
| 03:01PM | 17 | 3536Z-1 by Mr. MacKay.  I'm going to show you that exhibit in |
| 03:01PM | 18 | hard copy.  See that cover page there? |
| 03:01PM | 19 | A.  Yeah. |
| 03:01PM | 20 | Q.  I'll take it back.  Is that from an interview March 4th, |
| 03:02PM | 21 | 2019? |
| 03:02PM | 22 | A.  Yes, I believe so. |
| 03:02PM | 23 | Q.  Okay.  Is that when you were still withholding |
| 03:02PM | 24 | information and minimizing your dealings with Bongiovanni? |
| 03:02PM | 25 | A.  Yes. |

03:02PM  1   Q.  Okay.  So in terms of the jury's evaluation of your

03:02PM  2   truthfulness, we can basically rip this document up, correct?

03:02PM  3           **MR. MacKAY:**  Objection.

03:02PM  4           **THE COURT:**  Sustained.

03:02PM  5           **BY MR. TRIPI:**

03:02PM  6   Q.  Does this document hold any value?

03:02PM  7           **MR. MacKAY:**  Objection.

03:02PM  8           **THE COURT:**  Sustained.

03:02PM  9           **BY MR. TRIPI:**

03:02PM  10  Q.  In your view, were you truthful during this interview?

03:02PM  11  A.  Not fully.

03:02PM  12  Q.  Okay.  Are you being fully truthful now?

03:02PM  13  A.  Yes.

03:02PM  14  Q.  How many people were making money off of the drugs and

03:02PM  15  the sources of supply that you were bringing in to the

03:02PM  16  organization?

03:02PM  17  A.  I'd say probably 15 people at least.

03:02PM  18  Q.  Out of that 15, after you, where did Mike Masecchia rank

03:03PM  19  on the profit rankings?

03:03PM  20  A.  He became number one, basically.

03:03PM  21  Q.  Okay.  So was you getting arrested good for Mike

03:03PM  22  Masecchia's pocketbook, or bad?

03:03PM  23  A.  Good.

03:03PM  24  Q.  You getting arrested was good?

03:03PM  25  A.  Well, he tried to take over my customers.

03:03PM    1    Q.   Okay.  While you were -- before you were arrested --

03:03PM    2    A.   Oh, before?  Yeah, no, it would be bad.

03:03PM    3    Q.   It would be bad?

03:03PM    4    A.   Correct.

03:03PM    5    Q.   Was -- was $2,000, if Masecchia was stealing $2,000,

03:03PM    6    would that be pennies on the dollar for what he was earning

03:03PM    7    off of you each month?

03:03PM    8    A.   Yes.

03:03PM    9    Q.   If he was stealing $4,000 and splitting it with Lou

03:03PM   10    Selva, would that be pennies on the dollar for what they were

03:03PM   11    making off of you?

03:03PM   12    A.   Yes.

03:03PM   13    Q.   How much money monthly would you estimate Mike Masecchia

03:04PM   14    made off of your dealings and with marijuana and the drugs

03:04PM   15    you were bringing in?

03:04PM   16    A.   I would say probably at least 20,000.

03:04PM   17    Q.   Okay.  Do you fancy yourself, despite your drug

03:04PM   18    addictions, as a good businessman?

03:04PM   19    A.   I'm a very good businessman.

03:04PM   20    Q.   Very good?

03:04PM   21    A.   Yes.

03:04PM   22    Q.   And did you hold that opinion even when you were

03:04PM   23    addicted?

03:04PM   24    A.   Yes.

03:04PM   25    Q.   Okay.  Is it good business to steal 2- or $4,000 at the

03:04PM   1   risk of $20,000?

03:04PM   2   A.   No.

03:04PM   3   Q.   Why is that bad business?

03:04PM   4   A.   Because you lose the $20,000.

03:04PM   5   Q.   I haven't been great at math, but is 20,000 either 16- or

03:04PM   6   $18,000 more than 2- or $4,000?

03:04PM   7   A.   Correct.

03:04PM   8   Q.   Now, you were asked some questions about Lou Selva.  Just

03:04PM   9   to be clear, early on in those outdoor grow operations, and I

03:04PM   10  think you testified about this yesterday, did you say that

03:05PM   11  you actually clipped at one of the grows while Lou was

03:05PM   12  working the grow?

03:05PM   13  A.   Well, I clipped at Morgan Hollow when they brought it to

03:05PM   14  there.

03:05PM   15  Q.   Okay.

03:05PM   16  A.   I don't believe they grew it at that property.

03:05PM   17  Q.   And was Lou there clipping with you?

03:05PM   18  A.   Correct.

03:05PM   19  Q.   So you knew he was involved in the grows?

03:05PM   20  A.   Correct.

03:05PM   21  Q.   At some point later on, did you also have a dinner at the

03:05PM   22  Western Door with Mike Masecchia and Lou Selva?

03:05PM   23  A.   Yes.

03:05PM   24  Q.   Is that a fancy steak restaurant at one of the casinos?

03:05PM   25  A.   Yes.

03:05PM    1    Q.   At that dinner, did some business dealings related to

03:05PM    2    drug trafficking get discussed?

03:05PM    3    A.   I believe so.

03:05PM    4    Q.   Okay.  Did all of you have an understanding, the three of

03:05PM    5    you at that dinner table, whether you discussed it at that

03:05PM    6    dinner table or not, did all three of you have a shared

03:05PM    7    understanding that Bongiovanni was protecting all three of

03:05PM    8    you?

03:05PM    9    A.   Yes.

03:05PM   10    Q.   Any question in your mind about that?

03:05PM   11    A.   No.

03:05PM   12    Q.   You were asked a bunch of questions about sources of

03:06PM   13    supply that you had through the timeline, right?

03:06PM   14         Now, Mark Keegan, during any portions of the timeline

03:06PM   15    when you were being supplied drugs by Mark Keegan, was he

03:06PM   16    ever arrested for drug trafficking by the DEA?

03:06PM   17    A.   Not to my knowledge.

03:06PM   18    Q.   Was Michael Masecchia ever arrested for drug trafficking

03:06PM   19    by the DEA?

03:06PM   20    A.   No.

03:06PM   21    Q.   Was Anthony Gerace ever arrested for drug trafficking by

03:06PM   22    the DEA?

03:06PM   23    A.   No.

03:06PM   24    Q.   Was Jarrett Guy ever arrested for drug trafficking by the

03:06PM   25    DEA?

03:06PM  1    A.  No.

03:06PM  2    Q.  Now.  After, did -- did -- did HSI try to get into

03:06PM  3    Jarrett Guy after you cooperated in this case?

03:06PM  4    A.  Yes.

03:06PM  5    Q.  But he's up in Canada --

03:06PM  6    A.  Yes.

03:06PM  7    Q.  -- where there's some logistical challenges?

03:06PM  8    A.  Correct.

03:06PM  9    Q.  Was Santiago Gale only arrested after you stopped dealing

03:06PM  10   with him?

03:06PM  11   A.  Yes.

03:06PM  12   Q.  Now, Joe Tomasello early on, you were getting from him,

03:07PM  13   and he was dealing with Masecchia, right?

03:07PM  14   A.  Correct.

03:07PM  15   Q.  Was Joe Tomasello ever arrested by Defendant Bongiovanni?

03:07PM  16   A.  No.

03:07PM  17   Q.  You were asked about Mike Piazza.  Was Mike Piazza ever

03:07PM  18   arrested by the defendant?

03:07PM  19   A.  Not to my knowledge.

03:07PM  20   Q.  By the DEA?

03:07PM  21   A.  Not to my knowledge.

03:07PM  22   Q.  To your knowledge, was Joe Bella ever arrested by the

03:07PM  23   DEA?

03:07PM  24   A.  I don't know Joe Bella, so I would have no idea.

03:07PM  25   Q.  Now, after your interview, your proffer interview, do you

03:07PM   1   remember your July 20th, 2018, proffer interview where Curtis

03:07PM   2   Ryan was asking you questions?

03:07PM   3   A.  I believe so.

03:07PM   4   Q.  Is that the first proffer where you mentioned the

03:07PM   5   defendant's name?

03:07PM   6   A.  Yes.

03:07PM   7   Q.  Okay.  But even then, it wasn't the full truth, right?

03:07PM   8   A.  Correct.

03:07PM   9   Q.  Even after your first time in the grand jury, that wasn't

03:07PM   10  the full truth?

03:07PM   11  A.  Correct.

03:07PM   12  Q.  Even after your second time in grand jury, you still

03:07PM   13  withheld, didn't you?

03:07PM   14  A.  Correct.

03:07PM   15  Q.  It wasn't until October 2nd, 2019, where you admitted the

03:08PM   16  full scope of the bribes; isn't that true?

03:08PM   17  A.  Correct.

03:08PM   18  Q.  And then you testified the next day, October 3rd, 2019;

03:08PM   19  is that right?

03:08PM   20  A.  Correct.

03:08PM   21  Q.  From July 20th, 2018 on, were any DEA agents at all in

03:08PM   22  any of your proffer interviews with HSI and the U.S.

03:08PM   23  Attorney's Office?

03:08PM   24  A.  Not to my knowledge.

03:08PM   25  Q.  Now, did you need to know as the drug supplier, did you

03:08PM     1    need to know how problems were being fixed?  Or just that

03:08PM     2    they were being fixed?

03:08PM     3    A.   Just that they were being fixed.

03:08PM     4    Q.   Did you care the specifics about how the defendant was

03:08PM     5    keeping people away from you?

03:08PM     6    A.   No.

03:08PM     7    Q.   Did you care how he found out about Mario Vacanti's

03:08PM     8    investigation?

03:08PM     9    A.   No.

03:08PM    10    Q.   Did you care how he knew that R.K. was an informant?

03:08PM    11    A.   Nope.

03:08PM    12    Q.   Did you care how he knew T.S. was an informant?

03:08PM    13    A.   No.

03:08PM    14    Q.   Were you grateful to get that information?

03:09PM    15    A.   Yes.

03:09PM    16    Q.   Did you think t was worth the money you were paying?

03:09PM    17    A.   Yes.

03:09PM    18    Q.   You were asked some questions about Frank Burkhart and

03:09PM    19    Wayne Anderson; do you remember those questions on cross?

03:09PM    20    A.   Yes.

03:09PM    21         **MR. TRIPI:**  Ms. Champoux, can we pull up the pdf

03:09PM    22    that's Exhibit 8.  The pdf one.  8A.  Thank you.  8A.

03:09PM    23         **THE COURT:**  This is in evidence?

03:09PM    24         **MR. TRIPI:**  It's in evidence, Judge, yes.

           25

| | | |
|---|---|---|
| 03:09PM | 1 | **BY MR. TRIPI:** |
| 03:09PM | 2 | Q.  I'm going to skip -- actually, you were asked some |
| 03:09PM | 3 | questions about Remus Nowak; do you remember that question on |
| 03:09PM | 4 | cross? |
| 03:09PM | 5 | A.  Yes. |
| 03:09PM | 6 | Q.  All right.  I'm going to read something to you that's in |
| 03:09PM | 7 | evidence and ask you about it. |
| 03:09PM | 8 | Paragraph 3, this is page 6 of Exhibit 8A: |
| 03:10PM | 9 | Agents have identified Remus Nowak, a/k/a Remo, in a |
| 03:10PM | 10 | prior DEA investigation, C2-98-0030, for trafficking in |
| 03:10PM | 11 | multiple kilograms of marijuana.  Nowak is believed to be a |
| 03:10PM | 12 | major distributor and money launder source for the Serio DTO. |
| 03:10PM | 13 | Do you see that sentence? |
| 03:10PM | 14 | A.  Yes. |
| 03:10PM | 15 | Q.  Serio, that's you, right? |
| 03:10PM | 16 | A.  Yes. |
| 03:10PM | 17 | Q.  And you've been testifying about your drug-trafficking |
| 03:10PM | 18 | organization? |
| 03:10PM | 19 | A.  Yes. |
| 03:10PM | 20 | Q.  Was Remus Nowak a major marijuana distributor and money |
| 03:10PM | 21 | laundering source for you? |
| 03:10PM | 22 | A.  For me? |
| 03:10PM | 23 | Q.  Yes. |
| 03:10PM | 24 | A.  No. |
| 03:10PM | 25 | Q.  Were you the principal in the Serio DTO? |

USA v Bongiovanni - Serio - Tripi/Redirect - 3/12/24

190

03:10PM 1  A.  Yes.

03:10PM 2  Q.  Would you know who your money laundering sources were?

03:10PM 3  A.  Yes.

03:10PM 4  Q.  Were you laundering your own money?

03:10PM 5  A.  Yes.

03:10PM 6  Q.  We went through a decade of your suppliers.  Was Remus

03:10PM 7  Nowak one of them?

03:10PM 8  A.  Never.

03:10PM 9  Q.  So is that sentence written there utterly false in your

03:10PM 10  view?

03:11PM 11  A.  100 percent.

03:11PM 12  Q.  You were asked about your inner circle versus names you

03:11PM 13  passed along; do you remember that?

03:11PM 14  A.  Yes.

03:11PM 15  Q.  Now I want to define those.

03:11PM 16  Inner circle, those were people working with you and your

03:11PM 17  good friends?

03:11PM 18  A.  Correct.

03:11PM 19  Q.  Names you passed along, was that the same list of people?

03:11PM 20  A.  Wait, can you repeat that?

03:11PM 21  Q.  So, I want to be clear on what your understanding was.

03:11PM 22  You were asked questions about your inner circle.

03:11PM 23  A.  Yes.

03:11PM 24  Q.  And then questions about names you passed along.

03:11PM 25  A.  Yes.

03:11PM    1    Q.  Were those lists the same, or different?  Or was there

03:11PM    2    overlap there?

03:11PM    3    A.  There was overlap.

03:11PM    4    Q.  Okay.

03:11PM    5            MR. TRIPI:  Now, Ms. Champoux, can we control F

03:11PM    6    Frank Burkhart, or the last name Burkhart please?

03:11PM    7            THE COURT:  In this exhibit you're asking?

03:11PM    8            MR. TRIPI:  Yes, please.  It will get us to the -- I

03:12PM    9    think there's a D.  H-A-R-D-T.

03:12PM   10            Let's go with -- put in Hard Core, try that.  Two

03:12PM   11    words, please.  Sorry.  Okay.

03:12PM   12            BY MR. TRIPI:

03:12PM   13    Q.  Do you see on the -- we're on page 357 of Exhibit 8A.  Do

03:12PM   14    you see a reference highlighted there to Hard Core Tattoo

03:12PM   15    Studio?

03:12PM   16    A.  Yes.

03:12PM   17    Q.  Is that Frank Burkhart's tattoo studio?

03:12PM   18    A.  Yes.

03:12PM   19    Q.  Is that someone who was in your inner circle of drug

03:12PM   20    trafficking?

03:12PM   21    A.  Yes.

03:12PM   22    Q.  Does that look like phone information associated with

03:12PM   23    Frank Burkhart's Hard Core Tattoo Studio?

03:12PM   24    A.  Where it says contact work?

03:12PM   25    Q.  Financially liable party, user information, that section

03:13PM    1   down below.  Do you see a phone number there, 716?

03:13PM    2   A.  Oh, right there?  Yes.

03:13PM    3        **MR. TRIPI:**  Let's search Mark Falzone, please, with

03:13PM    4   an E.  Thank you.

03:13PM    5        **BY MR. TRIPI:**

03:13PM    6   Q.  Mark Falzone, is that your very good friend?

03:13PM    7   A.  Yes.

03:13PM    8   Q.  Is that his address, 377 Englewood?

03:13PM    9   A.  Correct.

03:13PM   10   Q.  Did you have drugs delivered there?

03:13PM   11   A.  Yes.

03:13PM   12   Q.  Now, is he a very good friend of yours, and part of your

03:13PM   13   drug-dealing circle?

03:13PM   14   A.  Yes.

03:13PM   15   Q.  And did -- did you confide in him that Bongiovanni was

03:13PM   16   providing information?

03:13PM   17   A.  Yes.

03:13PM   18   Q.  You were asked questions about -- about information you

03:14PM   19   received -- or, withdrawn -- questions about the mail and a

03:14PM   20   package that was seized; do you remember that?

03:14PM   21   A.  Yes.

03:14PM   22   Q.  When you asked for more information or protection, and

03:14PM   23   the price was increased $2,000 a month, were you concerned

03:14PM   24   about mailings?  Or were you concerned about trucks going

03:14PM   25   across the country?

03:14PM   1    A.   Trucks.   Because with the mail, how were you really gonna

03:14PM   2    track that?   They were only 20 pounds at a time.

03:14PM   3    Q.   Did any of the truckloads intended for you ever get

03:14PM   4    picked off?

03:14PM   5    A.   No.

03:14PM   6    Q.   Did any of the U-Haul trucks ever get picked off?

03:15PM   7    A.   No.

03:15PM   8    Q.   Did any of the drivers ever get arrested?

03:15PM   9    A.   No.

03:15PM   10   Q.   Did you ever get stopped going to or coming from New York

03:15PM   11   City?

03:15PM   12   A.   No.

03:15PM   13   Q.   Did you ever notice surveillance trucks setting up

03:15PM   14   outside your house on Lebrun?

03:15PM   15   A.   No.

03:15PM   16   Q.   Did you ever notice surveillance trucks sitting outside

03:15PM   17   your warehouse at 608 Michigan or 82 Sycamore?

03:15PM   18   A.   No.

03:15PM   19   Q.   Did you ever notice any surveillance around Mark

03:15PM   20   Falzone's house?

03:15PM   21   A.   No.

03:15PM   22   Q.   Were those all places you had drug activity?

03:15PM   23   A.   Yes.

03:15PM   24   Q.   Before the Erie County Sheriffs searched 91 Grimsby, did

03:15PM   25   you ever remember any surveillance sitting in front of your

03:15PM   1   house?

03:15PM   2   A.   No.

03:15PM   3   Q.   Now in 2015, you were asked, you know, some questions

03:15PM   4   about 180 North Park and 165 Wardman regarding buying and

03:15PM   5   selling as it related to Mario Vacanti, correct?

03:15PM   6   A.   Yeah.

03:15PM   7   Q.   When you received the information from Bongiovanni about

03:16PM   8   the investigation into the Vacanti, what was your, remind the

03:16PM   9   jury, what was your response?  What did you do?

03:16PM  10   A.   Told Mario to stop.

03:16PM  11   Q.   Stop doing what?  Explain it to them again.

03:16PM  12   A.   Stop selling marijuana.

03:16PM  13   Q.   And did you raise the name Paul Humphrey?

03:16PM  14   A.   Yes.

03:16PM  15   Q.   How did you tell him about Paul Humphrey?

03:16PM  16   A.   I just told him that Joe Bongiovanni -- or, I got word

03:16PM  17   from Mike Masecchia that Joe Bongiovanni said that Paul

03:16PM  18   Humphry is cooperating against you, and that he said he owed

03:16PM  19   you $4,000.

03:16PM  20   Q.   And did Vacanti confirm that information?

03:16PM  21   A.   Yes.

03:16PM  22   Q.   Was he surprised?

03:16PM  23   A.   Very surprised.

03:16PM  24   Q.   What did he tell you he was gonna do?

03:16PM  25   A.   He was gonna stop.

03:16PM    1    Q.  Was that an example of your belief you were getting real,

03:16PM    2    true, accurate information?

03:16PM    3    A.  Yes.

03:16PM    4    Q.  What other reasons do you understand that you were

03:16PM    5    getting real information from this defendant over here?

03:17PM    6    A.  What do you mean by that?

03:17PM    7    Q.  Other examples like that.

03:17PM    8    A.  Well, T.S. and R.K.

03:17PM    9    Q.  Being informants?

03:17PM    10    A.  Yes.

03:17PM    11    Q.  Now regarding R.K., I think you said he was present at

03:17PM    12    your house up to five times on Lebrun?  Five times or less?

03:17PM    13    A.  Correct.

03:17PM    14    Q.  Were all five of those drug transactions?

03:17PM    15    A.  Not all five of them.

03:17PM    16    Q.  How many of them were?

03:17PM    17    A.  At least three.

03:17PM    18    Q.  Were all of them involving Frank Burkhart?

03:17PM    19    A.  Yes.

03:17PM    20    Q.  The guy associated with Hard Core Tattoo?

03:17PM    21    A.  Correct.

03:17PM    22    Q.  R.K. gets arrested for burglary.  If six to eight months

03:17PM    23    go by and then he comes around and he's around Frank Burkhart

03:18PM    24    and he has money, do you sell to him?

03:18PM    25    A.  If he was around Frank Burkhart, yes.

03:18PM  1   Q.  You didn't know David Oddo personally, but you knew him

03:18PM  2   to be someone Anthony Gerace was getting cocaine from?

03:18PM  3   A.  Correct.

03:18PM  4   Q.  Did you provide more than one list of names or phone

03:18PM  5   numbers over time to Masecchia?

03:18PM  6   A.  Multiple lists.

03:18PM  7   Q.  Do you know how many times you provided lists?

03:18PM  8   A.  At least five.

03:18PM  9   Q.  Were they the same names and phone numbers every time, or

03:18PM  10  were they different?

03:18PM  11  A.  They were different.

03:18PM  12  Q.  Sometimes the names stay the same, and the numbers

03:18PM  13  change?

03:18PM  14  A.  Yes.

03:18PM  15  Q.  When you stored marijuana at Lou Selva's house, how many

03:19PM  16  times would you say you did that?

03:19PM  17  A.  At least five times.

03:19PM  18  Q.  Over what years?

03:19PM  19  A.  2015 to '16.  '15 to '16.

03:19PM  20  Q.  And what were your discussions with Lou Selva directly

03:19PM  21  about storing marijuana as it related to Defendant

03:19PM  22  Bongiovanni?

03:19PM  23  A.  There's an extra layer of protection, because -- since

03:19PM  24  his relationship with Joe that he would get the heads-up if

03:19PM  25  they were gonna raid his house.

03:19PM  1  Q.  Who said that?

03:19PM  2  A.  Lou Selva.

03:19PM  3  Q.  Okay.  Exactly, clearly, who is speaking?  What did Lou

03:19PM  4  Selva say about that?

03:19PM  5  A.  He said that it's an extra layer of protection because if

03:19PM  6  they're gonna raid Joe's house -- I mean, not Joe's house,

03:19PM  7  Lou's house -- that Joe Bongiovanni would get the heads-up.

03:19PM  8  Q.  Lou Selva told you that directly?

03:19PM  9  A.  Correct.

03:19PM  10  Q.  His lips to your ears?

03:19PM  11  A.  Yes.

03:19PM  12  Q.  And then what did you do with your marijuana?

03:19PM  13  A.  Stored it there.

03:20PM  14  Q.  Five times?

03:20PM  15  A.  Yeah.

03:20PM  16  Q.  So just to get the timelines right, from fall of 2010 to

03:20PM  17  spring 2012, you paid Bongiovanni $2,000 a month for

03:20PM  18  protection?

03:20PM  19  A.  Correct.

03:20PM  20  Q.  And then in spring 2012 to April 2017, approximately, you

03:20PM  21  paid $4,000 per month?

03:20PM  22  A.  Correct.

03:20PM  23  Q.  And that's over a quarter million dollars over that

03:20PM  24  period of time?

03:20PM  25  A.  Correct.

03:20PM   1   Q.  You didn't write those down in a book because they were

03:20PM   2   set costs?

03:20PM   3   A.  Yes.

03:20PM   4   Q.  Now, when Masecchia first told you in '07 or '08 that

03:20PM   5   Bongiovanni looked out or gave him a heads-up, Masecchia was

03:20PM   6   the one who was childhood friends with Bongiovanni, correct?

03:20PM   7   A.  Yes.

03:20PM   8   Q.  You were not?

03:20PM   9   A.  No.

03:20PM   10  Q.  When you became the person that was raking in the most

03:21PM   11  money in this organization, is that when you started paying

03:21PM   12  the bribes?

03:21PM   13  A.  Yes.

03:21PM   14          MR. TRIPI:  Nothing further.

03:21PM   15          THE COURT:  Mr. MacKay, anything more?

03:21PM   16          MR. MacKAY:  I do, Judge, I'll be very quick.

03:21PM   17

03:21PM   18              RECROSS-EXAMINATION BY MR. MacKAY:

03:21PM   19  Q.  All right.  Mr. Serio, you testified on redirect here that

03:21PM   20  you think you provided lists about five times of names and

03:21PM   21  numbers, correct?

03:21PM   22  A.  Correct.

03:21PM   23  Q.  When was the last one you provided do you think?

03:21PM   24  A.  Sometime in 2016.

03:21PM   25  Q.  Okay.  And one of the people closest to you that you

03:21PM   1   would want looked out for is Jacob Martinez, correct?

03:21PM   2   A.  I wouldn't say the closest.

03:21PM   3   Q.  But he was one of the ones --

03:21PM   4   A.  Yes.

03:21PM   5   Q.  -- that would have been one of the names?

03:21PM   6   A.  Yes.

03:21PM   7        MR. MacKAY:  Ms. Champoux, you just took it down, can

03:21PM   8   we put 8A back up.  Can you word search control F Martinez.

03:21PM   9        BY MR. MacKAY:

03:22PM  10   Q.  It looks like no results found here.  Is that what you're

03:22PM  11   seeing on the screen?

03:22PM  12   A.  Yeah, not seeing anything.  I'm seeing Wayne Anderson,

03:22PM  13   Damien Abbate.

03:22PM  14   Q.  But we're doing a word search for Martinez.

03:22PM  15       Dave Oddo, that was not a name or number you would have

03:22PM  16   provided to Mr. Bongiovanni for any sort of protection or

03:22PM  17   information?

03:22PM  18   A.  Correct.

03:22PM  19   Q.  Because you did not like him, correct?

03:22PM  20   A.  Correct.

03:22PM  21        MR. MacKAY:  All right.  Nothing further, Your Honor.

03:22PM  22        THE COURT:  Anything more?

03:22PM  23        MR. TRIPI:  No, Your Honor, thank you.

03:22PM  24        THE COURT:  You can step down, sir.

03:22PM  25        (Witness excused at 3:22 p.m.)

```
1                (Excerpt concluded at 3:22 p.m.)

2           *      *      *      *      *      *      *

3

4

5

6              CERTIFICATE OF REPORTER

7

8              In accordance with 28, U.S.C., 753(b), I

9     certify that these original notes are a true and correct

10    record of proceedings in the United States District Court for

11    the Western District of New York on March 12, 2024.

12

13

14                       s/ Ann M. Sawyer
                         Ann M. Sawyer, FCRR, RPR, CRR
15                       Official Court Reporter
                         U.S.D.C., W.D.N.Y.
16

17

18

19

20

21

22

23

24

25
```

1

2                    **TRANSCRIPT INDEX**

3              **EXCERPT OF RONALD SERIO DAY 2**

4                    **MARCH 12, 2024**

5

6    **W I T N E S S**                        **P A G E**

7    **R O N A L D   S E R I O**                 2

8       DIRECT EXAMINATION BY MR. TRIPI (CON'T):   2

9       VOIR DIRE EXAMINATION BY MR. MacKAY:      80

10      DIRECT EXAMINATION BY MR. TRIPI:          81

11      CROSS-EXAMINATION BY MR. MacKAY:         102

12      REDIRECT EXAMINATION BY MR. TRIPI:       181

13      RECROSS-EXAMINATION BY MR. MacKAY:       198

14

15

16   **E X H I B I T S**                        **P A G E**

17   GOV Exhibits 489A and B                     13

18   GOV Exhibits 41A-1, 2, 3 and 13             28

19   GOV Exhibits 42A-1 through 42A-32           31

20   GOV Exhibits 54 - 58                        42

21   GOV Exhibit 53                              43

22   GOV Exhibits 43A-1 - 43A-99                 47

23   GOV Exhibit 270                             66

24   GOV Exhibit 268                             66

25   GOV Exhibits 265 and 269                    67

```
 1    GOV Exhibit 275                              67

 2    GOV Exhibit 279                              68

 3    GOV Exhibit 280                              69

 4    GOV Exhibit 281A                             69

 5    GOV Exhibit 281B                             70

 6    GOV Exhibit 276                              70

 7    GOV Exhibit 271                              71

 8    GOV Exhibit 266                              72

 9    GOV Exhibit 274                              73

10    GOV Exhibit 272                              73

11    GOV Exhibit 267                              74

12    GOV Exhibit 44                               77

13    GOV Exhibit 46                               80

14    GOV Exhibits 48 and 49                       82

15

16

17

18

19

20

21

22

23

24

25
```