11:17AM

1

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

2

_____

3 UNITED STATES OF AMERICA,

Case No. 1:19-cr-227

4                   Plaintiff,                    (LJV)

v.

5                                    March 20, 2024

JOSEPH BONGIOVANNI,

6

_____Defendant._____

7

8            **TRANSCRIPT EXCERPT - ANTHONY CASULLO**
          **BEFORE THE HONORABLE LAWRENCE J. VILARDO**

9                 **UNITED STATES DISTRICT JUDGE**

10

**APPEARANCES:**            **TRINI E. ROSS, UNITED STATES ATTORNEY**

11                          **BY: JOSEPH M. TRIPI, ESQ.**
                              **NICHOLAS T. COOPER, ESQ.**

12                          **CASEY L. CHALBECK, ESQ.**
                          Assistant United States Attorneys

13                          Federal Centre
                          138 Delaware Avenue

14                          Buffalo, New York 14202
                              And

15                          **UNITED STATES DEPARTMENT OF JUSTICE**
                          **BY: JORDAN ALAN DICKSON, ESQ.**

16                          1301 New York Ave NW
                          Suite 1000

17                          Washington, DC 20530-0016
                          For the Plaintiff

18
                          **SINGER LEGAL PLLC**

19                          **BY: ROBERT CHARLES SINGER, ESQ.**
                          80 East Spring Street

20                          Williamsville, New York 14221
                              And

21                          **LAW OFFICES OF PARKER ROY MacKAY**
                          **BY: PARKER ROY MacKAY, ESQ.**

22                          3110 Delaware Avenue
                          Kenmore, New York  14217

23                          For the Defendant

24 **PRESENT:**              **BRIAN A. BURNS,** FBI Special Agent
                          **MARILYN K. HALLIDAY,** HSI Special Agent

25                          **KAREN A. CHAMPOUX,** USA Paralegal

| | | |
|---|---|---|
| 1 | **LAW CLERK:** | **REBECCA FABIAN IZZO, ESQ.** |
| 2 | **COURT DEPUTY CLERK:** | **COLLEEN M. DEMMA** |
| 3 | **COURT REPORTER:** | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 4 | | Robert H. Jackson Federal Courthouse |
| | | 2 Niagara Square |
| | | Buffalo, New York  14202 |
| 5 | | Ann_Sawyer@nywd.uscourts.gov |

6

7                    *     *     *     *     *     *     *

8

9          (Excerpt commenced at 11:17 a.m.)

10          (Jury is present.)

11:17AM    11          **THE COURT:**  The government may call its next witness.

11:17AM    12          **MR. DICKSON:**  The government calls Anthony Casullo.

11:17AM    13

11:18AM    14  **A N T H O N Y   C A S U L L O**, having been duly called and

11:18AM    15  sworn, testified as follows:

11:18AM    16          **MR. DICKSON:**  May I proceed?

11:19AM    17          **THE COURT:**  You may.

11:19AM    18

11:19AM    19                    **DIRECT EXAMINATION BY MR. DICKSON:**

11:19AM    20  Q.  Good morning.

11:19AM    21  A.  Good morning.

11:19AM    22  Q.  Can you introduce yourself to the jury, please?

11:19AM    23  A.  Hi, my name is Anthony Casullo.  How are you?

11:19AM    24  Q.  Mr. Casullo, where do you live?

11:19AM    25  A.  I live in Clarence, New York.

| | | |
|---|---|---|
| 11:19AM | 1 | Q. How long have you lived in that area? |
| 11:19AM | 2 | A. Oh, approximately -- purchased the house in 2012, so |
| 11:19AM | 3 | about 11, 12 years, other than when I was working in New York |
| 11:19AM | 4 | City. |
| 11:19AM | 5 | Q. Where did you grow up, Mr. Casullo? |
| 11:19AM | 6 | A. I grew up in Tonawanda, Kenmore.  Kenmore, New York. |
| 11:19AM | 7 | Q. Are you working right now? |
| 11:19AM | 8 | A. I am.  I'm currently employed. |
| 11:19AM | 9 | Q. What's your job? |
| 11:19AM | 10 | A. My job is as a subject matter expert for law enforcement |
| 11:20AM | 11 | investigations.  I work for a contract company, a U.S. |
| 11:20AM | 12 | contract company that's a technology company, and I provide |
| 11:20AM | 13 | advice and mentoring on our computer engineers on how to |
| 11:20AM | 14 | develop border security systems.  And we currently have a |
| 11:20AM | 15 | contract with the U.S. government. |
| 11:20AM | 16 | Q. Before this job, Mr. Casullo, did you have a career in |
| 11:20AM | 17 | law enforcement? |
| 11:20AM | 18 | A. Yes, I did. |
| 11:20AM | 19 | Q. Let's talk a little bit about that.  How did you get |
| 11:20AM | 20 | started in law enforcement? |
| 11:20AM | 21 | A. When I graduated from Canisius College, we had recruiters |
| 11:20AM | 22 | at our school for the CIA, FBI, and Immigration Service.  And |
| 11:20AM | 23 | applied with a job at the Immigration Service, and was hired |
| 11:20AM | 24 | as an immigration inspector.  That was in 1990. |
| 11:20AM | 25 | Q. 1990? |

11:20AM    1    A.   Yes.

11:20AM    2    Q.   Where did you go after that?

11:20AM    3    A.   So my assignment -- my first assignment was in Toronto,

11:20AM    4    Canada.   I worked in the airport in Toronto.   We did

11:20AM    5    preflight inspections.   We cleared flights before they left

11:20AM    6    Canada.   So once people arrived in the United States, they

11:21AM    7    could basically walk off because they were cleared, worked

11:21AM    8    there for five years.   And then at the land border port of

11:21AM    9    entry of in Niagara Falls for about a year.

11:21AM   10    Q.   Did you eventually make your way to the DEA?

11:21AM   11    A.   Yes, I did.

11:21AM   12    Q.   When did you start with the DEA?

11:21AM   13    A.   I started in July of 1999, is when I was hired and sent

11:21AM   14    to Quantico for training.

11:21AM   15    Q.   What DEA office did you work in first?

11:21AM   16    A.   So at the academy, they told us our first assignment

11:21AM   17    several weeks in, and mine was Las Vegas, Nevada.

11:21AM   18    Q.   So what period of time during your first stint at the

11:21AM   19    Las Vegas office did you work in Vegas?

11:21AM   20    A.   So I graduated from the DEA academy in November of '99.  I

11:21AM   21    went being back to Buffalo for, I believe, 30 days.   And then

11:21AM   22    to Las Vegas in December of 1999.   And I stayed with DEA in

11:21AM   23    Las Vegas until I believe it was June of 2002.

11:21AM   24    Q.   Where did you go in 2002?

11:22AM   25    A.   In 2002, I left the DEA and accepted a position as a

11:22AM    1    special agent with the FBI.

11:22AM    2    Q.  Why did you move to the FBI?

11:22AM    3    A.  So, like a lot of people in law enforcement, I was

11:22AM    4    working, and when 9/11 occurred, and I had a strong desire to

11:22AM    5    fight terrorism and investigate terrorists, and I had already

11:22AM    6    been halfway through the process with the FBI when I applied

11:22AM    7    with DEA.  And I contacted the FBI recruiter, and reinitiated

11:22AM    8    my application to work for the FBI.

11:22AM    9    Q.  Did you stay with the FBI for a long time?

11:22AM    10   A.  Not that long.  I was there approximately 13 months.  My

11:22AM    11   assignment out of the academy was Fayetteville, North

11:22AM    12   Carolina.  It was a smaller office.  I went on a

11:22AM    13   house-hunting trip.  I told my wife not to sell the house yet

11:22AM    14   in Las Vegas until I saw what the assignment was.

11:22AM    15       Initially, we thought it was going to be the Charlotte

11:22AM    16   field division.  They told us if you have prior law

11:22AM    17   enforcement experience, you may go to a smaller FBI office,

11:22AM    18   which I did, and it was Fayetteville, North Carolina.  And it

11:23AM    19   wasn't -- it was -- I worked with great people, but it was a

11:23AM    20   small office.  It was something different from what I was

11:23AM    21   used to working in a large group of DEA working gangs and

11:23AM    22   narcotics.

11:23AM    23       And I had the option to go back to DEA within a two-year

11:23AM    24   window, and I chose to go back to DEA in Las Vegas.

11:23AM    25   Q.  So then when you went back to DEA, how long were you in

| | | |
|---|---|---|
| 11:23AM | 1 | the Vegas office during that stint? |
| 11:23AM | 2 | A.  So when I went back, it was July of 2003, and then stayed |
| 11:23AM | 3 | until I went to New York City with DEA in -- I believe it was |
| 11:23AM | 4 | December of 2013. |
| 11:23AM | 5 | Q.  And eventually, Mr. Casullo, you told the jury you grew |
| 11:23AM | 6 | up in Buffalo.  Were you hoping to get back to the Buffalo |
| 11:23AM | 7 | DEA office? |
| 11:23AM | 8 | A.  Our plan was to eventually come back to Buffalo.  When we |
| 11:23AM | 9 | stayed in Vegas -- we had four children now, at the time we |
| 11:23AM | 10 | had three.  We had a fourth.  We weren't going to stay as |
| 11:23AM | 11 | long as we did, was our plan, but we did.  We stayed -- I |
| 11:24AM | 12 | think it was 13 years. |
| 11:24AM | 13 | But as our children got older and into high school, our |
| 11:24AM | 14 | plan was to come back to Buffalo and retire out of this |
| 11:24AM | 15 | office where I had family, and where our kids could go to |
| 11:24AM | 16 | school in New York State.  The education wasn't that great in |
| 11:24AM | 17 | Las Vegas.  And we saw more of that once they got into high |
| 11:24AM | 18 | school, so -- |
| 11:24AM | 19 | Q.  So did you eventually end up in the DEA Buffalo office? |
| 11:24AM | 20 | A.  I did.  At the time that we wanted to go back, because my |
| 11:24AM | 21 | daughter was going to be a junior in high school, they said |
| 11:24AM | 22 | there that were no openings in Buffalo, but I could go to |
| 11:24AM | 23 | New York City, which was -- Buffalo is part of the New York |
| 11:24AM | 24 | field division.  And as soon as there was a vacancy in |
| 11:24AM | 25 | Buffalo, that I could transfer into Buffalo.  And that's what |

| | | |
|---|---|---|
| 11:24AM | 1 | I chose to do. |
| 11:24AM | 2 | I actually bought a house in Buffalo, and I worked in |
| 11:24AM | 3 | New York City for approximately two years until someone |
| 11:24AM | 4 | retired, and then I came back to Buffalo. |
| 11:24AM | 5 | Q.  So what year did you start in the DEA Buffalo office? |
| 11:24AM | 6 | A.  So I started in -- that would have been September of 2015 |
| 11:24AM | 7 | is when I came back. |
| 11:24AM | 8 | Q.  When you came back to the Buffalo office, what was your |
| 11:25AM | 9 | job? |
| 11:25AM | 10 | A.  I was a special agent assigned to group D-57, which is |
| 11:25AM | 11 | one of the groups in the DEA office.  I believe there were |
| 11:25AM | 12 | three at the time, and I was in D-57 it was called. |
| 11:25AM | 13 | Q.  We'll talk about the groups in just a second, but tell |
| 11:25AM | 14 | the jury what kinds of cases you worked on back at the |
| 11:25AM | 15 | Buffalo office. |
| 11:25AM | 16 | A.  It was a little bit of everything.  We weren't restricted |
| 11:25AM | 17 | to any particular type of case.  The first case that I worked |
| 11:25AM | 18 | was a long-term heroin/cocaine investigation that we worked |
| 11:25AM | 19 | with the New York State Attorney General's Office.  I had |
| 11:25AM | 20 | known the chief over at that office, and we -- we had some |
| 11:25AM | 21 | purchases, undercover purchases into a heroin trafficker that |
| 11:25AM | 22 | was residing in the West Side area of Buffalo, and we ended |
| 11:25AM | 23 | up going on a long-term wiretap investigation on that |
| 11:25AM | 24 | organization that lasted approximately eight months, I |
| 11:25AM | 25 | believe. |

11:25AM    1    Q.  Mr. Casullo, were you interested in investigating

11:26AM    2    Organized Crime during your career at the DEA?

11:26AM    3    A.  I had interest and some experience doing that.

11:26AM    4    Q.  Can you tell the jury where that interest came from in

11:26AM    5    investigating Organized Crime?

11:26AM    6    A.  When I was in Las Vegas, my supervisor who had come

11:26AM    7    from -- he worked in New York City prior to being a

11:26AM    8    supervisor in Las Vegas, and he had worked some Italian

11:26AM    9    Organized Crime type cases when he was in New York City.

11:26AM    10    So when he came to Las Vegas, he still had an interest in

11:26AM    11    doing that, and asked if I would be interested in working

11:26AM    12    those types of cases if we came across them.  And I said

11:26AM    13    sure, absolutely.  So that was my first exposure to working

11:26AM    14    those types of cases.

11:26AM    15    And I did work a long-term investigation that was

11:26AM    16    targeting Italian Organized Crime members in Las Vegas and

11:26AM    17    Los Angeles, and they had ties to the Buffalo Italian

11:26AM    18    Organized Crime family.

11:26AM    19    Q.  We'll talk about that investigation in a minute.

11:26AM    20    I want to talk a little bit, though, about what DEA

11:26AM    21    responsibilities there were for special agents, what kind of

11:27AM    22    duties or rules you had to follow.

11:27AM    23    Generally, was the DEA responsible for investigating drug

11:27AM    24    trafficking?  Was that one of the jobs of a DEA special

11:27AM    25    agent?

11:27AM   1    A.   Absolutely.

11:27AM   2    Q.   Now, to do that, the DEA agents sometimes use

11:27AM   3    confidential sources?

11:27AM   4    A.   Very often.  We use them all the time.

11:27AM   5    Q.   Were confidential sources important to DEA

11:27AM   6    investigations?

11:27AM   7    A.   Extremely important.

11:27AM   8    Q.   Why?

11:27AM   9    A.   That was a way for investigators to have a person

11:27AM   10   actually face to face with criminals that we were targeting

11:27AM   11   to get realtime information, to get evidence, to tell us

11:27AM   12   things that were going on that we wouldn't have access to

11:27AM   13   otherwise.

11:27AM   14   Q.   Mr. Casullo, did the DEA, in your experience, sometimes

11:27AM   15   adopt a state or local case for federal investigation?

11:27AM   16        **MR. SINGER:** Judge, I object to cumulative at this

11:27AM   17   time.  We've heard the same testimony from multiple agents.

11:28AM   18        **THE COURT:** Overruled.

11:28AM   19        **BY MR. DICKSON:**

11:28AM   20   Q.   Mr. Casullo, did the DEA sometimes adopt state or local

11:28AM   21   investigations to become federal investigations in

11:28AM   22   prosecutions?

11:28AM   23   A.   In my experience, I worked on local task force groups,

11:28AM   24   meaning that in Las Vegas and New York City and Buffalo, I

11:28AM   25   worked within my group with local police officers, detectives

11:28AM  1    that were assigned to our group.  So for me, on my

11:28AM  2    experience, it happened pretty frequently.

11:28AM  3    Q.  Is there some kind of a benefit, or in your experience

11:28AM  4    what was the benefit of bringing a case to a federal level?

11:28AM  5    A.  Well, the benefit of bringing it to a federal level would

11:28AM  6    always be the resources of the federal government.  The DEA

11:28AM  7    had resources at times the state and local departments didn't

11:28AM  8    have.  And also when it came time to prosecution, the U.S.

11:28AM  9    Attorney's Office was the highest level of prosecution and

11:28AM  10   resources from a prosecution standpoint.

11:28AM  11      So there were benefits for department in terms of the

11:29AM  12   type of case that we would work jointly together to take it

11:29AM  13   to the next level.  Lots of times state or local

11:29AM  14   organizations might not be able to take it past the local or

11:29AM  15   state level.  If they teamed up with a federal agency, it was

11:29AM  16   not uncommon to take cases -- I traveled international to

11:29AM  17   Panama and Columbia with local police officers from

11:29AM  18   Las Vegas, based on working that case jointly and them being

11:29AM  19   part of our task force.

11:29AM  20      And asset forfeiture, as well.  If there were assets

11:29AM  21   involved from some of the criminals or drug traffickers that

11:29AM  22   we were arresting, and those were seized, there would be a

11:29AM  23   sharing of asset forfeiture money and resources that would go

11:29AM  24   back to the local departments.

11:29AM  25   Q.  Mr. Casullo, as a DEA special agent, were you supposed to

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24
11

| | | |
|---|---|---|
| 11:29AM | 1 | choose who you investigated based off of that person's race |
| 11:29AM | 2 | or ethnicity? |
| 11:29AM | 3 | A.  No.  No. |
| 11:29AM | 4 | Q.  Was there a DEA policy against choosing who you |
| 11:29AM | 5 | investigate based off of their race or ethnicity? |
| 11:30AM | 6 | A.  Yes. |
| 11:30AM | 7 | Q.  What was that policy? |
| 11:30AM | 8 | A.  That you cannot discriminate based on race or color on |
| 11:30AM | 9 | who you're going to investigate.  That could not be a |
| 11:30AM | 10 | determining factor.  And that's been consistent through my |
| 11:30AM | 11 | entire law enforcement career as a local police officer going |
| 11:30AM | 12 | through a police academy, to working at the border for CBP, |
| 11:30AM | 13 | and for being a special agent with the DEA and the FBI, and |
| 11:30AM | 14 | also working as an investigator on an Organized Crime task |
| 11:30AM | 15 | task force with the New York State Attorney General's Office. |
| 11:30AM | 16 | It was consistent through every single job I've had. |
| 11:30AM | 17 | Q.  We'll talk more about that policy in a little bit, |
| 11:30AM | 18 | Mr. Casullo, but first I want to ask you about somebody named |
| 11:30AM | 19 | Joseph Bongiovanni.  Do you know who that is? |
| 11:30AM | 20 | A.  Yes, I do. |
| 11:30AM | 21 | Q.  How do you know him? |
| 11:30AM | 22 | A.  I know him because we worked together as special agents |
| 11:30AM | 23 | in Buffalo, New York, when I was in group D-57. |
| 11:30AM | 24 | Q.  Do you see Mr. Bongiovanni in the courtroom today? |
| 11:30AM | 25 | A.  Yes, I do. |

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24

12

| | | |
|---|---|---|
| 11:30AM | 1 | Q.  Can you point to him and tell us something he's wearing, |
| 11:30AM | 2 | please? |
| 11:30AM | 3 | A.  Mr. Bongiovanni is wearing a gray suit, blue shirt, and |
| 11:31AM | 4 | red tie, wearing glasses, between his counselors. |
| 11:31AM | 5 | **MR. DICKSON:**  Will the record reflect that the |
| 11:31AM | 6 | witness identified the defendant, Judge? |
| 11:31AM | 7 | **THE COURT:**  It does. |
| 11:31AM | 8 | **MR. DICKSON:**  Thank you. |
| 11:31AM | 9 | **BY MR. DICKSON:** |
| 11:31AM | 10 | Q.  You said you worked with the defendant while you were at |
| 11:31AM | 11 | the DEA Buffalo office.  Do you remember how long you worked |
| 11:31AM | 12 | with him? |
| 11:31AM | 13 | A.  We -- I can't remember specifically how long I was in |
| 11:31AM | 14 | group D-57.  It may have been close to two years.  But I |
| 11:31AM | 15 | worked specifically on a couple investigations with -- with |
| 11:31AM | 16 | Bongiovanni.  One in particular was that long-term heroin |
| 11:31AM | 17 | investigation.  I was a case agent, and he was a co-case |
| 11:31AM | 18 | agent with me on that investigation which lasted, like I |
| 11:31AM | 19 | said, approximately eight months. |
| 11:31AM | 20 | And we worked a couple other smaller cases, one before |
| 11:31AM | 21 | and after together. |
| 11:31AM | 22 | Q.  Now you started at the Buffalo office in 2015, right? |
| 11:31AM | 23 | A.  Yes, December of 2015. |
| 11:31AM | 24 | Q.  Was the defendant in the Buffalo office in 2015 when you |
| 11:32AM | 25 | joined? |

11:32AM  1    A.  Yes.

11:32AM  2    Q.  As you understood it, had he been there for a while?

11:32AM  3    A.  Yes.  It was my understanding and knowledge that Joe had

11:32AM  4    been there a while.  I believe it was close to, I don't know,

11:32AM  5    maybe 18 years.

11:32AM  6    Q.  Now you said you started in the same group as the

11:32AM  7    defendant, and you said that was D-57; is that right?

11:32AM  8    A.  Yes.

11:32AM  9    Q.  What were the different groups in the DEA Buffalo office?

11:32AM  10   A.  So there's three groups, three enforcement groups, one

11:32AM  11   being D-57, which was a mixture of both agents -- mostly

11:32AM  12   agents and local task force officers.

11:32AM  13       The other group was D-58, which was across the hall from

11:32AM  14   us, which was the official task force which had more task

11:32AM  15   force officers and some DEA agents.

11:32AM  16       And then the third group is called the tactical diversion

11:32AM  17   squad where they investigate the diversion of pharmaceutical

11:33AM  18   drugs, and people involved in criminal activity in the

11:33AM  19   diversion, whether it's doctors, pharmacies, those types of

11:33AM  20   cases.

11:33AM  21   Q.  As you understand it, Mr. Casullo, did agents who were in

11:33AM  22   that tactical diversion group, did they still have access to

11:33AM  23   DEA databases?

11:33AM  24   A.  Yes.  We all, in terms of -- the main DEA database system

11:33AM  25   was called NADDIS.  And we all had access to that.

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24

14

11:33AM  1    As far as a case management system, each group had access

11:33AM  2  to their cases within a case management system.  But as far

11:33AM  3  as an intelligence system, database type system, it was

11:33AM  4  called NADDIS.  We all had access to that.

11:33AM  5  Q.  Mr. Casullo, can you describe for the jury your

11:33AM  6  relationship with the defendant when you first started at the

11:33AM  7  DEA in 2000 -- or, DEA Buffalo in 2015?

11:33AM  8  A.  It was -- it was fine.  We knew each other from before.

11:33AM  9  We met a couple times when I'd come home in the summer and

11:34AM  10  had met some of my friends from DEA out, DEA Buffalo office.

11:34AM  11  So I had met him through mutual friends that I had known from

11:34AM  12  the DEA Buffalo office.  And when we first started,

11:34AM  13  everything was fine.

11:34AM  14  Q.  Did your relationship with the defendant change over the

11:34AM  15  time that you worked together in DEA Buffalo?

11:34AM  16  A.  Yes, it did.

11:34AM  17  Q.  Were there specific reasons that caused your relationship

11:34AM  18  with the defendant to change over time?

11:34AM  19  A.  Yes, there were.

11:34AM  20  Q.  Sitting here today, Mr. Casullo, can you tell the jury

11:34AM  21  what your relationship is with the defendant?

11:34AM  22  A.  There is no relationship with the defendant whatsoever.

11:34AM  23  Q.  I want to talk now, Mr. Casullo, about one of those

11:34AM  24  investigations you mentioned a few minutes ago from back at

11:34AM  25  your time in Las Vegas.

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24

15

| 11:34AM | 1 |     Are you familiar with somebody named Michael Masecchia? |

11:34AM   1      Are you familiar with somebody named Michael Masecchia?

11:34AM   2   A.  Yes, I am.

11:34AM   3   Q.  How?

11:34AM   4   A.  Michael Masecchia was a -- from growing up in Kenmore and

11:35AM   5   Tonawanda, I worked out at a gym in Kenmore that he worked

11:35AM   6   out at.  And I had recognized -- I didn't know him

11:35AM   7   personally, never met him, but knew who he was from going to

11:35AM   8   this gym.  That was really it.  From childhood, just knowing

11:35AM   9   who he was by face and his name and that he was from North

11:35AM  10   Buffalo.

11:35AM  11      And then fast forward to my career at DEA when I was in

11:35AM  12   Las Vegas, we opened an investigation into Michael Masecchia

11:35AM  13   in about 2004 when I was in Las Vegas that I was the case

11:35AM  14   agent on.

11:35AM  15   Q.  Can you describe for the jury what your investigation in

11:35AM  16   2004 was about regarding Michael Masecchia?

11:35AM  17   A.  That particular investigation was targeting Italian

11:35AM  18   Organized Crime members in Las Vegas and Los Angeles,

11:35AM  19   California, that had ties to the Buffalo Italian Organized

11:35AM  20   Crime families and in narcotics investigations.  So there was

11:35AM  21   a drug nexus to it, but also had a nexus to Italian Organized

11:36AM  22   Crime.

11:36AM  23   Q.  Did you have an understanding of whether Mr. Masecchia

11:36AM  24   was affiliated or associated with Organized Crime?

11:36AM  25   A.  The intelligence that we had at the time was that he was,

11:36AM    1    either through marriage, either through friendships, either

11:36AM    2    through his family, that they did have relationships to

11:36AM    3    Italian Organized Crime in Buffalo, New York and in

11:36AM    4    Las Vegas.

11:36AM    5    Q.  Now in building this investigation into Michael Masecchia

11:36AM    6    in 2004, did you coordinate with any other DEA offices?

11:36AM    7    A.  We did.  When we initially started looking at some of the

11:36AM    8    targets of our investigations in Las Vegas and started

11:36AM    9    subpoenaing phone numbers to get call detail records from

11:36AM   10    those subpoenas on those phone numbers, we noticed that

11:36AM   11    several of the individuals that we were targeting in

11:36AM   12    Las Vegas, that their phones were in contact with 716 Buffalo

11:36AM   13    area code phone numbers.

11:36AM   14        So because of that, we made a decision to reach out to

11:37AM   15    the Buffalo DEA district office.  My supervisor asked me if I

11:37AM   16    knew any of the agents there, and I did.  One in particular,

11:37AM   17    Michael Hill, was a classmate of mine when I was at Quantico

11:37AM   18    as a special agent who was working in Buffalo, so I chose to

11:37AM   19    reach out to Mike Hill.

11:37AM   20    Q.  Mr. Casullo, is that a normal thing for DEA agents to do,

11:37AM   21    to coordinate with one another to help on investigations?

11:37AM   22    A.  It happens all the time.  You're taught that way, you

11:37AM   23    work that way.  It happens daily, depending on the type of

11:37AM   24    case you're working.

11:37AM   25    Q.  You mentioned that you reached out to Mike Hill in the

11:37AM    1    Buffalo office.  Why did you pick Mike Hill to reach out to?

11:37AM    2    A.  I chose Mike Hill because he was a friend of mine,

11:37AM    3    personal friend of mine from the academy, and I knew him

11:37AM    4    well.  And that's who I chose to reach out to.

11:37AM    5    Q.  And did you understand that Mike Hill eventually opened a

11:37AM    6    sort of parallel investigation into Mr. Masecchia?

11:37AM    7    A.  He did.  He did.

11:37AM    8    Q.  Now, after you talked with Mr. Hill in the Buffalo office

11:38AM    9    about your Masecchia investigation, did somebody else from

11:38AM    10    DEA Buffalo give you a call?

11:38AM    11    A.  Yes.

11:38AM    12    Q.  Who was that?

11:38AM    13    A.  That was Joe Bongiovanni.

11:38AM    14    Q.  To be clear, did you call the defendant, or did the

11:38AM    15    defendant call you?

11:38AM    16    A.  No, he called me unsolicited, unexpected.  Mike Hill

11:38AM    17    never mentioned that he was gonna call.  He called me one day

11:38AM    18    on my cell phone.

11:38AM    19    Q.  Was the subject of that conversation this investigation

11:38AM    20    into Michael Masecchia?

11:38AM    21    A.  Yes, it was.

11:38AM    22    Q.  Did you share information about your investigation into

11:38AM    23    Michael Masecchia with the defendant?

11:38AM    24    A.  In sum and substance, he mentioned that he had heard from

11:38AM    25    Mike Hill that we were working an investigation, that Michael

11:38AM  1   Masecchia's name came up in the investigation, and that he

11:38AM  2   knew Mr. Masecchia from growing up in North Buffalo, and that

11:38AM  3   he said that he could help with the investigation.

11:39AM  4       He said he couldn't put any names on the reports because

11:39AM  5   he knew some of these people, he knew Michael Masecchia, but

11:39AM  6   he'd be willing to help.

11:39AM  7       And he also mentioned something about his business card,

11:39AM  8   that he doesn't even put Buffalo on his DEA business card

11:39AM  9   because of this, which I found kind of odd, but that's what

11:39AM  10  he said.

11:39AM  11  Q.  Why did you find it odd?

11:39AM  12  A.  Because business cards are typically handed out to other

11:39AM  13  law enforcement officers.  There's really no reason to

11:39AM  14  conceal the office that you're working in.  I mean, you would

11:39AM  15  talk to people over the phone, they could tell where you

11:39AM  16  worked if they went into the DEA email system anyways.  And

11:39AM  17  there's really no reason to say that you worked at a field

11:39AM  18  division which is a large office, which is what his said,

11:39AM  19  New York City, the New York field division as opposed to

11:39AM  20  Buffalo.  To me it just seemed strange and odd, I had never

11:39AM  21  heard of an agent doing that before.

11:40AM  22  Q.  You said that the defendant told you he couldn't put his

11:40AM  23  name on any reports related to Michael Masecchia; is that

11:40AM  24  what you testified to?

11:40AM  25  A.  He said that he couldn't put my names or wouldn't put any

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24

11:40AM   1   names on any reports.  And the business card, that he doesn't

11:40AM   2   even put Buffalo on his business card, or Buffalo office on

11:40AM   3   the business card.

11:40AM   4   Q.  Now those DEA reports, are those supposed to be just

11:40AM   5   distributed to members of the public outside of law

11:40AM   6   enforcement?

11:40AM   7   A.  No, those are law enforcement sensitive, and they stay

11:40AM   8   just within the law enforcement community.  They stay within

11:40AM   9   the agency, and there's an actual policy and procedure to

11:40AM   10  share them with other law enforcement agencies if they're not

11:40AM   11  part of our task force.

11:40AM   12  Q.  Would there be an issue with one law enforcement agent

11:40AM   13  seeing a report with the defendant's name on it if that

11:40AM   14  report related to Michael Masecchia?

11:40AM   15  A.  No.  And that's where -- that's how it should work, if

11:40AM   16  they're a witness to something and they have information on

11:40AM   17  something, the report should read that way, because they're

11:40AM   18  the one that should, if it ever came to it, testify to it, or

11:41AM   19  write an affidavit.  If it's their information, their name

11:41AM   20  needs to go on the report because that's where it came from.

11:41AM   21  Q.  In your experience, was it typical for DEA special agents

11:41AM   22  to say that their name couldn't be associated with a

11:41AM   23  particular subject?

11:41AM   24  A.  I had never heard that before, so no.

11:41AM   25  Q.  In the course of your investigation into Michael

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24

20

11:41AM   1   Masecchia in Las Vegas, Mr. Casullo, did you have an

11:41AM   2   understanding that Michael Masecchia was going to be moving

11:41AM   3   from Buffalo to Las Vegas?

11:41AM   4   A.   Yes.  So the intelligence that we had at the time was

11:41AM   5   Michael Masecchia was a school teacher in Buffalo, New York,

11:41AM   6   which was unusual for us in terms of someone that we would be

11:41AM   7   target.  And that he was going to be moving out to Las Vegas

11:41AM   8   to live in one of the houses of one of the individuals that

11:41AM   9   we were targeting within a drug-trafficking organization.

11:42AM  10       And that pretty sure that he was friends or associated

11:42AM  11   with some of the other people.  But it was definitely one

11:42AM  12   particular individual that we were looking at that he was

11:42AM  13   supposed to live in his house, and I think through marriage

11:42AM  14   may have been related to that individual.

11:42AM  15   Q.   And after you talked with the defendant about Mike

11:42AM  16   Masecchia, did Mike Masecchia ever move from Buffalo to

11:42AM  17   Las Vegas as far as you know?

11:42AM  18   A.   No, to the best of my knowledge, he never came up.  Our

11:42AM  19   investigation turned out to be a long-term investigation, it

11:42AM  20   turned out to be a wiretap investigation.  We never saw him

11:42AM  21   out there.  We never heard him on our telephones.  And to the

11:42AM  22   best of my knowledge and the group that I was working with

11:42AM  23   was that he never -- never came out.

11:42AM  24   Q.   Did you eventually close your investigation in Vegas into

11:42AM  25   Mike Masecchia?

11:42AM    1    A.  We did, yes.

11:42AM    2    Q.  As you understood it, did the Buffalo office also close

11:42AM    3    its investigation into Mike Masecchia?

11:42AM    4    A.  I believe they closed ours -- closed theirs, Mike --

11:42AM    5    Agent Mike Hill called and said they couldn't get anywhere

11:42AM    6    with their leads, the phone numbers that we provided them.

11:43AM    7    I don't know how far they worked on it.  I know they analyzed

11:43AM    8    some of the phone numbers, I'm not sure if they did

11:43AM    9    surveillance, but that they were going to close their case

11:43AM   10    because they couldn't develop it any further, while we kept

11:43AM   11    going because we had advanced and were listening to people's

11:43AM   12    phones, we had introduced an undercover to the organization

11:43AM   13    into Italian Organized Crime associates that were

11:43AM   14    distributing cocaine.  So we had an undercover as an

11:43AM   15    informant into that group.  We had an informant into Buffalo

11:43AM   16    Italian Organized Crime associates in California.  So we were

11:43AM   17    advancing, we were at a much further stage.

11:43AM   18    Q.  Fair to say that you conducted an investigation into

11:43AM   19    Michael Masecchia; is that fair?

11:43AM   20    A.  Yeah, we tried.  We tried.

11:43AM   21    Q.  And in the course of that investigation, did you learn

11:43AM   22    information about Michael Masecchia and his contacts?

11:43AM   23    A.  We did about the individuals in Vegas, but not about

11:43AM   24    Michael Masecchia.  And really not much came from DEA Buffalo

11:44AM   25    and their investigation.

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24

11:44AM    1    Q.  But did you understand those people in Vegas were people

11:44AM    2    you thought might be in contact with Mike Masecchia?

11:44AM    3    A.  Yes.  Yes.

11:44AM    4    Q.  So you told us about your 2004 investigation into Michael

11:44AM    5    Masecchia.  I want to fast forward now to 2009.  Were you

11:44AM    6    still a special agent at that time?

11:44AM    7    A.  I was a special agent in Las Vegas, Nevada at that time

11:44AM    8    still working in Vegas.

11:44AM    9    Q.  As far as you understood it, was the defendant still a

11:44AM    10   special agent with the DEA at that time?

11:44AM    11   A.  To the best of my knowledge, Joe was still working for

11:44AM    12   DEA in Buffalo.

11:44AM    13   Q.  And in 2009, Mr. Casullo, did the defendant ever call you

11:44AM    14   to tell you that DEA Buffalo was opening an investigation

11:44AM    15   into Michael Masecchia?

11:44AM    16   A.  No.

11:44AM    17   Q.  Did he connect you with somebody named Corey Higgins to

11:44AM    18   talk about Mr. Higgins' investigation into Michael Masecchia?

11:44AM    19   A.  No.

11:44AM    20   Q.  Did Corey Higgins ever call you and tell you that the

11:44AM    21   defendant wanted him to call you?

11:45AM    22   A.  No.

11:45AM    23   Q.  Were you ever asked to share information about your 2004

11:45AM    24   investigation into Michael Masecchia with anybody from DEA

11:45AM    25   Buffalo in 2009?

11:45AM    1    A.   No, I had no idea what they were doing regarding that

11:45AM    2    investigation.

11:45AM    3    Q.   I want to move now to your time in the Buffalo office.

11:45AM    4    You told us that you started in 2015; is that right?

11:45AM    5    A.   December -- I'm sorry, September of 2015.  It was, yes,

11:45AM    6    it was in September of 2015 that I started in the Buffalo DEA

11:45AM    7    office.

11:45AM    8    Q.   Now, once you got to the Buffalo office, Mr. Casullo, did

11:45AM    9    the hear the defendant bring up the name Ron Serio?

11:45AM   10    A.   I don't know if he brought the name up.  It was a file

11:45AM   11    that sat on his desk.  So he brought up the file, and then

11:46AM   12    said it was a file on the Serio organization.  So in that

11:46AM   13    sense, yes.

11:46AM   14    Q.   So there was a file sitting on defendant's desk?

11:46AM   15    A.   There was a file that sat on his desk, and it -- from the

11:46AM   16    best that I can remember, it always was there.  It was a

11:46AM   17    bigger file that sat on his desk that I noticed, and it just

11:46AM   18    seemed like that was always there.  Which, to me, in my

11:46AM   19    experience, case files --

11:46AM   20         **MR. SINGER:** Objection.

11:46AM   21         **THE COURT:**  Sustained.

11:46AM   22         **BY MR. DICKSON:**

11:46AM   23    Q.   Mr. Casullo, did you and the defendant talk about Ron

11:46AM   24    Serio and that file that was sitting on his desk?

11:46AM   25    A.   Yeah, I can't remember if I asked Joe about it when we

11:46AM    1    were talking at his desk, or if he brought it to my

11:46AM    2    attention, but he said he had an investigation on Ron and Tom

11:46AM    3    Serio, and it was a big investigation.

11:46AM    4    Q.  How did he describe the investigation?

11:46AM    5    A.  Pardon?

11:46AM    6    Q.  How did he describe the investigation?

11:46AM    7    A.  He described it, it was like a big investigation, that he

11:46AM    8    was into a big group, and it was a big investigation.  It was

11:47AM    9    my understanding that that's, 'cuz he said it, that that's

11:47AM    10   what it was.

11:47AM    11   Q.  Did he tell you any of the other people who were involved

11:47AM    12   in the investigation?

11:47AM    13   A.  To the best of my memory and knowledge, the only name I

11:47AM    14   remember was Ron and Tom Serio.

11:47AM    15   Q.  And you told us that it was normal for DEA special agents

11:47AM    16   to share information with one another, right?

11:47AM    17   A.  Yes.

11:47AM    18   Q.  Was it also normal for DEA special agents to ask other

11:47AM    19   agents for any information they might have about people who

11:47AM    20   came up in their investigation?

11:47AM    21   A.  It happens daily.

11:47AM    22        **MR. DICKSON:**  Ms. Champoux, can we please pull up

11:47AM    23   Government Exhibit 8A which is already in evidence.

11:47AM    24        This is Government Exhibit 8A, Mr. Casullo.

11:47AM    25        Ms. Champoux, can we do a search for the word

11:47AM    1    Masecchia, please?

11:48AM    2         **BY MR. DICKSON:**

11:48AM    3    Q.  Mr. Casullo, do you see there on your screen that in this

11:48AM    4    case file, there's a reference to a Michael Masecchia?

11:48AM    5    A.  Yes, I see that.

11:48AM    6    Q.  You just told us this jury how in 2004 you investigated

11:48AM    7    Michael Masecchia and you spoke with the defendant about it,

11:48AM    8    right?

11:48AM    9    A.  Yes.

11:48AM   10    Q.  When you were having that conversation with the defendant

11:48AM   11    in Buffalo, about this big investigation into Ron Serio, did

11:48AM   12    he tell you that Michael Masecchia's name came up?

11:49AM   13    A.  No, he never mentioned that.

11:49AM   14    Q.  Did he ask you for information that you had developed

11:49AM   15    about Michael Masecchia in your prior investigation?

11:49AM   16    A.  No.

11:49AM   17    Q.  At this time, were you and the defendant still getting

11:49AM   18    along okay?

11:49AM   19    A.  Yes.

11:49AM   20    Q.  When the Buffalo office targets a big drug organization,

11:49AM   21    was it typical for multiple agents in the office to help out

11:49AM   22    in the investigation?

11:49AM   23    A.  Yes.  If it was a larger investigation, there would be

11:49AM   24    typically two case agents, but the whole group would

11:49AM   25    typically be working on it because it was a bigger case and

11:49AM    1    you needed those resources.

11:49AM    2    Q.  Did this defendant ever ask you, Mr. Casullo, to help

11:49AM    3    with any part of this investigation into Ron Serio or Michael

11:49AM    4    Masecchia?

11:49AM    5    A.  No.  No.

11:49AM    6         MR. DICKSON:  You can take that down, Ms. Champoux,

11:49AM    7    thank you.

11:49AM    8         BY MR. DICKSON:

11:49AM    9    Q.  I want to talk a little bit more about Mr. Serio and his

11:50AM   10    contacts, Mr. Casullo.  And to get us into that conversation,

11:50AM   11    I want to talk about deconfliction.  Can you just tell the

11:50AM   12    jury what deconfliction is in the law enforcement context?

11:50AM   13    A.  Sure.  In its simplest form, deconfliction is a way for

11:50AM   14    agents and investigators to enter a name essentially in a

11:50AM   15    database, a computer system, that was used exclusively for

11:50AM   16    keeping names of cases that agents were working on.

11:50AM   17         So if you opened a case and initiated a case, you would

11:50AM   18    typically take those names and enter them or query them into

11:50AM   19    that deconfliction system.  And the way that's supposed to

11:50AM   20    work is if other investigators are looking at either the same

11:50AM   21    individual, or the same telephone number, or the same

11:50AM   22    address, that when you enter that name, it will send an alert

11:50AM   23    to that investigator that initially put the information in.

11:50AM   24    And it will also alert the agent that's putting the

11:51AM   25    information in on his case.

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24

27

11:51AM    1    So, it puts you and alerts both -- both sides.  The

11:51AM    2    person that already had the information in, if they did, and

11:51AM    3    the person that's just entering his for the first time.

11:51AM    4    Q.  So, just to break that down, Mr. Casullo, if I enter

11:51AM    5    somebody's phone number into this deconfliction database, who

11:51AM    6    gets notified that I entered that phone number?

11:51AM    7    A.  So, the person that initially put their information into

11:51AM    8    the system typically would receive an alert or an email

11:51AM    9    stating that another individual has overlap with their

11:51AM   10    investigation, which would help investigators to broaden

11:51AM   11    their investigation, get leads from other people.

11:51AM   12    It was meant to coordinate.  It was meant for officer

11:51AM   13    safety, so officers weren't targeting the same person.  They

11:51AM   14    weren't out on the street running operations, purchasing

11:52AM   15    narcotics or firearms or conducting surveillance, not knowing

11:52AM   16    that another agency is doing it at the same time.

11:52AM   17    So it was there for case purposes, to expand the case,

11:52AM   18    coordinate a case, and it was done for officer safety as

11:52AM   19    well.  Both very important.

11:52AM   20    Q.  So you told us that agents and investigative analysts

11:52AM   21    would get notified.  How would those people get notified?

11:52AM   22    A.  Typically, in my experience, it would be through an

11:52AM   23    email.  An email -- if someone -- one particular system that

11:52AM   24    we used for phone numbers we called DARTS, if I entered a

11:52AM   25    phone number and another agency, DEA or even outside agency

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24

11:52AM   1  that was part of that deconfliction system was looking at

11:52AM   2  that same phone number, I would receive a realtime email to

11:52AM   3  my DEA email account.  And it would notify me of there's a

11:52AM   4  deconfliction, there's an overlap with another case, this is

11:52AM   5  their case number, this is the agent, this is their phone

11:53AM   6  number.  And it was meant so you would reach out and call.

11:53AM   7        Within DEA, if it was another DEA office, I could also

11:53AM   8  see the remarks, like a short sentence or two of what that

11:53AM   9  deconfliction was, like telephone number.  An example is a

11:53AM  10  telephone number utilized by a specific trafficker.  Or a

11:53AM  11  telephone number utilized by a trafficker that's in contact

11:53AM  12  with another telephone number.

11:53AM  13        So I could see that, if that was an overlap with another

11:53AM  14  DEA case.

11:53AM  15        If it was another agency, say the FBI or HSI, I would see

11:53AM  16  the same thing I just mentioned, but without the remarks.

11:53AM  17  But either way, I had an agent and a phone number to call to

11:53AM  18  deconflict.

11:53AM  19  Q.  You mentioned that DARTS system.  Is that system what

11:53AM  20  populates that email?

11:53AM  21  A.  For that particular deconfliction system that DEA uses,

11:53AM  22  it's called DARTS.  For other federal agencies such as FBI

11:53AM  23  and HSI, it's called DICE.  It's essentially the same system,

11:53AM  24  we just call it different things.

11:53AM  25  Q.  But for DARTS specifically, that email is auto generated;

| | | |
|---|---|---|
| 11:53AM | 1 | is that right? |
| 11:54AM | 2 | A.   Yes.  Yes.  It happens automatically. |
| 11:54AM | 3 | Q.   Mr. Casullo, I'm going to show you Government Exhibit 26 |
| 11:54AM | 4 | B, C, D, E, I, and M.  Mr. Casullo, take a look through those |
| 11:54AM | 5 | documents and tell me if you recognize them. |
| 11:55AM | 6 | A.   Yes.  These are the DARTS deconflictions that I was just |
| 11:55AM | 7 | talking about.  So this is a printout of essentially the |
| 11:55AM | 8 | email that would come to my inbox.  This is just a hard copy |
| 11:55AM | 9 | of it. |
| 11:55AM | 10 | Q.   So, Mr. Casullo, were you a recipient of each of those |
| 11:56AM | 11 | emails that you just looked at? |
| 11:56AM | 12 | A.   I created, so I was the initiator on several of them. |
| 11:56AM | 13 | And I believe -- |
| 11:56AM | 14 | Q.   And just to speed this up, Mr. Casullo, can you look at |
| 11:56AM | 15 | the sort of headers of the email to see if you and also the |
| 11:56AM | 16 | defendant received or initiated each one of those emails. |
| 11:56AM | 17 | A.   For each one, do you want me to go through them one by |
| 11:56AM | 18 | one, or -- |
| 11:56AM | 19 | Q.   I want you to look at the header of each email and see if |
| 11:56AM | 20 | your email address and the defendant's email address is on |
| 11:56AM | 21 | each one. |
| 11:56AM | 22 | A.   On the first one, mine and the defendant is on it. |
| 11:56AM | 23 |      On the second, mine and the defendant are on it. |
| 11:56AM | 24 |      On the third, we are both on it. |
| 11:56AM | 25 |      On the fourth one, we are both on it. |

11:57AM    1        On the fifth one, we're both on it.

11:57AM    2        And on the last one, we're both on it.   So yes.

11:57AM    3    Q.   Do those look like fair and accurate copies of

11:57AM    4    deconfliction notices?

11:57AM    5    A.   Yes.

11:57AM    6    Q.   Do they look like the same auto generated emails that are

11:57AM    7    populated by that computer system?

11:57AM    8    A.   Yes.

11:57AM    9    Q.   Is it a normal part of DEA business to keep deconfliction

11:57AM   10    notices as a part of your case file?

11:57AM   11    A.   Yes.

11:57AM   12             MR. DICKSON:   Your Honor, we'd offer 26B, 26C, 26D,

11:57AM   13    26E, 26I, and 26M into evidence.

11:57AM   14             MR. SINGER:  Just one moment, Judge.

11:59AM   15             Judge, I don't have objections to B, C, E, I, or M.

12:00PM   16    I do have an objection to D, and perhaps we should approach to

12:00PM   17    discuss that.

12:00PM   18             THE COURT:   Sure, come on up.

12:00PM   19             (Sidebar discussion held on the record.)

12:00PM   20             MR. SINGER:   So my objection on the D document,

12:00PM   21    Judge, is it's a DARTS report that has a number that

12:00PM   22    Mr. Bongiovanni logged back in 2013.   But the problem is, is

12:00PM   23    that the deconfliction that I think is pertinent is run after

12:00PM   24    he's retired and no longer working at the DEA.   And so there's

12:00PM   25    a relevance objection to it because if Mr. Casullo ran a

12:00PM   1    number in March of 2019 after Mr. Bongiovanni retired, it's

12:00PM   2    not gonna get any type of hit on this, and so as a result,

12:00PM   3    there's no relevance to whether this is one or not after he

12:00PM   4    retires.

12:00PM   5              MR. DICKSON:  So, Judge, on that deconfliction piece

12:00PM   6    there, I'll show this to the Court so you can see that I think

12:01PM   7    this is the entry that we're talking about here.  The third

12:01PM   8    entry, the bottom is where the defendant's listed.  The second

12:01PM   9    entry, the one immediately above it, is from January of 2019,

12:01PM   10   which is when Mr. Bongiovanni was still in the office.  So

12:01PM   11   when Mr. Casullo ran that on January 7th, Mr. Bongiovanni

12:01PM   12   would have seen this notification.

12:01PM   13             THE COURT:  Say it again?

12:01PM   14             MR. DICKSON:  When Mr. Casullo entered, did this

12:01PM   15   entry on January 7th --

12:01PM   16             THE COURT:  He was still employed.

12:01PM   17             MR. DICKSON:  -- he was still employed.

12:01PM   18             MR. SINGER:  Yeah, so, if we're admitting that

12:01PM   19   portion, I would agree that -- that -- that is relevant on

12:01PM   20   that basis.  But, I mean, the other hits that are being run, I

12:01PM   21   don't see what the relevance is.

12:01PM   22             THE COURT:  So there's one right above it, 3/13/2019.

12:01PM   23             MR. DICKSON:  I agree that's not relevant, Judge.  If

12:02PM   24   we try to redact it real quick.

12:02PM   25             THE COURT:  Okay.  So, subject to redaction.

| | | |
|---|---|---|
| 12:02PM | 1 | **MR. SINGER:**  Yeah, so I think -- let me just take a |
| 12:02PM | 2 | look at that.  So this is page 4, I think we're all looking |
| 12:02PM | 3 | at.  So, it's -- yeah, so it's -- if we're doing the top half |
| 12:02PM | 4 | of page 4, I don't have a problem, I mean, I guess you would |
| 12:02PM | 5 | do it on the ELMO for now. |
| 12:02PM | 6 | **MR. DICKSON:**  I might have a redacted one with just |
| 12:02PM | 7 | the top half. |
| 12:02PM | 8 | **MR. SINGER:**  You can use that. |
| 12:02PM | 9 | **THE COURT:**  Okay, so, B, C, E, I, and M are admitted. |
| 12:02PM | 10 | D is admitted subject to -- |
| 12:02PM | 11 | **MR. SINGER:**  And let me just -- and if I may, Judge, |
| 12:02PM | 12 | I'm sorry, can I just take a look at these again and see if |
| 12:02PM | 13 | there's any redactions that I want to apply?  I don't want to |
| 12:02PM | 14 | be difficult, and I don't want to waste the jury's time |
| 12:02PM | 15 | either. |
| 12:02PM | 16 | **MR. DICKSON:**  I do -- I did anticipate this might be |
| 12:02PM | 17 | an issue, so I do have redacted copies that I can show the |
| 12:02PM | 18 | defense. |
| 12:02PM | 19 | **MR. MacKAY:**  Yeah, that might be -- |
| 12:02PM | 20 | **THE COURT:**  Should we take our lunch right now? |
| 12:02PM | 21 | **MR. DICKSON:**  That's fine, Judge.  I think I can just |
| 12:03PM | 22 | show them redacted copies. |
| 12:03PM | 23 | **MR. SINGER:**  It will take about five minutes. |
| 12:03PM | 24 | **THE COURT:**  Okay.  Let's do it. |
| 12:03PM | 25 | (End of sidebar discussion.) |

| | | |
|---|---|---|
| 12:03PM | 1 | **THE COURT:** So I understand the government has some |
| 12:03PM | 2 | redacted copies it's going to show to the defense now. |
| 12:03PM | 3 | **MR. DICKSON:** Yes, Judge, I'll show the same exhibit, |
| 12:03PM | 4 | but just in redacted form. |
| 12:04PM | 5 | **MR. MacKAY:** Judge, I think there's one minor |
| 12:04PM | 6 | redaction we're going to do, and then they're all set. |
| 12:04PM | 7 | **THE COURT:** So they are admitted as redacted without |
| 12:04PM | 8 | objection, correct? |
| 12:04PM | 9 | **MR. SINGER:** Yes, Judge. |
| 12:04PM | 10 | **(GOV Exhibits 26B, C, D, E, I, M were received in evidence.)** |
| 12:04PM | 11 | **MR. DICKSON:** Give me one second, Judge, I'm sorry |
| 12:04PM | 12 | about that. |
| 12:04PM | 13 | **THE COURT:** That's okay. |
| 12:04PM | 14 | **MR. DICKSON:** Okay. So they're admitted, Judge? |
| 12:06PM | 15 | **THE COURT:** Yes. Just so the record is clear, B, C, |
| 12:06PM | 16 | D, E, I, and M have been redacted. And the defense is |
| 12:06PM | 17 | satisfied with the redactions; is that correct? |
| 12:06PM | 18 | **MR. SINGER:** That's correct, Your Honor. |
| 12:06PM | 19 | **THE COURT:** They are all admitted as redacted without |
| 12:06PM | 20 | objection. |
| 12:06PM | 21 | **MR. DICKSON:** All right. Thank you. |
| 12:06PM | 22 | **THE COURT:** Thank you. |
| 12:06PM | 23 | **MR. DICKSON:** Mr. Casullo, I'm going to take these |
| 12:06PM | 24 | back from you. |
| 12:07PM | 25 | **THE COURT:** Do you want to use the ELMO? |

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24
34

| | | |
|---|---|---|
| 12:07PM | 1 | MR. DICKSON:  I'm going to try this. |
| 12:07PM | 2 | THE COURT:  That's why I said it, because I knew as |
| 12:07PM | 3 | soon as I said it, the technology would work. |
| 12:08PM | 4 | MR. DICKSON:  Can we pull up Government Exhibit 26E |
| 12:08PM | 5 | in the redacted form. |
| 12:08PM | 6 | BY MR. DICKSON: |
| 12:08PM | 7 | Q.  Mr. Casullo, do you see that there? |
| 12:08PM | 8 | A.  Yes.  Yes. |
| 12:08PM | 9 | Q.  All right.  So I just want to walk through this first one |
| 12:08PM | 10 | so we all kind of understand the parts of it -- of these |
| 12:08PM | 11 | emails, and we'll just do it for this first part. |
| 12:08PM | 12 | So, do you see where it says DARTS request found? |
| 12:08PM | 13 | A.  Yes. |
| 12:08PM | 14 | Q.  What does that mean? |
| 12:08PM | 15 | A.  That it had found overlaps in the system. |
| 12:08PM | 16 | Q.  And what are overlaps? |
| 12:08PM | 17 | A.  It's, again, where you submit information into the |
| 12:08PM | 18 | deconfliction system.  In this case, it's a phone number.  So |
| 12:08PM | 19 | the phone number that you're looking at or investigating is |
| 12:08PM | 20 | found in other cases by other agents or officers.  They had |
| 12:09PM | 21 | entered the information, as well, for their case. |
| 12:09PM | 22 | Q.  And then below that, do you see where it says it is the |
| 12:09PM | 23 | responsibility of overlapped parties to contact one another |
| 12:09PM | 24 | for sharing of information; do you see that? |
| 12:09PM | 25 | A.  Yes. |

12:09PM  1   Q.  What does that mean?

12:09PM  2   A.  It goes back to what I explained for -- the whole point

12:09PM  3   of the system is to put each side in contact with each other

12:09PM  4   so that they can talk about their investigation, share

12:09PM  5   information, and make sure there's no officer safety issues,

12:09PM  6   again, where someone's out on an operation at the same time.

12:09PM  7   So it's to bring people together, alert each side that

12:09PM  8   whoever needs to talk to each other for those reasons.

12:09PM  9   Q.  And like you said, that's a normal part of being a DEA

12:09PM  10  agent, right?

12:09PM  11  A.  All the time.  Every day.

12:09PM  12          MR. DICKSON:  Can we go to page 2.  And blow up that

12:09PM  13  middle section for us, please.

12:09PM  14          BY MR. DICKSON:

12:10PM  15  Q.  All right.   So, Mr. Casullo, at the top there, where it

12:10PM  16  says Trinity item, and then it has a phone number, do you see

12:10PM  17  that?

12:10PM  18  A.  Yes.

12:10PM  19  Q.  So just explain generally, what is a Trinity item?  What

12:10PM  20  does that refer to?

12:10PM  21  A.  So that's the phone number that you're targeting or

12:10PM  22  investigating.

12:10PM  23  Q.  And then there's some priority levels listed.  What does

12:10PM  24  that mean?

12:10PM  25  A.  Priority levels has to do with the source of the

12:10PM   1   information.  So a 1 typically would be -- and there's -- I

12:10PM   2   believe there's a list within the system that has it coded to

12:10PM   3   the define each.  So 1 would be the number of the target,

12:10PM   4   like your target, that's should be a 1.  If you're putting

12:10PM   5   that number in the system, that should be a 1.

12:10PM   6       If you entered numbers, you had a phone number, and you

12:10PM   7   had a subpoena, and pulled information, got information from

12:10PM   8   the phone company that showed phones numbers that were in

12:11PM   9   contact with your number, so contacts to your main number,

12:11PM  10   you would also enter those numbers in.  So you wouldn't just

12:11PM  11   enter your main number, you would typically subpoena the

12:11PM  12   phone number, get call records for your number, and enter

12:11PM  13   those numbers, as well.  So it wasn't just the main number,

12:11PM  14   it was all those numbers -- I'm sorry -- you would enter the

12:11PM  15   numbers that are in contact with the phone number that you're

12:11PM  16   looking at.

12:11PM  17       So it would be both.  So you're digging deeper.  You're

12:11PM  18   expanding your investigation.  And typically those numbers

12:11PM  19   that you enter that are in contact with your main number are

12:11PM  20   designated as a 2, or a 3, depending.

12:11PM  21   Q.  So then let's look at this, the third entry listed here

12:11PM  22   where it says priority 1.  What's the date listed there?

12:11PM  23   A.  For the priority 1 record?  It's April 19th, 2013.

12:11PM  24   Q.  Does that mean that this phone number up in the top left

12:12PM  25   corner was entered on April 19th, 2013?

12:12PM    1    A.  That's the date that that number was queried in the

12:12PM    2    system.

12:12PM    3    Q.  Okay.  And then when says request ran by, it says Justin

12:12PM    4    Borst.  Do you know you who that is?

12:12PM    5    A.  Yes, I do.

12:12PM    6    Q.  Who is that?

12:12PM    7    A.  At the time that I was at DEA, and it looks like at this

12:12PM    8    time, because I wasn't at the DEA at this time, but based on

12:12PM    9    this record and me working with him, he was a nash -- he

12:12PM   10    worked for the National Guard, the U.S. Army National Guard,

12:12PM   11    as an analyst.  And he was assigned to the DEA office to work

12:12PM   12    in our office to assist in investigations as an analyst.  Not

12:12PM   13    an agent, not an officer.  He wasn't a sworn officer, he was

12:12PM   14    an analyst.

12:12PM   15    Q.  He helped out on investigations?

12:12PM   16    A.  Yes, typically investigations have case agents and an

12:12PM   17    analyst assigned, as well, to the investigation to work

12:12PM   18    together with an analyst.

12:12PM   19    Q.  Was one of the things that Mr. Borst would do, enter

12:13PM   20    phone numbers into DARTS at an agent's direction?

12:13PM   21    A.  For me, I -- when I -- I worked with Justin frequently

12:13PM   22    when I was in the office, and he would do that for me on

12:13PM   23    occasion.  I would either do it myself, or if the work became

12:13PM   24    overwhelming, he would do it and I would do it.  We would

12:13PM   25    split up the work.

12:13PM    1    Q.  And you see the case number there, that C2-13-0026?

12:13PM    2    A.  I do.

12:13PM    3    Q.  All right.  Now in the remarks part, Mr. Casullo, can you

12:13PM    4    read the remarks part just for that third entry that we've

12:13PM    5    been looking at?

12:13PM    6    A.  It says number part of ongoing narcotics investigation

12:13PM    7    belonging to Michael Masecchia, per S.A. Bongiovanni.

12:13PM    8    Q.  And do you understand that to mean that this phone number

12:13PM    9    in the top left per S.A. Bongiovanni belongs to Michael

12:13PM   10    Masecchia?

12:13PM   11    A.  Yes.

12:13PM   12    Q.  And then let's look at the second item on this list from

12:14PM   13    March 20th, 2013.  Is that that same case number there?

12:14PM   14    A.  That's correct.

12:14PM   15    Q.  What does the remarks section for that one say?

12:14PM   16    A.  It says number part of ongoing narcotics investigation in

12:14PM   17    contact with target number 716-830-3226 per S.A. Bongiovanni.

12:14PM   18         **MR. DICKSON:**  Give me just a second, Mr. Casullo.

12:14PM   19         **MR. TRIPI:**  Your Honor, if I may, just a point of

12:14PM   20    clarification before we go further.  Yesterday with the box,

12:14PM   21    it occurred to me at the end of the day, the box, Exhibit 100,

12:14PM   22    the file in it is Exhibit 100A, I think we just said 100A.  So

12:15PM   23    to make the record clear, when we moved them in, I -- 100 and

12:15PM   24    100A, the box and the file in the box should be what's in

12:15PM   25    evidence.

12:15PM   1            THE COURT:  Any objection to that?

12:15PM   2            MR. MacKAY:  That's how I understood it coming in.

12:15PM   3            THE COURT:  Okay so --

12:15PM   4            MR. TRIPI:  I thought maybe yesterday I misspoke, so

12:15PM   5   I just wanted to clarify.

12:15PM   6            THE COURT:  That's fine, as long as the defense has

12:15PM   7   no objection, 100 and 100A are both in evidence.

12:15PM   8            MR. TRIPI:  Sorry about that.

12:15PM   9       **(GOV Exhibits 100, 100A were again received in evidence.)**

12:15PM  10            THE COURT:  No problem.

12:15PM  11            BY MR. DICKSON:

12:15PM  12   Q.  Mr. Casullo, as we look at this remarks section, I'm

12:15PM  13   going to show you what's marked as 100E-1, which is already

12:15PM  14   in evidence.

12:15PM  15       Looking at that list, Mr. Casullo, that I just took out

12:15PM  16   of Government Exhibit 100, this phone number here

12:16PM  17   716-830-3226, do you see that phone number listed on that

12:16PM  18   page that you're holding?

12:16PM  19   A.  I do.

12:16PM  20   Q.  Who is -- whose name is listed right above that phone

12:16PM  21   number?

12:16PM  22   A.  It says Ron Serio.

12:16PM  23   Q.  Okay.  You can set that down for me, Mr. Casullo.

12:16PM  24       So as we look back at Exhibit 26E, as you understand it,

12:16PM  25   like you said, that number in the top left, that's Michael

12:16PM    1    Masecchia's number per S.A. Bongiovanni; is that right?

12:16PM    2    A.  Correct.

12:16PM    3    Q.  Do you understand that to mean all of this taken

12:16PM    4    together, that per S.A. Bongiovanni, Michael Masecchia is in

12:16PM    5    contact with Ron Serio?

12:16PM    6    A.  Correct.

12:16PM    7    Q.  So tell the jury, Mr. Casullo, what would happen if

12:16PM    8    another DEA special agent put Michael Masecchia's phone

12:16PM    9    number into DARTS?

12:16PM   10    A.  That there would be a deconfliction.  And the way it

12:17PM   11    should work is if Joe had that name in under his case, that

12:17PM   12    he would be alerted, or Justin Borst his analyst, would be

12:17PM   13    alerted.

12:17PM   14    Q.  And, in fact, Mr. Casullo --

12:17PM   15         **MR. DICKSON:**  Can we go back to page 1 of this

12:17PM   16    document, Ms. Champoux?

12:17PM   17         **BY MR. DICKSON:**

12:17PM   18    Q.  In fact, Mr. Casullo, did the defendant get a

12:17PM   19    notification?

12:17PM   20    A.  Yes.

12:17PM   21         **MR. DICKSON:**  We can take down 26E.

12:17PM   22         Can we pull up 26D, please, in redacted form.  I

12:17PM   23    think this was the one we were working on the pdf with.  Maybe

12:17PM   24    just zoom out a little bit for me, please.  Thank you.

          25

12:17PM    1         **BY MR. DICKSON:**

12:17PM    2    Q.  Mr. Casullo, is this another one of those deconfliction

12:17PM    3    emails?

12:17PM    4    A.  Yes.

12:17PM    5    Q.  All right.  We're gonna go -- we're gonna skip all the

12:18PM    6    intro stuff that you already did, we're gonna go to page 4.

12:18PM    7         All right.  Do you see this entry here?

12:18PM    8    A.  Yes, I do.

12:18PM    9    Q.  So that item on March 20th, 2013, do you see that one

12:18PM   10    there?

12:18PM   11    A.  Yes, I do.

12:18PM   12    Q.  Do you see the case number?

12:18PM   13    A.  Yes.

12:18PM   14    Q.  Is that the same case number we were talking about with

12:18PM   15    the prior exhibit?

12:18PM   16    A.  Yes.

12:18PM   17    Q.  Can you read the remarks section for that entry?

12:18PM   18    A.  It says number part of ongoing narcotics investigation in

12:18PM   19    contact with target number 716-830-3226 per S.A. Bongiovanni.

12:18PM   20    Q.  Is that Ron Serio's number from that paper that you just

12:18PM   21    looked at?

12:18PM   22    A.  Yes.

12:18PM   23    Q.  Now, Mr. Casullo, did you also enter a phone number into

12:18PM   24    DARTS, or enter the same phone number into DARTS?

12:19PM   25    A.  Yes, I did.

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24

12:19PM  1  Q.  Can you read the remarks section, please?

12:19PM  2  A.  When I entered it, the remarks read:  Phone numbers in

12:19PM  3  contact with Mike Sinatra related to a burglary and drug

12:19PM  4  trafficking in Buffalo and Niagara County.

12:19PM  5  Q.  And so this phone number here is 716-866-2687.  Do you

12:19PM  6  remember off the top of your head whose phone number that is,

12:19PM  7  Mr. Casullo?

12:19PM  8  A.  No, not off the top of my head.

12:19PM  9  Q.  Okay.  Let's check it out.

12:19PM  10      MR. DICKSON:  Ms. Champoux, can we pull up

12:19PM  11  Exhibit 8A, please?  Can we go to page 347.

12:19PM  12      BY MR. DICKSON:

12:19PM  13  Q.  Down below, Mr. Casullo, where it says user information,

12:19PM  14  do you see that phone number that was on Exhibit 26D?

12:20PM  15  A.  Yes.

12:20PM  16  Q.  Do you see that phone number there?

12:20PM  17  A.  Yes.

12:20PM  18      MR. DICKSON:  We can zoom out of that, Mr. Champoux.

12:20PM  19      BY MR. DICKSON:

12:20PM  20  Q.  Where it says billing party, what name is listed there?

12:20PM  21  A.  Where exactly is that?  Oh, billing party.  It has an

12:20PM  22  account number and then a name.  Do you want me to read the

12:20PM  23  name?

12:20PM  24  Q.  What's the name?

12:20PM  25  A.  Paul Francoforte.

| | | |
|---|---|---|
| 12:20PM | 1 | **MR. DICKSON:**  We can take down Exhibit 8A.  And put |
| 12:20PM | 2 | back up 26D, please. |
| 12:20PM | 3 | **BY MR. DICKSON:** |
| 12:20PM | 4 | Q.  So when you ran Mr. Francoforte's phone number in January |
| 12:20PM | 5 | of 2019, did other special agents who've also put that phone |
| 12:20PM | 6 | number into the system get notified? |
| 12:20PM | 7 | A.  Yes. |
| 12:20PM | 8 | **MR. DICKSON:**  And if we go to the first page of this |
| 12:20PM | 9 | document, please. |
| 12:20PM | 10 | **BY MR. DICKSON:** |
| 12:20PM | 11 | Q.  Did the defendant, in fact, get notified that you ran |
| 12:21PM | 12 | Paul Francoforte's phone number in DARTS? |
| 12:21PM | 13 | A.  Yes. |
| 12:21PM | 14 | **MR. DICKSON:**  We can take down 26D, please.  And then |
| 12:21PM | 15 | can we pull up 26M. |
| 12:21PM | 16 | **BY MR. DICKSON:** |
| 12:21PM | 17 | Q.  Another deconfliction email? |
| 12:21PM | 18 | A.  That's correct. |
| 12:21PM | 19 | Q.  We're going to skip all the intro stuff again. |
| 12:21PM | 20 | **MR. DICKSON:**  Can we go to page 2.  Blow that up for |
| 12:21PM | 21 | us.  Can we actually blow up the whole piece that's not |
| 12:21PM | 22 | redacted, Ms. Champoux, please?  Thank you very much. |
| 12:21PM | 23 | **BY MR. DICKSON:** |
| 12:21PM | 24 | Q.  That second entry there, Mr. Casullo, what's the date? |
| 12:21PM | 25 | A.  March 20, 2013. |

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24

44

| | | |
|---|---|---|
| 12:21PM | 1 | Q.  Same case number we've been looking at? |
| 12:21PM | 2 | A.  Yes. |
| 12:21PM | 3 | Q.  Also Justin Borst putting this number in? |
| 12:21PM | 4 | A.  That's correct. |
| 12:21PM | 5 | Q.  Can you read the remarks? |
| 12:21PM | 6 | A.  Number part of ongoing investigation in contact with |
| 12:22PM | 7 | target 716-830-3226 per S.A. Bongiovanni. |
| 12:22PM | 8 | Q.  So as you understand it, Mr. Casullo, does that mean this |
| 12:22PM | 9 | phone number in the top left corner per S.A. Bongiovanni is |
| 12:22PM | 10 | in contact with Ron Serio? |
| 12:22PM | 11 | A.  Correct. |
| 12:22PM | 12 | Q.  And did you also run this phone number in DARTS? |
| 12:22PM | 13 | A.  Yes, I did. |
| 12:22PM | 14 | Q.  What are your -- the remarks say for your entry? |
| 12:22PM | 15 | A.  Numbers in contact with Amherst, New York marijuana |
| 12:22PM | 16 | trafficker Dennis Tripi. |
| 12:22PM | 17 | Q.  So when you ran that phone number in the top left in |
| 12:22PM | 18 | DARTS in January of 2019, did other law enforcement agents |
| 12:22PM | 19 | get notified? |
| 12:22PM | 20 | A.  Yes. |
| 12:22PM | 21 | **MR. DICKSON:**  Can we zoom out and go to page 2, or |
| 12:22PM | 22 | page 1, excuse me. |
| 12:22PM | 23 | **BY MR. DICKSON:** |
| 12:22PM | 24 | Q.  Mr. Casullo, in fact, on this email, too, did the |
| 12:22PM | 25 | defendant get notified that you put that phone number into |

| | | |
|---|---|---|
| 12:22PM | 1 | DARTS that was in contact with Ron Serio? |
| 12:22PM | 2 | A.  Yes. |
| 12:22PM | 3 |       **MR. DICKSON:**  Can we pull up 26B, please. |
| 12:22PM | 4 |       **BY MR. DICKSON:** |
| 12:23PM | 5 | Q.  Is this another one of those deconfliction emails? |
| 12:23PM | 6 | A.  Correct. |
| 12:23PM | 7 |       **MR. DICKSON:** Can we go to page 2.  Zoom in on that. |
| 12:23PM | 8 |       **BY MR. DICKSON:** |
| 12:23PM | 9 | Q.  The second item there, what's the date? |
| 12:23PM | 10 | A.  March 20th, 2013. |
| 12:23PM | 11 | Q.  Same case number? |
| 12:23PM | 12 | A.  Correct. |
| 12:23PM | 13 | Q.  Still Justin Borst? |
| 12:23PM | 14 | A.  Yes, it is. |
| 12:23PM | 15 | Q.  What does the remarks section say? |
| 12:23PM | 16 | A.  Number part of ongoing narcotics investigation in contact |
| 12:23PM | 17 | with target number 716-578-5296 per S.A. Bongiovanni. |
| 12:23PM | 18 | Q.  Now do you know who that phone number belongs to, |
| 12:23PM | 19 | Mr. Casullo? |
| 12:23PM | 20 | A.  No. |
| 12:23PM | 21 | Q.  Well, let's find out. |
| 12:23PM | 22 |       **MR. DICKSON:**  Can we pull up Exhibit 8A, please?  Can |
| 12:23PM | 23 | we go to page 287. |
| 12:23PM | 24 |       **BY MR. DICKSON:** |
| 12:23PM | 25 | Q.  Do you see that phone number there under user |

| | | |
|---|---|---|
| 12:23PM | 1 | information? |
| 12:23PM | 2 | A.  Yes. |
| 12:24PM | 3 | MR. DICKSON:  And then if we zoom out of that, and go |
| 12:24PM | 4 | to billing party. |
| 12:24PM | 5 | BY MR. DICKSON: |
| 12:24PM | 6 | Q.  Who does that phone number belong to? |
| 12:24PM | 7 | A.  Thomas Serio. |
| 12:24PM | 8 | MR. DICKSON:  Can we go back to -- we can take this |
| 12:24PM | 9 | down and go back to 26B.   Zoom in again, please. |
| 12:24PM | 10 | BY MR. DICKSON: |
| 12:24PM | 11 | Q.  So as you understand it, Mr. Casullo, does that mean this |
| 12:24PM | 12 | phone number at the top left is in contact with Tom Serio per |
| 12:24PM | 13 | S.A. Bongiovanni? |
| 12:24PM | 14 | A.  Yes. |
| 12:24PM | 15 | Q.  Did you also put that number as a part -- into DARTS as a |
| 12:24PM | 16 | part of one of your investigations? |
| 12:24PM | 17 | A.  I did. |
| 12:24PM | 18 | Q.  What do the remarks say on your entry? |
| 12:24PM | 19 | A.  Numbers in contact with marijuana trafficker Anthony |
| 12:24PM | 20 | Gerace. |
| 12:24PM | 21 | Q.  So what happens, Mr. Casullo, when you enter that phone |
| 12:25PM | 22 | number in the top left into DARTS? |
| 12:25PM | 23 | A.  That an alert is going to go out to other agents and |
| 12:25PM | 24 | analysts. |
| 12:25PM | 25 | Q.  And let's look at page 1 to see who got that alert.  Did |

12:25PM   1    the defendant get alerted that you put that phone number into

12:25PM   2    DARTS that was in contact with Tom Serio?

12:25PM   3    A.  Yes.

12:25PM   4         **MR. DICKSON:**  You can take that down.  Pull up 26I,

12:25PM   5    please.

12:25PM   6         **BY MR. DICKSON:**

12:25PM   7    Q.  Another one of these deconfliction emails, Mr. Casullo?

12:25PM   8    A.  Yes.

12:25PM   9         **MR. DICKSON:** Can we go to page 3.  Zoom in, please.

12:25PM  10    Thank you.

12:25PM  11         **BY MR. DICKSON:**

12:25PM  12    Q.  Second entry there, same case number?

12:25PM  13    A.  That's correct.

12:25PM  14    Q.  Still Justin Borst?

12:25PM  15    A.  Yes.

12:25PM  16    Q.  What does the remarks section say?

12:25PM  17    A.  Number part of ongoing investigation in contact with

12:25PM  18    target number 716-578-5296 per S.A. Bongiovanni.

12:26PM  19    Q.  Is that Tom Serio's number again?

12:26PM  20    A.  Yes.

12:26PM  21    Q.  Does that mean, as you understand it, that the number in

12:26PM  22    the top left there is in contact with Tom Serio per

12:26PM  23    S.A. Bongiovanni?

12:26PM  24    A.  Correct.

12:26PM  25    Q.  So when this other agent or whoever this other person is

12:26PM    1    above enters that same phone number, do other law enforcement

12:26PM    2    agents get notified?

12:26PM    3    A.  Yes.

12:26PM    4         MR. DICKSON:  Can we go to page 1, please?

12:26PM    5         BY MR. DICKSON:

12:26PM    6    Q.  Did the defendant get notified that somebody else ran

12:26PM    7    that phone number that was in contact with Tom Serio?

12:26PM    8    A.  Yes.

12:26PM    9         MR. DICKSON:  Take this one down.  Can we go to 26C,

12:26PM   10    please.

12:26PM   11         BY MR. DICKSON:

12:26PM   12    Q.  Another one of these deconfliction emails, right?

12:26PM   13    A.  That's correct.

12:26PM   14         MR. DICKSON:  Can we zoom in on that first item.

12:26PM   15         BY MR. DICKSON:

12:26PM   16    Q.  Now, on this one, Mr. Casullo, underneath Trinity item,

12:26PM   17    is that that same number for Tom Serio that we looked at just

12:27PM   18    a second ago?

12:27PM   19    A.  I believe so.

12:27PM   20    Q.  All right.  What does the third entry's remarks say?

12:27PM   21    A.  Narcotics investigation number for Thomas Serio per

12:27PM   22    S.A. Bongiovanni.

12:27PM   23    Q.  Same case number, right?

12:27PM   24    A.  Yes.

12:27PM   25    Q.  Different person entering that number though?

12:27PM    1    A.   That's a different analyst.

12:27PM    2    Q.   Okay.  And then do you, Mr. Casullo, in August of 2018

12:27PM    3    also put Tom Serio's phone number into DARTS?

12:27PM    4    A.   Yes, I did.

12:27PM    5    Q.   What do your remarks say?

12:27PM    6    A.   Number part of ongoing marijuana investigation.

12:27PM    7    Q.   So when you enter Tom Serio's phone number into DARTS,

12:27PM    8    did other agents get notified that you were investigating Tom

12:27PM    9    Serio?

12:27PM   10    A.   Yes.

12:27PM   11    Q.   And if we can zoom out, in fact, did the defendant get

12:27PM   12    notified that you put Tom Serio's phone number into DARTS?

12:27PM   13    A.   Yes.

12:27PM   14         MR. DICKSON:  We can take that down, please,

12:28PM   15    Ms. Champoux.

12:28PM   16         THE COURT:  Are we going into a different area now?

12:28PM   17         MR. DICKSON:  I'm happy to stop now, Judge.  That

12:28PM   18    sounds good to me.

12:28PM   19         THE COURT:  So let's take -- just so you folks

12:28PM   20    understand, we're stopping at 4:45, right?  Somebody needs to

12:28PM   21    stop at 4:45 today; is that right?

12:28PM   22         JUROR:  Yes.

12:28PM   23         THE COURT:  So what we will do is we'll break from

12:28PM   24    now until 1:30, we'll come back, we'll go for an hour and a

12:28PM   25    half until 3:00, break till 3:15, and then go to 4:45.  That's

12:28PM  1    why I thought would be an opportune time do it.

12:28PM  2            So please remember my instructions about not talking

12:28PM  3    about the case with anyone, including each other.  Don't use

12:28PM  4    tools of technology to research the case or to communicate

12:28PM  5    about the case.  Don't read, or watch, or listen to any news

12:28PM  6    coverage of the case if there is any while the case is on

12:28PM  7    trial.  And don't make up your mind until the case has been

12:28PM  8    finally submitted to you.

12:28PM  9            See you back here in an hour, 1:30.  Thanks.

12:28PM  10           (Jury excused at 12:28 p.m.)

12:29PM  11           **THE COURT:**  Anything we need to put on the record

12:29PM  12   Mr. Dickson?

12:29PM  13           **MR. DICKSON:**  No, Judge.

12:29PM  14           **THE COURT:**  Anything from the defense?

12:29PM  15           **MR. SINGER:**  No, Your Honor.

12:29PM  16           **THE COURT:**  Okay.  We'll see you in an hour.

12:29PM  17           **THE CLERK:**  All rise.

12:29PM  18           (Off the record at 12:29 p.m.)

12:29PM  19           (Back on the record at 1:33 p.m.)

01:33PM  20           (Jury not present.)

01:33PM  21           **THE CLERK:**  All rise.

01:33PM  22           **THE COURT:**  Please be seated.

01:33PM  23           **THE CLERK:**  We are back on the record for the

01:33PM  24   continuation of the jury trial in case number 19-cr-227,

01:33PM  25   United States of America versus Joseph Bongiovanni.

01:33PM  1         All counsel and parties are present.

01:33PM  2         **THE COURT:** Okay.  Anything we want to put on the

01:33PM  3  record before we resume?

01:33PM  4         **MR. DICKSON:**  No, Judge.

01:33PM  5         **MR. SINGER:**  No, Your Honor.

01:34PM  6         **THE COURT:**  Okay.  Let's bring them back, please,

01:34PM  7  Pat.

01:36PM  8         (Jury seated at 1:36 p.m.)

01:36PM  9         **THE COURT:**  The record will reflect all our jurors

01:36PM 10  again are present.

01:36PM 11         I remind the witness that he's still under oath.

01:36PM 12         And you may continue.

01:36PM 13         **MR. DICKSON:**  Thank you, Judge.

01:36PM 14         **BY MR. DICKSON:**

01:36PM 15  Q.  All right.  Mr. Casullo, I promise no more deconfliction

01:36PM 16  emails with me.  I do want to go back, though, really quick

01:36PM 17  to when you were investigating Michael Masecchia in 2004 in

01:36PM 18  Las Vegas.  I forgot to ask you a question about that.

01:36PM 19      When you talked with the defendant about Michael

01:36PM 20  Masecchia, when you were back in Las Vegas, did the defendant

01:36PM 21  share any information that he knew about Michael Masecchia

01:36PM 22  with you?

01:36PM 23  A.  Yes.

01:36PM 24  Q.  What did he share?

01:36PM 25  A.  He mentioned that he heard, I believe it was the Erie

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24

52

| | | |
|---|---|---|
| 01:36PM | 1 | County Sheriff's Office, one of the sheriff's offices was |
| 01:36PM | 2 | investigating Masecchia for an outdoor marijuana grow. |
| 01:37PM | 3 | Q.  Did he say where? |
| 01:37PM | 4 | A.  It was set up somewhere in the Southern Tier. |
| 01:37PM | 5 | Q.  What's the Southern Tier?  Is that a part of this area? |
| 01:37PM | 6 | A.  It's a geographic area south of metropolitan Buffalo |
| 01:37PM | 7 | area. |
| 01:37PM | 8 | Q.  Now as a Las Vegas special agent, could you really |
| 01:37PM | 9 | investigate somebody who was just growing marijuana in the |
| 01:37PM | 10 | Buffalo area alone? |
| 01:37PM | 11 | A.  We wouldn't be investigating someone based on a Buffalo |
| 01:37PM | 12 | situation like that. |
| 01:37PM | 13 | Q.  Okay.  I want to move on from Michael Masecchia now and |
| 01:37PM | 14 | talk about Anthony Gerace. |
| 01:37PM | 15 | A.  Um-hum. |
| 01:37PM | 16 | Q.  Do you know who that is? |
| 01:37PM | 17 | A.  Yes. |
| 01:37PM | 18 | Q.  Did you investigate Anthony Gerace at a point in time -- |
| 01:37PM | 19 | A.  Yes. |
| 01:37PM | 20 | Q.  -- while you were with the Buffalo office, right? |
| 01:37PM | 21 | A.  That's correct. |
| 01:37PM | 22 | Q.  Did you get Anthony Gerace's phone records as a part of |
| 01:37PM | 23 | that investigation? |
| 01:37PM | 24 | A.  I did subpoena Anthony's phone records. |
| 01:37PM | 25 | Q.  And did you put Anthony Gerace's phone number into DARTS, |

01:37PM    1    that system we talked about?

01:37PM    2    A.  Yes.

01:37PM    3    Q.  After you put Anthony Gerace's records into DARTS, did

01:38PM    4    the defendant come speak to you about that?

01:38PM    5    A.  Yes, he did.

01:38PM    6    Q.  What did he say?

01:38PM    7    A.  He came over while I was sitting alone at my desk.  And

01:38PM    8    he said that -- I can't remember if he actually had the DARTS

01:38PM    9    deconfliction in his hands or not, but that he was aware I

01:38PM   10    was running tolls, phone records, relating to Anthony Gerace.

01:38PM   11         And he said, I can -- my wife is friends with people

01:38PM   12    related to Anthony in terms of the people that he associates

01:38PM   13    with on Facebook, and I could maybe help because, she is on

01:38PM   14    Facebook with them.

01:38PM   15         Which I said, okay.

01:38PM   16         And he mentioned that Anthony Gerace had his loads of

01:38PM   17    marijuana delivered to him behind Salvatore's Restaurant on

01:38PM   18    Transit.  That Anthony Gerace also sold cocaine to some of

01:38PM   19    his friends.  And I believe -- I believe that's it.

01:39PM   20    Q.  Did he say anything to you about how quickly you needed

01:39PM   21    to move in the investigation against Anthony Gerace?

01:39PM   22    A.  He did mention at the end before he walked away, he said,

01:39PM   23    you better hurry up and investigate him before they make --

01:39PM   24    you better hurry up and investigate him before they make

01:39PM   25    marijuana legal.

01:39PM    1    Q.  What did you understand that to mean?

01:39PM    2    A.  I took it as almost being snide and mocking me.  That's

01:39PM    3    how I took it.  I've never had someone say that to me before

01:39PM    4    about investigating someone for marijuana.

01:39PM    5    Q.  All right.  Mr. Casullo, I want to talk about a different

01:39PM    6    person now, somebody named Mark Vitale.

01:39PM    7            MR. DICKSON:  So, Ms. Champoux, if we can pull up

01:39PM    8    Government Exhibit 100A.1 which is already in evidence.   And

01:39PM    9    if we could click on the document that says Vitale Sprint sub

01:39PM   10    info, please.

01:40PM   11            BY MR. DICKSON:

01:40PM   12    Q.  Mr. Casullo, I'm going to have Ms. Champoux scroll

01:40PM   13    through the first page of this document real quick for you.

01:40PM   14        Does this look like a subpoena response that you

01:40PM   15    received?

01:40PM   16    A.  Correct.  Correct.

01:40PM   17    Q.  And was this a subpoena response related to Mr. Vitale in

01:40PM   18    some way?

01:40PM   19    A.  I can't tell from what I'm looking at right now.

01:40PM   20            MR. DICKSON:  Let's see if we can go to the second

01:40PM   21    page.  Scroll down just a little bit more for me.  Thank you?

01:40PM   22            BY MR. DICKSON:

01:40PM   23    Q.  Do you see the account billing address is there?

01:40PM   24    A.  Yes.

01:40PM   25    Q.  It looks like there's a Michelle Vitale listed there,

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24

55

01:40PM   1   right?

01:40PM   2   A.   Correct.

01:40PM   3   Q.   Mr. Casullo, as far as you understand it, is there any

01:40PM   4   legitimate law enforcement reason for the defendant to have a

01:41PM   5   subpoena that you issued in his basement after he retired

01:41PM   6   from the DEA?

01:41PM   7   A.   Not that I'm aware of.

01:41PM   8        **MR. DICKSON:**   All right.  We can take that down,

01:41PM   9   please.

01:41PM  10        **BY MR. DICKSON:**

01:41PM  11   Q.   I want to talk about another person, Mr. Casullo.  Let's

01:41PM  12   talk about somebody named Joe Bella, have you heard that name

01:41PM  13   before?

01:41PM  14   A.   Yes.

01:41PM  15   Q.   Did you attend a meeting with somebody named Tom Mozg

01:41PM  16   about Joe Bella?

01:41PM  17   A.   Yes.

01:41PM  18   Q.   Do you remember generally when it was?

01:41PM  19   A.   The time frame?

01:41PM  20   Q.   What year?

01:41PM  21   A.   It was while I was still in group D-57 and still working

01:41PM  22   with Joe, so maybe somewhere around possibly 2016.

01:41PM  23   Q.   How did you end up at this meeting with Tom Mozg about

01:41PM  24   Joe Bella?

01:41PM  25   A.   So I believe it was -- it was either an analyst at the

01:41PM    1    DEA that I had worked with, or an analyst from Homeland

01:41PM    2    Security, or they were talking to each other, the two

01:41PM    3    analysts.  But from what I remember, I'm pretty sure it was

01:41PM    4    one of our analysts said, hey, Tom Mozg, who didn't know at

01:42PM    5    the time, he's from Border Patrol and he had an

01:42PM    6    investigation, it was related to Joe Bella.  He had a lot of

01:42PM    7    really good information, and he wanted to talk to somebody

01:42PM    8    about it, and if I would be interested in talking to him.

01:42PM    9    And I said yes and agree.

01:42PM   10    Q.  So you go to this meeting with Mr. Mozg.  And did

01:42PM   11    Mr. Mozg share information with you?

01:42PM   12    A.  He did, yes.

01:42PM   13    Q.  Now, did the defendant come to that meeting also?

01:42PM   14    A.  Yes, Joe came to that meeting as well.

01:42PM   15    Q.  Did he show up late to the meeting?

01:42PM   16    A.  Yes, to the best of my knowledge, he showed up after it

01:42PM   17    already started.

01:42PM   18    Q.  Coming out of that meeting, Mr. Casullo, do you know

01:42PM   19    whether Agent Mozg continued investigating Joe Bella?

01:42PM   20    A.  I'm pretty sure he did.  I don't remember talking to him

01:42PM   21    much after that.  But I'm pretty sure that Tom kept working

01:42PM   22    that target and that organization.

01:42PM   23    Q.  Are you positive about that, or is that sort of what

01:43PM   24    you're thinking based on that experience?

01:43PM   25    A.  No, I think I knew --

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24    57

01:43PM    1                **MR. SINGER:**  Objection, lack of personal knowledge.

01:43PM    2                **THE COURT:**  I'm sorry?

01:43PM    3                **MR. SINGER:**  Lack of personal knowledge.

01:43PM    4                **THE COURT:**  To the question, are you positive about

01:43PM    5      it?

01:43PM    6                **MR. SINGER:**  Yeah.  It was the previous question,

01:43PM    7      Judge.  It's out, so I'll withdraw it.

01:43PM    8                **THE COURT:**  You'll withdraw it?  Great.

01:43PM    9                **BY MR. DICKSON:**

01:43PM    10     Q.  Just wondering, Mr. Casullo, did you talk to Mr. Mozg and

01:43PM    11     confirm that he did or did not investigate Joe Bella, or are

01:43PM    12     you just sort of surmising that?

01:43PM    13     A.  I'm sorry, can you ask that question again?

01:43PM    14     Q.  What I'm trying to understand is whether you know for

01:43PM    15     sure whether Tom Mozg continued to investigate Joe Bella or

01:43PM    16     not?

01:43PM    17     A.  Understand.  No, I don't know for sure.

01:43PM    18     Q.  Okay.  All right.  Now, I want to move on to a different

01:43PM    19     person and talk about Peter Gerace.  Do you know who that is?

01:43PM    20     A.  Yes.

01:43PM    21     Q.  How do you know Mr. Gerace?

01:43PM    22     A.  I know Mr. Gerace because we went to the same high school

01:43PM    23     together, Saint Joseph's Collegiate Institute.  We were in

01:43PM    24     the same graduating class in 1985.

01:44PM    25     Q.  While you were in high school with Mr. Gerace in the same

01:44PM    1    class, were you friends with him?

01:44PM    2    A.  We were not in the same friend group.  Everybody knew

01:44PM    3    each other at Saint Joe's, it's a small graduating class, but

01:44PM    4    we were not friends.

01:44PM    5    Q.  At any point after you graduated from high school, were

01:44PM    6    you friends with Peter Gerace?

01:44PM    7    A.  No, we were not friends.  We did not hang out, we did not

01:44PM    8    call each other, we did not go places together, no.

01:44PM    9    Q.  Mr. Casullo, is there somebody in your family who is

01:44PM    10   friends with Peter Gerace?

01:44PM    11   A.  Yes.

01:44PM    12   Q.  Who is that?

01:44PM    13   A.  My wife's brother is friends with Peter Gerace.

01:44PM    14   Q.  What is your wife's brother's name?

01:44PM    15   A.  His name is Phil Domiano.

01:44PM    16   Q.  Mr. Casullo, can you describe for this jury what your

01:44PM    17   relationship is like with your brother-in-law Phil Domiano?

01:44PM    18   A.  It's not good.  We don't talk.  He's not allowed at my

01:44PM    19   house.  And it's been that way for years.  And it goes back

01:44PM    20   to Las Vegas, actually.

01:45PM    21   Q.  Fair to say Mr. Domiano's caused a little bit of strife

01:45PM    22   throughout your life?

01:45PM    23   A.  Yes.

01:45PM    24   Q.  Do you know what Mr. Domiano's relationship is to

01:45PM    25   Mr. Gerace?

01:45PM  1    A.  I know they grew up on the same street -- well, across

01:45PM  2    the street from each other, around the block, in Tonawanda.

01:45PM  3    That they remain friends, to the best of my knowledge, up

01:45PM  4    until adulthood.  And I believe they're still currently

01:45PM  5    friends.

01:45PM  6    Q.  As far as you're aware, has Mr. Domiano done some things

01:45PM  7    that you don't necessarily approve of as a DEA special agent?

01:45PM  8    A.  Yes, that's most of the reason why I don't associate with

01:45PM  9    him and why he's not allowed at my house.

01:45PM  10    Q.  Mr. Casullo, did your relationship with Phil Domiano

01:45PM  11    impact your work at the DEA in any way?

01:46PM  12    A.  As far as investigations --

01:46PM  13    Q.  Did it impact any investigations that you conducted at

01:46PM  14    the DEA?

01:46PM  15    A.  No, I continued to do my job no matter who he was or who

01:46PM  16    he associated with.

01:46PM  17    Q.  Did Mr. Domiano's relationship to Mr. Gerace influence

01:46PM  18    any investigations that you did at the DEA?

01:46PM  19    A.  No, none at all.

01:46PM  20    Q.  Does your relationship with Mr. Domiano have any impact

01:46PM  21    on your testimony today?

01:46PM  22    A.  No, none whatsoever.

01:46PM  23    Q.  Does Mr. Domiano's relationship to Peter Gerace have any

01:46PM  24    impact on your testimony today?

01:46PM  25    A.  No.

| | | |
|---|---|---|
| 01:46PM | 1 | Q.  I want to show you what's already in evidence, |
| 01:46PM | 2 | Mr. Casullo, as Government Exhibit 99. |
| 01:46PM | 3 | **MR. DICKSON:** If we can pull that up, please. |
| 01:46PM | 4 | **BY MR. DICKSON:** |
| 01:46PM | 5 | Q.  Mr. Casullo, do you see who the author of this memorandum |
| 01:46PM | 6 | is? |
| 01:46PM | 7 | A.  Yes, I do. |
| 01:46PM | 8 | Q.  Who is it? |
| 01:46PM | 9 | A.  Joseph Bongiovanni. |
| 01:47PM | 10 | Q.  What's the subject? |
| 01:47PM | 11 | A.  Communication with Peter Gerace by Special Agent Anthony |
| 01:47PM | 12 | Casullo and Phil Domiano. |
| 01:47PM | 13 | **MR. DICKSON:**  Can we blow up the first paragraph, |
| 01:47PM | 14 | please? |
| 01:47PM | 15 | **BY MR. DICKSON:** |
| 01:47PM | 16 | Q.  Mr. Casullo, can you read just the first, actually, just |
| 01:47PM | 17 | read the whole paragraph quickly to the jury, please. |
| 01:47PM | 18 | A.  S.A. Joseph Bongiovanni is writing to inform you of |
| 01:47PM | 19 | information that he has acquired regarding the social |
| 01:47PM | 20 | affiliation and recent communications with Peter Gerace by |
| 01:47PM | 21 | S.A. Anthony Casullo and S.A. Casullo's brother-in-law, Phil |
| 01:47PM | 22 | Domiano.  In the past S.A. Bongiovanni has verbally informed |
| 01:47PM | 23 | you, my Group Supervisor Greg Yensan, and our ASAC David T. |
| 01:47PM | 24 | Zon, of information confirming the friendship of Domiano, |
| 01:47PM | 25 | Casullo, and Gerace.  Furthermore, S.A. Bongiovanni has |

01:47PM    1    attached information confirming that Domiano was a former

01:47PM    2    manager of Pharaoh's Gentlemen's Club in Cheektowaga on

01:48PM    3    behalf of Gerace.

01:48PM    4    Q.  Mr. Casullo, where it says that it says S.A. Bongiovanni

01:48PM    5    has verbally informed you, the supervisors, of information

01:48PM    6    confirming the friendship of Domiano, Casullo, and Gerace,

01:48PM    7    were you friends -- would you consider yourself to be a

01:48PM    8    friend of Phil Domiano?

01:48PM    9    A.  No.

01:48PM   10    Q.  Back in January of 2019, were you friends with Phil

01:48PM   11    Domiano?

01:48PM   12    A.  No.

01:48PM   13    Q.  Would you consider yourself to be a friend of Peter

01:48PM   14    Gerace?

01:48PM   15    A.  No.

01:48PM   16    Q.  Back in January of 2019, when this memo was written, were

01:48PM   17    you friends with Peter Gerace?

01:48PM   18    A.  No.

01:48PM   19         **MR. DICKSON:**  Take off this zoom, please.  And if we

01:48PM   20    can zoom into the second paragraph.

01:48PM   21         **BY MR. DICKSON:**

01:48PM   22    Q.  Can you read this paragraph for the jury, please?

01:48PM   23    A.  S.A. Bongiovanni has personally witnessed S.A. Casullo

01:48PM   24    meeting and drinking socially with Peter Gerace alone at the

01:49PM   25    Big Ditch Brewery and later at Tappo Italian Restaurant in

01:49PM    1    Buffalo, New York at approximately 9:45 p.m. on the evening

01:49PM    2    of June 13, 2015.

01:49PM    3    Q.  Mr. Casullo, you said that you and Peter Gerace went to

01:49PM    4    high school together.  Was there a high school reunion at Big

01:49PM    5    Ditch Brewery around that time frame?

01:49PM    6    A.  Yes.

01:49PM    7    Q.  And was Peter Gerace there?

01:49PM    8    A.  Yes, he was.

01:49PM    9    Q.  In this memo, it says that S.A. Bongiovanni has

01:49PM   10    personally witnessed S.A. Casullo meeting and drinking

01:49PM   11    socially with Peter Gerace alone at the Big Ditch Brewery.

01:49PM   12    On that day, were you meeting and drinking socially with

01:49PM   13    Peter Gerace alone at the Big Ditch Brewery?

01:49PM   14    A.  No.

01:49PM   15    Q.  Have you ever alone met with Peter Gerace at the Big

01:49PM   16    Ditch Brewery?

01:49PM   17    A.  Never.

01:49PM   18    Q.  Did you later, during that high school reunion, go with

01:50PM   19    Peter Gerace over to Tappo Italian Restaurant?

01:50PM   20    A.  Yes, I walked across the street from the Big Ditch to

01:50PM   21    Tappo Restaurant with Peter Gerace.

01:50PM   22    Q.  Why?

01:50PM   23    A.  Because Peter Gerace had told me that S.A. Bongiovanni

01:50PM   24    was across the street with his brother, and that we should go

01:50PM   25    see him.

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24

63

01:50PM  1    Q.  Did you do that?

01:50PM  2    A.  He asked me three times.  The first two I said no, that's

01:50PM  3    okay.  The third time, I agreed, then I did walk across the

01:50PM  4    street with Gerace.

01:50PM  5    Q.  When you went across the street with Peter Gerace, who

01:50PM  6    did you see?

01:50PM  7    A.  When I walked into Tappo, there was a bar when you walk

01:50PM  8    in.  To the right I saw Joe Bongiovanni with either -- I

01:50PM  9    can't remember for certain, either three or four individuals

01:50PM  10   sitting alone at the bar in their group.

01:50PM  11   Q.  Was one of those people Anthony Gerace?

01:50PM  12   A.  I didn't know at the time, because I had never met or

01:50PM  13   seen Anthony Gerace.  But Mr. Bongiovanni introduced me to

01:51PM  14   Anthony Gerace who was sitting right next to him.  He was one

01:51PM  15   of the four people.

01:51PM  16   Q.  What was the defendant's demeanor like when you and Peter

01:51PM  17   Gerace walked over to Tappo and met him?

01:51PM  18   A.  He looked very surprised.  He looked very uncomfortable.

01:51PM  19   First thing he said to me is, what are you doing here?  I

01:51PM  20   thought you were in New York -- meaning New York City.

01:51PM  21       I said, yes, I'm still working in New York, but I'm home

01:51PM  22   for the weekend visiting and attending a reunion.

01:51PM  23   Q.  After that conversation, Mr. Casullo, what happened?

01:51PM  24   A.  So after that conversation, and we weren't there for very

01:51PM  25   long, he introduced me to Anthony Gerace and whoever those

01:51PM   1   three or four other people were.

01:51PM   2       Shortly after that, he agreed to walk back to Big Ditch

01:51PM   3   where our reunion was.  And he walked back across the street

01:51PM   4   with myself and Peter Gerace back to the reunion at Big

01:51PM   5   Ditch.

01:51PM   6   Q.  When you say "he" walked back, who walked back with you?

01:51PM   7   A.  Joseph Bongiovanni walked back.

01:51PM   8   Q.  What did you see the defendant and Peter Gerace do when

01:52PM   9   you got back to the Big Ditch?

01:52PM  10   A.  Peter Gerace started socializing with the rest of the

01:52PM  11   people that were there at the reunion, and so did Joe

01:52PM  12   Bongiovanni.  I'm pretty sure he knew one of my classmates

01:52PM  13   from playing football, and they started talking.

01:52PM  14   Q.  What did you do?

01:52PM  15   A.  I drifted off to another group of people that were my

01:52PM  16   closer friends from high school, and sat and talked and

01:52PM  17   watched, actually, Peter Gerace and Joe Bongiovanni talk with

01:52PM  18   other classmates.

01:52PM  19       **MR. DICKSON:**  We can take this down, Ms. Champoux.

01:52PM  20   Thank you.

01:52PM  21       **BY MR. DICKSON:**

01:52PM  22   Q.  Mr. Casullo, during your time at the DEA Buffalo office,

01:52PM  23   did you ever attempt to investigate Peter Gerace?

01:52PM  24   A.  Yes, I did.

01:52PM  25   Q.  Did that investigation also include an investigation into

01:52PM  1  Pharaoh's Gentlemen's Club?

01:52PM  2  A.  Yes.

01:52PM  3  Q.  When did you start the investigation?

01:52PM  4  A.  I believe it was somewhere in the summer of 2016.

01:53PM  5  Q.  How did it come to your attention that Mr. Gerace might

01:53PM  6  be worth investigating?

01:53PM  7  A.  Amongst classmates, it was no secret that Peter Gerace

01:53PM  8  was a heavy, heavy cocaine user.  That was conversation

01:53PM  9  amongst classmates.  That wasn't uncommon.  He was at the

01:53PM  10  reunion.

01:53PM  11      I had a classmate tell me that Peter Gerace was

01:53PM  12  videotaping --

01:53PM  13          **MR. SINGER:**  Objection, hearsay.

01:53PM  14          **THE COURT:**  Yeah, sustained.

01:53PM  15          **BY MR. DICKSON:**

01:53PM  16  Q.  Was your investigation into Peter Gerace at least

01:53PM  17  initially a drug case?

01:53PM  18  A.  Yes, it was.

01:53PM  19  Q.  When you first began the investigation into Mr. Gerace,

01:53PM  20  what investigative steps did you take at the outset?

01:53PM  21  A.  Well, before I did anything, I approached my supervisor

01:53PM  22  of the group at the time in group D-57, which was Greg

01:54PM  23  Yensan.  And I mentioned, I said, what is your opinion on us

01:54PM  24  looking into Peter Gerace and Pharaoh's?  Is it worthy of us

01:54PM  25  to initiate any type of investigative steps?

01:54PM   1      Which he said, yes, he thought it would be fruitful

01:54PM   2   possibly.  He didn't believe at the time that we would -- the

01:54PM   3   way he worded it was there may not be a source of supply

01:54PM   4   right away that we could figure out, but through

01:54PM   5   investigating Gerace and Pharaoh's, that hopefully we could

01:54PM   6   get to the source of supply.  And that Peter Gerace had been

01:54PM   7   investigated multiple times by multiple agencies without any

01:54PM   8   success.

01:54PM   9   Q.  So as an initial step in this investigation, Mr. Casullo,

01:54PM  10   did you pull phone records for Mr. Gerace?

01:54PM  11   A.  I did.  I spoke to Greg and I said I'm gonna subpoena

01:54PM  12   phone records for his telephone number.  And, but, just to

01:54PM  13   make you aware, it's possible that Joe Bongiovanni's phone

01:55PM  14   number may be in the phone records, because I knew that he

01:55PM  15   was friends with Peter Gerace.

01:55PM  16   Q.  What did Mr. Yensan say?

01:55PM  17   A.  He said, okay, subpoena the records, and go through the

01:55PM  18   records, and if you see Joe's telephone number in the phone

01:55PM  19   records that are in communication with Peter Gerace's phone,

01:55PM  20   to let him know.

01:55PM  21   Q.  Did you pull those phone records, Mr. Casullo?

01:55PM  22   A.  Yes, I did.

01:55PM  23   Q.  When you pulled those phone records, Mr. Casullo, were

01:55PM  24   you investigating Peter Gerace?

01:55PM  25   A.  Yes.

01:55PM  1  Q.  When you pulled Peter Gerace's phone records,

01:55PM  2  Mr. Casullo, were you trying to get the defendant in any kind

01:55PM  3  of trouble?

01:55PM  4  A.  No.

01:55PM  5  Q.  When you got Mr. Gerace's phone records back, did the

01:55PM  6  defendant's phone number actually show up?

01:55PM  7  A.  Yes, his work cell phone was in the phone records.

01:55PM  8  Q.  And what did you do when you saw that?

01:55PM  9  A.  So I brought the phone records to Greg, and said, here

01:56PM  10  you go.  His -- Joe's work cell phone is in contact with

01:56PM  11  Gerace.

01:56PM  12      I can't remember how frequently.  I believe it was, like,

01:56PM  13  in the top ten most frequently called numbers.  I don't

01:56PM  14  remember how many times.  I brought it to Greg's attention.

01:56PM  15  Q.  Mr. Casullo, after you brought it to Mr. Yensan's

01:56PM  16  attention, did you notice a change in how the defendant

01:56PM  17  behaved around you or treated you?

01:56PM  18  A.  Yes.

01:56PM  19  Q.  How so?

01:56PM  20  A.  Shortly after that, we had just finished a long

01:56PM  21  investigation that I had mentioned prior.  So shortly after

01:56PM  22  this, within a couple days, I noticed that Joe wasn't

01:56PM  23  speaking to me anymore, and he looked like he was upset.

01:56PM  24  Q.  Did you do anything to try to -- to fix this?

01:56PM  25  A.  I did.

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24

68

01:56PM  1   Q.  What did you do?

01:56PM  2   A.  So I asked Joe if he would be willing to talk to me in

01:56PM  3   the conference room because I knew he was upset.

01:57PM  4   Q.  Just a conference room in the DEA offices.

01:57PM  5   A.  The conference room in my group at the DEA office, yes.

01:57PM  6   Q.  So did you and the defendant go together into one of

01:57PM  7   those conference rooms?

01:57PM  8   A.  So he agreed to speak with me.  We went into the

01:57PM  9   conference room, and I shut the door.

01:57PM  10  Q.  Was it just you and the defendant in that room?

01:57PM  11  A.  Just me and Joe, nobody else.

01:57PM  12  Q.  Why didn't you invite anybody else to the conversation?

01:57PM  13  A.  I thought would be an uncomfortable conversation.  I

01:57PM  14  didn't want to make matters worse with Joe.  I knew he was

01:57PM  15  upset, and I thought it would be something that I could

01:57PM  16  possibly clear up with him.  And it was just between me and

01:57PM  17  Joe.

01:57PM  18  Q.  So tell the jury how you began that conversation between

01:57PM  19  you and the defendant in the conference room.

01:57PM  20  A.  I said, I can tell you're upset, you're not speaking with

01:57PM  21  me.  I'm not trying to get you in any type of trouble.

01:57PM  22      And he was upset.

01:57PM  23  Q.  What was defendant's immediate response when you said you

01:57PM  24  weren't trying to get him in any trouble?

01:57PM  25  A.  First thing he said to me was, that kid, referring to

01:58PM    1    Gerace, called me when a stripper overdosed at his club, and

01:58PM    2    I told him to get her out of there.

01:58PM    3    Q.  After the defendant told you that he spoke with

01:58PM    4    Mr. Gerace and told him to get a stripper out of his club,

01:58PM    5    who was overdosing, did you ask him why he had said that to

01:58PM    6    Peter Gerace?

01:58PM    7    A.  I didn't say anything.  I was shocked.

01:58PM    8    Q.  Why not?

01:58PM    9    A.  'Cuz I had no idea what he was talking about.  And I was

01:58PM   10    in disbelief that he had just said that.

01:58PM   11         To me, someone overdosing in a club, my experience

01:58PM   12    working investigations, and moving someone, I had begun to

01:58PM   13    believe if he was possibly trying to cover up something.

01:58PM   14    Q.  What was the defendant's demeanor like when he was

01:58PM   15    telling you about his conversation with Mr. Gerace regarding

01:59PM   16    the person who was overdosing?

01:59PM   17    A.  He looked upset, angry.

01:59PM   18    Q.  What was his tone of voice like?

01:59PM   19    A.  It was loud.  I don't believe he was yelling at me

01:59PM   20    directly, but he was loud.  He was emotional about it.

01:59PM   21    Q.  After the defendant told you he had talked with Peter

01:59PM   22    Gerace and told him to get that stripper out of the club when

01:59PM   23    that person was overdosing, what did he say next to you?

01:59PM   24    A.  He asked me, isn't he friends with your brother-in-law?

01:59PM   25    Meaning Gerace.  Isn't Gerace friends with your

01:59PM    1    brother-in-law?

01:59PM    2    Q.   Is that Phil Domiano that we talked about?

01:59PM    3    A.   Which is Phil Domiano.

01:59PM    4    Q.   What did you say to that?

01:59PM    5    A.   I said, yes, he is, and he's caused a lot of problems for

01:59PM    6    me and my family in the past.

01:59PM    7    Q.   Do you know why, or did you ask the defendant why he was

01:59PM    8    bringing up Phil Domiano?

01:59PM    9    A.   No, it was the first thing he said.

01:59PM   10          MR. SINGER:   Objection, nonresponsive.

02:00PM   11          THE COURT:   I'm sorry?

02:00PM   12          MR. SINGER:   He answered no, and then --

02:00PM   13          THE COURT:   Yeah, so the objection is overruled.

02:00PM   14    Next question.

02:00PM   15          MR. DICKSON:   Yes, Judge.

02:00PM   16          BY MR. DICKSON:

02:00PM   17    Q.   After you talked about Phil Domiano, what did the

02:00PM   18    defendant say next?

02:00PM   19    A.   He asked me if I hated Italians.

02:00PM   20    Q.   Did you understand, Mr. Casullo, whether Peter Gerace was

02:00PM   21    Italian or not?

02:00PM   22    A.   I had a belief that he was of Italian descent.

02:00PM   23    Q.   When defendant asked you if you hated Italians, how did

02:00PM   24    you respond?

02:00PM   25    A.   I said, no, I'm Italian.  My family's Italian.  My wife's

02:00PM    1    Italian.  We're of Italian descent.

02:00PM    2    Q.  What did you understand the defendant to mean or to be

02:00PM    3    getting at when he said do you hate Italians?

02:00PM    4         MR. SINGER:  Objection, speculation.

02:01PM    5         THE COURT:  Yeah, sustained.

02:01PM    6         MR. DICKSON:  Judge, respectfully, I'm asking the

02:01PM    7    witness what his understanding of the comments were.  And I

02:01PM    8    can approach for a more substantive discussion.

02:01PM    9         THE COURT:  Because it's going to color what he said

02:01PM   10    back to him, is that the idea?

02:01PM   11         MR. DICKSON:  For that reason, and for another more

02:01PM   12    substantive legal reason which I can discuss at the bench.

02:01PM   13         THE COURT:  Okay.  Come on up.

02:01PM   14         (Sidebar discussion held on the record.)

02:01PM   15         MR. DICKSON:  So, Judge, I think as I previewed for

02:01PM   16    the Court during -- or, at the beginning of this trial,

02:01PM   17    McDonald, the Supreme Court case regarding bribery, makes it

02:01PM   18    an official act if you are pressuring another public official

02:01PM   19    to perform an official act.  If you are operating with the

02:01PM   20    intent that another official perform or not perform an

02:01PM   21    official act.

02:01PM   22         So Mr. Casullo's testimony is relevant to whether he

02:02PM   23    felt that the defendant was pressuring him to perform or not

02:02PM   24    perform an official act regarding Mr. Gerace.

02:02PM   25         THE COURT:  Well, but I'm not so sure that this is

02:02PM    1    the time to ask that question.  What he understood by

02:02PM    2    including that question is probably colored by what it gets

02:02PM    3    him to say after that.  So, I'm going to allow him to ask the

02:02PM    4    question eventually, how he felt.

02:02PM    5             MR. SINGER:  Well, I think he can testify to how he

02:02PM    6    felt, Judge.

02:02PM    7             THE COURT:  That's what he asked him.

02:02PM    8             MR. SINGER:  But no, what he asked was -- what he

02:02PM    9    asked was why do you think Bongiovanni asked that question.

02:02PM   10        Like, he was trying to get out an opinion as to

02:02PM   11    Bongiovanni's state of mind when asking that question, which

02:02PM   12    is something he wouldn't know, which is why I objected to the

02:02PM   13    speculation.

02:02PM   14             MR. DICKSON:  What I asked, Judge, was what was his

02:02PM   15    understanding --

02:02PM   16             THE COURT:  Right.

02:02PM   17             MR. DICKSON:  -- of what the defendant said.

02:02PM   18             THE COURT:  Right.

02:03PM   19             MR. SINGER:  So it's limited to, because it starting

02:03PM   20    to go somewhere like where I thought that Joe was --

02:03PM   21             THE COURT:  You don't have an objection to that

02:03PM   22    question?

02:03PM   23             MR. SINGER:  I understand the Court's ruling

02:03PM   24    vis-à-vis that.

02:03PM   25             THE COURT:  Fine.  Okay.  So are you going to

02:03PM   1    withdraw the objection?  Given my ruling, that I would let him

02:03PM   2    go into it eventually --

02:03PM   3              **MR. SINGER:**  Well, I think you overruled the

02:03PM   4    objection, Judge, so I guess --

02:03PM   5              **THE COURT:**  Fine.   Go ahead.

02:03PM   6              (End of sidebar discussion.)

02:03PM   7              **THE COURT:**  So the objection is overruled.

02:03PM   8              **BY MR. DICKSON:**

02:03PM   9    Q.  Mr. Casullo, what did you understand the defendant to

02:03PM   10   mean when he said do you hate Italians?

02:03PM   11   A.  He was talking about Peter Gerace.

02:03PM   12   Q.  After the defendant asked you if you hate Italians, did

02:03PM   13   he say something else to you?

02:03PM   14   A.  Yes, he did.

02:03PM   15   Q.  I don't want you to use the actual words, Mr. Casullo,

02:03PM   16   but can you tell us what the defendant said after he said do

02:03PM   17   you hate Italians?

02:04PM   18   A.  He said, we should be investigating black people and

02:04PM   19   Hispanics.  But he used another word, one beginning with an

02:04PM   20   "N," one beginning with an "S."

02:04PM   21   Q.  What was your reaction when the defendant said that to

02:04PM   22   you?

02:04PM   23   A.  Disbelief.  Shock.

02:04PM   24   Q.  Did you say anything?

02:04PM   25   A.  I said, I think we should be investigating any criminals.

02:04PM    1    Q.   Why did you say that?

02:04PM    2    A.   Because we took an oath to investigate any criminals, not

02:04PM    3    just ones that we wanted to investigate.

02:04PM    4    Q.   After the defendant made that comment to you,

02:04PM    5    Mr. Casullo, did he say anything else?

02:04PM    6    A.   He said Peter Gerace was more of a drug user, a cocaine

02:04PM    7    user.   That he was more involved with white collar or

02:04PM    8    fraud-type activities.   But that if he was dirty, he would

02:05PM    9    nail him to the wall.

02:05PM   10    Q.   Did you believe him?

02:05PM   11    A.   Absolutely not.

02:05PM   12    Q.   Why not?

02:05PM   13    A.   Because of things that he had said prior to me.

02:05PM   14    Q.   In that very conversation?

02:05PM   15    A.   Yes, moments before.

02:05PM   16    Q.   At that point, Mr. Casullo, how long had you been in the

02:05PM   17    Buffalo office?

02:05PM   18    A.   Not even a year, maybe eight months.

02:05PM   19    Q.   Had the defendant, as far as you understood it, been in

02:05PM   20    the Buffalo office longer than you?

02:05PM   21    A.   Yes.

02:05PM   22    Q.   Had something like that ever happened to you in your DEA

02:05PM   23    career besides that one time?

02:05PM   24    A.   Never.   Never.   Never in my entire law enforcement career

02:05PM   25    has anybody spoken to me that way so blatantly.

02:05PM    1    Q.  In all your years in the Buffalo office, Mr. Casullo,

02:05PM    2    with the defendant, did you ever see this defendant take any

02:05PM    3    investigative steps to help with any investigation of Peter

02:05PM    4    Gerace?

02:05PM    5    A.  No.  We never spoke about it again until later.

02:06PM    6    Q.  You told us that happened in 2016; is that right?

02:06PM    7    A.  Summer of 2016.

02:06PM    8    Q.  Mr. Casullo, when you left the conference room that day,

02:06PM    9    did you go tell your supervisors what the defendant said to

02:06PM    10   you?

02:06PM    11   A.  No, I didn't.

02:06PM    12   Q.  Did you wait a couple of years before reporting this

02:06PM    13   conversation with the defendant?

02:06PM    14   A.  I -- it was two years before I mentioned it to a

02:06PM    15   supervisor.  I had mentioned it to other employees that I

02:06PM    16   worked with, close friends of mine.  One that worked in

02:06PM    17   Washington, D.C., that was my supervisor in Las Vegas that

02:06PM    18   now worked in Washington.  Another agent that worked in

02:06PM    19   Miami, Florida, that was my field training agent.  And then

02:06PM    20   afterwards, and a couple DEA agents in Buffalo that were

02:06PM    21   really close friends of mine that I could trust.

02:06PM    22   Q.  Mr. Casullo, I want you to take a minute and explain to

02:06PM    23   this jury why you waited two years to report that

02:07PM    24   conversation with the defendant to your supervisors.

02:07PM    25   A.  First of all, it was very shocking to me.  Thoughts, at

02:07PM    1    the time, multiple things going through my head, like what

02:07PM    2    had just happened.  It was a different person that I had

02:07PM    3    worked with prior on an investigation for seven months, he

02:07PM    4    never spoke that way in front of me before.

02:07PM    5        It was multiple things.  It was me -- I knew from being

02:07PM    6    in law enforcement for years, if I chose at that point to

02:07PM    7    report that to management that that would start an internal

02:07PM    8    affairs investigation.  That would absolutely put me in a

02:07PM    9    situation.  As shallow as that sounds, I was concerned for my

02:07PM    10   own career, as well.  That I would be marginalized by people

02:07PM    11   that I work with for saying and informing, to some extent, to

02:07PM    12   another person that I work with.

02:07PM    13       Management wouldn't be happy about it.  I've witnessed

02:08PM    14   that in the past, where somebody's reported something, and it

02:08PM    15   doesn't go over well with management, because then the focus

02:08PM    16   comes on the office and people that supervised that person.

02:08PM    17       There were multiple reasons.

02:08PM    18   Q.  When you did tell your management about that conversation

02:08PM    19   and those comments that this defendant made, did you remember

02:08PM    20   that conversation clearly?

02:08PM    21   A.  When I told management -- when I told my management --

02:08PM    22   Q.  Right.

02:08PM    23   A.  -- when my management -- yes, I do.

02:08PM    24   Q.  Why did you remember that conversation and those comments

02:08PM    25   by this defendant so clearly two years later when you told

02:08PM    1    your management?

02:08PM    2    A.  Because they're so shocking and despicable.

02:08PM    3    Q.  Mr. Casullo, after that meeting with the defendant in

02:08PM    4    that conference room, did you hear from Peter Gerace?

02:08PM    5    A.  I did.  I did.

02:08PM    6    Q.  What happened?

02:08PM    7    A.  Approximately two weeks later, I received a phone call on

02:09PM    8    my cell phone.  It was a 716 telephone number.  I didn't

02:09PM    9    recognize the number.  I answered it.  I said hello.  The

02:09PM   10    person on the other phone made some joke like, hey, deputy

02:09PM   11    special agent from DEA, something to that effect, joking.

02:09PM   12        And I said, who is this?

02:09PM   13        And he said, it's Gerace.

02:09PM   14    Q.  Had Peter Gerace ever call you before?

02:09PM   15    A.  Peter Gerace never called me in my entire life.

02:09PM   16    Q.  Is there any reason that you can think of for Peter

02:09PM   17    Gerace to be checking in with you three weeks after that

02:09PM   18    conversation with the defendant?

02:09PM   19    A.  No.  He told me that he was in Ellicottville and he saw a

02:09PM   20    friend of mine, that I didn't even know, that he knew was a

02:09PM   21    friend of mine.  And he was calling just to say that he saw

02:09PM   22    him, which really didn't make sense to me.  Like, my reaction

02:09PM   23    was to myself, so what?

02:09PM   24    Q.  Did you have Peter Gerace's phone number saved in your

02:09PM   25    phone?

02:09PM   1    A.   No.

02:10PM   2    Q.   Do you know how he got yours?

02:10PM   3    A.   Yes, I do.  Yes, I do.

02:10PM   4    Q.   How?

02:10PM   5    A.   Years prior when I was still working in New York City, I

02:10PM   6    was home, I was -- it was a Friday night.  I would drive back

02:10PM   7    every Friday from work.  And I was on my way home, and I went

02:10PM   8    to Brennan's Irish Pub, which was still open, because it was

02:10PM   9    late, because I didn't eat dinner because I was driving for

02:10PM   10   seven hours.  And I stopped there to get chicken wings to

02:10PM   11   bring home.

02:10PM   12   Q.   And Peter Gerace was there?

02:10PM   13   A.   My wife's brother was there, Phil Domiano, with another

02:10PM   14   one of his friends.  Peter Gerace wasn't there at that point.

02:10PM   15   Q.   So how did that lead to Peter Gerace getting your phone

02:10PM   16   number?

02:10PM   17   A.   So, when I walked in, I saw my brother-in-law, who was at

02:10PM   18   the bar with his friend.  He recognized me, obviously.  I

02:10PM   19   recognized him, walked up, said hi.  Ordered my wings,

02:10PM   20   ordered a beer while I waited for my wings.

02:10PM   21        And while I was waiting, Peter Gerace walked in.  My

02:10PM   22   brother-in-law never said that he was showing up.  I had no

02:11PM   23   idea he was gonna walk in, and he walked in.

02:11PM   24   Q.   And how did that lead to him getting your number?

02:11PM   25   A.   So he spoke socially with us.  He was there to see my

02:11PM  1    brother-in-law.  And as we spoke socially, maybe 20 minutes

02:11PM  2    went by, 15 minutes, and my wife called to ask where I was.

02:11PM  3    And I answered the phone, and I said that I was at Brennan's,

02:11PM  4    that her brother was there, and I was waiting for my wings,

02:11PM  5    and that I would be home shortly.

02:11PM  6        And after the phone call, Peter Gerace said, hey, can I

02:11PM  7    have your telephone number, your cell number.

02:11PM  8        And I didn't think I could come up with a reason not to

02:11PM  9    give it to him, so I gave him my cell phone number.  Not

02:11PM  10   thinking he'd ever call me, but I gave it to him myself.

02:11PM  11   Q.  Between what incident and three weeks after the defendant

02:11PM  12   made those comments to you, did Peter Gerace ever call you?

02:11PM  13   A.  No.  He never called me up until that phone call.

02:11PM  14   Q.  After the defendant made those comments to you,

02:12PM  15   Mr. Casullo, in that conference room, did your investigation

02:12PM  16   into Peter Gerace kind of reach a lull for a point?

02:12PM  17   A.  Yes, I was still trying to process what Joe had said to

02:12PM  18   me in the room.  I was alarmed.  I was concerned.  I was

02:12PM  19   worried that he was going to say something to Gerace.  And it

02:12PM  20   stalled, essentially .  There wasn't much that I did other

02:12PM  21   than the phone records that I had, I was going through the

02:12PM  22   phone records and trying to identify the other people that he

02:12PM  23   was in contact with.

02:12PM  24   Q.  After your investigation stalled for a little bit into

02:12PM  25   Peter Gerace, did you eventually pick steam up again later

02:12PM    1    on?

02:12PM    2    A.   Yes.  I started working with another agent, a task force

02:12PM    3    officer from Homeland Security, either enforcement unit, was

02:12PM    4    a member of my task force in group D-57.  So I started

02:12PM    5    working with him.  And during that time frame, I worked

02:12PM    6    another investigation and arrested a certain individual.  And

02:13PM    7    after we arrested him, we interviewed him, and I asked him

02:13PM    8    questions about Peter Gerace and Pharaoh's.

02:13PM    9    Q.   And that helped pick up steam for your investigation

02:13PM   10    again?

02:13PM   11    A.   And he knew who Peter Gerace was.  And he --

02:13PM   12    Q.   I don't want to get into --

02:13PM   13    A.   Okay.

02:13PM   14    Q.   -- specifically what he said, but did that help --

02:13PM   15    A.   Yes.

02:13PM   16    Q.   -- your investigation pick up steam?

02:13PM   17    A.   Yes.  Okay, yes, it did.

02:13PM   18    Q.   Now in the course of your investigation into Peter

02:13PM   19    Gerace, did you look into DEA databases for any other

02:13PM   20    reports, DEA reports, mentioning Peter Gerace?

02:13PM   21    A.   Yes.  At some point I did.  Initially it was running his

02:13PM   22    name in our intelligence system to see if he was in NADDIS,

02:13PM   23    which is our database of drug intelligence.  And then later,

02:13PM   24    I ran a different type of search, a more broad search that

02:13PM   25    typically just the analysts use.  But analysts had trained me

02:13PM     1    in Las Vegas, showed me how to do a search a certain way,

02:13PM     2    which searched everything in DEA, not just the NADDIS

02:14PM     3    database, but all documents -- archived, present, opened,

02:14PM     4    closed.  Any time a name or a word was mentioned, it would

02:14PM     5    query everything in DEA.  It was a powerful search.

02:14PM     6    Q.  Did you find any reports referencing Peter Gerace?

02:14PM     7    A.  I did, I found one report.

02:14PM     8    Q.  Just one?

02:14PM     9    A.  Just one report on Peter Gerace, yes.

02:14PM    10         **MR. DICKSON:**  Ms. Champoux, can we please pull up

02:14PM    11    Government Exhibit 30A which is already in evidence.

02:14PM    12         **BY MR. DICKSON:**

02:14PM    13    Q.  Mr. Casullo, is this that report that you found?

02:14PM    14    A.  Yes, it is.

02:14PM    15    Q.  Who's the author of this report?

02:14PM    16    A.  S.A. Joseph Bongiovanni.

02:14PM    17    Q.  After you found this report in the DEA database, what did

02:14PM    18    you do with it?

02:14PM    19    A.  I eventually sent it to the -- shortly thereafter sent it

02:14PM    20    to the U.S. Attorney's Office.

02:14PM    21    Q.  Why did you send this report to the U.S. Attorney's

02:15PM    22    Office?

02:15PM    23    A.  Because we were working the Peter Gerace investigation,

02:15PM    24    and the prosecutors had explained to me that they were not

02:15PM    25    only interested in realtime operations that we were running,

02:15PM    1    which we weren't running at the time, but historical

02:15PM    2    information as well.

02:15PM    3        That they were in the process, or they had in the past to

02:15PM    4    build cases historically, and they would be interested in any

02:15PM    5    reports on Peter Gerace, not just current ones.

02:15PM    6    Q.  And so that's why you gave them this report?

02:15PM    7    A.  Well, that's why I was initially searching.

02:15PM    8        I also gave it to them because I believe this to be a

02:15PM    9    false report, that he was lying in the report.  That Joseph

02:15PM   10    Bongiovanni was lying in this report when referring to Peter

02:15PM   11    Gerace as an informant.

02:15PM   12    Q.  Now, Mr. Casullo, is it a normal part of DEA practice for

02:15PM   13    special agents to give reports to the U.S. Attorney's Office?

02:15PM   14    A.  Oh, we do it all the time.  All of the time.  That's how

02:15PM   15    they prosecute people.

02:16PM   16    Q.  Because this is what has the DEA investigative

02:16PM   17    information in it, right?

02:16PM   18    A.  Yes, the DEA-6 report of investigation, that's at the

02:16PM   19    core of what we detail and present as evidence to attorneys.

02:16PM   20    Q.  Did you consider it unusual or anything that you gave

02:16PM   21    this report to the U.S. Attorney's Office?

02:16PM   22    A.  No.  It was -- I was -- other agencies, we had agreed

02:16PM   23    upon at a coordination meeting that we had prior that the

02:16PM   24    agencies that we were working with, that were at that

02:16PM   25    meeting, the New York State Police, Homeland Security, the

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24
83

02:16PM    1    FBI, they all were going to query their systems to see what

02:16PM    2    reports they could pull up historically on Peter Gerace to

02:16PM    3    submit to the U.S. Attorney's Office.

02:16PM    4    Q.  After you sent this report to the U.S. Attorney's Office,

02:16PM    5    did the defendant approach you?

02:16PM    6    A.  Yes, he did.

02:16PM    7    Q.  What did he say?

02:16PM    8    A.  He came over again when I was alone sitting at my desk.

02:16PM    9    And he said, what is this that you sent some bullshit report

02:16PM   10    that I wrote over to the U.S. Attorney's Office?

02:17PM   11    Q.  What was his demeanor like when he said that to you?

02:17PM   12    A.  He was mad.

02:17PM   13    Q.  Mr. Casullo, I want to finish up by asking you about July

02:17PM   14    of 2018.  Were you at a proffer for somebody named Ron Serio?

02:17PM   15    A.  Yes, I was.

02:17PM   16    Q.  Did you understand that Mr. Serio had been arrested at

02:17PM   17    that point in time?

02:17PM   18    A.  Yes, I knew that he been arrested.

02:17PM   19    Q.  By local police and the FBI?

02:17PM   20    A.  Yes, that's correct.

02:17PM   21    Q.  Not by the DEA?

02:17PM   22    A.  No, not by us.

02:17PM   23    Q.  Did the U.S. Attorney's Office set up a proffer with

02:17PM   24    Mr. Serio for July of 2018?

02:17PM   25    A.  Yes, they did.  Since it wasn't our arrest, the U.S.

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24

84

02:17PM   1   Attorney's Office had to set that up for us.

02:17PM   2   Q.  Did they invite you to attend that proffer?

02:17PM   3   A.  Yes.

02:17PM   4   Q.  After the proffer with Mr. Serio, did you get a chance to

02:17PM   5   look at the defendant's earlier investigation or

02:18PM   6   investigative file into Ron Serio?

02:18PM   7   A.  Yes, I did.

02:18PM   8   Q.  How did that come to be?

02:18PM   9   A.  After the Ron Serio interview, when Ron Serio said that

02:18PM  10   Bongiovanni was passing names of informants, myself and

02:18PM  11   Curtis Ryan, a Homeland Security investigator that was my

02:18PM  12   partner at the time in my group, we went to speak with Jim

02:18PM  13   McHugh who was our supervisor in my group.  I was no longer

02:18PM  14   D-57, I was now in a different group, D-58, with a different

02:18PM  15   supervisor.

02:18PM  16       So because of what was said in that interview, we had to

02:18PM  17   speak to Jim to let him know what was said.  So, we did.

02:18PM  18       And I don't think it was that day, but shortly thereafter

02:18PM  19   I asked him if I would be able to review the Serio file,

02:18PM  20   because I know Joe had a file on the Serio case.

02:18PM  21   Q.  Did you look at the file?

02:18PM  22   A.  Yes, I did.

02:18PM  23   Q.  Did anything stand out to you as you were going through

02:18PM  24   the file?

02:18PM  25   A.  Yes.  One of the first reports that I read, I was trying

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24

02:19PM   1    to figure out if they had done anything operational, if they

02:19PM   2    had purchased any narcotics, if they had done any consensual

02:19PM   3    phone calls with any of the targets of the investigation,

02:19PM   4    which is typically what would be at the core of an

02:19PM   5    investigation that you would present to the U.S. Attorney's

02:19PM   6    Office.

02:19PM   7        And the first thing I noticed was that there was an

02:19PM   8    informant in the case, that the information to initiate the

02:19PM   9    case was based on information that was provided by an

02:19PM  10    informant.

02:19PM  11        And upon reading that, I expected that there would be

02:19PM  12    some purchases of narcotics because of that, because that's

02:19PM  13    typically what happens.  If someone is providing information

02:19PM  14    about what they can do in an investigation, that's typically

02:19PM  15    what you would see if that works out.

02:19PM  16        And there was -- there was nothing.  There were no

02:19PM  17    purchases.  There were very few surveillances.  I was looking

02:19PM  18    to see if there was surveillance, because you can still do

02:20PM  19    surveillance without an informant.  And there were very few

02:20PM  20    surveillances.  I remember one in particular on Sycamore.

02:20PM  21        And then after that, it was a lot of case statuses.

02:20PM  22    Every 90 days, you have to do a case status update on the

02:20PM  23    case.  And I saw a lot of case statuses.  And -- which led me

02:20PM  24    to think that there's really not much substance, and I was

02:20PM  25    expecting to see more because I had seen the file before, it

02:20PM    1    was a pretty thick file.  But there weren't a lot of DEA-6s

02:20PM    2    and there weren't a lot of -- the ones that there were

02:20PM    3    weren't related to operations.

02:20PM    4    Q.  Mr. Casullo, after that proffer with Mr. Serio at some

02:20PM    5    point, did you learn that you could no longer serve as a case

02:20PM    6    agent to investigate Mr. Serio or Peter Gerace?

02:20PM    7    A.  It was.  I was told not to investigate Peter Gerace any

02:20PM    8    longer.

02:20PM    9    Q.  Did you take some steps despite those directions to

02:21PM   10    continue investigating Anthony Gerace?

02:21PM   11    A.  I did.  I still pulled phone records on Anthony Gerace.

02:21PM   12    Q.  Should you have done that in retrospect?

02:21PM   13    A.  No.  In retrospect, not investigating Peter Gerace I

02:21PM   14    believe most likely meant Anthony, as well, but I did

02:21PM   15    anyways.

02:21PM   16    Q.  Did you understand, Mr. Casullo, why the decision was

02:21PM   17    made to take you off of being a case agent and instead just

02:21PM   18    treat you like another witness?

02:21PM   19    A.  Oh, yes.  I understood.  At the time, I was upset because

02:21PM   20    I wanted to work the investigation.  It was starting to move

02:21PM   21    along very well.  I enjoyed working with my partner from

02:21PM   22    Homeland Security, Curtis Ryan.  And I thought that the case

02:21PM   23    really had potential.

02:21PM   24        So when they initially told me I couldn't work it any

02:21PM   25    longer, I was upset.

USA v Bongiovanni - Casullo - Dickson/Direct - 3/20/24

02:21PM    1    Q.  But did you understand it eventually?

02:21PM    2    A.  Yeah, I understood 100 percent where we were at that

02:21PM    3    point after the Ron Serio interview where he mentioned Joe

02:21PM    4    was passing information that I couldn't be involved anymore.

02:22PM    5            MR. DICKSON:  Just a moment, please.

02:23PM    6            BY MR. DICKSON:

02:23PM    7    Q.  Mr. Casullo, just one clarification question.

02:23PM    8        When the defendant came up and talked to you about

02:23PM    9    Anthony Gerace after you pulled his toll records, do you

02:23PM   10    remember testifying about that?

02:23PM   11    A.  Yes.

02:23PM   12    Q.  Do you remember whether that was after the conversation

02:23PM   13    that you had with him, with the defendant, privately in that

02:23PM   14    conference room?

02:23PM   15    A.  I'm pretty confident it was after -- oh, I'm sorry, after

02:23PM   16    the meeting in the conference room?  Oh, 100 percent, yes.

02:23PM   17            MR. DICKSON:  Okay.  Thank you, Mr. Casullo.

02:23PM   18            Your Honor, I don't have any more questions at this

02:23PM   19    time.

02:23PM   20            THE COURT:  Cross?

02:23PM   21            MR. SINGER:  I do, Judge, but I have an exhibit that

02:23PM   22    I need to prepare.  It will take me about five minutes.  So I

02:23PM   23    don't know if we should take a break for just a few, and

02:23PM   24    then --

02:23PM   25            THE COURT:  Yeah, why don't we do that.

| | | |
|---|---|---|
| 02:23PM | 1 | So, folks, let's take a very short break, because I'd |
| 02:23PM | 2 | like to take one more break this afternoon. |
| 02:23PM | 3 | Please remember my instructions about not talking |
| 02:23PM | 4 | with each other or anybody else, and not making up your mind. |
| 02:23PM | 5 | We'll see you back here as soon as we can see you |
| 02:23PM | 6 | back here. |
| 02:23PM | 7 | (Jury excused at 2:23 p.m.) |
| 02:24PM | 8 | THE COURT:  Okay.  So let's get it done as quickly as |
| 02:24PM | 9 | you can. |
| 02:24PM | 10 | MR. SINGER:  I will, Judge, yes. |
| 02:24PM | 11 | MR. COOPER:  Judge, can the witness stay?  Do you |
| 02:24PM | 12 | want the witness to stay or leave? |
| 02:24PM | 13 | THE COURT:  The witness can stay or leave. |
| 02:24PM | 14 | MR. COOPER:  Dealer's choice. |
| 02:24PM | 15 | THE COURT:  Yeah.  Whatever you want to do. |
| 02:34PM | 16 | (Off the record at 2:24 p.m.) |
| 02:34PM | 17 | (Back on the record at 2:34 p.m.) |
| 02:34PM | 18 | (Jury not present.) |
| 02:34PM | 19 | THE CLERK:  We are back on the record for the |
| 02:34PM | 20 | continuation of the jury trial in case number 19-cr-227, |
| 02:34PM | 21 | United States of America versus Joseph Bongiovanni. |
| 02:34PM | 22 | All counsel and parties are present. |
| 02:34PM | 23 | THE COURT:  All set? |
| 02:34PM | 24 | MR. SINGER:  All set, Judge. |
| 02:34PM | 25 | THE COURT:  All set, government? |

USA v Bongiovanni - Casullo - Singer/Cross - 3/20/24

89

02:34PM    1              **MR. DICKSON:**  Yes, Judge.

02:34PM    2              **THE COURT:**  Okay.  Let's bring them back in, please,

02:34PM    3    Pat.

02:36PM    4              (Jury seated at 2:36 p.m.)

02:37PM    5              **THE COURT:**  The record will reflect that our jurors

02:37PM    6    are present again.

02:37PM    7              I remind the witness that he's still under oath.

02:37PM    8              And you may begin, Mr. Singer.

02:37PM    9              **MR. SINGER:** Thank you, Your Honor.

02:37PM   10

02:37PM   11                    **CROSS-EXAMINATION BY MR. SINGER:**

02:37PM   12    Q.  Good afternoon, Mr. Casullo.

02:37PM   13    A.  Good afternoon.

02:37PM   14    Q.  So, it seems like you started your law enforcement career

02:37PM   15    in 1990?

02:37PM   16    A.  1990, yes.

02:37PM   17    Q.  And then you continued along with, I guess, at that point

02:37PM   18    it was INS, it wasn't really Customs and Border Protection at

02:37PM   19    that point?

02:37PM   20    A.  Right, INS, Immigration and Naturalization Service.

02:37PM   21    Q.  And you worked with them, and you decided to apply to

02:37PM   22    become a DEA agent in the later '90s?

02:37PM   23    A.  I became a DEA agent in 1999.

02:37PM   24    Q.  So there's an application process, though, you go through

02:37PM   25    before you go to the academy; is that right?

USA v Bongiovanni - Casullo - Singer/Cross - 3/20/24
90

02:37PM    1    A.  Correct.

02:38PM    2    Q.  So when was it that you applied to become a DEA agent?

02:38PM    3    A.  I believe there are a couple different times that I

02:38PM    4    applied.  Initially out of college, when I got no response.

02:38PM    5    And the time that I got hired maybe, 1996 when I initially

02:38PM    6    applied.  I can't be remember for certain.

02:38PM    7    Q.  So you get accepted by the DEA, I think you also have

02:38PM    8    applications pending with FBI at the same time?

02:38PM    9    A.  Yes.

02:38PM    10   Q.  And you go to the academy, and you graduate in 1999,

02:38PM    11   right?

02:38PM    12   A.  I went to the academy, graduated from DEA I think it was

02:38PM    13   November of '99.

02:38PM    14   Q.  Okay.  And then from that point, you go to your first

02:38PM    15   duty station, which is in Las Vegas, Nevada, right?

02:38PM    16   A.  Yes.

02:38PM    17   Q.  And you worked there for a couple of years, and then you

02:38PM    18   decided to potentially look at another opportunity with FBI?

02:38PM    19   A.  So I worked there from December of 1999 until June of

02:38PM    20   2002, so, yes.

02:39PM    21   Q.  Okay.  And then post 9/11, you went over to FBI and got

02:39PM    22   stationed -- it looks like right outside the gates of -- of a

02:39PM    23   big Army base, right?

02:39PM    24   A.  Fort Bragg, correct.

02:39PM    25   Q.  Yeah.  So a little different than what you think you

02:39PM    1    might be doing with the FBI at that time?

02:39PM    2    A.  It was a little different than what I expected.

02:39PM    3    Q.  So after having that experience, you decide, you know

02:39PM    4    what, this is probably not for me, and you decide to go back

02:39PM    5    to the DEA at that point in time?

02:39PM    6    A.  So I went back to DEA in July of 2003, correct.

02:39PM    7    Q.  And you went back to the Las Vegas office that you were

02:39PM    8    working at?

02:39PM    9    A.  I did go back to the Las Vegas office, yes.

02:39PM    10   Q.  When you were working with the FBI, I know you mentioned

02:39PM    11   in your testimony, you didn't want your wife to sell the

02:39PM    12   house in Las Vegas.  Did you go over as a geographic bachelor

02:39PM    13   when you're working with the FBI, or did she come with you?

02:39PM    14   A.  I went myself.  I went on a house-hunting trip.  She came

02:39PM    15   a couple times while I was there, but I did the initial house

02:40PM    16   hunting-trip.

02:40PM    17   Q.  Okay.  And then both of you moved back to the original

02:40PM    18   house that you had in Las Vegas?

02:40PM    19   A.  She stayed in the house.  And I was alone in an apartment

02:40PM    20   in Raleigh, North Carolina.

02:40PM    21   Q.  Gotcha.  And so when you moved back, you guys were back

02:40PM    22   together again in Vegas?

02:40PM    23   A.  Yes.

02:40PM    24   Q.  You were back together with the DEA, as well?

02:40PM    25   A.  Correct.

USA v Bongiovanni - Casullo - Singer/Cross - 3/20/24

92

02:40PM   1   Q.  And so the types of investigations that you ran,

02:40PM   2   obviously, you ran narcotics investigations with the DEA,

02:40PM   3   correct?

02:40PM   4   A.  That's correct.

02:40PM   5   Q.  And you mentioned that your supervisor in Las Vegas, was

02:40PM   6   it when you first got started out there, or was it the second

02:40PM   7   time after the FBI you had a supervisor who had the prior

02:40PM   8   experience with Italian Organized Crime investigations in

02:40PM   9   New York City?

02:40PM  10   A.  That would have been my supervisor right before I left

02:40PM  11   DEA.  He was my supervisor for maybe a couple months.  And

02:40PM  12   then when I returned, I went back to his group.

02:40PM  13   Q.  Okay.  And so he had some experience investigating

02:40PM  14   traditional Italian Organized Crime targets in New York City

02:40PM  15   area?

02:40PM  16   A.  When he was in New York.

02:40PM  17   Q.  And so when he came out to Vegas, that was something that

02:41PM  18   he had experience doing, and it was something that I guess

02:41PM  19   caught his attention?

02:41PM  20   A.  Pretty much.

02:41PM  21   Q.  And that was something that also caught your attention?

02:41PM  22   A.  He mentioned it to me, the cases that worked, and it

02:41PM  23   seemed interesting, correct.

02:41PM  24   Q.  So you started to work cases in tandem with him or in

02:41PM  25   tandem with other agents who worked in the group?

02:41PM  1    A.  No, I had a partner on the Masecchia investigation, which

02:41PM  2    is the only one I was a case agent for.  I worked on other

02:41PM  3    Italian Organized Crime cases when I was out there, but as a

02:41PM  4    case agent, that was the only one.

02:41PM  5    Q.  Yeah.  So, in 2004, there's an investigation that gets

02:41PM  6    opened up into Italian Organized Crime figures operating in

02:41PM  7    Las Vegas, correct?

02:41PM  8    A.  The case I opened?

02:41PM  9    Q.  Yes.

02:41PM  10   A.  Yes.

02:41PM  11   Q.  And you believe that there was some roots that extended

02:41PM  12   from the Vegas targets to the Los Angeles crime family?

02:42PM  13   A.  There were connections, there were some -- a couple

02:42PM  14   individuals, Jimmy Caci was one, he was a soldier.

02:42PM  15   Q.  We don't need to get into the names.

02:42PM  16   A.  Okay.

02:42PM  17   Q.  But there was some connection?

02:42PM  18   A.  There were connections with Buffalo people in

02:42PM  19   Los Angeles, as well as Vegas.

02:42PM  20   Q.  Yeah, so there was a Los Angeles connection, but you also

02:42PM  21   mentioned that there was a Buffalo connection, correct?

02:42PM  22   A.  There was a Buffalo connection in terms of the phone

02:42PM  23   records that we were looking at.

02:42PM  24   Q.  Yep.  So you ran some toll logs, you saw 716 area code

02:42PM  25   numbers; fair to say?

02:42PM  1    A.  Yes.

02:42PM  2    Q.  And that's what triggered your interest in the connection

02:42PM  3    to Buffalo and what it was, correct?

02:42PM  4    A.  That's initially when we had just started talking about

02:42PM  5    the investigation, that was the initial stages.

02:42PM  6    Q.  And before you contacted Mike Hill in Buffalo, and we'll

02:42PM  7    get to that in a second, did you run the tolls and figure out

02:42PM  8    that one of the numbers was connected to Michael Masecchia?

02:42PM  9    A.  I don't recall if the number -- I can't remember for

02:43PM  10   certain if we had come across Masecchia's number at that

02:43PM  11   point.

02:43PM  12   Q.  So you're not sure if you called Hill and said, hey, we

02:43PM  13   identified this one person, Michael Masecchia from Buffalo,

02:43PM  14   we'd like you to take a look at him.  Or if you just handed

02:43PM  15   him 716 numbers that he might be able to pull some subpoenas

02:43PM  16   on?

02:43PM  17   A.  No, I mentioned to Mike that we were targeting Michael

02:43PM  18   Masecchia specifically.  I just can't remember if we had his

02:43PM  19   phone number at that point or not.

02:43PM  20   Q.  And so the connection between you and Mike Hill was that

02:43PM  21   both of you were DEA academy classmates back in 1999?

02:43PM  22   A.  That's how we initially met.

02:43PM  23   Q.  And so you'd mentioned on direct not out of the ordinary

02:43PM  24   for someone to call an agent from another office in the DEA

02:43PM  25   for help on a case investigation, correct?

02:43PM   1   A.   Yeah.   If you knew someone in that office you would call

02:43PM   2   them.

02:43PM   3   Q.   And you talked to your G.S., the one who had kind of the

02:43PM   4   affinity towards IOC cases or experience towards IOC cases,

02:43PM   5   correct?

02:43PM   6   A.   Pardon me?

02:43PM   7   Q.   You talked to your group supervisor, the one who had the

02:43PM   8   experience with IOC investigations in the past in New York

02:43PM   9   City?

02:43PM  10   A.   Yeah.   We talked during the investigation.

02:44PM  11   Q.   And you said, hey, I have this good classmate of mine,

02:44PM  12   Mike Hill, he works in the Buffalo office.   We've got some

02:44PM  13   Buffalo numbers here, do you mind if I give him a call?

02:44PM  14   A.   I told him I was gonna call Mike, 'cuz I knew him.

02:44PM  15   Q.   Okay.   So then you call up Mike Hill, and he's the person

02:44PM  16   you know based on the academy?

02:44PM  17   A.   Yes.

02:44PM  18   Q.   Joseph Bongiovanni, he's not someone you know from the

02:44PM  19   academy?

02:44PM  20   A.   Not from the academy.

02:44PM  21   Q.   So you speak to Mike, and you ask him, hey, can you help

02:44PM  22   me out with these numbers that we've identified?

02:44PM  23   A.   Pretty much.   Pretty much.

02:44PM  24   Q.   And probably you gave him a general overview about what

02:44PM  25   the scope of your investigation was at that point in time?

USA v Bongiovanni - Casullo - Singer/Cross - 3/20/24
96

02:44PM  1   A.  Just a brief on what we had at that point and what we

02:44PM  2   were gonna pass along.

02:44PM  3   Q.  And your expectation was that Mike was going to open up

02:44PM  4   some type of Buffalo case file on this matter?

02:44PM  5   A.  At some point.  He didn't say if he was gonna do it

02:44PM  6   initially, but the hope was they could possibly develop

02:44PM  7   something on their side as well.

02:44PM  8   Q.  And your understanding was Mike was gonna be running

02:44PM  9   point on this, right?

02:44PM  10  A.  My understanding, since I was just talking to Mike, was

02:45PM  11  yeah, that Mike would run things out there, whether he was

02:45PM  12  gonna be the case agent.  I assumed he was gonna be the case

02:45PM  13  agent.

02:45PM  14  Q.  All right.  And so you passed him information, and to

02:45PM  15  your understanding he started to subpoena some records on

02:45PM  16  telephones?

02:45PM  17  A.  I do believe at some point he did.  I don't know for

02:45PM  18  certain, but I'm pretty sure that was, you know, I gave him

02:45PM  19  the phone numbers, and that he would hopefully subpoena the

02:45PM  20  phone numbers and figure out who the people were.

02:45PM  21  Q.  And you spoke to Mike Hill about the progress he was

02:45PM  22  making on the subpoenas, I assume?

02:45PM  23  A.  We spoke occasionally.  If he had anything that was

02:45PM  24  developing, he'd give me a call.

02:45PM  25  Q.  And then you mentioned that unsolicited at some point in

USA v Bongiovanni - Casullo - Singer/Cross - 3/20/24

02:45PM   1   time after you speak with Mike Hill, Joseph Bongiovanni gives

02:45PM   2   you a call in your office in Las Vegas?

02:45PM   3   A.  He did, right.

02:45PM   4   Q.  And Mr. Bongiovanni, at that point in time, you don't

02:45PM   5   know each other, correct?

02:45PM   6   A.  We knew of each other.  I had met him I believe when I

02:45PM   7   was home over the summer on one occasion.  So I knew him by

02:46PM   8   name, but we weren't close friends.

02:46PM   9   Q.  Okay.  And he starts talking to you about, hey, I

02:46PM  10   understand that the target or one of the potential targets of

02:46PM  11   this investigation is a guy by the name of Michael Masecchia?

02:46PM  12   A.  Yes.

02:46PM  13   Q.  And he offers his assistance to give you background

02:46PM  14   information on Michael Masecchia if you need it for your

02:46PM  15   investigation, correct?

02:46PM  16   A.  He said he could, he just couldn't put his name on the

02:46PM  17   reports.

02:46PM  18   Q.  Correct.  And so one of the pieces of information that

02:46PM  19   you mentioned when we got back from the lunch break was that

02:46PM  20   he told you based on our understanding and intelligence, we

02:46PM  21   believe that Michael Masecchia might be involved in a grow

02:46PM  22   operation of marijuana down in the Southern Tier in New York

02:46PM  23   State, correct?

02:46PM  24   A.  He didn't say our intelligence, but he said his knowledge

02:46PM  25   was that.

02:46PM    1    Q.  Okay.  So he communicated something factual regarding

02:46PM    2    drug distribution, right?

02:46PM    3    A.  I didn't know if it was factual yet, but he provided us

02:46PM    4    with information.

02:46PM    5    Q.  Okay.  He provided you information --

02:46PM    6    A.  Yes yes.

02:46PM    7    Q.  -- about Michael Masecchia who was a target of yours,

02:46PM    8    right?

02:46PM    9    A.  Correct.

02:46PM   10    Q.  He provided you information about him being involved in

02:46PM   11    possible drug activity, correct?

02:46PM   12    A.  He did.

02:46PM   13    Q.  And that's something that would be of interest to your

02:47PM   14    investigation, correct?

02:47PM   15    A.  Yes.  Since he was our file title, yes.

02:47PM   16    Q.  I realize that, you know, you're in Vegas, and Michael

02:47PM   17    Masecchia's not there at that point in time, and the grow

02:47PM   18    operation is not there either.  But the fact that Michael

02:47PM   19    Masecchia and the grow operation are not in Vegas doesn't

02:47PM   20    necessarily mean that it's not important to you, for your

02:47PM   21    purposes of your investigation, correct?

02:47PM   22    A.  That it's of not importance?

02:47PM   23    Q.  For purposes of your investigation, correct?

02:47PM   24    A.  I hate to have you repeat it, but --

02:47PM   25    Q.  Yeah, I know, that was a terrible question.  I'm just

02:47PM   1    gonna take that.

02:47PM   2        If you can erase that, Ann, please.  Thank you.

02:47PM   3        So what I'm getting at is this.  Is that you have a --

02:47PM   4    you have a drug target investigation on Mike Masecchia,

02:48PM   5    right?

02:48PM   6    A.  Right.

02:48PM   7    Q.  He's not in Las Vegas, correct?

02:48PM   8    A.  Not at that point.

02:48PM   9    Q.  The grow operation that Mr. Bongiovanni is talking about

02:48PM   10   is not in Las Vegas, correct?

02:48PM   11   A.  No, it's in --

02:48PM   12   Q.  But those two facts of geographic proximity not being in

02:48PM   13   Vegas, it's still something that's important to your drug

02:48PM   14   investigation to know that Mr. Masecchia is engaging in some

02:48PM   15   type of drug activity, right?

02:48PM   16   A.  Oh, yes, that was.

02:48PM   17   Q.  Because part of what you do in your job is investigate

02:48PM   18   narcotics activity, right?

02:48PM   19   A.  Yes.

02:48PM   20   Q.  So, it's not completely valueless information, right?

02:48PM   21   A.  No, that has value.

02:48PM   22   Q.  Because I know you talked on direct about how, well,

02:48PM   23   there's really nothing we can do about it because that's

02:48PM   24   going on in Buffalo; do you remember saying that?

02:48PM   25   A.  I do.

02:48PM    1    Q.  But that's not necessarily 100 percent accurate, right?

02:48PM    2    A.  Could you ask that question again, please?

02:48PM    3    Q.  Sure.  So, like, what I'm getting at is you might not be

02:48PM    4    able to, from Vegas, go search for a grow operation in

02:48PM    5    Buffalo, right?

02:48PM    6    A.  Right.

02:49PM    7    Q.  But you can still act on information that Mr. Masecchia

02:49PM    8    has a grow operation in Buffalo going on, right?

02:49PM    9    A.  Back then, in what way?

02:49PM   10    Q.  Well, you can use that for purposes of furthering your

02:49PM   11    investigation in Las Vegas, correct?

02:49PM   12    A.  Based on the fact that we thought he was moving to Vegas,

02:49PM   13    and now Joe provided information saying that he was possibly

02:49PM   14    involved in marijuana trafficking, that had value.

02:49PM   15    Q.  Correct.  'Cuz what we're talking about here is a

02:49PM   16    conspiracy, correct?

02:49PM   17    A.  Correct.

02:49PM   18    Q.  More than two people are doing something to further a

02:49PM   19    criminal objective?

02:49PM   20    A.  Possibly.

02:49PM   21    Q.  And that's something that if you found out that people in

02:49PM   22    Vegas that you were looking at were helping Michael Masecchia

02:49PM   23    with his grow operation here in New York, you could use that

02:49PM   24    against the Vegas people you knew, correct?

02:49PM   25    A.  That's correct.

02:49PM    1    Q.  So, the phone call itself, two DEA agents talking with

02:49PM    2    each other about a case.  That's not something out of the

02:49PM    3    ordinary, correct?

02:49PM    4    A.  Just in general?  Or that specific conversation with --

02:49PM    5    Q.  The conversation with Mr. Bongiovanni is not something

02:50PM    6    that's not out of the ordinary, right?

02:50PM    7    A.  No, the only thing that seemed out of the ordinary to me

02:50PM    8    was just that I wasn't expecting the phone call.

02:50PM    9    Q.  But you know that Mr. Bongiovanni works in the office

02:50PM   10    because you had met him before, right?

02:50PM   11    A.  I knew that he had worked in Buffalo, yes.

02:50PM   12    Q.  And you knew Mike Hill worked in the Buffalo office,

02:50PM   13    that's why you called him, correct?

02:50PM   14    A.  Correct.

02:50PM   15    Q.  And were you aware that Mike Hill and Joseph Bongiovanni

02:50PM   16    worked together in the office?

02:50PM   17    A.  I didn't know if they were in the same group, but I knew

02:50PM   18    they were in the same office.

02:50PM   19    Q.  You worked for DEA for how long, sir?

02:50PM   20    A.  Total, from start to finish?

02:50PM   21    Q.  Total, from start to finish.

02:50PM   22    A.  Approximately over 22 years.

02:50PM   23    Q.  And I'm sure when you worked in various groups in various

02:50PM   24    offices, it's not out of the ordinary for groups to have

02:50PM   25    discussions about these are the cases I'm working on, ladies

02:50PM   1   and gentlemen, possibly?

02:50PM   2   A.   Possibly.

02:50PM   3   Q.   So it's possible that Mr. Hill could have communicated

02:50PM   4   this information that he was working on for you to

02:50PM   5   Mr. Bongiovanni, and Mr. Bongiovanni called you because he

02:50PM   6   had information relevant, right?

02:50PM   7   A.   Oh, correct.

02:50PM   8   Q.   So Mr. Bongiovanni provided you this information.  Did

02:51PM   9   you thank him for the information?

02:51PM  10   A.   I can't remember if I said thank you, but I was happy

02:51PM  11   that he provided it.

02:51PM  12   Q.   Do you ever follow up any more with Mr. Bongiovanni about

02:51PM  13   this grow operation going on in New York?

02:51PM  14   A.   I never spoke to Joe again about the case at all at that

02:51PM  15   point.

02:51PM  16   Q.   And what about Mike Hill, your colleague from the DEA

02:51PM  17   academy?  Did you ever talk to him about the connection

02:51PM  18   between Michael Masecchia and the grow operation that may be

02:51PM  19   happening down in the Southern Tier?

02:51PM  20   A.   Yeah, I spoke with Mike about it.

02:51PM  21   Q.   And what did Mike relate to you regarding the progress of

02:51PM  22   that investigation?

02:51PM  23        **MR. DICKSON:**  Objection.  Calls for hearsay.

02:51PM  24        **MR. SINGER:**  It's not offered for the truth, Judge,

02:51PM  25   it's offered for the effect on the listener here.

| | | |
|---|---|---|
| 02:51PM | 1 | **THE COURT:**  Yeah, I think that's right. |
| 02:51PM | 2 | And, folks, again, this is being offered for the |
| 02:51PM | 3 | witness's state of mind, in other words what he would have |
| 02:51PM | 4 | done next in the investigation, so it's not for the truth of |
| 02:52PM | 5 | what is being said.  Go ahead. |
| 02:52PM | 6 | **BY MR. SINGER:** |
| 02:52PM | 7 | Q.  Do you need me to ask that again or -- |
| 02:52PM | 8 | A.  Please. |
| 02:52PM | 9 | Q.  So, Mike Hill -- |
| 02:52PM | 10 | Actually, Ann, can you read that back?  I don't want to |
| 02:52PM | 11 | mess up another question. |
| 02:52PM | 12 | (The above-requested question was then read by the |
| 02:52PM | 13 | reporter.) |
| 02:52PM | 14 | **THE WITNESS:**  From what I remember, was just general |
| 02:52PM | 15 | information they were looking into it.  I can't remember him |
| 02:52PM | 16 | mentioning anything specific about going out on surveillance |
| 02:52PM | 17 | or things like that. |
| 02:52PM | 18 | **BY MR. SINGER:** |
| 02:52PM | 19 | Q.  Okay.  So this investigation into the targets in Vegas |
| 02:52PM | 20 | and Michael Masecchia here in Buffalo extends through 2004 to |
| 02:52PM | 21 | 2005; is that right? |
| 02:52PM | 22 | A.  So I believe it was initiated in 2004, I don't remember |
| 02:52PM | 23 | when we closed it, but I'm pretty sure that it went at least |
| 02:52PM | 24 | into 2005. |
| 02:52PM | 25 | Q.  And you recall that the targets that you were looking at |

02:53PM   1   in Vegas, you remember making arrests for cocaine possession

02:53PM   2   on those targets; is that right?

02:53PM   3   A.  We did make arrests for cocaine.

02:53PM   4   Q.  And as far as the link to Italian Organized Crime, that

02:53PM   5   wasn't part of the prosecution of the cocaine bust you made

02:53PM   6   on those two individuals, right?

02:53PM   7   A.  Like, if there was a specific charge, do you mean?

02:53PM   8   Q.  Well, I guess what I'm getting at is that you ended up

02:53PM   9   arresting those two people you were look at in Vegas for

02:53PM  10   cocaine possession, right?

02:53PM  11   A.  It was -- I can't remember the exact charges.  I'm pretty

02:53PM  12   sure it was conspiracy to distribute and possibly possession,

02:53PM  13   I don't know, but it was a drug charge.

02:53PM  14   Q.  It was a drug charge.  And there wasn't any type of

02:53PM  15   racketeering or Organized Crime charge that went along with

02:53PM  16   it?

02:53PM  17   A.  Not charged, no.

02:53PM  18   Q.  And at the time that you arrested these two individuals,

02:53PM  19   did that investigation no longer go any further?

02:53PM  20   A.  We arrested those two individuals.  We still had an

02:54PM  21   undercover into -- Sam Spano was the main target of that

02:54PM  22   investigation.

02:54PM  23   Q.  Okay.

02:54PM  24   A.  We had an undercover that was making purchases of cocaine

02:54PM  25   from Sam Spano.

USA v Bongiovanni - Casullo - Singer/Cross - 3/20/24

105

02:54PM  1      After Sam Spano, Adam Corvino and his associate were

02:54PM  2   arrested.

02:54PM  3      I believe we still had an undercover into Steven and

02:54PM  4   Vincent Cino, and they had supplied us with a sample of

02:54PM  5   methamphetamine to our undercover, and we were in the process

02:54PM  6   of trying to write and submit an affidavit to intercept their

02:54PM  7   telephones.

02:54PM  8   Q.   Okay.  So you were moving from just the pure buying/bust

02:54PM  9   kind of an operation to a Title III wiretap type of

02:54PM  10  operation?

02:54PM  11  A.   Well, the case initiated with Sam Spano as a buy

02:54PM  12  operation, buying narcotics, and it progressed to a wiretap

02:54PM  13  on Sam Spano's phone.  I believe we were listening to Adam

02:54PM  14  Corvino's phone, too.  And my partner at the time was in the

02:54PM  15  process of writing an affidavit to spin up, go to another

02:55PM  16  phone of the source of supply for Sam Spano and Adam Corvino.

02:55PM  17  Q.   What happened with Michael Masecchia?

02:55PM  18  A.   To the best of my knowledge, Michael Masecchia never

02:55PM  19  moved out to Vegas, so I don't recall Mike being intercepted

02:55PM  20  on any of the phones.  I'm certain we didn't do surveillance

02:55PM  21  on Mike, so I don't believe he ever -- I don't believe he

02:55PM  22  ever even moved out there.

02:55PM  23  Q.   What about the tolls?  Did he ever show up on tolls?

02:55PM  24  A.   On the Vegas phones?  As far as, like, intercept calls on

02:55PM  25  the wiretap?  Or tolls --

02:55PM   1   Q.  I'm just talking about tolls.  So you originally

02:55PM   2   identified Michael Masecchia based on your pulling of toll

02:55PM   3   records for these other people you mentioned, right?

02:55PM   4   A.  No, I -- I don't believe I said that I identified him

02:55PM   5   from the toll records.  We identified individuals, but

02:55PM   6   Michael Masecchia -- the intel came in initially was that he

02:55PM   7   was moving out to Las Vegas and was gonna live in the house

02:56PM   8   by Marty Mazzara.

02:56PM   9   Q.  Okay.  So there were no toll records that were discovered

02:56PM  10   regarding Michael Masecchia's phone?

02:56PM  11   A.  I can't remember for certain unless I saw a subpoena.

02:56PM  12   We may have pulled tolls on Michael's number, I think we did.

02:56PM  13   Q.  I guess it would make sense, because if you mentioned the

02:56PM  14   name Michael Masecchia to Mike Hill when you called him up,

02:56PM  15   and Mike Hill in DEA Buffalo ran subpoenas on the phones, you

02:56PM  16   wouldn't have known Michael Masecchia's phone number if you

02:56PM  17   had Mike Hill do that, right?

02:56PM  18   A.  I can't remember for certain if we had already had it

02:56PM  19   identified, or Mike had identified it for us.

02:56PM  20   Q.  Okay.  But --

02:56PM  21   A.  I can't remember for sure.

02:56PM  22   Q.  -- but bottom line is that Michael Masecchia doesn't make

02:56PM  23   his way out to Vegas, right?

02:56PM  24   A.  No, he didn't.

02:56PM  25   Q.  And he doesn't really pop up in this investigation

02:56PM 1 anymore, correct?

02:56PM 2 A.  No.

02:56PM 3 Q.  Okay.  You mentioned something on direct about you

02:57PM 4 knowing Michael Masecchia in some capacity in 2004; is that

02:57PM 5 right?

02:57PM 6 A.  I knew him because I saw him at a gym that I worked out

02:57PM 7 at on Delaware in Kenmore when I was college.

02:57PM 8 Q.  Yeah, that was the Fitness Factory, right?

02:57PM 9 A.  It was the Fitness Factory.

02:57PM 10 Q.  It's a very popular place, we've heard that a lot.

02:57PM 11 A.  Yes.

02:57PM 12 Q.  Did you see Mr. Tripi working out there?

02:57PM 13 A.  No, I didn't.

02:57PM 14 Q.  So as far as knowing Michael Masecchia --

02:57PM 15         **MR. TRIPI:**  Judge, I'm going to object to that.  It's

02:57PM 16 not funny.  I'm decades younger than these people.  I don't

02:57PM 17 find it funny, so I'm going to object to the commentary under

02:57PM 18 the 403.

02:57PM 19         **THE COURT:**  Okay.  So let's keep the commentary to a

02:57PM 20 minimum, please.

02:57PM 21         **MR. SINGER:**  I'll do that, Judge, and I apologize to

02:57PM 22 Mr. Tripi.

02:57PM 23         **MR. TRIPI:**  Thank you.

02:57PM 24         **BY MR. SINGER:**

02:57PM 25 Q.  As far as Michael Masecchia's concerned, so he's working

02:57PM    1   out at the Fitness Factory along with you, correct?

02:57PM    2   A.  I'd see him there, I never saw him working out.  I'd see

02:57PM    3   him walk in, he would talk to the owner of the club.  He'd

02:58PM    4   sometimes walk in the back.  And there were rumors, I guess,

02:58PM    5   that he was involved in steroid distribution.

02:58PM    6   Q.  How did you know him?

02:58PM    7   A.  Just from him coming into the club and asking someone

02:58PM    8   that I knew who that person was.

02:58PM    9   Q.  Did you ever have any conversations with Mr. Masecchia?

02:58PM   10   A.  Never.

02:58PM   11   Q.  Did you know anything about him being affiliated with

02:58PM   12   Organized Crime in any way before this 2004 investigation

02:58PM   13   started?

02:58PM   14   A.  I don't think I did while he was at Fitness Factory.

02:58PM   15   Q.  All right.  So you also mentioned that Mr. Bongiovanni,

02:58PM   16   he had business cards?

02:58PM   17   A.  Mr. Bongiovanni mentioned to me when we had the

02:58PM   18   conversation that he did not put Buffalo resident office on

02:58PM   19   his business card, he put New York field division.

02:58PM   20   Q.  So you recall him saying something to the effect of he

02:58PM   21   didn't have Buffalo on his cards?

02:58PM   22   A.  No, he didn't have Buffalo resident office.

02:58PM   23   Q.  So, did you ever see any of his business cards?

02:58PM   24   A.  I did see a copy of the business card.

02:59PM   25   Q.  So you're familiar with the fact that Mr. Bongiovanni

02:59PM    1    before working in Buffalo worked down in the Florida office,

02:59PM    2    correct?

02:59PM    3    A.  I was aware of that.

02:59PM    4    Q.  And you know, you've been a government employee for

02:59PM    5    22-plus years, you know that sometimes the government doesn't

02:59PM    6    always pay for your business cards, right?

02:59PM    7    A.  In my experience, they always paid for them.

02:59PM    8    Q.  In your experience, they always paid for them?

02:59PM    9    A.  Um-hum.

02:59PM   10    Q.  Did you have to use up all the business cards before you

02:59PM   11    got a new set?

02:59PM   12    A.  No, I have a lot left, because I just wanted DEA on my

02:59PM   13    business card.  There was a different design that I liked,

02:59PM   14    and I was able to order more business cards, so I had a lot

02:59PM   15    of business cards.

02:59PM   16    Q.  Did you pay for those business cards yourself because you

02:59PM   17    had a --

02:59PM   18    A.  No, actually the government --

02:59PM   19              **MR. DICKSON:**  Judge, relevance.

02:59PM   20              **THE COURT:**  Yeah, where we going with this?

02:59PM   21              **MR. SINGER:**  Judge, we have something that's talking

02:59PM   22    about Mr. Bongiovanni doing something particular to his card.

02:59PM   23    I'm just asking questions relevant to that.

02:59PM   24              **THE COURT:**  I'll allow it, but let's not go too far.

02:59PM   25              **MR. SINGER:**  We're not going that far, Judge, I

03:00PM    1    promise.

03:00PM    2            **BY MR. SINGER:**

03:00PM    3    Q.   So, so when you shifted offices from Las Vegas to

03:00PM    4    New York City, did you get new cards?

03:00PM    5    A.   I never got new cards.

03:00PM    6    Q.   Did you use the old cards that you had in Las Vegas?

03:00PM    7    A.   I can't remember, because I worked with a lot of

03:00PM    8    partners.  I -- I can't remember for certain if I passed them

03:00PM    9    out or not.

03:00PM    10   Q.   And I know this 2004 conversation that you had with

03:00PM    11   Mr. Bongiovanni about the business cards, many, many years

03:00PM    12   ago, right?  It was many, many years ago?

03:00PM    13   A.   The conversation with Joe about his card?

03:00PM    14   Q.   Yes.

03:00PM    15   A.   That was back when we initiated, 2004.

03:00PM    16   Q.   Yeah.  And so it's kind of inconsequential.  Are you

03:00PM    17   100 percent sure you're remembering this 100 percent?

03:00PM    18   A.   About the business card?

03:00PM    19   Q.   Yes.

03:00PM    20   A.   Oh, yes.

03:00PM    21   Q.   Okay.  So, with regard to your career, you -- you also

03:01PM    22   took note of I think something else that Mike Hill told you

03:01PM    23   when you would coordinate with him in 2004.  You remember

03:01PM    24   taking note of the fact that the DEA in Buffalo was having

03:01PM    25   their Christmas party at SoHo on Chippewa?

03:01PM  1      **MR. DICKSON:**  Objection, relevance.  Judge, we've --

03:01PM  2  we dealt with this issue it feels like three years ago with I

03:01PM  3  think the second witness who testified in this trial, and the

03:01PM  4  Court kept this -- this evidence out.

03:01PM  5      **THE COURT:**  Why don't we come up.

03:01PM  6      (Sidebar discussion held on the record.)

03:01PM  7      **THE COURT:**  I honestly don't remember, and I don't

03:01PM  8  know where you're going with it.  But  --

03:01PM  9      **MR. SINGER:**  So, Mr. Kasprzyk was the one who we

03:01PM  10  originally raised this with, but it's more pertinent to this

03:01PM  11  witness, Judge, hence the reason why is that SoHo has

03:01PM  12  co-owners.  Co-owners are Frank Parisi, and Mr. Bongiovanni

03:01PM  13  has in his phone, which had already been talked about in this

03:02PM  14  trial.  Also, Bobby Panaro is a co-owner at SoHo.

03:02PM  15      And what happened is that Mike Hill talked about the

03:02PM  16  fact that this was an IOC investigation, which is his buddy on

03:02PM  17  the stand right now.  It came up that one of the targets of

03:02PM  18  the Vegas -- the Vegas investigation was Bobby Panaro.

03:02PM  19      And Mr. Hill kind of quipped, hey, it's kind of funny

03:02PM  20  because, like, we have our DEA Christmas parties over at SoHo,

03:02PM  21  and I know Panaro owns SoHo.

03:02PM  22      And Mr. Casullo, that did not sit right with him.  He

03:02PM  23  had a conversation with his G.S. to basically communicate that

03:02PM  24  I don't think this is on the up and up.  I don't know where it

03:02PM  25  goes from there, but it talks about his misgivings about some

03:02PM    1    of the things that are done in Buffalo.

03:02PM    2         And I think it's relevant to this case, Judge,

03:02PM    3    because Frank Parisi is someone who my client called to

03:02PM    4    arrange these Christmas parties.  And they went on for a

03:02PM    5    decade.  And Mr. Casullo got here, they were continuing to go

03:02PM    6    on.

03:02PM    7         So I think it's relevant to talk about, number 1, the

03:03PM    8    background of they way he felt; and number 2, for bias.

03:03PM    9    Because, again, he did not consider my client to be anything

03:03PM   10    but dirty, and one of the connections is because of

03:03PM   11    connections to SoHo with Frank Parisi involved.

03:03PM   12         **THE COURT:**  Okay.

03:03PM   13         **MR. DICKSON:**  Given that, Judge, my understanding is

03:03PM   14    that the Christmas parties that we may be talking about are

03:03PM   15    predating any of the change in relationship between

03:03PM   16    Mr. Casullo and Mr. Bongiovanni.  I think we were at least

03:03PM   17    talking about 2004.  So I'm assuming that counsel is still

03:03PM   18    talking about 2004.

03:03PM   19         **MR. SINGER:**  Still talking about 2004, Judge.

03:03PM   20         **MR. DICKSON:**  Which predates any sort of acrimonious

03:03PM   21    relationship between Mr. Casullo and Mr. Bongiovanni.  So,

03:03PM   22    this piece about the Christmas party is in 2004, I mean, that

03:03PM   23    has nothing to do with how Mr. Casullo feels about

03:03PM   24    Mr. Bongiovanni 12 years later.

03:03PM   25         **MR. SINGER:**  Well, Judge, this is a seed that gets

03:04PM  1    planted, and it continues to fester.

03:04PM  2        **THE COURT:**  And the seed is that Bongiovanni is dirty

03:04PM  3    because he has relationships with Parisi and -- I forget the

03:04PM  4    other guy's name.

03:04PM  5        **MR. SINGER:**  And, by extension, Panaro.  Because

03:04PM  6    Panaro is an owner of SoHo.  And that DEA Buffalo is having

03:04PM  7    its Christmas parties here, and he doesn't agree with that, to

03:04PM  8    the point where it's not just he says, oh, whatever Mike, he

03:04PM  9    goes to his G.S. and says I think we have a big problem here.

03:04PM  10        So, that was his reaction, I think it's --

03:04PM  11        **THE COURT:**  Yeah, I think -- I think there's -- go

03:04PM  12    ahead.

03:04PM  13        **MR. DICKSON:**  The last thing is just that if that's

03:04PM  14    the case, then I think counsel first needs to establish as a

03:04PM  15    condition precedent that Mr. Casullo knows who owns SoHo and

03:04PM  16    their relationship to Mr. Bongiovanni.

03:04PM  17        **THE COURT:**  Well, I think you said that he already

03:04PM  18    could do that.

03:04PM  19        **MR. SINGER:**  Yes.

03:04PM  20        **THE COURT:**  And that was part of a proffer that he

03:04PM  21    just gave.

03:04PM  22        **MR. DICKSON:**  Okay.  So through this witness, that

03:04PM  23    will be established?

03:04PM  24        **THE COURT:**  I think that's what he said.

03:04PM  25        **MR. DICKSON:**  Okay.

03:04PM   1          **THE COURT:**  Let me just say this.  The -- the

03:04PM   2    relevance is peripheral.  But I think it's probably as

03:05PM   3    relevant as the fact that he went on a trip to Canada with

03:05PM   4    Frank Bifulco.

03:05PM   5          **MR. SINGER:**  Sure.

03:05PM   6          **THE COURT:**  I mean, you know, there's lots of stuff

03:05PM   7    that is relevant from one set of eyes and perhaps not from

03:05PM   8    another, and I'm trying to balance that.  But I think that

03:05PM   9    there's some minimal relevance here, and I'm going to let it

03:05PM  10    in.

03:05PM  11          **MR. DICKSON:**  Thank you.

03:05PM  12          **MR. SINGER:**  Just to the record straight, Judge, Paul

03:05PM  13    Francoforte.

03:05PM  14          **THE COURT:**  Whatever.

03:05PM  15          (End of sidebar discussion.)

03:05PM  16          **BY MR. SINGER:**

03:05PM  17    Q.  So, Mr. Casullo, so one of the other things that you

03:05PM  18    learned in talking with Mike Hill back in 2004 is the DEA had

03:05PM  19    its Christmas party at SoHo on Chippewa, correct?

03:05PM  20    A.  Mike had mentioned that to me before.

03:05PM  21    Q.  And this was something that, I guess, was a little odd to

03:05PM  22    you; fair to say?

03:05PM  23    A.  It was at the point that we were working our

03:05PM  24    investigation on Sam Spano.

03:06PM  25    Q.  Yeah.  So one of the connections that you believe Sam

03:06PM    1    Spano had in Las Vegas to someone in Buffalo was a person by

03:06PM    2    the name of Bobby Panaro; is that right?

03:06PM    3    A.   Yes.

03:06PM    4    Q.   And Bobby Panaro was an individual who had an ownership

03:06PM    5    interest in SoHo the restaurant, correct?

03:06PM    6    A.   I belive so.

03:06PM    7    Q.   And that was one of the facts when you're talking about

03:06PM    8    your investigation in Vegas that you communicated to

03:06PM    9    Mr. Hill, correct?

03:06PM   10    A.   I believe I -- I can't remember for certain.  It's

03:06PM   11    possible.

03:06PM   12    Q.   And that's what caused Mr. Hill to kind of say, well, you

03:06PM   13    know, it's funny, we know that Mr. Panaro is a co-owner at

03:06PM   14    SoHo, and we go there for our DEA Christmas parties all the

03:06PM   15    time?

03:06PM   16    A.   I don't remember if that's how the conversation went.  I

03:06PM   17    can't remember exactly my conversation with Mike regarding

03:06PM   18    SoHo.

03:06PM   19    Q.   But you do remember SoHo coming up, correct?

03:06PM   20    A.   I do remember SoHo coming up, and me having a

03:06PM   21    conversation with my supervisor.

03:06PM   22    Q.   Correct.  It was something that was of concern to you,

03:06PM   23    correct?

03:06PM   24    A.   It was at the time.

03:06PM   25    Q.   Because you believed if the DEA was going to a restaurant

03:06PM    1    or bar owned by someone who was a target of your

03:07PM    2    investigation, it would create problems, correct?

03:07PM    3    A.  My concern was they were having Christmas parties there.

03:07PM    4    Q.  And as far as the Christmas party conversation you had

03:07PM    5    with your G.S., do you know if your G.S. ever reached out to

03:07PM    6    Buffalo?

03:07PM    7    A.  I have no idea.

03:07PM    8    Q.  So after the investigation concludes in 2005, vis-à-vis

03:07PM    9    Mike Masecchia, you continued to work in the Las Vegas,

03:07PM    10    Nevada office for a number of years?

03:07PM    11    A.  Yes.

03:07PM    12    Q.  And Mr. Dickson asked you about something in 2009.  Do

03:07PM    13    you remember being asked on direct about a 2009 investigation

03:07PM    14    that DEA Buffalo conducted into a grow operation in the

03:07PM    15    Southern Tier?

03:07PM    16    A.  I remember him asking me.

03:07PM    17    Q.  And your understanding was that that was an investigation

03:07PM    18    started by an officer named Corey Higgins, correct?

03:08PM    19    A.  That was my understanding.

03:08PM    20    Q.  And your understanding was that Corey Higgins was the

03:08PM    21    case agent, correct?

03:08PM    22    A.  I found that out at some point.

03:08PM    23    Q.  And the target of that particular grow operation was by

03:08PM    24    the name of Mark Suppa, correct?

03:08PM    25    A.  I don't remember for certain of the names involved.   I

03:08PM  1    do remember when I went back to the DEA office and was

03:08PM  2    working there, having a conversation with Corey.  I don't

03:08PM  3    remember that name --

03:08PM  4    Q.  Okay.

03:08PM  5    A.  -- but I do remember Masecchia.

03:08PM  6    Q.  And I think, you know, Mr. Dickson asked you on direct

03:08PM  7    examination whether Mr. Bongiovanni ever called you in 2009

03:08PM  8    to talk to you about Michael Masecchia and a connection to

03:08PM  9    this grow operation that Corey Higgins was investigating?

03:08PM  10   A.  He did ask me that.

03:08PM  11   Q.  And you testified that he found it odd that

03:08PM  12   Mr. Bongiovanni didn't call you?

03:08PM  13   A.  For that?  On that case?

03:08PM  14   Q.  Yeah.

03:08PM  15   A.  If you can maybe show me that, I don't remember saying

03:09PM  16   that I thought was odd that he didn't call me on Corey's

03:09PM  17   investigation.

03:09PM  18   Q.  He didn't call you on what?

03:09PM  19   A.  On Corey's investigation.

03:09PM  20   Q.  So you thought it was odd that Mr. Bongiovanni didn't

03:09PM  21   call you on Corey Higgins' investigation?

03:09PM  22   A.  Is that what you're saying?  That I said that I found it

03:09PM  23   odd that Joe didn't call me?

03:09PM  24   Q.  That's what I'm saying.  I guess, what do you remember --

03:09PM  25   what do you remember testifying to about not being contacted

03:09PM   1   about this 2009 investigation being conducted by Corey

03:09PM   2   Higgins?

03:09PM   3   A.   That if Joe was aware of it, that I was never called.

03:09PM   4   Q.   Okay.  But you don't know if Joe was aware of this

03:09PM   5   investigation?

03:09PM   6   A.   Of the Corey Higgins investigation?

03:09PM   7   Q.   Yes.

03:09PM   8   A.   I'm not certain.

03:09PM   9   Q.   Yeah, you weren't in the office at that point in time,

03:09PM   10   right?

03:09PM   11   A.   Yeah, I'm not certain if he -- I'm not certain.

03:09PM   12   Q.   And did Corey Higgins, who was the case agent on that

03:09PM   13   investigation, ever contact you?

03:09PM   14   A.   To the best of my knowledge, what I found out after when

03:09PM   15   I went to Buffalo was that Corey Higgins was the case agent.

03:10PM   16   Q.   Yeah.  And I guess I'm talking about in the 2009

03:10PM   17   time frame when he was actively investigating that case, did

03:10PM   18   Corey Higgins ever contact you in Las Vegas?

03:10PM   19   A.   No.

03:10PM   20   Q.   So after you complete your time in Las Vegas, you move on

03:10PM   21   from Vegas to the New York City office of the DEA?

03:10PM   22   A.   I did.

03:10PM   23   Q.   And that was in 2013?

03:10PM   24   A.   December of 2013.

03:10PM   25   Q.   And that was in an effort to eventually get back home

USA v Bongiovanni - Casullo - Singer/Cross - 3/20/24
119

03:10PM   1    where you grew up?

03:10PM   2    A.  That was the plan.

03:10PM   3    Q.  Was your wife also from here as well?

03:10PM   4    A.  Yes.

03:10PM   5    Q.  So there weren't any spots available in the DEA Buffalo

03:10PM   6    office at that time, right?

03:10PM   7    A.  That's correct.

03:10PM   8    Q.  So you went to New York City with the hope that someone

03:10PM   9    would retire and a spot would open up for you?

03:10PM  10    A.  Correct.

03:10PM  11    Q.  And so then in New York City, you are working the same

03:10PM  12    type of narcotics investigations; is that right?

03:10PM  13    A.  I worked narcotics investigations in New York.

03:10PM  14    Different types of targets at times, but they were narcotics

03:10PM  15    investigations.

03:10PM  16    Q.  And eventually in 2015, you learned that there's going to

03:11PM  17    be an opportunity to for you to move back and join the

03:11PM  18    Buffalo office, correct?

03:11PM  19    A.  Yes, I was transferred back in 2015.

03:11PM  20    Q.  So you mentioned earlier that you grew up here and your

03:11PM  21    wife was from here.  You went to Saint Joe's Collegiate

03:11PM  22    Institute for high school?

03:11PM  23    A.  Correct.

03:11PM  24    Q.  And you officially started your duties in Buffalo in

03:11PM  25    September of 2015?

03:11PM  1    A.  Correct.

03:11PM  2    Q.  So, in 2015, in September, you get up to the office and

03:11PM  3    you're assigned to group D-57; is that right?

03:11PM  4    A.  I was.

03:11PM  5    Q.  And D-57 was the same group at that time that

03:11PM  6    Mr. Bongiovanni was also a part of?

03:11PM  7    A.  He was in that, yes, correct.

03:11PM  8    Q.  And you weren't partners with Mr. Bongiovanni, correct?

03:11PM  9    A.  At what point?

03:11PM  10   Q.  When you first got back in September of 2015.

03:11PM  11   A.  When I first got back, I believe the first case that I

03:11PM  12   was assigned was a controlled delivery.  And I can't remember

03:12PM  13   if Greg assigned Joe to work that with me, but Joe worked

03:12PM  14   that first controlled delivery with me.

03:12PM  15   Q.  Yeah, and I guess when I say "partners," what I'm talking

03:12PM  16   about is that was Mr. Bongiovanni someone you worked with

03:12PM  17   every single day, day in and day out?

03:12PM  18   A.  Well --

03:12PM  19   Q.  Meaning, like, were the two of you partners?  Or were you

03:12PM  20   somebody he worked with in D-57 because all of you were part

03:12PM  21   of the greater group?

03:12PM  22   A.  No, there were times we were partners.

03:12PM  23   Q.  All right.  And so one of the times that you guys were

03:12PM  24   partners I think early on was on a wiretap investigation; is

03:12PM  25   that right?

03:12PM    1    A.  Yes, sir.

03:12PM    2    Q.  Was it the Ramos Ramos case; do you remember that?

03:12PM    3    A.  That's correct.

03:12PM    4    Q.  And so you two worked together pretty extensively at that

03:12PM    5    point in time?

03:12PM    6    A.  That was an eight month, nine month investigation where

03:12PM    7    we were partners.

03:12PM    8    Q.  Would you see each other every single day?

03:12PM    9    A.  I don't know every single day, because the wire room was

03:12PM   10    over at the State Attorney General's Office, but pretty

03:12PM   11    frequently.

03:12PM   12    Q.  Okay.  But when you weren't working on Ramos Ramos or

03:13PM   13    some other matters, were you working with someone regularly

03:13PM   14    in the group?

03:13PM   15    A.  Other than that case?

03:13PM   16    Q.  Other than that case, other than Mr. Bongiovanni?

03:13PM   17    A.  I mean, that case took up all my time.  There were other

03:13PM   18    people who helped a lot with that case.  Joe Palmieri, I

03:13PM   19    wouldn't call him a co-case agent, but he spent more time

03:13PM   20    working that case than other individuals.  The whole group

03:13PM   21    helped.  But Joe Palmieri stands out as someone who was

03:13PM   22    pretty involved.

03:13PM   23    Q.  Yeah.  So it seemed like a pretty significant prosecution

03:13PM   24    that took a lot of resources from yourself, Mr. Bongiovanni,

03:13PM   25    and the office?

03:13PM    1    A.  It did.  It -- I don't remember if there were other cases

03:13PM    2    going on with other agents at the time, but yes, it was a

03:13PM    3    bigger case.

03:13PM    4       Again, to the best of my knowledge, thinking back, since

03:13PM    5    it was worked jointly with the State Attorney General's

03:13PM    6    Office, which is where I spent most of my time, there could

03:13PM    7    have been other things going on in my group that I wasn't

03:14PM    8    aware of.

03:14PM    9    Q.  And this was a heroin case, right?

03:14PM   10    A.  It was cocaine, it was heroin, it was fentanyl.  That's

03:14PM   11    what I remember.

03:14PM   12    Q.  Okay.  And eventually were there arrests made in the

03:14PM   13    Ramos Ramos case?

03:14PM   14    A.  Yes, there were a lot.

03:14PM   15    Q.  And so to lead up to the point of arrest, I'm sure that

03:14PM   16    you and Mr. Bongiovanni, since you were working in tandem on

03:14PM   17    that case, were occupied with a lot of different

03:14PM   18    responsibilities to get that case ready for arrests and later

03:14PM   19    for trial, correct?

03:14PM   20    A.  We were busy at that point.

03:14PM   21    Q.  So at the time you were working D-57 when you first

03:14PM   22    started, your group supervisor was a guy by the name of Greg

03:14PM   23    Yensan, correct?

03:14PM   24    A.  Correct.

03:14PM   25    Q.  And Yensan was both your supervisor as well as

03:14PM    1    Mr. Bongiovanni's supervisor, right?

03:14PM    2    A.   Yes.

03:14PM    3    Q.   And he also supervised everybody else in D-57?

03:14PM    4    A.   Yes.

03:14PM    5    Q.   So, you've worked in the New York City office, the

03:15PM    6    Las Vegas office, and the Buffalo office for DEA, correct?

03:15PM    7    A.   Yes.

03:15PM    8    Q.   Is it fair to say that each office kind of has its own

03:15PM    9    kind of separate culture?

03:15PM   10    A.   Each office was different in its own way.

03:15PM   11    Q.   And, you know, each office, the supervisors are

03:15PM   12    different, they have their own kind of expectation; fair

03:15PM   13    statement?

03:15PM   14    A.   All supervisors are different, just like all agents.

03:15PM   15    Q.   And I think one thing that you took notice of when you

03:15PM   16    got to D-57 in DEA Buffalo in 2015 was that the office didn't

03:15PM   17    seem to place a great emphasis on the investigation of

03:15PM   18    marijuana cases; fair statement?

03:15PM   19    A.   I wasn't working marijuana cases, so I really -- I don't

03:15PM   20    know, it just really wasn't something that came up for me.

03:15PM   21    Q.   So I know you weren't working any marijuana cases in

03:15PM   22    particular at that point in time, but is it a fair statement

03:15PM   23    that the DEA Buffalo office that you came to and started to

03:16PM   24    work in and know the culture of didn't seem to place a lot of

03:16PM   25    emphasis on the investigation of marijuana cases?

USA v Bongiovanni - Casullo - Singer/Cross - 3/20/24

124

03:16PM 1   A.  I would have no idea.  If what they placed -- if they put

03:16PM 2   an emphasis on that, or not, I just noticed that.  There

03:16PM 3   weren't other people working marijuana cases.

03:16PM 4       MR. SINGER:  Ms. Champoux, will you mind bringing up

03:16PM 5   for the witness and the witness only Government

03:16PM 6   Exhibit 3557AJ.  And if you can turn to page 11, please.

03:16PM 7       Actually, can you turn back to 1 again?  I'm sorry.

03:16PM 8       BY MR. SINGER:

03:16PM 9   Q.  So you remember talking and testifying before a grand

03:16PM 10  jury, Mr. Casullo, correct?

03:16PM 11  A.  Yes.

03:16PM 12  Q.  And you remember testifying one of the times on May 28th

03:16PM 13  of 2020?

03:16PM 14  A.  Yes.

03:16PM 15      MR. SINGER:  And, Ms. Champoux, can you please turn

03:16PM 16  to page 11, again?

03:16PM 17      BY MR. SINGER:

03:16PM 18  Q.  And do you remember testifying, directing your attention

03:16PM 19  to line 13.  Line 13.  Do you remember being asked a question

03:17PM 20  did it appear to be --

03:17PM 21      MR. DICKSON:  Judge, I'm going to object at this

03:17PM 22  point.  This is an improper impeachment.  There isn't a

03:17PM 23  contradiction from what the witness testified to.

03:17PM 24      MR. SINGER: The witness testified that he didn't have

03:17PM 25  knowledge.  I mean, we can come up and talk about this, Judge.

03:17PM   1        **MR. DICKSON:**  Which is exactly what is testified to

03:17PM   2    in the grand jury.

03:17PM   3            **THE COURT:**  No, I'm going to allow it.

03:17PM   4            **BY MR. SINGER:**

03:17PM   5    Q.  Do you remember testifying before the grand jury on that

03:17PM   6    day, question:  Did it appear to be a priority of DEA Buffalo

03:17PM   7    generally with regard to marijuana investigations?

03:17PM   8        And answering:  Not from what I saw.

03:17PM   9    A.  After reading this, yes.

03:17PM  10    Q.  Okay.

03:17PM  11            **MR. SINGER:** You can take that down, Ms. Champoux.

03:17PM  12            **BY MR. SINGER:**

03:17PM  13    Q.  So, again, fair statement that marijuana investigations

03:18PM  14    in the DEA Buffalo office were not really an emphasis?

03:18PM  15    A.  I didn't see -- I didn't see anyone working on them.

03:18PM  16    Q.  Yeah.  And so the cases that you were working on, like

03:18PM  17    you mentioned the Ramos Ramos case, that was a cocaine, crack

03:18PM  18    cocaine, heroin case, right?

03:18PM  19    A.  It was powder cocaine, heroin, and fentanyl.

03:18PM  20    Q.  Okay.  And is it a fair statement that the DEA Buffalo

03:18PM  21    office, when you arrived there in 2015, it concentrated on

03:18PM  22    harder, more dangerous drugs, like the ones involved in the

03:18PM  23    Ramos case?

03:18PM  24    A.  It depended on the group.  My group, the majority of the

03:18PM  25    cases that I noticed right away when I got there were powder

03:18PM   1   cocaine cases.  I noticed that.  The reason it sticks out is

03:18PM   2   we didn't work a lot of those cases in Las Vegas.  That's

03:18PM   3   what I remember as far as what I saw most frequently.

03:18PM   4   Q.  Okay.  And that was in D-57 that both you and

03:18PM   5   Mr. Bongiovanni worked?

03:18PM   6   A.  Yes.

03:19PM   7   Q.  And, you know, fair statement, too, that management sets

03:19PM   8   priorities for the group and the agents who work in the

03:19PM   9   group?

03:19PM  10   A.  In what way?

03:19PM  11   Q.  In investigative priorities.

03:19PM  12   A.  In, like, who to investigate?

03:19PM  13   Q.  Not who to investigate, but types of cases to

03:19PM  14   investigate.

03:19PM  15   A.  It was -- we had a lot of freedom in DEA to take a case

03:19PM  16   to a supervisor.  It was really a lot of the agent going to

03:19PM  17   the supervisor and saying this is what I have.

03:19PM  18       And from my experience, I had a lot of latitude.  If I

03:19PM  19   brought something and the supervisor was confident that I was

03:19PM  20   successful in the past, I had a lot of latitude to choose

03:19PM  21   what I wanted to work if I could justify what I was working.

03:19PM  22   Q.  And so I guess like, let's go back to the Ramos Ramos

03:19PM  23   case for a second.  So that was a pretty intensive wire

03:19PM  24   investigation involving cocaine, heroin, and fentanyl,

03:19PM  25   correct?

USA v Bongiovanni - Casullo - Singer/Cross - 3/20/24

127

| | | |
|---|---|---|
| 03:19PM | 1 | A.  Those are the three drugs I remember, yes. |
| 03:19PM | 2 | Q.  And it wasn't just you and Mr. Bongiovanni working the |
| 03:20PM | 3 | wire investigation of that, correct? |
| 03:20PM | 4 | A.  The other agents in the group, and there may have even |
| 03:20PM | 5 | been -- there were people from the State Attorney General's |
| 03:20PM | 6 | Office helping.  There were lots of people. |
| 03:20PM | 7 | Q.  A lot of people working.  And so I'm sure that the other |
| 03:20PM | 8 | people that were supporting you and Mr. Bongiovanni, they had |
| 03:20PM | 9 | other cases going on at the same time, correct? |
| 03:20PM | 10 | A.  I don't know for certain what they had on, I just know |
| 03:20PM | 11 | what I noticed.  I was hyper focused on what I was doing.  I |
| 03:20PM | 12 | can't remember what other people were doing. |
| 03:20PM | 13 | I spent a lot of time at the State Attorney General's |
| 03:20PM | 14 | Office.  So, again, I had a lot of latitude from my |
| 03:20PM | 15 | supervisor.  They knew what I was working on.  I had a key |
| 03:20PM | 16 | card to be at the State Attorney General's Office.  So I |
| 03:20PM | 17 | wasn't really aware as much as I normally might be in a group |
| 03:20PM | 18 | because I was over there what my group was working on.  I |
| 03:20PM | 19 | don't remember being called back to go out and help on |
| 03:20PM | 20 | operations because I was working that case. |
| 03:20PM | 21 | Q.  Yeah.  And I guess when you've been in supporting roles |
| 03:20PM | 22 | on wire investigations being handled by other agents, |
| 03:20PM | 23 | sometimes you get pulled off a case you're working on to go |
| 03:20PM | 24 | help out on the wire, correct? |
| 03:21PM | 25 | A.  Oh, yes.   Yep. |

03:21PM     1    Q.  That's something that's usually a directive issued by

03:21PM     2    your group supervisor, right?

03:21PM     3    A.  If they needed help, yes.

03:21PM     4    Q.  Because the group --

03:21PM     5    A.  I'm sorry, or the case agent.

03:21PM     6    Q.  Because the group supervisor at that point is setting

03:21PM     7    priorities inside the group, correct?

03:21PM     8    A.  Again, in my experience, the way it worked at DEA, the

03:21PM     9    case agents had a lot of latitude.  If they needed help and

03:21PM    10    they needed something worked on, they would call the agent up

03:21PM    11    themselves, and that's kind of -- was my experience in how

03:21PM    12    things worked.

03:21PM    13    Q.  Okay.

03:21PM    14    A.  Supervisors for the most part, with most of them, were

03:21PM    15    hands off as long as you were doing your job.

03:21PM    16    Q.  So, as far as the marijuana cases, we talked earlier

03:21PM    17    about how it wasn't necessarily a point of emphasis in

03:21PM    18    Buffalo in D-57 when you arrived there, correct?

03:21PM    19    A.  I don't remember in 57 when I got there many people

03:21PM    20    working marijuana.

03:21PM    21    Q.  And so as far as those prosecutions are concerned, you're

03:21PM    22    familiar with Title 21, Section 841 of the United States

03:22PM    23    Code, correct?

03:22PM    24    A.  841, yes.

03:22PM    25    Q.  And that's involving drug-trafficking offenses, correct?

03:22PM    1    A.  Possession with intent to distribute.

03:22PM    2    Q.  Um-hum.

03:22PM    3    A.  Yes.

03:22PM    4    Q.  It's something that you dealt with on a daily basis as a

03:22PM    5    DEA agent for 22 years?

03:22PM    6    A.  Very frequently.

03:22PM    7    Q.  And so you're familiar with mandatory minimum sentences

03:22PM    8    that arise under federal law, right?

03:22PM    9    A.  Yes.

03:22PM   10    Q.  And one of the ways that you investigate cases is you try

03:22PM   11    to see whether or not you can potentially find enough

03:22PM   12    narcotics to meet one of those mandatory minimums?

03:22PM   13    A.  That all depends.  That's not, like, that wasn't anything

03:22PM   14    that was written as a rule by any means.

03:22PM   15         Me, as an agent, I was aware very much of what the

03:22PM   16    mandatory minimums were.  I was taught that in Las Vegas.  I

03:22PM   17    actually had a chart on my desk.  But that didn't -- it would

03:22PM   18    always depend.  It depended on the group more than it did the

03:22PM   19    drug.

03:22PM   20         From my experience, the targeting was based on what the

03:22PM   21    group was involved in.  If there was narcotics trafficking,

03:22PM   22    number 1.  But number 2, were they violent?  Were they a

03:23PM   23    violent organization in that particular community?  Was that

03:23PM   24    a problem for that -- I worked in a local gang task force,

03:23PM   25    where we worked sometimes, lower level narcotics trafficking

03:23PM  1    because the group was so violent that we would still target

03:23PM  2    them.

03:23PM  3       But then I worked in an international group where it was

03:23PM  4    a completely different situation because of who we were

03:23PM  5    targeting.

03:23PM  6       We have something called priority targets in DEA.  We've

03:23PM  7    had priority targets that were marijuana traffickers, not

03:23PM  8    that I worked much, and we had ones that were cocaine

03:23PM  9    traffickers.

03:23PM  10      It was more based on the organization, the targeting, in

03:23PM  11   my experience, not the drug.  Other than -- I'm sorry, other

03:23PM  12   than fentanyl.

03:23PM  13   Q.   Yeah.  And I guess that's what I'm getting at, is that

03:23PM  14   priority targets, that's a way that the office can shape how

03:23PM  15   resources go to a certain investigation, correct?

03:23PM  16   A.   Priority targeting was something that we used to make

03:23PM  17   decisions on if a group would be targeted, but we worked

03:24PM  18   cases where someone was a target that wasn't a priority

03:24PM  19   target investigation.  It just all depended.

03:24PM  20   Q.   Correct.  And if there was an organization that engaged

03:24PM  21   in acts of violence, that was something that brought it up on

03:24PM  22   the list of priorities; fair to say?

03:24PM  23   A.   Possibly.

03:24PM  24   Q.   Okay.

03:24PM  25   A.   Yes, certainly could.

03:24PM   1    Q.  And I guess getting back to mandatory minimums, you're

03:24PM   2    familiar with them because you're a DEA agent, correct?

03:24PM   3    A.  I don't remember them as well anymore, it's been a -- but

03:24PM   4    yes.

03:24PM   5    Q.  I completely understand.

03:24PM   6    A.  Yep.

03:24PM   7    Q.  But you're at least familiar with the fact that when

03:24PM   8    you're able to investigate a case and produce a quantity of

03:24PM   9    narcotics in that investigation that triggers a mandatory

03:24PM  10    minimum, that's something that's going to be beneficial to

03:24PM  11    your investigation, correct?

03:24PM  12    A.  It -- the biggest thing that stands out with that is

03:24PM  13    sentencing.

03:24PM  14    Q.  Correct.  That's what I'm getting at.

03:24PM  15    A.  Okay.

03:24PM  16    Q.  So if something is beneficial to the investigation

03:24PM  17    because when you get to the prosecution stage, that's

03:24PM  18    something that is being held over the defendant's head in

03:24PM  19    that situation, correct?

03:24PM  20    A.  Again, at that point, it's more a prosecution thing than

03:25PM  21    an investigative thing.  We are aware of it, but we weren't

03:25PM  22    so involved at that point once they're arrested.

03:25PM  23    Q.  But I guess what I'm getting at, Mr. Casullo, is when you

03:25PM  24    have someone who is subject to a mandatory minimum --

03:25PM  25    A.  Yes.

03:25PM    1    Q.  -- in your experience of 22 years, it's more likely that

03:25PM    2    that person is going to cooperate with authorities than if a

03:25PM    3    mandatory minimum does not exist, correct?

03:25PM    4    A.  That's the hope, but I've seen all kinds of situations

03:25PM    5    based on who we arrested.  I've seen people looking at

03:25PM    6    20 years who I thought I could possibly talk to and have them

03:25PM    7    cooperate and agree to that, that, straight out -- that was

03:25PM    8    pretty common in Las Vegas based on types of cases I was

03:25PM    9    investigating.

03:25PM   10       I was investigating Mexican drug traffickers that were

03:25PM   11    looking at sometimes 20 years for trafficking

03:25PM   12    methamphetamine.  Regardless of the sentencing, because of

03:25PM   13    their closeness to Mexico, and their ties to their family in

03:25PM   14    Mexico, which is where the traffickers were, more often than

03:25PM   15    not they wouldn't cooperate out of fear of retaliation to

03:26PM   16    their family.

03:26PM   17       I experienced that in Buffalo, as well, with some cases.

03:26PM   18    Again, traffickers looking 20 years, even more at times, not

03:26PM   19    wanting to cooperate.  Wouldn't even consider, which I was

03:26PM   20    kind of like, wow, because they felt that their family

03:26PM   21    members would be targeted.

03:26PM   22       It would all depend.  There were other times when I'd

03:26PM   23    target people that weren't looking at much and flip, decide

03:26PM   24    to cooperate immediately.  It just kind of depended on the

03:26PM   25    person and their circumstances.  Who they were and what their

03:26PM  1  circumstances were.

03:26PM  2  Q.  But, again, you'd agree with me that when a mandatory

03:26PM  3  minimum was triggered, it would make the possibility of

03:26PM  4  cooperation higher than not?

03:26PM  5  A.  It's possible.

03:26PM  6  Q.  Okay.  So you're familiar with the marijuana laws,

03:26PM  7  correct?

03:26PM  8  A.  To some extent.  I don't -- I couldn't like quote you

03:26PM  9  mandatory minimums for marijuana.  I wasn't -- I didn't -- I

03:27PM  10  assisted in a substantial amount of marijuana investigations

03:27PM  11  especially when I was out West.  We did outdoor marijuana

03:27PM  12  grows, we did indoor marijuana grows.  But in terms of -- was

03:27PM  13  the question sentencing?

03:27PM  14  Q.  So let's go back and talk about this a little bit more.

03:27PM  15  A.  Sure.

03:27PM  16  Q.  So you're familiar with mandatory minimums for marijuana

03:27PM  17  it required 100 kilograms, 100 plants?

03:27PM  18         MR. DICKSON:  Judge, I'm going to object at this

03:27PM  19  point --

03:27PM  20         THE WITNESS:  I don't.

03:27PM  21         MR. DICKSON:  -- on a number of grounds.  Can we

03:27PM  22  approach, please?

03:27PM  23         THE COURT: Sure.

03:27PM  24         (Sidebar discussion held on the record.)

03:27PM  25         MR. DICKSON:  Judge, my first objection is a

03:27PM   1   relevance objection to this witness's understanding of

03:27PM   2   mandatory minimum laws.

03:27PM   3       If counsel is trying to get to what Mr. Bongiovanni

03:27PM   4   understood about mandatory minimum laws, perhaps that has some

03:27PM   5   relevance.  But I think --

03:27PM   6       **THE COURT:**  I think the idea is that they're gonna

03:27PM   7   argue that because this Serio drug organization was a

03:28PM   8   marijuana drug organization, it wasn't as important to the

03:28PM   9   office to investigate as a heroin or cocaine.

03:28PM  10       **MR. DICKSON:**  Which is relevant if Mr. Bongiovanni

03:28PM  11   had that belief, or had an understanding of the mandatory

03:28PM  12   minimum laws.  But this witness's understanding of mandatory

03:28PM  13   minimum laws doesn't in any way change the defendant's intent.

03:28PM  14       **THE COURT:**  Talk to me.

03:28PM  15       **MR. SINGER:**  He worked in the Buffalo office, he's

03:28PM  16   familiar with the culture of the Buffalo office.  He testified

03:28PM  17   about how marijuana cases were not as big a priority as other

03:28PM  18   drugs.

03:28PM  19       **THE COURT:**  He's trying to establish --

03:28PM  20       **MR. SINGER:**  I'm trying to establish why.

03:28PM  21       **THE COURT:**  Yeah.

03:28PM  22       **MR. SINGER:**  I realize it's talking a long time

03:28PM  23   because this witness --

03:28PM  24       **THE COURT:**  It's going on forever.

03:28PM  25       **MR. SINGER:** -- is just continuing to talk about

03:28PM   1   things, but that's not my problem, Judge.  I'm trying to get

03:28PM   2   the information out as quickly as I can.

03:28PM   3        **THE COURT:**  I understand.

03:28PM   4        **MR. DICKSON:**  The last thing I'll say is that I don't

03:28PM   5   know as much about drug sentencing as Mr. Cooper, Mr. Tripi,

03:28PM   6   and Ms. Chalbeck, so if I'm wrong about this, I apologize.

03:29PM   7   But we are getting dangerously close to talking about

03:29PM   8   punishments that could or could not be relevant in this case,

03:29PM   9   and that is extraordinarily prejudicial.

03:29PM   10       **THE COURT:**  Are there mandatory minimums as to --

03:29PM   11       **MR. COOPER:**  Yes.

03:29PM   12       **THE COURT:**  Yeah, there are?

03:29PM   13       **MR. COOPER:**  Yes, there are mandatory minimums

03:29PM   14   specifically related to marijuana and all of the different

03:29PM   15   amounts that Mr. Singer's about to go through that are gonna

03:29PM   16   end up in a questionnaire in front of this jury, which is

03:29PM   17   incredibly prejudicial.

03:29PM   18       **THE COURT:**  Yeah, that --

03:29PM   19       **MR. SINGER:**  I'm talking about mandatory minimums for

03:29PM   20   marijuana, Judge, that's all I'm going to get into.

03:29PM   21       **THE COURT:**  That's the problem.  That's the problem.

03:29PM   22   Can you do it in a general sense to ask him are there -- are

03:29PM   23   there more mandatory minimum -- more mandatory minimums for

03:29PM   24   lesser amounts for fentanyl and heroin than there are for --

03:29PM   25       **MR. SINGER:**  I can get into that, but we had

03:29PM  1    testimony from the government's own witness, Mr. Serio,

03:29PM  2    talking about why he keeps 99 plants instead of 100 plants,

03:30PM  3    because it doesn't trigger the federal mandatory minimum.

03:30PM  4         I mean, it's out there.  I'm not gonna be going

03:30PM  5    through stuff chapter and verse, all 841 mandatory minimums in

03:30PM  6    this case.  I'm just trying to establish one thing here.

03:30PM  7         **THE COURT:**  You're not going to say what the

03:30PM  8    mandatory minimum is?

03:30PM  9         **MR. SINGER:**  I can shy away from that, Judge, if I

03:30PM  10   can get into the weeds.

03:30PM  11        **THE COURT:**  Okay, I will allow it.  But I'm not going

03:30PM  12   to let you go a whole lot farther.  And I understand this is

03:30PM  13   doing more than yours, but we've got to move on.

03:30PM  14        **MR. SINGER:**  I understand Judge.

03:30PM  15        (End of sidebar discussion.)

03:30PM  16        **THE COURT:**  So the objection is overruled.  Go ahead.

03:30PM  17        **BY MR. SINGER:**

03:30PM  18   Q.  So getting back to my question, you're familiar with

03:30PM  19   marijuana having a mandatory minimum attached to it, correct?

03:30PM  20   A.  I am familiar with that.

03:30PM  21   Q.  And you're familiar with how it requires the possession

03:30PM  22   of 100 kilograms or 100 plants, correct?

03:30PM  23   A.  I don't know the exact amount, but I understand the

03:30PM  24   mandatory minimums, and it's different with each drug what

03:31PM  25   the amount is.

USA v Bongiovanni - Casullo - Singer/Cross - 3/20/24
137

03:31PM   1   Q.  But you don't have any reason to disagree with me that

03:31PM   2   that's the mandatory minimum if I were to tell you that's

03:31PM   3   what the law says?

03:31PM   4   A.  I can't remember.

03:31PM   5   Q.  I got you.  But let's say that it is, you know, 100

03:31PM   6   kilograms, that's 220 pounds, right?

03:31PM   7   A.  I'm not that good at math, I guess.

03:31PM   8   Q.  Okay.  All right.  But we're not talking about

03:31PM   9   insignificant quantities, correct?

03:31PM  10   A.  No.

03:31PM  11   Q.  All right.  And, so, those are some things sometimes that

03:31PM  12   drive decisionmaking as far as resource in cases, correct?

03:31PM  13   In your experience?

03:31PM  14   A.  I'm sorry, ask that again please.

03:31PM  15   Q.  Sure.  In your experience over 22 years in the DEA,

03:31PM  16   resources and decisions sometimes are driven by the amount of

03:31PM  17   drugs that someone is caught with, correct?

03:31PM  18   A.  It depends.  And it could, at times.

03:31PM  19   Q.  And you've also had experience, too, where cases that are

03:31PM  20   investigated by state authorities are proposed to the DEA for

03:32PM  21   adoption, for federal adoption?

03:32PM  22   A.  Sometimes.

03:32PM  23   Q.  And sometimes they just don't meet the threshold of

03:32PM  24   making it across the bar for federal prosecution?

03:32PM  25   A.  That's correct.

03:32PM    1    Q.   And usually sometimes it relates to the fact that the

03:32PM    2    amount of narcotics recovered off someone is just very low?

03:32PM    3    A.   Sometimes.

03:32PM    4    Q.   Okay.  So, for instance, in December of 2015, you recall

03:32PM    5    that you started to investigate a person by the name of Mark

03:32PM    6    Vitale, correct?

03:32PM    7    A.   Again, that name's been brought up, I just can't recall

03:32PM    8    what it's from.

03:32PM    9    Q.   So, Mark Vitale, if you recall, is somebody who is from

03:32PM   10    the Town of Tonawanda?

03:32PM   11    A.   Again, I know I issued a subpoena, because Jordan sent it

03:32PM   12    to me, or showed it to me when I was here, the prosecutor.

03:32PM   13    But as far as him being from the Town of Tonawanda, I don't

03:32PM   14    remember for certain at this point.

03:32PM   15    Q.   Do you recall having contact with Thomas Oswald who is a

03:32PM   16    detective with the Town of Tonawanda, sir?

03:32PM   17    A.   Regarding --

03:33PM   18    Q.   Regarding Mark Vitale, yes.

03:33PM   19    A.   It's possible.  I just don't remember the specific

03:33PM   20    conversation --

03:33PM   21    Q.   Okay.

03:33PM   22    A.   -- with Tom.  And I do know Tom.  I just don't remember

03:33PM   23    the specific conversation.

03:33PM   24    Q.   Do you remember any information about a tipster named

03:33PM   25    Corey Cannizzo being communicated to you by Tom Oswald?

03:33PM    1    A.  I don't remember that name either.

03:33PM    2    Q.  You were shown earlier a copy of a subpoena return,

03:33PM    3    correct?

03:33PM    4    A.  Correct.

03:33PM    5    Q.  And that subpoena return was dated 12/14/2015, correct?

03:33PM    6    A.  I can't remember.

03:33PM    7    Q.  But you wouldn't have any reason to disagree with me

03:33PM    8    about that, right, sir?

03:33PM    9    A.  No.

03:33PM   10    Q.  And so when you get subpoena returns, it usually

03:33PM   11    indicates that there's some steps that are taken prior to

03:33PM   12    that date that you get the return back to request the

03:33PM   13    records, correct?

03:33PM   14    A.  Prior steps that you would take before you request a

03:33PM   15    subpoena?

03:33PM   16    Q.  Yes, sir.

03:33PM   17    A.  There would most, yeah, there would be a reason to have

03:33PM   18    to issue the  subpoena, so someone would have -- there would

03:33PM   19    have to be a reason for it.

03:33PM   20    Q.  Yeah, the subpoenas don't come back the same day,

03:34PM   21    correct?

03:34PM   22    A.  Subpoenas don't come -- well, it depends.  I've had

03:34PM   23    subpoenas come back sometimes from certain carriers within

03:34PM   24    hours.  That was more towards the end of my career.  But

03:34PM   25    other times it was longer.

03:34PM    1    Q.   Yeah.   And back in the 2015 time period, it takes more

03:34PM    2    than just a couple hours to get back a subpoena return,

03:34PM    3    correct?

03:34PM    4    A.   It depends on the carrier.   I can't remember, I think it

03:34PM    5    was T-Mobile was the one that was quickest, and if they were

03:34PM    6    doing it as quickly in 2-'15 or not, but there -- sometimes

03:34PM    7    it's days.   It just depends on the carrier.   I can't remember

03:34PM    8    the time frame of when they came back quickly from T-Mobile.

03:34PM    9    Q.   Correct.   And so I know we're having a little trouble

03:34PM   10    remembering this case, but do you recall at least submitting

03:34PM   11    some type of subpoena for records off a cell phone that

03:34PM   12    Mr. Vitale was associated with?

03:34PM   13    A.   After being shown that subpoena, I remember after it was

03:34PM   14    shown to me with my name on it, that I did a subpoena, and I

03:34PM   15    believe it was for Vitale.

03:34PM   16    Q.   Correct.   And you were involved in the investigation in

03:35PM   17    some way, correct?

03:35PM   18    A.   I issued the subpoena.   I can't remember much else.

03:35PM   19    Q.   Do you remember being involved in the search warrant in

03:35PM   20    that case, sir?

03:35PM   21    A.   As far as at the house?

03:35PM   22    Q.   That's correct.

03:35PM   23    A.   It's possible, I just can't remember it.

03:35PM   24    Q.   Do you remember Mr. Bongiovanni being involved in that

03:35PM   25    case, sir?

03:35PM   1   A.  I can't remember.  I just don't remember much about that

03:35PM   2   case.

03:35PM   3   Q.  And you remember after the subpoena returns were

03:35PM   4   recovered, you remember running toll logs on the records that

03:35PM   5   you got?

03:35PM   6   A.  It's possible.  I can't remember if those were shown to

03:35PM   7   me or not.  But it's possible I could have done that.

03:35PM   8   Q.  Okay.  And you know that Joseph Palmieri, during that

03:35PM   9   time period, he worked at the Tonawanda Police Department as

03:35PM  10   a -- an officer, and then was associated with DEA as a task

03:35PM  11   force officer?

03:35PM  12   A.  Yes.

03:35PM  13   Q.  And he was somebody that worked with Mr. Bongiovanni,

03:35PM  14   correct?

03:35PM  15   A.  He was someone that worked with Mr. Bongiovanni?

03:35PM  16   Q.  Yes.

03:35PM  17   A.  To the best of my knowledge, they were partners before

03:35PM  18   I -- before I came to Buffalo.

03:35PM  19   Q.  Correct.  And so sometimes DEA would work on cases in

03:36PM  20   joint conjunction with the local police, correct?

03:36PM  21   A.  Yes, we've done that before.

03:36PM  22   Q.  And do you remember anything about putting Mr. Vitale's

03:36PM  23   phone number into DARTS?

03:36PM  24   A.  I don't remember specifically if I subpoenaed the number,

03:36PM  25   which after seeing the subpoena, I did.  In order to subpoena

03:36PM    1    number, I believe you do have to enter it into DARTS to get

03:36PM    2    to the subpoena aspect of it.  So I don't specifically

03:36PM    3    remember entering it into DARTS, but after seeing the

03:36PM    4    subpoena, I did the subpoena.  And I know the process is you

03:36PM    5    enter a number into DARTS to get to the subpoena section.

03:36PM    6    So --

03:36PM    7    Q.  And as far as the drugs that were -- that Mr. Vitale was

03:36PM    8    caught with on the date of the search warrant, do you have

03:36PM    9    recollection about how much marijuana or cocaine he was

03:36PM   10    caught with?

03:36PM   11    A.  I'm sorry, I just don't.  I don't remember that

03:36PM   12    investigation.  I don't remember the search warrant.  I don't

03:37PM   13    remember what he was caught with.

03:37PM   14    Q.  So you don't remember much about this case at all?

03:37PM   15    A.  When I was shown that subpoena, that really was it for

03:37PM   16    me.  And I didn't even remember it until I looked at it and

03:37PM   17    saw my name was on it.  I just don't remember the

03:37PM   18    investigation.

03:37PM   19    Q.  So I know you don't remember much about this, but this

03:37PM   20    happened in December of 2015, Christmas season is kind of on

03:37PM   21    the horizon; fair to say?

03:37PM   22    A.  During that time of year --

03:37PM   23    Q.  Yes.

03:37PM   24    A.  -- yes.

03:37PM   25    Q.  And as a result, did you attend the DEA Christmas party

03:37PM    1    that year?

03:37PM    2    A.  If you told me -- so, December of 2015, and I got back

03:37PM    3    September of 2015, do you remember -- I can't remember the

03:37PM    4    location.  Maybe if you told me, I'm pretty sure --

03:37PM    5    Q.  Did you attend it at SoHo that year?

03:37PM    6    A.  No, absolutely not.

03:37PM    7    Q.  You didn't attend at SoHo that year?

03:37PM    8    A.  No, absolutely not.

03:38PM    9    Q.  Why not?

03:38PM   10    A.  I've never attended a DEA Christmas party at SoHo.

03:38PM   11    Q.  So you've gone to a DEA Christmas party at SoHo.

03:38PM   12    A.  I've been to a DEA Christmas party, I can't remember

03:38PM   13    going to one at SoHo.

03:38PM   14    Q.  Okay.

03:38PM   15         **MR. SINGER:**  Judge, do you want to take our break?

03:38PM   16         **THE COURT:**  Yeah, why don't we take -- let's take ten

03:38PM   17    minutes, because we only have about an hour left.  Let's take

03:38PM   18    ten minutes.

03:38PM   19         Remember my instructions about not talking to anyone

03:38PM   20    including each other, not making up your mind.

03:38PM   21         See you back here at ten minutes before 4.

03:38PM   22         (Jury excused at 3:38 p.m.)

03:39PM   23         **THE COURT:**  Anything for the record, Mr. Dickson?

03:39PM   24         **MR. DICKSON:**  No, Your Honor.

03:39PM   25         **THE COURT:**  From the defense?

| | | |
|---|---|---|
| 03:39PM | 1 | **MR. SINGER:**  No, Your Honor. |
| 03:39PM | 2 | **THE COURT:**  Okay.  See you back here in ten minutes. |
| 03:39PM | 3 | Let's keep it at ten minutes, too. |
| 03:39PM | 4 | **THE CLERK:**  All rise. |
| 03:39PM | 5 | (Off the record at 3:39 p.m.) |
| 03:51PM | 6 | (Back on the record at 3:51 p.m.) |
| 03:52PM | 7 | (Jury not present.) |
| 03:52PM | 8 | **THE CLERK:**  All rise. |
| 03:52PM | 9 | **THE COURT:**  Please be seated. |
| 03:52PM | 10 | **THE CLERK:**  We are back on the record for the |
| 03:52PM | 11 | continuation of the jury trial in case number 19-cr-227, |
| 03:52PM | 12 | United States of America versus Joseph Bongiovanni. |
| 03:52PM | 13 | All counsel and parties are present. |
| 03:52PM | 14 | **THE COURT:**  Okay.  Are we ready to go? |
| 03:52PM | 15 | **MR. SINGER:**  Yes, Judge. |
| 03:52PM | 16 | **MR. DICKSON:**  Yes, Judge. |
| 03:52PM | 17 | **THE COURT:**  Let's bring them back, please. |
| 03:52PM | 18 | And depending on where we are, we're going to have a |
| 03:52PM | 19 | hard stop at 4:45 for a juror. |
| 03:52PM | 20 | **MR. SINGER:**  Yes, Judge. |
| 03:53PM | 21 | (Jury seated at 3:53 p.m.) |
| 03:53PM | 22 | **THE COURT:**  The record will reflect that all our |
| 03:53PM | 23 | jurors are present again. |
| 03:53PM | 24 | I remind the witness that he's still under oath. |
| 03:53PM | 25 | You may continue, Mr. Singer. |

03:53PM  1          **MR. SINGER:** Thank you, Your Honor.

03:53PM  2              **BY MR. SINGER:**

03:53PM  3  Q.  All right.  So we talked a little bit about case

03:53PM  4  investigations.  I want to go a little bit more deeply into

03:53PM  5  the Serio case investigation.

03:53PM  6          **MR. SINGER:**  So, Ms. Champoux, will you mind bringing

03:53PM  7  up Exhibit 26C in evidence, please.

03:53PM  8              **BY MR. SINGER:**

03:53PM  9  Q.  So you remember looking at this exhibit on direct

03:53PM  10  testimony, Mr. Casullo, correct?

03:53PM  11  A.  Yes.

03:53PM  12  Q.  And so the purpose of the DARTS entries is to work

03:54PM  13  through deconfliction, correct?

03:54PM  14  A.  That is correct.

03:54PM  15  Q.  And so if another agent is investigating a similar

03:54PM  16  target, the two agents can coordinate together, correct?

03:54PM  17  A.  That's correct.

03:54PM  18  Q.  And it also applies to agencies, correct?

03:54PM  19  A.  Agencies talking amongst each other.

03:54PM  20  Q.  Yes.

03:54PM  21  A.  Yes, sir.

03:54PM  22  Q.  Yeah.  So if a different federal agency is investigating

03:54PM  23  someone, like you mentioned that HSI, FBI, something along

03:54PM  24  those lines is investigating a target, and DEA is also

03:54PM  25  investigating that target, that is something that this tool

03:54PM   1   will be used for to help the agents get together and figure

03:54PM   2   out how to do things correctly?

03:54PM   3   A.   That's correct.

03:54PM   4   Q.   And so it applies to agencies and agents, correct?

03:54PM   5   A.   It applies to, yeah, whoever you work for.

03:55PM   6   Q.   Okay.  And, so, on this entry, I want to direct your

03:55PM   7   attention down to the bottom.

03:55PM   8        **MR. SINGER:**  Ms. Champoux, can we expand upon

03:55PM   9   everything from Trinity item 1, down.  Thank you very much.

03:55PM  10        **BY MR. SINGER:**

03:55PM  11   Q.   So what we're looking at here is a return on a positive

03:55PM  12   hit for a phone number, correct, sir?

03:55PM  13   A.   There's an overlap on that number, correct.

03:55PM  14   Q.   Correct.  And so the top entry that was entered by you in

03:55PM  15   case C2-17-001, correct?

03:55PM  16   A.   August 2nd, 2018, correct.

03:55PM  17   Q.   Yes.  And so that column on the left that says request

03:55PM  18   date, that's something that's talking about when you enter

03:55PM  19   into the DARTS system this number, correct?

03:55PM  20   A.   Yes.

03:55PM  21   Q.   And the case number that's the case number that you're

03:55PM  22   working on, correct?

03:55PM  23   A.   That's the case number that the deconfliction would be

03:56PM  24   under that case.

03:56PM  25   Q.   And you mentioned with regard to that column all the way

03:56PM  1   to the left, priority, there are different priority levels

03:56PM  2   assigned to different types of individuals entered into the

03:56PM  3   system, correct?

03:56PM  4   A.   Yeah, I can't remember for certain, again, other than

03:56PM  5   what I said previously.  But there are numbers, and there's a

03:56PM  6   system of doing that on how you categorize it either to be a

03:56PM  7   1 or 2.

03:56PM  8   Q.   Correct.  And you mentioned that priority 1s, those are

03:56PM  9   generally targets of the investigations, correct?

03:56PM  10  A.   Number 1 should be, in my experience, should be -- I

03:56PM  11  can't remember, there was an actual, like, pull-down menu,

03:56PM  12  like a help menu in the system to help you determine like

03:56PM  13  what falls under each category.

03:56PM  14      In thinking back, I'm pretty certain, like, if your

03:56PM  15  target is utilizing this phone number, and you put this phone

03:56PM  16  number into the system, that should be a 1.

03:56PM  17  Q.   Okay.  And number 2, that's something that's a little

03:57PM  18  different, correct?

03:57PM  19  A.   It should be.  It should be numbers in contact with that

03:57PM  20  number.

03:57PM  21  Q.   All right.

03:57PM  22  A.   It should be.

03:57PM  23  Q.   So the number that you entered here, we've established,

03:57PM  24  is Tom Serio's cell phone number, top left?

03:57PM  25  A.   I don't recognize the number, I can't remember if the

03:57PM   1    number came up before.  So, whose number is that?

03:57PM   2    Q.  Tom Serio.

03:57PM   3    A.  Again, I don't remember the number, that could be --

03:57PM   4    Q.  You see --

03:57PM   5    A.  -- if -- I know I --

03:57PM   6    Q.  -- in the --

03:57PM   7    A.  -- looked it up --

03:57PM   8    Q.  -- remarks section down --

03:57PM   9    A.  Oops.

03:57PM  10    Q.  -- to the --

03:57PM  11    A.  Sorry.

03:57PM  12    Q.  -- lower right --

03:57PM  13            THE COURT:  One at a time, guys.

03:57PM  14            THE WITNESS:  Yep.

03:57PM  15            THE COURT:  One at a time, please

03:57PM  16            MR. SINGER:  Sorry, Judge.

03:57PM  17            BY MR. SINGER:

03:57PM  18    Q.  You go down to the lower right, that reflects an entry

03:57PM  19    that says that's Tom Serio's cell phone number, correct?

03:57PM  20    A.  That's correct.

03:57PM  21    Q.  So with regard to what you see below your entry, I'm

03:57PM  22    looking at the 7/6/2012 entry, do you see that, sir?

03:57PM  23    A.  7/6/2012.  Yes.

03:57PM  24    Q.  That's an entry that was entered by someone different

03:57PM  25    than you, correct?

03:57PM   1   A.   Justin Borst.

03:57PM   2   Q.   And in the remarks section, it talks about how it's an

03:58PM   3   investigation that Special Agent Shane Nastoff is handling;

03:58PM   4   do you see that?

03:58PM   5   A.   A number belonging to -- per Special Agent Shane Nastoff.

03:58PM   6   Yes.  I see that, sir.

03:58PM   7   Q.   And, so, fair to say that the number for Tom Serio is

03:58PM   8   entered in pursuant to Special Agent Nastoff's instructions

03:58PM   9   to Justin Borst on 7/6/2012?

03:58PM  10   A.   Based on reading the remarks would have been Agent

03:58PM  11   Nastoff requesting that through Justin.  Like, I want this,

03:58PM  12   talking to his analyst, please do this for me.

03:58PM  13   Q.   Correct.  Because Borst is someone who is an analyst who

03:58PM  14   works for Nastoff in some capacity to help?

03:58PM  15   A.   That worked with him, correct.

03:58PM  16   Q.   Correct.  And then if you look down at the lowest entry,

03:58PM  17   that's the entry on 3/12/2013, that's a case associated with

03:58PM  18   Special Agent Bongiovanni, correct?

03:58PM  19   A.   Per the remarks section, yes.

03:58PM  20   Q.   And that's entered after Special Agent Nastoff directs

03:59PM  21   entry of this number, correct?

03:59PM  22   A.   Yes.  Correct.

03:59PM  23        **MR. SINGER:**  Okay.  If we could unexpand that,

03:59PM  24   please, Ms. Champoux and if we can turn to the second page.

         25

03:59PM    1           BY MR. SINGER:

03:59PM    2    Q.   Now, we also talked about how DARTS entries in the

03:59PM    3    system, they are sent out to agents with connections to the

03:59PM    4    case, correct?

03:59PM    5    A.   Yeah, it would be an email to an agent or an analyst.

03:59PM    6    Q.   And so part of deconfliction is that if another agent or

03:59PM    7    agency is investigating a particular number, that's something

03:59PM    8    that will pop up on someone's email as an alert of, hey, this

03:59PM    9    person is looking at the same person you're looking at,

03:59PM   10    correct?

03:59PM   11    A.   Yes, that's how it should work.

03:59PM   12    Q.   And so I know that you ran your entry in 2018, but what

03:59PM   13    you can see from the legacy data in this document is that

03:59PM   14    there was another officer who ran something related to this

03:59PM   15    case back on October 14th of 2015; is that right?

04:00PM   16    A.   That's what it looks like here.

04:00PM   17    Q.   And that person was Charles Tolias, correct?

04:00PM   18    A.   That's what the name is, yes.

04:00PM   19    Q.   And you are familiar with Agent Tolias as being

04:00PM   20    associated with the Department of Homeland Security?

04:00PM   21    A.   I don't -- I don't know that name, but I can tell by

04:00PM   22    reading the email @ice.dhs that he works for some component

04:00PM   23    of Homeland Security.

04:00PM   24           MR. SINGER:   And if we can turn back to the first

04:00PM   25    page, Ms. Champoux.

04:00PM    1                **BY MR. SINGER:**

04:00PM    2    Q.  So, fair to say that Agent Nastoff enters an entry on

04:00PM    3    this number first on 7/6/2012?

04:00PM    4    A.  Yeah, Justin did for Shane.

04:00PM    5    Q.  And then the second person to do this on the entry is

04:00PM    6    Agent Bongiovanni on 3/12/2013?

04:00PM    7    A.  Steve Bevilacqua did it for Bongiovanni.

04:00PM    8            **MR. SINGER:**  If we can turn to the second page,

04:00PM    9    please, Ms. Champoux.

04:00PM   10            **BY MR. SINGER:**

04:00PM   11    Q.  Then we have an alert that Charles Tolias also put in

04:00PM   12    something associated back on October of 2015, correct?

04:01PM   13    A.  That's correct.

04:01PM   14    Q.  And then we go back to the first page, it appears that

04:01PM   15    you were the last person to do an entry on this at least

04:01PM   16    pursuant to this one email on 8/2/2018, correct?

04:01PM   17    A.  That's correct.

04:01PM   18    Q.  So, fair statement that the people that entered the

04:01PM   19    information on this one particular number and case prior to

04:01PM   20    2018, when Agent Tolias entered the number into DARTS in

04:01PM   21    2015, he would have been alerted, correct?

04:01PM   22    A.  When he entered it in 2015 -- the way the system's

04:01PM   23    supposed to work, and what I'm looking at now is that an

04:01PM   24    alert should have gone out to Justin Borst and Steve

04:01PM   25    Bevilacqua, and then possibly those other case agents

04:01PM    1    mentioned in the remarks.

04:01PM    2    Q.  And those two case agents are Agent Bongiovanni and Agent

04:01PM    3    Nastoff?

04:01PM    4    A.  At the top.  So it would have gone to -- yep, Shane

04:01PM    5    Nastoff's email is here, and Bongiovanni's email is there.

04:01PM    6         **MR. SINGER:**  And if we can take down that exhibit,

04:01PM    7    Ms. Champoux, and put up 26D, please, in evidence.  And if we

04:02PM    8    can scroll to page 5, please, ma'am.

04:02PM    9         **BY MR. SINGER:**

04:02PM   10    Q.  So, we talked about this top entry that was related to an

04:02PM   11    entry that you put in in March of 2019.

04:02PM   12    A.  Looking at this here, that's what it says.

04:02PM   13    Q.  Okay.  So I want to direct your attention down to the

04:02PM   14    bottom entry.

04:02PM   15         **MR. SINGER:**  If we could blow up the bottom half of

04:02PM   16    that page, Ms. Champoux, please.

04:02PM   17         **BY MR. SINGER:**

04:02PM   18    Q.  So, on this particular result, we see again Charles

04:02PM   19    Tolias putting in entries on October 2015 like we talked

04:02PM   20    about in the last document, correct?

04:02PM   21    A.  Yes.

04:02PM   22    Q.  And we also see an entry on 2/2/2017, entered, correct?

04:02PM   23    A.  What was -- yes.

04:02PM   24    Q.  And so you see that there, correct?

04:02PM   25    A.  Yes.

| | | |
|---|---|---|
| 04:02PM | 1 | Q.  And you're familiar with the Serio case, correct, sir? |
| 04:03PM | 2 | A.  In what sense?  I've reviewed the case file, I didn't |
| 04:03PM | 3 | work on it. |
| 04:03PM | 4 | Q.  You're familiar with the fact that Ron Serio was arrested |
| 04:03PM | 5 | in April of 2017, correct? |
| 04:03PM | 6 | A.  Yes. |
| 04:03PM | 7 | Q.  And so this entry that was entered by Mr. Tolias in |
| 04:03PM | 8 | February of 2017, was roughly two months before his arrest, |
| 04:03PM | 9 | correct? |
| 04:03PM | 10 | A.  That, I don't remember the date of when Serio was |
| 04:03PM | 11 | arrested.  But if you told me the date that he was |
| 04:03PM | 12 | arrested -- can you tell me the date he was arrested, or -- |
| 04:03PM | 13 | Q.  So if he was arrested in April of 2017, that's roughly -- |
| 04:03PM | 14 | A.  Yes. |
| 04:03PM | 15 | Q.  -- about -- |
| 04:03PM | 16 | A.  Yep. |
| 04:03PM | 17 | Q.  -- two months -- |
| 04:03PM | 18 | A.  Yep. |
| 04:03PM | 19 | Q.  -- before. |
| 04:03PM | 20 | MR. SINGER:  If we can just unexpand out of that |
| 04:03PM | 21 | Ms. Champoux, and go back to page 1. |
| 04:03PM | 22 | BY MR. SINGER: |
| 04:03PM | 23 | Q.  And, again, when we're going through these |
| 04:03PM | 24 | deconflictions, these are things that are sent out to the |
| 04:03PM | 25 | agents who have prior entries, correct? |

04:03PM    1    A.  It should be the agent and/or the analyst.  When you set

04:03PM    2    it up, when you set your case up in DARTS, and I'm not sure

04:04PM    3    about DICE, when you set it up, you can set it up with the

04:04PM    4    case agent, more than one case agent, an analyst.

04:04PM    5        So, you have options.  But you should have a case agent

04:04PM    6    on there, and possibly an analyst.

04:04PM    7    Q.  And so, again, we have a situation where Mr. Tolias is

04:04PM    8    entering things into the system from the Department of

04:04PM    9    Homeland Security, correct?

04:04PM   10    A.  Correct.

04:04PM   11    Q.  He does so in 2015 and 2017, correct?

04:04PM   12    A.  Yeah, based on what we were just looking at, correct.

04:04PM   13    Q.  We know from looking at this document previously that

04:04PM   14    Mr. Bongiovanni has an entry related to everything on this

04:04PM   15    one particular exhibit, correct?

04:04PM   16    A.  Yeah.  I can't see it anymore, but --

04:04PM   17            **MR. SINGER:**  So if we can go back to page 5,

04:04PM   18    Ms. Champoux.

04:04PM   19            **THE WITNESS:**  So, yes, on June 17th, 2013.

04:04PM   20            **BY MR. SINGER:**

04:04PM   21    Q.  So, when Mr. Tolias put his entries in at the bottom, if

04:04PM   22    the system is working correctly, Mr. Bongiovanni should have

04:04PM   23    found out about that, correct?

04:04PM   24    A.  He should have found out about that.  An email should

04:04PM   25    have been sent to -- based on the prior page, should have

04:05PM    1    been sent to his email.

04:05PM    2          **MR. SINGER:**  Okay.  You can take down that exhibit,

04:05PM    3    thank you, Ms. Champoux.

04:05PM    4          **BY MR. SINGER:**

04:05PM    5    Q.  So with regard to your work in D-57, you worked with

04:05PM    6    Mr. Bongiovanni on the Ramos Ramos case, correct?

04:05PM    7    A.  Yes.

04:05PM    8    Q.  You also worked with him on a couple other different

04:05PM    9    cases, correct?

04:05PM    10   A.  There was a controlled delivery that I believe was before

04:05PM    11   the Ramos Ramos case.  And then I believe there was a

04:05PM    12   heroin -- a quick heroin buy/bust type case where we bought

04:05PM    13   narcotics and arrested the individual, fentanyl I believe it

04:05PM    14   was, shortly thereafter.

04:05PM    15   Q.  Okay.  And, you know, is it fair to say that the two of

04:05PM    16   you have different investigative styles?

04:05PM    17   A.  In what way?

04:05PM    18   Q.  Is it fair to say that you investigate things a little

04:05PM    19   differently?

04:05PM    20   A.  Maybe if you can be specifically --

04:05PM    21   Q.  Well, I mean, let me just ask you this.  Do you feel like

04:05PM    22   you're a more thorough agent than Mr. Bongiovanni?

04:06PM    23   A.  I -- I don't want to sound judgemental.  I know what I

04:06PM    24   do.  I believe I'm thorough.  I mean, that's my belief.

04:06PM    25   Q.  Do you believe that you're more thorough than

04:06PM  1    Mr. Bongiovanni?

04:06PM  2    A.   That I'm more thorough --

04:06PM  3    Q.   Yes.

04:06PM  4    A.   -- than Mr. Bongiovanni?

04:06PM  5    Q.   Yes.

04:06PM  6    A.   I could be at times.  That's my belief.  I believe at

04:06PM  7    times I was more thorough.

04:06PM  8    Q.   Okay.  One of the things that you received as a result of

04:06PM  9    your work was that when Mr. Yensan, your group supervisor,

04:06PM  10   was not in the office, you sometimes would step into an

04:06PM  11   acting role, correct?

04:06PM  12   A.   That's correct.

04:06PM  13   Q.   So you provided a leadership position; is that right?

04:06PM  14   A.   Yes.

04:06PM  15   Q.   And you weren't a D-57 as long as Mr. Bongiovanni,

04:06PM  16   correct?

04:06PM  17   A.   No, he was there before me.  And then I left and he was

04:06PM  18   still there.

04:06PM  19   Q.   And, so, is it a fair statement that over the course of

04:06PM  20   time, a couple things happened between you and

04:06PM  21   Mr. Bongiovanni that caused your relationship to deteriorate?

04:07PM  22   A.   It changed.

04:07PM  23   Q.   It changed.  Sometimes you made reports about things that

04:07PM  24   he did that you didn't agree with to Mr. Yensan, correct?

04:07PM  25   A.   That I made reports?

04:07PM   1    Q.   You made reports to G.S. Yensan about things you

04:07PM   2    disagreed with that Mr. Bongiovanni did, correct?

04:07PM   3    A.   Do you have a specific example?  I -- I don't know.

04:07PM   4    Q.   The judge doesn't want me to get into specific

04:07PM   5    examples --

04:07PM   6    A.   Okay.

04:07PM   7    Q.   -- but again, do you recall instances where you sat down

04:07PM   8    with G.S. Yensan to go talk about Mr. Bongiovanni doing

04:07PM   9    things that you didn't particularly approve of?

04:07PM  10    A.   I can't remember something specific.  It's possible.

04:07PM  11    Q.   Do you recall having any particular conversations about

04:07PM  12    Mr. Bongiovanni with G.S. Yensan?

04:07PM  13    A.   Doing what?

04:07PM  14    Q.   Do you recall any type of conversations that

04:07PM  15    Mr. Bongiovanni had with Mr. Yensan about things that you did

04:07PM  16    that he didn't agree with that got back to you?

04:07PM  17    A.   I can't remember anything specifically.

04:08PM  18              MR. SINGER:  Judge, can we approach, please?

04:08PM  19              THE COURT:  Sure.

04:08PM  20              (Sidebar discussion held on the record.)

04:08PM  21              MR. SINGER:  I've tried to avoid this, but --

04:08PM  22              THE COURT:  Can you show him documents and ask him --

04:08PM  23              MR. SINGER:  I don't have documents to talk to him

04:08PM  24    about particular incidents.  None of them exist.  I'm talking

04:08PM  25    to him about particular incidents regarding what happened with

04:08PM  1   what we talked about earlier today --

04:08PM  2          **THE COURT:**  Right.

04:08PM  3          **MR. SINGER:**  -- which you moved to exclude.  And at

04:08PM  4   this point, I'm not getting any answers at all.  So I don't

04:08PM  5   want to go into prohibited areas, but I'm kind of running out

04:08PM  6   of options to do it.

04:08PM  7          **THE COURT:**  Well, what was -- remind me what the

04:08PM  8   government's objection to the content was.

04:08PM  9          **MR. DICKSON:**  It's a relevance and a 403.

04:08PM  10         **THE COURT:**  But what is -- but what about the -- tell

04:09PM  11  me what it is.  So I ruled you could get into this general

04:09PM  12  area, but he couldn't do what.

04:09PM  13         **MR. DICKSON:**  I think the issue is that

04:09PM  14  Mr. Bongiovanni was exposed to fentanyl, and that Mr. Casullo,

04:09PM  15  if I'm understanding where counsel's going, is that

04:09PM  16  Mr. Casullo either wasn't there or didn't help, and

04:09PM  17  Mr. Bongiovanni got upset about that.

04:09PM  18         So, for example, just maybe to make things easier, I

04:09PM  19  don't have an issue if counsel wants to maybe refresh

04:09PM  20  Mr. Casullo's memory with the name of the person who was

04:09PM  21  investigated.  But going beyond that into fentanyl exposure --

04:09PM  22         **THE COURT:**  I think the fentanyl exposure is the

04:09PM  23  thing that I have a problem with.  But what about Bongiovanni

04:09PM  24  lodging a complaint behind his back?

04:09PM  25         **MR. SINGER:**  I mean, I could get into that, Judge, I

| | | |
|---|---|---|
| 04:09PM | 1 | don't know the answer I'm gonna get.  I just don't remember -- |
| 04:09PM | 2 | **THE COURT:**  He's not remembering anyway. |
| 04:09PM | 3 | **MR. SINGER:**  Yeah. |
| 04:09PM | 4 | **THE COURT:**  I get that.  So, it's tough, and not many |
| 04:10PM | 5 | things you can do about that. |
| 04:10PM | 6 | You can explore it, go incrementally. |
| 04:10PM | 7 | **MR. SINGER:**  Okay. |
| 04:10PM | 8 | **THE COURT:**  And what about -- what is the problem |
| 04:10PM | 9 | with reminding him about his complaints about Bongiovanni? |
| 04:10PM | 10 | **MR. SINGER:**  So we'll get into one of those |
| 04:10PM | 11 | complaints, which is the Peter Gerace situation.  But, you |
| 04:10PM | 12 | know, like, we don't have any specific things in our |
| 04:10PM | 13 | possession that we can use to refresh his memory because we |
| 04:10PM | 14 | just weren't provided anything. |
| 04:10PM | 15 | **MR. DICKSON:**  And that's what -- I mean, if the |
| 04:10PM | 16 | witness doesn't remember, he doesn't remember, they can call |
| 04:10PM | 17 | another witness to impeach him, they can do that. |
| 04:10PM | 18 | **THE COURT:**  Yeah, you can do it, but proceed |
| 04:10PM | 19 | incrementally. |
| 04:10PM | 20 | **MR. SINGER:**  I got you, Judge. |
| 04:10PM | 21 | **THE COURT:**  I'm not precluding you from objecting. |
| 04:10PM | 22 | **MR. DICKSON:**  Okay. |
| 04:10PM | 23 | **THE COURT:**  I'm not ruling on this now.  If you want |
| 04:10PM | 24 | to go step by step. |
| 04:10PM | 25 | **MR. SINGER:**  Okay. |

| 04:10PM | 1 | **MR. DICKSON:**  Thank you. |

04:10PM   1       **MR. DICKSON:**  Thank you.

04:10PM   2            (End of sidebar discussion.)

04:10PM   3       **THE COURT:** Go ahead, next question.

04:11PM   4       **MR. SINGER:**  Thank you, Your Honor.

04:11PM   5       **BY MR. SINGER:**

04:11PM   6   Q.  So, Mr. Casullo, do you remember any incidents where

04:11PM   7   Mr. Bongiovanni had complaints about your performance in the

04:11PM   8   field?

04:11PM   9   A.  No.

04:11PM   10  Q.  Do you recall any incidents about where he reported to

04:11PM   11  G.S. Yensan that he felt like you didn't have his back in the

04:11PM   12  field?

04:11PM   13  A.  No.

04:11PM   14  Q.  You don't recall anything with regard to him not having

04:11PM   15  your back on a particular arrest?

04:11PM   16  A.  I remember -- and I don't believe I complained to Greg

04:11PM   17  Yensan about it, when he left the surveillance when we were

04:11PM   18  up on a wire, and he left one of the task force officers on

04:11PM   19  the I-90 by himself and went home.  But Greg was mad, and was

04:11PM   20  so aware of it, I didn't have to say anything to Greg it.

04:11PM   21  Q.  Well, what I'm talking about is complaints that

04:11PM   22  Mr. Bongiovanni made about you, about particular arrests

04:11PM   23  where you didn't have his back.  Do you remember anything

04:11PM   24  about that?

04:11PM   25  A.  No, sir.

| | | |
|---|---|---|
| 04:11PM | 1 | Q.  Do you remember a person by the name of Steven Paschell? |
| 04:12PM | 2 | A.  Yes. |
| 04:12PM | 3 | Q.  And you remember that Mr. Paschell was arrested, correct? |
| 04:12PM | 4 | A.  Yes. |
| 04:12PM | 5 | Q.  And you recall that there was an incident that occurred |
| 04:12PM | 6 | that created a dangerous situation for -- |
| 04:12PM | 7 | **MR. DICKSON:** Objection. |
| 04:12PM | 8 | **BY MR. SINGER:** |
| 04:12PM | 9 | Q.  -- Mr. Bongiovanni during the arrest? |
| 04:12PM | 10 | **MR. DICKSON:**  Objection.  This is beyond doing this |
| 04:12PM | 11 | line of inquiry that we already dealt with this morning for |
| 04:12PM | 12 | the purpose of refreshing the witness. |
| 04:12PM | 13 | **THE COURT:**  No, I'm going to allow this and only |
| 04:12PM | 14 | this.  Go ahead. |
| 04:12PM | 15 | **BY MR. SINGER:** |
| 04:12PM | 16 | Q.  Do you recall an incident during the arrest of |
| 04:12PM | 17 | Mr. Paschell by Mr. Bongiovanni where there was an incident |
| 04:12PM | 18 | of danger that was created during the arrest? |
| 04:12PM | 19 | A.  I remember fentanyl when they went to arrest |
| 04:12PM | 20 | Mr. Paschell, and it was Bongiovanni and I believe agent |
| 04:12PM | 21 | Chris Wisniewski.  They were assigned to the arrest team on |
| 04:12PM | 22 | the vehicle that Paschell was driving in.  The operation plan |
| 04:12PM | 23 | was a buy/bust operation that we were going to buy narcotics |
| 04:13PM | 24 | and arrest him shortly thereafter.  He wasn't going to able |
| 04:13PM | 25 | to drive away like the prior buys. |

USA v Bongiovanni - Casullo - Singer/Cross - 3/20/24

162

04:13PM    1    And when that occurred, there was some type of struggle

04:13PM    2    within the vehicle when Bongiovanni and Wisniewski went to

04:13PM    3    arrest him out of the car, and there was fentanyl in the car,

04:13PM    4    I believe in the console area, and it became airborne.  And

04:13PM    5    it was in the air, it was all over Paschell's jacket, it may

04:13PM    6    have gotten on the agent's jacket.

04:13PM    7    So, I wasn't part of that arrest team, but they came back

04:13PM    8    to the office, and was made aware of it.  And it was a bad

04:13PM    9    situation.

04:13PM    10   Q.  So you don't recall being at the arrest scene that day,

04:13PM    11   sir?

04:13PM    12   A.  Again, I'd have to read the report if I was at the arrest

04:13PM    13   scene.  I think I was at the residence, because we were

04:13PM    14   gonna --

04:13PM    15   Q.  That wasn't the question I asked.  I asked you, do you

04:13PM    16   remember being at the arrest scene or not?  Yes or no?

04:13PM    17   A.  I don't remember specifically if I was at the arrest

04:13PM    18   scene or another location like the house.

04:13PM    19   Q.  And do you remember Mr. Bongiovanni lodging a complaint

04:13PM    20   against you, because he felt like you weren't acting in your

04:13PM    21   regard as an officer that day to back him up?

04:13PM    22   A.  No.

04:14PM    23   Q.  You don't remember that at all, sir?

04:14PM    24   A.  No, sir.

04:14PM    25   Q.  You don't remember Mr. Yensan talking to you about that?

04:14PM  1    A.  No.

04:14PM  2    Q.  Not at all?

04:14PM  3    A.  No.

04:14PM  4    Q.  So, you talked a little bit about friction starting to

04:14PM  5    develop between you two, correct?

04:14PM  6    A.  Our relationship did change from the beginning until we

04:14PM  7    stopped working together.

04:14PM  8    Q.  And so one of those friction points occurred in the

04:14PM  9    summer of 2016, correct?

04:14PM  10   A.  Summer of 2016?  Are you referring to something?

04:14PM  11   Q.  Do you recall when you started investigating Peter

04:14PM  12   Gerace, sir?

04:14PM  13   A.  That's -- yes, that's when things -- that's when --

04:14PM  14   Q.  You recall that?

04:14PM  15   A.  -- that's when things started to change.

04:14PM  16   Q.  Okay.  So 2016, you recall starting an investigation into

04:14PM  17   Peter Gerace that you testified to on direct, correct?

04:14PM  18   A.  Summer of 2016, when I issued a subpoena for his phone

04:14PM  19   number.

04:14PM  20   Q.  And so you start to look into Peter Gerace on suspicion

04:14PM  21   that he's distributing drugs, correct?

04:14PM  22   A.  Yes.

04:14PM  23   Q.  And that's when you alerted Mr. Yensan to the fact that

04:15PM  24   you're going to run toll logs on Mr. Gerace, correct?

04:15PM  25   A.  I asked him, because he had to sign off on it.  I said

USA v Bongiovanni - Casullo - Singer/Cross - 3/20/24

164

04:15PM    1    are you okay with me issuing, and he said yes.

04:15PM    2    Q.  And you had a concern about Mr. Bongiovanni's cell phone

04:15PM    3    number potentially turning up in those tolls, correct?

04:15PM    4    A.  I brought that to Greg's attention.

04:15PM    5    Q.  Based on the fact that you knew they knew each other in

04:15PM    6    some capacity, correct?

04:15PM    7    A.  They knew each other.

04:15PM    8    Q.  And as a result of that toll, you did find

04:15PM    9    Mr. Bongiovanni's phone numbers inside Mr. Gerace's phone

04:15PM    10   records?

04:15PM    11   A.  Yes, Greg instructed me to look to see if his number was

04:15PM    12   in the tolls.  And it was.

04:15PM    13   Q.  Were you aware of that fact that Mr. Yensan, after you

04:15PM    14   reported back to him of what you discovered, had a sit-down

04:15PM    15   with Mr. Bongiovanni, correct?

04:15PM    16   A.  Correct.  Greg told me shortly afterwards that he had

04:15PM    17   counseled Joe and told him --

04:15PM    18   Q.  I don't -- I don't want -- I'm not interesting in that,

04:15PM    19   sir.

04:15PM    20   A.  Sure.

04:15PM    21   Q.  Just please answer the questions and I'm asking.

04:15PM    22   A.  No problem.

04:15PM    23   Q.  Are you aware of the fact that Mr. Bongiovanni had a

04:15PM    24   conversation with Mr. Yensan after you reported about the

04:15PM    25   Peter Gerace's phone?

USA v Bongiovanni - Casullo - Singer/Cross - 3/20/24

04:15PM    1    A.  I was made aware that Greg Yensan had a convention with

04:16PM    2    Bongiovanni about his number being in the toll records.

04:16PM    3    Q.  And so as a result of that conversation, you started to

04:16PM    4    see Mr. Bongiovanni not being as friendly to you in the

04:16PM    5    office?

04:16PM    6    A.  Yeah, he stopped talking to me.

04:16PM    7    Q.  And that's when you decided to have a sit-down and try to

04:16PM    8    kind of smooth over things?

04:16PM    9    A.  I asked if he would talk to me in the conference room.

04:16PM   10    Q.  And the investigation into Gerace, I know you testified

04:16PM   11    on direct that you didn't believe it was motivated in any way

04:16PM   12    by the fact that Phil Domiano is somebody that you have a

04:16PM   13    relationship to, correct?

04:16PM   14    A.  That's my wife's brother.

04:16PM   15    Q.  And so it's your wife's brother, right?

04:16PM   16    A.  Phil Domiano is my wife's brother.

04:16PM   17    Q.  So he's your brother-in-law?

04:16PM   18    A.  Yes.

04:16PM   19    Q.  And he's somebody who's married to your wife's sister?

04:16PM   20    A.  I'm married to Phil Domiano's sister.

04:16PM   21    Q.  Okay.  And Mr. Domiano, he lived in Las Vegas for a

04:16PM   22    period of time, correct?

04:17PM   23    A.  He did, and he still does.

04:17PM   24    Q.  And when you were living in Las Vegas when you were

04:17PM   25    working at DEA in Las Vegas, Mr. Domiano was living there,

04:17PM    1    correct?

04:17PM    2    A.  He was when I was there.

04:17PM    3    Q.  And for some period of time, he was also living in

04:17PM    4    Buffalo, correct?

04:17PM    5    A.  There was a time when I was living in New York City that

04:17PM    6    he lived in Buffalo for short period of time, I think it was

04:17PM    7    several months, few months.

04:17PM    8    Q.  And at that point in time you understood he was working

04:17PM    9    for Peter Gerace, correct?

04:17PM   10    A.  I found out afterwards that -- when we interviewed, and I

04:17PM   11    don't remember her name, Curtis Ryan and I, that's when I

04:17PM   12    /TPOUPD out for certain that he was working for Peter Gerace

04:17PM   13    'cuz that's what she said.

04:17PM   14    Q.  So you found out for the first time that Phil Domiano was

04:17PM   15    working for Peter Gerace at Pharaoh's Gentlemen's Club later,

04:17PM   16    later?  How much later?

04:17PM   17    A.  Whenever that interview with Phlycia was.  He -- my wife

04:17PM   18    had said to me, she was upset, this is while I was working in

04:17PM   19    New York City, that her brother Phil was considering working

04:18PM   20    for Peter Gerace at this -- at his strip club, Pharaoh's.

04:18PM   21    She was upset about that because she thought Peter Gerace was

04:18PM   22    a degenerate, and I agreed with her.  To the point that when

04:18PM   23    I was home on the weekend, I saw him, I can't remember, I

04:18PM   24    believe he was visiting the house, and I said I heard that

04:18PM   25    you're planning or considering working for Peter Gerace.

04:18PM    1    And he said, yeah, I think so, I need a change.

04:18PM    2    And I told him I didn't that was a good idea.

04:18PM    3    And he said, why?

04:18PM    4    And I said, because Peter's a criminal.

04:18PM    5    And he said -- he really didn't say much.  He didn't say

04:18PM    6    much, and it was never spoken of again.

04:18PM    7    Q.  And, you know, I think you were contrite with the fact

04:18PM    8    that your familial relationship to Phil Domiano has caused

04:18PM    9    problems for you over the years, correct?

04:18PM   10    A.  He has caused problems for me.

04:18PM   11    Q.  It's put you in awkward situations being a DEA agent,

04:18PM   12    correct?

04:18PM   13    A.  That's correct.

04:18PM   14    Q.  Given some of the relationships that he keeps?

04:18PM   15    A.  Correct.

04:19PM   16    Q.  Given some of the places that he works?

04:19PM   17    A.  Yes.

04:19PM   18    Q.  And, you know, this is something that caused you some

04:19PM   19    issues in Las Vegas, correct?

04:19PM   20    A.  At one point, correct.

04:19PM   21    Q.  And, so, with regard to one of the things you said on

04:19PM   22    direct, you mentioned that it seemed odd back in 2004 that

04:19PM   23    Joe Bongiovanni told you, hey, you know, I'm willing to help

04:19PM   24    you out as much as I can, but please don't put my name on the

04:19PM   25    report, I can't have any name on the report; do you remember

04:19PM    1    talking about that?

04:19PM    2    A.   Yes.

04:19PM    3    Q.   Given your relationship to Phil Domiano, wouldn't it be

04:19PM    4    awkward for you to have your name on a report investigating

04:19PM    5    Phil Domiano?

04:19PM    6             MR. DICKSON:   Objection, relevance, 403.

04:19PM    7             THE COURT:   Overruled.

04:19PM    8             THE WITNESS:   Could you ask please the question

04:19PM    9    again, sir?

04:19PM   10             BY MR. SINGER:

04:19PM   11    Q.   Sure.   Would it be awkward for you to have your name on a

04:19PM   12    report investigating Phil Domiano?

04:19PM   13    A.   I don't believe that I would be allowed to, by my

04:19PM   14    agency's policy, to investigate my brother-in-law.

04:20PM   15    Q.   Yeah.   And I guess that's one the things DEA does,

04:20PM   16    right, it tries to remove you from certain situations

04:20PM   17    sometimes that might create awkward situations for you?

04:20PM   18    A.   It depends.   It depends on the relationship, the

04:20PM   19    closeness.   So  --

04:20PM   20    Q.   And, you know, you lived in Kenmore for a period of time

04:20PM   21    of your life, correct?

04:20PM   22    A.   I did, I grew up in Kenmore.

04:20PM   23    Q.   Worked out at the Fitness Factory, correct?

04:20PM   24    A.   I grew up in Kenmore.   I was a police officer in

04:20PM   25    Tonawanda.

04:20PM    1    Q.   And so you're aware of the fact that it's a pretty

04:20PM    2    close-knit community up there, correct?

04:20PM    3    A.   Kenmore?

04:20PM    4    Q.   Yes.

04:20PM    5    A.   Small village, I think 2.2 square miles.

04:20PM    6    Q.   Everybody knows each other?

04:20PM    7    A.   A lot of people know each other.

04:20PM    8    Q.   Lot of people work out at the Fitness Factory together?

04:20PM    9    A.   Again, I worked out there during college, and there

04:20PM   10    were -- there were, I wouldn't say a lot of people, but it

04:20PM   11    was a busy gym.

04:20PM   12    Q.   And you're aware of the fact that Mr. Bongiovanni at that

04:20PM   13    point in time was living in North Buffalo, correct?

04:20PM   14    A.   When I was in college?

04:20PM   15    Q.   No.  I'm talking about in the 2004 time frame, sir?

04:21PM   16    A.   He mentioned that he had grown up in North Buffalo, I

04:21PM   17    didn't know if he was still living there or not.

04:21PM   18    Q.   If I were to tell you that he was living there at that

04:21PM   19    point in time when you were investigating Masecchia and he

04:21PM   20    wanted to help, you can understand why he might be

04:21PM   21    apprehensive about putting his name on the report, right?

04:21PM   22    A.   I can understand that.

04:21PM   23    Q.   Because it puts him in an awkward position if he sees

04:21PM   24    Masecchia.

04:21PM   25    A.   I can understand that.

USA v Bongiovanni - Casullo - Singer/Cross - 3/20/24

04:21PM    1    Q.  So getting back to Peter Gerace, you start to look into

04:21PM    2    both Peter Gerace and also Pharaoh's Gentlemen's Club,

04:21PM    3    correct?

04:21PM    4    A.  That was initially when I first issued that first

04:21PM    5    subpoena.

04:21PM    6    Q.  And you're aware of the fact that Mr. Gerace has ties to

04:21PM    7    Joseph Todaro, correct?

04:21PM    8    A.  Joseph Todaro -- he has a cousin, Joseph Todaro, I

04:21PM    9    believe, and an uncle, Joseph Todaro.

04:21PM   10    Q.  Correct.  And so those are two people that, based on your

04:21PM   11    training and experience as law enforcement officer, you know

04:21PM   12    to have some type of claim that they're associated with

04:21PM   13    Italian Organized Crime?

04:22PM   14    A.  From things that -- from things that I've read in the

04:22PM   15    paper, or things that came up in intel in my job, yes.

04:22PM   16    Q.  And so that was another interest that you had with regard

04:22PM   17    to Peter Gerace, because he potentially might have some ties

04:22PM   18    to Italian Organized Crime, right?

04:22PM   19    A.  Peter wasn't targeted because of the Todaros.  Peter was

04:22PM   20    targeted because he was a drug trafficker operating a strip

04:22PM   21    joint in Cheektowaga, New York, as a convicted felon.

04:22PM   22    Q.  So one of the things that you talked about when you

04:22PM   23    worked in Las Vegas was the fact that your G.S. was someone

04:22PM   24    who had a background in investigating Italian Organized Crime

04:22PM   25    in New York City?

04:22PM  1   A.  I had a supervisor that had that type of experience in

04:22PM      New York City.

04:22PM  3   Q.  And that was something that he brought you under his wing

04:22PM  4   to teach you about, correct?

04:22PM  5   A.  He had an interest in it, asked if I would be interested

04:22PM  6   in working those types of cases if we had a valid lead, and I

04:22PM  7   agreed.

04:22PM  8   Q.  And those were some types of cases that you investigated

04:22PM  9   when you're out in Las Vegas, correct?

04:22PM  10  A.  There was that Sam Spano/Masecchia case.  I believe it

04:23PM  11  was another case that I wasn't a case agent on that assisted,

04:23PM  12  where two New York PD retired detectives were convicted of

04:23PM  13  doing hits for the Mafia.  That was our lead into

04:23PM  14  Los Angeles, but that was under the Spano case.  I can't

04:23PM  15  remember if there were others.

04:23PM  16  Q.  But there were a number of cases that you investigated

04:23PM  17  with the angle of Italian Organized Crime connected to it,

04:23PM  18  correct?

04:23PM  19  A.  There were a couple.  A couple.

04:23PM  20  Q.  When you get back up to Buffalo, that's not something

04:23PM  21  that completely disappears from your training and experience,

04:23PM  22  correct?

04:23PM  23  A.  Disappears in the sense of I forgot that -- or, could you

04:23PM  24  elaborate?

04:23PM  25  Q.  You didn't stop investigating targets of Organized Crime

04:23PM 1    figures when you got up to Buffalo, correct?

04:23PM 2    A.  I didn't -- stop?  I wasn't working on any.

04:23PM 3    Q.  Well, we bring back Peter Gerace.  You know his

04:23PM 4    relationship to Joseph Todaro, correct?

04:23PM 5    A.  Yes, correct.

04:23PM 6    Q.  Both Senior and Junior, correct?

04:23PM 7    A.  Yes.

04:23PM 8    Q.  And those are someone that you know based on your

04:24PM 9    experience to have some type of allegations are connected to

04:24PM 10   Organized Crime, correct?

04:24PM 11   A.  Yes.

04:24PM 12   Q.  And you're very well familiar as a DEA agent that when

04:24PM 13   you're trying to move up a chain of a criminal organization,

04:24PM 14   right, you're gonna start somewhere not at the top --

04:24PM 15   A.  Right.

04:24PM 16   Q.  -- but more so in the middle or the bottom, right?

04:24PM 17   A.  Correct.

04:24PM 18   Q.  And if you can get someone on some type of charges, even

04:24PM 19   if they don't have any relation to Organized Crime, sometimes

04:24PM 20   you can use those charges to have against them to squeeze

04:24PM 21   them for information, correct?

04:24PM 22   A.  That could happen.

04:24PM 23   Q.  And you're telling the jury that the connection that

04:24PM 24   Peter Gerace had familially to the Todaros was nothing that

04:24PM 25   influenced you in any way whatsoever?

04:24PM   1   A.  That had no bearing whatsoever.  Peter Gerace, to my

04:24PM   2   knowledge, was a drug trafficker operating Pharaoh's strip

04:24PM   3   club.  He was a convicted felon still running the strip club.

04:24PM   4   He was targeted because of his drug -- I don't want to say.

04:24PM   5   Because he was involved with cocaine, that's why Peter Gerace

04:25PM   6   was targeted.

04:25PM   7   Q.  So, getting back to summer of 2016.  You noticed that

04:25PM   8   Mr. Bongiovanni is somebody who is not acting the same way

04:25PM   9   that he did around you, correct?

04:25PM  10   A.  He wasn't after the subpoena.

04:25PM  11   Q.  And you can feel the tension in the office, correct?

04:25PM  12   A.  Yes.

04:25PM  13   Q.  And you wanted to try to diffuse things, right?

04:25PM  14   A.  Right.

04:25PM  15   Q.  So you meet up with him?

04:25PM  16   A.  We had -- I asked him if he would be willing to meet me

04:25PM  17   in the conference room and talk.

04:25PM  18   Q.  And so you two have a meeting inside the conference room,

04:25PM  19   correct?

04:25PM  20   A.  Yes.

04:25PM  21   Q.  It was just you and him?

04:25PM  22   A.  Just me and him.

04:25PM  23   Q.  You say in your direct testimony that the first thing

04:25PM  24   that he says is that Peter Gerace called me up about some

04:25PM  25   stripper who overdosed at a club, and I told him to get her

04:25PM    1    out of there?

04:25PM    2    A.  He said, that kid called me when a stripper overdosed in

04:25PM    3    his club, and I told him, meaning Peter, to get her out of

04:26PM    4    there.

04:26PM    5    Q.  And that was something that was totally unprompted?

04:26PM    6    A.  Completely unprompted.

04:26PM    7    Q.  Did you, after you invited Mr. Bongiovanni into the

04:26PM    8    conference room, ask him anything?

04:26PM    9    A.  About that?

04:26PM   10    Q.  Yes.

04:26PM   11    A.  No, I was too shocked about what he just said.

04:26PM   12    Q.  Well, did you ask him anything --

04:26PM   13    A.  About the overdose?

04:26PM   14    Q.  -- about Peter Gerace?

04:26PM   15    A.  No.  He just offered his information that he wasn't a

04:26PM   16    trafficker, he was more of a user.

04:26PM   17    Q.  So it's your testimony that you invite him into the

04:26PM   18    conference room, right?

04:26PM   19    A.  Yes.

04:26PM   20    Q.  He accepts the invitation, right?

04:26PM   21    A.  Yes.

04:26PM   22    Q.  You go and you close the door, correct?

04:26PM   23    A.  Yes.

04:26PM   24    Q.  And then he just says this right to you?

04:26PM   25    A.  I went to essentially apologize.  And didn't want him to

04:26PM    1    think that I was trying to get him in trouble.

04:26PM    2        To which he said, this is bullshit.

04:26PM    3        And I'm thinking, meaning that he's being counselled

04:26PM    4    because his phone is in contact with Peter Gerace.

04:26PM    5        And then unsolicited he said, that kid called me when a

04:27PM    6    stripper overdosed in the club, and I told him, Peter, to get

04:27PM    7    her out of there.  Completely unsolicited.  I had no idea

04:27PM    8    what he was talking about.

04:27PM    9    Q.  Okay.  So let's break that down a little bit.  So what

04:27PM   10    you're saying is that after you closed the door of the

04:27PM   11    conference room, right --

04:27PM   12    A.  Yes.

04:27PM   13    Q.  -- you attempt to make some type of apology and explain

04:27PM   14    how you are not targeting Joseph Bongiovanni in any way based

04:27PM   15    on running the tolls for Peter Gerace, right?

04:27PM   16    A.  That this wasn't about Joe, that this was about targeting

04:27PM   17    Peter.  And that I had known he had been counseled, that's

04:27PM   18    why I assumed that that's why he was upset.

04:27PM   19    Q.  Okay.  So there's some conversation before this

04:27PM   20    spontaneous utterance that you just talked about.

04:27PM   21    A.  There was me basically -- basically saying I'm not trying

04:27PM   22    to get you in trouble.  And that's when he said, this is

04:27PM   23    bullshit.

04:27PM   24    Q.  Okay.  So, he tells you it's bullshit.  And to the best

04:27PM   25    of your recollection, you don't recall him following up that

04:27PM  1   comment, with this is bullshit, talking about why he believes

04:28PM  2   your investigation into Peter Gerace is not accurate and

04:28PM  3   correct?

04:28PM  4   A.  No.

04:28PM  5   Q.  So he didn't preface anything about Peter Gerace being a

04:28PM  6   drug user as opposed to a drug distributor?

04:28PM  7   A.  That came after.

04:28PM  8   Q.  That all came after?

04:28PM  9   A.  That came after.

04:28PM 10   Q.  He just talks about how the kid called me up about a

04:28PM 11   stripper overdosing, I told him to get her out of there?

04:28PM 12   A.  He said that spontaneously at the very beginning, which

04:28PM 13   was very shocking, because I wasn't anywhere near that

04:28PM 14   subject and he spouted it out.

04:28PM 15   Q.  All right.  So let's get to that comment.   So -- so

04:28PM 16   Mr. Bongiovanni tells you that kid, referring to Gerace,

04:28PM 17   called me up on the phone when the stripper was overdosing,

04:28PM 18   and I told him to get her out of there, correct?

04:28PM 19   A.  That's correct.

04:28PM 20   Q.  And that's your memory of the conversation as it went

04:28PM 21   down, correct?

04:28PM 22   A.  Up to that point.

04:28PM 23   Q.  I know it's kind of a stupid question, but there's no

04:29PM 24   recording of this, right?

04:29PM 25   A.  No, sir.

USA v Bongiovanni - Casullo - Singer/Cross - 3/20/24

04:29PM   1   Q.  You didn't take any notes during the conversation,

04:29PM   2   correct?

04:29PM   3   A.  No.

04:29PM   4   Q.  You didn't take any notes after the conversation, right?

04:29PM   5   A.  No, not until I was requested in 2018 to write a memo by

04:29PM   6   my supervisor, which they never asked me for again.  And at

04:29PM   7   that point, I took notes in 2018.

04:29PM   8   Q.  And you talked about how you didn't ask any type of

04:29PM   9   clarifying questions after the statement was made, correct?

04:29PM  10   A.  About the stripper?

04:29PM  11   Q.  About -- about what Mr. Bongiovanni communicated to

04:29PM  12   Mr. Gerace in that phone call that you're saying?

04:29PM  13   A.  I didn't say anything after he said that.  I was in

04:29PM  14   shock.

04:29PM  15   Q.  So you don't know what Mr. Bongiovanni was referring to

04:29PM  16   when he says get the girl out of there, right?

04:29PM  17   A.  I know what I believed.  I believed that --

04:29PM  18   Q.  Well, I know what you believed, sir.

04:29PM  19   A.  Yes.

04:29PM  20   Q.  But what I'm getting at is you don't know what

04:29PM  21   Mr. Bongiovanni was referring to?

04:29PM  22   A.  I have no idea what he's talking about regarding the

04:30PM  23   whole incident, it was that shocking.

04:30PM  24   Q.  Yeah.  So you didn't ask him any clarifying questions

04:30PM  25   about, like, Joe, what do you mean by get her out of that?

04:30PM    1    A.  No, I was too shocked at what he had just said.

04:30PM    2    Q.  So you don't know if he's referring to get her out of

04:30PM    3    there in respect of call 911 and get an ambulance?

04:30PM    4    A.  No.  That didn't really make sense to me.

04:30PM    5        Like that -- if someone called me up and said a stripper

04:30PM    6    just overdosed, I'd say call 911.

04:30PM    7    Q.  So, yeah, so I guess -- you're a DEA agent, correct?

04:30PM    8    A.  Correct.

04:30PM    9    Q.  You go through different trainings with regard to certain

04:30PM   10    drugs, correct?

04:30PM   11    A.  We go through training with certain drugs, drug

04:30PM   12    identification, correct.

04:30PM   13    Q.  And you go through what should happen if someone's

04:30PM   14    exposed to drugs, correct?

04:30PM   15    A.  We did get Narcan training once fentanyl became a

04:30PM   16    problem.  That's -- to the best of my memory the training we

04:30PM   17    would get regarding exposure to drugs.  It was focused on

04:30PM   18    fentanyl because it's so dangerous.

04:30PM   19    Q.  Correct.  And you know that based on your training that

04:30PM   20    opiate overdoses are particularly dangerous, correct?

04:30PM   21    A.  Extremely.

04:31PM   22    Q.  They're something that can cause a person to die,

04:31PM   23    correct?

04:31PM   24    A.  Absolutely.

04:31PM   25    Q.  And that's why you're trained in Narcan administration,

USA v Bongiovanni - Casullo - Singer/Cross - 3/20/24

179

04:31PM     1    correct?

04:31PM     2    A.   We -- I was trained I believe several times on Narcan.

04:31PM     3    Q.   And that was done because in certain operations, you

04:31PM     4    might have an agent get exposed to a chemical that might

04:31PM     5    cause them to have a fentanyl overdose?

04:31PM     6    A.   That was done for agent safety.

04:31PM     7    Q.   And it was also done, too, for suspect safety.  You've

04:31PM     8    run into situations where people might be overdosing on drugs

04:31PM     9    when you walk into a scene, correct?

04:31PM    10    A.   First responders were trained in that way.  Our focus was

04:31PM    11    the agent.

04:31PM    12    Q.   Okay.

04:31PM    13    A.   But we wouldn't let someone die if we had Narcan and they

04:31PM    14    were overdosing.

04:31PM    15    Q.   The administration of Narcan, that's not the silver

04:31PM    16    bullet, so to speak.  Like, you need to get that person some

04:31PM    17    medical attention, correct?

04:31PM    18    A.   You need to call the paramedics.

04:31PM    19    Q.   Because follow-up medical treatment might be required

04:31PM    20    after the Narcan is administered, correct?

04:31PM    21    A.   Yes.  Paramedics should be called.

04:31PM    22    Q.   So, I mean, getting someone out of the club to help is

04:31PM    23    something that anybody can say, correct?

04:32PM    24    A.   What do you mean by get her out of the club?

04:32PM    25    Q.   Get her out of the club.  Like, if -- Pharaoh's

04:32PM    1   Gentlemen's Club doesn't have any type of Narcan, right?

04:32PM    2   A.  I don't know.

04:32PM    3   Q.  But let's say they don't.  Having that woman who's

04:32PM    4   overdosing in the club is not going to do anything to help

04:32PM    5   her, correct?

04:32PM    6   A.  If someone's overdosing, especially if you're a law

04:32PM    7   enforcement officer, you don't move them.  It becomes a crime

04:32PM    8   scene at that point.  You don't move them.

04:32PM    9   Q.  Sir, that's not the question I asked you.

04:32PM   10   A.  Okay.

04:32PM   11   Q.  All right?  What I'm asking is, is that if there's no

04:32PM   12   Narcan available in Pharaoh's Gentlemen's Club --

04:32PM   13   A.  Correct.

04:32PM   14   Q.  -- and someone's overdosing there, leaving them there is

04:32PM   15   not gonna get them help, correct?

04:32PM   16   A.  No, you call 911.

04:32PM   17   Q.  Okay.  So with regard to this one particular statement,

04:32PM   18   you don't recall anything about conversations about

04:32PM   19   Mr. Bongiovanni talking about getting Narcan to administer to

04:32PM   20   someone who's overdosing?

04:32PM   21   A.  No.

04:32PM   22   Q.  You don't recall any type of conversations with

04:32PM   23   Mr. Bongiovanni about how many times Mr. Gerace called him

04:33PM   24   about what to do with on overdose person?

04:33PM   25   A.  No.

04:33PM  1   Q.  But you drew an inference that, at that point in time,

04:33PM  2   what Mr. Bongiovanni told Mr. Gerace was for some type of

04:33PM  3   nefarious purpose, correct?

04:33PM  4          MR. DICKSON:  Objection, argumentative.  Drawing an

04:33PM  5   inference.

04:33PM  6          THE WITNESS:  Can you repeat the question.

04:33PM  7          BY MR. SINGER:

04:33PM  8   Q.  You drew the inference that what Mr. Bongiovanni told

04:33PM  9   Mr. Gerace as he admitted to you was for an nefarious

04:33PM  10  purpose, correct?

04:33PM  11  A.  To me, at that moment in time, and the way it was said to

04:33PM  12  me, unsolicited in an outburst, that was running through my

04:33PM  13  mind.  To -- to the point of even when I left that meeting

04:33PM  14  with him.  I didn't know for sure, but it certainly was at

04:33PM  15  the front of my mind.

04:33PM  16  Q.  So you worked with Mr. Bongiovanni at that point for

04:33PM  17  several months, correct?

04:33PM  18  A.  Yes.  We worked that long-term heroin case.

04:33PM  19  Q.  You worked with him at the Ramos and Ramos case for

04:34PM  20  several months, correct?

04:34PM  21  A.  Yes.

04:34PM  22  Q.  And he's someone that you grew to trust to some degree,

04:34PM  23  right?

04:34PM  24  A.  Yes.

04:34PM  25  Q.  And you knew that he was a law enforcement officer for

04:34PM  1   many, many years, right?

04:34PM  2   A.   Yes.

04:34PM  3   Q.   And you just jumped to the conclusion that he was --

04:34PM  4          MR. DICKSON:   Objection, argumentative.   Jumps to the

04:34PM  5   conclusion, Judge.

04:34PM  6          THE COURT:   Okay.   The objection to the form is

04:34PM  7   sustained.

04:34PM  8          BY MR. SINGER:

04:34PM  9   Q.   You just drew the inference that he was advising Peter

04:34PM  10  Gerace to cover up an overdose?

04:34PM  11  A.   To me, in a logical sense, someone doesn't have an

04:34PM  12  outburst of when someone overdoses, to move them and then

04:34PM  13  call 911.

04:34PM  14      Someone overdoses?   The first thing you say and do as a

04:34PM  15  first responder, or even an agent that's not out in the field

04:34PM  16  in a patrol car is you call 911.

04:34PM  17  Q.   And you weren't on that conversation with Mr. Bongiovanni

04:34PM  18  and Mr. Gerace --

04:34PM  19  A.   No, sir.

04:34PM  20  Q.   -- that was being referenced, right?

04:34PM  21  A.   No, sir.

04:34PM  22  Q.   And you don't know what was talked about in that

04:34PM  23  conversation, correct?

04:34PM  24  A.   Other than what he said to me, which was completely

04:35PM  25  unsolicited and shocking, no.   Just what he said to me.

04:35PM   1   Q.  So then you two continued to speak after this comment,

04:35PM   2   correct?

04:35PM   3   A.  For a short period of time.

04:35PM   4   Q.  And you're still in kind of a state of shock?

04:35PM   5   A.  Pretty surprised.

04:35PM   6   Q.  And so at that point in time, there's a newer

04:35PM   7   conversation about whether or not you dislike Italian

04:35PM   8   Americans?

04:35PM   9   A.  He did ask if I hate Italians.

04:35PM  10   Q.  And you're an Italian American, sir, correct?

04:35PM  11   A.  I'm of Italian descent, yes.

04:35PM  12   Q.  And you -- and you would agree with me that that would

04:35PM  13   seem a little out of place if you're an Italian American, and

04:35PM  14   someone is accusing you of being biased towards or against

04:35PM  15   Italian Americans, correct?

04:35PM  16   A.  The way I processed it was that he was referring to Peter

04:35PM  17   Gerace, because that's who we were talking about.  That I was

04:35PM  18   unfairly targeting Peter Gerace because he was Italian.

04:35PM  19   Q.  So then you basically talked to Mr. Bongiovanni about how

04:35PM  20   you're not biased, correct?

04:35PM  21   A.  No.

04:35PM  22   Q.  I'm sorry --

04:36PM  23   A.  I'm not biased?

04:36PM  24   Q.  Yes, did you relate to Mr. Bongiovanni that you're not

04:36PM  25   biased against Italian Americans?

USA v Bongiovanni - Casullo - Singer/Cross - 3/20/24
184

04:36PM    1    A.  When he said that, I said no.

04:36PM    2    Q.  Okay.  And that's where you state that in response to

04:36PM    3    that, Mr. Bongiovanni delivers that racially-charged comment,

04:36PM    4    correct?

04:36PM    5    A.  Absolutely.

04:36PM    6    Q.  So -- so you've been in the DEA for many years, right?

04:36PM    7    A.  Yes, sir.

04:36PM    8    Q.  Up to that point in wasn't 22 years, but it was more than

04:36PM    9    ten years, correct?

04:36PM   10    A.  Yes.

04:36PM   11    Q.  Was it 15 years at that point?

04:36PM   12    A.  Yeah.  Close to that.

04:36PM   13    Q.  Yeah, 2015, you started in '99, it would have been 16

04:36PM   14    years at that point?

04:36PM   15    A.  Yes.

04:36PM   16    Q.  And you've gone through a lot of different trainings with

04:36PM   17    regard to racial sensitivity, correct?

04:36PM   18    A.  Yes.

04:36PM   19    Q.  And diversity, correct?

04:36PM   20    A.  Yes.

04:36PM   21    Q.  And you're aware at that point, I think you testified on

04:36PM   22    direct, that obviously this type of comment is something that

04:36PM   23    is not appropriate, correct?

04:36PM   24    A.  No.

04:36PM   25    Q.  And it's also something that you've been trained in to

04:36PM  1    report to superiors when you observe it, right?

04:37PM  2    A.  Yes.

04:37PM  3    Q.  But following this alleged conversation in 2016, summer,

04:37PM  4    you have concerns about the fact that you believe

04:37PM  5    Mr. Bongiovanni provided advice to Mr. Gerace on how to cover

04:37PM  6    up an overdose?

04:37PM  7    A.  Yes.

04:37PM  8    Q.  And then secondly, made a completely inappropriate racial

04:37PM  9    remark --

04:37PM  10   A.  Yes.

04:37PM  11   Q.  -- and you report it to nobody?

04:37PM  12   A.  And I what?

04:37PM  13   Q.  You report it to nobody?

04:37PM  14   A.  I didn't report it to management.  No, I didn't.  I

04:37PM  15   should have, but I didn't.  I told several close friends

04:37PM  16   months afterwards.

04:37PM  17   Q.  So you'd agree with me that at that point in time it's

04:37PM  18   not like you're brand new to the office like you were in

04:37PM  19   September of 2015, correct?

04:37PM  20   A.  At what time, in 2016?

04:37PM  21   Q.  Summer?

04:37PM  22   A.  So, yeah, summer of 2016, eight months, I've been in the

04:37PM  23   office about eight months.

04:37PM  24   Q.  And you developed a relationship with Greg Yensan who was

04:37PM  25   your BOSS, correct?

| | | |
|---|---|---|
| 04:37PM | 1 | A.  Greg was my supervisor.  We were friends prior to that. |
| 04:38PM | 2 | I knew him a little bit, and he became my supervisor.  I |
| 04:38PM | 3 | consider him a friend. |
| 04:38PM | 4 | Q.  How far back did you and Yensan go before you arrived in |
| 04:38PM | 5 | Buffalo? |
| 04:38PM | 6 | A.  I met him at the gym when I worked in New York City, we |
| 04:38PM | 7 | worked out at the same gym.  And that's where I met him.  So |
| 04:38PM | 8 | I knew him from working out at gym that I would work out at |
| 04:38PM | 9 | on weekends if I came home from New York.  So that's how I |
| 04:38PM | 10 | knew him when I finally got to Buffalo. |
| 04:38PM | 11 | Q.  So, I mean, safe to say that you're comfortable with |
| 04:38PM | 12 | Mr. Yensan, correct? |
| 04:38PM | 13 | A.  Greg? |
| 04:38PM | 14 | Q.  Yes. |
| 04:38PM | 15 | A.  Yeah, he was a friend.  Not a close friend, but he was a |
| 04:38PM | 16 | friend. |
| 04:38PM | 17 | Q.  And you're comfortable with the fact that you can go to |
| 04:38PM | 18 | him with complaints you have about individuals, correct? |
| 04:38PM | 19 | A.  It depends. |
| 04:38PM | 20 | Q.  You're comfortable with going to him about |
| 04:38PM | 21 | Mr. Bongiovanni potentially being turned up in tolls that |
| 04:38PM | 22 | you're running on Peter Gerace, right? |
| 04:38PM | 23 | A.  We had that conversation before I even ran the tolls. |
| 04:38PM | 24 | Q.  Exactly. |
| 04:38PM | 25 | A.  So, because of that, I brought it to his attention that, |

04:38PM    1    hey, I'm pulling tolls, just be aware.  So, yes.

04:38PM    2    Q.  So you're comfortable enough with your relationship with

04:39PM    3    Greg Yensan to report that, right?

04:39PM    4    A.  At that point.

04:39PM    5    Q.  It wasn't like you're walking on eggshells saying, oh, I

04:39PM    6    gotta make this big report to my new boss?

04:39PM    7    A.  It was an uncomfortable conversation.  That's not

04:39PM    8    something you typically do in an investigation.  I have never

04:39PM    9    done that at any point in my law enforcement experience up to

04:39PM   10    that point.  So it was uncomfortable at first, but there was

04:39PM   11    the possibility that it was gonna come up, so I addressed it

04:39PM   12    beforehand.

04:39PM   13    Q.  So, you have comfort with that, but you still chose not

04:39PM   14    to make a report and raise this concern to your superiors

04:39PM   15    knowing, what you knew?

04:39PM   16    A.  There -- from making that report and not about the

04:39PM   17    stripper overdosing and the racial comments?

04:39PM   18    Q.  Yes.

04:39PM   19    A.  No, that was a big jump from that to that in terms of

04:39PM   20    seriousness.  And I didn't.  I should have, but I didn't.

04:39PM   21    Q.  Well, I mean, I go back to the point that at that point

04:39PM   22    in time you formed an opinion in your mind that

04:39PM   23    Mr. Bongiovanni was cooperating with someone who was under

04:40PM   24    investigation?

04:40PM   25    A.  That he was cooperating --

04:40PM    1    Q.  That he was providing some type of advice about what to

04:40PM    2    do with a stripper who overdosed at the club?

04:40PM    3    A.  Yes, I thought he may have been involved in a coverup.

04:40PM    4    Q.  And knowing that, you didn't raise anything to

04:40PM    5    leadership?

04:40PM    6    A.  No, I didn't . I was trying to process the whole

04:40PM    7    situation.  Number 1, what the hell -- what the heck was he

04:40PM    8    talking about?  Because he said it so spontaneously and

04:40PM    9    unsolicited.

04:40PM   10        The racially charged?  100 percent, I should have.  To

04:40PM   11    this day, I should have.

04:40PM   12        It was running through my mind at the time, is he gonna

04:40PM   13    tell Peter Gerace I'm investigating him?  That's number one.

04:40PM   14        Number two, if I do this, just the racial comments alone,

04:40PM   15    which are horrifying, that's going straight to OPR.  The

04:40PM   16    whole focus of everything Peter Gerace is secondary.  And it

04:40PM   17    should, it's a bad thing saying those things.  And that's

04:40PM   18    running through my mind.

04:40PM   19        The consequences to me, reporting something like that

04:40PM   20    about a fellow agent.  I've seen that in the past before,

04:40PM   21    whether it's right or wrong, and it's wrong, that agent

04:40PM   22    suffers because of it.  Whether it's initially with their

04:41PM   23    career, in terms of relationships with other agents in the

04:41PM   24    office, of not being trusted, of being marginalized.  And

04:41PM   25    when I did report it, all those things happened.  All those

04:41PM   1   things happened after I reported it.  It was horrible.

04:41PM   2   Horrible.

04:41PM   3   Q.  So let's get back to the Peter Gerace and PGC, Pharaoh's

04:41PM   4   Gentlemen's Club investigation.  So --

04:41PM   5          **THE COURT:**  Mr. Singer?

04:41PM   6          **MR. SINGER:**  Yes?

04:41PM   7          **THE COURT:**  It's almost quarter to.

04:41PM   8          **MR. SINGER:**  Oh, I got you, Judge.  Yeah, I think if

04:41PM   9   we continue tomorrow --

04:41PM  10          **THE COURT:**  Yeah, that's fine.  We will do that.

04:41PM  11   We'll break now for the evening.

04:41PM  12          Remember my instructions about not communicating

04:41PM  13   about the case with anyone, including each other.  Don't read

04:41PM  14   or watch or listen to any news coverage of the case if there

04:41PM  15   is any while the case is in progress.  Don't use tools of

04:41PM  16   technology to do any research about the case or to communicate

04:41PM  17   about the case.  And don't make up your mind until the case is

04:41PM  18   submitted to you for deliberations.

04:41PM  19          We'll be back tomorrow at 9:30, and we'll see you

04:41PM  20   then.

04:41PM  21          (Jury excused at 4:41 p.m.)

04:42PM  22          **THE COURT:**  Okay.  You can step down, Mr. Casullo.

04:42PM  23   And you're not to talk to anybody about your testimony or

04:42PM  24   anything about the facts in this case before you testify again

04:42PM  25   tomorrow.  Okay?

04:42PM    1              **THE WITNESS:**  Yes, Judge.

04:42PM    2              **THE COURT:**  Okay.  Thank you.

04:42PM    3              (Witness excused at 4:42 p.m.)

           4              (Excerpt concluded at 4:42 p.m.)

           5                   *      *      *      *      *      *      *

           6

           7

           8

           9

          10                   **CERTIFICATE OF REPORTER**

          11

          12              In accordance with 28, U.S.C., 753(b), I

          13    certify that these original notes are a true and correct

          14    record of proceedings in the United States District Court for

          15    the Western District of New York on March 20, 2024.

          16

          17

          18                        s/ Ann M. Sawyer
                                     _____
          19                         Ann M. Sawyer, FCRR, RPR, CRR
                                     Official Court Reporter
                                     U.S.D.C., W.D.N.Y.
          20

          21

          22

          23

          24

          25

1                                    **INDEX**

2              **TRANSCRIPT EXCERPT - ANTHONY CASULLO**

3                          **MARCH 20, 2024**

4

5     <u>**W I T N E S S**</u>                              <u>**P A G E**</u>

6     **A N T H O N Y   C A S U L L O**                    2

7         DIRECT EXAMINATION BY MR. DICKSON:               2

8         CROSS-EXAMINATION BY MR. SINGER:                 89

9

10

11

12    <u>**E X H I B I T S**</u>                            <u>**P A G E**</u>

13    GOV Exhibits 26B, C, D, E, I, M                      33

14    GOV Exhibits 100, 100A                               39

15

16

17

18

19

20

21

22

23

24

25