09:48AM

1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK
2
   _____
3  UNITED STATES OF AMERICA,
                                       Case No. 1:19-cr-227
4                 Plaintiff,                      (LJV)
   v.
5                                      March 21, 2024
   JOSEPH BONGIOVANNI,
6
                  Defendant.
7  _____

8    TRANSCRIPT EXCERPT - TESTIMONY OF ANTHONY CASULLO - DAY 2
                BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                    UNITED STATES DISTRICT JUDGE

10
   APPEARANCES:          TRINI E. ROSS, UNITED STATES ATTORNEY
11                       BY: JOSEPH M. TRIPI, ESQ.
                             NICHOLAS T. COOPER, ESQ.
12                           CASEY L. CHALBECK, ESQ.
                         Assistant United States Attorneys
13                       Federal Centre
                         138 Delaware Avenue
14                       Buffalo, New York 14202
                             And
15                       UNITED STATES DEPARTMENT OF JUSTICE
                         BY: JORDAN ALAN DICKSON, ESQ.
16                       1301 New York Ave NW
                         Suite 1000
17                       Washington, DC 20530-0016
                         For the Plaintiff
18
                         SINGER LEGAL PLLC
19                       BY: ROBERT CHARLES SINGER, ESQ.
                         80 East Spring Street
20                       Williamsville, New York 14221
                             And
21                       LAW OFFICES OF PARKER ROY MacKAY
                         BY: PARKER ROY MacKAY, ESQ.
22                       3110 Delaware Avenue
                         Kenmore, New York  14217
23                       For the Defendant

24 PRESENT:              BRIAN A. BURNS, FBI Special Agent
                         MARILYN K. HALLIDAY, HSI Special Agent
25                       KAREN A. CHAMPOUX, USA Paralegal

Case 1:19-cr-00227-LJV-MJR    Document 1075    Filed 07/19/24    Page 2 of 89
USA v Bongiovanni - Casullo - Singer/Cross - 3/21/24

2

| | | |
|---|---|---|
| 1 | **LAW CLERK:** | **REBECCA FABIAN IZZO, ESQ.** |
| 2 | **COURT DEPUTY CLERK:** | **COLLEEN M. DEMMA** |
| 3 | **COURT REPORTER:** | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 4 | | Robert H. Jackson Federal Courthouse<br>2 Niagara Square |
| 5 | | Buffalo, New York  14202<br>Ann_Sawyer@nywd.uscourts.gov |
| 6 | | |
| 7 | | *    *    *    *    *    *    * |
| 8 | | |

9        (Excerpt commenced at 9:48 a.m.)

10        (Jury is present.)

09:48AM  11        **THE COURT:**  I remind the witness he's still under

09:48AM  12  oath.  And you may continue.

09:48AM  13        **MR. SINGER:**  Thank you, Your Honor.

09:48AM  14

09:48AM  15  **A N T H O N Y   C A S U L L O**, having been previously duly

09:48AM  16  called and sworn, continued to testify as follows:

09:48AM  17

09:48AM  18            **CROSS-EXAMINATION BY MR. SINGER (CONT'D):**

09:48AM  19  Q.  Good morning, again, Mr. Casullo.

09:48AM  20  A.  Good morning.

09:48AM  21  Q.  So, before we get back to where we left off yesterday, I

09:48AM  22  wanted to go through a couple things.

09:48AM  23      So, first off, one of the things that we talked about

09:48AM  24  yesterday was the Mark Vitale investigation; do you remember

09:49AM  25  that?

09:49AM  1    A.  I remember talking with you about it, yes.

09:49AM  2    Q.  I know that you had some difficulty remembering some of

09:49AM  3    the investigative steps that you took in that case, right?

09:49AM  4    A.  A subpoena, I believe.

09:49AM  5    Q.  Correct.  And so I asked you a couple questions on the

09:49AM  6    subpoena and what you had done with the subpoena, correct?

09:49AM  7    A.  I believe so.

09:49AM  8    Q.  So, I was hoping to try to refresh your recollection.

09:49AM  9         **MR. SINGER:**  Ms. Champoux, can you please bring up

09:49AM  10   for the witness and the witness only a copy of Government

09:49AM  11   Exhibit 3557AV.  V as in Victor, my apologies.

09:49AM  12        **BY MR. SINGER:**

09:49AM  13   Q.  It's the wrong document, sir.  So I'm going to ask you to

09:50AM  14   take a look at this document.  When you've had an opportunity

09:50AM  15   to review it all, if you can look back up at me, Mr. Casullo.

09:50AM  16   A.  Okay.

09:50AM  17        **MR. SINGER:**  If you can take that down, Ms. Champoux.

09:50AM  18        **BY MR. SINGER:**

09:50AM  19   Q.  So, again, talked about the one subpoena that you sent to

09:50AM  20   Sprint for records regarding Mark Vitale's cell phone, right?

09:50AM  21   A.  Yes.

09:50AM  22   Q.  And you remember that after you got back the subpoena

09:50AM  23   return, you also ran toll analysis on Mr. Vitale's cell

09:50AM  24   phone, correct?

09:50AM  25   A.  After seeing the DARTS hit, yes.

09:50AM  1  Q.  And that's something that you recall now.  So on the 15th

09:50AM  2  of December of 2015 is when you performed some toll analysis,

09:50AM  3  on or about that time?

09:50AM  4  A.  From the DARTS hit, is that from that record?

09:51AM  5  Q.  I'm asking you.  Like, did that help refresh your memory

09:51AM  6  as to some toll analysis that you did?

09:51AM  7  A.  Seeing that, yes.  The date, I didn't check to see if

09:51AM  8  that was the date that I did the DARTS deconfliction though.

09:51AM  9  Q.  Okay.  And so I know we talked yesterday about the

09:51AM  10  subpoena return for Mark Vitale that came in on

09:51AM  11  December 14th, correct?

09:51AM  12  A.  Okay.

09:51AM  13  Q.  And you would have had to have sent some subpoena for

09:51AM  14  records before the 14th, correct?

09:51AM  15  A.  Right.

09:51AM  16  Q.  And so you got back the subpoena return on the 14th like

09:51AM  17  we saw in the Bongiovanni file, correct?

09:51AM  18  A.  Okay.

09:51AM  19  Q.  And then you would have performed, it looks like, some

09:51AM  20  type of toll analysis on those records, correct?

09:51AM  21  A.  Correct.

09:51AM  22  Q.  Because you recall seeing -- you recall there's something

09:51AM  23  DARTS entry that happens on the 15th of December of 2015,

09:51AM  24  correct?

09:51AM  25  A.  Is that what we were just looking at, that DARTS entry?

09:51AM  1        **MR. SINGER:**  So, Ms. Champoux, can you please bring

09:51AM  2  that back up on the witness's screen only again, 3557AV, as in

09:51AM  3  Victor?

09:51AM  4        **BY MR. SINGER:**

09:51AM  5  Q.  So I'm going to ask you to take a look at that again,

09:52AM  6  sir.  Don't read from it.  But when you're done, if it

09:52AM  7  refreshes your memory, we'll be able to --

09:52AM  8  A.  I'm looking at the date, and the date says December 15.

09:52AM  9  Q.  Hold on.

09:52AM 10  A.  Okay.

09:52AM 11  Q.  No problem.  And so, again, did this help refresh your

09:52AM 12  memory as to you ran some DARTS entries on the 15th of

09:52AM 13  December of 2015?

09:52AM 14  A.  Correct.

09:52AM 15  Q.  And you also knew that you were working in tandem with

09:52AM 16  Mr. Bongiovanni in some capacity regarding the tolls of Mark

09:52AM 17  Vitale, correct?

09:52AM 18  A.  I -- I think it was the Town of Tonawanda PD.  It's

09:52AM 19  possible that Joe was, too.

09:52AM 20        **MR. SINGER:**  So, Ms. Champoux, if we can bring up

09:52AM 21  3557AV again.

09:52AM 22        **BY MR. SINGER:**

09:52AM 23  Q.  Now I'll direct your attention down to the bottom of that

09:52AM 24  page, sir, and the times regarding the request dates, and see

09:52AM 25  if that refreshes your memory about what happened.

| | | |
|---|---|---|
| 09:52AM | 1 | A.  Okay.  So December 15th.  Okay. |
| 09:53AM | 2 | **MR. SINGER:**  And you can take that down, |
| 09:53AM | 3 | Ms. Champoux. |
| 09:53AM | 4 | **BY MR. SINGER:** |
| 09:53AM | 5 | Q.  So after reviewing that document, I know is a long time |
| 09:53AM | 6 | ago, but after reviewing that document, it appears like both |
| 09:53AM | 7 | of you are running information -- sorry DARTS analysis on |
| 09:53AM | 8 | numbers relating to Mark Vitale's phone, correct? |
| 09:53AM | 9 | A.  Yes. |
| 09:53AM | 10 | Q.  And so fair to say that both of you are working that up |
| 09:53AM | 11 | in some capacity in the office? |
| 09:53AM | 12 | A.  It looks like it. |
| 09:53AM | 13 | Q.  Because both of you worked in D-57 at that point in time, |
| 09:53AM | 14 | correct? |
| 09:53AM | 15 | A.  Correct.  I didn't check the case number that we ran them |
| 09:53AM | 16 | under, but we did run it on the same date, yes. |
| 09:53AM | 17 | Q.  All right.  So, another thing that we talked about |
| 09:53AM | 18 | yesterday was Mr. Bongiovanni's business card.  You had |
| 09:53AM | 19 | talked about a conversation you had with him in 2004; do you |
| 09:53AM | 20 | remember that? |
| 09:53AM | 21 | A.  Yes. |
| 09:54AM | 22 | Q.  And you talked about how his business cards noted |
| 09:54AM | 23 | something about the New York field division, correct? |
| 09:54AM | 24 | A.  He had mentioned that he doesn't put Buffalo field |
| 09:54AM | 25 | division on -- or, Buffalo office.  He doesn't put Buffalo, |

| | | |
|---|---|---|
| 09:54AM | 1 | he puts New York field division.  That's what he said to me |
| 09:54AM | 2 | back then, something to that effect. |
| 09:54AM | 3 | Q.   What I want to show you is Government Exhibit 100-C. |
| 09:54AM | 4 | Sorry, 100C, my apologies.  So, I'm going to ask you -- |
| 09:54AM | 5 | actually, let me put this up. |
| 09:54AM | 6 | MR. SINGER:  So I know that this exhibit currently is |
| 09:54AM | 7 | not in evidence, Judge, but my understanding is that the |
| 09:54AM | 8 | government has no objections to its admissibility at this |
| 09:54AM | 9 | time. |
| 09:54AM | 10 | THE COURT:  Do you want to offer it? |
| 09:54AM | 11 | MR. SINGER:  I want to offer it into evidence at this |
| 09:54AM | 12 | time. |
| 09:54AM | 13 | MR. TRIPI:  Yeah, Judge, no objection with the |
| 09:54AM | 14 | stipulation that it was among the items in the DEA box that is |
| 09:55AM | 15 | already in evidence.  We had removed it from Exhibit 100, so |
| 09:55AM | 16 | just that's where it came from. |
| 09:55AM | 17 | THE COURT:  Okay. |
| 09:55AM | 18 | MR. TRIPI:  Okay. |
| 09:55AM | 19 | THE COURT:  So, it really may already be in evidence, |
| 09:55AM | 20 | but now Mr. Singer is offering it in particular so he can show |
| 09:55AM | 21 | it to the jury, and you have no objection. |
| 09:55AM | 22 | MR. TRIPI:  No objection. |
| 09:55AM | 23 | THE COURT:  So it's received without objection. |
| 09:55AM | 24 | **(GOV Exhibit 100C was received in evidence.)** |
| | 25 | |

**BY MR. SINGER:**

Q.  So this was a box that was recovered from

Mr. Bongiovanni's house, and I know that you weren't present

for that, Mr. Casullo, but what I'm going to do is I'm going

to take a business that was retrieved out of that box, and

I'm going to put it up on the screen for you here.

    Do you see a copy of that card, sir, clearly?

A.  Yes, I do.

Q.  And so what we were talking about in your testimony

yesterday was that Mr. Bongiovanni, he worked as part of the

New York field division; is that right?

A.  Buffalo is part of the New York field division.

Q.  Yeah.  So we had some testimony about this, but just to

clarify it for the jury.  So the DEA that covers the New York

area, it's headquartered in New York City, correct?

A.  Yes.

Q.  And then there are also offices in Albany and Buffalo?

A.  Albany, Buffalo, other -- couple other places in New York

State.

Q.  Yeah.  So the Albany office is where the assistant

Special Agent in Charge sits that is responsible for

overseeing the DEA Buffalo office at that time?

A.  It -- it did.  When I got to Buffalo and then it changed

and went back to Buffalo.

Q.  I know it changed, but there's an office in Albany,

09:56AM   1   correct?

09:56AM   2   A.   Yep.

09:56AM   3   Q.   And then there's also an office in Buffalo, correct?

09:56AM   4   A.   Yes.

09:56AM   5   Q.   And then there's some smaller offices in other regions in

09:56AM   6   New York State, correct?

09:56AM   7   A.   Yes.

09:56AM   8   Q.   But all of those offices, Buffalo, Albany, the smaller

09:56AM   9   ones, they're all part of the New York field division of the

09:56AM   10  DEA?

09:56AM   11  A.   Correct.

09:56AM   12  Q.   And that's something that's headquartered down in

09:56AM   13  New York City, correct?

09:56AM   14  A.   Yes.

09:56AM   15  Q.   And New York City is all responsible for?

09:56AM   16  A.   Yes.

09:56AM   17  Q.   And so the New York field division is what encompasses

09:56AM   18  all of New York's DEA offices, correct?

09:56AM   19  A.   That's the main office, the New York office, yep.

09:56AM   20  Q.   Okay.  So, I mean, there's nothing inaccurate about the

09:57AM   21  statement that's on Mr. Bongiovanni's card, correct?

09:57AM   22  A.   Reading the card itself, without basing it on the

09:57AM   23  comments that he had made to me before in 2004, if I were to

09:57AM   24  look at this, I mean, I would see New York field division, I

09:57AM   25  would maybe wonder why it didn't say Buffalo resident office

09:57AM    1    because the address is here and says Buffalo.  So just

09:57AM    2    looking at this without that conversation, yeah, not so much,

09:57AM    3    but based on --

09:57AM    4    Q.  And I guess you see that the Buffalo address for the

09:57AM    5    New York field division is listed on the bottom left of that

09:57AM    6    card, correct?

09:57AM    7    A.  Correct.

09:57AM    8    Q.  And then the office number, the fax number, and the cell

09:57AM    9    number, they're all 716 area codes, correct?

09:57AM    10   A.  Correct.

09:57AM    11   Q.  And so those are numbers that are relevant to the

09:57AM    12   New York office?

09:57AM    13   A.  Those 716 numbers are numbers that should be relevant to

09:57AM    14   the Buffalo office.

09:57AM    15   Q.  Okay.  Thank you.

09:57AM    16       All right.  So, where we left off yesterday was the Peter

09:58AM    17   Gerace and the Pharaoh's Gentlemen's Club investigation.  So,

09:58AM    18   to backtrack a little, you had your conversation with

09:58AM    19   Mr. Bongiovanni in summer of 2016, correct?

09:58AM    20   A.  Yes.

09:58AM    21   Q.  And nothing came up about that conversation until

09:58AM    22   August 1st of 2018, correct, to your superiors?

09:58AM    23   A.  Was -- I don't know the date, but that I think was around

09:58AM    24   that time frame.

09:58AM    25   Q.  Okay.  And so with regard to the Peter Gerace

USA v Bongiovanni - Casullo - Singer/Cross - 3/21/24

| | | |
|---|---|---|
| 09:58AM | 1 | investigation, you continued that investigation in some |
| 09:58AM | 2 | fashion moving through 2016 and into 2017, correct? |
| 09:58AM | 3 | A.  A little bit, not much in 2016.  And then I did a |
| 09:58AM | 4 | proffer, I can't remember who it was with, I think another |
| 09:59AM | 5 | TFO.  And then during that proffer, some information was |
| 09:59AM | 6 | objected about Gerace and Pharaoh's.  Anthony Gerace, Peter |
| 09:59AM | 7 | Gerace, and Pharaoh's. |
| 09:59AM | 8 | I can't remember when that proffer took place.  The case |
| 09:59AM | 9 | initiated in 2017, but I can't remember exactly when the |
| 09:59AM | 10 | proffer was. |
| 09:59AM | 11 | Q.  Okay.  Are you talking about the Kevin Myszka proffer? |
| 09:59AM | 12 | A.  Yes.  Yep. |
| 09:59AM | 13 | Q.  All right.  So we'll get back to that in a second, but as |
| 09:59AM | 14 | far as your investigation, I know we talked a little bit |
| 09:59AM | 15 | about the Ramos Ramos wiretap case? |
| 09:59AM | 16 | A.  Okay. |
| 09:59AM | 17 | Q.  Yesterday, correct? |
| 09:59AM | 18 | A.  Um-hum.  Yes. |
| 09:59AM | 19 | Q.  That was one that you started at some point in the fall |
| 09:59AM | 20 | of 2015 when you got to the Buffalo office? |
| 09:59AM | 21 | A.  Yes. |
| 09:59AM | 22 | Q.  And that was something that continued forward for a |
| 09:59AM | 23 | period of several months after you got to the office? |
| 09:59AM | 24 | A.  Yes. |
| 09:59AM | 25 | Q.  And that was the case that you worked with |

09:59AM  1    Mr. Bongiovanni, correct?

09:59AM  2    A.  Yes.

09:59AM  3    Q.  And then we talked a little bit about the Mark Vitale

09:59AM  4    investigation, right?

09:59AM  5    A.  Yes.

09:59AM  6    Q.  That was something that happened in December of 2015,

09:59AM  7    correct?

09:59AM  8    A.  Now looking at all of this, yes.

09:59AM  9    Q.  But you were still involved in the Ramos Ramos wiretap

09:59AM  10   case with Mr. Bongiovanni at that time, correct?

09:59AM  11   A.  At the time of --

10:00AM  12   Q.  At the time of December of 2015?

10:00AM  13   A.  Yes.

10:00AM  14   Q.  And that was something that was, as we discussed

10:00AM  15   yesterday, a priority for the office, correct?

10:00AM  16   A.  Yes.

10:00AM  17   Q.  It was something that took up a lot of your time,

10:00AM  18   correct?

10:00AM  19   A.  It was certainly a priority for me and for my group.

10:00AM  20   Q.  And it was a priority for Joseph Bongiovanni, correct?

10:00AM  21   A.  Was it a priority for Joe?

10:00AM  22   Q.  The Ramos Ramos case.

10:00AM  23        MR. DICKSON:  Objection, speculation.  Priority for

10:00AM  24   Mr. Bongiovanni.

10:00AM  25        MR. SINGER:  Judge, he was partners with --

| | | |
|---|---|---|
| 10:00AM | 1 | **THE COURT:** Partners in a group, no, overruled. |
| 10:00AM | 2 | **BY MR. SINGER:** |
| 10:00AM | 3 | Q. So you recall being teamed up with Mr. Bongiovanni on the |
| 10:00AM | 4 | Ramos Ramos wiretap? |
| 10:00AM | 5 | A. Joe was the co-case agent on that, yes. |
| 10:00AM | 6 | Q. I'm sorry, you remember being teamed up with Joseph |
| 10:00AM | 7 | Bongiovanni on the Ramos Ramos wiretap? |
| 10:00AM | 8 | A. Yes. |
| 10:00AM | 9 | Q. And you two worked in tandem on that, correct? |
| 10:00AM | 10 | A. Yes. |
| 10:00AM | 11 | Q. You were manning the wires over at the AG's office from |
| 10:00AM | 12 | time to time? |
| 10:00AM | 13 | A. Yes, frequently. |
| 10:00AM | 14 | Q. And it took a lot of time off your plate, correct? |
| 10:00AM | 15 | A. It took a lot of time, most of my time. |
| 10:00AM | 16 | Q. And so presumably it would have taken a lot of time off |
| 10:00AM | 17 | of Joseph Bongiovanni, your co-case agent's, plate as well? |
| 10:00AM | 18 | A. I agree. |
| 10:00AM | 19 | Q. Okay. So, as far as the Peter Gerace investigation is |
| 10:01AM | 20 | concerned, we talked a little bit about your group |
| 10:01AM | 21 | supervisor, Greg Yensan. He was somebody who didn't prevent |
| 10:01AM | 22 | you from investigating Peter Gerace or Pharaoh's Gentlemen's |
| 10:01AM | 23 | Club, correct? |
| 10:01AM | 24 | A. Well, initially, he was very supportive. And things |
| 10:01AM | 25 | changed a little bit, but initially early on he was |

10:01AM  1   supportive.  He was one that I initially spoke to and agreed

10:01AM  2   to it.  He was supportive.

10:01AM  3   Q.  That's what I'm talking about.  In the 2016 time period,

10:01AM  4   after you had your conversation with Mr. Bongiovanni,

10:01AM  5   Mr. Yensan was supportive of the investigation, right?

10:01AM  6   A.  Oh, yes.

10:01AM  7   Q.  And so I guess the bottom line and that throughout 2016,

10:01AM  8   is it a fair statement that you didn't really develop many

10:01AM  9   leads into Peter Gerace or Pharaoh's Gentlemen's Club?

10:01AM  10  A.  It was basic information.  I believe I think it was,

10:01AM  11  like, a criminal history was run, maybe some other checks.  I

10:02AM  12  don't know if there was toll analysis done again.  So, it

10:02AM  13  wasn't anything significant.

10:02AM  14  Q.  And you didn't do anything like surveillance at Pharaoh's

10:02AM  15  Gentlemen's Club or his house?

10:02AM  16  A.  No, not that I remember.

10:02AM  17  Q.  Didn't do anything like trash pulls?

10:02AM  18  A.  No, I don't believe we did trash pulls.

10:02AM  19  Q.  You didn't do anything like interviews of -- of women who

10:02AM  20  worked at the club?

10:02AM  21  A.  No.

10:02AM  22  Q.  Did you coordinate with any offices within the Buffalo

10:02AM  23  area regarding Peter Gerace and Pharaoh's?

10:02AM  24  A.  Did I coordinate with anybody -- I'm sorry?

10:02AM  25  Q.  Any other offices, so state or federal agencies within

10:02AM    1   the area of Buffalo.  Did you coordinate with any agents

10:02AM    2   about past investigations they conducted with Peter Gerace?

10:02AM    3   A.  At some point, I don't remember exactly when, I started

10:02AM    4   talking with JoAnn DiNoto from the Amherst Police Department.

10:02AM    5   Q.  But as far as anything else, you don't recall doing much

10:02AM    6   investigation into Peter Gerace until you sat down with Kevin

10:02AM    7   Myszka?

10:03AM    8   A.  It wasn't until that proffer with Kevin that was

10:03AM    9   probably, it was at that point that things started to pick up

10:03AM   10   a little bit more.

10:03AM   11   Q.  And so Kevin Myszka was a case that you investigated, and

10:03AM   12   that would have been in the 2016 time period leading into

10:03AM   13   2017?

10:03AM   14   A.  I believe so.  I believe the case was initiated late

10:03AM   15   2016, and then into '17.

10:03AM   16   Q.  Because you remember that you executed a warrant at Kevin

10:03AM   17   Myszka's house in January of 2017, right?

10:03AM   18   A.  I don't remember the date, but yes, we did, yep.

10:03AM   19   Q.  And Mr. Bongiovanni was part of that, correct?

10:03AM   20   A.  I believe so.

10:03AM   21   Q.  So, Mr. Myszka, after he was arrested, at some point in

10:03AM   22   2017, you sat down for a proffer with Mr. Myszka?

10:03AM   23   A.  He was initially interviewed at the scene briefly.  And

10:03AM   24   then he was -- I can't remember if he was interviewed again

10:04AM   25   at the office afterwards.  And then he was proffered formally

10:04AM    1    through the U.S. Attorney's Office after he was arrested and

10:04AM    2    had his attorney.

10:04AM    3    Q.  So that would have happened weeks or months after his

10:04AM    4    arrest?

10:04AM    5    A.  Yeah, I can't remember how long, but yes, it was longer,

10:04AM    6    I think, even than that.

10:04AM    7    Q.  So we're getting into a little bit of the late winter or

10:04AM    8    early spring period of 2017?

10:04AM    9    A.  Again, I would have to see when the proffers took place,

10:04AM    10   but it was later on.

10:04AM    11   Q.  Okay.  But it was after his arrest in January?

10:04AM    12   A.  Yes.

10:04AM    13   Q.  And that's when you learned some information from

10:04AM    14   Mr. Myszka about Peter Gerace providing cocaine at Pharaoh's?

10:04AM    15   A.  Yes.

10:04AM    16   Q.  And that was when it comes down it really the first big

10:04AM    17   lead that you got regarding Peter Gerace and distribution at

10:04AM    18   Pharaoh's?

10:04AM    19   A.  It was more substantial in terms of actually a witness

10:04AM    20   providing that type of information.  Up to that point, it was

10:04AM    21   more of the things that I mentioned.

10:04AM    22   Q.  Okay.  So during the period of time that you're

10:04AM    23   investigating Mr. Gerace, it's a fair statement that

10:04AM    24   Mr. Bongiovanni didn't have any involvement in the Peter

10:05AM    25   Gerace investigation, correct?

10:05AM  1   A.  No.  After that conversation, we never spoke about Peter

10:05AM  2   Gerace again until -- till I sent the report about him

10:05AM  3   calling Peter Gerace an informant, and he came over to my

10:05AM  4   desk.

10:05AM  5   Q.  I mean, given the fact that Mr. Bongiovanni knew

10:05AM  6   Mr. Gerace in some capacity, Greg Yensan, your supervisor,

10:05AM  7   wouldn't have allowed him to investigate the case, correct?

10:05AM  8   A.  I don't know what -- the only thing I know that he was

10:05AM  9   told by Greg, because Greg told me was --

10:05AM  10  Q.  Well, I'm not interested in what you were told, I'm

10:05AM  11  asking --

10:05AM  12  A.  Sure.

10:05AM  13  Q.  -- let me ask you this way.  You're the lead case agent

10:05AM  14  on a case, correct?

10:05AM  15  A.  Yes.

10:05AM  16  Q.  You wouldn't have allowed Mr. Bongiovanni to participate

10:05AM  17  in the investigation, correct?

10:05AM  18  A.  Well, I didn't really know how close his relationship at

10:05AM  19  that point was at the beginning stages.

10:05AM  20  Q.  Okay.  But you would not have allowed him in 2016 or

10:05AM  21  2017, Mr. Bongiovanni, to participate in the investigation of

10:05AM  22  Peter Gerace or Pharaoh's, correct?

10:05AM  23  A.  After those comments, I didn't want him to be involved

10:06AM  24  with that --

10:06AM  25  Q.  Okay.

10:06AM   1   A.   -- investigation.

10:06AM   2   Q.   So bottom line is he wasn't involved in the

10:06AM   3   investigation?

10:06AM   4   A.   Not of my knowledge.

10:06AM   5   Q.   Okay.  So you mentioned at some point in time in 2016 you

10:06AM   6   recalled that Peter Gerace called you on the phone?

10:06AM   7   A.   Again, I can't remember the exact time frame.  Yes, it

10:06AM   8   would have been -- yes, probably three weeks after, two weeks

10:06AM   9   after the conversation with Joe, around 2016.  Yep.

10:06AM   10  Q.   So, you talked a little bit earlier about how was it that

10:06AM   11  Peter Gerace had your cell phone number, and you talked about

10:06AM   12  an incident where you were at Brennan's; is that right?

10:06AM   13  A.   Brennan's, yep.

10:06AM   14  Q.   You're waiting for your wings and having a beer?

10:06AM   15  A.   Yep.  Yes, I was.

10:06AM   16  Q.   And then Phil Domiano, your brother-in-law, he was also

10:06AM   17  at Brennan's?

10:07AM   18  A.   He was -- he was there before I was there, yes.

10:07AM   19  Q.   And then at some point in time Peter Gerace came up or

10:07AM   20  was introduced to you at the bar; is that right?

10:07AM   21  A.   He walked up over to where we were standing, yes.

10:07AM   22  Q.   And at that point in time, you exchanged your cell phone

10:07AM   23  number with Peter Gerace, correct?

10:07AM   24  A.   Yeah, that's correct.  I received a phone call from my

10:07AM   25  wife.  When I was done with the call, he said can I get your

10:07AM    1    number?  I didn't have an excuse not to give it to him, so I

10:07AM    2    gave it to him.

10:07AM    3    Q.  So you gave it to him, and I know that you said he didn't

10:07AM    4    really call you for a period of several years up until that

10:07AM    5    2016 phone call, correct?

10:07AM    6    A.  Never called me.

10:07AM    7    Q.  We talked a little yesterday about the fact that just

10:07AM    8    before you moved back up to Buffalo, you came up for a

10:07AM    9    reunion for Saint Joe's Collegiate Institute, correct?

10:07AM    10   A.  Yes, that would have been summer of '15.

10:07AM    11   Q.  Peter Gerace was present for that reunion, correct?

10:07AM    12   A.  Yes.

10:07AM    13   Q.  You were present for that reunion, correct?

10:07AM    14   A.  Yes.

10:07AM    15   Q.  A lot of other classmates from your graduating high

10:08AM    16   school class were at that reunion, correct?

10:08AM    17   A.  Yeah, I don't remember the exact amount, but I think it

10:08AM    18   was over 50 maybe.

10:08AM    19   Q.  And at that point in time, you knew that you were going

10:08AM    20   to be moving up to Buffalo, correct?

10:08AM    21   A.  No, at that point I didn't.

10:08AM    22   Q.  You didn't?

10:08AM    23   A.  Um-mmm.

10:08AM    24   Q.  But at some point in time, you moved back to Buffalo,

10:08AM    25   correct?

10:08AM   1    A.  I moved back in September of 2015, so several, you know,

10:08AM   2    a few months after that reunion.

10:08AM   3    Q.  And I'm sure you learned throughout the course of your

10:08AM   4    investigation of Peter Gerace that he has a lot of

10:08AM   5    relationships with people in law enforcement, correct?

10:08AM   6    A.  He does, yes.  I've learned more, initially knew he knew

10:08AM   7    people in law enforcement, some people.

10:08AM   8    Q.  And I mean we've heard him described in this trial as a

10:08AM   9    police groupie, in some respects.  You wouldn't have any

10:08AM   10   reason to disagree with that characterization based on your

10:08AM   11   investigation of Mr. Gerace, right?

10:08AM   12   A.  No, that wasn't really a part of my investigation.  I

10:08AM   13   never would have referred to Peter Gerace as a police

10:09AM   14   groupie.

10:09AM   15   Q.  Okay.  But you do know he has relationships with people

10:09AM   16   in law enforcement?

10:09AM   17   A.  Yes.

10:09AM   18   Q.  You know that he calls people sometimes in law

10:09AM   19   enforcement frequently, correct?

10:09AM   20   A.  I don't know that.

10:09AM   21   Q.  And him calling you, you're up in the Buffalo office at

10:09AM   22   the time he calls you, correct?

10:09AM   23   A.  When he called me, yes, it was, as I said, a few weeks

10:09AM   24   after I had spoken to Joe in the conference room.

10:09AM   25   Q.  So unlike the many years before you got back up to

10:09AM    1    Buffalo, you weren't living in Las Vegas or New York City,

10:09AM    2    hundreds of thousands of miles away from Buffalo at that

10:09AM    3    time?

10:09AM    4    A.   No, I was in Buffalo.

10:09AM    5    Q.   You were in Buffalo, correct?

10:09AM    6    A.   Yes.

10:09AM    7    Q.   All right.  So moving through 2016, '17, we talked a

10:09AM    8    little bit yesterday about how your relationship with

10:09AM    9    Mr. Bongiovanni is deteriorating; fair statement?

10:09AM   10    A.   Yes.

10:09AM   11    Q.   You guys are talking less about each other, correct?

10:09AM   12    A.   Yeah, we worked those cases that we spoke about

10:09AM   13    yesterday, and then started to fade away.

10:09AM   14    Q.   And we talked about complaints, I think you don't

10:10AM   15    remember him making regarding your performance to your group

10:10AM   16    supervisor, Greg Yensan?

10:10AM   17    A.   He could have made that to Greg, but I don't remember

10:10AM   18    Greg telling me about it.

10:10AM   19    Q.   Okay.  And we talked a little bit about some complaints

10:10AM   20    that you had made to Greg Yensan about Mr. Bongiovanni,

10:10AM   21    correct?

10:10AM   22    A.   I think it was what I mentioned yesterday about on I-90

10:10AM   23    when Phil went home and --

10:10AM   24    Q.   Yeah.  And so like there's complaints that both of you

10:10AM   25    are making back and forth against each other?

| | | |
|---|---|---|
| 10:10AM | 1 | A.  Well, I -- |
| 10:10AM | 2 | **MR. DICKSON:**  Objection, assumes facts not in |
| 10:10AM | 3 | evidence. |
| 10:10AM | 4 | **BY MR. SINGER:** |
| 10:10AM | 5 | Q.  Okay.  So -- |
| 10:10AM | 6 | **THE COURT:**  Sustained. |
| 10:10AM | 7 | **BY MR. SINGER:** |
| 10:10AM | 8 | Q.  -- let me ask the question this way.  Your ability to |
| 10:10AM | 9 | converse with Mr. Bongiovanni is starting to fall apart as |
| 10:10AM | 10 | things move forward into 2016, 2017, correct? |
| 10:10AM | 11 | A.  What time frame? |
| 10:10AM | 12 | Q.  We're talking about 2016 into 2017.  As time progresses, |
| 10:10AM | 13 | your ability to communicate with him becomes more and more |
| 10:11AM | 14 | difficult, right? |
| 10:11AM | 15 | A.  As far as communicating, it was less working together. |
| 10:11AM | 16 | We still were able to work in the same group.  We still spoke |
| 10:11AM | 17 | to each other.  But in terms of working together as partners, |
| 10:11AM | 18 | that's what really deteriorated. |
| 10:11AM | 19 | Q.  Do you remember any instances where Joseph Palmieri, |
| 10:11AM | 20 | Mr. Bongiovanni's partner, had to act as an intermediary |
| 10:11AM | 21 | between you two because things became just so toxic that you |
| 10:11AM | 22 | couldn't even talk to each other? |
| 10:11AM | 23 | A.  Between who? |
| 10:11AM | 24 | Q.  Between you and Mr. Joseph Palmieri. |
| 10:11AM | 25 | A.  No. |

10:11AM    1    Q.  You don't remember that at all?

10:11AM    2    A.  That -- could you explain to me what you just said again.

10:11AM    3    Q.  Certainly.  So, eventually did things become so toxic in

10:11AM    4    your relationship with Mr. Bongiovanni that the two of you

10:11AM    5    used Mr. Palmieri as an intermediary to discuss things back

10:11AM    6    and forth regarding cases?

10:11AM    7    A.  No, sir.

10:11AM    8    Q.  Don't remember that?

10:11AM    9    A.  No.

10:11AM    10   Q.  All right.  So, you also recalled yesterday, we talked a

10:11AM    11   little bit about it, Mr. Thomas Mozg, you had a meeting with

10:12AM    12   him?

10:12AM    13   A.  Correct.

10:12AM    14   Q.  And that meeting, was that -- that was after you

10:12AM    15   transferred into D-58?

10:12AM    16   A.  No, I was still in D-57.  If you have -- if you have that

10:12AM    17   date, but my memory, 'cuz Joe was part of it, we were still

10:12AM    18   talking, I would have been in D-57.

10:12AM    19   Q.  So best of your memory is that occurred before your

10:12AM    20   transfer to D-58?

10:12AM    21   A.  Yes.

10:12AM    22   Q.  And you recall at that meeting, you recall that you had

10:12AM    23   received a telephone call from Mr. Mozg; is that right?

10:12AM    24   A.  I don't know if Tom called me directly to set it up.  I

10:12AM    25   think initially it was set up through one of our analysts in

10:12AM  1   the office may have been in communication with Tom Mozg's

10:12AM  2   analyst.  So I don't remember if I spoke to Tom before he

10:12AM  3   came over.  I don't remember.

10:12AM  4   Q.  And you recall that Joseph Bongiovanni came into the

10:12AM  5   meeting a little late; is that right?

10:12AM  6   A.  He did.

10:12AM  7   Q.  And the topic of conversation that day was a guy by the

10:13AM  8   name of Joseph Bella, correct?

10:13AM  9   A.  Yes.

10:13AM  10  Q.  You didn't see anything in that meeting that was out of

10:13AM  11  the ordinary, correct?

10:13AM  12  A.  No.

10:13AM  13  Q.  It was just a good old fashioned sharing of information

10:13AM  14  between law enforcement officers?

10:13AM  15  A.  Tom had a chart.  He had a lot of good information.  But

10:13AM  16  my opinion was, and Joe's as well, was that there was an

10:13AM  17  informant that we could utilize at the time that they already

10:13AM  18  had to make a quick entry into the investigation, like

10:13AM  19  purchase narcotics, do undercover meetings.  It was

10:13AM  20  intelligence based.  It was a lot of information.  It was a

10:13AM  21  chart.  But at the end of the day, we had just either

10:13AM  22  finished that wire, and were cleaning up that case, and we're

10:13AM  23  still busy from the wire.  We didn't really brush Tom off,

10:13AM  24  but it was our opinion that it was good intelligence, but

10:13AM  25  nothing that we were -- could act on at that time.

10:13AM    1    Q.   Okay.  So, I want to talk a little bit about your

10:14AM    2    transfer.  So, in -- in 2018, June of 2018, you recall being

10:14AM    3    transferred from group D-57 to group D-58; is that right?

10:14AM    4    A.   Again, I don't remember the exact date.  But, yes, I was

10:14AM    5    transferred, I just can't remember -- it could have been that

10:14AM    6    time frame.

10:14AM    7    Q.   Do you recall it being in the summer?

10:14AM    8    A.   Again, it was -- I remember being in 57 for a couple

10:14AM    9    years approximately, so, I don't remember if it was summer or

10:14AM   10    fall, I don't really remember.

10:14AM   11    Q.   Do you remember the time of year, what it was like at

10:14AM   12    all?

10:14AM   13    A.   I remember when I transferred over.  But I don't -- I

10:14AM   14    don't remember really, no.

10:14AM   15    Q.   Well, it was prior to the time that you shared with the

10:14AM   16    U.S. Attorney's Office that Mr. Bongiovanni had made these

10:14AM   17    racial comments and communicated something about an

10:14AM   18    overdosing stripper with Peter Gerace, correct?

10:14AM   19    A.   Yes.

10:15AM   20    Q.   It was not, you know, just the day before, it was several

10:15AM   21    weeks before, correct?

10:15AM   22    A.   What was several weeks?  I'm sorry, sir.

10:15AM   23    Q.   Your conversation with the U.S. Attorney's Office about

10:15AM   24    Mr. Bongiovanni and that conversation that you had in October

10:15AM   25    of 2016.  That occurred several weeks before, sorry, several

10:15AM    1   weeks after your transfer from D-57, correct?

10:15AM    2   A.  I don't know how long it was afterwards.  But I think I

10:15AM    3   had been in that group for at least a few months at that

10:15AM    4   point.

10:15AM    5   Q.  Okay.  So, if that conversation occurs in August of 2018,

10:15AM    6   you'd agreeing with me, backing things up, if you were

10:15AM    7   transferred several months, before we're talking about the

10:15AM    8   spring or summertime in of 2018 when you were transferred?

10:15AM    9   A.  It could have been.

10:15AM   10   Q.  Could have been, or was it?

10:15AM   11   A.  Again, I don't remember exactly how long it was from the

10:15AM   12   time that conversation at the U.S. Attorney's Office took

10:15AM   13   place into the time I was transferred to D-58.

10:15AM   14   Q.  You just remember several months before your

10:16AM   15   conversation --

10:16AM   16   A.  I believe several, maybe a little longer, but not much

10:16AM   17   longer.

10:16AM   18   Q.  And, so, the transfer, when you get transferred over, the

10:16AM   19   Peter Gerace case, the Pharaoh's Gentlemen's Club case, that

10:16AM   20   gets retained by Greg Yensan and he assigns new investigators

10:16AM   21   to investigate that part of your investigation in D-57?

10:16AM   22   A.  Well, there wasn't an open file on Gerace.  We, at that

10:16AM   23   point, we had it was information in terms of a subpoena that

10:16AM   24   was issued and those things that I mentioned before, and I

10:16AM   25   believe that information was subpoenaed under the Quincy

10:16AM    1    Jeffries' case, so -- which was still in group D-57.  But

10:16AM    2    there was not a formal -- file never ever opened on Peter

10:16AM    3    Gerace.  On Anthony, but not Peter.

10:16AM    4    Q.  And I guess as far as your role in that investigation

10:16AM    5    though, when you transferred to D-58, it's a fair statement

10:16AM    6    that your superiors advised you that we're gonna retain this

10:17AM    7    file on Peter Gerace, and you're gonna go off to D-58 and

10:17AM    8    you're gonna do something new?

10:17AM    9    A.  No.

10:17AM   10    Q.  No?

10:17AM   11    A.  No.

10:17AM   12    Q.  Do you remember subjects Sharon Vega and Brandon Carr

10:17AM   13    being two people you investigated in connection with

10:17AM   14    Pharaoh's?

10:17AM   15    A.  I recognize those names, but I don't believe I was part

10:17AM   16    of that.

10:17AM   17    Q.  You don't believe you were part of that investigation at

10:17AM   18    all?

10:17AM   19    A.  Investigation of Shannon Vega?  That was more Dave

10:17AM   20    Davidzyk, a TFO.  Dave Davidzyk was a TFO that was a partner

10:17AM   21    of mine when I left group D-57 that was helping with some of

10:17AM   22    the Peter Gerace things that I was looking at.  He started

10:17AM   23    looking at more of those names that you just mentioned.

10:17AM   24    Those names weren't familiar to me before until Dave

10:17AM   25    mentioned them to me.

10:17AM    1    Q.  And so when you get to D-58, one of the task force

10:17AM    2    officers that you were working with in D-58 he was a person

10:18AM    3    by the name of Curtis Ryan; is that right?

10:18AM    4    A.  Correct.

10:18AM    5    Q.  And he was a task force officer assigned from the

10:18AM    6    Homeland Security Investigations office?

10:18AM    7    A.  Yes.

10:18AM    8    Q.  And so at that time in the summer of 2018, through

10:18AM    9    working with Mr. Ryan, you understood he was also in the

10:18AM   10    process of investigating people with links to Organized Crime

10:18AM   11    such as whether it's Italian Organized Crime, motorcycle

10:18AM   12    gangs, drug traffickers, that kinds of thing?

10:18AM   13    A.  He was not investigating anything whatsoever to do with

10:18AM   14    Italian Organized Crime.  To the best of my knowledge he was

10:18AM   15    investigating marijuana investigations, mostly an

10:18AM   16    international nexus to the Canadian border.

10:18AM   17        He may have been doing some Outlaw, or whatever they're

10:18AM   18    called, motorcycle gang type cases.  But my memory was they

10:18AM   19    were mostly marijuana cases with a nexus to the border.  But

10:18AM   20    nothing with Italian Organized Crime at that point that I

10:18AM   21    remember.

10:18AM   22    Q.  So Mr. Ryan was also taking a look at Ron Serio at that

10:19AM   23    time, correct?  In the summer of 2018?

10:19AM   24    A.  Curtis?  When Ron Serio came up, I don't -- other than

10:19AM   25    what I previously mentioned when I was in group D-57, Curtis

10:19AM    1    may have mentioned that he was looking -- at some point he

10:19AM    2    mentioned Serio, I believe.  There were a couple names that I

10:19AM    3    remember him talking about in terms of international

10:19AM    4    marijuana trafficking cases.  I believe afterwards, Joe Bella

10:19AM    5    was one of those.

10:19AM    6        I can't remember if Serio was mentioned early on at that

10:19AM    7    point.  It's possible.  It's possible.

10:19AM    8    Q.  You attended a proffer with Ron Serio and Curtis Ryan

10:19AM    9    back on July 20th of 2018, correct?

10:19AM    10    A.  Correct.

10:19AM    11    Q.  And that's after Ron Serio completes a long-term drug

10:19AM    12    treatment program and dries out?

10:19AM    13    A.  I don't know about that.

10:19AM    14    Q.  But you do recall attending that proffer?

10:20AM    15    A.  Yes.

10:20AM    16    Q.  It's not like you just showed up there randomly, correct?

10:20AM    17    A.  No, we had to set that up through the U.S. Attorney's

10:20AM    18    Office.

10:20AM    19    Q.  Yes.  And you got called into the case because you had

10:20AM    20    some information that they were interested in looking at,

10:20AM    21    correct?

10:20AM    22    A.  Who?

10:20AM    23    Q.  So based on your investigation into Peter Gerace and

10:20AM    24    Pharaoh's Gentlemen's Club, you were aware of the fact that

10:20AM    25    the Outlaws Motorcycle Club had some type of affiliation with

USA v Bongiovanni - Casullo - Singer/Cross - 3/21/24

30

10:20AM    1    Peter Gerace and Pharaoh's Gentlemen's Club, right?

10:20AM    2    A.  I'm trying to -- I was called by the U.S. Attorney's

10:20AM    3    Office when I -- I think it was when I -- yeah, it was when I

10:20AM    4    was in group D-58 I'm pretty sure, and the prosecutor told me

10:20AM    5    that based on whatever they were doing at the U.S. Attorney's

10:20AM    6    Office related to Outlaw motorcycle gangs, there was some

10:20AM    7    nexus to Pharaoh's.  That's how I became aware of it.

10:20AM    8    Q.  Correct.  And that's the reason why you attended the Ron

10:20AM    9    Serio proffer in July, on July 20th of 2018, correct?

10:20AM   10    A.  I attended it because I had previous information on Peter

10:21AM   11    and Anthony Gerace.  That information came out in the Myszka

10:21AM   12    interview that was conducted through and with the U.S.

10:21AM   13    Attorney's Office.  And my interest was still Peter and

10:21AM   14    Anthony Gerace at that point.  So that's why I was called, I

10:21AM   15    believe.

10:21AM   16    Q.  And the investigation at that point in time, it was

10:21AM   17    taking a little bit of a different tack away from just Ron

10:21AM   18    Serio and who he worked with, but also towards the Outlaws

10:21AM   19    and some of the other Organized Crime figures that may

10:21AM   20    operate in the sphere that you were investigating prior to

10:21AM   21    coming to D-58 and when you got to D-58, correct?

10:21AM   22    A.  I'm sorry, I'm going to try to get this straight.  Could

10:21AM   23    you say that again?

10:21AM   24    Q.  Sure.  So when you got to group D-58, you still have an

10:21AM   25    interest in Peter Gerace?

10:21AM   1   A.  Yes.

10:21AM   2   Q.  You still have an interest in Anthony Gerace?

10:21AM   3   A.  Yes.

10:21AM   4   Q.  You still have an interest in Pharaoh's Gentlemen's Club?

10:21AM   5   A.  Yes.

10:21AM   6   Q.  You're aware of the fact, working with Mr. Ryan, that the

10:21AM   7   investigation revolving around Ron Serio is moving into a

10:22AM   8   little bit different direction which encompasses that

10:22AM   9   material, correct?

10:22AM  10   A.  No, the whole -- what I remember is Ron Serio got

10:22AM  11   connected to that, because I was looking at Peter and Anthony

10:22AM  12   Gerace.  And the U.S. Attorney's Office said that they would

10:22AM  13   be interested in historical reporting, even if they were old

10:22AM  14   reports.  So when I found a report on Anthony Gerace, the

10:22AM  15   only report that I found, it was just one sentence, he wasn't

10:22AM  16   even indexed in a report, just his name was mentioned, that

10:22AM  17   Ron Serio said that he supplied him with marijuana.  So

10:22AM  18   that's when -- that's when for me I mentioned to Curtis, we

10:22AM  19   need to go see if we can interview Ron Serio, he may have

10:22AM  20   more information on Anthony Gerace.

10:22AM  21   Q.  Mr. Casullo, though, you worked with Mr. Ryan for at that

10:22AM  22   point several weekends or months, correct?

10:22AM  23   A.  Yeah.  Again, I don't remember months.

10:22AM  24   Q.  You worked in the group, correct?

10:22AM  25   A.  He sat right across from me.

10:22AM   1   Q.  And so you had knowledge of the fact that he was looking

10:23AM   2   at Ron Serio not just from a drug angle, but also from a debt

10:23AM   3   collection angle, correct?

10:23AM   4   A.  What I remember is that those names I mentioned, and I

10:23AM   5   believe Serio was one of them, and that they were marijuana

10:23AM   6   traffickers.  I don't remember much about debt collection at

10:23AM   7   that point.

10:23AM   8   Q.  Okay.  So you enter into the Serio proffer.  And at that

10:23AM   9   point in time, you're part of the proffer interview, correct?

10:23AM   10  A.  Yes.

10:23AM   11  Q.  And Ron Serio at that point states something to the

10:23AM   12  effect that he was bribing Mr. Bongiovanni for money to pay

10:23AM   13  for information and protection, correct?

10:23AM   14  A.  I don't remember bribes being mentioned while I was

10:23AM   15  there.  I remember him mentioning that Joe was passing names

10:23AM   16  of informants.

10:23AM   17  Q.  And so that was information that you learned as part of

10:23AM   18  that proffer interview, correct?

10:23AM   19  A.  About passing the information of C.I.s?

10:23AM   20  Q.  Yes.

10:23AM   21  A.  Yes, I learned that then.

10:23AM   22  Q.  And then after learning that inside the interview, you

10:24AM   23  talked yesterday about how you went back to your office with

10:24AM   24  Mr. Ryan, right?

10:24AM   25  A.  Yes.

10:24AM    1    Q.  And you sat down with your G.S., John McHugh?

10:24AM    2    A.  Jim McHugh.

10:24AM    3    Q.  Jim McHugh, sorry.

10:24AM    4    A.  Yep.

10:24AM    5    Q.  And you communicated the information that Ron Serio had

10:24AM    6    told you in the proffer interview to Mr. McHugh, correct?

10:24AM    7    A.  We told Jim, yes.

10:24AM    8    Q.  And then your understanding is at that point in time that

10:24AM    9    information was communicated up the chain of command in DEA,

10:24AM   10    correct?

10:24AM   11    A.  I don't know.  I don't know what happened after that, we

10:24AM   12    told Jim.  And I don't know who he communicated with.  I

10:24AM   13    don't want to assume.  Like, I have my opinions, but I don't

10:24AM   14    know who he communicated with.

10:24AM   15    Q.  So you start to take a look after learning that

10:24AM   16    information a little bit more deeply into Ron Serio, right?

10:24AM   17    A.  I asked to see the file.

10:24AM   18    Q.  And the file was something that you wanted to see.  You

10:24AM   19    also started taking a look at telephone numbers, correct?

10:25AM   20    A.  I believe I ran some deconfliction.

10:25AM   21    Q.  You ran some DARTS entries, correct.

10:25AM   22    A.  Yeah, I can't remember specifically which ones I would

10:25AM   23    have related to Serio, but I believe I did a few, I think.

10:25AM   24    Q.  And those hits were something that caused Mr. Bongiovanni

10:25AM   25    to become aware of the fact that you were taking a look at

10:25AM    1    things involving Ron Serio, correct?

10:25AM    2    A.  What I remember was I ran a deconfliction, and in my

10:25AM    3    remarks section had to do with phone numbers and contact with

10:25AM    4    Anthony Gerace.  And that's when I became aware that he

10:25AM    5    became aware, because he came over to my desk and asked me

10:25AM    6    about it.

10:25AM    7    Q.  Well, we took a look at files yesterday involving DARTS

10:25AM    8    entries that you conducted regarding Anthony Gerace; do you

10:25AM    9    remember that sir?

10:25AM   10    A.  Yes.

10:25AM   11    Q.  And you remember the date that that was run was the 7th

10:25AM   12    of January of 2019?

10:25AM   13    A.  Yes.  Again, exact date, but I remember it was later in

10:25AM   14    the year, yep.

10:26AM   15    Q.  So, again, go back to the fact that if that's run in

10:26AM   16    2019, but that all stuff that's happening with Serio is in

10:26AM   17    2018 in the summertime, that Anthony Gerace DARTS running

10:26AM   18    happened well after what happened with Serio in 2018,

10:26AM   19    correct?

10:26AM   20    A.  That 2019 one happened after the proffer with Ron Serio.

10:26AM   21    Q.  But you start looking at other things involving the Serio

10:26AM   22    investigation right after the Serio proffer in July of 2018,

10:26AM   23    correct?

10:26AM   24    A.  Again, could you specifically -- I -- well, after my

10:26AM   25    conversation with Jim McHugh, the first thing I did with him

USA v Bongiovanni - Casullo - Singer/Cross - 3/21/24

10:26AM  1  per his permission was the three names that Ron Serio

10:26AM  2  mentioned that Joe had passed, what I should do with that.

10:26AM  3  If I should check to see if they were C.I.s, which he said

10:26AM  4  yes, check.  And I did.

10:26AM  5  Q.  But you also started to look at other information.  And

10:26AM  6  at some point in time, you recall that Mr. Bongiovanni comes

10:26AM  7  up and talks to you about the Serio case, correct?

10:26AM  8  A.  In what time frame is this.

10:27AM  9  Q.  This is in July or early August of 2018.

10:27AM  10  A.  He didn't come -- I remember he didn't come to talk to me

10:27AM  11  about Serio, it was about Anthony Gerace.

10:27AM  12  Q.  You don't recall him coming up to you and talking to you

10:27AM  13  about the Serio file?

10:27AM  14  A.  In 2018?

10:27AM  15  Q.  Yes.

10:27AM  16  A.  I -- I -- I don't remember that.

10:27AM  17  Q.  You don't recall him coming up and providing you the

10:27AM  18  working file to the Serio case?

10:27AM  19  A.  Absolutely not.

10:27AM  20  Q.  You don't remember that at all?

10:27AM  21  A.  No, absolutely not.

10:27AM  22  Q.  You don't recall at all, sir?

10:27AM  23  A.  The file that I reviewed, I retrieved myself with the

10:27AM  24  permission of my supervisor from our file room.  Joe

10:27AM  25  Bongiovanni did not provide me with a file to look at on the

10:27AM   1   Ron Serio case.

10:27AM   2            **MR. SINGER:**  May I just have a moment, Judge?

10:28AM   3            **MR. COOPER:**  Judge, I'd ask that we be able to come

10:28AM   4   up and approach real quick before we excuse the witness?

10:28AM   5            **THE COURT:**  Sure.

10:28AM   6            **MR. COOPER:**  Thanks.

10:31AM   7            **BY MR. SINGER:**

10:31AM   8   Q.  All right.  Let's move off that for just a moment, okay?

10:31AM   9        So, you have a conversation you recall with

10:31AM  10   Mr. Bongiovanni at some point in July or early August of

10:31AM  11   2018; is that right?

10:31AM  12   A.  Is this regarding when he came over --

10:31AM  13   Q.  This is regarding Anthony Gerace?

10:31AM  14   A.  I remember that.

10:31AM  15   Q.  Okay.  So there was a conversation that you two had

10:31AM  16   there, and I think you said yesterday it was something to the

10:31AM  17   effect of you better hurry up and arrest Anthony Gerace

10:31AM  18   before marijuana is legalized; is that right?

10:31AM  19   A.  That was a comment he made, yes.

10:31AM  20   Q.  And so after that conversation -- sorry, before that

10:31AM  21   conversation, though, I want to talk to you about

10:31AM  22   investigative steps that you took.  So the U.S. Attorney's

10:31AM  23   Office asked you to pull some historical information ; is

10:31AM  24   that right?

10:31AM  25   A.  At some point after a coordination meeting.

10:31AM  1   Q.  And the coordination meeting you started to go look

10:31AM  2   through case files relevant to Peter Gerace; is that right?

10:31AM  3   A.  I wasn't going through -- I did a search of our system,

10:32AM  4   it was called electronic filing search.  It searches

10:32AM  5   everything in DEA.  And through that search, I found a couple

10:32AM  6   reports.  I found one in particular on Anthony Gerace which I

10:32AM  7   mentioned before.

10:32AM  8   Q.  Okay.  And you also found another one with regard to

10:32AM  9   Peter Gerace; is that right?

10:32AM  10  A.  I did.

10:32AM  11        **MR. SINGER:**  So, Ms. Champoux, can you bring up

10:32AM  12  Government Exhibit 30A, please.

10:32AM  13        **BY MR. SINGER:**

10:32AM  14  Q.  So, this one exhibit is what we talked about yesterday,

10:32AM  15  this is the report that you found regarding Peter Gerace

10:32AM  16  inside the DEA system, correct?

10:32AM  17  A.  Correct.

10:32AM  18  Q.  And so this was something that you provided over to the

10:32AM  19  United States Attorney's Office, correct?

10:32AM  20  A.  I did.

10:32AM  21  Q.  So you recall, and I know you may not remember the date,

10:32AM  22  but do you recall having a meeting in the United States

10:32AM  23  Attorney's Office with the prosecuting attorneys in this

10:32AM  24  case?

10:32AM  25  A.  I had been over there, I can't remember exactly when, but

10:32AM    1    we had that coordination meeting.  Do you mean after the

10:32AM    2    coordination meeting?

10:32AM    3    Q.  I'm talking about the coordination meeting right now that

10:33AM    4    occurred, my understanding, August 1st of 2018.  Do you

10:33AM    5    remember meeting with Mr. Tripi?

10:33AM    6    A.  Yes.

10:33AM    7    Q.  Do you remember meeting with AUSA Brendan Cullinane who

10:33AM    8    was another AUSA at the time?

10:33AM    9    A.  Yes.

10:33AM   10    Q.  And do you remember meeting with other agents assigned to

10:33AM   11    the case?

10:33AM   12    A.  The coordination meeting, yes.  Correct there were other

10:33AM   13    agents.  There were a lot of people, actually.

10:33AM   14    Q.  And do you remember your G.S., Jim McHugh, he was at that

10:33AM   15    meeting as well?

10:33AM   16    A.  I remember me, and Curtis, I don't remember if Jim was,

10:33AM   17    he could have been, I don't remember.

10:33AM   18    Q.  That's the time where you provide 30A over to the United

10:33AM   19    States Attorney's Office, correct?

10:33AM   20    A.  No.  I provided this after that meeting.

10:33AM   21    Q.  You provided it after the meeting?

10:33AM   22    A.  Yes.

10:33AM   23    Q.  Not before the meeting?

10:33AM   24    A.  No.

10:33AM   25    Q.  But that's a time at least that you, according to your

10:33AM   1   memory, you provided the information regarding the 2016

10:33AM   2   conversation you had with Mr. Bongiovanni, correct?

10:33AM   3   A.  I'm sorry, you're asking if I provided this report

10:33AM   4   after -- after what?

10:34AM   5   Q.  What I'm asking, Mr. Casullo --

10:34AM   6   A.  Yep.

10:34AM   7   Q.  -- is the summer of 2016 conversation you had with

10:34AM   8   Mr. Bongiovanni; do you remember that?

10:34AM   9   A.  Yes.

10:34AM  10   Q.  The one where he made the racially offensive remark?

10:34AM  11   A.  Yes.

10:34AM  12   Q.  The one where he talked about the stripper overdosing at

10:34AM  13   Pharaoh's Gentlemen's Club?

10:34AM  14   A.  Yes.

10:34AM  15   Q.  You remember talking to AUSA Tripi and the other

10:34AM  16   prosecuting attorneys assigned to the case about this

10:34AM  17   conversation at that meeting in August of 2018, correct?

10:34AM  18   A.  No.  It wasn't at the coordination meeting.

10:34AM  19   Q.  You don't remember having a conversation about that?

10:34AM  20   A.  I didn't talk about the things he said during that

10:34AM  21   coordination meeting.

10:34AM  22   Q.  When was it that you said these things?

10:34AM  23   A.  It was after that.

10:34AM  24   Q.  When?

10:34AM  25   A.  It was shortly after that coordination meeting that I had

10:34AM   1   said at the U.S. Attorney's Office with Jim McHugh, it was

10:34AM   2   myself, Jim -- I went over with Jim McHugh, so it was me and

10:34AM   3   Jim McHugh, and we wet with AUSA Tripi, and I don't remember

10:34AM   4   if there was someone else in there at the U.S. Attorney's

10:34AM   5   Office.  That was after the coordination meeting.

10:35AM   6   Q.  So you had that conversation, when was it that you had

10:35AM   7   that conversation, sir?

10:35AM   8   A.  At the U.S. Attorney's Office?

10:35AM   9   Q.  Yes.

10:35AM  10   A.  Short -- I don't want to say shortly, but it wasn't long

10:35AM  11   after the coordination meeting.  So maybe -- maybe weeks.

10:35AM  12   Q.  Weeks after?

10:35AM  13   A.  I believe so.

10:35AM  14   Q.  That's what you believe?

10:35AM  15   A.  It was after the coordination meeting.  It wasn't long

10:35AM  16   after.

10:35AM  17   Q.  So, at that meeting, that -- do you remember it occurred

10:35AM  18   weeks after the coordination meeting.  You explained to the

10:35AM  19   U.S. Attorney's Office that you believe that Mr. Bongiovanni

10:35AM  20   is dirty, correct?

10:35AM  21   A.  During that meeting, I relayed to them the things that he

10:35AM  22   said to me.

10:35AM  23   Q.  You related the conversation that you talked about

10:35AM  24   yesterday that happened in summer of 2016 to them, correct?

10:35AM  25   A.  Yes.  Some of it.  Yes.

| | | |
|---|---|---|
| 10:35AM | 1 | Q.  And that was the very first time that you'd ever |
| 10:35AM | 2 | mentioned that to people who were authority figures, correct? |
| 10:35AM | 3 | A.  That was the first time that I had mentioned it in front |
| 10:36AM | 4 | of a DEA supervisor.  And it was the first time that I had |
| 10:36AM | 5 | mentioned that to anybody at the U.S. Attorney's Office. |
| 10:36AM | 6 | Q.  And you also talked about 30A, correct? |
| 10:36AM | 7 | A.  When? |
| 10:36AM | 8 | Q.  In that meeting where you made the comments at the U.S. |
| 10:36AM | 9 | Attorney's Office about the summer of 2016 conversation you |
| 10:36AM | 10 | had with Mr. Bongiovanni? |
| 10:36AM | 11 | A.  I don't remember talking about this report at that |
| 10:36AM | 12 | meeting. |
| 10:36AM | 13 | Q.  You don't remember talking about how you believed that |
| 10:36AM | 14 | there was something wrong with this report? |
| 10:36AM | 15 | A.  I remember talking to the U.S. Attorneys about that, but |
| 10:36AM | 16 | I don't think it was at that meeting. |
| 10:36AM | 17 | Q.  Do you recall when it was you brought up this information |
| 10:36AM | 18 | about your belief that this report was not correct? |
| 10:36AM | 19 | A.  Again, it was after the coordination meeting, and I -- |
| 10:36AM | 20 | and it was before -- it was before -- I sent this report to |
| 10:36AM | 21 | the U.S. Attorney's Office before I advised them of the |
| 10:36AM | 22 | things that he had said to me. |
| 10:36AM | 23 | Q.  Do you recall writing any type of DEA-6s about the |
| 10:37AM | 24 | information that you're uncovering vis-à-vis Mr. Bongiovanni? |
| 10:37AM | 25 | A.  A DEA-6 about what, sir? |

10:37AM    1    Q.  About finding this Exhibit 30A?  Do you remember writing

10:37AM    2    any type of DEA-6 about that?

10:37AM    3    A.  No, I didn't write a 6.

10:37AM    4    Q.  Do you remember writing any DEA-6s about the summer of

10:37AM    5    2016 conversation?

10:37AM    6    A.  No.  No, sir.

10:37AM    7    Q.  Do you remember taking any type of notes when you were

10:37AM    8    looking up these things?

10:37AM    9    A.  As far as what took place and his comments that he made,

10:37AM   10    I didn't take notes and write anything until I was requested

10:37AM   11    to do so by my RAC at the time, Ed Orgon, which was shortly

10:37AM   12    after the meeting at the U.S. Attorney's Office when I

10:37AM   13    advised the U.S. Attorney's Office of the racial comments

10:37AM   14    that Joe made.

10:37AM   15    Q.  So, your review of the Serio file, I know you're unclear

10:37AM   16    about when that occurs, but you look through the Serio file,

10:38AM   17    and you see a couple of things that you take note of,

10:38AM   18    correct?

10:38AM   19    A.  There were a few things that I took note of.

10:38AM   20    Q.  You took note of the fact that toll logs were performed

10:38AM   21    during the course of the investigation into Ron Serio?

10:38AM   22    A.  I took note of the DEA-6s first --

10:38AM   23    Q.  Just answer my question, sir.

10:38AM   24    A.  Yes.

10:38AM   25    Q.  Did you take note of toll logs that were performed during

10:38AM    1    the course of that investigation?

10:38AM    2    A.   There were subpoenas, and to the best of my memory, there

10:38AM    3    were subpoenas for phone numbers.  There could have been

10:38AM    4    other things too, but --

10:38AM    5    Q.   So you took note of subpoena returns, correct?

10:38AM    6    A.   Yes.

10:38AM    7    Q.   You took note of DEA-6s that were located inside the

10:38AM    8    file, correct?

10:38AM    9    A.   Yes.

10:38AM    10   Q.   You mentioned yesterday that there was some surveillance

10:38AM    11   that was done in the case, correct?

10:38AM    12   A.   I remember one surveillance report off the top of my head

10:38AM    13   on Sycamore.

10:38AM    14   Q.   You recall that there were DEA-6s that were quarterly

10:38AM    15   updates regarding the progress of the investigation?

10:38AM    16   A.   There were a lot of case statuses, correct.

10:38AM    17   Q.   And that there were a lot of other investigative items in

10:38AM    18   there that were handwritten, correct?

10:38AM    19   A.   I don't remember so much that, they could have been in

10:39AM    20   there.  But what sticks out to me were the DEA-6s and the

10:39AM    21   subpoenas.

10:39AM    22   Q.   You remember the Serio file being, as you testified

10:39AM    23   yesterday, being on Mr. Bongiovanni's desk for periods of

10:39AM    24   time that you worked at the DEA, yes?

10:39AM    25   A.   Yes.

USA v Bongiovanni - Casullo - Singer/Cross - 3/21/24

44

10:39AM   1   Q.  And you remember it being not, you know, some small

10:39AM   2   flimsy little thing --

10:39AM   3   A.  No, it was --

10:39AM   4   Q.  -- it was a big stack of paper, correct?

10:39AM   5   A.  Correct.

10:39AM   6   Q.  So when you reviewed this file, because that was the file

10:39AM   7   you reviewed, right?

10:39AM   8   A.  Yes.  Well, I don't know if it's the same file that was

10:39AM   9   on his disk, because there was one that was on his desk, but

10:39AM  10   the one that I retrieved was from our file room.  So I don't

10:39AM  11   know if it was the same file, but it was the Serio file that

10:39AM  12   I retrieved.

10:39AM  13   Q.  And I guess that's what I'm getting at is that working

10:39AM  14   files, in your experience as a DEA agent, they're not

10:39AM  15   something that unless somebody is working on it right then

10:39AM  16   and there are kept on desks all the time, right?

10:39AM  17   A.  Yeah, unless you're working on it, you not gonna keep

10:39AM  18   that around.

10:39AM  19   Q.  Yeah.  Oftentimes what'll happen is an agent will take

10:39AM  20   that working file that they have with all their papers and

10:39AM  21   whatnot, and they will use it for a period of time, but when

10:40AM  22   they're done with it, they're going to return it back to the

10:40AM  23   file room, correct?

10:40AM  24   A.  That's what I did.  I would use it, look at it at my

10:40AM  25   desk, and then when I was done with it, I would secure the

USA v Bongiovanni - Casullo - Singer/Cross - 3/21/24
45

10:40AM   1   file.

10:40AM   2   Q.  And so again, you're going through this information, and

10:40AM   3   it gives you have insight into what Mr. Bongiovanni and

10:40AM   4   others in group D-57 were doing vis-à-vis the investigation,

10:40AM   5   right?

10:40AM   6   A.  Somewhat, yes.

10:40AM   7   Q.  As far as the working file, you looked at it for an

10:40AM   8   appreciable period of time, correct?

10:40AM   9   A.  I don't remember if it was just the one occasion, or if

10:40AM  10   it was a couple of occasions.  But enough to go through the

10:40AM  11   file quickly.  It wasn't that I spent hours doing it, but

10:40AM  12   quick enough to read through the DEA-6s.  I didn't

10:40AM  13   specifically go through the subpoenas that I remember, but I

10:40AM  14   know there were subpoenas, some were related to phone

10:40AM  15   numbers.  My focus was on reading the DEA-6 reports of

10:40AM  16   investigation, and I didn't spend a lot of time because there

10:40AM  17   just weren't a lot.

10:40AM  18   Q.  Okay.  So you came to the conclusion that at least in

10:41AM  19   your opinion, there wasn't a lot of investigation that was

10:41AM  20   done?

10:41AM  21   A.  Based on the 6s that I read, it just didn't appear that

10:41AM  22   there was a lot of operational aspects to it.  There wasn't a

10:41AM  23   lot, in my opinion, substance to what was there in the

10:41AM  24   DEA-6s.

10:41AM  25   Q.  You recall seeing operations plans for controlled

10:41AM   1   purchases concerning R.K., correct?

10:41AM   2   A.  No, I don't recall.

10:41AM   3   Q.  You don't recall seeing any of those in the files sir?

10:41AM   4   A.  No, I don't.

10:41AM   5   Q.  You don't recall anything about purchases in the May of

10:41AM   6   2013 time period that were being worked out in operations

10:41AM   7   plans?

10:41AM   8   A.  I don't recall seeing any operations plans, and

10:41AM   9   specifically what you mentioned about R.K., no.

10:41AM  10   Q.  Don't recall seeing that at all?

10:41AM  11   A.  No.  It could have been in there, I didn't see them.

10:41AM  12   Q.  How long was it that you looked through this file?

10:41AM  13   A.  Again, I can't remember if it was on more than one

10:41AM  14   occasion.  And my focus was mostly on the DEA-6s.  I didn't

10:41AM  15   go through it document by document.

10:41AM  16       I went through the 6s document by document, and read all

10:42AM  17   the 6s to the best of my memory.

10:42AM  18       And then when I saw a lot of the subpoenas with the phone

10:42AM  19   numbers, I went through those quickly.

10:42AM  20       And I don't remember going through any operations plans.

10:42AM  21   Definitely the ones you mentioned, I don't remember seeing

10:42AM  22   that.

10:42AM  23   Q.  All right.  So eventually, you receive information from

10:42AM  24   your RAC, Ed Orgon, that you were no longer to investigate

10:42AM  25   this case, correct?

10:42AM    1    A.  Shortly after the meeting at the U.S. Attorney's Office

10:42AM    2    when I relayed the information of Joe's comments, I was -- I

10:42AM    3    had a meeting with my RAC and Jim McHugh, and I was told to

10:42AM    4    no longer work the Peter Gerace investigation.

10:42AM    5    Q.  But, I mean, fair statement, like you talked about on

10:42AM    6    direct yesterday, you continued to look into things, correct?

10:42AM    7    A.  I looked into Anthony Gerace.  I believe I pulled his

10:42AM    8    tolls after that time frame.  Peter, I stayed away from.  But

10:42AM    9    I do think I did a couple things with Anthony in terms of

10:43AM   10    phone numbers.

10:43AM   11    Q.  And then besides Anthony Gerace, you also take an

10:43AM   12    interest in a burglary involving Michael Sinatra; is that

10:43AM   13    right?

10:43AM   14    A.  That's correct.

10:43AM   15    Q.  And so Mike Sinatra, the burglary occurs either in the

10:43AM   16    late night on December 31st of 2018, or the 1st of January of

10:43AM   17    2019, correct?

10:43AM   18    A.  It could be.

10:43AM   19    Q.  Yeah.  And so, I mean, it's undetermined when people

10:43AM   20    broke into his house, but you learned about this through the

10:43AM   21    Town of Tonawanda Police Department?

10:43AM   22    A.  I learned about this through -- it was a task force

10:43AM   23    officer that was assigned to group D-57 at the time.  I

10:43AM   24    believe he replaced Joe Palmieri, his name was Scott Sprague.

10:43AM   25    He was the task force from Tonawanda.

10:43AM    1    Q.  And you take an interest in this case based on

10:43AM    2    information that you have that Mike Sinatra is in some way

10:43AM    3    connected with Anthony Gerace?

10:43AM    4    A.  No.  Not initially.  My initial interest was Scott had

10:43AM    5    mentioned, hey, we've had a burglary, they stole a bunch of

10:44AM    6    money.

10:44AM    7        I think when I read the report -- he gave me a report at

10:44AM    8    some point, but initially it fit the profile, in my opinion,

10:44AM    9    of other things that came up in my office in terms of -- I

10:44AM   10    don't want to call it a trend, but a couple of incidents

10:44AM   11    where marijuana traffickers were breaking into the houses of

10:44AM   12    other traffickers and stealing their narcotics proceeds.

10:44AM   13    That was my prior knowledge.

10:44AM   14        So when Scott mentioned, hey, he had information on

10:44AM   15    another burglary that kind of fit that same type of profile,

10:44AM   16    I took an interest, and said can you give me a report?  He

10:44AM   17    gave me a report.  And that's when I went through the report.

10:44AM   18    Q.  And you start to enter information about Michael

10:44AM   19    Sinatra's number into DARTS, right?

10:44AM   20    A.  So initially when I went through the report, I -- I can't

10:44AM   21    remember, I most likely queried Michael Sinatra through our

10:44AM   22    databases, determined what his phone number was from the

10:44AM   23    report, and then ordered tolls pretty quickly on Michael

10:45AM   24    Sinatra's telephone.

10:45AM   25    Q.  And these things that you're querying in DARTS, they are

USA v Bongiovanni - Casullo - Singer/Cross - 3/21/24

| | | |
|---|---|---|
| 10:45AM | 1 | things that make their way back to Mr. Bongiovanni, correct? |
| 10:45AM | 2 | A.  I don't remember.  Possibly the Michael Sinatra one. |
| 10:45AM | 3 | What I remember that made its way back to Joe was the ones |
| 10:45AM | 4 | that I looked at yesterday, I can't remember if Michael |
| 10:45AM | 5 | Sinatra was one of those.  But Anthony Gerace was. |
| 10:45AM | 6 | Q.  And over the course of the month of January, you start to |
| 10:45AM | 7 | make investigative steps to execute search warrants at both |
| 10:45AM | 8 | Anthony Gerace's and Michael Sinatra's houses, correct? |
| 10:45AM | 9 | A.  Not Anthony Gerace's.  When I first looked into that -- |
| 10:45AM | 10 | I'm just trying to go through it chronologically -- I pulled |
| 10:45AM | 11 | the tolls, did toll analysis.  I advised Curtis Ryan that one |
| 10:45AM | 12 | of the most frequently called numbers of Michael Sinatra |
| 10:45AM | 13 | after doing toll analysis on his phone was Anthony Gerace. |
| 10:46AM | 14 | So Curtis became involved, and we started working that |
| 10:46AM | 15 | together. |
| 10:46AM | 16 | At some point, we found out that Michael Sinatra and, I |
| 10:46AM | 17 | believe, his father-in-law, that turned out to be Paul |
| 10:46AM | 18 | Francoforte -- |
| 10:46AM | 19 | Q.  Mr. -- |
| 10:46AM | 20 | A.  I'm trying go through it chronologically. |
| 10:46AM | 21 | Q.  I understand you're trying go through in your head, but |
| 10:46AM | 22 | again, I want to focus on what we're talking about. |
| 10:46AM | 23 | A.  I understand. |
| 10:46AM | 24 | Q.  So, again, going back to this -- |
| 10:46AM | 25 | A.  Yes. |

10:46AM   1   Q.  -- at some point you take an interest in Michael Sinatra,

10:46AM   2   right?

10:46AM   3   A.  Yes.

10:46AM   4   Q.  At some point, doesn't sound like you were the primary

10:46AM   5   person, but Curtis Ryan takes an interest in Anthony Gerace,

10:46AM   6   correct?

10:46AM   7   A.  I was the primary person because I received information

10:46AM   8   from Tonawanda.  I brought Curtis on to help.

10:46AM   9   Q.  And both of you, because you know this because you're a

10:46AM   10  member of D-58 at the time, correct?

10:46AM   11  A.  We're both in D-58.

10:46AM   12  Q.  Both of you start working towards a situation where

10:47AM   13  you're going to execute dual search warrants at the same time

10:47AM   14  at Michael Sinatra's residence and Anthony Gerace's

10:47AM   15  residence?

10:47AM   16  A.  Yeah.  I wasn't a part of that.  I was a part of the

10:47AM   17  search warrants at some other -- the suspect of who they

10:47AM   18  believed robbed Michael Sinatra, I was involved with that

10:47AM   19  search warrant.  I was not allowed to be part of the search

10:47AM   20  warrants at Michael Sinatra or Anthony Gerace.

10:47AM   21  Q.  But you're aware, being in D-58, that those search

10:47AM   22  warrants are in motion to happen at the end of January of

10:47AM   23  2019.

10:47AM   24  A.  No.  No.  I was walled off by that point.

10:47AM   25  Q.  Well, you're aware of the fact that those search warrants

10:47AM     1   were successfully executed in late January of 2019?

10:47AM     2   A.   Yes, I found out afterwards, right.

10:47AM     3   Q.   And those search warrants yielded evidence, correct?

10:47AM     4   A.   They did, from what I was told.

10:47AM     5   Q.   And Mr. Bongiovanni wasn't involved in that

10:47AM     6   investigation, correct?

10:47AM     7   A.   Was he involved in that investigation?

10:47AM     8   Q.   Yes.

10:47AM     9   A.   Not to my knowledge.

10:47AM    10   Q.   But you recall having a conversation with him at some

10:47AM    11   point in January of 2019 after you run -- I'm sorry, the

10:48AM    12   Anthony Gerace toll logs, correct?

10:48AM    13   A.   Again, I don't remember the exact date.  But he came over

10:48AM    14   to my desk.  I don't remember the exact time frame.  I know

10:48AM    15   we were looking at the DARTS deconflictions, and he mentioned

10:48AM    16   what I mentioned prior, yesterday, about Anthony Gerace, and

10:48AM    17   how his wife is friends with them on Facebook, that

10:48AM    18   conversation.

10:48AM    19   Q.   So that happened in January?

10:48AM    20   A.   I can't remember for certain when it was.  If I saw the

10:48AM    21   DARTS deconfliction again with Anthony Gerace when I ran the

10:48AM    22   toll analysis and saw that date, then I would know better the

10:48AM    23   time frame.

10:48AM    24   Q.   So I guess you testified a little bit earlier that you

10:48AM    25   had that conversation regarding Anthony Gerace back in the

| 10:48AM | 1 | July-August time frame of 2018. |
| 10:48AM | 2 | A.  I believe so.  Again, I'd have to look from yesterday. |
| 10:48AM | 3 | So, okay. |
| 10:48AM | 4 | Q.  But did you have that conversation then?  Or did you have |
| 10:48AM | 5 | it in 2019?  I mean, I asked you that earlier.  Do you |
| 10:49AM | 6 | remember? |
| 10:49AM | 7 | A.  I'm pretty sure it was 2018, I think.  I can't -- I can't |
| 10:49AM | 8 | remember for certain.  If I saw the DARTS deconfliction of |
| 10:49AM | 9 | when I ran Anthony Gerace, 'cuz he walked over, like, the |
| 10:49AM | 10 | same day, I -- I would know.  If I -- if I saw that DARTS |
| 10:49AM | 11 | deconfliction where I ran toll numbers and contact with |
| 10:49AM | 12 | Anthony Gerace, and the date on that, 'cuz I ran them, like, |
| 10:49AM | 13 | two or three batches, then I would know the date that he came |
| 10:49AM | 14 | over to my desk. |
| 10:49AM | 15 |          **MR. SINGER:**  Ms. Champoux, can you take 30A down, |
| 10:50AM | 16 | please?  Thank you. |
| 10:50AM | 17 |          **BY MR. SINGER:** |
| 10:50AM | 18 | Q.  So, the phone that Peter Gerace contacted you on, do you |
| 10:50AM | 19 | remember that in 2016? |
| 10:50AM | 20 | A.  Yes. |
| 10:50AM | 21 | Q.  The phone number that you were using, what number were |
| 10:50AM | 22 | you using back in that 2016 time period? |
| 10:50AM | 23 | A.  That was my personal cell phone. |
| 10:50AM | 24 | Q.  And what number is that, sir? |
| 10:50AM | 25 | A.  702-527-0721. |

USA v Bongiovanni - Casullo - Singer/Cross - 3/21/24

53

10:50AM 1  Q.  I want to talk to you a little bit about Government

10:50AM 2  Exhibit 99, that was the report that the government showed

10:50AM 3  you yesterday that Mr. Bongiovanni made with you, made about

10:50AM 4  you regarding Phil Domiano and Peter Gerace; do you remember

10:50AM 5  that?

10:50AM 6  A.  Correct.

10:50AM 7  Q.  So, the report talks about a reunion that you attended at

10:50AM 8  Big Ditch, correct?

10:50AM 9  A.  Yes.

10:50AM 10  Q.  And that was a reunion for SJCI back in 2015?

10:51AM 11  A.  Yes.

10:51AM 12  Q.  And Peter Gerace was there, of course, correct?

10:51AM 13  A.  He was.

10:51AM 14  Q.  Phil Domiano, was he there?

10:51AM 15  A.  No.

10:51AM 16  Q.  And, so, you recall, like you talked about yesterday,

10:51AM 17  that at some point in time that night, Peter Gerace and you

10:51AM 18  walked over to Tappo Restaurant to go see Joseph Bongiovanni?

10:51AM 19  A.  Yes.

10:51AM 20  Q.  And the two of you walked over together; is that right?

10:51AM 21  A.  Yes.

10:51AM 22  Q.  You know that Tappo and Big Ditch are kind of located in

10:51AM 23  the same neighborhood?

10:51AM 24  A.  Pretty much right across the street.

10:51AM 25  Q.  Yeah, right across the street from each other.  And so

10:51AM    1    you're aware that Big Ditch has kind of a patio, outdoor

10:51AM    2    area, correct?

10:51AM    3    A.  Big Ditch does from what I remember, yep.

10:51AM    4    Q.  And Tappo, it doesn't have that outdoor area, but it has

10:51AM    5    the big garage doors that open up in the summertime?

10:51AM    6    A.  I think so.

10:51AM    7    Q.  And it was summertime, right --

10:51AM    8    A.  It was.

10:51AM    9    Q.  -- when this is happening?  It was a nice day out?

10:52AM    10   A.  I remember it was summer, it was warm.

10:52AM    11   Q.  And you recall being outside with Mr. Gerace on the patio

10:52AM    12   at Big Ditch, correct?

10:52AM    13   A.  I remember walking in to -- oh, I'm sorry, I was at Big

10:52AM    14   Ditch, correct.  It could have been the patio.  There was the

10:52AM    15   patio, outdoor, and I believe we had some of the inside area

10:52AM    16   as well, and I was in both areas.

10:52AM    17   Q.  Okay.  So you were in both areas.  So you walked over

10:52AM    18   from Big Ditch with Peter Gerace to Tappo Restaurant,

10:52AM    19   correct?

10:52AM    20   A.  I did.

10:52AM    21   Q.  At that point you run into Mr. Bongiovanni, correct?

10:52AM    22   A.  Correct.

10:52AM    23   Q.  And you see him with three or four other gentlemen?

10:52AM    24   A.  Yes.

10:52AM    25   Q.  And you reported yesterday in your testimony that one of

| | | |
|---|---|---|
| 10:52AM | 1 | these individuals was Anthony Gerace, Peter Gerace's brother; |
| 10:52AM | 2 | is that right? |
| 10:52AM | 3 | A.  Yes. |
| 10:52AM | 4 | Q.  And you indicated on direct that you didn't discover that |
| 10:52AM | 5 | fact until later though; is that right? |
| 10:52AM | 6 | A.  Joe -- Peter initially said Bongiovanni's across the |
| 10:52AM | 7 | street, do you want to go over? |
| 10:53AM | 8 |     I said, no. |
| 10:53AM | 9 |     At some point he said, he's over across -- |
| 10:53AM | 10 | Q.  What I'm getting to is -- |
| 10:53AM | 11 | A.  Sure. |
| 10:53AM | 12 | Q.  -- what you saw, sir.  So you get to Tappo Restaurant, |
| 10:53AM | 13 | correct? |
| 10:53AM | 14 | A.  Yes. |
| 10:53AM | 15 | Q.  You see Bongiovanni there, correct? |
| 10:53AM | 16 | A.  Yep, three or four other people. |
| 10:53AM | 17 | Q.  Okay.  And you talked about how it wasn't right off the |
| 10:53AM | 18 | bat that you discovered that Anthony Gerace was one of those |
| 10:53AM | 19 | other people that Mr. Bongiovanni was hanging out with? |
| 10:53AM | 20 | A.  He quickly introduced me to the other people, one being |
| 10:53AM | 21 | Anthony Gerace. |
| 10:53AM | 22 | Q.  Okay.  Did you know Anthony Gerace at all? |
| 10:53AM | 23 | A.  No. |
| 10:53AM | 24 | Q.  And what did he look like? |
| 10:53AM | 25 | A.  He had dark hair, brown eyes, maybe about -- I don't |

USA v Bongiovanni - Casullo - Singer/Cross - 3/21/24

56

| | | |
|---|---|---|
| 10:53AM | 1 | know, he wasn't very tall.  He was taller than me.  Maybe |
| 10:53AM | 2 | shorter than Joe.  He was younger than me.  At the time I |
| 10:53AM | 3 | would have been maybe -- he was in his, I don't know, early |
| 10:53AM | 4 | 40s. |
| 10:53AM | 5 | Q.  How long were you at the reunion before you walked over |
| 10:54AM | 6 | to Tappo? |
| 10:54AM | 7 | A.  I don't remember how long it was.  Maybe, I don't know, |
| 10:54AM | 8 | maybe an hour. |
| 10:54AM | 9 | Q.  Were you drinking that night? |
| 10:54AM | 10 | A.  Pardon? |
| 10:54AM | 11 | Q.  Were you drinking alcohol that night? |
| 10:54AM | 12 | A.  I had maybe one, maybe two beers.  I couldn't drink a |
| 10:54AM | 13 | lot, I was driving. |
| 10:54AM | 14 | Q.  Big Ditch, correct, we're talking about Hayburners?  Or |
| 10:54AM | 15 | are we talking about something else? |
| 10:54AM | 16 | A.  No, I don't remember.  I believe I was drinking bottled |
| 10:54AM | 17 | beer because I don't like craft beer. |
| 10:54AM | 18 | Q.  And you walk over with Peter Gerace, and you see this |
| 10:54AM | 19 | person you've identified as Anthony Gerace.  You never met |
| 10:54AM | 20 | him in your life though? |
| 10:54AM | 21 | A.  I don't ever remember meeting Anthony Gerace, no. |
| 10:54AM | 22 | Q.  And you remember that he had brown eyes? |
| 10:54AM | 23 | A.  Pardon? |
| 10:54AM | 24 | Q.  You remember that he had brown eyes? |
| 10:54AM | 25 | A.  I think so. |

10:54AM    1    Q.  That's what you testified to?

10:54AM    2    A.  Brown eyes, dark hair.

10:54AM    3    Q.  That's what you remember?

10:54AM    4    A.  Um-hum.

10:54AM    5    Q.  Do you remember what he was wearing?

10:54AM    6    A.  He had kind of shiny shirt.

10:54AM    7    Q.  How long were you talking with him?

10:55AM    8    A.  We weren't there long, like less than five minutes from

10:55AM    9    what I remember.

10:55AM    10   Q.  And then you walked back to Big Ditch, correct, after

10:55AM    11   that?

10:55AM    12   A.  Yes.

10:55AM    13   Q.  And you never saw this person you identified as Anthony

10:55AM    14   Gerace again that night, right?

10:55AM    15   A.  No.

10:55AM    16   Q.  And when was the first time that you looked at a mugshot

10:55AM    17   of Anthony Gerace?

10:55AM    18   A.  I don't know if I ever did look at a mugshot of Anthony

10:55AM    19   Gerace.  I don't remember ever looking at a mugshot of

10:55AM    20   Anthony Gerace.

10:55AM    21   Q.  Well, you're investigating him as part of your

10:55AM    22   investigation, right?

10:55AM    23   A.  I did at some point.

10:55AM    24   Q.  And part of what investigators do is sometimes look at

10:55AM    25   driver's license pictures or other type of pictures of a

10:55AM 1   person you're investigating, right?

10:55AM 2   A.   Correct, yes.

10:55AM 3   Q.   And you investigated him, I think you testified earlier,

10:55AM 4   from 2016 onward; is that right?

10:55AM 5   A.   Yes.

10:55AM 6   Q.   And you never pulled any pictures of Anthony Gerace at

10:55AM 7   that time?

10:55AM 8   A.   I don't think I did on Anthony.

10:55AM 9   Q.   You never looked at a picture of him?

10:55AM 10  A.   I don't think I did.

10:56AM 11         **THE COURT:**  Mr. Singer, is this a good time for a

10:56AM 12  break?

10:56AM 13         **MR. SINGER:**  I just have a little more to finish up,

10:56AM 14  Judge, but let's take a break.

10:56AM 15         **THE COURT:**  Okay.  Let's take our morning break.

10:56AM 16         Remember my instructions about not talking about the

10:56AM 17  case with anyone, including each other, and not making up your

10:56AM 18  mind.

10:56AM 19         See you back here in ten or 15 minutes.  Thanks.

10:56AM 20         (Jury excused at 10:56 a.m.)

10:56AM 21         **THE COURT:**  Anything for the record before we break?

10:56AM 22         **MR. COOPER:**  Judge, I want to make a quick record,

10:57AM 23  but I think we should excuse the witness first.

10:57AM 24         **THE COURT:**  Sure.  Why don't you step out, sir?

10:57AM 25         (Witness excused at 10:57 a.m.)

10:57AM   1        **MR. COOPER:**  So, Judge, in no way am I saying that I

10:57AM   2   think Mr. Singer or Mr. MacKay have any part in this, but when

10:57AM   3   Mr. Singer was asking questions of Mr. Casullo, specifically

10:57AM   4   the question about sharing the working file and whether the

10:57AM   5   defendant shared his working file with Mr. Casullo, I looked

10:57AM   6   over and observed the defendant mouthing words at the witness

10:57AM   7   from the defense table.  I didn't see what the words were.

10:57AM   8   It's inappropriate, and I just want to make a record about it

10:57AM   9   because it should not continue to happen.

10:57AM  10        **THE COURT:**  Okay.  I saw reactions from the defense

10:57AM  11   table, but they were no different than reactions that I've

10:57AM  12   seen from the prosecutor's table from the testimony about

10:58AM  13   witnesses.  So, what I will do is instruct both sides.  The

10:58AM  14   defense has not raised it for me, but I've been watching.  I

10:58AM  15   watch body language, I watch laughter, I watch all sorts of

10:58AM  16   things.  And I've seen what I consider to be borderline

10:58AM  17   conduct from both tables during the course of testimony of the

10:58AM  18   witnesses.

10:58AM  19        So I will instruct both sides to keep their facial

10:58AM  20   expressions if they can, and their body language that would

10:58AM  21   indicate agreement or disagreement or whatever with the

10:58AM  22   witness's testimony to a minimum.

10:58AM  23        And I say that to both sides.  I don't ascribe any

10:58AM  24   ulterior motive.  I understand that sometimes reactions

10:58AM  25   happen, and they don't happen intentionally.  But I have seen

USA v Bongiovanni - Casullo - Singer/Cross - 3/21/24

60

| | | |
|---|---|---|
| 10:58AM | 1 | conduct at both tables that, again, I stay out of the case |
| 10:58AM | 2 | unless one side or the other asks me to.  You're asking me to |
| 10:58AM | 3 | now, so I will instruct both sides to keep that to a minimum. |
| 10:58AM | 4 | Just don't do it.  Just don't do it. |
| 10:59AM | 5 |     **MR. COOPER:**  Understood, Judge.  Thank you. |
| 10:59AM | 6 |     **THE COURT:**  Anything else. |
| 10:59AM | 7 |     **MR. COOPER:**  Nothing from the government. |
| 10:59AM | 8 |     **MR. SINGER:**  Not from here, Judge. |
| 10:59AM | 9 |     **THE COURT:**  Thanks. |
| 10:59AM | 10 |     **THE CLERK:**  All rise. |
| 10:59AM | 11 |     (Off the record at 10:59 a.m.) |
| 11:17AM | 12 |     (Back on the record at 11:17 a.m.) |
| 11:17AM | 13 |     (Jury not present.) |
| 11:17AM | 14 |     **THE CLERK:**  All rise. |
| 11:17AM | 15 |     **THE COURT:**  Please be seated. |
| 11:17AM | 16 |     **THE CLERK:**  We are back on the record for the |
| 11:17AM | 17 | continuation of the jury trial in case number 19-cr-227, |
| 11:17AM | 18 | United States of America versus Joseph Bongiovanni. |
| 11:17AM | 19 |     All counsel and parties are present. |
| 11:17AM | 20 |     **MR. TRIPI:**  Your Honor, I want to make more of a |
| 11:17AM | 21 | record about something else that happened today. |
| 11:17AM | 22 |     So I got to court a little bit before 9:30 this |
| 11:17AM | 23 | morning before proceedings occurred.  When I arrived, in the |
| 11:17AM | 24 | hallway I saw Special Agent Casullo sitting on a bench with |
| 11:17AM | 25 | Special Agent Ralph Joseph of the FBI.  And it was promptly |

11:17AM    1    reported to me by Special Agent Ralph Joseph of the FBI that

11:17AM    2    when Mr. Bongiovanni walked by the witness, who's in the

11:18AM    3    middle of cross-examination, Mr. Bongiovanni said to Anthony

11:18AM    4    Casullo, oh, security, huh.  Like, oh, you need security?

11:18AM    5         I've reviewed some caselaw this morning.  That could

11:18AM    6    be deemed sufficient to be witness tampering.  I just want to

11:18AM    7    alert this to the Court's attention, particularly when

11:18AM    8    combined with the additional reporting that Mr. Cooper put on

11:18AM    9    the record earlier.

11:18AM    10        We do intend to redirect on that.  We believe that

11:18AM    11   the witness shouldn't have been talked to by the defendant

11:18AM    12   whatsoever.  And I just wanted to alert -- we were going to

11:18AM    13   hold off and do that, but I think it's appropriate to flag it

11:18AM    14   for the Court at this time.

11:18AM    15           **THE COURT:**  And I appreciate that.

11:18AM    16           **MR. SINGER:**  And we disagree with that narrative,

11:18AM    17   Judge.  What happened was Mr. Casullo was using the restroom.

11:18AM    18   As you know, we only have one restroom, one men's room for

11:18AM    19   witnesses, court staff, agents, everybody else, including the

11:19AM    20   defendant.  Mr. Casullo was using the restroom.

           21        I believe, based on my experience in this case, and

           22   with other witnesses including Mr. Casullo, I almost walked

           23   into restroom yesterday when he was using the restroom, and

           24   one of the federal agents, I forget who, it was the one

           25   African-American agent with a beard, I don't know what his

| | | |
|---|---|---|
| 11:19AM | 1 | name is, so -- |
| 11:19AM | 2 | **MR. TRIPI:**  That's Special Agent Ralph Joseph.  So |
| 11:19AM | 3 | what I'm reporting happened -- |
| 11:19AM | 4 | **MR. SINGER:**  So, if I could finish.  If I could |
| 11:19AM | 5 | finish. |
| 11:19AM | 6 | **MR. TRIPI:**  -- not in the men's room. |
| 11:19AM | 7 | **MR. SINGER:**  So Mr. Joseph stopped me yesterday |
| 11:19AM | 8 | saying, oh, the witness is in the room. |
| 11:19AM | 9 | I said okay, so I stopped and waited for Mr. Casullo |
| 11:19AM | 10 | to exit. |
| 11:19AM | 11 | Mr. Bongiovanni walked into the restroom, he wasn't |
| 11:19AM | 12 | stopped by Mr. Joseph, and Mr. Casullo happened to be using |
| 11:19AM | 13 | the men's room at the same time.  So my client walked out. |
| 11:19AM | 14 | And when he saw Agent Joseph he made a comment of how come you |
| 11:19AM | 15 | didn't stop me, or something to that effect.  And then didn't |
| 11:19AM | 16 | go back into the restroom until Mr. Casullo exited. |
| 11:19AM | 17 | So that's my understanding of what happened. |
| 11:20AM | 18 | **MR. TRIPI:**  All right.  Judge, so he's talking about |
| 11:20AM | 19 | something that happened yesterday. |
| 11:20AM | 20 | **MR. SINGER:**  No, I'm talking about something that |
| 11:20AM | 21 | happened today. |
| 11:20AM | 22 | **THE COURT:**  Stop.  Both of you stop.  Right now. |
| 11:20AM | 23 | **MR. TRIPI:**  I thought he was done. |
| 11:20AM | 24 | **THE COURT:**  Both of you stop right now. |
| 11:20AM | 25 | Finish, Mr. Singer. |

11:20AM    1          **MR. SINGER:**  I'm talking about happened this morning.

11:20AM    2          **THE COURT:**  This morning?

11:20AM    3          **MR. SINGER:**  Yes, sir.

11:20AM    4          **THE COURT:**  Okay.

11:20AM    5          **MR. TRIPI:**  I heard the word yesterday.

11:20AM    6          What I'm reporting happened with the witness sitting

11:20AM    7  on the bench in the hallway with Special Agent Joseph, and the

11:20AM    8  defendant's attorneys weren't here yet.  They weren't in the

11:20AM    9  hallway.

11:20AM   10          When I came, it was reported to me.  I came in here,

11:20AM   11  I made a joke.  I said no one else from my team is here yet?

11:20AM   12  They weren't in here.

11:20AM   13          I immediately got pulled out because Special Agent

11:20AM   14  Joseph had something to report to me.

11:20AM   15          So they weren't there, Special Agent Joseph was.  I

11:20AM   16  told him to write a report.  We will be putting him on our

11:20AM   17  witness list as a rebuttal witness, because I'm also going to

11:20AM   18  cross-examine the defendant about it, and if he denies it

11:20AM   19  we'll put Special Agent Joseph up as a rebuttal witness.

11:20AM   20          **THE COURT:**  Anything more?

11:20AM   21          **MR. TRIPI:**  That's it, Judge.  Thank you.

11:21AM   22          **MR. SINGER:**  I don't think we need to make any more

11:21AM   23  record, Judge.

11:21AM   24          **THE COURT:**  Great.  Anything else we need to put on

11:21AM   25  the record before we resume?

| | | |
|---|---|---|
| 11:21AM | 1 | **MR. TRIPI:**  No. |
| 11:21AM | 2 | **MR. SINGER:**  No, Your Honor. |
| 11:21AM | 3 | **THE COURT:**  Okay.  Let's bring them back, please. |
| 11:21AM | 4 | **MR. TRIPI:**  My joke in all of that was I didn't get a |
| 11:21AM | 5 | chance to go to the men's room.  So a little laughter there. |
| 11:22AM | 6 | (Jury seated at 11:22 a.m.) |
| 11:22AM | 7 | **THE COURT:**  The record will reflect that our jurors |
| 11:22AM | 8 | again are present. |
| 11:22AM | 9 | I remind the witness that he's still under oath. |
| 11:22AM | 10 | And you may continue, Mr. Singer. |
| 11:22AM | 11 | **BY MR. SINGER:** |
| 11:22AM | 12 | Q.  So we're talking about the reunion when we left, |
| 11:22AM | 13 | Mr. Casullo.  So, after you're at Tappo, you recall you |
| 11:23AM | 14 | walked back with Peter Gerace and Mr. Bongiovanni? |
| 11:23AM | 15 | A.  Yes. |
| 11:23AM | 16 | Q.  And you recall that you continued to converse with |
| 11:23AM | 17 | Mr. Gerace and Peter -- sorry, Mr. Gerace and Mr. Bongiovanni |
| 11:23AM | 18 | for some period of time, correct? |
| 11:23AM | 19 | A.  Back at Tappos? |
| 11:23AM | 20 | Q.  Correct.  Or, no, not talking about Tappo, talking |
| 11:23AM | 21 | about -- |
| 11:23AM | 22 | A.  Sorry, back at Big Ditch, correct? |
| 11:23AM | 23 | Q.  Correct. |
| 11:23AM | 24 | A.  Moments.  They went into a group of -- I remember one |
| 11:23AM | 25 | football player in particular that Joe knew, and they started |

11:23AM  1    talking.  So I kind of went into my group of friends, and I

11:23AM  2    really wasn't -- I don't remember being with Joe.

11:23AM  3    Q.  It was kind of one of those situations where everyone

11:23AM  4    kind of melts into a conversation because it's a big group?

11:23AM  5    A.  They kind of melted into the football guys, and I was

11:23AM  6    with the hockey guys.

11:23AM  7    Q.  I got you.  And I guess one of things we talked about was

11:23AM  8    this Anthony Gerace DARTS entry.

11:23AM  9        MR. SINGER:  Ms. Champoux, will you mind bringing up

11:23AM  10   on the witness's screen and his screen only, 3557W, please?

11:24AM  11        I'm going to see if I can refresh your memory as to

11:24AM  12   what happened.

11:24AM  13        You can bring that down, Ms. Champoux.

11:24AM  14        BY MR. SINGER:

11:24AM  15   Q.  Does that help refresh your memory about when you ran a

11:24AM  16   report in DARTS on Anthony Gerace?

11:24AM  17   A.  There was that one, but I believe there's another DARTS

11:24AM  18   hit.  And since there were two right in a row and I wrote the

11:24AM  19   remarks section different for a reason, that's why I remember

11:24AM  20   that was the day that Joe came over.  So I don't know if

11:24AM  21   that -- I don't think that's the DARTS hit when he came over

11:24AM  22   to my desk, I think that was different one.

11:24AM  23   Q.  Let me show you 3557V.

11:24AM  24        MR. SINGER:  And only that one on his screen,

11:24AM  25   Ms. Champoux, thank you.  I'll refer your attention down to

11:25AM    1    the bottom of page 1.  If we can advance to page 2 whenever

11:25AM    2    Mr. Casullo is ready.

11:25AM    3              **THE WITNESS:**  Okay.  You can advance.

11:25AM    4              **MR. SINGER:**  Page 2, please.

11:25AM    5              **BY MR. SINGER:**

11:25AM    6    Q.  Okay?

11:25AM    7    A.  Yeah, I think that's -- that's a different one, I'm

11:25AM    8    sorry.

11:25AM    9    Q.  No, no problem.

11:25AM   10              **MR. SINGER:**  We can take that down, Ms. Champoux.

11:25AM   11              **BY MR. SINGER:**

11:25AM   12    Q.  Does that help refresh your memory?

11:25AM   13    A.  That was one from 2016, the other one was from 2018.  But

11:25AM   14    one of the ones that I looked at previously I believe was

11:25AM   15    different than both of those.  It was later.  I think it was

11:25AM   16    either 2018 or '19.  I remember because I ran numbers in

11:25AM   17    contact with Anthony Gerace, and that was my remarks section.

11:25AM   18    And then like minutes after that, I ran them again, it was

11:25AM   19    like the second batch of call detail records, and I put the

11:25AM   20    remarks different.  And I did that intentionally.  I did it

11:25AM   21    because I realized the first batch went to Bongiovanni, and I

11:25AM   22    was like he's gonna know that I'm looking at Anthony Gerace.

11:26AM   23    So I wrote the second batch, just marijuana investigation,

11:26AM   24    thinking that hopefully he wouldn't look at the first one,

11:26AM   25    but he did, and he came over to my desk.

USA v Bongiovanni - Casullo - Singer/Cross - 3/21/24

67

11:26AM  1    That's the time frame I remember, when he came over to my

11:26AM  2    desk.  Wherever that one is, and I've looked at it

11:26AM  3    previously, that's the day.

11:26AM  4  Q.  So it's not the 2016 one --

11:26AM  5  A.  No.

11:26AM  6  Q.  -- that we just saw?

11:26AM  7  A.  Right.

11:26AM  8  Q.  It's not the 2018 that we just saw?

11:26AM  9  A.  I don't believe it was 2018, no, it was another one.

11:26AM  10  Q.  Then we're talking about January 2019 DARTS?

11:26AM  11  A.  It could be, if I could see it again, if you want me to.

11:26AM  12  Q.  I just want to make sure we're certain here.  2019?

11:26AM  13  A.  I could tell if I looked at the remarks on the

11:26AM  14  deconfliction.

11:26AM  15  Q.  So, eventually Mr. Bongiovanni retires from the DEA in

11:26AM  16  February of 2019; is that right, sir?

11:26AM  17  A.  I don't remember when he did, but he did retire.

11:26AM  18  Q.  And I guess as far as you know, you know, based on your

11:26AM  19  experience, that Mr. Bongiovanni didn't get involved in the

11:27AM  20  Peter Gerace or Pharaoh's Gentlemen's Club investigation that

11:27AM  21  you were running, correct?

11:27AM  22  A.  While I was working it?

11:27AM  23  Q.  Yes.

11:27AM  24  A.  Other than the things that he said to me early on?

11:27AM  25  Q.  You knew he didn't get involved in the investigation,

USA v Bongiovanni - Casullo - Singer/Cross - 3/21/24

| | | |
|---|---|---|
| 11:27AM | 1 | correct? |
| 11:27AM | 2 | A.  Oh, as far as working with me? |
| 11:27AM | 3 | Q.  Yes. |
| 11:27AM | 4 | A.  He did not work with me after that. |
| 11:27AM | 5 | Q.  He didn't get involved in your investigation to Anthony |
| 11:27AM | 6 | Gerace, correct? |
| 11:27AM | 7 | A.  Other than walking over to my desk after I ran the |
| 11:27AM | 8 | deconfliction.  But he wasn't helping me in any way. |
| 11:27AM | 9 | Q.  He didn't get involved in any way in the Michael Sinatra |
| 11:27AM | 10 | investigation that you were working, correct? |
| 11:27AM | 11 | A.  Not to my -- he wasn't helping me. |
| 11:27AM | 12 | Q.  And you continued all three of these investigations like |
| 11:27AM | 13 | you would as a DEA agent, correct? |
| 11:27AM | 14 | A.  I continued to do what I was doing at that time. |
| 11:27AM | 15 | Q.  I know that, you know, it wasn't necessarily that you |
| 11:27AM | 16 | continued to investigate that same day because things pop up |
| 11:27AM | 17 | like we talked about earlier, but you continued to |
| 11:27AM | 18 | investigate these files, correct? |
| 11:27AM | 19 | A.  At some point I wasn't allowed to do Peter Gerace.  But |
| 11:28AM | 20 | Anthony Gerace and Michael Sinatra I continued on to some |
| 11:28AM | 21 | extent. |
| 11:28AM | 22 | Q.  And, again, the first time that you reported the racial |
| 11:28AM | 23 | comments and the overdosing stripper comments, that was in |
| 11:28AM | 24 | the conversation that you had at the U.S. Attorney's Office |
| 11:28AM | 25 | sometime in August of 2018? |

| | | |
|---|---|---|
| 11:28AM | 1 | A.  Yes.  Yes. |
| 11:28AM | 2 | Q.  And that was after you were aware that Mr. Bongiovanni |
| 11:28AM | 3 | was implicated by Ron Serio of taking some type of bribes or |
| 11:28AM | 4 | passing information? |
| 11:28AM | 5 | A.  Yes, it was after that. |
| 11:28AM | 6 | **MR. SINGER:**  I have no further questions, Judge. |
| 11:28AM | 7 | **THE COURT:**  Redirect? |
| 11:28AM | 8 | **MR. DICKSON:**  Yes, Judge, I'll be quick. |
| 11:28AM | 9 | |
| 11:28AM | 10 | **REDIRECT EXAMINATION BY MR. DICKSON:** |
| 11:28AM | 11 | Q.  Good morning, Mr. Casullo. |
| 11:28AM | 12 | A.  Good morning. |
| 11:28AM | 13 | Q.  Mr. Casullo, I want to start with when you got here this |
| 11:28AM | 14 | morning.  When you got to court this morning, were you |
| 11:29AM | 15 | waiting outside in the hallway there? |
| 11:29AM | 16 | A.  Yeah, I was waiting outside earlier, yes. |
| 11:29AM | 17 | Q.  Were you waiting with Special Agent Ralph Joseph? |
| 11:29AM | 18 | A.  Yes, I was. |
| 11:29AM | 19 | Q.  Did you have an interaction with -- did you and |
| 11:29AM | 20 | Mr. Joseph have an interaction with the defendant this |
| 11:29AM | 21 | morning? |
| 11:29AM | 22 | A.  Yes, he made a comment as we walked by me and Ralph |
| 11:29AM | 23 | Joseph while I was sitting there. |
| 11:29AM | 24 | Q.  What did he say? |
| 11:29AM | 25 | A.  He said, is he your security, to the best of my -- |

11:29AM   1   verbatim, but is he security, talking about Ralph that was

11:29AM   2   sitting next to me.

11:29AM   3   Q.   Did you say anything to the defendant?

11:29AM   4   A.   No.  I was in disbelief.  And I actually had to ask Ralph

11:29AM   5   again, what did he say?  And Ralph told me again, because it

11:29AM   6   was so shocking.

11:29AM   7   Q.   Mr. Singer asked you some questions about when the

11:29AM   8   defendant came over to talk to you about running Anthony

11:30AM   9   Gerace's tolls, right; is that right?

11:30AM  10   A.   He did, yes, sir.

11:30AM  11   Q.   Did you have a little bit of trouble remembering the date

11:30AM  12   that that happened on?

11:30AM  13   A.   I did, because I ran the deconfliction several times.

11:30AM  14   Q.   That's okay.  I just want to show you a document and see

11:30AM  15   if that helps you remember.  So what I'm going to do is I'm

11:30AM  16   going to give you this document and have you read the first

11:30AM  17   paragraph of it.  And when you're done, just look back up at

11:30AM  18   me before you say anything else, all right?

11:30AM  19   A.   Yes.

11:30AM  20        **MR. DICKSON:**  I'm going to hand Mr. Casullo 3557Z.

11:30AM  21        **BY MR. DICKSON:**

11:31AM  22   Q.   I'll take that document back from you.

11:31AM  23        Mr. Casullo, did reading that document help you remember

11:31AM  24   the date that the defendant came to talk to you about running

11:31AM  25   Anthony Gerace's tolls?

11:31AM    1    A.  Yes, it does.

11:31AM    2    Q.  What was the date of that conversation?

11:31AM    3    A.  I believe it was August 5th, 2018.

11:31AM    4    Q.  Does August 3rd sound right?

11:31AM    5    A.  Sorry, August 3rd.

11:31AM    6    Q.  That's okay.  Does that sound right to you?

11:31AM    7    A.  Yes, I could look at it again if you'd like.

11:31AM    8    Q.  Okay.  Let me just show it to you one more time, 3557Z.

11:32AM    9    A.  Sorry.

11:32AM   10    Q.  That's all right.

11:32AM   11    A.  I'm sorry.

11:32AM   12    Q.  Okay.  I'm going to take the document back from you now.

11:32AM   13    All right.  Did that help you remember the date that the

11:32AM   14    defendant came to talk to you about running Anthony Gerace's

11:32AM   15    tolls?

11:32AM   16    A.  Yes.

11:32AM   17    Q.  What was the date?

11:32AM   18    A.  August 3rd, 2018.

11:32AM   19    Q.  Okay.  Yesterday, Mr. Singer asked you about some DEA

11:32AM   20    Christmas parties at SoHo; is that right?

11:32AM   21    A.  He did.

11:32AM   22    Q.  Okay.  Did you have an understanding that the defendant

11:32AM   23    helped organize some of those Christmas parties at SoHo?

11:32AM   24    A.  That's what I had heard.

11:32AM   25    Q.  I think you said yesterday I think that you never went to

Case 1:19-cr-00227-LJV-MJR    Document 1075    Filed 07/19/24    Page 72 of 89
USA v Bongiovanni - Casullo - Dickson/Redirect - 3/21/24

72

11:32AM  1  Christmas parties at SoHo; is that right?

11:32AM  2  A.  No.

11:32AM  3  Q.  Why?

11:32AM  4  A.  Because of -- it was owned by Robert Panaro, and I

11:32AM  5  believe the other individual, I'm not sure, I think it was a

11:33AM  6  Frank Parisi owned it.  And I knew Robert Panaro to, at least

11:33AM  7  his father and possibly his son, to be involved in Organized

11:33AM  8  Crime.

11:33AM  9  Q.  Mr. Singer also asked you some questions yesterday about

11:33AM  10  the 2004 investigation into Michael Masecchia; do you

11:33AM  11  remember him asking you those questions?

11:33AM  12  A.  Yes.

11:33AM  13  Q.  You told us that you had a call with the defendant where

11:33AM  14  the defendant called you to talk about this Michael Masecchia

11:33AM  15  investigation; is that right?

11:33AM  16  A.  Yes.

11:33AM  17  Q.  During that call, did you share specifics about the

11:33AM  18  Michael Masecchia investigation with the defendant?

11:33AM  19  A.  I provided some information.

11:33AM  20  Q.  Like what?

11:33AM  21  A.  That Michael Masecchia was our file title, I believe.  I

11:33AM  22  don't think Sam Spano was involved at that point.  That we

11:33AM  23  had some -- I believe it was 716 numbers.  At that point, we

11:33AM  24  didn't have a lot of information.

11:34AM  25  Q.  But you provided some information to the defendant?

11:34AM   1   A.  Some.

11:34AM   2   Q.  Mr. Singer also asked you if you understood why it might

11:34AM   3   have put the defendant in an awkward position if his name was

11:34AM   4   listed on a report about Michael Masecchia; do you remember

11:34AM   5   those questions?

11:34AM   6   A.  Yes.

11:34AM   7   Q.  I just want to make sure I understand, Mr. Casullo.  If

11:34AM   8   the defendant's name was on an official DEA document, did

11:34AM   9   Michael Masecchia have to get a copy of that document for

11:34AM  10   some reason?

11:34AM  11           **MR. SINGER:**  Objection, leading.

11:34AM  12           **THE COURT:**  I'm sorry?

11:34AM  13           **MR. SINGER:**  Leading.

11:34AM  14           **THE COURT:**  No, overruled.

11:34AM  15           **BY MR. DICKSON:**

11:34AM  16   Q.  If the defendant's name is on some official DEA document

11:34AM  17   that's about Michael Masecchia, does the Michael Masecchia

11:34AM  18   necessarily have to get a copy of that document?

11:34AM  19   A.  Not at that time.

11:34AM  20   Q.  If it's an official DEA document, does that stay at the

11:34AM  21   DEA?

11:34AM  22   A.  It does up until discovery.

11:35AM  23   Q.  Until prosecution, right?

11:35AM  24   A.  Yes.

11:35AM  25   Q.  Mr. Singer also asked you about these business cards,

11:35AM   1   right?

11:35AM   2   A.  Yes.

11:35AM   3   Q.  What did the defendant say to you about the business

11:35AM   4   cards?  What was that conversation?

11:35AM   5   A.  It was something to the effect that he even goes to the

11:35AM   6   trouble of not -- that he even went to the trouble of having

11:35AM   7   New York field division on his business card.  It was in the

11:35AM   8   same context of the conversation of not having his name on

11:35AM   9   reports.

11:35AM   10  Q.  Reports about Michael Masecchia?

11:35AM   11  A.  About -- yes.

11:35AM   12  Q.  All right.  Now I want to move on and talk about a

11:35AM   13  wiretap that you said you and the defendant worked on

11:35AM   14  together.

11:35AM   15  A.  Yes.

11:35AM   16  Q.  That was -- what was the case called?  Ramos Ramos?

11:35AM   17  A.  I believe the file title was Jonathan Ramos Ramos.

11:35AM   18  Q.  Okay.  Mr. Singer asked you some questions about how busy

11:35AM   19  you and the defendant were when you were doing this wiretap;

11:36AM   20  is that right?

11:36AM   21  A.  It was a very busy case.

11:36AM   22  Q.  Wiretaps, do they take a lot of work?

11:36AM   23  A.  It's, in my opinion, the most extensive and time

11:36AM   24  consuming investigation in my experience.

11:36AM   25          MR. DICKSON:  Ms. Champoux, can we please pull up

| 11:36AM | 1 | Government Exhibit 8A which is already in evidence, page 3. |
| 11:36AM | 2 | And just zoom in on the entries for me, please. |
| 11:36AM | 3 | **BY MR. DICKSON:** |
| 11:36AM | 4 | Q.  Mr. Casullo, were you and the defendant working on that |
| 11:36AM | 5 | Ramos Ramos wiretap in November of 2012? |
| 11:36AM | 6 | A.  No. |
| 11:36AM | 7 | Q.  What about January 2013? |
| 11:36AM | 8 | A.  No. |
| 11:36AM | 9 | Q.  February 2013? |
| 11:36AM | 10 | A.  No. |
| 11:36AM | 11 | Q.  May 2013? |
| 11:36AM | 12 | A.  No. |
| 11:36AM | 13 | Q.  June 2013? |
| 11:36AM | 14 | A.  No. |
| 11:36AM | 15 | Q.  September 2013? |
| 11:36AM | 16 | A.  No. |
| 11:36AM | 17 | Q.  December 2013? |
| 11:36AM | 18 | A.  No. |
| 11:36AM | 19 | Q.  April 2014? |
| 11:36AM | 20 | A.  No. |
| 11:36AM | 21 | Q.  July 2014? |
| 11:36AM | 22 | A.  No. |
| 11:36AM | 23 | Q.  November 2014? |
| 11:36AM | 24 | A.  No. |
| 11:36AM | 25 | Q.  January 2015? |

11:36AM    1    A.  No.

11:37AM    2             MR. DICKSON:  Ms. Champoux, you can take that down

11:37AM    3    for me, please.

11:37AM    4             BY MR. DICKSON:

11:37AM    5    Q.  Did the defendant ever tell you that he was too busy to

11:37AM    6    work on the Ron Serio investigation?

11:37AM    7    A.  No.

11:37AM    8    Q.  Mr. Singer also asked you some questions about whether

11:37AM    9    marijuana cases were a priority in the DEA Buffalo office; do

11:37AM   10    you remember those questions?

11:37AM   11    A.  Yes.

11:37AM   12    Q.  Did the defendant ever tell you that the Ron Serio case

11:37AM   13    wasn't a priority for him?

11:37AM   14    A.  No.

11:37AM   15    Q.  What did he tell you about the Ron Serio case when you

11:37AM   16    talked about it?

11:37AM   17    A.  When he showed me the file, he mentioned in sum and

11:37AM   18    substance that it was a big case, that he had a big case on

11:37AM   19    the Serio organization.

11:37AM   20    Q.  Did the defendant ever tell you that his management

11:37AM   21    wanted him to put the Serio file on the back burner?

11:37AM   22    A.  No.

11:37AM   23    Q.  Did the defendant ever tell you that his management said

11:37AM   24    you can only do one single surveillance in furtherance of the

11:37AM   25    Ron Serio investigation?

11:37AM   1   A.  No.

11:37AM   2   Q.  Did the defendant ever tell you his supervisors told him

11:38AM   3   to close a confidential source after three months into the

11:38AM   4   Ron Serio investigation?

11:38AM   5   A.  He never told me that.

11:38AM   6   Q.  Did he ever tell you that his supervisors instructed him

11:38AM   7   don't have that confidential source do any controlled drug

11:38AM   8   buys?

11:38AM   9   A.  He didn't tell me that.

11:38AM  10   Q.  Were DEA agents between the years of let's say 2010 to

11:38AM  11   2017, were DEA agents allowed to investigate marijuana

11:38AM  12   trafficking?

11:38AM  13          MR. SINGER:  Object to form of the question, Judge.

11:38AM  14   Are we talking about the DEA Buffalo office?  Because if we

11:38AM  15   are, Mr. Casullo's not there until 2015.  I don't know what

11:38AM  16   we're talking about right here.

11:38AM  17          THE COURT:  Yeah, I'll sustain the objection to the

11:38AM  18   form of the question.

11:38AM  19          BY MR. DICKSON:

11:38AM  20   Q.  Mr. Casullo, when you joined the DEA Buffalo office in

11:38AM  21   2015, were you told you can't work marijuana investigations

11:38AM  22   here?

11:38AM  23   A.  No.

11:38AM  24   Q.  Mr. Singer also asked you about one of those

11:38AM  25   deconfliction emails, so I just want to look at that quickly.

11:39AM  1          **MR. DICKSON:**  If we can pull up 26D, Ms. Champoux,

11:39AM  2    please?  Go to page 5 for me if you don't mind.  If we can

11:39AM  3    zoom in on the DICE requests at the bottom there.  Thank you.

11:39AM  4          **BY MR. DICKSON:**

11:39AM  5    Q.  Mr. Casullo, do you remember Mr. Singer asking you about

11:39AM  6    this particular DARTS entry?

11:39AM  7    A.  Yes.

11:39AM  8    Q.  And do you remember him asking you that this was a couple

11:39AM  9    months before -- or, excuse me, DICE entry.  Do you remember

11:39AM  10   him asking you that this was a couple months before Ron Serio

11:39AM  11   was arrested?

11:39AM  12   A.  Yes.

11:39AM  13   Q.  Now, I want you to look at that top left, the number in

11:39AM  14   the top left corner under Trinity item; do you see that

11:39AM  15   there?

11:39AM  16   A.  Yes.

11:39AM  17   Q.  I'm going to show you Government Exhibit 100E-1 that we

11:39AM  18   looked at yesterday.  Is this number here, Mr. Casullo, that

11:40AM  19   Charles Tolias ran in February of 2017, is that number Ron

11:40AM  20   Serio's phone number that's listed there?

11:40AM  21   A.  Is it Ron Serio's number based on this form, is that what

11:40AM  22   you're asking me?

11:40AM  23   Q.  Based on that form.

11:40AM  24   A.  Based on what I'm looking at right now?  No.  The number

11:40AM  25   for Ron Serio is different from that number.

11:40AM    1    Q.  I'll take that back from you, sir.

11:40AM    2         **MR. DICKSON:**  We can take that down, Ms. Champoux.

11:40AM    3         **BY MR. DICKSON:**

11:40AM    4    Q.  Did the defendant ever talk to you or say anything to you

11:40AM    5    about seeing references to Organized Crime in any DARTS

11:40AM    6    entries?

11:40AM    7    A.  Did he ever say anything directly to me?

11:41AM    8    Q.  Yeah, about referencing Organized Crime in any DARTS

11:41AM    9    entries?

11:41AM   10    A.  Not directly to me.

11:41AM   11    Q.  Okay.  I want to talk about the timeline a little bit of

11:41AM   12    this Ron Serio proffer.  Do you remember Mr. Singer asking

11:41AM   13    you about that timeline of events of the meetings at the U.S.

11:41AM   14    Attorney's Office?

11:41AM   15    A.  Yes.

11:41AM   16    Q.  So did you have a coordination meeting at the U.S.

11:41AM   17    Attorney's Office?

11:41AM   18    A.  We did.

11:41AM   19    Q.  That was in 2018?

11:41AM   20    A.  Yes.

11:41AM   21    Q.  Okay.  After that, did you have a proffer with Ron Serio

11:41AM   22    in July of 2018?

11:41AM   23    A.  Yes.

11:41AM   24    Q.  And after that, did you report the statements that the

11:41AM   25    defendant made to you in the conference room?

USA v Bongiovanni - Casullo - Dickson/Redirect - 3/21/24

11:41AM  1  A.  It was after that, yes.

11:41AM  2  Q.  Now after -- at some point after this, did you review the

11:41AM  3  Ron Serio DEA file?

11:42AM  4  A.  I did at some point, yes, afterwards.

11:42AM  5  Q.  Do you remember Mr. Singer asking you about whether it

11:42AM  6  was the working file?

11:42AM  7  A.  Yes.

11:42AM  8  Q.  Can you explain the difference between a working file and

11:42AM  9  an actual DEA file?

11:42AM 10  A.  There's two different -- there's two files for a criminal

11:42AM 11  case file with the DEA.  One is the actual criminal case

11:42AM 12  file, and then there's a copy for the U.S. Attorney's Office.

11:42AM 13  So there's two copies essentially of the same case.  The

11:42AM 14  actual criminal file, and a copy for the U.S. Attorney's

11:42AM 15  Office.

11:42AM 16  Q.  And, Mr. Casullo, did you review the actual Ron Serio

11:42AM 17  file?

11:42AM 18  A.  I'm pretty sure it was the actual file, I can't remember

11:42AM 19  for sure.

11:42AM 20  Q.  Just to go back to the DARTS piece for a second,

11:43AM 21  Mr. Casullo, did the defendant complain about you referencing

11:43AM 22  IOC in DARTS entries?

11:43AM 23  A.  I was told by my supervisor that I could no longer

11:43AM 24  reference Italian Organized Crime, even mention it in the

11:43AM 25  remarks sections of my deconflictions when I entered the

11:43AM   1   remarks, because it was upsetting Joe Bongiovanni.

11:43AM   2   Q.  I want to talk about that conversation that you and the

11:43AM   3   defendant had in that conference room in the DEA, okay?

11:43AM   4       Mr. Casullo, should you have reported what the defendant

11:43AM   5   said to you right away?

11:43AM   6   A.  Yes.

11:43AM   7   Q.  Did you make a mistake by not doing that?

11:43AM   8   A.  Yes.

11:43AM   9   Q.  Were you worried about how you would be treated in the

11:43AM  10   DEA Buffalo office if you snitched on the defendant?

11:44AM  11   A.  Yes.

11:44AM  12   Q.  What happened when you finally told your supervisors

11:44AM  13   about what the defendant said to you?

11:44AM  14   A.  The things that I had mentioned.

11:44AM  15       I have people that I knew for 20 years, police officers

11:44AM  16   that I worked with, one in particular, that crossed the

11:44AM  17   street when she saw me outside the office.

11:44AM  18       I had people make snide comments about the U.S.

11:44AM  19   Attorney's Office knowing who I was working with and what I

11:44AM  20   was working on.

11:44AM  21       I had people ignore me in the office.  I went to the

11:44AM  22   extent -- thankfully, my group at the time was up on a

11:44AM  23   wiretap, and I could choose to work nights, which I chose,

11:44AM  24   even though it was difficult on my family just so I wouldn't

11:44AM  25   have to go in the office.

11:44AM    1        I chose to work surveillance on every single assignment I

11:44AM    2    took so I wouldn't have to go into the office.

11:44AM    3        Those are some of the things.  Some.

11:45AM    4    Q.  Mr. Casullo, did you make up that the defendant said to

11:45AM    5    you that he had a conversation with Peter Gerace about

11:45AM    6    getting a stripper out of the club when she was overdosing?

11:45AM    7    A.  No.

11:45AM    8    Q.  Did you tell this jury the truth when you told them the

11:45AM    9    defendant said that?

11:45AM   10    A.  Yes.

11:45AM   11    Q.  Did you make up that the defendant said to you do you

11:45AM   12    hate Italians when you were talking to him about Peter

11:45AM   13    Gerace?

11:45AM   14    A.  No.

11:45AM   15    Q.  Did you tell the jury the truth about what the defendant

11:45AM   16    said to you about Italians?

11:45AM   17    A.  Yes.

11:45AM   18    Q.  Did you make up that this defendant said to you we should

11:45AM   19    be investigating black people and Hispanic people, but using

11:45AM   20    racial slurs to make those comments?

11:45AM   21    A.  No.

11:45AM   22    Q.  Did you tell the jury the truth about what this defendant

11:45AM   23    said to you?

11:45AM   24    A.  Yes.

11:45AM   25        **MR. DICKSON:**  Nothing further.

USA v Bongiovanni - Casullo - Singer/Recross - 3/21/24

83

| | |
|---|---|
| 11:45AM | 1 |
| 11:45AM | 2 |
| 11:45AM | 3 |
| 11:45AM | 4 |
| 11:45AM | 5 |
| 11:46AM | 6 |
| 11:46AM | 7 |
| 11:46AM | 8 |
| 11:46AM | 9 |
| 11:46AM | 10 |
| 11:46AM | 11 |
| 11:46AM | 12 |
| 11:46AM | 13 |
| 11:46AM | 14 |
| 11:46AM | 15 |
| 11:46AM | 16 |
| 11:46AM | 17 |
| 11:46AM | 18 |
| 11:46AM | 19 |
| 11:46AM | 20 |
| 11:46AM | 21 |
| 11:46AM | 22 |
| 11:46AM | 23 |
| 11:46AM | 24 |
| 11:46AM | 25 |

1    **THE COURT:**  Mr. Singer?

2    **MR. SINGER:**  Briefly.

3    **THE COURT:**  Sure.

4

5                    **RECROSS-EXAMINATION BY MR. SINGER:**

6    Q.  So, Mr. Casullo, you talked about the discovery process,

7    remember talking about that on your redirect?

8    A.  Yes.

9    Q.  And, so, the discovery process, for the people who don't

10   know about it, that's when -- when someone is charged with a

11   crime, the prosecutor has a duty to turn over information

12   with regard to the investigation; that right?

13   A.  That's correct.

14   Q.  That's something that the defense attorneys can take a

15   look at, correct?

16   A.  Yes.

17   Q.  And that's something that the defendant in a case has a

18   chance to look at, correct?

19   A.  Yes.

20   Q.  And, so, you clarified your comment with Mr. Dickson

21   about how, while it's true that a case file or a case report

22   that you produce at DEA would not be turned over until a

23   person's charged, right?

24   A.  Correct.

25   Q.  It could be turned over to that person after they're

11:46AM 1    charged, correct?

11:46AM 2    A.  Correct, through their attorneys.

11:46AM 3    Q.  And we talked about how one of the people that you know

11:46AM 4    is Phil Domiano, correct?

11:47AM 5    A.  Yes.

11:47AM 6    Q.  Familial relation with him, correct?

11:47AM 7    A.  It's my wife's brother.  My brother-in-law.

11:47AM 8    Q.  And we talked how it would be uncomfortable for you to be

11:47AM 9    noted on a report of investigation if Phil Domiano was ever

11:47AM 10   charged with a crime, correct?

11:47AM 11   A.  I don't think I'd be allowed to work that type of case.

11:47AM 12   Q.  Exactly.  Because of all the various reasons.  There's a

11:47AM 13   conflict of interest involved in it, correct?

11:47AM 14   A.  Yes.

11:47AM 15   Q.  And it also could put you in an awkward spot, correct?

11:47AM 16   A.  Correct.

11:47AM 17   Q.  So, that was the concern Mr. Bongiovanni had, right?

11:47AM 18        **MR. DICKSON:**  Objection, speculation.

11:47AM 19        **THE COURT:**  No, overruled.

11:47AM 20        **BY MR. SINGER:**

11:47AM 21   Q.  That was a concern we talked about yesterday?

11:47AM 22   A.  He had mentioned because he grew up in North Buffalo and

11:47AM 23   knew those people, Masecchia, that was his reason.  That's

11:47AM 24   what he explained.

11:47AM 25   Q.  Correct.  You talked a little bit about the Ramos and

11:47AM    1    Ramos wiretap.  And that was a -- a very extensive and time

11:47AM    2    consuming endeavor, correct?

11:47AM    3    A.  It was.

11:47AM    4    Q.  Probably the most time consuming endeavor that DEA

11:48AM    5    conducts as far as investigations, correct?

11:48AM    6    A.  In my experience, that's the most time consuming.

11:48AM    7    Q.  And I know that you didn't come to the Buffalo office

11:48AM    8    until September of 2015, correct?

11:48AM    9    A.  September of 2015, correct.

11:48AM    10   Q.  So you're not aware of what DEA agents were working on

11:48AM    11   back in the 2013 time period when the Ron Serio case was

11:48AM    12   starting to get investigated, correct?

11:48AM    13   A.  I wasn't aware of what was happening in the Buffalo

11:48AM    14   office then.

11:48AM    15   Q.  Like, for instance, you weren't aware of the fact that

11:48AM    16   Special Agent Nastoff was involved in wiretap case at that

11:48AM    17   point in time, right?

11:48AM    18   A.  In 2013?

11:48AM    19   Q.  In 2012 and 2013.

11:48AM    20   A.  No.

11:48AM    21   Q.  And given the devotion of resources that you experienced

11:48AM    22   that the Ramos and Ramos case required, it wouldn't be

11:48AM    23   uncommon for the office at that point in time to devote the

11:48AM    24   same number of resources, correct?

11:48AM    25          **MR. DICKSON:**  Objection, speculation.  This is before

11:48AM  1  Mr. Casullo's in Buffalo.  It's the same objection the defense

11:48AM  2  made.

11:48AM  3           **THE COURT:**  Yeah, sustained.

11:48AM  4           **MR. SINGER:**  I'll withdraw the question, Judge.

11:48AM  5           Finally, Ms. Champoux, can you bring up side by side

11:49AM  6  Exhibit 26D and Exhibit 8A.  If we can scroll to -- I think

11:49AM  7  it's page 5 of Exhibit 26D.  Right there.  Yes.  And if we can

11:49AM  8  scroll to page 17 of Exhibit 8A, please.

11:49AM  9           **BY MR. SINGER:**

11:49AM  10  Q.  So Mr. Dickson asked you a question about the relevance

11:49AM  11  of that number, correct?

11:49AM  12  A.  Which number?

11:49AM  13  Q.  So we're talking about on Exhibit 26D, you see down at

11:49AM  14  the bottom portion of the page the number under Trinity

11:49AM  15  item 1, the 5618010221 number?

11:49AM  16  A.  Yes.

11:49AM  17  Q.  And you testified that you weren't aware of the

11:49AM  18  significance of it because of the fact that it did not appear

11:50AM  19  on that list in Exhibit 100E-1, correct?

11:50AM  20           **MR. DICKSON:**  Objection, that's not what he said.

11:50AM  21           **THE COURT:**  Yeah, sustained to the form of the

11:50AM  22  question.

11:50AM  23           **BY MR. SINGER:**

11:50AM  24  Q.  You testified that that number that appears in the DARTS

11:50AM  25  report in 26D was not on the list in Exhibit 100E-1 that you

| | | |
|---|---|---|
| 11:50AM | 1 | were shown, correct? |
| 11:50AM | 2 | **MR. DICKSON:** Objection. That's not what he |
| 11:50AM | 3 | testified to, Judge. The question I asked him was whether it |
| 11:50AM | 4 | was Ron Serio's phone number. |
| 11:50AM | 5 | **THE COURT:** Okay. So, again, the objection is |
| 11:50AM | 6 | sustained to the form of the question. You can ask. |
| 11:50AM | 7 | **BY MR. SINGER:** |
| 11:50AM | 8 | Q. So, do you see the number on Exhibit 8A at page 17, sir? |
| 11:50AM | 9 | I'll refer you to the indexing section. |
| 11:50AM | 10 | A. Okay. On the DEA-6? |
| 11:50AM | 11 | Q. Correct. |
| 11:50AM | 12 | A. Yes. |
| 11:50AM | 13 | Q. And that number, according to the DEA-6, belongs to |
| 11:50AM | 14 | Thomas Serio; is that right? |
| 11:50AM | 15 | A. According to this form, yes. |
| 11:50AM | 16 | Q. And the 561-801-0221 number that appears on the DEA-6 in |
| 11:51AM | 17 | Exhibit 8A, page 17, that's the same number that appears on |
| 11:51AM | 18 | the Trinity item 1 request in Exhibit 26D, correct? |
| 11:51AM | 19 | A. That's correct. |
| 11:51AM | 20 | **MR. SINGER:** Thank you. No further questions, Judge. |
| 11:51AM | 21 | **THE COURT:** Anything more? |
| 11:51AM | 22 | **MR. DICKSON:** Nothing more, Judge, thank you. |
| 11:51AM | 23 | **THE COURT:** Okay. You can step down, sir, thank you. |
| 11:51AM | 24 | (Witness excused and excerpt concluded at 11:51 a.m.) |
| | 25 | *    *    *    *    *    *    * |

1

2                        **CERTIFICATE OF REPORTER**

3

4                In accordance with 28, U.S.C., 753(b), I

5    certify that these original notes are a true and correct

6    record of proceedings in the United States District Court for

7    the Western District of New York on March 21, 2024.

8

9

10                              s/ Ann M. Sawyer
                               Ann M. Sawyer, FCRR, RPR, CRR
11                             Official Court Reporter
                               U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**TRANSCRIPT INDEX**

**EXCERPT OF ANTHONY CASULLO - DAY 2**

**MARCH 21, 2024**

**W I T N E S S**                                              **P A G E**

**A N T H O N Y   C A S U L L O**                              2

   CROSS-EXAMINATION BY MR. SINGER (CONT'D):        2

   REDIRECT EXAMINATION BY MR. DICKSON:             69

   RECROSS-EXAMINATION BY MR. SINGER:               83


**E X H I B I T S**                                            **P A G E**

 GOV Exhibit 100C                                           7