UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA

v.

JOSEPH BONGIOVANNI,                                    19-CR-227
                                                       DECISION & ORDER
                        Defendant.

_____


On October 31, 2019, the government filed an indictment against the defendant,

Joseph Bongiovanni, charging him with conspiring to defraud the United States in

violation of 18 U.S.C. § 371, conspiring to distribute controlled substances in violation of

21 U.S.C. § 846, accepting a bribe as a public official in violation of 18 U.S.C.

§ 201(b)(2)(A) and (b)(2)(C), obstructing justice in violation of 18 U.S.C. § 1519, and

making false statements to an agency of the United States in violation of 18 U.S.C.

§ 1001(a)(2).  Docket Item 1.

On June 4, 2020, the government filed a superseding indictment adding charges

against a second defendant, Michael Masecchia.  Docket Item 46.  Masecchia pleaded

guilty about six months later.  *See* Docket Item 69.  A few months after that, the

government filed a second superseding indictment adding another defendant, Peter

Gerace, Jr., and adding additional counts charging Bongiovanni with accepting bribes

from Gerace and conspiring with Gerace to defraud the United States and to distribute

controlled substances.  Docket Item 89.

In January 2024, when pretrial motions and other issues made it clear that

Gerace's case would not go to trial for some time, this Court granted Bongiovanni's

motion for a severance, Docket Item 709, and Bongiovanni's jury trial began on February 12, 2024.  *See* Docket Item 762.  After the government rested its case on March 26, 2024, Bongiovanni moved for a judgment of acquittal on counts 5, 6, 12, 14, and 15 under Federal Rule of Criminal Procedure 29 ("Rule 29 motion").  *See* Docket Item 838.  The Court reserved decision.  *See id.*  Bongiovanni then presented his evidence*, see* Docket Items 838-840, and on March 28, 2024, he rested his case*, see* Docket Item 840.

The jury began deliberating on April 3, 2024.  *See* Docket Item 852.  On April 12, 2024, after approximately a week of deliberations, the Court received a note from a juror stating that she had been subjected to "verbal attacks" that were "too much for [her] to handle."  Docket Item 877-1 at 1.  The note also stated that "[t]hings have . . . been said by others that ma[d]e [the juror] believe not everyone [wa]s fullfilling [sic] their duty as a Jury," such as "I knew he was guilty from day 1," and "[y]ou have to prove to us that he is innocent."  *Id.* at 1-2.  Based on that note, the Court halted deliberations.  *See* Docket Item 867.

The Court asked whether the jury had already reached a verdict on any counts, and when the foreperson indicated that they had, the Court took the partial verdict.  *See id.*  The jury acquitted Bongiovanni on count 12 (obstruction of justice related to his deleting information from his DEA-issued cell phone), convicted him on counts 13 and 15 (obstruction of justice and making false statements to an agency of the United States related to a DEA file that Bongiovanni kept after his retirement), but was unable to reach a unanimous verdict on the remaining 12 counts.  Docket Items 761 and 880.  The Court therefore declared a mistrial on counts 1-11 and 14.  *See* Docket Item 867.

2

On May 3, 2024, Bongiovanni filed a brief in support of his renewed Rule 29 motion on counts 5, 6, and 15.[1]  Docket Item 908.  Bongiovanni also moved for a judgment of acquittal on count 13 and for a new trial under Federal Rule of Criminal Procedure 33 on the counts on which he was convicted.  *Id.*  Several days later, Bongiovanni moved to dismiss all the unresolved counts on speedy trial grounds.  Docket Item 916.  The government responded to Bongiovanni's motions, Docket Items 948 and 956, and Bongiovanni replied, Docket Items 972 and 975.  After hearing oral argument, this Court reserved decision.  *See* Docket Item 1008.

For the reasons that follow, this Court grants Bongiovanni's motion for a judgment of acquittal under Rule 29 with respect to count 5 and denies it with respect to the remaining counts; denies Bongiovanni's motion for a new trial under Rule 33; and denies without prejudice Bongiovanni's motion to dismiss on speedy trial grounds.

## DISCUSSION[2]

I.   **RULE 29 MOTION**

   **A.  Legal Standard**

A defendant seeking a judgment of acquittal faces a heavy burden:  A court can grant a Rule 29 motion only if no "rational trier of fact could have found the essential

---

[1] Bongiovanni did not address count 14 in his brief.  *See* Docket Item 908.  To the extent that Bongiovanni has not abandoned that claim, his Rule 29 motion on count 14 is denied.  This Court agrees with the government that the testimony from Phlycia Hunt and Special Agent Curtis Ryan was sufficient to demonstrate under the Rule 29 standard that Bongiovanni had witnessed Gerace consume narcotics and made false statements about that fact.

[2] The Court assumes the reader's familiarity with the factual background and will recount the facts only as necessary to explain its decision.

elements of the crime beyond a reasonable doubt." *United States v. Cacace*, 796 F.3d 176, 191 (2d Cir. 2015) (quoting *United States v. Moore*, 54 F.3d 92, 100 (2d Cir. 1995)). Stated another way, "[a] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *See United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *United States v. White,* 673 F.2d 299, 301 (10th Cir. 1982)).

If a court reserves ruling on a Rule 29 motion until after the jury has returned a verdict, it "must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b); *see also United States v. Velasquez*, 271 F.3d 364, 371 (2d Cir. 2001). Here, because the Court first reserved ruling on Bongiovanni's Rule 29 motion following the close of the government's case, it examines whether the government met its burden based on the trial evidence at that time.[3] *See* Docket Item 838.

In conducting its analysis, the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (quoting *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017)). That being said, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a

---

[3] The exception to this is for count 13, on which Bongiovanni did not move until after trial. For that count, the Court considers all the evidence presented at trial.

reasonable jury must necessarily entertain a reasonable doubt."  *United States v.*

*Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotations omitted).

### B.  Count 5

Count 5 charges Bongiovanni with accepting a bribe as a public official.  Docket

Item 761 at 28.[4]  More specifically, count 5 alleges that Bongiovanni

> was paid United States currency to, among other acts and
> omissions, omit to enforce the drug laws of the United States
> against Peter Gerace Jr., and against Pharaoh's Gentlemen's
> Club located at 999 Aero Drive, Cheektowaga, New York; to
> falsely advise an Federal Bureau of Investigation (FBI)
> Special Agent (SA) that Peter Gerace Jr. was a DEA
> confidential source, thereby inducing the FBI SA to abandon
> a narcotics investigation into Peter Gerace Jr. and Pharaoh's
> Gentlemen's Club; to provide advice and information to Peter
> Gerace Jr.; to help Peter Gerace Jr. and Pharaoh's
> Gentlemen's Club avoid federal narcotics investigations; to
> make statements to his co-worker, a fellow DEA SA, to
> dissuade and discourage the fellow DEA SA from
> investigating Peter Gerace Jr., and Pharaoh's; to make false
> and misleading statements to other members of law
> enforcement; to provide information about law enforcement
> methods and techniques; and, to help such drug trafficking
> activities continue.

*Id.*

The elements the government must prove on count 5 are: (1) that between in or

about 2009 and on or about June 6, 2019, Bongiovanni demanded, sought, received, or

agreed to receive or accept something of value; (2) that at that time, Bongiovanni was a

public official; and (3) that Bongiovanni did so with the corrupt intent to be influenced in

the performance of an official act or to be induced to do an act or omit to do an act in

violation of his official duty.  *See* 1 Modern Federal Jury Instructions – Criminal ¶ 16.02

---

[4] Page numbers in docket citations refer to ECF pagination.

(2024).  Moreover, where—as here—"the government proceeds under the 'as opportunities arise' theory of bribery, it must prove 'that [Bongiovanni] received a payment to which he was not entitled' and that, 'at the time of the payment,' [Gerace] and [Bongiovanni] 'understood that [Bongiovanni] was expected as a result of the payment to exercise particular kinds of influence . . . as specific opportunities ar[o]se.'" *United States v. Reichberg*, 5 F.4th 233, 247 (2d Cir. 2021) (quoting *United States v. Skelos*, 988 F.3d 645, 655 (2d Cir. 2021)).

There is no dispute that Bongiovanni was a public official at the time he allegedly received the cash.  Bongiovanni argues, however, that the government failed to meet its burden on the first and third elements.

### 1.  Katrina Nigro's Testimony

One witness—Katrina Nigro, Gerace's ex-wife—testified that she twice gave Bongiovanni envelopes of what appeared to be cash at Gerace's direction.  Docket Item 856 at 47.  More specifically, Nigro said that on two occasions approximately six months apart in 2015, Bongiovanni came to the first-floor office of Pharaoh's, and she gave him an envelope containing cash.  *Id.* at 47-48, 66, 68-69.  Nigro did not know why Gerace was giving Bongiovanni cash.  *See id.* at 69.

Nigro also testified that Gerace gave Bongiovanni a card with cash at Bongiovanni's 50th birthday party at Boss restaurant.  *Id.* at 48-49.  According to Nigro, she saw Gerace put money in the card, and Gerace told her that he was giving Bongiovanni $5,000.  *Id.* at 49.  Nigro said that the birthday party occurred about three months after the first time Bongiovanni came to Pharaoh's to pick up an envelope from

her and three months before the second time.  *Id.* at 66, 68-69.  So all three payments

occurred in a six-month period in 2015.

### 2. Whether Bongiovanni Received Something of Value

Bongiovanni first argues that there was not enough evidence for the jury to

conclude beyond a reasonable doubt that the envelopes contained cash.  *See* Docket

Item 908 at 7.  This Court disagrees.  When asked how she knew the envelopes

contained cash, Nigro responded that she "could just feel it."  Docket Item 856 at 47.

And, she said, from her "life experience in paying other people in cash envelopes, [she]

knew it was cash."  *Id.*  Whether that testimony was credible is a question solely within

the purview of the jury.  *See United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000)

(explaining that "[i]t is not for the court on a Rule 29 motion to make credibility

determinations").  And a jury crediting that testimony could conclude beyond a

reasonable doubt that the envelopes contained cash.

### 3. Whether Bongiovanni Received the Cash in Exchange for Agreeing to Take Official Actions

The harder question is whether a rational juror could find beyond a reasonable

doubt that Bongiovanni accepted the envelopes of cash in exchange for his agreeing to

take or omit to take official actions to protect Gerace in the future.  In other words, when

Bongiovanni received the cash in 2015, did he know "that it was given with the

expectation that [he] would perform an 'official act' in return"?  *See McDonnell v. United

States*, 579 U.S. 550, 572 (2016).  "[T]he focus [of this analysis] has to be on

*[Bongiovanni]'s* state of mind and *his* understanding of the circumstances of the

payment, not those of [Gerace]."  *See United States v. Silver*, 2018 WL 4440496, at *7 (S.D.N.Y. Sept. 17, 2018).

The government argues that the jury could infer Bongiovanni's intent from other evidence presented at trial.  First, the government notes that "Lou Selva testified that [Bongiovanni] admitted that he 'stepped in' to help Gerace when Gerace was under scrutiny by U.S. Probation."  Docket Item 948 at 11-12.  And, the government says, there was "specific testimony about this incident, and the resulting attempts by the defendant to dissuade the FBI from pursuing Gerace, from U.S. Probation Officer Peter Lepiane, retired FBI Special Agent Thomas Herbst, and officer Robert Cottrell."  *Id.* at 12.  But as the government concedes, "this incident"—which happened in 2009— "occurred before Nigro provided the envelopes of cash to the defendant in 2015."  *Id.*; *see* Docket Item 772 at 72-73; Docket Item 775 at 19-31; Docket Item 909 at 20-22.  So if the payments were connected to that incident, they were "gratuities," that is "payments made to an official *after* an official act as a token of appreciation"—not "bribes," that is "payments made or agreed to *before* an official act in order to influence the official with respect to that future official act."  *See Snyder v. United States*, 144 S. Ct. 1947, 1951 (2024).  And based on Supreme Court caselaw, that distinction makes the evidence insufficient as a matter of law.  *See id.*; *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 405 (1999).

Apparently recognizing that issue, the government argues that the 2009 incident with U.S. Probation shows that—as a general matter—Bongiovanni "was willing to intercede with law enforcement on Gerace's behalf."  Docket Item 948 at 12.  "Thus," the government says, "when [Bongiovanni] later accepted cash from Gerace,

[Bongiovanni] accepted those payments with an understanding that he was expected to continue protecting Gerace from law enforcement scrutiny concerning drug-related investigations and to not, personally, investigate Gerace or Pharaoh's, in violation of his duties as a DEA Special Agent." *Id.*

The government also relies on A.P.'s[5] testimony that Gerace gave her Bongiovanni's business card in 2007 and told her to call Bongiovanni if she ever "got in trouble." *Id.*; *see* Docket Item 912 at 27-28, 34. According to the government, even though this occurred before any of the payments, "[t]his testimony, again, evinces an understanding of the arrangement between [Bongiovanni] and Gerace." Docket Item 948 at 12. More specifically, the government says, this evidence shows that "Gerace believed [Bongiovanni] was willing to assist Gerace and his associates as opportunities arose to avoid drug-related investigations." *Id.* And, the government suggests, "[t]he jury was free to infer that [Bongiovanni] shared the same understanding as Gerace." *Id.* Based on all that, the government concludes, "when [Bongiovanni] accepted the envelopes of cash from Nigro and accepted the birthday card full of cash from Gerace, there was circumstantial evidence of his corrupt mindset to continue to intercede on Gerace's behalf and protect him from law enforcement scrutiny concerning drug-related investigations." *Id.* at 12-13.

Bongiovanni responds that "[n]o evidence was adduced suggesting [he] was aware of—much less approved of—this action and statement," that is, Gerace's giving the business card and advice to A.P. Docket Item 972 at 5. "To believe otherwise," Bongiovanni says, "requires too many intervening inferences in a sea of evidence that

---

[5] Because A.P. is a protected witness, the Court will refer to her only by initials.

[he] and Peter Gerace otherwise had a long-standing friendship and that Peter Gerace had a fawning relationship with law enforcement generally."[6]  *Id.*  At most, Bongiovanni says, the evidence on which the government relies "presented proof of a gratuity, not a bribe."  Docket Item 1040 at 1.

Whether Bongiovanni is entitled to a judgment of acquittal on count 5 comes down to the line between "permissible inference and impermissible speculation."  *See Pauling*, 924 F.3d at 662.  As the Second Circuit has explained, "[a]n inference is not a suspicion or a guess.  It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist."  *Id.* at 656 (quoting *Siewe v. Gonzales*, 480 F.3d 160, 168 (2d Cir. 2007)).  "Impermissible speculation, on the other hand, is 'a complete absence of probative facts to support the conclusion reached.'"  *Id.* (quoting *Lavender v. Kurn*, 327 U.S. 645, 653 (1946)).  And "[w]hile we must defer to a jury's reasonable inferences, we give no deference to impermissible speculation."  *Id.* (citing *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994)).  In fact, mere speculation—even if reasonable—cannot support a criminal conviction.  *See Langston v. Smith*, 630 F.3d 310, 319 (2d Cir. 2011) (citing *Brown v. Palmer*, 441 F.3d 347, 352-53 (6th Cir.2006)); *see also Pauling*, 924 F.3d at 657 ("[W]here a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible.  We must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements,

---

[6] That "sea" included, for example, evidence that an Assistant United States Attorney ("AUSA") who had met Gerace only once or twice was surprised to learn that the AUSA's "name was being used" by Gerace to attempt "to get [Gerace] off, or to help . . . him not face the consequences of his violation [of supervised release]."  Docket Item 958 at 7-8.

is established beyond a reasonable doubt." (alteration in original) (quoting *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995))).

After careful consideration, this Court finds that "[a]lthough this is a close case that tests the boundary . . . between the drawing of a permissible inference and impermissible speculation, only surmise and guesswork could lead a jury to determine that" the money constituted a bribe rather than (1) a gratuity for past actions or in the *hope of* future action, or (2) a reimbursement or genuine gift to a longtime friend.  *See Pauling*, 924 F.3d at 662; *see also Autuori*, 212 F.3d at 120 (explaining that "[t]he jury may not be permitted to conjecture merely, or to conclude upon pure speculation" (quoting *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972))).

As an initial matter, no one testified about the purpose of the cash.  Nigro admitted that she did not know why Gerace gave it to Bongiovanni.  *See* Docket Item 856 at 69 ("Q. All right.  So, but going back to these envelopes, you have -- as you sit here today, you have no idea what the purpose of these envelopes w[as], correct?  A. Yes.").  And no other witness said anything about the envelopes.

More significantly, there was no circumstantial evidence from which a jury could infer beyond a reasonable doubt that the payments were bribes, as opposed to being gratuities or benign exchanges between friends.  Had there been, for example, a temporal connection between the money and acts taken, that might have supported an inference that Bongiovanni accepted the money in exchange for providing future protection to Gerace.  Or had Nigro testified—as she did before the grand jury—that she had "witnessed" Bongiovanni receive envelopes from Gerace on "about 30" occasions from 2013 to 2016, including giving Bongiovanni envelopes five or six times "[her]self" at

Gerace's direction, *see* Gov't Ex. 3577A at 75-76, that likely would have been sufficient. But looking only at what was presented to the jury at trial, as this Court must, there simply is no evidence—circumstantial or otherwise—from which a rational juror could infer *beyond a reasonable doubt* that the money was a bribe *in exchange for* Bongiovanni's taking official acts, rather than a gratuity or benign exchange between friends. *See D'Amato*, 39 F.3d at 1256 (explaining that to defeat a Rule 29 motion, "the government must do more than introduce evidence 'at least as consistent with innocence as with guilt'" (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991))). Stated another way, because it is at least equally likely that the money was a gift, a reimbursement, or a gratuity and not a bribe, "the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, [and] a reasonable jury must necessarily entertain a reasonable doubt." *Glenn*, 312 F.3d at 70 (citation and internal quotation marks omitted).

<blockquote>a.    *Bribes versus gratuities*</blockquote>

As Bongiovanni observes, caselaw—most recently, the Supreme Court's decision in *Snyder*, 144 S. Ct. 1947—distinguishes between bribes and gratuities. *See* Docket Item 1040 at 1. "As a general matter, bribes are payments made or agreed to *before* an official act in order to influence the official with respect to that future official act," whereas "[g]ratuities are typically payments made to an official *after* an official act as a token of appreciation." *Snyder*, 144 S. Ct. at 1951. "This distinction is important," Bongiovanni argues, "because [he] went to trial with [c]ount 5 being a bribery charge

[under 18 U.S.C. § 201(b)], yet the government, from its opening statement and throughout its case, presented proof of a gratuity, not a bribe."[7]  Docket Item 1040 at 1.

The Second Circuit analyzed the difference between bribes and gratuities in detail in *United States v. Alfisi*, 308 F.3d 144, 149 (2d Cir. 2002).  "The 'corrupt' intent necessary to a bribery conviction is in the nature of a *quid pro quo* requirement; that is, there must be 'a specific intent to give . . . . something of value *in exchange* for an official act,'" the court explained.  *Id.* at 149 (alteration in original) (quoting *Sun-Diamond Growers*, 526 U.S. at 404-05).  "Putting it only slightly differently, bribery involves the giving of value to procure a specific official action from a public official," whereas "[t]he element of a *quid pro quo* or a direct exchange is absent from the offense of paying an unlawful gratuity."  *Id.*  "To commit that offense, it is enough that the payment be a reward for a past official act or made *in the hope of obtaining general good will* in the payee's performance of official acts off in the future."  *Id.* (emphasis added) (citing *Sun-Diamond Growers*, 526 U.S. at 405).  So if Gerace paid Bongiovanni cash in an effort to foster a general sense of good will—rather than an exchange for a promise to take or not take future official acts—the cash was a gratuity, not a bribe.

The government identifies the following actions that Bongiovanni allegedly took after he received the envelopes of cash in 2015:

> he (1) interceded on Gerace's behalf to protect [Gerace] from investigations spearheaded by Anthony Casullo; (2) attempted to pressure Casullo into investigating [B]lack and Hispanic people instead of Gerace; (3) instructed Gerace to remove a woman overdosing at Phar[ao]h's from the club; (4) declined to assist other investigative efforts targeting Gerace

---

[7] A federal official can be charged for accepting unlawful gratuities under 18 U.S.C. § 201(c), but Bongiovanni was not charged under that section.  *See* Docket Item 761.  Had he been, the resolution of this motion likely would have been different.

> despite knowing Gerace's criminal conduct; and (5) disclosed sensitive law enforcement information regarding "ping" technology to Gerace.

Docket Item 1046 at 3.

As an initial matter, is not clear when the conversation between Bongiovanni and Gerace about the overdose occurred, and there was no evidence from which the jury could date that conversation *after* the envelopes.[8]  The conversation in which Bongiovanni allegedly pressured Casullo and told Casullo that Bongiovanni had instructed Gerace to remove a woman who had overdosed from Pharaoh's occurred in the summer of 2016.  Docket Item 1074 at 75.  And the text message about "ping" technology occurred in 2017.  *See* Docket Item 948 at 13 (citing Gov't Ex. 311).  In other words, even viewing the evidence in the light most favorable to the government, more than six months elapsed between the latest cash exchange between Gerace and Bongiovanni and the earliest relevant act the government identifies.

The lack of temporal proximity, in and of itself, is not fatal to the government's claim, as it may be that the "opportunity" to assist or protect Gerace did not "arise" until months after the envelope exchange.  But the remoteness of the events loosens the

---

[8]  Casullo testified that Bongiovanni told him that Gerace had "called [Bongiovanni] when a stripper overdosed at [Gerace's] club, and [Bongiovanni] told [Gerace] to get her out of there," but Casullo did not mention any date for that underlying conversation.  *See* Docket Item 1074 at 68-69.  Consistent with that testimony, the indictment states that the conversation between Gerace and Bongiovanni occurred "[o]n a date unknown to the Grand Jury."  Docket Item 761 at 23.  There was testimony from another witness, Douglas Augustyniak, that a dancer overdosed in "approximately 2015," Gerace made a call, and Gerace then told Augustyniak to "get her out of the club."  Docket Item 981 at 20-23.  But that witness did not say when in 2015.  *See id.*

connection between the payments and Bongiovanni's future intervention on behalf of Gerace.[9]

Simply put, there is no fact from which the jury could reasonably infer—as opposed to merely speculate—that Bongiovanni received the money from Gerace with the intent to accept the payment for continued intervention on Gerace's behalf, as opposed to accepting it as "a reward for a past official act or [a payment] made in the hope of obtaining general good will."[10]  *See Alfisi*, 308 F.3d at 149 (citing *Sun-Diamond Growers*, 526 U.S. at 405).  The government needed to prove more than that Bongiovanni was "was willing to intercede with law enforcement on Gerace's behalf," *see* Docket Item 948 at 12; it needed to prove that Bongiovanni accepted the cash *in exchange for* his continuing to do so.[11]

_____

[9] What is more, the impetus for the conversation in which Bongiovanni asked Casullo whether he "hated Italians" was Casullo's subpoenaing Gerace's phone records and discovering *Bongiovanni's* DEA cell phone number in those records.  *See* Docket Item 1074 at 66-73.  So Bongiovanni's attempt to stop Casullo from investigating Gerace could just as plausibly have been to protect himself as opposed to being in exchange for a payment from Gerace over a half a year earlier.

[10] The grand jury that indicted Bongiovanni, on the other hand, heard testimony that gave rise to a reasonable inference of bribery.  More specifically, as noted above, Nigro testified that she had witnessed Bongiovanni receive envelopes from Gerace on approximately 30 occasions from 2013 to 2016, including fix or six times that she "[her]self" gave them to Bongiovanni.  *See* Gov't Ex. 3577A at 75-76.  The sheer number of exchanges that Nigro testified about in front of the grand jury—an average of nearly once a month over three years—supports a reasonable inference that the money constituted bribes.  Two envelopes, six months apart and temporally removed from any alleged protection, plus a birthday gift to a friend, is an entirely different story.

[11] As Bongiovanni observes, the government in its opening statement referred to the envelopes of cash and the birthday card as "rewards for a job well done."  *See* Docket Item 1040 at 1-2 (emphasis omitted) (quoting Docket Item 857 at 66-67).  That describes a gratuity, not a bribe.  *See Snyder*, 144 S. Ct. at 1951; *Sun-Diamond Growers*, 526 U.S. at 404-05; *Alfisi*, 308 F.3d at 149.  And while this Court agrees with the government that opening statements are not evidence and therefore cannot be the basis for a decision on a Rule 29 motion, *see* Docket Item 1046 at 3, it is telling that

b.    *Bongiovanni and Gerace's friendship*

What is more, because of Bongiovanni and Gerace's longstanding friendship, there are plausible benign explanations for the money, as Bongiovanni observes in his motion.  *See* Docket Item 908 at 8 (arguing that "the lack of any context makes it impossible to determine without speculation what the purpose of the exchange was, . . . particularly where the only other evidence of possible exchanges between Gerace and Bongiovanni occurred in contexts clearly evidencing ordinary friendship").  For example, text messages between Bongiovanni and Gerace presented at trial addressed Bongiovanni's "possibly going to Phar[ao]h's to settle up the fee for a golf tournament." *See id.* at 7 (citing Gov't Ex. 310D).  So the envelopes could have been a reimbursement from Gerace to Bongiovanni—especially because there was no proof of how much cash was in either envelope, and Nigro testified that Gerace paid many people, including vendors, in cash.  *See* Docket Item 856 at 46.  And even assuming— as this Court must on a Rule 29 motion—that the birthday card actually contained $5,000, there is no evidence from which the jury could infer, rather than surmise, that the money was not a generous gift for a milestone birthday and wedding earlier that year, as Bongiovanni claims, *see* Docket Item 908 at 7, or an effort by Gerace to garner general good will with Bongiovanni in the hope of future acts.

As explained above, had there been more than two envelopes given to Bongiovanni at Pharaoh's, that might have made a difference.  For example, had the trial jury been told what the grand jury was told—that Nigro had knowledge of

even the government had trouble parsing whether Bongiovanni's conduct constituted a bribe or a gratuity.

16

Bongiovanni's receiving approximately 30 envelopes with cash over a period of three years, *see* Gov't Ex. 3577A at 75-76—the jury could have inferred that Bongiovanni would not have been picking up reimbursements or gifts from Gerace nearly once a month.  Or had there been a temporal connection between the money and something Bongiovanni did for Gerace, that might have tipped the balance.  Indeed, had the government presented *any evidence* that the money was for a future act, not for a past job well done or for the hope of some unknown future benefits, that likely would have been enough.

But two envelopes six months apart—temporally removed from any alleged official acts—and a birthday card with cash in the context of a lifelong friendship is simply not enough.  Even giving the government the benefit of every doubt and inference, the evidence gives nothing more than "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence."  *Glenn*, 312 F.3d at 70.

The government also argues that it "presented substantial evidence of [Bongiovanni's] lying to federal investigators . . . and submitting false memoranda to the DEA about his relationship with Gerace" and that this evidences Bongiovanni's consciousness of guilt.  *See* Docket Item 948 at 14.  But because accepting gratuities is just as illegal as accepting bribes, that observation—accurate as it may be—does not advance the government's argument at all.

In sum, based on the evidence presented at trial, the jury could only speculate that the money from Gerace was given as bribes as opposed to gratuities or even something more benign.  But the government did not charge Bongiovanni with accepting gratuities, and so the evidence was insufficient to convict him.  Stated another

way, having made its charging decision, the government was obligated to prove beyond a reasonable doubt that Bongiovanni committed the crime it chose to charge.  And because the proof presented at trial gave "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence"—at least innocence of the crime charged—that proof was insufficient as a matter of law to sustain the government's burden.  *See Glenn*, 312 F.3d at 70.

*c.*     *Rule 29 caselaw*

Other cases are instructive.  For example, in *United States v. Gotti*, 457 F. Supp. 2d 403, 405-07 (S.D.N.Y. 2006), the district court granted a judgment of acquittal under Rule 29 on one count of investment of racketeering proceeds into an enterprise affecting interstate commerce, in violation of 18 U.S.C. § 1962(a).  "After much thought," the court concluded that "the [g]overnment ha[d] not provided enough evidence, be it direct or circumstantial, upon which a reasonable juror could find beyond a reasonable doubt that there was a 'sufficient nexus' between the [defendant's] receipt of illicit money from [loansharking and construction industry extortion] and [the money's] investment in or withdrawal from Hempstead [Corporation] after May 22, 2001."  *Gotti*, 457 F. Supp. 2d at 406.  The court rejected the government's arguments that "all of [the defendant]'s income [wa]s traceable to racketeering proceeds" and that the government had presented sufficient evidence that the defendant "commingled personal and business funds and . . . may have used the Hempstead corporate account as his 'own personal piggy bank to make personal payments and investments.'"  *Id.* at 406-07 (citation omitted).  "Even if a jury were to accept the [g]overnment's argument that [the defendant] never earned legitimate income," the court explained, "there [we]re other equally plausible illicit sources of income—such as gambling and stock fraud."  *Id.* at

18

407.  At the end of the day, "[t]he [g]overnment must live with the indictment it brought,"

the court said.  *Id.*  And "[t]here [wa]s simply no proof that [the defendant] invested the

proceeds of loansharking and/or construction industry extortion in Hempstead."  *Id.*

Similarly, in *Pauling*, the Second Circuit affirmed a judgment of acquittal on a

change of conspiracy to distribute 100 grams or more of heroin.  924 F.3d at 662.  The

court was presented "with a single, discrete question: [w]hether the government

presented evidence sufficient for the jury to find beyond a reasonable doubt that an

additional 11 grams or more of heroin was attributable to the Pauling-Low conspiracy."

*Id.* at 655.  The government argued "that the evidence permitted the jury to infer that an

additional 14 grams of heroin was attributable to the Pauling-Low conspiracy by virtue of

[a] phone call, in which [a] buyer mentioned that he wanted the 'same thing as last time'

while placing an order for 14 grams of heroin."  *Id.* at 659 (citation omitted).  The court

reasoned that "[w]hile . . . the words 'same thing as last time' could have been a

reference to a prior 14-gram sale of heroin by Pauling to [the buyer], . . . no reasonable

jury could have found beyond a reasonable doubt that those 14 grams were sourced by

Low."  *Id.*  "Although a jury may infer facts from other facts that are established by

inference," the court noted, "each link in the chain of inferences must be sufficiently

strong to avoid a lapse into speculation."  *Id.* (quoting *Piaskowski v. Bett*, 256 F.3d 687,

693 (7th Cir. 2001)); *see also Guadagna*, 183 F.3d at 132 (granting judgment of

acquittal on charge of "wire fraud arising out of a phone call" because the government

presented only a "slim reed" of evidence "on which to place the timing of the call," and

"from that, to infer the state of [the defendant]'s knowledge at that time require[d] too great an inferential stretch").[12]

The same is true here.  Because the government presented absolutely no proof that the money was payment for future official acts—and, indeed, in its opening statement referred to the money as payment for past work well done, *see* note 10, *supra*—there was nothing to support a reasonable inference that the money was a bribe and not a gratuity.  Factor in the long-time friendship between Bongiovanni and Gerace, and the conclusion that the government relies on speculation, not inference, is even stronger.

The government cites bribery cases in which appellate courts affirmed the denial of Rule 29 motions.  *See* Docket Item 948 at 5-6 (citing *United States v. Turchin*, 21 F.4th 1192 (9th Cir. 2022), and *United States v. O'Grady*, 280 F. App'x 124 (3d Cir. 2008)).  But those cases are distinguishable from the caselaw described above.  Indeed, in both *Turchin* and *O'Grady*, there was ample evidence from which a jury could infer a nexus between the payment and the reason for it.

In *Turchin*, for example, "there was sufficient circumstantial evidence from which a jury could reasonably conclude, beyond a reasonable doubt, that [the defendant] had agreed to accept a thing of value—namely, cash—for entering fraudulent passing scores for applicants seeking California [commercial driver's licenses]."  21 F.4th at

---

[12] By contrast, the *Guadagna* court reversed the district court's judgment of acquittal on a wire fraud charge that was based on statements the defendant made in a March 1992 call.  *See* 183 F.3d at 130-31.  The court found that based on the "substantial body of evidence" the government had presented, "the jury was entitled to conclude that . . . [the defendant] knew exactly what he was doing [on that call]— misleading someone by suggesting that she had won a car and that she was somehow required to purchase overpriced air filters to claim her prize."  *Id.*

1203.  First, "ample evidence showed that a truck-school owner, Mangal Gill, took money from his students to help them obtain such licenses without having to pass the required exams."  *Id.* at 1203-04.  In addition, the government "presented evidence that Gill sent messages to [the defendant] with California driver's license numbers and that [the defendant] fraudulently updated the corresponding applications."  *Id.* at 1204.  The government "also presented evidence that [the defendant] sent messages to Gill listing portions of California driver's license numbers with the comment 'postage due'" and that just "[d]ays after those messages were sent, law enforcement officers found more than $10,000 in cash in envelopes in [the defendant]'s car."  *Id.*

In *O'Grady*, the government's proof was even stronger: testimony about bribes from undercover agents and a cooperating witness, as well as recorded conversations. 280 F. App'x at 127-28.

Here, there was no comparable evidence suggesting Bongiovanni's intent to accept a bribe.  Therefore, as in *Pauling* and *Gotti*, a jury would have to resort to "surmise and guesswork" to conclude beyond a reasonable doubt that Bongiovanni was guilty of the crime charged.  *See Pauling*, 924 F.3d at 662; *Gotti*, 457 F. Supp. 2d at 409.

Perhaps "one could argue, based on reasonable speculation, that it was 'likely' or 'probable' that" the cash was in exchange for Bongiovanni's continuing to protect Gerace; but "it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty."  *See Pauling*, 924 F.3d at 662 (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)).  While the Court is "obliged to view the evidence with all reasonable inferences drawn in the [g]overnment's favor, [it] may not

21

permit that rule to displace the even more important rule that all elements of an offense must be proven beyond a reasonable doubt."  *Id.* (citation omitted).

For all those reasons, Bongiovanni's motion for judgment of acquittal under Rule 29 is granted as to count 5.

### C.  Count 6

Count 6 charges Bongiovanni with conspiring to maintain Pharaoh's as a drug-involved premises.[13]  Docket Item 761 at 29.  For a defendant to be convicted of a drug conspiracy, "[t]he record must . . . permit a rational jury to find: (1) the existence of the conspiracy charged; (2) that the defendant had knowledge of the conspiracy; and (3) that the defendant intentionally joined the conspiracy."  *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (internal citations omitted).  To meet its burden, "the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it."  *Lorenzo*, 534 F.3d at 159 (quoting *United States v. Rodriguez*, 392 F.3d 539, 545 (2d Cir. 2004)).  The government does not, however, need to "show that the defendant knew all of the details of the conspiracy."  *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008).  Instead, it is sufficient to demonstrate that the defendant "knew [the conspiracy's] general nature and extent."  *United States v. Rosa*, 17 F.3d 1531, 1543 (2d Cir. 1994).

---

[13] The indictment also charges Bongiovanni with conspiring to possess with intent to distribute, and to distribute, cocaine, cocaine base, methamphetamine, amphetamine (also known as Adderall), marijuana, and heroin.  Docket Item 761 at 29.  But in its response to Bongiovanni's Rule 29 motion, the government says only that a rational jury could find that Bongiovanni conspired to maintain Pharaoh's as a drug-involved premises.  Docket Item 948 at 15-24.

Bongiovanni argues that the government did not prove that he knowingly and willfully joined Gerace's drug conspiracy. *See* Docket Item 908 at 9-10. More specifically, Bongiovanni says that "insufficient evidence exists to show that [he] could have been aware of any of the conduct occurring at [Pharaoh's]." *Id.* at 9. The government counters that based on the "ubiquity of drug-related activity at Phar[ao]h's" and Bongiovanni's "repeated patronage of Phar[ao]h's" and "access to employee-only areas within the club[,] . . . a rational jury could conclude that [he] knew of the drug activity unfolding within the club." Docket Item 948 at 21. This Court agrees with the government.

At trial, the government offered facts from which a rational jury could infer beyond a reasonable doubt that Bongiovanni knew about the drug activity at Pharaoh's, and that conclusion does not require impermissible speculation. As the government observes, numerous witnesses testified about the open use of drugs at Pharaoh's, and other witnesses testified that Bongiovanni had been to Pharaoh's on multiple occasions. *Id.* at 19-20. Particularly in light of Bongiovanni's DEA training, a jury could reasonably infer that he knew that it was being maintained as a drug-involved premises.

Moreover, that evidence was bolstered by DEA Agent Anthony Casullo's testimony that Bongiovanni recounted a time when Gerace called Bongiovanni about a stripper overdosing at Pharaoh's, and Bongiovanni told Gerace to "[g]et her out of there." Docket Item 1074 at 69. Assuming Casullo's credibility and drawing all inferences in the government's favor—as this Court must on a Rule 29 motion—that testimony also suggests Bongiovanni knew about the drug activity at Pharaoh's.

For all those reasons, Bongiovanni's motion for judgment of acquittal on count 6 is denied.

### D.  Counts 13 and 15

As noted above, the jury convicted Bongiovanni on counts 13 and 15—obstruction of justice and making false statements to an agency of the United States related to a DEA file that Bongiovanni had stored in his basement after his retirement. Count 13 alleged that Bongiovanni obstructed justice by retaining the file, and count 15 alleged that he made a false statement when he told Special Agent David Carpenter "that he kept the file . . . in his house because it was an old case and he thought it would come up again and . . . wanted to verify that everything was on the up and up."  Docket Item 761 at 35-37; *see* Docket Item 880 at 14, 16-17.

Bongiovanni argues that "[e]ven conceding that the removal of the . . . file could have been against DEA policy or, as often asked by the government of federal agent witnesses in the trial, [was] not an action [the government witnesses] would have taken in their law enforcement career[s], the evidence did not establish that the removal of the . . . file was done 'knowingly' to 'conceal' and 'cover up' anything with an intent to 'impede, obstruct, or influence' any investigation."  Docket Item 908 at 11 (quoting 18 U.S.C. § 1519).  According to Bongiovanni, "to reach this conclusion, [the jury] would have first had to find that . . . Bongiovanni's provision of various reasons why he took the file home were inaccurate, and then it would have had to speculate in the absence of any admission that such action was taken for an improper purpose."  *Id.*

But—as the Court observed at oral argument—this really comes down to a credibility question, which is solely within the purview of the jury.  *See Autuori*, 212 F.3d

at 118.  Rather than credit Bongiovanni's asserted reasons for taking the file home, it appears the jury credited the ample testimony from other DEA agents that it was against policy for Bongiovanni to bring the file home and that there was no legitimate reason to do that.  And from that testimony—combined with the other evidence that Bongiovanni used his position as a DEA agent to protect the drug conspiracy involved in that file— the jury could have reasonably inferred that the reason Bongiovanni brought the file home was to obstruct justice.

Bongiovanni also argues that he should be acquitted of the false statement conviction because Special Agent Curtis Ryan could not recall whether "up and up" were Bongiovanni's words or merely Ryan's summary of what Bongiovanni said. Docket Item 908 at 12.  But as Bongiovanni concedes, the false statement statute prohibits either a false "statement or representation."  *Id.* (quoting 18 U.S.C. § 1001(a)(2)).  Whether "up and up" were Bongiovanni's exact words or Curtis's rephrasing of what Bongiovanni said does not matter.  Either way, a rational jury could find beyond a reasonable doubt that Bongiovanni knowingly made a false statement or representation to federal agents.

Accordingly, Bongiovanni's motion for judgment of acquittal on counts 13 and 15 is denied.

## II.    RULE 33 MOTION

The defense moves for an inquiry of the jury or a new trial on the counts on which Bongiovanni was convicted based on a note written to the Court by a juror.  More specifically, Bongiovanni argues that he should get a new trial on those counts because: "(1) it is clear the environment in the jury deliberations degraded to an unacceptably

hostile level, and (2) the comments mentioned in the juror note indicate one o[r] more jurors failed to apply basic principles of the Court's instructions to . . . Bongiovanni's detriment."  *Id.* at 13.

"[A] defendant who seeks a new trial based on allegations of juror misconduct faces a very high hurdle."  *Id.* (quoting *United States v. Stewart*, 317 F. Supp. 2d 432, 436 (S.D.N.Y. 2004)).  Only where there is "clear, strong, substantial[,] and incontrovertible evidence . . . that a specific, non-speculative impropriety has occurred" is a post-verdict inquiry of jurors appropriate.  *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989); *see Anderson v. Miller*, 346 F.3d 315, 327 (2d Cir. 2003) (explaining "that possible *internal* abnormalities in a jury will not be inquired into *except* '*in the gravest and most important cases*'" (quoting *United States v. Dioguardi*, 492 F.2d 70, 79 n.12 (2nd Cir. 1974))).  Moreover, "an allegation of intra[-]jury pressure that does not rise to the level of physical coercion is insufficient to require a post-verdict jury inquiry."  *United States v. Yeagley*, 706 F. Supp. 2d 431, 434 (S.D.N.Y. 2010) (emphasis omitted).

Here, the reported pressure was limited to "verbal attacks."  *See* Docket Item 877-1 at 1.  There is no indication—let alone "clear, strong, substantial[,] and incontrovertible evidence," *see Ianniello*, 866 F.2d at 543—that the environment in the jury room reached the level of hostility required for a post-verdict inquiry.  And for that reason, the note on which Bongiovanni relies is insufficient to support his argument.

Bongiovanni's second argument presents a closer question.  A juror indicated to the Court that other jurors had made comments, including "I knew [Bongiovanni] was guilty from day 1" and "[y]ou have to prove to us that he is innocent."  Docket Item 877-1

at 2.  But as the government observes, those comments do not necessarily show that the jurors did not follow the Court's instructions.  *See* Docket Item 948 at 36.  The first comment, while indicating a tentative conclusion, does not conclusively demonstrate that the juror refused to keep an open mind in deliberations.  *See Brown v. Greiner*, 2003 WL 22964395, at *13 (E.D.N.Y. Oct. 2, 2003) ("Our criminal justice system does not contemplate that jurors will avoid forming tentative conclusions about the guilt or innocence of a defendant before all the evidence has been presented and the judge releases them to the jury room for deliberations.  All that is required of a juror is that he or she keep an 'open mind' and remain receptive to the parties['] arguments and evidence.").  And the second comment could easily have occurred in the context of a holdout situation during deliberations, i.e., asking the juror in the minority to convince the others of her conclusion, rather than a failure to apply the proper burden of proof.  This conclusion is bolstered by the fact that the jury reached a not-guilty verdict on one count and failed to reach a verdict on 12 others.

What is more, this Court halted deliberations upon receiving the note from the juror about the situation in the jury room.  The Court asked the jury whether they had already reached a verdict on any counts, and when the foreperson responded that they had, the Court ordered the jury to return only that partial verdict.  *See* Docket Item 867. The Court then brought each juror into the courtroom outside the presence of the other jurors and specifically asked whether the juror's verdict was a result of any coercion. Each juror answered that it was not.  *See id.*

For all those reasons, the Court finds that Bongiovanni has not cleared the very high hurdle required for a post-verdict inquiry of the jury or a new trial under Rule 33.

III.    **MOTION TO DISMISS**

Finally, Bongiovanni moves to dismiss the open counts of the indictment against him on speedy trial grounds.  "[A] speedy trial is guaranteed the accused by the Sixth Amendment to the Constitution."  *Barker v. Wingo*, 407 U.S. 514, 515 (1972).  The relevant factors the Court considers in evaluating whether the defendant's right to a speedy trial has been violated are: (1) the length of the delay; (2) the reasons for the delay; (3) whether the defendant asserted his right in the run-up to the trial; and (4) whether the defendant was prejudiced by the failure to bring the case to trial more quickly.  *Id.* at 530.

### A.  Timeliness of Bongiovanni's Motion

The government first argues that Bongiovanni's motion to dismiss should be denied because it is untimely.  Docket Item 956 at 28-30.  More specifically, the government argues that "[a] motion to dismiss due to a violation of constitutional speedy trial is untimely if it is not brought before trial in accordance with [Federal] Rule [of Criminal Procedure] 12(b)(3)."  *Id.* at 28.

But, as Bongiovanni observes, his motion was timely made before his second trial.  Docket Item 977 at 2-5.  He does not ask for dismissal of the counts that were resolved at the first trial; he asks only that the "the remaining unresolved counts" be dismissed.  *See* Docket Item 920 at 2.  The government has not cited—nor has this Court located—any authority supporting the argument that a motion to dismiss on speedy trial grounds cannot be raised between a first and second trial.

This Court therefore finds that Bongiovanni's motion is timely.

## B. Length of the Delay

The parties agree that the length of the delay—more than four years—cuts

against the government and is presumptively prejudicial.  *See* Docket Item 920 at 5;

Docket Item 956 at 33-34.  This Court concurs.  As the government observes, however,

"[d]elay, no matter how lengthy, cannot alone carry a Sixth Amendment claim without

regard to the other *Barker* criteria.  Instead, all four factors must be considered together

with such other circumstances as may be relevant."  Docket Item 956 at 46-47 (quoting

*United States v. Cabral*, 979 F.3d 150, 157 (2d Cir. 2020)).

## C. Reason for the Delay

The next *Barker* factor is the reason for the delay, and each side says that the

other is largely to blame.  Bongiovanni acknowledges that he is responsible for some of

the delay but argues "that the government and the Court did not push this case forward

as expeditiously as they should have."  Docket Item 920 at 25.  "While those actions

may not have been always intentional," Bongiovanni says, "the negligence displayed

should cause this Court to conclude that, at worst, half of the delays, or, at best, one-

quarter of the delays in this case are chargeable to the government and the Court."  *Id.*

Thus, Bongiovanni suggests, "the weight of those delays favors [him] under the second

*Barker* factor."  *Id.*

Among other things, Bongiovanni argues that the government's delay in charging

Gerace in "the second superseding indictment put a stop [to] the 266 days of progress

being made in . . . Bongiovanni's case" and "added an additional 169 days for . . .

Bongiovanni to get back to the same point he found himself in February 2021."  *Id.* at

17.  According to Bongiovanni, the timing of the second superseding indictment "pushed

evidentiary hearings that he would have been entitled to in March or April 2021 back into November 2021 and January 2022.  And it extended post-hearing briefing, a decision on the [Report & Recommendation ('R&R')], and later objections to the R&R even further back into 2022."  *Id.*

In sharp contrast, the government says that "[t]he overwhelming majority of the delay was caused by the defendant, and any other delay was valid or at least neutral." Docket Item 956 at 36.  "[W]hen given the opportunity by the district court in January 2022 to set a trial date," the government explains, Bongiovanni's "counsel stated, 'I would prefer to defer it, Judge, until we wrap up with [Magistrate] Judge Roemer.'"  *Id.* at 37 (emphasis omitted) (citing Docket Item 247 at 13).  And when "given the option to stick with the original schedule and pursue his recently filed motions, Bongiovanni chose to start over and re-file motions."  *Id.* at 38 (citing Docket Item 104 at 10).  Then, the government says, "Bongiovanni and Gerace engaged together in a joint, concerted, and protracted course of motion practice—filing *ad hoc* motions piecemeal to delay trial."  *Id.*

Although there is no question that there were lengthy delays in this case, including delay because of the timing of the government's second superseding indictment, the record demonstrates that when given the option to move forward more quickly, Bongiovanni chose a different strategy.  Therefore, after careful review of the lengthy and complicated docket in this case, this Court finds this factor to be neutral.

### D.  Whether the Defendant Asserted His Right

The inquiry on the third *Barker* factor "is closely related to the other three inquiries—we expect a defendant's assertion of his right to a speedy trial 'will be

affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences.'" *United States v. Black*, 918 F.3d 243, 263 (2d Cir. 2019) (quoting *Barker*, 407 U.S. at 531). The crux of the inquiry is "whether the government and the court were 'put on notice' that a defendant has asserted his right to a speedy trial." *Id.* (quoting *United States v. New Buffalo Amusement Corp.*, 600 F.2d 368, 378 (2d Cir. 1979)).

Bongiovanni concedes that he "was not vocal about [his speedy trial] right until the second half of 2023." Docket Item 920 at 26. Nevertheless, he argues that he wanted a speedy trial and that "many of [his] complaints about the pace of this case were confined to [his prior attorney]'s office or to messages left with [that attorney]'s support staff." *Id.*

But even if that is true, there still was no notice—to the Court or the government—that Bongiovanni wanted to assert his speedy trial right. On the contrary, as noted above, many of the actions taken by Bongiovanni's former attorney caused delays in the case. *See Vermont v. Brillon*, 556 U.S. 81, 94 (2009) (explaining that "delays caused by defense counsel are properly attributed to the defendant").

Regardless, neither Bongiovanni nor his attorneys did anything to alert the Court to a speedy trial issue until August 10, 2023, when Bongiovanni's current counsel moved for severance from Gerace. *See* Docket Item 586. And even in that motion, Bongiovanni's counsel explicitly *declined* to move for dismissal on speedy trial grounds, stating that the "delays, when evaluated holistically, do not presently present a reason for speedy trial dismissal under the *Barker* factors." Docket Item 586 at 14.

A month later—when issues related to Gerace's counsel persisted and this Court rescheduled the joint trial that was scheduled for October 23, 2023, Docket Item 626 at 14-15—the Court specifically asked whether Bongiovanni wanted a separate trial in October. *Id.* at 25-26. Defense counsel answered, "[N]o, Judge. At this time, I think the delay is fair and, you know, logistically speaking, I don't know that can be pulled off even if we asked for it. . . . So we'll withdraw that motion at this time." *Id.* at 25. The Court then confirmed, "So you're withdrawing the motion, the speedy trial motion?" and counsel responded, "[t]hat's correct." *Id.* at 25-26.

The rescheduled date on which trial was to begin was January 8, 2024. *See* Docket Item 622. On December 15, 2023, after moving to disqualify Gerace's attorney, the government indicated that it would consent to severing Bongiovanni's trial to avoid further delays. Docket Item 695. Rather than proceeding to trial on January 8, 2024, counsel for Bongiovanni asked for a trial commencing in early February so that the 42-day window to share 3500 materials would fall after the holidays. *See id.* at 1; Docket Item 697-1 at 3. And as noted above, Bongiovanni's trial started consistent with that request—on February 12, 2024.

In sum, this Court finds that this factor cuts strongly against Bongiovanni. While it may well be true that he was privately unhappy with his former attorney's strategy, neither he nor his attorney voiced those concerns to the government or the Court. Thus, there can be little dispute that Bongiovanni did not "put [the government and the Court] on notice" that he was "assert[ing] his right to a speedy trial." *See Black*, 918 F.3d at 263.

32

### E.  Prejudice to the Defendant

The last *Barker* factor is whether Bongiovanni was prejudiced by the delay.  The analysis of this factor is informed by the interests that the Sixth Amendment right to a speedy trial is designed to protect: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired."  *See Barker*, 407 U.S. at 532.

Although Bongiovanni has not been incarcerated pretrial, he notes that he has been on supervision, including onerous location monitoring.  *See* Docket Item 920 at 27-28.  Without minimizing the burden of being on supervision, this Court agrees with the government that the risk of "oppressive pretrial incarceration" is not applicable here because Bongiovanni has been out on release.  *See* Docket Item 956 at 44.

On the second interest, Bongiovanni states that the case has caused him significant anxiety and concern, particularly given the significant media attention this case has garnered.  *See* Docket Item 920 at 28-29.  And on the third, Bongiovanni notes that his father—who would have testified for him at trial—died on February 19, 2023.  *See id.* at 29-31.

Ultimately, this Court finds that while Bongiovanni has suffered some prejudice due to the delay, that cannot outweigh the failure to assert his speedy trial right.  Bongiovanni's attorneys repeatedly agreed to or requested delays and, even when directly given the opportunity, did not assert his right to a speedy trial.  There may well have been good strategic reason for that, and Bongiovanni cannot now claim that his right to a speedy trial was violated.

Thus, this case is markedly different than those cases in which the Second Circuit has dismissed indictments on speedy trial grounds.  In *United States v. Tigano*,

880 F.3d 602 (2d Cir. 2018), for example, the defendant "adamantly, consistently, and explicitly raised his speedy trial rights at nearly every appearance he made before the court." *Id.* at 617.  Likewise, in *Black*, the defendants "frequently expressed their desire for a speedy trial."  918 F.3d at 263.  Bongiovanni has not cited—nor has this Court found—any case in which a motion to dismiss on speedy trial grounds has been granted absent a finding that the government and the Court were "on notice" of the defendant's assertion of the right.

In sum, when looking at all four factors together, the circumstances do not amount to a violation of Bongiovanni's right to a speedy trial.  Bongiovanni's motion to dismiss is therefore denied.  That being said, the calculus may change in the future.  So this decision is without prejudice to Bongiovanni's moving again for dismissal.

## CONCLUSION

For all those reasons, this Court GRANTS Bongiovanni's motion for a judgment of acquittal under Rule 29 with respect to count 5 and DENIES it with respect to the remaining counts; DENIES Bongiovanni's motion for a jury inquiry or new trial under Rule 33; and DENIES without prejudice Bongiovanni's motion to dismiss on speedy trial grounds.

SO ORDERED.

Dated:        July 19, 2024
              Buffalo, New York


                                         */s/ Lawrence J. Vilardo*
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE