UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

v.                                                          **ATTORNEY DECLARATION**

JOSEPH BONGIOVANNI,                         Case No.: 19-CR-227

PETER GERACE, JR.,

Defendants.

_____

UNITED STATES OF AMERICA,

v.                                                          Case No.: 23-CR-37

PETER GERACE, JR.,

_____

Eric M. Soehnlein, Esq. declares the following under penalty of perjury:

1.  I am an attorney at law duly licensed to practice in the United States District
    Court for the Western District of New York.  Together with Mark A. Foti, Esq., I
    am co-counsel to Peter Gerace, Jr. in the above consolidated matter.  As such, I
    am fully familiar with the facts and circumstances of this case.

2.  I make this declaration in support of Mr. Gerace's motion to dismiss the above
    referenced indictments and for related disclosure.  The government's misconduct
    precludes Mr. Gerace from presenting a defense.   It injects unfairness into this
    prosecution and any trial on the merits.   The Court should dismiss the
    consolidated indictments and order the requested disclosure to ensure the
    government's misconduct does not go unpunished.

TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 3

II.   RELEVANT BACKGROUND ........................................................................... 4

   A.   INITIAL CHARGING DECISIONS ........................................................................ 4

   B.   THE GOVERNMENT'S EFFORTS TO DETAIN MR. GERACE ................................... 5

III.   FURTHER EFFORTS TO HINDER MR. GERACE'S DEFENSE ........................... 9

IV.   THE GOVERNMENT'S EFFORTS TO PREVENT MR. GERACE FROM
CALLING WITNESSES AT THE JANUARY 2024 TRIAL ................................. 11

   A.   BRIAN ROSENTHAL ........................................................................................ 12

   B.   DETECTIVE GREGORY TROTTER ...................................................................... 15

   C.   JESSICA LEYLAND ......................................................................................... 17

V.   THE GOVERNMENT HAS PRECLUDED MR. GERACE FROM PRESENTING A
DEFENSE ...................................................................................................... 19

   A.   DEPRIVATION OF MATERIAL AND EXCULPATORY EVIDENCE THAT COULD NOT BE
REASONABLY OBTAINED BY OTHER MEANS ...................................................... 20

   B.   THE GOVERNMENT'S BAD FAITH ..................................................................... 22

VI.   THE COURT SHOULD ORDER DISCLOSURE .............................................. 23

VII.   CONCLUSION ............................................................................................... 25

I.     INTRODUCTION

> "Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law."
>
> *Washington v. Texas*, 388 U.S. 14, 19 (1967)

3. In its effort to secure a conviction against Mr. Gerace at all costs, and as part of its campaign to preclude Mr. Gerace and his defense team from challenging the government's proof at trial, the government strategically employed charging decisions to prevent Mr. Gerace from calling witnesses in his defense.

4. Unhappy that Mr. Gerace had been granted more freedom and would be able to more easily participate in his defense, in early 2023 the government made charging decisions designed to pressure and "flip" witnesses that would otherwise provide helpful testimony to Mr. Gerace.  This was part of an effort to incarcerate Mr. Gerace on the eve of trial.

5. As another trial date approached, without any caselaw to support its position, the government made efforts to move the trial away from Buffalo, New York to make it more challenging for Mr. Gerace and his defense team to secure attendance and testimony from helpful defense witnesses.

6. More seriously, once it received Mr. Gerace's defense witness list, the government made charging decisions designed to preclude Mr. Gerace from obtaining helpful and exculpatory testimony from individuals whose testimony

would call into question the testimony of key government witnesses and
undercut allegations of prostitution, narcotics sales/distribution and witness
intimidation made by government witnesses.

7.  The government's deliberate actions in charging Brian Rosenthal, Amherst Police
Detective Gregory Trotter, and Jessica Leyland deprive Mr. Gerace of his right to
present a defense.   The criminal prosecutions were sought as part of the
prosecution's clear mandate to secure a conviction against Mr. Gerace at all costs
without regard to his constitutional rights or principles of fundamental fairness.

8.  The government's misconduct must be punished.  It should counsel the Court to
dismiss the consolidated indictments.

## II.   RELEVANT BACKGROUND

### a.  Initial Charging Decisions

9.  The government has pursued criminal charges against Mr. Gerace at a pace and
scope that is unprecedented in this district.  Mr. Gerace is currently facing
charges in four separate indictments, all charged by the same prosecution team
(*See* W.D.N.Y Case No. 19-cr-227, 23-cr-37, 23-cr-60, 23-cr-99).

10. On October 31, 2019, the government filed an indictment against Joseph
Bongiovanni charging him with conspiring to defraud the United States in
violation of 18 U.S.C. § 371, conspiring to distribute controlled substances in
violation of 21 U.S.C. § 846, accepting a bribe as a public official in violation of 18

U.S.C. § 201(b)(2)(A) and (b)(2)(C), obstructing justice in violation of 18 U.S.C. § 1519, and making false statements to an agency of the United States in violation of 18 U.S.C. § 1001(a)(2).  Dkt. # 1[1].

11. On February 21, 2021, the government filed a second superseding indictment adding Mr. Gerace and adding additional counts charging Bongiovanni with accepting bribes from Gerace and conspiring with Gerace to defraud the United States and to distribute controlled substances. Dkt. # 89.

12. The 19-cr-227 case proceeded through motion practice, and the trial was scheduled for June 21, 2023.  Dkt. # 325.  With the trial date pending, the government started its efforts to prevent Mr. Gerace from preparing for trial and from offering a defense.

### b.  The government's Efforts to Detain Mr. Gerace

13. Mr. Gerace was arrested while on family vacation in Florida. He was brought before a Magistrate Judge and released on an initial set of conditions on March 1, 2021.

14. Upon his return to the Western District of New York, the District Court found those conditions to be more restrictive than necessary and modified them.

15. For nearly two years, Mr. Gerace was under strict supervision of Probation, including GPD-monitored home detention. During that time, Mr. Gerace was

---

[1] Unless otherwise noted, all docket citations are to W.D.N.Y. Case No. 19-cr-227.

compliant with the conditions of release as was recognized by Probation, the Magistrate Judge, and the District Court Judge. Probation repeatedly indicated that less restrictive supervision could be permitted.

16. In January 2023, over the government's objection, the District Court modified the conditions of release to be less restrictive, allowing for a curfew.  The less restrictive conditions would have enabled Mr. Gerace to have more freedom to meet with his attorneys to prepare for trial, which was only months away at that time.

17. Shortly thereafter, the government set about efforts to detain Mr. Gerace for the June 2023 trial date by taking old events and using them as a basis for new charges against individuals who would provide helpful testimony to Mr. Gerace in the hopes that pressure from federal law enforcement would lead to new charges against Mr. Gerace.

18. By way of background, Crystal Quinn was a friend of Mr. Gerace.  She was also a former employee of his nightclub.  As someone who was close to Mr. Gerace, Mr. Gerace viewed Ms. Quinn as a valuable potential witness at his trial.  In part, Mr. Gerace believed Ms. Quinn's testimony would undercut testimony about the presence and prevalence of narcotics at his nightclub and would undercut testimony about purported intimidation of witnesses on Mr. Gerace's behalf.

19. On February 3, 2023, the federal government charged Ms. Quinn by criminal complaint. *See* Case No. 23-mj-11 at Dkt.# 1. The complaint documents some of the helpful testimony Mr. Gerace believed Mr. Quinn would be able to provide on his behalf.

20. Of note, while the complaint was filed on February 3, 2023, the events giving rise to the charges were considerably older. The bulk of the complaint, and certainly the most serious allegations in the complaint, stem from a Facebook conversation on November 19, 2019.

21. The other allegations in the complaint are the result of an interview Ms. Quinn had with the FBI on January 24, 2023 when an agent served Ms. Quinn with a target letter. 23-mj-11 at Dkt.# 1 at p. 14. Of note, that conversation with the FBI agent, where the government indicated to Ms. Quinn she was the target of a federal investigation, came five days after the District Court granted Mr. Gerace's motion lessening the restrictions on his conditions of release and allowing him curfew. Dkt.# 360, 361.

22. Upon information and belief, after she was charged on the criminal complaint, the government aggressively interviewed Ms. Quinn, seeking to "flip" her against Mr. Gerace.

23. The government's aggressive tactics were successful. On March 23, 2023 the government moved to unseal a new indictment against Mr. Gerace alleging

additional acts of drug distribution and witness tampering.  *See* Case No. 23-cr-37 at Dkt.# 1.   The witness tampering charges were based in large part on Ms. Quinn's testimony against Mr. Gerace.

24.  The following day the government moved to detain Mr. Gerace.  id. at Dkt. # 6. In moving for detention, the government conceded that the allegations against Mr. Gerace were ones the government had known about for years and had previously proffered about in prior efforts to restrict Mr. Gerace's movements:

**Mr. Tripi:** Now, the defense is going to argue: They knew about this for three years.

What I say to that, Judge, truth does not equal proof.  It was true three years ago that through proxies, he intimidated and tampered with this young lady.

There is a reason there is a five year statute of limitations; we are well within that.  We now have the proof from everyone else who was involved and the victim of the crime.

I ask that you detain him on this indictment for all the reasons stated.  Thank you, Judge.

**The Court:** While you're still there, Mr. Tripi, let me ask you – just about the last point about "truth does not equal proof."  Some of the proffers about the first three counts in the indictment are facts that I would have heard in the other case and would have accounted for.

**Mr. Tripi**: I don't think I went into that depth and detail at all.  Because we're a lot closer to trial, they have stuff now.  So there's a balance, Judge.

23-cr-37 at Dkt. # 6, p. 31.

25. A review of the record further demonstrates the government's focus on detaining Mr. Gerace.  Indeed, the 23-cr-37 indictment alleges Mr. Gerace participated in drug distribution, but all parties concede the events giving rise to that count happened years earlier and that the factual basis was recreational use of cocaine amongst friends, a factual predicate that would not typically warrant federal scrutiny, let alone federal prosecution.  Id. at p. 33.  Regardless, the government used that charge as the starting point of its detention proffer, emphasizing to the District Court Judge that every federal narcotics charge comes with a "presumption that the defendant is a flight risk and a danger to the community." id. at p. 9.

26. As the Court knows, Mr. Gerace was ultimately detained.

27. After the government achieved its desired result – Mr. Gerace's detention – and because Ms. Quinn had provided the government with the testimony it desired, on April 6, 2023 the government dismissed the case against Ms. Quinn.  23-mj-11 at Dkt.# 8.

### III.   FURTHER EFFORTS TO HINDER MR. GERACE'S DEFENSE

28. As the next trial date approached, the government engaged in further conduct demonstrating their efforts to hinder Mr. Gerace's ability to mount a defense.

29. In the late summer of 2023, Mr. Gerace fired Attorney Cohen and sought new counsel.  He engaged Attorney Foti, who then reached out to Attorney Soehnlein to come back into the case.   Undersigned attorneys reached out to the Court prior to a status conference on September 6, 2023 to indicate they were close to being retained.  Upon information and belief, the government was aware undersigned attorneys would be entering the case on Mr. Gerace's behalf in early September.

30. Undersigned attorneys entered their appearance on behalf of Mr. Gerace on September 6, 2023.  Dkt #. 620 and 621.  On that date, the Court held a pretrial conference where it set a trial date for January 8, 2024.  Dkt.# 622.

31. Also on the same day, the government made a lengthy motion for Intra-district transfer seeking to hold the trial in Rochester, New York.  Dkt.# 623.

32. In opposing the motion, both the defense teams for Bongiovanni and Gerace noted that moving the trial to Rochester would impose considerable hardship on the defendants, would limit the defendants' ability to bring defense witnesses to trial, and would make the trial challenging to defense counsel, most of whom have families and professional responsibilities in the Buffalo, New York area. Dkt.# 645 and 646.   Indeed, as the Court properly gleaned from its analysis of the issue, moving the trial to Rochester as the government suggested would place an

unfair and undue burden on both defendants and their counsel, particularly in a lengthy, complex, multi-week case.[2]

33. The Court ultimately denied the government's motion, but only after the parties were forced to engage in lengthy briefing on an issue where the government did not and could not cite to a single case in support of its position. Dkt.# 656.

## IV. THE GOVERNMENT'S EFFORTS TO PREVENT MR. GERACE FROM CALLING WITNESSES AT THE JANUARY 2024 TRIAL

34. As the Court knows, the June 2023 trial date was adjourned to August 2023, over Mr. Gerace's objection, due to health issues with Mr. Bongiovanni's counsel. Dkt. # 484. Later, due to issues with Mr. Gerace's counsel, the trial date was adjourned again to January 8, 2024. Dkt. # 638.

35. In the lead up to the August trial date, in an effort to preserve his right to call individuals who may provide helpful testimony at trial, Mr. Gerace provided a witness list of potential trial witnesses. Dkt.# 529.

36. The government used the witness list as a basis for charging decisions, charging individuals who will provide Mr. Gerace with helpful, exculpatory testimony with federal crimes to make the unavailable to the defense.

---

[2] The government's position on the motion was wholly unsupported by precedent. The Court's colloquy started with:

THE COURT: Do you have any caselaw where this sort of request was granted on a motion by the government over the objections of the defense?
MR. TRIPI: No. No. That's -- that's the short answer to your question, Judge.

### a. Brian Rosenthal

37.  Broadly speaking, the government's theory in the 19-cr-227 case is that Mr.

Gerace "knowingly maintained the premises known as Pharaoh's Gentlemen's

Club, located at 999 Aero Drive, Cheektowaga, New York, to facilitate

prostitution; to provide drugs and money to Pharaoh's employees in exchange

for sex with the defendant GERACE and others; and for use and distribution of

controlled substances, including cocaine, cocaine base, and amphetamine also

known as Adderall, Schedule II controlled substances, and marijuana and heroin,

Schedule I controlled substances." Dkt.# 89 at p. 26, para. 36.

38. As part of the defense, Mr. Gerace intends to rebut the government's proof that

he allowed prostitution and drug use at his nightclub. That proof is likely to

encompass evidence about protocols and procedures at the nightclub, as well as

testimony from individuals who worked for Mr. Gerace who will testify that he

did not condone illegal activity.  To that end, at trial Mr. Gerace intended to call

Brian Rosenthal, a manager at Pharaoh's who was responsible for the VIP room.

39. Mr. Rosenthal was disclosed as a potential witness on the Gerace defense witness

list so that he could testify to preventative measures Mr. Gerace and the business

undertook to prevent prostitution and drug use.  Prior to the filing of the witness

list, Mr. Rosenthal had also been interviewed by federal agents and provided

statements that were helpful and exculpatory to Mr. Gerace.   In sum, Mr.

Rosenthal had told the government he was not aware of any illegal activity and that Mr. Gerace did not permit prostitution or drug use at Pharoah's.

40. Mr. Rosenthal was interviewed by federal law enforcement in 2020.  He was not charged with making false statements or any other crimes at that time or in the years that immediately followed.

41. After Mr. Rosenthal was listed on the defense witness list in June, 2023, he was indicted by the Gerace trial team on September 14, 2023.  *See* Case No. 23-cr-102 at Dkt. # 1.[3] The indictment charges Mr. Rosenthal and another individual with Conspiracy to Commit Sex Trafficking, False Statements to the Grand Jury and Misprison of a Felony for conduct going back to 2013. id. at p. 1-4.

42. It is readily apparent that Mr. Rosenthal was indicted due to his proximity to Mr. Gerace.

43. At the September 28, 2023 detention hearing, the government moved for detention relying primarily on "allegations regarding a related case, 19-cr-227, which is a second superseding indictment charging Joseph Bongiovanni and Peter Gerace." id. at Dkt.# 43, p. 6.  Following that introduction, the bulk of the government's proffer in support of its efforts to detain Mr. Rosenthal stemmed

---

[3] Shortly after the indictment, the government moved to disqualify Mr. Rosenthal's chosen, retained counsel.  id at Dkt. # 6.  The government's motion resulted in months of litigation and, eventually, the attorney moved to withdraw because the conflict-of-interest litigation was draining Mr. Rosenthal's personal resources and preventing him from preparing a defense.  id. at Dkt. # 22.

from his employment at Pharoah's and allegations of misconduct at that

business.  id. at pp 8-12.   The allegations went back several years, and the

government's proffer included facts it had learned through the investigation of

Mr. Gerace's case.  id.

44. The government's proffer also noted that Mr. Rosenthal had been interviewed by

the FBI and that he was what the government characterized as a "loyalist,"

someone who "denied any illegal activity happened" at Mr. Gerace's business.

id. at pp 11-12.   The government's detention proffer wholly dismissed the

possibility that no illegal activity occurred at Mr. Gerace's club or that a witness

like Mr. Rosenthal would be unaware of illegal activity, instead arguing that any

witness who, like Mr. Rosenthal, denied illegal activity was either "lying, scared,

timid, embarrassed, or outright fearful."  id.

45. In moving for detention, one of the key facts the government relied upon was the

fact that, after Mr. Gerace was under investigation and after federal authorities

had executed search warrants at Pharoah's, Mr. Rosenthal stayed and continued

to work at the club and that, when interviewed by the FBI, he provided

information that was helpful and exculpatory to Mr. Gerace.  Id. at pp. 14-15.

46. Mr. Rosenthal was released on conditions.  Because of the charges pending

against him, however, he is no longer available as a defense witness for Mr.

Gerace.

### b. Detective Gregory Trotter

47.  As the Court knows, some of the most notable testimony against Mr. Gerace comes from his ex-wife, Katrina Nigro.  Ms. Nigro's wide-ranging, uncredible allegations are the sole basis for some charges against Mr. Gerace (*See, e.g.,* Dkt.# 1077 at p. 33).   The clear falsity of the testimony, the government's knowledge of that falsity, and the government's willingness to rely on that testimony in this prosecution is also the subject of ongoing motion practice.  Dkt.# 996 and 1083 .

48. Upon information and belief, Amherst Detective Gregory Trotter interacted with Ms. Nigro on several occasions prior to 2019 when he was called upon to investigate allegations Ms. Nigro made against Mr. Gerace.  Those allegations were unsubstantiated.  They resulted in Ms. Nigro being charged for her misconduct.  Key to those charging decision was the clear falsity of the allegations Ms. Nigro made.

49. Upon information and belief, Detective Trotter also interacted with Phylicia Hunt, another former friend and employee of Mr. Gerace.  As the Court knows, Ms. Hunt was accused of stealing a Rolex watch from Mr. Gerace.  Her arrest, which was effectuated in part by Detective Trotter, resulted in her interacting with federal law enforcement.  That interaction led to Ms. Hunt's cooperation against Mr. Gerace.

50. At trial the defense anticipated Detective Trotter's testimony would discredit the allegations made against Mr. Gerace by Ms. Nigro and Ms. Hunt.  Because Detective Trotter's testimony would undercut Ms. Nigro's and Ms. Hunt's allegations, Detective Trotter was included on the defense witness list filed in June, 2023.

51. The government had interviewed Detective Trotter in September, 2022.  At the time the defense filed its witness list, the government had not charged Detective Trotter.

52. Indeed, the government was well-aware of not only Detective Trotter's September, 2022 interview with law enforcement, but also of the content of his text messages with Mr. Gerace that would later give rise to the charges against him.  At a March 27, 2023 detention proffer, the government quoted from those text messages and summarized its view of Detective Trotter's relationship with Mr. Gerace.  *See* Case No. 23-cr-37, Dkt. #6 at p. 12-13.

53. Despite having been aware of Detective Trotter's interview and the content of his text messages for at least several months, the government did not choose to charge Detective Trotter until November 28, 2023, when the government charged Detective Trotter by way of criminal complaint alleging that Detective Trotter had made false statements to law enforcement in the September 30, 2022 interview.  *See* Case No. 23-mj1173 at Dkt.# 1, para. 22.

54. That case was indicted on April 23, 2024.  id. at Dkt. # 14.

55. Recently, Detective Trotter made a motion to dismiss his indictment, alleging the
government chose to charge Detective Trotter because he was disclosed as a
witness on the Gerace witness list.  Case No. 24-CR-60 at Dkt.# 24, p. 5.  The
government's response seemingly confirmed that fact, asserting "[g]overnment
agents sought to speak with the defendant, who counsel for Peter Gerace had
identified as a potential witness for Gerace in an upcoming trial." id. at Dkt.# 25,
p. 5.

56. While seemingly conceding that the government became interested in charging
Detective Trotter because he could provide testimony in Mr. Gerace's defense,
the government's response in that case wholly ignores the fact that the interview
of Detective Trotter that led to the charges occurred approximately nine months
before the Gerace defense witness list was filed, and the decision to charge
Detective Trotter apparently occurred weeks after he was disclosed as a Gerace
defense witness.

### c.   Jessica Leyland

57. By way of background, Jessica Leyland was an employee and friend of Mr.
Gerace for years.  As a former employee and friend, the defense anticipated Ms.
Leyland would provide favorable and helpful testimony to Mr. Gerace at trial,
including testimony that would undercut government allegations of narcotics

sales and use at Mr. Gerace's nightclub.  As a personal friend, Ms. Leyland's
testimony could also undercut allegations regarding Mr. Gerace's relationships
with other witnesses in this case.

58. Accordingly, Ms. Leyland was listed on the defense witness list as a potential
witness on Mr. Gerace's behalf.

59. From at least February 2023, the government had alleged that Ms. Leyland was
involved in an altercation with Ms. Hunt in 2019 whereby Ms. Leyland allegedly
placed Ms. Hunt in a headlock and threatened further violence because Ms. Hunt
spoke with federal law enforcement.  *See, e.g.*, Case No. 23-mj-11 at para. 17.

60. Although the allegations were known to the government and relied upon by the
government in advancing other litigation, including in seeking Mr. Gerace's
detention[4], the government did not charge Ms. Leyland with any crime before
the filing of the defense witness list.

61. After Ms. Leyland was placed on the defense witness list, however, the
government charged Ms. Leyland by criminal complaint on October 26, 2023.  *See*
Case No. 23-mj-5229 at Dkt. # 1.  In relevant part, the criminal complaint charges
Ms. Leyland with witness tampering and intimidation based on the 2019 incident
with Ms. Hunt.  id. at Dkt. # 4, p. 1.

---

[4] AUSA Tripi: "In July of 2019, a long-time associate of Mr. Gerace and employee at Pharaoh's attacked
that witness and made comments about speaking to the Feds." Case No.: 23-cr-37, Dkt.# 6 at p. 14.

### V.   THE GOVERNMENT HAS PRECLUDED MR. GERACE FROM PRESENTING A DEFENSE

62. "The Sixth Amendment guarantees criminal defendants the right to present a defense, which includes a right to call witnesses." *Rigas v. United States*, No. 02-CR-1236, 2020 U.S. Dist. LEXIS 86850, 2020 WL 2521530, at *22 (S.D.N.Y. May 15, 2020) (citing *United States v. Williams*, 205 F.3d 23, 29 (2d Cir. 2000)), aff'd, 848 F. App'x 464 (2d Cir. 2021). "It is elementary that criminal defendants have a right to establish a defense by presenting witnesses." *See Webb v. Texas*, 409 U.S. 95, 98, (1972).

63. The right to establish a defense by presenting witnesses serves the truth-seeking function of the trial process by protecting against the dangers of judgments "founded on a partial or speculative presentation of the facts." *Williams*, 205 F.3d at 29 (2d Cir. 2000).

64. "A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense -- a right to his day in court -- are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel. " *In re Oliver*, 333 U. S. 257, 273 (1948)(emphasis added).

65. "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)

66. "[J]udicial or prosecutorial intimidation that dissuades a potential defense witness from testifying for the defense can, under certain circumstances, violate the defendant's right to present a defense." *Williams*, 205 F.3d at 29.

67. "To demonstrate a due process violation based on the government's intimidation of witnesses, the defendant must show three elements: (1) that he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means, (2) bad faith on the part of the government, and (3) that the absence of fundamental fairness infected the prosecution." *United States v. Lebedev*, 932 F.3d 40, 55 (2d Cir. 2019) (quoting id.); *United States v. Chartier*, No. 17-CR-0372(JS), 2021 U.S. Dist. LEXIS 161972, at *62-63 (E.D.N.Y. Aug. 26, 2021).

68.  All elements are present here.

### a.  Deprivation of Material and Exculpatory Evidence That Could Not Be Reasonably Obtained by Other Means

69.  In making charging decisions, the government targeted individuals who would provide testimony – sometimes the only testimony – that would rebut allegations of government witnesses.  The decision to charge these individuals not only mandates their silence at Mr. Gerace's trial, but it also sends a message to other witnesses who may be willing to testify on Mr. Gerace's behalf – tell the truth and support Mr. Gerace at your peril, willingness to do so will subject you to federal prosecution.

70.  With regard to Mr. Rosenthal, as a long-time employee and manager responsible for the VIP area of Mr. Gerace's club, his testimony would rebut government allegations of prostitution, coercion and drug use.  Because of his history and place in the club, there is no other individual who would be able to provide the same testimony for Mr. Gerace at trial.

71.  With regard to Detective Trotter, his experience in investigating and arresting Ms. Nigro and Ms. Hunt would undercut the credibility of their allegations as they relate to Mr. Gerace.  His experience interacting with Mr. Gerace would demonstrate Mr. Gerace's good-faith efforts to seek the assistance of law enforcement.  As the Court knows, the defense anticipates the testimony of Ms. Nigro and Ms. Hunt will include allegations of public corruption, widespread narcotics use, prostitution and intimidation.  Detective Trotter's personal knowledge of the witnesses and the facts and circumstances giving rise to the allegations against Mr. Gerace make him a powerful and irreplaceable witness on Mr. Gerace's behalf.  Simply put, there is no other witness or evidence that could provide the same information on Mr. Gerace's behalf.

72.  With regard to Ms. Leyland, her experience and knowledge working at Pharoah's and knowing Mr. Gerace would give historical perspective to many of the government's allegations, and it would rebut allegations that Mr. Gerace was aware of narcotic sales/distribution at his club.  The defense also anticipates Ms.

Leyland would provide testimony showing that Mr. Gerace did not condone

prostitution or other commercial sex acts.  Because of her knowledge of

Pharoah's and her relationship with Mr. Gerace, there is no witness that could

provide the kind of helpful, exculpatory testimony Ms. Leyland would provide

for Mr. Gerace at trial.

### b.  The Government's Bad Faith

73. The government's bad faith has been a subject of other litigation in this matter,

and it permeates through the prosecution of Mr. Gerace.  *See, e.g.*, Dkt. # 996,

1070.  Recently there has been an explicit finding that the government (and the

same trial team) acted in bad faith in withholding discovery Mr. Gerace and his

co-defendants in willful violation of a Court order in the 23-cr-99 case.  *See* 23-cr-

99 at Dkt.# 173.

74. Independent of the other motion practice, the government's bad faith is also

evident in the timing and manner it sought to detain Mr. Gerace before trial, and

the timing and manner it sought to transfer this case to a different venue without

legal precedent.

75. The government's bad faith is further evident in its decision to charge Mr.

Rosenthal and Detective Trotter with lying to federal agents.  As the Court

knows, Mr. Gerace's ex-wife has testified to well-documented, easily proven

falsities throughout the time she has interacted with federal law enforcement.

The government acknowledged it did not believe her grand jury testimony as she was giving it. At the recent trial of Mr. Bongiovanni, her testimony was so different from her grand jury testimony that it led to a Rule 29 dismissal of Count 5 of the Indictment against Mr. Bongiovanni. Yet, despite Ms. Nigro's repeated lies, the government has not charged Ms. Nigro with obstruction of justice, lying to federal agents, or any other federal crime – presumably because her lies support the government's theory of prosecution against Mr. Gerace.

76. Finally, and perhaps most importantly, the government's bad faith is laid bare by the timing of its decisions to charge Rosenthal, Trotter and Leyland. Each individual was known to the government for years. The facts and circumstances giving rise to their charges were known to the government for years. And yet, the government did not choose to charge those individuals with federal crimes until the government learned Mr. Gerace contemplated calling those individuals to testify on his behalf in his case.

### VI.   THE COURT SHOULD ORDER DISCLOSURE

77. The above referenced facts support dismissal. That is particularly the case when the government's misconduct in this regard is reviewed alongside the misconduct detailed in related defense motions.

78. Given the facts above, the defense believes other documents and materials would further illustrate the government's bad faith.

23

79. In that regard, the defense requests that the Court Order disclosure of charging memoranda and related case forms prepared by the United States Attorney's Office with respect to the following cases in the Western District of New York: 23-mj-11; 23-cr-102; 23-mj-1173; 24-cr-60; 23-mj-5229.

80. The defense believes that any charging memoranda or new case forms generated by the prosecution would demonstrate the timing of the government's decision to charge the above referenced cases, including whether those decisions were made before or after the District Court's decision to modify Mr. Gerace's release conditions to a curfew and the filing of the Gerace witness list.

81. The charging memoranda would also indicate that the decision to charge these individuals was linked to the Gerace prosecution and not undertaken for any other or independent federal law enforcement objective.

82. The new case filing forms will indicate whether or not the government linked the charges against these individuals to the Gerace prosecution or other cases that are clearly related to Mr. Gerace (or even to each other).

83. This information is critical to understanding the government's misconduct.  If, as is evident from the record, the decision to charge Rosenthal, Trotter and Leyland was based on evidence known to the government for years but was not finally decided until after Gerace indicated those individuals would likely be called as witnesses on Mr. Gerace's behalf, it provides strong evidence of the

government's bad faith motive because it demonstrates that the critical fact in the government's decision to charge those individuals was not their alleged misconduct, but rather their potential role in Mr. Gerace's defense.

## VII.   CONCLUSION

84.  Asserting that the ends justify the means (Dkt # 1030), the government has disregarded Mr. Gerace's rights and fundamental fairness at every turn.

85. The government relied on witnesses who fabricate allegations in the grand jury. Dkt.# 1077 at p. 33.  The government invaded Mr. Gerace's defense team in disregard to DOJ protocols and based on an apparent misrepresentation to a federal district court judge.  Dkt. # 996.  The government used "flimsy" evidence and a misstatement of the law to threaten defense counsel with criminal prosecution in an effort to deprive Mr. Gerace of his Sixth Amendment rights. Dkt.# 889.  The government made charging decisions with the specific goal of detaining Mr. Gerace before trial.  Case No. 23-mj-11.   The government sought to move the trial to make it more difficult for Mr. Gerace to obtain helpful testimony from his witnesses.  Dkt. # 623.  In bad faith, the government has denied Mr. Gerace access to critical discovery in deliberate disregard to a court order.  Case No. 23-cr-99 at Dkt.# 173.

86. Against that backdrop, the government also used the Gerace witness list to make charging decisions in order to prevent Mr. Gerace from obtaining testimony from witnesses who may absolve him.

87. The government cannot be permitted to trample Mr. Gerace's rights.  The government's misconduct cannot be condoned.  Rather, the government's misconduct should be sanctioned by the Court. The consolidated indictments should be dismissed.  The Court should order the requested disclosure so that the record on this issue is clear.

DATED:  July 31, 2024

                                                                    s/ Eric M. Soehnlein
                                                                    Eric M. Soehnlein