IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

    v.          19-CR-227-LJV

PETER GERACE, JR.,

      Defendant
_____

UNITED STATES OF AMERICA,

    v.          23-CR-37-LJV

PETER GERACE, JR.,

      Defendant

_____

**GOVERNMENT'S RESPONSE TO DEFENDANT GERACE'S *BRADY* MOTION**

**THE UNITED STATES OF AMERICA**, by and through its attorney, Trini E. Ross, United

States Attorney for the Western District of New York, Joseph M. Tripi, Nicholas T. Cooper,

Casey L. Chalbeck, and Caitlin M. Higgins, Assistant United States Attorneys, hereby files

its response to defendant Peter Gerace's *Brady* motion.  *See* Doc. No. 1083.

**PRELIMINARY STATEMENT**

  The defendant states that trials are a search for truth.  The government agrees.  *See Nix*

*v. Whiteside*, 475 U.S. 157, 106 S. Ct. 988 (1986) ("In short, the responsibility of an ethical

lawyer, as an officer of the court and a key component of a system of justice, *dedicated to a*

*search for truth*, is essentially the same whether the client announces an intention to bribe or

threaten witnesses or jurors or to commit or procure perjury.  No system of justice worthy of

the name can tolerate a lesser standard." (emphasis added)).  More than that, however, cross

examination is "the greatest legal engine ever invented for the discovery of truth." *See California v. Green*, 399 U.S. 149, 158, 90 S. Ct. 1930 (1970). When witnesses testify, defendants test their credibility by, at times, impeaching witnesses with prior inconsistent statements. The jury, then, makes the assessment of whether to believe that witness or not.

The government invites and encourages the defendant to engage in an exacting search for the truth in this case because doing so is fair not only to him, but to the government and the public who have equal interest in the fair and efficient administration of justice in this case. But the defendant should do so on the merits. The defendant would rather distract this Court and the public with a false narrative than search for the truth. As this Court has often repeated, criminal prosecution is not a game of gotcha. In this case, the only party playing games is the defendant.

## BACKGROUND

On December 19, 2023, defendant Bongiovanni moved to sever the counts against him. *See* Docket No. 697. Neither defendant Gerace, nor the government opposed the motion. *See* Docket No. 703 and 700. On January 3, 2024, the Court granted defendant Bongiovanni's motion and severed his case from that of defendant Gerace. *See* Docket No. 709.

On February 12, 2024, defendant Bongiovanni's trial commenced. *See* Docket No. 762. On March 19, 2024, the government called Katrina Nigro to testify. *See* Docket No. 829, 856. On March 26, 2024, defendant Bongiovanni made a Federal Rule of Criminal Procedure ("FRCP") 29 motion to dismiss several charges, including Count 5. During that oral motion, defense counsel stated that Ms. Nigro's trial testimony "painted a very, very different picture," than her previous statements. *See* Tr. March 26, 2024, Oral Argument at

3.  Defense counsel stated that he thought "intentionally, the government never moved to refresh her recollection or move her toward that prior testimony in any fashion."  *Id.* at 4. The government responded by stating that defense "chose to cross her in the manner that they chose to cross her.  So if there's something more, and we went further in a grand jury transcript, they chose to ask the question they asked, we chose to ask the questions that we asked."  *Id.* at 14.  During this argument, the defense misconstrued and conflated two important facts by stating:  "[t]here's simply no reason to explain why Ms. Nigro, who testified before the grand jury that there were 60 -80 different envelopes over the course of time given to [defendant] Bongiovanni, would then come into this trial and say[] only two." *Id.* at 25.  The defense stated that this must have been intentional "because there's some ethical duty that the government rightfully . . . executed, and did not believe they could suborn perjury."  The government responded by stating:

> In grand jury, she talked about 60, or I think it was 30 other times where Peter provided envelopes. But, Judge, what does Rule 901 require? It requires personal knowledge.  If I tried to elicit that testimony, do you think the defense would have been objecting under Rule 901, personal knowledge?  So I chose to focus on what she personally was involved in, by observation and what she handed.  That was a conservative approach.  That was the opposite of being unethical and pushing the envelope.  That was inuring to their benefit in trying to play it straight.

*Id.* at 27.

On June 14, 2024, the defense moved to dismiss, *inter alia*, Count 5 pursuant to Rule 29 and Rule 33.  On July 19, 2024, the Court issued a Decision & Order that, in relevant part, granted the defendant's motions as to Count 5.  *See* Docket No. 1077.  The Court's analysis included the fact that "a jury crediting [Ms. Nigro's] testimony [that "she knew the envelopes contained cash" because "she could just feel it"] could conclude beyond a reasonable doubt that the envelopes contained cash."  *Id.* at 7 (internal quotation marks omitted).  The Court

held that although "this is a close case that tests the boundary . . . between the drawing of a permissible inference and impermissible speculation," (*id.* at 11), a rational juror "could not find beyond a reasonable doubt that [defendant] Bongiovanni accepted the envelopes of cash in exchange for his agreeing to take or omit to take official actions to protect Gerace in the future." *Id.* at 7.   In reaching this conclusion, the Court stated that, *inter alia*, "had Nigro testified—as she did before the grand jury—that she had witnessed [defendant] Bongiovanni receive envelopes from Gerace on about 30 occasions from 2013 to 2016, including giving Bongiovanni envelopes five or six times[1] herself at Gerace's direction . . . that likely would have been sufficient." *See id.* at 11-12.

On July 25, 2024, defendant Gerace filed a "joint motion" for *Brady* Disclosure and Related Brief.   *See* Docket No. 1083.[2]   In it, he posits the novel theory that where a witness (1) testifies in any way differently from her grand jury; (2) the government knew and must have endorsed the change in testimony; and (3) the government must have violated *Brady* in failing to disclose materials relevant to the "planned" change in testimony.   He does so without any supporting proof and despite the fact that the words in his own papers undermine

---

[1] Ms. Nigro testified in the grand jury that she personally gave the envelopes to defendant Bongiovanni "[p]robably five or six times," which indicates that Ms. Nigro was stating that the number as an unequivocal fact, but rather an estimate.   *See* Gov't Ex. 3577A at 75-76.

[2] Although defendant Gerace asserts that he his filing a joint motion on behalf of himself and defendant Bongiovanni, counsel for defendant Bongiovanni did not sign the motion.   Plainly, counsel for defendant Gerace does not represent counsel for Bongiovanni.   And because the defendants' cases are severed, any *Brady* violations impact them differently.   Thus, the government requests that if defendant Bongiovanni seeks relief for a purported *Brady* violation, that the Court direct him to file a motion.   The government contends, however, that because neither defendant can prove that the government knew Ms. Nigro would testify in any way, material or otherwise, from her grand jury, that the information was not suppressed because the government had no knowledge of it in the first place, and that the defendants cannot establish prejudice because both were able to utilize the information, the Court should deny the instant motion and any motion defendant Bongiovanni files with respect to the same.

this theory.  For all the reasons stated below, the Court should deny the defendant's motion in total.

## **ARGUMENT**

The Court should deny the defendant's motion because he fails to establish that Ms. Nigro's testimony was "dramatically altered," and, even if he could, he cannot make out a *Brady* violation.  Indeed, the defendant accuses the government of "permit[ing] [Katrina Nigro] to modify her sworn statements and testimony with government support and endorsement," in a separate trial.  *See* Docket No. 1083 at 4.  This callous accusation rests solely on rank speculation and unfounded assumptions.  Undeterred by this reality, and unarmed with supporting authority, the defendant boldly contends the government failed to abide by its disclosure obligations.  As such, the defendant requests that the Court: issue an order:

> 1.) directing the government, under Brady and its progeny, to disclose any and all material memorializing the government's knowledge of Katrina Nigro's trial testimony that diverged from her grand jury testimony in the trial of Joseph Bongiovanni; 2.) directing the government to provide a representation from a law enforcement agent with personal knowledge regarding the date, time and manner the government learned Katrine Nigro would provide testimony that was different from her grand jury testimony; and 3) for any other or further relief this the Court deems just and proper.

The Court should reject the defendant's unfounded accusations and decline to stretch *Brady* beyond recognition.

I.    **THE COURT SHOULD DENY THE DEFENDANT'S MOTION BECAUSE HE FAILS TO ESTABLISH A *BRADY* VIOLATION.**

A.  **The Defendant Fails to Demonstrate that Ms. Nigro "Dramatically Altered" Her Testimony.**

In this case, the defendant asserts that "[t]he sworn testimony elicited from Ms. Nigro at [defendant] Bongiovanni's trial was substantially different from the sworn testimony she gave in 2020 and from other information she originally provided to Federal law enforcement." Docket No. 1083 at 5.  As such, the defendant continues that "[n]either the Bongiovanni nor the Gerace defense team received notice or disclosure of Ms. Nigro's changed testimony before trial.  On this record, strong proof exists establishing the government's failure to abide by its disclosure obligations." *Id.*  The defendant, however, fails to proffer *any* proof, let alone strong proof, that the government failed to disclose materials relevant to Ms. Nigro's trial testimony.

Below, the government addresses each of the areas in which the defendant alleges that Ms. Nigro dramatically altered her testimony.

1.  Ms. Nigro Witnessing defendant Gerace Give Envelopes to defendant Bongiovanni.

The defendant incorrectly asserts that Ms. Nigro altered her testimony about the number of times she witnessed defendant Gerace give envelopes to defendant Bongiovanni. *See* Docket No. 1083 at 7.

In the grand jury, the government asked Ms. Nigro "how many times total would you say Joe Bongiovanni received an envelope of cash from Peter Gerace," to which Ms. Nigro responded: "[t]he ones I witnessed would be about 30."  *See* Gov't Ex. 3577A at 76.  The government, however, did not elicit this fact on direct, nor did the defense choose to raise it during cross examination.  Both were strategic decisions, *see* Tr. March 26, 2024, Oral

Argument at 27, that do not support the defendant's narrative.  The government is not required to follow, question by question, a witness' grand jury testimony.  Experienced trial attorneys know that the government may decide not to elicit facts that a witnessed testified about in grand jury for any number of reasons, none of which spring from nefarious intentions.  Nor is the defense entitled to a copy of the government's direct examination outline.  Accordingly, Ms. Nigro cannot be said to have altered her trial testimony in any way with respect to this fact because she was not asked a question about it.  If either defendant feels differently, they can confront her with the question on cross examination.

    2.  <u>The Number of Times Ms. Nigro Gave defendant Bongiovanni Envelopes.</u>

       The defense also contends that Ms. Nigro altered her testimony with respect to the number of occasions Ms. Nigro personally gave envelopes to defendant Bongiovanni.  The government concedes that while the numbers may be slightly different, both during grand jury and on direct examination, Ms. Nigro was asked to approximate.  The defendant omits this fact in his motion.  During grand jury, Ms. Nigro testified as follows:

```
    Q.   How many envelopes would you estimate you gave
Bongiovanni at Peter Gerace's direction overtime?
    A.   Probably five or six myself, but he was steadily
usually meeting him at the club and giving him an envelope
which he had put inside his pocket.
```

*See* Government Exhibit *See* Gov't Ex. 3577A at 75.  Importantly, Ms. Nigro used the qualifier "probably," before saying five or six times, indicating that her answer was an estimate, not an unequivocal statement of certainty.  During trial, Ms. Nigro testified on direct examination as follows:

```
Q.  Did you give this defendant envelopes of cash at

Mr. Gerace's direction?

A.  Yes.

Q.  Approximately how many times?

A.  I don't know if we included the birthday one, but two and

then the birthday card.
```

*See* Docket No. 856 at 47.  The government asked Ms. Nigro to *approximate* how many times she personally provided envelopes to defendant Gerace.  She responded that she did so on three occasions.  Significantly, on cross examination, defense counsel began his query stating "[n]ow, you estimated,"[3] recognizing that her testimony was an approximation.  *See id.* at 59. On cross examination, Ms. Nigro testified:

```
Q.  All right.  Now, you estimated -- strike that.

    You said on two occasions, you gave Mr. Bongiovanni

envelopes, correct?

A.  Yes.
```

*Id.*[4]  Defense counsel did not impeach Ms. Nigro with her prior testimony, which was a strategic decision because, as defense counsel notes, it benefitted the defendant.  To the extent the defendant feels that Ms. Nigro dramatically altered her estimate of the number of times, he could have impeached her credibility.  He chose not to — likely to prevent the jury from

---

[3] Defense counsel asked to strike that portion of his question because he wanted to pin her to three times (despite the fact that she testified on direct that it was an estimation).
[4] Defense counsel misstated Ms. Nigro's testimony on direct examination, where she stated that, when counting the birthday card, she provided envelopes to defendant Gerace on three occasions.

hearing that Ms. Nigro personally gave the defendant envelopes filled with cash five or six times.

3.  Knowledge of the Content of Envelopes.

The defendant argues that "in sharp contrast to her grand jury, the government's pretrial submission, and the government's opening statement, Ms. Nigro did not testify that she knew the content of the envelopes was cash."  *See* Docket No. 1083 at 9.  This is misleading at best and disingenuous at worst.  During grand jury, Ms. Nigro testified that:

```
Q.    What was in the envelope?

A.    Cash.

Q.    How do you know?

A.    Because you could feel it.

Q.    You knew it felt like cash based on your experience?

A.    Yeah.
```

*See* Gov't Ex. 3577A at 75.  During trial, Ms. Nigro testified as follows on direct examination:

```
Q.  So let's start -- I'll go back to the birthday card in a
moment.  But the two occasions that you recall handing the
defendant envelopes of cash, how did you know they were
envelopes of cash?
A.  You could just feel it.
Q.  And from your life experience in paying other people in
cash envelopes, you knew it was cash?
A.  Um-hum.
Q.  Yes?
A.  Yes.
```

*See* Docket No. 856 at 47.  On cross examination, Ms. Nigro testified that:

```
Q.  All right.  So, but going back to these envelopes, you
have -- as you sit here today, you have no idea what the
purpose of these envelopes were, correct?
A.  Yes.
Q.  Okay.  And you don't know whether it was, for example,
folded papers in the envelope, correct?
```

```
A.  I'm sorry, what?

Q.  You don't know what was in the envelope, correct?

A.  I knew it was, like, money, not papers.  But just from

feeling it.

Q.  Okay.  But you didn't look in the envelope, correct?

A.  No, I didn't open the envelope.
```

*Id.* at 69-70.  There is no contrast, sharp or obtuse, between Ms. Nigro's grand jury and trial testimony.  The defendant simply failed to include the entire portion of Ms. Nigro's cross examination in his papers.  The Court should ignore this argument entirely.

4.  <u>Knowledge of the Amount of Money Contained in the Birthday Card.</u>

The defendant contends that "in contrast with her prior testimony and the government's assertions to the Court and jury, Ms. Nigro acknowledged that she did not know the amount of money contained in the card."  *See* Docket No. 1083 at 10.  He is wrong. In grand jury, Ms. Nigro testified:

```
Q.   And you've seen Bongiovanni there on other occasions

where you saw him getting an envelope from Peter?

A.   Yeah.  And I saw Peter grab envelopes before going
```

```
to his house.  On his 50th birthday he gave him $5,000.

     Q.    Peter gave Joe Bongiovanni $5,000?

     A.    Yeah.  I know that for a fact.  I had to sign a card

and stuff, which I thought was outrageous.

     Q.    A card --

     A.    A birthday card and envelope.
```

*See* Gov't Ex. 3577A at 75-76.  During trial, on direct examination, Ms. Nigro testified that:

```
Q.  You referenced a birthday card.  Did Mr. Gerace give

Defendant Bongiovanni a birthday card that day?

A.  Yes.

Q.  When you were getting ready to go that evening to the

birthday party, were you home getting ready with Mr. Gerace?

A.  Yes.

Q.  Did you see what he put in the birthday card?

A.  He said he was giving him 5,000.
```

Q.  And did you see him put cash in the card?

A.  I knew he was putting money in the card, I didn't personally count it though.

Q.  Okay.  So you see him putting money in a card, and he said -- Gerace said when he's doing that, I'm gonna give him $5,000?

A.  Um-hum.

Q.  Yes?

A.  Yes.

Q.  Okay.

A.  For his 50th birthday.

*See* Docket No. 856 at 48-49.  On cross examination, Ms. Nigro testified:

A.  Yes.

Q.  Okay.  And you don't know how much money was put in there based on what you saw, correct?

A.  Yes.

Q.  Okay.  And you didn't see that much money put in the envelope, correct?

A.  What?

Q.  When you saw this envelope being prepared, you didn't see that much money being put in there, correct?

A.  No, I didn't.

Q.  Okay.  You didn't know if it was just a couple bills,
correct?

A.  No, he said he was giving him $5,000, but I don't know --

Q.  My question is what you saw Peter do.

A.  Yes.

Q.  Could have been a couple bills?

A.  It could have been.

Q.  Okay.  And as far as you understood, this was -- it's a
birthday present, correct?

A.  Yes.

*Id.* at 57-58. Ms. Nigro's trial testimony, again, was consistent with what she said before the grand jury. During grand jury, Ms. Nigro said she "kn[e]w for a fact," that "[defendant Gerace] gave [defendant Bongiovanni] $5,000." The government did not ask her how she knew this to be true, nor did Ms. Nigro volunteer how she knew. During trial, Ms. Nigro testified that defendant Gerace told her that he was giving defendant Bongiovanni $5,000. She testified that although she saw defendant Gerace putting money in the card, she did not count the money herself to confirm it was $5,000. That does not invalidate her testimony that defendant Gerace told her the amount of money. When Ms. Nigro tried to explain this fact on cross-examination, defense counsel cut her off because he wanted to pin her to an answer he wanted, not the one she was going to give. Accordingly, Ms. Nigro testified consistently with respect to the birthday card.

14

5. Purpose of Envelopes.

Defendant asserts that Ms. Nigro testified dramatically differently with respect to her knowledge of the purpose of the envelopes. *See* Docket No. 1083 at 10. This is untrue. During grand jury, Ms. Nigro testified that:

> Q.    Based upon your participation in giving Bongiovanni the envelopes and you're seeing Peter give him envelopes did you have a perception of what you thought the payments were for?
>
> A.    Yeah.
>
> Q.    What did you believe?
>
> A.    Drug dealing, paying off people.

*See* Gov't Ex. 3577A at 15. The government, for strategic reasons, did not elicit this fact on direct examination. On cross examination, Ms. Nigro testified:

> Q.  All right. So, but going back to these envelopes, you have -- as you sit here today, you have no idea what the purpose of these envelopes were, correct?
>
> A.  Yes.
>
> Q.  Okay. And you don't know whether it was, for example, folded papers in the envelope, correct?

A.   I'm sorry, what?

Q.   You don't know what was in the envelope, correct?

A.   I knew it was, like, money, not papers.  But just from feeling it.

Q.   Okay.  But you didn't look in the envelope, correct?

A.   No, I didn't open the envelope.

Docket No. 856 at 69-70.  Ms. Nigro did not have personal knowledge as to the purpose of the envelopes.  As demonstrated in her grand jury, she may have an opinion of what purpose of the envelopes and if the defendant Bongiovanni wanted to challenge that opinion, he could have raised it on cross examination.  Defense counsel made the strategic decision not to do so.  Defendant Gerace has the same option.

At bottom, the defendant's argument that Ms. Nigro "dramatically altered" her testimony is misleading.  What is more, if defendant believes this to be true, as he demonstrates in his papers, he is perfectly capable of impeaching her on cross examination, the greatest legal engine ever invented for the discovery of truth, with her prior sworn testimony.

## B. Even if the Court Holds that Ms. Nigro's Trial Testimony Differed Dramatically from her Grand Jury Testimony, the Defendant Fails to Establish a *Brady* Violation.

The government must disclose evidence favorable to the accused when it is material to guilt or punishment.  *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194 (1963).  Indeed, *Brady* and its progeny require the Government to disclose material information that is "favorable to the accused, either because it is exculpatory, or because it is impeaching." *Rodriguez,* 496 F.3d 221 at 226.  To demonstrate a *Brady* violation, a defendant must show

16

that: (1) the government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice. *See United States v. Coppa*, 267 F.3d 132, 140 (2d Cir.2001). First, information is "suppressed" when a prosecutor, whether in good or bad faith, fails to disclose "*known*, favorable evidence rising to a material level." *Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995) (emphasis added); *see also United States v. Agurs,* 427 U.S. 97, 103 (1976) (holding the government must disclose only "information which had been known to the prosecution but unknown to the defense"); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (*Brady* extends only to evidence "that is known to the prosecutor"). Furthermore, the Second Circuit has repeatedly held that "[e]vidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." *United States v. Ramsey*, No. 20-860, 2021 WL 5022640, at *2 (2d Cir. Oct. 29, 2021), *cert. denied sub nom. Muschette v. United States*, 212 L. Ed. 2d 608, 142 S. Ct. 2652 (2022).

Second, pursuant to *Brady*, favorable material encompasses impeachment evidence, which is "evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *Avellino*, 136 F.3d at 255. Impeachment evidence, however, is *not* material "when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *Hunter*, 32 F.4th at 34. That is, impeachment evidence is not material when it is cumulative. *See id.* ("[I]mpeachment based on withheld information would have been cumulative.") (citing *Avellino*, 136 F.3d at 257 ("[U]ndisclosed evidence may be cumulative, and hence not material.")). "Undisclosed impeachment evidence may be material where the

17

witness in question supplied the only evidence linking the defendant to the crime," but "where ample ammunition exists to attack a witness's credibility, evidence that would provide an additional basis for doing so is ordinarily deemed cumulative and hence immaterial." *United States v. Murphy*, No. 23-6470, 2024 WL 3264127 (2d Cir. July 2, 2024).

Third, "a defendant must show that he was prejudiced by the prosecution's failure to disclose." *United States v. Hunter*, 32 F.4th 22, 31 (2d Cir. 2022). "With respect to when the prosecution must make a disclosure required by Brady, the law . . . appears to be settled. *Brady* material must be disclosed in time for its effective use at trial." *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 1992). Indeed, the *Coppa* court held that:

> [A]s long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner. There is no *Brady* violation unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial.

*Id.* at 144.

Here, the defendant cannot prove a *Brady* violation because the record demonstrates that the government did not know that Ms. Nigro would testify any differently than she did in grand jury. Indeed, the defendant himself recognizes this fact when he argues that Ms. Nigro altered her testimony in contrast to "the government's pretrial submission, and the government's opening statement." *See* Docket No. 1083 at 9. If, *assuming arguendo*, the government knew that Ms. Nigro was going to alter her testimony to the government's detriment, then why would it include the more helpful statements in a pretrial memorandum or opening statement, only to have the testimony differ? The answer is simple: because the government did not know, and witnesses are human beings. And to the extent defendant Gerace speculates that the government belatedly learned through trial preparation that Ms.

18

Nigro was going to change her testimony, his "speculation that some . . . impeachment material may have been withheld is not enough for him to" substantiate a *Brady* or *Giglio* claim. *United States v. Walsh*, 774 F. App'x 706, 707 (2d Cir. 2019) (unpublished).

Even if the defendant could somehow prove that the government knew Ms. Nigro would allegedly testify in any way different from her grand jury, he fails to prove that the information was suppressed by the government.[5]  Defendant Gerace's motion demonstrates that he has the materials containing the alleged inconsistencies (*i.e.*, her grand jury testimony and trial testimony).  As the Seventh Circuit explained in *Carvajal v. Dominguez*, "inconsistent [ ] testimony does not a *Brady* violation make" where, as here, the defendant "could have discovered . . . inconsistent testimony himself" through a "hearing" — *i.e.*, through the transcript that he clearly possesses.  542 F.3d 561, 569 (7th Cir. 2008).  Certainly, defendant Gerace cannot credibly argue that the information was suppressed — he knew or should have known the information as of March 19, 2024 — more than 7 months before his trial commences.

Even defendant Bongiovanni cannot say that the information was suppressed because it came out in trial; he was able — and sought an adjournment — to adapt his cross examination to the witness's testimony—as defense attorneys the nation opt to do whenever they confront an opportunity to impeach a witness.  *See Coppa*, 267 F.3d at 135 ("*Brady* material must be disclosed in time for its effective use a trial.").  In other words, it simply

---

[5] The defendant contends that this information "was known only to the government and, because Ms. Nigro has been represented throughout the time she has been in contact with federal law enforcement, the information was not available in any form to the defense team." *See* Docket No. 1083 at 16.  That the witness is represented by counsel does not prohibit the defense from contacting Ms. Nigro's attorney to determine whether she would meet with the defense.

cannot be the case that the government "suppressed" a statement when Ms. Nigro — in response to the government's question — provided an answer slightly inconsistent with her grand jury testimony, and defendant Bongiovanni had an opportunity to "effective[ly] use" the inconsistency. *Id.* That defendant Bongiovanni strategically chose not to exploit the inconsistency by impeaching her — which could have hurt his defense — does not a suppression claim make. *See United States v. Bodkins*, 274 F. App'x 294, 300 (4th Cir. 2008) (unpublished) ("[W]e observe that Taylor's inconsistent statements were made known at trial. Accordingly, counsel . . . was afforded the opportunity to cross-examine Taylor about his prior inconsistent statements. We are thus unable to fathom how the outcome of the trial might have been different had [defendant] possessed the prior inconsistent statements earlier.").

Finally, even if the defendant could prove the government knew Ms. Nigro would allegedly testify differently from her grand jury and suppressed materials, either plain knowledge or written documents, relating to that fact, he fails to prove any prejudice to him whatsoever. In fact, the record demonstrates that Ms. Nigro's trial testimony benefited the defendants tremendously. That benefit, though salient in the Rule 29 context, does not extend into the realm of *Brady*.

The question becomes *why*, when the defendant has Ms. Nigro's grand jury testimony, her trial testimony, and numerous other reports and documents provided by the government to defendant Gerace, all of which provide classic fodder for cross examination, he seeks disclosures relating to the government's knowledge regarding Ms. Nigro's alleged altered testimony. The answer is inescapable and underlies all of defendant Gerace's recent filings and defendant Gerace's recent mailings to media outlets attempting to denigrate prosecutors: he is desperately searching for a way to prevent his trial from occurring — most recently, by

attempting to put the government on trial — so that he may avoid defending himself from the overwhelming proof of his guilt.  While the defendant is pounding the table, the government remains committed to the facts and the laws.  Regardless, because the defendant fails to prove a *Brady* violation, the Court should reject his motion in its entirety.

## **CONCLUSION**

For all the reasons stated above, the Court should deny the defendant's motion in total.


DATED:      Buffalo, New York, August 2, 2024


TRINI E. ROSS
United States Attorney


BY:    s/ JOSEPH M. TRIPI
/s NICHOLAS T. COOPER
/S CASEY L. CHALBECK
/S CAITLIN M. HIGGINS
Assistant United States Attorneys
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716-843-5818
Caitlin.Higgins@usdoj.gov