09:18AM

```
1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK
2
   _____
3  UNITED STATES OF AMERICA,
                                         Case No. 1:19-cr-227
4             Plaintiff,                           (LJV)
   v.
5                                        August 7, 2024
   JOSEPH BONGIOVANNI,
6
   _____
                   Defendant.
7

8     TRANSCRIPT EXCERPT - CONTINUED EXAMINATION OF THOMAS HERBST
              BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                  UNITED STATES DISTRICT JUDGE

10 APPEARANCES:        TRINI E. ROSS, UNITED STATES ATTORNEY
                       BY: JOSEPH M. TRIPI, ESQ.
11                         NICHOLAS T. COOPER, ESQ.
                           CASEY L. CHALBECK, ESQ.
12                     Assistant United States Attorneys
                       Federal Centre, 138 Delaware Avenue
13                     Buffalo, New York 14202
                       For the Plaintiff
14
                       SINGER LEGAL PLLC
15                     BY: ROBERT CHARLES SINGER, ESQ.
                       80 East Spring Street
16                     Williamsville, New York 14221
                          And
17                     LAW OFFICES OF PARKER ROY MacKAY
                       BY: PARKER ROY MacKAY, ESQ.
18                     3110 Delaware Avenue
                       Kenmore, New York 14217
19                        And
                       OSBORN, REED & BURKE, LLP
20                     BY: JOHN J. GILSENAN, ESQ.
                       120 Allens Creek Road
21                     Rochester, New York 14618
                       For the Defendant
22
   PRESENT:            BRIAN A. BURNS, FBI Special Agent
23                     MARILYN HALLIDAY, HSI Special Agent
                       KAREN A. CHAMPOUX, USA Paralegal
24
   LAW CLERK:          REBECCA FABIAN IZZO, ESQ.
25
```

| | |
|---|---|
| 1 | **COURT DEPUTY CLERK:**  **COLLEEN M. DEMMA** |
| 2 | **COURT REPORTER:**       **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 3 |                          Robert H. Jackson Federal Courthouse<br>2 Niagara Square |
| 4 |                          Buffalo, New York  14202<br>Ann_Sawyer@nywd.uscourts.gov |
| 5 | |
| 6 |            *    *    *    *    *    *    * |
| 7 | |

09:48AM 8    (Excerpt commenced at 9:48 a.m.)

09:48AM 9    (Jury seated at 9:48 a.m.)

09:49AM 10    **THE COURT:**  Good morning, everyone.

09:49AM 11    **JURORS:**  Good morning.

09:49AM 12    **THE COURT:**  The record will reflect that all our

09:49AM 13 jurors, again, are present.

09:49AM 14    I remind the witness that he's still under oath.

09:49AM 15    And, Mr. Singer, you may continue.

09:49AM 16    **MR. SINGER:**  Thank you, Judge.

09:49AM 17

09:49AM 18 **T H O M A S   H E R B S T**, having been previously duly called

09:49AM 19 and sworn, continued to testify as follows:

09:49AM 20

09:49AM 21            **CROSS-EXAMINATION BY MR. SINGER (CONT'D):**

09:49AM 22 Q.  Good morning, Mr. Herbst, again.

09:49AM 23 A.  Good morning, Mr. Singer.

09:49AM 24 Q.  You didn't have any pieces of paper, or any type of items

09:49AM 25 that you referenced over the night hours regarding your

USA v Bongiovanni - Herbst - Singer/Cross - 8/7/24

09:49AM    1    testimony, correct?

09:49AM    2    A.  I did not.

09:49AM    3    Q.  And you didn't talk to anybody about your testimony, of

09:49AM    4    course.

09:49AM    5    A.  I did not.

09:49AM    6    Q.  Good.  So where we left off yesterday, we were talking

09:49AM    7    about the meetings that you had leading up to the meeting

09:49AM    8    with Agent Bongiovanni and Peter Gerace on November 23rd of

09:49AM    9    2009, right?

09:49AM   10    A.  Regarding -- with probation?

09:49AM   11    Q.  Yes.

09:49AM   12    A.  Yes.

09:49AM   13    Q.  And we talked about how you had not kept a lot of notes

09:50AM   14    regarding some of these meetings or phone calls that led up

09:50AM   15    to the meeting with Peter Gerace.

09:50AM   16    A.  That's correct.

09:50AM   17    Q.  Okay.  So a lot of testimony that you're giving in court

09:50AM   18    is based on your memory, correct?

09:50AM   19    A.  Yes.

09:50AM   20    Q.  Okay.  So with regard to the meeting with Peter Gerace,

09:50AM   21    you testified yesterday that you didn't have any specific

09:50AM   22    notes that you took during that meeting, right?

09:50AM   23    A.  The meeting at DEA?

09:50AM   24    Q.  Yes.

09:50AM   25    A.  No, that's correct.

USA v Bongiovanni - Herbst - Singer/Cross - 8/7/24

09:50AM 1 Q. And you didn't write a report about it after the meeting,

09:50AM 2 correct?

09:50AM 3 A. I did not.

09:50AM 4 Q. Okay. But following the 23rd of November, do you

09:50AM 5 remember -- or, following the meeting on the 23rd of

09:50AM 6 November, do you remember having a conversation with

09:50AM 7 Mr. Lepiane about the fact that you had a meeting?

09:50AM 8 A. I'm sure I would have had that conversation, yes.

09:50AM 9 Q. So you recall following up with Mr. Lepiane of, hey, this

09:51AM 10 meeting we've been waiting to get with Peter Gerace has

09:51AM 11 finally happened?

09:51AM 12 A. Yeah, right. That's correct.

09:51AM 13 Q. Okay. And you remember talking to him about the fact

09:51AM 14 that there wasn't anything that substantively was discussed

09:51AM 15 in the meeting that would assist you in your investigation?

09:51AM 16 A. Yes.

09:51AM 17 Q. And you remember talking to him about how you were going

09:51AM 18 to continue to try to work with Peter Gerace to the extent

09:51AM 19 you could?

09:51AM 20 A. That could be true.

09:51AM 21 Q. Okay. And as far as that telephone is concerned,

09:51AM 22 telephone call is concerned, did Mr. Lepiane inform you about

09:51AM 23 what was going to happen with Peter Gerace vis-à-vis his

09:51AM 24 violation of supervision?

09:51AM 25 A. He may have.

USA v Bongiovanni - Herbst - Singer/Cross - 8/7/24

09:51AM   1   Q.  Do you recall if Mr. Lepiane talked to you about how

09:51AM   2   Mr. Gerace was going to be cited for location monitoring and

09:51AM   3   that was going to be a change to his supervision?

09:51AM   4   A.  I don't have a specific recollection about that as I sit

09:51AM   5   here today.  But that, I'm sure if it's in his report, that's

09:51AM   6   correct.

09:51AM   7   Q.  Did you have any memory of a conversation that you had

09:52AM   8   about the fact that Mr. Gerace was not going to be going to

09:52AM   9   jail as a result of what happened on the Halloween search?

09:52AM   10  A.  Yeah, I do have that understanding.

09:52AM   11  Q.  Okay.  So you at least knew he wasn't going to be going

09:52AM   12  to jail based on the violation?

09:52AM   13  A.  Yes.

09:52AM   14  Q.  Okay.  And when you talked yesterday in your testimony,

09:52AM   15  you were talking about how you left the meeting on the 23rd

09:52AM   16  of November of 2009 at DEA with the impression or assumption

09:52AM   17  that Peter Gerace was going to act as some type of

09:52AM   18  confidential source for the DEA?

09:52AM   19  A.  Yes, definitely.

09:52AM   20  Q.  And I guess I want to delve into that a little bit more.

09:52AM   21  A.  Sure.

09:52AM   22  Q.  At the meeting with you and Bongiovanni and Gerace,

09:52AM   23  Mr. Bongiovanni never told you Peter Gerace is a confidential

09:52AM   24  source of mine, correct?

09:52AM   25  A.  No.  I mean, he never used those words, but that would be

USA v Bongiovanni - Herbst - Singer/Cross - 8/7/24

09:52AM  1  an odd thing to say.

09:52AM  2  Q.  Yeah.  Peter Gerace never said in that meeting I'm a

09:52AM  3  confidential source for the DEA, correct?

09:53AM  4  A.  No, of course not.

09:53AM  5  Q.  Okay.  So neither Bongiovanni or Gerace mentioned the

09:53AM  6  word "confidential source," correct?

09:53AM  7  A.  That's correct.

09:53AM  8  Q.  Okay.  And as far as your case is concerned, you say that

09:53AM  9  after that meeting, based on the assumption that Peter Gerace

09:53AM  10  was going to be working with the DEA, you stopped

09:53AM  11  investigating him?

09:53AM  12  A.  Yes, that's correct.  I did not stop investigating my

09:53AM  13  case, but I -- that was one of the avenues I was going to

09:53AM  14  pursue to bolster my case, but I stopped pursuing that.  I

09:53AM  15  think we -- I don't know if it was you, I think it was

09:53AM  16  Mr. Cooper asked about a sub file.  So I stopped

09:53AM  17  investigating the sub file against Mr. Gerace.

09:53AM  18  Q.  So you ceased the investigation into potential drug

09:53AM  19  dealing going on at Pharaoh's Gentlemen's Club involving

09:53AM  20  Peter Gerace?

09:53AM  21  A.  Yes.

09:53AM  22  Q.  So I want to delve into that a little bit more.

09:53AM  23      So like you just testified, that wasn't the only inroad

09:53AM  24  into this cold case file that you were trying to develop,

09:54AM  25  correct?

09:54AM   1    A.   I'm not sure what you mean by "inroad" in this context.

09:54AM   2    Q.   Sure.   So another target of your investigation to help

09:54AM   3    develop leads in this cold case file was a person by the name

09:54AM   4    of Anthony Gerace, correct?

09:54AM   5    A.   I know Anthony Gerace, I know he's Peter brother, and I

09:54AM   6    had heard that name as him being involved in narcotics

09:54AM   7    trafficking, too, but I've never personally talked to Anthony

09:54AM   8    Gerace.

09:54AM   9    Q.   Yeah.   And so I guess what I'm getting at is similar to

09:54AM   10   how you learned about Peter Gerace being involved in

09:54AM   11   narcotics activity, people at your office also brought to

09:54AM   12   your attention that Anthony Gerace was another person who may

09:54AM   13   be involved in narcotics activity?

09:54AM   14   A.   Yeah, I definitely was -- I definitely was aware at that

09:54AM   15   time that Anthony Gerace was involved in narcotics activity.

09:54AM   16   I never talked to him or pursued an investigation against

09:55AM   17   him.

09:55AM   18   Q.   Yeah.   And I guess -- so your group, Squad 4 in the Safe

09:55AM   19   Streets Task Force, you have involvement in what's called

09:55AM   20   OCDETF investigations, correct?

09:55AM   21   A.   Yes.

09:55AM   22   Q.   And what is an OCDETF investigation?

09:55AM   23   A.   Organized Crime Drug Enforcement -- something like that.

09:55AM   24   Drug enforcement.

09:55AM   25   Q.   Would you agree Organized Crime Drug Enforcement Task

USA v Bongiovanni - Herbst - Singer/Cross - 8/7/24

09:55AM    1    Force?

09:55AM    2    A.   Yes.

09:55AM    3    Q.   So those particular investigations are looking into

09:55AM    4    organizational defendants or organizations that engage in

09:55AM    5    criminal activity?

09:55AM    6    A.   Yes.  But the primary work at Squad 4 was the Safe

09:55AM    7    Streets, so it was gang related, so not so much OCDETF.

09:55AM    8    Q.   But FBI does have involvement as a task force in OCDETF

09:55AM    9    investigations?

09:55AM   10    A.   Yes, absolutely.

09:55AM   11    Q.   And you remember a couple different people being

09:55AM   12    investigated at the same time.  Do you remember a David

09:56AM   13    Gambino being investigated as part of an OCDETF

09:56AM   14    investigation?

09:56AM   15    A.   I believe David Gambino may have been before my time.  It

09:56AM   16    might have been continuing.  And I'm not sure the FBI was the

09:56AM   17    primary investigative agency on that case, I don't have any

09:56AM   18    personal -- I know his name, I know what he was involved in.

09:56AM   19    I know he's, like, into drug trafficking.  I never personally

09:56AM   20    investigated him.  I don't even know if anybody in our office

09:56AM   21    did, but I'm certainly aware of him.

09:56AM   22    Q.   Are you aware of David Reynolds being investigated and

09:56AM   23    prosecuted?

09:56AM   24    A.   I don't know David Reynolds' name.

09:56AM   25    Q.   How about Ralph Acquino?  Do you recall that name as part

USA v Bongiovanni - Herbst - Singer/Cross - 8/7/24

| | | |
|---|---|---|
| 09:56AM | 1 | of your -- |
| 09:56AM | 2 | A.  I don't know that name either. |
| 09:56AM | 3 | Q.  So you do remember Gambino? |
| 09:56AM | 4 | A.  I do. |
| 09:56AM | 5 | Q.  But you don't remember the other two? |
| 09:56AM | 6 | A.  That's correct. |
| 09:56AM | 7 | Q.  And you do remember receiving information that Anthony |
| 09:56AM | 8 | Gerace is somebody who was involved in potential narcotics |
| 09:56AM | 9 | activity who was under investigation? |
| 09:56AM | 10 | A.  Yes. |
| 09:56AM | 11 | Q.  So Anthony Gerace, as you mentioned previous, is a |
| 09:56AM | 12 | brother to Peter Gerace, correct? |
| 09:56AM | 13 | A.  That's correct. |
| 09:56AM | 14 | Q.  And so he shares the same familial connection to the |
| 09:57AM | 15 | Todaros that Peter Gerace does, right? |
| 09:57AM | 16 | A.  He does. |
| 09:57AM | 17 | Q.  And he's also somebody who potentially, if you garnered |
| 09:57AM | 18 | leverage, could have potentially been used to get inside or |
| 09:57AM | 19 | used as a source for these cold case murders you're trying to |
| 09:57AM | 20 | investigate? |
| 09:57AM | 21 | A.  Yes, that's true. |
| 09:57AM | 22 | Q.  But you didn't take any type of investigative steps to -- |
| 09:57AM | 23 | A.  That's -- |
| 09:57AM | 24 | Q.  -- go about doing that -- |
| 09:57AM | 25 | A.  That's -- |

USA v Bongiovanni - Herbst - Singer/Cross - 8/7/24

| | | |
|---|---|---|
| 09:57AM | 1 | **THE COURT:** One at a time, guys. |
| 09:57AM | 2 | **BY MR. SINGER:** |
| 09:57AM | 3 | Q. -- doing that with Anthony Gerace, correct? |
| 09:57AM | 4 | A. That's correct. |
| 09:57AM | 5 | Q. So getting back to Peter Gerace, you never followed up |
| 09:57AM | 6 | with Special Agent Bongiovanni regarding whether his |
| 09:57AM | 7 | cooperation with Peter Gerace was something that was still |
| 09:57AM | 8 | ongoing, right? |
| 09:57AM | 9 | A. I did not. |
| 09:57AM | 10 | Q. And you didn't follow up with Special Agent Bongiovanni |
| 09:57AM | 11 | regarding whether the cooperation with Peter Gerace was |
| 09:57AM | 12 | completed, correct? |
| 09:57AM | 13 | A. No. |
| 09:57AM | 14 | Q. When you came to the assumption that Peter Gerace was |
| 09:58AM | 15 | acting as some type of confidential source for the DEA, I |
| 09:58AM | 16 | know you stopped your investigation, but did you provide |
| 09:58AM | 17 | Special Agent Bongiovanni with any of the materials? |
| 09:58AM | 18 | **MR. COOPER:** Objection as to the form of the |
| 09:58AM | 19 | question, Judge. When you came to the assumption that. |
| 09:58AM | 20 | **MR. SINGER:** That's what he testified to, Judge. |
| 09:58AM | 21 | **MR. COOPER:** That's not what he testified to, Judge. |
| 09:58AM | 22 | **THE COURT:** Overruled. |
| 09:58AM | 23 | **BY MR. SINGER:** |
| 09:58AM | 24 | Q. So, again, when you came to the assumption that Peter |
| 09:58AM | 25 | Gerace was going to be used as a confidential source by the |

USA v Bongiovanni - Herbst - Singer/Cross - 8/7/24

09:58AM    1   DEA, did you turn over any of your investigative files

09:58AM    2   regarding the activities that Peter Gerace was involved in?

09:58AM    3   A.  No.

09:58AM    4   Q.  And did you turn them over to Special Agent Bongiovanni?

09:58AM    5   A.  No.

09:58AM    6   Q.  Did you turn them over to the DEA in general?

09:58AM    7   A.  I did not.

09:58AM    8   Q.  You never followed up in any way whatsoever with the DEA

09:58AM    9   regarding what was going on with Peter Gerace?

09:58AM   10   A.  No, I -- I had the meeting with Agent Bongiovanni

09:58AM   11   regarding Peter Gerace and, you know, based on that meeting

09:59AM   12   and the calls from DEA to the FBI, and the conversation I had

09:59AM   13   with my supervisor at some point, I decided not to pursue

09:59AM   14   that after we knew of investigation because I thought that

09:59AM   15   Peter Gerace was -- meant more to DEA than he did to me, and

09:59AM   16   I had other avenues to pursue.

09:59AM   17   Q.  And as far as the cold case files is concerned, we talked

09:59AM   18   about how you didn't use Peter Gerace to get any inroads in

09:59AM   19   that file.

09:59AM   20   A.  That's correct.

09:59AM   21   Q.  And we talked about how you didn't use Anthony Gerace to

09:59AM   22   get any inroads on that file?

09:59AM   23   A.  That's correct.

09:59AM   24   Q.  And before you retired, that file wasn't closed out,

09:59AM   25   correct?

USA v Bongiovanni - Herbst - Singer/Cross - 8/7/24

09:59AM 1   A.  It was not.

09:59AM 2   Q.  Okay.  How many other cases do you think you investigated

09:59AM 3   during that time period besides this murder investigation

09:59AM 4   that you wanted to get into again?

09:59AM 5   A.  Maybe five or six at one time, including -- including a

09:59AM 6   wire.  You know --

09:59AM 7   Q.  Yeah.  And I guess, you know, what I'm getting at is you

09:59AM 8   joined Safe Streets Task Force when again?

10:00AM 9   A.  I went to the FBI office in Buffalo in November of 2007,

10:00AM 10  sometime right after Thanksgiving.  I was on another squad

10:00AM 11  for a short period of time.  So sometime in 2008, I can't

10:00AM 12  tell you exactly.

10:00AM 13  Q.  And you retired from FBI Buffalo at what point?

10:00AM 14  A.  2013.

10:00AM 15  Q.  And during that time period, '08 to '13, how many

10:00AM 16  different cases do you think you investigated on Squad 4?

10:00AM 17  A.  Boy.  At some point I switched to a different squad.  But

10:00AM 18  I would say a half dozen, maybe.

10:00AM 19  Q.  So this cold case murder case was one of those cases?

10:00AM 20  A.  Yes.

10:00AM 21  Q.  And the Peter Gerace case was one of those cases?

10:00AM 22  A.  Peter Gerace was, again, a sub file of the main file that

10:00AM 23  I was investigating.  So, yes.  But I'm not counting it as a

10:00AM 24  separate case, when I gave you the number of a half dozen,

10:01AM 25  but I'm not counting it as a separate case.

USA v Bongiovanni - Herbst - Singer/Cross - 8/7/24

10:01AM   1   Q.  So you mentioned that one of those other cases that you

10:01AM   2   were working on, that involved a wire investigation?

10:01AM   3   A.  Yes.

10:01AM   4   Q.  And that's a pretty intensive type of investigation?

10:01AM   5   A.  Yes, sir.

10:01AM   6   Q.  How many hours do you think you put into that one

10:01AM   7   particular case?

10:01AM   8   A.  A lot.

10:01AM   9   Q.  Yeah.  I guess, you know, I know -- we may know what "a

10:01AM  10   lot" is, but if you can explain to the jury:  What does "a

10:01AM  11   lot" mean in your parlance?

10:01AM  12   A.  More than Monday through Friday, and more than more than

10:01AM  13   9 to 5.  But each day is different, obviously.

10:01AM  14   Q.  So those cases require a substantial amount of resources

10:01AM  15   and attention?

10:01AM  16   A.  Absolutely.

10:01AM  17   Q.  And the other cases that you're working on, did they

10:01AM  18   involve wires or any other type investigation?

10:01AM  19   A.  They were other than wires.

10:01AM  20   Q.  Were there resources that were devoted to those cases

10:01AM  21   that went in excess of the cold case murder case we're

10:01AM  22   talking about?

10:01AM  23   A.  My resources?

10:01AM  24   Q.  Yeah.

10:01AM  25   A.  Yeah.

10:01AM   1   Q.  And it's a fair statement that those cases were more of a

10:01AM   2   focus of your time when you're with -- with Squad 4 and Safe

10:02AM   3   Streets?

10:02AM   4   A.  I think they were more of a priority of the squad.  My

10:02AM   5   main focus and priority would have been the cold case

10:02AM   6   homicide, but we don't need to go in depth on this, but it's,

10:02AM   7   you know, the focus of the Squad was Safe Streets.  Although

10:02AM   8   we had, you know, that you -- you characterized it correctly,

10:02AM   9   Squad 4 was the umbrella squad.  We had all the violent crime

10:02AM  10   violations, but -- and Organized Crime.  But Safe Streets was

10:02AM  11   the main priority, and you have limited resources.  So, the

10:02AM  12   cases that fit into the Safe Streets umbrella would have

10:02AM  13   been, certainly, the supervisor's priority.

10:02AM  14        MR. SINGER:  Understood.  Thank you very much.

10:02AM  15        Agent Herbst, I don't have any further questions.

10:02AM  16        THE WITNESS:  Thank you.

10:02AM  17        THE COURT:  Redirect?

10:02AM  18        MR. COOPER:  Just briefly, Judge.

10:02AM  19

10:02AM  20        REDIRECT EXAMINATION BY MR. COOPER:

10:02AM  21   Q.  Good morning, Special Agent Herbst.

10:02AM  22   A.  Good morning, sir.

10:02AM  23   Q.  You were asked some questions on cross-examination just

10:03AM  24   maybe two minutes ago about whether you provided Special

10:03AM  25   Agent Bongiovanni with your investigative materials into

USA v Bongiovanni - Herbst - Cooper/Redirect - 8/7/24

10:03AM    1    Peter Gerace's drug trafficking; do you remember when he

10:03AM    2    asked you those questions?

10:03AM    3    A.  I do.

10:03AM    4    Q.  Can you remind the jury, what did the defendant say to

10:03AM    5    you when you told him about the drug case that you had going

10:03AM    6    about Peter Gerace?

10:03AM    7    A.  He indicated it was not a very good case.

10:03AM    8    Q.  Did he seem interested in gathering your materials and

10:03AM    9    pursuing the case?

10:03AM    10   A.  Oh, no.  He wasn't going to pursue a case against Peter

10:03AM    11   Gerace, because Peter Gerace was working with him.  But

10:03AM    12   that's not the way it works.

10:03AM    13   Q.  He kind of pooh-poohed your case, right?

10:03AM    14   A.  He did.

10:03AM    15   Q.  Did anybody at the DEA ask you for your materials?

10:03AM    16   A.  No.

10:03AM    17   Q.  If they had, if he had called you and said, hey, Tom, can

10:03AM    18   you share your investigative materials with us?  Would you

10:03AM    19   have done that?

10:03AM    20   A.  Sure.

10:03AM    21   Q.  You were also asked some questions on cross-examination

10:04AM    22   about an -- I guess the word was used in the form of the

10:04AM    23   question that it was an assumption that Peter Gerace was this

10:04AM    24   defendant's source; do you remember being asked that

10:04AM    25   question?

USA v Bongiovanni - Herbst - Cooper/Redirect - 8/7/24

10:04AM  1   A.  I do.

10:04AM  2   Q.  Okay.  During the course of your lengthy career at the

10:04AM  3   FBI, have you had situations before where an informant has

10:04AM  4   been handed from one agency to another agency, or a

10:04AM  5   cooperator has been shared?

10:04AM  6   A.  It happens.  I don't know if I've had personal

10:04AM  7   experience.

10:04AM  8   Q.  Okay.  Did the defendant say to you during that meeting,

10:04AM  9   Tom, here's Peter, he can become your source?

10:04AM  10  A.  No.

10:04AM  11  Q.  Was there any form of those words at all used?

10:04AM  12  A.  No.

10:04AM  13  Q.  Was there a discussion about, hey, work with the FBI and

10:04AM  14  help them?

10:04AM  15  A.  No.

10:04AM  16  Q.  Did the defendant tell Peter Gerace in your presence,

10:04AM  17  hey, if you work with the FBI, maybe you can get yourself out

10:04AM  18  of trouble?

10:04AM  19  A.  No.

10:04AM  20  Q.  Did that topic come up at all?

10:04AM  21  A.  No.

10:04AM  22  Q.  You were asked some questions as well on

10:04AM  23  cross-examination about when's the last time you've looked at

10:05AM  24  some of your files and what reports you wrote, right?

10:05AM  25  A.  Correct.

USA v Bongiovanni - Herbst - Singer/Recross - 8/7/24

10:05AM    1    Q.  Was there any substantive information conveyed to you at

10:05AM    2    all during the meeting with Peter Gerace and this defendant?

10:05AM    3    A.  No.

10:05AM    4    Q.  Was there anything to write in a report?

10:05AM    5    A.  No.

10:05AM    6    Q.  If the defendant had told you here's Peter Gerace, he has

10:05AM    7    information on kilo-level cocaine traffickers, you can use

10:05AM    8    him; would you have documented that?

10:05AM    9    A.  Yes.

10:05AM   10    Q.  He didn't tell you that, did he?

10:05AM   11    A.  He did not.

10:05AM   12    Q.  You were asked some questions about the last time you've

10:05AM   13    looked at files; do you remember that?

10:05AM   14    A.  Yes.

10:05AM   15    Q.  You retired in 2013, right?

10:05AM   16    A.  That's correct.

10:05AM   17    Q.  Did you steal files from the FBI and hide them in your

10:05AM   18    basement?

10:05AM   19    A.  No.

10:05AM   20         MR. COOPER:  I have no further questions, Judge.

10:05AM   21         THE COURT:  Anything more, Mr. Singer?

10:05AM   22         MR. SINGER:  Yeah.

10:05AM   23

10:05AM   24              RECROSS-EXAMINATION BY MR. SINGER:

10:05AM   25    Q.  So, Agent Herbst, at this meeting with Peter Gerace, I

USA v Bongiovanni - Herbst - Singer/Recross - 8/7/24

10:05AM    1    know you have a limited recollection of it, but I want to get

10:05AM    2    into that a little bit more because you just got asked

10:05AM    3    questions on redirect.

10:05AM    4        Did Peter Gerace talk to you about any information that

10:06AM    5    he had?

10:06AM    6    A.   No.

10:06AM    7    Q.   Did Peter Gerace tell you about cocaine information that

10:06AM    8    he may have had?

10:06AM    9    A.   No.

10:06AM   10    Q.   Did Peter Gerace talk to you about why he wanted to

10:06AM   11    cooperate with you vis-à-vis his violation?

10:06AM   12    A.   No.

10:06AM   13    Q.   So he didn't say much of anything, right?

10:06AM   14    A.   He did not.

10:06AM   15    Q.   And did you ask him any specific questions about

10:06AM   16    information that he had?

10:06AM   17    A.   No.

10:06AM   18    Q.   So you never asked him any questions about whether he

10:06AM   19    knew something about cocaine dealers?

10:06AM   20    A.   No.  The meeting was more -- it was an odd meeting.  But

10:06AM   21    it was more, again, I went over to the DEA office, I met with

10:06AM   22    Agent Bongiovanni initially, went down to the mezzanine

10:06AM   23    level.  And then I believe Mr. Gerace called, and Agent

10:06AM   24    Bongiovanni told him to meet us at the -- in the mezzanine

10:06AM   25    level as he walked in the lobby.  And we had the meeting.

10:06AM    1    It was kind of, like, a get to know each other kind of

10:06AM    2    meeting.  I don't know how to describe it.  But it wasn't a

10:06AM    3    substantive meeting.  And I had -- I had already met

10:07AM    4    Mr. Gerace.

10:07AM    5    Q.  Again, so, this is somewhat similar to the same meeting

10:07AM    6    you had with Peter Gerace at Pharaoh's Gentlemen's Club back

10:07AM    7    on Halloween of 2009, correct?

10:07AM    8    A.  I think that's a correct characterization.

10:07AM    9    Q.  So you're just gabbing about things that don't have

10:07AM   10    anything to do with cases?

10:07AM   11    A.  Yes, sir.

10:07AM   12    Q.  Building a rapport?

10:07AM   13    A.  Yes.

10:07AM   14    Q.  But you're not getting down to the brass tacks of, hey,

10:07AM   15    this is the information that I have to provide you?

10:07AM   16    A.  That's correct.

10:07AM   17    Q.  And you've had situations before in your career where the

10:07AM   18    hope is, is that a person may be developed as a source,

10:07AM   19    right?

10:07AM   20    A.  Yes.

10:07AM   21    Q.  But ultimately that doesn't happen, correct?

10:07AM   22    A.  That's correct.

10:07AM   23    Q.  Because sometimes a source is not willing to move forward

10:07AM   24    with the information they have and tell you about it,

10:07AM   25    correct?

10:07AM   1   A.  That's correct.

10:07AM   2   Q.  And there could be a variety of reasons in your training

10:07AM   3   and experience why that happens, correct?

10:07AM   4   A.  That's correct.

10:07AM   5   Q.  So, for instance, a source can get fearful about

10:07AM   6   retaliation and, therefore, not share that information,

10:07AM   7   correct?

10:07AM   8   A.  That's correct.

10:07AM   9   Q.  Or a source can no longer be subject to the same type of

10:08AM   10   leverage that you think you may have, and therefore they make

10:08AM   11   the conclusion I don't really have to cooperate here,

10:08AM   12   correct?

10:08AM   13   A.  Correct.

10:08AM   14         **MR. COOPER:**  I would object, outside the scope.

10:08AM   15         **THE COURT:**  No, I don't think so.  Overruled.

10:08AM   16         **THE WITNESS:**  That's correct.

10:08AM   17         **BY MR. SINGER:**

10:08AM   18   Q.  That's correct.  So you learned about later, like you

10:08AM   19   talked about on cross-examination, that Mr. Lepiane's office

10:08AM   20   was going to cite Mr. Gerace for a violation, correct?

10:08AM   21   A.  Correct.

10:08AM   22   Q.  But that violation was only going to require location

10:08AM   23   monitoring?

10:08AM   24         **MR. COOPER:**  Objection.  Again, outside redirect,

10:08AM   25   Judge.

USA v Bongiovanni - Herbst - Singer/Recross - 8/7/24

| | | |
|---|---|---|
| 10:08AM | 1 | **THE COURT:**  No.  Overruled. |
| 10:08AM | 2 | **THE WITNESS:**  Correct. |
| 10:08AM | 3 | **BY MR. SINGER:** |
| 10:08AM | 4 | Q.  Wasn't going to involve jail time anymore, correct? |
| 10:08AM | 5 | A.  Correct. |
| 10:08AM | 6 | Q.  And after learning that fact, you never heard from Peter |
| 10:08AM | 7 | Gerace again, correct? |
| 10:08AM | 8 | A.  Well, I wouldn't have expected to hear from Peter Gerace. |
| 10:08AM | 9 | I would have expected -- in that context, I would have |
| 10:08AM | 10 | expected to hear from Agent Bongiovanni, you know, if, in |
| 10:08AM | 11 | fact, the FBI was getting involved in the investigation, but |
| 10:08AM | 12 | I didn't expect to hear from Peter Gerace. |
| 10:08AM | 13 | Q.  But you didn't hear from DEA after that point either, did |
| 10:08AM | 14 | you? |
| 10:08AM | 15 | A.  I did not. |
| 10:09AM | 16 | **MR. SINGER:**  Thank you.  I have no further questions, |
| 10:09AM | 17 | Judge. |
| 10:09AM | 18 | **THE COURT:**  Anything more? |
| 10:09AM | 19 | **MR. COOPER:**  No, thank you, Judge. |
| 10:09AM | 20 | **THE COURT:**  You can step down, sir. |
| 10:09AM | 21 | **THE WITNESS:**  Thank you, Your Honor. |
| | 22 | (Witness excused at 10:09 a.m.) |
| | 23 | (Excerpt concluded at 10:09 a.m.) |
| | 24 | *    *    *    *    *    *    * |
| | 25 | |

1

2                           **CERTIFICATE OF REPORTER**

3

4                    In accordance with 28, U.S.C., 753(b), I

5       certify that these original notes are a true and correct

6       record of proceedings in the United States District Court for

7       the Western District of New York on August 7, 2024.

8

9

10                          s/ Ann M. Sawyer
                            Ann M. Sawyer, FCRR, RPR, CRR
11                          Official Court Reporter
                            U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          **TRANSCRIPT INDEX**

3        **EXCERPT - CONTINUED EXAMINATION OF THOMAS HERBST**

4                           **AUGUST 7, 2024**

5

6

7     **W I T N E S S**                          **P A G E**

8     **T H O M A S   H E R B S T**                  2

9        CROSS-EXAMINATION BY MR. SINGER (CONT'D):    2

10       REDIRECT EXAMINATION BY MR. COOPER:          14

11       RECROSS-EXAMINATION BY MR. SINGER:           17

12

13

14

15

16

17

18

19

20

21

22

23

24

25