10:09AM

1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF NEW YORK
2
   _____
3  UNITED STATES OF AMERICA,
                                    Case No. 1:19-cr-227
4              Plaintiff,                     (LJV)
   v.
5                                   August 7, 2024
   JOSEPH BONGIOVANNI,
6
   _____Defendant.
7

8   TRANSCRIPT EXCERPT - EXAMINATION OF CHRISTOPHER WISNIEWSKI
            BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                 UNITED STATES DISTRICT JUDGE

10 APPEARANCES:          TRINI E. ROSS, UNITED STATES ATTORNEY
                         BY: JOSEPH M. TRIPI, ESQ.
11                           NICHOLAS T. COOPER, ESQ.
                             CASEY L. CHALBECK, ESQ.
12                       Assistant United States Attorneys
                         Federal Centre, 138 Delaware Avenue
13                       Buffalo, New York 14202
                         For the Plaintiff
14
                         SINGER LEGAL PLLC
15                       BY: ROBERT CHARLES SINGER, ESQ.
                         80 East Spring Street
16                       Williamsville, New York 14221
                            And
17                       LAW OFFICES OF PARKER ROY MacKAY
                         BY: PARKER ROY MacKAY, ESQ.
18                       3110 Delaware Avenue
                         Kenmore, New York 14217
19                          And
                         OSBORN, REED & BURKE, LLP
20                       BY: JOHN J. GILSENAN, ESQ.
                         120 Allens Creek Road
21                       Rochester, New York 14618
                         For the Defendant
22
   PRESENT:              BRIAN A. BURNS, FBI Special Agent
23                       MARILYN K. HALLIDAY, HSI Special Agent
                         KAREN A. CHAMPOUX, USA Paralegal
24
   LAW CLERK:            REBECCA FABIAN IZZO, ESQ.
25

1  **COURT DEPUTY CLERK:  COLLEEN M. DEMMA**

2  **COURT REPORTER:        ANN MEISSNER SAWYER, FCRR, RPR, CRR**
                             Robert H. Jackson Federal Courthouse
3                            2 Niagara Square
                             Buffalo, New York  14202
4                            Ann_Sawyer@nywd.uscourts.gov

5

6                    *    *    *    *    *    *    *

7

8             (Excerpt commenced at 10:09 a.m.)

9             (Jury is present.)

10:09AM   10        **THE COURT:**  The government can call its next witness.

10:09AM   11        **MR. COOPER:**  Thank you, Judge.  The government calls

10:09AM   12  Special Agent Chris Wisniewski from the DEA.

10:09AM   13

10:09AM   14  **C H R I S T O P H E R   W I S N I E W S K I**, having been duly

10:10AM   15  called and sworn, testified as follows:

10:10AM   16        **MR. COOPER:**  May I inquire, Judge?

10:10AM   17        **THE COURT:**  You may.

10:10AM   18

10:10AM   19                  **DIRECT-EXAMINATION BY MR. COOPER:**

10:10AM   20  Q.  Good morning, sir.  Would you introduce yourself to the

10:10AM   21  jury, please?

10:10AM   22  A.  Good morning, jury.  My name is Chris Wisniewski.  I'm a

10:10AM   23  special agent with the DEA here in Buffalo.

10:10AM   24  Q.  And how old are you, Chris?

10:10AM   25  A.  I'm going to be 50 this year.

10:10AM  1   Q.  Where did you grow up at?

10:10AM  2   A.  Connecticut.

10:10AM  3   Q.  And you mentioned that you're a special agent with the

10:10AM  4   DEA here in Buffalo?

10:10AM  5   A.  Yes.

10:10AM  6   Q.  When did you begin your career with the DEA?

10:10AM  7   A.  I was hired in 1998.

10:10AM  8   Q.  And before that, what kind of educational background did

10:10AM  9   you have?

10:10AM  10  A.  I went to college and law school.

10:10AM  11  Q.  And did you apply for a job with the DEA sometime after

10:10AM  12  finishing law school?

10:10AM  13  A.  While I was in law school.

10:10AM  14  Q.  You applied while you were in law school?

10:10AM  15  A.  Yes.

10:10AM  16  Q.  That's auspicious.  And what year did you begin work at

10:10AM  17  the DEA?

10:10AM  18  A.  In 1998.

10:10AM  19  Q.  And do you go through some training at the beginning of

10:11AM  20  your career?

10:11AM  21  A.  Yes.

10:11AM  22  Q.  Can you explain that for the jurors?

10:11AM  23  A.  After you get hired from your office of hire, you get

10:11AM  24  sent down to Quantico, Virginia where, at the time, all DEA

10:11AM  25  agents trained at the FBI Academy.  Separate classes, but

10:11AM   1    same buildings, same dormitories, same ranges, things of that

10:11AM   2    nature.

10:11AM   3        I want to say that the course is about 16 weeks long, and

10:11AM   4    covered basic law enforcement procedures, tactics, law,

10:11AM   5    things of that nature.

10:11AM   6    Q.  After that 16-week academy, do you receive an initial

10:11AM   7    assignment, a location where you have to go work?

10:11AM   8    A.  At some point in the academy, they -- yes, they give you

10:11AM   9    a preference sheet, and then you can pick at the time when

10:11AM   10   you went there you can pick three locations off the list.

10:11AM   11   Q.  And where did you go first after Quantico?

10:11AM   12   A.  To Buffalo.

10:11AM   13   Q.  When you arrived at Buffalo, what was your title there?

10:12AM   14   A.  Special agent.

10:12AM   15   Q.  Okay.  And what kinds of crimes, generally, just give

10:12AM   16   them an idea, what kind of crimes did you investigate?

10:12AM   17   A.  Drug crimes, financial crimes.

10:12AM   18   Q.  I want to speak with you now about the timeframe of 2008,

10:12AM   19   okay?

10:12AM   20   A.  Okay.

10:12AM   21   Q.  In 2008, were you working as a special agent at the DEA?

10:12AM   22   A.  Yes.

10:12AM   23   Q.  Okay.  And at that point, would it be fair to say that

10:12AM   24   you've been a special agent for about ten years?

10:12AM   25   A.  Yes.

| | | |
|---|---|---|
| 10:12AM | 1 | Q. Do you have some experience at that point? |
| 10:12AM | 2 | A. Yes. |
| 10:12AM | 3 | Q. Have you handled a number of different types of cases? |
| 10:12AM | 4 | A. Yes. |
| 10:12AM | 5 | Q. Where was the DEA office base physically located in 2008? |
| 10:12AM | 6 | A. I believe it was in the Electric Tower at that point. |
| 10:12AM | 7 | Q. At some point around that timeframe, did the DEA move to |
| 10:12AM | 8 | the Electric Tower? |
| 10:12AM | 9 | A. Yes, we started in the Guaranty Building, and then at |
| 10:12AM | 10 | some point during my career we moved over there to the |
| 10:12AM | 11 | Electric Tower. |
| 10:12AM | 12 | Q. Can you describe for the jury generally what the office |
| 10:12AM | 13 | space inside the Electric Tower looked like at the DEA? |
| 10:13AM | 14 | A. We had one whole floor, one entire floor, probably a half |
| 10:13AM | 15 | of another floor. Most of the work spaces were just what we |
| 10:13AM | 16 | called open bays. They were rows, long rows of low cubicles |
| 10:13AM | 17 | where the agents and task force officers faced each other and |
| 10:13AM | 18 | sat side by side in a long line. Pardon me. |
| 10:13AM | 19 | And then the supervisor's office was located at one of |
| 10:13AM | 20 | the ends. |
| 10:13AM | 21 | Q. You mentioned that there were those kind of low cubicles |
| 10:13AM | 22 | and a low bay, as you described it, would it be fair to say |
| 10:13AM | 23 | that it was easy to overhear conversations that were going on |
| 10:13AM | 24 | from other agents and other task force officers? |
| 10:13AM | 25 | A. Yes. |

10:13AM 1    Q.  Did the space appear, in your estimation, to be designed

10:13AM 2    to facilitate open communication?

10:13AM 3    A.  Yes.

10:13AM 4    Q.  Is open communication between special agents and task

10:14AM 5    force officers an important part of work as a special agent?

10:14AM 6    A.  Yes.

10:14AM 7    Q.  Why?  Can you tell them?

10:14AM 8    A.  The way that we investigate drug cases, you basically

10:14AM 9    can't do it alone.  You, for almost any kind of operation you

10:14AM 10   go on, you have to take team members with you.  Even when

10:14AM 11   you're doing something simple like conducting interviews, you

10:14AM 12   have another person with you.  Surveillance operations where

10:14AM 13   we would go and watch people, we would take, you know,

10:14AM 14   multiple vehicles and people.

10:14AM 15       So, sharing information is pretty vital in that line of

10:14AM 16   work.

10:14AM 17   Q.  Now, you mentioned that sometimes, if you're going to do

10:14AM 18   an interview you'd bring a partner with you.  Did DEA have or

10:14AM 19   did DEA special agents frequently work with a partner?

10:14AM 20   A.  Yes.  Yes.

10:14AM 21   Q.  And was that kind of a formalized partnership, selected

10:15AM 22   by management?  Or informal, selected by the people who are

10:15AM 23   working together?

10:15AM 24   A.  It was mostly informal.

10:15AM 25   Q.  Do you know a person by the name of Joseph Bongiovanni?

USA v Bongiovanni - Wisniewski - Cooper/Direct - 8/7/24

10:15AM   1   A.  I do.

10:15AM   2   Q.  How do you know that person?

10:15AM   3   A.  We worked together.

10:15AM   4   Q.  Did you work together -- approximately how long would you

10:15AM   5   say you worked with that individual?

10:15AM   6   A.  We met at the academy, so over 25 years.

10:15AM   7   Q.  As you sit here today, do you have any strong personal

10:15AM   8   feelings about him?

10:15AM   9   A.  Not one way or the other.  I like the guy.

10:15AM   10   Q.  Do you have any animosity towards him?

10:15AM   11   A.  No.

10:15AM   12   Q.  Are you excited about being here today?

10:15AM   13   A.  No.

10:15AM   14   Q.  Was he ever your partner?

10:15AM   15   A.  No.

10:15AM   16   Q.  Is he in court today?

10:15AM   17   A.  Yes.

10:15AM   18   Q.  Would you point him out and identify an article of

10:15AM   19   clothing for the record?

10:15AM   20   A.  He's the gentleman in the red and blue tie, sitting in

10:15AM   21   the middle.

10:15AM   22        **MR. COOPER:**  For the record, Judge, indicating the

10:15AM   23   defendant.

10:15AM   24        **THE COURT:**  It does.

10:15AM   25        **MR. COOPER:**  Thank you.

|          |    |                                                                    |
|----------|----|--------------------------------------------------------------------|
| 10:15AM  | 1  | **BY MR. COOPER:**                                                  |
| 10:15AM  | 2  | Q.  Despite the fact that you never partnered up with the          |
| 10:15AM  | 3  | defendant, were there times when you would engage in               |
| 10:16AM  | 4  | investigative activity together?                                   |
| 10:16AM  | 5  | A.  Yes.                                                            |
| 10:16AM  | 6  | Q.  Was he a frequent person you would seek out to work with?      |
| 10:16AM  | 7  | A.  We were on the same groups together, yes, we worked           |
| 10:16AM  | 8  | together almost on a daily basis.                                  |
| 10:16AM  | 9  | Q.  So my question is:  Is he someone you would seek out to        |
| 10:16AM  | 10 | go out and do something with?                                      |
| 10:16AM  | 11 | A.  No, I usually go with my partner.                              |
| 10:16AM  | 12 | Q.  Okay.  Have you heard the term DEA-6?                          |
| 10:16AM  | 13 | A.  Yes.                                                            |
| 10:16AM  | 14 | Q.  Okay.  I'm sure you've heard it quite a bit, right?           |
| 10:16AM  | 15 | A.  Yes.                                                            |
| 10:16AM  | 16 | Q.  Can you tell the jury what a DEA-6 is?                         |
| 10:16AM  | 17 | A.  It's a standard narrative report form where we write          |
| 10:16AM  | 18 | about investigative steps that we took.                            |
| 10:16AM  | 19 | Q.  Is that something all DEA special agents learn to do          |
| 10:16AM  | 20 | pretty early on?                                                   |
| 10:16AM  | 21 | A.  Right from the academy.                                        |
| 10:16AM  | 22 | Q.  Okay.  And is it important that when you generate a DEA-6     |
| 10:16AM  | 23 | and you write information in it, that that information be         |
| 10:16AM  | 24 | accurate?                                                          |
| 10:16AM  | 25 | A.  Yes.                                                            |

USA v Bongiovanni - Wisniewski - Cooper/Direct - 8/7/24
9

| | | |
|---|---|---|
| 10:16AM | 1 | Q.  Is it important that, to the best of your ability, the |
| 10:17AM | 2 | information that you report be truthful? |
| 10:17AM | 3 | A.  Yes. |
| 10:17AM | 4 | Q.  Why is that important? |
| 10:17AM | 5 | A.  Because all these reports are later used in prosecution. |
| 10:17AM | 6 | They can be used to launch other cases.  They're used to |
| 10:17AM | 7 | facilitate forfeiture actions.  And we rely on those reports |
| 10:17AM | 8 | to refresh our recollection when we come to court. |
| 10:17AM | 9 | Q.  When you work at the DEA investigating drug-trafficking |
| 10:17AM | 10 | offenses, would it be fair to say that a lot of the cases you |
| 10:17AM | 11 | investigate involve more than one target or suspect? |
| 10:17AM | 12 | A.  Yes. |
| 10:17AM | 13 | Q.  Are you often targeting organizations? |
| 10:17AM | 14 | A.  Yes. |
| 10:17AM | 15 | Q.  Have you heard of something called an organizational |
| 10:17AM | 16 | chart? |
| 10:17AM | 17 | A.  Yes. |
| 10:17AM | 18 | Q.  Can you describe for the jury what an organizational |
| 10:17AM | 19 | chart is? |
| 10:17AM | 20 | A.  An organization -- sorry, an organizational chart is |
| 10:17AM | 21 | basically -- most times it's like a box, a circle, or line |
| 10:18AM | 22 | diagram where you list names, phone numbers, addresses, and |
| 10:18AM | 23 | you sort of arrange them in a way that makes sense as a |
| 10:18AM | 24 | picture for investigators to sort of look at it and |
| 10:18AM | 25 | understand what you're dealing with as far as your case goes |

10:18AM  1   at that time.

10:18AM  2   Q.  You said a -- a box and line diagram, or a circle and

10:18AM  3   line diagram; is that correct?

10:18AM  4   A.  Yes.  Yes.

10:18AM  5   Q.  And generally, just speaking in generalities, would it

10:18AM  6   have names of different individuals involved in an

10:18AM  7   organization?

10:18AM  8   A.  It could.

10:18AM  9   Q.  And would the lines indicate connections between those

10:18AM  10  individuals?

10:18AM  11  A.  Yes.

10:18AM  12  Q.  And, generally, is there -- at least there's intended to

10:18AM  13  be some rhyme or reason in terms of how the organizational

10:18AM  14  chart is organized, right?

10:18AM  15  A.  Yes.

10:18AM  16  Q.  Trying to kind of create an image out of an organization

10:18AM  17  that exists in real life, right?

10:18AM  18  A.  Yes.

10:18AM  19  Q.  Is an organizational chart related to an organization

10:19AM  20  that the DEA is actively investigating a document that needs

10:19AM  21  to be handled delicately?

10:19AM  22  A.  Usually, yes, sir.

10:19AM  23  Q.  Is it something that you'd go home and post on your

10:19AM  24  Facebook account?

10:19AM  25  A.  No.

10:19AM  1    Q.  Would you show it to a friend at a bar who wasn't

10:19AM  2    involved in law enforcement?

10:19AM  3    A.  No.

10:19AM  4    Q.  Would it be fair to say that if an organizational chart

10:19AM  5    ended up in the hands of a wrong person, it could derail an

10:19AM  6    investigation?

10:19AM  7    A.  Potentially.

10:19AM  8    Q.  During the course of your career, did you participate in

10:19AM  9    an investigation involving an individual named David Gambino?

10:19AM  10   A.  Yes.

10:19AM  11   Q.  What was your role at the DEA in that investigation?

10:19AM  12   A.  When the case started, I was one of the case agents.

10:19AM  13   Q.  Now you said when the case started.  Can you estimate for

10:19AM  14   the jury when that case started from your point of view?

10:20AM  15   A.  I don't recall specifically.  It was a very long time

10:20AM  16   ago.  But I want to say that it was an '06 file number, so

10:20AM  17   the case would have formally been opened in 2006.

10:20AM  18   Q.  And those file numbers operate off of the fiscal year,

10:20AM  19   right?

10:20AM  20   A.  Yes.

10:20AM  21   Q.  So, and you indicated this, but you're estimating

10:20AM  22   somewhere around 2006; is that correct?

10:20AM  23   A.  Yes.

10:20AM  24   Q.  Was DEA the only law enforcement agency that was involved

10:20AM  25   in that investigation?

10:20AM   1    A.  No.

10:20AM   2    Q.  Can you tell the jury what other law enforcement agencies

10:20AM   3    were involved?

10:20AM   4    A.  It was designated as a higher level investigation.  So,

10:20AM   5    the main partner agencies were ICE -- or Homeland Security

10:20AM   6    Investigations, as it's known now -- the IRS, ATF was pretty

10:20AM   7    heavily involved at the beginning, of course the DEA.  We

10:20AM   8    also partnered with the FBI, Buffalo police, sheriff's

10:21AM   9    department, Amherst police, Town of Tonawanda.

10:21AM  10        Basically, wherever the organization operated, we sought

10:21AM  11    assistance and information from the local and state

10:21AM  12    authorities there.

10:21AM  13    Q.  And one of the agencies that you mentioned was HSI or

10:21AM  14    ICE; is that correct?

10:21AM  15    A.  Yes.

10:21AM  16    Q.  And that's Homeland Security Investigations?

10:21AM  17    A.  Yes.

10:21AM  18    Q.  Was there a point person or a lead agent from HSI

10:21AM  19    involved in the Gambino investigation when you were involved

10:21AM  20    in it?

10:21AM  21    A.  Yes.

10:21AM  22    Q.  Who was that person?

10:21AM  23    A.  Initially it was Joseph Dubreville, but he was replaced

10:21AM  24    by TJ Webb.

10:21AM  25    Q.  Are those both special agents with Homeland Security?

10:21AM  1   A.  Yes.

10:21AM  2   Q.  Can you give a brief summary, like just a 30,000-foot

10:21AM  3   view for the jury, what that investigation entailed, what was

10:21AM  4   it about?

10:21AM  5   A.  It was an interstate cocaine and marijuana case.

10:22AM  6   Q.  Was there a general geographic location in Western

10:22AM  7   New York where targets of that investigation either lived or

10:22AM  8   hung out?

10:22AM  9   A.  A lot of the targets were from, like, the North Buffalo

10:22AM  10  area.  They lived and hung out in that area near the

10:22AM  11  Tonawanda/Amherst lines.

10:22AM  12  Q.  Was there a suspected nexus to Italian Organized Crime

10:22AM  13  involved in that investigation?

10:22AM  14  A.  Yes.

10:22AM  15  Q.  I want to -- so sometime around 2006, you indicated you

10:22AM  16  became involved in the Gambino investigation, right?

10:22AM  17  A.  Yes.

10:22AM  18  Q.  And you've described it was kind of a large

10:22AM  19  investigation, right?

10:22AM  20  A.  Yes.

10:22AM  21  Q.  Did it go on for a number of years?

10:22AM  22  A.  Yes.

10:22AM  23  Q.  I want to fast forward now to 2008.

10:22AM  24      In 2008, do you remember getting contacted by somebody

10:22AM  25  regarding an organizational chart in the Gambino

| 10:22AM | 1 | investigation? |
| 10:22AM | 2 | A.   Yes. |
| 10:22AM | 3 | Q.   Who contacted you? |
| 10:22AM | 4 | A.   Special Agent Webb. |
| 10:22AM | 5 | Q.   Is that TJ Webb from HSI that we just spoke about? |
| 10:23AM | 6 | A.   Yes. |

10:23AM  7  Q.   Before Special Agent Webb contacted you about that

10:23AM  8  organizational chart, had anyone else ever contacted you

10:23AM  9  about the organizational chart?

10:23AM  10  A.   Not that I recall.

10:23AM  11  Q.   Was Special Agent Webb, based on your -- was that a phone

10:23AM  12  call or an in-person discussion?

10:23AM  13  A.   Again, it was a really long time ago.  But from what I

10:23AM  14  recall, I believe he called me initially to tell me what he

10:23AM  15  learned.

10:23AM  16  Q.   Where were you when you got that phone call?

10:23AM  17  A.   I believe I was at the U.S. Attorney's office.

10:23AM  18  Q.   On the Gambino case, or another case?

10:23AM  19  A.   I don't recall.

10:23AM  20  Q.   So you're at the U.S. Attorney's Office, and you receive

10:23AM  21  a phone call from Special Agent Webb; is that correct?

10:23AM  22  A.   I believe so.

10:23AM  23  Q.   And did Special Agent Webb appear excited or interested

10:23AM  24  in the information that he had learned?

10:23AM  25  A.   Yes.

Case 1:19-cr-00227-LJV-MJR    Document 1144    Filed 08/24/24    Page 15 of 64
USA v Bongiovanni - Wisniewski - Cooper/Direct - 8/7/24

15

10:23AM  1   Q.  Did you agree to meet with him and discuss it?

10:23AM  2   A.  Yes.

10:23AM  3   Q.  Now, as you sit here today in 2024, do you remember if

10:24AM  4   that meeting occurred the same day or shortly thereafter?

10:24AM  5   A.  I don't recall.  It was -- if it wasn't that same day,

10:24AM  6   then was shortly thereafter.

10:24AM  7   Q.  Do you recall ultimately having a meeting with Special

10:24AM  8   Agent Webb to discuss the organizational chart?

10:24AM  9   A.  Yes.

10:24AM  10  Q.  Where did that meeting occur?

10:24AM  11  A.  In my office, in my bay.

10:24AM  12  Q.  Is that at the Electric Tower?

10:24AM  13  A.  Yes.

10:24AM  14  Q.  And your "bay," as you described earlier, are those kind

10:24AM  15  of low cubicles in the open area; is that correct?

10:24AM  16  A.  Yes.

10:24AM  17  Q.  Are there other DEA agents milling around when you're

10:24AM  18  having conversations like that?

10:24AM  19  A.  Yes.

10:24AM  20  Q.  Are there other task force officers milling around when

10:24AM  21  you're having conversations?

10:24AM  22  A.  Yes.

10:24AM  23  Q.  Did Special Agent Webb bring that organizational chart to

10:24AM  24  the meeting with you?

10:24AM  25  A.  Yes.

USA v Bongiovanni - Wisniewski - Cooper/Direct - 8/7/24

| 10:24AM | 1 | Q. Did you discuss what was contained on it? |
| 10:24AM | 2 | A. Yes. |
| 10:24AM | 3 | Q. Does DEA sometimes assign cold case agents to cases? |
| 10:25AM | 4 | A. Yes. |
| 10:25AM | 5 | Q. Did you have a cold case agent from the DEA on the |
| 10:25AM | 6 | Gambino investigation? |
| 10:25AM | 7 | A. I did, yes. |
| 10:25AM | 8 | Q. Who was it? |
| 10:25AM | 9 | A. My partner, Christian Ulmer. |
| 10:25AM | 10 | Q. Was the defendant the co-case agent on the Gambino |
| 10:25AM | 11 | investigation? |
| 10:25AM | 12 | A. I'm sorry? |
| 10:25AM | 13 | Q. Was the defendant, Joe Bongiovanni, a co-case agent on |
| 10:25AM | 14 | the Gambino investigation? |
| 10:25AM | 15 | A. Oh, I'm sorry.  No, he wasn't. |
| 10:25AM | 16 | Q. At some point after Special Agent Webb brought this |
| 10:25AM | 17 | organizational chart to the DEA, and you had a discussion |
| 10:25AM | 18 | with him about it in the bay, did defendant Joseph |
| 10:25AM | 19 | Bongiovanni approach you to discuss a name that was on that |
| 10:25AM | 20 | organizational chart? |
| 10:25AM | 21 | A. Yes. |
| 10:25AM | 22 | Q. Who was the person he came up to you to discuss? |
| 10:26AM | 23 | A. Peter Gerace. |
| 10:26AM | 24 | Q. Was his name on the organizational chart? |
| 10:26AM | 25 | A. Yes. |

10:26AM 1  Q.  I'm holding what's marked as Government Exhibit 30B.

10:26AM 2      **MR. COOPER:**  May I approach the witness?

10:26AM 3      **THE COURT:**  You may.

10:26AM 4      **BY MR. COOPER:**

10:26AM 5  Q.  Take a moment and look through that three-page document,

10:26AM 6  sir, and when you're finished look up.

10:26AM 7      Do you recognize that?

10:26AM 8  A.  I do.  From my trial prep.

10:26AM 9  Q.  Is that a DEA-6 report?

10:26AM 10 A.  Yes.

10:26AM 11 Q.  Is there a case number on it?

10:26AM 12 A.  Yes.

10:26AM 13 Q.  Do you recognize the case number?

10:26AM 14 A.  Yes.

10:26AM 15 Q.  Okay.

10:26AM 16 A.  I do.

10:26AM 17 Q.  On the third page, or it's the second piece of paper,

10:27AM 18 it's double sided, is there an organizational chart?

10:27AM 19 A.  Yes.

10:27AM 20 Q.  Do you recognize that?

10:27AM 21 A.  Yes.

10:27AM 22 Q.  Starting with that organizational chart, is that a fair

10:27AM 23 and accurate depiction of the organizational chart that

10:27AM 24 Special Agent Webb brought to you and discussed with you at

10:27AM 25 the DEA?

Case 1:19-cr-00227-LJV-MJR    Document 1144    Filed 08/24/24    Page 18 of 64
USA v Bongiovanni - Wisniewski - Cooper/Direct - 8/7/24

18

10:27AM  1    A.  Yes.

10:27AM  2    Q.  And that DEA-6, is that a fair and accurate depiction of

10:27AM  3    a DEA-6 report that was entered into your file on the, as

10:27AM  4    you've called it, the David Gambino investigation?

10:27AM  5    A.  Yes.

10:27AM  6            MR. COOPER:  Judge, I'd offer Exhibit 30B into

10:27AM  7    evidence.

10:27AM  8            MR. MacKAY:  No objection.

10:27AM  9            THE COURT:  Received without objection.

10:27AM  10           (GOV Exhibit 30B was received in evidence.)

10:27AM  11           BY MR. COOPER:

10:27AM  12   Q.  May I have that back, sir?

10:27AM  13   A.  Sure.

10:27AM  14           MR. COOPER:  If we can publish to the jury just the

10:27AM  15   third page of Exhibit 30B right now.

10:27AM  16           BY MR. COOPER:

10:28AM  17   Q.  Sir, can you see that up on your screen?

10:28AM  18   A.  Yes.

10:28AM  19   Q.  Can you circle the name that the defendant came up to

10:28AM  20   speak with you about?

10:28AM  21       If you touch the screen, it should draw on it, hopefully.

10:28AM  22   A.  This one.

10:28AM  23           MR. COOPER:  Just for the record, Judge, there's a

10:28AM  24   green circle surrounding the box with Peter "Gerasi" Jr.

10:28AM  25   towards the top of the center of the exhibit?

10:28AM 1    **THE COURT:**  That's accurate.

10:28AM 2    **BY MR. COOPER:**

10:28AM 3    Q.  Special Agent Webb, the location of that name on this

10:28AM 4    organizational chart, would you term that as towards the top

10:28AM 5    of the chart?

10:28AM 6    A.  Yeah, top middle, upper middle.

10:28AM 7    Q.  And you just got my next question, but it's in the

10:28AM 8    center, right?

10:28AM 9    A.  Yes.

10:28AM 10   Q.  You described for us before that these organizational

10:28AM 11   charts are often box and line diagrams, right?

10:28AM 12   A.  Yes.

10:28AM 13   Q.  Is that what this chart is?

10:28AM 14   A.  Yes.

10:28AM 15   Q.  Are there a bunch of different lines coming off the name

10:29AM 16   Peter "Gerasi" Jr.

10:29AM 17   A.  Yes.

10:29AM 18   Q.  Those go to a variety of different names and individuals;

10:29AM 19   is that right?

10:29AM 20   A.  Yes.

10:29AM 21   Q.  When you got this chart from Special Agent TJ Webb did

10:29AM 22   you bring it over to the defendant and hand it to him?

10:29AM 23   A.  No.

10:29AM 24   Q.  Did you try to start a discussion with him about it?

10:29AM 25   A.  I don't recall.

10:29AM  1    Q.  Who started the discussion about the name Peter Gerace?

10:29AM  2    A.  I believe it was Special Agent Webb when we initially

10:29AM  3    were reviewing the chart.

10:29AM  4    Q.  And was the defendant a part of that initial conversation

10:29AM  5    with Special Agent Webb?

10:29AM  6    A.  I don't believe so, no.

10:29AM  7    Q.  So at some point later, the defendant comes up to talk to

10:29AM  8    you about this name Peter "Gerasi" on the chart?

10:29AM  9    A.  Yes.

10:29AM  10       MR. COOPER:  Ms. Champoux, can we go to page 1 of

10:29AM  11   this exhibit?  If we can zoom out so we get the whole thing?

10:30AM  12   Thank you.

10:30AM  13       Can we zoom in on the top portion through box 10?

10:30AM  14   Thank you.

10:30AM  15       BY MR. COOPER:

10:30AM  16   Q.  Can you see that, Special Agent Wisniewski?

10:30AM  17   A.  Yes.

10:30AM  18   Q.  At the box number 3, there's a file number; is that

10:30AM  19   correct?

10:30AM  20   A.  Yes.

10:30AM  21   Q.  C2-06-0120?

10:30AM  22   A.  Yes.

10:30AM  23   Q.  Was that the file number for your David Gambino

10:30AM  24   investigation?

10:30AM  25   A.  Yes.

10:30AM   1   Q.   Now in the box where it says file title, that says

10:30AM   2   Matthew Scalia; is that correct?

10:30AM   3   A.   Correct.

10:30AM   4   Q.   Can you just explain to the jury why it doesn't say David

10:30AM   5   Gambino?

10:30AM   6   A.   Because when we initiate -- when DEA initiates cases,

10:30AM   7   usually you will name the first person that you think most

10:30AM   8   likely you'll be able to arrest.   In this instance, where we

10:30AM   9   started the case it was a person by the name Matthew Scalia.

10:30AM  10   We purchased cocaine from him, and eventually arrested him.

10:31AM  11   And that took us to other parts of the case.

10:31AM  12   Q.   Based upon your investigation, did you use this file

10:31AM  13   title, Matthew Scalia, to continue to investigate the Gambino

10:31AM  14   organization?

10:31AM  15   A.   Yes.

10:31AM  16   Q.   Were there links between Scalia and Gambino?

10:31AM  17   A.   I believe so, yes.

10:31AM  18   Q.   Would it have been appropriate to build the Gambino

10:31AM  19   investigation into a file that had nothing to do with

10:31AM  20   Gambino?

10:31AM  21   A.   I'm sorry, say that again?

10:31AM  22   Q.   Would it have been appropriate to build the Gambino

10:31AM  23   investigation out in a file that had nothing to do with

10:31AM  24   Gambino?

10:31AM  25   A.   Generally not, no.

10:31AM   1   Q.  So if it's under the Scalia file title, based on your

10:31AM   2   training and experience, you'd expect there to be a link

10:31AM   3   between those two?

10:31AM   4   A.  Yes.

10:31AM   5   Q.  Okay.  What's the date that this report was prepared?

10:31AM   6   A.  It says -- it says December 2nd, 2008.

10:31AM   7   Q.  And who's the author of this report?

10:31AM   8   A.  Special Agent Joseph Bongiovanni.

10:31AM   9   Q.  Are there other officers listed?

10:31AM  10   A.  Yes.

10:31AM  11   Q.  Who are they?

10:31AM  12   A.  Myself, and police -- Buffalo Police Captain Mark

10:32AM  13   Marchiello.

10:32AM  14   Q.  You see the initials AGS in front of your name?

10:32AM  15   A.  Yes.

10:32AM  16   Q.  What does that mean, can you tell them?

10:32AM  17   A.  At the time of this report's writing, I was the acting

10:32AM  18   group supervisor.  So that basically means our supervisor

10:32AM  19   moved up a rank to run the office at the time, and I was

10:32AM  20   temporarily running the team.

10:32AM  21   Q.  In box 10, is that kind of a summary of what this report

10:32AM  22   is supposed to be about?

10:32AM  23   A.  Yes.

10:32AM  24   Q.  Can you read for the jury what it says in box 10?

10:32AM  25   A.  Acquisition of flowchart associated to the David Gambino

10:32AM   1    organization.

10:32AM   2    Q.   You didn't write this DEA-6, did you?

10:32AM   3    A.   No.

10:32AM   4    Q.   Did you direct that this DEA-6 be written?

10:32AM   5    A.   I don't recall the production of this DEA-6.  Again, it

10:32AM   6    was written a long time ago.

10:32AM   7              **MR. COOPER:**  Ms. Champoux, you can zoom out of that.

10:32AM   8    And we can take the exhibit down for just a minute.  Thank

10:32AM   9    you, ma'am.

10:33AM   10             **BY MR. COOPER:**

10:33AM   11   Q.   Would it be fair to say that an organizational chart like

10:33AM   12   the one we just looked at, the purpose of it is to map out

10:33AM   13   relationships between suspected criminal actors?

10:33AM   14   A.   Yes.

10:33AM   15   Q.   Okay.  Now at the time you got that chart, do you know

10:33AM   16   whether the information on it was accurate?

10:33AM   17   A.   I suspected that it might be.  That chart was not

10:33AM   18   prepared by law enforcement, it was prepared by -- it was

10:33AM   19   obtained by a confidential informant from the Buffalo Police

10:33AM   20   Department, so we didn't really know what was on that chart.

10:33AM   21   And then we -- a lot of the discussion was trying to figure

10:33AM   22   out what it actually meant and who was who and what was what.

10:33AM   23   Q.   Would it be fair to say it would require some follow-up

10:33AM   24   investigation to find out if the information contained on

10:33AM   25   here was accurate?

| | | |
|---|---|---|
| 10:33AM | 1 | A.  Yes. |
| 10:33AM | 2 | Q.  What the -- would it be also fair to say, though, that |
| 10:34AM | 3 | what the chart purports to be is relationships between |
| 10:34AM | 4 | criminal actors? |
| 10:34AM | 5 | A.  Yes. |
| 10:34AM | 6 | Q.  Now, a few minutes ago you told the jury that the |
| 10:34AM | 7 | defendant came up and approached you about the name Peter |
| 10:34AM | 8 | Gerace being on your chart; do you remember that? |
| 10:34AM | 9 | A.  Yes. |
| 10:34AM | 10 | Q.  What did the defendant say to you when he approached you |
| 10:34AM | 11 | about Peter Gerace being on this chart? |
| 10:34AM | 12 | A.  He said that he knew him from the old neighborhood.  And |
| 10:34AM | 13 | that he could talk to him and try to do what's called a cold |
| 10:34AM | 14 | approach to see if he would cooperate with us. |
| 10:34AM | 15 | Q.  You used the term "cold approach."  Can you just define |
| 10:34AM | 16 | that for the jury? |
| 10:34AM | 17 | A.  A cold approach is a technique where we just approach |
| 10:34AM | 18 | someone that we think can help us, and either bluff them that |
| 10:35AM | 19 | they have charges pending or could have charges pending, or |
| 10:35AM | 20 | because they're a good citizen they help us out. |
| 10:35AM | 21 | Q.  Is that a technique of first resort for you as -- |
| 10:35AM | 22 | A.  Not generally, because it's a little on the riskier side. |
| 10:35AM | 23 | Q.  When you say it's "a little on the riskier side," can you |
| 10:35AM | 24 | explain to the jury what the risks are on a cold approach? |
| 10:35AM | 25 | A.  If you're approaching a potential person under |

10:35AM    1    investigation, then you've tipped your hand that he's under

10:35AM    2    investigation.  And during the discussion, he may or may not

10:35AM    3    learn of the scope of your investigation and, like, some of

10:35AM    4    the goings on if you're not careful in the -- how you

10:35AM    5    approach the situation.

10:35AM    6    Q.  Now, would it be fair to say a cold approach could result

10:35AM    7    in gaining a valuable cooperator?

10:35AM    8    A.  If it works, it's very valuable.  It speeds up the

10:35AM    9    investigative process immensely.

10:35AM    10   Q.  And if it doesn't work, there are risks such as derailing

10:36AM    11   the investigation into that target, right?

10:36AM    12   A.  Yes.

10:36AM    13   Q.  Did you agree to allow the defendant to pursue that

10:36AM    14   investigative approach with Gerace?

10:36AM    15   A.  Yes.

10:36AM    16   Q.  At that time, when you had this conversation, was Gerace

10:36AM    17   the main target of your investigation?

10:36AM    18   A.  No.

10:36AM    19   Q.  Was he a key focus for you?

10:36AM    20   A.  No.

10:36AM    21   Q.  If he had been the main target, the head honcho in your

10:36AM    22   investigation, would you have a approved a cold approach out

10:36AM    23   of nowhere?

10:36AM    24   A.  It would have been a much lengthier, I think, discussion

10:36AM    25   with the partner agencies and leadership, management, about

10:36AM    1    whether or not that would be appropriate.

10:36AM    2    Q.  But in these circumstances, you agreed to allow the

10:36AM    3    defendant to try that; is that correct?

10:36AM    4    A.  Yes.

10:36AM    5    Q.  During that discussion about the defendant volunteering

10:36AM    6    to cold approach Peter Gerace, did he tell you that they were

10:36AM    7    personal friends?

10:36AM    8    A.  He didn't -- I don't really recall, he said he knew him

10:37AM    9    from the old neighborhood.

10:37AM   10    Q.  Okay.  Did he tell you that they went on double dates

10:37AM   11    together?

10:37AM   12    A.  No, I don't think so.

10:37AM   13    Q.  If he had told you that, would that have stuck out in

10:37AM   14    your mind?

10:37AM   15    A.  Yes.

10:37AM   16    Q.  Okay.  Does it stick out in your mind?

10:37AM   17    A.  No.

10:37AM   18    Q.  Did he tell you that him and Peter Gerace went on

10:37AM   19    vacations together?

10:37AM   20    A.  No.

10:37AM   21    Q.  Did he tell you that he and Peter Gerace exchanged social

10:37AM   22    phone calls together?

10:37AM   23    A.  No.

10:37AM   24    Q.  Did he tell you that he and Peter Gerace text messaged

10:37AM   25    each other?

10:37AM   1   A.  No.

10:37AM   2   Q.  If he had shared that information with you, would you

10:37AM   3   have said, yeah, go out, do the cold approach, see how it

10:37AM   4   goes?

10:37AM   5   A.  I don't know.  But it definitely would have affected the

10:37AM   6   decision-making process, it would have been a much lengthier

10:37AM   7   discussion.

10:37AM   8   Q.  Would you have brought this to a supervisor?

10:37AM   9   A.  Most likely, yes.

10:37AM  10   Q.  How many years have you been a DEA special agent?

10:37AM  11   A.  Now?  Over 25, going on 26 years.

10:38AM  12   Q.  Would you handle a close personal friend as a

10:38AM  13   confidential source?

10:38AM  14   A.  I would not, no.

10:38AM  15   Q.  Would you handle a close personal friend as a source of

10:38AM  16   information?

10:38AM  17   A.  Probably not.

10:38AM  18   Q.  Sometime after that conversation with the defendant, does

10:38AM  19   he come and report back to you about his cold approach of

10:38AM  20   Peter Gerace?

10:38AM  21   A.  Yes.

10:38AM  22   Q.  What does he tell you?

10:38AM  23   A.  That it wasn't going to happen.  Mr. Gerace didn't -- I

10:38AM  24   don't recall the exact conversation, again, it was a very

10:38AM  25   long time ago, but he either didn't know the right people or

USA v Bongiovanni - Wisniewski - Cooper/Direct - 8/7/24

10:38AM     1    he couldn't get the right quantities of drugs.  And it turned

10:38AM     2    out that it was going to be marijuana.  And I remember the

10:38AM     3    discussion was around 10 pounds, he could only get around 10

10:38AM     4    or less than 10.  I don't recall specifically, but it

10:38AM     5    didn't -- it wasn't going to work out.

10:39AM     6    Q.  When the defendant came back to talk to you, did he

10:39AM     7    encourage you to use Peter Gerace as a cooperator?

10:39AM     8    A.  Did he encourage me?

10:39AM     9    Q.  Did he encourage you.

10:39AM    10    A.  I don't recall.

10:39AM    11    Q.  Did the information that he provided you as you just

10:39AM    12    related to the jury, is that he told you this guy's not going

10:39AM    13    to help us, right?

10:39AM    14    A.  Yes.

10:39AM    15    Q.  That's not encouraging you to use him, is it?

10:39AM    16    A.  No.

10:39AM    17    Q.  Is there an inherent trust that exists between DEA

10:39AM    18    special agents?

10:39AM    19    A.  Yes.

10:39AM    20    Q.  Do you believe something that another special agent tells

10:39AM    21    you when you're at work?

10:39AM    22    A.  Yes.

10:39AM    23    Q.  Is that important?

10:39AM    24    A.  Yes.

10:39AM    25    Q.  Why is it important?

10:39AM    1    A.  Because we handle a tremendous amount of information, and

10:39AM    2    you can't possibly check it all yourself, you have to rely on

10:39AM    3    the work of others and the word of others to sort of make the

10:39AM    4    cases move forward.

10:39AM    5    Q.  When the defendant told you after his cold approach with

10:39AM    6    Peter Gerace that Gerace didn't have information that could

10:40AM    7    help you, did you believe him?

10:40AM    8    A.  Yes.

10:40AM    9    Q.  Did you go and vet it yourself and talk to Gerace

10:40AM   10    yourself?

10:40AM   11    A.  I did not, no.

10:40AM   12    Q.  When the defendant reported back to you that his cold

10:40AM   13    approach of Peter Gerace had essentially failed, does that

10:40AM   14    diminish your ability or inroads you could have to

10:40AM   15    investigate Peter Gerace?

10:40AM   16    A.  It could.

10:40AM   17    Q.  How so?

10:40AM   18    A.  I mean, well, he now knows that, you know, we have

10:40AM   19    information that he may be involved in drug trafficking.  So

10:40AM   20    he could potentially, like, stop trafficking for a while.  He

10:40AM   21    can change, like, who he deals with.  He can change his

10:40AM   22    method of operations.

10:40AM   23    Q.  Is it a fairly basic concept in drug investigations that

10:40AM   24    you don't want the target of your investigation to know

10:41AM   25    they're under investigation?

10:41AM   1   A.  Generally speaking, yes, sir.

10:41AM   2   Q.  It makes your job easier, right?

10:41AM   3   A.  Yes.

10:41AM   4   Q.  And to the contrary, if they know they're under

10:41AM   5   investigation, would that make your job harder?

10:41AM   6   A.  Yes.

10:41AM   7           MR. COOPER:  Ms. Champoux, can we go back to

10:41AM   8   Government Exhibit 30B on page 1, please.

10:41AM   9           Can you zoom in on paragraphs 1 and 2.

10:41AM  10           BY MR. COOPER:

10:41AM  11   Q.  This paragraph 1 sentence here, is that a standard

10:41AM  12   sentence that's used in DEA-6 reports?

10:41AM  13   A.  Sentence 1, yes.

10:41AM  14   Q.  Okay.  Can you just tell them, I think this may be the

10:41AM  15   first time we're going through it, can you explain to the

10:41AM  16   jury what that standard sentence is and what it means?

10:41AM  17   A.  So when we write that, we're linking this information to

10:42AM  18   the other information in the file.  When we report, some

10:42AM  19   agencies write one long comprehensive report.  When we do a

10:42AM  20   report, we do it by action.  So this information is here

10:42AM  21   because it is connected to other information in the file.

10:42AM  22   Q.  Can you read paragraph 2 for the jury?

10:42AM  23   A.  On December 1, 2008, at approximately 7:30 p.m., Special

10:42AM  24   Agent Bongiovanni met with Buffalo Police Captain Mark

10:42AM  25   Marchiello at Buffalo Police headquarters in Buffalo,

10:42AM   1   New York.  At that time, Captain Marchiello gave Special

10:42AM   2   Agent Bongiovanni an organizational chart listing drug

10:42AM   3   traffickers identified by target David Gambino.  The

10:42AM   4   organizational chart was sketched by Gambino himself, and

10:42AM   5   given to a confidential source utilized by BPD Captain

10:42AM   6   Marchiello.  The organizational chart describes significant

10:42AM   7   targets, both identified as drug traffickers and other

10:43AM   8   targets yet to be identified as those trafficking in cocaine

10:43AM   9   and marijuana in the Buffalo, New York area.

10:43AM  10            **MR. COOPER:**  Can you zoom out, Ms. Champoux?  And

10:43AM  11   zoom in on paragraph 3 and 4.

10:43AM  12            **BY MR. COOPER:**

10:43AM  13   Q.  Can you continue reading at paragraph 3, slowly?

10:43AM  14   A.  On December 2nd, 2008, Special Agent Bongiovanni turned

10:43AM  15   over the aforementioned chart to case agent -- Special Agent

10:43AM  16   Christopher Wisniewski in reference to case file C2-06-0120.

10:43AM  17        Special Agent Wisniewski stated he would contact BPD

10:43AM  18   Captain Marchiello to discuss the details of how the chart

10:43AM  19   was acquired.

10:43AM  20   Q.  Is the information in paragraph 3 accurate?

10:43AM  21   A.  I don't recall.  It -- it -- it's inconsistent with my

10:43AM  22   recollection.  I received the organizational chart from TJ

10:44AM  23   Webb.

10:44AM  24   Q.  Does the report say Special Agent Wisniewski received the

10:44AM  25   organizational chart from TJ Webb?

| | | |
|---|---|---|
| 10:44AM | 1 | A.  No. |
| 10:44AM | 2 | Q.  Is it accurate? |
| 10:44AM | 3 | A.  Not in that aspect, no. |
| 10:44AM | 4 | Q.  It says Special Agent Wisniewski stated that he would |
| 10:44AM | 5 | contact BPD Captain Marchiello to discuss the details of how |
| 10:44AM | 6 | the chart was acquired.  Did you state that? |
| 10:44AM | 7 | A.  I don't recall stating that.  I don't recall that I ever |
| 10:44AM | 8 | spoke with Captain Marchiello regarding the matter.  I |
| 10:44AM | 9 | believe it was all TJ Webb doing that. |
| 10:44AM | 10 | **MR. COOPER:**  You can zoom out, Ms. Champoux. |
| 10:44AM | 11 | Can you zoom in on boxes 11, 12, 13, 14, and 15. |
| 10:44AM | 12 | Thank you. |
| 10:44AM | 13 | **BY MR. COOPER:** |
| 10:44AM | 14 | Q.  Is this the signature block of DEA-6? |
| 10:44AM | 15 | A.  Yes. |
| 10:44AM | 16 | Q.  Who's the author of the report? |
| 10:44AM | 17 | A.  Special Agent Bongiovanni. |
| 10:44AM | 18 | Q.  Does it list you as the approver? |
| 10:44AM | 19 | A.  Yes. |
| 10:44AM | 20 | Q.  Do you have any independent recollection of approving |
| 10:44AM | 21 | that? |
| 10:44AM | 22 | A.  No. |
| 10:44AM | 23 | **MR. COOPER:**  You can zoom out of that, Ms. Champoux. |
| 10:45AM | 24 | **BY MR. COOPER:** |
| 10:45AM | 25 | Q.  In this DEA-6, is there any mention of the name Peter |

| | | |
|---|---|---|
| 10:45AM | 1 | Gerace? |
| 10:45AM | 2 | A.   No. |
| 10:45AM | 3 | Q.   Is there any mention of a cold approach? |
| 10:45AM | 4 | A.   No. |
| 10:45AM | 5 |        **MR. COOPER:**  Can you go to the next page, |
| 10:45AM | 6 | Ms. Champoux? |
| 10:45AM | 7 |        **BY MR. COOPER:** |
| 10:45AM | 8 | Q.   Down here at the bottom, do you see -- it's really at the |
| 10:45AM | 9 | top, do you see where it says indexing? |
| 10:45AM | 10 | A.   Yes. |
| 10:45AM | 11 | Q.   How many people are indexed? |
| 10:45AM | 12 | A.   One. |
| 10:45AM | 13 | Q.   Who? |
| 10:45AM | 14 | A.   David Gambino. |
| 10:45AM | 15 | Q.   Is Peter Gerace indexed? |
| 10:45AM | 16 | A.   No. |
| 10:45AM | 17 | Q.   Is there any reference in this DEA-6 to a cold approach |
| 10:45AM | 18 | of Peter Gerace? |
| 10:45AM | 19 | A.   No. |
| 10:45AM | 20 | Q.   Is there any reference in this DEA-6 to the defendant, |
| 10:45AM | 21 | Joseph Bongiovanni, going and talking to Peter Gerace about |
| 10:45AM | 22 | the organizational chart? |
| 10:45AM | 23 | A.   No. |
| 10:45AM | 24 |        **MR. COOPER:**  You can take that down, Ms. Champoux. |
| 10:45AM | 25 |        Judge, may I approach the witness? |

| | | |
|---|---|---|
| 10:45AM | 1 | **THE COURT:**  Sure. |
| 10:45AM | 2 | **BY MR. COOPER:** |
| 10:45AM | 3 | Q.  I'm holding what's in evidence as Government Exhibit 30A. |
| 10:46AM | 4 | Can you take a moment and look at that, and when you're |
| 10:46AM | 5 | finished, look back up at me, sir. |
| 10:46AM | 6 | Is that a DEA-6 report? |
| 10:46AM | 7 | A.  Yes. |
| 10:46AM | 8 | Q.  When's the first time you recall seeing that report? |
| 10:46AM | 9 | A.  This morning. |
| 10:46AM | 10 | Q.  Before you were shown that report this morning, do you |
| 10:46AM | 11 | recall ever seeing it before? |
| 10:46AM | 12 | A.  No. |
| 10:46AM | 13 | Q.  What file is that report written into? |
| 10:46AM | 14 | A.  C2-06-0120, Matthew Scalfia. |
| 10:46AM | 15 | Q.  Is that the investigation into David Gambino that you |
| 10:46AM | 16 | were involved in between '06 and '08? |
| 10:46AM | 17 | A.  Yes. |
| 10:46AM | 18 | Q.  Did you write this DEA-6? |
| 10:46AM | 19 | A.  No. |
| 10:46AM | 20 | Q.  Who's the author of it? |
| 10:46AM | 21 | A.  Special Agent Joseph Bongiovanni. |
| 10:47AM | 22 | **MR. COOPER:**  Can we publish Exhibit 30A to the jury, |
| 10:47AM | 23 | please?  Thank you. |
| 10:47AM | 24 | Can we zoom in on paragraph 2 and 3? |
| 10:47AM | 25 | Ms. Champoux, can you highlight the second sentence |

Case 1:19-cr-00227-LJV-MJR   Document 1144   Filed 08/24/24   Page 35 of 64
USA v Bongiovanni - Wisniewski - Cooper/Direct - 8/7/24

35

| | | |
|---|---|---|
| 10:47AM | 1 | in paragraph 2?  Starting here.  No, the second sentence. |
| 10:47AM | 2 | Thank you. |
| 10:47AM | 3 | **BY MR. COOPER:** |
| 10:47AM | 4 | Q.  We highlighted the second sentence in paragraph 2 of |
| 10:47AM | 5 | Government Exhibit 30A.  Do you see that? |
| 10:47AM | 6 | A.  Yes. |
| 10:47AM | 7 | Q.  Gerace has acted as a confidential source, and has been |
| 10:47AM | 8 | able to provide information regarding individuals in this |
| 10:47AM | 9 | case file and other narcotic investigation in the past. |
| 10:48AM | 10 | Is that what it says? |
| 10:48AM | 11 | A.  Yes. |
| 10:48AM | 12 | Q.  Where it says this case file, is that reference to |
| 10:48AM | 13 | C2-06-0120? |
| 10:48AM | 14 | A.  I would assume so. |
| 10:48AM | 15 | Q.  That's the file it's entered into, right? |
| 10:48AM | 16 | A.  Yes. |
| 10:48AM | 17 | Q.  Did the defendant ever tell you that Peter Gerace |
| 10:48AM | 18 | provided information regarding individuals in C2-06-0120? |
| 10:48AM | 19 | A.  Outside of what we've already discussed, no. |
| 10:48AM | 20 | Q.  Well, what you discussed was he couldn't help you, right? |
| 10:48AM | 21 | A.  Correct. |
| 10:48AM | 22 | Q.  Is what's written in this DEA-6 consistent with what the |
| 10:48AM | 23 | defendant told you about his meeting, his cold approach of |
| 10:48AM | 24 | Peter Gerace? |
| 10:48AM | 25 | A.  No. |

Case 1:19-cr-00227-LJV-MJR    Document 1144    Filed 08/24/24    Page 36 of 64
USA v Bongiovanni - Wisniewski - Cooper/Direct - 8/7/24

36

10:48AM  1   Q.  It's not?

10:48AM  2   A.  I'm sorry, it's not consistent.

10:48AM  3          **MR. COOPER:**  Okay.  You can zoom out, Ms. Champoux.

10:48AM  4          Thank you.  Can you go to page 2 of this exhibit.

10:48AM  5          **BY MR. COOPER:**

10:49AM  6   Q.  Do you see at the bottom where it says indexing section?

10:49AM  7   A.  Yes.

10:49AM  8   Q.  Is Peter Gerace indexed on that DEA-6?

10:49AM  9   A.  Yes.

10:49AM  10  Q.  Do you see where it says NADDIS number pending?

10:49AM  11  A.  Yes.

10:49AM  12  Q.  What does "NADDIS number pending" mean?

10:49AM  13  A.  That means information regarding that subject was entered

10:49AM  14  into the system, and the system -- the information was to be

10:49AM  15  processed, and it would generate a NADDIS number for that

10:49AM  16  person.

10:49AM  17  Q.  Now, just walk through this with me.  At the time you're

10:49AM  18  creating a DEA-6, not this one in particular, but you're

10:49AM  19  creating a DEA-6, and you enter someone into NADDIS.  Are you

10:49AM  20  checking to see if they already have a NADDIS number?

10:49AM  21  A.  You should, yes.

10:49AM  22  Q.  Okay.  And if they already have a NADDIS number, do you

10:49AM  23  put that NADDIS number in?

10:49AM  24  A.  Yes.

10:49AM  25  Q.  How do you check to see if someone already has a NADDIS

Case 1:19-cr-00227-LJV-MJR    Document 1144    Filed 08/24/24    Page 37 of 64
USA v Bongiovanni - Wisniewski - Cooper/Direct - 8/7/24

37

| 10:49AM | 1 | number? |
| 10:49AM | 2 | A.  You access NADDIS and run their name. |
| 10:49AM | 3 | Q.  Is it hard? |
| 10:50AM | 4 | A.  No, it only takes a few minutes. |
| 10:50AM | 5 | Q.  As an experienced DEA special agent, do you know how to |
| 10:50AM | 6 | check if someone has a NADDIS number? |
| 10:50AM | 7 | A.  Yes. |
| 10:50AM | 8 | Q.  Before you index someone, do you check to see if they |
| 10:50AM | 9 | have a NADDIS number? |
| 10:50AM | 10 | A.  Do I?  Yes, I do. |
| 10:50AM | 11 | Q.  Okay.  In NADDIS, can that include information about a |
| 10:50AM | 12 | person, like their phone number? |
| 10:50AM | 13 | A.  Yes. |
| 10:50AM | 14 | Q.  Can it include their address? |
| 10:50AM | 15 | A.  Yes. |
| 10:50AM | 16 | Q.  Is it something that helps the DEA to investigate people? |
| 10:50AM | 17 | A.  Yes. |
| 10:50AM | 18 | **MR. COOPER:**  Judge, may I approach the witness? |
| 10:50AM | 19 | **THE COURT:**  You may. |
| 10:50AM | 20 | **BY MR. COOPER:** |
| 10:50AM | 21 | Q.  I'm holding what's in evidence subject to connection and |
| 10:50AM | 22 | subject to authentication as Exhibit 437.  Do you recognize |
| 10:50AM | 23 | that document, sir? |
| 10:50AM | 24 | A.  Yes. |
| 10:50AM | 25 | Q.  Is that a NADDIS printout? |

| | | |
|---|---|---|
| 10:50AM | 1 | A.  Yes. |
| 10:50AM | 2 | Q.  Who does it pertain to? |
| 10:50AM | 3 | A.  Peter Gerace. |
| 10:50AM | 4 | Q.  Towards the top of that document, is there an indication |
| 10:51AM | 5 | as to when Peter Gerace was assigned a NADDIS number? |
| 10:51AM | 6 | A.  Yes. |
| 10:51AM | 7 | Q.  When is it? |
| 10:51AM | 8 | A.  It says date of record, January 16, 1992. |
| 10:51AM | 9 | Q.  Do NADDIS records expire after six months? |
| 10:51AM | 10 | A.  No. |
| 10:51AM | 11 | Q.  Do they last a long time? |
| 10:51AM | 12 | A.  Yes. |
| 10:51AM | 13 | Q.  Does that help you in investigations? |
| 10:51AM | 14 | A.  Yes. |
| 10:51AM | 15 | Q.  Is it important that you be able to look back and see if |
| 10:51AM | 16 | someone had come up in 1992? |
| 10:51AM | 17 | A.  It's helpful, yes. |
| 10:51AM | 18 | Q.  Okay.  So based on your 25-plus years of experience at |
| 10:51AM | 19 | the DEA, if you ran Peter Gerace in NADDIS in 2008, would he |
| 10:51AM | 20 | have shown up? |
| 10:51AM | 21 | A.  He should have. |
| 10:51AM | 22 | Q.  He's been in NADDIS since 1992, right? |
| 10:51AM | 23 | A.  Yes. |
| 10:51AM | 24 | **MR. COOPER:**  May I approach, Judge? |
| 10:51AM | 25 | **THE COURT:**  Yes. |

| | | |
|---|---|---|
| 10:51AM | 1 | **MR. COOPER:** Thank you. |
| 10:51AM | 2 | **BY MR. COOPER:** |
| 10:51AM | 3 | Q. When that report, Government Exhibit 30A, reports that |
| 10:51AM | 4 | Peter Gerace's NADDIS was pending, that was not accurate |
| 10:51AM | 5 | information, was it? |
| 10:51AM | 6 | A. No. |
| 10:51AM | 7 | Q. By volunteering to go do a cold approach on Peter Gerace, |
| 10:52AM | 8 | the defendant necessarily informed him that he was under a |
| 10:52AM | 9 | DEA investigation, right? |
| 10:52AM | 10 | **MR. MacKAY:** Objection. Objection. Assumes facts |
| 10:52AM | 11 | not in evidence. |
| 10:52AM | 12 | **MR. COOPER:** Judge, those facts are in evidence. |
| 10:52AM | 13 | **THE COURT:** Overruled. Overruled. You don't need -- |
| 10:52AM | 14 | overruled. |
| 10:52AM | 15 | **THE WITNESS:** I'm sorry, can you -- |
| 10:52AM | 16 | **MR. COOPER:** Ann, can you read back that question, |
| 10:52AM | 17 | please? |
| 10:52AM | 18 | (The above-requested question was then read by the |
| 10:52AM | 19 | reporter.) |
| 10:52AM | 20 | **THE WITNESS:** I don't know. I wasn't part of that |
| 10:52AM | 21 | conversation. I don't know what they discussed. I would |
| 10:52AM | 22 | assume that the subject would put enough information together |
| 10:52AM | 23 | to realize that, you know, his name came up. But, again, I |
| 10:53AM | 24 | wouldn't know for sure. |
| 10:53AM | 25 | **MR. COOPER:** Okay. I have no further questions, |

| | | |
|---|---|---|
| 10:53AM | 1 | Judge. |
| 10:53AM | 2 | **THE COURT:**  Mr. MacKay? |
| 10:53AM | 3 | |
| 10:53AM | 4 | **CROSS-EXAMINATION BY MR. MacKAY:** |
| 10:53AM | 5 | Q.  Good morning, Agent Wisniewski.  How are you? |
| 10:53AM | 6 | A.  Well, sir.  How are you? |
| 10:53AM | 7 | Q.  I'm well, thanks for asking. |
| 10:53AM | 8 | All right.  Let's start with timeframe.  Those events |
| 10:53AM | 9 | occur in late 2008, correct? |
| 10:53AM | 10 | A.  Yes. |
| 10:53AM | 11 | Q.  16 years ago, correct? |
| 10:53AM | 12 | A.  Yes. |
| 10:53AM | 13 | Q.  And I think it came up in your direct testimony, but a |
| 10:53AM | 14 | lot of the stuff you don't have a direct recollection of, |
| 10:53AM | 15 | correct? |
| 10:53AM | 16 | A.  It was a long time ago. |
| 10:53AM | 17 | Q.  And that's my question.  You're not remembering specific |
| 10:53AM | 18 | conversations, correct? |
| 10:53AM | 19 | A.  Yes. |
| 10:53AM | 20 | Q.  You're not remembering the words of the specific |
| 10:53AM | 21 | conversations, correct? |
| 10:53AM | 22 | A.  Not the specific ones, no, sir. |
| 10:53AM | 23 | Q.  You might have some takeaway from the conversation, but |
| 10:53AM | 24 | fair to say you're lacking a lot of -- you're lacking a |
| 10:54AM | 25 | recall of a lot of the specifics, correct? |

| | | |
|---|---|---|
| 10:54AM | 1 | A.  Yes. |
| 10:54AM | 2 | Q.  Okay.  Let's talk about DEA files. |
| 10:54AM | 3 | So Matt Scalia is the name of the C2 -- I'm sorry -- |
| 10:54AM | 4 | C2-06-0120 file, correct? |
| 10:54AM | 5 | A.  Yes. |
| 10:54AM | 6 | Q.  And I think you told us on direct, he's assigned a name |
| 10:54AM | 7 | probably because he's the first target or subject being |
| 10:54AM | 8 | looked at in that file, correct? |
| 10:54AM | 9 | A.  Yes. |
| 10:54AM | 10 | Q.  And that goes all the way back to around 2006, correct? |
| 10:54AM | 11 | A.  Yes. |
| 10:54AM | 12 | Q.  And at that point in time, you're what's called the case |
| 10:54AM | 13 | agent on the file, correct? |
| 10:54AM | 14 | A.  One of them, yes. |
| 10:54AM | 15 | Q.  The other one being Christian Ulmer, your partner? |
| 10:54AM | 16 | A.  Yes. |
| 10:54AM | 17 | Q.  You open that file up, right? |
| 10:54AM | 18 | A.  Yes. |
| 10:54AM | 19 | Q.  And from there, you told us a little bit on direct, DEA |
| 10:54AM | 20 | investigations can take different routes, right? |
| 10:54AM | 21 | A.  Yes. |
| 10:54AM | 22 | Q.  Start with one file that might branch off into |
| 10:54AM | 23 | investigating somebody else, correct? |
| 10:54AM | 24 | A.  Yes. |
| 10:54AM | 25 | Q.  And in this specific case, Dave Gambino becomes one |

10:55AM    1    avenue that the Matt Scalia file takes, correct?

10:55AM    2    A.  Yes.

10:55AM    3    Q.  Now, just kind of simplifying it, we've got the Matt

10:55AM    4    Scalia file, the whole file, correct?

10:55AM    5    A.  Yes.

10:55AM    6    Q.  Within there, you've got some information about Dave

10:55AM    7    Gambino, correct?

10:55AM    8    A.  Yes.

10:55AM    9    Q.  Now Dave Gambino is also connected to other law

10:55AM   10    enforcement agencies because he's the subject of an OCDETF

10:55AM   11    investigation, correct?

10:55AM   12    A.  Yes.

10:55AM   13    Q.  So when you're working on an investigation with Dave

10:55AM   14    Gambino, you're linking up with other agencies, correct?

10:55AM   15    A.  Yes.

10:55AM   16    Q.  And in that investigation, you had a lot of discussion

10:55AM   17    with a number of different agencies, correct?

10:55AM   18    A.  Yes.

10:55AM   19    Q.  And fair to say the Dave Gambino investigation took on a

10:55AM   20    life of its own?

10:55AM   21    A.  It was -- it became large, yes.

10:55AM   22    Q.  It was ultimately resulted in a prosecution where the

10:55AM   23    criminal complaint was filed by the DEA, correct?

10:55AM   24    A.  I believe so.

10:55AM   25    Q.  By Bobby Nunn?

| | | |
|---|---|---|
| 10:55AM | 1 | A.  At some point, I was taken off the case because I changed |
| 10:56AM | 2 | groups and I don't -- I don't have all the specifications of |
| 10:56AM | 3 | who was resolved. |
| 10:56AM | 4 | Q.  But within the David Gambino investigation, there was |
| 10:56AM | 5 | also the individual David Reynolds? |
| 10:56AM | 6 | A.  I believe so. |
| 10:56AM | 7 | Q.  Somewhere in that investigation, he's connected, correct? |
| 10:56AM | 8 | A.  I believe so. |
| 10:56AM | 9 | MR. MacKAY:  So, Ms. Champoux, can we pull up |
| 10:56AM | 10 | Government Exhibit 30B, please?  For everybody. |
| 10:56AM | 11 | THE CLERK:  All set. |
| 10:56AM | 12 | MR. MacKAY:  Can we go to page 3, the chart page. |
| 10:56AM | 13 | Okay. |
| 10:56AM | 14 | BY MR. MacKAY: |
| 10:56AM | 15 | Q.  Okay.  So in front of you, there's the chart that's |
| 10:56AM | 16 | attached to Government Exhibit 30B, do you see that? |
| 10:56AM | 17 | A.  Yes. |
| 10:56AM | 18 | Q.  Okay.  So it's your testimony that that chart, you |
| 10:56AM | 19 | specifically received from TJ Webb? |
| 10:56AM | 20 | A.  Yes. |
| 10:56AM | 21 | Q.  And you look at the bottom, you see TJ Webb's number on |
| 10:56AM | 22 | there, correct? |
| 10:56AM | 23 | A.  Yes. |
| 10:56AM | 24 | Q.  Right above that, I'm underlining it, do you see Mark |
| 10:57AM | 25 | Marchiello, and you see a phone number, correct? |

10:57AM    1   A.  Yes.

10:57AM    2   Q.  Your understanding is that somewhere along the process,

10:57AM    3   this information that's depicted in this chart comes through

10:57AM    4   Mark Marchiello from the Buffalo police?

10:57AM    5   A.  That's my understanding, yes.

10:57AM    6   Q.  Okay.  Over on the lower right, I'm sorry, lower left

10:57AM    7   side, you've got a file title -- I'm sorry, a file number

10:57AM    8   matching Matt Scalia, correct?

10:57AM    9   A.  Yes.

10:57AM   10   Q.  Now, right below there, I'm going to underline it, I

10:57AM   11   realize it's going vertical, it says conj, C-O-N-J, period,

10:57AM   12   W slash ICE.  Do you see that?

10:57AM   13   A.  Yes.

10:57AM   14   Q.  Is that -- I'm trying to spell that out, is that a fair

10:57AM   15   depiction of what you see there?

10:57AM   16   A.  I believe it says original with ice.

10:57AM   17   Q.  Oh, that's what I was wondering, is what does that stand

10:57AM   18   for.  And your understanding is that's --

10:58AM   19   A.  Original is with ICE.

10:58AM   20   Q.  Okay.

10:58AM   21   A.  So they maintained whatever Mark Marchiello had.

10:58AM   22   Q.  Okay.  Now, your testimony on direct is that TJ Webb

10:58AM   23   reaches out to you in a phone call when you're at the U.S.

10:58AM   24   Attorney's Office, right?

10:58AM   25   A.  I believe so, yes.

10:58AM    1    Q.  Okay.  And at some point in time after that, you get some

10:58AM    2    sort of organizational chart that he turns over to you,

10:58AM    3    correct?

10:58AM    4    A.  Yes.

10:58AM    5    Q.  Okay.  And that was all in the discussion of the Dave

10:58AM    6    Gambino case, correct?

10:58AM    7    A.  Yes.

10:58AM    8    Q.  You did not prepare a DEA-6 on the receipt of that chart

10:58AM    9    though, correct?

10:58AM   10    A.  No.

10:58AM   11    Q.  Okay.  Nowhere in the Matt Scalia file was there any

10:58AM   12    DEA-6 regarding your acquisition of a chart, correct?

10:58AM   13    A.  No.

10:58AM   14    Q.  Now, you met with in conjunction with this investigation

10:58AM   15    against Mr. Bongiovanni, you met with the Department of

10:58AM   16    Justice Office of Inspector General, correct?

10:59AM   17    A.  Yes.

10:59AM   18    Q.  Okay.  Fair to say that was around June of 2020, correct?

10:59AM   19    A.  I believe so.

10:59AM   20    Q.  Okay.  And do you recall being shown this chart at that

10:59AM   21    time?

10:59AM   22    A.  Yes.

10:59AM   23    Q.  Okay.  What you told them at that time is that doesn't

10:59AM   24    look like the same chart I got from TJ Webb, correct?

10:59AM   25    A.  I don't remember what I told them, but I --

| | | |
|---|---|---|
| 10:59AM | 1 | Q.  Well, let me stop you there. |
| 10:59AM | 2 | Would it help to refresh your recollection to look at the |
| 10:59AM | 3 | report there? |
| 10:59AM | 4 | A.  Yes. |
| 10:59AM | 5 | Q.  Okay. |
| 10:59AM | 6 | **MR. MacKAY:**  Ms. Champoux, can we show for the |
| 10:59AM | 7 | witness only Government Exhibit 3508B-1.  Can we go to the |
| 10:59AM | 8 | second page. |
| 11:00AM | 9 | Just bear with us, we'll get it up for you. |
| 11:00AM | 10 | **THE WITNESS:**  Sure. |
| 11:00AM | 11 | **MR. SINGER:**  3501B-1? |
| 11:00AM | 12 | **MR. MacKAY:**  Yeah. |
| 11:00AM | 13 | **MR. SINGER:**  I've got it. |
| 11:00AM | 14 | **MR. MacKAY:**  May I approach, Judge? |
| 11:00AM | 15 | **THE COURT:**  Sure. |
| 11:00AM | 16 | **MR. MacKAY:**  Stand by.  We're having some technical |
| 11:00AM | 17 | difficulties, Agent Wisniewski. |
| 11:01AM | 18 | **THE COURT:**  Why don't we take a break since we have |
| 11:01AM | 19 | this technical difficulty, and we'll try to figure it out. |
| 11:01AM | 20 | Please remember my instructions about not |
| 11:01AM | 21 | communicating about the case with anyone, including each |
| 11:01AM | 22 | other, not making up your mind.  And we'll see you back here |
| 11:01AM | 23 | in about 10 or 15 minutes.  Thanks. |
| 11:01AM | 24 | (Jury excused at 11:01 a.m.) |
| 11:02AM | 25 | **THE COURT:**  Okay.  Anything for the record from the |

| | | |
|---|---|---|
| 11:02AM | 1 | government? |
| 11:02AM | 2 | **MR. TRIPI:**  No, Your Honor.  Thank you very much. |
| 11:02AM | 3 | **THE COURT:**  From the defense? |
| 11:02AM | 4 | **MR. MacKAY:**  No, Your Honor. |
| 11:02AM | 5 | **THE COURT:**  See you folks in a few minutes. |
| 11:02AM | 6 | **THE CLERK:**  All rise. |
| 11:02AM | 7 | (Off the record at 11:02 a.m.) |
| 11:02AM | 8 | (Back on the record at 11:16 a.m.) |
| 11:16AM | 9 | (Jury not present.) |
| 11:16AM | 10 | **THE CLERK:**  All rise. |
| 11:16AM | 11 | **THE COURT:**  Please be seated. |
| 11:16AM | 12 | **THE CLERK:**  We are back on the record for the |
| 11:16AM | 13 | continuation in the jury trial in case number 19-cr-227, |
| 11:16AM | 14 | United States of America versus Joseph Bongiovanni. |
| 11:16AM | 15 | All counsel and parties are present. |
| 11:16AM | 16 | **THE COURT:**  Okay.  Anything we need to do before we |
| 11:16AM | 17 | bring the jury back? |
| 11:16AM | 18 | **MR. TRIPI:**  No, Your Honor. |
| 11:16AM | 19 | **MR. MacKAY:**  No, Your Honor. |
| 11:16AM | 20 | **THE COURT:**  Okay.  I need to break at 12:30.  I've |
| 11:16AM | 21 | got a call that I need to make right at 12:30.  So whoever is |
| 11:16AM | 22 | up doing whatever they're doing when we get close to there, |
| 11:17AM | 23 | just when there's a convenient time to break, let me know. |
| 11:17AM | 24 | **MR. COOPER:**  We're going to break for lunch at 12:30? |
| 11:17AM | 25 | **THE COURT:**  We're going to break for lunch at 12:30. |

11:17AM 1    Exactly.  Exactly.

11:17AM 2              Okay.  Let's bring them in, please, Pat.  Thank you.

11:18AM 3              (Jury seated at 11:18 a.m.)

11:18AM 4         **THE COURT:**  The record will reflect that all our

11:18AM 5    jurors, again, are present.

11:18AM 6              I remind the witness that he's still under oath.

11:19AM 7              And you may continue, Mr. MacKay.

11:19AM 8         **MR. MacKAY:**  Thank you, Your Honor.

11:19AM 9         **BY MR. MacKAY:**

11:19AM 10   Q.  All right.  So Agent Wisniewski, I want to back up a few

11:19AM 11   questions, because we took a break, I want to reorient you to

11:19AM 12   what we were talking about before I have you look at that.

11:19AM 13       So, 2020, as part of this investigation against

11:19AM 14   Mr. Bongiovanni, you go and you meet with the Office of

11:19AM 15   Inspector General for an interview, correct?

11:19AM 16   A.  I'm sorry.

11:19AM 17   Q.  You met in 2020 with the Office of Inspector General to

11:19AM 18   give an interview, correct?

11:19AM 19   A.  Yes.

11:19AM 20   Q.  Okay.  At that point in time, you had a lawyer with you,

11:19AM 21   correct?

11:19AM 22   A.  I believe I did, yes, on the telephone.

11:19AM 23   Q.  Okay.  And you were asked some questions about the case.

11:19AM 24   And I think you told us already you recall being shown this

11:19AM 25   chart that's in Government Exhibit 30B, correct?

11:19AM   1    A.   Yes.

11:19AM   2    Q.   But when you talked to OIG in 2020, you said that's not

11:19AM   3    the same chart, correct?

11:19AM   4    A.   I -- I want to -- I don't recall exactly what I told

11:20AM   5    them.

11:20AM   6    Q.   So -- so if you don't recall, what I'm going to say is

11:20AM   7    would it help to refresh your recollection --

11:20AM   8    A.   Yes.

11:20AM   9    Q.   -- to look at the MOI from that interview?

11:20AM  10    A.   Yes.

11:20AM  11    Q.   So you should have up on your screen there Government

11:20AM  12    Exhibit 3501B-1.  I'm going to direct you to the second full

11:20AM  13    paragraph.  Read that to yourself, and look up at me when

11:20AM  14    you're done.

11:20AM  15        Okay.  So does that refresh your recollection as to what

11:20AM  16    you told OIG back in 2020?

11:20AM  17    A.   It does.

11:20AM  18    Q.   Okay.  And that the chart you were looking at, at 30B, is

11:21AM  19    not the same one you were given by TJ Webb, correct?

11:21AM  20    A.   I didn't really recognize the chart that they showed me,

11:21AM  21    so I was a little taken aback, and I was trying to process

11:21AM  22    like if it was the one I was looking at.  And for some reason

11:21AM  23    I didn't recognize it.

11:21AM  24             MR. MacKAY:  Ms. Champoux, can we put Government

11:21AM  25    Exhibit 30B back up on the screen for the witness and the

11:21AM    1    jury?

11:21AM    2         Can we go to the third page, the chart?

11:21AM    3         **BY MR. MacKAY:**

11:21AM    4    Q.  Do you see your handwriting anywhere on the chart?

11:21AM    5    A.  Yes.

11:21AM    6    Q.  Where?

11:21AM    7    A.  The lower left corner.

11:21AM    8    Q.  What specifically?

11:21AM    9    A.  The C2-06-0120 copy, original with ICE.  Phone numbers

11:21AM   10    might be mine.  It's hard to tell.  I have very -- my

11:21AM   11    handwriting is just getting worse with age.

11:21AM   12    Q.  Mine too, Agent.

11:21AM   13         But we can agree, your handwriting's on there somewhere?

11:21AM   14    A.  Yes.

11:21AM   15    Q.  So you had this chart in your possession at some point in

11:22AM   16    time, correct?

11:22AM   17    A.  Yes.

11:22AM   18    Q.  And I think I've already asked you, but just to clarify,

11:22AM   19    when you purportedly received the chart from Special Agent

11:22AM   20    Webb, you did not write a DEA-6 on that separately?

11:22AM   21    A.  No.

11:22AM   22    Q.  You had the opportunity to review the Matt Scalia file

11:22AM   23    prior to testifying today?

11:22AM   24    A.  A few reports.

11:22AM   25    Q.  Would you have any reason to disagree with me that the

11:22AM    1    chart in front of you is the only handwritten organization

11:22AM    2    chart in the entire Matt Scalia file?

11:22AM    3    A.  I believe so.

11:22AM    4    Q.  Okay.  All right.  So let's put this chart aside for a

11:22AM    5    moment.

11:22AM    6            MR. MacKAY:  Ms. Champoux, you can take that down.

11:22AM    7    Thank you.

11:22AM    8            BY MR. MacKAY:

11:22AM    9    Q.  So, you have a discussion with Joseph Bongiovanni because

11:22AM   10    the name Peter Gerace is raised, correct?

11:22AM   11    A.  Yes.

11:22AM   12    Q.  And we took the chart down, but it appears like Peter

11:22AM   13    Gerace's name is on that chart, just misspelled in some

11:22AM   14    fashion, correct?

11:22AM   15    A.  That's what I assumed.

11:22AM   16    Q.  Okay.  And if you recall it says "Gerasi," but it's

11:23AM   17    spelled with an I instead of an E, correct?

11:23AM   18    A.  Yes.

11:23AM   19    Q.  So you have this conversation with Mr. Bongiovanni, and

11:23AM   20    what comes out of it in sum and substance is Mr. Bongiovanni

11:23AM   21    indicated he can make some -- what you called cold approach

11:23AM   22    of Peter Gerace, correct?

11:23AM   23    A.  Yes.

11:23AM   24    Q.  And at that point in time, you are the acting G.S.,

11:23AM   25    correct?

11:23AM    1    A.  Yes.

11:23AM    2    Q.  Acting G.S., so the jury understands again, you're

11:23AM    3    filling in as an acting supervisor, correct?

11:23AM    4    A.  Yes.

11:23AM    5    Q.  Who is the G.S. at the time?

11:23AM    6    A.  I want to say it was Brian Conneely.

11:23AM    7    Q.  And the RAC at the time?

11:23AM    8    A.  I think it was vacant.  I don't really recall.  I think

11:23AM    9    it was vacant, and I think Brian Conneely was the Acting RAC.

11:23AM   10    Q.  Do you recall whether Dale Kasprzyk held any supervisory

11:23AM   11    position at that point in time?

11:23AM   12    A.  I don't recall.  But --

11:23AM   13    Q.  Bottom line, even as the Acting G.S., you're still

11:23AM   14    reporting to somebody in Buffalo?

11:23AM   15    A.  Yes.

11:23AM   16    Q.  Whoever that is, there still is somebody above you?

11:24AM   17    A.  Yes.

11:24AM   18    Q.  Okay.  So you have this discussion with Mr. Bongiovanni

11:24AM   19    about a possible cold approach, yes?

11:24AM   20    A.  Yes.

11:24AM   21    Q.  Didn't take that up the chain to anybody else, correct?

11:24AM   22    A.  No, I discussed it with leadership and my other partners.

11:24AM   23    Q.  Who specifically?

11:24AM   24    A.  Most likely Brian Conneely.

11:24AM   25    Q.  And you got approved obviously?

11:24AM   1    A.   Yeah.   Everybody was in agreement that it was worth a

11:24AM   2    shot.

11:24AM   3    Q.   I mean, it might be putting the cart before the horse,

11:24AM   4    but if you're allowing him to go do that, that presumes he

11:24AM   5    has the authority to go do that, correct?

11:24AM   6    A.   Yes.

11:24AM   7    Q.   So somewhere along the line you're telling us that

11:24AM   8    somebody in leadership gave approval for Mr. Bongiovanni to

11:24AM   9    go make a connection to Peter Gerace, correct?

11:24AM  10    A.   Yes.

11:24AM  11    Q.   And you understood that happened because Mr. Bongiovanni

11:24AM  12    comes back on the other end of it and tells you that he did

11:24AM  13    do this cold approach, correct?

11:24AM  14    A.   Yes.

11:24AM  15    Q.   And it's your understanding that not much came out of it

11:24AM  16    though, correct?

11:24AM  17    A.   Correct.

11:24AM  18    Q.   Some information about possibly 10 kilograms or pounds of

11:25AM  19    marijuana?

11:25AM  20    A.   Yes.

11:25AM  21    Q.   Okay.

11:25AM  22    A.   Something -- something to that effect.

11:25AM  23    Q.   So there was -- you were in possession of some

11:25AM  24    information that Peter Gerace was involved in narcotics,

11:25AM  25    correct?

11:25AM   1   A.  Yes.

11:25AM   2   Q.  And from the chart that you're shown, Peter Gerace has

11:25AM   3   some connection at least in this org chart to Dave Reynolds,

11:25AM   4   correct?

11:25AM   5   A.  Yes, sir.

11:25AM   6   Q.  And from your recollection to the OCDETF investigation

11:25AM   7   into Dave Gambino, there's some connection between Dave

11:25AM   8   Gambino and Dave Reynolds, correct?

11:25AM   9   A.  I believe so, yes.

11:25AM  10   Q.  So, you would agree with me that it's a fair statement

11:25AM  11   that around 2008, the end of the year, DEA comes into

11:25AM  12   possession of some information from Peter Gerace, somehow

11:25AM  13   connected to Dave Reynolds and Dave Gambino, correct?

11:25AM  14   A.  Yes.

11:25AM  15   Q.  Now, as you told the jury though, you don't -- you don't

11:25AM  16   know what Mr. Bongiovanni said when he linked up with

11:26AM  17   Mr. Gerace, correct?

11:26AM  18   A.  No.

11:26AM  19   Q.  But let's put this date in perspective.  Do you recall

11:26AM  20   that Dave Reynolds is arrested by HSI in November of 2008?

11:26AM  21   A.  I don't recall that, no.

11:26AM  22   Q.  I think I might have touched on it already, but do you

11:26AM  23   recall that Dave Gambino is arrested by DEA sometime later in

11:26AM  24   late 2009?

11:26AM  25   A.  Again, I don't -- I -- I don't really recall any of that.

11:26AM  1    I think I was already off the case by that point.

11:26AM  2    Q.  Okay.  But in late 2008, you're still on the case in some

11:26AM  3    fashion, correct?

11:26AM  4    A.  Yes.

11:26AM  5    Q.  You're helping to fashion the case, the Dave Gambino

11:26AM  6    investigation, into a full prosecutable case, correct?

11:26AM  7    A.  Yes.

11:26AM  8    Q.  At that time, you came in receipt of some information

11:26AM  9    that Peter Gerace is involved in narcotics trafficking,

11:26AM  10   correct?

11:26AM  11   A.  Yes.

11:26AM  12   Q.  Okay.  Again, you didn't write a report on that, correct?

11:26AM  13   A.  No.

11:26AM  14   Q.  Do you recall taking that information up the chain to

11:26AM  15   leadership to report back on what the cold approach was?

11:27AM  16   A.  I don't recall, but they would have asked and I would

11:27AM  17   have told them that nothing came of it.

11:27AM  18   Q.  So it was procedure that on the back end of this cold

11:27AM  19   approach, you still had to go back up to leadership and tell

11:27AM  20   them what happened?

11:27AM  21   A.  Yes.

11:27AM  22   Q.  Okay.  And I guess what I'm getting towards is late 2008,

11:27AM  23   you've got information that Peter Gerace is involved in

11:27AM  24   narcotics trafficking, correct?

11:27AM  25   A.  Yes.

11:27AM 1   Q.  And did you have any information at that point in time

11:27AM 2   whether Peter Gerace is on supervised release?

11:27AM 3   A.  I don't recall that, knowing that, no.

11:27AM 4   Q.  But after you have this discussion with Mr. Bongiovanni

11:27AM 5   about the cold approach not working out, you don't take any

11:27AM 6   further investigative steps to investigate Peter Gerace,

11:27AM 7   correct?

11:27AM 8   A.  I don't recall that I did, no.

11:27AM 9   Q.  Okay.

11:27AM 10         MR. MacKAY:  Judge, could I just have one moment,

11:27AM 11  please?

11:27AM 12         THE COURT:  Yep.

11:28AM 13         MR. MacKAY:  I have no further questions, Your Honor.

11:28AM 14         MR. COOPER:  Just one second, please, Judge.

11:28AM 15         THE COURT:  Sure.

11:29AM 16

11:29AM 17         **REDIRECT EXAMINATION BY MR. COOPER:**

11:29AM 18  Q.  Special Agent Wisniewski, on cross-examination a moment

11:29AM 19  ago, you were asked some questions by Mr. MacKay about your

11:29AM 20  status as the acting group supervisor at or around the time

11:29AM 21  that the defendant recommended doing a cold approach of Peter

11:29AM 22  Gerace, right?

11:29AM 23  A.  Yes.

11:29AM 24  Q.  And Mr. MacKay said, oh, you approved that, right?

11:29AM 25  A.  Yes.

11:29AM    1    Q.  In 2008, when this is happening, about how long had you

11:29AM    2    worked with the defendant for, approximately?

11:29AM    3    A.  Again, we met each other at the academy, 1998, 1999.  And

11:30AM    4    we were on the same team multiple times.  I would say I've

11:30AM    5    known him pretty much my entire career.

11:30AM    6    Q.  At that time, you've known him about a decade; is that

11:30AM    7    correct?

11:30AM    8    A.  Yes.

11:30AM    9    Q.  Do you occasionally socialize with other agents?

11:30AM   10    A.  Yes.

11:30AM   11    Q.  Do you have a friendly atmosphere in the office?

11:30AM   12    A.  Yes.

11:30AM   13    Q.  Did you trust him at that time?

11:30AM   14    A.  I did.

11:30AM   15    Q.  When the defendant recommended doing a cold approach and

11:30AM   16    when you approved it, did he tell you that he was friends

11:30AM   17    with the person?

11:30AM   18    A.  He said that he knew him from the old neighborhood is

11:30AM   19    what I recall.

11:30AM   20    Q.  Did he tell you they were close personal friends?

11:30AM   21    A.  I don't recall having an extended conversation about the

11:30AM   22    nature of their relationship.

11:30AM   23    Q.  Did he tell you they went to dinner together?

11:30AM   24    A.  No.

11:30AM   25    Q.  Did he tell you that they went on dates together?

11:30AM    1    A.   No.

11:30AM    2    Q.   Did he tell you that they texted and talked on the phone?

11:30AM    3    A.   No, not that I recall.

11:30AM    4    Q.   Are there ethical standards for DEA special agents about

11:30AM    5    who you can and can't investigate when you have a

11:30AM    6    relationship with a person?

11:30AM    7    A.   Yes.

11:30AM    8    Q.   Is it appropriate for a DEA special -- agent as an acting

11:31AM    9    group supervisor, would you approve a DEA special agent

11:31AM    10   investigating someone he's personal friends with?

11:31AM    11   A.   I would definitely run that up the chain of command.

11:31AM    12   There is a policy in place where you're supposed to report

11:31AM    13   the connection, and then there's an internal process where

11:31AM    14   things like that get reviewed.  And I would say most times

11:31AM    15   the agent that's close personal friends does not work that

11:31AM    16   case.

11:31AM    17   Q.   There are some pretty obvious problems investigating your

11:31AM    18   close personal friends, right, sir?

11:31AM    19   A.   Yes.

11:31AM    20        **MR. MacKAY:**  Objection, leading.

11:31AM    21        **THE COURT:**  Sustained.

11:31AM    22        **BY MR. COOPER:**

11:31AM    23   Q.   Would you approve somebody --

11:31AM    24        **THE COURT:**  Stop, stop, stop.

11:31AM    25        The jury will strike that last question and answer.

USA v Bongiovanni - Wisniewski - Cross/Redirect - 8/7/24

11:31AM   1          Go ahead, Mr. Cooper.

11:31AM   2          **BY MR. COOPER:**

11:31AM   3   Q.  As an acting group supervisor, would you approve someone

11:31AM   4   to investigate their close personal friend?

11:31AM   5   A.  Probably not.

11:32AM   6   Q.  If you had known in 2008 when you approved the defendant

11:32AM   7   to do the cold approach that he was close personal friends

11:32AM   8   with Peter Gerace, would you have approved it?

11:32AM   9   A.  Again, as I stated earlier, I would definitely -- it

11:32AM   10  would definitely affect the decision-making process.  It

11:32AM   11  would be discussed above my level.  And then I probably

11:32AM   12  wouldn't be the one making that decision.

11:32AM   13  Q.  That's not what happened, though, right?

11:32AM   14  A.  No.

11:32AM   15  Q.  Do you know a person by the name of Dale Kasprzyk?

11:32AM   16  A.  Yes.

11:32AM   17  Q.  Would it be fair to say he became a group supervisor

11:32AM   18  sometime at or after 2009?

11:32AM   19  A.  Again, I don't recall specifically, but that sounds like

11:32AM   20  it could be correct.

11:32AM   21  Q.  Do you -- can you just tell the jury who specifically are

11:32AM   22  the people that you recall discussing the defendant doing a

11:32AM   23  cold approach with?

11:32AM   24  A.  TJ Webb, Dave Turri from the IRS, partner agencies.

11:33AM   25  Brian Conneely.  And I don't know if Dale Kasprzyk was a part

11:33AM   1   of those conversations, or not.

11:33AM   2   Q.  You don't have any recollection of discussing it with

11:33AM   3   Dale Kasprzyk?

11:33AM   4   A.  I don't.

11:33AM   5   Q.  Okay.  And you were asked some questions on

11:33AM   6   cross-examination at the beginning of the cross about the

11:33AM   7   passage of time that's occurred between when this incident

11:33AM   8   happened and your testimony here today, right?

11:33AM   9   A.  Yes.

11:33AM   10  Q.  And you were asked some questions about your ability to

11:33AM   11  recall details of conversations, right?

11:33AM   12  A.  Yes, right.

11:33AM   13  Q.  When you didn't remember something, when you were asked a

11:33AM   14  question, did you say you didn't remember?

11:33AM   15  A.  I believe I did.

11:33AM   16  Q.  Okay.  Have you made anything up from the witness stand,

11:33AM   17  sir?

11:33AM   18  A.  No.

11:33AM   19  Q.  Did you want to come here and testify against your former

11:33AM   20  coworker?

11:33AM   21  A.  No, I did not.

11:33AM   22  Q.  When you told the jury that you remembered something, did

11:34AM   23  you remember it?

11:34AM   24  A.  Yes.

11:34AM   25  Q.  Did you tell them the details that you remembered?

11:34AM    1    A.  Yes.

11:34AM    2    Q.  Did you make any of that up?

11:34AM    3    A.  No.

11:34AM    4         MR. COOPER:  No further questions, Judge.

11:34AM    5

11:34AM    6              RECROSS-EXAMINATION BY MR. MacKAY:

11:34AM    7    Q.  Just to finish up, Agent Wisniewski, discussing this cold

11:34AM    8    approach, that's a connection that the office would try to

11:34AM    9    make to Peter Gerace, correct?

11:34AM   10    A.  Yes.

11:34AM   11    Q.  Wouldn't necessarily change who was investigating the

11:34AM   12    case, correct?

11:34AM   13    A.  No.

11:34AM   14    Q.  I mean, let's say a cold approach was theoretically

11:34AM   15    successful, it doesn't mean that Mr. Bongiovanni is going to

11:34AM   16    take the case over, correct?

11:34AM   17    A.  Correct.

11:34AM   18    Q.  It was still in your hands or whoever was handling the

11:34AM   19    case, correct?

11:34AM   20    A.  Correct.

11:34AM   21    Q.  You testified earlier that you were the case agent for a

11:34AM   22    long time on the Matt Scalia file, correct?

11:34AM   23    A.  Yes.

11:34AM   24    Q.  Okay.  Regarding, again, this discussion about starting

11:34AM   25    the cold approach, as you sit here today do you remember that

11:35AM    1    you did discuss this with leadership in some way, correct?

11:35AM    2    A.  Yes.

11:35AM    3    Q.  There were people you told who were above you, correct?

11:35AM    4    A.  Yes.

11:35AM    5    Q.  And as best you can fathom it, it obviously got approved,

11:35AM    6    because you told Mr. Bongiovanni he could go do it?

11:35AM    7    A.  Yes.

11:35AM    8    Q.  You said he also made links to outside agencies telling

11:35AM    9    them that this was gonna happen, correct?

11:35AM    10   A.  Yes.

11:35AM    11   Q.  And --

11:35AM    12           MR. MacKAY:  Just checking my notes here.

11:35AM    13           That's all the questions I have.  Thank you.

11:35AM    14           THE COURT:  Anything more, Mr. Cooper?

11:35AM    15           MR. COOPER:  No, thank you, Judge.

11:35AM    16           THE COURT:  You can step down, sir.

11:35AM    17           THE WITNESS:  Yes, Judge.

11:35AM    18           (Witness excused at 11:35 a.m.)

           19           (Excerpt concluded at 11:35 a.m.)

           20           *     *     *     *     *     *     *

           21

           22

           23

           24

           25

1

2                    **CERTIFICATE OF REPORTER**

3

4              In accordance with 28, U.S.C., 753(b), I

5    certify that these original notes are a true and correct

6    record of proceedings in the United States District Court for

7    the Western District of New York on August 7, 2024.

8

9

10                         s/ Ann M. Sawyer
                          Ann M. Sawyer, FCRR, RPR, CRR
11                        Official Court Reporter
                          U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        **TRANSCRIPT INDEX**

3          **EXCERPT - EXAMINATION OF CHRISTOPHER WISNIEWSKI**

4                           **AUGUST 7, 2024**

5

6

7    **W I T N E S S**                                    **P A G E**

8    **C H R I S T O P H E R   W I S N I E W S K I**      2

9      DIRECT-EXAMINATION BY MR. COOPER:                 2

10     CROSS-EXAMINATION BY MR. MacKAY:                  40

11     REDIRECT EXAMINATION BY MR. COOPER:               56

12     RECROSS-EXAMINATION BY MR. MacKAY:                61

13

14

15   **E X H I B I T**                                    **P A G E**

16   GOV Exhibit 30B                                     18

17

18

19

20

21

22

23

24

25