09:27AM

1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK
2
   _____
3  UNITED STATES OF AMERICA,

                                    Case No. 1:19-cr-227
4                 Plaintiff,                    (LJV)
   v.
5                                   August 28, 2024
   JOSEPH BONGIOVANNI,
6
   _____
7                 Defendant.


8       TRANSCRIPT EXCERPT - EXAMINATION OF LOUIS SELVA - DAY 2
              BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                    UNITED STATES DISTRICT JUDGE

10 APPEARANCES:              TRINI E. ROSS, UNITED STATES ATTORNEY
                             BY: JOSEPH M. TRIPI, ESQ.
11                               NICHOLAS T. COOPER, ESQ.
                                 CASEY L. CHALBECK, ESQ.
12                           Assistant United States Attorneys
                             Federal Centre, 138 Delaware Avenue
13                           Buffalo, New York 14202
                             For the Plaintiff
14
                             SINGER LEGAL PLLC
15                           BY: ROBERT CHARLES SINGER, ESQ.
                             80 East Spring Street
16                           Williamsville, New York 14221
                                And
17                           LAW OFFICES OF PARKER ROY MacKAY
                             BY: PARKER ROY MacKAY, ESQ.
18                           3110 Delaware Avenue
                             Kenmore, New York 14217
19                              And
                             OSBORN, REED & BURKE, LLP
20                           BY: JOHN J. GILSENAN, ESQ.
                             120 Allens Creek Road
21                           Rochester, New York 14618
                             For the Defendant
22
   PRESENT:                  BRIAN A. BURNS, FBI Special Agent
23                           MARILYN K. HALLIDAY, HSI Special Agent
                             KAREN A. CHAMPOUX, USA Paralegal
24
   LAW CLERK:                REBECCA FABIAN IZZO, ESQ.
25

| | |
|---|---|
| 1 | **COURT DEPUTY CLERK:**  **JENNIFER L. VERNEN** |
| 2 | **COURT REPORTER:**      **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 3 | Robert H. Jackson Federal Courthouse 2 Niagara Square Buffalo, New York 14202 |
| 4 | Ann_Sawyer@nywd.uscourts.gov |
| 5 | |
| 6 | *      *      *      *      *      *      * |
| 7 | (Excerpt commenced at 9:37 a.m.) |
| 8 | (Jury seated at 9:37 a.m.) |
| 9 | **THE COURT:**  Good morning, everyone. |
| 10 | **ALL PARTIES:**  Good morning. |
| 11 | **THE COURT:**  The record will reflect that all of our |
| 12 | jurors, again, are present. |
| 13 | I remind the witness that he's still under oath. |
| 14 | And, Mr. Tripi, you may continue. |
| 15 | **MR. TRIPI:**  Thank you, Your Honor. |
| 16 | |
| 17 | **L O U I S   S E L V A,** having been previously duly called and |
| 18 | sworn, continued to testify as follows: |
| 19 | |
| 20 | **(CONT'D) DIRECT EXAMINATION BY MR. TRIPI:** |
| 21 | Q.  Good morning, Mr. Selva. |
| 22 | A.  Good morning. |
| 23 | Q.  Just to set the scene where we left off yesterday, you |
| 24 | had just finished describing your initial conversation with |
| 25 | the defendant where you made the offer to him for $2,000 per |

Timestamps (left margin): lines 7-25 marked 09:37AM (lines 7-13) and 09:38AM (lines 14-25).

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

09:38AM 1  month.  He -- he was reluctant, and said he would have your

09:38AM 2  back, that the conversation was between you and he.  And you

09:38AM 3  left off saying you wanted to talk with Mike and Ron; is that

09:38AM 4  right?

09:38AM 5  A.  Correct.

09:38AM 6  Q.  That's where we left off yesterday?  Okay.

09:38AM 7      After that discussion with the defendant, did you leave

09:38AM 8  that discussion thinking you would eventually or ultimately

09:38AM 9  be able to convince him to accept the bribe payments?

09:38AM 10  A.  Yes, eventually.

09:39AM 11  Q.  Why were you confident?

09:39AM 12  A.  Just the trust factor that we had in each other, our

09:39AM 13  relationship.

09:39AM 14  Q.  After that discussion with the defendant, did you go back

09:39AM 15  to Masecchia and relay to him your conversation that you had

09:39AM 16  had with this defendant?

09:39AM 17  A.  I did, yes.

09:39AM 18  Q.  What did you -- what did you tell Masecchia and what did

09:39AM 19  he respond?

09:39AM 20  A.  I told him he's reluctant and hesitant in doing it.  But

09:39AM 21  I'm gonna set up another meeting, and I'm sure that he'll

09:39AM 22  agree to it.

09:39AM 23  Q.  What did -- what did Masecchia contribute to that

09:39AM 24  discussion, if anything?

09:39AM 25  A.  He just -- same thing, he reiterated the figure that was

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

4

| | | |
|---|---|---|
| 09:39AM | 1 | involved, and not much. |
| 09:40AM | 2 | Q.  When you say "he reiterated the figure that was |
| 09:40AM | 3 | involved," what do you mean by? |
| 09:40AM | 4 | A.  That the $2,000, he said stress that, how that could be |
| 09:40AM | 5 | of help to him and what it can do for his situation. |
| 09:40AM | 6 | Q.  Did you advise Masecchia that you had laid out the whole |
| 09:40AM | 7 | operation to the defendant, as well as the participants? |
| 09:40AM | 8 | A.  I did, yes. |
| 09:40AM | 9 | Q.  What, if anything, did Masecchia say to that? |
| 09:40AM | 10 | A.  He -- he agreed to it.  Yeah.  He said that's good.  He |
| 09:40AM | 11 | just wanted to make sure all bases were going to be covered |
| 09:40AM | 12 | when it was being presented. |
| 09:40AM | 13 | Q.  So ultimately did a little bit of time pass before you |
| 09:40AM | 14 | set up another meeting? |
| 09:40AM | 15 | A.  Yes. |
| 09:40AM | 16 | Q.  About how much time passed, if you had to estimate? |
| 09:40AM | 17 | A.  Week, two weeks, week and a half, somewhere around there. |
| 09:40AM | 18 | Q.  How did you set up the next meeting with the defendant? |
| 09:41AM | 19 | A.  I reached out and said I wanted to get together and talk. |
| 09:41AM | 20 | Q.  Was the purpose of that meeting to take another try to |
| 09:41AM | 21 | essentially convince him to go on retainer? |
| 09:41AM | 22 | A.  Yes, exactly. |
| 09:41AM | 23 | Q.  Do you remember where you ultimately met that time? |
| 09:41AM | 24 | A.  It was a bar downtown for a drink. |
| 09:41AM | 25 | Q.  You remember it was a bar at least? |

| | | |
|---|---|---|
| 09:41AM | 1 | A.  It was a bar, I believe. |
| 09:41AM | 2 | Q.  Describe that next meeting with the defendant to discuss |
| 09:41AM | 3 | further this $2,000 per month retainer. |
| 09:41AM | 4 | A.  Again, I told him I talked to Ron and Mike regarding what |
| 09:41AM | 5 | was proposed.  If he'd give it any thought, how it can help |
| 09:41AM | 6 | him get through the situation he's involved in with his |
| 09:41AM | 7 | finances. |
| 09:41AM | 8 | Q.  What did you mean by that?  What were you referencing, |
| 09:41AM | 9 | the situation with his finances? |
| 09:42AM | 10 | A.  Well, with his expenses, his divorce, and those expenses |
| 09:42AM | 11 | and living expenses and all the expenses he's been incurring. |
| 09:42AM | 12 | Q.  Please continue with the discussion.  Go ahead. |
| 09:42AM | 13 | A.  Explained that.  And he -- he -- eventually he agreed. |
| 09:42AM | 14 | Q.  Did you have to do some persuading during the discussion? |
| 09:42AM | 15 | A.  Yes. |
| 09:42AM | 16 | Q.  What did you say? |
| 09:42AM | 17 | A.  I kept highlighting how it could help.  How this |
| 09:42AM | 18 | additional money could help -- help him get through a rough |
| 09:42AM | 19 | time.  And it will be consistent every month. |
| 09:42AM | 20 | Q.  What did he say in agreeing to do it? |
| 09:42AM | 21 | A.  He agreed.  He was hesitant, but he agreed.  He says, |
| 09:42AM | 22 | okay.  We'll meet once a month.  That was gonna be with Mike. |
| 09:42AM | 23 | And he would keep an eye.  He would make sure things were |
| 09:43AM | 24 | okay.  It was gonna start. |
| 09:43AM | 25 | Q.  Did you tell him what type of information that you would |

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

6

09:43AM     1    want provided?

09:43AM     2    A.   Yes.

09:43AM     3    Q.   What did you tell him?

09:43AM     4    A.   If there was any investigations, if anybody was hot or

09:43AM     5    followed, if anyone had been busted that had mentioned names.

09:43AM     6    Anything pertaining to what was going on.

09:43AM     7    Q.   What do you mean by if there were any investigations,

09:43AM     8    like, elaborate for the jury so they understand.

09:43AM     9    A.   If somebody was hot or under investigation by a different

09:43AM    10    agency, or his agency, or whatever.  I mean, if somebody's

09:43AM    11    name had come up, just to be aware of that.

09:43AM    12    Q.   What do you mean by if someone's name had come up?

09:43AM    13    A.   The names that I had mentioned, Ron, Mike, myself, in our

09:44AM    14    group.

09:44AM    15    Q.   When you say "our group," are you referencing the other

09:44AM    16    people that you referenced the other day?

09:44AM    17    A.   Yes.  Yes.  Yes.

09:44AM    18    Q.   Did you express to him whether you were interested in

09:44AM    19    learning about if there were any informants that were talking

09:44AM    20    about members of the group?

09:44AM    21    A.   Yes.

09:44AM    22    Q.   What did you say in that regard?

09:44AM    23    A.   I said if you have any information on informants that are

09:44AM    24    working with agencies, that would be very helpful so we can

09:44AM    25    get a heads-up.

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24    7

| | | |
|---|---|---|
| 09:44AM | 1 | Q.  What did he say to each of those categories of |
| 09:44AM | 2 | information and help? |
| 09:44AM | 3 | A.  He said he would do his best or have his eyes open.  And |
| 09:44AM | 4 | going forward, he'll be aware of it and let us know. |
| 09:44AM | 5 | Q.  Was there a plan that you had discussed with Masecchia |
| 09:45AM | 6 | about what you would do if the defendant notified you that in |
| 09:45AM | 7 | fact there was an investigation into your group or into the |
| 09:45AM | 8 | area? |
| 09:45AM | 9 | A.  If the defendant -- could -- |
| 09:45AM | 10 | Q.  Was there a plan that you had discussed with Masecchia |
| 09:45AM | 11 | about what you would do if the defendant came back and said, |
| 09:45AM | 12 | hey, you guys are under investigation, what was the plan? |
| 09:45AM | 13 | A.  Yes.  Get rid of everything right away, all the evidence, |
| 09:45AM | 14 | break everything down, break all contact. |
| 09:45AM | 15 | Q.  With each other? |
| 09:45AM | 16 | A.  With each other.  Any burner phones that he had -- Mike |
| 09:45AM | 17 | had quite a few burner phones, him and Ron, get rid of those, |
| 09:45AM | 18 | get rid of all the -- |
| 09:45AM | 19 | Q.  What would you do with the grow operation? |
| 09:45AM | 20 | A.  Destroy it. |
| 09:45AM | 21 | Q.  How? |
| 09:45AM | 22 | A.  We would go out there and physically remove it, cut it |
| 09:45AM | 23 | down.  Get rid of everything. |
| 09:45AM | 24 | Q.  When the defendant told you he was agreeable to the |
| 09:45AM | 25 | $2,000 per month, was there further conversation with regard |

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

8

09:46AM  1  to how frequent the payments would be?

09:46AM  2  A.  Yes, once a month.  And that would be through Mike.

09:46AM  3  Q.  Describe that part of the discussion that the payments

09:46AM  4  would come through Mike.

09:46AM  5  A.  Ron was paying Mike.  So Mike had said I'll reach out

09:46AM  6  once a month, and I'll meet him at a location, undisclosed

09:46AM  7  location that they agreed upon, and he would pay him in cash.

09:46AM  8  Q.  And you explained that to the defendant?

09:46AM  9  A.  Yes.

09:46AM  10  Q.  What did the defendant say about taking the cash receipt,

09:46AM  11  receiving the cash payments from Masecchia?

09:46AM  12  A.  He was fine with it.  It was going to be a brief meeting.

09:46AM  13  Q.  Did you discuss with the defendant who the ultimate

09:46AM  14  source of the money was?

09:46AM  15  A.  Yes.

09:46AM  16  Q.  What did you tell him?

09:46AM  17  A.  I told him it's coming from Ron Serio, who is the top of

09:46AM  18  this thing.  He's been cashing us out and providing the cash

09:46AM  19  for this.

09:47AM  20  Q.  Was there a discussion between you and the defendant

09:47AM  21  about what you -- your role with him would be moving forward?

09:47AM  22  A.  Just to meet once a month, get together, see how things

09:47AM  23  are going, if anything's happening.  So --

09:47AM  24  Q.  What do you mean by see how things are going, if

09:47AM  25  anything's happening?

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

09:47AM  1   A.  If there are any investigations, anyone's hot, anyone's

09:47AM  2   been busted, that type of thing.

09:47AM  3   Q.  When were the payments from Masecchia to the defendant

09:47AM  4   sourced by Ron Serio to be made every month?  Was it near the

09:47AM  5   beginning of the month, do you know?

09:47AM  6   A.  I don't recall.  Maybe the middle of the month.  I -- I

09:47AM  7   don't recall.

09:47AM  8   Q.  Was there a set day when you would meet with the

09:47AM  9   defendant each month or did it --

09:47AM  10  A.  No.

09:47AM  11  Q.  -- happen --

09:47AM  12  A.  It usually happened after that, I would meet with him.

09:47AM  13  We'd get together.  And then Ron and Mike would coordinate

09:47AM  14  the payments and that arrangement was made.

09:47AM  15  Q.  So the defendant would meet and have discussions with you

09:48AM  16  monthly, and meet separately with Masecchia for the payments?

09:48AM  17  A.  Briefly, yes.

09:48AM  18  Q.  Were all meetings in person?

09:48AM  19  A.  I believe so, yes.

09:48AM  20  Q.  Was everything you did with Masecchia in person?

09:48AM  21  A.  Yes.

09:48AM  22  Q.  Did you provide the defendant with a way to contact

09:48AM  23  Masecchia or did you provide Masecchia with a way to contact

09:48AM  24  the defendant so they could coordinate?

09:48AM  25  A.  I provided Masecchia a way.  I gave him the defendant's

09:48AM    1    number, because he was using different burner phones.

09:48AM    2    Q.  What do you mean by a "burner phone?"

09:48AM    3    A.  A burner phone is a prepaid phone you buy, it has

09:48AM    4    minutes, and then when you're done with it, you kind of throw

09:48AM    5    it out so to speak.  It has no use after that, unless you

09:48AM    6    reload the minutes, but there's no account name on it.

09:49AM    7    Q.  Masecchia used a lot of those different burner phones?

09:49AM    8    A.  Yes.

09:49AM    9    Q.  Were you privy to the actual times and locations that

09:49AM   10    Masecchia and the defendant met to exchange money?

09:49AM   11    A.  No.  No.  That was between them.

09:49AM   12    Q.  Did you know those meetings were happening though?

09:49AM   13    A.  Yes.  Mike would tell me.

09:49AM   14    Q.  I'll get to this in a little bit more detail later on,

09:49AM   15    but over time, did the defendant complain he wanted more

09:49AM   16    money from the group?

09:49AM   17    A.  Eventually.

09:49AM   18    Q.  Did that confirm for you the defendant was getting the

09:50AM   19    money each month from Masecchia?

09:50AM   20    A.  Yes.

09:50AM   21    Q.  When you discussed this initial payment scheme with

09:50AM   22    Masecchia, did he tell you why he would be the one handling

09:50AM   23    the money drops to the defendant?

09:50AM   24    A.  Ron had paid him.  And then Mike -- that was just Mike,

09:50AM   25    he just handled all the cash and anything to do with it, he

09:50AM   1    wanted to handle it.  There was no specific reason.

09:50AM   2    Q.  By this point, are you fully aware that Mike Masecchia is

09:50AM   3    a made guy?

09:50AM   4    A.  Yes.

09:50AM   5    Q.  Was Ron Serio a made guy?

09:50AM   6    A.  No.

09:50AM   7    Q.  Did that give Masecchia some status in the organization?

09:50AM   8    A.  Yes.

09:50AM   9    Q.  What was your agreement with the defendant, how you would

09:51AM  10    coordinate the monthly meetings to meet up for information

09:51AM  11    exchanges?

09:51AM  12    A.  Reach out to him, we'd meet out -- it was a brief

09:51AM  13    conversation:  How's everything going?  Everything okay?

09:51AM  14    Anything we should be concerned about?  Any investigations?

09:51AM  15    Anyone that's been busted?  That's it.  Just brief overview.

09:51AM  16    Q.  And what would the defendant typically say?

09:51AM  17    A.  Everything's okay.

09:51AM  18    Q.  And then you would carry on with your evening and talk

09:51AM  19    about other things?

09:51AM  20    A.  That's it.  It was a brief conversation.

09:51AM  21    Q.  When the defendant would meet with Masecchia exchanging

09:51AM  22    the money, did that provide them an opportunity to meet as

09:51AM  23    well?

09:51AM  24    A.  Yes.

09:51AM  25    Q.  Why were your set meetings once a month?

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

09:52AM   1    A.   That's how Ron wanted to do it.   He said he wanted to pay

09:52AM   2    once a month.

09:52AM   3    Q.   So the way it was set up was Serio provides 2,000 a month

09:52AM   4    to Masecchia, right?

09:52AM   5    A.   Yes.

09:52AM   6    Q.   Masecchia pays the defendant?

09:52AM   7    A.   Yes.

09:52AM   8    Q.   And you and the defendant meet separately for updates?

09:52AM   9    A.   Correct.

09:52AM   10   Q.   In the context of the defendant meeting with you for the

09:52AM   11   updates, did you have a further conversation with the

09:52AM   12   defendant about Masecchia's status?

09:52AM   13   A.   No.   He was aware of it.   Didn't come up much.

09:52AM   14   Q.   I guess what I'm asking you is, was there a reason that

09:53AM   15   the meetings for information in the sit-downs would be with

09:53AM   16   you as opposed to Masecchia?

09:53AM   17   A.   No.   He knew of Mike's status.   Basically, that was

09:53AM   18   really Mike's doing.   He wanted to get together and make sure

09:53AM   19   the payment was there, pay him directly.

09:53AM   20   Q.   My question -- did you believe it would be less

09:53AM   21   conspicuous for the defendant to meet with you monthly versus

09:53AM   22   Masecchia because of Masecchia's status?

09:53AM   23   A.   Yes.

09:53AM   24   Q.   Okay.   That's what I'm asking.

09:53AM   25   A.   Yes.

09:53AM    1    Q.  Can you explain that part for the jury?

09:53AM    2    A.  Yes.  Him and Mike would meet at undisclosed locations.

09:53AM    3    So not to meet with me would kind of, like, leave me out of

09:53AM    4    the equation so to speak.

09:53AM    5        Nobody would see us together, figuring out or looking at

09:53AM    6    us like there was being cash or whatever.  I don't know what

09:53AM    7    was -- we don't know what was going on, but it just was the

09:53AM    8    agreement that was made.

09:53AM    9    Q.  Was Masecchia high profile in the neighborhood?

09:54AM   10    A.  He was.

09:54AM   11    Q.  Did the defendant want to be seen with Masecchia in

09:54AM   12    public a lot?

09:54AM   13    A.  Not a lot.

09:54AM   14    Q.  Okay.  Was that one of the reasons why you were meeting

09:54AM   15    with him to see what was going on?

09:54AM   16    A.  Yes.

09:54AM   17    Q.  At that point, who were the people that you were aware of

09:54AM   18    that knew that cash was going to be paid from Serio to

09:54AM   19    Masecchia to the defendant?

09:54AM   20    A.  Who knew?

09:54AM   21    Q.  Yeah.  As of that point in time, who did you -- who were

09:54AM   22    you aware of that knew about this setup?

09:54AM   23    A.  The parties that were involved: Myself, Mike, Ron and the

09:54AM   24    defendant.

09:55AM   25    Q.  As -- as these meetings started to happen and time

09:55AM  1  started go on, were there times when Masecchia would mention

09:55AM  2  something to you that he discussed with Bongiovanni?

09:55AM  3  A.  No.  It was just basically the handoff of what was being

09:55AM  4  paid and that was it.

09:55AM  5  Q.  Were there times when Bongiovanni mentioned Mike in

09:55AM  6  discussions with you?

09:55AM  7  A.  Yes.

09:55AM  8  Q.  Just generally?

09:55AM  9  A.  Yes.  Yes.  Yes.

09:55AM  10  Q.  Did the fact there were times that they were talking

09:55AM  11  about one another confirm for you they were meeting?

09:55AM  12  A.  Yes.

09:55AM  13  Q.  Approximately how long in terms of number of years were

09:56AM  14  the payments at the $2,000-per-month level?

09:56AM  15  A.  From, like, 2008, '9, to '11, '12, right around there,

09:56AM  16  three or four years.

09:56AM  17  Q.  I think you've previously estimated about two years, are

09:56AM  18  you estimating all times?

09:56AM  19  A.  I'm estimating, yes, sir.

09:56AM  20  Q.  What's your best estimate, would you say?

09:56AM  21  A.  Between two to three years.

09:56AM  22  Q.  What happened to the amount of monthly payments after

09:56AM  23  that time?

09:56AM  24  A.  It was proposed to go up because their operation was

09:56AM  25  expanding.

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

09:56AM   1   Q.  So the amount increased?

09:56AM   2   A.  Yes.

09:56AM   3   Q.  As time went on, did the defendant say things to you

09:57AM   4   about the -- his value to your group?

09:57AM   5   A.  Yes.

09:57AM   6   Q.  What types of things did the defendant say to you over

09:57AM   7   time?

09:57AM   8   A.  The information he's bringing.  The different agencies

09:57AM   9   they have in contact with.

09:57AM  10   Q.  Like what, be specific, if you can.

09:57AM  11   A.  Like if the operation -- I mentioned to him that the

09:57AM  12   operation was growing, it was about ready to grow.  And it's

09:57AM  13   gonna start expanding from different areas.  And, therefore,

09:57AM  14   there's going to be different information needed, because

09:57AM  15   it's going to be transported through different venues --

09:57AM  16   trucking, New York City runs, that type thing.

09:57AM  17       So we would need more information from different, like,

09:57AM  18   other agencies were involved.

09:57AM  19   Q.  Did you -- did you tell the defendant about specific

09:57AM  20   methods of transportation for narcotic -- for marijuana

09:57AM  21   distribution?

09:57AM  22   A.  I did.

09:58AM  23   Q.  What did you -- be specific.  What did you tell them?

09:58AM  24   A.  It was coming -- let me explain the areas:  It was coming

09:58AM  25   from British Columbia, Canada, and New York, and there was

09:58AM  1    going to be trucking, and there was going to be

09:58AM  2    transportation from New York to Buffalo.

09:58AM  3        We were gonna be driving, Ron and Mike.  So they just

09:58AM  4    needed to make sure that things were okay when they were

09:58AM  5    traveling and moving it.

09:58AM  6    Q.  You explained all that to the defendant?

09:58AM  7    A.  Yes.

09:58AM  8    Q.  What did he say about his ability to keep a lookout for

09:58AM  9    the transportation angle?

09:58AM  10   A.  He said he'll do his best.  He'll keep a watchful eye on

09:58AM  11   it.  And if something unusual happened, he would let us know.

09:58AM  12   Q.  In that context, did the defendant start indicating to

09:58AM  13   you he wanted more money?

09:58AM  14   A.  Yes.

09:58AM  15   Q.  What was he saying?

09:58AM  16   A.  Because the operation is expanded and I'm giving more

09:59AM  17   information through different agencies, the figure has to

09:59AM  18   increase, and then it did.

09:59AM  19   Q.  What did the figure go up to?

09:59AM  20   A.  $4,000 a month.

09:59AM  21   Q.  Describe when the -- when the defendant indicated that

09:59AM  22   he'd like more money, what conversations did you have with

09:59AM  23   Masecchia or Serio?  Explain that for the jury.

09:59AM  24   A.  I told Ron and Mike that it was brought up that --

09:59AM  25   because you're asking for more, they're -- he's -- the

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

09:59AM  1  defendant's asking for more money, and the value it's

09:59AM  2  bringing.  And they understood that.

09:59AM  3      Because as this thing expanded, it was a more wider

09:59AM  4  range.  So they agreed to it.  They understood the -- they

09:59AM  5  understood.

09:59AM  6  Q.  By that point, you indicated there were trips happening

09:59AM  7  back and forth from the New York City area?

09:59AM  8  A.  There were, yes.

09:59AM  9  Q.  Were there trucks coming across the country?

10:00AM  10  A.  There were, from British Columbia, Canada, I believe.  Or

10:00AM  11  I'm sorry, yes, from California.  I'm sorry, British Columbia

10:00AM  12  is Canada.  California and British Columbia.

10:00AM  13  Q.  So there were trucks coming from California, as well as

10:00AM  14  through Canada?

10:00AM  15  A.  Yes, my mistake.

10:00AM  16  Q.  California, as well as through Canada?

10:00AM  17  A.  Yes.

10:00AM  18  Q.  As those operations were expanding, were Mike and Ron

10:00AM  19  having more concerns about their exposure?

10:00AM  20  A.  They were.  Because obviously it's getting bigger, it's

10:00AM  21  going through different state lines, from a different

10:00AM  22  country, obviously, the risk is going to be a little higher.

10:00AM  23  So they were very interested in more information and being

10:00AM  24  accurate.

10:00AM  25  Q.  Over that initial two to three year initial period before

10:00AM  1  this dollar amount is negotiated to be higher, okay, by that

10:01AM  2  point, had the defendant been generally providing information

10:01AM  3  that there were no investigations?

10:01AM  4  A.  Yes.

10:01AM  5  Q.  Did he -- did he ever get specific to you about how he

10:01AM  6  was protecting the group and looking out?

10:01AM  7  A.  He knew the players, and he would just be aware if

10:01AM  8  anything was going on -- if their names were brought up.  If

10:01AM  9  anyone was busted that had mentioned their names, that type

10:01AM  10  thing.  Any informant that had mentioned their names.

10:01AM  11  Q.  Based on your discussions with the defendant, do you

10:01AM  12  believe he had a lot of access to law enforcement

10:01AM  13  information?

10:01AM  14  A.  Yes.

10:01AM  15  Q.  When -- how did you communicate to the defendant that

10:01AM  16  Serio and Masecchia were -- were agreeable to paying more

10:02AM  17  money and that it would be $4,000 per month?  Can you

10:02AM  18  describe that conversation with the defendant?

10:02AM  19  A.  Yes.  I reached out to him.  We had met for a drink, and

10:02AM  20  I explained that because the operation is expanded and

10:02AM  21  they're asking more, the amount would be $4,000.  And it was

10:02AM  22  agreed upon.  So --

10:02AM  23  Q.  Was one other law enforcement agency that Masecchia

10:02AM  24  specifically was -- indicated he was concerned about, was it

10:02AM  25  a federal agency formerly known as ICE?

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

19

| | | |
|---|---|---|
| 10:02AM | 1 | A.  Yes, Mike brought that up.  He was concerned about that. |
| 10:02AM | 2 | Q.  Did you relay that to the defendant? |
| 10:02AM | 3 | A.  I did.  And I'm not familiar with what ICE does. |
| 10:02AM | 4 | Q.  Do you understand ICE to be affiliated with or now |
| 10:02AM | 5 | Homeland Security? |
| 10:02AM | 6 | A.  Yes, now. |
| 10:03AM | 7 | Q.  Did Mike and Ron also want to know whether any phones |
| 10:03AM | 8 | were being tapped? |
| 10:03AM | 9 | A.  They did. |
| 10:03AM | 10 | Q.  Did they want to make sure that nobody was on to their |
| 10:03AM | 11 | New York City travels? |
| 10:03AM | 12 | A.  They did, yes. |
| 10:03AM | 13 | Q.  Did they want to make sure there were no informants in |
| 10:03AM | 14 | the group? |
| 10:03AM | 15 | A.  They did. |
| 10:03AM | 16 | Q.  Did you relay all of that to the defendant? |
| 10:03AM | 17 | A.  I did. |
| 10:03AM | 18 | Q.  Did he agree to look out for all of that? |
| 10:03AM | 19 | A.  Yes. |
| 10:03AM | 20 | Q.  As time went on, did the defendant ever comment to you, |
| 10:03AM | 21 | if you recall, about whether Serio was making a lot of money |
| 10:03AM | 22 | or anything about Serio's finances that you recall? |
| 10:03AM | 23 | A.  No.  No. |
| 10:03AM | 24 | Q.  Were you also generally aware that Serio was someone who |
| 10:04AM | 25 | had access to and distributed cocaine on occasion? |

10:04AM   1    A.  I was aware of it, yes.

10:04AM   2    Q.  Now we talked a little bit about the defendant's end of

10:04AM   3    his relationship with Melissa and then the beginning of his

10:04AM   4    relationship with Lindsay yesterday; do you remember that?

10:04AM   5    A.  Yes.

10:04AM   6    Q.  So my question to you is in the context of these prices

10:04AM   7    that are being renegotiated.  By the time the defendant is

10:04AM   8    renegotiating to get $4,000 per month, at that point had he

10:04AM   9    taken on financial obligations related to his then-girlfriend

10:05AM   10   now-wife Lindsay?

10:05AM   11   A.  He did.

10:05AM   12   Q.  Okay.  Can you describe -- describe for the jury the

10:05AM   13   financial obligations that the defendant had taken on with

10:05AM   14   respect to his then-girlfriend now-wife Lindsay.

10:05AM   15   A.  They had moved in together from Lovering.  And she was a

10:05AM   16   full-time nursing student.  And her focus was school and

10:05AM   17   taking care of her son, so I don't believe she was working.

10:05AM   18       And the focus of all the financial obligations would be

10:05AM   19   met with the defendant.  So that was more -- quite a bit more

10:05AM   20   money.

10:05AM   21   Q.  What did he tell you he was going to pay for as it

10:05AM   22   related to Lindsay moving in with him?

10:05AM   23   A.  Living expenses -- I don't know her arrangement with

10:05AM   24   school, but if she needed any help with that.  Any type of

10:05AM   25   medical expenses.  Anything that she would need.

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24
21

| | | |
|---|---|---|
| 10:05AM | 1 | Q.  How old was her son at the time? |
| 10:05AM | 2 | A.  He was a -- I don't know. |
| 10:06AM | 3 | Q.  Was he young? |
| 10:06AM | 4 | A.  He was young. |
| 10:06AM | 5 | Q.  Was the defendant paying for him as well? |
| 10:06AM | 6 | A.  I don't believe so. |
| 10:06AM | 7 | Q.  Okay.  Did the defendant indicate he was paying all the |
| 10:06AM | 8 | bills? |
| 10:06AM | 9 | A.  Yes. |
| 10:06AM | 10 | Q.  Did the defendant still have financial obligations |
| 10:06AM | 11 | related to his child support and financial obligations |
| 10:06AM | 12 | related to his daughter, Chelsea? |
| 10:06AM | 13 | A.  Yes. |
| 10:06AM | 14 | Q.  Did the defendant start to complain less, over time, |
| 10:06AM | 15 | about his finances as he was accepting bribes? |
| 10:06AM | 16 | A.  Yes. |
| 10:06AM | 17 | Q.  Do you believe the cash bribes he was receiving helped |
| 10:07AM | 18 | him take on the additional financial burdens related to |
| 10:07AM | 19 | Lindsay and her son? |
| 10:07AM | 20 | A.  I -- |
| 10:07AM | 21 | **MR. SINGER:**  Objection, speculation. |
| 10:07AM | 22 | **THE COURT:**  Sustained.  Sustained.  The jury will |
| 10:07AM | 23 | strike that question and answer. |
| 10:07AM | 24 | **BY MR. TRIPI:** |
| 10:07AM | 25 | Q.  Did the defendant seem less stressed out about his |

| | | |
|---|---|---|
| 10:07AM | 1 | finances while Lindsay and his son -- her son are moving in? |
| 10:07AM | 2 | A.  Less stressed out. |
| 10:07AM | 3 | Q.  Yeah.  During that time period, was he -- as he's getting |
| 10:07AM | 4 | bribes and he's taking on Lindsay and her son -- |
| 10:07AM | 5 | A.  Yes. |
| 10:07AM | 6 | Q.  -- was he expressing less stress? |
| 10:07AM | 7 | A.  Yes, because of the additional income that was coming in. |
| 10:07AM | 8 | Q.  What was his social life like? |
| 10:07AM | 9 | A.  At that time, they were just starting going out.  They |
| 10:07AM | 10 | would go to dinners, go out.  They had a social life, very |
| 10:07AM | 11 | active social life. |
| 10:07AM | 12 | Q.  Did you know them to go for dinners? |
| 10:08AM | 13 | A.  Yes. |
| 10:08AM | 14 | Q.  Did you know them to go for drinks? |
| 10:08AM | 15 | A.  Yes. |
| 10:08AM | 16 | Q.  Did you know the defendant to like nice clothes? |
| 10:08AM | 17 | A.  Yes. |
| 10:08AM | 18 | Q.  Did you know Lindsay to like nice clothes? |
| 10:08AM | 19 | A.  Yes. |
| 10:08AM | 20 | Q.  Did you know the defendant to like watches? |
| 10:08AM | 21 | A.  Yes. |
| 10:08AM | 22 | Q.  What type of watches was the defendant interested in? |
| 10:08AM | 23 | A.  Invictas, Rolex. |
| 10:08AM | 24 | Q.  What type of watch is an Invicta watch? |
| 10:08AM | 25 | A.  It's a big, thick -- they range in price from -- it's a |

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

| | | |
|---|---|---|
| 10:08AM | 1 | broad range from either 300 to thousands of dollars.  It's |
| 10:08AM | 2 | just a bigger, like, diver watch.  A real big thick watch. |
| 10:08AM | 3 | Q.  Do you own one? |
| 10:08AM | 4 | A.  Yes. |
| 10:08AM | 5 | Q.  How much was yours? |
| 10:08AM | 6 | A.  300.  And then -- I have two -- |
| 10:08AM | 7 | Q.  Is yours a lower end or higher end? |
| 10:08AM | 8 | A.  -- I have three of them.  They are in the medium range. |
| 10:08AM | 9 | Q.  How many did the defendant have, if you have know? |
| 10:08AM | 10 | A.  I don't recall. |
| 10:08AM | 11 | Q.  Did he have nicer ones or worse ones than you? |
| 10:08AM | 12 | A.  No, he had nicer ones.  Much better than mine. |
| 10:08AM | 13 | Q.  Did you know him to buy a Rolex as well? |
| 10:09AM | 14 | A.  I believe so, yes. |
| 10:09AM | 15 | Q.  Is that a more expensive watch than an Invicta? |
| 10:09AM | 16 | A.  Yes, quite a bit. |
| 10:09AM | 17 | Q.  Is a Cadillac Escalade an expensive vehicle? |
| 10:09AM | 18 | A.  Very. |
| 10:09AM | 19 | Q.  Did he and Lindsay go on trips? |
| 10:09AM | 20 | A.  They did. |
| 10:09AM | 21 | Q.  Where did they travel to, as far as you know? |
| 10:09AM | 22 | A.  Florida, Vegas, maybe New York. |
| 10:09AM | 23 | Q.  Meaning New York City? |
| 10:09AM | 24 | A.  Yes, sir. |
| 10:09AM | 25 | Q.  Where did the defendant like to shop for his clothes? |

10:09AM  1  A.  High-end mens shops.  I mean I --

10:09AM  2  Q.  Did he have a friend who happened to own a high-end men's

10:09AM  3  shop that he hung out with?

10:09AM  4  A.  Yes.  It was actually his brother-in-law at the time.

10:09AM  5  Q.  Who was that?

10:10AM  6  A.  Napoli's Men's Shop.

10:10AM  7  Q.  Is that someone you and the defendant have used cocaine

10:10AM  8  with as well?

10:10AM  9  A.  Yes.

10:10AM  10  Q.  Are the clothes in Napoli's expensive?

10:10AM  11  A.  Yes, sir.

10:10AM  12  Q.  Did the defendant like to shop there?

10:10AM  13  A.  Yes.

10:10AM  14  Q.  Did he shop at other high-end men's shops as well?

10:10AM  15  A.  Yes.

10:10AM  16  Q.  After he started taking bribes, did he buy the Lovering

10:10AM  17  house from his parents?

10:10AM  18  A.  I don't recall.  That might have been before.  I'm not

10:10AM  19  quite sure.

10:10AM  20  Q.  After he started taking bribes, did he buy another

10:10AM  21  residence at 85 Alder Place?

10:10AM  22  A.  Yes.

10:11AM  23  Q.  When the defendant would go out with you and others, did

10:11AM  24  you go out with him?

10:11AM  25  A.  Yes.

10:11AM    1    Q.  Did you go to bars in groups?

10:11AM    2    A.  On occasion, yes.

10:11AM    3    Q.  Do you know Gassan Rizek?

10:11AM    4    A.  Yes.

10:11AM    5    Q.  Is he someone who would go out to bars with you and the

10:11AM    6    defendant?

10:11AM    7    A.  Not with me, but he was part of the defendant's group,

10:11AM    8    yes.

10:11AM    9    Q.  Would you be present?

10:11AM    10    A.  Yes, a few times, yes.

10:11AM    11    Q.  How was Gassan Rizek related to the defendant?

10:11AM    12    A.  I believe their girlfriends were friends.  Gassan's wife

10:11AM    13    now, I believe.

10:11AM    14    Q.  And we talked about Tom Napoli, was he in the defendant's

10:11AM    15    group?

10:11AM    16    A.  He was.  He was his brother-in-law at the time, well,

10:11AM    17    future brother-in-law at the time.

10:11AM    18    Q.  Who did Mr. Napoli marry that made him the defendant's

10:11AM    19    brother-in-law?

10:11AM    20    A.  He married his wife's sister.

10:11AM    21    Q.  What's her name?

10:11AM    22    A.  Ashley.

10:11AM    23    Q.  And is her maiden name Schuh?

10:11AM    24    A.  Yes.

10:12AM    25    Q.  And we've talked yesterday about Tom Doctor.  Is he

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

26

10:12AM    1   someone who would hang out on occasion and go to bars with

10:12AM    2   the defendant when you were present?

10:12AM    3   A.   On occasion, yes.

10:12AM    4   Q.   Based on your interactions, were those individuals that

10:12AM    5   we just talked about, have you been present with them and the

10:12AM    6   defendant when they were using cocaine?

10:12AM    7   A.   Yes.

10:12AM    8   Q.   On those occasions, was the defendant participating in

10:12AM    9   the cocaine use?

10:12AM   10   A.   Yes.

10:12AM   11   Q.   Were you -- were you at the defendant's wedding --

10:13AM   12   A.   Yes.

10:13AM   13   Q.   -- to his wife, Lindsay?

10:13AM   14   A.   Yes.

10:13AM   15   Q.   Where was that wedding?

10:13AM   16   A.   It was in Cabo San Lucas, Mexico.

10:13AM   17   Q.   And was that in or about February of 2015?

10:13AM   18   A.   It was.

10:13AM   19   Q.   So this is after the bribes had been being paid for years

10:13AM   20   by that point, right?

10:13AM   21   A.   Yes.

10:13AM   22   Q.   Who paid for the wedding?

10:13AM   23   A.   I believe the defendant did.

10:13AM   24   Q.   Were you the best man at that wedding?

10:13AM   25   A.   Yes.

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

10:13AM    1    Q.  Did you and the defendant and a group of the guys we just

10:13AM    2    talked about use cocaine at that wedding?

10:13AM    3    A.  Yes.

10:13AM    4    Q.  Describe that circumstance.

10:13AM    5    A.  There was a -- it was a resort, and it was a nightclub,

10:14AM    6    and we were getting ready to go out, down to it.  And cocaine

10:14AM    7    was there, and we did it.  We --

10:14AM    8    Q.  Who procured the cocaine?  Who had it?

10:14AM    9    A.  Tom had it.

10:14AM    10   Q.  Tom -- last name?

10:14AM    11   A.  Napoli.  And then I got it from someone at the hotel.  So

10:14AM    12   we all -- there was -- it was around.

10:14AM    13   Q.  Who were the guys -- where were you using it in a room?

10:14AM    14   A.  Yes.

10:14AM    15   Q.  Who were the guys using it?

10:14AM    16   A.  Myself, the defendant, Tom Napoli, and I believe Tom

10:14AM    17   Doctor.

10:14AM    18   Q.  What did the defendant say about hiding the usage?

10:14AM    19   A.  He didn't want to do it in public, so that's why we did

10:14AM    20   it in the room and just kind of keep it low key.

10:14AM    21   Q.  Can you estimate the total number of times that you were

10:15AM    22   present and either observed or did cocaine with the defendant

10:15AM    23   while he was a DEA agent?

10:15AM    24   A.  Five to ten.

10:15AM    25   Q.  And that's an estimate?

| | | |
|---|---|---|
| 10:15AM | 1 | A.  It's an estimate. |
| 10:15AM | 2 | Q.  That includes at the wedding in Mexico? |
| 10:15AM | 3 | A.  Yes. |
| 10:15AM | 4 | Q.  Where were some of the other locations that you remember |
| 10:15AM | 5 | the defendant using cocaine in a social situation? |
| 10:15AM | 6 | A.  Being out one time at the Curtiss Hotel.  Other time -- |
| 10:15AM | 7 | at Tom Doctor's, he had a cottage in Angola. |
| 10:15AM | 8 | Q.  Is that near a bar named Mickey Rats? |
| 10:16AM | 9 | A.  It is. |
| 10:16AM | 10 | Q.  Curtiss Hotel, that's a hotel in downtown Buffalo here? |
| 10:16AM | 11 | A.  Yes. |
| 10:16AM | 12 | Q.  They have, like, a rooftop bar? |
| 10:16AM | 13 | A.  Yes. |
| 10:16AM | 14 | Q.  Is that where you were? |
| 10:16AM | 15 | A.  Yes. |
| 10:16AM | 16 | Q.  Was there another bar you and the defendant used to go to |
| 10:16AM | 17 | at times called Mother's? |
| 10:16AM | 18 | A.  Yes. |
| 10:16AM | 19 | Q.  Where's that? |
| 10:16AM | 20 | A.  It's in the Buffalo -- in the Virginia Alley. |
| 10:16AM | 21 | Q.  Did you and the defendant know a bartender who worked |
| 10:16AM | 22 | there? |
| 10:16AM | 23 | A.  We did, yes. |
| 10:16AM | 24 | Q.  Who was that person? |
| 10:16AM | 25 | A.  At that time, it was Robert Missana. |

| | | |
|---|---|---|
| 10:16AM | 1 | Q.  First name Robert, you said? |
| 10:16AM | 2 | A.  Robert.   Robert Missana. |
| 10:16AM | 3 | Q.  Did you know Robert Missana to be someone who distributed |
| 10:16AM | 4 | cocaine over the bar at times? |
| 10:16AM | 5 | A.  At times. |
| 10:16AM | 6 | Q.  Was there an occasion you were there with the defendant |
| 10:16AM | 7 | when you were standing next to the defendant where Missana |
| 10:16AM | 8 | was selling cocaine over the bar? |
| 10:17AM | 9 | A.  Yes. |
| 10:17AM | 10 | Q.  Did you observe it? |
| 10:17AM | 11 | A.  Yes. |
| 10:17AM | 12 | Q.  Was the defendant standing right next to you? |
| 10:17AM | 13 | A.  Yes. |
| 10:17AM | 14 | Q.  Did he jump over the bar and arrest Missana? |
| 10:17AM | 15 | A.  No. |
| 10:17AM | 16 | **MR. SINGER:**  Objection. |
| 10:17AM | 17 | **THE COURT:**  I'm sorry? |
| 10:17AM | 18 | **MR. SINGER:**  Objection, form. |
| 10:17AM | 19 | **MR. TRIPI:**  What's wrong with the form? |
| 10:17AM | 20 | **THE COURT:**  Overruled.   Overruled. |
| 10:17AM | 21 | **BY MR. TRIPI:** |
| 10:17AM | 22 | Q.  No? |
| 10:17AM | 23 | A.  No, no.   No. |
| 10:17AM | 24 | Q.  How did you and the defendant know Robert Missana? |
| 10:17AM | 25 | A.  From growing up.   He's within our age group.   He's our |

10:17AM  1   age.  So through the years, just friends with him.

10:17AM  2   Q.  In the run up to the defendant's wedding, were you guys

10:17AM  3   going out to bars more, like, with the people who would be

10:17AM  4   going to the destination wedding?

10:17AM  5   A.  A few times.

10:17AM  6   Q.  Was there a night at SoHo on Chippewa where there was

10:17AM  7   some cocaine use?

10:17AM  8   A.  There was.

10:17AM  9   Q.  Can you describe that situation?

10:18AM 10   A.  Yes.  A group at that party had met.  I had met them.

10:18AM 11   And I had had it, and we went into the bathroom and -- in the

10:18AM 12   stall, and we did a -- we did a blast of cocaine.

10:18AM 13   Q.  Who is "we?"

10:18AM 14   A.  Myself, the defendant, and then there was the other

10:18AM 15   parties that were involved, too.  Not with me.

10:18AM 16   Q.  Who was that?

10:18AM 17   A.  I believe Tom Doctor and Tom Napoli, too, on that

10:18AM 18   occasion.

10:18AM 19   Q.  Handing up Government Exhibit 127 for identification

10:19AM 20   purposes at this point.

10:19AM 21       Mr. Selva, is that a photograph?

10:19AM 22   A.  Yes.

10:19AM 23   Q.  Are there multiple people in the photograph?

10:19AM 24   A.  There are.

10:19AM 25   Q.  You're not in that photograph, are you?

10:19AM  1   A.  I am not.

10:19AM  2   Q.  Do you recognize several of the people in the photograph?

10:19AM  3   A.  Yes, a few, yes.

10:19AM  4   Q.  Do you see the defendant there?

10:19AM  5   A.  Yes.

10:19AM  6   Q.  Do you see his wife Lindsay in the photo?

10:19AM  7   A.  Yes.

10:19AM  8   Q.  Do you see Peter Gerace in the photo?

10:19AM  9   A.  Yes.

10:19AM  10  Q.  Do you see Tom Doctor in the photo?

10:19AM  11  A.  Yes.

10:19AM  12  Q.  You mentioned a moment ago that you were the best man at

10:19AM  13  the wedding?

10:19AM  14  A.  Yes.

10:19AM  15  Q.  About five months or so after the wedding, did you -- did

10:20AM  16  you have a Twitter account that you sent some pictures of the

10:20AM  17  wedding out on?

10:20AM  18  A.  Yeah, I did.

10:20AM  19  Q.  I'm going to show you Government Exhibit 213-1 through

10:20AM  20  213-5, inclusive.

10:20AM  21      Flip through those, if you can.  When you're done, look

10:20AM  22  up.

10:20AM  23      Do you recognize Exhibits 213-1 through 213-5 inclusive?

10:20AM  24  A.  I do, yes.

10:20AM  25  Q.  What do you recognize those to be?

10:20AM    1    A.   Those are pictures from the party at the wedding and

10:20AM    2    those who attended.

10:20AM    3    Q.   And are those pictures that you tweeted out in the May

10:21AM    4    following the February wedding?

10:21AM    5    A.   Yes.

10:21AM    6    Q.   Do they fairly and accurately depict pictures you took

10:21AM    7    and tweets that you made about the wedding?

10:21AM    8    A.   Yes.

10:21AM    9          **MR. TRIPI:**  The government offers Exhibits 213-1

10:21AM   10    through 5, Your Honor.

10:21AM   11          **MR. SINGER:**  No objection.

10:21AM   12          **THE COURT:**  They are received without objection.

10:21AM   13      **(GOV Exhibits 213-1 thru 5 were received in evidence.)**

10:21AM   14          **MR. TRIPI:**  Ms. Champoux, if we could just publish

10:21AM   15    those for the jury.  Starting 213-1, please.

10:21AM   16          Looks a little darker on the screen.

10:21AM   17          Ms. Champoux, can you zoom in on the top photo?

10:21AM   18    Maybe see if that lightens it up?

10:21AM   19          **BY MR. TRIPI:**

10:21AM   20    Q.   Who's that a photo of?

10:21AM   21    A.   Myself and the defendant.

10:21AM   22    Q.   Where are you guys?

10:21AM   23    A.   That's I believe on a booze cruise in Cabo.

10:21AM   24    Q.   So there were some excursions that occurred during that

10:21AM   25    wedding?

| | | |
|---|---|---|
| 10:21AM | 1 | A.  Yes. |
| 10:21AM | 2 | Q.  How long were you guys there? |
| 10:21AM | 3 | A.  I think a few hours. |
| 10:21AM | 4 | Q.  In terms of in Cabo, total? |
| 10:22AM | 5 | A.  Oh.  Four days, five days. |
| 10:22AM | 6 | Q.  Were there -- were there several excursions that you went |
| 10:22AM | 7 | on? |
| 10:22AM | 8 | A.  No. |
| 10:22AM | 9 | Q.  Just one booze cruise? |
| 10:22AM | 10 | A.  That, and then there was a lot of activities at the |
| 10:22AM | 11 | resort.  We hung out by the pool.  There was a nightclub |
| 10:22AM | 12 | there. |
| 10:22AM | 13 | Q.  Do you know who paid for the booze cruise? |
| 10:22AM | 14 | A.  I don't.  I'm not sure.  I thought we all pitched in. |
| 10:22AM | 15 | Q.  Okay. |
| 10:22AM | 16 | A.  Okay. |
| 10:22AM | 17 | **MR. TRIPI:**  Okay.  We can zoom out of that one. |
| 10:22AM | 18 | Let's go to 213-2. |
| 10:22AM | 19 | **BY MR. TRIPI:** |
| 10:22AM | 20 | Q.  Looks very similar.  In the bottom photo, is that you |
| 10:22AM | 21 | with the gray suit on? |
| 10:22AM | 22 | A.  Yes. |
| 10:22AM | 23 | **MR. TRIPI:**  Let's go to 213-3, please. |
| 10:22AM | 24 | **BY MR. TRIPI:** |
| 10:22AM | 25 | Q.  All right.  That top photo there, can we zoom in on that? |

10:23AM    1    A.   That's the wedding party.

10:23AM    2    Q.   And from left to right, can you just go through everybody

10:23AM    3    who's in the photo?

10:23AM    4    A.   Sure.  Tom Napoli, the defendant, myself, and Lindsay's

10:23AM    5    son, Matty.

10:23AM    6    Q.   That's the child we were discussing earlier?

10:23AM    7    A.   Yes.

10:23AM    8         MR. TRIPI:  We can zoom out of that one.  Let's go to

10:23AM    9    213-4.

10:23AM   10         BY MR. TRIPI:

10:23AM   11    Q.   Is that the defendant and his wife in the top photo

10:23AM   12    there?

10:23AM   13    A.   Yes.

10:23AM   14    Q.   And that's his -- Lindsay Schuh became Lindsay

10:23AM   15    Bongiovanni?

10:23AM   16    A.   Yes.

10:23AM   17         MR. TRIPI:  Let's go to 213-5.

10:23AM   18         BY MR. TRIPI:

10:23AM   19    Q.   And again, there's a photo down at the bottom there,

10:23AM   20    who's in that picture?

10:23AM   21    A.   That's myself and the maid of honor, who was Lindsay's

10:23AM   22    sister.

10:23AM   23    Q.   Which sister?

10:23AM   24    A.   Not Ashley.  I'm drawing a blank -- Christie, I'm sorry.

10:24AM   25    Q.   That's okay.

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

35

10:24AM   1          **MR. TRIPI:**  We can take that down, Ms. Champoux.

10:24AM   2          **BY MR. TRIPI:**

10:24AM   3   Q.  Yesterday and a little bit today we talked about

10:25AM   4   Masecchia and you learning -- confirming what you'd long

10:25AM   5   believed that he was a member of Italian Organized Crime; do

10:25AM   6   you remember that?

10:25AM   7   A.  Yes.

10:25AM   8   Q.  About what year was it when you had the conversation with

10:25AM   9   him -- you know, so, you testified you got involved in around

10:25AM  10   '08, '09.  How much time went by before you got comfortable

10:25AM  11   enough to specifically ask him the question?

10:25AM  12   A.  Right around 2011, '12, three or four years as we were

10:25AM  13   into this we got more comfortable with one another, we became

10:25AM  14   closer.

10:25AM  15       It might have been even a little longer than that.  I

10:25AM  16   don't exactly recall.

10:25AM  17       But as our relationship evolved, we just became closer,

10:25AM  18   and I felt -- I felt comfortable asking that question.

10:25AM  19   Q.  So you had believed it for a long time, but you --

10:25AM  20   A.  Yes.

10:25AM  21   Q.  -- after some years, you asked him that question?

10:25AM  22   A.  Correct.

10:25AM  23   Q.  And after you had it confirmed, you relayed it to the

10:26AM  24   defendant?

10:26AM  25   A.  Yes.

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

36

10:26AM  1   Q.  That basically what we thought for a long time is

10:26AM  2   accurate?

10:26AM  3   A.  Yes.  According to Mike -- I mean, that's what Mike had

10:26AM  4   told me.

10:26AM  5   Q.  Describe the conversation you had with Mike.

10:26AM  6   A.  I asked him.  We were out, and I says, you know, this has

10:26AM  7   been on my mind for a long time, there's a lot of

10:26AM  8   speculation.  People say -- Mike was a big guy, he had a very

10:26AM  9   strong presence.

10:26AM  10      And I just asked him, I says, you know, people are

10:26AM  11  fearful of you, and they hear things on the street.  Are you

10:26AM  12  connected?

10:26AM  13      And he told me he was.  He told me he was a made guy.

10:26AM  14  Q.  Did he tell you who he was with?  Did he reference

10:26AM  15  Butchie Bifulco at all?

10:27AM  16  A.  Yes, he did.

10:27AM  17  Q.  What did he say?

10:27AM  18  A.  He said that he was very close with Butchie because of

10:27AM  19  the relationship with his father.  His father and Butchie,

10:27AM  20  like I said yesterday, were very close.  And Butchie was a

10:27AM  21  very prominent figure.  So, they had become very close.

10:27AM  22  Q.  Did you or Masecchia use the term soldier in that

10:27AM  23  discussion?

10:27AM  24  A.  No.

10:27AM  25  Q.  But the term "made guy"?

10:27AM  1    A.   Yes.

10:27AM  2    Q.   Okay.  And to you, "made guy" meant he was a member of

10:27AM  3    the organization?

10:27AM  4    A.   Correct.

10:27AM  5    Q.   As the conspiracy wore on, did there come a point in time

10:27AM  6    when Masecchia made a comment to you that he needed to,

10:27AM  7    quote, kick up money he was making?

10:28AM  8    A.   He did, yes.

10:28AM  9    Q.   What was the context of that discussion?

10:28AM  10   A.   He said that he had people to answer to.  As this thing

10:28AM  11   grew, as he was making money, that he to pay people as well.

10:28AM  12   And he referenced -- he referenced --

10:28AM  13        MR. SINGER:  Your Honor, I'm going to object at this

10:28AM  14   time as to relevance.

10:28AM  15        THE COURT:  Yeah, I agree.  Do you want to come up?

10:28AM  16        MR. TRIPI:  Yeah, sure, Judge.

10:28AM  17        (Sidebar discussion held on the record.)

10:28AM  18        THE COURT:  I thought I made it clear pretrial this

10:28AM  19   was not going to be a case about organized crime.  And now

10:28AM  20   we're getting into the inner workings of organized crime.

10:28AM  21   This has nothing to do with the defendant's knowledge of this,

10:28AM  22   unless you're gonna link this to a conversation he has with

10:28AM  23   the defendant.

10:28AM  24        MR. TRIPI:  Well, I think I -- just to back up, we

10:29AM  25   went this far at the last trial, so I haven't exceeded where

10:29AM  1  we went last time, just so you're aware.

10:29AM  2       THE COURT:  That's okay.

10:29AM  3       MR. TRIPI:  This is as far as I can go with him

10:29AM  4  because this is as far as he knows in terms of the

10:29AM  5  conversation, but --

10:29AM  6       THE COURT:  What's the relevance of Masecchia having

10:29AM  7  to kick upstairs that we need to hear this time?

10:29AM  8       MR. TRIPI:  Well, this defendant -- or, this witness

10:29AM  9  has explained that he's relayed Masecchia's status to the

10:29AM  10 defendant.  So that goes to the -- to the knowledge --

10:29AM  11      THE COURT:  Absolutely.

10:29AM  12      MR. TRIPI:  -- and the awareness --

10:29AM  13      THE COURT:  Absolutely.

10:29AM  14      MR. TRIPI:  And I think there has to be some context

10:29AM  15 for -- it's important enough for this defendant -- it has to

10:29AM  16 be a significant enough conver -- I keep saying defendant, for

10:29AM  17 this witness, it has to be a significant enough piece of

10:29AM  18 information the jury has to assess is this something that

10:29AM  19 Mr. Selva would bother to tell the defendant.

10:29AM  20      THE COURT:  Um-hum.

10:29AM  21      MR. TRIPI:  And, so, that is kind of a memorable line

10:29AM  22 when you've -- if you follow my train of logic for a moment,

10:30AM  23 Judge, he's thinks he's a made guy for a long time.  He

10:30AM  24 finally gets comfortable enough to ask him.  Masecchia

10:30AM  25 confirms it.  And then later on says I need to kick up.

10:30AM    1        All of those things, if you bundle them together, may

10:30AM    2    lead a jury to conclude, yeah, okay, I believe that testimony

10:30AM    3    that it was important enough for the defendant to relay the

10:30AM    4    actual status and confirm it to defendant.

10:30AM    5        So that's as far as I'm going, and that was my train

10:30AM    6    of logic.

10:30AM    7        THE COURT:  And I understand what you're saying.  But

10:30AM    8    I think the "I need to kick up" doesn't add anything to the

10:30AM    9    story, and I think that's irrelevant, so I'm going to sustain

10:30AM   10    the objection to that.

10:30AM   11        MR. TRIPI:  Well, "kick up" came out already.  I'm

10:30AM   12    not going any further than that.

10:30AM   13        THE COURT:  Fine.

10:30AM   14        MR. SINGER:  It's consistent with the same objection

10:30AM   15    you sustained last time, Judge.  We've got kick up --

10:30AM   16        MR. TRIPI:  "Kick up" came in.  It's page 96 of the

10:30AM   17    transcript.

10:30AM   18        THE COURT:  Say it again.

10:30AM   19        MR. SINGER:  We had "kick up" come in.

10:30AM   20        MR. TRIPI:  Yes.

10:30AM   21        MR. SINGER:  Thereafter, I objected.  You sustained

10:30AM   22    the objection, and moved on after that.  So --

10:30AM   23        THE COURT:  That's fine.

10:30AM   24        MR. TRIPI:  That's where we are.

10:31AM   25        THE COURT:  So you're fine with it where it is right

10:31AM    1    now?

10:31AM    2            **MR. SINGER:**  Well, it's where I've made my objection,

10:31AM    3    Judge.

10:31AM    4            **THE COURT:**  Okay.

10:31AM    5            **MR. SINGER:**  So at this point, I think the issue is

10:31AM    6    done.

10:31AM    7            **THE COURT:**  So I will sustain the objection, and we

10:31AM    8    can move on.

10:31AM    9            **MR. TRIPI:**  Yeah.  I wasn't --

10:31AM    10            **THE COURT:**  Mr. Singer?  Are you asking me to strike

10:31AM    11    the "kick up?"

10:31AM    12            **MR. TRIPI:**  Well, Judge, that came in last time.  I

10:31AM    13    haven't gone further.

10:31AM    14            **THE COURT:**  Which is why I'm asking --

10:31AM    15            **MR. SINGER:**  I would prefer, Judge, that "kick up"

10:31AM    16    gets struck.  My understanding of the previous ruling was that

10:31AM    17    it remained in, but --

10:31AM    18            **THE COURT:**  It did remain in the last time?

10:31AM    19            **MR. SINGER:**  That's -- that's what I understood.

10:31AM    20            **MR. TRIPI:**  It's at page 96 of that transcript.

10:31AM    21            **THE COURT:**  Okay.  Fine.  Then we'll leave it as it

10:31AM    22    is.

10:31AM    23            (End of sidebar discussion.)

10:31AM    24            **THE COURT:**  The objection is sustained.

10:31AM    25            You can move on to the next question.

10:31AM    1           **BY MR. TRIPI:**

10:31AM    2    Q.   All right.  So regarding the marijuana operation, you've

10:31AM    3    described it earlier that the operation was expanding.  We've

10:32AM    4    talked about trucks.  And by "trucks," did you mean

10:32AM    5    tractor-trailers?

10:32AM    6    A.   Tractor-trailers.

10:32AM    7    Q.   Not pickup trucks?

10:32AM    8    A.   No, tractor-trailers.

10:32AM    9    Q.   Trips to New York City, right?

10:32AM   10    A.   Yes.

10:32AM   11    Q.   But did the organization also use storage locations to

10:32AM   12    store marijuana?

10:32AM   13    A.   They did.

10:32AM   14    Q.   In fact, one of those storage locations was at your house

10:32AM   15    for a period of time; is that right?

10:32AM   16    A.   It was.  For a short period of time, yes.

10:32AM   17    Q.   Was that in or about 2014?

10:32AM   18    A.   Yes.

10:32AM   19    Q.   Can you describe how you started to store some of the

10:32AM   20    organization's -- Mr. Serio's marijuana at your house?

10:32AM   21    A.   As he got it in from his distribution point, he had

10:32AM   22    reached out to me and asked me if I can keep it in your

10:32AM   23    basement in bins, secured, until I could distribute it.

10:32AM   24         And I said sure.  And he did that.

10:33AM   25         It was kept in my basement.  I had a back room in my

10:33AM    1    basement, and it was in there in bins.

10:33AM    2    Q.  Did you -- did you believe that was an added layer of

10:33AM    3    protection for that --

10:33AM    4    A.  Yes.

10:33AM    5    Q.  -- marijuana?

10:33AM    6    A.  Yes.

10:33AM    7    Q.  Why did you believe that was an added layer of

10:33AM    8    protection, storing it at your house?

10:33AM    9    A.  Because it was under my roof now, and I felt comfort and

10:33AM    10   protected that the defendant had my back.

10:33AM    11   Q.  And by that point in time, had you used your house for

10:33AM    12   marijuana grows in terms of getting the clones ready?

10:33AM    13   A.  Yes.

10:33AM    14   Q.  Eventually, did you progress to actually having an indoor

10:33AM    15   marijuana grow, where the plants would be grown to maturity

10:33AM    16   in your basement?

10:33AM    17   A.  We did a small indoor operation, yes.

10:33AM    18   Q.  What happened first, the indoor operation where you would

10:33AM    19   grow plants to maturity, or storing Serio's marijuana at your

10:34AM    20   house?

10:34AM    21   A.  Storing the marijuana first.

10:34AM    22   Q.  Okay.  After you started storing the marijuana, did

10:34AM    23   Mr. Masecchia and Serio help you build a full grow operation

10:34AM    24   in your basement?

10:34AM    25   A.  They did.

10:34AM   1   Q.  Describe the discussions that led up to that, and then

10:34AM   2   I'll ask some follow-ups.

10:34AM   3   A.  They were explaining to me the -- how the value of

10:34AM   4   hydroponics, an indoor plant, would bring more money, because

10:34AM   5   that's what I had stored for Ron.

10:34AM   6       And he says we can set up a small room in your basement

10:34AM   7   with the retractable light, 40 to 50 plants.  They don't get

10:34AM   8   real big like outdoor, but you get a better grade, you get a

10:34AM   9   higher quality.

10:34AM  10       So I said okay.  And the three of us did it.  We set it

10:34AM  11   up.  I cleared my basement out, and we did it.

10:34AM  12   Q.  For how many years did you have a 40- to 50-plant grow in

10:35AM  13   your basement?

10:35AM  14   A.  It was a few years.  And it wasn't all the time, too.  It

10:35AM  15   was, you know, I would get a crop, take a break for a few

10:35AM  16   months, then we'd do another one.  So it wasn't constant.

10:35AM  17   Q.  But unlike outdoor plants, you could grow year-round if

10:35AM  18   you wanted to?

10:35AM  19   A.  It -- that was the purpose, yes.

10:35AM  20   Q.  Whereas outdoors, you're limited to basically May through

10:35AM  21   October?

10:35AM  22   A.  Correct.

10:35AM  23   Q.  And it's a longer process?

10:35AM  24   A.  It's a longer process.

10:35AM  25   Q.  While you had a marijuana grow operation as a part of the

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

44

| | | |
|---|---|---|
| 10:35AM | 1 | organization in your basement, did the defendant ever come |
| 10:35AM | 2 | over your house? |
| 10:35AM | 3 | A.  Yes. |
| 10:35AM | 4 | Q.  Did you have a discussion with him about what you had |
| 10:35AM | 5 | going on in your house? |
| 10:35AM | 6 | A.  Yes. |
| 10:35AM | 7 | Q.  Describe that for the jury. |
| 10:35AM | 8 | A.  Told him I -- he smelled it.  It had a -- even though we |
| 10:35AM | 9 | had an ionizer, which helps with the smell, and then we had a |
| 10:36AM | 10 | ventilation hooked up through the -- it went through my vent |
| 10:36AM | 11 | dryer, my dryer going outside, Ron had this suction system. |
| 10:36AM | 12 | But it still -- you could still faintly smell it. |
| 10:36AM | 13 | He smelled it, and I told him what was going on. |
| 10:36AM | 14 | Q.  What did he say? |
| 10:36AM | 15 | A.  Be careful.  Watch your utilities.  Limit your movement. |
| 10:36AM | 16 | My kids were older at that time, they were still coming |
| 10:36AM | 17 | around, and I was very cautious when they came over of when I |
| 10:36AM | 18 | had them, so -- |
| 10:36AM | 19 | Q.  He didn't arrest you on the spot? |
| 10:36AM | 20 | A.  No. |
| 10:36AM | 21 | Q.  He didn't write a criminal complaint and drag you to |
| 10:36AM | 22 | federal court? |
| 10:36AM | 23 | A.  No. |
| 10:36AM | 24 | Q.  He gave you advice about your utilities? |
| 10:36AM | 25 | A.  Yes. |

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

10:36AM  1   Q.  What specifically was the advice he gave you about your

10:36AM  2   utilities?

10:36AM  3   A.  Watch utilities.  That's a red flag.  Be double cautious

10:37AM  4   when you leave.  Make sure everything's shut off.

10:37AM  5       Because I had a timer set up in the basement, so it was a

10:37AM  6   thousand watt grow light, so it was drawing a lot of energy,

10:37AM  7   so I was very conscious of other usage in my house.

10:37AM  8   Q.  Did the defendant explain to you how use of the

10:37AM  9   electric -- the electricity could be a red flag?

10:37AM  10  A.  Yes.  On the chart it would be a red flag with National

10:37AM  11  Grid, it could flag something.

10:37AM  12  Q.  Did you follow that advice?

10:37AM  13  A.  I -- I did, yeah.

10:37AM  14  Q.  How did you follow the advice?  What did you do?

10:37AM  15  A.  I did what he told me to.  I made sure when I left, any

10:37AM  16  unnecessary things were shut off.  The only thing that was on

10:37AM  17  was the lights in the basement, the timers.  That's it.

10:37AM  18  Q.  And who -- who helped you build that grow in your

10:37AM  19  basement?

10:37AM  20  A.  Ron.

10:37AM  21  Q.  Did Mike?

10:37AM  22  A.  And Mike, Ron and Mike, yeah.

10:37AM  23  Q.  Did Mike visit it periodically as well?

10:37AM  24  A.  He did, yes.

10:38AM  25  Q.  How long did it take to set up the equipment to build the

10:38AM   1    grow?

10:38AM   2    A.   Week.   It was a retractable light on a timer.   We had to

10:38AM   3    get the ventilation system on.

10:38AM   4         Ron had this device that sucked the air out that went

10:38AM   5    through my vent in my dryer that went outside my house.

10:38AM   6         And behind my house there's a field, so any of that smell

10:38AM   7    would go to the field.   It smelled like a skunk, so it

10:38AM   8    blended in.

10:38AM   9         And then he hooked up an ionizer, which constantly was

10:38AM   10   spraying, like, a scent.

10:38AM   11   Q.   To tamp down the odor?

10:38AM   12   A.   To tamp down the odor, yes.

10:38AM   13   Q.   When the plants that you grew in your basement were ready

10:38AM   14   for harvest, what was the process?

10:38AM   15   A.   Mike and I would cut them down.   And then we'd line up --

10:39AM   16   we'd line up clothes lines in my basement, and we'd hang the

10:39AM   17   plants in a dark room with fans blowing and a humidifier.

10:39AM   18        It wasn't as long as a process.   Usually outdoor, because

10:39AM   19   they were bigger, it was three to four days.   This was about

10:39AM   20   two days.

10:39AM   21        And once they were dry, we'd clip them.   We'd clip off

10:39AM   22   all the stem and all the shake, so to speak, and get the bud.

10:39AM   23   And we would process the bud in quarter-pound and half-pound

10:39AM   24   baggies.

10:39AM   25   Q.   And then how much would be taken for distribution?

10:39AM    1    A.  What -- depending on the yield.  I mean, it was -- it

10:39AM    2    wasn't as big as an outdoor crop.

10:39AM    3    Q.  How many pounds on average would you yield?

10:39AM    4    A.  On an indoor, 10 to 15.

10:39AM    5    Q.  And who was taking that to move it?

10:40AM    6    A.  Mike would take it to Ron, and then Ron would cash it

10:40AM    7    out.

10:40AM    8    Q.  And what were you getting in exchange for this indoor

10:40AM    9    grow that you had built for them?

10:40AM    10   A.  The -- they were covering my utilities and expenses,

10:40AM    11   electric bill, that type thing.  Any expenses that I

10:40AM    12   incurred, as well as a percentage.

10:40AM    13   Q.  What was the percentage you got?

10:40AM    14   A.  Of that?  It was split three ways, so it was a little

10:40AM    15   higher.  It was 33 percent.

10:40AM    16   Q.  So whatever the profits were, you guys split?

10:40AM    17   A.  Yeah.

10:40AM    18   Q.  What you were growing in your house, three ways?

10:40AM    19   A.  Yep.

10:40AM    20   Q.  Was this in addition to your role still helping

10:41AM    21   manufacture and get the outdoor grows in Franklinville and

10:41AM    22   Angelica growing?

10:41AM    23   A.  Yes.

10:41AM    24   Q.  So that's still happening?

10:41AM    25   A.  It was, yes.

10:41AM    1    Q.  And Ron is still having other trips to New York City and

10:41AM    2    trucks brought in?

10:41AM    3    A.  Yes.

10:41AM    4    Q.  So all those things are happening?

10:41AM    5    A.  Yes.

10:41AM    6    Q.  By that point, were the same people you mentioned before,

10:41AM    7    Hersey, Martone, Lima, yourself, Masecchia, all involved in

10:41AM    8    the outdoor grows?

10:41AM    9    A.  Yes.

10:41AM    10   Q.  Did Sal Volpe come into play as well and start helping?

10:41AM    11   A.  He did, yes.

10:41AM    12   Q.  And we saw him in a picture yesterday, right?

10:41AM    13   A.  Yes.

10:41AM    14   Q.  Were Serio's close associates helping move the product,

10:42AM    15   as far as you knew?

10:42AM    16   A.  Through Ron, yes.

10:42AM    17        **MR. TRIPI:**  Just checking on when you want the break

10:42AM    18   to be, Judge.

10:42AM    19        **THE COURT:**  How much longer do you think we have?

10:42AM    20        **MR. TRIPI:**  I've got a while still, probably halfway

10:42AM    21   almost.

10:42AM    22        **THE COURT:**  Oh, okay.

10:42AM    23        **MR. TRIPI:**  Yeah, so, I just didn't know.

10:42AM    24        **THE COURT:**  Let's go another 15 minutes.

10:42AM    25        **MR. TRIPI:**  I wasn't sure if it was 10:45 or 11.

10:42AM    1          Ms. Champoux, if you can please pull up Exhibit 8A.

10:42AM    2          You're gonna see something on your screen.

10:42AM    3          This is in evidence, Your Honor.  This is all going

10:42AM    4    to be in evidence.

10:42AM    5          **THE COURT:**  Okay.

10:42AM    6          **MR. TRIPI:**  Ms. Champoux, if you can go to page 289,

10:42AM    7    please.  And can we just highlight from the top of the page

10:42AM    8    through the user information just to make it a little larger

10:43AM    9    for everybody.

10:43AM   10          **BY MR. TRIPI:**

10:43AM   11    Q.  All right.  Mr. Selva, do you see there's a date in the

10:43AM   12    upper left-hand corner, March 21st, 2013?

10:43AM   13    A.  I do.  I do.

10:43AM   14    Q.  Do you see in the middle there it says subscriber

10:43AM   15    information?

10:43AM   16    A.  Subscriber information?

10:43AM   17    Q.  Right here.

10:43AM   18    A.  Yes.  I'm sorry, yes.

10:43AM   19    Q.  And then in this next box, do you see financially liable

10:43AM   20    party?

10:43AM   21    A.  I do, yes.

10:43AM   22    Q.  Do you see a name and an address there?

10:43AM   23    A.  Ronald Serio, 697 Lebrun Road, Amherst, New York.

10:43AM   24    Q.  Is that the Ron Serio we've been talking about?

10:43AM   25    A.  It is, yes.

10:43AM   1   Q.   And you see some user information for a phone?

10:43AM   2   A.   Yes.

10:43AM   3   Q.   Okay.  So Mr. Serio was principal in this organization,

10:43AM   4   right?

10:43AM   5   A.   He was, yes.

10:44AM   6        **MR. TRIPI:**  Ms. Champoux, if we can zoom out of that,

10:44AM   7   let's go at Exhibit 8A at page 134, please.

10:44AM   8        **BY MR. TRIPI:**

10:44AM   9   Q.   Do you see this page?

10:44AM   10  A.   I do, yes.

10:44AM   11  Q.   Do you see where it says subscription info basic with a

10:44AM   12  phone number, and then do you see whose account billing

10:44AM   13  address that is?

10:44AM   14  A.   Yes.

10:44AM   15  Q.   Michael Masecchia?

10:44AM   16  A.   Michael Masecchia of Colvin, and another address for

10:44AM   17  Hertel Avenue.

10:44AM   18  Q.   Is that the Michael Masecchia we've been talking about?

10:44AM   19  A.   It is, yes.

10:44AM   20  Q.   And this is the same person who was a principal in this

10:44AM   21  organization that you were in?

10:44AM   22  A.   Yes.

10:44AM   23  Q.   And let's go to page 197.  Do you see whose information

10:44AM   24  is there, Mr. Selva?

10:44AM   25  A.   Yes, that's mine.

10:44AM  1   Q.  Was your phone number -- your main phone during this time

10:44AM  2   period 716-903-1654?

10:45AM  3   A.  It was, yes.

10:45AM  4   Q.  Was the grow operation and storage of marijuana you just

10:45AM  5   talked about at 128 Rebecca Park, Buffalo, New York?

10:45AM  6   A.  It was, yes.

10:45AM  7   Q.  You had that phone number going all the way back to 2009?

10:45AM  8   A.  I did, yes.

10:45AM  9   Q.  You had that number all the way until you were arrested

10:45AM  10  by Homeland Security -- withdrawn -- until Homeland Security

10:45AM  11  did a search warrant at your house August 23rd, 2019,

10:45AM  12  correct?

10:45AM  13  A.  I did, yes.

10:45AM  14          MR. TRIPI:  Let's go to Exhibit 8A at page 365.

10:45AM  15          BY MR. TRIPI:

10:46AM  16  Q.  Do you see this date here, March 13th, 2013?

10:46AM  17  A.  I do, yes.

10:46AM  18  Q.  All these operations that you were explaining, grow

10:46AM  19  operations, trucking, marijuana distribution, it's happening

10:46AM  20  in 2013, right?

10:46AM  21  A.  Yes.

10:46AM  22  Q.  It's happening in 2014?

10:46AM  23  A.  Yes.

10:46AM  24  Q.  It's happening in 2015?

10:46AM  25  A.  Yes.

10:46AM     1    Q.  This one relates to Thomas Serio, right?

10:46AM     2    A.  That's the name on there, Thomas Serio.

10:46AM     3    Q.  And that's Ron Serio's brother?

10:46AM     4    A.  It is.

10:46AM     5    Q.  Close associate?

10:46AM     6    A.  Yes.

10:46AM     7            MR. TRIPI:  Let's go to Exhibit 8A at page 354.

10:46AM     8            BY MR. TRIPI:

10:46AM     9    Q.  See this here?

10:46AM    10    A.  Yes.

10:46AM    11    Q.  Christopher Baker?

10:46AM    12    A.  Yes.

10:46AM    13    Q.  Is he a close associate of Ron Serio?

10:46AM    14    A.  I -- yes.  I don't know him, though, but I've heard his

10:46AM    15    name mentioned through Ron and Mike.

10:46AM    16    Q.  You knew he was part of the larger group?

10:47AM    17    A.  Yes.

10:47AM    18    Q.  You knew he was a distributor?

10:47AM    19    A.  Yes.

10:47AM    20    Q.  So he's helping move the marijuana even if you're not

10:47AM    21    dealing with him directly?

10:47AM    22    A.  I believe so, yes.

10:47AM    23            MR. TRIPI:  Let's go to Exhibit 8A at page 324.

10:47AM    24            I'm going to ask you actually scroll to 3.  Hover

10:47AM    25    between the two pages.  There you go.  Thank you.

|          |    |                                                            |
|----------|----|------------------------------------------------------------|
| 10:47AM  | 1  | **BY MR. TRIPI:**                                          |
| 10:47AM  | 2  | Q.  All right.  Do you see the subscription information    |
| 10:47AM  | 3  | there?                                                      |
| 10:47AM  | 4  | A.  Yes.                                                    |
| 10:47AM  | 5  | Q.  Do you see a name?                                      |
| 10:47AM  | 6  | A.  Mark Falzone.                                           |
| 10:47AM  | 7  | Q.  Is that Ron Serio's best friend?                        |
| 10:47AM  | 8  | A.  It is.                                                  |
| 10:47AM  | 9  | Q.  Is he a close associate in the organization?            |
| 10:47AM  | 10 | A.  Yes, he's -- he was very close with Ron, best friends.  |
| 10:47AM  | 11 | Q.  Was he helping move product and helping with operations |
| 10:47AM  | 12 | as you knew?                                                |
| 10:47AM  | 13 | A.  On Ron's end, he never worked with myself or Mike.      |
| 10:47AM  | 14 | Q.  I'm asking about the larger organization, did you know he |
| 10:47AM  | 15 | was a part of it?                                           |
| 10:47AM  | 16 | A.  I did, yes.                                             |
| 10:48AM  | 17 | **MR. TRIPI:**  I'm going to go to Exhibit 8A at 360.      |
| 10:48AM  | 18 | **BY MR. TRIPI:**                                          |
| 10:48AM  | 19 | Q.  Do you see the name there?                              |
| 10:48AM  | 20 | A.  Yes.                                                    |
| 10:48AM  | 21 | Q.  T.S.?                                                   |
| 10:48AM  | 22 | A.  Yes.                                                    |
| 10:48AM  | 23 | Q.  We're going to talk a little bit more about T.S. in a   |
| 10:48AM  | 24 | little while.                                               |
| 10:48AM  | 25 | A.  Okay.                                                   |

10:48AM    1    Q.  But was he part of the organization?

10:48AM    2    A.  He was, yes, through Ron.  Yes.

10:48AM    3    Q.  Was there another individual, Frank Burkhart, who was

10:48AM    4    close with Serio?

10:48AM    5    A.  He was, yes.

10:48AM    6    Q.  Is Frank Burkhart also friends with Wayne Anderson as far

10:48AM    7    as you know?

10:48AM    8    A.  As far as I know, yes.

10:48AM    9    Q.  Is Frank Burkhart also friends with B.K. as far as you

10:48AM    10   know?

10:48AM    11   A.  I believe so, yes.

10:48AM    12   Q.  Did Frank Burkhart own a tattoo parlor called Hard Core?

10:49AM    13   A.  On Elmwood, yes, I believe he did.

10:49AM    14        **MR. TRIPI:**  Let's go to Exhibit 8A at page 357.

10:49AM    15        **BY MR. TRIPI:**

10:49AM    16   Q.  Do you see a Hard Core Tattoo Studio listed there, 902

10:49AM    17   Elmwood Avenue?

10:49AM    18   A.  I do, yes.

10:49AM    19   Q.  March 13th, 2013?

10:49AM    20   A.  Yes.

10:49AM    21   Q.  Is Paul Francoforte someone nicknamed Hot Dog that you

10:49AM    22   know?

10:49AM    23   A.  Yes.

10:49AM    24   Q.  Is that person friends with the defendant?

10:49AM    25   A.  Yes.

| | | |
|---|---|---|
| 10:49AM | 1 | Q.  Has the defendant ever told you about a situation where |
| 10:49AM | 2 | he helped out Paul Francoforte? |
| 10:49AM | 3 | A.  Yes. |
| 10:49AM | 4 | Q.  What did he tell you about that? |
| 10:49AM | 5 | A.  Mr. Francoforte was a big gambler, and he was coming over |
| 10:49AM | 6 | the border in Niagara Falls with, I believe, an amount over |
| 10:50AM | 7 | $10,000 that he had won or whatever, however he got it.  And |
| 10:50AM | 8 | he was stopped.  And they seized -- I believe they seized the |
| 10:50AM | 9 | money. |
| 10:50AM | 10 | Q.  What did the defendant tell you he did? |
| 10:50AM | 11 | A.  He stepped in to help him, to help him any way he could. |
| 10:50AM | 12 | **MR. TRIPI:**  Let's go to Exhibit 8A at page 347. |
| 10:50AM | 13 | **BY MR. TRIPI:** |
| 10:50AM | 14 | Q.  Do you see that name there? |
| 10:50AM | 15 | A.  I do, yes. |
| 10:50AM | 16 | Q.  Paul Francoforte? |
| 10:50AM | 17 | A.  Yes. |
| 10:50AM | 18 | Q.  Is that the defendant's friend? |
| 10:50AM | 19 | A.  Yes. |
| 10:50AM | 20 | **MR. TRIPI:**  Let's go to page 1. |
| 10:50AM | 21 | **BY MR. TRIPI:** |
| 10:50AM | 22 | Q.  Do you see a case name there Wayne Anderson? |
| 10:50AM | 23 | A.  I do, yes. |
| 10:50AM | 24 | Q.  Is that a person the defendant grew up with? |
| 10:50AM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 10:50AM | 1 | Q.  Is he friends with the defendant? |
| 10:51AM | 2 | A.  Yes. |
| 10:51AM | 3 | Q.  Is that a person who was at the defendant's stag party |
| 10:51AM | 4 | before his wedding? |
| 10:51AM | 5 | A.  He was, yes. |
| 10:51AM | 6 | Q.  Did you have a benefit in June of 2017 because you were |
| 10:51AM | 7 | going to have open-heart surgery? |
| 10:51AM | 8 | A.  Yes. |
| 10:51AM | 9 | Q.  Did the defendant work the door? |
| 10:51AM | 10 | A.  Yes. |
| 10:51AM | 11 | Q.  Did Mike Masecchia work the door? |
| 10:51AM | 12 | A.  Yes. |
| 10:51AM | 13 | Q.  Was Wayne Anderson at your benefit? |
| 10:51AM | 14 | A.  He was, yes. |
| 10:51AM | 15 | **MR. TRIPI:**  Let's go to page 351. |
| 10:51AM | 16 | **BY MR. TRIPI:** |
| 10:51AM | 17 | Q.  Do you see a name here, name Michael Mazzara? |
| 10:51AM | 18 | A.  Yes. |
| 10:51AM | 19 | Q.  Do you know Michael Mazzara? |
| 10:51AM | 20 | A.  I do. |
| 10:51AM | 21 | Q.  Who's he related to? |
| 10:51AM | 22 | A.  He's Masecchia -- Mike Masecchia's wife's cousin, first |
| 10:51AM | 23 | cousin. |
| 10:51AM | 24 | Q.  So he's related to the Masecchia family? |
| 10:51AM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 10:51AM | 1 | Q. What's Mike Masecchia's wife name? |
| 10:52AM | 2 | A. Her maiden name is Mazzara. Krista Mazzara. |
| 10:52AM | 3 | Q. Through marriage, Krista Masecchia? |
| 10:52AM | 4 | A. Correct. |
| 10:52AM | 5 | **MR. TRIPI:** Let's go to 8A page 205. |
| 10:52AM | 6 | **BY MR. TRIPI:** |
| 10:52AM | 7 | Q. Do you see what the top sentence there says, subscriber |
| 10:52AM | 8 | for a connection number followed by a phone number? |
| 10:52AM | 9 | A. Yes. Yes. |
| 10:52AM | 10 | Q. Do you see the contact name and email associated with |
| 10:52AM | 11 | that? |
| 10:52AM | 12 | A. I do, yes. |
| 10:52AM | 13 | Q. Whose name is that? |
| 10:52AM | 14 | A. Krista Masecchia, Michael Masecchia's wife. |
| 10:52AM | 15 | Q. You said Dave Hersey was someone you guys grew up with |
| 10:52AM | 16 | who was part of the grow operation; is that right? |
| 10:52AM | 17 | A. Yes. |
| 10:52AM | 18 | **MR. TRIPI:** Let's go to 205, Exhibit 8A. Zoom in on |
| 10:53AM | 19 | the top of that chart there, please. |
| 10:53AM | 20 | **BY MR. TRIPI:** |
| 10:53AM | 21 | Q. Do you see David Hersey's name there? |
| 10:53AM | 22 | A. Yes, I do. |
| 10:53AM | 23 | Q. With a phone number and an account number to the left? |
| 10:53AM | 24 | A. Yes. I do, yes. |
| 10:53AM | 25 | Q. Do you see Matthew Suppa's name there? |

| | | |
|---|---|---|
| 10:53AM | 1 | A.  I do. |
| 10:53AM | 2 | Q.  Whose land were these grows located near? |
| 10:53AM | 3 | A.  Near the land that was owned by Mark Suppa. |
| 10:53AM | 4 | Q.  Is Matt Mark's brother? |
| 10:53AM | 5 | A.  Yes. |
| 10:53AM | 6 | Q.  Is John Suppa also Matt's brother? |
| 10:53AM | 7 | A.  Yes. |
| 10:53AM | 8 | Q.  So there's three brothers:  John, Mark, and Matt? |
| 10:53AM | 9 | A.  Yes. |
| 10:53AM | 10 | Q.  Are they all friends with the defendant? |
| 10:53AM | 11 | A.  Yes. |
| 10:53AM | 12 | Q.  Are they all friends with Masecchia? |
| 10:53AM | 13 | A.  Yes.  Yes. |
| 10:53AM | 14 | Q.  Are they all friends with you? |
| 10:53AM | 15 | A.  Yes. |
| 10:54AM | 16 | Q.  Did Ron Serio have another person close to him who helped |
| 10:54AM | 17 | distribute named Jason Campbell, or Jay Campbell? |
| 10:54AM | 18 | A.  I've heard that name, yes.  I don't know Jay Campbell, |
| 10:54AM | 19 | but yes. |
| 10:54AM | 20 | **MR. TRIPI:**  Let's go to 8A, page 307. |
| 10:54AM | 21 | Can we scroll down maybe to the next page?  I |
| 10:54AM | 22 | apologize.  Oh there we go. |
| 10:54AM | 23 | **BY MR. TRIPI:** |
| 10:54AM | 24 | Q.  Do you see an email with the name Jason Campbell there |
| 10:54AM | 25 | associated with this record? |

10:54AM   1    A.  I do, yes.

10:54AM   2    Q.  Do you know who Robert Rine is?

10:54AM   3    A.  Robert Rine?  I believe he's affiliated, he was friends

10:54AM   4    with Ron Serio.

10:54AM   5    Q.  And when you say "affiliated," do you believe him to be

10:55AM   6    involved with the activities in the distribution of Ron

10:55AM   7    Serio?

10:55AM   8    A.  I believe so, yes.

10:55AM   9            **MR. TRIPI:**  Let's go to Exhibit 8A, page 314.

10:55AM   10            **BY MR. TRIPI:**

10:55AM   11   Q.  Do you see a phone number, subscriber information with

10:55AM   12   the name Robert Rine there?

10:55AM   13   A.  Yes.

10:55AM   14   Q.  Was Michael Moynihan another affiliate of Ron Serio?

10:55AM   15   A.  Yeah, that name's familiar.  I don't know Mr. Moynihan,

10:55AM   16   but yes.

10:55AM   17            **MR. TRIPI:**  Let's go to page 332.

10:55AM   18            **BY MR. TRIPI:**

10:55AM   19   Q.  Do you see another subscriber record there with a phone

10:55AM   20   number and associated with a Michael Moynihan?

10:55AM   21   A.  I do, yes.

10:55AM   22   Q.  Are you familiar with the name Mark Kagan in the context

10:55AM   23   of this organization?

10:55AM   24   A.  Yes.

10:55AM   25   Q.  What was his role, if you know?

| | | |
|---|---|---|
| 10:55AM | 1 | A.  I believe he was with Ron, receiving product from Ron. |
| 10:55AM | 2 | Q.  You've heard the name though? |
| 10:55AM | 3 | A.  I've heard the name, but I don't know him. |
| 10:55AM | 4 | **MR. TRIPI:**  Okay.  Let's go to page 370. |
| 10:56AM | 5 | **BY MR. TRIPI:** |
| 10:56AM | 6 | Q.  Do you see a record there related to a Mark Kagan? |
| 10:56AM | 7 | A.  Yes. |
| 10:56AM | 8 | Q.  Do you see an address there, Brooklyn, New York? |
| 10:56AM | 9 | A.  I do. |
| 10:56AM | 10 | Q.  And did you say New York City was an area where Serio and |
| 10:56AM | 11 | Masecchia were traveling to get marijuana? |
| 10:56AM | 12 | A.  Yes. |
| 10:56AM | 13 | Q.  Did other people take some trips as well? |
| 10:56AM | 14 | A.  I believe so, yes. |
| 10:56AM | 15 | Q.  Did you ever travel with them to New York City? |
| 10:56AM | 16 | A.  No. |
| 10:56AM | 17 | Q.  Do you know who Adrian Fina is? |
| 10:56AM | 18 | A.  Adrian Fina?  I know her aunt, I don't know her. |
| 10:56AM | 19 | Q.  Did Ron have a wife named Lauren? |
| 10:56AM | 20 | A.  Yes. |
| 10:56AM | 21 | Q.  Did she have a sister named Adrian? |
| 10:56AM | 22 | A.  That's -- yes. |
| 10:56AM | 23 | **MR. TRIPI:**  Let's go to page 8A at page 421. |
| 10:56AM | 24 | **BY MR. TRIPI:** |
| 10:56AM | 25 | Q.  Do you see a subscriber record there for an Adrian Fina? |

| | | |
|---|---|---|
| 10:56AM | 1 | A.  Yes. |
| 10:56AM | 2 | Q.  Was Michael Buttitta a member of this organization that |
| 10:57AM | 3 | moved some marijuana? |
| 10:57AM | 4 | A.  Yes, he was close with Ron. |
| 10:57AM | 5 | **MR. TRIPI:**  Let's go to page -- excuse me, 8A at |
| 10:57AM | 6 | page 378. |
| 10:57AM | 7 | **BY MR. TRIPI:** |
| 10:57AM | 8 | Q.  Do you see a subscriber record there for a Michael |
| 10:57AM | 9 | Buttitta with a phone number? |
| 10:57AM | 10 | A.  I do, yes. |
| 10:57AM | 11 | Q.  Earlier we mentioned Mark Suppa; do you recall that? |
| 10:57AM | 12 | A.  Yes. |
| 10:57AM | 13 | **MR. TRIPI:**  Can we go to page 149, please? |
| 10:57AM | 14 | **BY MR. TRIPI:** |
| 10:57AM | 15 | Q.  Did Mark Suppa live in Chicago? |
| 10:57AM | 16 | A.  He does. |
| 10:57AM | 17 | Q.  He's a landowner though? |
| 10:57AM | 18 | A.  Yes, it's -- believe it's in his wife's name. |
| 10:57AM | 19 | Q.  So his land was down near where these grows were? |
| 10:57AM | 20 | A.  Yes, the state land was very close to that. |
| 10:57AM | 21 | Q.  And did you guys use his cabin to help work on the |
| 10:58AM | 22 | marijuana? |
| 10:58AM | 23 | A.  Yes. |
| 10:58AM | 24 | Q.  Okay.  So his property was home base in terms of the |
| 10:58AM | 25 | grow? |

10:58AM  1    A.  Yes.

10:58AM  2    Q.  Do you see a subscriber there with his address and phone

10:58AM  3    number?

10:58AM  4    A.  Yes, I do.

10:58AM  5           MR. TRIPI:  Are we good now, Judge?

10:58AM  6           THE COURT:  Good a time as any.

10:58AM  7           MR. TRIPI:  Thank you.

10:58AM  8           THE COURT:  We'll take our break now.  Remember my

10:58AM  9    instructions about not talking about the case, including with

10:58AM  10   each other, and not making up your mind.

10:58AM  11          See you back here in about 10 or 15 minutes.

10:58AM  12          (Jury excused at 10:58 a.m.)

10:59AM  13          THE COURT:  Anything for the record before we break,

10:59AM  14   Mr. Singer?

10:59AM  15          MR. SINGER:  Not from me, Judge.

10:59AM  16          THE COURT:  Mr. Tripi?

10:59AM  17          MR. TRIPI:  No, thank you.

10:59AM  18          THE COURT:  We'll see you back here in 10 or 15

10:59AM  19   minutes.

10:59AM  20          THE CLERK:  All rise.

10:59AM  21          (Off the record at 10:59 a.m.)

11:19AM  22          (Back on the record at 11:19 a.m.)

11:19AM  23          (Jury not present.)

11:19AM  24          THE COURT:  Please be seated.

11:19AM  25          THE CLERK:  We are back on the record for the

| | | |
|---|---|---|
| 11:19AM | 1 | continuation of the jury trial in 19-cr-227, United States of |
| 11:19AM | 2 | America versus Joseph Bongiovanni. |
| 11:19AM | 3 | All counsel and parties are present. |
| 11:19AM | 4 | **THE COURT:**  Anything we need to do before we bring |
| 11:19AM | 5 | the jury back, Mr. Singer? |
| 11:19AM | 6 | **MR. SINGER:**  No. |
| 11:19AM | 7 | **THE COURT:**  Mr. Tripi? |
| 11:19AM | 8 | **MR. TRIPI:**  No, thanks, Judge. |
| 11:19AM | 9 | **THE COURT:**  Let's bring them back, please, Pat. |
| 11:22AM | 10 | (Jury seated at 11:22 a.m.) |
| 11:22AM | 11 | **THE COURT:**  Okay.  Welcome back, everybody. |
| 11:22AM | 12 | I just learned I have another matter that I have to |
| 11:22AM | 13 | handle at 12:30, so we'll break then and we'll break until |
| 11:22AM | 14 | about 1:30. |
| 11:22AM | 15 | The record will reflect that all our jurors are, |
| 11:22AM | 16 | again, present. |
| 11:22AM | 17 | I remind the witness that he's still under oath. |
| 11:22AM | 18 | Mr. Tripi, you may continue. |
| 11:22AM | 19 | **MR. TRIPI:**  Thank you, Judge. |
| 11:22AM | 20 | **BY MR. TRIPI:** |
| 11:22AM | 21 | Q.  Mr. Selva, before that break we went through a number of |
| 11:23AM | 22 | names and phone numbers that you saw on the screen; is that |
| 11:23AM | 23 | right? |
| 11:23AM | 24 | A.  Correct. |
| 11:23AM | 25 | Q.  Was one of the things that Mr. Masecchia asked you to do |

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

64

11:23AM  1   for Mr. Serio was to check with the defendant to make sure

11:23AM  2   phone numbers of certain individuals were not being tapped?

11:23AM  3   A.   Yes.

11:23AM  4   Q.   And in order to get the defendant that information, were

11:23AM  5   you provided lists of names and phone numbers to pass along

11:23AM  6   to the defendant?

11:23AM  7   A.   Yes.

11:23AM  8   Q.   Describe that process for the jury.

11:23AM  9   A.   Ron had reached out to Mike and asked me -- he was

11:23AM  10  concerned about some individuals, and he had the numbers and

11:23AM  11  the names.  And he asked me to pass it along to the

11:23AM  12  defendant.

11:23AM  13       I wrote it on a piece of paper from the sheet that Ron

11:23AM  14  gave me, just wrote it on a notebook paper, and I did that.

11:23AM  15       I reached out with the defendant, met with him and gave

11:23AM  16  him the list.

11:23AM  17  Q.   And was this a list that Ron gave to Mike and Mike gave

11:24AM  18  to you?

11:24AM  19  A.   Yes.

11:24AM  20  Q.   And how many times did this process repeat itself where

11:24AM  21  you would get a list of names and phone numbers from Ron to

11:24AM  22  Mike to you, to pass along to the defendant to see if the

11:24AM  23  names were clear?

11:24AM  24  A.   A few, whenever it came up.  A few.

11:24AM  25  Q.   What do you mean by "a few?"  Can you estimate a number?

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

65

11:24AM 1    A.  Three.  Two or three.  I'm not quite sure.  I don't

11:24AM 2    remember.

11:24AM 3    Q.  Is that your best estimate?

11:24AM 4    A.  That's my best estimate.

11:24AM 5    Q.  And were there multiple names on the list each time?

11:24AM 6    A.  Yes.

11:24AM 7    Q.  Did Mike and Ron also want you to make sure that their

11:24AM 8    main phone numbers, not their burner phones, but their main

11:24AM 9    phone numbers were cleared?

11:24AM 10   A.  Yes.

11:24AM 11   Q.  What was the discussion in that regard?

11:24AM 12   A.  They highlighted that.  They said make sure when you get

11:24AM 13   together that you reiterate to make sure that our main

11:24AM 14   numbers, the ones that we're primarily using, are not tapped

11:25AM 15   or there's any interference.

11:25AM 16   Q.  Can you distinguish for the jury between their main

11:25AM 17   number and their burner phones?  What do you mean by that,

11:25AM 18   "main number?"

11:25AM 19   A.  Well, they had a variety of different burner phones, and

11:25AM 20   then they both had a regular phone that they used that was

11:25AM 21   for their family or whatever.  That was their main number

11:25AM 22   that they called from mostly.

11:25AM 23      They conducted the business with the burner phones.

11:25AM 24   Q.  Over time, did this defendant provide you with general

11:25AM 25   information about the DEA and law enforcement techniques and

11:25AM    1    procedures to help you and others in the organization not get

11:25AM    2    caught?

11:25AM    3    A.   Yes.

11:25AM    4    Q.   Did the defendant also provide you with specific

11:25AM    5    information about investigative techniques being used or

11:25AM    6    considered?

11:25AM    7    A.   Yes.

11:25AM    8    Q.   Did you in your role pass on information to Masecchia and

11:26AM    9    Serio that was both general law enforcement tactics and

11:26AM   10    procedures and specific as to their organization and any

11:26AM   11    threats to it?

11:26AM   12    A.   I did, yes.

11:26AM   13    Q.   First, let's go through general law enforcement tactics

11:26AM   14    and procedures that the defendant told you about from the

11:26AM   15    time you first began receiving information from him in

11:26AM   16    exchange for bribes.   Okay?

11:26AM   17    A.   Okay.

11:26AM   18    Q.   Did you and the defendant ever discuss the law

11:26AM   19    enforcement technique of how the DEA and other law

11:26AM   20    enforcement agencies get a wiretap?

11:26AM   21    A.   He mentioned it.   They have to get a Court order for

11:26AM   22    that.   If they have information regarding somebody who might

11:26AM   23    be a high-value suspect, they get a Court order, and they

11:26AM   24    would tap their phones.

11:26AM   25    Q.   Did the defendant tell you how getting caught on a

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

67

11:27AM    1    wiretap could be avoided?

11:27AM    2    A.  Yes.

11:27AM    3    Q.  What did he --

11:27AM    4    A.  Don't talk over the phone.

11:27AM    5    Q.  Yeah.  What did he say in that regard?

11:27AM    6    A.  Be very generic when you talk on the phone, no details,

11:27AM    7    no explanations.  A lot of meeting in person, hey, let's get

11:27AM    8    together, grab coffee, whatever.  Do a lot of that in person.

11:27AM    9    Q.  So did you learn from what the defendant told you?

11:27AM   10    A.  Yes.

11:27AM   11    Q.  Did you pass that information along?

11:27AM   12    A.  I did.

11:27AM   13    Q.  How often did the defendant stress to you the importance

11:27AM   14    of not talking about conspiracy business openly over the

11:27AM   15    phone?

11:27AM   16    A.  Every time.  Every time we got together, just don't talk

11:27AM   17    over the phone.  Be very vague.  Quick phone call.  Let's get

11:27AM   18    together, talk in person.  Get together, go for a walk around

11:27AM   19    the park, whatever.

11:28AM   20    Q.  And did you pass that type of information along?

11:28AM   21    A.  I did.

11:28AM   22    Q.  And in fact, did Masecchia use multiple burner phones?

11:28AM   23    A.  He did.

11:28AM   24    Q.  Did Ron Serio use multiple burner phones?

11:28AM   25    A.  He did.

11:28AM 1  Q.  Did they continuously discard phones and change numbers?

11:28AM 2  A.  Constantly.

11:28AM 3  Q.  Did you believe as part of the organization that their

11:28AM 4  use of burner phones was important for them to not get caught

11:28AM 5  on a wiretap?

11:28AM 6  A.  Yes.

11:28AM 7  Q.  When you discussed conspiracy business with Serio or

11:28AM 8  Masecchia, was it in person?

11:28AM 9  A.  It was always in person.  Always a quick phone call.

11:28AM 10  Hey, what are you doing?  Are you around?  Do you want to

11:28AM 11  grab a beer, coffee, like, or stop by?

11:28AM 12  Q.  And now your primary contact was with Masecchia; is that

11:28AM 13  right?

11:28AM 14  A.  Yes, most of the time.

11:28AM 15  Q.  But Mr. Serio's been to your house?

11:28AM 16  A.  Yes.  I've spoken to Ron on a few occasions, he's been to

11:28AM 17  my house, yes.

11:28AM 18  Q.  You've been to his house --

11:28AM 19  A.  Yes.

11:29AM 20  Q.  -- on Lebrun?

11:29AM 21  A.  Yes.

11:29AM 22  Q.  Did the defendant discuss with you the law enforcement

11:29AM 23  technique of physical surveillance?

11:29AM 24  A.  Yes.

11:29AM 25  Q.  What is your understanding of physical surveillance and

11:29AM  1    how law enforcement uses it based on your discussions with

11:29AM  2    the defendant?

11:29AM  3    A.  They'll follow you.  They'll put a vehicle on you,

11:29AM  4    different teams.  Usually they are dark shaded windows.  They

11:29AM  5    use utility vehicles.

11:29AM  6        If you see a utility vehicle at the end of your block for

11:29AM  7    a few days, it could be a red flag.

11:29AM  8    Q.  You said the term "different teams."  What did the

11:29AM  9    defendant tell you about how different teams are used on

11:29AM  10   surveillance?

11:29AM  11   A.  Meaning if they're following somebody, they work in

11:29AM  12   teams.  Like, if somebody's following somebody, and they go

11:29AM  13   to a different area, then it would be handed off to a

11:29AM  14   different team.

11:29AM  15   Q.  What, if anything, did he tell you about the different

11:30AM  16   types of vehicles law enforcement used on surveillance?

11:30AM  17   A.  Like I mentioned, all tinted windows.  Chargers, utility

11:30AM  18   vehicles.  Like I said prior, if it was at the end of your

11:30AM  19   block or wherever you were for a period of time, that would

11:30AM  20   raise a red flag.

11:30AM  21   Q.  Now, before testifying here today, have you been thinking

11:30AM  22   more about the physical surveillance question and things that

11:30AM  23   the defendant told you about?

11:30AM  24   A.  Yes.

11:30AM  25   Q.  Before coming in to court today, did you -- did you

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

11:30AM   1   remember something that you let us know relatively

11:30AM   2   recently --

11:30AM   3   A.   Yes.

11:30AM   4   Q.   -- in terms of -- in terms of vehicles used on

11:30AM   5   surveillance?

11:31AM   6   A.   Yes.

11:31AM   7   Q.   So did there come a time that you recalled where the

11:31AM   8   defendant actually showed you some of the DEA's surveillance

11:31AM   9   vehicles?

11:31AM   10  A.   Yes, it was --

11:31AM   11  Q.   Can you describe for the jury the circumstances under

11:31AM   12  which the defendant showed you some of the DEA's surveillance

11:31AM   13  vehicles?

11:31AM   14  A.   He was dropping off his vehicle to the garage, and I was

11:31AM   15  following him.   I was gonna give him a ride.   And I went into

11:31AM   16  the garage, and I saw different vehicles that were there.

11:31AM   17      And I was just asking question, being inquisitive.   There

11:31AM   18  was a utility truck, a cab, quite a few Chargers, SUVs, all

11:31AM   19  of dark windowed.

11:31AM   20      And I just asked him, I says, are these your surveillance

11:31AM   21  vehicles?   And he told me yes.

11:31AM   22  Q.   Let's break that down a little bit.   Did you know where

11:31AM   23  the defendant's office was?

11:31AM   24  A.   The electric avenue -- the Electric building.

11:31AM   25  Q.   Is that here in Buffalo?

11:31AM  1    A.  Yes.

11:31AM  2    Q.  Not far from the courthouse?

11:31AM  3    A.  Yes, downtown Buffalo, yes.

11:31AM  4    Q.  And you said he was dropping his vehicle off there?

11:32AM  5    A.  His DEA vehicle.  His vehicle.  And I was going to give

11:32AM  6    him a ride back.

11:32AM  7    Q.  Do you know what purpose did he need to drop it off for

11:32AM  8    and why did you have to drop him back?

11:32AM  9    A.  I don't recall.

11:32AM  10   Q.  And did this occur during the timeframe when he was

11:32AM  11   protecting you and the organization and receiving bribes?

11:32AM  12   A.  Yes.

11:32AM  13   Q.  Now when you got there, was it -- did you park and walk

11:32AM  14   in with him?  How did that work?

11:32AM  15   A.  I couldn't pull my vehicle in there.  I parked in the

11:32AM  16   lot, and then I walked in.  Underneath -- it was like an

11:32AM  17   underground garage, so I walked in.

11:32AM  18   Q.  Did the defendant let you in?

11:32AM  19   A.  Yes.

11:32AM  20   Q.  Was it, like, after hours?

11:32AM  21   A.  I believe so, yes.

11:32AM  22   Q.  How many different surveillance vehicles did you see in

11:32AM  23   there?

11:32AM  24   A.  Six or eight.  A bunch.

11:32AM  25   Q.  Was it helpful to you as someone involved in the

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

72

| | | |
|---|---|---|
| 11:33AM | 1 | manufacture, storage, and transportation of marijuana as part |
| 11:33AM | 2 | of the organization to actually see the different types of |
| 11:33AM | 3 | vehicles they use on surveillance? |
| 11:33AM | 4 | A.  Yes. |
| 11:33AM | 5 | Q.  Did you pass what you saw and learned along to Masecchia? |
| 11:33AM | 6 | A.  Yes. |
| 11:33AM | 7 | Q.  What did you tell him? |
| 11:33AM | 8 | A.  I told him what -- where I just was, and to be extra |
| 11:33AM | 9 | cautious.  And they knew about the Chargers and SUVs, but I |
| 11:33AM | 10 | says, well, what particularly got my attention was the |
| 11:33AM | 11 | utility vehicles.  If you see any utility vehicles parked for |
| 11:33AM | 12 | a long time. |
| 11:33AM | 13 | Q.  Has the defendant ever told you anything about how the |
| 11:33AM | 14 | DEA shares information with other law enforcement agencies in |
| 11:33AM | 15 | the area? |
| 11:33AM | 16 | A.  No. |
| 11:33AM | 17 | Q.  Earlier you talked about knowing that or believing he had |
| 11:34AM | 18 | access to a lot of information, right? |
| 11:34AM | 19 | A.  Yes. |
| 11:34AM | 20 | Q.  How did you form that belief?  What did he tell you about |
| 11:34AM | 21 | that? |
| 11:34AM | 22 | A.  Well, he was in contact with different agencies and he |
| 11:34AM | 23 | had different contacts.  So they might have been -- I was |
| 11:34AM | 24 | just assuming they were sharing information. |
| 11:34AM | 25 | Q.  Has he told you about task force officers? |

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

73

| | | |
|---|---|---|
| 11:34AM | 1 | A.  Yes. |
| 11:34AM | 2 | Q.  Have you met some task force officers? |
| 11:34AM | 3 | A.  I have, yes. |
| 11:34AM | 4 | Q.  Was Tom Doctor a DEA task force officer? |
| 11:34AM | 5 | A.  He was, yes. |
| 11:34AM | 6 | Q.  That's someone you did cocaine with, right? |
| 11:34AM | 7 | A.  Yes. |
| 11:34AM | 8 | Q.  Do you know who Joe Palmieri is? |
| 11:34AM | 9 | A.  I do, yes. |
| 11:34AM | 10 | Q.  Who's that? |
| 11:34AM | 11 | A.  He was with the DEA task force assigned by, I believe, |
| 11:34AM | 12 | from Tonawanda Police. |
| 11:34AM | 13 | Q.  Okay.  So you know about task forces, right? |
| 11:34AM | 14 | A.  Yes. |
| 11:34AM | 15 | Q.  Who told you about that? |
| 11:34AM | 16 | A.  The defendant. |
| 11:34AM | 17 | Q.  All right.  What did he tell you about that? |
| 11:34AM | 18 | A.  He just said that different agencies will assign officers |
| 11:34AM | 19 | to their task force and they'll work with them on cases.  And |
| 11:34AM | 20 | they're not agents, but they're part of the DEA task force. |
| 11:35AM | 21 | Q.  And you knew Tom Doctor to be a Buffalo police detective, |
| 11:35AM | 22 | right? |
| 11:35AM | 23 | A.  Yes.  Yes. |
| 11:35AM | 24 | Q.  You know Joe Palmieri to be a Town of Tonawanda police |
| 11:35AM | 25 | detective, right? |

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

| | | |
|---|---|---|
| 11:35AM | 1 | A.  Yes. |
| 11:35AM | 2 | Q.  And you knew there were other task force officers, right? |
| 11:35AM | 3 | A.  Yes. |
| 11:35AM | 4 | Q.  And they all come together and help the DEA? |
| 11:35AM | 5 | A.  Correct. |
| 11:35AM | 6 | Q.  Did you ever tell Masecchia or Serio about how the DEA |
| 11:35AM | 7 | uses task force officers based on what you learned through |
| 11:35AM | 8 | the defendant? |
| 11:35AM | 9 | A.  I did. |
| 11:35AM | 10 | Q.  What did you tell him? |
| 11:35AM | 11 | A.  I told them that there's different agencies that are |
| 11:35AM | 12 | involved that will provide officers, and then they will be |
| 11:35AM | 13 | assigned.  They're not federal agents, but they're working |
| 11:35AM | 14 | with them under their jurisdiction. |
| 11:35AM | 15 | Q.  Did you believe that the fact that the defendant worked |
| 11:35AM | 16 | with task force officers and local agencies was helpful to |
| 11:35AM | 17 | the -- to the organization? |
| 11:35AM | 18 | A.  Yes. |
| 11:35AM | 19 | Q.  How did that -- when the defendant said he would keep a |
| 11:36AM | 20 | watchful eye, did you believe that having access to task |
| 11:36AM | 21 | force officers was helpful? |
| 11:36AM | 22 | A.  Yes. |
| 11:36AM | 23 | Q.  Why? |
| 11:36AM | 24 | A.  It gives him a broader range, just more ways to get |
| 11:36AM | 25 | information. |

11:36AM   1   Q.  Now we talked earlier about the utilities that you were

11:36AM   2   using when you were growing marijuana.  Can you elaborate

11:36AM   3   more fully about what the defendant told you about how the

11:36AM   4   DEA checks utilities, as it relates to suspected drug

11:36AM   5   dealers?

11:36AM   6   A.  If it raises a red flag from National Grid, National Grid

11:36AM   7   would contact law enforcement agencies and tell them about

11:36AM   8   the usage patterns, that it's increased for whatever period

11:36AM   9   of time, and they might want to take a look at it for

11:36AM  10   possible illegal activity.

11:36AM  11   Q.  Did he tell you -- did the defendant tell you how he

11:36AM  12   learned that?  How he knew that through his job?

11:37AM  13   A.  No.

11:37AM  14   Q.  Did you believe it was based on his experience and

11:37AM  15   training?

11:37AM  16   A.  Yes.

11:37AM  17        **MR. TRIPI:**  Ms. Champoux, please pull up Exhibit 30

11:37AM  18   in evidence.  And if we can -- this will be shown to

11:37AM  19   everybody, thank you.

11:38AM  20        I'd like to scroll down, Ms. Champoux, to line number

11:38AM  21   23, if you could highlight that.

11:38AM  22        **BY MR. TRIPI:**

11:38AM  23   Q.  Do you see those columns there, Mr. Selva?

11:38AM  24   A.  Yes.  Yes.

11:38AM  25   Q.  Do you see the first -- we're in row 23, and the columns

| | | |
|---|---|---|
| 11:38AM | 1 | first name, last name, Joseph Bongiovanni? |
| 11:38AM | 2 | A.   Yes. |
| 11:38AM | 3 | Q.   Can you read the description there? |
| 11:38AM | 4 | A.   Indoor marijuana grow site and APR training completed. |
| 11:38AM | 5 | No exam. |
| 11:38AM | 6 | Q.   And what's the date there, that training was completed? |
| 11:38AM | 7 | A.   5/23/13. |
| 11:38AM | 8 | Q.   By that point, in your involvement in the Masecchia-Serio |
| 11:38AM | 9 | organization, had there been marijuana grows at other |
| 11:38AM | 10 | locations besides your house? |
| 11:38AM | 11 | A.   Yes, there was quite a few. |
| 11:38AM | 12 | Q.   And then you had one in your house as well? |
| 11:39AM | 13 | A.   Yes. |
| 11:39AM | 14 | Q.   And the defendant told you about red flags? |
| 11:39AM | 15 | A.   Yes. |
| 11:39AM | 16 | Q.   He told you about people investigating those type of |
| 11:39AM | 17 | indoor grows? |
| 11:39AM | 18 | A.   Yes. |
| 11:39AM | 19 | **MR. TRIPI:**  We can take that down. |
| 11:39AM | 20 | **BY MR. TRIPI:** |
| 11:39AM | 21 | Q.   Did you use the information the defendant told you about |
| 11:39AM | 22 | to help yourself avoid being detected? |
| 11:39AM | 23 | A.   Absolutely, yes. |
| 11:39AM | 24 | Q.   Did you pass that information along to Masecchia? |
| 11:39AM | 25 | A.   Yes. |

11:39AM    1    Q.  What, if anything, did the defendant tell you about how

11:39AM    2    GPS trackers worked and how the DEA uses -- just generally,

11:39AM    3    how the DEA uses GPS trackers?

11:39AM    4    A.  They would put them on a vehicle for somebody they had

11:39AM    5    under surveillance, of interest.  And they would track their

11:39AM    6    movements, their patterns, trying to get information or a

11:40AM    7    location on where their stash house is or grow house,

11:40AM    8    whatever it is they were looking for.

11:40AM    9    Q.  Did he tell you where on vehicles they put GPS trackers?

11:40AM    10   A.  Underneath.

11:40AM    11   Q.  Was that information helpful to you as someone who

11:40AM    12   traveled and transported marijuana from the Southern Tier to

11:40AM    13   the city?

11:40AM    14   A.  Yes.

11:40AM    15   Q.  Did you tell him how you blended into traffic during rush

11:40AM    16   hour?

11:40AM    17   A.  Yes.

11:40AM    18   Q.  What did he say about that when you told him that?

11:40AM    19   A.  He said that's the best way to do it, draw no attention.

11:40AM    20   Q.  What, if anything, did the defendant ever tell you about

11:40AM    21   how law enforcement investigates banking activity?

11:40AM    22   A.  If there were large deposits made of cash, IRS

11:41AM    23   regulations, anything over $10,000, you have to report.  But

11:41AM    24   if there was a pattern of cash deposits, that could raise a

11:41AM    25   red flag.

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

11:41AM  1   Q.  And a red flag's a bad thing for someone involved in

11:41AM  2   trafficking?

11:41AM  3   A.  Correct, yes.

11:41AM  4   Q.  Did you know not to keep the money, the cash you were

11:41AM  5   making from distribution of marijuana, out of the banking

11:41AM  6   system?

11:41AM  7   A.  Yes.

11:41AM  8   Q.  How did you know not to put the money in the bank?

11:41AM  9   A.  From what I was told.

11:41AM  10  Q.  And who told that to you?

11:41AM  11  A.  The defendant.  I kept it as cash.

11:41AM  12  Q.  How did you spend it?

11:41AM  13  A.  Living expenses.  I spent it as cash.  It just went.

11:41AM  14  Q.  Did you buy groceries?

11:41AM  15  A.  Groceries.

11:41AM  16  Q.  Did you buy gas?

11:41AM  17  A.  I bought gas, things for my kids.

11:41AM  18  Q.  Clothes?

11:41AM  19  A.  Yes, clothes.

11:41AM  20  Q.  Did you -- did you learn not to claim the cash you were

11:41AM  21  getting from the elicit drug distribution on your taxes?

11:42AM  22  A.  Yes.

11:42AM  23  Q.  Did you talk about how the DEA investigates and helps

11:42AM  24  investigate tax information?

11:42AM  25  A.  Brief.  Briefly, not -- not much.  I -- I knew not to

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

79

11:42AM   1   include it on my taxes.

11:42AM   2   Q.  What -- was this information helpful to you, Masecchia,

11:42AM   3   and Serio in not getting caught?

11:42AM   4   A.  Yes.

11:42AM   5   Q.  Now I'd like to discuss with you specific information

11:42AM   6   about your organization that the defendant relayed to you and

11:42AM   7   that you relayed to Masecchia and ultimately to Serio, okay?

11:42AM   8   A.  Go ahead.

11:42AM   9   Q.  Generally, were requests from Serio passed from -- to you

11:43AM  10   from Masecchia?

11:43AM  11   A.  Yes.

11:43AM  12   Q.  Generally, was information the defendant provided passed

11:43AM  13   from you to Masecchia back to Serio?

11:43AM  14   A.  Yes.

11:43AM  15   Q.  Was the information exchanged face to face?

11:43AM  16   A.  It's always face to face.

11:43AM  17   Q.  Was that consistent with how the defendant told you to do

11:43AM  18   things?

11:43AM  19   A.  Yes.

11:43AM  20   Q.  Was operating face to face, to put a finer point on it,

11:43AM  21   consistent with the general instructions and information the

11:43AM  22   defendant gave you about how the DEA and other law

11:43AM  23   enforcement conduct wiretaps?

11:43AM  24   A.  Yes.  Never talk over the phone.  Back to that.

11:43AM  25   Q.  In terms of meeting face to face, did you discuss drug

11:43AM    1    business with Serio and Masecchia, have you met with them at

11:43AM    2    your house?

11:43AM    3    A.  A few times, yes.

11:43AM    4    Q.  Did you meet with them at Serio's house?

11:43AM    5    A.  Yes.

11:43AM    6    Q.  Did you meet with them at the outdoor grow site?

11:44AM    7    A.  No.

11:44AM    8    Q.  Have you been at the outdoor grow at the same time as

11:44AM    9    Serio and Masecchia?

11:44AM    10   A.  As Masecchia.

11:44AM    11   Q.  Okay.

11:44AM    12   A.  Serio was never there.  So when Mike and I were together,

11:44AM    13   we would talk -- the answer is yes.

11:44AM    14   Q.  Have you gone to the Western Door with them and had

11:44AM    15   dinner together?

11:44AM    16   A.  I did, yes.

11:44AM    17   Q.  What other places would you meet with Masecchia, as

11:44AM    18   opposed to all of them together?

11:44AM    19   A.  Usually a bar.  When him and I would meet, we would

11:44AM    20   either meet at Gables, Kelly's Korner, M.T. Pockets,

11:44AM    21   somewhere.

11:44AM    22   Q.  Are those bars in and around the North Buffalo area?

11:44AM    23   A.  They're in the North Buffalo area, they're in the

11:44AM    24   neighborhood area.

11:44AM    25   Q.  In order for this defendant -- we've touched on this, but

11:44AM    1    in order for the defendant to effectively protect the

11:44AM    2    organization, did he have to have -- did he have to

11:44AM    3    understand the scope of it?

11:44AM    4    A.  Yes.

11:44AM    5    Q.  Did you explain the scope of it to him and update it as

11:45AM    6    operations expanded?

11:45AM    7    A.  Yes.

11:45AM    8    Q.  Was it important to keep him apprised with updates as

11:45AM    9    necessary?

11:45AM   10    A.  Yes.

11:45AM   11    Q.  Why was that important?

11:45AM   12    A.  In case something would have happened.  The operation is

11:45AM   13    growing, we needed as much information as possible.

11:45AM   14    Q.  As to one aspect, were Masecchia and Serio and others

11:45AM   15    traveling to New York City to engage in marijuana

11:45AM   16    transactions?

11:45AM   17    A.  Yes, they were.

11:45AM   18    Q.  Did you describe that to the defendant?

11:45AM   19    A.  Yes.

11:45AM   20    Q.  Why?

11:45AM   21    A.  Because they were doing it quite a bit.  And the route

11:45AM   22    they were taking, they wanted to make sure they weren't

11:45AM   23    followed, there was no surveillance, just everything was

11:45AM   24    okay.  The pat --

11:45AM   25    Q.  Did you start -- did you start to say the pattern?

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

82

11:45AM  1   A.  Yes.

11:45AM  2   Q.  What did you mean by that, as you started to say pattern?

11:45AM  3   A.  They made frequent trips to -- to New York.  So when they

11:45AM  4   went, they were always concerned.  They wanted to make sure

11:45AM  5   that there was nothing -- no surveillance or nothing.  No new

11:45AM  6   investigation or anything that had come up.

11:45AM  7   Q.  So did Masecchia ask you to find out if anyone was on to

11:46AM  8   him and Ron's travels?

11:46AM  9   A.  He did, yes.

11:46AM  10  Q.  Did you ask the defendant about that?

11:46AM  11  A.  I did.

11:46AM  12  Q.  What did the defendant tell you?

11:46AM  13  A.  He told me he was all clear, not that he's aware of.

11:46AM  14  Q.  What did you report back to Masecchia?

11:46AM  15  A.  I told him exactly that.  That it's all clear, and

11:46AM  16  there's nothing to worry about, as far as I know, as far as

11:46AM  17  was told to me.

11:46AM  18  Q.  We've talked about this, but as operations were

11:46AM  19  expanding, they wanted you to have certain phone numbers

11:46AM  20  checked out?

11:46AM  21  A.  Yes.

11:46AM  22  Q.  And that was the list we talked about?

11:46AM  23  A.  Yes.

11:46AM  24  Q.  After you had passed the list to the defendant, would he

11:46AM  25  report back as to whether any phones were tapped?

| | | |
|---|---|---|
| 11:46AM | 1 | A.  Yes. |
| 11:46AM | 2 | Q.  What did he report back? |
| 11:46AM | 3 | A.  He reported a few were tapped, that were off the list. |
| 11:46AM | 4 | Q.  What did he report?  Who? |
| 11:46AM | 5 | A.  R.K., T.S. |
| 11:47AM | 6 | Q.  Did he report that their phones were tapped, or that they |
| 11:47AM | 7 | were informants? |
| 11:47AM | 8 | A.  That they were informants. |
| 11:47AM | 9 | Q.  All right.  I'm asking about wiretaps. |
| 11:47AM | 10 | A.  Okay. |
| 11:47AM | 11 | Q.  When they -- when they asked you for the lists and the |
| 11:47AM | 12 | names we just went through, were the phones clear from |
| 11:47AM | 13 | wiretaps? |
| 11:47AM | 14 | A.  Off the list that he gave me, yes. |
| 11:47AM | 15 | Q.  Okay.  We'll get to R.K. and T.S. in a moment. |
| 11:47AM | 16 | Would you get the lists and then rewrite them on a |
| 11:47AM | 17 | smaller piece of paper? |
| 11:47AM | 18 | A.  I did, yes. |
| 11:47AM | 19 | Q.  Describe why you did that. |
| 11:47AM | 20 | A.  Just to -- that was just me.  I would just write it down, |
| 11:47AM | 21 | tell them who they were, and then I would dispose of the |
| 11:47AM | 22 | other list. |
| 11:47AM | 23 | Q.  What was your purpose of writing it on a smaller piece of |
| 11:47AM | 24 | paper? |
| 11:47AM | 25 | A.  Just to get rid of the -- the main list.  I'd have -- |

11:47AM   1   just so I could reference what I had to do and who I had to

11:48AM   2   get checked.

11:48AM   3   Q.  Would you hand the smaller piece of paper to the

11:48AM   4   defendant?

11:48AM   5   A.  Yes.

11:48AM   6   Q.  Did you make sure it fit, like, in the palm of your hand?

11:48AM   7   A.  Yes.

11:48AM   8   Q.  Why did you do that?  That's what I want you to explain.

11:48AM   9   A.  Just smaller, undetectable, just easier.

11:48AM  10   Q.  Every time you passed a list, did the defendant look into

11:48AM  11   it for you?

11:48AM  12   A.  He did.

11:48AM  13   Q.  Getting back to the trucks -- the trailers that were

11:48AM  14   coming from California and British Columbia.  Did you

11:48AM  15   understand that they were 100 pounds or more of marijuana in

11:48AM  16   those trucks?

11:48AM  17   A.  There was a great deal, yes.

11:49AM  18   Q.  Did you understand that there were cover loads to conceal

11:49AM  19   the marijuana in those trucks?

11:49AM  20   A.  Yes.  Mike had mentioned that, yes.

11:49AM  21   Q.  Did you explain where those trucks were coming from to

11:49AM  22   the defendant?

11:49AM  23   A.  I did.

11:49AM  24   Q.  What, if anything, did he say as to whether any of those

11:49AM  25   trucks were being watched?

11:49AM   1   A.  None were.  They were all clear.  It was no worry.

11:49AM   2   Q.  Sometime in or around 2013, did the defendant

11:49AM   3   specifically advise you that law enforcement were considering

11:49AM   4   or using GPS trackers on Masecchia's vehicle?

11:49AM   5   A.  Yes.

11:49AM   6   Q.  What did the defendant tell you about that?

11:49AM   7   A.  He told me that he had placed trackers on Mike's vehicle,

11:49AM   8   and they were trying to locate different locations that him

11:50AM   9   and Ron had had, and they were using trackers for that.

11:50AM   10   Q.  And what did you tell Mike Masecchia?

11:50AM   11   A.  I told him what -- that there's trackers on his vehicle,

11:50AM   12   and he better be careful, change his patterns, change your

11:50AM   13   routine.

11:50AM   14   Q.  What did Masecchia do in response to the information you

11:50AM   15   told him?

11:50AM   16   A.  He changed his -- he changed his whole routine, from what

11:50AM   17   he told me.  He didn't go to the same patterns, same

11:50AM   18   locations.  He changed it all up.

11:50AM   19   Q.  Did he use different vehicles, if you know?

11:50AM   20   A.  He used different vehicles, too.  He took his wife's

11:50AM   21   vehicle more, too.

11:50AM   22   Q.  Did you know whether any GPS trackers actually got placed

11:51AM   23   on Masecchia's vehicle?

11:51AM   24   In other words, did Masecchia look under his truck or

11:51AM   25   under his vehicle?

11:51AM    1    A.  He never told me that he did, but I knew they were there.

11:51AM    2    And so did he.  And, like I said, he immediately changed

11:51AM    3    patterns.  He started using Krista's truck more.

11:51AM    4    Q.  Did the defendant ever tell you about the IRS or any

11:51AM    5    financial investigation into Ron Serio?

11:51AM    6    A.  Yes.

11:51AM    7    Q.  What did the defendant tell you?

11:51AM    8    A.  He said because of Ron's -- he was a heavy gambler, and

11:51AM    9    he was winning quite a bit from the casinos.  He was actually

11:51AM    10    being banned from them.

11:51AM    11    There was an IRS investigation into his winnings.

11:51AM    12    Q.  Did the defendant tell you whether he had access to that

11:51AM    13    IRS investigation?

11:51AM    14    A.  No.

11:51AM    15    Q.  What did he -- what did he tell you that you passed along

11:51AM    16    to Masecchia?

11:51AM    17    A.  I told Masecchia that Ron is being looked at by the IRS,

11:51AM    18    so he's to change his patterns with his gambling.

11:52AM    19    Q.  Now I want to talk about informants, okay?

11:52AM    20    Did Defendant Bongiovanni disclose to you the identity of

11:52AM    21    informants that you should stay away from and that could

11:52AM    22    threaten the organization that you were a part of?

11:52AM    23    A.  Yes.

11:52AM    24    Q.  I want to ask you about a person named J.D., okay?

11:52AM    25    A.  Okay.

11:52AM  1    Q.  Do you know who that person is?

11:52AM  2    A.  Yes.

11:52AM  3    Q.  How do you know him?

11:52AM  4    A.  I knowing him from the gym, the Fitness Factory, going

11:52AM  5    there.  Mutual friends.

11:52AM  6    Q.  When you started as part of this organization with Ron

11:53AM  7    and Mike, getting the -- getting involved, you were getting

11:53AM  8    the clones ready in your basement, as you described?

11:53AM  9    A.  Yes.

11:53AM  10   Q.  And so that was something that happened basically right

11:53AM  11   out of the gate?

11:53AM  12   A.  Correct.

11:53AM  13   Q.  Is there a lot of watering and moisture involved in that

11:53AM  14   part of the process?

11:53AM  15   A.  There is.

11:53AM  16   Q.  Did the defendant know you were doing that and getting

11:53AM  17   the clones ready?

11:53AM  18   A.  Yes.

11:53AM  19   Q.  And then it's by -- around 2014, where you started

11:53AM  20   growing plants to maturity; is that right?

11:53AM  21   A.  Correct.

11:53AM  22   Q.  Did you get mold in your basement as a result of the

11:53AM  23   repeated grows and the water and the moisture?

11:53AM  24   A.  I did, yes.

11:53AM  25   Q.  Did you know J.D. was someone who could do tile work?

11:54AM    1    A.  Tile work, drywall.  He was a handyman.

11:54AM    2    Q.  Did you hire him to help fix some tile in the basement as

11:54AM    3    a result of the mold from the marijuana grows?

11:54AM    4    A.  He had cut out the --

11:54AM    5    Q.  Did you hire him?  "Yes" or "no."

11:54AM    6    A.  I did, yes.

11:54AM    7    Q.  So describe the work that you hired him to do in the

11:54AM    8    basement.

11:54AM    9    A.  Well, there was no floor on my basement, it was a

11:54AM   10    concrete floor at that time.  But the mold from the wall,

11:54AM   11    the -- the wall, he cut it out, he cut it halfway out, and

11:54AM   12    then he did the drywall, he redid the drywall.  He was very

11:54AM   13    good at taping, and it looked very clean and neat.

11:54AM   14    Q.  Did you tell the defendant that you had this work done in

11:54AM   15    your basement, and that J.D. did it?

11:54AM   16    A.  Yes.

11:54AM   17    Q.  Do you remember a time when you were in the gym and then

11:54AM   18    you saw J.D. with the defendant, where the defendant told you

11:55AM   19    some information about J.D.?

11:55AM   20    A.  Yes.

11:55AM   21    Q.  Describe the circumstances and what the defendant told

11:55AM   22    you about J.D..

11:55AM   23    A.  We were at the gym.  J.D. seemed to be there a lot, too,

11:55AM   24    when we were there.  We said hello, and then he walked away.

11:55AM   25        And then when he walked away, the defendant said keep a

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

89

| 11:55AM | 1 | low profile with him, he's an informant. |
| 11:55AM | 2 | Q.  Did he tell you stay away from him? |
| 11:55AM | 3 | A.  Stay away from him. |
| 11:55AM | 4 | Q.  Did he tell you that after J.D. had done the work in your |
| 11:55AM | 5 | basement? |
| 11:55AM | 6 | A.  Yes. |
| 11:55AM | 7 | Q.  Was this after the bribes had been started to be paid for |
| 11:55AM | 8 | the defendant? |
| 11:55AM | 9 | A.  Yes. |
| 11:55AM | 10 | Q.  Did you understand the defendant to be warning you that |
| 11:56AM | 11 | J.D. could be someone that would potentially get you in |
| 11:56AM | 12 | trouble because he was an informant? |
| 11:56AM | 13 | A.  Yes. |
| 11:56AM | 14 | Q.  Did you pass J.D.'s name along to Masecchia or anyone |
| 11:56AM | 15 | else? |
| 11:56AM | 16 | A.  To Masecchia, and then he -- I believe he told Ron. |
| 11:56AM | 17 | Q.  Did you know R.K., B.K.? |
| 11:56AM | 18 | A.  I didn't know him, but he was a friend of Ron's. |
| 11:56AM | 19 | Q.  You knew who he was? |
| 11:56AM | 20 | A.  I knew of him. |
| 11:56AM | 21 | Q.  Who was he associated with that was close to Serio as |
| 11:56AM | 22 | well? |
| 11:56AM | 23 | A.  Who else? |
| 11:56AM | 24 | Q.  Was he also close with Frank Burkhart? |
| 11:56AM | 25 | A.  Yes.  They were -- they were -- again, I didn't know |

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24
90

11:56AM    1   them, but they were good friends from what I --

11:56AM    2   Q.  Did you see R.K. around from time to time?

11:56AM    3   A.  A few times, yes.

11:56AM    4   Q.  Where do you recall seeing him around a few times?

11:57AM    5   A.  One time at a bar.  Other times -- the first time I went

11:57AM    6   to Ron's, he was actually leaving Ron's house.

11:57AM    7   Q.  Do you remember who he was leaving Ron's house with?

11:57AM    8   A.  I don't.

11:57AM    9   Q.  You're talking about the house on 697 Lebrun?

11:57AM   10   A.  On Lebrun, yes.

11:57AM   11   Q.  Was that a big beautiful house?

11:57AM   12   A.  It was.

11:57AM   13   Q.  Easy to find?

11:57AM   14   A.  Yeah.

11:57AM   15   Q.  Did there come a time -- after that occasion where you

11:57AM   16   had seen him leaving Ron's house, did there come a time where

11:57AM   17   Masecchia instructed you to look into R.K. for Serio to see

11:57AM   18   if R.K. was an informant?

11:57AM   19   A.  Yes.

11:57AM   20   Q.  What did Masecchia tell you?

11:57AM   21   A.  He said Ron was concerned.  He said that he heard that

11:57AM   22   R.K. got busted, and he was concerned because he was doing

11:58AM   23   quite a business -- quite a lot of business with Ron, that he

11:58AM   24   could become an informant.

11:58AM   25   Q.  When was this approximately?

| | | |
|---|---|---|
| 11:58AM | 1 | A.  2014, '15, that timeframe. |
| 11:58AM | 2 | **MR. TRIPI:**  Ms. Champoux, can we pull up Exhibit 92. |
| 11:58AM | 3 | **BY MR. TRIPI:** |
| 11:58AM | 4 | Q.  Do you see what's on your screen there, Government |
| 11:59AM | 5 | Exhibit 92, what it says at the top? |
| 11:59AM | 6 | A.  Yes. |
| 11:59AM | 7 | Q.  It says confidential source agreement? |
| 11:59AM | 8 | A.  I see it, yes. |
| 11:59AM | 9 | **MR. TRIPI:**  I'd like to go to page 2 of that. |
| 11:59AM | 10 | **BY MR. TRIPI:** |
| 11:59AM | 11 | Q.  Can you read paragraph 13, Mr. Selva? |
| 11:59AM | 12 | A.  I understand that this agreement is in force from 4/29/13 |
| 11:59AM | 13 | in 4/29/14. |
| 11:59AM | 14 | Q.  Okay. |
| 11:59AM | 15 | **MR. TRIPI:**  Zoom out of that, please. |
| 11:59AM | 16 | **BY MR. TRIPI:** |
| 11:59AM | 17 | Q.  Do you see some signatures down there, Mr. Selva? |
| 11:59AM | 18 | A.  I do, yes, sir. |
| 11:59AM | 19 | Q.  Do you see the date of those signatures? |
| 11:59AM | 20 | A.  Yes. |
| 11:59AM | 21 | Q.  What date is that? |
| 11:59AM | 22 | A.  4/29/13. |
| 11:59AM | 23 | Q.  Okay.  Is that around the timeframe when the defendant |
| 11:59AM | 24 | informed you about Mr. R.K.? |
| 11:59AM | 25 | A.  Yes, it was 2013, like I said, between that timeframe. |

11:59AM  1   Q.  A moment ago you said 2014, '15.  Does this help you

11:59AM  2   recall the timeframe?

12:00PM  3   A.  It does.  I wasn't exactly clear on the time frames.

12:00PM  4   Q.  And was it in proximity to when Mr. R.K. had gotten into

12:00PM  5   some trouble?

12:00PM  6   A.  Yes.

12:00PM  7   Q.  Gotten arrested?

12:00PM  8   A.  Yes.

12:00PM  9         MR. TRIPI:  You can take that down, Ms. Champoux.

12:00PM  10        BY MR. TRIPI:

12:00PM  11  Q.  After you were asked to have the defendant look into

12:00PM  12  R.K., what did you do?  Describe the conversation that you

12:00PM  13  had with this defendant.

12:00PM  14  A.  I asked him, I says, they're concerned, when it was

12:00PM  15  brought to my attention by Mike, if he could check him out

12:00PM  16  and find out if he's an informant.

12:00PM  17  Q.  So we're using "he" a lot again.

12:00PM  18  A.  He --

12:00PM  19  Q.  If who could be checked out?  Use names, please.

12:00PM  20  A.  If R.K. could be checked, out because there's concern,

12:00PM  21  like I mentioned before, that he can be an informant, he had

12:00PM  22  got arrested.

12:00PM  23  Q.  You said that to the defendant?

12:00PM  24  A.  Yes.

12:00PM  25  Q.  What did the defendant say?

12:01PM    1    A.  He in fact reiterated that he is an informant, that he's

12:01PM    2    working.

12:01PM    3    Q.  Did he say it in the same conversation?  Or did he come

12:01PM    4    back and tell you?  Was there any time delay?  How did that

12:01PM    5    work?

12:01PM    6    A.  No, it was pretty quick.

12:01PM    7    Q.  Okay.

12:01PM    8    A.  It was pretty quick.

12:01PM    9    Q.  What did the defendant say?

12:01PM   10    A.  He said that he is an informant, he is working with us,

12:01PM   11    so be careful.

12:01PM   12    Q.  What did you do with that information?

12:01PM   13    A.  I told Mike.  And I told -- I told Mike.  I reached out

12:01PM   14    to Mike, because I talked to him mostly, and I believe he

12:01PM   15    reiterated that to Ron.

12:01PM   16    Q.  Was that a face-to-face discussion with you and

12:01PM   17    Masecchia?

12:01PM   18    A.  Yes, it was always face to face.

12:01PM   19    Q.  Did you take your time and wait days, weeks, to talk to

12:01PM   20    Masecchia?  Or did you get in touch with him right away?

12:01PM   21    A.  No, it was immediate.

12:01PM   22    Q.  Why was it immediate?

12:01PM   23    A.  Because I had just found out, that this is information

12:01PM   24    that they wanted to know about, that's what they asked me,

12:01PM   25    and it can hurt the organization.

| | | |
|---|---|---|
| 12:01PM | 1 | Q. Is an informant in the organization a bad thing? |
| 12:02PM | 2 | A. Yes. |
| 12:02PM | 3 | Q. Could everyone go to jail? |
| 12:02PM | 4 | A. Yes. |
| 12:02PM | 5 | Q. Was it your understanding that R.K. had access to several |
| 12:02PM | 6 | people in the group? |
| 12:02PM | 7 | A. Yes. |
| 12:02PM | 8 | Q. Was this big information? |
| 12:02PM | 9 | A. It was very big. |
| 12:02PM | 10 | Q. Was it concerning to you? |
| 12:02PM | 11 | A. Yes. |
| 12:02PM | 12 | Q. Was it concerning to Mike? |
| 12:02PM | 13 | A. Yes. R.K. was very close with Ron, so -- |
| 12:02PM | 14 | Q. Did -- did the defendant tell you anything he would do as |
| 12:02PM | 15 | it related to R.K.? |
| 12:02PM | 16 | A. Just keep -- keep an eye out, if something were to |
| 12:02PM | 17 | happen. |
| 12:02PM | 18 | Q. So he didn't give you any specifics about that? |
| 12:02PM | 19 | A. No specifics. |
| 12:02PM | 20 | Q. After the defendant confirmed R.K. as an informant, did |
| 12:03PM | 21 | you shortly thereafter learn that Masecchia and Serio wanted |
| 12:03PM | 22 | another person named T.S. looked into? |
| 12:03PM | 23 | A. Yes. |
| 12:03PM | 24 | Q. How did you become aware that they wanted T.S. looked |
| 12:03PM | 25 | into? |

12:03PM    1    A.  Mike had reached out to me.  He said Ron's concerned

12:03PM    2    about T.S..  I didn't know him.  He said he recently had

12:03PM    3    gotten arrested, and if he can get him -- he was concerned

12:03PM    4    that he might have become an informant, if we could get it

12:03PM    5    checked out.

12:03PM    6    Q.  After you were asked to have the defendant look into

12:03PM    7    T.S., did you meet up with the defendant?

12:03PM    8    A.  I did.

12:03PM    9    Q.  What did you say to the defendant?

12:03PM   10    A.  I asked him, I says, this name is of concern.  Ron does

12:03PM   11    quite a bit of business with him.  He had just got arrested.

12:03PM   12    He's concerned that he can be an informant.

12:03PM   13        And he confirmed that he was.

12:03PM   14    Q.  Was there any delay there?  Did the defendant get back to

12:04PM   15    you on that one?

12:04PM   16    A.  Believe there was a delay on that.

12:04PM   17    Q.  How much time?

12:04PM   18    A.  Just a day.

12:04PM   19    Q.  What did you do with that information?

12:04PM   20    A.  I immediately reached out to Mike, I gotta talk to you.

12:04PM   21    He actually came over my house and I told him what I had

12:04PM   22    found out.

12:04PM   23    Q.  Was Mike relaying that information to Serio?

12:04PM   24    A.  He was going to be relaying it to Ron, yes.

12:04PM   25    Q.  At that point, did you -- did they then stay away from

12:04PM   1   T.S.?

12:04PM   2   A.  As far as I know, yes.

12:04PM   3   Q.  How long after you were asked -- withdrawn.

12:04PM   4       How long after you asked the defendant to check into R.K.

12:04PM   5   did you get additional instructions from Masecchia to have

12:04PM   6   him look into T.S.?

12:04PM   7   A.  It wasn't long after that.  Once it came to Ron's

12:05PM   8   attention about Tom T.S., he immediately reached out to Mike

12:05PM   9   to have Mike contact me and find out.

12:05PM  10   Q.  Are you saying there wasn't a lot of time between

12:05PM  11   checking on R.K. and checking on T.S.?

12:05PM  12   A.  There wasn't, no.

12:05PM  13   Q.  You had mentioned that R.K. was associated with Frank

12:05PM  14   Burkhart; do you remember that?

12:05PM  15   A.  Yes.

12:05PM  16   Q.  Were you also asked to ask the defendant if Frank

12:05PM  17   Burkhart was an informant?

12:05PM  18   A.  Yes.

12:05PM  19   Q.  And what did the defendant come back and tell you on that

12:05PM  20   one?

12:05PM  21   A.  He told me no, he was not.

12:05PM  22   Q.  Now as time went on, did the -- did Ron Serio get close

12:06PM  23   to another person who was moving a lot of marijuana in the

12:06PM  24   organization named Mario Vacanti?

12:06PM  25   A.  He did, yes.

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

12:06PM   1   Q.  Did they have extensive dealings with one another as far

12:06PM   2   as you understood it?

12:06PM   3   A.  As far as I understood it, yes.

12:06PM   4   Q.  Was Mario Vacanti someone whose name you had advised the

12:06PM   5   defendant was part of the organization at a point in time?

12:06PM   6   A.  Yes.

12:06PM   7   Q.  At some point, did the defendant bring some information

12:06PM   8   to your attention regarding Vacanti?

12:06PM   9   A.  Yes, there's an investigation going on.

12:06PM  10   Q.  Did the defendant provide you some information about

12:06PM  11   investigation into Vacanti?

12:06PM  12   A.  He just said that there was an investigation going on.

12:06PM  13   Q.  Do you remember the specifics of what he told you as you

12:06PM  14   sit here today?

12:06PM  15   A.  I don't.  If you have something I could recall.

12:06PM  16   Q.  Whatever he told you, did you pass it along?

12:07PM  17   A.  I did, yes.

12:07PM  18   Q.  Describe what you did for the jury.  Tell them the steps

12:07PM  19   you took.

12:07PM  20   A.  Once I found out that he was, I reached out to Mike and I

12:07PM  21   told him to get ahold of Ron, that yes, he is.  There's an

12:07PM  22   investigation going on with Mario.

12:07PM  23   Q.  Was your communication with Mike in person?

12:07PM  24   A.  It was always in person, yes.

12:07PM  25   Q.  Did you provide whatever specifics you learned at the

12:07PM    1    time?

12:07PM    2    A.  What I learned I provided to them, yes.

12:07PM    3    Q.  Was your intention to get the information to Masecchia so

12:07PM    4    he could inform Serio?

12:07PM    5    A.  Yes.

12:07PM    6    Q.  Earlier you mentioned that the defendant told you about

12:07PM    7    GPS trackers related to Masecchia, and IRS investigation into

12:07PM    8    Ron Serio in terms of some of the specific things he was

12:08PM    9    telling you; do you recall that?

12:08PM   10    A.  I do.

12:08PM   11    Q.  Did the defendant tell you he was part of that

12:08PM   12    investigation?

12:08PM   13    A.  No, I don't recall.

12:08PM   14    Q.  Did he tell you he had access to that investigation?

12:08PM   15    A.  He had access to information.

12:08PM   16    Q.  After about a year and a half, did he tell you the

12:08PM   17    investigation was being closed?

12:08PM   18    A.  I don't recall.

12:08PM   19           **MR. TRIPI:**  One moment, please, Your Honor.

12:08PM   20           **BY MR. TRIPI:**

12:09PM   21    Q.  I'm going to ask you to read Government Exhibit 3540N,

12:10PM   22    page 91 just at the bottom, from line 23 to the end, and then

12:10PM   23    I want you to read all of page 92.  Okay?  I'm going to hand

12:10PM   24    this up to you, read that to yourself.

12:10PM   25       So page 91, line 23 to the end, and all of page 92, okay?

12:10PM    1    A.  Okay.

12:10PM    2          MR. SINGER:  Your Honor, the document is not in

12:10PM    3    evidence.

12:10PM    4          MR. TRIPI:  I'm refreshing his recollection.

12:10PM    5          MR. SINGER:  So we're refreshing?

12:10PM    6          MR. TRIPI:  Yes.

12:10PM    7          THE COURT:  He hasn't asked a question yet, he's just

12:10PM    8    asking him to read the document.

12:10PM    9          MR. SINGER:  I understand, Judge.

12:10PM    10         MR. TRIPI:  And when you're done reading, just look

12:10PM    11   at me, okay?

12:10PM    12         BY MR. TRIPI:

12:12PM    13   Q.  Mr. Selva, did that refresh your recollection as

12:12PM    14   regarding the -- whether the defendant told you investigation

12:12PM    15   into Serio and Masecchia was over?

12:12PM    16   A.  Yes.

12:12PM    17   Q.  What did he say to you in that regard?

12:12PM    18   A.  He said the investigation was going nowhere.  They were

12:12PM    19   not able to locate the grow houses and the operation,

12:12PM    20   additional grow houses through the trackers, and therefore

12:12PM    21   it's dead.

12:12PM    22   Q.  Did he tell you that after about one and a half years?

12:12PM    23   A.  Yes.

12:12PM    24   Q.  Did he reference that the IRS had nothing?

12:13PM    25   A.  He did, yes.  He referenced they had nothing.

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

100

| | | |
|---|---|---|
| 12:13PM | 1 | Q.  Did he reference the DEA had not found any grow houses? |
| 12:13PM | 2 | A.  Yes. |
| 12:13PM | 3 | Q.  But your house was a grow house, wasn't it? |
| 12:13PM | 4 | A.  It was. |
| 12:13PM | 5 | Q.  And the defendant was in your house, and you talked about |
| 12:13PM | 6 | it being a grow house, didn't you? |
| 12:13PM | 7 | A.  Yes. |
| 12:13PM | 8 | Q.  At any time before that DEA file, that investigation, was |
| 12:13PM | 9 | closed, did the defendant ever express to you feeling |
| 12:13PM | 10 | pressure as a result of the protection he was providing? |
| 12:13PM | 11 | A.  Yes, he did feel pressure. |
| 12:13PM | 12 | Q.  What did he say? |
| 12:13PM | 13 | A.  He just said that they were -- he felt, because of the |
| 12:13PM | 14 | relationship, that he was getting a lot of pressure to |
| 12:13PM | 15 | produce, finding something. |
| 12:14PM | 16 | Q.  Did he bring up the top -- the idea of maybe throwing him |
| 12:14PM | 17 | a bone, someone from the organization he could arrest? |
| 12:14PM | 18 | A.  He did, yes. |
| 12:14PM | 19 | Q.  What did he say about that? |
| 12:14PM | 20 | A.  He said if Ron or Mike could give me a name of somebody |
| 12:14PM | 21 | that was doing business with them, a low-level person, if |
| 12:14PM | 22 | they could get a bust, it would maybe sway things away and |
| 12:14PM | 23 | loosen things up.  He wouldn't feel as much pressure. |
| 12:14PM | 24 | Q.  Did you mention that request to Mike? |
| 12:14PM | 25 | A.  I did. |

12:14PM  1    Q.  How far did that go?

12:14PM  2    A.  It didn't go too far.

12:14PM  3    Q.  Each time the defendant gave you a name of a specific DEA

12:14PM  4    informant, did you pass that information along to Masecchia?

12:15PM  5    A.  I did.

12:15PM  6            MR. TRIPI:  Do you want me to go 10 more minutes,

12:15PM  7    Judge?

12:15PM  8            THE COURT:  Sure.

12:15PM  9            BY MR. TRIPI:

12:15PM  10   Q.  Okay.  I want to ask you about other investigations that

12:15PM  11   the defendant talked to you about.  Okay?

12:15PM  12      Earlier, yesterday I asked you about a name Anthony

12:15PM  13   Anastasia.

12:15PM  14   A.  Yes.

12:15PM  15   Q.  Do you know Anthony Anastasia?  Just remind the jury.

12:15PM  16   A.  I do.

12:15PM  17   Q.  How do you know him?

12:15PM  18   A.  I know him from Gables.  Gables was a bar in North

12:15PM  19   Buffalo.  He tended bar there.  We had mutual friends.

12:15PM  20   Q.  And did the defendant know Anthony Anastasia?

12:15PM  21   A.  He did, yes.

12:15PM  22   Q.  Is Anthony Anastasia someone that you would occasionally

12:15PM  23   get cocaine from for your personal use?

12:15PM  24   A.  Yes.

12:15PM  25   Q.  Did you ever middle any deals for Anastasia?  In other

12:15PM    1    words, someone you knew needed cocaine and got it from

12:15PM    2    Anastasia?

12:15PM    3    A.  No, it was just my personal use.

12:15PM    4    Q.  Did there come a point in time where the defendant warned

12:16PM    5    you to stay away from Anthony Anastasia because he was under

12:16PM    6    investigation?

12:16PM    7    A.  There did, yes.

12:16PM    8    Q.  What did the defendant say to you in that regard?

12:16PM    9    A.  Well, I told him that I bought from him for personal use.

12:16PM    10       And he said stay away, because he's being looked at.

12:16PM    11   There's an investigation going on with him.  So don't do that

12:16PM    12   again.

12:16PM    13   Q.  Did you stay away from Anastasia in terms of trying to

12:16PM    14   get cocaine from him?

12:16PM    15   A.  Immediately.

12:16PM    16   Q.  Eventually did you learn that some point after the

12:16PM    17   defendant told you that, did you learn that Anthony Anastasia

12:16PM    18   was arrested by the DEA?

12:16PM    19   A.  I did, yes.

12:16PM    20   Q.  What did the defendant tell you about that?

12:16PM    21   A.  They arrested him, I believe, at Delaware and Hertel.

12:16PM    22   They got him in custody, and he was gonna be charged.

12:16PM    23   Q.  Earlier I asked you about Robert Missana, the bartender

12:17PM    24   at Mother's, who was there was an occasion you were there and

12:17PM    25   he was selling cocaine over the bar.

12:17PM  1   A.  Yes.

12:17PM  2   Q.  Was the defendant standing next to you when that was

12:17PM  3   happening?

12:17PM  4   A.  He was.

12:17PM  5   Q.  How far were both of you away from Missana when that was

12:17PM  6   happening?

12:17PM  7   A.  We were right in the middle of the bar, and he was

12:17PM  8   serving somebody, so I don't know.

12:17PM  9   Q.  Was he closer than you and I are right now?

12:17PM  10  A.  A little bit.  Yeah.

12:17PM  11          **MR. SINGER:**  Your Honor, I'd just like the record to

12:17PM  12  reflect that the distance between Mr. Tripi and Mr. Selva is

12:18PM  13  approximately 10 feet.

12:18PM  14          **MR. TRIPI:**  Is that right, Judge?  I have no idea.

12:18PM  15          **THE WITNESS:**  3 to 5 feet, I don't know.

12:18PM  16          **BY MR. TRIPI:**

12:18PM  17  Q.  What would you estimate?

12:18PM  18  A.  We were in the middle of a bar.  I don't know, 3 to 5

12:18PM  19  feet from me to the railing where the juror box is.

12:18PM  20          **MR. TRIPI:**  3 to 5 feet is the witness's estimate,

12:18PM  21  Judge.

12:18PM  22          **THE COURT:**  The estimate of the distance between

12:18PM  23  Mr. Tripi and the witness is probably about right, I'm not

12:18PM  24  very good at that.  A little more than 10 feet would be my --

12:18PM  25          **MR. SINGER:**  We'll take your word for it, Judge.

|         |    |                                                                              |
|---------|----|------------------------------------------------------------------------------|
| 12:18PM | 1  | **BY MR. TRIPI:**                                                             |
| 12:18PM | 2  | Q.  All right.  I want to transition to, we mentioned the                    |
| 12:18PM | 3  | stag party a little bit earlier.  I want to ask you a little                 |
| 12:18PM | 4  | more about that, okay?                                                        |
| 12:18PM | 5  | A.  Okay.                                                                     |
| 12:18PM | 6  | Q.  Was the defendant's stag party in, like, late 2014 before                |
| 12:18PM | 7  | the wedding in February of 2015?                                             |
| 12:18PM | 8  | A.  It was, yes.                                                              |
| 12:18PM | 9  | Q.  Where was that stag party?                                               |
| 12:18PM | 10 | A.  Iron Works in the Cobblestone District.                                  |
| 12:18PM | 11 | Q.  Is that a bar sort of near where the Sabres play?                        |
| 12:19PM | 12 | A.  Yes.                                                                      |
| 12:19PM | 13 | Q.  Earlier, I asked you if Masecchia was there.  I asked you                |
| 12:19PM | 14 | if Wayne Anderson was there; do you remember that?                           |
| 12:19PM | 15 | A.  Yes.                                                                      |
| 12:19PM | 16 | Q.  So they were there?                                                       |
| 12:19PM | 17 | A.  They were.                                                                |
| 12:19PM | 18 | Q.  You were there?                                                           |
| 12:19PM | 19 | A.  I was there.                                                              |
| 12:19PM | 20 | Q.  What other people do you recall being there?                             |
| 12:19PM | 21 | A.  Peter Gerace showed up later.  His brother-in-law at the                 |
| 12:19PM | 22 | time, Tom Napoli.  Our friend, Victor Sorrento.  Just friends                |
| 12:19PM | 23 | from the neighborhood.                                                        |
| 12:19PM | 24 | Q.  Were there a lot of people there?                                        |
| 12:19PM | 25 | A.  60 to 70.                                                                 |

12:19PM    1    Q.  Who arranged the location of that stag party?

12:19PM    2    A.  I did.  I reached out to the manager who was a friend of

12:19PM    3    mine.

12:19PM    4    Q.  Do you recall whether Tom Doctor was there?

12:19PM    5    A.  I don't recall.

12:19PM    6    Q.  Do you recall whether Mike Piazza was there?

12:19PM    7    A.  I believe Mike was there, yes.

12:19PM    8    Q.  How about Samir Rizek?

12:20PM    9    A.  Yes.

12:20PM   10    Q.  Is that that Gassan Rizek's brother?

12:20PM   11    A.  I'm not sure, I thought cousin.  They might -- I don't

12:20PM   12    know their relation.

12:20PM   13    Q.  Do you know whether Joe Palmieri, that TFO from the DEA,

12:20PM   14    was there?  Tonawanda detective?

12:20PM   15    A.  I believe he was.  I don't -- I don't recall.  I'm sorry.

12:20PM   16    Q.  That's okay.  Do you recall whether Joe Tomasello was

12:20PM   17    there?

12:20PM   18    A.  I believe he was there, yes.

12:20PM   19    Q.  Do you recall whether Dave Hersey was there?

12:20PM   20    A.  I believe so, yes.

12:20PM   21    Q.  Okay.  I'm going to show you Government Exhibit 3540M at

12:21PM   22    page 3.  See if this refreshes.

12:21PM   23        You said there were a few people you didn't remember.  I

12:22PM   24    want to see if this refreshes your recollection.

12:22PM   25        I accidentally wrote on this piece of paper, just ignore

| 12:22PM | 1 | that. |

12:22PM    2         **MR. TRIPI:**  Do you want to see this?

12:22PM    3         **MR. SINGER:**  M as in Mike.

12:22PM    4         **MR. TRIPI:**  M as in Mike.

12:22PM    5         **BY MR. TRIPI:**

12:22PM    6    Q.  Ignore my handwriting, starting about halfway down?

12:22PM    7    A.  Halfway down, all right.

12:23PM    8    Q.  Did that refresh your recollection as to some of the

12:23PM    9    names?

12:23PM   10    A.  Yes.

12:23PM   11    Q.  I might have forgot to ask this.  Was Masecchia there?

12:23PM   12    A.  Masecchia was there.

12:23PM   13    Q.  Did that refresh your recollection as to whether or not

12:23PM   14    Joe Palmieri was there?

12:23PM   15    A.  Yes.

12:23PM   16    Q.  Was he?

12:23PM   17    A.  He was there, yes.

12:23PM   18         **THE COURT:**  Good time?

12:23PM   19         **MR. TRIPI:**  It's a good time.

12:23PM   20         **THE COURT:**  We will take our lunch recess now.

12:23PM   21    Please remember my instructions about not communicating about

12:23PM   22    the case with anyone.  Don't use tools of technology to read

12:23PM   23    about the case or to learn about the case.

12:23PM   24         Don't read, watch, or listen to any news coverage

12:23PM   25    about the case, if there is, any while the case is in

| | | |
|---|---|---|
| 12:23PM | 1 | progress.  And don't make up your mind before you start |
| 12:23PM | 2 | deliberating. |
| 12:24PM | 3 | We'll see you back here in an hour.  Thank you. |
| 12:24PM | 4 | (Jury excused at 12:24 p.m.) |
| 12:24PM | 5 | **THE COURT:**  Anything for the record, Mr. Singer? |
| 12:24PM | 6 | **MR. SINGER:**  Nothing from me, Judge. |
| 12:24PM | 7 | **THE COURT:**  Mr. Tripi? |
| 12:24PM | 8 | **MR. TRIPI:**  No, thank you, Judge. |
| 12:24PM | 9 | **THE COURT:**  We'll see you folks in about an hour. |
| 12:24PM | 10 | **THE CLERK:**  All rise. |
| 12:24PM | 11 | (Off the record at 12:24 p.m.) |
| 01:38PM | 12 | (Back on the record at 1:38 p.m.) |
| 01:38PM | 13 | (Jury not present.) |
| 01:38PM | 14 | **THE CLERK:**  All rise. |
| 01:38PM | 15 | **THE COURT:**  Please be seated. |
| 01:38PM | 16 | **THE CLERK:**  We are back on the record for the |
| 01:38PM | 17 | continuation of the jury trial in the United States of America |
| 01:38PM | 18 | versus Joseph Bongiovanni, 19-cr-227. |
| 01:38PM | 19 | All counsel and parties are present. |
| 01:38PM | 20 | **THE COURT:**  Our jurors have expressed some concern |
| 01:38PM | 21 | about how long the trial is going to last, especially the |
| 01:39PM | 22 | juror that has some medical appointments the week of the 18th, |
| 01:39PM | 23 | I think. |
| 01:39PM | 24 | They've also asked if we can go on Fridays.  And the |
| 01:39PM | 25 | answer to that is yes, I think we can pick up at least one |

| | | |
|---|---|---|
| 01:39PM | 1 | full day by going two half Fridays.  This Friday doesn't work. |
| 01:39PM | 2 | But I think next Friday works, and the Friday after that |
| 01:39PM | 3 | works. |
| 01:39PM | 4 | I have not checked further than that, but I think we |
| 01:39PM | 5 | can do at least two full half days -- two full half days?  Two |
| 01:39PM | 6 | half days. |
| 01:39PM | 7 | **MR. TRIPI:**  Just a quick question, Judge.  Are they |
| 01:39PM | 8 | morning half days?  Or are they -- |
| 01:39PM | 9 | **THE COURT:**  I think they'll be afternoon half days. |
| 01:39PM | 10 | **MR. TRIPI:**  I'm just trying to set up an appointment |
| 01:39PM | 11 | for, like, a medical situation on a Friday.  So I just want to |
| 01:39PM | 12 | know which -- |
| 01:39PM | 13 | **THE COURT:**  Yeah, I think -- |
| 01:39PM | 14 | Where's Rebecca?  I think they're going to be |
| 01:39PM | 15 | afternoon half days. |
| 01:39PM | 16 | **MR. TRIPI:**  Afternoon half days? |
| 01:39PM | 17 | **THE COURT:**  Yeah, I think the mornings I'm going to |
| 01:39PM | 18 | do the other things, because it's easier to move those things |
| 01:40PM | 19 | to the mornings. |
| 01:40PM | 20 | **MR. SINGER:**  And, like I said yesterday, Judge, on |
| 01:40PM | 21 | 9/13 which is the Friday in two weeks from now I have a |
| 01:40PM | 22 | hearing in the morning, so I know that's totally out for me. |
| 01:40PM | 23 | **THE COURT:**  The morning? |
| 01:40PM | 24 | **MR. SINGER:**  Correct. |
| 01:40PM | 25 | **THE COURT:**  Is out.  Okay.  So it would be the |

01:40PM    1    afternoon anyways.

01:40PM    2            MR. SINGER:  Yes.

01:40PM    3            THE COURT:  Okay.  Good.

01:40PM    4            MR. TRIPI:  Okay.

01:40PM    5            THE COURT:  So, yeah, I think it would probably make

01:40PM    6    some sense.

01:40PM    7            Do you have a sense of when your case is going to be

01:40PM    8    done now?

01:40PM    9            MR. TRIPI:  I think, obviously, we're -- I think we

01:40PM   10    can probably give a better update once we're done with

01:40PM   11    business Monday.  Because I think once we get past this

01:40PM   12    witness, we're going to hit some witnesses that are going to

01:40PM   13    be quicker just by the very nature of the testimony.  And so I

01:40PM   14    think we can get a good gauge as to where we're at once we get

01:40PM   15    past this witness.

01:40PM   16            THE COURT:  Okay.  Great.  How much longer do you

01:40PM   17    have with the direct?

01:41PM   18            MR. TRIPI:  Could be 90 minutes, could be two hours,

01:41PM   19    I'm on page 50 of a 65 page outline.

01:41PM   20            THE COURT:  How long do you expect the cross to go?

01:41PM   21            MR. SINGER:  Maybe finish him today, Judge, but I

01:41PM   22    can't make any promises.

01:41PM   23            THE COURT:  No, no, I'm not asking for promises,

01:41PM   24    believe me.

01:41PM   25            Okay.  So when we're finished with this witness or

01:41PM   1   when we're finished with the day, I will talk to the jurors

01:41PM   2   about this and tell them that we're going to go some Fridays,

01:41PM   3   and tell them that we'll have a better gauge for them when the

01:41PM   4   trial will end sometime next week.

01:41PM   5        **MR. TRIPI:**  We're going to take a hard look at what

01:41PM   6   we can trim as well --

01:41PM   7        **THE COURT:**  Great.

01:41PM   8        **MR. TRIPI:**  -- in terms of we'll do our best --

01:41PM   9        **THE COURT:**  Terrific.

01:41PM  10        **MR. TRIPI:**  -- to actually --

01:41PM  11        **THE COURT:**  Good.

01:41PM  12        **MR. TRIPI:**  -- whittle it down more.

01:41PM  13        **THE COURT:**  Great.  Good.  Yeah, we'll all work

01:41PM  14   together to get it done as quickly as we can.

01:41PM  15        Okay.  Anything we need to do before we bring them

01:41PM  16   back, Mr. Singer?

01:41PM  17        **MR. SINGER:**  No, Judge.

01:41PM  18        **THE COURT:**  Mr. Tripi.

01:41PM  19        **MR. TRIPI:**  No, Your Honor, thank you very much.

01:41PM  20        **THE COURT:**  Let's get the witness back in.

01:41PM  21        And, Pat, let's please bring them in.

01:42PM  22        (Witness seated at 1:41 p.m.)

01:42PM  23        (Jury seated at 1:42 p.m.)

01:43PM  24        **THE COURT:**  The record will reflect that all our

01:43PM  25   jurors are present.

01:43PM    1          I remind the witness he's still under oath.

01:43PM    2          Mr. Tripi, you may continue.

01:43PM    3          **MR. TRIPI:**  Thank you, Your Honor.

01:43PM    4          **BY MR. TRIPI:**

01:43PM    5    Q.  Mr. Selva, before the break, I showed you an exhibit,

01:43PM    6    Exhibit 9E-2.

01:43PM    7          **MR. TRIPI:**  Ms. Champoux, can we pull it up real

01:43PM    8    quick?  And go to the second page.

01:43PM    9          **BY MR. TRIPI:**

01:43PM   10    Q.  Do you remember I had you read from this document --

01:43PM   11    A.  Yes.

01:43PM   12    Q.  -- before the break?

01:43PM   13          Would it be accurate to say that before today, in your --

01:43PM   14    reviewing this while you're on the witness stand, I've never

01:43PM   15    shown you that document before?

01:43PM   16    A.  No, you have not.

01:43PM   17    Q.  You saw it today for the first time?

01:43PM   18    A.  For the first time, yes.

01:43PM   19          **MR. TRIPI:**  Can we take that down?

01:43PM   20          **BY MR. TRIPI:**

01:43PM   21    Q.  And with respect to Exhibit 8A, do you remember we went

01:43PM   22    through a bunch of names, and we don't need to pull it up,

01:43PM   23    but we went through a bunch of names and phone numbers and

01:43PM   24    subscriber records?

01:43PM   25    A.  Yes.

01:43PM    1    Q.  I've never shown you that before either, have I?

01:43PM    2    A.  No.

01:43PM    3    Q.  You saw it for the first time on the --

01:43PM    4    A.  First time.

01:43PM    5    Q.  -- stand earlier today?

01:44PM    6    A.  Yes.

01:44PM    7    Q.  All right.  I'd like to talk to you a little bit more

01:44PM    8    about the defendant's travel, purchases, financial picture,

01:44PM    9    after he started taking bribes, okay?

01:44PM   10    A.  Okay.

01:44PM   11    Q.  After the defendant started accepting the bribes, did he

01:44PM   12    purchase a classic Buick?

01:44PM   13    A.  I believe so, yes.

01:44PM   14    Q.  I'm going to show you what's been marked as -- premarked

01:44PM   15    as Government Exhibit 109AB; do you recognize that?

01:44PM   16    A.  Yes.

01:44PM   17    Q.  What do you recognize that to be?

01:44PM   18    A.  It's the defendant's classic Buick.

01:44PM   19    Q.  How do you recognize it?

01:44PM   20    A.  I believe I took the picture.

01:44PM   21    Q.  Is it a fair and accurate photo of the defendant and his

01:45PM   22    classic Buick when you took that picture?

01:45PM   23    A.  Yes.

01:45PM   24         **MR. TRIPI:**  The government offers Government

01:45PM   25    Exhibit 109AB.

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24
113

01:45PM  1      **MR. SINGER:**  No objection.

01:45PM  2      **THE COURT:**  Received without objection.

01:45PM  3      **(GOV Exhibit 109AB was received in evidence.)**

01:45PM  4      **MR. TRIPI:**  Ms. Champoux, can we please publish that,

01:45PM  5  and make sure it's published to the jury.  Thank you.

01:45PM  6      **BY MR. TRIPI:**

01:45PM  7  Q.  Can you tell the jury where this photo was taken from?

01:45PM  8  A.  It was taken from the patio at M.T. Pockets on Hertel,

01:45PM  9  it's a bar.  This is on Hertel and Wellington, the corner.

01:45PM  10  Q.  And is this in the North Buffalo neighborhood --

01:45PM  11  A.  Yes.

01:45PM  12  Q.  -- that you grew up in?

01:45PM  13  A.  It's in the North Buffalo neighborhood that we grew up

01:45PM  14  in.

01:45PM  15  Q.  Is M.T. Pockets one of those bars that you would go to

01:45PM  16  with the defendant, a neighborhood bar?

01:45PM  17  A.  On occasion, yes.

01:45PM  18  Q.  How about Masecchia?

01:45PM  19  A.  Yes.

01:45PM  20  Q.  Okay.  Is this a vehicle that he bought after the

01:45PM  21  financial arrangement between yourself, him, Serio, Masecchia

01:46PM  22  was consummated?

01:46PM  23  A.  I believe so, yes.

01:46PM  24  Q.  When he first bought the car, did it look like that?

01:46PM  25  A.  No, there was work done to it.

01:46PM 1   Q.  Did he -- did he invest in it and make improvements over

01:46PM 2   time?

01:46PM 3   A.  Yes.

01:46PM 4   Q.  What types of things did he do to make that car look the

01:46PM 5   way it does in the photo?

01:46PM 6   A.  I believe a bumper, a paint job, maybe the convertible

01:46PM 7   top, and the interior, there was some work done to that, too.

01:46PM 8   Q.  Was that a hobby of his, restoring that vehicle?

01:46PM 9   A.  Yes.

01:46PM 10  Q.  Did you see it when he first bought it?

01:46PM 11  A.  Yes.

01:46PM 12  Q.  How did it compare in terms of how it looks from when he

01:46PM 13  first bought it to how it looks in that picture?

01:46PM 14  A.  It looks perfect in that picture.  When he first bought

01:46PM 15  it, it needed work.  Needed some work.

01:46PM 16  Q.  Is that the defendant driving the vehicle?

01:46PM 17  A.  Yes.

01:46PM 18  Q.  Do you know whether he got new tires for the car?

01:47PM 19  A.  I'm not sure.  I don't recall.

01:47PM 20        **MR. TRIPI:**  We can take that down, Ms. Champoux.

01:47PM 21        **BY MR. TRIPI:**

01:47PM 22  Q.  Now, earlier we mentioned a residence that he bought at

01:47PM 23  85 Alder Place; do you recall that?

01:47PM 24  A.  Yes.

01:47PM 25  Q.  Is that a house that he purchased and then moved into

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

115

01:47PM   1   with his now wife Lindsay?

01:47PM   2   A.   Yes.

01:47PM   3   Q.   And where did they move from?  Where were they living and

01:47PM   4   where did they move to?

01:47PM   5   A.   I believe in Lovering in North Buffalo to the new house.

01:47PM   6   Q.   When he moved into the new house, did he purchase things

01:48PM   7   for the house?

01:48PM   8   A.   I believe so, yes.

01:48PM   9   Q.   What things do you recall him purchasing for the new

01:48PM  10   house he was moving into?

01:48PM  11   A.   Garage door.  There was some interior updates.  I believe

01:48PM  12   he purchased a kitchen island he added.  Just cosmetics to

01:48PM  13   the home.

01:48PM  14   Q.   Did he get new furniture, if you know?

01:48PM  15   A.   New furniture, yes.

01:48PM  16   Q.   You mentioned earlier that the defendant worked out at a

01:48PM  17   gym called Fitness Factory?

01:48PM  18   A.   For a while, yes.

01:48PM  19   Q.   Did he also like to purchase fitness equipment for the

01:48PM  20   house?

01:48PM  21   A.   I believe so, yes.  He did have fitness equipment in the

01:48PM  22   basement.

01:48PM  23   Q.   What type of fitness equipment did he have?

01:48PM  24   A.   Treadmill.  I think an elliptical.  Free weights.  Bench.

01:48PM  25   Bar.  Weights.

01:49PM   1   Q.  Do you know where he purchased that stuff from?

01:49PM   2   A.  I don't.

01:49PM   3          MR. TRIPI:  I'm going to hand up Exhibits 523 and

01:49PM   4   524.

01:49PM   5          BY MR. TRIPI:

01:49PM   6   Q.  Starting with Exhibit 523, do you recognize that?

01:49PM   7   A.  Yes.

01:49PM   8   Q.  What do you recognize that to be?

01:49PM   9   A.  It's the defendant's home at 85 Alder Place.  The front

01:49PM  10   of the house.

01:49PM  11   Q.  Is that -- is that a photo of what the house looked like

01:49PM  12   closer in time to when he first obtained it?

01:49PM  13   A.  Yes.

01:49PM  14   Q.  Did you see it before he did any work to it?  Any

01:50PM  15   cosmetic updates?

01:50PM  16   A.  Yes.

01:50PM  17   Q.  And does the picture in Exhibit 523 fairly and accurately

01:50PM  18   depict what it looked like before the defendant made some

01:50PM  19   upgrades?

01:50PM  20   A.  It does, yes.

01:50PM  21   Q.  Now looking at Exhibit 524, do you recognize that?

01:50PM  22   A.  Yes.

01:50PM  23   Q.  What do you recognize it to be?

01:50PM  24   A.  It's the defendant's house with a new garage door,

01:50PM  25   landscaping, that's pretty much it.

01:50PM    1    Q.  And it's an exterior view?

01:50PM    2    A.  It's an exterior view, yes.

01:50PM    3    Q.  Does Exhibit 524 fairly and accurately depict what the

01:50PM    4    defendant's exterior of the house looked like after he

01:50PM    5    purchased it and did some upgrades to the front and to the

01:50PM    6    exterior?

01:50PM    7    A.  Yes.

01:50PM    8         MR. TRIPI:  The government offers 523 and 524,

01:50PM    9    Your Honor.

01:50PM   10         MR. SINGER:  No objection.

01:50PM   11         THE COURT:  They are received without objection.

01:50PM   12       (GOV Exhibits 523, 524 were received in evidence.)

01:50PM   13         MR. TRIPI:  Ms. Champoux, can we publish 523 and 524

01:50PM   14    for the jury and publish them side by side.

01:51PM   15         BY MR. TRIPI:

01:51PM   16    Q.  Can you tell the jury what they're looking at in the

01:51PM   17    photo on the left, Exhibit 523?

01:51PM   18    A.  Yeah.

01:51PM   19    Q.  Tell them.

01:51PM   20    A.  It's 85 Alder Place prior to the improvements, which are

01:51PM   21    on the right-hand side.

01:51PM   22    Q.  And so what improvements did you describe that are

01:51PM   23    visible on the right-hand side?

01:51PM   24    A.  The garage door and landscaping.

01:51PM   25    Q.  In your life experience, is landscaping something that

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24
118

01:51PM  1  can be costly?

01:51PM  2  A.  Yes.

01:51PM  3  Q.  Did you see improvements to the front yard and the grass

01:51PM  4  and the shrubbery?

01:51PM  5  A.  Yes.  The lawn, as well.  The lawn care.

01:51PM  6  Q.  Did the defendant, did he tell you where he got the new

01:52PM  7  garage door from?

01:52PM  8  A.  No.

01:52PM  9  Q.  Do you know who installed it?

01:52PM  10  A.  I don't.

01:52PM  11  Q.  Based on your knowledge of the defendant, is he a handy

01:52PM  12  person?  Is he a person who does a lot of personal home

01:52PM  13  improvement projects?

01:52PM  14  A.  No, just maintenance.  But something like this, I don't

01:52PM  15  think so.

01:52PM  16       MR. TRIPI:  Okay.  We can take those down.

01:52PM  17       BY MR. TRIPI:

01:53PM  18  Q.  You've been inside the defendant's residence at 85 Alder

01:53PM  19  Place?

01:53PM  20  A.  I have, yes.

01:53PM  21  Q.  You've been in the basement?

01:53PM  22  A.  Yes.

01:53PM  23  Q.  You've been in the kitchen area?

01:53PM  24  A.  Yes.

01:53PM  25  Q.  What other parts of the house have you been in?

| | | |
|---|---|---|
| 01:53PM | 1 | A.  The bathroom and the living area in the back. |
| 01:53PM | 2 | Q.  Have you seen his gym equipment in the basement? |
| 01:53PM | 3 | A.  Yes. |
| 01:53PM | 4 | Q.  I'm going to show you Government Exhibit 103-62.  Do you |
| 01:53PM | 5 | recognize that? |
| 01:53PM | 6 | A.  Yes. |
| 01:53PM | 7 | Q.  What do you recognize it to be? |
| 01:54PM | 8 | A.  It's the equipment -- the gym equipment from the |
| 01:54PM | 9 | defendant's house.  An elliptical and a StairMaster and some |
| 01:54PM | 10 | weights. |
| 01:54PM | 11 | Q.  Is there a rowing machine also? |
| 01:54PM | 12 | A.  A rowing machine too, yes. |
| 01:54PM | 13 | Q.  Does it fairly and accurately depict equipment that |
| 01:54PM | 14 | you've seen in the defendant's basement at 85 Alder Place? |
| 01:54PM | 15 | A.  Yes. |
| 01:54PM | 16 | MR. TRIPI:  The government offers Exhibit 103-62, |
| 01:54PM | 17 | Your Honor. |
| 01:54PM | 18 | MR. SINGER:  No objection. |
| 01:54PM | 19 | THE COURT:  Received without objection. |
| 01:54PM | 20 | (GOV Exhibit 103-62 was received in evidence.) |
| 01:54PM | 21 | MR. TRIPI:  Can we please publish that, Ms. Champoux, |
| 01:54PM | 22 | for the jury as well? |
| 01:54PM | 23 | BY MR. TRIPI: |
| 01:54PM | 24 | Q.  Starting left to right on the screen, can you first point |
| 01:54PM | 25 | out the rowing machine for the jury?  Tap the screen.  You |

| | | |
|---|---|---|
| 01:54PM | 1 | should get an arrow. |
| 01:54PM | 2 | A.  Rowing machine. |
| 01:54PM | 3 | Q.  Can you point out the elliptical next? |
| 01:54PM | 4 | And can you point out the treadmill? |
| 01:54PM | 5 | I'm going to show you Exhibit 103-13.  Do you recognize |
| 01:55PM | 6 | what's depicted in 103-13? |
| 01:55PM | 7 | A.  Yes. |
| 01:55PM | 8 | Q.  What do you recognize that to be? |
| 01:55PM | 9 | A.  A bench with free weights.  A bar.  And then a rack to |
| 01:55PM | 10 | place the weights on. |
| 01:55PM | 11 | Q.  Is that also in the defendant's basement? |
| 01:55PM | 12 | A.  Yes. |
| 01:55PM | 13 | Q.  Does it fairly and accurately depict weights you've seen |
| 01:55PM | 14 | in the defendant's basement? |
| 01:55PM | 15 | A.  Yes. |
| 01:55PM | 16 | Q.  And that is also in the background, sort of, of 103-62 up |
| 01:55PM | 17 | on your screen; is that right?  Maybe you can't see it as |
| 01:55PM | 18 | well on that screen. |
| 01:55PM | 19 | A.  Yes, it is in the background. |
| 01:55PM | 20 | **MR. TRIPI:**  The government offers Exhibit 103-13, |
| 01:55PM | 21 | Your Honor. |
| 01:55PM | 22 | **MR. SINGER:**  No objection. |
| 01:55PM | 23 | **THE COURT:**  Received without objection. |
| 01:56PM | 24 | **(GOV Exhibit 103-13 was received in evidence.)** |
| 01:56PM | 25 | **MR. TRIPI:**  Can we publish them next to each other, |

01:56PM   1   Ms. Champoux?  103-62 and 103-13, please?

01:56PM   2           **BY MR. TRIPI:**

01:56PM   3   Q.  And in 103-13, can you circle where you see the weight

01:56PM   4   bench and the weights, Mr. Selva?

01:56PM   5       Is fitness equipment items that one can purchase with

01:56PM   6   cash?

01:56PM   7   A.  Yes.

01:56PM   8   Q.  When -- have you ever bought weights in your life?

01:56PM   9   A.  No.  I've always been a member of a gym.  I never bought

01:56PM  10   any weights.

01:56PM  11   Q.  Other than the classic car, do you know what other

01:57PM  12   vehicles the defendant had?

01:57PM  13   A.  Tahoe, a truck.

01:57PM  14   Q.  A Chevy Tahoe?

01:57PM  15   A.  A Chevy Tahoe.

01:57PM  16   Q.  What type of vehicle did his wife drive, if you know?

01:57PM  17   A.  I think an Audi truck or car, I'm not sure.  I don't

01:57PM  18   remember.

01:57PM  19   Q.  Earlier you talked about Invicta watches and a Rolex

01:57PM  20   watch; do you recall that?

01:57PM  21   A.  Yes.

01:57PM  22   Q.  I'm going to show you Exhibit 103-20.

01:57PM  23       Do you recognize what's depicted in Exhibit 103-20?

01:57PM  24   A.  Yes.

01:57PM  25   Q.  What do you recognize that to be?

01:57PM  1   A.  It looks like a Rolex on the shelf in the closet.

01:58PM  2   Q.  Is there another watch that you recognize as well?

01:58PM  3   A.  To the left of it, it's an Invicta.

01:58PM  4   Q.  Do you recognize that to be watches that the defendant

01:58PM  5   had?

01:58PM  6   A.  Yes.

01:58PM  7   Q.  Do they fairly and accurately depict watches that you've

01:58PM  8   seen the defendant with?

01:58PM  9   A.  Yes.

01:58PM  10  Q.  Showing you Exhibit 103-49.  Do you see part of one of

01:58PM  11  the same watches in that photo?

01:58PM  12  A.  Yes, to the left.

01:58PM  13  Q.  Which watch is that, that you see in that photo?

01:58PM  14  A.  That looks like the Rolex.

01:58PM  15  Q.  Okay.  Does that fairly and accurately depict that

01:58PM  16  portion of the Rolex you see, a watch you've seen the

01:58PM  17  defendant with?

01:58PM  18  A.  Yes.

01:58PM  19        **MR. TRIPI:**  The government offers Exhibit 103-20 and

01:59PM  20  103-49, Your Honor.

01:59PM  21        **MR. SINGER:**  No objection.

01:59PM  22        **THE COURT:**  Both are received without objection.

01:59PM  23    **(GOV Exhibits 103-20, 103-49 were received in evidence.)**

01:59PM  24        **MR. TRIPI:**  Ms. Champoux, can we start with

01:59PM  25  Exhibit 103-20.  And can we zoom in on that shelving area?

01:59PM    1              **BY MR. TRIPI:**

01:59PM    2    Q.  Starting with the watch that has the red background

01:59PM    3    there, do you see that?

01:59PM    4    A.  Yes.

01:59PM    5    Q.  What do you recognize that to be?

01:59PM    6    A.  A Rolex.

01:59PM    7    Q.  And there's -- might be a little glare, but do you see a

01:59PM    8    watch to the left of that as well?

01:59PM    9    A.  Yes.

01:59PM   10    Q.  And what do you recognize that to be?

01:59PM   11    A.  An Invicta.

01:59PM   12              **MR. TRIPI:**  And can we pull up 103-49?

01:59PM   13              **BY MR. TRIPI:**

01:59PM   14    Q.  Does this show part of that same watch that you described

02:00PM   15    as looking like the Rolex?

02:00PM   16    A.  Yes.

02:00PM   17    Q.  Did you know Michael Masecchia to also have a Rolex?

02:00PM   18    A.  Yes.

02:00PM   19    Q.  Did you have a Rolex?

02:00PM   20    A.  No.

02:00PM   21    Q.  Earlier you mentioned the defendant taking trips to, I

02:00PM   22    think, Las Vegas, New York City, Florida; do you recall that?

02:00PM   23    A.  I do.

02:00PM   24    Q.  Do you know whether or not he also traveled to Toronto?

02:00PM   25    A.  I believe so, yes.

02:01PM    1    Q.  Do you know how many times?

02:01PM    2    A.  Once that I was aware of.

02:01PM    3         **MR. TRIPI:**  One moment please, Your Honor.

02:01PM    4         **BY MR. TRIPI:**

02:01PM    5    Q.  Do you know how many trips per year the defendant would

02:01PM    6    take?

02:01PM    7    A.  One or two.

02:01PM    8    Q.  Is that your best estimate?

02:01PM    9    A.  Yes.

02:01PM   10    Q.  Now, earlier you indicated that you had been to

02:02PM   11    Mr. Serio's house at 697 Lebrun?

02:02PM   12    A.  Yes.

02:02PM   13    Q.  Approximately how many times?

02:02PM   14    A.  Few.  Two, three.

02:02PM   15    Q.  Were all your trips for purposes of the drug conspiracy

02:02PM   16    you were involved in?

02:02PM   17    A.  Yes.  To talk to Ron, meet Mike there, yes.

02:02PM   18    Q.  So those were all business related?

02:02PM   19    A.  Yes.

02:02PM   20    Q.  Who was there on the occasions were you there?  Earlier

02:02PM   21    you mentioned you had seen R.K. leaving?

02:02PM   22    A.  Yes.

02:02PM   23    Q.  Who else have you seen there?

02:02PM   24    A.  Myself, Mike, Ron, Mark Falzone.

02:02PM   25    Q.  Anybody else that you recall?

02:02PM    1    A.  No one else I can recall.

02:02PM    2    Q.  Okay.  In April of 2017, did you learn that Ron Serio had

02:03PM    3    been arrested?

02:03PM    4    A.  Yes.

02:03PM    5    Q.  How did you find out?

02:03PM    6    A.  Mike Masecchia told me.

02:03PM    7    Q.  How did he tell you?

02:03PM    8    A.  Called me and he said I gotta stop by.

02:03PM    9        He stopped by my house, and he told me that Ron had been

02:03PM   10    busted, had been arrested.

02:03PM   11    Q.  What did Masecchia tell you about Ron's bust at that

02:03PM   12    point?

02:03PM   13    A.  He didn't know much about it.  He just said that he'd

02:03PM   14    been arrested, everything's shutting down.  Start clearing

02:03PM   15    things out.

02:03PM   16    Q.  In April of 2017, were any of the outdoor grow plants in

02:03PM   17    the ground yet?

02:03PM   18    A.  No.

02:03PM   19    Q.  Did you clear out anything out of your house at that

02:04PM   20    point?

02:04PM   21    A.  I wasn't started yet.  It would have started in May.

02:04PM   22    There was -- there was nothing in my house that was going.

02:04PM   23    Q.  Nothing active?

02:04PM   24    A.  Active.

02:04PM   25    Q.  Initially were you confused wondering how Ron could get

02:04PM  1   arrested?

02:04PM  2   A.  Yes.

02:04PM  3   Q.  Why did that confuse you?

02:04PM  4   A.  Because of what has been going on.  Because there was a

02:04PM  5   figure being paid, and we were supposed to be under a

02:04PM  6   watchful eye.

02:04PM  7   Q.  Whose watchful eye?

02:04PM  8   A.  The defendant's.  We were supposed to be tipped off, and

02:04PM  9   that didn't happen.

02:04PM  10  Q.  Shortly after you learned about Ron Serio's arrest, did

02:04PM  11  you call the defendant?

02:04PM  12  A.  I did.

02:04PM  13  Q.  Why did you call him?

02:04PM  14  A.  I wanted to get some information.

02:04PM  15  Q.  So did you call because Ron was arrested?

02:04PM  16  A.  Yes.

02:04PM  17  Q.  Did you learn that Ron was arrested on or about April 18,

02:05PM  18  2017?

02:05PM  19  A.  Yes.

02:05PM  20  Q.  Is that the same day that Masecchia visited you?

02:05PM  21  A.  Yes.

02:05PM  22          **MR. TRIPI:**  Ms. Champoux, can we please publish

02:05PM  23  Exhibit 358 in evidence.

02:05PM  24          And please go to the PDF that says 190131677 bills

02:05PM  25  dot PDF.  Thank you.

02:05PM  1          And can we just -- I want to just look at a couple

02:05PM  2  things.

02:05PM  3          **BY MR. TRIPI:**

02:05PM  4  Q.  Mr. Selva, can you please just read what it says is the

02:05PM  5  billing address there?

02:05PM  6  A.  DEA New York division.  99 10th Avenue, New York,

02:06PM  7  New York, 10011-4713.

02:06PM  8          **MR. TRIPI:**  And, Ms. Champoux, can you scroll down

02:06PM  9  just a little bit, please?  Okay.

02:06PM  10          **BY MR. TRIPI:**

02:06PM  11  Q.  Do you see what phone number this Verizon wireless bill

02:06PM  12  relates to?

02:06PM  13  A.  Yes.

02:06PM  14  Q.  What number is that?

02:06PM  15  A.  That's the defendant's old number, 716-818-0966.

02:06PM  16  Q.  That was the phone number he had on his DEA phone?

02:06PM  17  A.  Yes.

02:06PM  18  Q.  And you had that number?

02:06PM  19  A.  Yes.

02:06PM  20  Q.  Before I go further, during your discussions with the

02:07PM  21  defendant while he's having your back and taking bribes, did

02:07PM  22  you and the defendant during that time period ever discuss

02:07PM  23  what you should say if anyone ever came to question you?

02:07PM  24  A.  Yes.

02:07PM  25  Q.  What did the defendant tell you to say if any other

| | | |
|---|---|---|
| 02:07PM | 1 | member of law enforcement ever tried to question you? |
| 02:07PM | 2 | A.  He said to reach out to him immediately, and he would |
| 02:07PM | 3 | coach me.  But, to say I was his informant.  I was working as |
| 02:07PM | 4 | an informant for him. |
| 02:07PM | 5 | Q.  Was it -- would that have been a lie? |
| 02:07PM | 6 | A.  It would have been a lie. |
| 02:07PM | 7 | Q.  Was that the cover story? |
| 02:07PM | 8 | A.  Yes. |
| 02:07PM | 9 | Q.  And, so, you were able to call this number freely from |
| 02:07PM | 10 | your known cell phone? |
| 02:07PM | 11 | A.  Correct. |
| 02:07PM | 12 | MR. TRIPI:  Ms. Champoux, can we go to page 433 -- or |
| 02:08PM | 13 | 443, I'm sorry.  Yep.  Can you highlight 419, at 10:47 a.m. |
| 02:08PM | 14 | BY MR. TRIPI: |
| 02:08PM | 15 | Q.  Mr. Selva, is that your phone number highlighted there in |
| 02:08PM | 16 | blue? |
| 02:08PM | 17 | A.  Yes, it was. |
| 02:08PM | 18 | Q.  And you indicated that you had called Mr. Bongiovanni |
| 02:08PM | 19 | after you learned of Serio's arrest? |
| 02:08PM | 20 | A.  Yes. |
| 02:08PM | 21 | Q.  Is April 19th about a day after you learned of the |
| 02:08PM | 22 | arrest? |
| 02:08PM | 23 | A.  It is. |
| 02:08PM | 24 | MR. TRIPI:  Scroll down a little further, |
| 02:08PM | 25 | Ms. Champoux. |

| | | |
|---|---|---|
| 02:08PM | 1 | **BY MR. TRIPI:** |
| 02:08PM | 2 | Q.  So I showed you one call at 10:47 a.m.  Do you see |
| 02:08PM | 3 | another call at 7:13 p.m.? |
| 02:08PM | 4 | A.  Yes. |
| 02:08PM | 5 | Q.  Okay.  So after you had contacted the defendant by phone, |
| 02:09PM | 6 | did you meet up with him? |
| 02:09PM | 7 | A.  After by phone, yes. |
| 02:09PM | 8 | Q.  What did the defendant tell you when you met up with him? |
| 02:09PM | 9 | A.  Obviously, Ron had been busted.  Stick with the story. |
| 02:09PM | 10 | If anyone is to question you, reach out to me.  I will prep |
| 02:09PM | 11 | you and coach you for techniques that are gonna be used, and |
| 02:09PM | 12 | stick with the story that you're my informant. |
| 02:09PM | 13 | Q.  Did you ask the defendant questions about how it was, how |
| 02:09PM | 14 | Ron could be arrested and the defendant not know about it, or |
| 02:09PM | 15 | anything like that? |
| 02:09PM | 16 | A.  Yeah, he was vague on it.  He didn't know a lot of |
| 02:09PM | 17 | information on it. |
| 02:09PM | 18 | Q.  Did the defendant indicate to you that it was not the DEA |
| 02:09PM | 19 | that arrested Ron? |
| 02:09PM | 20 | A.  Yes.  I believe it was Erie County Sheriffs, I thought. |
| 02:10PM | 21 | I could be wrong.  I don't recall. |
| 02:10PM | 22 | **MR. TRIPI:**  You can take that down, Ms. Champoux. |
| 02:10PM | 23 | **BY MR. TRIPI:** |
| 02:10PM | 24 | Q.  What did he say about whose investigation it was, |
| 02:10PM | 25 | understanding that it was fresh? |

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

02:10PM   1   A.  It wasn't his, so he didn't have a lot of information.

02:10PM   2   Again, I thought that it was -- he had mentioned Erie County

02:10PM   3   Sheriffs.  I don't recall.  But it was not his investigation.

02:10PM   4   Q.  To the best of your recollection, he mentioned the Erie

02:10PM   5   County Sheriffs?

02:10PM   6   A.  Yes.

02:10PM   7   Q.  Now you worked for the Erie County Sheriff's Office later

02:10PM   8   in life, correct?

02:10PM   9   A.  Yes.

02:10PM   10  Q.  They have a division of people that work at the jail,

02:10PM   11  correct?

02:10PM   12  A.  Correct, that's where I worked, yes.

02:10PM   13  Q.  But they also have investigators who do narcotics

02:10PM   14  investigations; is that right?

02:10PM   15  A.  Yes.

02:10PM   16  Q.  Did the defendant mention to you whether or not he had

02:11PM   17  heard Ron Serio ask for him after Ron was arrested?

02:11PM   18  A.  Yes.

02:11PM   19  Q.  What did the defendant say about that?

02:11PM   20  A.  He was taken aback by it.  He said that when Ron was

02:11PM   21  brought into custody, when they brought him in the

02:11PM   22  questioning room, the interview room, he had said that Ron

02:11PM   23  said he would only speak to himself.

02:11PM   24  Q.  Speak to --

02:11PM   25  A.  The defendant.  That he wants to speak to the defendant.

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24
131

| | | |
|---|---|---|
| 02:11PM | 1 | Q.  Bongiovanni? |
| 02:11PM | 2 | A.  Yes. |
| 02:11PM | 3 | Q.  What was the defendant's demeanor when mentioning to you |
| 02:11PM | 4 | that Serio asked for him after the arrest? |
| 02:11PM | 5 | A.  He was taken back. |
| 02:11PM | 6 | Q.  What do you mean by that? |
| 02:11PM | 7 | A.  He didn't think that -- it was unexpected.  I mean, maybe |
| 02:11PM | 8 | done more on a private matter, not in an interview room. |
| 02:11PM | 9 | Q.  Did he express concern about the fact that Ron mentioned |
| 02:11PM | 10 | his name? |
| 02:11PM | 11 | A.  Yes. |
| 02:11PM | 12 | Q.  What did he -- what concerns did he express? |
| 02:12PM | 13 | A.  The concern was now that there's gonna be questions he'd |
| 02:12PM | 14 | have to answer.  Why is this suspect asking for you in the |
| 02:12PM | 15 | interview room?  Saying he'd speak to you only. |
| 02:12PM | 16 | Q.  Did the defendant say how he would handle that if anyone |
| 02:12PM | 17 | asked him about his connection to Ron Serio? |
| 02:12PM | 18 | A.  I did, yes. |
| 02:12PM | 19 | Q.  What did the defendant say? |
| 02:12PM | 20 | A.  He was gonna say that he didn't know him.  That he never |
| 02:12PM | 21 | met him, and was gonna play dumb to the whole thing. |
| 02:12PM | 22 | Q.  And in fact, the way things worked out, was it set up so |
| 02:12PM | 23 | that Serio and the defendant never met face to face? |
| 02:12PM | 24 | A.  That's just how it worked out.  That was Masecchia |
| 02:12PM | 25 | coordinating that.  They never did -- |

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

132

02:12PM   1    Q.  So my question is:  Is that in fact how it was, Serio and

02:12PM   2    the defendant never met face to face?

02:12PM   3    A.  They never did, no.

02:12PM   4    Q.  Was that by design?

02:12PM   5    A.  I guess so, yes.

02:12PM   6    Q.  Who set that up?

02:12PM   7    A.  That was done through, well, defendant's request.  He

02:13PM   8    never wanted to meet with Ron.

02:13PM   9    Q.  So the defendant never want to meet with --

02:13PM   10   A.  Never wanted to meet with Ron.

02:13PM   11   Q.  When you said the defendant indicated he would play

02:13PM   12   stupid, he would play dumb, what was that in regards to?

02:13PM   13   A.  If he was questioned, if he was questioned why Ron would

02:13PM   14   ask for him.

02:13PM   15   Q.  Okay.  Did the defendant reiterate or reinforce to you

02:13PM   16   what you should do if any members of law enforcement

02:13PM   17   approached you?

02:13PM   18   A.  Yes.

02:13PM   19   Q.  What did he say?

02:13PM   20   A.  Again, reach out to him if I was able to first, and he

02:14PM   21   would prep me for the questioning.  If not, if they pulled me

02:14PM   22   in, mention that I was his informant, I was working with him

02:14PM   23   as an informant.

02:14PM   24   Q.  Was that consistent with what he told you he did for

02:14PM   25   Anthony Gerace at a point earlier --

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

133

02:14PM    1    A.  Yes.

02:14PM    2    Q.  -- when Amherst was interested in Anthony Gerace?

02:14PM    3    A.  Yes.

02:14PM    4    Q.  Was it your understanding that that had worked in the

02:14PM    5    past?

02:14PM    6    A.  Yes.

02:14PM    7    Q.  Did you think it was a good plan?

02:14PM    8    A.  It sounded good.  It made sense.

02:14PM    9    Q.  How many times after Serio's arrest in April of 2017 did

02:14PM   10    you meet up with the defendant and go over this part of the

02:15PM   11    plan, the cover story, that you're an informant?

02:15PM   12    A.  A few times.

02:15PM   13    Q.  Now after Serio was arrested and the aftermath of that,

02:15PM   14    after you talked to Masecchia, after you talked to the

02:15PM   15    defendant, did you bump into Mark Falzone somewhere?

02:15PM   16    A.  Yes.

02:15PM   17    Q.  Remind the jury who Mark Falzone is in the context of Ron

02:15PM   18    Serio.

02:15PM   19    A.  Mark Falzone is a very close friend of Ron Serio.  He was

02:15PM   20    actually his best friend.  They grew up together.

02:15PM   21    Q.  And Mark was involved in the marijuana distribution?

02:15PM   22    A.  He was.

02:15PM   23    Q.  Where did you -- where did you happen to bump into Mark

02:16PM   24    Falzone after Serio was arrested?

02:16PM   25    A.  Home Depot, I believe.  I was at Home Depot.

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

134

| | | |
|---|---|---|
| 02:16PM | 1 | Q. Did you have an interaction with him? |
| 02:16PM | 2 | A. Yeah, briefly we talked. |
| 02:16PM | 3 | Q. Did he say something that made you nervous? |
| 02:16PM | 4 | A. Yes. |
| 02:16PM | 5 | Q. What -- what did Mark Falzone say to you? |
| 02:16PM | 6 | A. He was taken aback that -- that Ron got arrested. |
| 02:16PM | 7 | Q. What did he say to you? |
| 02:16PM | 8 | A. He said Ron got arrested. Ron got busted. |
| 02:16PM | 9 | And I already knew that. So what happened? |
| 02:16PM | 10 | 'Cuz Ron was aware what was -- was going on -- or, Mark |
| 02:16PM | 11 | was aware of what was going on. |
| 02:16PM | 12 | Q. Was Mark questioning you as to how Ron could get |
| 02:16PM | 13 | arrested? |
| 02:16PM | 14 | A. Yes. |
| 02:16PM | 15 | Q. What did he say? |
| 02:16PM | 16 | A. How could it happen? I thought that there was an |
| 02:16PM | 17 | arrangement made with the defendant. He mentioned him by |
| 02:16PM | 18 | name. 'Cuz Ron made Mark very aware of what was going on, |
| 02:16PM | 19 | they were very close. |
| 02:16PM | 20 | Q. At the time, did you know that Mark knew that |
| 02:16PM | 21 | information? |
| 02:16PM | 22 | A. I did, yes. |
| 02:16PM | 23 | Q. At that moment in time? |
| 02:16PM | 24 | A. Not at that moment in time, no. |
| 02:17PM | 25 | Q. Did that make you nervous? |

02:17PM    1    A.  It did, yes.

02:17PM    2    Q.  How did you react to that?

02:17PM    3    A.  I didn't know what to say.  I mean, it took me off guard.

02:17PM    4    I got nervous.  Everything was falling apart.

02:17PM    5    Q.  Did you take your concerns to Mike Masecchia, the fact

02:17PM    6    that Mark Falzone also knew about the arrangement?

02:17PM    7    A.  Yes.

02:17PM    8    Q.  What did you say to Mike?

02:17PM    9    A.  I told Mike, I says, I told him, I called him

02:17PM    10   immediately, he came over, we met.  I says I just ran into

02:17PM    11   Mark Falzone at Home Depot, and he's fully aware of what's

02:17PM    12   going on and he was questioning me about it.  So obviously

02:17PM    13   he's fully involved and knows what's going on.

02:17PM    14   Q.  Did Masecchia -- what did Masecchia say to you?

02:17PM    15   A.  He -- he called Ron "Greenie."  He goes, well, Greenie is

02:17PM    16   tight with Mark, so he obviously confided in him and told him

02:17PM    17   everything.

02:17PM    18   Q.  Did that concern you?

02:17PM    19   A.  It did, yes.

02:17PM    20   Q.  Did it seem to concern Mike?

02:18PM    21   A.  It did.  Because it seems like there were leaks.  Like,

02:18PM    22   people were starting to know.

02:18PM    23   Q.  As far as you knew up to that point, the only three

02:18PM    24   people who knew were you, Mike and Ron?

02:18PM    25   A.  That's it.

02:18PM   1   Q.  And this defendant?

02:18PM   2   A.  That's correct.

02:18PM   3   Q.  I guess that's four people, right?

02:18PM   4   A.  Yes, four.

02:18PM   5   Q.  After Serio's arrested, and I think we alluded to it

02:18PM   6   earlier, were you having some health issues?

02:18PM   7   A.  Yes.

02:18PM   8   Q.  What were the nature of your health issues?

02:18PM   9   A.  I had open-heart surgery.  My aortic valve tore, and I

02:18PM   10   needed to have heart valve replacement.

02:18PM   11   Q.  In June or July of 2017, a few months after Ron's

02:18PM   12   arrested, did -- was there a benefit for you?

02:18PM   13   A.  Yes.

02:18PM   14   Q.  Where was that held?

02:18PM   15   A.  At the Knights of Columbus on Kenmore.

02:18PM   16   Q.  Was that to raise money for your medical expenses?

02:19PM   17   A.  Yes.

02:19PM   18   Q.  Who was working the front door collecting the money as

02:19PM   19   people came in?

02:19PM   20   A.  Mike.  The defendant.  Victor, a friend of ours.  My

02:19PM   21   daughter, her friends.  My older daughter and a few of her

02:19PM   22   friends.

02:19PM   23   Q.  When you say "Mike," are you referring to Masecchia?

02:19PM   24   A.  Masecchia, yes.

02:19PM   25   Q.  And the defendant?

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24
137

| | | |
|---|---|---|
| 02:19PM | 1 | A.  Yes. |
| 02:19PM | 2 | Q.  Was Mark Falzone at that benefit? |
| 02:19PM | 3 | A.  I believe so, yes. |
| 02:19PM | 4 | Q.  And earlier you mentioned Wayne Anderson being there? |
| 02:19PM | 5 | A.  Yes. |
| 02:19PM | 6 | Q.  Every year, from your involvement up to Ron Serio's |
| 02:19PM | 7 | arrest, had marijuana trafficking been going on within this |
| 02:19PM | 8 | organization? |
| 02:19PM | 9 | A.  Yes. |
| 02:20PM | 10 | Q.  Every year, had there been outdoor grows that had |
| 02:20PM | 11 | transpired in Franklinville and Angelica? |
| 02:20PM | 12 | A.  Up to 2017, yes. |
| 02:20PM | 13 | Q.  In the -- in between those points in time, you grew |
| 02:20PM | 14 | plants inside your house and stored marijuana? |
| 02:20PM | 15 | A.  Yes. |
| 02:20PM | 16 | Q.  At some point after Serio was arrested, did Masecchia |
| 02:20PM | 17 | continue operations down the road? |
| 02:20PM | 18 | A.  Not that I was aware of, no.  Everything shut down. |
| 02:20PM | 19 | Q.  Your part ended? |
| 02:20PM | 20 | A.  Yes. |
| 02:20PM | 21 | Q.  Did you make efforts to keep apprised or monitor Ron |
| 02:20PM | 22 | Serio's court case? |
| 02:20PM | 23 | A.  While I was recovering, yes, with open-heart surgery, |
| 02:20PM | 24 | yes. |
| 02:20PM | 25 | Q.  Did you learn he had been charged in federal court? |

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

02:21PM    1    A.  I did.

02:21PM    2    Q.  Did you keep in touch with Masecchia?

02:21PM    3    A.  Not as much.

02:21PM    4    Q.  Did the defendant come visit you while you were

02:21PM    5    recovering?

02:21PM    6    A.  Yes, in the hospital.  Yes.

02:21PM    7    Q.  Did you talk about the progress of Serio's case at all --

02:21PM    8    A.  No.

02:21PM    9    Q.  -- and what the defendant learned or heard?

02:21PM    10    A.  No.

02:21PM    11    Q.  As time went on and no one came to talk to you, did you

02:21PM    12    form a belief that Serio was not cooperating?

02:21PM    13    A.  Yes.

02:21PM    14    Q.  So you thought you were, at some point, you thought you

02:21PM    15    were in the clear?

02:21PM    16    A.  Yes.  I started to relax a little bit.  I had a lot going

02:21PM    17    on.

02:21PM    18    Q.  What did you say there?

02:21PM    19    A.  I had a lot going on.  I just had open-heart surgery, so

02:21PM    20    there was a lot going on.

02:21PM    21    Q.  But my question was, as time went on, did your -- did

02:22PM    22    your concern diminish?  Did you not think Serio was

02:22PM    23    cooperating?

02:22PM    24    A.  I did.

02:22PM    25    Q.  Okay.  Fast forward now to the summer/fall of 2018, okay?

| | | |
|---|---|---|
| 02:22PM | 1 | So about a year-plus later? |
| 02:22PM | 2 | A.  Okay. |
| 02:22PM | 3 | Q.  Okay?  In the late summer, early fall of 2018, did the |
| 02:22PM | 4 | defendant alert you to some trouble he was having at work? |
| 02:22PM | 5 | A.  Yes. |
| 02:22PM | 6 | Q.  Was he concerned about something? |
| 02:22PM | 7 | A.  Yes. |
| 02:22PM | 8 | Q.  Did he start talking about retiring? |
| 02:22PM | 9 | A.  He did, yes. |
| 02:22PM | 10 | Q.  What did he tell you he was concerned about at work? |
| 02:22PM | 11 | A.  There being an internal investigation.  He was having a |
| 02:22PM | 12 | problem with an agent that he worked with, and he was gonna |
| 02:22PM | 13 | take retirement, early retirement and get out. |
| 02:22PM | 14 | Q.  Did he name the -- when you say "an agent," do you mean |
| 02:22PM | 15 | another DEA agent? |
| 02:22PM | 16 | A.  Yes. |
| 02:22PM | 17 | Q.  Did he name that agent for you? |
| 02:22PM | 18 | A.  He did. |
| 02:22PM | 19 | Q.  Who did he name? |
| 02:22PM | 20 | A.  Tony Casullo. |
| 02:23PM | 21 | Q.  Did the defendant indicate to you his relationship with |
| 02:23PM | 22 | Peter Gerace had come under scrutiny? |
| 02:23PM | 23 | A.  Yes. |
| 02:23PM | 24 | Q.  What did he say in that regard? |
| 02:23PM | 25 | A.  That he was being questioned about it.  That their |

02:23PM   1   relationship had come -- come to realm, and had a lot of eyes

02:23PM   2   on it now, and he had to answer for it.

02:23PM   3   Q.  What was his plan that he expressed to you regarding

02:23PM   4   retiring?  What did he say?

02:23PM   5   A.  He was gonna retire, and get a place down in Florida

02:23PM   6   eventually.

02:23PM   7   Q.  Did the defendant talk to you about anyone else whole had

02:23PM   8   done that in a similar situation?

02:23PM   9   A.  Yes.

02:23PM   10  Q.  Who did he talk to you about?

02:23PM   11          **MR. SINGER:**  Objection.  Can we approach, Judge?

02:23PM   12          **THE COURT:**  Sure.

02:23PM   13          (Sidebar discussion held on the record.)

02:24PM   14          **MR. SINGER:**  So I think we're about to go into a

02:24PM   15  place where the Court had made a ruling previously.  And this

02:24PM   16  is in regard to Tom Doctor and his retirement, and it being a

02:24PM   17  hasty retirement from the Buffalo Police Department.

02:24PM   18          So at the last trial, the government attempted to

02:24PM   19  elicit the same testimony to basically draw an analogy

02:24PM   20  between -- that Mr. Bongiovanni was doing the exact same thing

02:24PM   21  here.  And the Court ruled on the objection we placed, and

02:24PM   22  sustained the objection.  So I just want to make sure we're

02:24PM   23  not going down that road again.

02:24PM   24          **MR. TRIPI:**  Yeah.  So these questions are framed

02:24PM   25  differently.  There's been a different foundation laid than

02:24PM    1    there was the prior time.  I'm allowed to try to do better

02:24PM    2    than I did last time.

02:24PM    3              **THE COURT:**  Of course.

02:24PM    4              **MR. TRIPI:**  It wasn't a motion in limine ruling.

02:24PM    5    I've abided by those.  Rob is right, there was an objection

02:24PM    6    and no testimony.

02:24PM    7              This time, what's different is I framed in it in the

02:24PM    8    context of these discussions.  I did a poor job last time of

02:24PM    9    laying out when it was.  Now we're in the context of a

02:25PM   10    discussion of a hasty retirement, and Defendant Bongiovanni

02:25PM   11    linking his decision to something that -- that he knew that

02:25PM   12    happened with Doctor.

02:25PM   13              And so it's statement of a party opponent --

02:25PM   14              **THE COURT:**  Hang on.  Hang on.

02:25PM   15              **MR. TRIPI:**  Yeah.

02:25PM   16              **THE COURT:**  So what he's going to testify?

02:25PM   17              **MR. TRIPI:**  He's gonna say that --

02:25PM   18              **THE COURT:**  Doctor retired --

02:25PM   19              **MR. TRIPI:**  -- Doctor was under suspicion, he

02:25PM   20    retired, went to Florida.

02:25PM   21              And I'm not sure exactly how it's gonna come out of

02:25PM   22    his mouth, but he -- Bongiovanni referred to that situation in

02:25PM   23    the context of saying I'm under scrutiny at work, I'm gonna

02:25PM   24    retire.  And he talks about Doctor.

02:25PM   25              **THE COURT:**  Is there a link -- Bongiovanni talks

02:25PM    1    about Doctor?

02:25PM    2         MR. TRIPI:  That's what I believe he's about to

02:25PM    3    testify about.  That in the context of this conversation,

02:25PM    4    there's -- there's discussion about Doctor.

02:25PM    5         THE COURT:  So why wouldn't that be relevant?  If

02:25PM    6    Bongiovanni tells him that Doctor did this and he's going to

02:25PM    7    do the same thing, why wouldn't that be relevant?

02:25PM    8         MR. SINGER:  Sure.  So, again, first the problem is

02:25PM    9    it assumes a fact that's not in evidence.  There's no evidence

02:26PM   10    about Doctor retiring because of some misconduct incident.

02:26PM   11    And so that's a problem.  Number 2 --

02:26PM   12         THE COURT:  I thought that's what he's gonna testify?

02:26PM   13         MR. TRIPI:  That's -- I don't know exactly how it

02:26PM   14    will come out, but my belief is that the -- Mr. Selva will

02:26PM   15    make that link.

02:26PM   16         THE COURT:  Why don't we do it outside the presence

02:26PM   17    of the jury?

02:26PM   18         MR. TRIPI:  Sure.

02:26PM   19         MR. COOPER:  Before we leave, can we stay up for one

02:26PM   20    second?

02:26PM   21         I just want to let the Court now and, Rob, obviously

02:26PM   22    you guys as well, Ms. Chalbeck is having some dizziness, and

02:26PM   23    so she just let Rebecca know while we are up here.

02:26PM   24         THE COURT:  Say it again?

02:26PM   25         MR. COOPER:  Ms. Chalbeck is having some dizziness.

02:26PM    1    She just let Rebecca know while we are up here, I think,

02:26PM    2    that's why she's not up at the bench, she's going to stay

02:26PM    3    seated.  And then if she needs to leave, she's gonna just

02:26PM    4    leave.

02:26PM    5        **THE COURT:**  Does this have something to do with her

02:26PM    6    appointment?

02:26PM    7        **MR. COOPER:**  I don't know, maybe.  So I told her to

02:26PM    8    stay seated.

02:26PM    9        We might want to address it with the jury not in here

02:26PM    10   and just see.  I think she might need to hear from you that

02:26PM    11   it's okay.

02:26PM    12       **THE COURT:**  Absolutely.

02:26PM    13       **MR. COOPER:**  She's a trouper, but --

02:26PM    14       **THE COURT:**  Yeah.

02:26PM    15       **MR. COOPER:**  -- I don't want her to put herself at

02:27PM    16   risk.

02:27PM    17       **THE COURT:**  Yeah.

02:27PM    18       **MR. TRIPI:**  Thanks.

02:27PM    19       (End of sidebar discussion.)

02:27PM    20       **THE COURT:**  Okay.  Folks, we have a legal issue that

02:27PM    21   we're going to need to do outside your presence, so I'm going

02:27PM    22   to excuse you for a little while.

02:27PM    23       Please, while you're excused don't talk about the

02:27PM    24   case, even with each other.  And, again, remember not to make

02:27PM    25   up your mind.

02:27PM   1          We'll get you back here as soon as we can get you

02:27PM   2   back here.

02:27PM   3          (Jury excused at 2:27 p.m.)

02:27PM   4          **THE COURT:**  Okay.  Everybody can sit.

02:27PM   5          First of all, Ms. Chalbeck, I understand that you're

02:28PM   6   feeling a little light-headed.  I think that prudence should

02:28PM   7   require you to leave and perhaps just rest a little bit,

02:28PM   8   especially since you have an appointment tomorrow, you said.

02:28PM   9          And I think that we can make the very vanilla

02:28PM  10   statement to the jury now rather than tomorrow.  I know you'd

02:28PM  11   like to stay here, but your health comes first and, you know,

02:28PM  12   you do what you want, I'm not excluding you from the

02:28PM  13   courtroom, certainly, I'm just suggesting to you that you

02:28PM  14   might want to take care of yourself first, especially since

02:28PM  15   this is a witness that Mr. Tripi is very ably handling in, you

02:28PM  16   know, without your being here.

02:28PM  17          **MS. CHALBECK:**  It is has been a light week for me,

02:28PM  18   Your Honor, I appreciate that, thank you.

02:28PM  19          **THE COURT:**  Okay.  You do whatever you want.  I'm

02:28PM  20   just suggesting you do that.

02:28PM  21          **MR. TRIPI:**  What do you want to do?

02:28PM  22          **MS. CHALBECK:**  I'm going to go.

02:29PM  23          **MR. TRIPI:**  Okay.  I think she's going to take the

02:29PM  24   Court's invitation/advice and --

02:29PM  25          **MS. CHALBECK:**  Thank you, Judge.

02:29PM   1          **MR. TRIPI:**  Thank you for that, Judge.  If you can

02:29PM   2   sort of make that vanilla statement to the jury, we'd

02:29PM   3   appreciate it.

02:29PM   4          **THE COURT:**  I will, yep.  Yep.  Yep.  As important

02:29PM   5   as, you know, these cases are to me, people are more

02:29PM   6   important, so --

02:29PM   7          **MS. CHALBECK:**  I appreciate that, Judge.

02:29PM   8          **THE COURT:**  Okay.  So let's do the proffer.

02:29PM   9          **MR. TRIPI:**  Do you want me to run the questions,

02:29PM  10   Judge, and see how they come out?

02:29PM  11          **THE COURT:**  Absolutely.  So for the record --

02:29PM  12          **MR. TRIPI:**  I'd be more comfortable with that as

02:29PM  13   well.

02:29PM  14          **THE COURT:**  For the record, we're now outside the

02:29PM  15   presence of the jury, and Mr. Tripi is going to proffer some

02:29PM  16   testimony, and then we'll let Mr. Singer make an argument and

02:29PM  17   objection as he sees fit.

02:30PM  18

02:30PM  19          **PROFFER OUTSIDE PRESENCE OF JURY - BY MR. TRIPI:**

02:30PM  20   Q.  Mr. Selva, you testify a moment ago that the defendant

02:30PM  21   expressed concern about work, Special Agent Casullo, and that

02:30PM  22   his relationship with Peter Gerace had sort of come under

02:30PM  23   scrutiny.

02:30PM  24      When the defendant was discussing these topics with you,

02:30PM  25   and he started mentioning that he's going to retire and move

02:30PM    1    to Florida eventually, did he bring up Tom Doctor's

02:30PM    2    retirement and what Tom Doctor had done?

02:30PM    3    A.  Yes, he did.

02:30PM    4    Q.  Can you explain for the Court, because the Court's going

02:30PM    5    to need to rule on whether this is going to be allowed to

02:30PM    6    testified in front of the jury, what did the defendant say

02:30PM    7    about Tom Doctor's situation with you?

02:30PM    8    A.   Tom Doctor had a situation where he was being

02:30PM    9    scrutinized, possible under investigation, and he immediately

02:30PM    10   retired.  He retired, he sold his house in Grand Island, and

02:30PM    11   he moved down to Florida to start over.

02:30PM    12   Q.  Did the defendant indicate to you whether -- did he

02:31PM    13   express any view whether that was helpful to Doctor's

02:31PM    14   situation, the scrutiny or anything like that?

02:31PM    15   A.  No, he did not.

02:31PM    16   Q.  Okay.  So he just mentioned that that's what Doctor did?

02:31PM    17   A.  Yes.

02:31PM    18          MR. TRIPI:  Okay.  I think that's as far as it would

02:31PM    19   go, Judge.

02:31PM    20          MR. SINGER:  Again, Judge, I renew the objection,

02:31PM    21   there's no connection to it based on the testimony.

02:31PM    22          THE COURT:  I agree.

02:31PM    23          MR. TRIPI:  My only -- I would argue that inference

02:31PM    24   to the jury, that's --

02:31PM    25          THE COURT:  No, I don't think so.

| | | |
|---|---|---|
| 02:31PM | 1 | **MR. TRIPI:**  Okay. |
| 02:31PM | 2 | **THE COURT:**  I don't think so.  If you could have made |
| 02:31PM | 3 | more of a connection, I would have allowed you to do it, but |
| 02:31PM | 4 | there's not more. |
| 02:31PM | 5 | **MR. TRIPI:**  I understand, Judge.  Thanks for allowing |
| 02:31PM | 6 | the proffer to happen. |
| 02:31PM | 7 | **THE COURT:**  Absolutely. |
| 02:31PM | 8 | **MR. TRIPI:**  As long as we're down, can we take a |
| 02:31PM | 9 | two-minute bathroom break? |
| 02:31PM | 10 | **THE COURT:**  I think we should take a little bit more |
| 02:31PM | 11 | than that.  Let's take a little more than that, 10 or 15 |
| 02:31PM | 12 | minutes, our afternoon break now. |
| 02:31PM | 13 | **THE CLERK:**  All rise. |
| 02:31PM | 14 | (Off the record at 2:31 p.m. |
| 02:42PM | 15 | (Back on the record at 2:42 p.m.) |
| 02:48PM | 16 | (Jury not present.) |
| 02:48PM | 17 | **THE CLERK:**  All rise. |
| 02:48PM | 18 | **THE COURT:**  Please be seated. |
| 02:48PM | 19 | **THE CLERK:**  We are back on the record for the |
| 02:48PM | 20 | continuation of the jury trial in United States of America |
| 02:48PM | 21 | versus Joseph Bongiovanni, 19-cr-227. |
| 02:48PM | 22 | All counsel and parties are present. |
| 02:48PM | 23 | **THE COURT:**  Okay.  Anything that we should do before |
| 02:48PM | 24 | we bring them back? |
| 02:48PM | 25 | **MR. TRIPI:**  No, Judge, I just -- on behalf of our |

02:48PM    1    team, I wanted to thank the Court one more time for how you

02:48PM    2    handled the situation with Ms. Chalbeck.  We appreciate it.

02:48PM    3            **THE COURT:**  I would have done that for anybody on

02:48PM    4    either side in any kind of case.

02:48PM    5            **MR. TRIPI:**  I know.

02:48PM    6            **THE COURT:**  It's, as I say, that's not -- I don't

02:48PM    7    need to be thanked for it.  I care about the people in my

02:48PM    8    courtroom.

02:48PM    9            So anything from the defense?

02:49PM   10            **MR. SINGER:**  No, Your Honor.

02:49PM   11            **THE COURT:**  Okay.  So let's get the witness back in,

02:49PM   12    and let's bring them back, please, Pat.

02:49PM   13            (Witness seated at 2:49 p.m.)

02:49PM   14            (Jury seated at 2:49 p.m.)

02:50PM   15            **THE COURT:**  Okay.  The record will reflect that all

02:50PM   16    our jurors, again, are present.

02:50PM   17            You'll notice that one of the government attorneys is

02:50PM   18    not here.  She had a matter of some considerable importance

02:50PM   19    that will take her the rest of the day today and tomorrow.

02:50PM   20    And I -- she asked to be excused, and I excused her.  I told

02:50PM   21    her I thought she should be excused for the matter that she

02:50PM   22    asked to be excused for.  And so you folks shouldn't speculate

02:50PM   23    about anything.  She had good reason to leave, and that's why

02:50PM   24    she's not here.  Okay?

02:50PM   25            I remind the witness that he's still under oath.

02:50PM  1    Mr. Tripi, you may continue.

02:50PM  2    **MR. TRIPI:**  Thank you, Your Honor.

02:50PM  3

02:50PM  4    **(CONT'D) DIRECT EXAMINATION BY MR. TRIPI:**

02:50PM  5  Q.  Before the break, we left off talking about discussions

02:50PM  6  that you had in or about the fall of 2018 where the defendant

02:50PM  7  was bringing up retirement.  I'd like to direct your

02:50PM  8  attention forward in time a little bit further in or about

02:51PM  9  January of 2019, so as the calendar turns to 2019.

02:51PM  10    Did you learn around that time that someone named Mike

02:51PM  11  Sinatra's house was raided by law enforcement?

02:51PM  12  A.  Yes, I had heard.  Yes.

02:51PM  13  Q.  Did you know Michael Sinatra to be someone who was

02:51PM  14  associated with the defendant?

02:51PM  15  A.  Yes.

02:51PM  16  Q.  Did you also learn around that same time Anthony Gerace,

02:51PM  17  who you've talked about, that his house was also raided?

02:51PM  18  A.  Yes.

02:51PM  19  Q.  How did you hear about Mike Sinatra's house and Anthony

02:51PM  20  Gerace's house being raided, that's a search by law

02:51PM  21  enforcement?

02:51PM  22  A.  Well, Anthony Gerace I heard about through Masecchia.

02:51PM  23  Masecchia told me that he had been pulled over, and they

02:51PM  24  raided his house.

02:51PM  25  Q.  And how about Mr. Sinatra?  How did you learn about that?

02:51PM  1   A.  I just heard about that.  I just heard.  It was just --

02:52PM  2   conversation.  It was brought up.  I don't recall who said

02:52PM  3   it.

02:52PM  4   Q.  After you learned that both Anthony Gerace and Michael

02:52PM  5   Sinatra's house had been searched by law enforcement, did you

02:52PM  6   have an occasion to speak with the defendant about the fact

02:52PM  7   that their houses were searched?

02:52PM  8   A.  Yes.

02:52PM  9   Q.  What was his general demeanor about the fact that their

02:52PM  10  houses were searched?

02:52PM  11  A.  Not -- I mean, he knew -- he knew them both, obviously.

02:52PM  12  Q.  Did he say anything about Sinatra?

02:52PM  13  A.  He told me that Mike had done some landscaping for him.

02:52PM  14  He did some work for him.  Told me what he had got arrested

02:52PM  15  for, I believe, cocaine possession.

02:52PM  16  Q.  Do you recall whether or not the defendant expressed to

02:52PM  17  you any concerns about the fact that Sinatra's house was

02:53PM  18  raided?

02:53PM  19  A.  I don't recall.

02:53PM  20  Q.  I'm going to try to show you something to see if I can

02:53PM  21  refresh your recollection.  Okay?

02:53PM  22  A.  Okay.  Thank you.

02:53PM  23          **MR. TRIPI:**  For the record, I'm going to be showing

02:53PM  24  him Exhibit 3540N at page 107.  N as in Nancy.  Thank you.

        25

02:54PM    1    **BY MR. TRIPI:**

02:54PM    2    Q.  I'm going to ask you to read page 107 and 108, up to line

02:54PM    3    16.  I'll make a little mark at the end there, okay?

02:54PM    4    So 107, the whole page, and 108 up to page -- line 16,

02:54PM    5    please.  Okay?

02:54PM    6    A.  Okay.

02:54PM    7    Q.  Read that to yourself, and when you're done, look up.

02:54PM    8    Will you move those bottles of water so I don't knock

02:55PM    9    them over?  Thank you.

02:55PM    10   Actually can you please read all the way through

02:55PM    11   page 110?  Sorry, it's four pages.

02:58PM    12   Did you read pages 107 to 110 there?

02:58PM    13   A.  Yes.

02:58PM    14   Q.  Did you read page 107, 108, 109, and 110?

02:58PM    15   A.  Yes.

02:58PM    16   Q.  Does that refresh your recollection?

02:58PM    17   A.  Yes.

02:58PM    18   Q.  What did the defendant say about the fact that Mike

02:59PM    19   Sinatra's house was raided?

02:59PM    20   A.  He was concerned, if anything could get tied back to him.

02:59PM    21   I guess Mike had cash in his house, he had $40,000 in cash,

02:59PM    22   as well as drugs.  And he had just done work for him on his

02:59PM    23   house.

02:59PM    24   Q.  What did the defendant say about Anthony Gerace's

02:59PM    25   situation?

02:59PM    1    A.  He was worried about Anthony because of -- if anything

02:59PM    2    can come back to him, his relationship with Peter.  He was

02:59PM    3    concerned about that, as well.

02:59PM    4    Q.  What do you mean if anything could come back to him?

02:59PM    5    A.  They would question, like, things would come up with his

02:59PM    6    relationship with Peter.  Because he had stepped in before

02:59PM    7    and helped Anthony.

02:59PM    8    Q.  The month of those searches, Sinatra and Gerace's

03:00PM    9    searches, did he talk to you more about retiring?

03:00PM    10   A.  He did, yes.

03:00PM    11   Q.  Was he in fact getting set to retire?

03:00PM    12   A.  He was.

03:00PM    13   Q.  At that point, did he have another job lined up?

03:00PM    14   A.  No, he was just going to take retirement.

03:00PM    15   Q.  In discussing those searches, do you believe the

03:00PM    16   defendant was becoming stressed?

03:00PM    17   A.  Yes.

03:00PM    18   Q.  Were you becoming stressed?

03:00PM    19   A.  Yes.

03:00PM    20   Q.  Why were you becoming stressed?

03:00PM    21   A.  Because the whole organization was about to be exposed.

03:00PM    22   That's how it seemed.

03:00PM    23   Q.  Did it make you nervous?

03:00PM    24   A.  It did.

03:00PM    25   Q.  By January of 2019, had you started your job as a sheriff

03:00PM   1   yet?

03:00PM   2   A.   No.

03:00PM   3   Q.   Where were you in that application process?

03:01PM   4   A.   I was waiting to start the academy.   The academy started

03:01PM   5   in March of 2019.

03:01PM   6   Q.   So you knew you were accepted and you were gonna be

03:01PM   7   starting that job?

03:01PM   8   A.   Yes.

03:01PM   9   Q.   When the defendant did retire, did he tell you anything

03:01PM   10  about what he did with that DEA phone, that phone number that

03:01PM   11  you had that we saw earlier, 818-0966?

03:01PM   12  A.   I believe he cancelled it.

03:01PM   13  Q.   Did he get a new phone number?

03:01PM   14  A.   Yes, he did.

03:01PM   15  Q.   Did you get that new phone number?

03:01PM   16  A.   I did.

03:01PM   17  Q.   But for years, your communication with him had been on

03:01PM   18  that DEA phone number we saw earlier?

03:01PM   19  A.   Yes, on that phone number.

03:01PM   20  Q.   When you were start -- when you were going into the

03:02PM   21  academy to start your job, did that involve some scholastic

03:02PM   22  training as well?

03:02PM   23  A.   It did, yes, sir.

03:02PM   24  Q.   Were there times when you would go over to the

03:02PM   25  defendant's house and did he help you study?

03:02PM    1   A.  He did, yes.  Went through different techniques.

03:02PM    2   Q.  Would you and him be alone at his house during those

03:02PM    3   times?

03:02PM    4   A.  Yes.

03:02PM    5   Q.  Did that also provide you with an opportunity to discuss

03:02PM    6   these situations?

03:02PM    7   A.  Yes.

03:02PM    8   Q.  Fast forwarding --

03:02PM    9           **MR. TRIPI:**  Let's pull up Exhibit 109AA, which is in

03:02PM   10   evidence again.

03:02PM   11           **BY MR. TRIPI:**

03:02PM   12   Q.  Earlier you said this was a picture from when you

03:02PM   13   graduated the academy?

03:02PM   14   A.  Yes.

03:02PM   15   Q.  What month was that in 2019?

03:03PM   16   A.  I believe that was May of -- May --

03:03PM   17   Q.  Okay.

03:03PM   18   A.  -- 2019.

03:03PM   19   Q.  About a month or so later, on June 6th, 2019, did you

03:03PM   20   learn the defendant's house at 85 Alder Place was searched by

03:03PM   21   members of federal law enforcement?

03:03PM   22   A.  Yes.

03:03PM   23   Q.  Where were you when you learned it?

03:03PM   24   A.  I was actually home.  I had heard it.  Was in --

03:03PM   25   Q.  Let me ask a question.  Who did you hear it from first?

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

155

03:03PM  1    A.  Masecchia.

03:03PM  2    Q.  Did you also hear it from your girlfriend?

03:03PM  3    A.  And from Kim, yeah, at the time.  Yes, sir.

03:03PM  4    Q.  What's her name?

03:03PM  5    A.  Her name at the time was Kim Mecca.

03:03PM  6    Q.  How did it make you feel when you learned that the

03:04PM  7    defendant's house had been raided?

03:04PM  8    A.  Uncomfortable.  Nervous.

03:04PM  9    Q.  What did you do when you found out?

03:04PM  10   A.  I couldn't do anything.  I mean, just -- tried to go

03:04PM  11   about my life.  You know, start this job as a sheriff and lay

03:04PM  12   low.  I mean, just go forward.

03:04PM  13   Q.  What did you think the search of defendant's house was

03:04PM  14   about?

03:04PM  15   A.  Related to what was going on.  I mean, in the back of

03:04PM  16   my --

03:04PM  17   Q.  This situation that you're testifying about?

03:04PM  18   A.  This situation, yes.  The organization that we had.  So I

03:04PM  19   assumed it was regarding that.  It made me very uneasy.

03:04PM  20   Q.  In the aftermath of the defendant's house being searched,

03:04PM  21   was he readily accessible to you?

03:04PM  22   A.  No.

03:04PM  23   Q.  Was he laying low?

03:04PM  24   A.  Yes.

03:04PM  25   Q.  Was he screening his calls?

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24
156

| | | |
|---|---|---|
| 03:05PM | 1 | A.  I believe so, yes. |
| 03:05PM | 2 | Q.  What happened to the phone number that you had for him? |
| 03:05PM | 3 | A.  It got turned in.  Disconnected. |
| 03:05PM | 4 | Q.  Eventually, how did you try to get ahold of him? |
| 03:05PM | 5 | A.  Believe I stopped over, I reached out to his wife. |
| 03:05PM | 6 | Q.  So you had a number for Lindsay? |
| 03:05PM | 7 | A.  Yes, I sent her a text. |
| 03:05PM | 8 | Q.  And that window of time, when the defendant was laying |
| 03:05PM | 9 | low, did you speak to Masecchia? |
| 03:05PM | 10 | A.  Yes. |
| 03:05PM | 11 | Q.  Did you discuss with Masecchia any concerns you had about |
| 03:05PM | 12 | whether the defendant might talk about you guys? |
| 03:05PM | 13 | A.  Yes.  It was a big concern.  We were both concerned.  So, |
| 03:06PM | 14 | we thought we would just lay low, just not communicate. |
| 03:06PM | 15 | Q.  After a while, did you and the defendant start to |
| 03:06PM | 16 | communicate again? |
| 03:06PM | 17 | A.  Yes. |
| 03:06PM | 18 | Q.  How did that transition from him not speaking or |
| 03:06PM | 19 | communicating to communicating with you again? |
| 03:06PM | 20 | A.  Once I got his number, I reached out to him. |
| 03:06PM | 21 | Q.  How did you get his number? |
| 03:06PM | 22 | A.  I believe he gave it to me. |
| 03:06PM | 23 | Q.  Did you stop over his house? |
| 03:06PM | 24 | A.  I stopped over his house, yes. |
| 03:06PM | 25 | Q.  So he gave it to you in person? |

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

03:06PM    1    A.  Yeah, in person, I had to stop over at his house to reach

03:06PM    2    out to him.

03:06PM    3    Q.  After the search warrant at the defendant's house, did

03:06PM    4    you have a couple of in-person meetings with him?

03:07PM    5    A.  A few, yes.

03:07PM    6    Q.  Was one of them at his house?

03:07PM    7    A.  Yes.

03:07PM    8    Q.  After that, did you have another meeting where you walked

03:07PM    9    near Delaware Park?

03:07PM   10    A.  Yes.

03:07PM   11    Q.  Okay.  I want to focus first on when you stopped over his

03:07PM   12    house, okay?

03:07PM   13        When you stopped over, where did you -- did you go into

03:07PM   14    the house?  Or did you stay outside?  How did that work?

03:07PM   15    A.  We were actually talking in front of the house.  I

03:07PM   16    knocked on the door, and then we went in the backyard, both

03:07PM   17    inside and outside.

03:07PM   18    Q.  What was your discussion when you stopped over the

03:07PM   19    defendant's house?

03:07PM   20    A.  See what was going on.  How he's doing.  Feel him out.

03:07PM   21    What the temperature was.  We haven't really been

03:07PM   22    communicating.

03:07PM   23    Q.  So what did you say?

03:07PM   24    A.  I asked him what happened.

03:07PM   25    Q.  And when you asked what happened, were you referencing

03:08PM 1    the search of his house?

03:08PM 2    A.   Yes.

03:08PM 3    Q.   What did the defendant tell you?

03:08PM 4    A.   He didn't tell me a lot.  He said that they came in, they

03:08PM 5    knocked his door down, they confiscated computers and stuff

03:08PM 6    from his house, and he was real vague about it.

03:08PM 7    Q.   Did he express any concerns about Ron Serio at that

03:08PM 8    point?

03:08PM 9    A.   Yes.

03:08PM 10   Q.   What did he say?

03:08PM 11   A.   He was worried about if they were going to tie him into

03:08PM 12   Ron somehow.  Even though they never officially met.  It was

03:08PM 13   all through Masecchia.

03:08PM 14   Q.   Did the defendant give you any reminders during that

03:08PM 15   conversation?

03:08PM 16   A.   Yes.  If I was to be reached out by law enforcement, to

03:08PM 17   reach out to him.  He would prep me on any interview

03:08PM 18   techniques.  Remember, say you were my CI at the time.  That

03:09PM 19   type thing.

03:09PM 20   Q.   So was that basically going over the cover story that you

03:09PM 21   had?

03:09PM 22   A.   Exactly, yes.

03:09PM 23   Q.   After that, somewhere near later in July, did you and the

03:09PM 24   defendant meet up and walk near Delaware Park?

03:09PM 25   A.   Yes.

03:09PM    1    Q.   And that's a -- that's a park in the City of Buffalo?

03:09PM    2    A.   Yes.

03:09PM    3    Q.   Why did you meet up with the defendant in that area?

03:09PM    4    A.   I ran -- I was driving down the street, and he pulled up

03:09PM    5    alongside me.  He says follow me, let's go for a walk.

03:09PM    6    That's what we did, that's where we met.  We went to Delaware

03:09PM    7    Park.

03:09PM    8    Q.   During that walk, did the defendant express concerns

03:10PM    9    about Anthony Gerace and/or Ron Serio?

03:10PM   10    A.   Yes.

03:10PM   11    Q.   What did he say to you?

03:10PM   12    A.   If it was gonna come back to him, Anthony Gerace, he had

03:10PM   13    been arrested.  He had reached out and helped Anthony.

03:10PM   14    Anthony was a part of this organization with Ron.  He was

03:10PM   15    worried about any tie back from Ron to him.  So he was

03:10PM   16    concerned.

03:10PM   17    Q.   What were you saying to the defendant?

03:10PM   18    A.   I was concerned, too.  I didn't -- I didn't have the

03:10PM   19    answer, because I didn't know how it was gonna play out.  I

03:10PM   20    was very concerned.

03:10PM   21           **MR. TRIPI:**  Just a moment, please, Your Honor.

03:11PM   22           **BY MR. TRIPI:**

03:11PM   23    Q.   Now Mr. Selva, about a month or so later, we've talked

03:11PM   24    about it a few times, August 23rd, 2019, was your house

03:11PM   25    raided?

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

160

03:11PM   1   A.  It was.

03:11PM   2   Q.  And did you learn the law enforcement agency had

03:11PM   3   conducted the search of your residence?

03:11PM   4   A.  I did.

03:11PM   5   Q.  What agency was that?

03:11PM   6   A.  Homeland Security.

03:12PM   7   Q.  And I'm going to ask you more about that day in a moment.

03:12PM   8   But on that day, did you give Special Agent Marilyn Halliday

03:12PM   9   of the Department of Homeland Security your cell phone, and

03:12PM  10   did you give her consent to search your phone?

03:12PM  11   A.  I did.

03:12PM  12   Q.  And have you reviewed the data that's been extracted from

03:12PM  13   your phone to verify that it's the contents of your cell

03:12PM  14   phone?

03:12PM  15   A.  It was, yes.

03:12PM  16   Q.  I'm going to hand you first Government Exhibit 208.

03:12PM  17   A.  Okay.

03:12PM  18   Q.  Have you reviewed the contents of that flash drive prior

03:12PM  19   to today?

03:12PM  20   A.  Yes.

03:13PM  21   Q.  And did you initial that, back of that flash drive there?

03:13PM  22   A.  I did.

03:13PM  23   Q.  And in reviewing the contents, did you verify that was

03:13PM  24   the data that was on your cell phone?

03:13PM  25   A.  Yes.

03:13PM     1    Q.  Contacts, messages, things of that nature?

03:13PM     2    A.  Yes.

03:13PM     3    Q.  Was everything fair and accurate for what you had on your

03:13PM     4    phone?

03:13PM     5    A.  It was.

03:13PM     6    Q.  And in fact, some of the evidence we've used in this

03:13PM     7    trial, like this was a picture that you took with your phone,

03:13PM     8    correct?

03:13PM     9    A.  Correct.

03:13PM    10    Q.  This exhibit, I've held up 109AB?

03:13PM    11    A.  Correct.

03:13PM    12    Q.  Right?  So is Exhibit 208 an authentic copy of what was

03:13PM    13    on your phone?

03:13PM    14    A.  Yes.

03:13PM    15    Q.  Next I'm going to hand you Exhibit 208C.  I'm going to

03:14PM    16    ask you to take a look at 208C, there's a CD and some paper

03:14PM    17    copies.  I'm going to ask you to look at that.  And then I'm

03:14PM    18    going to ask you some questions about that, okay?

03:14PM    19    A.  Okay.

03:14PM    20    Q.  Handing up Exhibit 208C.

03:14PM    21    A.  Do you want me to look through this?

03:14PM    22    Q.  You look through as much of it as you need to, and when

03:14PM    23    you're done you look up and then I'll ask some questions.

03:14PM    24    A.  Okay.

03:14PM    25    Q.  Is Exhibit 208C text messages between you and the

03:14PM   1    defendant that were extracted from your phone when the

03:15PM   2    defendant was using 716-818-0966?

03:15PM   3    A.  Yes.

03:15PM   4    Q.  Are they fair and accurate as it relates to the messages

03:15PM   5    that were still on your phone at the time you gave consent to

03:15PM   6    search?

03:15PM   7    A.  They were.

03:15PM   8           **MR. TRIPI:**  Judge, I'll offer 208C.

03:15PM   9           **MR. SINGER:**  No objection.

03:15PM   10          **THE COURT:**  Received without objection.

03:15PM   11          **(GOV Exhibit 208C was received in evidence.)**

03:15PM   12          **MR. TRIPI:**  Thank you.

03:15PM   13          **BY MR. TRIPI:**

03:15PM   14   Q.  I'm going to remove those from you and hand up Exhibit

03:15PM   15   208D.  I want you to do the same thing, look at it and then

03:15PM   16   I'll ask you some questions.

03:15PM   17          **THE COURT:**  What is this one, Mr. Tripi?

03:15PM   18          **MR. TRIPI:**  208D, as in dog, Your Honor.

03:15PM   19          **THE WITNESS:**  Okay.

03:15PM   20          **BY MR. TRIPI:**

03:15PM   21   Q.  Do you recognize 208D to be a portion of the contacts

03:16PM   22   that you had stored in your cell phone?

03:16PM   23   A.  Yes.

03:16PM   24   Q.  Are they fair and accurate contacts that you had stored

03:16PM   25   in your phone as of the time you gave consent to search your

03:16PM    1   phone?

03:16PM    2   A.  They are.

03:16PM    3           MR. TRIPI:  The government offers Exhibit 208D,

03:16PM    4   Your Honor.

03:16PM    5           MR. SINGER:  No objection.

03:16PM    6           THE COURT:  Received without objection.

03:16PM    7           **(GOV Exhibit 208D was received in evidence.)**

03:16PM    8           MR. TRIPI:  Thank you, Your Honor.  Counsel.

03:16PM    9           **BY MR. TRIPI:**

03:16PM   10   Q.  Next I'm going to hand you up Exhibit 208E.  Do you

03:16PM   11   recognize 208E to be thumbnails of images you had stored on

03:17PM   12   your phone?

03:17PM   13   A.  Yes.

03:17PM   14   Q.  Are they fair and accurate depictions of images you had

03:17PM   15   stored on your phone?

03:17PM   16   A.  They are.

03:17PM   17           **MR. TRIPI:**  One moment, please.

03:17PM   18           **BY MR. TRIPI:**

03:17PM   19   Q.  Next I'm going to hand up 208E-1, 2, 3, 9, 10, 13, 14.

03:18PM   20   So just give me a moment to do that.  Handing those exhibits

03:18PM   21   I've just announced up.  Can you flip through those, please.

03:18PM   22       Do you recognize Exhibits 208E-1, 2, 3, 9, 10, 13, and

03:19PM   23   14?

03:19PM   24   A.  I do.

03:19PM   25   Q.  Are those images that were some of the images that were

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

164

03:19PM    1    contained on your phone?

03:19PM    2    A.   Yes.

03:19PM    3    Q.   And are some of those, actually, duplicates of photos

03:19PM    4    we've already put into evidence?

03:19PM    5    A.   They are.

03:19PM    6    Q.   Do they fairly and accurately depict photos that were on

03:19PM    7    your phone at the time you consented to search?

03:19PM    8    A.   They do.

03:19PM    9        **MR. TRIPI:**  The government offers 208E-1, 2, 3, 9,

03:19PM   10    10, 13, and 14, Your Honor.

03:19PM   11        **MR. SINGER:**  No objection to that series.

03:19PM   12        **THE COURT:**  Received without objection.

03:19PM   13        **MR. TRIPI:**  Thank you, Your Honor.

03:19PM   14        **(GOV Exhibit 208E-1, 2, 3, 9, 10, 13, 14 were**

03:19PM   15                    **received in evidence.)**

03:19PM   16        **BY MR. TRIPI:**

03:19PM   17    Q.   Okay.  Before I go any further, I want to ask you some

03:19PM   18    questions about some of the exhibits that we've put into

03:19PM   19    evidence.  So I'm going to circle back to 208C for a moment,

03:19PM   20    which is in evidence.

03:19PM   21        **MR. TRIPI:**  I'm going to ask you to pull that up,

03:19PM   22    Ms. Champoux.

03:20PM   23        **THE COURT:**  208C?

03:20PM   24        **MR. TRIPI:**  208C.

03:20PM   25        **THE COURT:**  I don't think that's in.

03:20PM   1          **MR. TRIPI:**  That was the first one in the series.

03:20PM   2          **MR. SINGER:**  Yeah, that's in, Judge.

03:20PM   3          **THE COURT:**  It is?

03:20PM   4          **MR. TRIPI:**  Yeah.  C, D, and E are of this series.

03:20PM   5   Thank you, Your Honor.

03:20PM   6          Can we blow up the first page a little bit more,

03:20PM   7   Ms. Champoux?

03:20PM   8          **THE CLERK:**  Do you want the jury to see this.

03:20PM   9          **MR. TRIPI:**  Oh, yes, please.

03:20PM  10          **THE CLERK:**  Okay.

03:20PM  11          **MR. TRIPI:**  Thank you.

03:20PM  12          **BY MR. TRIPI:**

03:20PM  13   Q.  Now, Mr. Selva, your phone number was 903-1654; is that

03:20PM  14   right?

03:20PM  15   A.  It was, yes.

03:20PM  16   Q.  And this particular exhibit are some texts that you had

03:20PM  17   with the defendant when he had a DEA work phone?

03:20PM  18   A.  Yes.

03:20PM  19   Q.  And can you just read the first blue bubble text there?

03:20PM  20   Is that from the defendant to you?

03:20PM  21   A.  Yes.  It says, Bro, what are you guys doing on Wednesday

03:20PM  22   night?

03:20PM  23   Q.  And did you respond?

03:21PM  24   A.  Yep.  No plans.  What are you doing?

03:21PM  25   Q.  And did the defendant respond?

03:21PM    1    A.  We're going out for drinks maybe to casino, Vic and

03:21PM    2    Stephanie are in.

03:21PM    3    Q.  So is this basically November 19th --

03:21PM    4    A.  Yes.

03:21PM    5    Q.  -- 2018?

03:21PM    6    A.  Yes.

03:21PM    7    Q.  Is this an example of just some of the ways that you and

03:21PM    8    the defendant would make social arrangements?

03:21PM    9    A.  Yes.

03:21PM    10    Q.  Okay.

03:21PM    11    **MR. TRIPI:**  Ms. Champoux, can we go to the second

03:21PM    12    page for a moment?

03:21PM    13    **BY MR. TRIPI:**

03:21PM    14    Q.  Again, when you would text, would you ever text any

03:21PM    15    conspiracy business?

03:21PM    16    A.  No.

03:21PM    17    Q.  Okay.  So when you're texting with the defendant, these

03:21PM    18    are social texts?

03:21PM    19    A.  They are.

03:21PM    20    **MR. TRIPI:**  Can we just scroll through briefly

03:21PM    21    page 3?

03:22PM    22    **BY MR. TRIPI:**

03:22PM    23    Q.  For example, when there would be a holiday, like

03:22PM    24    Thanksgiving, would you and the defendant reach out to one

03:22PM    25    another?

03:22PM    1   A.  Yeah.  Exchange a holiday gesture.  Wishing each other

03:22PM    2   happy holiday.

03:22PM    3   Q.  On page 3 here, I've made a blue box, does that

03:22PM    4   encapsulate the defendant wishing you a Happy Thanksgiving

03:22PM    5   and you responding?

03:22PM    6   A.  It does, yes.

03:22PM    7   Q.  Did you and the defendant refer to one other as brother

03:22PM    8   at times?

03:22PM    9   A.  Yes.

03:22PM   10   Q.  Can you read the text that I've boxed on the bottom of

03:22PM   11   page 3?  Is that you responding to the defendant?

03:22PM   12   A.  Yes.  It says happy birthday -- or, excuse me, happy

03:23PM   13   Thanksgiving, Bro.  Love you, brother.

03:23PM   14        **MR. TRIPI:**  Let's go to page 4.

03:23PM   15        **BY MR. TRIPI:**

03:23PM   16   Q.  Again, examples of social texts between the two of you?

03:23PM   17   A.  Yes.

03:23PM   18   Q.  Okay.  Updating each other about one another's life?

03:23PM   19   A.  Exactly, yes.

03:23PM   20   Q.  Okay.

03:23PM   21        **MR. TRIPI:**  We can take that one down, Ms. Champoux.

03:23PM   22   I'd like to go to the 208E series.  We've seen some of these,

03:23PM   23   but can we just pull up 208E-1.

03:23PM   24        **BY MR. TRIPI:**

03:23PM   25   Q.  That's the same photo we've seen already, correct?

| | | |
|---|---|---|
| 03:23PM | 1 | A.  Correct. |
| 03:23PM | 2 | Q.  It's also 109AA; is that right? |
| 03:24PM | 3 | A.  Correct. |
| 03:24PM | 4 | Q.  And that photo, 208E-1 is from your graduation from the |
| 03:24PM | 5 | Sheriff's Office -- |
| 03:24PM | 6 | A.  Yes. |
| 03:24PM | 7 | Q.  -- academy? |
| 03:24PM | 8 | A.  Yes. |
| 03:24PM | 9 | Q.  Let's go to 208E-2.  Again these are all photos that were |
| 03:24PM | 10 | on your phone, correct? |
| 03:24PM | 11 | A.  Correct. |
| 03:24PM | 12 | Q.  And when is this picture from? |
| 03:24PM | 13 | A.  That's from Cabo San Lucas at Joe's wedding. |
| 03:24PM | 14 | Q.  Now you were the best man, right? |
| 03:24PM | 15 | A.  Yes. |
| 03:24PM | 16 | Q.  Did the defendant buy you your suit? |
| 03:24PM | 17 | A.  Yes. |
| 03:24PM | 18 | Q.  From where? |
| 03:24PM | 19 | A.  Napoli's. |
| 03:24PM | 20 | **MR. TRIPI:**  Let's go to 208E-3. |
| 03:24PM | 21 | **BY MR. TRIPI:** |
| 03:24PM | 22 | Q.  This is actually a photo that we showed, we looked at |
| 03:24PM | 23 | earlier, that you tweeted it out, correct? |
| 03:24PM | 24 | A.  Yes. |
| 03:25PM | 25 | Q.  And this is also from that booze cruise during the |

03:25PM     1    wedding?

03:25PM     2    A.  I believe so, yes.

03:25PM     3    Q.  And I guess for record purposes, that's you and the

03:25PM     4    defendant in the photo?

03:25PM     5    A.  Yes.

03:25PM     6          MR. TRIPI:  Let's go to 208E-10.

03:25PM     7          BY MR. TRIPI:

03:25PM     8    Q.  Now we haven't seen this photo yet during your testimony,

03:25PM     9    correct?

03:25PM    10    A.  Correct.

03:25PM    11    Q.  Is that you in the middle?

03:25PM    12    A.  Yes.

03:25PM    13    Q.  Is that the defendant with you to the left of the

03:25PM    14    picture?

03:25PM    15    A.  Yes.

03:25PM    16    Q.  Again, is the defendant someone that when you would go

03:25PM    17    out and socialize you were with frequently?

03:25PM    18    A.  Yes.  From time to time, yes.

03:25PM    19    Q.  Was he your best friend?

03:25PM    20    A.  Yes.

03:25PM    21          MR. TRIPI:  Let's go to -- can we split the screen

03:25PM    22    with 208E-14?

03:26PM    23          MR. COOPER:  14.

03:26PM    24          MR. TRIPI:  14.  208E-14, please.

           25

03:26PM   1              BY MR. TRIPI:

03:26PM   2    Q.  Again, are those basically pictures of you with the

03:26PM   3    defendant in bars?

03:26PM   4    A.  Yes.

03:26PM   5              MR. TRIPI:  Let's go to 208E-13.

03:26PM   6              BY MR. TRIPI:

03:26PM   7    Q.  Again, that's the same picture that we saw earlier,

03:26PM   8    that's already in evidence as 109AB, you took that photo from

03:26PM   9    your phone, correct?

03:26PM  10    A.  Correct.

03:26PM  11              MR. TRIPI:  We can take that down, Ms. Champoux.

03:27PM  12              If we can pull up exhibit 208D which is in evidence.

03:27PM  13              BY MR. TRIPI:

03:27PM  14    Q.  This is the contact, a portion of the contacts you had

03:27PM  15    stored in your phone; is that right?

03:27PM  16    A.  Correct.

03:27PM  17              MR. TRIPI:  Ms. Champoux, can we highlight maybe the

03:27PM  18    first three.  Or zoom in, I should say, zoom in.

03:27PM  19              BY MR. TRIPI:

03:27PM  20    Q.  First contact you have in your phone there is

03:27PM  21    number 716-799-7724 with the name Anthony Gerace?

03:27PM  22    A.  Correct.

03:27PM  23    Q.  Is that the Anthony Gerace we've been discussing?

03:27PM  24    A.  It is.

03:27PM  25    Q.  Contact number 2 you have in your phone, there is a guy

03:27PM    1    named Baby Joe.  Who is that?

03:27PM    2    A.  It's Baby Joe Mesi.  He's a friend of mine.

03:27PM    3    Q.  A former pro boxer in this area?

03:27PM    4    A.  Yes.

03:27PM    5    Q.  Is that someone the defendant knew as well?

03:27PM    6    A.  Yes.

03:27PM    7    Q.  Number 3 contact you have there, is a number 812-0664,

03:28PM    8    you have under the name Gorilla Ape Boy.  Who's that?

03:28PM    9    A.  That was Mike Masecchia's nickname, Gorilla, because he

03:28PM   10    was a big tough guy.

03:28PM   11    Q.  So my question is, is that Mike Masecchia?

03:28PM   12    A.  That's his number, yes.

03:28PM   13         **MR. TRIPI:**  All right.  Can we please highlight 4

03:28PM   14    through 8, please.  Or 7, sorry.  4 through 7 is fine.  All

03:28PM   15    right.

03:28PM   16         **BY MR. TRIPI:**

03:28PM   17    Q.  Contact number 4, you have Gorilla new number.  Is that a

03:28PM   18    different phone number you had for Mike Masecchia?

03:28PM   19    A.  It was.

03:28PM   20    Q.  And then contact 5 is Grover Gorilla.  What is that

03:28PM   21    contact?

03:28PM   22    A.  That was his work number at Grover.  He was a teacher at

03:28PM   23    Grover Cleveland.

03:28PM   24    Q.  Mike Masecchia?

03:28PM   25    A.  Yes.

| | | |
|---|---|---|
| 03:28PM | 1 | Q.  Grover Cleveland High School is a high school, right? |
| 03:29PM | 2 | A.  It's a high school on the West Side of Buffalo. |
| 03:29PM | 3 | Q.  Contact number 6 is Joe Bella.  Who's that? |
| 03:29PM | 4 | A.  He was an acquaintance, a friend, friend of mine. |
| 03:29PM | 5 | Q.  Is that someone the defendant also knew? |
| 03:29PM | 6 | A.  I believe so, yes. |
| 03:29PM | 7 | **MR. TRIPI:**  Let's go down to the next page.  I don't |
| 03:29PM | 8 | need that portion.  Let's go down to 9 -- 8 through 11, |
| 03:29PM | 9 | please. |
| 03:29PM | 10 | **BY MR. TRIPI:** |
| 03:29PM | 11 | Q.  All right.  Contact number 8.  Who's Joe Bong? |
| 03:29PM | 12 | A.  That's the defendant. |
| 03:29PM | 13 | Q.  And you had how many different phone numbers stored |
| 03:29PM | 14 | there? |
| 03:29PM | 15 | A.  Two. |
| 03:29PM | 16 | Q.  Is one of the numbers that he had before his search |
| 03:30PM | 17 | warrant, and another number he had after the search of his |
| 03:30PM | 18 | house? |
| 03:30PM | 19 | A.  I believe so, yes. |
| 03:30PM | 20 | Q.  Contact number 9.  Who is Krista Masecchia? |
| 03:30PM | 21 | A.  That was Mike Masecchia's wife. |
| 03:30PM | 22 | Q.  Contact number 10.  Who is that? |
| 03:30PM | 23 | A.  That was the defendant's wife. |
| 03:30PM | 24 | Q.  Lindsay? |
| 03:30PM | 25 | A.  Yes. |

03:30PM 1   Q.  Contact number 11.  Who's that?

03:30PM 2   A.  He was a friend of the girl I used to go out with, Lillo

03:30PM 3   Brancato.  He's --

03:30PM 4   Q.  Who's the girl?

03:30PM 5   A.  Kim Mecca.  They were close, and I became pretty good

03:30PM 6   friends with him through her.

03:30PM 7   Q.  Is that the person who acted in the movie Bronx Tale

03:30PM 8   and --

03:30PM 9   A.  Yes, he's an actor.  He's been in quite a few movies.

03:30PM 10  Q.  Was he in the TV show Soprano's?

03:30PM 11  A.  He was, yes.

03:30PM 12  Q.  Was he also friendly with Peter Gerace if you know?

03:30PM 13  A.  Yes, very, very good friends.

03:31PM 14          **MR. TRIPI:**  Okay.  Let's go to contact number 12

03:31PM 15  through -- let's say 14, please.

03:31PM 16          **THE COURT:**  Oh, okay.  The jurors need a, what do we

03:31PM 17  call them?  Comfort breaks.  So we will take a short break.

03:31PM 18  We'll be back in about ten minutes.

03:31PM 19          Remember my instructions, don't talk to each other

03:31PM 20  and don't make up your minds, see you in a few minutes.

03:31PM 21          (Jury excused at 3:31 p.m.)

03:31PM 22          **THE COURT:**  Okay.  Anything for the record?

03:32PM 23          **MR. SINGER:**  For the record, it's a health and

03:32PM 24  comfort break.

03:32PM 25          **THE COURT:**  Health and comfort break?

03:32PM    1                 **MR. SINGER:**  It's a military term.

03:32PM    2                 **THE COURT:**  Okay.

03:32PM    3                 **MR. SINGER:**  That means I gotta pee.

03:32PM    4                 **THE COURT:**  Yeah, I had never heard that expression.

03:32PM    5      It was in a trial, wasn't it?  Yeah, that one of the lawyers

03:32PM    6      asked for a comfort break.

03:32PM    7                 Anything from the government?

03:32PM    8                 **MR. TRIPI:**  No, Your Honor.

03:32PM    9                 **THE COURT:**  Okay.  See you in a few minutes.

03:32PM    10                (Off the record at 3:32 p.m.)

03:43PM    11                (Back on the record at 3:43 p.m.)

03:43PM    12                (Jury not present.)

03:43PM    13                **THE CLERK:**  All rise.

03:43PM    14                **THE COURT:**  Please be seated.

03:43PM    15                **THE CLERK:**  We are back on the record for the

03:43PM    16     continuation of the jury trial in United States of America

03:43PM    17     Joseph Bongiovanni, 19-CR-227.

03:43PM    18                All counsel and parties are present.

03:43PM    19                **THE COURT:**  So Ann reminded me that the term I just

03:43PM    20     learned during the trial was "bio break."

03:43PM    21                **MR. TRIPI:**  Oh.

03:43PM    22                **THE COURT:**  It was bio break.  The comfort break, I

03:43PM    23     now remember, I learned on a trip to Ireland --

03:43PM    24                **MR. TRIPI:**  Okay.

03:43PM    25                **THE COURT:**  -- when we were on the bus and the bus

03:43PM     1    driver said we were taking comfort breaks.

03:43PM     2          **MR. TRIPI:**  I think comfort, I like that one better.

03:43PM     3          **THE COURT:**  So, correct the record.

03:43PM     4          Anything we need to put on the record before we

03:44PM     5    resume?

03:44PM     6          **MR. TRIPI:**  No, Your Honor.

03:44PM     7          **THE COURT:**  You're gonna finish today, right?

03:44PM     8          **MR. TRIPI:**  Oh, yeah.  I have eight pages to go,

03:44PM     9    we're just in a slow part right here.

03:44PM    10          **THE COURT:**  Okay.  Anything for the record?

03:44PM    11          **MR. SINGER:**  I -- I believe bio, bio break is a bad

03:44PM    12    term, it's an Air Force term.  So I just like the Navy term

03:44PM    13    better.

03:44PM    14          **THE COURT:**  Okay.  As I say, I had never heard the

03:44PM    15    term "bio break" until a trial a couple months ago, so --

03:44PM    16          Okay.  Let's bring them in, please, Pat.

03:44PM    17          What do the Marines say?  That is the question.

03:44PM    18          **MR. SINGER:**  They're a whole 'nother animal.  They

03:44PM    19    say UGH.

03:44PM    20          **MR. TRIPI:**  They pretend they don't take breaks,

03:44PM    21    right, Rob?

03:45PM    22          (Jury seated at 3:45 p.m.)

03:45PM    23          **THE COURT:**  The record will reflect that all our

03:45PM    24    jurors, again, are present.

03:45PM    25          I remind the witness he's still under oath.

03:45PM   1          Mr. Tripi, you may continue.

03:45PM   2          **MR. TRIPI:**  Thank you, Your Honor.

03:45PM   3          **BY MR. TRIPI:**

03:45PM   4   Q.  Mr. Selva, I'm going to direct your attention to contact

03:45PM   5   number 12, that name Mike Buttitta?

03:45PM   6   A.  Yes.

03:45PM   7   Q.  That's a name that you've talked about earlier today, you

03:45PM   8   saw some phone records related to that person earlier; do you

03:45PM   9   remember that?

03:45PM  10   A.  Yes.

03:45PM  11   Q.  And who is Mike Buttitta in the context of the

03:45PM  12   organization?

03:45PM  13   A.  He was one of Ron's closest friends.

03:45PM  14   Q.  Was he a distributor?

03:45PM  15   A.  I believe so, yes.

03:45PM  16   Q.  And contact 13, is that another number you had for Mike

03:45PM  17   Masecchia?

03:45PM  18   A.  Yes.  I believe that was his actual home number, it was a

03:46PM  19   landline phone.

03:46PM  20   Q.  Is that about the fourth phone number you had in your

03:46PM  21   phone?

03:46PM  22   A.  Yeah.  They were always changing.  And I put them under

03:46PM  23   different references.

03:46PM  24   Q.  Contact number 14 is a name Mike Sinatra with a phone

03:46PM  25   number.  Do you see that?

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

177

03:46PM   1   A.  Yes.

03:46PM   2   Q.  Is that the same Michael Sinatra that we've been

03:46PM   3   referencing in your discussions with the defendant?

03:46PM   4   A.  I believe so, yes.

03:46PM   5   Q.  You believe so, or you know?

03:46PM   6   A.  It is.

03:46PM   7   Q.  Okay.  Let's go to contact 15 through 18.  There's a name

03:46PM   8   there Peter Gerace with a phone number 716-725-1931.

03:46PM   9   A.  Yes.

03:46PM   10  Q.  Is that the owner of Pharaoh's you discussed earlier?

03:46PM   11  A.  It is.

03:46PM   12  Q.  Anthony Gerace's brother?

03:46PM   13  A.  It is.

03:46PM   14  Q.  And that's this defendant's friend?

03:46PM   15  A.  Yes.

03:46PM   16  Q.  And who's contact number 16 there?

03:46PM   17  A.  Ron Serio.

03:46PM   18  Q.  And, again, is that his main phone, or one of his burner

03:47PM   19  phones?

03:47PM   20  A.  That might have been his main phone.

03:47PM   21  Q.  Okay.  Below that is his brother Tom?

03:47PM   22  A.  Yes, his brother Tom.

03:47PM   23  Q.  And who is in contact position number 18?

03:47PM   24  A.  Wayne Anderson.

03:47PM   25           **MR. TRIPI:**  Let's go to number 19.  Let's highlight

03:47PM   1    maybe zoom in on 19 through 21.

03:47PM   2              BY MR. TRIPI:

03:47PM   3    Q.  Is number 19 another entry you had in your phone for

03:47PM   4    Wayne Anderson?

03:47PM   5    A.  Yes.

03:47PM   6    Q.  And contact number 20, who's that?

03:47PM   7    A.  Frank Parisi.

03:47PM   8    Q.  Is he someone who is also friends with the defendant?

03:47PM   9    A.  Yes.

03:47PM  10    Q.  Contact number 21, there's a name there, do you see that?

03:47PM  11    A.  Yes.

03:47PM  12    Q.  And who's that?

03:47PM  13    A.  Donnie Panepinto.

03:48PM  14    Q.  Is that person the brother of Dana Panepinto as you

03:48PM  15    talked about earlier?

03:48PM  16    A.  Yes.

03:48PM  17    Q.  That's the defendant's former girlfriend?

03:48PM  18    A.  Yes.

03:48PM  19    Q.  Is that the person whose father's nickname was Turtle?

03:48PM  20    A.  Yes.

03:48PM  21    Q.  You talked about him yesterday?

03:48PM  22    A.  I did, yes.

03:48PM  23              MR. TRIPI:  Let's highlight 22 and 23.

03:48PM  24              BY MR. TRIPI:

03:48PM  25    Q.  Now there's an entry there named Frank Tripi, correct?

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

179

03:48PM   1   A.  Yes.

03:48PM   2   Q.  No relation to mine?

03:48PM   3   A.  Correct.

03:48PM   4   Q.  Okay.  Was he another person who was associated with

03:48PM   5   Anthony Gerace, Ron Serio, and the defendant?

03:48PM   6   A.  Yes, he was a North Buffalo guy.  Yes.

03:48PM   7   Q.  And you have an organization Direct Mediators, what's

03:48PM   8   that?

03:48PM   9   A.  That might have been the business he had at the time.

03:48PM  10   Q.  Was that a debt collection agency?

03:48PM  11   A.  I believe so, yes.

03:48PM  12       **MR. TRIPI:**  Can we zoom out of that, Ms. Champoux?

03:49PM  13   Is that the last page?

03:49PM  14       **MS. CHAMPOUX:**  No.

03:49PM  15       **MR. TRIPI:**  Oops, we've got another page, sorry about

03:49PM  16   that.  Let's go to the next three contacts on the list.

03:49PM  17       **BY MR. TRIPI:**

03:49PM  18   Q.  All right.  Who is Maria Grisanti, do you know?

03:49PM  19   A.  Yes.  It's Mark Grisanti, who was a former senator, it's

03:49PM  20   his wife.

03:49PM  21       **MR. TRIPI:**  Okay.  And we can zoom out of that.

03:49PM  22   Let's go to 28 through 30, please.

03:49PM  23       **BY MR. TRIPI:**

03:49PM  24   Q.  Number 28, you have a name and a phone number for Nancy

03:49PM  25   Standish.  Who is that?

Case 1:19-cr-00227-LJV-MJR   Document 1178   Filed 09/07/24   Page 180 of 226
USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

180

03:49PM   1   A.  Just an old friend from knowing in the bar business.

03:49PM   2   Q.  Did she -- where does she bar-tend?

03:49PM   3   A.  God, she worked -- back in the day, maybe The Stuffed

03:50PM   4   Mushroom, then Crocodile Bar on Chippewa.  I forget.

03:50PM   5   Q.  And then contact 30, that's that Senator Grisanti you

03:50PM   6   were talking about earlier?

03:50PM   7   A.  Correct, yes.

03:50PM   8        MR. TRIPI:  Let's go to 31 to 33, if we can zoom in

03:50PM   9   on those.

03:50PM   10        BY MR. TRIPI:

03:50PM   11   Q.  31 is a person Skip Giambrone.  Who's that?

03:50PM   12   A.  He's a friend of mine that I've known, not a long time,

03:50PM   13   but I've known him.  He's just a friend.

03:50PM   14   Q.  Is that someone who knew Masecchia as well?

03:50PM   15   A.  He did.  He knew Masecchia and Ron.

03:50PM   16   Q.  And Mr. Serio?

03:50PM   17   A.  Yes.

03:50PM   18        MR. TRIPI:  And number 33, will you zoom in on 33 so

03:50PM   19   we can see it better?

03:50PM   20        BY MR. TRIPI:

03:50PM   21   Q.  And who is that?

03:50PM   22   A.  Thomas Napoli.

03:50PM   23   Q.  Is that a Facebook contact with a phone number?

03:50PM   24   A.  I believe so, yes.

03:50PM   25   Q.  Is that the person who was in the wedding party that we

03:51PM    1    looked at a picture earlier --

03:51PM    2    A.  Yes.

03:51PM    3    Q.  -- from your tweets?

03:51PM    4    A.  Yes.

03:51PM    5    Q.  Is that one of the people that you did cocaine with with

03:51PM    6    the defendant?

03:51PM    7    A.  Yes.

03:51PM    8         MR. TRIPI:  Let's go to 34, 35, and 36.

03:51PM    9         BY MR. TRIPI:

03:51PM   10    Q.  34 there, the number's cut off, but it's Bart cell.  Who

03:51PM   11    is Bart?

03:51PM   12    A.  He's deceased.  It's Bart Mazzara, Mike Masecchia's

03:51PM   13    brother-in-law.

03:51PM   14         MR. TRIPI:  Let's go to 36.

03:51PM   15         BY MR. TRIPI:

03:51PM   16    Q.  We have a number for Matt Suppa.  Is that the same Matt

03:51PM   17    Suppa we looked at?  His name and phone number earlier when

03:51PM   18    we looked at Exhibit 8A?

03:51PM   19    A.  Yes.

03:51PM   20    Q.  His brothers are Mark and John?

03:51PM   21    A.  They are.

03:51PM   22         MR. TRIPI:  Let's go to the next contact.  Let's look

03:51PM   23    at 38 and 39.

03:51PM   24         BY MR. TRIPI:

03:51PM   25    Q.  You've referenced a Joe Tomasello earlier in your

03:52PM    1    testimony as being part of the grow operation group; is that

03:52PM    2    right?

03:52PM    3    A.  Correct.

03:52PM    4    Q.  That's that same person in your contacts?

03:52PM    5    A.  It is.

03:52PM    6    Q.  Is that a person who knows the defendant as well?

03:52PM    7    A.  Yes.

03:52PM    8           MR. TRIPI:  Let's go to contact number 40.

03:52PM    9           That's it?  Okay.  Thank you.

03:52PM   10           BY MR. TRIPI:

03:52PM   11    Q.  I'd like to hand you up -- we have a few more to go

03:52PM   12    through, 208F, 208G.

03:52PM   13        Let's start with 208F, take a look at that.

03:52PM   14    A.  Okay.

03:52PM   15    Q.  Are those -- do you recognize those to be text messages

03:52PM   16    between you and the defendant subsequent to the search

03:52PM   17    warrant at his house after he was using phone number

03:53PM   18    716-416-1797?

03:53PM   19    A.  Yes.

03:53PM   20    Q.  Are those texts from the dates of August 19th and 20th,

03:53PM   21    2019?

03:53PM   22    A.  They are, yes.

03:53PM   23    Q.  Are they fair and accurate exchanges between you and the

03:53PM   24    defendant as they existed in your cell phone as of the date

03:53PM   25    it was extracted when you consented?

03:53PM   1    A.   They are.

03:53PM   2           **MR. TRIPI:**  The government offers 208F, Your Honor.

03:53PM   3           **MR. SINGER:**  No objection.

03:53PM   4           **THE COURT:**  Received without objection.

03:53PM   5           **(GOV Exhibit 208F was received in evidence.)**

03:53PM   6           **BY MR. TRIPI:**

03:53PM   7    Q.   I don't think we need to publish these, but basically are

03:53PM   8    these a couple days' worth of text messages where you're

03:53PM   9    talking to one another?

03:53PM  10    A.   That's exactly what they look like, yes.

03:53PM  11    Q.   Are you -- do you and the defendant reference each other

03:53PM  12    as brothers in these texts?

03:53PM  13    A.   In the texts, yes.

03:53PM  14    Q.   I'm going to hand you 208G next.  Do you recognize

03:54PM  15    Exhibit 208G?

03:54PM  16    A.   Yes.

03:54PM  17    Q.   Do you recognize that to be text messages between you and

03:54PM  18    the defendant using phone number 716-570-2784 from before --

03:54PM  19    from before when the defendant's house was searched?

03:54PM  20    A.   Yes.

03:54PM  21    Q.   Are they fair and accurate text messages between you and

03:54PM  22    the defendant as they existed in your cell phone when it was

03:54PM  23    extracted with him using that number?

03:54PM  24    A.   Yes.

03:54PM  25           **MR. TRIPI:**  The government offers 208G, Your Honor.

03:54PM  1        **MR. SINGER:**  No objection.

03:54PM  2        **THE COURT:**  Received without objection.

03:54PM  3        **(GOV Exhibit 208G was received in evidence.)**

03:54PM  4        **MR. TRIPI:**  Thank you, Your Honor.

03:55PM  5        I'd like to go through some of these text messages,

03:55PM  6  so can we pull up 208G, please.

03:55PM  7        **BY MR. TRIPI:**

03:55PM  8  Q.  Now earlier you testified when you were studying for --

03:55PM  9  for the academy, there were times when you would go over to

03:55PM  10  the defendant's house?

03:55PM  11  A.  Yes.  Sorry.

03:55PM  12  Q.  And you also indicated, I think, that during some of

03:55PM  13  those visits, you would talk about some of the matters that

03:55PM  14  you're testifying about?

03:55PM  15  A.  Yes.

03:55PM  16        **MR. TRIPI:**  I'm going to ask Ms. Champoux to zoom in

03:55PM  17  on row 27.

03:55PM  18        **BY MR. TRIPI:**

03:55PM  19  Q.  Do you see a text exchange between you and the defendant,

03:55PM  20  from the defendant to you on April 5th, 2019?

03:55PM  21  A.  Yes.

03:55PM  22  Q.  And what did the defendant write there?

03:55PM  23  A.  It's just come on over.  Come over at that time.  Bring

03:56PM  24  your study stuff.  Lindsay's working.

03:56PM  25  Q.  So on that date, were you and the defendant alone at the

03:56PM    1   defendant's house?

03:56PM    2   A.   Yes.

03:56PM    3   Q.   Was that a timeframe after he retired but before the

03:56PM    4   search of his house?

03:56PM    5   A.   Yes.

03:56PM    6          MR. TRIPI:   Could we look at row 38, please.

03:56PM    7          BY MR. TRIPI:

03:56PM    8   Q.   Is that a text from the defendant to you on March 27th,

03:56PM    9   2019?

03:56PM   10   A.   Yes.

03:56PM   11   Q.   And what did he write there?

03:56PM   12   A.   Call me, bro.

03:56PM   13   Q.   And is that consistent with how you would text one

03:56PM   14   another when you needed to talk?

03:56PM   15   A.   Yes.

03:57PM   16   Q.   After the defendant retired, was he trying to get a job?

03:57PM   17   A.   He retired, and he was -- yeah.

03:57PM   18   Q.   Did you --

03:57PM   19   A.   Something part time.

03:57PM   20   Q.   Did you have a job that you were about to leave due to

03:57PM   21   your role at the Sheriff's Office?

03:57PM   22   A.   Yes, it was a bartending job.

03:57PM   23   Q.   Where were you bartending?

03:57PM   24   A.   At Fanara's.

03:57PM   25   Q.   Where is that located?

03:57PM   1   A.   That's an Italian restaurant on Delaware and Tonawanda.

03:57PM   2   Q.   Were you the bartender there?

03:57PM   3   A.   Two nights a week, yes.

03:57PM   4   Q.   Did the defendant express some interest in maybe getting

03:57PM   5   your old job?

03:57PM   6   A.   Yeah.  Yes.

03:57PM   7   Q.   Okay.  I'm going to show you --

03:57PM   8        **MR. TRIPI:**  You if we can zoom in on rows 50 and 51,

03:57PM   9   Ms. Champoux.

03:57PM  10        **BY MR. TRIPI:**

03:57PM  11   Q.   Looking at row 51 first, do you see a text from the

03:57PM  12   defendant on March 15th, 2019?

03:57PM  13   A.   Yes.

03:58PM  14   Q.   And what did the defendant write to you?

03:58PM  15   A.   Bro, will Fanara have an opening when you start the

03:58PM  16   sheriffs?  I'm interested.

03:58PM  17   Q.   And did you respond to that text?

03:58PM  18   A.   I did.

03:58PM  19   Q.   What did you respond?

03:58PM  20   A.   I said yes, my last shift there is this Monday.  You

03:58PM  21   would be a perfect fit there, Bro.  I'll tell Joe Monday

03:58PM  22   you're interested.  Just brush up on your martinis,

03:58PM  23   Manhattans, muddled Old Fashions.  What I do, bro, if I

03:58PM  24   forget is I go to the waitress station out of sight and I

03:58PM  25   just Google it.  If you forget a recipe, that's what I was

03:58PM      1    referencing.

03:58PM      2    Q.  Please keep reading it.  Just read it word for word.

03:58PM      3    A.  Google it.  You would do great there.  Very easy bar to

03:58PM      4    work, and the money is awesome.  You serve a lot of food at

03:58PM      5    the bar.  Easy, bro.

03:58PM      6           **MR. TRIPI:**  Can we show row 53, please?

03:58PM      7           **BY MR. TRIPI:**

03:58PM      8    Q.  Is this a text from the defendant to you on March 1st,

03:59PM      9    2019?

03:59PM     10    A.  Yes.

03:59PM     11    Q.  And what did the defendant write to you?

03:59PM     12    A.  Dude, I got a pass Saturday.  Lindsay and her friends are

03:59PM     13    going to Belsitos.  You want to get out early about 7 for a

03:59PM     14    couple?

03:59PM     15    Q.  Was that the defendant inviting you to meet him at a bar?

03:59PM     16    A.  Yes, just to meet out for drinks.

03:59PM     17           **MR. TRIPI:**  Okay.  We can take those down

03:59PM     18    Ms. Champoux.  Thank you.

03:59PM     19           **BY MR. TRIPI:**

03:59PM     20    Q.  Now you indicated earlier that after the search warrant,

03:59PM     21    you tried to get ahold of the defendant by initially

03:59PM     22    contacting his wife Lindsay; is that right?

03:59PM     23    A.  That's correct.

03:59PM     24    Q.  And you had her number, so you communicated with her at

03:59PM     25    times?

03:59PM   1   A.   Correct.

03:59PM   2   Q.   I'm going to show you exhibit 208J.  Do you recognize

04:00PM   3   Exhibit 208J?

04:00PM   4   A.   I do, yes.

04:00PM   5   Q.   What do you recognize those to be?

04:00PM   6   A.   Texts between myself and Lindsay.

04:00PM   7   Q.   The defendant's wife?

04:00PM   8   A.   The defendant's wife.

04:00PM   9   Q.   Are they fair and accurate text messages as they existed

04:00PM   10   in your phone at the time it was extracted?

04:00PM   11   A.   Yes.

04:00PM   12        MR. TRIPI:  The government offers Exhibit 208J,

04:00PM   13   Your Honor.

04:00PM   14        MR. SINGER:  No objection.

04:00PM   15        THE COURT:  Admitted without objection.

04:00PM   16        **(GOV Exhibit 208J was received in evidence.)**

04:00PM   17        MR. TRIPI:  Thank you.

04:00PM   18        Ms. Champoux, can we publish Exhibit 208J briefly.

04:00PM   19   If we can highlight row 5 first, please.

04:00PM   20        **BY MR. TRIPI:**

04:00PM   21   Q.   First can you read the date of that text, Mr. Selva?

04:00PM   22   A.   6/10/2019.

04:01PM   23   Q.   So that's June 10th?

04:01PM   24   A.   Correct, June 10th.

04:01PM   25   Q.   A couple days after the search warrant at the defendant's

04:01PM 1 house?

04:01PM 2 A. Yes.

04:01PM 3 Q. Had you been trying to get ahold of him?

04:01PM 4 A. I have.

04:01PM 5 Q. Did his wife Lindsay text you?

04:01PM 6 A. Yes, she responded back.

04:01PM 7 Q. What did she say?

04:01PM 8 A. Hey, Lou, just got your message. Joe's fine. We're

04:01PM 9 good. Just hanging out. Love you.

04:01PM 10 Q. Now, had you called Lindsay when you couldn't get ahold

04:01PM 11 of Joe?

04:01PM 12 A. Yes.

04:01PM 13        MR. TRIPI: Can we go to row number 4, please,

04:01PM 14 Ms. Champoux.

04:01PM 15        BY MR. TRIPI:

04:01PM 16 Q. Did you respond to Lindsay?

04:01PM 17 A. Yes.

04:01PM 18 Q. What did you respond?

04:01PM 19 A. I said, okay. Thank you, Lindsay. If you guys need

04:01PM 20 anything at all, just reach out. Okay. Love you guys.

04:01PM 21 Q. Okay.

04:01PM 22        MR. TRIPI: Can we go to row 3 Ms. Champoux?

04:01PM 23        BY MR. TRIPI:

04:01PM 24 Q. And did she write you back?

04:01PM 25 A. Yes. Quick response. All is good.

04:01PM    1        **MR. TRIPI:**  Can we go to row 2, Ms. Champoux.

04:02PM    2        **BY MR. TRIPI:**

04:02PM    3   Q.  About six days later, did you reach out again?

04:02PM    4   A.  I did.

04:02PM    5   Q.  What did you write to Lindsay?

04:02PM    6   A.  Hi, Lindsay.  Hope all is well with you guys.  If you

04:02PM    7   need anything, just reach out to me.  Wish Joe a Happy

04:02PM    8   Father's Day for me.  Love you both.

04:02PM    9        **MR. TRIPI:**  And go back and can we zoom in on row 1.

04:02PM   10        **BY MR. TRIPI:**

04:02PM   11   Q.  Did she respond to you?

04:02PM   12   A.  She did, yes.

04:02PM   13   Q.  And what did she say?

04:02PM   14   A.  Thank you, Louie.  Joe said Happy Father's Day to you

04:02PM   15   also.

04:02PM   16        **MR. TRIPI:**  We can take that down, Ms. Champoux.

04:02PM   17        **BY MR. TRIPI:**

04:03PM   18   Q.  After you met the defendant at his house, did basically

04:03PM   19   text messaging after the search warrant at his house and

04:03PM   20   after you met with him that time at his house, did most text

04:03PM   21   messaging stop?

04:03PM   22   A.  It did.

04:03PM   23   Q.  I'm going to show you Government Exhibit 208M.  Do you

04:04PM   24   recognize exhibit 208M.

04:04PM   25   A.  I do.

04:04PM    1    Q.  What do you recognize that to be?

04:04PM    2    A.  Outgoing calls I made to the defendant.

04:04PM    3    Q.  Are those call logs between you and the defendant using

04:04PM    4    his number 716-416-1797?

04:04PM    5    A.  They are.

04:04PM    6    Q.  Is that in July and August of 2019?

04:04PM    7    A.  It is, yes.

04:04PM    8    Q.  Are they accurate as extracted as the call log data that

04:04PM    9    existed in your phone at the time you consented to its

04:04PM    10   search?

04:04PM    11   A.  Yes.

04:04PM    12          MR. TRIPI:  The government offers Exhibit 208M,

04:04PM    13   Your Honor.

04:04PM    14          MR. SINGER:  No objection.

04:04PM    15          THE COURT:  Received without objection.

04:04PM    16          (GOV Exhibit 208M was received in evidence.)

04:04PM    17          MR. TRIPI:  Ms. Champoux, can we pull up exhibit

04:04PM    18   208M.

04:04PM    19          Ms. Champoux, can we actually go down -- can we

04:04PM    20   highlight -- is there a row 247?  I'm sorry, my eyes are

04:05PM    21   pretty bad, Ms. Champoux, can we zoom in on the bottom so I

04:05PM    22   can see the dates?  Maybe rows 13 and 14.

04:05PM    23          I apologize.  Okay.

04:05PM    24          BY MR. TRIPI:

04:05PM    25   Q.  So is this a phone number that you started calling after

04:05PM    1   the search warrant in communicating with the defendant?

04:05PM    2   A.  Yes.

04:05PM    3   Q.  And sometimes did you delete the calls that you would

04:05PM    4   make to the defendant if you would make a call?

04:05PM    5   A.  Sometimes.

04:05PM    6          MR. TRIPI:  Okay.  Can we zoom out of that,

04:05PM    7   Ms. Champoux.  Can we highlight or zoom in on row 8.

04:05PM    8          BY MR. TRIPI:

04:05PM    9   Q.  Is that an incoming call you received from the defendant?

04:05PM   10   A.  Yes, it is.

04:05PM   11   Q.  Lasted a couple minutes?

04:05PM   12   A.  Two minutes.

04:05PM   13   Q.  And what's the date there?

04:06PM   14   A.  7/30/2019.

04:06PM   15   Q.  So that's the end of July?

04:06PM   16   A.  The end of July.

04:06PM   17          MR. TRIPI:  Ms. Champoux, can you zoom in on row

04:06PM   18   number 6.

04:06PM   19          BY MR. TRIPI:

04:06PM   20   Q.  Is that an example of an outgoing call you made to the

04:06PM   21   defendant August 14th, 2019?

04:06PM   22   A.  Yes.

04:06PM   23   Q.  Did you speak for just a little over a minute there?

04:06PM   24   A.  Yes.

04:06PM   25   Q.  And that's about nine days before the search warrant at

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24
193

| | | |
|---|---|---|
| 04:06PM | 1 | your house; is that right? |
| 04:06PM | 2 | A.  Correct. |
| 04:06PM | 3 | **MR. TRIPI:**  Can we go to row 5, please. |
| 04:06PM | 4 | **BY MR. TRIPI:** |
| 04:06PM | 5 | Q.  Does that indicate a 19 minute, 12 second call that you |
| 04:06PM | 6 | and the defendant had with one another on August 16th, 2019? |
| 04:06PM | 7 | A.  Yes. |
| 04:06PM | 8 | Q.  So that's about roughly a week or so before your house |
| 04:07PM | 9 | got searched? |
| 04:07PM | 10 | A.  Yes. |
| 04:07PM | 11 | **MR. TRIPI:**  Can we go to row 3, please, Ms. Champoux. |
| 04:07PM | 12 | **BY MR. TRIPI:** |
| 04:07PM | 13 | Q.  Does that indicate a call that's a little less than 12 |
| 04:07PM | 14 | minutes long between you and the defendant on August 19th, |
| 04:07PM | 15 | 2019? |
| 04:07PM | 16 | A.  Yes. |
| 04:07PM | 17 | Q.  And this one's about four days before the search at your |
| 04:07PM | 18 | house? |
| 04:07PM | 19 | A.  Correct. |
| 04:07PM | 20 | **MR. TRIPI:**  And can we highlight row number 2, |
| 04:07PM | 21 | Ms. Champoux. |
| 04:07PM | 22 | **BY MR. TRIPI:** |
| 04:07PM | 23 | Q.  Is that a call between you and the defendant that lasted |
| 04:07PM | 24 | a little over ten minutes? |
| 04:07PM | 25 | A.  Yes. |

04:07PM    1          **MR. TRIPI:**  And let's go to row 1, Ms. Champoux.

04:07PM    2          **BY MR. TRIPI:**

04:07PM    3   Q.  And did you try to call him on August 21st, 2019?

04:07PM    4   A.  I did, yes.

04:08PM    5          **MR. TRIPI:**  We can zoom out of that, Ms. Champoux.

04:08PM    6   Thank you.

04:08PM    7          **BY MR. TRIPI:**

04:08PM    8   Q.  Now we just saw some calls, one in the end of July, we

04:08PM    9   saw some calls in August, right, just a moment ago?

04:08PM   10      I'm going to show you Exhibit 208K now.

04:08PM   11      Among the things that were extracted from your phone,

04:08PM   12   things that you had done on your phone were, like, Google

04:08PM   13   searches you made, right?

04:08PM   14   A.  Yes.

04:08PM   15   Q.  Or searches, internet searches?

04:08PM   16   A.  Correct.

04:08PM   17   Q.  Was one thing you were searching Anthony Gerace, and

04:08PM   18   Buffalo News articles about Anthony Gerace?

04:08PM   19   A.  I was.

04:08PM   20   Q.  And by July of 2019, he had been charged after that

04:09PM   21   search warrant we talked about earlier; is that right?

04:09PM   22   A.  Correct.

04:09PM   23   Q.  And that was concerning to you?

04:09PM   24   A.  It was.

04:09PM   25   Q.  Do you recognize 208K to be searches of Anthony Gerace

04:09PM   1   that you did in your phone?

04:09PM   2   A.  Yes, they are.

04:09PM   3   Q.  Are those fair and accurate searches that you did, that

04:09PM   4   you remember doing that were in your phone?

04:09PM   5   A.  Yes.

04:09PM   6          MR. TRIPI:  The government offers Exhibit 208K,

04:09PM   7   Your Honor.

04:09PM   8          MR. SINGER:  No objection.

04:09PM   9          THE COURT:  Received without objection.

04:09PM  10          (GOV Exhibit 208K was received in evidence.)

04:09PM  11          MR. TRIPI:  If we can pull up Exhibit 208K,

04:09PM  12   Ms. Champoux.  And just zoom in on the box there.  Searched

04:09PM  13   items, 9.

04:09PM  14          BY MR. TRIPI:

04:09PM  15   Q.  So did you make some searches of Anthony Gerace on

04:09PM  16   June 30th, 2019?

04:09PM  17   A.  I did, yes.

04:09PM  18   Q.  On July 8th, 2019?

04:09PM  19   A.  Yes.

04:09PM  20   Q.  And July 30th, 2019?

04:10PM  21   A.  June 30th, I believe it is.

04:10PM  22   Q.  Look at row 1.

04:10PM  23   A.  Oh, I'm sorry, I didn't see -- I was looking at the

04:10PM  24   bottom.  Yes, correct.

04:10PM  25   Q.  And July 30th, 2019, that's the day you had some phone

04:10PM    1    calls earlier in the day with the defendant that we just

04:10PM    2    looked at?

04:10PM    3    A.  Yes.

04:10PM    4    Q.  And was the end of July, to the best of your

04:10PM    5    recollection, when you walked with the defendant around the

04:10PM    6    Delaware Park area?

04:10PM    7    A.  Yes.

04:10PM    8    Q.  Was Anthony Gerace a topic of conversation?

04:10PM    9    A.  He came up, yes.

04:10PM   10    Q.  We just talked about that earlier, right?

04:10PM   11    A.  Yes.  He was.

04:10PM   12         **MR. TRIPI:**  We can zoom out of that Ms. Champoux.

04:10PM   13         **BY MR. TRIPI:**

04:11PM   14    Q.  I'm going to show you Government Exhibit 208N, Mr. Selva.

04:11PM   15         **MR. SINGER:**  This is N?

04:11PM   16         **MR. TRIPI:**  N as in Nancy.

04:11PM   17         **MR. SINGER:**  Thank you.

04:11PM   18         **BY MR. TRIPI:**

04:11PM   19    Q.  Do you recognize Exhibit 208N?

04:11PM   20    A.  I do.  Yes.

04:11PM   21    Q.  Are those call logs between you and the defendant with

04:11PM   22    his phone number 716-507-2784?

04:11PM   23    A.  They were, yes, sir.

04:11PM   24    Q.  Are those accurate as the call log data that existed in

04:11PM   25    your phone by the time you gave consent and it was searched?

04:11PM  1   A.  Yes.

04:11PM  2   Q.  Is it accurate?

04:11PM  3   A.  It is, yes.

04:11PM  4        **MR. TRIPI:**  The government offers Exhibit 208N,

04:11PM  5   Your Honor.

04:11PM  6        **MR. SINGER:**  No objection.

04:11PM  7        **THE COURT:**  Received without objection.

04:12PM  8        **(GOV Exhibit 208N was received in evidence.)**

04:12PM  9        **MR. TRIPI:**  Thank you, Your Honor.

04:12PM  10       **BY MR. TRIPI:**

04:12PM  11  Q.  Mr. Selva, I'm going to ask Ms. Champoux to publish 208N

04:12PM  12  also for the jury.  Using this phone number, did you have

04:12PM  13  several times when you called the defendant and -- including

04:12PM  14  an occasion when you spoke to him for a little over seven

04:12PM  15  minutes in April?

04:12PM  16  A.  Yes, that's correct.

04:12PM  17  Q.  Now those times you tried to get ahold of him in July,

04:12PM  18  did you have another number that you contacted him on that we

04:12PM  19  just looked at a moment ago?

04:12PM  20  A.  I did, yes.

04:12PM  21  Q.  Okay.  Sometimes when you get a new number for somebody,

04:12PM  22  and you have two numbers in your phone, do you sometimes call

04:12PM  23  the old number accidentally?

04:13PM  24  A.  Yes.

04:13PM  25  Q.  By July 2019, the defendant wasn't using this phone

04:13PM  1    anymore?

04:13PM  2    A.  I believe so, yes.

04:13PM  3         MR. TRIPI:  We can take that down, Ms. Champoux.

04:13PM  4         BY MR. TRIPI:

04:13PM  5    Q.  Now earlier we talked about the grow locations that were

04:13PM  6    in Franklinville and Angelica that you've been to with

04:13PM  7    Mr. Masecchia; is that right?

04:13PM  8    A.  Yes.

04:13PM  9    Q.  I'm going to show you two photographs, Government

04:13PM  10   Exhibit 221I (sic) and Government Exhibit 222G.

04:13PM  11        Do you recognize Exhibits 222I and 222G?

04:14PM  12   A.  I do.

04:14PM  13   Q.  What do you recognize those to be?

04:14PM  14   A.  They're myself and Mike Masecchia.

04:14PM  15   Q.  And what's the setting of those photos?

04:14PM  16   A.  It's at a cabin in Ellicottville on the back deck.

04:14PM  17   Q.  Is it in the vicinity of where you guys had some of the

04:14PM  18   grows, outdoor grows?

04:14PM  19   A.  Yes, not far away.

04:14PM  20        MR. TRIPI:  The government offers Exhibit 222I and

04:14PM  21   222G.

04:14PM  22        MR. SINGER:  No objection.

04:14PM  23        THE COURT:  Received without objection.

04:14PM  24        **(GOV Exhibits 222I and G were received in evidence.)**

04:14PM  25        MR. TRIPI:  Can we pull them both up and split the

04:14PM  1   screen, Ms. Champoux?

04:14PM  2            BY MR. TRIPI:

04:14PM  3   Q.  222I, is that a picture of you?

04:14PM  4   A.  It is.

04:14PM  5   Q.  And 222G, is that a picture of Masecchia?

04:14PM  6   A.  It is.

04:14PM  7   Q.  Were you both shooting guns out there on the property?

04:14PM  8   A.  We were.  We were target shooting.

04:14PM  9   Q.  Do you see the treeline in the back there?

04:15PM  10  A.  Um-hum.  Yes.

04:15PM  11  Q.  Is that generally somewhere out in there where the grows

04:15PM  12  were located?

04:15PM  13  A.  Not in this vicinity, no.

04:15PM  14  Q.  Where were the grows?

04:15PM  15  A.  To the left, about three miles.

04:15PM  16  Q.  Okay.  So, off camera?

04:15PM  17  A.  Off camera on state land.

04:15PM  18            MR. TRIPI:  Okay.  We can take those down,

04:15PM  19  Ms. Champoux.

04:15PM  20            BY MR. TRIPI:

04:15PM  21  Q.  That brings to me to August 23rd, 2019.  We've referenced

04:15PM  22  it a few times, Mr. Selva, but did Homeland Security

04:15PM  23  Investigations execute a search warrant at your house that

04:15PM  24  day?

04:15PM  25  A.  Yes, they did.

| | | |
|---|---|---|
| 04:15PM | 1 | Q.  Did they seize some evidence? |
| 04:15PM | 2 | A.  They did, yes. |
| 04:15PM | 3 | Q.  Did that include marijuana grow equipment that you had in |
| 04:15PM | 4 | your house, some marijuana, as well as firearms that you had? |
| 04:16PM | 5 | A.  Yes. |
| 04:16PM | 6 | Q.  How many firearms did you have that were taken? |
| 04:16PM | 7 | A.  I had a .22 rifle, and a pistol grip shotgun too. |
| 04:16PM | 8 | Q.  And what -- what marijuana grow equipment did you have |
| 04:16PM | 9 | that was taken? |
| 04:16PM | 10 | A.  A 1000 watt light with a ballast. |
| 04:16PM | 11 | Q.  Anything else?  Did you have some pumps and things like |
| 04:16PM | 12 | that? |
| 04:16PM | 13 | A.  Some pumps.  I forget, yes, pumps. |
| 04:16PM | 14 | Q.  Okay. |
| 04:16PM | 15 | A.  Equipment that was used. |
| 04:16PM | 16 | Q.  I'm going to show you some photos first. |
| 04:16PM | 17 | **MR. TRIPI:**  Just give me one moment, please. |
| 04:16PM | 18 | **BY MR. TRIPI:** |
| 04:16PM | 19 | Q.  Before I get into these, just generally describe what |
| 04:16PM | 20 | happened that day.  Tell the jury what was going on that |
| 04:16PM | 21 | morning when the search happens. |
| 04:16PM | 22 | A.  I was getting ready to go to work at the sheriff's |
| 04:16PM | 23 | department.  And it was early.  It was 6:00 in the morning. |
| 04:17PM | 24 | Just had a cup of coffee -- actually, it was before that, it |
| 04:17PM | 25 | was a quarter to 6.  And I heard a boom.  They came through |

04:17PM    1    my front door, and they were in my living room.  A search

04:17PM    2    warrant was executed.

04:17PM    3    Q.  What was the first thought you had in your head as to why

04:17PM    4    they were there that day?

04:17PM    5    A.  Everything that's been transpiring that -- now it's my

04:17PM    6    turn, I'm -- I'm in trouble.

04:17PM    7    Q.  Did you think it related to this situation that you're

04:17PM    8    testifying about today?

04:17PM    9    A.  Yes, absolutely.

04:17PM   10    Q.  Do you remember what the first thing you asked them was?

04:17PM   11    A.  I don't recall.  I don't remember.  It was nerve-racking.

04:17PM   12    Q.  After they came in and they started to execute the

04:19PM   13    search, what happened to you?  Where did they put you?

04:19PM   14    A.  They handcuffed me.  They brought me outside while they

04:19PM   15    executed the search.

04:19PM   16    Q.  And did they bring you back in?

04:19PM   17    A.  They brought me back in after a while, yes.

04:19PM   18    Q.  Sit you down?

04:19PM   19    A.  Sat me down.

04:19PM   20    Q.  Did you give a brief interview?

04:19PM   21    A.  Yes.

04:19PM   22    Q.  Were you completely honest?

04:19PM   23    A.  No.

04:19PM   24    Q.  Did you give them all the details that you told this jury

04:19PM   25    over the course of two days?

04:19PM   1   A.  At that.

04:19PM   2   Q.  Yeah, at that time?

04:19PM   3   A.  No.  No.

04:19PM   4   Q.  That same day, did you -- is that when you gave

04:20PM   5   Ms. Halliday your cell phone to be searched?

04:20PM   6   A.  Yes.

04:20PM   7   Q.  Did you resign your position that same day at the

04:20PM   8   Sheriff's Office?

04:20PM   9   A.  I did.

04:20PM   10   Q.  Describe for the jury how that went.

04:20PM   11   A.  I was -- when the search was executed and they were done

04:20PM   12   with me, the Sheriff's Department sent their -- a chief down,

04:20PM   13   chief of narcotics.  He took me to internal affairs.  I met

04:20PM   14   with the internal affairs, and I immediately resigned my

04:20PM   15   position.  I wrote a resignation letter.

04:20PM   16   Q.  Were the agents going around taking photographs in

04:20PM   17   addition to seizing information?

04:21PM   18   A.  They were, yes.

04:21PM   19   Q.  I'm going to show you a series of photographs.  I'm just

04:21PM   20   going to call them all out at once and hand up the stack.

04:21PM   21        This will be Government Exhibit 200A-17, 200A-18,

04:21PM   22   200A-19, 200A-22, 200A-26, 200A-28, 200A-29, 200A-31,

04:21PM   23   200A-32, 33, 34, and 35.  Okay?

04:21PM   24        Going to hand those all up to you now.  Just flip through

04:21PM   25   them and look up at me.

04:21PM   1   A.  Sure.  Thank you.

04:21PM   2   Q.  You're welcome.  Did you look through each of those

04:22PM   3   exhibits that I just listed?

04:22PM   4   A.  I did.  Yes.

04:22PM   5   Q.  Do each of those fairly and accurately depict items that

04:22PM   6   you had in your house at the time of the search?

04:23PM   7   A.  Yes.

04:23PM   8   Q.  Those are all different photographs?

04:23PM   9   A.  Yes.

04:23PM  10   Q.  Do they all fairly and accurately depict things that you

04:23PM  11   had inside your house the day of the search?

04:23PM  12   A.  They do.

04:23PM  13        **MR. TRIPI:**  The government offers the listed

04:23PM  14   exhibits, Your Honor, 200A-7 -- do you want me to name them

04:23PM  15   all again?

04:23PM  16        **THE COURT:**  Mr. Singer?

04:23PM  17        **MR. SINGER:**  No objection to the series, Judge.

04:23PM  18        **THE COURT:**  They are all admitted.

04:23PM  19        **MR. TRIPI:**  Thank you very much.

04:23PM  20        **(GOV Exhibits 200A-17, 18, 19, 22, 26, 28, 29, 31,**

04:23PM  21          **32, 33, 34, and 35 were received in evidence.)**

04:23PM  22        **MR. TRIPI:**  Ms. Champoux, can we have pull up

04:23PM  23   Exhibit 200A-17, please?

04:23PM  24        **BY MR. TRIPI:**

04:23PM  25   Q.  Is this a photo of a photograph that you had in your

04:23PM   1   house?

04:23PM   2   A.  It was, yes.

04:23PM   3   Q.  Where did you have this photo posted?

04:23PM   4   A.  I believe it was a photo that was in my kitchen.

04:23PM   5   Q.  Okay.  Are you depicted in the photograph?

04:24PM   6   A.  Yes.

04:24PM   7   Q.  Is Mr. Bongiovanni?

04:24PM   8   A.  Yes.

04:24PM   9   Q.  Is he in the white shirt?

04:24PM   10   A.  Yes.

04:24PM   11   Q.  Closer to the right?

04:24PM   12   A.  Yes.

04:24PM   13   Q.  Is Tom Napoli also in that picture?

04:24PM   14   A.  Yes.

04:24PM   15   Q.  The same Tom Napoli that you referenced in your

04:24PM   16   testimony?

04:24PM   17   A.  Yes.

04:24PM   18   Q.  Can you tap him so the jury can see?

04:24PM   19          **MR. TRIPI:**  Okay.  We can pull that one down,

04:24PM   20   Ms. Champoux.  Can we pull up Exhibit 200 A-18 please.  Okay.

04:24PM   21          **BY MR. TRIPI:**

04:24PM   22   Q.  Can you tell the jury what's depicted in this photo and

04:24PM   23   on -- specifically looking at the left-hand side of the

04:24PM   24   photo?

04:24PM   25   A.  Those were tickets for the benefit that was organized for

04:24PM   1   me, just to keep track if somebody bought a ticket, who to

04:24PM   2   send a thank you to.

04:24PM   3   Q.  Was that a list you were keeping to write out some thank

04:24PM   4   you cards?

04:24PM   5   A.  Yeah.  Somebody had given it to me on a piece of paper

04:24PM   6   and I wrote it in a notebook, these tickets were paid, I have

04:25PM   7   the money, so I just marked them down.

04:25PM   8   Q.  Entry number one, who's the name you wrote down there?

04:25PM   9   A.  Tom Doctor.

04:25PM  10   Q.  Is that the same person that you've been talking about

04:25PM  11   during your testimony?

04:25PM  12   A.  Yes.

04:25PM  13   Q.  And you indicated $70 this was for two tickets?

04:25PM  14   A.  I believe so, yes.

04:25PM  15        **MR. TRIPI:**  Okay.  Let's take a look at Government

04:25PM  16   Exhibit 200A-19, please.

04:25PM  17        **BY MR. TRIPI:**

04:25PM  18   Q.  Is that one of your firearms?

04:25PM  19   A.  It was, yes.

04:25PM  20   Q.  Which one is that?

04:25PM  21   A.  That's a Mossberg pistol grip shotgun.

04:25PM  22        **MR. TRIPI:**  Can we go to 200A-22, please.

04:25PM  23        **BY MR. TRIPI:**

04:25PM  24   Q.  What's depicted in this photograph?

04:25PM  25   A.  That was in a drawer.  Stuff that I had.

04:25PM  1   Q.  Is there a scale there?

04:25PM  2   A.  Yes.

04:25PM  3   Q.  And what was the scale used for?

04:26PM  4   A.  Weighing marijuana.  Small amounts.

04:26PM  5           **MR. TRIPI:**  Could we look at 200A-28.

04:26PM  6           **BY MR. TRIPI:**

04:26PM  7   Q.  First, where is this location, is this like a hidden

04:26PM  8   location?

04:26PM  9   A.  It's in my basement.  It was a storage facility that I

04:26PM  10  had built, and it's -- that's a ballast with a light.  And

04:26PM  11  then some other stuff in a basket pertaining to the grow

04:26PM  12  operation.

04:26PM  13  Q.  Is that marijuana grow equipment?

04:26PM  14  A.  Yes.

04:26PM  15  Q.  Did you have that concealed?  In other words, did the

04:26PM  16  agents have to remove something from the panel there to find

04:26PM  17  that stuff?

04:26PM  18  A.  They did, yes.

04:26PM  19  Q.  So how did you have it concealed, explain that for the

04:26PM  20  jury?

04:26PM  21  A.  There was a door that went over, and there was a piece of

04:26PM  22  rug over the door.  This thing right here was just a storage

04:26PM  23  facility.  So it was camouflaged, there was a piece of

04:27PM  24  outdoor carpet on top and over the door.

04:27PM  25  Q.  I'm going to hand you up Government Exhibit -- got my

04:27PM    1    number right here -- 201.  Do you recognize that?

04:27PM    2    A.  Yes.

04:27PM    3    Q.  What is that?

04:27PM    4    A.  It's a 1000 watt grow light with a ballast.

04:27PM    5    Q.  Is that what's depicted in the photo, Government Exhibit

04:27PM    6    200A-28?

04:27PM    7    A.  Yes.

04:27PM    8    Q.  And is that in the same or substantially same condition

04:27PM    9    today as when the agents found it in that part of your house?

04:27PM    10   A.  It is, yes.

04:27PM    11          **MR. TRIPI:**  The government offers Exhibit 201,

04:27PM    12   Your Honor.

04:27PM    13          **MR. SINGER:**  No objection.

04:27PM    14          **THE COURT:**  Received without objection.

04:27PM    15          **(GOV Exhibit 201 was received in evidence.)**

04:27PM    16          **MR. TRIPI:**  It's large, but I'm publishing it for the

04:28PM    17   jury.

04:28PM    18          **BY MR. TRIPI:**

04:28PM    19   Q.  What is the purpose of that?

04:28PM    20   A.  That's to grow -- you put the marijuana under it, and

04:28PM    21   it's on a retractor, it goes back and forth on a timer.  It's

04:28PM    22   to grow the marijuana.

04:28PM    23          **MR. TRIPI:**  Can we pull up Government

04:28PM    24   Exhibit 200A-26, please.

           25

04:28PM    1              **BY MR. TRIPI:**

04:28PM    2    Q.  What is that?

04:28PM    3    A.  That's just stem and shake from the marijuana that was

04:28PM    4    grown, cleanup that never got thrown out.

04:28PM    5    Q.  So that's some of the remnants from the parts of the

04:28PM    6    marijuana plant that you don't sell?

04:28PM    7    A.  Correct.  It's just leaves and stems.

04:28PM    8              **MR. TRIPI:**  Can we pull up Government Exhibit

04:28PM    9    200A-31, please.

04:28PM   10              **BY MR. TRIPI:**

04:28PM   11    Q.  What is that?

04:28PM   12    A.  That's more of that.  That's just leaves, shake, and

04:29PM   13    stem.

04:29PM   14    Q.  So is that more of the discarded remnants from the actual

04:29PM   15    bud?

04:29PM   16    A.  It's discarded, yes.

04:29PM   17              **MR. TRIPI:**  Let's pull up 200A-32.

04:29PM   18              **BY MR. TRIPI:**

04:29PM   19    Q.  Can you tell the jury what they're looking at there?

04:29PM   20    A.  That's just stems and shake, same thing, from marijuana

04:29PM   21    residue or plants that were in my house.

04:29PM   22    Q.  Let's look at Government Exhibit 200A-33.  Before I ask

04:29PM   23    you about this, did you -- did you have -- other than the

04:29PM   24    grow lamp that you hid and you concealed, did some of the

04:29PM   25    other stuff, did you forget you had it?

04:29PM    1    A.  Completely forgot I had it.  It was underneath my

04:29PM    2    stairwell.

04:29PM    3    Q.  Okay.  Had you remembered you had it, given everything

04:29PM    4    that was happening, would you have discarded it?

04:29PM    5    A.  Yes.

04:29PM    6    Q.  Looking at Government Exhibit 200A-33, what's the jury

04:30PM    7    looking at there?

04:30PM    8    A.  Those are little transplant plant buckets or containers

04:30PM    9    that we would transplant in and then bring them outside.

04:30PM    10   Q.  So you had them in a black garbage bag there stashed

04:30PM    11   under your stairs?

04:30PM    12   A.  Yes.

04:30PM    13   Q.  Those were the pots that you would transfer the clones to

04:30PM    14   the country in?

04:30PM    15   A.  Yes.  When the clones were ready to -- when they were big

04:30PM    16   enough and we brought them out, we would put them in those

04:30PM    17   plants and transport them.

04:30PM    18   Q.  Did you forget you had that under your stairs?

04:30PM    19   A.  Yes.

04:30PM    20   Q.  As you sit there today, do you wish you had thrown that

04:30PM    21   stuff out?

04:30PM    22   A.  Absolutely.

04:30PM    23        **MR. TRIPI:**  Let's go to Government Exhibit 200A-34.

04:30PM    24        **BY MR. TRIPI:**

04:30PM    25   Q.  Is that another photo of you and the defendant somewhere?

| | | |
|---|---|---|
| 04:30PM | 1 | A.  Yes. |
| 04:30PM | 2 | Q.  Where -- what's the back setting of that photo, do you |
| 04:31PM | 3 | remember? |
| 04:31PM | 4 | A.  I don't recall.  Maybe a bar on Hertel.  I don't recall. |
| 04:31PM | 5 | Q.  So that's a photo of a photo that was in your house, |
| 04:31PM | 6 | correct? |
| 04:31PM | 7 | A.  Yes. |
| 04:31PM | 8 | MR. TRIPI:  Let's go to 200A-35, please. |
| 04:31PM | 9 | BY MR. TRIPI: |
| 04:31PM | 10 | Q.  And what are we looking at here? |
| 04:31PM | 11 | A.  That's my storage bin in my garage.  That's just an empty |
| 04:31PM | 12 | ballast.  There's nothing in it. |
| 04:31PM | 13 | Q.  So there's not an actual lamp in there -- |
| 04:31PM | 14 | A.  No. |
| 04:31PM | 15 | Q.  -- but it was similar to Government Exhibit 201 we looked |
| 04:31PM | 16 | at? |
| 04:31PM | 17 | A.  Same thing, but with no lamp. |
| 04:31PM | 18 | Q.  Were those the two when you had your grow running, the |
| 04:31PM | 19 | two lamps that you had? |
| 04:31PM | 20 | A.  Yes. |
| 04:31PM | 21 | Q.  And you'd fit, like, 40 plants under there? |
| 04:31PM | 22 | A.  Yes. |
| 04:31PM | 23 | MR. TRIPI:  We can pull that down, Ms. Champoux. |
| 04:31PM | 24 | BY MR. TRIPI: |
| 04:31PM | 25 | Q.  What happened at the end of the search that day at your |

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

04:32PM   1   house?

04:32PM   2   A.  After I resigned?

04:32PM   3   Q.  Yeah.  What happened after that?

04:32PM   4   A.  My phones were confiscated, and I got -- contacted my

04:32PM   5   lawyer, and that was it.

04:32PM   6   Q.  Did you make plans to come in the following Monday at the

04:32PM   7   U.S. Attorney's Office?

04:32PM   8   A.  I did.  I made plans to come in with my attorney to the

04:32PM   9   U.S. Attorney's Office.

04:32PM  10   Q.  Now when law enforcement left that day, did you also

04:32PM  11   receive information or did you learn that Mike Masecchia's

04:32PM  12   residence had been searched the same day?

04:32PM  13   A.  On the same day, yes.

04:32PM  14   Q.  Did that concern you?

04:32PM  15   A.  It did, yes.

04:32PM  16   Q.  When did you learn -- in relation to the search that

04:32PM  17   happened at your house, when did you learn about Mike

04:32PM  18   Masecchia's house being searched?

04:32PM  19   A.  Not far -- not long after.  Actually, right after

04:32PM  20   Homeland Security left.

04:32PM  21   Q.  How did you learn that Masecchia's house had also been

04:33PM  22   searched the same day?

04:33PM  23   A.  Through Kim, the girl I was with at the time.  She got a

04:33PM  24   text.

04:33PM  25   Q.  Was Kim friends with Mike's wife?

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

04:33PM   1    A.  She was.

04:33PM   2    Q.  Now even though you got an attorney and arranged to come

04:33PM   3    into the U.S. Attorney's Office office and talk that

04:33PM   4    following Monday, were you still torn at that point?

04:33PM   5    A.  Yes.

04:33PM   6    Q.  Are you still torn as you sit here today?

04:33PM   7    A.  Yes.

04:33PM   8    Q.  Are you telling the truth?

04:33PM   9    A.  Yes.

04:33PM  10    Q.  Does it hurt you to do that?

04:33PM  11    A.  Yes.

04:33PM  12    Q.  After you started coming in in August of 2019, after the

04:33PM  13    search at your house, and meeting with the government, did

04:33PM  14    your relationship with the defendant change?

04:33PM  15    A.  Yes.  It ceased.

04:33PM  16    Q.  You didn't tell him that you were coming in and talking,

04:33PM  17    right?

04:33PM  18    A.  No.

04:33PM  19    Q.  After the search warrant at your house and after you

04:34PM  20    began meeting with the government, were there occasions,

04:34PM  21    interactions between you and the defendant, that led you to

04:34PM  22    believe the defendant was watching you?

04:34PM  23    A.  Yes.

04:34PM  24    Q.  Did one such occasion occur after he saw you in traffic

04:34PM  25    and you -- asked you to meet at the bike path in the Town of

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

213

| | | |
|---|---|---|
| 04:34PM | 1 | Tonawanda? |
| 04:34PM | 2 | A.  Yes. |
| 04:34PM | 3 | Q.  Describe that situation for the jury. |
| 04:34PM | 4 | A.  I was driving down Delaware.  He pulled up alongside of |
| 04:34PM | 5 | me.  He said follow me, let's talk. |
| 04:34PM | 6 | And I followed him.  We went to the bike path in |
| 04:34PM | 7 | Tonawanda by TTFA Park. |
| 04:34PM | 8 | Q.  So let me ask, for those who don't live in that area, is |
| 04:34PM | 9 | there a bike path, like, near a football field? |
| 04:34PM | 10 | A.  TTFA, yes.  Town of Tonawanda Football. |
| 04:35PM | 11 | Q.  Is that a bike path that's not far from the defendant's |
| 04:35PM | 12 | house? |
| 04:35PM | 13 | A.  I believe so, yes, it's close to it. |
| 04:35PM | 14 | Q.  So describe what happened when you and he went and met up |
| 04:35PM | 15 | at that bike path. |
| 04:35PM | 16 | A.  Parked our cars.  We got out.  We walked along the bike |
| 04:35PM | 17 | path.  He asked me how am I doing?  Are you okay?  What |
| 04:35PM | 18 | happened? |
| 04:35PM | 19 | I said, no, I'm not okay.  I resigned.  I don't know |
| 04:35PM | 20 | what's gonna happen. |
| 04:35PM | 21 | Q.  Were you upset to have resigned your position? |
| 04:35PM | 22 | A.  Yes, but it was the right thing to do. |
| 04:35PM | 23 | Q.  Describe the conversation as it progressed from there. |
| 04:35PM | 24 | A.  I told him what I had done.  I resigned my position, |
| 04:35PM | 25 | because I could no longer go on being a sheriff after what |

| | | |
|---|---|---|
| 04:35PM | 1 | happened. |
| 04:35PM | 2 | And then I said I don't know what I'm gonna do.  I was |
| 04:35PM | 3 | confused.  I didn't know what I was gonna do. |
| 04:35PM | 4 | And he asked me, did they ask about me?  Did they ask |
| 04:35PM | 5 | questions about me? |
| 04:35PM | 6 | Q.  What did you say to him about that? |
| 04:35PM | 7 | A.  I said no, they didn't. |
| 04:36PM | 8 | Q.  Now, that wasn't true, right? |
| 04:36PM | 9 | A.  That wasn't true. |
| 04:36PM | 10 | Q.  Why didn't you tell him, yeah, they talked about you. |
| 04:36PM | 11 | A.  I just didn't. |
| 04:36PM | 12 | Q.  Had you been -- had you already at this point been in to |
| 04:36PM | 13 | the U.S. Attorney's Office's office? |
| 04:36PM | 14 | A.  What was the date again on this?  This was -- |
| 04:36PM | 15 | Q.  You tell me. |
| 04:36PM | 16 | A.  It was right after.  No, I had not been to the U.S. |
| 04:36PM | 17 | Attorney's Office -- yes, I was, I'm sorry.  I'm sorry, yes. |
| 04:36PM | 18 | I'm getting confused. |
| 04:36PM | 19 | Q.  Please continue with the conversation from there. |
| 04:36PM | 20 | A.  That was it.  Just what are you gonna do?  How are you? |
| 04:36PM | 21 | Did they ask questions about me? |
| 04:36PM | 22 | I said no.  I got a weird feeling about it, like I was |
| 04:36PM | 23 | being feeled out. |
| 04:36PM | 24 | And from that point on, we really didn't communicate |
| 04:36PM | 25 | anymore. |

04:36PM      1    Q.  Well, did the defendant -- did the defendant seem nervous

04:36PM      2    during that conversation?

04:36PM      3    A.  He did.

04:36PM      4    Q.  Did he make you nervous?

04:36PM      5    A.  He did.  We were both nervous.

04:37PM      6    Q.  Was there any conversation at that time between you and

04:37PM      7    him about what you were going to do next for work?

04:37PM      8    A.  Yes.  I told him I -- I didn't know what I was gonna do.

04:37PM      9        And he says, well, you can go back in sales.

04:37PM     10        I didn't -- I didn't have a plan.  I didn't know what was

04:37PM     11    going to happen.

04:37PM     12    Q.  How did that comment sit with you, that you can go back

04:37PM     13    to sales?

04:37PM     14    A.  It didn't.  It didn't sit well at all.  I mean, this

04:37PM     15    whole situation was a mess.  I was hoping to -- it didn't sit

04:37PM     16    well.  I was really confused.  It was in a rough time.

04:37PM     17    Speaking off my cuff, I didn't make any sense.

04:37PM     18    Q.  At any point in that discussion, did the defendant remind

04:37PM     19    you again of the story to tell if they asked about him?

04:38PM     20    A.  Yes.

04:38PM     21    Q.  What did he say?

04:38PM     22    A.  If he was brought into the equation, if they asked about

04:38PM     23    him, just let them know that I was his informant.

04:38PM     24    Q.  In fact after that, were you asked to take a polygraph?

04:38PM     25    A.  I did.

04:38PM    1   Q.  Did you try, during the course of that interview related

04:38PM    2   to polygraph, to claim you were the defendant's informant?

04:38PM    3   A.  I did.  And I failed.

04:38PM    4   Q.  So you told a lie?

04:38PM    5   A.  I told a lie.

04:38PM    6   Q.  After that point in time, did you begin telling more and

04:38PM    7   more of what really happened?

04:38PM    8   A.  Yes.

04:38PM    9   Q.  In or about October 2019, by that point you had several

04:38PM   10   meetings with the government?

04:38PM   11   A.  Yes.

04:38PM   12   Q.  In fact, was it on or about October 3rd, 2019 when you

04:39PM   13   testified before a federal grand jury?

04:39PM   14   A.  Yes.

04:39PM   15   Q.  Later that month, did the defendant approach you outside

04:39PM   16   the gym that you both belonged to?

04:39PM   17   A.  Yes.

04:39PM   18        **MR. TRIPI:**  Withdrawn, I said later that month.

04:39PM   19        **BY MR. TRIPI:**

04:39PM   20   Q.  In or about that month, I'm sorry, did he approach you in

04:39PM   21   the vicinity of the gym you both belonged to?

04:39PM   22   A.  Yes.

04:39PM   23   Q.  Describe that interaction for the jury.

04:39PM   24   A.  I was coming out of the gym, and he pulled up alongside

04:39PM   25   of me.  And --

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

217

04:39PM   1   Q.   Were you planning to work out with him like you had in

04:39PM   2   the past?

04:39PM   3   A.   No.  No.  This was purely just -- pulled right up.

04:39PM   4   Q.   Was he dressed in gym clothes?

04:39PM   5   A.   No.

04:39PM   6   Q.   Describe what happened.

04:39PM   7   A.   It startled me.  I was getting in my truck, he pulled up

04:39PM   8   alongside.  It felt like he was watching my vehicle.  And he

04:39PM   9   said let's take a ride.  Let's talk.  Follow me.

04:40PM   10   Q.   Did you stay with him there, or did you just talk outside

04:40PM   11   the gym?

04:40PM   12   A.   We talked outside the gym for a minute.  I mean, there

04:40PM   13   wasn't much to say.

04:40PM   14   Q.   Was there another occasion on or about October 24th,

04:40PM   15   after you had testified in the grand jury, and after you had

04:40PM   16   given several interviews where you saw the defendant near a

04:40PM   17   post office?

04:40PM   18   A.   Yes.

04:40PM   19   Q.   Where was that?

04:40PM   20   A.   It was on Hertel near my house.  Hertel in North Buffalo.

04:40PM   21   Q.   Was the defendant, when he approached you that day, did

04:40PM   22   you notice he was driving a different car?

04:40PM   23   A.   He was.

04:40PM   24   Q.   What different car was he driving?

04:40PM   25   A.   I believe his stepson's vehicle.  He had switched

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24

218

04:40PM    1    vehicles, and he made a weird comment to me like there was a

04:40PM    2    camera at my house.  He said oh, you got a security camera.

04:41PM    3        And that was placed there by Homeland Security.  And that

04:41PM    4    told me he drove by my house already.

04:41PM    5    Q.  And did you give him an excuse for the camera?

04:41PM    6    A.  I did.  I told him I just bought it.  I didn't obviously

04:41PM    7    tell him it was Homeland Security.  I just told him I just

04:41PM    8    set it up with what happened, very uneasy with what happened.

04:41PM    9    Q.  And so was the defendant driving a vehicle you didn't

04:41PM   10    typically associate with him when he saw you on that

04:41PM   11    occasion?

04:41PM   12    A.  Yes.

04:41PM   13    Q.  Do you remember what kind of car it was?

04:41PM   14    A.  I don't, but it was not his.

04:41PM   15    Q.  In close proximity to that interaction, did you come home

04:41PM   16    and find something on your porch?

04:41PM   17    A.  Yes.

04:41PM   18    Q.  What was on your porch?

04:41PM   19    A.  A bottle of Crown Royal, with a note, happy birthday.

04:42PM   20    Q.  When was your birthday?

04:42PM   21    A.  The day before.

04:42PM   22    Q.  What's your birthday?

04:42PM   23    A.  October 23rd.

04:42PM   24    Q.  Did you immediately contact Homeland Security and turn in

04:42PM   25    the bottle that was on your porch?

04:42PM    1    A.  Yes.

04:42PM    2    Q.  Was that how you and the defendant normally operated,

04:42PM    3    leaving bottles of alcohol on each other's porches?

04:42PM    4    A.  No.  We would do it in person, more personable.

04:42PM    5    Q.  Did all of those interactions that you've just described

04:42PM    6    lead you to conclude you believed the defendant was watching

04:42PM    7    you?

04:42PM    8    A.  Yes.

04:42PM    9          **MR. TRIPI:**  I'm going to hand up Government Exhibit

04:42PM   10    209.

04:43PM   11          **MR. SINGER:**  I'm sorry, Joe?

04:43PM   12          **MR. TRIPI:**  209.

04:43PM   13          **MR. SINGER:**  Thank you.

04:43PM   14          **MR. TRIPI:**  You're welcome.

04:43PM   15          **BY MR. TRIPI:**

04:43PM   16    Q.  Do you recognize that item?

04:43PM   17    A.  I do.

04:43PM   18    Q.  What is Government Exhibit 209?

04:43PM   19    A.  It's a wrap -- it's a wrapped bottle of alcohol with

04:43PM   20    Happy Birthday, Brother.  55's no jive.  Love you, Bonge.

04:43PM   21    Q.  Is that the bottle of Crown Royal that was left on your

04:43PM   22    porch?

04:43PM   23    A.  Yes.

04:43PM   24    Q.  Is that the bottle in the brown paper bag that you turned

04:43PM   25    in to Homeland Security when you found it?

USA v Bongiovanni - Selva - Tripi/Direct - 8/28/24
220

| | | |
|---|---|---|
| 04:43PM | 1 | A.  Yes. |
| 04:43PM | 2 | Q.  As far as you could tell, even though it's in that |
| 04:43PM | 3 | plastic bag now, as far as you could tell, is it the same or |
| 04:43PM | 4 | substantially same condition today as it was when you turned |
| 04:43PM | 5 | it over to Homeland Security? |
| 04:43PM | 6 | A.  It is, yes. |
| 04:43PM | 7 | **MR. TRIPI:**  The government offers Exhibit 209, |
| 04:43PM | 8 | Your Honor. |
| 04:43PM | 9 | **MR. SINGER:**  No objection. |
| 04:44PM | 10 | **THE COURT:**  Received without objection. |
| 04:44PM | 11 | **(GOV Exhibit 209 was received in evidence.)** |
| 04:44PM | 12 | **BY MR. TRIPI:** |
| 04:44PM | 13 | Q.  And was that your 55th birthday? |
| 04:44PM | 14 | A.  It was, yes. |
| 04:44PM | 15 | **MR. TRIPI:**  I'm holding it up for the jury so they |
| 04:44PM | 16 | can see it, Your Honor. |
| 04:44PM | 17 | **BY MR. TRIPI:** |
| 04:44PM | 18 | Q.  Did the manner in which the defendant was acting towards |
| 04:44PM | 19 | you during that time period concern you? |
| 04:44PM | 20 | A.  Yes.  It was erratic.  It wasn't of the norm.  Popping |
| 04:44PM | 21 | up, I felt like he was following me. |
| 04:44PM | 22 | Q.  Did you decide you were gonna stop minimizing and trying |
| 04:44PM | 23 | to protect yourself and the defendant? |
| 04:44PM | 24 | A.  Yes. |
| 04:44PM | 25 | Q.  In a few moments, I'm going to be done asking you |

04:45PM    1    questions.  I expect the defense is going to get up here and

04:45PM    2    ask you some questions claiming that you and Masecchia stole

04:45PM    3    Serio's money all those years and never gave any of it to the

04:45PM    4    defendant.  Is that true or false?

04:45PM    5    A.  That's false.

04:45PM    6    Q.  Explain how false that is.

04:45PM    7    A.  It's false because it happened.  It's false because the

04:45PM    8    money was being used to help his lifestyle, going out, taking

04:45PM    9    trips, buying clothes.  It's all false.

04:45PM   10    Q.  Was the information the defendant providing to you

04:45PM   11    helpful to your organization?

04:45PM   12    A.  Yes, very.

04:45PM   13    Q.  Did you see some records here in court of a real

04:45PM   14    informant that the defendant told you about?

04:45PM   15    A.  Yes.

04:45PM   16    Q.  Based on your discussions with the defendant and your

04:46PM   17    discussions with Masecchia, was there any question in your

04:46PM   18    mind that this defendant was getting paid?

04:46PM   19    A.  100 percent, yes.

04:46PM   20    Q.  100 percent he was?

04:46PM   21    A.  He was getting paid, yes.  No question.

04:46PM   22    Q.  Based upon the information the defendant was providing,

04:46PM   23    were you, Masecchia, and Serio, and others in the

04:46PM   24    organization relying on him?

04:46PM   25    A.  Yes.

04:46PM    1    Q.  Was Serio making money for everybody?

04:46PM    2    A.  He was.

04:46PM    3    Q.  Was he good at making money for everybody?

04:46PM    4    A.  He was.

04:46PM    5    Q.  Did you feel like the information the defendant was

04:46PM    6    giving you was helpful and specific?

04:46PM    7    A.  Yes.

04:46PM    8    Q.  Did you make people aware of the information, Masecchia

04:46PM    9    specifically, to tell Serio of the information the defendant

04:46PM   10    passed to you?

04:46PM   11    A.  Yes.

04:46PM   12    Q.  After a while, the defendant receiving $2,000 per month,

04:46PM   13    did he start complaining that he should get more money?

04:46PM   14    A.  Yes.

04:46PM   15    Q.  Did that confirm for you that he was, in fact, getting

04:46PM   16    paid?

04:46PM   17    A.  It did confirm, yes.

04:47PM   18    Q.  Did the defendant stress less about his financial

04:47PM   19    situation after he started accepting bribes?

04:47PM   20         **MR. SINGER:**  Objection, asked and answered.

04:47PM   21         **THE COURT:**  Sustained.

04:47PM   22         **BY MR. TRIPI:**

04:47PM   23    Q.  If the defendant wasn't getting paid, do you believe he

04:47PM   24    had enough information to bust you and all of you whenever he

04:47PM   25    wanted?

04:47PM    1    A.  Yes.

04:47PM    2            **MR. SINGER:**  Objection, asked and answered.

04:47PM    3            **MR. TRIPI:**  That's not.

04:47PM    4            **THE COURT:**  Overruled, no.

04:47PM    5            **THE WITNESS:**  At any time.  At any time we could have

04:47PM    6    went down.

04:47PM    7            **BY MR. TRIPI:**

04:47PM    8    Q.  In 2009?

04:47PM    9    A.  In 2009, '10, '11, yes.

04:47PM   10    Q.  In '12?

04:47PM   11    A.  '12.

04:47PM   12    Q.  '13?

04:47PM   13    A.  '13.

04:47PM   14    Q.  '14?

04:47PM   15    A.  '14.

04:47PM   16    Q.  '15?

04:47PM   17    A.  Any time, between that timeframe.

04:47PM   18    Q.  '15?

04:47PM   19    A.  '15.

04:47PM   20    Q.  '16?

04:47PM   21    A.  '16.

04:47PM   22    Q.  '17?

04:47PM   23    A.  '17.

04:47PM   24    Q.  '18?

04:47PM   25    A.  '18.

04:47PM   1   Q.  '19?

04:47PM   2   A.  '19.

04:47PM   3          **MR. TRIPI:**  No further direct.

04:47PM   4          **THE COURT:**  Okay.  We're going to break for the day

04:47PM   5   now.

          6          (Excerpt concluded at 4:47 p.m.)

          7          *     *     *     *     *     *     *     *

          8

          9

         10

         11              **CERTIFICATE OF REPORTER**

         12

         13          In accordance with 28, U.S.C., 753(b), I

         14   certify that these original notes are a true and correct

         15   record of proceedings in the United States District Court for

         16   the Western District of New York on August 28, 2024.

         17

         18

         19                    s/ Ann M. Sawyer
                               _____
         20                    Ann M. Sawyer, FCRR, RPR, CRR
                               Official Court Reporter
         21                    U.S.D.C., W.D.N.Y.

         22

         23

         24

         25

| | | |
|---|---|---|
| 1 | **TRANSCRIPT INDEX** | |
| 2 | **EXCERPT - EXAMINATION OF LOUIS SELVA - DAY 2** | |
| 3 | **AUGUST 28, 2024** | |
| 4 | | |
| 5 | **W I T N E S S** | **P A G E** |
| 6 | **L O U I S   S E L V A** | 2 |
| 7 | (CONT'D) DIRECT EXAMINATION BY MR. TRIPI: | 2 |
| 8 | PROFFER OUTSIDE PRESENCE OF JURY - BY TRIPI: | 145 |
| 9 | (CONT'D) DIRECT EXAMINATION BY MR. TRIPI: | 149 |
| 10 | | |
| 11 | | |
| 12 | **E X H I B I T S** | **P A G E** |
| 13 | GOV Exhibits 213-1 thru 5 | 32 |
| 14 | GOV Exhibit 109AB | 113 |
| 15 | GOV Exhibits 523, 524 | 117 |
| 16 | GOV Exhibit 103-62 | 119 |
| 17 | GOV Exhibit 103-13 | 120 |
| 18 | GOV Exhibits 103-20, 103-49 | 122 |
| 19 | GOV Exhibit 208C | 162 |
| 20 | GOV Exhibit 208D | 163 |
| 21 | GOV Exhibit 208E-1, 2, 3, 9, 10, 13, 14 | 164 |
| 22 | GOV Exhibit 208F | 183 |
| 23 | GOV Exhibit 208G | 184 |
| 24 | GOV Exhibit 208J | 188 |
| 25 | GOV Exhibit 208M | 191 |

1    GOV Exhibit 208K                                    195

2    GOV Exhibit 208N                                    197

3    GOV Exhibits 222I and G                             198

4    GOV Exhibits 200A-17, 18, 19, 22, 26, 28, 29,       203

5    31, 32, 33, 34, and 35

6    GOV Exhibit 201                                     207

7    GOV Exhibit 209                                     220

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25