09:15AM

1            UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF NEW YORK
2

   _____
3  UNITED STATES OF AMERICA,

                            Case No. 1:19-cr-227
4              Plaintiff,              (LJV)
   v.
5                           August 29, 2024
   JOSEPH BONGIOVANNI,
6
               Defendant.
7  _____


8      TRANSCRIPT EXCERPT - EXAMINATION OF LOUIS SELVA - DAY 3
            BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                 UNITED STATES DISTRICT JUDGE

10 **APPEARANCES:**        **TRINI E. ROSS, UNITED STATES ATTORNEY**
                          **BY: JOSEPH M. TRIPI, ESQ.**
11                            **NICHOLAS T. COOPER, ESQ.**
                              **CASEY L. CHALBECK, ESQ.**
12                        Assistant United States Attorneys
                          Federal Centre, 138 Delaware Avenue
13                        Buffalo, New York 14202
                          For the Plaintiff
14
                          **SINGER LEGAL PLLC**
15                        **BY: ROBERT CHARLES SINGER, ESQ.**
                          80 East Spring Street
16                        Williamsville, New York 14221
                             And
17                        **LAW OFFICES OF PARKER ROY MacKAY**
                          **BY: PARKER ROY MacKAY, ESQ.**
18                        3110 Delaware Avenue
                          Kenmore, New York 14217
19                           And
                          **OSBORN, REED & BURKE, LLP**
20                        **BY: JOHN J. GILSENAN, ESQ.**
                          120 Allens Creek Road
21                        Rochester, New York 14618
                          For the Defendant
22
   **PRESENT:**            **BRIAN A. BURNS,** FBI Special Agent
23                        **MARILYN K. HALLIDAY,** HSI Special Agent
                          **KAREN A. CHAMPOUX,** USA Paralegal
24
   **LAW CLERK:**          **REBECCA FABIAN IZZO, ESQ.**
25

1    **COURT DEPUTY CLERK:   JENNIFER L. VERNEN**

2    **COURT REPORTER:        ANN MEISSNER SAWYER, FCRR, RPR, CRR**
                              Robert H. Jackson Federal Courthouse
3                             2 Niagara Square
                              Buffalo, New York  14202
4                             Ann_Sawyer@nywd.uscourts.gov

5
                    *    *    *    *    *    *    *
6

09:36AM  7          (Excerpt commenced at 9:36 a.m.)

09:36AM  8          (Jury seated at 9:37 a.m.)

09:37AM  9          **THE COURT:**  Good morning, everyone.

09:37AM  10         **JURORS:**  Good morning.

09:37AM  11         **THE COURT:**  The record will reflect that all our

09:37AM  12    jurors are present.

09:37AM  13         I remind the witness that he's still under oath.

09:37AM  14         And, Mr. Singer, you may begin.

09:37AM  15         **MR. SINGER:**  Thank you.

09:37AM  16

09:37AM  17    **L O U I S   S E L V A,** having been previously duly called and

09:37AM  18    sworn, continued to testify as follows:

09:37AM  19

09:37AM  20              **CROSS-EXAMINATION BY MR. SINGER:**

09:37AM  21    Q.  Good morning, Mr. Selva.

09:37AM  22    A.  Good morning.

09:37AM  23    Q.  So I guess you are the proverbial inside man; is that

09:37AM  24    right?

09:37AM  25    A.  Yes, sir.

09:37AM      1    Q.  You've had a long-standing relationship with

09:37AM      2    Mr. Bongiovanni; is that right?

09:37AM      3    A.  Yes, sir.

09:37AM      4    Q.  You guys have known each other pretty much all your

09:37AM      5    lives, correct?

09:37AM      6    A.  Correct.

09:37AM      7    Q.  And yesterday, you talked at length about this criminal

09:38AM      8    conspiracy that you claim that Mr. Bongiovanni was involved

09:38AM      9    in, correct?

09:38AM     10    A.  Correct.

09:38AM     11    Q.  And a lot of the meetings that you and Mr. Bongiovanni

09:38AM     12    had, at that time according to your testimony, it was between

09:38AM     13    you and him, correct?

09:38AM     14    A.  Correct.

09:38AM     15    Q.  Mike Masecchia wasn't there?

09:38AM     16    A.  No, he wasn't.

09:38AM     17    Q.  It was just you guys?

09:38AM     18    A.  Yes.

09:38AM     19    Q.  Alone?

09:38AM     20    A.  Yes.

09:38AM     21    Q.  Sometimes at a bar?

09:38AM     22    A.  Sometimes.

09:38AM     23    Q.  Sometimes talking on the phone?

09:38AM     24    A.  Yes.

09:38AM     25    Q.  Sometimes at a park?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

09:38AM    1    A.  Yes.

09:38AM    2    Q.  We heard a lot of different places, right?

09:38AM    3    A.  Yes.

09:38AM    4    Q.  But it's just you two, right?

09:38AM    5    A.  Yes.

09:38AM    6    Q.  And at the time that you got arrested, you started

09:38AM    7    cooperating with the government, you didn't wear a wire

09:38AM    8    during any conversations you had with Mr. Bongiovanni, right?

09:38AM    9    A.  No.

09:38AM   10    Q.  So there's no recordings of conversations that you and he

09:38AM   11    may have had in the late summer to early fall of 2019?

09:38AM   12    A.  No.

09:38AM   13    Q.  No conversations that occurred that were recorded between

09:39AM   14    you guys that happened after that time, right?

09:39AM   15    A.  No.

09:39AM   16    Q.  So I want to go a little bit into some of the aspects of

09:39AM   17    your testimony.

09:39AM   18        Let's start first with your relationship with

09:39AM   19    Mr. Bongiovanni.

09:39AM   20        So you two grew up together right?

09:39AM   21    A.  Yes.

09:39AM   22    Q.  And that friendship progressed through the high school

09:39AM   23    years, correct?

09:39AM   24    A.  Correct.

09:39AM   25    Q.  You guys grew up in the same neighborhood?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

09:39AM  1   A.  We did.

09:39AM  2   Q.  And then after graduation from high school, when that

09:39AM  3   happened, that was going back into like the late '80s?

09:39AM  4   A.  '82.

09:39AM  5   Q.  So early '80s?

09:39AM  6   A.  Early '80s.

09:39AM  7   Q.  So we're talking about 40 years ago?

09:39AM  8   A.  Graduated from high school, yes.

09:39AM  9   Q.  And after the high school years were finished there were

09:39AM  10  times when you two associated together when you're in the

09:39AM  11  college years, correct?

09:39AM  12  A.  Correct.

09:39AM  13  Q.  So we're talking about moving out of your late teens and

09:40AM  14  into your early to 20s; is that right?

09:40AM  15  A.  Yes.

09:40AM  16  Q.  And eventually you two start up to become adults and have

09:40AM  17  families, correct?

09:40AM  18  A.  That's correct.

09:40AM  19  Q.  So as we progress into the mid '90s, were Bongiovanni,

09:40AM  20  he's dating his first wife, JoAnn, right?

09:40AM  21  A.  In the mid '90s?

09:40AM  22  Q.  Yeah.

09:40AM  23  A.  I believe so, yes.

09:40AM  24  Q.  And you're start to date your then wife at that time,

09:40AM  25  correct?

09:40AM     1    A.  Yes.

09:40AM     2    Q.  When was it that you got married?

09:40AM     3    A.  I got married in '92.

09:40AM     4    Q.  So you got a little earlier than Mr. Bongiovanni,

09:40AM     5    correct?

09:40AM     6    A.  I believe so, yes.

09:40AM     7    Q.  Because he got married in 1994?

09:40AM     8    A.  Yes.

09:40AM     9    Q.  And when was it that you had your first child?

09:40AM    10    A.  Me?

09:40AM    11    Q.  Yes.

09:40AM    12    A.  In '92.

09:40AM    13    Q.  So right in '92?

09:40AM    14    A.  Yes.

09:40AM    15    Q.  It was a daughter, correct?

09:40AM    16    A.  That's correct.

09:40AM    17    Q.  And then you had a second child in that relationship as

09:40AM    18    well, right?

09:40AM    19    A.  I did.

09:40AM    20    Q.  When was that?

09:40AM    21    A.  1996.

09:40AM    22    Q.  Okay.  So a little bit later?

09:40AM    23    A.  Yes.

09:40AM    24    Q.  Mr. Bongiovanni, he had his first daughter in 1997,

09:40AM    25    correct?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

09:41AM   1    A.   I believe so.  That was the timeframe, yes.

09:41AM   2    Q.   And, you know, I know I've got buddies too, and when I

09:41AM   3    was -- before I was married I used to hang out with them a

09:41AM   4    lot, right?

09:41AM   5    A.   That's correct.

09:41AM   6    Q.   You used to do the same thing with Mr. Bongiovanni?

09:41AM   7    A.   Yes.

09:41AM   8    Q.   But eventually when you settle down, things change a

09:41AM   9    little bit, right?

09:41AM   10   A.   Yes.

09:41AM   11   Q.   So, when you got married in 1992, you were hanging out

09:41AM   12   with your wife and your newborn daughter a lot more than

09:41AM   13   Mr. Bongiovanni, right?

09:41AM   14   A.   Yes.

09:41AM   15   Q.   And I know you guys would see each other every now and

09:41AM   16   then, weekends that kind of thing, right?

09:41AM   17   A.   Yes.

09:41AM   18   Q.   But it wasn't like you were hanging out the same way you

09:41AM   19   were as teenagers?

09:41AM   20   A.   No.

09:41AM   21   Q.   Or even before you were married?

09:41AM   22   A.   No.

09:41AM   23   Q.   And eventually Joe gives up bachelorhood and he gets

09:41AM   24   married in '94, right?

09:41AM   25   A.   Yes.

09:41AM    1    Q.  And so that's a situation where you might expect him to

09:41AM    2    spend more time with his new wife, correct?

09:41AM    3    A.  It's logical, yes.

09:41AM    4    Q.  Um-hum.  And that was something that, you know, you

09:42AM    5    caused you guys to hang out a little bit less, right?

09:42AM    6    A.  Yes.

09:42AM    7    Q.  You also mentioned that at some period of time, you move

09:42AM    8    out to Las Vegas with your wife and your child, right?

09:42AM    9    A.  Both children.  Yes.

09:42AM   10    Q.  Both children?

09:42AM   11    A.  Yes.

09:42AM   12    Q.  So, you move out to Vegas in 1997?

09:42AM   13    A.  '97, correct.

09:42AM   14    Q.  So that was right after the birth, a year or so after the

09:42AM   15    birth of your second child?

09:42AM   16    A.  It was.  She was a baby at that time, yes.

09:42AM   17    Q.  And you mentioned how Mr. Bongiovanni in the earlier

09:42AM   18    years around his marriage, he was working for the Sheriff's

09:42AM   19    Office?

09:42AM   20    A.  Yes.

09:42AM   21    Q.  He was working as a deputy in the corrections center?

09:42AM   22    A.  Yes.

09:42AM   23    Q.  And then at some point in time, he decides he wants to

09:42AM   24    change careers and he applies to the DEA, correct?

09:42AM   25    A.  Yes.

09:42AM    1    Q.   He was accepted into the DEA and then he went to the DEA

09:42AM    2    academy, correct?

09:42AM    3    A.   Correct.

09:42AM    4    Q.   And his acceptance in the DEA, that happens after you

09:42AM    5    moved to Las Vegas, correct?

09:42AM    6    A.   I was in Las Vegas, correct.

09:43AM    7    Q.   And we talked a little bit about it, we're talking about

09:43AM    8    the late '90s here, so cell phones are a thing, but not like

09:43AM    9    they are today, right?

09:43AM   10    A.   Correct.  There was a different time, yes, but a lot of

09:43AM   11    people still had them.

09:43AM   12    Q.   Um-hum.  So some people had them.  And we're not quite in

09:43AM   13    the same time of the big box, right?

09:43AM   14    A.   Not what they are today at that time, no.

09:43AM   15    Q.   Yeah, but we're talking about something that's a little

09:43AM   16    bigger, correct?

09:43AM   17    A.   Yes.

09:43AM   18    Q.   And the more expensive too?

09:43AM   19    A.   Now or then?

09:43AM   20    Q.   Back then.

09:43AM   21    A.   Not that expensive.

09:43AM   22    Q.   Well, you know back in the day, you worked in the

09:43AM   23    cellular industry, right?

09:43AM   24    A.   Correct.

09:43AM   25    Q.   And up know back in the day, people used to pay minutes

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

09:43AM  1   as opposed to just pay for the unlimited minutes, right?

09:43AM  2   A.  At that timeframe in Las Vegas, we were introducing the

09:43AM  3   unlimited plan so.

09:43AM  4   Q.  Back then you had unlimited minutes?

09:43AM  5   A.  Yes.

09:43AM  6   Q.  It was a night and weekends thing right?

09:43AM  7   A.  And after, I don't recall after 5 or 6.

09:43AM  8   Q.  Yeah.  Night and weekends?

09:43AM  9   A.  But then there were business plans when could you go on

09:44AM  10  and speak whatever, any time.

09:44AM  11  Q.  But I guess what I'm getting at is cell phones were as

09:44AM  12  ubiquitous as they were now?

09:44AM  13  A.  No.

09:44AM  14  Q.  You were still calling up Mr. Bongiovanni on a landline,

09:44AM  15  right?

09:44AM  16  A.  Yes.  On a landline, right.

09:44AM  17  Q.  He was picking up the landline the same way when you

09:44AM  18  called, right?

09:44AM  19  A.  Correct.

09:44AM  20  Q.  And I'm sure having two young daughters being in a new

09:44AM  21  city trying to make sure that you guys are getting up on your

09:44AM  22  feet financially took a lot of work, right?

09:44AM  23  A.  Yes.

09:44AM  24  Q.  What did you do out in Las Vegas again at the time?

09:44AM  25  A.  I was in the cell -- wireless business.

09:44AM    1    Q.  You also mentioned that you bartended as well?

09:44AM    2    A.  Not in Las Vegas at all.

09:44AM    3    Q.  Not in Las Vegas at all?

09:44AM    4    A.  No.

09:44AM    5    Q.  So you were kind of trying to establish yourself, right?

09:44AM    6    A.  Yes.

09:44AM    7    Q.  And your wife, was she working at the time?

09:44AM    8    A.  She was, she was working part time.

09:44AM    9    Q.  So you guys are managing two kids in a new town, right?

09:44AM   10    A.  Yes.

09:44AM   11    Q.  And you didn't have a lot of family there, right?

09:44AM   12    A.  I had my brother, and I did have family there, a few

09:45AM   13    cousins.

09:45AM   14    Q.  Were they helping out with the kids?

09:45AM   15    A.  We worked out a schedule, yes, it worked.

09:45AM   16    Q.  But it was busy, right?

09:45AM   17    A.  Yes, everyone pitched in.

09:45AM   18    Q.  And Joe was busy at the same time, too, he was down at

09:45AM   19    the DEA academy training to be a new agent, right?

09:45AM   20    A.  I believe so, yes.

09:45AM   21    Q.  And then after you had mentioned he graduated DEA,

09:45AM   22    academy, he moved down to Florida for his first duty station,

09:45AM   23    right?

09:45AM   24    A.  I believe so, yes.

09:45AM   25    Q.  And he moved down there with his wife, correct?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

09:45AM  1   A.  Correct.

09:45AM  2   Q.  And their child?

09:45AM  3   A.  Yes.

09:45AM  4   Q.  He was establishing himself in a new job just like you

09:45AM  5   were out in Vegas, right?

09:45AM  6   A.  Yes.

09:45AM  7   Q.  And so I know you guys would talk from time to time, but

09:45AM  8   it wasn't like it was a frequent thing, right?

09:45AM  9   A.  No, but we did keep in touch.

09:45AM  10  Q.  I'm not saying you didn't keep in touch, sir, but it

09:45AM  11  wasn't like it was every single day, right?

09:45AM  12  A.  Not at that time.

09:45AM  13  Q.  It wasn't like it was every single week, right?

09:45AM  14  A.  Maybe, you know, once a week, every other week.  That

09:45AM  15  time.

09:45AM  16  Q.  Um-hum.  Sporadic is the way you put it, correct?

09:46AM  17  A.  Correct.

09:46AM  18  Q.  And that was how the contact was, sporadic?

09:46AM  19  A.  At that point in time.

09:46AM  20  Q.  And you mentioned that you had never gone down to Florida

09:46AM  21  to go visit Joseph Bongiovanni, right?

09:46AM  22  A.  No.

09:46AM  23  Q.  Not that time period?

09:46AM  24  A.  Not a that time period, no.

09:46AM  25  Q.  You also mentioned that he didn't come out to Vegas to

09:46AM    1    visit you, correct?

09:46AM    2    A.  No.

09:46AM    3    Q.  Okay.  So you start to move into the 2000s, that's when

09:46AM    4    you suffer some marital difficulties; is that right?

09:46AM    5    A.  I'm sorry, can you repeat that.

09:46AM    6    Q.  Certainly, you move into the 2000s and you start to

09:46AM    7    suffer some marital difficulties, right?

09:46AM    8    A.  Correct.

09:46AM    9    Q.  You and your family move from Vegas back to Buffalo?

09:46AM    10   A.  That's correct.

09:46AM    11   Q.  And at the time, you and your wife separated, correct?

09:46AM    12   A.  After a while, being back in Buffalo, we tried to make it

09:46AM    13   work, and then we made an agreement to separate.

09:46AM    14   Q.  When did the divorce proceedings start up in that case?

09:46AM    15   A.  2002.  I think.  I don't recall exactly.

09:47AM    16   Q.  When Mr. Bongiovanni made it back kind of had the same

09:47AM    17   issues going on, fair to say?

09:47AM    18   A.  Yes.  I believe so, yes.

09:47AM    19   Q.  And he tried to make some things work but things

09:47AM    20   eventually didn't work out, correct?

09:47AM    21   A.  Correct.

09:47AM    22   Q.  So he separated from his wife?

09:47AM    23   A.  I believe so.  I don't know the timeframe.  But yes.  He

09:47AM    24   did separate.

09:47AM    25   Q.  And eventually, he starts to go down the same path that

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

09:47AM 1    you did, with the divorce, correct?

09:47AM 2    A.  Correct.

09:47AM 3    Q.  And you mentioned in your testimony that it was really at

09:47AM 4    that time where both you were kind of single again, for lack

09:47AM 5    of a better word, that you start to see each other a little

09:47AM 6    bit more again?

09:47AM 7    A.  Yes.  I was working a second job.  Bartending.  I'm

09:47AM 8    trying to get back on my feet and get in a routine with my

09:47AM 9    kids.  So, yes.

09:47AM 10   Q.  So that's the Harry Harbor job that you mentioned

09:47AM 11   yesterday, right?

09:47AM 12   A.  Yes.

09:47AM 13   Q.  So you guys, you start to see each other a little bit.

09:48AM 14   You start to hang out a little bit, but eventually

09:48AM 15   Mr. Bongiovanni, he divorces fully, correct?

09:48AM 16   A.  I believe so, yes.

09:48AM 17   Q.  And you had mentioned that at some point, for a short

09:48AM 18   period, he had those support obligations to his ex spouse?

09:48AM 19   A.  I'm sorry, I didn't hear you with the coughing, can you

09:48AM 20   repeat that?

09:48AM 21   Q.  No problem.  So at some point after the divorce, you

09:48AM 22   mentioned that Mr. Bongiovanni owes a support obligation to

09:48AM 23   his spouse, for spousal maintenance?

09:48AM 24   A.  Correct, he had obligations, correct.

09:48AM 25   Q.  But that's not something that lasted as long as the child

09:48AM    1    support that he owed for his daughter, correct?

09:48AM    2    A.  I wasn't aware of that.

09:48AM    3    Q.  You weren't aware of what?

09:48AM    4    A.  I thought it lasted quite longer than that.

09:48AM    5    Q.  Okay.  So, you think that the spousal maintenance support

09:48AM    6    payments that he made to his ex-wife lasted for how long?

09:48AM    7    A.  I don't know.  A while.  It was --

09:48AM    8    Q.  Give me a time, sir, how long?

09:48AM    9    A.  Ten years.

09:48AM    10    Q.  Ten years?

09:48AM    11    A.  I believe.

09:49AM    12    Q.  That's how long you believe the spousal maintenance

09:49AM    13    support lasted of lasted?

09:49AM    14    A.  I believe so.

09:49AM    15    Q.  What led you to believe that?

09:49AM    16    A.  Just his demeanor, conversation.  Bring it up.  Expenses.

09:49AM    17    Q.  You thought it lasted for ten years?

09:49AM    18    A.  I did.

09:49AM    19    Q.  All right.  So, as far as the child support payments were

09:49AM    20    concerned, you talked about that, right?

09:49AM    21    A.  Correct.

09:49AM    22    Q.  You talked about how he paid those support payments,

09:49AM    23    correct?

09:49AM    24    A.  Correct.

09:49AM    25    Q.  But there were some issues that he had, right?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

09:49AM    1    A.  Yes.

09:49AM    2    Q.  Like one of the issues was, is that after the divorce,

09:49AM    3    his ex-wife didn't go back to work, correct?

09:49AM    4    A.  I don't believe she ever worked.

09:49AM    5    Q.  Yeah, and you mentioned that she had a master's degree,

09:49AM    6    right?

09:49AM    7    A.  Yes.

09:49AM    8    Q.  And that was one of the complaints that Mr. Bongiovanni

09:49AM    9    had, correct?

09:49AM   10    A.  Yes.

09:49AM   11    Q.  Like, hey, she's got a master's degree but she doesn't go

09:49AM   12    back to work and she's not pitching in on the financial side,

09:49AM   13    right?

09:49AM   14    A.  Correct.

09:49AM   15    Q.  And you had kind of similar squabbles sometimes with your

09:50AM   16    ex spouse, right?

09:50AM   17    A.  No, my ex spouse always worked.

09:50AM   18    Q.  Okay.  Did you have any type of issues with the way the

09:50AM   19    support obligations were are divided up between you?

09:50AM   20    A.  Are you talking about when I was divorced?

09:50AM   21    Q.  Talking about when you're divorced.

09:50AM   22    A.  Yes, that's why I was working two jobs.

09:50AM   23    Q.  Stuff pops up, right?

09:50AM   24    A.  Yes.

09:50AM   25    Q.  You guys divorce for a reason, right?

09:50AM  1    A.  I had two kids, not one, yes.

09:50AM  2    Q.  So you had even more of an obligation?

09:50AM  3    A.  I did.  I had medical obligations that needed to be met

09:50AM  4    for my kids, clothing and school, and my ex and I we worked

09:50AM  5    that -- we worked it out amicably.

09:50AM  6    Q.  And if your ex-wife, she chose not to work and you were

09:50AM  7    the person responsible for all the financial support, you'd

09:50AM  8    understand how that would be frustrating sometimes, right?

09:50AM  9    A.  That wasn't my situation, sir.  My ex-wife worked two

09:50AM  10   jobs and we worked it out.

09:50AM  11   Q.  That's not the question I asked you.

09:50AM  12   A.  Well, so I don't understand what you're saying.

09:50AM  13   Q.  I'll ask you questions and you can provide answers, can

09:50AM  14   we agree on that?

09:50AM  15   A.  We can agree on that, yes, sir.

09:50AM  16   Q.  So the question was, you can understand how somebody who

09:50AM  17   had a spouse they divorced from didn't work would being

09:51AM  18   frustrated with the fact that spouse didn't work, correct?

09:51AM  19   A.  Correct.

09:51AM  20   Q.  Okay.  So, as far as things moving forward, you'd

09:51AM  21   mentioned that around 2004, Mr. Bongiovanni gets into another

09:51AM  22   relationship, correct?

09:51AM  23   A.  Correct.

09:51AM  24   Q.  That was with a lady named Melissa?

09:51AM  25   A.  Correct.

09:51AM  1   Q.  And that's something that turns into a committed

09:51AM  2   relationship, right?

09:51AM  3   A.  Correct.

09:51AM  4   Q.  And it's something that lasts for a couple of years,

09:51AM  5   correct?

09:51AM  6   A.  From my knowledge, five years.

09:51AM  7   Q.  Yeah.  So five years is pretty long period of time?

09:51AM  8   A.  Correct.

09:51AM  9   Q.  And they were committed together, correct?

09:51AM  10  A.  They were engaged, I believe.

09:51AM  11  Q.  Um-hum.  Things didn't work out in the engagement but it

09:51AM  12  was something where, you know, they would see each other a

09:51AM  13  lot during that time period, correct?

09:51AM  14  A.  Correct.

09:51AM  15  Q.  And during that same time period, you also get into a

09:51AM  16  relationship with another lady, correct?

09:51AM  17  A.  Correct.

09:51AM  18  Q.  And, so, was it a committed relationship?

09:51AM  19  A.  It was.

09:51AM  20  Q.  And I'm assuming that you probably would spend a lot of

09:52AM  21  time with the person that you're in that relationship with,

09:52AM  22  correct?

09:52AM  23  A.  She had kids, and I had kids.  So it wasn't, we worked it

09:52AM  24  out.  There was, our children first, and then when we had

09:52AM  25  time we would spend time together.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

09:52AM  1   Q.  Um-hum.  So I think probably your priorities was children

09:52AM  2   first, right?

09:52AM  3   A.  Correct.

09:52AM  4   Q.  I think everyone understands that, right?

09:52AM  5   A.  Yes, sir.

09:52AM  6   Q.  Then the next was your relationship with the woman that

09:52AM  7   you're dating, correct?

09:52AM  8   A.  If there was free time, yes.

09:52AM  9   Q.  Then you had work kind of spattered in there?

09:52AM  10  A.  Work was an obligation, biggest obligation, yes.

09:52AM  11  Q.  And at that point, your children are how old?

09:52AM  12  A.  What was the time?

09:52AM  13  Q.  Later 2000s.

09:52AM  14  A.  Later 2000s, they were born -- they were pre teens, '92

09:52AM  15  and '96, so --

09:52AM  16  Q.  So they're involved in school sports and school

09:52AM  17  activities?

09:52AM  18  A.  Yes.  But I was still very close with my children and I

09:52AM  19  saw them on a regular basis.

09:52AM  20  Q.  I don't doubt that at all.  What I'm getting at is it

09:52AM  21  a -- a pretty busy time in your life with your kids at that

09:52AM  22  point, right?

09:52AM  23  A.  Yes, sir.

09:52AM  24  Q.  I mean, to be committed parent with teenagers who were

09:53AM  25  involved in activities -- your kids were involved in

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

09:53AM  1    activities, right?

09:53AM  2    A.  Yes.

09:53AM  3    Q.  It takes a lot of work, right?

09:53AM  4    A.  It did, yes.

09:53AM  5    Q.  And so after you had that time left over you tried to

09:53AM  6    devote some time to the relationship that you were in with

09:53AM  7    your significant other, right?

09:53AM  8    A.  Yes.

09:53AM  9    Q.  And then if there was time left over after of all that,

09:53AM  10   that's when maybe you hang out with your friends, right?

09:53AM  11   A.  Yes.  When there was free time, yes.

09:53AM  12   Q.  So, again, during that time period, where he's in a

09:53AM  13   relationship and you're in a relationship, you guys have

09:53AM  14   kids, same things going on, it's not like you guys are

09:53AM  15   hanging out every single day, right?

09:53AM  16   A.  No, but we kept in contact though.  We still

09:53AM  17   communicated.

09:53AM  18   Q.  I don't doubt that.  I don't doubt that, but it's not

09:53AM  19   like you were hang out like teenagers, right?

09:53AM  20   A.  Not like teenagers, but we would still get together.

09:53AM  21   Q.  Not like you were hanging out in your 20s either, right?

09:53AM  22   Where you're not in a relationship, right?

09:53AM  23   A.  It was a different time, no.

09:53AM  24   Q.  So you had mentioned that at some point in time after

09:53AM  25   that five year relationship that Joe was in, with Melissa,

09:53AM    1    things end, correct?

09:53AM    2    A.  Correct.

09:54AM    3    Q.  And you had mentioned that somewhere around 2009 or 2010,

09:54AM    4    he starts up another relationship with his current wife

09:54AM    5    Lindsay, correct?

09:54AM    6    A.  Correct.

09:54AM    7    Q.  And the two of them met because Lindsay was a tenant in

09:54AM    8    the 221 Lovering property; is that right?

09:54AM    9    A.  That's correct.

09:54AM    10   Q.  And she had moved in there after Joe's parents had moved

09:54AM    11   out of there, correct?

09:54AM    12   A.  That's correct.

09:54AM    13   Q.  After Joe had purchased the house from his parents?

09:54AM    14   A.  I believe so.  Yes.

09:54AM    15   Q.  Okay.  And, so, over time, their relationship blossoms,

09:54AM    16   correct?

09:54AM    17   A.  Correct.

09:54AM    18   Q.  And they decide to move in together, correct?

09:54AM    19   A.  Correct.

09:54AM    20   Q.  And Joe's involved in that relationship just as much as

09:54AM    21   he was in any of his other relationships, right?

09:54AM    22   A.  Yes.

09:54AM    23   Q.  He has also got a kid at the time, correct?  Chelsea?

09:54AM    24   A.  Correct, he still has his daughter, yes.

09:54AM    25   Q.  And he's helping raise her, correct?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

| | | |
|---|---|---|
| 09:54AM | 1 | A.  Yes. |
| 09:54AM | 2 | Q.  And Lindsay, she also has a child in relationship, |
| 09:54AM | 3 | correct? |
| 09:55AM | 4 | A.  Yes. |
| 09:55AM | 5 | Q.  And you mentioned on your direct testimony yesterday that |
| 09:55AM | 6 | Joe's also helping out with helping raise that child, |
| 09:55AM | 7 | correct? |
| 09:55AM | 8 | A.  Yes. |
| 09:55AM | 9 | Q.  So, lot of things going on in his life, correct? |
| 09:55AM | 10 | A.  Yes. |
| 09:55AM | 11 | Q.  Things are going on in your life, correct? |
| 09:55AM | 12 | A.  Correct. |
| 09:55AM | 13 | Q.  And again it's a situation where you guys would see each |
| 09:55AM | 14 | other, right? |
| 09:55AM | 15 | A.  Yes. |
| 09:55AM | 16 | Q.  You guys would speak on the phone? |
| 09:55AM | 17 | A.  Yes. |
| 09:55AM | 18 | Q.  But we're not talking about like it was back in the |
| 09:55AM | 19 | teenage days, right? |
| 09:55AM | 20 | A.  No. |
| 09:55AM | 21 | Q.  Not talking about the 20's single days either, correct? |
| 09:55AM | 22 | A.  No. |
| 09:55AM | 23 | Q.  So you mentioned that you would sometimes get together |
| 09:55AM | 24 | for drinks at bars, right? |
| 09:55AM | 25 | A.  Yes. |

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

23

| | | |
|---|---|---|
| 09:55AM | 1 | Q.  Catch up, that kind of thing? |
| 09:55AM | 2 | A.  Yes. |
| 09:55AM | 3 | Q.  You mentioned that you guys would get together for |
| 09:55AM | 4 | special events, right? |
| 09:55AM | 5 | A.  Yes. |
| 09:55AM | 6 | Q.  So you mentioned the wedding in Cabo San Lucas? |
| 09:55AM | 7 | A.  It was later.  Not during the time frame I think you were |
| 09:56AM | 8 | describing, correct me if I am wrong, but, yes, later, yes. |
| 09:56AM | 9 | Q.  It's later, 2015, right? |
| 09:56AM | 10 | A.  Yes. |
| 09:56AM | 11 | Q.  So that's one of those special occasions you had |
| 09:56AM | 12 | mentioned that you had a benefit after you had a heart attack |
| 09:56AM | 13 | and heart surgery, correct? |
| 09:56AM | 14 | A.  I had open-heart surgery. |
| 09:56AM | 15 | Q.  And you mentioned about the benefit that's happening in |
| 09:56AM | 16 | July of 2017, right? |
| 09:56AM | 17 | A.  Yes. |
| 09:56AM | 18 | Q.  And that was another example of you and Joe getting |
| 09:56AM | 19 | together for another type of special event, correct? |
| 09:56AM | 20 | A.  Correct. |
| 09:56AM | 21 | Q.  You showed a picture -- sorry, the government showed a |
| 09:56AM | 22 | picture yesterday when you graduated from the Sheriff's |
| 09:56AM | 23 | Office academy.  Remember that? |
| 09:56AM | 24 | A.  Correct. |
| 09:56AM | 25 | Q.  And so that there was a picture of you, Joe, and a |

09:56AM   1   gentleman by the name of Vic Sorrento?

09:56AM   2   A.  Correct.

09:56AM   3   Q.  And Vic was another one of your good friends, kind of

09:56AM   4   goes back a ways, right?

09:56AM   5   A.  Correct.

09:56AM   6   Q.  And, that's an example of a special event where you guys

09:56AM   7   got together, right?

09:56AM   8   A.  Yes.

09:56AM   9   Q.  So, you guys would catch up in those kind of situations,

09:56AM  10   catch up at bars, also talk on the phone, correct?

09:56AM  11   A.  Correct.

09:56AM  12   Q.  And as far as the phone periods and contacts and stuff

09:57AM  13   like that, you guys spoke on a pretty regular basis, right?

09:57AM  14   A.  On a regular basis, yes.

09:57AM  15   Q.  This was using your personal cell phone, correct?

09:57AM  16   A.  Correct.

09:57AM  17   Q.  So the one that we were talking about yesterday, that you

09:57AM  18   had all the contacts listed in, that HSI seized from you

09:57AM  19   during the search?

09:57AM  20   A.  Correct.  It was my 716-903 number -- 1654 at the time.

09:57AM  21   Q.  Um-hum, that 1654 number is something you maintained for

09:57AM  22   a very long time, up until 2019, right?

09:57AM  23   A.  For a very long time.

09:57AM  24   Q.  And that's the number that you would converse with with

09:57AM  25   Mr. Bongiovanni on his cell phone, correct?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

25

| | | |
|---|---|---|
| 09:57AM | 1 | A.  Correct. |
| 09:57AM | 2 | Q.  And his cell phone that you called him on that was his |
| 09:57AM | 3 | DEA-issued cell phone, right? |
| 09:57AM | 4 | A.  Correct. |
| 09:57AM | 5 | Q.  And you guys would have these contacts over the phone, |
| 09:57AM | 6 | correct? |
| 09:57AM | 7 | A.  Correct. |
| 09:57AM | 8 | Q.  I mean, we've been through the records, like there are a |
| 09:57AM | 9 | lot of contacts, right? |
| 09:57AM | 10 | A.  Yes. |
| 09:57AM | 11 | Q.  I mean, we're talking about dozens and dozens of calls, |
| 09:57AM | 12 | every single year, correct? |
| 09:58AM | 13 | A.  Correct. |
| 09:58AM | 14 | Q.  Sometimes dozens and dozens of calls every single month, |
| 09:58AM | 15 | correct? |
| 09:58AM | 16 | A.  Yes. |
| 09:58AM | 17 | Q.  But there are also periods of time where you two don't |
| 09:58AM | 18 | have a lot of contact, right? |
| 09:58AM | 19 | A.  There were times, yes. |
| 09:58AM | 20 | Q.  Yeah.  So, like, in June of 2014, May and June of 2014, |
| 09:58AM | 21 | do you remember how you guys didn't speak as often back then? |
| 09:58AM | 22 | A.  We still spoke. |
| 09:58AM | 23 | Q.  Do you remember how you two got into a little bit of an |
| 09:58AM | 24 | argument over something you were doing with one of your |
| 09:58AM | 25 | friends' wives? |

09:58AM   1    A.  I don't recall that.

09:58AM   2    Q.  Don't recall anything about how you and Joe got into an

09:58AM   3    argument about the fact that you were carrying on an affair

09:58AM   4    with Gary Quatrani's wife?

09:58AM   5    A.  I wasn't carrying on an affair.

09:58AM   6    Q.  You weren't carrying on an affair?

09:58AM   7    A.  No, we were friends, I've known her my whole life.

09:58AM   8    Q.  Do you remember any point in time when Mr. Bongiovanni

09:58AM   9    stopped talking to you for several weeks during that May to

09:58AM   10   June 2014 time period because of what he felt was untoward

09:59AM   11   conduct by you?

09:59AM   12   A.  No.  No, I was in Florida with my daughter and he was

09:59AM   13   down there with Lindsay at that time.  And her name is Kim,

09:59AM   14   she was down there with her friend and we all together, so

09:59AM   15   no.

09:59AM   16   Q.  You don't recall any point in time where you guys just

09:59AM   17   stopped speaking on the phone?

09:59AM   18   A.  I don't, no.

09:59AM   19   Q.  You don't recall that at all?

09:59AM   20   A.  No.  We never had an argument.

09:59AM   21   Q.  You never had any arguments?

09:59AM   22   A.  Not over this.

09:59AM   23   Q.  So there were no drop offs in calls between you and

09:59AM   24   Mr. Bongiovanni between May and June of 2014?

09:59AM   25   A.  No.

09:59AM      1    Q.   Okay.  Part of this conspiracy that you spoke of was that

09:59AM      2    during the course of it, you and Mr. Bongiovanni would have

09:59AM      3    to have contact, right?

09:59AM      4    A.   Yes.

09:59AM      5    Q.   And part of that contact was to ensure that you were

09:59AM      6    being kept up to date on any type of investigations or

09:59AM      7    problems that may exist with regard to law enforcement,

09:59AM      8    right?

09:59AM      9    A.   Correct.

10:00AM     10    Q.   And another reason you guys had to stay in contact was

10:00AM     11    you were the point person for the information, right?

10:00AM     12    A.   Correct.

10:00AM     13    Q.   So if Ron Serio or Mike Masecchia had anybody who, hey,

10:00AM     14    had concerns about, they'd go to you to ask Joseph

10:00AM     15    Bongiovanni about it?

10:00AM     16    A.   It would go from Ron to Mike to me, yes.

10:00AM     17    Q.   And then if they had anybody who they wanted checked out,

10:00AM     18    they'd go to you, to find out from Mr. Bongiovanni whether

10:00AM     19    there were any issues, right?

10:00AM     20    A.   Correct.

10:00AM     21    Q.   And you'd agree with me that having that type of regular

10:00AM     22    contact was something that facilitated the information

10:00AM     23    sharing, right?

10:00AM     24    A.   Yes.

10:00AM     25    Q.   Like if you guys don't talk, for an extended period of

| | | |
|---|---|---|
| 10:00AM | 1 | time, there's no information going back and forth, right? |
| 10:00AM | 2 | A.  Correct. |
| 10:00AM | 3 | Q.  And that would create a potential threat to the |
| 10:00AM | 4 | organization, right? |
| 10:00AM | 5 | A.  Can you repeat that? |
| 10:00AM | 6 | Q.  Sure.  If you two are not talking, you and |
| 10:00AM | 7 | Mr. Bongiovanni, for a long period of time, that would create |
| 10:00AM | 8 | a threat to the organization, correct? |
| 10:00AM | 9 | **MR. TRIPI:**  Objection, assumes facts not in evidence. |
| 10:01AM | 10 | He answered no to those questions so now he's assuming the |
| 10:01AM | 11 | fact is true and asking him the question. |
| 10:01AM | 12 | **THE COURT:**  No, overruled.  I'll allow it. |
| 10:01AM | 13 | **THE WITNESS:**  No. |
| 10:01AM | 14 | **BY MR. SINGER:** |
| 10:01AM | 15 | Q.  No, so? |
| 10:01AM | 16 | A.  The answer is no. |
| 10:01AM | 17 | Q.  So the answer is, if you two don't have contact for a |
| 10:01AM | 18 | long period of time, and you don't share information, the |
| 10:01AM | 19 | organization's not at threat? |
| 10:01AM | 20 | **MR. TRIPI:**  Objection, it's a hypothetical to a fact |
| 10:01AM | 21 | witness.  It's improper, Your Honor. |
| 10:01AM | 22 | **THE COURT:**  Yeah, I think, Mr. Singer -- |
| 10:01AM | 23 | **MR. SINGER:**  I'm asking him, Judge, he's part of the |
| 10:01AM | 24 | organization and I'm asking if he doesn't have regular contact |
| 10:01AM | 25 | with Mr. Bongiovanni, does that threaten the organization, |

10:01AM    1    it's a direct question of a coconspirator.

10:01AM    2            **MR. TRIPI:**  It's also a hypothetical.

10:01AM    3            **THE COURT:**  I will allow it, yes.

10:01AM    4            **THE WITNESS:**  No.  If there was a specific situation,

10:01AM    5    I would reach out.  No.

10:01AM    6            **BY MR. SINGER:**

10:01AM    7    Q.  Well you talked yesterday, sir, about how you would keep

10:01AM    8    in contact regularly with Mr. Bongiovanni?

10:01AM    9    A.  And I would.

10:01AM    10   Q.  At least once a month, right?

10:01AM    11   A.  Yes.

10:01AM    12   Q.  At least once I a month you would meet and talk, right?

10:02AM    13   A.  That's correct.

10:02AM    14   Q.  And the purpose of that was to protect the organization,

10:02AM    15   right?

10:02AM    16   A.  That's correct.

10:02AM    17   Q.  To share information, correct?

10:02AM    18   A.  That's correct.

10:02AM    19   Q.  To find out information, correct?

10:02AM    20   A.  Correct.

10:02AM    21   Q.  So if you guys don't speak for a long period of time,

10:02AM    22   that's not happening, right?

10:02AM    23   A.  Correct.

10:02AM    24   Q.  And that's a problem for the organization, correct?

10:02AM    25   A.  Yes, but we spoke once a month.

| | | |
|---|---|---|
| 10:02AM | 1 | Q.  Okay. |
| 10:02AM | 2 | A.  Like I said. |
| 10:02AM | 3 | Q.  But you don't remember any drop off in May and June of |
| 10:02AM | 4 | 2014? |
| 10:02AM | 5 | A.  I don't, no. |
| 10:02AM | 6 | Q.  Okay.  All right.  So, as far as other points in time, |
| 10:02AM | 7 | you talked about, are you aware of the fact that there's a |
| 10:02AM | 8 | drop off in calls between you and Mr. Bongiovanni in March |
| 10:02AM | 9 | and April of 2015? |
| 10:02AM | 10 | A.  I, I'm not, I don't recall that. |
| 10:02AM | 11 | Q.  Well, you do recall attending Mr. Bongiovanni's wedding, |
| 10:02AM | 12 | correct? |
| 10:02AM | 13 | A.  Correct. |
| 10:02AM | 14 | Q.  And his wedding occurred in February of 2015, correct? |
| 10:02AM | 15 | A.  That's correct. |
| 10:02AM | 16 | Q.  And after the wedding, you go home to Buffalo from Cabo, |
| 10:02AM | 17 | correct? |
| 10:02AM | 18 | A.  Correct. |
| 10:02AM | 19 | Q.  But he spends some period of time with Lindsay, correct? |
| 10:03AM | 20 | A.  I believe so, yes. |
| 10:03AM | 21 | Q.  And your phone records indicate a drop off in calls |
| 10:03AM | 22 | during that time period, correct? |
| 10:03AM | 23 | A.  I don't recall looking at that -- at that timeframe, I |
| 10:03AM | 24 | don't recall.  But we still kept in touch. |
| 10:03AM | 25 | Q.  Okay.  So you would agree with me that if you have a drop |

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

10:03AM  1  off in calls during that time period, there's gonna be less

10:03AM  2  information shared between both of you, correct?

10:03AM  3  A.  No.

10:03AM  4  Q.  No?

10:03AM  5  A.  I would stop over.  Still reach out to him.  Let him know

10:03AM  6  I want to get together.

10:03AM  7  Q.  So you would still reach out to him every now and then?

10:03AM  8  A.  Yes.  If we didn't speak all the time, I'd take a ride

10:03AM  9  over sometime.

10:03AM  10  Q.  Would you use those burners that you were talking about,

10:03AM  11  sir?

10:03AM  12  A.  I did not use a burner, no.

10:03AM  13  Q.  You never used a burner with Mr. Bongiovanni?

10:03AM  14  A.  No, I had my phone, no.

10:03AM  15  Q.  Because you testified yesterday that in addition to the

10:03AM  16  phones that were just talking about, your number that you had

10:03AM  17  for many years, Mr. Bongiovanni's DEA cell phone that he had

10:03AM  18  for many years, you also would use burner telephones to

10:04AM  19  communicate?

10:04AM  20  A.  I did not use them.  I said Mr. Masecchia and Mr. Serio

10:04AM  21  had burner phones.  I did not have a burner phone.

10:04AM  22  Q.  So Mr. Bongiovanni never communicated with you with a

10:04AM  23  burner phone?

10:04AM  24  A.  No.

10:04AM  25  Q.  And Mr. Bongiovanni didn't possess a burner phone?

10:04AM 1  A.  Not to my knowledge.  No.

10:04AM 2  Q.  Okay.  So, as far as your communication, it would have to

10:04AM 3  be just on the two phones we're talking about, right?

10:04AM 4  A.  Yes.

10:04AM 5  Q.  These open public phones, correct?

10:04AM 6  A.  Correct.

10:04AM 7  Q.  So, in 2017, in the spring, you start to have your heart

10:04AM 8  issues, correct?

10:04AM 9  A.  That's correct.

10:04AM 10  Q.  And eventually, it leads to you having open-heart

10:04AM 11  surgery, correct?

10:04AM 12  A.  Correct.

10:04AM 13  Q.  And this is something that was kind of emergent, right?

10:04AM 14  A.  Yes.

10:04AM 15  Q.  How long did you spend in the hospital?

10:04AM 16  A.  I was in the hospital, I had to go two different times.

10:05AM 17  The first time it was a week.  And then I had to go back two

10:05AM 18  weeks later for another week.  So, it was quite a long time

10:05AM 19  of rehabilitation.

10:05AM 20  Q.  Yeah, we're talking about in the April, May, 2017 time

10:05AM 21  period, correct?

10:05AM 22  A.  Yes.

10:05AM 23  Q.  And I'm sure Joe being a good friend of yours,

10:05AM 24  Mr. Bongiovanni reached out to you on that time period?

10:05AM 25  A.  Yes, sir.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

33

10:05AM    1    Q.  And you guys were in pretty frequent contact during that

10:05AM    2    period of time, correct?

10:05AM    3    A.  Yes.

10:05AM    4    Q.  He was checking in on you about your health, correct?

10:05AM    5    A.  Yes.

10:05AM    6    Q.  He visited you in the hospital I think you mentioned

10:05AM    7    yesterday?

10:05AM    8    A.  Yes.

10:05AM    9    Q.  On a couple different occasions, correct?

10:05AM    10   A.  I believe so, yes.

10:05AM    11   Q.  And after you get discharged from the hospital, you have

10:05AM    12   a lot of medical expenses to pay, right?

10:05AM    13   A.  That's correct.

10:05AM    14   Q.  So one of the things that Joe did for you is that he

10:05AM    15   helped organize a benefit for you, correct?

10:05AM    16   A.  That's correct.

10:05AM    17   Q.  That benefit you mentioned was at the Knights of

10:05AM    18   Columbus, correct?

10:05AM    19   A.  It was.

10:05AM    20   Q.  The Knights of Columbus in Kenmore?

10:06AM    21   A.  It's on Kenmore Avenue, yes.

10:06AM    22   Q.  So kind of like the stag parties that we'll get into a

10:06AM    23   little bit later, the purpose of this benefit is to help

10:06AM    24   defray some of the costs of the hospital?

10:06AM    25   A.  That's correct.

10:06AM    1    Q.  Because at that time that you were ill, and you had heart

10:06AM    2    issues going on, you weren't working as regularly as you once

10:06AM    3    did, correct?

10:06AM    4    A.  No, I was on disability from work.

10:06AM    5    Q.  And you were in financial distress as a result of that?

10:06AM    6    A.  Correct.

10:06AM    7    Q.  And so many of the people who you knew decided to pitch

10:06AM    8    in and help, correct?

10:06AM    9    A.  Correct.

10:06AM   10    Q.  So, Mr. Bongiovanni put together this benefit for you at

10:06AM   11    the Knights of Columbus, right?

10:06AM   12    A.  That's correct.

10:06AM   13    Q.  Helped organize things?

10:06AM   14    A.  Yes.

10:06AM   15    Q.  And there were dozens of people that showed up for this,

10:06AM   16    correct?

10:06AM   17    A.  Yes.

10:06AM   18    Q.  There were other people who couldn't make it, but they

10:06AM   19    bought tickets, correct?

10:06AM   20    A.  That's correct.

10:06AM   21    Q.  Or they made some type of donation to you, correct?

10:06AM   22    A.  That's correct.

10:06AM   23    Q.  And that was something that helped you out, right?

10:06AM   24    A.  Yes.

10:06AM   25    Q.  I think you mentioned yesterday that there was a ledger

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

10:07AM   1   or a book that mentioned three names of people who you had to

10:07AM   2   send thank yous to?

10:07AM   3   A.   People had given me tickets that they were paid by these

10:07AM   4   individuals.  And I just wanted to mark it down.

10:07AM   5   Q.   And you talked about how Mike Masecchia was present at

10:07AM   6   this particular benefit, right?

10:07AM   7   A.   He was.

10:07AM   8   Q.   You mentioned that you recall that Mr. Bongiovanni and

10:07AM   9   Mike Masecchia worked the front door area along with your

10:07AM   10  daughter?

10:07AM   11  A.   My daughter and her friends, there was quite a few people

10:07AM   12  there, yes.

10:07AM   13  Q.   So this is kind of collective effort to allow people in

10:07AM   14  and stuff like that?

10:07AM   15  A.   Yes.

10:07AM   16  Q.   But there wasn't any type of coordination between Joseph

10:07AM   17  Bongiovanni and Mike Masecchia to make this happen, right?

10:07AM   18  A.   Well, they spoke.

10:07AM   19  Q.   Yeah, but I guess what I'm getting at is Mr. Bongiovanni

10:07AM   20  was the one who helped organize this, right?

10:07AM   21  A.   Yes.

10:07AM   22  Q.   Mr. Masecchia was there to help out in that front door

10:07AM   23  area?

10:07AM   24  A.   He was organizing it too, behind the scenes.  He was I

10:07AM   25  believe selling tickets for it, helping out.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

36

10:08AM  1   Q.  Selling tickets and that kind of thing, right?

10:08AM  2   A.  Yeah.  And then.

10:08AM  3   Q.  He wasn't the person who was booking the space, right?

10:08AM  4   A.  No.  I don't recall who did that.

10:08AM  5   Q.  He wasn't the person that was arranging for food or

10:08AM  6   anything like that, right?

10:08AM  7   A.  Mr. Masecchia?

10:08AM  8   Q.  Yeah.

10:08AM  9   A.  I -- I don't remember who did that.  I don't recall.

10:08AM  10  Q.  Yeah, I mean Joe was the point person on this, right?

10:08AM  11  A.  Yes.

10:08AM  12  Q.  And you remember that the Knights of Columbus, that's

10:08AM  13  un-air-conditioned space?

10:08AM  14  A.  Yes.

10:08AM  15  Q.  And it was a summertime, right?

10:08AM  16  A.  Yes.

10:08AM  17  Q.  A lot of people were coming to this, correct?

10:08AM  18  A.  Correct.

10:08AM  19  Q.  And one of the points of contention between you and

10:08AM  20  Mr. Bongiovanni was he wanted to get it into an air

10:08AM  21  conditioned space, right?

10:08AM  22  A.  Yes, it was.  I remember it was very warm, yes.

10:08AM  23  Q.  Because he felt like the people who were attending would

10:08AM  24  be more comfortable, right?

10:08AM  25  A.  That's correct.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

10:08AM    1    Q.  But you wanted it at the Knights of Columbus, right?

10:08AM    2    A.  Yes.  It was the most logical spot at that time.  Yes.

10:08AM    3    Q.  So you two had a disagreement about that, right?

10:09AM    4    A.  It wasn't a disagreement.  We just --

10:09AM    5    Q.  Okay.

10:09AM    6    A.  -- chose the Knights of Columbus.

10:09AM    7    Q.  Okay.  And then after the benefit, money was raised for

10:09AM    8    you, correct?

10:09AM    9    A.  Correct.

10:09AM    10    Q.  And then I think you took an extended leave of absence,

10:09AM    11    right, from your job?  To recover?

10:09AM    12    A.  Now I was still, I still had issues going on, my doctor

10:09AM    13    did not release me.

10:09AM    14    Q.  Yeah, that's what I'm getting at?

10:09AM    15    A.  Yes.

10:09AM    16    Q.  You weren't 100 percent back to normal after this

10:09AM    17    benefit, right?

10:09AM    18    A.  No.

10:09AM    19    Q.  There's still a lot of rehab and recovery entailed in

10:09AM    20    that, right?

10:09AM    21    A.  Yes, cardiac rehab and exercise, yes.

10:09AM    22    Q.  There's a period of time where you were doing that rehab

10:09AM    23    outside the Buffalo area?

10:09AM    24    A.  What do you mean, outside the Buffalo area?

10:09AM    25    Q.  Traveling around, getting out of town sometimes to help

10:09AM    1    recuperate?

10:09AM    2    A.  No, I would do all my recuperation in Buffalo.  I would

10:09AM    3    walk the park.  Start exercising as much as I can.  I went to

10:09AM    4    cardiac rehab.  I followed the protocol they set.

10:10AM    5    Q.  You were working hard on all that recovery?

10:10AM    6    A.  Yeah, I was trying to get back to normal.

10:10AM    7    Q.  And that was your main focus at that point in time?

10:10AM    8    A.  It was, I mean, it was a life-changing event, yes.

10:10AM    9    Q.  And after that benefit, there's a drop off in calls

10:10AM    10    between you and Mr. Bongiovanni again, correct?

10:10AM    11    A.  No, we always kept in communication.

10:10AM    12    Q.  Always kept in communication?

10:10AM    13    A.  Kept in communication with a lot of people.  Actually

10:10AM    14    even more, because people were concerned and following up,

10:10AM    15    how things were going.

10:10AM    16    Q.  So you're saying today that you and Mr. Bongiovanni

10:10AM    17    communicated more after the benefit than you did before?

10:10AM    18    A.  The way I remember it, yes.  I mean, more frequent.

10:10AM    19    Q.  So, when was it, that you remember talking to

10:10AM    20    Mr. Bongiovanni more frequently?

10:11AM    21    A.  During that period as I got stronger, got back on my feet

10:11AM    22    and got able to get back to work.

10:11AM    23    Q.  So you think after you got back on your feet is when you

10:11AM    24    guys started to communicate a little bit more?

10:11AM    25    A.  We were communicating the whole time, but as I got

10:11AM  1    stronger then yes, there would be more communication.

10:11AM  2    Q.  Okay.  And, so, did you guys communicate with the same

10:11AM  3    type of frequency kind of moving through 2018 into 2019?

10:11AM  4    A.  Yes.  It was regular, yes.

10:11AM  5    Q.  You guys would still get together, right?

10:11AM  6    A.  Yes.

10:11AM  7    Q.  Whether it was for special occasions, like we saw

10:11AM  8    yesterday, you guys are wishing each other a happy

10:11AM  9    Thanksgiving, right?

10:11AM  10   A.  That's correct.

10:11AM  11   Q.  And sometimes you get out to bars when Joe's wife was

10:11AM  12   working or out with her girlfriends, right?

10:11AM  13   A.  Correct.  Yes.

10:11AM  14   Q.  Sometimes used meet up with other people and there's

10:12AM  15   different events happened, right?

10:12AM  16   A.  That's correct.

10:12AM  17   Q.  You guys would talk on the phone, correct?

10:12AM  18   A.  Correct.

10:12AM  19   Q.  As far as leading through to 2019, you got pretty busy in

10:12AM  20   2019, right?

10:12AM  21   A.  Yes.

10:12AM  22   Q.  So, you mentioned that you trained to become a sheriff in

10:12AM  23   the winter and fall, early spring of 2019?

10:12AM  24   A.  Yes.

10:12AM  25   Q.  And you mentioned that you started up at the academy in

10:12AM    1    March; is that right?

10:12AM    2    A.   That's correct.

10:12AM    3    Q.   And when did you graduate again?

10:12AM    4    A.   The end of May of 2019.

10:12AM    5    Q.   And that's something that takes a lot of time to do,

10:12AM    6    right?

10:12AM    7    A.   It did.

10:12AM    8    Q.   That was the focus for you?

10:12AM    9    A.   Yes, sir.

10:12AM    10   Q.   And you talked yesterday about how Mr. Bongiovanni, he

10:12AM    11   also was sheriff back in the early or later '90s, correct?

10:12AM    12   A.   Correct.

10:12AM    13   Q.   So he went through the same process as you were going

10:12AM    14   through at that point in time?

10:12AM    15   A.   Yes.  I believe it's the academy was a little bit

10:12AM    16   different back then, but --

10:12AM    17   Q.   Same kind of shared experience, right?

10:12AM    18   A.   Same experience, yes.

10:12AM    19   Q.   That's one of the reasons you reached out to him and

10:13AM    20   said, hey, Joe, can you help me study?

10:13AM    21   A.   Correct.

10:13AM    22   Q.   That's one of the reasons why it offered an opportunity

10:13AM    23   for you to sit down and go through the books, right?

10:13AM    24   A.   Yes.

10:13AM    25   Q.   Go through the regulations?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

10:13AM    1    A.  Yes.

10:13AM    2    Q.  Make sure you're prepared to take your exam and pass,

10:13AM    3    right?

10:13AM    4    A.  Correct.

10:13AM    5    Q.  Because you knew how difficult it was for you over the

10:13AM    6    previous year recovering from your heart condition, right?

10:13AM    7    A.  Yes.

10:13AM    8    Q.  And he wanted to see you get back on your feet, right?

10:13AM    9    A.  Yes.

10:13AM   10    Q.  And with regard to the calls, we talked a little bit

10:13AM   11    earlier, but you said, yesterday, that the rule was you and

10:13AM   12    Joe didn't talk narcotics business over the phone, right?

10:13AM   13    A.  No.

10:13AM   14    Q.  So, you wouldn't have extended conversations on those

10:13AM   15    telephones you used about what was happening, right?

10:13AM   16    A.  No.

10:13AM   17    Q.  So, safe to assume that if there's calls of a longer

10:14AM   18    duration on the phone with you, and him, they're not talking

10:14AM   19    about things involving Ron Serio, right?

10:14AM   20    A.  No.

10:14AM   21    Q.  Not talking about things involving Mike Masecchia, right?

10:14AM   22    A.  No.

10:14AM   23    Q.  Those type of conversations are ones that you would only

10:14AM   24    have in person face to face?

10:14AM   25    A.  Yes, it was a brief conversation, let's get together.

| | | |
|---|---|---|
| 10:14AM | 1 | Q.  And you guys are pretty steadfast with that, that was the |
| 10:14AM | 2 | rule, correct? |
| 10:14AM | 3 | A.  Yes. |
| 10:14AM | 4 | Q.  And that was operational security for you, correct? |
| 10:14AM | 5 | A.  Yes. |
| 10:14AM | 6 | Q.  It was operational security for him, correct? |
| 10:14AM | 7 | A.  Yes.  Yes. |
| 10:14AM | 8 | Q.  That was operation at security for the greater Serio |
| 10:14AM | 9 | organization, correct? |
| 10:14AM | 10 | A.  That's correct. |
| 10:14AM | 11 | Q.  So you mentioned that yesterday, you got a bottle of |
| 10:14AM | 12 | Crown Royal for your 55th birthday, right? |
| 10:14AM | 13 | A.  Correct. |
| 10:14AM | 14 | Q.  You talked about how that was something that was odd to |
| 10:14AM | 15 | you, the way it was delivered, right? |
| 10:14AM | 16 | A.  Yes.  Because it was just left with a note.  Yes. |
| 10:15AM | 17 | Q.  But that was not something that was out of the ordinary |
| 10:15AM | 18 | for you two to exchange bottles like that on special |
| 10:15AM | 19 | occasions? |
| 10:15AM | 20 | A.  That's why I thought it was odd because in the past it |
| 10:15AM | 21 | would be in person.  This was not.  And this was after |
| 10:15AM | 22 | everything had just happened.  So, it was left there.  So |
| 10:15AM | 23 | that was the odd part to you, not the exchange of the bottle, |
| 10:15AM | 24 | or the note on the bottle, what made it odd after we had |
| 10:15AM | 25 | spoken about the bottle was he said he noticed the camera |

10:15AM    1    that was at my house and that made it odd.

10:15AM    2    Q.   Okay.  But, he dropped off the bottle nonetheless, right?

10:15AM    3    A.   He left it on my doorstep.  And then I saw him at the

10:15AM    4    post office on Hertel.

10:15AM    5    Q.   So, let's break that down a little bit.  Based on your

10:15AM    6    testimony, you say that prior to dropping off this bottle,

10:15AM    7    Mr. Bongiovanni was aware that somebody had hung a camera

10:15AM    8    outside your house, right?

10:15AM    9    A.   He made an comment about it when I saw him at the post

10:16AM   10    office, yes.

10:16AM   11    Q.   Um-hum and that was before you got the bottle, right?

10:16AM   12    A.   He said he just stopped by my house.

10:16AM   13    Q.   Yeah?

10:16AM   14    A.   Then when I got to my house, I saw the bottle, but he

10:16AM   15    made the camera before I knew the bottle was there.

10:16AM   16    Q.   So he saw the camera before the bottle?

10:16AM   17    A.   Yes.  Before I saw the bottle.

10:16AM   18    Q.   But he still dropped it off, right?

10:16AM   19    A.   Yes.  He dropped it off on my doorstep, yes.

10:16AM   20    Q.   So, kind of getting back to things, as far as your living

10:16AM   21    situation was concerned, we talked about that, but as far as

10:16AM   22    your employment situation, what type of jobs did you have?

10:16AM   23    A.   I've been in sales, I've been in the wireless business

10:16AM   24    most of my career.  And I bartended as a second job.

10:16AM   25    Q.   You bartended sometimes?

10:16AM    1    A.  Yes, sir.

10:16AM    2    Q.  There was a period of time where I think you got a

10:16AM    3    settlement, right?

10:16AM    4    A.  Yes, for a work jury that I had, yes.

10:16AM    5    Q.  And I think you tried to get together some type of

10:16AM    6    collections business, right?

10:16AM    7    A.  It was for a short period, but it failed.

10:17AM    8    Q.  That was something you used some of your settlement funds

10:17AM    9    to put together?

10:17AM   10    A.  I did.  Yes.

10:17AM   11    Q.  And as far as these jobs, were these jobs that you

10:17AM   12    maintained for really long periods of time?  Did you work at

10:17AM   13    that one particular company with the cell business for ten or

10:17AM   14    15 years?

10:17AM   15    A.  When I originally started the business, I worked for

10:17AM   16    NYNEX from is Verizon today, for eight years and then in Las

10:17AM   17    Vegas I took a position with a company which is AlTell.  The

10:17AM   18    only reason I left that position was because my wife and I at

10:17AM   19    the time thought it would be beneficial to come become to

10:17AM   20    Buffalo, we were having issues in our marriage and that was

10:17AM   21    not a good environment with our children so we made the

10:17AM   22    decision to come back to Buffalo, but I was in the wireless

10:17AM   23    business for quite a long time.

10:17AM   24    Q.  As far as the narcotics business you were talking about

10:17AM   25    that you were involved in, that was something you got

10:17AM  1   involved in because it helped solve some financial problems

10:17AM  2   for you, right?

10:17AM  3   A.  That's correct.

10:17AM  4   Q.  So at the time you approached Mike Masecchia about

10:17AM  5   getting involved in his grow operations, that was something

10:17AM  6   that you did as a result of coming out of a bankruptcy,

10:18AM  7   right?

10:18AM  8   A.  That's correct.

10:18AM  9   Q.  And having trouble securing employment, that paid the

10:18AM  10  bills, correct?

10:18AM  11  A.  I was working, but I had obligations with my kids.  I

10:18AM  12  they had medical issues, they had dental issues, there were

10:18AM  13  braces.  There were a lot of obligations and I was

10:18AM  14  overwhelmed.

10:18AM  15  Q.  There were a lot of obligations, a lot of financial

10:18AM  16  obligations?

10:18AM  17  A.  Yes.

10:18AM  18  Q.  A lot of issues going on, right?

10:18AM  19  A.  Yes.

10:18AM  20  Q.  And that's why you got involved, right?

10:18AM  21  A.  Yes.

10:18AM  22  Q.  Because it's something that helped support your kids,

10:18AM  23  right?

10:18AM  24  A.  Correct.

10:18AM  25  Q.  Something that helped you support yourself, right?

10:18AM   1   A.  Not really myself.  The additional expenses, my job and

10:18AM   2   tending bar was sufficient for that.  But I had a lot of

10:18AM   3   obligations, like I said that were coming up with my

10:18AM   4   children.

10:18AM   5   Q.  All right.  So, I want to talk a little bit about Italian

10:18AM   6   Organized Crime.

10:18AM   7        So, you mentioned a couple of older guys, one of those

10:19AM   8   was Joe Todaro Sr.; do you remember that?

10:19AM   9   A.  Yes.

10:19AM  10   Q.  And he was somebody who based on what you heard in the

10:19AM  11   neighborhood was someone who was the Boss of IOC in Buffalo?

10:19AM  12   A.  Yes, like I said just allegedly.  Things that you hear.

10:19AM  13   Q.  But you've never had a sit down conversation with Joe

10:19AM  14   Todaro Sr. saying, hey, are you the Boss?

10:19AM  15   A.  No.

10:19AM  16   Q.  Not like you had with Mike Masecchia, right?

10:19AM  17   A.  It was a different conversation, yes.  I never had a

10:19AM  18   conversation with Mr. Todaro Sr..

10:19AM  19   Q.  Okay.  Never had a conversation with him ever?

10:19AM  20   A.  Just said hello.

10:19AM  21   Q.  Okay.

10:19AM  22   A.  I've never had a conversation with him, no.

10:19AM  23   Q.  And that was it.  And one of the reasons is why is

10:19AM  24   because when you're seeing him, he's what, 20 or 30 years

10:19AM  25   your senior?

10:19AM    1    A.   Yes.  It would always be like I said a cordial hello,

10:19AM    2    shake his hand and say hello, hi, how are you, that type of

10:19AM    3    thing.

10:19AM    4    Q.   And you mentioned another guy, a Tommy Machelli, Tommy

10:20AM    5    Chooch; do you remember that?

10:20AM    6    A.   Yes.

10:20AM    7    Q.   He's another guy who's roughly the same age as Joe Todaro

10:20AM    8    Sr., correct?

10:20AM    9    A.   Yes.

10:20AM   10    Q.   So he's a guy who's older by what, 20, 30 years?

10:20AM   11    A.   Yes.

10:20AM   12    Q.   You mentioned another person, Joe Rosato?

10:20AM   13    A.   Yes.

10:20AM   14    Q.   And he's another guy who's like 20 or 30 years older than

10:20AM   15    you?

10:20AM   16    A.   Yes.  They were all my father's age.

10:20AM   17    Q.   Yeah.

10:20AM   18    A.   Yeah.

10:20AM   19    Q.   I'm talking about your parents generation, right?

10:20AM   20    A.   Yes.

10:20AM   21    Q.   Joe Rosato, he died back in 2008, right?

10:20AM   22    A.   Yes.

10:20AM   23    Q.   John Catanzaro was another person you mentioned?

10:20AM   24    A.   Yes.

10:20AM   25    Q.   Another guy who was from your father's generation?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

| | | |
|---|---|---|
| 10:20AM | 1 | A.  Yes. |
| 10:20AM | 2 | Q.  He's well older than you, right? |
| 10:20AM | 3 | A.  Yes. |
| 10:20AM | 4 | Q.  So he's like your parents friends or generation, right? |
| 10:20AM | 5 | A.  Yes. |
| 10:20AM | 6 | Q.  You mentioned Butchie Bifocals, correct? |
| 10:20AM | 7 | A.  Yes. |
| 10:20AM | 8 | Q.  He's another person who's well older than you? |
| 10:20AM | 9 | A.  Correct, yes. |
| 10:20AM | 10 | Q.  He's someone who died, correct? |
| 10:20AM | 11 | A.  Yes.  Correct. |
| 10:21AM | 12 | Q.  Bart Mazzara Sr. is another person you mentioned? |
| 10:21AM | 13 | A.  Yes. |
| 10:21AM | 14 | Q.  He's another person who's way, way older than you, |
| 10:21AM | 15 | correct? |
| 10:21AM | 16 | A.  He was, but I don't recall mentioning him yesterday. |
| 10:21AM | 17 | Q.  Okay. |
| 10:21AM | 18 | A.  But yes, I knew the gentleman, yes. |
| 10:21AM | 19 | Q.  Okay.  He had some relation to Mike Masecchia, correct? |
| 10:21AM | 20 | A.  It was his father-in-law, correct. |
| 10:21AM | 21 | Q.  Yeah.  So that's how it came up, right? |
| 10:21AM | 22 | A.  Yes. |
| 10:21AM | 23 | Q.  Okay.  And he's someone who died back in 2003, correct? |
| 10:21AM | 24 | A.  Correct. |
| 10:21AM | 25 | Q.  So, bottom line is that all these guys that you talked |

10:21AM   1   about who were in the neighborhood, we're talking about

10:21AM   2   observations you made back in the 1970s and 1980s, right?

10:21AM   3   A.   Later than that, too.  You know.  As we went out, if you

10:21AM   4   run into them wherever you're at, yes.

10:21AM   5   Q.   You talked about how you and Joe would sometimes converse

10:21AM   6   about these guys in the neighborhood, correct?

10:21AM   7   A.   Yes.

10:21AM   8   Q.   It was back in your 20s, when you're out, right?

10:21AM   9   A.   20s, late 20s, yes.

10:21AM   10  Q.   Right?

10:21AM   11  A.   Early 30s.

10:21AM   12  Q.   So we're talking about 1980s, 1990's in some cases?

10:22AM   13  A.   Correct.

10:22AM   14  Q.   But none of these people that you two were talking about,

10:22AM   15  they're not contemporaries of yours, correct?

10:22AM   16  A.   No.

10:22AM   17  Q.   Yeah, we're talking about, like, their your parents

10:22AM   18  generation, right?

10:22AM   19  A.   Yes.

10:22AM   20  Q.   I mean you were children when these people were adults,

10:22AM   21  correct?

10:22AM   22  A.   Correct.

10:22AM   23  Q.   We're talking about conversations that you and Joe

10:22AM   24  allegedly had in some cases 30 or 40 years ago, right?

10:22AM   25  A.   Yes.

10:22AM  1   Q.  And you didn't really have a personal relationship with

10:22AM  2   any of these people we just went through, correct?

10:22AM  3   A.  Any of these people --

10:22AM  4   Q.  Yes?

10:22AM  5   A.  -- you mentioned?

10:22AM  6   Q.  Yes?

10:22AM  7   A.  No, I did.

10:22AM  8   Q.  Who did have a personal relationship with?

10:22AM  9   A.  Mr. Machelli was a very close friend with our family, he

10:22AM  10  was actually a cousin of my grandmother's.

10:22AM  11  Q.  So you had a personal relationship with him but as far as

10:22AM  12  the other persons -- I'm sorry.

10:22AM  13  A.  He was a cousin of my grandmothers.  They were from the

10:22AM  14  same town in Sicily.

10:22AM  15  Q.  But as far as a personal relationship with other people,

10:22AM  16  like, you didn't have a personal relationship with them,

10:22AM  17  right?

10:22AM  18  A.  Mr. Rosato, I knew pretty well.

10:23AM  19  Q.  So you would see him, right?

10:23AM  20  A.  I went to his daughter's wedding through an invitation

10:23AM  21  from him.

10:23AM  22  Q.  So he was another person you had some type of a

10:23AM  23  relationship with, correct?

10:23AM  24  A.  Yes.  It was a cordial relationship, yes.

10:23AM  25  Q.  So you'd see him out, right?

10:23AM  1    A.  If I saw him, yes.

10:23AM  2    Q.  Say hello, correct?

10:23AM  3    A.  Yes.  Always.

10:23AM  4    Q.  You would shake his hand, correct?

10:23AM  5    A.  Yes.  Try to be a gentleman and shake his hand, yes.

10:23AM  6    Q.  I'm sure, you probably -- you grew up in an Italian

10:23AM  7    neighborhood, back in the '70s and '80s, right?

10:23AM  8    A.  Yes.

10:23AM  9    Q.  And, so, you were probably taught as a young child to

10:23AM  10   when you see an adult, go look them in the eye and say hello,

10:23AM  11   right?

10:23AM  12   A.  I was, yes.

10:23AM  13   Q.  Go look them in the eye and go shake their hand, correct?

10:23AM  14   A.  Correct.

10:23AM  15   Q.  You probably had situations like with my parents where if

10:23AM  16   you didn't say hello to that one person your parents would

10:23AM  17   make a spectacle of that and correct you and say go say hello

10:23AM  18   to that person, right?

10:23AM  19   A.  Yes.

10:23AM  20   Q.  Because that's the way you were raised, right?

10:23AM  21   A.  Yes.

10:23AM  22   Q.  I'm sure as you progress out of your younger years and

10:24AM  23   teen years into your 20s, you're still saying those same

10:24AM  24   hellos to those same people, right?

10:24AM  25   A.  Yes, as we grew older, they were growing older and you

10:24AM   1   run into them from time to time, yes, and say hello.

10:24AM   2   Q.  So every now and then, you say, hi, Mr. Rosato, how are

10:24AM   3   you?

10:24AM   4   A.  It would be a little more personal.  You go up, shake his

10:24AM   5   hand, hi, how's everything, keep it moving, yes.

10:24AM   6   Q.  That's what I'm getting is that you extend these

10:24AM   7   courtesies, because that's the way you're raised but it's not

10:24AM   8   like you're good, good friends with any of these guys, right?

10:24AM   9   A.  No, like I mentioned Mr. Machelli had a close

10:24AM   10   relationship our family, I saw him more often, picnics,

10:24AM   11   Christmas parties.

10:24AM   12   Q.  You see him at that kind of thing, but you wouldn't see

10:24AM   13   him elsewhere, right?

10:24AM   14   A.  No, no, no.

10:24AM   15   Q.  You wouldn't call him up on the phone and say, hey,

10:24AM   16   Mr. Machelli, let's go hang out on a Friday night?

10:24AM   17   A.  He lived down the street from me in Rebecca Park.

10:24AM   18   Q.  Yeah.  But that's?

10:24AM   19   A.  So I would see him more.

10:24AM   20   Q.  So what I am getting at is you wouldn't call him up and

10:24AM   21   invite him out, right?

10:24AM   22   A.  No.

10:24AM   23   Q.  He wasn't that type of friend?

10:24AM   24   A.  No.

10:24AM   25   Q.  He was someone you knew?

| | | |
|---|---|---|
| 10:24AM | 1 | A.  Yes. |
| 10:24AM | 2 | Q.  But he wasn't a friend of yours, right? |
| 10:25AM | 3 | A.  He was more family. |
| 10:25AM | 4 | Q.  So, as far as -- as far as the opinion about these |
| 10:25AM | 5 | particular people being involved in Italian Organized Crime a |
| 10:25AM | 6 | lot of it was based on what you heard, right? |
| 10:25AM | 7 | A.  Yes. |
| 10:25AM | 8 | Q.  What other people said? |
| 10:25AM | 9 | A.  Yes. |
| 10:25AM | 10 | Q.  You said you mentioned you read newspapers, right? |
| 10:25AM | 11 | A.  Yes.  It was a long time ago. |
| 10:25AM | 12 | Q.  Books? |
| 10:25AM | 13 | A.  Yes. |
| 10:25AM | 14 | Q.  Correct? |
| 10:25AM | 15 | A.  Yes. |
| 10:25AM | 16 | Q.  As far as like this club on Commonwealth and Lovering, |
| 10:25AM | 17 | you had mentioned that you had heard that Mr. Bongiovanni's |
| 10:25AM | 18 | father had played cards there, correct? |
| 10:25AM | 19 | A.  Yes. |
| 10:25AM | 20 | Q.  But as far as The Club, you were never inside The Club |
| 10:25AM | 21 | when you were a child, right? |
| 10:25AM | 22 | A.  Not when I was child, no. |
| 10:25AM | 23 | Q.  Never inside The Club when you were a teenager, right? |
| 10:25AM | 24 | A.  No. |
| 10:25AM | 25 | Q.  I think you mentioned you went over to that club at some |

| | | |
|---|---|---|
| 10:25AM | 1 | point in time when you're an adult, correct? |
| 10:25AM | 2 | A.  Yes, I was briefly there.  Yes. |
| 10:25AM | 3 | Q.  But that was really just to talk about, with Mr. Machelli |
| 10:25AM | 4 | some situation going on with like the homeowners association? |
| 10:26AM | 5 | A.  That's correct, that's the only time. |
| 10:26AM | 6 | Q.  So you never sat down and played cards there? |
| 10:26AM | 7 | A.  No, not a card player. |
| 10:26AM | 8 | Q.  So, you really can't say with any definitive opinion |
| 10:26AM | 9 | about what happened inside The Club because you weren't |
| 10:26AM | 10 | there, right? |
| 10:26AM | 11 | A.  Well, the day I was there, the cards were being played. |
| 10:26AM | 12 | Q.  So you saw card playing going on there? |
| 10:26AM | 13 | A.  Yeah. |
| 10:26AM | 14 | Q.  But that wasn't the focus of your meeting.  You didn't |
| 10:26AM | 15 | sit down and play cards, right? |
| 10:26AM | 16 | A.  No, but I was there, for whatever it was, ten or 15 |
| 10:26AM | 17 | minutes on two different occasions, and there was always |
| 10:26AM | 18 | cards being played. |
| 10:26AM | 19 | Q.  Okay? |
| 10:26AM | 20 | A.  So the assumption was that everyone played cards there. |
| 10:26AM | 21 | Q.  So based on those two different experiences, you said, |
| 10:26AM | 22 | hey, this is where people play cards, right? |
| 10:26AM | 23 | A.  Correct.  And things you've heard in the neighborhood, |
| 10:26AM | 24 | too, where it was. |
| 10:26AM | 25 | Q.  And that's it? |

10:26AM  1   A.  Yeah.  It was a spot known where older gentlemen played

10:26AM  2   cards.

10:26AM  3   Q.  So as far as the deference that you say Mr. Bongiovanni

10:26AM  4   paid to some of these people, he was saying hello to them

10:26AM  5   just like you were, right?

10:26AM  6   A.  Yes.

10:26AM  7   Q.  'Cuz he grew up in the same neighborhood you did, right?

10:26AM  8   A.  Yes.

10:26AM  9   Q.  His parents, like your parents, were friends with some of

10:27AM  10  these people, right?

10:27AM  11  A.  Yes.

10:27AM  12  Q.  His parents, like your parents, would see these people as

10:27AM  13  adults in the community, right?

10:27AM  14  A.  Yes.

10:27AM  15  Q.  And the area that you grew up in, it was a pretty close

10:27AM  16  knit place, right?

10:27AM  17  A.  It was, yes.

10:27AM  18  Q.  People knew each other, right?

10:27AM  19  A.  Yes.

10:27AM  20  Q.  So, he is saying hello to people who are his parents'

10:27AM  21  contemporaries, right?

10:27AM  22  A.  Yes.

10:27AM  23  Q.  Who are your parents' contemporaries, right?

10:27AM  24  A.  Correct, yes.

10:27AM  25  Q.  Extending a courtesy of saying hi or shaking their hand,

10:27AM  1   right?

10:27AM  2   A.  Yes.

10:27AM  3   Q.  And you said you guys grew up, you know, for a long time

10:27AM  4   when you were little boys, right?

10:27AM  5   A.  Correct.

10:27AM  6   Q.  And I'm sure that you observed Mr. Bongiovanni's parents

10:27AM  7   enforcing those same type of mores on Mr. Bongiovanni to go

10:27AM  8   say hello to adults that he saw, right?

10:27AM  9   A.  Yes, sir.

10:27AM  10  Q.  And so that's essentially what was going on here?  You

10:27AM  11  were saying hello to people inside the community, right?

10:27AM  12  A.  Yes.

10:27AM  13  Q.  He wasn't friends with these guys, like you weren't

10:27AM  14  friends with these guys, right?

10:28AM  15  A.  No, we were acquaintances.  We said hello, they knew our

10:28AM  16  families.

10:28AM  17  Q.  And you say that you have an opinion about how

10:28AM  18  Mr. Bongiovanni thinks about Italian Organized Crime because

10:28AM  19  you had conversations about it in your 20s, correct?

10:28AM  20  A.  Yes.

10:28AM  21  Q.  And --

10:28AM  22  A.  And later.

10:28AM  23  Q.  You didn't always claim, though, that you and he had

10:28AM  24  conversations about Italian Organized Crime to law

10:28AM  25  enforcement, correct?

10:28AM    1    A.  No.  We didn't all the time.

10:28AM    2    Q.  Do you remember back in your first proffer interview,

10:28AM    3    second proffer interview, you told federal agents that you

10:28AM    4    and Mr. Bongiovanni never talked about Italian Organized

10:28AM    5    Crime; do you remember that?

10:28AM    6    A.  Not in depth, but we would talk about it, but generically

10:28AM    7    speaking, just --

10:28AM    8    Q.  Do you remember telling law enforcement when asked

10:28AM    9    whether you and Mr. Bongiovanni talk about Italian Organized

10:28AM   10    Crime, responding to them, no, we don't talk about that.

10:28AM   11    A.  Yes.

10:28AM   12         MR. TRIPI:  Objection, hearsay.  Improper

10:28AM   13    impeachment.  Set it up as an inconsistent.

10:29AM   14         THE COURT:  No, overruled.

10:29AM   15         BY MR. SINGER:

10:29AM   16    Q.  So, you didn't first talk to law enforcement about how

10:29AM   17    you and Mr. Bongiovanni had conversations like this, right?

10:29AM   18    A.  Correct.

10:29AM   19    Q.  That's something that came out later, correct?

10:29AM   20    A.  Correct.

10:29AM   21    Q.  Like, in your trial testimony over the last two days,

10:29AM   22    right?

10:29AM   23    A.  Correct.

10:29AM   24    Q.  Now you claim that, actually, we did have conversations

10:29AM   25    likes this, correct?

10:29AM   1   A.   Yes.   Generically.   Who allegedly was who, or if we saw

10:29AM   2   somebody.   Those types of conversations.

10:29AM   3   Q.   And fair to say that a lot of what Mr. Bongiovanni

10:29AM   4   allegedly stated to you in these conversations was based on

10:29AM   5   the same type of things that you based your opinion about

10:29AM   6   Italian Organized Crime figures on, right?

10:29AM   7   A.   For those individuals, yes.

10:29AM   8   Q.   Yeah.   What people may have said in the community, right?

10:29AM   9   A.   Correct.

10:29AM   10   Q.   What you may have read in the paper, that kind of thing?

10:29AM   11   A.   Correct.

10:29AM   12   Q.   Okay.   So you didn't have any type of intimate knowledge

10:29AM   13   or insider knowledge different from yours, correct?

10:29AM   14   A.   Correct.

10:29AM   15   Q.   Now, as far as Mike Masecchia is concerned, you stated

10:30AM   16   that he was a made member of IOC, right?

10:30AM   17   A.   That's correct.

10:30AM   18   Q.   That was based on something that he told you, correct?

10:30AM   19   A.   I asked him, yes.

10:30AM   20   Q.   When did he tell you that, definitively.

10:30AM   21   A.   2008, 2009, that timeframe.   We were together.   I've been

10:30AM   22   hearing things, a lot of things.   Mike was a big, strong

10:30AM   23   figure.   He had a reputation, he was a tough guy.   And I

10:30AM   24   point, we were alone, and I asked him.   And he told me he

10:30AM   25   was.

10:30AM  1   Q.  And he provided the answer that he was?

10:30AM  2   A.  He just said yes.

10:30AM  3   Q.  And you recall back in the grand jury you gave a

10:30AM  4   different timeframe than that, correct?

10:30AM  5   A.  Yes.  I don't recall exactly the timeframe.

10:30AM  6   Q.  Do you recall in the grand jury talking about how you had

10:30AM  7   this conversation with Masecchia back in the 2013 to '14 time

10:30AM  8   period?

10:31AM  9   A.  Yes.  Like I said, I wasn't quite sure on it, but it was

10:31AM  10  the mid 2000s, but I did have a conversation with him about

10:31AM  11  it, I did ask him.

10:31AM  12  Q.  That's different than what you just said, right?

10:31AM  13  A.  I mixed it up, I said I was not clear on it, it was

10:31AM  14  2000s.

10:31AM  15  Q.  2000s?

10:31AM  16  A.  Mid 2000s.  Between 2008, 2013, '14.  It was that

10:31AM  17  timeframe.  I don't remember the exact date when I asked him

10:31AM  18  that.

10:31AM  19  Q.  That's a lot of different years, Mr. Selva.

10:31AM  20  A.  I asked him the question, I don't remember when it was.

10:31AM  21  Q.  Okay.

10:31AM  22  A.  We were out, and I asked him it.

10:31AM  23  Q.  Okay.

10:31AM  24  A.  We were together, him and I, we had become close.

10:31AM  25  Q.  But you did have this conversation with him about how he

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

60

10:31AM   1    confirmed it to you, right?

10:31AM   2    A.  We did, yes.

10:31AM   3    Q.  And you mentioned that there were also other rumors

10:31AM   4    circulating before he had that confirmation conversation

10:31AM   5    whether it was '08 or '14, I know you don't remember.

10:31AM   6    A.  It was before that and during that time frame, yes,

10:31AM   7    that's why I asked him to confirm what I'd been hearing.

10:31AM   8    Q.  And this is something that was floating around the

10:31AM   9    community as well, right?

10:32AM   10   A.  It was.

10:32AM   11   Q.  It was something that Ron Serio was aware of, correct?

10:32AM   12   A.  Yes.

10:32AM   13   Q.  This was something that other people inside of your

10:32AM   14   organization were aware of, correct?

10:32AM   15   A.  Yes.  Correct.

10:32AM   16   Q.  One of the things that attracted you to the organization

10:32AM   17   itself, right?

10:32AM   18   A.  Yes.  Mike was a big figure, yes.

10:32AM   19   Q.  Yeah, I mean the thought that you join an organization

10:32AM   20   that potentially has protection from this element is

10:32AM   21   something that was attractive to you, right?

10:32AM   22   A.  At that time, yes.

10:32AM   23   Q.  It would make it potentially less likely that something

10:32AM   24   would be discovered and you would get arrested, correct?

10:32AM   25   A.  Correct.

10:32AM    1    Q.  Okay.  So, you described Mike Masecchia as an

10:32AM    2    intimidating guy, correct?

10:32AM    3    A.  Yes.

10:32AM    4    Q.  We saw on a cell phone entries yesterday that his

10:32AM    5    nickname was the gorilla, right?

10:32AM    6    A.  Yes.  All our friends, many people called him the

10:32AM    7    gorilla, yes.

10:32AM    8    Q.  That was an earned reputation nickname, right?

10:32AM    9    A.  It was an earned reputation.  Yes.

10:32AM   10    Q.  Because you did something across him, he beat you up,

10:32AM   11    right?

10:32AM   12    A.  He was a tough guy.

10:32AM   13    Q.  Yeah.  Intimidating guy, right?

10:33AM   14    A.  Yes.

10:33AM   15    Q.  He liked to intimidate other people, too?

10:33AM   16    A.  Yes.

10:33AM   17    Q.  He liked to make sure that his reputation was well-known

10:33AM   18    with others, correct?

10:33AM   19    A.  Correct.

10:33AM   20    Q.  And you would agree with me that being a made Italian

10:33AM   21    Organized Crime figure is something that made him more

10:33AM   22    intimidating, right?

10:33AM   23    A.  Yes.

10:33AM   24    Q.  I mean, it wasn't just physically -- oh, my God, this guy

10:33AM   25    might beat me up, right?

10:33AM    1    A.  Right.

10:33AM    2    Q.  It was, there might be a greater part of an organization

10:33AM    3    that might go after me, too, right?

10:33AM    4    A.  That would be the assumption, yes.

10:33AM    5    Q.  And that's something that would make him more

10:33AM    6    intimidating, correct?

10:33AM    7    A.  Correct.

10:33AM    8    Q.  And that's something that Ron Serio knew, correct?

10:33AM    9    A.  Correct.

10:33AM    10   Q.  So, as far as Mr. Bongiovanni is concerned, he and his

10:33AM    11   family, you testified that one of the -- the figures -- I

10:33AM    12   guess, that Mr. Bongiovanni may have associated with, quote

10:33AM    13   unquote in his teenage years was a person named Donald

10:34AM    14   Panepinto.

10:34AM    15   A.  Yes.

10:34AM    16   Q.  And Donald Panepinto, you mentioned his nickname is

10:34AM    17   Turtle?

10:34AM    18   A.  Yes that was the father of his girlfriend at the time.

10:34AM    19   Q.  Yeah, you mentioned the association between

10:34AM    20   Mr. Bongiovanni and Mr. Panepinto was that Mr. Bongiovanni

10:34AM    21   dated Dana Panepinto when he was a teenager, correct?

10:34AM    22   A.  That's correct.

10:34AM    23   Q.  That that was a couple years as a teenagers, correct?

10:34AM    24   A.  I believe for five years.

10:34AM    25   Q.  And so we're talking about a high school relationship?

10:34AM   1   A.  Yes.

10:34AM   2   Q.  And that's something that fizzled off after high school?

10:34AM   3   A.  High school through college, yes.

10:34AM   4   Q.  Through college.  Are we talking about all of college?

10:34AM   5   A.  I said through -- no, they lasted five years, from high

10:34AM   6   school through his first two years of college.

10:34AM   7   Q.  Yeah, and then basically filtered off after that because

10:34AM   8   he moved away, right?

10:34AM   9   A.  That's correct.

10:34AM   10   Q.  He went to Boston?

10:34AM   11   A.  I believe so, yes.  Yes.

10:34AM   12   Q.  That was the end of the relationship, correct?

10:34AM   13   A.  I believe it was on the rocks from what I remember, yes,

10:34AM   14   and then it ended.

10:34AM   15   Q.  And was Mr. Bongiovanni deferential to Donald Panepinto?

10:35AM   16   A.  I'm sorry, define deferential.

10:35AM   17   Q.  Sure.  Did he say hello to him?

10:35AM   18   A.  Yes.  He saw him quite a bit.

10:35AM   19   Q.  Did he shake his hand?

10:35AM   20   A.  Yes.

10:35AM   21   Q.  Was he respectful?

10:35AM   22   A.  Yes, he was at his house quite a bit because he was

10:35AM   23   dating his daughter at that time.

10:35AM   24   Q.  Yeah.  I mean, you've dated people in your teenage years,

10:35AM   25   correct?

10:35AM   1   A.  Correct.

10:35AM   2   Q.  Were you deferential to their fathers?

10:35AM   3   A.  Always.

10:35AM   4   Q.  Shook their hands?

10:35AM   5   A.  Always.

10:35AM   6   Q.  Said hello?

10:35AM   7   A.  Yes.

10:35AM   8   Q.  Were polite?

10:35AM   9   A.  Yes.

10:35AM   10  Q.  And that's probably the reason why Mr. Bongiovanni did

10:35AM   11  it, right?

10:35AM   12  A.  Correct.

10:35AM   13  Q.  Okay.  You spoke about an Uncle Cheech.  Do you remember

10:35AM   14  that?

10:35AM   15  A.  Correct.

10:35AM   16  Q.  So Uncle Cheech was someone who Mr. Bongiovanni allegedly

10:35AM   17  said was a person in his family, who was associated with

10:35AM   18  Italian Organized Crime in Las Vegas?

10:35AM   19  A.  Yes.  He moved out there, and yes.

10:35AM   20  Q.  That was based on something that a family member had told

10:35AM   21  Mr. Bongiovanni when he was a child?

10:35AM   22          **MR. TRIPI:**  Objection.  602 and hearsay.  How we know

10:36AM   23  a relative told Mr. Bongiovanni?

10:36AM   24          **MR. SINGER:**  They had the conversation, Judge.

10:36AM   25          **THE COURT:**  No, I understand that, but you need to

10:36AM    1    lay that foundation, Mr. Singer, so sustained to the form of

10:36AM    2    the question.

10:36AM    3              **BY MR. SINGER:**

10:36AM    4    Q.  So you had conversations about Uncle Cheech with Joe

10:36AM    5    Bongiovanni, correct?

10:36AM    6    A.  Correct.

10:36AM    7    Q.  And Mr. Bongiovanni in these conversations explained to

10:36AM    8    you how he had an Uncle Cheech, correct?

10:36AM    9    A.  Correct.

10:36AM    10   Q.  And he explained to you about how Mr. Bongiovanni had a

10:36AM    11   thought about him being associated with Italian Organized

10:36AM    12   Crime?

10:36AM    13   A.  Correct.  It was, again, an alleged, like everything

10:36AM    14   else.

10:36AM    15   Q.  And that was -- that was like you said --

10:36AM    16   A.  Just comment.  A comment.

10:36AM    17   Q.  And that was based on something he had learned from

10:36AM    18   another family member, correct?

10:36AM    19   A.  I believe so, yes.

10:36AM    20   Q.  Because that's something he told you, right?

10:36AM    21   A.  Yes.

10:36AM    22   Q.  He didn't say that I went up and asked Uncle Cheech if he

10:36AM    23   was Italian Organized Crime, right?

10:36AM    24   A.  No.

10:36AM    25   Q.  He said, hey, I learned this based on something that

10:37AM    1    someone else told me in my family, correct?

10:37AM    2    A.  Correct.

10:37AM    3    Q.  Did you ever meet Uncle Cheech out in Las Vegas?

10:37AM    4    A.  No.  Not when I lived there, no.  Never met him.

10:37AM    5    Q.  And this conversation about Uncle Cheech we're talking

10:37AM    6    about something that happened 40 years ago, right?

10:37AM    7    A.  Correct.

10:37AM    8    Q.  You talked a little bit about Mr. Bongiovanni's father,

10:37AM    9    Frederick Bongiovanni, do you remember that?

10:37AM   10    A.  Correct.

10:37AM   11    Q.  And you testified that Mr. Bongiovanni told you -- sorry,

10:37AM   12    Joseph Bongiovanni told you that that Mr. Bongiovanni, his

10:37AM   13    dad, said he had some friends who were connected?

10:37AM   14    A.  Correct.

10:37AM   15    Q.  And that was what he said, correct?

10:37AM   16    A.  Correct.

10:37AM   17    Q.  As far as you understood it, though, Mr. Bongiovanni

10:37AM   18    wasn't connected to Italian Organized Crime, correct?

10:37AM   19    A.  Correct.

10:37AM   20    Q.  He was not a part of this inner circle, correct?

10:37AM   21    A.  Correct.

10:37AM   22    Q.  He knew people in his community who were adults, correct?

10:37AM   23    A.  Correct.

10:37AM   24    Q.  Same guys that your father and parents would hang out

10:37AM   25    with from time to time correct?

10:37AM    1    A.  Yes, correct.

10:38AM    2    Q.  And so they, by extension, also knew people who were

10:38AM    3    potentially connected to Italian Organized Crime, right?

10:38AM    4    A.  Potentially, yes.

10:38AM    5    Q.  Mr. Bongiovanni never said that my dad's a made member of

10:38AM    6    Italian Organized Crime, right?

10:38AM    7    A.  No, he never said that.

10:38AM    8    Q.  But he did mention that from time to time he played cards

10:38AM    9    at this restaurant over on Commonwealth?

10:38AM    10   A.  It was The Club on Hertel.

10:38AM    11   Q.  Um-hum.  And that's something that other people would do

10:38AM    12   in the community, correct?

10:38AM    13   A.  Correct.

10:38AM    14   Q.  Like you didn't have to be a member of Italian Organized

10:38AM    15   Crime to hang out with Italian guys at this club and play

10:38AM    16   cards, right?

10:38AM    17   A.  I don't know the membership rules or how they went about

10:38AM    18   it, but it was mostly older Italian men from the

10:38AM    19   neighborhood.

10:38AM    20   Q.  And not all of them, based on your understanding had a

10:38AM    21   reputation of being in IOC, correct?

10:38AM    22   A.  I don't know that.

10:38AM    23   Q.  So this was a place that Italian men in the community

10:38AM    24   went to play cards?

10:38AM    25   A.  Correct.  It was --

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24
68

10:38AM    1    Q.  So, we talked a little bit about friends yesterday, I

10:39AM    2    want to get into that a little bit more.  We talked about

10:39AM    3    people that you're friends with; is that right?

10:39AM    4    A.  Yes.

10:39AM    5    Q.  You talked about people who were friends of Joe

10:39AM    6    Bongiovanni according to your observations, correct?

10:39AM    7    A.  Correct.

10:39AM    8    Q.  So, I think I've asked you this before, but what is your

10:39AM    9    definition of a friend?  Can you define that?

10:39AM   10    A.  There's different definitions of friends.  There's close

10:39AM   11    friends, there's friends who are acquaintances, there's a

10:39AM   12    friend you know from work or friend from school.  I -- my

10:39AM   13    definition of a close friend --

10:39AM   14    Q.  Yeah.  So let's start with close friend, what's your

10:39AM   15    definition of a close friend?

10:39AM   16    A.  Somebody you've grown up with and known a long time and

10:39AM   17    developed a relationship with, you become friends, start

10:39AM   18    hanging out doing things together.  Get to know one another,

10:39AM   19    get to know their families, you become good friends.

10:40AM   20    Q.  How about an acquaintance, that's another category of a

10:40AM   21    friend that you mentioned?

10:40AM   22    A.  An acquaintance, there's different acquaintances, there's

10:40AM   23    work acquaintances, there is casual acquaintances, an

10:40AM   24    acquaintance to a friend, somebody you would know and just

10:40AM   25    say hi to, exchange a pleasantry, how are you, maybe see from

10:40AM    1    time to time with that person who knew them or if you knew

10:40AM    2    them, if you develop a casual acquaintance.

10:40AM    3    Q.  All right.  So is there a different categories of those

10:40AM    4    acquaintances then?

10:40AM    5    A.  There's personal, there's professional -- yeah, family

10:40AM    6    acquaintances.

10:40AM    7    Q.  Okay.  So it's based on how you know the acquaintance

10:40AM    8    that you would categorize it that way, correct?

10:40AM    9    A.  Yes.  Or if you met somebody, and it was just an

10:40AM   10    acquaintance, you're not close with them, you're not close

10:40AM   11    with everybody you meet.  If you meet somebody and they're an

10:40AM   12    acquaintance, you know them, hi how are you, that type thing,

10:40AM   13    it's casual acquaintance for it's professional acquaintance,

10:40AM   14    you work with them, you see them every day at work.

10:40AM   15    Q.  All right.

10:40AM   16    A.  Hey, how is it going, how was your weekend, that type

10:41AM   17    thing.

10:41AM   18    Q.  So an acquaintance is someone you know because you may

10:41AM   19    have been introduced to them before?

10:41AM   20    A.  Yes.

10:41AM   21    Q.  An acquaintance is somebody you know based on some type

10:41AM   22    of professional relationship you might have?

10:41AM   23    A.  Professional, personal.  It can be defined a lot of

10:41AM   24    different ways, you can have an acquaintance if you're

10:41AM   25    involved in sports, athletic club, a gym you work out at, it

10:41AM   1   really depends.  An acquaintance can be a lot of different

10:41AM   2   things.

10:41AM   3   Q.  But I guess what I am getting at is -- is, an

10:41AM   4   acquaintance is somebody you know, correct?

10:41AM   5   A.  Yes, acquaintance is somebody you know.

10:41AM   6   Q.  You know their face, you know their name, that kind of

10:41AM   7   thing?

10:41AM   8   A.  Yes, sir.

10:41AM   9   Q.  But a friend is actually someone you have a relationship,

10:41AM   10  correct?

10:41AM   11  A.  A friend is a little more in depth.

10:41AM   12  Q.  It's someone you hang out with?

10:41AM   13  A.  Correct.

10:41AM   14  Q.  Call on the phone?

10:41AM   15  A.  If it's that type of friendship, yes.  Every friend you

10:41AM   16  don't call on the phone, but yes.

10:41AM   17  Q.  Somebody you see out from time to time?

10:41AM   18  A.  Yes.

10:41AM   19  Q.  Somebody you make plans with?

10:42AM   20  A.  Yes.

10:42AM   21  Q.  So it's something more than I just know this person?

10:42AM   22  A.  Correct.

10:42AM   23  Q.  Okay.  So as far as some of these people that you were

10:42AM   24  talking about that Mr. Bongiovanni's friends with, I want to

10:42AM   25  go through some of those people right now, okay?

10:42AM    1    A.  Okay.

10:42AM    2    Q.  One of the people that you mentioned that Mr. Bongiovanni

10:42AM    3    is allegedly a friend with is a guy by the name of Joe

10:42AM    4    Tomasello; do you remember that?

10:42AM    5    A.  Yes.

10:42AM    6    Q.  So Joe Tomasello, let's start off, you know him because

10:42AM    7    he grew up inside the same community as you and

10:42AM    8    Mr. Bongiovanni, correct?

10:42AM    9    A.  Correct.

10:42AM   10    Q.  He is not the same age as you and Mr. Bongiovanni,

10:42AM   11    though, right?

10:42AM   12    A.  He's a little younger.

10:42AM   13    Q.  Right.  You know him through some of his older siblings,

10:42AM   14    older brothers, I should say.

10:42AM   15    A.  He has an older brother, yes, Angelo.

10:42AM   16    Q.  And so you know Joe Tomasello based on knowing the older

10:42AM   17    part of his family, correct?

10:42AM   18    A.  No.  I knew his older brother.  But I knew Joe through

10:42AM   19    Joe.  Through our neighborhood.

10:42AM   20    Q.  Okay.  So you knew him, he was a little bit younger than

10:42AM   21    you, correct?

10:43AM   22    A.  Correct, a few years.

10:43AM   23    Q.  He was younger than Mr. Bongiovanni, correct?

10:43AM   24    A.  Correct.

10:43AM   25    Q.  And you believed that Joe Tomasello was a friend of

10:43AM    1    Mr. Bongiovanni because you guys grew up in the same

10:43AM    2    neighborhood, correct?

10:43AM    3    A.   Correct, and his sisters were friends with Joe's sister.

10:43AM    4    So, there was more than that, everyone was.

10:43AM    5    Q.   Yes.

10:43AM    6    A.   Friends.

10:43AM    7    Q.   As far as the sisters knowing each other, we're talking

10:43AM    8    about how Joe's sisters and his family with friends with Joe

10:43AM    9    Tomasello's sister, right?

10:43AM    10   A.   Correct.

10:43AM    11   Q.   And this is going back to high school, correct?

10:43AM    12   A.   Correct.

10:43AM    13   Q.   So we're talking about teenage girlfriends?

10:43AM    14   A.   Correct.

10:43AM    15   Q.   And Joe knew Tomasello based on his sister's relationship

10:43AM    16   with Joe Tomasello's sister?

10:43AM    17   A.   Correct.  And them being in the neighborhood, too.  As

10:43AM    18   well, yes.

10:43AM    19   Q.   Okay.  But as far as I guess moving past high school,

10:43AM    20   getting into the '80s, '90s, 2000, that kind of thing, you

10:44AM    21   didn't see Joe Tomasello hang out with Joseph Bongiovanni,

10:44AM    22   right?

10:44AM    23   A.   No.

10:44AM    24   Q.   You didn't sow Joe Bongiovanni go talk to Joe Tomasello

10:44AM    25   on the telephone?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

| 10:44AM | 1 | A.  Not that I saw, no. |
| 10:44AM | 2 | Q.  You didn't sow Joe Bongiovanni talk to Tomasello |
| 10:44AM | 3 | regularly, correct? |
| 10:44AM | 4 | A.  No. |
| 10:44AM | 5 | Q.  Didn't see him make plans to hang out, correct? |
| 10:44AM | 6 | A.  Correct. |
| 10:44AM | 7 | Q.  So, that would be classified under your definition as not |
| 10:44AM | 8 | a friend, but as an acquaintance, correct? |
| 10:44AM | 9 | A.  That would be a little bit deeper, no, I would say a |
| 10:44AM | 10 | friend, because they knew each other their -- their, from the |
| 10:44AM | 11 | neighborhood and their sisters were friends, so, yes, they |
| 10:44AM | 12 | were friendly.  They were friends. |
| 10:44AM | 13 | Q.  Mr. Selva, we just went through a couple minutes ago, do |
| 10:44AM | 14 | you remember going through these definitions? |
| 10:44AM | 15 | A.  Yes. |
| 10:44AM | 16 | Q.  So you remember talking about how a close friend or |
| 10:44AM | 17 | friend is someone you have a relationship with, right? |
| 10:44AM | 18 | A.  Right. |
| 10:44AM | 19 | Q.  You talk on the phone with? |
| 10:44AM | 20 | A.  Yes. |
| 10:44AM | 21 | Q.  You see out? |
| 10:44AM | 22 | A.  Yes.  You. |
| 10:44AM | 23 | Q.  Make plans with? |
| 10:44AM | 24 | A.  Yes. |
| 10:44AM | 25 | Q.  You hang out with? |

10:45AM     1    A.  Yes.  They weren't that, they were not that category.

10:45AM     2    Q.  They were not that category, right?

10:45AM     3    A.  No.  They were not talking all the time and hanging out.

10:45AM     4    No.

10:45AM     5    Q.  Correct.  So the other part of that was not a friend, but

10:45AM     6    an acquaintance, do you remember that definition?

10:45AM     7    A.  Yes.

10:45AM     8    Q.  This was someone that you may have known from a

10:45AM     9    professional capacity, correct?

10:45AM    10    A.  Yes.

10:45AM    11    Q.  May have known from a sports related capacity, correct?

10:45AM    12    A.  Correct.

10:45AM    13    Q.  You may have known from growing up in the neighborhood

10:45AM    14    capacity, correct?

10:45AM    15    A.  Correct.

10:45AM    16    Q.  And this is someone that you recognize their face,

10:45AM    17    correct?

10:45AM    18    A.  Correct.

10:45AM    19    Q.  Race their name, correct?

10:45AM    20    A.  Correct.

10:45AM    21    Q.  If you saw him out, you may say helicopter /HRORBGS,

10:45AM    22    correct?

10:45AM    23    A.  Correct.

10:45AM    24    Q.  But you don't have a relationship with that person,

10:45AM    25    right?

10:45AM   1    A.   You know that person.   No.

10:45AM   2    Q.   That's what I'm getting at again, is when you said that

10:45AM   3    Joe Tomasello was a friend of Mr. Bongiovanni, that's not

10:45AM   4    correct, right?

10:45AM   5    A.   I -- I'm confused.   They were.   They were friends, they

10:45AM   6    knew each other.   I understand what you explaining, but they

10:45AM   7    were friends.

10:45AM   8    Q.   Let's go through this again if we have to, all right?

10:46AM   9         **MR. TRIPI:**   Objection, it's argumentative at this

10:46AM  10    point, Judge.

10:46AM  11         **THE COURT:**   Yeah, I think it is.   I think it is,

10:46AM  12    Mr. Singer.

10:46AM  13         **MR. SINGER:**   Okay.   Well, I can move on to the next

10:46AM  14    one, Judge.

10:46AM  15         **BY MR. SINGER:**

10:46AM  16    Q.   All right.   So the next person I had mentioned, I think

10:46AM  17    you had mentioned that Dave Hersey, do you remember talking

10:46AM  18    about Dave Hersey?

10:46AM  19    A.   I do.

10:46AM  20    Q.   And Dave Hersey was someone that you and Mr. Bongiovanni

10:46AM  21    knew going back to your college years in your 20s, right?

10:46AM  22    A.   Yes.   Back in the day.   Locker Room, all of the bars,

10:46AM  23    that type of thing.

10:46AM  24    Q.   So back in the day, you, Joe Bongiovanni, Dave Hersey and

10:46AM  25    others, they would hang out in the bars, correct?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

76

| Time | Line | Text |
|------|------|------|
| 10:46AM | 1 | A.  See -- see each other, yes.  We were all friends. |
| 10:46AM | 2 | Q.  You guys would talk, drink beers? |
| 10:46AM | 3 | A.  Yes. |
| 10:46AM | 4 | Q.  Make plans to see each other out? |
| 10:46AM | 5 | A.  See each other out, yes.  Groups of guys, yes. |
| 10:46AM | 6 | Q.  Probably talk on the telephone at that point in time, |
| 10:46AM | 7 | too? |
| 10:46AM | 8 | A.  With who? |
| 10:46AM | 9 | Q.  With Dave Hersey? |
| 10:46AM | 10 | A.  Yes, I was friends with him, yes. |
| 10:46AM | 11 | Q.  And that's when you say Joe Bongiovanni hanging out with |
| 10:47AM | 12 | Dave Hersey, correct? |
| 10:47AM | 13 | A.  Correct. |
| 10:47AM | 14 | Q.  And so we're talking about early 1990s, 30 to 35 years |
| 10:47AM | 15 | ago? |
| 10:47AM | 16 | A.  Yes. |
| 10:47AM | 17 | Q.  But fast forward, when Joe Bongiovanni gets married and |
| 10:47AM | 18 | he moves into his 30s and 40s and his 50s, he and Dave Hersey |
| 10:47AM | 19 | weren't hanging out every single weekend, right? |
| 10:47AM | 20 | A.  No. |
| 10:47AM | 21 | Q.  You didn't see them make plans to hang out, correct? |
| 10:47AM | 22 | A.  Correct. |
| 10:47AM | 23 | Q.  You didn't see them speaking on the phone together, |
| 10:47AM | 24 | correct? |
| 10:47AM | 25 | A.  No. |

10:47AM    1    Q.  It was one of those things if you ran into Dave Hersey at

10:47AM    2    a bar, maybe you see Joe Bongiovanni say hey, how is it

10:47AM    3    going, Dave, that kind of thing?

10:47AM    4    A.  Yes.  They knew each other.  They would say hello, yes.

10:47AM    5    Q.  Shake hands?

10:47AM    6    A.  Yes, sir.

10:47AM    7    Q.  But that was really it, right?

10:47AM    8    A.  Yes, they exchange pleasantries.

10:47AM    9    Q.  So Dave Hersey and Joe Bongiovanni they're not friends,

10:47AM    10    they're acquaintances, correct?

10:47AM    11    A.  From that point, yes, they are acquaintances and they

10:47AM    12    knew each other, yes.

10:47AM    13    Q.  So Sal Volpe was another name you mentioned yesterday do

10:47AM    14    you remember that?

10:47AM    15    A.  Yes.

10:48AM    16    Q.  Sal Volpe you testified was a friend of yours?

10:48AM    17    A.  Yes, he was from North Buffalo, he is since deceased.

10:48AM    18    But yes, sir.

10:48AM    19    Q.  When he was still alive, he was someone you would see out

10:48AM    20    from time to time, right?

10:48AM    21    A.  Yes.

10:48AM    22    Q.  Somebody who you would make plans to hang out with every

10:48AM    23    now and then?

10:48AM    24    A.  I would see him, yes.

10:48AM    25    Q.  Talk to him on the telephone?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

10:48AM    1    A.  I did, yes.

10:48AM    2    Q.  And you testified yesterday that you assume or believed

10:48AM    3    that Mr. Bongiovanni knew him when he was alive because he

10:48AM    4    was from the neighborhood, correct?

10:48AM    5    A.  Yes.

10:48AM    6    Q.  But fast forward again, as we get out of 20 year old time

10:48AM    7    period and Mr. Bongiovanni's 30s, 40s, 50s, that kind of

10:48AM    8    thing, you didn't see him hanging out with Sal Volpe?

10:48AM    9    A.  No, they didn't run in the same circles but they knew

10:48AM    10   each other from the neighborhood.

10:48AM    11   Q.  So once again, he's not a friend of Mr. Bongiovanni, he's

10:48AM    12   an acquaintance.

10:48AM    13   A.  He's an acquaintance, they knew each other.

10:48AM    14   Q.  Who hadn't spoken together based on your knowledge for 30

10:48AM    15   years?

10:48AM    16   A.  Based on my knowledge, yes.

10:48AM    17   Q.  Wayne Anderson was another person you had mentioned as a

10:48AM    18   friend of Mr. Bongiovanni, correct?

10:49AM    19   A.  Correct.

10:49AM    20   Q.  All right.  So, you testified that Mr. Bongiovanni knows

10:49AM    21   Wayne Anderson because he grew up in the neighborhood, right?

10:49AM    22   A.  Yes.

10:49AM    23   Q.  And you guys used to hang out back when you were 20s and

10:49AM    24   that kind of thing?

10:49AM    25   A.  Yes.  Different timeframe, yes.

10:49AM   1   Q.  So we're talking about, like, you know, the late '80s,

10:49AM   2   early '90s, right?

10:49AM   3   A.  Correct.

10:49AM   4   Q.  We're talking about 30 or 40 years ago, right?

10:49AM   5   A.  Yeah.  And then through the years, we'd also see Wayne.

10:49AM   6   He was always around, he's been a friend.

10:49AM   7   Q.  Let's concentrate for this one period for a second.

10:49AM   8   A.  Yes.

10:49AM   9   Q.  So late '80s, early '90s, to put things into perspective

10:49AM  10   for the jury, this is the same time that Ronald Reagan and

10:49AM  11   George Bush were President of the United States, right?

10:49AM  12   A.  Yes.

10:49AM  13   Q.  It's the same time when the Buffalo Bills were in four

10:49AM  14   straight Super Bowls, right?

10:49AM  15   A.  Not the '80s, the '90s.

10:49AM  16   Q.  The early '90s, right?

10:49AM  17   A.  Yes.

10:49AM  18   Q.  It's the same point in time where you know like a lot of

10:49AM  19   things are going on.  I'm thinking like when you're going out

10:49AM  20   in the late '80s, was it like the Wedding Singer in some way?

10:50AM  21       I was a little kid back then, help me understand, what

10:50AM  22   was the scene like.

10:50AM  23   A.  In the late '80s, '90s?

10:50AM  24   Q.  Yeah.

10:50AM  25   A.  It was a different timeframe, different styles, different

10:50AM    1    time frame.

10:50AM    2    Q.  So let's fast forward in to Joe Bongiovanni's 30, 40s,

10:50AM    3    50s, the fact is, you don't see Joe Bongiovanni socializing

10:50AM    4    with Wayne Anderson on a regular basis anymore like you did

10:50AM    5    back then?

10:50AM    6    A.  But we knew him.  If we were out and we see him, we'd

10:50AM    7    talk.  We were friends.

10:50AM    8    Q.  Um-hum.  Yeah.  You mentioned like you know you see him

10:50AM    9    from time to time, like Wayne Anderson you mentioned was at

10:50AM    10   Joe's stag back in 2014, right?

10:50AM    11   A.  Yes.

10:50AM    12   Q.  You mentioned that you believed he was at your benefit in

10:50AM    13   July of 2017?

10:50AM    14   A.  Correct.

10:50AM    15   Q.  So you know, you may have caught up with him on those

10:50AM    16   occasions?

10:50AM    17   A.  Right.

10:50AM    18   Q.  Said hello?

10:50AM    19   A.  Yes.  He was an old friend, yes, he was a friend.

10:50AM    20   Q.  But outside of those two particular occasions, and

10:50AM    21   running into each other at a bar, you didn't see Joe

10:51AM    22   Bongiovanni making plans to hang out with Wayne Anderson,

10:51AM    23   right?

10:51AM    24   A.  No.

10:51AM    25   Q.  Didn't see him talking on the phone?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

81

10:51AM    1    A.  No.

10:51AM    2    Q.  Correct?

10:51AM    3    A.  No.

10:51AM    4    Q.  So he may have known Mr. Anderson like you said, but

10:51AM    5    Wayne Anderson is just an acquaintance, not a friend,

10:51AM    6    correct?

10:51AM    7    A.  It's a little bit deeper because we did hang out at one

10:51AM    8    time when we were younger.  When we were younger it was at

10:51AM    9    the -- you mentioned 19, 20s, we were at the beach.  Out in

10:51AM    10   the bars, yes, we've known each other a long time.

10:51AM    11   Q.  We talked about that with Dave Hersey?

10:51AM    12   A.  This is a little bit different because we've known each

10:51AM    13   other longer.

10:51AM    14   Q.  Okay.  So you've known each other a little bit longer?

10:51AM    15   A.  Yes.

10:51AM    16   Q.  You don't hang out anymore, right?

10:51AM    17   A.  No.

10:51AM    18   Q.  And you can understand how sometimes friendships evolve,

10:51AM    19   right?

10:51AM    20   A.  Correct.

10:51AM    21   Q.  Like sometimes you're really good friends with someone

10:51AM    22   when you're younger, right?

10:51AM    23   A.  Correct.

10:51AM    24   Q.  But as you get older you drift apart?

10:51AM    25   A.  That's correct.

10:51AM    1    Q.  So you may know each other and you may say hello to each

10:51AM    2    other but you don't hang out in the same way?

10:51AM    3    A.  That's human nature.

10:52AM    4    Q.  I'm sure you had friends who you knew when you were

10:52AM    5    younger back in grade school?

10:52AM    6    A.  Yes.

10:52AM    7    Q.  But you stopped being friends with them when you're a

10:52AM    8    teenager, right?

10:52AM    9    A.  Correct.

10:52AM    10   Q.  I'm sure you had friends you hung out with in college,

10:52AM    11   right?

10:52AM    12   A.  Different paths, correct.

10:52AM    13   Q.  But you don't hang out with them on a regular basis?

10:52AM    14   A.  Right.

10:52AM    15   Q.  I had my 25th college reunion a couple of weeks ago.

10:52AM    16   Went up there and saw people I hadn't seen in 25 years, but I

10:52AM    17   said hello to them because I knew them back then, but I

10:52AM    18   hadn't called them in many, many years.  You can understand

10:52AM    19   how that happens in relationships, right?

10:52AM    20   A.  Yes.  I understand, yes, sir.

10:52AM    21   Q.  You mentioned the Suppa brothers, Mark, John and Matt, do

10:52AM    22   you remember those?

10:52AM    23   A.  Yes.

10:52AM    24   Q.  And you mentioned that Mr. Bongiovanni is friends with

10:52AM    25   these people?

10:52AM    1    A.  Yes.

10:52AM    2    Q.  So, he was friends because these folks that lived in the

10:52AM    3    neighborhood, right?

10:52AM    4    A.  Lived in the neighborhood and at one time I believe they

10:52AM    5    lived in the same, it was a double on Colvin that they

10:52AM    6    upstairs/downstairs.

10:52AM    7    Q.  Yeah, the Suppa family lived in a duplex that the

10:53AM    8    Bongiovannis lived in, right?

10:53AM    9    A.  Yes.  In the duplex.

10:53AM   10    Q.  So they knew each other back then?

10:53AM   11    A.  Yes.

10:53AM   12    Q.  We're talking 40, 45 years ago, right?

10:53AM   13    A.  Yeah, but we were good friends through the years, too.

10:53AM   14    We really knew each other.

10:53AM   15    Q.  Okay.  But then fast forward getting --

10:53AM   16    A.  More Mark and Matt, John was older, there's three

10:53AM   17    brothers.

10:53AM   18    Q.  Okay.

10:53AM   19    A.  John was much older -- 7 years older than us.

10:53AM   20    Q.  But once you start to get into the 1990s, 2000s, stuff

10:53AM   21    like that, Mr. Bongiovanni is older and married, or dating

10:53AM   22    people and has kids he's not hanging out with the Suppas,

10:53AM   23    right?

10:53AM   24    A.  No.

10:53AM   25    Q.  You didn't see him out there with them, correct?

10:53AM  1   A.  Correct.

10:53AM  2   Q.  And in fact one of the Suppa brothers, he moved to

10:53AM  3   Chicago, right?

10:53AM  4   A.  Yes.

10:53AM  5   Q.  And you didn't see him talking to the Suppas on the

10:53AM  6   phone, correct?

10:53AM  7   A.  No.

10:53AM  8   Q.  So, they're not friends of Mr. Bongiovanni, they're

10:53AM  9   acquaintances, correct?

10:53AM  10  A.  They're -- I would say friends because when they lived

10:53AM  11  together, they became close, they were good friends, not live

10:53AM  12  together, but in the same duplex, and Mark was our age, so we

10:53AM  13  all knew each, we knew Mark a little bit better.

10:54AM  14  Q.  But again by your own definition of friends, they're not

10:54AM  15  friends, you get that, right?

10:54AM  16  A.  They have a friendship.  Yes.  They're acquaintances at

10:54AM  17  this point in life.  Yes.

10:54AM  18  Q.  Okay.  Thank you, Anthony Martone, do you remember

10:54AM  19  talking about him yesterday?

10:54AM  20  A.  Yes.

10:54AM  21  Q.  And he was someone who you said Mr. Bongiovanni was

10:54AM  22  friends with because he knew him from the neighborhood,

10:54AM  23  right?

10:54AM  24  A.  Correct.

10:54AM  25  Q.  But same kind of thing, fast forward to Joe Bongiovanni's

10:54AM   1   30s, 40s, 50s, he as friends with Joe Martone or Anthony

10:54AM   2   Martone anymore, right?

10:54AM   3   A.  No.  Just --

10:54AM   4   Q.  They're acquaintances, right?

10:54AM   5   A.  Acquaintances from the neighborhood, yes.

10:54AM   6   Q.  Joe Bella was someone you mentioned yesterday, do you

10:54AM   7   remember?

10:54AM   8   A.  Yes.  He's an acquaintance.

10:54AM   9   Q.  And Joe Bella, he's not from the neighborhood at all,

10:54AM  10   right?

10:54AM  11   A.  No, he's acquaintance later from life.

10:54AM  12   Q.  You knew him from the bar scene, right?

10:54AM  13   A.  Correct.

10:54AM  14   Q.  And you didn't see Joe Bongiovanni hanging out with Joe

10:54AM  15   Bella all the time, right?

10:54AM  16   A.  No.

10:54AM  17   Q.  You didn't see them talking on the phone, right?

10:55AM  18   A.  No.

10:55AM  19   Q.  Okay.  Frank Tripi, I don't think we talked about him.

10:55AM  20   But he's another guy from the neighborhood, correct?

10:55AM  21   A.  Correct.

10:55AM  22   Q.  You guys would hang out as teenagers from time to time?

10:55AM  23   A.  Yes.

10:55AM  24   Q.  And fast forward going into the 30s and 40s and 50s and

10:55AM  25   Mr. Bongiovanni, he wasn't hanging out with Frank Tripi,

10:55AM    1    right?

10:55AM    2    A.   No.

10:55AM    3    Q.   Didn't observe them speaking on the phone, correct?

10:55AM    4    A.   Correct.

10:55AM    5    Q.   So, another acquaintance of Joe Bongiovanni, correct?

10:55AM    6    A.   Correct.

10:55AM    7    Q.   Can't remember if Skip Giambrone came up, but he's

10:55AM    8    somebody who is older than you, right?

10:55AM    9    A.   Yes.

10:55AM    10    Q.   You met him later in life?

10:55AM    11    A.   I did, yes.

10:55AM    12    Q.   But you never saw Joe Bongiovanni hang out with Skip

10:55AM    13    Giambrone, correct?

10:55AM    14    A.   No.  No.

10:55AM    15    Q.   Steve Brucato is somebody we talked about yesterday.  Do

10:55AM    16    you remember him?

10:55AM    17    A.   Yes.

10:55AM    18    Q.   And you testified I believe that Joe Bongiovanni knows

10:55AM    19    him 'cuz they hung out in the same neighborhood together?

10:55AM    20    A.   Yeah.  Steve was our age group.  Grew up in the

10:55AM    21    neighborhood.  Worked at Gables.

10:55AM    22    Q.   Um-hum.

10:56AM    23    A.   Yes.  We all knew each other.

10:56AM    24    Q.   So, Joe Bongiovanni knows him based on where he grew up

10:56AM    25    and where he tended bar, right?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

87

10:56AM   1   A.  Yes.

10:56AM   2   Q.  But they're not friends, right?

10:56AM   3   A.  They knew each other.  So, yes, I guess at this point

10:56AM   4   they'd be acquaintances.

10:56AM   5   Q.  So acquaintances and not friends, correct?

10:56AM   6   A.  I --

10:56AM   7   Q.  It's okay to say yes.  Acquaintances not friends,

10:56AM   8   correct?

10:56AM   9   A.  They're acquaintances.  They know each other, so --

10:56AM   10   Q.  Thank you.  The Mazzaras.  Bart and Marty.  They were the

10:56AM   11   sons of Bart Mazzara, Sr., right?

10:56AM   12   A.  No.  That's not correct.  Bart was, Marty was not.

10:56AM   13   Q.  Okay.  So different person?

10:56AM   14   A.  Marty is his nephew.

10:56AM   15   Q.  So Bart, he's the son of Bart Mazzara Sr., right?

10:56AM   16   A.  Yes.

10:56AM   17   Q.  I guess he would be the brother-in-law of Mike Masecchia;

10:56AM   18   is that correct?

10:56AM   19   A.  That's correct.

10:56AM   20   Q.  And he's someone who's no longer with us?

10:56AM   21   A.  He has passed, yes.

10:56AM   22   Q.  And Joe Bongiovanni and you and Bart Mazzara hung out,

10:56AM   23   you guys grew up in the same neighborhood, right?

10:57AM   24   A.  Yes.

10:57AM   25   Q.  But kind of fast forward, he didn't live in Buffalo

10:57AM   1   anymore when he got to be an adult, correct?

10:57AM   2   A.  Who, Bart?

10:57AM   3   Q.  Yes.

10:57AM   4   A.  No, Bart did.

10:57AM   5   Q.  Bart did?

10:57AM   6   A.  Bart lived in Buffalo his whole life, Marty moved away.

10:57AM   7   Q.  Marty moved away?

10:57AM   8   A.  Marty lives in Las Vegas.

10:57AM   9   Q.  But you didn't see Mr. Bongiovanni hanging out with Bart

10:57AM  10   Mazzara all the time?

10:57AM  11   A.  No.  But we knew each other, again from that timeframe we

10:57AM  12   were younger all the way through life, you see them, you

10:57AM  13   evolve, say hello, how are you?  You would always pick you

10:57AM  14   where you left off.

10:57AM  15   Q.  But once again acquaintances, correct?

10:57AM  16   A.  We may be able to define that a little bit, when you know

10:57AM  17   somebody a long time, when you see him, you give him a hug,

10:57AM  18   hi, how are you, how is everything.  That's how that was.

10:57AM  19   Q.  So this is morphing into a third category?

10:57AM  20   A.  I'm sorry?

10:57AM  21   Q.  It's morphing into a third category?

10:57AM  22   A.  I'm just describing how it was, sir, that's all.  I mean

10:57AM  23   with Bart Mazzara.

10:57AM  24   Q.  Okay.

10:57AM  25   A.  And some people.

10:57AM 1 Q. Marty Mazzara was a relative of Bart; is that right?

10:57AM 2 A. Yes.

10:58AM 3 THE COURT: Mr. Singer, how many more people do you

10:58AM 4 have to go through?

10:58AM 5 MR. SINGER: I've just got one more, Judge.

10:58AM 6 THE COURT: Okay.

10:58AM 7 MR. SINGER: Do you think we can take a break after

10:58AM 8 that?

10:58AM 9 THE COURT: If you want, yeah.

10:58AM 10 BY MR. SINGER:

10:58AM 11 Q. As far as Marty's concerned, he's out in Vegas, right?

10:58AM 12 A. He is.

10:58AM 13 Q. And you never saw Joe Bongiovanni hanging out with him on

10:58AM 14 a regular basis, correct?

10:58AM 15 A. It's been quite some time he's been out in Las Vegas a

10:58AM 16 long time.

10:58AM 17 Q. So you're not even sure if Mr. Bongiovanni is an

10:58AM 18 acquaintance of him anymore, right?

10:58AM 19 A. I'm not sure, I don't know.

10:58AM 20 Q. Okay.

10:58AM 21 MR. SINGER: We can pause here, Judge.

10:58AM 22 THE COURT: Okay. We'll take our morning break,

10:58AM 23 remember my instructions about not talking about the case with

10:58AM 24 anyone including each other, not making up your mind, see you

10:58AM 25 pack near about ten or 15 minutes.

| | | |
|---|---|---|
| 10:58AM | 1 | (Jury excused at 10:58 a.m.) |
| 10:59AM | 2 | **THE COURT:**  Anything for the record from the |
| 10:59AM | 3 | government? |
| 10:59AM | 4 | **MR. TRIPI:**  No, Your Honor, thank you. |
| 10:59AM | 5 | **THE COURT:**  From the defense? |
| 10:59AM | 6 | **MR. SINGER:**  No, Your Honor. |
| 10:59AM | 7 | **THE COURT:**  Okay.  See you in about ten or 15 |
| 10:59AM | 8 | minutes. |
| 10:59AM | 9 | **THE CLERK:**  All rise. |
| 10:59AM | 10 | (Off the record at 10:59 a.m.) |
| 11:16AM | 11 | (Back on the record at 11:16 a.m.) |
| 11:16AM | 12 | (Jury not present.) |
| 11:16AM | 13 | **THE CLERK:**  All rise. |
| 11:16AM | 14 | **THE COURT:**  Please be seated. |
| 11:17AM | 15 | **THE CLERK:**  We are back on the record for the jury |
| 11:17AM | 16 | trial in the matter of United States versus Joseph |
| 11:17AM | 17 | Bongiovanni, 19-cr-227.  All counsel and parties are present. |
| 11:17AM | 18 | **THE COURT:**  Are we ready to go? |
| 11:17AM | 19 | **MR. TRIPI:**  Yes. |
| 11:17AM | 20 | **MR. SINGER:**  Ready. |
| 11:17AM | 21 | **THE COURT:**  Okay.  Let's bring the witness back in. |
| 11:17AM | 22 | Let's get the jury back in, please. |
| 11:18AM | 23 | (Mr. Selva seated at 11:17 a.m.) |
| 11:18AM | 24 | (Jury seated at 11:18 a.m.) |
| 11:18AM | 25 | **THE COURT:**  The record will reflect that all our |

11:18AM      1    jurors are present.

11:18AM      2              I remind the witness he's still under oath.

11:18AM      3              Mr. Singer, you may continue.

11:18AM      4              **MR. SINGER:**  Thank you, Your Honor.

11:18AM      5              **BY MR. SINGER:**

11:18AM      6    Q.  I hate to play name games with you, Mr. Selva, but I'm

11:18AM      7    going to do it two more times.  So we talked about Steve

11:18AM      8    Brucato.  He was a bartender who worked up in the Hertel

11:18AM      9    area; is that right?

11:18AM     10    A.  Yes.

11:18AM     11    Q.  Tony Anastasia?

11:18AM     12    A.  Yes.

11:18AM     13    Q.  He was another guy who was a bartender?

11:18AM     14    A.  He was.

11:18AM     15    Q.  Where did he work?

11:18AM     16    A.  Gables.

11:18AM     17    Q.  So he is another guy up in the Hertel area, correct?

11:18AM     18    A.  Correct.

11:18AM     19    Q.  And I think Tony was another person who kind of grew up

11:19AM     20    in the neighborhood, correct?

11:19AM     21    A.  I don't know if he grew up in the neighborhood, I met him

11:19AM     22    later in life.

11:19AM     23    Q.  But you met him, Mr. Bongiovanni met him through

11:19AM     24    bartending at Gables on Hertel?

11:19AM     25    A.  That's correct.

11:19AM   1   Q.  And, so, I think Bobby Missana was a name that came up

11:19AM   2   yesterday was as well I believe?

11:19AM   3   A.  Yes.

11:19AM   4   Q.  And Bobby Missana was not someone who grew up in the

11:19AM   5   neighborhood, right?

11:19AM   6   A.  Grew up on the right side, I believe.

11:19AM   7   Q.  Yeah.  But he was someone who was roughly around the same

11:19AM   8   age as you guys?

11:19AM   9   A.  He was the same age, yes.

11:19AM  10   Q.  He was a person who tended bar at a number of different

11:19AM  11   locations?

11:19AM  12   A.  Yes.

11:19AM  13   Q.  In the City of Buffalo, correct?

11:19AM  14   A.  Correct.

11:19AM  15   Q.  You mentioned Mother's?

11:19AM  16   A.  Correct.

11:19AM  17   Q.  But he was also out in the suburbs in the Northtowns,

11:19AM  18   correct?

11:19AM  19   A.  I believe so, I'm not quite sure where.

11:19AM  20   Q.  So you knew Anastasia and you and Bongiovanni knew

11:19AM  21   Anastasia and Missana mainly based on them being behind the

11:19AM  22   bar pouring you drinks, correct?

11:19AM  23   A.  Yes.

11:19AM  24   Q.  And you've been a bartender before, right?

11:19AM  25   A.  Yes.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

93

11:19AM 1    Q.  So you talk to patrons, correct?

11:19AM 2    A.  Yes.

11:19AM 3    Q.  Patrons talk to you, correct?

11:19AM 4    A.  Yes.

11:20AM 5    Q.  And they might even share some of their issues with you

11:20AM 6    sometimes, right?

11:20AM 7    A.  Correct.

11:20AM 8    Q.  But it's a different type of relationship when it's a

11:20AM 9    bartender/patron relationship?

11:20AM 10   A.  Correct.

11:20AM 11   Q.  You wouldn't consider patrons your friends all the time,

11:20AM 12   correct?

11:20AM 13   A.  Depends.  If I get to know them and become friendly.

11:20AM 14   Q.  Become friendly, but it's not like you're making plans to

11:20AM 15   go hang out with your bartender all the time, right?

11:20AM 16   A.  No.

11:20AM 17   Q.  So you know them based on your conversations in the bar

11:20AM 18   but a little bit different relationship, right?

11:20AM 19   A.  Yes.

11:20AM 20   Q.  And I know we have been talking a lot of names that end

11:20AM 21   in vowels and stuff like that, but I know we talked about,

11:20AM 22   you know, your neighborhood, you grew up in the predominantly

11:20AM 23   Italian at the time, correct?

11:20AM 24   A.  It was.

11:20AM 25   Q.  But it's not like that's the only ethnicity there,

| | | |
|---|---|---|
| 11:20AM | 1 | correct? |
| 11:20AM | 2 | A.  Correct. |
| 11:20AM | 3 | Q.  So like guys like Dave Boshel or people that you knew, |
| 11:20AM | 4 | he's somebody that you knew growing up? |
| 11:20AM | 5 | A.  No.  I worked for Dave, and he was from South Buffalo. |
| 11:20AM | 6 | Q.  So you didn't know him.  How about Joe Tali? |
| 11:20AM | 7 | A.  Joe Tali? |
| 11:21AM | 8 | Q.  Yeah. |
| 11:21AM | 9 | A.  I don't know a Joe Tali. |
| 11:21AM | 10 | Q.  You don't know Joe at all? |
| 11:21AM | 11 | What about Dick Manke? |
| 11:21AM | 12 | A.  Dick Manke, I know, yes from, bartending. |
| 11:21AM | 13 | Q.  Bartending and stuff like that? |
| 11:21AM | 14 | A.  Yes. |
| 11:21AM | 15 | Q.  So these are guys that you know from that neighborhood |
| 11:21AM | 16 | but they might not necessarily be Italian, right? |
| 11:21AM | 17 | A.  Dick Manke was not from North Buffalo, I knew him from |
| 11:21AM | 18 | the Stuffed Mushroom. |
| 11:21AM | 19 | Q.  Yeah.  So you knew him from that capacity? |
| 11:21AM | 20 | A.  Yes. |
| 11:21AM | 21 | Q.  But, the people that we've gone through, I realize a lot |
| 11:21AM | 22 | of them are Italian, you and Joe Bongiovanni had friends |
| 11:21AM | 23 | other than people who were Italian, correct? |
| 11:21AM | 24 | A.  Correct. |
| 11:21AM | 25 | Q.  Because people grew up in that neighborhood from all |

11:21AM  1   ethnicities, correct?

11:21AM  2   A.  Correct.

11:21AM  3   Q.  So I want to kind of shift gears here talk a little bit

11:21AM  4   about Mike Masecchia again.

11:21AM  5       So, Mike Masecchia, he is somebody who you testified

11:21AM  6   yesterday grew up in the neighborhood, right?

11:21AM  7   A.  Correct.

11:21AM  8   Q.  He's somebody who was I think two years younger than you

11:21AM  9   and Joe, right?

11:21AM  10  A.  I believe so.  That's about right.

11:21AM  11  Q.  But he's somebody who you guys hung out with in your

11:21AM  12  teenage years, correct?

11:21AM  13  A.  Yes.

11:22AM  14  Q.  During high school?

11:22AM  15  A.  Yes.

11:22AM  16  Q.  That kind of thing?

11:22AM  17  A.  Yes.

11:22AM  18  Q.  And then later when you transitioned into your early 20s

11:22AM  19  and college stuff like that, you guys are still hanging out?

11:22AM  20  A.  Correct.

11:22AM  21  Q.  I think you mentioned that Joe and Mike Masecchia had

11:22AM  22  also gone to college together in some capacity?

11:22AM  23  A.  Correct.  They went to U.B. together.

11:22AM  24  Q.  And so we're talking about the early 1990s when

11:22AM  25  everyone's hanging out in -- in their 20s and that kind of

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

| | | |
|---|---|---|
| 11:22AM | 1 | thing.  We're talking about those kind of years, right? |
| 11:22AM | 2 | A.  Correct. |
| 11:22AM | 3 | Q.  And you saw Masecchia and Joe Bongiovanni hanging out |
| 11:22AM | 4 | during that period of time, correct? |
| 11:22AM | 5 | A.  Yes. |
| 11:22AM | 6 | Q.  But when you fast forward, kind of like all these other |
| 11:22AM | 7 | people we talked about, into Joe's 30s and 40s and 50s, |
| 11:22AM | 8 | you're not seeing him hanging out with Mike Masecchia all the |
| 11:22AM | 9 | time, right? |
| 11:22AM | 10 | A.  Not hanging out, no. |
| 11:22AM | 11 | Q.  You're not seeing him make plans with Mike Masecchia, |
| 11:22AM | 12 | right? |
| 11:22AM | 13 | A.  Not that I knew of.  No. |
| 11:22AM | 14 | Q.  They're not hanging out for holidays and stuff like that? |
| 11:23AM | 15 | A.  No. |
| 11:23AM | 16 | Q.  They're not talking on the phone to make plans or |
| 11:23AM | 17 | checking in to see how each other's doing, correct? |
| 11:23AM | 18 | A.  Not on a personal note, yeah. |
| 11:23AM | 19 | Q.  Yeah, so those kind of things I guess go back to the same |
| 11:23AM | 20 | kind of definition, like at that point in time, Mike |
| 11:23AM | 21 | Masecchia's is not Joe Bongiovanni's friend, right? |
| 11:23AM | 22 | A.  No, he was his friend. |
| 11:23AM | 23 | Q.  Okay.  So -- |
| 11:23AM | 24 | A.  He was his friend. |
| 11:23AM | 25 | Q.  So you base that on the fact that they're talking about |

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24
97

11:23AM  1    this criminal conspiracy you were alleging yesterday?

11:23AM  2    A.  Yes.

11:23AM  3    Q.  Okay.  So that's the basis of the friendship, right?

11:23AM  4    A.  No.  They've known each other longer than that.  Those

11:23AM  5    time frames you just mentioned so there's a little bit of a

11:23AM  6    history there.

11:23AM  7    Q.  But we just went again back to the fact that they're not

11:23AM  8    hanging out on a social basis anymore, right?

11:23AM  9    A.  Right.  But it doesn't mean they're not friends.

11:23AM  10   Q.  Okay.

11:23AM  11   A.  I mean, they're --

11:23AM  12   Q.  I'll go back to the question, they're not hanging out on

11:23AM  13   a social basis anymore, right?

11:23AM  14   A.  At what timeframe?

11:23AM  15   Q.  We're talking about moving past the 1990s, into the

11:24AM  16   2000s.

11:24AM  17   A.  No.

11:24AM  18   Q.  They're not hanging out socially, right?

11:24AM  19   A.  Not socially, no, but they --

11:24AM  20   Q.  They're not hanging out for the holidays, right?

11:24AM  21   A.  No.

11:24AM  22   Q.  They may see each other at things like a stag or a

11:24AM  23   funeral?

11:24AM  24   A.  Yes, sir.

11:24AM  25   Q.  But they're not making plans to hang out at those

11:24AM     1   particular places, right?

11:24AM     2   A.  Not that I know of.  No.

11:24AM     3   Q.  You don't see them talking on the phone on a regular

11:24AM     4   basis, correct?

11:24AM     5   A.  No.

11:24AM     6   Q.  You wouldn't be shocked if there wasn't a single call

11:24AM     7   from Mike Masecchia on Joe Bongiovanni's phone, correct?

11:24AM     8   A.  At that timeframe, yes.

11:24AM     9   Q.  Yeah.  Stark contrast to you, back in that 2012 to 2019

11:24AM    10   time period, you're talking to Joe quite frequently, right?

11:24AM    11   A.  Right.

11:24AM    12   Q.  That's why you're his friend, right?

11:24AM    13   A.  Right.

11:24AM    14   Q.  So safe to say that Joe Bongiovanni again may have known

11:24AM    15   who Mike Masecchia was, but they're not friends in the 2000s?

11:24AM    16   A.  No, they're still friends.  I disagree with that.

11:24AM    17   Q.  I guess we'll agree to disagree on that.

11:24AM    18           **MR. TRIPI:**  Objection to the commentary.

11:24AM    19           **THE COURT:**  Sustained.

11:24AM    20           **MR. TRIPI:**  Move to strike the comment.

11:24AM    21           **THE COURT:**  It's stricken.

11:25AM    22           **BY MR. SINGER:**

11:25AM    23   Q.  So let's go back to I guess a little bit about what you

11:25AM    24   testified to yesterday.  So you testified that you reach out

11:25AM    25   to Mike Masecchia to get involved in this grow operation,

11:25AM    1    correct?

11:25AM    2    A.  Correct.

11:25AM    3    Q.  And you testified that what you proposed to Mr. Masecchia

11:25AM    4    was that, hey, look, I can help you out by helping you grow

11:25AM    5    the marijuana plants, right?

11:25AM    6    A.  It was discussed what to do to get involved, yes.

11:25AM    7    Q.  That was one of the values you brought to being involved

11:25AM    8    in the operation, correct?

11:25AM    9    A.  That's correct.

11:25AM   10    Q.  You also offered up your house as a potential place to

11:25AM   11    grow the seedlings, correct?

11:25AM   12    A.  Correct.

11:25AM   13    Q.  And you also talked to Mike Masecchia about the fact that

11:25AM   14    you had a connection to Joe Bongiovanni, correct?

11:25AM   15    A.  Yes.  He knew that.

11:25AM   16    Q.  That was far different than his, correct?

11:25AM   17    A.  He knew that, yes.

11:25AM   18    Q.  Yeah.  You were really good friends with Joe Bongiovanni,

11:25AM   19    right?

11:25AM   20    A.  Yes, he knew that, yes.

11:25AM   21    Q.  And Mike Masecchia knew that he wasn't, correct?

11:25AM   22    A.  Mike knew that he was good friends with him, yes.  Again,

11:26AM   23    we all grew up with each other and he knew him on a personal

11:26AM   24    level, so, yes.

11:26AM   25    Q.  So, Mr. Selva, the value you brought to Mike Masecchia as

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

100

11:26AM   1   you testified yesterday was not just that you could help grow

11:26AM   2   marijuana, right?

11:26AM   3   A.  Correct.

11:26AM   4   Q.  The value you brought to him in addition to that was that

11:26AM   5   you had a close relationship with Joe Bongiovanni, right?

11:26AM   6   A.  Correct.

11:26AM   7   Q.  And that value to him was it permitted him to have a

11:26AM   8   conduit to get to Joe Bongiovanni to propose these bribes,

11:26AM   9   correct?

11:26AM   10  A.  Correct.

11:26AM   11  Q.  So, what you're saying is, Mike Masecchia is a friend of

11:26AM   12  Joe Bongiovanni now?

11:26AM   13  A.  He always been.

11:26AM   14  Q.  So, I guess, Mr. Selva, if Mike Masecchia's a friend of

11:26AM   15  Mr. Bongiovanni, right?

11:26AM   16  A.  Right.

11:26AM   17  Q.  Why does he get you involved in this?

11:26AM   18  A.  What do you mean, why does he get me involved in this?

11:26AM   19  Mike?

11:26AM   20  Q.  Well, Mr. Selva, Mike Masecchia, if he's a friend of

11:27AM   21  Mr. Bongiovanni can go directly to Joe Bongiovanni and say,

11:27AM   22  hey, Joe, I need some help here, here's a bribe?

11:27AM   23  A.  No.  He felt I was closer, and I should do it.

11:27AM   24  Q.  So -- so, you can't have it both ways, sir.

11:27AM   25          **MR. TRIPI:**  Objection, argumentative.

| 11:27AM | 1 | **THE COURT:**  Sustained. |

11:27AM 2 **BY MR. SINGER:**

11:27AM 3 Q.  You're saying that you have a closer relationship to Joe

11:27AM 4 Bongiovanni than Mike Masecchia, correct?

11:27AM 5 A.  Correct.

11:27AM 6 Q.  And that's because you guys speak on the phone on a

11:27AM 7 regular basis, right?

11:27AM 8 A.  Correct.

11:27AM 9 Q.  You hang out on a regular basis?

11:27AM 10 A.  Correct.

11:27AM 11 Q.  You do things together and make plans, correct?

11:27AM 12 A.  Correct.

11:27AM 13 Q.  And it was not just back in 1990 something that you did

11:27AM 14 all those things, right?

11:27AM 15 A.  That's correct.

11:27AM 16 Q.  You continued to do those things into the late 1990s,

11:27AM 17 correct?

11:27AM 18 A.  That's correct.

11:27AM 19 Q.  After college and after graduation?

11:27AM 20 A.  That's correct.

11:27AM 21 Q.  You continued to do those things in the early 2000s, when

11:27AM 22 you guys were going through marital strife, correct?

11:27AM 23 A.  Correct.

11:27AM 24 Q.  You continued to do those things after your later 2000s,

11:27AM 25 when you guys are moving into different parts of your

11:27AM   1   relationship, correct?

11:27AM   2   A.   Correct.

11:28AM   3   Q.   And you continued to do those things into the 2010s, when

11:28AM   4   you guys are either married again or have older kids,

11:28AM   5   correct?

11:28AM   6   A.   Correct.

11:28AM   7   Q.   And that's because you're good friends with him, right?

11:28AM   8   A.   Correct.

11:28AM   9   Q.   But Mike Masecchia did not have that same type of

11:28AM  10   relationship with Joe Bongiovanni, correct?

11:28AM  11   A.   He wasn't as close as we were, no, but they were good

11:28AM  12   friends.

11:28AM  13   Q.   Yeah, they didn't hang out on a regular basis, right?

11:28AM  14   A.   No, but they were still good friends.

11:28AM  15   Q.   They didn't hang out on a regular basis?

11:28AM  16   A.   Correct.

11:28AM  17   Q.   They didn't go out and meet for dinner all the time?

11:28AM  18   A.   Correct.

11:28AM  19   Q.   They didn't go out and do things on a regular basis,

11:28AM  20   correct?

11:28AM  21   A.   Correct.

11:28AM  22   Q.   No social things, correct?

11:28AM  23   A.   As far as I know, correct.

11:28AM  24   Q.   They might see each other out and say hello at the bars

11:28AM  25   and that kind of thing?

11:28AM    1    A.  Maybe a little bit more than that.

11:28AM    2    Q.  But that's really the extent of what's going on?

11:28AM    3    A.  Correct.

11:28AM    4    Q.  So again, that's the value you say you bring to this

11:28AM    5    organization, correct?

11:28AM    6    A.  Correct.

11:28AM    7    Q.  Because Mike Masecchia didn't have as close a

11:28AM    8    relationship with Joe Bongiovanni, correct?

11:28AM    9    A.  Correct.

11:28AM   10    Q.  So now you see, it's fair to say that Mike Masecchia was

11:29AM   11    not that close to Joe Bongiovanni, like you, correct?

11:29AM   12          **MR. TRIPI:**  Objection, argumentative, asked and

11:29AM   13    answered.

11:29AM   14          **THE COURT:**  Overruled.

11:29AM   15          **THE WITNESS:**  We were close.  We --

11:29AM   16          **BY MR. SINGER:**

11:29AM   17    Q.  You and Joe were?

11:29AM   18    A.  Yes.

11:29AM   19    Q.  And Mike Masecchia and Joe Bongiovanni were not, correct?

11:29AM   20    A.  They were good friends.  So I don't know if they were

11:29AM   21    close, as him and I, but they were friends.

11:29AM   22    Q.  But again, the whole reason why you proposed to

11:29AM   23    Mr. Masecchia that you get involved in this thing was based

11:29AM   24    on your relationship with Joe, correct?

11:29AM   25    A.  Correct.

11:29AM   1        **MR. TRIPI:**  Objection.

11:29AM   2            **BY MR. SINGER:**

11:29AM   3   Q.  And he saw the value in that?

11:29AM   4        **THE COURT:**  Overruled.  One at a time, folks.

11:29AM   5        **MR. SINGER:**  Sorry.

11:29AM   6        **THE COURT:**  Overruled.  Next question.

11:29AM   7            **BY MR. SINGER:**

11:29AM   8   Q.  And Mike Masecchia saw the value in your relationship,

11:29AM   9   correct?

11:29AM  10        **MR. TRIPI:**  Objection as to what Mike Masecchia saw.

11:29AM  11   602.  He asked what he said.

11:29AM  12        **THE COURT:**  Yeah.  The objection to the form of the

11:29AM  13   question is sustained.  Ask another question, please,

11:29AM  14   Mr. Singer.

11:29AM  15            **BY MR. SINGER:**

11:29AM  16   Q.  Mike Masecchia asked you to become a part of the

11:29AM  17   organization based on your relationship, your close

11:29AM  18   relationship with Joe Bongiovanni, right?

11:29AM  19   A.  Correct.

11:29AM  20   Q.  Because it was closer than his, correct?

11:30AM  21   A.  Correct.

11:30AM  22   Q.  And, so, as far as the offers that you had went through,

11:30AM  23   you talked about how when you originally approached Joe

11:30AM  24   Bongiovanni about this offer to get involved in this scheme

11:30AM  25   to provide information, he originally rejected that offer,

11:30AM   1   right?

11:30AM   2   A.  Correct.

11:30AM   3   Q.  You talked about how you had gone back to Mike Masecchia

11:30AM   4   to report this to him, correct?

11:30AM   5   A.  Correct.

11:30AM   6   Q.  And you talked about how yesterday you had confidence

11:30AM   7   that Joe would eventually come around based on your

11:30AM   8   relationship with him?

11:30AM   9   A.  Correct.

11:30AM   10   Q.  And when you approached Joe Bongiovanni the second time

11:30AM   11   to propose this to him, Mike Masecchia wasn't with you,

11:30AM   12   correct?

11:30AM   13   A.  No, he was not.

11:30AM   14   Q.  Like, he didn't say, hey, let me come along with you, I

11:30AM   15   know Joe, too, both of us can close this deal, correct?

11:31AM   16   A.  No.

11:31AM   17   Q.  He relied on you?

11:31AM   18   A.  Relied on me.

11:31AM   19   Q.  You alone?

11:31AM   20   A.  Correct.

11:31AM   21   Q.  And the reason for that, sir, is because again you had a

11:31AM   22   much closer relationship to Joe Bongiovanni than Mike

11:31AM   23   Masecchia ever did at that time, correct?

11:31AM   24   A.  At that time.  Yes.

11:31AM   25   Q.  And used also agree with me that going back to the

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

106

11:31AM    1    earlier 2000s, before this scheme began, you had a much

11:31AM    2    closer relationship to Joe Bongiovanni than Mike Masecchia

11:31AM    3    ever had, too, correct?

11:31AM    4    A.  Correct.

11:31AM    5    Q.  In fact, to your knowledge, they weren't really speaking

11:31AM    6    much at all until this whole thing was proposed back in 2008,

11:31AM    7    according to your testimony, correct?

11:31AM    8    A.  If they saw each other, they -- you know, like you

11:31AM    9    mentioned before, if you run into each other, you see each

11:31AM    10    other, yes.  Correct.

11:31AM    11    Q.  Back then they were just acquaintances, correct?

11:31AM    12    A.  Friends.

11:31AM    13    Q.  So, after this protection scheme starts up, it was your

11:32AM    14    testimony that Mike Masecchia and Joe Bongiovanni didn't

11:32AM    15    really hang out that much at all either, correct?

11:32AM    16    A.  Correct.

11:32AM    17    Q.  And that was, according to your testimony, based on a

11:32AM    18    preference that Mr. Bongiovanni had not to be seen with him,

11:32AM    19    correct?

11:32AM    20    A.  Correct.

11:32AM    21    Q.  It was also based on a preference to protect you in some

11:32AM    22    ways, correct?

11:32AM    23    A.  Correct.

11:32AM    24    Q.  That's what you testified to yesterday?

11:32AM    25    A.  Correct.

11:32AM  1   Q.  And so that's where you set up this arrangement where you

11:32AM  2   became the information conduit, right?

11:32AM  3   A.  That's correct.

11:32AM  4   Q.  So, you two would continue to have your same relationship

11:32AM  5   that you enjoyed over the last three, four decades, right?

11:32AM  6   A.  Correct.

11:32AM  7   Q.  And you guys would meet each other out at bars from time

11:32AM  8   to time, correct?

11:32AM  9   A.  Correct.

11:32AM  10  Q.  You'd talk on open telephones, correct?

11:32AM  11  A.  Correct.

11:32AM  12  Q.  So you called him on your regular telephone, right?

11:32AM  13  A.  Correct.

11:32AM  14  Q.  And you would call him at his DEA telephone, correct?

11:32AM  15  A.  Correct.

11:32AM  16  Q.  And that would be, you know, multiple calls a month,

11:32AM  17  correct?

11:33AM  18  A.  Correct.

11:33AM  19  Q.  You guys would text on those same lines, correct?

11:33AM  20  A.  Correct.

11:33AM  21  Q.  Because you didn't really have any concern about that

11:33AM  22  given the long-standing relationship you had, correct?

11:33AM  23  A.  Correct.

11:33AM  24  Q.  Didn't need to use burners because of that?

11:33AM  25  A.  No.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

108

11:33AM    1    Q.  But Mike Masecchia is in a different category, right?

11:33AM    2    A.  Correct.

11:33AM    3    Q.  Your claim was that you provide Joe Bongiovanni numbers

11:33AM    4    of burners that Mike Masecchia had for the purpose of him

11:33AM    5    calling him, correct?

11:33AM    6    A.  I gave Mike Joe's number, yes, and then he reached out.

11:33AM    7    Q.  So you're saying that Mike Masecchia called Joe

11:33AM    8    Bongiovanni?

11:33AM    9    A.  From burner phones.

11:33AM   10    Q.  That's how he reached out?

11:33AM   11    A.  I believe so.  Yes.

11:33AM   12    Q.  And you provided him the DEA cell phone?

11:33AM   13    A.  Yes.

11:33AM   14    Q.  You didn't have any concerns about that?

11:33AM   15    A.  Well, I knew it would be a short meeting, just let's get

11:33AM   16    together.  It was a brief conversation, I knew how Mike

11:33AM   17    worked.

11:33AM   18    Q.  Did Mike Masecchia have any concerns about you or him

11:34AM   19    calling Joe Bongiovanni DEA cellphone?

11:34AM   20    A.  No.

11:34AM   21    Q.  Didn't care?

11:34AM   22    A.  No.

11:34AM   23    Q.  So as far as the information was concerned, you handled

11:34AM   24    that part of the relationship, correct?

11:34AM   25    A.  Correct.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

109

| | | |
|---|---|---|
| 11:34AM | 1 | Q.  Mike Masecchia, he was the money guy, correct? |
| 11:34AM | 2 | A.  Ron Serio was.  Mike was the one I handed it off. |
| 11:34AM | 3 | Q.  He was the hander of the money, correct? |
| 11:34AM | 4 | A.  Yes. |
| 11:34AM | 5 | Q.  So according to your testimony, Ron Serio would provide |
| 11:34AM | 6 | Mike Masecchia those funds, correct? |
| 11:34AM | 7 | A.  Correct. |
| 11:34AM | 8 | Q.  And then Mike Masecchia would make arrangements to meet |
| 11:34AM | 9 | with Mr. Bongiovanni, correct? |
| 11:34AM | 10 | A.  That's correct. |
| 11:34AM | 11 | Q.  You would provide Joe Bongiovanni's cell phone number, |
| 11:34AM | 12 | the DEA cell phone to Mike Masecchia, correct? |
| 11:34AM | 13 | A.  Correct. |
| 11:34AM | 14 | Q.  And then Mike Masecchia would place a call to that DEA |
| 11:34AM | 15 | cell phone to coordinate with Joe Bongiovanni, correct? |
| 11:34AM | 16 | A.  I believe so, yes. |
| 11:34AM | 17 | Q.  And then they meet up and the best of your knowledge |
| 11:34AM | 18 | that's where the money exchange happened, correct? |
| 11:34AM | 19 | A.  That's correct. |
| 11:35AM | 20 | Q.  And those type of meetings -- you know, I've been through |
| 11:35AM | 21 | it a bunch of times, those are not social meetings, right? |
| 11:35AM | 22 | A.  No, they're brief meetings. |
| 11:35AM | 23 | Q.  Brief meetings, not at bars, correct? |
| 11:35AM | 24 | A.  No. |
| 11:35AM | 25 | Q.  We went through a number of people before we took our |

11:35AM    1    break of individuals you claimed you were friends with and

11:35AM    2    you claim that Joe Bongiovanni was friends with, remember?

11:35AM    3    A.  Yes.

11:35AM    4    Q.  So, unlike Mr. Bongiovanni, some of those people that we

11:35AM    5    talked about, they were friends of yours, right?

11:35AM    6    A.  Yes.  Can you be specific which ones you were talking

11:35AM    7    about?

11:35AM    8    Q.  Sure.  So I'm not going to go through all the names

11:35AM    9    again, but bottom line is many of those people, you

11:35AM   10    socialized with them, correct?

11:35AM   11    A.  Correct.

11:35AM   12    Q.  Many of those people you called on the phone, correct?

11:35AM   13    A.  From time to time.  Yes.  Depending on who it was, I

11:35AM   14    don't know exactly who you're referencing, but yes, sir.

11:35AM   15    Q.  Some of those people were part of your criminal

11:36AM   16    associates in this drug-trafficking organization, correct?

11:36AM   17    A.  Depending on who you're referencing, yes.

11:36AM   18    Q.  And you'd see them based on your --

11:36AM   19         MR. TRIPI:  Objection.  At this point I'm going to

11:36AM   20    object to being more specific.  Several times the witness has

11:36AM   21    indicated he doesn't know who Mr. Singer is referencing.

11:36AM   22         THE COURT:  I think he's answering the questions fine

11:36AM   23    and Mr. Singer can ask the questions he wants to ask them so,

11:36AM   24    overruled.

          25

11:36AM   1        **BY MR. SINGER:**

11:36AM   2   Q.  So some of these people you would see out at the job

11:36AM   3   sites, whether it's grow sites down in the Southtowns,

11:36AM   4   correct?

11:36AM   5   A.  Yes.

11:36AM   6   Q.  And you probably hang out with them from time to time too

11:36AM   7   after you get done doing your drug business, correct?

11:36AM   8   A.  Depends.

11:36AM   9   Q.  And so it was fundamentally different than a relationship

11:36AM  10   we talked about with Mr. Bongiovanni and these people at that

11:36AM  11   point in his life?

11:36AM  12   A.  With those specific people?

11:36AM  13   Q.  Yes.

11:36AM  14   A.  Yes.

11:36AM  15   Q.  You were not just acquaintances to many of those people,

11:36AM  16   you actually were friends because you did socialize with

11:36AM  17   them, correct?

11:36AM  18   A.  Yes, again I'm kind of vague on who you're referencing,

11:37AM  19   but, yes.  You're talking about friends that were involved in

11:37AM  20   that, yes.

11:37AM  21   Q.  Okay.  So I want to shift gears a little bit and talk

11:37AM  22   about Peter Gerace.  So you testified that you knew Peter

11:37AM  23   Gerace, correct?

11:37AM  24   A.  Yes, he was an acquaintance.

11:37AM  25   Q.  And you also testified that you knew his brother Anthony

| | | |
|---|---|---|
| 11:37AM | 1 | Gerace; is that right? |
| 11:37AM | 2 | A.  Yes. |
| 11:37AM | 3 | Q.  And, so, they didn't grow up in North Buffalo, correct? |
| 11:37AM | 4 | A.  No. |
| 11:37AM | 5 | Q.  They weren't from the neighborhood? |
| 11:37AM | 6 | A.  They were not. |
| 11:37AM | 7 | Q.  And Anthony Gerace, your understanding that he's not the |
| 11:37AM | 8 | same age as you and Mr. Bongiovanni, correct? |
| 11:37AM | 9 | A.  That's correct. |
| 11:37AM | 10 | Q.  That's Peter's younger brother? |
| 11:37AM | 11 | A.  Yes. |
| 11:37AM | 12 | Q.  By a couple years? |
| 11:37AM | 13 | A.  I don't know how old, but he's maybe in his 40s, mid 40s, |
| 11:37AM | 14 | I'm not sure how old he is, but yes, he's younger. |
| 11:37AM | 15 | Q.  And how old are you? |
| 11:37AM | 16 | A.  I'm 59. |
| 11:37AM | 17 | Q.  So if he's in his 40s, that's quite a few years, correct? |
| 11:37AM | 18 | A.  For Anthony.  Peter is more closer to our age. |
| 11:37AM | 19 | Q.  Yes.  And Peter is more the contemporary between you and |
| 11:37AM | 20 | Joe Bongiovanni, correct? |
| 11:37AM | 21 | A.  Correct. |
| 11:37AM | 22 | Q.  Okay.  So you testified that Mr. Bongiovanni and |
| 11:37AM | 23 | Mr. Gerace, you had witnessed them bartend at the Ramada at |
| 11:38AM | 24 | some point in time? |
| 11:38AM | 25 | A.  Correct.  It was called the Bubble back in the day. |

11:38AM    1   Q.  Yeah, and we're talking about back in the day, we're

11:38AM    2   talking about 30 years ago.

11:38AM    3   A.  Long time ago, yes.

11:38AM    4   Q.  So that was going back to the college days again, right?

11:38AM    5   A.  Correct.

11:38AM    6   Q.  And so you witnessed them doing that at that point in

11:38AM    7   time, and you testified that they kept up a relationship over

11:38AM    8   the course of time?

11:38AM    9   A.  That's correct.

11:38AM   10   Q.  So it wasn't just kind of this acquaintance situation

11:38AM   11   that we talked about with several people Mr. Bongiovanni grew

11:38AM   12   up back in the '80s and '90s with, right?

11:38AM   13   A.  Correct.  Because that evolved to a friendship with them.

11:38AM   14   Q.  Because he was making plans with Peter Gerace to hang

11:38AM   15   out, correct?

11:38AM   16   A.  To my understanding, correct.

11:38AM   17   Q.  Talking to him on the phone?

11:38AM   18   A.  Correct.

11:38AM   19   Q.  Texting, that kind of thing?

11:38AM   20   A.  Correct.

11:38AM   21   Q.  Okay.  Not the same thing with Anthony Gerace though it's

11:38AM   22   your understanding, correct?

11:38AM   23   A.  No, it was Peter's younger brother.

11:38AM   24   Q.  Okay.  So Bongiovanni wasn't calling him up on the phone

11:38AM   25   all the time, right?

| | | |
|---|---|---|
| 11:38AM | 1 | A.  Not that I know of.  Right. |
| 11:38AM | 2 | Q.  Wasn't hanging out with him all the time? |
| 11:38AM | 3 | A.  Not that I know of. |
| 11:38AM | 4 | Q.  So as far as Peter Gerace is concerned, you had stated |
| 11:39AM | 5 | that at some point in time, back in 2013, to 2015 -- I know |
| 11:39AM | 6 | you couldn't pinpoint it, you had gone to Pharaoh's |
| 11:39AM | 7 | Gentlemen's Club with Joe Bongiovanni; is that right? |
| 11:39AM | 8 | A.  That's correct. |
| 11:39AM | 9 | Q.  And I think after Mr. Tripi asked you more directly, you |
| 11:39AM | 10 | said it was two times, correct? |
| 11:39AM | 11 | A.  It was a couple times, yes. |
| 11:39AM | 12 | Q.  Well, do you remember, he asked you that question? |
| 11:39AM | 13 | A.  Yes. |
| 11:39AM | 14 | Q.  Is it a couple, and you remember how you responded, it's |
| 11:39AM | 15 | two? |
| 11:39AM | 16 | A.  It was two. |
| 11:39AM | 17 | Q.  Yeah, because he wanted a direct answer out of you? |
| 11:39AM | 18 | A.  Correct. |
| 11:39AM | 19 | Q.  So we're talking about two times? |
| 11:39AM | 20 | A.  Two times. |
| 11:39AM | 21 | Q.  So one of those times, you guys went to the bar; is that |
| 11:39AM | 22 | right? |
| 11:39AM | 23 | A.  That's correct. |
| 11:39AM | 24 | Q.  And you were kind of hanging out at the bar and Peter |
| 11:39AM | 25 | wasn't there? |

| | | |
|---|---|---|
| 11:39AM | 1 | A.  Correct. |
| 11:39AM | 2 | Q.  And then the second time, you recall that you went there |
| 11:39AM | 3 | with Joe Bongiovanni again, correct? |
| 11:39AM | 4 | A.  Correct. |
| 11:39AM | 5 | Q.  And you hung out at the bar? |
| 11:39AM | 6 | A.  Correct. |
| 11:39AM | 7 | Q.  And at that point in time Peter Gerace was there, |
| 11:39AM | 8 | correct? |
| 11:39AM | 9 | A.  He was, he came behind the bar and he saw us, correct. |
| 11:39AM | 10 | Q.  I think you stated that he said hello to you, correct? |
| 11:39AM | 11 | A.  Said hello to me, yes. |
| 11:40AM | 12 | Q.  And he said hello to Joe, correct? |
| 11:40AM | 13 | A.  Yes. |
| 11:40AM | 14 | Q.  And then at some point he asked Joe to come over to |
| 11:40AM | 15 | another corner and talk to him for a second? |
| 11:40AM | 16 | A.  They had a private conversation that I wasn't involved |
| 11:40AM | 17 | in, correct. |
| 11:40AM | 18 | Q.  And they had a three to five-minute conversation, as you |
| 11:40AM | 19 | said yesterday? |
| 11:40AM | 20 | A.  Correct, I was standing in the middle of the bar drinking |
| 11:40AM | 21 | a drink and they stepped away, correct? |
| 11:40AM | 22 | Q.  And after that ended, Joe came back to the bar, right? |
| 11:40AM | 23 | A.  Correct. |
| 11:40AM | 24 | Q.  And you guys continued to hang out the rest of the night, |
| 11:40AM | 25 | right? |

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

11:40AM    1    A.  Not the whole night, we left short after.  Yes.  We had a

11:40AM    2    couple drinks and left.

11:40AM    3    Q.  Okay.  So you had a couple drinks and left?

11:40AM    4    A.  Yes.

11:40AM    5    Q.  All right.  You have no idea what that conversation was

11:40AM    6    about?

11:40AM    7    A.  No idea.

11:40AM    8    Q.  Because you weren't part of it?

11:40AM    9    A.  I wasn't part of it, correct.

11:40AM   10    Q.  And you had situations where you had separated

11:40AM   11    conversations from people you were hanging out with?

11:40AM   12    A.  Correct.

11:40AM   13    Q.  And you didn't think anything of it?

11:40AM   14    A.  Correct.

11:40AM   15    Q.  You testified there was something that Joe Bongiovanni

11:40AM   16    told you vis-à-vis Anthony Gerace, right?

11:40AM   17    A.  Yes.

11:40AM   18    Q.  You had testified that there was some type of arrest that

11:41AM   19    Anthony Gerace had suffered by Amherst Police Department?

11:41AM   20    A.  Correct.

11:41AM   21    Q.  And you couldn't really pinpoint any time on this, right?

11:41AM   22    A.  Mid 2000s, like I said I wasn't sure on the timeframe,

11:41AM   23    2013, '12, '14, that timeframe.

11:41AM   24    Q.  Well, so when you say mid 2000s, I'm thinking 2005, 2006?

11:41AM   25    A.  Let me rephrase that, a little later then.

11:41AM   1   Q.   You're thinking about something a little later then?

11:41AM   2   A.   Yes, I don't recall the timeframe.

11:41AM   3   Q.   So you don't recall the timeframe, because yesterday you

11:41AM   4   said mid 2000s.

11:41AM   5   A.   Mid 2000 -- 2012.

11:41AM   6           MR. TRIPI:   Objection.

11:41AM   7           THE COURT:   Hold on.   Stop, stop, stop.

11:41AM   8           MR. TRIPI:   That misstates what he said yesterday.

11:41AM   9           THE COURT:   Well, I -- I don't remember what he said

11:41AM  10   yesterday, so overruled.

11:41AM  11           BY MR. SINGER:

11:41AM  12   Q.   So, was it the mid 2000s?   Was it 2015?   What was it?

11:41AM  13   A.   2012, '10, I don't, exactly know the dates.

11:42AM  14   Q.   Okay.

11:42AM  15   A.   Sometime in that timeframe.

11:42AM  16   Q.   So sometime in that ten year timeframe?

11:42AM  17   A.   Yes.

11:42AM  18   Q.   And you said that Anthony Gerace was arrested with some

11:42AM  19   quantity of cocaine?

11:42AM  20   A.   Correct.

11:42AM  21   Q.   And Amherst Police Department was the arresting agency,

11:42AM  22   based on what you were told?

11:42AM  23   A.   I believe so, from what I was told, yes.

11:42AM  24   Q.   Which Amherst police officers were involved in this

11:42AM  25   arrest?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

118

11:42AM   1    A.  I don't know the officers' names, I just know the

11:42AM   2    department that was involved.  I don't know the officers'

11:42AM   3    names.

11:42AM   4    Q.  Do you know what happened with the charges?

11:42AM   5    A.  No.  He just got arrested and Peter reached out to

11:42AM   6    Mr. Bongiovanni and he stepped in and helped him.

11:42AM   7    Q.  Did you speak to Anthony Gerace about this?

11:42AM   8    A.  No, I did not.

11:42AM   9    Q.  Did Mike Masecchia ask you about this arrest?

11:42AM   10   A.  Mike Masecchia knew about the arrest.

11:42AM   11   Q.  He knew about it?

11:42AM   12   A.  Yes.

11:42AM   13   Q.  How about Ron Serio?

11:42AM   14   A.  I believe Ron knew, too.  That Anthony been arrested, I

11:42AM   15   don't know.  But I know Mike knew.

11:43AM   16   Q.  So you believed that both of them knew?

11:43AM   17   A.  Yes.  The word had gotten out.  That Anthony had been

11:43AM   18   busted.  He got busted with a few ounces of cocaine.

11:43AM   19   Q.  But --

11:43AM   20   A.  And people heard about it. ^ DAVID STARTED HERE.

11:43AM   21   Q.  You're not really clear on the date on this, sir, right?

11:43AM   22   A.  It's -- like I said, it was the mid-2000s, either between

11:43AM   23   2008 to 2013, that timeframe.  I don't recall.  But I know it

11:43AM   24   happened.

11:43AM   25   Q.  So '08 or something like that, right?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

119

11:43AM    1    A.  Could have been, yes.

11:43AM    2    Q.  And you know it happened, right?

11:43AM    3    A.  Again, it's what I heard, yes.

11:43AM    4    Q.  Exactly.  That's what I'm getting at, is like you don't

11:43AM    5    know what it happened?

11:43AM    6    A.  I don't know what happened, no.

11:43AM    7    Q.  You know what you're told, right?

11:43AM    8    A.  I was told that Anthony had got arrested for possession

11:43AM    9    of cocaine.

11:43AM   10    Q.  But you don't know anything else about it, correct?

11:43AM   11    A.  Then I told you what else I said, that Peter had reached

11:43AM   12    out to the defendant and he made a phone call to the Amherst

11:43AM   13    Police Department, a contact he had.  And that's all I know.

11:43AM   14    Q.  So Peter Gerace was also somebody that, I guess, you

11:44AM   15    talked about Joe Bongiovanni having a conversation about

11:44AM   16    having trouble with the probation office, right?

11:44AM   17    A.  Correct.

11:44AM   18    Q.  And you said that the Joe had shared with you at some

11:44AM   19    point in time that he had helped out Peter in some way only

11:44AM   20    to get an ankle bracelet; is that right?

11:44AM   21    A.  Yes.  Peter had been -- I believe he had just been

11:44AM   22    released from federal custody and something happened.  He

11:44AM   23    violated it, and he had stepped in to give him a hand.

11:44AM   24    Q.  When was this?

11:44AM   25    A.  When Peter was released, I don't know, 2013, '14.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

| | | |
|---|---|---|
| 11:44AM | 1 | Somewhere around there. |
| 11:44AM | 2 | Q.  When was the conversation? |
| 11:44AM | 3 | A.  What do you mean, when was the conversation? |
| 11:44AM | 4 | Q.  When did you have this conversation with Mr. Bongiovanni? |
| 11:44AM | 5 | A.  After it happened.  After he -- |
| 11:44AM | 6 | Q.  When did he tell you this? |
| 11:44AM | 7 | A.  He told me -- |
| 11:44AM | 8 | Q.  When did he tell you thing? |
| 11:44AM | 9 | A.  He told me after it happened.  After he stepped in to |
| 11:44AM | 10 | help Mr. Gerace. |
| 11:44AM | 11 | Q.  In 2013? |
| 11:44AM | 12 | A.  '13 or '14.  That timeframe. |
| 11:44AM | 13 | Q.  Was it '13? |
| 11:44AM | 14 | A.  It was either '13 or '14.  I'm not -- I'm not quite sure |
| 11:45AM | 15 | on that. |
| 11:45AM | 16 | Q.  So you really can't pin that down? |
| 11:45AM | 17 | A.  I can't pin down the timeframe. |
| 11:45AM | 18 | Q.  All right.  So, you had mentioned a couple of things that |
| 11:45AM | 19 | led you to believe that Mr. Bongiovanni was using this bribe |
| 11:45AM | 20 | money to help him and help others; do you remember that? |
| 11:45AM | 21 | A.  Yes. |
| 11:45AM | 22 | Q.  So, for instance, one of the things you talked about was |
| 11:45AM | 23 | suits for his wedding in February of 2015; do you remember |
| 11:45AM | 24 | that? |
| 11:45AM | 25 | A.  Correct. |

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

121

11:45AM  1  Q.  So you had claimed that he went to a store named

11:45AM  2  Napoli's, right?

11:45AM  3  A.  Correct.

11:45AM  4  Q.  And that's a store that's owned by Tom Napoli and his

11:45AM  5  father, correct?

11:45AM  6  A.  Correct.

11:45AM  7  Q.  Out in Williamsville?

11:45AM  8  A.  Correct.

11:45AM  9  Q.  And, so Tom Napoli at that time, he had a familial

11:45AM  10  relation to Joe Bongiovanni, right?

11:45AM  11  A.  Yes.

11:45AM  12  Q.  They were brothers-in-law, correct?

11:45AM  13  A.  About to be, yes.

11:45AM  14  Q.  Um-hum.  And, so, you guys go over to Napoli's.  You said

11:46AM  15  it was a -- it was a fine clothing store; is that right?

11:46AM  16  A.  Yes.

11:46AM  17  Q.  You said that -- that Joe liked to shop there, correct?

11:46AM  18  A.  Yes, he liked fine clothes, yes.

11:46AM  19  Q.  And so Joe liked to shop at a store owned by his

11:46AM  20  brother-in-law?

11:46AM  21  A.  I believe so, yes.

11:46AM  22  Q.  Are you aware of any discounts that he got as a result of

11:46AM  23  that family relationship?

11:46AM  24  A.  I'm not aware of the relation -- arrangement they had,

11:46AM  25  no.

11:46AM   1   Q.  Okay.  So you're not aware of that at all?

11:46AM   2   A.  I'm not aware of that, no.

11:46AM   3   Q.  All right.  So as far as the suit for the wedding, you

11:46AM   4   claim that -- that Joe Bongiovanni purchased your suit; is

11:46AM   5   that right?

11:46AM   6   A.  That's correct.

11:46AM   7   Q.  And it was -- it was a nice suit, right?

11:46AM   8   A.  Yes.

11:46AM   9   Q.  Is it the one you're wearing today?

11:46AM   10  A.  No, it was a different color.

11:46AM   11  Q.  And so that's something that he did based on the fact

11:46AM   12  that you were serving as his best man; is that right?

11:46AM   13  A.  Yes.

11:46AM   14  Q.  I think you mentioned that he also bought suits for --

11:46AM   15  for other people in the wedding party?

11:46AM   16  A.  I believe so, yes.

11:46AM   17  Q.  Like, for instance, he brought -- bought a suit for

11:46AM   18  his -- his kind of a not adopted son, but stepson, correct?

11:46AM   19  A.  Correct.

11:46AM   20  Q.  That was Lindsay's son from another relationship?

11:46AM   21  A.  Correct.

11:47AM   22  Q.  And he was -- Matty, only -- only young kid at that time,

11:47AM   23  right?

11:47AM   24  A.  Correct.

11:47AM   25  Q.  So he bought you a suit, he bought Matty a suit.  How

11:47AM   1   many other suits did he buy?

11:47AM   2   A.   Just the three.

11:47AM   3   Q.   And you're not aware of any type of relation -- financial

11:47AM   4   arrangement that he had made with Tom Napoli, the owner of

11:47AM   5   the store?

11:47AM   6   A.   I have no knowledge of that, no.

11:47AM   7   Q.   Okay.  But he got you the suit, correct?

11:47AM   8   A.   Correct.

11:47AM   9   Q.   You mentioned that you believed that there are watches

11:47AM  10   that -- that he owned that were expensive, correct?

11:47AM  11   A.   Correct.

11:47AM  12   Q.   So you talked about how he had an Invicta watch; is that

11:47AM  13   right?

11:47AM  14   A.   Correct.

11:47AM  15   Q.   You talked about how you believe that he had other

11:47AM  16   Invicta watches?

11:47AM  17   A.   Yes.  A few.

11:47AM  18   Q.   You talked about how these were more expensive than the

11:47AM  19   ones you perhaps owned?

11:47AM  20   A.   Yes, there were different classes of Invicta, from what I

11:47AM  21   know.

11:47AM  22   Q.   Okay.  Are you a jeweler, sir?

11:48AM  23   A.   No.  It's from what I looked at on line when I was

11:48AM  24   researching it to buy the one from myself.  It went from one

11:48AM  25   price range to another.

11:48AM    1   Q.  Do you know the particular models that Joe Bongiovanni

11:48AM    2   owns as far as watches, Invictas?

11:48AM    3   A.  I do not.  They are Invictas.  The other one was a Rolex.

11:48AM    4   Q.  Okay.  So let's go on to that Rolex.  So the Rolex, you

11:48AM    5   believe he owns a Rolex, too?

11:48AM    6   A.  I believe, yes.

11:48AM    7        **MR. SINGER:**  So, Ms. Champoux, would you mind putting

11:48AM    8   up Government Exhibit side by side 103-20, and 103-49.

11:48AM    9        **THE COURT:**  These are both in evidence.

11:48AM   10        **MR. SINGER:**  Both in evidence, yes, Judge.

11:48AM   11        And 103-49.  Thanks, Ms. Champoux.  If we could just

11:48AM   12   zoom in right up on that self area, Ms. Champoux.

11:48AM   13        Thank you very much.

11:48AM   14        **BY MR. SINGER:**

11:49AM   15   Q.  So what we're talking about, Mr. Selva, is we're talking

11:49AM   16   about this watch here in the circle and this watch here in

11:49AM   17   the circle in the screen?

11:49AM   18   A.  Yes, it looks like a Rolex.

11:49AM   19   Q.  And so this particular Rolex -- again, you're not a

11:49AM   20   jeweler, right?

11:49AM   21   A.  I'm not a jeweler, no.

11:49AM   22   Q.  And this particular allegation, you mentioned this Rolex

11:49AM   23   for the very first time about a week ago during a witness

11:49AM   24   prep session, right?

11:49AM   25   A.  Yes.

11:49AM  1   Q.  And that was after the government presented these

11:49AM  2   photographs to you and asked you, are you aware of this?

11:49AM  3   A.  I wasn't -- ^ CK AUDIO yes, they showed them to me, and

11:49AM  4   yes.

11:49AM  5   Q.  They asked you do you know if this is a Rolex?

11:49AM  6   A.  Yes.  And it looked like a Rolex to me, yes.

11:49AM  7   Q.  And so you told them, yes, it looks like a Rolex to me,

11:49AM  8   correct?

11:49AM  9   A.  Yes.

11:49AM  10  Q.  And that's the basis for your testimony?

11:49AM  11  A.  I was asked a question and I answered it.

11:49AM  12  Q.  Okay.

11:49AM  13  A.  Yes.  It look -- it looks like a Rolex to me.

11:49AM  14  Q.  Are you aware if this is a Rolex or not a real Rolex?

11:50AM  15  A.  I'm not aware of that, no.

11:50AM  16  Q.  Are you even aware if it's a Rolex at all?

11:50AM  17  A.  It looks like a Rolex.

11:50AM  18  Q.  Were you shown a close-up of this particular watch?

11:50AM  19  A.  No, but it just looks like a Rolex to me.  I mean, I'm

11:50AM  20  looking at the same picture you are.

11:50AM  21  Q.  Do you own a Rolex?

11:50AM  22  A.  No.

11:50AM  23  Q.  Have you ever owned a Rolex?

11:50AM  24  A.  No.

11:50AM  25  Q.  Have you ever touched a Rolex?

11:50AM   1   A.  I've touched one, but I've never -- I don't own one.

11:50AM   2   Q.  But you can tell from these pictures, even the blown up

11:50AM   3   one, that this is a Rolex?

11:50AM   4   A.  It looks like a Rolex from what I've seen.  The face, the

11:50AM   5   structure, the band, it looks like a Rolex.

11:50AM   6   Q.  So the government asks you if function it was a Rolex and

11:50AM   7   you told them yes?

11:50AM   8   A.  I gave them my opinion that it looked like a Rolex.

11:50AM   9           **MR. SINGER:**  Okay.  Ms. Champoux, if you could take

11:50AM  10   those down.

11:50AM  11           **BY MR. SINGER:**

11:50AM  12   Q.  So we also talked yesterday about Mr. Bongiovanni's

11:50AM  13   houses and -- and the Buick.  I want to get into those a

11:51AM  14   little bit.

11:51AM  15       So, this Buick, this particular Buick was purchased back

11:51AM  16   in -- in the 2012 time period; is that right?

11:51AM  17   A.  I believe so, yes.

11:51AM  18   Q.  It's a classic car, right?

11:51AM  19   A.  Yes.

11:51AM  20   Q.  You saw the pictures on it.  It was something that you

11:51AM  21   said needed some work done on it to make it road serviceable

11:51AM  22   when it was purchased?

11:51AM  23   A.  At the time, a bumper.  I believe the convertible top,

11:51AM  24   the interior, stuff like that.

11:51AM  25   Q.  So we're talking about the cosmetics, right?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

11:51AM    1    A.  Cosmetics.

11:51AM    2    Q.  So we're not talking about rehauling the engine, right?

11:51AM    3    A.  No.

11:51AM    4    Q.  We're not talking about tearing out the transition and

11:51AM    5    redoing that, correct?

11:51AM    6    A.  No, nothing like that, no.

11:51AM    7    Q.  Not talking about doing all of the exhaust system on the

11:51AM    8    car, correct?

11:51AM    9    A.  No.

11:51AM    10   Q.  We're talking about the cosmetic things like the bumper?

11:51AM    11   A.  Correct.

11:51AM    12   Q.  Some interior work?

11:51AM    13   A.  Yes.

11:51AM    14   Q.  I think you mentioned paint also needed to be done in

11:51AM    15   some areas?

11:51AM    16   A.  Yes.

11:51AM    17   Q.  I think you also mentioned that maybe the -- the top on

11:51AM    18   it needed to be improved?

11:51AM    19   A.  I believe so, yes.

11:51AM    20   Q.  And you talked about how Mr. Bongiovanni, this is a hobby

11:52AM    21   of his, right?

11:52AM    22   A.  Yes.

11:52AM    23   Q.  Did work on the car?

11:52AM    24   A.  Yes.

11:52AM    25   Q.  Are you aware of how he paid for these items?

11:52AM   1   A.  I am not, no.

11:52AM   2   Q.  Are you aware that he took out a loan to pay for some of

11:52AM   3   these improvements?

11:52AM   4   A.  I am not, no.  Not aware of that.

11:52AM   5   Q.  With regard to 221 Lovering, we talked a little bit about

11:52AM   6   that.  That was Mr. Bongiovanni's childhood home, correct?

11:52AM   7   A.  Correct.

11:52AM   8   Q.  And it's a duplex in North Buffalo?

11:52AM   9   A.  Yes.

11:52AM   10  Q.  So, the way it's set up, just so the jury understands, is

11:52AM   11  that there's a downstairs apartment on the first floor,

11:52AM   12  correct?

11:52AM   13  A.  Yes.

11:52AM   14  Q.  And there's an upstairs apartment on the second floor?

11:52AM   15  A.  Correct.  A two-family home, correct.

11:52AM   16  Q.  I think you mentioned at one point in time when

11:52AM   17  Mr. Bongiovanni was living there, were the Suppas living

11:52AM   18  there or was that a different address?

11:52AM   19  A.  It was on Colvin.

11:52AM   20  Q.  Okay.  So, that's a different address but the same kind

11:52AM   21  of thing?

11:52AM   22  A.  Different address.  Same set up, yes.

11:52AM   23  Q.  And you talked about how -- how Joe's parents had owned

11:52AM   24  that -- that house for -- for many, many years, correct?

11:52AM   25  A.  Quite some time, yes.

11:53AM  1    Q.  And at the point in time where Mr. Bongiovanni's

11:53AM  2    relationship with his first wife, JoAnn, ended, he moved back

11:53AM  3    to his parents' house, correct?

11:53AM  4    A.  As far as my -- I know, yes.

11:53AM  5    Q.  Yeah.  And he moved into that upstairs apartment in the

11:53AM  6    221 Lovering address, correct?

11:53AM  7    A.  Yes.

11:53AM  8    Q.  And, so, he was living upstairs from his parents,

11:53AM  9    correct?

11:53AM  10   A.  Correct.

11:53AM  11   Q.  And they were living downstairs, correct?

11:53AM  12   A.  Correct.

11:53AM  13   Q.  I'm assuming the -- the rent situation, were you aware of

11:53AM  14   any of the details on that?

11:53AM  15   A.  I was not.

11:53AM  16   Q.  Okay.  So, eventually, Frederick and Maria, Joe's

11:53AM  17   parents, they decide to -- to sell their place and move

11:53AM  18   somewhere else, correct?

11:53AM  19   A.  Correct.

11:53AM  20   Q.  And Joe was the person who decides to buy 221 Lovering

11:53AM  21   from his parents, right?

11:53AM  22   A.  That's correct.

11:53AM  23   Q.  And you're aware of the fact it's not some like $1 family

11:53AM  24   transaction.  This is something where a mortgage was taken

11:53AM  25   out, correct?

11:53AM   1   A.  I -- I wouldn't know ^ CK AUDIO how the transaction

11:53AM   2   transpired, but it's -- obviously, it's a -- an expensive

11:54AM   3   transaction.

11:54AM   4   Q.  Um-hum.  So it's not like Mr. Bongiovanni paid his

11:54AM   5   parents a dollar and got a house for it, correct?

11:54AM   6   A.  Correct.

11:54AM   7   Q.  All right.  So he moves into 221 Lovering as the landlord

11:54AM   8   at that point, correct?

11:54AM   9   A.  I believe so, yes.

11:54AM  10   Q.  And his parents are no longer living downstairs, correct?

11:54AM  11   A.  Correct.

11:54AM  12   Q.  And that's when he starts to rent out 221 Lovering,

11:54AM  13   correct?

11:54AM  14   A.  That's correct.

11:54AM  15   Q.  And he had several tenants who occupied the downstairs

11:54AM  16   unit, correct?

11:54AM  17   A.  I'm not aware of several, but he did have tenants, yes.

11:54AM  18   Q.  And he had other tenants -- well, so, when he first

11:54AM  19   purchased the house, he was living in the upstairs place,

11:54AM  20   correct?

11:54AM  21   A.  He was living upstairs.

11:54AM  22   Q.  He started renting the downstairs place, right?

11:54AM  23   A.  Correct.

11:54AM  24   Q.  I think you testified Lindsay Bongiovanni was one of

11:54AM  25   those downstairs tenants, right?

| | | |
|---|---|---|
| 11:54AM | 1 | A.  That's correct. |
| 11:54AM | 2 | Q.  That's how the two of them met in 2009? |
| 11:54AM | 3 | A.  That's correct. |
| 11:54AM | 4 | Q.  And, so, at some point in time, Joe Bongiovanni decides |
| 11:54AM | 5 | to move in with Lindsay Bongiovanni, right? |
| 11:54AM | 6 | A.  That's correct. |
| 11:54AM | 7 | Q.  It was your understanding that Joe decided to move from |
| 11:55AM | 8 | the upstairs apartment to the downstairs apartment, correct? |
| 11:55AM | 9 | A.  That's correct. |
| 11:55AM | 10 | Q.  Same place that his parents lived all those years? |
| 11:55AM | 11 | A.  That's correct. |
| 11:55AM | 12 | Q.  And the upstairs apartment is unoccupied when he moves |
| 11:55AM | 13 | out, right? |
| 11:55AM | 14 | A.  That's correct. |
| 11:55AM | 15 | Q.  But it's not unoccupied for forever, right? |
| 11:55AM | 16 | A.  I'm not aware of that.  I don't know. |
| 11:55AM | 17 | Q.  But you're aware of the fact that he did rent out the |
| 11:55AM | 18 | upstairs apartment when he left? |
| 11:55AM | 19 | A.  I'm not aware of that.  I thought it was just, they lived |
| 11:55AM | 20 | in the lower.  I thought the top was not rented. |
| 11:55AM | 21 | Q.  So your understanding was that the top was totally |
| 11:55AM | 22 | unrented? |
| 11:55AM | 23 | A.  From my understanding, yes. |
| 11:55AM | 24 | Q.  And this forms your belief about the financial pressures |
| 11:55AM | 25 | that Mr. Bongiovanni was under, correct? |

11:55AM  1   A.  Correct.

11:55AM  2   Q.  But you don't know what was going on with that upstairs

11:55AM  3   apartment?

11:55AM  4   A.  I don't know what's going on with it.

11:55AM  5   Q.  85 Alder was another place that you talked about

11:55AM  6   yesterday; do you remember that?

11:55AM  7   A.  Yes.

11:55AM  8   Q.  So this was the home that Lindsay and Joe purchased

11:56AM  9   before their wedding?

11:56AM  10  A.  Correct.

11:56AM  11  Q.  And it's a split level home out in Tonawanda, correct?

11:56AM  12  A.  Correct.

11:56AM  13  Q.  You're aware of the fact that they used a mortgage to pay

11:56AM  14  for that property, right?

11:56AM  15  A.  I -- I don't know the arrangement.  But I'm -- if you say

11:56AM  16  so.  I don't know how they paid for it.

11:56AM  17  Q.  So you don't know personally how they paid for it?

11:56AM  18  A.  No.

11:56AM  19  Q.  You testified that they did a number of improvements on

11:56AM  20  the property; do you remember that?

11:56AM  21  A.  Yes.

11:56AM  22  Q.  So, for instance, one of the things you talked about

11:56AM  23  yesterday was that they painted the walls, right?

11:56AM  24  A.  Painted the -- yes.  They painted, yes.

11:56AM  25  Q.  That was something you saw with your own eyes?

| | | |
|---|---|---|
| 11:56AM | 1 | A.  Yes. |
| 11:56AM | 2 | Q.  Like there was a difference between when they purchased |
| 11:56AM | 3 | it versus when you -- when you saw the pink ^ CK AUDIO paint |
| 11:56AM | 4 | on the walls? |
| 11:56AM | 5 | A.  Yes. |
| 11:56AM | 6 | Q.  And you're a homeowner, right? |
| 11:56AM | 7 | A.  Yes. |
| 11:56AM | 8 | Q.  You painted your places, I'm sure, before? |
| 11:56AM | 9 | A.  Yes. |
| 11:56AM | 10 | Q.  We're not talking about a $1 million improvement with |
| 11:56AM | 11 | paint, right? |
| 11:56AM | 12 | A.  No. |
| 11:56AM | 13 | Q.  Go down to Home Depot, you get a gallon, you put it up on |
| 11:57AM | 14 | the walls, get some rollers, right? |
| 11:57AM | 15 | A.  No, it was a little more involved than that. |
| 11:57AM | 16 | Q.  Well, it's a little more involved?  What did you see, |
| 11:57AM | 17 | sir? |
| 11:57AM | 18 | A.  I have high cathedral ceilings.  I own a town home. |
| 11:57AM | 19 | Q.  I'm talking about -- |
| 11:57AM | 20 | A.  It's more expensive. |
| 11:57AM | 21 | Q.  I'm talking about 85 Alder? |
| 11:57AM | 22 | A.  I just saw new paint. |
| 11:57AM | 23 | Q.  And it was more expensive to do at your house than it was |
| 11:57AM | 24 | at their house, right? |
| 11:57AM | 25 | A.  I don't know the cost factor, but I know what it cost me, |

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

134

11:57AM   1    so --

11:57AM   2    Q.  You mentioned that there was a kitchen island that was

11:57AM   3    added to the kitchen?

11:57AM   4    A.  Yes.

11:57AM   5    Q.  Do you know where that was purchased?

11:57AM   6    A.  I do not.

11:57AM   7    Q.  Do you know how much it cost?

11:57AM   8    A.  I do not.

11:57AM   9    Q.  Do you know whether it was installed by someone

11:57AM   10   professionally or whether it was just placed in the kitchen?

11:57AM   11   A.  I was assume -- it looked like it was installed

11:57AM   12   professionally.

11:57AM   13   Q.  Okay.  So -- so you said assume right there before you

11:57AM   14   gave that answer; do you remember that?

11:57AM   15   A.  Yes.

11:57AM   16   Q.  You're not aware of how it was installed, right?

11:57AM   17   A.  I'm not aware, but I'm just saying how it looked.  It

11:57AM   18   looked professionally installed.

11:57AM   19   Q.  So it looked professionally installed to you, right?

11:57AM   20   A.  Yes.

11:57AM   21   Q.  You didn't see it installed?

11:57AM   22   A.  I didn't see it installed.

11:57AM   23   Q.  And Joe didn't tell you how it was installed, right?

11:58AM   24   A.  No.

11:58AM   25   Q.  So you don't know?

11:58AM      1    A.  I don't know.

11:58AM      2    Q.  I don't think you mentioned it yesterday, but remember in

11:58AM      3    prior proceedings talking about how the floors of this house

11:58AM      4    were redone?

11:58AM      5    A.  Yes.

11:58AM      6    Q.  Do you know whether, in fact, that was done before or

11:58AM      7    after the purchase of the house?

11:58AM      8    A.  I believe after.

11:58AM      9    Q.  You believe?

11:58AM     10    A.  I believe, I'm not -- I'm not quite sure.

11:58AM     11    Q.  So you don't know?

11:58AM     12    A.  I don't know.

11:58AM     13    Q.  You mentioned that there was a new garage door that was

11:58AM     14    put in place; do you remember that?

11:58AM     15    A.  Yes.

11:58AM     16         **MR. SINGER:**  Ms. Champoux, is it possible -- can you

11:58AM     17    bring up side by side Government Exhibit 523 and 524, both in

11:58AM     18    evidence?

11:58AM     19         **BY MR. SINGER:**

11:58AM     20    Q.  So we talked a little bit about this yesterday.  You had

11:58AM     21    mentioned that there was a garage door that was replaced at

11:58AM     22    the house; is that right?

11:58AM     23    A.  Yes.

11:58AM     24    Q.  We're talking about this garage door right here, correct?

11:58AM     25    A.  Correct.

| | | |
|---|---|---|
| 11:58AM | 1 | Q.  And that's something that was -- was done according to |
| 11:59AM | 2 | you by the Bongiovannis after they moved in, right? |
| 11:59AM | 3 | A.  Correct. |
| 11:59AM | 4 | Q.  Have you ever installed a new garage door at your house, |
| 11:59AM | 5 | sir? |
| 11:59AM | 6 | A.  I never have, but I've gotten it done.  I don't know how |
| 11:59AM | 7 | to do that work. |
| 11:59AM | 8 | Q.  Okay. |
| 11:59AM | 9 | A.  Yes. |
| 11:59AM | 10 | Q.  So you've gotten it done by some professional company, |
| 11:59AM | 11 | right? |
| 11:59AM | 12 | A.  Yes. |
| 11:59AM | 13 | Q.  As far as this particular garage door, do you know how |
| 11:59AM | 14 | much it cost? |
| 11:59AM | 15 | A.  I don't. |
| 11:59AM | 16 | Q.  Do you know how much Joe and Lindsay paid for someone to |
| 11:59AM | 17 | install it? |
| 11:59AM | 18 | A.  I don't, no. |
| 11:59AM | 19 | Q.  In your experience as a homeowner, is this something |
| 11:59AM | 20 | that's like a $10,000 repair? |
| 11:59AM | 21 | A.  No, couple thousand, 1500 ^ CK.  Depends on the quality. |
| 11:59AM | 22 | It depends on what you have to get done. |
| 11:59AM | 23 | Q.  Um-hum.  So, again, we're talking about 1500 ^ CK, |
| 11:59AM | 24 | $2,000, right? |
| 11:59AM | 25 | A.  Yes. |

11:59AM  1  Q.  You talked about how landscaping work was also performed

11:59AM  2  at the house; do you remember that?

11:59AM  3  A.  Yes.

11:59AM  4  Q.  And, so what we're talking about is we're talking about

12:00PM  5  the grass, correct?

12:00PM  6  A.  Correct.

12:00PM  7  Q.  So it appears like some grass seed, based on your

12:00PM  8  experience as a homeowner, was probably put down on the

12:00PM  9  grass, right?

12:00PM  10  A.  Yeah.  Yes, sod, maybe.

12:00PM  11  Q.  Do you know if sod was installed?

12:00PM  12  A.  I don't know, but it looks like it.  I mean -- I don't

12:00PM  13  know.  I -- I'm not a landscaper, I don't know.  I said sod

12:00PM  14  maybe.  It looks like --

12:00PM  15  Q.  So you said sod maybe, but you don't know?

12:00PM  16  A.  No.  It looks like seed.  You're asking my opinion, it

12:00PM  17  looks like seed, it looks like sod, I don't know.

12:00PM  18  Q.  Do you have a lawn at your house?

12:00PM  19  A.  Yes.

12:00PM  20  Q.  Does the lawn look like the picture on the left in 523

12:00PM  21  when you don't water it?

12:00PM  22  A.  No.  Yes, it did -- it -- it depends on the summer.  If

12:00PM  23  it's a dry summer, yes, you have to really stay on top of it.

12:00PM  24  Q.  When you water your lawn, does it look like the picture

12:00PM  25  on the right in 524?

12:00PM   1   A.   Yes.

12:00PM   2   Q.   So for all you know, the Bongiovannis might just have

12:00PM   3   cared for the lawn more than the previous owners?

12:01PM   4   A.   Yes, I don't know.

12:01PM   5   Q.   You talked about some of the landscaping that was done in

12:01PM   6   addition to the grass.

12:01PM   7        **MR. SINGER:**  So, Ms. Champoux, is it possible we

12:01PM   8   could zoom in on this area of the house right here?

12:01PM   9        Thank you.

12:01PM  10        **BY MR. SINGER:**

12:01PM  11   Q.   So, there was some shrubs, it looks like, that were torn

12:01PM  12   out in front and replaced --

12:01PM  13   A.   Um-hmm.

12:01PM  14   Q.   -- based on the differences of the pictures you saw,

12:01PM  15   correct?

12:01PM  16   A.   Yes.

12:01PM  17        **MR. SINGER:**  So Ms. Champoux, is it possible we could

12:01PM  18   zoom out of this and zoom into the same front of the house on

12:01PM  19   524?

12:01PM  20        **BY MR. SINGER:**

12:01PM  21   Q.   So, the improvements that we're talking about are the

12:01PM  22   ones right over here, right?

12:01PM  23   A.   Yes.

12:01PM  24   Q.   So we're talking about the addition of this -- this

12:01PM  25   little tree here?

| | | |
|---|---|---|
| 12:01PM | 1 | A.  Yes. |
| 12:01PM | 2 | Q.  And a couple of these decorative shrubs in the front and |
| 12:01PM | 3 | in the bed in the front of the bay window? |
| 12:01PM | 4 | A.  Yes.  It looks like new soil, all new shrubs, yes. |
| 12:01PM | 5 | Q.  It looks like new soil to you? |
| 12:01PM | 6 | A.  Well, shrub, whatever it's called.  Whatever the |
| 12:01PM | 7 | terminology is. |
| 12:01PM | 8 | Q.  You're talking about mulch? |
| 12:02PM | 9 | A.  That's it. |
| 12:02PM | 10 | Q.  No problem. |
| 12:02PM | 11 | A.  My fault. |
| 12:02PM | 12 | Q.  Yeah, don't worry about it. |
| 12:02PM | 13 | A.  I'm not a landscaper. |
| 12:02PM | 14 | Q.  I -- I do mulch a lot more, so I unfortunately know that |
| 12:02PM | 15 | word all too well. |
| 12:02PM | 16 | A.  Okay. |
| 12:02PM | 17 | Q.  So as far as, you know, the mulch, you're aware it's not |
| 12:02PM | 18 | really that expensive, right? |
| 12:02PM | 19 | A.  I -- I don't know how much mulch costs, no. |
| 12:02PM | 20 | Q.  And this picture is from 2020, so you don't know when the |
| 12:02PM | 21 | mulch was put in? |
| 12:02PM | 22 | A.  I don't. |
| 12:02PM | 23 | Q.  As far as these shrubs, you don't know when they were put |
| 12:02PM | 24 | in, right? |
| 12:02PM | 25 | A.  I don't. |

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

12:02PM   1   Q.  As far as the cost of these various shrubs here, couple

12:02PM   2   of small bushes, you're not aware of how much they cost,

12:02PM   3   right?

12:02PM   4   A.  I am not, no.

12:02PM   5   Q.  As a homeowner, have you ever had to replace your shrubs

12:02PM   6   in your house before?

12:02PM   7   A.  I have, yes.

12:02PM   8   Q.  And we're not talking about $10,000 worth of shrub work

12:02PM   9   right here, right?

12:02PM  10   A.  No.

12:02PM  11   Q.  In your experience, it looks like, you know, at best,

12:02PM  12   what, 50 to $100 per plant?

12:02PM  13   A.  Well, maybe a little bit more expensive than that.  I

12:02PM  14   mean, it depends on what you get, too, you know.  So --

12:02PM  15   Q.  Does it appear like high-end shrubs to you?

12:02PM  16   A.  No.

12:02PM  17   Q.  Okay.  So, again, we're talking about maybe $1,000 worth

12:03PM  18   of work, maybe $2,000, but nothing that's --

12:03PM  19   A.  Couple thousand dollars worth of work, yes.

12:03PM  20   Q.  Nothing that's crazy, right?

12:03PM  21   A.  No, just maintenance.

12:03PM  22        **MR. SINGER:**  Ms. Champoux, you can take that down.

12:03PM  23        Ms. Champoux, is it possible you could put up

12:03PM  24   Government Exhibits side by side, 103-62 and 103-13.

         25

| | | |
|---|---|---|
| 12:03PM | 1 | **BY MR. SINGER:** |
| 12:03PM | 2 | Q.  So you remember talking about the -- the home gym down in |
| 12:03PM | 3 | the basement -- |
| 12:03PM | 4 | A.  Yes. |
| 12:03PM | 5 | Q.  -- Mr. Selva? |
| 12:03PM | 6 | A.  Yes. |
| 12:03PM | 7 | Q.  And this is what we're talking about, right? |
| 12:03PM | 8 | A.  Yes. |
| 12:03PM | 9 | Q.  We're talking about this weight bench over here on the |
| 12:03PM | 10 | right in 103-13? |
| 12:03PM | 11 | A.  Correct.  You mentioned -- |
| 12:03PM | 12 | Q.  Do you know when Mr. Bongiovanni purchased that weight |
| 12:03PM | 13 | bench? |
| 12:03PM | 14 | A.  I don't. |
| 12:03PM | 15 | Q.  Do you know when he purchased the weights to the right of |
| 12:03PM | 16 | it? |
| 12:03PM | 17 | A.  I don't. |
| 12:03PM | 18 | Q.  How about in 103-62, do you know when he purchased any of |
| 12:04PM | 19 | these machines that we see here? |
| 12:04PM | 20 | A.  I don't. |
| 12:04PM | 21 | Q.  Do you know how much any of these things cost? |
| 12:04PM | 22 | A.  Yeah, they're expense. |
| 12:04PM | 23 | Q.  Have you purchased them yourself, sir? |
| 12:04PM | 24 | A.  No, but I know they're expensive.  I mean, I've seen them |
| 12:04PM | 25 | priced out in stores. |

12:04PM    1    Q.  Do you know the particular models that are picture here.

12:04PM    2    A.  Just an elliptical and a treadmill.  And then --

12:04PM    3    Q.  Yeah, he's getting at his --

12:04PM    4         **THE COURT:**  On at a time.

12:04PM    5         **MR. SINGER:**  I'm sorry Ann, I'm sorry Judge.  Let me

12:04PM    6    start again.

12:04PM    7         **BY MR. SINGER:**

12:04PM    8    Q.  Do you know the particular models of these pieces of

12:04PM    9    equipment?

12:04PM    10   A.  I do not.

12:04PM    11   Q.  Do you know whether the high-end models or the

12:04PM    12   entry-level models?

12:04PM    13   A.  I -- I have no idea.  I don't know.

12:04PM    14   Q.  So you have actually no idea?

12:04PM    15   A.  I don't.

12:04PM    16   Q.  And this home gym is a far cry than what you guys used to

12:04PM    17   work out at the Fitness Factory, right?

12:04PM    18   A.  Yes.

12:04PM    19   Q.  Yeah, the Fitness Factory was far nicer than this, right?

12:04PM    20   A.  Yes.  More equipment, yes.

12:04PM    21   Q.  Okay.

12:04PM    22        **MR. SINGER:**  You can take that done Ms. Champoux.

12:04PM    23   Thank you.

12:04PM    24        **BY MR. SINGER:**

12:04PM    25   Q.  We talked a little bit yesterday about the alleged drug

12:05PM  1   use that you observed Mr. Bongiovanni engaged in.  So I want

12:05PM  2   to go talk about that a little bit now.

12:05PM  3       So, fair statement that you did not tell law enforcement

12:05PM  4   in your initial interviews about Mr. Bongiovanni engaging in

12:05PM  5   drug abuse, correct?

12:05PM  6   A.  Correct.

12:05PM  7   Q.  When your house was raided back on 8/23/2019, you didn't

12:05PM  8   tell law enforcement that morning that Mr. Bongiovanni used

12:05PM  9   cocaine, correct?

12:05PM  10  A.  Correct.

12:05PM  11  Q.  During your first proffer meeting with the government,

12:05PM  12  you didn't talk to them about Mr. Bongiovanni using cocaine,

12:05PM  13  correct?

12:05PM  14  A.  Correct.

12:05PM  15  Q.  It wasn't until the second proffer meeting later in

12:05PM  16  September where you decided to say that Mr. Bongiovanni used

12:05PM  17  cocaine on approximately five different occasions over the

12:05PM  18  last ten years?

12:05PM  19  A.  Correct.

12:05PM  20  Q.  And as far as other times, you started to talk a little

12:05PM  21  bit more as you got to the grand jury about the particular

12:05PM  22  dates this occurred, right?

12:06PM  23  A.  Correct.

12:06PM  24  Q.  And we're talking about into the 2000s, correct?

12:06PM  25  A.  Correct.

12:06PM    1    Q.  And you start to talk about Mr. Bongiovanni allegedly

12:06PM    2    using drugs when you guys are out, correct?

12:06PM    3    A.  Correct.

12:06PM    4    Q.  This was at particular bars around the area; is that

12:06PM    5    right?

12:06PM    6    A.  Correct.

12:06PM    7    Q.  It was never in the house, right?

12:06PM    8    A.  It was in a cottage at one time.

12:06PM    9    Q.  Was it in a cottage or was it in a bar?

12:06PM   10    A.  It was in a cottage, it was in a bar.  It was in the

12:06PM   11    hotel in Cabo San Lucas.

12:06PM   12    Q.  So Mr. Selva, you talked a little bit about the cottage.

12:06PM   13    That's Tom Doctor's cottage, right?

12:06PM   14    A.  Yes, sir.

12:06PM   15    Q.  You talked a little bit about how you had used cocaine

12:06PM   16    with Mr. Bongiovanni at one point in time when you're at the

12:06PM   17    cottage?

12:06PM   18    A.  Yes.

12:06PM   19    Q.  But you didn't use inside the cottage, right?

12:06PM   20    A.  In a room in the cottage.

12:06PM   21    Q.  Do you remember testifying in a previous proceeding in

12:06PM   22    this case?

12:07PM   23    A.  Yes.

12:07PM   24    Q.  And do you remember testifying about how you used at

12:07PM   25    Mickey Rats?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

145

12:07PM   1    A.  We did.  It was there and it was also down the street at

12:07PM   2    Mickey Rats, correct.

12:07PM   3    Q.  So -- so it's not just at Mickey Rats, it's at Mickey

12:07PM   4    Rats and the cottage?

12:07PM   5    A.  Correct.

12:07PM   6    Q.  And if you testified at a prior proceeding that you used

12:07PM   7    at the bar and not the cottage, that would be inconsistent

12:07PM   8    with your testimony today, right?

12:07PM   9    A.  Correct.

12:07PM   10   Q.  Okay.  You testified about other times that you had used

12:07PM   11   at these other bars, right?

12:07PM   12   A.  Yes.

12:07PM   13   Q.  And so these other bars, your claim is that you would use

12:07PM   14   in the bathroom?

12:07PM   15   A.  Correct.

12:07PM   16   Q.  How did you do it?

12:07PM   17   A.  Went into the stall, closed the door, and did it.

12:07PM   18   Q.  So the two of you would go --

12:07PM   19   A.  No.

12:07PM   20   Q.  -- in the stall together?

12:07PM   21   A.  No, I would go and then give it to him and then he would

12:07PM   22   go, wouldn't go together.

12:07PM   23   Q.  So one of you would go into the stall, correct?

12:07PM   24   A.  Yes.

12:07PM   25   Q.  Use, right?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

146

12:08PM    1    A.  Yes.

12:08PM    2    Q.  Then the other person would go in the stall, correct?

12:08PM    3    A.  Yes.  If you see two then in the stall, it's going to

12:08PM    4    attract attention.

12:08PM    5    Q.  Okay.  So, as far as the cocaine that you're using on

12:08PM    6    these times, this is cocaine that you had on your person,

12:08PM    7    right?

12:08PM    8    A.  Yes.  It was personal use, yes.

12:08PM    9    Q.  And this is cocaine that you purchased, correct?

12:08PM   10    A.  Correct.

12:08PM   11    Q.  And this is cocaine that you -- you had in your

12:08PM   12    possession, right?

12:08PM   13    A.  Correct.

12:08PM   14    Q.  Mr. Bongiovanni didn't purchase this cocaine, correct?

12:08PM   15    A.  No.

12:08PM   16    Q.  He didn't possess this cocaine, correct?

12:08PM   17    A.  No.

12:08PM   18    Q.  You've had a problem abusing cocaine throughout many

12:08PM   19    years, correct?

12:08PM   20    A.  I've not had a problem.  I've done it.

12:08PM   21    Q.  How often do you use cocaine a year, sir, before you were

12:08PM   22    arrested?

12:08PM   23    A.  How often?  I don't know.  If it was around, if I was

12:08PM   24    out.  It wasn't a lot.

12:08PM   25    Q.  Used purchase it, right?

12:08PM    1    A.  Small amounts.

12:08PM    2    Q.  You had a regular dealer that you went to?

12:08PM    3    A.  If I knew somebody and I was out, yes, I would purchase

12:09PM    4    it, yes, if it -- if I -- I felt like it at that point.

12:09PM    5    Q.  But that's not the same type of connection that

12:09PM    6    Mr. Bongiovanni had to it, correct?

12:09PM    7    A.  Not that I know of.

12:09PM    8    Q.  So, Cabo wedding you mentioned was one place where you

12:09PM    9    had used, allegedly, cocaine with Mr. Bongiovanni, correct?

12:09PM   10    A.  Correct.

12:09PM   11    Q.  You didn't bring cocaine with you to Mexico, right?

12:09PM   12    A.  No.

12:09PM   13    Q.  So, where did you get it?

12:09PM   14    A.  It was at the resort.  Tom had it.  I got it at the

12:09PM   15    resort from one of the ^ CK AUDIO.

12:09PM   16    Q.  Where did you get it?

12:09PM   17    A.  From one of the employees at the resort.

12:09PM   18    Q.  What did he look like?

12:09PM   19    A.  I don't know, he was a -- he was a guy that worked there.

12:09PM   20    Q.  How did you know he was selling cocaine?

12:09PM   21    A.  We asked.  We asked questions.

12:09PM   22    Q.  Who did you ask?

12:09PM   23    A.  I asked somebody there if, you know, we can get some

12:09PM   24    party treats.

12:09PM   25    Q.  So you asked some random person at the hotel?

12:09PM    1    A.  No, one of the waiters that was waiting on us, became

12:10PM    2    friendly with us, and that was it.

12:10PM    3    Q.  What did that person look like?

12:10PM    4    A.  Hispanic, Mexican.

12:10PM    5    Q.  And what did he tell you?

12:10PM    6    A.  He said he can get.

12:10PM    7    Q.  Who came to provide you the cocaine?

12:10PM    8    A.  Somebody that he called.  I have no idea.

12:10PM    9    Q.  Who came to provide you the cocaine?  What did the person

12:10PM   10    look like?

12:10PM   11    A.  He was Mexican, sir.

12:10PM   12    Q.  And what happened when he arrived?  How did you pay him?

12:10PM   13    A.  Paid him in cash and then I brought it back to the -- the

12:10PM   14    suite we were at and everyone did it.

12:10PM   15    Q.  Pesos or dollars?

12:10PM   16    A.  It was dollars, I believe it was.

12:10PM   17    Q.  How much did you pay?

12:10PM   18    A.  I don't recall.

12:10PM   19    Q.  You don't recall?

12:10PM   20    A.  I don't recall.  A couple hundred dollars.

12:10PM   21    Q.  What was quantity of cocaine you got?

12:10PM   22    A.  A 16th or an 8 Ball, I don't remember what it was.

12:10PM   23    Q.  And then you say that Tom Napoli also purchased cocaine

12:10PM   24    or had cocaine?

12:10PM   25    A.  I believe he had it there, yes.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24
149

12:10PM    1   Q. Where did he get there?

12:10PM    2   A. That, I don't know. I have no idea.

12:10PM    3   Q. Did he go through the same connect that you met?

12:11PM    4   A. I have no idea.

12:11PM    5   Q. How many other people went in on this with you?

12:11PM    6   A. What, when I got it?

12:11PM    7   Q. When you bought it, who pitched in?

12:11PM    8   A. Everyone pitched in who was in the room.

12:11PM    9   Q. Who's everyone?

12:11PM    10   A. Myself, the defendant, I believe Tom, whoever was in the

12:11PM    11   room. Guys ^ CK AUDIO, Tom Doctor.

12:11PM    12   Q. Why did Tom pitch in for cocaine if Tom already had

12:11PM    13   cocaine?

12:11PM    14   A. It this was another time. This is twice. This is the

12:11PM    15   time I had gotten it and then he had gotten it.

12:11PM    16   Q. So this is a second time that you all used?

12:11PM    17   A. In Cabo, yes.

12:11PM    18   Q. Which hotel room?

12:11PM    19   A. I don't recall. It was one of the suite rooms.

12:11PM    20   Q. Was it your hotel room?

12:11PM    21   A. It was not my hotel room. I don't recall.

12:11PM    22   Q. What time of night?

12:11PM    23   A. It was before we were going down to the nightclub.

12:11PM    24   Q. What time of day?

12:11PM    25   A. It was in the evening.

12:11PM    1    Q.  When you went down to the nightclub, how were you

12:11PM    2    feeling?

12:11PM    3    A.  Good.  Awake now.

12:11PM    4    Q.  You were hanging out with Joe's family, right?

12:12PM    5    A.  Yes.

12:12PM    6    Q.  People were there from his family, correct?

12:12PM    7    A.  Yes.

12:12PM    8    Q.  Close friends, right?

12:12PM    9    A.  Yes.

12:12PM   10    Q.  Police officers, correct?

12:12PM   11    A.  Well, just -- no.

12:12PM   12    Q.  No?

12:12PM   13    A.  Not that I -- police officers from the party or from --

12:12PM   14    Q.  From his friend group, from his family.

12:12PM   15    A.  No.  Just Tom.  Tom Doctor who was retired, I believe, at

12:12PM   16    the time.

12:12PM   17    Q.  Kids were there, right, at the wedding?

12:12PM   18    A.  There were no kids there, no.

12:12PM   19    Q.  There were no kids at the wedding?

12:12PM   20    A.  Well, Matty, but he wasn't -- he wasn't -- at the time

12:12PM   21    when he did this, he was not there.

12:12PM   22    Q.  He was not down there?

12:12PM   23    A.  He was not there when it was done.

12:12PM   24    Q.  And when did this occur in relation to the wedding?

12:12PM   25    A.  Couple days, a day or two before.  It was a celebration.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24
151

| | | |
|---|---|---|
| 12:12PM | 1 | There was a nightclub, we were going out, and it was done. |
| 12:12PM | 2 | Q.  It was done.  So we saw pictures of a booze. |
| 12:12PM | 3 | Cruise, right? |
| 12:12PM | 4 | A.  Yes. |
| 12:12PM | 5 | Q.  Did you use any cocaine there? |
| 12:12PM | 6 | A.  No. |
| 12:13PM | 7 | Q.  We saw pictures of the wedding day, right? |
| 12:13PM | 8 | A.  Yes. |
| 12:13PM | 9 | Q.  Did you use any cocaine there? |
| 12:13PM | 10 | A.  No. |
| 12:13PM | 11 | Q.  How about before the wedding, use any cocaine? |
| 12:13PM | 12 | A.  No, there was a party.  There was a -- like I said, there |
| 12:13PM | 13 | was a couple nights where we went out.  The place had a nice |
| 12:13PM | 14 | club.  Those were the nights that it was used. |
| 12:13PM | 15 | Q.  And these other bars that you mentioned, same kind of |
| 12:13PM | 16 | thing, right, you go into a stall? |
| 12:13PM | 17 | A.  Correct.  Not -- except here it was done in a room. |
| 12:13PM | 18 | Q.  You provide the cocaine, right? |
| 12:13PM | 19 | A.  I had gotten it on that occasion, yes, in Cabo. |
| 12:13PM | 20 | Q.  You're aware of the fact that Mr. Bongiovanni gets tested |
| 12:13PM | 21 | for drugs based on his status as a DEA agent, correct? |
| 12:13PM | 22 | **MR. TRIPI:**  Objection. |
| 12:13PM | 23 | **THE WITNESS:**  Correct. |
| 12:13PM | 24 | **MR. TRIPI:**  Objection, Rule 602.  If we can approach? |
| 12:13PM | 25 | **MR. SINGER:**  Judge, he said this on direct. |

| | | |
|---|---|---|
| 12:13PM | 1 | **THE COURT:**  Stop, stop, stop, stop, stop. |
| 12:13PM | 2 | Yeah, let's approach, if you want to approach, |
| 12:13PM | 3 | Mr. Tripi. |
| 12:14PM | 4 | (Sidebar discussion held on the record.) |
| 12:14PM | 5 | **MR. TRIPI:**  Judge, it's a -- it's a Rule 602 and a |
| 12:14PM | 6 | Rule 403 objection. |
| 12:14PM | 7 | First, Rule 602.  How would this witness know if |
| 12:14PM | 8 | Mr. Bongiovanni's ever been tested by the DEA?  In truth and |
| 12:14PM | 9 | in fact, he would have no idea. |
| 12:14PM | 10 | **THE COURT:**  Well, didn't he already testify that |
| 12:14PM | 11 | he -- that's why he didn't use marijuana -- |
| 12:14PM | 12 | **MR. SINGER:**  Correct. |
| 12:14PM | 13 | **THE COURT:** -- that's why he used cocaine. |
| 12:14PM | 14 | **MR. SINGER:**  You brought that out on direct. |
| 12:14PM | 15 | **MR. TRIPI:**  About being drug tested?  I did not. |
| 12:14PM | 16 | I -- I brought -- I brought up drug usage. |
| 12:14PM | 17 | **THE COURT:**  Yeah, he testified that the reason that |
| 12:14PM | 18 | he used marijuana -- |
| 12:14PM | 19 | **MR. TRIPI:**  And not cocaine? |
| 12:14PM | 20 | **MR. SINGER:**  The other way around. |
| 12:14PM | 21 | **MR. TRIPI:**  Yeah. |
| 12:14PM | 22 | **THE COURT:**  Cocaine and not marijuana was because |
| 12:14PM | 23 | cocaine stays in your system a shorter period of time than |
| 12:14PM | 24 | marijuana stays in your system. |
| 12:14PM | 25 | **MR. TRIPI:**  Yes, that's true.  But this |

12:14PM    1   cross-examination question asks this witness if he's been drug

12:16PM    2   tested for his job.  In truth and in fact, has he been drug

12:16PM    3   tested for his job.  That's the way I understand the question.

12:16PM    4        How would this witness know that?  Firstly.

12:16PM    5        Secondly, we know from -- sorry about that.  We know

12:16PM    6   from the last trial, we -- we don't have access to -- to those

12:16PM    7   records.  We don't know one way or the other whether or not

12:16PM    8   this defendant was ever actually tested for controlled

12:16PM    9   substances.

12:16PM   10        I know a lot of DEA agents, I've asked them in prep.

12:16PM   11   Maybe I'll ask some of them at this trial.  I'm unaware of any

12:16PM   12   of them ever being actually tested from the Buffalo office.

12:16PM   13        **THE COURT:**  What's -- what's the point of the

12:16PM   14   question, Mr. Singer?

12:16PM   15        **MR. SINGER:**  So -- so, number 1, it's the talk about

12:16PM   16   how they spoke about the -- the masking or the drug usage and

12:16PM   17   why he used one over the other.

12:16PM   18        **MR. TRIPI:**  I have no objection to that.

12:16PM   19        **MR. SINGER:**  The second part of it is that as far as

12:16PM   20   the -- it goes to the credibility of the allegations

12:16PM   21   themselves, Judge.

12:16PM   22        If Mr. Bongiovanni is talking to Mr. Selva about

12:16PM   23   getting drug tested when he's using drugs at the same time,

12:16PM   24   there's an element of risk -- there's no guarantee that it's

12:16PM   25   going to wash out of his system right away.

| | | |
|---|---|---|
| 12:16PM | 1 | **THE COURT:**  Right. |
| 12:16PM | 2 | **MR. SINGER:**  So this again goes to credibility of the |
| 12:16PM | 3 | allegations that -- |
| 12:16PM | 4 | **THE COURT:**  I'm going to allow it.  I'm going to |
| 12:16PM | 5 | allow it. |
| 12:16PM | 6 | **MR. TRIPI:**  Thanks for letting me come up. |
| 12:16PM | 7 | (Sidebar discussion ended.) |
| 12:16PM | 8 | **THE COURT:**  The objection is overruled. |
| 12:16PM | 9 | **BY MR. SINGER:** |
| 12:16PM | 10 | Q.  So you recall talking on direct, Mr. Selva, about how |
| 12:16PM | 11 | Mr. Bongiovanni preferred to use cocaine over marijuana, |
| 12:16PM | 12 | right? |
| 12:16PM | 13 | A.  Correct. |
| 12:16PM | 14 | Q.  And he preferred to use that because cocaine flushes out |
| 12:16PM | 15 | of your system faster than marijuana, right? |
| 12:16PM | 16 | A.  Correct. |
| 12:16PM | 17 | Q.  And -- and he was concerned about the flushing out of the |
| 12:16PM | 18 | system based on the fact that he was tested at the DEA, |
| 12:16PM | 19 | correct? |
| 12:16PM | 20 | A.  That's correct. |
| 12:16PM | 21 | Q.  And you'd agree with me that -- that there's no guarantee |
| 12:16PM | 22 | that after he uses a quantity of cocaine, that that's going |
| 12:16PM | 23 | to be flushed out of his system at any particular period of |
| 12:16PM | 24 | time, right? |
| 12:16PM | 25 | A.  From what I -- what I was told was 72 hours. |

| 12:16PM | 1 | Q.  But you'd agree with me that Mr. Bongiovanni is not aware |

12:16PM    1   Q.  But you'd agree with me that Mr. Bongiovanni is not aware

12:16PM    2   of 100 percent of the time of when he's going to get tested,

12:16PM    3   right?

12:16PM    4         MR. TRIPI:  Objection, that's Rule 602, as to what

12:16PM    5   Mr. Bongiovanni's aware of.

12:16PM    6         THE WITNESS:  I don't --

12:16PM    7         THE COURT:  Stop, stop, stop.  Please, Mr. Selva.

12:17PM    8   Please.

12:17PM    9         No, I'm going to allow it, overruled.

12:17PM   10         THE WITNESS:  I don't know when he's tested.

12:17PM   11         BY MR. SINGER:

12:17PM   12   Q.  You'd agree with me that it's a pretty risky thing to do

12:17PM   13   as a federal agent to use drugs if you're being tested for

12:17PM   14   drugs, right?

12:17PM   15   A.  Correct.

12:17PM   16   Q.  Because that's something, to your understanding, that if

12:17PM   17   he tested positive could cause him to lose his job, right?

12:17PM   18   A.  Correct.

12:17PM   19   Q.  Could cause him to get fired, correct?

12:17PM   20   A.  That's correct.

12:17PM   21   Q.  Could cause him maybe even to get criminally prosecuted?

12:17PM   22   A.  Possibly.

12:17PM   23   Q.  But you maintain that he accepted that risk and did it

12:17PM   24   anyway?

12:17PM   25   A.  Yes, flush it out of his system.

12:17PM  1   Q.  Let's talk a little bit about the stag party in 2014.

12:17PM  2       So, I went through this before.  I -- I didn't grow up

12:17PM  3   here in Buffalo so this is something foreign to me.  But what

12:17PM  4   I understand about what happens at a Buffalo stag now is

12:17PM  5   that, you know, it's a large event, right?

12:17PM  6   A.  Yes.

12:17PM  7   Q.  This particular event was down in Iron Works, correct?

12:18PM  8   A.  Correct.

12:18PM  9   Q.  And this was something that you helped arrange, correct?

12:18PM  10  A.  Correct.

12:18PM  11  Q.  You rented out the space, right?

12:18PM  12  A.  Correct.

12:18PM  13  Q.  And it was a larger space, correct?

12:18PM  14  A.  Correct.  It was a bar-type setting with a big venue,

12:18PM  15  yes.

12:18PM  16  Q.  There was a food menu that was -- that was prepared for

12:18PM  17  it, correct?

12:18PM  18  A.  Correct.  We had a catered, correct.

12:18PM  19  Q.  It was kind of an open bar situation; is that right?

12:18PM  20  A.  Yes.  For a short -- I believe it was draft beer, there

12:18PM  21  were drinks -- I don't recall the arrangement, but yes, it

12:18PM  22  was draft beer.

12:18PM  23  Q.  You guys kind of buy the first keg and then everyone's

12:18PM  24  responsible for what happened after that?

12:18PM  25  A.  There might have been an open bar period, too.  I

12:18PM   1   don't -- I don't recall.

12:18PM   2   Q.  People get into the stag by purchasing tickets, right?

12:18PM   3   A.  Purchase a ticket, correct.

12:18PM   4   Q.  And friends of the groom are the people that sell the

12:18PM   5   tickets, not the groom?

12:18PM   6   A.  Correct.

12:18PM   7   Q.  So you were one of the particular people who sold the

12:18PM   8   tickets to the stag, correct?

12:18PM   9   A.  Correct, myself and others.

12:18PM  10   Q.  And other people sold tickets?

12:18PM  11   A.  Correct.

12:18PM  12   Q.  And these other people, they included family of Joseph

12:19PM  13   Bongiovanni, right?

12:19PM  14   A.  Family, friends, correct.

12:19PM  15   Q.  They included DEA coworkers of Joseph Bongiovanni,

12:19PM  16   correct?

12:19PM  17   A.  I don't know if DEA coworkers sold the tickets.  I'm not

12:19PM  18   aware of that.

12:19PM  19   Q.  But you are tended the ^ CK AUDIO DEA coworkers did

12:19PM  20   attend, correct?

12:19PM  21   A.  Yes.

12:19PM  22   Q.  Like you mentioned Joseph Palmieri was one of those

12:19PM  23   people, correct?

12:19PM  24   A.  I believe so, yes.

12:19PM  25   Q.  And other officers that Joe was friendly with from his

12:19PM   1   office, they came, too?  Do you have an understanding?

12:19PM   2   A.  I don't recall seeing anyone else that I would recognize.

12:19PM   3   Q.  So you don't remember?

12:19PM   4   A.  I don't remember.

12:19PM   5   Q.  Okay.  And, so after all these people sell these tickets,

12:19PM   6   they sell to people who they want to sell to, right?

12:19PM   7   A.  Correct.

12:19PM   8   Q.  Who may have a close relationship to Joe Bongiovanni,

12:19PM   9   correct?

12:19PM  10   A.  Correct.

12:19PM  11   Q.  But who also may not have a close relationship to Joe

12:19PM  12   Bongiovanni?

12:19PM  13   A.  That's correct.

12:19PM  14   Q.  And the people that you sold tickets to, they were people

12:19PM  15   that primarily you hung around with?

12:19PM  16   A.  Hung around that knew Joe, yes.

12:19PM  17   Q.  That were friends with you, correct?

12:19PM  18   A.  Friends with us both, yes.

12:20PM  19   Q.  And, so, again, the stag is kind of like -- it's like a

12:20PM  20   baby shower for the groom in some ways?

12:20PM  21   A.  Yeah.  It's a different way of putting it, yes.

12:20PM  22   Q.  Yeah.  And so there are profits that are generated at the

12:20PM  23   end of the night, right?

12:20PM  24   A.  Yeah, to, like, congratulate the groom, yes.

12:20PM  25   Q.  So that's one of the reasons why you sell tickets, it's

12:20PM   1   not just to pay for the event, right?

12:20PM   2   A.   Yeah.  Whatever's left, you give to the groom and it's

12:20PM   3   kind of like a wedding present.

12:20PM   4   Q.   Um-hum.  And -- and all the things that you did that

12:20PM   5   night, it -- it was provided to Joe Bongiovanni that -- the

12:20PM   6   profit left over at the end of night, right?

12:20PM   7   A.   Yes.

12:20PM   8   Q.   And we're talking about, like, more than $1,000, right?

12:20PM   9   A.   I believe so, yes.

12:20PM  10   Q.   Yeah.  We're talking about a significant amount of money,

12:20PM  11   correct?

12:20PM  12   A.   Correct.

12:20PM  13   Q.   And that was something that he used to help pay for

12:20PM  14   wedding expenses as you understood it, right?

12:20PM  15   A.   I believe so, yes.

12:20PM  16   Q.   There were a lot of people that attended the stag,

12:20PM  17   correct?

12:20PM  18   A.   Yes.

12:20PM  19   Q.   From Joe's family, right?

12:20PM  20   A.   Yes.  Some.  Yes.

12:20PM  21   Q.   Family member friends, correct?

12:20PM  22   A.   Yes.

12:20PM  23   Q.   We talked about the coworkers, right?

12:21PM  24   A.   Yes.  The one that I remember, yes.  There might have

12:21PM  25   been what I didn't know.

12:21PM    1    Q.  Okay.

12:21PM    2    A.  People -- I didn't know everybody there.

12:21PM    3    Q.  Yeah.  I mean, and this is, like, 100 people, right?

12:21PM    4    A.  Yeah.  There was quite a few people, yes.  It was a dark

12:21PM    5    venue, it was a bar, it was -- yes.

12:21PM    6    Q.  And as far as, like, the older friends, people from the

12:21PM    7    neighborhood kind of people, you mentioned that Wayne

12:21PM    8    Anderson was somebody who attended, right?

12:21PM    9    A.  Yes.  Wayne attended, yes.

12:21PM   10    Q.  You mentioned that Mike Masecchia was another person who

12:21PM   11    attended, right?

12:21PM   12    A.  Yes.

12:21PM   13    Q.  And they were people, as we talked about earlier, that

12:21PM   14    Joe Bongiovanni grew up with, right?

12:21PM   15    A.  Correct.

12:21PM   16    Q.  Was friends with back in the day, correct?

12:21PM   17    A.  Correct.

12:21PM   18    Q.  And there are other people that kind of fell into that

12:21PM   19    same kind of category, correct?

12:21PM   20    A.  Correct.

12:21PM   21    Q.  Did you sell these individuals tickets?

12:21PM   22    A.  To who?  Mike Masecchia and those guys?

12:21PM   23    Q.  Yeah.

12:21PM   24    A.  Yes, I gave them tickets, and then they paid at the door.

12:21PM   25    Q.  Um-hum.  And because these were people that, you know,

12:21PM   1   you would hang out with a little more frequently than Joe at

12:21PM   2   the time, right?

12:21PM   3   A.   I saw them, yes, and told them about the stag, gave them

12:22PM   4   the ticket, and then they showed up.

12:22PM   5   Q.   And it's not like Joe has, like, an invite list in

12:22PM   6   advance and says, oh, no, Lou, this person can't come, right?

12:22PM   7   A.   No.  No.

12:22PM   8   Q.   Are you aware of whether or not the profits generated at

12:22PM   9   the stag were used to help pay for your suit?

12:22PM  10   A.   I -- I don't know how they were used.  It was just given

12:22PM  11   to the groom.  I don't know.

12:22PM  12   Q.   Would you agree with me that the suit's a wedding

12:22PM  13   expense, right?

12:22PM  14   A.   Yes.

12:22PM  15            MR. SINGER:  How -- how much do you want to go,

12:22PM  16   Judge, before we take a break?

12:22PM  17            THE COURT:  At least -- how -- how much longer do you

12:22PM  18   have?

12:22PM  19            MR. SINGER:  I have a while, so --

12:22PM  20            THE COURT:  Okay.  Let's keep going.

12:22PM  21            MR. SINGER:  Okay.

12:22PM  22            BY MR. SINGER:

12:22PM  23   Q.   All right.  So, let's get a little bit into the Ron Serio

12:22PM  24   drug-trafficking organization.

12:22PM  25        The first statement, Mr. Selva, you've been pretty

| | | |
|---|---|---|
| 12:22PM | 1 | consistent from the beginning that Ron Serio and Joe |
| 12:22PM | 2 | Bongiovanni never met each other during the course of this. |
| 12:22PM | 3 | A.  That's correct. |
| 12:22PM | 4 | Q.  They never spoke on the phone, correct? |
| 12:22PM | 5 | A.  Correct. |
| 12:22PM | 6 | Q.  And to your knowledge, the relationship between Ron Serio |
| 12:23PM | 7 | and Mike Masecchia, that began sometime in the later 2000s, |
| 12:23PM | 8 | right? |
| 12:23PM | 9 | A.  Correct.  No, before -- no, they knew each other before |
| 12:23PM | 10 | that. |
| 12:23PM | 11 | Q.  So they knew each other before that? |
| 12:23PM | 12 | A.  Yes, they knew each other in -- from early 2000s. |
| 12:23PM | 13 | Q.  So I guess what I'm getting at is that, is that they know |
| 12:23PM | 14 | each other, and again, we're getting into this know versus -- |
| 12:23PM | 15 | A.  Well, they've been -- they've been friends longer than |
| 12:23PM | 16 | I've -- I've known, longer than this period. |
| 12:23PM | 17 | Q.  Okay.  When you say "I," who are you referring to?  I'm |
| 12:23PM | 18 | sorry, I'm a little confused. |
| 12:23PM | 19 | A.  Just myself, longer than the period that was the 2008 to |
| 12:23PM | 20 | 2017.  They were friends prior to that. |
| 12:23PM | 21 | Q.  Okay.  So you're talking about Ron Serio and Mike |
| 12:23PM | 22 | Masecchia's relationship? |
| 12:23PM | 23 | A.  Yes.  That's what you were asking, correct? |
| 12:23PM | 24 | Q.  Yeah. |
| 12:23PM | 25 | A.  Yes. |

12:23PM    1    Q.  So Ron Serio and Mike Masecchia's relationship, that

12:23PM    2    extends before 2008?

12:23PM    3    A.  Yes.

12:23PM    4    Q.  But as far as the business part of it, when -- when Ron

12:24PM    5    was cashing out Mike Masecchia, when do you understand that

12:24PM    6    started?

12:24PM    7    A.  Before they've known each other, Mike's been in this

12:24PM    8    quite a while, so it might have been before 2008.  I don't

12:24PM    9    know that.

12:24PM    10   Q.  Yeah, I guess what I'm getting at is that you don't know

12:24PM    11   when the business relationship between Ron Serio and Mike

12:24PM    12   Masecchia started, right?

12:24PM    13   A.  I don't.

12:24PM    14   Q.  You know only after you joined the conspiracy, according

12:24PM    15   to you in 2008, that you were aware of that relationship,

12:24PM    16   right?

12:24PM    17   A.  That's correct.

12:24PM    18   Q.  Okay.  And so when you first talked to Mike Masecchia,

12:24PM    19   you're aware of the fact that -- that Masecchia and others

12:24PM    20   that you knew and grew up with, they had this grow operation

12:24PM    21   down in Franklinville or Ellicottville?

12:24PM    22   A.  Franklinville, Angelica, yes.

12:24PM    23   Q.  And so you're aware of the fact when you entered that Ron

12:24PM    24   Serio was the one who purchased the outdoor grow proceeds,

12:24PM    25   right?

12:24PM    1    A.  What do you mean, purchased the --

12:24PM    2    Q.  So -- so, Mike Masecchia and others that you mentioned,

12:25PM    3    they would grow the marijuana down in these Southern Tier

12:25PM    4    locations, correct?

12:25PM    5    A.  Correct.

12:25PM    6    Q.  And so after the marijuana was cultivated and dried out

12:25PM    7    in these two locations --

12:25PM    8    A.  Yes, then Ron would -- correct.  I'm -- I'm confused.

12:25PM    9    Q.  In these two locations, that's when Ron came into the

12:25PM   10    picture?

12:25PM   11    A.  Yes.  It would be brought to Ron, and he would cash it

12:25PM   12    out, so to speak.

12:25PM   13    Q.  Yeah.  And when you're saying "cash out," you're saying

12:25PM   14    that --

12:25PM   15    A.  Meaning he would purchase it.

12:25PM   16    Q.  -- he would pay Mike Masecchia for the marijuana?

12:25PM   17    A.  Correct.

12:25PM   18    Q.  And then the proceeds would be divvied out between the

12:25PM   19    amount of people that were in the organization?

12:25PM   20    A.  Correct.

12:25PM   21    Q.  And so you testified yesterday that over time, this

12:25PM   22    relationship between Masecchia and Serio evolves, right?

12:25PM   23    A.  It did.

12:25PM   24    Q.  It's not just these smaller grow operations in the

12:25PM   25    outdoors in the Southern Tier anymore, right?

12:25PM    1    A.   No, it's -- it's grown way beyond that.  They had grow

12:25PM    2    rooms and getting it from different locations.

12:26PM    3    Q.   Yeah.  You talked about how there -- there were different

12:26PM    4    indoor grow locations that started to sprout up, right?

12:26PM    5    A.   Yes.

12:26PM    6    Q.   You talked about how Ron Serio would source marijuana

12:26PM    7    from places other than these grow locations, right?

12:26PM    8    A.   Correct.

12:26PM    9    Q.   He'd source marijuana from other people in the drug

12:26PM   10    trade, correct?

12:26PM   11    A.   Correct.  He -- he expanded quite a bit, yes.

12:26PM   12    Q.   Other regions, correct?

12:26PM   13    A.   Other regions, yes.

12:26PM   14    Q.   Now, eventually, you get involved in the Ron Serio

12:26PM   15    drug-trafficking organization, and you testified yesterday

12:26PM   16    that your purpose was to assist with deliveries of marijuana,

12:26PM   17    like the bulk that you've harvested from these grow

12:26PM   18    operations, right?

12:26PM   19    A.   Correct.  Help harvest it, and then -- yes.

12:26PM   20    Q.   You testified that you would grow seedlings.  And, again,

12:26PM   21    I'm sorry, I'm not using the right term, when you're first

12:26PM   22    growing the marijuana before you put these --

12:26PM   23    A.   Clones.

12:26PM   24    Q.   Clones, that's right.  So, you mentioned that, that you

12:26PM   25    would be responsible for growing the clones?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

166

12:27PM 1 A.  The clones.  And then you transplant them, and then you

12:27PM 2 bring them outdoors.

12:27PM 3 Q.  All right.  And another aspect of your involvement in

12:27PM 4 this organization is that you also stored marijuana inside of

12:27PM 5 your house, correct?

12:27PM 6 A.  Yeah.  On a few occasions for Ron, yes.

12:27PM 7 Q.  You also grew marijuana inside of your basement, correct?

12:27PM 8 A.  Yes.  It was a small indoor operation, yes.

12:27PM 9 Q.  And like we talked about, you know, one of the key things

12:27PM 10 for you is that you also were the conduit of information in

12:27PM 11 relationship to Joe Bongiovanni, right?

12:27PM 12 A.  Correct.

12:27PM 13 Q.  Because that's something that Ron Serio didn't have,

12:27PM 14 right?

12:27PM 15 A.  Correct.

12:27PM 16 Q.  And as we talked about, something Mike Masecchia didn't

12:27PM 17 have, right?

12:27PM 18 A.  Correct.

12:27PM 19 Q.  All right.  So, you claim that there's protection money

12:27PM 20 that's being paid since 2008?

12:27PM 21 A.  Correct.

12:27PM 22 Q.  And I think you testified that it was -- it was a little

12:27PM 23 bit structured, so at first it was $2,000 a month; is that

12:27PM 24 right?

12:27PM 25 A.  Correct.

12:28PM   1   Q.  And eventually that changes to $4,000 a month?

12:28PM   2   A.  Correct.  As their operation had evolved, correct.

12:28PM   3   Q.  Yeah.  And I think you testified that -- that one of the

12:28PM   4   concerns Serio had is that as he expanded, there was more

12:28PM   5   exposure, correct?

12:28PM   6   A.  I'm -- I'm sorry, can you repeat that?

12:28PM   7   Q.  One of the concerns that Ron Serio had was that as he

12:28PM   8   expanded operations, his exposure expanded, correct?

12:28PM   9   A.  Correct.

12:28PM  10   Q.  And so he felt like more money paid to Mr. Bongiovanni

12:28PM  11   would help protect him more, correct?

12:28PM  12   A.  Correct.

12:28PM  13   Q.  And you stated that -- that this continued uninterrupted

12:28PM  14   until April 2017 when Serio was arrested, right?

12:28PM  15   A.  Correct.

12:28PM  16   Q.  Is it a fair statement, sir, that you haven't been

12:28PM  17   100 percent consistent with authorities about how things

12:28PM  18   happened in the course of this conspiracy?

12:28PM  19          **MR. TRIPI:**  Objection, it's vague.

12:28PM  20          **THE COURT:**  Yeah.

12:28PM  21          **MR. SINGER:**  I can get into the specifics, Judge.

12:28PM  22   I'm just laying the groundwork.

12:29PM  23          **MR. TRIPI:**  Objection, vague.

12:29PM  24          **THE COURT:**  Yeah, I -- I think you need to get a

12:29PM  25   little more specific, Mr. Singer.

12:29PM    1           **MR. SINGER:**  Certainly.

12:29PM    2           **BY MR. SINGER:**

12:29PM    3   Q.  So, Mr. -- Mr. Selva, is it fair to say that -- that when

12:29PM    4   you spoke to authorities about when you first got involved in

12:29PM    5   the Ron Serio drug-trafficking organization, things have not

12:29PM    6   always been consistent about the dates you've chosen?

12:29PM    7   A.  It evolved over time.  The more I -- I spoke to the

12:29PM    8   authorities, yes, I came forth more.

12:29PM    9   Q.  So I guess I want to get into that a little bit more.

12:29PM   10       So -- so you recall at your first proffer interview, you

12:29PM   11   recall about talking to the authorities about how you -- you

12:29PM   12   got into the organization itself, right?

12:29PM   13   A.  Correct.

12:29PM   14   Q.  So in that first proffer interview, you talked about a

12:29PM   15   guy by the name of Joe Tomasello, right?

12:29PM   16   A.  Correct.

12:29PM   17   Q.  And we've talked about him before this morning.  He was

12:29PM   18   one of these individuals who you grew up with in the

12:30PM   19   neighborhood, right?

12:30PM   20   A.  Correct.

12:30PM   21   Q.  Little younger than you, correct?

12:30PM   22   A.  Little younger, correct.

12:30PM   23   Q.  But as you explained, he was somebody who you knew and

12:30PM   24   you also knew was involved in this drug-trafficking

12:30PM   25   organization, correct?

12:30PM    1    A.  Correct.

12:30PM    2    Q.  And you told authorities during that first proffer

12:30PM    3    interview back in August of 2019 that -- that he was the

12:30PM    4    person you first approached about the operation, correct?

12:30PM    5    A.  Correct.

12:30PM    6    Q.  And that Joe Tomasello at that point in time said, hey,

12:30PM    7    you should talk to Larry Falzone, right?

12:30PM    8    A.  No, he said talk to Mike Masecchia.

12:30PM    9    Q.  He didn't say talk to Larry Falzone?

12:30PM   10    A.  Larry Falzone was a friend.  He might have, yes.  I don't

12:30PM   11    recall.

12:30PM   12    Q.  Yeah.  And I guess you also talked to Larry Falzone,

12:30PM   13    according to your first proffer?

12:30PM   14    A.  I -- I did, yes.  I did speak to Larry Falzone, correct.

12:30PM   15    Q.  So you talked to the authorities back in August of

12:30PM   16    2019 --

12:30PM   17    A.  Larry was since deceased, too.  He's no longer.

12:30PM   18    Q.  You spoke to the authorities about -- back in August 2019

12:30PM   19    talking in the first proffer about how you spoke with Joe

12:31PM   20    Tomasello and spoke with Larry Falzone about getting entry

12:31PM   21    into this drug-trafficking organization?

12:31PM   22    A.  Yes.  They were both good friends with -- they were close

12:31PM   23    with Mike, and they knew what was going on.  Like I had

12:31PM   24    mentioned, too, Larry's no longer here.

12:31PM   25    Q.  Okay.

12:31PM    1    A.  He passed.

12:31PM    2    Q.  And then you -- and then after speaking to Tomasello and

12:31PM    3    Falzone, then you stated that you spoke to Mike Masecchia

12:31PM    4    getting involved, right?

12:31PM    5    A.  Correct.

12:31PM    6    Q.  And you recall talking to authorities about how that

12:31PM    7    conversation with Masecchia about getting involved, that

12:31PM    8    occurred back in 2012 and 2013, according to your first

12:31PM    9    proffer, right?

12:31PM   10    A.  Correct.

12:31PM   11    Q.  All right.  So then fast forward about a week and a half,

12:31PM   12    two weeks later, you sit down for a second proffer with the

12:31PM   13    government, right?

12:31PM   14    A.  Okay.

12:31PM   15    Q.  Yes?

12:31PM   16    A.  Yes.

12:31PM   17    Q.  Do you remember that?

12:31PM   18    A.  Yes, I do.  Yes.

12:31PM   19    Q.  Okay.  And, your story slightly changed a little bit,

12:31PM   20    right?

12:31PM   21    A.  Yes.

12:31PM   22    Q.  Like, so, for instance, you talked with authorities at

12:31PM   23    that point in time about how Joe Tomasello was someone who

12:31PM   24    told you about the operation, right?

12:31PM   25    A.  Yes.

12:31PM  1   Q.  But then you mentioned that you talked directly to Mike

12:32PM  2   Masecchia, right?

12:32PM  3   A.  That's correct.  Joe -- Joe was more knowledgeable of

12:32PM  4   what was going on, so, yes, I spoke to Joe.

12:32PM  5   Q.  And you never got --

12:32PM  6   A.  And then I -- then I spoke to Mike.

12:32PM  7   Q.  Yeah, and -- and I guess what I'm getting at is you never

12:32PM  8   mentioned Larry Falzone at the second proffer meeting?

12:32PM  9   A.  No.  Larry was living in California at the time, too,

12:32PM  10  so --

12:32PM  11  Q.  Okay.  So you mentioned him the first time, but not the

12:32PM  12  second time, Larry Falzone.

12:32PM  13  A.  Right.  He was a close friend of Mike's.

12:32PM  14  Q.  And then you also talked a little bit differently about

12:32PM  15  the time period that you joined into this conspiracy in the

12:32PM  16  second proffer, right?

12:32PM  17  A.  Yes.

12:32PM  18  Q.  So the first one, we talked about how it was 2012 to

12:32PM  19  2013, right?

12:32PM  20  A.  Yes.

12:32PM  21  Q.  But the second proffer interview, you shifted backwards

12:32PM  22  to 2010 and 2011, right?

12:32PM  23  A.  2008, '9, that timeframe, I believe.  That's when it

12:32PM  24  started.

12:32PM  25  Q.  Okay.  Well, let's see if we can refresh your

| | | |
|---|---|---|
| 12:32PM | 1 | recollection. |
| 12:32PM | 2 | A.  Please. |
| 12:32PM | 3 | **MR. SINGER:**  Ms. Champoux, is it possible we could |
| 12:32PM | 4 | bring up for the witness and only the witness Government |
| 12:32PM | 5 | Exhibit 3540I at 3?  And if we can go to page 3, please. |
| 12:32PM | 6 | **BY MR. SINGER:** |
| 12:33PM | 7 | Q.  I'd like you to take a look at this document, sir.  I'd |
| 12:33PM | 8 | like you to just see whether this helps refresh your memory |
| 12:33PM | 9 | about when it was you had this conversation. |
| 12:33PM | 10 | A.  Where am I reading from?  The whole -- |
| 12:33PM | 11 | Q.  Take a look at that blue dot, sir.  Maybe that will help |
| 12:33PM | 12 | you out. |
| 12:33PM | 13 | **THE COURT:**  And -- and you -- you said you want to |
| 12:33PM | 14 | refresh his recollection about when he had this conversation? |
| 12:33PM | 15 | **MR. SINGER:**  When he -- when he told in his second |
| 12:33PM | 16 | proffer interview, when it was he had the conversation with |
| 12:33PM | 17 | Mr. -- |
| 12:33PM | 18 | **THE COURT:**  So, do you understand what he's asking, |
| 12:33PM | 19 | Mr. Selva? |
| 12:33PM | 20 | What he's asking you is, does this refresh -- after |
| 12:33PM | 21 | you read this, he's going to ask you:  Does this refresh your |
| 12:33PM | 22 | recollection about what you told them about when you got |
| 12:33PM | 23 | involved when you had your second proffer? |
| 12:33PM | 24 | **THE WITNESS:**  Yes. |
| 12:33PM | 25 | **THE COURT:**  Okay.  So take a look at this. |

12:34PM    1          **THE WITNESS:**  Okay.

12:34PM    2          **BY MR. SINGER:**

12:34PM    3    Q.  Are you good, sir?

12:34PM    4    A.  Yes.

12:34PM    5    Q.  So, does that help refresh your memory about having that

12:34PM    6    conversation back -- back then in the second proffer

12:34PM    7    interview in 2010, 2011, not 2012, 2013 like you said in the

12:34PM    8    first proffer interview?

12:34PM    9    A.  That this was regarding a specific crop.  It was coming

12:34PM   10    in, and that was the timeframe.

12:34PM   11    Q.  Okay.  So that's a different timeframe?

12:34PM   12    A.  It was for the -- for that particular incident, yes.

12:34PM   13    Q.  All right.

12:34PM   14          **MR. SINGER:**  So if we can take that down,

12:34PM   15    Ms. Champoux.

12:34PM   16          **BY MR. SINGER:**

12:34PM   17    Q.  So, then you testified before the grand jury on

12:34PM   18    October 3rd of 2019, right, Mr. Selva?

12:34PM   19    A.  Yes.

12:34PM   20    Q.  And at that point in time is when you testified that the

12:35PM   21    conversation you had with Joe Tomasello wasn't in the 2012,

12:35PM   22    2013 or 2010, '11 timeframe, it was in 2008.

12:35PM   23          **MR. TRIPI:**  Objection.  This is improper impeachment,

12:35PM   24    Your Honor.  The way he's doing it is -- he hasn't set up an

12:35PM   25    inconsistency.

|        |    |                                                                        |
|--------|----|------------------------------------------------------------------------|
| 12:35PM | 1  | **THE COURT:**  Well, no.  I -- I don't think it is,                    |
| 12:35PM | 2  | Mr. Tripi.  And -- and I -- I don't think he's impeaching him.          |
| 12:35PM | 3  | I think he's -- he's questioning him about whether his story           |
| 12:35PM | 4  | changed over time.  That's -- that's a little different than           |
| 12:35PM | 5  | whether his testimony today is inconsistent with what he said          |
| 12:35PM | 6  | something previously.                                                  |
| 12:35PM | 7  | Am -- am I correct?                                                    |
| 12:35PM | 8  | **MR. SINGER:**  That's correct, Judge.                                |
| 12:35PM | 9  | **MR. TRIPI:**  All right.  Then I'll withdraw.                        |
| 12:35PM | 10 | **THE WITNESS:**  2008 is when I originally got involved.              |
| 12:35PM | 11 | 2010, what you just showed me, was a specific crop                     |
| 12:35PM | 12 | that was coming about.                                                 |
| 12:35PM | 13 | **BY MR. SINGER:**                                                     |
| 12:35PM | 14 | Q.  Yeah, but what I'm getting at, Mr. Selva, is that do you           |
| 12:35PM | 15 | remember testifying in front of the grand jury in October of          |
| 12:35PM | 16 | 2019?                                                                  |
| 12:35PM | 17 | A.  Yes.                                                               |
| 12:35PM | 18 | Q.  And you remember testifying in front of the grand jury            |
| 12:36PM | 19 | that the time you had this conversation about getting                  |
| 12:36PM | 20 | involved is 2008 at that point, correct?                               |
| 12:36PM | 21 | A.  Correct.                                                           |
| 12:36PM | 22 | Q.  And that's different than the other times you provide in          |
| 12:36PM | 23 | your previous proffers, correct?                                       |
| 12:36PM | 24 | A.  2008 is when I did get involved.                                   |
| 12:36PM | 25 | Q.  Okay.  But what I'm getting at is, again, you'd agree             |

12:36PM    1    with me that the timeframe you provided in your first proffer

12:36PM    2    was different than the timeframe you provided to the grand

12:36PM    3    jury, correct?

12:36PM    4    A.  I -- I believe so, yes.

12:36PM    5    Q.  Okay.  And similar, you don't really mention Larry

12:36PM    6    Falzone in the grand jury like you did the first time, right?

12:36PM    7    A.  No.

12:36PM    8    Q.  So, why the change?  Why not mention Larry Falzone?

12:36PM    9    A.  Larry was sick.  He died.  I mean, he was having some

12:36PM   10    issues.  He really wasn't -- he was a friend.

12:36PM   11        What I was looking for was a connection to talk to Mike,

12:36PM   12    that was the whole purpose of reaching out to Joe.

12:36PM   13        Larry was close to Mike.  And he was also in California.

12:36PM   14    So, I more relied on Joe for that than -- Joe Tomasello than

12:37PM   15    Larry for that.

12:37PM   16    Q.  Okay.  So you left out Larry in the grand jury, unlike

12:37PM   17    the first time, right?

12:37PM   18              **MR. TRIPI:**  Objection.

12:37PM   19              **THE WITNESS:**  I mentioned --

12:37PM   20              **MR. TRIPI:**  Objection.

12:37PM   21              **THE COURT:**  Stop, stop, stop.

12:37PM   22              **MR. TRIPI:**  Objection.  He hasn't established he was

12:37PM   23    asked about Falzone in the grand jury.  That's my objection.

12:37PM   24              **THE COURT:**  Okay.

12:37PM   25              **THE WITNESS:**  Yeah, I don't remember being --

| | | |
|---|---|---|
| 12:37PM | 1 | **THE COURT:**  Stop, stop, stop. |
| 12:37PM | 2 | **THE WITNESS:**  I'm sorry. |
| 12:37PM | 3 | **THE COURT:**  Mr. Selva, please let me -- let me rule. |
| 12:37PM | 4 | So that objection is sustained.  You can lay more of |
| 12:37PM | 5 | a foundation. |
| 12:37PM | 6 | **BY MR. SINGER:** |
| 12:37PM | 7 | Q.  Okay.  Let's move on a little. |
| 12:37PM | 8 | Let's talk about your -- your start date of your |
| 12:37PM | 9 | involvement.  So your claim at trial was that you started in |
| 12:37PM | 10 | 2008, right? |
| 12:37PM | 11 | A.  Correct. |
| 12:37PM | 12 | Q.  But you've also told the authorities different times |
| 12:37PM | 13 | regarding the start date, correct? |
| 12:37PM | 14 | A.  Correct. |
| 12:37PM | 15 | Q.  So, for instance, you remember when you first had your |
| 12:37PM | 16 | house raided on August 23rd, 2019, right? |
| 12:37PM | 17 | A.  Yes. |
| 12:37PM | 18 | Q.  And you remember sitting down and talking with police |
| 12:37PM | 19 | investigators at that time, correct? |
| 12:37PM | 20 | A.  Yes. |
| 12:37PM | 21 | Q.  And you remember talking to them about your involvement |
| 12:37PM | 22 | in this conspiracy, correct? |
| 12:37PM | 23 | A.  Correct. |
| 12:37PM | 24 | Q.  Do you remember talking to them about how your |
| 12:38PM | 25 | involvement started in the 2009 to 2010 time period, correct? |

12:38PM    1    A.  Correct.

12:38PM    2    Q.  Do you remember telling them somewhere in the

12:38PM    3    neighborhood of six to seven years prior to that date; is

12:38PM    4    that right?

12:38PM    5    A.  Correct.

12:38PM    6    Q.  And you recall then shifting a little bit and saying it

12:38PM    7    was three or four years ago at a later point in the

12:38PM    8    conversation you had with agents that morning?

12:38PM    9    A.  What's -- yes.

12:38PM    10    Q.  And then you also talked to them about how it was five

12:38PM    11    years before Ron Serio's arrest, correct?

12:38PM    12    A.  Correct.

12:38PM    13    Q.  So, using those kind of guideposts when you first talked

12:38PM    14    to agents about your involvement here, you're talking about

12:38PM    15    2012 to 2017 time period, right?

12:38PM    16    A.  Correct.  But then as I was involved with the meetings, I

12:38PM    17    became more truthful, and I told them the exact timeframe

12:38PM    18    when I did start, which was 2008.

12:38PM    19    Q.  Well, we'll get to that.

12:38PM    20        So as far as your first proffer interview, do you

12:38PM    21    remember talking to them about the conversations you had with

12:38PM    22    Mike Masecchia to get involved?

12:39PM    23    A.  Yes.

12:39PM    24    Q.  And you remember talking to them about grow operations in

12:39PM    25    your basement; is that right?

12:39PM    1    A.  Yes.

12:39PM    2    Q.  And you talked about there about how it was five years

12:39PM    3    prior to Ron Serio's arrest that you got involved, right?

12:39PM    4    A.  Yes, I said --

12:39PM    5    Q.  And again, we're talking 2012, 2017; is that right?

12:39PM    6    A.  Well, with -- yes.  Well, Ron was always involved.  Ron

12:39PM    7    was the one who we would cash out with, so that's being --

12:39PM    8    Q.  I don't doubt that.  I don't doubt that.

12:39PM    9    A.  That -- that's -- that's how I was involved.  With Ron

12:39PM   10    from 2008, it would be just cashed out to him.

12:39PM   11    Q.  Okay.  But when you first talked to the government,

12:39PM   12    whether it was at that initial interview when your house was

12:39PM   13    raided or at the first proffer interview, you weren't talking

12:39PM   14    2008, correct, sir?

12:39PM   15    A.  No.

12:39PM   16    Q.  All right.  So, then getting to September, your second

12:39PM   17    proffer interview, you started talking about how it was a few

12:39PM   18    years ago, right?  From 2019?

12:39PM   19    A.  2019 -- what?  Can you be more specific?

12:39PM   20    Q.  Certainly.  So you had your arrest, and you had your

12:40PM   21    second proffer interview on September 11th of 2019, correct?

12:40PM   22    A.  I -- I I --

12:40PM   23    Q.  You didn't have your arrest on the date, but you had the

12:40PM   24    second proffer interview, September 11th, 2019?

12:40PM   25    A.  On 2019?

| 12:40PM | 1 | Q.  Yes. |

12:40PM  1   Q.  Yes.

12:40PM  2   A.  Yeah, I -- I don't recall.

12:40PM  3   Q.  Okay.  You don't recall talking to the government about

12:40PM  4   how --

12:40PM  5   A.  I recall but I don't --

12:40PM  6          **THE COURT:**  One at a time, guys.  One at a time.

12:40PM  7          **BY MR. SINGER:**

12:40PM  8   Q.  Your start date was a few years back from 2019?

12:40PM  9   A.  I don't recall the date when I did speak to the

12:40PM  10  government.  I remember speaking to them about the start

12:40PM  11  date, but I don't recall the date.

12:40PM  12  Q.  Okay.  And you remember telling them about how it was a

12:40PM  13  few years back from your arrest, correct?

12:40PM  14  A.  Correct.

12:40PM  15  Q.  All right.  And then in your grand jury, kind of similar

12:40PM  16  to trial, is when you first bring up the 2008 date, correct?

12:40PM  17  A.  Correct.

12:40PM  18  Q.  Do you remember talking to the government about grow

12:40PM  19  equipment in your basement, Mr. Selva?

12:40PM  20  A.  Yes.

12:40PM  21  Q.  So they first found, the government, grow equipment in

12:40PM  22  your basement going back to that initial search in August of

12:41PM  23  2019, correct?

12:41PM  24  A.  Correct.

12:41PM  25  Q.  And when agents found that grow equipment, they

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

180

12:41PM  1   confronted you about it, correct?

12:41PM  2   A.  They did.

12:41PM  3   Q.  They talked to you about, you know, when did you start

12:41PM  4   growing marijuana in your basement, correct?

12:41PM  5   A.  Correct.

12:41PM  6   Q.  And you first told the agents that you started to grow

12:41PM  7   marijuana in your basement during the 2009-2010 time period

12:41PM  8   at that interview, correct?

12:41PM  9   A.  Correct.

12:41PM  10  Q.  Then later in the same course of events during that day,

12:41PM  11  you tell the agents you hadn't been involved in growing for,

12:41PM  12  like, six to seven years; do you remember that?

12:41PM  13  A.  Yes.

12:41PM  14  Q.  So we're talking again about the 2012 to 2013 time period

12:41PM  15  where this grow equipment gets installed in your basement?

12:41PM  16  A.  Correct.

12:41PM  17  Q.  All right.  Then in the same interview you went to three

12:41PM  18  to four years ago; do you remember that?

12:41PM  19  A.  Yes.

12:41PM  20  Q.  And so three to four years ago from 2019, you're talking

12:41PM  21  about 2016-2015 time period at that time, right?

12:42PM  22  A.  Correct.

12:42PM  23  Q.  And then you told them in the same interview it was about

12:42PM  24  five years ago; do you remember that?

12:42PM  25  A.  Correct.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

12:42PM   1   Q.  So five years from 2014, we're talking about 2014 and

12:42PM   2   that point, correct?

12:42PM   3   A.  Yes.

12:42PM   4   Q.  So a couple different dates in the same interview, right,

12:42PM   5   sir?

12:42PM   6   A.  Yes.

12:42PM   7   Q.  Then in your 2013 -- sorry, in your third proffer meeting

12:42PM   8   that you have, just before your grand jury testimony, do you

12:42PM   9   remember talking with the government about how your start

12:42PM  10   date with the grow equipment was going back to 2009?

12:42PM  11   A.  Yes.  It was actually 2008-2009 timeframe to 2017 that

12:42PM  12   this operation was going on.  That's what I told them, and

12:42PM  13   that was what happened.

12:42PM  14   Q.  But again, going back.  Do you recall in the third

12:42PM  15   proffer just before your grand jury testimony you told them

12:42PM  16   2009, right?

12:42PM  17   A.  I -- yes.

12:42PM  18   Q.  And then you go into the grand jury two days later, and

12:42PM  19   then that's when you start talking about 2008?

12:42PM  20   A.  I made a mistake.  The timeframe was 2008 to 2017.

12:43PM  21   Q.  But you actually made a mistake about how it was 2013,

12:43PM  22   right?

12:43PM  23   A.  Yes.  It was not --

12:43PM  24   Q.  So, your -- yeah, your initial part of your grand jury

12:43PM  25   testimony, you were talking about 2013, right?

12:43PM    1            **MR. TRIPI:**  Objection.  Now --

12:43PM    2            **THE COURT:**  Yeah.  Yes, yes.  Sustained.

12:43PM    3            **BY MR. SINGER:**

12:43PM    4    Q.  You claim that your involvement in this started in 2008,

12:43PM    5    sir, correct?

12:43PM    6    A.  Correct.

12:43PM    7    Q.  Do you remember testifying before the grand jury?

12:43PM    8    A.  Yes.  I told them 2008.

12:43PM    9    Q.  You told them 2008?

12:43PM   10    A.  That's what I believe, yes.

12:43PM   11            **MR. SINGER:**  Ms. Champoux, can you bring up for the

12:43PM   12    witness and only the witness Government Exhibit 3540 November.

12:43PM   13            If you could advance to page 58, Ms. Champoux.

12:43PM   14            **BY MR. SINGER:**

12:44PM   15    Q.  Do you remember testifying before the grand jury about,

12:44PM   16    "they were, but my residence became involved in 2013"?  Do

12:44PM   17    you remember saying that to the grand jury, sir?

12:44PM   18            **MR. TRIPI:**  Objection.

12:44PM   19            **THE COURT:**  Sustained.  I'm sorry.

12:44PM   20            So if you want to impeach him for this, you need to

12:44PM   21    lay the correct foundation to impeach him if that's what you

12:44PM   22    are trying to do.  If.

12:44PM   23            You're trying to impeach him with a prior

12:44PM   24    inconsistent statement, you can do that, but you need to --

12:44PM   25    you need to lay the foundation.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

183

12:45PM   1          **MR. TRIPI:**  Judge, I don't know if you want to have

12:45PM   2    argument at the bench, but my position is there's nothing

12:45PM   3    inconsistent, so it's improper impeachment.

12:45PM   4          **THE COURT:**  Well, I'm -- that's -- I -- I don't know

12:45PM   5    if there's something inconsistent or not.  I'm saying he needs

12:45PM   6    to lay the foundation.

12:45PM   7          **MR. SINGER:**  Can we approach real quick, Judge?

12:45PM   8          **THE COURT:**  Why don't we take our break now for

12:45PM   9    lunch, and we'll talk about this in your absence.

12:45PM   10         Folks, please remember my instructions, don't talk

12:45PM   11   about this case with anyone including each other.  Don't use

12:45PM   12   tools of technology to research the case or learn anything

12:45PM   13   about the case.  Don't read, or watch, or listen to any news

12:45PM   14   coverage of the case, if there is any, while the trial is in

12:45PM   15   progress.  And don't make up your mind about anything until

12:45PM   16   you start deliberating.

12:45PM   17         We'll come back at 2:00.  Thanks.

12:45PM   18         (Jury excused at 12:45 p.m.)

12:46PM   19         **THE COURT:**  Okay.  Mr. Selva, can you step outside,

12:46PM   20   please?

12:46PM   21         **THE WITNESS:**  Sure.

12:46PM   22         **THE COURT:**  And you're not to talk with anyone during

12:46PM   23   the break about your testimony.  Okay?

12:46PM   24         **THE WITNESS:**  Okay.

12:46PM   25         (Witness excused at 12:46 p.m.)

12:46PM  1      **THE COURT:**  So as I understand it, there's two

12:46PM  2   different types of impeachment going on here.  One is the

12:46PM  3   inconsistency in prior stories, and -- and that's not

12:46PM  4   impeaching with the prior inconsistent statements.

12:46PM  5      In other words, as you brought out on your direct, I

12:46PM  6   think, Mr. Tripi, the -- the story evolved over time.  He

12:46PM  7   didn't give as much information during the first interview, as

12:46PM  8   he did during the second, as he did during the third, as he

12:47PM  9   finally did in the grand jury.

12:47PM  10      **MR. TRIPI:**  Yeah, impeachment by omissions, I agree.

12:47PM  11      **THE COURT:**  That's -- that's -- that's a little

12:47PM  12   different than saying at the grand jury you testified to

12:47PM  13   something different than you're testifying to today.

12:47PM  14      If you want to impeach with that as a prior

12:47PM  15   inconsistent statement, you need to lay the foundation.

12:47PM  16      Did you testify before the grand jury?  Did you take

12:47PM  17   an oath?  And were you asked these questions and did you give

12:47PM  18   these answers?  And then you can lay that out.

12:47PM  19      But -- but it needs to be inconsistent.

12:47PM  20      And I'm not sure whether this is inconsistent with

12:47PM  21   what he's saying today.  Tell me why this is inconsistent.

12:47PM  22      **MR. SINGER:**  So the inconsistency, Judge, is that the

12:47PM  23   trial testimony was the start date was 2008 --

12:47PM  24      **THE COURT:**  Right.

12:47PM  25      **MR. SINGER:** -- for the -- for the grow equipment.

12:47PM    1              **THE COURT:**  Yes.

12:47PM    2              **MR. SINGER:**  For the clone-related stuff.

12:47PM    3              **THE COURT:**  Yes.  Sit -- sit down and talk into the

12:47PM    4     microphone.

12:47PM    5              **MR. SINGER:**  Oh, I'm sorry, Judge.

12:47PM    6              **THE COURT:**  Everybody can sit down.

12:47PM    7              **MR. SINGER:**  Thank you.  I'll take the invitation.

12:47PM    8         So, the -- at least vis-à-vis the cloning equipment,

12:47PM    9     the grow operations started in his basement in 2008, and

12:48PM   10     that's what he's testifying to --

12:48PM   11              **THE COURT:**  Right.

12:48PM   12              **MR. SINGER:**  -- at the -- at the trial.

12:48PM   13         And then also in the grand jury, he eventually gets

12:48PM   14     there, but his first answer is 2013, and then eventually that

12:48PM   15     changes up.

12:48PM   16         And so the difficulty I was having with the witness

12:48PM   17     on this particular point, Judge, is that he was not able to

12:48PM   18     recall what he said regarding the 2013 date.  I'm not going to

12:48PM   19     refresh his recollection because I'm on cross at that point in

12:48PM   20     time.  I'm just going to impeach him with the inconsistency in

12:48PM   21     his grand jury testimony --

12:48PM   22              **THE COURT:**  Well, you can do that.

12:48PM   23              **MR. SINGER:**  -- talking about 2013.

12:48PM   24              **THE COURT:**  Well, fine.

12:48PM   25              **MR. SINGER:**  I -- and I thought I laid the proper

12:48PM    1    foundation.

12:48PM    2              **MR. TRIPI:**  But, Your Honor --

12:48PM    3              **THE COURT:**  No, no.  I think you need to -- I think

12:48PM    4    you need to do it the way you impeach with a prior

12:48PM    5    inconsistent statement; that is, the way I just suggested it.

12:48PM    6    Were you asked these questions and did you give these answers?

12:48PM    7              Then, Mr. Tripi, if you say that that's not

12:48PM    8    inconsistent and that he misunderstood the question or

12:48PM    9    whatever, you can rehabilitate him on redirect with other

12:49PM   10    testimony where he said his grow operation was involved and

12:49PM   11    started in 2008.

12:49PM   12              Go ahead.  Tell me why I'm wrong.

12:49PM   13              **MR. TRIPI:**  No, I -- I understand what you're saying,

12:49PM   14    Your Honor, but -- but I think the initial premise is wrong

12:49PM   15    because to -- to first get the prior inconsistency in, you

12:49PM   16    have to make a threshold determination, I believe, that there

12:49PM   17    is some inconsistency.

12:49PM   18              **THE COURT:**  Right.

12:49PM   19              **MR. TRIPI:**  So what we're looking at here -- and for

12:49PM   20    several pages back, you go back a couple pages, the witness is

12:49PM   21    talking about beginning in 2008 or 2009.  This particular

12:49PM   22    portion, I'm not asking him in grand jury about when the

12:49PM   23    clones were started in his basement.

12:49PM   24              He's talking about in 2013 when they set up the full

12:49PM   25    grow operation in his basement, which is largely consistent

12:49PM  1   in, I think, his trial testimony he might have said 2014, but

12:49PM  2   this is -- this portion is not asking him about the clones

12:49PM  3   in -- in beginning the clones in his basement.  So it's not

12:50PM  4   inconsistent.  It -- it's just apples and oranges at that

12:50PM  5   point.

12:50PM  6        If you -- if he's asking him --

12:50PM  7        **THE COURT:**  So, I -- I -- you're telling me I have to

12:50PM  8   read more of his testimony in order to get what I need to get?

12:50PM  9        **MR. TRIPI:**  I'm not suggesting that you should read

12:50PM  10  the whole thing.

12:50PM  11       **THE COURT:**  Well, I'm -- you're saying -- so he says,

12:50PM  12  my residence came into play around 2013.

12:50PM  13       That seems to me to be inconsistent fundamentally

12:50PM  14  with his saying that his residence got involved in 2008 when

12:50PM  15  he started the clones and everything else.

12:50PM  16       Now, if -- if that's different because the

12:50PM  17  questioning was on a different topic, I understand.  But I --

12:50PM  18  but I don't see that from what I'm looking at right here.

12:50PM  19       **MR. TRIPI:**  I -- I understand what you're saying.  At

12:50PM  20  the time, I was not asking about clones, I was asking about

12:50PM  21  the grow.  That's what this is about.  So, to --

12:50PM  22       **MR. SINGER:**  I'll make this easy, Judge.  If -- if --

12:50PM  23  if that's what's being discussed here and I got it wrong, I'm

12:51PM  24  just going to withdraw the question and move on.

12:51PM  25       **THE COURT:**  Okay.  So why don't you take a look --

12:51PM    1              **MR. SINGER:**  Yeah.

12:51PM    2              **THE COURT:**  And let's come back at -- so let's come

12:51PM    3    back in an hour, at ten minutes before 2, and we'll discuss

12:51PM    4    this then.  Okay?

12:51PM    5              **MR. TRIPI:**  I'll -- I'll take a closer look as well.

12:51PM    6              **THE COURT:**  I just -- I want people to understand

12:51PM    7    the -- and maybe I don't understand the evidence rules and --

12:51PM    8    and I'm doing this wrong.

12:51PM    9              **MR. SINGER:**  No, I think you --

12:51PM   10              **THE COURT:**  No, I'm -- I'm not -- I'm not being

12:51PM   11    facetious, I'm being serious.  But what I will allow

12:51PM   12    Mr. Singer to cross-examine about inconsistencies in the prior

12:51PM   13    story as it evolved without laying the same foundation --

12:51PM   14              Mr. Tripi, I want you to understand where I'm coming

12:51PM   15    from.

12:51PM   16              -- without laying the same foundation as an

12:51PM   17    inconsistency in a prior statement with what he's testifying

12:51PM   18    to today.  That's a -- that's a fundamentally different way of

12:51PM   19    cross-examining, I think --

12:51PM   20              **MR. TRIPI:**  Judge, I think you're right.  I think you

12:51PM   21    were picking up on the technique he was using quicker than I

12:51PM   22    was in that situation.  I agree with you.

12:52PM   23              **THE COURT:**  Okay.  Great.  Good.  You don't have to

12:52PM   24    agree with me, but thank you.

12:52PM   25              **MR. TRIPI:**  Nope.

12:52PM   1           THE COURT:  And we'll see you folks in about an hour.

12:52PM   2    Thank you.

12:52PM   3           MR. TRIPI:  Thank you.

12:52PM   4           MR. SINGER:  Thank you.

12:52PM   5           (Off the record at 12:52 p.m.)

01:54PM   6           (Back on the record at 1:54 p.m.)

01:54PM   7           (Jury not present.)

01:54PM   8           THE CLERK:  All rise.

01:54PM   9           THE COURT:  Please be seated.

01:54PM  10           THE CLERK:  We are back on the record for the

01:54PM  11    continuation of the jury trial in United States of America

01:54PM  12    versus Joseph Bongiovanni, 19-cr-227.

01:55PM  13           All counsel and parties are present.

01:55PM  14           THE COURT:  Okay.  Mr. Singer?

01:55PM  15           MR. SINGER:  I had a chance to take a look at that

01:55PM  16    portion of the grand jury transcript.  I told Mr. Tripi, I'm

01:55PM  17    just going to withdraw that question, Judge, because his

01:55PM  18    recollection of it is the correct version.  It was about the

01:55PM  19    cloning, not the -- I'm sorry, it was about the grow of the

01:55PM  20    marijuana, not the cloning, so --

01:55PM  21           THE COURT:  Okay.  Does anybody want to argue what I

01:55PM  22    said about the rulings on the two different types of

01:55PM  23    cross-examination that Mr. Singer was trying to do?

01:55PM  24           MR. TRIPI:  No, Your Honor.  On reflection, like I

01:55PM  25    said before the break, I think the Court was correctly

01:55PM     1    assessing the cross-examination, so I'm good.

01:55PM     2            **THE COURT:**  Okay.  Great.  Good.  Okay.

01:55PM     3            So I don't think the jury's back yet, since we gave

01:55PM     4    them five minutes, so we're early.  How's everybody doing?

01:55PM     5            **MR. TRIPI:**  Doing great.

01:56PM     6            **THE COURT:**  How long do you think you're going to be,

01:56PM     7    Mr. Singer?  The rest of the afternoon?

01:56PM     8            **MR. SINGER:**  I'll probably be two hours, Judge.  We

01:56PM     9    talked about it at the break.  We have one witness on standby

01:56PM    10    in case there's something to fill.

01:56PM    11            **THE COURT:**  Okay.

01:56PM    12            **MR. COOPER:**  We have two witnesses on standby as

01:56PM    13    we're overly optimistic, but I -- I talked with Mr. Singer,

01:56PM    14    and he was kind enough to give us an estimate, and I think if

01:56PM    15    anything we'll get to Mr. Anzalone and maybe just his direct

01:56PM    16    today, maybe the whole thing.  Who knows.

01:56PM    17            **THE COURT:**  Okay.  We'll move as quickly as we can.

01:56PM    18    That's all we can do.

01:57PM    19            **MR. SINGER:**  But I think, like we were talking about

01:57PM    20    yesterday, once we get through Mr. Selva, I mean, we're going

01:57PM    21    to start to pick --

01:57PM    22            **THE COURT:**  Pick up quickly.

01:57PM    23            **MR. SINGER:**  -- up the pace, yes.

01:57PM    24            **THE COURT:**  I hope so.

01:57PM    25            **MR. COOPER:**  Keep it moving.

01:57PM   1          **MR. TRIPI:**  We are.  Yeah, the plan is a lot of

01:57PM   2   shorter witnesses for next -- the beginning of next week, at

01:57PM   3   least give us the perception of progress.  You know, so --

01:57PM   4          **THE COURT:**  Yeah, I know.  So the week of the 16th, I

01:57PM   5   know we have a juror with some issues.

01:57PM   6          **THE CLERK:**  We're waiting for one juror, still on 2.

01:57PM   7          **THE COURT:**  Okay.  That's fine.

01:57PM   8          (Off the record at 1:57 p.m.)

01:57PM   9          (Back on the record at 2:02 p.m.)

02:02PM   10         (Jury not present.)

02:02PM   11         **THE COURT:**  All here?

02:02PM   12         **OFFICER DANAHEY:**  All here.

02:02PM   13         **THE COURT:**  Ready to go?

02:02PM   14         **MR. TRIPI:**  Yes.

02:02PM   15         **MR. SINGER:**  Yes.

02:02PM   16         **THE COURT:**  So let's get the witness back in.

02:02PM   17         Let's being the jury back in first, Joe.  Thank you.

02:02PM   18         (Witness and jury seated at 2:02 p.m.)

02:03PM   19         **THE COURT:**  The record will reflect that all our

02:03PM   20   jurors are present.

02:03PM   21         I will remind the witness that he's still under oath.

02:03PM   22         Mr. Singer, you may continue.

02:03PM   23         **MR. SINGER:**  Thank you.

02:03PM   24         **BY MR. SINGER:**

02:03PM   25   Q.  Welcome back, Mr. Selva.

02:03PM  1   A.  Thank you.

02:03PM  2   Q.  So we left off talking about what was happening back at

02:04PM  3   the house with regards to the grow equipment, so I want to

02:04PM  4   move on to a different subject then.  And one of the things

02:04PM  5   you testified about as well at this trial was that at some

02:04PM  6   point in time, you alleged that Mr. Bongiovanni smelled

02:04PM  7   marijuana growing in your basement; do you remember that

02:04PM  8   testimony on that?

02:04PM  9   A.  Yes.

02:04PM  10  Q.  So you testified, when was it that Mr. Bongiovanni

02:04PM  11  smelled that, according to your memory?

02:04PM  12  A.  He stopped over in 2014, '15, that timeframe.

02:04PM  13  Q.  Okay.  So 2014-2015 is --

02:04PM  14  A.  Yes.

02:04PM  15  Q.  -- when you think that occurred?

02:04PM  16  A.  Yes.

02:04PM  17  Q.  Okay.  And you weren't consistent with that statement

02:04PM  18  during your course of time speaking with investigators,

02:04PM  19  right?

02:04PM  20  A.  Not that I recall.

02:04PM  21  Q.  Yeah.  So do you remember back at your first proffer

02:04PM  22  meeting how you talked about how Mr. Bongiovanni -- I'm

02:04PM  23  sorry.

02:04PM  24      Do you remember back at your first proffer meeting back

02:04PM  25  in August of 2019 about how you alleged that Mr. Bongiovanni

02:05PM    1    smelled this in 2016; do you remember saying that to

02:05PM    2    investigators?

02:05PM    3    A.   Yes.

02:05PM    4    Q.   Yes.  And then the second proffer interview, something

02:05PM    5    that moves to 2014, to your memory, correct?

02:05PM    6    A.   Correct.

02:05PM    7    Q.   And then when you go into the grand jury, you talk about

02:05PM    8    2014, right?

02:05PM    9    A.   Correct.

02:05PM   10    Q.   But you also mentioned that it could be 2015, correct?

02:05PM   11    A.   Correct.  It was within that -- those time frames, he

02:05PM   12    stopped over, and it was in my house and it could be smelled.

02:05PM   13    Q.   So you'd agree with me that, you know, again, we're

02:05PM   14    talking about different dates, different times you talked to

02:05PM   15    investigators and juries about this, right?

02:05PM   16    A.   Correct.

02:05PM   17    Q.   So different times you talked to investigators or other

02:05PM   18    people about this, the times changed, correct?

02:05PM   19    A.   It didn't change.  It was consistent.  I mean, between

02:05PM   20    that that timeframe of 2014, '16, '17, I -- I don't remember

02:05PM   21    exactly what date, but it was within what timeframe.

02:05PM   22    Q.   Okay.  So within that four-year timeframe you're alleging

02:05PM   23    this occurred?

02:05PM   24    A.   Yes.

02:05PM   25    Q.   All right.  So I want to get into a little bit about your

02:06PM    1    testimony regarding the bribe amounts.

02:06PM    2        So you testified that the initial bribe payments that you

02:06PM    3    allege were made here started at a $2,000 a month figure,

02:06PM    4    correct?

02:06PM    5    A.  Correct.

02:06PM    6    Q.  And then eventually, that was increased to $4,000 a

02:06PM    7    month, correct?

02:06PM    8    A.  Correct.

02:06PM    9    Q.  So I want to get into a little bit of the sequence of

02:06PM   10    events.  You talked in your testimony to the jury about how

02:06PM   11    sequentially the -- the $2,000 figure came up, because that's

02:06PM   12    the initial figure that you proposed to Mr. Bongiovanni,

02:06PM   13    right?

02:06PM   14    A.  Correct.

02:06PM   15    Q.  And that initial proposal was made by you and eventually

02:06PM   16    accepted by him, correct?

02:06PM   17    A.  Correct.

02:06PM   18    Q.  And then later on, how long ago -- how -- how -- how far

02:06PM   19    into the bribe payments did things change regarding $4,000?

02:06PM   20    A.  As their operation expanded, it went up.

02:06PM   21    Q.  Yeah.  And I guess what I'm getting at is what's the

02:06PM   22    timeframe on that?

02:07PM   23    A.  Between 2012, '11.  2011, '12, that timeframe, all of the

02:07PM   24    way to the end at 2017.

02:07PM   25    Q.  So this is something that you allege began in 2008,

02:07PM    1    right?

02:07PM    2    A.    Yes.

02:07PM    3    Q.    Payments increased sometimes in 2012, 2011 time period?

02:07PM    4    A.    2011, '12.  Right around that timeframe.  It was a

02:07PM    5    three-year timeframe, and then it went up --

02:07PM    6    Q.    Okay.  So it was three years the 2,000 figure -- sorry --

02:07PM    7    so it was -- sorry --

02:07PM    8    A.    And then it increased.

02:07PM    9            **MR. SINGER:**  Sorry about that, Ann.

02:07PM    10           **THE WITNESS:**  Sorry.

02:07PM    11           **BY MR. SINGER:**

02:07PM    12   Q.    So -- so, then after that three-year time period,

02:07PM    13   roughly, then it increased to $4,000, correct?

02:07PM    14   A.    That's correct.

02:07PM    15   Q.    Okay.  So with regard to that, so, you remember talking

02:07PM    16   about -- with investigators in your first proffer meeting

02:08PM    17   that there was an initial rejection of the $2,000 figure,

02:08PM    18   correct?

02:08PM    19   A.    Correct.

02:08PM    20   Q.    And do you remember talking to them about, when this was

02:08PM    21   rejected initially, you went back to Mike Masecchia and Ron

02:08PM    22   Serio to say, look, he needs more money, and then there was a

02:08PM    23   proposal to make it $4,000 a month, correct?

02:08PM    24   A.    That was later on, yes.

02:08PM    25   Q.    Well, what I'm talking about is in your first proffer

02:08PM   1    interview with the government, sir.  All right?

02:08PM   2    A.  Yes.

02:08PM   3    Q.  So in the first proffer interview, you talked about a

02:08PM   4    $2,000 figure being offered, correct?

02:08PM   5    A.  Right, correct.

02:08PM   6    Q.  And you talked about that $2,000 figure being rejected by

02:08PM   7    Mr. Bongiovanni, correct?

02:08PM   8    A.  Correct.

02:08PM   9    Q.  And then you talked about going back to Mike Masecchia

02:08PM   10   and Ron Serio about the rejected offer, and then asking them

02:08PM   11   to propose more per month, correct?

02:08PM   12   A.  Not right away, no.

02:08PM   13   Q.  Not right away?

02:08PM   14   A.  No, no.

02:08PM   15   Q.  You don't remember talking to investigators about that?

02:08PM   16   A.  I told them I'd have to talk to him, he didn't feel

02:08PM   17   comfortable, he rejected it, and I went back, and then

02:08PM   18   eventually it was receptive.

02:08PM   19   Q.  So, do you recall in your second proffer interview also

02:09PM   20   talking to the government about a $2,000 offer to

02:09PM   21   Mr. Bongiovanni?

02:09PM   22   A.  Yes.

02:09PM   23   Q.  And do you recall about that initial offer being

02:09PM   24   rejected?

02:09PM   25   A.  It was, because he did not feel comfortable.

02:09PM    1      I told you, guarding his career, he did not feel

02:09PM    2  comfortable doing it.

02:09PM    3  Q.  And do you recall talking to investigators after that

02:09PM    4  proffer interview about how Mr. Masecchia, after the

02:09PM    5  rejection, directs you to offer $4,000 to Mr. Bongiovanni?

02:09PM    6  A.  That was later on that that was accepted, yes.

02:09PM    7  Q.  Let's see if we can refresh your recollection on that

02:09PM    8  point, sir.

02:09PM    9          **MR. SINGER:**  Ms. Champoux, can you bring up for the

02:09PM   10  witness and only the witness Government Exhibit 3540I, as in

02:09PM   11  India.

02:09PM   12          And if you can turn to page 4 of the document,

02:09PM   13  Ms. Champoux.

02:09PM   14          **BY MR. SINGER:**

02:09PM   15  Q.  I'll direct your attention to these top bullets.

02:09PM   16      If you can read through that, sir, to see if that

02:09PM   17  refreshes your memory about what you told government

02:10PM   18  investigators back in your second proffer.

02:10PM   19  A.  Okay.

02:10PM   20  Q.  So did you have an opportunity to review that document,

02:10PM   21  sir?

02:10PM   22  A.  Yes.

02:10PM   23  Q.  Does that refresh your memory about telling investigators

02:10PM   24  in your second proffer interview that the increased figure

02:10PM   25  was from 2,000 to 4,000 before it was agreed to?

02:10PM   1    A.  Yes.

02:10PM   2    Q.  And --

02:10PM   3         MR. SINGER:  You can take that down, Ms. Champoux.

02:10PM   4    Thank you.

02:10PM   5         BY MR. SINGER:

02:10PM   6    Q.  And the reason why you say that Mr. Bongiovanni agreed to

02:11PM   7    this in your second proffer was that he agreed that the

02:11PM   8    $4,000 was a fair price, right?

02:11PM   9    A.  Correct.

02:11PM   10   Q.  So in this particular meeting, what you're saying is that

02:11PM   11   the $4,000 figure didn't happen later on, but happened right

02:11PM   12   away, correct?

02:11PM   13   A.  Right now?

02:11PM   14   Q.  I'm talking about in that second proffer meeting that we

02:11PM   15   were just talking about.  That second proffer meeting you

02:11PM   16   told investigators that the $4,000 figure happened off the

02:11PM   17   bat, correct?

02:11PM   18   A.  It happened at -- after the original offer of 2,000,

02:11PM   19   that's when it happened.  It went to 4,000.

02:11PM   20   Q.  But that's not what you told investigators back in your

02:11PM   21   second proffer interview, correct?

02:11PM   22   A.  Correct.  But it did increase.

02:11PM   23   Q.  Okay.  So, again, just focusing on the second proffer.

02:11PM   24   A.  Okay.

02:11PM   25   Q.  Can you do that?

02:11PM  1    A.  Yes.

02:11PM  2    Q.  What you told investigators was that you proposed 2,000,

02:11PM  3    right?

02:11PM  4    A.  Correct.

02:11PM  5    Q.  Mr. Bongiovanni rejected 2,000, correct?

02:11PM  6    A.  Correct.

02:11PM  7    Q.  You then told investigators you went back to Masecchia

02:11PM  8    and Serio to ask for more money, correct?

02:11PM  9    A.  Correct.

02:12PM  10   Q.  They offered $4,000, correct?

02:12PM  11   A.  Correct.

02:12PM  12   Q.  You made that offer to Mr. Bongiovanni?

02:12PM  13   A.  Correct.

02:12PM  14   Q.  And then he agreed to that as a fair price?

02:12PM  15   A.  Correct.

02:12PM  16   Q.  And that was from the beginning, correct?

02:12PM  17   A.  No, not from the beginning.

02:12PM  18   Q.  That's what you told investigators back in the second

02:12PM  19   proffer interview, right, sir?

02:12PM  20   A.  Yes.

02:12PM  21   Q.  Okay.  Thank you.

02:12PM  22       So, then in the third proffer interview that you had, you

02:12PM  23   told the same thing to the investigators, the 2,000 at first

02:12PM  24   that was rejected, and the $4,000 was eventually accepted,

02:12PM  25   right?

02:12PM    1    A.   Yes.

02:12PM    2    Q.   And then you go into the grand jury, correct?

02:12PM    3    A.   Correct.

02:12PM    4    Q.   And inside the grand jury, you actually add something new

02:12PM    5    for the first time; do you remember that?

02:12PM    6         **MR. TRIPI:**  Objection as to --

02:12PM    7         **THE WITNESS:**  I don't recall.

02:12PM    8         **MR. TRIPI:**  -- form.

02:12PM    9         **THE COURT:**  Yeah, sustained.

02:12PM   10         **MR. SINGER:**  Okay.  I'll rephrase, Judge.  I will

02:12PM   11    withdraw.

02:12PM   12         **BY MR. SINGER:**

02:12PM   13    Q.   Do you recall in your grand jury testimony talking about

02:12PM   14    how at first you approached Mr. Bongiovanni and asked him

02:13PM   15    whether or not he'd be willing to do this for free?  To

02:13PM   16    provide information and protection to you and others based on

02:13PM   17    your relationship alone?

02:13PM   18    A.   In the beginning, yes.

02:13PM   19    Q.   So, you talked about how you wanted Mr. Bongiovanni's

02:13PM   20    help, but there was no money offer proposed the first time,

02:13PM   21    right?

02:13PM   22    A.   The first part, the beginning.

02:13PM   23    Q.   Okay.  So that's a change in the sequence; you'd agree

02:13PM   24    with me on that, correct?

02:13PM   25    A.   Correct.

02:13PM  1   Q.  And then you testified about how Mr. Bongiovanni rejected

02:13PM  2   that, and it caused some problems between the two of you,

02:13PM  3   right?

02:13PM  4   A.  Correct.

02:13PM  5   Q.  You guys didn't talk for a few months after that?

02:13PM  6   A.  Not a few months, a few weeks.  A little -- little time

02:13PM  7   went by.

02:13PM  8   Q.  A few weeks?

02:13PM  9   A.  A little time went by.

02:13PM  10  Q.  A little time when by?

02:13PM  11  A.  Yes.

02:13PM  12  Q.  And then after that period of time, you say that

02:13PM  13  Masecchia asked you, hey, can you go back to Joe with a

02:13PM  14  $2,000 a month figure, correct?

02:13PM  15  A.  He had talked it over with Ron, yes.

02:13PM  16  Q.  And that's something that you claim that you eventually

02:13PM  17  did go back and propose to Mr. Bongiovanni, correct?

02:14PM  18  A.  Correct.

02:14PM  19  Q.  But that was four to six months, based on what you told

02:14PM  20  the grand jury, after this initial conversation, right?

02:14PM  21  A.  I believe so, correct.

02:14PM  22  Q.  So there's a period of time that intervenes, correct?

02:14PM  23  A.  Yes.

02:14PM  24  Q.  And I think you talked about it yesterday on direct

02:14PM  25  examination.  The proposal here was linked up with the grow

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

202

02:14PM    1    season, right?

02:14PM    2    A.  In the beginning, yes.

02:14PM    3    Q.  So you initially proposed this offer at the beginning of

02:14PM    4    the grow season, right?

02:14PM    5    A.  Correct.

02:14PM    6    Q.  And based on what you told the grand jury, four to six

02:14PM    7    months later, that's at the end of the grow season, right?

02:14PM    8    A.  Correct.

02:14PM    9    Q.  Okay.

02:14PM   10    A.  But it was still going on.  There were still other things

02:14PM   11    happening.

02:14PM   12    Q.  And you'd agree with me that -- that when you testified

02:14PM   13    yesterday about how you made an initial offer to

02:14PM   14    Mr. Bongiovanni that was rejected, and then went back to him

02:14PM   15    a week or so later --

02:14PM   16    A.  That's correct.

02:14PM   17    Q.  -- that would be different than what you told the grand

02:14PM   18    jury back in 2019, correct?

02:14PM   19    A.  Correct.

02:14PM   20    Q.  So in the grand jury, there's also a change regarding the

02:15PM   21    sequence based on what the figure was started at, correct?

02:15PM   22    A.  I don't recall, but I just remember proposing the $2,000.

02:15PM   23    Q.  Sure.  So --

02:15PM   24    A.  Originally it was just to watch out for me, and then it

02:15PM   25    increased.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

203

02:15PM   1   Q.   Yeah.   So we talked about your proffer interviews where

02:15PM   2   you said that the -- the initial starting figure was $4,000;

02:15PM   3   do you remember that?

02:15PM   4   A.   Yes.

02:15PM   5   Q.   But in the grand jury, you changed that to the first

02:15PM   6   proposal of 2,000 was accepted, right?

02:15PM   7   A.   Correct, for that timeframe.   Yes.

02:15PM   8   Q.   And then there was a time period where $2,000 was in

02:15PM   9   place, correct?

02:15PM   10   A.   It was -- it was increased, correct.

02:15PM   11   Q.   And then after roughly a three-year period, it was

02:15PM   12   increased to $4,000, correct?

02:15PM   13   A.   That's correct.

02:15PM   14   Q.   So that's different than what you told investigators in

02:15PM   15   your proffers, correct?

02:15PM   16   A.   Well, I -- I don't recall what I told the -- I told them

02:16PM   17   that timeframe.   I told them the amount, and when it did

02:16PM   18   increase.

02:16PM   19   Q.   Yes.

02:16PM   20   A.   That's what I remember.

02:16PM   21   Q.   Yes.   And you told them that it was $4,000 to start in

02:16PM   22   the beginning of your proffers, correct?

02:16PM   23   A.   Correct.

02:16PM   24   Q.   But in the grand jury, you changed that it was $2,000.

02:16PM   25   A.   Because that went back to 2008.   Correct.

02:16PM    1    Q.   Okay.  So, with regard to the reason for the increase,

02:16PM    2    the reason for the increase was predicated on Mr. Serio's

02:16PM    3    desire for greater protection, correct?

02:16PM    4    A.   Correct.  He was expanding, and he was doing different

02:16PM    5    things, correct.

02:16PM    6    Q.   And Mr. Serio was concerned about the expansion of his

02:16PM    7    operations would expose him to greater scrutiny by

02:16PM    8    investigators?

02:16PM    9    A.   Correct.

02:16PM    10   Q.   And the reason why the $4,000 figure was proposed was

02:16PM    11   because he wanted Mr. Bongiovanni to do more than what he

02:16PM    12   currently was doing, correct?

02:16PM    13   A.   Correct.  They were asking more, correct.

02:17PM    14   Q.   So, it was not because Mr. Bongiovanni said, hey, Joe --

02:17PM    15   sorry, hey, Lou, I need extra money, right?

02:17PM    16   A.   No.  It was because their -- again, like I just

02:17PM    17   mentioned, their operation was expanding.  And he had

02:17PM    18   obligations, and there was more to be asked for him.

02:17PM    19        So they said, propose an offer of $4,000, because we're

02:17PM    20   asking more.

02:17PM    21   Q.   So yesterday you testified on direct that one of the

02:17PM    22   reasons why the figure was increased was because Joe

02:17PM    23   allegedly went up to you and said, hey, I need more money,

02:17PM    24   this is not working out; do you remember testifying to that

02:17PM    25   yesterday?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24
205

02:17PM  1    A.   Yes.  Yes.  His expenses were increasing, the operation

02:17PM  2    was expanding, so it only made sense.  He was -- if we're

02:17PM  3    gonna ask more, we're gonna pay more.  But his situation was

02:17PM  4    changing, too.

02:17PM  5    Q.   But you just recall testifying, sir, that the impetus for

02:17PM  6    this increase was not based on anything that he allegedly

02:17PM  7    said, it was what Ron Serio wanted, correct?

02:18PM  8    A.   That was the proposal, yes.

02:18PM  9    Q.   Yeah.  Ron Serio proposed the 4,000, because he wanted

02:18PM  10   greater protection, right?

02:18PM  11   A.   Because it was expanding, yes.

02:18PM  12   Q.   And that's why you brought back the $4,000 figure to

02:18PM  13   Mr. Bongiovanni?

02:18PM  14   A.   Yes.  And his expenses were increasing, he was under

02:18PM  15   stress, he would express to me different things regarding his

02:18PM  16   expenses.  And I said, this can help.  This would be a way to

02:18PM  17   help achieve that.

02:18PM  18   Q.   So you're saying it was both now?

02:18PM  19   A.   It was.  It was both.  I mean, I got the offer because

02:18PM  20   their operation was expanding, and at the same time, his

02:18PM  21   expenses were expanding.  So it kind of coincided with one

02:18PM  22   another.

02:18PM  23   Q.   Okay.  We talked a little bit about that initial proposal

02:18PM  24   that you had made in your -- as you testified in the grand

02:18PM  25   jury, that you went up to Mr. Bongiovanni just as a friend

02:18PM  1   and say, hey, are you willing to help me out, are you willing

02:19PM  2   to protect me, right?

02:19PM  3   A.   Watch my back, yes.

02:19PM  4   Q.   Yep.  And that was without any type of monetary offer

02:19PM  5   attached, correct?

02:19PM  6   A.   In the beginning, yes.

02:19PM  7   Q.   But you didn't mention that yesterday, right?

02:19PM  8   A.   No, it was in the beginning.  It was in an initial

02:19PM  9   conversation.

02:19PM  10  Q.   Yeah.  Yesterday you testified that Mr. Bongiovanni

02:19PM  11  rejected your initial offer, right?

02:19PM  12  A.   He did, yes.

02:19PM  13  Q.   And but then he said something to the effect of don't

02:19PM  14  worry, Lou, I got your back, right?

02:19PM  15  A.   That's what he said, yes.

02:19PM  16  Q.   But that's not in the context of the conversation that

02:19PM  17  you proposed to the grand jury back in 2019, right?

02:19PM  18  A.   I don't recall what I said then.

02:19PM  19  Q.   Well, you told them, we just went through it.  You told

02:19PM  20  the --

02:19PM  21          **MR. TRIPI:**  Objection, improper impeachment.

02:19PM  22          **THE COURT:**  Yeah, that's -- that's sustained.

02:19PM  23          You can go back and do it, Mr. Singer.

02:19PM  24          **MR. SINGER:**  I know, Judge, but I think at this

02:19PM  25  point --

02:19PM    1           **THE COURT:**  But you can --

02:19PM    2           **MR. SINGER:**  -- we don't need to --

02:19PM    3           **THE COURT:** -- you can use the transcript, go ahead.

02:20PM    4           **BY MR. SINGER:**

02:20PM    5    Q.  So, with regard to Mr. Bongiovanni's request that he made

02:20PM    6    to you that Mr. Serio should -- should give up a grow house;

02:20PM    7    do you remember talking about that on -- on your testimony?

02:20PM    8    A.  Yes.

02:20PM    9    Q.  And you testified about how this was something that

02:20PM   10    Mr. Bongiovanni felt might -- might help him in some ways?

02:20PM   11    A.  Yes.

02:20PM   12    Q.  And perhaps might help Mr. Serio in some ways, correct?

02:21PM   13    A.  Yes, through -- well, more Mr. Bongiovanni.

02:21PM   14    Q.  And you brought back this proposal from Mr. Bongiovanni

02:21PM   15    to Mr. Serio and Mr. Masecchia, correct?

02:21PM   16    A.  Correct.

02:21PM   17    Q.  And this was a particular meeting that you had with Mike

02:21PM   18    Masecchia and Ron Serio at The Western Door where you

02:21PM   19    discussed this, correct?

02:21PM   20    A.  Correct.

02:21PM   21    Q.  And you testified that that meeting occurred sometime in

02:21PM   22    2010 to 2011, right?

02:21PM   23           **MR. TRIPI:**  Objection.

02:21PM   24           **THE WITNESS:**  2011, I --

02:21PM   25           **MR. TRIPI:**  Objection.

| | | |
|---|---|---|
| 02:21PM | 1 | **THE COURT:**  Hang on. |
| 02:21PM | 2 | What's the objection? |
| 02:21PM | 3 | **MR. TRIPI:**  There was no testimony as to the |
| 02:21PM | 4 | timeframe yesterday, so I don't -- I don't know where we are |
| 02:21PM | 5 | back in time. |
| 02:21PM | 6 | **THE COURT:**  Overruled. |
| 02:21PM | 7 | **THE WITNESS:**  The timeframe? |
| 02:21PM | 8 | **BY MR. SINGER:** |
| 02:21PM | 9 | Q.  Yes. |
| 02:21PM | 10 | A.  It was -- it wasn't 2011, it was later than that.  It was |
| 02:21PM | 11 | 2014, '15. |
| 02:21PM | 12 | Q.  It was 2014 that -- |
| | 13 | A.  '15. |
| | 14 | Q.  -- you claim -- |
| | 15 | A.  Around there -- |
| | 16 | (Simultaneous talking.) |
| | 17 | **BY MR. SINGER:** |
| 02:21PM | 18 | Q.  It was 2014 that you claim that this meeting at The |
| 02:21PM | 19 | Western Door happened? |
| 02:22PM | 20 | A.  That timeframe, yes.  It was 2000 -- maybe it -- I may be |
| 02:22PM | 21 | wrong.  It was 2000 -- while it was going on, 2012, 2015, |
| 02:22PM | 22 | between that and maybe 2014.  I don't recall the exact date. |
| 02:22PM | 23 | Q.  Do you recall testifying at a prior hearing in this |
| 02:22PM | 24 | matter back in February of 2024? |
| 02:22PM | 25 | A.  I do. |

02:22PM  1   Q.  And you testified under oath at that proceeding, correct?

02:22PM  2   A.  Yes.

02:22PM  3   Q.  And you swore to tell the truth at that proceeding,

02:22PM  4   correct?

02:22PM  5   A.  Yes.

02:22PM  6   Q.  And you testified to the best of your ability, correct?

02:22PM  7   A.  Correct.

02:22PM  8        MR. SINGER:  Ms. Champoux, would you mind bringing up

02:22PM  9   for the witness and the witness only Government Exhibit

02:22PM  10  3540AH, alpha hotel?

02:22PM  11       And if you can please turn to page 262 of the

02:22PM  12  document.

02:22PM  13       BY MR. SINGER:

02:22PM  14  Q.  Do you also recall, Mr. Selva, linking up this

02:23PM  15  conversation that you had regarding the need for a bust with

02:23PM  16  an increase in the payment for Mr. Bongiovanni regarding his

02:23PM  17  compensation, correct?

02:23PM  18  A.  Correct.  Right.

02:23PM  19  Q.  And do you remember providing the following answers to

02:23PM  20  the following questions?

02:23PM  21     Question:  --

02:23PM  22       THE COURT:  What line?

02:23PM  23       MR. SINGER:  Line 6, Judge.

02:23PM  24       BY MR. SINGER:

02:23PM  25  Q.  "Now there was a meeting at The Western Door.  Do you

02:23PM   1  remember you were asked questions about that?"

02:23PM   2  A.  Yes.

02:23PM   3  Q.  "Answer:  Yes."

02:23PM   4  A.  Yes.

02:23PM   5          **THE COURT:**  Let him ask the question.

02:23PM   6          **THE WITNESS:**  I'm sorry.

02:23PM   7          **BY MR. SINGER:**

02:23PM   8  Q.  "Question:  I think on cross you stated that meeting was

02:23PM   9  a different meeting though; is that right?

02:23PM  10     "Answer:  But it was still regarding the operation.

02:23PM  11     "Question:  Okay.  Regarding the operation, but not the

02:23PM  12  original negotiation?

02:23PM  13     "Answer:  Correct.

02:23PM  14     "Question:  What was the meeting at The Western Door

02:23PM  15  about?  Tell the jury.

02:23PM  16     "Answer:  The meeting at The Western Door was to talk

02:23PM  17  about a proposal, they wanted to make $4,000.

02:23PM  18     "Question:  Was there information about a bust that was

02:24PM  19  discussed there, giving a bust -- giving Joe a bust?

02:24PM  20     "Answer:  Yes.

02:24PM  21     "Question:  Describe that conversation.

02:24PM  22     "Answer:  Ron had mentioned that he can feed information

02:24PM  23  for Joe through Mike or myself that something was going on to

02:24PM  24  kind of deteriorate things a little bit."

02:24PM  25          **MR. SINGER:**  Ms. Champoux, can you turn to the next

02:24PM  1    page, please.  To 263, thank you.

02:24PM  2              BY MR. SINGER:

02:24PM  3    Q.  "Question:  Did the defendant ask you anything about

02:24PM  4    helping him out?

02:24PM  5        "Answer:  Helping?  Yes, he did.

02:24PM  6        "Question:  What did the defendant ask you?

02:24PM  7        "Answer:  He asked me if Ron could provide someone that

02:24PM  8    he knows that is of a less significance to help push the

02:24PM  9    trail off a little bit, so to speak.  Give him a bust, give

02:24PM  10   him something.

02:24PM  11       "Question:  Ultimately, that was not agreed to, correct?

02:24PM  12       "Answer:  Correct.  It was not.

02:24PM  13       "Question:  Was that discussed in the meeting at The

02:24PM  14   Western Door as far as you recall it?

02:24PM  15       "Answer:  As far as I recall, yes."

02:24PM  16             MR. SINGER:  You can bring that down, Ms. Champoux.

02:25PM  17             BY MR. SINGER:

02:25PM  18   Q.  So that meeting about the $4,000, that goes back to the

02:25PM  19   2011 --

02:25PM  20             MR. TRIPI:  Objection.

02:25PM  21             BY MR. SINGER:

02:25PM  22   Q.  -- 2012 period, correct?

02:25PM  23             THE COURT:  Yes.

02:25PM  24             MR. TRIPI:  Objection.

02:25PM  25             THE COURT:  Sustained.

02:25PM    1          **MR. TRIPI:**  That was consistent with his testimony,

02:25PM    2    and there wasn't a timeframe, Your Honor.

02:25PM    3          **THE COURT:**  And he wasn't asked a question about that

02:25PM    4    testimony that you read.  You didn't ask him if he was asked

02:25PM    5    those questions and did you give those answers, and I'm --

02:25PM    6          Why don't you come up?

02:25PM    7          **MR. SINGER:**  Judge --

02:25PM    8          (Sidebar discussion held on the record.)

02:25PM    9          **THE COURT:**  What's the inconsistency?

02:25PM   10          **MR. SINGER:**  So the issue is that he's -- he's

02:25PM   11    claiming that this conversation occurred in 2014.

02:25PM   12          The conversation, based on his testimony previously,

02:25PM   13    occurred at an earlier date, which was this Western Door

02:25PM   14    conversation, which occurred before that time.

02:25PM   15          **THE COURT:**  How do you know that?

02:25PM   16          **MR. TRIPI:**  Your Honor --

02:25PM   17          **MR. SINGER:**  Because -- because it's linked up with

02:25PM   18    the $4,000 payment.

02:25PM   19          The $4,000 proposal is something that they discussed

02:25PM   20    back in the 2011, '12 time period that Mr. Selva has

02:25PM   21    consistently testified about.  Not in 2014, as he just

02:26PM   22    testified earlier.

02:26PM   23          So I'm trying to establish the fact that he testified

02:26PM   24    that this conversation about the bust is linked to the

02:26PM   25    conversation about the $4,000 increase, and as a result, it

02:26PM   1   happened at an earlier time period than he's testifying here

02:26PM   2   today in court.

02:26PM   3          **THE COURT:**  Okay.  I get that.  But I'm not so sure

02:26PM   4   that -- that what you just read was impeachment because

02:26PM   5   there's nothing about anything that he said there --

02:26PM   6          I mean, I think you can ask him "so, The Western Door

02:26PM   7   meeting was when the $4,000 was brought up."

02:26PM   8          **MR. SINGER:**  Yeah, that's the basic fact I'm trying

02:26PM   9   to establish.

02:26PM  10          **THE COURT:**  And The Western Door meeting happened

02:26PM  11   when?

02:26PM  12          **MR. SINGER:**  According to his testimony, it happened

02:26PM  13   sometime in the 2011 or 2012 time period.

02:26PM  14          **MR. TRIPI:**  That's the problem with the -- the page

02:26PM  15   that was shown, there's no timeframe in that.

02:26PM  16          **THE COURT:**  Right.

02:26PM  17          **MR. TRIPI:**  So if there's another timeframe somewhere

02:26PM  18   else, maybe, I -- I don't recall the entire transcript --

02:26PM  19          **THE COURT:**  I don't either.  That's the --

02:26PM  20          **MR. TRIPI:**  -- but that page didn't do it.

02:27PM  21          **THE COURT:**  I have that same -- I have that same

02:27PM  22   problem.  I mean, I -- I don't see how that establishes the

02:27PM  23   timeframe.  I think you can -- you can ask questions about

02:27PM  24   that.

02:27PM  25          **MR. SINGER:**  I can do it in another way, Judge --

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

214

| | | |
|---|---|---|
| 02:27PM | 1 | **THE COURT:**  Okay. |
| 02:27PM | 2 | **MR. SINGER:**  -- if the Court's not inclined. |
| 02:27PM | 3 | **THE COURT:**  Okay. |
| 02:27PM | 4 | (End of sidebar discussion.) |
| 02:27PM | 5 | **THE COURT:**  Okay.  So the objection is sustained. |
| 02:27PM | 6 | You can ask another question. |
| 02:27PM | 7 | **BY MR. SINGER:** |
| 02:27PM | 8 | Q.  So, Mr. Selva, the $4,000 proposal to Mr. Bongiovanni |
| 02:27PM | 9 | that you discussed with Mr. Masecchia and with Ron Serio; do |
| 02:27PM | 10 | you remember that? |
| 02:27PM | 11 | A.  Yes. |
| 02:27PM | 12 | Q.  That's -- that's something that you discussed at The |
| 02:27PM | 13 | Western Door meeting, correct? |
| 02:27PM | 14 | A.  Yes. |
| 02:27PM | 15 | Q.  And the conversation also included the proposal from |
| 02:27PM | 16 | Mr. Bongiovanni that Ron Serio offer up a bust, correct? |
| 02:27PM | 17 | A.  Correct. |
| 02:27PM | 18 | Q.  That conversation regarding $4,000, right, the |
| 02:27PM | 19 | increase -- |
| 02:27PM | 20 | A.  Correct. |
| 02:27PM | 21 | Q.  -- that's something that you testified earlier occurred |
| 02:28PM | 22 | back in 2011, 2012, right? |
| 02:28PM | 23 | A.  Correct. |
| 02:28PM | 24 | Q.  So, the conversation about the bust, by extension, also |
| 02:28PM | 25 | happened back in 2011, 2012, right? |

02:28PM      1    A.  It happened at that dinner, yes.

02:28PM      2    Q.  That's what I'm getting at, sir.

02:28PM      3    A.  Yes, yes.

02:28PM      4    Q.  So the two are linked, right?

02:28PM      5    A.  Yes.  It was a conversation over dinner.

02:28PM      6    Q.  The request for the bust and the $4,000 increase occurred

02:28PM      7    at the same dinner?

02:28PM      8    A.  Correct.

02:28PM      9    Q.  It occurred at The Western Door?

02:28PM     10    A.  Correct.

02:28PM     11    Q.  It occurred, best of your memory, sometime between 2011

02:28PM     12    and 2012?

02:28PM     13    A.  That's correct.

02:28PM     14    Q.  So you're aware of the fact that the DEA in Buffalo had

02:28PM     15    not opened up an investigation into Ron Serio until 2013,

02:28PM     16    right?

02:28PM     17    A.  I -- I'm not aware of the exact date.

02:28PM     18    Q.  You're not aware of the exact date that Mr. Bongiovanni

02:28PM     19    opened up an investigation?

02:28PM     20    A.  No, I'm not.

02:28PM     21    Q.  Would you agree with me, sir, that it would be a little

02:29PM     22    difficult to bust a grow house when you don't have an open

02:29PM     23    investigation?

02:29PM     24    A.  Yes.

02:29PM     25    Q.  So I want to get into a little bit some of the

02:29PM    1    information that was provided by Mr. Bongiovanni to you.

02:29PM    2        So, again, you are the person that Mr. Bongiovanni met up

02:29PM    3    with for information, right?

02:29PM    4    A.  Correct.

02:29PM    5    Q.  You were the conduit that provided requests to him from

02:29PM    6    Ron Serio and Mike Masecchia?

02:29PM    7    A.  Correct.

02:29PM    8    Q.  And you were also the conduit who provided responses back

02:29PM    9    to Mike Masecchia and Ron Serio that you got from

02:29PM    10   Mr. Bongiovanni, allegedly, right?

02:29PM    11   A.  That's correct.

02:29PM    12   Q.  And Mr. Masecchia, he wasn't involved in that role,

02:29PM    13   correct?

02:29PM    14   A.  No, it was just myself.

02:29PM    15   Q.  He was the payment guy, right?

02:29PM    16   A.  Yes.  Ron was, to him --

02:29PM    17   Q.  Yeah.

02:30PM    18   A.  -- yes.

02:30PM    19   Q.  Yeah.  Ron was the person who --

02:30PM    20   A.  Yes.

02:30PM    21   Q.  -- provided the money --

02:30PM    22   A.  Yes.

02:30PM    23   Q.  -- right?

02:30PM    24   A.  Yes.

02:30PM    25   Q.  And Mr. Masecchia was the one who provided Joe

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

02:30PM   1   Bongiovanni the money --

02:30PM   2   A.   Yes.

02:30PM   3   Q.   -- right?

02:30PM   4   A.   Correct.

02:30PM   5   Q.   Okay.  And again, you didn't see Mike Masecchia pay

02:30PM   6   Mr. Bongiovanni, because you weren't part of those meetings,

02:30PM   7   right?

02:30PM   8   A.   No.

02:30PM   9   Q.   Okay.  So, you testified yesterday that when you met up

02:30PM   10  with Mr. Bongiovanni to discuss information that either he

02:30PM   11  had or you were asking for, you had met up in public places,

02:30PM   12  right?

02:30PM   13  A.   Yes.

02:30PM   14  Q.   You met up in public places like bars?

02:30PM   15  A.   Yes.

02:30PM   16  Q.   And you would agree with me, I mean, you're a bartender.

02:30PM   17  A bar is not the most secretive places in a world, right?

02:30PM   18  A.   That depends where you are.  If you're alone on a corner

02:30PM   19  or sitting at a table, then you're alone.

02:30PM   20  Q.   Okay.

02:30PM   21  A.   Nobody can hear you.

02:30PM   22  Q.   But a bar is a public place, right?

02:30PM   23  A.   It's a public place, correct.

02:30PM   24  Q.   And you said that you met out Mr. Bongiovanni to

02:31PM   25  socialize with him, right?

02:31PM    1    A.  Correct.

02:31PM    2    Q.  You went out during days of the week, right?

02:31PM    3    A.  On occasion, yes.

02:31PM    4    Q.  And these were after working hours, right?

02:31PM    5    A.  Yes.

02:31PM    6    Q.  Times that people go to bars, correct?

02:31PM    7    A.  Correct.

02:31PM    8    Q.  And there was a bartender present during some of these

02:31PM    9    meetings, correct, I'm assuming?

02:31PM   10    A.  Who served us alcohol, yes.

02:31PM   11    Q.  And so your testimony is that you had these conversations

02:31PM   12    about this criminal conspiracy in this public place?

02:31PM   13    A.  Yes.  But there was no one around.  I mean, away from --

02:31PM   14    away from people when I was asking questions.

02:31PM   15        We'd either be sitting at a table or be sitting alone.

02:31PM   16    Q.  So that was a risk that you were willing to accept as

02:31PM   17    part of the --

02:31PM   18    A.  It was loud.  If you lean over and you ask somebody a

02:31PM   19    question in their ear, that's it.  I don't think anyone

02:31PM   20    else -- I wasn't aware of anyone eavesdropping.  So it was in

02:31PM   21    a public place like you mentioned, it was in a bar, yes.

02:31PM   22    Q.  So, again, I'll go back to my question.

02:31PM   23        You accepted the risk to have these conversations in a

02:31PM   24    public place like a bar?

02:31PM   25    A.  Yes, it was a brief -- a brief conversation, and then

02:32PM    1    we'd continue to socialize.

02:32PM    2    Q.  And Mr. Bongiovanni, according to you, also accepted that

02:32PM    3    risk to have these public conversations -- to have these

02:32PM    4    conversations in a public place like a bar?

02:32PM    5    A.  They were brief conversations.  There was no attention

02:32PM    6    being drawn to us.  We were just two guys just getting

02:32PM    7    together, either standing at a bar alone, or sitting at a

02:32PM    8    table alone --

02:32PM    9    Q.  Ron --

02:32PM   10    A.  -- in conversation.

02:32PM   11    Q.  -- Ron Serio accepted that risk?

02:32PM   12    A.  I'm sorry?

02:32PM   13    Q.  Ron Serio accepted that risk?

02:32PM   14    A.  Yes.  I told him where I was meeting him.  I told Mike to

02:32PM   15    tell Ron where we were gonna meet.

02:32PM   16    Q.  And Mike Masecchia, the guy who didn't really meet up

02:32PM   17    with Mr. Bongiovanni much at all, he accepted that risk as

02:32PM   18    well?

02:32PM   19    A.  I didn't see it really as a risk.  I mean, we were

02:32PM   20    friends.  We were just socializing.

02:32PM   21    Q.  You talked a little bit about lists that were provided to

02:32PM   22    you of people to check into; do you remember that?

02:32PM   23    A.  Yes.

02:32PM   24    Q.  And, so, some of these lists, they dealt with people who

02:32PM   25    Mr. Serio viewed as a potential threat to the organization?

02:33PM    1    A.  Correct.

02:33PM    2    Q.  And other people on these lists dealt with people who --

02:33PM    3    concerned people that -- that Ron Serio wanted to make sure

02:33PM    4    were -- were protected in some way, right?

02:33PM    5    A.  Correct.

02:33PM    6    Q.  Because they had some type of connection to the

02:33PM    7    organization?

02:33PM    8    A.  Correct.

02:33PM    9    Q.  So, I want to talk a little bit about those lists.

02:33PM   10       So, you haven't always been consistent with investigators

02:33PM   11    about -- about how you received this information, whether

02:33PM   12    it's on a written list or spoken, right?

02:33PM   13    A.  It was -- it was on a written list that was given from

02:33PM   14    Ron to Mike to me.  Then I would rewrite it on a piece of

02:33PM   15    paper.  That's what I told investigators.

02:33PM   16    Q.  Yeah, I guess that's what I'm getting at is that so -- do

02:33PM   17    you recall testifying before the grand jury that the list of

02:33PM   18    names, like, you never got a list of names of anybody; do you

02:33PM   19    remember saying that in the grand jury?

02:33PM   20    A.  I don't recall that.

02:33PM   21    Q.  You don't recall talking in the grand jury about -- about

02:34PM   22    not receiving a list of names of people who -- who deserve

02:34PM   23    some protection?

02:34PM   24         **MR. TRIPI:**  Objection, hearsay.

02:34PM   25         **THE COURT:**  Sustained.

02:34PM    1          **BY MR. SINGER:**

02:34PM    2    Q.   Do you recall testifying about how people showed up on

02:34PM    3    these lists, about how you got them?

02:34PM    4    A.   No, they were provided by Ron.  I don't -- I don't

02:34PM    5    recall.  It was a list, it was from Ron, given to Mike, given

02:34PM    6    to me.

02:34PM    7    Q.   And this list you testified that -- that you hand copied

02:34PM    8    this list onto something you could palm in your hand?

02:34PM    9    A.   It was a piece of notebook paper.

02:34PM   10    Q.   And you didn't provide that list of names to

02:34PM   11    Mr. Bongiovanni directly, right?  You talked about the names?

02:34PM   12    A.   We talked about the names, yes, off the list.

02:34PM   13    Q.   This was at these bars, right?

02:34PM   14    A.   Or wherever we were at, yes.

02:34PM   15    Q.   So as far as the list of people was concerned, do you

02:34PM   16    remember talking about how the list of people that you were

02:35PM   17    concerned about as far as threats of the organization, that

02:35PM   18    was one of those lists, right?

02:35PM   19          **MR. TRIPI:**  Objection, "talk about," I'm confused.

02:35PM   20          **THE COURT:**  Yeah.

02:35PM   21          **MR. TRIPI:**  Is he talking about testimony in court

02:35PM   22    or --

02:35PM   23          **MR. SINGER:**  Let me -- let me -- let me break it down

02:35PM   24    a little bit, Judge.

          25

02:35PM    1              **BY MR. SINGER:**

02:35PM    2    Q.  Do you remember talking to the grand jury about providing

02:35PM    3    a certain number of names to Mr. Bongiovanni to check out if

02:35PM    4    they were threats to the organization?

02:35PM    5    A.  I remember the list.  Whatever was on the list, I

02:35PM    6    provided.

02:35PM    7    Q.  Yeah, and so I guess --

02:35PM    8    A.  Yes.

02:35PM    9    Q.  -- who -- who was it that was on this list for you to

02:35PM   10    check out?

02:35PM   11    A.  They were associates of Mr. Serio's.  People that he'd

02:35PM   12    known and he was concerned about.

02:35PM   13    Q.  What names, Mr. Selva?

02:35PM   14    A.  I -- I don't recall the names.  I mean, they were names

02:35PM   15    that were given from Ron, to -- to Mike, to me.  And then

02:35PM   16    just had them checked out.

02:35PM   17    Q.  You talked about some of those names yesterday.

02:35PM   18    A.  Some of those names yesterday:  Frank Burkhart, R.K.,

02:35PM   19    T.S., Baker -- Chris Baker I believe was one.  I don't recall

02:35PM   20    more than that.  I don't recall the rest of them.

02:36PM   21    Q.  Do you remember telling the grand jury about -- about

02:36PM   22    Burkhart and R.K.?

02:36PM   23    A.  I do.

02:36PM   24    Q.  Do you remember telling the grand jury about T.S. and

02:36PM   25    Mario Vacanti?

02:36PM  1   A.  I do.

02:36PM  2   Q.  Do you remember telling the grand jury about some guy

02:36PM  3   named Dave Mitchkay?

02:36PM  4   A.  Yes.  He was on the one list, yes.

02:36PM  5   Q.  All right.  Mike Sinatra?

02:36PM  6   A.  Yes.

02:36PM  7   Q.  And these were people that you wanted checked out because

02:36PM  8   they were potential threats to the organization, right?

02:36PM  9   A.  Yes.  Ron was doing business with them, yes.  He was

02:36PM  10  concerned.

02:36PM  11  Q.  Do you remember in February talking about -- about

02:36PM  12  Mitchkay?

02:36PM  13          **MR. TRIPI:**  Objection, hearsay.

02:36PM  14          **THE COURT:**  Yeah, in -- in February, I don't -- I

02:36PM  15  don't -- what are you -- what are you talking about?

02:36PM  16          **BY MR. SINGER:**

02:36PM  17  Q.  Do you remember testifying at a prior hearing in this

02:36PM  18  matter and talking about how Dave Mitchkay should be checked

02:36PM  19  out?

02:36PM  20          **MR. TRIPI:**  Objection.

02:36PM  21          **THE COURT:**  Yeah, sustained.

02:36PM  22          You need to focus him on the testimony.  You've got

02:36PM  23  the testimony, focus him on the testimony.

02:36PM  24          **BY MR. SINGER:**

02:36PM  25  Q.  So, in your testimony yesterday, you never mentioned a

02:37PM   1   guy by the name of Siwiec or Siwek, right?

02:37PM   2   A.  Yeah, Dave Siwiec was just a friend.  He had nothing to

02:37PM   3   do with this.

02:37PM   4   Q.  Do you remember talking about how he was a potential

02:37PM   5   person to check into?

02:37PM   6          MR. TRIPI:  Objection.  Remember, when?

02:37PM   7          BY MR. SINGER:

02:37PM   8   Q.  Do you remember testifying at a prior hearing in this

02:37PM   9   matter in February about how Mr. Siwek or Siwiec was someone

02:37PM   10  that Mr. Serio directed you to look into?

02:37PM   11  A.  No, that -- that -- that's not true.  He was never -- I

02:37PM   12  don't believe they were friends, Mr. Siwiec and Mr. Serio.

02:37PM   13  Q.  So you talked about how after you provided these names to

02:37PM   14  Mr. Bongiovanni, your testimony yesterday, that -- that he --

02:37PM   15  he checked out these people; is that right?

02:37PM   16  A.  That's correct.

02:37PM   17  Q.  And as far as other people, you also mentioned that

02:37PM   18  individuals who Mr. Serio wanted protection for in the

02:37PM   19  organization who were working with him or for him in some

02:37PM   20  ways, you also passed names like that to Mr. Bongiovanni; is

02:37PM   21  that right?

02:37PM   22  A.  People of concern, yes.

02:38PM   23  Q.  And sometimes phone numbers as well?

02:38PM   24  A.  Yes.

02:38PM   25  Q.  And, so, as far as those individuals are concerned, the

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24
225

02:38PM  1  people who wanted protection or something along those lines,

02:38PM  2  who are those people?  What are their names?

02:38PM  3  A.  I don't recall.  Whatever was on the list.  I don't

02:38PM  4  recall.  Do you have something to refresh my memory?

02:38PM  5      I don't remember every name on the list.

02:38PM  6  Q.  How many names are we talking?

02:38PM  7  A.  I don't know, maybe six, eight, nine, I don't recall.

02:38PM  8  Whatever was on the list.

02:38PM  9  Q.  Do you remember if Tom Serio was on that list?

02:38PM  10  A.  I don't believe Tom Serio was on the list.

02:38PM  11  Q.  You knew Tom Serio to be Ron Serio's brother?

02:38PM  12  A.  That's Ron's brother, correct.

02:38PM  13  Q.  And you knew him to be part of Ron Serio's

02:38PM  14  drug-trafficking organization, right?

02:38PM  15  A.  I believe so, yes.

02:38PM  16  Q.  And Mark Falzone was someone you were familiar with,

02:38PM  17  correct?

02:38PM  18  A.  Yes.

02:38PM  19  Q.  He was someone who Ron Serio dealt with directly,

02:38PM  20  correct?

02:38PM  21  A.  Correct, he was not on the list.

02:38PM  22  Q.  He wasn't on the list?

02:38PM  23  A.  No.

02:38PM  24  Q.  But he was someone who dealt directly with Ron Serio,

02:39PM  25  right?

02:39PM     1    A.  But he was his best friend.

02:39PM     2    Q.  Okay.

02:39PM     3    A.  They were best friends.

02:39PM     4    Q.  But you'd agree with me that it would be important to

02:39PM     5    find out whether Mark Falzone was under investigation, right?

02:39PM     6    A.  I understand, but it was never asked.

02:39PM     7    Q.  So Ron Serio never asked you to take and make sure that

02:39PM     8    he was protected?

02:39PM     9    A.  Not that --

02:39PM    10         **MR. TRIPI:**  Objection.

02:39PM    11         **BY MR. SINGER:**

02:39PM    12    Q.  So Ron Serio never asked you make sure that Mark Falzone

02:39PM    13    was protected?

02:39PM    14         **THE COURT:**  Don't answer.

02:39PM    15         **MR. TRIPI:**  I'll withdraw the -- I'll withdraw the

02:39PM    16    objection.  There were two different --

02:39PM    17         **THE COURT:**  Fine.

02:39PM    18         **MR. TRIPI:**  -- words put in there.  So --

02:39PM    19         **MR. SINGER:**  I misspoke, Judge.

02:39PM    20         **THE COURT:**  You can answer that question.

02:39PM    21         **THE WITNESS:**  Can you repeat the question?

02:39PM    22         **BY MR. SINGER:**

02:39PM    23    Q.  So, Ron Serio never asked you to check into whether or

02:39PM    24    not Mark Falzone was someone who was a subject of an

02:39PM    25    investigation?

02:39PM    1    A.  No.

02:39PM    2    Q.  Chris Baker was a name that you had also mentioned; do

02:39PM    3    you remember that?

02:39PM    4    A.  Yes.  I believe he was -- that name was familiar.  It was

02:39PM    5    on the list, yes.

02:39PM    6    Q.  He was somebody who Ron Serio dealt with, right?

02:39PM    7    A.  I believe so, yes.

02:39PM    8    Q.  But you believe that he was somebody who Ron Serio asked

02:39PM    9    you to ask Mr. Bongiovanni to take a look into and make sure

02:40PM    10    he was all clear?

02:40PM    11    A.  I believe so.  If he was on the list, then yes.

02:40PM    12    Q.  I don't know.  You tell me.

02:40PM    13    A.  I -- again, I said I'm not really familiar with who was

02:40PM    14    on the list.  I mean, that name sounded familiar.  I'm

02:40PM    15    sure -- I believe he might have been on the list, yes.

02:40PM    16         If he was on the list, yes.

02:40PM    17    Q.  Was -- was Mike Moynihan somebody who was on this list?

02:40PM    18    A.  Again, I -- it sounds familiar.  I believe he might have

02:40PM    19    been.

02:40PM    20    Q.  What about Mike Buttitta?  Was he on the list?

02:40PM    21    A.  I do not believe Mike Buttitta was on the list, no.

02:40PM    22    Q.  How about Charles Butera?

02:40PM    23    A.  Who?

02:40PM    24    Q.  Charles Butera?

02:40PM    25    A.  I don't recall.

02:40PM    1    Q.  What about John Robinson?

02:40PM    2    A.  I don't recall.

02:40PM    3    Q.  What about Mark Vitale?

02:40PM    4    A.  Who?

02:40PM    5    Q.  Mark Vitale?

02:40PM    6    A.  I don't recall that name either.

02:40PM    7    Q.  How about Jacob Martinez?

02:40PM    8    A.  Sir, again, I -- I -- I don't recall.

02:40PM    9        I mean, again, the list was given to me, and it was

02:40PM   10    handed, I wrote it down.  I don't remember all the names.

02:41PM   11    Q.  How about Anthony Greco?

02:41PM   12    A.  I don't believe -- I don't recall.

02:41PM   13    Q.  Matt LoTempio?

02:41PM   14    A.  I -- I don't recall.

02:41PM   15    Q.  Anthony Gerace?

02:41PM   16    A.  No, I don't recall.

02:41PM   17    Q.  Jarrett Guy?

02:41PM   18    A.  I'm sorry?

02:41PM   19    Q.  Jarrett Guy.

02:41PM   20    A.  I don't know that, I don't recall.

02:41PM   21    Q.  How about Santiago Gale?

02:41PM   22    A.  I -- I don't recall.

02:41PM   23    Q.  Mark Kagan?

02:41PM   24    A.  He might have been -- I believe he might have been one of

02:41PM   25    the names.  Again, I -- it was vague, sir.  It was a list.

02:41PM  1   It was given to me, it was handed over.  After I wrote it

02:41PM  2   down, handed over.

02:41PM  3   Q.  Well, you testified that you didn't hand it over, though,

02:41PM  4   right?

02:41PM  5   A.  Relayed.  Sorry.

02:41PM  6   Q.  Okay.

02:41PM  7   A.  Asked, relayed.

02:41PM  8   Q.  So, again, you didn't hand over any list --

02:41PM  9   A.  Right.

02:41PM  10  Q.  -- to Mr. Bongiovanni allegedly, right?

02:41PM  11  A.  Relayed the names on the list.

02:41PM  12  Q.  Okay.  How about Mike Piazza, was he on the list?

02:41PM  13  A.  I don't recall.  I don't believe so, no.

02:41PM  14  Q.  So -- so, you don't really recall a lot of these names

02:42PM  15  that were passed to make sure that these people were

02:42PM  16  protected?

02:42PM  17  A.  Not the ones that you mentioned, I don't recall, but

02:42PM  18  there were names on a list.

02:42PM  19  Q.  These people that I just named off, you understood them

02:42PM  20  to have a connection to Ron Serio, right?

02:42PM  21  A.  Correct.

02:42PM  22  Q.  You understood them to be in the marijuana business with

02:42PM  23  him, right?

02:42PM  24  A.  Not all of them.  I mean, if -- if they were connected to

02:42PM  25  Ron, he put them on -- and he was worried about them, he

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

230

02:42PM    1    asked, he wrote it on a list.  Then I would do my due

02:42PM    2    diligence.

02:42PM    3    Q.   From those people I just discussed, who was involved in

02:42PM    4    the marijuana business with Ron Serio to the best of your

02:42PM    5    understanding?

02:42PM    6    A.   I -- you mentioned his brother.  Chris Baker.  I don't --

02:42PM    7    I don't remember the rest of the names said.

02:42PM    8    Q.   Mark Falzone?

02:42PM    9    A.   Mark Falzone.

02:42PM   10    Q.   Mike Moynihan?

02:42PM   11    A.   Yes.

02:42PM   12    Q.   Mike Buttitta?

02:43PM   13    A.   Yes.

02:43PM   14    Q.   Charles Butera?

02:43PM   15    A.   I'm not sure.

02:43PM   16    Q.   John Robinson.

02:43PM   17    A.   That sounds familiar, yes.  Sounds familiar that he was

02:43PM   18    doing business with Ron.

02:43PM   19    Q.   Mark Vitale?

02:43PM   20    A.   I'm not sure.

02:43PM   21    Q.   Jacob Martinez?

02:43PM   22    A.   That doesn't sound familiar.

02:43PM   23    Q.   Anthony Greco?

02:43PM   24    A.   No, that doesn't sound familiar.

02:43PM   25    Q.   Matt LoTempio?

02:43PM   1    A.  That doesn't sound familiar.

02:43PM   2    Q.  Anthony Gerace?

02:43PM   3    A.  Yes.

02:43PM   4    Q.  Jarrett Guy?

02:43PM   5    A.  I'm sorry, what was that name?

02:43PM   6    Q.  Jarrett Guy.

02:43PM   7    A.  It sounds familiar.

02:43PM   8    Q.  Santiago Gale?

02:43PM   9    A.  I -- again, I -- I -- it doesn't sound familiar.  I don't

02:43PM  10    know.

02:43PM  11    Q.  Mark Kagan?

02:43PM  12    A.  That names sounds familiar, that was on the list.

02:43PM  13    Q.  Mike Piazza?

02:43PM  14    A.  That name was not on the list.

02:43PM  15    Q.  Not on the list?

02:43PM  16    A.  I don't believe so.

02:43PM  17    Q.  Did you understand Mr. Serio to have dealings with T.S.

02:43PM  18    in the marijuana business?

02:43PM  19    A.  Yes.  T.S. is one, yes.

02:44PM  20         **MR. SINGER:**  Ms. Champoux, can you bring up for the

02:44PM  21    witness and the witness only if we can go to Government

02:44PM  22    Exhibit 100A.1, please.

02:44PM  23         If we can go to the 716-830-3226 hot sheet.

02:44PM  24         **BY MR. SINGER:**

02:44PM  25    Q.  Have you ever seen this document before, sir.

02:44PM   1   A.  I have not, no.

02:44PM   2   Q.  That number that I just stated, the 716-830-3226 number,

02:45PM   3   you know that to be Ron Serio's cell number, correct?

02:45PM   4   A.  Yes.

02:45PM   5   Q.  This was the cell phone that was his public phone, for

02:45PM   6   lack of a better word?

02:45PM   7   A.  His primary phone, yes.

02:45PM   8   Q.  Yeah.

02:45PM   9         MR. SINGER:  So, I know this document is not in

02:45PM  10   evidence, but Judge, I -- I expect this to be admitted at some

02:45PM  11   later date, and so I'd like to ask these questions subject to

02:45PM  12   connection.

02:45PM  13         THE COURT:  Ask the questions, and we'll see what

02:45PM  14   Mr. Tripi says.

02:45PM  15         BY MR. SINGER:

02:45PM  16   Q.  So you see this list before you, sir?

02:45PM  17   A.  Yes.

02:45PM  18   Q.  And do you see a number of phone numbers on it related to

02:45PM  19   individuals who had contact with Ron Serio's cell phone?

02:45PM  20   A.  Yes.

02:45PM  21   Q.  And so, do you see Chris Baker on that list?

02:45PM  22   A.  I do, yes.

02:45PM  23   Q.  And do you see how this record reflects that there were

02:45PM  24   446 contacts?

02:45PM  25         MR. TRIPI:  Objection.

| | | |
|---|---|---|
| 02:46PM | 1 | **THE COURT:** Sustained. |
| 02:46PM | 2 | If you can get the document in, you can -- can ask |
| 02:46PM | 3 | him questions about it after it's in, but you can't -- you |
| 02:46PM | 4 | can't do that until the document's in. |
| 02:46PM | 5 | **MR. SINGER:** No, I mean, I can -- I can always recall |
| 02:46PM | 6 | him, Judge. So, I mean, if that's what we're gonna have to |
| 02:46PM | 7 | do, but it is what it is. |
| 02:46PM | 8 | **BY MR. SINGER:** |
| 02:46PM | 9 | Q. Do you see a Thomas Serio on that list, sir? |
| 02:46PM | 10 | A. Yes. |
| 02:46PM | 11 | Q. Do you see a Mike Buttitta on that list, sir? |
| 02:46PM | 12 | A. I do. |
| 02:46PM | 13 | Q. Do you see a T.S. on that list, sir? |
| 02:46PM | 14 | A. Yes, yes. |
| 02:46PM | 15 | Q. Do you see another number for Chris Baker on that list? |
| 02:46PM | 16 | A. On the bottom, yes. |
| 02:46PM | 17 | **MR. SINGER:** Ms. Champoux, can you go to the second |
| 02:46PM | 18 | page? Thanks, Ms. Champoux. |
| 02:47PM | 19 | **BY MR. SINGER:** |
| 02:47PM | 20 | Q. Do you see a Mike Masecchia on that list? |
| 02:47PM | 21 | A. I do, yes. |
| 02:47PM | 22 | Q. Do you see a Mike Moynihan on the list? |
| 02:47PM | 23 | A. Yes. |
| 02:47PM | 24 | Q. Do you see a Mark Kagan on that list? |
| 02:47PM | 25 | A. Yes. |

02:47PM   1   Q.  Do you see a Mark Falzone on that list?

02:47PM   2   A.  On the bottom, yes.

02:47PM   3          **MR. SINGER:**  Ms. Champoux, can you go to the third

02:47PM   4   page of the document, please.

02:47PM   5          If you can bring that down, Ms. Champoux.

02:47PM   6          **BY MR. SINGER:**

02:48PM   7   Q.  So you talked a little bit about Tom Serio.  He was Ron's

02:48PM   8   Serio's brother, right?

02:48PM   9   A.  Yes.

02:48PM  10   Q.  And he was involved in Ron Serio's drug-trafficking

02:48PM  11   organization, correct?

02:48PM  12   A.  Yes.

02:48PM  13   Q.  What particular information did Joe Bongiovanni share

02:48PM  14   with you regarding investigations into Tom Serio?

02:48PM  15   A.  He mentioned that he got busted before for cocaine.  I

02:48PM  16   believe he did a little time that.  Other than that, nothing.

02:48PM  17   Q.  He provided you no other information about Tom Serio?

02:48PM  18   A.  No.  Nothing that I remember, no.

02:48PM  19   Q.  Nothing else?

02:48PM  20   A.  No, sir.  Nothing else at that time, no.

02:48PM  21   Q.  Did he talk to you about how Tom Serio was under

02:48PM  22   investigation by the DEA by a different agent than him?

02:48PM  23   A.  Not at that time, no.  What timeframe are you talking

02:48PM  24   about again?

02:48PM  25   Q.  I'm talking about during the course of this conspiracy,

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

235

| | | |
|---|---|---|
| 02:48PM | 1 | sir? |
| 02:48PM | 2 | A.  No, sir. |
| 02:48PM | 3 | Q.  So, Joe Bongiovanni provided you absolutely no |
| 02:49PM | 4 | information about Tom Serio being under investigation? |
| 02:49PM | 5 | A.  No, sir, just regarding that he had a prior record and he |
| 02:49PM | 6 | did time for possession of cocaine.  That was it. |
| 02:49PM | 7 | Q.  Did Joe Bongiovanni talk to you about any type of phones |
| 02:49PM | 8 | that were being tracked by the DEA regarding Tom Serio? |
| 02:49PM | 9 | A.  No. |
| 02:49PM | 10 | Q.  Did he talk to you about any type of photographs that |
| 02:49PM | 11 | were being taken of Tom Serio's vehicle? |
| 02:49PM | 12 | A.  No. |
| 02:49PM | 13 | Q.  Did he talk to you about any type of entries into the |
| 02:49PM | 14 | DEA's DARTS system regarding Tom Serio's phone number? |
| 02:49PM | 15 | A.  No. |
| 02:49PM | 16 | Q.  Did he talk to you about anything involving a guy by the |
| 02:49PM | 17 | name of G.R.? |
| 02:49PM | 18 | A.  No. |
| 02:49PM | 19 | Q.  Did he talk to you about any type of HSI investigations |
| 02:49PM | 20 | into Tom Serio? |
| 02:49PM | 21 | A.  No. |
| 02:49PM | 22 | Q.  Anthony Gerace.  He was somebody who you said was part of |
| 02:50PM | 23 | the Serio drug-trafficking organization? |
| 02:50PM | 24 | A.  Yes. |
| 02:50PM | 25 | Q.  What information did Mr. Bongiovanni share with you |

02:50PM   1   regarding Anthony Gerace besides what you told him about how

02:50PM   2   he helped him out in APD allegedly?

02:50PM   3   A.   Just that he -- prior to what I said that he had gotten

02:50PM   4   arrested, and he stepped in to help him with Amherst PD.

02:50PM   5   That's -- that's it.  No information.

02:50PM   6   Q.   So you received no other information about Anthony Gerace

02:50PM   7   whatsoever?

02:50PM   8   A.   No.

02:50PM   9   Q.   Did Mr. Bongiovanni share with you the fact that Special

02:50PM  10   Agent Tony Casullo opened an investigation into Anthony

02:50PM  11   Gerace in 2016?

02:50PM  12   A.   No.

02:50PM  13             **MR. TRIPI:**  Objection as to timeframe.  2016?

02:50PM  14             **THE COURT:**  He said in 2016, so overruled.

02:51PM  15             **BY MR. SINGER:**

02:51PM  16   Q.   Did Mr. -- Mr. Bongiovanni ask you about -- sorry, inform

02:51PM  17   you about any investigations that Mr. Casullo at the DEA

02:51PM  18   opened up into Anthony Gerace in 2017?

02:51PM  19   A.   He mentioned that Mr. Casullo didn't like his brother,

02:51PM  20   Peter.  There was no -- no mention about that.  Not that I

02:51PM  21   recall.

02:51PM  22   Q.   So nothing else?

02:51PM  23   A.   Not that I recall.

02:51PM  24   Q.   Did Mr. Bongiovanni provide you any information regarding

02:51PM  25   a person named Santiago Gale?

02:51PM    1    A.  No.

02:51PM    2    Q.  Were you aware of the fact that Gale was a supplier of

02:51PM    3    Ron Serio?

02:51PM    4    A.  I -- I was not.  I don't -- I don't know who Santiago

02:51PM    5    Gale was.

02:51PM    6    Q.  You don't know who he was?

02:51PM    7    A.  No.

02:51PM    8    Q.  But you never heard his name out of Joe Bongiovanni's

02:52PM    9    mouth, huh?

02:52PM   10    A.  No, no.

02:52PM   11    Q.  I mentioned the name Mark Vitale.  Did you receive any

02:52PM   12    information regarding a Mark Vitale?

02:52PM   13    A.  No, not familiar.

02:52PM   14    Q.  We talked a little bit about the Suppas?

02:52PM   15    A.  Yes.

02:52PM   16    Q.  And it was on their property that you and Michael

02:52PM   17    Masecchia and others were conducting outdoor grow activities,

02:52PM   18    right?

02:52PM   19    A.  Not on their property.

02:52PM   20    Q.  Yeah, I think we talked about this.  So it wasn't

02:52PM   21    actually their property where the grow was happening, right?

02:52PM   22    A.  It was not on their property, no.  It was on state land

02:52PM   23    near their property.

02:52PM   24    Q.  Yeah.  So the -- so the state land was where the grow

02:52PM   25    was, right?

02:52PM    1   A.  Correct.

02:52PM    2   Q.  But the logistics hub for that grow was the Suppas'

02:52PM    3   property, correct?

02:52PM    4   A.  Mark Suppa was the owner of that, yes.

02:53PM    5   Q.  That's how -- that's where you would drive down to get to

02:53PM    6   the grow site, right?

02:53PM    7   A.  Yes.

02:53PM    8   Q.  That's where you guys would sometimes dry out the

02:53PM    9   marijuana after it was harvested?

02:53PM   10   A.  A few occasions, yes.

02:53PM   11   Q.  And you'd -- you'd use that as your base of operations

02:53PM   12   for water and stuff like that?

02:53PM   13   A.  No, we would water at the -- at the site through a --

02:53PM   14   with a creek.  It was always near a water facility.

02:53PM   15       We didn't transport water from there, if that's what

02:53PM   16   you're asking, no.

02:53PM   17   Q.  No, but I guess -- I guess what I'm getting at is that

02:53PM   18   you'd you use that for a base of operations for -- for

02:53PM   19   storing all the buckets for where you did this, right?

02:53PM   20   A.  Sure.  On -- on the land, yes.

02:53PM   21   Q.  Were you ever made aware of any type of DEA investigation

02:53PM   22   into the Suppas?

02:53PM   23   A.  I believe there was -- a while back, I heard something

02:53PM   24   that there was an investigation, and they cut some plants

02:53PM   25   down that were not on their land, but right next door --

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

02:53PM    1    Q.  Okay.

02:53PM    2    A.  -- near on the state land.  I heard about that a while

02:53PM    3    ago.

02:53PM    4    Q.  Were you ever aware that Suppa himself was the target of

02:53PM    5    a DEA investigation?

02:53PM    6    A.  Which Suppa?  There's three of them.

02:54PM    7    Q.  Mark.

02:54PM    8    A.  No.  Mark lived in Chicago.  He was -- as far as I knew,

02:54PM    9    he was never involved in drug trafficking.

02:54PM   10    Q.  What about Matt?

02:54PM   11    A.  No.

02:54PM   12    Q.  Did you hear that he was the subject of an investigation?

02:54PM   13    A.  I never knew that, no.

02:54PM   14    Q.  What about John?

02:54PM   15    A.  John, I know had did time for telemarketing or something.

02:54PM   16    Q.  I'm not interested in that.  What I'm interesting in is

02:54PM   17    whether or not you were aware if John Suppa was under a DEA

02:54PM   18    investigation.

02:54PM   19    A.  I was never aware of that, no.

02:54PM   20    Q.  Were you aware of the fact that the Suppas had some

02:54PM   21    connection to a property on 1195 Hertel?

02:54PM   22    A.  Yes.

02:54PM   23        **MR. SINGER:**  So, Ms. Champoux, would you mind

02:54PM   24    bringing up Government Exhibit 8.  If you could open up the

02:55PM   25    1195 Hertel file, the first one.

02:55PM  1          **THE COURT:**  This is just for the witness.

02:55PM  2          **MR. SINGER:**  This is for the -- this is in evidence

02:55PM  3  already, Judge.

02:55PM  4          **THE COURT:**  This is in evidence?

02:55PM  5          **MR. SINGER:**  Correct.

02:55PM  6          **THE COURT:**  Okay.

02:55PM  7          **THE WITNESS:**  Yes.

02:55PM  8          **BY MR. SINGER:**

02:55PM  9  Q.  That's a property that you're familiar with that Suppas

02:55PM  10  had some connection with, correct?

02:55PM  11  A.  Yes.  I believe Mark Suppa is the owner if I'm not

02:55PM  12  mistaken.

02:55PM  13  Q.  And Mike Masecchia also had a connection to this

02:55PM  14  property, too, you're understanding, correct?

02:55PM  15  A.  I know he's friends -- he was close with Mark.  I don't

02:55PM  16  know that he was connected with it, with the property.

02:55PM  17  Q.  You know at least that the Suppas have some connection to

02:55PM  18  this property, right?

02:55PM  19  A.  Yes.

02:55PM  20  Q.  Did Mr. Bongiovanni ever inform you that in August of

02:55PM  21  2013, surveillance photos were taken of this?

02:55PM  22  A.  No.

02:55PM  23  Q.  Did he ever inform you that the DEA pulled utility

02:55PM  24  records regarding this particular property?

02:55PM  25  A.  No.

02:55PM   1        **MR. SINGER:**  You can take that down, Ms. Champoux.

02:56PM   2        May I just have a moment, Judge?

02:56PM   3        **THE COURT:**  Sure.

02:56PM   4        **BY MR. SINGER:**

02:56PM   5   Q.  Again, you're the conduit of information for the Serio

02:56PM   6   drug-trafficking organization and Mr. Bongiovanni's part of

02:56PM   7   the scheme, right?

02:56PM   8   A.  Correct.

02:56PM   9   Q.  Like, you're the guy, right?

02:56PM  10   A.  Correct.

02:56PM  11   Q.  We went through that.  Like Mr. Bongiovanni's

02:56PM  12   communicating solely with you to provide information to

02:56PM  13   Masecchia and Serio?

02:56PM  14   A.  Yes.

02:56PM  15   Q.  And Serio and Masecchia are communicating directly with

02:56PM  16   you to provide information to Bongiovanni, right?

02:56PM  17   A.  Correct.

02:56PM  18   Q.  So I want to go through a little bit of, you also

02:57PM  19   mentioned on your direct testimony that there was -- there's

02:57PM  20   some type of financial investigation into -- into Ron Serio,

02:57PM  21   right?

02:57PM  22   A.  Yes.

02:57PM  23   Q.  And you allege that Mr. Bongiovanni provided you some

02:57PM  24   information about that, correct?

02:57PM  25   A.  Regarding an IRS investigation, correct.

02:57PM   1   Q.  So he -- he -- he allegedly told you that there was some

02:57PM   2   type of financial investigation conducted by the IRS into Ron

02:57PM   3   Serio?

02:57PM   4   A.  Correct.

02:57PM   5   Q.  And that was related to his gambling activities?

02:57PM   6   A.  His gambling, yes.

02:57PM   7   Q.  And you're aware of Mr. Serio's gambling activities,

02:57PM   8   right?

02:57PM   9   A.  I was.

02:57PM   10  Q.  I mean, they were pretty prolific, right?

02:57PM   11  A.  Yes.

02:57PM   12  Q.  Like, he would go into casinos and -- and gamble tens of

02:58PM   13  thousands of dollars, right?

02:58PM   14  A.  That's correct.

02:58PM   15  Q.  Sometimes hundreds of thousands of dollars, right?

02:58PM   16  A.  It was substantial, yes.

02:58PM   17  Q.  And -- and that was one method with which your

02:58PM   18  organization would -- would attempt to wash money, correct?

02:58PM   19  A.  I never did.  But Ron was a heavy gambler.  I don't

02:58PM   20  gamble.

02:58PM   21  Q.  Okay.

02:58PM   22  A.  So --

02:58PM   23  Q.  So you don't know whether or not it was used for that

02:58PM   24  purpose --

02:58PM   25  A.  I don't know.

02:58PM    1    Q.  -- of washing money?

02:58PM    2    A.  I don't know.

02:58PM    3    Q.  But you do know that he was a heavy gambler, right?

02:58PM    4    A.  I do know he was a heavy gambler.

02:58PM    5    Q.  Okay.  I want to go through a little bit of the people

02:58PM    6    that you had mentioned that Ron Serio and Mike Masecchia

02:58PM    7    asked to check out for whether or not they were confidential

02:58PM    8    sources, confidential informants, okay?

02:58PM    9    A.  Okay.

02:58PM   10    Q.  So, you talked a little bit about Robert R.K., right?

02:58PM   11    A.  Yes.

02:58PM   12    Q.  He was someone that Ron Serio had made a request to check

02:58PM   13    into at one point in time?

02:58PM   14    A.  Correct.

02:58PM   15    Q.  When was that request made?

02:59PM   16    A.  '14, '15, I don't recall.  He gave me -- it was on a

02:59PM   17    list.  His name was on a list.  He was worried about it.

02:59PM   18    Bob -- Bob R.K. just got busted.  He was a known drug user,

02:59PM   19    and Ron was concerned about it.

02:59PM   20    Q.  Okay.  So, you ask about him, not sure exactly when, but

02:59PM   21    you're aware of the fact that he has a long criminal history,

02:59PM   22    right?

02:59PM   23    A.  Yes.

02:59PM   24    Q.  You're aware of the fact that he was a drug addict,

02:59PM   25    right?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

244

02:59PM    1    A.   Yes.

02:59PM    2    Q.   He was a junkie, right?

02:59PM    3    A.   Yes.

02:59PM    4    Q.   He had that reputation based on what you knew of him?

02:59PM    5    A.   From -- again, I didn't know him, but you hear things,

02:59PM    6    yes.

02:59PM    7    Q.   And Mike Masecchia was aware of the fact that he was a

02:59PM    8    junkie as well, correct?

02:59PM    9    A.   Knew he was a drug user, yes.

02:59PM   10    Q.   Mike Masecchia was aware of the fact that Robert R.K. was

02:59PM   11    somebody who had a criminal record, correct?

02:59PM   12    A.   Correct.

02:59PM   13    Q.   And -- and both you and Mike Masecchia were aware of the

03:00PM   14    fact that Mr. R.K. had been arrested for two burglaries in

03:00PM   15    that time period, right?

03:00PM   16    A.   I wasn't aware of the burglaries, but I knew he got

03:00PM   17    arrested.  I didn't know for what.

03:00PM   18    Q.   You weren't aware of any type of -- but you were of

03:00PM   19    arrests that happened around that time period, arrests?

03:00PM   20    A.   Yes, that's why Ron was concerned.  He heard he had got

03:00PM   21    busted again, and that's how the whole thing came about.

03:00PM   22    Q.   Okay.  So you don't remember the specific facts of the

03:00PM   23    arrest, but you remember that it was something you learned

03:00PM   24    about?

03:00PM   25    A.   Yes.

03:00PM  1   Q.  And it was a -- it was a public arrest, right?  It was

03:00PM  2   something that was pretty high profile?

03:00PM  3   A.  I heard about it through -- through Mike when Ron had

03:00PM  4   asked him, so --

03:00PM  5   Q.  Okay.  So -- so Ron was aware of the fact that R.K. got

03:00PM  6   arrested?

03:00PM  7   A.  Yes.

03:00PM  8   Q.  And that's why Ron asked Mike --

03:00PM  9   A.  Yes.

03:00PM  10  Q.  -- to check into --

03:00PM  11  A.  Yes.

03:00PM  12  Q.  -- Robert R.K.?

03:00PM  13  A.  Yes.

03:00PM  14  Q.  And Mike Masecchia made you aware of that arrest?

03:00PM  15  A.  He did, yes.

03:00PM  16  Q.  Okay.  So what exactly did Joe Bongiovanni tell you

03:01PM  17  regarding Robert R.K.?

03:01PM  18  A.  When it was brought to my attention to reach out

03:01PM  19  regarding Bobby R.K., he checked it out and told me he came

03:01PM  20  back, he's an informant.

03:01PM  21  Q.  Did you tell -- did he tell you that he was -- Robert

03:01PM  22  R.K. was his informant?

03:01PM  23  A.  Yes.

03:01PM  24  Q.  And as far as other information that he provided, what

03:01PM  25  else did he tell you about R.K.?

03:01PM    1    A.  He had just been arrested, but he didn't tell me for

03:01PM    2    what, but he had a long drug history.

03:01PM    3    Q.  Now previously, when you testified before the grand jury,

03:01PM    4    do you recall testifying that you didn't have any -- you

03:01PM    5    didn't -- that Mr. Bongiovanni indicated that there was

03:01PM    6    nothing going on with R.K., correct?

03:01PM    7            **MR. TRIPI:**  Objection.  Hearsay, improper

03:01PM    8    impeachment.

03:01PM    9            **THE COURT:**  Yeah, sustained.

03:01PM    10           **BY MR. SINGER:**

03:01PM    11   Q.  So, it's your testimony today that Robert R.K. was

03:01PM    12   someone that Joseph Bongiovanni informed you about?

03:02PM    13   A.  Yes.

03:02PM    14   Q.  And he was someone who told -- that Joseph Bongiovanni

03:02PM    15   told you that he was a CI; is that right?

03:02PM    16   A.  Correct.

03:02PM    17   Q.  And you maintained that that's what you were told,

03:02PM    18   correct?

03:02PM    19   A.  Correct.

03:02PM    20   Q.  But you recall testifying at the grand jury, correct?

03:02PM    21   A.  Yes.

03:02PM    22   Q.  And you recall testifying at that proceeding back in

03:02PM    23   October of 2019, correct?

03:02PM    24   A.  At the grand jury, no.

03:02PM    25   Q.  October of 2019.

| | | |
|---|---|---|
| 03:02PM | 1 | A.  At the grand jury? |
| 03:02PM | 2 | Q.  Yes. |
| 03:02PM | 3 | A.  I -- it wasn't 2019. |
| 03:02PM | 4 | Q.  Your testimony before the grand jury wasn't October 2019, |
| 03:02PM | 5 | sir? |
| 03:02PM | 6 | A.  I -- I -- I'm sorry, it was, I'm mixing it up.  Yes. |
| 03:02PM | 7 | Sorry, yes. |
| 03:02PM | 8 | Q.  Yeah, and you testified at that proceeding under oath, |
| 03:02PM | 9 | correct? |
| 03:02PM | 10 | A.  Yes, yes. |
| 03:02PM | 11 | Q.  And Mr. Tripi was the person who was questioning you, |
| 03:02PM | 12 | correct? |
| 03:02PM | 13 | A.  Correct, yes. |
| 03:02PM | 14 | Q.  You remember being asked questions about Robert R.K. at |
| 03:02PM | 15 | that proceeding, correct? |
| 03:02PM | 16 | A.  Correct. |
| 03:02PM | 17 | **MR. TRIPI:**  Objection.  Could I get a page and a line |
| 03:02PM | 18 | number. |
| 03:02PM | 19 | **MR. SINGER:**  Ms. Champoux, if you could bring up for |
| 03:02PM | 20 | the witness and only the witness Government Exhibit 3540 |
| 03:03PM | 21 | November. |
| 03:03PM | 22 | Okay.  Advance to page 88, please. |
| 03:03PM | 23 | **BY MR. SINGER:** |
| 03:03PM | 24 | Q.  I direct your attention to lines 11 and 12. |
| 03:03PM | 25 | Do you remember telling the grand jury on that date to |

Case 1:19-cr-00227-LJV-MJR    Document 1179    Filed 09/08/24    Page 248 of 369
USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

248

03:03PM   1    the following:

03:03PM   2        "Question:  What information did you get back on Bob

03:03PM   3    R.K.?

03:03PM   4        "Answer:  He was okay.  There was no investigation."

03:03PM   5    A.  Yes.  At that timeframe, yes.

03:03PM   6    Q.  At what timeframe?

03:03PM   7    A.  I -- I -- at that specific timeframe, there was no

03:03PM   8    investigation.  But he was under -- he was -- he was an

03:03PM   9    informant for Mr. Bongiovanni when I asked him that.

03:03PM   10       **MR. SINGER:**  Ms. Champoux, could you please advance

03:03PM   11   to page 90?

03:03PM   12       **BY MR. SINGER:**

03:03PM   13   Q.  Direct your attention to lines 8 to 10.  Do you remember

03:03PM   14   responding to the question, "What about Robert R.K., Bobby

03:03PM   15   R.K.?"

03:03PM   16   A.  Yes.

03:03PM   17   Q.  "Answer:  I gave that information as well, as he was, per

03:04PM   18   Joe, there was nothing going on."

03:04PM   19       Do you remember giving that answer at the grand jury,

          20   sir?

          21   A.  Yes.

          22       **MR. SINGER:**  Take that down, Ms. Champoux.

          23       **BY MR. SINGER:**

          24   Q.  So what you told the grand jury was different than what

03:04PM   25   you told the jury here today, right?

03:04PM    1              **MR. TRIPI:**  Objection.

03:04PM    2              **THE COURT:**  Sustained.

03:04PM    3              **BY MR. SINGER:**

03:04PM    4    Q.  You claim that Mr. Bongiovanni told you that Bobby R.K.

03:04PM    5    was a -- was a CS, right?

03:04PM    6    A.  Correct.

03:04PM    7    Q.  Did he tell you about any other specific information that

03:04PM    8    R.K. provided to him?

03:04PM    9    A.  No.

03:04PM   10    Q.  So he didn't tell you about T.S.?

03:04PM   11    A.  No.  T.S. was asked by Ron.  Ron had asked Mike to ask me

03:04PM   12    about T.S..  that was another incident.

03:04PM   13    Q.  So Mr. Bongiovanni didn't tell you any information about

03:04PM   14    T.S. being implicated by Bobby R.K.?

03:04PM   15    A.  No.

03:04PM   16    Q.  He didn't give you any information regarding operations

03:04PM   17    that the DEA had planned against T.S. involving Robert R.K.?

03:04PM   18    A.  No, just that when I asked him if T.S. was an informant,

03:05PM   19    he said, yes.

03:05PM   20    Q.  Mr. Bongiovanni didn't provide you any information about

03:05PM   21    whether another person, Robert Mettal, was someone that R.K.

03:05PM   22    implicated, right?

03:05PM   23    A.  I'm sorry, what was that name?

03:05PM   24    Q.  Robert Mettal?

03:05PM   25    A.  No, not that I recall.

03:05PM    1    Q.  Never mentioned that name?

03:05PM    2    A.  No.

03:05PM    3    Q.  T.S. was somebody that we just talked about, you just

03:05PM    4    mentioned.  You said Ron Serio made some type of request

03:05PM    5    regarding T.S. as well?

03:05PM    6    A.  Yes.

03:05PM    7    Q.  And when was that request made?

03:05PM    8    A.  A little bit after R.K..

03:05PM    9    Q.  So a little bit after R.K.?

03:05PM    10   A.  Yes.

03:05PM    11   Q.  What prompted that particular request?

03:05PM    12   A.  I believe Ron was concerned, believed he -- he might have

03:05PM    13   even busted.  He reached out to Mike.  Mike says, can you

03:05PM    14   reach out and find out if this guy is an informant.

03:05PM    15   Q.  So when you say busted, you mean T.S. was arrested at

03:05PM    16   some point?

03:05PM    17   A.  He was arrested.

03:06PM    18   Q.  Based on information that you received or Ron Serio

03:06PM    19   received?

03:06PM    20   A.  Correct.  What I was told, yes.

03:06PM    21   Q.  And that's what prompted the request?

03:06PM    22   A.  Correct.

03:06PM    23   Q.  Where was it that T.S. was arrested at that point in

03:06PM    24   time?

03:06PM    25   A.  I -- I don't recall.  I don't know.

03:06PM    1    Q.  Do you know what he was arrested for?

03:06PM    2    A.  I don't.

03:06PM    3    Q.  And this is when you allege that Joe Bongiovanni got back

03:06PM    4    to you, right?

03:06PM    5    A.  Correct.

03:06PM    6    Q.  And he informed you that -- that T.S. was also a

03:06PM    7    confidential source?

03:06PM    8    A.  That's correct.

03:06PM    9    Q.  Who did Mr. Bongiovanni tell you that T.S. was working

03:06PM   10    for at that time?

03:06PM   11    A.  He just told me he was an informant.  He didn't get what

03:06PM   12    agency or nothing.  He just said he's an informant.

03:06PM   13    Q.  Did he give you a timeframe?

03:06PM   14    A.  No, at that timeframe when I asked, that's when it was

03:06PM   15    confirmed.

03:06PM   16    Q.  I know you testified to that now and today, but you

03:06PM   17    recall testifying in front of the grand jury, correct?

03:06PM   18    A.  Correct.

03:06PM   19    Q.  And do you remember testifying under oath at that

03:07PM   20    proceeding back in October 2019, correct?

03:07PM   21    A.  Yes, correct.

03:07PM   22         **MR. SINGER:**  Ms. Champoux, would you mind bringing up

03:07PM   23    3540 November for the witness again?

03:07PM   24         If you can turn to page 88.

          25

03:07PM   1              **BY MR. SINGER:**

03:07PM   2    Q.  Do you recall -- and I'll direct your attention to line

03:07PM   3    13 through 15 -- providing the following answer to the

03:07PM   4    following question.

03:07PM   5        "Question:  What information did you get back from

03:07PM   6    Bongiovanni on T.S.?

03:07PM   7        "Answer:  There was nothing going on."

03:07PM   8        Do you remember providing that to the grand jury as an

03:07PM   9    answer, sir?

03:07PM  10    A.  Yes.

03:07PM  11              **MR. SINGER:**  If you can turn to page 89,

03:07PM  12    Ms. Champoux.

03:07PM  13              **BY MR. SINGER:**

03:07PM  14    Q.  I'll direct your attention to page 25 -- I'm sorry, page

03:07PM  15    89, line 25.

03:07PM  16        Do you remember providing the following answers to the

03:07PM  17    following questions:

03:07PM  18        "Question:  Did Joe tell you to be leery of T.S.?"

03:08PM  19              **MR. SINGER:**  Can we advance to the next page,

03:08PM  20    Ms. Champoux.

03:08PM  21              **BY MR. SINGER:**

03:08PM  22    Q.  "Answer:"  Again, that time -- sorry.

03:08PM  23        "Answer:  Yes.

03:08PM  24        "Question:  What did he say?

03:08PM  25        "Answer:  Be careful.  T.S. is out there, and there could

03:08PM   1   be a possible investigation."

03:08PM   2       Do you remember providing those answers, sir?

03:08PM   3   A.  Yes.

03:08PM   4   Q.  And you'll agree with me that does not include anything

03:08PM   5   about a CI, correct?

03:08PM   6   A.  No.

03:08PM   7            MR. SINGER:  You can bring that now, Ms. Champoux.

03:08PM   8            BY MR. SINGER:

03:08PM   9   Q.  Mario Vacanti was somebody that you also indicated

03:08PM  10   Mr. Bongiovanni allegedly provided information about; is that

03:08PM  11   right?

03:08PM  12   A.  Yes.

03:08PM  13   Q.  Okay.  So I want to get into -- so, Mario Vacanti, he's

03:08PM  14   somebody that you know to be related to Sam Vacanti; is that

03:08PM  15   right?

03:08PM  16   A.  Correct.

03:08PM  17   Q.  And Sam Vacanti is Mario Vacanti's brother?

03:08PM  18   A.  Correct.

03:08PM  19   Q.  And you're aware of the fact that Sam Vacanti was

03:08PM  20   convicted of a murder, correct?

03:08PM  21   A.  Yes.

03:08PM  22   Q.  That involved a person named Monty Massimi?

03:09PM  23   A.  Yes.

03:09PM  24   Q.  And it was a pretty widely-known fact in the North

03:09PM  25   Buffalo community, right?

03:09PM    1    A.  Correct.

03:09PM    2            **MR. TRIPI:**  Objection.  Judge, may we approach?

03:09PM    3            **THE COURT:**  Sure.

03:09PM    4            (Sidebar discussion held on the record.)

03:09PM    5            **MR. TRIPI:**  I'm not quite sure where -- I'm not quite

03:09PM    6    sure where we're going, Judge, but first, I'll object on 403

03:09PM    7    grounds.  The Massimi murder, I don't know what that has to do

03:09PM    8    with anything.

03:09PM    9            **THE COURT:**  Yeah.

03:09PM   10            **MR. TRIPI:**  But I'll also caution everyone that you

03:09PM   11    precluded me from asking about the fact that Bongiovanni's

03:09PM   12    supplier used to be, when he would get -- procure cocaine, one

03:09PM   13    of the Massimi brothers.  And so that was a ruling from the

03:09PM   14    last trial that I didn't ask him about.

03:09PM   15            And I -- I think counsel already opened the door to

03:09PM   16    that, because he asked Mr. Selva about people he procured

03:09PM   17    cocaine from, and said that wasn't like Mr. Bongiovanni's

03:09PM   18    involvement with cocaine.

03:09PM   19            And I think he's opened the door to the Massimi

03:09PM   20    cocaine supply situation between Bongiovanni and Massimi.

03:10PM   21            But now we're getting into a murder of Massimi that

03:10PM   22    has nothing to do -- nothing to do with this trial.

03:10PM   23            And I think -- I speculate, it -- it may be just to

03:10PM   24    make Mr. Selva nervous because he's asking about a person

03:10PM   25    who's convicted of murder that's related to Mario Vacanti, and

03:10PM    1    then he's going to ask him questions about Mario Vacanti to

03:10PM    2    try to put him in fear and cause him to say something that's

03:10PM    3    inconsistent with his prior testimony.

03:10PM    4         And I don't think that that's -- that's a proper

03:10PM    5    purpose.

03:10PM    6         **THE COURT:**  Well, certainly that's not proper.

03:10PM    7    Next --

03:10PM    8         **MR. SINGER:**  And, of course, certainly I'm not doing

03:10PM    9    it for that purpose, Judge.

03:10PM   10         The proper purpose for which I'm introducing this

03:10PM   11    testimony, it's not very long, is to establish what it was

03:10PM   12    that Selva allegedly says he learned from Bongiovanni.

03:10PM   13         So in the grand jury, Mr. Selva talks about how

03:10PM   14    Mr. Bongiovanni provided information regarding Mario Vacanti.

03:11PM   15    The nature of the information that he testified at that point

03:11PM   16    in time was provided related to the fact that Vacanti was

03:11PM   17    related to Sammy Vacanti, that his brother was convicted of

03:11PM   18    murder, and that Mario Vacanti was a marijuana dealer and had

03:11PM   19    some operation that he took over for his brother.  And that

03:11PM   20    was the nature of the information.

03:11PM   21         If you recall back in this trial, part of what Ron

03:11PM   22    Serio and other people have had to say is that the information

03:11PM   23    provided regarding Mario Vacanti was much more specific

03:11PM   24    regarding the specific investigation that was being conducted

03:11PM   25    into him in 2015.

| | | |
|---|---|---|
| 03:11PM | 1 | **THE COURT:**  Who said this? |
| 03:11PM | 2 | **MR. TRIPI:**  Selva's testimony on this point was:  I |
| 03:11PM | 3 | don't remember the specifics of the information, but whatever |
| 03:11PM | 4 | I was told, I provided at the time. |
| 03:11PM | 5 | He can ask Ron Serio what the information was, but he |
| 03:11PM | 6 | can't ask this witness.  Because he's trying to set up a |
| 03:11PM | 7 | distinction between the two, I understand that, but he doesn't |
| 03:11PM | 8 | have the specifics. |
| 03:11PM | 9 | He testified, I don't remember the specifics, but |
| 03:11PM | 10 | whatever it was, I passed along.  That was his testimony |
| 03:11PM | 11 | yesterday. |
| 03:12PM | 12 | **MR. SINGER:**  And I'll refresh his recollection with |
| 03:12PM | 13 | his grand jury testimony as to what the information was, |
| 03:12PM | 14 | Judge. |
| 03:12PM | 15 | But on cross, I should have the ability, since |
| 03:12PM | 16 | they're trying to paint this out as Bongiovanni provided |
| 03:12PM | 17 | specific information -- |
| 03:12PM | 18 | **THE COURT:**  So you want to show him this to refresh |
| 03:12PM | 19 | his recollection on what? |
| 03:12PM | 20 | **MR. SINGER:**  I -- so I want to -- I want to -- I'm on |
| 03:12PM | 21 | this line of inquiry for two reasons. |
| 03:12PM | 22 | One, is to establish the fact that he's aware of this |
| 03:12PM | 23 | murder on his own -- |
| 03:12PM | 24 | **MR. TRIPI:**  Okay. |
| 03:12PM | 25 | **MR. SINGER:**  -- and so is Masecchia, because it's |

03:12PM    1    something that is well-known.

03:12PM    2         The second part of it is that when he gets

03:12PM    3    information back from Bongiovanni, that Bongiovanni is limited

03:12PM    4    to, hey, I know Massimi is connected to his brother, his

03:12PM    5    brother was convicted of murder, and Massimi -- I'm sorry,

03:12PM    6    that -- that -- that Mario is the person who took over his

03:12PM    7    marijuana operation.  That's all.

03:12PM    8         THE COURT:  Hold on.  Well I think you can ask, did

03:12PM    9    you testify yesterday you don't remember what information you

03:12PM   10    provided about Massimi, and then show him his grand jury

03:12PM   11    testimony and refresh his recollection on that question.  And

03:12PM   12    then ask the questions that you're asking.  I think you can do

03:12PM   13    that.

03:12PM   14         Is that what you want to do?

03:12PM   15         MR. SINGER:  So, that's -- so, again, I'm going down

03:13PM   16    this line to establish that he's aware of the background of

03:13PM   17    Mario Vacanti, which I think I've almost gone through at this

03:13PM   18    point.

03:13PM   19         And secondly, that the information that was provided

03:13PM   20    through refreshing his recollection with the grand jury

03:13PM   21    transcript from Bongiovanni allegedly is that it was related

03:13PM   22    to his connection with -- with his brother, and the murder,

03:13PM   23    and the marijuana dealings.  And that's all.

03:13PM   24         MR. TRIPI:  I still don't understand how referencing

03:13PM   25    back to the murder before you asked -- if you want to know

03:13PM     1    what Bongiovanni told him, ask that question.  Even lead on

03:13PM     2    it.  But why referencing the murder?  I don't understand.

03:13PM     3                **THE COURT:**  I think he can -- if he's -- did he

03:13PM     4    testify yesterday he didn't remember what he said --

03:13PM     5                **MR. TRIPI:**  He didn't remember the specifics.

03:13PM     6                **THE COURT:**  And did he tell the grand jury something?

03:13PM     7                **MR. SINGER:**  He told specifics then.  And, again,

03:13PM     8    like the reason -- like, part of our theory is that this

03:13PM     9    information that he's claiming was communicated to him by

03:13PM    10    Bongiovanni is just a well-known fact.

03:13PM    11                **THE COURT:**  I get that.  I get that.  I think you --

03:13PM    12    I think you can do what I just suggested.

03:13PM    13                **MR. TRIPI:**  I think the -- the reason he's not going

03:13PM    14    Q and A is because the grand jury is a little more amorphus

03:14PM    15    than Mr. Singer is making it out to be.  So we were conflating

03:14PM    16    concepts in there at the time.  It wasn't he -- this murder

03:14PM    17    investigation was different than what was being --

03:14PM    18                **THE COURT:**  I get it.  You can ask -- show him the

03:14PM    19    transcript to refresh his recollection.  There's no reason he

03:14PM    20    can't do that.

03:14PM    21                **MR. TRIPI:**  100 percent, I agree with that.

03:14PM    22                **THE COURT:**  If he wants to refresh his recollection,

03:14PM    23    he can do that.  So let's do that.

03:14PM    24                **MR. SINGER:**  Okay.

03:14PM    25                (End of sidebar discussion.)

03:14PM    1    **THE COURT:**  Next question.

03:14PM    2    **BY MR. SINGER:**

03:14PM    3    Q.  So, with regard to -- to this murder committed by Sam

03:14PM    4    Vacanti, this is something that Mr. Masecchia was also aware

03:14PM    5    of, right?

03:14PM    6    A.  Correct.

03:14PM    7    Q.  Okay.  And you were aware that -- that Mario Vacanti was

03:14PM    8    somebody who was arrested for a marijuana conspiracy charge

03:14PM    9    back in 2011?

03:14PM   10    A.  Correct.  I heard that, yes.

03:14PM   11    Q.  And Mr. Masecchia was also aware of that fact, correct?

03:14PM   12    A.  I believe so, yes.

03:14PM   13    Q.  And, so, your testimony yesterday was that at some point

03:15PM   14    in time, Ron Serio asks you about Mario Vacanti, correct?

03:15PM   15    A.  Correct.

03:15PM   16    Q.  And whether he's a potential threat to the organization,

03:15PM   17    correct?

03:15PM   18    A.  Correct.

03:15PM   19    Q.  And yesterday when you testified, you testified that you

03:15PM   20    weren't sure of the type of information that Joseph

03:15PM   21    Bongiovanni allegedly communicated to you regarding Mario

03:15PM   22    Vacanti, right?

03:15PM   23    A.  Correct.

03:15PM   24    **MR. SINGER:**  So, Ms. Champoux, if we can bring up

03:15PM   25    Exhibit 3540N again.

03:15PM    1          If we can turn to page 89.

03:15PM    2          **BY MR. SINGER:**

03:15PM    3    Q.  And I'm going to direct your attention, Mr. Selva, to

03:15PM    4    lines 5 through 25.

03:15PM    5        Could you please read those and see if that refreshes

03:15PM    6    your memory as to what type of information Joseph Bongiovanni

03:15PM    7    allegedly communicated to you regarding Mario Vacanti.

03:16PM    8    A.  Okay.

03:16PM    9    Q.  Now, did that help refresh your memory, sir?

03:16PM   10    A.  Yes.

03:16PM   11    Q.  So the nature of the information that Joseph Bongiovanni

03:16PM   12    allegedly communicated to you regarding Mario Vacanti related

03:16PM   13    to the fact that his brother was convicted of that murder,

03:16PM   14    correct?

03:16PM   15    A.  Correct.

03:16PM   16    Q.  And that Mario Vacanti was somebody who was taking over

03:16PM   17    his brother's marijuana business?

03:16PM   18    A.  Correct.  His brother had an operation that was extended

03:16PM   19    all the way out to California.

03:16PM   20    Q.  And that's why Joe Bongiovanni told you allegedly to

03:17PM   21    watch out for him?

03:17PM   22    A.  Yes.

03:17PM   23          **MR. SINGER:**  Okay.  You can take that down,

03:17PM   24    Ms. Champoux.

          25

03:17PM    1          **BY MR. SINGER:**

03:17PM    2    Q.  Now this is information that you state that you received

03:17PM    3    from Mr. Bongiovanni, right?

03:17PM    4    A.  Correct.

03:17PM    5    Q.  So naturally, in the pipeline of events, the next thing

03:17PM    6    you would do would be to meet up with Mike Masecchia; is that

03:17PM    7    correct?

03:17PM    8    A.  Correct.

03:17PM    9    Q.  And you would communicate that particular information to

03:17PM    10   him?

03:17PM    11   A.  Yes.

03:17PM    12   Q.  And it was your understanding that Mr. Masecchia would

03:17PM    13   then take that information to Ron Serio, correct?

03:17PM    14   A.  Correct.

03:17PM    15   Q.  And another piece of information that Mr. Bongiovanni

03:17PM    16   told you at that point in time as well was that Mario Vacanti

03:17PM    17   was not under investigation, correct?

03:17PM    18   A.  Correct.

03:17PM    19   Q.  And that's another piece of information you would have

03:17PM    20   communicated to Mr. Masecchia, right?

03:17PM    21   A.  Correct.

03:17PM    22   Q.  Who then presumably would have communicated that same

03:17PM    23   piece of information up to Ron Serio?

03:18PM    24   A.  Yes.

03:18PM    25   Q.  Okay.  I want to move on to GPS trackers.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

03:18PM    1    So, you had alleged in your direct testimony that

03:18PM    2    Mr. Bongiovanni told you that the DEA or others had installed

03:18PM    3    GPS trackers on Mike Masecchia's vehicle, correct?

03:18PM    4    A.  Correct.

03:18PM    5    Q.  And I think you said that like you knew it and he knew

03:18PM    6    it, correct?

03:18PM    7    A.  Correct.

03:18PM    8    Q.  Did you guys find a GPS tracker on Mike Masecchia's

03:18PM    9    vehicle?

03:18PM   10    A.  No.  But he -- I told him it was there.

03:18PM   11    Q.  Did you look for one?

03:18PM   12    A.  No.  Mike -- I don't know where it would have been put,

03:18PM   13    either under the hood or anything, but it was there.  He was

03:18PM   14    made aware it was there.

03:18PM   15    Q.  Did Mike --

03:18PM   16    A.  He felt -- Mike felt if he moved it, it would raise a red

03:18PM   17    flag that they know it was moved, and now they're gonna move

03:18PM   18    in, and it can cause a -- an arrest or something that it was

03:18PM   19    found.

03:18PM   20    Q.  When was it that -- that you received this piece of

03:18PM   21    information that a tracker was installed on his car?

03:18PM   22    A.  Once I found out, I called Mike and I told him.

03:19PM   23    Q.  And that's what I'm getting at, is that, when was that

03:19PM   24    time?

03:19PM   25    A.  I don't recall the timeframe.  Do you have something to

03:19PM 1    refresh my memory?  2015, '16, I'm not --

03:19PM 2    Q.  So you believe it was 2015 or '16 that this happened?

03:19PM 3    A.  I don't recall.

03:19PM 4    Q.  You just don't recall?

03:19PM 5    A.  The exact timeframe.

03:19PM 6    Q.  Did Joseph Bongiovanni talk to you about any potential

03:19PM 7    efforts to install trackers on Tom Serio's vehicles?

03:19PM 8    A.  No.

03:19PM 9    Q.  If a law enforcement agency was intending on installing

03:19PM 10   trackers on Tom Serio's vehicles, that would be information

03:19PM 11   that would be important to protect the organization; is that

03:19PM 12   correct?

03:19PM 13   A.  Correct.

03:19PM 14           **MR. TRIPI:**  Objection.

03:19PM 15           **THE COURT:**  No, overruled.

03:19PM 16           **THE WITNESS:**  Correct.

03:19PM 17           **BY MR. SINGER:**

03:19PM 18   Q.  Yeah.  Like Ron Serio would want to know about that,

03:19PM 19   right?

03:19PM 20   A.  Correct.

03:19PM 21   Q.  If his brother was being tracked, right?

03:20PM 22   A.  Correct.

03:20PM 23   Q.  Because that could potentially bring the entire

03:20PM 24   organization down, right?

03:20PM 25   A.  Yes.  It could cause a headache for Ron, yes.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

264

03:20PM   1   Q.  For the particular grow locations, we talked a little bit

03:20PM   2   about the 1195 Hertel address; do you remember that a few

03:20PM   3   minutes ago?

03:20PM   4   A.  You just showed me that, yes, the Suppas.

03:20PM   5   Q.  And we talked about whether or not Mr. Bongiovanni

03:20PM   6   alerted you to the fact that utility records were run on that

03:20PM   7   one particular location, correct?

03:20PM   8   A.  Correct.

03:20PM   9   Q.  And you stated that you never received that information,

03:20PM  10   right?

03:20PM  11   A.  I did not, no.

03:20PM  12   Q.  Did you receive any type of particular information

03:20PM  13   regarding the utilities that were pulled on other properties

03:20PM  14   owned by Ron or Tom Serio?

03:20PM  15   A.  No.

03:20PM  16   Q.  Did you receive any information about other agents in the

03:20PM  17   DEA investigating Ron and Tom Serio's properties going even

03:20PM  18   further back into 2012?

03:20PM  19   A.  No.

03:20PM  20   Q.  You talked a little bit about utility usage, and you said

03:21PM  21   that if the utilities ran a little too high, that it's

03:21PM  22   possible that National Grid was going to alert law

03:21PM  23   enforcement, right?

03:21PM  24   A.  Raise the red flag, yes.

03:21PM  25   Q.  You talked a little bit about Ron Serio.  Ron Serio used

03:21PM    1    his Lebrun address to grow marijuana, right?

03:21PM    2    A.  I believe so, yes.

03:21PM    3    Q.  Did Mr. Bongiovanni alert you to the fact the utilities

03:21PM    4    records were pulled for that particular address?

03:21PM    5    A.  No.

03:21PM    6    Q.  You talked a little bit about other confidential

03:21PM    7    informant names that you kind of learned along the way.  So

03:21PM    8    J.D. was -- was someone you allege Mr. Bongiovanni mentioned

03:21PM    9    was a CS to you?

03:21PM   10    A.  Correct.

03:21PM   11    Q.  And that was apparently at -- allegedly at the -- the

03:21PM   12    Fitness Factory, right?

03:21PM   13    A.  That's correct.

03:21PM   14    Q.  All right.  So, you knew J.D., correct?

03:21PM   15    A.  Yes.

03:21PM   16    Q.  I think you mentioned that he was somebody who performed

03:22PM   17    mold remediation work down in your basement?

03:22PM   18    A.  He did some work for me in my house, yes.

03:22PM   19    Q.  And he was also someone who you just knew from the

03:22PM   20    neighborhood, right?

03:22PM   21    A.  Yes.  He was younger than me, but yes, I -- I knew him.

03:22PM   22    Q.  He was someone that you knew to -- to have sometimes drug

03:22PM   23    problems, right?

03:22PM   24    A.  From what I heard, yes.

03:22PM   25    Q.  And you knew that he was somebody who would sometimes get

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

266

| | | |
|---|---|---|
| 03:22PM | 1 | clean, but then relapse, right? |
| 03:22PM | 2 | A.  Yes. |
| 03:22PM | 3 | Q.  And then he'd kind of run into problems with the law when |
| 03:22PM | 4 | he relapsed, right? |
| 03:22PM | 5 | A.  Yes.  From what I heard, yes. |
| 03:22PM | 6 | Q.  Okay.  So you mentioned that you hired him at some point |
| 03:22PM | 7 | to help out with mold remediation; is that right? |
| 03:22PM | 8 | A.  That's correct.  Like I said, he cut the mold out, he put |
| 03:22PM | 9 | new drywall up, he seamed it, cleaned it up, took care of it. |
| 03:22PM | 10 | Q.  And the reason for the mold remediation, sir, was the |
| 03:22PM | 11 | fact that you had grow operations operating down in your |
| 03:22PM | 12 | basement, right? |
| 03:22PM | 13 | A.  Correct, there's some mold that happened through the |
| 03:22PM | 14 | mildew that happens, yes. |
| 03:22PM | 15 | Q.  So you testified yesterday that -- that these grow |
| 03:23PM | 16 | operations started to occur in your house, not the smaller |
| 03:23PM | 17 | cloning, but -- but the actual grow operations, the plants, |
| 03:23PM | 18 | in the 2013 to 2014 timeframe, roughly? |
| 03:23PM | 19 | A.  That's correct. |
| 03:23PM | 20 | Q.  And so as far as the mold remediation, naturally that |
| 03:23PM | 21 | would happen after you did the growing, right? |
| 03:23PM | 22 | A.  Once I noticed it, I wanted it taken care of. |
| 03:23PM | 23 | Q.  Um-hum. |
| 03:23PM | 24 | A.  So -- |
| 03:23PM | 25 | Q.  Yes. |

03:23PM    1    A.   -- it was -- it was -- it was, like, year and a half, two

03:23PM    2    years, two years later, so.

03:23PM    3    Q.   Okay.  So, J.D. -- when was it that Mr. Bongiovanni told

03:23PM    4    you about him being a CS?

03:23PM    5        Do you recall testifying about how this happened

03:23PM    6    potentially before his wedding?

03:23PM    7    A.   Yes, but -- but J.D., he helped me, I believe it was

03:23PM    8    2013, '14 that I got the mold removed.

03:23PM    9    Q.   Well, hold on Mr. Selva.  You said that the grow

03:23PM   10    operation started in your house in 2013, right?

03:23PM   11    A.   Yeah, but it wasn't always going, so when it shut down,

03:24PM   12    that's when I got it done, cleaned everything out.  He came

03:24PM   13    in, he cut the drywall, he rehung it, he taped it and then it

03:24PM   14    was back to -- it was going again.

03:24PM   15    Q.   So your testimony is that he came over to your house

03:24PM   16    sometime in 2013 or '14 to do mold remediation?

03:24PM   17    A.   Yes, there was nothing in my -- we shut everything down,

03:24PM   18    there was nothing there, took care of the mold problem and

03:24PM   19    then the operation resumed.

03:24PM   20    Q.   Mr. J.D. came in and testified that it was 2015 --

03:24PM   21            **MR. TRIPI:**  Objection.

03:24PM   22            **BY MR. SINGER:**

03:24PM   23    Q.   -- that he was performing these operations?

03:24PM   24            **MR. TRIPI:**  Objection.

03:24PM   25            **THE COURT:**  Hang on.  Stop.

Case 1:19-cr-00227-LJV-MJR   Document 1179   Filed 09/08/24   Page 268 of 369
USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

268

03:24PM    1          **THE WITNESS:**  When was --

03:24PM    2          **MR. TRIPI:**  Objection.

03:24PM    3          **THE COURT:**  Stop.

03:24PM    4          **THE WITNESS:**  Sorry.

03:24PM    5          **MR. TRIPI:**  Wait.

03:24PM    6          **THE COURT:**  I -- I didn't hear the question.

03:24PM    7          (The above-requested question was then read by the

03:24PM    8   reporter.)

03:24PM    9          **THE COURT:**  So that -- that objection is sustained to

03:24PM   10   that statement and the jury will strike that statement.

03:25PM   11          **MR. SINGER:**  I'll -- I'll withdraw the question,

03:25PM   12   Judge.

03:25PM   13          **BY MR. SINGER:**

03:25PM   14   Q.  Anthony Anastasia was somebody else that you had

03:25PM   15   mentioned, right?

03:25PM   16   A.  Yes.

03:25PM   17   Q.  And it was alleged that Mr. Bongiovanni told you that he

03:25PM   18   was under investigation at some point, right?

03:25PM   19   A.  Yes.

03:25PM   20   Q.  And that was some point in 2011?

03:25PM   21   A.  I don't recall the timeframe, 2012, between '11 and '13

03:25PM   22   timeframe, maybe.

03:25PM   23   Q.  You were aware of the fact that -- that Anastasia was

03:25PM   24   arrested in 2010 at some point, right?

03:25PM   25   A.  Yes, like I said, it was -- I'm -- I was a year off,

| | | |
|---|---|---|
| 03:25PM | 1 | correct, it was within that timeframe. |
| 03:25PM | 2 | Q.  You arrest -- you were aware of the arrest for cocaine in |
| 03:25PM | 3 | 2010? |
| 03:25PM | 4 | A.  I was, yes. |
| 03:25PM | 5 | Q.  Okay.  So, this information regarding law enforcement -- |
| 03:25PM | 6 | MR. SINGER:  Judge, I'm sorry.  How long have we been |
| 03:25PM | 7 | going? |
| 03:25PM | 8 | THE COURT:  I think this is a great time.  I -- I've |
| 03:26PM | 9 | been waiting for you to suggest it. |
| 03:26PM | 10 | MR. SINGER:  No problem, Judge.  Let's -- let's take |
| 03:26PM | 11 | a break. |
| 03:26PM | 12 | THE COURT:  Let's take our afternoon break now. |
| 03:26PM | 13 | Remember my instructions about not talking about the |
| 03:26PM | 14 | case, even with each other, and not making up your minds. |
| 03:26PM | 15 | See you back here in about 15 minutes. |
| 03:26PM | 16 | (Jury excused at 3:26 p.m.) |
| 03:26PM | 17 | THE COURT:  I hate to break in, so that's why I -- |
| 03:26PM | 18 | MR. SINGER:  No, no, that's fine. |
| 03:26PM | 19 | THE COURT:  Okay.  Anything before we break, |
| 03:26PM | 20 | Mr. Singer? |
| 03:26PM | 21 | MR. SINGER:  Nothing from me, Judge. |
| 03:26PM | 22 | THE COURT:  Mr. Tripi? |
| 03:26PM | 23 | MR. TRIPI:  No, thank you, Judge. |
| 03:27PM | 24 | THE COURT:  Okay.  Great.  See you in about 15 |
| 03:27PM | 25 | minutes. |

03:27PM    1                    (Off the record at 3:27 p.m.)

03:27PM    2                    (Back on the record at 3:44 p.m.)

03:27PM    3                    (Jury not present.)

03:27PM    4            **THE CLERK:**  All rise.

03:44PM    5            **THE COURT:**  Please be seated.

03:44PM    6            **THE CLERK:**  We are back on the record for the

03:44PM    7    continuation of the jury trial in United States of America

03:44PM    8    versus Joseph Bongiovanni 19-cr-227.

03:44PM    9            All counsel and parties are present.

03:44PM   10            **THE COURT:**  Ready to continue?

03:44PM   11            **MR. SINGER:**  Yes, Your Honor.

03:44PM   12            **THE COURT:**  How much longer?

03:44PM   13            **MR. SINGER:**  Probably about a half an hour.

03:44PM   14            **THE COURT:**  Okay.  How long is your redirect going to

03:44PM   15    go?

03:44PM   16            **MR. TRIPI:**  I'll try to keep it to 15 minutes or so.

03:44PM   17            **THE COURT:**  Okay.  So we're going to finish him

03:44PM   18    today?

03:44PM   19            **MR. TRIPI:**  Yeah, I'd like to finish him today.

03:44PM   20            **THE COURT:**  Okay.

03:44PM   21            **MR. COOPER:**  Judge, you plan on going all the way to

03:44PM   22    5, though?

03:44PM   23            **THE COURT:**  I guess it's going to depend on when

03:44PM   24    we're done.  The next witness is going to take how long?

03:44PM   25            **MR. COOPER:**  The last trial, it's 55 minutes long.

03:44PM   1   The direct was about 30 or 40 of those minutes, so we might be

03:44PM   2   able to get through the direct today.

03:44PM   3           **THE COURT:**  Yeah.  So if we finish by 3:30 with this

03:44PM   4   witness, yeah, we'll do the direct of the next witness.

03:44PM   5           **MR. COOPER:**  Thank you, appreciate it.

03:44PM   6           **THE COURT:**  Okay.  Let's bring them in, please.

03:44PM   7           (Jury seated at 3:44 p.m.)

03:44PM   8           **THE COURT:**  The record will reflect that all our

03:44PM   9   jurors, again, are present.

03:44PM  10           I remind the witness that he's still under oath.

03:44PM  11           And you may continue, Mr. Singer.

03:44PM  12           **MR. SINGER:**  Thank you, Judge.

03:44PM  13           **BY MR. SINGER:**

03:44PM  14   Q.  So we left off talking about information that

03:44PM  15   Mr. Bongiovanni allegedly provided you.  One of the other

03:44PM  16   things that he provided you was -- was the tactical

03:45PM  17   information; do you remember testifying about that,

03:45PM  18   Mr. Selva?

03:45PM  19   A.  Yes, I do.

03:45PM  20   Q.  So these -- this conversation about law enforcement

03:45PM  21   tactics, where did this occur?

03:45PM  22   A.  We were out, just occurred.  I don't recall where.

03:45PM  23   Q.  Were you whispering into his ear and he whispering into

03:45PM  24   your ear when this is happening?

03:45PM  25   A.  It might be even happened when we were alone at his

03:45PM   1   house, or we were always alone.  It wasn't in a public place.

03:45PM   2   Q.  So -- so when you had these in-depth conversations, these

03:45PM   3   were different than the information conversations that you

03:45PM   4   had at the bar?

03:45PM   5   A.  I don't recall where I had it, sir.

03:45PM   6   Q.  Okay.  Do you recall when you had this conversations?

03:45PM   7   A.  I don't recall.

03:45PM   8   Q.  Was it 2008 or 2017, when was it?

03:45PM   9   A.  Between that timeframe, 2014, '15, somewhere around

03:45PM  10   there.

03:45PM  11   Q.  So 2014, 2015?

03:45PM  12   A.  Yes.

03:45PM  13   Q.  Best you can recollect?

03:45PM  14   A.  Best I can recollect.

03:45PM  15   Q.  All right.  So, a couple of these things that -- that

03:45PM  16   were discussed in this conversation was, don't speak on the

03:45PM  17   phone, right?

03:45PM  18   A.  Correct.

03:46PM  19   Q.  And you're aware of this because this was a practice Mike

03:46PM  20   Masecchia practiced, right?

03:46PM  21   A.  Correct.

03:46PM  22   Q.  And you knew this because you were a part of the --

03:46PM  23   the -- the cell phone business, right, for lack of a better

03:46PM  24   word?

03:46PM  25   A.  Correct.

03:46PM  1    Q.  Like you understood based on your work that when someone

03:46PM  2    made a call on a cell phone, it's something that gets logged

03:46PM  3    into a system, right?

03:46PM  4    A.  Correct.

03:46PM  5    Q.  That can later be pulled potentially by law enforcement,

03:46PM  6    right?

03:46PM  7    A.  That's correct.

03:46PM  8    Q.  And so, Mr. Bongiovanni, when he told you to, you know,

03:46PM  9    not talk on the phone about narcotics activity, that's not

03:46PM  10   something that's really groundbreaking, right?

03:46PM  11   A.  No.

03:46PM  12   Q.  It's pretty basic, right?

03:46PM  13   A.  Yes, sir.

03:46PM  14   Q.  Okay.  All right.  One of the other things you mentioned

03:46PM  15   was be aware of your surroundings was something he

03:46PM  16   communicated to you, right?

03:46PM  17   A.  Yes.

03:46PM  18   Q.  And look automatic for police, right?

03:46PM  19   A.  Surveillance vehicles, tinted windows, utility vehicles,

03:46PM  20   those type things.

03:46PM  21   Q.  Yeah, so --

03:46PM  22   A.  If one is parked at the end of the block for quite a bit

03:47PM  23   of the time, that could raise a red flag.

03:47PM  24   Q.  So be aware of your surroundings, you know, look out for

03:47PM  25   the police.  And that's another thing that's pretty basic,

03:47PM  1    right?

03:47PM  2    A.  Police, we have by, meaning undercover.  That's what I

03:47PM  3    meant.

03:47PM  4    Q.  Like -- like when you're driving down the road and you

03:47PM  5    see, you know, a potential officer who might be running a

03:47PM  6    speed trap, you're -- you're on the lookout for that, right?

03:47PM  7    A.  Of course, yes.

03:47PM  8    Q.  Okay.  So it's the same kind of thing here, like, look

03:47PM  9    out for police activity?

03:47PM  10   A.  Under surveillance type.  Not a regular police -- I don't

03:47PM  11   know -- I don't understand the question.  Are you talking

03:47PM  12   about a regular police car?  Or just --

03:47PM  13   Q.  Let's start first with the regular police car.

03:47PM  14       Did he tell you to watch out for police cars?

03:47PM  15   A.  No.  That's common sense.

03:47PM  16   Q.  Okay.  He, instead, you say started talking about

03:47PM  17   surveillance-based vehicles, right?

03:47PM  18   A.  Correct.

03:47PM  19   Q.  So these would be vehicles that might have tinted windows

03:47PM  20   on them?

03:47PM  21   A.  Smoke windows, Chargers, Tahoes, SUVs --

03:47PM  22   Q.  Yeah, Chargers, Tahoes, like government-type vehicles?

03:47PM  23   A.  Yes, yes.  Like I mentioned, utility vehicles, if you see

03:47PM  24   one at the end of the block for quite some time, that could

03:48PM  25   raise a red flag.

03:48PM  1   Q.  Okay.  So that was something a little more specific than

03:48PM  2   the generic government vehicle, right?

03:48PM  3   A.  Yes, I was just giving you examples of all of them.

03:48PM  4   Q.  So he told you about that information, to -- to keep an

03:48PM  5   eye out for that, right?

03:48PM  6   A.  Yes.

03:48PM  7   Q.  But again, like, you know, the fact that government

03:48PM  8   vehicles have window tints, are a particular make or model,

03:48PM  9   that's pretty basic information too, right?

03:48PM  10  A.  Correct.

03:48PM  11  Q.  Okay.  I think one of the things you mentioned was -- was

03:48PM  12  whether federal law enforcement information -- agencies share

03:48PM  13  information about investigations, right; remember that?

03:48PM  14  A.  Yes.

03:48PM  15  Q.  And I think Mr. Tripi talked to you about how you knew

03:48PM  16  this because you knew that Joe Palmieri or other people

03:48PM  17  worked on task forces, right?

03:48PM  18  A.  I understand how that worked, yes.

03:48PM  19  Q.  And they were local police officers who worked with the

03:48PM  20  DEA, right?

03:48PM  21  A.  Yes.

03:48PM  22  Q.  Shared information, correct?

03:48PM  23  A.  Correct.

03:48PM  24  Q.  And again, I mean, that's something that's pretty basic,

03:48PM  25  right?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

276

03:48PM  1   A.  I -- I don't know if everyone understands that, but, yes,

03:48PM  2   I -- I understood how it worked.

03:48PM  3   Q.  That police talk, right?

03:49PM  4   A.  Well, if you're assigned to a task force, if you're a

03:49PM  5   detective, or whatever your position is within that force, if

03:49PM  6   you're assigned to a task force, now you're working with them

03:49PM  7   specifically, so you're sworn in as a -- an agent, I would

03:49PM  8   believe.

03:49PM  9   Q.  Yeah, it sounded like you -- you learned this from your

03:49PM  10  conversations with Mr. Palmieri, right?

03:49PM  11  A.  I never had that conversation with Mr. Palmieri.

03:49PM  12  Q.  And you learned it from conversations you had, from

03:49PM  13  conversations with Mr. Bongiovanni, right, about who his

03:49PM  14  partner was and what he did, where he worked?

03:49PM  15  A.  Yes, he told me that he was with the task force.

03:49PM  16  Q.  Okay.  So, pretty basic conversation, right?

03:49PM  17  A.  Yes.

03:49PM  18  Q.  Those are some of the pieces of information that

03:49PM  19  Mr. Serio paid $4,000 a month for?

03:49PM  20  A.  Not that information.  I mean, I -- I don't understand

03:49PM  21  what you're -- you're --

03:49PM  22  Q.  Well, you said that you had this conversation sometime in

03:49PM  23  2014, '15.  I know you couldn't pin down a date, but around

03:49PM  24  that timeframe, right?

03:50PM  25  A.  Yes.

03:50PM 1 Q.  And that was when Ron Serio, according to you, is paying

03:50PM 2 Joe Bongiovanni $4,000 a month for information, right?

03:50PM 3 A.  Yes, yes.

03:50PM 4 Q.  So that's the type of information he was paying $4,000 a

03:50PM 5 month for, right?

03:50PM 6 A.  If it was -- yes.  Yes.

03:50PM 7 Q.  So, you talked a little bit about -- too, about a recent

03:50PM 8 revelation about some of these surveillance vehicles; do you

03:50PM 9 remember that?

03:50PM 10 A.  Yes.

03:50PM 11 Q.  Like it just popped in your head over the last two weeks

03:50PM 12 that you recalled an incident where you allege

03:50PM 13 Mr. Bongiovanni brought you into a DEA garage; do you

03:50PM 14 remember that?

03:50PM 15 A.  I remember that, yes.

03:50PM 16 Q.  That was something that came up in a witness prep session

03:50PM 17 prior to your testimony?

03:50PM 18 A.  Yes.

03:50PM 19 Q.  And you claimed that this particular garage was at the

03:50PM 20 Electric Tower?

03:50PM 21 A.  Next to it.

03:50PM 22 Q.  Next door to it?

03:50PM 23 A.  I believe so, yes.

03:50PM 24 Q.  And it was underground?

03:50PM 25 A.  It was an underground garage.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

03:50PM  1   Q.  And I think what you stated was that it happened sometime

03:51PM  2   when?

03:51PM  3   A.  2014, '15.  That timeframe.  Maybe '16.  I don't recall.

03:51PM  4   Q.  So '14, '15 or '16, best of --

03:51PM  5   A.  Again, I -- I -- best of my recollection, yes.

03:51PM  6   Q.  And I think what you stated was that on this particular

03:51PM  7   date, whenever it was, you were going over the DEA to go pick

03:51PM  8   up Mr. Bongiovanni; is that right?

03:51PM  9   A.  I followed him to drop off his vehicle, and then I was

03:51PM  10  gonna give him a ride back home.

03:51PM  11  Q.  Okay.  So to give him a lift; is that right?

03:51PM  12  A.  Yes.

03:51PM  13  Q.  And I think you said you -- you got to the garage where

03:51PM  14  it was located, right?

03:51PM  15  A.  Yes.

03:51PM  16  Q.  And it was something where there was some type of gate

03:51PM  17  with a sensor in front of it?

03:51PM  18  A.  Yes.

03:51PM  19  Q.  And he opened it up and you can't drive in there, right?

03:51PM  20  A.  I left my car outside, obviously.

03:51PM  21  Q.  And then you -- you walked into the building when he was

03:51PM  22  dropping the car off in the space?

03:51PM  23  A.  It was like a garage area.  I walked underneath, yes.

03:51PM  24  Q.  And you stated that while you're inside the garage, you

03:51PM  25  saw a bunch of vehicles that -- that you recognized as

03:51PM  1   government vehicles?

03:51PM  2   A.  Yes, there was different surveillance vehicles.  That's

03:52PM  3   why I mentioned the utility vehicle, I believe I thought

03:52PM  4   there was a cab, a lot of -- there was Chargers, Tahoes.

03:52PM  5   Q.  So the same blackout window, government-type vehicles we

03:52PM  6   talked about earlier?

03:52PM  7   A.  Yes, yes.

03:52PM  8   Q.  With the exception of that utility truck, right?

03:52PM  9   A.  Correct.

03:52PM  10  Q.  And you had asked the question of, hey -- hey, Joe, what

03:52PM  11  are all these cars?

03:52PM  12  A.  I did.  I asked.  He said we use them for surveillance.

03:52PM  13  Q.  Okay.

03:52PM  14  A.  It was a generic question.

03:52PM  15  Q.  And that was the -- the extent of the answer you got?

03:52PM  16  A.  That was it.  That was it.

03:52PM  17  Q.  And then you guys leave the garage and go into the car?

03:52PM  18  A.  I left first.  I went to my car.  He locked up, do what

03:52PM  19  he had to do, and then came.

03:52PM  20  Q.  And you drive away after that?

03:52PM  21  A.  Yep.

03:52PM  22  Q.  And that's it, right?

03:52PM  23  A.  That's it.

03:52PM  24  Q.  And you mentioned a little bit about the utility trucks,

03:52PM  25  make sure that they, you know, don't hang out -- outside your

03:52PM     1    house too much; is that right?

03:52PM     2    A.  If you see one for an extended period of time at the end

03:52PM     3    of the black, three, four days, that can raise a red flag.

03:53PM     4    Q.  So you talked about how you're not a 100 percent sure

03:53PM     5    when you had this conversation but you think it occurred

03:53PM     6    sometime in 2014 or '15, around those time periods, right?

03:53PM     7    A.  Around those time frames, yes.

03:53PM     8    Q.  But the marijuana conspiracy in this particular case that

03:53PM     9    you're involved in goes all the way back to 2008, right?

03:53PM    10    A.  Correct.

03:53PM    11    Q.  And that's when you allege that Mr. Bongiovanni starts

03:53PM    12    accepting payments for information, correct?

03:53PM    13    A.  Correct.

03:53PM    14    Q.  And during that period of time, you would drive your

03:53PM    15    vehicle with marijuana in it, right?

03:53PM    16    A.  That's correct.

03:53PM    17    Q.  From like the grow site down in the Southern Tier all the

03:53PM    18    way up to your house; is that right?

03:53PM    19    A.  My house or Ron's, wherever we're meeting Ron usually,

03:53PM    20    that was the rendezvous point.

03:53PM    21    Q.  And you talked about how when you would do this, you

03:53PM    22    would sometimes try to do it during rush hour so you wouldn't

03:53PM    23    try to --

03:53PM    24    A.  Correct.

03:53PM    25    Q.  -- you know, bring any attention to yourself; is that

03:53PM    1    right?

03:53PM    2    A.   That's correct.

03:53PM    3    Q.   So you had these conversations years after you're already

03:53PM    4    engaging in that type of activity, correct?

03:53PM    5    A.   Yes.

03:53PM    6    Q.   So, you weren't really protected back in 2008 or '9 when

03:54PM    7    you were transporting drugs, right?

03:54PM    8    A.   It was -- when we were transporting, we drove during rush

03:54PM    9    hour.  We were told to go during rush hour, that's the best

03:54PM   10    way to blend in, and that's what we did.

03:54PM   11    Q.   Yep.  But Mr. Bongiovanni didn't share that information

03:54PM   12    with you at that point in time, right?  That was something

03:54PM   13    you learned on your own?

03:54PM   14    A.   We learned that on our own, yes, that's the best time to

03:54PM   15    go.

03:54PM   16    Q.   And you learned on your own at that point in time to,

03:54PM   17    hey, you know, watch out for potential police vehicles; is

03:54PM   18    that right?

03:54PM   19    A.   Surveillance vehicle, but not particular types, but just

03:54PM   20    in general a regular police car, a state trooper car, you

03:54PM   21    want to blend in during rush hour, go the speed limit, don't

03:54PM   22    cause any attention to yourself.

03:54PM   23    Q.   So you didn't look out for any type of, you know, tinted

03:54PM   24    windows, government-type vehicles?

03:54PM   25    A.   All -- all of that, yes.

03:54PM   1   Q.  Yeah, because you already knew that information, right?

03:54PM   2   A.  At that time, yes, we were going during the -- the flow

03:54PM   3   of traffic and we were aware of everything.

03:54PM   4   Q.  Yeah, I mean that was not some special police information

03:54PM   5   you got.  That was just a tactic that drug dealers use,

03:54PM   6   right?

03:54PM   7   A.  Correct.  It was just basic information.

03:55PM   8   Q.  Um-hum, and that's something you learned as working for

03:55PM   9   drug dealers, right?

03:55PM   10   A.  Correct.

03:55PM   11   Q.  You learned about how to conceal the marijuana in your

03:55PM   12   car, not based on anything that Bongiovanni told you, but

03:55PM   13   just working for drug dealers, right?

03:55PM   14   A.  Correct.  Conceal it and drive slow and drive during

03:55PM   15   business hours -- or rush hour, I'm sorry.

03:55PM   16   Q.  And you talked a little bit, too, about -- about watching

03:55PM   17   Mr. Bongiovanni trying to watch out for transportation of

03:55PM   18   marijuana between New York City, the trips that Ron Serio and

03:55PM   19   some others would take sometimes?

03:55PM   20   A.  Yes.

03:55PM   21   Q.  And you talked about that he would -- would try to keep a

03:55PM   22   watchful eye out during these operations; is that right?

03:55PM   23   A.  Correct.  When the travel periods were going, correct.

03:55PM   24   Q.  But you never spoke in your testimony about providing him

03:55PM   25   any type of license plate numbers for the vehicles that were

03:55PM   1    transporting marijuana, right?

03:55PM   2    A.   No.

03:55PM   3    Q.   You didn't talk about providing information about the

03:55PM   4    particular drivers who were transporting the marijuana,

03:55PM   5    correct?

03:55PM   6    A.   I told them the drivers.  It was Masecchia and Serio that

03:56PM   7    would have been going.

03:56PM   8    Q.   Okay.  But what about the greater operation?  What I'm

03:56PM   9    talking about now is trucks that were transporting marijuana

03:56PM  10    from places out west.  You didn't provide him any specific

03:56PM  11    information about those people, right?

03:56PM  12    A.   No.  I didn't -- I didn't have that, no.

03:56PM  13    Q.   And you didn't provide him any specific information about

03:56PM  14    people who were transporting marijuana from Canada, right?

03:56PM  15    A.   Correct.

03:56PM  16    Q.   When Mr. Serio was dealing with Mr. Gerace, you were

03:56PM  17    familiar with the fact that Anthony Gerace was helping to

03:56PM  18    transport marijuana for him at some point in time, right?

03:56PM  19    A.   I -- I heard that, yes.  He was transporting for him,

03:56PM  20    yes.

03:56PM  21    Q.   But you never provided any specific information about

03:56PM  22    those drivers or when they were crossing the border to

03:56PM  23    Mr. Bongiovanni, right?

03:56PM  24    A.   No.  I -- I didn't know he was going -- I didn't know

03:56PM  25    where he was going with it.  I -- it never came up.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

03:56PM   1    Their -- their objective was just to know if there was

03:56PM   2   anything going on when they were from California, British

03:56PM   3   Columbia, New York City.  And that's what I relayed.

03:56PM   4   Q.  And I guess this expectation was that he was going to

03:57PM   5   provide some type of protection or information about

03:57PM   6   investigations on those type of activities, right?

03:57PM   7   A.  If those vehicles were -- if there was an investigation,

03:57PM   8   yes.

03:57PM   9   Q.  But you didn't provide any information to help them take

03:57PM  10   a look and see if any of those vehicles were flagged, right?

03:57PM  11   A.  No.  The objective was if he had heard anything.  If he

03:57PM  12   had heard anything while these guys are traveling, it would

03:57PM  13   be a great -- great knowledge.

03:57PM  14   Q.  And that's what Ron Serio was paying $4,000 a month for?

03:57PM  15   A.  Yes, if they -- when they were traveling, told them when

03:57PM  16   they were going and this is the route they're going through,

03:57PM  17   New York to Brooklyn wherever it was, if anything was to

03:57PM  18   happen, let us know, let them know.

03:57PM  19   Q.  So, let's talk a little bit about Ron Serio.

03:57PM  20    So, Ron Serio, you knew him as the head of the

03:57PM  21   conspiracy, correct?

03:57PM  22   A.  Correct.

03:57PM  23   Q.  He was the person who would cash out Mike Masecchia; is

03:57PM  24   that right?

03:58PM  25   A.  Correct.

03:58PM    1    Q.  And that was in the earlier part of the days, right?

03:58PM    2    A.  Correct.

03:58PM    3    Q.  But later, as things started to expand, Mike Masecchia

03:58PM    4    took a more active role in the -- in the overall operation,

03:58PM    5    correct?

03:58PM    6    A.  That's correct.

03:58PM    7    Q.  The day-to-day management of -- of how marijuana is

03:58PM    8    getting imported, correct?

03:58PM    9    A.  He was with Ron on that.  Ron was still coordinating all

03:58PM   10    that, I believe.

03:58PM   11    Q.  Yeah, and it wasn't just that Mike Masecchia was still

03:58PM   12    doing the outdoor grows down in Franklinville, right?

03:58PM   13    A.  No, he had expanded with Ron, correct.

03:58PM   14    Q.  Yeah.  I mean at that point in time as you get later in

03:58PM   15    the conspiracy before Ron Serio's arrest, he's involved in

03:58PM   16    the indoor grow operations, right?

03:58PM   17    A.  Yes.

03:58PM   18    Q.  He's involved in the importation activities, correct?

03:58PM   19    A.  That's correct.

03:58PM   20    Q.  Coordinating visits with Ron Serio with some potential

03:58PM   21    people might be able to provide marijuana, correct?

03:58PM   22    A.  That's correct.

03:58PM   23    Q.  Also helping identify individuals who might be potential

03:58PM   24    sellers down the chain, right?

03:58PM   25    A.  I believe so, correct.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

286

03:58PM   1   Q.  So he's not just kind of a bit player, he's doing an

03:59PM   2   outdoor grow at that point?

03:59PM   3   A.  No, like I mentioned, his role had expanded.

03:59PM   4   Q.  But as far as your role in the organization, it's

03:59PM   5   something that remained pretty static throughout the entirety

03:59PM   6   of the operation, right?

03:59PM   7   A.  Yes.

03:59PM   8   Q.  But you were limited to the outdoor grows, correct?

03:59PM   9   A.  Correct.

03:59PM   10  Q.  You were limited to the indoor grows that occurred in

03:59PM   11  your house, right?

03:59PM   12  A.  Correct.

03:59PM   13  Q.  You're limited to some of the activities as far as

03:59PM   14  breaking down the marijuana and packaging it when it was

03:59PM   15  ready after harvest?

03:59PM   16  A.  Correct.

03:59PM   17  Q.  Whether it was indoor or outdoor?

03:59PM   18  A.  Correct, just help them clean it up, trim it, correct.

03:59PM   19  Q.  And then that role, of course, was the -- the

03:59PM   20  communication piece between Ron Serio, Mike Masecchia and Joe

03:59PM   21  Bongiovanni, correct?

03:59PM   22  A.  That's correct.

03:59PM   23  Q.  Okay.  So, as far as Ron Serio was concerned, you're

03:59PM   24  aware of the fact that he abused drugs during the course of

03:59PM   25  the conspiracy, correct?

03:59PM 1  A.  I've heard that, yes.  He got tied up in drug use, yes.

03:59PM 2  Q.  Yeah.  And we're not talking about, like, marijuana.

03:59PM 3  We're talking about hard drugs, correct?

03:59PM 4  A.  Correct.

03:59PM 5  Q.  We're talking about opiates?

03:59PM 6  A.  Correct.

03:59PM 7  Q.  Talking about both pills and heroin, right?

04:00PM 8  A.  Correct.

04:00PM 9  Q.  We're talking about amphetamines, right?

04:00PM 10  A.  Correct.

04:00PM 11  Q.  We're talking about cocaine?

04:00PM 12  A.  Correct.  I heard that, yes.

04:00PM 13  Q.  And, you know, these are things -- I think at one point

04:00PM 14  in time in a proffer interview, you remember describing him

04:00PM 15  as being a mess to the government, correct?

04:00PM 16  A.  Yes.

04:00PM 17  Q.  So these are things, his addictions, his use of these

04:00PM 18  drugs, affected his judgment, memory sometimes, right?

04:00PM 19  A.  Yes.

04:00PM 20  Q.  I mean, you know, you've used drugs in your life,

04:00PM 21  correct?

04:00PM 22  A.  Yes.

04:00PM 23  Q.  And when you used drugs in the past, they affected your

04:00PM 24  memory and judgment, correct?

04:00PM 25  A.  Yes.  I've never used heroin or what he was using, but

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24
288

| | | |
|---|---|---|
| 04:00PM | 1 | yes. |
| 04:00PM | 2 | Q.  Yeah. |
| 04:00PM | 3 | A.  Yes. |
| 04:00PM | 4 | Q.  I mean, like you weren't using those really hard core |
| 04:00PM | 5 | drugs, right? |
| 04:00PM | 6 | A.  No. |
| 04:00PM | 7 | Q.  I mean, you used cocaine, right? |
| 04:00PM | 8 | A.  Recreational drugs, yes. |
| 04:00PM | 9 | Q.  Um-hmm. |
| 04:00PM | 10 | A.  Yes. |
| 04:00PM | 11 | Q.  But you weren't into, like, the opiate stuff, right? |
| 04:00PM | 12 | A.  No. |
| 04:00PM | 13 | Q.  And you've seen other people who have used those type of |
| 04:00PM | 14 | drugs, right? |
| 04:00PM | 15 | A.  Yes. |
| 04:00PM | 16 | Q.  I mean, it's not something that's very pretty, right? |
| 04:00PM | 17 | When they're -- |
| 04:00PM | 18 | A.  It's not. |
| 04:00PM | 19 | Q.  -- heavily -- |
| 04:00PM | 20 | A.  No. |
| 04:01PM | 21 | Q.  -- addicted.  And they suffer from some type of memory |
| 04:01PM | 22 | problems and judgment calls, correct? |
| 04:01PM | 23 | A.  Correct, it's hard to function. |
| 04:01PM | 24 | Q.  So Ron Serio, he was also somebody who had a lot of |
| 04:01PM | 25 | money, right? |

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

04:01PM  1    A.  He did, yes.

04:01PM  2    Q.  Yeah, I mean, we've seen the -- the pictures of the

04:01PM  3    mansion on Lebrun that we've been talking about, right?

04:01PM  4    A.  Yes, sir.

04:01PM  5    Q.  You've been over there, right?

04:01PM  6    A.  A few times, I was there, yes.

04:01PM  7    Q.  I mean, it's a pretty lavish place, right?

04:01PM  8    A.  Yes, it was.

04:01PM  9    Q.  It was a lavish place before he put some money into

04:01PM  10   renovating it, right?

04:01PM  11   A.  I saw before and after, yes.

04:01PM  12   Q.  And it looked even more beautiful afterwards, right?

04:01PM  13   A.  It did.

04:01PM  14   Q.  Okay.  And he was somebody you know drove luxury cars,

04:01PM  15   right?

04:01PM  16   A.  Yes.

04:01PM  17   Q.  He also owned multiple properties, right?

04:01PM  18   A.  Yes.

04:01PM  19   Q.  He was in a much better financial situation than you

04:01PM  20   were, correct?

04:01PM  21   A.  Oh, yes.

04:01PM  22   Q.  Like hand over fist, right?

04:01PM  23   A.  Twice.

04:01PM  24   Q.  And he was in a better financial situation than Mike

04:01PM  25   Masecchia was, right?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

290

04:01PM     1    A.  Yes.

04:01PM     2    Q.  So as far as your involvement in the conspiracy, I know

04:02PM     3    you mentioned that you got cuts from some of these outdoor

04:02PM     4    grows; is that right?

04:02PM     5    A.  Correct, percentages, yes.

04:02PM     6    Q.  You got percentages based on information that you helped

04:02PM     7    act as a conduit between Mr. Bongiovanni and Ron Serio and

04:02PM     8    Mike Masecchia, as you were talking about yesterday on the

04:02PM     9    stand?

04:02PM    10    A.  Correct.  And participation as well, helping.  Yes, the

04:02PM    11    overall spectrum of it, yes.

04:02PM    12    Q.  Yeah.  And there's some other monetary allotments you

04:02PM    13    would get from Ron Serio, like, so if you stored marijuana in

04:02PM    14    his -- in the inside of your house, you would make money off

04:02PM    15    of that, right?

04:02PM    16    A.  A little bit, yes.

04:02PM    17    Q.  When you acted as a place where Ron Serio could do an

04:02PM    18    indoor grow operation in your basement, you'd get money for

04:02PM    19    that, right?

04:02PM    20    A.  Yes.

04:02PM    21    Q.  They'd pay your utilities and electric bills?

04:02PM    22    A.  Yes.  I explained that, yes.

04:02PM    23    Q.  You'd also get cuts from the organization to the extent

04:02PM    24    that you helped them with any type of distribution

04:02PM    25    material -- activities, right?

04:02PM    1    A.   I wasn't involved in that part, no.  It was primarily Ron

04:03PM    2    and Mike.

04:03PM    3    Q.   Yeah, I should have been a little more specific than

04:03PM    4    that.  What I'm talking about transportation activities,

04:03PM    5    right?

04:03PM    6    A.   I wasn't cut in.  No, whatever was from outdoor --

04:03PM    7    Q.   Okay.

04:03PM    8    A.   -- yes.  If it was an outdoor, yes, but whatever they had

04:03PM    9    going on, I was not privy to and transporting.

04:03PM   10    Q.   You were not a part of that?

04:03PM   11    A.   No, they have other things they going on that I was not

04:03PM   12    part of, no.

04:03PM   13    Q.   And notwithstanding all this income that you were

04:03PM   14    receiving from this illegal funnel from the drug-trafficking

04:03PM   15    organization, you still had financial problems, right?

04:03PM   16    A.   Yes.

04:03PM   17    Q.   Like, so, for instance, we talked about the suit for

04:03PM   18    Joe's wedding, right?

04:03PM   19    A.   Yes.

04:03PM   20    Q.   Like, he bought that for you, right?

04:03PM   21    A.   Yes.

04:03PM   22    Q.   And if, you know, you were asked to go purchase a $600

04:03PM   23    suit, you'd create some problems for you potentially, right?

04:03PM   24    A.   It was expensive.  Yes, it --

04:03PM   25    Q.   And, so, as far as the payments, again, you were never

04:03PM    1    part of Ron Serio setting aside a particular amount of money

04:04PM    2    for Joseph Bongiovanni, right?

04:04PM    3    A.  No.  Ron took care of that.

04:04PM    4    Q.  And he would provide that money to Mike Masecchia and you

04:04PM    5    were never a part of that, right?

04:04PM    6    A.  Correct, it was given to Mike.

04:04PM    7    Q.  And when Mike met up with Joe to allegedly provide this

04:04PM    8    money, you were never part of any of those meetings, right?

04:04PM    9    A.  No, that meeting was coordinated with them.

04:04PM   10    Q.  So you don't really have any firsthand knowledge of the

04:04PM   11    money going from Masecchia to Joseph Bongiovanni?

04:04PM   12         **MR. TRIPI:**  Objection as to firsthand knowledge.

04:04PM   13    He's testified about the money going back and forth.

04:04PM   14         I guess define "firsthand knowledge."

04:04PM   15         **MR. SINGER:**  I'll withdraw the question and ask it

04:04PM   16    another way, Judge.

04:04PM   17         **THE COURT:**  Okay.

04:04PM   18         **BY MR. SINGER:**

04:04PM   19    Q.  You never observed Mike Masecchia hand money to Joseph

04:04PM   20    Bongiovanni, right?

04:04PM   21    A.  No.  But I know it went there.

04:04PM   22    Q.  Yeah, that's based on what you've been telling the jury

04:04PM   23    about as far as information being shared back and forth,

04:04PM   24    right?

04:04PM   25    A.  That, and his expenses being covered and spending more,

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

293

| 04:04PM | 1 | yes. |

04:04PM    1    yes.

04:04PM    2    Q.  Like so those expenses, we're talking about the

04:05PM    3    improvements to the 85 Alder Place, right?

04:05PM    4    A.  Lifestyle, everything.

04:05PM    5    Q.  Yeah, we're talking about --

04:05PM    6    A.  Money could be spent a lot of different ways.

04:05PM    7    Q.  Yeah.  We're talking about shopping at Napoli's, his

04:05PM    8    brother-in-law's store, right?

04:05PM    9    A.  Sure.

04:05PM    10    Q.  Which you classified as a high-end clothing store?

04:05PM    11    A.  Yes.

04:05PM    12    Q.  And we talked about the Rolex that you allegedly observed

04:05PM    13    in the closet in that picture, correct?

04:05PM    14    A.  Yes.

04:05PM    15    Q.  We talked about the Invicta watches that you think may

04:05PM    16    have been more expensive than yours?

04:05PM    17    A.  Yes.

04:05PM    18    Q.  We talked about other things as far as his lifestyle, how

04:05PM    19    many houses he kept, right?

04:05PM    20    A.  Correct.

04:05PM    21    Q.  But I think you testified, too, when we went through a

04:05PM    22    lot of those things, you weren't really 100 percent sure

04:05PM    23    about how Mr. Bongiovanni paid for those items, right?

04:05PM    24    A.  No.

04:05PM    25    Q.  You weren't sure about whether he financed particular

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

294

04:05PM  1   items, right?

04:05PM  2   A.  I'm not aware of that, no.

04:05PM  3   Q.  Yeah.  So like you're not, for instance, aware of how he

04:05PM  4   financed or if he financed the 221 Lovering property that he

04:05PM  5   purchased from his parents, right?

04:05PM  6   A.  I'm not aware of how the financing went, no.

04:06PM  7   Q.  You're not aware of the finances for the 85 Alder Place,

04:06PM  8   right?

04:06PM  9   A.  I'm not aware of that, no.

04:06PM  10  Q.  And you're not aware of how he financed these watches

04:06PM  11  that you allege he owns, right?

04:06PM  12  A.  No, sir.

04:06PM  13  Q.  I mean, you don't even know if he, like, took a loan out

04:06PM  14  for a Rolex or something like that, right?

04:06PM  15  A.  I have no idea.

04:06PM  16  Q.  Yeah.  I mean, you don't even know if it's a Rolex,

04:06PM  17  right?

04:06PM  18  A.  It looked like a Rolex.

04:06PM  19  Q.  Well, I know you said that.  I know you said that.

04:06PM  20  A.  Again, that was my assumption.  It looked like a Rolex.

04:06PM  21  My opinion.

04:06PM  22  Q.  But you don't know?

04:06PM  23  A.  I don't know.

04:06PM  24  Q.  Yeah.  You don't know, right?

04:06PM  25  A.  No.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

04:06PM   1   Q.  That's okay.  So, as far as these other things that you

04:06PM   2   talked about with the finances, you think Mr. Bongiovanni is

04:06PM   3   living a high lifestyle, but you don't know how he's

04:06PM   4   financing it, right?

04:06PM   5   A.  No.

04:06PM   6   Q.  Your assumption is, is well, he must be using this --

04:06PM   7   this bribe money to pay for these things, right?

04:06PM   8   A.  To subsidize it, yes.

04:06PM   9   Q.  And that's based on the fact that you had these

04:06PM  10   conversations with him where sometimes he complained about

04:06PM  11   the quabbles that he had with his ex-spouse over how much

04:06PM  12   money was being spent on his daughter by him versus her,

04:07PM  13   right?

04:07PM  14   A.  Yes.  She was not working, like I mentioned, and he was

04:07PM  15   picking up the majority of the expenses.

04:07PM  16   Q.  Um-hmm.  So, the main reason why you got into this

04:07PM  17   conspiracy, again, was -- was to help supplement your own

04:07PM  18   income, right?

04:07PM  19   A.  Correct.

04:07PM  20   Q.  And part of the reason, too, was that you knew some of

04:07PM  21   the people that were involved because you grew up with them,

04:07PM  22   right?

04:07PM  23   A.  That's correct.

04:07PM  24   Q.  And the other part of it was that you had a value add for

04:07PM  25   Ron Serio because, unlike him or Mike Masecchia, he knew Joe

04:07PM   1   Bongiovanni very well, right?

04:07PM   2   A.   Correct.

04:07PM   3   Q.   You had an established friendship with him at that time,

04:07PM   4   right?

04:07PM   5   A.   Correct.

04:07PM   6   Q.   Right.  So you claim that this conspiracy lasted until

04:07PM   7   the day that Ron Serio was arrested in April 2017, right?

04:07PM   8   A.   Correct.

04:07PM   9   Q.   The money payments continued to Joe Bongiovanni right up

04:07PM  10   until that point?

04:07PM  11   A.   Right up until that, yes, everything fell apart, then it

04:07PM  12   stopped.

04:07PM  13   Q.   So, let's fast forward.  After Ron Serio's arrest in June

04:08PM  14   of 2019, you become aware of the fact that the federal

04:08PM  15   government executed a search warrant at Joe Bongiovanni's

04:08PM  16   home, right?

04:08PM  17   A.   Correct.

04:08PM  18   Q.   And that was something you learned, I think, through --

04:08PM  19   through friends; is that right?

04:08PM  20   A.   Through a -- I heard about it through a girl I was with

04:08PM  21   at the time, yes.  And then word had gotten out, yes.

04:08PM  22   Q.   And you heard about this and -- and that's something that

04:08PM  23   you testified yesterday, it scared you, right?

04:08PM  24   A.   Yes.

04:08PM  25   Q.   Because it was something that -- that you had concerns

04:08PM     1    about if -- if his house was raided, maybe I'm next, right?

04:08PM     2    A.  I was next.  I was next.

04:08PM     3    Q.  Um-hum.  Yeah, a couple months later --

04:08PM     4    A.  So was Mike Masecchia, same day.

04:08PM     5    Q.  Couple months later?

04:08PM     6    A.  August 23rd.

04:08PM     7    Q.  August 23rd is when the federal government executed a

04:08PM     8    search warrant at your house, right?

04:08PM     9    A.  And Mike Masecchia's.

04:08PM    10    Q.  And Mike Masecchia's, yeah.  I'm talking about Joe

04:08PM    11    Bongiovanni?

04:08PM    12    A.  And he was -- it was in May for him.

04:08PM    13    Q.  Yeah.  It was earlier, right?

04:08PM    14    A.  Believe so.

04:08PM    15    Q.  Okay.  So two weeks prior to your arrest, do you remember

04:09PM    16    reading an article on your cell phone about two politicians

04:09PM    17    who went to prison for crimes they committed?

04:09PM    18    A.  I don't recall.

04:09PM    19    Q.  Well, let's -- let's see if we can refresh your

04:09PM    20    recollection on that.  So, you recall in your direct

04:09PM    21    testimony that HSI was the investigating agency that -- that

04:09PM    22    went into your house the day of the search warrant, right?

04:09PM    23    A.  Correct.

04:09PM    24    Q.  And you testified about how, during the time that they

04:09PM    25    were there, one of the things they did was they seized your

04:09PM   1   cell phone, right?

04:09PM   2   A.  That's correct.

04:09PM   3   Q.  And you testified yesterday that you took a look at the

04:09PM   4   contents of a drive that contained a copy of your cell

04:09PM   5   phone's contents, right?

04:09PM   6   A.  Correct.

04:09PM   7   Q.  And that was something that was substantially the same

04:09PM   8   condition, right?

04:09PM   9   A.  Correct.

04:09PM  10   Q.  When it was seized by the federal government, correct?

04:09PM  11   A.  Correct.

04:09PM  12   Q.  And that had a litany of information regarding what

04:09PM  13   happened on your cell phone up until the point that it was

04:09PM  14   seized, right?

04:09PM  15   A.  Correct.

04:09PM  16   Q.  And you had that phone for -- for a period of several

04:09PM  17   years prior to the time that the federal government came in

04:09PM  18   your house, right?

04:09PM  19   A.  Yes.

04:10PM  20   Q.  So, are you aware of the fact that search history on your

04:10PM  21   phone, is something that is maintained on your phone and can

04:10PM  22   be seen and copied on your phone?

04:10PM  23   A.  I -- I am aware of that, yes.

04:10PM  24   Q.  Okay.  So I want to show you a copy of one of the

04:10PM  25   searches.  I'll hand you up a document, sir.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

04:10PM  1          **THE COURT:**  Has it been marked?

04:10PM  2          **MR. TRIPI:**  No.

04:10PM  3          **MR. SINGER:**  It's not been marked, Judge.  I'm just

04:10PM  4    using it to refresh his recollection.

04:10PM  5          **MR. TRIPI:**  Yeah, I'd like it marked.

04:10PM  6          **THE COURT:**  Of course, you have to mark it.

04:10PM  7          **MR. SINGER:**  Mr. Selva, do you mind if I take that

04:10PM  8    back real quick?

04:11PM  9          **MR. TRIPI:**  Where is this in Exhibit 208?

04:11PM  10         We might need a moment here, Judge.  We might need a

04:11PM  11   moment here, Judge.  I -- I -- I'm not recognizing this.

04:11PM  12         **THE COURT:**  Do -- do you want to come up?

04:11PM  13         **MR. TRIPI:**  Sure.

04:11PM  14         (Sidebar discussion held on the record.)

04:11PM  15         **MR. TRIPI:**  I apologize in advance, but I don't have

04:11PM  16   all of Exhibit 208 memorized.  But -- fair, fair enough.  But,

04:11PM  17   in the moment I'm handed this, I can't match the front page to

04:11PM  18   the search history.

04:11PM  19         This is not a report that we created.  The whole

04:11PM  20   extraction is turned over, but I should have had this before.

04:11PM  21   So now I'm -- I'm trying to see if I can authenticate it in

04:12PM  22   the ten seconds he wants to throw it in front of the witness.

04:12PM  23   I should have had this before this moment.

04:12PM  24         **THE COURT:**  Okay.

04:12PM  25         **MR. SINGER:**  It's very easy.  So, this is his cell

04:12PM     1    phone copy, right?  The electronic copy of the government --

04:12PM     2         **MR. TRIPI:**  How do I link the cover page to this,

04:12PM     3    what you've stapled?  So --

04:12PM     4         **MR. SINGER:**  So this is the first page of the

04:12PM     5    Cellebrite regarding the phone.

04:12PM     6         **MR. TRIPI:**  Yeah, I see that.

04:12PM     7         **MR. SINGER:**  The second page is regarding the history

04:12PM     8    tab --

04:12PM     9         **MR. TRIPI:**  But what --

04:12PM    10         **MR. SINGER:**  -- and search for the word present.

04:12PM    11         **THE COURT:**  Hold on.  Stop, stop.

04:12PM    12                    (Simultaneous talking.)

04:12PM    13         **THE COURT:**  Yes, I'm trying to stop everyone --

04:12PM    14         **MR. TRIPI:**  I'm sorry.

04:12PM    15         **THE COURT:**  -- and hear Mr. Singer.

04:12PM    16         Go ahead.

04:12PM    17         **MR. SINGER:**  Thank you.

04:12PM    18         So this is the web's history tab in Cellebrite.

04:12PM    19    There's a word search for the word "prison."  This particular

04:12PM    20    article comes up as a word search on 8/11/2019.

04:12PM    21         **COURT REPORTER:**  Speak louder, please.

04:12PM    22         **MR. SINGER:**  I'm sorry, Ann.

04:12PM    23         This -- this -- this particular word search comes in

04:12PM    24    at 8/11/2019.  This is the particular link to that one

04:12PM    25    article.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

04:12PM  1        This is in an expanded form regarding what the title

04:13PM  2   of the article is, and again the link.

04:13PM  3        And this is a copy of the article itself.

04:13PM  4        **MR. COOPER:**  Which is not in Exhibit 208, right?

04:13PM  5        **MR. SINGER:**  It's not something that's saved in the

04:13PM  6   phone, it's the --

04:13PM  7        **MR. TRIPI:**  Yeah, yeah, yeah, yeah.

04:13PM  8        **MR. COOPER:**  It's not a part of Exhibit 208.

04:13PM  9        **MR. TRIPI:**  It's not a part of what he authenticated.

04:13PM  10       They went and did a Google search, and then stapled

04:13PM  11  it to the cover sheet.

04:13PM  12       **THE COURT:**  This is not in 208?

04:13PM  13       **MR. SINGER:**  So this particular article is the link

04:13PM  14  in 208.

04:13PM  15       **MR. COOPER:**  So "no" is the answer to your question.

04:13PM  16       **COURT REPORTER:**  Speak louder, please.

04:13PM  17       **MR. COOPER:**  So "no" is the answer to the Judge's

04:13PM  18  question.

04:13PM  19       **THE COURT:**  Everything except the article --

04:13PM  20       **MR. SINGER:**  The article's not saved.  So the phone

04:13PM  21  contents --

04:13PM  22       **THE COURT:**  Let me -- let me finish my question --

04:13PM  23       **MR. SINGER:**  Sure, Judge.

04:13PM  24       **THE COURT:**  -- and then you can answer the question.

04:13PM  25  I know you guys are very -- you probably know what I'm going

04:13PM   1   to ask.  But the first three pages of this are part of 208.

04:14PM   2           MR. SINGER:  Part of the Cellebrite software, yes,

04:14PM   3   Judge.

04:14PM   4           THE COURT:  Okay.

04:14PM   5           MR. TRIPI:  Can we pull it up on 208 on the screen?

04:14PM   6   They clearly know where it is.  Let's pull it up in 208 and

04:14PM   7   show them, and then I'll have no issue.

04:14PM   8           MR. SINGER:  I don't know if we have, like, the link

04:14PM   9   itself inside -- I don't know, like, what the internet access

04:14PM  10   is going to be like off the link.

04:14PM  11           THE COURT:  Should we do this Tuesday morning?

04:14PM  12           MR. SINGER:  I mean --

04:14PM  13           MR. TRIPI:  I'd like to try to finish the witness.

04:14PM  14           THE COURT:  I would, too.

04:14PM  15           MR. SINGER:  Yeah.

04:14PM  16           MR. TRIPI:  Yeah.  But, I mean, I just have no, you

04:14PM  17   know --

04:14PM  18           THE COURT:  Can you -- can -- can you do it without

04:14PM  19   showing him the article itself?

04:14PM  20           MR. SINGER:  So, like, he doesn't have -- he

04:14PM  21   testified he didn't have a specific recollection of the

04:14PM  22   article.  Like, we haven't gotten to the point where he's

04:14PM  23   taking a look --

04:14PM  24           THE COURT:  We certainly can show him the article and

04:14PM  25   ask him if he remembers searching for this article on his --

04:14PM    1    his cell phone.

04:14PM    2            MR. SINGER:  Yeah.  I mean, that's -- we're getting

04:14PM    3    that here.

04:14PM    4            THE COURT:  Yeah.  I think he -- he can ask him if

04:14PM    5    that refreshes his recollection as to whether he --

04:14PM    6            Yeah, I think he can do that.  I mean, he can show

04:15PM    7    him anything, right?

04:15PM    8            MR. TRIPI:  Yeah, I agree with that legal concept,

04:15PM    9    you can show anything to refresh recollection.

04:15PM   10            MR. COOPER:  The concern that I had is stapling the

04:15PM   11    cover sheet of the extraction --

04:15PM   12            MR. TRIPI:  Right.

04:15PM   13            MR. COOPER:  -- and making it look like the article

04:15PM   14    is in the extraction, when the article --

04:15PM   15            THE COURT:  Stop.

04:15PM   16            MR. COOPER:  -- is not, there's a hyperlink in there.

04:15PM   17            THE COURT:  Stop.  These things from 208, we can mark

04:15PM   18    this separately.

04:15PM   19            MR. TRIPI:  That's fine.

04:15PM   20            MR. SINGER:  Okay.

04:15PM   21            THE COURT:  And then -- and then ask him some

04:15PM   22    questions.  You can show him -- you can show him anything you

04:15PM   23    want to refresh his recollection.

04:15PM   24            MR. SINGER:  Okay.

04:15PM   25            THE COURT:  So, I think that's the solution to this

04:15PM    1    problem.

04:15PM    2            **MR. SINGER:**  Okay.  That's fine.

04:15PM    3            (End of sidebar discussion.)

04:15PM    4            **THE COURT:**  So let -- let us know what you're

04:15PM    5    marking, Mr. Singer.

04:15PM    6            **MR. SINGER:**  Yes, Judge.

04:16PM    7            So I'm going to mark as Defendant Exhibit U.1 a copy

04:16PM    8    of the extraction details, and as U.2 for identification, a

04:16PM    9    copy of an article off the hot link.  Okay?

04:16PM   10            **THE COURT:**  Fine.

04:16PM   11            **MR. SINGER:**  So I'm going to hand up to the witness a

04:16PM   12    copy of the Defendant Exhibit U.1.

04:16PM   13            **BY MR. SINGER:**

04:16PM   14    Q.  So, Mr. Selva, what I'm going to ask you to do is, first

04:16PM   15    off, do you recognize the information on that first page as

04:16PM   16    the information regarding your cell phone; is that right?

04:16PM   17    A.  It's my email -- my email address and my cell phone

04:16PM   18    number, yes.

04:16PM   19    Q.  Yes.  And you -- you testified earlier that you took a

04:16PM   20    look at the government exhibit of your cell phone, the

04:16PM   21    electronic copy, correct?

04:16PM   22    A.  Correct.

04:16PM   23    Q.  And you opened up the software, correct?

04:16PM   24    A.  Correct.

04:16PM   25    Q.  You're familiar with the Cellebrite software, right?

04:16PM    1    A.  Yes.

04:16PM    2    Q.  And that's what appears on the front page when you open

04:16PM    3    up --

04:16PM    4    A.  Yes.

04:16PM    5    Q.  -- based on your understanding?

04:16PM    6    A.  On my understanding, yes.

04:16PM    7    Q.  Okay.  So what I'd ask you to do then is -- is turn to

04:17PM    8    the second and third page of that exhibit and take a look at

04:17PM    9    the information there regarding search history and see if

04:17PM   10    that refreshes your memory about a search you performed back

04:17PM   11    in August of 2019 regarding a prison article?

04:17PM   12    A.  I can't -- the one that's highlighted?

04:17PM   13    Q.  Yes, sir.

04:17PM   14    A.  I can't read that.  It says --

04:17PM   15    Q.  Is the font too small?

04:17PM   16    A.  I just can't read it.  It's too --

04:17PM   17         **MR. SINGER:**  Hey, Jen, can we set up the ELMO just

04:17PM   18    for the witness?

04:17PM   19         **THE WITNESS:**  I'm looking at it.  I can --

04:17PM   20         **BY MR. SINGER:**

04:17PM   21    Q.  Does that make it a little better, Mr. Selva?

04:17PM   22    A.  Yes.

04:17PM   23    Q.  Okay.  When you're ready to move on to the next page,

04:18PM   24    just tell me.

04:18PM   25    A.  Okay.  Okay.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

04:18PM    1    Q.  So does looking at U.1 help refresh your memory about a

04:18PM    2    particular article regarding prison that you read back on

04:18PM    3    August 11, 2019?

04:18PM    4    A.  Yes, now it does.

04:18PM    5    Q.  Okay.  And so that particular article, to your

04:18PM    6    recollection, discussed the experience of -- of two

04:18PM    7    individuals who were politicians and their experience in --

04:18PM    8    in prison?

04:18PM    9    A.  I don't recall what the article was, sir.  I -- I vaguely

04:18PM    10   remember Googling that, and looking at it, but if that's what

04:18PM    11   it was, yes.

04:18PM    12   Q.  Sir, let me try to refresh your memory again.

04:18PM    13       So what I'm going to do is hand up a copy of Defendant's

04:18PM    14   Exhibit U.2 to you for identification?

04:19PM    15               **THE COURT:**  U.2?

04:19PM    16               **MR. SINGER:**  U.2, yes, Judge.

04:19PM    17               **BY MR. SINGER:**

04:19PM    18   Q.  Take a look through that document, sir, and just look up

04:19PM    19   at me when you're done.

04:19PM    20   A.  Okay.

04:19PM    21   Q.  So does that help refresh your memory about the article,

04:19PM    22   sir?

04:19PM    23   A.  Yes.

04:19PM    24   Q.  So there's an article about the experience of two

04:19PM    25   politicians who are incarcerated; is that right?

04:19PM    1    A.  Correct.

04:19PM    2    Q.  And you learned through reading that article that people

04:19PM    3    who are convicted felons and went to jail, their time in jail

04:19PM    4    is difficult, correct?

04:19PM    5    A.  Correct.

04:19PM    6    Q.  You read about, you know, certain tactics that the

04:20PM    7    government used that they allege the government used in their

04:20PM    8    particular cases, correct?

04:20PM    9    A.  Yes.  Correct.

04:20PM   10    Q.  You learned about the financial difficulties that can

04:20PM   11    arise from criminal prosecution, correct?

04:20PM   12    A.  Correct.

04:20PM   13    Q.  You -- you read about in the article about how being in

04:20PM   14    the press is something that makes things difficult for a

04:20PM   15    defendant, correct?

04:20PM   16    A.  Correct.  I -- I don't really recall the article, but

04:20PM   17    what you just -- yes, correct.

04:20PM   18    Q.  This is consistent with what you recall in the article,

04:20PM   19    correct?

04:20PM   20    A.  Yes.

04:20PM   21    Q.  And you knew from the article, too, that, you know,

04:20PM   22    lawyers defending people in criminal cases, they don't come

04:20PM   23    cheap, right?

04:20PM   24    A.  No, sir.

04:20PM   25    Q.  And when you read all these things in that article two

04:20PM   1   weeks before your arrest, these are things that scared you,

04:20PM   2   correct?

04:20PM   3   A.  Yes.  Correct.

04:20PM   4   Q.  Because you don't have a lot of resources at that point

04:20PM   5   in time to go off and hire an attorney, correct?

04:20PM   6   A.  Correct.

04:20PM   7   Q.  You don't have a lot of family who's in a position to

04:20PM   8   help purchase an attorney for you because you can't, correct?

04:21PM   9   A.  Correct.

04:21PM  10   Q.  And you know being in prison is something that

04:21PM  11   potentially could cause you financial problems, right?

04:21PM  12   A.  Correct.

04:21PM  13   Q.  And, so, two weeks later, your house is searched by the

04:21PM  14   government, correct?

04:21PM  15   A.  Correct.

04:21PM  16   Q.  You also mentioned that Mike Masecchia's residence was

04:21PM  17   searched on that same date?

04:21PM  18   A.  Correct.

04:21PM  19   Q.  And you knew why the police were at your house on

04:21PM  20   August 23rd of 2019 almost immediately, right?

04:21PM  21   A.  Correct.

04:21PM  22   Q.  I mean, right when you heard them blow through your door

04:21PM  23   that morning, you knew why they were there, correct?

04:21PM  24   A.  Correct.

04:21PM  25   Q.  And you also knew at that point in time that you had grow

| | | |
|---|---|---|
| 04:21PM | 1 | equipment that was located down in your basement, right? |
| 04:21PM | 2 | A.  I had forgotten about that, but yes, it was there. |
| 04:21PM | 3 | Q.  You have evidence of the crime that they were looking |
| 04:21PM | 4 | into -- |
| 04:21PM | 5 | A.  Yes, it was. |
| 04:21PM | 6 | Q.  -- in your house, right? |
| 04:21PM | 7 | A.  Yes. |
| 04:21PM | 8 | Q.  And you knew at that point in time that -- and Ron Serio |
| 04:21PM | 9 | had been arrested for a little more than a year, right? |
| 04:21PM | 10 | A.  Correct. |
| 04:22PM | 11 | Q.  And I think you expressed yesterday you had concerns |
| 04:22PM | 12 | based on the fact that you weren't really aware of what was |
| 04:22PM | 13 | going on with him that he might be cooperating with the Feds, |
| 04:22PM | 14 | correct? |
| 04:22PM | 15 | A.  I was not aware, we have not spoken, no. |
| 04:22PM | 16 | Q.  Were you aware at that point in time at least that he was |
| 04:22PM | 17 | charged with some significant federal offenses, correct? |
| 04:22PM | 18 | A.  Correct. |
| 04:22PM | 19 | Q.  And you were aware that other people involved in this |
| 04:22PM | 20 | conspiracy like -- like Anthony Gerace was charged whether |
| 04:22PM | 21 | federal offenses? |
| 04:22PM | 22 | A.  That's correct. |
| 04:22PM | 23 | Q.  And at that point in time, besides being, concerned about |
| 04:22PM | 24 | going to jail potentially, you worked in a jail, right? |
| 04:22PM | 25 | A.  Correct. |

04:22PM    1    Q.  You were a corrections officer?

04:22PM    2    A.  Correct.

04:22PM    3    Q.  At that point in time for a number of months, right?

04:22PM    4    A.  Six months, correct.

04:22PM    5    Q.  And you worked inside the pods, correct?

04:22PM    6    A.  Correct.

04:22PM    7    Q.  You were familiar with what jail is like, at least at the

04:22PM    8    local setting, correct?

04:22PM    9    A.  Correct.

04:22PM    10    Q.  And that's not the best place, right?

04:22PM    11    A.  No.

04:22PM    12    Q.  I mean, the food is horrible, right?

04:22PM    13    A.  Yeah, on occasions.

04:22PM    14    Q.  You don't get what you -- you don't get to do what you

04:22PM    15    want to do all the time, right?

04:22PM    16    A.  No, no.

04:23PM    17    Q.  I mean, you have someone like you as a correction officer

04:23PM    18    telling you what to do if you're a prisoner, right?

04:23PM    19    A.  That's correct.

04:23PM    20    Q.  Your contact with family --

04:23PM    21        **MR. TRIPI:**  Objection.  Rule 403 at this point,

04:23PM    22    Judge.

04:23PM    23        **THE COURT:**  Overruled.

04:23PM    24        **BY MR. SINGER:**

04:23PM    25    Q.  Your contact with family is monitored, right?

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24

04:23PM    1    A.  Correct.

04:23PM    2    Q.  And it's limited, correct?

04:23PM    3    A.  Correct.

04:23PM    4    Q.  And you also knew at that point in time that if you went

04:23PM    5    to jail, you're not just be going to jail as Lou Selva, you'd

04:23PM    6    be going to be jail as Lou Selva, a former corrections

04:23PM    7    officer, right?

04:23PM    8    A.  Correct.

04:23PM    9    Q.  And you learned being inside the prison as a corrections

04:23PM   10    officer that people don't look too kindly on individuals who

04:23PM   11    had an association with law enforcement in the past, right?

04:23PM   12    A.  That's correct.

04:23PM   13    Q.  So that could potentially make jail in the future worse

04:23PM   14    for you, right?

04:23PM   15    A.  That's correct.

04:23PM   16    Q.  And, so, these things are running through your head right

04:23PM   17    when the government breaks down your door in the morning of

04:23PM   18    their search, correct?

04:23PM   19    A.  A lot of things were going through my head at that time.

04:23PM   20    Q.  But these are some of the things, right?

04:24PM   21    A.  Yeah., eventually, I guess.

04:24PM   22    Q.  I mean, these are some of the things that have been going

04:24PM   23    through your head ever since you got the search conducted at

04:24PM   24    your house, correct?

04:24PM   25    A.  Correct.

04:24PM    1    Q.  I mean, there's still things that are going on in your

04:24PM    2    head today, right?

04:24PM    3    A.  Correct.

04:24PM    4    Q.  They're still concerns, right?

04:24PM    5    A.  Yes.

04:24PM    6    Q.  And, so, with that mindset, you decide that after

04:24PM    7    speaking with your attorney, you want to cooperate with the

04:24PM    8    federal government, right?

04:24PM    9    A.  That's correct.

04:24PM   10    Q.  And you're aware of the fact when you make that decision

04:24PM   11    that Ron Serio was arrested, right?

04:24PM   12    A.  I was.

04:24PM   13    Q.  And you testified earlier you're not aware that Ron Serio

04:24PM   14    is a cooperator at that point in time, right?

04:24PM   15    A.  I'm not, no.

04:24PM   16    Q.  But you're aware of what he knows, right?

04:24PM   17    A.  Yes.

04:24PM   18    Q.  Yeah, I mean, you're aware of the fact that -- that he is

04:24PM   19    somebody who believes that he provided bribe payments to Joe

04:24PM   20    Bongiovanni, right?

04:24PM   21    A.  Correct.

04:24PM   22    Q.  And you are aware of the fact that Ron Serio believes

04:25PM   23    that --

04:25PM   24              **MR. TRIPI:**  Objection as to what Ron Serio believes.

04:25PM   25              There's two things in there.  "You're aware," but

04:25PM   1   that's fine.  But that "he believes" is the part I have a

04:25PM   2   problem with.

04:25PM   3              **THE COURT:**  Yeah, I agree with that, yes.

04:25PM   4              So -- so that -- that's sustained to the form of the

04:25PM   5   question.

04:25PM   6              **BY MR. SINGER:**

04:25PM   7   Q.  You are aware of the fact that -- that Ron Serio made

04:25PM   8   payments to Mike Masecchia, right?

04:25PM   9   A.  I am.

04:25PM  10   Q.  You're aware of the fact that Ron Serio has payments

04:25PM  11   funneling down to a federal officer, right?

04:25PM  12   A.  I am.

04:25PM  13   Q.  You're aware of the fact that you are this conduit of

04:25PM  14   information between Ron Serio and Joseph Bongiovanni, right?

04:25PM  15   A.  I am.

04:25PM  16   Q.  You're aware of the fact that you would help communicate

04:25PM  17   information back and forth purportedly between

04:25PM  18   Mr. Bongiovanni and Ron Serio, right?

04:25PM  19   A.  That's correct.

04:25PM  20   Q.  And you're aware of the fact that Ron Serio knows all

04:25PM  21   those things, right?

04:25PM  22   A.  Correct.

04:25PM  23   Q.  So, you know, certainly something on your mind at that

04:25PM  24   point in time that, you know, if Ron Serio does the same

04:25PM  25   thing that I'm about to do, like, I'm really dead in the

04:26PM    1    water, right?

04:26PM    2    A.   Yes.  Correct.  That's --

04:26PM    3    Q.   So, in 2019, you end up signing a cooperation agreement

04:26PM    4    with the government; is that right?

04:26PM    5    A.   That's correct.

04:26PM    6    Q.   And that cooperation agreement --

04:26PM    7            MR. TRIPI:  Objection as to time.  I believe that

04:26PM    8    date was different, 2020.

04:26PM    9            THE COURT:  Well, do you want to show it to him?

04:26PM    10           MR. SINGER:  It's okay, Judge.

04:26PM    11           BY MR. SINGER:

04:26PM    12   Q.   At some point in time after the search, you sign a

04:26PM    13   cooperation agreement with the government, right?

04:26PM    14   A.   Correct.

04:26PM    15   Q.   And so a part of that cooperation agreement between you

04:26PM    16   and the government talks about how they're not going to

04:26PM    17   charge you with a crime at this point in time, right?

04:26PM    18   A.   I believe so, correct.

04:26PM    19   Q.   Yeah, you signed a waiver of statute of limitations; is

04:26PM    20   that right?

04:26PM    21   A.   That's correct.

04:26PM    22   Q.   So they can charge you in the future for a crime; is that

04:26PM    23   right?

04:26PM    24   A.   That's correct.

04:26PM    25   Q.   But as of today, you're not charged with anything?

| | | |
|---|---|---|
| 04:26PM | 1 | A.  That's correct. |
| 04:26PM | 2 | Q.  And you don't know what eventually the government may |
| 04:26PM | 3 | charge you with? |
| 04:26PM | 4 | A.  That's correct. |
| 04:26PM | 5 | Q.  You don't know if they ever will charge you with |
| 04:27PM | 6 | anything, right? |
| 04:27PM | 7 | A.  I don't know. |
| 04:27PM | 8 | Q.  And, so, at this -- at this point in time, you start |
| 04:27PM | 9 | talking to law enforcement about Ron Serio, correct? |
| 04:27PM | 10 | A.  Correct. |
| 04:27PM | 11 | Q.  You started talking to law enforcement about Mike |
| 04:27PM | 12 | Masecchia, correct? |
| 04:27PM | 13 | A.  That's correct. |
| 04:27PM | 14 | Q.  And you start talking to law enforcement about Joe |
| 04:27PM | 15 | Bongiovanni, right? |
| 04:27PM | 16 | A.  That's correct. |
| 04:27PM | 17 | Q.  And it's your understanding that in the first couple of |
| 04:27PM | 18 | proffer interviews, safe to say the government doesn't |
| 04:27PM | 19 | believe what you're telling them, right? |
| 04:27PM | 20 |         **MR. TRIPI:**  Objection as to what the government |
| 04:27PM | 21 | believes. |
| 04:27PM | 22 |         **THE COURT:**  Yeah, sustained to the form of the |
| 04:27PM | 23 | question.  But you -- you -- you can get at this topic. |
| 04:27PM | 24 |         **BY MR. SINGER:** |
| 04:27PM | 25 | Q.  So, you sit down with the government on the first proffer |

04:27PM    1    interview, right?

04:27PM    2    A.   Yes.

04:27PM    3    Q.   And it's after the statements you made back at your house

04:27PM    4    at the time of the search warrant execution, right?

04:27PM    5    A.   That's correct.

04:27PM    6    Q.   And you provide them information, correct?

04:27PM    7    A.   At my house, yes.  Correct.

04:28PM    8    Q.   But at some point in time, you come to the opinion that

04:28PM    9    the government doesn't believe you're becoming 100 percent

04:28PM   10    truthful in those conversations, right?

04:28PM   11    A.   As we moved along, yes, correct.

04:28PM   12    Q.   And so you sit down for a second proffer interview with

04:28PM   13    the government, right?

04:28PM   14    A.   That's correct.

04:28PM   15    Q.   I think you said that in between the first and the second

04:28PM   16    time you sat down for a proffer interview, there was a

04:28PM   17    polygraph that was administered?

04:28PM   18    A.   I don't remember when the poly -- it was in -- in that

04:28PM   19    timeframe, yes.

04:28PM   20    Q.   All right.  And you sit down and you talk to them again,

04:28PM   21    that second proffer interview, right?

04:28PM   22    A.   That's correct.

04:28PM   23    Q.   And at some point in time, you form the opinion that,

04:28PM   24    again, the government doesn't believe everything you're

04:28PM   25    telling them?

04:28PM    1    A.  That's correct.

04:28PM    2    Q.  And so you sit down with them a number of different times

04:28PM    3    until you get to the grand jury, correct?

04:28PM    4    A.  Correct.  Each time I came forward more with more

04:28PM    5    information.

04:28PM    6    Q.  Okay.  And, so, you understand that the government's the

04:28PM    7    one that controls your proffer agreements, right?

04:28PM    8    A.  Correct.

04:28PM    9    Q.  And the government is also the one, the entity that

04:29PM   10    controls your cooperation agreement, right?

04:29PM   11    A.  That's correct.

04:29PM   12    Q.  So, if the government doesn't believe that you're

04:29PM   13    following through on your proffer obligation or under the

04:29PM   14    cooperation agreement provisions, like, they can take that

04:29PM   15    away from you, right?

04:29PM   16    A.  That's correct.

04:29PM   17    Q.  And fair to say that -- that from the first time that you

04:29PM   18    met with prosecutors in the first proffer, two later times

04:29PM   19    you met with them, their tone towards you changed a little

04:29PM   20    bit?

04:29PM   21    A.  Tone, how?  What do you --

04:29PM   22    Q.  Did you come to the opinion based on those multiple

04:29PM   23    meetings that later on, you had the opinion that prosecutors

04:29PM   24    viewed the information you were giving them as more credible

04:29PM   25    than the first time or second time?

04:29PM    1    A.  As I gave more, yes.

04:29PM    2    Q.  Okay.  So, as far as your lawyer is concerned, his advice

04:29PM    3    to you not to get into bits and details on it was, you know,

04:29PM    4    just continue to work with them, right?

04:30PM    5    A.  We spoke about it, yes.

04:30PM    6    Q.  And -- and the reason for that is because you continued

04:30PM    7    to work with them, you know, maybe there will be a benefit

04:30PM    8    for you in the end, right?

04:30PM    9    A.  Correct.

04:30PM   10    Q.  And as far as the benefit is concerned, that benefit

04:30PM   11    relates to the charges in this case, right?

04:30PM   12    A.  That's correct.

04:30PM   13    Q.  Your hope is that by coming in here and testifying

04:30PM   14    against Mr. Bongiovanni, and talking about criminal behavior

04:30PM   15    that you may have engaged in, that the government may look

04:30PM   16    favorably upon you when it comes time to sentence you for

04:30PM   17    what happens in your situation, right?

04:30PM   18    A.  That's correct.

04:30PM   19    Q.  You're not doing this for free, right?

04:30PM   20    A.  I'm -- correct.  It's an agreement I have with the

04:30PM   21    government.

04:30PM   22    Q.  And you're aware of the fact that the charges in this

04:30PM   23    case are pretty significant, right?

04:30PM   24    A.  Correct.

04:30PM   25    Q.  So you're aware of the fact that the drug conspiracy

04:30PM   1   counts that you could be facing as a result of your

04:30PM   2   participation with Ron Serio could carry a five-year

04:30PM   3   mandatory minimum sentence, right?

04:30PM   4   A.  Correct.

04:30PM   5   Q.  You're aware of the fact that that particular firearms

04:31PM   6   that were found in your house.

04:31PM   7           MR. SINGER:  So, Ms. Champoux if we could bring up

04:31PM   8   Government Exhibit 200A-19, side by side with 222I.

04:31PM   9           I'm sorry, 222I.  Thanks, Karen.

04:31PM  10           BY MR. SINGER:

04:31PM  11   Q.  So, 200A point -- sorry, -19.  That's a shotgun that was

04:31PM  12   found inside of your house during the search; is that right?

04:31PM  13   A.  Yes.  I bought that legally, yes.

04:31PM  14   Q.  But you also had illegal marijuana grow equipment located

04:31PM  15   in your house, right?

04:31PM  16   A.  Correct.

04:31PM  17   Q.  You also had possession of I think it was shake, but it

04:31PM  18   was --

04:31PM  19   A.  Shake.

04:31PM  20   Q.  -- marijuana inside your house, right?

04:31PM  21   A.  Marijuana leaves, shake, yes.

04:31PM  22   Q.  So it was the grow equipment, the shake, and you also

04:32PM  23   have this gun here, correct?

04:32PM  24   A.  Correct.

04:32PM  25   Q.  And you mentioned that this particular picture, 222I,

04:32PM    1    this is a picture down at the farm?

04:32PM    2    A.   That's -- yes.   That was in Franklinville.   We were

04:32PM    3    just -- that's not my weapon.   We were target shooting.

04:32PM    4    Q.   That's the Suppas' place, right?

04:32PM    5    A.   Correct.

04:32PM    6    Q.   And we talked about earlier how that was a logistics hub

04:32PM    7    for marijuana activity you were conducting illegally on the

04:32PM    8    state lands?

04:32PM    9    A.   Correct.

04:32PM   10    Q.   And your lawyer, of course, probably talked to you about

04:32PM   11    the fact that possession of a firearm in connection with a

04:32PM   12    narcotics offense is another federal crime, right?

04:32PM   13    A.   Correct.

04:32PM   14    Q.   And that's something that could potentially carry a

04:32PM   15    five-year mandatory minimum consecutive sentence, correct?

04:32PM   16    A.   Correct.

04:32PM   17    Q.   So, you know, based on just the math, you could be

04:32PM   18    looking at a ten-year mandatory minimum sentence for what you

04:32PM   19    did in this conspiracy, right, sir?

04:32PM   20    A.   Correct.

04:32PM   21    Q.   And you're aware of the fact that beyond the mandatory

04:32PM   22    minimum, it's possible you could spend even more time in

04:32PM   23    jail, right?

04:32PM   24    A.   Correct.

04:32PM   25    Q.   How old are you again?

04:33PM   1   A.   59.

04:33PM   2   Q.   So ten years from now you'll be 69?

04:33PM   3   A.   Yes.

04:33PM   4   Q.   You have a heart condition, right?

04:33PM   5   A.   I do.

04:33PM   6   Q.   I'm sure you have a concern, you know, if I go to jail

04:33PM   7   for ten years, am I going to make it out of there alive?

04:33PM   8   A.   Correct.

04:33PM   9   Q.   That's one of the things that's going through your head

04:33PM  10   today, right?

04:33PM  11   A.   It goes through my head every day.  I have an aneurysm in

04:33PM  12   my heart valve.

04:33PM  13   Q.   There -- so one of the things that's going through your

04:33PM  14   head at the time when you're making a decision of whether to

04:33PM  15   cooperate or not, right?

04:33PM  16   A.   I'm sorry, can you repeat that?

04:33PM  17   Q.   That was one of the concerns you had when you made your

04:33PM  18   decision of whether to cooperate or not with the government,

04:33PM  19   right?

04:33PM  20   A.   It was part of it.

04:33PM  21   Q.   Um-hum.  Yeah.  It's a big part, right?  Because you

04:33PM  22   still have daughters, right?

04:33PM  23   A.   Correct.

04:33PM  24   Q.   You still have family, right?

04:33PM  25   A.   Correct.

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24
322

| | | |
|---|---|---|
| 04:33PM | 1 | Q. And you love them, right? |
| 04:33PM | 2 | A. Yes. |
| 04:33PM | 3 | Q. And you want to see them, right? |
| 04:33PM | 4 | A. Correct. |
| 04:33PM | 5 | Q. And if you go off to jail, it's going to affect your |
| 04:33PM | 6 | relationship with them, right? |
| 04:33PM | 7 | A. Correct. |
| 04:33PM | 8 | Q. So spending time in jail also affects you financially, |
| 04:33PM | 9 | right? |
| 04:33PM | 10 | A. Correct. |
| 04:34PM | 11 | Q. Like, you could lose your house, correct? |
| 04:34PM | 12 | A. Correct. |
| 04:34PM | 13 | Q. I mean, you could lose your house as part of criminal |
| 04:34PM | 14 | charges in this case, right? |
| 04:34PM | 15 | A. I believe so, correct. |
| 04:34PM | 16 | Q. Yeah. I mean, you have the understanding that because |
| 04:34PM | 17 | you engaged in grow activity at your house, and they found |
| 04:34PM | 18 | evidence of that, the government can move to seize your |
| 04:34PM | 19 | house, right? |
| 04:34PM | 20 | A. Correct. |
| 04:34PM | 21 | Q. And, you know, if you eventually walk out of jail after a |
| 04:34PM | 22 | sentence and you're older, in your late 60s, that's going to |
| 04:34PM | 23 | be a concern for you financially, correct? |
| 04:34PM | 24 | A. Correct. |
| 04:34PM | 25 | Q. So what are you going to do to support yourself, right? |

04:34PM   1   A.  I go to work, I don't know.  I mean, what am I going to

04:34PM   2   do?

04:34PM   3   Q.  But it would be a lot more difficult than it is today,

04:34PM   4   right?

04:34PM   5   A.  It might be.

04:34PM   6   Q.  So you're scared about the outcome that awaits you,

04:34PM   7   correct?

04:34PM   8   A.  I'm sorry?

04:34PM   9   Q.  You're scared about the outcome that awaits you

04:34PM  10   potentially, correct?

04:34PM  11   A.  Yeah.  That's a worry, sure.

04:34PM  12       **MR. SINGER:**  So, Ms. Champoux, you can bring down

04:34PM  13   those exhibits.  Thank you.

04:34PM  14       **BY MR. SINGER:**

04:34PM  15   Q.  So, a big thing here is that you're still hiding another

04:34PM  16   fact in this case, right?

04:34PM  17   A.  I'm hiding nothing.

04:35PM  18   Q.  You're hiding nothing?

04:35PM  19   A.  No.

04:35PM  20   Q.  Are you hiding the fact that you and Mike Masecchia never

04:35PM  21   made any payments to Joe Bongiovanni?

04:35PM  22   A.  That's not true.

04:35PM  23   Q.  That's not true?

04:35PM  24   A.  That's not true.  I'm not hiding that.

04:35PM  25   Q.  That's not true, sir?

04:35PM    1    A.  That's not true.

04:35PM    2    Q.  So there was no scheme to defraud Ron Serio --

04:35PM    3    A.  There was no scheme.

04:35PM    4    Q.  -- out of his money?

04:35PM    5    A.  No, sir.

04:35PM    6    Q.  No scheme whatsoever?

04:35PM    7    A.  No scheme, sir.

04:35PM    8    Q.  I mean, so Mike Masecchia, you mentioned earlier that he

04:35PM    9    was a made member of IOC, right?

04:35PM    10   A.  According to him, when I asked the question, yes, sir.

04:35PM    11   Q.  And he's somebody who's heavily connected to Italian

04:35PM    12   Organized Crime members, right?

04:35PM    13   A.  Correct.

04:35PM    14   Q.  By family, correct?

04:35PM    15   A.  Correct.

04:35PM    16   Q.  To your understanding, correct?

04:35PM    17   A.  To my understanding, yes.

04:35PM    18   Q.  He's somebody who ran in the same type of debt-collection

04:35PM    19   circles sometimes as Ron Serio, right?

04:35PM    20   A.  I believe so, correct.

04:35PM    21   Q.  He's somebody that was older than Ron Serio, right?

04:35PM    22   A.  He was.

04:35PM    23   Q.  And he's somebody that -- that Ron Serio attempted to

04:35PM    24   ingratiate himself with, right?

04:35PM    25   A.  Yes.  He wanted him around him, yes.

04:36PM    1    Q.  Yeah.  Like, Ron Serio, you know, didn't just kind of

04:36PM    2    like the -- the power that Mike Masecchia brought to his

04:36PM    3    organization, right?

04:36PM    4    A.  Correct.  He enjoyed his company, and they became

04:36PM    5    friends, and obviously they were conducting what was going

04:36PM    6    on.

04:36PM    7    Q.  Yeah.  And he also liked, you know, some of the

04:36PM    8    protection that Mike Masecchia brought along with him, right?

04:36PM    9    A.  Yes, Mike had a presence.

04:36PM   10    Q.  That tough-guy personality we talked about earlier?

04:36PM   11    A.  He had a presence, yes.

04:36PM   12    Q.  And Ron Serio, to your understanding, he was somebody who

04:36PM   13    said, hey, maybe one day I can be a made member of Italian

04:36PM   14    Organized Crime?

04:36PM   15    A.  I don't have knowledge of that.  I don't know if Ron ever

04:36PM   16    said that.

04:36PM   17    Q.  Don't know about that?

04:36PM   18    A.  I don't know if Ron ever said that.

04:36PM   19    Q.  I mean, bottom line is that all those different

04:36PM   20    relationships and who Mike Masecchia was didn't make an

04:36PM   21    attempt to pull off a scheme to defraud Ron Serio very

04:36PM   22    difficult, right?

04:36PM   23              **MR. TRIPI:**  Objection.

04:36PM   24              **THE COURT:**  Sustained.  Sustained.  Sustained.

04:36PM   25              **THE WITNESS:**  I knew of no --

04:36PM   1      **THE COURT:** Stop. Stop. Stop.

04:36PM   2           Sustained.

04:36PM   3           Next question.

04:36PM   4      **BY MR. SINGER:**

04:36PM   5  Q. So you would agree with me that Mike Masecchia, based on

04:36PM   6  who he was and where he lived, had access to information,

04:36PM   7  right?

04:36PM   8  A. Correct.

04:37PM   9  Q. So, for instance, Mike Masecchia grew up in North Buffalo

04:37PM  10  all his life, right?

04:37PM  11  A. Yes.

04:37PM  12  Q. He knew and was plugged into people who were in and

04:37PM  13  around the neighborhood and community, right?

04:37PM  14  A. Yes.

04:37PM  15  Q. He had friends who grew up in the neighborhood, correct?

04:37PM  16  A. Yes.

04:37PM  17  Q. Some of these friends are the same criminal associates

04:37PM  18  that he had involved in this Serio drug-trafficking

04:37PM  19  organization, correct?

04:37PM  20  A. Correct.

04:37PM  21  Q. And according to your testimony, he was somebody that was

04:37PM  22  involved in the marijuana business since the 1990s?

04:37PM  23  A. Yes. Long time, yes.

04:37PM  24  Q. A long time, right?

04:37PM  25  A. Yes.

04:37PM     1    Q.  I mean, he was doing grow operations a long time before

04:37PM     2    you got involved, right?

04:37PM     3    A.  Correct.

04:37PM     4    Q.  He was doing marijuana sales a long time before you were

04:37PM     5    involved, right?

04:37PM     6    A.  Correct.

04:37PM     7    Q.  And you talked about how, over time, his part in the

04:37PM     8    organization with Serio became a lot more complex, right?

04:37PM     9         **MR. TRIPI:**  Objection.  Asked and answered.

04:37PM    10         **THE COURT:**  Overruled.

04:37PM    11         **THE WITNESS:**  Yes.  It had grown.  His -- his role

04:38PM    12    had grown, yes.

04:38PM    13         **BY MR. SINGER:**

04:38PM    14    Q.  And based on all of that, you know, Mike Masecchia had a

04:38PM    15    lot of connections in the marijuana business over the years,

04:38PM    16    correct?

04:38PM    17         **MR. TRIPI:**  Objection, asked and answered two hours

04:38PM    18    ago.

04:38PM    19         **THE WITNESS:**  Correct.

04:38PM    20         **THE COURT:**  We're starting to get repetitive,

04:38PM    21    Mr. Singer, but I'll allow this one.

04:38PM    22         Overruled.

04:38PM    23         **BY MR. SINGER:**

04:38PM    24    Q.  As far as his information -- sorry, as far as his

04:38PM    25    associations within the Hertel Avenue community, like, he was

04:38PM    1    a regular at certain bars on Hertel?

04:38PM    2         **MR. TRIPI:**  Objection.  Asked and answered.

04:38PM    3         **THE COURT:**  Overruled.

04:38PM    4         **THE WITNESS:**  Yes.  He frequented bars on Hertel.

04:38PM    5         **BY MR. SINGER:**

04:38PM    6    Q.  And he was also a regular in downtown bars, correct?

04:38PM    7    A.  I believe so, yes.

04:38PM    8    Q.  He was somebody who knew bartenders from patronizing

04:38PM    9    those establishments?

04:38PM   10    A.  Yes.  Yes, sir.

04:38PM   11    Q.  We've talked about Anastasia, for instance, right?

04:38PM   12    A.  Yes.

04:38PM   13    Q.  He knew Tony Anastasia, right?

04:38PM   14    A.  Yes.

04:38PM   15    Q.  Because he was somebody who also went to Gables, correct?

04:38PM   16    A.  Correct.

04:38PM   17    Q.  And he knew some of these bartenders because he grew up

04:38PM   18    with these people, right?

04:38PM   19    A.  Correct.

04:38PM   20    Q.  Same neighborhood as you guys, right?

04:38PM   21    A.  Correct.

04:38PM   22    Q.  And Mike Masecchia was also not just familiar with --

04:39PM   23    with drug dealers and bartenders, he was also familiar with

04:39PM   24    some of the junkies in the neighborhood, right?

04:39PM   25         **MR. TRIPI:**  Objection, relevance.

04:39PM    1          **THE COURT:**  Overruled.

04:39PM    2          **THE WITNESS:**  I don't know.  I'm sure he did, yes.

04:39PM    3          **BY MR. SINGER:**

04:39PM    4    Q.  He was a seller of marijuana for decades, right?

04:39PM    5    A.  I'm -- I'm sure he was aware, yes.

04:39PM    6    Q.  So he knew was -- he knew people who were high on drugs,

04:39PM    7    right?

04:39PM    8    A.  I'm sure he did, yes.

04:39PM    9    Q.  And he knew people through his associations with other

04:39PM    10   dealers who tended to buy drugs, correct?

04:39PM    11   A.  Correct.

04:39PM    12   Q.  So, Mike Masecchia, he's also somebody who is familiar to

04:39PM    13   some degree with law enforcement tactics, right?

04:39PM    14   A.  Vaguely, yes.

04:39PM    15   Q.  Well, you testified earlier that Mike Masecchia's father

04:39PM    16   was somebody that you suspected had a reputation of an

04:39PM    17   organized crime figure; is that right?

04:39PM    18   A.  He knew -- he was friends with them, yes.

04:39PM    19   Q.  And you also testified that -- that his wife had a

04:39PM    20   connection to somebody who was an organized crime figure,

04:39PM    21   correct?

04:39PM    22   A.  Correct.

04:39PM    23   Q.  And, so, you know, he talked to you about how family and

04:40PM    24   friends of his over time were investigated by the federal

04:40PM    25   government, correct?

04:40PM    1    A.  No.  He never talked about that.

04:40PM    2    Q.  He never talked about any investigations that were

04:40PM    3    ongoing against him and his family?

04:40PM    4    A.  No.

04:40PM    5    Q.  Did he talk to you about certain surveillance that was

04:40PM    6    being done?

04:40PM    7    A.  No.

04:40PM    8    Q.  Never talked to you about any type of investigation that

04:40PM    9    anyone was under that he knew?

04:40PM   10    A.  No, not that I recall.  We never had that conversation.

04:40PM   11    Q.  As far as the information, you know, we talked about

04:40PM   12    Robert R.K. was one of the people that you allege

04:40PM   13    Mr. Bongiovanni provided information on, correct?

04:40PM   14    A.  Yes.

04:40PM   15    Q.  But as we talked about earlier, Robert R.K. was someone

04:40PM   16    who was known to Mike Masecchia and to yourself, right?

04:40PM   17    A.  I knew of him, I didn't know him.  Yes.

04:40PM   18    Q.  But you testified at least that Mike Masecchia was -- was

04:40PM   19    familiar with his criminal history, right?

04:40PM   20    A.  He was, yes.

04:40PM   21    Q.  His abuse history of drugs?

04:40PM   22    A.  Right.

04:40PM   23            **MR. TRIPI:**  Objection, asked and answered.

04:40PM   24            **THE COURT:**  Yeah.  We are starting to get repetitive,

04:40PM   25    Mr. Singer.

04:41PM   1          **MR. SINGER:**  I got you, Judge.  I'll move through

04:41PM   2   this very quickly.

04:41PM   3          **THE COURT:**  Okay.  Overruled.

04:41PM   4          **BY MR. SINGER:**

04:41PM   5   Q.  His history of drug abuse?

04:41PM   6   A.  Yes.

04:41PM   7   Q.  His arrests that -- that happened?

04:41PM   8   A.  That's correct.

04:41PM   9   Q.  Correct.  And so as far as all those things, Mike

04:41PM  10   Masecchia was also aware of the fact that Robert R.K. was

04:41PM  11   somebody who went over to Ron Serio's house, right?

04:41PM  12          **MR. TRIPI:**  Objection as to what Masecchia was aware

04:41PM  13   of.

04:41PM  14          **THE COURT:**  Sustained.

04:41PM  15          **BY MR. SINGER:**

04:41PM  16   Q.  Anthony Anastasia was somebody that you mentioned too,

04:41PM  17   right?

04:41PM  18          **MR. TRIPI:**  Objection, asked and answered.

04:41PM  19          **THE COURT:**  Overruled.

04:41PM  20          **THE WITNESS:**  Yes.

04:41PM  21          **BY MR. SINGER:**

04:41PM  22   Q.  And Mike Masecchia knew Anthony Anastasia, correct?

04:41PM  23          **MR. TRIPI:**  Objection, asked and answered.

04:41PM  24          **THE COURT:**  Overruled.

04:41PM  25          **THE WITNESS:**  He did know him, yes.

04:41PM    1         **BY MR. SINGER:**

04:41PM    2    Q.  And he also knew about his arrest, correct?

04:41PM    3    A.  Yes.

04:41PM    4    Q.  He also knew about, you know, things that went on as far

04:41PM    5    as drug-dealing activities with Anastasia, correct?

04:41PM    6    A.  I believe so, yes.

04:41PM    7    Q.  Yeah, because he was part of a close knit member of the

04:41PM    8    Buffalo community that Mike Masecchia was?

04:41PM    9    A.  Yes.  I believe so, yes.

04:41PM   10    Q.  T.S..  T.S. was another person you mentioned, correct?

04:42PM   11    A.  I'm sorry.  Would you repeat that?

04:42PM   12    Q.  T.S. was somebody else you mentioned?

04:42PM   13    A.  Yes.

04:42PM   14    Q.  And you alleged that Mr. Bongiovanni provided information

04:42PM   15    about him?

04:42PM   16    A.  Correct.  He was friends with Ron and part of Ron's

04:42PM   17    organization.

04:42PM   18    Q.  And Mike Masecchia knew T.S. based on his dealings with

04:42PM   19    Ron Serio, correct?

04:42PM   20    A.  Based on his dealings with Ron, yes.

04:42PM   21    Q.  Once admitted he had a history with Amherst Police

04:42PM   22    Department, correct?

04:42PM   23    A.  I don't know.

04:42PM   24         **MR. TRIPI:**  Objection as to what someone else.

04:42PM   25         **THE WITNESS:**  I don't know about that.

04:42PM  1          **THE COURT:**  Yeah, sustained.

04:42PM  2          **BY MR. SINGER:**

04:42PM  3    Q.  One of the things that Mike --

04:42PM  4          **THE COURT:**  Again, Mr. Singer, you can ask these

04:42PM  5    questions, but you can't ask him what somebody else knew --

04:42PM  6          **MR. SINGER:**  I understand, Judge.

04:42PM  7          **THE COURT:**  -- unless there's a foundation for him

04:42PM  8    knowing what that person knew.

04:42PM  9          **MR. SINGER:**  Understand, Judge.

04:42PM  10         **BY MR. SINGER:**

04:42PM  11   Q.  You did testify, though, that -- that Mike Masecchia

04:42PM  12   believed that T.S. was arrested, right?

04:42PM  13   A.  Yes.

04:42PM  14   Q.  And that's what prompted the inquiry, correct?

04:42PM  15   A.  Correct.

04:42PM  16   Q.  So Mike Masecchia was plugged into information regarding

04:42PM  17   T.S.?

04:42PM  18   A.  Yes, which he heard from Ron.

04:42PM  19   Q.  J.D. was somebody that you mentioned too, right?

04:42PM  20   A.  Yes.

04:42PM  21   Q.  Mike Masecchia was somebody who worked out at Fitness

04:43PM  22   Factory, right?

04:43PM  23   A.  No.

04:43PM  24   Q.  He wasn't?

04:43PM  25   A.  No.

04:43PM   1   Q.  But he was someone who lived in the same general

04:43PM   2   community as J.D., correct?

04:43PM   3   A.  Yes.  But they didn't -- I don't believe they knew each

04:43PM   4   other.

04:43PM   5   Q.  You don't know that they knew each other?

04:43PM   6   A.  I don't know, we never saw them --

04:43PM   7   Q.  But you don't know what Mike Masecchia knows about J.D.?

04:43PM   8   A.  I don't know.  I've never seen him work out or socialize

04:43PM   9   or talk.

04:43PM  10   Q.  You knew at least, though, that J.D. did have a history

04:43PM  11   of drug abuse in his --

04:43PM  12   A.  I did.

04:43PM  13          **MR. TRIPI:**  Objection.

04:43PM  14          **THE COURT:**  Sustained.

04:43PM  15          **BY MR. SINGER:**

04:43PM  16   Q.  Mario Vacanti was somebody who you mentioned, too?

04:43PM  17   A.  Right.

04:43PM  18   Q.  And Mario Vacanti was somebody that Mike Masecchia

04:43PM  19   knew -- knew as well, correct?

04:43PM  20   A.  Yes.

04:43PM  21   Q.  And Mike Masecchia was somebody who dealt with Mario

04:43PM  22   Vacanti in the marijuana business?

04:43PM  23          **MR. TRIPI:**  Objection, 403.  Waste of time, Judge.

04:43PM  24          **THE COURT:**  Well, I mean, I -- I --

04:43PM  25          **MR. SINGER:**  I ask these questions about what

04:43PM 1   Mr. Bongiovanni communicated.  I didn't always get into what

04:43PM 2   Mike Masecchia knew, Judge, and that's why I'm just running

04:43PM 3   through these things.

04:44PM 4          **THE COURT:**  Well, if he has a foundation for knowing

04:44PM 5   it.  So you need to -- so, the question -- question is,

04:44PM 6   whether Mike Masecchia dealt with Vacanti?

04:44PM 7          **MR. SINGER:**  Correct.

04:44PM 8          **THE COURT:**  I'll allow him to answer that.

04:44PM 9          Overruled.

04:44PM 10         **THE WITNESS:**  I believe Ron dealt with Mario Vacanti.

04:44PM 11  So if Ron dealt with him, I'm -- I'm -- I'm assuming Mike knew

04:44PM 12  as well.

04:44PM 13         **BY MR. SINGER:**

04:44PM 14  Q.  Okay.  And we talked also about information that was

04:44PM 15  communicated allegedly from Mr. Bongiovanni to you, right?

04:44PM 16  A.  Correct.

04:44PM 17  Q.  Well, we talked about a number of things, too, that you

04:44PM 18  never learned anything about, right?

04:44PM 19  A.  Correct.

04:44PM 20  Q.  All those DEA investigations into various people involved

04:44PM 21  in this organization, right?

04:44PM 22  A.  Correct.

04:44PM 23  Q.  All these phone logs that potentially names of people

04:44PM 24  connected to the organization, right?

04:44PM 25  A.  Correct.

04:44PM   1   Q.   The utility poles on addresses associated with the

04:45PM   2   entity, correct?

04:45PM   3   A.   Correct.

04:45PM   4   Q.   The surveillance, correct?

04:45PM   5   A.   Correct.

04:45PM   6   Q.   And, you know, I think a fair statement, if Ron Serio

04:45PM   7   found out about all these things he didn't know about today,

04:45PM   8   he would be pretty pissed off, right?  He's not getting his

04:45PM   9   money --

04:45PM  10          MR. TRIPI:  Objection as to what Ron Serio would

04:45PM  11   think.

04:45PM  12          THE COURT:  Overruled.

04:45PM  13          THE WITNESS:  Ron only asked about what Ron asked

04:45PM  14   about.  Whatever he asked, he was given an answer to.

04:45PM  15          BY MR. SINGER:

04:45PM  16   Q.   Mr. Selva, he's paying, allegedly, Mr. Bongiovanni $4,000

04:45PM  17   a month for information, right?

04:45PM  18   A.   Correct.

04:45PM  19   Q.   And so these -- the information at meetings that you guys

04:45PM  20   are having at the bars where you guys whisper in your ear

04:45PM  21   about what's going on, right?

04:45PM  22   A.   That's.

04:45PM  23   Q.   I mean, is -- is what you're saying that what he got for

04:45PM  24   that $4,000 was you and Mr. Bongiovanni meeting up and you

04:45PM  25   and Mr. Bongiovanni telling you in your ear, hey, there's

USA v Bongiovanni - Selva - Singer/Cross - 8/29/24
337

04:45PM   1   nothing going on.  All clear.

04:45PM   2       Is that what's going on every month?

04:45PM   3   A.  I asked a question.  Whatever answer I got, I was given,

04:45PM   4   relayed it back, yes.

04:45PM   5   Q.  And that's all you got?

04:45PM   6   A.  That's it.

04:45PM   7   Q.  That's what you communicated back to -- to Mike

04:45PM   8   Masecchia?

04:45PM   9   A.  That's all I had.

04:46PM  10   Q.  And that's what got communicated back to Ron Serio?

04:46PM  11   A.  Yes.

04:46PM  12   Q.  So, you know, we talked a little bit about, you know, Ron

04:46PM  13   Serio being an opioid addict, right?

04:46PM  14   A.  Correct.

04:46PM  15   Q.  You described him as a mess to the government, right?

04:46PM  16   A.  After -- yes, during his arrest, yes.  He was -- he had

04:46PM  17   an addiction problem, yes.

04:46PM  18   Q.  But your understanding was that he was taking upwards of

04:46PM  19   40 oxy pills a day at some point?

04:46PM  20   A.  I don't know what he was taking, but I just heard he was

04:46PM  21   in bad shape.

04:46PM  22   Q.  But he was in bad shape, right?

04:46PM  23   A.  Yeah.

04:46PM  24   Q.  And it's easy to take advantage of a person who is in bad

04:46PM  25   shape, right?

04:46PM      1              **MR. TRIPI:**  Objection, argumentative.

04:46PM      2              **THE COURT:**  Overruled.

04:46PM      3              **THE WITNESS:**  This was -- again, I heard about this

04:46PM      4     after the arrest.

04:46PM      5              **BY MR. SINGER:**

04:46PM      6     Q.  Like we talked about, sir, about how you've done drugs

04:46PM      7     yourself, right?

04:46PM      8     A.  Yes.

04:46PM      9     Q.  We've talked about how you've witnessed other people do

04:46PM     10     drugs, right?

04:46PM     11     A.  Yes.

04:46PM     12     Q.  And we've talked about how you witnessed addicts,

04:46PM     13     correct?

04:46PM     14     A.  Yes.

04:46PM     15     Q.  And people who use drugs, their judgment is affected like

04:46PM     16     you said earlier, right?

04:47PM     17     A.  Yes.

04:47PM     18     Q.  Their perception and their memory is affected based on

04:47PM     19     the drug use, right?

04:47PM     20     A.  Depends on the individuals, yes.

04:47PM     21     Q.  And we talked about how, you know, someone who's a heavy

04:47PM     22     opioid addict is somebody who has a lot more problems than

04:47PM     23     just someone who recreationally uses cocaine?

04:47PM     24              **MR. TRIPI:**  Objection, asked and answered.

04:47PM     25              **THE COURT:**  Yeah.  Mr. Singer, we were getting

04:47PM   1   awfully repetitive here.  Let's get to the point.

04:47PM   2          Sustained.

04:47PM   3          **BY MR. SINGER:**

04:47PM   4   Q.  So, again, when we talk about all these things, Ron Serio

04:47PM   5   is in that state when this is happening, right?

04:47PM   6   A.  He was.  He was in an addictive state, but he was a very

04:47PM   7   intelligent guy.  He always knew what was going on.  He was

04:47PM   8   very aware -- whenever I saw him and what I heard from Mike

04:47PM   9   was that Joe was aware of his surroundings.

04:47PM  10   Q.  So that's easy to take money from somebody who's in that

04:47PM  11   state, right?

04:47PM  12          **MR. TRIPI:**  Objection.  Asked and answered, Your

04:47PM  13   Honor.  Repetitive.

04:47PM  14          **THE WITNESS:**  No.

04:47PM  15          **THE COURT:**  Overruled.

04:47PM  16          **THE WITNESS:**  No, we never took money from him.

04:47PM  17          **BY MR. SINGER:**

04:47PM  18   Q.  Well, you took money from Ron Serio, right?

04:47PM  19   A.  Right, but he never took advantage -- I think you're

04:47PM  20   getting at he took advantage of Ron Serio.  No, he didn't.

04:47PM  21   Q.  Let's get into that.  So -- so you admit that you stole

04:48PM  22   money from Ron Serio.

04:48PM  23   A.  I didn't admit that.  I did not steal money from Ron

04:48PM  24   Serio.  I was never given money from Ron Serio.

04:48PM  25   Q.  Do you remember, sir, storing marijuana in your house?

04:48PM    1    A.  Yes.

04:48PM    2    Q.  And you remember it was Ron Serio's marijuana, right?

04:48PM    3    A.  Correct.

04:48PM    4    Q.  And you remember that at one point in time, $27,000 worth

04:48PM    5    of marijuana goes missing that was Ron Serio's from your

04:48PM    6    house, right?

04:48PM    7    A.  It was not, no.  That's -- that's -- it was never missing

04:48PM    8    from my house.  I did not steal that.

04:48PM    9    Q.  So you don't remember stealing money from Ron Serio?

04:48PM   10    A.  I never stole money from Ron Serio, I never stole

04:48PM   11    marijuana from Ron Serio.

04:48PM   12    Q.  You never stole money or weed from Ron Serio?

04:48PM   13    A.  Never.

04:48PM   14    Q.  Never?

04:48PM   15    A.  Never.

04:48PM   16    Q.  Okay.  And so as far as everything that's going on here,

04:48PM   17    all those things that we just -- just -- just went through,

04:48PM   18    the information that Mike Masecchia knew, that would provide

04:48PM   19    a conduit for information regarding people in the community,

04:48PM   20    correct?

04:48PM   21    A.  Correct.

04:48PM   22    Q.  Mr. Masecchia and his relationship to Ron Serio, and how

04:48PM   23    Ron Serio revered him, that's something that ingratiated

04:49PM   24    Mr. Serio to Mr. Masecchia, correct?

04:49PM   25    A.  Correct.

| 04:49PM | 1 | Q.  Ron Serio -- |

A.  He, like we said, Mike had a fearful reputation.

Q.  And Ron Serio's drug activity is something that made him
vulnerable, correct?

MR. TRIPI:  Objection.  Asked and answered.

THE COURT:  Sustained.

BY MR. SINGER:

Q.  So, you also mentioned on direct that Ron Serio was
somebody who was cautious around Mike Masecchia, correct?

MR. TRIPI:  Objection.  Misstates facts not in
evidence.

THE COURT:  Hold on.

Overruled.

THE WITNESS:  I don't recall saying "cautious."

BY MR. SINGER:

Q.  But he was someone, Ron Serio, who revered Mike Masecchia
based on his tough-guy reputation, right?

A.  Yes, he respected him.  They were friends.  And his
reputation was a fearful one.

Q.  And, so, that caused you not to always question Mike
Masecchia, right?

A.  No.  If I had a question, I would be direct with him and
ask him a question.

Q.  But, you also had some concerns sometimes about
challenging Mike Masecchia, right?

04:50PM   1   A.  No.  If I -- I had the relationship with him, if I had

04:50PM   2   something to talk to him about, it was direct, I would be

04:50PM   3   direct and ask him a question.  Could he hurt me?  Sure, but

04:50PM   4   I would be direct with him.

04:50PM   5   Q.  That was something in the back of your mind, right?

04:50PM   6   A.  I guess.  Yes.

04:50PM   7   Q.  And, so, your fear of Mike Masecchia --

04:50PM   8   A.  I wouldn't call it fear.

04:50PM   9   Q.  Okay.  But, you know, that could be a reason why you're

04:50PM  10   not testifying truthful today, correct?

04:50PM  11   A.  I am testifying truthful today.

04:50PM  12   Q.  But your fear of Mike Masecchia could be a reason for you

04:50PM  13   to fabricate your testimony, right?

04:50PM  14   A.  No.

04:50PM  15   Q.  You wouldn't have any concerns about him potentially

04:50PM  16   going after you?

04:50PM  17   A.  No.

04:50PM  18   Q.  You wouldn't have any concerns about Italian Organized

04:50PM  19   Crime friends of his going after you?

04:50PM  20   A.  No.

04:50PM  21   Q.  You wouldn't have any concerns like that whatsoever?

04:50PM  22   A.  I have no concerns.

04:50PM  23   Q.  There would also be financial motives for --

04:50PM  24       **MR. TRIPI:**  Objection.

         25

04:50PM   1           **BY MR. SINGER:**

04:50PM   2   Q.  -- you to potentially testify, right?

04:50PM   3   A.  There's no financial motives.

04:50PM   4           **THE COURT:**  Stop, stop.

04:50PM   5           **MR. TRIPI:**  He's asked and answered about financial

04:50PM   6   motives several times.  We're just running out the clock here,

04:50PM   7   Judge.  I don't appreciate it.

04:51PM   8           **THE COURT:**  Well, we're not -- no one is running out

04:51PM   9   any clock, so, the objection is overruled.

04:51PM  10           Go ahead.

04:51PM  11           **THE WITNESS:**  I'm not fearful.  Could you repeat the

04:51PM  12   question?

04:51PM  13           **BY MR. SINGER:**

04:51PM  14   Q.  You're not fearful at all, sir?

04:51PM  15   A.  No.

04:51PM  16   Q.  The basic fact is, Mr. Selva, is that this was going on,

04:51PM  17   as far as duping Ron Serio, you don't really have an

04:51PM  18   incentive to come clean on that, correct?

04:51PM  19   A.  Sir, I did not dupe Ron Serio.

04:51PM  20   Q.  But you don't have an incentive to come clean on that

04:51PM  21   right now because if you did, that would do away with your

04:51PM  22   entire cooperation agreement?

04:51PM  23   A.  I didn't.  So that's the answer to the question, I did

04:51PM  24   not.

04:51PM  25   Q.  Because moving forward, if you said something like that,

04:51PM    1    do away with the entire cooperation agreement, right?

04:51PM    2    A.  Yes, but I didn't.

04:51PM    3    Q.  And it would potentially take away you from your family,

04:51PM    4    correct?

04:51PM    5    A.  Correct.

04:51PM    6    Q.  It would put you in jail, correct?

04:51PM    7    A.  Correct.

04:51PM    8    Q.  It would make, potentially, that you never see the light

04:51PM    9    of day out of jail, correct?

04:51PM   10    A.  I'm -- I'm losing it.

04:51PM   11         Yes.  If that were the case, yes.

04:51PM   12    Q.  And you've duped friends of yours before, correct?

04:52PM   13    A.  I have not.

04:52PM   14    Q.  You have not?

04:52PM   15    A.  No.

04:52PM   16         MR. SINGER:  Ms. Champoux, can you bring up

04:52PM   17    Government Exhibit 215, please.

04:52PM   18         MR. TRIPI:  Is this in evidence?

04:52PM   19         MR. SINGER:  This is in evidence.

04:52PM   20         BY MR. SINGER:

04:52PM   21    Q.  Do you remember this document, Mr. Selva?

04:52PM   22    A.  Yes.

04:52PM   23    Q.  You saw it right at the beginning of your testimony?

04:52PM   24    A.  Yes.

04:52PM   25         MR. SINGER:  Ms. Champoux, can you blow up block 43,

04:52PM       1    please?

04:52PM       2         **BY MR. SINGER:**

04:52PM       3    Q.  This is your application to the Sheriff's Office; is that

04:52PM       4    right, Mr. Selva?

04:52PM       5    A.  Correct.

04:52PM       6    Q.  And you listed three different people in your life as

04:52PM       7    references; is that right?

04:52PM       8    A.  Correct.

04:52PM       9    Q.  One of them was Joseph Bongiovanni, correct?

04:52PM      10    A.  Correct.

04:52PM      11    Q.  Another one was Mark Grisanti?

04:52PM      12    A.  Correct.

04:52PM      13    Q.  Mark Grisanti, he's a judge, New York State?

04:52PM      14    A.  Correct.

04:52PM      15    Q.  You've known him for 42 years?

04:52PM      16    A.  Long time, yes.

04:52PM      17    Q.  Thomas Phillips was another person that you put down on

04:52PM      18    the application, right?

04:52PM      19    A.  Correct.

04:52PM      20    Q.  He, at that time, was chief of police of the Kenmore

04:53PM      21    Police Department?

04:53PM      22    A.  I believe he still is if I'm not mistaken, but, yes.

04:53PM      23    Q.  He's someone that you had known for at that point

04:53PM      24    15 years?

04:53PM      25    A.  Correct.

04:53PM    1    Q.  And before you submitted this application.  You didn't

04:53PM    2    tell Judge Grisanti about any of the marijuana activity you

04:53PM    3    engaged in over a decade, correct?

04:53PM    4    A.  No.

04:53PM    5    Q.  Before you submitted this, you didn't tell Thomas

04:53PM    6    Phillips about any of the marijuana activity you engaged in,

04:53PM    7    correct?

04:53PM    8    A.  No.

04:53PM    9    Q.  And they're listed as references on your application,

04:53PM   10    right?

04:53PM   11    A.  Correct.

04:53PM   12    Q.  So you duped them, right?

04:53PM   13    A.  I didn't come forward and tell them I was involved in

04:53PM   14    marijuana, no.

04:53PM   15         **MR. SINGER:**  Ms. Champoux, if you could unexpand out

04:53PM   16    of that, please.

04:53PM   17         **BY MR. SINGER:**

04:53PM   18    Q.  And you also misstated facts to the police before,

04:53PM   19    correct?

04:53PM   20    A.  As far as what?

04:53PM   21    Q.  Well, let's go take a look at question number 42.

04:53PM   22         Do you see that question there, sir, on the application?

04:54PM   23    A.  Yes.

04:54PM   24    Q.  So you marked no to that question, right, sir?

04:54PM   25    A.  Yes.

04:54PM   1   Q.   And you agree with me that engaging in a drug-trafficking

04:54PM   2   organization for ten years is something that would be a

04:54PM   3   disqualifying mark for someone pursuing a sheriff's office

04:54PM   4   career, correct?

04:54PM   5   A.   It would be, correct.

04:54PM   6   Q.   So you lied in your application right there, sir, right?

04:54PM   7   A.   I did not come forward with that, no.

04:54PM   8   Q.   Because that's what do you to protect yourself sometimes,

04:54PM   9   lying, right?

04:54PM  10   A.   For that job.  Yes.  And I was wrong.

04:54PM  11          **MR. SINGER:**  I have no further questions, Judge.

04:54PM  12          **MR. TRIPI:**  Judge, I'm going to ask if the jury if

04:54PM  13   they'll stay 20 minutes so I can finish my redirect so we

04:54PM  14   don't have to bring back Mr. Selva back on Tuesday?

04:54PM  15          **THE COURT:**  Yeah, I agree.  I think that's fair.

04:54PM  16          And I see the jurors nodding their heads so I

04:54PM  17   think --

04:54PM  18          **MR. TRIPI:**  Thank you to the jury.

04:54PM  19

04:54PM  20          **REDIRECT EXAMINATION BY MR. TRIPI:**

04:54PM  21   Q.   Mr. Masecchia -- you mentioned in your testimony that

04:54PM  22   Mr. Masecchia said that he had to kick up to someone above

04:54PM  23   him; do you remember that testimony?

04:54PM  24   A.   I do.

04:54PM  25   Q.   Do you agree it would be pretty dumb for Mr. Masecchia to

04:54PM  1   ruin the lucrative business he had with Ron Serio for pennies

04:55PM  2   on the dollar to steal from Ron Serio?

04:55PM  3   A.  Yes.

04:55PM  4   Q.  Was Mr. Masecchia making a lot more money than the bribe

04:55PM  5   payments to Mr. Bongiovanni?

04:55PM  6   A.  Yes.

04:55PM  7   Q.  Was Mr. Masecchia's access to law enforcement sensitive

04:55PM  8   information and informants this defendant?

04:55PM  9   A.  Yes.

04:55PM  10  Q.  Through you?

04:55PM  11  A.  Yes.

04:55PM  12  Q.  When -- the defendant and Mr. Masecchia are both adult

04:55PM  13  males, right?

04:55PM  14  A.  Yes.

04:55PM  15  Q.  When they meet in secret to exchange cash, can they talk

04:55PM  16  to one another?

04:55PM  17  A.  Absolutely, yes.

04:55PM  18  Q.  So do you think there's some things that maybe the

04:55PM  19  defendant told Mr. Masecchia that you weren't aware of?

04:55PM  20       **MR. SINGER:**  Object to speculation, lack of personal

04:55PM  21  knowledge.

04:55PM  22       **MR. TRIPI:**  That's fair.  He crossed on it.

04:55PM  23       **THE COURT:**  Overruled.

04:55PM  24       **THE WITNESS:**  Yes.

         25

04:55PM    1           **BY MR. TRIPI:**

04:55PM    2    Q.  Nothing stops them from talking to one another when

04:56PM    3    they're in person with other exchanging cash, correct?

04:56PM    4    A.  No, sir.

04:56PM    5           **MR. SINGER:**  Objection, leading.

04:56PM    6           **THE COURT:**  Overruled.  But don't lead.

04:56PM    7           **MR. TRIPI:**  I understand, Judge.

04:56PM    8           **THE COURT:**  Thank you.

04:56PM    9           **BY MR. TRIPI:**

04:56PM   10    Q.  Did you actually later learn -- going back to the camera

04:56PM   11    and when the defendant left the bottle on your front porch;

04:56PM   12    do you remember that?  Did you later learn that the camera

04:56PM   13    actually didn't work but it was left up as a prop?

04:56PM   14    A.  I figured that out, yes.

04:56PM   15    Q.  Mr. Singer asked you a question on cross about -- I think

04:56PM   16    he said, first, telling law enforcement about IOC or Italian

04:57PM   17    Organized Crime conversations at this trial, words to that

04:57PM   18    effect?

04:57PM   19    A.  Yes, sir.

04:57PM   20    Q.  If I heard that right, I just want to clarify.

04:57PM   21        Did you tell law enforcement about the defendant's

04:57PM   22    comments about his father's Italian Organized Crime-connected

04:57PM   23    friends a long time ago?

04:57PM   24    A.  A long time ago, yes.

04:57PM   25    Q.  In fact, I mean, you sat for a lot of interviews; is that

USA v Bongiovanni - Selva - Tripi/Redirect - 8/29/24

350

04:57PM    1    right?

04:57PM    2    A.   Yes, sir.

04:57PM    3    Q.   Would it be fair to say that the questions that

04:57PM    4    prosecutors were asking you became more specific over time?

04:57PM    5    A.   They did.

04:57PM    6    Q.   Would it be fair to say, did you have a lot of time to

04:57PM    7    think about information between 2019 and now?

04:57PM    8    A.   Yes.

04:57PM    9    Q.   Sometimes do additional -- does additional information

04:57PM    10   come to mind?

04:57PM    11   A.   That's human nature, yes.

04:57PM    12   Q.   Do you remember early on there was another prosecutor

04:57PM    13   involved in your case, Mr. Cullinane?

04:57PM    14   A.   I do, yes.

04:58PM    15   Q.   Did he ever tell you anything to say?

04:58PM    16   A.   Never.

04:58PM    17   Q.   Did he ever tell you anything other than tell the truth?

04:58PM    18   A.   Correct.

04:58PM    19   Q.   Did I ever tell you anything to say?

04:58PM    20   A.   No.

04:58PM    21   Q.   Did I ever tell you anything other than tell the truth?

04:58PM    22   A.   Yes.

04:58PM    23   Q.   How about Mr. Cooper?

04:58PM    24   A.   Same thing.

04:58PM    25   Q.   How about Ms. Chalbeck when she was here?

04:58PM    1   A.  Same thing.

04:58PM    2   Q.  How about Special Agent Burns?

04:58PM    3   A.  Same thing.

04:58PM    4   Q.  How about Special Agent Halliday?

04:58PM    5   A.  The same thing.

04:58PM    6   Q.  When you were giving more information and you were being

04:58PM    7   asked more questions, is that because you actually were

04:58PM    8   withholding information?

04:58PM    9   A.  Yes, I was thinking about it, and it was coming to mind

04:58PM   10   and becoming more truthful.

04:58PM   11   Q.  Was Mike Masecchia and Ron, were they close friends?

04:58PM   12   A.  They were.

04:58PM   13   Q.  Were they business partners?

04:58PM   14   A.  They were.

04:58PM   15   Q.  Was Masecchia close friends, maybe not as close as you,

04:58PM   16   but also close friends with the defendant?

04:58PM   17   A.  Yes.  Like I said before --

04:58PM   18   Q.  There was no question about that?

04:58PM   19   A.  There's no question, we all grew up.

04:58PM   20   Q.  Did the -- did -- did Masecchia ever try to intimidate

04:59PM   21   you?

04:59PM   22   A.  No.

04:59PM   23   Q.  Did he ever try to intimidate Ron Serio?

04:59PM   24   A.  No.

04:59PM   25   Q.  Did he ever try to intimidate the defendant?

04:59PM  1   A.   No.

04:59PM  2   Q.   So those questions, Mr. Serio -- Mr. Singer was asking

04:59PM  3   you about had zero applicability to this case, right?

04:59PM  4   A.   Correct.

04:59PM  5   Q.   When Wayne Anderson walked into Bongiovanni's stag party

04:59PM  6   at Iron Works, did the defendant say, hey, Lou, get Wayne out

04:59PM  7   of here, I have an open file on him?

04:59PM  8   A.   Not at all.  No.

04:59PM  9   Q.   Did he tell you, hey, get Wayne Anderson out of here, I'm

04:59PM  10  investigating him?

04:59PM  11  A.   Not at all.  He said hello.

04:59PM  12  Q.   And did Wayne stay and have drinks?

04:59PM  13  A.   He did.

04:59PM  14  Q.   Did he buy a ticket?

04:59PM  15  A.   He did.

04:59PM  16  Q.   Was he hanging out?

04:59PM  17  A.   He was.

04:59PM  18  Q.   With his friends?

04:59PM  19  A.   With his friends.

04:59PM  20  Q.   The Suppas actually lived in the same house as this

05:00PM  21  defendant?

05:00PM  22  A.   On Colvin Avenue, yeah.  For a short time, yes.  They

05:00PM  23  were renting or --

05:00PM  24  Q.   So they played with each other since childhood?

05:00PM  25  A.   Yes.

05:00PM     1    Q.  Would you call that a long-standing relationship?

05:00PM     2    A.  Absolutely.

05:00PM     3    Q.  Did the defendant and Mr. Masecchia actually drive to

05:00PM     4    college together at U.B.?

05:00PM     5    A.  They did.

05:00PM     6    Q.  Did you know that because you spoke to each one of them?

05:00PM     7    A.  Yes.

05:00PM     8    Q.  Did Mr. Masecchia, was he a silent partner in a bar

05:00PM     9    called the Locker Room?

05:00PM    10    A.  He was.

05:00PM    11    Q.  Did you and the defendant go there and drink?

05:00PM    12    A.  We did.

05:00PM    13    Q.  Did you hang out with Mike Masecchia there?

05:00PM    14    A.  It was the whole crew, yes.  Everybody from our

05:00PM    15    neighborhood.

05:00PM    16    Q.  Did he also partially own a bar in Niagara Falls called

05:00PM    17    The Pleasure Dome?

05:00PM    18    A.  He did.

05:00PM    19    Q.  Did you go there with the defendant?

05:01PM    20    A.  On occasion, yes.

05:01PM    21    Q.  Is that in addition to the Gables bar that you would see

05:01PM    22    Masecchia at?

05:01PM    23    A.  Yes.

05:01PM    24    Q.  Is that in addition to M.T. Pockets?

05:01PM    25    A.  Yes.

05:01PM   1   Q.  Did the defendant go to those bars, too?

05:01PM   2   A.  Yes.

05:01PM   3   Q.  And those are on Hertel, right in the neighborhood,

05:01PM   4   right?

05:01PM   5   A.  They're neighborhood bars, yes.

05:01PM   6   Q.  Now, Mr. Singer was asking you questions, and he was

05:01PM   7   saying that Mike Masecchia asked you to get involved.  That's

05:01PM   8   not how it was, was it?

05:01PM   9   A.  I asked Mike Masecchia.

05:01PM  10   Q.  You asked to become a part of it, correct?

05:01PM  11   A.  Correct, I reached out to him.

05:01PM  12   Q.  And did Mike Masecchia want to make sure Ron was

05:01PM  13   protected?

05:01PM  14   A.  Yes.  Ron was top of the food chain.

05:01PM  15   Q.  And what was Ron's nickname?

05:01PM  16   A.  Greenie.

05:01PM  17   Q.  Is that because he was good at making money?

05:01PM  18   A.  Yeah.  He had the money, Greenie.

05:01PM  19   Q.  Independent of the photo that you saw and your -- your

05:01PM  20   opinion that it was a Rolex in the defendant's house, do you

05:02PM  21   believe you've seen him wear a Rolex over the years?

05:02PM  22   A.  Yes.

05:02PM  23   Q.  When you talked about the defendant's financial pressures

05:02PM  24   and money he's paying to his ex-wife and financial

05:02PM  25   obligations he's taking on with respect to his current wife,

USA v Bongiovanni - Selva - Tripi/Redirect - 8/29/24

05:02PM    1    are you basing your testimony on the things the defendant

05:02PM    2    said to you?

05:02PM    3    A.  Yes.

05:02PM    4    Q.  You didn't review his financial statements, right?

05:02PM    5    A.  No.

05:02PM    6    Q.  But you know what he said to you?

05:02PM    7    A.  I know what he said, yes.

05:02PM    8    Q.  Are you being truthful with them?

05:02PM    9    A.  Yes.

05:02PM   10    Q.  When the defendant was in Cabo San Lucas in Mexico with

05:02PM   11    you and Tom Doctor and Tom Napoli using cocaine, do you think

05:02PM   12    there was any threat of the DEA coming and drug testing him

05:02PM   13    in Mexico?

05:02PM   14    A.  No.

05:02PM   15    Q.  Did he ever actually tell you he was actually drug tested

05:03PM   16    by the DEA?

05:03PM   17    A.  No.

05:03PM   18    Q.  But he was concerned about it, right?

05:03PM   19    A.  Yes.

05:03PM   20    Q.  But that's a risk much smaller than taking bribes and

05:03PM   21    protecting a drug organization, wouldn't you say?

05:03PM   22    A.  Yes.

05:03PM   23    Q.  By the time you were in grand jury, were you more

05:03PM   24    forthcoming?

05:03PM   25    A.  I was, yes.

05:03PM    1    Q.  And the meetings that followed that, did you think of

05:03PM    2    more information?

05:03PM    3    A.  Yes.

05:03PM    4    Q.  Like Mr. Singer was asking you questions, and he asked

05:03PM    5    the question, and you said actually the defendant told you

05:03PM    6    R.K. was his informant, right?

05:03PM    7    A.  Correct.

05:03PM    8    Q.  So in grand jury, when you -- when you indicated the

05:03PM    9    defendant told there was nothing going on with R.K., did that

05:03PM   10    mean R.K. was not infiltrating the organization?

05:04PM   11    A.  No, he was an informant.

05:04PM   12    Q.  But R.K. wasn't doing anything to harm you?

05:04PM   13    A.  He was doing nothing to harm me at that time, correct.

05:04PM   14    Not harm me, harm the organization.

05:04PM   15    Q.  And R.K. was whose informant?

05:04PM   16    A.  The defendant's.

05:04PM   17    Q.  Do you think that meant the defendant controlled R.K.?

05:04PM   18    A.  Yes.

05:04PM   19    Q.  Was that a comforting feeling?

05:04PM   20    A.  It was.

05:04PM   21    Q.  Have you had a number of conversations with Mr. Serio and

05:04PM   22    Masecchia, more so with Masecchia, but also Serio over time,

05:04PM   23    about the parameters of this defendant's protection of the

05:04PM   24    organization?

05:04PM   25    A.  Yes.

05:04PM   1   Q.  Did everything you talked about, whether it was '13, '14,

05:04PM   2   '12, did everything you talked about happen between 2008 and

05:04PM   3   2017?

05:04PM   4   A.  It did.

05:04PM   5   Q.  So everything you told this jury happened within that

05:04PM   6   window of time?

05:05PM   7   A.  Within that timeframe.  Yes.

05:05PM   8   Q.  Are you making any of it up?

05:05PM   9   A.  No.

05:05PM   10  Q.  Are you framing your best friend to get out of trouble?

05:05PM   11  A.  No.

05:05PM   12  Q.  When the defendant told you about meeting in public

05:05PM   13  places and not talking on the phone, is that the protocol you

05:05PM   14  both followed?

05:05PM   15  A.  Yes.

05:05PM   16  Q.  Do you believe that locations, private locations, could

05:05PM   17  potentially be bugged?

05:05PM   18  A.  Potentially, if they're made aware of.

05:05PM   19  Q.  So the places you spoke were where, Delaware Park?

05:05PM   20  A.  Delaware Park.

05:05PM   21  Q.  Bike path?

05:05PM   22  A.  Yes.

05:05PM   23  Q.  Bars?

05:05PM   24  A.  Yes.

05:05PM   25  Q.  The defendant's house?

05:05PM  1   A.  Yes.

05:05PM  2   Q.  Do you think the defendant would have some insight as to

05:05PM  3   wiretaps and bugs?

05:05PM  4   A.  Yes.

05:05PM  5   Q.  Did you think his house was a safe place?

05:05PM  6   A.  Yes.

05:05PM  7   Q.  When you were passing lists -- let's clear that up.  When

05:06PM  8   you were passing lists on pieces of paper with names and

05:06PM  9   phone numbers from Ron Serio, were those the names and phone

05:06PM  10  numbers he wanted to make sure were not tapped?

05:06PM  11  A.  It was what he was given, yes.

05:06PM  12  Q.  That's separate and distinct from the people he wanted to

05:06PM  13  see if they were informants; is that right?

05:06PM  14  A.  Correct.

05:06PM  15  Q.  So Chris Baker, for example, that's a phone number Ron

05:06PM  16  Serio wanted to see if it was on a wiretap, right?

05:06PM  17  A.  Correct.

05:06PM  18  Q.  Robert R.K., T.S., those were people he wanted to see if

05:06PM  19  they were informants?

05:06PM  20  A.  Those were informants.

05:06PM  21  Q.  Okay.  Was Tom Serio also friendly with Masecchia, tight

05:06PM  22  with Masecchia?

05:06PM  23  A.  He was friendly with him, yes.

05:06PM  24  Q.  Did Butchie Bifocals actually work at Mike Masecchia's

05:06PM  25  debt collection agency?

05:06PM   1    A.  I'm not sure.  I don't know that.

05:06PM   2    Q.  Okay.  Anything you're aware of that would prevent

05:06PM   3    Masecchia and Tom Serio from talking directly?

05:07PM   4    A.  No.

05:07PM   5    Q.  Who was closer to Anthony Gerace, you or Peter Gerace?

05:07PM   6    A.  Peter Gerace.

05:07PM   7    Q.  Peter Gerace friends with the defendant?

05:07PM   8    A.  Yes.

05:07PM   9    Q.  And who was it that asked the defendant to help Anthony

05:07PM  10    Gerace?  Was that you or was that Peter Gerace, remind the

05:07PM  11    jury.

05:07PM  12    A.  It was Peter Gerace.

05:07PM  13    Q.  That's what the defendant told you?

05:07PM  14    A.  Yes.

05:07PM  15    Q.  Did the defendant ever explain chapter and verse exactly

05:07PM  16    how he was protecting the organization?

05:07PM  17    A.  No.

05:07PM  18    Q.  Did he, you heard of DARTS the first time out of

05:07PM  19    Mr. Singer's mouth; is that right?

05:07PM  20    A.  Yes.

05:07PM  21    Q.  In terms of the drug organization you were a part of,

05:07PM  22    would someone who was formally an informant be a threat to

05:07PM  23    the organization?

05:07PM  24    A.  Yes.

05:07PM  25    Q.  Just like if someone's currently an informant, right?

05:07PM   1   A.  Correct.

05:07PM   2   Q.  Could a former informant become a current informant?

05:08PM   3   A.  To my knowledge, yes.

05:08PM   4   Q.  Does that rat or snitch label stick with people?

05:08PM   5   A.  Yes.

05:08PM   6   Q.  Is that something you struggled with?

05:08PM   7   A.  Yes.

05:08PM   8   Q.  Ultimately, do you feel like you're doing the right thing

05:08PM   9   sitting here?

05:08PM  10   A.  Yes.

05:08PM  11   Q.  I notice the word "junkie" was used to describe Robert

05:08PM  12   R.K., and then you used the term "drug user."

05:08PM  13       Did you think the word "junkie" was a little offensive?

05:08PM  14           **MR. SINGER:**  Objection.

05:08PM  15           **THE WITNESS:**  I --

05:08PM  16           **THE COURT:**  Stop.  Yeah.  Sustained.  Sustained.

05:08PM  17           Next question.

05:08PM  18           **BY MR. TRIPI:**

05:08PM  19   Q.  When the defendant was explaining to you how surveillance

05:08PM  20   worked, did he tell you -- remind the jury how he told you

05:09PM  21   they use different teams?

05:09PM  22   A.  He said when somebody was under surveillance, different

05:09PM  23   teams were involved.  When they were following somebody, it

05:09PM  24   wouldn't just be one car, it would be different teams.

05:09PM  25   Q.  Is that something that you believe is specific?

05:09PM    1    A.   Yes.

05:09PM    2    Q.   Is that something you think everybody knows?

05:09PM    3    A.   No.

05:09PM    4    Q.   Were you -- you described Ron and Mike as partners in

05:09PM    5    this business?

05:09PM    6    A.   Yes.

05:09PM    7    Q.   When you were talking about Ron Serio's drug addiction,

05:09PM    8    that was closer in time to his arrest, right?

05:09PM    9    A.   Correct.

05:09PM    10   Q.   Okay.  The whole time, do you believe Ron was a smart

05:09PM    11   guy?

05:09PM    12   A.   A very smart guy.

05:09PM    13   Q.   Were you -- now, in terms of -- in terms of like your

05:09PM    14   involvement here, were you trying to be Ron Serio?  Were you

05:09PM    15   trying to live in a mansion and be the biggest drug dealer in

05:09PM    16   Buffalo?

05:09PM    17   A.   No.

05:09PM    18   Q.   Were you trying to be Mike Masecchia and be a made guy?

05:10PM    19   A.   No.

05:10PM    20   Q.   Were you trying to be Mike Masecchia and buy property in

05:10PM    21   Florida?

05:10PM    22   A.   No.

05:10PM    23   Q.   Were you just trying to keep your head above water?

05:10PM    24   A.   Yes.

05:10PM    25   Q.   And you committed crimes to do that, right?

05:10PM    1    A.  I did.

05:10PM    2    Q.  You've been honest with this jury about the crimes you've

05:10PM    3    committed?

05:10PM    4    A.  I have.

05:10PM    5    Q.  Are you being honest with this jury about the crimes this

05:10PM    6    defendant committed?

05:10PM    7    A.  I have.

05:10PM    8    Q.  Are you ashamed of your behavior?

05:10PM    9    A.  I am.

05:10PM   10    Q.  When they came into your house and found shake and

05:10PM   11    marijuana, were you concerned about the crumbs of marijuana

05:10PM   12    in your house or were you concerned about the fact that this

05:10PM   13    bribery scheme was up?

05:10PM   14    A.  It was up.

05:10PM   15    Q.  This?

05:10PM   16    A.  This.  It all crumbled down.

05:10PM   17    Q.  The garbage in your house, were you concerned about that?

05:10PM   18    A.  No.  The bigger picture.

05:10PM   19    Q.  Defense has questioned your -- your -- you several

05:11PM   20    different ways here, but going back to October 1st, 2019, you

05:11PM   21    told law enforcement that Bobby R.K., Mario Vacanti and Frank

05:11PM   22    Burkhart were people that Ron wanted looked into and that you

05:11PM   23    asked the defendant about; is that right?

05:11PM   24    A.  Correct.

05:11PM   25    Q.  Frank Burkhart; is that right?

05:11PM    1    A.  That's correct.

05:11PM    2    Q.  And then you also told law enforcement about T.S.; is

05:11PM    3    that right?

05:11PM    4    A.  That's correct.

05:11PM    5    Q.  And did the -- did the defendant produce results about

05:11PM    6    that?

05:11PM    7    A.  Yes.

05:11PM    8    Q.  You were asked about your cooperation agreement.  I'm

05:12PM    9    going to show you, Government Exhibit 3540E-1.  Take a look

05:12PM   10    at that, look at that signature page.

05:12PM   11        Do you recognize that to be your cooperation agreement?

05:12PM   12    A.  It is, yes.

05:12PM   13    Q.  It's a fair and accurate copy of the agreement that you

05:12PM   14    signed?

05:12PM   15    A.  Yes.

05:12PM   16            **MR. TRIPI:**  The government offers the exhibit,

05:12PM   17    Your Honor.

05:12PM   18            **MR. SINGER:**  One minute, Judge, sorry.

05:12PM   19            No objections.

05:12PM   20            **THE COURT:**  Received without objection.

05:12PM   21        **(GOV Exhibit 3540E-1 was received in evidence.)**

05:12PM   22            **MR. TRIPI:**  Can we show paragraph -- pull this up,

05:12PM   23    show paragraph 1, Ms. Champoux.

05:12PM   24            **MR. COOPER:**  Can you repeat that?

05:12PM   25            **MR. TRIPI:**  3540E-1.

05:12PM    1          Thank you.

05:13PM    2          **BY MR. TRIPI:**

05:13PM    3    Q.  Does paragraph 1 -- just to move it along, I going to

05:13PM    4    read it out loud.

05:13PM    5          Does paragraph 1 read:  "The witness will cooperate with

05:13PM    6    the government by providing complete and truthful information

05:13PM    7    regarding the witness's knowledge of any and all criminal

05:13PM    8    activity, whether undertaken by the witness or others, in any

05:13PM    9    way or related to the unlawful possession, manufacture

05:13PM   10    distribution, or importation of controlled substances,

05:13PM   11    firearms, possession, bribery, and public corruption.

05:13PM   12          The witness's cooperation shall also include submitting

05:13PM   13    to interviews by government attorneys and agents as well as

05:13PM   14    testifying truthfully and completely before grand juries and

05:13PM   15    at such pretrial and trial proceedings as the government

05:13PM   16    shall deem necessary including, but not limited to, pretrial

05:13PM   17    hearings, trial, sentencing hearing, and forfeiture

05:13PM   18    proceedings.

05:13PM   19          Is that what it says?

05:13PM   20    A.  That's correct.

05:13PM   21    Q.  Is that what you agreed to do?

05:13PM   22    A.  That's what I agreed to.

05:13PM   23    Q.  Anywhere in there does it say you have to incriminate Joe

05:13PM   24    Bongiovanni?

05:13PM   25    A.  No.

USA v Bongiovanni - Selva - Tripi/Redirect - 8/29/24

365

05:13PM  1   Q.  Anywhere in there does it say you need to talk about Mike

05:13PM  2   Masecchia?

05:13PM  3   A.  No.

05:13PM  4   Q.  Anywhere in there does it say you need to help

05:13PM  5   incriminate Ron Serio?

05:13PM  6   A.  No.

05:13PM  7   Q.  What's the operative word in there?

05:14PM  8   A.  Cooperation.

05:14PM  9   Q.  Truth?

05:14PM  10  A.  Truth.

05:14PM  11  Q.  Let's go to paragraph 2 real quick.

05:14PM  12      As you sit here today, Mr. Selva, let me ask you a

05:14PM  13  question:  You don't know what's going to happen to you, do

05:14PM  14  you?

05:14PM  15  A.  No, sir.

05:14PM  16  Q.  You're taking a leap of faith?

05:14PM  17  A.  Yes, sir.

05:14PM  18  Q.  And some prosecutor, not me, some U.S. Attorney is going

05:14PM  19  to decide what happens to you?

05:14PM  20  A.  That's correct.

05:14PM  21  Q.  Paragraph 2 says, in exchange for your cooperation, as

05:14PM  22  set forth in this agreement, you and the government agree

05:14PM  23  that the office of the United States Attorney's office for

05:14PM  24  the Western District of New York will hold in abeyance until

05:14PM  25  the completion of cooperation it's decision to file charges

05:14PM  1   or to offer a plea agreement to the witness for any federal

05:14PM  2   criminal offenses the witness may have committed in the

05:14PM  3   Western District of New York, and any way involving or

05:14PM  4   related to unlawful possession, manufacture, distribution,

05:14PM  5   importation of controlled substances, firearm possession

05:15PM  6   bribery, and public corruption, correct?

05:15PM  7   A.  Correct.

05:15PM  8   Q.  Does that mean you have no guarantees?

05:15PM  9   A.  I have no guarantees.

05:15PM  10  Q.  Other than what's written on this paper?

05:15PM  11  A.  That's correct.

05:15PM  12  Q.  I'm going to skip down to 4.

05:15PM  13      If you provide false information, or you testify falsely,

05:15PM  14  in addition to everything else, could you be charged with

05:15PM  15  perjury?

05:15PM  16  A.  Yes.

05:15PM  17  Q.  Could you be charged with false statements?

05:15PM  18  A.  Yes.

05:15PM  19  Q.  Are you telling the truth to this jury?

05:15PM  20  A.  Yes.

05:15PM  21  Q.  So those are charges that can be brought on top of

05:15PM  22  everything else you've just admitted in front of this judge?

05:15PM  23  A.  That's correct.

05:15PM  24  Q.  If you lie or make false statements, could we use every

05:15PM  25  word you've said against you?

05:15PM   1   A.  Yes.

05:15PM   2   Q.  In addition to all the other information we have?

05:15PM   3   A.  That's correct.

05:15PM   4   Q.  Is that basically what this agreement says?

05:16PM   5   A.  That's exactly what it says.

05:16PM   6   Q.  So as you sit there on this witness stand, is your

05:16PM   7   incentive to tell the truth or to lie?

05:16PM   8   A.  Tell the truth.

05:16PM   9   Q.  Even if it hurts you?

05:16PM  10   A.  Yes.

05:16PM  11   Q.  Even it breaks your heart?

05:16PM  12   A.  Yes.

05:16PM  13           **MR. TRIPI:**  No further redirect.  Thank you, Judge.

05:16PM  14           **THE COURT:**  Anything further, Mr. Singer?

05:16PM  15

05:16PM  16               **RECROSS-EXAMINATION BY MR. SINGER:**

05:16PM  17   Q.  Mr. Selva, we just went through your cooperation

05:16PM  18   agreement, correct?

05:16PM  19   A.  Correct.

05:16PM  20   Q.  They decide whether you agree and fulfill the entire

05:16PM  21   commitments of your agreement, correct?

05:16PM  22   A.  Correct.

05:16PM  23   Q.  And that's it, right?

05:16PM  24   A.  That's it.

05:16PM  25           **MR. SINGER:**  Nothing further.

Case 1:19-cr-00227-LJV-MJR   Document 1179   Filed 09/08/24   Page 368 of 369
USA v Bongiovanni - Selva - Singer/Recross - 8/29/24

368

05:16PM    1              **THE COURT:**  Anything more, Mr. Tripi?

05:16PM    2              **MR. TRIPI:**  No, Your Honor.

05:16PM    3              **THE COURT:**  Okay.  You can step down, sir.  Thank

05:16PM    4    you.

05:16PM    5              **THE WITNESS:**  Okay.

05:16PM    6              (Witness excused at 5:16 p.m.)

        7              (Excerpt concluded at 5:16 p.m.)

        8              *     *     *     *     *     *     *

        9

       10

       11

       12              **CERTIFICATE OF REPORTER**

       13

       14              In accordance with 28, U.S.C., 753(b), I

       15    certify that these original notes are a true and correct

       16    record of proceedings in the United States District Court for

       17    the Western District of New York on August 29, 2024.

       18

       19

       20              s/ Ann M. Sawyer
                       Ann M. Sawyer, FCRR, RPR, CRR
       21              Official Court Reporter
                       U.S.D.C., W.D.N.Y.

       22

       23

       24

       25

1

2                        **TRANSCRIPT INDEX**

3            **EXCERPT - EXAMINATION OF LOUIS SELVA - DAY 3**

4                        **AUGUST 29, 2024**

5

6

7   **W I T N E S S**                              **P A G E**

8   **L O U I S   S E L V A**                       2

9       CROSS-EXAMINATION BY MR. SINGER:             2

10      REDIRECT EXAMINATION BY MR. TRIPI:          347

11      RECROSS-EXAMINATION BY MR. SINGER:          367

12

13  **E X H I B I T**                              **P A G E**

14    GOV Exhibit 3540E-1                          363

15

16

17

18

19

20

21

22

23

24

25