UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

**REDACTED PUBLIC VERSION**

v.

Case No. 19-CR-227-1-LJV

JOSEPH BONGIOVANNI,

Defendant.

_____

### DEFENDANT JOSEPH BONGIOVANNI'S BRIEF REGARDING WHY INQUIRY INTO SPECIFIC ACTS OF UNTRUTHFULLNESS OF KATRINA NIGRO SHULD BE PERMITTED ON THE DEFENSE'S REDIRECT OF RUTHANN ARIDA

Prior to trial, the government disclosed an email that government witness Ruthann Arida sent to the FBI on June 13, 2024. *See* GE 4562G. In this email, Ms. Arida provided the FBI with evidence that Katrina Nigro was dishonest in the past and was using her status as a witness at this trial for publicity and financial gain. More specifically, Ms. Arida stated that, prior to this trial and in the past:

1) ████████████████████████████████████████
████████████████████████

2) █████████████████████████████████████;

3) ████████████████████████████████████;

4) ████████████████████████████████████████
████████████

5) ████████████████████████████████████████
██████

6) ████████████████████████████████████████████

7) ███████████████████████████████████████████████.

Such evidence directly contradicts Nigro's claims that she was scared and reluctant to testify in this case and that she sought publicity for the purpose of protection. In her email, Ms. Arida stated to the FBI that "█████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████." *Id.* Based on the contents of this disclosure, the defense had a good-faith basis to believe that Ms. Arida could offer opinion and reputation evidence regarding Katrina Nigro that would be favorable to Mr. Bongiovanni.

During cross-examination of Ms. Arida, the defense adopted Ms. Arida as its own witness and asked questions about 1) Ms. Arida's opinion regarding Katrina Nigro's character for untruthfulness and 2) Ms. Arida's knowledge of Katrina Nigro's reputation for untruthfulness. The Court permitted inquiry into both topics and Ms. Arida testified that she believed that Katrina Nigro was an untruthful person and had a reputation for untruthfulness.

On redirect/cross examination of Ms. Arida, the government attempted to undermine the opinion and reputation testimony offered by Ms. Arida in two fashions. First, the government attacked Ms. Arida as a biased and interested witness. *See* Rule 607; *see also United States v. Abel,* 469 U.S. 45, 50-51 (1984) (holding that proof of bias is almost always relevant during cross examination). This line of attack centered on Ms. Arida having a parenting relationship with Peter Gerace and attending at least one court hearing involving Peter Gerace at which she sat on his side of the courtroom. *See* Transcript at 22:2-23:13 (financial support of child); 26:7-29:3 (interest in case, appearing in court); 30:22-31:17 (impact on family). Second, the government attacked Ms. Arida's testimony by asking Ms. Arida factual and hypothetical questions regarding testimony offered by Ms. Nigro at this trial. The government asked whether Ms. Arida had any reason to disagree with certain facts that mirrored answers offered by Ms. Nigro, such as:

```
18   Q.  Okay.  If Ms. Nigro said Joe Bongiovanni is friends with
19   Peter Gerace, you wouldn't have any reason to disagree with
20   that, right?
21   A.  No.
22   Q.  None at all, right?
23   A.  No.
```

T. at 31:18-23.

```
22   Q.  If Ms. Nigro said women who worked at Pharaoh's used
23   drugs, you wouldn't have any reason to disagree with that,
24   right?
25   A.  No.
```

T. at 42:22-25.

```
7    Q.  If she said that women who worked at Pharaoh's bought
8    drugs from people at Pharaoh's, you wouldn't have any reason
9    to disagree with that, right?
10   A.  No.
```

T. at 43:7-10.

```
16   Q.  If she said Peter blew lines of coke, would you have any
17   reason to disagree with that?
18   A.  No.
19   Q.  If she said that women at Pharaoh's were put in
20   precarious situations with men that came to Pharaoh's, would
21   you have any reason to disagree with that?
22        MR. SINGER:  Objection, hearsay and 403.
23        THE COURT:  Overruled.
24        THE WITNESS:  Yes.
```

T. at 43:16-24.

```
13  Q.  Katrina Nigro, if she testified, or if she told you that
14  Joe Bongiovanni and Peter Gerace were friends, you wouldn't
15  have any reason to disagree with that either, right, ma'am?
16  A.  No.
```

T. at 44:13-16.

This line of cross was employed by the government to show that Nigro's answers at this trial were truthful and accurate.  Over defense objection[1], Ms. Arida testified that she generally agreed that the information offered by Ms. Nigro was not subject to dispute.

On re-direct, the defense attempted to rehabilitate Ms. Arida's opinion as well as address the "human lie detector testimony" solicited by the government by inquiring about specific acts of untruthfulness committed by Katrina Nigro that informed Ms. Arida's opinion of Katrina Nigro's untruthfulness.  The government objected.  This Court ordered briefing on the issue.  For the reasons set forth below, this Court should find that the government "opened the door" to inquiry regarding specific acts of untruthfulness committed by Katrina Nigro that form the basis of

---

[1] The defense levied objection to this testimony on two bases.  First, the defense objected on the ground that the questions elicited impermissible hearsay pursuant to Rule 801 and 803.  Second, the defense objected on Rule 403 grounds because the testimony was unfairly prejudicial.  More specifically, the Rule 403 objection invoked the Second Circuit's prohibition of 1) having a witness opine on the credibility of another witness at trail because such testimony constitutes improper bolstering, *see, e.g., United States v. Scop,* 846 F.2d 135, 142 (2d Cir.)*, rev'd in part on reh'g on other grounds,* 856 F.2d 5 (2d Cir. 1988) ("The credibility of witnesses is exclusively for the determination by the jury, *United States v. Richter,* 826 F.2d 206, 208 (2d Cir. 1987), and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial."), and 2) the government posing hypothetical questions to defense character witnesses which assume the defendant's guilt, *see, e.g., United States v. Oshatz,* 912 F.2d 534, 539 (2d Cir. 1990)(holding that "hypothetical questions, posed to non-expert character witnesses and based on an assumption of defendant's guilt, should not be asked because they undermine the presumption of innocence to which a defendant is entitled and suggest that there may be evidence of defendant's guilt in the hands of the prosecutor that goes beyond the evidence before the jury.")  While Katrina Nigro is not the defendant in this case, the nature of the questions posed to Ms. Arida requested the jury to assume both that Nigro was truthful and that Mr. Bongiovanni was, therefore, guilty.  The Court overruled defense objections to practically all of these questions.

Ms. Arida's opinion.  Moreover, the Court should find that bases exist for the admission of some of this evidence independent of Rule 405 and 608.

### A. Rule 405, Rule 608, and Opinion/Reputation evidence regarding untruthfulness.

Pursuant to Rule 404, evidence of a witness's character generally is not permitted, but Rule 404(a)(3) permits inquiry into a witness's character if permitted by Rules 607, 608, and 609. Pursuant to Rule 608(a), a "witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character.  But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked."  Pursuant to Rule 405(a), "[w]hen evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion."  Consistent with Rule 405(a) and Rule 608(b)(2), a party is permitted to ask a witness about specific instances of conduct that bear on the character for truthfulness or untruthfulness of "another witness whose character the witness being cross-examined has testified about."  *See* Rule 608(b)(2); *see also* Rule 405(a) ("On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct."); *See Hickson Corp. v. Norfolk S. Ry.*, 124 F. App'x 336, 343 (6th Cir. 2005) ("Under Rule 405, once a party 'opens the door' to reputation or character evidence on direct examination, inquiry is allowed into 'relevant specific instances of conduct' that rebut or impeach that evidence.").  The purpose of permitting inquiry into relevant specific acts involving the truthfulness or untruthfulness of "another witness whose character the witness being cross-examined has testified about," *see* Rule 608(b)(2), is to allow an opponent to challenge and impeach the opinion offered by the testifying witness and to show the jury that the testifying witness' opinion may not carry much weight.

**B. The specific acts evidence solicited by the government did not constitute *prior specific acts* of truthfulness of Katrina Nigro; instead, the government solicited this testimony to prove specific acts of truthfulness of Katrina Nigro *at this trial*.**

When the government started its cross examination of Ms. Arida, it could have asked Ms. Arida whether she was aware of *previous acts* of truthfulness of Ms. Nigro.  Under Rule 405(a) and Rule 608(b)(2), this line of inquiry is permitted because such "have you heard" and "do you know" questions are the type of questions classically used to challenge the testifying witness' opinion.  For example, the government could have asked Ms. Arida whether she knew that "Katrina Nigro made a mistake on her taxes in 2014 and informed the IRS about the mistake and returned a refund that she was not entitled to because of the mistake" (assuming this hypothetical is true and the government had a "good-faith" basis to ask the question).  This previous (and hypothetical) specific act of truthfulness would have been probative to challenge the foundation of Ms. Arida's opinion.  However, the government chose not to ask Ms. Arida any questions regarding *previous acts* of truthfulness involving Katrina Nigro.  Instead, the government purposefully asked Ms. Arida questions designed to show that Katrina Nigro's *trial testimony* was truthful.  Such questions did not involve *previous specific acts* at all.  The defense levied objections to these questions as impermissible hearsay, bolstering, and guilt-assuming hypotheticals.  *See infra* at n. 1.  The Court overruled these objections and permitted Ms. Arida to affirm that during specific instances *in this trial*, Ms. Nigro had told the truth.

After asking these questions, the government attempted to cast its rational for making these inquires in terms of challenging Ms. Arida's ability to perceive events accurately:

```
15          MR. COOPER:  Judge, I would respond to that that my

16    questions were about the -- her ability to make certain

17    perceptions when she was associated with Peter, when she was

18    associated with Katrina, if she was invited to certain events.

19    That's completely extraneous to what she wants -- what would

20    like to have this witness talk about, which are totally

21    unrelated things where she thinks --
```

T. at 48:15-21.  But an examination of the questions asked by the government tells a different story.
Each of the questions asked of Ms. Arida had nothing to do with Ms. Arida's ability to perceive
events accurately; rather, *all* of the questions had to do with whether Katrina Nigro's trial testimony
was truthful and accurate.  The record is replete with such examples.

```
18    Q.  Okay.  If Ms. Nigro said Joe Bongiovanni is friends with

19    Peter Gerace, you wouldn't have any reason to disagree with

20    that, right?

21    A.  No.

22    Q.  None at all, right?

23    A.  No.
```

T. at 31:18-23.  This question has nothing to do with Ms. Arida's ability to perceive events.  It is
focused on whether Katrina Nigro testified truthfully about Bongiovanni and Gerace being friends.

```
22    Q.  If Ms. Nigro said women who worked at Pharaoh's used

23    drugs, you wouldn't have any reason to disagree with that,

24    right?

25    A.  No.
```

T. at 42:22-25.  This question has nothing to do with Ms. Arida's ability to perceive events.  It is
focused on whether Katrina Nigro testified truthfully about women who worked at Pharaoh's
Gentemen's Club using drugs.

```
 7   Q.  If she said that women who worked at Pharaoh's bought
 8   drugs from people at Pharaoh's, you wouldn't have any reason
 9   to disagree with that, right?
10   A.  No.
```

T. at 43:7-10.  This question has nothing to do with Ms. Arida's ability to perceive events.  It is focused on whether Katrina Nigro testified truthfully about women who worked at Pharaoh's Gentemen's Club purchasing drugs from other people at Pharaoh's.

```
16   Q.  If she said Peter blew lines of coke, would you have any
17   reason to disagree with that?
18   A.  No.
19   Q.  If she said that women at Pharaoh's were put in
20   precarious situations with men that came to Pharaoh's, would
21   you have any reason to disagree with that?
22        MR. SINGER:  Objection, hearsay and 403.
23        THE COURT:  Overruled.
24        THE WITNESS:  Yes.
```

T. at 43:16-24.  Neither of these questions has anything to do with Ms. Arida's ability to perceive events.  The first question is focused on whether Katrina Nigro testified truthfully about Gerace using cocaine.  The second question is focused on whether Katrina Nigro testified truthfully about female workers at Pharaoh's Gentemen's Club being placed in precarious positions with male patrons.

```
13   Q.  Katrina Nigro, if she testified, or if she told you that
14   Joe Bongiovanni and Peter Gerace were friends, you wouldn't
15   have any reason to disagree with that either, right, ma'am?
16   A.  No.
```

T. at 44:13-16.  This question has nothing to do with Ms. Arida's ability to perceive events.  It is focused on whether Katrina Nigro testified truthfully about Bongiovanni and Gerace being friends.

**C. The Court should permit inquiry into the specific acts of untruthfulness that form the basis of Ms. Arida's opinion.**

At least two reasons exist which permit the defense to inquire about specific acts of untruthfulness that inform Ms. Arida's opinion. And even if Ms. Arida's impermissible testimony is struck from the record, the government (and the Court) "opened the door" to inquiry using both rationales below.

      **i.    The government's use of specific acts of truthfulness for impeachment permits the defense to use specific acts of untruthfulness for rehabilitation.**

When an opponent attacks the basis of a testifying witness's opinion regarding the untruthfulness of another witnesses by using specific acts of truthfulness of the other witness, then the opponent "opens the door" to the party who offers the character testimony to inquire into the relevant specific acts that support the testifying witness's opinion. Here, the government purposefully chose to impeach Ms. Arida's opinion not by pointing to bias only, but by challenging the foundation of Ms. Arida's opinion using specific acts of truthfulness. While these specific acts did not involve *prior acts* of truthfulness that occurred before trial, the government used specific acts evidence nonetheless. As a result, this cross-examination technique "opened the door" to the defense's use of specific acts evidence to rehabilitate Ms. Arida's opinion.

      **ii.   The government's strategy of using Ms. Arida to improperly bolster Nigro's testimony – and the Court permitting this to happen – necessitates a remedy. The remedy is either striking the improper testimony or permitting the defense to inquire into prior specific acts of untruthfulness by Nigro.**

As set forth above, the questions asked by the government 1) were not probative of Ms. Arida's knowledge, perception, or bias and 2) did not involve prior acts of truthfulness of Nigro designed to impeach Ms. Arida's opinion of Nigro's untruthfulness; rather, the questions were designed to bolster Katrina Nigro's trial testimony only. The defense objected to these questions. The Court overruled these objections and permitted the government to ask Ms. Arida whether she

"disagreed" with Nigro's trial testimony in this case.  These questions also asked the witness to

assume Mr. Bongiovanni's guilt.  The defense believes that the Court's rulings on these questions

were erroneous and the admission of this testimony was improper.  And now the defense is left in

the position where it must address and defend against these impermissible answers in some fashion.

As this Cort knows, "[d]istrict courts are empowered to 'correct errors made in the

course of trial while [they] still ha[ve] the opportunity to do so.'"  *United States v. Robinson*, 749 F.

App'x 35, 37 (2d Cir. 2018) (quoting *United States v. Burger*, 739 F.2d 805, 810 (2d Cir. 1984)).  This

power includes the ability to strike impermissible testimony from the record after-the-fact.  This

power also includes the ability to admit otherwise inadmissible evidence.  More specifically, the

"concept of 'opening the door,' or 'curative admissibility,' gives the trial court discretion to permit a

party to introduce otherwise inadmissible evidence on an issue (a) when the opposing party has

introduced inadmissible evidence on the same issue, and (b) when it is needed to rebut a false

impression that may have resulted from the opposing party's evidence."  *United States v. Rea*, 958

F.2d 1206, 1225 (2d Cir. 1992) (citations omitted); *accord United States v. Howard,* 639 F. App'x 686,

689 (2d Cir. 2016).

Here, the defense believes that this Court improperly admitted testimony by

Ms. Arida regarding the truthfulness of Nigro's testimony at this trial and improperly permitted the

government to pose hypotheticals which assumed Mr. Bongiovanni's guilt.  These ruling were

erroneous and should be remediated.  One option the Court has is to strike this testimony from the

record.  While the defense believes that striking this testimony would be proper, under the

circumstances, the defense is concerned that striking this testimony and instructing the jury to not

consider this testimony will not be effective because such impermissible opinion testimony was not

limited to just one question; instead, the government asked several questions of Ms. Arida that had

bearing on the truthfulness of Nigro's trial testimony.  Moreover, Katrina Nigro is a key witness to

Count 2 of the indictment.  She is the only government witness who says that Pere Gerace allegedly paid money to Mr. Bongiovanni.  Thus, Nigro's credibility, in general, as well as more specifically, regarding her allegation of the payment of a bribe on three occasions, is of critical importance.  For this reason, the defense does not believe that striking this testimony alone will cure the erroneously admitted evidence and "curative admissibility" is the better remedy.

While the defense does not believe that introducing specific acts of Nigro's untruthfulness on redirect would be impermissible under Rule 405(a), by permitting the defense to ask questions of Ms. Arida about the specific acts of untruthfulness committed by Nigro that inform her opinion regarding Nigro's untruthful character, the Court will level the playing field and permit the defense to rebut the false impression that Ms. Arida believes that Nigro was telling the truth at this trial.  This remedy will cure the defect of this improperly admitted testimony.  And the Court should permit the defense to inquire about the specific acts of untruthfulness that Ms. Arida told the FBI about in her email.

### D. Alternatively, some of the specific acts of which Ms. Arida is aware are admissible to prove bias/self-interest pursuant to Rule 402 and amissible under the doctrine of impeachment by contradiction.

While Rule 608(b) generally disallows the introduction of testimony and evidence to extrinsically prove specific instances of conduct of a witness relating to truthfulness or untruthfulness, there are two well recognized exceptions to that rule.  First, a defendant can introduce extrinsic evidence of a government witness's bias and self-interest.  Second, a defendant can introduce extrinsic evidence to contradict a government witness's testimony so long as the evidence is not collateral.  Under both doctrines, the Court should admit many of the acts Ms. Arida told the FBI about in her June 13, 2024 email.

i.      Introduction of certain acts to prove bias and self-interest.

Consistent with Supreme Court precedent, the Second Circuit has opined "that impeachment for bias is admissible under Rule 402 even when the impeachment material is not independently admissible under Rule 608 as 'concerning [the witness's] character for truthfulness or untruthfulness.'" *United States v. Figueroa*, 548 F.3d 222, 229 & n.8-9 (2d Cir. 2008) (citing *Abel*, 469 U.S. at 51, 55-56 & n.4 and Rule 608) (footnotes omitted).  As the Second Circuit explained:

> Rule 402 provides, in pertinent part: "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority." Fed. R. Evid. 402.  "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.  **"A successful showing of bias on the part of a witness would have a tendency to make the facts to which [s]he testified less probable in the eyes of the jury than it would be without such testimony."**  *Abel*, 469 U.S. at 51.

*Figueroa*, 548 F.3d at 229 n.8 (emphasis added).  "Bias is a term used in the 'common law of evidence' to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, [her] testimony in favor of or against a party.  **Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest."**  *Id.* at 230 (emphasis added) (citing *Abel*, 469 U.S. at 52.).

Here, Katrina Nigro has a bias against Peter Gerace and Joseph Bongiovanni that colors her testimony.  Nigro also has a personal self interest in the continuation and outcome of Mr. Bongiovanni's and Gerace's cases.  As Ms. Arida observed, Katrina Nigro's involvement in this case has provided Nigro with a platform and notoriety.  Nigro has monetized her platform and notoriety in several ways.  First, she has used her notoriety and the publicity surrounding this case as a means to get cast in a film depicting the mafia, sex, drugs, and alcohol.  Without being a witness in this matter, this opportunity would not exist.  Second, Ms. Nigro has used this case to make herself

more widely known.  For someone who is an exhibitionist and who uses social media and podcasts as a source of income, "fame" is a large determiner of an influencer's ability to monetize her social media endeavors.  Without this case, Nigro would be less well known.  All of this evidence constitutes proof of bias and self-interest.  Thus, the holdings in *Abel* and *Figueroa* as well as Rule 402 permit the extrinsic introduction of this evidence.  The Court should admit this evidence under this rationale which is independent of any restrictions embodied in Rule 608(b).

> ### ii.     Introduction of certain acts to impeach by contradiction.

Under the doctrine of impeachment by contradiction, when a government witness lies about an event/subject during her testimony, the defendant is permitted to prove that the government witness lied by presenting extrinsic proof of the lie, thereby contradicting the validity of her testimony about the event/subject.  Importantly, impeachment by contradiction operates independently of the restrictions within Rule 608(b).  *See, e.g., United States v. Benedetto*, 571 F.2d 1246, 1250 n.7 (2d Cir. 1978) ("Rule 607 appears to allow the continuation of federal practice in admitting extrinsic evidence to impeach specific errors or falsehoods in a witness' direct testimony, subject to Rule 403 considerations.") (citing *Walder v. United States*, 347 U.S. 62 (1954)); *United States v. Opager*, 589 F.2d 799, 802-03 (5th Cir.1979) (holding that Rule 608(b)'s prohibition of extrinsic evidence used to prove specific instances of misconduct does not apply when the evidence is offered to contradict a witness's testimony as to a material issue of the case); *United States v. Castillo*, 181 F.3d 1129, 1132 (9th Cir. 1999) ("Rule 608(b) prohibits the use of extrinsic evidence of conduct to impeach a witness' credibility in terms of his general veracity.  In contrast, the concept of impeachment by contradiction permits courts to admit extrinsic evidence that specific testimony is false, because contradicted by other evidence . . . .").

The only restriction with the doctrine is that the contradiction sought to be proven extrinsically must relate to a material rather than collateral matter in the case.  *See, e.g., United States v.*

*Hendrickson*, 417 F.2d 225, 228 (3d Cir. 1969) (holding that a party cannot offer "extrinsic evidence to impeach [a witness]'s testimony on a collateral matter."); *see also United States v. Payne*, 102 F.3d 289, 294 (7th Cir. 1996) ("[O]ne may not impeach by contradiction regarding collateral or irrelevant matters.").  "A matter is collateral when it cannot reasonably be considered crucial or material to the issues on trial." *United States v. Budzanoski*, 462 F.2d 443, 455 (3d Cir. 1972).  "[T]he determinative question in deciding whether extrinsic evidence contradicting a witness' testimony is admissible is not whether the contradicting extrinsic evidence is material or collateral, but whether the assertion that the impeaching party seeks to contradict is itself material or collateral." *Justice v. Hoke*, 90 F.3d 43, 48 (2d Cir. 1996) (citations omitted); *see also United States v. Innamorati*, 996 F.2d 456, 479 (1st Cir. 1993) (excluding evidence proposed by the defense to contradict a government witness because "the proposed contradiction involved a matter collateral to the main issues in this trial, since the [] incident did not in any way involve any of the defendants or the charges against them").

At this trial, Katrina Nigro testified that she was scared about testifying because of Peter Gerace's alleged ties to Italian Organized Crime.  Nigro also testified that she publicized her involvement as a witness in this case to help protect her against threats and intimidation, reasoning that the greater the notoriety she had as a result of her own efforts to publicize her involvement in this case, the more likely it was that she would remain safe.  Specific acts evidence known by Ms. Arida – more specifically, that Katrina Nigro publicized her involvement for monetary gain as well as securing roles in movies and films depicting the mafia, sex, drugs, and alcohol – contradicts Nigro's claims of being scared and posting about her involvement in this case or the outfits that she wore to court for the purpose of protection.  Furthermore, Nigro's assertion that she posted on social media about her involvement as a witness because of her fear of IOC involves a material issue in this case, to wit: the existence of IOC in Buffalo.  The government has gone to great lengths to make this trial about IOC.  In fact, Nigro testified that Gerace had familial links to IOC and used

those alleged links as a tool to intimidate Nigro and others.  Consequently, her assertions on this subject are not collateral, but material.  As such, the defense should be permitted to use impeachment by contradiction to undermine this material assertion.

Nigro also testified that women at Pharaoh's Gentlemen's Club were mistreated. During cross-examination of Ms. Arida, the government asked Ms. Arida whether she had any reason to disagree with Nigro's assertion that women were put into "precarious situations" at Pharaoh's.  *See* T. at 43:16-24.  The evidence in Ms. Arida's possession, to wit: that Nigro sought roles in movies that glorify the sexual exploitation of women and chose to act in roles where women have freedom to trade sex for drugs[2] directly contradicts Nigro's testimony on this subject.  Like IOC, the government has gone to equal lengths to portray women who work at Pharaoh's as lacking such freedom and authority.  And the government used Nigro to reinforce this point.  As such, Nigro's assertion is material, not collateral to this case, and the defense should be allowed to impeach her on this subject.

Finally, the admission of impeachment by contradiction evidence is governed by Rule 403.  Rule 403 permits a court to exclude relevant evidence if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion, and waste of time. Here, the evidence proposed for admission is probative of Nigro's veracity on the topic of IOC. Contradicting this point does not constitute unfair prejudice.  Moreover, the facts that Ms. Arida can testify to – which impeach Nigro on this subject – can be handled quickly and constitute only a few

---

[2] By way of analogy, Courts in this district routinely admit rap video's and songs made by defendants depicting criminal behavior under the belief that the lyrics and actions in these songs depict real life as opposed to make-believe.  The same is true of Nigro's movies.  Acting in films that glorify sex and drugs is not just make-believe, but actions she has taken in real life.  Moreover, these are not roles that a victim of sexual assault and exploitation would take.  Doing so would prove traumatic. This evidence thoroughly contradicts the testimony offered by Nigro at this trial.

questions.  Thus, the risk of confusion and waste of time is negligible.  For these reasons, the Court

should permit the defense to question Ms. Arida about her observations.


### Conclusion

For the above reasons, this Court should permit inquiry into all of the specific acts

known to Ms. Arida.  These acts rehabilitate Ms. Arida's opinion, provide a remedy to the

impermissible testimony solicited by the government, and are independently admissible to prove

bias/interest as well as contradiction of Nigro's false material assertions.

Dated: September 15, 2024
      Buffalo, New York                            Respectfully submitted,

                                       s/Parker R. MacKay
                                     **The Law Office of Parker R. MacKay**
                                      Parker R. MacKay, Esq.
                                        3110 Delaware Avenue
                                        Kenmore, NY 14217
                                        Ph: (716) 803-8166
                                        Fx: (716) 408-1651
                                        Em: Parker@MacKayLawOffice.com

                                     s/Robert C. Singer



                                     Robert C. Singer, Esq.
                                       80 East Spring Street
                                     Williamsville, New York 14221
                                     (716) 222-3288
                                     rob@singerlegalpllc.com

                                     *Attorneys for Joseph Bongiovanni*

















04:06PM

```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF NEW YORK
 2
   _____
 3 UNITED STATES OF AMERICA,
                                       Case No. 1:19-cr-227
 4              Plaintiff,                      (LJV)
   v.
 5                                     September 13, 2024
   JOSEPH BONGIOVANNI,
 6
   _____Defendant._____
 7

 8     TRANSCRIPT EXCERPT - CROSS-EXAMINATION OF RUTHANN ARIDA
               BEFORE THE HONORABLE LAWRENCE J. VILARDO
 9                  UNITED STATES DISTRICT JUDGE

10 APPEARANCES:         TRINI E. ROSS, UNITED STATES ATTORNEY
                        BY: JOSEPH M. TRIPI, ESQ.
11                          NICHOLAS T. COOPER, ESQ.
                            CASEY L. CHALBECK, ESQ.
12                      Assistant United States Attorneys
                        Federal Centre, 138 Delaware Avenue
13                      Buffalo, New York 14202
                        For the Plaintiff
14
                        SINGER LEGAL PLLC
15                      BY: ROBERT CHARLES SINGER, ESQ.
                        80 East Spring Street
16                      Williamsville, New York 14221
                           And
17                      LAW OFFICES OF PARKER ROY MacKAY
                        BY: PARKER ROY MacKAY, ESQ.
18                      3110 Delaware Avenue
                        Kenmore, New York 14217
19                         And
                        OSBORN, REED & BURKE, LLP
20                      BY: JOHN J. GILSENAN, ESQ.
                        120 Allens Creek Road
21                      Rochester, New York 14618
                        For the Defendant
22
   PRESENT:             BRIAN A. BURNS, FBI Special Agent
23                      MARILYN K. HALLIDAY, HSI Special Agent
                        KAREN A. CHAMPOUX, USA Paralegal
24
   LAW CLERK:           REBECCA FABIAN IZZO, ESQ.
25
```

1   COURT DEPUTY CLERK:   COLLEEN M. DEMMA

2   COURT REPORTER:       ANN MEISSNER SAWYER, FCRR, RPR, CRR
                          Robert H. Jackson Federal Courthouse
3                         2 Niagara Square
                          Buffalo, New York  14202
4                         Ann_Sawyer@nywd.uscourts.gov

5                *     *     *     *     *     *     *

6

7           (Excerpt commenced at 4:06 p.m.)

8           (Jury is present)

9

10  R U T H A N N   A R I D A, having been duly called and sworn,

11  testified as follows:

04:06PM  12

04:06PM  13              CROSS-EXAMINATION BY MR. SINGER:

04:06PM  14  Q.  Hi, Ms. Arida.

04:06PM  15  A.  Hi.

04:06PM  16  Q.  So, you testified on direct that you first met Joe

04:07PM  17  Bongiovanni through Peter Gerace.

04:07PM  18  A.  Yes.

04:07PM  19  Q.  And that particular photograph that we saw of you four at

04:07PM  20  the restaurant, that was something that was taken right

04:07PM  21  around the same time that you started a relationship with

04:07PM  22  Peter Gerace?

04:07PM  23  A.  Yes.

04:07PM  24  Q.  So at that particular dinner, was anyone using drugs?

04:07PM  25  A.  No.

USA v Bongiovanni - Arida - Singer/Cross - 9/13/24

3

| 04:07PM | 1 | Q.  You came to learn that Peter and Joe Bongiovanni, they |
| 04:07PM | 2 | were friends based on having a relationship for a number of |
| 04:07PM | 3 | years? |
| 04:07PM | 4 | A.  Yes. |
| 04:07PM | 5 | Q.  And you dated Peter Gerace starting in 2005; is that |
| 04:07PM | 6 | right? |
| 04:07PM | 7 | A.  Yes. |
| 04:07PM | 8 | Q.  When was it that your relationship with Peter Gerace |
| 04:07PM | 9 | ended? |
| 04:07PM | 10 | A.  Well, it was very tumultuous.  It probably lasted about |
| 04:07PM | 11 | seven or eight years on and off. |
| 04:07PM | 12 | Q.  Okay.  So it was an on-again-off-again situation? |
| 04:07PM | 13 | A.  Yes. |
| 04:07PM | 14 | Q.  You mentioned that you had a child together; is that |
| 04:07PM | 15 | right? |
| 04:07PM | 16 | A.  Yes. |
| 04:07PM | 17 | Q.  When was it that your son was born, again? |
| 04:07PM | 18 | A.  2006. |
| 04:07PM | 19 | Q.  And how soon after your son was born did things start to |
| 04:08PM | 20 | kind to become on and off with Peter? |
| 04:08PM | 21 | A.  Pretty much immediately. |
| 04:08PM | 22 | Q.  Okay.  So you were on again and off again from 2006 |
| 04:08PM | 23 | onward? |
| 04:08PM | 24 | A.  Yes. |
| 04:08PM | 25 | Q.  All right.  Now you recall that when you first started |

USA v Bongiovanni - Arida - Singer/Cross - 9/13/24

4

| | | |
|---|---|---|
| 04:08PM | 1 | dating Peter in 2005, that's when you saw Mr. Bongiovanni |
| 04:08PM | 2 | more often? |
| 04:08PM | 3 | A.  Yes. |
| 04:08PM | 4 | Q.  But as your relationship progressed throughout the years, |
| 04:08PM | 5 | you didn't see him as often? |
| 04:08PM | 6 | A.  No. |
| 04:08PM | 7 | Q.  You talked about a time where you, Peter, Joe, and his |
| 04:08PM | 8 | girlfriend went down to Ellicottville? |
| 04:08PM | 9 | A.  Yes. |
| 04:08PM | 10 | Q.  And so Ellicottville, it's kind of like a ski town about |
| 04:08PM | 11 | an hour south of here? |
| 04:08PM | 12 | A.  Yes. |
| 04:08PM | 13 | Q.  A bunch of shops and restaurants? |
| 04:08PM | 14 | A.  Yeah, shops and restaurants. |
| 04:08PM | 15 | Q.  Did you guys spend the night there, or did you just go |
| 04:08PM | 16 | down there for the day? |
| 04:08PM | 17 | A.  We spent the night there. |
| 04:08PM | 18 | Q.  And was that just for a weekend? |
| 04:08PM | 19 | A.  Yes. |
| 04:09PM | 20 | Q.  Was that particular trip something that happened in 2005 |
| 04:09PM | 21 | before you got pregnant? |
| 04:09PM | 22 | A.  Yes. |
| 04:09PM | 23 | Q.  You also mentioned that you went to Niagara-on-the-Lake? |
| 04:09PM | 24 | A.  Yes. |
| 04:09PM | 25 | Q.  And that sounded like it was just a day trip? |

04:09PM   1    A.  Yeah.

04:09PM   2    Q.  And I think you said that you did some horse-drawn

04:09PM   3    carriage and also went to some wineries?

04:09PM   4    A.  Yes.

04:09PM   5    Q.  And that you had some dinner?

04:09PM   6    A.  Yes.

04:09PM   7    Q.  And then you crossed the border and went on your separate

04:09PM   8    ways?

04:09PM   9    A.  Yes.

04:09PM   10   Q.  And so as far as Mr. Bongiovanni was concerned, you

04:09PM   11   wouldn't see him every day of the week --

04:09PM   12   A.  No.

04:09PM   13   Q.  -- when you were dating Peter?

04:09PM   14   A.  No.

04:09PM   15   Q.  No?

04:09PM   16   A.  No.

04:09PM   17   Q.  Safe to say you'd see him maybe one or two times a month?

04:09PM   18   A.  Yeah, safe to say that.  Maybe every other weekend, so,

04:09PM   19   yes.

04:09PM   20   Q.  And in the context that you'd see him, you'd see in kind

04:09PM   21   of a social situation like a bar or restaurant?

04:10PM   22   A.  Yes.

04:10PM   23   Q.  Did you ever see him use any type of illegal substances?

04:10PM   24   A.  Never.

04:10PM   25   Q.  Did you and Peter ever use illegal substances in his

| | | |
|---|---|---|
| 04:10PM | 1 | presence? |
| 04:10PM | 2 | A.  Never. |
| 04:10PM | 3 | Q.  Peter also had another friend Dan Derenda; is that right? |
| 04:10PM | 4 | A.  Yes. |
| 04:10PM | 5 | Q.  And Daniel Derenda, he was the commissioner of police for |
| 04:10PM | 6 | Buffalo? |
| 04:10PM | 7 | A.  Um-hum. |
| 04:10PM | 8 | Q.  I think he had a relationship with Peter based on the |
| 04:10PM | 9 | fact that Mr. Derenda was a godfather to one of Peter's |
| 04:10PM | 10 | children? |
| 04:10PM | 11 | A.  Yes. |
| 04:10PM | 12 | Q.  Is that your son? |
| 04:10PM | 13 | A.  No. |
| 04:10PM | 14 | Q.  Okay.  How often would you see Peter hanging out with Dan |
| 04:10PM | 15 | Derenda? |
| 04:10PM | 16 | **MR. COOPER:**  Objection, relevance. |
| 04:10PM | 17 | **THE COURT:**  Overruled. |
| 04:10PM | 18 | **THE WITNESS:**  Not very often. |
| 04:10PM | 19 | **BY MR. SINGER:** |
| 04:10PM | 20 | Q.  Was it kind of the same frequency as you saw Peter |
| 04:10PM | 21 | hanging out with Joseph Bongiovanni? |
| 04:10PM | 22 | A.  Yes, but less. |
| 04:10PM | 23 | Q.  You talked a little bit about your experience within the |
| 04:11PM | 24 | strip club industry? |
| 04:11PM | 25 | A.  Yes. |

04:11PM  1   Q.  And I think one of the things that you mentioned --

04:11PM  2       Excuse me, let me just get my pad.

04:11PM  3       -- one of the things you mentioned on direct is it was

04:11PM  4   very difficult to work a job like that sober; do you remember

04:11PM  5   testifying to that?

04:11PM  6   A.  Yes.

04:11PM  7   Q.  And in your experience, I think you also testified that

04:11PM  8   drug use is very common at exotic clubs like that?

04:11PM  9   A.  Yes.

04:11PM  10  Q.  And I think you also testified that based on the nature

04:11PM  11  of the work, and based on some of the pressures associated

04:11PM  12  with it, you started to use narcotics more often as time

04:11PM  13  progressed in the industry?

04:11PM  14  A.  Yes.

04:11PM  15  Q.  Was that your experience that other women who worked in

04:11PM  16  the industry would kind of go down a similar path?

04:11PM  17  A.  Absolutely.

04:11PM  18  Q.  Is that somewhat the culture that exists inside exotic

04:12PM  19  dance clubs?

04:12PM  20       **MR. COOPER:**  Objection as to culture.

04:12PM  21       **THE COURT:**  Go ahead.

04:12PM  22       **MR. COOPER:**  There's one club that's at issue in this

04:12PM  23  trial.  The culture in other clubs is not relevant to this

04:12PM  24  proceeding.

04:12PM  25       **THE COURT:**  Yeah.  Overruled.

USA v Bongiovanni - Arida - Singer/Cross - 9/13/24

| | | |
|---|---|---|
| 04:12PM | 1 | **THE WITNESS:**  It's common through strip clubs |
| 04:12PM | 2 | everywhere in America. |
| 04:12PM | 3 | **BY MR. SINGER:** |
| 04:12PM | 4 | Q.  Do you know a person by the name of Katrina Nigro? |
| 04:12PM | 5 | A.  Yes. |
| 04:12PM | 6 | Q.  How do you know Ms. Nigro? |
| 04:12PM | 7 | A.  I used to dance with her in the early 2000s.  She owned a |
| 04:12PM | 8 | clothing store, I bought some exotic clothing costumes from |
| 04:12PM | 9 | her. |
| 04:12PM | 10 | Q.  So what year do you think you first met Ms. Nigro? |
| 04:13PM | 11 | A.  2003 or 2004. |
| 04:13PM | 12 | Q.  And how -- I guess, was there a point in time where you |
| 04:13PM | 13 | stopped seeing Ms. Nigro? |
| 04:13PM | 14 | A.  Yes. |
| 04:13PM | 15 | Q.  When do you think you stopped seeing Ms. Nigro?  When did |
| 04:13PM | 16 | that time occur? |
| 04:13PM | 17 | A.  What do you mean, stopped seeing her? |
| 04:13PM | 18 | Q.  Sure.  So I guess I think you just testified that you |
| 04:13PM | 19 | first met her in 2003; is that right? |
| 04:13PM | 20 | A.  Yes. |
| 04:13PM | 21 | Q.  And then after meeting her in 2003, you'd see her, it |
| 04:13PM | 22 | sounds like, in work situations? |
| 04:13PM | 23 | A.  Yes, in work situations. |
| 04:13PM | 24 | Q.  You testified that she sold different types of clothing? |
| 04:13PM | 25 | A.  Um-hum. |

| 04:13PM | 1 | Q.  Were you a customer at her store? |
| 04:13PM | 2 | A.  Yes. |
| 04:13PM | 3 | Q.  And you also saw her at various clubs that you worked at? |
| 04:13PM | 4 | A.  Yes. |
| 04:13PM | 5 | Q.  And we're not talking about Pharaoh's Gentlemen's Club, |
| 04:13PM | 6 | correct? |
| 04:13PM | 7 | A.  No. |
| 04:13PM | 8 | Q.  We're talking about other locations? |
| 04:13PM | 9 | A.  Yes. |
| 04:13PM | 10 | Q.  Were those locations within the City of Buffalo? |
| 04:13PM | 11 | A.  No. |
| 04:13PM | 12 | Q.  Where are those locations at? |
| 04:13PM | 13 | A.  Erie, Pennsylvania.  Rochester. |
| 04:13PM | 14 | Q.  Would you go down to -- trips to Erie, Pennsylvania, or |
| 04:14PM | 15 | out to Rochester with Ms. Nigro? |
| 04:14PM | 16 | A.  Yes. |
| 04:14PM | 17 | Q.  Would the two of you drive together? |
| 04:14PM | 18 | A.  I'm not sure if we drove together, it was a long time |
| 04:14PM | 19 | ago.  But we, like, we would -- she would message me and tell |
| 04:14PM | 20 | me this club is, you know, I'm working here tonight, or |
| 04:14PM | 21 | there's money here, so I would obviously go to that club. |
| 04:14PM | 22 | **MR. COOPER:**  Judge, I'm going to object at this point |
| 04:14PM | 23 | to relevance on this line of questioning. |
| 04:14PM | 24 | **THE COURT:**  Yes, I'm not getting the relevance |
| 04:14PM | 25 | either. |

| | | |
|---|---|---|
| 04:14PM | 1 | **MR. SINGER:**  May we approach, Judge? |
| 04:14PM | 2 | **THE COURT:**  Yeah, come on up. |
| 04:14PM | 3 | (Sidebar discussion held on the record.) |
| 04:14PM | 4 | **THE COURT:**  I'm giving you real wide berth in cross. |
| 04:14PM | 5 | **MR. SINGER:**  I understand, Judge. |
| 04:14PM | 6 | And so we're preparing to lay foundation for |
| 04:14PM | 7 | Ms. Arida to offer her opinion as to the character for |
| 04:14PM | 8 | truthfulness of Ms. Nigro, as well as her reputation within |
| 04:14PM | 9 | the community or the business community that she exists as far |
| 04:14PM | 10 | as truthfulness is concerned.  I can adopt this witness as my |
| 04:14PM | 11 | own, or I can recall her.  That's where I'm going. |
| 04:15PM | 12 | **MR. COOPER:**  Well, I think he certainly think he has |
| 04:15PM | 13 | to adopt the witness as his own, no question. |
| 04:15PM | 14 | But I didn't make a leading objection.  I mean, I |
| 04:15PM | 15 | actually think he was asking open-ended questions, so I'm not |
| 04:15PM | 16 | trying to give him a hard time about that.  I didn't know |
| 04:15PM | 17 | where we were headed with this, and I tried to give it a |
| 04:15PM | 18 | little bit, but I still didn't know. |
| 04:15PM | 19 | **THE COURT:**  Okay.  So you'll withdraw your objection? |
| 04:15PM | 20 | You'll withdraw your relevance objection? |
| 04:15PM | 21 | **MR. COOPER:**  I'll withdraw my relevance objection, |
| 04:15PM | 22 | but I, yeah, I may lodge some additional objections as we go, |
| 04:15PM | 23 | yeah. |
| 04:15PM | 24 | **MR. SINGER:**  You can object as much as you like. |
| 04:15PM | 25 | **MR. COOPER:**  Yeah. |

04:15PM  1                    (End of sidebar discussion.)

04:15PM  2             **THE COURT:**  So the objection is withdrawn?

04:15PM  3             **MR. COOPER:**  That's correct, Judge.

04:15PM  4             **BY MR. SINGER:**

04:15PM  5    Q.  So getting back to the times when you were in either

04:15PM  6    Erie, Pennsylvania, or Rochester.

04:15PM  7         Would you hang out with Katrina Nigro when you were at

04:15PM  8    those clubs with her?

04:15PM  9    A.  Yes, if we were with customers, if we were at the bar,

04:15PM  10   you know, I would see her and I would talk to her, yes.

04:15PM  11   Q.  And so you mentioned that you first started talking to

04:16PM  12   her and associating with her back in 2002, 2003.

04:16PM  13   A.  Um-hum.  Yes.

04:16PM  14   Q.  And I asked you a little bit about when was it that you

04:16PM  15   stopped hanging around her.

04:16PM  16   A.  Around the time I met Peter.

04:16PM  17   Q.  And so what time was that?

04:16PM  18   A.  2005.

04:16PM  19   Q.  And was there a period of time where you reassociated

04:16PM  20   with Ms. Nigro?

04:16PM  21   A.  No.  Well, she -- well, that's kind of, like, a

04:16PM  22   complicated question, because she eventually ended up

04:16PM  23   marrying Peter.  So she had to -- I had to coparent with this

04:16PM  24   woman.

04:16PM  25   Q.  Yeah.  And I guess that's what I was getting at.

USA v Bongiovanni - Arida - Singer/Cross - 9/13/24

12

| | | |
|---|---|---|
| 04:16PM | 1 | So we talked a little bit earlier in your direct about |
| 04:16PM | 2 | how you had a child in common with Peter? |
| 04:16PM | 3 | A.  Yes. |
| 04:16PM | 4 | Q.  It was a son who was born in 2006? |
| 04:16PM | 5 | A.  Yes. |
| 04:16PM | 6 | Q.  So after you said things started to get rocky with Peter, |
| 04:16PM | 7 | you said it was a little on and off? |
| 04:16PM | 8 | A.  Yes. |
| 04:16PM | 9 | Q.  For a couple different years? |
| 04:16PM | 10 | A.  Um-hum. |
| 04:17PM | 11 | Q.  And during that period of time, did Peter start dating |
| 04:17PM | 12 | Katrina Nigro at some point? |
| 04:17PM | 13 | A.  Yes. |
| 04:17PM | 14 | Q.  So when Peter was dating Katrina Nigro, what type of |
| 04:17PM | 15 | interactions did you have with Ms. Nigro during that period? |
| 04:17PM | 16 | A.  I didn't have the best interactions with her, but I did |
| 04:17PM | 17 | have to be civil with her because she was with my son and she |
| 04:17PM | 18 | was with Peter. |
| 04:17PM | 19 | Q.  And how often would you see Ms. Nigro during that period? |
| 04:17PM | 20 | A.  I really didn't see her very often.  It was more like |
| 04:17PM | 21 | phone conversations, or through Messenger.  And, truthfully, |
| 04:17PM | 22 | I really didn't -- I would prefer not to talk to her, I would |
| 04:17PM | 23 | rather talk to Peter -- |
| 04:17PM | 24 | Q.  Okay. |
| 04:17PM | 25 | A.  -- concerning my child. |

USA v Bongiovanni - Arida - Singer/Cross - 9/13/24

13

04:17PM   1    Q.  But there were some type of interactions that you had

04:17PM   2    with her during that period that she dated Peter?

04:17PM   3    A.  Yes.

04:17PM   4    Q.  What years do you think that occurred as far as your

04:17PM   5    interaction with Katrina Nigro?

04:17PM   6    A.  Like 2015, 2016.

04:17PM   7    Q.  As far as your relationship, I'm sorry -- strike that.

04:17PM   8        As far as the child custody arrangement between you and

04:18PM   9    Peter at the time with your son, what was the arrangement at

04:18PM  10    that time?

04:18PM  11    A.  At that time, they had -- he had joint custody with my

04:18PM  12    parents.

04:18PM  13    Q.  And so how often would you interact with Peter regarding

04:18PM  14    custody matters involving your son?

04:18PM  15    A.  I mean, there really -- we didn't really interact that

04:18PM  16    much about it.  Are you talking about visitation, or --

04:18PM  17    Q.  Yeah, visitation.

04:18PM  18    A.  Yeah.  We had an open communication, so on a weekly

04:18PM  19    basis.

04:18PM  20    Q.  How often would you see Peter to visit your son?

04:18PM  21    A.  On a weekly basis.

04:18PM  22    Q.  And during these times that you would interact with

04:18PM  23    Peter, I think you testified that you also interacted with

04:18PM  24    Katrina sometimes?

04:18PM  25    A.  Yes.

04:18PM 1  Q.  It wasn't necessarily always by your choice, right?

04:18PM 2  A.  Yes.

04:18PM 3  Q.  But you still interacted with her?

04:18PM 4  A.  Um-hum.

04:18PM 5  Q.  Would you have conversations with her?

04:19PM 6  A.  Yeah, but they were far and few between.

04:19PM 7  Q.  And as far as your time in the exotic dancing business,

04:19PM 8  when was it that you first got involved in the exotic dancing

04:19PM 9  business?

04:19PM 10  A.  When was it that I got involved?

04:19PM 11  Q.  Yeah, year-wise.

04:19PM 12  A.  Between 2002, 2003.

04:19PM 13  Q.  And when was it that you left the exotic dancing

04:19PM 14  business?

04:19PM 15  A.  Why did I leave?

04:19PM 16  Q.  No, not why.  When was it that you left?

04:19PM 17  A.  2006.

04:19PM 18  Q.  And so during the time period that you were on the road

04:19PM 19  with Ms. Nigro either in Rochester or Erie, Pennsylvania, you

04:19PM 20  testified that you hung around with her, correct?

04:19PM 21  A.  Um-hum.

04:19PM 22  Q.  Did you also hang around with Ms. Nigro back here in the

04:19PM 23  City of Buffalo at various other establishments other than

04:19PM 24  Pharaoh's?

04:19PM 25  A.  Yes.

Case 1:19-cr-00227-LJV-MJR   Document 1201   Filed 09/17/24   Page 39 of 74
USA v Bongiovanni - Arida - Singer/Cross - 9/13/24

15

| | | |
|---|---|---|
| 04:19PM | 1 | Q.  And how often would you see her in those establishments? |
| 04:19PM | 2 | A.  It depended on when I worked.  I mean, if I worked five |
| 04:20PM | 3 | days a week, sometimes I would see her all five days, |
| 04:20PM | 4 | sometimes I would see her two days. |
| 04:20PM | 5 | Q.  And as far as work interaction, you talked a little bit |
| 04:20PM | 6 | about how you would interact with her at work.  How was it |
| 04:20PM | 7 | that you interacted with Ms. Nigro at work?  What kind of |
| 04:20PM | 8 | context? |
| 04:20PM | 9 | A.  The context usually was to do with, like, customers, or |
| 04:20PM | 10 | making money, or drinking. |
| 04:20PM | 11 | Q.  So in one context, would you two maybe speak to each |
| 04:20PM | 12 | other when you were waiting to get on the stage? |
| 04:20PM | 13 | A.  Yes. |
| 04:20PM | 14 | Q.  And in another context, would you two speak to each other |
| 04:20PM | 15 | when you were around the club when you were interacting with |
| 04:20PM | 16 | customers? |
| 04:20PM | 17 | A.  Yes. |
| 04:20PM | 18 | Q.  And during this period, did you form an opinion with |
| 04:20PM | 19 | regard to Ms. Nigro's character and truthfulness? |
| 04:20PM | 20 | A.  Absolutely. |
| 04:20PM | 21 | **MR. COOPER:**  Judge, I'd object at this point.  Can we |
| 04:20PM | 22 | come up? |
| 04:20PM | 23 | **THE COURT:**  Sure. |
| 04:20PM | 24 | (Sidebar discussion held on the record.) |
| 04:21PM | 25 | **MR. COOPER:**  What's permissible is opinion and |

USA v Bongiovanni - Arida - Singer/Cross - 9/13/24

16

04:21PM 1    reputation, not the person's, not -- I don't believe that the

04:21PM 2    foundation has been properly laid to elicit what the question

04:21PM 3    that was asked.

04:21PM 4            THE COURT:  Did you form an opinion with respect to

04:21PM 5    Ms. Nigro's character and truthfulness.

04:21PM 6            MR. TRIPI:  I didn't think he said truthfulness.

04:21PM 7            THE COURT:  He said character and truthfulness.

04:21PM 8            MR. SINGER:  Character for truthfulness.

04:21PM 9            THE COURT:  For truthfulness.  Yes, I think that's

04:21PM 10   fine.

04:21PM 11           MR. COOPER:  Character for truthfulness.

04:21PM 12           THE COURT:  Right.

04:21PM 13           MR. COOPER:  Character --

04:21PM 14           MR. TRIPI:  I didn't hear the -- after the --

04:21PM 15   anything after the word.

04:21PM 16           MR. COOPER:  I think the word was "and," not "for,"

04:21PM 17   so --

04:21PM 18           THE COURT:  It says "and."  You meant to say "for?"

04:21PM 19           MR. SINGER:  I thought I said "for."

04:21PM 20           MR. TRIPI:  I didn't hear the word "truthfulness"

04:21PM 21   either.

04:21PM 22           THE COURT:  No, "truthfulness" he said.

04:21PM 23           MR. TRIPI:  Okay.

04:21PM 24           THE COURT:  I'm reading "truthfulness."

04:21PM 25           MR. TRIPI:  Okay.  My fault.

| | | |
|---|---|---|
| 04:21PM | 1 | **THE COURT:**  So, and a witness's credibility may be |
| 04:21PM | 2 | attacked or supported by the testimony about the witness's |
| 04:21PM | 3 | reputation, or having a character for truthfulness or |
| 04:22PM | 4 | untruthfulness, or by testimony in the form of an opinion |
| 04:22PM | 5 | about that character that is for truthfulness or |
| 04:22PM | 6 | untruthfulness. |
| 04:22PM | 7 | So I will sustain the objection to the form of the |
| 04:22PM | 8 | question because it says "and" -- |
| 04:22PM | 9 | **MR. SINGER:**  Okay. |
| 04:22PM | 10 | **THE COURT:**  -- and you can re-ask. |
| 04:22PM | 11 | (End of sidebar discussion.) |
| 04:22PM | 12 | **THE COURT:**  The objection to the form of the question |
| 04:22PM | 13 | is sustained.  You can ask another question. |
| 04:22PM | 14 | **BY MR. SINGER:** |
| 04:22PM | 15 | Q.  So I think I may have said "and" by mistake, so let me |
| 04:22PM | 16 | re-ask the question again, Ms. Arida. |
| 04:22PM | 17 | Did you form an opinion with regard to the character for |
| 04:22PM | 18 | truthfulness of Ms. Nigro during this period? |
| 04:22PM | 19 | A.  Yes, I did. |
| 04:22PM | 20 | Q.  And what is your opinion? |
| 04:22PM | 21 | A.  I think she's a compulsive liar, and I think she's |
| 04:22PM | 22 | untruthful. |
| 04:22PM | 23 | Q.  So you also mentioned that you worked a lot with |
| 04:22PM | 24 | Ms. Nigro, correct? |
| 04:22PM | 25 | A.  Yes. |

04:22PM    1    Q.  How many different clubs do you think you worked with

04:22PM    2    Ms. Nigro during that 2003 to 2006 time period?

04:22PM    3    A.  Three or four.

04:22PM    4    Q.  And did you interact with other dancers during that

04:22PM    5    period?

04:22PM    6    A.  Yes.

04:22PM    7    Q.  Did Ms. Nigro interact with other dancers during that

04:23PM    8    period?

04:23PM    9    A.  Yes.

04:23PM   10    Q.  And you said that you worked in the same clubs as

04:23PM   11    Ms. Nigro?

04:23PM   12    A.  Yes.

04:23PM   13    Q.  How often would you think you saw her in those clubs

04:23PM   14    during that specific time period?

04:23PM   15    A.  A week, are you talking?

04:23PM   16    Q.  You know, during that 2003 to 2006 time period, how often

04:23PM   17    do you think you saw her inside the clubs and inside the

04:23PM   18    establishments you worked at?

04:23PM   19    A.  I mean, that's in a two-year period you're asking?

04:23PM   20    Q.  Yeah.

04:23PM   21    A.  Almost -- over 20 times.

04:23PM   22    Q.  And to your knowledge, did Ms. Nigro have a reputation

04:23PM   23    within that community as far as her truthfulness?

04:23PM   24    A.  Yes.

04:23PM   25    Q.  What was that reputation?

04:23PM    1            **MR. COOPER:**  Objection.  Improper foundation.  Again,

04:23PM    2    I'd like to come up, Judge.

04:23PM    3            **THE COURT:**  Sure.  Come on up.

04:23PM    4            (Sidebar discussion held on the record.)

04:23PM    5            **MR. COOPER:**  It's my understanding that the proper --

04:24PM    6    or, the necessary foundation for this line of questioning is

04:24PM    7    about did you have conversations with other people in that

04:24PM    8    community regarding this character trait eliciting, when those

04:24PM    9    conversations were, who they occurred with.

04:24PM   10            I don't think we have any of that.

04:24PM   11            **THE COURT:**  How does she know?

04:24PM   12            **MR. SINGER:**  I can lay a better foundation.

04:24PM   13            **THE COURT:**  Okay.

04:24PM   14            (End of sidebar discussion.)

04:24PM   15            **THE COURT:**  The objection is sustained.

04:24PM   16            **BY MR. SINGER:**

04:24PM   17    Q.  Ms. Nigro (sic), when you were working inside the clubs

04:24PM   18    during that time period, did you speak with other individuals

04:24PM   19    inside the clubs about Ms. Nigro?

04:24PM   20    A.  Yes.

04:24PM   21    Q.  And more specifically, did you have conversations with

04:24PM   22    other people inside of those clubs regarding their particular

04:24PM   23    thoughts on Ms. Nigro's truthfulness or untruthfulness?

04:24PM   24    A.  Yes.

04:24PM   25    Q.  How many people do you think you've spoken to in that

| | | |
|---|---|---|
| 04:24PM | 1 | time period about Ms. Nigro's character for truthfulness? |
| 04:24PM | 2 | A.  Quite a few.  The dancers there, whether or not, like, if |
| 04:24PM | 3 | a customer -- like, she burned a customer or whatever, I |
| 04:25PM | 4 | mean, it's a very intricate kind of, like, the club circuit |
| 04:25PM | 5 | is very intricate.  So you find things out very fast. |
| 04:25PM | 6 | Q.  And so we're talking about multiple conversations you had |
| 04:25PM | 7 | with multiple people over that time period? |
| 04:25PM | 8 | A.  Yes. |
| 04:25PM | 9 | Q.  And they were focused on Ms. Nigro? |
| 04:25PM | 10 | A.  Yes. |
| 04:25PM | 11 | Q.  And they were focused on her character for truthfulness |
| 04:25PM | 12 | or untruthfulness? |
| 04:25PM | 13 | A.  Yes. |
| 04:25PM | 14 | Q.  And did you form an opinion regarding what her reputation |
| 04:25PM | 15 | in the community was with regard to her character for |
| 04:25PM | 16 | truthfulness? |
| 04:25PM | 17 | A.  I think she's a dishonest con artist. |
| 04:25PM | 18 | MR. COOPER:  Objection.  I'd ask to strike that |
| 04:25PM | 19 | answer -- |
| 04:25PM | 20 | THE COURT:  Yeah. |
| 04:25PM | 21 | MR. COOPER:  -- as not responsive to the question. |
| 04:25PM | 22 | THE COURT:  That answer is stricken. |
| 04:25PM | 23 | Listen to the question -- |
| 04:25PM | 24 | THE WITNESS:  Okay. |
| 04:25PM | 25 | THE COURT:  -- and answer the question, please. |

04:25PM    1             The jury is not to consider that in your

04:25PM    2    deliberations.

04:25PM    3             Go ahead, Mr. Singer.

04:25PM    4             **BY MR. SINGER:**

04:25PM    5    Q.   Thank you.  So again, we -- we already got through what

04:25PM    6    your particular opinion is.

04:25PM    7    A.   Okay.

04:25PM    8    Q.   What I want to focus on is just Ms. Nigro's reputation

04:26PM    9    with the other people that you spoke with, and interacted

04:26PM   10    with in the exotic dancing community.

04:26PM   11    A.   Okay.

04:26PM   12    Q.   Did you have information which led you to conclude what

04:26PM   13    Katrina Nigro's reputation was within the exotic dancing

04:26PM   14    community regarding her character for truthfulness?

04:26PM   15    A.   Untruthful.

04:26PM   16    Q.   And that -- was that the reputation she had?

04:26PM   17    A.   Yes.

04:26PM   18             **MR. SINGER:**  Okay.  Thank you.  I have no further

04:26PM   19    questions, Judge.

04:26PM   20             **MR. COOPER:**  Judge, I'm going to start with the some

04:26PM   21    cross-examination from the adoption of the witness and --

04:26PM   22             **THE COURT:**  Yep.

04:26PM   23             **MR. COOPER:**  -- then maybe circle back.

04:26PM   24             **THE COURT:**  Go right ahead.

04:26PM   25

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 04:26PM  | 1  | **CROSS-EXAMINATION BY MR. COOPER:**                         |
| 04:26PM  | 2  | Q.  Ma'am, you have a child with Peter Gerace, you told the  |
| 04:26PM  | 3  | jury before, that was in 2006, right?                        |
| 04:26PM  | 4  | A.  Yes.                                                     |
| 04:26PM  | 5  | Q.  Okay.  And Peter's still involved in your child's life,  |
| 04:26PM  | 6  | right?                                                       |
| 04:26PM  | 7  | A.  Yes.                                                     |
| 04:26PM  | 8  | Q.  And you care about your child, right?                    |
| 04:26PM  | 9  | A.  Yes.                                                     |
| 04:26PM  | 10 | Q.  And during the time from, let's say, 2006 to 2024, is    |
| 04:26PM  | 11 | that 18 years?                                               |
| 04:26PM  | 12 | A.  Yes.                                                     |
| 04:26PM  | 13 | Q.  Okay.  So for 18 years, you've had an association with   |
| 04:26PM  | 14 | Peter, right?                                                |
| 04:27PM  | 15 | A.  Yes.                                                     |
| 04:27PM  | 16 | Q.  Whether willingly or unwillingly, I guess, right?        |
| 04:27PM  | 17 | A.  Yes.                                                     |
| 04:27PM  | 18 | Q.  And you've had an association with Peter's family, right?|
| 04:27PM  | 19 | A.  Yes.                                                     |
| 04:27PM  | 20 | Q.  And Peter gives you money for his kid, right?            |
| 04:27PM  | 21 | A.  No.                                                      |
| 04:27PM  | 22 | Q.  No, that doesn't happen?                                 |
| 04:27PM  | 23 | A.  No.                                                      |
| 04:27PM  | 24 | Q.  Did Peter ever give you money for your child with him?   |
| 04:27PM  | 25 | A.  No.                                                      |

04:27PM    1    Q.  That never happened?

04:27PM    2    A.  I -- I -- no.  He had -- no.  Because I don't have

04:27PM    3    custody of my child.  My family does.  My mom does.

04:27PM    4    Q.  Does Peter -- maybe I phrased that question poorly.

04:27PM    5        Has Peter ever, since your child was born, financially

04:27PM    6    supported your child?

04:27PM    7    A.  Yes.

04:27PM    8    Q.  Is that a --

04:27PM    9    A.  Sorry, sir.

04:27PM   10    Q.  That's okay.  Are you okay?

04:27PM   11    A.  Yes.

04:27PM   12    Q.  Is that important to you?

04:27PM   13    A.  Yes.

04:27PM   14    Q.  Okay.  And you're --

04:27PM   15            **MR. COOPER:**  Can we come up real quick?  I'm sorry.

04:27PM   16            **THE COURT:**  Sure.

04:27PM   17            **MR. COOPER:**  I want to be cautious here.

04:27PM   18            (Sidebar discussion held on the record.)

04:27PM   19            **MR. COOPER:**  I just want to be cautious here.

04:27PM   20        I don't think this is improper, but she's come to

04:27PM   21    court for Peter, sat on Peter's side of the courtroom,

04:27PM   22    appeared at court appearances.

04:27PM   23        I'm about to say Peter has a court case, and I just

04:28PM   24    want to front that for everybody.

04:28PM   25            I think it's clear from the indictment as well, and I

04:28PM  1    just want to front it.  So, if you want to object, object.

04:28PM  2    But --

04:28PM  3         MR. SINGER:  Yeah, again, I mean, I object on 403

04:28PM  4    grounds, Judge.  I just think that the danger of unfair

04:28PM  5    prejudice to Mr. Bongiovanni --

04:28PM  6         (Simultaneous talking.)

04:28PM  7         MR. COOPER:  This door got opened --

04:28PM  8         THE COURT:  Stop.  I think you can ask have you been

04:28PM  9    to court for a court case that Peter has.

04:28PM  10        You need to link it to this.

04:28PM  11        MR. COOPER:  Absolutely.  Yeah.  It's the substance

04:28PM  12   of this case, her child's father is charged in the case.

04:28PM  13        MR. SINGER:  Count 2 of --

04:28PM  14        (Indecipherable speech.)

04:28PM  15        MR. COOPER:  It's bias.  I have to be able to explore

04:28PM  16   bias when this line of questioning comes out.  It didn't

04:28PM  17   happen last time, so I didn't front it.  But I've got to --

04:28PM  18        THE COURT:  Yeah, I think you can do that.

04:28PM  19        MR. SINGER:  So the bias, I think, Judge, though, if

04:28PM  20   they're probing on bias is that she showed up and supported

04:28PM  21   him in court.  I don't think you need to get into the

04:29PM  22   particular case --

04:29PM  23        MR. COOPER:  It's way more bias when it's this case.

04:29PM  24        MR. TRIPI:  She's got a rooting interest in this case

04:29PM  25   as it relates to Peter --

04:29PM    1              **THE COURT:**  As it relates --

04:29PM    2              **MR. TRIPI:**  -- and Katrina is linked heavily, as you

04:29PM    3    know, to that case as well.  The charges overlap with this

04:29PM    4    defendant, because Peter is charged with bribing this

04:29PM    5    defendant in this case, and charged with conspiring in Count 2

04:29PM    6    of this case.

04:29PM    7              **THE COURT:**  Okay.  But why does that have to be

04:29PM    8    related to this case.

04:29PM    9              **MR. COOPER:**  Judge --

04:29PM   10              **THE COURT:**  Just listen.  Just listen to me for just

04:29PM   11    a second.

04:29PM   12         Why isn't the fact that she knows that there is

04:29PM   13    another case against Peter in which Nigro is a witness, why

04:29PM   14    isn't that enough?  Why does it have to be related to this

04:29PM   15    particular case?

04:29PM   16              **MR. COOPER:**  Because Nigro's testifying against this

04:29PM   17    particular defendant in this particular case that's linked to

04:29PM   18    her husband -- that's linked to -- they're inextricably

04:29PM   19    intertwined.  The bias is inextricably intertwined.  And I

04:30PM   20    didn't bring this up --

04:30PM   21              **THE COURT:**  Right.

04:30PM   22              **MR. COOPER:**  -- and it didn't come up at the last

04:30PM   23    trial, so I wasn't prepared to front it for the Court.

04:30PM   24         I'm sure Mr. Singer knew he was gonna do it, I'm sure

04:30PM   25    he intentionally didn't tell me, so now we're making the

04:30PM     1    argument up here.

04:30PM     2              But it's fair game, Judge, when they --

04:30PM     3              **THE COURT:**  I think it is fair game.

04:30PM     4              **MR. SINGER:**  Yeah.

04:30PM     5              (End of sidebar discussion.)

04:30PM     6              **BY MR. COOPER:**

04:30PM     7    Q.  Peter's charged with conduct that got him charged here in

04:30PM     8    federal court, right?

04:30PM     9    A.  Yes.

04:30PM    10    Q.  And you're aware of that, right?

04:30PM    11    A.  Yes.

04:30PM    12    Q.  And you've been aware of it since it happened, right?

04:30PM    13    A.  Yes.

04:30PM    14    Q.  And you've got some pretty strong feelings about it,

04:30PM    15    right?

04:30PM    16    A.  Yes.

04:30PM    17    Q.  Not happy about it, right, ma'am?

04:30PM    18    A.  No.

04:30PM    19    Q.  Okay.  And you're aware that the conduct is some of the

04:30PM    20    same conduct that's being discussed here in this case, right?

04:30PM    21    A.  Yes.

04:30PM    22    Q.  And you're aware that a lot of the witnesses that are in

04:30PM    23    the case involving your child's father are the same witnesses

04:30PM    24    that will be here in this case, right?

04:30PM    25    A.  Yes.

| | | |
|---|---|---|
| 04:30PM | 1 | Q.   Okay.  And you've shown up in court on Peter's case |
| 04:31PM | 2 | before, right? |
| 04:31PM | 3 | A.   Yes. |
| 04:31PM | 4 | Q.   And you've walked in and sat with his family behind him, |
| 04:31PM | 5 | right? |
| 04:31PM | 6 | A.   Yes. |
| 04:31PM | 7 | Q.   Okay.  So fair to say you have a rooting interest in the |
| 04:31PM | 8 | outcome of the case against Peter, right, ma'am? |
| 04:31PM | 9 | A.   A rooting outcome? |
| 04:31PM | 10 | Q.   A rooting interest.  You'd like to see something happen |
| 04:31PM | 11 | in that case, right? |
| 04:31PM | 12 | A.   Like, what would I like to see?  What are you implying? |
| 04:31PM | 13 | Q.   Well, no, no. |
| 04:31PM | 14 | A.   I'm sorry. |
| 04:31PM | 15 | Q.   I'm asking you, just be honest with the jury here, not |
| 04:31PM | 16 | hard, do you have a rooting interest in the outcome of the |
| 04:31PM | 17 | case against Peter? |
| 04:31PM | 18 | A.   Yes. |
| 04:31PM | 19 | Q.   Yes, you do, right? |
| 04:31PM | 20 | And that's causing you to have some bias when you talk |
| 04:31PM | 21 | about Ms. Nigro, right, ma'am? |
| 04:31PM | 22 | A.   No. |
| 04:31PM | 23 | Q.   You dislike Ms. Nigro, right? |
| 04:31PM | 24 | A.   Do I dislike her?  I don't like her character. |
| 04:31PM | 25 | Q.   So my -- |

04:31PM    1    A.   And I know some of --

04:31PM    2    Q.   Ma'am, I'm going to ask questions.  And I'd ask for

04:31PM    3    you -- I'm going to be respectful to you, and I'd ask that

04:31PM    4    you be respectful to me.

04:31PM    5    A.   Okay.

04:31PM    6    Q.   And we'll work through it, okay?

04:31PM    7         Just a simple "yes" or "no":  Do you dislike Ms. Nigro?

04:31PM    8    A.   Yes.

04:31PM    9    Q.   Okay.  And you have strong feelings for Peter Gerace,

04:31PM   10    right?

04:31PM   11    A.   No.

04:31PM   12    Q.   No?  You sure?

04:31PM   13    A.   I don't have strong feelings for him.

04:32PM   14    Q.   Okay.  You show up in court, and you sit with his family,

04:32PM   15    right?

04:32PM   16    A.   For support of my son, I'm his mother.

04:32PM   17    Q.   Okay.  So my question is:  Do you show up in court and

04:32PM   18    sit with his family?

04:32PM   19    A.   Once.

04:32PM   20    Q.   Okay.  That's a yes, right?

04:32PM   21    A.   Yes.

04:32PM   22    Q.   Okay.  So you sit there.  And the reason that you show up

04:32PM   23    is to show support for Peter in front of his family, right,

04:32PM   24    ma'am?

04:32PM   25    A.   No, it's to show support for my son.

USA v Bongiovanni - Arida - Cooper/Cross - 9/13/24

29

04:32PM   1   Q.  Okay.  It's not your son who's charged in the case,

04:32PM   2   right?

04:32PM   3   A.  I understand that, but it is his father.

04:32PM   4   Q.  Okay.  You talked about these conversations that you had

04:32PM   5   with other people about Ms. Nigro, right?

04:32PM   6   A.  Yes.

04:32PM   7   Q.  Can you name the people that you've had these

04:32PM   8   conversations with?

04:32PM   9   A.  Customers, other dancers.

04:32PM  10   Q.  Names, ma'am.  Do you know what a -- a name.  Do you know

04:32PM  11   their names?

04:32PM  12   A.  Name?  No.

04:32PM  13   Q.  One name, you can't give?

04:32PM  14   A.  It was too long ago, no, I don't know any names.

04:32PM  15   Q.  Not a single one?

04:32PM  16   A.  Do you want stage names?

04:32PM  17   Q.  No, no, no.  I'm asking you:  Mr. Singer just asked you

04:32PM  18   all these questions, you were happy to answer them, and you

04:32PM  19   were explaining all these various people that you had these

04:32PM  20   conversations with about Katrina Nigro's character for

04:32PM  21   truthfulness --

04:32PM  22   A.  Well, it's really not --

04:33PM  23   Q.  Ma'am, I'm still asking a question, so wait until I

04:33PM  24   finish the question, and then answer it, okay?

04:33PM  25       I'm going to be respectful to you, but I need to finish

04:33PM    1    my questions, okay?

04:33PM    2    A.   Okay.

04:33PM    3    Q.   Mr. Singer asked you questions about all the different

04:33PM    4    people that you had these conversations with.

04:33PM    5    A.   Um-hum.

04:33PM    6    Q.   What I'm asking you to do is tell them one name.

04:33PM    7    A.   I don't know one name.

04:33PM    8    Q.   Okay.

04:33PM    9         Before you came here to testify, we've met and we've

04:33PM   10    prepared and we've gone over some questions and answers,

04:33PM   11    right?

04:33PM   12    A.   Yes.

04:33PM   13    Q.   Okay.  And during those times, we've never had any

04:33PM   14    consternation like this before, right?

04:33PM   15    A.   No.

04:33PM   16    Q.   Okay.  You've been treated with respect by the FBI agents

04:33PM   17    when they've interviewed you or came to talk to?

04:34PM   18              MR. SINGER:   Objection, relevance.

04:34PM   19              MR. COOPER:   I'll move on Judge.

04:34PM   20              BY MR. COOPER:

04:34PM   21    Q.   Let me ask you a question.

04:34PM   22         Your child's grandmother, would it be fair to say that

04:34PM   23    the charges against Peter have been pretty devastating for

04:34PM   24    that person?

04:34PM   25    A.   Yes.

04:34PM   1   Q. Okay. And would it be a fair statement to say that the

04:34PM   2   charges against Peter have been devastating for your son?

04:34PM   3   A. Yes.

04:34PM   4   Q. Your son's been -- and I'm not trying to make light of

04:34PM   5   this at all, but your son's been bullied in school as a

04:34PM   6   result of having human trafficking charges pending against

04:34PM   7   his father, right?

04:34PM   8   A. Yes.

04:34PM   9   Q. That's upsetting to you, right?

04:34PM   10   A. Of course.

04:34PM   11   Q. I understand that.

04:34PM   12   Before you came up here to testify today, you knew that

04:34PM   13   Ms. Nigro was a witness in this case, right?

04:34PM   14   A. Yes, it's in the newspapers.

04:34PM   15   Q. Okay. So I'm just asking if you're aware of it, that's

04:34PM   16   all. You knew that, right?

04:34PM   17   A. Yes.

04:34PM   18   Q. Okay. If Ms. Nigro said Joe Bongiovanni is friends with

04:35PM   19   Peter Gerace, you wouldn't have any reason to disagree with

04:35PM   20   that, right?

04:35PM   21   A. No.

04:35PM   22   Q. None at all, right?

04:35PM   23   A. No.

04:35PM   24   Q. Okay. During the timeframe that Mr. Singer asked you

04:35PM   25   about when you were, I think, seeing Peter on a weekly basis

04:35PM 1    to have visitation with your son, like 2015, 2016 is that

04:35PM 2    when you were sometimes interacting with Ms. Nigro?

04:35PM 3    A.  Yes.

04:35PM 4    Q.  Would it be fair to say during that time Ms. Nigro was

04:35PM 5    seeing a lot more of Peter Gerace than you were?

04:35PM 6    A.  Yes.

04:35PM 7    Q.  Okay.  And at that name your life, 2015, 2016, were you

04:35PM 8    at Pharaoh's frequently?

04:35PM 9    A.  Never.

04:35PM 10   Q.  Not at all?

04:35PM 11   A.  Not at all.

04:35PM 12   Q.  Okay.  Do you think Katrina was at Pharaoh's at that

04:35PM 13   time?

04:35PM 14   A.  Yes.

04:35PM 15   Q.  Okay.  So would it be a fair statement for me to say you

04:35PM 16   couldn't tell this jury anything about what was happening at

04:35PM 17   Pharaoh's in 2015, could you?

04:35PM 18   A.  I could.  She posted it on social media.

04:35PM 19   Q.  That's not my question.

04:35PM 20      My question is:  If could you tell the jury based on your

04:36PM 21   own observations of what was happening inside Pharaoh's?

04:36PM 22   A.  No.

04:36PM 23   Q.  You couldn't do that, right?

04:36PM 24   A.  No.

04:36PM 25   Q.  Okay.

| | | |
|---|---|---|
| 04:36PM | 1 | **THE COURT:** How much more do you have, Mr. Cooper? |
| 04:36PM | 2 | **MR. COOPER:** I'm not sure, Judge. |
| 04:36PM | 3 | **BY MR. COOPER:** |
| 04:36PM | 4 | Q. Earlier on direct examination, towards the end of the |
| 04:36PM | 5 | direct examination, I asked you a question about did you have |
| 04:36PM | 6 | a confrontation with Peter about these photos; do you |
| 04:36PM | 7 | remember being asked that question? |
| 04:36PM | 8 | A. Yes. |
| 04:36PM | 9 | Q. Okay. And I asked you if that happened close in time |
| 04:36PM | 10 | to -- or, the same day, rather, to finding out what the |
| 04:36PM | 11 | defendant did for work; do you remember that question? |
| 04:36PM | 12 | A. Yes. |
| 04:36PM | 13 | Q. And you said you didn't think it was the same day; do you |
| 04:36PM | 14 | remember that? |
| 04:36PM | 15 | When I just -- |
| 04:36PM | 16 | A. Can you -- |
| 04:36PM | 17 | Q. That you didn't learn what the defendant did for work on |
| 04:37PM | 18 | the same day that you had this confrontation with Peter about |
| 04:37PM | 19 | the Playboy Bunny photos; do you remember that? |
| 04:37PM | 20 | **MR. SINGER:** Objection. Outside the scope. |
| 04:37PM | 21 | **MR. COOPER:** Judge, I think -- |
| 04:37PM | 22 | **THE COURT:** No, overruled. |
| 04:37PM | 23 | **BY MR. COOPER:** |
| 04:37PM | 24 | Q. Do you remember I asked you that on direct? |
| 04:37PM | 25 | A. Yes. |

Case 1:19-cr-00227-LJV-MJR   Document 1201   Filed 09/17/24   Page 58 of 74
USA v Bongiovanni - Arida - Cooper/Cross - 9/13/24

34

04:37PM  1   Q.  And you said you didn't think that happened on the same

04:37PM  2   day?

04:37PM  3   A.  I don't think that happened.  But I learned he was a DEA

04:37PM  4   agent --

04:37PM  5   Q.  Okay.

04:37PM  6   A.  -- on that day particularly.

04:37PM  7   Q.  Okay.  So that's what I'm getting at, ma'am.  The day

04:37PM  8   Peter confronts you about these photos of you in the bunny

04:37PM  9   outfit --

04:37PM  10  A.  Yes.

04:37PM  11  Q.  -- is that the same day that you learned that this

04:37PM  12  defendant works as a DEA agent?

04:37PM  13  A.  Yes.

04:37PM  14  Q.  Okay.

04:37PM  15  A.  I mean, obviously he -- yeah, he's a --

04:37PM  16  Q.  Just yes, right?  Is that the answer?

04:37PM  17  A.  Yes.

04:37PM  18  Q.  Okay.

04:37PM  19          **MR. COOPER:**  Can I just have one second, Judge?

04:37PM  20          **THE COURT:**  Yes.

04:37PM  21          **BY MR. COOPER:**

04:38PM  22  Q.  As you sit here today, were you at the Boss Restaurant

04:38PM  23  with the defendant and Peter Gerace and Katrina Nigro in

04:38PM  24  2016?

04:38PM  25  A.  Was I at -- the what?

04:38PM  1   Q.   The Boss, a restaurant.   Did you go to that?

04:38PM  2        **MR. SINGER:**   Objection, outside the scope.

04:38PM  3        **MR. COOPER:**   No, Judge.

04:38PM  4        **THE COURT:**   How is that --

04:38PM  5        **MR. COOPER:**   I don't want to argue in front of the

04:38PM  6   jury.   I mean, I'll come up.

04:38PM  7        **THE COURT:**   Come on up.   Come on up.   Come on up.

04:38PM  8        (Sidebar discussion held on the record.)

04:38PM  9        **MR. COOPER:**   So what I'm going to do with -- what I

04:38PM 10   intend to do with this line of questioning, if I'm permitted,

04:38PM 11   is show different access to information, different access to

04:38PM 12   Peter and the defendant.

04:38PM 13        So Mr. Singer brought up through this impeachment

04:39PM 14   about character and truthfulness, he brought up how much she

04:39PM 15   interacted with Peter, how much she interacted with Katrina,

04:39PM 16   and when those things happened.

04:39PM 17        I'd like to now clarify on my cross-examination that

04:39PM 18   she wasn't around for other periods of time.

04:39PM 19        That's directly responsive to the direct that

04:39PM 20   Mr. Singer did.

04:39PM 21        **MR. SINGER:**   So she -- she already testified to the

04:39PM 22   exact periods that she had interaction with Peter.

04:39PM 23        **THE COURT:**   Why can't he explore that in response to

04:39PM 24   your cross-examination -- or, direct examination?

04:39PM 25        **MR. SINGER:**   Because this is going into a totally

04:39PM   1    different direction, Judge.  This has nothing to do with how

04:39PM   2    often she would see Peter, or how often she would see Katrina

04:39PM   3    Nigro.  It has absolutely nothing to do with that.

04:39PM   4         MR. COOPER:  Judge, I'm very familiar with the way

04:39PM   5    that you rule on questions for a cross-examination, and I

04:39PM   6    think that this falls squarely within, hey, you went in one

04:39PM   7    direction on direct, now cross gets to show a different piece

04:39PM   8    of that.

04:39PM   9         MR. SINGER:  But how does the --

04:39PM   10        MR. COOPER:  That's how cross is.

04:39PM   11        MR. SINGER:  -- interactions from Boss inform

04:39PM   12   anything about what she testified to?  I guess that's where

04:39PM   13   I'm missing the link here.

04:39PM   14        MR. COOPER:  Because she wasn't there for it, that's

04:39PM   15   the point.

04:39PM   16        He doesn't have to like the question, but it's --

04:39PM   17        THE COURT:  Easy.

04:40PM   18        MR. COOPER:  -- responsive to --

04:40PM   19        THE COURT:  Easy.

04:40PM   20        MR. COOPER:  -- how much time --

04:40PM   21        THE COURT:  Easy.

04:40PM   22        MR. COOPER:  -- they spent together.

04:40PM   23        THE COURT:  Everybody calm down.  Let's do this

04:40PM   24   slowly and logically.

04:40PM   25        So you're trying to show that she doesn't have the

USA v Bongiovanni - Arida - Cooper/Cross - 9/13/24

37

| | | |
|---|---|---|
| 04:40PM | 1 | kind of access to Katrina Nigro -- |
| 04:40PM | 2 | **MR. COOPER:** To Peter and Katrina during time frames |
| 04:40PM | 3 | that Katrina came in and offered testimony to this jury about, |
| 04:40PM | 4 | right? So they choose to -- |
| 04:40PM | 5 | **THE COURT:** Yes. |
| 04:40PM | 6 | **MR. COOPER:** -- go through this door -- |
| 04:40PM | 7 | **THE COURT:** Okay. |
| 04:40PM | 8 | **MR. COOPER:** -- without it -- |
| 04:40PM | 9 | **MR. SINGER:** So she -- |
| 04:40PM | 10 | **THE COURT:** But what he's saying is that during these |
| 04:40PM | 11 | time periods that are crucial to Katrina's testimony, this |
| 04:40PM | 12 | witness is not having -- is not in contact with her and Peter. |
| 04:40PM | 13 | **MR. SINGER:** So she testified to the fact that she |
| 04:40PM | 14 | would interact with Peter and with Katrina during the child |
| 04:40PM | 15 | care turnover visitations. |
| 04:40PM | 16 | **THE COURT:** Right. |
| 04:40PM | 17 | **MR. SINGER:** And that was the extent of her |
| 04:40PM | 18 | interaction during that period. |
| 04:40PM | 19 | **THE COURT:** Right. |
| 04:40PM | 20 | **MR. SINGER:** That's all. So I guess the purpose of a |
| 04:40PM | 21 | cross is to show a contradiction in that. There's no |
| 04:40PM | 22 | contradiction -- |
| 04:40PM | 23 | **THE COURT:** No, no, no. I don't think so. I think |
| 04:40PM | 24 | the purpose of the cross is to show that the interaction was |
| 04:41PM | 25 | even more limited, and of course he can do that. |

| | | |
|---|---|---|
| 04:41PM | 1 | **MR. COOPER:**  Thank you. |
| 04:41PM | 2 | (End of sidebar discussion.) |
| 04:41PM | 3 | **BY MR. COOPER:** |
| 04:41PM | 4 | Q.  You need another water? |
| 04:41PM | 5 | A.  No, I'm good.  Thank you. |
| 04:41PM | 6 | Q.  Okay.  I need some water.  Give me one second. |
| 04:41PM | 7 | Were you invited to a dinner with Joe Bongiovanni, Peter |
| 04:41PM | 8 | Gerace, and Katrina Nigro in 2016? |
| 04:41PM | 9 | A.  No. |
| 04:41PM | 10 | Q.  Okay.  Did you attend a dinner with those people in 2016? |
| 04:41PM | 11 | A.  No. |
| 04:41PM | 12 | Q.  So do you know what happened there? |
| 04:41PM | 13 | A.  No. |
| 04:41PM | 14 | Q.  Okay.  Did you work at Pharaoh's Gentlemen's Club between |
| 04:41PM | 15 | 2013 and 2016? |
| 04:41PM | 16 | A.  No. |
| 04:41PM | 17 | Q.  Katrina worked there during that timeframe, right? |
| 04:41PM | 18 | A.  Yes. |
| 04:41PM | 19 | Q.  Thank you. |
| 04:41PM | 20 | You didn't interact with Ms. Nigro -- with Ms. Nigro for |
| 04:41PM | 21 | years directly at all, right? |
| 04:41PM | 22 | Years would go by where you didn't interact with her at |
| 04:41PM | 23 | all, right? |
| 04:41PM | 24 | A.  Yes. |
| 04:41PM | 25 | Q.  Okay.  As you sit here today, you're not aware of whether |

04:42PM  1    there's text messages about a dinner that occurred at the

04:42PM  2    Boss Restaurant in 2016, right?

04:42PM  3    A.  No.

04:42PM  4    Q.  You never saw those?

04:42PM  5    A.  I never saw text messages.

04:42PM  6    Q.  You wouldn't know if they exist, right?

04:42PM  7    A.  No.

04:42PM  8    Q.  You're not aware of whether Joe Bongiovanni ever texted

04:42PM  9    Peter Gerace and said, hey, what's your address so I can send

04:42PM  10   you a thank you card?

04:42PM  11       You don't know if that happened, right?

04:42PM  12   A.  No.

04:42PM  13   Q.  Okay.  And you weren't there for the dinner, so you don't

04:42PM  14   know what happened at the dinner either, right?

04:42PM  15   A.  No.

04:42PM  16   Q.  Okay.  You testified on one of your examinations, I don't

04:42PM  17   recall which one, about women who work in exotic dance clubs

04:42PM  18   using drugs, right?

04:42PM  19   A.  Yes.

04:42PM  20   Q.  That's something that happens, right?

04:42PM  21   A.  Yes.

04:42PM  22   Q.  Have you seen women that work in exotic dancing clubs

04:42PM  23   that have track marks on their arms?

04:42PM  24   A.  I haven't seen that personally.

04:42PM  25   Q.  Okay.

| | | |
|---|---|---|
| 04:42PM | 1 | A.  I mean, I worked before the opiate epidemic, so I didn't |
| 04:42PM | 2 | see that. |
| 04:42PM | 3 | Q.  Got it.  Did you see woman who showed signs of severe |
| 04:43PM | 4 | drug addiction working at those clubs? |
| 04:43PM | 5 | A.  Yes. |
| 04:43PM | 6 | Q.  Did you see drugs distributed at the clubs? |
| 04:43PM | 7 | A.  Yes. |
| 04:43PM | 8 | MR. SINGER:  Just for clarification, are we back on |
| 04:43PM | 9 | redirect now? |
| 04:43PM | 10 | MR. COOPER:  Crossing. |
| 04:43PM | 11 | THE COURT:  I'm -- okay, he's still crossing. |
| 04:43PM | 12 | MR. SINGER:  Can we approach? |
| 04:43PM | 13 | THE COURT:  Sure. |
| 04:43PM | 14 | (Sidebar discussion held on the record.) |
| 04:43PM | 15 | MR. SINGER:  That's the reason I interrupted, Judge, |
| 04:43PM | 16 | is because it's a leading objection. |
| 04:43PM | 17 | If we're back on redirect, which I think we are, all |
| 04:43PM | 18 | these questions start to go to information I solicited not |
| 04:43PM | 19 | having to do with anything about an opinion or reputation |
| 04:43PM | 20 | regarding truthfulness, but with regard to what Ms. Arida |
| 04:43PM | 21 | testified to on direct. |
| 04:43PM | 22 | So if we're back into that area, which I think we |
| 04:43PM | 23 | squarely are, then we've got to go back into -- he's direct |
| 04:43PM | 24 | and cross. |
| 04:43PM | 25 | THE COURT:  It wasn't leading. |

04:43PM   1            **MR. COOPER:**  This is --

04:43PM   2            **THE COURT:**  I didn't think the questions were

04:43PM   3   leading.

04:43PM   4            **MR. COOPER:**  I think my tone of voice invokes

04:43PM   5   objection sometimes, but I'm --

04:44PM   6            **THE COURT:**  Don't lead now.

04:44PM   7            **MR. COOPER:**  Well, Judge, I would just -- there's a

04:44PM   8   line of cross-examination about -- so, he evokes this

04:44PM   9   reputation, we talk about access to Pharaoh's when there was

04:44PM  10   access to Pharaoh's --

04:44PM  11            **THE COURT:**  Right.

04:44PM  12            **MR. COOPER:**  -- with whether she knows it or not,

04:44PM  13   whether she knows it or not, this jury's heard testimony from

04:44PM  14   lots of witnesses about stuff that's gone on at Pharaoh's with

04:44PM  15   respect to drug addiction.  So I'm exploring that now in the

04:44PM  16   context of my cross-examination of her that I didn't expect to

04:44PM  17   be doing today.  But this is where we were.  I don't have a

04:44PM  18   cross written out because I found out about it 25 minutes ago.

04:44PM  19            **THE COURT:**  We're ending at 5, so --

04:44PM  20            **MR. COOPER:**  Okay.

04:44PM  21            **THE COURT:**  If we've got to bring her back Monday,

04:44PM  22   we'll bring her back Monday.

04:44PM  23            **MR. COOPER:**  Okay.

04:44PM  24            (End of sidebar discussion.)

         25

| | | |
|---|---|---|
| 04:44PM | 1 | **BY MR. COOPER:** |
| 04:44PM | 2 | Q.  You've seen signs of somebody that's heavily using drugs |
| 04:44PM | 3 | when you've worked in these clubs, right? |
| 04:44PM | 4 | A.  Yes. |
| 04:44PM | 5 | Q.  That's something that happens? |
| 04:44PM | 6 | A.  Yes. |
| 04:44PM | 7 | Q.  You've seen people distributing drugs in those contests, |
| 04:44PM | 8 | right? |
| 04:44PM | 9 | A.  In other clubs? |
| 04:44PM | 10 | Q.  In clubs, yeah. |
| 04:45PM | 11 | A.  Yes. |
| 04:45PM | 12 | Q.  Okay.  So if Ms. Nigro said that women use drugs at |
| 04:45PM | 13 | Pharaoh's, you wouldn't have any reason to disagree with |
| 04:45PM | 14 | that, right? |
| 04:45PM | 15 | **MR. SINGER:**  Objection to the hearsay. |
| 04:45PM | 16 | **THE COURT:**  Sus -- |
| 04:45PM | 17 | **MR. COOPER:**  So I'm not asking her to -- |
| 04:45PM | 18 | **THE COURT:**  Hang on. |
| 04:45PM | 19 | **MR. COOPER:**  -- elicit an out-of-court statement. |
| 04:45PM | 20 | **THE COURT:**  Yeah.  Overruled.  I'll allow that. |
| 04:45PM | 21 | **BY MR. COOPER:** |
| 04:45PM | 22 | Q.  If Ms. Nigro said women who worked at Pharaoh's used |
| 04:45PM | 23 | drugs, you wouldn't have any reason to disagree with that, |
| 04:45PM | 24 | right? |
| 04:45PM | 25 | A.  No. |

04:45PM    1    Q.  If she said women who worked at Pharaoh's had opiate

04:45PM    2    addictions, you wouldn't have any reason to disagree with

04:45PM    3    that, right?

04:45PM    4          MR. SINGER:  Objection, same basis.

04:45PM    5          THE COURT:  Overruled.

04:45PM    6          BY MR. COOPER:

04:45PM    7    Q.  If she said that women who worked at Pharaoh's bought

04:45PM    8    drugs from people at Pharaoh's, you wouldn't have any reason

04:45PM    9    to disagree with that, right?

04:45PM   10    A.  No.

04:45PM   11          MR. SINGER:  Sorry, Judge.  Again, I'll have to

04:45PM   12    object for the record.

04:45PM   13          THE COURT:  I understand.  I understand.

04:45PM   14          Overruled.

04:45PM   15          BY MR. COOPER:

04:45PM   16    Q.  If she said Peter blew lines of coke, would you have any

04:45PM   17    reason to disagree with that?

04:45PM   18    A.  No.

04:45PM   19    Q.  If she said that women at Pharaoh's were put in

04:46PM   20    precarious situations with men that came to Pharaoh's, would

04:46PM   21    you have any reason to disagree with that?

04:46PM   22          MR. SINGER:  Objection, hearsay and 403.

04:46PM   23          THE COURT:  Overruled.

04:46PM   24          THE WITNESS:  Yes.

          25

04:46PM    1          **BY MR. COOPER:**

04:46PM    2    Q.  You told the jury earlier that people who work at these

04:46PM    3    clubs are -- are put in uncomfortable situations with men

04:46PM    4    when I was asking you questions on direct; do you --

04:46PM    5    A.  What does "vicarious" mean?  I mean, what are you trying

04:46PM    6    to ask me?

04:46PM    7    Q.  No, precarious.

04:46PM    8    A.  What -- okay, so what does that entail?

04:46PM    9    Q.  Dangerous.  Uncomfortable.

04:46PM   10    A.  Sure, uncomfortable.  Being a stripper's uncomfortable.

04:46PM   11    Q.  That's what I'm getting at, ma'am.

04:46PM   12    A.  Okay.

04:46PM   13    Q.  Katrina Nigro, if she testified, or if she told you that

04:46PM   14    Joe Bongiovanni and Peter Gerace were friends, you wouldn't

04:46PM   15    have any reason to disagree with that either, right, ma'am?

04:46PM   16    A.  No.

04:46PM   17          **MR. COOPER:**  Okay.  I'm good.  Thank you, Judge.

04:47PM   18

04:47PM   19          **RECROSS-EXAMINATION BY MR. SINGER:**

04:47PM   20    Q.  Ms. Nigro, the government challenged your opinion

04:47PM   21    regarding -- sorry.

04:47PM   22      Ms. Arida, the government challenged your opinion

04:47PM   23    regarding Ms. Nigro, and I want to get into a couple reasons

04:47PM   24    why you hold that opinion.  Okay?

04:47PM   25    A.  Yes.

04:47PM    1    Q.  Did Ms. Nigro tell you and others that she --

04:47PM    2              MR. COOPER:  Objection.  Specific instances are

04:47PM    3    improper, Judge.

04:47PM    4              MR. SINGER:  Unless the witness is impeached.

04:47PM    5              THE COURT:  Okay.  We are going to quit for the day,

04:47PM    6    folks.  So remember my instructions about not making up your

04:48PM    7    mind about anything until the case has been given to you to

04:48PM    8    deliberate.  Don't communicate about the case with anyone.

04:48PM    9    Again, this is a weekend, so you'll be together with family,

04:48PM   10    don't tell them anything about this case.  Don't use tools of

04:48PM   11    technology to try to learn anything about the case or to

04:48PM   12    communicate about the case.  If there's any news coverage

04:48PM   13    about the case whatsoever, in the newspaper, on the radio, on

04:48PM   14    TV, on the internet, don't watch or listen or read that while

04:48PM   15    the case is in progress.  You'll be able to read plenty when

04:48PM   16    it's over, if there is any, but don't look for anything now.

04:48PM   17    And if you see anything inadvertently, let me know about it.

04:48PM   18    Okay?  We'll see you Monday at 9:30.  Monday, Tuesday, at

04:48PM   19    9:30.  And then Friday at 9:30.  But Wednesday and Thursday we

04:48PM   20    will be down.  Okay?

04:48PM   21         Everybody have a great weekend, and I guess that's

04:49PM   22    it.  Thanks.

04:49PM   23              (Jury excused at 4:49 p.m.)

04:49PM   24              THE COURT:  Okay.  So, I understand -- let's excuse

04:49PM   25    the witness.

04:49PM    1              MR. COOPER:  I agree.

04:49PM    2              THE COURT:  I don't want to do argument now, but

04:49PM    3    ma'am, you can step down.

04:49PM    4              THE WITNESS:  Thank you.

04:49PM    5              THE COURT:  You're not to talk to anybody about your

04:49PM    6    testimony at all --

04:49PM    7              THE WITNESS:  Yes, sir.

04:49PM    8              THE COURT:  -- between now and when you come back on

04:49PM    9    Monday, okay?

04:49PM   10              THE WITNESS:  Yep.

04:49PM   11              THE COURT:  Okay?

04:49PM   12              THE WITNESS:  Thank you.

04:49PM   13              (Witness excused at 4:49 p.m.)

04:49PM   14              MR. TRIPI:  What time Monday, Judge?

04:49PM   15              THE COURT:  9:30.

04:50PM   16              So a couple things.  Do you guys want to brief this?

04:50PM   17              MR. COOPER:  So I guess I'll beat the same drum that

04:50PM   18    I've been beating since the beginning of this trial, which is

04:50PM   19    we can have an opportunity to brief things for the Court and

04:50PM   20    not argue them for 20 or 30 minutes at the sidebar when we

04:50PM   21    know that issues are going to arise.  And over and over again

04:50PM   22    during the course of the trial, the defense has chosen to

04:50PM   23    operate by trial by surprise --

04:50PM   24              THE COURT:  So let me go back and ask the question:

04:50PM   25    Do you want to brief this?

| | | |
|---|---|---|
| 04:50PM | 1 | **MR. COOPER:**  Yes. |
| 04:50PM | 2 | **THE COURT:**  Okay.  By Sunday at midnight? |
| 04:50PM | 3 | **MS. CHALBECK:**  Works for us, Judge.  We'll try to get |
| 04:50PM | 4 | it to you sooner. |
| 04:50PM | 5 | **THE COURT:**  Simultaneous briefs. |
| 04:50PM | 6 | **MR. SINGER:**  Yeah, that's fine, Judge.  Just give me |
| 04:50PM | 7 | a deadline. |
| 04:50PM | 8 | **MR. TRIPI:**  Judge, the question is, I just want to |
| 04:51PM | 9 | frame the question, the question is now that Mr. Singer is |
| 04:51PM | 10 | back up on his recross -- |
| 04:51PM | 11 | **MR. COOPER:**  Redirect. |
| 04:51PM | 12 | **MR. TRIPI:**  -- redirect, or whatever it is, can he |
| 04:51PM | 13 | get into specific instances of conduct that bolster the |
| 04:51PM | 14 | opinion testimony as to Ms. Nigro's credibility that he's |
| 04:51PM | 15 | elicited from Arida.  That was -- |
| 04:51PM | 16 | **THE COURT:**  Because, because it's -- because her |
| 04:51PM | 17 | credibility has been attacked on that -- |
| 04:51PM | 18 | **MR. TRIPI:**  Yeah. |
| 04:51PM | 19 | **THE COURT:**  -- on cross. |
| 04:51PM | 20 | **MR. TRIPI:**  So can -- but he's asking not for |
| 04:51PM | 21 | specific instances of conduct to bolster Ms. Arida's |
| 04:51PM | 22 | credibility, he's asking for specific instances of conduct to |
| 04:51PM | 23 | bolster her opinion testimony about Ms. Nigro.  That's the |
| 04:51PM | 24 | objection, and that's what we'll be briefing. |
| 04:51PM | 25 | **MR. SINGER:**  Well, I phrased it a different way. |

USA v Bongiovanni - Arida - Singer/Recross - 9/13/24

48

04:51PM    1            She offered her opinion about Ms. Nigro's

04:51PM    2    untruthfulness.  She also offered her opinion regarding the

04:51PM    3    reputation of Ms. Nigro for her untruthfulness.

04:51PM    4            On cross-examination, the government did two things:

04:52PM    5            1, is that they attacked her credibility on the basis

04:52PM    6    of her opinion on bias grounds.

04:52PM    7            Number 2, they offered multiple instances of specific

04:52PM    8    acts of what they would believe are truthful statements

04:52PM    9    that -- that the witness would not disagree were untruthful.

04:52PM   10            That is what I believe opened the door, Judge, to

04:52PM   11    specific acts that I can get into regarding her opinion.

04:52PM   12            I didn't open that door.  I actually leveled some

04:52PM   13    objections to some of those questions.  That's why the door is

04:52PM   14    open.

04:52PM   15            **MR. COOPER:**  Judge, I would respond to that that my

04:52PM   16    questions were about the -- her ability to make certain

04:52PM   17    perceptions when she was associated with Peter, when she was

04:52PM   18    associated with Katrina, if she was invited to certain events.

04:52PM   19    That's completely extraneous to what she wants -- what would

04:52PM   20    like to have this witness talk about, which are totally

04:52PM   21    unrelated things where she thinks --

04:52PM   22            **THE COURT:**  And you can put that in your papers, and

04:52PM   23    Mr. Singer can argue to the contrary in his papers.

04:52PM   24            **MR. COOPER:**  Got it.  Understood.

04:53PM   25            **THE COURT:**  The only other thing I wanted to raise

USA v Bongiovanni - Arida - Singer/Recross - 9/13/24

49

04:53PM  1   was so we had that go-around on the coconspirator statement,

04:53PM  2   that whole big go-around.  And there was -- and you might want

04:53PM  3   to look at the transcript, Mr. Singer and Mr. MacKay, because

04:53PM  4   at the beginning of that, there was a question and an answer

04:53PM  5   and an objection that was never really ruled on.  And I think

04:53PM  6   that the answer that came out may be contrary to the ruling

04:53PM  7   that I made.  So we may need to do a curative instruction on

04:53PM  8   that.

04:53PM  9          So, Ann, if you can get them the transcript of that,

04:53PM  10  just the beginning, before that whole roll-around with the

04:53PM  11  long argument that we had on the -- the coconspirator

04:53PM  12  statement, whether it came in as a coconspirator statement,

04:53PM  13  whether it came in a statement against penal interests, the

04:53PM  14  very beginning of it.

04:53PM  15          **THE REPORTER:**  Sure, Judge.

04:53PM  16          **THE COURT:**  The question that triggered that had an

04:54PM  17  answer that I think may be problematic.  Okay?  So take a look

04:54PM  18  at that, and we can decide what to do about it.

04:54PM  19          **MR. SINGER:**  Okay, Judge.

04:54PM  20          **THE COURT:**  Okay?  Anything else from the government?

04:54PM  21          **MR. TRIPI:**  No, thank you, Judge.

04:54PM  22          **THE COURT:**  Anything from the defense?

04:54PM  23          **MR. SINGER:**  No, Your Honor.  Have a good weekend.

04:54PM  24          **THE CLERK:**  All rise.

04:54PM  25          (Off the record at 4:54 p.m.)

1

2                          **CERTIFICATE OF REPORTER**

3

4                  In accordance with 28, U.S.C., 753(b), I

5       certify that these original notes are a true and correct

6       record of proceedings in the United States District Court for

7       the Western District of New York on September 13, 2024.

8

9

10                              s/ Ann M. Sawyer
                                Ann M. Sawyer, FCRR, RPR, CRR
11                              Official Court Reporter
                                U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25