09:20AM

1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK
2
      _____
3     UNITED STATES OF AMERICA,
                                        Case No. 1:19-cr-227
4                     Plaintiff,                 (LJV)
      v.
5                                       September 10, 2024
      JOSEPH BONGIOVANNI,
6
                      Defendant.
7     _____

8        TRANSCRIPT EXCERPT - EXAMINATION OF CURTIS RYAN - DAY 1
               BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                    UNITED STATES DISTRICT JUDGE

10    APPEARANCES:        TRINI E. ROSS, UNITED STATES ATTORNEY
                          BY: JOSEPH M. TRIPI, ESQ.
11                            NICHOLAS T. COOPER, ESQ.
                              CASEY L. CHALBECK, ESQ.
12                        Assistant United States Attorneys
                          Federal Centre, 138 Delaware Avenue
13                        Buffalo, New York 14202
                          For the Plaintiff
14
                          SINGER LEGAL PLLC
15                        BY: ROBERT CHARLES SINGER, ESQ.
                          80 East Spring Street
16                        Williamsville, New York 14221
                             And
17                        LAW OFFICES OF PARKER ROY MacKAY
                          BY: PARKER ROY MacKAY, ESQ.
18                        3110 Delaware Avenue
                          Kenmore, New York 14217
19                           And
                          OSBORN, REED & BURKE, LLP
20                        BY: JOHN J. GILSENAN, ESQ.
                          120 Allens Creek Road
21                        Rochester, New York 14618
                          For the Defendant
22
      PRESENT:            BRIAN A. BURNS, FBI Special Agent
23                        MARILYN K. HALLIDAY, HSI Special Agent
                          KAREN A. CHAMPOUX, USA Paralegal
24
      LAW CLERK:          REBECCA FABIAN IZZO, ESQ.
25

| | |
|---|---|
| 1 | **COURT DEPUTY CLERK:   COLLEEN M. DEMMA** |
| 2 | **COURT REPORTER:**        **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 3 | Robert H. Jackson Federal Courthouse 2 Niagara Square Buffalo, New York  14202 |
| 4 | Ann_Sawyer@nywd.uscourts.gov |
| 5 | |
| 6 | *     *     *     *     *     *     * |
| 7 | |
| 8 | (Excerpt commenced at 9:44 a.m.) |
| 9 | (Jury seated at 9:44 a.m.) |
| 10 | **THE COURT:**  Good morning, everyone. |
| 11 | **JURORS:**  Good morning. |
| 12 | **THE COURT:**  The record will reflect that all our |
| 13 | jurors are present.  The government can call its next witness. |
| 14 | **MR. TRIPI:**  We call Special Agent Curtis Ryan, |
| 15 | Your Honor. |
| 16 | |
| 17 | **C U R T I S   R Y A N**, having been duly called and sworn, |
| 18 | testified as follows: |
| 19 | **MR. TRIPI:**  May I proceed, Your Honor? |
| 20 | **THE COURT:**  You may. |
| 21 | **MR. TRIPI:**  Thank you. |
| 22 | |
| 23 | **DIRECT EXAMINATION BY MR. TRIPI:** |
| 24 | Q.  Good morning, Special Agent Ryan.  How are you? |
| 25 | A.  I'm well.  Good morning. |

Timestamps (left margin):
- 09:44AM (line 7)
- 09:44AM (line 8)
- 09:45AM (line 9)
- 09:45AM (line 10)
- 09:45AM (line 11)
- 09:45AM (line 12)
- 09:45AM (line 13)
- 09:45AM (line 14)
- 09:45AM (line 15)
- 09:45AM (line 16)
- 09:46AM (line 17)
- 09:46AM (line 18)
- 09:46AM (line 19)
- 09:46AM (line 20)
- 09:46AM (line 21)
- 09:46AM (line 22)
- 09:46AM (line 23)
- 09:46AM (line 24)
- 09:46AM (line 25)

09:46AM    1    Q.  Can you tell the jury by whom you're currently employed?

09:46AM    2    A.  Homeland Security Investigations.

09:46AM    3    Q.  And what is your job with the Homeland Security?

09:46AM    4    A.  I'm the Resident Agent in Charge of the HSI office in

09:46AM    5    Indianapolis, Indiana.

09:46AM    6    Q.  Does that mean you're the head of that office?

09:46AM    7    A.  Yes, I'm the head of that office.  We're responsible for

09:46AM    8    HSI investigations in the Southern District of Indiana.

09:46AM    9    Q.  How long in total have you been employed a Homeland

09:46AM   10    Security Investigations?

09:46AM   11    A.  Since February of 2012.

09:46AM   12    Q.  So roughly a little over 12 years?

09:47AM   13    A.  Yes.

09:47AM   14    Q.  Can you tell the jury, what is the mission of Homeland

09:47AM   15    Security Investigations?

09:47AM   16    A.  HSI investigates transnational criminal organizations.

09:47AM   17    And in particularly, those that seek to exploit the customs

09:47AM   18    or immigration laws of the United States.

09:47AM   19    Q.  Does that generally involve a nexus to the United States

09:47AM   20    Border in some way?

09:47AM   21    A.  Yes, a nexus to the border, some type of smuggling

09:47AM   22    network.

09:47AM   23    Q.  What other positions have you held during your tenure

09:47AM   24    with Homeland Security Investigations?  Can you talk the jury

09:47AM   25    through your trajectory through that department -- that

09:47AM    1    office?

09:47AM    2    A.   Sure.  So I was hired in February 2012.  Left NCIS and

09:47AM    3    came to HSI.  Went through the HSI training, then I came to

09:47AM    4    Buffalo in August of 2012.

09:47AM    5        I was assigned to a group that investigated outbound

09:48AM    6    technology smuggling and did that for several years.

09:48AM    7        And then early in 2016, I moved to one of the drug

09:48AM    8    smuggling groups.  Did that for several years.

09:48AM    9        In October of 2020, I was maybe the acting group

09:48AM   10    supervisor of a financial group.  And then I was permanently

09:48AM   11    promoted to group supervisor in March of '21, and I held that

09:48AM   12    position until I left for Indianapolis in July of last year.

09:48AM   13    Q.   So you were in Buffalo from August of 2012 to July of

09:48AM   14    2023?

09:48AM   15    A.   Yes.

09:48AM   16    Q.   And can you tell the jury what -- what other

09:48AM   17    professional -- well, first, let's step back.

09:48AM   18        Tell them about your educational background.

09:48AM   19    A.   Sure.  Is it all right if I go from back to front?

09:48AM   20    Q.   Go ahead.

09:48AM   21    A.   So, working, education, it's kind of -- it's mixed up.

09:49AM   22        So college student right after high school, then I also

09:49AM   23    joined the Army National Guard in my hometown, so that's

09:49AM   24    1992.  I was a pretty good soldier and a midline college

09:49AM   25    student, so I went to the Army full time on active duty in

09:49AM   1   April of '95.

09:49AM   2       Was an artilleryman until December '97.

09:49AM   3       Started to go through the process to switch my -- it's

09:49AM   4   called MOS, military occupational specialty, to Army CID

09:49AM   5   special agent.

09:49AM   6   Q.  Tell them what that is.  What is that?

09:49AM   7   A.  So, it's civilian now, but at the time when I did it in

09:49AM   8   the Army, there's a -- there's was a group of about 750 Army

09:49AM   9   CID special agents that investigated felony crimes that

09:49AM  10   happened on Army bases, or that somehow affect the Army.

09:49AM  11   There's a lot of stuff that happens around the outside of a

09:49AM  12   base that still affects the people on the base.

09:50AM  13   Q.  Please continue.

09:50AM  14   A.  Yeah.  So, I finished the -- the formal training for that

09:50AM  15   in April '99.  Went to Fort Lewis, Washington, couple years.

09:50AM  16   Carlisle Barracks, Pennsylvania for about one year.  And then

09:50AM  17   Fort Bragg in North Carolina, which is now Fort Freedom, I

09:50AM  18   think, for two years and that was the end of my time in the

09:50AM  19   Army.  And then I finished my undergraduate degree in

09:50AM  20   criminal justice in 2003.

09:50AM  21   Q.  Where did you get your degree from?

09:50AM  22   A.  Saint Martin's University.

09:50AM  23   Q.  And what -- where did your employment history take you

09:50AM  24   from there?

09:50AM  25   A.  I moved to Indianapolis, actually, working for the Army

09:50AM  1   as a civilian.  Still as a special agent in a small unit the

09:51AM  2   Army has.  It investigates contract fraud in Army contracts.

09:51AM  3   I was there for about two and a half years.

09:51AM  4       Left and went to Washington, D.C. and worked for the

09:51AM  5   Department of Defense Inspector General as a special agent.

09:51AM  6   I had a very short stint for the Department of Justice,

09:51AM  7   Office of Inspector General as a special agent.

09:51AM  8       And then in 2008, I moved to Georgia and worked for the

09:51AM  9   Naval Criminal Investigative Service until I was hired by

09:51AM  10  HSI.

09:51AM  11  Q.  And what did you do for the Naval Criminal Investigative

09:51AM  12  Service, what is that?

09:51AM  13  A.  So as a special agent, similar to the Army, or to Army

09:51AM  14  CID.  NCIS investigates crimes within the Navy or that affect

09:51AM  15  the Navy.  I worked or was assigned to an office in Georgia

09:51AM  16  called the Contingency Response Field Office.

09:51AM  17      At the time, the Navy had a lot of people overseas, and

09:51AM  18  we covered the NCIS support to the Navy missions in the Horn

09:52AM  19  of Africa, there was an afloat counter-piracy mission in Iraq

09:52AM  20  and Afghanistan.  I went to Afghanistan three times.

09:52AM  21  Q.  And that brings you to HSI; is that right?

09:52AM  22  A.  That's correct.

09:52AM  23  Q.  Throughout your investigative career, have you

09:52AM  24  investigated narcotics and narcotics-related trafficking

09:52AM  25  cases?

09:52AM  1   A.  Yes, going back to the Army.

09:52AM  2   Q.  Conspiracies?

09:52AM  3   A.  Yes.

09:52AM  4   Q.  As a part of your training with Homeland Security

09:52AM  5   Investigations, do you also have -- have you also received

09:52AM  6   training on traditional organized crime groups and a subset

09:52AM  7   of that referenced as Italian Organized Crime?

09:52AM  8   A.  Yes.

09:52AM  9   Q.  While you were a Homeland Security special agent here in

09:53AM  10  Buffalo, did there come a point in time in or about April of

09:53AM  11  2017 where you also joined the DEA as a task force officer?

09:53AM  12  A.  Yes.

09:53AM  13  Q.  Can you describe what your job is like while you're an

09:53AM  14  HSI special agent but also a DEA task force officer?  Can you

09:53AM  15  explain that for the jury?

09:53AM  16  A.  Yes.  So I was assigned to a group at the Buffalo

09:53AM  17  Resident Office.  It's called D-58.  The common name for it

09:53AM  18  was the task force group.  There were four or five DEA

09:53AM  19  special agents, and then task force officers from state,

09:53AM  20  local, and other federal law enforcement agencies.

09:53AM  21      And then my role was to try to use HSI's border

09:53AM  22  authorities to help enhance the cases that the group was

09:54AM  23  doing.

09:54AM  24  Q.  Is that sort of the idea behind task forces, everyone on

09:54AM  25  the task force brings a -- a -- a piece of investigative

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

09:54AM  1   experience or specialty to the group?

09:54AM  2   A.  Right.  Yes.  Everybody tries to do what you're -- you

09:54AM  3   know, do what your agency does best and then pull all of

09:54AM  4   those bests together.

09:54AM  5   Q.  While you worked for the DEA in group D-58, were you also

09:54AM  6   separately working for Homeland Security?

09:54AM  7   A.  Yes.

09:54AM  8   Q.  During that time after you joined the DEA as a task force

09:54AM  9   officer in April 2017, who was your group supervisor in D-58?

09:54AM  10  A.  James McHugh.

09:54AM  11  Q.  And who was the RAC in the DEA at that point, if you

09:54AM  12  recall?

09:54AM  13  A.  I will recall if I think about it.  John Flickinger.

09:54AM  14  Q.  Okay.

09:54AM  15  A.  And then later, Ed Orgon.

09:55AM  16  Q.  Okay.  And when you worked there, was the DEA located in

09:55AM  17  the Electric Tower building in downtown Buffalo?

09:55AM  18  A.  Yes, on the fourth and fifth floors.

09:55AM  19  Q.  And that's not too far from this building, correct?

09:55AM  20  A.  Correct.

09:55AM  21  Q.  And was there a DEA special agent in a different group

09:55AM  22  named Joseph Bongiovanni who you knew of?

09:55AM  23  A.  Yes.

09:55AM  24  Q.  What group was that person in?

09:55AM  25  A.  D-57.

09:55AM   1   Q.   And by that point in time, who was his group supervisor,

09:55AM   2   if you know?

09:55AM   3   A.   Greg Yensan.

09:55AM   4   Q.   And do you see DEA Special Agent Joseph Bongiovanni or

09:55AM   5   former DEA Special Agent Bongiovanni in court today?

09:55AM   6   A.   Yes.

09:55AM   7   Q.   Can you please point to him and describe something he's

09:55AM   8   wearing?

09:55AM   9   A.   He's at the defense table in the blue suit and wearing

09:55AM  10   glasses.

09:56AM  11        **MR. TRIPI:**  May the record reflect the witness

09:56AM  12   pointed to and identified the defendant, Your Honor.

09:56AM  13        **THE COURT:**  It does.

09:56AM  14        **MR. TRIPI:**  Thank you.

09:56AM  15        **BY MR. TRIPI:**

09:56AM  16   Q.   Now, I'd like to direct your attention to in or about of

09:56AM  17   February of 2018.  By that point in time, had -- had the FBI

09:56AM  18   and the Erie County Sheriff's Office arrested and charged

09:56AM  19   federally an individual by the name of Ron Serio?

09:56AM  20   A.   Yes.

09:56AM  21   Q.   By February of 2018, were you invited to a proffer

09:56AM  22   interview of Ron Serio at the U.S. Attorney's Office?

09:56AM  23   A.   Yes, I was.

09:56AM  24   Q.   And just remind the jury, just basically, the general --

09:56AM  25   what is a proffer interview?

09:56AM   1   A.   It's an interview done under an agreement between the

09:56AM   2   defendant and the U.S. Attorney's Office where the U.S.

09:56AM   3   Attorney's Office agrees to not prosecute the defendant based

09:56AM   4   solely on something they say in that interview.

09:56AM   5   Q.   So it's an interview governed by that document that

09:57AM   6   allows someone to come in and talk?

09:57AM   7   A.   Yes.

09:57AM   8   Q.   And the U.S. Attorney's Office basically evaluates the

09:57AM   9   information?

09:57AM  10   A.   Yes.

09:57AM  11   Q.   As well as the agents or the agencies?

09:57AM  12   A.   Correct.

09:57AM  13   Q.   And in February of 2018, who invited you to attend a

09:57AM  14   proffer interview of Ron Serio?

09:57AM  15   A.   Assistant United States Attorney Paul Parisi.

09:57AM  16   Q.   And he's not with the U.S. Attorney's Office anymore,

09:57AM  17   correct?

09:57AM  18   A.   He is not.

09:57AM  19   Q.   Okay.  Was your interest at that time in proffering Ron

09:57AM  20   Serio, was it related to potentially who was supplying him

09:57AM  21   with large amounts of controlled substances?

09:57AM  22   A.   Yes.

09:57AM  23   Q.   Did you prepare for that proffer in any way?

09:57AM  24   A.   There had been a previous proffer by the FBI.  I reviewed

09:57AM  25   that report.

| | | |
|---|---|---|
| 09:57AM | 1 | Q.  And was that a proffer interview from on or about |
| 09:58AM | 2 | April 26th, 2017? |
| 09:58AM | 3 | A.  Yes. |
| 09:58AM | 4 | Q.  So, some time had passed from April 26, 2017, to |
| 09:58AM | 5 | February 8th, 2018.  Is it your understanding that Mr. Serio |
| 09:58AM | 6 | had gone into some treatment at that point -- |
| 09:58AM | 7 | A.  Yes. |
| 09:58AM | 8 | Q.  -- for his -- for drug addiction? |
| 09:58AM | 9 | The February proffer, was that on or about February 28th, |
| 09:58AM | 10 | 2018? |
| 09:58AM | 11 | A.  Yes. |
| 09:58AM | 12 | Q.  Who did you attend the proffer with? |
| 09:58AM | 13 | A.  DEA Special Agent David Walters and HSI Special Agent |
| 09:58AM | 14 | Matthew Infante. |
| 09:58AM | 15 | Q.  So I think maybe my last question referenced it, but can |
| 09:58AM | 16 | you explain for the jury, what was the focus that you had |
| 09:58AM | 17 | going into that proffer interview of Ron Serio at that point |
| 09:58AM | 18 | in time. |
| 09:58AM | 19 | A.  Well, to determine where he was obtaining and how he was |
| 09:58AM | 20 | obtaining marijuana and particularly some pills that he had |
| 09:58AM | 21 | that were counterfeit oxycodones that contained fentanyl. |
| 09:58AM | 22 | Q.  And based upon your review of the prior proffer he had |
| 09:59AM | 23 | given, did you have an understanding by that point that he |
| 09:59AM | 24 | had a Canadian source of supply for marijuana and those |
| 09:59AM | 25 | fentanyl pills named Jarrett Guy? |

09:59AM    1    A.  Yes.

09:59AM    2    Q.  Was Mr. Guy the focus of your interview at that point?

09:59AM    3    A.  Yes.

09:59AM    4    Q.  And was Mr. Guy -- where was he stationed or where was he

09:59AM    5    from?

09:59AM    6    A.  Vancouver and British Columbia.

09:59AM    7    Q.  So in Canada, far, far away?

09:59AM    8    A.  Far, far west Canada.

09:59AM    9    Q.  Now, in that proffer interview in February of 2018, did

09:59AM   10    you or anyone else -- withdrawn.

09:59AM   11         Did Serio mention at all an individual named Mike

09:59AM   12    Masecchia?

09:59AM   13    A.  No.

09:59AM   14    Q.  Did Serio mention at all a person named Lou Selva?

09:59AM   15    A.  No.

09:59AM   16    Q.  Did Serio mention at all Defendant Bongiovanni?

09:59AM   17    A.  No.

09:59AM   18    Q.  Were you asking any questions at that point about Italian

09:59AM   19    Organized Crime?

09:59AM   20    A.  No.

09:59AM   21    Q.  In fact, did your training in traditional and Italian

10:00AM   22    Organized Crime in your career happen at a later point after

10:00AM   23    that interview?

10:00AM   24    A.  Yes.

10:00AM   25    Q.  You actually went to another country and got some

USA v Bongiovanni - Ryan - Tripi/Direct - 9710/24

13

10:00AM    1    training in Italian Organized Crime after that; is that

10:00AM    2    right?

10:00AM    3    A.  Yes, that's correct.

10:00AM    4    Q.  At that point, did you know to ask any questions about

10:00AM    5    Mike Masecchia or Lou Selva?

10:00AM    6    A.  No.

10:00AM    7    Q.  You had no idea about them, right?

10:00AM    8    A.  No.

10:00AM    9    Q.  I'd like to fast forward in time from February of 2018 to

10:00AM    10   July 20th, 2018.  Moving to July 20th, 2018, were you invited

10:00AM    11   to another proffered interview of Ron Serio at the U.S.

10:00AM    12   Attorney's Office?

10:00AM    13   A.  Yes.

10:00AM    14   Q.  Who else -- to the best of your recollection, who else

10:01AM    15   was present for that interview?

10:01AM    16   A.  DEA Special Agent Anthony Casullo, HSI Special Agent Greg

10:01AM    17   Mango, and a Buffalo Police Department detective named Mike

10:01AM    18   Maiola.  Greg and Mike were task force officers with FBI Safe

10:01AM    19   Streets.

10:01AM    20   Q.  So even though Greg Mango is a Homeland Security special

10:01AM    21   agent like you, he was on an FBI task force?

10:01AM    22   A.  Yes.

10:01AM    23   Q.  And even though Mike Maiola was a Buffalo police

10:01AM    24   detective, he was on an FBI task force?

10:01AM    25   A.  Yes.

10:01AM   1   Q.  Okay.  At that point, did the focus of the topics that

10:01AM   2   you wanted to question Mr. Serio about shifted -- shift

10:01AM   3   somewhat?

10:01AM   4   A.  Yes.

10:01AM   5   Q.  And had you been also consulting with the U.S. Attorney's

10:01AM   6   Office regarding topics to cover during the proffer?

10:01AM   7   A.  Yes, we had.

10:01AM   8   Q.  At that point, what was -- how did -- describe for the

10:02AM   9   jury how the focus of the proffer interview of Mr. Serio

10:02AM  10   shifted from Jarrett Guy out in Vancouver, Canada to other

10:02AM  11   topics?

10:02AM  12   A.  We wanted to spend more effort on identifying Mr. Serio's

10:02AM  13   Buffalo distribution network.  And then also Special Agent

10:02AM  14   Mango had recently concluded an investigation of a motorcycle

10:02AM  15   gang called the Kingsmen.  The president went to trial, was

10:02AM  16   convicted.

10:02AM  17       Anyway, he had learned in that investigation that there

10:02AM  18   was some intersection between the Kingsmen, the Outlaws,

10:02AM  19   which are another motorcycle gang, and then Pharaoh's

10:02AM  20   Gentlemen's Club, which is owned by Peter Gerace.

10:02AM  21   Q.  And by that point in time, had you developed an awareness

10:02AM  22   that Ron Serio had a connection to Anthony Gerace?

10:02AM  23   A.  Yes.

10:03AM  24   Q.  What had you learned just briefly and generally about

10:03AM  25   Anthony Gerace's connection to Ron Serio by that point?

10:03AM   1   A.   That -- that the day the FBI had arrested Ron Serio, it

10:03AM   2   was an Erie County detective that was working with them

10:03AM   3   watched Anthony Gerace go in and then come out of Ron Serio's

10:03AM   4   house on Lebrun after a short time.  They followed him away,

10:03AM   5   did a traffic stop, and found some of those counterfeit

10:03AM   6   oxycodone pills.

10:03AM   7   Q.   And was that a detective that you had worked with and

10:03AM   8   known named Adam Day?

10:03AM   9   A.   Yes.

10:03AM  10   Q.   And he had told you about that?

10:03AM  11   A.   Yes.

10:03AM  12   Q.   So with that background, was the focus of that proffer

10:03AM  13   going to be Pharaoh's, Peter Gerace, Anthony Gerace, and

10:03AM  14   connections, if any, to Italian Organized Crime?

10:03AM  15   A.   Yes.

10:03AM  16   Q.   Did you also know that Peter and Anthony Gerace were the

10:03AM  17   grandsons of Joseph Todaro Sr.?

10:04AM  18   A.   Yes.

10:04AM  19   Q.   And were you aware of his reputation in the law

10:04AM  20   enforcement community?

10:04AM  21   A.   By that point, I was, yes.

10:04AM  22   Q.   And what was that reputation of Todaro Sr. by that point?

10:04AM  23   A.   That he was the head of the organized crime in Buffalo,

10:04AM  24   Italian Organized Crime.

10:04AM  25   Q.   By that point he was deceased, but that had been his

10:04AM    1    reputation?

10:04AM    2    A.   Right.

10:04AM    3    Q.   And was Mr. Serio represented by counsel during the

10:04AM    4    interview?

10:04AM    5    A.   Yes.

10:04AM    6    Q.   And who was that?

10:04AM    7    A.   Herbert Greenman.

10:04AM    8    Q.   When you started asking -- did -- did you ask a lot of

10:04AM    9    the questions in the proffer interview?

10:04AM    10   A.   I did.

10:04AM    11   Q.   When you started asking questions on these topics to

10:04AM    12   Mr. Serio, did you notice a -- a demeanor or any change in

10:04AM    13   his behavior from your prior proffer?

10:04AM    14   A.   He didn't want to answer the questions about Buffalo.

10:04AM    15   Q.   To put it simply, did he seem to get more tightlipped?

10:04AM    16   A.   Yes.

10:04AM    17   Q.   Did he look more uncomfortable?

10:05AM    18   A.   He was very uncomfortable.

10:05AM    19   Q.   How did you interpret the feedback you were observing

10:05AM    20   from Mr. Serio?  How did that affect your questioning?

10:05AM    21   A.   It led me to think that we were -- I was asking the right

10:05AM    22   kind of questions, and then also to ask more questions about

10:05AM    23   those areas to see if I could get him to provide some more

10:05AM    24   information.

10:05AM    25   Q.   When you walked into that proffer interview that day, or

10:05AM    1    at any time before that proffer, were you intent upon

10:05AM    2    investigating this defendant, Joseph Bongiovanni, a special

10:05AM    3    agent who was active in the DEA at that point?

10:05AM    4    A.  No.  I had not ever considered anything like that.

10:05AM    5    Q.  Did something happen in that proffer that -- that changed

10:05AM    6    your focus?

10:05AM    7    A.  Yes.

10:05AM    8    Q.  Without getting into the specifics about what Mr. Serio

10:05AM    9    said, did something he said cause you to ask a specific

10:06AM    10   question about Anthony and Peter Gerace?

10:06AM    11   A.  Yes.

10:06AM    12   Q.  Did you ask him, Mr. Serio, what it meant for someone to

10:06AM    13   be connected?

10:06AM    14   A.  Yes.  It was a word that he had used to describe them.

10:06AM    15   And then I started to press him on what he meant when he said

10:06AM    16   that word.  And then I asked him the same question several

10:06AM    17   times in a row, "What does it mean to be connected?"

10:06AM    18   Q.  And -- and on that line of questioning with regard to

10:06AM    19   Peter and Anthony Gerace being connected, is that when you

10:06AM    20   really started to notice Mr. Serio's demeanor shifting?

10:06AM    21   A.  Yes.

10:06AM    22   Q.  How would you characterize his demeanor?

10:06AM    23   A.  Nervous, almost to the point of panic.

10:06AM    24   Q.  As you continued down those line of questions about

10:07AM    25   Anthony and Peter Gerace being connected, did Mr. Serio say

10:07AM  1   something that changed your investigation in the direction

10:07AM  2   and focus of it for the next several years?

10:07AM  3   A.   Yes.

10:07AM  4   Q.   Whose name did Mr. Serio utter that changed your focus?

10:07AM  5   A.   Mr. Bongiovanni.

10:07AM  6   Q.   In particular, did Mr. Serio indicate that

10:07AM  7   Mr. Bongiovanni had provided information about informants to

10:07AM  8   Anthony Gerace?

10:07AM  9   A.   Yes.

10:07AM  10  Q.   Did he name those informants?

10:07AM  11  A.   He did.

10:07AM  12  Q.   Were the names R.K. and T.S.?

10:07AM  13  A.   Yes.

10:07AM  14  Q.   Now at that point did you know whether R.K. or T.S. were

10:07AM  15  in fact DEA informants?

10:07AM  16  A.   No, I had no idea.

10:07AM  17  Q.   So this was going to take some investigation?

10:07AM  18  A.   Yes.

10:07AM  19  Q.   Was this a lengthy proffer interview?

10:07AM  20  A.   Several hours by the time we were done.

10:07AM  21  Q.   At the conclusion of the interview when -- did Mr. Serio

10:08AM  22  and his attorney, Mr. Greenman, leave?

10:08AM  23  A.   Yes.

10:08AM  24  Q.   Was there a discussion had at that point between you, the

10:08AM  25  other investigators, and the prosecutors as to how to handle

10:08AM  1    the information that was just discussed by Mr. Serio --

10:08AM  2    A.  Yes.

10:08AM  3    Q.  -- as it relates to Mr. Bongiovanni, in particular?

10:08AM  4    A.  Yes.

10:08AM  5    Q.  What determination was made as to how to handle the

10:08AM  6    information and -- and how the investigation would move going

10:08AM  7    forward?

10:08AM  8    A.  So, the -- we had a couple issues that we had to handle.

10:08AM  9        The first was how to handle the written report for the

10:08AM  10   interview.  I didn't want to create a DEA report of

10:08AM  11   investigation that included the allegation against

10:08AM  12   Mr. Bongiovanni, simply because those reports are queriable

10:08AM  13   by everyone who has access to the DEA system.

10:08AM  14       So, the determination was made to omit that information

10:08AM  15   from the DEA report.  I wrote a separate HSI report of

10:09AM  16   investigation that included the allegation.  Within the HSI

10:09AM  17   system, I had the ability to limit by name who could see that

10:09AM  18   report.  So I was able to limit that to my immediate

10:09AM  19   supervisor and then Greg Mango who was there in the room when

10:09AM  20   it was said.

10:09AM  21       It was done to protect Mr. Bongiovanni's reputation in

10:09AM  22   the event the allegation was false.  And the next

10:09AM  23   determination that was made was that we needed to immediately

10:09AM  24   brief the DEA chain of command about what was said.

10:09AM  25   Q.  Was it also done, I think you mentioned earlier, and is

10:09AM  1  maybe implicit in your answer, but you indicated to not

10:09AM  2  include the information that Mr. Serio provided about

10:09AM  3  Mr. Bongiovanni in the DEA reports because you said it was

10:09AM  4  queriable by anyone in DEA; what did you mean by that?

10:09AM  5  A.  There's an electronic case management system the DEA used

10:09AM  6  at the time.  I don't know if it's changed.  But somebody

10:10AM  7  from another office, someone else in the DEA office in

10:10AM  8  Buffalo or in the DEA group in Buffalo could find that report

10:10AM  9  and read it, and we didn't want to broadcast that allegation

10:10AM  10  to all of DEA in the event it was false.

10:10AM  11  Q.  Did you also -- were you also concerned about keeping the

10:10AM  12  security of the investigation that would commence under

10:10AM  13  wraps?

10:10AM  14  A.  Yes.

10:10AM  15  Q.  Was the information handled on a need-to-know basis?

10:10AM  16  A.  It was.

10:10AM  17  Q.  Did it include a small number of investigators?

10:10AM  18  A.  Yes.

10:10AM  19  Q.  Did it include a small number of prosecutors?

10:10AM  20  A.  Yes, as small as we could keep it.

10:10AM  21  Q.  And your direct supervisor as well as the U.S. Attorney

10:10AM  22  and the First Assistant U.S. Attorney at the time?

10:10AM  23  A.  Yes.

10:10AM  24  Q.  Was one complicating factor the fact that the defendant

10:10AM  25  was still an active DEA agent working cases in the Buffalo

10:11AM  1   area?

10:11AM  2   A.  Yes.

10:11AM  3   Q.  Someone who could visit the U.S. Attorney's Office and

10:11AM  4   walk through the hallways with other prosecutors?

10:11AM  5   A.  Yes.

10:11AM  6   Q.  Did that create some sort of time pressure for the

10:11AM  7   investigation as well?

10:11AM  8   A.  Yes, it did.

10:11AM  9   Q.  A short time after that, on or about August 1st, 2018,

10:11AM  10  did you become aware that DEA Special Agent Anthony Casullo,

10:11AM  11  subsequent to the Ron Serio proffer interview, disclosed some

10:11AM  12  race-related comments that he had -- he had heard

10:11AM  13  Mr. Bongiovanni make directly to him?

10:11AM  14  A.  Yes.

10:11AM  15  Q.  Did you become aware that those comments were reported by

10:11AM  16  Mr. Casullo to his management?

10:11AM  17  A.  Yes.

10:11AM  18  Q.  How, if at all, did Mr. Casullo, who was part of this

10:12AM  19  original Serio proffer, how did that impact his role moving

10:12AM  20  forward in the investigation?

10:12AM  21  A.  It -- because he was turning into a witness or turned

10:12AM  22  into a witness at that point, and because the allegation

10:12AM  23  involved potential misconduct by a DEA employee, the decision

10:12AM  24  was made to remove him from the investigative team.

10:12AM  25  Q.  So Mr. Casullo became a fact witness, but he was no

10:12AM    1   longer an investigator in the -- in the case; is that right?

10:12AM    2   A.  That's correct.

10:12AM    3   Q.  Over time, did you step -- you had -- you had mentioned

10:12AM    4   earlier that you were a DEA task force officer.  As time

10:12AM    5   moves forward, did you stop -- stop going to DEA?

10:12AM    6   A.  Yeah.  Probably by the end of 2018 I didn't go to DEA

10:12AM    7   anymore.

10:12AM    8   Q.  So within a couple of months or so?

10:12AM    9   A.  Yeah.

10:12AM   10   Q.  I didn't hear that?

10:12AM   11   A.  Yes.

10:12AM   12   Q.  Shortly after Mr. Casullo reported the race-related

10:13AM   13   statements by Mr. Bongiovanni, did Department of Justice

10:13AM   14   Office of Inspector General join the investigation?

10:13AM   15   A.  Yes.

10:13AM   16   Q.  Who was the special agent from DOJ, OIG?  That's the "for

10:13AM   17   short," right?

10:13AM   18   A.  Yes.

10:13AM   19   Q.  Who was the special agent assigned?

10:13AM   20   A.  David Carpenter.

10:13AM   21   Q.  Were efforts made to conceal the investigative details of

10:13AM   22   this investigation from broader members of the DEA and -- and

10:13AM   23   the law enforcement community?

10:13AM   24   A.  Yes.

10:13AM   25   Q.  Is that in large part for the reasons you've already

10:13AM  1   mentioned?

10:13AM  2   A.  Yes, but primarily for the security of the investigation,

10:13AM  3   the information in the investigation.  But then again, also

10:13AM  4   to just -- we weren't going to waive that allegation around

10:13AM  5   town either.

10:13AM  6   Q.  After -- after Mr. Serio's proffer and after August 1st,

10:14AM  7   2018, just to put a final point on this question, did Mr.

10:14AM  8   Casullo -- Special Agent Casullo have any decision-making

10:14AM  9   authority in the investigation of Defendant Bongiovanni?

10:14AM  10  A.  No.

10:14AM  11  Q.  Did he have any decision-making authority in the

10:14AM  12  investigation of Peter Gerace?

10:14AM  13  A.  No.

10:14AM  14  Q.  Was he involved in any of the day-to-day aspects of those

10:14AM  15  investigations?

10:14AM  16  A.  No.

10:14AM  17  Q.  Were you the lead case agent?

10:14AM  18  A.  Yes.

10:14AM  19  Q.  Fast forward from late July, early August 2019 -- sorry,

10:14AM  20  2018, I want to make sure I got my dates right, the proffer

10:15AM  21  was July 20th, 2018 and the race-related statements were

10:15AM  22  reported August 1st, 2018, correct?

10:15AM  23  A.  Yes.

10:15AM  24  Q.  Fast forwarding to January 1st, 2019, did you -- did

10:15AM  25  there come a time when you learned that Michael Sinatra's

| | | |
|---|---|---|
| 10:15AM | 1 | residence was burglarized? |
| 10:15AM | 2 | A.  Yes. |
| 10:15AM | 3 | Q.  Now, between July of 2018 and January of 2019, had you |
| 10:15AM | 4 | begun investigating and looking into potential associates of |
| 10:15AM | 5 | Mr. Bongiovanni and others? |
| 10:15AM | 6 | A.  Yes. |
| 10:15AM | 7 | Q.  Had you basically been working from the moment you heard |
| 10:15AM | 8 | the information Mr. Serio provided to work towards seeing |
| 10:15AM | 9 | where that would go? |
| 10:15AM | 10 | A.  Yes. |
| 10:15AM | 11 | Q.  When you learned of Mr. Sinatra's house being |
| 10:15AM | 12 | burglarized, did there come a point where you were made aware |
| 10:15AM | 13 | of comments the defendant made to another member of law |
| 10:16AM | 14 | enforcement regarding the Sinatra burglary? |
| 10:16AM | 15 | A.  Yes. |
| 10:16AM | 16 | Q.  Without telling us the comments that that the defendant |
| 10:16AM | 17 | made to another person, who was that member of law |
| 10:16AM | 18 | enforcement that the defendant made some comments to? |
| 10:16AM | 19 | A.  Detective Tom Oswald. |
| 10:16AM | 20 | Q.  Is he a Town of Tonawanda Police narcotics detective? |
| 10:16AM | 21 | A.  He was at the time.  He's retired now, I think. |
| 10:16AM | 22 | Q.  And the way that Mr. Bongiovanni's comments made their |
| 10:16AM | 23 | way to you, did -- was it your understanding that Mr. Oswald |
| 10:16AM | 24 | told a colleague of his, a Detective Jeff Campanella? |
| 10:16AM | 25 | A.  Yes. |

10:16AM  1  Q.  And did Detective Jeff Campanella relay the information

10:16AM  2  to you?

10:16AM  3  A.  Yes.

10:16AM  4  Q.  After you learned of things that Mr. Bongiovanni said to

10:16AM  5  Oswald, did -- did you and others at HSI interview Detective

10:16AM  6  Thomas Oswald?

10:17AM  7  A.  Yes.

10:17AM  8  Q.  At that point when you had learned about Mr. Sinatra's

10:17AM  9  burglary, did you start investigating names of people who you

10:17AM  10  understood to be involved in burglarizing Mr. Sinatra?

10:17AM  11  A.  Yes.

10:17AM  12  Q.  By that point, did you believe it was a targeted

10:17AM  13  drug-related burglary?

10:17AM  14  A.  Yes.

10:17AM  15  Q.  Ultimately, did you and another special agent with HSI,

10:17AM  16  Marilyn Halliday, get to the point where you can arrest --

10:17AM  17  you were able to arrest two individuals who were involved

10:17AM  18  with that burglary?

10:17AM  19  A.  Yes.

10:17AM  20  Q.  Who were those two individuals?

10:17AM  21  A.  John McDonald and Ronald Rowles.

10:17AM  22  Q.  Eventually, were -- were they both charged federally?

10:18AM  23  A.  Yes.

10:18AM  24  Q.  Eventually, did Mr. McDonald plead guilty and agree to

10:18AM  25  cooperate?

10:18AM 1    A.  Yes.

10:18AM 2    Q.  Did he sit for several interviews?

10:18AM 3    A.  He did.

10:18AM 4    Q.  A couple weeks after you learned of -- a couple weeks

10:18AM 5    after you learned of the defendant's statements to Detective

10:18AM 6    Oswald, did you get to the point on or about January 28th,

10:18AM 7    2019, where HSI was able to execute two federal search

10:18AM 8    warrants related to this investigation?

10:18AM 9    A.  Yes.

10:18AM 10   Q.  Who were the targets of those federal search warrants?

10:18AM 11   A.  Anthony Gerace and Michael Sinatra.

10:18AM 12   Q.  So it's fair to say roughly within six months of

10:18AM 13   proffering Ron Serio, and you commencing this -- this -- this

10:18AM 14   investigation, you were able to do search warrants at Anthony

10:19AM 15   Gerace and Michael Sinatra's house?

10:19AM 16   A.  Yes.

10:19AM 17   Q.  Where was Anthony Gerace's residence?

10:19AM 18   A.  In Clarence Center, 9070 Michael Douglas Drive.

10:19AM 19   Q.  Generally, what did that search warrant permit you to

10:19AM 20   search for?

10:19AM 21   A.  Drugs, other evidence of drug trafficking.  Firearms,

10:19AM 22   currency.

10:19AM 23   Q.  Evidence --

10:19AM 24   A.  Books of records.

10:19AM 25   Q.  Evidence of drug conspiracy?

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

10:19AM  1   A.  Yes.

10:19AM  2   Q.  Did you say firearm evidence as well?

10:19AM  3   A.  I did.

10:19AM  4   Q.  Now, previously, had you been working towards obtaining a

10:19AM  5   search warrant for Anthony Gerace's prior residence at 2130

10:19AM  6   Kensington in Amherst, New York?

10:19AM  7   A.  Yes.

10:19AM  8   Q.  Had you enlisted the Amherst Police Department to provide

10:19AM  9   you some assistance in that investigation?

10:19AM  10  A.  Yes.

10:19AM  11  Q.  And specifically, did you coordinate with JoAnn DiNoto?

10:19AM  12  A.  I did.

10:19AM  13  Q.  What did they help you with?

10:19AM  14  A.  A trash pull.

10:19AM  15  Q.  And what was the purpose of trying a trash pull at

10:19AM  16  Anthony Gerace's residence when he lived at 2130 Kensington?

10:20AM  17  A.  Just to see if there was anything in the household

10:20AM  18  garbage that would indicate drug trafficking or any other

10:20AM  19  criminal activity.

10:20AM  20  Q.  And, in fact, did they find evidence related to marijuana

10:20AM  21  packaging in the -- in his garbage?

10:20AM  22  A.  Yes.

10:20AM  23  Q.  Did you include that information in your search warrant

10:20AM  24  application?

10:20AM  25  A.  Yes.

10:20AM    1    Q.  Did it help you get a search warrant even though he moved

10:20AM    2    to a new residence?

10:20AM    3    A.  It did.

10:20AM    4    Q.  When JoAnn DiNoto spoke to you about helping as it

10:20AM    5    related to Anthony Gerace, did you tell her, nah, I got it, I

10:20AM    6    don't want your help?

10:20AM    7    A.  No.

10:20AM    8    Q.  Did you blow her off?

10:20AM    9    A.  No.

10:20AM    10   Q.  But ultimately, you didn't search 2130 Kensington because

10:20AM    11   right around the time you were about to ask for a search

10:20AM    12   warrant, Anthony moved?

10:20AM    13   A.  That's correct.

10:20AM    14   Q.  How did you learn he was moving?

10:20AM    15   A.  I was -- went to drive by the house to take a picture of

10:20AM    16   the front of the house for the warrant application and there

10:21AM    17   was a moving truck in the driveway.

10:21AM    18   Q.  Did you decide to wait?

10:21AM    19   A.  Decided to wait.

10:21AM    20   Q.  And turning to Michael Sinatra for a moment, where was

10:21AM    21   his residence that was searched on January 28th, 2019?

10:21AM    22   A.  2802 Colvin Boulevard in the Town of Tonawanda.

10:21AM    23   Q.  Now as it relates to the Anthony Gerace search warrant,

10:21AM    24   were you in charge at that location?

10:21AM    25   A.  At Anthony's, yes.

10:21AM  1    Q.  And as to the Michael Sinatra location at 2802 Colvin

10:21AM  2    Boulevard, was your co-case agent Marilyn Halliday, the case

10:21AM  3    agent in charge on that scene?

10:21AM  4    A.  Yes.

10:21AM  5    Q.  Generally what did the Michael Sinatra search warrant

10:21AM  6    permit HSI to search for?

10:21AM  7    A.  The same types of items.  Evidence of drug conspiracy,

10:21AM  8    drug trafficking, books, records, firearms, currency.

10:21AM  9    Q.  Were the search warrants at both Anthony Gerace's

10:21AM  10   residence and Michael Gerace's (sic) residence executed

10:21AM  11   simultaneously?

10:21AM  12   A.  Yes.

10:21AM  13   Q.  Explain for the jury why the two warrants would be

10:22AM  14   executed simultaneously.

10:22AM  15   A.  So we had seen in the phone records in the aftermath of

10:22AM  16   the burglary that New Year's that Michael Sinatra and Anthony

10:22AM  17   Gerace were on the phone a lot.  That there was -- seemed

10:22AM  18   like that was a relationship there.  The investigation

10:22AM  19   indicated that also.

10:22AM  20       So, to prevent one from being able to tip the other off

10:22AM  21   that we were out executing search warrants that morning, just

10:22AM  22   do them both at the same time, prevents one from warning the

10:22AM  23   other.

10:22AM  24   Q.  Again, were you making efforts to keep these prongs of

10:22AM  25   the investigation as limited as you -- as possible?

10:22AM    1    A.  Yes.

10:22AM    2    Q.  By that point in time, did you believe both Mr. Gerace

10:22AM    3    and Mr. Sinatra had a nexus to the defendant?

10:23AM    4    A.  Yes.

10:23AM    5    Q.  At Anthony Gerace's house, can you describe the manner in

10:23AM    6    which the search warrant was executed?  So just go through

10:23AM    7    the process of entry and then the steps that occurred.

10:23AM    8    A.  Yes.  So the initial entry was done by an HSI tactical

10:23AM    9    team.  They go through and they're searching the house for

10:23AM    10    people.  It's a process we call clearing.  And once they

10:23AM    11    determine -- once they've found all the people that are in

10:23AM    12    the house, in this case it was Anthony, his girlfriend and

10:23AM    13    their child, and have those people secured, they're in a

10:23AM    14    secure place, the next step is to photograph the residence.

10:23AM    15    I think that morning we ran a drug dog through the

10:23AM    16    residence, so a K-9 unit that can detect controlled

10:23AM    17    substances.

10:23AM    18    And then after photographs were done and that's done,

10:24AM    19    search teams are assigned, the rooms were all identified, and

10:24AM    20    we began searching the house in pairs.

10:24AM    21    Q.  What's the purpose of photographing things in the house?

10:24AM    22    A.  To document the way we found the house.

10:24AM    23    Q.  As the lead case agent on that search warrant, did you

10:24AM    24    observe and review all the evidence that was collected at the

10:24AM    25    scene?

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

10:24AM   1   A.   Yes.

10:24AM   2   Q.   What evidence did you observe?

10:24AM   3   A.   There was firearms, vegetable -- so plant marijuana --

10:24AM   4   THC oil, vape cartridges, THC edible gummies.

10:24AM   5   Q.   Is THC the active ingredient in marijuana?

10:24AM   6   A.   Yes, I'm sorry, tetrahydrocannabinol.

10:24AM   7   Q.   Are these controlled substances federally?

10:24AM   8   A.   Schedule I controlled substances.

10:24AM   9   Q.   Okay.  Please continue.

10:24AM  10   A.   More currency.  There were some books and records

10:25AM  11   type-evidence.

10:25AM  12   Q.   Was there ammunition?

10:25AM  13   A.   There was.

10:25AM  14   Q.   When you say books and records, are you describing like a

10:25AM  15   ledger or a log of names?

10:25AM  16   A.   There was a ledger with names, it looked like a

10:25AM  17   Super Bowl Squares ledger.  And then when I say books and

10:25AM  18   records to, I also mean, you know, like a utility bill that

10:25AM  19   has the address and the name of the person to show who -- who

10:25AM  20   lives in the house, those types of things.

10:25AM  21   Q.   And did you mention there were THC edibles?

10:25AM  22   A.   Yes.

10:25AM  23   Q.   I might have -- with respect to that -- that ledger, that

10:25AM  24   logbook, is that something that gets seized in a -- in a

10:25AM  25   narcotics investigation to try to identify relationships

| | | |
|---|---|---|
| 10:25AM | 1 | among people? |
| 10:25AM | 2 | A.  Yes.  In a conspiracy investigation. |
| 10:25AM | 3 | Q.  I want to show you some photographs now, okay? |
| 10:25AM | 4 | A.  Okay. |
| 10:26AM | 5 | **MR. TRIPI:**  I'll just read into the record what I'm |
| 10:26AM | 6 | handing up, Your Honor, and then I'll hand them up. |
| 10:26AM | 7 | **BY MR. TRIPI:** |
| 10:26AM | 8 | Q.  So I'm going to hand you up Exhibit 72A-72, 72A-24, |
| 10:26AM | 9 | 72A-25, 72A-37, 72A-42, 72A-44, 72A-45, 72A-46, 72A-48, |
| 10:26AM | 10 | 72A-49, 72A-50, 72A-55, 72A-56, 72A-58, 72A-59, 72A-60, |
| 10:27AM | 11 | 72A-61, 72A-62, 72A-77, 72A-111, and 72A-112. |
| 10:27AM | 12 | I'm going to hand up all of those exhibits.  If you could |
| 10:27AM | 13 | just take a look and when you're done looking through them, |
| 10:27AM | 14 | look up at me. |
| 10:28AM | 15 | **BY MR. TRIPI:** |
| 10:28AM | 16 | Q.  Do you recognize each of those exhibits that I've handed |
| 10:28AM | 17 | up which I previously read into the record? |
| 10:28AM | 18 | A.  Yes. |
| 10:28AM | 19 | Q.  Do those fairly and accurately depict the location of |
| 10:29AM | 20 | Anthony Gerace's residence as well as the items you observed |
| 10:29AM | 21 | and that were seized during the search of Anthony Gerace's |
| 10:29AM | 22 | residence on January 28th, 2019? |
| 10:29AM | 23 | A.  Yes, they do. |
| 10:29AM | 24 | **MR. TRIPI:**  The government offers those exhibits as |
| 10:29AM | 25 | I've read them into the record, Your Honor. |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

| | | |
|---|---|---|
| 10:29AM | 1 | **MR. MacKAY:**  No objection, Your Honor. |
| 10:29AM | 2 | **THE COURT:**  They are all received without objection. |
| 10:29AM | 3 | **MR. TRIPI:**  Thank you. |
| 10:29AM | 4 | **(GOV Exhibits 72A-72, 72A-24, 72A-25, 72A-37, 72A-42, 72A-44,** |
| 10:29AM | 5 | **72A-45, 72A-46, 72A-48, 72A-49, 72A-50, 72A-55, 72A-56,** |
| 10:29AM | 6 | **72A-58, 72A-59, 72A-60, 72A-61, 72A-62, 72A-77, 72A-111, and** |
| 10:29AM | 7 | **72A-112 were received in evidence.)** |
| 10:29AM | 8 | **BY MR. TRIPI:** |
| 10:29AM | 9 | Q.  I'd like to go through these photos with you, okay? |
| 10:29AM | 10 | A.  Yes. |
| 10:29AM | 11 | **MR. TRIPI:**  Ms. Champoux, can we start and please |
| 10:29AM | 12 | pull up first 72A-72. |
| 10:29AM | 13 | **BY MR. TRIPI:** |
| 10:29AM | 14 | Q.  So, again, this is January 28th, 2019; is that right? |
| 10:29AM | 15 | A.  Yes. |
| 10:29AM | 16 | Q.  And what residence is that? |
| 10:29AM | 17 | A.  That's 9070 Michael Douglas Drive, Anthony's. |
| 10:29AM | 18 | Q.  That's in Clarence, New York? |
| 10:29AM | 19 | A.  Yes. |
| 10:29AM | 20 | Q.  And we have it looks to be like a typical Buffalo winter, |
| 10:29AM | 21 | right? |
| 10:30AM | 22 | A.  It was a cold day. |
| 10:30AM | 23 | Q.  Before I go through these photos further, just can you |
| 10:30AM | 24 | describe the your flow through the residence and what |
| 10:30AM | 25 | happened, just what you saw as you entered. |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

10:30AM    1    A.  Oh.  I -- well, I mean, I went inside -- I had

10:30AM    2    actually -- I had talked to members of the tactical team

10:30AM    3    outside before I went in.

10:30AM    4    Q.  Okay.

10:30AM    5    A.  And they were telling me some of the things that they had

10:30AM    6    observed while they were going through the house.

10:30AM    7    Q.  And then did you walk through those areas?

10:30AM    8    A.  Yes.

10:30AM    9    Q.  Okay.  And did you see the items that they had debriefed

10:30AM   10    you on?

10:30AM   11    A.  Yes.

10:30AM   12    Q.  And where was Mr. Gerace situated at that point, if you

10:30AM   13    recall?

10:30AM   14    A.  It was in the dining room, which is the -- the front

10:30AM   15    corner of the home to the right of the door as we're looking

10:30AM   16    at this picture.

10:30AM   17    Q.  Okay.  Did you make your way eventually down to the

10:30AM   18    basement area?

10:30AM   19    A.  Yes.

10:30AM   20    Q.  Okay.  I'm going to show you Exhibit 72A-24 next.

10:31AM   21        And can you tell the jury what they're looking at here.

10:31AM   22    A.  So that's a storage closet.  That was underneath the

10:31AM   23    basement stairs, you know, by the void by the stairs coming

10:31AM   24    down.

10:31AM   25        And those boxes were there, the black shiny plastic in

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

35

10:31AM  1    the top of that open box is the packaging for the THC oil

10:31AM  2    cartridges.

10:31AM  3    Q.  Can you circle it so the jury knows what you're

10:31AM  4    referencing.

10:31AM  5         **MR. TRIPI:**  May the record reflect that the witness

10:31AM  6    placed a temporary circle in the -- directly in the center of

10:31AM  7    Exhibit 72A-24.

10:31AM  8         **THE COURT:**  It does.

10:31AM  9         **MR. TRIPI:**  Thank you.

10:31AM  10        **BY MR. TRIPI:**

10:31AM  11   Q.  And what were in those other boxes, other items that you

10:31AM  12   just described as -- as items that's were seized?

10:31AM  13   A.  Yeah.  Firearms in those cases behind.  The gummies were

10:31AM  14   in there also.

10:32AM  15   Q.  When you say gummies?

10:32AM  16   A.  The THC gummies.

10:32AM  17   Q.  Let's move on to Exhibit 72A-25, please.

10:32AM  18        And is this a more focused view on some of the firearms

10:32AM  19   that were in the classes there?

10:32AM  20   A.  Yes.

10:32AM  21   Q.  Did you also make your way to Mr. Anthony Gerace's

10:32AM  22   bedroom?

10:32AM  23   A.  Yes.

10:32AM  24   Q.  In there, did you see evidence of currency as well as

10:32AM  25   firearm evidence in the bedroom area?

| | | |
|---|---|---|
| 10:32AM | 1 | A.  Yes.  There was currency in a drawer in the nightstand |
| 10:32AM | 2 | next to the bed.  And then in the closet in that bedroom, |
| 10:32AM | 3 | there were several firearms and then some more packaged |
| 10:32AM | 4 | currency. |
| 10:32AM | 5 | **MR. TRIPI:**  Okay.  If we can publish 72A-37, please. |
| 10:33AM | 6 | **BY MR. TRIPI:** |
| 10:33AM | 7 | Q.  Can you tell the jury what's depicted in this photo? |
| 10:33AM | 8 | A.  That's the nightstand drawer that I mentioned and the |
| 10:33AM | 9 | currency that was there. |
| 10:33AM | 10 | **MR. TRIPI:**  Can we move on to 72A-42. |
| 10:33AM | 11 | **BY MR. TRIPI:** |
| 10:33AM | 12 | Q.  What's depicted in that photo? |
| 10:33AM | 13 | A.  That's rifle ammunition. |
| 10:33AM | 14 | **MR. TRIPI:**  Go on to 72A-44, please. |
| 10:33AM | 15 | **BY MR. TRIPI:** |
| 10:33AM | 16 | Q.  And what's depicted in that photo? |
| 10:33AM | 17 | A.  That's an inside suit pocket of a coat that was hanging |
| 10:33AM | 18 | in the closet and that plastic bag had a couple pills in it. |
| 10:33AM | 19 | **MR. TRIPI:**  Let's go to 72A-45. |
| 10:33AM | 20 | **BY MR. TRIPI:** |
| 10:33AM | 21 | Q.  Is this a different men's coat in the closet? |
| 10:33AM | 22 | A.  Same closet.  And that, there's a syringe in that plastic |
| 10:34AM | 23 | wrapper and then the box says AndroTest 250, which is |
| 10:34AM | 24 | testosterone. |
| 10:34AM | 25 | Q.  So basically steroids? |

| | | |
|---|---|---|
| 10:34AM | 1 | A.  Um-hum. |
| 10:34AM | 2 | Q.  Is that yes? |
| 10:34AM | 3 | A.  Yes. |
| 10:34AM | 4 | **MR. TRIPI:**  Let's go to 72A-46. |
| 10:34AM | 5 | **BY MR. TRIPI:** |
| 10:34AM | 6 | Q.  What's depicted in that photo? |
| 10:34AM | 7 | A.  So that's a shelf in the closet, and that's the packaged |
| 10:34AM | 8 | currency that I mentioned before. |
| 10:34AM | 9 | Q.  Now, is there anything, based on your training and |
| 10:34AM | 10 | experience, significant about the manner in which these bills |
| 10:34AM | 11 | were packaged? |
| 10:34AM | 12 | A.  Yes.  That's how I have seen currency packaged many times |
| 10:34AM | 13 | during drug investigations. |
| 10:34AM | 14 | Q.  When you're dealing with sort of bulk currency? |
| 10:34AM | 15 | A.  Bulk currency. |
| 10:34AM | 16 | Q.  Was this vacuum sealed? |
| 10:34AM | 17 | A.  It was, if you zoom in. |
| 10:34AM | 18 | **MR. TRIPI:**  Ms. Champoux, can we zoom in on just the |
| 10:34AM | 19 | money, please? |
| 10:34AM | 20 | **THE WITNESS:**  So that way the kind of snakeskin look |
| 10:35AM | 21 | over the money, that's a bag, that vacuum-seal bag, similar to |
| 10:35AM | 22 | the way bulk marijuana is packaged. |
| 10:35AM | 23 | **MR. TRIPI:**  We can zoom out of that, Ms. Champoux. |
| 10:35AM | 24 | Thank you. |
| 10:35AM | 25 | Can we please publish Exhibit 72A-48. |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

38

10:35AM  1          **BY MR. TRIPI:**

10:35AM  2    Q.  Describe what is depicted in that photo.

10:35AM  3    A.  That's a handgun that was in that closet in the upstairs

10:35AM  4    bedroom.

10:35AM  5    Q.  Does that also have ammunition in a magazine there?

10:35AM  6    A.  Yes.

10:35AM  7          **MR. TRIPI:**  And let's go to 72A-49, please.

10:35AM  8          **BY MR. TRIPI:**

10:35AM  9    Q.  Tell the jury what's depicted in this photo.

10:35AM  10   A.  Still in that upstairs closet, that's another handgun

10:36AM  11   with a magazine and ammunition.

10:36AM  12         **MR. TRIPI:**  And let's go to 72A-50.

10:36AM  13         **BY MR. TRIPI:**

10:36AM  14   Q.  Is that another view of that handgun?

10:36AM  15   A.  I think it's a different one.  Can you go back?

10:36AM  16   Q.  Oh, I'm sorry.

10:36AM  17         **MR. TRIPI:**  Can we put 72A-49 and 50 next to each

10:36AM  18   other, Ms. Champoux?

10:36AM  19         **THE WITNESS:**  No, that's a different case and a

10:36AM  20   different handgun.

10:36AM  21         **MR. TRIPI:**  Okay.  Thank you.

10:36AM  22         Can we go to 72A-55.

10:36AM  23         **BY MR. TRIPI:**

10:36AM  24   Q.  And tell the jury what's depicted here.

10:36AM  25   A.  It's a -- it's a spiral notebook, and it's a list a names

| | | |
|---|---|---|
| 10:36AM | 1 | for Super Bowl squares. |
| 10:37AM | 2 | **MR. TRIPI:**  We're going to come back to that in just |
| 10:37AM | 3 | a moment. |
| 10:37AM | 4 | Can we go to 72A-56, please. |
| 10:37AM | 5 | **BY MR. TRIPI:** |
| 10:37AM | 6 | Q.  What do you see there? |
| 10:37AM | 7 | A.  It's the poster of the actual squares and appears to go |
| 10:37AM | 8 | with the list.  So it's for a Philadelphia Eagles/New England |
| 10:37AM | 9 | Patriots Super Bowl. |
| 10:37AM | 10 | Q.  Does that appear to be like a high stakes Super Bowl |
| 10:37AM | 11 | squares? |
| 10:37AM | 12 | A.  $10,000 a square -- or, no, what is it?  It's high |
| 10:37AM | 13 | stakes, for sure. |
| 10:37AM | 14 | **MR. TRIPI:**  Can we go to Exhibit 72A-58, please. |
| 10:37AM | 15 | **BY MR. TRIPI:** |
| 10:37AM | 16 | Q.  Tell the jury what's depicted in that photo. |
| 10:37AM | 17 | A.  The THC gummies.  The edible gummies. |
| 10:37AM | 18 | **MR. TRIPI:**  Let's go to 72A-59. |
| 10:38AM | 19 | **BY MR. TRIPI:** |
| 10:38AM | 20 | Q.  Tell the jury what's depicted in that photo. |
| 10:38AM | 21 | A.  That's another picture of the edible THC gummies. |
| 10:38AM | 22 | Q.  And now we're looking at some of the boxes that were in |
| 10:38AM | 23 | the basement under the stairs? |
| 10:38AM | 24 | A.  Yes. |
| 10:38AM | 25 | Q.  These boxes have now been opened up for photographic |

10:38AM    1    purposes?

10:38AM    2    A.  Yes.

10:38AM    3          **MR. TRIPI:**  Let's go to 72A-60.

10:38AM    4          **BY MR. TRIPI:**

10:38AM    5    Q.  Tell the jury what's depicted in that photo.

10:38AM    6    A.  Tikka is a rifle manufacturer.  That's a box for a rifle.

10:38AM    7    We did collect a Tikka rifle from the house that day.

10:38AM    8          **MR. TRIPI:**  Let's show 72A-61, please.

10:38AM    9          **BY MR. TRIPI:**

10:38AM   10    Q.  Tell the jury what's depicted there.

10:38AM   11    A.  That's another view inside the boxes under the stairs and

10:38AM   12    this is -- one of the boxes with the THC vape cartridges

10:39AM   13    opened up to give a better view.

10:39AM   14          **MR. TRIPI:**  Let's move on to 72A-62.

10:39AM   15          **BY MR. TRIPI:**

10:39AM   16    Q.  Tell the jury what's depicted there.

10:39AM   17    A.  Black duffle bag about the size of a hockey bag with

10:39AM   18    sealed packages of the vegetable marijuana.

10:39AM   19    Q.  And was this located under the stairs as well in the

10:39AM   20    basement?

10:39AM   21    A.  It was in the basement, yes.

10:39AM   22          **MR. TRIPI:**  Let's go to 72A-77, please.

10:39AM   23          **BY MR. TRIPI:**

10:39AM   24    Q.  Tell the jury what's depicted there.

10:39AM   25    A.  It's a Smith & Wesson AR-15-style rifle that was in the

| | | |
|---|---|---|
| 10:39AM | 1 | basement. |
| 10:39AM | 2 | Q.  So that was in proximity to the drug evidence in the |
| 10:39AM | 3 | basement? |
| 10:39AM | 4 | A.  Yes. |
| 10:39AM | 5 | Q.  So was that Tikka rifle? |
| 10:39AM | 6 | A.  I'm not -- I don't recall if the Tikka was one of the |
| 10:40AM | 7 | ones in the cases behind the marijuana or not. |
| 10:40AM | 8 | MR. TRIPI:  Let's pull up -- |
| 10:40AM | 9 | THE WITNESS:  I'd have to look at the picture again. |
| 10:40AM | 10 | MR. TRIPI:  Okay.  We'll move on.  Let's go to |
| 10:40AM | 11 | 72A-111, please. |
| 10:40AM | 12 | BY MR. TRIPI: |
| 10:40AM | 13 | Q.  Tell the jury what they're looking at here. |
| 10:40AM | 14 | A.  So this is when we're processing the evidence back at the |
| 10:40AM | 15 | HSI office, it's all the bags of the vegetable marijuana |
| 10:40AM | 16 | pulled out and arranged for a photograph. |
| 10:40AM | 17 | MR. TRIPI:  Can we put 72A-112 next to this, |
| 10:40AM | 18 | Ms. Champoux. |
| 10:40AM | 19 | THE WITNESS:  That's the -- the remaining that we |
| 10:40AM | 20 | weren't able to fit into the first photograph. |
| 10:40AM | 21 | BY MR. TRIPI: |
| 10:40AM | 22 | Q.  Based on your experience, did the -- the marijuana, the |
| 10:41AM | 23 | THC products that you found in the residence, did it have a |
| 10:41AM | 24 | considerable street value? |
| 10:41AM | 25 | A.  Yes. |

10:41AM   1   Q.  In summary, how many firearms were seized from Anthony

10:41AM   2   Gerace's residence?

10:41AM   3   A.  14.

10:41AM   4   Q.  How many rounds of ammunition were seized?

10:41AM   5   A.  562.

10:41AM   6   Q.  How many THC oil vape cartridges?

10:41AM   7   A.  991.

10:41AM   8   Q.  How many edible marijuana gummy packages?

10:41AM   9   A.  394.

10:41AM  10   Q.  How many kilograms of marijuana?

10:41AM  11   A.  7.9.

10:41AM  12   Q.  How many pills?

10:41AM  13   A.  Just a couple, two maybe.

10:41AM  14   Q.  Did that turn out to be Alprazolam?

10:41AM  15   A.  Yes, sir.

10:41AM  16   Q.  Is that a controlled substance?

10:41AM  17   A.  It is.

10:42AM  18        MR. TRIPI:  Your Honor, this is going to take a

10:42AM  19   moment to get some of this stuff ready.  Is it too early for

10:42AM  20   take a break?

10:42AM  21        THE COURT:  It is too early.  It's been less than an

10:42AM  22   hour, so --

10:42AM  23        MR. TRIPI:  Sorry about that.

10:42AM  24        Getting my exercise this morning, Your Honor.

10:42AM  25        Ms. Champoux, can we pull up Government Exhibit

10:43AM    1    72A-24 and 25 next to one another.

10:43AM    2            And for the record, I'm handing up Government

10:43AM    3    Exhibit 78-1 for the witness.

10:43AM    4            **BY MR. TRIPI:**

10:43AM    5    Q.   Take a moment to look at that.  Would you like gloves?

10:43AM    6    Are you okay?

10:43AM    7    A.   I'm okay.

10:43AM    8    Q.   You can stand up if you need to.

10:43AM    9            Starting with Exhibit 78-1, do you recognize that?

10:44AM    10   A.   Yes.

10:44AM    11   Q.   What do you recognize it to be?

10:44AM    12   A.   That's a box from the Anthony Gerace search warrant, one

10:44AM    13   of the boxes that was under the stairs containing the THC

10:44AM    14   vape oil cartridges.

10:44AM    15   Q.   Is that depicted in 72A-24 in the photo?

10:44AM    16   A.   Yes.

10:44AM    17   Q.   Other than labelling and markings related to production

10:44AM    18   here in court, is it in the same or substantially same

10:44AM    19   condition today as when it was recovered from Mr. Gerace's

10:44AM    20   residence?

10:44AM    21   A.   Yes.

10:44AM    22            **MR. TRIPI:**  Next I'm going to hand up 78-2,

10:44AM    23   Your Honor.

10:44AM    24            Handing up Exhibit 78-2 for the witness now.

          25

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

| | | |
|---|---|---|
| 10:45AM | 1 | **BY MR. TRIPI:** |
| 10:45AM | 2 | Q.  Do you recognize Government Exhibit 78-2? |
| 10:45AM | 3 | A.  Yes. |
| 10:45AM | 4 | Q.  What do you recognize it to be? |
| 10:45AM | 5 | A.  It's the second box from the photograph from under the |
| 10:45AM | 6 | stairs on the right-hand side. |
| 10:45AM | 7 | Q.  Some more THC cartridges? |
| 10:45AM | 8 | A.  Yes. |
| 10:45AM | 9 | Q.  Other than any labelling due to handling in court, is it |
| 10:45AM | 10 | in the same or substantially same condition today as when it |
| 10:45AM | 11 | was recovered from Anthony Gerace's residence January 28th, |
| 10:45AM | 12 | 2019? |
| 10:45AM | 13 | A.  Yes, it is. |
| 10:45AM | 14 | Q.  And a sample of these were sent to the lab, tested and |
| 10:46AM | 15 | confirmed to be THC? |
| 10:46AM | 16 | A.  Yes. |
| 10:46AM | 17 | **MR. TRIPI:**  The government offers Exhibit 78-1 and 2, |
| 10:46AM | 18 | Your Honor. |
| 10:46AM | 19 | **MR. MacKAY:**  No objection. |
| 10:46AM | 20 | **THE COURT:**  Received without objection. |
| 10:46AM | 21 | **(GOV Exhibits 78-1 and 78-2 were received in evidence.)** |
| 10:46AM | 22 | **MR. TRIPI:**  I'll do my best to publish to the jury |
| 10:46AM | 23 | without spilling them. |
| 10:46AM | 24 | **BY MR. TRIPI:** |
| 10:46AM | 25 | Q.  I don't think I asked you this yet.  Before I get to the |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

10:47AM  1  next exhibit, how much total currency was seized from Anthony

10:47AM  2  Gerace's residence?

10:47AM  3  A.  $103,360.

10:47AM  4       **MR. TRIPI:**  For the record, handing up Exhibit 79,

10:47AM  5  Your Honor.

10:47AM  6       **BY MR. TRIPI:**

10:47AM  7  Q.  Do you recognize Exhibit 79?

10:47AM  8  A.  Yes.

10:47AM  9       **MR. TRIPI:**  Ms. Champoux, can we pull up

10:47AM  10  Exhibit 72A-58 and 59 side by side.

10:48AM  11       72A-58 and 59 side by side.

10:48AM  12       **BY MR. TRIPI:**

10:48AM  13  Q.  While she's doing that, what do you recognize Exhibit 79

10:48AM  14  to be?

10:48AM  15  A.  The edible THC gummies we seized at Anthony Gerace's

10:48AM  16  house.

10:48AM  17  Q.  And again, a portion of those were tested and confirmed

10:48AM  18  to be THC?

10:48AM  19  A.  Yes.

10:48AM  20  Q.  Other than any changes due to handling for court

10:48AM  21  purposes, is it the same or substantially same condition

10:48AM  22  today as it was when it was seized from Anthony Gerace's

10:48AM  23  residence back on January 28th, 2019?

10:48AM  24  A.  Yes.

10:48AM  25       **MR. TRIPI:**  The government offers Exhibit 79,

| | | |
|---|---|---|
| 10:48AM | 1 | Your Honor. |
| 10:48AM | 2 | **MR. MacKAY:**  No objection. |
| 10:48AM | 3 | **THE COURT:**  Received without objection. |
| 10:48AM | 4 | **(GOV Exhibit 79 was received in evidence.)** |
| 10:48AM | 5 | **BY MR. TRIPI:** |
| 10:48AM | 6 | Q.  This is the 394 packages of edible marijuana gummies? |
| 10:48AM | 7 | A.  Yes. |
| 10:48AM | 8 | **MR. TRIPI:**  I'll publish it as best I can for the |
| 10:48AM | 9 | jury, Your Honor. |
| 10:49AM | 10 | **BY MR. TRIPI:** |
| 10:49AM | 11 | Q.  Do you want to hold one up for them so they can see one |
| 10:49AM | 12 | from there.  Turn it around. |
| 10:49AM | 13 | Does it have the amount of milligrams like right on the |
| 10:49AM | 14 | packaging of THC? |
| 10:49AM | 15 | A.  It does.  It says 400 milligrams THC.  Made in LA. |
| 10:49AM | 16 | Q.  Okay.  Can you put it down? |
| 10:49AM | 17 | Special Agent Ryan, where did you say the packaging label |
| 10:49AM | 18 | said it was made? |
| 10:49AM | 19 | A.  LA, Los Angeles. |
| 10:49AM | 20 | Q.  Los Angeles?  So California? |
| 10:49AM | 21 | A.  Yes. |
| 10:50AM | 22 | **MR. TRIPI:**  Could I have Exhibit 77, please. |
| 10:50AM | 23 | I almost threw it everywhere.  It's a lot lighter. |
| 10:50AM | 24 | Handing you Exhibit 77, please take a look at that. |
| 10:50AM | 25 | Exhibit 77. |

10:50AM   1          **BY MR. TRIPI:**

10:50AM   2    Q.   Do you recognize that?

10:50AM   3    A.   Yes.

10:50AM   4    Q.   What do you recognize it to be?

10:50AM   5    A.   It's the plant marijuana we seized from Anthony Gerace's

10:50AM   6    house.

10:50AM   7    Q.   How do you recognize it?

10:50AM   8    A.   From the evidence markings on the box, and then also the

10:50AM   9    markings on the bags.

10:50AM  10    Q.   Other than any changes due to handling in court, is it in

10:51AM  11    the same -- it's been taken out of the duffle bags; is that

10:51AM  12    fair to say?

10:51AM  13    A.   Taken out of the duffle bags and then this evidence tape

10:51AM  14    is here because we cut into the bags for sampling and then

10:51AM  15    sealed -- resealed them.

10:51AM  16          **MR. TRIPI:**  Ms. Champoux, while we're doing this, can

10:51AM  17    you put up 72A-111 and 112 next to each other.

10:51AM  18          **BY MR. TRIPI:**

10:51AM  19    Q.   And so a photograph of that day, you had taken it out of

10:51AM  20    the duffle bags as well; is that right?

10:51AM  21    A.   Yes.

10:51AM  22    Q.   Other than -- again, is it in the same or substantially

10:51AM  23    same condition today as the last time you observed it on the

10:51AM  24    day it was seized?

10:51AM  25    A.   Yes.

10:51AM   1          MR. TRIPI:  The government offers Exhibit 77

10:51AM   2   Your Honor.

10:51AM   3          MR. MacKAY:  No objection.

10:51AM   4          THE COURT:  Received without objection.

10:51AM   5          (GOV Exhibit 77 was received in evidence.)

10:51AM   6          MR. TRIPI:  Publishing for the jury, Your Honor.

10:52AM   7          I'm going to take one out of the box and -- I'm so

10:52AM   8   sorry.

10:52AM   9          JUROR:  That's okay.

10:52AM  10          MR. TRIPI:  Just one moment, please, Your Honor.

10:52AM  11          Ms. Champoux, can we pull up Government Exhibit

10:52AM  12   72A-55.

10:53AM  13          MR. MacKAY:  That's the ledger?

10:53AM  14          MR. TRIPI:  Yeah.

10:53AM  15          BY MR. TRIPI:

10:53AM  16   Q.  Handing you up exhibit 75, is that the ledger that was

10:53AM  17   seized that you referenced earlier that is depicted in

10:53AM  18   Exhibit 72A-55?

10:53AM  19   A.  Yes, it is.

10:53AM  20   Q.  How do you recognize it?

10:53AM  21   A.  I can see part of the ledger through the bag, here, and

10:53AM  22   then also from the markings on the bag.

10:53AM  23   Q.  Is that consistent with your case file numbers and all of

10:53AM  24   that?

10:53AM  25   A.  Yes.

10:53AM    1    Q.  Is that in the same or substantially same condition today

10:53AM    2    as the last time you observed it when it was seized?

10:53AM    3    A.  Yes.

10:53AM    4         MR. TRIPI:  The government offers Exhibit 75,

10:53AM    5    Your Honor.

10:53AM    6         MR. MacKAY:  No objection.

10:53AM    7         THE COURT:  Received without objection.

10:53AM    8         **(GOV Exhibit 75 was received in evidence.)**

10:53AM    9         MR. TRIPI:  Your Honor, I'm just going to remove the

10:53AM   10    actual exhibit from the paperwork and so I can display it.  I

10:53AM   11    think it will be easier to show it on the ELMO as opposed to

10:53AM   12    reading -- having the jury read it on an angle.  I'll just

10:53AM   13    take a moment to do that.

10:54AM   14         Do you have scissors up there?

10:54AM   15         AGENT BURNS:  Switchblade.

10:54AM   16         MR. TRIPI:  Oops.

10:54AM   17         AGENT BURNS:  I was opening it for you.

10:54AM   18         MR. TRIPI:  Having quite a morning, Your Honor.

10:54AM   19         If we can have the witness just open that for us.

10:55AM   20         BY MR. TRIPI:

10:55AM   21    Q.  Does it appear that one page fell out of the notebook due

10:55AM   22    to handling a moment ago?

10:55AM   23    A.  Yes.

10:55AM   24         MR. TRIPI:  Your Honor, I'm publishing Exhibit 75 on

10:55AM   25    the ELMO including the loose page that was depicted in the

| | | |
|---|---|---|
| 10:55AM | 1 | photo. |
| 10:55AM | 2 | **BY MR. TRIPI:** |
| 10:55AM | 3 | Q.  Okay.  I'd like to go through some of these names with |
| 10:55AM | 4 | you, okay? |
| 10:55AM | 5 | A.  Yes. |
| 10:55AM | 6 | Q.  Do you see entry number 6, Matt LoTempio? |
| 10:55AM | 7 | A.  Yes. |
| 10:55AM | 8 | Q.  Is that a name that you're familiar with through the |
| 10:55AM | 9 | investigation? |
| 10:55AM | 10 | A.  Yes. |
| 10:55AM | 11 | Q.  Is that an individual associated with Ron Serio? |
| 10:55AM | 12 | A.  Yes. |
| 10:55AM | 13 | Q.  Do you see entry number 10, Peter Gerace Jr.? |
| 10:55AM | 14 | A.  Yes. |
| 10:55AM | 15 | Q.  Is that Anthony's brother? |
| 10:55AM | 16 | A.  Yes. |
| 10:55AM | 17 | Q.  He's the owner of Pharaoh's Gentlemen's Club? |
| 10:56AM | 18 | A.  That's correct. |
| 10:56AM | 19 | Q.  Do you see entry number 14? |
| 10:56AM | 20 | A.  Yes. |
| 10:56AM | 21 | Q.  What name is that? |
| 10:56AM | 22 | A.  Wayne. |
| 10:56AM | 23 | Q.  Is there a Wayne Anderson involved in this case? |
| 10:56AM | 24 | A.  Yes. |
| 10:56AM | 25 | Q.  Is that actually that person Wayne Anderson the file |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

| | | |
|---|---|---|
| 10:56AM | 1 | title of DEA file C2-13-0026? |
| 10:56AM | 2 | A.  Yes, he is. |
| 10:56AM | 3 | Q.  15, we see Peter Gerace Jr. again? |
| 10:56AM | 4 | A.  Yes. |
| 10:56AM | 5 | Q.  18, we see Matt LoTempio again? |
| 10:56AM | 6 | A.  Yes. |
| 10:56AM | 7 | Q.  23, we see a Russell Jr.? |
| 10:56AM | 8 | A.  Yes. |
| 10:56AM | 9 | Q.  Was there a Russell Salvatore that came up in this case? |
| 10:56AM | 10 | A.  Yes. |
| 10:56AM | 11 | Q.  Number 26, do you see the name, Tom Napoli? |
| 10:56AM | 12 | A.  Yes. |
| 10:56AM | 13 | Q.  Who is that? |
| 10:56AM | 14 | A.  At one time was the defendant's brother-in-law. |
| 10:57AM | 15 | Q.  I'd like to look at the next row beginning at 34 now. |
| 10:57AM | 16 | Do you see a name at number 41?  Can you read that name? |
| 10:57AM | 17 | A.  Brent Phillips. |
| 10:57AM | 18 | Q.  And how about at number 42? |
| 10:57AM | 19 | A.  Peter Gerace Jr. again. |
| 10:57AM | 20 | Q.  Do you see number 53? |
| 10:57AM | 21 | A.  Yes.  It says Marcus. |
| 10:57AM | 22 | Q.  Is there a person named Marcus Black associated with |
| 10:57AM | 23 | Pharaoh's that came up in this case? |
| 10:57AM | 24 | A.  Yes. |
| 10:57AM | 25 | Q.  Now directing your attention to that last row. |

| 10:58AM | 1 | Second row down at the bottom there, do you see another |
| 10:58AM | 2 | entry for number 66, Wayne? |
| 10:58AM | 3 | A.  Yes. |
| 10:58AM | 4 | Q.  Turning to the next page now.  Do you see another list of |
| 10:58AM | 5 | three columns? |
| 10:58AM | 6 | A.  Yes, I do. |
| 10:58AM | 7 | Q.  On this page, do you see again entry number 6 for a Matt |
| 10:59AM | 8 | Lo? |
| 10:59AM | 9 | A.  Yes. |
| 10:59AM | 10 | Q.  Is there a Matt LoTempio associated with Ron Serio? |
| 10:59AM | 11 | A.  Yes. |
| 10:59AM | 12 | Q.  Entry number 8, read that name? |
| 10:59AM | 13 | A.  Ron Serio. |
| 10:59AM | 14 | Q.  Entry Number 9, there's another entry for Marcus; is that |
| 10:59AM | 15 | right? |
| 10:59AM | 16 | A.  Correct. |
| 10:59AM | 17 | Q.  Entry 10, is that Peter Gerace Jr.'s name? |
| 10:59AM | 18 | A.  Yes. |
| 10:59AM | 19 | Q.  Entry 14, is that Wayne? |
| 10:59AM | 20 | A.  Yes. |
| 10:59AM | 21 | Q.  Is that consistent with a Wayne Anderson who's part of |
| 10:59AM | 22 | this case? |
| 10:59AM | 23 | A.  Yes. |
| 10:59AM | 24 | Q.  And you know him to be connected to Anthony Gerace as |
| 10:59AM | 25 | well? |

| | | |
|---|---|---|
| 10:59AM | 1 | A.  Yes. |
| 10:59AM | 2 | Q.  Number 20, do you see Dave Oddo? |
| 10:59AM | 3 | A.  Yes. |
| 10:59AM | 4 | Q.  Do you see Dave Oddo's name entered again at Entry |
| 10:59AM | 5 | Number -- or Number 28? |
| 10:59AM | 6 | A.  Yes. |
| 10:59AM | 7 | Q.  Now, based on your review of the file C2-13-0026, Dave |
| 11:00AM | 8 | Oddo was one of the individuals that the defendant filled out |
| 11:00AM | 9 | a DEA-202 form adding him to the case on December 24th, 2012; |
| 11:00AM | 10 | is that right? |
| 11:00AM | 11 | A.  That's correct. |
| 11:00AM | 12 | Q.  Second row -- or second column, I apologize.  Do you see |
| 11:00AM | 13 | an entry again, Number 37, for Ron Serio? |
| 11:00AM | 14 | A.  Yes. |
| 11:00AM | 15 | Q.  Do you see another entry for Pete G. Jr.? |
| 11:00AM | 16 | A.  42, yes. |
| 11:00AM | 17 | Q.  Do you believe that to be Peter Gerace Jr.? |
| 11:00AM | 18 | A.  Yes. |
| 11:00AM | 19 | Q.  Do you see an entry number 53 for a Jordy Wolfson? |
| 11:00AM | 20 | A.  Yes. |
| 11:00AM | 21 | Q.  Is there a Jordan Wolfson you know to be associated with |
| 11:00AM | 22 | Kevin Myszka in this matter? |
| 11:00AM | 23 | A.  Yes. |
| 11:00AM | 24 | Q.  Number 54, Marcus again? |
| 11:00AM | 25 | A.  Yes. |

| 11:00AM | 1 | Q.  Number 60, Dave Oddo again? |
| 11:00AM | 2 | A.  Yes. |
| 11:01AM | 3 | Q.  Number 66, is that Wayne again? |
| 11:01AM | 4 | A.  It is. |
| 11:01AM | 5 | Q.  Who's at entry number 91? |
| 11:01AM | 6 | A.  I'm not able to see 91. |
| 11:01AM | 7 | Ron Serio. |
| 11:01AM | 8 | Q.  Publishing it one more time, there's an entry for number |
| 11:01AM | 9 | 86.  Do you see an name there? |
| 11:01AM | 10 | A.  Mike Sinatra. |
| 11:02AM | 11 | Q.  Now, earlier -- |
| 11:02AM | 12 | MR. TRIPI:  We can switch back to the computer now. |
| 11:02AM | 13 | Thank you very much. |
| 11:02AM | 14 | BY MR. TRIPI: |
| 11:02AM | 15 | Q.  Earlier you mentioned that Anthony Gerace's girlfriend |
| 11:02AM | 16 | was present at the search warrant? |
| 11:02AM | 17 | A.  Yes. |
| 11:02AM | 18 | Q.  What was her name or what is her name? |
| 11:02AM | 19 | A.  Lauren Seitz. |
| 11:02AM | 20 | Q.  And can you describe the scenario as it played out as you |
| 11:02AM | 21 | were -- withdrawn. |
| 11:02AM | 22 | Did you arrest Anthony Gerace? |
| 11:02AM | 23 | A.  Yes. |
| 11:02AM | 24 | Q.  Was he charged ultimately that day by -- by complaint? |
| 11:02AM | 25 | A.  Yes. |

11:02AM   1   Q.  As you were walking Anthony Gerace out of the residence,

11:02AM   2   did he -- did he direct his girlfriend to do something?

11:03AM   3   A.  Yes.

11:03AM   4   Q.  What did you hear Anthony Gerace say to Lauren?

11:03AM   5   A.  Call Peter.

11:03AM   6   Q.  Who did you understand the reference Peter to be of?

11:03AM   7   A.  His brother, Peter.

11:03AM   8   Q.  So after you seized 14 guns, 562 rounds of ammunition,

11:03AM   9   991 THC cartridges, 394 edible marijuana packages, 7.9 kilos

11:03AM  10   of marijuana and over $103,000, Anthony told Lauren to call

11:03AM  11   Peter?

11:03AM  12   A.  Yes.

11:03AM  13           MR. TRIPI:  Would you like to take a break now,

11:03AM  14   Your Honor.  I'm just moving to another area.  It's up to you.

11:03AM  15           THE COURT:  Okay.  Yeah, we can take a break now.

11:03AM  16           We'll take our morning break.  Remember my

11:03AM  17   instructions about not talking about the case even with each

11:03AM  18   and not making up your mind.

11:03AM  19           We'll see you back here in about 15 minutes.

11:04AM  20           (Jury excused at 11:04 a.m.)

11:04AM  21           THE COURT:  Anything before we break?

11:04AM  22           MR. TRIPI:  No, thank you, Your Honor.

11:04AM  23           THE COURT:  Anything?

11:04AM  24           MR. MacKAY:  No, Your Honor.

11:04AM  25           THE COURT:  Okay.  See you in a few minutes.

| | | |
|---|---|---|
| 11:04AM | 1 | **THE CLERK:** All rise. |
| 11:04AM | 2 | (Off the record at 11:04 a.m.) |
| 11:20AM | 3 | (Back on the record at 11:20 a.m.) |
| 11:20AM | 4 | (Jury not present.) |
| 11:20AM | 5 | **THE CLERK:** All rise. |
| 11:20AM | 6 | **THE COURT:** Please be seated. |
| 11:20AM | 7 | **THE CLERK:** We are back on the record for the |
| 11:20AM | 8 | continuation of the jury trial in case number 19-cr-227, |
| 11:21AM | 9 | United States of America versus Joseph Bongiovanni. |
| 11:21AM | 10 | All counsel and parties are present. |
| 11:21AM | 11 | **THE COURT:** Anything for the record before we resume? |
| 11:21AM | 12 | **MR. MacKAY:** No, Your Honor. |
| 11:21AM | 13 | **MR. TRIPI:** No, Your Honor. Thank you. |
| 11:21AM | 14 | **THE COURT:** Great. Let's bring them back, please, |
| 11:21AM | 15 | Pat. |
| 11:22AM | 16 | (Jury seated at 11:22 a.m.) |
| 11:22AM | 17 | **THE COURT:** The record will reflect all our jurors, |
| 11:22AM | 18 | again, are present. I remind the witness, he's still under |
| 11:22AM | 19 | oath. |
| 11:22AM | 20 | Mr. Tripi, you may continue. |
| 11:23AM | 21 | **MR. TRIPI:** Thank you, Your Honor. |
| 11:23AM | 22 | **BY MR. TRIPI:** |
| 11:23AM | 23 | Q. Special Agent Ryan -- or I should say Resident Agent in |
| 11:23AM | 24 | Charge Ryan, after that August 1st, 2018 reporting by Special |
| 11:23AM | 25 | Agent Casullo regarding the race-related statements as well |

11:23AM 1  as the proffer by Mr. Serio that had happened a couple weeks

11:23AM 2  earlier, when DOJ Office of Inspector General or DOJ OIG came

11:23AM 3  in to the case, was there a portion of the investigation

11:23AM 4  focused on those race-related statements as well as

11:23AM 5  Mr. Bongiovanni's relationship with Peter Gerace?

11:23AM 6  A.  Yes.

11:23AM 7  Q.  But you were working in tandem at that point?

11:23AM 8  A.  Yes.

11:23AM 9  Q.  As part of the investigation, did Department of Justice

11:23AM 10  Office of Inspector General acquire memoranda that the

11:23AM 11  defendant wrote to his DEA supervisors and submit it prior to

11:23AM 12  his retirement?

11:23AM 13  A.  Yes, they did.

11:23AM 14  Q.  As part of the investigation, were those made available

11:24AM 15  to you for review?

11:24AM 16  A.  Yes.

11:24AM 17  Q.  Was there a memo submitted by Defendant Bongiovanni to

11:24AM 18  his DEA management on November 1st, 2018?

11:24AM 19  A.  Yes.

11:24AM 20  Q.  Was there a memo submitted by the defendant to his DEA

11:24AM 21  management on December 10th, 2018?

11:24AM 22  A.  Yes.

11:24AM 23  Q.  Was there a memo submitted by the defendant to his

11:24AM 24  management on January 28th, 2019?

11:24AM 25  A.  Yes.

11:24AM   1   Q.  I'm going to hand you up Government Exhibits 97, 98, and

11:24AM   2   99.

11:26AM   3       Do you recognize Exhibits 97, 98 and 99 to be the memos

11:26AM   4   that I just referenced?

11:26AM   5   A.  Yes.

11:26AM   6   Q.  Do they fairly and accurately depict the memos that the

11:26AM   7   defendant submitted to his management and were acquired by

11:26AM   8   Department of Justice OIG and reviewed by you?

11:26AM   9   A.  Yes.

11:26AM  10       MR. TRIPI:  The government offers Government Exhibits

11:26AM  11   97, 98, and 99, Your Honor.

11:26AM  12       MR. MacKAY:  No objections.

11:26AM  13       THE COURT:  Received without objection.

11:26AM  14   **(GOV Exhibits 97, 98, and 99 were received in evidence.)**

11:26AM  15       MR. TRIPI:  Thank you.  I'm just going to take those

11:26AM  16   back.

11:26AM  17       I'd like to start with Exhibit Number 97.

11:26AM  18   Ms. Champoux, can we pull that one up.

11:26AM  19       BY MR. TRIPI:

11:26AM  20   Q.  I'd like to work through there with you, Special Agent

11:26AM  21   Ryan.  Can you read for the jury what the subject of this

11:27AM  22   memorandum is?

11:27AM  23   A.  Communication with Peter Gerace between June 30th and

11:27AM  24   October 27th, 2018.

11:27AM  25   Q.  And can you read for the jury the date of this

11:27AM    1    memorandum?

11:27AM    2    A.   November 1st, 2018.

11:27AM    3    Q.   Can you read who it was to?

11:27AM    4    A.   It's to Edward A. Orgon, Jr., the Resident Agent in

11:27AM    5    Charge in charge of the Buffalo Resident Office.

11:27AM    6    Q.   And can you read who it's to?

11:27AM    7    A.   Gregory R. Yensan, group supervisor, Buffalo Resident

11:27AM    8    Office.

11:27AM    9    Q.   And can you read who it's from?

11:27AM   10    A.   Joseph Bongiovanni, Special Agent, Buffalo Resident

11:27AM   11    Office.

11:27AM   12         MR. TRIPI:  Okay.  Ms. Champoux, can we just zoom in

11:27AM   13    on paragraph -- the first paragraph for now.

11:27AM   14         BY MR. TRIPI:

11:27AM   15    Q.   And could you read that paragraph that Mr. Bongiovanni

11:27AM   16    wrote, please?

11:27AM   17    A.   It was brought to my attention that Peter Gerace had

11:27AM   18    become a target of a federal investigation.  Based on the

11:28AM   19    intelligence I have received, I have attempted to terminate

11:28AM   20    all contact with Gerace.

11:28AM   21        It should be known that any contact I have had with

11:28AM   22    Gerace in the past was minimal in person contact, and

11:28AM   23    primarily consisted of a random telephonic communication

11:28AM   24    based on the fact we were childhood friends.  I would

11:28AM   25    sometimes randomly encounter Gerace at a restaurant or golf

| | | |
|---|---|---|
| 11:28AM | 1 | outing and have not made personal plans to meet him socially |
| 11:28AM | 2 | in several years. |
| 11:28AM | 3 |      **MR. TRIPI:** Ms. Champoux, could we keep that up and |
| 11:28AM | 4 | also pull up Government Exhibit 127, please. |
| 11:28AM | 5 |      Can we zoom in on -- |
| 11:28AM | 6 |      **BY MR. TRIPI:** |
| 11:28AM | 7 | Q.  Do you see Government Exhibit 127 on the right there? |
| 11:28AM | 8 | A.  Yes. |
| 11:28AM | 9 | Q.  Do you see Mr. Bongiovanni? |
| 11:28AM | 10 | A.  Yes. |
| 11:28AM | 11 | Q.  Do you see who he's standing next to? |
| 11:28AM | 12 | A.  Peter Gerace in the red shirt. |
| 11:28AM | 13 |      **MR. TRIPI:** Ms. Champoux, can we zoom in on |
| 11:29AM | 14 | paragraph 1 and put it under the photo for a moment. |
| 11:29AM | 15 |      **BY MR. TRIPI:** |
| 11:29AM | 16 | Q.  Fast forwarding from this November 1st, 2018 memo, on |
| 11:29AM | 17 | December 12th, 2019, so almost a year later, did Homeland |
| 11:29AM | 18 | Security Investigations execute two federal search warrants, |
| 11:29AM | 19 | one at Pharaoh's Gentlemen's Club and one at Mr. Gerace's |
| 11:29AM | 20 | residence? |
| 11:29AM | 21 | A.  Yes. |
| 11:29AM | 22 | Q.  Initially that day were you at Mr. Gerace's residence? |
| 11:29AM | 23 | A.  I was. |
| 11:29AM | 24 | Q.  After you cleared from that location, did you make your |
| 11:29AM | 25 | way over to Pharaoh's Gentlemen's Club? |

| | | |
|---|---|---|
| 11:29AM | 1 | A.  I did. |
| 11:29AM | 2 | Q.  Did you help with the search there? |
| 11:29AM | 3 | A.  I did, with the tail end of it. |
| 11:29AM | 4 | Q.  Did you find some evidence at Pharaoh's Gentlemen's Club? |
| 11:29AM | 5 | A.  Yes. |
| 11:29AM | 6 | Q.  I'm going to hand you up Government Exhibit 490A. |
| 11:30AM | 7 | Do you recognize Exhibit 490A? |
| 11:30AM | 8 | A.  Yes. |
| 11:30AM | 9 | Q.  Is that a photograph of something that you recovered -- |
| 11:30AM | 10 | A.  Yes. |
| 11:30AM | 11 | Q.  -- at Pharaoh's? |
| 11:30AM | 12 | A.  Yes.  That's correct. |
| 11:30AM | 13 | Q.  How do you recognize it? |
| 11:30AM | 14 | A.  I recognize the picture. |
| 11:30AM | 15 | Q.  And does that picture fairly and accurately depict an |
| 11:30AM | 16 | item you physically recovered from Pharaoh's? |
| 11:30AM | 17 | A.  Yes. |
| 11:30AM | 18 | MR. TRIPI:  The government offers Exhibit 490A, |
| 11:30AM | 19 | Your Honor. |
| 11:30AM | 20 | MR. MacKAY:  No objection. |
| 11:30AM | 21 | THE COURT:  Received without objection. |
| 11:31AM | 22 | (GOV Exhibit 490A was received in evidence.) |
| 11:31AM | 23 | MR. TRIPI:  Can we publish Exhibit -- Ms. Champoux, |
| 11:31AM | 24 | can we publish Exhibit 490A with these two items?  Can we do |
| 11:31AM | 25 | all three? |

| | | |
|---|---|---|
| 11:31AM | 1 | All right.  Let's zoom in on Exhibit 490A for a |
| 11:31AM | 2 | moment. |
| 11:31AM | 3 | **BY MR. TRIPI:** |
| 11:31AM | 4 | Q.  Where did you find that -- that physical item? |
| 11:31AM | 5 | A.  In an upstairs room at Pharaoh's, so up the stairs near |
| 11:31AM | 6 | the employee entrance, and then there was a long hallway, and |
| 11:31AM | 7 | at the far end of the hallway, there was a -- it -- it dead |
| 11:31AM | 8 | ended into a room. |
| 11:31AM | 9 | Q.  Was it a frame -- is it in a frame indicating this was |
| 11:31AM | 10 | from a Cirque de Soleil at -- in Las Vegas? |
| 11:31AM | 11 | A.  Yes, it was in a commemorative frame from a show I think |
| 11:32AM | 12 | called Viva Elvis. |
| 11:32AM | 13 | Q.  Is the photo dated? |
| 11:32AM | 14 | A.  August 25th, 2011. |
| 11:32AM | 15 | Q.  And do you see Mr. Bongiovanni in the photo? |
| 11:32AM | 16 | A.  Yes. |
| 11:32AM | 17 | Q.  Can you circle him? |
| 11:32AM | 18 | A.  Yes. |
| 11:32AM | 19 | Q.  Do you see Mr. Gerace in the photo? |
| 11:32AM | 20 | A.  Yes. |
| 11:32AM | 21 | Q.  Can you circle him? |
| 11:32AM | 22 | Do you see Tom Napoli in the photo? |
| 11:32AM | 23 | A.  I'm not sure if that's Tom or not. |
| 11:32AM | 24 | Q.  All right.  I'll withdraw that question then, but do you |
| 11:32AM | 25 | see Mr. Gerace and Mr. Bongiovanni? |

11:32AM    1    A.  Yes.

11:32AM    2         **MR. TRIPI:**  May the record reflect the witness has

11:32AM    3    placed on Exhibit 498 two temporary electronic circles over

11:32AM    4    the -- around Mr. Bongiovanni and Mr. Gerace's faces.  It's to

11:32AM    5    the middle and the right-hand side of the photo, Your Honor.

11:32AM    6         **THE COURT:**  It -- it does.

11:32AM    7         **MR. TRIPI:**  Fair enough.  Okay.

11:32AM    8         Okay.  I'm going to clear out of that.

11:32AM    9         If we could zoom out of that photo, Ms. Champoux and

11:33AM   10    let's just go back to Exhibit 97 for a moment.

11:33AM   11         **BY MR. TRIPI:**

11:33AM   12    Q.  Did the photo of them together in Las Vegas appear to you

11:33AM   13    to be, like, a random, in-person contact?

11:33AM   14    A.  No.

11:33AM   15    Q.  Did the photo of them in the Exhibit 127, when they were

11:33AM   16    in that photo, did that appear to be a random in-person

11:33AM   17    contact?

11:33AM   18    A.  No.

11:33AM   19         **MR. TRIPI:**  Let's go to paragraph 2.

11:33AM   20         **BY MR. TRIPI:**

11:33AM   21    Q.  Can you read that?

11:33AM   22    A.  Over the past several months, I have received a series of

11:33AM   23    phone calls from Gerace which I did not answer.

11:33AM   24         On October 23rd and October 27th, 2018, I received a

11:33AM   25    series of text messages from Gerace, which was out of the

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

64

11:34AM   1   ordinary.

11:34AM   2      In the aforementioned text messages, Gerace seemed very

11:34AM   3   concerned by my failure to return his calls or text messages,

11:34AM   4   and was questioning why I did not return a social text

11:34AM   5   inquiry.

11:34AM   6         **MR. TRIPI:**  Let's go to paragraph 3, Ms. Champoux.

11:34AM   7         **BY MR. TRIPI:**

11:34AM   8   Q.  Please read that.

11:34AM   9   A.  In an effort to maintain a sense of novel activity and

11:34AM  10   with hopes of not alerting Gerace that something may be

11:34AM  11   wrong, I returned a text and stated that I was working

11:34AM  12   midnights and was sorry for my large gaps of no

11:34AM  13   communication.

11:34AM  14      I hoped that this reply would satisfy Gerace's curiosity

11:34AM  15   as to my absence of returning calls and texts.  Please see

11:34AM  16   the attached text messages.

11:34AM  17         **MR. TRIPI:**  Okay.  Ms. Champoux, can we zoom back in

11:34AM  18   on paragraph 1 again for a moment again and -- and also zoom

11:34AM  19   in on paragraph 3.

11:35AM  20         And Ms. Champoux, can you highlight the sentence in

11:35AM  21   the -- in the first zoom in, paragraph 1, where it says "it

11:35AM  22   should be known that any contact," and highlight the rest of

11:35AM  23   that sentence.

11:35AM  24         And then, Ms. Champoux, in the bottom, can you

11:35AM  25   highlight where it says "in an effort to maintain a normal

11:35AM    1    sense of activity," that sentence?

11:35AM    2            That portion is fine.

11:35AM    3            **BY MR. TRIPI:**

11:35AM    4    Q.  Special Agent Ryan, when you reviewed these memorandums

11:35AM    5    and you looked at those two paragraphs, how -- how did you --

11:35AM    6    what assessments did you make comparing Bongiovanni's

11:35AM    7    statement that I have had -- "any contact I've had with

11:35AM    8    Gerace in the past was minimal in-person and primarily

11:35AM    9    consisted of random telephonic communications" with paragraph

11:35AM    10   3 where he wrote "in an effort to maintain a sense of normal

11:36AM    11   activity"?

11:36AM    12           **MR. MacKAY:**  Objection, improper opinion.

11:36AM    13           **MR. TRIPI:**  I asked what assessments he made.

11:36AM    14           **THE COURT:**  I'm going to sustain the objection to the

11:36AM    15   form of the question.  So ask another question, please.

11:36AM    16           **BY MR. TRIPI:**

11:36AM    17   Q.  Mr. Ryan, in -- in your view, are those two paragraphs

11:36AM    18   consistent or inconsistent with each other?

11:36AM    19   A.  They're inconsistent with each other.

11:36AM    20           **MR. TRIPI:**  We can zoom out of those, Ms. Champoux.

11:36AM    21   Let's highlight --

11:36AM    22           **BY MR. TRIPI:**

11:36AM    23   Q.  Just read that last sentence.  We don't have to zoom in

11:36AM    24   on it.

11:36AM    25   A.  I have reported this unsolicited contact with Gerace to

USA v Bongiovanni - Ryan - Tripi/Direct - 9710/24
66

11:36AM  1  my group supervisor, Gregory Yensan, and will continue to

11:37AM  2  avoid any future contact.

11:37AM  3  Q.  And so did the -- was there -- were there some

11:37AM  4  attachments to this exhibit?

11:37AM  5  A.  Yes, the text messages.

11:37AM  6  Q.  And who -- who selected and provided the text messages?

11:37AM  7  A.  Mr. Bongiovanni.

11:37AM  8       **MR. TRIPI:**  Ms. Champoux, can we go to page 2 of

11:37AM  9  Exhibit 97.

11:37AM  10       **BY MR. TRIPI:**

11:37AM  11  Q.  And tell the jury what they're looking at here.

11:37AM  12  A.  Screen prints of text messages from an iPhone, it looks

11:37AM  13  like.

11:37AM  14  Q.  So like photocopies of the actual texts?

11:37AM  15  A.  I think they're probably screen captures that were

11:37AM  16  printed out and then have since been photocopied.

11:37AM  17  Q.  And did Mr. Bongiovanni write the date of the first

11:37AM  18  entry?

11:37AM  19  A.  Yes.

11:37AM  20  Q.  What did he write?

11:37AM  21  A.  June 30th, '18, for 2018.

11:37AM  22  Q.  And did he write -- who wrote that text?

11:37AM  23  A.  From me.  So the dark texts are from his phone.

11:37AM  24  Q.  And what did Mr. Bongiovanni write to the defendant on

11:38AM  25  June 30th, 2018?

11:38AM   1   A.  The first message?

11:38AM   2   Q.  Yes.

11:38AM   3   A.  Miss ya, bro.  I'm going up to Sunset today.

11:38AM   4   Q.  Do you have an understanding of what the reference to

11:38AM   5   Sunset is?

11:38AM   6   A.  Sunset Beach on Lake Erie.

11:38AM   7   Q.  And are there sort of, like, bars and cottages in that

11:38AM   8   area?

11:38AM   9   A.  Yes.

11:38AM   10   Q.  Under that, there's another text message.  And who wrote

11:38AM   11   from Peter Gerace?

11:38AM   12   A.  Mr. Bongiovanni.

11:38AM   13   Q.  And what does that message say?

11:38AM   14   A.  Do you have a cottage?

11:38AM   15   Q.  And what did Mr. Bongiovanni respond?

11:38AM   16   A.  No, just going up.  Tommy Doc is in town and a couple of

11:38AM   17   Lindsay's friends.

11:38AM   18         MR. TRIPI:  Okay.  Ms. Champoux, next to this page,

11:38AM   19   can we pull up Exhibit 127 again.  And can we zoom in on

11:38AM   20   Exhibit 127.

11:39AM   21         BY MR. TRIPI:

11:39AM   22   Q.  Do you see that reference to Tommy Doc a moment ago in

11:39AM   23   the text messages?

11:39AM   24   A.  Yes.

11:39AM   25   Q.  Are you familiar with a former Buffalo police detective

11:39AM   1    named Tom Doctor?

11:39AM   2    A.  Yes.

11:39AM   3    Q.  As you understand it, is he a former DEA task force

11:39AM   4    officer?

11:39AM   5    A.  Yes.

11:39AM   6    Q.  Do you see him in the photo depicted in Exhibit 127?

11:39AM   7    A.  Yes.  In the sunglasses without a shirt on the left side

11:39AM   8    as I look at it.

11:39AM   9    Q.  And in that photo, there's a circle around his face?

11:39AM   10   A.  Yes.

11:39AM   11   Q.  Okay.

11:39AM   12        MR. TRIPI:  We can zoom back out of that,

11:39AM   13   Ms. Champoux.

11:39AM   14        BY MR. TRIPI:

11:39AM   15   Q.  Oh.  And the text message says "and a couple of Lindsay's

11:39AM   16   friends."  Do you see Lindsay Bongiovanni with

11:39AM   17   Mr. Bongiovanni in that photo?

11:39AM   18   A.  In front of him in the red shirt and white shorts.

11:39AM   19        MR. TRIPI:  You can with zoom out of that.

11:39AM   20        BY MR. TRIPI:

11:39AM   21   Q.  Does that appear to be a random telephonic communication

11:39AM   22   or chance encounter?

11:39AM   23   A.  No.

11:39AM   24        MR. TRIPI:  Let's go to page 3 of the Exhibit 97,

11:39AM   25   please.

11:39AM  1           **BY MR. TRIPI:**

11:40AM  2   Q.  And what did Mr. Gerace write next in the thread that he

11:40AM  3   defendant provided?

11:40AM  4   A.  There's a girl from Las Vegas staying with me with some

11:40AM  5   other chick that works for me.  Let me see what they wanna

11:40AM  6   do.

11:40AM  7           **MR. TRIPI:**  Ms. Champoux, could we zoom back in on

11:40AM  8   page -- Exhibit 127.

11:40AM  9           **BY MR. TRIPI:**

11:40AM 10   Q.  Fast forwarding to April of 2019, did you interview a

11:40AM 11   young lady named Phlycia Hunt?

11:40AM 12   A.  Yes.

11:40AM 13   Q.  Do you see her in the photo?

11:40AM 14   A.  Yes.

11:40AM 15   Q.  Can you please circle Ms. Hunt for us?

11:40AM 16           **MR. TRIPI:**  May the record reflect the witness has

11:40AM 17   placed a temporary circle on a woman who is fifth from the

11:40AM 18   right to left near the center of the photo.  She appears to

11:40AM 19   have long brown hair in the photo.

11:41AM 20           **BY MR. TRIPI:**

11:41AM 21   Q.  Did you -- did you understand Ms. Hunt to be someone who

11:41AM 22   sometimes lived in Las Vegas but mainly was from Buffalo?

11:41AM 23   A.  Yes.

11:41AM 24           **MR. TRIPI:**  Okay.  Let's go back to the text message.

         25

11:41AM   1           **BY MR. TRIPI:**

11:41AM   2   Q.  Is there a reference to a girl that's in town from Las

11:41AM   3   Vegas staying with me in Mr. Gerace's text?

11:41AM   4   A.  Yes.

11:41AM   5   Q.  Okay.  What did Mr. Bongiovanni write under that that he

11:41AM   6   provided in this attachment?

11:41AM   7   A.  I'll be cool for a happy hour anytime.  I'm off the 4, 5,

11:41AM   8   6.

11:41AM   9   Q.  Do you believe that to be a reference to July 4th, 5th,

11:41AM  10   and 6th?

11:41AM  11   A.  Yes.

11:41AM  12   Q.  Because this thread is June 30th, 2018, almost right

11:41AM  13   before the Fourth of July?

11:41AM  14   A.  Yes.

11:41AM  15   Q.  And what's the next portion of the text that we see on

11:41AM  16   this page at least that Mr. Bongiovanni writes?

11:41AM  17   A.  Okay.  We are going in the afternoon about 1 or 2.

11:41AM  18   Q.  Does that indicate they're making plans to go to Sunset

11:41AM  19   Bay and meet each other?

11:41AM  20   A.  Yes.

11:42AM  21           **MR. TRIPI:**  Let's go to the next page of this

11:42AM  22   exhibit, Ms. Champoux, page 4 of Exhibit 97.

11:42AM  23           **BY MR. TRIPI:**

11:42AM  24   Q.  Can we read what Mr. Gerace responds to the text from

11:42AM  25   Mr. Bongiovanni?

11:42AM   1   A.  Is there that concert today?  Heard it's going to be a

11:42AM   2   zoo.

11:42AM   3   Q.  And that's what Mr. Gerace wrote?

11:42AM   4   A.  Yes.

11:42AM   5   Q.  As labeled by the defendant, correct?

11:42AM   6   A.  That's correct.

11:42AM   7   Q.  And what did the defendant respond?

11:42AM   8   A.  Don't know, but I'm sure it will be busy.  We usually go

11:42AM   9   to Cabana Sam.

11:42AM   10  Q.  Is Cabana Sam a reference to a bar?

11:42AM   11  A.  Yes.

11:42AM   12       **MR. TRIPI:**  Let's go to the next page, page 5 of the

11:42AM   13  text that Mr. Bongiovanni attached to the memo.

11:42AM   14       **BY MR. TRIPI:**

11:42AM   15  Q.  What did Mr. Bongiovanni indicate next that Mr. Gerace

11:42AM   16  wrote?

11:42AM   17  A.  But I heard something on Facebook that there's a huge

11:42AM   18  concert and they sold a couple thousand tickets and they were

11:42AM   19  saying to get there early to park way down in 5.  And then RT

11:43AM   20  and then the number 5.

11:43AM   21     So, probably a reference to Route 5.

11:43AM   22       **MR. TRIPI:**  Let's go to the next page, Ms. Champoux.

11:43AM   23       We're on Exhibit 97, page 6, now.

11:43AM   24       **BY MR. TRIPI:**

11:43AM   25  Q.  Can you read what Mr. Bongiovanni wrote?

11:43AM   1   A.  Wow, and then there's an emoji, and then it says, I don't

11:43AM   2   know, waiting for Lindsay.  Maybe LOL, but there's a space in

11:43AM   3   it or maybe it's I'll ask her.  Probably I'll ask her.

11:43AM   4   Q.  What did Mr. Gerace respond?

11:43AM   5   A.  I thought it was this weekend because of the Fourth of

11:43AM   6   July.  Maybe I'm wrong.  Maybe it's next weekend.

11:43AM   7           **MR. TRIPI:**  And we'll go to the next page to start

11:43AM   8   reading the next text.

11:43AM   9           Let's go to page 7.

11:43AM  10           **BY MR. TRIPI:**

11:44AM  11   Q.  And what did Mr. Bongiovanni write next as referenced by

11:44AM  12   him?

11:44AM  13   A.  We are gonna see Fortini play on the 6th and I know

11:44AM  14   there's a band playing then.  But I don't think Fortini could

11:44AM  15   pack 'em in to Route 5, and then an emoji.

11:44AM  16   Q.  And what did Mr. Gerace write after that?

11:44AM  17   A.  Ha, ha, ha.  Only Joe Bong could do that.

11:44AM  18   Q.  And did Mr. Bongiovanni respond?

11:44AM  19   A.  He said, I'm like the old David Cassidy.

11:44AM  20           **MR. TRIPI:**  Let's go to the next page.

11:44AM  21           **BY MR. TRIPI:**

11:44AM  22   Q.  Can you pick it up from the response Mr. Gerace wrote?

11:44AM  23   A.  Yeah.  You and I feel like Milton Berle.

11:44AM  24       And then Mr. Bongiovanni says, LOL, Uncle Misty, and then

11:45AM  25   corrects it to Uncle Milty.

11:45AM   1        **MR. TRIPI:**  Let's go to page 9 please.

11:45AM   2        **BY MR. TRIPI:**

11:45AM   3   Q.  What did Mr. Gerace write?

11:45AM   4   A.  I'm thinking about taking them down to RiverWorks.  Last

11:45AM   5   time I was there was with you and Lindsay.

11:45AM   6        Then we went to Dock of the Bay.  Remember we had to help

11:45AM   7   Lindsay through the parking lot?

11:45AM   8   Q.  And what does Mr. Bongiovanni write next in that thread

11:45AM   9   that he provided?

11:45AM  10   A.  Yes, I do.  An then emoji.  And then have fun, be safe.

11:45AM  11   Q.  And what's the next --

11:45AM  12        **MR. TRIPI:**  And go to the next page, please.

11:45AM  13        **THE WITNESS:**  It says, Thanks brother, I'm home.

11:45AM  14   From Peter.

11:45AM  15        **BY MR. TRIPI:**

11:45AM  16   Q.  And then is there a response at 2:14 a.m.?

11:45AM  17   A.  Yes, on July 1st.  It says from Mr. Bongiovanni, glad you

11:45AM  18   got home safe.

11:45AM  19   Q.  Is there a text message that Mr. Bongiovanni provided on

11:46AM  20   July 2nd, 2018?

11:46AM  21   A.  The one from Mr. Gerace?

11:46AM  22   Q.  Yes.

11:46AM  23   A.  Yes.  It says, Golf money due this week, 25th, Pharaoh's

11:46AM  24   8th Annual Golf Outing, Wednesday, August 2nd.  Kis-N-Green,

11:46AM  25   Alden, limo buses, lunch and drinks, dinner after at

11:46AM   1   Pharaoh's.  Shotgun start.  Will get time this week.

11:46AM   2            **MR. TRIPI:**  And can we go to the next page,

11:46AM   3   Ms. Champoux?

11:46AM   4            **BY MR. TRIPI:**

11:46AM   5   Q.  Is there another text that he attached there that he

11:46AM   6   didn't appear to label?

11:46AM   7   A.  Yes.

11:46AM   8   Q.  What does it say?

11:46AM   9   A.  8th Annual Golf Outing, Wednesday, July 25th,

11:46AM  10   Kis-N-Green.  Buses leave Pharaoh's 9 a.m., shotgun 10 a.m.,

11:46AM  11   pig roast at Pharaoh's after, $600 per foursome, limited to

11:47AM  12   128 golfers, first to pay are in.

11:47AM  13            **BY MR. TRIPI:**

11:47AM  14   Q.  And as you understand it, does golf -- withdrawn.

11:47AM  15       Does Pharaoh's have annual golf outings?

11:47AM  16   A.  Yes.

11:47AM  17   Q.  Okay.  Let's move on to the next page.  Going to page 13

11:47AM  18   of the exhibit.

11:47AM  19       Now Mr. Bongiovanni is labelling that this occurred on,

11:47AM  20   looks like, October 23rd of '18; is that right?

11:47AM  21   A.  Yes.

11:47AM  22   Q.  And these are messages now from Mr. Gerace?

11:47AM  23   A.  Yes.

11:47AM  24   Q.  By this point in time, had -- as you understand it, had

11:47AM  25   Mr. Bongiovanni become aware that his connection to

| | | |
|---|---|---|
| 11:47AM | 1 | Mr. Gerace was under scrutiny as well as those race-related |
| 11:47AM | 2 | statements? |
| 11:47AM | 3 | A.  Yes. |
| 11:47AM | 4 | Q.  And so here by October of 2018, we don't see any |
| 11:47AM | 5 | responses from Mr. Bongiovanni in the text he provided; is |
| 11:47AM | 6 | that right? |
| 11:47AM | 7 | A.  That's correct. |
| 11:47AM | 8 | Q.  At least in this exhibit? |
| 11:47AM | 9 | A.  Right. |
| 11:47AM | 10 | Q.  But let's finish the pages.  What does -- what does |
| 11:48AM | 11 | Mr. Gerace write on October 23rd, 2018? |
| 11:48AM | 12 | A.  Are you alive?  Just get a new phone?  Did you move out |
| 11:48AM | 13 | of town?  What the fuck? |
| 11:48AM | 14 | Q.  And what was the next text Mr. Gerace sent on |
| 11:48AM | 15 | October 27th, 2018, as labeled here? |
| 11:48AM | 16 | A.  Is there a reason why you're not talking to me? |
| 11:48AM | 17 | **MR. TRIPI:**  Let's go to the next page, page 14 of the |
| 11:48AM | 18 | exhibit. |
| 11:48AM | 19 | **BY MR. TRIPI:** |
| 11:48AM | 20 | Q.  Did Mr. Bongiovanni respond to that one on October 27th? |
| 11:48AM | 21 | A.  Dude.  Sorry, been working midnights and I've been |
| 11:48AM | 22 | sleeping till 3 or 4.  Sorry, my bad. |
| 11:48AM | 23 | Q.  What did Mr. Gerace respond as indicated in this exhibit? |
| 11:48AM | 24 | A.  Okay.  I'm just making sure, brother. |
| 11:48AM | 25 | Q.  And what did Mr. Bongiovanni respond? |

| | | |
|---|---|---|
| 11:48AM | 1 | A.  Hope all is well.  You're not the only one mad at me. |
| 11:48AM | 2 | LOL. |
| 11:48AM | 3 | **MR. TRIPI:**  Let's go to the next page of this |
| 11:49AM | 4 | exhibit, page 15. |
| 11:49AM | 5 | **BY MR. TRIPI:** |
| 11:49AM | 6 | Q.  What's the next message that Mr. Gerace wrote? |
| 11:49AM | 7 | A.  I'm not mad, brother.  Just keep in touch. |
| 11:49AM | 8 | Q.  Is there a photo attached? |
| 11:49AM | 9 | A.  Yes. |
| 11:49AM | 10 | Q.  Were you able to make out who's in these photos? |
| 11:49AM | 11 | A.  Peter's in that one.  I would need to see the one that |
| 11:49AM | 12 | wasn't photocopied. |
| 11:49AM | 13 | **MR. TRIPI:**  Let's go to the next page, page 16. |
| 11:49AM | 14 | Can we rotate that, Ms. Champoux? |
| 11:49AM | 15 | **BY MR. TRIPI:** |
| 11:49AM | 16 | Q.  Is that another photo that was attached to the text |
| 11:49AM | 17 | thread that Mr. Bongiovanni indicated was from Mr. Gerace? |
| 11:49AM | 18 | A.  Yes. |
| 11:49AM | 19 | Q.  Now -- now, who -- who selected the text messages to |
| 11:49AM | 20 | attach to this memo? |
| 11:49AM | 21 | A.  Mr. Bongiovanni. |
| 11:49AM | 22 | Q.  Who selected how far to go back? |
| 11:49AM | 23 | A.  Mr. Bongiovanni. |
| 11:50AM | 24 | **MR. TRIPI:**  Okay.  We can take 97 down, Ms. Champoux, |
| 11:50AM | 25 | and let's move on to Exhibit 98. |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

11:50AM  1          **BY MR. TRIPI:**

11:50AM  2  Q.  What date did he write the memo that's depicted in

11:50AM  3  Exhibit 98?

11:50AM  4  A.  December 10th, 2018.

11:50AM  5  Q.  So, basically a month and ten days or so later than the

11:50AM  6  first memo?

11:50AM  7  A.  Yes.

11:50AM  8  Q.  Separately, was your investigation continuing?

11:50AM  9  A.  Yes.

11:50AM  10  Q.  And who did Mr. Bongiovanni write this memo to?

11:50AM  11  A.  Edward Orgon, Jr., Resident Agent in Charge, Buffalo

11:50AM  12  Resident Office.

11:50AM  13  Q.  And can you read that first sentence there?

11:50AM  14  A.  Reference memorandum dated November 1st, 2018, titled

11:50AM  15  Communication With Peter Gerace.

11:50AM  16  Q.  So, does that indicate this is purporting to be a

11:50AM  17  continuation of that memorandum, like an update?

11:50AM  18  A.  Yes.

11:50AM  19  Q.  And the way it's written there, does it indicate it's

11:51AM  20  incorporating the first memo essentially by reference into

11:51AM  21  this one?

11:51AM  22  A.  Yes.

11:51AM  23          **MR. TRIPI:**  Ms. Champoux, can we zoom in on the next

11:51AM  24  paragraph under that.

  25

11:51AM 1    **BY MR. TRIPI:**

11:51AM 2    Q.  Can you read what Mr. Bongiovanni wrote in this memo for

11:51AM 3    the jury in paragraph 1, the first full paragraph.

11:51AM 4    A.  On December 10, 2018, I have received an incoming phone

11:51AM 5    call from Peter Gerace and ignored the call.  Immediately

11:51AM 6    following the call from Gerace, I received another incoming

11:51AM 7    call from the number 716-525-6511 and I ignored the call

11:51AM 8    because I did not recognized the number.

11:51AM 9        Immediately after my failure to answer the aforementioned

11:51AM 10    calls, I received a series of text messages from Gerace out

11:51AM 11    of the ordinary and over a span of a couple minutes.

11:51AM 12        In the text messages, Gerace seemed very concerned, and

11:51AM 13    in his text, Gerace asked me to text him back on the number

11:51AM 14    they just called you on.

11:51AM 15        Gerace immediately followed the call with another text

11:52AM 16    which read ASAP, A-S-A-P.

11:52AM 17        **MR. TRIPI:**  We can zoom out of that, Ms. Champoux.

11:52AM 18    And can we zoom in on the second full paragraph there.

11:52AM 19        **BY MR. TRIPI:**

11:52AM 20    Q.  And can you read that paragraph?

11:52AM 21    A.  In effort to maintain a sense of normal activity and with

11:52AM 22    hopes of not alerting Gerace that something may be wrong, I

11:52AM 23    responded and called the number 716-525-6511.

11:52AM 24    Q.  Let me stop you there.  This is the second time he's used

11:52AM 25    that phrase "in an effort to maintain a sense of normal

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

11:52AM  1   activity;" is that right?

11:52AM  2   A.   Yes.

11:52AM  3   Q.   He used it in first memo as well?

11:52AM  4   A.   Yes.

11:52AM  5   Q.   What does that indicate to you as to normal activity

11:52AM  6   between the two of them?

11:52AM  7   A.   That normal activity is for them to be in contact.

11:52AM  8   Q.   Please continue reading the paragraph.

11:52AM  9   A.   Gerace answered the phone and I was agitated and asked

11:52AM  10  Gerace why he was calling me over and over.  I then asked

11:53AM  11  Gerace why he was calling me on a different number.

11:53AM  12      Gerace stated that the number 716-525-6511 belonged to

11:53AM  13  his girlfriend.  I stated that I did not respond to his calls

11:53AM  14  and text because I was in court.

11:53AM  15      At that time, Gerace stated that he needed to tell me

11:53AM  16  something important but he didn't want to talk on the phone.

11:53AM  17      I told Gerace that it was fine to talk on the phone and

11:53AM  18  asked Gerace what was the problem.

11:53AM  19      Gerace stated that he, Gerace, parenthetically, was told

11:53AM  20  that I was being watched.

11:53AM  21      I asked Gerace who was watching me.

11:53AM  22      Gerace responded that he heard I was being watched by

11:53AM  23  internal affairs.

11:53AM  24      I responded, is that so?  I asked Gerace who was giving

11:53AM  25  him this information?

11:53AM    1        At that time, Gerace seemed to stumble and said that this

11:53AM    2    information was told to him by somebody he encountered while

11:53AM    3    he was dining or drinking at Salvatore's restaurant and

11:53AM    4    hotel.

11:53AM    5        Gerace stated that he did not recall the person's name.

11:54AM    6        Again, I asked Gerace who said I was being watched by

11:54AM    7    internal affairs?

11:54AM    8        Again, Gerace failed to identify his source.

11:54AM    9        At that time, I told Gerace that his information was

11:54AM   10    bullshit.  I also told Gerace that DEA does not even have a

11:54AM   11    Bureau of Internal Affairs.

11:54AM   12    Q.  DEA does have an Office of Profession Responsibility; is

11:54AM   13    that right?

11:54AM   14    A.  Yes.

11:54AM   15    Q.  Do they interact with the Department of Justice, Office

11:54AM   16    of Inspector General, when DOJ OIG is investigating federal

11:54AM   17    agents like DEA agents?

11:54AM   18    A.  Yes.

11:54AM   19    Q.  So in other words, Mr. Bongiovanni by that point was

11:54AM   20    under investigation; is that right?

11:54AM   21    A.  Yes.

11:54AM   22    Q.  And he had been made aware of his contacts with Gerace

11:54AM   23    and the statements that he made that were race-related were

11:54AM   24    under review; is that right?

11:54AM   25    A.  Yes.

11:54AM   1   Q.  Were efforts made, though, to conceal any -- any notice

11:55AM   2   to Mr. Bongiovanni that his behavior with respect to the Ron

11:55AM   3   Serio file was also under investigation by you?

11:55AM   4   A.  Yes.

11:55AM   5   Q.  Was that closely held?

11:55AM   6   A.  Yes.

11:55AM   7   Q.  Do you believe he was unaware of that?

11:55AM   8           MR. MacKAY:  Objection to -- objection, speculation.

11:55AM   9           THE COURT:  Yeah, sustained.

11:55AM  10           MR. TRIPI:  Okay.

11:55AM  11           Let's move on to the next paragraph.

11:55AM  12           BY MR. TRIPI:

11:55AM  13   Q.  Read that next paragraph.

11:55AM  14   A.  Gerace stated that the person believes that internal

11:55AM  15   affairs is watching me because Gerace and I have been friends

11:55AM  16   since we were kids and now he owns Pharaoh's Gentlemen's

11:55AM  17   Club.

11:55AM  18       I responded that, yes, we have been friends for years,

11:56AM  19   but I never come into your club.  Gerace says he agrees.

11:56AM  20       Gerace reiterated that we were friends and the reason for

11:56AM  21   the call was that Gerace was looking out for me.  I respond

11:56AM  22   that there was nothing going on and his information was

11:56AM  23   false.

11:56AM  24           MR. TRIPI:  Let's move on to the next paragraph.

11:56AM  25           THE WITNESS:  Gerace sent me a text shortly after the

11:56AM   1    conclusion of the telephone call and in sum and substance

11:56AM   2    stated that we haven't talked in a while but he considered me

11:56AM   3    one of his best friends and that he always had my back.

11:56AM   4            As a continued effort to maintain a sense of normal

11:56AM   5    activity, I texted Gerace back.  We have been friends for 25

11:56AM   6    years bud, all good.

11:56AM   7            On December 8th, 2018, I received a reply text from

11:56AM   8    Gerace, you mean 36 years.

11:56AM   9            **MR. TRIPI:**  And let's move on to the next page of

11:56AM  10    this exhibit.

11:56AM  11            **BY MR. TRIPI:**

11:56AM  12    Q.  Did Mr. Bongiovanni provide as an attachment to his memo

11:57AM  13    that he wrote text messages?

11:57AM  14    A.  Yes.

11:57AM  15    Q.  Are they attached here on this -- and visible here on the

11:57AM  16    screen?

11:57AM  17    A.  Yes.

11:57AM  18    Q.  Can you read the text messages and who they're from?

11:57AM  19    A.  Call me on the phone, they just called your number, ASAP.

11:57AM  20    Q.  And what did Mr. Bongiovanni write as to who was sending

11:57AM  21    the message?

11:57AM  22    A.  Actually, the next one is from Peter Gerace again.  These

11:57AM  23    are all from Peter Gerace.

11:57AM  24    Q.  And what date Mr. Bongiovanni write they were from?

11:57AM  25    A.  Oh, from December 7th, 2018, all three messages.

| | | |
|---|---|---|
| 11:57AM | 1 | Q.  And what's the last one.  I don't think you read that |
| 11:57AM | 2 | bottom one yet? |
| 11:57AM | 3 | A.  Hey, brother, I know we haven't talked in a while, but |
| 11:57AM | 4 | you'll always be one of my best friends and you know I always |
| 11:57AM | 5 | have your back. |
| 11:57AM | 6 | MR. TRIPI:  And let's go to the next page, page 4, of |
| 11:57AM | 7 | this exhibit. |
| 11:57AM | 8 | BY MR. TRIPI: |
| 11:57AM | 9 | Q.  What did Mr. Bongiovanni indicate he responded? |
| 11:57AM | 10 | A.  We have been friends for 25 years, bud.  All good. |
| 11:58AM | 11 | Q.  And what's the response from Mr. Gerace as indicated in |
| 11:58AM | 12 | the handwritten portion on December 8th, 2018? |
| 11:58AM | 13 | A.  You mean 36 years? |
| 11:58AM | 14 | Q.  Is that where the thread ends? |
| 11:58AM | 15 | A.  I think so, yes. |
| 11:58AM | 16 | MR. TRIPI:  Let's go back to the -- let's go back to |
| 11:58AM | 17 | the paragraph, the last paragraph.  Could you zoom in on that? |
| 11:58AM | 18 | "I have and will report all contact." |
| 11:58AM | 19 | BY MR. TRIPI: |
| 11:58AM | 20 | Q.  Other than the text messages that Mr. Gerace attached -- |
| 11:58AM | 21 | withdrawn -- Mr. Bongiovanni attached to these memos between |
| 11:58AM | 22 | he and Mr. Gerace, are you aware of far more contacts |
| 11:58AM | 23 | between -- as you sit here now, are you aware of far more |
| 11:58AM | 24 | contacts than Mr. Bongiovanni reported in these memos? |
| 11:59AM | 25 | A.  Yes. |

11:59AM  1   Q.  Did those include texts?

11:59AM  2   A.  Yes.

11:59AM  3   Q.  Do those include calls?

11:59AM  4   A.  Yes.

11:59AM  5   Q.  Do those include travel?

11:59AM  6   A.  Yes.

11:59AM  7            **MR. TRIPI:**  Let's move on to Exhibit 99.

11:59AM  8            **By MR. TRIPI:**

11:59AM  9   Q.  Did Mr. Bongiovanni submit another memo the same day that

11:59AM  10  HSI was executing search warrants as to Anthony Gerace and

11:59AM  11  Michael Sinatra's residences?

11:59AM  12  A.  Yes.

11:59AM  13  Q.  What date is that?

11:59AM  14  A.  January 28th, 2019.

11:59AM  15  Q.  And this one has a subject.  Can you read that subject?

11:59AM  16  A.  Communication with Peter Gerace by Special Agent Anthony

11:59AM  17  Casullo and Phil Domiano.

11:59AM  18  Q.  And was this to Mr. Orgon, the Resident Agent in Charge

11:59AM  19  through Gregory Yensan by Mr. Bongiovanni?

11:59AM  20  A.  Yes.

11:59AM  21  Q.  So Mr. Bongiovanni wrote all these words and provided all

11:59AM  22  the attachments; is that right?

11:59AM  23  A.  Yes.

11:59AM  24            **MR. TRIPI:**  All right.  Let's zoom in on the first

11:59AM  25  paragraph, Ms. Champoux.

12:00PM   1          **BY MR. TRIPI:**

12:00PM   2   Q.  Could you read that for the jury.

12:00PM   3   A.  S.A. Joseph Bongiovanni is writing to inform you of

12:00PM   4   information that he has acquired regarding the social

12:00PM   5   affiliation and recent communications with Peter Gerace by

12:00PM   6   Special Agent Anthony Casullo and S.A. Casullo's

12:00PM   7   brother-in-law, Phil Domiano.

12:00PM   8        In the -- in that past, S.A. Bongiovanni has verbally

12:00PM   9   informed you, my group supervisor Greg Yensan, and our ASAC,

12:00PM  10   David T. Zon of information confirming the friendship of

12:00PM  11   Domiano, Casullo, and Gerace.

12:00PM  12        Furthermore, S.A. Bongiovanni has attached information

12:00PM  13   confirming that Domiano was a former manager of Pharaoh's

12:00PM  14   Gentlemen's Club in Cheektowaga, New York, on behalf of

12:00PM  15   Gerace.

12:00PM  16   Q.  Now, regarding the information in this paragraph, did

12:00PM  17   you -- did you -- did you learn that Special Agent Casullo

12:00PM  18   had sought to investigate Peter Gerace in 2016?

12:01PM  19   A.  Yes.

12:01PM  20   Q.  So are they friends?

12:01PM  21   A.  No, not that I'm aware of.

12:01PM  22          **MR. TRIPI:**  Let's go to the second paragraph.

12:01PM  23          **BY MR. TRIPI:**

12:01PM  24   Q.  Can you read that -- that paragraph.

12:01PM  25   A.  S.A. Bongiovanni has personally witnessed S.A. Casullo

12:01PM  1   meeting and drinking socially with Peter Gerace alone at the

12:01PM  2   Big Ditch Brewery and later at Tappo Italian Restaurant in

12:01PM  3   Buffalo, New York, at approximately 9:45 p.m. on the evening

12:01PM  4   of June 13th, 2015.

12:01PM  5   Q.  So approximately six months before this memo, Special

12:01PM  6   Agent Casullo had made reports about this defendant's

12:01PM  7   conduct; is that right?

12:01PM  8   A.  Yes.

12:01PM  9   Q.  And six months later, right before he's retiring, the

12:01PM  10  defendant is submitting this memo?

12:01PM  11  A.  Yes.

12:01PM  12          **MR. TRIPI:**  Let's go to paragraph 3.

12:01PM  13          **BY MR. TRIPI:**

12:02PM  14  Q.  Could you read that?

12:02PM  15  A.  Also, S.A. Casullo's actions approximately eight months

12:02PM  16  ago by advising AUSA Joseph Tripi that S.A. Bongiovanni was a

12:02PM  17  racist in the presence of G.S. James McHugh was completely

12:02PM  18  unprofessional.

12:02PM  19      S.A. Casullo advised AUSA Tripi that S.A. Bongiovanni

12:02PM  20  told S.A. Casullo approximately two years ago that he,

12:02PM  21  Casullo, shouldn't investigate Italians, but should

12:02PM  22  investigate -- two words that are redacted.  S.A. Casullo did

12:02PM  23  not advise --

12:02PM  24  Q.  Were those words that were redacted, were they racial

12:02PM  25  epithets for black people and Hispanic people?

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

87

12:02PM   1    A.   Yes.

12:02PM   2    Q.   Please continue.

12:02PM   3    A.   S.A. Casullo did not advise his chain of command prior to

12:02PM   4    making these allegations and has ruined S.A. Bongiovanni's

12:02PM   5    character.  This incident was not documented within DEA and

12:03PM   6    no investigation has been conducted against S.A. Casullo.

12:03PM   7    S.A. Bongiovanni completely denies making this statement.

12:03PM   8         **MR. TRIPI:**  Let's go on top the next paragraph.

12:03PM   9         **BY MR. TRIPI:**

12:03PM  10    Q.   Please read that.

12:03PM  11    A.   S.A. Joseph Bongiovanni is forwarding this information

12:03PM  12    through the DEA chain of command because he knows that this

12:03PM  13    will be required to be disclosed to OPR and the AUSO office

12:03PM  14    in the Western -- or, WDNY based on the ongoing investigation

12:03PM  15    of Gerace.  Should you need any additional information,

12:03PM  16    please contact S.A. Joseph Bongiovanni.

12:03PM  17         Thank you for your attention in this matter.

12:03PM  18    Q.   So all of Mr. Bongiovanni's memos in totality, all three,

12:03PM  19    relate to his relationship with Gerace, and in this last one,

12:03PM  20    the comments that Casullo had reported about black and

12:03PM  21    Hispanic people; is that right?

12:03PM  22    A.   Yes.

12:03PM  23    Q.   There's some attachments that Mr. Bongiovanni provided

12:04PM  24    from apparently Facebook?

12:04PM  25    A.   Yes.

| | | |
|---|---|---|
| 12:04PM | 1 | **MR. TRIPI:** And we can scroll through those for now, |
| 12:04PM | 2 | Ms. Champoux. Let me stop you there. |
| 12:04PM | 3 | **BY MR. TRIPI:** |
| 12:04PM | 4 | Q. Is the reference to Katrina Lee, is that a name that |
| 12:04PM | 5 | Katrina Nigro uses? |
| 12:04PM | 6 | A. Yes. |
| 12:04PM | 7 | **MR. TRIPI:** You can please continue. |
| 12:05PM | 8 | **BY MR. TRIPI:** |
| 12:05PM | 9 | Q. As you understand it, did Special Agent Casullo and |
| 12:05PM | 10 | Mr. Gerace actually go to high school together? |
| 12:05PM | 11 | A. Yes. |
| 12:05PM | 12 | Q. Were they in the same graduating class at Saint Joe's |
| 12:05PM | 13 | Collegiate Institute? |
| 12:05PM | 14 | A. Yes. |
| 12:05PM | 15 | Q. Is that a photo of a high school reunion as you |
| 12:05PM | 16 | understand it that occurred on July 14, 2015? |
| 12:05PM | 17 | A. Yes. |
| 12:05PM | 18 | **MR. TRIPI:** Please continue to scroll a little bit. |
| 12:06PM | 19 | Okay. You can take that one down. |
| 12:06PM | 20 | **BY MR. TRIPI:** |
| 12:06PM | 21 | Q. Within several days of that memo, Mr. Bongiovanni |
| 12:06PM | 22 | retires; is that right? |
| 12:06PM | 23 | A. Yes. |
| 12:06PM | 24 | Q. I'd like to -- so you -- you reviewed those memos as well |
| 12:06PM | 25 | as Special Agent Carpenter from DOJ OIG; is that right? |

| | | |
|---|---|---|
| 12:06PM | 1 | A.  Yes. |
| 12:06PM | 2 | Q.  On March 29th, 2019, was Special Agent Carpenter of DOJ |
| 12:06PM | 3 | OIG planning to attempt to interview Mr. Bongiovanni who |
| 12:06PM | 4 | had -- had retired the prior month? |
| 12:06PM | 5 | A.  Yes. |
| 12:06PM | 6 | Q.  Were there any discussions you had with Special Agent |
| 12:06PM | 7 | Carpenter regarding the parameters of Carpenter's interview |
| 12:06PM | 8 | in areas to make sure that Special Agent Carpenter did not |
| 12:06PM | 9 | talk about or disclose to the defendant? |
| 12:07PM | 10 | A.  Yes. |
| 12:07PM | 11 | Q.  Describe -- describe that plan. |
| 12:07PM | 12 | A.  The -- the plan was for Special Agent Carpenter to focus |
| 12:07PM | 13 | on the race-related comments and anything that was generally |
| 12:07PM | 14 | known, but to specifically avoid any questions or discussions |
| 12:07PM | 15 | of Mr. Serio's allegations. |
| 12:07PM | 16 | Q.  Was that to keep the Serio prong of the investigation |
| 12:07PM | 17 | concealed from the defendant? |
| 12:07PM | 18 | A.  Yes. |
| 12:07PM | 19 | Q.  In your experience, can questions that investigators ask |
| 12:07PM | 20 | people during interviews, can that reveal the direction and |
| 12:07PM | 21 | potential scope of an investigation? |
| 12:07PM | 22 | A.  Yes. |
| 12:07PM | 23 | Q.  Did you want to avoid that? |
| 12:07PM | 24 | A.  Yes. |
| 12:07PM | 25 | Q.  Did you and Special Agent Carpenter agree to keep that |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

12:07PM 1    information concealed and contained from the defendant?

12:07PM 2    A.  Yes.

12:08PM 3    Q.  Now, earlier you had mentioned that Homeland Security has

12:08PM 4    some specialty in investigating activities that relate to the

12:08PM 5    United States Border; is that right?

12:08PM 6    A.  Yes.

12:08PM 7    Q.  You have ability to check on information in terms of

12:08PM 8    international travel?

12:08PM 9    A.  Yes.

12:08PM 10   Q.  And those are through -- that's through information

12:08PM 11   available to you through Homeland Security; is that right?

12:08PM 12   A.  That's correct.

12:08PM 13   Q.  On April 27th, 2019, were you aware that Peter Gerace,

12:08PM 14   Jr., the owner of Pharaoh's, had international travel and was

12:08PM 15   scheduled to return into the United States from a foreign

12:08PM 16   country?

12:08PM 17   A.  Yes.

12:08PM 18   Q.  Generally, were you aware of that because you had entered

12:08PM 19   information in the database that would then alert you if

12:08PM 20   Mr. Gerace was crossing an international border?

12:09PM 21   A.  Yes, that's correct.

12:09PM 22   Q.  When you learned that Mr. Gerace was going to be

12:09PM 23   traveling internationally and then reentering the United

12:09PM 24   States, what arrangements did you make?

12:09PM 25   A.  Contacted HSI agents at Newark airport where he was going

12:09PM  1   to enter the United States and arranged for what we call a

12:09PM  2   secondary examination.  And if he had a phone with him, for

12:09PM  3   the phone to be detained for a border search.

12:09PM  4   Q.  And is that type of authority within HSI's scope of

12:09PM  5   ordinary investigative duties?

12:09PM  6   A.  Yes.

12:09PM  7   Q.  Did you communicate specifically with HSI Newark and then

12:09PM  8   get into contact with an agent named Robert Van Etten?

12:09PM  9   A.  Yes.

12:09PM  10  Q.  On that date, did you learn that Van Etten had detained

12:10PM  11  Mr. Gerace's phone and was going to be FedExing Mr. Gerace's

12:10PM  12  phone to you for further examination?

12:10PM  13  A.  Yes.

12:10PM  14  Q.  Did you coordinate with Mr. Van Etten, Special Agent

12:10PM  15  Van Etten out of HSI Newark to receive Peter Gerace's cell

12:10PM  16  phone?

12:10PM  17  A.  Yes.

12:10PM  18  Q.  How did you receive it?

12:10PM  19  A.  By FedEx.

12:10PM  20  Q.  When you received it, was it intact?

12:10PM  21  A.  Yes.

12:10PM  22  Q.  When a phone like that is detained, are records generated

12:10PM  23  in the ordinary course of business?

12:10PM  24  A.  Yes.

12:10PM  25  Q.  Is it called a detention notice and custody receipt for

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

92

| | | |
|---|---|---|
| 12:10PM | 1 | detained property? |
| 12:10PM | 2 | A.  Yes. |
| 12:10PM | 3 | Q.  I'm going to hand you up Government Exhibit 310A.  Just |
| 12:10PM | 4 | take a moment to review that. |
| 12:11PM | 5 | Do you recognize that? |
| 12:11PM | 6 | A.  I do. |
| 12:11PM | 7 | Q.  What do you recognize it to be? |
| 12:11PM | 8 | A.  It's the detention notice and custody receipt for |
| 12:11PM | 9 | detained property for Peter Gerace's iPhone X. |
| 12:11PM | 10 | Q.  Is that -- was that document made in the ordinary course |
| 12:11PM | 11 | of HSI business? |
| 12:11PM | 12 | A.  Yes. |
| 12:11PM | 13 | Q.  Is it the ordinary course of Homeland Security |
| 12:11PM | 14 | Investigation business to make and keep that record? |
| 12:11PM | 15 | A.  Yes. |
| 12:11PM | 16 | Q.  Are the entries made at or near the time the events are |
| 12:11PM | 17 | recorded in the document? |
| 12:11PM | 18 | A.  Yes. |
| 12:11PM | 19 | Q.  Ar the entries made under the obligation to do so |
| 12:11PM | 20 | accurately, in this instance, Special Agent Van Etten? |
| 12:12PM | 21 | A.  Yes. |
| 12:12PM | 22 | MR. TRIPI:  The government offers Exhibit 310A, |
| 12:12PM | 23 | Your Honor. |
| 12:12PM | 24 | MR. MacKAY:  No objection. |
| 12:12PM | 25 | THE COURT:  Received without objection. |

| | | |
|---|---|---|
| 12:12PM | 1 | **(GOV Exhibit 310A was received in evidence.)** |
| 12:12PM | 2 | **MR. TRIPI:**  Can we publish -- thank you. |
| 12:12PM | 3 | Can we publish Exhibit 310A, please.  All right. |
| 12:12PM | 4 | **BY MR. TRIPI:** |
| 12:12PM | 5 | Q.  All right.  When these forms are being filled out, is it |
| 12:12PM | 6 | basically like the old school carbon paper where you've got |
| 12:12PM | 7 | several sheets and so each one you're getting a copy? |
| 12:12PM | 8 | A.  Yes. |
| 12:12PM | 9 | Q.  Can you just orient the jury to the information, just |
| 12:12PM | 10 | kind of go through the different boxes and information that's |
| 12:12PM | 11 | documented in the form? |
| 12:12PM | 12 | A.  Yes.  So -- |
| 12:12PM | 13 | Q.  Start with maybe box 6? |
| 12:12PM | 14 | A.  That's the port code.  So 4601 is either the Port of |
| 12:12PM | 15 | Newark or specific to Newark International Airport. |
| 12:13PM | 16 | The detention date, April 27th, 2019. |
| 12:13PM | 17 | Q.  So that means when HSI obtained Mr. Gerace's phone? |
| 12:13PM | 18 | A.  Yes. |
| 12:13PM | 19 | Q.  Please continue. |
| 12:13PM | 20 | A.  And then the time is -- looks like 1809, so 6:09 p.m. |
| 12:13PM | 21 | And then where it says seal or other ID, and then it has, |
| 12:13PM | 22 | PEB, a dash, and then A-2862367.  That's the unique number on |
| 12:13PM | 23 | the bag that Special Agent Van Etten sealed the phone in. |
| 12:13PM | 24 | And then name:  Peter George Gerace.  His address, 5145 |
| 12:13PM | 25 | Luxor Lane in Clarence, New York.  And the remarks that it's |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

94

12:13PM  1   an iPhone X, and then the code is in parenthesis with the

12:13PM  2   numbers to unlock the phone, 123456.

12:14PM  3   Q.  Is that phone number 716-725-1931?

12:14PM  4   A.  Yes.

12:14PM  5   Q.  And then below that, you are the point of contact?

12:14PM  6   A.  Yes.

12:14PM  7   Q.  Below that the reason for the detention of the phone,

12:14PM  8   border search?

12:14PM  9   A.  Yes.

12:14PM  10  Q.  Under that, forensics.  Was that an indication that HSI

12:14PM  11  would be looking at the extracted data information from the

12:14PM  12  cell phone?

12:14PM  13  A.  Yes.

12:14PM  14  Q.  In the proper -- box 19, the property, is that

12:14PM  15  referencing the same iPhone X?

12:14PM  16  A.  Yes.

12:14PM  17  Q.  And box 20, is that the name and signature of Special

12:14PM  18  Agent Van Etten who you were coordinating with?

12:14PM  19  A.  Yes.

12:14PM  20  Q.  And then below that, the acceptance chain of custody,

12:14PM  21  does that indicate, you know, who it went from once it got to

12:14PM  22  Buffalo?

12:14PM  23  A.  Yes.

12:14PM  24  Q.  And that's basically you, and then Special Agent

12:14PM  25  Donoghue?

12:14PM    1    A.  Yes.

12:14PM    2    Q.  Who is Special Agent Donoghue?

12:14PM    3    A.  He's a special agent in the HSI office with training in

12:14PM    4    computer forensics.

12:15PM    5    Q.  After you obtained and secured Mr. Gerace's iPhone X, did

12:15PM    6    you give that phone to Mr. -- Special Agent Donoghue to

12:15PM    7    extract the data that was contained in Mr. Gerace's phone?

12:15PM    8    A.  Yes.

12:15PM    9    Q.  Did that include contacts, text messages, that type of

12:15PM    10   thing?

12:15PM    11   A.  Yes.

12:15PM    12   Q.  Photographs, voicemails?

12:15PM    13   A.  Yes.

12:15PM    14   Q.  And did Special Agent Donoghue extract the phone?

12:15PM    15   A.  He did.

12:15PM    16   Q.  When he was done extracting the information on

12:15PM    17   Mr. Gerace's iPhone X, did he give the phone back to you?

12:15PM    18   A.  He did.

12:15PM    19   Q.  Once you got the phone back from Special Agent Donoghue,

12:15PM    20   what did you do with it?

12:15PM    21   A.  Well, Special Agent Donoghue had the phone, I received

12:15PM    22   it, telephone call from Attorney Tom Eoannou.

12:15PM    23   Q.  Now, is that the attorney that had been representing

12:15PM    24   Anthony Gerace in federal court?

12:15PM    25   A.  Yes.

12:15PM   1    Q.  And Anthony's Peter's brother?

12:16PM   2    A.  That's correct.

12:16PM   3    Q.  And did he request when HSI was done with the phone to

12:16PM   4    have you return Mr. Peter Gerace's phone to Mr. Eoannou's

12:16PM   5    office?

12:16PM   6    A.  He did.

12:16PM   7    Q.  Is that what you did?

12:16PM   8    A.  Yes, on May 10th.

12:16PM   9    Q.  May 10th, 2019?

12:16PM  10    A.  Yes.

12:16PM  11    Q.  And so basically, the extraction is a copy of the

12:16PM  12    information that was able to be extracted from the phone; is

12:16PM  13    that right?

12:16PM  14    A.  Yes.

12:16PM  15    Q.  Fair to say, sometimes the equipment doesn't extract

12:16PM  16    everything?  Sometimes there's stuff that might be deleted

12:16PM  17    off of the phone that the equipment may not capture?

12:16PM  18    A.  Yes, that's correct.

12:16PM  19    Q.  Okay.  I'm going to hand you up a flash drive marked

12:17PM  20    Government Exhibit 310.

12:17PM  21        Do you recognize Exhibit 310?

12:17PM  22    A.  Yes.

12:17PM  23    Q.  What do you recognize it to be?

12:17PM  24    A.  It's a copy of the phone extraction from Peter Gerace's

12:17PM  25    iPhone X with telephone number 716-725-1931.

12:17PM    1    Q.  How do you recognize it?

12:17PM    2    A.  By the label and then by my initials, which I placed on

12:17PM    3    the label.

12:17PM    4    Q.  So basically what happens is Special Agent Donoghue

12:17PM    5    creates that extraction, makes it available to you, puts it

12:17PM    6    on a flash drive, and then here it is in federal court; is

12:17PM    7    that right?

12:17PM    8    A.  Yes.

12:17PM    9    Q.  Were there text messages and content regarding Peter

12:17PM   10    Gerace inside that extraction?

12:17PM   11    A.  Yes.

12:17PM   12    Q.  Were there contacts in the phone?

12:17PM   13    A.  Yes.

12:17PM   14    Q.  Was the phone number associated with the device a number

12:18PM   15    that you had previously identified for Mr. Gerace, this

12:18PM   16    725-1931?

12:18PM   17    A.  Yes.

12:18PM   18    Q.  Did you also know by that point in the investigation that

12:18PM   19    the phone number that had been associated with Defendant

12:18PM   20    Bongiovanni when he was at DEA was 716-818-0966?

12:18PM   21    A.  Yes.

12:18PM   22    Q.  When you looked at contents of -- of that phone, did --

12:18PM   23    did you -- did it indicate further that based on the contents

12:18PM   24    that it was in fact Peter Gerace's iPhone X?

12:18PM   25    A.  Yes.

12:18PM   1   Q.  Did that include the content of the text messages and the

12:18PM   2   phone number itself?

12:18PM   3   A.  Yes.

12:18PM   4   Q.  When you reviewed that extraction, did you focus in on

12:18PM   5   text communications between Mr. Bongiovanni and Mr. Gerace

12:18PM   6   that were contained in Mr. Gerace's iPhone X?

12:19PM   7   A.  Yes.

12:19PM   8   Q.  I'm going to hand you up now what's been submarked from

12:19PM   9   the extraction as Government Exhibit 310D, D as in dog.

12:20PM   10      Do you recognize Exhibit 310D?

12:20PM   11   A.  Yes.

12:20PM   12   Q.  What do you recognize that to be?

12:20PM   13   A.  It's a report of the text messages between Peter Gerace

12:20PM   14   and Joseph Bongiovanni generated from the extraction of

12:20PM   15   Mr. Gerace's phone.

12:20PM   16   Q.  So those are the texts between those two that were

12:20PM   17   extracted from the phone?

12:20PM   18   A.  Yes.

12:20PM   19   Q.  Is it accurate for the text messages between the two that

12:20PM   20   were extracted from Exhibit 310?

12:20PM   21   A.  Yes.

12:20PM   22       MR. TRIPI:  The government offers Exhibit 310D,

12:20PM   23   Your Honor.

12:20PM   24       MR. MacKAY:  No objection to 310D.

12:20PM   25       THE COURT:  Received without objection.

12:20PM    1              **(GOV Exhibit 310D was received in evidence.)**

12:20PM    2              **BY MR. TRIPI:**

12:20PM    3    Q.  And we'll get to this a little bit later, but was there

12:20PM    4    also in the text messages in the data extracted from the

12:20PM    5    phone, if there's like a voicemail message, things like that,

12:20PM    6    does that get extracted as well?

12:21PM    7    A.  Yes.

12:21PM    8    Q.  Was there a particular text message in that thread that

12:21PM    9    was in 310D that was also downloaded as part of the

12:21PM   10    extraction?

12:21PM   11    A.  Yes.

12:21PM   12    Q.  I'm going to hand you up Government Exhibit 311.  Do you

12:21PM   13    recognize that?

12:21PM   14    A.  I do.

12:21PM   15    Q.  What do you recognize it to be?

12:21PM   16    A.  It's the voice recording that was contained in the text

12:21PM   17    messages.

12:21PM   18    Q.  And was that a particular voice message May 4th, 2017?

12:21PM   19    A.  Yes.

12:21PM   20    Q.  Is that accurate?

12:21PM   21    A.  It is.

12:21PM   22    Q.  A copy?

12:21PM   23    A.  Yes, it is.

12:21PM   24              **MR. TRIPI:**  The government offers Exhibit 311,

12:21PM   25    Your Honor.

| 12:21PM | 1 | **MR. MacKAY:** No objection. |
| 12:21PM | 2 | **THE COURT:** Received without objection. |
| 12:21PM | 3 | **(GOV Exhibit 311 was received in evidence.)** |
| 12:21PM | 4 | **MR. TRIPI:** All right. Ms. Champoux, if we could, |
| 12:21PM | 5 | please publish Exhibit 310D. |
| 12:21PM | 6 | **BY MR. TRIPI:** |
| 12:22PM | 7 | Q. Okay. Let's orient the jury to the exhibit, okay? |
| 12:22PM | 8 | A. Okay. |
| 12:22PM | 9 | Q. What does IOS Message, SMS, MMS mean? |
| 12:22PM | 10 | A. So, IOS is iPhone Messenger, that's IOS iMessage. SMS |
| 12:22PM | 11 | and MMS are two other formats for text messages. |
| 12:22PM | 12 | Q. And it says number of participants, two? |
| 12:22PM | 13 | A. Yes. |
| 12:22PM | 14 | Q. Does that mean this is a text thread between just two |
| 12:22PM | 15 | people? |
| 12:22PM | 16 | A. Yes. |
| 12:22PM | 17 | Q. And where it says display name, 1-716-818-0966, is that |
| 12:22PM | 18 | telling you the other phone number for the other person who |
| 12:22PM | 19 | Mr. Gerace is texting with? |
| 12:22PM | 20 | A. Yes. |
| 12:22PM | 21 | Q. Does this tell you the number of messages between those |
| 12:22PM | 22 | two numbers? |
| 12:22PM | 23 | A. 391, between January 6th, 2015 and February 22nd, 2019. |
| 12:23PM | 24 | Q. Just looking at those text messages from January 6th, |
| 12:23PM | 25 | 2015 to February 22nd, 2019, 391 text messages, does that |

| | | |
|---|---|---|
| 12:23PM | 1 | seem like primarily random telephonic communication to you? |
| 12:23PM | 2 | A.  No. |
| 12:23PM | 3 | Q.  But that's what Mr. Bongiovanni wrote in one of his |
| 12:23PM | 4 | memos, Exhibit 97? |
| 12:23PM | 5 | A.  Yes. |
| 12:23PM | 6 | Q.  Okay.  Now, I'd like to go through these text messages. |
| 12:23PM | 7 | **MR. TRIPI:**  Ms. Champoux, is there any way we can |
| 12:23PM | 8 | make them a little bit bigger? |
| 12:23PM | 9 | Your Honor, in terms of a sense of time, when do you |
| 12:23PM | 10 | want to break? |
| 12:23PM | 11 | **THE COURT:**  Are you going to through 391? |
| 12:23PM | 12 | **MR. TRIPI:**  We're going to go through -- it's going |
| 12:23PM | 13 | to be relatively quick though, Judge.  We ended up doing |
| 12:23PM | 14 | that -- yeah, we're going to go through them so we're not |
| 12:23PM | 15 | going back and forth. |
| 12:23PM | 16 | **THE COURT:**  I'm sorry. |
| 12:23PM | 17 | **MR. TRIPI:**  Yes, so we're not going to go through |
| 12:23PM | 18 | Ping-Ponging too much, we're going to go through 391. |
| 12:23PM | 19 | **THE COURT:**  Okay. |
| 12:24PM | 20 | **BY MR. TRIPI:** |
| 12:24PM | 21 | Q.  So the first message is January 6, 2015; is that right? |
| 12:24PM | 22 | A.  Yes. |
| 12:24PM | 23 | Q.  Now I want you to orient the jury though, when you see |
| 12:24PM | 24 | the blue bubbles, who's writing that message? |
| 12:24PM | 25 | A.  Peter Gerace. |

12:24PM   1    Q.   And when we see the gray with the 818 phone number, or

12:24PM   2    0966, who's writing that?

12:24PM   3    A.   Joseph Bongiovanni.

12:24PM   4    Q.   And in terms of the date and time, is this in UTC?

12:24PM   5    A.   Yes.

12:24PM   6    Q.   So when you see a time, for example, the first message it

12:24PM   7    says 2:02 a.m., and 46 seconds, in terms of UTC time, if in

12:24PM   8    it's in the wintertime, do you subtract five hours?

12:24PM   9    A.   Yes.

12:24PM   10   Q.   If it's in the summertime do you generally subtract four

12:24PM   11   hours?

12:24PM   12   A.   Yes, during daylight savings, the difference is four

12:24PM   13   hours.

12:24PM   14   Q.   I want to scroll through some of these so the jury can

12:24PM   15   get a feel for the relationship between the two.

12:24PM   16        **MR. TRIPI:**  Ms. Champoux --

12:24PM   17        **BY MR. TRIPI:**

12:24PM   18   Q.   I'm going to have her scroll down, and can you read and

12:24PM   19   assign who's writing each thing, and I'll stop and ask some

12:25PM   20   questions along the way.

12:25PM   21   A.   Yes.  The first one is from Mr. Gerace.  It says we need

12:25PM   22   to get together soon.

12:25PM   23       Special Mr. Bongiovanni responds, I know, Bro.  Maybe

12:25PM   24   lunch soon, miss you Bro.

12:25PM   25       And then Mr. Gerace:  Yeah, how is Friday or Saturday.

| | | |
|---|---|---|
| 12:25PM | 1 | **MR. TRIPI:**  Okay.  Please keep scrolling. |
| 12:25PM | 2 | **BY MR. TRIPI:** |
| 12:25PM | 3 | Q.  And those are all January 6th, 2015? |
| 12:25PM | 4 | A.  Yes. |
| 12:25PM | 5 | Q.  Please continue? |
| 12:25PM | 6 | A.  Continuing on January 6th.  Mr. Bongiovanni says Saturday |
| 12:25PM | 7 | best.  My Uncle John Mambrino passed away.  He was Babe |
| 12:25PM | 8 | Mambrino's brother, so I have the funeral later this week. |
| 12:25PM | 9 | Mr. Gerace same day says:  Sorry to hear.  And then, |
| 12:25PM | 10 | okay. |
| 12:25PM | 11 | And then Mr. Bongiovanni says:  Get with you later this |
| 12:25PM | 12 | week. |
| 12:25PM | 13 | And then the last text on that day is Mr. Gerace saying |
| 12:25PM | 14 | okay. |
| 12:25PM | 15 | Q.  And then the next text is on what date? |
| 12:25PM | 16 | A.  January 18, 2015. |
| 12:26PM | 17 | Q.  Who writes it? |
| 12:26PM | 18 | A.  Mr. Gerace. |
| 12:26PM | 19 | **MR. TRIPI:**  Can we zoom in on it so we can see it |
| 12:26PM | 20 | better, Ms. Champoux? |
| 12:26PM | 21 | **BY MR. TRIPI:** |
| 12:26PM | 22 | Q.  Again we're looking at January 18th, 2015 and this is |
| 12:26PM | 23 | really 11:49 p.m., right? |
| 12:26PM | 24 | A.  Yes, sir. |
| 12:26PM | 25 | Q.  This is 11:49 p.m. on the 17th? |

12:26PM    1    A.  Yes.

12:26PM    2    Q.  Okay.  And that one says need have lunch this week?

12:26PM    3    A.  Yes, it does.

12:26PM    4         **MR. TRIPI:**  We can zoom out of that.

12:26PM    5         **BY MR. TRIPI:**

12:26PM    6    Q.  And does Mr. Bongiovanni respond?

12:26PM    7    A.  Tuesday, Wednesday, or Thursday good for me.

12:26PM    8    Q.  And please just continue reading the content and the date

12:26PM    9    and time, please.

12:26PM   10    A.  Mr. Gerace says okay, Wednesday.

12:26PM   11         Still on January 18th, I guess it's late on the -- no,

12:26PM   12    this is January 18th, Mr. Bongiovanni says, cool.

12:26PM   13         And then it skips to January 21st at about 11:06 a.m.

12:26PM   14    Mr. Gerace says:  What time is good today.

12:26PM   15         Mr. Bongiovanni says:  Not good at all, bro.  I'm stuck.

12:27PM   16    Maybe tomorrow.  Fuck job.  Fucking job never fails.

12:27PM   17         And then Mr. Gerace says:  All good, bud.

12:27PM   18    Q.  Please, continue.

12:27PM   19    A.  Now it's March 1st in the afternoon.  Sorry, Bro, I saw

12:27PM   20    you called.

12:27PM   21    Q.  You've got to say who's writing the messages.

12:27PM   22    A.  Mr. Bongiovanni says:  Sorry, Bro, I saw you called.

12:27PM   23    I've been exhausted.  Just hanging with my bride.

12:27PM   24         And then Mr. Gerace responds:  All good.  Pictures look

12:27PM   25    beautiful.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

| | | |
|---|---|---|
| 12:27PM | 1 | Mr. Bongiovanni says:  Thank you, bro.  Hope all is well |
| 12:27PM | 2 | with you and Katrina. |
| 12:27PM | 3 | Q.  At that point Mr. Gerace is married to Katrina Nigro? |
| 12:27PM | 4 | A.  Yes. |
| 12:27PM | 5 | Q.  And at that point Mr. Bongiovanni had recently married |
| 12:27PM | 6 | his wife, Lindsay? |
| 12:27PM | 7 | A.  Yes. |
| 12:27PM | 8 | Q.  Okay.  Please, continue. |
| 12:27PM | 9 | A.  Still on March 1st, Mr. Gerace says:  Let me know when we |
| 12:27PM | 10 | can grab lunch. |
| 12:27PM | 11 | Same day, Mr. Bongiovanni responds:  Okay, this week I |
| 12:28PM | 12 | should be good.  Maybe Wednesday.  We can go anywhere. |
| 12:28PM | 13 | And Mr. Gerace says:  Okay, bud. |
| 12:28PM | 14 | Q.  Please continue.  We're now on page 5 of the exhibit. |
| 12:28PM | 15 | A.  So, March 10th, about 4:00 in the afternoon, |
| 12:28PM | 16 | Mr. Bongiovanni says:  Peter, you and Katrina are invited |
| 12:28PM | 17 | Sunday, March 15th at 11 a.m., Saint Patrick's Day party at |
| 12:28PM | 18 | my house.  About 40 people will be there.  I hope you guys |
| 12:28PM | 19 | can make it. |
| 12:28PM | 20 | Mr. Gerace responds:  Cool, thanks. |
| 12:28PM | 21 | Q.  Now, let me ask you this.  When -- so that's a message on |
| 12:28PM | 22 | March 10th.  The Saint Patrick's Day party was planned for |
| 12:28PM | 23 | March 15th according to that message; is that right? |
| 12:28PM | 24 | A.  That's what it says, yes. |
| 12:28PM | 25 | Q.  Had -- have you ever invited a confidential source to a |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24
106

| | | |
|---|---|---|
| 12:28PM | 1 | party at your house? |
| 12:28PM | 2 | A.  No. |
| 12:28PM | 3 | **MR. MacKAY:**  Objection, improper opinion. |
| 12:28PM | 4 | **MR. TRIPI:**  I didn't ask his opinion, I asked if he's |
| 12:29PM | 5 | ever done it. |
| 12:29PM | 6 | **THE COURT:**  I'm sorry? |
| 12:29PM | 7 | **MR. TRIPI:**  I didn't ask his opinion, I asked if he's |
| 12:29PM | 8 | ever done it. |
| 12:29PM | 9 | **MR. MacKAY:**  It's improper lay witness testimony. |
| 12:29PM | 10 | Objection, Judge. |
| 12:29PM | 11 | **THE COURT:**  No, overruled. |
| 12:29PM | 12 | **BY MR. TRIPI:** |
| 12:29PM | 13 | Q.  Have you ever as an investigator with Homeland Security |
| 12:29PM | 14 | or any other agency invited a confidential source over to |
| 12:29PM | 15 | your house for a party? |
| 12:29PM | 16 | A.  No.  Never. |
| 12:29PM | 17 | Q.  Have you ever invited a source of information over to |
| 12:29PM | 18 | your house for a party? |
| 12:29PM | 19 | A.  Never. |
| 12:29PM | 20 | Q.  Please continue. |
| 12:29PM | 21 | A.  So March 10th, 2015.  Mr. Bongiovanni says:  Hope you |
| 12:29PM | 22 | could make it, bro. |
| 12:29PM | 23 | Same day Mr. Gerace says:  I'll let you know. |
| 12:29PM | 24 | Then it jumps to March 14th.  Mr. Gerace says:  Bud, |
| 12:29PM | 25 | tomorrow not looking good.  Nick missed four days of school. |

12:29PM   1   He still has fever, now I got it.  This sucks.  I will see

12:29PM   2   you soon.  She got that cut off her ankle this a.m.

12:30PM   3   Q.  And what did Mr. Bongiovanni respond the 14th?

12:30PM   4   A.  No problem, bud.  I understand.  Chelsea's sick too.

12:30PM   5   Q.  Does Mr. Gerace have a son named Nick, and did

12:30PM   6   Mr. Bongiovanni -- does Mr. Bongiovanni have a daughter named

12:30PM   7   Chelsea?

12:30PM   8   A.  Yes.

12:30PM   9   Q.  Okay.  Please continue.

12:30PM  10   A.  Still March 14th, Mr. Gerace says:  Sucks.

12:30PM  11        Then it jumps to May 1st.

12:30PM  12   Q.  And who's writing a message May 1st?

12:30PM  13   A.  Mr. Bongiovanni says:  Peter, I didn't know you were

12:30PM  14   sick.  Glad you are feeling better.

12:30PM  15        Same day Mr. Gerace says:  Thanks.  I still have a gift

12:30PM  16   for you.

12:30PM  17        And same day Mr. Bongiovanni says:  Just get better, bro.

12:30PM  18   I will pick you up in the old Buick and we will hang out.

12:30PM  19             **MR. TRIPI:**  Ms. Champoux, can you pull up Government

12:30PM  20   Exhibit 109AB in evidence.

12:30PM  21             **BY MR. TRIPI:**

12:30PM  22   Q.  Can you tell the jury what they're looking at there

12:30PM  23   Special Agent Ryan?

12:31PM  24   A.  Mr. Bongiovanni in his classic Buick.

12:31PM  25   Q.  Would that be consistent with an old Buick?

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

12:31PM    1    A.  Yes.

12:31PM    2         **MR. TRIPI:**  We can go back to the text thread

12:31PM    3    Ms. Champoux.

12:31PM    4         **BY MR. TRIPI:**

12:31PM    5    Q.  We're on 310D where we left off.

12:31PM    6    A.  So on May 1st, Mr. Gerace responds:  Love to, thanks.

12:31PM    7    Then it jumps to May 13th.

12:31PM    8    Q.  Is there some type of multimedia sent that day from

12:31PM    9    Mr. Gerace?

12:31PM    10   A.  Yes.

12:31PM    11   Q.  We can continue scrolling.  What's the next message?

12:31PM    12   A.  May 13th from Mr. Bongiovanni says:  Ain't that the

12:31PM    13   truth.

12:31PM    14        May 13th Mr. Gerace sends a thumbs up emoji.

12:31PM    15        And then May 28th:  Pharaoh's 6th annual golf outing,

12:31PM    16   Wednesday, July 29th, included limo, food, booze, girls, and

12:31PM    17   pig roast.  Limited spots.  First to pay are in.  Money due

12:32PM    18   before July 10th.  $600 foursome.

12:32PM    19        Then it jumps to June 14th.  Mr. Gerace says:  Where are

12:32PM    20   you?

12:32PM    21        Then on July 6th, Mr. Gerace says:  Do you have your

12:32PM    22   foursome.

12:32PM    23        Again on July 6th, Mr. Gerace says:  Pharaoh's 6th annual

12:32PM    24   golf outing, Wednesday, July 29th.  Included limo, food,

12:32PM    25   booze, girls, and pig roast.  Limited spots.  First to pay

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

12:32PM 1   are in.  Money due before July 10th.

12:32PM 2   Q.  So among the things that are being offered for the -- in

12:32PM 3   that text message for the 6th annual golf outing are food,

12:32PM 4   booze, and girls.

12:32PM 5   A.  Yes.

12:32PM 6   Q.  Please, continue.

12:32PM 7   A.  Mr. Gerace on July 9th:  Did you and MS.

12:32PM 8      And then next text on July 9th from Mr. Gerace:  Napoli

12:33PM 9   get foursome.

12:33PM 10  Q.  Do you believe it to be a reference to Tom Napoli?

12:33PM 11  A.  Yes.

12:33PM 12  Q.  Please, continue.

12:33PM 13  A.  From Mr. Gerace on July 9th:  Arcangelo says he does, and

12:33PM 14  Flo is in.

12:33PM 15  Q.  Okay.  Let me stop you there for a second.

12:33PM 16       **MR. TRIPI:**  Can we pull up Government Exhibit 126 in

12:33PM 17  evidence, please.

12:33PM 18       **BY MR. TRIPI:**

12:33PM 19  Q.  I'm going to tap the screen and make marks, and ask you

12:33PM 20  if you know who the person is in this photo, okay?

12:33PM 21  A.  Yes.

12:33PM 22  Q.  Exhibit 126 in evidence.  Do you see who I tapped above

12:33PM 23  there?

12:33PM 24  A.  Oh, the blue dot?  Yes.  Joseph Bongiovanni.

12:33PM 25  Q.  Okay.  So that's the defendant, right?

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

110

| | | |
|---|---|---|
| 12:33PM | 1 | A.  Yes. |
| 12:33PM | 2 | Q.  See the person next to him? |
| 12:33PM | 3 | A.  Tom Napoli. |
| 12:33PM | 4 | Q.  Is that the person that was just referenced in the text |
| 12:33PM | 5 | thread between Mr. Gerace and Mr. Bongiovanni? |
| 12:33PM | 6 | A.  Yes.  Arcangelo Cappazollo. |
| 12:33PM | 7 | Q.  Was there an Arcangelo just referenced in the text thread |
| 12:34PM | 8 | between Mr. Gerace and Mr. Bongiovanni? |
| 12:34PM | 9 | A.  Yes. |
| 12:34PM | 10 | Q.  Okay.  And just to finish it off, who's that? |
| 12:34PM | 11 | A.  Kevin Myszka. |
| 12:34PM | 12 | Q.  Is he someone who ultimately began to proffer and |
| 12:34PM | 13 | cooperate in the investigation? |
| 12:34PM | 14 | A.  Yes. |
| 12:34PM | 15 | Q.  Who's that? |
| 12:34PM | 16 | A.  Michael Sinatra. |
| 12:34PM | 17 | Q.  Is he the Michael Sinatra you talked about earlier, |
| 12:34PM | 18 | Homeland Security searched his residence? |
| 12:34PM | 19 | A.  Yes. |
| 12:34PM | 20 | Q.  Do you remember who that is? |
| 12:34PM | 21 | A.  Where the pencil is now? |
| 12:34PM | 22 | Q.  Yeah. |
| 12:34PM | 23 | A.  Eric Bogart. |
| 12:34PM | 24 | Q.  Do you know who that is? |
| 12:34PM | 25 | A.  Gassan Rizek. |

12:34PM    1    Q.  And do you know who that is?

12:34PM    2    A.  Not sure.

12:34PM    3    Q.  Okay.

12:34PM    4         MR. TRIPI:  We can take that one down, Ms. Champoux.

12:34PM    5    And go back to where we left off, please.

12:34PM    6         BY MR. TRIPI:

12:34PM    7    Q.  Next page.  So, who writes Arcangelo says he does and Flo

12:35PM    8    is in?

12:35PM    9    A.  Peter Gerace.

12:35PM    10   Q.  And who writes the next message?  Please continue.

12:35PM    11   A.  Peter Gerace on July 13th:  Are you and Tommy in for

12:35PM    12   golf?  Need to know by tomorrow a.m.

12:35PM    13   Q.  And what does Mr. Bongiovanni respond?

12:35PM    14   A.  Same day.  I ask him, bud, call tomorrow.

12:35PM    15   Q.  Okay.

12:35PM    16        MR. TRIPI:  Let's go to the next message, please.

12:35PM    17        Go up a little further, Ms. Champoux.  There you go.

12:35PM    18        BY MR. TRIPI:

12:35PM    19   Q.  Thank you.

12:35PM    20   A.  It's from Mr. Gerace on July 13th.  Okay.  Arcangelo and

12:35PM    21   his friend paid Y-E-S-T for yesterday.  Tom said he was

12:35PM    22   waiting on you.

12:35PM    23   Q.  In the context of this thread, do you believe that Tom to

12:35PM    24   be a reference to Tom Napoli?

12:35PM    25   A.  Yes.

| | | |
|---|---|---|
| 12:35PM | 1 | Q.  Please continue.  What does Mr. Bongiovanni respond? |
| 12:35PM | 2 | A.  Same day, he responds:  I'll call him now. |
| 12:35PM | 3 | Mr. Gerace responds:  Okay. |
| 12:35PM | 4 | Still July 13th, Mr. Bongiovanni says:  Tom's going to |
| 12:36PM | 5 | call me tomorrow at 10 a.m.  He has to get someone to cover |
| 12:36PM | 6 | at work.  Once he does that and we are in, I'll call you to |
| 12:36PM | 7 | meet you to pay.  Either way, I'll call you. |
| 12:36PM | 8 | Q.  And what's the next message? |
| 12:36PM | 9 | A.  July 13th, Mr. Gerace says:  Okay, Joe.  Thanks.  Love to |
| 12:36PM | 10 | see you.  We will have fun. |
| 12:36PM | 11 | Same day Mr. Bongiovanni says:  Me, too. |
| 12:36PM | 12 | Q.  What's the next message? |
| 12:36PM | 13 | A.  Still July 13th.  Mr. Gerace says:  Pig roast after will |
| 12:36PM | 14 | be fun. |
| 12:36PM | 15 | Same day Mr. Bongiovanni says:  Cool. |
| 12:36PM | 16 | Still July 13th, Mr. Gerace says:  I'll be there at noon. |
| 12:36PM | 17 | July 13th, at -- when is this, about 11:52 a.m. |
| 12:36PM | 18 | Mr. Bongiovanni says:  Leaving my office now. |
| 12:36PM | 19 | Same day, same time roughly, Mr. Gerace says:  Okay. |
| 12:37PM | 20 | And then sends another text message that says:  Employee |
| 12:37PM | 21 | E-N-T on Aero. |
| 12:37PM | 22 | Q.  Now you've been to the Pharaoh's Gentlemen's Club when it |
| 12:37PM | 23 | was being searched; is that right? |
| 12:37PM | 24 | A.  Yes. |
| 12:37PM | 25 | Q.  Is there what appears to be an employee entrance on Aero |

12:37PM    1    Drive in terms of the physical structure?

12:37PM    2    A.  Yes, it's on the wall that faces Aero Drive.

12:37PM    3    Q.  Do you believe that's what's being referenced in that

12:37PM    4    text message for Mr. Bongiovanni to go to the employee

12:37PM    5    entrance?

12:37PM    6    A.  Yes.

12:37PM    7    Q.  Please continue the texts and where they pick up.

12:37PM    8    A.  July 14th, Mr. Bongiovanni says:  Those are bad ass kick,

12:37PM    9    bro.

12:37PM   10        Same day Mr. Gerace responds:  Get 'em, Joe.

12:37PM   11    Q.  Do you believe they're talking about shoes there?

12:37PM   12    A.  Yes.

12:37PM   13        Same date, Mr. Bongiovanni says:  Gonna for sure.

12:37PM   14        And then the next text is the next day July 15th from

12:38PM   15    Mr. Bongiovanni:  Going up to Boss tonight.  What day is your

12:38PM   16    golf tournament again?

12:38PM   17    Q.  And what is the reference to Boss?  Do you have an

12:38PM   18    understanding of that?

12:38PM   19    A.  I think it's the restaurant that used to be at Hertel and

12:38PM   20    Starin.

12:38PM   21    Q.  Okay.

12:38PM   22    A.  Steak restaurant.

12:38PM   23    Q.  And what did Mr. Gerace respond?

12:38PM   24    A.  He responded on July 15th with:  Pharaoh's 6th annual

12:38PM   25    golf outing, Wednesday, July 29.  Included, limo, food,

12:38PM    1   booze, girls, and pig roast.  Limited spots.  First to pay

12:38PM    2   are in.  Money due before July 10th.  $600 foursome.

12:38PM    3           **THE COURT:**  Do we have to read that text every time

12:38PM    4   it comes up, Mr. Tripi?

12:38PM    5           **MR. TRIPI:**  Yeah, Judge, I was going to interrupt him

12:38PM    6   there.  I should have.  Well taken.

12:38PM    7           **BY MR. TRIPI:**

12:38PM    8   Q.  All right.  What's your next text?

12:38PM    9   A.  Same day from Mr. Gerace:  What day is your B day?

12:38PM   10   Q.  And what did Mr. Bongiovanni respond?

12:38PM   11   A.  Same day:  Saturday.

12:39PM   12   Q.  Please continue.

12:39PM   13   A.  And then this is all July 15th.  Mr. Gerace says:  Okay.

12:39PM   14       Then another text that says:  I'm kid free.

12:39PM   15       And then another text that says:  I'm taking Nick to fest

12:39PM   16   T-O-M probably for tomorrow afternoon.

12:39PM   17   Q.  And what is the next text?

12:39PM   18   A.  On July 15th Mr. Bongiovanni says:  We are meeting at my

12:39PM   19   house for drinks, then to Boss or Scinta's if it don't rain

12:39PM   20   at the festival.  Come over, bro.

12:39PM   21   Q.  This time period, was there a yearly festival on Hertel

12:39PM   22   Avenue in Buffalo where Boss is located at the time, it was

12:39PM   23   called the Italian festival?

12:39PM   24   A.  Yes.

12:39PM   25   Q.  Do you believe it to be what's being referenced by fest,

12:39PM  1  short for festival?

12:39PM  2  A.  Yes.

12:39PM  3  Q.  Please continue with the text between the two.

12:39PM  4  A.  So still July 15th Mr. Gerace says:  When?

12:39PM  5      And Mr. Bongiovanni responds:  Around 5 p.m.

12:40PM  6      Still July 15th, Mr. Gerace asks:  What day?

12:40PM  7      Mr. Bongiovanni responds:  Saturday.

12:40PM  8      And that's the end of July 15th.  And then it jumps to

12:40PM  9  July 18th.

12:40PM  10  Q.  And based upon your research, was that July 18th, 2015 a

12:40PM  11  Saturday?

12:40PM  12  A.  Yes.

12:40PM  13  Q.  Okay.  So this is the day they were just talking about?

12:40PM  14  A.  Yes.

12:40PM  15  Q.  Please continue from there.

12:40PM  16  A.  Mr. Gerace says:  Happy B day.

12:40PM  17      Then sends another text that says:  What's the plan?

12:40PM  18      And a third text that says:  What's your address?

12:40PM  19      And then July 18th, Mr. Bongiovanni responds 85 Alder

12:40PM  20  Place, Tonawanda.

12:40PM  21  Q.  Let me ask you this:  In your career, in your experience,

12:40PM  22  have you given confidential sources and/or sources of

12:40PM  23  information your personal home address?

12:40PM  24  A.  No, never.

12:40PM  25          **MR. TRIPI:**  Please continue scrolling, Ms. Champoux.

12:40PM 1        **BY MR. TRIPI:**

12:41PM 2    Q.  And can you read the next message?

12:41PM 3    A.  Mr. Bongiovanni says:  About 4 p.m.  Then we are going G

12:41PM 4    up to F-B-E and then Boss, I think it's a typo.

12:41PM 5    Q.  Again, is Boss believed to be the reference to that

12:41PM 6    restaurant?

12:41PM 7    A.  Yes.

12:41PM 8    Q.  Next message?

12:41PM 9    A.  He writes again:  To Boss.  Don't mention the golf

12:41PM 10   tournament to L-I-N-D-A-Y, which I think is supposed to be

12:41PM 11   Lindsay.

12:41PM 12   Q.  And what actual time is that message?  It says 7:56 p.m.

12:41PM 13   in this text, but is that 2:56 p.m.?

12:41PM 14   A.  It would be 3:56 in July.

12:41PM 15   Q.  In July.  Sorry.

12:41PM 16   A.  Yep.

12:41PM 17   Q.  Four hour difference there.

12:41PM 18   A.  Yes.

12:41PM 19   Q.  Please continue.

12:41PM 20   A.  This is on 7/18.  Mr. Gerace:  I know.  What time Boss?

12:41PM 21       And Mr. Gerace says:  I just woke up.

12:41PM 22       Mr. Bongiovanni responds:  6:30 p.m.

12:42PM 23       Mr. Gerace says:  Can you get me in for dinner W U,

12:42PM 24   shorthand for with you.  Just 2.

12:42PM 25   Q.  Now at this time, Mr. Gerace is married to Katrina Nigro,

| | | |
|---|---|---|
| 12:42PM | 1 | correct? |
| 12:42PM | 2 | A.  Yes. |
| 12:42PM | 3 | Q.  Do you -- is that your understanding of the reference to |
| 12:42PM | 4 | just 2? |
| 12:42PM | 5 | A.  Yes. |
| 12:42PM | 6 | Q.  Please continue. |
| 12:42PM | 7 | A.  Still July 18th.  Mr. Gerace asks:  How many people |
| 12:42PM | 8 | having dinner? |
| 12:42PM | 9 | Mr. Bongiovanni responds:  Yes.  We have a big table. |
| 12:42PM | 10 | Some people are doing dinner, others are doing apps. |
| 12:42PM | 11 | Same day Mr. Gerace says:  Can we get in? |
| 12:42PM | 12 | Mr. Bongiovanni says:  Yeah, you got your ID? |
| 12:42PM | 13 | Mr. Gerace responds:  LOL.  And then Mr. Gerace asks: |
| 12:42PM | 14 | How old are you now? |
| 12:42PM | 15 | Mr. Bongiovanni responds:  41. |
| 12:42PM | 16 | Q.  Please continue. |
| 12:42PM | 17 | A.  Mr. Gerace says:  Ha, ha, good try.  But I'll go -- |
| 12:43PM | 18 | shorthand for with it. |
| 12:43PM | 19 | Then Mr. Gerace says:  Call me.  And then still on |
| 12:43PM | 20 | July 18th, he says:  Anthony is stopping up. |
| 12:43PM | 21 | Q.  And about what time is that in realtime, July 18th, 2015 |
| 12:43PM | 22 | at what time? |
| 12:43PM | 23 | A.  5:56 p.m. |
| 12:43PM | 24 | Q.  So that's about 40 minutes or so before the dinner was |
| 12:43PM | 25 | supposed to start? |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

12:43PM   1   A.  Yes.

12:43PM   2   Q.  Please continue.  What does Mr. Bongiovanni respond

12:43PM   3   when -- after Mr. -- after Peter Gerace writes Anthony is

12:43PM   4   stopping up?

12:43PM   5   A.  He wrote cool.

12:43PM   6       Then Mr. Gerace asks again:  What time dinner?

12:43PM   7       Mr. Bongiovanni responds:  We are here now, but no

12:43PM   8   ordered yet.

12:43PM   9       Then Mr. Bongiovanni says:  6:30.  I'll wait for you.  I

12:43PM  10   got three seats.

12:43PM  11   Q.  And is three consistent with the number of people Peter

12:43PM  12   Gerace, his wife, and his brother Anthony?

12:44PM  13   A.  Yes.

12:44PM  14   Q.  Please continue.

12:44PM  15   A.  Then the last text on July 18th says -- is from

12:44PM  16   Mr. Gerace, and it says:  I'm on way.

12:44PM  17   Q.  Okay.  Is that the last text for July 18th, 2015, I'm on

12:44PM  18   way?

12:44PM  19   A.  Yes.

12:44PM  20   Q.  And then there's about three day delay until there's more

12:44PM  21   texts; is that right?

12:44PM  22   A.  Yes.

12:44PM  23   Q.  And what's that next text message?

12:44PM  24   A.  It's from Mr. Gerace, it says:  Stockman's Tavern.

12:44PM  25   Q.  Is that a bar?

12:44PM   1    A.  Yes, on Transit Road.

12:44PM   2    Q.  And what does Mr. Bongiovanni respond on July 21st, 2015?

12:44PM   3    A.  Let's do it.  Call me.

12:44PM   4    Q.  Okay.  Please continue from there.

12:44PM   5    A.  Mr. Gerace on the same day says:  Okay.  And then that's

12:44PM   6    it for July 21st, and it jumped to August 3rd.

12:44PM   7    Q.  Can you pick it up from there, August 3rd?

12:44PM   8    A.  Mr. Bongiovanni says:  Peter, if I wanted to send you a

12:44PM   9    letter, which address do you have?

12:45PM   10   Q.  And what did Mr. -- did Mr. Gerace respond and text to

12:45PM   11   that?

12:45PM   12   A.  On August 6th, he said:  Thanks for the note, Joe.

12:45PM   13   Always there for you.

12:45PM   14   Q.  So there was no direct response to the text on

12:45PM   15   August 3rd; is that right?

12:45PM   16   A.  No text response.  But --

12:45PM   17   Q.  But the next text that we do see is thanks for the note

12:45PM   18   Joe, always there for you?

12:45PM   19   A.  Yes, on August 6th.

12:45PM   20   Q.  Okay.  Please continue from there.

12:45PM   21   A.  August 6th, Mr. Bongiovanni says:  Love you, bro.  Sorry

12:45PM   22   I've been crazy busy.  And I owe you clams casino and we will

12:45PM   23   get them soon.

12:45PM   24       Same day Mr. Gerace says:  It's 9-14 August Paradise Bay

12:45PM   25   Camp, Findlay Lake, cabin 2 and 3.  Then Mr. Gerace says:

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

120

| | | |
|---|---|---|
| 12:45PM | 1 | Love to see you.  That's it for August 6th. |
| 12:45PM | 2 | Q.  Does that seem like or does that indicate that Mr. Gerace |
| 12:46PM | 3 | invited Mr. Bongiovanni camping to Findlay Lake? |
| 12:46PM | 4 | A.  That's the way it reads to me, yes. |
| 12:46PM | 5 | Q.  Then they pick up again August -- or excuse me, |
| 12:46PM | 6 | October 14th, 2015? |
| 12:46PM | 7 | A.  Yes. |
| 12:46PM | 8 | Q.  And who, who reaches out? |
| 12:46PM | 9 | A.  Mr. Gerace says:  What you doing, bud?  And sends another |
| 12:46PM | 10 | text that says:  We have to get lunch soon. |
| 12:46PM | 11 | And then a third text on October 14th that says:  I'm |
| 12:46PM | 12 | going to Vegas Sunday. |
| 12:46PM | 13 | Q.  Okay.  Then does the texting pick back up November 30th, |
| 12:46PM | 14 | 2015? |
| 12:46PM | 15 | A.  Yes. |
| 12:46PM | 16 | Q.  And what does Mr. Gerace say there? |
| 12:46PM | 17 | A.  Mr. Gerace says:  Hope all going well.  Like to get |
| 12:46PM | 18 | together soon. |
| 12:46PM | 19 | Q.  Then is there another sort of gap in texts from |
| 12:46PM | 20 | November 30th, 2015 to January 15th, 2016? |
| 12:46PM | 21 | A.  Yes. |
| 12:46PM | 22 | Q.  Who texts? |
| 12:46PM | 23 | A.  Mr. Gerace says:  What's up. |
| 12:47PM | 24 | **THE COURT:**  Okay.  We're in a new year, so let's take |
| 12:47PM | 25 | a break.  We'll take our lunch break now, folks. |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

121

12:47PM   1          Please remember my instructions.  Don't communicate

12:47PM   2   about the case including with each other.  Don't use tools of

12:47PM   3   technology to research the case or communicate about the case.

12:47PM   4   Don't read, watch, or listen to any news coverage about the

12:47PM   5   case if there is any while the case in progress.  And don't

12:47PM   6   make up your mind about anything until you start deliberating.

12:47PM   7          We'll see you back at about a quarter to 2, so about

12:47PM   8   an hour.  Thanks.

12:47PM   9          (Jury excused at 12:47 p.m.)

12:47PM  10          **THE COURT:**  Okay.  Anything before we break?

12:47PM  11          **MR. COOPER:**  Just a housekeeping matter.

12:48PM  12          **MR. TRIPI:**  You can step down.

12:48PM  13          **MR. COOPER:**  Just a housekeeping matter.  Special

12:48PM  14   Agent Burns just asked me if it would be okay with the Court

12:48PM  15   if agents can stay in the courtroom during the break because

12:48PM  16   there's drug evidence in here, to prevent them from having to

12:48PM  17   bring it back somewhere.  Is the Court okay with that?

12:48PM  18          **THE COURT:**  I'm not -- I'm confused.

12:48PM  19          **MR. COOPER:**  An agent wants to stay physically in the

12:48PM  20   courtroom since there's drugs in here, as opposed to taking

12:48PM  21   the drugs and bringing them somewhere else during the one-hour

12:48PM  22   break.  Are you okay with that?

12:48PM  23          **THE COURT:**  With someone staying in the courtroom

12:48PM  24   while we're on our break?

12:48PM  25          **MR. COOPER:**  Yes, sir.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

| | | |
|---|---|---|
| 12:48PM | 1 | **THE COURT:**  Of course. |
| 12:48PM | 2 | **MR. COOPER:**  Okay.  Just checking. |
| 12:48PM | 3 | **THE COURT:**  No, of course. |
| 12:48PM | 4 | **MR. TRIPI:**  And then the only thing, Judge, I just |
| 12:48PM | 5 | wanted to -- |
| 12:48PM | 6 | I went back and I looked at the transcript, and I |
| 12:48PM | 7 | felt like we actually spent more time when we ping-ponged back |
| 12:48PM | 8 | and forth going to different portions, and then having to go |
| 12:48PM | 9 | back and put it back in context, so that's why I made the |
| 12:48PM | 10 | decision to just go through them all. |
| 12:48PM | 11 | I actually, as tedious as it seems, I feel like this |
| 12:48PM | 12 | is gonna save a little time.  Maybe I'm wrong, but that's why. |
| 12:48PM | 13 | I just wanted to let you know I at least thought about it, and |
| 12:49PM | 14 | that's why I did it. |
| 12:49PM | 15 | **THE COURT:**  Look it.  I don't want to tell anybody |
| 12:49PM | 16 | how to try their cases.  I swore I wasn't gonna do that.  So |
| 12:49PM | 17 | you do whatever you think you need to do, and if there are |
| 12:49PM | 18 | objections, I will entertain them. |
| 12:49PM | 19 | Okay.  Anything from the defense? |
| 12:49PM | 20 | **MR. MacKAY:**  No, Your Honor. |
| 12:49PM | 21 | **THE COURT:**  Okay.  We'll see you in about an hour. |
| 12:49PM | 22 | (Off the record at 12:49 p.m.) |
| 01:51PM | 23 | (Back on the record at 1:51 p.m.) |
| 01:51PM | 24 | (Jury not present.) |
| 01:51PM | 25 | **THE CLERK:**  All rise. |

01:51PM     1            **THE COURT:** Please be seated.

01:51PM     2            **THE CLERK:** We are back on the record for the

01:51PM     3 continuation of the jury trial in case number 19-cr-227,

01:51PM     4 United States of America versus Joseph Bongiovanni.

01:51PM     5            All counsel and parties are present.

01:51PM     6            **THE COURT:** Okay. Anything we need to do before we

01:51PM     7 bring them back?

01:51PM     8            **MR. COOPER:** Just one scheduling thing I want to put

01:51PM     9 on your radar. Tomorrow we have C.C. scheduled to testify.

01:52PM    10 He's in a rehabilitation or treatment facility that's pretty

01:52PM    11 far away, it's about a five-hour trip in each direction. So

01:52PM    12 we've arranged for his transportation here and transportation

01:52PM    13 back. But because of the lengthy trip, we really need to make

01:52PM    14 sure that we're able to get him up tomorrow. And so I would

01:52PM    15 ask, I don't know think it will be necessary given the

01:52PM    16 progress we've made, but if for some reason we're in the

01:52PM    17 middle of a witness and we need to pivot, I would just ask for

01:52PM    18 the indulgence of the defense and the Court.

01:52PM    19            **THE COURT:** Any problem with that?

01:52PM    20            **MR. SINGER:** No. No, Judge that's fine.

01:52PM    21            **MR. COOPER:** Thank you everybody.

01:52PM    22            **THE COURT:** Absolutely. No, whenever there's an

01:52PM    23 issue with a witness timing like that, I'm always generous

01:52PM    24 about that. And unless there's a good reason and -- an

01:52PM    25 objection and good reason for the objection on the other side,

01:52PM    1    I'll always allow that.

01:52PM    2            MR. COOPER:  We appreciate that, Judge.  Thank you,

01:52PM    3    defense.

01:52PM    4            THE COURT:  Anything else, defense?

01:52PM    5            MR. MacKAY:  No.

01:52PM    6            THE COURT:  Okay.  Let's bring them in, please, Pat.

01:52PM    7            MR. TRIPI:  Can we get Curtis up?

01:53PM    8            (Witness and Jury seated at 1:53 p.m.)

01:54PM    9            THE COURT:  Welcome back from lunch.

01:54PM    10           The record will reflect that all our jurors are

01:54PM    11   present.

01:54PM    12           I'll remind the witness that he's still under oath.

01:54PM    13           And, Mr. Tripi, you may continue.

01:54PM    14           MR. TRIPI:  Thank you.

01:54PM    15           BY MR. TRIPI:

01:54PM    16   Q.  Special Agent Ryan, before the break we had made it to

01:54PM    17   2016.  If you can pick up and read the text message that

01:54PM    18   Mr. Gerace sent to Mr. Bongiovanni February 22nd, 2016.

01:54PM    19   A.  Yes.  It says:  What's up stranger?

01:54PM    20   Q.  And did Mr. Bongiovanni respond to that?

01:54PM    21   A.  Yes, the same day, he said:  What up, Bro?  Saw you

01:54PM    22   brother in Toronto last weekend.

01:54PM    23           MR. TRIPI:  And can we scroll down a little bit

01:54PM    24   Ms Champoux?

01:54PM    25           BY MR. TRIPI:

01:54PM   1    Q.   Did Mr. Gerace respond to that?

01:54PM   2    A.   Yes.  On the same day he said:  Anthony?

01:54PM   3    Q.   And what did Mr. Bongiovanni reply?

01:54PM   4    A.   Same day:  Yes, sir.  It was -- T was my wife's sister

01:55PM   5    Ashley 30 birthday.

01:55PM   6            **MR. TRIPI:**  Ms. Champoux, can we pull up Government

01:55PM   7    Exhibit 126 in evidence.

01:55PM   8            **BY MR. TRIPI:**

01:55PM   9    Q.   Again, is that the photograph from that referencing that

01:55PM  10    trip in Toronto as far as you understand it?

01:55PM  11    A.   Yes, that's my understanding.

01:55PM  12            **MR. TRIPI:**  We can take down 126, Ms. Champoux.

01:55PM  13            **BY MR. TRIPI:**

01:55PM  14    Q.   All right.  The next day, did Mr. Gerace write to

01:55PM  15    Mr. Bongiovanni again?

01:55PM  16    A.   He did.  He said:  Cool.  When we getting together.

01:55PM  17    Q.   And then after of that, did Mr. Gerace -- is the next

01:55PM  18    text message further in time forward to March 6, 2016?

01:55PM  19    A.   Yes, it's a photograph of Mr. Gerace and another male.

01:56PM  20    Q.   And are you generally familiar with the background

01:56PM  21    setting of that photo?

01:56PM  22    A.   No.

01:56PM  23    Q.   Does Pharaoh's have red walls?

01:56PM  24    A.   It does.

01:56PM  25    Q.   Okay.  Do you recognize the individual who's in that

01:56PM   1   photo with Mr. Gerace?

01:56PM   2   A.   Yes.

01:56PM   3   Q.   Who is that?

01:56PM   4   A.   It's a movie actor, Lillo Brancato.

01:56PM   5   Q.   And just to frame it for the jury, was he in a couple

01:56PM   6   movies like the Bronx Tale, and in a TV series called the

01:56PM   7   Sopranos?

01:56PM   8   A.   He was in both of those, yes.

01:56PM   9          **MR. TRIPI:**  Keep scrolling down, Ms. Champoux.   The

01:56PM   10  next text message is from April 19th, 2016.

01:56PM   11          **BY MR. TRIPI:**

01:56PM   12  Q.   What's that say?

01:56PM   13  A.   It says -- it's from Mr. Gerace, it says:  Is Joel V

01:56PM   14  still at US ATTNY, for attorney.

01:56PM   15  Q.   What did Mr. Bongiovanni respond?

01:56PM   16  A.   Same date, he said:  Yes.

01:56PM   17  Q.   And what did Mr. Gerace write back?

01:56PM   18  A.   On the same date:  Do you have his number?

01:57PM   19      And then another text:  He must have recently changed it.

01:57PM   20  Q.   And what did Mr. Bongiovanni respond on that day?

01:57PM   21  A.   Two texts.  The first one says:  Only his office number,

01:57PM   22  716-843-5700.

01:57PM   23      And then the next text says:  I don't have his cell

01:57PM   24  anymore.

01:57PM   25  Q.   Okay.  And did you vet that information in your

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

127

01:57PM   1   investigation?

01:57PM   2   A.  Yes.

01:57PM   3   Q.  All right.  And did you understand that Mr. Violanti and

01:57PM   4   Mr. Gerace have no personal relationship?

01:57PM   5   A.  Yes.

01:57PM   6   Q.  Is it your understanding that they met one time through

01:57PM   7   Mr. Bongiovanni?

01:57PM   8   A.  Yes.

01:57PM   9   Q.  Okay.  Moving on to May 13th, 2016.  Can you read the

01:57PM  10   text messages that date?

01:57PM  11   A.  Yes.  So the first one's from Mr. Gerace that says:  I

01:57PM  12   need your address.  And then another message right after that

01:57PM  13   says:  Home address.

01:57PM  14   Q.  And what did Mr. Bongiovanni write?

01:58PM  15   A.  85 Alder Place, Tonawanda, New York 14223.

01:58PM  16   Q.  So is this the second time in this thread of messages

01:58PM  17   where the defendant has provided Mr. Gerace his home address?

01:58PM  18   A.  Yes.

01:58PM  19   Q.  And what's the next message in the thread from May 22nd,

01:58PM  20   2016?

01:58PM  21   A.  It's from Mr. Gerace, it says:  Did you get invite?

01:58PM  22   Q.  And actually if we look at that time of that message,

01:58PM  23   that message was actually written on May 21st; is that right?

01:58PM  24   A.  Local time, yes.

01:58PM  25   Q.  And what did Mr. Bongiovanni respond?

01:58PM  1  A.  Yes, Bro, I got it.  We will see you then, and thanks the

01:58PM  2  invitation.

01:58PM  3  Q.  And please continue.  What was the next question?

01:58PM  4  A.  Same date.  Mr. Gerace:  Great.  And then it skips to May

01:58PM  5  28, 2016.

01:58PM  6  Q.  On May 28th, 2016, what did Mr. Bongiovanni write?

01:59PM  7  A.  It says:  I'm 8 N, which is I think a typo for in, the

01:59PM  8  shower.  I'll call you back.

01:59PM  9      Mr. Gerace says:  Who does eyebrows?

01:59PM  10     And then a second text message that says:  At Good to

01:59PM  11  Glow.

01:59PM  12  Q.  And what did Mr. Bongiovanni respond to that?

01:59PM  13  A.  Lindsay's sister Ashley.

01:59PM  14  Q.  Can you please continue?  What's the next message that

01:59PM  15  day?

01:59PM  16  A.  Last message that day is:  Where is it?  From Mr. Gerace.

01:59PM  17  Q.  And then what -- what's the text message on the next day?

01:59PM  18  A.  It says:  Great time.  Miss you brother.  That's from

01:59PM  19  Mr. Gerace.

01:59PM  20  Q.  That's also May 28th, 2016, but later at night, right?

01:59PM  21  A.  Yes.

01:59PM  22  Q.  And did Mr. Bongiovanni respond that same day, the 28th?

01:59PM  23  A.  Yes.  It says:  Awesome time, and then a typo, but maybe

01:59PM  24  it's supposed to be with, and then it says you guys.  And I'm

02:00PM  25  glad your, another typo, but home safe.  We will get together

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

129

02:00PM   1   for dinner soon.

02:00PM   2   Q.   Is that an indication to you that they were together at

02:00PM   3   some place?

02:00PM   4   A.   Yes.

02:00PM   5   Q.   And what's the next message on actually May 28th, but

02:00PM   6   late at night?

02:00PM   7   A.   Mr. Gerace says:  Okay.  And then:  Boss.

02:00PM   8   Q.   Does -- do the messages then skip forward to June 9th,

02:00PM   9   2016?

02:00PM   10   A.   Yes.

02:00PM   11   Q.   Does Mr. Gerace provide a name of someone related to a

02:00PM   12   offense?

02:00PM   13   A.   Yes, it says fence, and then the name Danny Ricotta.

02:00PM   14   Q.   What's the next message?

02:00PM   15   A.   Same day, Mr. Bongiovanni says:  Thank you, Peter.

02:00PM   16        And then the same day, Mr. Gerace says:  Let me know if

02:00PM   17   you need number.

02:00PM   18   Q.   Okay.  And then we have a picture of a fish on June 11th,

02:01PM   19   we can scroll past that.

02:01PM   20        Another picture of a fish on June 11th.

02:01PM   21        Another picture of a fish on June 11th; is that right?

02:01PM   22   A.   Yes.

02:01PM   23   Q.   And does Mr. Bongiovanni respond to those three text

02:01PM   24   messages?

02:01PM   25   A.   Yes.  On June 11th, he says:  Nice, Bro.

02:01PM    1    Q.  And on June 17th, 2016 what does Mr. Bongiovanni write?

02:01PM    2    A.  Yes, bro.  It will be just me.  My wife works tonight.

02:01PM    3    Q.  And what does Mr. Gerace respond?

02:01PM    4    A.  Same day, he says:  Okay, bring Tommy.

02:01PM    5    Q.  Did Mr. Bongiovanni reply to that?

02:01PM    6    A.  He did.  So it's still June 17th, he says:  Pete, on my

02:01PM    7    way.  What are people wearing?  Suit?

02:01PM    8        Mr. Gerace responds:  Yes.  And then he sends a message

02:01PM    9    after that that says I'm bringing them in at 7.

02:01PM   10    Q.  Is it your understanding that around this time there was

02:02PM   11    a 50th anniversary for Mr. Gerace's parents?

02:02PM   12    A.  Yes.

02:02PM   13    Q.  Does it seem like these texts about bringing them in

02:02PM   14    relate to that?

02:02PM   15    A.  Yes.

02:02PM   16    Q.  June 17th, 2016, Mr. Bongiovanni responds?

02:02PM   17    A.  Yep.  He says:  Okay, got it.

02:02PM   18        And then same day, Mr. Gerace says:  First banquet room

02:02PM   19    in back.

02:02PM   20        And then the last one on the page is Mr. Bongiovanni

02:02PM   21    saying:  On my way.  Got out of work at 6 p.m.

02:02PM   22            MR. TRIPI:  Can we scroll down from there

02:02PM   23    Ms. Champoux.

02:02PM   24            BY MR. TRIPI:

02:02PM   25    Q.  The next day, does Mr. Bongiovanni write a text to

02:02PM   1   Mr. Gerace?

02:02PM   2   A.   Yes.  It says:  Great -- great time last night.  It was

02:02PM   3   great to see your parents.  Thanks again for the invitation.

02:02PM   4   Q.   The next day on July -- excuse me, June 19th, does

02:02PM   5   Mr. Gerace reach out and write something to Mr. Bongiovanni.

02:02PM   6   A.   He does.  He says:  Happy Father's Day.

02:03PM   7       And Mr. Bongiovanni replies:  Happy Father's Day to you

02:03PM   8   my friend.

02:03PM   9       And that's it for that day.

02:03PM  10   Q.   The next message picks up on June 26th, 2016.  What does

02:03PM  11   that say?

02:03PM  12   A.   From Mr. Bongiovanni:  Cool, Bro.  I'm going to get my

02:03PM  13   brother-in-law Thomas downtown, then I'm heading your way.

02:03PM  14   Sorry for the delay, bro.

02:03PM  15       Then Mr. Gerace says:  Hurry.

02:03PM  16       Then same day Mr. Bongiovanni says:  Peter, I'm sorry I

02:03PM  17   didn't make it out there.  I ran into Roy Espinosa.  Then

02:03PM  18   I -- I think that's supposed to be was pulled 87 different

02:03PM  19   directions.  Love you, Bro.

02:03PM  20   Q.   Okay.  Can you read the next message from June 27th, 2016

02:03PM  21   from Mr. Gerace?

02:03PM  22   A.   Yes.  It says:  It's okay, just wanted to hook up.  Ended

02:03PM  23   up taking Slick Tom from 97 Rock back to Pharaoh's.  We had a

02:03PM  24   great time.  Was packed.

02:03PM  25   Q.   And is there another text message on July 7th from

02:04PM  1    Mr. Gerace to Mr. Bongiovanni?

02:04PM  2    A.  Yes.  It says:  You should come visit.  I'm in

02:04PM  3    Ellicottville until Sunday, S-U-N, I assume it's Sunday.

02:04PM  4    Q.  And the next day does Mr. Bongiovanni respond to that?

02:04PM  5    A.  He does.  He says:  Thanks bro, but I have Doctor's

02:04PM  6    birthday S-A-T for Saturday and parents dinner on Sunday.

02:04PM  7    Have fun.  Be safe buddy.

02:04PM  8    Q.  Do you believe the Doctor's birthday references Tom

02:04PM  9    Doctor?

02:04PM  10   A.  Yes.

02:04PM  11   Q.  What's the next message on July 29th for Mr. Bongiovanni?

02:04PM  12   A.  Yes, I do, bro.  Hope you are well.  I been hanging

02:04PM  13   around not doing too much.

02:04PM  14   Q.  And then on July 29th, there's a message from Mr. Gerace.

02:04PM  15   What did he write?

02:04PM  16   A.  He wrote:  Did Ellicottville for a week.  Just got back.

02:04PM  17   Week of camping.

02:04PM  18   Q.  And please read Mr. Bongiovanni's response that day.

02:04PM  19   A.  Nice.  Hope you had a good time.  I'm trying to get a

02:04PM  20   crew together for the Bills game in the Miami in October.

02:05PM  21   Q.  That year, did the Bills play the Miami dolphins in

02:05PM  22   October?

02:05PM  23   A.  Yes.

02:05PM  24   Q.  Please continue.  What's the next text message?

02:05PM  25   A.  Mr. Gerace says:  What's the date we are going to Aruba?

02:05PM   1    Mr. Bongiovanni replies to that on August 3rd and says:

02:05PM   2    Bro, not this year.

02:05PM   3    Q.  So by this point in reviewing the texts, did you develop

02:05PM   4    an understanding that these two were close friends?

02:05PM   5    A.  Yes.

02:05PM   6    Q.  Please continue with the text messages.

02:05PM   7    A.  So on August 3rd, Mr. Gerace says:  Okay.

02:05PM   8        August 8th, Mr. Bongiovanni says:  Sounds good, Bro.

02:05PM   9        Then on September 6th, Mr. Bongiovanni says:  We are not

02:05PM   10   going to the game.  I don't even want to go on the trip.  I

02:05PM   11   don't want you to book and we flake out.  I need peace.

02:05PM   12       Same day Mr. Bongiovanni says:  Going through shit now,

02:06PM   13   brother, sorry.

02:06PM   14       Mr. Gerace responds on the same day:  Sorry.

02:06PM   15            **MR. TRIPI:**  Can we scroll down Ms. Champoux.

02:06PM   16            **THE WITNESS:**  Same day Mr. Gerace says:  You want to

02:06PM   17   go -- or, you want to golf S-A-T for probably Saturday a.m.  I

02:06PM   18   paid for foursome 8:30, Rothland.

02:06PM   19            **BY MR. TRIPI:**

02:06PM   20   Q.  And did Mr. Bongiovanni respond to that invitation to

02:06PM   21   golf?

02:06PM   22   A.  I'm sorry, it's not you, it my psycho wife.  Let me work

02:06PM   23   this out.

02:06PM   24   Q.  And what did Mr. Gerace respond to that?

02:06PM   25   A.  Always here for you, brother.

02:06PM    1    And then another text that says:  It's okay.  I just got

02:06PM    2    call from state police.

02:06PM    3    Q.  And what did Mr. Bongiovanni reply?

02:06PM    4    A.  He wrote:  Thanks.

02:06PM    5    And then there's another message under that one that I

02:06PM    6    can't see yet from Mr. Bongiovanni it says:  For what?

02:06PM    7    Q.  And then does Mr. Gerace respond?

02:06PM    8    A.  He said -- he does.  He says:  Ex said I threaten.  Then

02:07PM    9    it says:  I have order of protection against her.  Then a

02:07PM   10    third says:  Amherst PD straightened out.  Caught her lying

02:07PM   11    again.

02:07PM   12    Q.  And what does Mr. Bongiovanni respond?

02:07PM   13    A.  Get a restraining order on her so she can't accuse you.

02:07PM   14    Then Mr. Gerace said:  I did.  Police were going to send

02:07PM   15    to DA.  LOL is the next message from Mr. Gerace.

02:07PM   16    And then he says in the third message:  Even though they

02:07PM   17    had no proof.

02:07PM   18    Q.  And what did Mr. Bongiovanni write next on that same day?

02:07PM   19    A.  It says:  Document all calls, texted and photographs.

02:07PM   20    And then Mr. Gerace responds:  I never call her.

02:07PM   21    In another message it says:  I do, trying have her

02:07PM   22    arrested tomorrow.

02:07PM   23    Mr. Bongiovanni on the same day responds:  Don't isolate

02:07PM   24    yourself, and time will make things right.

02:07PM   25    And then the second message said:  I'm going through the

02:08PM   1   same shit.  Always accusing me of cheating.

02:08PM   2   Q.  So are these two in this portion of the thread discussing

02:08PM   3   personal situations with each other?

02:08PM   4   A.  Yes.

02:08PM   5   Q.  Regarding their wives?

02:08PM   6   A.  Yes.

02:08PM   7   Q.  Have you ever discussed your family situation with a

02:08PM   8   confidential source or a source of information?

02:08PM   9   A.  No.

02:08PM  10   Q.  Can you continue with the 9/6/2016, what does Mr. Gerace

02:08PM  11   write next?

02:08PM  12   A.  So there are at least four text messages.  The first one

02:08PM  13   is:  Lawyer Amherst PD all over it.

02:08PM  14       Second is:  You never cheat.

02:08PM  15       Third is:  You never would.

02:08PM  16       And the fourth is:  I know how much you love her.

02:08PM  17   Q.  And what did Mr. Bongiovanni respond to?

02:08PM  18   A.  That on the same day, he says:  Thanks, bro.

02:08PM  19       And then Mr. Gerace says:  Well, SAT is paid for.  Only

02:09PM  20   golf to one.

02:09PM  21   Q.  And then what did -- so in response to reference to golf

02:09PM  22   what does Mr. Bongiovanni write?

02:09PM  23   A.  It's the last text on 9/6, it says:  Thanks man.  And

02:09PM  24   that's the end of the 9/6 conversation.

02:09PM  25   Q.  And then the text thread forward picks up again about

02:09PM    1   eight days later on September 14th, 2016?

02:09PM    2   A.   Yes.

02:09PM    3   Q.   What does Mr. Bongiovanni start by writing?

02:09PM    4   A.   In court.

02:09PM    5        And then Mr. Gerace says:  Okay, I'm downtown.

02:09PM    6        Mr. Bongiovanni replies:  Trial prep.

02:09PM    7        Mr. Gerace replies:  Okay.

02:09PM    8        And then on 9/19 Mr. Bongiovanni says:  In court on

02:09PM    9   trial.  Call you soon.

02:09PM   10        Mr. Gerace responds with:  Okay.

02:09PM   11        And then it skips to October 3rd.

02:09PM   12   Q.   And what did Mr. Bongiovanni write October 3rd?

02:09PM   13   A.   It says:  Peter, I'm sorry I've not responded.  I have

02:10PM   14   been using another phone.  I just saw messages and I'm

02:10PM   15   getting back to people.

02:10PM   16        October 3rd, Mr. Gerace responds with three messages:

02:10PM   17   It's okay.  You call me when you want, or when you what, and

02:10PM   18   he corrects it to want.

02:10PM   19   Q.   And the next message are about a week later on

02:10PM   20   October 10th, 2016?

02:10PM   21   A.   Yes.

02:10PM   22            **MR. TRIPI:**  Can we scroll down, Ms. Champoux?

02:10PM   23            **BY MR. TRIPI:**

02:10PM   24   Q.   What did Mr. Bongiovanni write there?

02:10PM   25   A.   He wrote:  Great photo.  Glad to see you happy again.

02:10PM  1   Q.  Let me stop you there for a second.  We don't see a photo

02:10PM  2   in that text exchange, right?

02:10PM  3   A.  Correct.

02:10PM  4   Q.  Could that be an example of the extraction not getting

02:10PM  5   all of the information that was in the -- in the phone or

02:10PM  6   something that was deleted?

02:10PM  7   A.  Yes.

02:10PM  8   Q.  Okay.  Because clearly there's a reference to a photo

02:10PM  9   that we don't see; is that right?

02:10PM  10  A.  Right.

02:10PM  11  Q.  Okay.  What is the response by Mr. Gerace?

02:10PM  12  A.  So, on October 10th, he says:  Very.

02:11PM  13      And then same day, Mr. Bongiovanni sends two texts.  The

02:11PM  14  first says:  All that matters.  And then the second says:

02:11PM  15  Boarding my plane in Miami.

02:11PM  16  Q.  So Mr. Bongiovanni was in Miami October 25th, 2016?

02:11PM  17  A.  Yes, sir.

02:11PM  18  Q.  Do you remember what day the Bills played the Dolphins

02:11PM  19  that year in October?

02:11PM  20  A.  I think it was the day before.

02:11PM  21  Q.  Around that time?

02:11PM  22  A.  It was definitely around that time.

02:11PM  23  Q.  What did Mr. Gerace respond?

02:11PM  24  A.  On October 25th, he said:  Okay.  And then a second

02:11PM  25  message same day says:  Safe flight.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

138

02:11PM    1    And then it jumps to November 11th.

02:11PM    2    Q.  And what does Mr. Bongiovanni write to Mr. Gerace on

02:11PM    3    November 11th, 2016?

02:11PM    4    A.  Hopefully soon, bro.  I'm never out, but we have some

02:11PM    5    birthday party tonight.

02:11PM    6    And then same day Mr. Gerace says:  Soon.

02:11PM    7    Q.  And what -- the next message goes forward in time to

02:12PM    8    December 6th, 2016; is that right?

02:12PM    9    A.  Yes.  It's Mr. Bongiovanni, he says:  Yes, I know who he

02:12PM    10    is, but I don't know him well.  That's a shame about his son.

02:12PM    11    Q.  And what did Mr. Gerace respond?

02:12PM    12    A.  Yeah.  It was just talking with Pat Carney there.

02:12PM    13    Q.  And what did Mr. Bongiovanni write on December 20, 2016,

02:12PM    14    a couple weeks later?

02:12PM    15    A.  He says:  Yes, Bro.  I have been busy.  I don't even go

02:12PM    16    anywhere.  Maybe next week after Christmas.  Have a great

02:12PM    17    holiday.  I'll be out this Thursday.

02:12PM    18    The same day, Mr. Gerace says:  Okay, where Thursday?

02:12PM    19    And then same day Mr. Gerace says:  Who you gonna be

02:12PM    20    with?

02:12PM    21    Mr. Bongiovanni responds:  I have a couple office parties

02:12PM    22    I have to go, but I may end up at Bada-Bing later or Frankie

02:13PM    23    Primo.

02:13PM    24    **MR. TRIPI:**  Real quick, scroll back down

02:13PM    25    Ms. Champoux.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

139

02:13PM    1           **BY MR. TRIPI:**

02:13PM    2    Q.  The time of that text message it says in the text that it

02:13PM    3    was December 20, 2016 at 2 a.m. but what actual day and time

02:13PM    4    is that?

02:13PM    5    A.  In Buffalo, that's the day before at 9 p.m.

02:13PM    6           **MR. TRIPI:**  And continue with the next screen,

02:13PM    7    Ms. Champoux, thank you.

02:13PM    8           **BY MR. TRIPI:**

02:13PM    9    Q.  What did Mr. Gerace respond to that?

02:13PM   10    A.  I think I'm going to game.

02:13PM   11         And then Mr. Bongiovanni says:  Give me a text after the

02:13PM   12    game.

02:13PM   13         And then last text is from Mr. Gerace that day that says:

02:13PM   14    Okay.

02:13PM   15    Q.  And then the next set of messages, is that Christmas Day

02:13PM   16    they wish each other a Merry Christmas?

02:13PM   17    A.  Yes.

02:13PM   18    Q.  Later on is Mr. Gerace indicating he misses the

02:13PM   19    defendant?

02:13PM   20    A.  He does.

02:13PM   21    Q.  Let's scroll to the next page.

02:13PM   22         What does the defendant respond on December 25th, 2016?

02:14PM   23    A.  Yes, Pete, we will try to get together soon.

02:14PM   24    Q.  Go ahead.  What did Mr. Gerace respond?

02:14PM   25    A.  Okay.  And then Mr. Bongiovanni says:  I'm chasing my

02:14PM  1  tail most of the time.

02:14PM  2       Mr. Gerace says, it's probably supposed to be we'll, but

02:14PM  3  it says:  Well make time, life is short.

02:14PM  4       Then it jumps to February 1st.

02:14PM  5  Q.  What does Mr. Gerace write February 1, 2017?

02:14PM  6  A.  We need to get together soon.  And then there's no text

02:14PM  7  until April 20th, 2017.

02:14PM  8  Q.  And then what does Mr. Gerace say then?

02:14PM  9  A.  Lunch soon?

02:14PM  10  Q.  And does Mr. Bongiovanni respond to that?

02:14PM  11  A.  He does.  Same day, he says:  Sure with, Sammy Caps, Ray,

02:14PM  12  and Louie at Frankie Primo.

02:14PM  13  Q.  Are you familiar with the reference to Sammy Caps?

02:14PM  14  A.  Yes.

02:14PM  15  Q.  Who do you believe that to be?

02:14PM  16  A.  Sam Capitano.

02:15PM  17  Q.  And who is he, if you know?

02:15PM  18  A.  He's part of the leadership of a local labor union.

02:15PM  19  Q.  Is that the Local 210?

02:15PM  20  A.  Yes.

02:15PM  21  Q.  And do you know the reference, do you have an

02:15PM  22  understanding of the reference to Louie?

02:15PM  23  A.  Yes, I believe that's Lou Selva.

02:15PM  24  Q.  And what does Mr. Gerace respond to that?

02:15PM  25  A.  On the same day, he just says yes.

02:15PM   1   Q.   Okay.  Then on May 4th, skipping forward to May 4th,

02:15PM   2   2017, was there -- was there a voicemail audio that was left

02:15PM   3   on Mr. Bongiovanni's phone that he responded to?

02:15PM   4   A.   Yes.

02:15PM   5   Q.   Is that Exhibit 311 that we talked about earlier?

02:15PM   6   A.   Yes.

02:15PM   7          **MR. TRIPI:**  Okay.  Ms. Champoux, if you could play

02:15PM   8   the audio that was Exhibit 311 that was on Mr. Bongiovanni's

02:15PM   9   phone for the jury.

02:16PM   10          (311 audio was played.)

02:16PM   11          **MR. TRIPI:**  Play it again from the beginning one more

02:16PM   12   time, Ms. Champoux.

02:16PM   13          (311 Audio was played.)

02:16PM   14          **MR. TRIPI:**  Just one moment, please, Your Honor.

02:16PM   15          I might need just a moment, Your Honor, I think

02:17PM   16   something got cut off on the audio.

02:17PM   17          I'll circle back to it.  I'll keep asking other

02:17PM   18   questions.

02:17PM   19          **BY MR. TRIPI:**

02:17PM   20   Q.   All right.  You've heard that call, that voice message

02:17PM   21   numerous times?

02:17PM   22   A.   Yes.

02:17PM   23   Q.   At the beginning, it sounded a little cut off there, does

02:17PM   24   it say:  Hey, Joe, it's Peter?

02:17PM   25   A.   Yes.

02:17PM  1   Q.   And what was Mr. Gerace asking Joe, the defendant, about

02:17PM  2   in that call?

02:17PM  3   A.   If it's possible to ping a regular phone or a TracFone

02:17PM  4   like the police do.

02:17PM  5   Q.   Okay.  Now, you've used the term there "TracFone," right?

02:17PM  6   What is a TracFone?

02:18PM  7   A.   That's one brand of prepaid cell phone.

02:18PM  8   Q.   In your experience, is that a type of cell phone

02:18PM  9   particularly some years ago, in this general timeframe, that

02:18PM  10  a lot of individuals involved in the drug trade utilized?

02:18PM  11  A.   Yes.

02:18PM  12  Q.   Is another word for it, a TracFone, would that be

02:18PM  13  commonly associated with being a burner phone?

02:18PM  14  A.   Yes.

02:18PM  15  Q.   And does it sound like Mr. Gerace was asking

02:18PM  16  Mr. Bongiovanni about that type of phone in that audio?

02:18PM  17  A.   Either that type of phone, or a regular phone.  And if

02:18PM  18  there's a way to ping it, which is sort of like police jargon

02:18PM  19  for locate.

02:18PM  20  Q.   Yeah.  I'll get to that in just a second.

02:18PM  21  A.   Okay.

02:18PM  22          **MR. TRIPI:**  Ms. Champoux, can we play that audio one

02:18PM  23  more time?

02:18PM  24          (Audio was played.)

         25

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24
143

02:19PM  1          **BY MR. TRIPI:**

02:19PM  2  Q.  So when he says "ping it," what is your understanding of

02:19PM  3  what a ping is?  Based upon your involvement in law

02:19PM  4  enforcement.

02:19PM  5  A.  It's a way to locate the hand set or that phone in space.

02:19PM  6  A geolocation of the phone.

02:19PM  7  Q.  Is that a sensitive law enforcement technique?

02:19PM  8  A.  It is.

02:19PM  9  Q.  Is that a technique that you only discuss amongst members

02:19PM  10  of law enforcement?

02:19PM  11  A.  Yes.

02:19PM  12  Q.  Is that actually a technique you've used in the past?

02:19PM  13  A.  Yes.

02:19PM  14          **MR. TRIPI:**  Ms. Champoux, can we pull back up

02:19PM  15  Exhibit 310D.

02:19PM  16          **BY MR. TRIPI:**

02:19PM  17  Q.  Did Mr. Bongiovanni respond by text message to Peter

02:19PM  18  Gerace's voice message?

02:19PM  19  A.  Yes.

02:19PM  20  Q.  And what did he respond?

02:19PM  21  A.  He said, yes, but you would need a warrant to get a ping

02:20PM  22  order.

02:20PM  23  Q.  Now Mr. Gerace is not a member of law enforcement,

02:20PM  24  correct?

02:20PM  25  A.  Correct.

02:20PM  1   Q.  So in that exchange, was Mr. Bongiovanni providing law

02:20PM  2   enforcement sensitive information to Mr. Gerace about pings?

02:20PM  3   A.  Yes.

02:20PM  4   Q.  Is that information you would ever share with someone

02:20PM  5   who's not law enforcement?

02:20PM  6          **MR. MacKAY:**  Objection.

02:20PM  7          **THE COURT:**  Sustained.

02:20PM  8          **BY MR. TRIPI:**

02:20PM  9   Q.  Why is it important to keep those type -- that type of

02:20PM  10  information from being widely disseminated?

02:20PM  11  A.  The more widely known that technique is, the easier it is

02:20PM  12  for somebody to come up with a countermeasure to defeat it.

02:20PM  13  Q.  And what are some countermeasures to that type of thing?

02:20PM  14  A.  Burner phones are the first one.  Constantly rotating

02:20PM  15  your phone number.  Turning off your cell data.  There's ways

02:20PM  16  to do it.

02:20PM  17  Q.  If you try to get a search warrant for a ping for a

02:21PM  18  phone, and you have to start over because they get a new

02:21PM  19  phone, what does that do to the investigation?

02:21PM  20  A.  It slows you down significantly.  You have to identify

02:21PM  21  the new number, associate the new number with the person you

02:21PM  22  think is using it, develop probable cause that the new number

02:21PM  23  is still involved in criminal activity.  It can delay things

02:21PM  24  by weeks or longer.  Or you may never even find the new

02:21PM  25  number.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

145

02:21PM 1    Q.  All right.  And does Mr. Gerace respond to

02:21PM 2    Mr. Bongiovanni saying yes, but you would need a warrant to

02:21PM 3    get a ping order?

02:21PM 4    A.  He does.  He sends two messages.  The first says:  Okay.

02:21PM 5    And the second says:  Thanks.

02:21PM 6    Q.  So the information between the back and forth that's

02:21PM 7    communicated regarding TracFones is that they can be tracked

02:21PM 8    with a ping order; is that accurate?

02:21PM 9    A.  Yes.

02:21PM 10   Q.  Fast forwarding to May 9th, 2017, does Mr. Gerace write a

02:22PM 11   text a couple days later to Mr. Bongiovanni?

02:22PM 12   A.  He does.  He says:  Call me.

02:22PM 13           **MR. TRIPI:**  If we can scroll down, Ms. Champoux.

02:22PM 14           **THE WITNESS:**  And then a second text that says let me

02:22PM 15   know if you can grab a coffee.

02:22PM 16           Mr. Bongiovanni responds:  I'm at the air base all

02:22PM 17   day, Bro.

02:22PM 18           Mr. Gerace says:  Really?  That's cool.

02:22PM 19           Mr. Bongiovanni says:  Helicopters.  And then:

02:22PM 20   What's up?

02:22PM 21           And that's it for the day.

02:22PM 22           **BY MR. TRIPI:**

02:22PM 23   Q.  And if we move forward in time about nine more days,

02:22PM 24   there's a text message from Mr. Gerace and Mr. Bongiovanni

02:22PM 25   May 18th, 2017; is that right?

02:22PM    1    A.  Yes, it says lunch next week.

02:22PM    2    Q.  And can you please continue from there?

02:23PM    3    A.  August 17th, Mr. Bongiovanni says:  I see you.  And then

02:23PM    4    the second message:  The godfather.

02:23PM    5    Q.  That August 17th, 2017 reference to the godfather, do you

02:23PM    6    believe that to be the movie they're referencing?

02:23PM    7    A.  Probably.  And that's also August 16 in Buffalo.

02:23PM    8    Q.  Yeah, I was gonna ask you, what's that actual date and

02:23PM    9    time?

02:23PM   10    A.  Yeah.  So that's 9:00 at night, 9:11 on the 16th.

02:23PM   11            **MR. TRIPI:**  We can scroll past the photo.

02:23PM   12            **BY MR. TRIPI:**

02:23PM   13    Q.  Those next few, does it appear like Mr. Gerace is texting

02:23PM   14    events that are happening at Pharaoh's to Mr. Bongiovanni?

02:23PM   15    A.  Yes.

02:23PM   16    Q.  So that brings us to September 8th, 2017.  Can you tell

02:23PM   17    us what Mr. Gerace writes there?

02:24PM   18    A.  He says:  Do you have John Linguino's number?

02:24PM   19        And Mr. Bongiovanni says:  Sorry, I do not.

02:24PM   20    Q.  And then what does Mr. Gerace respond?

02:24PM   21    A.  Who would have it?

02:24PM   22        Mr. Bongiovanni says:  Try Louie Selva.

02:24PM   23        Mr. Gerace says:  Can you text him?  And then another

02:24PM   24    message says:  I don't have number.  That's from Mr. Gerace.

02:24PM   25        And Mr. Bongiovanni responds 903-1654.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

147

02:24PM   1   Q.  Is that the phone number for Lou Selva who -- whose house

02:24PM   2   Homeland Security later searched?

02:24PM   3   A.  Yes.

02:24PM   4   Q.  And who you interviewed several times?

02:24PM   5   A.  Yes.

02:24PM   6   Q.  Please continue.  What did Mr. Gerace respond to the

02:24PM   7   phone number for Lou Selva?

02:24PM   8   A.  Mr. Gerace says:  Thank you.

02:24PM   9        Mr. Bongiovanni says:  No problem, bud.

02:24PM  10        And that's it for the 9th -- or, the 8th, actually.  The

02:24PM  11   time change.

02:24PM  12   Q.  Can you repeat what you said there?

02:24PM  13   A.  It's actually the 8th with the time change from UTC for

02:25PM  14   September 8th, I was correcting, I said the 9th.

02:25PM  15   Q.  The next message is September 29th, 2017?

02:25PM  16   A.  Yes.

02:25PM  17   Q.  Can you read that for the jury?

02:25PM  18   A.  That's from Mr. Gerace, it says:  No love.

02:25PM  19        And Mr. Bongiovanni responds:  Sorry, Peter.  I've been a

02:25PM  20   loner most of the summer, but you still love you, dude.

02:25PM  21   Q.  And what did Gerace respond?

02:25PM  22   A.  Just miss you.

02:25PM  23        Mr. Bongiovanni says:  I miss you too, Bro.  I've been

02:25PM  24   just doing nothing.

02:25PM  25   Q.  Then it goes forward in time to November 12th, 2017; is

02:25PM     1    that right?

02:25PM     2    A.  Yes.

02:25PM     3    Q.  There's a series of texts or two texts that day from

02:25PM     4    Mr. Gerace, sort of in the evening?

02:25PM     5    A.  Yes.  It says:  Call me.  And then the second one says:

02:25PM     6    Important.

02:25PM     7    Q.  The next text is November, November 12th, actually, at

02:26PM     8    about 11 p.m.; is that right?  Or is that 10 p.m.?

02:26PM     9    A.  11.

02:26PM    10    Q.  11?

02:26PM    11    A.  Yeah.  It says:  March 23rd to the 27th.  We're getting

02:26PM    12    married on the 24th.

02:26PM    13    Q.  And what did Mr. Bongiovanni respond?

02:26PM    14    A.  Thank you, bro.  I will try to make it.  We will get out

02:26PM    15    soon.  Congratulations.  I'm glad you -- you are happy.

02:26PM    16        And Mr. Gerace says:  The happiest I've been in 50 years.

02:26PM    17        And then Mr. Gerace says:  I'm gonna call you when I book

02:26PM    18    the flights, then let's do dinner in the next couple weeks

02:26PM    19    please.

02:26PM    20        Mr. Bongiovanni says:  Sounds good, Bro.  See you then.

02:26PM    21        Mr. Gerace says:  Just pick the date.

02:26PM    22        Mr. Bongiovanni says:  I'll see the wifey's work

02:26PM    23    schedule.

02:26PM    24        Then there's an emoji for Mr. Gerace, and that's the last

02:26PM    25    text for that day.

02:26PM      1    Q.   Then if we move forward in time to February 22nd, 2016.

02:27PM      2    Or 2018 is that?

02:27PM      3         **MR. TRIPI:**  Can you zoom that in, Ms. Champoux.  I

02:27PM      4    can't see the date.  All right.  You can zoom out of that.

02:27PM      5         **BY MR. TRIPI:**

02:27PM      6    Q.   At the top of the screen, does Mr. Gerace start out a

02:27PM      7    text on February 22nd?

02:27PM      8    A.   He does.  He sends two.  It says:  Happy anniversary,

02:27PM      9    Joe.  And then the next one says:  Still waiting to grab

02:27PM     10    lunch together, LOL.

02:27PM     11         Mr. Bongiovanni responds:  Thank you my friend.  I still

02:27PM     12    love you, Bro, even though we haven't gotten to catch up.

02:27PM     13         Mr. Gerace says:  Soon brother.

02:27PM     14         And then it jumps to April 1.

02:27PM     15    Q.   And what did Mr. Gerace write April 1st, 2018.

02:27PM     16    A.   Happy Easter to you and the family.

02:27PM     17         And then another text that says:  Funny, I thought of

02:27PM     18    you.  I'm watching Stuart Little.  LOL.

02:27PM     19    Q.   Does Mr. Bongiovanni respond?

02:27PM     20    A.   He does, the same day:  I'm Stuart Little.  Happy Easter.

02:28PM     21         And then Mr. Gerace says:  Vegas.

02:28PM     22    Q.   Then Bongiovanni responds with some type of photo?

02:28PM     23    A.   Yeah.  It's a photo of a mouse in a Giant's jersey.

02:28PM     24         **MR. TRIPI:**  Keep scrolling Ms. Champoux, thank you.

            25

|          |    |                                                                   |
|----------|----|-------------------------------------------------------------------|
| 02:28PM  | 1  | **BY MR. TRIPI:**                                                  |
| 02:28PM  | 2  | Q.  Are there some more texts on April 1st?                        |
| 02:28PM  | 3  | A.  Yes.  From Mr. Gerace:  LOL it's on now.  And then a           |
| 02:28PM  | 4  | second text:  I'm free all week for lunch.                         |
| 02:28PM  | 5  | Mr. Bongiovanni says:  Miss you, Bro.                              |
| 02:28PM  | 6  | Mr. Gerace responds:  Miss you too, Joe.  By the way, too          |
| 02:28PM  | 7  | long, brother.                                                    |
| 02:28PM  | 8  | Q.  And then is there a response from Mr. Bongiovanni              |
| 02:28PM  | 9  | April 1st, 2018?                                                  |
| 02:28PM  | 10 | A.  Yes.  It says:  I know, life takes over.  Hope all is          |
| 02:28PM  | 11 | well my friend.                                                  |
| 02:28PM  | 12 | Mr. Gerace says:  Busier than ever.  Where do you see my           |
| 02:28PM  | 13 | new collection.  And then he corrects that to:  Wait until         |
| 02:28PM  | 14 | you see my new.                                                   |
| 02:29PM  | 15 | And then Mr. Bongiovanni says:  I'll come see you at              |
| 02:29PM  | 16 | Pharaoh's.                                                       |
| 02:29PM  | 17 | **MR. TRIPI:**  Okay.  We can go to Exhibit Number 98             |
| 02:29PM  | 18 | Ms. Champoux.                                                    |
| 02:29PM  | 19 | **BY MR. TRIPI:**                                                 |
| 02:29PM  | 20 | Q.  Earlier in the text thread we saw a portion where             |
| 02:29PM  | 21 | Mr. Bongiovanni and Mr. Gerace were referencing                   |
| 02:29PM  | 22 | Mr. Bongiovanni going to Pharaoh's and using the employee         |
| 02:29PM  | 23 | entrance; do you remember that?                                   |
| 02:29PM  | 24 | A.  Yes.                                                          |
| 02:29PM  | 25 | Q.  And then here, where we were now on Exhibit 310D, it           |

02:29PM     1    looks like page 54, we see a reference to Mr. Bongiovanni

02:29PM     2    saying I'll come see you at Pharaoh's?  See that?

02:29PM     3    A.  Yes.

02:29PM     4         **MR. TRIPI:**  Ms. Champoux, on Exhibit 98, can we zoom

02:29PM     5    in on the bottom there?  And can you highlight the sentence

02:30PM     6    starting "I responded that?"

02:30PM     7         **BY MR. TRIPI:**

02:30PM     8    Q.  All right.  So Mr. Bongiovanni in his December 10th, 2018

02:30PM     9    memo wrote:  I responded that, yes, we have been friends for

02:30PM    10    years, but I never come into your club.

02:30PM    11         Do you see that there Special Agent Ryan?

02:30PM    12    A.  I do.

02:30PM    13    Q.  Is what Mr. Bongiovanni wrote and represented to his

02:30PM    14    supervision at the DEA consistent with the text threads that

02:30PM    15    we've just reviewed?

02:30PM    16    A.  No.

02:30PM    17         **MR. TRIPI:**  Okay.  We can zoom out of that.

02:30PM    18         **BY MR. TRIPI:**

02:30PM    19    Q.  Was there a text response to Mr. Bongiovanni's text, I'll

02:30PM    20    come see you at Pharaoh's, by Mr. Gerace?

02:30PM    21    A.  Yes.  He says:  Yeah, you should.  I just bought a

02:30PM    22    guitar.  We will be coming -- will be coming in, so I'm by

02:30PM    23    Elvis Presley -- oh, coming in.  Maybe that's supposed to be

02:30PM    24    signed by Elvis Presley, Johnny Cash, and Carl Perkins and

02:31PM    25    Jerry Lee Lewis.  Only five in the world.

02:31PM    1          **MR. TRIPI:**  Please scroll down further.

02:31PM    2          **BY MR. TRIPI:**

02:31PM    3   Q.  Does Mr. Gerace start talking about his collection

02:31PM    4   of items that's he's acquiring?

02:31PM    5   A.  Yes.

02:31PM    6   Q.  What does he write?

02:31PM    7   A.  I just bought Superman's cape from the movie.  Reeves,

02:31PM    8   the guy that died.  I just bought Marciano's glove, that just

02:31PM    9   got delivered.  And then the last text from Mr. Gerace says:

02:31PM   10   Rocky.

02:31PM   11       And then Mr. Bongiovanni says:  Wow, I'd love to see it.

02:31PM   12   That awesome.

02:31PM   13   Q.  What else did Mr. Gerace write about his collection that

02:31PM   14   he was growing on the April 1st, 2018?

02:31PM   15   A.  I got Mario Andretti race suit, the last one he ever

02:31PM   16   wore.  The next text is:  I have a picture come in and signed

02:31PM   17   by Winston Churchill, and some of the top pilots from World

02:31PM   18   War II.

02:32PM   19       Mr. Gerace says:  Just investing some money and some

02:32PM   20   artworks, too.  You will love this stuff.  It's all displayed

02:32PM   21   behind bulletproof glass.

02:32PM   22       And then there's the last text from Mr. Gerace, and that

02:32PM   23   string is:  What day are you free?  My father does lunch on

02:32PM   24   Monday, Tuesdays, Thursdays, and Friday, noon to 4.

02:32PM   25   Q.  And what does Mr. Bongiovanni respond?

| | | |
|---|---|---|
| 02:32PM | 1 | A.  Really cool bro.  Great investments.  Can't wait to see |
| 02:32PM | 2 | it all. |
| 02:32PM | 3 | MR. TRIPI:  Okay.  Scroll down.  We can keep |
| 02:32PM | 4 | scrolling. |
| 02:32PM | 5 | BY MR. TRIPI: |
| 02:32PM | 6 | Q.  Are there text messages that seem to be associated with |
| 02:32PM | 7 | the various things that Mr. Gerace was just describing as |
| 02:32PM | 8 | were part of his collection? |
| 02:32PM | 9 | A.  Yes. |
| 02:33PM | 10 | MR. TRIPI:  We can keep scrolling a little bit, |
| 02:33PM | 11 | Ms. Champoux. |
| 02:33PM | 12 | BY MR. TRIPI: |
| 02:33PM | 13 | Q.  On April 1st there, it's marked as 8:12 p.m., what does |
| 02:33PM | 14 | Mr. Bongiovanni respond to the series of text messages that |
| 02:33PM | 15 | we scrolled through a moment ago? |
| 02:33PM | 16 | A.  It says:  Ha, ha, better than the stock market. |
| 02:33PM | 17 | MR. TRIPI:  Keep scrolling down, Ms. Champoux. |
| 02:33PM | 18 | BY MR. TRIPI: |
| 02:33PM | 19 | Q.  Are we still on April 1st, 2018? |
| 02:33PM | 20 | A.  Yes. |
| 02:33PM | 21 | Q.  A number of texts back and forth? |
| 02:33PM | 22 | A.  Yes. |
| 02:33PM | 23 | Q.  What did Mr. Bongiovanni write to Mr. Gerace a little |
| 02:33PM | 24 | while later on April 1st, 2018, what's marked down here as |
| 02:33PM | 25 | 8/14/54 p.m.? |

02:33PM  1   A.  It says:  Yeah, and people love them because it reminds

02:33PM  2   them of the childhood and the -- will always pay big dollar

02:33PM  3   sign then older they get.

02:34PM  4   Q.  So, what actual time is that in text message?

02:34PM  5   A.  That's right on the cusp of daylight savings.  It's

02:34PM  6   either 3:14 p.m. or 4:14 p.m.

02:34PM  7   Q.  Okay.

02:34PM  8       MR. TRIPI:  You can keep scrolling down,

02:34PM  9   Ms. Champoux.  Let's go a touch slower, but keep scrolling.

02:34PM  10      All right.  Stop there.

02:34PM  11      BY MR. TRIPI:

02:34PM  12  Q.  Do you see a text Mr. Bongiovanni writes about a birthday

02:34PM  13  drink?

02:34PM  14  A.  Yes.

02:34PM  15  Q.  Can you read that for the jury?

02:34PM  16  A.  It says:  Okay.  I'll see you for a birthday drink,

02:34PM  17  buddy.  Be safe and keep in touch.

02:34PM  18  Q.  Do you go for birthday drinks with your confidential

02:35PM  19  sources or sources of information?

02:35PM  20  A.  No.

02:35PM  21  Q.  Let's move forward in time, and take a look at the

02:35PM  22  April 24th, 2018 text message.

02:35PM  23      MR. TRIPI:  Ms. Champoux, you had it.  Let's go up a

02:35PM  24  little bit.  Right here.

         25

02:35PM  1          **BY MR. TRIPI:**

02:35PM  2   Q.  Can you read that one for the jury?

02:35PM  3   A.  Yes.  It's from Mr. Gerace, it says:  Am I ever going to

02:35PM  4   see you again?  And then a message right behind it that says:

02:35PM  5   My old friend.

02:35PM  6   Q.  And what time is that?

02:35PM  7   A.  That's April 23rd, at 8 p.m.  Roughly.

02:35PM  8   Q.  Does Mr. Bongiovanni respond to that?

02:35PM  9   A.  He does.  He says:  Glad you're home safe, buddy.  Sorry

02:35PM  10  I'm still working, Bro, miss you.

02:35PM  11      And Mr. Gerace says:  That's okay, Bro.  I'd love to grab

02:36PM  12  coffee or lunch one day.  I haven't seen you in so damn long.

02:36PM  13  Q.  And what does Mr. Bongiovanni respond to that?

02:36PM  14  A.  He says:  I know, bud, too long.

02:36PM  15          **MR. TRIPI:**  Keep scrolling down Ms. Champoux.

02:36PM  16          **BY MR. TRIPI:**

02:36PM  17  Q.  And then on April 24th, what does Mr. Gerace respond?

02:36PM  18  A.  Will you let me know when you get an hour free?

02:36PM  19      And then Mr. Bongiovanni, says:  Sure, Bro I don't see

02:36PM  20  anybody anymore.

02:36PM  21  Q.  And what did Mr. Gerace respond?

02:36PM  22  A.  I know, brother, but life is going by fast.

02:36PM  23      And Mr. Bongiovanni responds:  Sure is.

02:36PM  24          **MR. TRIPI:**  Stop there.

         25

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

156

02:36PM  1        **BY MR. TRIPI:**

02:36PM  2   Q.  On June 5th, 2018 does it look like Mr. Gerace invites

02:36PM  3   Mr. Bongiovanni to a pig roast at Pharaoh's?

02:36PM  4   A.  Yes.

02:36PM  5   Q.  Later that month, June 30th, 2018, what does

02:37PM  6   Mr. Bongiovanni -- or, withdrawn.  What does Mr. Gerace

02:37PM  7   write?

02:37PM  8   A.  He writes:  Am I ever going to see you again?

02:37PM  9       And Mr. Bongiovanni responds:  Miss you, Bro, I'm going

02:37PM  10  up to Sunset today.

02:37PM  11       **MR. TRIPI:**  Okay.  Now, Ms. Champoux, can we pull up

02:37PM  12  Exhibit 97 on the right?  And keep the text messages in 310D

02:37PM  13  up on the left.  Thank you.

02:37PM  14       Okay.  Now on Exhibit 310D Ms. Champoux, can you

02:38PM  15  scroll so that the miss you bro, I'm going to Sunset today, is

02:38PM  16  at the top of the screen?

02:38PM  17       Leave it there, thank you.

02:38PM  18       **BY MR. TRIPI:**

02:38PM  19  Q.  We looked at Exhibit 97 earlier; is that right?

02:38PM  20  A.  Yes.

02:38PM  21       **MR. TRIPI:**  Ms. Champoux, can we scroll to the

02:38PM  22  documents that were attached to this looking at page 2 of

02:38PM  23  Exhibit 97.  Stop there.

02:38PM  24       **BY MR. TRIPI:**

02:38PM  25  Q.  Does it appear that we're at the same point in time now

02:38PM   1   on the text thread?

02:38PM   2   A.   Yes.

02:38PM   3   Q.   Rough estimate, we've gone through a couple hundred text

02:38PM   4   messages before June 30th, 2016 between Mr. Gerace and

02:38PM   5   Mr. Bongiovanni; is that right?

02:38PM   6   A.   Yes.

02:38PM   7   Q.   But the first text that Mr. Bongiovanni chose to attach

02:38PM   8   to his memo were beginning on June 30th, 2018; is that right?

02:38PM   9   A.   Yes.

02:38PM   10  Q.   Okay.  So, continuing on the messages on the left, can

02:38PM   11  you read those from Exhibit 310D?

02:38PM   12  A.   Yeah.  So Mr. Gerace says:  Do you have a cottage?

02:39PM   13       And Mr. Bongiovanni responds:  No, just going up.  Tommy

02:39PM   14  Doc is in town and a couple of Lindsay's friends.

02:39PM   15       **MR. TRIPI:**  Ms. Champoux, can we advance Exhibit 97

02:39PM   16  to page 3 please.

02:39PM   17       **BY MR. TRIPI:**

02:39PM   18  Q.   And can you continue reading from 310D, Special Agent

02:39PM   19  Ryan?

02:39PM   20  A.   Yes.  Mr. Gerace says:  Cool.  Then he says:  I --

02:39PM   21  there's a girl in town from Las Vegas staying with me with

02:39PM   22  some other chick that works for me.  Let me see what they

02:39PM   23  wanna do.

02:39PM   24  Q.   And reading from Exhibit 310D still, what does

02:39PM   25  Mr. Bongiovanni respond?

02:39PM    1    A.  I'll be cool for a happy hour any time.  I'm off the 4,

02:39PM    2    5, 6.

02:39PM    3             MR. TRIPI:  Ms. Champoux, can you scroll 310D to the

02:39PM    4    next several messages.

02:39PM    5             BY MR. TRIPI:

02:39PM    6    Q.  Can you continue from where you left off reading from

02:39PM    7    310D, Mr. Ryan?

02:39PM    8    A.  Mr. Bongiovanni says:  Okay.  We are going in the

02:40PM    9    afternoon about 1 or 2.

02:40PM   10             MR. TRIPI:  Can I stop you there, Ms. Champoux.

02:40PM   11    Scroll Exhibit 97 to page 4 now.

02:40PM   12             BY MR. TRIPI:

02:40PM   13    Q.  And Special Agent Ryan, can you continue please reading

02:40PM   14    from 310D?

02:40PM   15    A.  Mr. Gerace says:  Is there that concert today?  Heard

02:40PM   16    it's going to be a zoo.

02:40PM   17        Mr. Bongiovanni says:  Don't know, but I'm sure it will

02:40PM   18    be busy.  We usually go to Cabana Sam.

02:40PM   19        Mr. Gerace says:  I heard something on Facebook that

02:40PM   20    there's a huge concert, and they sold a couple thousand

02:40PM   21    tickets, and they were saying to get there early to park way

02:40PM   22    down in 5.  And a text that says RT from Mr. Gerace.

02:40PM   23             MR. TRIPI:  Can we scroll a little Ms. Champoux?

02:40PM   24             THE WITNESS:  And then a third text with the

02:40PM   25    number 5.

02:40PM  1    **MR. TRIPI:**  Can you move to the next page on Exhibit

02:40PM  2  97.  And can we go to actually page 6 of that document.

02:40PM  3          **BY MR. TRIPI:**

02:40PM  4  Q.  All right.  Can you pick it up here, Exhibit 310D?

02:40PM  5  A.  Mr. Bongiovanni says:  Wow.  There's an emoji.  Then it

02:41PM  6  says:  I don't know anything -- or, I don't know, waiting for

02:41PM  7  Lindsay.  I'll ask her.

02:41PM  8      Mr. Gerace says:  Maybe it was this weekend, or I thought

02:41PM  9  it was this weekend because of the Fourth of July.  Maybe I'm

02:41PM  10  wrong, maybe it's next weekend.

02:41PM  11      Mr. Bongiovanni says --

02:41PM  12          **MR. TRIPI:**  Ms. Champoux, can we advance Exhibit 97?

02:41PM  13  Thank you.

02:41PM  14          **BY MR. TRIPI:**

02:41PM  15  Q.  We're now on page 7 of that exhibit.  And we're on page

02:41PM  16  71 of Exhibit 310D.  Please continue.

02:41PM  17  A.  Mr. Bongiovanni says:  We are going to see Fortini play

02:41PM  18  on the 6th, and I know there's a band playing then, but I

02:41PM  19  don't think Fortini could pack 'em in to Route 5.

02:41PM  20      Mr. Gerace says:  Ha, ha, ha, only Joe Bong can do that.

02:41PM  21      And Mr. Bongiovanni says:  I'm like the old David Cassidy

02:41PM  22  now.

02:41PM  23      And Mr. Gerace says:  Yeah, you and I feel like Milton

02:42PM  24  Berle.

02:42PM  25      And Mr. Bongiovanni says:  LOL, Uncle Misty, and then

02:42PM   1   Uncle Milty.

02:42PM   2        **MR. TRIPI:**  Can we go to page 7 of Exhibit 97?

02:42PM   3        **BY MR. TRIPI:**

02:42PM   4   Q.  And can you continue reading?

02:42PM   5   A.  Mr. Gerace says:  I'm thinking of taking them down to

02:42PM   6   RiverWorks.  Last time I was there was with you and Lindsay.

02:42PM   7        Another text from Mr. Gerace says:  Then we went to Dock

02:42PM   8   of the Bay.  Remember, we had to help Lindsay through the

02:42PM   9   parking lot.

02:42PM   10       Mr. Bongiovanni says:  Yes, I do.  An emoji.  And then:

02:42PM   11   Have fun, be safe.

02:42PM   12       Then later Mr. Gerace says:  Thanks, brother, I'm home.

02:42PM   13       And Mr. Bongiovanni says:  Glad you got home safe.

02:42PM   14       **MR. TRIPI:**  Okay.  I'd like to hold it up right there

02:42PM   15   for a moment Ms. Champoux.  Can we go -- scroll back to that

02:42PM   16   last text message he just read, please.  Leave it there.

02:42PM   17       And can we pull up Exhibit 98 at page 2, please.

02:43PM   18       On the right I need Exhibit 98 at page 2, please,

02:43PM   19   thank you.  And can we zoom in on the last sentence.

02:43PM   20       **BY MR. TRIPI:**

02:43PM   21   Q.  Have there been several hundred text messages that were

02:43PM   22   unreported between Exhibits 97 and 98?

02:43PM   23   A.  Yes.

02:43PM   24   Q.  What did Mr. Bongiovanni write to his DEA supervisors

02:43PM   25   about his reporting of communications?

02:43PM   1   A.  I have and will report all contact with Gerace to a DEA

02:43PM   2   supervisor like I have in the past and will in the future

02:43PM   3   should unsolicited communication with Gerace occur.

02:44PM   4   Q.  Are the text messages and the volume of them that we've

02:44PM   5   just reviewed inconsistent with that representation he made

02:44PM   6   to DEA?

02:44PM   7   A.  Yes.

02:44PM   8        MR. TRIPI:  Zoom out of Exhibit 98, Ms. Champoux.

02:44PM   9        We can take that down, actually.  I'll stay with

02:44PM  10   Exhibit 310D now, if you could get us back to where we were.

02:44PM  11   Keep it there for just a moment.

02:44PM  12        I'd like to turn now to Exhibit 127.  Can we zoom in

02:44PM  13   on that again.  Bear with me for just a moment.

02:45PM  14        BY MR. TRIPI:

02:45PM  15   Q.  After you had acquired Mr. Gerace's text messages that we

02:45PM  16   were just going through, eventually we're going to get to a

02:45PM  17   photograph from that June 30th day at the cottage in the

02:45PM  18   text; is that right?

02:45PM  19   A.  From the telephone extraction.

02:45PM  20   Q.  From the phone extraction.

02:45PM  21   A.  Yes.

02:45PM  22   Q.  We haven't gotten there yet, but we're gonna get there,

02:45PM  23   right?

02:45PM  24   A.  Yes.

02:45PM  25   Q.  Did you -- were you the one who acquired this particular

02:45PM    1    photo that we see in Government Exhibit 127?

02:45PM    2    A.   Yes.

02:45PM    3    Q.   And that's from the text thread extraction that we're in

02:45PM    4    the process of going through that's Exhibit 310D?

02:45PM    5    A.   Yes.

02:45PM    6    Q.   And then earlier you mentioned you had interviewed

02:46PM    7    Phlycia Hunt; is it that, right?

02:46PM    8    A.   Yes.

02:46PM    9    Q.   And briefly, were the circumstances of your initial

02:46PM   10    interview of Phlycia Hunt that she was arrested by the

02:46PM   11    Amherst Police Department in April of 2019 and a supervisor

02:46PM   12    there, JoAnn DiNoto, alerted law enforcement and you

02:46PM   13    responded and interviewed Ms. Hunt?

02:46PM   14    A.   Yes.

02:46PM   15    Q.   And did you conduct a relatively lengthy interview of

02:46PM   16    Ms. Hunt that day?

02:46PM   17    A.   Yes.

02:46PM   18    Q.   Following that interview of Ms. Hunt, did you engage in

02:46PM   19    further interviews of her?

02:46PM   20    A.   Yes.

02:46PM   21    Q.   Eventually, did you use the photograph you acquired from

02:46PM   22    the text thread that you had reviewed in Mr. Gerace's phone

02:46PM   23    and present Ms. Hunt with this photograph?

02:46PM   24    A.   Yes.

02:46PM   25    Q.   Now, had you heard her describe to you what transpired at

02:47PM 1   the cottage that day when you interviewed her?

02:47PM 2   A.  On the day that I showed her the photograph, or --

02:47PM 3   Q.  Yeah.  My question is:  Did she explain doing cocaine,

02:47PM 4   and who she did it with?

02:47PM 5   A.  Yes.

02:47PM 6   Q.  At that point, did you ask her to circle the people who

02:47PM 7   she did cocaine with that day other than Peter Gerace?

02:47PM 8   A.  Yes.

02:47PM 9   Q.  What did she do in response to that?

02:47PM 10  A.  She circled the defendant and Tom Doctor.

02:47PM 11  Q.  Did you tell her who to circle?

02:47PM 12  A.  No.

02:47PM 13  Q.  Did you indicate who she should circle?

02:47PM 14  A.  No.

02:47PM 15  Q.  What did you say to Ms. Hunt when you handed her this

02:47PM 16  photo?

02:47PM 17         **MR. MacKAY:**  Objection, hearsay -- I'm sorry,

02:47PM 18  withdrawn.

02:47PM 19             **BY MR. TRIPI:**

02:47PM 20  Q.  Go ahead.

02:47PM 21  A.  I asked her if she remembered being there that day.  I

02:47PM 22  asked her what it was, where she was.

02:47PM 23     I asked her what she remembered about the day, and about

02:47PM 24  the people in the picture.  If she remembered anybody's

02:48PM 25  names.

02:48PM     1          She said she didn't remember names, but that -- she did

02:48PM     2    remember who brought cocaine that day.

02:48PM     3    Q.  And is that when you asked her -- what did you ask her to

02:48PM     4    do at that point?

02:48PM     5    A.  I asked her who it was.  And she said --

02:48PM     6          MR. MacKAY:  Objection, improper -- hearsay, it's an

02:48PM     7    improper identification.

02:48PM     8          MR. TRIPI:  That's not accurate, Your Honor, we can

02:48PM     9    step up.  Can we -- can I please argue it at the bench?

02:48PM    10          THE COURT:  Come on up.

02:48PM    11          MR. TRIPI:  Thank you.

02:48PM    12          (Sidebar discussion held on the record.)

02:48PM    13          MR. TRIPI:  We went -- Mr. -- you will recall that we

02:48PM    14    went through this exact same objection that was overruled at

02:48PM    15    the last trial.  They've impeached Ms. Hunt on all grounds.

02:48PM    16    They attacked her credibility on all grounds.  This statement

02:48PM    17    is pursuant to 801(d)(1)(B)(ii).  Remember, the rule was

02:49PM    18    amended, it doesn't have to be a prior statement.  You had

02:49PM    19    done the research last time.

02:49PM    20          THE COURT:  Okay.  So, what are you trying to -- so

02:49PM    21    it's a prior consistent statement.

02:49PM    22          MR. TRIPI:  No, it's under 801(d)(1)(B).  In 2014,

02:49PM    23    that rule was amended to include subsection 2, which expands

02:49PM    24    the purposes for which prior consistent statements may be

02:49PM    25    offered.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

02:49PM   1        **THE COURT:**  Right.

02:49PM   2        **MR. TRIPI:**  So I guess you're right.

02:49PM   3        **THE COURT:**  Right.

02:49PM   4        **MR. TRIPI:**  Sorry, I'm just in my mode here, I'm

02:49PM   5  reading.

02:49PM   6        **THE COURT:**  That's okay.

02:49PM   7        **MR. TRIPI:**  It permitted substantive use of prior

02:49PM   8  consistent statements to rehabilitate the declarant's

02:49PM   9  credibility not only by rebutting charges of recent

02:49PM  10  fabrication, but others including improper motive, et cetera.

02:49PM  11        **THE COURT:**  And what are you trying to --

02:49PM  12        **MR. TRIPI:**  They impeached her credibility on drug

02:49PM  13  use, everything.  So I'm not limited to -- I'm not limited to

02:49PM  14  rehabilitating her just because it doesn't have to be --

02:49PM  15        **THE COURT:**  But there's no -- yeah, but there's got

02:50PM  16  to be something that you're rehabilitating.  So if they

02:50PM  17  attacked her credibility because of what she said --

02:50PM  18        **MR. TRIPI:**  They attacked her credibility on her

02:50PM  19  ability to perceive, recall, all of it.

02:50PM  20        **THE COURT:**  Stop for a second.

02:50PM  21        **MR. TRIPI:**  Okay.

02:50PM  22        **THE COURT:**  Stop for a second.

02:50PM  23        If they attacked her credibility on her ability to

02:50PM  24  perceive at the time she perceived it, in other words she's

02:50PM  25  drunk at the time that this happened, this doesn't

| | | |
|---|---|---|
| 02:50PM | 1 | rehabilitate that at all.  This is simply a restatement of |
| 02:50PM | 2 | something that she said once before.  And it's the same thing |
| 02:50PM | 3 | that she's saying now, and it doesn't -- |
| 02:50PM | 4 | **MR. TRIPI:**  Ann can't hear. |
| 02:50PM | 5 | **THE COURT:**  -- it doesn't rehabilitate it at all |
| 02:50PM | 6 | because if she didn't receive it when she initially saw it, |
| 02:50PM | 7 | then she told the wrong story to this guy, and she told the |
| 02:50PM | 8 | wrong story to the jury.  So that doesn't help you at all.  So |
| 02:50PM | 9 | what are you trying to rehabilitate her, what -- what |
| 02:50PM | 10 | impeachment are you trying to rehabilitate her from? |
| 02:50PM | 11 | **MR. TRIPI:**  Judge, they impeached her on the use of |
| 02:51PM | 12 | alcohol -- |
| 02:51PM | 13 | **THE COURT:**  At the time -- |
| 02:51PM | 14 | **MR. TRIPI:**  -- on her use of drugs -- |
| 02:51PM | 15 | **THE COURT:**  Yeah. |
| 02:51PM | 16 | **MR. TRIPI:**  -- and her ability to recall now.  They |
| 02:51PM | 17 | went through a lengthy cross-examination of her history of |
| 02:51PM | 18 | drug, use all of that, and they attacked her on every ground. |
| 02:51PM | 19 | They attacked her on her perception.  They attacked her on her |
| 02:51PM | 20 | motivations for cooperating.  They attacked her across the |
| 02:51PM | 21 | board. |
| 02:51PM | 22 | **THE COURT:**  So if it's motivation for cooperating, |
| 02:51PM | 23 | and if it's -- and if it's memory, I think, think this does |
| 02:51PM | 24 | rehabilitate it. |
| 02:51PM | 25 | **MR. TRIPI:**  And I think they did that. |

02:51PM   1          **THE COURT:**  If it's perception at the time, it

02:51PM   2   doesn't.

02:51PM   3          **MR. MacKAY:**  Also, Judge, it's my recollection

02:51PM   4   Ms. Hunt, she was able to identify him -- so there's not an

02:51PM   5   inconsistency.  She doesn't -- during her testimony she

02:51PM   6   doesn't say I can't remember who it is, or it's not true.  She

02:51PM   7   gave the answer to Court on the stand identifying

02:51PM   8   Mr. Bongiovanni and identifying in court.  So there's

02:51PM   9   nothing -- there's no prior -- I'm not sure we've reached

02:51PM  10   that.

02:51PM  11          **MR. TRIPI:**  A prior statement of identification is

02:51PM  12   also not hearsay, so I get this in under two grounds.

02:52PM  13          **THE COURT:**  You've already gotten in the circled --

02:52PM  14   the two of them circled, and there's no objection to that.  So

02:52PM  15   that's in already.  That's the identification, and that's in.

02:52PM  16          **MR. TRIPI:**  There was a whole cross-examination --

02:52PM  17          **THE COURT:**  Okay.  Look it.  I'm not remembering the

02:52PM  18   cross-examination as well as you are, Mr. Tripi, so we can

02:52PM  19   take a break, and we can have Ann go back and take a look at

02:52PM  20   the cross-examination.

02:52PM  21          **MR. TRIPI:**  Yeah, if I could just try to jog your

02:52PM  22   memory a little bit, this exact scenario played out, we argued

02:52PM  23   it basically exactly the same way.  You initially sustained

02:52PM  24   the objection when I tried to argue that it was a prior

02:52PM  25   statement of identification.  I understand they didn't object

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

02:52PM   1   to that part of it this time.  But then further when we went

02:52PM   2   to get this portion of the testimony in, you ultimately

02:52PM   3   admitted it under 801(d)(1)(B)(ii) because we made the similar

02:52PM   4   argument here that they attacked her credibility across the

02:52PM   5   board.  It wasn't just limited to ability to perceive at that

02:52PM   6   time --

02:52PM   7            THE COURT:  Yeah, I'm gonna --

02:53PM   8            MR. TRIPI:  -- and her ability to recall --

02:53PM   9            THE COURT:  I'm going to have to take a look at the

02:53PM  10   rule, and I'm going to have to take a look at the

02:53PM  11   cross-examination.

02:53PM  12            Go ahead.

02:53PM  13            MR. SINGER:  Just one thing, Judge, if it was

02:53PM  14   admitted last time as a prior consistent statement, then with

02:53PM  15   respect to that rule, as you know, to admit a prior consistent

02:53PM  16   statement it needs to exist for the motive to fabricate

02:53PM  17   occurs.  In this situation, Ms. Hunt came in to Agent Ryan

02:53PM  18   after the arrest.

02:53PM  19            THE COURT:  Mr. Tripi is saying that rule has been

02:53PM  20   changed.

02:53PM  21            MR. TRIPI:  Yeah, he's under (ii)(1), I'm under

02:53PM  22   (ii)(2).  So we're arguing two different things here.

02:53PM  23            THE COURT:  We're going to take a break.  We're going

02:53PM  24   to take a break now.  We're going to let the jury go, and

02:53PM  25   we'll talk.

02:53PM  1        **MR. TRIPI:**  I appreciate that.

02:53PM  2            (Sidebar discussion ended.)

02:53PM  3        **THE COURT:**  Okay.  Folks, we've got a matter that

02:53PM  4   needs some attention outside your presence, so we are going to

02:53PM  5   take your afternoon break.  It may be a little longer than

02:53PM  6   usual.

02:53PM  7            Please remember my instructions about not

02:53PM  8   communicating about the case even with each other and not

02:53PM  9   making up your mind.

02:53PM  10           We'll see you back here as soon as we're done.

02:54PM  11           (Jury excused at 2:54 p.m.)

02:54PM  12       **THE COURT:**  Okay.  Give me the rule again Mr. Tripi.

02:54PM  13       **MR. TRIPI:**  Yeah, Judge, 801(d)(1)(B)(ii), the

02:54PM  14   declarant --

02:54PM  15       **THE COURT:**  Let me find it.  Let me find it.

02:54PM  16       **MR. TRIPI:**  801(d)(1)(B)(ii), statements that are not

02:54PM  17   hearsay needs the following conditions.  The declarant

02:54PM  18   testifies, is subject to cross-examination about a prior

02:54PM  19   statement and the statement is consistent with the declarant's

02:55PM  20   testimony and is offered to rehabilitate the declarant's

02:55PM  21   credibility as a witness when attacked on another ground.

02:55PM  22           So this is different than express or implied recent

02:55PM  23   fabrication which is (i).

02:55PM  24       **THE COURT:**  Right.

02:55PM  25       **MR. TRIPI:**  Under the rule, these statements are

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

02:55PM 1    substantive evidence.  The prior statement is consistent with

02:55PM 2    the testimony given on the stand, and if the opposite party

02:55PM 3    opens the door, which they did, here they didn't just

02:55PM 4    cross-examine her on her alcohol and drug use at the time, but

02:55PM 5    they also crossed Ms. Hunt on her recent drug use in April or

02:55PM 6    May of this year.

02:55PM 7         So, prior to -- between the two trials, you recall

02:55PM 8    her testimony, she had a slipup in her drug usage.  So that's

02:55PM 9    attacking her credibility on another ground.

02:55PM 10        And, so, that is, I believe, brings us within the

02:55PM 11   ambit of the rule.

02:55PM 12        **THE COURT:**  Yeah, why isn't that -- so if you attack

02:56PM 13   her credibility on her current drug use, why wouldn't the fact

02:56PM 14   that she gave this information to Agent Ryan earlier

02:56PM 15   rehabilitate that?

02:56PM 16        You -- the word "rehabilitate" can't be read as

02:56PM 17   broadly as you're suggesting, Mr. Tripi.  It can't be read to

02:56PM 18   simply allow a witness to repeat what the witness said to an

02:56PM 19   agent before.  There's got to be some reason.

02:56PM 20        Now, Mr. Singer says that under (i), it can be

02:56PM 21   brought in to rehabilitate based on a prior inconsistent

02:56PM 22   statement if the consistent statement arose before the witness

02:56PM 23   had a reason to fabricate it.  And that's right.  And what

02:56PM 24   you're saying is that (i) --

02:56PM 25        **MR. TRIPI:**  Double I.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

02:56PM    1          **THE COURT:**  -- (ii) expands that, so that there are

02:56PM    2    other ways that prior consistent statements can rehabilitate.

02:57PM    3          And I agree with that, because obviously that -- that

02:57PM    4    (ii) makes it broader.  But it still has to rehabilitate.  It

02:57PM    5    can't simply be repeat.

02:57PM    6          **MR. TRIPI:**  Yeah.  And part of it under U.S. versus

02:57PM    7    Purcell, which is a 2nd Circuit case from 2020 speaks to rebut

02:57PM    8    a charge of faulty memory, which is what they attacked her on.

02:57PM    9          **MR. COOPER:**  And specifically from the cross this

02:57PM   10    time, Judge, the cross-examination was about what color sheets

02:57PM   11    were on the bed.  Well, she's testifying in this trial in 2024

02:57PM   12    six years after the incident occurred.  When you choose to

02:57PM   13    make that cross-examination about what color sheets were on

02:57PM   14    the bed, we get to say, hey, in 2019 when her memory was five

02:57PM   15    years clearer, she circled these people in the photo.  That's

02:57PM   16    how it's responsive.

02:57PM   17          **THE COURT:**  You've already got the circles.  You've

02:57PM   18    already got the circled.  So what else is it that you want to

02:57PM   19    get now?

02:57PM   20          **MR. TRIPI:**  The context of why she circled them, who

02:57PM   21    were the people using the cocaine.

02:57PM   22          **THE COURT:**  Well, isn't that already in?  Isn't that

02:57PM   23    what she just said?

02:58PM   24          **MR. TRIPI:**  I think -- I think this all might be -- I

02:58PM   25    was trying to clarify the testimony that was already in, and

02:58PM   1   then that drew an objection.

02:58PM   2           **THE COURT:**  Hang on.  At that point, did you ask her

02:58PM   3   to circle the people that she did cocaine with that day other

02:58PM   4   than Peter Gerace.

02:58PM   5           Answer:  Yes.

02:58PM   6           Question:  What did she do in response to that?

02:58PM   7           Answer:  She circled the defendant and Tom Doctor.

02:58PM   8           Question:  Did you tell her who to circle?

02:58PM   9           Answer:  No.

02:58PM   10           Question:  Did you indicate who she should circle?

02:58PM   11           Answer:  No.

02:58PM   12           What did you say to Ms. Hunt when you handed her this

02:58PM   13   photo?

02:58PM   14           Objection, hearsay, withdrawn.

02:58PM   15           Mr. Tripi:  Go ahead.

02:58PM   16           Answer:  I asked her if she remembered being there

02:58PM   17   that day.  I asked her what it was, where she was.  I asked

02:59PM   18   her what she remembered about that day, and about the people

02:59PM   19   in the picture, if she remembered anybody's names.  She said

02:59PM   20   she didn't remember names, but she did remember who brought

02:59PM   21   the cocaine that day.

02:59PM   22           And when you asked her what did you say -- what did

02:59PM   23   you ask her to do at that point?

02:59PM   24           I asked her who it was, and she said --

02:59PM   25           And that's where the objection came in, and that's

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

173

02:59PM    1    when we came up.

02:59PM    2         So she's already identified without objection the

02:59PM    3    defendant and Mr. Doctor.

02:59PM    4         **MR. TRIPI:**  Okay.  I'll move on then.  I think what

02:59PM    5    you read --

02:59PM    6         **THE COURT:**  Great.  Okay.  Because I -- if there's

02:59PM    7    something else that you think --

02:59PM    8         **MR. TRIPI:**  No.  I think it was in, I was circling

02:59PM    9    back a second time, so maybe there's an asked and answered

02:59PM   10    objection there would be sustained.

02:59PM   11         **MR. MacKAY:**  Yes, Judge, and just for clarity, the

02:59PM   12    decision not to necessarily make an objection right up front

03:00PM   13    here in this instance more has to deal with the flow of how

03:00PM   14    things are coming out, and whether or not to object like we

03:00PM   15    did last time.  I think the objection here was lodged, like,

03:00PM   16    is this going to go further and repeat more of the

03:00PM   17    conversation.  That's where it's meant to cut off.  And it

03:00PM   18    sounds like we're not going to go there anyways.

03:00PM   19         **THE COURT:**  I get it.  But again, I -- I'm not going

03:00PM   20    to raise objections myself.  If you had an objection to the

03:00PM   21    identification, you should have made it then, you didn't.

03:00PM   22    That came in.

03:00PM   23         But I'm not inclined to let anything in further

03:00PM   24    unless there is something that her prior discussion with Agent

03:00PM   25    Ryan rehabilitates.  That's all I'm saying.  And I don't see

03:00PM    1    anything right now.

03:00PM    2              So that's where we are.  You decide what you want to

03:00PM    3    do.  I want to take a break.

03:00PM    4         **MR. TRIPI:**  I think that sometimes when you're up

03:00PM    5    there, Judge, you don't have a -- when you read it back, I

03:00PM    6    covered what needed to be covered.

03:00PM    7              **THE COURT:**  Okay.  Great.  Thank you.

03:00PM    8              **THE CLERK:**  All rise.

03:00PM    9         **MR. COOPER:**  What time do you want us back, Judge.

03:00PM   10              **THE COURT:**  3:15.

03:01PM   11         **MR. COOPER:**  Okay.  Thank you.

03:01PM   12              (Off the record at 3:01 p.m.)

03:17PM   13              (Back on the record at 3:17 p.m.)

03:17PM   14              (Jury not present.)

03:17PM   15              **THE CLERK:**  All rise.

03:17PM   16              **THE COURT:**  Please be seated.

03:17PM   17              **THE CLERK:**  We are back on the record for the

03:17PM   18    continuation of the jury trial in case number 19-cr-227,

03:17PM   19    United States of America versus Joseph Bongiovanni.

03:17PM   20              All counsel and parties are present.

03:17PM   21              **THE COURT:**  Okay.  Ready to go.

03:17PM   22         **MR. TRIPI:**  Yeah, we're just getting the witness up.

03:17PM   23              **THE COURT:**  Anything?

03:17PM   24         **MR. MacKAY:**  No, Your Honor.

03:18PM   25              **THE COURT:**  Okay.  So let's bring the jury back in,

| | | |
|---|---|---|
| 03:18PM | 1 | please. |
| 03:19PM | 2 | (Witness and Jury seated at 3:19 p.m.) |
| 03:19PM | 3 | **THE COURT:**  Okay.  The record will reflect that all |
| 03:19PM | 4 | our jurors are present, again. |
| 03:19PM | 5 | I remind the witness that he's still under oath. |
| 03:20PM | 6 | The objection to the last question is sustained.  And |
| 03:20PM | 7 | you can ask another question, Mr. Tripi. |
| 03:20PM | 8 | **MR. TRIPI:**  Thank you, Your Honor. |
| 03:20PM | 9 | Ms. Champoux, can you -- I think we had Exhibit 127 |
| 03:20PM | 10 | up on the screen. |
| 03:20PM | 11 | **BY MR. TRIPI:** |
| 03:20PM | 12 | Q.  Special Agent Ryan, with respect to the interview when |
| 03:20PM | 13 | Ms. Hunt circled Mr. Bongiovanni and Mr. Doctor as you just |
| 03:20PM | 14 | testified, do you remember that interview was subsequent to |
| 03:20PM | 15 | you obtaining the extraction and the text messages from |
| 03:20PM | 16 | Mr. Gerace's phone; is that right? |
| 03:20PM | 17 | A.  Yes. |
| 03:20PM | 18 | Q.  Do you remember when that interview was specifically? |
| 03:20PM | 19 | A.  I don't recall the specific date, no. |
| 03:20PM | 20 | Q.  I'm going to show you a document to see if I can refresh |
| 03:20PM | 21 | your recollection as to a specific date. |
| 03:20PM | 22 | **MR. TRIPI:**  Counsel, I'm going to be showing 3583I, |
| 03:20PM | 23 | and I'm going to direct the witness's attention to the bottom |
| 03:21PM | 24 | of page 2 going on to page 3. |
| | 25 | |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

176

03:21PM   1          **BY MR. TRIPI:**

03:21PM   2   Q.   If you can look at that.

03:21PM   3        Did Exhibit 3583I refresh your recollection as to the

03:21PM   4   date that you interviewed Ms. Hunt and showed her this

03:21PM   5   photograph?

03:21PM   6   A.   Yes.

03:21PM   7   Q.   What was that date?

03:21PM   8   A.   October 16th, 2019.

03:21PM   9   Q.   2019?

03:21PM   10  A.   Yes.

03:21PM   11  Q.   That was a little over a year after the text exchange

03:21PM   12  that we just saw about the meeting at the cottage at Sunset

03:21PM   13  Bay, correct?

03:21PM   14  A.   Yes.

03:21PM   15  Q.   Your interview was closer in time that event?

03:22PM   16       Your interview of Ms. Hunt was closer in time to that

03:22PM   17  event?

03:22PM   18  A.   Than today, yes.

03:22PM   19  Q.   Yes.  Now, during that interview were you asking her

03:22PM   20  questions like what color were the sheets on the bed?  Or

03:22PM   21  were you asking her questions about who did cocaine with her?

03:22PM   22  A.   The latter.

03:22PM   23  Q.   So you didn't ask about sheets on the bed?

03:22PM   24  A.   No.

03:22PM   25  Q.   You didn't ask her about the color or the type of vehicle

03:22PM   1   she arrived in?

03:22PM   2   A.  No.

03:22PM   3   Q.  Were those less important details to ask about?

03:22PM   4   A.  Yes.

03:22PM   5            **MR. TRIPI:**  Okay.  Ms. Champoux, we can bring down

03:22PM   6   Exhibit 127, and let's go back to Exhibit 310D, please.  I'd

03:22PM   7   like to keep working through that.

03:22PM   8            And let's go back to where we left off, please.

03:22PM   9            **BY MR. TRIPI:**

03:22PM  10   Q.  All right.  We had just finished the text thread

03:22PM  11   June 30th, 2018 where Mr. Gerace writes:  Thanks, brother,

03:22PM  12   I'm home.

03:22PM  13       Looks like there's another text message the following

03:23PM  14   morning, is that right, July 1st, 2018?

03:23PM  15   A.  Yes.

03:23PM  16   Q.  And what does Mr. Bongiovanni write?

03:23PM  17   A.  Glad you got home safe.

03:23PM  18   Q.  Okay.

03:23PM  19            **MR. TRIPI:**  And can we scroll down Ms. Champoux?

03:23PM  20            **BY MR. TRIPI:**

03:23PM  21   Q.  And is there a text July 2nd from Mr. Gerace?

03:23PM  22   A.  There are several on July 2nd.

03:23PM  23   Q.  Can you go through the July 2nd text?  And skip over that

03:23PM  24   same Pharaoh's one we've been looking at.  We can let the

03:23PM  25   jury read that.

03:23PM   1   A.  The first one says:  Golf money due this week.

03:23PM   2       The second one says:  25th.

03:23PM   3       Then there's the advertisement text for the Pharaoh's

03:23PM   4   golf outing.  And then another advertisement text for the

03:23PM   5   Pharaoh's golf outing.

03:23PM   6   Q.  And so those texts about the golf outing were July 2nd,

03:23PM   7   2018; is that right?

03:23PM   8   A.  Yes.

03:23PM   9   Q.  Now that month, that same month, July, July 20th, 2018 is

03:23PM  10   when Ron Serio proffered; is that right?

03:23PM  11   A.  Yes.

03:23PM  12   Q.  And August 1st, 2018, is when, on or about the day that

03:24PM  13   Special Agent Casullo reported the race-related statements

03:24PM  14   from Mr. Bongiovanni to his management, correct?

03:24PM  15   A.  Yes.

03:24PM  16   Q.  And so we see a gap here from July 2nd to October 23rd;

03:24PM  17   do you see that?

03:24PM  18   A.  I do.

03:24PM  19   Q.  On October 23rd, 2018, what does Mr. Bongiovanni write?

03:24PM  20   A.  It's Mr. Gerace.

03:24PM  21   Q.  I'm sorry, what does Mr. Gerace write to Mr. Bongiovanni?

03:24PM  22   Thank you.

03:24PM  23   A.  He says:  Are you alive?  Just got a new phone?  Or, are

03:24PM  24   you alive?  Just get a new phone?  Did you move out of town?

03:24PM  25   What the fuck?

Case 1:19-cr-00227-LJV-MJR    Document 1244    Filed 09/28/24    Page 179 of 242
USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

179

03:24PM   1         **MR. TRIPI:** And can you continue to scroll down a

03:24PM   2   little bit, Ms. Champoux?

03:24PM   3         **BY MR. TRIPI:**

03:24PM   4   Q.  Is there some text there, the 27th of October?

03:24PM   5   A.  There's one from the 27th of October from Mr. Gerace, it

03:24PM   6   says:  Is there a reason why you're not talking to me?

03:24PM   7   Q.  And Mr. Bongiovanni responds?

03:24PM   8   A.  He does, on October 27th, he says:  Dude, sorry, been

03:24PM   9   working midnights, and I've been sleeping until 3 or 4,

03:24PM  10   sorry, my bad.

03:24PM  11   Q.  And then does Mr. Gerace respond?

03:25PM  12   A.  Yes.  On the same day he says:  Okay.  I'm just making

03:25PM  13   sure, brother.

03:25PM  14   Q.  And what does Mr. Bongiovanni write?

03:25PM  15   A.  On the same day:  Hope all is well.  You're not the only

03:25PM  16   one mad at me.  LOL.

03:25PM  17   Q.  And what did Mr. Gerace respond?

03:25PM  18   A.  I'm not mad, brother, just keep in touch.

03:25PM  19   Q.  What happened next?

03:25PM  20   A.  There's a photograph that didn't get extracted.

03:25PM  21   Q.  And then is there another photograph after that?

03:25PM  22   A.  Yes.  A photograph of -- looks like a dinner party.

03:25PM  23   Q.  This is October, this text of the photo is October 27th,

03:25PM  24   2018; is that right?

03:25PM  25   A.  Yes.

03:25PM   1   Q.  So it's in that same series.

03:25PM   2        **MR. TRIPI:**  Can we zoom in on the photo,

03:25PM   3   Ms. Champoux?

03:25PM   4        **BY MR. TRIPI:**

03:25PM   5   Q.  Do you see Peter Gerace in the photo?

03:25PM   6   A.  Yes, the far end of the table on the left side as I'm

03:25PM   7   looking at it.

03:25PM   8   Q.  Do you also see that same actor from before, Lillo

03:26PM   9   Brancato?

03:26PM  10   A.  He's across the table from Mr. Gerace.

03:26PM  11   Q.  Can you circle him?

03:26PM  12        Do you also see someone who's sort of like a famous

03:26PM  13   boxing trainer in the photograph?

03:26PM  14   A.  Freddie Roach, right here.

03:26PM  15   Q.  Can you circle Mr. Gerace for the jury?

03:26PM  16        **MR. TRIPI:**  Okay.  May the record reflect the witness

03:26PM  17   has placed three circles on this photo, two on the right-hand

03:26PM  18   side, upper right-hand corner of the photo, one on sort of the

03:26PM  19   middle of the photograph, far end of the table.

03:26PM  20        **THE COURT:**  Yeah.  So, just so the record's clear, on

03:26PM  21   the left side of the photograph, the person not at the head of

03:26PM  22   the table but next to that person at the far end of the table

03:26PM  23   was circled.

03:26PM  24        And then on the right side of the table, not the

03:26PM  25   person at the head of the table but the person to that

03:26PM   1   person's left, and then the person sitting the third seat in

03:27PM   2   on the same side is circled.

03:27PM   3           **MR. TRIPI:**  Thank you, Your Honor.  That was a better

03:27PM   4   description.  Appreciate it.

03:27PM   5           We can clear that now.  And we can get back to the

03:27PM   6   text thread.

03:27PM   7           **BY MR. TRIPI:**

03:27PM   8   Q.  Now those photos -- or, withdrawn.

03:27PM   9       Those text messages to include that photo were attached

03:27PM  10   to Exhibit 98, that memo that were Bongiovanni sent; is that

03:27PM  11   right?

03:27PM  12   A.  Yes.

03:27PM  13           **MR. TRIPI:**  Can we keep scrolling down.

03:27PM  14           **BY MR. TRIPI:**

03:27PM  15   Q.  And now is there another text from Mr. Gerace that picks

03:27PM  16   up December 7th, 2018?

03:27PM  17   A.  Yes.  It says:  Call me on the phone they just called

03:27PM  18   your number.

03:27PM  19       The next text from Mr. Gerace on the same date says:

03:27PM  20   ASAP.

03:27PM  21       And then there's another text from Mr. Gerace that says:

03:27PM  22   Hey, brother, I know we haven't talked in a while, but you'll

03:27PM  23   always be one of my best friends, and you know I always have

03:28PM  24   your back.

03:28PM  25           **MR. TRIPI:**  And Ms. Champoux, can we pull up

03:28PM  1   Government Exhibit 30A, please?

03:28PM  2       I'm going to direct your attention to Exhibit 30A at

03:28PM  3   paragraph number 2.

03:28PM  4       **BY MR. TRIPI:**

03:28PM  5   Q.  First of all, is this a DEA-6 Mr. Bongiovanni wrote?

03:28PM  6   A.  Yes.

03:28PM  7   Q.  And he wrote that on November 6th, 2009?

03:28PM  8   A.  Yes.

03:28PM  9       **MR. TRIPI:**  Ms. Champoux, under paragraph 2, could

03:28PM  10  you highlight the first two sentences, please?

03:28PM  11      **BY MR. TRIPI:**

03:28PM  12  Q.  Can you read what Mr. Bongiovanni wrote on November 6th

03:28PM  13  2009, to his Group Supervisor Dale Kasprzyk regarding his

03:29PM  14  description of who Peter Gerace was?

03:29PM  15  A.  On November 1st, 2009, S.A. Joseph Bongiovanni received a

03:29PM  16  telephone call from Peter G. Gerace.

03:29PM  17      Gerace has acted as a confidential source, and has been

03:29PM  18  able to provide information regarding individuals in this

03:29PM  19  case file and other narcotics investigations in the past.

03:29PM  20  Q.  Now, going back to Exhibit 310D, December 7th, 2018, how

03:29PM  21  did Mr. Gerace describe Mr. Bongiovanni in that, that text

03:29PM  22  that's 11:07 p.m. UTC time?

03:29PM  23  A.  You'll always be one of my best friends.

03:29PM  24  Q.  And the defendant's response, what did he say about their

03:29PM  25  friendship?

03:29PM   1   A.  We have been friends for 25 years, bud, all good.

03:29PM   2   Q.  In 30A, anywhere in that document, does Mr. Bongiovanni

03:29PM   3   write that he has been friends with Gerace for 25 years?

03:29PM   4   A.  No.

03:29PM   5   Q.  Does any -- does he write anywhere that Gerace is one of

03:30PM   6   his best friends?

03:30PM   7   A.  No.

03:30PM   8   Q.  How does he describe Gerace to his boss?

03:30PM   9   A.  As a confidential source who's provided reliable

03:30PM   10  information in the past.

03:30PM   11  Q.  Who has provided information regarding individuals?

03:30PM   12  A.  Yes.

03:30PM   13        **MR. TRIPI:**  We can pull down Exhibit Number 30A.  If

03:30PM   14  we can continue with 310D where we were, which is page 76.

03:30PM   15        **BY MR. TRIPI:**

03:30PM   16  Q.  After Mr. Gerace wrote:  You mean 36 years; did he send

03:30PM   17  another photo?

03:30PM   18  A.  Yes.

03:30PM   19        **MR. TRIPI:**  Can you zoom in on that text message,

03:30PM   20  Ms. Champoux?  The whole text message, if you can capture the

03:30PM   21  header of it, too.

03:30PM   22        **BY MR. TRIPI:**

03:30PM   23  Q.  Is that a text with a photograph Mr. Gerace sent on

03:30PM   24  December 19th, 2018?

03:30PM   25  A.  Yes.

03:30PM   1   Q.  So that's a few days before Christmas?

03:31PM   2   A.  Yes.

03:31PM   3   Q.  Is that the same photograph that we later used with when

03:31PM   4   he interviewed Ms. Hunt which we've seen in evidence as

03:31PM   5   Exhibit 127?

03:31PM   6   A.  Yes.

03:31PM   7        **MR. TRIPI:**  And we can zoom out of that.  Thank you.

03:31PM   8        **BY MR. TRIPI:**

03:31PM   9   Q.  Now by that point in time, Mr. Bongiovanni was writing he

03:31PM   10  had begun writing the memos that we looked at, correct?

03:31PM   11  A.  Yes.

03:31PM   12  Q.  And then are there a couple more text messages that don't

03:31PM   13  get responded to?

03:31PM   14  A.  Yes.  Looks like they start on February 2nd, 2019.

03:31PM   15  Q.  As you understand it, Mr. Bongiovanni -- his last day at

03:31PM   16  the DEA using that DEA phone was February 1st, 2019, correct?

03:31PM   17  A.  Correct.

03:31PM   18  Q.  So Mr. Gerace is essentially after that date texting an

03:31PM   19  old phone for Mr. Bongiovanni after February 1st?

03:31PM   20  A.  Correct.

03:32PM   21        **MR. TRIPI:**  We can close out of 310D, Ms. Champoux.

03:32PM   22        **BY MR. TRIPI:**

03:32PM   23  Q.  As part of the extraction that was Exhibit 310, Special

03:32PM   24  Agent Donoghue was also able to extract contacts that were in

03:32PM   25  Mr. Gerace's phone; is that right?

| 03:32PM | 1 | A.  Yes. |

03:32PM   1   A.  Yes.

03:32PM   2   Q.  I'm going to hand you up 310AT.  Look through that

03:32PM   3   briefly.

03:32PM   4       Do you recognize Exhibit 310AT?

03:32PM   5   A.  Yes.

03:32PM   6   Q.  Is that a portion of the contacts that were extracted for

03:33PM   7   Mr. Gerace's iPhone X consistent with the complete extraction

03:33PM   8   that is Exhibit 310?

03:33PM   9   A.  Yes.

03:33PM   10  Q.  Is it accurate from the original extraction?

03:33PM   11  A.  Yes.

03:33PM   12          **MR. TRIPI:**  The government offers Exhibit 310AT,

03:33PM   13  which is list of contacts, Your Honor.

03:33PM   14          **MR. MacKAY:**  Joe, can I just see this?  My 310AT is

03:33PM   15  not -- I'm not going to have an objection, Judge, it's just a

03:33PM   16  mishmash with exhibit numbers.

03:33PM   17          **THE COURT:**  But there's no objection?

03:33PM   18          **MR. MacKAY:**  No objection.

03:33PM   19          **THE COURT:**  It's received without objection.

03:33PM   20          **(GOV Exhibit 310AT was received in evidence.)**

03:33PM   21          **MR. MacKAY:**  I think we're good, Judge.  We have the

03:33PM   22  right copy here on one of our computers.

03:34PM   23          **BY MR. TRIPI:**

03:34PM   24  Q.  I'd like to go through some of these contacts.  I'm not

03:34PM   25  going to go through all of them, though.  Just bear with me

03:34PM      1    for a moment.

03:34PM      2         So we're looking at contacts in Mr. Gerace's phone.

03:34PM      3              **MR. TRIPI:**  Ms. Champoux, can you bring that up?

03:34PM      4              And can you advance to page 4 of this exhibit?

03:34PM      5              **BY MR. TRIPI:**

03:34PM      6    Q.  Under record number 2, do you see a contact in

03:34PM      7    Mr. Gerace's phone with a phone number for Jeff Anzalone?

03:34PM      8    A.  Yes.

03:34PM      9    Q.  Is Mr. Anzalone also someone who HSI investigated and

03:34PM     10    ultimately charged with drug trafficking?

03:34PM     11    A.  Yes.

03:34PM     12    Q.  Did he ultimately plead guilty in his case and cooperate

03:34PM     13    in this investigation?

03:34PM     14    A.  Yes, he did.

03:34PM     15    Q.  Record number 3, do you see an entry in Mr. Gerace's

03:34PM     16    phone, a contact in the phone for Wayne Anderson?

03:34PM     17    A.  Yes.

03:34PM     18              **MR. TRIPI:**  Let's go to page number 5, please,

03:35PM     19    Ms. Champoux.

03:35PM     20              **BY MR. TRIPI:**

03:35PM     21    Q.  There's a record number 4.  Do you see a contact for an

03:35PM     22    individual with a phone number for Joseph -- sorry, Joe

03:35PM     23    Bella?

03:35PM     24    A.  Yes.

03:35PM     25    Q.  Is there also a Facebook contact for Mr. Bella?

03:35PM    1    A.  Yes.

03:35PM    2    Q.  Okay.

03:35PM    3              **MR. TRIPI:**  Can we go to page number 6.

03:35PM    4              **BY MR. TRIPI:**

03:35PM    5    Q.  Record number 7.  Is there a contact for an individual

03:35PM    6    named Frank Burkhart with a phone number?

03:35PM    7    A.  Yes.

03:35PM    8    Q.  Do you know that individual to be associated with a

03:35PM    9    tattoo parlor called Hard Core Tattoo on Elmwood?

03:35PM   10    A.  Yes.

03:35PM   11    Q.  Do you see a contact for Tony Casullo?

03:35PM   12    A.  Yes.

03:35PM   13    Q.  And is that the DEA special agent?

03:35PM   14    A.  Yes.  I think so.  Looks like it's just for his book.

03:35PM   15    Q.  And did Mr. Casullo explain to you, we'll have him

03:36PM   16    describe that himself, but did he explain to you why

03:36PM   17    Mr. Gerace had his phone number?

03:36PM   18    A.  Oh, there is his phone number.  I don't recall.

03:36PM   19    Q.  Okay.  Let's move on to record number 10 on page 7.

03:36PM   20         Do you see an entry for a Jessica, Charm?

03:36PM   21    A.  Yes.

03:36PM   22    Q.  Phone number?

03:36PM   23    A.  Yes.

03:36PM   24    Q.  Do you know that to be a reference to Jessica Leyland?

03:36PM   25    A.  Yes.

03:36PM   1   Q.  Let's go to record number 13.  It begins on the bottom of

03:36PM   2   page 7 and continues to page 8.  Do you see a record in

03:36PM   3   Mr. Gerace's phone for Tommy Doctor?

03:36PM   4   A.  Yes.

03:36PM   5   Q.  Again, is that one of the people who were circled in

03:36PM   6   Exhibit 127?

03:36PM   7   A.  Yes.

03:36PM   8   Q.  Let's go to record number 15, page number 8.  Do you see

03:37PM   9   an entry for Eric Fox with a phone number?

03:37PM  10   A.  Yes.

03:37PM  11   Q.  Let's go to page number 9, it's going to be record 16.

03:37PM  12   Do you see an entry for a Pauly, Hot Dog, with a phone

03:37PM  13   number?

03:37PM  14   A.  Yes.

03:37PM  15        **MR. TRIPI:**  Ms. Champoux, can we bring up Government

03:37PM  16   Exhibit 8A next to this.  And can you do me a favor, can you

03:37PM  17   control F and search for the name Francoforte?  Can you search

03:37PM  18   for it first then.  Thanks.  So we're going to bring down for

03:38PM  19   a moment 310AT and let her do that.

03:38PM  20        Okay.  Can you show Exhibit 8A.  Let's scroll down a

03:38PM  21   little bit more on this page.

03:38PM  22        **BY MR. TRIPI:**

03:38PM  23   Q.  We're at Exhibit 8A at page 347.  Do you see a subscriber

03:38PM  24   record in file C2.

03:38PM  25   A.  Yes.

03:38PM  1    Q.  Do you know that person's name to be Hot Dog?

03:38PM  2    A.  Yes.

03:38PM  3    Q.  Can you scroll down a little bit.  Do you see a phone

03:38PM  4    number there, 716-866-2687?

03:38PM  5    A.  Yes.

03:38PM  6    Q.  Is that the same number in Mr. Gerace's phone?

03:38PM  7    A.  Can I see the contact again?

03:39PM  8         **MR. TRIPI:**  Can we go back to 310AT Ms. Champoux.

03:39PM  9         We're at record number 16.  Right there.  Can you

03:39PM  10   zoom in on the phone number.

03:39PM  11        **THE WITNESS:**  Yes.  It's the same.

03:39PM  12        **BY MR. TRIPI:**

03:39PM  13   Q.  The same phone number that's in the Wayne Anderson file?

03:39PM  14   A.  Yes.

03:39PM  15        **MR. TRIPI:**  We can zoom out of that file, please.

03:39PM  16   Look at record number 18.  Can we zoom in on that.

03:39PM  17        **BY MR. TRIPI:**

03:39PM  18   Q.  Do you see an entry in Mr. Gerace's phone for a Marcus?

03:39PM  19   A.  Yes.

03:39PM  20   Q.  With a phone number?

03:39PM  21   A.  Yes.

03:39PM  22   Q.  Do you even see a Facebook address that references Marcus

03:39PM  23   Black?

03:39PM  24   A.  Yes.

03:40PM  25        **MR. TRIPI:**  Let's go to Exhibit 20, zoom in on that.

03:40PM    1              BY MR. TRIPI:

03:40PM    2    Q.  Do you see a reference entry for a Mike Masecchia?

03:40PM    3    A.  Yes.

03:40PM    4    Q.  With a phone number?

03:40PM    5    A.  Yes.

03:40PM    6    Q.  And phone number 716-812-0664?

03:40PM    7    A.  Yes.

03:40PM    8              MR. TRIPI:  Ms. Champoux, can we go back to

03:40PM    9    Exhibit 8A, please.  And can you search the last name

03:40PM   10    Masecchia.  Can we scroll down?

03:40PM   11              BY MR. TRIPI:

03:40PM   12    Q.  Do you see that account contact number, 716-812-8664?

03:40PM   13    A.  Yes.

03:40PM   14    Q.  Is that the same number that's in Mr. Gerace's phone?

03:40PM   15    A.  Yes.

03:40PM   16    Q.  Let me get what page that was.  For the record, that was

03:40PM   17    Exhibit 8A at page 349 that we just displayed for the phone

03:41PM   18    number 716-812-0664 related to Mike Masecchia.

03:41PM   19              MR. TRIPI:  Let's go back to Exhibit 310AT, please.

03:41PM   20    Thank you.  Record number 21, can we zoom in on that.

03:41PM   21              BY MR. TRIPI:

03:41PM   22    Q.  Do you see an entry with a phone number for a Sue

03:41PM   23    Michalski?

03:41PM   24    A.  Yes.

03:41PM   25    Q.  Do you know her to be the wife of the former New York

03:41PM   1   State Supreme Court Judge John Michalski?

03:41PM   2   A.  Yes.

03:41PM   3           **MR. TRIPI:**  Let's go down to record number 22,

03:41PM   4   please.  Zoom in on that.

03:41PM   5           **BY MR. TRIPI:**

03:41PM   6   Q.  Do you see an entry for Kim Mecca?

03:41PM   7   A.  Yes.

03:41PM   8   Q.  Do you know her to be the former girlfriend of Lou Selva?

03:41PM   9   A.  Yes.

03:41PM   10  Q.  Is there a phone number for her there?

03:41PM   11  A.  716-870-8083.

03:42PM   12  Q.  Let's go to record 23.

03:42PM   13      Do you see an entry for a Frank Parisi with a phone

03:42PM   14  number there?

03:42PM   15  A.  Yes.

03:42PM   16  Q.  Let's go to record 25.

03:42PM   17      Do you see an entry for a Joe Palmieri in Mr. Gerace's

03:42PM   18  contacts?

03:42PM   19  A.  Yes.

03:42PM   20  Q.  Do you know who Joe Palmieri is?

03:42PM   21  A.  Yes.

03:42PM   22  Q.  Who is that?

03:42PM   23  A.  He's a Town of Tonawanda detective and task force officer

03:42PM   24  at the DEA office in D-57.

03:42PM   25  Q.  Was he someone who was frequently partnered with

03:42PM   1   Mr. Bongiovanni?

03:42PM   2   A.  Yes, he was.

03:42PM   3        **MR. TRIPI:**  Ms. Champoux, would you take that down

03:42PM   4   for a moment.  I'd like to go back to Exhibit 310AT.  Or, I'm

03:42PM   5   sorry, I misspoke, Exhibit 8A.  And can I search the word Elm?

03:43PM   6   E-L-M.  Go ahead.  Scroll through one for a second.  Keep

03:43PM   7   going, please.

03:43PM   8        Yeah, Elmview.  That's the word I want, sorry.

03:43PM   9        Keep going, I'm looking for Elmview on a Buffalo

03:43PM   10  police report.  So I need you to keep going.

03:43PM   11       Keep going.  I'll tell you when to stop.  All right.

03:43PM   12       **BY MR. TRIPI:**

03:43PM   13  Q.  All right.  Do you see Buffalo Police Department booking

03:43PM   14  data sheet for Damien Abbate?

03:44PM   15  A.  Yes.

03:44PM   16  Q.  Does it -- is it -- we're in file number C2-13-0026?

03:44PM   17  A.  Yes.

03:44PM   18  Q.  This is page 74 of Exhibit 8A.  Do you see who printed

03:44PM   19  that report on November 28th, 2012?

03:44PM   20  A.  Joseph Palmieri.

03:44PM   21  Q.  And that's someone who's working with Special Agent

03:44PM   22  Bongiovanni?

03:44PM   23  A.  Yes.

03:44PM   24       **MR. TRIPI:**  Ms. Champoux, can we scroll down the next

03:44PM   25  page?  The one after that.  Okay.  Stop there.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

03:44PM   1         **BY MR. TRIPI:**

03:44PM   2    Q.  We're at page 77 of Exhibit 8A.  Is this the arrest,

03:44PM   3    local police booking data sheet for Wayne Anderson?

03:44PM   4    A.  Yes.

03:44PM   5    Q.  And do you see who printed that booking data sheet for

03:45PM   6    the file?

03:45PM   7    A.  Joseph Palmieri.

03:45PM   8    Q.  And do you see a Post-It note with State Police Officer

03:45PM   9    Mike O'Rourke's phone number photocopied onto that page?

03:45PM  10    A.  Yes.

03:45PM  11         **MR. TRIPI:**  Okay.  We can zoom out of or take down

03:45PM  12    Exhibit 8A.  And let's go back to Exhibit 310AT.  Let's go to

03:45PM  13    record number 29.  It's on page 13.

03:45PM  14         **BY MR. TRIPI:**

03:45PM  15    Q.  Do you see that entry?

03:45PM  16    A.  Yes.

03:45PM  17    Q.  What's the name there?

03:45PM  18    A.  Derek Roy.

03:45PM  19    Q.  Do you see a phone number for that person?

03:45PM  20    A.  647-642-9886.

03:46PM  21    Q.  As you understand it, is Mr. Roy a former Buffalo Sabre?

03:46PM  22    A.  Yes, Derek Roy.

03:46PM  23    Q.  Are you pronouncing it the Canadian way?

03:46PM  24    A.  I guess I am.

03:46PM  25         **MR. TRIPI:**  Let's go to record number 35.  Can you

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

194

| | | |
|---|---|---|
| 03:46PM | 1 | zoom in on that one? |
| 03:46PM | 2 | **BY MR. TRIPI:** |
| 03:46PM | 3 | Q.  Do you see that name, Turtle? |
| 03:46PM | 4 | A.  I do. |
| 03:46PM | 5 | Q.  Do you know there to be an individual name Donald |
| 03:46PM | 6 | Panepinto a/k/a Turtle? |
| 03:46PM | 7 | A.  Yes. |
| 03:46PM | 8 | Q.  As far as reputation in the law enforcement community you |
| 03:46PM | 9 | were a part of, was that person believed to be associated |
| 03:46PM | 10 | with Italian Organized Crime? |
| 03:46PM | 11 | A.  Yes. |
| 03:46PM | 12 | Q.  Yes.  Do you see a phone number in Mr. Gerace's phone for |
| 03:47PM | 13 | that person? |
| 03:47PM | 14 | A.  Yes. |
| 03:47PM | 15 | Q.  Look at record number 38, please.  Do you see an entry |
| 03:47PM | 16 | for that person? |
| 03:47PM | 17 | A.  K.L. |
| 03:47PM | 18 | Q.  As you understand it, was Ms. K.L. someone who was later |
| 03:47PM | 19 | subpoenaed to testify before a federal grand jury as part of |
| 03:47PM | 20 | your investigation? |
| 03:47PM | 21 | A.  Yes. |
| 03:47PM | 22 | Q.  Let's go to record 38. |
| 03:47PM | 23 | Who is that? |
| 03:47PM | 24 | A.  Lindsay Schuh. |
| 03:47PM | 25 | Q.  Is that the defendant's wife's maiden name? |

03:47PM    1    A.  Yes.

03:47PM    2    Q.  So that's Lindsay Bongiovanni's phone number?

03:47PM    3    A.  Yes.

03:47PM    4    Q.  Let's go to record 40.

03:48PM    5        Is there an entry for Tom Napoli?

03:48PM    6    A.  Yes.

03:48PM    7    Q.  And I won't pull it up again, but is he one of the people

03:48PM    8    in that photo with the defendant in Toronto, Exhibit 126?

03:48PM    9    A.  Yes, he is.

03:48PM   10        **MR. TRIPI:**  Let's go to record 46 please.

03:48PM   11        **BY MR. TRIPI:**

03:48PM   12    Q.  Do you know who that person is?  Tommy O?

03:48PM   13    A.  Yes.

03:48PM   14    Q.  Who is that?

03:48PM   15    A.  He's the head of the Outlaws, and the day manager at

03:48PM   16    Pharaoh's.  John Ermin is his name.

03:49PM   17    Q.  Can we go to record 48?  And do you see that person's

03:49PM   18    name?

03:49PM   19    A.  Yes.

03:49PM   20    Q.  And who's that?

03:49PM   21    A.  Frank Tripi.

03:49PM   22    Q.  Do you see a phone number for that person?

03:49PM   23    A.  Yes.

03:49PM   24    Q.  Is that person, based upon his reputation in the law

03:49PM   25    enforcement community, believed to be associated with Italian

03:49PM 1    Organized Crime?

03:49PM 2    A.  Yes.

03:49PM 3    Q.  No relative of mine, right?

03:49PM 4    A.  He is not.

03:49PM 5    Q.  Do you see record 49?  Do you see that entry?

03:49PM 6    A.  Joe Tomasello.

03:49PM 7    Q.  Do you see a phone number for that person in Mr. Gerace's

03:49PM 8    phone?

03:49PM 9    A.  Yes.

03:49PM 10   Q.  Let's go to record number 50.

03:50PM 11       Do you see who's entered in record number 50 in

03:50PM 12   Mr. Gerace's contact?

03:50PM 13   A.  Phlycia Ray.

03:50PM 14   Q.  What's another name for Phlycia Ray?

03:50PM 15   A.  Phlycia Hunt.

03:50PM 16   Q.  Is that the woman who you showed that exhibit to, 127?

03:50PM 17   A.  Yes.

03:50PM 18          **MR. TRIPI:**  Let's go to record 51, please.

03:50PM 19          **BY MR. TRIPI:**

03:50PM 20   Q.  What's the name of the entry there that was in

03:50PM 21   Mr. Gerace's phone?

03:50PM 22   A.  It says Anthony, and last name Bro.

03:50PM 23   Q.  And is that a reference to Anthony Gerace, the

03:50PM 24   defendant's brother?

03:50PM 25   A.  Yes.

03:50PM    1    Q.  Is that the phone number you have associated with

03:50PM    2    Mr. Gerace?

03:50PM    3    A.  Yes.

03:50PM    4    Q.  Anthony Gerace?

03:50PM    5    A.  Yes.

03:50PM    6    Q.  Let's go to record number 52.

03:50PM    7        Do you see that person's name?

03:51PM    8    A.  Matt Barnaby.

03:51PM    9    Q.  Do you see a -- is that just a Facebook contact?  If you

03:51PM   10    know?

03:51PM   11    A.  Let's see.  I don't see anything that says Facebook.  Is

03:51PM   12    there more to it than what's zoomed?

03:51PM   13    Q.  I'll withdraw it.  Let's go to -- I think that was it.

03:51PM   14    We can take down Exhibit 310AT.  All right.  Now, earlier I

03:51PM   15    had asked you -- we looked at Exhibit 490A; do you remember

03:52PM   16    that.

03:52PM   17        **MR. TRIPI:**  Ms. Champoux, it's in evidence.  Can we

03:52PM   18    pull that up?

03:52PM   19        **BY MR. TRIPI:**

03:52PM   20    Q.  And can you describe for the jury again how you located

03:52PM   21    the photo that we see here at Pharaoh's on December 12th,

03:52PM   22    2019?

03:52PM   23    A.  So it was a room at the far end of the upstairs hallway

03:52PM   24    from the staircase.  It was mostly empty, there was one piece

03:52PM   25    of furniture in there.  And then immediately inside the door

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

03:52PM   1   along on the wall on the left-hand side as you walk in the

03:52PM   2   room was some stuff on the floor.  One of the things on the

03:52PM   3   floor was a plastic tote, a storage tote.  And I searched

03:52PM   4   through the tote and found the picture.

03:52PM   5   Q.  I'm going hand you up now Government Exhibit 236A.  If

03:53PM   6   you can take a look at that.

03:53PM   7       Do you recognize Exhibit 236A?  You it take it out if you

03:53PM   8   need to.

03:53PM   9   A.  Yes.  It's the same photo that's depicted in 490A.

03:53PM   10  Q.  Is that from the performance in Las Vegas that you talked

03:53PM   11  about earlier?

03:53PM   12  A.  Yes.

03:53PM   13  Q.  Is that photo album, I guess for lack of a better term,

03:53PM   14  in the same or substantially the same condition today as the

03:53PM   15  last time you had obtained it?

03:53PM   16  A.  Yes.

03:53PM   17          **MR. TRIPI:**  The government offers Exhibit 236A, I

03:53PM   18  believe it is, Your Honor.  236A.

03:54PM   19          **MR. MacKAY:**  Can I just review it real quickly,

03:54PM   20  Judge?

03:54PM   21          No objection, Your Honor.

03:54PM   22          **THE COURT:**  Received without objection.

03:54PM   23          **(GOV Exhibit 236A was received in evidence.)**

03:54PM   24          **MR. TRIPI:**  Your Honor, I'm going to publish it to

03:54PM   25  the jury and let them pass it around.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

199

03:54PM   1        **THE COURT:**  Sure.  It's just a single photo, the same

03:54PM   2   photo of 490A, right?

03:54PM   3        **MR. TRIPI:**  There's one other photo in there.

03:55PM   4        May have the record reflect that Exhibit 236A was

03:55PM   5   published for the jury, Your Honor.

03:55PM   6        **BY MR. TRIPI:**

03:55PM   7   Q.  All right.  Also in April 2019, did you arrange for a

03:55PM   8   border search of Mr. Bongiovanni's phone when you learned he

03:56PM   9   was gonna be returning to the United States from another

03:56PM  10   country?

03:56PM  11   A.  Yes.

03:56PM  12        **MR. TRIPI:**  We can take down 490A, Ms. Champoux.

03:56PM  13        **BY MR. TRIPI:**

03:56PM  14   Q.  Just very briefly, what were the circumstances of that?

03:56PM  15   A.  He was returning from the Caribbean to BWI in Baltimore,

03:56PM  16   or through BWI in Baltimore.  Coordinated with Customs and

03:56PM  17   Border Protection officers at the airport to conduct a

03:56PM  18   cursory review of his phone, and a secondary examination of

03:56PM  19   his baggage.

03:56PM  20   Q.  Now regarding that, did you get a full extraction like

03:56PM  21   you did in Peter Gerace's phone?

03:56PM  22   A.  No.

03:56PM  23   Q.  Did you get a couple photocopies of some PDF or a couple

03:56PM  24   pages of contacts?

03:56PM  25   A.  Picture of the phone -- or, pictures of the phone screen,

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

200

03:56PM  1   explain various contacts embedded in a pdf.

03:56PM  2   Q.  Did the CBP officers who had interacted with

03:57PM  3   Mr. Bongiovanni in Baltimore return his phone to him on site?

03:57PM  4   A.  Yes.

03:57PM  5   Q.  So you never had that phone?

03:57PM  6   A.  No.

03:57PM  7   Q.  Fast forwarding from April to June 6th of 2019, by that

03:57PM  8   point in your investigation, did you get to the point where

03:57PM  9   you had prepared a federal search warrant application and

03:57PM  10  affidavit seeking to execute a warrant at Mr. Bongiovanni's

03:57PM  11  residence located at 85 Alder Place in the Town of Tonawanda?

03:57PM  12  A.  Yes.

03:57PM  13  Q.  By that point in time, were other agencies participating

03:57PM  14  with you?

03:57PM  15  A.  The Department of Justice Office of Inspector General and

03:57PM  16  the FBI.

03:57PM  17  Q.  And was that sort of the FBI's initial involvement in the

03:57PM  18  case?

03:57PM  19  A.  Yes.

03:57PM  20  Q.  Was that through Special Agent Brian Burns?

03:57PM  21  A.  Yes.

03:57PM  22  Q.  Generally, can you describe how the search warrant with

03:58PM  23  Mr. Bongiovanni's residence was conducted?

03:58PM  24  A.  Similar to the other search warrants I've described, the

03:58PM  25  house was cleared and secured by the HSI tactical team,

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

03:58PM    1    photographed.  Search team searched for evidence, was

03:58PM    2    documented and brought to the kitchen -- or, brought to the

03:58PM    3    kitchen and then documented, collected, and then we left.

03:58PM    4    Q.  All right.  There's a lot to unpack there so, I'm going

03:58PM    5    to go step by step.

03:58PM    6    A.  Sure.

03:58PM    7    Q.  At first the tactical team enters?

03:58PM    8    A.  Yes.

03:58PM    9    Q.  And then after a period of time, you're notified to come

03:58PM   10    in and sort of take over the search and the scene?

03:58PM   11    A.  Yes.

03:58PM   12    Q.  What was your role that day?

03:58PM   13    A.  I was going to interview Mr. Bongiovanni if he was

03:58PM   14    willing, with Special Agent Carpenter and Special Agent Fusco

03:58PM   15    from DOJ OIG.

03:58PM   16    Q.  So, Special Agent Carpenter, we've heard his name before.

03:59PM   17    He was the DOJ OIG agent assigned after the race-related

03:59PM   18    comments were made known by Special Agent Casullo?

03:59PM   19    A.  Yes.

03:59PM   20    Q.  And Special Agent Fusco was there with Special Agent

03:59PM   21    Carpenter?

03:59PM   22    A.  Yes.

03:59PM   23    Q.  Was your co-case agent Special Agent Halliday?

03:59PM   24    A.  Yes.

03:59PM   25    Q.  What was her role that day?

03:59PM 1   A.  She was there.  She was in charge of the search and

03:59PM 2   evidence collection.

03:59PM 3   Q.  And what was FBI Special Agent Burns's role that day?

03:59PM 4   A.  He assisted with interviews.

03:59PM 5   Q.  Primarily was he involved with dealing with

03:59PM 6   Mr. Bongiovanni's wife Lindsay?

03:59PM 7   A.  Yes.

03:59PM 8   Q.  Were other agents from HSI there helping search and

03:59PM 9   document the location?

03:59PM 10  A.  Yes.

03:59PM 11  Q.  Were you going to be the primary interviewer?

03:59PM 12  A.  Yes.

03:59PM 13  Q.  Were you the only agent on that scene who had been

04:00PM 14  working the case since the moment Ron Serio first uttered

04:00PM 15  Joseph Bongiovanni's name on July 20th, 2018?

04:00PM 16  A.  Yes.

04:00PM 17  Q.  Were photographs taken of the residence?

04:00PM 18  A.  Yes.

04:00PM 19  Q.  Now, when you entered, did you almost immediately upon

04:00PM 20  entry interact with Mr. Bongiovanni?

04:00PM 21  A.  Yes, almost as soon as I passed through the front door.

04:00PM 22  Q.  Describe that very initial interaction with

04:00PM 23  Mr. Bongiovanni.

04:00PM 24  A.  He was standing up between the front door and the kitchen

04:00PM 25  island, sort of behind the couch in the living room.  And

04:00PM   1   when he saw me, he immediately began to ask me if we were

04:00PM   2   there to execute a search warrant, or if it was also an

04:00PM   3   arrest warrant.  He asked me that question several times.

04:00PM   4   Q.  Did you answer him?

04:01PM   5   A.  I did.

04:01PM   6   Q.  What did you tell him?

04:01PM   7   A.  I told him we were there to execute a search warrant, and

04:01PM   8   that he was not under arrest.

04:01PM   9   Q.  What happened from there?

04:01PM  10   A.  From there we moved towards the dining room table.  I

04:01PM  11   asked him if he'd be willing to speak with me and Special

04:01PM  12   Agent Carpenter.

04:01PM  13       And he was also still handcuffed at the time.  I asked

04:01PM  14   him, I say, hey, if I take your handcuffs off, are you going

04:01PM  15   to, you know, be nice and be a gentleman?

04:01PM  16       He said yes, so I took his handcuffs off.  Then we sat

04:01PM  17   down at the table.

04:01PM  18   Q.  With respect to telling him it was just a search warrant

04:01PM  19   and not an arrest warrant, did that mean you were going to

04:01PM  20   search the house that day but not arrest Mr. Bongiovanni?

04:01PM  21   A.  Correct.

04:01PM  22   Q.  Was your investigation continuing?

04:01PM  23   A.  Yes.

04:01PM  24   Q.  Was it going to continue after that search warrant?

04:01PM  25   A.  Yes.

04:01PM    1    Q.  Did you tell Mr. Bongiovanni if he wants, he could leave,

04:01PM    2    but -- how did that go?

04:01PM    3    A.  Yes.  So, I told him he could leave if he wanted.  But

04:02PM    4    that if he left, we wouldn't let him back into the house

04:02PM    5    until we were finished searching.

04:02PM    6    Q.  What did he decide to do?

04:02PM    7    A.  He decided to stay.

04:02PM    8    Q.  And talk to you?

04:02PM    9    A.  Yes.

04:02PM    10   Q.  I'd like that show you a series of photos to sort of set

04:02PM    11   the location, okay?

04:02PM    12   A.  Sure.

04:02PM    13   Q.  I'm going to read these into the record.  I'm going to

04:02PM    14   hand you up 103-72, 103-1, 103-2, 103-3, 103-4, 103-5.

04:03PM    15   That's it for now.  Handing those up to you now.

04:03PM    16       Do you recognize each of those photos that I just handed

04:03PM    17   up to you, and the numbers of which I just read into the

04:03PM    18   record?

04:03PM    19   A.  Yes.

04:03PM    20   Q.  What do you recognize them to be generally?

04:03PM    21   A.  They're photos of Mr. Bongiovanni's residence taken the

04:03PM    22   day we executed the search warrant.

04:03PM    23   Q.  Now are these exhibits limited to sort of the areas of

04:03PM    24   the house that you saw, observed, and were in?

04:03PM    25   A.  Yes.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

205

| | | |
|---|---|---|
| 04:03PM | 1 | Q.  Would it be accurate to say you didn't make your way |
| 04:03PM | 2 | through the whole house because you encountered |
| 04:03PM | 3 | Mr. Bongiovanni and then sat down with him? |
| 04:04PM | 4 | A.  I never made it off that first floor. |
| 04:04PM | 5 | Q.  All right. |
| 04:04PM | 6 | **MR. TRIPI:**  Your Honor, the government offers |
| 04:04PM | 7 | Exhibits 103-72, 103-1, 2, 3, 4, and 5 into evidence. |
| 04:04PM | 8 | **MR. MacKAY:**  No objection. |
| 04:04PM | 9 | **THE COURT:**  Received without objection. |
| 04:04PM | 10 | **(GOV Exhibits 103-1, 2, 3, 4, 5, 72 were received in evidence.)** |
| 04:04PM | 11 | **MR. TRIPI:**  I'd like to go through these briefly, |
| 04:04PM | 12 | Special Agent Ryan. |
| 04:04PM | 13 | Ms. Champoux, if we can publish 103-72. |
| 04:04PM | 14 | **BY MR. TRIPI:** |
| 04:04PM | 15 | Q.  Is this just a picture of the front of the house as it |
| 04:04PM | 16 | generally appeared that day? |
| 04:04PM | 17 | A.  Yes. |
| 04:04PM | 18 | Q.  And let's go to 103-1. |
| 04:04PM | 19 | Is this picture of sort of the front door? |
| 04:04PM | 20 | A.  It is the front door, yes. |
| 04:04PM | 21 | Q.  Okay.  Let's go to 103-2. |
| 04:04PM | 22 | When you open the front door, is this basically what you |
| 04:04PM | 23 | see? |
| 04:04PM | 24 | A.  Yes. |
| 04:04PM | 25 | Q.  Now, this photo, was this taken at a point in time after |

04:05PM   1   the search had been conducted?

04:05PM   2   A.   Yes.

04:05PM   3   Q.   This particular case there, is that HSI property?

04:05PM   4   A.   Yes.

04:05PM   5   Q.   Is that where you were collecting some of the evidence?

04:05PM   6   A.   Yes.

04:05PM   7          **MR. TRIPI:**  Let's split 103-4 on the left and 103-3

04:05PM   8   on the right if we could.  Can you switch those around?

04:05PM   9          **BY MR. TRIPI:**

04:05PM   10  Q.   Okay.  On your screen you have Exhibit 103-4 on the left

04:06PM   11  and 103-3 on the right.  Can you explain this area of the

04:06PM   12  house for the jury and how sort of the room flowed?

04:06PM   13  A.   So this is the end of the house to the right as you're

04:06PM   14  standing and looking at the house from outside.  The large

04:06PM   15  window in 103-3 is the front of the house, the sitting room,

04:06PM   16  and then behind that and to the right of the kitchen, that

04:06PM   17  window is the back wall of the house and the dining room.

04:06PM   18  They're adjacent.

04:06PM   19  Q.   So basically, this depicts one whole room?

04:06PM   20  A.   Basically, yes.

04:06PM   21  Q.   And this is off the kitchen, we just looked at that

04:06PM   22  photo, 103-2?

04:06PM   23  A.   Yes.  To the right of the kitchen, if you're walking in

04:06PM   24  through the front door.

04:06PM   25  Q.   All right.  So is this, we can just keep up 103-4, is

04:07PM    1    this the setting where the interview commenced with

04:07PM    2    Mr. Bongiovanni?

04:07PM    3    A.  Yes.

04:07PM    4    Q.  Can you describe for the jury or indicate where

04:07PM    5    Mr. Bongiovanni was seated?

04:07PM    6    A.  Yes.  Is there a particular mark you would like me to

04:07PM    7    make, or just circle?

04:07PM    8    Q.  I don't know how to change the colors here, so maybe

04:07PM    9    let's put a JB if we could.

04:07PM   10    A.  All right.

04:07PM   11         **MR. TRIPI:**  May the record reflect he's made a mark

04:07PM   12    JB on the first chair on the far side of the table to the

04:07PM   13    right of the photograph.

04:07PM   14         **BY MR. TRIPI:**

04:07PM   15    Q.  Okay.  And where were you?

04:07PM   16         **MR. TRIPI:**  Again, he's made a CR in the middle chair

04:07PM   17    on the far side of the table, sort of in the middle of the

04:07PM   18    photo.

04:07PM   19         **BY MR. TRIPI:**

04:07PM   20    Q.  Where was Special Agent Carpenter?

04:07PM   21    A.  This center chair on the other side.

04:08PM   22    Q.  Indicating the middle chair on what we'll reference on

04:08PM   23    the near side of the table from the vantage point of the

04:08PM   24    photographer, sort of to the left of the photograph.

04:08PM   25         Was anyone else seated at the table?

04:08PM    1    A.  Special Agent Fusco was here.

04:08PM    2    Q.  Okay.

04:08PM    3    A.  For the majority of the time.

04:08PM    4    Q.  And he's indicated -- what's that first initial?

04:08PM    5    A.  D.

04:08PM    6    Q.  DF in the first chair on the near side of the table

04:08PM    7    closest to the vantage point of the photographer, sort of in

04:08PM    8    the center of the photo towards the bottom.

04:08PM    9        All right.  We can leave that up while we talk through

04:08PM   10    this.

04:08PM   11        Okay.  After you got situated at the table and you made

04:08PM   12    Mr. Bongiovanni aware it was a search warrant, not an arrest

04:09PM   13    warrant, did he ask you any questions about who the lead

04:09PM   14    investigation -- was the lead on the investigation?

04:09PM   15    A.  He did.  He was asking, going back and forth between

04:09PM   16    Special Agent Carpenter and myself, asking us who -- who was

04:09PM   17    the case agent.

04:09PM   18    Q.  And did you answer him immediately?

04:09PM   19    A.  The first time or two, or maybe even three times, we just

04:09PM   20    kind of let it hang and didn't answer him.  And then

04:09PM   21    ultimately we said, well, we both are.

04:09PM   22    Q.  About how many times did he ask you that question?

04:09PM   23    A.  It was at least three, may have been more than that.

04:09PM   24    Q.  After you established that Mr. Bongiovanni could leave if

04:09PM   25    he wanted to, if he was going to speak with you, how did you

04:09PM   1   begin the interview?

04:09PM   2   A.   Started by asking him about his relationship with Peter

04:09PM   3   Gerace.  I asked him to characterize it, you know, just

04:10PM   4   describe it to us.

04:10PM   5   Q.   Now, as you're asking him questions, are you also taking

04:10PM   6   sort of contemporaneous notes?

04:10PM   7   A.   Yes.

04:10PM   8   Q.   And what did Mr. Bongiovanni say to you about his

04:10PM   9   relationship with Peter Gerace?

04:10PM  10   A.   He said that he wasn't in a -- that he wouldn't

04:10PM  11   characterize it as a close relationship, or it wasn't a close

04:10PM  12   relationship.

04:10PM  13   Q.   What else did he say?

04:10PM  14   A.   That it was, the way he described it was as a one-sided

04:10PM  15   relationship with the contact initiated by Peter Gerace,

04:10PM  16   always to him, not the other way around.  It wasn't the kind

04:10PM  17   of relationship where they planned to do things together.

04:10PM  18   Q.   At one point did he say there were times, a lot of times

04:10PM  19   that he saw Peter Gerace and walked the other way?

04:10PM  20   A.   He did say that.  That he would run into him in a public

04:11PM  21   setting, and if he saw him, he would go in the other

04:11PM  22   direction so that he wouldn't have to talk to him.

04:11PM  23   Q.   Was that statement when he made it to you consistent or

04:11PM  24   inconsistent with the information that you saw in the text

04:11PM  25   messages?

04:11PM  1  A.  It seemed inconsistent to me.

04:11PM  2  Q.  Was it consistent or inconsistent with what you've now

04:11PM  3  seen as the photo of them together in Las Vegas?

04:11PM  4  A.  Inconsistent.

04:11PM  5  Q.  Did the defendant describe what his policy was with

04:11PM  6  regard to whether or not he would go to lunch with Gerace?

04:11PM  7  A.  I did ask him about that because of the communication and

04:11PM  8  text messages.  And he said that it was his policy to never

04:11PM  9  go to lunch with Gerace.

04:11PM  10  Q.  Never?

04:11PM  11  A.  Yes.

04:11PM  12  Q.  Did you ask him if he ever reached out to Peter Gerace to

04:12PM  13  arrange a meeting?

04:12PM  14  A.  I asked him, do you ever contact him and set up anything

04:12PM  15  socially?  He said no.

04:12PM  16  Q.  Did you ask him when the last time he spoke with Gerace

04:12PM  17  was?

04:12PM  18  A.  I did.  He said that it had been more than a year from

04:12PM  19  the time that we were sitting there.

04:12PM  20  Q.  Did you ask him if they had celebrated birthdays

04:12PM  21  together?

04:12PM  22  A.  I did.  Again, based on the text message string, I was

04:12PM  23  asking about the Boss party.  I didn't mention Boss, I just

04:12PM  24  asked him if they did things like celebrate birthdays

04:12PM  25  together.  He said no.

04:12PM   1          **MR. TRIPI:**  Ms. Champoux, can we take this one down

04:12PM   2   and go to Exhibit 310D.  I think it's page 11 of the PDF.

04:13PM   3   Scroll down a little bit, please.

04:13PM   4          **BY MR. TRIPI:**

04:13PM   5   Q.  We're looking at pages 11, 12.  You went through these

04:13PM   6   text messages in detail earlier.  Are these text messages

04:13PM   7   that relate to Mr. Bongiovanni inviting Gerace to his

04:13PM   8   birthday dinner at Boss?

04:13PM   9   A.  Yes.

04:13PM   10  Q.  So was his answer to you about whether they celebrated

04:13PM   11  birthdays together consistent or inconsistent with the text

04:13PM   12  messages that you had reviewed?

04:13PM   13  A.  Inconsistent.

04:13PM   14  Q.  Now you didn't tell Mr. Bongiovanni that you had

04:13PM   15  Mr. Gerace's text threads, correct?

04:13PM   16  A.  That's correct.

04:13PM   17          **MR. TRIPI:**  Will you take that down.

04:13PM   18          We can pull back up Exhibit 103-4.  Thank you.

04:13PM   19          **BY MR. TRIPI:**

04:14PM   20  Q.  How did Mr. Bongiovanni describe Peter Gerace?

04:14PM   21  A.  He said he was a pain in the ass.

04:14PM   22  Q.  Did he say it's someone he wanted to get away from?

04:14PM   23  A.  He did.

04:14PM   24          **MR. TRIPI:**  Can we show Exhibit 127 next to

04:14PM   25  Exhibit 490A, please?

04:14PM    1           BY MR. TRIPI:

04:14PM    2    Q.  In each of those Exhibits, 127 and 490A, is

04:14PM    3    Mr. Bongiovanni and Mr. Gerace basically right next to each

04:14PM    4    other?

04:14PM    5    A.  Yes.  They're right next to each other in 127, and very

04:14PM    6    close in 490A.

04:14PM    7    Q.  And one is at a cottage in Sunset Bay, and one is across

04:15PM    8    the country in Las Vegas?

04:15PM    9    A.  Yes.  And seven years apart.  Maybe eight.

04:15PM   10           MR. TRIPI:  Going back to 310D at page 23,

04:15PM   11    Ms. Champoux.

04:15PM   12           BY MR. TRIPI:

04:15PM   13    Q.  Did we also see texts indicating that Mr. Bongiovanni was

04:15PM   14    invited to and then went to Mr. Gerace's parents'

04:15PM   15    anniversary?

04:15PM   16    A.  Yes.

04:15PM   17           MR. TRIPI:  Let's go to page 29 as well,

04:15PM   18    Ms. Champoux.

04:15PM   19           BY MR. TRIPI:

04:15PM   20    Q.  And on page 29, are we looking at a text message

04:15PM   21    June 18th, 2016, where Mr. Bongiovanni wrote:  Great time

04:15PM   22    last night.  It was great to see you and your parents.

04:15PM   23    Thanks again for your invitation?

04:15PM   24    A.  Yes.  It was great to see your parents, but yes.

04:16PM   25    Q.  Oh, I'm sorry.  Bad eyes, thank you.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

213

04:16PM    1    Describe how the conversation with you and

04:16PM    2    Mr. Bongiovanni progressed from there as it related to

04:16PM    3    Mr. Gerace.

04:16PM    4    A.   I asked him if -- we talked about whether or not he had

04:16PM    5    ever been to Pharaoh's, and he said that he didn't, he hadn't

04:16PM    6    gone to Pharaoh's.

04:16PM    7        I said well, what about the golf outings or something

04:16PM    8    alone those lines?  Because I had seen the text messages

04:16PM    9    about that.

04:16PM   10        And he told me that he been to one Pharaoh's golf outing

04:16PM   11    maybe 12 to 15 years before the interview, the day of the

04:16PM   12    interview as we were sitting there.

04:16PM   13    Q.   Did Mr. Bongiovanni make a statement to you regarding

04:16PM   14    penalizing a person for who they grew up with?

04:16PM   15    A.   He did say that.

04:16PM   16    Q.   Describe how that came up and what he said.

04:17PM   17    A.   We started the interview by asking him a series of

04:17PM   18    questions about Peter Gerace like we'd been going through.

04:17PM   19        That statement was not in response to any specific

04:17PM   20    question.  I felt like at the time it was more -- it was

04:17PM   21    something that he was saying as a reaction to us asking so

04:17PM   22    many questions about Peter Gerace.

04:17PM   23    Q.   So what did he say?

04:17PM   24    A.   He said you can't penalize somebody for who they grew up

04:17PM   25    with.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

214

04:17PM    1    Q.  Is that what you were doing there?

04:17PM    2    A.  No.

04:17PM    3    Q.  Had you followed evidence for a number of months that led

04:17PM    4    you to that point?

04:17PM    5    A.  Yes.

04:17PM    6    Q.  Did you ask Mr. Bongiovanni about Gerace and any family

04:17PM    7    connections Mr. Gerace had to Italian Organized Crime?

04:18PM    8    A.  I did.

04:18PM    9    Q.  What did he say?

04:18PM   10    A.  He said that Peter's grandfather, he thought, had had

04:18PM   11    something to do with organized crime.

04:18PM   12       And then I asked him a question about, you know, Peter,

04:18PM   13    do you think he does?  And he said he didn't know him well

04:18PM   14    enough to answer that.

04:18PM   15       And then we talked a little bit about just generally, I

04:18PM   16    asked him opinion of organized crime in Buffalo.  He said he

04:18PM   17    thought it was dead.

04:18PM   18    Q.  When he offered you that opinion, did he -- did you ask

04:18PM   19    him if he ever tried to investigate it?

04:18PM   20    A.  I did.

04:18PM   21    Q.  What did he say?

04:18PM   22    A.  He said that he had never done an organized crime

04:18PM   23    investigation, and that it was something that was outside of

04:18PM   24    his wheelhouse.

04:18PM   25    Q.  So he never investigated it, but he offered you an

04:18PM  1  opinion that it was dead?

04:18PM  2  A.  Yes.

04:18PM  3  Q.  Does that make any sense?

04:18PM  4  A.  It didn't make much sense, no.

04:18PM  5  Q.  Back to the topic of Pharaoh's.

04:18PM  6      When you asked him about that, did he describe it as a

04:19PM  7  seedy place?

04:19PM  8  A.  He did.

04:19PM  9  Q.  How did that come up?

04:19PM  10 A.  I was talking to him about Pharaoh's, Peter Gerace, also

04:19PM  11 in the context of the Outlaws' involvement in Pharaoh's.  And

04:19PM  12 it was his opinion of Pharaoh's that he volunteered.

04:19PM  13 Q.  And what was that opinion that he volunteered again?

04:19PM  14 A.  That he thought it was a seedy place.

04:19PM  15 Q.  What did you understand seedy place to mean?

04:19PM  16 A.  Unseemly.  Things happen there that weren't nice.

04:19PM  17 Q.  Is that along the lines of when you asked him if he'd

04:19PM  18 ever went there?

04:19PM  19 A.  Yes.

04:19PM  20 Q.  I won't pull it up again to spare some of the reviewing

04:19PM  21 these texts again.  But in Exhibit 310D, did you see text

04:20PM  22 messages where Mr. Gerace was indicating that Bongiovanni

04:20PM  23 should go to Pharaoh's and use the employee entrance?

04:20PM  24 A.  Yes.

04:20PM  25 Q.  Would that indicate to you that, in fact, Mr. Bongiovanni

04:20PM  1  had been to Pharaoh's?

04:20PM  2  A.  It did.  And I had those in mind, or those texts in mind

04:20PM  3  when I was asking the question.

04:20PM  4  Q.  At a certain point in the interview, did Anthony Gerace's

04:20PM  5  arrest on January 28th, 2019 come up?

04:20PM  6  A.  Yes.

04:20PM  7  Q.  How did that come up?

04:20PM  8  A.  Just as we switched from Peter to Anthony, asking about

04:20PM  9  that, we were asking about it, too, because of the proximity

04:20PM  10  of the arrest to his retirement.  And we just asked him if he

04:20PM  11  heard about Anthony's arrest.

04:20PM  12  Q.  What did he say about that?

04:20PM  13  A.  That he had.  That he was concerned that the arrest would

04:21PM  14  raise some suspicion about him, but that also he was happy

04:21PM  15  that Anthony was arrested.

04:21PM  16  Q.  Did he ever explain to you why he was concerned Anthony's

04:21PM  17  arrest would raise suspicion about him?

04:21PM  18  A.  No, he didn't.

04:21PM  19  Q.  As you were discussing Anthony Gerace, did you ask if he

04:21PM  20  ever attended any parties with Anthony Gerace or went on any

04:21PM  21  trips?

04:21PM  22  A.  Yes.  He said that he had seen Anthony at a -- was it a

04:21PM  23  Just Pizza golf outing, I think.  But that it had been

04:21PM  24  several years.  And other than that, that he hadn't seen him,

04:21PM  25  that they didn't go on trips.

04:21PM    1    Q.  Did he say to you regarding a party that he had never

04:21PM    2    attended a party with Anthony Gerace?

04:21PM    3    A.  Yes.  I specifically asked him about a party, attending

04:21PM    4    parties.

04:21PM    5            **MR. TRIPI:**  Ms. Champoux, can we pull up Exhibit 310D

04:21PM    6    at page 19.

04:21PM    7            **BY MR. TRIPI:**

04:22PM    8    Q.  Can you read that text from February 22nd, 2016, from

04:22PM    9    Mr. Bongiovanni to Mr. Gerace on page 19 of Exhibit 310D?

04:22PM   10    A.  It says:  What up, Bro.  Saw your brother in Toronto last

04:22PM   11    weekend.

04:22PM   12    Q.  And Mr. Gerace writes:  Anthony?  And then what does

04:22PM   13    Mr. Bongiovanni say?

04:22PM   14    A.  He says:  Yes, sir.  It was my wife's sister Ashley 30th

04:22PM   15    birthday.

04:22PM   16    Q.  Is a birthday a party?

04:22PM   17    A.  Yes.  And then I also had the Boss party in mind, too,

04:22PM   18    when I asked the question.

04:22PM   19    Q.  Meaning the defendant's birthday party that we talked

04:22PM   20    about a moment ago?

04:22PM   21    A.  Yes.

04:22PM   22            **MR. TRIPI:**  We can take that down, Ms. Champoux.

04:22PM   23            **BY MR. TRIPI:**

04:22PM   24    Q.  Did you ask the defendant if he knew Michael Sinatra?

04:22PM   25    A.  I did.

Case 1:19-cr-00227-LJV-MJR    Document 1244    Filed 09/28/24    Page 218 of 242
USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

218

04:22PM    1    Q.  What did he say about his relationship, if any, with

04:22PM    2    Michael Sinatra?

04:22PM    3    A.  He said that he did know Mr. Sinatra.  Mr. Sinatra had

04:22PM    4    done some landscaping for him.

04:23PM    5        And then also I think there was romantic relationship

04:23PM    6    maybe between Mr. Sinatra and his wife's youngest sister at

04:23PM    7    some point.

04:23PM    8        And then we discussed the burglary that occurred at

04:23PM    9    Mr. Sinatra's house.  He said that Sinatra'd called him in

04:23PM   10    some short time after the burglary --

04:23PM   11    Q.  Before we get to that --

04:23PM   12    A.  Sure.

04:23PM   13    Q.  -- I mean, did you ask him if he socialized or went on

04:23PM   14    any trips with Mr. Sinatra?

04:23PM   15    A.  I did.

04:23PM   16    Q.  What did he say to that?

04:23PM   17    A.  He said that he did not.

04:23PM   18           **MR. TRIPI:**  Okay.  Can we show Exhibit 126.

04:23PM   19           **BY MR. TRIPI:**

04:23PM   20    Q.  Is this Mr. Sinatra in a photo with Mr. Bongiovanni in

04:23PM   21    Toronto?

04:23PM   22    A.  Yes.

04:23PM   23    Q.  Is that at that party we've referenced?

04:23PM   24    A.  Yes.

04:23PM   25    Q.  Is that a social event?

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

219

| | | |
|---|---|---|
| 04:23PM | 1 | A.  Yes. |
| 04:24PM | 2 | MR. TRIPI:  You can leave that up. |
| 04:24PM | 3 | BY MR. TRIPI: |
| 04:24PM | 4 | Q.  Now, you were talking about his comments about |
| 04:24PM | 5 | Mr. Sinatra's burglary.  Can you describe how that came up? |
| 04:24PM | 6 | A.  It came up as we were talking about Sinatra.  It may have |
| 04:24PM | 7 | been in response to a question about the last time he talked |
| 04:24PM | 8 | to him.  But it did come out that they had spoken earlier |
| 04:24PM | 9 | that year in the time immediately after the burglary at |
| 04:24PM | 10 | Sinatra's house. |
| 04:24PM | 11 | Sinatra had called him to ask his opinion as to why law |
| 04:24PM | 12 | enforcement was moving slowly.  Mr. Sinatra believed that |
| 04:24PM | 13 | he'd identified the house where his stolen money was being |
| 04:24PM | 14 | kept, and he didn't understand why law enforcement wasn't |
| 04:24PM | 15 | moving faster to get a search warrant for that house. |
| 04:24PM | 16 | Q.  Now, had Mr. Bongiovanni characterized his relationship |
| 04:24PM | 17 | with Mr. Sinatra earlier in the interview before he mentioned |
| 04:24PM | 18 | that? |
| 04:24PM | 19 | A.  Yes. |
| 04:24PM | 20 | Q.  How did he characterize the relationship? |
| 04:24PM | 21 | A.  That Mr. Sinatra was his landscaper, and that they |
| 04:24PM | 22 | weren't social friends. |
| 04:24PM | 23 | Q.  When he gave you -- when he further talked about Sinatra |
| 04:25PM | 24 | calling him to ask why law enforcement wasn't moving faster |
| 04:25PM | 25 | to obtain a search warrant as to where his -- he thought his |

04:25PM    1    money had gone to, did that sound to you like something a

04:25PM    2    landscaper calls someone about?

04:25PM    3            **MR. MacKAY:**  Objection, speculation.

04:25PM    4            **THE COURT:**  Sustained.

04:25PM    5            **BY MR. TRIPI:**

04:25PM    6    Q.  Have you ever had landscapers?

04:25PM    7    A.  Yes.

04:25PM    8    Q.  Have they ever called you to ask why police aren't

04:25PM    9    getting search warrants --

04:25PM    10           **MR. MacKAY:**  Objection.

04:25PM    11           **BY MR. TRIPI:**

04:25PM    12   Q.  -- more quickly?

04:25PM    13           **THE COURT:**  Sustained.  Sustained.

04:25PM    14           **BY MR. TRIPI:**

04:25PM    15   Q.  When you heard his explanation, did that sound like a

04:25PM    16   standard landscaper relationship?

04:25PM    17           **MR. MacKAY:**  Objection.  Improper opinion.

04:25PM    18           **THE COURT:**  Sustained.

04:25PM    19           **MR. TRIPI:**  Judge, it frames -- it frames where he's

04:25PM    20   going in the interview.

04:25PM    21           **THE COURT:**  Sustained.

04:25PM    22           **BY MR. TRIPI:**

04:25PM    23   Q.  Okay.  Did the defendant say to you why he had Michael

04:25PM    24   Sinatra's phone number?

04:25PM    25   A.  Because of the landscaping.

| | | |
|---|---|---|
| 04:25PM | 1 | Q. By that point in time, did you learn that the defendant |
| 04:26PM | 2 | had wiped his DEA phone when he turned it in -- |
| 04:26PM | 3 | A. Yes. |
| 04:26PM | 4 | Q. -- before he left the DEA? |
| 04:26PM | 5 | A. Yes, we had. |
| 04:26PM | 6 | Q. Did you ask him questions about that? |
| 04:26PM | 7 | A. Yes. |
| 04:26PM | 8 | Q. What did you ask him, and what did he say? |
| 04:26PM | 9 | A. Asked him about his work phone, if he'd had -- if he ever |
| 04:26PM | 10 | had a personal phone while he worked for DEA.  He said that |
| 04:26PM | 11 | he had not, he said he used his DEA phone for work and |
| 04:26PM | 12 | personal calls for his entire career. |
| 04:26PM | 13 | And then he also said that he did erase the phone, and he |
| 04:26PM | 14 | did so because he thought DEA policy required it.  He had |
| 04:26PM | 15 | done that with previous phones he had turned in. |
| 04:26PM | 16 | Q. By that point in time in your investigation, was it your |
| 04:26PM | 17 | understanding the defendant had used that phone that he had |
| 04:26PM | 18 | wiped for a very long period of time? |
| 04:26PM | 19 | A. I know he had that number for a long time, I don't know |
| 04:27PM | 20 | how long he'd had that particular phone. |
| 04:27PM | 21 | Q. Okay.  In your experience, is factory resetting a phone a |
| 04:27PM | 22 | way to wipe the data from it? |
| 04:27PM | 23 | A. It does. |
| 04:27PM | 24 | Q. I think you might have mentioned this, but did you ask |
| 04:27PM | 25 | him specifically about attending Pharaoh's golf tournaments? |

04:27PM   1    A.  Yes.

04:27PM   2    Q.  What did you ask him, and what did he say as specifically

04:27PM   3    as you can recall?

04:27PM   4    A.  I asked him if he had ever attended a Pharaoh's golf

04:27PM   5    outing.  He said that he had attended one, and that it had

04:27PM   6    been 12 or 15 years ago.

04:27PM   7    Q.  We just looked at a text thread in Exhibit 310D about a

04:27PM   8    Pharaoh's golf outing; do you remember that?

04:27PM   9    A.  Yes.

04:27PM   10   Q.  Was it ten or 15 years ago, or was it much closer in time

04:27PM   11   to your interview?

04:28PM   12   A.  Much closer in time.

04:28PM   13   Q.  When you had asked him questions and he had given you

04:28PM   14   some answers about organized crime, when he offered you his

04:28PM   15   opinion that organized crime was dead, do you remember you

04:28PM   16   had referenced that a moment ago?

04:28PM   17   A.  Yes.

04:28PM   18   Q.  Did the defendant make any reference in any part of his

04:28PM   19   conversation with you to agents always wanting to sit out in

04:28PM   20   front of LaNova?

04:28PM   21   A.  He did.  He referred to it as the pizza place.

04:28PM   22   Q.  And what did you understand that to mean?

04:28PM   23   A.  LaNova on West Ferry.

04:28PM   24   Q.  Is that a pizza place that was associated with Gerace's

04:28PM   25   grandfather?

04:28PM    1    A.  Yes.

04:28PM    2    Q.  And is currently associated with Gerace's uncle?

04:28PM    3    A.  Yes.

04:28PM    4    Q.  What did the defendant say about that location?

04:28PM    5    A.  That when new agents come to town, they always want to

04:28PM    6    sit on the pizza place and do surveillance and see if they

04:29PM    7    can make an organized crime case.

04:29PM    8    Q.  What was his demeanor when he was making that comment?

04:29PM    9    A.  Dismissive.  Like it was a joke that you would sit there

04:29PM   10    and try to do that.

04:29PM   11    Q.  At some point in the interview, did you ask him why he

04:29PM   12    didn't investigate Pharaoh's?

04:29PM   13    A.  I asked him if he had ever tried to make a case at

04:29PM   14    Pharaoh's.  He said that --

04:29PM   15    Q.  Let me ask you this before you get there, what he said to

04:29PM   16    that.

04:29PM   17        Had you already had the conversation with him where he

04:29PM   18    mentioned Pharaoh's, or said it was a seedy place --

04:29PM   19    A.  Yes.

04:29PM   20    Q.  -- earlier in the interview?

04:29PM   21    A.  Yes.

04:29PM   22    Q.  And then later you circled back and asked this question?

04:29PM   23    A.  Yes.

04:29PM   24    Q.  Okay.  What was the question you asked?

04:29PM   25    A.  Did you ever try it make a case at Pharaoh's.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

224

04:29PM   1   Q.  And so what did he say?

04:30PM   2   A.  The Cheektowaga police kept and eye on Pharaoh's.  And

04:30PM   3   that he never had any information that was good enough to

04:30PM   4   start a case.

04:30PM   5   Q.  Did he offer you a description of Peter Gerace's

04:30PM   6   cooperation at one point with the DEA?

04:30PM   7   A.  Yes.

04:30PM   8   Q.  All right.

04:30PM   9        **MR. TRIPI:**  Ms. Champoux, can we pull up Exhibit 30A.

04:30PM   10        **BY MR. TRIPI:**

04:30PM   11   Q.  We've looked at this a couple times, you're familiar with

04:30PM   12   this DEA-6 report?

04:30PM   13   A.  Yes.

04:30PM   14   Q.  Now you didn't show the defendant that you had this

04:30PM   15   report or had access to this report, correct?

04:30PM   16   A.  I did not.

04:30PM   17   Q.  Did he offer you a description that differed from even

04:30PM   18   this report?

04:31PM   19        I'll withdraw that question.

04:31PM   20        Tell the jury how the defendant described Peter Gerace's

04:31PM   21   attempt to cooperate with the DEA.  What did the defendant

04:31PM   22   say to you?

04:31PM   23   A.  So, I asked him if he knew if Peter Gerace ever had been

04:31PM   24   a source.  And he said that there was a time where he did try

04:31PM   25   to cooperate, Peter Gerace contacted him, said he had

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

04:31PM    1    information.  Mr. Bongiovanni referred that to his

04:31PM    2    supervisor.  He told me that he recused himself because of

04:31PM    3    his personal relationship with Mr. Gerace.  And his

04:31PM    4    supervisor Dale Kasprzyk ultimately made the determination to

04:31PM    5    pass the information to the FBI.

04:31PM    6    Q.  So --

04:31PM    7    A.  And refer Mr. Gerace to the FBI.  And then I asked him --

04:31PM    8    Q.  Hang on one second.  Let me ask a follow-up.

04:31PM    9        So in his answer to you, did the defendant say Dale

04:31PM    10   Kasprzyk made the decision to refer Gerace to the FBI?

04:31PM    11   A.  That was the sum and substance of it, yes.

04:32PM    12   Q.  Did the defendant say to you he recused himself because

04:32PM    13   he knew Gerace personally?

04:32PM    14   A.  Yes, he did say that.

04:32PM    15   Q.  Did the defendant say to you he did not know if Gerace

04:32PM    16   was ever signed up as an informant by the FBI?

04:32PM    17   A.  I asked him.  After he said that he was referred -- if he

04:32PM    18   knew that Gerace had ever been signed up by the FBI or any

04:32PM    19   other law enforcement agency.

04:32PM    20   Q.  And what did he say?

04:32PM    21   A.  He said he didn't know.

04:32PM    22   Q.  Now I'd like you to read Government Exhibit 30A again to

04:32PM    23   yourself.  And let us know when you've got to go to the next

04:32PM    24   page, okay?

04:33PM    25   A.  Okay.  Okay.

04:34PM   1    Q.  Anywhere in Exhibit 30A did the Defendant Bongiovanni

04:34PM   2    write that -- to his DEA supervisor that he needed to recuse

04:34PM   3    himself?

04:34PM   4    A.  No.

04:34PM   5    Q.  Anywhere in Exhibit 30A did the defendant write that he

04:34PM   6    knew Gerace personally?

04:34PM   7    A.  No.

04:34PM   8    Q.  Anywhere in Exhibit 30A -- withdrawn.

04:34PM   9        In 30A, did the defendant describe Gerace as a DEA

04:34PM  10    confidential source?

04:34PM  11    A.  He did.

04:34PM  12    Q.  Was that information the defendant represented to his

04:34PM  13    supervisor at the DEA inconsistent with the descriptions he

04:34PM  14    was providing to you during in your interview?

04:34PM  15              **MR. MacKAY:**  Objection, improper opinion.

04:34PM  16              **THE COURT:**  Sustained.

04:34PM  17              **BY MR. TRIPI:**

04:35PM  18    Q.  Did you ask Mr. Gerace -- withdrawn.

04:35PM  19        Did you ask Mr. Bongiovanni if Mr. Gerace had ever spoken

04:35PM  20    with him about someone overdosing on drugs at Pharaoh's?

04:35PM  21    A.  Yes.

04:35PM  22    Q.  What was the genesis of your question?  In other words,

04:35PM  23    where had you learned that information?

04:35PM  24    A.  It was something that I had learned he said to Special

04:35PM  25    Agent Casullo.

04:35PM    1    Q.  When you asked the defendant that question, whether

04:35PM    2    Gerace had ever spoken to him about someone overdosing on

04:35PM    3    drugs at Pharaoh's, what did the defendant say specifically?

04:35PM    4    A.  He said that they had talked about it.  He couldn't

04:35PM    5    recall if it was because someone had overdosed or if it was

04:35PM    6    because Mr. Gerace was afraid someone would overdose.

04:35PM    7         And so Mr. Bongiovanni recommended that Mr. Gerace become

04:36PM    8    certified to administer Narcan, which is a lifesaving drug

04:36PM    9    that stops an opioid overdose.

04:36PM   10    Q.  Did Mr. Bongiovanni also say to you or indicate to you

04:36PM   11    that it was common knowledge that strip clubs have problems?

04:36PM   12    A.  He did.

04:36PM   13    Q.  But you were focusing in on Pharaoh's, right?

04:36PM   14    A.  Yes.

04:36PM   15    Q.  Now, you worked at the DEA, right?

04:36PM   16    A.  Yes.

04:36PM   17    Q.  They investigate drug overdoses?

04:36PM   18    A.  Yes.

04:36PM   19    Q.  Are drug overdoses some of the most important cases that

04:36PM   20    DEA agents and task force officers work?

04:36PM   21    A.  Yes.

04:36PM   22    Q.  Did the defendant in his interview with you ever indicate

04:36PM   23    that he asked Gerace who overdosed?

04:36PM   24    A.  No.

04:36PM   25    Q.  Did the defendant ever say he opened an investigation

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

228

04:36PM 1    into drug overdoses at Pharaoh's?

04:36PM 2    A.  No.

04:36PM 3    Q.  Did he indicate or say anything at all that indicated to

04:36PM 4    you he had any desire to investigate overdoses at Pharaoh's?

04:37PM 5    A.  No.

04:37PM 6    Q.  Now, from that cursory search as you described it that

04:37PM 7    CBP did at the BWI airport back in April, had you learned

04:37PM 8    some of the names that were contained in Mr. Bongiovanni's

04:37PM 9    contacts of his phone?

04:37PM 10   A.  Yes.

04:37PM 11   Q.  Did you ask him about people like Frank Parisi, Tommy

04:37PM 12   Francoforte, and Frank Todaro?

04:37PM 13   A.  I did.  I had the PDF in a manila folder next to me, and

04:37PM 14   went through the names in order.

04:37PM 15   Q.  With respect to the name Tommy Francoforte, did he -- did

04:37PM 16   any conversation come up about Paul Francoforte, that entry

04:37PM 17   Hot Dog that we looked at earlier --

04:37PM 18   A.  Yes.

04:37PM 19   Q.  -- that was in Mr. Gerace's phone?

04:37PM 20   A.  Yes.

04:37PM 21   Q.  Describe the conversation regarding Hot Dog, or Paul

04:38PM 22   Francoforte.

04:38PM 23   A.  I knew that Paul Francoforte and Mr. Bongiovanni had a

04:38PM 24   previous border crossing where they traveled in from Canada

04:38PM 25   in the same car.  So when the name Francoforte came up, I

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

04:38PM   1   asked if there was any relationship to Paul Francoforte.  And

04:38PM   2   then once Paul Francoforte came up, I asked about the border

04:38PM   3   crossing.

04:38PM   4   Q.  How did the defendant describe to you his interstate --

04:38PM   5   or, withdrawn -- international travel to Canada with Hot Dog,

04:38PM   6   Paul Francoforte?

04:38PM   7   A.  He said that he had taken him over there to go to Swiss

04:38PM   8   Chalet to get chicken.

04:38PM   9   Q.  Was another name in Mr. Bongiovanni's phone contacts, at

04:38PM   10  least the portion that you were able to see from the cursory

04:38PM   11  search, an individual named Kim Mecca?

04:38PM   12  A.  Yes.

04:38PM   13  Q.  By that point, did you know who Kim Mecca was in relation

04:38PM   14  to Lou Selva?

04:38PM   15  A.  Yes.

04:38PM   16  Q.  Did you know it was his girlfriend?  Mr. Selva's

04:39PM   17  girlfriend.

04:39PM   18  A.  No, at that point I did not.

04:39PM   19  Q.  You did not?

04:39PM   20  A.  No, that's before I knew.

04:39PM   21  Q.  You asked about Kim Mecca though?

04:39PM   22  A.  I -- yeah.  Like everyone else on the PDF, I asked who

04:39PM   23  she was.

04:39PM   24  Q.  Describe the conversation about Kim Mecca.  And if you

04:39PM   25  need your report, I have it.

04:39PM   1   A.   It he said she was the girlfriend of a friend.

04:39PM   2   Q.   Okay.  And what happened from there?

04:39PM   3   A.   I said, who's the friend?

04:39PM   4        And then he said that it was Lou Selva, but his body

04:39PM   5   language changed.

04:39PM   6   Q.   What did you observe with respect to the defendant's body

04:39PM   7   language when he mentioned the name Lou Selva?

04:39PM   8   A.   Well, it -- it started when I mentioned the name Kim

04:39PM   9   Mecca, he leaned forward, put his elbows on his knees, his

04:39PM   10  head was down almost like he was talking straight down

04:39PM   11  through his knees towards the floor.

04:39PM   12  Q.   Can do you the same thing that you saw the defendant do

04:39PM   13  when you started asking about Kim Mecca, Lou Selva's

04:39PM   14  girlfriend?

04:39PM   15  A.   So, we're talking like this.  And then I asked him about

04:40PM   16  Kim Mecca, and he did this.

04:40PM   17        **MR. TRIPI:**  May the record reflect the witness has

04:40PM   18  placed both of his elbows on his knees, and dropped his head

04:40PM   19  staring towards his feet from the seated position.

04:40PM   20        **THE WITNESS:**  And then, as I said, he said Kim Mecca

04:40PM   21  was the girlfriend of a friend.

04:40PM   22        I said, well, who's the friend?

04:40PM   23        And he mumbled the name Lou Selva.  It was very low.

04:40PM   24        **BY MR. TRIPI:**

04:40PM   25  Q.   Did you ask him to clarify that name?

| | | |
|---|---|---|
| 04:40PM | 1 | A.  No, I could understand the name, but it was just very |
| 04:40PM | 2 | different from the -- his tone in the previous conversation, |
| 04:40PM | 3 | or the conversation leading up to that, I should say. |
| 04:40PM | 4 | Q.  What were your observations of his demeanor at that point |
| 04:40PM | 5 | some? |
| 04:40PM | 6 | A.  It was a look of defeat, at least in that moment. |
| 04:40PM | 7 | Q.  Was there another name in the contacts of his phone that |
| 04:40PM | 8 | you asked about, Kerry Doctor? |
| 04:40PM | 9 | A.  Yes. |
| 04:40PM | 10 | Q.  As you sit here today, do you have an understanding of |
| 04:41PM | 11 | who Kerry Doctor is in relation to Tom Doctor? |
| 04:41PM | 12 | A.  I asked him who is that.  And his answer was the wife of |
| 04:41PM | 13 | Tom Doctor, who had been his partner when he was a TFO with |
| 04:41PM | 14 | DEA. |
| 04:41PM | 15 | Q.  Referencing Tom Doctor had been a DEA TFO? |
| 04:41PM | 16 | A.  Yes. |
| 04:41PM | 17 | Q.  Now at this point in the interview, you had asked him |
| 04:41PM | 18 | about socializing or partying with Anthony Gerace and Michael |
| 04:41PM | 19 | Sinatra; is that right? |
| 04:41PM | 20 | A.  Yes. |
| 04:41PM | 21 | Q.  You've already described his answers in that regard.  Did |
| 04:41PM | 22 | you circle back and ask him about that that trip you knew |
| 04:41PM | 23 | about to Toronto? |
| 04:41PM | 24 | A.  Yes. |
| 04:41PM | 25 | Q.  Did you actually at that point in the interview show him |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

232

04:41PM    1    the photo that you had?

04:41PM    2    A.  Yes.

04:41PM    3         **MR. TRIPI:**  Can we pull up Exhibit 126, put it back

04:41PM    4    on the screen.

04:41PM    5         **BY MR. TRIPI:**

04:41PM    6    Q.  So you had a copy of this photo with you?

04:41PM    7    A.  Yes.

04:41PM    8    Q.  At that point in the interview, after he had given you

04:42PM    9    the answers about Michael Sinatra and Anthony Gerace, did you

04:42PM   10    pull this photo out and ask him about the photo?

04:42PM   11    A.  Yes.

04:42PM   12    Q.  Describe that part of the interview.

04:42PM   13    A.  I asked him if he remembered the photo, the events around

04:42PM   14    it.  He said that he and his wife had gone to Toronto for his

04:42PM   15    wife's sister's birthday.

04:42PM   16      I asked him who the people were in the photo.  He named

04:42PM   17    them.  He said they stayed overnight at the Intercontinental

04:42PM   18    Hotel in Toronto, that it was a birthday party.

04:42PM   19      I asked if there were other people at the party that

04:42PM   20    weren't in the photo.  He said a couple names, Chris Di Re.

04:42PM   21    I think Dwyer, maybe.

04:42PM   22    Q.  Would your report refresh your recollection as to names

04:42PM   23    he mentioned?

04:42PM   24    A.  Yes.

04:42PM   25    Q.  I'm going to hand up Government Exhibit 3594BJ-1.

04:43PM    1    3594BJ-1.  Does that refresh your recollection as to the

04:43PM    2    names that he provided that were there?

04:43PM    3    A.  Yes.

04:43PM    4    Q.  What names did Mr. Bongiovanni provide you as to who was

04:43PM    5    in Toronto?

04:43PM    6    A.  So he did identify Kevin Myszka, the gentleman on the

04:43PM    7    right side, being at the party.

04:44PM    8        Then he told me that Myszka had become the target of a --

04:44PM    9    an investigation that his group was conducting later on.  And

04:44PM   10    that when that came up, he reported to his supervisor, who

04:44PM   11    was Greg Yensan at the time, that he had been at this party

04:44PM   12    with Kevin Myszka and others.

04:44PM   13        And then as far as the people who were at the party but

04:44PM   14    not in the picture, it was Dave Dwyer and Chris Di Re.

04:44PM   15        And then I asked him if Anthony Gerace was at the party,

04:44PM   16    and he said he couldn't remember.

04:44PM   17    Q.  When you v specifically asked him about Anthony Gerace, he

04:44PM   18    said he couldn't remember?

04:44PM   19    A.  Yes.

04:44PM   20        MR. TRIPI:  Ms. Champoux, can we pull up Government

04:44PM   21    Exhibit 310D, and go to a text on Friday 22nd, 2016.  I don't

04:44PM   22    have a page number.  Oh, I do.  It's -- I don't have a page

04:45PM   23    number for you, I'm sorry.  Page 19.  Thank you.

04:45PM   24        BY MR. TRIPI:

04:45PM   25    Q.  And we've seen this text before, but he was texting with

04:45PM  1    Peter Gerace that Anthony was at the party?

04:45PM  2    A.  Yes.

04:45PM  3    Q.  But he told you he didn't remember?

04:45PM  4    A.  Yes.

04:45PM  5    Q.  And he told you he didn't remember after he had already

04:45PM  6    told you that he had never partied or socialized with

04:45PM  7    Anthony, correct?

04:45PM  8    A.  That's correct.

04:45PM  9    Q.  Did you also show him that photo we've looked at a couple

04:45PM  10   times, Exhibit 127, the photo of the cottage?

04:46PM  11   A.  Yes.

04:46PM  12   Q.  Did you ask him about that?

04:46PM  13   A.  Yes.

04:46PM  14   Q.  Did you do that again after he had already gave you all

04:46PM  15   the answers that you've talked about already regarding Peter

04:46PM  16   Gerace, and I'm summarizing, but avoiding Peter?

04:46PM  17   A.  Yes.

04:46PM  18   Q.  Is that why you showed him that picture, and then asked

04:46PM  19   him more questions later on?

04:46PM  20   A.  Yes.

04:46PM  21           MR. TRIPI:  We can take that down, Ms. Champoux,

04:46PM  22   310D.

04:46PM  23           BY MR. TRIPI:

04:46PM  24   Q.  When you showed him that picture, the version you showed

04:46PM  25   him didn't have the circles on it that Ms. Hunt made, right?

04:46PM    1    A.  Right.  That came later.

04:46PM    2    Q.  What -- what did the defendant tell you about that event

04:46PM    3    at the cottage?

04:46PM    4    A.  Oh, that it was Tom Doctor's parents' cottage around the

04:46PM    5    Fourth of July, a year or two previous to the interview.

04:46PM    6         I said, how did you end up there with Peter?

04:46PM    7         He said it happened by chance, that it wasn't a planned

04:47PM    8    event.

04:47PM    9    Q.  We just looked at 310D extensively; is that right?

04:47PM   10    A.  Yes.

04:47PM   11    Q.  Around page 69 of that exhibit, were there a number of

04:47PM   12    text messages that indicated they were arranging to meet each

04:47PM   13    other at that location?

04:47PM   14    A.  Yes.

04:47PM   15            **MR. MacKAY:**  Objection.

04:47PM   16            **THE COURT:**  Basis?

04:47PM   17            **MR. MacKAY:**  Mischaracterization of the evidence.

04:47PM   18            **MR. TRIPI:**  All right.  Let's go to 310D at 69, I was

04:47PM   19    trying to just moving it along, but I --

04:47PM   20            **THE COURT:**  So you withdraw the question?

04:47PM   21            **MR. TRIPI:**  Yep, let's go to 310D at 69.

04:47PM   22            **BY MR. TRIPI:**

04:47PM   23    Q.  All right.  Look at exhibit -- text June 30th, 2018,

04:47PM   24    2:37 p.m.?

04:47PM   25    A.  It starts at least one page up from here.

04:47PM   1   Q.  Oh, okay.  Let's go a little higher then.  How does it

04:47PM   2   start out?

04:47PM   3   A.  A text from Mr. Bongiovanni that says:  Miss you, bro.

04:48PM   4   I'm going up to Sunset today.

04:48PM   5   Q.  And when you were framing your questions, and you later

04:48PM   6   saw the photograph in that text thread, correct?

04:48PM   7   A.  Well --

04:48PM   8   Q.  When you were -- let me -- when you reviewed the texts

04:48PM   9   before the interview, you had seen these texts, and then you

04:48PM  10   also had seen a photo regarding that event; is that right?

04:48PM  11   A.  Yes.  So I'd seen them twice.  I'd seen them attached --

04:48PM  12   at least part of them attached to the memorandum.

04:48PM  13   Q.  Right.

04:48PM  14   A.  These in the extraction.  And then ultimately when I get

04:48PM  15   to then end of the review, the photo.

04:48PM  16   Q.  And who reaches out about Sunset?

04:48PM  17   A.  Mr. Bongiovanni.

04:48PM  18   Q.  And then are there a whole series of texts where they're

04:48PM  19   communicating that ultimately culminate in Mr. Gerace and

04:48PM  20   Phlycia Hunt going to Sunset?

04:48PM  21   A.  Yes.

04:48PM  22   Q.  Was that -- was that how the defendant described it to

04:48PM  23   you during the interview?

04:48PM  24   A.  No.

04:48PM  25   Q.  What did -- how did Mr. Bongiovanni describe their

04:49PM  1    meeting at Sunset Bay cottage there?

04:49PM  2    A.  That it was by chance that Peter just showed up.

04:49PM  3    Q.  Did he tell you the meeting was not planned?

04:49PM  4    A.  Yes.

04:49PM  5    Q.  Did he tell you he didn't want to see Peter that day?

04:49PM  6    A.  Yes.

04:49PM  7    Q.  All right.  Now --

04:49PM  8            **MR. TRIPI:**  We can take that down, Ms. Champoux.

04:49PM  9            **BY MR. TRIPI:**

04:49PM  10   Q.  During your interview, other agents were searching

04:49PM  11   various parts of the house; is that right?

04:49PM  12   A.  Yes.

04:49PM  13   Q.  As you were sitting with Mr. Bongiovanni, did eventually

04:49PM  14   Special Agent Halliday bring over a box to you that had a

04:50PM  15   file in it?

04:50PM  16   A.  Yes.

04:50PM  17   Q.  Did she -- did you have a chance to look at that during

04:50PM  18   the interview?

04:50PM  19   A.  Just very briefly.

04:50PM  20   Q.  Okay.  Enough to see generally what it was?

04:50PM  21   A.  Yes.

04:50PM  22   Q.  What was it?

04:50PM  23   A.  It was a Redweld folder about that big with several

04:50PM  24   documents in it, and three or four inches of paper.  And it

04:50PM  25   was -- and with notes written on the outside on the front of

04:50PM    1    the folder.

04:50PM    2    Q.   Okay.  From there, if you can see it, I'm holding up

04:50PM    3    Government Exhibit 100.  What does the outside of the box

04:50PM    4    say?

04:50PM    5    A.   DEA evidence.

04:50PM    6    Q.   Is this the box that was brought to you?  This is in

04:50PM    7    evidence already.

04:50PM    8    A.   Oh, yes.

04:51PM    9    Q.   Did you have an opportunity to peek inside the box when

04:51PM   10    it was brought to you?

04:51PM   11    A.   Yes.

04:51PM   12    Q.   Did you look at Government Exhibit 100A briefly?

04:51PM   13    A.   Is that the folder?

04:51PM   14    Q.   Yeah.  You can pull that out.  You can stand up if you

04:51PM   15    need to.  Did you take a look at that folder while you were

04:51PM   16    sitting at the table?

04:51PM   17    A.   Just enough to see the writing on the front.

04:51PM   18    Q.   Did it look like -- did it look to you like something

04:51PM   19    that you would characterize as a DEA working file from your

04:51PM   20    time at DEA?

04:51PM   21    A.   I mean, certainly the outside, yes.

04:51PM   22    Q.   And did you have a chance to thumb through any of the

04:52PM   23    documents on the inside?

04:52PM   24    A.   At the table?

04:52PM   25    Q.   Yeah.

04:52PM    1    A.  No.

04:52PM    2    Q.  Did seeing that folder ask you -- or, withdrawn -- cause

04:52PM    3    you to ask the defendant why he had reports related to Serio

04:52PM    4    in his home?

04:52PM    5    A.  Yes.

04:52PM    6    Q.  Okay.  So did you -- that file, just looking at it,

04:52PM    7    indicated to you that there were reports related to Serio in

04:52PM    8    the file?

04:52PM    9    A.  Whoever brought it to the table mentioned something to

04:52PM   10    me, that there were -- also that there was paperwork in it

04:52PM   11    related to Serio.

04:52PM   12    Q.  So those reports?

04:52PM   13    A.  Yes.

04:52PM   14         MR. TRIPI:  Your Honor, I'm not going to be done

04:52PM   15    today.  Is this an okay time to take a break --

04:52PM   16         THE COURT:  Sure.

04:52PM   17         MR. TRIPI:  -- for the day before I get into all

04:52PM   18    this?

04:52PM   19         THE COURT:  Okay, folks, so we will break for the

04:52PM   20    evening now.

04:52PM   21         Please remember my instructions about not

04:52PM   22    communicating about the case, not using tools of technology to

04:52PM   23    communicate about the case or to research the case.  Not to

04:53PM   24    read, or watch, or listen to any news coverage of the case if

04:53PM   25    there is any while the case is in progress.  And not to make

USA v Bongiovanni - Ryan - Tripi/Direct - 9/10/24

240

04:53PM   1   up your mind about anything until the case is submitted to you

04:53PM   2   for deliberations.

04:53PM   3             See you tomorrow morning at 9:30.  We'll go 9:30 to 5

04:53PM   4   tomorrow, the same way we did today.  Then Thursday, 9 until

04:53PM   5   2.  And then Friday 12:30 until 5-ish.  Okay?

04:53PM   6             So 9 on Thursday.  Somebody asked -- said they're not

04:53PM   7   going to remember.  I'm reminding you again.  And then 12:30

04:53PM   8   on Friday.  Okay?

04:53PM   9             Thanks, folks.  Drive carefully.  Get a good night's

04:53PM   10  sleep.

04:53PM   11            (Jury excused at 4:53 p.m.)

04:54PM   12            **THE COURT:**  Okay, anything we need to do before we

04:54PM   13  break?

04:54PM   14            **MR. TRIPI:**  No, Your Honor.

04:54PM   15            **MR. MacKAY:**  No, Your Honor.

04:54PM   16            **THE COURT:**  Okay.  See you folks tomorrow morning.

04:54PM   17            Oh, and you're not to talk to anybody about your

04:54PM   18  testimony while we're on the break until tomorrow.

04:54PM   19            How much longer do you think you're going to be?

04:54PM   20            **MR. TRIPI:**  I would say I'm 75 percent done with him.

04:54PM   21  I'm on page 24 of a 34-page outline.

04:54PM   22            **THE COURT:**  Okay.  Okay.

04:54PM   23            **MR. TRIPI:**  Thank you, Judge.

          24            (Excerpt concluded at 4:54 p.m.)

          25            *      *      *      *      *      *      *

1

2                    **CERTIFICATE OF REPORTER**

3

4              In accordance with 28, U.S.C., 753(b), I

5    certify that these original notes are a true and correct

6    record of proceedings in the United States District Court for

7    the Western District of New York on September 10, 2024.

8

9

10                         s/ Ann M. Sawyer
                           Ann M. Sawyer, FCRR, RPR, CRR
11                         Official Court Reporter
                           U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **TRANSCRIPT INDEX**

2     **EXCERPT - EXAMINATION OF CURTIS RYAN - DAY 1**

3              **SEPTEMBER 10, 2024**

4

5     **W I T N E S S**                              **P A G E**

6     **C U R T I S   R Y A N**                      2

7        DIRECT EXAMINATION BY MR. TRIPI:            2

8

9     **E X H I B I T S**                            **P A G E**

10    GOV Exhibits 72A-72, 72A-24, 72A-25, 72A-37,   33

11       72A-42, 72A-44, 72A-45, 72A-46, 72A-48, 72A-49,

12       72A-50, 72A-55, 72A-56, 72A-58, 72A-59, 72A-60,

13       72A-61, 72A-62, 72A-77, 72A-111, and 72A-112

14    GOV Exhibits 78-1 and 78-2                     44

15    GOV Exhibit 79                                 46

16    GOV Exhibit 77                                 48

17    GOV Exhibit 75                                 49

18    GOV Exhibits 97, 98, and 99                    58

19    GOV Exhibit 490A                               61

20    GOV Exhibit 310A                               93

21    GOV Exhibit 310D                               99

22    GOV Exhibit 311                                100

23    GOV Exhibit 310AT                              185

24    GOV Exhibit 236A                               198

25    GOV Exhibits 103-1, 2, 3, 4, 5, 72             205