09:18AM

1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK
2
    _____
3   UNITED STATES OF AMERICA,

                                        Case No. 1:19-cr-227
4                    Plaintiff,                    (LJV)
    v.
5                                       September 11, 2024
    JOSEPH BONGIOVANNI,
6
    _____Defendant._____
7

8       TRANSCRIPT EXCERPT - EXAMINATION OF CURTIS RYAN - DAY 2
             BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                   UNITED STATES DISTRICT JUDGE

10  APPEARANCES:            TRINI E. ROSS, UNITED STATES ATTORNEY
                            BY: JOSEPH M. TRIPI, ESQ.
11                              NICHOLAS T. COOPER, ESQ.
                                CASEY L. CHALBECK, ESQ.
12                          Assistant United States Attorneys
                            Federal Centre, 138 Delaware Avenue
13                          Buffalo, New York 14202
                            For the Plaintiff
14
                            SINGER LEGAL PLLC
15                          BY: ROBERT CHARLES SINGER, ESQ.
                            80 East Spring Street
16                          Williamsville, New York 14221
                               And
17                          LAW OFFICES OF PARKER ROY MacKAY
                            BY: PARKER ROY MacKAY, ESQ.
18                          3110 Delaware Avenue
                            Kenmore, New York 14217
19                             And
                            OSBORN, REED & BURKE, LLP
20                          BY: JOHN J. GILSENAN, ESQ.
                            120 Allens Creek Road
21                          Rochester, New York 14618
                            For the Defendant
22
    PRESENT:                BRIAN A. BURNS, FBI Special Agent
23                          MARILYN K. HALLIDAY, HSI Special Agent
                            KAREN A. CHAMPOUX, USA Paralegal
24
    LAW CLERK:              REBECCA FABIAN IZZO, ESQ.
25

| | |
|---|---|
| 1 | **COURT DEPUTY CLERK:**  **COLLEEN M. DEMMA** |
| 2 | **COURT REPORTER:**      **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 3 | Robert H. Jackson Federal Courthouse<br>2 Niagara Square<br>Buffalo, New York  14202 |
| 4 | Ann_Sawyer@nywd.uscourts.gov |
| 5 | |
| 6 | *      *      *      *      *      *      * |
| 7 | |

09:43AM  8        (Excerpt commenced at 9:43 a.m.)

09:43AM  9        (Jury seated at 9:43 a.m.)

09:43AM  10        **THE COURT:**  Good morning, everyone.

09:43AM  11        **JURORS:**  Good morning.

09:43AM  12        **THE COURT:**  The record will reflect that all our

09:43AM  13  jurors are present again.

09:43AM  14        I remind the witness he's still under oath.

09:43AM  15        Mr. Tripi, you may continue.

09:43AM  16        **MR. TRIPI:**  Thank you, Your Honor.

09:43AM  17

09:43AM  18  **C U R T I S   R Y A N**, having been previously duly called and

09:43AM  19  sworn, continued to testify as follows:

09:43AM  20

09:43AM  21        **(CONT'D) DIRECT EXAMINATION BY MR. TRIPI:**

09:43AM  22  Q.  Special Agent Ryan, we last -- let me start over.

09:44AM  23     Where we left off yesterday, you were at the point of the

09:44AM  24  interview where colleagues of yours brought over the -- the

09:44AM  25  DEA evidence box, which contained the file labeled Ron Serio

09:44AM   1   on it; remember that?

09:44AM   2   A.  Yes.

09:44AM   3   Q.  Okay.  I'd like to pick it up from there.  Okay?

09:44AM   4       At that point when you were alerted to that, did you ask

09:44AM   5   the defendant why he had reports related to Ron Serio in his

09:44AM   6   home?

09:44AM   7   A.  I did.

09:44AM   8   Q.  What was the defendant's response to your question?

09:44AM   9   A.  He said that he was aware that there was an organized

09:44AM  10   crime investigation ongoing, that Serio's name qualified as

09:44AM  11   being part of that investigation, and that he brought that

09:44AM  12   file home because he wanted to show that the investigation

09:44AM  13   that he had done was on the up and up.

09:44AM  14   Q.  And when he referenced organized crime investigation,

09:44AM  15   did -- did he characterize it as, like, an Italian Organized

09:45AM  16   Crime case?

09:45AM  17   A.  He did.

09:45AM  18   Q.  Did he mention anything about Serio's last name in giving

09:45AM  19   you that answer?

09:45AM  20   A.  He did.  He --

09:45AM  21   Q.  What did he say?

09:45AM  22   A.  That Serio's last name qualified, which I understood to

09:45AM  23   mean it was an Italian last name.  So, that it could be

09:45AM  24   related to the Italian Organized Crime case.

09:45AM  25   Q.  During the course of your interview, did there come a

09:45AM    1    point where the Bongiovanni -- where Mr. Bongiovanni made

09:45AM    2    statements to you regarding the fact that you were asking him

09:45AM    3    about names of Italian ancestry?

09:45AM    4    A.  He did.

09:45AM    5    Q.  Can you describe how that came up and that interaction

09:45AM    6    between yourself and the defendant?

09:45AM    7    A.  There were a couple times where he asked why we were only

09:45AM    8    asking about people with Italian last names.  I think the

09:46AM    9    first time it came up I said -- it was when we were going

09:46AM   10    through the contacts in the phone.  And I explained I'm

09:46AM   11    asking you about the contacts that I know were in your phone,

09:46AM   12    it doesn't, you know, I'm not thinking about what kind of

09:46AM   13    last name it is.

09:46AM   14       And then he brought it up at least one other time, maybe

09:46AM   15    more than one other time because it did start to irritate me.

09:46AM   16    And eventually I got fed up with it.  And I said, hey, look,

09:46AM   17    there's an Irish mob, too, but that's not why we're here

09:46AM   18    today, or something along those lines.

09:46AM   19    Q.  When you saw the DEA evidence box and the file in it that

09:46AM   20    had the label of Ron Serio and some other names on it, did

09:46AM   21    you believe that file to be a DEA working file when you

09:47AM   22    looked at it?

09:47AM   23    A.  From first glance, yes.

09:47AM   24    Q.  Now, you've worked at the DEA, right?

09:47AM   25    A.  Yes.

09:47AM    1    Q.  In terms of DEA policy and procedure, are DEA file

09:47AM    2    materials supposed to remain in DEA secure space?

09:47AM    3    A.  Yes.

09:47AM    4    Q.  And at the time the defendant had it, he was retired from

09:47AM    5    the DEA, correct?

09:47AM    6    A.  Yes.

09:47AM    7    Q.  Did you then continue to ask Mr. Bongiovanni questions,

09:47AM    8    and in particular, did you ask about a situation where he was

09:47AM    9    at Buffalo RiverWorks with Mr. Gerace?

09:47AM   10    A.  I did.  I asked questions based off those -- the text

09:47AM   11    messages.

09:47AM   12    Q.  Now, were those text messages that you showed him, or

09:47AM   13    ones that you had remembered?

09:48AM   14    A.  That I had remembered.

09:48AM   15    Q.  Okay.  So, what was your question and what was his

09:48AM   16    response regarding that topic?

09:48AM   17    A.  I just, I asked him if he remembered the time at Buffalo

09:48AM   18    RiverWorks and how that came to be.

09:48AM   19    Q.  And what did the defendant say?

09:48AM   20    A.  That it was another chance encounter.  That he didn't

09:48AM   21    meet Mr. Gerace there as part of any plan.

09:48AM   22    Q.  Did he give you any details about what happened that

09:48AM   23    night?

09:48AM   24    A.  He did say that there was another person there, the name

09:48AM   25    escapes me, within that night.  And I -- I think he said that

09:48AM  1  he did confirm that Peter helped him help Lindsay to the car.

09:48AM  2  Q.  So, there was discussion about his wife Lindsay being

09:48AM  3  intoxicated?

09:48AM  4  A.  Yes.

09:48AM  5  Q.  In terms of his relationship with Gerace, did there come

09:49AM  6  a point in your interview where the defendant indicated to

09:49AM  7  you that Gerace obsessively called the defendant, and has

09:49AM  8  been for a long time?

09:49AM  9  A.  Yes.  That was how he characterized it.

09:49AM  10  Q.  How did that come up?

09:49AM  11  A.  It was -- I wasn't satisfied with the answers about the

09:49AM  12  communication, so I asked some questions about it.  It didn't

09:49AM  13  seem, to me, it didn't seem one way like he had characterized

09:49AM  14  it earlier in the interview, so, I circled back to it and

09:49AM  15  asked about it again.

09:49AM  16      And again, he left me with the impression that

09:49AM  17  communication and the relationship was one way.  Mr. Gerace

09:49AM  18  called him, he didn't return phone calls.

09:49AM  19  Q.  Now yesterday you also mentioned a part of the discussion

09:49AM  20  where you asked him about the contact, Kim Mecca, in his

09:49AM  21  phone; do you remember that?

09:49AM  22  A.  Yes.

09:49AM  23  Q.  And you explained how he put his head down and his elbows

09:50AM  24  on his knees?

09:50AM  25  A.  Yes.

09:50AM   1   Q.  When he indicated to you that Kim Mecca was Lou Selva's

09:50AM   2   girlfriend, did you follow up and ask questions about Lou

09:50AM   3   Selva?  Or did he tell you anything about who Lou Selva was?

09:50AM   4   A.  He did.  I can't remember if it was in response to a

09:50AM   5   question, or if it was a follow-on from saying the name when

09:50AM   6   I said whose girlfriend.

09:50AM   7        But I remember him saying that, he had -- Lou Selva had

09:50AM   8   recently graduated from the Erie County Sheriff's Academy.

09:50AM   9   Q.  As a corrections officer?

09:50AM  10   A.  Yes, as a corrections deputy.

09:50AM  11        **MR. TRIPI:**  Ms. Champoux, can we pull up

09:50AM  12   Exhibit 109AA and 109AC, they're both in evidence.  Just put

09:50AM  13   them side by side.

09:51AM  14        **BY MR. TRIPI:**

09:51AM  15   Q.  And just for clarification, Government Exhibit 109AA on

09:51AM  16   the left of your screen, is Mr. Selva the individual in the

09:51AM  17   middle in the sheriff's outfit?

09:51AM  18   A.  He is.

09:51AM  19   Q.  And in Government Exhibit 109AC, is Mr. Selva the person

09:51AM  20   to the far right of the picture?

09:51AM  21   A.  Yes.

09:51AM  22   Q.  And Mr. Bongiovanni is in both pictures with him?

09:51AM  23   A.  Yes, he is.

09:51AM  24        **MR. TRIPI:**  Okay.  We can take that down,

09:51AM  25   Ms. Champoux.

09:51AM   1          **BY MR. TRIPI:**

09:51AM   2   Q.  Explain for this jury sort of how you -- how you closed

09:51AM   3   the interview, how you wound it down?

09:51AM   4   A.  Well, I asked about the working file again.

09:51AM   5   Q.  Why?

09:51AM   6   A.  The first answer didn't make sense to me.  I just wanted

09:51AM   7   to ask about it again.

09:51AM   8   Q.  Why didn't it make sense to you?

09:51AM   9   A.  Didn't make sense to me that he had the file.  It didn't

09:51AM  10   make sense because of Mr. Serio's disclosure.  It didn't make

09:51AM  11   sense in the context of why we were there.  It just -- I felt

09:51AM  12   like I needed to ask another question.

09:51AM  13   Q.  So, what'd you ask him?

09:52AM  14   A.  I just asked him again, I said, hey, why did you bring

09:52AM  15   this home?  Why this one?

09:52AM  16   Q.  What did the defendant say sort of the second time

09:52AM  17   around?

09:52AM  18   A.  He said that he had burned his other papers, but that he

09:52AM  19   brought the Serio file home.

09:52AM  20   Q.  Did he say when he brought it home?

09:52AM  21   A.  At retirement.

09:52AM  22   Q.  Okay.  And retirement, just remind the jury, his last day

09:52AM  23   was February 1st, 2019?

09:52AM  24   A.  Yes.

09:52AM  25   Q.  Okay.  Please continue.

09:52AM  1   A.  And then we talked a little bit about the case.  And I

09:52AM  2   just, I asked him, what happened with the investigation?

09:52AM  3   Q.  To be clear, the Serio investigation?

09:52AM  4   A.  Yes.  The Serio investigation.

09:52AM  5   Q.  What did he say?

09:52AM  6   A.  He said that the -- his source in the case was arrested

09:52AM  7   for selling fentanyl and maybe another controlled substance,

09:52AM  8   And that that effectively ended the case.

09:52AM  9       And then I asked him who --

09:52AM  10  Q.  Let me jump in with a question here.

09:52AM  11  A.  Sure.

09:52AM  12  Q.  When he said his source in the case, in the context of

09:53AM  13  the conversation you were having, what did you understand his

09:53AM  14  use of the word "source" to mean?

09:53AM  15  A.  Confidential source or informant.

09:53AM  16  Q.  Did he tell you who that person was?

09:53AM  17  A.  I asked him who it was, and he said it was Peter

09:53AM  18  Militello.

09:53AM  19  Q.  And did he tell you why his source in the case, Peter

09:53AM  20  Militello, became unavailable?

09:53AM  21  A.  He did.  He said he was arrested.

09:53AM  22  Q.  For what?

09:53AM  23  A.  For selling fentanyl and maybe one other controlled

09:53AM  24  substance.  I think there was another one.

09:53AM  25  Q.  Would your report refresh your recollection?

| | | |
|---|---|---|
| 09:53AM | 1 | A.  Yes. |
| 09:53AM | 2 | Q.  I'm going to hand you up Government Exhibit 3594BJ-1 for |
| 09:53AM | 3 | identification.  Take a look at it, and when you're done look |
| 09:53AM | 4 | up. |
| 09:54AM | 5 | Does that refresh your recollection as to the other |
| 09:54AM | 6 | substance he indicated Mr. Militello was arrested for |
| 09:54AM | 7 | selling? |
| 09:54AM | 8 | A.  Yes. |
| 09:54AM | 9 | Q.  What was it? |
| 09:54AM | 10 | A.  Heroin. |
| 09:54AM | 11 | Q.  Okay.  Now, at that time, as you sat there in that |
| 09:54AM | 12 | interview, did you know who the informant was that |
| 09:54AM | 13 | Mr. Bongiovanni had into the Serio investigation? |
| 09:54AM | 14 | A.  I mean -- |
| 09:54AM | 15 | Q.  Or did you learn that later? |
| 09:54AM | 16 | A.  I had heard some names of possible informants, but |
| 09:54AM | 17 | nothing solid until later. |
| 09:54AM | 18 | Q.  Okay.  So my question is:  Did you verify later who the |
| 09:54AM | 19 | actual informant was -- |
| 09:54AM | 20 | A.  Yes. |
| 09:54AM | 21 | Q.  -- in the investigation? |
| 09:54AM | 22 | MR. TRIPI:  Okay.  Ms. Champoux, let's pull up |
| 09:54AM | 23 | Exhibit 9E-2.  This is in evidence, Your Honor. |
| 09:54AM | 24 | BY MR. TRIPI: |
| 09:55AM | 25 | Q.  Do you recognize this as a DEA confidential source |

09:55AM  1   agreement?

09:55AM  2   A.  Yes.

09:55AM  3        **MR. TRIPI:**  And can we go to the signature blocks,

09:55AM  4   Ms. Champoux?

09:55AM  5        **BY MR. TRIPI:**

09:55AM  6   Q.  And who was the informant in that actual investigation?

09:55AM  7   A.  R.K.

09:55AM  8   Q.  And do you see who the handling agent or the controlling

09:55AM  9   investigator was who signed under Mr. R.K.'s source number?

09:55AM  10  A.  Yes.

09:55AM  11  Q.  Who's that?

09:55AM  12  A.  Mr. Bongiovanni.

09:55AM  13       **MR. TRIPI:**  Okay.  We can take that down,

09:55AM  14  Ms. Champoux.

09:55AM  15       **BY MR. TRIPI:**

09:55AM  16  Q.  And again, after this interview with Mr. Bongiovanni, did

09:55AM  17  there come a point where you were able to review Exhibit 8A,

09:55AM  18  which is file -- the actual DEA file for C2-13-0026?

09:55AM  19  A.  Yes.

09:55AM  20  Q.  Was the informant in that file actually R.K.?

09:55AM  21  A.  Yes.

09:55AM  22  Q.  And there's no reference to Peter Militello in that file

09:56AM  23  whatsoever; is that correct?

09:56AM  24  A.  None at all.

09:56AM  25  Q.  At that point in the interview, did Mr. Bongiovanni

09:56AM  1    indicate to you that he knew that you guys were investigating

09:56AM  2    Ronald Serio?

09:56AM  3    A.  He did.  He made that statement.

09:56AM  4    Q.  And when he said "you guys," who was he referring to?

09:56AM  5    A.  He gestured toward me, which I took to mean HSI.

09:56AM  6        That was just my understanding of his body language and

09:56AM  7    his answer at the time.

09:56AM  8    Q.  Did you follow up with a question?

09:56AM  9    A.  I did.  I asked him how he learned about the

09:56AM  10   investigation, because we had made efforts to keep that

09:56AM  11   information held as closely as possible.

09:56AM  12       And he said that Special Agent Carpenter had told him

09:56AM  13   about it in his OIG interview.

09:57AM  14   Q.  And when you say "it," are you referring to the

09:57AM  15   investigation of Serio?

09:57AM  16   A.  The Serio investigation.

09:57AM  17   Q.  Okay.  And was that his explanation of why he took his

09:57AM  18   Serio file home --

09:57AM  19   A.  Yes.

09:57AM  20   Q.  -- at retirement?

09:57AM  21       Now, earlier you mentioned that Bongiovanni's retirement

09:57AM  22   was February 1st, 2019, right?

09:57AM  23   A.  Yes.

09:57AM  24   Q.  And earlier you mentioned that Special Agent Carpenter's

09:57AM  25   interview with Mr. Bongiovanni was March 29th, 2019, correct?

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

09:57AM   1   A.  Yes.

09:57AM   2   Q.  So, the interview by DOJ OIG was after Mr. Bongiovanni

09:57AM   3   had retired; is that right?

09:57AM   4   A.  Yes.

09:57AM   5   Q.  Given the timeline of events, was it possible for

09:57AM   6   Mr. Bongiovanni to remove the Serio file on February 1st,

09:57AM   7   2019, based upon an interview that had not yet happened with

09:57AM   8   Special Agent Carpenter?

09:57AM   9   A.  No.

09:57AM  10   Q.  When you completed the interview, was it your intent to

09:58AM  11   further investigate?

09:58AM  12   A.  Yes.

09:58AM  13   Q.  And did you do so?

09:58AM  14   A.  Yes.

09:58AM  15   Q.  So, Mr. Bongiovanni was not arrested that day, correct?

09:58AM  16   A.  No.

09:58AM  17   Q.  He was not charged?

09:58AM  18   A.  No, not charged that day.

09:58AM  19   Q.  Okay.  Now, during the course of that same interview, was

09:58AM  20   Mr. Bongiovanni's personal cell phone obtained from HSI?

09:58AM  21   A.  Yes.

09:58AM  22   Q.  Was it brought to you during your interview of him?

09:58AM  23   A.  Yes.

09:58AM  24   Q.  And did he confirm for you his pass code to get into that

09:58AM  25   phone?

| | | |
|---|---|---|
| 09:58AM | 1 | A.  Yes. |
| 09:58AM | 2 | Q.  And later on, that phone was searched; is that right? |
| 09:58AM | 3 | A.  Yes. |
| 09:59AM | 4 | MR. TRIPI:  One moment please, Your Honor. |
| 10:00AM | 5 | BY MR. TRIPI: |
| 10:00AM | 6 | Q.  And was information later extracted from |
| 10:00AM | 7 | Mr. Bongiovanni's personal phone -- |
| 10:00AM | 8 | A.  Yes. |
| 10:00AM | 9 | Q.  -- pursuant to a federal search warrant? |
| 10:00AM | 10 | A.  Yes. |
| 10:00AM | 11 | MR. TRIPI:  Judge, we've read the stip, but I would |
| 10:00AM | 12 | just like to reread the stipulation we've previously entered |
| 10:00AM | 13 | in context for the jury, because we read it out of context |
| 10:00AM | 14 | last time. |
| 10:00AM | 15 | MR. MacKAY:  No objection. |
| 10:00AM | 16 | THE COURT:  Go ahead. |
| 10:00AM | 17 | MR. TRIPI:  This is Court's Exhibit 6, United States |
| 10:00AM | 18 | of America by and through its attorneys. |
| 10:00AM | 19 | I'm going to skip, actually, the introduction |
| 10:00AM | 20 | paragraph. |
| 10:00AM | 21 | Hereby stipulate to the admissibility into evidence |
| 10:00AM | 22 | at trial in this case the following facts regarding specific |
| 10:00AM | 23 | government exhibits: |
| 10:00AM | 24 | Or on or about June 26, 2019, HSI Special Agent |
| 10:00AM | 25 | Curtis Ryan seized Joseph Bongiovanni's personal cell phone, |

10:00AM   1   Samsung Galaxy J3, with unique identifier IMEI number

10:00AM   2   3542-720-908-09267.

10:00AM   3        The Department of Justice Office of Inspector General

10:01AM   4   extracted the data that was stored on Mr. Bongiovanni's

10:01AM   5   personal cell phone and examined the data.  The results of the

10:01AM   6   examination are marked as Government Exhibit 109A, and

10:01AM   7   sub-exhibits of the examination are marked as Government

10:01AM   8   Exhibits 109B through 109Z, and 109AA through 109AH.

10:01AM   9        Those exhibits are authentic and accurate copies of

10:01AM   10  the data that was extracted -- excuse me, that was on

10:01AM   11  Mr. Bongiovanni's personal cell phone.

10:01AM   12       The parties stipulate and agree that the following

10:01AM   13  exhibits shall be received into evidence:

10:01AM   14       Government Exhibit 109F, 109I, 109N, 109O, 109P,

10:01AM   15  109R, 109V, 109X, 109Z, 109AA, 109AB, 109AC, and 109AE.

10:01AM   16       And that was signed by all parties on August 26th,

10:02AM   17  2024, Your Honor.

10:02AM   18       Thank you for that indulgence.

10:02AM   19  **BY MR. TRIPI:**

10:02AM   20  Q.  After that interview was completed, after you obtained

10:02AM   21  Mr. Bongiovanni's phone and the file materials which we'll

10:02AM   22  get into in a little bit, did that essentially end the

10:02AM   23  investigation that day in Mr. Bongiovanni's residence?

10:02AM   24  A.  Yes.

10:02AM   25  Q.  As part of your continuing investigation, did Homeland

10:02AM    1    Security Investigations obtain additional search warrants on

10:02AM    2    August 23rd -- that were executed on or about August 23rd,

10:02AM    3    2019, to search residences associated with Michael Masecchia

10:02AM    4    and Lou Selva?

10:02AM    5    A.  Yes.

10:02AM    6    Q.  So, within approximately one year of the investigation,

10:03AM    7    both of those residences were searched and items of evidence

10:03AM    8    were seized?

10:03AM    9    A.  Yes.

10:03AM   10    Q.  Were you the lead HSI case agent at the Masecchia

10:03AM   11    residence?

10:03AM   12    A.  I was.

10:03AM   13    Q.  And from the FBI, was Special Agent Burns there with you?

10:03AM   14    A.  Yes, he was.

10:03AM   15    Q.  And were there other individuals who helped with that

10:03AM   16    search from your agency?

10:03AM   17    A.  Yes.

10:03AM   18    Q.  As to the Selva search warrant, obviously he lives in a

10:03AM   19    different location; is that right?

10:03AM   20    A.  Yes.

10:03AM   21    Q.  Who was the head of that search team?

10:03AM   22    A.  Special Agent Halliday.

10:03AM   23    Q.  And she's with HSI, correct?

10:03AM   24    A.  Yes.

10:03AM   25    Q.  All right.  Regarding the Masecchia search warrant on

10:03AM  1  August 23rd, 2019, and the Selva search warrant that same

10:03AM  2  day, were they executed simultaneously?

10:03AM  3  A.  Yes.

10:03AM  4  Q.  Was that for the same logic and reasoning that the

10:03AM  5  Anthony Gerace and Michael Sinatra search warrants were

10:03AM  6  executed simultaneously?

10:03AM  7  A.  Yes.

10:03AM  8  Q.  Would all your answers, if I asked the same questions, be

10:04AM  9  the same to this jury about why that was done that way?

10:04AM  10  A.  Yes, they would.

10:04AM  11  Q.  Okay.  Now, with regard to the Masecchia warrant

10:04AM  12  execution, can you describe for the jury what happened that

10:04AM  13  day, and give them an overview of what was seized?

10:04AM  14  A.  So, that was another tactical team entry.  So, they

10:04AM  15  searched the residence for people.  Mr. Masecchia was there,

10:04AM  16  his wife, two or maybe three of his children, so they were

10:04AM  17  secured and brought outside.

10:04AM  18      Special Agent Burns and I conducted a short interview

10:04AM  19  with Mr. Masecchia.  After that was over, I assisted with the

10:04AM  20  search.

10:04AM  21  Q.  Okay.

10:04AM  22  A.  And then -- do you want me to go through some of the

10:04AM  23  things we found, or --

10:04AM  24  Q.  Yeah.  Let me ask a follow-up question.

10:04AM  25      Where did Mr. Masecchia live?  Where was his residence?

| | | |
|---|---|---|
| 10:04AM | 1 | A.  On Main Street in Williamsville.  5907, I think is the |
| 10:05AM | 2 | number.  I'm not remembering right.  But across the street |
| 10:05AM | 3 | from Williamsville South High School. |
| 10:05AM | 4 | Q.  Okay.  Was your conversation with Mr. Masecchia |
| 10:05AM | 5 | relatively brief? |
| 10:05AM | 6 | A.  Yes. |
| 10:05AM | 7 | Q.  Did it ever make it to any substance of any of the |
| 10:05AM | 8 | matters at hand? |
| 10:05AM | 9 | A.  No. |
| 10:05AM | 10 | Q.  Okay.  Did Special Agent Burns, at Mr. Masecchia's |
| 10:05AM | 11 | request, actually call an attorney of Mr. Masecchia's choice |
| 10:05AM | 12 | for him? |
| 10:05AM | 13 | A.  Either Special Agent Burns did or I did. |
| 10:05AM | 14 | Q.  One of the two of you? |
| 10:05AM | 15 | A.  One of the two of us did.  I think between the two of us, |
| 10:05AM | 16 | we had the number, and we called on Mr. Masecchia's behalf. |
| 10:05AM | 17 | Q.  And getting to the search now, can you tell the jury, |
| 10:05AM | 18 | give them an overview of the items that were located and |
| 10:05AM | 19 | seized by Homeland Security? |
| 10:05AM | 20 | A.  Yes.  Most of the items were found in the upstairs master |
| 10:05AM | 21 | bedroom.  There were eight firearms.  $27,950 -- |
| 10:06AM | 22 | Q.  In United States currency? |
| 10:06AM | 23 | A.  Yes.  About 100 rounds of ammunition.  There was |
| 10:06AM | 24 | marijuana.  There was at least some THC-based edibles.  I'm |
| 10:06AM | 25 | trying to remember what else. |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

| | | |
|---|---|---|
| 10:06AM | 1 | Q. Was there some cocaine in his truck? |
| 10:06AM | 2 | A. There was cocaine in the truck. |
| 10:06AM | 3 | Q. Was there some steroids on the scene? |
| 10:06AM | 4 | A. And there were steroids, yes. |
| 10:06AM | 5 | Q. And I'm sorry, I missed the number of firearms. |
| 10:06AM | 6 | A. Eight. |
| 10:06AM | 7 | Q. And was ammunition in proximity to the firearms? |
| 10:06AM | 8 | A. Yes. |
| 10:06AM | 9 | Q. Were the firearms in proximity to marijuana and that |
| 10:06AM | 10 | $27,950? |
| 10:06AM | 11 | A. Yes. So, the currency was in the closet in the bedroom. |
| 10:06AM | 12 | And then there was one firearm in particular that was at the |
| 10:07AM | 13 | side of the bed by a nightstand where ammunition and |
| 10:07AM | 14 | marijuana were found. |
| 10:07AM | 15 | Q. Did it appear that that firearm was, like, in a ready |
| 10:07AM | 16 | position in proximity to where Mr. Masecchia would be |
| 10:07AM | 17 | sleeping? |
| 10:07AM | 18 | A. Yes. |
| 10:07AM | 19 | Q. Shortly after that search, was Mr. Masecchia charged? |
| 10:07AM | 20 | A. Yes. |
| 10:07AM | 21 | Q. After he was charged, did he come in for what's called a |
| 10:07AM | 22 | proffer interview? |
| 10:07AM | 23 | A. He did. |
| 10:07AM | 24 | Q. Did he come in a few times? |
| 10:07AM | 25 | A. At least twice. |

10:07AM    1    Q.  Did you ask him questions during those proffer

10:07AM    2    interviews?

10:07AM    3    A.  Yes.

10:07AM    4    Q.  What was his demeanor when you asked Mr. Masecchia

10:07AM    5    questions?

10:07AM    6    A.  He was evasive.

10:07AM    7    Q.  Without getting into any results or questions asked, was

10:08AM    8    he polygraphed?

10:08AM    9    A.  Yes.

10:08AM   10    Q.  After that, did he ever submit to any further interviews

10:08AM   11    after that?

10:08AM   12    A.  No.

10:08AM   13    Q.  Ultimately, did Mr. Masecchia plead guilty in his own

10:08AM   14    case to conspiracy to distribute marijuana?

10:08AM   15    A.  Yes.

10:08AM   16    Q.  Did he not cooperate?

10:08AM   17    A.  He did not.

10:08AM   18    Q.  I'd like to ask you about Lou Selva.

10:08AM   19        After the search warrant that was led by Special Agent

10:08AM   20    Halliday that same day, without getting into what Special

10:08AM   21    Agent Halliday told you, did you learn details about what had

10:08AM   22    transpired at Mr. Selva's residence at 128 Rebecca Court that

10:08AM   23    day?

10:08AM   24    A.  Yes.

10:08AM   25    Q.  All right.  Did you get to review the evidence that was

| | | |
|---|---|---|
| 10:08AM | 1 | obtained from Mr. Selva's residence? |
| 10:08AM | 2 | A.  Yes. |
| 10:08AM | 3 | Q.  Within a short time after Mr. Selva's search warrant, did |
| 10:09AM | 4 | he come in for a proffer interview? |
| 10:09AM | 5 | A.  Yes. |
| 10:09AM | 6 | Q.  Did Mr. Selva also -- had you become aware by that point |
| 10:09AM | 7 | he had agreed to turn his cell phone over to be searched? |
| 10:09AM | 8 | A.  Yes. |
| 10:09AM | 9 | Q.  Did Mr. Selva come in for several proffers that you were |
| 10:09AM | 10 | in? |
| 10:09AM | 11 | A.  Yes. |
| 10:09AM | 12 | Q.  Ultimately, was he polygraphed? |
| 10:09AM | 13 | A.  Yes. |
| 10:09AM | 14 | Q.  Without getting into the questions of the polygraph or |
| 10:09AM | 15 | the results, after Mr. Selva was polygraphed, did he come in |
| 10:09AM | 16 | for more proffer interviews? |
| 10:09AM | 17 | A.  Yes. |
| 10:09AM | 18 | Q.  As time went on, can you describe how Mr. Selva's |
| 10:09AM | 19 | demeanor was in the beginning and how it progressed over time |
| 10:09AM | 20 | over the course of the interviews following his polygraph? |
| 10:09AM | 21 | A.  He was very nervous, even scared in the beginning. |
| 10:10AM | 22 | Q.  Was he -- did he appear at times in the beginning to be |
| 10:10AM | 23 | evasive? |
| 10:10AM | 24 | A.  Yes. |
| 10:10AM | 25 | Q.  Did he appear to be minimizing to you at times? |

10:10AM  1   A.  Yes.

10:10AM  2   Q.  As time went on, what did you notice with respect to that

10:10AM  3   portion of his demeanor?

10:10AM  4   A.  As time went on, he became less evasive, more

10:10AM  5   forthcoming.

10:10AM  6   Q.  Did he become less evasive after the polygraph, in your

10:10AM  7   review?

10:10AM  8   A.  Yes.

10:10AM  9   Q.  Ultimately, Mr. Selva went into grand jury?

10:10AM  10  A.  He did.

10:10AM  11  Q.  Did he remain scared and nervous?

10:10AM  12  A.  Yes.

10:10AM  13  Q.  Did that ever change?

10:11AM  14  A.  No.

10:11AM  15  Q.  Now, after Mr. Selva started proffering again, without

10:11AM  16  getting into what he said in the proffers, did he provide you

10:11AM  17  information that enabled you to go back and ask more specific

10:11AM  18  questions to Mr. Serio?

10:11AM  19  A.  Yes.

10:11AM  20  Q.  Did the information that Mr. Selva provided you in his

10:11AM  21  interviews result in better questions that you were able to

10:11AM  22  ask Mr. Serio?  More pointed questions, I should say?

10:11AM  23  A.  Yes.

10:11AM  24  Q.  Did Mr. Serio then provide you more information?

10:11AM  25  A.  Yes.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

10:11AM   1   Q.  In terms of the amount of money that Mr. Serio had

10:11AM   2   initially indicated to you was involved in the bribes, what

10:11AM   3   did Mr. Serio -- how did he modify his answer?

10:11AM   4   A.  Increased significantly, the amount.

10:11AM   5   Q.  Did you tell him the amount that he bribed the defendant?

10:11AM   6   A.  No.

10:11AM   7   Q.  Did that information come from Mr. Serio?

10:11AM   8   A.  Yes.

10:11AM   9   Q.  Did you ever tell Mr. Serio, hey, Lou Selva told me X?

10:12AM   10      Did you ever tell Serio you were talking to Selva?

10:12AM   11  A.  No.

10:12AM   12  Q.  Did you ever tell Selva you were talking to Serio?

10:12AM   13  A.  No.

10:12AM   14  Q.  I'd like to move on to talk a little bit more about --

10:12AM   15  I'd like to actually go back and ask you a few more questions

10:12AM   16  about evidence that was recovered from Alder Place.  I

10:12AM   17  apologize to circle back to that, but I forgot to ask a

10:12AM   18  couple questions.  Okay?

10:12AM   19      So, going backwards in the timeline again, back to

10:12AM   20  June 6th, 2019, okay?

10:12AM   21  A.  Yes.

10:12AM   22  Q.  As a part of the -- essentially the lead case agent on

10:13AM   23  that matter, did you ultimately review all the evidence that

10:13AM   24  was seized and secured that day?

10:13AM   25  A.  Yes.

10:13AM   1   Q.  Did you seize some wedding cards that HSI had recovered

10:13AM   2   from Mr. Bongiovanni's residence?

10:13AM   3   A.  Yes.

10:13AM   4   Q.  Okay.  I'm going to hand you up another exhibit.  I'm

10:13AM   5   going to hand up what's previously been marked as Government

10:13AM   6   Exhibit 100D. D, as in dog, sorry.

10:13AM   7       Generally, do you recognize Government Exhibit 100D?

10:14AM   8   A.  Yes.

10:14AM   9   Q.  Do you recognize 100D to be the different wedding cards

10:14AM  10   that were seized during the search of Mr. Bongiovanni's

10:14AM  11   residence by HSI on June 6th, 2019?

10:14AM  12   A.  I do.

10:14AM  13   Q.  Are they in the same or substantially same condition

10:14AM  14   today as when you last saw them, other than now that there's

10:14AM  15   a hole in the bag that you ripped open?

10:14AM  16   A.  Yes.

10:14AM  17   Q.  Can I see those cards for one moment?

10:14AM  18       Within that bag, are there two cards marked Government

10:14AM  19   Exhibit 100D-1 and 100D-2?

10:14AM  20   A.  Yes.

10:14AM  21   Q.  Okay.  I'd like to focus you in on those.  Is 100D-1, a

10:14AM  22   card that was seized, that is in the same or substantially

10:14AM  23   same condition today as when it was recovered from

10:15AM  24   Mr. Bongiovanni's residence?

10:15AM  25   A.  Yes.

```
10:15AM    1   Q.  And with regard to 100D-2, is that a wedding card that
10:15AM    2   was seized from Mr. Bongiovanni's residence, and is it in the
10:15AM    3   same or substantially same condition today as when it was
10:15AM    4   seized?
10:15AM    5   A.  Yes.
10:15AM    6          MR. TRIPI:  The government offers just 100D-1 and
10:15AM    7   100D-2, Your Honor.
10:15AM    8          MR. MacKAY:  No objection, Your Honor.
10:15AM    9          THE COURT:  They are received without objection.
10:15AM   10      (GOV Exhibits 100D-1 and 2 were received in evidence.)
10:15AM   11          MR. TRIPI:  Thank you.
10:15AM   12          BY MR. TRIPI:
10:15AM   13   Q.  Starting with 100D-1, if you wouldn't mind, who is that
10:15AM   14   wedding card from?
10:15AM   15   A.  It's signed by Lou Selva.
10:15AM   16   Q.  Okay.  And can you move on to 100D-2?
10:15AM   17      Could you tell the jury who that wedding card is from?
10:15AM   18   A.  Hot Dog and Lynn.
10:15AM   19   Q.  Now, through this investigation, do you know Hot Dog to
10:15AM   20   be the nickname of a particular individual?
10:15AM   21   A.  Paul Francoforte.
10:15AM   22   Q.  And can you read for the jury what's written in the card
10:16AM   23   from Hot Dog and Lynn?
10:16AM   24   A.  It says, Love, Hot Dog and Lynn.  Honored to be your
10:16AM   25   friends.  Many years of happiness.
```

10:16AM    1    Q.  Okay.  I'd like you to put that card down.

10:16AM    2            **MR. TRIPI:**  Ms. Champoux, can we please pull up

10:16AM    3    Government Exhibit 8A and go to page 347?

10:16AM    4            Just one moment, Your Honor.

10:16AM    5            **BY MR. TRIPI:**

10:16AM    6    Q.  Do you recognize this document from the DEA file title

10:16AM    7    Wayne Anderson C2-13-0026?

10:16AM    8    A.  Yes.

10:16AM    9    Q.  Is this a response -- a phone record for subscriber

10:16AM    10    information related to an administrative subpoena for Paul

10:16AM    11    Francoforte's phone number?

10:16AM    12    A.  Yes.

10:16AM    13    Q.  Is that phone number 716-866-2687?

10:16AM    14    A.  Yes, I see it.

10:17AM    15    Q.  Based upon your knowledge of the DEA DARTS system, is a

10:17AM    16    subscriber subpoena like this for phone information

10:17AM    17    sufficient to get an individual's name and number into DARTS

10:17AM    18    for deconfliction purposes?

10:17AM    19    A.  Yes.

10:17AM    20    Q.  So, if an agent causes this to be put in DARTS associated

10:17AM    21    with them, if this ever comes up on a wiretap, that agent

10:17AM    22    will be notified?

10:17AM    23    A.  Yes.

10:17AM    24            **MR. TRIPI:**  We can take that down.

          25

10:17AM    1          **BY MR. TRIPI:**

10:17AM    2    Q.  During the course of your investigation, did you also

10:17AM    3    have an opportunity to locate and review an online digital

10:17AM    4    memorial for Joseph Todaro Sr.?

10:17AM    5    A.  Yes.

10:17AM    6    Q.  And did that online memorial have a number of photographs

10:17AM    7    that were part of the memorial?

10:17AM    8    A.  It did.

10:17AM    9    Q.  I'm going to hand you up what's now marked Government

10:18AM   10    Exhibit 393.  Do you recognize Exhibit 393?

10:18AM   11    A.  I do.

10:18AM   12    Q.  What do you recognize that to be?

10:18AM   13    A.  Its a photograph that was included in the memorial.

10:18AM   14    Q.  And whose online memorial is that?

10:18AM   15    A.  Joseph Todaro Sr.

10:18AM   16    Q.  And during your interview of Mr. Bongiovanni, remind the

10:18AM   17    jury what he told you in terms of the position that

10:18AM   18    Todaro Sr. had.

10:18AM   19    A.  That he was the head of the Buffalo Mafia.

10:18AM   20    Q.  As well as Gerace's grandfather?

10:18AM   21    A.  Yes.

10:18AM   22    Q.  Is that photo --

10:18AM   23    A.  Actually, I should say that he had something to do with

10:19AM   24    the Buffalo Mafia.

10:19AM   25    Q.  Thank you for the clarification.

10:19AM   1      In terms of the law enforcement reputation for

10:19AM   2  Todaro Sr., were you familiar with that?

10:19AM   3  A.   Yes.

10:19AM   4  Q.   And what was that reputation?

10:19AM   5  A.   That he was the head of the Buffalo Mafia.

10:19AM   6  Q.   Okay.  Is Government Exhibit 393, does it fairly and

10:19AM   7  accurately depict a photo that was on part of the Todaro Sr.

10:19AM   8  online memorial?

10:19AM   9  A.   Yes.

10:19AM   10         MR. TRIPI:  The government offers Exhibit 393,

10:19AM   11  Your Honor.

10:19AM   12         MR. MacKAY:  No objection.

10:19AM   13         THE COURT:  Received without objection.

10:19AM   14         (GOV Exhibit 393 was received in evidence.)

10:19AM   15         MR. TRIPI:  Ms. Champoux, can we publish Exhibit 393?

10:19AM   16         BY MR. TRIPI:

10:19AM   17  Q.   Now, your screen is a touchscreen like a football

10:19AM   18  telestrator.  Can you show the jury who Mr. Todaro Sr. is in

10:19AM   19  that photo by tapping your finger on the screen?

10:19AM   20         MR. TRIPI:  May the record reflect he's placed a mark

10:19AM   21  in green on the individual in the front row wearing a light

10:19AM   22  green shirt on the photo.

10:19AM   23         BY MR TRIPI:

10:19AM   24  Q.   Let's see here.  Do you see Paul Francoforte, also known

10:20AM   25  as Hot Dog in this photo?

10:20AM   1    A.  Yes.

10:20AM   2    Q.  Can you make a mark on him, please?

10:20AM   3       All right.  I thought I changed the color, but we have

10:20AM   4    another green mark placed on the individual whose left hand

10:20AM   5    is on the shoulder of Todaro Sr.  Is that an accurate

10:20AM   6    description, Agent Ryan?

10:20AM   7    A.  Yes.

10:20AM   8    Q.  He's wearing a tan shirt?

10:20AM   9    A.  Yes.

10:20AM   10   Q.  And you've made a now plus mark on him, correct?

10:20AM   11   A.  Yes.

10:20AM   12   Q.  Okay.  Is that the same person whose phone number was in

10:20AM   13   that DARTS entry -- withdrawn -- in that subscriber subpoena

10:20AM   14   response we just looked at?

10:20AM   15   A.  Yes.

10:20AM   16   Q.  Is that the same person who wrote Mr. Bongiovanni a

10:20AM   17   wedding card?

10:20AM   18   A.  Yes.

10:20AM   19          **MR. TRIPI:**  Okay.  We can take that down,

10:20AM   20   Ms. Champoux.  Thank you.

10:20AM   21          **BY MR. TRIPI:**

10:21AM   22   Q.  We had just read stipulation Court Exhibit 6.  Exhibit

10:21AM   23   109F is in evidence.  You reviewed Mr. Bongiovanni's contacts

10:21AM   24   that were in his phone?

10:21AM   25   A.  Yes.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

| | | |
|---|---|---|
| 10:21AM | 1 | **MR. TRIPI:** Ms. Champoux, let's pull up Exhibit 109F. |
| 10:21AM | 2 | **BY MR. TRIPI:** |
| 10:21AM | 3 | Q. And you see contact number 1 listed on Exhibit 109F? |
| 10:21AM | 4 | A. I do. |
| 10:21AM | 5 | Q. And who is that? |
| 10:21AM | 6 | A. It says Louie. |
| 10:21AM | 7 | Q. And is that the phone number for Mr. Selva? |
| 10:21AM | 8 | A. It is. |
| 10:21AM | 9 | **MR. TRIPI:** Ms. Champoux, can we go back for a moment |
| 10:22AM | 10 | to Government Exhibit 8A? |
| 10:22AM | 11 | And can you control F the last name Selva? I |
| 10:22AM | 12 | apologize, I don't have a page number, but I think there |
| 10:22AM | 13 | should be only one entry. |
| 10:22AM | 14 | **BY MR. TRIPI:** |
| 10:22AM | 15 | Q. Okay. We're now at Exhibit 8A on page 197. Do you |
| 10:22AM | 16 | recognize this to be an administrative subpoena response? |
| 10:22AM | 17 | A. Yes. |
| 10:22AM | 18 | Q. That's in file C2-13-0026? |
| 10:22AM | 19 | A. Yes. |
| 10:22AM | 20 | Q. Is that for Lou Selva, and his phone number 903-1654? |
| 10:22AM | 21 | A. Yes. |
| 10:22AM | 22 | Q. That's the person that the defendant told you he was |
| 10:22AM | 23 | friends with during his interview? |
| 10:22AM | 24 | A. Yes. |
| 10:22AM | 25 | Q. Let's go back now to Exhibit 109F, please. Is that the |

| | | |
|---|---|---|
| 10:22AM | 1 | same phone number the defendant had? |
| 10:23AM | 2 | A.  Yes. |
| 10:23AM | 3 | Q.  Again, that administrative subpoena response for |
| 10:23AM | 4 | Mr. Selva, is that sufficient to get Mr. Selva's phone number |
| 10:23AM | 5 | in DARTS? |
| 10:23AM | 6 | A.  The entry, yes.  The -- the requesting of the subpoena |
| 10:23AM | 7 | is, yes. |
| 10:23AM | 8 | Q.  Because the administrative subpoena is run through DARTS, |
| 10:23AM | 9 | correct? |
| 10:23AM | 10 | A.  They're generated through the DARTS system, yes. |
| 10:23AM | 11 | Q.  And is that sufficient to be able to make sure that the |
| 10:23AM | 12 | agent associated with the entry, in this case |
| 10:23AM | 13 | Mr. Bongiovanni, would be notified if Mr. Selva's phone |
| 10:23AM | 14 | number was ever on a wiretap? |
| 10:23AM | 15 | A.  Yes. |
| 10:23AM | 16 | Q.  Do you enter any of your close personal friends in DARTS? |
| 10:23AM | 17 | A.  No. |
| 10:23AM | 18 | **MR. TRIPI:**  At this point, Ms. Champoux, can we go |
| 10:23AM | 19 | down to Government Exhibit 109F?  Go to entry number 49 back |
| 10:24AM | 20 | to Hot Dog for a moment. |
| 10:24AM | 21 | Can we zoom in on that? |
| 10:24AM | 22 | **BY MR. TRIPI:** |
| 10:24AM | 23 | Q.  Again, did Mr. Bongiovanni have the personal phone number |
| 10:24AM | 24 | for Hot Dog in his phone? |
| 10:24AM | 25 | A.  Yes. |

10:24AM    1    Q.   Is that the same phone number that he subpoenaed that we

10:24AM    2    looked at a moment ago?

10:24AM    3    A.   Yes.

10:24AM    4    Q.   Now you've also reviewed contacts from Mr. Serio, one of

10:24AM    5    Mr. Serio's phones; is that right?

10:24AM    6    A.   Yes.

10:24AM    7    Q.   Did Mr. Serio also have the contact information with this

10:24AM    8    same phone number for Hot Dog in his phone?

10:24AM    9    A.   He did.

10:24AM   10    Q.   Did Mr. Serio have the same contact information and phone

10:24AM   11    number for Lou Selva in his phone?

10:24AM   12    A.   Yes.

10:24AM   13         **MR. TRIPI:**  Could we go to Exhibit 109F entry number

10:24AM   14    72, please?

10:24AM   15         **BY MR. TRIPI:**

10:25AM   16    Q.   Is there an entry for Parisi there?

10:25AM   17    A.   Yes.

10:25AM   18    Q.   And in Mr. Serio's phone, did you review that, was there

10:25AM   19    an entry for a Frank Parisi with that same phone number?

10:25AM   20    A.   Yes.

10:25AM   21         **MR. TRIPI:**  Can we go to 109F number 6?

10:25AM   22         **BY MR. TRIPI:**

10:25AM   23    Q.   Do you know through this investigation Mr. Bongiovanni to

10:25AM   24    have a sister-in-law named Ashley Schuh?

10:25AM   25    A.   Yes.

| 10:25AM | 1  | Q.  Do you see an entry for an Ashley in record number 6 in |
| 10:25AM | 2  | his contact list? |
| 10:25AM | 3  | A.  Yes. |
| 10:25AM | 4  | Q.  Did Mr. Serio in the contacts of his phone have an Ash S |
| 10:25AM | 5  | with the same phone number? |
| 10:25AM | 6  | A.  Yes. |
| 10:25AM | 7  | MR. TRIPI:  Can we go to 109F at number 5, please? |
| 10:25AM | 8  | BY MR. TRIPI: |
| 10:25AM | 9  | Q.  Are you familiar with the name Angelo Natale in this |
| 10:25AM | 10 | investigation? |
| 10:25AM | 11 | A.  Yes. |
| 10:25AM | 12 | Q.  Do you see a phone number there for a person named |
| 10:26AM | 13 | Angelo? |
| 10:26AM | 14 | A.  Yes. |
| 10:26AM | 15 | Q.  When you looked at Mr. Serio's contacts from his phone, |
| 10:26AM | 16 | did he have an Angelo Natale in his contacts with that same |
| 10:26AM | 17 | phone number? |
| 10:26AM | 18 | A.  Yes. |
| 10:26AM | 19 | MR. TRIPI:  Could we go to entry number 68 please in |
| 10:26AM | 20 | 109F? |
| 10:26AM | 21 | BY MR. TRIPI: |
| 10:26AM | 22 | Q.  Do you see an entry there for Mike Sinatra? |
| 10:26AM | 23 | A.  Yes. |
| 10:26AM | 24 | Q.  Is that the Mike Sinatra who HSI executed a search |
| 10:26AM | 25 | warrant at his residence on January 28th, 2019? |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

| | | |
|---|---|---|
| 10:26AM | 1 | A.  Yes. |
| 10:26AM | 2 | **MR. TRIPI:**  Can we go to number 82, please? |
| 10:26AM | 3 | **BY MR. TRIPI:** |
| 10:26AM | 4 | Q.  Do you see an entry for T-H-O-M-A-D Napoli? |
| 10:26AM | 5 | A.  I do. |
| 10:26AM | 6 | Q.  Do you believe that to be Thomas Napoli, just a typo? |
| 10:26AM | 7 | A.  Yes. |
| 10:26AM | 8 | Q.  Thomas Napoli is someone we've seen in several photos, in |
| 10:26AM | 9 | particular 126, that we looked at yesterday? |
| 10:27AM | 10 | A.  Yes. |
| 10:27AM | 11 | **MR. TRIPI:**  Below that, can we go to the next entry, |
| 10:27AM | 12 | number 83? |
| 10:27AM | 13 | **BY MR. TRIPI:** |
| 10:27AM | 14 | Q.  Do you see an entry for Doctor Tommy? |
| 10:27AM | 15 | A.  Yes. |
| 10:27AM | 16 | Q.  Did we see Tom Doctor in photo and Exhibit 127 yesterday? |
| 10:27AM | 17 | A.  Yes. |
| 10:27AM | 18 | Q.  Okay.  I won't show those again. |
| 10:27AM | 19 | **MR. TRIPI:**  Okay.  We can take 109F down, please. |
| 10:27AM | 20 | **BY MR. TRIPI:** |
| 10:27AM | 21 | Q.  Yesterday we talked a little bit about your participation |
| 10:27AM | 22 | in the search of Pharaoh's Gentlemen's Club; do you remember |
| 10:27AM | 23 | that? |
| 10:27AM | 24 | A.  Yes, I do. |
| 10:27AM | 25 | Q.  Now, during the course of your investigation, subsequent |

| | | |
|---|---|---|
| 10:27AM | 1 | to the execution of that search warrant, did you acquire |
| 10:27AM | 2 | various photos online and subpoena records regarding |
| 10:28AM | 3 | photographs that were of individuals inside Pharaoh's? |
| 10:28AM | 4 | A.  Yes. |
| 10:28AM | 5 | Q.  Generally, just to clarify the timeline, before the |
| 10:28AM | 6 | search warrant at Pharaoh's and at Mr. Gerace's residence on |
| 10:28AM | 7 | December 12th, 2019, fair to say Ms. Nigro had not been |
| 10:28AM | 8 | interviewed as part of this investigation? |
| 10:28AM | 9 | A.  She had not. |
| 10:28AM | 10 | Q.  So none of her information was part of how you got the |
| 10:28AM | 11 | search warrants, right? |
| 10:28AM | 12 | A.  That's correct. |
| 10:28AM | 13 | Q.  When you did start, when law enforcement did start |
| 10:28AM | 14 | interviewing her, did she provide certain information |
| 10:28AM | 15 | regarding individuals who frequented Pharaoh's? |
| 10:28AM | 16 | A.  Yes. |
| 10:28AM | 17 | Q.  Did you see some of the photos of people that she |
| 10:28AM | 18 | mentioned in the photos that you acquired? |
| 10:28AM | 19 | A.  Yes. |
| 10:28AM | 20 | Q.  Did that include some of the -- an attorney she |
| 10:28AM | 21 | mentioned? |
| 10:28AM | 22 | A.  Yes. |
| 10:28AM | 23 | Q.  In the texts in Mr. Gerace's phone, did he have other |
| 10:29AM | 24 | text threads that Special Agent Halliday reviewed and you |
| 10:29AM | 25 | later became aware of? |

10:29AM   1    A.  Yes.

10:29AM   2    Q.  Did -- did Gerace's phone contain text threads between

10:29AM   3    him and former New York State Supreme Court Judge John

10:29AM   4    Michalski?

10:29AM   5    A.  Yes.

10:29AM   6    Q.  I'd like to ask you a little bit about Mr. Bongiovanni's

10:29AM   7    partner at the DEA, Joseph Palmieri, okay?

10:29AM   8    A.  Okay.

10:29AM   9    Q.  Along the way, did he also become a subject of the

10:30AM  10    investigation?

10:30AM  11    A.  Yes.

10:30AM  12    Q.  Was he notified by letter that he was a subject of the

10:30AM  13    investigation?

10:30AM  14    A.  Yes.

10:30AM  15    Q.  Did you participate in several interviews of him?

10:30AM  16    A.  Yes.

10:30AM  17    Q.  What was his demeanor during the interviews you

10:30AM  18    conducted?

10:30AM  19    A.  Evasive.

10:30AM  20    Q.  Did he get -- did he take a polygraph?

10:30AM  21    A.  Yes.

10:30AM  22    Q.  Did he talk to you any more after that?

10:30AM  23    A.  No.

10:30AM  24    Q.  Did you acquire a search warrant and search his

10:30AM  25    residence?

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

37

10:30AM    1    A.  Yes.

10:30AM    2    Q.  Did another person who had worked with Bongiovanni at

10:30AM    3    DEA, Special Agent Mike Hill, become a subject of

10:30AM    4    investigation after he was interviewed?

10:30AM    5    A.  Yes.

10:30AM    6    Q.  Did he receive a notification that he was a subject of

10:30AM    7    this investigation?

10:30AM    8    A.  Yes.

10:30AM    9    Q.  Did Special Agent Greg Yensan who had worked with the

10:30AM    10   defendant and later became his supervisor, did he submit to a

10:30AM    11   series of interviews?

10:30AM    12   A.  Yes.

10:30AM    13   Q.  Was he later informed he was a subject of the

10:30AM    14   investigation?

10:30AM    15   A.  Yes.

10:30AM    16   Q.  Specifically was Palmieri, the one that we looked at

10:31AM    17   yesterday, that pulled the Wayne Anderson arrest reports in

10:31AM    18   that file?

10:31AM    19   A.  Yes.

10:31AM    20   Q.  Specifically the Wayne Anderson report, the day after

10:31AM    21   Wayne Anderson's arrest?

10:31AM    22   A.  Yes.

10:31AM    23   Q.  Was Mike Hill one of the case agents on the 2004 Mike

10:31AM    24   Masecchia case that had Mr. Bongiovanni listed as an "other

10:31AM    25   officer?"

10:31AM   1   A.  Yes.

10:31AM   2   Q.  Did Greg Yensan have some involvement, as far as you

10:31AM   3   understood it, in C2-13-0026?

10:31AM   4   A.  Yes.

10:31AM   5   Q.  Were all three of them interviewed and asked questions

10:31AM   6   about their knowledge of Bongiovanni's activities?

10:31AM   7   A.  Yes.

10:31AM   8   Q.  In the context of those questions, were all three of them

10:31AM   9   evasive?

10:31AM  10   A.  Yes.

10:32AM  11   Q.  How would you contrast their demeanor to the interviews

10:32AM  12   of Dave Leary, Shane Nastoff, and other DEA personnel?

10:32AM  13        **MR. MacKAY:**  Objection.

10:32AM  14        **THE COURT:**  Sustained.

10:32AM  15        **BY MR. TRIPI:**

10:32AM  16   Q.  Do you believe Shane Nastoff was ever evasive?

10:32AM  17        **MR. MacKAY:**  Objection.

10:32AM  18        **THE COURT:**  Sustained.

10:32AM  19        **BY MR. TRIPI:**

10:32AM  20   Q.  Did you interview Shane Nastoff?

10:32AM  21   A.  No.

10:32AM  22   Q.  Okay.  Earlier I asked you about Lou Selva.  And you had

10:32AM  23   talked about him being nervous and scared; do you remember

10:32AM  24   that?

10:32AM  25   A.  Yes.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

| | | |
|---|---|---|
| 10:32AM | 1 | Q. Now, after the search warrant at Mr. Bongiovanni's |
| 10:33AM | 2 | residence, and then after the search warrant at Mr. Selva's |
| 10:33AM | 3 | residence, did you make a decision to not attempt to use |
| 10:33AM | 4 | Mr. Selva to make recordings regarding Mr. Bongiovanni? |
| 10:33AM | 5 | A. Yes. |
| 10:33AM | 6 | Q. Can you explain why you didn't think that would be an |
| 10:33AM | 7 | effective strategy for this investigation? |
| 10:33AM | 8 | A. Given his demeanor, I didn't think he was capable of it. |
| 10:33AM | 9 | Q. Was he nervous? |
| 10:33AM | 10 | A. Yes. |
| 10:33AM | 11 | Q. As far as you understood it through working with this |
| 10:33AM | 12 | defendant and being a member of law enforcement, did you |
| 10:33AM | 13 | believe the defendant was trained in handling sources and the |
| 10:33AM | 14 | methods that law enforcement used to wire up people? |
| 10:33AM | 15 | A. Yes. |
| 10:33AM | 16 | Q. Did that create an additional challenge to the |
| 10:33AM | 17 | investigation? |
| 10:33AM | 18 | A. Yes. |
| 10:33AM | 19 | Q. Did that combination cause you to not try that technique |
| 10:33AM | 20 | with Mr. Selva? |
| 10:33AM | 21 | A. Yes. |
| 10:33AM | 22 | Q. Did you believe you would be able to get the defendant in |
| 10:34AM | 23 | a controlled situation with Mr. Selva? |
| 10:34AM | 24 | **MR. MacKAY:** Objection, speculation. |
| 10:34AM | 25 | **THE COURT:** Sustained. |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

40

10:34AM    1           **MR. TRIPI:**  It's his own belief, it's his own

10:34AM    2    investigation.  Can I argue it, Judge?

10:34AM    3           **THE COURT:**  Sure, come on up.

10:34AM    4           (Sidebar discussion held on the record.)

10:34AM    5           **THE COURT:**  I'll tell you, a lot of the stuff that

10:34AM    6    you're doing, the defense is not objecting.  But evasive, for

10:34AM    7    instance, is not an observation about how someone is behaving.

10:34AM    8    It's --

10:34AM    9           **MR TRIPI:**  I believe--

10:34AM   10           **THE COURT:**  -- it's an observation about whether

10:34AM   11    their answers are truthful or consistent, or whether they're

10:34AM   12    trying to avoid answering questions.  So I don't think that is

10:34AM   13    fair game.

10:34AM   14           **MR. TRIPI:**  Judge, I--

10:34AM   15           **THE COURT:**  But there haven't been any objection.

10:34AM   16           **MR. TRIPI:**  Respectfully, I've gotten that type of

10:34AM   17    testimony in at dozens of trials, so you may have a different

10:35AM   18    view, but I think it's within a 701 opinion, firmly.

10:35AM   19           **THE COURT:**  Evasive?

10:35AM   20           **MR. TRIPI:**  Yeah.  When you're asking questions.  If

10:35AM   21    you ask me questions, Judge, and I don't answer you, you can

10:35AM   22    form an opinion I'm being evasive.

10:35AM   23           **THE COURT:**  I don't know.

10:35AM   24           **MR. TRIPI:**  You've probably done that at times

10:35AM   25    sitting on the bench in terms of you're asking questions to

10:35AM  1    parties and they're not answering your questions.  And you

10:35AM  2    say -- you form a belief that they're being evasive, and you

10:35AM  3    say, answer my question.

10:35AM  4            I think I've been on the other side of some of those.

10:35AM  5            **THE COURT:**  Maybe.  Maybe.  But anyway, so let's talk

10:35AM  6    about this one.

10:35AM  7            **MR. TRIPI:**  Okay.  So, can you refresh my memory why

10:35AM  8    we -- oh, what was the objection?

10:35AM  9            **MR. MacKAY:**  About --

10:35AM  10           **THE COURT:**  Whether he thought he could get

10:35AM  11   Bongiovanni --

10:35AM  12           **MR. TRIPI:**  It might be a foundational issue, Judge.

10:35AM  13   I did go right to the question.  But they crossed another

10:35AM  14   witness, and I think they opened on no recordings and stuff

10:35AM  15   like that.  And so --

10:35AM  16           **THE COURT:**  He's already said that he --

10:35AM  17           **MR. TRIPI:**  He didn't use the tactic, but I think a

10:35AM  18   little explanation about why beyond, you know, you have to be

10:35AM  19   in a controlled -- I can certainly lay more foundation, but

10:36AM  20   you have to be in a controlled environment controlled by law

10:36AM  21   enforcement, and where I'm driving at is that he -- part of

10:36AM  22   his assessment is he didn't think he would be able -- after

10:36AM  23   the search warrant at Selva's house, he didn't think he'd be

10:36AM  24   able to create a scenario that was controlled and safe.  And I

10:36AM  25   don't have to use the word "safe," but controlled by law

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

42

10:36AM    1    enforcement to be able to use that tactic.

10:36AM    2           Now I've got pieces of it out, but that was sort of

10:36AM    3    the last prong that I wanted to cover.

10:36AM    4           **THE COURT:**  Okay.  If you want to try to lay more

10:36AM    5    foundation, I'll --

10:36AM    6           **MR. TRIPI:**  Okay.

10:36AM    7           **THE COURT:**  -- I'll consider it.  But I don't think

10:36AM    8    there's enough there.

10:36AM    9           Go ahead, Mr. --

10:36AM    10          **MR. MacKAY:**  And the objection I think, too, is that

10:36AM    11   it's sort of pre-loading the answer of that when we think

10:36AM    12   we're gonna do that because we think we're gonna trip him up

10:36AM    13   he's gonna be guilty.  It sort of front loads that assumption

10:36AM    14   to the jury that they're trying to catch him in something, and

10:36AM    15   that -- it's inserting his belief that he believes he's

10:36AM    16   guilty, and he's gonna try to set that up.

10:36AM    17          **MR. TRIPI:**  I'll try to lay more foundation, Judge --

10:36AM    18          **THE COURT:**  Go ahead.

10:37AM    19          **MR. TRIPI:**  -- and I'll move on if we can't.

10:37AM    20          **THE COURT:**  Okay.

10:37AM    21          (End of sidebar discussion.)

10:37AM    22          **BY MR. TRIPI:**

10:37AM    23   Q.  All right.  I'd like to try to ask you a couple more

10:37AM    24   questions on the issue of controlled recordings using Lou

10:37AM    25   Selva.  Okay?

10:37AM    1    You've talked a little bit about some of your

10:37AM    2    decisionmaking process, but let me step back for a second.

10:37AM    3    When you use that law enforcement technique, is -- do you

10:37AM    4    have to ensure the safety of the operation?

10:37AM    5    A.  Yes.

10:37AM    6    Q.  Is part of ensuring the safety of the operation, does it

10:37AM    7    relate to law enforcement being able to control the scenario

10:37AM    8    where the person with the recording and the person who you

10:37AM    9    want to record will be situated?

10:37AM   10    A.  Yes.

10:37AM   11    Q.  Generally can you describe for the jury, just in a

10:37AM   12    general case, how that's done?

10:37AM   13    A.  Primarily, by trying to always dictate the location so

10:37AM   14    that it's a location that law enforcement, the cover team,

10:38AM   15    has advanced notice of.

10:38AM   16    Q.  What do you mean by "cover team?"

10:38AM   17    A.  The people closest to either an undercover agent or the

10:38AM   18    person cooperating with law enforcement.

10:38AM   19    Q.  Is that for safety purposes?

10:38AM   20    A.  They're primarily responsible for the safety of the

10:38AM   21    person in the covert role.

10:38AM   22    Q.  Okay.  And generally speaking, could this be a dangerous

10:38AM   23    technique to utilize?

10:38AM   24    A.  Yes.

10:38AM   25    Q.  Now, did -- did -- did those considerations factor also

10:38AM    1    into your decisionmaking ability or your decision making with

10:38AM    2    respect to whether you were going to ask Mr. Selva to try

10:38AM    3    that technique with the defendant?

10:38AM    4         **MR. MacKAY:**  Same objection, Judge.

10:38AM    5         **THE COURT:**  Yeah, sustained.

10:38AM    6         **BY MR. TRIPI:**

10:38AM    7    Q.  Okay.  Ultimately, you didn't use that technique for the

10:38AM    8    reasons that you've at least stated already?

10:38AM    9    A.  Yes.

10:38AM    10        **MR. MacKAY:**  Same objection, Judge.

10:38AM    11        **MR. TRIPI:**  He's answered some portions of it.

10:38AM    12        **THE COURT:**  That's overruled.

10:38AM    13        **MR. MacKAY:**  The remainder, I thought he said, for

10:39AM    14   the reasons you just stated.

10:39AM    15        **MR. TRIPI:**  He had answered some of it earlier,

10:39AM    16   Your Honor.

10:39AM    17        **THE COURT:**  No, so -- so, ultimately, you didn't use

10:39AM    18   that technique is fine.

10:39AM    19        For the same reasons, no, that's the same objection

10:39AM    20   and that is sustained.

10:39AM    21        So the jury will strike that answer.

10:39AM    22        You can ask another question, but not that question.

10:39AM    23        **MR. TRIPI:**  Okay.

10:39AM    24        **BY MR. TRIPI:**

10:39AM    25   Q.  All right.  We're going to move on, okay?

10:39AM   1    All right.  I'd like to get back to the file that was

10:39AM   2   seized on June 6th, 2019.  Okay?

10:39AM   3   A.  Yes.

10:39AM   4   Q.  Okay.  Government Exhibit 100A is in evidence.  Are there

10:39AM   5   a couple documents that were originally in 100A that at

10:39AM   6   various other proceedings got marked separately?

10:39AM   7   A.  Yes.

10:39AM   8   Q.  So I'd like to show you those documents if I can now and

10:39AM   9   ask you a few questions.  Okay?

10:40AM  10    First I'm going to hand up, for the record, Government

10:40AM  11   Exhibit 100E-1 and 100F-1.  Do you need to see those?

10:40AM  12        **MR. TRIPI:**  All right.  Judge, I'm handing up 100E-1

10:40AM  13   and 100F-1.

10:40AM  14        I'm also handing up 100A, which is already in

10:40AM  15   evidence.

10:40AM  16        **BY MR. TRIPI:**

10:40AM  17   Q.  Do you recognize 100E-1 and 100F-1 to be documents that

10:41AM  18   are marked separately, but were also part of the original

10:41AM  19   case file that was recovered from the defendant's residence?

10:41AM  20   A.  Yes.

10:41AM  21        **MR. TRIPI:**  The government offers 100E-1 and 100F-1,

10:41AM  22   Your Honor.

10:41AM  23        **MR. MacKAY:**  No objection.

10:41AM  24        **THE COURT:**  Received without objection.

10:41AM  25   **(GOV Exhibits 100E-1 and 100F-1 were received in evidence.)**

| | | |
|---|---|---|
| 10:41AM | 1 | **MR. MacKAY:**  Judge, is it possible we could |
| 10:41AM | 2 | potentially take a comfort break? |
| 10:41AM | 3 | **THE COURT:**  Sure, absolutely.  So let's take -- |
| 10:41AM | 4 | **MR. TRIPI:**  No objection. |
| 10:41AM | 5 | **THE COURT:**  Yeah.  Let's take our morning break right |
| 10:41AM | 6 | now.  Remember my instructions about not communicating about |
| 10:41AM | 7 | the case even with each other, and not making up your mind. |
| 10:41AM | 8 | See you back here in about 15 minutes. |
| 10:41AM | 9 | (Jury excused at 10:41 a.m.) |
| 10:42AM | 10 | **THE COURT:**  Okay, anything for the record? |
| 10:42AM | 11 | **MR. TRIPI:**  No, Your Honor. |
| 10:42AM | 12 | **THE COURT:**  Anything? |
| 10:42AM | 13 | **MR. MacKAY:**  No, Judge.  Thank you. |
| 10:42AM | 14 | Mr. Bongiovanni just -- |
| 10:42AM | 15 | **THE COURT:**  That's fine. |
| 10:42AM | 16 | **THE DEFENDANT:**  Thank you, Your Honor. |
| 10:42AM | 17 | **THE CLERK:**  All rise. |
| 10:42AM | 18 | (Off the record at 10:42 a.m.) |
| 11:02AM | 19 | (Back on the record at 11:02 a.m.) |
| 11:02AM | 20 | (Jury not present.) |
| 11:02AM | 21 | **THE CLERK:**  All rise. |
| 11:02AM | 22 | **THE COURT:**  We are back on the record for the |
| 11:02AM | 23 | continuation of the jury trial in case number 19-cr-227, |
| 11:02AM | 24 | United States of America versus Joseph Bongiovanni. |
| 11:02AM | 25 | All counsel and parties are present. |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24
47

| | | |
|---|---|---|
| 11:03AM | 1 | (Jury seated at 11:03 a.m.) |
| 11:03AM | 2 | **THE COURT:**  Okay.  The record will reflect that all |
| 11:03AM | 3 | our jurors are present. |
| 11:03AM | 4 | I have a couple requests from you folks on the jury. |
| 11:03AM | 5 | First, you've asked whether you can wear Buffalo Bills gear |
| 11:03AM | 6 | tomorrow.  The answer to that is:  Yes, you're welcome to. |
| 11:03AM | 7 | And question number 2 is that one of the jurors has a |
| 11:03AM | 8 | reservation for dinner and an overnight stay at Salvatore's |
| 11:03AM | 9 | next week, and the question is whether she can keep that |
| 11:03AM | 10 | reservation because the trial is ongoing, and I've instructed |
| 11:03AM | 11 | you not to visit places that have been mentioned. |
| 11:03AM | 12 | We've talked about it.  There's no reason not to do |
| 11:03AM | 13 | that.  I don't know which of the jurors has that request, but |
| 11:04AM | 14 | there's no reason for you not to go.  There's nothing about |
| 11:04AM | 15 | that place that might, we don't think, that might affect your |
| 11:04AM | 16 | ability to be fair. |
| 11:04AM | 17 | Anything you see, obviously, if there's something |
| 11:04AM | 18 | that changes as a result of your going there, let us know. |
| 11:04AM | 19 | But we don't -- none of the lawyers nor I see any reason why |
| 11:04AM | 20 | you can't go there.  So the answer is:  Yes, you can go. |
| 11:04AM | 21 | I remind the witness he's still under oath. |
| 11:04AM | 22 | And, Mr. Tripi, you may continue. |
| 11:04AM | 23 | **MR. TRIPI:**  Thank you, Your Honor. |
| 11:04AM | 24 | **BY MR. TRIPI:** |
| 11:04AM | 25 | Q.  Earlier I handed up Government Exhibit 100A.  I just want |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

48

| | | |
|---|---|---|
| 11:04AM | 1 | to ask you a few more questions about that. |
| 11:04AM | 2 | Regarding the documents that are -- that are in the file, |
| 11:04AM | 3 | including 100A, 100E-1 and 100F-1, did you and Special Agent |
| 11:04AM | 4 | Halliday work together to scan the documents and to |
| 11:04AM | 5 | potentially try to make it easier to review them in court as |
| 11:05AM | 6 | opposed to thumbing through each of the documents? |
| 11:05AM | 7 | A.  Yes. |
| 11:05AM | 8 | Q.  And when you did that, did you try to organize the |
| 11:05AM | 9 | documents that were in there in a way that made it logical? |
| 11:05AM | 10 | A.  Yes. |
| 11:05AM | 11 | Q.  However, sometimes did you scan documents that might not |
| 11:05AM | 12 | belong in the same PDF, for lack of a better ways to phrase |
| 11:05AM | 13 | it? |
| 11:05AM | 14 | A.  Possibly, yes. |
| 11:05AM | 15 | Q.  Okay.  Now, this Government Exhibit 100A.1 is already in |
| 11:05AM | 16 | evidence, but is that the exhibit that was generated in terms |
| 11:05AM | 17 | of the PDF scans that you and Special Agent Halliday did? |
| 11:05AM | 18 | A.  Yes. |
| 11:05AM | 19 | **MR. TRIPI:**  If we could, please, bring up |
| 11:05AM | 20 | Exhibit 100A.1. |
| 11:05AM | 21 | **BY MR. TRIPI:** |
| 11:05AM | 22 | Q.  And are these the scans that you guys created? |
| 11:05AM | 23 | A.  Yes. |
| 11:05AM | 24 | Q.  All right.  I'd like to work through just a couple of |
| 11:05AM | 25 | these.  Okay? |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

49

| | | |
|---|---|---|
| 11:05AM | 1 | First of all, before I get into specific documents, in |
| 11:06AM | 2 | terms of your work as a trained agent at the DEA and Homeland |
| 11:06AM | 3 | Security, by monitoring a lead phone, does that -- of an |
| 11:06AM | 4 | organization, does that usually also help you get to the |
| 11:06AM | 5 | subordinates of the organization? |
| 11:06AM | 6 | A.  Something bumped and I wasn't able to hear the middle of |
| 11:06AM | 7 | your question, I'm sorry. |
| 11:06AM | 8 | Q.  By monitoring -- if you were to get a wiretap to monitor |
| 11:06AM | 9 | a lead phone of a leader of an organization, does that also |
| 11:06AM | 10 | help you to get to the subordinates in the organization who |
| 11:06AM | 11 | are in contact with the leadership? |
| 11:06AM | 12 | A.  Yes, it could. |
| 11:06AM | 13 | Q.  And it is a main goal and objective usually in an |
| 11:06AM | 14 | investigation to get to the leadership's phones? |
| 11:06AM | 15 | A.  Yes. |
| 11:06AM | 16 | Q.  For a wiretap? |
| 11:06AM | 17 | A.  Yes. |
| 11:06AM | 18 | Q.  And we've heard a lot about that, but is that a lengthy |
| 11:06AM | 19 | process of doing enough investigation to get up to a wiretap? |
| 11:06AM | 20 | A.  Yes. |
| 11:07AM | 21 | Q.  Okay. |
| 11:07AM | 22 |     MR. TRIPI:  Now, Ms. Champoux, I'd like you to click |
| 11:07AM | 23 | on the PDF that's labeled, there's a long number in front of |
| 11:07AM | 24 | it, but Serio toll analysis.  Do you see that?  Right there. |
| 11:07AM | 25 | Serio T, toll analysis.  All right. |

|          |    |                                                                  |
|----------|----|------------------------------------------------------------------|
| 11:07AM  | 1  | **BY MR. TRIPI:**                                                 |
| 11:07AM  | 2  | Q.  Do you see this document that was recovered in the file      |
| 11:07AM  | 3  | that was in the defendant's residence?                           |
| 11:07AM  | 4  | A.  Yes.                                                         |
| 11:07AM  | 5  | Q.  Are you familiar generally, with these types of             |
| 11:07AM  | 6  | documents?                                                       |
| 11:07AM  | 7  | A.  Yes.                                                         |
| 11:07AM  | 8  | Q.  What does this appear to be to you, based on your time at    |
| 11:07AM  | 9  | DEA Buffalo office?                                               |
| 11:07AM  | 10 | A.  It's the subscriber report for -- generated from subpoena   |
| 11:07AM  | 11 | results.                                                         |
| 11:07AM  | 12 | Q.  And the way, in the ordinary course and practice at DEA     |
| 11:07AM  | 13 | Buffalo, do intel analysts work with case agents and special    |
| 11:08AM  | 14 | agents to subpoena phone records and create these types of      |
| 11:08AM  | 15 | reports?                                                         |
| 11:08AM  | 16 | A.  Yes.  And then this one is what we would typically -- the    |
| 11:08AM  | 17 | jargon for it is a "hot sheet."  So, it goes from most-dialed    |
| 11:08AM  | 18 | number to least-dialed number from the target phone for         |
| 11:08AM  | 19 | whatever the period of tolls is.                                 |
| 11:08AM  | 20 | Q.  So, you're talking about this row here that talks about      |
| 11:08AM  | 21 | frequency?                                                       |
| 11:08AM  | 22 | A.  Yes.                                                         |
| 11:08AM  | 23 | Q.  And that number in there is the number of contacts that     |
| 11:08AM  | 24 | the target number has with the phone number listed in the       |
| 11:08AM  | 25 | chart?                                                           |

11:08AM     1    A.  Yes.

11:08AM     2    Q.  And this particular hot number list, it relates to a

11:08AM     3    phone number 561-801-0221; is that right?

11:08AM     4    A.  Yes.

11:08AM     5    Q.  And it was associated to a DEA file C2-11-0126?

11:08AM     6    A.  Yes.

11:08AM     7    Q.  Under that, there's a name Bongo; do you see that?

11:08AM     8    A.  I do.

11:08AM     9    Q.  Is that ordinary practice for the intel analyst to list

11:08AM    10    the case number and the agent on the hot sheet?

11:09AM    11    A.  Yes.

11:09AM    12    Q.  And then there's some hand-written information regarding

11:09AM    13    Thomas Serio, sort of above the spreadsheet?

11:09AM    14    A.  Yes, I see that.

11:09AM    15    Q.  Or at the top of the list, I should say?  Do you see that

11:09AM    16    there?

11:09AM    17    A.  I do.

11:09AM    18    Q.  Okay.  If we go down to entry number 15, do you see that

11:09AM    19    name, John Robinson?

11:09AM    20    A.  I do.

11:09AM    21    Q.  Do you recognize that name?

11:09AM    22    A.  Yes.

11:09AM    23    Q.  Is that someone you interviewed in the course of your

11:09AM    24    investigation of these matters?

11:09AM    25    A.  Yes.

| 11:09AM | 1 | Q. What year did you interview John Robinson? |
| 11:09AM | 2 | A. 2019, 2020 -- oh, no.  2020.  At least that late. |
| 11:09AM | 3 | Q. Did you interview him a couple of times? |
| 11:09AM | 4 | A. Yes. |
| 11:09AM | 5 | Q. By the time you went to interview John Robinson, was it |
| 11:09AM | 6 | your understanding he was a member of the Ron Serio |
| 11:09AM | 7 | trafficking organization? |
| 11:09AM | 8 | A. I mean, his name appeared several times in the file.  One |
| 11:10AM | 9 | of the reasons for locating him and interviewing him was to |
| 11:10AM | 10 | try to understand that relationship and if and how he -- |
| 11:10AM | 11 | involved he was with the Ron Serio organization. |
| 11:10AM | 12 | Q. And that was a name that, in part, you learned through |
| 11:10AM | 13 | the documents that were in Mr. Bongiovanni's basement? |
| 11:10AM | 14 | A. Yes. |
| 11:10AM | 15 | Q. All right.  Now, do you see this hot number list at the |
| 11:10AM | 16 | top, do you see run date? |
| 11:10AM | 17 | A. Yes. |
| 11:10AM | 18 | Q. What date does that say? |
| 11:10AM | 19 | A. November 30th, 2012. |
| 11:10AM | 20 | Q. And do you see the case file that that's run out of? |
| 11:10AM | 21 | A. According to the handwritten note, it's C2-11-0126. |
| 11:10AM | 22 | Q. And under that you see a name Bongo.  Was that a nickname |
| 11:11AM | 23 | for somebody in the DEA Buffalo office? |
| 11:11AM | 24 | A. Mr. Bongiovanni. |
| 11:11AM | 25 | Q. So is that an indication that this was a hot list for him |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

53

11:11AM    1    that an analyst did?

11:11AM    2    A.  Yes.

11:11AM    3    Q.  Now, what's the date that the subpoena and that hot list

11:11AM    4    was run, the run date?

11:11AM    5    A.  Oh.  November 30th, 2012.

11:11AM    6         **MR. TRIPI:**  And, Ms. Champoux, can we go to

11:11AM    7    Government Exhibit 8A at page 365?

11:11AM    8         **BY MR. TRIPI:**

11:11AM    9    Q.  Now, this is a subpoena response regarding Thomas Serio

11:11AM   10    in file C2-13-0026; is that right?

11:11AM   11    A.  Yes.

11:11AM   12    Q.  And what date is this subpoena?

11:11AM   13    A.  March 13th, 2013.

11:11AM   14    Q.  Is it the same phone number for the hot list that we just

11:12AM   15    looked at, that was in the box in the basement?

11:12AM   16    A.  Could I see the other one again, please?

11:12AM   17    Q.  Yeah, we can't toggle them next to each other, so let's

11:12AM   18    pull that back up.  We're looking again at a PDF, just for

11:12AM   19    the record, in Exhibit 100A.1, it's 5618010221 Serio T toll

11:12AM   20    analysis PDF.

11:12AM   21    A.  Yes.  It's the same number.

11:12AM   22    Q.  So, this was run out of a different file?

11:12AM   23    A.  Yes.

11:12AM   24         **MR. TRIPI:**  Let's go back to Exhibit 8A as page 365.

          25

11:13AM    1           **BY MR. TRIPI:**

11:13AM    2    Q.  Approximately five months or so later, it was subpoenaed

11:13AM    3    again in the Wayne Anderson file?

11:13AM    4    A.  Yes.

11:13AM    5           **MR. TRIPI:**  Ms. Champoux, can we go to Exhibit 8A at

11:13AM    6    page 54?  Can we scroll to page maybe 53?

11:13AM    7           **BY MR. TRIPI:**

11:13AM    8    Q.  Do you see this DEA-202 for Tom Serio?

11:13AM    9    A.  Yes.

11:13AM   10    Q.  And this is how an individual gets added to a file; is

11:13AM   11    that right?

11:13AM   12    A.  Yes.

11:13AM   13    Q.  Do you see box number 45 where it says submission,

11:13AM   14    initial?  Down at the bottom of the page?

11:13AM   15    A.  Yes.

11:13AM   16    Q.  What date was this DEA-202 in that file?

11:13AM   17        Look at box 6, please.

11:13AM   18    A.  December 24th, 2012.

11:13AM   19    Q.  So, that's approximately a month after Mr. Serio, Tom

11:14AM   20    Serio's tolls were run out of a different file?

11:14AM   21    A.  Yes.

11:14AM   22           **MR. TRIPI:**  And let's go to the signature blocks

11:14AM   23    here.  On the second page of -- we're now at page 54, we were

11:14AM   24    at page 53 of 8A, we're now at page 54.

          25

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

11:14AM    1          **BY MR. TRIPI:**

11:14AM    2    Q.   Who was the agent who submitted this 202 --

11:14AM    3    A.   Joseph --

11:14AM    4    Q.   -- on Christmas Eve in 2012?

11:14AM    5    A.   -- Joseph Bongiovanni.

11:14AM    6          **MR. TRIPI:**   And, Ms. Champoux, if we can go to page 4

11:14AM    7    of Exhibit 8A?

11:14AM    8          **BY MR. TRIPI:**

11:14AM    9    Q.   This is a case closing DEA-6 for that file; is that

11:14AM   10    right?

11:14AM   11    A.   Yes.

11:14AM   12    Q.   And Tom Serio is not indexed in the closing, correct?

11:15AM   13    A.   He's not.

11:15AM   14          **MR. TRIPI:**   Ms. Champoux, can we go to, I think, page

11:15AM   15    16.  Let's try 19.  Scroll down a little bit.

11:15AM   16          I'm sorry, I have the page number wrong.  We'll get

11:15AM   17    there in a second.

11:15AM   18          Okay.  We're at Exhibit 8A at page 22.  If you can

11:15AM   19    scroll down to the second page of that particular -- now on

11:15AM   20    page 23.  Let's go to page 24.  All right.

11:15AM   21          **BY MR. TRIPI:**

11:15AM   22    Q.   So in this DEA-6 prepared November 28th, 2012, Tom

11:15AM   23    Serio's not indexed, correct?

11:15AM   24    A.   Correct.

11:15AM   25          **MR. TRIPI:**   Ms. Champoux, can you scroll upwards, so

11:16AM    1    to the next DEA-6 in the file, and I'll call out the page

11:16AM    2    number that it is.

11:16AM    3              Scroll to the second page of that.  Third page.

11:16AM    4    Sorry.  All right.

11:16AM    5              **BY MR. TRIPI:**

11:16AM    6    Q.  There's a DEA-6 that's cross-referenced to the file

11:16AM    7    prepared January 17th, 2013.  Is Tom Serio indexed there?

11:16AM    8    A.  No.

11:16AM    9              **THE COURT:**  Can you state the page?

11:16AM   10              **MR. TRIPI:**  Oh, I'm sorry, yes, Your Honor.  We are

11:16AM   11    looking at now Exhibit 8A at page 21.

11:16AM   12              Ms. Champoux, can we go up to the earlier DEA-6 now?

11:16AM   13    Okay.  Let's stop there.

11:16AM   14              **BY MR. TRIPI:**

11:16AM   15    Q.  There's another DEA-6 in the file, February 7th, 2013; is

11:17AM   16    that right?

11:17AM   17    A.  Yes.

11:17AM   18    Q.  And now we're looking at Exhibit 8A, page 18.  Is Tom

11:17AM   19    Serio indexed there?

11:17AM   20    A.  No.

11:17AM   21    Q.  But we just looked -- his phone number was run out of a

11:17AM   22    different file on a hot list November 30th, correct --

11:17AM   23    A.  Yes.

11:17AM   24    Q.  -- of 2012?

11:17AM   25    A.  Yes, 2012.

11:17AM   1    Q.   Okay.

11:17AM   2              MR. TRIPI:  Let's go to the next DEA-6 in the file,

11:17AM   3    Ms. Champoux.  We're going to go to page 16 and 17.

11:17AM   4              BY MR. TRIPI:

11:17AM   5    Q.   All right.  So this one is a cross-reference to the file

11:17AM   6    of a source debriefing, correct?

11:17AM   7    A.   Yes.

11:17AM   8    Q.   And this is February 22nd, 2013?

11:17AM   9    A.   Yes.

11:17AM  10              MR. TRIPI:  All right.  Let's scroll down there and

11:17AM  11    see if he's indexed.

11:17AM  12              BY MR. TRIPI:

11:17AM  13    Q.   Now on February 22nd, 2012, the author of this report

11:17AM  14    indexed Thomas Serio; is that right?

11:17AM  15    A.   Yes.

11:17AM  16    Q.   And he provided the NADDIS number and a telephone number?

11:17AM  17    A.   Yes.

11:18AM  18    Q.   And this report was written from C2-12-0090; is that

11:18AM  19    right?

11:18AM  20    A.   Yes.

11:18AM  21              MR. TRIPI:  All right.  Ms. Champoux, let's go back

11:18AM  22    to Government Exhibit 108.1, that PDF we were looking at

11:18AM  23    earlier.

11:18AM  24              BY MR. TRIPI:

11:18AM  25    Q.   Nastoff's file is a different file than the one indicated

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24
58

| | | |
|---|---|---|
| 11:18AM | 1 | in the upper right-hand corner with the word Bongo under it; |
| 11:18AM | 2 | is that correct? |
| 11:18AM | 3 | A.  Yes. |
| 11:18AM | 4 | **MR. TRIPI:**  Okay.  Let's go back to Exhibit 8A. |
| 11:18AM | 5 | **BY MR. TRIPI:** |
| 11:18AM | 6 | Q.  And for the record, this January -- February 22nd, 2013, |
| 11:18AM | 7 | DEA-6 we just looked at was authored by Special Agent |
| 11:18AM | 8 | Nastoff; is that right? |
| 11:18AM | 9 | A.  Could I see that?  Yes. |
| 11:18AM | 10 | **MR. TRIPI:**  Ms. Champoux, let's go to the next DEA-6 |
| 11:18AM | 11 | in the file.  We'll be heading to pages -- I think 13, 14, and |
| 11:18AM | 12 | 15, but let's go to the first page of that. |
| 11:18AM | 13 | **BY MR. TRIPI:** |
| 11:18AM | 14 | Q.  Okay.  Now we're looking at a DEA-6 in the Wayne Anderson |
| 11:19AM | 15 | file, which you understand to be the Serio file; correct? |
| 11:19AM | 16 | A.  Yes. |
| 11:19AM | 17 | Q.  Date prepared is May 2nd, 2013? |
| 11:19AM | 18 | A.  Yes. |
| 11:19AM | 19 | Q.  This is the initial source debriefing of who we know is |
| 11:19AM | 20 | R.K.; is that right? |
| 11:19AM | 21 | A.  Yes. |
| 11:19AM | 22 | Q.  Who's the author of this report? |
| 11:19AM | 23 | A.  Joseph Bongiovanni. |
| 11:19AM | 24 | **MR. TRIPI:**  Let's scroll. |
| 11:19AM | 25 | **THE COURT:**  What page are we on? |

11:19AM    1            MR. TRIPI:  Thank you, Judge.  We're looking at

11:19AM    2   Government Exhibit 8A at page 13.  And it's page 1 of 3 of

11:19AM    3   that DEA-6 dated May 2nd, 2013.

11:19AM    4            BY MR. TRIPI:

11:19AM    5   Q.  Now, I'm not going to have you read the whole thing, but

11:19AM    6   names that are mentioned are Ronald Serio, Thomas Serio, and

11:19AM    7   David Oddo in this source debriefing among others, correct?

11:19AM    8   A.  Yes.

11:19AM    9            MR. TRIPI:  Okay.  Let's scroll down, Ms. Champoux,

11:19AM   10   and look at the indexing.

11:19AM   11            BY MR. TRIPI:

11:19AM   12   Q.  Okay.  Now this one was authored by Mr. Bongiovanni,

11:19AM   13   correct?

11:19AM   14   A.  Yes.

11:19AM   15   Q.  We're looking at Exhibit 8A at page number 15.  What did

11:20AM   16   Mr. Bongiovanni write for Thomas Serio's NADDIS?

11:20AM   17   A.  He said it was negative.

11:20AM   18   Q.  Didn't we just look at one from February where there was

11:20AM   19   a NADDIS number that Shane Nastoff wrote in there?

11:20AM   20   A.  Yes.

11:20AM   21            MR. TRIPI:  Now let's go to the next DEA-6.

11:20AM   22            BY MR. TRIPI:

11:20AM   23   Q.  Is that the first time on a report that Mr. Bongiovanni's

11:20AM   24   authoring in terms of a DEA-6 that Mr. Serio was indexed?

11:20AM   25   A.  Yes.

| | | |
|---|---|---|
| 11:20AM | 1 | Q.  Okay.  And I should say Thomas Serio, correct? |
| 11:20AM | 2 | A.  Thomas Serio, yes. |
| 11:20AM | 3 | **MR. TRIPI:**  Keep scrolling up.  Let's go to the next |
| 11:20AM | 4 | one. |
| 11:20AM | 5 | **BY MR. TRIPI:** |
| 11:20AM | 6 | Q.  Now we're looking at June 18th, 2013, surveillance DEA-6 |
| 11:20AM | 7 | authored by Defendant Bongiovanni.  We're at Exhibit 8A at |
| 11:20AM | 8 | page 12; is that right? |
| 11:20AM | 9 | A.  Yes. |
| 11:20AM | 10 | Q.  Who's the author of this report? |
| 11:20AM | 11 | A.  Joseph Bongiovanni. |
| 11:20AM | 12 | Q.  And what did he write for Thomas Serio's NADDIS number? |
| 11:21AM | 13 | A.  That it was pending. |
| 11:21AM | 14 | Q.  But we know from Nastoff's report there was a NADDIS |
| 11:21AM | 15 | number back in February of 2013; is that right? |
| 11:21AM | 16 | A.  Yes. |
| 11:21AM | 17 | **MR. TRIPI:**  Let's go to the next DEA-6 in the file. |
| 11:21AM | 18 | **BY MR. TRIPI:** |
| 11:21AM | 19 | Q.  Is this a DEA-6 authored by the defendant September 11th, |
| 11:21AM | 20 | 2013? |
| 11:21AM | 21 | A.  Yes. |
| 11:21AM | 22 | Q.  We're looking at Exhibit 8A at page 11; is that right? |
| 11:21AM | 23 | A.  Yes. |
| 11:21AM | 24 | Q.  What did he write for Thomas Serio's NADDIS number here? |
| 11:21AM | 25 | A.  Pending. |

11:21AM    1    Q.  But again, there was one back in February already,

11:21AM    2    correct?

11:21AM    3    A.  Yes.

11:21AM    4         MR. TRIPI:  Let's go to Exhibit 8A, the next page up,

11:21AM    5    page 10.  Let's go to page 9, I'm sorry.

11:21AM    6         BY MR. TRIPI:

11:21AM    7    Q.  This is a DEA-6 case status written by Defendant

11:21AM    8    Bongiovanni on December 31st, 2013?

11:21AM    9    A.  Yes.

11:21AM   10    Q.  And we're looking at Exhibit 8A at page 9 now, right?

11:21AM   11    A.  Yes.

11:21AM   12    Q.  Is Thomas Serio referenced anywhere in the indexing?

11:22AM   13    A.  No.

11:22AM   14         MR. TRIPI:  Let's go to the next DEA-6 in the file.

11:22AM   15    Let's go to the first page of it.  We're looking now at

11:22AM   16    Exhibit 8A at page 7.

11:22AM   17         BY MR. TRIPI:

11:22AM   18    Q.  Is this a status update, excuse me, written by the

11:22AM   19    defendant April 7th, 2014?

11:22AM   20    A.  Yes.

11:22AM   21    Q.  We're at Exhibit 8A at page 7.  Does it reference Thomas

11:22AM   22    Serio at all --

11:22AM   23    A.  No.

11:22AM   24    Q.  -- in the indexing?

11:22AM   25    A.  No, it does not.

11:22AM   1              MR. TRIPI:  Let's go to Exhibit 8A at page 6.

11:22AM   2              BY MR. TRIPI:

11:22AM   3     Q.  Is this another case status written by the defendant,

11:22AM   4     this one's July 7th, 2014?

11:22AM   5     A.  Yes.

11:22AM   6     Q.  Again, this is in file C2-13-0026, correct?

11:22AM   7     A.  Yes.

11:22AM   8     Q.  Does the indexing reference Tom Serio at all?

11:22AM   9     A.  No.

11:22AM   10             MR. TRIPI:  Let's go to the next DEA-6 in the file.

11:22AM   11             BY MR. TRIPI:

11:22AM   12    Q.  Is this another case status authored by the defendant,

11:23AM   13    this one November 4th, 2014?

11:23AM   14    A.  Yes.

11:23AM   15    Q.  And we're at Exhibit 8A at page 5; is that right?

11:23AM   16    A.  Yes.

11:23AM   17    Q.  Does he index Thomas Serio at all?

11:23AM   18    A.  No.

11:23AM   19             MR. TRIPI:  And let's go to the final one in the

11:23AM   20    file.

11:23AM   21             BY MR. TRIPI:

11:23AM   22    Q.  Looking at this, is this a case closing DEA-6 authored by

11:23AM   23    the defendant, January 28th, 2015?

11:23AM   24    A.  Yes.

11:23AM   25    Q.  In this one, does he index either Ron Serio or Tom Serio?

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

| | | |
|---|---|---|
| 11:23AM | 1 | A.  No. |
| 11:23AM | 2 | **THE COURT:**  Is this page 4? |
| 11:23AM | 3 | **MR. TRIPI:**  Yes, Exhibit 8A, page 4.  Thank you, |
| 11:23AM | 4 | Your Honor. |
| 11:23AM | 5 | We can zoom out of that, close that down, |
| 11:23AM | 6 | Ms. Champoux.  Now, let's go back to Exhibit 100A.1. |
| 11:24AM | 7 | **BY MR. TRIPI:** |
| 11:24AM | 8 | Q.  You've reviewed the DARTS deconflictions that are -- that |
| 11:24AM | 9 | are scanned in this exhibit; is that correct? |
| 11:24AM | 10 | A.  Yes. |
| 11:24AM | 11 | Q.  For the DARTS deconflictions regarding -- that relate to |
| 11:24AM | 12 | Thomas Serio, Ronald Serio, do those DARTS deconflictions |
| 11:24AM | 13 | indicate that there were no -- their phones were not being |
| 11:24AM | 14 | intercepted by any wiretaps? |
| 11:24AM | 15 | A.  Yes. |
| 11:24AM | 16 | Q.  As a result, any subordinates that were in touch with |
| 11:24AM | 17 | them on those phones would not be intercepted on any |
| 11:24AM | 18 | intercepts of Thomas or Ronald Serio's phones, correct? |
| 11:24AM | 19 | A.  Correct. |
| 11:24AM | 20 | **MR. TRIPI:**  Ms. Champoux, if we can go -- there's a |
| 11:24AM | 21 | PDF labeled DARTS email 01-07-2019.  Can you find that?  Thank |
| 11:24AM | 22 | you. |
| 11:24AM | 23 | **BY MR. TRIPI:** |
| 11:24AM | 24 | Q.  We've had testimony about this, but DARTS deconflictions |
| 11:25AM | 25 | are automatic email notices; is that right? |

11:25AM    1    A.  Yes.

11:25AM    2    Q.  In order for an email to make its way to a file folder

11:25AM    3    like Exhibit 100A, what steps need to occur for a DARTS email

11:25AM    4    to make it into a file folder like this?

11:25AM    5    A.  You would have to print it.

11:25AM    6    Q.  Then what?

11:25AM    7    A.  And then, well, I mean, where we found that, take it

11:25AM    8    home.

11:25AM    9    Q.  Put it in the file?

11:25AM   10    A.  Put it in the file, take it home.

11:25AM   11    Q.  And is this a DARTS deconfliction email that the

11:25AM   12    defendant received among others on January 7th, 2019?

11:25AM   13    A.  Yes.

11:25AM   14    Q.  And do you see where it says an investigative overlap was

11:25AM   15    created by?

11:25AM   16    A.  Yes.

11:25AM   17    Q.  Can you explain for jury what that means?

11:25AM   18    A.  It means that Special Agent Casullo and Shawn Hoerner,

11:26AM   19    who was an analyst, entered something that overlapped with a

11:26AM   20    file or entered a telephone number that overlapped with, or

11:26AM   21    excuse me, it was in common with numbers that the other

11:26AM   22    people who had entered or received this email entered

11:26AM   23    previously.

11:26AM   24    Q.  So, this is a -- this is a notification, this is an

11:26AM   25    example of the deconfliction database at work?

11:26AM   1    A.  Yes.

11:26AM   2    Q.  So some -- and a phone number, Special Agent Casullo was

11:26AM   3    investigating intersected with a phone number that

11:26AM   4    Mr. Bongiovanni had caused to be put in DARTS?

11:26AM   5    A.  Yes.

11:26AM   6         MR. TRIPI:  Ms. Champoux, this is only seven pages.

11:26AM   7    Can we scroll down, please?

11:26AM   8         Okay.  Stop there.

11:26AM   9         BY MR. TRIPI:

11:26AM  10    Q.  So, we have Trinity item 1.  We've heard some testimony

11:26AM  11    about what that means, but can you remind the jury what that

11:27AM  12    is?

11:27AM  13    A.  Telephone number that was entered.

11:27AM  14    Q.  Okay.  So this is the phone number that was entered --

11:27AM  15    A.  Yes.

11:27AM  16    Q.  -- right?

11:27AM  17         And the remarks section under priority 3, that first one

11:27AM  18    across, you got the request January 7, 2019.  Does that

11:27AM  19    indicate that was the same date as the -- date as the top of

11:27AM  20    the email, correct?

11:27AM  21    A.  Yes.

11:27AM  22    Q.  Does that indicate that that's the entry that caused this

11:27AM  23    overlap?

11:27AM  24    A.  Yes.

11:27AM  25    Q.  And it gives you the case number.  And who was the

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

66

11:27AM    1    request run by?

11:27AM    2    A.   Special Agent Casullo and Shawn Hoerner.

11:27AM    3    Q.   And what was the remark?

11:27AM    4    A.   From numbers in contact with Mike Sinatra related to a

11:27AM    5    burglary and drug trafficking in Buffalo and Niagara County.

11:27AM    6    Q.   And then there's another entry related to that same file

11:27AM    7    number a couple days -- with a different request date; do you

11:28AM    8    see that?

11:28AM    9    A.   Are you talking about the next one down?

11:28AM   10    Q.   No, the one below that.

11:28AM   11    A.   Two down?  From January 3rd?

11:28AM   12    Q.   Yeah.

11:28AM   13    A.   Yes.

11:28AM   14    Q.   And was that also ran by Special Agent Casullo?

11:28AM   15    A.   Yes.

11:28AM   16    Q.   What were the remarks he put in there?

11:28AM   17    A.   Numbers related to ongoing investigation in Tonawanda,

11:28AM   18    New York, and worked jointly with HSI Buffalo.  Information

11:28AM   19    provided by TTPD Detective Campanella.

11:28AM   20         **MR. TRIPI:**  Let's scroll down.

11:28AM   21         **BY MR. TRIPI:**

11:28AM   22    Q.   We have another Trinity item here; is that right?

11:28AM   23    A.   Yes.

11:28AM   24         **MR. TRIPI:**  Can we go -- can we go down to Trinity

11:28AM   25    item 1?

| | | |
|---|---|---|
| 11:28AM | 1 | **BY MR. TRIPI:** |
| 11:28AM | 2 | Q.  With the phone number 716-866-2687, is that another |
| 11:28AM | 3 | request run January 7th, 2019, by Special Agent Casullo? |
| 11:28AM | 4 | A.  Yes. |
| 11:28AM | 5 | Q.  And he put some remarks in there? |
| 11:28AM | 6 | A.  Yes. |
| 11:28AM | 7 | Q.  Does that mean that according to what Casullo wrote, does |
| 11:29AM | 8 | that mean that this phone number, 866-2687, was a phone |
| 11:29AM | 9 | number in contact with Michael Sinatra? |
| 11:29AM | 10 | A.  Yes. |
| 11:29AM | 11 | Q.  And did Bongiovanni receive notice of that based upon |
| 11:29AM | 12 | something that he did in terms of a subpoena in 13-0026, the |
| 11:29AM | 13 | Wayne Anderson/Ron Serio file? |
| 11:29AM | 14 | A.  Yes. |
| 11:29AM | 15 | Q.  And in the remarks for that entry, what -- what did the |
| 11:29AM | 16 | analyst write, per Special Agent Bongiovanni? |
| 11:29AM | 17 | A.  Number part of ongoing narcotics investigation in contact |
| 11:29AM | 18 | with target number 716-830-3226. |
| 11:29AM | 19 | Q.  And through a review of the other DARTS entries in this |
| 11:29AM | 20 | file folder and the case, is that 830-3226 number, was that a |
| 11:29AM | 21 | phone number associated with Ron Serio? |
| 11:29AM | 22 | A.  Yes. |
| 11:30AM | 23 | Q.  Did your mic go out again? |
| 11:30AM | 24 | A.  It did, yes. |
| 11:30AM | 25 | Q.  All right. |

USA v Bongiovanni - Ryan - Tripi/Direct - 9711/24

11:30AM   1        **MR. TRIPI:**  Ms. Champoux, I'd like you to go back to

11:30AM   2   Exhibit 8A, at page 347, so we can see whose phone number is

11:30AM   3   716 -- hang on one second, let me finish, sorry -- so we can

11:30AM   4   see who phone number 866-2687 belongs to.

11:30AM   5        All right.  Now we can go to Exhibit 8A at 347.

11:30AM   6        **BY MR. TRIPI:**

11:30AM   7   Q.  So whose phone number is that?

11:30AM   8   A.  Paul Francoforte.

11:30AM   9        **MR. TRIPI:**  Ms. Champoux, can you put up this

11:30AM  10   Exhibit 393 again?

11:30AM  11        **BY MR. TRIPI:**

11:30AM  12   Q.  Is that the person with his hand on Todaro Sr.'s

11:30AM  13   shoulder --

11:30AM  14   A.  Yes.

11:30AM  15   Q.  -- in Exhibit 393?  I should make a better record.

11:31AM  16   A.  Yes.

11:31AM  17        **MR. TRIPI:**  We can take 393 down, Ms. Champoux.

11:31AM  18        And could we go back to Exhibit 100A.1?

11:31AM  19        **BY MR. TRIPI:**

11:31AM  20   Q.  As part of the work that he originally was doing for

11:31AM  21   Mr. Bongiovanni as it related to Ron Serio, did Scott Deming

11:31AM  22   provide various financial spreadsheets to Mr. Bongiovanni in

11:31AM  23   that initial investigation?

11:31AM  24   A.  Yes.

11:31AM  25        **MR. TRIPI:**  Ms. Champoux, can you go to a PDF called

11:31AM  1    financial spreadsheet?  Thank you.  Can we open that up in

11:31AM  2    Exhibit 100A.1?

11:31AM  3            **BY MR. TRIPI:**

11:31AM  4    Q.  Now, it's 158 pages, but do you see on page 1 there's an

11:31AM  5    entry for Ronald Serio memo-loan?

11:31AM  6    A.  Yes.

11:32AM  7            **MR. TRIPI:**  Ms. Champoux, kind of just scroll

11:32AM  8    through, I'm going to ask some questions as we go.  Keep

11:32AM  9    going.

11:32AM  10           **BY MR. TRIPI:**

11:32AM  11   Q.  Have you looked at this document before?

11:32AM  12   A.  Yes.

11:32AM  13   Q.  Do you recognize this to be financial work that Scott

11:32AM  14   Deming did in the original Serio case file?

11:32AM  15   A.  Yes.  This -- it's part of a spreadsheet that's wider

11:32AM  16   than the page it was printed on, so this is probably the

11:32AM  17   far-right column of, you know, a spreadsheet of data.

11:32AM  18   Q.  And this was, again, to be clear, found in the

11:32AM  19   defendant's basement?

11:32AM  20   A.  Yes.

11:32AM  21           **MR. TRIPI:**  We can get out of there, Ms. Champoux.

11:32AM  22           Can we go to the next PDF I want to look at, it's

11:32AM  23   labeled FTR-2117.  Scroll down a little bit.  Withdrawn.

11:32AM  24           Scroll back up to the top.

          25

11:32AM 1          **BY MR. TRIPI:**

11:32AM 2     Q.  Did we see who ran this information from the document

11:32AM 3     here?

11:32AM 4     A.  Yes.  It says Joseph Bongiovanni.

11:33AM 5     Q.  And what is this type of record?

11:33AM 6     A.  Could you scroll down a little bit?  It looks like

11:33AM 7     vehicle registration check.

11:33AM 8     Q.  And so, who --

11:33AM 9               **MR. TRIPI:**  Let's stop there.

11:33AM 10              **BY MR. TRIPI:**

11:33AM 11    Q.  Who was Mr. Bongiovanni running a vehicle registration

11:33AM 12    check on?

11:33AM 13    A.  So, it looks like he was trying to identify the

11:33AM 14    registered owner of a plate that's maybe off the top of the

11:33AM 15    screen.

11:33AM 16    Q.  Look at "registered to" at the top of the page.

11:33AM 17    A.  Yeah, but the plate that he ran was registered to Louis

11:33AM 18    Selva.

11:33AM 19    Q.  Okay.  That's the person who you understood to be his

11:33AM 20    best friend, correct?

11:33AM 21    A.  Yes.

11:33AM 22              **MR. TRIPI:**  Let's go back to the top of the page.

11:33AM 23              **BY MR. TRIPI:**

11:33AM 24    Q.  When did he run this?

11:33AM 25    A.  May 22nd, 2013.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

| | | |
|---|---|---|
| 11:34AM | 1 | **MR. TRIPI:**  Okay.  We can get out of that document. |
| 11:34AM | 2 | Next, I'd like to go to PDF labeled SafetyNet, please. |
| 11:34AM | 3 | SafetyNet submission. |
| 11:34AM | 4 | **BY MR. TRIPI:** |
| 11:34AM | 5 | Q.  Now, this is a six-page scan, but have you since |
| 11:34AM | 6 | ascertained that the first page doesn't relate to the other |
| 11:34AM | 7 | pages in this particular PDF scan? |
| 11:34AM | 8 | A.  Yes. |
| 11:34AM | 9 | **MR. TRIPI:**  Okay.  Let's go to the second page, |
| 11:34AM | 10 | Ms. Champoux.  Okay.  Stop there. |
| 11:34AM | 11 | **BY MR. TRIPI:** |
| 11:34AM | 12 | Q.  What -- what is this document? |
| 11:34AM | 13 | A.  It's a form to submit a name to SafetyNet that notifies |
| 11:34AM | 14 | every user of SafetyNet that, in this case, DEA is |
| 11:34AM | 15 | investigating. |
| 11:34AM | 16 | Q.  We'll get into the names in a minute, but it's a state |
| 11:34AM | 17 | deconfliction database? |
| 11:34AM | 18 | A.  Yes. |
| 11:34AM | 19 | Q.  Is it maintained by New York State? |
| 11:34AM | 20 | A.  Yes. |
| 11:35AM | 21 | Q.  And what was the date of this fax submission? |
| 11:35AM | 22 | A.  January 4th. |
| 11:35AM | 23 | **MR. TRIPI:**  Okay.  Let's scroll down. |
| 11:35AM | 24 | **THE WITNESS:**  According to the fax machine. |
| | 25 | |

11:35AM     1              **BY MR. TRIPI:**

11:35AM     2    Q.  2013?  2013?

11:35AM     3    A.  Yes.

11:35AM     4              **MR. TRIPI:**  Okay.  Scroll down, please.

11:35AM     5              **BY MR. TRIPI:**

11:35AM     6    Q.  And who does the -- the entry on page 2 indicate was the

11:35AM     7    investigator?

11:35AM     8    A.  Joseph Bongiovanni.

11:35AM     9              **MR. TRIPI:**  And scroll down a little bit, please.

11:35AM    10              **BY MR. TRIPI:**

11:35AM    11    Q.  And who was the individual that he was submitting into

11:35AM    12    SafetyNet?

11:35AM    13    A.  Thomas Serio.

11:35AM    14              **MR. TRIPI:**  And let's go to page 3, please.

11:35AM    15              **BY MR. TRIPI:**

11:35AM    16    Q.  Who was the -- is this also, the investigator is

11:35AM    17    Mr. Bongiovanni?

11:35AM    18    A.  Yes.

11:35AM    19    Q.  Does he list his DEA cell phone number there?

11:35AM    20    A.  Yes.

11:35AM    21    Q.  And what's that number, just for record purposes?

11:35AM    22    A.  716-818-0966.

11:36AM    23              **MR. TRIPI:**  And can we scroll down?

11:36AM    24              **BY MR. TRIPI:**

11:36AM    25    Q.  Did he leave the case blank on that particular

11:36AM   1   submission?

11:36AM   2   A.  Can we scroll back to it?

11:36AM   3        **MR. TRIPI:**  No.  Stay there.  Move up a little bit,

11:36AM   4   Ms. Champoux.

11:36AM   5        All right.  Scroll down a page, I apologize.  I said

11:36AM   6   up, I meant down.

11:36AM   7        **BY MR. TRIPI:**

11:36AM   8   Q.  See the case number?

11:36AM   9   A.  Yes.  It's blank.

11:36AM  10   Q.  Okay.

11:36AM  11        **MR. TRIPI:**  Keep scrolling down the page.

11:36AM  12        **BY MR. TRIPI:**

11:36AM  13   Q.  And who's -- who did he submit in this particular entry?

11:36AM  14   A.  David Oddo.

11:36AM  15        **MR. TRIPI:**  And let's go next to page 4.

11:36AM  16        **BY MR. TRIPI:**

11:36AM  17   Q.  And again, is the agent Mr. Bongiovanni?

11:36AM  18   A.  Yes.

11:36AM  19        **MR. TRIPI:**  Can we scroll down to see who he

11:36AM  20   submitted, please?

11:36AM  21        **BY MR. TRIPI:**

11:36AM  22   Q.  Now, is that the wrong file number for C2-0026?

11:37AM  23   A.  Yes.

11:37AM  24   Q.  The actual case file was 13; is that right?

11:37AM  25   A.  Yes.

11:37AM  1    Q.  But Mr. Bongiovanni is the point of contact for this?

11:37AM  2    A.  Yes.

11:37AM  3    Q.  And who did he enter on this page?

11:37AM  4    A.  Ronald Serio.

11:37AM  5    Q.  And what address did he put into SafetyNet as being one

11:37AM  6    he wanted to get notice of if someone was investigating the

11:37AM  7    address?

11:37AM  8    A.  697 Lebrun in Buffalo.

11:37AM  9    Q.  And that's the purpose of SafetyNet, right?  If you have

11:37AM  10   an investigative interest in the same person, property,

11:37AM  11   location, or vehicle, it allows for agents to deconflict and

11:37AM  12   communicate; is that right?

11:37AM  13   A.  Yes.

11:37AM  14   Q.  Now in C2-13-0026, did you see any surveillances or any

11:37AM  15   investigative action that this defendant took at 697 Lebrun?

11:37AM  16   A.  No.

11:37AM  17   Q.  And do you know that to be Ron Serio's mansion?

11:37AM  18   A.  Yes.

11:38AM  19          **MR. TRIPI:**  Can we scroll down?

11:38AM  20          **BY MR. TRIPI:**

11:38AM  21   Q.  Did -- on Mr. Serio, did he also put in a vehicle

11:38AM  22   description?

11:38AM  23   A.  Yes.

11:38AM  24   Q.  And was that a 2007 Maserati?

11:38AM  25   A.  Yes.

11:38AM  1    Q.  Do you know of any investigative action that

11:38AM  2    Mr. Bongiovanni took that is documented in the file towards

11:38AM  3    this Maserati?

11:38AM  4    A.  I don't.

11:38AM  5    Q.  How about towards Mr. Serio's Range Rover?

11:38AM  6    A.  No, I don't.

11:38AM  7    Q.  No?

11:38AM  8    A.  No.

11:38AM  9    Q.  Okay.

11:38AM  10          MR. TRIPI:  We can exit out of that one,

11:38AM  11   Ms. Champoux, thank you.

11:38AM  12          Can we scroll down more?  All right.  Can you click

11:38AM  13   on Tripi O-C-D-E-T-F proposal?

11:39AM  14          BY MR. TRIPI:

11:39AM  15   Q.  Again, all these documents were found in the defendant's

11:39AM  16   basement; is that right?

11:39AM  17   A.  Yes.

11:39AM  18   Q.  Are you familiar with an OCDETF investigation initiation

11:39AM  19   form?

11:39AM  20   A.  Yes.

11:39AM  21   Q.  Tell the jury, we've heard a little bit about it, but

11:39AM  22   it's been a while.  Tell the jury what that is.

11:39AM  23   A.  So, it's a two-part form worksheet where you fill in

11:39AM  24   targets, and there's a series of questions about what kind of

11:39AM  25   activity the targets are engaged in, where they're engaged in

11:39AM   1    that activity geographically.

11:39AM   2        And then there's a second narrative portion where you

11:39AM   3    write a narrative description of the organization that you're

11:39AM   4    proposing to investigate.

11:39AM   5    Q.  Are all these documents we've been looking at law

11:39AM   6    enforcement sensitive?

11:39AM   7    A.  Yes.

11:39AM   8    Q.  Is an OCDETF, Drug Enforcement Task Force investigation

11:39AM   9    initiation form, a particularly sensitive document?

11:39AM   10   A.  Yes.

11:39AM   11   Q.  Does it provide details of investigations that are larger

11:40AM   12   in scope?

11:40AM   13   A.  Yes.

11:40AM   14        **MR. TRIPI:**  Scroll down this page.

11:40AM   15        **BY MR. TRIPI:**

11:40AM   16   Q.  Does each -- now, do you see there's an OCDETF

11:40AM   17   investigation number.  Would a completed form, a complete

11:40AM   18   form, have that full number filled in?

11:40AM   19   A.  Yes.

11:40AM   20   Q.  Does that indicate this is a draft?

11:40AM   21   A.  Yes.

11:40AM   22   Q.  The fact that it's empty?

11:40AM   23   A.  Yes, it hasn't been reviewed by the regional board, so it

11:40AM   24   doesn't have a number.

11:40AM   25   Q.  And does every operation get a name?

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

| | | |
|---|---|---|
| 11:40AM | 1 | A.  Yes. |
| 11:40AM | 2 | Q.  And this particular draft form, what was the operation |
| 11:40AM | 3 | name? |
| 11:40AM | 4 | A.  Past Due. |
| 11:40AM | 5 | Q.  Okay.  Who was the case attorney? |
| 11:40AM | 6 | A.  Timothy Lynch. |
| 11:40AM | 7 | Q.  And as you understood it for a time, he was the chief of |
| 11:40AM | 8 | narcotics at the U.S. Attorney's Office? |
| 11:40AM | 9 | A.  Yes. |
| 11:40AM | 10 | Q.  Does it have the case agents listed? |
| 11:41AM | 11 | A.  Yes. |
| 11:41AM | 12 | Q.  Excuse me? |
| 11:41AM | 13 | A.  Yes. |
| 11:41AM | 14 | Q.  Do you know Chris Clark? |
| 11:41AM | 15 | A.  I do. |
| 11:41AM | 16 | Q.  Is he a task force officer with the DEA? |
| 11:41AM | 17 | A.  Yes, a Niagara Falls detective. |
| 11:41AM | 18 | Q.  Okay.  So, he's based out of Niagara Falls? |
| 11:41AM | 19 | A.  Yes. |
| 11:41AM | 20 | Q.  And then Dave Turri, is he an IRS agent? |
| 11:41AM | 21 | A.  Yes. |
| 11:41AM | 22 | Q.  And Jason Bernhard, is he an ATF agent? |
| 11:41AM | 23 | A.  I don't know Jason. |
| 11:41AM | 24 | Q.  He's listed as ATF though? |
| 11:41AM | 25 | A.  He is. |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

| | | |
|---|---|---|
| 11:41AM | 1 | MR. TRIPI:  Can we please scroll down? |
| 11:41AM | 2 | BY MR. TRIPI: |
| 11:41AM | 3 | Q.  And in bold capital letters, what does it say at the |
| 11:41AM | 4 | bottom of that first page? |
| 11:41AM | 5 | A.  Law enforcement sensitive. |
| 11:41AM | 6 | MR. TRIPI:  Okay.  Please scroll down.  And stop |
| 11:41AM | 7 | there. |
| 11:41AM | 8 | BY MR. TRIPI: |
| 11:41AM | 9 | Q.  At the very bottom of the page, can you read what it says |
| 11:41AM | 10 | there? |
| 11:41AM | 11 | A.  The attached information must be protected and not |
| 11:41AM | 12 | released to unauthorized individuals. |
| 11:41AM | 13 | MR. TRIPI:  Can we scroll down further? |
| 11:41AM | 14 | BY MR. TRIPI: |
| 11:41AM | 15 | Q.  Again, now we're on page 2 of this particular PDF.  The |
| 11:42AM | 16 | number for this proposal is not filled in, correct? |
| 11:42AM | 17 | A.  Correct. |
| 11:42AM | 18 | MR. TRIPI:  If we can scroll down further. |
| 11:42AM | 19 | BY MR. TRIPI: |
| 11:42AM | 20 | Q.  Does this have an indication of the targets of Task Force |
| 11:42AM | 21 | Officer Clark's investigation? |
| 11:42AM | 22 | A.  Yes. |
| 11:42AM | 23 | Q.  And the number one person on the list, what's that |
| 11:42AM | 24 | person's name? |
| 11:42AM | 25 | A.  Frank Tripi. |

USA v Bongiovanni - Ryan - Tripi/Direct - 9711/24

| | | |
|---|---|---|
| 11:42AM | 1 | Q. And who's the second person on the list? |
| 11:42AM | 2 | A. Lawrence Panaro. |
| 11:42AM | 3 | Q. And are there a number of other people, as well? |
| 11:42AM | 4 | A. Yes, 11 total. |
| 11:42AM | 5 | Q. Is this a document that's supposed to be kept in a secure |
| 11:42AM | 6 | space? |
| 11:42AM | 7 | A. Yes. |
| 11:42AM | 8 | Q. Is this a document that is supposed to leave the law |
| 11:42AM | 9 | enforcement agency's secure location? |
| 11:42AM | 10 | A. We could transport it from one law enforcement agency to |
| 11:42AM | 11 | another, but you would have to maintain custody of it and |
| 11:43AM | 12 | then when you're done with it, it should be kept in a secured |
| 11:43AM | 13 | space. |
| 11:43AM | 14 | Q. Sure. If you're bringing it to Tim Lynch to sign where |
| 11:43AM | 15 | he's supposed to sign on the document, you transport it, |
| 11:43AM | 16 | right? |
| 11:43AM | 17 | A. That's what I'm describing, yes. |
| 11:43AM | 18 | Q. And then you put it back in secure storage? |
| 11:43AM | 19 | A. Yes. |
| 11:43AM | 20 | Q. This is not a document you would take to your personal |
| 11:43AM | 21 | residence, correct? |
| 11:43AM | 22 | **MR. MacKAY:** Objection. |
| 11:43AM | 23 | **THE COURT:** Sorry? |
| 11:43AM | 24 | **MR. MacKAY:** Objection. |
| 11:43AM | 25 | **MR. TRIPI:** I'm asking him about -- |

| 11:43AM | 1 | **THE COURT:** Overruled. |

| 11:43AM | 2 | **BY MR. TRIPI:** |

11:43AM 3 Q. Is this a document you would take to your personal

11:43AM 4 residence?

11:43AM 5 A. No.

11:43AM 6 Q. Are there rules against removing it from secure space?

11:43AM 7 A. Yes. It's a record. And sensitive.

11:43AM 8 Q. Okay.

11:43AM 9 **MR. TRIPI:** Please scroll down, Ms. Champoux. Let's

11:43AM 10 go to page 3.

11:43AM 11 **BY MR. TRIPI:**

11:43AM 12 Q. Just generally, does page 3 tell you the different

11:43AM 13 agencies involved in the investigation?

11:43AM 14 A. Yes.

11:43AM 15 Q. And that's indicated by the Xs marked next to those

11:43AM 16 various agencies?

11:43AM 17 A. Yes.

11:43AM 18 Q. And, so, you mentioned earlier that Chris Clark is a

11:43AM 19 Niagara Falls police detective assigned to DEA as a task

11:44AM 20 force officer?

11:44AM 21 A. Yes.

11:44AM 22 Q. So, Niagara Falls police is checked on the box?

11:44AM 23 A. Yes.

11:44AM 24 **MR. TRIPI:** Scroll down. Let's go to the next page.

11:44AM 25 Stop there, actually. Sorry.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

11:44AM  1          **BY MR. TRIPI:**

11:44AM  2   Q.  And these boxes at the bottom relate to funding?

11:44AM  3   A.  Yes.

11:44AM  4   Q.  Is that part of what happens in an OCDETF case that opens

11:44AM  5   up additional funding?

11:44AM  6   A.  Yes.

11:44AM  7          **MR. TRIPI:**  Please scroll down.  Stop there.

11:44AM  8          **BY MR. TRIPI:**

11:44AM  9   Q.  Does this portion of the form indicate the different

11:44AM  10  districts, states, and countries that investigators believe

11:44AM  11  the criminal activity is linked to?

11:44AM  12  A.  Yes.

11:44AM  13  Q.  And on this form, what country is linked?

11:44AM  14  A.  Canada.

11:44AM  15  Q.  Now, in your case, when you were initially proffering

11:45AM  16  Mr. Serio, his supplier, Jarrett Guy, was based out of

11:45AM  17  Canada; is that right?

11:45AM  18  A.  Yes.

11:45AM  19  Q.  You're also familiar with California being a place that

11:45AM  20  had legalized marijuana much earlier than New York State; is

11:45AM  21  that right?

11:45AM  22  A.  Yes.

11:45AM  23  Q.  Did a lot of cases over the years, once California

11:45AM  24  legalized, did a lot of people get involved transporting

11:45AM  25  cross country large marijuana loads?

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

11:45AM  1   A.  Yes.

11:45AM  2   Q.  From places like California?

11:45AM  3   A.  California.  And then Oregon once Oregon legalized.

11:45AM  4   Q.  Okay.  And we also have an indication of Nevada here?

11:45AM  5   A.  Yes.

11:45AM  6       MR. TRIPI:  If we can go down further.

11:45AM  7       BY MR. TRIPI:

11:45AM  8   Q.  Here the Task Force Officer Clark indicated the different

11:45AM  9   types of drugs he believed would be involved in this case; is

11:45AM  10  that right?

11:46AM  11  A.  Yes.

11:46AM  12  Q.  And what are drugs he checked?

11:46AM  13  A.  Cocaine, heroin, marijuana.

11:46AM  14  Q.  And did he indicate he believed there would be money

11:46AM  15  laundering involved in the case?

11:46AM  16  A.  Yes.

11:46AM  17  Q.  And what did he check for that?

11:46AM  18  A.  Bulk cash movement by air.  Oh.

11:46AM  19      MR. TRIPI:  You can keep on scrolling down.

11:46AM  20      BY MR. TRIPI:

11:46AM  21  Q.  And take a look, he checked several boxes of potential

11:46AM  22  money laundering, correct?

11:46AM  23  A.  He did.  Also, wire transfer, business fronts, casinos,

11:46AM  24  and property investments.

11:46AM  25      MR. TRIPI:  Okay scrolling down.

11:46AM  1          **BY MR. TRIPI:**

11:46AM  2  Q.  And then, we're at page 5 now.  It describes different

11:46AM  3  types of law enforcement techniques that may be utilized?

11:46AM  4  A.  Yes.

11:46AM  5  Q.  And is that something that can evolve over time?

11:46AM  6  A.  Yes.

11:47AM  7          **MR. TRIPI:**  Keep scrolling down.  Go to the next

11:47AM  8  page.  Let's go to page 6.

11:47AM  9          **BY MR. TRIPI:**

11:47AM  10  Q.  And just for the record, on every page, does it say law

11:47AM  11  enforcement sensitive?

11:47AM  12  A.  Yes, I think top and bottom.

11:47AM  13          **MR. TRIPI:**  Keep scrolling down.

11:47AM  14          **BY MR. TRIPI:**

11:47AM  15  Q.  Now we're going past page 7, here's the signature lines,

11:47AM  16  we see that nobody signed off on it yet; is that right?

11:47AM  17  A.  Correct.

11:47AM  18  Q.  Is that a further indication this is a draft?

11:47AM  19  A.  Yes.

11:47AM  20          **MR. TRIPI:**  Keep scrolling down.

11:47AM  21          **BY MR. TRIPI:**

11:47AM  22  Q.  Now we're at page 8.  Does this give a narrative that the

11:47AM  23  case agent writes, in this particular matter Task Force

11:47AM  24  Officer Clark, about the background of his investigation and

11:47AM  25  the predication for making it an OCDETF case?

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

11:47AM  1   A.  Yes.

11:47AM  2   Q.  And does this provide highly specific information about

11:48AM  3   what his investigation entails?

11:48AM  4   A.  Yes.

11:48AM  5            **MR. TRIPI:**  Lets scroll down a little bit,

11:48AM  6   Ms. Champoux.  Stop there.

11:48AM  7            Publishing it for the jury.  Just give me a moment,

11:48AM  8   Your Honor.

11:48AM  9            **BY MR. TRIPI:**

11:48AM  10  Q.  I'm not going to have you read it, I'm going to have the

11:48AM  11  jury take a look at it.

11:48AM  12           **MR. TRIPI:**  Ms. Champoux, can we bring the page down

11:48AM  13  a little bit?  Lets look at paragraphs C and D now.  We're

11:49AM  14  still on page 8 for record purposes of the Tripi OCDETF

11:49AM  15  proposal PDF.

11:49AM  16           **BY MR. TRIPI:**

11:49AM  17  Q.  We looked at Peter Gerace's phone contacts yesterday, was

11:49AM  18  there a contact for Frank Tripi in there?

11:49AM  19  A.  Yes.

11:49AM  20  Q.  Okay.

11:50AM  21           **MR. TRIPI:**  Let's scroll to the next page, page 9,

11:49AM  22  now, Ms. Champoux.

11:50AM  23           Bring it down a little bit further, Ms. Champoux, so

11:50AM  24  all of paragraph G is able to be read.  Thank you.

11:50AM  25           Let's scroll down a little bit further, Ms. Champoux.

11:51AM  1  We'll expose the rest of the page.  Let's go down to page 10.

11:51AM  2       BY MR. TRIPI:

11:51AM  3  Q.  They saw two names -- while they're reading that, they

11:51AM  4  saw two names on the list of targets; is that right?  The

11:51AM  5  first two names were Frank Tripi and Lawrence Panaro?

11:51AM  6  A.  Yes.

11:51AM  7  Q.  As far as the law enforcement that you -- the community

11:51AM  8  that you are a part of, were those -- those two names

11:51AM  9  believed to be associated in some way with Italian Organized

11:51AM  10  Crime, as far as you were concerned?

11:51AM  11  A.  Yes.

11:52AM  12       MR. TRIPI:  Scroll down a little bit further,

11:52AM  13  Ms. Champoux.

11:52AM  14       We can go to the next page, page 11.  Stop there.

11:52AM  15  All right.  Let's go all the way down to the bottom.

11:52AM  16       BY MR. TRIPI:

11:52AM  17  Q.  All right.  Was that a highly sensitive law enforcement

11:52AM  18  document that provided information of a sensitive nature

11:52AM  19  regarding targets that were operating -- believed to be

11:52AM  20  operating in multiple states and internationally?

11:52AM  21  A.  Yes.

11:52AM  22  Q.  Should a document like that ever be removed from secure

11:53AM  23  space?

11:53AM  24  A.  No.

11:53AM  25       MR. TRIPI:  One moment please, Your Honor.

11:53AM    1            I don't have any further direct examination,

11:53AM    2    Your Honor.

11:53AM    3            **THE COURT:**  Mr. MacKay, what's your thought?

11:53AM    4            **MR. MacKAY:**  I'm sorry?

11:53AM    5            **THE COURT:**  What's your thought?  Would you like to

11:53AM    6    break for lunch now and then come back at 1:30 and take the

11:53AM    7    witness out of order, then?

11:53AM    8            **MR. MacKAY:**  Yeah, why don't we do that, Judge.  That

11:53AM    9    makes it a little bit smoother.

11:53AM    10           **THE COURT:**  Okay.  So, we will -- we will break for

11:53AM    11   lunch now folks.  When we come back -- we'll break for an hour

11:54AM    12   and a half, when we come back at 1:30, we'll probably take

11:54AM    13   another witness out of order.  We're trying to streamline

11:54AM    14   things for you folks so that we don't have large gaps in the

11:54AM    15   testimony.  So, we're going to take a witness out of order,

11:54AM    16   and then come back for this witness's cross-examination.

11:54AM    17           So while you're gone, please remember, follow my

11:54AM    18   instructions about not communicating about the case, not using

11:54AM    19   tools of technology to research the case, or to communicate

11:54AM    20   about the case, and not read, or watch, or listen to any news

11:54AM    21   coverage, if there is any, while the trial is in progress.

11:54AM    22   And please don't make up your mind until the case has been

11:54AM    23   submitted to you for deliberations.

11:54AM    24           We'll see you back here at 1:30.  Thanks.

11:54AM    25           (Jury excused at 11:54 a.m.)

11:55AM  1          **THE COURT:**  Okay.  Anything we need to do?

11:55AM  2          **MR. TRIPI:**  Just one thing, I'd like to make a record

11:55AM  3  of before we get into cross.  As you know, Judge, we ended

11:55AM  4  with sort of the Frank Tripi OCDETF proposal.  I had the FBI

11:55AM  5  interview Frank Tripi twice.  They generated reports.  I've

11:55AM  6  provided those reports to the defense.

11:55AM  7          Obviously, I'm paraphrasing.  Big takeaway is

11:55AM  8  essentially he did not confirm that Mr. Bongiovanni provided

11:55AM  9  him any information.  Again, paraphrasing.  They have the

11:55AM  10  information, they can call him if they want, but I want to

11:55AM  11  make a clear record that I provided those reports.

11:55AM  12          **MR. MacKAY:**  We got them, Judge.  We're aware.

11:55AM  13          **THE COURT:**  Okay.  Great.  Anything from you before

11:55AM  14  we break?

11:55AM  15          **MR. MacKAY:**  No, Your Honor.

11:55AM  16          **THE COURT:**  Okay.  We'll see you folks at 1:30.

11:55AM  17          **MR. MacKAY:**  Thank you for letting us break this up.

11:55AM  18          **THE COURT:**  No, no, no, I think it makes sense to do

11:55AM  19  that.

11:56AM  20          (Off the record at 11:56 a.m.)

02:57PM  21          (Witness taken out of order from 1:33 to 2:57 p.m.)

02:57PM  22          **THE COURT:**  Let's begin the cross of Mr. Ryan.

02:57PM  23          **MR. COOPER:**  And I appreciate the indulgence with

02:57PM  24  the --

02:57PM  25          **THE COURT:**  Oh, that's fine.

02:58PM    1    **C U R T I S   R Y A N,** having been previously duly called and

02:58PM    2    sworn, continued to testify as follows:

02:58PM    3          **THE COURT:**  I remind the witness he's still under

02:58PM    4    oath.

02:58PM    5          And, Mr. MacKay, you may begin.

02:58PM    6          **MR. MacKAY:**  Thank you, Judge.

02:58PM    7          Just for planning purposes did the Court intend to

02:58PM    8    take another afternoon break?  Or --

02:58PM    9          **THE COURT:**  Yeah, I think it's probably a good idea

02:58PM   10    to take one more break since we've been at it for a little bit

02:58PM   11    and we have a long way to go this afternoon.  Wherever is a

02:58PM   12    convenient spot to stop.

02:58PM   13          **MR. MacKAY:**  Okay.  Flag me when it's good.  Let me

02:58PM   14    get set up here.

02:58PM   15

02:58PM   16                **CROSS-EXAMINATION BY MR. MacKAY:**

02:58PM   17    Q.  Welcome back, Agent Ryan.  I will try to get you done so

02:58PM   18    you can get back to the crossroads of America tonight.

02:58PM   19    A.  Thank you.

02:58PM   20    Q.  So, let's start with the search at 85 Alder Place.

02:58PM   21    That's Mr. Bongiovanni's residence, correct?

02:58PM   22    A.  Yes.

02:58PM   23    Q.  Okay.  That's executed about 6:02 in the morning,

02:58PM   24    correct?

02:59PM   25    A.  Yes.

02:59PM    1    Q.  Battering rams used to break down the door, correct?

02:59PM    2    A.  I think so, but I was down the street.

02:59PM    3        **MR. MacKAY:**  Okay.  Can we show, Ms. Champoux,

02:59PM    4    Government Exhibit 103-1.

02:59PM    5        **BY MR. MacKAY:**

02:59PM    6    Q.  Okay.  That's the door as it looked that day of the raid

02:59PM    7    of the search warrant execution.

02:59PM    8    A.  Are you talking about the mark next to the handle?

02:59PM    9    Q.  Yes.

02:59PM   10    A.  Yes.

02:59PM   11    Q.  That's consistent with using a battering ram, correct?

02:59PM   12    A.  Yes.

02:59PM   13        **MR. MacKAY:**  You can take that down, Ms. Champoux,

02:59PM   14    thank you.

02:59PM   15        **BY MR. MacKAY:**

02:59PM   16    Q.  All right.  To your recollection, a flash-bang device is

02:59PM   17    used outside the residence to distract?

02:59PM   18    A.  I heard one, yes.

02:59PM   19    Q.  Okay.  I mean, you said you heard one, and you were down

02:59PM   20    the street, correct?

02:59PM   21    A.  I was a distance away, yes.

02:59PM   22    Q.  I mean, just so the jury understands, they're pretty

02:59PM   23    loud, correct?

02:59PM   24    A.  Yes.

02:59PM   25    Q.  All right.  And to your knowledge, Mr. Bongiovanni's

03:00PM    1    handcuffed when he's encountered immediately inside, correct?

03:00PM    2    A.   Yes.

03:00PM    3    Q.   Because by the time you encounter him, he's still in

03:00PM    4    handcuffs, correct?

03:00PM    5    A.   Yes.

03:00PM    6    Q.   And do you recall him, you first encounter him, was he

03:00PM    7    outside the residence at that point in time?

03:00PM    8    A.   No, inside.

03:00PM    9    Q.   Do you recall if he was brought outside and then brought

03:00PM   10    back in?

03:00PM   11    A.   My recollection is that he was inside.

03:00PM   12    Q.   So your first encounter with him, he's back inside,

03:00PM   13    correct?

03:00PM   14    A.   Yes.

03:00PM   15    Q.   Do you recall him wearing, like, boxers and a T-shirt at

03:00PM   16    the time?

03:00PM   17    A.   No, I recall basketball shorts.  Like, mesh shorts almost

03:00PM   18    knee length and a t-shirt.

03:00PM   19    Q.   A little bit more formal, but still, you know, what he

03:00PM   20    might have slept in, for example?

03:00PM   21    A.   He may have, but when you say boxer shorts, I'm thinking

03:00PM   22    underwear.  These were not.

03:00PM   23    Q.   So was I, but we've got the picture.

03:00PM   24    A.   Okay.

03:00PM   25    Q.   So while that's happening, the entry team is securing the

03:01PM   1   rest of the premises, correct?

03:01PM   2   A.  No, that's done before I get close to the house.

03:01PM   3   Q.  Okay.  I don't want to get the timeline mixed up.  Once

03:01PM   4   the entry team enters, they secure Mr. Bongiovanni, correct?

03:01PM   5   A.  Yes.

03:01PM   6   Q.  And then the procedure is they then clear and secure the

03:01PM   7   house, correct?

03:01PM   8   A.  Yes.

03:01PM   9   Q.  And then that had all occurred, and then you encounter

03:01PM  10   Mr. Bongiovanni, correct?

03:01PM  11   A.  Yes.

03:01PM  12   Q.  And over your years of experience, you've been part of a

03:01PM  13   number of these search warrant executions, correct?

03:01PM  14   A.  Yes.

03:01PM  15   Q.  Now, just as background, sometimes when these are

03:01PM  16   occurring, it's just a search warrant, correct?

03:01PM  17   A.  Yes.

03:01PM  18   Q.  Meaning, the intention is just to go to a location and

03:01PM  19   look for evidence, correct?

03:01PM  20   A.  Yes.

03:01PM  21   Q.  Other times, there can be an arrest warranted coupled

03:01PM  22   with that?

03:01PM  23   A.  Yes, sir.

03:01PM  24   Q.  Which means not only might they be searching for

03:01PM  25   evidence, but somebody's going to be arrested that day,

USA v Bongiovanni - Ryan - MacKay/Cross - 9/11/24

03:01PM   1   correct?

03:01PM   2   A.  Yes.

03:01PM   3   Q.  Okay.  Now, again, in your experience, you've done both,

03:02PM   4   search warrant execution and an arrest execution, correct?

03:02PM   5   A.  Yes.

03:02PM   6   Q.  And you told the jury when you encountered

03:02PM   7   Mr. Bongiovanni, he asked a couple times whether this was a

03:02PM   8   search warrant or an arrest warrant, correct?

03:02PM   9   A.  He did.

03:02PM  10   Q.  In your experience, in executing search and arrest

03:02PM  11   warrants, fair to say it's fairly common for people to ask,

03:02PM  12   you know, if it's clear they're being placed under arrest

03:02PM  13   about things like posting bail and stuff?

03:02PM  14   A.  Sometimes.

03:02PM  15   Q.  Right.  I mean, sometimes people will ask, like, you know

03:02PM  16   can I have an opportunity to secure my residence; fair to

03:02PM  17   say?

03:02PM  18   A.  I -- I guess.  In what sense though?  Secure it from

03:02PM  19   what?

03:02PM  20   Q.  Well, if they know they're not coming back that day,

03:02PM  21   correct?

03:02PM  22   A.  I mean, it's our responsibility to secure the residence

03:02PM  23   after a search warrant, so that's not consistent with my

03:02PM  24   experience.

03:02PM  25   Q.  Yeah, I mean, but have you heard people sometimes when

03:02PM    1    they're in the process of being arrested express concerns

03:03PM    2    about, like, please contact somebody, or something like that,

03:03PM    3    correct?

03:03PM    4    A.   Yes.  I mean, generally, the questions are about what's

03:03PM    5    happening and what's gonna happen next.

03:03PM    6    Q.   Right.  So in it's your experience that we've seen people

03:03PM    7    in these situations they tend to be a bit flustered, correct?

03:03PM    8    A.   Sometimes.

03:03PM    9    Q.   And they're asking what's happening currently?

03:03PM   10    A.   Yes, sir.

03:03PM   11    Q.   And then they're asking what's happening next, right?

03:03PM   12    A.   Yes.

03:03PM   13    Q.   Now, and all this will was done, and you had known that

03:03PM   14    previously in March of that year, about three months earlier,

03:03PM   15    Mr. Bongiovanni had voluntarily come in to the U.S.

03:03PM   16    Attorney's Office to sit down and talk with OIG inspectors,

03:03PM   17    correct?

03:03PM   18    A.   Yes.

03:03PM   19    Q.   Right.  So, you know, this -- back in March, there wasn't

03:03PM   20    any sort of search warrant execution or anything that took

03:03PM   21    place at his house, right?

03:03PM   22    A.   Yes, that's correct.

03:03PM   23    Q.   That was -- the March interview you did not attend,

03:03PM   24    correct?

03:03PM   25    A.   I did not.

| | | |
|---|---|---|
| 03:03PM | 1 | Q. But to your knowledge, that, you know, Mr. Bongiovanni |
| 03:04PM | 2 | was contacted and voluntarily appeared at a location to give |
| 03:04PM | 3 | an interview, correct? |
| 03:04PM | 4 | A. Yes. |
| 03:04PM | 5 | Q. Okay. Okay. So after your initial account, initial |
| 03:04PM | 6 | encounter, ultimately, you sit down with Mr. Bongiovanni at a |
| 03:04PM | 7 | dining room table, correct? |
| 03:04PM | 8 | A. Correct. |
| 03:04PM | 9 | Q. It's you and it's two other agents, correct? |
| 03:04PM | 10 | A. Yes. |
| 03:04PM | 11 | Q. It was you, it was Special Agent Carpenter, and Special |
| 03:04PM | 12 | Agent Fusco, correct? |
| 03:04PM | 13 | A. That's correct. |
| 03:04PM | 14 | Q. And you drew the diagram of where everybody was seated, |
| 03:04PM | 15 | but this is occurring at his dining room table, correct? |
| 03:04PM | 16 | A. Yes. |
| 03:04PM | 17 | Q. And was it when you sat him down, or was it before that |
| 03:04PM | 18 | you had told him, you know, I'll take the cuffs off if you, |
| 03:04PM | 19 | quote, unquote, behave? |
| 03:04PM | 20 | A. The phrase I always use is are you going to be a |
| 03:05PM | 21 | gentleman? So that's what I said. And it's as we're sitting |
| 03:05PM | 22 | down -- |
| 03:05PM | 23 | Q. Okay. |
| 03:05PM | 24 | A. -- or within a minute of when we first sat down. |
| 03:05PM | 25 | Q. Okay. And so you ask him that. He tells you I'm going |

03:05PM  1   to be a gentleman?

03:05PM  2   A.  Yes.  It's a way to gauge if somebody's amped up to the

03:05PM  3   point that I shouldn't take the cuffs off, and then also I

03:05PM  4   want to hear the answer as part of the assessment.

03:05PM  5        But he said that he would, and so I took his cuffs off.

03:05PM  6   Q.  Right.  That was my question.  He did that, and then you

03:05PM  7   started to chat with him at the dining room table, correct?

03:05PM  8   A.  Yes.

03:05PM  9   Q.  Now at the same time the house is being searched by other

03:05PM  10  agents, correct?

03:05PM  11  A.  For evidence, yes.

03:05PM  12  Q.  Right.  So initially they do sort of a cursory search to

03:05PM  13  clear the house.  At that point in time, though, while you're

03:05PM  14  talking to Mr. Bongiovanni, the more intensive sort of

03:05PM  15  evidence search is occurring, correct?

03:06PM  16  A.  Yes.

03:06PM  17  Q.  I think you showed on one of the pictures there's a big

03:06PM  18  black box near the kitchen island; do you remember that

03:06PM  19  picture?

03:06PM  20  A.  Yes.

03:06PM  21  Q.  So there's boxes like that that are being set up in the

03:06PM  22  residence, correct?

03:06PM  23  A.  Just that one, but yes.

03:06PM  24  Q.  Okay.  And the rooms in the house are being designated by

03:06PM  25  different search -- I don't want to call them teams, but

03:06PM     1    people are sort of pairing off and searching various rooms in

03:06PM     2    the house, correct?

03:06PM     3    A.   Yes.

03:06PM     4    Q.   Okay.  And that's all, you know, while Mr. Bongiovanni is

03:06PM     5    talking to you, correct?

03:06PM     6    A.   Yes.

03:06PM     7    Q.   And at the same time, his wife is present, correct?

03:06PM     8    A.   She is.

03:06PM     9    Q.   And his stepson is present, correct?

03:06PM    10    A.   Initially, and then he went to school.

03:06PM    11    Q.   But he, to your knowledge, the stepson was there when the

03:06PM    12    search warrant was first executed, correct?

03:06PM    13    A.   He was, because he was still there when I got to the

03:06PM    14    house.

03:06PM    15    Q.   Okay.  Now, you conduct an interview with Mr. Bongiovanni

03:06PM    16    at his dining room table, correct?

03:07PM    17    A.   Yes.

03:07PM    18    Q.   You had a Smartphone with you at the time?

03:07PM    19    A.   I did.

03:07PM    20    Q.   You didn't record the interview in any fashion with the

03:07PM    21    Smartphone, correct?

03:07PM    22    A.   I did not.

03:07PM    23    Q.   And to your knowledge, though, this would have been the

03:07PM    24    second interview conducted directly with Mr. Bongiovanni in

03:07PM    25    the course of your investigation, correct?

03:07PM    1    A.  Yes.

03:07PM    2    Q.  The first one being the one in March, and now you're

03:07PM    3    getting to this one at his house?

03:07PM    4    A.  Yes.

03:07PM    5    Q.  It involves multiple federal agencies, correct?

03:07PM    6    A.  Yes.

03:07PM    7    Q.  Involved potential allegations of corruption, correct?

03:07PM    8    A.  Yes.

03:07PM    9    Q.  And you had previously reviewed some evidence related to

03:07PM   10    the Michael Sinatra burglary in Tonawanda, correct?

03:07PM   11    A.  Yes.

03:07PM   12    Q.  And you were aware that in that investigation, Michael

03:07PM   13    Sinatra was video and audio recorded interviewed, correct?

03:07PM   14    A.  I don't know if that's accurate, no.  I remember

03:07PM   15    reviewing the police reports.

03:08PM   16    Q.  Okay.  So you don't know -- you don't know whether he was

03:08PM   17    video and audio recorded when he was interviewed?

03:08PM   18    A.  I don't.

03:08PM   19    Q.  Okay.  But when you did this interview, you walked into

03:08PM   20    it with specific topics you wanted to talk to Mr. Bongiovanni

03:08PM   21    about, correct?

03:08PM   22    A.  Yes.

03:08PM   23    Q.  I think you told the jury on direct, you were still in

03:08PM   24    the process of investigating, correct?

03:08PM   25    A.  Yes.

03:08PM  1  Q.  And obviously Mr. Bongiovanni's answers or non answers or

03:08PM  2  however he reacts to this interview are going to be important

03:08PM  3  for you in how you direct your investigation, correct?

03:08PM  4  A.  Yes.

03:08PM  5  Q.  Okay.  Now, you've interviewed, fair to say, a lot of

03:08PM  6  people in your career?

03:08PM  7  A.  Probably many hundreds, yes.

03:08PM  8  Q.  Yeah.  I was gonna ask a number.  Hundreds?

03:08PM  9  A.  Yes.

03:08PM  10  Q.  You've interviewed both witnesses and subjects of

03:08PM  11  investigation, correct?

03:08PM  12  A.  Yes.

03:08PM  13  Q.  Fair to say that when interviewing witnesses or subjects,

03:09PM  14  body language can be important?

03:09PM  15  A.  Yes.

03:09PM  16  Q.  Tone of voice can be important, correct?

03:09PM  17  A.  Yes.

03:09PM  18  Q.  Facial expressions can be important?

03:09PM  19  A.  Yes.

03:09PM  20  Q.  Because all of these help you as an interviewer to

03:09PM  21  determine what the words the person is actually saying might

03:09PM  22  mean, correct?

03:09PM  23  A.  Yes.

03:09PM  24  Q.  Okay.  It can help you to assess whether the individual

03:09PM  25  you're interviewing is potentially confused by a question,

03:09PM 1  correct?

03:09PM 2  A.  It could.

03:09PM 3  Q.  You did record the interview in some fashion with

03:09PM 4  handwritten notes, correct?

03:09PM 5  A.  Yes.

03:09PM 6  Q.  Now, remind us again.  Were you the primary questioner of

03:09PM 7  Mr. Bongiovanni during this interview?

03:09PM 8  A.  I was.

03:09PM 9  Q.  Okay.  So you're both questioning him, and you're writing

03:09PM 10  notes, correct?

03:09PM 11  A.  Yes.

03:09PM 12  Q.  So fair to say your attention is sort of split between

03:10PM 13  doing both, correct?

03:10PM 14  A.  Yes.

03:10PM 15  Q.  Okay.  And then ultimately you reduce those notes to a

03:10PM 16  typewritten report, correct?

03:10PM 17  A.  Yes, a few days later.

03:10PM 18  Q.  Right.  So you get the handwritten notes, make

03:10PM 19  typewritten report a few days later, correct?

03:10PM 20  A.  Yes.

03:10PM 21  Q.  And then that's what you -- you reviewed that typewritten

03:10PM 22  report in preparation for testimony today, correct?

03:10PM 23  A.  Yes.

03:10PM 24  Q.  And that's now, you know, about five years later,

03:10PM 25  correct?

03:10PM    1    A.  Yes.

03:10PM    2    Q.  Okay.  So let's talk about some things Mr. Bongiovanni

03:10PM    3    says during the interview.

03:10PM    4        You asked him a little bit about Peter Gerace, correct?

03:10PM    5    A.  I did.

03:10PM    6    Q.  That subject comes up in the interview, correct?

03:10PM    7    A.  His relationship with Peter Gerace was the first thing

03:10PM    8    that came up, yes.

03:10PM    9    Q.  Okay.  And I think your testimony was he wouldn't

03:10PM   10    characterize his relationship --

03:10PM   11              **MR. TRIPI:**  Objection.

03:10PM   12              **MR. MacKAY:**  Did he -- I'll withdraw.

03:10PM   13              **THE COURT:**  Okay, withdrawn.

03:10PM   14              **BY MR. MacKAY:**

03:10PM   15    Q.  He used the -- did -- he said something to the effect

03:11PM   16    of --

03:11PM   17              **MR. TRIPI:**  Objection.

03:11PM   18              **THE COURT:**  What's the objection?

03:11PM   19              **MR. TRIPI:**  Hearsay.  He's asking what his client

03:11PM   20    said and rephrasing it in his words, it's hearsay.  He's not

03:11PM   21    the party opponent.

03:11PM   22              **MR. MacKAY:**  He said on direct.

03:11PM   23              **MR. TRIPI:**  Can we approach?

03:11PM   24              **THE COURT:**  Yeah, come up.

03:11PM   25              (Sidebar discussion held on the record.)

03:11PM  1        THE COURT:  This is cross-examination based on what

03:11PM  2   you got him to say on direct.

03:11PM  3        MR. TRIPI:  Yeah, there's nuance to it though,

03:11PM  4   Your Honor.  If he's asking a question about what this witness

03:11PM  5   said on direct, that's going to be fine.

03:11PM  6        But I thought I heard the rephrasing of his question

03:11PM  7   was, he's saying what Mr. Bongiovanni said during the

03:11PM  8   interview.

03:11PM  9        And counsel is not permitted under the rules of

03:11PM  10  hearsay to restate what their client said in the form of a

03:11PM  11  question in the format they so choose to drive at a yes.

03:11PM  12  That's hearsay.

03:11PM  13       THE COURT:  You can cross-examine on that.

03:11PM  14       MR. TRIPI:  Judge, that's hearsay.  They're not the

03:12PM  15  party opponent.

03:12PM  16       THE COURT:  I understand that.  This is

03:12PM  17  cross-examination.

03:12PM  18       MR. TRIPI:  But they don't get to restate it, and

03:12PM  19  then get to ask for yes or no.

03:12PM  20       THE COURT:  He can say to him you testified on direct

03:12PM  21  that Mr. Bongiovanni said I stole this document from my --

03:12PM  22  isn't it true that he didn't say that to you?  That he said

03:12PM  23  something else you.  He can't do that?

03:12PM  24       MR. TRIPI:  That's not what's happening though.

03:12PM  25       MR. MacKAY:  I'm just asking --

03:12PM    1          **MR. TRIPI:**  That's not what's happening.  I would

03:12PM    2   agree with you there, Judge.  I don't think that that's what

03:12PM    3   just happened.

03:12PM    4          **MR. MacKAY:**  I'm just asking, he characterized it as

03:12PM    5   not a close relationship, which I think is actually what he

03:12PM    6   reported that Mr. Bongiovanni said to him on direct.

03:12PM    7          **THE COURT:**  Right.  Yeah.  I'm going to allow this.

03:12PM    8          **MR. TRIPI:**  Judge --

03:12PM    9          **THE COURT:**  I'm going to allow this.

03:12PM   10          **MR. TRIPI:**  Okay.  Just in general terms --

03:12PM   11          **THE COURT:**  Make your record.

03:12PM   12          **MR. TRIPI:**  In general terms, I don't want to make a

03:12PM   13   record necessarily, but in general terms, Judge, they can't

03:12PM   14   elicit their client's own statements --

03:12PM   15          **THE COURT:**  I agree --

03:12PM   16          **MR. TRIPI:**  -- and rephrase --

03:12PM   17          **THE COURT:**  -- 100 percent.

03:12PM   18          **MR. TRIPI:**  -- it.  So that's where I'm at.

03:12PM   19          **THE COURT:**  I agree --

03:12PM   20          **MR. TRIPI:**  That's all.

03:12PM   21          **THE COURT:**  -- with you 100 percent on that.  I don't

03:12PM   22   think there's any question about that.  I think that it's not

03:12PM   23   hearsay when the party opponent introduces it.  It's hearsay

03:12PM   24   when the party himself or herself introduces it.  I understand

03:13PM   25   that very well.

03:13PM    1          This is cross-examination about what you elicited on

03:13PM    2    direct that his client said to the witness.  And there's no

03:13PM    3    doubt in my mind that it is appropriate to probe the witness

03:13PM    4    on those statements you made to him.

03:13PM    5          **MR. TRIPI:**  My only -- my only point to that, Judge,

03:13PM    6    I don't have any issue with that, but if they're restating

03:13PM    7    words in a way that's more favorable to their client in

03:13PM    8    driving at a yes, that's gonna be a hearsay objection.

03:13PM    9          **THE COURT:**  That's cross-examination.

03:13PM   10          (End of sidebar discussion.)

03:13PM   11          **BY MR. MacKAY:**

03:13PM   12    Q.  Okay.  So Mr. Bongiovanni attempted to characterize his

03:13PM   13    relationship with Peter Gerace, correct?

03:13PM   14    A.  He did.

03:13PM   15    Q.  And he said it was not a close relationship, correct?

03:14PM   16    A.  Correct, that's what he said.

03:14PM   17    Q.  That was a term he used, correct?

03:14PM   18    A.  Yes.

03:14PM   19    Q.  The phrase "close relationship" were the words that came

03:14PM   20    out of his mouth as you recall it, correct?

03:14PM   21    A.  It first came out of my mouth in the form of a question,

03:14PM   22    and then he responded to that.

03:14PM   23    Q.  Okay.  So, walk through.  What did you ask?  What was the

03:14PM   24    question you asked?

03:14PM   25    A.  Talk about the relationship.  Is it a close relationship?

03:14PM   1   Q.  And his answer was?

03:14PM   2   A.  That it was not.

03:14PM   3   Q.  Okay.  So, the sum and substance you took from that is

03:14PM   4   Mr. Bongiovanni's telling you it's not a close relationship,

03:14PM   5   correct?

03:14PM   6   A.  Correct.

03:14PM   7   Q.  Okay.  As you sit here, you don't know what he meant by

03:14PM   8   the phrase "close relationship," correct?

03:14PM   9   A.  I don't think that's accurate, because we asked some

03:14PM  10   follow-up questions about communication and --

03:14PM  11   Q.  Well --

03:14PM  12   A.  -- additional questions about the relationship.

03:14PM  13   Q.  Sure.  But you asked questions to understand what in fact

03:14PM  14   the relationship was between Mr. Gerace and Mr. Bongiovanni,

03:14PM  15   correct?

03:15PM  16   A.  Yes.

03:15PM  17   Q.  But as you sit here today, when Mr. Bongiovanni responded

03:15PM  18   to your question about whether it was a close relationship,

03:15PM  19   you don't know how he defines that term in his mind, correct?

03:15PM  20   A.  I did not ask him to define that term, no.

03:15PM  21   Q.  Right.  That's what I'm getting at.

03:15PM  22       There wasn't a series of questions to define generally

03:15PM  23   what Mr. Bongiovanni thought close relationship was, correct?

03:15PM  24   A.  No, again, I have to disagree with that a little bit,

03:15PM  25   because I think the one-way relationship comment doesn't come

03:15PM    1    out if we're not talking about what that means.

03:15PM    2    Q.  Okay.  So, beyond that though, Mr. Bongiovanni expressed

03:15PM    3    annoyance about Peter, correct?

03:15PM    4    A.  He did.

03:15PM    5    Q.  Okay.  And then I think you just said it, but the other

03:15PM    6    phrase that came up was that the relationship was one sided?

03:15PM    7    A.  Yes.

03:15PM    8    Q.  Okay.  That was his description of what the relationship

03:15PM    9    was, correct?

03:15PM   10    A.  Yes.

03:16PM   11    Q.  And then fair to say you probed that explanation a little

03:16PM   12    bit more with questions about contact between Mr. Gerace and

03:16PM   13    Mr. Bongiovanni, correct?

03:16PM   14    A.  Yes.

03:16PM   15    Q.  And one of the questions you asked Mr. Bongiovanni was

03:16PM   16    when he had last spoken to Peter Gerace, correct?

03:16PM   17    A.  Yes.

03:16PM   18    Q.  And you get the answer over a year ago, correct?

03:16PM   19    A.  Yes.

03:16PM   20    Q.  So Mr. Gerace's number, as you recall, it is

03:16PM   21    716-725-1931, correct?

03:16PM   22    A.  Yes.

03:16PM   23    Q.  And in connection with this investigation, you reviewed

03:16PM   24    phone records, correct?

03:16PM   25    A.  I did.

| | | |
|---|---|---|
| 03:16PM | 1 | Q.  You reviewed both Mr. Bongiovanni's phone records, |
| 03:16PM | 2 | correct? |
| 03:16PM | 3 | A.  In part, yes. |
| 03:16PM | 4 | Q.  And Mr. Gerace's phone records, correct? |
| 03:16PM | 5 | A.  In part, yes. |
| 03:16PM | 6 | Q.  Okay.  Any reason to disagree with me that the last time |
| 03:16PM | 7 | Mr. Bongiovanni and Mr. Gerace, that there's a phone call |
| 03:16PM | 8 | reflected between them, is November 12th of 2017? |
| 03:16PM | 9 | A.  Without looking at the records, I don't know. |
| 03:17PM | 10 | **MR. MacKAY:**  Okay.  Ms. Champoux, can we pull up |
| 03:17PM | 11 | what's in evidence as Government Exhibit 358. |
| 03:17PM | 12 | Okay.  So we're -- just so the record's clear, we're |
| 03:17PM | 13 | in a folder for Government Exhibit 358, can we go to the file |
| 03:17PM | 14 | that begins with the PDF. |
| 03:17PM | 15 | **THE COURT:**  This is all in evidence. |
| 03:17PM | 16 | **MR. MacKAY:**  Yes. |
| 03:17PM | 17 | **MR. TRIPI:**  Yes. |
| 03:17PM | 18 | **MR. MacKAY:**  19013167bills.pdf. |
| 03:17PM | 19 | Okay.  And can we control F, let's do 725-1931.  All |
| 03:18PM | 20 | right.  We're not going to go through 560, I'm sorry, 55. |
| 03:18PM | 21 | Can we go to page 505 in this record? |
| 03:18PM | 22 | **BY MR. MacKAY:** |
| 03:18PM | 23 | Q.  Okay.  Do you see that that's reflected, it's |
| 03:18PM | 24 | November 11th, I'm sorry, November 12th.  Do you see |
| 03:18PM | 25 | Mr. Gerace's number there? |

03:18PM   1   A.  Yes.

03:18PM   2   Q.  And just so the jury's clear, we're looking at

03:18PM   3   Mr. Bongiovanni's phone records, correct?

03:18PM   4   A.  Yes, his DEA phone.

03:18PM   5   Q.  Okay.  And can you see up at the top the bill says due

03:18PM   6   date, 12/18/2017?

03:18PM   7   A.  Yes.

03:18PM   8   Q.  So, fair to say these calls here occur in November of

03:18PM   9   2017, correct?

03:18PM  10   A.  Yes.

03:18PM  11   Q.  From what you can see in the records, correct?

03:18PM  12   A.  From this page of this phone record, yes.

03:18PM  13   Q.  Yes.  Okay.

03:19PM  14         **MR. MacKAY:**  Okay.  Can we close that out,

03:19PM  15   Ms. Champoux.  And can we open Government Exhibit 359.

03:19PM  16         It's also in evidence.

03:19PM  17         It's going to be a folder.  Can we go to the one

03:19PM  18   that's -- that ends in underscore 2016 underscore 2018.pdf.

03:19PM  19         Can we go to page 990 here.

03:19PM  20         And can we scroll down a little bit further.  A

03:19PM  21   little bit further, please.

03:19PM  22         **BY MR. MacKAY:**

03:19PM  23   Q.  And can you see where I've highlighted, that's

03:20PM  24   Mr. Bongiovanni's number at the bottom there, correct?

03:20PM  25   A.  Yes.

03:20PM   1    Q.  818-0966, correct?

03:20PM   2    A.  Yes.

03:20PM   3    Q.  That's that same date, November 12th, 2017, correct?

03:20PM   4    A.  Yes.

03:20PM   5    Q.  And we can pull it back up, but do you have anything to

03:20PM   6    disagree with me that the 42-minute length corresponds to the

03:20PM   7    42 minutes that's in the other document?

03:20PM   8    A.  No.

03:20PM   9    Q.  So this is sort of a reflection of -- it's the other side

03:20PM   10   of the phone call that we see from the other -- that we've

03:20PM   11   now seen both sides of the phone records, correct?

03:20PM   12   A.  Yes.

03:20PM   13   Q.  Okay.

03:20PM   14        MR. MacKAY:  Now, Ms. Champoux can we go to

03:20PM   15   page 1056.  Scroll down a little bit further.

03:20PM   16        BY MR. MacKAY:

03:20PM   17   Q.  So we're now on a further page past what we looked at.

03:21PM   18   And do you see again Mr. Bongiovanni's phone number?

03:21PM   19   A.  Yes.

03:21PM   20   Q.  I might have drawn right over that, but same phone

03:21PM   21   number, the date is January 16th?

03:21PM   22   A.  Yes.

03:21PM   23   Q.  And do you see here where it says VM deposit CL?

03:21PM   24   A.  Yes.

03:21PM   25   Q.  Do you understand that when reviewing phone records to

03:21PM  1    mean that looks like Mr. Gerace attempted to call

03:21PM  2    Mr. Bongiovanni and left a voicemail?

03:21PM  3    A.  Yes.

03:21PM  4    Q.  Okay.  So the search process, I'm not going to go through

03:21PM  5    all of it, but any reason to disagree with me that the

03:21PM  6    remainder of these bills through 2/8/2018 his number doesn't

03:21PM  7    show up anymore?

03:21PM  8    A.  I don't know that that's true or not.

03:21PM  9    Q.  Okay.

03:21PM  10   A.  And I wasn't -- the question wasn't only about telephone

03:21PM  11   calls --

03:21PM  12   Q.  Okay.

03:21PM  13   A.  -- when I asked him.

03:21PM  14   Q.  Right.  And we're going to get to that.

03:21PM  15       So it would have talked about, and what we've seen here,

03:21PM  16   is that looks like --

03:21PM  17           **MR. MacKAY:**  You can take that down, Ms. Champoux,

03:21PM  18   thank you.

03:22PM  19           **BY MR. MacKAY:**

03:22PM  20   Q.  -- there were some phone calls in November of 2017,

03:22PM  21   correct?

03:22PM  22   A.  Yes.  According to the records.

03:22PM  23   Q.  From the records, it looks like Mr. Gerace tried to leave

03:22PM  24   Mr. Bongiovanni a voicemail in early 2018, correct?

03:22PM  25   A.  Yes.

03:22PM    1    Q.  And then so that time period is approximately a year and

03:22PM    2    a half before you had interviewed Mr. Bongiovanni at his

03:22PM    3    house, correct?

03:22PM    4    A.  Yes.

03:22PM    5    Q.  Now, we went through those text messages in -- you went

03:22PM    6    through them on direct in Government Exhibit 310D; do you

03:22PM    7    recall all those?

03:22PM    8    A.  I do.

03:22PM    9    Q.  We're going to go through them later in detail, but do

03:22PM   10    you agree that with the exception of the June 30th, 2018

03:22PM   11    incident at the cottage, do you agree with me that after that

03:22PM   12    date, early -- I'm sorry, agree with me that after early

03:22PM   13    2018, and with the exception of that date at the cottage,

03:22PM   14    there's nothing in the text messages that reflects they ever

03:23PM   15    met up, correct?

03:23PM   16    A.  I'd have to go back and look at them.

03:23PM   17    Q.  I'll circle back to that later.  But you had understood

03:23PM   18    that they had potentially been together at a cottage on

03:23PM   19    June 30th of 2018, correct?

03:23PM   20    A.  Yes.

03:23PM   21    Q.  And by the time you interview Mr. Bongiovanni, that's

03:23PM   22    June 6th, 2019 at his house, correct?

03:23PM   23    A.  Yes.

03:23PM   24    Q.  That's almost a year in the past, but not quite, correct?

03:23PM   25    A.  Yes.

| | | |
|---|---|---|
| 03:23PM | 1 | Q.  Just about 11 months, correct? |
| 03:23PM | 2 | A.  Yes. |
| 03:23PM | 3 | Q.  Okay.  Now, the 2018 cottage party. |
| 03:23PM | 4 | So when you walked into the interview with |
| 03:23PM | 5 | Mr. Bongiovanni, the only evidence you had about this party |
| 03:23PM | 6 | came from, was it, number 1, your review of these text |
| 03:23PM | 7 | messages that had come from Mr. Gerace's phone, correct? |
| 03:24PM | 8 | A.  From, well, from the memo.  There were some -- most of |
| 03:24PM | 9 | the text messages or at least some of them were in the memos. |
| 03:24PM | 10 | And then I reviewed Mr. Gerace's phone.  So I reviewed the |
| 03:24PM | 11 | text messages from there also. |
| 03:24PM | 12 | Q.  And then you had had some conversations with Phlycia Hunt |
| 03:24PM | 13 | at that time? |
| 03:24PM | 14 | A.  Not about the party, no. |
| 03:24PM | 15 | Q.  Okay.  So at that point in time, she had not done that |
| 03:24PM | 16 | circling on the photo, correct? |
| 03:24PM | 17 | A.  No, that was four months later. |
| 03:24PM | 18 | Q.  Okay.  Now you had the text messages that we've all seen |
| 03:24PM | 19 | in 310D because they came from Mr. Gerace's phone? |
| 03:24PM | 20 | A.  Yes. |
| 03:24PM | 21 | Q.  But you had not walked through those text messages at the |
| 03:24PM | 22 | time of this interview with Mr. Bongiovanni, correct? |
| 03:24PM | 23 | A.  Not one text message at a time, no.  But I did walk |
| 03:24PM | 24 | through them with my questions.  I mean, that's part of what |
| 03:24PM | 25 | I was doing. |

03:24PM   1   Q.  Okay.

03:24PM   2        **MR. MacKAY:**  Ms. Champoux, can we put up Government

03:25PM   3   Exhibit 310D on page 68.

03:25PM   4        **BY MR. MacKAY:**

03:25PM   5   Q.  And just before we start going through a few of these,

03:25PM   6   Mr. Bongiovanni had described this as sort of a chance

03:25PM   7   encounter, correct?

03:25PM   8   A.  Which encounter?

03:25PM   9   Q.  The June 30th cottage party.

03:25PM   10  A.  Yes.

03:25PM   11  Q.  Okay.  He described it as not a planned event, correct?

03:25PM   12  A.  Correct.

03:25PM   13  Q.  Okay.  I just want to set the stage here.

03:25PM   14      Let's start -- there's a text message from Mr. Gerace to

03:25PM   15  Mr. Bongiovanni that's April 24th, 2018, and he says, I know

03:25PM   16  brother, but life is going by fast, correct?

03:25PM   17  A.  Yes.

03:25PM   18  Q.  And then Mr. Bongiovanni sort of concludes the

03:26PM   19  conversation that day by texting, sure is, correct?

03:26PM   20  A.  Yes.

03:26PM   21  Q.  Now the next jump down is to June 5th, 2018.  And does

03:26PM   22  that appear to be sort of one of those advertisement blast

03:26PM   23  text messages that we've seen throughout the text string?

03:26PM   24  A.  I mean, it's not a golf outing, it's a different event.

03:26PM   25  But yes, it seems to be.

03:26PM    1    Q.  Yeah, I mean, what I was terming sort of an advertising

03:26PM    2    blast is like these text messages that advertise something

03:26PM    3    going on at Pharaoh's, correct?

03:26PM    4    A.  Yes.  But that wouldn't come as a blast from Mr. Gerace's

03:26PM    5    phone.

03:26PM    6    Q.  Well --

03:26PM    7    A.  What I'm saying is it's not like constant contact or

03:26PM    8    something like that.  It's a text message that's sent, but it

03:26PM    9    appears to be probably a copy of something and forwarded.

03:26PM   10    Q.  That's what I'm getting at.  Is in your experience, have

03:26PM   11    you sometimes seen that when things are being advertised by

03:26PM   12    text, somebody might cut and paste a standard message and

03:26PM   13    send it out to a bunch of people?

03:27PM   14    A.  Well, this isn't a text message with a bunch of people.

03:27PM   15    Q.  No, I mean, I'm saying they might send the same --

03:27PM   16    A.  Yeah.

03:27PM   17    Q.  -- worded text message to a bunch of people?

03:27PM   18    A.  Yes.

03:27PM   19    Q.  You've gotten those in your own life, you know,

03:27PM   20    advertising some event --

03:27PM   21    A.  Yes.

03:27PM   22    Q.  -- that's going on, correct?

03:27PM   23    A.  Yes.

03:27PM   24    Q.  Now, so that's June 5th, 2018.  Jumping down, the next

03:27PM   25    text message, Mr. Gerace says on June 30th, am I ever gonna

USA v Bongiovanni - Ryan - MacKay/Cross - 9/11/24

114

03:27PM  1   see you again, correct?

03:27PM  2   A.   Yes.

03:27PM  3   Q.   And, you know, the text messages show there's no text

03:27PM  4   message between June 5th and June 30th, correct?

03:27PM  5   A.   Not in the extraction anyway.

03:27PM  6   Q.   Okay.  And then you get Mr. Bongiovanni's response about

03:27PM  7   two hours after Mr. Gerace sends the message, it says miss

03:27PM  8   you bro.  I'm going you to Sunset today, correct?

03:27PM  9   A.   Yes.

03:27PM  10  Q.   Now in that text message, fair to say, he's not --

03:27PM  11  there's no explicit invite to join him at Sunset, correct?

03:28PM  12  A.   I think that's what their next several text messages are

03:28PM  13  about, isn't it?

03:28PM  14  Q.   Well, I'm gonna go through those, but in this text

03:28PM  15  message here, he's not saying, you know, come join me at

03:28PM  16  Sunset, correct?

03:28PM  17  A.   If you're asking me if that literally doesn't say come

03:28PM  18  see me at Sunset, then yes, that's correct.

03:28PM  19  Q.   But, you know, what he's actually saying, the actual

03:28PM  20  words are, miss you, bro, I'm going up to Sunset today,

03:28PM  21  correct?

03:28PM  22  A.   Yes, but you're asking me to take it out of context with

03:28PM  23  the rest of the text string.

03:28PM  24  Q.   I'm asking you to just talk about this one text message

03:28PM  25  first.

03:28PM   1      In that text message he's, in sum and substance, telling

03:28PM   2  him I'm going to Sunset today, correct?

03:28PM   3  A.  Yes.

03:28PM   4      MR. MacKAY:  Can we scroll down a little bit,

03:28PM   5  Ms. Champoux?

03:28PM   6      BY MR. MacKAY:

03:28PM   7  Q.  Now in the response a couple minutes later, Mr. Gerace

03:28PM   8  says do you have a cottage, correct?

03:28PM   9  A.  Yes.

03:28PM   10  Q.  And then the next text a couple minutes after that

03:28PM   11  Mr. Bongiovanni says, no, just going up.  Tommy Doc is in

03:29PM   12  town, and a couple of Lindsay's friends, correct?

03:29PM   13  A.  Yes.

03:29PM   14  Q.  And then Mr. Gerace responds 30 seconds later saying

03:29PM   15  cool.  Do you see that text?

03:29PM   16  A.  I do.

03:29PM   17  Q.  And the next text message, he says there's a -- I,

03:29PM   18  there's a girl in town from Las Vegas staying with me with

03:29PM   19  some other chick that works for me.  Let me see what they

03:29PM   20  want to do.  That's the next message, correct?

03:29PM   21  A.  Yes.

03:29PM   22  Q.  Okay.  Now --

03:29PM   23      MR. MacKAY:  Can you scroll up a little further

03:29PM   24  Ms. Champoux?

03:29PM   25      MS. CHAMPOUX:  Up or down.

03:29PM    1          **MR. MacKAY:**  Up.  What I meant was down.  Okay.

03:29PM    2    Thank you.

03:29PM    3          **BY MR. MacKAY:**

03:29PM    4    Q.  And then Mr. Bongiovanni responds I'll be cool for a

03:29PM    5    happy hour any time, I'm off the 4, 5, 6.  Do you see that

03:29PM    6    text message?

03:30PM    7    A.  I do.

03:30PM    8    Q.  And then what he says is okay, we are going in the

03:30PM    9    afternoon about 1 or 2.  That's the next text message,

03:30PM   10    correct?

03:30PM   11    A.  Yes.

03:30PM   12    Q.  And in context, you understand that to mean he's

03:30PM   13    reporting that he's -- when he might be going to Tommy

03:30PM   14    Doctor's cottage, correct?

03:30PM   15    A.  Yes.

03:30PM   16    Q.  Now, fair to say that the next few text messages are some

03:30PM   17    back and forth about a concert that might be occurring on the

03:30PM   18    holiday weekend, correct?

03:30PM   19    A.  And traffic difficulties to get to Sunset related --

03:30PM   20    Q.  Yep.

03:30PM   21    A.  -- to the concert.

03:30PM   22    Q.  Yep.

03:30PM   23          **MR. MacKAY:**  Now, can we scroll down a little bit

03:30PM   24    further, Ms. Champoux.  Little bit further please.  I think to

03:30PM   25    page 72.

03:30PM  1          **BY MR. MacKAY:**

03:30PM  2   Q.  Okay.  So we're on page 72 now, I think it is.

03:30PM  3        We're still on June 30th, 2018.  Peter Gerace texts and

03:31PM  4   says I'm thinking about taking them down to RiverWorks.  Last

03:31PM  5   time I was there, I was with you and Lindsay.  See that text

03:31PM  6   message?

03:31PM  7   A.  I do.

03:31PM  8   Q.  Okay.  Then next text message, he -- fair to say he

03:31PM  9   appears to be talking about a past time they went to Dock at

03:31PM  10  the Bay?

03:31PM  11  A.  After they were at RiverWorks, was the way I read that.

03:31PM  12  Q.  Right.  And so both of these two text messages they're

03:31PM  13  talking about the -- fair to say looks like they're

03:31PM  14  reminiscing about a past outing they had at some point in

03:31PM  15  time, correct?

03:31PM  16  A.  Yes.

03:31PM  17  Q.  Okay.  But in the first text message, what

03:31PM  18  Mr. Bongiovanni -- what Mr. Gerace is communicating is the

03:31PM  19  women that I'm with, I'm thinking of taking them to

03:31PM  20  RiverWorks; is that fair to say?

03:31PM  21  A.  Yes.

03:31PM  22  Q.  Okay.  The context of that message is Mr. Gerace

03:31PM  23  communicating the women that I've got in town, one of them in

03:31PM  24  from out of town from Vegas, I'm thinking of taking them to

03:32PM  25  RiverWorks, correct?

03:32PM    1    A.  Yes.

03:32PM    2    Q.  Okay.  And then Mr. Bongiovanni responds and says at the

03:32PM    3    end, yes, have fun, be safe.

03:32PM    4    A.  Yes.

03:32PM    5    Q.  Now, after that, I mean, so that occurs at about -- this

03:32PM    6    was 3:48 UTC, and help me with my math, that would be what

03:32PM    7    time?

03:32PM    8    A.  Four hours earlier in Buffalo that day.  So 11:48.

03:32PM    9    Q.  So it's about noon on the 30th, correct?

03:32PM   10    A.  Yes.

03:32PM   11    Q.  And then the next message in the string occurs -- help me

03:32PM   12    with my math again, it's going to be four hours before that,

03:32PM   13    so 8:43 p.m.; is that correct?

03:32PM   14    A.  Yeah.  No.  7.

03:32PM   15    Q.  7.  7:43 p.m.  He says thanks brother, I'm home?

03:32PM   16        That's the message Mr. Gerace sends at that point in

03:32PM   17    time, correct?

03:33PM   18    A.  Yes.

03:33PM   19    Q.  And, again, right after that, the next message occurs --

03:33PM   20    what would essentially be early in the morning the next day,

03:33PM   21    July 1st, Mr. Bongiovanni stating glad you got home safe,

03:33PM   22    correct?

03:33PM   23    A.  Yes.

03:33PM   24    Q.  Okay.  So the last two messages that I've kind of

03:33PM   25    highlighted here, you understood the context of that to be

03:33PM  1   essentially Mr. Gerace texting Mr. Bongiovanni after he'd

03:33PM  2   gotten home from the cottage, correct?

03:33PM  3   A.  Yes.

03:33PM  4   Q.  Okay.  Meaning that you understood they had met up

03:33PM  5   before, and this is essentially glad to see you got home safe

03:33PM  6   text message at the back end of that, correct?

03:33PM  7   A.  I mean, if you're asking me is I read this in advance of

03:33PM  8   the interview, if I knew that had all related to the

03:33PM  9   cottage --

03:33PM  10  Q.  No, I'm saying as you sit here today, is that kind of

03:33PM  11  what you understand these text messages to mean?

03:33PM  12  A.  Yes.

03:33PM  13  Q.  Okay.  So, between this 3:48 p.m. -- or, well, we've

03:34PM  14  established to be 11:48 a.m., and the text message that

03:34PM  15  Mr. Gerace sends later at 7:43 p.m., there's no text messages

03:34PM  16  in here further about them specifically going to meet up at

03:34PM  17  the cottage, correct?

03:34PM  18  A.  No.

03:34PM  19  Q.  So, in the string of these text messages, the last text

03:34PM  20  message that Mr. Bongiovanni received that it shows in these

03:34PM  21  records is Peter Gerace saying he's going to RiverWorks,

03:34PM  22  correct?

03:34PM  23          **MR. TRIPI:**  Objection.  Misstates what the text says.

03:34PM  24          **THE COURT:**  Say it again?

03:34PM  25          **MR. TRIPI:**  Misstates what the text says.

03:34PM    1          **BY MR. MacKAY:**

03:34PM    2    Q.  I'm getting a little messy here, let me clear up some of

03:34PM    3    the things on the screen.

03:34PM    4          **THE COURT:**  Hang on.

03:34PM    5          **BY MR. MacKAY:**

03:34PM    6    Q.  So earlier in the day --

03:34PM    7          **THE COURT:**  Do you withdraw the question?

03:34PM    8          **MR. MacKAY:**  Yeah, I withdraw the question,

03:35PM    9    Your Honor.  Thank you.

03:35PM   10          **BY MR. MacKAY:**

03:35PM   11    Q.  So earlier in the day, Mr. Bongiovanni receives a text

03:35PM   12    where Peter's talking about going to RiverWorks, correct?

03:35PM   13    A.  He says I'm thinking about taking them down to

03:35PM   14    RiverWorks.

03:35PM   15    Q.  Right.  And RiverWorks, to your knowledge, that's in the

03:35PM   16    City of Buffalo, correct?

03:35PM   17    A.  It is.

03:35PM   18    Q.  It's kind of roughly in the area of the Sabres arena,

03:35PM   19    more or less?

03:35PM   20    A.  More or less.

03:35PM   21    Q.  More or less.  And Sunset Beach, that's about an hour

03:35PM   22    away in Chautauqua County, correct?

03:35PM   23    A.  I'm not sure how long it takes to drive there.

03:35PM   24    Q.  It's in Chautauqua County, correct?

03:35PM   25    A.  I never looked at a map to see where it -- what county

03:35PM   1   it's in.  I know it's on Lake Erie in that direction.

03:35PM   2   Q.  Okay.  Do you know it to be near Irving, New York?

03:35PM   3   A.  Sorry?

03:35PM   4   Q.  Do you know it to be near Irving, New York?

03:35PM   5   A.  That direction, yes.

03:35PM   6   Q.  Okay.  I mean, it's not right there in the City of

03:35PM   7   Buffalo; fair to say?

03:35PM   8   A.  No.  It's not.  It's further west down the lake.

03:35PM   9   Q.  Okay.  Further down south and west of the city, correct?

03:35PM  10   A.  Yes.

03:35PM  11   Q.  Okay.  So, other than a text message where there --

03:36PM  12   Mr. Gerace is communicating about a prior incident at the

03:36PM  13   Dock of the Bay, the text message before that, Mr. Gerace is

03:36PM  14   saying I'm going to RiverWorks, correct?

03:36PM  15   A.  He said he's thinking about going to RiverWorks.

03:36PM  16   Q.  Thinking of going to RiverWorks.

03:36PM  17       And we don't have to review all the phone records again,

03:36PM  18   but do you have any reason to disagree with me that there's

03:36PM  19   no phone contact in the records that can be seen between

03:36PM  20   Mr. Gerace and Mr. Bongiovanni on June 30th?

03:36PM  21   A.  No, I can't say that without seeing the records.

03:36PM  22   Q.  Okay.  Let's go to a different subject.

03:37PM  23       You asked Mr. Bongiovanni about this party in Toronto in

03:37PM  24   2016, correct?

03:37PM  25   A.  Yes.

USA v Bongiovanni - Ryan - MacKay/Cross - 9/11/24
122

03:37PM    1    Q.  And you understood that to be his sister-in-law's 30th

03:37PM    2    birthday party, correct?

03:37PM    3    A.  Yes.

03:37PM    4    Q.  Now at that point in time, it would have been

03:37PM    5    approximately three and a half years before you sat down with

03:37PM    6    Mr. Bongiovanni's house to do this interview, correct?

03:37PM    7    A.  Yes.

03:37PM    8    Q.  All right.  February of 2016 versus June 2019, correct?

03:37PM    9    A.  Yep, so three years and a few months, yes.

03:37PM   10    Q.  And his answer to one of your questions was, in sum and

03:37PM   11    substance, he couldn't remember if Anthony Gerace was there,

03:37PM   12    correct?

03:37PM   13    A.  That is correct.  He said he could not remember.

03:37PM   14    Q.  Okay.  Now, I'm not going to put it back up on the

03:37PM   15    screen, but do you recall if you were shown that photo of a

03:37PM   16    number of gentlemen including Mr. Bongiovanni that was all

03:37PM   17    purported to be taken up in Toronto?

03:37PM   18    A.  Yes.

03:37PM   19    Q.  Okay.  And you'd agree with Mr. Gerace is not in that

03:38PM   20    photo, correct?

03:38PM   21    A.  Anthony or Peter.

03:38PM   22    Q.  Anthony Gerace.

03:38PM   23    A.  Neither of them are in the photo.

03:38PM   24    Q.  But specifically, Anthony Gerace was not in that photo,

03:38PM   25    correct?

03:38PM   1    A.   He was not.

03:38PM   2         **MR. MacKAY:**  Ms. Champoux, can we go to page 19,

03:38PM   3    Government Exhibit 310D.

03:38PM   4         **BY MR. MacKAY:**

03:38PM   5    Q.   Directing your attention to this text message here.  This

03:38PM   6    text message indicates Mr. Bongiovanni texted Mr. Gerace and

03:38PM   7    says:  What up, bro?  Saw you -- brother in Toronto last

03:38PM   8    weekend.  That's what it says, correct?

03:38PM   9    A.   Are you asking --

03:38PM   10   Q.   That's what that says, correct?

03:38PM   11   A.   Yes.

03:38PM   12   Q.   Looks like he misspelled -- "you" should have been

03:38PM   13   "your," correct?

03:38PM   14   A.   That's the way I read it, yes.

03:38PM   15   Q.   Now, you don't know as you sit here today whether Anthony

03:38PM   16   Gerace and Joseph Bongiovanni interacted at all while they

03:39PM   17   were up in Toronto for this birthday party weekend event,

03:39PM   18   correct?

03:39PM   19   A.   I was told they were at the party together.

03:39PM   20   Q.   Right.  And you were told by -- was that information you

03:39PM   21   received from, ultimately, somebody else through Kevin

03:39PM   22   Myszka?

03:39PM   23   A.   What do you mean by from somebody else?

03:39PM   24   Q.   Well, who -- when you were told that they were there

03:39PM   25   together, where did you receive that information from?

03:39PM    1    A.  From Kevin Myszka.

03:39PM    2    Q.  Right.  That -- so Kevin Myszka had reported -- was that

03:39PM    3    directly to you, or was that through somebody else?

03:39PM    4    A.  To me.

03:39PM    5    Q.  You were in an interview and he reported that?

03:39PM    6    A.  Yes.

03:39PM    7    Q.  Okay.  So by the time you get to your interview with

03:39PM    8    Mr. Bongiovanni in June of 2019, your understanding about

03:39PM    9    what may or may not have happened up at the party was based

03:39PM   10    on Kevin Myszka had previously told you, correct?

03:39PM   11    A.  And a corresponding border crossing.

03:39PM   12    Q.  Yeah, and you -- let's go through that.  You had reviewed

03:40PM   13    some border crossing records, correct?

03:40PM   14    A.  Yes.

03:40PM   15    Q.  And from reviewing those records, you knew that Anthony

03:40PM   16    Gerace had crossed the border to go to Canada, correct?

03:40PM   17    A.  Yes.

03:40PM   18    Q.  And you knew Mr. Bongiovanni had crossed the border to go

03:40PM   19    to Canada as well, too, correct?

03:40PM   20    A.  Yes.

03:40PM   21    Q.  But nothing in the review of those records showed that

03:40PM   22    they had, for example, crossed together in the same vehicle,

03:40PM   23    correct?

03:40PM   24    A.  No, they did not.

03:40PM   25    Q.  And we don't need to go into detail, but border crossing

03:40PM   1   records just essentially show, you know, for example, what

03:40PM   2   time and what port somebody crossed at, correct?

03:40PM   3   A.   That depends on how deeply you look into them.  But at

03:40PM   4   their most basic level, that's what they show.

03:40PM   5   Q.   Yeah.  And the records that you reviewed were -- was it

03:40PM   6   fair to say they were more towards the basic level than the

03:40PM   7   more in-depth records?

03:40PM   8   A.   Yes, I was looking at them for the timing of the

03:40PM   9   crossings --

03:40PM   10  Q.   Right, and --

03:40PM   11  A.   -- to see if they corresponded with the party.

03:40PM   12  Q.   Right.  So when you walked into the interview with

03:40PM   13  Mr. Bongiovanni, number 1, you had information from Kevin

03:41PM   14  Myszka who was reporting what his recollection of the party

03:41PM   15  was, correct?

03:41PM   16  A.   Yes.

03:41PM   17  Q.   And then you had some border crossing information that

03:41PM   18  confirmed when people crossed to and from Canada, correct?

03:41PM   19  A.   Yes.

03:41PM   20  Q.   Okay.

03:41PM   21  A.   And then also the text messages about the previous party

03:41PM   22  at Boss.

03:41PM   23  Q.   Okay.  Now, other than what Mr. Myszka reported, you

03:41PM   24  don't have any firsthand information about whether

03:41PM   25  Mr. Bongiovanni and Anthony Gerace interacted while up in

USA v Bongiovanni - Ryan - MacKay/Cross - 9/11/24

126

03:41PM   1   Toronto, correct?

03:41PM   2   A.  Are you asking me if I saw them interact?

03:41PM   3   Q.  Yeah.  From -- as you sit here today, obviously, you

03:41PM   4   weren't there in 2016 at the party, correct?

03:41PM   5   A.  I was not.

03:41PM   6   Q.  And so in -- you weren't there to observe what did or did

03:41PM   7   not happen up at the party, correct?

03:41PM   8   A.  That's correct, I was not at the party.

03:41PM   9   Q.  And then your only other observation -- the only other

03:41PM   10  information about somebody who was at the party was being

03:41PM   11  reported through Kevin Myszka, correct?

03:41PM   12  A.  Yes.

03:41PM   13  Q.  All right.  Now, a similar subject, you asked about Mike

03:42PM   14  Sinatra, correct?

03:42PM   15  A.  Yes.

03:42PM   16  Q.  And, again, he's in that same photo with all the

03:42PM   17  gentlemen up in Toronto, correct?

03:42PM   18  A.  Yes.

03:42PM   19  Q.  And, again, the only information when you walked in to

03:42PM   20  interview Mr. Bongiovanni in June of 2019, you had -- about

03:42PM   21  what Mike Sinatra what might or might not have done were

03:42PM   22  those same groups of information, the -- what Kevin Myszka

03:42PM   23  reported and the border crossings, correct?

03:42PM   24  A.  What do you mean by what I might or might not have done?

03:42PM   25  Q.  I'm sorry, that's kind of a bad question.

03:42PM   1        When you're intending to question Mr. Bongiovanni about

03:42PM   2    Michael Sinatra, again, what you knew about whether Michael

03:42PM   3    Sinatra was up in Toronto for that party, that came from

03:42PM   4    information that was reported by Kevin Myszka, correct?

03:43PM   5    A.  About the party, yes.

03:43PM   6    Q.  Yeah.  And what I'm talking about whether is Michael

03:43PM   7    Sinatra was at that party, that information came from, number

03:43PM   8    1, the photo you reviewed, correct?

03:43PM   9    A.  Yes.

03:43PM   10   Q.  Number 2, what Kevin Myszka reported, correct?

03:43PM   11   A.  Yes.

03:43PM   12   Q.  And your review of border crossings, correct?

03:43PM   13   A.  Yes.

03:43PM   14   Q.  Okay.  And again, I may have asked this, but there was no

03:43PM   15   evidence that showed that Michael Sinatra and Joe Bongiovanni

03:43PM   16   either crossed to or from Canada together, correct?

03:43PM   17   A.  No, I think -- actually, well, I don't -- they didn't

03:43PM   18   cross together.  Mike Sinatra crossed with somebody else.  It

03:43PM   19   was either Kevin or Anthony, I don't recall which one.

03:43PM   20   Q.  Okay.  And Mr. Bongiovanni reported that he, in sum and

03:43PM   21   substance, he knew Mike Sinatra because it was his

03:43PM   22   landscaper, correct?

03:43PM   23   A.  That is what he said, yes.

03:43PM   24   Q.  Okay.  And you had looked into Mike Sinatra, and you know

03:44PM   25   that in fact he is a landscaper, correct?

| | | |
|---|---|---|
| 03:44PM | 1 | A.  He is a landscaper, and maybe something else, but yes, he |
| 03:44PM | 2 | does have a landscape business. |
| 03:44PM | 3 | Q.  Okay.  That's my question, he owns a landscape business, |
| 03:44PM | 4 | correct? |
| 03:44PM | 5 | A.  Yes. |
| 03:44PM | 6 | Q.  And Mr. Bongiovanni reported he had done some -- |
| 03:44PM | 7 | Mr. Sinatra had done some work on his house? |
| 03:44PM | 8 | A.  That's what he said, yes. |
| 03:44PM | 9 | **MR. MacKAY:**  Judge, just based on the time, this |
| 03:44PM | 10 | might be a good time to take the break before it gets too |
| 03:44PM | 11 | late. |
| 03:44PM | 12 | **THE COURT:**  Okay.  We'll take another break now. |
| 03:44PM | 13 | Remember my instructions about not communicating |
| 03:44PM | 14 | about the case and not making up your mind. |
| 03:44PM | 15 | We'll see you back near ten or 15 minutes. |
| 03:44PM | 16 | (Jury excused at 3:44 p.m.) |
| 03:45PM | 17 | **THE COURT:**  Anything for the record? |
| 03:45PM | 18 | **MR. MacKAY:**  No, Your Honor. |
| 03:45PM | 19 | **MR. COOPER:**  No, thank you, Judge. |
| 03:45PM | 20 | **THE COURT:**  Great.  See you in a few minutes. |
| 03:45PM | 21 | (Off the record at 3:45 p.m.) |
| 04:02PM | 22 | (Back on the record at 4:02 p.m.) |
| 04:02PM | 23 | (Jury not present.) |
| 04:02PM | 24 | **THE CLERK:**  All rise. |
| 04:02PM | 25 | **THE COURT:**  Please be seated. |

04:02PM    1          THE CLERK:  We are back on the record for the

04:02PM    2    continuation of the jury trial in case number 19-cr-227,

04:02PM    3    United States of America versus Joseph Bongiovanni.

04:02PM    4          All counsel and parties are present.

04:02PM    5          THE COURT:  Anything before we resume?

04:02PM    6          MR. TRIPI:  Not from the government, Judge.

04:02PM    7          MR. MacKAY:  No, Your Honor.

04:02PM    8          THE COURT:  Okay.  Let's bring the jury in, please.

04:02PM    9          We're still going to finish today?

04:02PM   10          MR. MacKAY:  It's going a little slower than I

04:02PM   11    expected, Judge.

04:02PM   12          MR. TRIPI:  We just talked about that.  Probably not.

04:02PM   13    It's close, but --

04:03PM   14          (Jury seated at 4:03 p.m.)

04:04PM   15          THE COURT:  The record will reflect that all our

04:04PM   16    jurors, again, are present.

04:04PM   17          I remind the witness that he's still under oath.

04:04PM   18          We'll go until 5:00 and break then.

04:04PM   19          You may continue, Mr. MacKay.

04:04PM   20          BY MR. MacKAY:

04:04PM   21    Q.  Okay.  Mr. Ryan, we were talking about Mike Sinatra; do

04:04PM   22    you remember that?

04:04PM   23    A.  Yes.

04:04PM   24    Q.  Kevin Myszka had reported information about Joe

04:04PM   25    Bongiovanni and Mike Sinatra being present in Toronto,

04:04PM  1   direct?

04:04PM  2   A.  Yes, sir.

04:04PM  3   Q.  You had no other information, though, that Mike Sinatra

04:04PM  4   and Joe Bongiovanni socialized together, correct?

04:04PM  5   A.  As I was doing the interview, you're asking?  Yes, that's

04:04PM  6   correct.

04:04PM  7   Q.  Now you also asked Mr. Bongiovanni questions about Peter

04:04PM  8   Gerace, you know, and there were responses about whether he

04:04PM  9   was a confidential source, correct?

04:04PM  10  A.  Yes.

04:05PM  11       **MR. MacKAY:**  Ms. Champoux, can we show Government

04:05PM  12  Exhibit 30A.

04:05PM  13       **BY MR. MacKAY:**

04:05PM  14  Q.  Do you recall being shown this on your direct, correct?

04:05PM  15  A.  Yes.

04:05PM  16  Q.  Are you familiar this is a report that Mr. Bongiovanni

04:05PM  17  writes back in 2009, correct?

04:05PM  18  A.  Yes.

04:05PM  19  Q.  And without going through it all, some part of it

04:05PM  20  reflects that Mr. Gerace was -- had acted as a confidential

04:05PM  21  source, correct?

04:05PM  22  A.  Yes, it says that.

04:05PM  23  Q.  Yep.  Now, this had occurred a decade before you

04:05PM  24  questioned Mr. Bongiovanni, correct?

04:05PM  25  A.  Yes.

04:05PM   1   Q.  This report was not in the context of the discussion you

04:05PM   2   were having about Mr. Gerace and being a confidential source

04:05PM   3   shown to him at any point in time?

04:05PM   4   A.  No.  I did not show him the report.

04:05PM   5   Q.  Meaning, you weren't having him review this report and

04:05PM   6   tell you what he meant by it, correct?

04:05PM   7   A.  Correct.

04:05PM   8   Q.  Now you're aware that Special Agent Chris Wisniewski had

04:06PM   9   a case in or about 2008, in relation to that case he

04:06PM  10   approached his supervisors about permitting Mr. Bongiovanni

04:06PM  11   to do a cold approach with Peter Gerace in relation to that

04:06PM  12   case; were you aware of that?

04:06PM  13   A.  No.

04:06PM  14   Q.  So you're not aware of any details of a cold approach

04:06PM  15   Mr. Bongiovanni may have done of Peter Gerace back in 2018 or

04:06PM  16   2009?

04:06PM  17   A.  Is this the Gambino case?  What case are we talking

04:06PM  18   about?

04:06PM  19   Q.  Well, I'm asking you just generally.  Do you have any

04:06PM  20   knowledge about Mr. Bongiovanni doing a cold -- what's -- let

04:06PM  21   me -- do you know what a cold approach is?

04:06PM  22   A.  Yes.

04:06PM  23   Q.  Okay.  Do you, as you sit here, do you -- do you have any

04:06PM  24   knowledge of any details of a potential cold approach

04:06PM  25   Mr. Bongiovanni did with Mr. Gerace or purportedly did with

04:07PM    1    Mr. Gerace back in 2008 or 2009?

04:07PM    2    A.  The information I have about '8 or '9 is that there was

04:07PM    3    information that came in that said Peter Gerace was involved

04:07PM    4    in a drug-trafficking organization, and that Mr. Bongiovanni

04:07PM    5    and Mr. Palmieri would interview him.

04:07PM    6    Q.  Okay.  But that's the only information you have about

04:07PM    7    that, correct?

04:07PM    8    A.  Yes.

04:07PM    9    Q.  Now, another topic you discussed --

04:07PM    10            MR. MacKAY:  You can take that down, Ms. Champoux.

04:07PM    11            BY MR. MacKAY:

04:07PM    12    Q.  -- another topic you discussed was this file, 100A, that

04:07PM    13    was found in the basement, correct?

04:07PM    14    A.  Yes.

04:07PM    15    Q.  That's the physical file, so the jury remembers what I'm

04:07PM    16    talking about, correct?

04:07PM    17    A.  The Redweld folder.  Yes.

04:07PM    18    Q.  Yes.  You're doing your interview, and that's eventually

04:07PM    19    presented to you by some other agent while you're doing your

04:07PM    20    interview, correct?

04:07PM    21    A.  Yes, it was William Gamble.

04:07PM    22    Q.  And in sum and substance, you asked Mr. Bongiovanni what

04:07PM    23    it was there for.  And he said that it was to verify

04:08PM    24    everything's on the up and up?

04:08PM    25    A.  Yes.

04:08PM   1   Q.   Okay.  And you asked him a couple times about the

04:08PM   2   subject, correct?

04:08PM   3   A.   Twice.

04:08PM   4   Q.   And then, but one of the answers he gives you is that he

04:08PM   5   wanted to verify everything is on the up and up, correct?

04:08PM   6   A.   The first time, yes.

04:08PM   7   Q.   And that he knew there was an ongoing IOC investigation,

04:08PM   8   correct?

04:08PM   9   A.   Yes.

04:08PM  10   Q.   Now at that -- in late 2018, early 2019, you were in

04:08PM  11   group -- let me withdraw that.

04:08PM  12        You were always in group D-58, correct?

04:08PM  13   A.   Yes --

04:08PM  14   Q.   And I think --

04:08PM  15   A.   -- since my time with DEA.

04:08PM  16   Q.   -- and I think you told us on your direct towards the end

04:08PM  17   of 2018 you stopped reporting to DEA, correct?

04:08PM  18   A.   Sometime between, I would say, from Halloween on, very

04:09PM  19   irregular.  By the end of the year, not at all.

04:09PM  20   Q.   Okay.  Now in your work with D-58, did you have much, if

04:09PM  21   any, interactions with D-57?

04:09PM  22   A.   No.

04:09PM  23   Q.   Okay.  So as you sit here today, you don't know what, if

04:09PM  24   anything, was being said by members of D-57 about any

04:09PM  25   investigations that were going on with Mr. Bongiovanni in

04:09PM    1   late 2018, correct?

04:09PM    2   A.  Nobody from D-57 said anything to me.  I didn't hear

04:09PM    3   anybody say anything.

04:09PM    4   Q.  That was my question.  Nobody told anything to you,

04:09PM    5   correct?

04:09PM    6   A.  Correct.

04:09PM    7   Q.  Now, the phrase "on the up and up," those were

04:09PM    8   Mr. Bongiovanni's words, correct?

04:09PM    9   A.  I don't know that they were exactly his words.

04:09PM   10       The sum and substance of the exchange was that he wanted

04:09PM   11   to be able to show that he had done a legitimate

04:09PM   12   investigation of Ron Serio.

04:09PM   13   Q.  Okay.  So that's what you -- so, those words he told you

04:09PM   14   to explain why he had the Serio file at his home, correct?

04:10PM   15   A.  I don't know if that's an exact quote, no.

04:10PM   16   Q.  So --

04:10PM   17   A.  Like I said, the sum and substance of the exchange was

04:10PM   18   that he had taken a legitimate look at Ron Serio.

04:10PM   19   Q.  What are the exact words you remember Mr. Bongiovanni

04:10PM   20   saying?

04:10PM   21   A.  I don't recall his exact words.

04:10PM   22   Q.  Now, later, you returned -- you said you talked about why

04:10PM   23   the Serio file was in his home twice during the entire

04:10PM   24   interview, correct?

04:10PM   25   A.  Yes.

04:10PM   1   Q.  Now during the second time, you circle back to the

04:10PM   2   subject.  He tells you, well, I burned the rest of the files,

04:10PM   3   correct?

04:10PM   4   A.  His work papers, he was talking about.

04:10PM   5   Q.  Well, I mean, when he said work papers, what did you

04:10PM   6   understand that to mean?

04:10PM   7   A.  His other DEA work papers.

04:10PM   8   Q.  Yeah.  I'm asking you, what did you understand what

04:10PM   9   DEA -- what did you understand what DEA work papers to mean

04:10PM  10   when you heard that?

04:10PM  11   A.  I don't know.  I don't know what his other DEA work

04:11PM  12   papers were.

04:11PM  13   Q.  Well, when some -- well, generally speaking, if somebody

04:11PM  14   says DEA work papers, what do you understand that phrase to

04:11PM  15   mean?

04:11PM  16        MR. TRIPI:  Objection.  Asked and answered.

04:11PM  17        THE COURT:  Overruled.

04:11PM  18        THE WITNESS:  That can be a myriad of things.  All

04:11PM  19   the types of things that were in that file just related to

04:11PM  20   other cases.

04:11PM  21        BY MR. MacKAY:

04:11PM  22   Q.  And you know that agents generally keep working files

04:11PM  23   about the files they're working on at any one time, correct?

04:11PM  24   A.  When they're working on them, yes.

04:11PM  25   Q.  So, I think then you asked him about something about the

04:11PM   1   Serio investigation.  And he says he brought -- he -- he

04:11PM   2   learned about it in the March of 2019 interview, correct?

04:11PM   3   A.  I asked him why -- why this file, you know, if you're

04:11PM   4   only going to keep one, why this one?

04:11PM   5       And he said he learned about the Serio investigation

04:11PM   6   during the OIG interview.

04:11PM   7   Q.  Okay.  Now, when you were working this investigation, it

04:12PM   8   centered around Mr. Bongiovanni, you made a priority not to

04:12PM   9   let anybody else know about it other than very need-to-know

04:12PM  10   individuals, correct?

04:12PM  11   A.  Yes.

04:12PM  12   Q.  Okay.  You didn't talk to Mr. Bongiovanni about the fact

04:12PM  13   he was under investigation, correct?

04:12PM  14   A.  Correct.

04:12PM  15   Q.  And I'm focusing on the time after July 20th, 2018,

04:12PM  16   because that's the time period -- whether that's the exact

04:12PM  17   date, when there's an important revelation that's made,

04:12PM  18   correct?

04:12PM  19   A.  Yes.

04:12PM  20   Q.  So after that date, you don't tell Mr. Bongiovanni he's

04:12PM  21   under investigation in any fashion, correct?

04:12PM  22   A.  I did not.

04:12PM  23   Q.  You didn't tell Mr. Bongiovanni after that date that you

04:12PM  24   were investigating Ron Serio, correct?

04:12PM  25   A.  I did not.

| | | |
|---|---|---|
| 04:12PM | 1 | Q. Okay. And, I mean, you had previously been investigating |
| 04:12PM | 2 | Ron Serio before you walked into the July 20th, 2018, meeting |
| 04:12PM | 3 | with him, correct? |
| 04:12PM | 4 | A. Yes. |
| 04:12PM | 5 | Q. Because you had attended a proffer back in February of |
| 04:13PM | 6 | 2018, correct? |
| 04:13PM | 7 | A. Yes. |
| 04:13PM | 8 | Q. And that was also of Mr. Serio, correct? |
| 04:13PM | 9 | A. Yes. I would say, though, to say that we were |
| 04:13PM | 10 | investigating Mr. Serio is not an accurate characterization |
| 04:13PM | 11 | of it. I mean, Mr. Serio was done at that point. |
| 04:13PM | 12 | Q. Because he had been arrested by the FBI and Erie County |
| 04:13PM | 13 | Sheriffs, and charged in federal court, correct? |
| 04:13PM | 14 | A. Right. |
| 04:13PM | 15 | Q. But you were doing an investigation that involved Ron |
| 04:13PM | 16 | Serio through 2018, correct? |
| 04:13PM | 17 | A. That's true. |
| 04:13PM | 18 | Q. And you did not share any information that you were |
| 04:13PM | 19 | investigating any Ron Serio DTO with Joe Bongiovanni, |
| 04:13PM | 20 | correct? |
| 04:13PM | 21 | A. I did not. |
| 04:13PM | 22 | Q. Now, you talked about that you and Special Agent Dave |
| 04:13PM | 23 | Carpenter met and discussed in relation to how this March |
| 04:13PM | 24 | 2019 interview would be conducted, and there was a decision |
| 04:13PM | 25 | made that the Serio component of the case would not be |

| 04:14PM | 1 | discussed with Mr. Bongiovanni, correct? |

04:14PM  1  discussed with Mr. Bongiovanni, correct?

04:14PM  2  A.  Yes.

04:14PM  3  Q.  It was your understanding that when Mr. -- when Agent

04:14PM  4  Carpenter was going to interview Mr. Bongiovanni in March of

04:14PM  5  2019, he wasn't going to talk in any fashion about the Serio

04:14PM  6  investigation, correct?

04:14PM  7  A.  Yes.

04:14PM  8  Q.  The intention was for him to talk only about this race

04:14PM  9  comments investigation, correct?

04:14PM  10  A.  Yes.

04:14PM  11  Q.  Okay.  And the purpose of doing so, and why you had these

04:14PM  12  discussions, was that so this March 2019 interview would not

04:14PM  13  alert Mr. Bongiovanni to any investigation that was occurring

04:14PM  14  about Ron Serio and him, correct?

04:14PM  15  A.  By --

04:14PM  16  Q.  Him --

04:14PM  17  A.  -- Ron Serio and Mr. Bongiovanni?

04:14PM  18  Q.  Yes.

04:14PM  19  A.  Yes.

04:14PM  20  Q.  Now, you're aware, though, that Special Agent Carpenter

04:14PM  21  didn't follow those rules when he conducted the interview,

04:14PM  22  correct?

04:14PM  23      **MR. TRIPI:**  Objection.  Calls for hearsay, and

04:14PM  24  argumentative, and speculative.

04:14PM  25      **THE COURT:**  Overruled.

04:15PM     1              BY MR. MacKAY:

04:15PM     2     Q.  Are you aware he didn't follow that plan that you

04:15PM     3     discussed, correct?

04:15PM     4     A.  No.

04:15PM     5     Q.  Okay.  You're aware -- are you aware that he asked

04:15PM     6     questions about T.S. in that March 2019 interview?

04:15PM     7     A.  I don't recall.

04:15PM     8     Q.  Okay.  And you're aware from your investigation

04:15PM     9     separately that T.S. had some connection to Ron Serio,

04:15PM    10     correct?

04:15PM    11     A.  Yes.

04:15PM    12              MR. MacKAY:  Ms. Champoux, can we show Government

04:15PM    13     Exhibit 26E?

04:15PM    14              MS. CHAMPOUX:  E as in Edward?

04:15PM    15              MR. MacKAY:  Yes.

04:15PM    16              THE COURT:  In evidence?

04:15PM    17              MR. MacKAY:  Yes.

04:15PM    18              BY MR. MacKAY:

04:15PM    19     Q.  All right.  So I'm showing you Government Exhibit 26E.

04:15PM    20     Do you recognize that to be a DARTS email?

04:15PM    21     A.  Yes.

04:15PM    22     Q.  Okay.  And we've done this throughout this trial a lot,

04:15PM    23     but I just want to orient the jury again.  This is an email

04:16PM    24     that members of law enforcement receive when there's an

04:16PM    25     overlap about numbers that are put into DARTS; is that fair

04:16PM   1    to say?

04:16PM   2    A.   This particular email doesn't originate from DARTS.

04:16PM   3    Q.   Okay.

04:16PM   4    A.   It's been forwarded once.

04:16PM   5    Q.   Okay.  Where was it forwarded from originally?

04:16PM   6    A.   Well, it's from Joseph Bongiovanni, using his iPhone, to

04:16PM   7    Gregory Yensan.

04:16PM   8    Q.   Yeah, let me narrow this a little bit better.

04:16PM   9         I'm talking about, sort of, the lower half of the email.

04:16PM  10    A.   So the part that's from, and has my name and email

04:16PM  11    address down, yes, that's from DARTS.

04:16PM  12    Q.   Okay.  So that's, like, let's just -- I kind of want to

04:16PM  13    just ignore the top here.

04:16PM  14         But what's below that is a -- what we can refer to it as

04:16PM  15    a DARTS email, correct?

04:16PM  16    A.   Yes.

04:16PM  17    Q.   Okay.  That's the email that's automatically generated

04:16PM  18    when there's overlap in numbers, correct?

04:16PM  19    A.   Yes.

04:16PM  20    Q.   And the date this occurs is August 21st, 2018, correct?

04:17PM  21    A.   Yes.

04:17PM  22    Q.   And it's being sent from your email address, correct?

04:17PM  23    A.   It doesn't show up in your out box, but that's the way

04:17PM  24    they're formatted, yes.

04:17PM  25    Q.   So it's being automatically generated but, you know, it's

04:17PM    1    not like you -- and it's being associated with you, but it's

04:17PM    2    not that you're personally sending this email; is that a way

04:17PM    3    of characterizing it?

04:17PM    4    A.  Yes.

04:17PM    5    Q.  Okay.  But this DARTS entry that occurs on this date is

04:17PM    6    generated because of action you take on that date, correct?

04:17PM    7    A.  Yes.

04:17PM    8    Q.  And that's why it shows as coming from your email,

04:17PM    9    correct?

04:17PM   10    A.  Yes.

04:17PM   11            **MR. MacKAY:**  Ms. Champoux, can we blow up the from

04:17PM   12    date and to section there?  Okay.

04:17PM   13            **BY MR. MacKAY:**

04:18PM   14    Q.  And then when there's a DARTS overlap, generally what

04:18PM   15    happens is anybody who has a -- withdrawn.  Let me reword

04:18PM   16    that.

04:18PM   17        When one of these emails is sent, it's sent out to other

04:18PM   18    people who might cross-reference or overlap with the numbers

04:18PM   19    in the DARTS system, correct?

04:18PM   20    A.  Yes.

04:18PM   21    Q.  And that's who the -- who's encompassed to this "to"

04:18PM   22    section, correct?

04:18PM   23    A.  Yes.

04:18PM   24    Q.  Okay.  And it's -- Mr. Bongiovanni is noted as one of the

04:18PM   25    recipients, correct?

04:18PM    1    A.  Yes.

04:18PM    2    Q.  So in simple parlance, he's getting one of these DARTS

04:18PM    3    emails on that date that purports to originate from you,

04:18PM    4    correct?

04:18PM    5    A.  Yes.

04:18PM    6         MR. MacKAY:  Can we unblow that up, Ms. Champoux.

04:18PM    7         And now can we go down and blow up the lower half of

04:18PM    8    the page?

04:18PM    9         BY MR. MacKAY:

04:18PM   10    Q.  So for this first entry, it's indicating that you're

04:19PM   11    logging a number here, correct?

04:19PM   12    A.  Yes.

04:19PM   13    Q.  I might not have the parlance exactly, but what's going

04:19PM   14    on here is that this is a number that you're somehow entering

04:19PM   15    where I circled, and that's going into the DARTS system and

04:19PM   16    generating an overlap, correct?

04:19PM   17    A.  Yes.

04:19PM   18    Q.  And the remarks you're putting in in association with

04:19PM   19    running this number are numbers associated with Ron Serio

04:19PM   20    DTO, correct?

04:19PM   21    A.  Yes.

04:19PM   22    Q.  And you are identifying a DEA file number here, correct?

04:19PM   23    A.  Yes.

04:19PM   24    Q.  Okay.  And then the overlap is created the next entry

04:19PM   25    down with similar number that Justin Borst, the intel

| | | |
|---|---|---|
| 04:19PM | 1 | analyst, entered, correct? |
| 04:19PM | 2 | A.  Yes. |
| 04:19PM | 3 | **MR. MacKAY:**  Okay.  Can we unblow that up?  I don't |
| 04:19PM | 4 | know a better word. |
| 04:19PM | 5 | **BY MR. MacKAY:** |
| 04:19PM | 6 | Q.  So, Mr. Bongiovanni is receiving this email on |
| 04:20PM | 7 | August 21st, 2018, correct? |
| 04:20PM | 8 | A.  Yes. |
| 04:20PM | 9 | Q.  And he's able, I mean, based on what's in the email, he's |
| 04:20PM | 10 | able to see that you're running a number associated with the |
| 04:20PM | 11 | Ron Serio DTO on August 21st, 2018, correct? |
| 04:20PM | 12 | A.  Yes. |
| 04:20PM | 13 | Q.  Okay.  And he can see, presumably based on what's in this |
| 04:20PM | 14 | email, that it has some overlap with the case he did, which |
| 04:20PM | 15 | was the Wayne Anderson case, correct? |
| 04:20PM | 16 | A.  Yes.  The number overlapped. |
| 04:20PM | 17 | Q.  Right.  I circled the number there.  That's the Wayne |
| 04:20PM | 18 | Anderson file number, correct? |
| 04:20PM | 19 | A.  Yes. |
| 04:20PM | 20 | Q.  Okay.  And this date is August 21st, 2018, is a month |
| 04:20PM | 21 | after you interviewed Ron Serio, correct? |
| 04:20PM | 22 | A.  Yes. |
| 04:20PM | 23 | Q.  And you're logging this number associated with the Ron |
| 04:21PM | 24 | Serio DTO under a C2-16-0087 file number, correct? |
| 04:21PM | 25 | A.  Yes. |

04:21PM | 1 | Q.  And do you recall as you sit here what the file title for
04:21PM | 2 | that case number was?
04:21PM | 3 | A.  It may have been Joe Bella, or it may have been Jarrett
04:21PM | 4 | Guy.
04:21PM | 5 | Q.  Okay.  But at the same time, I think you've already
04:21PM | 6 | testified, in August of 2018, you're not talking to
04:21PM | 7 | Mr. Bongiovanni about Ron Serio in any fashion though,
04:21PM | 8 | correct?
04:21PM | 9 | A.  That's correct.
04:21PM | 10 | **MR. MacKAY:**  Now, Ms. Champoux, can you take that
04:21PM | 11 | down?  Can we pull up in Government Exhibit 100A.1, the file
04:22PM | 12 | entitled DARTS email 1/7/19.
04:22PM | 13 | **MR. TRIPI:**  I'm sorry, I missed the exhibit number.
04:22PM | 14 | **MR. MacKAY:**  100A.1.
04:22PM | 15 | **MR. TRIPI:**  Thank you.
04:22PM | 16 | **MR. MacKAY:**  Sorry about that.  It was DARTS email
04:22PM | 17 | 1/7/19.
04:22PM | 18 | Can we zoom out just a little bit?
04:22PM | 19 | **BY MR. MacKAY:**
04:22PM | 20 | Q.  And this is another of these DARTS emails, correct?
04:22PM | 21 | A.  Yes.
04:22PM | 22 | Q.  And this one, from what you can see, it's occurring on
04:22PM | 23 | January 7th, 2019, correct?
04:22PM | 24 | A.  Yes.
04:22PM | 25 | Q.  And it's got your name as one of the recipients, correct?

04:22PM  1    A.  Yes.

04:22PM  2    Q.  And it's got Joseph Bongiovanni's name as one of the

04:22PM  3    recipients, correct?

04:22PM  4    A.  It does.

04:22PM  5        MR. MacKAY:  Okay.  Can we scroll down a little bit,

04:22PM  6    Ms. Champoux.  Okay.  Actually, just a little bit further up.

04:22PM  7        BY MR. MacKAY:

04:23PM  8    Q.  So, again, based on how DARTS emails work, this is a

04:23PM  9    copy -- I'm sorry, this is an email that Mr. Bongiovanni

04:23PM 10    would have seen, correct?

04:23PM 11    A.  Yes.

04:23PM 12    Q.  Because he would have --

04:23PM 13    A.  Presumably.

04:23PM 14    Q.  -- because he would have received it, correct?

04:23PM 15    A.  He would have received it, yes, sir.

04:23PM 16    Q.  And in fact, this is a scan of a printout that was in

04:23PM 17    100A, correct?

04:23PM 18    A.  Yes.

04:23PM 19    Q.  Okay.  Now, this first entry, do you see here it says

04:23PM 20    1/7/19, correct?

04:23PM 21    A.  Yes.

04:23PM 22    Q.  And it's Anthony Casullo is running a number, correct?

04:23PM 23    A.  Yes.

04:23PM 24    Q.  And it shows that it's a -- phone numbers in contact with

04:23PM 25    Mike Sinatra related to a burglary and drug trafficking in

04:23PM  1   Buffalo and Niagara County, correct?

04:23PM  2   A.  Yes.

04:23PM  3   Q.  And then two entries down, it shows an entry that, again,

04:24PM  4   Anthony Casullo put in, correct?

04:24PM  5   A.  Yes.

04:24PM  6   Q.  It was a couple days earlier on January 3rd, 2019,

04:24PM  7   correct?

04:24PM  8   A.  Yes.

04:24PM  9   Q.  And it's numbers related to ongoing investigation in

04:24PM  10  Tonawanda, New York, and worked jointly with HSI Buffalo,

04:24PM  11  correct?

04:24PM  12  A.  Yes.

04:24PM  13  Q.  As you were interviewing Mr. Bongiovanni, at one point in

04:24PM  14  time during the interview in his house, he indicates that he

04:24PM  15  knew -- something to the effect that he knew you guys were

04:24PM  16  looking at Serio, correct?

04:24PM  17  A.  Yes.

04:24PM  18  Q.  And you took that to mean HSI, correct?

04:24PM  19  A.  He gestured towards me, yes.

04:24PM  20  Q.  Okay.  And at the time, you were still with HSI, correct?

04:24PM  21  A.  Yes.

04:24PM  22  Q.  All right.

04:24PM  23       **MR. MacKAY:**  You can take that down, Ms. Champoux,

04:24PM  24  thank you.

04:24PM  25       Oops, I'm sorry.  Can you leave that up for one

04:24PM   1   second?  Can you go down to the next page?

04:25PM   2           **BY MR. MacKAY:**

04:25PM   3   Q.  All right.  So we're on the second page now.  This is

04:25PM   4   another number that's run, correct?

04:25PM   5   A.  Yes.

04:25PM   6   Q.  And, again, it shows on January 7th, 2019, an overlap

04:25PM   7   that Anthony Casullo is running a number related to the Mike

04:25PM   8   Sinatra burglary, in sum and substance, correct?

04:25PM   9   A.  Yes.

04:25PM   10  Q.  And below that, it ties to an entry that was inputted

04:25PM   11  back in 2013 with Justin Borst, correct?

04:25PM   12  A.  It does.

04:25PM   13  Q.  And it's got that same entry again regarding Anthony

04:25PM   14  Casullo inputting something on January 3, 2019, correct?

04:25PM   15  A.  Yes.

04:25PM   16  Q.  That one also refers to the joint investigation with HSI,

04:25PM   17  correct?

04:25PM   18  A.  Yes.

04:25PM   19  Q.  And that middle entry, that was also in reference to the

04:25PM   20  Wayne Anderson file, correct?

04:25PM   21  A.  Are you talking about C2-13-0026, yes.

04:26PM   22  Q.  Yes.  So, based on this email, Mr. Bongiovanni is

04:26PM   23  receiving an email that shows that there's some overlap

04:26PM   24  between the Wayne Anderson file he investigated back in 2013,

04:26PM   25  and the current ongoing investigation worked jointly with

04:26PM   1   HSI, correct?

04:26PM   2   A.  Well, it's specific to phone numbers, so that's the

04:26PM   3   overlap.

04:26PM   4   Q.  Right.  But there's some overlap between an investigation

04:26PM   5   HSI is doing in early 2019, and something he did in Wayne

04:26PM   6   Anderson back in 2013, correct?

04:26PM   7   A.  It's correct.  There's an overlap.  I'm just elaborating

04:26PM   8   that it's specific to phone numbers.  So it's not the sum

04:26PM   9   overlap.  The overlap is the phone numbers.

04:26PM   10  Q.  Right.  So there's an overlap between the phone numbers

04:26PM   11  which is some part of the investigation that was done back in

04:26PM   12  2013, overlaps with something that's occurring in 2019,

04:26PM   13  correct?

04:26PM   14  A.  I just -- I feel like you're trying to make it more

04:26PM   15  general than it is, when it's very specific.

04:27PM   16      It's very specifically the phone number that's overlaps.

04:27PM   17  Q.  Let me ask it again.

04:27PM   18      The phone numbers in 2019 that are being investigated in

04:27PM   19  a joint investigation of HSI and DEA overlap with phone

04:27PM   20  numbers that are associated with the Wayne Anderson file back

04:27PM   21  in 2013, correct?

04:27PM   22  A.  Yes.  Yes.

04:27PM   23          **MR. MacKAY:**  You can take that down, Ms. Champoux.

04:27PM   24          **BY MR. MacKAY:**

04:27PM   25  Q.  Now another subject you talked about was generally about

04:27PM    1    Peter Militello, correct?  During the interview with

04:27PM    2    Mr. Bongiovanni?

04:27PM    3    A.  No, not generally about Peter Militello.  That was in

04:27PM    4    response to a question.

04:27PM    5    Q.  Well, it's a subject that came up in the interview,

04:27PM    6    correct?

04:27PM    7    A.  Peter Militello?  That name was a response to a specific

04:27PM    8    question, so yes, it came up in that context.

04:27PM    9    Q.  Yes.  So the name Peter Militello came up in your

04:27PM   10    interview with Joe Bongiovanni in June of 2019, correct?

04:28PM   11    A.  Yes.

04:28PM   12    Q.  Now, this was in relation to who -- the questions about

04:28PM   13    who the source in the Wayne Anderson file was, correct?

04:28PM   14    A.  Yes.

04:28PM   15    Q.  Okay.  You asked Mr. Bongiovanni some questions, and he

04:28PM   16    responded that the source was Peter Militello; is that fair

04:28PM   17    to say?

04:28PM   18    A.  No, not the source.  I was asking him what happened with

04:28PM   19    his Ron Serio investigation.

04:28PM   20    Q.  Okay.

04:28PM   21    A.  He said his source was arrested for selling fentanyl and

04:28PM   22    heroin, meaning his confidential source, his source into Ron

04:28PM   23    Serio.  So that effectively ended his investigation.

04:28PM   24    Q.  Okay.  Now, you had previously reviewed the Wayne

04:28PM   25    Anderson file prior to interviewing Mr. Bongiovanni, correct?

04:28PM    1    A.  Yes.

04:28PM    2    Q.  And you knew that Peter Militello was not in any way a

04:28PM    3    confidential source in the Wayne Anderson file, correct?

04:28PM    4    A.  I didn't know that as I sat there, no.

04:28PM    5    Q.  You had not seen Peter Militello's name in the Wayne

04:29PM    6    Anderson file, correct?

04:29PM    7    A.  If he was the source in the file, it wouldn't be in

04:29PM    8    there.

04:29PM    9    Q.  So my question to you was:  You did not see Peter's

04:29PM   10    Militello name in the Wayne Anderson file, correct?

04:29PM   11    A.  I thought your question was whether or not I knew if he

04:29PM   12    was the source in the Wayne Anderson file.

04:29PM   13    Q.  So what I'm getting toward is when you reviewed the Wayne

04:29PM   14    Anderson file prior to interviewing Mr. Bongiovanni, you

04:29PM   15    didn't see Peter Militello's name in that file?

04:29PM   16         **MR. TRIPI:**  Objection.

04:29PM   17         **MR. MacKAY:**  Correct?

04:29PM   18         **MR. TRIPI:**  Presumes facts not in evidence.  I don't

04:29PM   19    think there was any evidence that he reviewed it before the

04:29PM   20    interview.

04:29PM   21         **THE COURT:**  I'll sustain the objection to the form of

04:29PM   22    the question.  Ask another question.

04:29PM   23         **BY MR. MacKAY:**

04:29PM   24    Q.  Did you review the Wayne Anderson file prior to

04:29PM   25    interviewing Joseph Bongiovanni in June of 2019?

USA v Bongiovanni - Ryan - MacKay/Cross - 9/11/24

151

04:29PM    1    A.  At least the DEA-6s.

04:29PM    2    Q.  Okay.  And in those DEA-6s, fair to say there's no

04:29PM    3    mention of Peter Militello, correct?

04:29PM    4    A.  There is not.

04:29PM    5    Q.  Peter Militello is not identified as a confidential

04:30PM    6    source in any of those DEA-6s, correct?

04:30PM    7    A.  No one would be identified by a name as a confidential

04:30PM    8    source in a DEA-6.

04:30PM    9    Q.  My question was:  Peter Militello is never identified as

04:30PM   10    any sort of confidential source in those DEA-6s, correct?

04:30PM   11    A.  No.

04:30PM   12    Q.  Okay.  His name doesn't appear in any fashion,

04:30PM   13    confidential source or otherwise, in those DEA-6s, correct?

04:30PM   14    A.  It doesn't.

04:30PM   15    Q.  Okay.  So you were not familiar with the Peter Militello

04:30PM   16    name from the Wayne Anderson file when you sat down with Joe

04:30PM   17    Bongiovanni in June of 2019, correct?

04:30PM   18    A.  Not from the file, no.

04:30PM   19    Q.  Okay.

04:30PM   20    A.  I don't know if I already knew about his case or not.

04:30PM   21    Q.  Now your review of the DEA-6s indicated that R.K. was

04:30PM   22    potentially associated with the Wayne Anderson file as a

04:30PM   23    confidential source, correct?

04:30PM   24    A.  That didn't come from a review of the 6s, no.

04:30PM   25    Q.  Okay.  That came of a review of other documents

04:31PM    1    associated with the DEA in some fashion?

04:31PM    2    A.  Well, I mean, at some point the DEA turned over the

04:31PM    3    source file to DOJ OIG.

04:31PM    4    Q.  Okay.  So when you went in to sit down with

04:31PM    5    Mr. Bongiovanni in June of 2019, were you familiar with the

04:31PM    6    name R.K.?

04:31PM    7    A.  I can't recall if I heard it before or not.

04:31PM    8    Q.  But you asked Mr. Bongiovanni questions about who the

04:31PM    9    confidential source was in that -- in that file?

04:31PM    10   A.  I asked what happened to his investigation, what the

04:31PM    11   result was.  He said his source was arrested.  And I said,

04:31PM    12   oh, who was your source?  And he told me Peter Militello.

04:31PM    13   Q.  Okay.  And I'm just trying to clarify that's the first

04:31PM    14   time you hear Peter Militello's name?

04:31PM    15   A.  I think so, yes.

04:31PM    16   Q.  And it's your testimony that Joseph Bongiovanni was

04:31PM    17   describing him as a, quote, unquote, confidential source?

04:31PM    18   A.  Yes, his source.

04:31PM    19   Q.  His source.  So I want to get the wording clear.

04:32PM    20       What he's saying is it's, quote, unquote, his source?

04:32PM    21   A.  Yes.  So, it's two law enforcement guys talking in our

04:32PM    22   jargon, the sum and substance of it is that Peter Militello

04:32PM    23   is his source.

04:32PM    24   Q.  Okay.  So the words he used were, quote, unquote, his

04:32PM    25   source?

04:32PM   1    A.  Yes.

04:32PM   2    Q.  Okay.  He didn't use the word "confidential source"

04:32PM   3    directly to you, correct?

04:32PM   4    A.  No.

04:32PM   5    Q.  Okay.  All right.  So did you come to learn -- I mean,

04:32PM   6    did you further investigate that name Peter Militello after

04:32PM   7    that interview?

04:32PM   8    A.  Yes.

04:32PM   9    Q.  Okay.  And you came to learn that Peter Militello was not

04:32PM   10   in any way a, quote, unquote, confidential source, correct?

04:32PM   11   A.  No.  I don't think he ever was.

04:32PM   12   Q.  He was a target of an investigation, correct?

04:32PM   13   A.  Yes.

04:32PM   14   Q.  And he was arrested for selling fentanyl, correct?

04:32PM   15   A.  Yes.

04:32PM   16   Q.  And that was an investigation Joseph Bongiovanni worked,

04:32PM   17   correct?

04:33PM   18   A.  Yes.

04:33PM   19   Q.  And did you review the file at some point prior to

04:33PM   20   testifying that that investigation was worked out of

04:33PM   21   regarding Peter Militello?

04:33PM   22   A.  I have seen it, yes.

04:33PM   23   Q.  And do you recall in those DEA-6s associated with that

04:33PM   24   file that Peter Militello is also identified as being a

04:33PM   25   source of supply?

04:33PM   1   A.  I don't.

04:33PM   2   Q.  Now, when you started the conversation with

04:33PM   3   Mr. Bongiovanni, this interview, at some point in time after

04:33PM   4   the start, you orient him to the fact that you're talking

04:33PM   5   about Italian Organized Crime, correct?

04:33PM   6   A.  Actually, that comes up talking about Peter.  He mentions

04:34PM   7   that Peter's grandfather had something to do with organized

04:34PM   8   crime.  And then I asked him what he thought about that.

04:34PM   9   Q.  Okay.  And Peter was one of the first subjects you

04:34PM  10   covered in the interview, correct?

04:34PM  11   A.  The first.

04:34PM  12   Q.  Okay.  And then at some point in time in the interview,

04:34PM  13   you start going through a list of names with Mr. Bongiovanni,

04:34PM  14   correct?

04:34PM  15   A.  Yes.

04:34PM  16   Q.  And those had come from where again?

04:34PM  17   A.  From the border search of his phone.

04:34PM  18   Q.  Okay.  And you went through a number of those on direct,

04:34PM  19   but ultimately you get to the name Kim Mecca, correct?

04:34PM  20   A.  Yes.

04:34PM  21   Q.  And he mentions the -- Mr. Bongiovanni mentions the

04:34PM  22   connection between Kim Mecca and who her boyfriend is,

04:34PM  23   correct?

04:34PM  24   A.  He said that Kim Mecca was the girlfriend of a friend of

04:34PM  25   his.

04:34PM    1    Q.  And then ultimately tells you that friend is Lou Selva,

04:34PM    2    correct?

04:34PM    3    A.  Yes.

04:34PM    4    Q.  And then he -- I think you demonstrated the reaction he

04:34PM    5    had, some sort of physical reaction when he brought up Lou

04:35PM    6    Selva's name, correct?

04:35PM    7    A.  In between, like, saying the girlfriend of a friend

04:35PM    8    through the Lou Selva answer, yes.

04:35PM    9    Q.  Okay.  Now, and when you're going through these names

04:35PM   10    with Mr. Bongiovanni, these names weren't all random names,

04:35PM   11    correct?

04:35PM   12    A.  No, they were the only names that I had.

04:35PM   13    Q.  Okay.  Well, that you had -- so is it fair to say you had

04:35PM   14    an interest in asking about these names because you brought

04:35PM   15    this list of who these names were to the interview?

04:35PM   16    A.  But it's not a list that I made.  It was the totality of

04:35PM   17    what we knew from the border encounter.

04:35PM   18    Q.  Okay.  Yeah.  Let's talk about how you get some of that

04:35PM   19    information.

04:35PM   20        When there's an extraction done of a phone, it produces

04:35PM   21    list of contacts, correct?

04:35PM   22    A.  Yes.

04:35PM   23    Q.  And did you have the entire list of contacts from

04:35PM   24    Mr. Bongiovanni's phone?

04:36PM   25    A.  No.

USA v Bongiovanni - Ryan - MacKay/Cross - 9/11/24

156

04:36PM    1    Q.  Okay.  What you had was a subreport of some contacts of

04:36PM    2    Mr. Bongiovanni's phone?

04:36PM    3    A.  It wasn't a subreport from an extraction.  No extraction

04:36PM    4    was ever done.  It was photographs taken of the phone as

04:36PM    5    somebody thumbed through it.

04:36PM    6    Q.  Okay.  I want to sort of orient the jury to this.

04:36PM    7        Mr. Bongiovanni's phone at the border was never fully

04:36PM    8    extracted, correct?

04:36PM    9    A.  That's correct.

04:36PM   10    Q.  What you got in response was an HSI agent somewhere

04:36PM   11    basically taking photos of -- screenshots of his phone,

04:36PM   12    correct?

04:36PM   13    A.  Yes.

04:36PM   14    Q.  Okay.  And those are what you review prior to going into

04:36PM   15    the interview with Mr. Bongiovanni, correct?

04:36PM   16    A.  Yes.

04:36PM   17    Q.  Now, the photos that you were looking at of the

04:36PM   18    screenshots of Mr. Bongiovanni's phone, those weren't every

04:36PM   19    one of his contacts, correct?

04:36PM   20    A.  No.

04:36PM   21    Q.  No, it was --

04:36PM   22    A.  I don't think so.

04:36PM   23    Q.  Did it appear to you that there were specific contacts

04:37PM   24    that had been singled out?

04:37PM   25    A.  I don't know how they were singled out, if that's what

04:37PM    1    you're asking me.

04:37PM    2    Q.   No, I --

04:37PM    3    A.   I think it was a -- it was a selection of contacts from

04:37PM    4    his phone --

04:37PM    5    Q.   That's what I'm asking.

04:37PM    6    A.   -- done by somebody else.

04:37PM    7    Q.   It was a selection of the contacts in some fashion,

04:37PM    8    correct?

04:37PM    9    A.   Yes.

04:37PM    10   Q.   It was not the entire list of contacts, correct?

04:37PM    11        From what you could see, based on how you received these

04:37PM    12   photos?

04:37PM    13   A.   I mean, I -- to know absolutely it was every contact?

04:37PM    14   No.  But nobody's phone has 11 contacts in it, or whatever

04:37PM    15   that was.  It just didn't seem like enough to be all of them.

04:37PM    16   Q.   Okay.  And so you estimated approximately 11 contacts

04:37PM    17   here?

04:37PM    18   A.   I -- I'm guessing.  It's around ten.  It's not a long

04:37PM    19   list.

04:37PM    20   Q.   Okay.  So prior to entering the interview with

04:37PM    21   Mr. Bongiovanni, those contacts had some significance

04:37PM    22   because, as you just said, they weren't all of the contacts

04:37PM    23   in his phone, correct?

04:37PM    24   A.   I don't understand that question now.

04:37PM    25   Q.   Meaning you had received a number of contacts of

04:38PM    1    Mr. Bongiovanni's phone, and they weren't all of the contacts

04:38PM    2    in the phone, correct?

04:38PM    3    A.  That's correct.

04:38PM    4    Q.  And you proceeded to ask him questions about these

04:38PM    5    specific contacts, correct?

04:38PM    6    A.  Yes.

04:38PM    7    Q.  Okay.  Now, we'll move on to a different subject.

04:38PM    8        You directed the search at Anthony Gerace's house in

04:38PM    9    Clarence, correct?

04:38PM   10    A.  Yes.

04:38PM   11    Q.  It was in January of 2019, correct?

04:38PM   12    A.  Yes.

04:38PM   13    Q.  You testified there was approximately $103,000 that were

04:38PM   14    found -- that was found there, correct?

04:38PM   15    A.  Yes.

04:38PM   16    Q.  We looked at, on your direct, what appeared to be a

04:38PM   17    Super Bowl ledger book; do you recall that?

04:38PM   18    A.  The spiral notebook?  Yes.

04:38PM   19        **MR. MacKAY:**  Yeah, Ms. Champoux, can we put that up,

04:38PM   20    Government Exhibit 72A-55.

04:39PM   21        **BY MR. MacKAY:**

04:39PM   22    Q.  That's the photo of the physical notebook you reviewed,

04:39PM   23    correct?

04:39PM   24    A.  Yes.

04:39PM   25    Q.  And you went through some names on direct with Mr. Tripi,

USA v Bongiovanni - Ryan - MacKay/Cross - 9/11/24
159

04:39PM   1   correct?

04:39PM   2   A.  Yes.

04:39PM   3           **MR. MacKAY:**  Can we blow that up a little bit,

04:39PM   4   Ms. Champoux?  Yeah, that -- that quarter is good.

04:39PM   5           **BY MR. MacKAY:**

04:39PM   6   Q.  Let me give you a number, number 34.  That's 67 West.  Do

04:39PM   7   you see that?

04:39PM   8   A.  Yes.

04:39PM   9   Q.  You know that to be a bar on Chippewa in Buffalo,

04:39PM  10   correct?

04:39PM  11   A.  No, I don't, but --

04:39PM  12   Q.  Okay.  You have no reason to disagree with me that that's

04:39PM  13   a bar on Chippewa?

04:39PM  14   A.  No, I don't.

04:39PM  15   Q.  Okay.  Number 40, you see that it says Wing Kings?

04:39PM  16   A.  Yes.

04:40PM  17   Q.  Do you understand that to be a restaurant on Elmwood

04:40PM  18   Avenue at one point in time?

04:40PM  19   A.  I have no idea.

04:40PM  20   Q.  No reason to disagree with me there was a restaurant

04:40PM  21   named Wing Kings on Elmwood Avenue at one point?

04:40PM  22   A.  I just don't know.

04:40PM  23   Q.  All right.  Now, there was -- I think it was in the first

04:40PM  24   column.

04:40PM  25           **MR. MacKAY:**  Ms. Champoux, can you blow up number 14?

04:40PM   1           **BY MR. MacKAY:**

04:40PM   2   Q.  It says Wayne.  Do you see that one?

04:40PM   3   A.  Yes.

04:40PM   4   Q.  Are you familiar with the name Wayne Anderson from your

04:40PM   5   review of C2-13-0026, correct?

04:40PM   6   A.  Yes.

04:40PM   7   Q.  This one doesn't have any last name associated with it

04:40PM   8   though, correct?  Here, what you see?

04:40PM   9   A.  No, there's no last name there.

04:40PM  10   Q.  So, no idea whether that's in reference to the same Wayne

04:40PM  11   Anderson, correct?

04:40PM  12   A.  Just that it's Wayne.

04:40PM  13           **MR. MacKAY:**  Okay.  Can we zoom out, Ms. Champoux.

04:40PM  14           **BY MR. MacKAY:**

04:40PM  15   Q.  Let's go to number 76.  That name is Rodney Giove.  Do

04:41PM  16   you understand him to be a lawyer in the Niagara Falls area?

04:41PM  17   A.  Rodney Giove?

04:41PM  18   Q.  Yeah.

04:41PM  19   A.  Yes.

04:41PM  20           **MR. MacKAY:**  Can you zoom out, and can we go to

04:41PM  21   number 88.

04:41PM  22           **BY MR. MacKAY:**

04:41PM  23   Q.  That says Jay Dockside.  Do you understand that to be Jay

04:41PM  24   Shepard, the gentleman who owns Dockside Restaurant in NT?

04:41PM  25   A.  I know that there's a Dockside Restaurant in NT.  I have

04:41PM    1    no idea who owns it.

04:41PM    2    Q.  Would you have any reason to disagree with me that that

04:41PM    3    restaurant is owned by a gentleman named Jay Shepard?

04:41PM    4    A.  I just don't know who owns it.

04:41PM    5         MR. MacKAY:  Okay.  And, Ms. Champoux, can we go to

04:41PM    6    number 23.

04:41PM    7         BY MR. MacKAY:

04:41PM    8    Q.  And that one says Russell Jr.; do you see that one?

04:41PM    9    A.  Yes.

04:41PM    10   Q.  Now, you're familiar there's a Russell Salvatore who owns

04:41PM    11   Salvatore's Hotel in the area, correct?

04:41PM    12   A.  Yes.

04:41PM    13   Q.  That's Russell Sr., not Russell Jr., correct?

04:41PM    14   A.  I don't recall as I sit here.  I know there's a

04:42PM    15   father/son in the other place, I don't know --

04:42PM    16   Q.  Yeah.

04:42PM    17   A.  -- I don't know if it's Jr. or III or the --

04:42PM    18   Q.  Do you understand one to be older, and one to be quite

04:42PM    19   younger?

04:42PM    20   A.  Yes.

04:42PM    21   Q.  Okay.  And do you understand the older one to own the

04:42PM    22   restaurant -- I'm sorry, to own the hotel?

04:42PM    23   A.  I think they both do, right?

04:42PM    24   Q.  I'm asking you what you understand.

04:42PM    25   A.  Yes.

| | | |
|---|---|---|
| 04:42PM | 1 | **MR. MacKAY:**  Okay.  Now, number 37.  Can we blow that |
| 04:42PM | 2 | one up? |
| 04:42PM | 3 | **BY MR. TRIPI:** |
| 04:42PM | 4 | Q.  That's Ron Serio, correct? |
| 04:42PM | 5 | A.  Yes. |
| 04:42PM | 6 | Q.  And he was arrested in April of 2017, correct? |
| 04:42PM | 7 | A.  Yes. |
| 04:42PM | 8 | Q.  Did you understand as part of his release conditions that |
| 04:42PM | 9 | he was to refrain from any type of gambling activity? |
| 04:42PM | 10 | A.  I don't know. |
| 04:42PM | 11 | **MR. TRIPI:**  Objection, 403. |
| 04:42PM | 12 | **THE COURT:**  I'm sorry? |
| 04:42PM | 13 | **MR. TRIPI:**  403, his release conditions. |
| 04:42PM | 14 | **THE COURT:**  Overruled. |
| 04:42PM | 15 | **THE WITNESS:**  I don't know what his release |
| 04:43PM | 16 | conditions were.  I never read them. |
| 04:43PM | 17 | **MR. MacKAY:**  Okay.  Can we go to the upper left-hand |
| 04:43PM | 18 | corner? |
| 04:43PM | 19 | **BY MR. MacKAY:** |
| 04:43PM | 20 | Q.  It says $105,000; is that fair to say? |
| 04:43PM | 21 | A.  Yes. |
| 04:43PM | 22 | Q.  Now, as you viewed this ledger and the related Super Bowl |
| 04:43PM | 23 | squares, fair to say you understood this to mean that Anthony |
| 04:43PM | 24 | Gerace was running some sort of Super Bowl pool, correct? |
| 04:43PM | 25 | A.  Yes. |

04:43PM  1   Q.  And we actually looked at the Super Bowl squares chart on

04:43PM  2   your direct.

04:43PM  3            MR. MacKAY:  Ms. Champoux, can we show Government

04:43PM  4   Exhibit 72A-56?

04:43PM  5            BY MR. MacKAY:

04:43PM  6   Q.  Okay.  And that's the actual Super Bowl squares, correct?

04:43PM  7   A.  Yes.

04:43PM  8   Q.  You can see both the horizontal and vertical axis.  This

04:43PM  9   was Philadelphia Eagles, and the New England Patriots,

04:43PM  10  correct?

04:44PM  11  A.  Yes.

04:44PM  12  Q.  Do you understand that was the 2018 Super Bowl?

04:44PM  13  A.  Yes, it was -- yeah, the year before.

04:44PM  14  Q.  Right.  So that's what I'm asking.  This was the

04:44PM  15  Super Bowl the year before -- almost a year before when the

04:44PM  16  search warrant was executed at his house, correct?

04:44PM  17  A.  Yes.

04:44PM  18  Q.  The 2019 Super Bowl hadn't yet occurred, correct?

04:44PM  19  A.  Right.

04:44PM  20  Q.  Okay.  Now, Ron Serio's name is nowhere to be found on

04:44PM  21  that chart, correct?

04:44PM  22  A.  I don't -- do you want me to search the whole chart?

04:44PM  23  Q.  Sure.

04:44PM  24  A.  I don't see -- I don't see it.

04:44PM  25  Q.  Now --

04:44PM    1    A.  Was that Ron at the intersection of 9 and 8?  It's hard

04:45PM    2    to tell with the fold.

04:45PM    3             MR. MacKAY:  Yeah, we can blow that up.

04:45PM    4             THE WITNESS:  No.  It says R and W.

04:45PM    5             BY MR. MacKAY:

04:45PM    6    Q.  Okay.  All right.  So fair to say it doesn't show Ron

04:45PM    7    Serio's name anywhere on this chart, correct?

04:45PM    8    A.  I don't see it.

04:45PM    9    Q.  Okay.  Now, I want to go to the lower corner of the

04:45PM   10    document.

04:45PM   11             MR. MacKAY:  Can you blow that up, Ms. Champoux?

04:45PM   12             BY MR. MacKAY:

04:45PM   13    Q.  Okay.  See where it says on the left there, 10 percent

04:45PM   14    commission taken out of all prizes besides touching squares?

04:45PM   15    A.  Yes.

04:45PM   16    Q.  Generally speaking, do you understand that under New York

04:45PM   17    law, to take a commission out of a Super Bowl pool, that

04:45PM   18    that's not legal?

04:45PM   19    A.  I do.

04:45PM   20    Q.  And just explain that for the jury, what that means?

04:45PM   21    A.  So it's the difference between, you know, doing Super

04:45PM   22    Bowls squares, I guess, for your hockey team or something,

04:45PM   23    and all the money that comes in is all paid out.  That's

04:46PM   24    okay.  That's my understanding.

04:46PM   25         But if the organizer of the game keeps a percentage of

04:46PM  1   the money, that that makes it illegal under New York law.

04:46PM  2   Q.  Okay.  And you had seen some packaged cash, I think we

04:46PM  3   talked about, in Mr. Gerace's house, correct?

04:46PM  4   A.  Yes.

04:46PM  5   Q.  And you opined that it was -- that you have seen similar

04:46PM  6   packagings of cash in relation to narcotics trafficking,

04:46PM  7   correct?

04:46PM  8   A.  Yes.

04:46PM  9   Q.  But you can see here from at least what it shows here in

04:46PM  10  the Super Bowl pool, Mr. Gerace -- Mr. Anthony Gerace appears

04:46PM  11  to be running a Super Bowl pool that's not in conjunction

04:46PM  12  with the law, that he's taking cuts out of, correct?

04:46PM  13  A.  Well, the year before, correct.

04:46PM  14  Q.  Yeah, the year before, correct?

04:46PM  15  A.  Yes.

04:46PM  16  Q.  And as you sit here today, you don't know how many years

04:46PM  17  Mr. Anthony Gerace had been running any Super Bowl pools,

04:46PM  18  correct?

04:46PM  19  A.  I don't.

04:46PM  20       MR. MacKAY:  We can take that down, Ms. Champoux,

04:47PM  21  thank you.

04:47PM  22       BY MR. MacKAY:

04:47PM  23  Q.  All right.  So let's talk about how you get started in

04:47PM  24  this investigation with -- that involves Ron Serio.

04:47PM  25       You were present for a proffer in February of 2018,

| | | |
|---|---|---|
| 04:47PM | 1 | correct? |
| 04:47PM | 2 | A.  Yes. |
| 04:47PM | 3 | Q.  And then you then attend a proffer with Mr. Serio in July |
| 04:47PM | 4 | of 2018, correct? |
| 04:47PM | 5 | A.  Yes. |
| 04:47PM | 6 | Q.  And it's the -- it's what's revealed in the July 2018 |
| 04:47PM | 7 | proffer that sort of all begins the investigation into |
| 04:47PM | 8 | Mr. Bongiovanni, correct? |
| 04:47PM | 9 | A.  Yes. |
| 04:47PM | 10 | Q.  Now, DEA Special Agent Casullo, he's present for the July |
| 04:47PM | 11 | proffer, correct? |
| 04:47PM | 12 | A.  Yes. |
| 04:47PM | 13 | Q.  But he's not present for the February proffer, correct? |
| 04:47PM | 14 | A.  Correct. |
| 04:47PM | 15 | Q.  Now, you understood that by that point in time, he was |
| 04:47PM | 16 | handling a case related to Kevin Myszka, correct? |
| 04:47PM | 17 | A.  Are you asking me if I knew that in July? |
| 04:47PM | 18 | Q.  Yeah.  By the time you got to the July proffer -- |
| 04:47PM | 19 | A.  No, I wasn't aware of that case then. |
| 04:47PM | 20 | Q.  Okay.  But you and -- by the time, you know, we're |
| 04:48PM | 21 | talking July 2018, were you and Mr. Casullo working together |
| 04:48PM | 22 | as partners in any cases? |
| 04:48PM | 23 | A.  That he had just moved from 57 to 58. |
| 04:48PM | 24 | Q.  Yeah.  Do you recall when he moved from D-57 to D-58? |
| 04:48PM | 25 | A.  Not exactly.  But I'd say it was within weeks or maybe a |

04:48PM    1    month before that.

04:48PM    2    Q.   Okay.   And do you recall whether that was prompted by any

04:48PM    3    tensions between him and Mr. Bongiovanni?

04:48PM    4    A.   I had no idea why he moved.

04:48PM    5    Q.   Okay.   But ultimately, once he moves to duty 58, do you

04:48PM    6    partner up with him on cases?

04:48PM    7    A.   On a few things.

04:48PM    8    Q.   Okay.   Now, so the February proffer, the federal

04:48PM    9    prosecutor who's in that that invites you to that, that's

04:48PM   10    Paul Parisi, correct?

04:48PM   11    A.   Yes.

04:48PM   12    Q.   And then it's Mr. Tripi who's the prosecutor for the July

04:48PM   13    proffer, correct?

04:48PM   14    A.   Yes.

04:48PM   15    Q.   And in the July proffer, you've also got FBI Special

04:49PM   16    Agent Greg Mango, correct?

04:49PM   17    A.   He's an HSI special agent, but yes.

04:49PM   18    Q.   Oh, I'm sorry, I mislabeled him.   He's HSI, but he's --

04:49PM   19    A.   He's --

04:49PM   20    Q.   -- let me just ask the question, he's new to the proffer

04:49PM   21    in July, correct?

04:49PM   22    A.   Yes.

04:49PM   23    Q.   Okay.   Meaning he hadn't been at the February proffer,

04:49PM   24    correct?

04:49PM   25    A.   He had not.

04:49PM   1    Q.  And I think you told us on direct, he had recently

04:49PM   2    completed the Kingsmen trial, correct?

04:49PM   3    A.  Yes.

04:49PM   4    Q.  And there was some information that had come out of that

04:49PM   5    trial linking motorcycle clubs and Pharaoh's Gentlemen's

04:49PM   6    Club, correct?

04:49PM   7    A.  Yes.

04:49PM   8    Q.  Okay.  And in the meantime, between February and July of

04:49PM   9    2018, that those professors you had attended, I think you

04:49PM  10    said, some out of the country training about IOC?

04:49PM  11    A.  In Canada.

04:49PM  12    Q.  Okay.  But that occurred between those two proffers,

04:49PM  13    correct?

04:49PM  14    A.  It was in the month of April.  It may not have been --

04:49PM  15    actually, it may not have been until the April after the July

04:50PM  16    proffer.

04:50PM  17    Q.  Okay.  I just wanted to clarify.  I think you said on

04:50PM  18    direct that you thought it might have occurred between the

04:50PM  19    two proffers?

04:50PM  20    A.  No, I think it was the April after.

04:50PM  21    Q.  Okay.

04:50PM  22    A.  I'm certain it was after.

04:50PM  23    Q.  But at some point in time after the July 2018 proffer,

04:50PM  24    you understood Special Agent Casullo was directed not to have

04:50PM  25    any further part as an investigating agent in the

04:50PM  1   investigation, correct?

04:50PM  2   A.   Saying after the -- at some point after the July proffer?

04:50PM  3   Q.   Yes.

04:50PM  4   A.   Yes.

04:50PM  5   Q.   And part of that had to do with the fact that he was

04:50PM  6   deemed to be a fact witness, correct?

04:50PM  7   A.   Yes.

04:50PM  8   Q.   And that related to allegations that were made about the

04:50PM  9   race-related comments, correct?

04:50PM  10  A.   I wasn't aware of what the allegations were.  I mean, I

04:51PM  11  had -- I was generally aware of them at the time, not too

04:51PM  12  much of the specifics of them.  But, yes, I knew the reason.

04:51PM  13  Q.   Right.  That's what I'm getting toward, is that he's

04:51PM  14  deemed to be a fact witness, regardless of what the

04:51PM  15  allegations were he's deemed to be a fact witness because of

04:51PM  16  whatever was surrounding the race-related comment issue,

04:51PM  17  correct?

04:51PM  18  A.   Yes.

04:51PM  19  Q.   All right.  He's not at this point in time a fact witness

04:51PM  20  regarding anything with Ron Serio, correct?

04:51PM  21  A.   I'm sorry, could you --

04:51PM  22  Q.   Meaning that when he's deemed to be a fact witness, it's

04:51PM  23  not arising from something regarding what was said in the

04:51PM  24  July 20th, 2018 proffer, correct?

04:51PM  25  A.   That's correct.

04:51PM    1    Q.  He's not a fact witness to anything that's being revealed

04:51PM    2    at that point in time, correct?

04:51PM    3    A.  That's correct.

04:51PM    4    Q.  Now, when you -- when Mr. Casullo -- when Agent Casullo

04:52PM    5    comes to the July 2018 proffer, did he make mention in any

04:52PM    6    fashion of whether he had reviewed any files related to Ron

04:52PM    7    Serio before he came into that proffer?

04:52PM    8    A.  I don't remember him mentioning that, no.  But we had all

04:52PM    9    done that, so I would assume that he had.

04:52PM   10    Q.  When you say you "had all done that," what do you mean

04:52PM   11    specifically?

04:52PM   12    A.  As part of getting that investigation going, we had all,

04:52PM   13    we had queried the systems that we had access to to look for

04:52PM   14    reports that could connect to that proffer and what we wanted

04:52PM   15    to look at.

04:52PM   16    Q.  Okay.  And you were querying the Ron Serio name, correct?

04:52PM   17    A.  Not just the Ron Serio name.  It was anything to do with

04:52PM   18    Pharaoh's, Gerace.  It was broader than that.

04:52PM   19    Q.  Okay.  So that's what I want to get toward, is by the

04:52PM   20    time you go into the July 2018 proffer, both you and Anthony

04:52PM   21    Casullo have looked up, as far as you understood it,

04:52PM   22    everything that you could search in the DEA databases about,

04:53PM   23    for example, Ron Serio, correct?

04:53PM   24    A.  Well, I searched HSI databases.

04:53PM   25    Q.  Okay.

04:53PM   1   A.  I assumed Tony searched DEA.

04:53PM   2   Q.  Okay.  Because, well, when Mr. Casullo came to the July

04:53PM   3   2018 proffer, was it fair to say he appeared to understand at

04:53PM   4   least something about Mr. Serio, correct?

04:53PM   5   A.  Yes.

04:53PM   6   Q.  I mean, he didn't come into the meeting blind; it's fair

04:53PM   7   to say, correct?

04:53PM   8   A.  Yes.

04:53PM   9   Q.  He appeared to have come in prepped knowing at least some

04:53PM  10   information about Ron Serio, correct?

04:53PM  11   A.  Yes.

04:53PM  12   Q.  And based on what you did with reviewing HSI records, you

04:53PM  13   made the conclusion that Anthony Casullo had looked up

04:53PM  14   records about Ron Serio that were DEA related.

04:53PM  15   A.  Yes.

04:53PM  16       **MR. MacKAY:**  Judge, it's 5 to.  Before I go into a

04:53PM  17   new area --

04:53PM  18       **THE COURT:**  Yeah, that's fine.  So we will now break

04:53PM  19   for the day.

04:53PM  20       Remember tomorrow, 9:00 until 2.  Brings snacks.

04:53PM  21   We're not going to take a lunch break, 9 until 2.

04:53PM  22       And Friday, 12:30 until 5-ish.  Maybe a little before

04:54PM  23   5.  Close to 5.

04:54PM  24       So please remember my instructions about not talking

04:54PM  25   about the case with each other or anybody else, not using

04:54PM    1    tools of technology to research the case or to communicate

04:54PM    2    about the case, and not watching or listening or reading any

04:54PM    3    news coverage of the case if there is any.

04:54PM    4        Don't make up your mind either until the case has

04:54PM    5    been submitted to you to deliberate.

04:54PM    6        We'll see you tomorrow morning at 9.  Get a good

04:54PM    7    night's sleep.  Leave a little earlier tomorrow to get to

04:54PM    8    court, and we'll see you then.

04:54PM    9        (Jury excused at 4:54 p.m.)

04:54PM    10        **THE COURT:**  Anything for the record?

04:55PM    11        **MR. TRIPI:**  No, Your Honor.

04:55PM    12        **MR. MacKAY:**  No, Your Honor.

04:55PM    13        **MR. COOPER:**  Just thank you again to the parties and

04:55PM    14    to the Court for letting us get Mr. C.C. up and down.  I know

04:55PM    15    it's a pain in the butt for them, so I'm grateful.

04:55PM    16        **THE COURT:**  Yeah.  So I want to talk for just a

04:55PM    17    second about the discussion we had at the bench about the

04:55PM    18    witness's testimony about whether somebody he was interviewing

04:55PM    19    was -- what was the word that you used?

04:55PM    20        **COURT REPORTER:**  Evasive.

04:55PM    21        **THE COURT:**  Evasive, thank you, Ann.  Evasive.

04:55PM    22        The reason I have a problem with that, Mr. Tripi, and

04:55PM    23    you said that comes in all the time, and maybe it does.

04:55PM    24        **MR. TRIPI:**  Of course that doesn't mean you need to

04:55PM    25    let it in.

| | | |
|---|---|---|
| 04:55PM | 1 | **THE COURT:**  No, no. |
| 04:55PM | 2 | **MR. TRIPI:**  I mean, I understand the Court's |
| 04:55PM | 3 | decision. |
| 04:55PM | 4 | **THE COURT:**  I want to explain my thought process. |
| 04:55PM | 5 | So, you couldn't ask a witness for his or her opinion |
| 04:55PM | 6 | about whether the person was being truthful, right?  That |
| 04:55PM | 7 | certainly would be off limits. |
| 04:55PM | 8 | **MR. TRIPI:**  Sure. |
| 04:55PM | 9 | **THE COURT:**  You can ask what the person looked like? |
| 04:55PM | 10 | Was the person -- and it's -- even though it's lay opinion |
| 04:55PM | 11 | testimony, he can testify that the person appeared nervous, |
| 04:56PM | 12 | that the person appeared jittery, that the person, you know, |
| 04:56PM | 13 | the car appeared to be speeding.  Those kinds of things are |
| 04:56PM | 14 | lay opinion, legitimate lay opinion. |
| 04:56PM | 15 | Asking whether a witness is evasive, I think, is |
| 04:56PM | 16 | closer to the truthful than it is to the nervous.  Because |
| 04:56PM | 17 | evasive involves the content of what the witness is saying, |
| 04:56PM | 18 | not the way the witness is saying it.  Unless you make more of |
| 04:56PM | 19 | a foundation with respect to what "evasive" means.  And if |
| 04:56PM | 20 | evasive means, you know, he was looking around like this, |
| 04:56PM | 21 | or -- or -- or something like that -- |
| 04:56PM | 22 | **MR. TRIPI:**  Okay. |
| 04:56PM | 23 | **THE COURT:**  -- but that's -- that's the -- my thought |
| 04:56PM | 24 | process is that you can't ask for a lay opinion about whether |
| 04:56PM | 25 | a witness is being truthful.  You can ask for a lay opinion |

04:56PM  1    about whether a witness is nervous or other things that you

04:56PM  2    can observe.  And the word "evasive" seems to me to go to the

04:56PM  3    content of what is being said rather than the witness's

04:57PM  4    demeanor.

04:57PM  5            **MR. COOPER:**  Can I ask a follow-up question on that?

04:57PM  6            **THE COURT:**  Yeah, you go right ahead.

04:57PM  7            And I'm not saying I'm right on this.  I'm just

04:57PM  8    telling you that's where I'm coming from.

04:57PM  9            **MR. COOPER:**  I'm following your train of thought.  I

04:57PM  10   guess my follow-up question would be envisioning a scenario,

04:57PM  11   and I think this came up at the bench with Mr. Tripi where

04:57PM  12   direct questions are being asked of a witness, and a witness

04:57PM  13   is kind of skirting around answering those.  I mean, we've all

04:57PM  14   in our life experience/encountered a situation like that.

04:57PM  15           And without getting into content, I think a trained

04:57PM  16   law enforcement officer can offer a lay opinion that they were

04:57PM  17   asking direct questions, like is the sky blue, and a witness

04:57PM  18   is saying, well, you know, I haven't looked at the sky in a

04:57PM  19   while.  And that could be an example where you're not

04:57PM  20   expressly providing content, and in your common-sense life

04:57PM  21   experience, you are just using the word "evasive" because

04:57PM  22   that's the word anyone would use to describe that.

04:57PM  23           **THE COURT:**  Maybe.  Maybe.  Maybe.  I get it.  And

04:57PM  24   maybe you're right.  And I'm not saying that this is how I'm

04:57PM  25   going to rule on this in the future where there hasn't been an

04:58PM    1    objection to this yet, I'm just telling you.

04:58PM    2          And that's a good response, Mr. Cooper, and I will

04:58PM    3    think about that.

04:58PM    4          But, the -- the lay opinion, I think when it goes to

04:58PM    5    the content of what's being said, it's a little more

04:58PM    6    problematic.  And I'm just saying I think "evasive" may be --

04:58PM    7    I don't know, maybe you're right, maybe you're right.

04:58PM    8          **MR. COOPER:**  I think that you're right about the

04:58PM    9    truthful, and I think we can ask questions in a slightly

04:58PM   10    different way.  And sometimes this is how it's resolved, we

04:58PM   11    can ask questions in a slightly different way.  Were you

04:58PM   12    asking direct questions and receiving direct answers, or was

04:58PM   13    something else happening?

04:58PM   14          **THE COURT:**  Yeah.

04:58PM   15          **MR. COOPER:**  So we can work on it as well.

04:58PM   16          **THE COURT:**  Yeah.  Okay.  Great.

04:58PM   17          Anything you folks want to say?

04:58PM   18          **MR. MacKAY:**  No, Your Honor, point well taken.

04:58PM   19          **THE COURT:**  Okay.  You know, I love this stuff so

04:58PM   20    much, as you probably can tell, and it --

04:58PM   21          **MR. TRIPI:**  It's helpful to have that type of

04:58PM   22    dialogue sometimes.  You get an objection sustained or

04:58PM   23    overruled, and you have no idea why that happened, and so I

04:58PM   24    think it's nice to get some insight.

04:58PM   25          **THE COURT:**  Good.

04:58PM    1              **MR. TRIPI:**  So I appreciate it.

04:58PM    2              **THE COURT:**  Terrific.

04:58PM    3              **MR. MacKAY:**  I'm better schooled and better versed in

04:59PM    4    evidence than I was one and a half trials ago.

04:59PM    5              **THE COURT:**  I guess that's a good thing.  Thanks,

04:59PM    6    everybody.

04:59PM    7              **MR. COOPER:**  So tomorrow is 9 a.m.?

04:59PM    8              **THE COURT:**  9 a.m.  Yep.  Be on time.

04:59PM    9              **MR. COOPER:**  Yes.  I'll do my darndest.

04:59PM   10              **MR. TRIPI:**  I won't be involved in drop-offs

04:59PM   11    tomorrow.

          12              (Excerpt concluded at 4:59 p.m.)

          13              *       *       *       *       *       *       *

          14

          15                    **CERTIFICATE OF REPORTER**

          16

          17              In accordance with 28, U.S.C., 753(b), I

          18    certify that these original notes are a true and correct

          19    record of proceedings in the United States District Court for

          20    the Western District of New York on September 11, 2024.

          21

          22

          23              s/ Ann M. Sawyer
                          Ann M. Sawyer, FCRR, RPR, CRR
          24              Official Court Reporter
                          U.S.D.C., W.D.N.Y.

          25

1

2                    **TRANSCRIPT INDEX**

3        **EXCERPT - EXAMINATION OF CURTIS RYAN - DAY 2**

4                    **SEPTEMBER 11, 2024**

5

6

7    **W I T N E S S**                          **P A G E**

8    **C U R T I S   R Y A N**                     2

9      (CONT'D) DIRECT EXAMINATION BY MR. TRIPI:     2

10     CROSS-EXAMINATION BY MR. MacKAY:            88

11

12

13   **E X H I B I T S**                          **P A G E**

14   GOV Exhibits 100D-1 and 2                     25

15   GOV Exhibit 393                               28

16   GOV Exhibits 100E-1 and 100F-1                45

17

18

19

20

21

22

23

24

25