08:52AM

1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK
2
     _____
3    UNITED STATES OF AMERICA,

                                        Case No. 1:19-cr-227
4              Plaintiff,                        (LJV)
     v.
5                                       September 12, 2024

     JOSEPH BONGIOVANNI,
6

                     Defendant.
7    _____


8       TRANSCRIPT EXCERPT - EXAMINATION OF CURTIS RYAN - DAY 3
                BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                    UNITED STATES DISTRICT JUDGE

10   APPEARANCES:           TRINI E. ROSS, UNITED STATES ATTORNEY
                            BY: JOSEPH M. TRIPI, ESQ.
11                              NICHOLAS T. COOPER, ESQ.
                                CASEY L. CHALBECK, ESQ.
12                          Assistant United States Attorneys
                            Federal Centre, 138 Delaware Avenue
13                          Buffalo, New York 14202
                            For the Plaintiff
14
                            SINGER LEGAL PLLC
15                          BY: ROBERT CHARLES SINGER, ESQ.
                            80 East Spring Street
16                          Williamsville, New York 14221
                               And
17                          LAW OFFICES OF PARKER ROY MacKAY
                            BY: PARKER ROY MacKAY, ESQ.
18                          3110 Delaware Avenue
                            Kenmore, New York 14217
19                             And
                            OSBORN, REED & BURKE, LLP
20                          BY: JOHN J. GILSENAN, ESQ.
                            120 Allens Creek Road
21                          Rochester, New York 14618
                            For the Defendant
22
     PRESENT:               BRIAN A. BURNS, FBI Special Agent
23                          MARILYN K. HALLIDAY, HSI Special Agent
                            KAREN A. CHAMPOUX, USA Paralegal
24
     LAW CLERK:             REBECCA FABIAN IZZO, ESQ.
25

1    **COURT DEPUTY CLERK:   COLLEEN M. DEMMA**

2    **COURT REPORTER:**        **ANN MEISSNER SAWYER, FCRR, RPR, CRR**
                                Robert H. Jackson Federal Courthouse
3                               2 Niagara Square
                                Buffalo, New York  14202
4                               Ann_Sawyer@nywd.uscourts.gov

5

6                    *     *     *     *     *     *     *

7

8            (Excerpt commenced at 9:11 a.m.)

9            (Witness and Jury seated at 9:11 a.m.)

10           **THE COURT:**  Good morning.

11           **JURORS:**  Good morning.

12           **THE COURT:**  You all look great in your blue and

13   white.

14           **JURORS:**  Theme day.

15           **THE COURT:**  The record will reflect that all our

16   jurors are present again.

17           I remind the witness that he's still under oath.

18           And, Mr. MacKay, you may continue.

19

20   **C U R T I S   R Y A N,** having been previously duly called and

21   sworn, continued to testify as follows:

22

23                **(CONT'D) CROSS-EXAMINATION BY MR. MacKAY:**

24   Q.  Good morning again, Agent Ryan.

25   A.  Good morning.

09:12AM   1    Q.  I just want to kind of recenter us and get us back on

09:12AM   2    track of what we were talking about yesterday.

09:12AM   3         You were one of the two lead investigators into

09:12AM   4    Mr. Bongiovanni, correct?  With HSI?

09:12AM   5    A.  Yes.

09:12AM   6    Q.  Okay.  That would be you and Agent Halliday, correct?

09:12AM   7    A.  Yes.

09:12AM   8    Q.  And then there was obviously an OIG component with Agents

09:12AM   9    Fusco and Carpenter, correct?

09:12AM   10   A.  Yes.

09:12AM   11   Q.  Okay.  I think we discussed yesterday, when you sat

09:12AM   12   Mr. Bongiovanni down in June of 2019, one of the -- at least

09:12AM   13   part of the answer he gave to you for why he brought the

09:12AM   14   Serio file home was that he wanted to show that he did

09:13AM   15   legitimate work on the file, correct?

09:13AM   16   A.  Yes.

09:13AM   17   Q.  And you had testified that after that July 20th, 2018

09:13AM   18   date, you had tried to keep any investigation about

09:13AM   19   Mr. Bongiovanni in connection to Serio from Mr. Bongiovanni,

09:13AM   20   correct?

09:13AM   21   A.  Yes.

09:13AM   22   Q.  And we walked through, though, I showed you Government

09:13AM   23   Exhibit 26E that was a DARTS email about a month and a day

09:13AM   24   later that you caused to be generated, correct?

09:13AM   25   A.  Yes.

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

4

```
09:13AM    1   Q.  And we saw in there, if you recall, there's reference in
09:13AM    2   there to the Ron Serio drug-trafficking organization,
09:13AM    3   correct?
09:13AM    4   A.  Yes.
09:13AM    5   Q.  And the Ron Serio drug-trafficking organization was what
09:13AM    6   you understood Mr. Bongiovanni was investigating back in 2013
09:13AM    7   with the Wayne Anderson/Ron Serio file, correct?
09:13AM    8   A.  Yes.
09:13AM    9   Q.  Okay.  And 100A, that's that Redweld you talked about,
09:13AM   10   correct?
09:13AM   11   A.  Yes.
09:13AM   12   Q.  You reviewed that, ultimately, prior to testifying here
09:14AM   13   today, correct?
09:14AM   14   A.  Yes.
09:14AM   15   Q.  As part of your investigation, you went through all the
09:14AM   16   documents, correct?
09:14AM   17   A.  Yes.
09:14AM   18   Q.  And part of that was you actually had to scan them in and
09:14AM   19   make them into a digital version, correct?
09:14AM   20   A.  I didn't scan them all, but I helped with that, yes.
09:14AM   21   Q.  Right, you were part of that process to ultimately
09:14AM   22   produce what we're going to go though as 100A.1, correct?
09:14AM   23   A.  Yes.
09:14AM   24   Q.  All right.  Now, in your experience with -- as HSI agent
09:14AM   25   working over with the DEA, just remind the jury, working
```

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

5

| | | |
|---|---|---|
| 09:14AM | 1 | files, is it fair to characterize them as sort of the agent's |
| 09:14AM | 2 | personal collection of papers on a file while they're working |
| 09:14AM | 3 | the file? |
| 09:14AM | 4 | A.  It's the documents that don't go to the official file in |
| 09:14AM | 5 | the file room. |
| 09:14AM | 6 | Q.  Okay.  Fair to characterize it's something like the |
| 09:14AM | 7 | documents sort of immediately needed for the agent that they |
| 09:14AM | 8 | might thumb through when they're working on the case? |
| 09:14AM | 9 | A.  Yes. |
| 09:14AM | 10 | Q.  It's kind of the quick reference to the file, maybe? |
| 09:15AM | 11 | A.  That's one reason to have those, yes. |
| 09:15AM | 12 | Q.  Right, yeah.  I'm just kind of trying to paint the |
| 09:15AM | 13 | picture, that the working file is something that the agent |
| 09:15AM | 14 | has at their quick disposal so that they don't have to go to |
| 09:15AM | 15 | the sort of master file to get the stuff out of every time, |
| 09:15AM | 16 | correct? |
| 09:15AM | 17 | A.  Right. |
| 09:15AM | 18 | Q.  And ultimately, the agent, according to policy, should |
| 09:15AM | 19 | put everything in the final master file, correct? |
| 09:15AM | 20 | A.  Yes. |
| 09:15AM | 21 | Q.  And at that time back in 2013, DEA was transitioning to |
| 09:15AM | 22 | an electronic file system, correct? |
| 09:15AM | 23 | A.  I don't know, I wasn't there in 2013. |
| 09:15AM | 24 | Q.  No, when -- you came on board, again, when?  At the DEA |
| 09:15AM | 25 | as a task force officer. |

| | | |
|---|---|---|
| 09:15AM | 1 | A.  Late '16, early '17, somewhere in there. |
| 09:15AM | 2 | Q.  By then, the -- the shared or master files were all |
| 09:15AM | 3 | electronic? |
| 09:15AM | 4 | A.  No.  There were still paper case files in the file room |
| 09:15AM | 5 | then. |
| 09:15AM | 6 | Q.  Okay.  So, fair to say it was still in transition working |
| 09:15AM | 7 | its way from paper to electronic? |
| 09:15AM | 8 | A.  Yes. |
| 09:15AM | 9 | Q.  And then at some point in time after that, the files do |
| 09:15AM | 10 | become fully electronic? |
| 09:16AM | 11 | A.  Not while I was there.  I don't know. |
| 09:16AM | 12 | Q.  Okay.  All right.  So, I want to go through some of the |
| 09:16AM | 13 | things in 100A.1. |
| 09:16AM | 14 | MR. MacKAY:  Ms. Champoux, can you pull up Government |
| 09:16AM | 15 | Exhibit 100A.1? |
| 09:16AM | 16 | Can we start with the 4-19-13 subscriber list PDF |
| 09:16AM | 17 | right at the top? |
| 09:16AM | 18 | And can we just rotate that, please? |
| 09:16AM | 19 | BY MR. MacKAY: |
| 09:16AM | 20 | Q.  Okay.  This is a subscriber list, correct? |
| 09:16AM | 21 | A.  Yes. |
| 09:16AM | 22 | Q.  Tell the jury again what this, what we're looking at |
| 09:16AM | 23 | here, what one of these documents does? |
| 09:16AM | 24 | A.  I think this is a report from PenLink, that's what it |
| 09:16AM | 25 | looks like to me.  So, it's a list of the subscribers |

09:16AM   1   identified in that subset of the data in PenLink.

09:16AM   2   Q.  So, what I'm trying to get the jury to understand is how

09:17AM   3   do we get this list, how does somebody get this list

09:17AM   4   produced?  Does it come from a phone number that's already

09:17AM   5   been generated somewhere?  How do we wind up with this

09:17AM   6   document?

09:17AM   7   A.  Subpoenas of all of these phone numbers for the

09:17AM   8   subscriber information.

09:17AM   9   Q.  Okay.  And in your experience, typically it's the intel

09:17AM  10   analyst who worked to produce the subpoenas and get the

09:17AM  11   subpoena returns back?

09:17AM  12   A.  I always produced my own, but I know the intel analysts

09:17AM  13   often did it, as well.

09:17AM  14   Q.  And obviously there's two parts of that.  The subpoena

09:17AM  15   has to go out the door to get the information, correct?

09:17AM  16   A.  Yes.

09:17AM  17   Q.  And then the subpoena return comes back to the DEA with

09:17AM  18   raw data, correct?

09:17AM  19   A.  Yes.

09:17AM  20   Q.  And then that data has to be essentially parsed and

09:17AM  21   sorted into something, and is it fair to say that that's sort

09:17AM  22   of what was this something is that we're looking at?

09:17AM  23   A.  Yes, it's a report from the something, which I think at

09:17AM  24   the time was a software called PenLink.

09:17AM  25   Q.  Right.  Yeah.  Again, I know it's a little painful to

09:18AM   1   step through step by step, but I want to go through that, you

09:18AM   2   know, a subpoena goes out the door, information comes back,

09:18AM   3   it's put into a program that ultimately generates a report

09:18AM   4   like this, correct?

09:18AM   5   A.   Yes.

09:18AM   6   Q.   And in your experience, agents use this to sort of, for

09:18AM   7   example, find out what numbers are most calling a specific

09:18AM   8   number, correct?

09:18AM   9   A.   Well, this one, the hot sheet is the what numbers most

09:18AM  10   called.  This is more about who the people are that are

09:18AM  11   calling.

09:18AM  12   Q.   Okay.  Yeah, we'll get to one of those there.  This is

09:18AM  13   just, usually this is organized by alphabetical list,

09:18AM  14   correct?  Alphabetically by last name, it looks like,

09:18AM  15   correct?

09:18AM  16   A.   Yes.

09:18AM  17   Q.   So, what this list shows is for a specific number that

09:18AM  18   was subpoenaed, these are the numbers that are calling that

09:18AM  19   number, correct?

09:18AM  20   A.   I don't --

09:18AM  21   Q.   Interacting with that number?

09:18AM  22   A.   I think this is all of the -- this is based on all of the

09:18AM  23   numbers that were subpoenaed in that case file.  You'd have

09:18AM  24   to run a different report to figure out which numbers where

09:19AM  25   interacting with which.

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

09:19AM 1    Q.  And what's that report?

09:19AM 2    A.  It could be a hot list.  Or you could query by the one

09:19AM 3    number that you're talking about, and then it would -- you

09:19AM 4    know, if you set the query up properly, it would return all

09:19AM 5    the numbers that talked to that number.

09:19AM 6    Q.  Okay.  And again, you said that oftentimes it's the --

09:19AM 7    well, not in your experience with what do you with your own

09:19AM 8    reports, but you know that a lot of times the analysts run

09:19AM 9    this actual, like, I think you said, PenLink software?

09:19AM 10   A.  Yes.

09:19AM 11   Q.  And then they produce the reports and turn them over to

09:19AM 12   the agents, correct?

09:19AM 13   A.  Yes.

09:19AM 14        **MR. MacKAY:**  Now, Ms. Champoux, can we pull up -- can

09:19AM 15   we take this down, and can we pull up the file 81513

09:19AM 16   electronic records, electric records?

09:19AM 17        Okay.

09:19AM 18        **BY MR. MacKAY:**

09:19AM 19   Q.  Okay.  All right.  This is another document in the file;

09:19AM 20   fair to say?

09:19AM 21   A.  Yes.

09:19AM 22        **MR. MacKAY:**  And this -- can we go to, I think it's

09:19AM 23   page 2.

09:19AM 24        **BY MR. MacKAY:**

09:19AM 25   Q.  Okay.  This looks like a return for some sort of

09:20AM    1    information request regarding utilities at an address,

09:20AM    2    correct?

09:20AM    3    A.   It's for electric from National Grid.

09:20AM    4    Q.   Right.  So, something -- so a request went out to

09:20AM    5    National Grid, and this is what came back regarding a

09:20AM    6    specific address, correct?

09:20AM    7    A.   Yes.

09:20AM    8    Q.   And in this specific document, it's the address of 1195

09:20AM    9    Hertel Avenue, correct?

09:20AM   10    A.   Yes.

09:20AM   11    Q.   And, you know, based on the name, it appears that the

09:20AM   12    person in whom the utilities are named is John Suppa,

09:20AM   13    correct?

09:20AM   14    A.   Yes.

09:20AM   15    Q.   And did you understand this 1195 Hertel Avenue in the

09:20AM   16    course of your investigation to have any significance?

09:20AM   17    A.   There were several addresses that were controlled by Ron

09:20AM   18    Serio.  I wasn't reinvestigating all of this, so this wasn't

09:20AM   19    all that important to me --

09:20AM   20    Q.   Well, did you understand --

09:20AM   21    A.   -- the actual address.

09:20AM   22    Q.   Did you understand this address to come up in the

09:20AM   23    investigation at any point, this 1195 Hertel Avenue?

09:20AM   24    A.   Which investigation?

09:21AM   25    Q.   When you were reviewing the Wayne Anderson file, in

09:21AM   1   looking at what had been done back in 2013, and reviewing the

09:21AM   2   original investigation, did you understand this 1195 Hertel

09:21AM   3   Avenue address to come up?

09:21AM   4   A.  I mean, I know it came up because it's here, I don't

09:21AM   5   remember anything else about it.

09:21AM   6   Q.  Okay.  And, so, you don't know whether they were

09:21AM   7   investigating this location as a grow location, correct?

09:21AM   8   A.  I know they were investigating grow locations, I don't

09:21AM   9   remember the addresses.

09:21AM  10   Q.  Okay.  And subpoenaing utilities is one way agents can

09:21AM  11   investigate whether a location may be a grow location,

09:21AM  12   correct?

09:21AM  13   A.  One way.

09:21AM  14   Q.  Because they're looking for out of the ordinary

09:21AM  15   electronic usage, correct?

09:21AM  16   A.  Yes.

09:21AM  17         **MR. MacKAY:**  All right.  Ms. Champoux, can we take

09:21AM  18   that down?  Can we pull up the file 467 Tacoma, elec sub?

09:21AM  19         Can we zoom out a little bit, please?

09:22AM  20         **BY MR. MacKAY:**

09:22AM  21   Q.  And this, for example, what we're looking at, this is a

09:22AM  22   subpoena for electric records, correct?

09:22AM  23   A.  Yes.

09:22AM  24   Q.  Okay.  And it appears to be associated with this address,

09:22AM  25   467 Tacoma Avenue?

| | | |
|---|---|---|
| 09:22AM | 1 | A.  And also 469. |
| 09:22AM | 2 | Q.  And 469. |
| 09:22AM | 3 | **MR. MacKAY:**  Can we scroll down on that? |
| 09:22AM | 4 | **BY MR. MacKAY:** |
| 09:22AM | 5 | Q.  Okay.  It also appears in the same document to have |
| 09:22AM | 6 | that -- there's a reference to this 132 Rhode Island Street? |
| 09:22AM | 7 | A.  Yes. |
| 09:22AM | 8 | Q.  Okay. |
| 09:22AM | 9 | A.  I don't know if that -- that could be something that I |
| 09:22AM | 10 | caused, or shuffling of the papers caused, I don't |
| 09:22AM | 11 | necessarily know that they go together. |
| 09:22AM | 12 | Q.  Okay.  But you had said, you know, at least from what you |
| 09:22AM | 13 | could see and what you knew about the Wayne Anderson |
| 09:22AM | 14 | investigation, that there were some grow locations being |
| 09:22AM | 15 | investigated, correct? |
| 09:22AM | 16 | A.  Yes. |
| 09:22AM | 17 | **MR. MacKAY:**  All right.  Can we scroll down a little |
| 09:22AM | 18 | further, Ms. Champoux? |
| 09:22AM | 19 | **BY MR. MacKAY:** |
| 09:22AM | 20 | Q.  And again, here, I think we're on page 3 now, again, this |
| 09:23AM | 21 | is a return for an electric subpoena, correct? |
| 09:23AM | 22 | A.  Yes. |
| 09:23AM | 23 | Q.  And it's just showing who properties might be associated |
| 09:23AM | 24 | with, correct? |
| 09:23AM | 25 | A.  Yes. |

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

13

09:23AM    1            **MR. MacKAY:**  All right.  Let's take that down,

09:23AM    2    Ms. Champoux, can we go to document that begins with a 561801?

09:23AM    3    That one right there.

09:23AM    4            **BY MR. MacKAY:**

09:23AM    5    Q.  Okay.  Now, this, I think you looked at this on direct,

09:23AM    6    this is what's called a hot sheet, correct?

09:23AM    7    A.  Yes.

09:23AM    8    Q.  This looks kind of similar to what we were looking at

09:23AM    9    before but it's a little bit different, correct?

09:23AM   10    A.  It's different in that it's organized by the number of

09:23AM   11    times the number's been called from most times to least.

09:23AM   12    Q.  Okay.  So, it's circled up here and it's -- you can see

09:23AM   13    it says hot number list is what you're referring to as a hot

09:23AM   14    sheet, correct?

09:23AM   15    A.  Yes.

09:23AM   16    Q.  Okay.  And this one appears to have been on

09:23AM   17    November 30th, 2012, correct?

09:24AM   18    A.  Yes.

09:24AM   19    Q.  Okay.  Now, and the number, you knew that to be from your

09:24AM   20    investigation Tom Serio's number?

09:24AM   21    A.  Yes.

09:24AM   22    Q.  Okay.  And again, I think you were directing everybody's

09:24AM   23    attention to the way this is organized.  So if you look from

09:24AM   24    rows one down further, fair to say what you're telling us is

09:24AM   25    that this report organizes the numbers that called this

09:24AM  1   561-801-0221 number in order of who called the most and who

09:24AM  2   called the least, correct?

09:24AM  3   A.   The calls both directions, but yes.

09:24AM  4   Q.   Yes.  So, so, what this report generates is looking at

09:24AM  5   all the calls both directions, in and out of that cell phone

09:24AM  6   number of Tom Serio's, and its ranking them by where the most

09:24AM  7   frequent to least frequent, correct?

09:24AM  8   A.   Yes.

09:24AM  9   Q.   Okay.  And what's the investigative use for one of these

09:24AM  10  in an DEA investigation?

09:24AM  11  A.   Well, this one to me looks like a starting point.  And

09:25AM  12  then you have to make a decision about whether or not you're

09:25AM  13  going to subpoena all of these numbers in the tolls, or

09:25AM  14  select certain ones, prioritize the order you're going to do

09:25AM  15  the next round of subpoenas in.

09:25AM  16  Q.   Okay.  And you're talking about there's multiple rounds

09:25AM  17  of subpoenas.  This hot sheet list, does this come after one

09:25AM  18  subpoena has already been sent out and information has come

09:25AM  19  back about phone numbers for -- connected to a specific phone

09:25AM  20  number?

09:25AM  21  A.   To me, this looks like one of the first subpoenas done in

09:25AM  22  the file.

09:25AM  23  Q.   Okay.

09:25AM  24  A.   Because of the -- there are so many no subscriber

09:25AM  25  entries, if previous subpoenas had been done that identified

09:25AM 1    subscribers, some of those should populate.

09:25AM 2    Q.  Yeah, I guess, so the question I have is the previous

09:25AM 3    document we looked at, that subscriber list, you send out a

09:25AM 4    subpoena in general to a number and you get back the

09:25AM 5    information about it, correct?

09:25AM 6    A.  Yes.

09:25AM 7    Q.  Now, what we saw before was the alphabetically organized

09:25AM 8    list, now we've got the hot sheet.  Do those two reports get

09:26AM 9    generated at the same time, or is it sort of one after

09:26AM 10   another in practice?

09:26AM 11   A.  The subscriber list filled in like that one was --

09:26AM 12   Q.  Yes.

09:26AM 13   A.  -- would have to come after several rounds of subpoenas.

09:26AM 14   Q.  Okay.  So, I mean, again, we're just kind of going

09:26AM 15   through it step by step.  But the first stage is you've got

09:26AM 16   to figure out what numbers generally are calling or being

09:26AM 17   called by a number, correct?

09:26AM 18   A.  Yes.

09:26AM 19   Q.  So, that's the first round of subpoenas that goes out,

09:26AM 20   and you get back that information presumably in response to

09:26AM 21   the subpoena, correct?

09:26AM 22   A.  Yes.

09:26AM 23   Q.  And then what an agent might do then is produce that list

09:26AM 24   that we saw before that shows all of the numbers that call

09:26AM 25   it, correct?

09:26AM    1    A.  Yes.

09:26AM    2    Q.  Or -- or are being called by that number, correct?

09:26AM    3    A.  Right.

09:26AM    4    Q.  And then the next stage would be if there's a lot of no

09:26AM    5    subscribers, they would have to further subpoena who those

09:26AM    6    numbers are and figure out, like, I'm sorry, they would have

09:26AM    7    to subpoena those numbers to figure out who the actual

09:26AM    8    subscriber is, correct?

09:26AM    9    A.  Right.

09:26AM   10    Q.  So, if we look at this report dated 11/30/2012, and we'll

09:27AM   11    just take for example row number 2, there's a number, but

09:27AM   12    there's no subscriber; fair to say?

09:27AM   13    A.  Yes.

09:27AM   14    Q.  So, what this says is that in November of 2012, whoever's

09:27AM   15    viewing this report knows that this 533-6338 number called

09:27AM   16    Tom Serio's number, but they don't know who it is, correct?

09:27AM   17    A.  Right.

09:27AM   18    Q.  Because they, you know, it says no subscriber, so --

09:27AM   19    correct?

09:27AM   20         MR. TRIPI:  Objection as to what someone else knows,

09:27AM   21    and who are "they."

09:27AM   22         THE COURT:  No.

09:27AM   23         MR. TRIPI:  Speculative, Judge.

09:27AM   24         THE COURT:  I understand what you're saying,

09:27AM   25    Mr. Tripi, but no, I think it's a fair question.

Case 1:19-cr-00227-LJV-MJR    Document 1246    Filed 09/29/24    Page 17 of 164
USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

17

**BY MR. MacKAY:**

09:27AM  1

09:27AM  2   Q.  All right.  So, somebody viewing this would not know

09:27AM  3   the -- who that 533 number is associated with because the

09:27AM  4   report is saying no subscriber, correct?

09:27AM  5   A.  Unless they already knew the number, right, the report

09:27AM  6   doesn't tell you.

09:27AM  7   Q.  Right.  But this report alone just says no subscriber,

09:27AM  8   correct?

09:27AM  9   A.  Right.

09:27AM  10  Q.  So, the next step is that 533 number would have to be

09:28AM  11  subpoenaed independently, correct?

09:28AM  12  A.  Yes.

09:28AM  13  Q.  And then that subpoena would return information

09:28AM  14  presumably identify who's -- who the subscriber for the 533

09:28AM  15  number is, correct?

09:28AM  16  A.  If it's the type of phone where the company has the

09:28AM  17  subscriber data, then yes.

09:28AM  18  Q.  Right.  So, in order to get a list like this ultimately

09:28AM  19  filled in that doesn't say no subscribers, you've got to do a

09:28AM  20  second round of subpoenas to get the subscribers from all of

09:28AM  21  these numbers, correct?

09:28AM  22  A.  Yes.

09:28AM  23  Q.  So, that's what, if I'm understanding it correctly, when

09:28AM  24  you first said this looks like a very early on in the

09:28AM  25  investigation document, it's because none of these numbers

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

18

09:28AM      1    have the subscribers associated with them yet, correct?

09:28AM      2    A.  Correct.

09:28AM      3    Q.  Okay.  And you said generally investigation, I think,

09:28AM      4    you've got do multiple rounds of these subpoenas to sort of

09:28AM      5    fill in and identify who all these folks are that call each

09:28AM      6    other, correct?

09:28AM      7    A.  Yes.

09:28AM      8    Q.  And then a separate level of investigation might be, in

09:29AM      9    your experience, to then take the subscriber names that you

09:29AM     10    find from these numbers and subpoena utilities associated

09:29AM     11    with the addresses, correct?

09:29AM     12    A.  You could, yes.

09:29AM     13    Q.  If there's a suspicion that that might be a grow

09:29AM     14    location, you would do, for example, the utilities subpoenas,

09:29AM     15    correct?

09:29AM     16    A.  Well, I don't think that's the track.  If I had a

09:29AM     17    suspicion about a location, I would subpoena the location.

09:29AM     18    If I was looking at a person, then I would subpoena by the

09:29AM     19    person.

09:29AM     20    Q.  Right.  But I guess what I'm saying is you might not in

09:29AM     21    your investigation know where a location is until you have it

09:29AM     22    off of a subscriber information subpoena return, correct?

09:29AM     23    A.  That's correct.

09:29AM     24    Q.  And you might not even know who the subscriber is in the

09:29AM     25    first place until you have that back from the subpoena

| | | |
|---|---|---|
| 09:29AM | 1 | return, correct? |
| 09:29AM | 2 | A.  Correct. |
| 09:29AM | 3 | Q.  So, what I'm saying generally speaking is sometimes |
| 09:29AM | 4 | multiple rounds of subpoenas are necessary to get to the |
| 09:30AM | 5 | point where you as an agent have names and addresses that you |
| 09:30AM | 6 | can work further in your investigation, correct? |
| 09:30AM | 7 | A.  Yes. |
| 09:30AM | 8 | Q.  Okay.  And I think you went through this earlier, but at |
| 09:30AM | 9 | the top it's circled it says, C2-11-0126, that file number, |
| 09:30AM | 10 | correct? |
| 09:30AM | 11 | A.  Yes. |
| 09:30AM | 12 | Q.  And that was not the Wayne Anderson file, correct? |
| 09:30AM | 13 | A.  It's not. |
| 09:30AM | 14 | Q.  And below it, it says the name Bongo, right? |
| 09:30AM | 15 | A.  Yes. |
| 09:30AM | 16 | Q.  And you understood that in your investigation or your |
| 09:30AM | 17 | personal time at the DEA to be Joe Bongiovanni's nickname, |
| 09:30AM | 18 | correct? |
| 09:30AM | 19 | A.  Yes. |
| 09:30AM | 20 | Q.  So, and I think you told us on direct it's common for |
| 09:30AM | 21 | intel analysts to write this sort of information on the top |
| 09:30AM | 22 | of one of these reports, correct? |
| 09:30AM | 23 | A.  Yes. |
| 09:30AM | 24 | Q.  Because ultimately, they have to give these reports in |
| 09:30AM | 25 | paper form to one of the agents, correct? |

| | | |
|---|---|---|
| 09:30AM | 1 | A.  Yes. |
| 09:30AM | 2 | Q.  So, at least from what you can tell in this report, it |
| 09:30AM | 3 | looks like an agent wrote this case number and Joe |
| 09:31AM | 4 | Bongiovanni's nickname to provide him with this report that |
| 09:31AM | 5 | we see here, correct? |
| 09:31AM | 6 | A.  Yes. |
| 09:31AM | 7 | Q.  Okay.  And in your experience with the DEA as a TFO, it's |
| 09:31AM | 8 | not uncommon for agents to work other agents' cases, correct? |
| 09:31AM | 9 | A.  To assist each other? |
| 09:31AM | 10 | Q.  To assist, yes. |
| 09:31AM | 11 | A.  Yes, that's correct. |
| 09:31AM | 12 | Q.  Okay. |
| 09:31AM | 13 | MR. MacKAY:  All right.  Ms. Champoux, can we take |
| 09:31AM | 14 | that down and can we pull up -- it's the next one down, |
| 09:31AM | 15 | 716-481-8002 toll analysis. |
| 09:31AM | 16 | BY MR. MacKAY: |
| 09:31AM | 17 | Q.  Okay.  So now, we're looking at another toll analysis, |
| 09:31AM | 18 | correct? |
| 09:31AM | 19 | A.  Yes. |
| 09:31AM | 20 | Q.  Okay.  And, you know, based on the file number, and this |
| 09:32AM | 21 | number circled at the top, you understand this to be John |
| 09:32AM | 22 | Robinson's phone number? |
| 09:32AM | 23 | A.  I don't see a file number.  I recognize that telephone |
| 09:32AM | 24 | number. |
| 09:32AM | 25 | Q.  Oh, when I was talking about the file number at the top, |

09:32AM    1    I guess I meant the actual file number PDF.

09:32AM    2    A.   Oh, the file name?  Yes.

09:32AM    3    Q.   But do you recognize both from that file name and from

09:32AM    4    the number that's here, do you recognize that to be John

09:32AM    5    Robinson's cell phone number?

09:32AM    6    A.   Yes.

09:32AM    7    Q.   Okay.  Now when we go back, do you recall that being a

09:32AM    8    number that -- strike that.

09:32AM    9         So, this is occurring on April 19th of 2013, correct?

09:32AM    10   A.   Yes.

09:32AM    11   Q.   Okay.  And this is, you know, about six months almost

09:32AM    12   after that initial Tom Serio document we looked at, correct?

09:32AM    13   A.   Yes.

09:32AM    14   Q.   Okay.  All right.  Now, so what this -- what this is, so

09:32AM    15   the jury understands, is a list of numbers that are calling

09:32AM    16   or being called by John Robinson's phone number, correct?

09:33AM    17   A.   Yes.

09:33AM    18   Q.   Okay.  And, you know, some numbers we see here are Tom

09:33AM    19   Serio, correct?

09:33AM    20   A.   Yes.

09:33AM    21        **MR. MacKAY:**  Ms. Champoux, can we go to the next

09:33AM    22   page, please?

09:33AM    23            Just rotate that.

09:33AM    24        **BY MR. MacKAY:**

09:33AM    25   Q.   And okay.  Some other names came up that you knew had

09:33AM  1  some significance in the Wayne Anderson investigation.  Do

09:33AM  2  you recall the name T.S.?

09:33AM  3  A.  Yes.

09:33AM  4  Q.  Okay.  Do you recall Hard Core Tattoo?

09:33AM  5  A.  Yes.

09:33AM  6  Q.  Okay.  You say there was Ron Serio, correct?

09:33AM  7  A.  Yes.

09:33AM  8  Q.  Michael Moynihan?

09:33AM  9  A.  Yes.

09:33AM  10  Q.  We've talked about him already, but Tom Serio?

09:34AM  11  A.  Yes.

09:34AM  12         MR. MacKAY:  Can we go to the next page,

09:34AM  13  Ms. Champoux?

09:34AM  14         BY MR. MacKAY:

09:34AM  15  Q.  Here we see Michael Masecchia?

09:34AM  16  A.  Yes.

09:34AM  17  Q.  Chris Baker?

09:34AM  18  A.  Yes.

09:34AM  19  Q.  Looks like there's a couple different numbers there for

09:34AM  20  him, correct?

09:34AM  21  A.  Two.

09:34AM  22  Q.  Paul Francoforte?

09:34AM  23  A.  Yes.

09:34AM  24  Q.  Michael Buttitta?

09:34AM  25  A.  Yes.

USA v Bongiovanni - Ryan - MacKay/Cross - 9712/24

09:34AM    1    Q.  Okay.

09:34AM    2         MR. MacKAY:  Then can we go to the next page,

09:34AM    3    Ms. Champoux?

09:34AM    4         BY MR. MacKAY:

09:34AM    5    Q.  Mark Kagan, correct?

09:34AM    6    A.  Yes.

09:34AM    7    Q.  And Mark Kagan, you understood in the course of your

09:34AM    8    investigation, to have some source of supply -- source of

09:34AM    9    supply relationship with Ron Serio?

09:34AM   10    A.  Source of supply, or maybe brokers of source of supply.

09:35AM   11    Q.  Okay.  Now, when you looked at one of the earlier

09:35AM   12    documents, when we looked at one of the documents earlier in

09:35AM   13    you testimony here, I think you described as being relatively

09:35AM   14    early on in the process of an investigation, correct?

09:35AM   15    A.  Are you talking about the Tom Serio subpoena?

09:35AM   16    Q.  Yes.

09:35AM   17    A.  Yes.

09:35AM   18    Q.  Now, compared to that one, fair to say this one

09:35AM   19    represents sort of a further step in the investigation,

09:35AM   20    correct?

09:35AM   21    A.  That's more filled in, yes.

09:35AM   22    Q.  Yes, that's what I mean.  Because there's more

09:35AM   23    information here, it's fair to assume this is sort of further

09:35AM   24    along in the investigative process, correct?

09:35AM   25    A.  As far as subpoenas go anyways, yes.

| | | |
|---|---|---|
| 09:35AM | 1 | Q.  Right, because you talked about how there's multiple |
| 09:35AM | 2 | rounds of subpoenas this looks like it came after several |
| 09:35AM | 3 | rounds, correct? |
| 09:35AM | 4 | A.  Yes. |
| 09:35AM | 5 | Q.  Okay.  And we know in any event that date-wise it's a |
| 09:35AM | 6 | number of months after that Tom Serio sheet, correct? |
| 09:35AM | 7 | A.  Yes. |
| 09:35AM | 8 | MR. MacKAY:  Can we take that down, Ms. Champoux? |
| 09:35AM | 9 | Can we pull up the -- going to the next one down, |
| 09:36AM | 10 | 716-578-5296.  Okay. |
| 09:36AM | 11 | BY MR. MacKAY: |
| 09:36AM | 12 | Q.  All right.  So, and this is another hot sheet, correct? |
| 09:36AM | 13 | A.  Yes. |
| 09:36AM | 14 | Q.  But this one, this goes back, crossed it right out but I |
| 09:36AM | 15 | was trying to underline, this goes back to July 16th of 2012, |
| 09:36AM | 16 | correct? |
| 09:36AM | 17 | A.  It does. |
| 09:36AM | 18 | Q.  So, this is even earlier than that prior sheet we looked |
| 09:36AM | 19 | at with Tom Serio, correct? |
| 09:36AM | 20 | A.  Yes. |
| 09:36AM | 21 | Q.  And this one, there's a case number in the upper |
| 09:36AM | 22 | right-hand corner C2-12-0090, correct? |
| 09:36AM | 23 | A.  Yes. |
| 09:36AM | 24 | Q.  And that is not the Wayne Anderson file, correct? |
| 09:36AM | 25 | A.  It is not. |

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

25

09:36AM   1   Q.  And that is, do you recall that being the G.R. file

09:36AM   2   number?

09:36AM   3   A.  I remember the name G.R., I'd need to see the documents

09:36AM   4   to be able to say for sure that it's -- that's the right case

09:36AM   5   number.

09:36AM   6   Q.  Okay.  If I told you that was the number from the case

09:36AM   7   file, would you have any reason to disagree with me?

09:37AM   8   A.  I'd like to see the documents before I say that it is or

09:37AM   9   it isn't.

09:37AM  10   Q.  Okay.  I don't want to break off and kind of pull that

09:37AM  11   off and go back, so let's stick with this document for a

09:37AM  12   moment.

09:37AM  13      This is a different number that's being looked up,

09:37AM  14   correct?  This -- this is a different number than the one in

09:37AM  15   November that's being looked up, correct?

09:37AM  16   A.  Yes.

09:37AM  17   Q.  This is a 716 area code, correct?

09:37AM  18   A.  Yes.

09:37AM  19   Q.  The one in November was a 561 area code, correct?

09:37AM  20   A.  Yes.

09:37AM  21   Q.  But based on the address and the name that's written next

09:37AM  22   to it, it looks like this is also for Tom Serio though,

09:37AM  23   correct?

09:37AM  24   A.  Yes.

09:37AM  25   Q.  Just generally speaking, the G.R. file, do you recall

09:37AM   1   that being one of Shane Nastoff's files?

09:37AM   2   A.  I don't.

09:37AM   3   Q.  Do you recall who worked it?

09:37AM   4   A.  No.

09:37AM   5   Q.  It wasn't Joe Bongiovanni; is that fair to say?

09:37AM   6   A.  I don't know that either.

09:38AM   7   Q.  Okay.

09:38AM   8        MR. MacKAY:  Ms. Champoux, can we show the witness

09:38AM   9   only --

09:38AM  10        BY MR. MacKAY:

09:38AM  11   Q.  Would it help to refresh anything -- refresh your memory

09:38AM  12   to show you something?

09:38AM  13   A.  I mean, if I saw a report with names and case numbers on

09:38AM  14   it, then yes.

09:38AM  15        MR. MacKAY:  Sure.  So Ms. Champoux, can we show for

09:38AM  16   the witness only Government Exhibit 8J?

09:38AM  17        MS. CHAMPOUX:  J?

09:38AM  18        MR. MacKAY:  J as in Jim.

09:38AM  19        BY MR. MacKAY:

09:38AM  20   Q.  Just take a look at that for a moment to yourself, let me

09:38AM  21   know if that refreshes your recollection.

09:38AM  22   A.  Yes.  It's a --

09:38AM  23        MR. MacKAY:  Let me just take that down.

09:38AM  24   Ms. Champoux, you can take that down.

         25

09:38AM    1          BY MR. MacKAY:

09:38AM    2     Q.  Does that refresh your recollection that the G.R. file

09:38AM    3     was, number 1, the case number was C2-12-0090?

09:38AM    4     A.  I saw the case number and the agents.  Could I see the

09:38AM    5     file title again?

09:38AM    6          MR. MacKAY:  Yeah, can we show that again

09:38AM    7     Ms. Champoux?

09:39AM    8          THE WITNESS:  Okay.

09:39AM    9          MR. MacKAY:  Okay.  All right.  We can take that

09:39AM   10     down, Ms. Champoux.

09:39AM   11          BY MR. MacKAY:

09:39AM   12     Q.  So, again, back to both of my questions.  Does that

09:39AM   13     refresh your recollection first on what the case number for

09:39AM   14     G.R. was?

09:39AM   15     A.  C2-12-0090.

09:39AM   16     Q.  And number two, who the agent was who worked that case?

09:39AM   17     A.  Shane Nastoff.

09:39AM   18     Q.  Okay.

09:39AM   19          MR. MacKAY:  We can take that down, Ms. Champoux.

09:39AM   20     Can we pull up the next one down -- actually, I'm sorry, one

09:39AM   21     more down.  716-830-3226 hot sheet.

09:39AM   22          BY MR. MacKAY:

09:39AM   23     Q.  Okay.  Now, this is another hot sheet that's run,

09:39AM   24     correct?

09:39AM   25     A.  Yes.

09:39AM  1    Q.  So, again, for the jury, that's the report that itemizes

09:39AM  2    in order of most called to the least called, the numbers

09:39AM  3    interacting with the main number, correct?

09:39AM  4    A.  Yes.

09:39AM  5    Q.  And the number being focused on here is the 716-830-3226

09:40AM  6    number, correct?

09:40AM  7    A.  Yes.

09:40AM  8    Q.  And you understand that to be Ron Serio's cell phone

09:40AM  9    number?

09:40AM  10   A.  I think it was one of them, yes.

09:40AM  11   Q.  Okay.  And this is occurring, this report is being run,

09:40AM  12   April 19th of 2013?

09:40AM  13   A.  Yes.

09:40AM  14   Q.  Okay.  So again, some of the same names were showing up,

09:40AM  15   I'm going to go through the names here, and let me know if

09:40AM  16   these are the same names you saw on some of the other hot

09:40AM  17   sheets and subscriber lists I showed you.

09:40AM  18       Chris Baker, correct?

09:40AM  19   A.  Yes.

09:40AM  20   Q.  Okay.  Looks like he's interacting with Ron Serio's phone

09:40AM  21   number, he's either calling him or getting called by Chris

09:40AM  22   Baker 446 times, correct?

09:40AM  23   A.  Yes.

09:40AM  24   Q.  There's his brother, Tom Serio, correct?

09:40AM  25   A.  Yes.

| | | |
|---|---|---|
| 09:40AM | 1 | Q.  127 times they're calling or -- in some fashion, correct? |
| 09:41AM | 2 | A.  Yes. |
| 09:41AM | 3 | Q.  Mike Buttitta, correct? |
| 09:41AM | 4 | A.  Yes. |
| 09:41AM | 5 | Q.  And that's 77 times? |
| 09:41AM | 6 | A.  Yes, it is. |
| 09:41AM | 7 | Q.  T.S.? |
| 09:41AM | 8 | A.  Yes, I see that. |
| 09:41AM | 9 | **MR. MacKAY:**  Go to the next page, Ms. Champoux. |
| 09:41AM | 10 | **BY MR. MacKAY:** |
| 09:41AM | 11 | Q.  Michael Masecchia? |
| 09:41AM | 12 | A.  Yes. |
| 09:41AM | 13 | Q.  Michael Moynihan? |
| 09:41AM | 14 | A.  Yes. |
| 09:41AM | 15 | Q.  Mark Kagan? |
| 09:41AM | 16 | A.  Yes. |
| 09:41AM | 17 | Q.  Paul Francoforte? |
| 09:41AM | 18 | A.  Yes. |
| 09:41AM | 19 | Q.  Hard Core Tattoos? |
| 09:41AM | 20 | A.  Yes. |
| 09:41AM | 21 | Q.  Okay.  And just those were some of the same numbers we |
| 09:41AM | 22 | saw, appear to have interacted with some of the prior numbers |
| 09:41AM | 23 | that were in prior subscriber lists and hot sheets, correct? |
| 09:41AM | 24 | A.  Yes. |
| 09:42AM | 25 | Q.  Okay.  So, it seems to be that at least from what you can |

09:42AM    1    see there's several reports here that have an overlap in the

09:42AM    2    same names and numbers being called, correct?

09:42AM    3    A.  Yes.

09:42AM    4    Q.  Now, you were shown in exhibit, Government

09:42AM    5    Exhibit 100E-1, do you remember that one?  That's the list,

09:42AM    6    the handwritten list of numbers?

09:42AM    7    A.  Yes.

09:42AM    8    Q.  And that came out of the Redweld which you know to be

09:42AM    9    Government Exhibit 100A, correct?

09:42AM    10   A.  Yes.

09:42AM    11   Q.  Fair to say a lot of the names we just went through were

09:42AM    12   names and numbers that were on that handwritten sheet,

09:42AM    13   correct?

09:42AM    14   A.  Yes.

09:42AM    15   Q.  Okay.

09:42AM    16           **MR. MacKAY:**  Ms. Champoux, we can take down that

09:42AM    17   document.

09:42AM    18           Let's go two more down.  We've got the cursor, Baker

09:42AM    19   C rap sheet.

09:42AM    20           If we can zoom out a little bit.

09:42AM    21           **BY MR. MacKAY:**

09:42AM    22   Q.  Okay.  This, you know to be sort of a criminal history

09:42AM    23   check of somebody, correct?

09:43AM    24   A.  Yes.  It's a -- we call it a "triple I check," it stands

09:43AM    25   for Interstate Identification Index.

09:43AM    1    Q.  Okay.  And sort of layman's terms, is this like running a

09:43AM    2    rap sheet on somebody?

09:43AM    3    A.  No, this won't necessarily give you the rap sheet.  The

09:43AM    4    triple I check tells you if someone has a rap sheet and then

09:43AM    5    there's another step you take to go find it.

09:43AM    6    Q.  Okay.  So, this is sort of the initial step of finding

09:43AM    7    out whether somebody has a prior criminal history, correct?

09:43AM    8    A.  Yes.

09:43AM    9    Q.  So, you have a name and some personal identification

09:43AM    10   information, you can send out a query to this NCIC

09:43AM    11   organization and you get back, in this sort of report, an

09:43AM    12   initial response of whether there's a rap sheet to be found

09:43AM    13   for that individual, correct?

09:43AM    14   A.  Right.

09:43AM    15   Q.  Could come back and there's no criminal history, correct?

09:43AM    16   A.  It would come back and say no record on file, but yeah,

09:43AM    17   means a person's not in there.

09:44AM    18   Q.  Yeah, and then opposite would be it says there is

09:44AM    19   something in there, correct?

09:44AM    20   A.  Yes.

09:44AM    21   Q.  And then you can do a further search to find out what the

09:44AM    22   person's prior criminal history is, correct?

09:44AM    23   A.  Yes.

09:44AM    24   Q.  And you can see this report is being run by

09:44AM    25   Mr. Bongiovanni, correct?

USA v Bongiovanni - Ryan - MacKay/Cross - 9712/24

32

| | | |
|---|---|---|
| 09:44AM | 1 | A.  Yes. |
| 09:44AM | 2 | Q.  And it's being run on that same date as that hot sheet |
| 09:44AM | 3 | you saw before, April 19th, 2013, correct? |
| 09:44AM | 4 | A.  Yes. |
| 09:44AM | 5 | Q.  And we saw the name Chris Baker on that April 19th, 2013 |
| 09:44AM | 6 | hot sheet, correct? |
| 09:44AM | 7 | A.  Yes. |
| 09:44AM | 8 | Q.  So, is it fair to say a standard investigative procedure |
| 09:44AM | 9 | is to start doing some criminal history inquiries into |
| 09:44AM | 10 | individuals that show up on hot sheets? |
| 09:44AM | 11 | A.  Yes. |
| 09:44AM | 12 | Q.  Fair to say that, sort of, we talked about earlier and I |
| 09:44AM | 13 | don't want to keep going through every little step, but that |
| 09:44AM | 14 | there's multiple rounds of subpoenas to get information on |
| 09:45AM | 15 | phone numbers and individuals, correct? |
| 09:45AM | 16 | A.  Yes. |
| 09:45AM | 17 | Q.  And that helps to identify, in your experience, who's |
| 09:45AM | 18 | most in contact with a phone number, correct? |
| 09:45AM | 19 | A.  Yes. |
| 09:45AM | 20 | Q.  And then, if you're investigating that contact the next |
| 09:45AM | 21 | step might be something like this, which is figuring out |
| 09:45AM | 22 | whether any of these individuals have prior criminal |
| 09:45AM | 23 | histories, correct? |
| 09:45AM | 24 | A.  Yes. |
| 09:45AM | 25 | Q.  All right. |

09:45AM    1    **MR. MacKAY:** Can we take this down, Ms. Champoux?

09:45AM    2    And then can we go to the next down, Baker C, toll

09:45AM    3    analysis?  Okay.

09:45AM    4    **BY MR. MacKAY:**

09:45AM    5    Q.  Now, what are we looking at here in this document?

09:45AM    6    A.  Well, in the first page, it's subscriber information for

09:45AM    7    Chris Baker.

09:45AM    8    Q.  Okay.

09:45AM    9    **MR. MacKAY:** Can we scroll down a little bit,

09:45AM    10    Ms. Champoux?

09:45AM    11    **BY MR. MacKAY:**

09:45AM    12    Q.  And then what are we seeing here?

09:45AM    13    A.  Then this is a hot list for 716-830-3226.

09:45AM    14    Q.  And that was Ron, one of Ron Serio's phone numbers,

09:45AM    15    correct?

09:45AM    16    A.  Yes.

09:45AM    17    Q.  And this hot sheet was being run about a month before on

09:45AM    18    the April date on March 19th, 2013, correct?

09:46AM    19    A.  Yes.

09:46AM    20    Q.  And, again, what this shows in common parlance is the

09:46AM    21    most called numbers to and from Ron Serio's phone number,

09:46AM    22    correct?

09:46AM    23    A.  Yes.

09:46AM    24    Q.  Because this would have been run, you know, a month

09:46AM    25    before the April date, is it fair to say this sort of

09:46AM    1    captures a further back date as far as what the calls were?

09:46AM    2    Does that make sense?

09:46AM    3    A.   I would have to go back and look at the date range again

09:46AM    4    to see how they match up, they're similar, but it, I mean, it

09:46AM    5    has to be at least, so, in other words, there's the date of

09:46AM    6    the report and then there's the date of the records.

09:46AM    7    Q.   Okay.

09:46AM    8    A.   You could run the report on multiple days without the

09:46AM    9    records changing, that's why the date range on right column

09:46AM   10    matters.

09:46AM   11    Q.   Okay.  So, that's right there.  Yeah.  So, I guess what

09:46AM   12    I'm asking is --

09:46AM   13    A.   Well, no.  Not that date range, the -- the -- that's the

09:46AM   14    date range that's queried.  So basically, the query is run

09:46AM   15    against all records for all time right, because it goes from

09:47AM   16    1980 to 2099.

09:47AM   17    Q.   Okay.

09:47AM   18    A.   The date of the records is -- can I mark the screen?

09:47AM   19    Q.   Yes.

09:47AM   20    A.   It's this column.

09:47AM   21    Q.   Okay.  So, what this is saying, glad you sort of cleared

09:47AM   22    this up because I might not have explained it well.

09:47AM   23         What it's saying is the report date here encompasses in

09:47AM   24    some fashion February 10th of 2013 to March 11th of 2013,

09:47AM   25    correct?

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

09:47AM   1    A.   Right.  And so --

09:47AM   2    Q.   And what does that date represent in terms of what this

09:47AM   3    report is showing?

09:47AM   4    A.   That's the date range of the phone records.

09:47AM   5    Q.   Okay.

09:47AM   6    A.   That are available for the system to analyze.

09:47AM   7    Q.   Right.  So, what that means is, is it fair to say that

09:47AM   8    that's what this report is operating off of that got back

09:47AM   9    from the subpoena?

09:47AM  10    A.   Well --

09:47AM  11    Q.   I'm trying to find out the easiest way to explain this.

09:47AM  12         So when the report -- the subpoena goes out, and you get

09:47AM  13    back the subscriber information and the calls, is that what

09:47AM  14    this date column is representing?

09:48AM  15    A.   Yes.

09:48AM  16    Q.   Is what was returned from the phone company as far as

09:48AM  17    dates of activity?

09:48AM  18    A.   Yes.

09:48AM  19    Q.   Okay.  So, at this point in time, it's analyzing

09:48AM  20    February 10th, 2013, to March 11th, 2013, correct?

09:48AM  21    A.   Yes.

09:48AM  22         **MR. MacKAY:**  Ms. Champoux, can we jump back two

09:48AM  23    documents to this one I've marked up there, the 716830.

09:48AM  24         **BY MR. MacKAY:**

09:48AM  25    Q.   And this one, again, was the hot sheet that was run on

09:48AM   1   April 19th, 2013, correct?

09:48AM   2   A.   Yes.

09:48AM   3   Q.   Looks like in some places, in that same column the dates

09:48AM   4   are about the same?

09:48AM   5   A.   They're similar.  So, that that means that so, for

09:48AM   6   example, in the first line for the number ending 0664, for

09:48AM   7   Michael Masecchia, there are 37 contacts between the number

09:48AM   8   that was queried and Michael Masecchia's number from

09:49AM   9   February 12th to March 11th.

09:49AM  10       But then when you see that date range change, it just

09:49AM  11   means that the outside limits of when the contacts occurred

09:49AM  12   are different for the different numbers.

09:49AM  13   Q.   From what you can see in the date column here versus the

09:49AM  14   date column in last document we looked at, it looks like the

09:49AM  15   records are all in the approximately February to March

09:49AM  16   timeframe of 2013, correct?

09:49AM  17   A.   Yes.

09:49AM  18   Q.   Okay.

09:49AM  19       **MR. MacKAY:**   Okay.  You can close that out,

09:49AM  20   Ms. Champoux.

09:49AM  21       Can we go to -- can we jump down two more to

09:49AM  22   Buttitta M rap sheet?

09:49AM  23       And just zoom out, thank you.

09:49AM  24       **BY MR. MacKAY:**

09:49AM  25   Q.   Okay.  This is another one of these what you said was a

| | | |
|---|---|---|
| 09:49AM | 1 | triple I check? |
| 09:49AM | 2 | A.  Yes. |
| 09:49AM | 3 | Q.  Again, run by Mr. Bongiovanni, correct? |
| 09:49AM | 4 | A.  Yes. |
| 09:49AM | 5 | Q.  Run on April 19th, 2013, correct? |
| 09:49AM | 6 | A.  Yes. |
| 09:49AM | 7 | Q.  And it's being run for an individual named Michael |
| 09:50AM | 8 | Buttitta, correct? |
| 09:50AM | 9 | A.  Yes. |
| 09:50AM | 10 | Q.  And again, this is the document that -- it's the return |
| 09:50AM | 11 | of a query to tell whether somebody has a criminal history or |
| 09:50AM | 12 | not, correct? |
| 09:50AM | 13 | A.  Yes. |
| 09:50AM | 14 | Q.  And do you recall Michael Buttitta is a name that shows |
| 09:50AM | 15 | up in some of those subscriber and hot sheets that we've |
| 09:50AM | 16 | already gone through, correct? |
| 09:50AM | 17 | A.  Yes. |
| 09:50AM | 18 | Q.  Okay.  So, again, this represents, like, I think you said |
| 09:50AM | 19 | before, the next step of looking into the specific |
| 09:50AM | 20 | individuals who might be identified as subscribers in one of |
| 09:50AM | 21 | these reports, correct? |
| 09:50AM | 22 | A.  Yes. |
| 09:50AM | 23 | Q.  Okay. |
| 09:50AM | 24 | **MR. MacKAY:**  You can close that out, Ms. Champoux. |
| 09:50AM | 25 | Can we pull up handwritten notes?  Can we zoom out a |

| | | |
|---|---|---|
| 09:50AM | 1 | little bit? |
| 09:50AM | 2 | A little bit more so we can just capture it all. |
| 09:50AM | 3 | **BY MR. MacKAY:** |
| 09:50AM | 4 | Q.  Okay.  And do you recall this handwritten sheet of notes |
| 09:50AM | 5 | being in the file? |
| 09:50AM | 6 | A.  Yes. |
| 09:50AM | 7 | Q.  Okay.  And in your investigation, did you understand this |
| 09:51AM | 8 | to be a document written by Joseph Bongiovanni? |
| 09:51AM | 9 | A.  I don't know who authored it. |
| 09:51AM | 10 | Q.  Okay.  In your experience as a DEA agent, is it -- as a |
| 09:51AM | 11 | TFO with the DEA, is it fair to say sometimes you get |
| 09:51AM | 12 | information coming in from sources that you sit down and have |
| 09:51AM | 13 | an interview with? |
| 09:51AM | 14 | A.  Yes. |
| 09:51AM | 15 | Q.  Yeah.  I mean, in common parlance, you sit down with |
| 09:51AM | 16 | somebody who's got information to give you, and you make |
| 09:51AM | 17 | notes of what they said, right? |
| 09:51AM | 18 | A.  Yes. |
| 09:51AM | 19 | Q.  And sometimes that's one of your confidential sources who |
| 09:51AM | 20 | comes in with information, correct? |
| 09:51AM | 21 | A.  Yes. |
| 09:51AM | 22 | Q.  Sometimes you get sort of unsolicited tips and things off |
| 09:51AM | 23 | the street? |
| 09:51AM | 24 | A.  You could. |
| 09:51AM | 25 | Q.  Sometimes you get sources of information who want to walk |

09:51AM  1  in and tell you something, but don't want to really act as a

09:51AM  2  confidential source, correct?

09:51AM  3  A.  You could.

09:51AM  4  Q.  Okay.  At least from what you can see in using your own

09:51AM  5  experience, does this appear to be memorialization of some

09:52AM  6  sort of notes that, you know, an agent may have made

09:52AM  7  regarding an interview or discussion with somebody?

09:52AM  8  A.  I -- there's no way that I could say that, either way.

09:52AM  9  Q.  Okay.  But you see a couple names that you recognize from

09:52AM  10  the Wayne Anderson investigation on here, correct?

09:52AM  11  A.  I, yes.

09:52AM  12  Q.  Who specifically do you see?

09:52AM  13  A.  I see Ron Serio and Dave Oddo, those are the first two.

09:52AM  14  Q.  Okay.  You see Tom Serio as well, too?

09:52AM  15  A.  I do.

09:52AM  16  Q.  Do you see right next to it, you see what says Creme

09:52AM  17  Beame?

09:52AM  18  A.  Yes.

09:52AM  19  Q.  Did you understand Tom Serio sometime in the 2012, 2013

09:52AM  20  timeframe to drive a white BMW?

09:52AM  21  A.  No.

09:52AM  22  Q.  Okay.  Did you see the phone number below that?

09:52AM  23  A.  Yes.

09:52AM  24  Q.  578 phone number, did you understand that to be a cell

09:52AM  25  phone number that associated with Tom Serio in your

| | | |
|---|---|---|
| 09:52AM | 1 | investigation? |
| 09:52AM | 2 | A.  I have to go back and look at records. |
| 09:52AM | 3 | **MR. MacKAY:**  Yeah if we -- Ms. Champoux, I've just |
| 09:53AM | 4 | kind of marked a window up there, can we flip back to that |
| 09:53AM | 5 | document? |
| 09:53AM | 6 | **BY MR. MacKAY:** |
| 09:53AM | 7 | Q.  Okay.  And we're looking at the 716-578-5296 document? |
| 09:53AM | 8 | A.  Okay. |
| 09:53AM | 9 | Q.  So, do you understand that number that you saw in the |
| 09:53AM | 10 | hand-written notes to be Tom Serio's cell phone number? |
| 09:53AM | 11 | A.  Yes. |
| 09:53AM | 12 | **MR. MacKAY:**  All right.  Can we take that down, |
| 09:53AM | 13 | Ms. Champoux?  All right. |
| 09:53AM | 14 | Can we go a few more down.  Can we go to the Jeremie |
| 09:53AM | 15 | Jones misc pdf?  Can we zoom out? |
| 09:53AM | 16 | **BY MR. MacKAY:** |
| 09:53AM | 17 | Q.  Now, Jeremie Jones was a name that you knew came up in |
| 09:53AM | 18 | the Wayne Anderson file, correct? |
| 09:53AM | 19 | A.  I mean, I only know about it because its in the file. |
| 09:53AM | 20 | Q.  Would you recall reviewing the entire file and seeing a |
| 09:53AM | 21 | DEA-202 for Jeremie Jones? |
| 09:53AM | 22 | A.  In the Anderson file? |
| 09:53AM | 23 | Q.  Yes. |
| 09:53AM | 24 | A.  I don't recall that. |
| 09:54AM | 25 | Q.  Okay.  Do you remember that there were two DEA-202 forms |

09:54AM    1    for both Tom Serio and Ron Serio?

09:54AM    2    A.  I do remember those.

09:54AM    3    Q.  Those were the forms that put somebody in the file,

09:54AM    4    correct?

09:54AM    5    A.  And then Wayne Anderson, I remember, Damian Abbate.

09:54AM    6    Q.  And do you remember David Oddo?

09:54AM    7    A.  Yes.

09:54AM    8    Q.  Okay.  And do you remember about the same date there's

09:54AM    9    also one for Jeremie Jones?

09:54AM    10   A.  I, I don't recall Jeremie Jones, no.

09:54AM    11   Q.  Okay.

09:54AM    12          MR. MacKAY:  Ms. Champoux, can--

09:54AM    13          BY MR. MacKAY:

09:54AM    14   Q.  Would it help to refresh your recollection to look at

09:54AM    15   something from the file?

09:54AM    16   A.  Yes.

09:54AM    17          MR. MacKAY:  Ms. Champoux, can we show Government

09:54AM    18   Exhibit -- well, it's in evidence, can we show Government

09:54AM    19   Exhibit 8A at page 59?

09:54AM    20          BY MR. MacKAY:

09:54AM    21   Q.  Can you see that clearly on your screen?

09:54AM    22   A.  I can.

09:54AM    23   Q.  That's the, that's a 202 for Jeremie Jones, correct?

09:54AM    24   A.  It is.

09:54AM    25   Q.  It looks like it was prepared on January 2nd, 2013?

| | | |
|---|---|---|
| 09:54AM | 1 | A.  Yes. |
| 09:54AM | 2 | Q.  So, in your experience, the 202 is a document created by |
| 09:54AM | 3 | an agent to associate a name with a file, correct? |
| 09:54AM | 4 | A.  Yes.  And then the next page should have some remarks |
| 09:55AM | 5 | that explain the association. |
| 09:55AM | 6 | Q.  Okay.  Now, I want to jump back to that document that we |
| 09:55AM | 7 | were at.  The Jeremie Jones misc pdf.  What it looks like |
| 09:55AM | 8 | here, this looks like a mugshot, correct? |
| 09:55AM | 9 | A.  That looks like that, yes. |
| 09:55AM | 10 | MR. MacKAY:  And can we go to the next page, |
| 09:55AM | 11 | Ms. Champoux? |
| 09:55AM | 12 | BY MR. MacKAY: |
| 09:55AM | 13 | Q.  And at the top, you see this looks like a -- the document |
| 09:55AM | 14 | that follows from page 2, that appears to be a booking sheet? |
| 09:55AM | 15 | A.  Yes. |
| 09:55AM | 16 | Q.  Okay.  And it looks like this booking sheet from what you |
| 09:55AM | 17 | can see from the upper right-hand corner was run -- was the |
| 09:55AM | 18 | report was run on January 2nd, 2013, at about 9:33 in the |
| 09:55AM | 19 | morning? |
| 09:55AM | 20 | A.  Could we zoom on that? |
| 09:55AM | 21 | Q.  Yeah.  I'll clear that. |
| 09:55AM | 22 | A.  That's better, yes, January 2nd, 2013. |
| 09:55AM | 23 | Q.  And then that report is run by Joseph Palmieri, correct? |
| 09:55AM | 24 | A.  Yes. |
| 09:55AM | 25 | Q.  And from what you just looked at in Government |

09:55AM 1    Exhibit 8A, that's the same day Jeremie Jones is entered in

09:56AM 2    the file, correct?

09:56AM 3    A.  Yes.

09:56AM 4        MR. MacKAY:  Can we go to page 7 of this document,

09:56AM 5    please?

09:56AM 6        BY MR. MacKAY:

09:56AM 7    Q.  Okay.  Now, this is a NADDIS record being run for the

09:56AM 8    same person, Jeremie Jones, correct?

09:56AM 9    A.  Yes.

09:56AM 10   Q.  Okay.  And just so the jury understands, we've heard

09:56AM 11   about NADDIS before.  Can you just explain what they just saw

09:56AM 12   with the booking report versus what a NADDIS report is?

09:56AM 13   A.  The NADDIS records are DEA records.  The booking report

09:56AM 14   was a Buffalo PD record.

09:56AM 15   Q.  So, the previous document we looked concerns some arrest

09:56AM 16   Jeremie Jones had with the Buffalo Police, correct?

09:56AM 17   A.  Yes.

09:56AM 18   Q.  But what we're looking at now on page 7 is the internal

09:56AM 19   DEA record for whether there's any prior investigations or

09:56AM 20   cases open with Jeremie Jones, correct?

09:56AM 21   A.  Yes.

09:56AM 22   Q.  And if we look at the upper right-hand corner, this

09:57AM 23   NADDIS report is being run by Shane Nastoff, correct?

09:57AM 24   A.  Yes, that's what it says.

09:57AM 25   Q.  And it's being run on December 30th, 2012?

| | | |
|---|---|---|
| 09:57AM | 1 | A.  Yes. |
| 09:57AM | 2 | Q.  Okay.  So, you know, a couple days before you saw that, |
| 09:57AM | 3 | that 202 in Government Exhibit 8A, that enters him into the |
| 09:57AM | 4 | file, correct? |
| 09:57AM | 5 | A.  Yes. |
| 09:57AM | 6 | Q.  And you understood Shane Nastoff to be listed as the |
| 09:57AM | 7 | co-case agent on the Wayne Anderson file, correct? |
| 09:57AM | 8 | A.  I don't know that, I don't know that, no. |
| 09:57AM | 9 | Q.  Did you know Shane Nastoff, you know, to appear in the |
| 09:57AM | 10 | Wayne Anderson file on reports in some fashion? |
| 09:57AM | 11 | A.  Yes. |
| 09:57AM | 12 | Q.  Okay. |
| 09:58AM | 13 | **MR. MacKAY:**  Can we close that out, Ms. Champoux? |
| 09:58AM | 14 | Can we go to Masecchia M phone info? |
| 09:58AM | 15 | **BY MR. MacKAY:** |
| 09:58AM | 16 | Q.  Again, so, first page of this is -- we're looking at is |
| 09:58AM | 17 | the subscriber information for, appears to be Michael |
| 09:58AM | 18 | Masecchia, correct? |
| 09:58AM | 19 | A.  Yes. |
| 09:58AM | 20 | Q.  And again, it's circled at the top, Bongo, correct? |
| 09:58AM | 21 | A.  Yes. |
| 09:58AM | 22 | Q.  So, this at least from what you can review from this |
| 09:58AM | 23 | document seen in front of you, that suggests that this |
| 09:58AM | 24 | document is first produced to an intel analyst and then |
| 09:58AM | 25 | there's some handwriting on it intending to be passed to |

| | | |
|---|---|---|
| 09:58AM | 1 | Mr. Bongiovanni? |
| 09:58AM | 2 | A.   Yes. |
| 09:58AM | 3 | Q.   Okay.  Because in your, again, I think you told us before |
| 09:58AM | 4 | but in your experience, it's not uncommon for the subpoena |
| 09:58AM | 5 | returns to come back directly to the intel analyst, correct? |
| 09:58AM | 6 | A.   Yes. |
| 09:58AM | 7 | Q.   Because they can sort through that information and have |
| 09:58AM | 8 | the programs to analyze it, correct? |
| 09:58AM | 9 | A.   Everybody had access to that program.  But, not everybody |
| 09:58AM | 10 | did it the same way. |
| 09:58AM | 11 | Q.   Okay.  Now, this is being run on -- |
| 09:59AM | 12 | **MR. MacKAY:**  Can we go to the next page, |
| 09:59AM | 13 | Ms. Champoux?  Okay.  Can we zoom in a little bit? |
| 09:59AM | 14 | I'm sorry. |
| 09:59AM | 15 | **BY MR. MacKAY:** |
| 09:59AM | 16 | Q.   Okay.  So, what are we seeing in front of us right now? |
| 09:59AM | 17 | A.   Somebody, I'm trying to see if it says who, it's a print |
| 09:59AM | 18 | screen from DARTS. |
| 09:59AM | 19 | Q.   Okay.  So, what exactly is it that we're looking at, what |
| 09:59AM | 20 | does that do?  What does this screen do in terms of DEA |
| 09:59AM | 21 | activity? |
| 09:59AM | 22 | A.   I'm not sure I understand the question.  What does the |
| 09:59AM | 23 | screen do? |
| 09:59AM | 24 | Q.   Yeah.  So, I mean, we said it's a screen from DARTS, what |
| 09:59AM | 25 | we've seen already are DARTS emails, correct? |

09:59AM  1  A.  Yes.

09:59AM  2  Q.  Those are the emails that get generated when there's an

09:59AM  3  overlap, correct?

09:59AM  4  A.  Yes.

09:59AM  5  Q.  Is this fair to say this is sort of the other end when a

10:00AM  6  number is getting put into DARTS?

10:00AM  7  A.  This, I think, is the subpoena return, because it has the

10:00AM  8  link for view packages in the view print.  It means that the

10:00AM  9  subpoena, this -- this C2 number here, C2-13-581484, is the

10:00AM  10  subpoena number.

10:00AM  11      The service provider it was sent to, case number, who

10:00AM  12  prepared it, that means that the tolls or whatever was

10:00AM  13  subpoenaed is ready for download.

10:00AM  14  Q.  Sure.  I just I just want to walk through this, because

10:00AM  15  it looks like a couple stages in a computer program that's

10:00AM  16  being used.  Because I think what you were referring to is

10:00AM  17  this is the link you're talking about where it says view

10:00AM  18  packages.

10:00AM  19  A.  Yes.

10:00AM  20  Q.  So, at the time in 2013, when agents or intel analysts

10:00AM  21  are subpoenaing information from phone companies, they're not

10:00AM  22  necessarily getting back physical paper records, correct?

10:00AM  23  A.  No.  This subpoena was sent electronically and returned

10:01AM  24  electronically.

10:01AM  25  Q.  Right.  That's what I'm getting towards, is the way

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

47

10:01AM   1   that -- in this case, Sprint Nextel Corporation produces the

10:01AM   2   records to DEA, is they send them some sort of electronic

10:01AM   3   link, correct?

10:01AM   4   A.  Yes.

10:01AM   5   Q.  And the link, it appears from what we can see from this

10:01AM   6   internet, internet explorer screenshot, it's sort of the link

10:01AM   7   is opened directly in the DARTS program?

10:01AM   8   A.  Yes.

10:01AM   9   Q.  Okay.  So, again, just -- I know we're going through some

10:01AM   10  of the steps a little bit slowly, but the subpoena goes out

10:01AM   11  the door, correct?

10:01AM   12  A.  Electronically in this case, yes.

10:01AM   13  Q.  So, you would send, if you identified a number, you would

10:01AM   14  subpoena Sprint Nextel by first preparing one of the actual

10:01AM   15  subpoena papers that we've seen before, correct?

10:01AM   16  A.  No.

10:01AM   17  Q.  Okay.  Wait, so, I mean, you have to prepare the actual

10:01AM   18  subpoena, correct?

10:01AM   19  A.  In this case, no.

10:01AM   20  Q.  Okay.

10:01AM   21  A.  It's all done electronically.

10:01AM   22  Q.  Well, so, I know previously and I think the jury has seen

10:01AM   23  what look to be like subpoenas, correct?

10:02AM   24  A.  Okay.  I guess when you said paper, it's -- it was

10:02AM   25  different by service provider when I was there.  So, there

10:02AM  1    was some service providers where you actually had to print a

10:02AM  2    paper subpoena, and then submit it through some other means.

10:02AM  3        There's no paper subpoena, there might be a subpoena form

10:02AM  4    generated, but there's no paper subpoena that's ever

10:02AM  5    generated for Sprint at the time.

10:02AM  6    Q.  Yeah, okay.  That's what I'm getting at.  Is with some of

10:02AM  7    the subpoenas, what you've got to do is actually prepare a

10:02AM  8    physical piece of paper, and then send it out to whoever

10:02AM  9    you're subpoenaing, correct?

10:02AM  10   A.  Yes.

10:02AM  11   Q.  But when you're dealing with some of these phone

10:02AM  12   companies, specifically Sprint Nextel, you go through the

10:02AM  13   DARTS -- the intel analyst or the agent goes through the

10:02AM  14   DARTS program and prepares some sort of form that goes out to

10:02AM  15   Sprint Nextel?

10:02AM  16   A.  We always go through DARTS.

10:02AM  17   Q.  Yes.

10:02AM  18   A.  I mean, whether you're sending a paper subpoena or an

10:02AM  19   electronic subpoena, DARTS prepares it either way.

10:02AM  20   Q.  Okay.  So, that's sort of the portal to send it out to

10:02AM  21   the company, correct?  Is that a fair way of characterizing

10:02AM  22   it?

10:02AM  23   A.  That's one thing that it does.

10:03AM  24   Q.  Okay.  But yeah, so when you're dealing with subpoenas

10:03AM  25   though, you're routing them all through this DARTS online

10:03AM  1   program, correct?

10:03AM  2   A.   Yes.

10:03AM  3   Q.   And then the return, for somebody like Sprint Nextel,

10:03AM  4   what you're saying is they send everything back through the

10:03AM  5   DARTS program through that same portal, correct?

10:03AM  6   A.   That's correct.

10:03AM  7   Q.   And then what the return -- the subpoena return recipient

10:03AM  8   gets is something that we're looking at in front of us,

10:03AM  9   correct?

10:03AM  10  A.   Yes.

10:03AM  11  Q.   This is basically a notification that says, hey, your

10:03AM  12  subpoena records are ready, click here, correct?

10:03AM  13  A.   Yes.

10:03AM  14  Q.   And then once this is, I presume, once you open this

10:03AM  15  package, that's how the numbers that are associated get

10:03AM  16  loaded into DARTS?

10:03AM  17  A.   No.

10:03AM  18  Q.   So, how do the numbers -- so, walk us through how when

10:03AM  19  you get a subpoena return back, how the actual numbers get

10:03AM  20  into DARTS.

10:03AM  21  A.   So at this point, just what I'm looking at this, the only

10:03AM  22  number that you can know for sure that's in DARTS is the

10:04AM  23  phone number here, 716-812-0664.  Because you have to put it

10:04AM  24  into DARTS first before DARTS will let you generate a

10:04AM  25  subpoena, that's happened or you wouldn't have a return.

10:04AM   1   Whatever numbers are on this return, the way I would have

10:04AM   2   done it, is put them in, take the return, get the return

10:04AM   3   loaded into PenLink so that I could actually see the numbers

10:04AM   4   on the spreadsheet.  And then you have to go from the PenLink

10:04AM   5   spreadsheet back to the first page of DARTS, and put the

10:04AM   6   numbers in and start the process all over again.

10:04AM   7   Q.  Okay.  So, again, so we're just catching all of the steps

10:04AM   8   here, this 812-0664 number you understood that to be Michael

10:04AM   9   Masecchia's phone number, correct?

10:04AM  10   A.  Yes.

10:04AM  11   Q.  Okay.  And what you're saying is that in order to get a

10:04AM  12   subpoena for that number, you've first got to put that number

10:04AM  13   into DARTS, correct?

10:04AM  14   A.  Yes.

10:04AM  15   Q.  You've got to generate the subpoena and send it out

10:04AM  16   through DARTS, correct?

10:04AM  17   A.  Yes.

10:04AM  18   Q.  And what you get back through DARTS is the subpoena

10:04AM  19   return, correct?

10:04AM  20   A.  Yes.

10:04AM  21   Q.  And that may have a bunch of further numbers that are

10:05AM  22   associated with Mike Masecchia's number, correct?

10:05AM  23   A.  It's going to be his toll records and the subscriber

10:05AM  24   information.

10:05AM  25   Q.  Right.  It's all, what you're gonna see is all the

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

10:05AM   1    numbers that he's called or is calling, correct?

10:05AM   2    A.  Yes.

10:05AM   3    Q.  And then what I think you jut told us is in order to put

10:05AM   4    those further numbers into DARTS, you then have to go through

10:05AM   5    a separate step of inputting each one of those, correct?

10:05AM   6    A.  Yes.

10:05AM   7    Q.  Unless you were going through and subpoenaing each one of

10:05AM   8    those numbers themselves, correct?

10:05AM   9    A.  I mean, unless you had already subpoenaed it.  Yes.

10:05AM   10   Q.  Right.  So like, again, I'll give you an example.  You

10:05AM   11   get a random number back from this subpoena return.  If you'd

10:05AM   12   never seen it before, it's not going to be in DARTS, correct?

10:05AM   13   A.  If I -- it could be.  DARTS is going to tell me if it's

10:05AM   14   in DARTS or not.

10:05AM   15   Q.  Okay.  And if it's not, if you're not going to separately

10:05AM   16   then subpoena that number, you'd have to manually input it

10:05AM   17   into DARTS, correct?

10:05AM   18   A.  Yes.

10:05AM   19   Q.  Right.  So, I guess what I'm just trying to get at is

10:06AM   20   just because a number that goes out the door for a subpoena

10:06AM   21   and comes back with numbers on a return doesn't just

10:06AM   22   necessarily mean that all those numbers that are returned on

10:06AM   23   the subpoena return automatically go into DARTS; is that fair

10:06AM   24   to say?

10:06AM   25   A.  They do not.

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

52

10:06AM  1   Q.  Okay.  Okay.  Now on this one, the "prepared by" column

10:06AM  2   is Justin Borst, correct?

10:06AM  3   A.  Yes.

10:06AM  4   Q.  He's one of the intel analysts at the DEA at the time,

10:06AM  5   correct?

10:06AM  6   A.  Yes.

10:06AM  7   Q.  So, what you see from this is, does it appear by the way

10:06AM  8   he's getting -- by the way he's listed as the prepared by,

10:06AM  9   that indicates he prepared the subpoena to go out the door,

10:06AM  10  correct?

10:06AM  11  A.  Yes.

10:06AM  12  Q.  And then, he would be the person who -- for whom the

10:06AM  13  subpoena is returned, correct?

10:06AM  14  A.  Yes.

10:06AM  15  Q.  And that's what we're seeing here again, where he clicks

10:06AM  16  on the package, and it says view package, and that's how you

10:06AM  17  view the package, correct?

10:06AM  18  A.  Yes.

10:06AM  19  Q.  Okay.  And then, we've gone through this with some of the

10:07AM  20  prior reports, but what you said happens sometimes is that

10:07AM  21  the analyst will then take the numbers that come in from the

10:07AM  22  subpoena return, run it through this PenLink program, and you

10:07AM  23  get the reports that we've already seen, correct?

10:07AM  24  A.  Yes.

10:07AM  25  Q.  And then those reports in your experience, the intel

10:07AM  1   analysts sometimes print out label by the case number and

10:07AM  2   agent and then give it to the agent, correct?

10:07AM  3   A.  Yes.

10:07AM  4   Q.  Okay.  I think we've got all steps of the process now.

10:07AM  5       **MR. MacKAY:**  All right.  Can we close this one out

10:07AM  6   Ms. Champoux?

10:07AM  7       Can we jump down two more to Mettal docs?

10:07AM  8       **BY MR. MacKAY:**

10:07AM  9   Q.  First page, again, looks like one of those subscriber

10:07AM  10  returns, correct?

10:07AM  11  A.  Yes.

10:07AM  12  Q.  Again, it's labeled by what you know to be an intel

10:07AM  13  analyst directing it to Mr. Bongiovanni, from what you can

10:07AM  14  see, correct?

10:07AM  15  A.  Yes.

10:07AM  16  Q.  Return an address in Kew Garden Hills, correct?

10:07AM  17  A.  No, New Gar -- no, it is Kew Garden Hills, yes.

10:08AM  18  Q.  And do you understand that to be a municipality in

10:08AM  19  downstate near New York City?

10:08AM  20  A.  I don't know where it is.

10:08AM  21  Q.  But it's got the 11367 zip code?

10:08AM  22  A.  It does.

10:08AM  23      **MR. MacKAY:**  Let's go to the next page, Ms. Champoux.

10:08AM  24      **BY MR. MacKAY:**

10:08AM  25  Q.  Okay.  Looking at the top here, this again, this is a hot

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

54

10:08AM   1   sheet, correct?

10:08AM   2   A.   Yes.

10:08AM   3   Q.   So, what we're looking at again, is one of these reports

10:08AM   4   that shows how many times certain numbers call or were called

10:08AM   5   by the target number, correct?

10:08AM   6   A.   Yes.

10:08AM   7   Q.   And again, it's organized by most to least, correct?

10:08AM   8   A.   Yes.

10:08AM   9   Q.   And we know that the number that's being targeted is that

10:08AM  10   516 number, correct?

10:08AM  11   A.   Yes.

10:08AM  12   Q.   And this is being run on August 26th of 2013, correct?

10:08AM  13   A.   Yes.

10:08AM  14   Q.   Okay.  Now, do you recall in your review of the Wayne

10:08AM  15   Anderson file the Robert Mettal name coming up?

10:09AM  16   A.   Yes.

10:09AM  17   Q.   And do you remember that -- and do you recall that being

10:09AM  18   a name that the confidential source R.K. indicates he may be

10:09AM  19   able to contact about purchases of narcotics?

10:09AM  20   A.   I would need to review that report to be certain.

10:09AM  21   Q.   Okay.  But he was a name that had come up in the file,

10:09AM  22   correct?

10:09AM  23   A.   Yes.

10:09AM  24   Q.   All right.  So, do you recall what Mr. R.K.'s phone

10:09AM  25   number was offhand?

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

10:09AM   1   A.  No.

10:09AM   2          MR. MacKAY:  Okay.  Ms. Champoux we can't do side by

10:09AM   3   side with this document, can we?

10:09AM   4          MS. CHAMPOUX:  No.

10:09AM   5          MR. MacKAY:  Okay.  Can we pull up Government Exhibit

10:09AM   6   9E at page 5?  Okay.  Can we zoom in on block 20?

10:09AM   7          BY MR. MacKAY:

10:10AM   8   Q.  And while we've got part of the screen blown up, do you

10:10AM   9   understand this to be the CS establishment form for R.K.?

10:10AM   10  A.  I'm looking for the name to make sure I'm looking at

10:10AM   11  right one.

10:10AM   12  Q.  Yeah.

10:10AM   13         MR. MacKAY:  Ms. Champoux --

10:10AM   14         THE CLERK:  I'm sorry, is this in evidence?

10:10AM   15         MR. MacKAY:  Yes.

10:10AM   16         THE CLERK:  Is it 9-E, as in Edward?

10:10AM   17         MR. MacKAY:  Is it shown for the jury as well, too?

10:10AM   18         THE CLERK:  It is now.

10:10AM   19         THE WITNESS:  I see it, yes, it's for R.K.

10:10AM   20         BY MR. MacKAY:

10:10AM   21  Q.  So -- so, this was the CS establishment form for R.K.  We

10:10AM   22  can un-minimize it.  And going back to block 20, do you see

10:10AM   23  the phone number that's associated with him?

10:10AM   24  A.  I do.

10:10AM   25  Q.  It's 716-935-0252?

10:10AM  1    A.  Yes.

10:10AM  2            MR. MacKAY:  Can we take this down, Ms. Champoux.

10:10AM  3    Can we go back to the Mettal document?

10:10AM  4            Can you control F, search for that same number,

10:11AM  5    935-0252.  Okay.

10:11AM  6            It's not OCR, so let's do it this way.  Can we scroll

10:11AM  7    down -- go down to the next page, Ms. Champoux, please?  One

10:11AM  8    more page, please.  One more page.

10:11AM  9            BY MR. MacKAY:

10:11AM  10   Q.  Okay.  Do you see where I'm indicating?

10:11AM  11   A.  Yes.

10:11AM  12   Q.  Do you see that's R.K.'s number there?

10:11AM  13   A.  Yes.  Row 95.

10:11AM  14   Q.  Okay.  And from what you can see from this report, it

10:11AM  15   looks like there are three telephone calls with Robert

10:11AM  16   Mettal, correct?

10:11AM  17   A.  Yes.

10:11AM  18   Q.  And we know that happens, from what you can see from the

10:12AM  19   report, sorry, not very accurate with these marks, we can see

10:12AM  20   that the date range in the report is May 17th, 2013 to

10:12AM  21   May 17th, 2013, correct?

10:12AM  22   A.  Yes.

10:12AM  23   Q.  So, it looks, again, interpreting what that third column

10:12AM  24   means, it looks like the only, so, when this -- this list was

10:12AM  25   run, the only information about R.K.'s phone number connected

10:12AM    1    to Mr. Mettal's phone number is limited to that one date on

10:12AM    2    May 17th, correct?

10:12AM    3    A.   Yes.

10:12AM    4    Q.   It's all the records that were returned, correct?  It's

10:12AM    5    all the information -- it's all the information that's being

10:12AM    6    returned about that phone number between that date, correct?

10:12AM    7    A.   Available in that particular case on -- in PenLink on

10:12AM    8    that day, yes.

10:12AM    9    Q.   Right.  So, so, again, what this line indicates is that

10:13AM   10    there appear to be three calls between R.K. and Robert Mettal

10:13AM   11    on May 17th, 2013, correct?

10:13AM   12    A.   Yes.

10:13AM   13    Q.   Okay.  And in your experience with these lists, you can't

10:13AM   14    tell if the calls were connected or not, correct?

10:13AM   15    A.   Not from this list, you would need to look at the actual

10:13AM   16    returned records.

10:13AM   17    Q.   Okay.  But at least this indicates that there's some

10:13AM   18    attempted contact or contact between those two phone numbers

10:13AM   19    on that specific date, correct?

10:13AM   20    A.   Yes.

10:13AM   21         **MR. MacKAY:**  You can take that down, Ms. Champoux.

10:13AM   22         Can we go to two down, Moynihan M, phone info.

10:13AM   23         **BY MR. MacKAY:**

10:13AM   24    Q.   Again, this is another one of those subscriber returns,

10:13AM   25    and it's for the individual named Michael Moynihan, correct?

| | | |
|---|---|---|
| 10:13AM | 1 | A.  Yes. |
| 10:13AM | 2 | Q.  Again, it's associated with the Wayne Anderson file |
| 10:14AM | 3 | number, correct? |
| 10:14AM | 4 | A.  Yes. |
| 10:14AM | 5 | Q.  And like prior versions of this document we've seen, it's |
| 10:14AM | 6 | got Mr. Bongiovanni's name on the top of the subscriber |
| 10:14AM | 7 | information return and handwriting? |
| 10:14AM | 8 | A.  His nickname, yes. |
| 10:14AM | 9 | Q.  Yeah.  And as you've said, you indicate this generally |
| 10:14AM | 10 | means to you that it's an intel analyst providing this |
| 10:14AM | 11 | document to Mr. Bongiovanni, correct? |
| 10:14AM | 12 | A.  Yes. |
| 10:14AM | 13 | Q.  Okay. |
| 10:14AM | 14 | **MR. MacKAY:**  Let's go to the next page. |
| 10:14AM | 15 | **BY MR. MacKAY:** |
| 10:14AM | 16 | Q.  Again, we went through this before with Michael |
| 10:14AM | 17 | Masecchia, but this is one of these same things, it's a |
| 10:14AM | 18 | subpoena return package for the number for Michael Moynihan, |
| 10:14AM | 19 | correct? |
| 10:14AM | 20 | A.  Yes. |
| 10:14AM | 21 | Q.  Again, prepared by Justin Borst the intel analyst, |
| 10:14AM | 22 | correct? |
| 10:14AM | 23 | A.  Yes. |
| 10:14AM | 24 | Q.  And it looks like the prepared date was April 19th, 2013, |
| 10:14AM | 25 | correct? |

10:14AM    1    A.    Yes.

10:14AM    2    Q.    Now, in your experience, when numbers are subpoenaed back

10:15AM    3    around this point in time and they're done solely through

10:15AM    4    this DARTS system and it's all electronic subpoena and

10:15AM    5    return, approximately how long do you remember it took to

10:15AM    6    actually get the return back?

10:15AM    7    A.    So, my experience with it is later, just for

10:15AM    8    clarification, but similar, it could be relatively quick.

10:15AM    9        Sprint may be a day to a week on the long end.  And that

10:15AM   10    wouldn't happen very often.

10:15AM   11    Q.    Okay.  Okay.  Can we go to the -- so, it looks like from

10:15AM   12    what we can see here the prepared date is April 19th, 2013,

10:15AM   13    correct?

10:15AM   14    A.    Yes.

10:15AM   15            **MR. MacKAY:**  Let's go to the next page.

10:15AM   16            **BY MR. MacKAY:**

10:15AM   17    Q.    Okay.  And then, again, we see one of these hot sheet

10:15AM   18    produced again?

10:15AM   19    A.    Yes.

10:15AM   20    Q.    This one is April 24th, 2013, correct?

10:16AM   21    A.    Yes, it is.

10:16AM   22    Q.    So, based on what you saw on the prior page, it looks

10:16AM   23    like subpoenas prepared on the 19th and then by the 24th,

10:16AM   24    there's enough information back to run one of these hot

10:16AM   25    sheets, correct?

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

10:16AM  1    A.  Yes.

10:16AM  2    Q.  And there what you can see based on the dialed name

10:16AM  3    column that a lot of those are no subscribers.  Do you

10:16AM  4    understand that to be sort of as you explained, an early step

10:16AM  5    in an investigation with this number?

10:16AM  6    A.  Yes.

10:16AM  7    Q.  Because at this point, there's no subscribers identified

10:16AM  8    with any of the numbers that are calling or being called by

10:16AM  9    Mike Moynihan's phone, correct?

10:16AM  10   A.  Well, there's -- I see at least one.  You'd have to

10:16AM  11   scroll through the rest of the document to know how many, but

10:16AM  12   there aren't many.

10:16AM  13   Q.  Okay.  So, again, in your experience this is generally

10:16AM  14   early on in an investigation because from what you can see,

10:16AM  15   there's not a lot of information available yet for this

10:16AM  16   report, correct?

10:16AM  17   A.  At least from this page, yes.

10:16AM  18   Q.  Okay.

10:17AM  19          **MR. MacKAY:**  Can we zoom out and scroll down a little

10:17AM  20   bit, Ms. Champoux?  I want to catch a little more of the page.

10:17AM  21   Okay.

10:17AM  22          **BY MR. MacKAY:**

10:17AM  23   Q.  I mean, like you said, you do see some names that are

10:17AM  24   already identified, correct?

10:17AM  25   A.  I see two on this page.

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

| | | |
|---|---|---|
| 10:17AM | 1 | Q. Do you actually see three? |
| 10:17AM | 2 | A. Oh, I'm sorry, I was looking in the address column. Yes, |
| 10:17AM | 3 | I see three. |
| 10:17AM | 4 | Q. So, Tom Serio and Chris Baker, correct? |
| 10:17AM | 5 | A. Yes. And Robert Rine. |
| 10:17AM | 6 | Q. Yeah. Now, Robert Rine, did you understand his name to |
| 10:17AM | 7 | have some significance around the time Ron Serio was |
| 10:17AM | 8 | arrested? |
| 10:17AM | 9 | A. Some. That's not the thing that I remember the most |
| 10:17AM | 10 | about Robert Rine though, no. |
| 10:17AM | 11 | Q. Okay. What do you remember about Robert Rine? |
| 10:17AM | 12 | MR. TRIPI: Objection, hearsay. Any awareness would |
| 10:18AM | 13 | come through hearsay from a witness who has yet to testify in |
| 10:18AM | 14 | this trial. |
| 10:18AM | 15 | THE COURT: No, I disagree with that, it could come |
| 10:18AM | 16 | from reviewing a file, it could come from a lot of different |
| 10:18AM | 17 | things. |
| 10:18AM | 18 | BY MR. MacKAY: |
| 10:18AM | 19 | Q. Yeah, I mean, if you know, what do you recall about |
| 10:18AM | 20 | Robert Rine? |
| 10:18AM | 21 | MR. TRIPI: Judge, same objection. Unless he's going |
| 10:18AM | 22 | to ask him if you reviewed that name in the file, same |
| 10:18AM | 23 | objection. Then it's going to come from hearsay. |
| 10:18AM | 24 | THE COURT: Overruled. |
| 10:18AM | 25 | THE WITNESS: My awareness is from an interview of |

10:18AM    1    another person.

10:18AM    2              BY MR. MacKAY:

10:18AM    3    Q.  Was that Ron Serio?

10:18AM    4    A.  Yes.

10:18AM    5    Q.  Okay.  So, we'll leave that at this point for now.

10:18AM    6         But back to this hot sheet.  What it shows is that this

10:18AM    7    Mike Moynihan individual appears to be in contact with Tom

10:18AM    8    Serio and Chris Baker, correct?

10:18AM    9    A.  Yes.

10:18AM   10              MR. MacKAY:  Can we go to the next page of this

10:18AM   11    Ms. Champoux?

10:18AM   12              BY MR. MacKAY:

10:18AM   13    Q.  Again, the second page has a couple -- it's fair to say

10:19AM   14    it's mostly no subscribers, but there looks like there's

10:19AM   15    three names that are identified?

10:19AM   16    A.  Yes.

10:19AM   17    Q.  And that's Mark Falzone, Michael Buttitta, and it's Chris

10:19AM   18    Baker again, correct?

10:19AM   19    A.  Yes.

10:19AM   20    Q.  And again, those are names that you recall seeing on

10:19AM   21    Government Exhibit 100E-1, the handwritten note?

10:19AM   22    A.  Yes.

10:19AM   23              MR. MacKAY:  All right.  Can we take this document

10:19AM   24    down, Ms. Champoux?

10:19AM   25              Can we pull up Oddo NADDIS record?

10:19AM    1          **BY MR. MacKAY:**

10:19AM    2    Q.  Okay.  Similar to the Jeremie Jones documents, it appears

10:19AM    3    to be a mugshot of David Oddo?

10:19AM    4    A.  Yes.

10:19AM    5          **MR. MacKAY:**  Can we go to the next page,

10:19AM    6    Ms. Champoux?

10:19AM    7          **BY MR. MacKAY:**

10:19AM    8    Q.  Okay.  Up at the top, if you can see it, do you see the

10:19AM    9    date it was run?

10:19AM   10    A.  July 2nd, 2012.

10:20AM   11    Q.  It's being run by Shane Nastoff, correct?

10:20AM   12    A.  Yes.

10:20AM   13    Q.  Okay.  And this is back then in the summer of 2012 before

10:20AM   14    the Wayne Anderson file was opened, correct?

10:20AM   15    A.  Yes.

10:20AM   16    Q.  Okay.

10:20AM   17          **MR. MacKAY:**  All right.  Can we take that down,

10:20AM   18    Ms. Champoux?

10:20AM   19          Actually, I'm sorry, can we leave that up one more

10:20AM   20    time?

10:20AM   21          **BY MR. MacKAY:**

10:20AM   22    Q.  Now, at the bottom of this page, do you see there's an

10:20AM   23    associated case number?

10:20AM   24    A.  Yes.

10:20AM   25    Q.  And the file title appears to be Fred Weir?

| | | |
|---|---|---|
| 10:20AM | 1 | A.  Yes. |
| 10:20AM | 2 | Q.  Okay.  Do you recall that name coming up in some of the |
| 10:20AM | 3 | hot sheets that we've looked at before? |
| 10:20AM | 4 | A.  I remember seeing it in the file, yes. |
| 10:20AM | 5 | Q.  Okay.  And that indicates, we talked about NADDIS records |
| 10:20AM | 6 | a little bit, but what that entry indicates is the DEA had a |
| 10:20AM | 7 | file on Fred Weir at some point in time in the past before |
| 10:20AM | 8 | this report was run, correct? |
| 10:20AM | 9 | A.  Yes. |
| 10:20AM | 10 | MR. MacKAY:  All right.  Can we take this down |
| 10:20AM | 11 | Ms. Champoux?  Can we pull up two more down, its Robert Mettal |
| 10:21AM | 12 | misc.  Zoom out, please. |
| 10:21AM | 13 | BY MR. MacKAY: |
| 10:21AM | 14 | Q.  Similar to both Oddo and Jeremie Jones, this appears to |
| 10:21AM | 15 | be a mugshot of Robert Mettal, correct? |
| 10:21AM | 16 | A.  Yes. |
| 10:21AM | 17 | Q.  It looks like there's even a phone number associated with |
| 10:21AM | 18 | it, correct? |
| 10:21AM | 19 | A.  Yes. |
| 10:21AM | 20 | Q.  Okay.  And you recall, you recall seeing that number in |
| 10:21AM | 21 | one of the Robert Mettal subpoena documents that we looked at |
| 10:21AM | 22 | before? |
| 10:21AM | 23 | A.  I remember a 516 number, yes. |
| 10:21AM | 24 | MR. MacKAY:  Okay.  Go to the next page, |
| 10:21AM | 25 | Ms. Champoux, please? |

10:21AM    1          BY MR. MacKAY:

10:21AM    2    Q.  Again, we did this with Jeremie Jones, but again, what

10:21AM    3    we're looking at right now is a Buffalo Police Department

10:21AM    4    booking sheet.  So, that would indicate something associated

10:21AM    5    with an arrest Robert Mettal had by Buffalo police?

10:21AM    6    A.  Yes.

10:21AM    7    Q.  Okay.  And this report, if you look at the upper

10:21AM    8    right-hand corner, appears to be run by Joseph Palmieri?

10:21AM    9    A.  Yes.  But could we zoom on that, please?  Or just make

10:22AM   10    the document larger?  Thank you.

10:22AM   11          Yes.  Joseph Palmieri.

10:22AM   12    Q.  And the report dates May 6th, 2013, correct?

10:22AM   13    A.  Yes.

10:22AM   14    Q.  So, pulling booking data sheets, that's an investigative

10:22AM   15    procedure DEA agents do from time to time, correct?

10:22AM   16    A.  Background checks like this, yes.

10:22AM   17    Q.  Yes.  So, that's what I'm asking, this is part of a

10:22AM   18    background check into a specific individual, correct?

10:22AM   19    A.  Yes.

10:22AM   20    Q.  And do you recall that some of the documents we've shown

10:22AM   21    that identify Mr. Phone -- Mr. Mettal's phone activity, those

10:22AM   22    were in 2013, correct?

10:22AM   23    A.  Yes.

10:22AM   24    Q.  Okay.

10:22AM   25          MR. MacKAY:  All right.  Can we take that down,

10:22AM   1   Ms. Champoux?  Can we go to Serio real property recs?

10:23AM   2           Okay.  Can we zoom out a little bit?

10:22AM   3           **BY MR. MacKAY:**

10:23AM   4   Q.  Okay.  And can you see at the bottom there's a date of

10:23AM   5   May 22nd, 2013?

10:23AM   6   A.  Yes.

10:23AM   7   Q.  So, this is occurring kind of around the same time in May

10:23AM   8   of 2013 from the document we just looked at, correct?

10:23AM   9   A.  Yes.

10:23AM  10   Q.  And this is, you know, again, we're all, fair to say that

10:23AM  11   most of the documents that we've been looking at so far, they

10:23AM  12   reflect activity occurring in March, April, and May of 2013?

10:23AM  13   A.  Yes.

10:23AM  14   Q.  Okay.  And what does this appear to be to you?

10:23AM  15   A.  It's from -- looks like it's from Google Maps.

10:23AM  16   Somebody's looking at something on an internet browser and

10:23AM  17   printed part of page 2 or all of page 2 of a three-page

10:23AM  18   document.

10:23AM  19   Q.  Okay.  Do you understand, do you understand from the file

10:23AM  20   from your review of the Wayne Anderson file, any of these

10:24AM  21   addresses to have any connection to Ron Serio?

10:24AM  22   A.  I see 467 and 469 Tacoma.

10:24AM  23   Q.  Okay.  And do you recall from your review of the file the

10:24AM  24   132 Rhode Island --

10:24AM  25   A.  That was.

10:24AM  1    Q.  -- address having some investigative activity associated

10:24AM  2    with it?

10:24AM  3            MR. TRIPI:  Objection.

10:24AM  4            THE COURT:  What's the basis for that?

10:24AM  5            MR. TRIPI:  602, investigative activity in the file

10:24AM  6    from this.

10:24AM  7            THE COURT:  From this, no, he's not asking that, he's

10:24AM  8    asking whether there was activity in the file shown with

10:24AM  9    respect to this address.  What's wrong with that?

10:24AM  10            MR. TRIPI:  I'll withdraw it.  Sorry.

10:24AM  11            THE WITNESS:  The picture.  But I'm unaware of

10:24AM  12    anything else.

10:24AM  13            BY MR. MacKAY:

10:24AM  14    Q.  Okay.  And specifically on this document, we see 132

10:24AM  15    Rhode Island circled and highlighted, correct?

10:24AM  16    A.  It is.

10:24AM  17    Q.  And it looks like somebody wrote in a date of

10:25AM  18    October 12th, 2012, correct?

10:25AM  19    A.  Yes.

10:25AM  20    Q.  So, and that's a date prior to the Wayne Anderson file

10:25AM  21    having been opened, correct?

10:25AM  22    A.  Yes.

10:25AM  23    Q.  So, I mean, just at least from what you can see here,

10:25AM  24    that there's some focus on 132 Rhode Island, the address of

10:25AM  25    132 Rhode Island before the Wayne Anderson file is ever even

| | | |
|---|---|---|
| 10:25AM | 1 | opened? |
| 10:25AM | 2 |      **MR. TRIPI:**  Objection. |
| 10:25AM | 3 |      **THE COURT:**  Yeah, sustained to the form of the |
| 10:25AM | 4 | question. |
| 10:25AM | 5 |      **BY MR. MacKAY:** |
| 10:25AM | 6 | Q.  But in any event, the October date that's listed here, |
| 10:25AM | 7 | that's at least several weeks before Wayne Anderson, that |
| 10:25AM | 8 | file was opened, correct? |
| 10:25AM | 9 | A.  The date is, but -- |
| 10:25AM | 10 | Q.  Yeah. |
| 10:25AM | 11 | A.  -- this couldn't have been written before May 22nd or |
| 10:25AM | 12 | 3rd, or whatever it is, so I have no idea what it means. |
| 10:25AM | 13 | Q.  Right.  So, I mean, the number, the date at the bottom, |
| 10:25AM | 14 | do you understand that to be a date that the report is run? |
| 10:25AM | 15 | A.  This is -- it's a -- it looks like a printout of a web |
| 10:26AM | 16 | browser like I said was done in May of 2013. |
| 10:26AM | 17 | Q.  Right.  So, what you can see from the report.  It looks |
| 10:26AM | 18 | like this is a page printed out where the report is run on |
| 10:26AM | 19 | May 22nd of 2013, correct? |
| 10:26AM | 20 | A.  Yes. |
| 10:26AM | 21 | Q.  And then somebody is circling the 132 Rhode Island Street |
| 10:26AM | 22 | and writing a date of 10/12/2012 there, correct? |
| 10:26AM | 23 | A.  Yes. |
| 10:26AM | 24 | Q.  Okay. |
| 10:26AM | 25 |      **MR. MacKAY:**  And you can take that down, |

| | | |
|---|---|---|
| 10:26AM | 1 | Ms. Champoux.  And can we pull up -- it's T.S. rap sheet.  Or |
| 10:26AM | 2 | S.T. rap sheet. |
| 10:26AM | 3 | **BY MR. MacKAY:** |
| 10:26AM | 4 | Q.  Okay.  Again, the T.S. name, that's a name you saw within |
| 10:26AM | 5 | the Wayne Anderson file, correct? |
| 10:26AM | 6 | A.  Yes. |
| 10:26AM | 7 | Q.  And you -- do you recall him having some association in |
| 10:26AM | 8 | some fashion with R.K., the confidential source? |
| 10:26AM | 9 | A.  Yes. |
| 10:26AM | 10 | Q.  Okay.  Again, this is a triple I check record done by |
| 10:26AM | 11 | Mr. Bongiovanni on April 19 of 2013, correct? |
| 10:27AM | 12 | A.  Yes. |
| 10:27AM | 13 | Q.  And do you recall that April 19, 2013 date being the same |
| 10:27AM | 14 | date as one of the hot sheets that was run for Ron Serio's |
| 10:27AM | 15 | cell phone number? |
| 10:27AM | 16 | A.  Yes. |
| 10:27AM | 17 | Q.  So it appears at least from what you can see from the |
| 10:27AM | 18 | records that Tom Serio's number's appearing in a hot sheet |
| 10:27AM | 19 | for Ron Serio on the same date that Mr. Bongiovanni is |
| 10:27AM | 20 | running Mr. T.S.'s name to see if there's a -- any criminal |
| 10:27AM | 21 | history for Mr. T.S.? |
| 10:27AM | 22 | A.  I think you said Tom Serio's number and then -- |
| 10:27AM | 23 | Q.  I might have misspoken. |
| 10:27AM | 24 | A.  -- Mr. T.S.'s name.  Which one do you mean? |
| 10:27AM | 25 | Q.  Yeah, I'm sorry, I misspoke there. |

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

10:27AM  1    From the records you've reviewed, you can see that on the

10:27AM  2  same date T.S.'s name is showing up in a hot sheet for Ron

10:27AM  3  Serio's number, Mr. Bongiovanni appears to be running a

10:27AM  4  report to see if Mr. T.S. has any criminal history, correct?

10:27AM  5  A.  Yes.

10:27AM  6      **THE COURT:**  Mr. MacKay, do you have a sense of how

10:28AM  7  much longer you're going to be?

10:28AM  8      **MR. MacKAY:**  45 minutes.

10:28AM  9      **THE COURT:**  Okay.  So let's take a break, folks.

10:28AM  10     Remember my instructions about not talking about the

10:28AM  11  case, even with each other, and not making up your minds.

10:28AM  12     See you back here in about ten or 15 minutes.

10:28AM  13     (Jury excused at 10:28 a.m.)

10:28AM  14     **THE COURT:**  Okay.  Anything for the record before we

10:28AM  15  break, Mr. MacKay?

10:28AM  16     **MR. MacKAY:**  No, Your Honor.

10:28AM  17     **THE COURT:**  Mr. Tripi.

10:29AM  18     **MR. TRIPI:**  No, thank you, Judge.

10:29AM  19     **THE COURT:**  Okay, see you in a few minutes.

10:29AM  20     **THE CLERK:**  All rise.

10:29AM  21     (Off the record at 10:29 a.m.)

10:48AM  22     (Back on the record at 10:48 a.m.)

10:48AM  23     (Jury not present.)

10:48AM  24     **THE CLERK:**  All rise.

10:48AM  25     **THE COURT:**  Please be seated.

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24
71

| | | |
|---|---|---|
| 10:48AM | 1 | **THE CLERK:**  We are back on the record for the |
| 10:48AM | 2 | continuation of the jury trial in case number 19-cr-227, |
| 10:48AM | 3 | United States of America versus Joseph Bongiovanni. |
| 10:48AM | 4 | All counsel and parties are present. |
| 10:48AM | 5 | **THE COURT:**  Ready to go? |
| 10:48AM | 6 | **MR. MacKAY:**  I am. |
| 10:48AM | 7 | **THE COURT:**  Anything? |
| 10:48AM | 8 | **MR. TRIPI:**  No. |
| 10:48AM | 9 | **THE COURT:**  Let's bring them in, please.  Let's get |
| 10:48AM | 10 | the witness in, too. |
| 10:49AM | 11 | **MR. MacKAY:**  Judge, I think I'm well more than |
| 10:49AM | 12 | halfway done.  I'm just having trouble estimating time. |
| 10:49AM | 13 | **THE COURT:**  No, no, no, look it, I understand. |
| 10:50AM | 14 | (Witness and Jury seated at 10:50 a.m.) |
| 10:50AM | 15 | **THE COURT:**  The report will reflect that all our |
| 10:50AM | 16 | jurors, again, are present. |
| 10:50AM | 17 | I remind the witness he's still under oath. |
| 10:50AM | 18 | And, Mr. MacKay, you may continue. |
| 10:50AM | 19 | **BY MR. MacKAY:** |
| 10:50AM | 20 | Q.  Agent Ryan, before I continue, I want to go back and |
| 10:50AM | 21 | clarify something we were talking about and make sure I'm |
| 10:50AM | 22 | clear on it. |
| 10:50AM | 23 | **MR. MacKAY:**  Ms. Champoux, can we go back to the |
| 10:50AM | 24 | Government Exhibit 100A.1, and can we pull up the C Baker toll |
| 10:50AM | 25 | analysis? |

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

|          |    |                                                             |
|----------|----|-------------------------------------------------------------|
| 10:50AM  | 1  | **BY MR. MacKAY:**                                          |
| 10:50AM  | 2  | Q.  Okay.  We looked at this before.  This was a subpoena   |
| 10:50AM  | 3  | return you understood for Chris Baker, correct?             |
| 10:50AM  | 4  | A.  It's -- this is not the actual return, this is the      |
| 10:50AM  | 5  | information loaded into PenLink, I think.                   |
| 10:50AM  | 6  | Q.  Okay.  And then the phone number, the 830-3226 number,  |
| 10:51AM  | 7  | you understood that to be associated with Ron Serio?        |
| 10:51AM  | 8  | A.  I don't remember the phone number from the case.  I can't |
| 10:51AM  | 9  | remember without looking at records.                        |
| 10:51AM  | 10 | Q.  Okay.                                                   |
| 10:51AM  | 11 | A.  If it's -- I mean, according to this, it's Chris Baker. |
| 10:51AM  | 12 | I need to look at something else to see if there's another  |
| 10:51AM  | 13 | record that associates it's Ron Serio.                      |
| 10:51AM  | 14 | Q.  Okay.  But what I want to --                            |
| 10:51AM  | 15 | **MR. MacKAY:**  Can we go to page 2 again.  All right.     |
| 10:51AM  | 16 | **BY MR. MacKAY:**                                          |
| 10:51AM  | 17 | Q.  So, I just want to focus in on something I think you told |
| 10:51AM  | 18 | us earlier.  This was a hot sheet, and this is one of the   |
| 10:51AM  | 19 | ones that has primarily no subscribers on it, correct?      |
| 10:51AM  | 20 | A.  Right, it's mostly no subscribers.                      |
| 10:51AM  | 21 | Q.  Right.  Meaning that there's no subscriber information  |
| 10:51AM  | 22 | known for the phone numbers, correct?                       |
| 10:51AM  | 23 | A.  For the ones that say no subscriber, that's correct.    |
| 10:51AM  | 24 | Q.  Right.  And so what it means is if you've got an entry  |
| 10:51AM  | 25 | like this, indicating line 7 where it says Tom Serio is, you |

10:51AM    1    know, in the -- instead of no subscriber, that means -- am I

10:52AM    2    understanding it to mean that Tom Serio's number is already

10:52AM    3    in the DARTS system?

10:52AM    4    A.   No.  This is separate from DARTS.

10:52AM    5    Q.   Okay.

10:52AM    6    A.   So, DARTS deconflicts telephone numbers and generates

10:52AM    7    subpoenas.  Very generally, right.

10:52AM    8    Q.   Yeah.  Why would Tom Serio's name already be in one of

10:52AM    9    these hot sheet lists rather than one with no subscriber?

10:52AM    10   A.   Because there was a previous subpoena return for that

10:52AM    11   phone, that 561 phone number, that's been you uploaded to

10:52AM    12   this set of data in PenLink.

10:52AM    13   Q.   Okay.  So, if you see no subscriber in one of these

10:52AM    14   reports, it means there's never been a subpoena to that

10:52AM    15   number before?

10:52AM    16   A.   No.

10:52AM    17   Q.   What does it mean then?  Or did you say no, as in there's

10:52AM    18   never been a subpoena?

10:52AM    19   A.   I'm saying it doesn't necessarily mean that, because

10:52AM    20   you're talking about two different -- two different

10:52AM    21   databases.

10:52AM    22       So PenLink is small, local.  It only has what, you know,

10:53AM    23   what you put in it.

10:53AM    24       If my recollection is correct, even the data within

10:53AM    25   PenLink is separated by cases.  So, I mean, so you were

10:53AM    1    asking about a phone number that says no subscriber, right?

10:53AM    2    Q.  Right.

10:53AM    3    A.  It could be identified -- I think I'm correct about this,

10:53AM    4    it could be identified in 15 other cases in PenLink, but it's

10:53AM    5    not identified in this one.

10:53AM    6    Q.  Okay.

10:53AM    7    A.  But if it's -- once it goes into DARTS, it's in DARTS.

10:53AM    8    Q.  Okay.  So in your experience, when an agent receives one

10:53AM    9    of those hot lists and sees no subscriber, that's generally

10:53AM   10    an indication that they're going to need to subpoena that

10:53AM   11    number to get the information and to find out who the

10:53AM   12    subscriber is?

10:53AM   13    A.  Yes.

10:53AM   14        MR. MacKAY:  So can we go to the next page of this

10:53AM   15    document?

10:53AM   16        BY MR. MacKAY:

10:53AM   17    Q.  All right.  There up at the top, the 812-0664 number,

10:53AM   18    that you recall to be Michael Masecchia's number?

10:53AM   19    A.  I think that's correct.

10:54AM   20    Q.  So in this column we see that it's no subscriber,

10:54AM   21    correct?

10:54AM   22    A.  Yes.

10:54AM   23    Q.  So, that means to you that within the context of a

10:54AM   24    PenLink, Michael Masecchia's name and number have never been

10:54AM   25    associated there before?  That's what I'm trying to

10:54AM  1  understand.

10:54AM  2  A.  In this data set.

10:54AM  3  Q.  Okay.

10:54AM  4  A.  It's my recollection that PenLink is the data sets were

10:54AM  5  unique by case.  So each time you started a case, you were

10:54AM  6  starting from scratch in PenLink to build a new data set.

10:54AM  7  Q.  Okay.  And then I think we did this before, but this hot

10:54AM  8  sheet's run on March 19, 2013, correct?

10:54AM  9  A.  Yes.

10:54AM  10  Q.  Okay.

10:54AM  11        MR. MacKAY:  Ms. Champoux, can you pull up Government

10:54AM  12  Exhibit 8A, page 348.

10:54AM  13        BY MR. MacKAY:

10:54AM  14  Q.  Okay.  And this appears to be a subpoena cover letter for

10:54AM  15  a subpoena that's generated in connection with the Wayne

10:55AM  16  Anderson case, correct?

10:55AM  17  A.  It looks like it's from Sprint to Justin Borst in

10:55AM  18  connection with the Wayne Anderson case.

10:55AM  19  Q.  Okay.  So it's the subpoena -- it's the return side of

10:55AM  20  the subpoena, correct?

10:55AM  21  A.  Yes.

10:55AM  22  Q.  And that's coming back on March 20th, 2013?

10:55AM  23  A.  Yes.

10:55AM  24  Q.  Okay.

10:55AM  25        MR. MacKAY:  And then can we go to the next page,

| | | |
|---|---|---|
| 10:55AM | 1 | please, Ms. Champoux. |
| 10:55AM | 2 | **BY MR. MacKAY:** |
| 10:55AM | 3 | Q.  And it looks like it's that same 812-0664 number, |
| 10:55AM | 4 | correct? |
| 10:55AM | 5 | A.  Yes. |
| 10:55AM | 6 | Q.  So what this is telling you, at least looking at the |
| 10:55AM | 7 | records, is that Justin Borst is getting back a subpoena |
| 10:55AM | 8 | return regarding this number on -- or at least it was -- the |
| 10:55AM | 9 | return was sent from Sprint on March 20th, 2013, correct? |
| 10:55AM | 10 | A.  Yes. |
| 10:55AM | 11 | Q.  And then what we just looked at over in the Government |
| 10:55AM | 12 | Exhibit 100A.1 file, when the report had been run on |
| 10:55AM | 13 | March 19th, 2013 there was no name associated with that |
| 10:55AM | 14 | 812-0664 number at that time, correct? |
| 10:56AM | 15 | A.  In the PenLink. |
| 10:56AM | 16 | Q.  In PenLink. |
| 10:56AM | 17 | So at least from what you can see from the documents, it |
| 10:56AM | 18 | looks like following the PenLink or around the same time, I'm |
| 10:56AM | 19 | sorry, following the generation of a hot sheet, Justin Borst |
| 10:56AM | 20 | sent out a subpoena for that 812-0664 number? |
| 10:56AM | 21 | A.  Yes. |
| 10:56AM | 22 | Q.  And you know it was Justin Borst because it indicates he |
| 10:56AM | 23 | was the individual to receive the return, correct? |
| 10:56AM | 24 | A.  Yes. |
| 10:56AM | 25 | Q.  All right. |

| | | |
|---|---|---|
| 10:56AM | 1 | **MR. MacKAY:** You can take that down, Ms. Champoux. |
| 10:56AM | 2 | Can we go to the Tripi OCDETF proposal in Government |
| 10:56AM | 3 | Exhibit 100A.1. |
| 10:56AM | 4 | **BY MR. MacKAY:** |
| 10:56AM | 5 | Q. Okay. And you went through this document quite a bit on |
| 10:57AM | 6 | direct; do you remember that? |
| 10:57AM | 7 | A. I do. |
| 10:57AM | 8 | Q. This is what you understand to be a draft OCDETF proposal |
| 10:57AM | 9 | regarding Operation Past Due, correct? |
| 10:57AM | 10 | A. Yes. |
| 10:57AM | 11 | Q. Now, based on some of the names that are here, you see |
| 10:57AM | 12 | Special Agent Dave Turri of the IRS, correct? |
| 10:57AM | 13 | A. I do. |
| 10:57AM | 14 | Q. TFA Chris Clark, he's with the DEA, correct? |
| 10:57AM | 15 | A. Yes. |
| 10:57AM | 16 | Q. And then Tim Lynch who is with the U.S. Attorney's |
| 10:57AM | 17 | Office, correct? |
| 10:57AM | 18 | A. Yes. |
| 10:57AM | 19 | Q. Now, two of those three names, Dave Turri and Tim Lynch, |
| 10:57AM | 20 | you understood from the review of the file to be associated |
| 10:57AM | 21 | with the Wayne Anderson case, correct? |
| 10:57AM | 22 | A. Yes. |
| 10:57AM | 23 | **MR. MacKAY:** Can we scroll down to page 6. |
| 10:57AM | 24 | **BY MR. MacKAY:** |
| 10:57AM | 25 | Q. Now, in this box for Section 8, it looks like there's -- |

10:57AM    1   it's indicating in some fashion that intel analyst Steve

10:58AM    2   Bevilacqua is going to be involved in this operation?

10:58AM    3   A.  It looks like he's identified as having sent information

10:58AM    4   to SOD already.

10:58AM    5   Q.  What does that mean?

10:58AM    6   A.  Well, it says communication devices previously submitted

10:58AM    7   to SOD.  Yes.  And then submitted by, and it says I.A.

10:58AM    8   Stephen Bevilacqua.

10:58AM    9   Q.  Okay.  So, is it fair to say from this part of the record

10:58AM   10   Stephen Bevilacqua is intended to have some interaction with

10:58AM   11   the OCDETF operations being drafted?

10:58AM   12   A.  Or he had already done something in support of it, yes.

10:58AM   13   Q.  Yeah.  I guess that's what I'm asking.  Him showing up

10:58AM   14   here shows he's done some work or might do some work if this

10:58AM   15   project gets off the ground, correct?

10:58AM   16   A.  Well, I don't know if I agree with gets off the ground.

10:58AM   17   It's not really at that stage.  Right, if this operation is

10:59AM   18   approved, there was a case that was already going.

10:59AM   19   Q.  Okay.  And it looks like this is being generated on or

10:59AM   20   about March 13th of 2013, from what you can see?

10:59AM   21   A.  It looks like that's that he made the submission to SOD.

10:59AM   22   Q.  Okay.  And do you understand from your review of the

10:59AM   23   file, of your review of the Wayne Anderson file, that Stephen

10:59AM   24   Bevilacqua had performed some work in connection with the

10:59AM   25   Wayne Anderson file?

10:59AM   1   A.  I think he had, yes.

10:59AM   2   Q.  All right.  And we've talked about the name Justin Borst,

10:59AM   3   he's also an -- Stephen Bevilacqua is also an intel analyst

10:59AM   4   at the time at the DEA, correct?

10:59AM   5   A.  I think so.  I wasn't there then, but I think he was

10:59AM   6   there then.

10:59AM   7           **MR. MacKAY:**  Okay.  Can we go to page 8.

10:59AM   8           **BY MR. MacKAY:**

11:00AM   9   Q.  We don't have to go through all of the information in

11:00AM  10   here, but this is essentially the background of the facts of

11:00AM  11   the case that would support why an operation is being

11:00AM  12   proposed?

11:00AM  13   A.  Yes.

11:00AM  14   Q.  Targets were involved in debt collection, to your

11:00AM  15   understanding, correct?

11:00AM  16   A.  Yes.

11:00AM  17   Q.  They're also involved in marijuana trafficking in some

11:00AM  18   connection, correct?

11:00AM  19   A.  Yes.

11:00AM  20   Q.  And this arose at least from what you can see from the

11:00AM  21   report here something regarding the Niagara Falls Police

11:00AM  22   Department having some sort of confidential source regarding

11:00AM  23   marijuana dealers in the Niagara Falls area?

11:00AM  24   A.  Yes.

11:00AM  25           **MR. MacKAY:**  Can we go to the next page,

11:00AM   1    Ms. Champoux.

11:00AM   2              **BY MR. MacKAY:**

11:00AM   3    Q.  All right.  There's also information that targets in this

11:00AM   4    operation, proposed operation involving in cocaine

11:00AM   5    trafficking, correct?

11:01AM   6    A.  Can we zoom back in, please?  Yes.

11:01AM   7    Q.  As well as heroin trafficking?

11:01AM   8    A.  Yes.

11:01AM   9    Q.  As well as money laundering?

11:01AM  10    A.  Yes.

11:01AM  11    Q.  There's information that the CS with the Niagara Falls

11:01AM  12    Police Department may also have information regarding the

11:01AM  13    money-laundering activities?

11:01AM  14    A.  Are you pointing to a particular sentence?

11:01AM  15    Q.  I'll just withdraw the question.  I'll ask it this way.

11:01AM  16        So it appears that the proposed operation involved a CS

11:01AM  17    with a Niagara Falls Police Department, correct?

11:01AM  18    A.  Yes.

11:01AM  19    Q.  And that confidential source appeared to have some

11:01AM  20    information about what was going up -- what was going on up

11:01AM  21    in Niagara Falls, correct?

11:02AM  22    A.  Yes.

11:02AM  23    Q.  I think you told us on direct that this individual, Frank

11:02AM  24    Tripi, you believed he had, based on law enforcement

11:02AM  25    reputation, some connection to Italian Organized Crime,

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24
81

11:02AM    1    correct?

11:02AM    2    A.   Yes.

11:02AM    3    Q.   That was possibly based on family connections?

11:02AM    4    A.   Family connections, his past activity, it was just his

11:02AM    5    reputation.

11:02AM    6    Q.   Okay.  So I just want to review, the information that's

11:02AM    7    at least embodied in this report, is it fair to say there's

11:02AM    8    some of the same types of criminal activity being

11:02AM    9    investigated that the Ron Serio investigation with the Wayne

11:02AM    10   Anderson case focused on?

11:02AM    11   A.   Are you saying the crossover with the types of drugs?

11:02AM    12   Q.   Yes, for one.

11:02AM    13   A.   I mean, the there's no mention of the counterfeit

11:02AM    14   oxycodone in here.  There's mention of marijuana.

11:02AM    15   Q.   Let me ask it this way.  The Ron Serio investigation

11:02AM    16   that's being conducted back in 2013, that involved marijuana

11:02AM    17   to some degree, correct?

11:03AM    18   A.   Yes.

11:03AM    19   Q.   It involved at least the possibility of some cocaine

11:03AM    20   being investigated, correct?

11:03AM    21   A.   Yes.

11:03AM    22   Q.   And it involved money laundering as well, correct?

11:03AM    23   A.   It did.

11:03AM    24   Q.   And as we saw on the first page, some of the individuals

11:03AM    25   that are in this proposed operation are the same folks that

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

82

| | | |
|---|---|---|
| 11:03AM | 1 | are also involved in the Wayne Anderson case as well, too, |
| 11:03AM | 2 | correct? |
| 11:03AM | 3 | A.  Talking about Tim Lynch and -- |
| 11:03AM | 4 | Q.  Yes. |
| 11:03AM | 5 | A.  Yes. |
| 11:03AM | 6 | Q.  And then there's also potential -- do you recall that the |
| 11:03AM | 7 | Ron Serio investigation back in 2013, there was some thought |
| 11:03AM | 8 | about connections to organized crime? |
| 11:03AM | 9 | A.  I don't remember seeing that in that file. |
| 11:03AM | 10 | MR. MacKAY:  You can take that down, Ms. Champoux. |
| 11:03AM | 11 | BY MR. MacKAY: |
| 11:03AM | 12 | Q.  All right.  So just to finish up, on your direct, you had |
| 11:03AM | 13 | talked about you had been involved in a number of interviews |
| 11:04AM | 14 | with other DEA employees of the Buffalo office, right? |
| 11:04AM | 15 | A.  No, I said that I was not involved with the interviews of |
| 11:04AM | 16 | the DEA employees at the office. |
| 11:04AM | 17 | Q.  Okay.  But I think you did tell us though that there were |
| 11:04AM | 18 | a number of DEA officials that were interviewed in some |
| 11:04AM | 19 | capacity, correct? |
| 11:04AM | 20 | A.  There were. |
| 11:04AM | 21 | Q.  Like, Joseph Palmieri, correct? |
| 11:04AM | 22 | A.  Yes. |
| 11:04AM | 23 | Q.  Mark Gentile? |
| 11:04AM | 24 | A.  I -- yes. |
| 11:04AM | 25 | Q.  Okay.  Shane Nastoff, correct? |

11:04AM   1   A.   Yes.

11:04AM   2   Q.   Mike Hill, correct?

11:04AM   3   A.   I believe so, yes.

11:04AM   4   Q.   Brian Chella, correct?

11:04AM   5   A.   Yes.

11:04AM   6   Q.   And I think you told us on direct there was a

11:04AM   7   characterization that some of these individuals were evasive

11:04AM   8   in their interviews?

11:04AM   9   A.   So, I can only talk about the ones that I participated

11:04AM  10   in.  I did talk to Mr. Palmieri.  And I talked to Mr. Yensan.

11:04AM  11   I was part of those interviews.

11:04AM  12   Q.   I left out the name, so, Mr. Yensan, he was at the time,

11:05AM  13   at one point in time a supervisor at the DEA, correct?

11:05AM  14   A.   Yes.

11:05AM  15   Q.   And, so from your testimony, you were saying that both

11:05AM  16   Yensan and Palmieri, in your opinion, presented as evasive,

11:05AM  17   correct?

11:05AM  18   A.   Yes.

11:05AM  19   Q.   And in response to that, those individuals were both sent

11:05AM  20   subject or target letters, correct?

11:05AM  21   A.   Not solely in response to that, but ultimately that did

11:05AM  22   happen.

11:05AM  23   Q.   Did you understand that at some point in time Greg Yensan

11:05AM  24   was moved out of a supervisor position at the DEA?

11:05AM  25   A.   I do know that he moved out of his supervisory position,

11:05AM    1   yes.

11:05AM    2   Q. Okay. Now Shane Nastoff, he was an individual, I think

11:05AM    3   you said you might not have participated in the interview,

11:05AM    4   but you understand that he was interviewed in the context of

11:05AM    5   this whole case, correct?

11:05AM    6   A. Yes.

11:05AM    7   Q. And ultimately did you come to understand that he was

11:05AM    8   promoted to a group supervisor sometime following

11:05AM    9   Mr. Bongiovanni's retirement from the DEA?

11:05AM   10   A. He was promoted, yes.

11:05AM   11   Q. Okay. And just so the jury understands, what is a target

11:06AM   12   or subject letter?

11:06AM   13   A. It's a letter from the U.S. Attorney's Office to an

11:06AM   14   individual advising them that they're the target of an

11:06AM   15   investigation.

11:06AM   16   Q. All right.

11:06AM   17        **MR. MacKAY:** All right. Judge, can I just have one

11:06AM   18   moment?

11:06AM   19        **THE COURT:** Sure.

11:06AM   20        **MR. MacKAY:** No further questions, Your Honor.

11:06AM   21        **THE COURT:** Redirect.

11:06AM   22        **MR. TRIPI:** Yes, Your Honor, thank you.

11:06AM   23

11:06AM   24           **REDIRECT EXAMINATION BY MR. TRIPI:**

11:06AM   25   Q. So just to finish off that last thought, was Palmieri

11:06AM    1    served a subject letter before he was ever interviewed?

11:06AM    2    A.  I don't recall the sequence.

11:06AM    3    Q.  You don't recall?  That was served by Special Agent

11:06AM    4    Carpenter, correct?

11:06AM    5    A.  Yes.

11:06AM    6    Q.  And then just remind us, yesterday you said he sat for

11:06AM    7    several interviewed and then polygraphed, right?

11:06AM    8    A.  Yes.

11:06AM    9    Q.  And then after all that, a federal search warrant was

11:06AM    10   executed at his residence, correct?

11:06AM    11   A.  Yes.

11:06AM    12   Q.  All right.  I'm going to start with what was covered

11:07AM    13   today, and then I'm going to go back to yesterday, all right?

11:07AM    14       All right.  Right out of the gate, I just want to ask

11:07AM    15   you, you know, working as a DEA task force officer, do DEA

11:07AM    16   standards of conduct preclude agents and task force officers

11:07AM    17   from associating with known felons, drug dealers, and people

11:07AM    18   under investigation?

11:07AM    19   A.  Yes.

11:07AM    20           **MR. TRIPI:**  Let's pull up Exhibit 127.

11:07AM    21           **BY MR. TRIPI:**

11:07AM    22   Q.  As of June 30th, 2018, was Peter Gerace a federally

11:07AM    23   convicted felon?

11:07AM    24   A.  Yes.

11:07AM    25   Q.  As of June 30th, 2018, was Peter Gerace a suspected drug

11:07AM    1    dealer?

11:07AM    2    A.  Yes.

11:07AM    3    Q.  As of June 30th, 2018, was Peter Gerace someone who law

11:07AM    4    enforcement was -- had an investigative interest in?

11:07AM    5    A.  Yes.

11:07AM    6    Q.  So, all three of those things apply to Mr. Gerace who's

11:08AM    7    standing next to this defendant, right?

11:08AM    8    A.  They do.

11:08AM    9    Q.  Okay.

11:08AM    10        MR. TRIPI:  Let's take that down.

11:08AM    11        BY MR. TRIPI:

11:08AM    12    Q.  Now, from your time working at DEA, as well as your time

11:08AM    13    as a special agent for several agencies that are involved in

11:08AM    14    investigations, is it the case agent's job to make sure all

11:08AM    15    pertinent paperwork gets to the official file?

11:08AM    16    A.  Yes.

11:08AM    17    Q.  Okay.  So here, all of those hot sheets and subpoena

11:08AM    18    responses that Mr. MacKay showed you, were any of those in

11:08AM    19    the official DEA paper file that DEA had access to when you

11:08AM    20    got the file?

11:08AM    21    A.  I saw the scan of the official file.

11:08AM    22    Q.  Right.

11:08AM    23    A.  None of those were in the scan, or not all of those were

11:08AM    24    in the scan.

11:08AM    25        MR. TRIPI:  Let's pull up 8A, Ms. Champoux.

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 11:08AM  | 1  | **BY MR. TRIPI:**                                        |
| 11:09AM  | 2  | Q.  You've seen this file, right?                        |
| 11:09AM  | 3  | A.  This is 1326, yes.                                   |
| 11:09AM  | 4  | Q.  Have you seen a hot sheet in this paper file?        |
| 11:09AM  | 5  | A.  No.                                                  |
| 11:09AM  | 6  | Q.  Have you seen a hot sheet in the case management system |
| 11:09AM  | 7  | file for C2-13-0026?                                     |
| 11:09AM  | 8  | A.  No.                                                  |
| 11:09AM  | 9  | Q.  Did you see a hot sheet for Tom Serio in this paper file? |
| 11:09AM  | 10 | A.  No.                                                  |
| 11:09AM  | 11 | Q.  Did you see a hot sheet for Chris Baker in this paper |
| 11:09AM  | 12 | file?                                                    |
| 11:09AM  | 13 | A.  No.                                                  |
| 11:09AM  | 14 | Q.  Did you see a hot sheet for Mike Moynihan in this paper |
| 11:09AM  | 15 | file?                                                    |
| 11:09AM  | 16 | A.  No.                                                  |
| 11:09AM  | 17 | Q.  Did you see any of the documents that Mr. MacKay showed |
| 11:09AM  | 18 | you regarding Mike Masecchia, the DARTS screen prints in this |
| 11:09AM  | 19 | file?                                                    |
| 11:09AM  | 20 | A.  No.                                                  |
| 11:09AM  | 21 | Q.  What file did you see those in?                      |
| 11:09AM  | 22 | A.  The Redweld that we found in Mr. Bongiovanni's house. |
| 11:09AM  | 23 | Q.  Is that the only place you saw those documents?      |
| 11:09AM  | 24 | A.  Yes.                                                 |
| 11:09AM  | 25 | Q.  All those documents in the defendant's basement are DEA |

| | | |
|---|---|---|
| 11:09AM | 1 | property though, right? |
| 11:10AM | 2 | A.  They're DEA records, yes. |
| 11:10AM | 3 | Q.  Just because he's a case agent, it doesn't make them his, |
| 11:10AM | 4 | correct? |
| 11:10AM | 5 | A.  Correct. |
| 11:10AM | 6 | Q.  You've been involved in drug investigations for a long |
| 11:10AM | 7 | time; is that right? |
| 11:10AM | 8 | A.  Yes. |
| 11:10AM | 9 | Q.  In all of those cases, have you ever made a drug case |
| 11:10AM | 10 | resulting in any arrests based simply on subpoenas and |
| 11:10AM | 11 | subpoena returns? |
| 11:10AM | 12 | A.  No. |
| 11:10AM | 13 | Q.  Is issuing subpoenas and receiving subpoena returns the |
| 11:10AM | 14 | bare minimum an agent can do in an investigation? |
| 11:10AM | 15 | **MR. MacKAY:**  Objection. |
| 11:10AM | 16 | **THE COURT:**  Sustained. |
| 11:10AM | 17 | **BY MR. TRIPI:** |
| 11:10AM | 18 | Q.  Would you feel like you were conducting a thorough |
| 11:10AM | 19 | investigation if all you did was subpoena records? |
| 11:10AM | 20 | **MR. MacKAY:**  Objection. |
| 11:10AM | 21 | **THE COURT:**  Sustained. |
| 11:10AM | 22 | **BY MR. TRIPI:** |
| 11:10AM | 23 | Q.  Will a bunch of -- would a bunch of subpoena returns |
| 11:11AM | 24 | without further investigative action result in a drug arrest? |
| 11:11AM | 25 | **MR. MacKAY:**  Objection. |

11:11AM  1          **MR. TRIPI:**  Judge, this is within the scope of --

11:11AM  2          **THE COURT:**  Wait, wait, wait.  Stop, stop, stop.  I

11:11AM  3  want to think about it.

11:11AM  4          **MR. MacKAY:**  I think it's speculation.

11:11AM  5          **MR. TRIPI:**  It wasn't speculation on cross.

11:11AM  6          **THE COURT:**  Let's -- let's -- let me think about

11:11AM  7  this, please.

11:11AM  8          Overruled.

11:11AM  9          **THE WITNESS:**  Could you ask the question again,

11:11AM 10  please?

11:11AM 11          **MR. TRIPI:**  Ms. Sawyer, would you please read the

11:11AM 12  question.

11:11AM 13          (The above-requested question was then read by the

11:11AM 14  reporter.)

11:11AM 15          **THE WITNESS:**  No.

11:11AM 16          **BY MR. TRIPI:**

11:11AM 17  Q.  In your review of Exhibit 8A, both the paper file and the

11:11AM 18  case management file, did you see any -- any interviews of

11:12AM 19  John Robinson?

11:12AM 20  A.  No.

11:12AM 21  Q.  Did you see any interviews of Mike Moynihan?

11:12AM 22  A.  No.

11:12AM 23  Q.  Did you see any interview of Chris Baker?

11:12AM 24  A.  No.

11:12AM 25  Q.  Did you see any interviews of Kelly Brace?

11:12AM  1    A.  No.

11:12AM  2    Q.  Did you see any interviews of anyone who you understood

11:12AM  3    to be a subordinate to Ron and Tom Serio in the Serio

11:12AM  4    organization?

11:12AM  5    A.  No.

11:12AM  6    Q.  Did you see any interviews of anybody, anybody in the

11:12AM  7    Serio drug-trafficking organization in the DEA-6s in the

11:12AM  8    file?

11:12AM  9    A.  Not in the 6s, no.

11:12AM  10   Q.  Well, that's where they would be documented, right?

11:12AM  11   A.  The only -- I'm thinking of --

11:12AM  12   Q.  I'm not asking you about the confidential source.

11:12AM  13   A.  Understood.

11:12AM  14   Q.  Put that aside.  Any of the other players?

11:12AM  15   A.  No.

11:12AM  16   Q.  Did you observe one single surveillance by Special Agent

11:12AM  17   Dave Leary?

11:12AM  18   A.  One.

11:13AM  19   Q.  That was the only one, right?

11:13AM  20   A.  Yes.

11:13AM  21   Q.  Did you see any pen registers?

11:13AM  22   A.  No.

11:13AM  23   Q.  That's the next step, after getting all those subpoenas

11:13AM  24   is to advance to a pen register; is that right?

11:13AM  25   A.  That's one way to do it, yes.  It would be a more

11:13AM    1    advanced technique.

11:13AM    2    Q.  Did you see any recorded calls?

11:13AM    3    A.  No.

11:13AM    4    Q.  Did you see any controlled buys?

11:13AM    5    A.  Some attempts, but none completed.

11:13AM    6    Q.  Did you see any actual controlled buys?

11:13AM    7    A.  No.

11:13AM    8    Q.  Did you see any trash pulls?

11:13AM    9    A.  No.

11:13AM    10   Q.  You saw an operation plan for a buy into T.S. that never

11:13AM    11   happened, correct?

11:13AM    12   A.  That's what I'm thinking of, yes.

11:13AM    13   Q.  And the case agent writes the operation plan; is that

11:13AM    14   right?

11:13AM    15   A.  Yes.

11:13AM    16   Q.  That doesn't mean there was ever a buy actually planned

11:13AM    17   though, does it?

11:13AM    18   A.  There's no DEA-6 that documents an attempted buy.

11:13AM    19   Q.  Okay.  There was no pole cameras put up, putting a video

11:14AM    20   camera in front of Ron Serio's house on a telephone pole, was

11:14AM    21   there?

11:14AM    22   A.  No.

11:14AM    23   Q.  Or any other address associated with Ron Serio, was

11:14AM    24   there?

11:14AM    25   A.  No.

| | | |
|---|---|---|
| 11:14AM | 1 | Q.  There were no arrests in the case, was there? |
| 11:14AM | 2 | A.  Not after the ones the state police did, no. |
| 11:14AM | 3 | Q.  Wayne Anderson and Damien Abbate were arrested, and then |
| 11:14AM | 4 | the DEA, this defendant adopted that case, right? |
| 11:14AM | 5 | A.  Yes. |
| 11:14AM | 6 | Q.  After that, nobody got arrested? |
| 11:14AM | 7 | A.  Correct. |
| 11:14AM | 8 | Q.  There were no federal or state prosecutions after that, |
| 11:14AM | 9 | correct? |
| 11:14AM | 10 | A.  Correct. |
| 11:14AM | 11 | **MR. TRIPI:**  Let's go to Exhibit 8A at page 13. |
| 11:14AM | 12 | **BY MR. TRIPI:** |
| 11:14AM | 13 | Q.  Do you recognize this to be the DEA-6 prepared May 2nd, |
| 11:15AM | 14 | 2013, the initial debriefing of R.K.? |
| 11:15AM | 15 | A.  Yes. |
| 11:15AM | 16 | **MR. TRIPI:**  And I'd like to scroll down to the next |
| 11:15AM | 17 | page, page 14, Ms. Champoux. |
| 11:15AM | 18 | **BY MR. TRIPI:** |
| 11:15AM | 19 | Q.  Okay.  Do you see under the financial-related |
| 11:15AM | 20 | information, do you see where it says DEA agents are |
| 11:15AM | 21 | coordinating the investigation with the AUSA WDNY New York |
| 11:15AM | 22 | State Attorney General, New York State Police, Buffalo FBI, |
| 11:15AM | 23 | IRS, and are working towards wire intercepts? |
| 11:15AM | 24 | A.  Yes. |
| 11:15AM | 25 | Q.  Other than issuing some subpoenas, do you see a single |

11:15AM    1    investigative step that would satisfy an exhaustion

11:15AM    2    requirement in a Title III wiretap application?

11:15AM    3    A.   Only Dave Leary's surveillance.

11:15AM    4    Q.   Okay.  Other than Dave Leary's surveillance, not a single

11:15AM    5    step would satisfy exhaustion, right?

11:15AM    6    A.   No.

11:15AM    7         **MR. MacKAY:**  Objection.  That calls for a legal

11:15AM    8    conclusion.

11:16AM    9         **MR. TRIPI:**  It's not a legal conclusion, Your Honor.

11:16AM    10   Agents know how to do wiretaps.

11:16AM    11        **THE COURT:**  Mr. Tripi, please.

11:16AM    12        **MR. TRIPI:**  I'm just briefly responding.

11:16AM    13        **THE COURT:**  I understand.  When there's an objection,

11:16AM    14   let me think about it.  If I need argument, I will ask for the

11:16AM    15   argument.  Okay?

11:16AM    16        **MR. TRIPI:**  You got it.

11:16AM    17        **THE COURT:**  Okay.

11:16AM    18        The objection is overruled.

11:16AM    19        **BY MR. TRIPI:**

11:16AM    20   Q.   And even in a case where you are making an application

11:16AM    21   for Title III, you need to do more than one surveillance; is

11:16AM    22   that right?

11:16AM    23   A.   Yes, you would have to do many hours of surveillance over

11:16AM    24   many days.

11:16AM    25   Q.   Did anything like that happen in this case file that's

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24

11:16AM   1   been documented in any DEA-6s?

11:16AM   2   A.  No.

11:16AM   3   Q.  Earlier --

11:17AM   4        **MR. TRIPI:**  We can take that down.

11:17AM   5        **BY MR. TRIPI:**

11:17AM   6   Q.  -- you were shown Exhibit 101A.1, and Mr. MacKay showed

11:17AM   7   you the Chris Baker rap sheet, and then he showed you the

11:17AM   8   Baker toll analysis after that; do you remember that?

11:17AM   9   A.  I do.

11:17AM  10   Q.  And the rap sheet was actually run after the tolls were

11:17AM  11   obtained.  Do you remember those dates?  The rap sheet was

11:17AM  12   run in April, but the tolls were in March?

11:17AM  13   A.  Yes.

11:17AM  14   Q.  Did -- did the defendant document in any report anywhere

11:17AM  15   how he got those phone numbers?

11:17AM  16   A.  No.

11:17AM  17   Q.  How he knew these phone numbers?

11:17AM  18   A.  No.

11:17AM  19   Q.  Normally, as an investigator who works drug cases, when

11:18AM  20   you don't know someone's phone number, do you start with the

11:18AM  21   record checks on the person first to try to locate or find a

11:18AM  22   potential phone number?

11:18AM  23   A.  Yes.  Background checks, public record checks, something

11:18AM  24   that might point to a phone number.

11:18AM  25   Q.  You don't start with the phone number subpoena, right?

11:18AM    1    You've got to find that number.

11:18AM    2    A.  It has to come to you somehow, yes.

11:18AM    3    Q.  But here, you saw records showing that the subpoena

11:18AM    4    preceded the record check; is that right?

11:18AM    5    A.  Yes.

11:18AM    6    Q.  Same with Mike Buttitta that he showed you.  The criminal

11:18AM    7    record checks started after the subpoena response came in,

11:18AM    8    true?

11:18AM    9    A.  Yes.

11:18AM    10    Q.  And the defendant didn't write how he knew those numbers

11:18AM    11    in the file, did he?

11:18AM    12    A.  No.

11:19AM    13    Q.  Now, you went through a bunch of documents this morning

11:19AM    14    with Mr. MacKay in Exhibit 100A.1, which is that file, we've

11:19AM    15    shown it plenty of times, 100A, right?

11:19AM    16    A.  Yes.

11:19AM    17    Q.  Based on DEA policy, procedure, and your training and

11:19AM    18    experience, was this defendant permitted to remove a single

11:19AM    19    one of those documents Mr. MacKay showed you and keep it in

11:19AM    20    his basement at retirement?

11:19AM    21    A.  No.

11:19AM    22    **MR. TRIPI:**  Can we pull up Exhibit 100A.1 and go to

11:19AM    23    the Masecchia hot sheet.  Masecchia phone info and hot -- it

11:19AM    24    says, let me get the record correct, Masecchia M phone info

11:19AM    25    and hot sheet.  Thank you.

| | | |
|---|---|---|
| 11:19AM | 1 | **BY MR. TRIPI:** |
| 11:19AM | 2 | Q.  You looked at this earlier, right? |
| 11:19AM | 3 | A.  Yes. |
| 11:19AM | 4 | Q.  And it's a six-page scan? |
| 11:19AM | 5 | **MR. TRIPI:**  Can we scroll down, Ms. Champoux.  We're |
| 11:19AM | 6 | at page 2. |
| 11:19AM | 7 | **BY MR. TRIPI:** |
| 11:19AM | 8 | Q.  I think earlier you indicated that this is, like, this is |
| 11:20AM | 9 | the DARTS for the subpoena related to Masecchia's number, |
| 11:20AM | 10 | right? |
| 11:20AM | 11 | A.  This is the screen in DARTS that shows that Sprint has |
| 11:20AM | 12 | returned records, and that they're available for download. |
| 11:20AM | 13 | Q.  Now I just want to be clear, Justin Borst is an intel |
| 11:20AM | 14 | analyst, right? |
| 11:20AM | 15 | A.  Yes. |
| 11:20AM | 16 | Q.  Intel analysts oftentimes run the subpoenas for case |
| 11:20AM | 17 | agents, correct? |
| 11:20AM | 18 | A.  Yes. |
| 11:20AM | 19 | Q.  But read the full Trinity remarks that Justin Borst wrote |
| 11:20AM | 20 | as associated to this phone number 812-0664.  Read the whole |
| 11:20AM | 21 | thing. |
| 11:20AM | 22 | A.  Number part of ongoing narcotics investigation belonging |
| 11:20AM | 23 | to Michael Masecchia per S.A. Bongiovanni. |
| 11:20AM | 24 | Q.  Did the defendant write a single sentence in any report |
| 11:20AM | 25 | and file C2-13-0026 explaining how Michael Masecchia was |

| | | |
|---|---|---|
| 11:20AM | 1 | connected to the Ron Serio case or Wayne Anderson? |
| 11:21AM | 2 | A.  No. |
| 11:21AM | 3 | Q.  Now, the Trinity remarks, based upon DEA protocol and |
| 11:21AM | 4 | procedure, are reflective of what the agent has indicated to |
| 11:21AM | 5 | the analyst preparing the DARTS subpoena, correct? |
| 11:21AM | 6 | A.  Right. |
| 11:21AM | 7 | Q.  That's how we get those remarks? |
| 11:21AM | 8 | A.  Right. |
| 11:21AM | 9 | Q.  It does not say there number part of investigation |
| 11:21AM | 10 | belonging to Mike Masecchia, who Special Agent Bongiovanni |
| 11:21AM | 11 | went to high school with, right? |
| 11:21AM | 12 | A.  Correct. |
| 11:21AM | 13 | Q.  It does not say number part of an ongoing narcotics |
| 11:21AM | 14 | investigation belonging to Mike Masecchia who Special Agent |
| 11:21AM | 15 | Bongiovanni drove to college with, correct? |
| 11:21AM | 16 | A.  Correct. |
| 11:21AM | 17 | Q.  It doesn't say part of an ongoing narcotics investigation |
| 11:21AM | 18 | belonging to Mike Masecchia who Bongiovanni has known for 40 |
| 11:21AM | 19 | years, correct? |
| 11:21AM | 20 | A.  Correct. |
| 11:21AM | 21 | **MR. TRIPI:**  We can take that down. |
| 11:21AM | 22 | **BY MR. TRIPI:** |
| 11:21AM | 23 | Q.  That entry, though, that we saw is in DARTS, that means |
| 11:22AM | 24 | Bongiovanni's going to get a notice any time that phone |
| 11:22AM | 25 | number linked to Mike Masecchia comes up in DARTS; is that |

11:22AM      1    right?

11:22AM      2    A.   Yes.

11:22AM      3    Q.   And that's the point of DARTS, the analysts get these

11:22AM      4    subpoenaed responses, and they push them into DARTS to

11:22AM      5    develop the robust deconfliction system that DEA has,

11:22AM      6    correct?

11:22AM      7    A.   Correct.   DARTS forces you to deconflict the number

11:22AM      8    before you do the subpoena.

11:22AM      9    Q.   In other words, you've got to put it into DARTS to do the

11:22AM     10    subpoena?

11:22AM     11    A.   Yes.

11:22AM     12    Q.   So if we were to see a subpoena for Lou Selva in that

11:22AM     13    case file, which we've seen already, that means it went into

11:22AM     14    DARTS?

11:22AM     15    A.   Yes.

11:22AM     16    Q.   We see a subpoena for Paul Francoforte, that means his

11:22AM     17    number went into DARTS?

11:22AM     18    A.   Yes.

11:22AM     19    Q.   We see subpoenas for Mike Masecchia, Ron Serio, that

11:23AM     20    means their numbers went into DARTS, right?

11:23AM     21    A.   Yes.

11:23AM     22    Q.   That means he gets notice any time that number hits

11:23AM     23    anywhere in the world, correct?

11:23AM     24    A.   Yes.

11:23AM     25    Q.   Not just the United States, the world, where DEA has

11:23AM    1    offices, correct?

11:23AM    2    A.   Yes.

11:23AM    3    Q.   Oh.  On that DEA DARTS report that we just had on the

11:23AM    4    screen for Masecchia, we don't have to pull it up again, but

11:23AM    5    it said for DEA official use only; do you remember that?

11:23AM    6    A.   I do.

11:23AM    7    Q.   Can a retired DEA agent conduct official business from

11:23AM    8    his basement?

11:23AM    9    A.   No.

11:23AM   10    Q.   Mr. MacKay showed you a hot sheet for 561 -- withdrawn.

11:23AM   11    I don't know if it's a hot sheet.

11:23AM   12         **MR. TRIPI:**  Let's pull up 100A.1.  561-801-0221.

11:24AM   13         **THE COURT:**  And this is from exhibit --

11:24AM   14         **MR. TRIPI:**  From Exhibit 100A.1.  It's near the top,

11:24AM   15    I believe, Ms. Champoux.

11:24AM   16         There you go.  You got it.  Thank you.

11:24AM   17         For the record, this is 561-801-0221, Serio T toll

11:24AM   18    analysis as in Exhibit 100A.1.

11:24AM   19         **THE COURT:**  This is a folder in that exhibit.

11:24AM   20         **MR. TRIPI:**  That is correct.  Thank you, Your Honor.

11:24AM   21         **BY MR. TRIPI:**

11:24AM   22    Q.   Now earlier you were talking about this document, and it

11:24AM   23    was a hot number list.  The number to the left, that shows

11:24AM   24    the number of times that number was called during a certain

11:24AM   25    time period, which is the date range to the far right,

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24

100

| | | |
|---|---|---|
| 11:24AM | 1 | correct? |
| 11:24AM | 2 | A.  Yes. |
| 11:24AM | 3 | Q.  And you went through sort of no subscriber with |
| 11:24AM | 4 | Mr. MacKay, but one other -- one other way you could see a no |
| 11:24AM | 5 | subscriber is sometimes they are prepaid phones where, like, |
| 11:25AM | 6 | a TracFone, where there is no subscriber, correct? |
| 11:25AM | 7 | A.  Yes. |
| 11:25AM | 8 | Q.  That could be another explanation for a phone that has no |
| 11:25AM | 9 | subscriber assigned to it? |
| 11:25AM | 10 | A.  I don't know if it would have a comment that says |
| 11:25AM | 11 | TracFone or something in there or not. |
| 11:25AM | 12 | Q.  Okay.  But just generally, I guess, the point of prepaid |
| 11:25AM | 13 | phones sometimes in terms of drug dealers' utilization of |
| 11:25AM | 14 | them is they don't have a subscriber associated with them. |
| 11:25AM | 15 | A.  Correct. |
| 11:25AM | 16 | Q.  All right.  Okay.  In here, the actual hot list, number |
| 11:25AM | 17 | 15 that's highlighted, had a phone number 716-481-8002 which |
| 11:25AM | 18 | you know to be John Robinson, correct? |
| 11:25AM | 19 | A.  Yes. |
| 11:25AM | 20 | Q.  That's somebody you've interviewed, correct? |
| 11:25AM | 21 | A.  I called that phone number and found him. |
| 11:25AM | 22 | Q.  And you did that in, like, 2020? |
| 11:25AM | 23 | A.  Yes. |
| 11:25AM | 24 | Q.  And then you went and talked to him? |
| 11:25AM | 25 | A.  Yes. |

11:25AM     1    Q.  And that was the first time John Robinson was ever talked

11:25AM     2    to with anything related to this --

11:26AM     3    A.  Yes.

11:26AM     4    Q.  -- correct?  Was he a little surprised to see you at his

11:26AM     5    house in Corning, New York?

11:26AM     6    A.  He was.

11:26AM     7    Q.  And this hot number list was done in 2012?

11:26AM     8    A.  November 30th, yes.

11:26AM     9    Q.  And yet nobody ever talked to John Robinson until you

11:26AM    10    did; is that right?

11:26AM    11    A.  Yes.

11:26AM    12    Q.  And that was after you found this in the defendant's

11:26AM    13    basement?

11:26AM    14    A.  Yes.

11:26AM    15    Q.  That was someone that worked for Ron and Tom Serio,

11:26AM    16    correct?

11:26AM    17    A.  Yes, he did.

11:26AM    18    Q.  You were shown a bunch of local police reports that were

11:27AM    19    in Government Exhibit 100A, several of those Buffalo police

11:27AM    20    booking sheets.  I think you saw one for Robert Mettal and a

11:27AM    21    couple others that Mr. MacKay showed you a moment ago on

11:27AM    22    cross; do you remember that?

11:27AM    23    A.  Yes.

11:27AM    24    Q.  For all of the ones that you've looked at in court here

11:27AM    25    today and in the file, was it Joseph Palmieri who ran those

| | | |
|---|---|---|
| 11:27AM | 1 | local police reports for the defendant? |
| 11:27AM | 2 | A.  Yes. |
| 11:27AM | 3 | Q.  So it seems from your review of the file and in court |
| 11:27AM | 4 | here today that when this defendant wanted something done |
| 11:27AM | 5 | locally in terms of running a police report, Joseph Palmieri |
| 11:27AM | 6 | did it? |
| 11:27AM | 7 | **MR. MacKAY:**  Objection, speculation. |
| 11:27AM | 8 | **MR. TRIPI:**  I asked from his review of what was in |
| 11:27AM | 9 | court and the file.  It's consistent with the line of |
| 11:27AM | 10 | questioning from before.  I got you. |
| 11:27AM | 11 | **THE COURT:**  So the question -- |
| 11:28AM | 12 | **MR. TRIPI:**  I can repeat it if you'd like, Judge. |
| 11:28AM | 13 | **BY MR. TRIPI:** |
| 11:28AM | 14 | Q.  So Joe Palmieri, from the reports you reviewed in court |
| 11:28AM | 15 | and in the file, seems to run all the local police reports |
| 11:28AM | 16 | the defendant wants in this case. |
| 11:28AM | 17 | **MR. TRIPI:**  That's my question, Your Honor. |
| 11:28AM | 18 | **THE COURT:**  Did you object to that?  Are you |
| 11:28AM | 19 | objecting to that?  He reworded the question.  Do you object |
| 11:28AM | 20 | to that question? |
| 11:28AM | 21 | **MR. MacKAY:**  No, I'll withdraw the objection. |
| 11:28AM | 22 | **THE COURT:**  Okay. |
| 11:28AM | 23 | **BY MR. TRIPI:** |
| 11:28AM | 24 | Q.  And your answer is? |
| 11:28AM | 25 | A.  Yes, Joe Palmieri ran the local reports. |

| | | |
|---|---|---|
| 11:28AM | 1 | Q.  And those generally were people associated with the Serio |
| 11:28AM | 2 | organization; is that right? |
| 11:28AM | 3 | A.  Yes. |
| 11:28AM | 4 | Q.  I'll get back to Operation Past Due in a moment, but -- |
| 11:29AM | 5 | **MR. TRIPI:**  Can we take this down? |
| 11:29AM | 6 | **BY MR. TRIPI:** |
| 11:29AM | 7 | Q.  -- yesterday, you talked about the January 6th, 2019 |
| 11:29AM | 8 | interview, do you remember that? |
| 11:29AM | 9 | Obviously, it was part of the cross-examination today, |
| 11:29AM | 10 | direct yesterday, cross yesterday. |
| 11:29AM | 11 | A.  June 6th? |
| 11:29AM | 12 | Q.  June 6th.  Did I say January?  I'm sorry.  June 6th, |
| 11:29AM | 13 | 2019.  When you were sitting at the table, you had marked |
| 11:29AM | 14 | yesterday sort of where everyone was situated.  I think you |
| 11:29AM | 15 | marked yourself as next to the defendant on the same side of |
| 11:29AM | 16 | the table; is that right? |
| 11:29AM | 17 | A.  I was, to his right. |
| 11:29AM | 18 | Q.  Did you sort of turn or orient your chair, were you and |
| 11:29AM | 19 | him actually facing each other, even though you were both on |
| 11:29AM | 20 | that side of the table? |
| 11:29AM | 21 | A.  Yes, I was turned towards him. |
| 11:29AM | 22 | Q.  You were asked some questions yesterday about not |
| 11:29AM | 23 | recording your interview with the defendant on your iPhone; |
| 11:30AM | 24 | do you recall those questions? |
| 11:30AM | 25 | A.  Yes. |

11:30AM    1    Q.  Was that a conscientious decision by you?

11:30AM    2    A.  Yes.

11:30AM    3    Q.  Can you please explain why, based on your training and

11:30AM    4    experience, you chose to conduct the interview the way you

11:30AM    5    did?  Explain to the jury.

11:30AM    6    A.  Specifically with the iPhone, if the phone rings, it

11:30AM    7    interferes with the recording.  When you're the case agent on

11:30AM    8    search warrant day, you can expect your phone to ring, so

11:30AM    9    it's not a good recording tool.

11:30AM   10        Then the other problem with a recording in that kind of

11:30AM   11    environment in my experience is that the background noise

11:30AM   12    tends to block out the conversation that you're trying to

11:30AM   13    record.  Not completely, but in large sections.  And if you

11:30AM   14    can imagine furniture is moving, people are walking around,

11:30AM   15    boxes and other things are being moved around, there's a lot

11:30AM   16    of background noise.

11:30AM   17    Q.  Was the interview and the way you documented what the

11:30AM   18    defendant said consistent with your training and experience

11:31AM   19    as an Army CID investigator?

11:31AM   20    A.  Yes.

11:31AM   21    Q.  Was it consistent with your training and experience as an

11:31AM   22    NCIS investigator?

11:31AM   23    A.  Yes.

11:31AM   24    Q.  Was it consistent with your training and experience as a

11:31AM   25    Department of Defense investigator?

11:31AM    1    A.  Yes.

11:31AM    2    Q.  Was it consistent with your training and experience as a

11:31AM    3    Department of Justice Office of Inspector General

11:31AM    4    investigator?

11:31AM    5    A.  Yes.

11:31AM    6    Q.  Was it consistent with your training as a Homeland

11:31AM    7    Security special agent?

11:31AM    8    A.  Yes.

11:31AM    9    Q.  Did you take your notes contemporaneous to the

11:31AM    10   conversation you were having?

11:31AM    11   A.  Yes.

11:31AM    12   Q.  Are you able to do two things at once?

11:31AM    13   A.  Yes.

11:31AM    14   Q.  Can you talk to someone and also take some notes?

11:31AM    15   A.  Yes.

11:31AM    16   Q.  If you need to clarify something, do you go back and

11:31AM    17   write more notes?

11:31AM    18   A.  Yes.  Or ask a clarifying question.

11:31AM    19   Q.  And do you have a memory?

11:31AM    20   A.  Yes.

11:31AM    21   Q.  Were these things important to you during your

11:31AM    22   investigation?

11:31AM    23   A.  Yes.

11:31AM    24   Q.  Were you intent upon remembering the things that happened

11:31AM    25   that day?

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24

11:31AM   1   A.  Yes.

11:31AM   2   Q.  Was the interview you conducted in the defendant's living

11:31AM   3   room consistent with the policies and procedures of your

11:32AM   4   agency?

11:32AM   5   A.  Yes.

11:32AM   6   Q.  You were asked about recording back at the police

11:32AM   7   station.  That was a different -- that wasn't the interview

11:32AM   8   that was conducted that day, right?

11:32AM   9   A.  Correct.

11:32AM  10   Q.  You weren't arresting the defendant, right?

11:32AM  11   A.  We did not.

11:32AM  12   Q.  You were in his living room talking to him, weren't you?

11:32AM  13   A.  In the dining room, yes.

11:32AM  14   Q.  At that point in your investigation, you were just happy

11:32AM  15   that he was talking to you, right?

11:32AM  16   A.  Yes.

11:32AM  17   Q.  Did you expect him to talk to you?

11:32AM  18   A.  No.

11:32AM  19   Q.  The manner which you conducted the interview, in your

11:32AM  20   training and experience, is an interview of the sort that you

11:32AM  21   conducted that day different from an interrogation?

11:32AM  22   A.  Yes.

11:32AM  23   Q.  Tell the jury, what's the difference between those two

11:32AM  24   techniques.

11:32AM  25   A.  An interview involves open-ended questions.  Not much

11:33AM    1    talking by the person that's doing the interviewing other

11:33AM    2    than open-ended questions and maybe a clarifying question.

11:33AM    3    And then you allow the person that you're interviewing do

11:33AM    4    most of the talking.

11:33AM    5        An interrogation is very different.  In an interrogation,

11:33AM    6    if I'm doing it, I'm doing almost all of the talking.  And

11:33AM    7    most of the questions are going to have short answers like

11:33AM    8    yes or no.

11:33AM    9    Q.  In an interrogation, are you confronting people with

11:33AM   10    evidence you've acquired?

11:33AM   11    A.  Yes.

11:33AM   12    Q.  And you didn't do too much of that during your interview

11:33AM   13    with the defendant other than showing him a couple pictures?

11:33AM   14    A.  The two pictures.

11:33AM   15    Q.  In your experience interviewing people, do individuals

11:33AM   16    sometimes provide interviews -- withdrawn.

11:33AM   17        In your experience interviewing people, are you cognizant

11:33AM   18    of the fact that sometimes the questions or the more

11:33AM   19    specificity that's in your questions, it could -- it could

11:34AM   20    provide details of your investigation?

11:34AM   21    A.  Always.

11:34AM   22    Q.  Is that part of the assessment you make when deciding how

11:34AM   23    much detail to provide or confront somebody with during an

11:34AM   24    interview?

11:34AM   25    A.  How much detail to provide, or even which questions to

11:34AM  1  ask.

11:34AM  2  Q.  And as of that date in June, you were still intent upon

11:34AM  3  further investigating, right?

11:34AM  4  A.  Yes.

11:34AM  5  Q.  Mr. Bongiovanni didn't get arrested until the

11:34AM  6  following -- until October of 2019; is that right?

11:34AM  7  A.  October or November.  Maybe the first week of November,

11:34AM  8  yes, sir.

11:34AM  9  Q.  Okay.  So, this was just one part of the investigation;

11:34AM  10  is that right?

11:34AM  11  A.  Yes.

11:34AM  12  Q.  But to sum it up, was it an interview that you did not

11:34AM  13  want to at that point put all your cards on the table?

11:34AM  14  A.  Yes.

11:35AM  15  Q.  Because you were still investigating?

11:35AM  16  A.  Yes.

11:35AM  17  Q.  Were you still learning information?

11:35AM  18  A.  Yes.

11:35AM  19  Q.  For example, if you had had and had time to review every

11:35AM  20  single document that the defendant was storing in his

11:35AM  21  basement, would you have had a lot more questions to ask?

11:35AM  22  A.  Many.  Yes.

11:35AM  23  Q.  You were asked yesterday about if you determined whether

11:35AM  24  the defendant was confused, or if he seemed confused by any

11:35AM  25  of your questions.  Did the defendant seem confused by your

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24

11:35AM      1   questions at any point?

11:35AM      2   A.  Not at all.

11:35AM      3   Q.  If the defendant had been confused about anything, would

11:35AM      4   you have made sure to clarify your question to make sure he

11:35AM      5   understood?

11:35AM      6   A.  Yes.

11:35AM      7   Q.  Do you recall needing to do that at all?

11:35AM      8   A.  No.

11:35AM      9   Q.  Did the defendant ever say to you, I'm confused by your

11:35AM     10   questions?

11:35AM     11   A.  I don't remember that, no.

11:35AM     12   Q.  As -- as you walked in the door that day to do your

11:36AM     13   interview, you had an awareness that the defendant was a

11:36AM     14   20-year veteran special agent similar to yourself, correct?

11:36AM     15   A.  Yes.

11:36AM     16   Q.  As you walked in there, do you believe the defendant had

11:36AM     17   similar training as it relates to interview and interrogation

11:36AM     18   tactics?

11:36AM     19   A.  Yes.

11:36AM     20   Q.  Was that also a consideration as to part of your approach

11:36AM     21   how to deal with him?

11:36AM     22   A.  Yes.

11:36AM     23   Q.  Is remembering important details and documenting them an

11:36AM     24   important part of your job training experience?

11:36AM     25   A.  Yes.

11:36AM   1   Q.  You were asked some questions on cross-examination about

11:36AM   2   what the defendant meant when he said that he and Peter

11:36AM   3   Gerace were not in a close relationship; do you remember

11:36AM   4   that?  I think yesterday, Mr. MacKay asked you, you didn't

11:36AM   5   have him define "close relationship," right?

11:36AM   6   A.  I did not.

11:36AM   7   Q.  You remember those questions yesterday?

11:37AM   8   A.  I do.

11:37AM   9   Q.  Did you need an English dictionary to understand what the

11:37AM   10  defendant meant when he said him and Peter Gerace were not in

11:37AM   11  a close relationship?

11:37AM   12  A.  No.

11:37AM   13  Q.  You were asked questions yesterday about the defendant's

11:37AM   14  statement to you wherein in your interview he claimed he

11:37AM   15  could not remember whether Anthony was at the party in

11:37AM   16  Toronto; do you remember being asked those questions

11:37AM   17  yesterday?

11:37AM   18  A.  I do.

11:37AM   19  Q.  But the text messages that we looked at, Exhibit 310D, at

11:37AM   20  least during that time period when he was texting with Peter

11:37AM   21  Gerace, the defendant remembered Anthony Gerace being at the

11:37AM   22  party in Toronto; is that right?

11:37AM   23  A.  That's how it appears, yes.

11:37AM   24  Q.  And we looked at those text messages yesterday, right?

11:38AM   25  A.  Yes.

| | | |
|---|---|---|
| 11:38AM | 1 | Q.   In 20 -- in or about 2019 when Kevin Myszka was |
| 11:38AM | 2 | interviewed -- |
| 11:38AM | 3 | **MR. TRIPI:**  Let's pull up exhibit 126, Ms. Champoux. |
| 11:38AM | 4 | **BY MR. TRIPI:** |
| 11:38AM | 5 | Q.   -- Kevin Myszka was interviewed about three years after |
| 11:38AM | 6 | the trip to Toronto; is that right? |
| 11:38AM | 7 | A.   Yes. |
| 11:38AM | 8 | Q.   And Kevin Myszka remembered Anthony Gerace -- |
| 11:38AM | 9 | **MR. MacKAY:**  Objection.  Calls for hearsay. |
| 11:38AM | 10 | **MR. TRIPI:**  I'm asking what he indicated he |
| 11:38AM | 11 | remembered. |
| 11:38AM | 12 | **THE COURT:**  No.  Sustained. |
| 11:38AM | 13 | **BY MR. TRIPI:** |
| 11:38AM | 14 | Q.   Did Kevin Myszka provide details in an interview that you |
| 11:38AM | 15 | were able to corroborate through a border crossing record? |
| 11:38AM | 16 | A.   Yes. |
| 11:38AM | 17 | Q.   Did that border crossing record establish that Anthony |
| 11:38AM | 18 | Gerace was in Toronto? |
| 11:38AM | 19 | **MR. MacKAY:**  Objection, calls for hearsay. |
| 11:38AM | 20 | **MR. TRIPI:**  Does not.  It's a border crossing record |
| 11:38AM | 21 | that he reviewed. |
| 11:38AM | 22 | **THE COURT:**  Mr. Tripi, please. |
| 11:38AM | 23 | Overruled. |
| 11:38AM | 24 | **THE WITNESS:**  It established that he was in Canada, |
| 11:38AM | 25 | yes. |

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24

11:38AM  1          **BY MR. TRIPI:**

11:38AM  2   Q.  I'm sorry, Toronto is in Canada.

11:39AM  3   A.  Yes.

11:39AM  4   Q.  Now the defendant told you he knew you were conducting an

11:39AM  5   Italian Organized Crime investigation; is that right?

11:39AM  6   A.  Yes.

11:39AM  7   Q.  Now you never told the defendant when you guys worked

11:39AM  8   together that you were conducting an IOC, Italian Organized

11:39AM  9   Crime, investigation, correct?

11:39AM 10   A.  I did not.

11:39AM 11   Q.  Did the defendant ever explain to you how he found out

11:39AM 12   you were conducting an IOC investigation?

11:39AM 13        An IOC investigation, not talking about Ron Serio.

11:39AM 14   A.  No.

11:39AM 15   Q.  Now on cross-examination, you were asked about the

11:39AM 16   defendant's first explanation about why the file, the Ron

11:39AM 17   Serio file, was in his house.

11:39AM 18        And he told you he knew that you were conducting an

11:39AM 19   investigation into Italian Organized Crime, and that he took

11:39AM 20   the Serio file home at retirement to, in his words, verify

11:39AM 21   that he -- everything's on the up and up, or that he did a

11:39AM 22   legitimate investigation, right?

11:39AM 23   A.  Yes.

11:39AM 24   Q.  Does taking the file and removing it from DEA and putting

11:40AM 25   it in his basement in any way help you verify that he did a

11:40AM    1   legitimate investigation?

11:40AM    2   A.   No.

11:40AM    3   Q.   Does it do the opposite of helping you verify that?

11:40AM    4   A.   Yes.

11:40AM    5   Q.   So as you sat in an interview, did you understand the

11:40AM    6   defendant's explanation to be that he took the file out of

11:40AM    7   DEA to a place that no one in the DEA or law enforcement

11:40AM    8   would ever see it so that he could some day show law

11:40AM    9   enforcement that he conducted an legitimate investigation?

11:40AM   10          **MR. MacKAY:**  Objection.

11:40AM   11          **THE COURT:**  Sustained.

11:40AM   12          **BY MR. TRIPI:**

11:40AM   13   Q.   Did his explanation that he did give you make any sense

11:40AM   14   to you?

11:40AM   15   A.   No, that's why I asked him the other question, or asked

11:40AM   16   him about it again.

11:40AM   17          **MR. TRIPI:**  All right.  Ms. Champoux, let's pull down

11:40AM   18   Exhibit 126, and let's go to Exhibit 26E.

11:40AM   19          **BY MR. TRIPI:**

11:41AM   20   Q.   This was shown to you yesterday as we get it up; do you

11:41AM   21   remember this?

11:41AM   22   A.   Yes.

11:41AM   23   Q.   You began to explain yesterday, I think, during cross

11:41AM   24   that this isn't an actual -- that the from email from

11:41AM   25   Mr. Bongiovanni to Mr. Yensan is not the email from DARTS.

11:41AM  1   Can you describe that again for the jury?

11:41AM  2   A.  Yes.  So this email as it appears is a forwarded DARTS

11:41AM  3   email from Mr. Bongiovanni to Greg Yensan who was at the time

11:41AM  4   his supervisor.

11:41AM  5   Q.  And do you notice other than sent from my iPhone, it's

11:41AM  6   forwarded to Greg Yensan without comment?

11:41AM  7   A.  Yes.

11:41AM  8   Q.  And it's forwarded on what date?  The sent date on the

11:42AM  9   top.

11:42AM  10  A.  I see it, August 21st, 2018.

11:42AM  11  Q.  Is that about a month after the July 20th, 2018 proffer

11:42AM  12  that you and Special Agent Casullo and several others were in

11:42AM  13  with Ron Serio?

11:42AM  14  A.  Yes.

11:42AM  15  Q.  Is that about three weeks after Special Agent Casullo

11:42AM  16  reported Bongiovanni's race-related comments?

11:42AM  17  A.  Yes.

11:42AM  18          MR. TRIPI:  And, Ms. Champoux, if we can now go to

11:42AM  19  sort of the -- blow this up so he can see it maybe better.

11:42AM  20          BY MR. TRIPI:

11:42AM  21  Q.  Now we're moving to the lower part of the document.  In

11:42AM  22  the to line, I'm sorry, in the from line, the forwarding of

11:42AM  23  the DARTS email indicates that this is based upon an

11:42AM  24  investigative overlap created by you.  What does that mean?

11:42AM  25  A.  So if you look at the -- if we just use the first Trinity

11:43AM    1    item as an example, that means that I entered that phone

11:43AM    2    number because I wanted to subpoena the tolls and the

11:43AM    3    subscriber DARTS forces you to deconflict it first.  And that

11:43AM    4    deconfliction overlapped with the same phone number appearing

11:43AM    5    in C2-13-0026 in the DARTS database.

11:43AM    6    Q.  So now yesterday you were asked about this C2-16-0087

11:43AM    7    file that was for you, and you said you thought was either

11:43AM    8    Jarrett Guy or Joseph Bella; do you remember that?

11:43AM    9    A.  Yes.

11:43AM    10   Q.  Now you were asking Mr. Serio about Jarrett Guy in 2017,

11:43AM    11   do you recall that in your professors with him?

11:43AM    12   A.  Yes.

11:43AM    13   Q.  Does that help you recall whether it was Joseph Bella or

11:43AM    14   Jarrett Guy on that file, C2-16-0087?

11:43AM    15   A.  I believe it was Joseph Bella.

11:43AM    16   Q.  Okay.  So your file that you had on Joseph Bella had an

11:43AM    17   overlap with this number, came up in both your file and the

11:44AM    18   Wayne Anderson case file; is that right?

11:44AM    19   A.  Yes.

11:44AM    20   Q.  And this is why the DARTS is getting generated?

11:44AM    21   A.  Yes.

11:44AM    22   Q.  And you wrote in the comments, what was -- withdrawn.

11:44AM    23   What were the remarks?

11:44AM    24   A.  My remarks?

11:44AM    25   Q.  Did you write your own remarks?

11:44AM  1    A.  Yes.

11:44AM  2    Q.  Okay.  What did you write?

11:44AM  3    A.  Numbers associated with Ron Serio DTO.

11:44AM  4    Q.  And if we look to Mr. Bongiovanni's case, what did Justin

11:44AM  5    Borst write in the remarks?

11:44AM  6    A.  Number part of ongoing narcotics investigation in contact

11:44AM  7    with target number 716-830-3226 per S.A. Bongiovanni.

11:44AM  8    Q.  Per S.A. Bongiovanni; what does that indicate?

11:44AM  9    A.  If those -- he only knows those remarks because he

11:44AM  10   received the information from Mr. Bongiovanni.

11:45AM  11   Q.  So Bongiovanni told Borst?

11:45AM  12   A.  Yes.

11:45AM  13        **MR. TRIPI:**  Okay.  Let's zoom out of that, and let's

11:45AM  14   scroll down a little bit further.  And let's stop there.  And

11:45AM  15   if can we zoom in on this one, please.

11:45AM  16        **BY MR. TRIPI:**

11:45AM  17   Q.  We're at page 2 of the document, and we're looking at a

11:45AM  18   Trinity item for 716-812-0664.  We've looked at that number

11:45AM  19   several times.  Is that associated with Michael Masecchia?

11:45AM  20   A.  Yes.

11:45AM  21        **MR. TRIPI:**  Ms. Champoux, can we go to -- just let's

11:45AM  22   verify it.  Let's pull up Exhibit 8A at page 134 next to this.

11:45AM  23        **BY MR. TRIPI:**

11:46AM  24   Q.  And so we see at the top subscription information,

11:46AM  25   there's a different number being subpoenaed in 13-0026 at the

11:46AM   1   top, right?

11:46AM   2   A.  Yes.

11:46AM   3   Q.  But in the account details, the account information we

11:46AM   4   have 812-0664 associated with Masecchia; is that right?

11:46AM   5   A.  Yes.

11:46AM   6        MR. TRIPI:  Ms. Champoux, can we go up a prior page

11:46AM   7   so I can check exhibit -- let's go to 133.  And let's scroll

11:46AM   8   back up a little bit higher on 26E.  Stay there on 8A.  Let's

11:46AM   9   go up.  All right.

11:46AM   10       Thank you for that.  Okay.  We can take down

11:46AM   11   Exhibit 8A.  Keep up 26E.  So again, we can zoom in on this.

11:47AM   12        BY MR. TRIPI:

11:47AM   13   Q.  What's the comment that you wrote in your DARTS

11:47AM   14   deconfliction for that phone number August 21st, 2018?

11:47AM   15   A.  Numbers associated with Ron Serio DTO.

11:47AM   16   Q.  And we just looked back at Exhibit 8A.  At the time, you

11:47AM   17   had not reviewed Exhibit 8A, the actual Wayne Anderson file

11:47AM   18   in August?

11:47AM   19   A.  No, I had not.

11:47AM   20   Q.  Okay.  Now you know that there was -- that that number

11:47AM   21   was associated with Mike Masecchia though, right?

11:47AM   22   A.  Yes.

11:47AM   23   Q.  And if we look at the entry for March 20th, 2013, what

11:47AM   24   were the remarks that Justin Borst wrote into DARTS per

11:47AM   25   Special Agent Bongiovanni for that Masecchia number?

11:47AM   1   A.   Number part of ongoing narcotics investigation in contact

11:48AM   2   with target number 716-830-3226.

11:48AM   3   Q.   And what did he write, or what did Borst write again in

11:48AM   4   another DARTS deconfliction on April 19th, 2013?

11:48AM   5   A.   Number part of ongoing narcotics investigation belonging

11:48AM   6   to Michael Masecchia per S.A. Bongiovanni.

11:48AM   7   Q.   So, almost a year in August of 2018, about ten months or

11:48AM   8   so before your June 2019 interview of Bongiovanni, he was

11:48AM   9   getting DARTS deconflictions related to Ron Serio and Mike

11:48AM   10  Masecchia through entries that you were putting into DARTS?

11:48AM   11  A.   Yes.

11:48AM   12  Q.   He never said during your interview when you asked him

11:48AM   13  how he knew of your IOC investigation, he never said:  I saw

11:48AM   14  your DARTS entry, so I knew you were investigating Italian

11:48AM   15  Organized Crime.  Did he?

11:49AM   16  A.   No.

11:49AM   17  Q.   Is this an example of the defendant's deconflictions

11:49AM   18  working to give him notice through DARTS?

11:49AM   19  A.   Yes.

11:49AM   20       **MR. MacKAY:**  Objection.

11:49AM   21       **THE COURT:**  Sustained.

11:49AM   22       **MR. TRIPI:**  Judge, can we approach on that?

11:49AM   23       **THE COURT:**  Sure.

11:49AM   24       (Sidebar discussion held on the record.)

11:49AM   25       **MR. TRIPI:**  The plain language of my question wasn't

| | | |
|---|---|---|
| 11:49AM | 1 | argumentative or accusatory at all.  I asked him:  Is this |
| 11:49AM | 2 | DARTS working for the numbers Bongiovanni put in? |
| 11:49AM | 3 | I don't understand what's object -- he might not like |
| 11:49AM | 4 | my tone of voice, but I don't understand what the plain |
| 11:49AM | 5 | language is that's objectionable.  This is DARTS working as |
| 11:49AM | 6 | it's supposed to.  I don't --  I just -- |
| 11:49AM | 7 | **THE COURT:**  I don't think there was a question. |
| 11:49AM | 8 | **MR. MacKAY:**  Judge, the objection was it's |
| 11:50AM | 9 | argumentative because it's argumentative in going to the |
| 11:50AM | 10 | ultimate issue of whether DARTS is working in line with the |
| 11:50AM | 11 | theory they're setting up. |
| 11:50AM | 12 | **THE COURT:**  Yeah.  So that's -- that's what I |
| 11:50AM | 13 | understood the question to be, as well.  Is DARTS working the |
| 11:50AM | 14 | way the defendant intended DARTS to. |
| 11:50AM | 15 | **MR. TRIPI:**  That's not what I said. |
| 11:50AM | 16 | **THE COURT:**  Well -- |
| 11:50AM | 17 | **MR. TRIPI:**  I'm going to re-ask.  I'll take a shot at |
| 11:50AM | 18 | reasking. |
| 11:50AM | 19 | (End of sidebar discussion.) |
| 11:50AM | 20 | **THE COURT:**  So the objection is sustained. |
| 11:50AM | 21 | You can ask another question. |
| 11:50AM | 22 | **BY MR. TRIPI:** |
| 11:50AM | 23 | Q.  In this instance, did DARTS work in the manner in which |
| 11:50AM | 24 | it was intended by design of the database to deconflict |
| 11:50AM | 25 | numbers associated with Mike Masecchia and Ron Serio? |

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24

120

11:50AM    1    A.  Yes.

11:50AM    2    Q.  Did the defendant, in August of 2018, get notice through

11:50AM    3    DARTS by this entry?

11:50AM    4    A.  Yes.

11:50AM    5    Q.  So this is an example of DARTS working in the manner in

11:51AM    6    which it's intended, to provide notice between two agents,

11:51AM    7    correct?

11:51AM    8    A.  Yes.

11:51AM    9    Q.  Did the defendant ever come over to you, he still worked

11:51AM    10   at the DEA in August, and say, hey, can I help you with

11:51AM    11   Masecchia and Serio?

11:51AM    12   A.  No.

11:51AM    13          MR. TRIPI:  We can take that down, Ms. Champoux.

11:51AM    14          Can we pull up Government Exhibit 100A.1, and there's

11:51AM    15   DARTS email for -- DARTS email 1-7-2019.

11:51AM    16          BY MR. TRIPI:

11:51AM    17   Q.  Okay.  Now we're back to Exhibit 100A.1.  This is the

11:51AM    18   file materials that were in the defendant's house, scanned,

11:51AM    19   correct?

11:51AM    20   A.  Yes.

11:51AM    21   Q.  And this particular one is labeled DARTS email 01-07-2019

11:52AM    22   scanned into that file, or this exhibit, correct?

11:52AM    23   A.  Yes.

11:52AM    24   Q.  Okay.  So who is Shawn Hoerner?

11:52AM    25   A.  He was an analyst at DEA.

11:52AM    1    Q.  Just like Justin Borst and Steve Bevilacqua whose names

11:52AM    2    we've seen?

11:52AM    3    A.  Yes, same kind of position.  Same position.

11:52AM    4    Q.  Who received this DARTS email from Shawn Hoerner.

11:52AM    5    A.  Anthony Casullo, Angelique Gunton, Nathan Schumaker,

11:52AM    6    Shawn Hoerner's copied again, Amy Wiltse, myself, James

11:52AM    7    McHugh, David Lamp, Joseph Bongiovanni.

11:52AM    8    Q.  And let's scroll down a little bit.  And we see that

11:52AM    9    again it says an investigative overlap was created by, and

11:53AM   10    this one has agent POC, does that mean point of contact?

11:53AM   11    A.  Yes.

11:53AM   12    Q.  And is that Anthony Casullo?

11:53AM   13    A.  Yes.

11:53AM   14          MR. TRIPI:  And can we scroll down a little bit.

11:53AM   15    Just to Trinity item 1 there.

11:53AM   16          BY MR. TRIPI:

11:53AM   17    Q.  On January 7th, 2019, that date was roughly three weeks

11:53AM   18    before Mr. Bongiovanni retired; is that about right?

11:53AM   19    A.  Yes.

11:53AM   20    Q.  And for the Trinity item 1, the request ran by Special

11:53AM   21    Agent Casullo, what were the remarks that Special Agent

11:53AM   22    Casullo put into DARTS when he deconflicted that number?

11:53AM   23    A.  Which date?

11:53AM   24    Q.  Very first one.

11:53AM   25    A.  Phone numbers in contact with Mike Sinatra related to

11:53AM  1   burglary and drug -- or related to a burglary and drug

11:53AM  2   trafficking in Buffalo and Niagara County.

11:53AM  3   Q.  And, so, everybody on that to line that we read earlier,

11:53AM  4   including the defendant, would be able to see that remark?

11:53AM  5   A.  Yes.

11:54AM  6   Q.  Okay.  And just by way of reminder, Michael Sinatra is

11:54AM  7   one of the people who HSI executed a search warrant for on

11:54AM  8   January 28th, 2019; is that right?

11:54AM  9   A.  Yes.

11:54AM  10         MR. TRIPI:  Okay.  Let's scroll down.  Let's go a

11:54AM  11   little bit further down.  Stop right there.

11:54AM  12         BY MR. TRIPI:

11:54AM  13   Q.  Another one I want to look at is this 866-2687 number,

11:54AM  14   we've seen that number earlier today.  But does Casullo write

11:54AM  15   the same remark essentially in relation to that number?

11:54AM  16   A.  Yes.  It appears that he entered a list of numbers, and

11:54AM  17   then, you know, whether you enter one number or 15, you put

11:54AM  18   the remarks in once, and then it gets associated with however

11:54AM  19   many you entered.

11:54AM  20   Q.  And this one is what triggers the email to Bongiovanni;

11:55AM  21   is that a correct understanding of this record?

11:55AM  22   A.  This one would trigger that email, yes.

11:55AM  23   Q.  Can you circle for the jury why through the DARTS system

11:55AM  24   Mr. Bongiovanni's notified?

11:55AM  25         Show them which -- which file creates the deconfliction

11:55AM    1    here.

11:55AM    2    A.  So, the number that you marked was entered in DARTS with

11:55AM    3    that case number at some point.

11:55AM    4    Q.  And by that point in time, it had been entered into DARTS

11:55AM    5    in March of 2013?

11:55AM    6    A.  Yes.

11:55AM    7    Q.  So, roughly a little less than six years earlier?

11:55AM    8    A.  Yes.

11:55AM    9    Q.  And what were the remarks that Justin Borst wrote into

11:55AM   10    DARTS in the remarks section?

11:55AM   11    A.  Number part of ongoing narcotics investigation in contact

11:55AM   12    with target number 716-830-3226 per S.A. Bongiovanni.

11:56AM   13         **MR. TRIPI:**  Okay.  Now, Ms. Champoux, let's go and

11:56AM   14    pull up Exhibit 109F.  And could we go to the entry for

11:56AM   15    Hot Dog?

11:56AM   16         **BY MR. TRIPI:**

11:56AM   17    Q.  We looked at this yesterday, this is Mr. Bongiovanni's

11:56AM   18    phone contacts from his personal phone that you acquired

11:56AM   19    during the search, correct?

11:56AM   20    A.  Yes.

11:56AM   21    Q.  Is that the same phone number?

11:56AM   22    A.  Yes.

11:56AM   23         **MR. TRIPI:**  Ms. Champoux, please pull up Exhibit 393.

11:57AM   24         **BY MR. TRIPI:**

11:57AM   25    Q.  Is this the photo with Hot Dog with his hand on

| | | |
|---|---|---|
| 11:57AM | 1 | Todaro Sr.'s shoulder? |
| 11:57AM | 2 | A.  Yes. |
| 11:57AM | 3 | **MR. TRIPI:**  Let's go to Exhibit 8A at 347. |
| 11:57AM | 4 | **BY MR. TRIPI:** |
| 11:57AM | 5 | Q.  Is this the administrative subpoena to AT&T in file |
| 11:57AM | 6 | C2-13-0026 that resulted in that phone number going into |
| 11:57AM | 7 | DARTS? |
| 11:57AM | 8 | A.  I think this is the return for that subpoena, but yes, |
| 11:57AM | 9 | that's all connected. |
| 11:57AM | 10 | Q.  Same phone number, same person? |
| 11:57AM | 11 | A.  Yes. |
| 11:57AM | 12 | Q.  And you had indicated yesterday, I think, that you had |
| 11:57AM | 13 | reviewed a border crossing where the defendant and Hot Dog or |
| 11:57AM | 14 | Paul Francoforte had crossed into Canada together? |
| 11:57AM | 15 | A.  Returning from Canada. |
| 11:57AM | 16 | Q.  Oh, my fault.  Okay. |
| 11:58AM | 17 | You were asked yesterday about phone records and if you |
| 11:58AM | 18 | looked at some phone records for Mr. Bongiovanni; do you |
| 11:58AM | 19 | remember that? |
| 11:58AM | 20 | A.  Yes. |
| 11:58AM | 21 | **MR. TRIPI:**  Ms. Champoux, let's pull up Exhibit 358 |
| 11:58AM | 22 | which is in evidence. |
| 11:58AM | 23 | Let's scroll down just a little bit. |
| 11:58AM | 24 | **BY MR. TRIPI:** |
| 11:58AM | 25 | Q.  Do you understand this to be the bills related to |

| | | |
|---|---|---|
| 11:58AM | 1 | Mr. Bongiovanni's DEA cell phone beginning back in 2013? |
| 11:58AM | 2 | A.  Yes. |
| 11:58AM | 3 | **MR. TRIPI:**  Let's scroll down a little bit. |
| 11:59AM | 4 | Ms. Champoux, we're going to stay in this year 2013, and let's |
| 11:59AM | 5 | go to page number 10.  And go to December 2nd at 8:07 p.m. |
| 11:59AM | 6 | **BY MR. TRIPI:** |
| 11:59AM | 7 | Q.  Do you see a call, a ten-minute call between the |
| 11:59AM | 8 | defendant and Hot Dog on December 2nd, 2013? |
| 11:59AM | 9 | A.  Yes, it's an incoming call. |
| 11:59AM | 10 | Q.  And is that about -- is that while the Wayne Anderson |
| 11:59AM | 11 | file was open, C2-13-0026? |
| 11:59AM | 12 | A.  It was still open. |
| 11:59AM | 13 | Q.  In your narcotics investigations, do you call subjects or |
| 11:59AM | 14 | targets of your investigation that you put into DARTS? |
| 11:59AM | 15 | **MR. MacKAY:**  Objection. |
| 11:59AM | 16 | **THE COURT:**  Sustained. |
| 12:00PM | 17 | **MR. TRIPI:**  Let's go to -- I'd like to move into |
| 12:00PM | 18 | February of 2014 on this record.  Let's move down to page 42. |
| 12:00PM | 19 | And go to the top for a moment.  Can you go up another page. |
| 12:00PM | 20 | **BY MR. TRIPI:** |
| 12:00PM | 21 | Q.  The way these bills are printed, you basically have to |
| 12:00PM | 22 | scroll through the whole year to see the date in the first, |
| 12:00PM | 23 | right? |
| 12:00PM | 24 | A.  Yes. |
| 12:00PM | 25 | Q.  As we get to page 42 here, have we gone through a couple |

| | | |
|---|---|---|
| 12:00PM | 1 | years already? |
| 12:00PM | 2 | A.  Yes. |
| 12:00PM | 3 | Q.  So we're gonna go to an entry February 21st, 2014 at |
| 12:01PM | 4 | 12:29 p.m.  Do you see another call between the defendant and |
| 12:01PM | 5 | Paul Francoforte on the record? |
| 12:01PM | 6 | A.  Yes.  There's an outgoing call for one minute, and then |
| 12:01PM | 7 | an oncoming call for 11 minutes. |
| 12:01PM | 8 | Q.  Right below it, correct? |
| 12:01PM | 9 | A.  Yes. |
| 12:01PM | 10 | Q.  Let's stay in that same year, and let's go to page 48. |
| 12:01PM | 11 | And we're going to go to March 6th at 12:47 p.m.  Do you see |
| 12:01PM | 12 | another call between the defendant and Paul Francoforte? |
| 12:01PM | 13 | A.  Yes, incoming call for 11 minutes. |
| 12:02PM | 14 | Q.  By incoming call, you mean Francoforte's calling the |
| 12:02PM | 15 | defendant? |
| 12:02PM | 16 | A.  Yes. |
| 12:02PM | 17 | Q.  Let's stay in that same year, let's go to page number 50. |
| 12:02PM | 18 | And March 11th at 3:28 p.m.  Do you see another call from |
| 12:02PM | 19 | Francoforte to the defendant on that day? |
| 12:02PM | 20 | A.  Yes. |
| 12:02PM | 21 | Q.  For how long? |
| 12:02PM | 22 | A.  Six minutes. |
| 12:02PM | 23 | Q.  We'll stay in that same year, let's go to page 52.  And |
| 12:02PM | 24 | I'm looking for March 19th at 8:28 p.m.  do you see another |
| 12:02PM | 25 | call from Francoforte there? |

| | | |
|---|---|---|
| 12:02PM | 1 | A.  Yes. |
| 12:02PM | 2 | Q.  For how long? |
| 12:02PM | 3 | A.  Five minutes. |
| 12:02PM | 4 | Q.  For all these calls, the Wayne Anderson file/Ron Serio |
| 12:03PM | 5 | file is still open, and the DEA -- the defendant has that |
| 12:03PM | 6 | file open still, correct? |
| 12:03PM | 7 | A.  Yes. |
| 12:03PM | 8 | Q.  Okay.  Let's go to that same year, let's go to page 77. |
| 12:03PM | 9 | May 21, 2014 at 7:10 p.m.  5/21.  And do we see another |
| 12:03PM | 10 | incoming call from Hot Dog to the defendant? |
| 12:03PM | 11 | A.  Yes. |
| 12:03PM | 12 | Q.  How long is that one? |
| 12:03PM | 13 | A.  Two minutes. |
| 12:03PM | 14 | Q.  Let's go to May 23rd, 2014 at 4:06 p.m., that should be |
| 12:03PM | 15 | page 77 as well.  Do we see another incoming call from |
| 12:03PM | 16 | Hot Dog to the defendant on that day? |
| 12:03PM | 17 | A.  Yes, for 13 minutes. |
| 12:03PM | 18 | Q.  And again, file C2-13-0026 is still open, correct? |
| 12:03PM | 19 | A.  Yes. |
| 12:03PM | 20 | Q.  Let's go to page 85, June 17th, 2014, at 4:38 p.m.  Is |
| 12:04PM | 21 | that another call from Hot Dog to the defendant on that day? |
| 12:04PM | 22 | A.  Yes. |
| 12:04PM | 23 | Q.  And that one's approximately one minute? |
| 12:04PM | 24 | A.  Yes. |
| 12:04PM | 25 | Q.  And do we have another one at 4:50? |

12:04PM   1   A.  Yes, for one minute.

12:04PM   2   Q.  Let's go to page 87, June 21st, 2014 at 3:15 p.m.  Is

12:04PM   3   this another incoming call from Hot Dog to the defendant?

12:04PM   4   A.  Yes, for six minutes.

12:04PM   5   Q.  Is file C2-13-0026 still open?

12:04PM   6   A.  Yes.

12:04PM   7   Q.  Let's go to page number 90.  June 25th, 2014, at -- I'm

12:05PM   8   sorry, 3:33 p.m.  Is that another incoming call from Hot Dog

12:05PM   9   to the defendant?

12:05PM  10   A.  Yes, for three minutes.

12:05PM  11   Q.  Let's go to page 91.  I'm looking for June 27th at

12:05PM  12   9:45 a.m.

12:05PM  13   A.  I see it.

12:05PM  14   Q.  Is that another call from Hot Dog to the defendant?

12:05PM  15   A.  Yes, for ten minutes.

12:05PM  16   Q.  And let's go to August 18th, 2014, that should be

12:05PM  17   page 111, at 12 p.m.  Do you see that call?

12:05PM  18   A.  I do.

12:05PM  19   Q.  And was that about a one minute outgoing call from the

12:05PM  20   defendant?

12:05PM  21   A.  Yes.

12:06PM  22   Q.  Let's go to August 24th, 2014, 4:25 p.m., that should be

12:06PM  23   at page 115.

12:06PM  24        **MR. MacKAY:**  Judge, I'm going to object at some point

12:06PM  25   to cumulativeness under 403.

| | | |
|---|---|---|
| 12:06PM | 1 | **THE COURT:**  I've been waiting for that. |
| 12:06PM | 2 | Mr. Tripi, how long are we going to do this? |
| 12:06PM | 3 | **MR. TRIPI:**  Can we step up to let you know. |
| 12:06PM | 4 | **THE COURT:**  Come on up. |
| 12:06PM | 5 | (Sidebar discussion held on the record.) |
| 12:06PM | 6 | **MR. TRIPI:**  They're all different calls, so each one |
| 12:06PM | 7 | is not cumulative.  They're all through the -- I'm not even |
| 12:06PM | 8 | through the time he's got the file open yet.  Not even through |
| 12:06PM | 9 | 2015 yet, Judge.  And so this is important evidence.  He's |
| 12:06PM | 10 | subpoenaing a number of a person who we just saw the photo |
| 12:06PM | 11 | and -- |
| 12:06PM | 12 | **THE COURT:**  At some point -- at some point -- |
| 12:06PM | 13 | **MR. TRIPI:**  There's 50 calls, I'm through 17 of them. |
| 12:06PM | 14 | **THE COURT:**  You're going to go through all 50. |
| 12:07PM | 15 | **MR. TRIPI:**  I think I'm moving quickly through them. |
| 12:07PM | 16 | **THE COURT:**  Mr. Tripi, if you think this is |
| 12:07PM | 17 | effective, you go right ahead. |
| 12:07PM | 18 | **MR. TRIPI:**  I do, Judge. |
| 12:07PM | 19 | **THE COURT:**  You go right ahead. |
| 12:07PM | 20 | **MR. TRIPI:**  Thank you. |
| 12:07PM | 21 | (End of sidebar discussion.) |
| 12:07PM | 22 | **THE COURT:**  Okay.  We're going to keep going. |
| 12:07PM | 23 | **MR. TRIPI:**  Okay.  September 22nd, 2014 at 7:51 p.m. |
| 12:07PM | 24 | Let's go to page 124.  I think 7:51 p.m.  9/22.  Yeah. |
| 12:07PM | 25 | **BY MR. TRIPI:** |

| | | |
|---|---|---|
| 12:07PM | 1 | Q.  Is that another call from Hot Dog to the defendant? |
| 12:07PM | 2 | A.  Yes. |
| 12:07PM | 3 | Q.  For how long? |
| 12:07PM | 4 | A.  Two minutes. |
| 12:07PM | 5 | Q.  And let's go to page 127.  And here September 24th, 2014, |
| 12:07PM | 6 | I'm looking for 6:05 p.m.  Is that another call from Hot Dog |
| 12:07PM | 7 | to the defendant? |
| 12:07PM | 8 | A.  Yes. |
| 12:07PM | 9 | Q.  That one's for one minute? |
| 12:08PM | 10 | A.  Yes. |
| 12:08PM | 11 | Q.  Let's go to September 27th, 2014.  This should be page |
| 12:08PM | 12 | 127.  By this date, is the Wayne Anderson file, the file that |
| 12:08PM | 13 | Mr. Bongiovanni subpoenaed Francoforte's number, still open? |
| 12:08PM | 14 | A.  Yes. |
| 12:08PM | 15 | Q.  And how long is this call on September 27th? |
| 12:08PM | 16 | A.  It's an outgoing call for three minutes. |
| 12:08PM | 17 | Q.  So the defendant called Hot Dog? |
| 12:08PM | 18 | A.  Yes. |
| 12:08PM | 19 | Q.  Let's go to page 165, this should be January 7th, 2015. |
| 12:08PM | 20 | At 9:51 p.m. |
| 12:08PM | 21 | **MR. TRIPI:**  January 7th, 2015, second one from the |
| 12:09PM | 22 | top, Karen.  Thank you. |
| 12:09PM | 23 | **BY MR. TRIPI:** |
| 12:09PM | 24 | Q.  And is this a call from the defendant to Hot Dog? |
| 12:09PM | 25 | A.  Yes, for six minutes. |

12:09PM    1    Q. And the Wayne Anderson file was still open, that was

12:09PM    2    closed January 28th, 2015; is that right?

12:09PM    3    A. Yes.

12:09PM    4    Q. Do they continue to talk after that? Let's look at

12:09PM    5    page 186, March 17th, 2015 at 1:29 p.m. Is that an outgoing

12:09PM    6    call from the defendant to Hot Dog for eight minutes?

12:09PM    7    A. Yes.

12:09PM    8    Q. Let's go to March 25th, 2015, at page 198. I'm looking

12:10PM    9    for April 25th at 6:23 p.m. Does the defendant call Hot Dog

12:10PM   10    again?

12:10PM   11    A. Yes.

12:10PM   12    Q. For how long?

12:10PM   13    A. Two minutes.

12:10PM   14    Q. Let's go to April 26th, at 2:25 p.m. Does the defendant

12:10PM   15    call Hot Dog again?

12:10PM   16    A. Yes.

12:10PM   17       **MR. TRIPI:** Ms. Champoux, let's just search now that

12:10PM   18    number, 716-866-2687, can we do that? How many -- may the

12:10PM   19    record reflect the search indicated there are 50 entries.

12:10PM   20       And, Ms. Champoux, can you just keep clicking through

12:10PM   21    them and we'll go through it that way.

12:12PM   22       May the record reflect we've clicked through 50 of

12:12PM   23    them.

12:12PM   24       **BY MR. TRIPI:**

12:12PM   25    Q. Is it your understanding that the last entry, let's go to

12:12PM   1   page 558 in the bills here, so we're in 19013167 bills pdf of

12:12PM   2   Exhibit 358.

12:12PM   3       Is it your understanding the last entry is May 9th, 2018,

12:12PM   4   at 2:26 p.m.

12:12PM   5   A.  That appears to be, yes.

12:12PM   6   Q.  For this portion of the records?

12:12PM   7   A.  Yes.

12:12PM   8   Q.  And is that an eight-minute call?

12:12PM   9   A.  It's an eight-minute incoming phone call.

12:12PM   10  Q.  Okay.  So we've covered from 2013 to 2018.  And just to

12:12PM   11  summarize, there was communication through all of those

12:12PM   12  years?

12:12PM   13  A.  Yes.

12:12PM   14       **MR. TRIPI:**  And, Ms. Champoux, if we close out of

12:12PM   15  that, and briefly open the Volte spreadsheet.

12:13PM   16       **BY MR. TRIPI:**

12:13PM   17  Q.  We're opening an Excel spreadsheet now, 190131677,

12:13PM   18  V-O-L-T-E.

12:13PM   19       Special Agent Ryan is it your understanding that when

12:13PM   20  records are of a certain age, only bills like we looked at in

12:13PM   21  those pdfs are available, but closer in time to the subpoena,

12:13PM   22  sometimes call detail records become available?

12:13PM   23  A.  Yes.

12:13PM   24  Q.  And is that a what a Volte spreadsheet is?

12:13PM   25  A.  For Verizon, yes.

12:13PM  1   Q.  For Verizon.  Thank you.

12:13PM  2         **MR. TRIPI:**  I just want to look at one here.

       3   Ms. Champoux, can we go to January 28th, 2019.  Can you expand

12:14PM  4   some of these columns first, expand B and C so they can see.

12:14PM  5   Can you expand B.  All right.  Thank you.

12:14PM  6         Now go down to January 28th, 2019, please.  We're

12:14PM  7   past it.

12:14PM  8         **BY MR. TRIPI:**

12:14PM  9   Q.  Okay.  Do you see an incoming call from Hot Dog to

12:14PM  10  Mr. Bongiovanni's DEA phone that day?

12:14PM  11  A.  I'm trying to figure out the direction.

12:14PM  12  Q.  Do you need to see the top?

12:14PM  13        **MR. TRIPI:**  Go back up to the top, Ms. Champoux, so

12:15PM  14  he can see what E and F are.  Scroll all the way to the top.

12:15PM  15        **THE WITNESS:**  Okay.  So, E is the call number column,

12:15PM  16  thank you.

12:15PM  17        **MR. TRIPI:**  Now go back down, Ms. Champoux, to

12:15PM  18  January 28th, 2019.  It should be 1407 GMT.

12:15PM  19        **THE COURT:**  Folks, we're going to take our second

12:16PM  20  break now.

12:16PM  21        Please remember my instructions about not talking

12:16PM  22  about the case and not making up your mind.  We'll see you

12:16PM  23  back here in about ten or 15 minutes.

12:16PM  24        (Jury excused at 12:16 p.m.)

12:16PM  25        **THE COURT:**  Anything before we break from the

| | | |
|---|---|---|
| 12:16PM | 1 | defense? |
| 12:16PM | 2 | **MR. MacKAY:**  No, Your Honor. |
| 12:16PM | 3 | **THE COURT:**  From the government? |
| 12:16PM | 4 | **MR. TRIPI:**  No, Your Honor. |
| 12:16PM | 5 | **THE COURT:**  Okay.  See you in a few minutes. |
| 12:16PM | 6 | **THE CLERK:**  All rise. |
| 12:16PM | 7 | (Off the record at 12:16 p.m.) |
| 12:32PM | 8 | (Back on the record at 12:32 p.m.) |
| 12:32PM | 9 | (Jury not present.) |
| 12:32PM | 10 | **THE CLERK:**  All rise. |
| 12:32PM | 11 | **THE COURT:**  Please be seated. |
| 12:32PM | 12 | **THE CLERK:**  We are back on the record for the |
| 12:32PM | 13 | continuation of the jury trial in case number 19-cr-227, |
| 12:32PM | 14 | United States of America versus Joseph Bongiovanni. |
| 12:33PM | 15 | All counsel and parties are present. |
| 12:33PM | 16 | **THE COURT:**  Okay.  Are we ready to go? |
| 12:33PM | 17 | **MR. TRIPI:**  Yes, Your Honor, thank you. |
| 12:33PM | 18 | **THE COURT:**  Anything? |
| 12:33PM | 19 | **MR. MacKAY:**  No. |
| 12:33PM | 20 | **THE COURT:**  Great.  Let's bring them in. |
| 12:34PM | 21 | (Jury seated at 12:34 p.m.) |
| 12:34PM | 22 | **THE COURT:**  The record will reflect that all our |
| 12:34PM | 23 | jurors are present. |
| 12:34PM | 24 | I remind the witness he's still under oath. |
| 12:34PM | 25 | Mr. Tripi, you may continue. |

| | | |
|---|---|---|
| 12:34PM | 1 | **MR. TRIPI:**  Thank you. |
| 12:34PM | 2 | I'd like to show you one more call related to Paul |
| 12:34PM | 3 | Francoforte, and we were having a little trouble before with |
| 12:34PM | 4 | the spreadsheet.  I think we got that squared away. |
| 12:34PM | 5 | I thank the Court and the jury for its indulgence. |
| 12:34PM | 6 | Let's pull that up, Ms. Champoux, the 19013167 |
| 12:34PM | 7 | V-O-L-T-E spreadsheet.  We've honed in on an entry at row 2511 |
| 12:35PM | 8 | dated January 28th, 2019. |
| 12:35PM | 9 | **BY MR. TRIPI:** |
| 12:35PM | 10 | Q.  And you've oriented yourself to this spreadsheet now. |
| 12:35PM | 11 | Can you tell the jury what this call is? |
| 12:35PM | 12 | A.  It's a call from 866-2687 to 818-0966 for 15 minutes. |
| 12:35PM | 13 | Q.  So that's Francoforte calling to Bongiovanni? |
| 12:35PM | 14 | A.  Yes. |
| 12:35PM | 15 | Q.  For 15 minutes or seconds? |
| 12:35PM | 16 | A.  Actually, no, that's probably seconds.  Now that I see |
| 12:35PM | 17 | the rest of those numbers without seeing the top. |
| 12:35PM | 18 | Q.  That same day, January 28th, 2019, is that the same day |
| 12:35PM | 19 | that HSI executed a search warrant at Michael Sinatra's |
| 12:35PM | 20 | residence? |
| 12:35PM | 21 | A.  Yes. |
| 12:35PM | 22 | Q.  Is there a familial relationship between Paul Francoforte |
| 12:35PM | 23 | and Michael Sinatra? |
| 12:35PM | 24 | A.  Yes. |
| 12:35PM | 25 | Q.  And what is that relationship? |

| | | |
|---|---|---|
| 12:35PM | 1 | A.  Michael Sinatra is married to Paul Francoforte wife's |
| 12:36PM | 2 | daughter. |
| 12:36PM | 3 | Q.  Is there any explanation documented in any report in this |
| 12:36PM | 4 | defendant's file, C2-13-0026, explaining Paul Francoforte's |
| 12:36PM | 5 | connection to anyone in that file? |
| 12:36PM | 6 | A.  None that I saw, no. |
| 12:36PM | 7 | **MR. TRIPI:**  You can take that down, Ms. Champoux. |
| 12:36PM | 8 | **BY MR. TRIPI:** |
| 12:36PM | 9 | Q.  Yesterday you were shown Exhibit 72A-55. |
| 12:36PM | 10 | **MR. TRIPI:**  Can we pull that up very briefly.  And I |
| 12:36PM | 11 | think -- you can zoom in on 14, if we could. |
| 12:36PM | 12 | **BY MR. TRIPI:** |
| 12:36PM | 13 | Q.  Mr. MacKay directed you to a person in row number 14, |
| 12:36PM | 14 | first name Wayne; do you remember that? |
| 12:36PM | 15 | A.  Yes. |
| 12:36PM | 16 | Q.  In this -- in this case in the investigation you |
| 12:37PM | 17 | conducted, other than Wayne Anderson, did you identify any |
| 12:37PM | 18 | Wayne that was connected to Joe Bongiovanni? |
| 12:37PM | 19 | A.  No. |
| 12:37PM | 20 | Q.  Did you identify any Wayne that had any connection to Lou |
| 12:37PM | 21 | Selva? |
| 12:37PM | 22 | A.  No. |
| 12:37PM | 23 | Q.  Did you identify any Wayne other than Wayne Anderson that |
| 12:37PM | 24 | had any connection with Anthony Gerace? |
| 12:37PM | 25 | **MR. MacKAY:**  Objection to this line of questioning at |

12:37PM    1    this point as relevant to what's connected to Joe Bongiovanni.

12:37PM    2            THE COURT:  Yeah, I agree.  What's the point,

12:37PM    3    Mr. Tripi?

12:37PM    4            MR. TRIPI:  I'll withdraw as to Bongiovanni.  I'll

12:37PM    5    re-ask it.

12:37PM    6            BY MR. TRIPI:

12:37PM    7    Q.  Did you identify any other Wayne that had a connection to

12:37PM    8    Anthony Gerace other than Wayne Anderson?

12:37PM    9            MR. MacKAY:  Objection.

12:37PM   10            THE COURT:  Yeah, sustained.  I don't understand what

12:37PM   11    the point is.  How do we know this Wayne is connected to

12:37PM   12    anybody -- there's thousands, maybe millions of people in this

12:37PM   13    world named Wayne, aren't there?

12:37PM   14            MR. TRIPI:  I think there's a logical inference to be

12:37PM   15    drawn from the question, Judge, but if the Court disagrees,

12:37PM   16    I'll move on.

12:37PM   17            THE COURT:  Yeah, please.

12:37PM   18            BY MR. TRIPI:

12:37PM   19    Q.  I'll ask it one different way.  The only Wayne Anderson

12:38PM   20    identified in this investigation is the Wayne Anderson that's

12:38PM   21    file title C2-13-0026; is that right?

12:38PM   22    A.  Yes.

12:38PM   23            MR. TRIPI:  We can take that down.  Ms. Champoux, can

12:38PM   24    we pull up Exhibit 310D.

12:38PM   25            BY MR. TRIPI:

| | | |
|---|---|---|
| 12:38PM | 1 | Q.  Those were the text messages that you reviewed all day |
| 12:38PM | 2 | yesterday essentially; do you recall that? |
| 12:38PM | 3 | A.  I do. |
| 12:38PM | 4 | Q.  Yesterday, Mr. MacKay cross-examined you about |
| 12:38PM | 5 | communications and gaps in communication in the text |
| 12:38PM | 6 | messages, generally; do you remember that line of |
| 12:38PM | 7 | questioning? |
| 12:38PM | 8 | A.  Yes. |
| 12:38PM | 9 | Q.  Okay.  But you've reviewed at least some of the phone |
| 12:38PM | 10 | records associated with Mr. Gerace and Mr. Bongiovanni; is |
| 12:38PM | 11 | that true? |
| 12:38PM | 12 | A.  Yes. |
| 12:38PM | 13 | Q.  In between those gaps in text messages, did you observe |
| 12:38PM | 14 | phone contact? |
| 12:38PM | 15 | A.  Yes. |
| 12:38PM | 16 | Q.  I'd like to just go through some examples of that. |
| 12:39PM | 17 | **MR. TRIPI:**  We can take this down Ms. Champoux.  And |
| 12:39PM | 18 | let's pull up Government Exhibit 359.  And I'm looking for the |
| 12:39PM | 19 | pdf 190115566 billed calls 2014_2015. |
| 12:39PM | 20 | **BY MR. TRIPI:** |
| 12:39PM | 21 | Q.  And I'd like to -- so it's your understanding that the |
| 12:39PM | 22 | beginning of this begins in 2014, then we go into 2015, do |
| 12:39PM | 23 | you see that? |
| 12:39PM | 24 | A.  Well, is this December 2013 or 2014?  Can I see when this |
| 12:39PM | 25 | bill is due? |

| | | |
|---|---|---|
| 12:39PM | 1 | Q.  I think we have to go to the first batch. |
| 12:39PM | 2 | A.  I think we're at the top page. |
| 12:40PM | 3 | **MR. TRIPI:**  One moment.  Let's zoom out of this, |
| 12:40PM | 4 | Ms. Champoux.  And let's go to billed calls 2012, 2013 for a |
| 12:40PM | 5 | moment.  Go all the way to the bottom. |
| 12:40PM | 6 | **BY MR. TRIPI:** |
| 12:40PM | 7 | Q.  Okay.  So you see the last date there, end of 2013 is |
| 12:40PM | 8 | 12/25? |
| 12:40PM | 9 | A.  Yes. |
| 12:40PM | 10 | Q.  Okay.  So let's go to the next pdf now.  We're still in |
| 12:40PM | 11 | 2013 here? |
| 12:40PM | 12 | A.  12/26/2013. |
| 12:40PM | 13 | Q.  Now you're oriented? |
| 12:40PM | 14 | A.  Yes.  Thank you. |
| 12:40PM | 15 | Q.  You're welcome. |
| 12:40PM | 16 | **MR. TRIPI:**  I'm looking for a call January 10th, |
| 12:40PM | 17 | 2015, Ms. Champoux, and I'd like to go to page 654 of this |
| 12:41PM | 18 | pdf. |
| 12:41PM | 19 | **MR. MacKAY:**  Judge, I'm going to object at this point |
| 12:41PM | 20 | as beyond the scope.  I believe my cross only focused on the |
| 12:41PM | 21 | June 30th cottage time and then I think it's post November |
| 12:41PM | 22 | 2017. |
| 12:41PM | 23 | **MR. TRIPI:**  Judge, I disagree.  I think he |
| 12:41PM | 24 | cross-examined him generally about gaps in communication. |
| 12:41PM | 25 | **THE COURT:**  About? |

12:41PM     1          MR. TRIPI:  Gaps in communication regarding the text

12:41PM     2     messages.

12:41PM     3          THE COURT:  I'll allow it.  I'll allow it.

12:41PM     4          MR. TRIPI:  Looking for a call January 10th

12:41PM     5     between -- okay.  Thank you.  You caught it for me.

12:41PM     6          BY MR. TRIPI:

12:41PM     7     Q.  So we see this is the call detail record we're looking at

12:41PM     8     for Mr. Gerace; do you see that?

12:41PM     9     A.  Yes.

12:41PM     10    Q.  And do you see a number that -- that's associated with

12:41PM     11    Mr. Bongiovanni on January 10th, what is it, 2015 in this

12:41PM     12    record?

12:41PM     13    A.  Yes, that's 7:12 p.m.

12:42PM     14    Q.  And is that an incoming or outgoing call?

12:42PM     15    A.  That is an outgoing call from Mr. Gerace.

12:42PM     16    Q.  So that's from Mr. Gerace to Mr. Bongiovanni

12:42PM     17    January 10th?

12:42PM     18    A.  Yes.

12:42PM     19          MR. TRIPI:  Okay.  If we can go to page 704.  And

12:42PM     20    look at February 16th, at 2:40.

12:42PM     21          BY MR. TRIPI:

12:42PM     22    Q.  Do we see a call there from Mr. Gerace to

12:42PM     23    Mr. Bongiovanni?

12:42PM     24    A.  Yes.  2:45 p.m. for six minutes.

12:42PM     25          MR. TRIPI:  All right.  Now Ms. Champoux, I'd like

| | | |
|---|---|---|
| 12:42PM | 1 | you to go to Exhibit 358 for a moment.  And I'd like you to |
| 12:43PM | 2 | open the bills at the top. |
| 12:43PM | 3 | **BY MR. TRIPI:** |
| 12:43PM | 4 | Q.  We're in Exhibit 358 now.  This is Mr. Bongiovanni's |
| 12:43PM | 5 | billed records, we looked at those earlier; do you see that? |
| 12:43PM | 6 | A.  Yes. |
| 12:43PM | 7 | **MR. TRIPI:**  Ms. Champoux, can we go to page 177. |
| 12:43PM | 8 | Looking for a call that same day, February 16th, 2015. |
| 12:43PM | 9 | **BY MR. TRIPI:** |
| 12:43PM | 10 | Q.  Do you see a call to Mr. Gerace? |
| 12:43PM | 11 | A.  Yes, at 2:40 for one minute. |
| 12:43PM | 12 | Q.  From Mr. Bongiovanni? |
| 12:43PM | 13 | A.  Yes. |
| 12:43PM | 14 | Q.  So that's -- is that an example of them calling each |
| 12:43PM | 15 | other? |
| 12:43PM | 16 | A.  Yes. |
| 12:43PM | 17 | Q.  Two-way communication? |
| 12:43PM | 18 | A.  Yes. |
| 12:43PM | 19 | Q.  Now in your interview with Mr. Bongiovanni, he indicated |
| 12:43PM | 20 | to you the communication was one way? |
| 12:44PM | 21 | A.  Yes, that's correct. |
| 12:44PM | 22 | Q.  I'd like to stay in this exhibit, and walk through a |
| 12:44PM | 23 | couple examples.  Okay? |
| 12:44PM | 24 | **MR. TRIPI:**  Ms. Champoux, if we can go to page 211, |
| 12:44PM | 25 | call June 6th, 2015 at 3:55 p.m. |

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24
142

12:44PM    1          **BY MR. TRIPI:**

12:44PM    2    Q.  Is that an example of a call from Mr. Bongiovanni to

12:44PM    3    Mr. Gerace?

12:44PM    4    A.  Yes.

12:44PM    5    Q.  And what's the duration?

12:44PM    6    A.  Six minutes.

12:44PM    7    Q.  I'd like to stay in the same exhibit.  Let's go to

12:44PM    8    page 212, looking for a call on that day.  June 10th.

12:44PM    9        Is this an example of a nine-minute call June 10th, 2015,

12:44PM   10    from Mr. Bongiovanni to Mr. Gerace?

12:45PM   11    A.  Yes, at 6:29 p.m.

12:45PM   12    Q.  And then you see two calls below that, a call from

12:45PM   13    Mr. Bongiovanni to 903-1654?

12:45PM   14    A.  I see one above to 1654.  Oh, I see it.

12:45PM   15    Q.  Is that 903-1654, is that Lou Selva's phone number?

12:45PM   16    A.  Yes.

12:45PM   17    Q.  Let's go to a call July 19th, it's going to be at

12:45PM   18    page 226, 3:01 p.m.  Is that another example of a call in

12:45PM   19    Exhibit 358 from Mr. Bongiovanni to Mr. Gerace on July --

12:45PM   20    that one's July 19th?

12:46PM   21    A.  Yes, at 3:01 p.m. for six minutes.

12:46PM   22    Q.  I'm looking next for a call July 21st, 2015, it's going

12:46PM   23    to be at page 227.  This will be at 9:30 a.m. on July 21st.

12:46PM   24    9:34 a.m.  Sorry, I misspoke.  Is this another call from

12:46PM   25    Mr. Bongiovanni to Mr. Gerace?

12:46PM    1    A.  Yes, for seven minutes.

12:46PM    2    Q.  I'd like to go to August 1st, 2015.  It's going to be

12:46PM    3    page 234.  It should be at 6:18 p.m.  Is that another example

12:46PM    4    of a call from Mr. Bongiovanni to Mr. Gerace?

12:46PM    5    A.  Yes, for two minutes.

12:46PM    6    Q.  I'd like to go to page 244.  It should be a call at

12:47PM    7    7:25 p.m. on 9/1.  Is that an example of a call

12:47PM    8    September 21st from Mr. Bongiovanni to Mr. Gerace at

12:47PM    9    7:25 p.m.?

12:47PM   10    A.  Yes.

12:47PM   11    Q.  For how long?

12:47PM   12    A.  Two minutes.

12:47PM   13    Q.  I'd like to go to September 15th at 9:58 p.m.  That

12:47PM   14    should be at page 246 at 9:58 p.m.  Is that another example

12:47PM   15    of a call September 12th, 2015 from Mr. Bongiovanni to

12:47PM   16    Mr. Gerace at 9:58 p.m.?

12:47PM   17    A.  Yes.

12:47PM   18    Q.  And that was for a minute?

12:47PM   19    A.  One minute.

12:47PM   20    Q.  Next I'm looking for a call October 23rd, 2015, at

12:48PM   21    12:48 p.m.  That should be at page 258, at 12:48 p.m. on the

12:48PM   22    23rd.  And is that an example of an 11-minute call from

12:48PM   23    Mr. Bongiovanni to Mr. Gerace on that date, October 23rd?

12:48PM   24    A.  Yes.

12:48PM   25    Q.  Do those calls that we've just gone through fill some of

12:48PM   1   the gaps in the text messaging that was in Exhibit 310D?

12:48PM   2   A.  Yes.

12:48PM   3          MR. MacKAY:  Objection, argumentative.

12:48PM   4          MR. TRIPI:  I'm trying to frame it.

12:48PM   5          THE COURT:  No, overruled.

12:48PM   6          BY MR. TRIPI:

12:48PM   7   Q.  Was there also a gap in texts in the text thread that you

12:48PM   8   looked at from roughly November 30th, 2015 to February 22nd,

12:49PM   9   2016 where you didn't see a lot of texts from Bongiovanni

12:49PM  10   back to Gerace?

12:49PM  11   A.  Yes.

12:49PM  12   Q.  In that gap in time, were there some text -- withdrawn,

12:49PM  13   some phone calls between the two of them?

12:49PM  14   A.  Yes.

12:49PM  15          MR. TRIPI:  I'd like to stay in this exhibit,

12:49PM  16   Ms. Champoux.  And let's go to a date January 6th, 2016, at

12:49PM  17   8:16 a.m.  It should be on page 289.  And, again, that time is

12:49PM  18   8:16 a.m. on January 6th.

12:49PM  19          BY MR. TRIPI:

12:49PM  20   Q.  Is this another example of a call from Mr. Bongiovanni to

12:49PM  21   Mr. Gerace during that -- on that day?

12:49PM  22   A.  Yes.  It's a two-minute call.

12:49PM  23   Q.  And is there another call at 8:28 a.m. that same day?

12:49PM  24   A.  Yes, for four minutes.

12:49PM  25   Q.  Is that other another outgoing call from Mr. Bongiovanni

12:50PM   1   to Mr. Gerace?

12:50PM   2   A.   It is.

12:50PM   3   Q.   Was there another sort of window of time in the text

12:50PM   4   messages that you looked at in Exhibit 310D from roughly

12:50PM   5   February 22nd, 2016 until April 19th where there were less

12:50PM   6   text communications where Mr. Bongiovanni was texting back?

12:50PM   7   A.   Yes.

12:50PM   8   Q.   But were there -- were there calls that you saw during

12:50PM   9   that window of time?

12:50PM  10   A.   Yes.

12:50PM  11        **MR. TRIPI:**  Ms. Champoux, can we go to April 1, 2016?

12:50PM  12   This should be in the same exhibit on page 321.  It's going to

12:50PM  13   be April 1st, 2016 at 9:37 a.m.

12:50PM  14        **BY MR. TRIPI:**

12:50PM  15   Q.   Do you see a call from Mr. Bongiovanni to Mr. Gerace that

12:50PM  16   day?

12:50PM  17   A.   That's an incoming call.  So --

12:50PM  18   Q.   I'm sorry --

12:50PM  19   A.   -- the other direction for 31 minutes.

12:51PM  20   Q.   So from Mr. Gerace to Mr. Bongiovanni?

12:51PM  21   A.   Yes.

12:51PM  22   Q.   And how long was it for?

12:51PM  23   A.   31 minutes.

12:51PM  24   Q.   And I'd like to stick with that same date, April 21st,

12:51PM  25   2016, at 3:03 p.m.

12:51PM  1   A.  I see it.

12:51PM  2   Q.  In which direction is that call?

12:51PM  3   A.  From Mr. Bongiovanni to Mr. Gerace for two minutes.

12:51PM  4   Q.  Were you able to look at or ascertain what day of the

12:51PM  5   week it was on April 1st, 2016, if you -- if you recall?

12:51PM  6   A.  I recall doing it, I can't recall the day right now.

12:51PM  7   Q.  Let's go to April 18th, 2016.  Let's look at a call on

12:51PM  8   that date, it's going to be at page 326, at 10:36 p.m.

12:52PM  9      Is that an incoming call from Mr. Gerace to

12:52PM  10  Mr. Bongiovanni at 10:36 p.m. that day?

12:52PM  11  A.  Yes, for six minutes.

12:52PM  12  Q.  Again, this is addressing that window from February to

12:52PM  13  April of 2016, right?

12:52PM  14  A.  Yes.

12:52PM  15  Q.  And then if we go -- if you go back to 310D, after that

12:52PM  16  call, texts pick back up; is that right?  On April 19th,

12:52PM  17  2016?

12:52PM  18      **MR. TRIPI:**  Can we scroll down 310D to texts in April

12:52PM  19  of 2016, Ms. Champoux?  Scroll up a little bit further.  Yeah,

12:53PM  20  right there.

12:53PM  21      **BY MR. TRIPI:**

12:53PM  22  Q.  So we had some text communication in March, and then we

12:53PM  23  pick back up April 19th; is that right?

12:53PM  24  A.  Yes.

12:53PM  25      **MR. TRIPI:**  You can take that down.  Go back to

12:53PM   1    Exhibit 358, Ms. Champoux.

12:53PM   2           **BY MR. TRIPI:**

12:53PM   3    Q.  I'd like to show you another one.  Looking for May 28th,

12:53PM   4    2016, should be at page 340 at 2:16 p.m.  May 28th, page 340,

12:53PM   5    2:16 p.m.

12:54PM   6        Do you see calls -- a call on that day from the defendant

12:54PM   7    to Mr. Gerace?

12:54PM   8    A.  Yes, for four minutes.

12:54PM   9    Q.  And then later that day, do you see two more calls?

12:54PM  10    A.  Yes.  For two minutes, and then for three minutes.

12:54PM  11    Q.  So there are calls at 2:16, 3:37, and 3:44 p.m.?

12:54PM  12    A.  Yes.

12:54PM  13    Q.  And, again, those were just some of the calls you looked

12:54PM  14    at, you didn't look at all the records; is that right?

12:54PM  15    A.  That's right.

12:54PM  16           **MR. TRIPI:**  We can take that down, Ms. Champoux.

12:54PM  17           **BY MR. TRIPI:**

12:55PM  18    Q.  You were asked some questions yesterday about what

12:55PM  19    Special Agent Casullo did or didn't do before the Ron Serio

12:55PM  20    proffer; do you recall being asked questions about what

12:55PM  21    Special Agent Casullo did?

12:55PM  22    A.  Yes.

12:55PM  23    Q.  Fair to say Special Agent Casullo will know more about

12:55PM  24    what he did or didn't do before that proffer than you would?

12:55PM  25           **MR. MacKAY:**  Objection.

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24

| | | |
|---|---|---|
| 12:55PM | 1 | **MR. TRIPI:**  He was asked to speculate what someone |
| 12:55PM | 2 | else did yesterday, I'm just trying to address that. |
| 12:55PM | 3 | **THE COURT:**  What's the basis of the objection? |
| 12:55PM | 4 | **MR. MacKAY:**  Withdrawn. |
| 12:55PM | 5 | **BY MR. TRIPI:** |
| 12:55PM | 6 | Q.  Fair to say -- can you answer that question? |
| 12:55PM | 7 | A.  He will know better. |
| 12:55PM | 8 | Q.  He'll know better, right? |
| 12:55PM | 9 | A.  Yes. |
| 12:55PM | 10 | Q.  All right.  I want to cover one more thing with you, and |
| 12:55PM | 11 | then we'll be done. |
| 12:55PM | 12 | **MR. TRIPI:**  If we can pull up 100A.1 and go back to |
| 12:56PM | 13 | that OCDETF report that we looked at, Ms. Champoux. |
| 12:56PM | 14 | **BY MR. TRIPI:** |
| 12:56PM | 15 | Q.  We looked at this yesterday.  This is the Frank Tripi |
| 12:56PM | 16 | OCDETF report, for lack of a better way to describe it, |
| 12:56PM | 17 | correct? |
| 12:56PM | 18 | A.  Yes. |
| 12:56PM | 19 | **MR. TRIPI:**  Okay.  Ms. Champoux, let's show them |
| 12:56PM | 20 | Exhibit 310AT, please.  Take this one down for a moment. |
| 12:56PM | 21 | **BY MR. TRIPI:** |
| 12:56PM | 22 | Q.  And these were the contacts in Mr. Gerace's phone; do you |
| 12:56PM | 23 | remember that? |
| 12:56PM | 24 | A.  Yes. |
| 12:56PM | 25 | **MR. TRIPI:**  Ms. Champoux, can we show the entry for |

| | | |
|---|---|---|
| 12:56PM | 1 | Frank Tripi in this record? |
| 12:56PM | 2 | **BY MR. TRIPI:** |
| 12:57PM | 3 | Q.  Do you see that phone number, there 716-429-06 -- I'm |
| 12:57PM | 4 | sorry, 429-6445? |
| 12:57PM | 5 | A.  Yes.  Yes, I do. |
| 12:57PM | 6 | Q.  And although the last name is spell wrong, that's a |
| 12:57PM | 7 | contact in Peter Gerace's phone? |
| 12:58PM | 8 | A.  Yes. |
| 12:58PM | 9 | Q.  And yesterday you indicated you reviewed contacts in Ron |
| 12:58PM | 10 | Serio's phone as well? |
| 12:58PM | 11 | A.  Yes. |
| 12:58PM | 12 | Q.  He had the same number and the same contact for Frank |
| 12:58PM | 13 | Tripi, correct? |
| 12:58PM | 14 | A.  Yes. |
| 12:58PM | 15 | **MR. TRIPI:**  And I'd like to pull up Exhibit 30, |
| 12:58PM | 16 | Ms. Champoux. |
| 12:58PM | 17 | **BY MR. TRIPI:** |
| 12:58PM | 18 | Q.  Now you indicated yesterday Mr. Bongiovanni's retirement |
| 12:58PM | 19 | was on or about February 1st, 2019; do you recall that? |
| 12:58PM | 20 | A.  Yes. |
| 12:58PM | 21 | **MR. TRIPI:**  Can we go down to October training, is |
| 12:58PM | 22 | October trainings in 2018?  I was wrong.  It's September, |
| 12:58PM | 23 | right there. |
| 12:58PM | 24 | **BY MR. TRIPI:** |
| 12:58PM | 25 | Q.  Do you see, preretirement seminar he took on |

12:59PM    1    September 21st, 2018?

12:59PM    2    A.  Yes.

12:59PM    3    Q.  Is that date, September 21st, 2018, a date after the Ron

12:59PM    4    Serio proffer and a date after Casullo reported the

12:59PM    5    race-related comments?

12:59PM    6    A.  Yes.

12:59PM    7    Q.  Okay.  Now let's go take a look at -- go back to

12:59PM    8    Exhibit 358 at page 610.  And we're in the 190131677 bills

12:59PM    9    pdf.  And we're in 2018 billing cycle; do you see that?

12:59PM   10    A.  Yes.

12:59PM   11    Q.  So we're gonna go to a call, October 28th, 2018, with

12:59PM   12    429-6445.  We're looking for --

01:00PM   13            **MR. TRIPI:**  I might have misspoke, October 18th,

01:00PM   14    Ms. Champoux.  It's right here.  Can you highlight that?

01:00PM   15            **BY MR. TRIPI:**

01:00PM   16    Q.  Do you see several calls actually on that day with that

01:00PM   17    Frank Tripi phone?  5:30, 5:38?

01:00PM   18    A.  Yes, I see them.

01:00PM   19    Q.  And do you see another one on October 19th at 2:14 p.m.?

01:00PM   20    A.  Yes.

01:00PM   21    Q.  I misspoke, I got that one wrong.  I'm sorry.  There's

01:00PM   22    two.  Do you see those?

01:00PM   23    A.  October 18th at 5:30 and 5:38 p.m.

01:00PM   24    Q.  And the outgoing call is from Mr. Bongiovanni to that

01:01PM   25    number, 429-6445?

01:01PM  1    A.  Yes.

01:01PM  2    Q.  And if we go to page 611, I'm looking for -- all right,

01:01PM  3    now that's the -- October of 2018 is about four months or so

01:01PM  4    and change before Mr. Bongiovanni retired?

01:01PM  5    A.  Yes.

01:01PM  6         MR. TRIPI:  And let's go back to 100A.1 and go to the

01:01PM  7    OCDETF report.  Let's scroll down.  Scroll down to the

01:02PM  8    narrative sort of the second-to-last page.  Scroll up a little

01:02PM  9    bit.  Keep going.

01:02PM  10        BY MR. TRIPI:

01:02PM  11   Q.  As she's doing that, did you see some dates in here

01:02PM  12   earlier -- there it is, March 11th, 2013?

01:02PM  13   A.  Yes.

01:02PM  14   Q.  That's a date around the time this draft is being

01:02PM  15   prepared, fair to say?

01:02PM  16   A.  I would say that this draft is prepared sometime soon

01:02PM  17   after that.

01:02PM  18   Q.  Okay.  A little over five years later, this defendant is

01:02PM  19   in phone contact with Frank Tripi from the records we just

01:02PM  20   saw?

01:02PM  21   A.  Yes.

01:02PM  22   Q.  And then this document is found in the defendant's

01:02PM  23   basement at retirement; is that right?

01:02PM  24   A.  After retirement, yes.

01:03PM  25        MR. TRIPI:  Just a moment, Judge.

| | | |
|---|---|---|
| 01:03PM | 1 | I don't have any further redirect.  Thank you, |
| 01:03PM | 2 | Your Honor. |
| 01:03PM | 3 | **THE COURT:**  Mr. MacKay? |
| 01:03PM | 4 | |
| 01:03PM | 5 | **RECROSS-EXAMINATION BY MR. MacKAY:** |
| 01:03PM | 6 | Q.  Okay.  I'll try to be brief here, Agent Ryan.  I know |
| 01:03PM | 7 | you've been here for a few days. |
| 01:03PM | 8 | **MR. MacKAY:**  All right.  So, Ms. Champoux, can we |
| 01:03PM | 9 | pull up Government Exhibit 310AT. |
| 01:03PM | 10 | **MR. TRIPI:**  Did you say AT? |
| 01:03PM | 11 | **MR. MacKAY:**  Yeah, AT, yeah, what we were looking at |
| 01:03PM | 12 | with the contacts. |
| 01:03PM | 13 | **MR. TRIPI:**  I'm sorry. |
| 01:03PM | 14 | **MR. MacKAY:**  Actually, no, let me skip this.  You can |
| 01:03PM | 15 | take this down.  Can we go back to Exhibit 358, |
| 01:03PM | 16 | Mr. Bongiovanni's call records. |
| 01:04PM | 17 | Pull up the 190 bills.  And can we again control F |
| 01:04PM | 18 | Mr. Tripi's number, 429-6445. |
| 01:04PM | 19 | Looks like it's not searching for it exactly. |
| 01:04PM | 20 | **MS. CHALBECK:**  Parker, it's easier if you just do the |
| 01:04PM | 21 | last four. |
| 01:04PM | 22 | **MR. MacKAY:**  Okay.  Can you do just 6445? |
| 01:04PM | 23 | **BY MR. MacKAY:** |
| 01:04PM | 24 | Q.  Okay.  So it comes up three times here you see in the |
| 01:04PM | 25 | search, correct? |

01:04PM    1    A.  Yes.

01:04PM    2    Q.  Okay.  October 18th, here?

01:04PM    3    A.  I see that.

01:04PM    4    Q.  Can we go to the next -- and then those two that

01:04PM    5    Mr. Tripi asked you about, Mr. Tripi asked you about

01:04PM    6    Mr. Tripi's calls.  So all three are on October 18th,

01:04PM    7    correct?

01:04PM    8    A.  October 18th, 2018, yes.

01:05PM    9    Q.  Are you aware of whether Mr. Bongiovanni was in contact

01:05PM   10    with Mr. Tripi about buying a Roomba vacuum on Facebook

01:05PM   11    marketplace?

01:05PM   12    A.  I'm not aware.

01:05PM   13    Q.  Do you know whether the FBI, prior to this trial,

01:05PM   14    interviewed Mr. Tripi about that situation, alleged

01:05PM   15    situation?

01:05PM   16    A.  I don't know.

01:05PM   17    Q.  And you don't know whether he confirmed that, do you?

01:05PM   18    A.  No.

01:05PM   19         **MR. MacKAY:**  You can take that down, Ms. Champoux,

01:05PM   20    thank you.

01:05PM   21         **BY MR. MacKAY:**

01:05PM   22    Q.  Okay.  You were asked about what Mr. -- Agent Casullo may

01:05PM   23    or may not have done prior to the July 2018 Ron Serio

01:05PM   24    proffer, correct?

01:05PM   25    A.  Yes.

USA v Bongiovanni - Ryan - MacKay/Recross - 9/12/24
154

01:05PM    1    Q.  Okay.  And obviously the way you reported it, it was he's

01:05PM    2    gonna know what he knows, correct?

01:05PM    3    A.  Yes.

01:05PM    4    Q.  But fair to say from what you were able to observe in

01:05PM    5    your dealings in the proffer, Mr. Casullo came to the proffer

01:06PM    6    prepared to talk about Ron Serio and the subjects that were

01:06PM    7    discussed?

01:06PM    8    A.  Yes.

01:06PM    9    Q.  Appeared -- you could tell, again, he didn't go in blind,

01:06PM   10    correct?

01:06PM   11    A.  It didn't look that way, no.

01:06PM   12    Q.  He appeared to know about the topics being discussed on

01:06PM   13    Mr. Serio, correct?

01:06PM   14    A.  Yes.

01:06PM   15    Q.  Okay.  You were shown a lot of phone logs here with the

01:06PM   16    phone bills, you went through with Mr. Tripi, and you saw all

01:06PM   17    the dates; do you remember those?

01:06PM   18    A.  I don't remember each date, but I remember doing it.

01:06PM   19    Q.  No, but you remember the format of those bills; is that

01:06PM   20    fair to say?

01:06PM   21    A.  Yes.

01:06PM   22    Q.  What those looked like?  I just don't want to go through

01:06PM   23    them all.  But is it your experience typically when you see

01:06PM   24    an entry on a phone bill and you see a one-minute entry,

01:06PM   25    that's consistent sometimes with a phone call not even

01:06PM    1    connecting?

01:06PM    2    A.  I think it's at least connected.

01:06PM    3    Q.  But beyond that, it's not clear whether there's any

01:06PM    4    contact on a one-minute call, correct?

01:07PM    5    A.  Something up to a minute, it could be a voicemail, it

01:07PM    6    could be a brief conversation.

01:07PM    7    Q.  Right.  It could be as little as, like, a second or two

01:07PM    8    long call and just registers as one minute is the least

01:07PM    9    amount of time that shows on the bills, correct?

01:07PM   10    A.  Yes.

01:07PM   11    Q.  Okay.

01:07PM   12         MR. MacKAY:  Okay.  Can we show Government Exhibit

01:07PM   13    26E please, Ms. Champoux.

01:07PM   14         BY MR. MacKAY:

01:07PM   15    Q.  Okay.  We went through this before.  This is the DARTS

01:07PM   16    email.  And the way you described it is the lower part is

01:07PM   17    sort of the original DARTS email that Mr. Bongiovanni would

01:07PM   18    have received on August 21st, 2018, correct?

01:07PM   19    A.  Yes.

01:07PM   20    Q.  And when we went through this, it would have alerted him

01:07PM   21    based on what you can see, about you doing something in

01:07PM   22    relation to the Ron Serio DTO investigation, correct?

01:07PM   23    A.  I entered those phone numbers.

01:08PM   24    Q.  Right.  So my question, though, was this email would have

01:08PM   25    shown him that you were working on something associated with

01:08PM    1    investigating a Ron Serio DTO, correct?

01:08PM    2    A.  You mean, you're asking me to decide what he concluded?

01:08PM    3    Q.  No.  I'm asking you not what he concluded, but what he's

01:08PM    4    able to see based on what he receives here in this record.

01:08PM    5    A.  And I'm just saying it's, again, like, yesterday or

01:08PM    6    whatever it was that we went through it, it's specific to

01:08PM    7    telephone numbers.  So I'm just trying to keep my answers

01:08PM    8    specific to what the email shows.

01:08PM    9    Q.  Right.  I mean --

01:08PM   10    A.  I entered a phone number, and I said it was associated to

01:08PM   11    the Ron Serio DTO.  And that's the extent of what it shows.

01:08PM   12    Q.  Yes.  And maybe we're dancing around it, but ultimately

01:08PM   13    this email Mr. Bongiovanni receives, correct?

01:08PM   14    A.  Yes.

01:08PM   15    Q.  And it's got something to do with the Ron Serio DTO,

01:08PM   16    correct?  From what you can see on the email?

01:08PM   17    A.  The phone number is associated with the Ron Serio DTO.

01:08PM   18    Yes.

01:08PM   19    Q.  And that record shows that you're doing some work with

01:08PM   20    that phone number, correct?

01:08PM   21    A.  Yes.

01:08PM   22    Q.  And then what Mr. Bongiovanni does after that, about an

01:09PM   23    hour or more after that email is sent, he appears to forward

01:09PM   24    it to his boss, correct?

01:09PM   25    A.  Yes.

01:09PM    1    Q.  Greg Yensan was his group boss at that time, correct?

01:09PM    2    A.  Yes.

01:09PM    3    Q.  So what we can tell just by looking at the email is

01:09PM    4    Mr. Bongiovanni received this, and he forwarded it to his

01:09PM    5    boss?

01:09PM    6    A.  Yes.

01:09PM    7    Q.  And just to be clear, at this time, Greg Yensan is the

01:09PM    8    D-57 boss, group supervisor in which Mr. Bongiovanni is in

01:09PM    9    that group, correct?

01:09PM   10    A.  That's correct.

01:09PM   11    Q.  But you were over in D-58 at the time, correct?

01:09PM   12    A.  Yes.

01:09PM   13          **MR. MacKAY:**  Now, you can take that down,

01:09PM   14    Ms. Champoux.  Thank you.

01:09PM   15          **BY MR. MacKAY:**

01:09PM   16    Q.  You were asked some questions on redirect about the term

01:10PM   17    "close relationship;" do you remember that?

01:10PM   18    A.  Yes.

01:10PM   19    Q.  And that was in the interview about describing the

01:10PM   20    relationship between Mr. Bongiovanni and Mr. Gerace, correct?

01:10PM   21    A.  Yes.

01:10PM   22    Q.  My -- remind me, I think you said on cross, though, you

01:10PM   23    don't remember what Mr. Bongiovanni actually said to describe

01:10PM   24    the relationship, correct?

01:10PM   25    A.  Right.  The sum and substance of his statements were that

01:10PM    1    it was a relationship that was not a close relationship.  And

01:10PM    2    a relationship where communication went one way from

01:10PM    3    Mr. Gerace to Mr. Bongiovanni.

01:10PM    4    Q.  Okay.  But I just want to be clear, the way you're

01:10PM    5    describing it, Mr. Bongiovanni doesn't use the term "close

01:10PM    6    relationship," correct?  He doesn't use that phrase, whether

01:10PM    7    he's referring to whether something is a close relationship

01:10PM    8    or not a close relationship, he doesn't use that phrase?

01:10PM    9    A.  I don't remember if he used that exact phrasing, no.

01:10PM   10    Q.  Because you can't remember the exact words he used as you

01:10PM   11    sit here today, correct?

01:10PM   12    A.  No, I remember his message.

01:10PM   13    Q.  Okay.  Okay.  And then we can respond to some of

01:11PM   14    Mr. Tripi's questions.  You talked about that there were a

01:11PM   15    lot of subpoenas and subpoena records in the Wayne Anderson

01:11PM   16    file that you reviewed, correct?

01:11PM   17    A.  Yes.

01:11PM   18    Q.  Now, there was other information and other papers in that

01:11PM   19    file as well, too, correct?

01:11PM   20    A.  Yes.

01:11PM   21    Q.  And we're talking not just about the --

01:11PM   22    A.  Actually, can I -- can we differentiate which Wayne

01:11PM   23    Anderson file you're asking about?

01:11PM   24    Q.  Yeah, I'm gonna actually expand it to be both, both the

01:11PM   25    shared file and the physical file that you found at

01:11PM    1    Mr. Bongiovanni's house.

01:11PM    2    A.  But specific to the last question, which one are you

01:11PM    3    asking me about?

01:11PM    4    Q.  I'm asking about both.

01:11PM    5    A.  Okay.

01:11PM    6    Q.  You saw things like photos that appeared to be some sort

01:11PM    7    of surveillance, correct?

01:11PM    8    A.  No.  That was a Google Maps photo.

01:11PM    9    Q.  I'm saying, did you review the shared file contents?  The

01:11PM   10    shared file contents of the Wayne Anderson file.

01:12PM   11    A.  Online shared file?

01:12PM   12    Q.  Yes.

01:12PM   13    A.  Yeah.  There were -- yes, there were photos in there.

01:12PM   14    Q.  There were photos.  That contained subpoenas, correct?

01:12PM   15    A.  Yes.

01:12PM   16    Q.  It contained the hot sheets and reports that are

01:12PM   17    generated in response to subpoenas, correct?

01:12PM   18    A.  Yes.

01:12PM   19    Q.  There were a number of subpoena utility returns, correct?

01:12PM   20    A.  There were some, yes.

01:12PM   21    Q.  You said there were some maps and locations of Google

01:12PM   22    Maps, correct?

01:12PM   23    A.  Yes.

01:12PM   24    Q.  Okay.  Appeared to be criminal histories that were run,

01:12PM   25    correct?

01:12PM     1    A.  You -- the line of questioning is a little bit of

01:12PM     2    confusing though, because you're talking about online shared

01:12PM     3    files, you're conflating them with what was in his basement.

01:12PM     4    Q.  I'm talking about in relation to the entire Wayne

01:12PM     5    Anderson investigation.  Whether it was in a physical copy or

01:12PM     6    whether it was on the shared --

01:12PM     7            MR. TRIPI:  Judge --

01:12PM     8            MR. MacKAY:  I --

01:12PM     9            MR. TRIPI:  -- I object under 403.  It's clearly the

01:12PM    10    witness is saying he's conflating two files, he can't answer

01:13PM    11    it in the way it's being asked.

01:13PM    12            THE COURT:  He hasn't asked a question yet.

01:13PM    13            MR. TRIPI:  It was right before --

01:13PM    14            THE COURT:  Ask a question.

01:13PM    15            BY MR. MacKAY:

01:13PM    16    Q.  In relation to all of the material that you saw

01:13PM    17    associated with the Wayne Anderson investigation, that's what

01:13PM    18    my -- that was done in 2013 -- that was started in 2012, went

01:13PM    19    into 2013, so I'm talking about both the physical file you

01:13PM    20    saw at Mr. Bongiovanni's house and I'm talking about the

01:13PM    21    online file, all those things I just went through, you saw

01:13PM    22    them somewhere in that investigation, correct?

01:13PM    23            MR. TRIPI:  Objection as to the term "investigation."

01:13PM    24            THE COURT:  No, I don't have a problem with that.

01:13PM    25    But the "all that" I have a problem with.

01:13PM   1          MR. MacKAY:  Well --

01:13PM   2          THE COURT:  So I'm going to sustain the objection to

01:13PM   3   the form of the question.

01:13PM   4          BY MR. MacKAY:

01:13PM   5   Q.   Okay.  So I listed a bunch of different things that we

01:13PM   6   talked about, different -- we'll call them investigative

01:13PM   7   materials.  Do you recall all of those I just went through?

01:14PM   8   A.   Yes.

01:14PM   9   Q.   Like the subpoenas, correct?

01:14PM   10  A.   Yes.

01:14PM   11  Q.   Photos, correct?

01:14PM   12  A.   Yes.

01:14PM   13  Q.   The subpoena returns for utilities, correct?

01:14PM   14  A.   Yes.

01:14PM   15  Q.   Criminal histories, correct?

01:14PM   16  A.   Yes.

01:14PM   17  Q.   NADDIS searches, correct?

01:14PM   18  A.   Yes.

01:14PM   19  Q.   DMV records, correct?

01:14PM   20  A.   Yes.

01:14PM   21  Q.   Now those are all things that, in your experience as a

01:14PM   22  DEA agent, are things that are associated with investigative

01:14PM   23  steps in an investigation with the DEA, correct?

01:14PM   24  A.   They're part of doing the background on targets, yes.

01:14PM   25  Q.   Right.  So those are background steps that are taken in

01:14PM    1    an investigation for the DEA, correct?

01:14PM    2    A.   Yes.

01:14PM    3    Q.   And no matter where the pieces of the Wayne Anderson file

01:14PM    4    were located -- on a share file, in the physical file at his

01:14PM    5    house -- you saw those things that we just went through,

01:14PM    6    correct?

01:14PM    7    A.   I guess if you're talking about after the search warrant

01:14PM    8    at his house, then yes, that's correct.

01:14PM    9    Q.   Through the course of your investigation, you came to sit

01:15PM   10    here today and you reviewed all of that material, you saw all

01:15PM   11    of those things, correct?

01:15PM   12    A.   Yes.

01:15PM   13         **MR. MacKAY:**  Okay.  No further questions, Your Honor.

01:15PM   14         **MR. TRIPI:**  I just have one, Judge.

01:15PM   15

01:15PM   16              **RE-REDIRECT EXAMINATION BY MR. TRIPI:**

01:15PM   17    Q.   To be clear, just because there was some confusion a

01:15PM   18    minute ago, there were no hot sheets or phone analysis in the

01:15PM   19    official DEA files, either in hard copy or in the shared

01:15PM   20    file, that you had access to before you did the search

01:15PM   21    warrant at the defendant's house, correct?

01:15PM   22    A.   No.  None that I saw, no.

01:15PM   23    Q.   So, correct?

01:15PM   24    A.   Correct, yes.

01:15PM   25    Q.   Those were in his basement?

01:15PM   1   A.   Yes.

01:15PM   2              **MR. TRIPI:**  Nothing further.

01:15PM   3              **MR. MacKAY:**  No further questions, Your Honor.

01:15PM   4              **THE COURT:**  Amen.  You are -- you are finally done.

        5   You may step down.  Thank you.

01:15PM   6              **THE WITNESS:**  Thank you, Your Honor.

        7              (Witness excused at 1:15 p.m.)

        8              *       *       *       *       *       *       *

        9

       10

       11              <u>**CERTIFICATE OF REPORTER**</u>

       12

       13              In accordance with 28, U.S.C., 753(b), I

       14   certify that these original notes are a true and correct

       15   record of proceedings in the United States District Court for

       16   the Western District of New York on September 12, 2024.

       17

       18                        s/ Ann M. Sawyer
                                  Ann M. Sawyer, FCRR, RPR, CRR
       19                        Official Court Reporter
                                  U.S.D.C., W.D.N.Y.

       20

       21

       22

       23

       24

       25

```
1
2                    TRANSCRIPT INDEX
3        EXCERPT - EXAMINATION OF CURTIS RYAN - DAY 3
4                    SEPTEMBER 12, 2024
5
6
7   W I T N E S S                              P A G E
8   C U R T I S   R Y A N                        2
9     (CONT'D) CROSS-EXAMINATION BY MR. MacKAY:    2
10    REDIRECT EXAMINATION BY MR. TRIPI:         84
11    RECROSS-EXAMINATION BY MR. MacKAY:        152
12    RE-REDIRECT EXAMINATION BY MR. TRIPI:     162
13
14
15
16
17
18
19
20
21
22
23
24
25
```