02:46PM

1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF NEW YORK
2
   _____
3  UNITED STATES OF AMERICA,
                                  Case No. 1:19-cr-227
4                 Plaintiff,              (LJV)
   v.
5                                 September 13, 2024
   JOSEPH BONGIOVANNI,
6
                  Defendant.
7  _____

8    TRANSCRIPT EXCERPT - EXAMINATION OF PROTECTED WITNESS 6, R.A.
            BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                 UNITED STATES DISTRICT JUDGE

10 **APPEARANCES:**        **TRINI E. ROSS, UNITED STATES ATTORNEY**
                      **BY: JOSEPH M. TRIPI, ESQ.**
11                        **NICHOLAS T. COOPER, ESQ.**
                          **CASEY L. CHALBECK, ESQ.**
12                    Assistant United States Attorneys
                      Federal Centre, 138 Delaware Avenue
13                    Buffalo, New York 14202
                      For the Plaintiff
14
                      **SINGER LEGAL PLLC**
15                    **BY: ROBERT CHARLES SINGER, ESQ.**
                      80 East Spring Street
16                    Williamsville, New York 14221
                          And
17                    **LAW OFFICES OF PARKER ROY MacKAY**
                      **BY: PARKER ROY MacKAY, ESQ.**
18                    3110 Delaware Avenue
                      Kenmore, New York 14217
19                        And
                      **OSBORN, REED & BURKE, LLP**
20                    **BY: JOHN J. GILSENAN, ESQ.**
                      120 Allens Creek Road
21                    Rochester, New York 14618
                      For the Defendant
22
   **PRESENT:**           **BRIAN A. BURNS,** FBI Special Agent
23                    **MARILYN K. HALLIDAY,** HSI Special Agent
                      **KAREN A. CHAMPOUX,** USA Paralegal
24
   **LAW CLERK:**         **REBECCA FABIAN IZZO, ESQ.**
25

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

| | |
|---|---|
| 1 | <u>**COURT DEPUTY CLERK:**</u>   **COLLEEN M. DEMMA** |
| 2 | <u>**COURT REPORTER:**</u>         **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 3 | Robert H. Jackson Federal Courthouse<br>2 Niagara Square<br>Buffalo, New York  14202 |
| 4 | Ann_Sawyer@nywd.uscourts.gov |
| 5 | |
| 6 | *     *     *     *     *     *     * |
| 7 | |
| 8 | (Excerpt commenced at 2:46 p.m.) |
| 9 | (Jury is present.) |

02:46PM  10     **THE COURT:**  The government can call its next witness.

02:46PM  11     **MR. COOPER:**  The government calls R.A., Judge.

02:46PM  12

02:48PM  13   **R. A.,** after being duly called and sworn, testified as

02:48PM  14   follows:

02:48PM  15         **MR. COOPER:**  May I inquire, Judge?

02:48PM  16         **THE COURT:**  You may.

02:48PM  17

02:48PM  18               **DIRECT EXAMINATION BY MR. COOPER:**

02:48PM  19   Q.  Good afternoon, ma'am.

02:48PM  20   A.  Good afternoon.

02:48PM  21   Q.  Would you introduce yourself to the jury?

02:48PM  22   A.  My name is R.A.

02:48PM  23   Q.  And how old are you, Ms. R.A.?

02:48PM  24   A.  I am 42.

02:48PM  25   Q.  Where did you grow up at?

02:48PM  1    A.  Pendleton, New York.

02:48PM  2    Q.  And can you tell the jury a little bit about your

02:48PM  3    educational background?

02:48PM  4    A.  Yes.  I graduated from Starpoint High School.  I have a

02:49PM  5    degree from University of Buffalo in behavioral science.  And

02:49PM  6    I am currently in graduate school for clinical mental health

02:49PM  7    counseling.

02:49PM  8    Q.  Now, when you graduated from high school, did you start

02:49PM  9    working at that point, or did you go to school?

02:49PM  10   A.  I went to school.

02:49PM  11   Q.  Okay.  And where did you go to school initially after

02:49PM  12   high school?

02:49PM  13   A.  Syracuse University.

02:49PM  14   Q.  Okay.  And did you finish up your education at Syracuse

02:49PM  15   University at that time?

02:49PM  16   A.  No.

02:49PM  17   Q.  Okay.  What happened?

02:49PM  18   A.  I kind of took the wrong path, and started working in the

02:49PM  19   bar business.

02:49PM  20   Q.  Okay.  Did you remain working in the bar business --

02:49PM  21   first of all, what age did that start when you started

02:49PM  22   working at bars?

02:49PM  23   A.  About 19, 20.

02:49PM  24   Q.  And did you start drinking around that time?

02:49PM  25   A.  Yes.

| | | |
|---|---|---|
| 02:49PM | 1 | Q. Did you start using marijuana? |
| 02:49PM | 2 | A. Yes. |
| 02:49PM | 3 | Q. Okay. And did that kind take your life down a different |
| 02:49PM | 4 | path than you had initially expected? |
| 02:49PM | 5 | A. Absolutely. |
| 02:49PM | 6 | Q. Okay. After you started working in the bar business, did |
| 02:49PM | 7 | you start working in exotic dancing? |
| 02:50PM | 8 | A. Yes. |
| 02:50PM | 9 | Q. At some point in your life, did alcohol use become a |
| 02:50PM | 10 | problem for you? |
| 02:50PM | 11 | A. Yes. |
| 02:50PM | 12 | Q. Okay. About what age was that? |
| 02:50PM | 13 | A. I would have to say around 19 and 20, it started |
| 02:50PM | 14 | escalating. |
| 02:50PM | 15 | Q. Okay. And was in something you struggled with for a |
| 02:50PM | 16 | number of years? |
| 02:50PM | 17 | A. Absolutely. |
| 02:50PM | 18 | Q. Is it something that is a problem the same way for you |
| 02:50PM | 19 | today? |
| 02:50PM | 20 | A. No. |
| 02:50PM | 21 | Q. When's the last time you drank alcohol? |
| 02:50PM | 22 | A. January 5th, 2017. |
| 02:50PM | 23 | Q. What's the last time you used drugs? |
| 02:50PM | 24 | A. 2016. |
| 02:50PM | 25 | Q. From that age, 19 or 20, that you told us about a moment |

02:50PM  1    ago, did the alcohol use and drug use progress?

02:50PM  2    A.  Yes.

02:50PM  3    Q.  Did it get worse over time?

02:50PM  4    A.  Yes.

02:50PM  5    Q.  What kind of drugs did you use during that time in your

02:50PM  6    life?

02:50PM  7    A.  I used a lot of drugs.  I used cocaine, heroin, ecstasy,

02:50PM  8    pretty much anything I could get my hands on.

02:50PM  9    Q.  When you -- when you left Syracuse, you said you started

02:51PM  10   working at bars; is that right?

02:51PM  11   A.  Yes.

02:51PM  12   Q.  What bars were you working at?

02:51PM  13   A.  Mademoiselle's, Rick's Tally-Ho, Colonie.

02:51PM  14   Q.  Okay.  And Mademoiselle's, is that a bar that also offers

02:51PM  15   exotic dancing there?

02:51PM  16   A.  Yes.

02:51PM  17   Q.  And how about Rick's Tally-Ho?

02:51PM  18   A.  Yes.

02:51PM  19   Q.  And Colonie, is that an exotic dancing club?

02:51PM  20   A.  Yes.

02:51PM  21   Q.  Can you describe for the jury how working in that

02:51PM  22   industry in strip clubs impacted your drug and alcohol use?

02:51PM  23   A.  Of course.  Usually, it's very difficult to work a job

02:51PM  24   like that sober.  There's a -- it's a very hostile

02:51PM  25   environment.  You're working with other exotic dancers, men,

02:51PM  1   you don't know who they are or where they're from.  And drug

02:51PM  2   use is very common.

02:51PM  3   Q.  Did working in that industry cause your drug use to

02:51PM  4   escalate?

02:51PM  5   A.  Yes.

02:51PM  6   Q.  Was there a time when you were working in that exotic

02:52PM  7   dancing industry when you began using cocaine basically every

02:52PM  8   day that you worked?

02:52PM  9   A.  Yes.

02:52PM  10  Q.  And at some point, did you switch from working as a

02:52PM  11  bartender to working as a dancer in those clubs?

02:52PM  12  A.  Yes.

02:52PM  13  Q.  What's the total timeframe that you worked in that

02:52PM  14  industry?  From what age to what age?

02:52PM  15  A.  I would have to say from 19 to about 22.

02:52PM  16  Q.  Okay.  And would that be sometime around 2004, 2005 when

02:52PM  17  you were 22?

02:52PM  18  A.  Yes.

02:52PM  19  Q.  Okay.  Did there come a time when you met a person by the

02:52PM  20  name of Craig Border?

02:52PM  21  A.  Yes.

02:52PM  22  Q.  Was there a time in your life when Craig Border was a

02:52PM  23  boyfriend of yours?

02:52PM  24  A.  He was someone I dated.

02:52PM  25  Q.  How long did you date Craig Border for?

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

| | | |
|---|---|---|
| 02:52PM | 1 | A.  Maybe to two or three months. |
| 02:52PM | 2 | Q.  And during the two or three months that you were dating |
| 02:53PM | 3 | Craig Border, I'm not trying to embarrass you, did Craig |
| 02:53PM | 4 | Border have some photographs of you in some lingerie or some |
| 02:53PM | 5 | revealing clothing? |
| 02:53PM | 6 | A.  Yes. |
| 02:53PM | 7 | Q.  Did you know that he had those photos of you? |
| 02:53PM | 8 | A.  I wasn't sure if I knew he had photos, but I definitely |
| 02:53PM | 9 | took the photos -- |
| 02:53PM | 10 | Q.  Okay. |
| 02:53PM | 11 | A.  -- or, he took the photos. |
| 02:53PM | 12 | Q.  Okay.  Let me try to -- |
| 02:53PM | 13 | A.  Okay. |
| 02:53PM | 14 | Q.  You were aware at some time during your two- or |
| 02:53PM | 15 | three-month relationship with Craig Border that he took some |
| 02:53PM | 16 | pictures of you in some lingerie or some kind of outfit? |
| 02:53PM | 17 | A.  Yes. |
| 02:53PM | 18 | Q.  Yeah? |
| 02:53PM | 19 | A.  Yes. |
| 02:53PM | 20 | Q.  Did there -- we're going to come back to that in a |
| 02:53PM | 21 | minute.  Did there come a time when you met an individual |
| 02:53PM | 22 | named Peter Gerace? |
| 02:53PM | 23 | A.  Yes. |
| 02:53PM | 24 | Q.  How did you meet that person? |
| 02:53PM | 25 | A.  I met him at Mademoiselle's, and I also had met him at |

02:53PM    1    his restaurant at the time.

02:53PM    2    Q.  Okay.  And what restaurant was that?

02:53PM    3    A.  It was called Pietro's.

02:53PM    4    Q.  When you met him at Mademoiselle's, was that a time when

02:53PM    5    you were working there?

02:53PM    6    A.  Yes.

02:53PM    7    Q.  Was he working there at that time?

02:53PM    8    A.  No.

02:53PM    9    Q.  Was he a patron when you met him?

02:53PM   10    A.  Yes.

02:54PM   11    Q.  Okay.  And did you develop or eventually develop a

02:54PM   12    relationship with Peter Gerace?

02:54PM   13    A.  Yes.

02:54PM   14    Q.  Can you describe that for the jury?

02:54PM   15    A.  Yes.  I eventually married him, and we had a child

02:54PM   16    together.

02:54PM   17    Q.  What was the period of time from when you first met Peter

02:54PM   18    Gerace at Mademoiselle's to when you began a relationship

02:54PM   19    with him?

02:54PM   20    A.  It really progressed very quickly.  Probably within a

02:54PM   21    matter of two weeks.

02:54PM   22    Q.  Okay.  And eventually you said that you and Peter had a

02:54PM   23    child together?

02:54PM   24    A.  Yes.

02:54PM   25    Q.  What year was that that you had a child?

02:54PM    1    A.  2006.

02:54PM    2    Q.  In those couple months -- I'm going to withdraw that.

02:54PM    3        Do you remember what year you first met Peter?

02:54PM    4    A.  2004, 2005.

02:54PM    5    Q.  Okay.  And then by about a year later, give or take, you

02:54PM    6    guys had a child together?

02:54PM    7    A.  Yes.

02:54PM    8    Q.  Okay.  During the period of months while you were dating

02:55PM    9    Peter but before you had a child together, were you guys

02:55PM   10    living together?

02:55PM   11    A.  Yes.

02:55PM   12    Q.  Did you socialize together?

02:55PM   13    A.  Yes.

02:55PM   14    Q.  Did you go out with other people and hang out?

02:55PM   15    A.  Yes.

02:55PM   16    Q.  Did you get to know some of Peter's friends?

02:55PM   17    A.  Yes.

02:55PM   18    Q.  Now you told the jury a few moments ago that in that age

02:55PM   19    range of, like, 19 to 22, cocaine use and alcohol use had

02:55PM   20    become a problem for you; is that right?

02:55PM   21    A.  Yes.

02:55PM   22    Q.  Did something cause your cocaine use to drop off pretty

02:55PM   23    significantly at one point?

02:55PM   24    A.  Yes, I became pregnant.

02:55PM   25    Q.  Okay.  And did that cause you to stop going out and

02:55PM    1    partying with cocaine or using it at work?

02:55PM    2    A.  Yes, I stopped using completely.

02:55PM    3    Q.  Do you know an individual by the name of Joe Bongiovanni?

02:55PM    4    A.  Yes.

02:55PM    5    Q.  How do you know that person?

02:55PM    6    A.  He was friends with Peter.

02:55PM    7    Q.  When did you first meet Joe Bongiovanni?

02:55PM    8    A.  I met him, I think, either -- probably 2004.

02:55PM    9    Q.  Did you meet him by yourself, or were you with someone?

02:55PM   10    A.  I was with Peter.

02:56PM   11    Q.  And did Peter introduce you to Joe?

02:56PM   12    A.  Yes.

02:56PM   13    Q.  What did he say?

02:56PM   14    A.  This is my friend Joe.

02:56PM   15    Q.  Was that the only time that you remember meeting him?

02:56PM   16    A.  No.

02:56PM   17    Q.  Okay.  Have you seen him and socialized with him at

02:56PM   18    different places other than just SoHo?

02:56PM   19    A.  Yes.

02:56PM   20    Q.  Can you describe some of the things that you did with

02:56PM   21    Peter and Joe Bongiovanni?

02:56PM   22    A.  We went to dinner.  We went on a trip.  So, I don't know,

02:56PM   23    we did kind of socialization things.

02:56PM   24    Q.  Okay.  Where did you go on a trip together?

02:56PM   25    A.  We went to Ellicottville.

02:56PM  1    Q.  What's Ellicottville?

02:56PM  2    A.  It's, like, a ski country with shops and bars.  It's

02:56PM  3    cute, quaint town.

02:56PM  4    Q.  Okay.  And was that trip to Ellicottville with Peter and

02:56PM  5    Joe, was that something that was planned in advance?

02:56PM  6    A.  Yes.

02:56PM  7    Q.  Who else was on that trip, do you remember?

02:56PM  8    A.  Joe, me, Peter, and his girlfriend at the time, I don't

02:56PM  9    recall her name.

02:56PM  10   Q.  Whose girlfriend?

02:56PM  11   A.  Joe's girlfriend.

02:56PM  12   Q.  Okay.  So it was the four of you?

02:56PM  13   A.  Yes.

02:56PM  14        MR. COOPER:  Ms. Champoux, can we pull up what's

02:57PM  15   already in evidence as Government Exhibit 421 -- or, 426-1, I

02:57PM  16   apologize.  You can put that up for everybody.  Thank you.

02:57PM  17        BY MR. COOPER:

02:57PM  18   Q.  Do you see the picture on your screen?

02:57PM  19   A.  Yes.

02:57PM  20   Q.  You have a screen right there, too.

02:57PM  21   A.  Oh, right there.  Thank you.

02:57PM  22   Q.  Do you see that picture?

02:57PM  23   A.  Yes.

02:57PM  24   Q.  Who's in the red shirt right there?

02:57PM  25   A.  That's me.

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

12

| | | |
|---|---|---|
| 02:57PM | 1 | Q.  And to the right side of the photograph in the green |
| 02:57PM | 2 | shirt, who's that? |
| 02:57PM | 3 | A.  Peter. |
| 02:57PM | 4 | Q.  And all the way on the left in the burgundy shirt, who's |
| 02:57PM | 5 | that? |
| 02:57PM | 6 | A.  Joe. |
| 02:57PM | 7 | Q.  And in the shirt, the cream-colored shirt or white shirt, |
| 02:57PM | 8 | who's that? |
| 02:57PM | 9 | A.  His girlfriend at the time. |
| 02:57PM | 10 | Q.  And do you recall her name as you sit here today? |
| 02:57PM | 11 | A.  No. |
| 02:57PM | 12 | Q.  Is that the same group of four people that went out to |
| 02:57PM | 13 | Ellicottville together? |
| 02:57PM | 14 | A.  Yes. |
| 02:57PM | 15 | Q.  And is that around the same time generally? |
| 02:57PM | 16 | A.  Yes. |
| 02:57PM | 17 | Q.  Do you remember this night in particular? |
| 02:57PM | 18 | A.  Yes. |
| 02:57PM | 19 | Q.  What was this night about? |
| 02:57PM | 20 | A.  We went out to dinner, I think we had some drinks.  I |
| 02:57PM | 21 | think we were at a bar called Balloons. |
| 02:58PM | 22 | Q.  And was that a planned event? |
| 02:58PM | 23 | A.  Yes. |
| 02:58PM | 24 | Q.  Did there come a time when you learned what Joe -- |
| 02:58PM | 25 | Peter's friend Joe Bongiovanni did for work? |

02:58PM  1    A.  Yes.

02:58PM  2    Q.  Okay.  And what was that?

02:58PM  3    A.  I -- well, Peter told me that he worked for the DEA.

02:58PM  4    Q.  Can you describe for this jury how you learned, like, the

02:58PM  5    context of how you learned that Joe Bongiovanni worked for

02:58PM  6    the DEA?

02:58PM  7    A.  I guess what had happened was -- was Peter had came up to

02:58PM  8    me and said that he -- or, Joe had seen --

02:58PM  9            **MR. SINGER:**  Objection, hearsay.

02:58PM  10           **MR. COOPER:**  Judge, can we come up?

02:58PM  11           **THE COURT:**  Sure.

02:58PM  12           (Sidebar discussion held on the record.)

02:59PM  13           **MR. COOPER:**  So, Judge, this is the same question and

02:59PM  14   answer that we did at the last trial.

02:59PM  15           I do think that we litigated it at the last trial.

02:59PM  16   There's not an objection right here in the direct.

02:59PM  17           But essentially, the chain of events is Peter

02:59PM  18   confronts her with this and says there's this picture of you,

02:59PM  19   whatever.  Joe told me he pulled it out of some guy's house.

02:59PM  20           The context of him -- of her learning that the

02:59PM  21   defendant works for the DEA is the conversation with Peter

02:59PM  22   where he tells her, you know, I'm doing -- Peter tells her Joe

02:59PM  23   showed me this photograph.

02:59PM  24           And, so, I -- first of all, I don't think it's in

02:59PM  25   dispute at the trial that the defendant works for the DEA.  He

| | | |
|---|---|---|
| 02:59PM | 1 | works for the DEA.  And the confronting her with -- about the |
| 02:59PM | 2 | photograph is nonhearsay, so -- |
| 03:00PM | 3 | **MR. SINGER:**  The confrontation about the photograph |
| 03:00PM | 4 | is hearsay, Judge. |
| 03:00PM | 5 | **THE COURT:**  Why? |
| 03:00PM | 6 | **MR. SINGER:**  It's not in furtherance of the |
| 03:00PM | 7 | conspiracy.  This is a statement made by Peter Gerace.  The |
| 03:00PM | 8 | government's attempting to offer it for the truth of the |
| 03:00PM | 9 | matter asserted.  It has nothing to do with furthering the |
| 03:00PM | 10 | conspiracy whatsoever at that point in time, it's hearsay. |
| 03:00PM | 11 | I mean, I realize -- |
| 03:00PM | 12 | **THE COURT:**  If he says the defendant told me that |
| 03:00PM | 13 | there are pictures that he found on his job. |
| 03:00PM | 14 | **MR. SINGER:**  Um-hum. |
| 03:00PM | 15 | **THE COURT:**  Right? |
| 03:00PM | 16 | **MR. SINGER:**  It's hearsay. |
| 03:00PM | 17 | **THE COURT:**  It's a statement -- Bongiovanni's |
| 03:00PM | 18 | statement -- |
| 03:00PM | 19 | **THE REPORTER:**  I can't hear the judge. |
| 03:00PM | 20 | **THE COURT:**  I'm thinking out loud, Ann. |
| 03:00PM | 21 | Bongiovanni's statement that Peter is not hearsay, |
| 03:00PM | 22 | why isn't Peter's statement to her hearsay? |
| 03:00PM | 23 | **MR. COOPER:**  So, first of all, Judge, I think that |
| 03:00PM | 24 | the defendant is searching a drug dealer's house.  He finds |
| 03:00PM | 25 | these pictures of somebody related to Peter -- |

Case 1:19-cr-00227-LJV-MJR    Document 1321    Filed 10/27/24    Page 15 of 110
USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

15

03:00PM    1          **THE COURT:** But that's --

03:00PM    2          **MR. COOPER:** Hold on. I'm just -- may I --

03:00PM    3          I apologize.

03:00PM    4          I think it is a statement that's made in furtherance

03:01PM    5   of the -- the statement that Bongiovanni makes to him, working

03:01PM    6   our way back, would be a party opponent, but also in

03:01PM    7   furtherance of the conspiracy.

03:01PM    8          **THE COURT:** I agree.

03:01PM    9          **MR. COOPER:** It's like, hey, your girlfriend has nude

03:01PM   10   pictures or whatever in a drug dealer's house.

03:01PM   11          **THE COURT:** Yep.

03:01PM   12          **MR. COOPER:** The statement that Peter makes to her is

03:01PM   13   it's somebody he socializes with, that lives with him, there's

03:01PM   14   an association between her and a drug dealer, he learns it

03:01PM   15   from the defendant, and he confronts her with it.

03:01PM   16          So it's information related to a drug investigation

03:01PM   17   that the defendant passes to the person that he's allegedly

03:01PM   18   bribed by, that's what this trial is about.

03:01PM   19          And this woman, who has an association with that

03:01PM   20   drug trafficker, is informed by Peter Gerace the DEA searched

03:01PM   21   this guy's house.

03:01PM   22          **MR. TRIPI:** If I can just jump in for a case to

03:01PM   23   amplify the point? On the coconspirator argument, what

03:01PM   24   Mr. Cooper's arguing is essentially it's a coconspirator

03:01PM   25   statement. The problem that I think defense and you have is

| | | |
|---|---|---|
| 03:01PM | 1 | Ms. M.U. is not part of that conspiracy, right? |
| 03:01PM | 2 | **THE COURT:**  R.A. |
| 03:02PM | 3 | **MR. TRIPI:**  I'm sorry, I'm confused.  R.A. is not |
| 03:02PM | 4 | part of the conspiracy. |
| 03:02PM | 5 | I believe that's the Beechnut case in the 2nd Circuit |
| 03:02PM | 6 | which says essentially you don't have to be a member of the |
| 03:02PM | 7 | conspiracy to be the recept -- |
| 03:02PM | 8 | **THE COURT:**  Receive the -- |
| 03:02PM | 9 | **MR. TRIPI:**  -- and to transmit the coconspirator's |
| 03:02PM | 10 | statement. |
| 03:02PM | 11 | So, I would ask the Court to look at that, perhaps, |
| 03:02PM | 12 | for five minutes before saying no. |
| 03:02PM | 13 | **THE COURT:**  No, no, I'm not -- I'm more saying yes |
| 03:02PM | 14 | than no right now. |
| 03:02PM | 15 | **MR. TRIPI:**  Yeah, okay. |
| 03:02PM | 16 | **THE COURT:**  Tell me why he's not -- so the statement |
| 03:02PM | 17 | from Bongiovanni -- do you agree with me the statement from |
| 03:02PM | 18 | Bongiovanni to Gerace is not hearsay? |
| 03:02PM | 19 | **MR. SINGER:**  Yeah, it's a party opponent, so I don't |
| 03:02PM | 20 | have any argument on that.  So it's hearsay within hearsay. |
| 03:02PM | 21 | **THE COURT:**  It's the Gerace statement to her -- |
| 03:02PM | 22 | **MR. SINGER:**  Yeah, that was my objection, was based |
| 03:02PM | 23 | on the hearsay that Gerace is providing to R.A.  So, again, |
| 03:02PM | 24 | like, if you look at -- |
| 03:02PM | 25 | **THE COURT:**  Gerace says Joe Bongiovanni told me. |

03:02PM   1           **MR. SINGER:**  X, Y, Z.

03:03PM   2           **THE COURT:**  Yes.

03:03PM   3           **MR. SINGER:**  And that's hearsay.

03:03PM   4           **THE COURT:**  No, well, let's think about this for a

03:03PM   5   second.

03:03PM   6           **MR. SINGER:**  Okay.

03:03PM   7           **THE COURT:**  Joe Bongiovanni -- so, so the -- the

03:03PM   8   truth of the fact that Joe Bongiovanni told him that is what

03:03PM   9   you're admitting the statement for?

03:03PM  10           **MR. SINGER:**  Yeah, they're offering it -- it's not to

03:03PM  11   show the effect on the listener or anything like that.  It's

03:03PM  12   being offered --

03:03PM  13           **MR. COOPER:**  Yeah, and I haven't argued that it was.

03:03PM  14   It's a coconspirator statement.

03:03PM  15           **THE COURT:**  Right.  So it's a coconspirator

03:03PM  16   statement.  How is it in furtherance of the conspiracy?

03:03PM  17           **MR. COOPER:**  Because his child's -- the person who

03:03PM  18   becomes his child's mother, who's living with him at the time,

03:03PM  19   has an association with a drug trafficker.

03:03PM  20           The DEA agent that Peter Gerace is allegedly

03:03PM  21   bribing -- right, what this trial is about -- is providing him

03:03PM  22   information.  Hey, a person you live with has this association

03:03PM  23   to a drug dealer whose house we just raided.

03:03PM  24           I mean, that -- it's --

03:03PM  25           **MR. TRIPI:**  It's Gerace weaponizing the information

03:03PM  1   that he's received as part of the conspiracy.  And this is

03:03PM  2   what he needs to --

03:03PM  3           **THE COURT:**  How is Gerace's statement to --

03:04PM  4           R.A.?

03:04PM  5           **MR. COOPER:**  Yes.

03:04PM  6           **THE COURT:**  -- how is Gerace's statement to R.A. in

03:04PM  7   furtherance of the conspiracy?  How does that further the

03:04PM  8   conspiracy?

03:04PM  9           **MR. COOPER:**  It's -- it's alerting her that the DEA

03:04PM  10  has raided the home of a drug trafficker, which is information

03:04PM  11  that Peter never should have had that he received from the

03:04PM  12  defendant.

03:04PM  13          He conveys it to this person whom he's close with

03:04PM  14  because she's a cocaine user, this guy's a drug dealer, and

03:04PM  15  he's telling her the DEA was in this person's house searching.

03:04PM  16          **MR. TRIPI:**  Judge, if I may?

03:04PM  17          **THE COURT:**  Yeah.

03:04PM  18          **MR. TRIPI:**  The coconspirator statement is the

03:04PM  19  statement Bongiovanni to Gerace we, in sum and substance, we

03:04PM  20  raided a drug dealer's house, and R.A. has pictures in the

03:04PM  21  house.  That's the statement.

03:04PM  22          **THE COURT:**  I get that.

03:04PM  23          **MR. TRIPI:**  Right?  So --

03:04PM  24          **THE COURT:**  No, no, the statement -- the statement

03:04PM  25  that she's going to testify to is Gerace says Bongiovanni --

03:04PM    1          **MR. TRIPI:**  Told me.  Right?  So that's the

03:05PM    2    coconspiracy.  Bongiovanni told me --

03:05PM    3          **THE COURT:**  Bongiovanni told me.

03:05PM    4          **MR. TRIPI:**  So that goes -- that's the Beechnut case.

03:05PM    5    That is --

03:05PM    6          **THE COURT:**  Okay.  I'm going to look at the case.

03:05PM    7          **MR. TRIPI:**  -- she needs -- she can transmit the

03:05PM    8    Joe/Peter conversation even if she's not a coconspirator.

03:05PM    9          So on the analysis on the furtherance prong that you

03:05PM   10    asked about is:  Is the conversation, that statement, Joe to

03:05PM   11    Peter, in furtherance of.

03:05PM   12          **THE COURT:**  No.

03:05PM   13          **MR. TRIPI:**  We would submit --

03:05PM   14          **THE COURT:**  No, no.  The furtherance has to be the

03:05PM   15    statement from Peter to her.

03:05PM   16          **MR. SINGER:**  Correct.

03:05PM   17          **THE COURT:**  Is that in furtherance of a conspiracy.

03:05PM   18    Because that's -- that's the --

03:05PM   19          **MR. TRIPI:**  But that's the --

03:05PM   20          **MR. SINGER:**  That's the basis of my objection.

03:05PM   21          **MR. TRIPI:**  -- that's the back end of the information

03:05PM   22    he received.  So it doesn't further anything if it's not

03:05PM   23    information important to Peter that he's going to use to

03:05PM   24    confront this person.

03:05PM   25          **MR. SINGER:**  Right.

| | | |
|---|---|---|
| 03:05PM | 1 | **THE COURT:**  But the point -- so, this is hearsay |
| 03:05PM | 2 | within hearsay, right?  And the hearsay statement -- okay, |
| 03:05PM | 3 | let's excuse the jury. |
| 03:05PM | 4 | **MR. TRIPI:**  I'm sorry, Your Honor. |
| 03:05PM | 5 | **THE COURT:**  No, no, that's okay.  This is an |
| 03:05PM | 6 | interesting question. |
| 03:05PM | 7 | (End of sidebar discussion.) |
| 03:05PM | 8 | **THE COURT:**  Okay, folks.  We have a pretty |
| 03:06PM | 9 | interesting legal issue that we need to argue outside your |
| 03:06PM | 10 | presence, so we'll take our second and last afternoon break |
| 03:06PM | 11 | now. |
| 03:06PM | 12 | Please remember my instructions about not talking |
| 03:06PM | 13 | about the case even with each other, and not making up your |
| 03:06PM | 14 | mind.  We'll see you back here as soon as we're done. |
| 03:06PM | 15 | (Jury excused at 3:06 p.m.) |
| 03:06PM | 16 | **THE COURT:**  Mr. Tripi, do you have a cite for the |
| 03:06PM | 17 | Beechnut case? |
| 03:06PM | 18 | **MR. TRIPI:**  In my -- |
| 03:06PM | 19 | **MS. CHALBECK:**  I've got it, Judge. |
| 03:06PM | 20 | **MR. TRIPI:**  Thank you. |
| 03:06PM | 21 | **MS. CHALBECK:**  I believe it's 871 F.2d 1181, |
| 03:06PM | 22 | 2nd Circuit, 1989. |
| 03:06PM | 23 | **THE COURT:**  Can you find that? |
| 03:06PM | 24 | **MS. IZZO:**  Ms. Chalbeck, could you say that again? |
| 03:07PM | 25 | Sorry. |

| | | |
|---|---|---|
| 03:07PM | 1 | **MR. COOPER:**  Slower. |
| 03:07PM | 2 | **THE COURT:**  Oh, look who's talking. |
| 03:07PM | 3 | **MS. CHALBECK:**  871 F.2d 1181, 2nd Circuit, 1989.  I |
| 03:07PM | 4 | think it's United States versus Beechnut Nutrition Corp. |
| 03:07PM | 5 | Does that sound right, Joe? |
| 03:07PM | 6 | **MR. TRIPI:**  That sounds right. |
| 03:07PM | 7 | **THE COURT:**  Okay.  So here's -- I'm going to -- |
| 03:07PM | 8 | everybody can sit. |
| 03:07PM | 9 | **MR. COOPER:**  Can we excuse the witness? |
| 03:07PM | 10 | **THE COURT:**  Oh, I'm sorry.  Yeah. |
| 03:07PM | 11 | **MR. COOPER:**  Thank you. |
| 03:07PM | 12 | **THE COURT:**  You can step down, ma'am, please. |
| 03:07PM | 13 | **THE WITNESS:**  Oh, okay. |
| 03:07PM | 14 | **MR. COOPER:**  You didn't do anything wrong. |
| 03:07PM | 15 | **THE COURT:**  No, you didn't do anything wrong. |
| 03:07PM | 16 | **MS. CHALBECK:**  We did something wrong. |
| 03:07PM | 17 | **MR. COOPER:**  Yeah, we just have to have a legal |
| 03:07PM | 18 | argument in here without you. |
| 03:07PM | 19 | **THE COURT:**  I forgot she was still there. |
| 03:07PM | 20 | (Witness excused at 3:07 p.m.) |
| 03:07PM | 21 | **THE COURT:**  So as understand it, what's being |
| 03:07PM | 22 | elicited right now is the fact that Gerace says to her: |
| 03:08PM | 23 | Bongiovanni told me that law enforcement has some photos of |
| 03:08PM | 24 | you, some photos of you in lingerie. |
| 03:08PM | 25 | And so that's -- so this is -- so there's two |

03:08PM    1    statements that we're talking about here.

03:08PM    2          **MR. COOPER:**  Before we -- can I read you -- because I

03:08PM    3    think the words that I expect her to say are important for the

03:08PM    4    analysis on the --

03:08PM    5          **THE COURT:**  Go right ahead.

03:08PM    6          **MR. COOPER:**  So the answer that she gave, I asked

03:08PM    7    her:

03:08PM    8          "Question:  What does Pete say to you?

03:08PM    9          This is page 13 of her trial transcript.

03:08PM   10          "Answer:  Pete says to me, oh, Joe saw a picture of

03:08PM   11    you in this guy's house, this drug dealer's house or

03:08PM   12    something."

03:08PM   13          So that's the -- the statement that she makes, and

03:08PM   14    then she further clarifies that he tells her --

03:08PM   15          **THE COURT:**  Okay.

03:08PM   16          **MR. COOPER:**  -- that he's a DEA agent.

03:08PM   17          **THE COURT:**  So Bongiovanni says to Gerace:  I saw a

03:08PM   18    picture of R.A. in a drug dealer's house?

03:08PM   19          **MR. COOPER:**  Or he gives it to him, but yeah,

03:08PM   20    something like that.

03:08PM   21          **THE COURT:**  Whatever -- that's not -- that's not

03:08PM   22    hearsay, because that's a statement by a party --

03:09PM   23          **MR. COOPER:**  Agreed.

03:09PM   24          **THE COURT:**  -- and -- and probably in furtherance of

03:09PM   25    the conspiracy as well.

03:09PM   1          But the statement from Gerace to R.A. that

03:09PM   2    Bongiovanni said to me, he saw a photo of you in lingerie in a

03:09PM   3    drug dealer's house, that's hearsay.

03:09PM   4          And unless it's a statement of a coconspirator in

03:09PM   5    furtherance of the conspiracy, and I don't see how that's in

03:09PM   6    furtherance of the conspiracy --

03:09PM   7          **MR. COOPER:**  So if John Smith and Jane Smith live

03:09PM   8    together.  And John Smith's in a conspiracy with another

03:09PM   9    person, a drug conspiracy.  And the other person says, hey,

03:09PM   10   Jane Smith was interacting with this other drug dealer, and

03:09PM   11   that person's hot.  Law enforcement searched their house,

03:09PM   12   they're on to them.  And John Smith conveys that to Jane

03:09PM   13   Smith:  You were at a person's house, or there's pictures of

03:09PM   14   you in a person's house who's on law enforcement's radar.

03:10PM   15          It's protecting John Smith.  Because a person who

03:10PM   16   lives with him has exposure to someone who's on law

03:10PM   17   enforcement's radar.

03:10PM   18          **THE COURT:**  But isn't that --

03:10PM   19          **MR. COOPER:**  So they're --

03:10PM   20          **THE COURT:**  -- different than here where the reason

03:10PM   21   that he's telling her that there's photos of her is that he

03:10PM   22   wants to, I mean, he's concerned about the fact that there are

03:10PM   23   photos of his girlfriend out there.  That's different than --

03:10PM   24          **MR. COOPER:**  I don't know that to be the case, and

03:10PM   25   there's not that testimony.  He's --

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

24

| | | |
|---|---|---|
| 03:10PM | 1 | **THE COURT:**  What's the protection?  Is she a |
| 03:10PM | 2 | conspirator? |
| 03:10PM | 3 | **MR. COOPER:**  I don't believe so. |
| 03:10PM | 4 | **THE COURT:**  Okay.  So what's then the protection that |
| 03:10PM | 5 | is gonna happen by virtue of his telling her that? |
| 03:10PM | 6 | **MR. COOPER:**  So the inference, and I would suggest to |
| 03:10PM | 7 | the Court, is that she's going to stay away from this person |
| 03:10PM | 8 | whose house was just raided by law enforcement, because |
| 03:10PM | 9 | Peter's telling her this person's house was just raided by law |
| 03:10PM | 10 | enforcement and your picture was in there. |
| 03:10PM | 11 | And that protects Peter.  Because Peter lives with |
| 03:10PM | 12 | her, and they socialize together.  And I expect that there is |
| 03:11PM | 13 | going to be testimony that there's heavy cocaine use by her |
| 03:11PM | 14 | and by Peter. |
| 03:11PM | 15 | And it doesn't -- I don't think that it needs to be |
| 03:11PM | 16 | her being a conspirator for it to be protecting of Peter to |
| 03:11PM | 17 | say, hey, this guy's hot right now.  Your picture was in his |
| 03:11PM | 18 | house.  The Feds just raided his house. |
| 03:11PM | 19 | That helps Peter isolate Peter. |
| 03:11PM | 20 | **THE COURT:**  Yeah, why not, Mr. Singer? |
| 03:11PM | 21 | **MR. SINGER:**  So in our initial brief, Judge, we cited |
| 03:11PM | 22 | one case, United States v -- I'm gonna butcher this, sorry, |
| 03:11PM | 23 | Katsougrakis, which is K-A-T-S-O-U-G-R-A-K-I-S -- |
| 03:11PM | 24 | **THE COURT:**  That's not as bad as Mr. Cooper butchered |
| 03:11PM | 25 | Buscaglia. |

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

25

| 03:11PM | 1 | **MR. SINGER:**  So it's 715 F.2d 769, 2nd Circuit, 1983. |
| 03:11PM | 2 | And so what the 2nd Circuit said in that case is that |
| 03:11PM | 3 | when you're talking about statements made in furtherance under |
| 03:11PM | 4 | 801(d)(2)(E), it has to prompt the listener to respond in a |
| 03:11PM | 5 | way that facilitates the carrying out of some type of criminal |
| 03:12PM | 6 | activity. |
| 03:12PM | 7 | And so what we've had in this case is, you know, |
| 03:12PM | 8 | like, we've had situations where Lou Selva was testifying to |
| 03:12PM | 9 | statements made by other coconspirators involved in the Serio |
| 03:12PM | 10 | DTO that would have prompted him to engage in the criminal |
| 03:12PM | 11 | activity, or prompted other people to take certain actions as |
| 03:12PM | 12 | part of the criminal activity. |
| 03:12PM | 13 | **THE COURT:**  Right. |
| 03:12PM | 14 | **MR. SINGER:**  And that's why the Courts let them in, |
| 03:12PM | 15 | and that's why for the most part we haven't objected to a lot |
| 03:12PM | 16 | of those statements.  That's easy. |
| 03:12PM | 17 | So this is a little different.  And so it's different |
| 03:12PM | 18 | in a couple different ways. |
| 03:12PM | 19 | First off is that the distinction between Ms. R.A. |
| 03:12PM | 20 | and many of the other witnesses who came in here who happen to |
| 03:12PM | 21 | be exotic dancers is that the others all worked at Pharaoh's. |
| 03:12PM | 22 | Ms. R.A. never worked at Pharaoh's.  So that's a |
| 03:12PM | 23 | distinction right there. |
| 03:12PM | 24 | The second thing about it -- |
| 03:12PM | 25 | **THE COURT:**  Why does that matter with this issue? |

03:12PM    1        **MR. SINGER:**  Because what the theory the government

03:12PM    2    has made in a lot of these cases where they're saying

03:12PM    3    statements are made in furtherance is that all of these ladies

03:12PM    4    who are coming in are also coconspirators.

03:12PM    5        And as the government conceded earlier --

03:12PM    6        **THE COURT:**  I understand that.  But the fact that

03:13PM    7    she's not a co --

03:13PM    8        So Mr. Cooper's argument I think is that the

03:13PM    9    reason -- this is not made to protect her, it's made to

03:13PM   10    protect Gerace.  It's made in furtherance of a conspiracy,

03:13PM   11    because Gerace is basically messaging his girlfriend, fiancée,

03:13PM   12    not to go to this house of the drug dealer, and -- because

03:13PM   13    that might connect him to the drug dealer.

03:13PM   14        **MR. SINGER:**  So, again, if you kind of work through

03:13PM   15    that, it's preposterous on its face, Judge.

03:13PM   16        Ms. R.A. doesn't have a relationship with Craig

03:13PM   17    Border at all at that point.  And it's not like she had a

03:13PM   18    relationship with him very recently.  It was over and done

03:13PM   19    with, at least in my understanding of the situation, like,

03:13PM   20    years ago.

03:13PM   21        So she has no relationship to this individual at all.

03:13PM   22    Mr. Border doesn't have any relationship to the drug

03:13PM   23    conspiracy involved in this case at all.

03:13PM   24        Ms. R.A.'s not involved in the drug conspiracy that's

03:14PM   25    alleged in the indictment at all.  And so none of those things

03:14PM    1    connect her in any way whatsoever.

03:14PM    2              And that's the basis of the objection of the hearsay,

03:14PM    3    is that while I didn't object, and I would concede that on the

03:14PM    4    first layer of hearsay, which is the statement Bongiovanni

03:14PM    5    made to Gerace, comes in at least as an admission of a party

03:14PM    6    opponent, the second layer doesn't fulfill the in-furtherance

03:14PM    7    requirement, because Peter Gerace is communicating something,

03:14PM    8    a hearsay statement that's being offered to prove the truth of

03:14PM    9    the matter asserted in this Border search issue where they're

03:14PM    10   trying to prove up something in the indictment that's charged,

03:14PM    11   and the issue is is that it's hearsay.  It's just rank

03:14PM    12   hearsay.

03:14PM    13             I realize it didn't come up at the first trial but,

03:14PM    14   you know, like, we missed the objection.  We missed the

03:14PM    15   objection.

03:14PM    16        **MR. COOPER:**  Judge, it's not years apart.  That's

03:14PM    17   factually inaccurate.

03:14PM    18             You're gonna hear that the search warrant at Border's

03:14PM    19   house happened in December of 2005.

03:14PM    20             The photo of them all hanging out together, Peter and

03:15PM    21   the defendant, that photo is from 2005 in July.  So, July to

03:15PM    22   December is five months.

03:15PM    23        **THE COURT:**  Well, no, but he's saying the

03:15PM    24   relationship between R.A. and Border was over for a long time.

03:15PM    25        **MR. SINGER:**  Correct.  She testified that it was

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

03:15PM    1    between 2003 or '4 that they started up their relationship.

03:15PM    2    So she's long done with Border at that point.

03:15PM    3        **THE COURT:**  The relationship Peter started then.

03:15PM    4        **MR. SINGER:**  Correct.

03:15PM    5        **THE COURT:**  Right.  So we know she has not been in a

03:15PM    6    relationship with Border.  So the -- the timeframe that

03:15PM    7    Mr. Singer's talking about is the timeframe from when the

03:15PM    8    pictures were taken, when she had the relationship with

03:15PM    9    Border.  Not really when the pictures were taken, but when she

03:15PM    10   had the relationship with Border, until the statement is made.

03:15PM    11       So he's saying it's preposterous to think that Peter

03:15PM    12   is telling her that in furtherance of the conspiracy to say

03:15PM    13   don't go to Border's house, because she's never going to go to

03:15PM    14   Border's house.  She hasn't been in a relationship with the

03:15PM    15   guy in years.

03:15PM    16       **MR. COOPER:**  That's assuming that Peter knows all of

03:15PM    17   that to be true.

03:15PM    18       As opposed to Peter gets a call from the defendant

03:16PM    19   and says:  There's pictures of your girlfriend in this dude's

03:16PM    20   house.  He's a drug dealer.  We just raided his house.

03:16PM    21       There's no proof or evidence that Peter had in his

03:16PM    22   mind at the time he said it, that relationship's been over for

03:16PM    23   years.  She hasn't been there in years.

03:16PM    24       That's all out of thin air in this argument.  But

03:16PM    25   there's no proof or --

03:16PM   1      **THE COURT:**  He's telling her that though?  The reason

03:16PM   2    he's telling her that is because he learned his girlfriend has

03:16PM   3    pictures that he'd rather not have somebody else see in the

03:16PM   4    hands of somebody else.

03:16PM   5      **MR. COOPER:**  But what he says to her is:  This drug

03:16PM   6    dealer's house.  Found photos of you in this drug dealer's

03:16PM   7    house.

03:16PM   8      So I don't think it would be -- I don't think the

03:16PM   9    decision should ride on which way you cut on what's most

03:16PM   10   likely about what Peter indicated.

03:16PM   11     The words are:  There's pictures of you in a drug

03:16PM   12   dealer's house, and my buddy who's in the DEA was just in

03:16PM   13   there, and there's a reasonable inference there that he's

03:16PM   14   telling her stay away from that place.

03:16PM   15     They're both involved in drugs, Peter and R.A.  He's

03:17PM   16   telling her stay away from that place.

03:17PM   17     **THE COURT:**  You get the last word, then I'm going to

03:17PM   18   go read this case.

03:17PM   19     **MR. SINGER:**  And Judge, again, so if you kind of

03:17PM   20   break down the situation, so she starts dating Peter in like

03:17PM   21   2004.  Let's just put it there, because she wasn't able to

03:17PM   22   kind of establish whether it was earlier or later, but she

03:17PM   23   said 2004 clearly.

03:17PM   24     They start dating.  They eventually get married.

03:17PM   25     She testified about how she was pregnant in 2005,

03:17PM   1   that's why she stopped taking drugs.  She has a child with him

03:17PM   2   in 2006.

03:17PM   3         She's been dating Peter Gerace at that point in time

03:17PM   4   for two-plus years when, you know, the most logical point

03:17PM   5   where this potential conversation may have occurred, occurs.

03:17PM   6         So again, like, her relationship with Border is done.

03:17PM   7   I mean, it is not even coming back into existence.

03:17PM   8         MR. COOPER:  Peter's doesn't know that.

03:17PM   9         MR. SINGER:  And there's no evidence to suggest that

03:17PM  10   it ever would.  And so that's where, I realize the government

03:17PM  11   is saying, well, Peter Gerace would have no reason to believe

03:17PM  12   that.  The evidence clearly says otherwise, Judge.

03:17PM  13         MR. COOPER:  What evidence?  What evidence says

03:17PM  14   otherwise?  That Peter would have knowledge that the

03:18PM  15   relationship with Border ended years ago?  What evidence?

03:18PM  16         MR. SINGER:  Out of the witness's own mouth about the

03:18PM  17   fact that they're in an exclusive relationship at that point

03:18PM  18   in time.

03:18PM  19         MR. COOPER:  She didn't say that.

03:18PM  20         THE COURT:  Well, but --

03:18PM  21         MR. SINGER:  And she's pregnant with his child.

03:18PM  22         MS. CHALBECK:  We also don't know if Ms. R.A. was

03:18PM  23   buying drugs from the drug dealer.  I mean, that's another

03:18PM  24   point.

03:18PM  25         MR. COOPER:  Or that Peter thought that.  There's no

03:18PM  1    evidence of that.

03:18PM  2          So counsel can say he thinks it's most likely, but to

03:18PM  3    say that evidence supports that is not accurate.

03:18PM  4          **MR. SINGER:**  And I think now we're starting to get so

03:18PM  5    far afield.  Well, Ms. R.A. could have purchased drugs from

03:18PM  6    Mr. Border.

03:18PM  7          Like, Judge, the arguments that are being

03:18PM  8    proffered -- all right, I understand why they're making them,

03:18PM  9    but the government doesn't have any idea what was fact and

03:18PM  10   fiction in this.  And so it's just a stretch.

03:18PM  11         **MR. COOPER:**  The operative question is what's in

03:18PM  12   Peter's mind.  And the operative question is what's in Peter

03:18PM  13   mind at the time.

03:18PM  14         And so offering up alternative -- alternatives --

03:18PM  15         They have one alternative they want the Court to

03:18PM  16   accept as fact.  There's another alternative, which is Peter

03:18PM  17   doesn't know if she had a relationship with Craig, when it

03:18PM  18   ended.  All he knows is what she testifies to.

03:19PM  19         He says, my friend in the DEA found your photos in a

03:19PM  20   drug dealer's house.  Those are the facts.

03:19PM  21         **THE COURT:**  We don't even know the name of the drug

03:19PM  22   dealer necessarily, right?

03:19PM  23         **MR. COOPER:**  I don't even think she said that.

03:19PM  24         She said, Joe saw a picture of you in this guy's

03:19PM  25   house, this drug dealer's house.

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

03:19PM    1          **THE COURT:**  Okay.  Let me go think about it.

03:19PM    2          Thank you.

03:19PM    3          (Off the record at 3:19 p.m.)

03:19PM    4          (Back on the record at 3:27 p.m.)

03:27PM    5          (Jury not present.)

03:27PM    6          **THE CLERK:**  All rise.  We are back on the record for

03:27PM    7    the continuation of the jury trial in case number 19-CR-227,

03:27PM    8    United States of America versus Joseph Bongiovanni.

03:27PM    9          All counsel and parties are present.

03:27PM   10          **THE COURT:**  Okay.  So here's what the case says.

03:28PM   11          Case says, first of all, there is no requirement that

03:28PM   12    the person to whom the statement is made also be a member of

03:28PM   13    the conspiracy.  So that's out.

03:28PM   14          Whether a proper statement is made in furtherance of

03:28PM   15    a conspiracy is a preliminary question of fact to be

03:28PM   16    determined by the trial court by a preponderance of the

03:28PM   17    evidence.  So the question is whether the statement promoted

03:28PM   18    or was intended to promote the goals of the conspiracy.

03:28PM   19          With respect to intended to promote, I think it's --

03:28PM   20    there's no way in the world that I can find by a preponderance

03:28PM   21    of the evidence that Gerace said that to her intending to

03:28PM   22    promote the conspiracy.

03:28PM   23          He might have.  You're right, Mr. Cooper, it's

03:28PM   24    conceivable that he did.  But I can't find by a preponderance

03:28PM   25    of the evidence that that was the reason.  In fact, I

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

03:28PM   1   personally think it was more likely that he told him that

03:28PM   2   because he was unhappy with the fact that somebody had a photo

03:29PM   3   of her in lingerie.

03:29PM   4        And so while you're right, I can't let my own

03:29PM   5   judgment about that color the valuation of it, I still can't

03:29PM   6   say by a preponderance of the evidence that that's why he said

03:29PM   7   it to her.

03:29PM   8        It's at least as likely that there was another

03:29PM   9   reason.  So the question becomes, did the statement promote

03:29PM  10   the conspiracy, and can I find by the preponderance of the

03:29PM  11   evidence that the statement in fact promoted the conspiracy.

03:29PM  12        And for that, I think we need a voir dire out of the

03:29PM  13   presence of the jury.

03:29PM  14        **MR. COOPER:**  Okay.

03:29PM  15        **THE COURT:**  I think we need to find out from her.

03:29PM  16   And, Mr. Singer, I'll let you ask questions.  But I think we

03:29PM  17   need to find out from her whether that statement had any

03:29PM  18   effect on her as to whether she did or did not do anything.

03:29PM  19        **MR. COOPER:**  Whether she, in fact, like, went on to

03:29PM  20   associate with Border, like, decided to --

03:29PM  21        **THE COURT:**  Yeah.

03:29PM  22        **MR. COOPER:**  -- associate with Border.

03:29PM  23        **THE COURT:**  Did it change -- did it -- did it affect

03:29PM  24   her decisions about whether to associate with this guy, did

03:30PM  25   she know who it was.

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

34

03:30PM  1          **MR. COOPER:**  Okay.

03:30PM  2          **THE COURT:**  Did it affect her decisions whether to

03:30PM  3  associate with the guy.  You know, why did it affect her

03:30PM  4  decisions not to -- I mean, you know, she may say I was never

03:30PM  5  going to associate with him anyway.

03:30PM  6          **MR. COOPER:**  Sure.

03:30PM  7          **THE COURT:**  And if that's the case, then I don't

03:30PM  8  think so.

03:30PM  9          **MR. COOPER:**  Can I make a -- if -- before we do that,

03:30PM  10  can I make another argument as to a different -- I think

03:30PM  11  there's an argument as well that it's a statement against

03:30PM  12  Peter's penal interests to indicate to her that he's accepted

03:30PM  13  information that's law-enforcement sensitive about private

03:30PM  14  photos in a person's house, he's expressing that to her, it's

03:30PM  15  something we're going to offer against Peter at Peter's trial

03:30PM  16  in a couple months.  Peter's unavailable to us.  And so I

03:30PM  17  would argue as an alternative that Peter admitting this to her

03:30PM  18  is a statement against his penal interests.

03:30PM  19          **MR. SINGER:**  I think that's more far afield than some

03:30PM  20  of other arguments I've heard, Judge.

03:30PM  21          Statements against penal interest are something along

03:30PM  22  the lines of I shot the sheriff, you know?  Or yes, I engaged

03:31PM  23  in drug dealing all the time.

03:31PM  24          There's something where clearly it indicates to the

03:31PM  25  listener from the perspective of the declarant that I

03:31PM    1    committed some type of criminal activity, and I'm telling you

03:31PM    2    this which, of course, is against their penal interest to do.

03:31PM    3        What is being communicated here is that I found out

03:31PM    4    that from my law enforcement buddy that there are pictures of

03:31PM    5    you existing in this house.  That's not something that even

03:31PM    6    comes close to the clear-cut rule under declaration against

03:31PM    7    penal interest.  It just doesn't fit.

03:31PM    8        **MR. COOPER:**  Judge, not all cases are 711 robberies.

03:31PM    9    I shot the clerk is not the only statement.

03:31PM   10        This is a bribery case.  Mr. Singer said it's about

03:31PM   11    her perspective, it's not.  It doesn't require that you

03:31PM   12    analyze what her perspective is.

03:31PM   13        Peter is saying I received law-enforcement sensitive

03:31PM   14    information from a DEA agent.  That's a statement against his

03:31PM   15    penal interests, especially when the facts that exist in this

03:31PM   16    case exist surrounding it.  It's not in a vacuum.  You don't

03:32PM   17    have to consider it in isolation.  He's making an admission to

03:32PM   18    her that he received law-enforcement sensitive information

03:32PM   19    from the defendant.

03:32PM   20        Whether she knew that or not does not matter.

03:32PM   21        **MR. SINGER:**  And, again, I guess what you talk about

03:32PM   22    law-enforcement sensitive information, Judge, law-enforcement

03:32PM   23    sensitive information is:  Joe told me that the DEA's about to

03:32PM   24    execute a search at Craig Border's house.

03:32PM   25        That's law-enforcement sensitive information.

03:32PM    1          **MR. COOPER:**  Not true, Judge.

03:32PM    2          **THE COURT:**  I'm not so sure that -- I'm not so sure

03:32PM    3    that a statement about what someone found during a search of

03:32PM    4    somebody's premises is not law-enforcement sensitive as well.

03:32PM    5          Why wouldn't that be law-enforcement sensitive?

03:32PM    6          **MR. SINGER:**  Again, it -- it's not involving

03:32PM    7    something that has to go to the -- the -- the entirety of the

03:32PM    8    case that the law enforcement agency's building against a

03:32PM    9    person.  So like if, for instance, there was a communication

03:32PM   10    of we found 4 ounces of cocaine at this one particular

03:33PM   11    address.

03:33PM   12          **THE COURT:**  Easy.

03:33PM   13          **MR. SINGER:**  We found evidence that links you to this

03:33PM   14    particular person in this particular crime because your

03:33PM   15    fingerprints are on the --

03:33PM   16          **THE COURT:**  Like a photograph.

03:33PM   17          **MR. SINGER:**  No, but the photograph is different

03:33PM   18    because -- here's the difference, Judge.  It wasn't a

03:33PM   19    photograph of Peter that they found.  They didn't find Peter

03:33PM   20    Gerace's photograph --

03:33PM   21          **THE COURT:**  Who cares?

03:33PM   22          **MR. SINGER:**  -- or mail or other things like that

03:33PM   23    inside the residence.

03:33PM   24          **THE COURT:**  Who cares who the photograph is of?

03:33PM   25          What I'm -- the question is, is this law-enforcement

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

03:33PM   1   sensitive?  And I think that anything's that's found in a

03:33PM   2   search is law-enforcement sensitive because anything that's

03:33PM   3   found in the search might link someone to --

03:33PM   4        I mean, it's sort of like the Fifth Amendment inquiry

03:33PM   5   that we make when a witness says I decline to answer on the

03:33PM   6   grounds that it may incriminate me.  That doesn't have to be a

03:33PM   7   directly incriminatory statement, it could be something in a

03:33PM   8   link of things, right?

03:33PM   9        **MR. SINGER:**  So going back to the perspective of the

03:34PM  10   declarant, so Peter Gerace is the one who's making the

03:34PM  11   statement in the case, so he's the one who has to have some

03:34PM  12   type of awareness that it's against his penal interest --

03:34PM  13        **THE COURT:**  Yeah.

03:34PM  14        **MR. SINGER:**  -- to make a statement like that --

03:34PM  15        **THE COURT:**  Yeah.

03:34PM  16        **MR. SINGER:**  -- this is -- this is the issue is that

03:34PM  17   when it's very clear-cut about, like, they found drugs that

03:34PM  18   are connecting you to this, like, the declarant's going to

03:34PM  19   know, like, oh, my God, I'm screwed.

03:34PM  20        I mean, very similar to the Beechnut case where the

03:34PM  21   declarants are saying, we got away with it, I can't believe

03:34PM  22   it.  That's clear-cut.

03:34PM  23        **THE COURT:**  Yep.

03:34PM  24        **MR. SINGER:**  That's not the same thing when we found

03:34PM  25   a picture of your current girlfriend in this guy's house,

03:34PM   1   that's not something that meets the same bar, Judge.

03:34PM   2          **MR. COOPER:**  Judge --

03:34PM   3          **THE COURT:**  Well, there's no question that you're

03:34PM   4   right about that, but the question is does it -- does it -- is

03:34PM   5   it enough?

03:34PM   6          Go ahead.

03:34PM   7          **MR. COOPER:**  So Peter Gerace is telling this person,

03:34PM   8   I received what I think at least the government and the Court

03:34PM   9   agree is law-enforcement sensitive information from the

03:34PM  10   defendant.

03:34PM  11          And the context surrounding it is that this defendant

03:34PM  12   is on trial for receiving bribes from that person.  There's

03:34PM  13   so, the facts surrounding it are that Peter Gerace is

03:35PM  14   conspiring to bribe Joseph Bongiovanni, then saying to someone

03:35PM  15   I received law-enforcement sensitive information from Joseph

03:35PM  16   Bongiovanni is obviously, in his mind, a statement against his

03:35PM  17   penal interest.

03:35PM  18          They're never smart statements to make.  You would

03:35PM  19   never sit up there and think, like, should a person say this.

03:35PM  20   But do they, in their mind, know it's against their penal

03:35PM  21   interests to say I received law-enforcement sensitive

03:35PM  22   information from a DEA agent.

03:35PM  23          **THE COURT:**  Yeah, that -- it's a harder question for

03:35PM  24   me to decide.  And I don't know, is this the last argument

03:35PM  25   you're going to make on this?

03:35PM    1              If I go back, you're not going to come out and tell

03:35PM    2     me you've got another one, are you?

03:35PM    3              **MR. COOPER:**  I'm not.  And that one was brought to my

03:35PM    4     attention, if I'm being honest, in between the breaks.  So --

03:35PM    5              **THE COURT:**  Yeah.  So let me go and think about this,

03:35PM    6     too.  And I also want -- can we find a case that talks about

03:35PM    7     whether it is in fact -- Mr. Singer and I have been discussing

03:35PM    8     this as if it is a forgone conclusion that the standard is

03:36PM    9     what the person who made the statement was thinking when he

03:36PM   10     made the statement.  Did he have to know that it was against

03:36PM   11     his penal interests.

03:36PM   12              **MR. MacKAY:**  And, Judge, if I could supplement that a

03:36PM   13     little bit in response to Mr. Cooper's argument?

03:36PM   14              If I understand it, the government's argument is sort

03:36PM   15     of presuming the fact that they're in a bribery relationship,

03:36PM   16     and that's why he knows it's against his penal interest.  I

03:36PM   17     mean, the general idea of hearsay as I understand it is that

03:36PM   18     certain categories of statements are admissible because

03:36PM   19     they're independently trustworthy for other reasons here.

03:36PM   20              So in order to get to the government's theory, I

03:36PM   21     think it has to presume the fact that they're trying to prove

03:36PM   22     in the first place that there's some sort of elicit

03:36PM   23     relationship.

03:36PM   24              I mean, if somebody, I guess, walked up to me on the

03:36PM   25     street and told me your ex-girlfriend's photos are in this

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

03:36PM   1   house, I saw them and I'm a law enforcement officer, I'm not

03:36PM   2   sure that I would make that jump that it's law-enforcement

03:36PM   3   sensitive information and I'm somehow in trouble for telling

03:37PM   4   my current girlfriend that that's what's going on.

03:37PM   5         I think the government's argument presumes that in

03:37PM   6   the middle there's that elicit relationship that's the focus

03:37PM   7   of this case.

03:37PM   8         **MR. COOPER:** When the Court considers it, you should

03:37PM   9   consider it in the context of the proof and the evidence that

03:37PM   10   you've heard about the nature of that illicit relationship --

03:37PM   11         **THE COURT:** Of course.

03:37PM   12         **MR. COOPER:** -- of cocaine together.

03:37PM   13         **THE COURT:** Of course.

03:37PM   14         **MR. COOPER:** And I would add, Judge, I'm reading from

03:37PM   15   Courtroom Evidence, Second Edition from February of 2001.

03:37PM   16   So -- 2001.

03:37PM   17         But note that the relevant inquiry is whether the

03:37PM   18   declarant believed the statement to be contrary to his or her

03:37PM   19   own interest at the time the statement was made, not whether

03:37PM   20   the statement actually was against their interest.

03:37PM   21         I assume that hasn't changed since 2001, but it may

03:37PM   22   have.

03:37PM   23         **MR. TRIPI:** Judge, I would just note that Count 2,

03:37PM   24   the charge between the defendant and Mr. Gerace goes all the

03:37PM   25   way back to 2005, so I think that undercuts it a little bit

03:37PM    1    about what Mr. MacKay just argued.

03:37PM    2            **THE COURT:**  Yeah, I'm not so sure the thing you just

03:38PM    3    read to me, Mr. Cooper, cuts.  I mean, this statement

03:38PM    4    certainly was against his penal interest.  So, it actually

03:38PM    5    was.

03:38PM    6            The question is, did he -- did he recognize that it

03:38PM    7    was against his penal interest when he made it.

03:38PM    8            Okay.  Let me go think.

03:38PM    9            **THE CLERK:**  Okay, all rise.

03:38PM   10            **MR. TRIPI:**  We appreciate the Court taking a hard

03:38PM   11    look at this.

03:38PM   12            **THE COURT:**  Oh, no, no, no.  These are -- you know,

03:38PM   13    again, these are interesting issues.  And I want to get it

03:38PM   14    right.  And I want to get it right.

03:38PM   15            **MR. COOPER:**  Thanks, Judge.

03:38PM   16            (Off the record at 3:38 p.m.)

03:43PM   17            (Back on the record at 3:43 p.m.)

03:43PM   18            (Jury not present.)

03:43PM   19            **THE CLERK:**  All rise.

03:43PM   20            **THE COURT:**  Like a Jack-in-the-Box, right.

03:43PM   21            **THE CLERK:**  We are back.

03:43PM   22            **THE COURT:**  Please be seated.

03:43PM   23            **THE CLERK:**  We are back on the record for the

03:43PM   24    continuation of the jury trial in case number 19-cr-227,

03:43PM   25    United States of America versus Joseph Bongiovanni.

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

03:43PM    1          All counsel and parties are present.

03:43PM    2          **THE COURT:**  Okay.  You guys are making me earn every

03:43PM    3    penny of my salary today.

03:43PM    4          So the question with respect to statement against

03:44PM    5    interest is whether the offered statement would be perceived

03:44PM    6    by a reasonable person to be detrimental to his or her own

03:44PM    7    penal interest.  And I'm citing United States versus Ojudun,

03:44PM    8    915 F.3d 875, a 2nd Circuit case from 2019.

03:44PM    9          And so -- and I don't think that a reasonable person

03:44PM    10   who's not a prosecutor, not a defense lawyer, just a regular

03:44PM    11   average schmoe, would perceive that as being against his penal

03:44PM    12   interest.  It's just too -- there's too many steps there.  And

03:44PM    13   so I don't think it crosses that threshold.

03:44PM    14         I do still think we have the issue of whether the

03:44PM    15   statement was, in fact, in furtherance of the conspiracy,

03:44PM    16   whether accomplished something to further the conspiracy.  So

03:45PM    17   I think we need to do a brief voir dire on that.

03:45PM    18         And, again, I'll let you ask some questions --

03:45PM    19         **MR. COOPER:**  Yeah.

03:45PM    20         **THE COURT:**  I'll let Mr. Singer ask some questions,

03:45PM    21   and then I'll make a decision.

03:45PM    22         **MR. COOPER:**  Understood.  Thanks, Judge.

03:45PM    23         Can we bring her back in, Brian?  Thank you.

03:45PM    24         Ann, can you tell me that last question real quick?

03:45PM    25         (The above-requested question was then read by the

03:45PM    1    reporter.)

03:45PM    2            **MR. COOPER:**  Okay.

03:46PM    3            (Witness seated at 3:46 p.m.)

03:46PM    4            (Jury not present.)

03:46PM    5            **MR. COOPER:**  Ann, will you let me know when you're

03:46PM    6    ready?

03:46PM    7            Judge, may I inquire?

03:46PM    8            **THE COURT:**  You may.

03:46PM    9

03:46PM   10        **VOIR DIRE EXAMINATION - NO JURY - BY MR. COOPER:**

03:46PM   11    Q.  So, ma'am, we're going to ask you some questions without

03:46PM   12    the jury here just to decide a legal issue about whether

03:46PM   13    something's admissible or not.  It doesn't have anything to

03:46PM   14    do with anything you said right or wrong; do you understand?

03:46PM   15    A.  Yes.

03:46PM   16    Q.  Okay.  Peter Gerace ultimately tells you that -- well,

03:46PM   17    let me read it.

03:46PM   18        Peter tells you, Joe saw a picture of you in this drug

03:46PM   19    dealer's house or something like that --

03:46PM   20    A.  Yeah.

03:46PM   21    Q.  -- is that right?

03:46PM   22    A.  Along the context of that.

03:46PM   23    Q.  Okay.  And when Peter said that to you, did that cause

03:46PM   24    you in the future to avoid associating with Craig Border?

03:46PM   25    A.  I don't think it necessarily avoided me associating with

03:46PM    1    him.  He ended up just going to jail.

03:46PM    2    Q.  Okay.  Well, I guess not whether it did cause you to

03:46PM    3    avoid associating with him, but in your head, were you like,

03:46PM    4    oh, I'm going to stay away from that guy.  Now did that

03:47PM    5    thought cross your mind when Peter told you this?

03:47PM    6    A.  Potentially.  But it was more so that I was dating Peter,

03:47PM    7    so I was no longer dating Craig.

03:47PM    8    Q.  I get that.  But the question is, did -- I'm asking did

03:47PM    9    the thought cross your mind, like, I better stay away from

03:47PM   10    Craig 'cuz he's a drug dealer, and a DEA agent raided his

03:47PM   11    house?

03:47PM   12    A.  Truthfully, I -- I -- I mean, I was -- I don't think it

03:47PM   13    really made a difference.  I mean, I'm not gonna, like --

03:47PM   14    Q.  All we want is the truth.

03:47PM   15         **THE COURT:**  That's right.  He's not trying to get you

03:47PM   16    to say anything.

03:47PM   17         We just want to know when you heard that, did you

03:47PM   18    think to yourself, I shouldn't go see Craig Border because

03:47PM   19    he's a drug dealer who's being investigated?

03:47PM   20         **THE WITNESS:**  Yes.

03:47PM   21         **MR. COOPER:**  Okay.

03:47PM   22         **THE COURT:**  You did think that?

03:47PM   23         **THE WITNESS:**  I thought that.

03:47PM   24         **THE COURT:**  Okay.  Mr. Singer, do you want to ask

03:47PM   25    some questions?

USA v Bongiovanni - R.A. - Singer/Voir Dire - 9/13/24

45

03:47PM    1

03:47PM    2         **VOIR DIRE EXAMINATION - NO JURY - BY MR. SINGER:**

03:47PM    3   Q.  So Ms. R.A. -- I'm sorry, I'll go from here.

03:47PM    4      So Ms. R.A., so let's break it down a little bit.

03:48PM    5      So you and Peter are together in a room when you have

03:48PM    6   this conversation?

03:48PM    7   A.  I'm sorry, I didn't hear you.

03:48PM    8   Q.  Where are you and Peter when Peter tells you about this

03:48PM    9   photograph that was found in Craig Border's house?

03:48PM   10   A.  I think we were at our house, or our apartment.

03:48PM   11   Q.  So you're in your house, to the best of your memory,

03:48PM   12   right?

03:48PM   13   A.  Yes.

03:48PM   14   Q.  And then when Peter is bringing this up in conversation,

03:48PM   15   was this something that just came out of the blue?  Or were

03:48PM   16   you guys involved in some type of conversation at the time?

03:48PM   17   A.  I just think, like, Peter had tendency to be a little

03:48PM   18   jealous sometimes, so I think it came in -- like, came up in

03:48PM   19   a disagreement probably from -- because of what I did in my

03:48PM   20   past or whatever.  He's kind of like, oh, by the way, like,

03:48PM   21   you know, this happened.

03:48PM   22   Q.  So I'm guilty of this sometimes where my wife tells me I

03:48PM   23   do something wrong, and I say well, hold on a second, do you

03:48PM   24   remember when you did this?

03:48PM   25   A.  Right.

03:48PM   1    Q.  Was that kind of the context of something that this came

03:49PM   2    up in?

03:49PM   3    A.  Yes.

03:49PM   4    Q.  All right.

03:49PM   5    A.  It was like that.

03:49PM   6    Q.  So when he made the statement to you, Peter, about what

03:49PM   7    Joe Bongiovanni purportedly found in the house --

03:49PM   8    A.  Um-hum.

03:49PM   9    Q.  -- what was the first thing that came in your head after

03:49PM  10    that statement was made?

03:49PM  11    A.  Actually, I was kind of embarrassed because, oh, like,

03:49PM  12    his friend saw me in some lingerie.  I mean, that's really

03:49PM  13    kind of what the first thing that came into my head was.

03:49PM  14    Q.  So the first thing that came up in your head was

03:49PM  15    embarrassment.

03:49PM  16    A.  Yes.

03:49PM  17    Q.  As -- as time progressed, what was the next thing that

03:49PM  18    came up in your mind about what you'd just been told?

03:49PM  19    A.  Well, like, what do you mean by that?

03:49PM  20    Q.  Yeah.  So I guess one of the things you just stated

03:49PM  21    during this question-and-answer process is that you had some

03:49PM  22    type of concerns about I shouldn't hang out with this guy.

03:50PM  23        I realize, like, that's what the judge asked you and

03:50PM  24    that's what prosecutor asked you, right?

03:50PM  25    A.  Um-hum.

03:50PM  1   Q.  But what I'm trying to determine is when did that thought

03:50PM  2   enter your head?

03:50PM  3   A.  I wasn't hanging out with him at all anyway.  I wasn't,

03:50PM  4   like, he was already, like, in jail I think.  Or -- I'm not

03:50PM  5   really sure how that all came about.

03:50PM  6       But I didn't think I'm not going to hang out with him

03:50PM  7   because I'm wouldn't hang out with him anyway because I'm

03:50PM  8   dating Peter.

03:50PM  9   Q.  Yeah, and so let's kind of backtrack a little bit.

03:50PM  10      So you testified on direct about --

03:50PM  11  A.  Right.

03:50PM  12  Q.  -- you started dating Peter sometime in -- when?  What

03:50PM  13  year?

03:50PM  14  A.  2005, it had to be.

03:50PM  15  Q.  So we saw the picture of you and Peter at the restaurant,

03:50PM  16  right?

03:50PM  17  A.  Yes.

03:50PM  18  Q.  That was July of '05, correct?

03:50PM  19  A.  Yes.

03:50PM  20  Q.  So did you start dating Peter before that?

03:50PM  21  A.  Yes.

03:50PM  22  Q.  How much more before that July dinner photo did you date

03:50PM  23  Peter?

03:50PM  24  A.  Let's see.  Probably two months before that.

03:51PM  25  Q.  All right.  So it would have been summer of 2005 when you

| | | |
|---|---|---|
| 03:51PM | 1 | started dating? |
| 03:51PM | 2 | A.  Yes. |
| 03:51PM | 3 | Q.  Fast forward, this particular conversation, when do you |
| 03:51PM | 4 | believe this conversation occurred? |
| 03:51PM | 5 | A.  In September. |
| 03:51PM | 6 | Q.  So were you pregnant at the time? |
| 03:51PM | 7 | A.  I just found out I was pregnant. |
| 03:51PM | 8 | Q.  All right.  So you just found out you were pregnant. |
| 03:51PM | 9 | Were you married at the time to Peter at that time? |
| 03:51PM | 10 | A.  Was I married to him? |
| 03:51PM | 11 | Q.  Yes. |
| 03:51PM | 12 | A.  No. |
| 03:51PM | 13 | Q.  Okay.  So you're still -- were you engaged at that time? |
| 03:51PM | 14 | A.  No. |
| 03:51PM | 15 | Q.  So in September of 2005, how much time had elapsed since |
| 03:51PM | 16 | you ended your relationship with Craig Border? |
| 03:51PM | 17 | A.  Well, I was dating Craig right before I met Peter.  Like |
| 03:52PM | 18 | right before, probably like a month before. |
| 03:52PM | 19 | Q.  And you said you started up your relationship with Peter |
| 03:52PM | 20 | sometime in May of 2005? |
| 03:52PM | 21 | A.  Yes. |
| 03:52PM | 22 | Q.  So would you have been dating Craig up to when in '05? |
| 03:52PM | 23 | A.  Probably beginning of July maybe.  No, I'm sorry, June. |
| 03:52PM | 24 | Q.  I'm sorry? |
| 03:52PM | 25 | A.  May and June.  I only dated him for like a month. |

| | | |
|---|---|---|
| 03:52PM | 1 | Q.  Yeah, and I guess -- so I'm a little confused.  So you |
| 03:52PM | 2 | started dating Peter you just said in May of '05; is that |
| 03:52PM | 3 | right? |
| 03:52PM | 4 | A.  Yes. |
| 03:52PM | 5 | Q.  Because that was -- that was roughly about two months |
| 03:52PM | 6 | before that July dinner photo that we saw in 2005, correct? |
| 03:52PM | 7 | A.  What? |
| 03:52PM | 8 | Q.  So the picture that you got shown on direct? |
| 03:52PM | 9 | A.  Okay, yes.  This is a really long time ago, so -- |
| 03:52PM | 10 | Q.  No, no, no, I know.  I'm sorry, I'm trying to work |
| 03:52PM | 11 | through it.  So that particular photograph was taken in July |
| 03:52PM | 12 | of 2005? |
| 03:52PM | 13 | A.  Yes. |
| 03:52PM | 14 | Q.  We know that from the stamp on the back of it. |
| 03:53PM | 15 | A.  Um-hum. |
| 03:53PM | 16 | Q.  So, you said that you started dating Peter in May of |
| 03:53PM | 17 | 2005, right? |
| 03:53PM | 18 | A.  Um-hum. |
| 03:53PM | 19 | Q.  So, you just said that you were dating Craig in June of |
| 03:53PM | 20 | '05. |
| 03:53PM | 21 | A.  I'm sorry, so it had to have been in April then. |
| 03:53PM | 22 | Q.  Okay. |
| 03:53PM | 23 | A.  Like a month before. |
| 03:53PM | 24 | Q.  Yeah.  No, no, that's what I was getting at. |
| 03:53PM | 25 | Okay.  So, yeah.  So your relationship with Border |

03:53PM   1   completely ends before you start dating Peter?

03:53PM   2   A.  Yes.

03:53PM   3   Q.  So the last possible time you could have probably been

03:53PM   4   dating him was in April of 2005?

03:53PM   5   A.  Yes.

03:53PM   6   Q.  So, April to September of '05, that's a number of months,

03:53PM   7   correct?

03:53PM   8   A.  Um-hum.

03:53PM   9   Q.  And had you seen Craig Border at all in that period of

03:53PM  10   time after you broke up with him and started dating Peter?

03:53PM  11   A.  No.

03:53PM  12   Q.  Had you talked to him on the phone?

03:53PM  13   A.  No.

03:53PM  14   Q.  Had you ever purchased any type of drugs from him?

03:53PM  15   A.  No.

03:53PM  16         THE COURT:  Would you have seen him if Peter had not

03:53PM  17   told you that there was a -- that somebody saw a photograph of

03:53PM  18   you at his house and he was being investigated for drugs?

03:54PM  19         THE WITNESS:  I probably wouldn't talk to him,

03:54PM  20   because I'd be like, oh, well, he's being investigated.  Like,

03:54PM  21   you know.

03:54PM  22         THE COURT:  No, no.  But I'm saying if Peter hadn't

03:54PM  23   said that to you, would you have seen him and talked to him?

03:54PM  24         THE WITNESS:  I wouldn't be afraid to if I saw him.

03:54PM  25         THE COURT:  Yeah, but the question I have is, I mean,

03:54PM   1    so you broke up with him.

03:54PM   2            **THE WITNESS:**  Yes.

03:54PM   3            **THE COURT:**  And now we're six months down the road.

03:54PM   4            **THE WITNESS:**  Right.

03:54PM   5            **THE COURT:**  And now the question is, would you have

03:54PM   6    seen him?  Would you have had occasion to see him, would you

03:54PM   7    have had reason to see him, had Peter not said that to you?

03:54PM   8    Did it make a difference?

03:54PM   9            **THE WITNESS:**  No.

03:54PM   10           **THE COURT:**  It didn't make a difference.

03:54PM   11           **THE WITNESS:**  I don't think it made a difference.

03:54PM   12           I'm sorry, I'm really confused.

03:54PM   13           **MR. COOPER:**  You're doing fine.  This is legal stuff

03:55PM   14   for us to argue about.  All you have to do is answer the

03:55PM   15   questions.  You're doing fine.

03:55PM   16           Judge, I have I think a little argument depending on

03:55PM   17   which way you're coming down here, but I'll wait.

03:55PM   18           **THE COURT:**  Do you want -- well, let's see if

03:55PM   19   Mr. Singer has any more questions.

03:55PM   20           **MR. SINGER:**  Just one moment, Judge.

03:55PM   21           **THE WITNESS:**  I mean, I'm just thinking of -- oh.

03:55PM   22           **BY MR. SINGER:**

03:55PM   23   Q.  I think the only other question I had is when you broke

03:55PM   24   up with Border, you just left him completely, correct?

03:55PM   25   A.  Yes.

Case 1:19-cr-00227-LJV-MJR    Document 1321    Filed 10/27/24    Page 52 of 110
USA v Bongiovanni - R.A. - Singer/Voir Dire - 9/13/24

52

03:55PM    1    Q.  And there really wasn't a lot of communication about the

03:55PM    2    breakup between both of you?

03:55PM    3    A.  No.

03:55PM    4    Q.  And that's why there wasn't any communication --

03:55PM    5    A.  Right.

03:55PM    6    Q.  -- between the both of you?

03:55PM    7    A.  Um-hum.

03:55PM    8    Q.  Did you leave on bad terms?

03:55PM    9    A.  No, it was just really short lived.

03:55PM   10    Q.  Okay.  So it was a -- kind of a superficial relationship?

03:56PM   11    A.  Yeah, a relationship of opportunity, I would have to say

03:56PM   12    that.

03:56PM   13    Q.  And how long was that relationship with Craig again?

03:56PM   14    A.  Probably a month.

03:56PM   15    Q.  All right.

03:56PM   16         **THE COURT:**  Did you ever see him after that?

03:56PM   17         **THE WITNESS:**  No.

03:56PM   18         **THE COURT:**  To this day?

03:56PM   19         **THE WITNESS:**  No.

03:56PM   20         **THE COURT:**  Okay.  Anything?

03:56PM   21         **MR. COOPER:**  I don't have any -- I don't think I need

03:56PM   22    to ask more questions.

03:56PM   23         **THE COURT:**  Fine.

03:56PM   24         Okay.  So why don't you step out, ma'am.

03:56PM   25         (Witness excused at 3:56 p.m.)

03:56PM     1              (Jury not present.)

03:56PM     2          **MR. COOPER:**  So focusing only on the second prong

03:56PM     3      that Your Honor brought her in for the voir dire for.

03:56PM     4          **THE COURT:**  Right.

03:56PM     5          **MR. COOPER:**  The second prong is about whether it in

03:56PM     6      fact furthered a goal of the conspiracy.

03:56PM     7              What she said was if he hadn't said anything to me,

03:56PM     8      had not said anything to me, I wouldn't have been concerned

03:57PM     9      about interacting with Border in the future.

03:57PM    10              Because he did say something to me -- because he did

03:57PM    11      say something to me, I would have been concerned to interact

03:57PM    12      with him in the future.

03:57PM    13          **THE COURT:**  She said it wouldn't have made any

03:57PM    14      difference.

03:57PM    15          **MR. COOPER:**  But, Judge, what we were asking her to

03:57PM    16      do with those questions is speculate whether she ever would

03:57PM    17      have ever seen that person again.

03:57PM    18              But at the moment she's hearing it, it causes her to

03:57PM    19      say if he hadn't said it, I wouldn't have had any problem

03:57PM    20      associating with him.  Once he said it, I would have a

03:57PM    21      problem.

03:57PM    22              Those were the operative questions.  Your Honor, I

03:57PM    23      think, hit both of them.  But that's the analysis for that

03:57PM    24      second prong.

03:57PM    25          **MR. SINGER:**  So, Judge, if you notice the approach

03:57PM    1    that I took in contrast, with all due respect, to yourself and

03:57PM    2    Mr. Cooper, I asked very open-ended questions about what was

03:57PM    3    the first thing in your mind, and allowed Ms. R.A. to fill in

03:57PM    4    the blank.

03:57PM    5         What did I not do is say, hey, did this put in your

03:57PM    6    head that you should stay away from him?

03:57PM    7         And if you noticed, when I asked her the open-ended

03:58PM    8    question, I think we got the most truthful and accurate

03:58PM    9    answer, versus when we asked her the close-ended question of

03:58PM   10    simply getting out the answer which would allow this to become

03:58PM   11    admissible from the government's perspective.

03:58PM   12         And when you start to further dive into the context,

03:58PM   13    Judge, this is happening during some type of lover's quarrel

03:58PM   14    or something elsewhere where, you know, she says one thing, he

03:58PM   15    says the other, and then he kind of he retorts back, well, you

03:58PM   16    know what?  I know that you have pictures over here because

03:58PM   17    someone told me.

03:58PM   18         And she, as she testified, the first thing in her

03:58PM   19    head is like, oh, my God that's embarrassing.

03:58PM   20         That's what's going on.

03:58PM   21         On top of that, she has a very superficial

03:58PM   22    relationship with Mr. Border.  It lasts a month.  She never

03:58PM   23    purchased drugs from Mr. Border, so she doesn't really have

03:58PM   24    any understanding of what's going on with him with regard to

03:58PM   25    his drug-dealing activities.

03:58PM   1            And if, you know, she was -- she also testified that

03:58PM   2   she never would go there to go purchase drugs because she

03:58PM   3   didn't have any type of a relationship with him at all.

03:58PM   4            THE COURT:  Okay.

03:58PM   5            MR. SINGER:  That all falls apart right there.

03:59PM   6            I think if you go back to the Beechnut case, Judge,

03:59PM   7   this falls into that idle chatter or mere narrative which is

03:59PM   8   not in furtherance of the conspiracy.

03:59PM   9            THE COURT:  Okay.  You get the last word, Mr. Cooper.

03:59PM  10            MR. COOPER:  First of all, I -- I understand that the

03:59PM  11   open-ended, non-leading question, elicited the answer that was

03:59PM  12   obviously most in her mind, which makes sense, because it is

03:59PM  13   embarrassing, probably mortifying for her.  But that doesn't

03:59PM  14   mean the answer she gave the Court was inaccurate, or that you

03:59PM  15   put it in her -- in her mind.

03:59PM  16            You asked her, would it have made you less likely to

03:59PM  17   interact with the person in the future.  She answered that

03:59PM  18   question.

03:59PM  19            A separate question was, if he hadn't -- you asked

03:59PM  20   her, Judge, if he had not said anything to you, would that --

03:59PM  21   would you have?  And she said sure.

03:59PM  22            Like, the delineating fact there is Peter saying it

03:59PM  23   to her.  And so that's the final argument that I have, and

03:59PM  24   I'll submit to the Court's ruling.

03:59PM  25            THE COURT:  This is -- it's a very close question.

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24
56

04:00PM  1   And I think what tips the balance for me was her statement

04:00PM  2   that it wouldn't have made any difference.

04:00PM  3        And I think that based on that, she would not have

04:00PM  4   seen him, and it's not in furtherance of the conspiracy.

04:00PM  5        So it's a close question.  I know we've rolled around

04:00PM  6   with it quite a bit, but I'm not going to let it in.  I'm not

04:00PM  7   going to let it in.

04:00PM  8        And it's, as I say, it's a -- if the standard weren't

04:00PM  9   a preponderance, then I would let it in.  But it is a

04:00PM  10  preponderance, I've got to find more likely than not, and I

04:00PM  11  just don't think I can in good conscience find it.

04:00PM  12       Okay.  Let's get the jury back in, let's bring her

04:00PM  13  back in.  How much longer are you going to be, Mr. Cooper?

04:00PM  14       **MR. COOPER:**  I've lost my place, give me a second.

04:00PM  15  It's been a while.

04:00PM  16       **THE COURT:**  Yeah, I know.

04:00PM  17       **MR. COOPER:**  Very short.  And I do plan to go about

04:00PM  18  this in different ways without eliciting hearsay.  So I'm not

04:01PM  19  trying to be sideways with it.  Obviously, he can object as

04:01PM  20  much as he wants, but I just want to be clear about that.

04:01PM  21       **MR. SINGER:**  I will object as much as I want.

04:01PM  22       **MR. COOPER:**  No, I didn't mean that in a --

04:01PM  23       **THE COURT:**  He didn't need your permission?

04:01PM  24       **MR. COOPER:**  Correct.  Definitely didn't think that.

04:01PM  25       **THE COURT:**  Who's after her?

04:01PM 　 1 　　　　　 **MR. COOPER:** Craig Border. Less than 20 minutes.

04:01PM 　 2 　　　　　 **MR. TRIPI:** And he's going to say certain photos are

04:01PM 　 3 missing in his residence.

04:01PM 　 4 　　　　　 (Witness seated at 4:01 p.m.)

04:03PM 　 5 　　　　　 (Jury seated at 4:03 p.m.)

04:03PM 　 6 　　　　　 **THE COURT:** Okay. The record will reflect that all

04:03PM 　 7 our jurors are present again.

04:03PM 　 8 　　　　　 I apologize for the delay, but as I say, we had a

04:03PM 　 9 legal issue that we needed to vet outside your presence.

04:03PM 　 10 　　　　　 You may continue.

04:03PM 　 11 　　　　　 I remind the witness she's still under oath.

04:03PM 　 12 　　　　　 You may continue.

04:03PM 　 13 　　　　　 **MR. COOPER:** Thank you, Judge.

04:03PM 　 14

04:03PM 　 15 　　　　　 **(CONT'D) DIRECT EXAMINATION BY MR. COOPER:**

04:03PM 　 16 Q. Ms. R.A., a little while ago, I was asking you questions

04:03PM 　 17 about some photographs that someone took of you; do you

04:03PM 　 18 remember those questions?

04:03PM 　 19 A. Yes.

04:03PM 　 20 Q. What was the name of the person who took those

04:03PM 　 21 photographs?

04:03PM 　 22 A. Craig Border.

04:03PM 　 23 Q. Okay. And that was like a boyfriend from before you met

04:03PM 　 24 Peter Gerace, right?

04:03PM 　 25 A. Yes.

04:03PM   1    Q.  Was he -- was your relationship with Border kind of the

04:03PM   2    one right before you got involved in a relationship with

04:03PM   3    Gerace?

04:03PM   4    A.  Yes.

04:03PM   5    Q.  Okay.  We talked about those photos before.  Was that

04:03PM   6    wearing, like, a Playboy Bunny outfit?

04:03PM   7    A.  Yes.

04:03PM   8    Q.  Okay.  And did you -- did you ever tell Peter Gerace

04:04PM   9    about the existence of those photos?

04:04PM   10   A.  No.

04:04PM   11   Q.  Did there come a time when Peter Gerace confronted you

04:04PM   12   about the existence of those photos?

04:04PM   13   A.  Yes.

04:04PM   14        MR. SINGER:  Objection.  Again, calls for hearsay.

04:04PM   15        MR. COOPER:  It's a confrontation, Judge.

04:04PM   16        THE COURT:  No.  No.  Overruled.

04:04PM   17        BY MR. COOPER:

04:04PM   18   Q.  Did Peter Gerace confront you about the existence of

04:04PM   19   those photos?

04:04PM   20   A.  Yes.

04:04PM   21   Q.  Is that -- you recall that happening specifically in your

04:04PM   22   mind?

04:04PM   23   A.  Yes.

04:04PM   24   Q.  I'm not going ask you what was said during that

04:04PM   25   confrontation, but was that the same time in your life when

| | | |
|---|---|---|
| 04:04PM | 1 | you learned what this defendant did for work? |
| 04:04PM | 2 | A.   Yes. |
| 04:04PM | 3 | Q.   Was it the same day? |
| 04:04PM | 4 | A.   No. |
| 04:04PM | 5 | Q.   Without getting into the contents of what Peter Gerace |
| 04:04PM | 6 | said to you, did you come to learn from talking with Peter |
| 04:04PM | 7 | Gerace how Peter Gerace knew about those photos of you in the |
| 04:05PM | 8 | Playboy Bunny outfit in Craig Border's house? |
| 04:05PM | 9 | A.   Yes. |
| 04:05PM | 10 | **MR. SINGER:**  Objection.  Calls for hearsay. |
| 04:05PM | 11 | **THE COURT:**  No.  Did she learn, no. |
| 04:05PM | 12 | **BY MR. COOPER:** |
| 04:05PM | 13 | Q.   Did you come to learn that, ma'am? |
| 04:05PM | 14 | A.   Yes. |
| 04:05PM | 15 | Q.   Who's the person who told you that?  Who told you how |
| 04:05PM | 16 | they learned of it? |
| 04:05PM | 17 | A.   Peter. |
| 04:05PM | 18 | Q.   Peter told you how he learned of it? |
| 04:05PM | 19 | A.   Yes. |
| 04:05PM | 20 | Q.   Okay.  During the course of your relationship with Peter |
| 04:05PM | 21 | Gerace, did there come a time where you learned that he was |
| 04:05PM | 22 | using cocaine? |
| 04:05PM | 23 | A.   Yes. |
| 04:05PM | 24 | Q.   Okay.  And did that cocaine use by Peter cause some |
| 04:05PM | 25 | consternation in your relationship with him? |

| | | |
|---|---|---|
| 04:05PM | 1 | A.  Yes. |
| 04:05PM | 2 | Q.  Why? |
| 04:05PM | 3 | A.  Because he wouldn't come home sometimes. |
| 04:05PM | 4 | Q.  Okay.  Did you know where he worked when you were living |
| 04:05PM | 5 | with him in your relationship? |
| 04:05PM | 6 | A.  Yes. |
| 04:05PM | 7 | Q.  Where did he work? |
| 04:05PM | 8 | A.  Pharaoh's. |
| 04:05PM | 9 | Q.  Okay.  What was his role or his position there? |
| 04:05PM | 10 | A.  He ran it. |
| 04:05PM | 11 | Q.  Okay.  Did you understand him to be the owner? |
| 04:05PM | 12 | A.  Yes. |
| 04:05PM | 13 | **MR. COOPER:**  Can I just have one second, please, |
| 04:06PM | 14 | Judge? |
| 04:06PM | 15 | **THE COURT:**  Sure. |
| 04:06PM | 16 | **BY MR. COOPER:** |
| 04:06PM | 17 | Q.  Ma'am, that individual, Craig Border, as you sit here, do |
| 04:06PM | 18 | you recall where you -- where he lived when you were dating |
| 04:06PM | 19 | him? |
| 04:06PM | 20 | A.  Yes. |
| 04:06PM | 21 | Q.  Was that on Main Street? |
| 04:06PM | 22 | A.  Yes. |
| 04:06PM | 23 | Q.  Do you remember the exact address? |
| 04:06PM | 24 | A.  It was the Sidway Building. |
| 04:06PM | 25 | Q.  What's that? |

04:06PM   1   A.  It was the Sidway Building --

04:06PM   2   Q.  Okay.

04:06PM   3   A.  -- before it was U.B., whatever they have there.

04:06PM   4   Q.  Got it.

04:06PM   5        **MR. COOPER:**  I have no further direct.  Thank you,

04:06PM   6   Judge.

04:06PM   7        **THE COURT:**  Okay.  Cross?

04:06PM   8

04:06PM   9             **CROSS-EXAMINATION BY MR. SINGER:**

04:06PM  10   Q.  Hi, Ms. R.A.

04:06PM  11   A.  Hi.

04:06PM  12   Q.  So, you testified on direct that you first met Joe

04:07PM  13   Bongiovanni through Peter Gerace.

04:07PM  14   A.  Yes.

04:07PM  15   Q.  And that particular photograph that we saw of you four at

04:07PM  16   the restaurant, that was something that was taken right

04:07PM  17   around the same time that you started a relationship with

04:07PM  18   Peter Gerace?

04:07PM  19   A.  Yes.

04:07PM  20   Q.  So at that particular dinner, was anyone using drugs?

04:07PM  21   A.  No.

04:07PM  22   Q.  You came to learn that Peter and Joe Bongiovanni, they

04:07PM  23   were friends based on having a relationship for a number of

04:07PM  24   years?

04:07PM  25   A.  Yes.

04:07PM    1    Q.  And you dated Peter Gerace starting in 2005; is that

04:07PM    2    right?

04:07PM    3    A.  Yes.

04:07PM    4    Q.  When was it that your relationship with Peter Gerace

04:07PM    5    ended?

04:07PM    6    A.  Well, it was very tumultuous.  It probably lasted about

04:07PM    7    seven or eight years on and off.

04:07PM    8    Q.  Okay.  So it was an on-again-off-again situation?

04:07PM    9    A.  Yes.

04:07PM   10    Q.  You mentioned that you had a child together; is that

04:07PM   11    right?

04:07PM   12    A.  Yes.

04:07PM   13    Q.  When was it that your son was born, again?

04:07PM   14    A.  2006.

04:07PM   15    Q.  And how soon after your son was born did things start to

04:08PM   16    kind to become on and off with Peter?

04:08PM   17    A.  Pretty much immediately.

04:08PM   18    Q.  Okay.  So you were on again and off again from 2006

04:08PM   19    onward?

04:08PM   20    A.  Yes.

04:08PM   21    Q.  All right.  Now you recall that when you first started

04:08PM   22    dating Peter in 2005, that's when you saw Mr. Bongiovanni

04:08PM   23    more often?

04:08PM   24    A.  Yes.

04:08PM   25    Q.  But as your relationship progressed throughout the years,

04:08PM   1   you didn't see him as often?

04:08PM   2   A.  No.

04:08PM   3   Q.  You talked about a time where you, Peter, Joe, and his

04:08PM   4   girlfriend went down to Ellicottville?

04:08PM   5   A.  Yes.

04:08PM   6   Q.  And so Ellicottville, it's kind of like a ski town about

04:08PM   7   an hour south of here?

04:08PM   8   A.  Yes.

04:08PM   9   Q.  A bunch of shops and restaurants?

04:08PM   10  A.  Yeah, shops and restaurants.

04:08PM   11  Q.  Did you guys spend the night there, or did you just go

04:08PM   12  down there for the day?

04:08PM   13  A.  We spent the night there.

04:08PM   14  Q.  And was that just for a weekend?

04:08PM   15  A.  Yes.

04:09PM   16  Q.  Was that particular trip something that happened in 2005

04:09PM   17  before you got pregnant?

04:09PM   18  A.  Yes.

04:09PM   19  Q.  You also mentioned that you went to Niagara-on-the-Lake?

04:09PM   20  A.  Yes.

04:09PM   21  Q.  And that sounded like it was just a day trip?

04:09PM   22  A.  Yeah.

04:09PM   23  Q.  And I think you said that you did some horse-drawn

04:09PM   24  carriage and also went to some wineries?

04:09PM   25  A.  Yes.

USA v Bongiovanni - R.A. - Singer/Cross - 9713/24
64

04:09PM    1    Q.  And that you had some dinner?

04:09PM    2    A.  Yes.

04:09PM    3    Q.  And then you crossed the border and went on your separate

04:09PM    4    ways?

04:09PM    5    A.  Yes.

04:09PM    6    Q.  And so as far as Mr. Bongiovanni was concerned, you

04:09PM    7    wouldn't see him every day of the week --

04:09PM    8    A.  No.

04:09PM    9    Q.  -- when you were dating Peter?

04:09PM   10    A.  No.

04:09PM   11    Q.  No?

04:09PM   12    A.  No.

04:09PM   13    Q.  Safe to say you'd see him maybe one or two times a month?

04:09PM   14    A.  Yeah, safe to say that.  Maybe every other weekend, so,

04:09PM   15    yes.

04:09PM   16    Q.  And in the context that you'd see him, you'd see in kind

04:09PM   17    of a social situation like a bar or restaurant?

04:10PM   18    A.  Yes.

04:10PM   19    Q.  Did you ever see him use any type of illegal substances?

04:10PM   20    A.  Never.

04:10PM   21    Q.  Did you and Peter ever use illegal substances in his

04:10PM   22    presence?

04:10PM   23    A.  Never.

04:10PM   24    Q.  Peter also had another friend Dan Derenda; is that right?

04:10PM   25    A.  Yes.

| | | |
|---|---|---|
| 04:10PM | 1 | Q. And Daniel Derenda, he was the commissioner of police for |
| 04:10PM | 2 | Buffalo? |
| 04:10PM | 3 | A. Um-hum. |
| 04:10PM | 4 | Q. I think he had a relationship with Peter based on the |
| 04:10PM | 5 | fact that Mr. Derenda was a godfather to one of Peter's |
| 04:10PM | 6 | children? |
| 04:10PM | 7 | A. Yes. |
| 04:10PM | 8 | Q. Is that your son? |
| 04:10PM | 9 | A. No. |
| 04:10PM | 10 | Q. Okay. How often would you see Peter hanging out with Dan |
| 04:10PM | 11 | Derenda? |
| 04:10PM | 12 | **MR. COOPER:** Objection, relevance. |
| 04:10PM | 13 | **THE COURT:** Overruled. |
| 04:10PM | 14 | **THE WITNESS:** Not very often. |
| 04:10PM | 15 | **BY MR. SINGER:** |
| 04:10PM | 16 | Q. Was it kind of the same frequency as you saw Peter |
| 04:10PM | 17 | hanging out with Joseph Bongiovanni? |
| 04:10PM | 18 | A. Yes, but less. |
| 04:10PM | 19 | Q. You talked a little bit about your experience within the |
| 04:11PM | 20 | strip club industry? |
| 04:11PM | 21 | A. Yes. |
| 04:11PM | 22 | Q. And I think one of the things that you mentioned -- |
| 04:11PM | 23 | Excuse me, let me just get my pad. |
| 04:11PM | 24 | -- one of the things you mentioned on direct is it was |
| 04:11PM | 25 | very difficult to work a job like that sober; do you remember |

04:11PM   1    testifying to that?

04:11PM   2    A.   Yes.

04:11PM   3    Q.   And in your experience, I think you also testified that

04:11PM   4    drug use is very common at exotic clubs like that?

04:11PM   5    A.   Yes.

04:11PM   6    Q.   And I think you also testified that based on the nature

04:11PM   7    of the work, and based on some of the pressures associated

04:11PM   8    with it, you started to use narcotics more often as time

04:11PM   9    progressed in the industry?

04:11PM   10   A.   Yes.

04:11PM   11   Q.   Was that your experience that other women who worked in

04:11PM   12   the industry would kind of go down a similar path?

04:11PM   13   A.   Absolutely.

04:11PM   14   Q.   Is that somewhat the culture that exists inside exotic

04:12PM   15   dance clubs?

04:12PM   16         **MR. COOPER:**  Objection as to culture.

04:12PM   17         **THE COURT:**  Go ahead.

04:12PM   18         **MR. COOPER:**   There's one club that's at issue in this

04:12PM   19   trial.  The culture in other clubs is not relevant to this

04:12PM   20   proceeding.

04:12PM   21         **THE COURT:**  Yeah.  Overruled.

04:12PM   22         **THE WITNESS:**  It's common through strip clubs

04:12PM   23   everywhere in America.

04:12PM   24         **BY MR. SINGER:**

04:12PM   25   Q.   Do you know a person by the name of Katrina Nigro?

04:12PM    1    A.  Yes.

04:12PM    2    Q.  How do you know Ms. Nigro?

04:12PM    3    A.  I used to dance with her in the early 2000s.  She owned a

04:12PM    4    clothing store, I bought some exotic clothing costumes from

04:12PM    5    her.

04:12PM    6    Q.  So what year do you think you first met Ms. Nigro?

04:13PM    7    A.  2003 or 2004.

04:13PM    8    Q.  And how -- I guess, was there a point in time where you

04:13PM    9    stopped seeing Ms. Nigro?

04:13PM   10    A.  Yes.

04:13PM   11    Q.  When do you think you stopped seeing Ms. Nigro?  When did

04:13PM   12    that time occur?

04:13PM   13    A.  What do you mean, stopped seeing her?

04:13PM   14    Q.  Sure.  So I guess I think you just testified that you

04:13PM   15    first met her in 2003; is that right?

04:13PM   16    A.  Yes.

04:13PM   17    Q.  And then after meeting her in 2003, you'd see her, it

04:13PM   18    sounds like, in work situations?

04:13PM   19    A.  Yes, in work situations.

04:13PM   20    Q.  You testified that she sold different types of clothing?

04:13PM   21    A.  Um-hum.

04:13PM   22    Q.  Were you a customer at her store?

04:13PM   23    A.  Yes.

04:13PM   24    Q.  And you also saw her at various clubs that you worked at?

04:13PM   25    A.  Yes.

04:13PM   1   Q.  And we're not talking about Pharaoh's Gentlemen's Club,

04:13PM   2   correct?

04:13PM   3   A.  No.

04:13PM   4   Q.  We're talking about other locations?

04:13PM   5   A.  Yes.

04:13PM   6   Q.  Were those locations within the City of Buffalo?

04:13PM   7   A.  No.

04:13PM   8   Q.  Where are those locations at?

04:13PM   9   A.  Erie, Pennsylvania.  Rochester.

04:13PM  10   Q.  Would you go down to -- trips to Erie, Pennsylvania, or

04:14PM  11   out to Rochester with Ms. Nigro?

04:14PM  12   A.  Yes.

04:14PM  13   Q.  Would the two of you drive together?

04:14PM  14   A.  I'm not sure if we drove together, it was a long time

04:14PM  15   ago.  But we, like, we would -- she would message me and tell

04:14PM  16   me this club is, you know, I'm working here tonight, or

04:14PM  17   there's money here, so I would obviously go to that club.

04:14PM  18           MR. COOPER:  Judge, I'm going to object at this point

04:14PM  19   to relevance on this line of questioning.

04:14PM  20           THE COURT:  Yes, I'm not getting the relevance

04:14PM  21   either.

04:14PM  22           MR. SINGER:  May we approach, Judge?

04:14PM  23           THE COURT:  Yeah, come on up.

04:14PM  24           (Sidebar discussion held on the record.)

04:14PM  25           THE COURT:  I'm giving you real wide berth in cross.

USA v Bongiovanni - R.A. - Singer/Cross - 9/13/24

04:14PM    1          **MR. SINGER:**  I understand, Judge.

04:14PM    2          And so we're preparing to lay foundation for Ms. R.A.

04:14PM    3    to offer her opinion as to the character for truthfulness of

04:14PM    4    Ms. Nigro, as well as her reputation within the community or

04:14PM    5    the business community that she exists as far as truthfulness

04:14PM    6    is concerned.  I can adopt this witness as my own, or I can

04:14PM    7    recall her.  That's where I'm going.

04:15PM    8          **MR. COOPER:**  Well, I think he certainly think he has

04:15PM    9    to adopt the witness as his own, no question.

04:15PM   10          But I didn't make a leading objection.  I mean, I

04:15PM   11    actually think he was asking open-ended questions, so I'm not

04:15PM   12    trying to give him a hard time about that.  I didn't know

04:15PM   13    where we were headed with this, and I tried to give it a

04:15PM   14    little bit, but I still didn't know.

04:15PM   15          **THE COURT:**  Okay.  So you'll withdraw your objection?

04:15PM   16    You'll withdraw your relevance objection?

04:15PM   17          **MR. COOPER:**  I'll withdraw my relevance objection,

04:15PM   18    but I, yeah, I may lodge some additional objections as we go,

04:15PM   19    yeah.

04:15PM   20          **MR. SINGER:**  You can object as much as you like.

04:15PM   21          **MR. COOPER:**  Yeah.

04:15PM   22          (End of sidebar discussion.)

04:15PM   23          **THE COURT:**  So the objection is withdrawn?

04:15PM   24          **MR. COOPER:**  That's correct, Judge.

          25

USA v Bongiovanni - R.A. - Singer/Cross - 9/13/24

70

**BY MR. SINGER:**

04:15PM 1

04:15PM 2  Q.  So getting back to the times when you were in either

04:15PM 3  Erie, Pennsylvania, or Rochester.

04:15PM 4     Would you hang out with Katrina Nigro when you were at

04:15PM 5  those clubs with her?

04:15PM 6  A.  Yes, if we were with customers, if we were at the bar,

04:15PM 7  you know, I would see her and I would talk to her, yes.

04:15PM 8  Q.  And so you mentioned that you first started talking to

04:16PM 9  her and associating with her back in 2002, 2003.

04:16PM 10  A.  Um-hum.  Yes.

04:16PM 11  Q.  And I asked you a little bit about when was it that you

04:16PM 12  stopped hanging around her.

04:16PM 13  A.  Around the time I met Peter.

04:16PM 14  Q.  And so what time was that?

04:16PM 15  A.  2005.

04:16PM 16  Q.  And was there a period of time where you reassociated

04:16PM 17  with Ms. Nigro?

04:16PM 18  A.  No.  Well, she -- well, that's kind of, like, a

04:16PM 19  complicated question, because she eventually ended up

04:16PM 20  marrying Peter.  So she had to -- I had to coparent with this

04:16PM 21  woman.

04:16PM 22  Q.  Yeah.  And I guess that's what I was getting at.

04:16PM 23     So we talked a little bit earlier in your direct about

04:16PM 24  how you had a child in common with Peter?

04:16PM 25  A.  Yes.

04:16PM   1   Q.  It was a son who was born in 2006?

04:16PM   2   A.  Yes.

04:16PM   3   Q.  So after you said things started to get rocky with Peter,

04:16PM   4   you said it was a little on and off?

04:16PM   5   A.  Yes.

04:16PM   6   Q.  For a couple different years?

04:16PM   7   A.  Um-hum.

04:17PM   8   Q.  And during that period of time, did Peter start dating

04:17PM   9   Katrina Nigro at some point?

04:17PM  10   A.  Yes.

04:17PM  11   Q.  So when Peter was dating Katrina Nigro, what type of

04:17PM  12   interactions did you have with Ms. Nigro during that period?

04:17PM  13   A.  I didn't have the best interactions with her, but I did

04:17PM  14   have to be civil with her because she was with my son and she

04:17PM  15   was with Peter.

04:17PM  16   Q.  And how often would you see Ms. Nigro during that period?

04:17PM  17   A.  I really didn't see her very often.  It was more like

04:17PM  18   phone conversations, or through Messenger.  And, truthfully,

04:17PM  19   I really didn't -- I would prefer not to talk to her, I would

04:17PM  20   rather talk to Peter --

04:17PM  21   Q.  Okay.

04:17PM  22   A.  -- concerning my child.

04:17PM  23   Q.  But there were some type of interactions that you had

04:17PM  24   with her during that period that she dated Peter?

04:17PM  25   A.  Yes.

04:17PM  1   Q.  What years do you think that occurred as far as your

04:17PM  2   interaction with Katrina Nigro?

04:17PM  3   A.  Like 2015, 2016.

04:17PM  4   Q.  As far as your relationship, I'm sorry -- strike that.

04:17PM  5       As far as the child custody arrangement between you and

04:18PM  6   Peter at the time with your son, what was the arrangement at

04:18PM  7   that time?

04:18PM  8   A.  At that time, they had -- he had joint custody with my

04:18PM  9   parents.

04:18PM  10  Q.  And so how often would you interact with Peter regarding

04:18PM  11  custody matters involving your son?

04:18PM  12  A.  I mean, there really -- we didn't really interact that

04:18PM  13  much about it.  Are you talking about visitation, or --

04:18PM  14  Q.  Yeah, visitation.

04:18PM  15  A.  Yeah.  We had an open communication, so on a weekly

04:18PM  16  basis.

04:18PM  17  Q.  How often would you see Peter to visit your son?

04:18PM  18  A.  On a weekly basis.

04:18PM  19  Q.  And during these times that you would interact with

04:18PM  20  Peter, I think you testified that you also interacted with

04:18PM  21  Katrina sometimes?

04:18PM  22  A.  Yes.

04:18PM  23  Q.  It wasn't necessarily always by your choice, right?

04:18PM  24  A.  Yes.

04:18PM  25  Q.  But you still interacted with her?

04:18PM  1    A.   Um-hum.

04:18PM  2    Q.   Would you have conversations with her?

04:19PM  3    A.   Yeah, but they were far and few between.

04:19PM  4    Q.   And as far as your time in the exotic dancing business,

04:19PM  5    when was it that you first got involved in the exotic dancing

04:19PM  6    business?

04:19PM  7    A.   When was it that I got involved?

04:19PM  8    Q.   Yeah, year-wise.

04:19PM  9    A.   Between 2002, 2003.

04:19PM  10   Q.   And when was it that you left the exotic dancing

04:19PM  11   business?

04:19PM  12   A.   Why did I leave?

04:19PM  13   Q.   No, not why.  When was it that you left?

04:19PM  14   A.   2006.

04:19PM  15   Q.   And so during the time period that you were on the road

04:19PM  16   with Ms. Nigro either in Rochester or Erie, Pennsylvania, you

04:19PM  17   testified that you hung around with her, correct?

04:19PM  18   A.   Um-hum.

04:19PM  19   Q.   Did you also hang around with Ms. Nigro back here in the

04:19PM  20   City of Buffalo at various other establishments other than

04:19PM  21   Pharaoh's?

04:19PM  22   A.   Yes.

04:19PM  23   Q.   And how often would you see her in those establishments?

04:19PM  24   A.   It depended on when I worked.  I mean, if I worked five

04:20PM  25   days a week, sometimes I would see her all five days,

USA v Bongiovanni - R.A. - Singer/Cross - 9713/24
74

| | | |
|---|---|---|
| 04:20PM | 1 | sometimes I would see her two days. |
| 04:20PM | 2 | Q.  And as far as work interaction, you talked a little bit |
| 04:20PM | 3 | about how you would interact with her at work.  How was it |
| 04:20PM | 4 | that you interacted with Ms. Nigro at work?  What kind of |
| 04:20PM | 5 | context? |
| 04:20PM | 6 | A.  The context usually was to do with, like, customers, or |
| 04:20PM | 7 | making money, or drinking. |
| 04:20PM | 8 | Q.  So in one context, would you two maybe speak to each |
| 04:20PM | 9 | other when you were waiting to get on the stage? |
| 04:20PM | 10 | A.  Yes. |
| 04:20PM | 11 | Q.  And in another context, would you two speak to each other |
| 04:20PM | 12 | when you were around the club when you were interacting with |
| 04:20PM | 13 | customers? |
| 04:20PM | 14 | A.  Yes. |
| 04:20PM | 15 | Q.  And during this period, did you form an opinion with |
| 04:20PM | 16 | regard to Ms. Nigro's character and truthfulness? |
| 04:20PM | 17 | A.  Absolutely. |
| 04:20PM | 18 | **MR. COOPER:**  Judge, I'd object at this point.  Can we |
| 04:20PM | 19 | come up? |
| 04:20PM | 20 | **THE COURT:**  Sure. |
| 04:20PM | 21 | (Sidebar discussion held on the record.) |
| 04:21PM | 22 | **MR. COOPER:**  What's permissible is opinion and |
| 04:21PM | 23 | reputation, not the person's, not -- I don't believe that the |
| 04:21PM | 24 | foundation has been properly laid to elicit what the question |
| 04:21PM | 25 | that was asked. |

USA v Bongiovanni - R.A. - Singer/Cross - 9713/24

04:21PM    1          **THE COURT:**  Did you form an opinion with respect to

04:21PM    2    Ms. Nigro's character and truthfulness.

04:21PM    3          **MR. TRIPI:**  I didn't think he said truthfulness.

04:21PM    4          **THE COURT:**  He said character and truthfulness.

04:21PM    5          **MR. SINGER:**  Character for truthfulness.

04:21PM    6          **THE COURT:**  For truthfulness.  Yes, I think that's

04:21PM    7    fine.

04:21PM    8          **MR. COOPER:**  Character for truthfulness.

04:21PM    9          **THE COURT:**  Right.

04:21PM    10          **MR. COOPER:**  Character --

04:21PM    11          **MR. TRIPI:**  I didn't hear the -- after the --

04:21PM    12    anything after the word.

04:21PM    13          **MR. COOPER:**  I think the word was "and," not "for,"

04:21PM    14    so --

04:21PM    15          **THE COURT:**  It says "and."  You meant to say "for?"

04:21PM    16          **MR. SINGER:**  I thought I said "for."

04:21PM    17          **MR. TRIPI:**  I didn't hear the word "truthfulness"

04:21PM    18    either.

04:21PM    19          **THE COURT:**  No, "truthfulness" he said.

04:21PM    20          **MR. TRIPI:**  Okay.

04:21PM    21          **THE COURT:**  I'm reading "truthfulness."

04:21PM    22          **MR. TRIPI:**  Okay.  My fault.

04:21PM    23          **THE COURT:**  So, and a witness's credibility may be

04:21PM    24    attacked or supported by the testimony about the witness's

04:21PM    25    reputation, or having a character for truthfulness or

04:22PM   1   untruthfulness, or by testimony in the form of an opinion

04:22PM   2   about that character that is for truthfulness or

04:22PM   3   untruthfulness.

04:22PM   4          So I will sustain the objection to the form of the

04:22PM   5   question because it says "and" --

04:22PM   6          **MR. SINGER:**  Okay.

04:22PM   7          **THE COURT:**  -- and you can re-ask.

04:22PM   8          (End of sidebar discussion.)

04:22PM   9          **THE COURT:**  The objection to the form of the question

04:22PM  10   is sustained.  You can ask another question.

04:22PM  11          **BY MR. SINGER:**

04:22PM  12   Q.  So I think I may have said "and" by mistake, so let me

04:22PM  13   re-ask the question again, Ms. R.A.

04:22PM  14      Did you form an opinion with regard to the character for

04:22PM  15   truthfulness of Ms. Nigro during this period?

04:22PM  16   A.  Yes, I did.

04:22PM  17   Q.  And what is your opinion?

04:22PM  18   A.  I think she's a compulsive liar, and I think she's

04:22PM  19   untruthful.

04:22PM  20   Q.  So you also mentioned that you worked a lot with

04:22PM  21   Ms. Nigro, correct?

04:22PM  22   A.  Yes.

04:22PM  23   Q.  How many different clubs do you think you worked with

04:22PM  24   Ms. Nigro during that 2003 to 2006 time period?

04:22PM  25   A.  Three or four.

| | | |
|---|---|---|
| 04:22PM | 1 | Q. And did you interact with other dancers during that |
| 04:22PM | 2 | period? |
| 04:22PM | 3 | A. Yes. |
| 04:22PM | 4 | Q. Did Ms. Nigro interact with other dancers during that |
| 04:23PM | 5 | period? |
| 04:23PM | 6 | A. Yes. |
| 04:23PM | 7 | Q. And you said that you worked in the same clubs as |
| 04:23PM | 8 | Ms. Nigro? |
| 04:23PM | 9 | A. Yes. |
| 04:23PM | 10 | Q. How often would you think you saw her in those clubs |
| 04:23PM | 11 | during that specific time period? |
| 04:23PM | 12 | A. A week, are you talking? |
| 04:23PM | 13 | Q. You know, during that 2003 to 2006 time period, how often |
| 04:23PM | 14 | do you think you saw her inside the clubs and inside the |
| 04:23PM | 15 | establishments you worked at? |
| 04:23PM | 16 | A. I mean, that's in a two-year period you're asking? |
| 04:23PM | 17 | Q. Yeah. |
| 04:23PM | 18 | A. Almost -- over 20 times. |
| 04:23PM | 19 | Q. And to your knowledge, did Ms. Nigro have a reputation |
| 04:23PM | 20 | within that community as far as her truthfulness? |
| 04:23PM | 21 | A. Yes. |
| 04:23PM | 22 | Q. What was that reputation? |
| 04:23PM | 23 | **MR. COOPER:** Objection. Improper foundation. Again, |
| 04:23PM | 24 | I'd like to come up, Judge. |
| 04:23PM | 25 | **THE COURT:** Sure. Come on up. |

| 04:23PM | 1 | (Sidebar discussion held on the record.) |

**MR. COOPER:**  It's my understanding that the proper --
or, the necessary foundation for this line of questioning is
about did you have conversations with other people in that
community regarding this character trait eliciting, when those
conversations were, who they occurred with.

I don't think we have any of that.

**THE COURT:**  How does she know?

**MR. SINGER:**  I can lay a better foundation.

**THE COURT:**  Okay.

(End of sidebar discussion.)

**THE COURT:**  The objection is sustained.

**BY MR. SINGER:**

Q.  Ms. Nigro (sic), when you were working inside the clubs
during that time period, did you speak with other individuals
inside the clubs about Ms. Nigro?

A.  Yes.

Q.  And more specifically, did you have conversations with
other people inside of those clubs regarding their particular
thoughts on Ms. Nigro's truthfulness or untruthfulness?

A.  Yes.

Q.  How many people do you think you've spoken to in that
time period about Ms. Nigro's character for truthfulness?

A.  Quite a few.  The dancers there, whether or not, like, if
a customer -- like, she burned a customer or whatever, I

USA v Bongiovanni - R.A. - Singer/Cross - 9713/24

04:25PM   1   mean, it's a very intricate kind of, like, the club circuit

04:25PM   2   is very intricate.  So you find things out very fast.

04:25PM   3   Q.  And so we're talking about multiple conversations you had

04:25PM   4   with multiple people over that time period?

04:25PM   5   A.  Yes.

04:25PM   6   Q.  And they were focused on Ms. Nigro?

04:25PM   7   A.  Yes.

04:25PM   8   Q.  And they were focused on her character for truthfulness

04:25PM   9   or untruthfulness?

04:25PM  10   A.  Yes.

04:25PM  11   Q.  And did you form an opinion regarding what her reputation

04:25PM  12   in the community was with regard to her character for

04:25PM  13   truthfulness?

04:25PM  14   A.  I think she's a dishonest con artist.

04:25PM  15          **MR. COOPER:**  Objection.  I'd ask to strike that

04:25PM  16   answer --

04:25PM  17          **THE COURT:**  Yeah.

04:25PM  18          **MR. COOPER:**  -- as not responsive to the question.

04:25PM  19          **THE COURT:**  That answer is stricken.

04:25PM  20          Listen to the question --

04:25PM  21          **THE WITNESS:**  Okay.

04:25PM  22          **THE COURT:**  -- and answer the question, please.

04:25PM  23          The jury is not to consider that in your

04:25PM  24   deliberations.

04:25PM  25          Go ahead, Mr. Singer.

04:25PM    1            BY MR. SINGER:

04:25PM    2    Q.  Thank you.  So again, we -- we already got through what

04:25PM    3    your particular opinion is.

04:25PM    4    A.  Okay.

04:25PM    5    Q.  What I want to focus on is just Ms. Nigro's reputation

04:26PM    6    with the other people that you spoke with, and interacted

04:26PM    7    with in the exotic dancing community.

04:26PM    8    A.  Okay.

04:26PM    9    Q.  Did you have information which led you to conclude what

04:26PM   10    Katrina Nigro's reputation was within the exotic dancing

04:26PM   11    community regarding her character for truthfulness?

04:26PM   12    A.  Untruthful.

04:26PM   13    Q.  And that -- was that the reputation she had?

04:26PM   14    A.  Yes.

04:26PM   15            MR. SINGER:  Okay.  Thank you.  I have no further

04:26PM   16    questions, Judge.

04:26PM   17            MR. COOPER:  Judge, I'm going to start with the some

04:26PM   18    cross-examination from the adoption of the witness and --

04:26PM   19            THE COURT:  Yep.

04:26PM   20            MR. COOPER:  -- then maybe circle back.

04:26PM   21            THE COURT:  Go right ahead.

04:26PM   22

04:26PM   23    CROSS-EXAMINATION BY MR. COOPER (From Gov't Adopted Case):

04:26PM   24    Q.  Ma'am, you have a child with Peter Gerace, you told the

04:26PM   25    jury before, that was in 2006, right?

04:26PM  1   A.  Yes.

04:26PM  2   Q.  Okay.  And Peter's still involved in your child's life,

04:26PM  3   right?

04:26PM  4   A.  Yes.

04:26PM  5   Q.  And you care about your child, right?

04:26PM  6   A.  Yes.

04:26PM  7   Q.  And during the time from, let's say, 2006 to 2024, is

04:26PM  8   that 18 years?

04:26PM  9   A.  Yes.

04:26PM  10  Q.  Okay.  So for 18 years, you've had an association with

04:26PM  11  Peter, right?

04:27PM  12  A.  Yes.

04:27PM  13  Q.  Whether willingly or unwillingly, I guess, right?

04:27PM  14  A.  Yes.

04:27PM  15  Q.  And you've had an association with Peter's family, right?

04:27PM  16  A.  Yes.

04:27PM  17  Q.  And Peter gives you money for his kid, right?

04:27PM  18  A.  No.

04:27PM  19  Q.  No, that doesn't happen?

04:27PM  20  A.  No.

04:27PM  21  Q.  Did Peter ever give you money for your child with him?

04:27PM  22  A.  No.

04:27PM  23  Q.  That never happened?

04:27PM  24  A.  I -- I -- no.  He had -- no.  Because I don't have

04:27PM  25  custody of my child.  My family does.  My mom does.

| | | |
|---|---|---|
| 04:27PM | 1 | Q.  Does Peter -- maybe I phrased that question poorly. |
| 04:27PM | 2 |     Has Peter ever, since your child was born, financially |
| 04:27PM | 3 | supported your child? |
| 04:27PM | 4 | A.  Yes. |
| 04:27PM | 5 | Q.  Is that a -- |
| 04:27PM | 6 | A.  Sorry, sir. |
| 04:27PM | 7 | Q.  That's okay.  Are you okay? |
| 04:27PM | 8 | A.  Yes. |
| 04:27PM | 9 | Q.  Is that important to you? |
| 04:27PM | 10 | A.  Yes. |
| 04:27PM | 11 | Q.  Okay.  And you're -- |
| 04:27PM | 12 | **MR. COOPER:**  Can we come up real quick?  I'm sorry. |
| 04:27PM | 13 | **THE COURT:**  Sure. |
| 04:27PM | 14 | **MR. COOPER:**  I want to be cautious here. |
| 04:27PM | 15 | (Sidebar discussion held on the record.) |
| 04:27PM | 16 | **MR. COOPER:**  I just want to be cautious here. |
| 04:27PM | 17 |     I don't think this is improper, but she's come to |
| 04:27PM | 18 | court for Peter, sat on Peter's side of the courtroom, |
| 04:27PM | 19 | appeared at court appearances. |
| 04:27PM | 20 |     I'm about to say Peter has a court case, and I just |
| 04:28PM | 21 | want to front that for everybody. |
| 04:28PM | 22 |     I think it's clear from the indictment as well, and I |
| 04:28PM | 23 | just want to front it.  So, if you want to object, object. |
| 04:28PM | 24 | But -- |
| 04:28PM | 25 | **MR. SINGER:**  Yeah, again, I mean, I object on 403 |

04:28PM    1    grounds, Judge.  I just think that the danger of unfair

04:28PM    2    prejudice to Mr. Bongiovanni --

04:28PM    3            (Simultaneous talking.)

04:28PM    4        **MR. COOPER:**  This door got opened --

04:28PM    5        **THE COURT:**  Stop.  I think you can ask have you been

04:28PM    6    to court for a court case that Peter has.

04:28PM    7            You need to link it to this.

04:28PM    8        **MR. COOPER:**  Absolutely.  Yeah.  It's the substance

04:28PM    9    of this case, her child's father is charged in the case.

04:28PM   10        **MR. SINGER:**  Count 2 of --

04:28PM   11            (Indecipherable speech.)

04:28PM   12        **MR. COOPER:**  It's bias.  I have to be able to explore

04:28PM   13    bias when this line of questioning comes out.  It didn't

04:28PM   14    happen last time, so I didn't front it.  But I've got to --

04:28PM   15        **THE COURT:**  Yeah, I think you can do that.

04:28PM   16        **MR. SINGER:**  So the bias, I think, Judge, though, if

04:28PM   17    they're probing on bias is that she showed up and supported

04:28PM   18    him in court.  I don't think you need to get into the

04:29PM   19    particular case --

04:29PM   20        **MR. COOPER:**  It's way more bias when it's this case.

04:29PM   21        **MR. TRIPI:**  She's got a rooting interest in this case

04:29PM   22    as it relates to Peter --

04:29PM   23        **THE COURT:**  As it relates --

04:29PM   24        **MR. TRIPI:**  -- and Katrina is linked heavily, as you

04:29PM   25    know, to that case as well.  The charges overlap with this

USA v Bongiovanni - R.A. - Cooper/Cross - 9/13/24

84

04:29PM  1    defendant, because Peter is charged with bribing this

04:29PM  2    defendant in this case, and charged with conspiring in Count 2

04:29PM  3    of this case.

04:29PM  4         **THE COURT:**  Okay.  But why does that have to be

04:29PM  5    related to this case.

04:29PM  6         **MR. COOPER:**  Judge --

04:29PM  7         **THE COURT:**  Just listen.  Just listen to me for just

04:29PM  8    a second.

04:29PM  9         Why isn't the fact that she knows that there is

04:29PM  10   another case against Peter in which Nigro is a witness, why

04:29PM  11   isn't that enough?  Why does it have to be related to this

04:29PM  12   particular case?

04:29PM  13        **MR. COOPER:**  Because Nigro's testifying against this

04:29PM  14   particular defendant in this particular case that's linked to

04:29PM  15   her husband -- that's linked to -- they're inextricably

04:29PM  16   intertwined.  The bias is inextricably intertwined.  And I

04:30PM  17   didn't bring this up --

04:30PM  18        **THE COURT:**  Right.

04:30PM  19        **MR. COOPER:**  -- and it didn't come up at the last

04:30PM  20   trial, so I wasn't prepared to front it for the Court.

04:30PM  21        I'm sure Mr. Singer knew he was gonna do it, I'm sure

04:30PM  22   he intentionally didn't tell me, so now we're making the

04:30PM  23   argument up here.

04:30PM  24        But it's fair game, Judge, when they --

04:30PM  25        **THE COURT:**  I think it is fair game.

04:30PM    1              **MR. SINGER:**  Yeah.

04:30PM    2              (End of sidebar discussion.)

04:30PM    3          **BY MR. COOPER:**

04:30PM    4    Q.  Peter's charged with conduct that got him charged here in

04:30PM    5    federal court, right?

04:30PM    6    A.  Yes.

04:30PM    7    Q.  And you're aware of that, right?

04:30PM    8    A.  Yes.

04:30PM    9    Q.  And you've been aware of it since it happened, right?

04:30PM   10    A.  Yes.

04:30PM   11    Q.  And you've got some pretty strong feelings about it,

04:30PM   12    right?

04:30PM   13    A.  Yes.

04:30PM   14    Q.  Not happy about it, right, ma'am?

04:30PM   15    A.  No.

04:30PM   16    Q.  Okay.  And you're aware that the conduct is some of the

04:30PM   17    same conduct that's being discussed here in this case, right?

04:30PM   18    A.  Yes.

04:30PM   19    Q.  And you're aware that a lot of the witnesses that are in

04:30PM   20    the case involving your child's father are the same witnesses

04:30PM   21    that will be here in this case, right?

04:30PM   22    A.  Yes.

04:30PM   23    Q.  Okay.  And you've shown up in court on Peter's case

04:31PM   24    before, right?

04:31PM   25    A.  Yes.

04:31PM    1    Q.  And you've walked in and sat with his family behind him,

04:31PM    2    right?

04:31PM    3    A.  Yes.

04:31PM    4    Q.  Okay.  So fair to say you have a rooting interest in the

04:31PM    5    outcome of the case against Peter, right, ma'am?

04:31PM    6    A.  A rooting outcome?

04:31PM    7    Q.  A rooting interest.  You'd like to see something happen

04:31PM    8    in that case, right?

04:31PM    9    A.  Like, what would I like to see?  What are you implying?

04:31PM    10   Q.  Well, no, no.

04:31PM    11   A.  I'm sorry.

04:31PM    12   Q.  I'm asking you, just be honest with the jury here, not

04:31PM    13   hard, do you have a rooting interest in the outcome of the

04:31PM    14   case against Peter?

04:31PM    15   A.  Yes.

04:31PM    16   Q.  Yes, you do, right?

04:31PM    17       And that's causing you to have some bias when you talk

04:31PM    18   about Ms. Nigro, right, ma'am?

04:31PM    19   A.  No.

04:31PM    20   Q.  You dislike Ms. Nigro, right?

04:31PM    21   A.  Do I dislike her?  I don't like her character.

04:31PM    22   Q.  So my --

04:31PM    23   A.  And I know some of --

04:31PM    24   Q.  Ma'am, I'm going to ask questions.  And I'd ask for

04:31PM    25   you -- I'm going to be respectful to you, and I'd ask that

USA v Bongiovanni - R.A. - Cooper/Cross - 9/13/24

04:31PM   1   you be respectful to me.

04:31PM   2   A.   Okay.

04:31PM   3   Q.   And we'll work through it, okay?

04:31PM   4        Just a simple "yes" or "no":  Do you dislike Ms. Nigro?

04:31PM   5   A.   Yes.

04:31PM   6   Q.   Okay.  And you have strong feelings for Peter Gerace,

04:31PM   7   right?

04:31PM   8   A.   No.

04:31PM   9   Q.   No?  You sure?

04:31PM  10   A.   I don't have strong feelings for him.

04:32PM  11   Q.   Okay.  You show up in court, and you sit with his family,

04:32PM  12   right?

04:32PM  13   A.   For support of my son, I'm his mother.

04:32PM  14   Q.   Okay.  So my question is:  Do you show up in court and

04:32PM  15   sit with his family?

04:32PM  16   A.   Once.

04:32PM  17   Q.   Okay.  That's a yes, right?

04:32PM  18   A.   Yes.

04:32PM  19   Q.   Okay.  So you sit there.  And the reason that you show up

04:32PM  20   is to show support for Peter in front of his family, right,

04:32PM  21   ma'am?

04:32PM  22   A.   No, it's to show support for my son.

04:32PM  23   Q.   Okay.  It's not your son who's charged in the case,

04:32PM  24   right?

04:32PM  25   A.   I understand that, but it is his father.

04:32PM   1   Q.  Okay.  You talked about these conversations that you had

04:32PM   2   with other people about Ms. Nigro, right?

04:32PM   3   A.  Yes.

04:32PM   4   Q.  Can you name the people that you've had these

04:32PM   5   conversations with?

04:32PM   6   A.  Customers, other dancers.

04:32PM   7   Q.  Names, ma'am.  Do you know what a -- a name.  Do you know

04:32PM   8   their names?

04:32PM   9   A.  Name?  No.

04:32PM   10   Q.  One name, you can't give?

04:32PM   11   A.  It was too long ago, no, I don't know any names.

04:32PM   12   Q.  Not a single one?

04:32PM   13   A.  Do you want stage names?

04:32PM   14   Q.  No, no, no.  I'm asking you:  Mr. Singer just asked you

04:32PM   15   all these questions, you were happy to answer them, and you

04:32PM   16   were explaining all these various people that you had these

04:32PM   17   conversations with about Katrina Nigro's character for

04:32PM   18   truthfulness --

04:32PM   19   A.  Well, it's really not --

04:33PM   20   Q.  Ma'am, I'm still asking a question, so wait until I

04:33PM   21   finish the question, and then answer it, okay?

04:33PM   22       I'm going to be respectful to you, but I need to finish

04:33PM   23   my questions, okay?

04:33PM   24   A.  Okay.

04:33PM   25   Q.  Mr. Singer asked you questions about all the different

USA v Bongiovanni - R.A. - Cooper/Cross - 9/13/24

89

04:33PM  1  people that you had these conversations with.

04:33PM  2  A.  Um-hum.

04:33PM  3  Q.  What I'm asking you to do is tell them one name.

04:33PM  4  A.  I don't know one name.

04:33PM  5  Q.  Okay.

04:33PM  6      Before you came here to testify, we've met and we've

04:33PM  7  prepared and we've gone over some questions and answers,

04:33PM  8  right?

04:33PM  9  A.  Yes.

04:33PM  10  Q.  Okay.  And during those times, we've never had any

04:33PM  11  consternation like this before, right?

04:33PM  12  A.  No.

04:33PM  13  Q.  Okay.  You've been treated with respect by the FBI agents

04:33PM  14  when they've interviewed you or came to talk to?

04:34PM  15           **MR. SINGER:**  Objection, relevance.

04:34PM  16           **MR. COOPER:**  I'll move on Judge.

04:34PM  17           **BY MR. COOPER:**

04:34PM  18  Q.  Let me ask you a question.

04:34PM  19      Your child's grandmother, would it be fair to say that

04:34PM  20  the charges against Peter have been pretty devastating for

04:34PM  21  that person?

04:34PM  22  A.  Yes.

04:34PM  23  Q.  Okay.  And would it be a fair statement to say that the

04:34PM  24  charges against Peter have been devastating for your son?

04:34PM  25  A.  Yes.

04:34PM  1    Q.  Your son's been -- and I'm not trying to make light of

04:34PM  2    this at all, but your son's been bullied in school as a

04:34PM  3    result of having human trafficking charges pending against

04:34PM  4    his father, right?

04:34PM  5    A.  Yes.

04:34PM  6    Q.  That's upsetting to you, right?

04:34PM  7    A.  Of course.

04:34PM  8    Q.  I understand that.

04:34PM  9        Before you came up here to testify today, you knew that

04:34PM  10   Ms. Nigro was a witness in this case, right?

04:34PM  11   A.  Yes, it's in the newspapers.

04:34PM  12   Q.  Okay.  So I'm just asking if you're aware of it, that's

04:34PM  13   all.  You knew that, right?

04:34PM  14   A.  Yes.

04:34PM  15   Q.  Okay.  If Ms. Nigro said Joe Bongiovanni is friends with

04:35PM  16   Peter Gerace, you wouldn't have any reason to disagree with

04:35PM  17   that, right?

04:35PM  18   A.  No.

04:35PM  19   Q.  None at all, right?

04:35PM  20   A.  No.

04:35PM  21   Q.  Okay.  During the timeframe that Mr. Singer asked you

04:35PM  22   about when you were, I think, seeing Peter on a weekly basis

04:35PM  23   to have visitation with your son, like 2015, 2016 is that

04:35PM  24   when you were sometimes interacting with Ms. Nigro?

04:35PM  25   A.  Yes.

USA v Bongiovanni - R.A. - Cooper/Cross - 9/13/24

04:35PM    1    Q.  Would it be fair to say during that time Ms. Nigro was

04:35PM    2    seeing a lot more of Peter Gerace than you were?

04:35PM    3    A.  Yes.

04:35PM    4    Q.  Okay.  And at that name your life, 2015, 2016, were you

04:35PM    5    at Pharaoh's frequently?

04:35PM    6    A.  Never.

04:35PM    7    Q.  Not at all?

04:35PM    8    A.  Not at all.

04:35PM    9    Q.  Okay.  Do you think Katrina was at Pharaoh's at that

04:35PM   10    time?

04:35PM   11    A.  Yes.

04:35PM   12    Q.  Okay.  So would it be a fair statement for me to say you

04:35PM   13    couldn't tell this jury anything about what was happening at

04:35PM   14    Pharaoh's in 2015, could you?

04:35PM   15    A.  I could.  She posted it on social media.

04:35PM   16    Q.  That's not my question.

04:35PM   17        My question is:  If could you tell the jury based on your

04:36PM   18    own observations of what was happening inside Pharaoh's?

04:36PM   19    A.  No.

04:36PM   20    Q.  You couldn't do that, right?

04:36PM   21    A.  No.

04:36PM   22    Q.  Okay.

04:36PM   23            **THE COURT:**  How much more do you have, Mr. Cooper?

04:36PM   24            **MR. COOPER:**  I'm not sure, Judge.

04:36PM   25            **BY MR. COOPER:**

| | | |
|---|---|---|
| 04:36PM | 1 | Q.  Earlier on direct examination, towards the end of the |
| 04:36PM | 2 | direct examination, I asked you a question about did you have |
| 04:36PM | 3 | a confrontation with Peter about these photos; do you |
| 04:36PM | 4 | remember being asked that question? |
| 04:36PM | 5 | A.  Yes. |
| 04:36PM | 6 | Q.  Okay.  And I asked you if that happened close in time |
| 04:36PM | 7 | to -- or, the same day, rather, to finding out what the |
| 04:36PM | 8 | defendant did for work; do you remember that question? |
| 04:36PM | 9 | A.  Yes. |
| 04:36PM | 10 | Q.  And you said you didn't think it was the same day; do you |
| 04:36PM | 11 | remember that? |
| 04:36PM | 12 | When I just -- |
| 04:36PM | 13 | A.  Can you -- |
| 04:36PM | 14 | Q.  That you didn't learn what the defendant did for work on |
| 04:37PM | 15 | the same day that you had this confrontation with Peter about |
| 04:37PM | 16 | the Playboy Bunny photos; do you remember that? |
| 04:37PM | 17 | **MR. SINGER:**  Objection.  Outside the scope. |
| 04:37PM | 18 | **MR. COOPER:**  Judge, I think -- |
| 04:37PM | 19 | **THE COURT:**  No, overruled. |
| 04:37PM | 20 | **BY MR. COOPER:** |
| 04:37PM | 21 | Q.  Do you remember I asked you that on direct? |
| 04:37PM | 22 | A.  Yes. |
| 04:37PM | 23 | Q.  And you said you didn't think that happened on the same |
| 04:37PM | 24 | day? |
| 04:37PM | 25 | A.  I don't think that happened.  But I learned he was a DEA |

USA v Bongiovanni - R.A. - Cooper/Cross - 9713/24

04:37PM   1   agent --

04:37PM   2   Q.  Okay.

04:37PM   3   A.  -- on that day particularly.

04:37PM   4   Q.  Okay.  So that's what I'm getting at, ma'am.  The day

04:37PM   5   Peter confronts you about these photos of you in the bunny

04:37PM   6   outfit --

04:37PM   7   A.  Yes.

04:37PM   8   Q.  -- is that the same day that you learned that this

04:37PM   9   defendant works as a DEA agent?

04:37PM   10  A.  Yes.

04:37PM   11  Q.  Okay.

04:37PM   12  A.  I mean, obviously he -- yeah, he's a --

04:37PM   13  Q.  Just yes, right?  Is that the answer?

04:37PM   14  A.  Yes.

04:37PM   15  Q.  Okay.

04:37PM   16       MR. COOPER:  Can I just have one second, Judge?

04:37PM   17       THE COURT:  Yes.

04:37PM   18       BY MR. COOPER:

04:38PM   19  Q.  As you sit here today, were you at the Boss Restaurant

04:38PM   20  with the defendant and Peter Gerace and Katrina Nigro in

04:38PM   21  2016?

04:38PM   22  A.  Was I at -- the what?

04:38PM   23  Q.  The Boss, a restaurant.  Did you go to that?

04:38PM   24       MR. SINGER:  Objection, outside the scope.

04:38PM   25       MR. COOPER:  No, Judge.

USA v Bongiovanni - R.A. - Cooper/Cross - 9713/24

04:38PM   1        **THE COURT:**  How is that --

04:38PM   2        **MR. COOPER:**  I don't want to argue in front of the

04:38PM   3   jury.  I mean, I'll come up.

04:38PM   4        **THE COURT:**  Come on up.  Come on up.  Come on up.

04:38PM   5        (Sidebar discussion held on the record.)

04:38PM   6        **MR. COOPER:**  So what I'm going to do with -- what I

04:38PM   7   intend to do with this line of questioning, if I'm permitted,

04:38PM   8   is show different access to information, different access to

04:38PM   9   Peter and the defendant.

04:38PM   10        So Mr. Singer brought up through this impeachment

04:39PM   11   about character and truthfulness, he brought up how much she

04:39PM   12   interacted with Peter, how much she interacted with Katrina,

04:39PM   13   and when those things happened.

04:39PM   14        I'd like to now clarify on my cross-examination that

04:39PM   15   she wasn't around for other periods of time.

04:39PM   16        That's directly responsive to the direct that

04:39PM   17   Mr. Singer did.

04:39PM   18        **MR. SINGER:**  So she -- she already testified to the

04:39PM   19   exact periods that she had interaction with Peter.

04:39PM   20        **THE COURT:**  Why can't he explore that in response to

04:39PM   21   your cross-examination -- or, direct examination?

04:39PM   22        **MR. SINGER:**  Because this is going into a totally

04:39PM   23   different direction, Judge.  This has nothing to do with how

04:39PM   24   often she would see Peter, or how often she would see Katrina

04:39PM   25   Nigro.  It has absolutely nothing to do with that.

04:39PM  1          **MR. COOPER:**  Judge, I'm very familiar with the way

04:39PM  2  that you rule on questions for a cross-examination, and I

04:39PM  3  think that this falls squarely within, hey, you went in one

04:39PM  4  direction on direct, now cross gets to show a different piece

04:39PM  5  of that.

04:39PM  6          **MR. SINGER:**  But how does the --

04:39PM  7          **MR. COOPER:**  That's how cross is.

04:39PM  8          **MR. SINGER:**  -- interactions from Boss inform

04:39PM  9  anything about what she testified to?  I guess that's where

04:39PM  10  I'm missing the link here.

04:39PM  11          **MR. COOPER:**  Because she wasn't there for it, that's

04:39PM  12  the point.

04:39PM  13          He doesn't have to like the question, but it's --

04:39PM  14          **THE COURT:**  Easy.

04:40PM  15          **MR. COOPER:**  -- responsive to --

04:40PM  16          **THE COURT:**  Easy.

04:40PM  17          **MR. COOPER:**  -- how much time --

04:40PM  18          **THE COURT:**  Easy.

04:40PM  19          **MR. COOPER:**  -- they spent together.

04:40PM  20          **THE COURT:**  Everybody calm down.  Let's do this

04:40PM  21  slowly and logically.

04:40PM  22          So you're trying to show that she doesn't have the

04:40PM  23  kind of access to Katrina Nigro --

04:40PM  24          **MR. COOPER:**  To Peter and Katrina during time frames

04:40PM  25  that Katrina came in and offered testimony to this jury about,

USA v Bongiovanni - R.A. - Cooper/Cross - 9/13/24

04:40PM    1    right?  So they choose to --

04:40PM    2              **THE COURT:**  Yes.

04:40PM    3         **MR. COOPER:**  -- go through this door --

04:40PM    4              **THE COURT:**  Okay.

04:40PM    5         **MR. COOPER:**  -- without it --

04:40PM    6         **MR. SINGER:**  So she --

04:40PM    7              **THE COURT:**  But what he's saying is that during these

04:40PM    8    time periods that are crucial to Katrina's testimony, this

04:40PM    9    witness is not having -- is not in contact with her and Peter.

04:40PM   10         **MR. SINGER:**  So she testified to the fact that she

04:40PM   11    would interact with Peter and with Katrina during the child

04:40PM   12    care turnover visitations.

04:40PM   13              **THE COURT:**  Right.

04:40PM   14         **MR. SINGER:**  And that was the extent of her

04:40PM   15    interaction during that period.

04:40PM   16              **THE COURT:**  Right.

04:40PM   17         **MR. SINGER:**  That's all.  So I guess the purpose of a

04:40PM   18    cross is to show a contradiction in that.  There's no

04:40PM   19    contradiction --

04:40PM   20              **THE COURT:**  No, no, no.  I don't think so.  I think

04:40PM   21    the purpose of the cross is to show that the interaction was

04:41PM   22    even more limited, and of course he can do that.

04:41PM   23         **MR. COOPER:**  Thank you.

04:41PM   24              (End of sidebar discussion.)

          25

04:41PM    1         **BY MR. COOPER:**

04:41PM    2    Q.  You need another water?

04:41PM    3    A.  No, I'm good.  Thank you.

04:41PM    4    Q.  Okay.  I need some water.  Give me one second.

04:41PM    5         Were you invited to a dinner with Joe Bongiovanni, Peter

04:41PM    6    Gerace, and Katrina Nigro in 2016?

04:41PM    7    A.  No.

04:41PM    8    Q.  Okay.  Did you attend a dinner with those people in 2016?

04:41PM    9    A.  No.

04:41PM   10    Q.  So do you know what happened there?

04:41PM   11    A.  No.

04:41PM   12    Q.  Okay.  Did you work at Pharaoh's Gentlemen's Club between

04:41PM   13    2013 and 2016?

04:41PM   14    A.  No.

04:41PM   15    Q.  Katrina worked there during that timeframe, right?

04:41PM   16    A.  Yes.

04:41PM   17    Q.  Thank you.

04:41PM   18         You didn't interact with Ms. Nigro -- with Ms. Nigro for

04:41PM   19    years directly at all, right?

04:41PM   20         Years would go by where you didn't interact with her at

04:41PM   21    all, right?

04:41PM   22    A.  Yes.

04:41PM   23    Q.  Okay.  As you sit here today, you're not aware of whether

04:42PM   24    there's text messages about a dinner that occurred at the

04:42PM   25    Boss Restaurant in 2016, right?

| | | |
|---|---|---|
| 04:42PM | 1 | A.  No. |
| 04:42PM | 2 | Q.  You never saw those? |
| 04:42PM | 3 | A.  I never saw text messages. |
| 04:42PM | 4 | Q.  You wouldn't know if they exist, right? |
| 04:42PM | 5 | A.  No. |
| 04:42PM | 6 | Q.  You're not aware of whether Joe Bongiovanni ever texted |
| 04:42PM | 7 | Peter Gerace and said, hey, what's your address so I can send |
| 04:42PM | 8 | you a thank you card? |
| 04:42PM | 9 | You don't know if that happened, right? |
| 04:42PM | 10 | A.  No. |
| 04:42PM | 11 | Q.  Okay.  And you weren't there for the dinner, so you don't |
| 04:42PM | 12 | know what happened at the dinner either, right? |
| 04:42PM | 13 | A.  No. |
| 04:42PM | 14 | Q.  Okay.  You testified on one of your examinations, I don't |
| 04:42PM | 15 | recall which one, about women who work in exotic dance clubs |
| 04:42PM | 16 | using drugs, right? |
| 04:42PM | 17 | A.  Yes. |
| 04:42PM | 18 | Q.  That's something that happens, right? |
| 04:42PM | 19 | A.  Yes. |
| 04:42PM | 20 | Q.  Have you seen women that work in exotic dancing clubs |
| 04:42PM | 21 | that have track marks on their arms? |
| 04:42PM | 22 | A.  I haven't seen that personally. |
| 04:42PM | 23 | Q.  Okay. |
| 04:42PM | 24 | A.  I mean, I worked before the opiate epidemic, so I didn't |
| 04:42PM | 25 | see that. |

USA v Bongiovanni - R.A. - Cooper/Cross - 9713/24

| | | |
|---|---|---|
| 04:42PM | 1 | Q.  Got it.  Did you see woman who showed signs of severe |
| 04:43PM | 2 | drug addiction working at those clubs? |
| 04:43PM | 3 | A.  Yes. |
| 04:43PM | 4 | Q.  Did you see drugs distributed at the clubs? |
| 04:43PM | 5 | A.  Yes. |
| 04:43PM | 6 | MR. SINGER:  Just for clarification, are we back on |
| 04:43PM | 7 | redirect now? |
| 04:43PM | 8 | MR. COOPER:  Crossing. |
| 04:43PM | 9 | THE COURT:  I'm -- okay, he's still crossing. |
| 04:43PM | 10 | MR. SINGER:  Can we approach? |
| 04:43PM | 11 | THE COURT:  Sure. |
| 04:43PM | 12 | (Sidebar discussion held on the record.) |
| 04:43PM | 13 | MR. SINGER:  That's the reason I interrupted, Judge, |
| 04:43PM | 14 | is because it's a leading objection. |
| 04:43PM | 15 | If we're back on redirect, which I think we are, all |
| 04:43PM | 16 | these questions start to go to information I solicited not |
| 04:43PM | 17 | having to do with anything about an opinion or reputation |
| 04:43PM | 18 | regarding truthfulness, but with regard to what Ms. R.A. |
| 04:43PM | 19 | testified to on direct. |
| 04:43PM | 20 | So if we're back into that area, which I think we |
| 04:43PM | 21 | squarely are, then we've got to go back into -- he's direct |
| 04:43PM | 22 | and cross. |
| 04:43PM | 23 | THE COURT:  It wasn't leading. |
| 04:43PM | 24 | MR. COOPER:  This is -- |
| 04:43PM | 25 | THE COURT:  I didn't think the questions were |

04:43PM   1   leading.

04:43PM   2          MR. COOPER:  I think my tone of voice invokes

04:43PM   3   objection sometimes, but I'm --

04:44PM   4          THE COURT:  Don't lead now.

04:44PM   5          MR. COOPER:  Well, Judge, I would just -- there's a

04:44PM   6   line of cross-examination about -- so, he evokes this

04:44PM   7   reputation, we talk about access to Pharaoh's when there was

04:44PM   8   access to Pharaoh's --

04:44PM   9          THE COURT:  Right.

04:44PM  10          MR. COOPER:  -- with whether she knows it or not,

04:44PM  11   whether she knows it or not, this jury's heard testimony from

04:44PM  12   lots of witnesses about stuff that's gone on at Pharaoh's with

04:44PM  13   respect to drug addiction.  So I'm exploring that now in the

04:44PM  14   context of my cross-examination of her that I didn't expect to

04:44PM  15   be doing today.  But this is where we were.  I don't have a

04:44PM  16   cross written out because I found out about it 25 minutes ago.

04:44PM  17          THE COURT:  We're ending at 5, so --

04:44PM  18          MR. COOPER:  Okay.

04:44PM  19          THE COURT:  If we've got to bring her back Monday,

04:44PM  20   we'll bring her back Monday.

04:44PM  21          MR. COOPER:  Okay.

04:44PM  22          (End of sidebar discussion.)

04:44PM  23          BY MR. COOPER:

04:44PM  24   Q.  You've seen signs of somebody that's heavily using drugs

04:44PM  25   when you've worked in these clubs, right?

USA v Bongiovanni - R.A. - Cooper/Cross - 9/13/24    101

04:44PM   1   A.  Yes.

04:44PM   2   Q.  That's something that happens?

04:44PM   3   A.  Yes.

04:44PM   4   Q.  You've seen people distributing drugs in those contests,

04:44PM   5   right?

04:44PM   6   A.  In other clubs?

04:44PM   7   Q.  In clubs, yeah.

04:45PM   8   A.  Yes.

04:45PM   9   Q.  Okay.  So if Ms. Nigro said that women use drugs at

04:45PM  10   Pharaoh's, you wouldn't have any reason to disagree with

04:45PM  11   that, right?

04:45PM  12         MR. SINGER:  Objection to the hearsay.

04:45PM  13         THE COURT:  Sus --

04:45PM  14         MR. COOPER:  So I'm not asking her to --

04:45PM  15         THE COURT:  Hang on.

04:45PM  16         MR. COOPER:  -- elicit an out-of-court statement.

04:45PM  17         THE COURT:  Yeah.  Overruled.  I'll allow that.

04:45PM  18         BY MR. COOPER:

04:45PM  19   Q.  If Ms. Nigro said women who worked at Pharaoh's used

04:45PM  20   drugs, you wouldn't have any reason to disagree with that,

04:45PM  21   right?

04:45PM  22   A.  No.

04:45PM  23   Q.  If she said women who worked at Pharaoh's had opiate

04:45PM  24   addictions, you wouldn't have any reason to disagree with

04:45PM  25   that, right?

USA v Bongiovanni - R.A. - Cooper/Cross - 9/13/24

04:45PM    1          **MR. SINGER:**  Objection, same basis.

04:45PM    2          **THE COURT:**  Overruled.

04:45PM    3          **BY MR. COOPER:**

04:45PM    4    Q.  If she said that women who worked at Pharaoh's bought

04:45PM    5    drugs from people at Pharaoh's, you wouldn't have any reason

04:45PM    6    to disagree with that, right?

04:45PM    7    A.  No.

04:45PM    8          **MR. SINGER:**  Sorry, Judge.  Again, I'll have to

04:45PM    9    object for the record.

04:45PM   10          **THE COURT:**  I understand.  I understand.

04:45PM   11          Overruled.

04:45PM   12          **BY MR. COOPER:**

04:45PM   13    Q.  If she said Peter blew lines of coke, would you have any

04:45PM   14    reason to disagree with that?

04:45PM   15    A.  No.

04:46PM   16    Q.  If she said that women at Pharaoh's were put in

04:46PM   17    precarious situations with men that came to Pharaoh's, would

04:46PM   18    you have any reason to disagree with that?

04:46PM   19          **MR. SINGER:**  Objection, hearsay and 403.

04:46PM   20          **THE COURT:**  Overruled.

04:46PM   21          **THE WITNESS:**  Yes.

04:46PM   22          **BY MR. COOPER:**

04:46PM   23    Q.  You told the jury earlier that people who work at these

04:46PM   24    clubs are -- are put in uncomfortable situations with men

04:46PM   25    when I was asking you questions on direct; do you --

| | | |
|---|---|---|
| 04:46PM | 1 | A.  What does "vicarious" mean?  I mean, what are you trying |
| 04:46PM | 2 | to ask me? |
| 04:46PM | 3 | Q.  No, precarious. |
| 04:46PM | 4 | A.  What -- okay, so what does that entail? |
| 04:46PM | 5 | Q.  Dangerous.  Uncomfortable. |
| 04:46PM | 6 | A.  Sure, uncomfortable.  Being a stripper's uncomfortable. |
| 04:46PM | 7 | Q.  That's what I'm getting at, ma'am. |
| 04:46PM | 8 | A.  Okay. |
| 04:46PM | 9 | Q.  Katrina Nigro, if she testified, or if she told you that |
| 04:46PM | 10 | Joe Bongiovanni and Peter Gerace were friends, you wouldn't |
| 04:46PM | 11 | have any reason to disagree with that either, right, ma'am? |
| 04:46PM | 12 | A.  No. |
| 04:46PM | 13 | **MR. COOPER:**  Okay.  I'm good.  Thank you, Judge. |
| 04:47PM | 14 | |
| 04:47PM | 15 | **RECROSS-EXAMINATION BY MR. SINGER:** |
| 04:47PM | 16 | Q.  Ms. Nigro, the government challenged your opinion |
| 04:47PM | 17 | regarding -- sorry. |
| 04:47PM | 18 | Ms. R.A., the government challenged your opinion |
| 04:47PM | 19 | regarding Ms. Nigro, and I want to get into a couple reasons |
| 04:47PM | 20 | why you hold that opinion.  Okay? |
| 04:47PM | 21 | A.  Yes. |
| 04:47PM | 22 | Q.  Did Ms. Nigro tell you and others that she -- |
| 04:47PM | 23 | **MR. COOPER:**  Objection.  Specific instances are |
| 04:47PM | 24 | improper, Judge. |
| 04:47PM | 25 | **MR. SINGER:**  Unless the witness is impeached. |

04:47PM 1        **THE COURT:**  Okay.  We are going to quit for the day,

04:47PM 2   folks.  So remember my instructions about not making up your

04:48PM 3   mind about anything until the case has been given to you to

04:48PM 4   deliberate.  Don't communicate about the case with anyone.

04:48PM 5        Again, this is a weekend, so you'll be together with

04:48PM 6   family, don't tell them anything about this case.  Don't use

04:48PM 7   tools of technology to try to learn anything about the case or

04:48PM 8   to communicate about the case.  If there's any news coverage

04:48PM 9   about the case whatsoever, in the newspaper, on the radio, on

04:48PM 10  TV, on the internet, don't watch or listen or read that while

04:48PM 11  the case is in progress.  You'll be able to read plenty when

04:48PM 12  it's over, if there is any, but don't look for anything now.

04:48PM 13  And if you see anything inadvertently, let me know about it.

04:48PM 14  Okay?

04:48PM 15       We'll see you Monday at 9:30.  Monday, Tuesday, at

04:48PM 16  9:30.  And then Friday at 9:30.

04:48PM 17       But Wednesday and Thursday we will be down.  Okay?

04:48PM 18       Everybody have a great weekend, and I guess that's

04:49PM 19  it.  Thanks.

04:49PM 20       (Jury excused at 4:49 p.m.)

04:49PM 21       **THE COURT:**  Okay.  So, I understand -- let's excuse

04:49PM 22  the witness.

04:49PM 23       **MR. COOPER:**  I agree.

04:49PM 24       **THE COURT:**  I don't want to do argument now, but

04:49PM 25  ma'am, you can step down.

04:49PM   1           **THE WITNESS:**  Thank you.

04:49PM   2           **THE COURT:**  You're not to talk to anybody about your

04:49PM   3   testimony at all --

04:49PM   4           **THE WITNESS:**  Yes, sir.

04:49PM   5           **THE COURT:**  -- between now and when you come back on

04:49PM   6   Monday, okay?

04:49PM   7           **THE WITNESS:**  Yep.

04:49PM   8           **THE COURT:**  Okay?

04:49PM   9           **THE WITNESS:**  Thank you.

04:49PM   10          (Witness excused at 4:49 p.m.)

04:49PM   11          **MR. TRIPI:**  What time Monday, Judge?

04:49PM   12          **THE COURT:**  9:30.

04:50PM   13          So a couple things.  Do you guys want to brief this?

04:50PM   14          **MR. COOPER:**  So I guess I'll beat the same drum that

04:50PM   15   I've been beating since the beginning of this trial, which is

04:50PM   16   we can have an opportunity to brief things for the Court and

04:50PM   17   not argue them for 20 or 30 minutes at the sidebar when we

04:50PM   18   know that issues are going to arise.  And over and over again

04:50PM   19   during the course of the trial, the defense has chosen to

04:50PM   20   operate by trial by surprise --

04:50PM   21          **THE COURT:**  So let me go back and ask the question:

04:50PM   22   Do you want to brief this?

04:50PM   23          **MR. COOPER:**  Yes.

04:50PM   24          **THE COURT:**  Okay.  By Sunday at midnight?

04:50PM   25          **MS. CHALBECK:**  Works for us, Judge.  We'll try to get

USA v Bongiovanni - Proceedings - 9/13/24

04:50PM    1    it to you sooner.

04:50PM    2         **THE COURT:**  Simultaneous briefs.

04:50PM    3         **MR. SINGER:**  Yeah, that's fine, Judge.  Just give me

04:50PM    4    a deadline.

04:50PM    5         **MR. TRIPI:**  Judge, the question is, I just want to

04:51PM    6    frame the question, the question is now that Mr. Singer is

04:51PM    7    back up on his recross --

04:51PM    8         **MR. COOPER:**  Redirect.

04:51PM    9         **MR. TRIPI:**  -- redirect, or whatever it is, can he

04:51PM   10    get into specific instances of conduct that bolster the

04:51PM   11    opinion testimony as to Ms. Nigro's credibility that he's

04:51PM   12    elicited from R.A.  That was --

04:51PM   13         **THE COURT:**  Because, because it's -- because her

04:51PM   14    credibility has been attacked on that --

04:51PM   15         **MR. TRIPI:**  Yeah.

04:51PM   16         **THE COURT:**  -- on cross.

04:51PM   17         **MR. TRIPI:**  So can -- but he's asking not for

04:51PM   18    specific instances of conduct to bolster Ms. R.A.'s

04:51PM   19    credibility, he's asking for specific instances of conduct to

04:51PM   20    bolster her opinion testimony about Ms. Nigro.  That's the

04:51PM   21    objection, and that's what we'll be briefing.

04:51PM   22         **MR. SINGER:**  Well, I phrased it a different way.

04:51PM   23         She offered her opinion about Ms. Nigro's

04:51PM   24    untruthfulness.  She also offered her opinion regarding the

04:51PM   25    reputation of Ms. Nigro for her untruthfulness.

| | | |
|---|---|---|
| 04:51PM | 1 | On cross-examination, the government did two things: |
| 04:52PM | 2 | 1, is that they attacked her credibility on the basis |
| 04:52PM | 3 | of her opinion on bias grounds. |
| 04:52PM | 4 | Number 2, they offered multiple instances of specific |
| 04:52PM | 5 | acts of what they would believe are truthful statements |
| 04:52PM | 6 | that -- that the witness would not disagree were untruthful. |
| 04:52PM | 7 | That is what I believe opened the door, Judge, to |
| 04:52PM | 8 | specific acts that I can get into regarding her opinion. |
| 04:52PM | 9 | I didn't open that door. I actually leveled some |
| 04:52PM | 10 | objections to some of those questions. That's why the door is |
| 04:52PM | 11 | open. |
| 04:52PM | 12 | **MR. COOPER:** Judge, I would respond to that that my |
| 04:52PM | 13 | questions were about the -- her ability to make certain |
| 04:52PM | 14 | perceptions when she was associated with Peter, when she was |
| 04:52PM | 15 | associated with Katrina, if she was invited to certain events. |
| 04:52PM | 16 | That's completely extraneous to what she wants -- what would |
| 04:52PM | 17 | like to have this witness talk about, which are totally |
| 04:52PM | 18 | unrelated things where she thinks -- |
| 04:52PM | 19 | **THE COURT:** And you can put that in your papers, and |
| 04:52PM | 20 | Mr. Singer can argue to the contrary in his papers. |
| 04:52PM | 21 | **MR. COOPER:** Got it. Understood. |
| 04:53PM | 22 | **THE COURT:** The only other thing I wanted to raise |
| 04:53PM | 23 | was so we had that go-around on the coconspirator statement, |
| 04:53PM | 24 | that whole big go-around. And there was -- and you might want |
| 04:53PM | 25 | to look at the transcript, Mr. Singer and Mr. MacKay, because |

USA v Bongiovanni - Proceedings - 9/13/24

04:53PM    1    at the beginning of that, there was a question and an answer

04:53PM    2    and an objection that was never really ruled on.  And I think

04:53PM    3    that the answer that came out may be contrary to the ruling

04:53PM    4    that I made.  So we may need to do a curative instruction on

04:53PM    5    that.

04:53PM    6            So, Ann, if you can get them the transcript of that,

04:53PM    7    just the beginning, before that whole roll-around with the

04:53PM    8    long argument that we had on the -- the coconspirator

04:53PM    9    statement, whether it came in as a coconspirator statement,

04:53PM   10    whether it came in as a statement against penal interests, the

04:53PM   11    very beginning of it.

04:53PM   12            **THE REPORTER:**  Sure, Judge.

04:53PM   13            **THE COURT:**  The question that triggered that had an

04:54PM   14    answer that I think may be problematic.  Okay?  So take a look

04:54PM   15    at that, and we can decide what to do about it.

04:54PM   16            **MR. SINGER:**  Okay, Judge.

04:54PM   17            **THE COURT:**  Okay?  Anything else from the government?

04:54PM   18            **MR. TRIPI:**  No, thank you, Judge.

04:54PM   19            **THE COURT:**  Anything from the defense?

04:54PM   20            **MR. SINGER:**  No, Your Honor.  Have a good weekend.

04:54PM   21            **THE CLERK:**  All rise.

04:54PM   22            (Proceedings concluded at 4:54 p.m.)

          23            (Excerpt concluded at 4:54 p.m.)

          24            *    *    *    *    *    *    *

          25

1

2                    **CERTIFICATE OF REPORTER**

3

4              In accordance with 28, U.S.C., 753(b), I

5    certify that these original notes are a true and correct

6    record of proceedings in the United States District Court for

7    the Western District of New York on September 13, 2024.

8

9                         s/ Ann M. Sawyer
                          Ann M. Sawyer, FCRR, RPR, CRR
10                        Official Court Reporter
                          U.S.D.C., W.D.N.Y.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    **TRANSCRIPT INDEX**

3        **EXCERPT - EXAMINATION OF PROTECTED WITNESS 6, R.A.**

4                     **SEPTEMBER 13, 2024**

5

6    **W I T N E S S**                              **P A G E**

7    **R.A.**                                             2

8      DIRECT EXAMINATION BY MR. COOPER:               2

9          VOIR DIRE EXAMINATION BY MR. COOPER:        43

10          VOIR DIRE EXAMINATION BY MR. SINGER:        45

11      (CONT'D) DIRECT EXAMINATION BY MR. COOPER:      57

12      CROSS-EXAMINATION BY MR. SINGER:                61

13      CROSS-EXAMINATION BY MR. COOPER (Gov Adopted):  80

14      RECROSS-EXAMINATION BY MR. SINGER:              103

15

16

17

18

19

20

21

22

23

24

25