09:34AM

1                  **UNITED STATES DISTRICT COURT**
                  **WESTERN DISTRICT OF NEW YORK**

2

    _____

3  **UNITED STATES OF AMERICA,**

                         Case No. 1:19-cr-227

4           Plaintiff,          (LJV)

    v.

5                       September 23, 2024

    **JOSEPH BONGIOVANNI,**

6

              Defendant.

7

8     **TRANSCRIPT EXCERPT - EXAMINATION OF DAVID CARPENTER**
        **BEFORE THE HONORABLE LAWRENCE J. VILARDO**

9             **UNITED STATES DISTRICT JUDGE**

10  **APPEARANCES:**       **TRINI E. ROSS, UNITED STATES ATTORNEY**
                 **BY: JOSEPH M. TRIPI, ESQ.**

11                   **NICHOLAS T. COOPER, ESQ.**
                   **CASEY L. CHALBECK, ESQ.**

12                Assistant United States Attorneys
                Federal Centre, 138 Delaware Avenue

13                Buffalo, New York 14202
                For the Plaintiff

14

                **SINGER LEGAL PLLC**

15                **BY: ROBERT CHARLES SINGER, ESQ.**
                80 East Spring Street

16                Williamsville, New York 14221
                  And

17                **LAW OFFICES OF PARKER ROY MacKAY**
                **BY: PARKER ROY MacKAY, ESQ.**

18                3110 Delaware Avenue
                Kenmore, New York 14217

19                  And
                **OSBORN, REED & BURKE, LLP**

20                **BY: JOHN J. GILSENAN, ESQ.**
                120 Allens Creek Road

21                Rochester, New York 14618
                For the Defendant

22

    **PRESENT:**         **BRIAN A. BURNS,** FBI Special Agent

23                **MARILYN K. HALLIDAY,** HSI Special Agent
                **KAREN A. CHAMPOUX,** USA Paralegal

24

    **LAW CLERK:**        **REBECCA FABIAN IZZO, ESQ.**

25

| | |
|---|---|
| 1 | **COURT DEPUTY CLERK:  COLLEEN M. DEMMA** |
| 2 | **COURT REPORTER:        ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 3 | Robert H. Jackson Federal Courthouse<br>2 Niagara Square<br>Buffalo, New York  14202 |
| 4 | Ann_Sawyer@nywd.uscourts.gov |
| 5 | |

12:09PM   6              *    *    *    *    *    *    *

12:09PM   7

12:09PM   8              (Excerpt commenced at 12:09 p.m.)

12:09PM   9              (Jury is present.)

12:09PM  10        **THE COURT:**  The government may call its next witness.

12:09PM  11        **MS. CHALBECK:**  Thank you, Your Honor.  The government

12:09PM  12  calls David Carpenter.

12:09PM  13        And, Judge, just so I know, the Court wants to stop

12:09PM  14  around 12:30?

12:09PM  15        **THE COURT:**  Around then is fine.

12:09PM  16        **MS. CHALBECK:**  If I get to a good place?  Thank you.

12:09PM  17

12:09PM  18  **D A V I D   C A R P E N T E R**, having been duly called and

12:10PM  19  sworn, testified as follows:

12:10PM  20        **MS. CHALBECK:**  May I inquire, Judge?

12:10PM  21        **THE COURT:**  You may.

12:10PM  22

12:10PM  23                **DIRECT EXAMINATION BY MS. CHALBECK:**

12:10PM  24  Q.  Good afternoon, Mr. Carpenter.

12:10PM  25  A.  Good afternoon.

12:10PM | 1 | Q.  Please introduce yourself to the jury.

12:10PM | 2 | A.  My name is David Carpenter.  I'm an assistant special

12:10PM | 3 | agent in charge for the Treasury Inspector General for Tax

12:10PM | 4 | Administration, the acronym is TIGTA.

12:10PM | 5 | Q.  Now, assistant special agent in charge, is that ASAC for

12:10PM | 6 | short?

12:10PM | 7 | A.  Yes.

12:10PM | 8 | Q.  I think that's an acronym that this jury has probably

12:10PM | 9 | heard before, so I might refer to you as that.

12:10PM | 10 | And then I think you said you work for the Treasury

12:10PM | 11 | Inspector General for Tax Administration?

12:11PM | 12 | A.  Yes.

12:11PM | 13 | Q.  And can I call that TIGTA for short?

12:11PM | 14 | A.  Yes.

12:11PM | 15 | Q.  Okay.  What do you do as the ASAC for TIGTA?

12:11PM | 16 | A.  I supervise seven special agents and one support staff.

12:11PM | 17 | Q.  And what sort of -- is TIGTA -- does TIGTA investigate

12:11PM | 18 | criminal acts?

12:11PM | 19 | A.  Yes.

12:11PM | 20 | Q.  What sort of offenses does TIGTA investigate?

12:11PM | 21 | A.  TIGTA investigates attempts to corrupt the tax

12:11PM | 22 | administration.

12:11PM | 23 | Q.  Does that include, like, left it by taxpayers, threats --

12:11PM | 24 | A.  Yes.  We -- that's -- theft of refunds from taxpayers.

12:11PM | 25 | Threats to IRS employees from taxpayers, if they don't feel a

12:11PM   1   resolution is going favorably for them.  Threats of harm that

12:11PM   2   taxpayers may say against themselves as a way of trying to

12:12PM   3   expedite handling of an issue they have.  Another example, an

12:12PM   4   attempt to bribe an IRS employee for a more favorable outcome

12:12PM   5   to a despite.

12:12PM   6   Q.  Okay.  And how long have you been the ASAC for TIGTA?

12:12PM   7   A.  About 90 days.

12:12PM   8   Q.  And prior to being the ASAC, what were you?

12:12PM   9   A.  I was a special agent.

12:12PM  10   Q.  And were you, as a special agent, investigating all of

12:12PM  11   those kinds of offenses that you just described for this

12:12PM  12   jury?

12:12PM  13   A.  Yes.

12:12PM  14   Q.  Now, prior to joining TIGTA, where did you work?

12:12PM  15   A.  I was a special agent with the Department of Justice

12:12PM  16   Office of Inspector General's office.

12:12PM  17   Q.  I think that's another office or agency that this jury

12:12PM  18   has heard about.  Can I call it OIG for short?

12:12PM  19   A.  Yes.

12:12PM  20   Q.  And you're going to know what I'm talking about?

12:12PM  21   A.  Yes.

12:12PM  22   Q.  Okay.  Over what period of time did you work for OIG?

12:12PM  23   A.  From May of 2018 to September of 2020.

12:12PM  24   Q.  And what sorts of crimes or offenses does OIG

12:13PM  25   investigate?

12:13PM   1   A.  We investigated allegations of misconduct by employees of

12:13PM   2   the Department of Justice regarding their employment there.

12:13PM   3   Q.  And you said you investigate claims of misconduct by

12:13PM   4   employees within the Department of Justice.  Does the

12:13PM   5   Department of Justice have a bunch of agencies kind of under

12:13PM   6   that broader umbrella?

12:13PM   7   A.  Yes.

12:13PM   8   Q.  Is the DEA one of the agencies kind of housed within the

12:13PM   9   greater Department of Justice?

12:13PM   10  A.  Yes.

12:13PM   11  Q.  And so if there was -- if there were allegations of

12:13PM   12  wrongdoing against a DEA employee, would OIG be one of the

12:13PM   13  agencies to investigate that?

12:13PM   14  A.  Yes.

12:13PM   15  Q.  Would the DEA really investigate that?

12:13PM   16  A.  No.

12:13PM   17  Q.  Why not?

12:13PM   18  A.  The DEA would not be involved in investigating their own

12:13PM   19  so that a -- it avoids any conflict of interest that may

12:14PM   20  arise from the investigation as a way of walling off the DEA,

12:14PM   21  the Department of Justice is taking a step further to ensure

12:14PM   22  an unbiased investigation.

12:14PM   23  Q.  Is that kind of why Offices of Inspector Generals were

12:14PM   24  created, to investigate in an unbiased and accurate way

12:14PM   25  claims that might trigger a conflict of interest?

12:14PM  1   A.  Yes.

12:14PM  2              MR. SINGER:  Objection.

12:14PM  3              THE WITNESS:  Yes.

12:14PM  4              MR. SINGER:  Sorry.  Is everyone awake?

12:14PM  5              Objection to bolstering, Judge.

12:14PM  6              THE COURT:  No.  Overruled.

12:14PM  7              BY MS. CHALBECK:

12:14PM  8   Q.  Okay.  Moving right along, prior to working at OIG, where

12:14PM  9   did you work?

12:14PM  10  A.  I was a special agent with the United States Secret

12:14PM  11  Service for about eight and a half years.

12:14PM  12  Q.  And can you just generally and briefly describe what you

12:14PM  13  did in your capacity as a special agent with the Secret

12:15PM  14  Service?

12:15PM  15  A.  The Secret Service has what they refer to as a dual

12:15PM  16  mission.  Half their mission is investigating financial

12:15PM  17  fraud, and the other half is regarding the protection of

12:15PM  18  domestic protectees and foreign heads of state when they

12:15PM  19  visit America.

12:15PM  20  Q.  And when you worked at the Secret Service, did you kind

12:15PM  21  of work towards both missions?  Did you at one point

12:15PM  22  investigate financial fraud, and then at another point were

12:15PM  23  you on protective details?

12:15PM  24  A.  Yes.  For the first seven years or so of my time in

12:15PM  25  Secret Service I was doing both financial investigations as

12:15PM    1    well as protection assignments.

12:15PM    2        In my last year there, I was assigned full time to the

12:15PM    3    presidential protective detail exclusively doing protection.

12:15PM    4    Q.  Okay.  And prior to working for the Secret Service, where

12:15PM    5    were did you work?

12:15PM    6    A.  I was a probation and parole officer for the State of

12:15PM    7    North Carolina.

12:15PM    8    Q.  Now I want to bring you back to your time with OIG, the

12:16PM    9    Office of Inspector General within DOJ.

12:16PM   10        When did you -- withdrawn.

12:16PM   11        Around August of 2018, did you begin working on an

12:16PM   12    investigation into Joseph Bongiovanni?

12:16PM   13    A.  I did.

12:16PM   14    Q.  Do you see Mr. Bongiovanni present in the courtroom

12:16PM   15    today?

12:16PM   16    A.  I do.

12:16PM   17    Q.  Have you met him before?

12:16PM   18    A.  I have.

12:16PM   19    Q.  Could you please identify him by an article of clothing

12:16PM   20    that he's wearing?

12:16PM   21    A.  Red tie -- or, glasses.

12:16PM   22    Q.  Okay.

12:16PM   23        **MS. CHALBECK:**  Judge, may the record reflect that the

12:16PM   24    witness has identified the defendant.

12:16PM   25        **THE COURT:**  It does.

Case 1:19-cr-00227-LJV-MJR    Document 1325    Filed 10/27/24    Page 8 of 172
USA v Bongiovanni - Carpenter - Chalbeck/Direct - 9/23/24

8

| | | |
|---|---|---|
| 12:16PM | 1 | **MS. CHALBECK:** I was seeing two red ties there, |
| 12:16PM | 2 | Your Honor. |
| 12:16PM | 3 | **MR. SINGER:** Go Bills. |
| 12:16PM | 4 | **BY MS. CHALBECK:** |
| 12:16PM | 5 | Q. At the time that you began investigating the defendant, |
| 12:16PM | 6 | what was his job? |
| 12:16PM | 7 | A. He was a special agent with the DEA. |
| 12:16PM | 8 | Q. And I should have asked earlier, when you started |
| 12:16PM | 9 | investigating the defendant, were you the only investigator |
| 12:17PM | 10 | on that case? |
| 12:17PM | 11 | A. No. |
| 12:17PM | 12 | Q. Was OIG the only agency involved in that case? |
| 12:17PM | 13 | A. No. |
| 12:17PM | 14 | Q. Who were the other -- what other agencies were involved |
| 12:17PM | 15 | in investigating the defendant? |
| 12:17PM | 16 | A. HSI was involved, with Special Agent Curtis Ryan. |
| 12:17PM | 17 | And then later on, the FBI became involved. |
| 12:17PM | 18 | Q. And did -- when you joined the investigation, were you |
| 12:17PM | 19 | able to get connected with Special Agent Curtis Ryan at HSI? |
| 12:17PM | 20 | A. Yes. |
| 12:17PM | 21 | Q. Was the DEA part of the investigative team? |
| 12:17PM | 22 | A. No. |
| 12:17PM | 23 | Q. And why not? |
| 12:17PM | 24 | A. Again, there were -- they were walled off from the |
| 12:17PM | 25 | investigation to prevent any conflicts of interest that may |

| | | |
|---|---|---|
| 12:17PM | 1 | have been there, to provide a more unbiased investigation. |
| 12:17PM | 2 | Q.  And in addition to that, were some DEA employees viewed |
| 12:17PM | 3 | by the investigative team as potential subjects or witnesses? |
| 12:17PM | 4 | A.  Yes. |
| 12:17PM | 5 | Q.  Just in general terms, can you explain the division of |
| 12:18PM | 6 | labor between you and OIG on the one hand, and Curtis Ryan |
| 12:18PM | 7 | and Homeland Security on the other? |
| 12:18PM | 8 | A.  We worked together on this investigation.  However, we |
| 12:18PM | 9 | were -- we were separate in our attentions. |
| 12:18PM | 10 | Curtis Ryan was focusing on a -- a drug-trafficking |
| 12:18PM | 11 | organization involving Ron Serio. |
| 12:18PM | 12 | And I was focusing my investigation into allegations made |
| 12:18PM | 13 | against Joseph Bongiovanni. |
| 12:18PM | 14 | Q.  So though you had a focus on -- withdrawn. |
| 12:18PM | 15 | Though Curtis was -- Special Agent Ryan was focused on |
| 12:18PM | 16 | maybe the Ron Serio leg of the investigation into the |
| 12:18PM | 17 | defendant, did he investigate all the other claims involving |
| 12:19PM | 18 | the defendant, too? |
| 12:19PM | 19 | A.  I'm not sure of the -- |
| 12:19PM | 20 | Q.  I'll rephrase my question. |
| 12:19PM | 21 | I think you just testified, Mr. Carpenter, that your |
| 12:19PM | 22 | focus was on certain allegations into the defendant? |
| 12:19PM | 23 | A.  Yes. |
| 12:19PM | 24 | Q.  Were those allegations his relationship with Peter |
| 12:19PM | 25 | Gerace, and his alleged use of racial slurs in reference to |

12:19PM    1    DEA targets?

12:19PM    2    A.  Yes.

12:19PM    3    Q.  Okay.  And then I think you testified that Special Agent

12:19PM    4    Curtis Ryan and his team at Homeland Security were focused on

12:19PM    5    the Ron Serio investigation as it relates to this defendant;

12:19PM    6    is that correct?

12:19PM    7    A.  Yes.

12:19PM    8    Q.  Okay.  Now, though you were focused on the defendant's

12:19PM    9    relationship with Peter Gerace, and his use of racial slurs,

12:19PM   10    his alleged use of racial slurs, is it fair to say that

12:19PM   11    Curtis Ryan was not so limited?  His investigation

12:19PM   12    encompassed all of the allegations?

12:19PM   13    A.  Correct.

12:19PM   14    Q.  Okay.  But yours, by contrast, was focused just on his

12:19PM   15    relationship with Peter Gerace, that being the defendant's,

12:20PM   16    and the alleged use of racial slurs?

12:20PM   17    A.  Correct.

12:20PM   18    Q.  Okay.  You said that you became involved in the

12:20PM   19    investigation into the defendant around August of 2018.  I

12:20PM   20    want to speed up to -- and fast forward to March 29th of

12:20PM   21    2019.

12:20PM   22        Were you still working on the investigation on that day?

12:20PM   23    A.  I was.

12:20PM   24    Q.  What was just the general status of the investigation in

12:20PM   25    March of 2019?

12:20PM   1   A.  The investigation was active and ongoing.  They were

12:20PM   2   still collecting evidence and vetting information.

12:20PM   3   Q.  And was it still focused on those three categories that I

12:20PM   4   outlined earlier:  The Serio leg, the Gerace leg, and the

12:20PM   5   racial slurs leg?

12:20PM   6   A.  Yes.

12:20PM   7   Q.  Now prior to March of 2019, had you ever spoken with this

12:20PM   8   defendant about the investigation?

12:21PM   9   A.  No.

12:21PM  10   Q.  But in March of 2019, did you make contact with him?

12:21PM  11   A.  Yes.

12:21PM  12   Q.  What did you make contact with him for?

12:21PM  13   A.  I called him on the phone, and I asked him if he would be

12:21PM  14   willing to meet with me for a voluntary interview regarding

12:21PM  15   allegations of him using racial slurs to a fellow DEA agent,

12:21PM  16   and allegations of his relationship with Peter Gerace and

12:21PM  17   providing law enforcement information to him.

12:21PM  18   Q.  Now we'll get into that in a minute, but just more

12:21PM  19   generally, when you're doing an investigation, can it be

12:21PM  20   valuable as an investigator to speak to the person you're

12:21PM  21   investigating?

12:21PM  22   A.  Yes.

12:21PM  23   Q.  Why is that?

12:21PM  24   A.  It allows us the opportunity to hear directly from them

12:21PM  25   their side of the story.  It allows them to explain their

12:21PM    1    perspective.  It allows them to provide a context to their

12:21PM    2    actions.  It allows them to explain any intent that was

12:21PM    3    behind any -- any -- any activities that they did.

12:22PM    4    Q.  In that context, is it important for the person being

12:22PM    5    interviewed to tell the truth?

12:22PM    6    A.  Yes.

12:22PM    7    Q.  Why is it important for your investigation for the person

12:22PM    8    you're interviewing to tell the truth?

12:22PM    9    A.  As we're investigating his activities, failure to tell

12:22PM   10    the truth would provide us with falls leads, false

12:22PM   11    information, it could result in an unfair, unbiased, and

12:22PM   12    incomplete investigation.

12:22PM   13    Q.  What is the ultimate goal, you know, when you're

12:22PM   14    investigating?

12:22PM   15    A.  Our ultimate goal is to find the truth, whatever it is.

12:22PM   16    Q.  So if someone is dishonest, it frustrates that goal?

12:22PM   17    A.  Yes.

12:22PM   18    Q.  So did there come a time in March of 2019, I think you

12:22PM   19    said that you invited the defendant for a voluntary

12:22PM   20    interview?

12:22PM   21    A.  Yes.

12:23PM   22    Q.  How did the defendant respond?

12:23PM   23    A.  He agreed to meet with me.

12:23PM   24    Q.  And did you tell him over the phone that it was a

12:23PM   25    voluntary interview?

USA v Bongiovanni - Carpenter - Chalbeck/Direct - 9/23/24

13

12:23PM    1    A.   I did.

12:23PM    2    Q.   Did you explain what that meant?

12:23PM    3    A.   Yes.

12:23PM    4    Q.   Tell the jury what you said.

12:23PM    5    A.   I explained to them that this was a voluntary interview.

12:23PM    6    That he was free not to participate.   That there was no

12:23PM    7    punishment or consequence to his declining of this interview.

12:23PM    8    Q.   And you did also over the phone notify him kind of the

12:23PM    9    general topics that you wanted to discuss with him?

12:23PM    10    A.   Yes.   I told him what -- I told him the two topics that I

12:23PM    11    wanted to discuss, which were the allegations made that he

12:23PM    12    used racial slurs to a follow DEA agent, as well as his

12:23PM    13    relationship with Peter Gerace and providing law-enforcement

12:23PM    14    sensitive information.

12:23PM    15    Q.   Why did you tell the defendant the topics that you wanted

12:23PM    16    to discuss with him in this interview?

12:23PM    17    A.   I thought it was important so he would know up front what

12:23PM    18    the interview was all about so he could make an informed

12:23PM    19    decision on whether he wanted to participate or not so that

12:24PM    20    we could start off the interview on a trusting level as a way

12:24PM    21    of developing a rapport.

12:24PM    22    Q.   Okay.   And after you said this, but did he agree to be

12:24PM    23    interviewed?

12:24PM    24    A.   Yes.

12:24PM    25    Q.   When was that interviewed ultimately scheduled?

12:24PM    1    A.  March 29th of 2019.

12:24PM    2    Q.  Where was it scheduled to take place?

12:24PM    3    A.  The U.S. Attorney's Office here in Buffalo.

12:24PM    4    Q.  Why did you schedule the interview to take place at the

12:24PM    5    U.S. Attorney's Office?

12:24PM    6    A.  U.S. Attorney's Office is a spot where -- I was trying to

12:24PM    7    create an environment for him that would be conducive to an

12:24PM    8    honest discussion.  The U.S. Attorney's Office conference

12:24PM    9    rooms there tend to be pretty comfortable, it's a spot that

12:24PM    10    he was familiar with, that he should have felt comfortable

12:24PM    11    there.  So that's why I -- why I used it.

12:24PM    12    Q.  Did you understand that the defendant, as a DEA special

12:24PM    13    agent, had walked the halls of the U.S. Attorney's Office

12:24PM    14    many times before?

12:24PM    15    A.  Yes.

12:24PM    16    Q.  And when you began the interview, did you reiterate to

12:25PM    17    him that it was voluntary?

12:25PM    18    A.  I did.

12:25PM    19    Q.  Did he say anything in response to that reiteration?

12:25PM    20    A.  He said that as a 20-year plus law enforcement officer,

12:25PM    21    he knew his rights.

12:25PM    22    Q.  And did you -- I think you testified earlier,

12:25PM    23    Mr. Carpenter, that you told the defendant over the phone

12:25PM    24    what the topics would be.

12:25PM    25        Did you reiterate those topics again in person when the

USA v Bongiovanni - Carpenter - Chalbeck/Direct - 9/23/24

12:25PM    1    defendant arrived?

12:25PM    2    A.  I did.

12:25PM    3    Q.  You told him it was -- the interview was gonna be focused

12:25PM    4    on his relationship with Peter Gerace?

12:25PM    5    A.  Yes.

12:25PM    6    Q.  And his alleged use of racial slurs referring to DEA

12:25PM    7    targets?

12:25PM    8    A.  Yes.

12:25PM    9    Q.  Why did you not want to talk with him about the Ron Serio

12:25PM    10    leg of the investigation?

12:25PM    11    A.  As I was not a part of that investigation, it would have

12:26PM    12    been -- it was not my place to interview him regarding that.

12:26PM    13    Q.  Did -- withdrawn.

12:26PM    14       Was it your understanding that topics or matters related

12:26PM    15    to the Ron Serio investigation were to be avoided in order to

12:26PM    16    not compromise that investigation?

12:26PM    17    A.  Yes.

12:26PM    18    Q.  And in other words, if you had said, hey,

12:26PM    19    Mr. Bongiovanni, I want to talk with you about Ron Serio,

12:26PM    20    would that have tipped this defendant off that you were

12:26PM    21    investigating or someone in DOJ was investigating Ron Serio?

12:26PM    22    A.  Yes.

12:26PM    23    Q.  And I think you said earlier that when you spoke to the

12:27PM    24    defendant on the phone and told him about the topics you did

12:27PM    25    want to cover, it was to build a rapport with him; is that

12:27PM  1   the same reason why you reiterated the topics when the

12:27PM  2   interview began?

12:27PM  3   A.  Yes.

12:27PM  4   Q.  Did you want this defendant to be comfortable speaking to

12:27PM  5   you?

12:27PM  6   A.  Yes.

12:27PM  7   Q.  Did you want to get his side of the story?

12:27PM  8   A.  Yes.

12:27PM  9   Q.  Now, before we get into what the defendant told you about

12:27PM  10  his relationship with Peter Gerace and the alleged use of

12:27PM  11  racial slurs, I want to ask you a couple of questions about

12:27PM  12  the Ron Serio investigation and some names that you dropped

12:27PM  13  during your interview with the defendant; is that all right?

12:27PM  14  A.  Yes.

12:27PM  15  Q.  All right.  To be clear, were you part of the Ron Serio

12:28PM  16  investigation?

12:28PM  17  A.  No.

12:28PM  18  Q.  To the extent that you assisted in that investigation at

12:28PM  19  all, was it to deliver documents to Special Agent Ryan?

12:28PM  20  A.  I was a conduit of information, yes.

12:28PM  21  Q.  Was the Ron Serio investigation top secret for a lack of

12:28PM  22  a better way of putting it, and not a lot of people were

12:28PM  23  supposed to know about it?

12:28PM  24  A.  Correct.

12:28PM  25  Q.  And you were with OIG, and that was not OIG's focus; is

USA v Bongiovanni - Carpenter - Chalbeck/Direct - 9/23/24

| | | |
|---|---|---|
| 12:28PM | 1 | that fair? |
| 12:28PM | 2 | A.  Yes. |
| 12:28PM | 3 | Q.  Nevertheless, were you in communication with Special |
| 12:28PM | 4 | Agent Ryan when this interview was coming down the pipeline? |
| 12:28PM | 5 | A.  Yes. |
| 12:28PM | 6 | Q.  Did Special Agent Ryan give you a list of seven names to |
| 12:28PM | 7 | bring up in the interview? |
| 12:28PM | 8 | A.  He did. |
| 12:28PM | 9 | Q.  What were those names? |
| 12:29PM | 10 | A.  The first one I only had a single name for, and that was |
| 12:29PM | 11 | Dwyer.  There was T.S.  There was Michael Clark.  There was |
| 12:29PM | 12 | Charles Newkirk.  There was Jay Neil.  There was -- last |
| 12:29PM | 13 | name -- first name, single name only, was Krule. |
| 12:29PM | 14 | Excuse me one second. |
| 12:29PM | 15 | Q.  Was there someone with the last name of Ziccari? |
| 12:29PM | 16 | A.  Yes, Ziccari. |
| 12:29PM | 17 | Q.  And were those the seven people, the seven names that |
| 12:29PM | 18 | Special Agent Ryan asked you to bring up? |
| 12:29PM | 19 | A.  Yes. |
| 12:29PM | 20 | Q.  When you brought up those names, did you say, hey, |
| 12:30PM | 21 | Mr. Bongiovanni, I want to talk with you about some people |
| 12:30PM | 22 | connected to the Ron Serio investigation? |
| 12:30PM | 23 | A.  No. |
| 12:30PM | 24 | Q.  That didn't happen? |
| 12:30PM | 25 | A.  No. |

12:30PM    1    Q.  At the time that you were interviewing this defendant,

12:30PM    2    did you know if any of those people even related to the Ron

12:30PM    3    Serio investigation?

12:30PM    4    A.  I -- at the time, I don't believe so.

12:30PM    5    Q.  At the time that you brought them up --

12:30PM    6    A.  I believe -- I believe one was, yes.  At the time -- I

12:30PM    7    apologize.

12:30PM    8        At the time I brought them up, I don't believe -- I don't

12:30PM    9    know what their relationship to the Serio investigation was.

12:30PM   10    Q.  Did you find out later on that one of those people had a

12:30PM   11    connection --

12:30PM   12    A.  Yes.

12:30PM   13    Q.  -- to the Ron Serio investigation?

12:30PM   14    A.  I did.

12:30PM   15    Q.  Which person?

12:30PM   16    A.  T.S.

12:30PM   17    Q.  And did you sandwich T.S.'s name in between six other

12:31PM   18    names?

12:31PM   19    A.  Yes.

12:31PM   20    Q.  Did you know the purpose behind asking the defendant

12:31PM   21    about those seven people?

12:31PM   22    A.  I did not.

12:31PM   23    Q.  Nevertheless, Mr. Carpenter, do you remember testifying

12:31PM   24    in a prior proceeding?

12:31PM   25    A.  Yes.

USA v Bongiovanni - Carpenter - Chalbeck/Direct - 9/23/24
19

12:31PM    1    Q.  Do you recall being asked questions related to the same

12:31PM    2    questions that I just asked you?

12:31PM    3    A.  Yes.

12:31PM    4    Q.  Specifically, and I'll direct counsel's attention to

12:31PM    5    Government Exhibit --

12:31PM    6            MR. SINGER:  Objection.  Improper impeachment judge.

12:31PM    7            THE COURT:  I don't know that this is impeachment.

12:31PM    8            MS. CHALBECK:  Can we approach?

12:31PM    9            THE COURT:  Let's take our break now for the

12:31PM    10   afternoon.  I have a couple of matters that I need to do over

12:31PM    11   the lunch hour, so we're going to take a little bit longer

12:32PM    12   than usual.

12:32PM    13           Please remember my instructions about not

12:32PM    14   communicating about the case with anyone, including each

12:32PM    15   other.  Don't use tools of technology to learn anything about

12:32PM    16   the case or to communicate about the case.

12:32PM    17           Don't read, or watch, or listen to any news coverage

12:32PM    18   of the case, if there is any, while the case is in progress.

12:32PM    19   And don't make up your mind until you start deliberating.

12:32PM    20           We'll see you back here at quarter to 2.  You may

12:32PM    21   have to wait a little bit, but let's start with quarter to 2.

12:32PM    22   Okay?  Thanks.

12:32PM    23           (Jury excused at 12:32 p.m.)

12:32PM    24           MS. CHALBECK:  Your Honor, could we excuse the

12:33PM    25   witness?

| | | |
|---|---|---|
| 12:33PM | 1 | **THE COURT:**  Yeah, but we're not going to argue it |
| 12:33PM | 2 | now. |
| 12:33PM | 3 | **MS. CHALBECK:**  Okay. |
| 12:33PM | 4 | **THE COURT:**  We'll do it when we come back.  Anything |
| 12:33PM | 5 | other than that that you want to do right now? |
| 12:33PM | 6 | **MS. CHALBECK:**  No, Your Honor. |
| 12:33PM | 7 | **THE COURT:**  Anything else? |
| 12:33PM | 8 | **MR. SINGER:**  I want to warn the witness. |
| 12:33PM | 9 | **THE COURT:**  Yeah.  So you're not to talk to anybody |
| 12:33PM | 10 | about your testimony during the break, okay? |
| 12:33PM | 11 | **THE WITNESS:**  Yes, Your Honor. |
| 12:33PM | 12 | **THE COURT:**  Okay.  And we'll see you then. |
| 12:33PM | 13 | (Off the record at 12:33 p.m.) |
| 01:56PM | 14 | (Back on the record at 1:56 p.m.) |
| 01:56PM | 15 | (Jury not present.) |
| 01:56PM | 16 | **THE CLERK:**  All rise. |
| 01:56PM | 17 | **THE COURT:**  Please be seated. |
| 01:56PM | 18 | **THE CLERK:**  We are back on the record for the |
| 01:56PM | 19 | continuation of the jury trial in case number 19-cr-227, |
| 01:56PM | 20 | United States of America versus Joseph Bongiovanni. |
| 01:56PM | 21 | All counsel and parties are present. |
| 01:56PM | 22 | **THE COURT:**  Okay.  So let's argue the objection. |
| 01:56PM | 23 | Where are we going with this? |
| 01:56PM | 24 | **MS. CHALBECK:**  Judge, as the Court knows under |
| 01:56PM | 25 | Rule 607, any party, including the party that's calling the |

01:56PM    1    witness, may impeach that witness including by bringing up

01:56PM    2    prior inconsistent statements.

01:56PM    3              I think if Mr. Singer has an objection to my bringing

01:56PM    4    in the prior testimony, like, word for word and introducing

01:56PM    5    the transcript, I can probably circumvent that issue by asking

01:56PM    6    a different question.  Specifically, I can just ask about did

01:56PM    7    you provide erroneous answers during a prior proceeding when

01:56PM    8    Mr. Singer cross-examined you?

01:56PM    9         **MR. SINGER:**  I guess, I mean, you use impeachment for

01:57PM   10    inconsistency when the person is testifying not at a previous

01:57PM   11    hearing, but at the hearing here.

01:57PM   12              So what is the inconsistency with the testimony

01:57PM   13    today?  That's why I lodged the objection, because it wasn't

01:57PM   14    really clear to me what we're impeaching.

01:57PM   15         **MS. CHALBECK:**  Okay.  So I'm reading off Government

01:57PM   16    Exhibit 3595.

01:57PM   17         **THE COURT:**  What did he say today first that's

01:57PM   18    inconsistent?

01:57PM   19         **MS. CHALBECK:**  So today he said that the names that

01:57PM   20    he dropped during the March 29th, 2019 interview with

01:57PM   21    Mr. Bongiovanni that he did not have any awareness at the time

01:57PM   22    that those names were related to the Ron Serio investigation.

01:57PM   23         **THE COURT:**  Okay.

01:57PM   24         **MS. CHALBECK:**  He similarly I think testified on

01:57PM   25    direct that he did not know the purpose of him asking those

01:57PM    1   questions.

01:57PM    2          In the prior proceeding, which was March 21st of this

01:57PM    3   year, that's 3595CW, on cross-examination Mr. Singer asked,

01:58PM    4   quote:

01:58PM    5          "And another person you had brought up was a person

01:58PM    6   by the name of Charles Newkirk.

01:58PM    7          "Answer:  Yes.

01:58PM    8          "And those are things, that was another person that

01:58PM    9   was associated with the Ron Serio investigation, correct?

01:58PM   10          "Answer:  I believe so, yes.

01:58PM   11          And then as you go further on in the

01:58PM   12   cross-examination, he answers yes to the question.

01:58PM   13          And the purpose of you bringing up those names was to

01:58PM   14   further the Ron Serio investigation, which is directly

01:58PM   15   inconsistent his testimony today.

01:58PM   16          **THE COURT:**  Well, no, I'm not so sure it is.

01:58PM   17          He -- if you show -- okay.  Hang on.  Let me go look

01:58PM   18   at what he testified to today.

01:58PM   19          Did you know the purpose behind asking the defendant

02:01PM   20   about those seven people?

02:01PM   21          I did not.

02:01PM   22          Is that the statement you're going to impeach him on?

02:01PM   23          **MS. CHALBECK:**  Well, there are three statements.

02:01PM   24          One is:  Was Charles Newkirk someone associated with

02:01PM   25   the Ron Serio investigation?

USA v Bongiovanni - Carpenter - Chalbeck/Direct - 9/23/24

02:01PM   1        On cross last time, I'm going -- there are going to
02:01PM   2   be three statements total, that's one of the statements,
02:01PM   3   Your Honor, there are two others.
02:01PM   4        **THE COURT:**  What are the others?
02:01PM   5        **MS. CHALBECK:**  The second one is:  What was the
02:01PM   6   purpose -- or, I'm sorry.  The second one was:  Was Charles
02:01PM   7   Newkirk someone who was associated with the Ron Serio
02:01PM   8   investigation?
02:01PM   9        **THE COURT:**  You asked him that today.
02:01PM  10        **MS. CHALBECK:**  If I haven't asked him yet, then I
02:01PM  11   will ask him.  But in the last proceeding, he testified yes.
02:01PM  12        I anticipate that the -- the witness will answer no,
02:01PM  13   I didn't know Charles Newkirk was associated with the Ron
02:01PM  14   Serio investigation.
02:01PM  15        **THE COURT:**  And tell me what he said at the last
02:01PM  16   proceeding.
02:01PM  17        **MS. CHALBECK:**  Question:  And another person you
02:01PM  18   brought up was a person by the name of Charles Newkirk.
02:01PM  19        Answer:  Yes.
02:01PM  20        That was another person that was associated with the
02:01PM  21   Ron Serio investigation, correct?
02:01PM  22        Answer:  I believe so, yes.
02:01PM  23        **THE COURT:**  That doesn't say he knew about it at the
02:01PM  24   time.
02:01PM  25        **MS. CHALBECK:**  Well, I also anticipate that witness

02:01PM 1  will say that he doesn't know if Charles Newkirk was

02:01PM 2  associated with the Ron Serio investigation period.

02:01PM 3          **THE COURT:**  Well if he says that, then you can

02:01PM 4  impeach him with that, but you can't impeach him with that yet

02:01PM 5  because you haven't shown me something that's inconsistent

02:01PM 6  with what was he said.  He said today that he didn't know at

02:01PM 7  the time.  So if you've got something to say, yeah, I knew at

02:01PM 8  the time that what I was asking about were people involved in

02:01PM 9  the Serio drug-trafficking organization, that's good

02:01PM 10 impeachment.

02:01PM 11         **MS. CHALBECK:**  And I was -- I'm sorry.

02:01PM 12         **THE COURT:**  That's okay.  But it has to be

02:01PM 13 inconsistent with what he testified to today, and I'm not

02:01PM 14 hearing any inconsistency.

02:01PM 15         **MS. CHALBECK:**  I think I can -- I can correct that by

02:01PM 16 modifying the question slightly.

02:01PM 17         **MR. SINGER:**  Yeah, I mean, if there's an

02:01PM 18 inconsistency, I'm not going to object to it.  I didn't feel

02:01PM 19 like there was basis on that point and time.

02:01PM 20         **THE COURT:**  I didn't hear it, that question is going

02:01PM 21 to be sustained.  But you can use to impeach.  But it's got to

02:01PM 22 be inconsistent before we do that.

02:01PM 23         **MS. CHALBECK:**  Okay.

02:01PM 24         **THE COURT:**  Anything else before we resume?

02:01PM 25         **MS. CHALBECK:**  Not from the government.

02:01PM    1          **MR. SINGER:**  No, Judge.

02:01PM    2          **THE COURT:**  Okay.

02:01PM    3          **MS. CHALBECK:**  Mr. Carpenter, you can stand up there.

02:02PM    4          (Jury and witness seated at 2:02 p.m.)

02:02PM    5          **THE COURT:**  Okay.  Welcome back, everybody.

02:02PM    6          A couple things before we resume.  First of all, last

02:03PM    7    week, one of the jurors asked a question, and I responded to

02:03PM    8    that by saying you can't ask questions, and I may have done

02:03PM    9    that harshly because I understand that the juror was concerned

02:03PM   10    about that afterwards, and I certainly did not mean to be

02:03PM   11    harsh.

02:03PM   12          You folks don't know the rules, and I'm here to tell

02:03PM   13    you about the rules.  But please don't be concerned about

02:03PM   14    anything like that.  Okay?  I will let you know if there's

02:03PM   15    something that you want that you can't have.

02:03PM   16          You folks can't ask questions of the witnesses.

02:03PM   17    That's just not allowed in the system.  The lawyers do that.

02:03PM   18    But you have no way of knowing that.

02:03PM   19          So please don't be upset with yourselves if do you

02:03PM   20    something that you didn't know about.

02:03PM   21          And then number 2, when I noticed number 4 on the

02:03PM   22    shirt of juror number -- 1, 2, 3, 4, 5 -- 6, it reminded me

02:03PM   23    that over the weekend that I was babysitting my two-year old

02:03PM   24    granddaughter, and she had a little toy, she had several

02:03PM   25    little Bills toys, one of them had number 4 on it.

02:04PM  1              And I said to her, is that your Buffalo Bills toy?

02:04PM  2              And she said no, Papa, that's Cook.

02:04PM  3              So, even the little ones know about this now.  You

02:04PM  4      know, like, Papa's an idiot.  Don't you know that's James

02:04PM  5      Cook?

02:04PM  6              Okay.  I remind the witness he's still under oath.

02:04PM  7              And you may continue.

02:04PM  8              **MS. CHALBECK:**  Thank you, Your Honor.

02:04PM  9              **BY MS. CHALBECK:**

02:04PM  10     Q.  Mr. Carpenter, I think before the break, we were talking

02:04PM  11     about names that you had dropped during your March 29th, 2019

02:04PM  12     interview with this defendant; does that sound, right?

02:04PM  13     A.  Yes.

02:04PM  14     Q.  And those names were provided -- there were seven names,

02:04PM  15     and those names were provided to you by Special Agent Curtis

02:04PM  16     Ryan; is that correct?

02:04PM  17     A.  Correct.

02:04PM  18     Q.  And I think you testified earlier, and just to provide

02:04PM  19     some further context, Special Agent Ryan, he was

02:04PM  20     investigating the reports that this defendant was protecting

02:04PM  21     the Ron Serio drug-trafficking organization; is that right?

02:05PM  22     A.  Yes.

02:05PM  23     Q.  Okay.  And then in addition to that, he was investigating

02:05PM  24     the defendant's conduct as it related to Peter Gerace, and as

02:05PM  25     it related to racial slurs said in -- in respect to DEA

02:05PM    1    targets; is that correct?

02:05PM    2    A.  Yes.

02:05PM    3    Q.  Okay.  With respect to those names, I think you mentioned

02:05PM    4    that Charles Newkirk was someone who you had mentioned --

02:05PM    5    A.  Yes.

02:05PM    6    Q.  -- is that right?

02:05PM    7        Do you know if that person had any association with the

02:05PM    8    Ron Serio drug-trafficking organization?

02:05PM    9    A.  I do not.

02:05PM   10    Q.  Do you know -- did you know at the time that you asked

02:05PM   11    whether any of those people, those seven names, had a

02:06PM   12    connection to the Ron Serio drug-trafficking organization?

02:06PM   13    A.  I did not.

02:06PM   14    Q.  As you sit here today, do you know if any of those people

02:06PM   15    have a connection to the Ron Serio drug-trafficking

02:06PM   16    organization?

02:06PM   17    A.  I know one, T.S..

02:06PM   18    Q.  Okay.  Do you know the purpose behind your asking about

02:06PM   19    those names?

02:06PM   20    A.  No.

02:06PM   21    Q.  You don't know if the purpose was to further an

02:06PM   22    investigation into this defendant's protection of the Ron

02:06PM   23    Serio drug-trafficking organization, or something else; is

02:06PM   24    that correct?

02:06PM   25             **MR. SINGER:**  Objection.  Speculation.  Witness said

02:06PM    1    he doesn't know.

02:06PM    2              **THE COURT:**  Say it again?

02:06PM    3              **MR. SINGER:**  Speculation, lack of personal knowledge.

02:06PM    4              **THE COURT:**  Well, no, she's asking whether he knows

02:06PM    5    about it.  So how can that be?

02:06PM    6              **MR. SINGER:**  Just based on his last answer, Judge.

02:06PM    7              **THE COURT:**  No, overruled.

02:06PM    8              **BY MS. CHALBECK:**

02:06PM    9    Q.  You may answer.

02:06PM   10    A.  Can you repeat the question?

02:06PM   11              **MS. CHALBECK:**  Ann, can you -- Ms. Sawyer, can you

02:06PM   12    read back the last question?

02:06PM   13              (The above-requested question was then read by the

02:06PM   14    reporter.)

02:07PM   15              **THE WITNESS:**  That is correct.

02:07PM   16              **BY MS. CHALBECK:**

02:07PM   17    Q.  Mr. Carpenter, nevertheless, do you recall being asked

02:07PM   18    kind of those same series of questions in a prior proceeding

02:07PM   19    earlier this year on cross-examination by Mr. Singer?

02:07PM   20    A.  Yes.

02:07PM   21    Q.  Did you give erroneous answers to those questions?

02:07PM   22    A.  Yes.

02:07PM   23    Q.  Just tell the jury your errors.

02:07PM   24    A.  During prior testimony, I stated that that information

02:07PM   25    was in furtherance of the Ron Serio investigation when, in

02:08PM    1    fact, I had no direct knowledge of the purpose of those

02:08PM    2    names.  Mr. Ryan never told me the purpose of those names.  I

02:08PM    3    leapt to a conclusion which was unfounded based on

02:08PM    4    assumptions that I made, which turned out to be -- which was

02:08PM    5    baseless on my part and careless on my part.

02:08PM    6    Q.  Was that your first time testifying in a federal criminal

02:08PM    7    trial?

02:08PM    8    A.  It was.

02:08PM    9    Q.  Is it a nerve-racking experience being up here and being

02:08PM    10   asked questions, having everything you say, you know, being

02:08PM    11   taken down?

02:08PM    12   A.  I find it nerve-racking, yes.

02:08PM    13   Q.  Okay.  Were you in a rhythm during the prior proceeding

02:08PM    14   on cross-examination where Mr. Singer was asking you a bunch

02:08PM    15   of question where the answer was yes and correct and --

02:08PM    16          **MR. SINGER:**  Objection.

02:08PM    17          **THE COURT:**  Sustained.

02:08PM    18          **BY MS. CHALBECK:**

02:08PM    19   Q.  Are you telling this jury the truth to the best of your

02:08PM    20   ability?

02:08PM    21   A.  Yes.

02:08PM    22   Q.  Other than T.S., as you sit here today, do any of those

02:09PM    23   names have a connection to the Ron Serio drug-trafficking

02:09PM    24   organization?

02:09PM    25   A.  I do not know.

02:09PM    1    Q.  And is it your testimony today, Mr. Carpenter, that you

02:09PM    2    did not bring up the Ron Serio investigation to this

02:09PM    3    defendant when you met with him on March 29th, 2019?

02:09PM    4            MR. SINGER:  Objection, asked and answered.

02:09PM    5            THE COURT:  Overruled.

02:09PM    6            BY MS. CHALBECK:

02:09PM    7    Q.  You may answer.

02:09PM    8    A.  I did not mention the name Ron Serio during my interview

02:09PM    9    with Mr. Bongiovanni.

02:09PM   10    Q.  Okay.  I want to talk with you about the topics that you

02:09PM   11    did discuss with this defendant, Peter Gerace and the racial

02:09PM   12    slurs.

02:09PM   13        Before you started asking those questions, did you ask

02:10PM   14    the defendant to describe his background to you?

02:10PM   15    A.  I did.

02:10PM   16    Q.  What did he say about his own professional experience?

02:10PM   17    A.  He described his professional law enforcement experience

02:10PM   18    as starting off in 1995 when he was hired by the Erie County

02:10PM   19    Sheriff's Department.

02:10PM   20        He went on to complete -- he left the Erie County

02:10PM   21    Sheriff's Department, and went on to the DEA where he

02:10PM   22    graduated from the academy in 1998.  His first office was in

02:10PM   23    Orlando, Florida, where he stayed for about three years.  And

02:10PM   24    then he transferred back to Buffalo until his retirement in

02:10PM   25    2019.

USA v Bongiovanni - Carpenter - Chalbeck/Direct - 9/23/24    31

02:10PM   1    Q.  And was it after you kind of got his professional

02:10PM   2    background that you then started asking him questions about

02:10PM   3    Peter Gerace?

02:10PM   4    A.  I did.

02:10PM   5    Q.  Why were you interested in learning about the defendant's

02:10PM   6    story, or telling of his relationship with Peter Gerace?

02:10PM   7    A.  I wanted to know and hear from him directly about his

02:10PM   8    relationship with Peter Gerace.  What type of, if any,

02:11PM   9    relationship they had.  What, if any, contact/communications

02:11PM   10   they had.  Learn more about them and the relationship to see

02:11PM   11   if there was opportunity to provide law-enforcement sensitive

02:11PM   12   information to Gerace.

02:11PM   13   Q.  And so to that end, was it important for you to kind of

02:11PM   14   learn the kinds of communications and the frequency of

02:11PM   15   communication that this defendant had with Peter Gerace?

02:11PM   16   A.  Yes.

02:11PM   17   Q.  Did that go to direct -- did that directly go to your

02:11PM   18   concern about whether the defendant had an opportunity to

02:11PM   19   share law-enforcement sensitive information with Mr. Gerace?

02:11PM   20   A.  Yes.

02:11PM   21   Q.  How did he describe his relationship?

02:11PM   22   A.  He stated that as growing up, that the Bongiovanni family

02:11PM   23   and the Gerace family were family friends.

02:11PM   24       That in his late teens, early 20s, the defendant was a

02:12PM   25   bartender, and he taught Mr. Gerace how to bartend.

02:12PM    1    That they fell out of contact when he moved to Orlando

02:12PM    2    with the DEA.

02:12PM    3    That when he came back to Buffalo, he saw Mr. Gerace and

02:12PM    4    they became reacquainted.

02:12PM    5    He went on to say that Gerace is somebody that he likes

02:12PM    6    to -- tries to keep at an arm's length.  That -- he described

02:12PM    7    Mr. Gerace as a police groupie.

02:12PM    8    He stated that Gerace is someone that he has denied ever

02:12PM    9    initiating contact with, and that he denied ever witnessing

02:12PM    10    Mr. Gerace consume narcotics.

02:12PM    11    Q.  Did he also deny ever going to Mr. Gerace's home?

02:12PM    12    A.  He did.

02:12PM    13    Q.  And did he say something about a desire to investigate

02:12PM    14    Pharaoh's?

02:12PM    15    A.  He stated that -- he stated that he liked -- wanted to

02:13PM    16    keep Mr. Gerace on a short leash with the hope of obtaining

02:13PM    17    information to investigate Pharaoh's.

02:13PM    18    Q.  "Short leash," Mr. Carpenter, is that like an exact quote

02:13PM    19    of what defendant said?

02:13PM    20    A.  Yes.

02:13PM    21    Q.  Okay.  I want to break down some of those statements.

02:13PM    22    You mentioned that the defendant said that he liked to

02:13PM    23    keep Mr. Gerace at arms length, and he denied ever initiating

02:13PM    24    contact with him; is that correct?

02:13PM    25    A.  Yes.

02:13PM  1      **MS. CHALBECK:**  Ms. Champoux, can we please pull up

02:13PM  2  Government Exhibit 310D as in David.

02:13PM  3          This is already in evidence, Your Honor.

02:13PM  4      **BY MS. CHALBECK:**

02:13PM  5  Q.  Generally, Mr. Carpenter, do you understand that this is

02:13PM  6  a series of text messages between the defendant and Peter

02:13PM  7  Gerace?

02:13PM  8  A.  Yes.

02:14PM  9      **MS. CHALBECK:**  Can we go to page 5, Ms. Champoux.

02:14PM  10      **BY MS. CHALBECK:**

02:14PM  11  Q.  I'm going to circle this text message from March 10th,

02:14PM  12  2015.  Mr. Carpenter, when this defendant told you that he

02:14PM  13  kept Peter Gerace at an arms length, did he tell you that he

02:14PM  14  invited Peter over to a Saint Patrick's Day party at his

02:14PM  15  house?

02:14PM  16  A.  No.

02:14PM  17  Q.  Do you see what -- how Mr. Gerace responds to that

02:14PM  18  invitation?

02:14PM  19  A.  Yes.

02:14PM  20  Q.  What does he say?

02:14PM  21  A.  Cool, thanks.

02:14PM  22  Q.  And how does the defendant reply?

02:14PM  23  A.  Hope you can make it bro.

02:14PM  24      **MS. CHALBECK:**  Can we go to page 6, please,

02:14PM  25  Ms. Champoux.

02:14PM    1              **BY MS. CHALBECK:**

02:15PM    2    Q.  And do you understand that the text messages in blue are

02:15PM    3    from Mr. Gerace, and that the text messages in gray are from

02:15PM    4    Mr. Bongiovanni?

02:15PM    5    A.  Yes.

02:15PM    6    Q.  Okay.  When this defendant said that he kept Peter Gerace

02:15PM    7    at an arms length, did he tell you that Peter Gerace had

02:15PM    8    gifts for him?

02:15PM    9    A.  No.

02:15PM   10    Q.  Do you see a text message from May 1st, 2015?

02:15PM   11    A.  Yes.

02:15PM   12    Q.  What does that text message say?

02:15PM   13    A.  Thanks.  I still have a gift for you.

02:15PM   14    Q.  And how does this defendant respond?

02:15PM   15    A.  Just get better, bro, and I'll pick you up in the old

02:15PM   16    Buick and we'll hang out.

02:15PM   17    Q.  And I should have asked, Mr. Carpenter, but did the

02:16PM   18    defendant deny that he was close friends with Mr. Gerace?

02:16PM   19    A.  Yes.

02:16PM   20    Q.  Is he calling him "bro" in this text message here?

02:16PM   21    A.  Yes.

02:16PM   22    Q.  Did he tell you about Peter Gerace's gift for him when he

02:16PM   23    denied being close friends with Peter?

02:16PM   24    A.  No.

02:16PM   25    Q.  Did he tell you about Peter Gerace's gift for him when he

02:16PM    1    said that he kept Peter at an arms length?

02:16PM    2    A.  No.

02:16PM    3           MS. CHALBECK:  Ms. Champoux, can we please go to

02:16PM    4    page 12.

02:16PM    5           BY MS. CHALBECK:

02:16PM    6    Q.  Do you see a text message here from July 15th, 2015 from

02:16PM    7    the defendant to Peter Gerace?

02:16PM    8    A.  Yes.

02:16PM    9    Q.  Does that text message appear to -- withdrawn.

02:17PM   10       Can you read that text message, Mr. Carpenter?

02:17PM   11    A.  We are meeting at my house for drinks then to Boss or

02:17PM   12    Scinta's if it don't rain at the festival.  Come over, bro.

02:17PM   13    Q.  When this defendant said that he kept Peter Gerace at an

02:17PM   14    arms length and denied being close friends with him, did he

02:17PM   15    tell you about the time that he invited Peter Gerace over for

02:17PM   16    drinks?

02:17PM   17    A.  No.

02:17PM   18           MS. CHALBECK:  Can we go to page 14, Ms. Champoux.

02:17PM   19    Is this page 14?  Okay.

02:17PM   20           Can we go to page 15?  Oh, excuse me.  I'm sorry.

02:17PM   21    I'm blind and couldn't see it.

02:18PM   22           BY MS. CHALBECK:

02:18PM   23    Q.  Do you see a text message from this defendant to Peter

02:18PM   24    Gerace on July 18th, 2015?

02:18PM   25    A.  I see a few.

02:18PM     1    Q.  Do you see -- what's the second typed message?

02:18PM     2    A.  To Boss.  Don't mention the golf tournament to Lindsay.

02:18PM     3    Q.  And how does Peter Gerace reply?

02:18PM     4    A.  I know.  What time Boss?

02:18PM     5    Q.  Do you understand that the golf tournament was a

02:18PM     6    Pharaoh's golf tournament, a stripper golf tournament that

02:18PM     7    Peter Gerace was sponsoring?

02:18PM     8    A.  Yes.

02:18PM     9    Q.  And is this the defendant texting Peter saying don't

02:18PM    10    bring that up to my wife?

02:18PM    11    A.  Yes.

02:18PM    12    Q.  And does Peter Gerace say, I know?

02:18PM    13    A.  Yes.

02:18PM    14    Q.  So did the defendant tell you that when he denied being

02:18PM    15    close friends with Peter Gerace and said that he kept him at

02:18PM    16    an arms length?

02:18PM    17    A.  No.

02:18PM    18         MS. CHALBECK:  Can we go to page 17, please,

02:18PM    19    Ms. Champoux?

02:19PM    20         BY MS. CHALBECK:

02:19PM    21    Q.  Do you see at the bottom of your screen, Mr. Carpenter, a

02:19PM    22    text message from the defendant to Peter Gerace where it says

02:19PM    23    that he wanted to send Peter a letter, and he's asking for

02:19PM    24    his address?

02:19PM    25    A.  Yes.

02:19PM    1    Q.  Did the defendant tell you that he tried to send Peter a

02:19PM    2    letter in the mail when he denied being close friends with

02:19PM    3    him, and said he kept him at an arms length?

02:19PM    4    A.  No.

02:19PM    5    Q.  A letter in the mail.  I think you also said,

02:19PM    6    Mr. Carpenter, that the defendant denied ever initiating

02:19PM    7    contact with Peter; is that correct?

02:19PM    8    A.  Correct.

02:19PM    9    Q.  So is sending Peter Gerace a letter in the mail

02:19PM    10   consistent or inconsistent with that denial?

02:19PM    11   A.  It would be inconsistent.

02:19PM    12       **MS. CHALBECK:**  Can we go to page 18, Ms. Champoux?

02:19PM    13       I'm sorry, can we go to page 28.

02:20PM    14       Can we go to page 29, Ms. Champoux?

02:20PM    15       **BY MS. CHALBECK:**

02:20PM    16   Q.  Do you see a text message from June 18th, 2016 --

02:20PM    17   A.  I do.

02:20PM    18   Q.  -- from this defendant to Peter Gerace?

02:20PM    19   A.  Yes.

02:20PM    20   Q.  What does -- what does that text message say?

02:20PM    21   A.  Great time last night.  It was great to see you -- your

02:20PM    22   parents.  Thanks again for the invitation.

02:20PM    23   Q.  When this defendant said that he kept Peter Gerace at an

02:20PM    24   arms length and denied being close friends with him, did he

02:20PM    25   tell you that he attended Peter Gerace's family's functions?

02:20PM    1    A.  No.

02:20PM    2            MS. CHALBECK:  Can we go to page 30, Ms. Champoux?

02:21PM    3            BY MS. CHALBECK:

02:21PM    4    Q.  Do you see a text message at the bottom here?

02:21PM    5    A.  Yes.

02:21PM    6    Q.  What does that text message say?

02:21PM    7    A.  Nice.  Hope you had a good time.

02:21PM    8        I'm trying to get a crew together for the Bills game in

02:21PM    9    Miami in October.

02:21PM    10   Q.  So when the defendant said to you that he kept Peter

02:21PM    11   Gerace at an arms length and denied being close friends with

02:21PM    12   him, did he tell you that he once invited Peter Gerace to be

02:21PM    13   part of his crew to go to a Bills game in Miami?

02:21PM    14   A.  No.

02:21PM    15           MS. CHALBECK:  Can we go to page 34, Ms. Champoux?

02:21PM    16           BY MS. CHALBECK:

02:21PM    17   Q.  Do you see text messages between Peter Gerace and the

02:21PM    18   defendant on pages 34 and 35 of this exhibit where they

02:21PM    19   appear to be complaining about their wives?

02:22PM    20           MS. CHALBECK:  Can we scroll up a little bit?

02:22PM    21           THE WITNESS:  Thank you.

02:22PM    22           MS. CHALBECK:  And can we scroll down, Ms. Champoux?

02:22PM    23           BY MS. CHALBECK:

02:22PM    24   Q.  What does this defendant say to Peter Gerace on

02:22PM    25   September 6th, 2016?

02:22PM    1    A.  I going through the same shit.  Always accusing me of

02:22PM    2    cheating.

02:22PM    3    Q.  Do you understand that the defendant was married to

02:22PM    4    Lindsay Bongiovanni at the time?

02:22PM    5    A.  Yes.

02:22PM    6    Q.  So does it appear that he's telling Peter Gerace that he

02:22PM    7    also has marital difficulties?

02:22PM    8    A.  Yes.

02:22PM    9    Q.  Is that consistent or inconsistent with his denial to you

02:22PM   10    that they were close friends?

02:22PM   11    A.  It would appear that they be close friends.

02:23PM   12    Q.  Did you review all of the text messages between this

02:23PM   13    defendant and Peter Gerace contained in Government

02:23PM   14    Exhibit 310D?

02:23PM   15    A.  Yes.

02:23PM   16    Q.  How many times does this defendant tell Peter Gerace that

02:23PM   17    he loves him in this exhibit?

02:23PM   18    A.  I saw five times.

02:23PM   19    Q.  What dates were those?

02:23PM   20    A.  I saw August 6th of 2015.  I saw May 29th of 2016.  I saw

02:23PM   21    June 26th of 2016.  I saw September 29th of 2017.  And

02:23PM   22    February 22nd of 2018.

02:23PM   23    Q.  That's five times in the course of a handful of years

02:23PM   24    this defendant is telling Peter Gerace that he loves him?

02:23PM   25    A.  Yes.

02:23PM    1    Q.  Did he tell you that when he denied being close friends

02:23PM    2    with Peter and told you that he kept him at an arms length?

02:23PM    3    A.  No.

02:24PM    4         MS. CHALBECK:  We can get out of this exhibit,

02:24PM    5    Ms. Champoux.  And can we please bring up Government

02:24PM    6    Exhibit 426-1 in evidence.

02:24PM    7         BY MS. CHALBECK:

02:24PM    8    Q.  When the defendant denied being close friends with Peter

02:24PM    9    Gerace and told him he kept him at an arms length, did he

02:24PM   10    tell you that he went on double dates with Peter Gerace?

02:24PM   11    A.  He did not.

02:24PM   12    Q.  He didn't say, oh, yeah, I used to go on carriage rides

02:24PM   13    with Peter Gerace and my ex fiancée at Niagara-on-the-Lake?

02:24PM   14         MR. SINGER:  Objection.

02:24PM   15         THE COURT:  Basis?

02:24PM   16         MR. SINGER:  I'll withdraw it, Judge.

02:24PM   17         THE COURT:  Okay.

02:24PM   18         BY MS. CHALBECK:

02:24PM   19    Q.  You can answer the question.

02:24PM   20    A.  He did not.

02:24PM   21    Q.  Did you ask the defendant if he ever went on vacations

02:24PM   22    with Peter Gerace?

02:24PM   23    A.  I did.

02:24PM   24    Q.  And what did he say when you asked that question?

02:25PM   25    A.  He denied ever going on vacations or vacationing with

02:25PM    1   Peter Gerace.

02:25PM    2   Q.  After he denied it, did he give a followup to that

02:25PM    3   question?

02:25PM    4   A.  He did.

02:25PM    5   Q.  What did he say?

02:25PM    6   A.  He did mention that there was one trip that he -- the

02:25PM    7   defendant took to Las Vegas.  While out there, he ran into

02:25PM    8   Peter Gerace.  He said there was no preplanning of that trip,

02:25PM    9   that was just a purely coincidental running in.

02:25PM   10        MS. CHALBECK:  Ms. Champoux, can we please pull up

02:25PM   11   Government's Exhibit 490A, as in alpha.  It's already in

02:25PM   12   evidence.

02:25PM   13        BY MS. CHALBECK:

02:25PM   14   Q.  Mr. Carpenter, do you see a photo of this defendant

02:25PM   15   standing next to Peter Gerace?

02:25PM   16   A.  Yes.

02:25PM   17   Q.  Do you understand that this photograph was taken in

02:25PM   18   Las Vegas?

02:25PM   19   A.  Yes.

02:25PM   20   Q.  And can you just read the date in the lower left-hand

02:25PM   21   corner of the picture?

02:25PM   22   A.  August 25th, 2011.

02:25PM   23        MS. CHALBECK:  And, Ms. Champoux, I'm sorry, can we

02:26PM   24   please bring back up and put side by side Government Exhibits

02:26PM   25   426-1.

02:26PM    1          **BY MS. CHALBECK:**

02:26PM    2    Q.  With respect to 426, Government Exhibit 426-1,

02:26PM    3    Mr. Carpenter, do you understand that this photograph was

02:26PM    4    taken approximately in the summer of 2005?

02:26PM    5    A.  Yes.

02:26PM    6    Q.  So that's about six years in between these photographs?

02:26PM    7    A.  Yes.

02:26PM    8    Q.  Mr. Bongiovanni is with two different women in this

02:26PM    9    photograph, fair to say -- in these photographs?

02:26PM   10    A.  Yes.

02:26PM   11    Q.  But Peter Gerace is still there?

02:26PM   12    A.  Correct.

02:26PM   13          **MS. CHALBECK:**  We can keep these up, Ms. Champoux.

02:26PM   14          **BY MS. CHALBECK:**

02:26PM   15    Q.  And, Mr. Carpenter, I want to turn to some other comments

02:26PM   16    that the defendant made during your interview with him.

02:27PM   17        I think he said earlier he liked to keep Peter Gerace on

02:27PM   18    a, quote, short leash, unquote, in an effort to gather

02:27PM   19    information about criminal activity at Pharaoh's; is that

02:27PM   20    correct?

02:27PM   21    A.  Yes.

02:27PM   22    Q.  What did you understand that to mean?

02:27PM   23    A.  I understood that to mean that to whatever extent there

02:27PM   24    was a relationship there, that he was using it as a way of

02:27PM   25    trying to obtain information that he could possibly use to

| | | |
|---|---|---|
| 02:27PM | 1 | investigate Pharaoh's. |
| 02:27PM | 2 | Q.  Do these photos show the defendant socializing with the |
| 02:27PM | 3 | owner of Pharaoh's? |
| 02:27PM | 4 | A.  Yes. |
| 02:27PM | 5 | Q.  What did the defendant say to you about his contact with |
| 02:27PM | 6 | Peter Gerace? |
| 02:27PM | 7 | A.  He denied ever initiating contact. |
| 02:27PM | 8 | Q.  Why was it important for you to understand whether the |
| 02:28PM | 9 | defendant ever initiated contact with Mr. Gerace? |
| 02:28PM | 10 | A.  I wanted to know if that relationship was a one-way or |
| 02:28PM | 11 | two-way street.  If the communication flowed both ways.  If |
| 02:28PM | 12 | one of them reached out more than the other, or if there was |
| 02:28PM | 13 | ignoring of communication on an end. |
| 02:28PM | 14 | **MS. CHALBECK:**  Ms. Champoux, can we take these down, |
| 02:28PM | 15 | and can we please pull up Government Exhibit 358-A. |
| 02:28PM | 16 | Judge, this is just a submarked exhibit of 358, which |
| 02:28PM | 17 | is already in evidence. |
| 02:28PM | 18 | **BY MS. CHALBECK:** |
| 02:28PM | 19 | Q.  Now, let's orient the jury a little bit to what we're |
| 02:28PM | 20 | looking at. |
| 02:28PM | 21 | Do you understand these to be the defendant's phone |
| 02:28PM | 22 | bills -- |
| 02:28PM | 23 | A.  Yes. |
| 02:28PM | 24 | Q.  -- from his DEA telephone number? |
| 02:28PM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 02:28PM | 1 | Q.  Okay.  Do you see DEA kind of in the address column |
| 02:28PM | 2 | there? |
| 02:28PM | 3 | A.  Yes. |
| 02:28PM | 4 | Q.  Okay.  And does it look like these bills start in |
| 02:29PM | 5 | December of 2013? |
| 02:29PM | 6 | A.  Yes. |
| 02:29PM | 7 | Q.  And they go to about 2018; is that correct? |
| 02:29PM | 8 | A.  Yes. |
| 02:29PM | 9 |      **MS. CHALBECK:**  Ms. Champoux, can we please go to page |
| 02:29PM | 10 | 52.  Maybe we can zoom in, there's a telephone call from |
| 02:29PM | 11 | March, we can start at the top. |
| 02:29PM | 12 |      Well, first, here -- withdrawn. |
| 02:29PM | 13 |      **BY MS. CHALBECK:** |
| 02:29PM | 14 | Q.  Do you see the date in the top right-hand corner of these |
| 02:29PM | 15 | bills, Mr. Carpenter? |
| 02:29PM | 16 | A.  April 18th, 2014. |
| 02:29PM | 17 | Q.  Okay.  So we're in the year 2014? |
| 02:29PM | 18 | A.  Yes. |
| 02:29PM | 19 |      **MS. CHALBECK:**  And, Ms. Champoux, can we just zoom in |
| 02:29PM | 20 | on maybe the first half? |
| 02:29PM | 21 |      **BY MS. CHALBECK:** |
| 02:29PM | 22 | Q.  Now, do you see at this very top row, there's a line here |
| 02:30PM | 23 | called incoming?  Do you see that? |
| 02:30PM | 24 | A.  Yes. |
| 02:30PM | 25 | Q.  Do you understand that to be how the bills register |

02:30PM   1   incoming calls?

02:30PM   2   A.   Yes.

02:30PM   3   Q.   And so if "incoming" is not there, is it your

02:30PM   4   understanding that that's an outgoing call?

02:30PM   5   A.   Yes.

02:30PM   6   Q.   A call that the defendant would place to some other

02:30PM   7   telephone number?

02:30PM   8   A.   Yes.

02:30PM   9   Q.   Do you see a call on March 19th, 2014, at 8:27 p.m. from

02:30PM  10   this defendant to Peter Gerace?

02:30PM  11   A.   Yes.

02:30PM  12   Q.   Is that the defendant initiating contact with Peter

02:30PM  13   Gerace?

02:30PM  14   A.   Yes.

02:30PM  15   Q.   Do you see Peter Gerace calling this defendant earlier in

02:30PM  16   the day?

02:30PM  17   A.   I do not.

02:30PM  18   Q.   Okay.

02:30PM  19        **MS. CHALBECK:**  Let's go to page 83 of this exhibit,

02:31PM  20   Ms. Champoux, to June 7th, 2014, at around 7:40 p.m.

02:31PM  21        **BY MS. CHALBECK:**

02:31PM  22   Q.   And just so that the record is clear, Mr. Carpenter,

02:31PM  23   Peter Gerace's number is 716-725-1931; is that correct?

02:31PM  24   A.   Yes.

02:31PM  25   Q.   On June 7th, 2014, at around 7:40 p.m., do you see this

02:31PM    1    defendant placing another call to Peter Gerace?

02:31PM    2    A.  Yes.

02:31PM    3    Q.  Did he tell you about that call when he denied initiating

02:31PM    4    contact with Peter Gerace?

02:31PM    5    A.  No.

02:31PM    6    Q.  Is this call consistent or inconsistent with his

02:31PM    7    statements to you?

02:31PM    8    A.  Inconsistent.

02:31PM    9           **MS. CHALBECK:**  Ms. Champoux, can we go to page 99.

02:31PM   10    And can -- thank you.

02:31PM   11           **BY MS. CHALBECK:**

02:31PM   12    Q.  Mr. Carpenter, do you see another call that this

02:32PM   13    defendant placed to Peter Gerace on July 23rd, at 9:47 a.m.?

02:32PM   14    A.  Yes.

02:32PM   15    Q.  How long is that call?

02:32PM   16    A.  Four minutes.

02:32PM   17    Q.  Did the defendant tell you about that when he denied ever

02:32PM   18    initiating contact with Peter Gerace?

02:32PM   19    A.  No.

02:32PM   20    Q.  But this is a call that this defendant placed to Peter on

02:32PM   21    that day; is that correct?

02:32PM   22    A.  Yes.

02:32PM   23           **MS. CHALBECK:**  Can we go to page 118, Ms. Champoux?

02:32PM   24    We're looking at September 4th at around 12:21 p.m.

02:32PM   25

02:32PM    1              **BY MS. CHALBECK:**

02:32PM    2    Q.  Do you see a call that this defendant placed to Peter

02:32PM    3    Gerace on September 4th at 12:21 p.m.?

02:32PM    4    A.  Yes.

02:32PM    5    Q.  How long is that call for?

02:32PM    6    A.  20 minutes.

02:32PM    7    Q.  20 minutes.  Did this defendant tell you about that call

02:33PM    8    when he denied ever initiating contact with Peter Gerace?

02:33PM    9    A.  No.

02:33PM   10    Q.  So is this 20-minute phone call that the defendant

02:33PM   11    initiated consistent or inconsistent with his comments to

02:33PM   12    you?

02:33PM   13    A.  Inconsistent.

02:33PM   14              **MS. CHALBECK:**  Could we go to page 154, Ms. Champoux?

02:33PM   15    And we're looking for December 8th, 2014, at around 12:52 p.m.

02:33PM   16              **BY MS. CHALBECK:**

02:33PM   17    Q.  Mr. Carpenter, do you see in about the top here, another

02:33PM   18    instance of this defendant initiating contact with Peter

02:33PM   19    Gerace?

02:33PM   20    A.  Yes.

02:33PM   21    Q.  Does it, in fact, actually look like he calls Peter, and

02:33PM   22    then Peter calls him back soon thereafter?

02:33PM   23    A.  Yes.

02:33PM   24    Q.  And you know that because "incoming," right?

02:33PM   25    A.  Correct.

02:33PM   1   Q.  Did he tell you about those calls when he denied ever

02:34PM   2   initiating contact?

02:34PM   3   A.  No.

02:34PM   4          MS. CHALBECK:  Ms. Champoux, can we please go to

02:34PM   5   page 211, to June 6th, 2015 at 3:55 p.m.

02:34PM   6          BY MS. CHALBECK:

02:34PM   7   Q.  ASAC Carpenter, do you see another instance of this

02:34PM   8   defendant calling Peter Gerace?

02:34PM   9   A.  Yes.

02:34PM  10   Q.  How long is the call?

02:34PM  11   A.  Six minutes.

02:34PM  12   Q.  Did he tell you about that when he denied ever initiating

02:34PM  13   contact with Peter Gerace?

02:34PM  14   A.  No.

02:34PM  15          MS. CHALBECK:  Can we go to page 212, Ms. Champoux,

02:35PM  16   to June 10th, 2015 at 6:29.

02:35PM  17          BY MS. CHALBECK:

02:35PM  18   Q.  And just a few days later, Mr. Carpenter, does this

02:35PM  19   defendant call Peter Gerace again?

02:35PM  20   A.  Yes.

02:35PM  21   Q.  How long is the call?

02:35PM  22   A.  Nine minutes.

02:35PM  23   Q.  Is that a call that this defendant initiated to Peter

02:35PM  24   Gerace?

02:35PM  25   A.  Yes.

02:35PM    1    Q.  Did he tell you about that call?

02:35PM    2    A.  No.

02:35PM    3           MS. CHALBECK:  Could we go to page 225, Ms. Champoux,

02:35PM    4    to July 13th, 2015, at 10:46 a.m.

02:35PM    5           BY MS. CHALBECK:

02:35PM    6    Q.  Do you see a call at 10:46 a.m. that this defendant

02:36PM    7    places to Peter Gerace, Mr. Carpenter?

02:36PM    8    A.  I do.

02:36PM    9    Q.  And does it look like, again, Peter called him back just

02:36PM   10    a short time later?

02:36PM   11    A.  Yes.

02:36PM   12    Q.  But when Peter calls him back, that's after this

02:36PM   13    defendant initiated contact, fair?

02:36PM   14    A.  That's correct.

02:36PM   15    Q.  Did he tell you about that?

02:36PM   16    A.  No.

02:36PM   17           MS. CHALBECK:  Can we please go to page 226,

02:36PM   18    Ms. Champoux, to July 19th at 3:01.  I think it's at the very

02:36PM   19    bottom.

02:36PM   20           BY MS. CHALBECK:

02:36PM   21    Q.  On this date, July 19th, do you see another instance of

02:36PM   22    this defendant initiating contact with Peter Gerace?

02:36PM   23    A.  Yes.

02:36PM   24    Q.  Is that a six-minute call?

02:37PM   25    A.  Yes.

02:37PM   1   Q.  Is that consistent or inconsistent with his denial that

02:37PM   2   he ever initiated contact with Peter Gerace?

02:37PM   3   A.  Inconsistent.

02:37PM   4   Q.  For that matter, is it consistent or inconsistent with

02:37PM   5   him saying that he kept Peter Gerace at an arms length?

02:37PM   6   A.  Inconsistent.

02:37PM   7          **MS. CHALBECK:**  Can we go to page 227, Ms. Champoux?

02:37PM   8   I'm looking for July 21st, 2015, at 9:34 a.m.

02:37PM   9          **BY MS. CHALBECK:**

02:37PM  10   Q.  Do you see a call here from this defendant to Peter

02:37PM  11   Gerace where he is initiating contact?

02:37PM  12   A.  Yes.

02:37PM  13   Q.  How long is that call for?

02:37PM  14   A.  Seven minutes.

02:37PM  15   Q.  Did he tell you about that during your interview with

02:37PM  16   him?

02:37PM  17   A.  No.

02:38PM  18          **MS. CHALBECK:**  Ms. Champoux, can we please go to page

02:38PM  19   234, to August 1st, 2015 at 6:18 p.m.?

02:38PM  20          **BY MS. CHALBECK:**

02:38PM  21   Q.  Do you see another instance here where this defendant is

02:38PM  22   calling Peter Gerace?

02:38PM  23   A.  Yes.

02:38PM  24   Q.  How long is that call for?

02:38PM  25   A.  Two minutes.

| | | |
|---|---|---|
| 02:38PM | 1 | Q.  I'm going to fast forward, Mr. Carpenter, to 2017. |
| 02:38PM | 2 | **MS. CHALBECK:**  Can you please go to page 450, |
| 02:38PM | 3 | Ms. Champoux? |
| 02:38PM | 4 | **BY MS. CHALBECK:** |
| 02:38PM | 5 | Q.  Now we were just looking at 2015 calls.  And now fair to |
| 02:39PM | 6 | say that we're in 2017? |
| 02:39PM | 7 | A.  Yes. |
| 02:39PM | 8 | Q.  Is it fair to say that there are a number of calls in |
| 02:39PM | 9 | between where we just were in 2015 to 2017 where this |
| 02:39PM | 10 | defendant calls Peter Gerace? |
| 02:39PM | 11 | A.  I'm sorry? |
| 02:39PM | 12 | Q.  Sorry, I asked a poorly-phrased question. |
| 02:39PM | 13 | So we've just fast forwarded two years roughly.  Is it |
| 02:39PM | 14 | fair to say that in that period, even though we didn't go |
| 02:39PM | 15 | through them one by one, that this defendant calls Peter |
| 02:39PM | 16 | Gerace several times -- |
| 02:39PM | 17 | A.  Yes. |
| 02:39PM | 18 | Q.  -- where he's initiating contact, telephone contact with |
| 02:39PM | 19 | Peter Gerace? |
| 02:39PM | 20 | A.  Yes. |
| 02:39PM | 21 | Q.  Now, on page 450 of this exhibit? |
| 02:39PM | 22 | **MS. CHALBECK:**  Ms. Champoux, can we zoom in on |
| 02:39PM | 23 | May 9th, 2017 at 10:57 a.m. |
| 02:39PM | 24 | **BY MS. CHALBECK:** |
| 02:39PM | 25 | Q.  Who called who in this call? |

02:39PM   1   A.  At 10:57, the defendant calls Peter Gerace.

02:39PM   2   Q.  How long does that call last?

02:40PM   3   A.  16 minutes.

02:40PM   4   Q.  He didn't tell you about that call?

02:40PM   5   A.  No.

02:40PM   6   Q.  Are all of these telephone calls that we went through and

02:40PM   7   then the ones in that interim two-year period, are those all

02:40PM   8   inconsistent with this defendant's denial that he ever

02:40PM   9   initiated contact with Peter Gerace?

02:40PM  10   A.  Yes.

02:40PM  11        **MS. CHALBECK:**  Ms. Champoux, can we please bring up

02:40PM  12   Government Exhibit 98 already in evidence?

02:40PM  13        **BY MS. CHALBECK:**

02:40PM  14   Q.  Are you familiar with this memo, Mr. Carpenter?

02:40PM  15   A.  Yes.

02:40PM  16   Q.  Did you review it prior to your interview with the

02:40PM  17   defendant on March 29th, 2019?

02:40PM  18   A.  Yes.

02:40PM  19   Q.  Is this a, you know, fair to say that this is a memo that

02:40PM  20   this defendant authored to his supervisors in the DEA?

02:40PM  21   A.  Yes.

02:40PM  22   Q.  And you see the subject in this upper left-hand corner?

02:40PM  23   A.  Communication with Peter Gerace.

02:40PM  24   Q.  And what's the date?

02:41PM  25   A.  December 10th, 2018.

02:41PM    1    Q.  Okay.

02:41PM    2         MS. CHALBECK:  Ms. Champoux, can we please go to

02:41PM    3    page 2.  And can we zoom in on that last sentence.

02:41PM    4         BY MS. CHALBECK:

02:41PM    5    Q.  Will you please read that last sentence into the record,

02:41PM    6    Mr. Carpenter?

02:41PM    7    A.  I have and will report all contact with Gerace to a DEA

02:41PM    8    supervisor like I have in the past and will in the future

02:41PM    9    should unsolicited communication with Gerace occur.

02:41PM    10   Q.  Now, in your capacity in this investigation, have you

02:41PM    11   seen anything suggesting that this defendant reported any of

02:41PM    12   those calls that we just went through to a DEA supervisor?

02:41PM    13   A.  No.

02:41PM    14   Q.  I want to pivot to other statements that this defendant

02:41PM    15   made during your March 29th interview.

02:41PM    16        Did you ask the defendant if he had ever seen Mr. Gerace

02:42PM    17   use illegal drugs?

02:42PM    18   A.  I believe I asked him if he'd seen him consume drugs.

02:42PM    19   Q.  Okay.

02:42PM    20   A.  And he denied seeing Peter Gerace consume drugs.

02:42PM    21   Q.  Okay.  Using drugs, consuming drugs, basically the same

02:42PM    22   thing?

02:42PM    23   A.  You can't use without consuming.

02:42PM    24   Q.  Okay.  Why did you ask him if he had ever seen Peter

02:42PM    25   Gerace consume illegal drugs?

02:42PM   1    A.  I wanted to know in the context of their friendship,

02:42PM   2    their relationship, to what extent their relationship was.

02:42PM   3    If that was somebody that he had seen use narcotics, that

02:42PM   4    would have indicated the type of relationship that they had.

02:42PM   5        Also would have indicated if it was true, to present an

02:42PM   6    opportunity for Mr. Bongiovanni to provide law-enforcement

02:42PM   7    sensitive information to somebody he witnessed using drugs.

02:42PM   8    And as people use narcotics continue to use narcotics knowing

02:42PM   9    they're illegal, if they're getting any information to allow

02:43PM  10    them to continue that illegal activity would be beneficial to

02:43PM  11    them, to continue that illegal activity is useful.

02:43PM  12    Q.  Okay.  Was knowing whether this defendant consumed --

02:43PM  13    withdrawn.

02:43PM  14        Is knowing whether this defendant saw Peter Gerace

02:43PM  15    consume narcotics important to your investigation?

02:43PM  16    A.  Yes.

02:43PM  17    Q.  And when you asked him that question, what response did

02:43PM  18    he give you?

02:43PM  19    A.  He denied seeing Peter Gerace consume narcotics.

02:43PM  20    Q.  I think you testified earlier, Mr. Carpenter, that the

02:43PM  21    defendant wanted to keep Peter Gerace on a short leash; is

02:43PM  22    that right?

02:43PM  23    A.  Yes.

02:44PM  24    Q.  And I think you testified that that was so that he could

02:44PM  25    investigate criminal activity at Pharaoh's?

02:44PM    1    A.  So he could obtain -- in the hopes of obtaining

02:44PM    2    information for investigative purposes, yes.

02:44PM    3    Q.  Did the defendant -- I'm sorry.  Did the defendant tell

02:44PM    4    you that he knew Peter Gerace was the owner of Pharaoh's?

02:44PM    5    A.  Yes.

02:44PM    6    Q.  Kind of in connection with that part of the interview,

02:44PM    7    Mr. Carpenter, did you ask the defendant if Peter Gerace had

02:44PM    8    ever called him while someone was actively overdosing?

02:44PM    9    A.  Yes.

02:44PM    10   Q.  And what did the defendant say?

02:44PM    11   A.  He denied receiving a phone call from Peter Gerace while

02:44PM    12   somebody was actively overdosing at Pharaoh's.

02:44PM    13       He said that Peter Gerace had asked him about what he

02:44PM    14   should do if somebody at Pharaoh's were to overdose.

02:45PM    15       And Mr. Bongiovanni stated that -- he advised him to

02:45PM    16   become trained in Narcan.

02:45PM    17   Q.  That's what this defendant said about what he told Peter

02:45PM    18   Gerace?

02:45PM    19   A.  Yes.

02:45PM    20   Q.  With respect to his comment about, you know, wanting to

02:45PM    21   investigate Pharaoh's, in your capacity in this

02:45PM    22   investigation, have you seen anything suggesting that this

02:45PM    23   defendant was ever investigating Pharaoh's?

02:45PM    24   A.  I have not.

02:45PM    25   Q.  So we've just talked about March 29th, 2019, your

02:45PM  1   interview with him.  I want to fast forward a few months to

02:45PM  2   June 6th of 2019.

02:45PM  3       Did you, along with Special Agent Curtis Ryan, interview

02:45PM  4   the defendant a second time that day?  Or a second time on

02:45PM  5   that day?

02:45PM  6   A.  Agent Ryan and I interviewed the defendant on June 6th,

02:46PM  7   yes.

02:46PM  8   Q.  Okay.  Can you just describe for the jury the context of

02:46PM  9   that interview?  What lead to it?

02:46PM  10  A.  A search warrant was conducted at the defendant's

02:46PM  11  residence.  And after the search warrant, after things had

02:46PM  12  settled down, the defendant was approached to see if he would

02:46PM  13  agree to be interviewed, which he agreed to do.

02:46PM  14  Q.  Was that a voluntary interview again?

02:46PM  15  A.  It was.

02:46PM  16  Q.  And fair to say that when the search warrant was first

02:46PM  17  being executed, there was like a SWAT-like team that entered

02:46PM  18  the residence?

02:46PM  19  A.  Yes.

02:46PM  20  Q.  Did your interview occur decently after that?

02:46PM  21  A.  Yes.

02:46PM  22  Q.  Okay.  There were still law enforcement agents in the

02:46PM  23  residence, correct?

02:46PM  24  A.  Yes.

02:46PM  25  Q.  Okay.  What was the defendant's demeanor when you

02:46PM    1    initiated the interview?

02:46PM    2    A.  He seemed calm.  He seemed relaxed.  He seemed

02:46PM    3    comfortable.

02:46PM    4    Q.  Who was leading the interview?

02:47PM    5    A.  Curtis Ryan.

02:47PM    6    Q.  And what was your job?

02:47PM    7    A.  My job was help Curtis, if he were to forget, help him

02:47PM    8    out.  If there's something said that needed a follow-up

02:47PM    9    question, to make sure that we stayed on task.  Just to help

02:47PM   10    facilitate the interview.  More of a passive participant in

02:47PM   11    it.

02:47PM   12    Q.  So fair to say you were just kind of there to assist if

02:47PM   13    needed?

02:47PM   14    A.  Yes.

02:47PM   15    Q.  I'm not going to ask questions about, you know, a lot of

02:47PM   16    what was said during that interview because the jury's

02:47PM   17    already heard it.  But just generally, did Special Agent Ryan

02:47PM   18    ask this defendant a series, like, of questions?

02:47PM   19    A.  Yes.

02:47PM   20    Q.  At some point, did the conversation turn to an individual

02:48PM   21    named Frank Parisi?

02:48PM   22    A.  Yes.

02:48PM   23    Q.  Did Special Agent Ryan ask the defendant about Frank

02:48PM   24    Parisi?

02:48PM   25    A.  He did.

02:48PM    1    Q.  Was the defendant answering those questions?

02:48PM    2    A.  I can't recall exactly how much he said about Frank

02:48PM    3    Parisi.

02:48PM    4    Q.  At some point during the conversation, Mr. Carpenter, did

02:48PM    5    the defendant's wife interject herself while you all were

02:48PM    6    talking about Frank Parisi?

02:48PM    7    A.  Yes.

02:48PM    8    Q.  When the defendant's wife interjected herself, what

02:48PM    9    happened to the defendant and Special Agent Ryan's, like,

02:48PM   10    attention?

02:48PM   11    A.  Their attention was refocused to her as she was coming

02:48PM   12    from a different part of the room.  So they instinctively

02:48PM   13    just turned towards her were and looking at her.

02:48PM   14    Q.  While Special Agent Ryan's attention was on the

02:49PM   15    defendant's wife, where was your focus?

02:49PM   16    A.  I looked -- I was looking at the defendant.

02:49PM   17    Q.  Did you see this defendant do anything while agents were

02:49PM   18    listening to his wife start talking about Frank Parisi?

02:49PM   19    A.  As she was speaking, I saw him shake his head in a left

02:49PM   20    to right no fashion.

02:49PM   21    Q.  Can you just demonstrate that for the jury?

02:49PM   22    A.  (Demonstrating.)

02:49PM   23    Q.  That's what this defendant did to his wife --

02:49PM   24    A.  Yes.

02:49PM   25    Q.  -- when she was talking about Frank Parisi?

02:49PM   1   A.  Yes.

02:49PM   2   Q.  I'm going to pause right there.

02:49PM   3        **MS. CHALBECK:**  Ms. Champoux, can we please bring up

02:49PM   4   Government Exhibit 46 already in evidence?  And can we go, I

02:49PM   5   think it's on page 2, I think it's the contact for Frank

02:49PM   6   Parisi.

02:50PM   7        **BY MS. CHALBECK:**

02:50PM   8   Q.  What's the telephone number for Frank Parisi in this

02:50PM   9   exhibit?

02:50PM  10   A.  716-481-8111.

02:50PM  11   Q.  Okay.

02:50PM  12        **MS. CHALBECK:**  We can pull that down, Ms. Champoux.

02:50PM  13        And then can we please pull back up Government

02:50PM  14   Exhibit 358A already in evidence.

02:50PM  15        **BY MS. CHALBECK:**

02:50PM  16   Q.  These are Mr. -- fair to say these are Mr. Bongiovanni's

02:50PM  17   bills, we were just looking at them?

02:50PM  18   A.  Yes.

02:50PM  19        **MS. CHALBECK:**  Okay.  And can we go to page 48.

02:50PM  20        **BY MS. CHALBECK:**

02:50PM  21   Q.  And at the very bottom, we're in April of 2014 of this

02:50PM  22   bill cycle, do you see an incoming call from Frank Parisi to

02:50PM  23   this defendant?

02:50PM  24   A.  Yes.

02:50PM  25   Q.  That's the same person who this defendant to his wife

02:51PM    1    went and look shook his head back and forth from left to,

02:51PM    2    right?

02:51PM    3    A.  Yes.

02:51PM    4    Q.  Okay.  Going back to your June 6th, 2019 interview with

02:51PM    5    the defendant, did there come a time when a box of DEA file

02:51PM    6    materials was discovered in the defendant's basement?

02:51PM    7    A.  Yes.

02:51PM    8    Q.  Do you recall Special Agent Ryan asking the defendant why

02:51PM    9    he had that box?

02:51PM   10    A.  Yes.

02:51PM   11    Q.  Did he actually end up asking the defendant two times why

02:51PM   12    he had the box?

02:51PM   13    A.  Yes.

02:51PM   14    Q.  As best as you can recall, Mr. Carpenter, what did the

02:51PM   15    defendant say?

02:51PM   16    A.  The first time the defendant stated that he had the box

02:51PM   17    because he knew that HSI was investigating Italian Organized

02:52PM   18    Crime and that this case fit that profile.  And he wanted to

02:52PM   19    hold onto it in case there were any inconsistencies.

02:52PM   20    Q.  Did the defendant explain how he knew that there was an

02:52PM   21    Italian Organized Crime investigation going on?

02:52PM   22    A.  He stated that during my March interview with him, that I

02:52PM   23    mentioned the name of Ron Serio and that led to this.

02:52PM   24    Q.  Okay.  Did he, at some point, tell you, though, both you

02:52PM   25    and Special Agent Ryan, that he took the box home at

02:52PM  1  retirement?

02:52PM  2  A.  Yes.

02:52PM  3  Q.  When do you understand that the defendant retired?

02:52PM  4  A.  His effective date of retirement was January 31st of

02:52PM  5  2021.  However, due to weather, the office was closed.  So he

02:52PM  6  was not able to gather his belongings until February 1st.  So

02:53PM  7  February 1st was the day he turned in all of his --

02:53PM  8  February 1st was his last effective day at the DEA.

02:53PM  9  Q.  Okay.  And did this defendant tell you that he took the

02:53PM  10  box home because he learned in your interview with him that

02:53PM  11  you all were investigating -- or, that someone was

02:53PM  12  investigating Ron Serio?

02:53PM  13  A.  Yes.

02:53PM  14  Q.  When did your interview with the defendant take place?

02:53PM  15  A.  March 29th of 2018.

02:53PM  16  Q.  It's almost -- almost two full months after the defendant

02:53PM  17  took the box home?

02:53PM  18  A.  Yes.

02:53PM  19  Q.  According to him?

02:53PM  20  A.  Yes.

02:53PM  21  Q.  Like, is that possible, Mr. Carpenter?

02:53PM  22          MR. SINGER:  Objection.

02:53PM  23          THE COURT:  Sustained.

02:53PM  24          BY MS. CHALBECK:

02:53PM  25  Q.  Is that consistent or inconsistent with, like, the timing

02:53PM    1    of events?

02:53PM    2            **MR. SINGER:**  Objection.

02:53PM    3            **THE COURT:**  Yeah, sustained.

02:54PM    4            **BY MS. CHALBECK:**

02:54PM    5    Q.  Your interview with this defendant occurred on March 29th

02:54PM    6    of 2019; is that correct?

02:54PM    7    A.  Yes.

02:54PM    8    Q.  This defendant told you all that he took the box home on

02:54PM    9    February 1st?

02:54PM   10    A.  Yes.

02:54PM   11    Q.  When you asked -- excuse me.  When Special Agent Ryan

02:54PM   12    asked why the defendant took the box home, did he in sum and

02:54PM   13    substance say it was because he learned from your March 29th

02:54PM   14    interview?

02:54PM   15    A.  Yes.

02:54PM   16    Q.  Okay.  During that March 29, 2019 interview, did you ever

02:54PM   17    bring up the name Ron Serio?

02:54PM   18    A.  No.

02:54PM   19    Q.  And in that list of names that you asked about during the

02:54PM   20    interview, were there seven people?

02:54PM   21    A.  Yes.

02:54PM   22    Q.  And T.S.'s name was sandwiched between six other folks?

02:54PM   23    A.  Yes.

02:54PM   24            **MS. CHALBECK:**  May I have one moment, Your Honor?

02:54PM   25            **THE COURT:**  Yes.

02:54PM    1         **BY MS. CHALBECK:**

02:55PM    2   Q.  Going back to the June 6th interview with the search

02:55PM    3   warrant at the defendant's home.

02:55PM    4      Did this defendant say at the table when you were

02:55PM    5   interviewing him that he kept the file to confirm that

02:55PM    6   everything was on the up and up?

02:55PM    7   A.  I believe that was the quote, yes.

02:55PM    8        **MS. CHALBECK:**  Nothing further, Your Honor.

02:55PM    9        **THE COURT:**  Mr. Singer.

02:55PM   10

02:55PM   11            **CROSS-EXAMINATION BY MR. SINGER:**

02:56PM   12   Q.  All right.  So, Mr. Carpenter, so the way that I

02:56PM   13   understand it is that you got involved in this investigation

02:56PM   14   in 2018; is that right?

02:56PM   15   A.  Yes.

02:56PM   16   Q.  And at the time, I know that you had a number of

02:56PM   17   different jobs in law enforcement.  But at that one

02:56PM   18   particular period of time, you were working as -- was it an

02:56PM   19   inspector for the Department of Justice OIG?  Or what was

02:56PM   20   your title?

02:56PM   21   A.  Special agent, criminal investigator.

02:56PM   22   Q.  Special agent, okay.  So your principal job at the OIG,

02:56PM   23   that's Office of Inspector General, right?

02:56PM   24   A.  Yes.

02:56PM   25   Q.  Your principal job at the OIG's office was to investigate

02:57PM   1    allegations of misconduct that rose to a criminal level

02:57PM   2    involving employees that worked for the Department of Justice

02:57PM   3    or its subdepartments?

02:57PM   4    A.  Yes.

02:57PM   5    Q.  And I think you mentioned that the distinction between

02:57PM   6    you and someone like Frank DiCarlo is that Mr. DiCarlo, he at

02:57PM   7    the time was working at the DEA's Office of Professional

02:57PM   8    Responsibility?

02:57PM   9    A.  I don't recall discussing Mr. DiCarlo.

02:57PM   10   Q.  Okay.  You know who Frank DiCarlo is though?

02:57PM   11   A.  I do.

02:57PM   12   Q.  He's somebody who works, at that time, at the DEA Office

02:57PM   13   of Professional Responsibility?

02:57PM   14   A.  Yes.

02:57PM   15   Q.  That's nicknamed OPR for short?

02:57PM   16   A.  Yes.

02:57PM   17   Q.  And OPR was different than OIG, because OPR took more

02:57PM   18   administrative misconduct cases?

02:57PM   19   A.  Correct.

02:57PM   20   Q.  Ones that didn't rise to a criminal level as far as the

02:57PM   21   investigative activities were concerned?

02:57PM   22   A.  Yes.

02:57PM   23   Q.  And so that was the distinction between you two, correct?

02:57PM   24   A.  Yes.

02:57PM   25   Q.  And then you also talked about a distinction that also

02:57PM  1  existed between yourself and Special Agent Ryan, correct?

02:58PM  2  A.  Correct.

02:58PM  3  Q.  And so Special Agent Ryan, he worked for the Department

02:58PM  4  of Homeland Security?

02:58PM  5  A.  Yes.

02:58PM  6  Q.  HSI?

02:58PM  7  A.  Yes.

02:58PM  8  Q.  Okay.  And he was tasked with a criminal investigation

02:58PM  9  regarding Ron Serio?

02:58PM  10  A.  Yes.

02:58PM  11  Q.  But there were also some allegations involving

02:58PM  12  Mr. Bongiovanni in that case, correct?

02:58PM  13  A.  Yes.

02:58PM  14  Q.  And, so, he was also investigating Mr. Bongiovanni on a

02:58PM  15  criminal level, correct?

02:58PM  16  A.  Yes.

02:58PM  17  Q.  And I think the way that you described it was that you

02:58PM  18  two agreed -- or, was it you two, or was it somebody else

02:58PM  19  above you?  How was the line drawn between your investigation

02:58PM  20  and Special Agent Ryan's investigation?

02:58PM  21  A.  My investigation was focused on the allegations made

02:58PM  22  against the defendant and as related to the Ron Serio piece.

02:58PM  23  Q.  Yeah.  No, no, I think you established that on direct.

02:58PM  24  What I'm getting at is who was it that tried to draw this

02:58PM  25  line between your two investigations?

02:58PM   1    A.  I can't recall.

02:58PM   2    Q.  Okay.  Was it one of your superiors that did this?  Or

02:59PM   3    was it you and Agent Ryan that had this agreement?

02:59PM   4    A.  I don't recall who the -- how it came down.

02:59PM   5    Q.  Okay.  But you do recall that at least in some fashion,

02:59PM   6    you and Special Agent Ryan had a gentleman's agreement, let's

02:59PM   7    put it that way, where you would stick your investigation

02:59PM   8    focused solely on the racial allegation that Mr. Casullo made

02:59PM   9    against Mr. Bongiovanni, right?

02:59PM  10    A.  Yes.

02:59PM  11    Q.  And then also focus it on whether there was an

02:59PM  12    inappropriate relationship with Peter Gerace, between Mr.

02:59PM  13    Bongiovanni and Mr. Gerace, correct?

02:59PM  14    A.  Yes.

02:59PM  15    Q.  And then Special Agent Ryan would focus his investigation

02:59PM  16    on Ron Serio and whether Mr. Bongiovanni did anything

02:59PM  17    inappropriate there?

02:59PM  18    A.  That's part of his organization -- as part of his larger

02:59PM  19    investigation, yes.

02:59PM  20    Q.  Okay.  So that was the line that you two drew, correct?

02:59PM  21    A.  Yes.

02:59PM  22    Q.  All right.  So, before I get into that, I just want to go

02:59PM  23    through a couple things going on.

02:59PM  24        So you talked about how your part of the investigation

02:59PM  25    didn't only involve Mr. Bongiovanni at the DEA; is that

| | | |
|---|---|---|
| 02:59PM | 1 | right? |
| 03:00PM | 2 | A.  I don't recall.  I only recall discussing |
| 03:00PM | 3 | Mr. Bongiovanni. |
| 03:00PM | 4 | Q.  Sure.  So OIG at the time that you're involved in this |
| 03:00PM | 5 | case was investigating other agents at the DEA office in |
| 03:00PM | 6 | Buffalo, correct? |
| 03:00PM | 7 | A.  Not that I know of. |
| 03:00PM | 8 | Q.  You don't know of any other agents that were being |
| 03:00PM | 9 | investigated? |
| 03:00PM | 10 | A.  No. |
| 03:00PM | 11 | Q.  Well, sir, you talked about subject letters.  Remember |
| 03:00PM | 12 | that part of your direct testimony? |
| 03:00PM | 13 | A.  I don't recall discussing subject letters. |
| 03:00PM | 14 | Q.  You don't recall discussing any type of subject letters? |
| 03:00PM | 15 | A.  No. |
| 03:00PM | 16 | Q.  Did you serve any subject letters on any other DEA agents |
| 03:00PM | 17 | who worked at the Buffalo office as part of your |
| 03:00PM | 18 | investigation? |
| 03:00PM | 19 | A.  I recall serving one. |
| 03:00PM | 20 | Q.  Okay.  That was to Joe Palmieri, correct? |
| 03:00PM | 21 | A.  Yes. |
| 03:00PM | 22 | Q.  And Mr. Palmieri, we've heard his name before, he was a |
| 03:00PM | 23 | task force officer assigned to the DEA Buffalo office? |
| 03:00PM | 24 | A.  Yes. |
| 03:00PM | 25 | Q.  And he was somebody who was also associated with |

03:00PM    1    Mr. Bongiovanni as a partner for several years during the

03:00PM    2    time period you were investigating?

03:00PM    3    A.  Yes.

03:00PM    4    Q.  Okay.  So there were other people in the DEA office under

03:00PM    5    investigation at the same time you were working this case,

03:00PM    6    correct?

03:00PM    7    A.  Palmieri, correct.

03:01PM    8    Q.  All right.  And there were also other agents that were

03:01PM    9    being investigated at that same time to your awareness,

03:01PM    10   correct?

03:01PM    11   A.  Not that I'm aware of.

03:01PM    12   Q.  So you don't know of any other agents that were being

03:01PM    13   served subject letters or being investigated by OIG at that

03:01PM    14   time?

03:01PM    15   A.  No.

03:01PM    16   Q.  Okay.  So to prepare for this March 2019 interview that

03:01PM    17   you conducted at the U.S. Attorney's Office, you did a couple

03:01PM    18   of different things before you went into the interview,

03:01PM    19   correct?

03:01PM    20   A.  Yes.

03:01PM    21   Q.  Like, you talked about how you called Agent Bongiovanni

03:01PM    22   and invited him into the interview, correct?

03:01PM    23   A.  Yes.

03:01PM    24   Q.  But before you did that, you took a couple of

03:01PM    25   investigative steps to orient yourself to potential questions

03:01PM  1  you may want to ask him, right?

03:01PM  2  A.  Yes.

03:01PM  3  Q.  And you conducted your own investigation into the

03:01PM  4  allegations, correct?

03:01PM  5  A.  Yes.

03:01PM  6  Q.  Because that's good police practice, correct?

03:01PM  7  A.  Yes.

03:01PM  8  Q.  So, with regard to Mr. Bongiovanni's DEA cell phone, you

03:02PM  9  talked on your direct testimony about phone records that were

03:02PM  10  recovered regarding Mr. Bongiovanni's cell phone, right?

03:02PM  11  A.  We reviewed them, yes.

03:02PM  12  Q.  Yeah.  But that's not something you reviewed prior to

03:02PM  13  your March 2019 interview, correct?

03:02PM  14  A.  Correct.

03:02PM  15  Q.  So, whatever we talked about today happened after your

03:02PM  16  March 2019 interview?

03:02PM  17  A.  Yes.

03:02PM  18  Q.  It happened after your June 2019 interview at his house,

03:02PM  19  correct?

03:02PM  20  A.  Yes.

03:02PM  21  Q.  It happened years after, right?

03:02PM  22  A.  I'm not sure about years, I don't --

03:02PM  23  Q.  Well, when did you first review the phone records that

03:02PM  24  you were testifying to today?

03:02PM  25  A.  I don't recall the exact date on that.

03:02PM   1   Q.  I mean, are we talking about yesterday?

03:02PM   2   A.  No.

03:02PM   3   Q.  Are we talking about a year ago?

03:02PM   4   A.  It's been years since I've left the DOJ.  I -- I don't

03:02PM   5   recall when we received the phone records, or when my first

03:02PM   6   review of them was.

03:02PM   7   Q.  Okay.  But you know in any event, your review of those

03:03PM   8   records happened after the March 2019 interview?

03:03PM   9   A.  Yes.

03:03PM   10  Q.  It happened after the June 2019 interview?

03:03PM   11  A.  I can't say for sure, but --

03:03PM   12  Q.  Okay.  But you just don't recall at this point?

03:03PM   13  A.  Correct.

03:03PM   14  Q.  And you testified to several text messages as well; is

03:03PM   15  that right?

03:03PM   16  A.  Yes.

03:03PM   17  Q.  Those text messages were not something that you reviewed

03:03PM   18  prior to your March 2019 interview, right?

03:03PM   19  A.  Correct.

03:03PM   20  Q.  And they weren't something you reviewed prior to your

03:03PM   21  June 2019 interview, correct?

03:03PM   22  A.  Correct.

03:03PM   23  Q.  So, with regard to the DEA cell phone, your understanding

03:03PM   24  was that Mr. Bongiovanni, like every other agent in the DEA,

03:03PM   25  has a cell phone that's issued to him by the organization,

03:03PM    1    correct?

03:03PM    2    A.  Yes.

03:03PM    3    Q.  And so as part of your investigation, when did you first

03:03PM    4    get assigned to this case?

03:03PM    5    A.  August of 2018.

03:03PM    6    Q.  All right.  So, Mr. Bongiovanni, back in August of 2018,

03:03PM    7    is still working at the DEA, correct?

03:03PM    8    A.  Yes.

03:03PM    9    Q.  He's not going to retire until February 1st of 2019?

03:04PM    10    A.  I don't know what his retirement plans were at that time.

03:04PM    11    Q.  Okay.  But you understood that he did retire from the DEA

03:04PM    12    in February of 2019, correct?

03:04PM    13    A.  Yes.

03:04PM    14    Q.  And so as far as, you know, that's concerned, you started

03:04PM    15    on this case in August, right?  So that's August, September,

03:04PM    16    October, November, December, January, February 1st he

03:04PM    17    retires.  So that's six months before his retirement,

03:04PM    18    correct?

03:04PM    19    A.  Yes.

03:04PM    20    Q.  And you were aware of the fact that there are allegations

03:04PM    21    at that point in time that he had an inappropriate

03:04PM    22    relationship with Peter Gerace as alleged in the case,

03:04PM    23    correct?

03:04PM    24    A.  Yes.

03:04PM    25    Q.  You were also aware of a memoranda that we went through

USA v Bongiovanni - Carpenter - Singer/Cross - 9/23/24

03:04PM    1   where he referenced text messages that he exchanged between

03:04PM    2   Peter Gerace and explained what was happening in those text

03:04PM    3   messages?

03:04PM    4   A.  Yes.

03:04PM    5   Q.  And you reviewed those memoranda, correct?

03:04PM    6   A.  Yes.

03:04PM    7   Q.  So you knew that there was contact between Peter Gerace

03:04PM    8   and Joe Bongiovanni occurring on the DEA cell phone that he

03:04PM    9   possessed, correct?

03:04PM   10   A.  I don't know where that contact was occurring.

03:04PM   11   Q.  Okay.  Well, you knew was happening on a phone, right?

03:05PM   12   A.  Correct.

03:05PM   13   Q.  And at the time you knew that he was issued a DEA cell

03:05PM   14   phone, correct?

03:05PM   15   A.  Yes.

03:05PM   16   Q.  So, you never made any efforts to seize Mr. Bongiovanni's

03:05PM   17   DEA cell phone prior to his retirement date, correct?

03:05PM   18   A.  Correct.

03:05PM   19   Q.  In fact, you only asked about his DEA cell phone after

03:05PM   20   his retirement, correct?

03:05PM   21   A.  Yes.

03:05PM   22   Q.  The DEA cell phone that he possessed, that's government

03:05PM   23   property, right?

03:05PM   24   A.  Yes.

03:05PM   25   Q.  So you can take that at any time, correct?

03:05PM    1    A.  Yes.

03:05PM    2    Q.  You don't require a search warrant to get that phone from

03:05PM    3    Mr. Bongiovanni, correct?

03:05PM    4    A.  Correct.

03:05PM    5    Q.  You can go to the DEA office and request the phone

03:05PM    6    records for that phone, correct?

03:05PM    7    A.  Yes.

03:05PM    8    Q.  You don't require a search warrant for that either?

03:05PM    9    A.  Correct.

03:05PM   10    Q.  But you didn't take any of those steps prior to his

03:05PM   11    retirement?

03:05PM   12    A.  Correct.

03:05PM   13    Q.  You didn't take any of those steps prior to your March

03:05PM   14    2019 interview?

03:05PM   15    A.  Correct.

03:05PM   16    Q.  With the exception of asking for his cell phone after he

03:05PM   17    already left the DEA, correct?

03:05PM   18    A.  Correct.

03:05PM   19    Q.  And I think you understood that after you made that

03:05PM   20    request following his retirement, you found out that the

03:06PM   21    phone had been wiped; is that right?

03:06PM   22    A.  Yes.

03:06PM   23    Q.  We've heard a couple things about wiping.

03:06PM   24        You understood that it was DEA policy that when an agent

03:06PM   25    turns in a phone, that phone is cleared of its data, correct?

USA v Bongiovanni - Carpenter - Singer/Cross - 9/23/24

74

03:06PM  1   A.  I'm not sure of that policy at all.

03:06PM  2   Q.  You're not sure of that policy?

03:06PM  3   A.  No.

03:06PM  4   Q.  Have you turned in a phone when you worked for the DOJ,

03:06PM  5   sir?

03:06PM  6   A.  Yes.

03:06PM  7   Q.  Did it contain information that was proprietary to the

03:06PM  8   DOJ?

03:06PM  9   A.  I turned in my cell phone, I don't recall any policy

03:06PM  10  specific to wiping it.

03:06PM  11  Q.  Okay.  So you don't know what the DEA policy was?

03:06PM  12  A.  Correct.

03:06PM  13  Q.  Okay.  So you did review the text messages after the

03:06PM  14  fact; is that right?

03:06PM  15  A.  Yes.

03:06PM  16  Q.  And you'd agree with me that your review of those text

03:06PM  17  messages, there was no discussion about bribes, correct?

03:06PM  18  A.  Correct.

03:06PM  19  Q.  There's no discussion involving legal activity, correct?

03:06PM  20  A.  That would be correct.

03:06PM  21  Q.  The text messages we're talking about is about almost 400

03:07PM  22  text messages over the course of that period of time where

03:07PM  23  the cell phone messages exist; is that right?

03:07PM  24  A.  Almost, yes.

03:07PM  25  Q.  And that was between 2015 to roughly 2018, 2019?

03:07PM   1   A.   Yes.

03:07PM   2   Q.   The messages that you reviewed, there were more messages

03:07PM   3   on that phone from Peter Gerace to Joe Bongiovanni than the

03:07PM   4   other way around, correct?

03:07PM   5   A.   I didn't count the -- I didn't count the numbers.

03:07PM   6   Q.   Well, you talked about, sir, about the importance in your

03:07PM   7   investigation about knowing how often Peter Gerace and Joe

03:07PM   8   Bongiovanni would interact, correct?

03:07PM   9   A.   Yes.

03:07PM  10   Q.   And one of the questions that you asked in the interview

03:07PM  11   was whether Mr. Bongiovanni initiated contact, quote,

03:07PM  12   unquote, with Peter Gerace, right?

03:07PM  13   A.   Yes.

03:07PM  14   Q.   And it was important, as you testified on direct, to know

03:07PM  15   how often that may have occurred, right?

03:07PM  16   A.   Yes.

03:07PM  17   Q.   But you never counted?

03:07PM  18   A.   I didn't count the back and forth between them, no.

03:08PM  19   Q.   If you did count, do you think you would have found

03:08PM  20   consistent with the messages that Peter Gerace contacted Joe

03:08PM  21   Bongiovanni more often than the other way around?

03:08PM  22   A.   I don't know what I would have found.

03:08PM  23   Q.   You just don't know?

03:08PM  24   A.   Correct.

03:08PM  25   Q.   Because you never looked?

03:08PM    1    A.  I didn't add them up, correct.

03:08PM    2    Q.  When you reviewed these messages, did you see points in

03:08PM    3    time where Mr. Bongiovanni did not respond to Peter Gerace?

03:08PM    4    A.  Yes.

03:08PM    5    Q.  And that was more than one time, right?

03:08PM    6    A.  I can't recall the exact number, but yes.

03:08PM    7    Q.  Did you not count those either, sir?

03:08PM    8    A.  No.

03:08PM    9    Q.  All right.  So, let's move on to a different topic.

03:08PM   10        One of the things that you learned throughout the course

03:08PM   11    of this investigation is that there are allegations that Joe

03:08PM   12    Bongiovanni used illegal narcotics during the time he was a

03:08PM   13    DEA agent, correct?

03:08PM   14    A.  I'm sorry, can you repeat that.

03:08PM   15    Q.  You learned during the course of your investigation that

03:08PM   16    there were allegations that Joe Bongiovanni used illegal

03:09PM   17    narcotics during the time he was a DEA agent, correct?

03:09PM   18    A.  Yes.

03:09PM   19    Q.  And one of the steps that you took to verify whether

03:09PM   20    there was information relevant to that was to look at drug

03:09PM   21    testing records that the DEA possessed, correct?

03:09PM   22    A.  I requested them, yes.

03:09PM   23    Q.  Because it was your understanding that the DEA conducts

03:09PM   24    drug testing of its agents, correct?

03:09PM   25    A.  It does to my understanding, yes.

03:09PM    1    Q.  And so you asked Mr. DiCarlo to try to track down those

03:09PM    2    records for you; is that right?

03:09PM    3    A.  Yes.

03:09PM    4    Q.  And Mr. DiCarlo reported back to you, right?

03:09PM    5    A.  Yes.

03:09PM    6    Q.  And there were no records of positive results involving a

03:09PM    7    drug test from Joe Bongiovanni, right?

03:09PM    8    A.  There are no records at all.

03:09PM    9    Q.  And that was for the duration of his entire career?

03:09PM   10    A.  Yes.

03:09PM   11    Q.  So, another thing that you took a look at was you took a

03:09PM   12    look at whether or not T.S., which was a name that we were

03:09PM   13    talking about on direct, was ever a DEA confidential source;

03:10PM   14    is that right?

03:10PM   15    A.  Yes.

03:10PM   16    Q.  Because that's something that came up during the course

03:10PM   17    of the investigation, right?

03:10PM   18    A.  Yes.

03:10PM   19    Q.  And you looked into the records with regard to that,

03:10PM   20    right?

03:10PM   21    A.  I requested them, yes.

03:10PM   22    Q.  And one of the things that you received back in response

03:10PM   23    was a report that was in the possession of the DEA in the

03:10PM   24    New York City office?

03:10PM   25    A.  I don't recall if it was a report, but I did receive

03:10PM   1   something back, yes.

03:10PM   2   Q.  Correct.  And so your understanding was is that when the

03:10PM   3   DEA signs up someone as a confidential source, that's

03:10PM   4   something that requires documentation; is that right?

03:10PM   5   A.  Yes.

03:10PM   6   Q.  And it's a closely guarded secret, correct?

03:10PM   7   A.  Yes.

03:10PM   8   Q.  Your understanding is that the process is, is that when

03:10PM   9   the request for the CS is approved locally for an individual

03:10PM   10  agent requesting that someone gets signed up as a CS, it's

03:10PM   11  then sent down to New York City?

03:10PM   12  A.  I'm not exactly sure of the whole process or the policy

03:10PM   13  on it as I sit here today.

03:10PM   14  Q.  You don't know the DEA's policy with regard to how a CS

03:10PM   15  request is routed?

03:10PM   16  A.  Not as I sit here today, no.

03:11PM   17  Q.  Did you ever talk to anyone about it?

03:11PM   18  A.  I can't recall if I did or didn't.

03:11PM   19  Q.  Did you talk to Frank DiCarlo about it?

03:11PM   20  A.  I can't recall any specific conversation with him about

03:11PM   21  it.

03:11PM   22  Q.  Okay.  Okay.  Well, as far as the CS records are

03:11PM   23  concerned, you understand that New York City keeps those

03:11PM   24  records under lock and key; is that right?

03:11PM   25  A.  I hope so, yes.

03:11PM  1    Q.  And your understanding is that there's very limited

03:11PM  2    access to those records, correct?

03:11PM  3    A.  Yes.

03:11PM  4    Q.  That individual agents just can't go query the DEA system

03:11PM  5    as to, hey, is this person a confidential source?

03:11PM  6    A.  I'm not sure what the -- I don't -- I don't believe so,

03:11PM  7    correct.

03:11PM  8    Q.  I'm sorry, can you --

03:11PM  9    A.  I don't believe they can query for that information,

03:11PM  10   correct.

03:11PM  11   Q.  Okay.  So the record that you got back indicated that

03:11PM  12   T.S. was a confidential source for the DEA from January of

03:11PM  13   2009 to September of 2009?

03:11PM  14   A.  I believe so.

03:11PM  15   Q.  And Mr. Bongiovanni wasn't the case agent on the case

03:12PM  16   that T.S. was signed up as a source, correct?

03:12PM  17   A.  I don't recall the specific case, no.

03:12PM  18        **MR. SINGER:**  Just one moment, Judge.

03:12PM  19        Ms. Champoux, will you mind bringing up Government

03:12PM  20   Exhibit 16, please?  And if we can scroll to the -- I think

03:12PM  21   it's the third page, please.

03:12PM  22        And if we can expand on that section.

03:12PM  23        **BY MR. SINGER:**

03:12PM  24   Q.  So this is the record we've just been talking about for a

03:12PM  25   couple minutes, correct, sir?

03:12PM 1    A.   Thank you.

03:12PM 2    Q.   And as far as the agents that are involved in the case,

03:12PM 3    do you see them down at the bottom?

03:12PM 4    A.   I do.

03:12PM 5    Q.   None of those people are Joe Bongiovanni, correct?

03:12PM 6    A.   That's correct.

03:12PM 7    Q.   Your understanding was that Mr. T.S. was not signed up to

03:13PM 8    investigate Ron Serio, right?

03:13PM 9    A.   As it relates to his role as a DEA operations, I don't

03:13PM 10   recall what he was -- what his case file was on that.

03:13PM 11   Q.   Okay.  Well, you're familiar with the fact that the Ron

03:13PM 12   Serio investigation wasn't opened until earliest November of

03:13PM 13   2012, correct?

03:13PM 14   A.   I'm not really familiar with the Ron Serio investigation.

03:13PM 15   Q.   Okay.  You're not familiar with that at all?

03:13PM 16   A.   Not -- not particularly, no.

03:13PM 17   Q.   All right.  You didn't find any evidence that Joe

03:13PM 18   Bongiovanni was in contact with T.S. during the entirety of

03:13PM 19   his career, correct?

03:13PM 20   A.   In the documents I reviewed, I didn't see any.

03:13PM 21        **MR. SINGER:**  You can bring that down, Ms. Champoux,

03:13PM 22   thank you.

03:13PM 23        **BY MR. SINGER:**

03:13PM 24   Q.   So one of the other things that we talked about in this

03:13PM 25   case is the DARTS system.  You have a familiarity with what

03:14PM  1   DARTS is, correct?

03:14PM  2   A.  Yes.

03:14PM  3   Q.  So DARTS is a deconfliction database; is that right?

03:14PM  4   A.  Yes.

03:14PM  5   Q.  It's a place where phone numbers are kept that are run on

03:14PM  6   particular targets and subjects of investigation?

03:14PM  7   A.  Yes.

03:14PM  8   Q.  And it's something that is specific to the DEA, correct?

03:14PM  9   A.  Yes.

03:14PM  10  Q.  And the DARTS system, unlike the CS system that we were

03:14PM  11  just talking about, that's something that individual agents

03:14PM  12  do have access to, correct?

03:14PM  13  A.  Yes.

03:14PM  14  Q.  And people can perform searches inside the DARTS system

03:14PM  15  for particular names or numbers?

03:14PM  16  A.  Yes.

03:14PM  17  Q.  And, so, prior to the March 2019 interview, you performed

03:14PM  18  a search of the DARTS system to determine whether or not Joe

03:14PM  19  Bongiovanni ever searched for names or numbers of people

03:14PM  20  associated with the Ron Serio drug-trafficking organization,

03:14PM  21  correct?

03:14PM  22  A.  I requested information to the DEA at the request of

03:14PM  23  Curtis Ryan.

03:14PM  24  Q.  Okay.  And when you got back the results of that, no

03:14PM  25  records were found indicating that Joe Bongiovanni did any

03:15PM  1  search into DARTS for those people, correct?

03:15PM  2  A.  That's correct.

03:15PM  3  Q.  You also took a look into another person by the name of

03:15PM  4  Michael Sinatra; is that right?

03:15PM  5  A.  Yes.

03:15PM  6  Q.  And Mike Sinatra, you also asked the DEA to search for

03:15PM  7  records indicating whether or not Joe Bongiovanni had

03:15PM  8  searched the DARTS system for his name and number, correct?

03:15PM  9  A.  Yes.

03:15PM  10  Q.  And once again, nothing came back to indicate that Joe

03:15PM  11  Bongiovanni conducted a search like that?

03:15PM  12  A.  Correct.

03:15PM  13  Q.  You also did a similar request with regard to the Peter

03:15PM  14  Gerace and people associated with him and his

03:15PM  15  drug-trafficking organization, correct?

03:15PM  16  A.  Is there anybody specific?  I don't recall any

03:15PM  17  specific --

03:15PM  18  Q.  Do you recall a person by the name of John Ermin?

03:15PM  19  A.  Yes.

03:15PM  20  Q.  He was somebody who was associated with Peter Gerace,

03:15PM  21  correct?

03:15PM  22  A.  Yes.

03:15PM  23  Q.  And you did a search of the system to determine whether

03:16PM  24  or not Joe Bongiovanni ever performed a search of the system

03:16PM  25  for him in DARTS?

03:16PM   1   A.  I don't recall a DARTS request for that.

03:16PM   2   Q.  You don't recall making the request, or you don't recall

03:16PM   3   the result?

03:16PM   4   A.  Either one.

03:16PM   5          MR. SINGER:  Just one moment, Judge.

03:16PM   6          I don't know when you're thinking about the afternoon

03:17PM   7   break, Judge.  I can continue if you want to, but I just don't

03:17PM   8   want to hold anyone up.

03:17PM   9          THE COURT:  I'm thinking sometime around 3:30 --

03:17PM  10          MR. SINGER:  I'll keep going.

03:17PM  11          THE COURT:  -- is a good time to balance the two

03:17PM  12   halves.

03:17PM  13          MR. SINGER:  That's perfectly fine, Judge.

03:17PM  14          BY MR. SINGER:

03:17PM  15   Q.  So, Mr. Carpenter, so another thing that you talked about

03:17PM  16   was the memoranda that you reviewed regarding, sorry --

03:17PM  17   strike that.

03:17PM  18       Another thing you discussed was the memoranda that

03:17PM  19   Mr. Bongiovanni provided towards the end of his tenure at

03:17PM  20   DEA; is that right?

03:17PM  21   A.  Yes.

03:17PM  22   Q.  And he provided three different memos with regard to his

03:17PM  23   interactions involving Peter Gerace, as well as Tony's

03:17PM  24   Casullo's interactions with someone associated with Peter

03:17PM  25   Gerace, correct?

03:17PM    1    A.  Yes.

03:17PM    2    Q.  So with regard to one of those memoranda, it was in

03:17PM    3    January of 2019 just before Mr. Bongiovanni left the DEA that

03:18PM    4    he provided a memorandum regarding Tony Casullo; is that

03:18PM    5    right?

03:18PM    6    A.  I don't recall the date, but I do recall him providing a

03:18PM    7    memo, yes.

03:18PM    8         MR. SINGER:  Ms. Champoux, can we bring up Government

03:18PM    9    Exhibit 99, please?

03:18PM   10         BY MR. SINGER:

03:18PM   11    Q.  So, does this help refresh your memory as to the

03:18PM   12    memoranda that was submitted regarding Tony Casullo?

03:18PM   13    A.  Thank you.

03:18PM   14    Q.  So with regard to this particular memoranda,

03:18PM   15    Mr. Bongiovanni talks about a number of things; is that

03:18PM   16    right?

03:18PM   17    A.  Yes.

03:18PM   18         MR. SINGER:  So, Ms. Champoux, if we can please

03:18PM   19    expand into the first paragraph of this memo.

03:18PM   20         BY MR. SINGER:

03:18PM   21    Q.  Can you please read that for the jury?

03:18PM   22    A.  S.A. Joseph Bongiovanni is writing to inform you of

03:18PM   23    information that he has acquired regarding the social

03:18PM   24    affiliation and recent communications with Peter Gerace by

03:19PM   25    S.A. Anthony Casullo, and S.A.'s Casullo brother-in-law, Phil

03:19PM  1    Domiano.

03:19PM  2        In the past, S.A. Bongiovanni has verbally informed you,

03:19PM  3    my group supervisor, Greg Yensan, and our ASAC, David T. Zon,

03:19PM  4    of information confirming the friendship of Domiano, Casullo,

03:19PM  5    and Gerace.

03:19PM  6        Furthermore, S.A. Bongiovanni has attached information

03:19PM  7    confirming that Domiano was a former manager of Pharaoh's

03:19PM  8    Gentlemen's Club in Cheektowaga, New York on behalf of

03:19PM  9    Gerace.

03:19PM  10   Q.  So the first paragraph in that particular memorandum is

03:19PM  11   talking about a familial relationship between Special Agent

03:19PM  12   Tony Casullo and Phil Domiano?

03:19PM  13   A.  Yes.

03:19PM  14   Q.  And you understood it, based on your reading of the

03:19PM  15   memoranda, that Phil Domiano is related to Tony Casullo by

03:20PM  16   marriage?

03:20PM  17   A.  Yes.

03:20PM  18   Q.  Phil Domiano, more specifically, is his brother-in-law,

03:20PM  19   correct?

03:20PM  20   A.  I'm sorry, whose brother?

03:20PM  21   Q.  So Phil Domiano -- I'm sorry, I asked that poorly.

03:20PM  22       Phil Domiano is related to Tony Casullo as Tony Casullo's

03:20PM  23   brother-in-law.

03:20PM  24   A.  Brother-in-law?

03:20PM  25   Q.  Yes.

03:20PM    1    A.   Correct.

03:20PM    2    Q.   And so the relationship is is that Tony Casullo is

03:20PM    3    married to Phil Domiano's sister?

03:20PM    4    A.   Yes, that's how -- that's how it works.

03:20PM    5    Q.   Okay.  All right.  So this is something that was raised

03:20PM    6    to your attention as well, correct?

03:20PM    7    A.   Yes.

03:20PM    8    Q.   And this is something that the DEA had potential concerns

03:20PM    9    about, correct?

03:20PM   10    A.   I'm not sure if they did or didn't.

03:20PM   11    Q.   Okay.  That was not part of your investigation?

03:20PM   12    A.   No.

03:20PM   13         MR. SINGER:  Okay.  Ms. Champoux, can we please

03:20PM   14    un-expand out of that.  And if we can expand -- I'm sorry.  If

03:20PM   15    we can move on to the second page.  And stop right there.

03:21PM   16         BY MR. SINGER:

03:21PM   17    Q.   So attached to this particular memoranda that you

03:21PM   18    reviewed were a number of Facebook posts; is that right, sir?

03:21PM   19    A.   I think specific Facebook Message posts.

03:21PM   20    Q.   And these related to Phil Domiano, correct?

03:21PM   21    A.   Yes.

03:21PM   22    Q.   This is something that Special Agent Bongiovanni provided

03:21PM   23    as part of his memo to his supervisor, correct?

03:21PM   24    A.   Yes.

03:21PM   25    Q.   And it indicated contact that Peter Gerace had with Phil

03:21PM 1  Domiano; is that correct?

03:21PM 2  A.  Yes.

03:21PM 3  Q.  So, for instance, in this first page that we're looking

03:21PM 4  at, it's indicating that Peter Gerace is feeling excited with

03:21PM 5  Domiano at the Vegas Golden Knights arena; is that right?

03:21PM 6  A.  Yes.

03:21PM 7  Q.  And that particular post is dated March 2nd, 2018?

03:21PM 8  A.  Correct.

03:21PM 9        MR. SINGER:  You can scroll down to the next page,

03:21PM 10 Ms. Champoux.

03:21PM 11       BY MR. SINGER:

03:21PM 12 Q.  And this particular post, it's indicating that Peter

03:22PM 13 Gerace was eating dinner at Andiamo, Las Vegas in September

03:22PM 14 of 2017?

03:22PM 15 A.  Yes.

03:22PM 16 Q.  And that his great friends with Domiano?

03:22PM 17 A.  Yes.

03:22PM 18       MR. SINGER:  Can you go to the next page,

03:22PM 19 Ms. Champoux?

03:22PM 20       BY MR. SINGER:

03:22PM 21 Q.  This is another post by Phil Domiano; is that correct?

03:22PM 22 A.  Yes.

03:22PM 23 Q.  And that's dated August 20th of 2017?

03:22PM 24 A.  Yes.

03:22PM 25       MR. SINGER:  Go to the next page, Ms. Champoux.

03:22PM    1              **BY MR. SINGER:**

03:22PM    2    Q.  It looks like in response to this post, Peter Gerace

03:22PM    3    posted a message?

03:22PM    4    A.  Yes.

03:22PM    5              **MR. SINGER:**  Can we go on to the next page, please?

03:22PM    6              **BY MR. SINGER:**

03:22PM    7    Q.  So in this particular post, Mr. Domiano is indicating on

03:22PM    8    March 30th, 2014 that he's back in Buffalo; is that right?

03:22PM    9    A.  Yes.

03:22PM   10    Q.  And that he's managing Pharaoh's Gentlemen's Club at

03:22PM   11    999 Aero Drive?

03:22PM   12    A.  Yes.

03:22PM   13    Q.  And that's something that was liked by Peter Gerace?

03:23PM   14    A.  Yes.

03:23PM   15    Q.  And you understood Pharaoh's Gentlemen's Club to be owned

03:23PM   16    by Peter Gerace?

03:23PM   17    A.  Yes.

03:23PM   18    Q.  And so it looks like in this situation, Phil Domiano,

03:23PM   19    Tony Casullo's brother-in-law, is a manager of Pharaoh's

03:23PM   20    Gentlemen's Club?

03:23PM   21    A.  Yes.

03:23PM   22              **MR. SINGER:**  Can we go on to the next page, please?

03:23PM   23              **BY MR. SINGER:**

03:23PM   24    Q.  It looks like there's a picture posted; is that right?

03:23PM   25    A.  Yes.

03:23PM    1    Q.  It looks like Phil Domiano is pictured in a picture with

03:23PM    2    Peter Gerace?

03:23PM    3    A.  Yes.

03:23PM    4         MR. SINGER:  Go on to the next page, please.  And the

03:23PM    5    page after, Ms. Champoux.  Thank you.

03:23PM    6         BY MR. SINGER:

03:23PM    7    Q.  Another post on Facebook regarding Peter Gerace?

03:23PM    8    A.  Yes.

03:23PM    9         MR. SINGER:  Go to the next page, Ms. Champoux.  Stop

03:23PM   10    there.

03:23PM   11         BY MR. SINGER:

03:23PM   12    Q.  Looked like there's another connection vis-à-vis this

03:24PM   13    case, Joe Bella.  Do you know who that is, sir?

03:24PM   14    A.  No.

03:24PM   15    Q.  Does it appear like there's a Facebook friends

03:24PM   16    relationship at least that exists between Joe Bella and Phil

03:24PM   17    Domiano?

03:24PM   18    A.  Yes.

03:24PM   19         MR. SINGER:  Can you go to the next page,

03:24PM   20    Ms. Champoux?

03:24PM   21         THE WITNESS:  Actually, can I see that again?

03:24PM   22         BY MR. SINGER:

03:24PM   23    Q.  Sure.  Does it appear to you, based on your review of

03:24PM   24    this information, that there's a Facebook friend relationship

03:24PM   25    at least between Domiano and Joe Bella?

03:24PM  1  A.  I can't tell with this if the add friend is they're not

03:24PM  2  friends, or what that relationship is indicating.

03:24PM  3  Q.  Okay.  You're familiar with Facebook generally, right?

03:24PM  4  You're not -- you're not young enough where you're just doing

03:24PM  5  SnapChat, right?

03:24PM  6  A.  It's been many years since I've used Facebook.

03:24PM  7  Q.  Okay.

03:24PM  8  A.  So I'm familiar with it, but I'm not familiar with --

03:24PM  9  it's been years, probably 2016.

03:24PM  10  Q.  So -- so back -- going back to 2016, maybe I'm dating

03:25PM  11  myself on these questions, but when you bring up a list of

03:25PM  12  who someone's friends with on Facebook, it spits out a whole

03:25PM  13  list of people; do you recall that?

03:25PM  14  A.  This -- this is -- this is Domiano's friends list?

03:25PM  15  Q.  That's correct.

03:25PM  16  A.  Okay.  Thank you.

03:25PM  17  Q.  And so if you do it to your own profile, you have the

03:25PM  18  option of adding a friend by hitting a button?

03:25PM  19  A.  Understood.  Thank you.

03:25PM  20  Q.  Okay.  So does that help --

03:25PM  21  A.  Yes.

03:25PM  22  Q.  -- clear up the confusion?

03:25PM  23  A.  Yes, thank you.

03:25PM  24  Q.  No problem.

03:25PM  25          **MR. SINGER:**  And if we can scroll down to the next

03:25PM    1    page, Ms. Champoux.  And to the page after that?  And to the

03:25PM    2    page after that.

03:25PM    3              **BY MR. SINGER:**

03:25PM    4    Q.  Are you familiar with this particular picture?

03:25PM    5    A.  Yes.

03:25PM    6    Q.  This is the reunion picture for Saint Joe's high school

03:25PM    7    reunion back in 2015?

03:25PM    8    A.  Yes.

03:25PM    9    Q.  And you're under the understanding that Tony Casullo and

03:25PM   10    Peter Gerace are pictured in that same photograph, correct?

03:26PM   11    A.  Yes.

03:26PM   12    Q.  They attended the same reunion, correct?

03:26PM   13    A.  Yes, sir.

03:26PM   14    Q.  Because they attended the same high school class?

03:26PM   15    A.  Yes.

03:26PM   16              **MR. SINGER:**  Move down to the next photo, please,

03:26PM   17    Ms. Champoux.

03:26PM   18              **BY MR. SINGER:**

03:26PM   19    Q.  It looks like those two people are identified in this

03:26PM   20    photograph that's blown up?

03:26PM   21    A.  Yes.

03:26PM   22              **MR. SINGER:**  If we go to the last page.

03:26PM   23              **BY MR. SINGER:**

03:26PM   24    Q.  That looks like that's another blow-up?

03:26PM   25    A.  Correct.

03:26PM   1        **MR. SINGER:**  Okay.  If we can go back to the first

03:26PM   2   page of the memo, Ms. Champoux.

03:26PM   3        **BY MR. SINGER:**

03:26PM   4   Q.  So the purpose of this memo was not just to address

03:26PM   5   Casullo's relationship with Phil Domiano, correct?

03:26PM   6        **MS. CHALBECK:**  Objection, Your Honor.  I -- I don't

03:26PM   7   think the witness can answer what the defendant's purpose was

03:26PM   8   in offering the memo.  Lacks personal knowledge.

03:26PM   9        **THE COURT:**  Yeah, I think sustained.

03:26PM  10        **MR. SINGER:**  Certainly.

03:26PM  11        **THE COURT:**  But you can ask general questions about

03:26PM  12   that document.

03:26PM  13        **MR. SINGER:**  No problem.

03:26PM  14        Ms. Champoux, can we please expand on this one

03:26PM  15   particular paragraph?

03:27PM  16        **BY MR. SINGER:**

03:27PM  17   Q.  Mr. Carpenter, can you please read that to the jury?

03:27PM  18   A.  Also, S.A. Casullo's actions approximately eight months

03:27PM  19   ago by advising AUSA Joseph Tripi that S.A. Bongiovanni was a

03:27PM  20   racist in the presence of G.S. James McHugh was completely

03:27PM  21   unprofessional.

03:27PM  22      S.A. Casullo advised AUSA Tripi that Bongiovanni told

03:27PM  23   Casullo approximately two years ago that he, Casullo -- that

03:27PM  24   he, quote, Casullo shouldn't investigate Italians, but should

03:27PM  25   investigate -- racial slurs, end quote.

03:27PM    1    S.A. Casullo did not advise his chain of command prior to

03:27PM    2    making these allegations and has ruined S.A. Bongiovanni's

03:27PM    3    character.

03:27PM    4    This incident was not documented within DEA, and no

03:28PM    5    investigation was conducted against S.A. Casullo.

03:28PM    6    S.A. Bongiovanni completely denies making these

03:28PM    7    statements.

03:28PM    8    Q.  So we talked about purpose.  But the memorandum doesn't

03:28PM    9    just discuss Tony Casullo's relationship with Domiano,

03:28PM   10    correct?

03:28PM   11    A.  Correct.

03:28PM   12    Q.  It also takes on the allegations that Tony Casullo levied

03:28PM   13    against Mr. Bongiovanni, correct?

03:28PM   14    A.  Correct.

03:28PM   15    Q.  Regarding those racial slurs that your investigation was

03:28PM   16    initiated to investigate?

03:28PM   17    A.  Yes.

03:28PM   18    Q.  And in this particular memo, he denies making those

03:28PM   19    statements, correct?

03:28PM   20    A.  Yes.

03:28PM   21        **MR. SINGER:**  Ms. Champoux, if we could expand the

03:28PM   22    bottom paragraph.

03:28PM   23        **BY MR. SINGER:**

03:28PM   24    Q.  And, sir, could you please read that for the jury as

03:28PM   25    well?

03:28PM  1   A.  S.A. Joseph Bongiovanni is forwarding this information

03:28PM  2   through the DEA chain of command because he knows that this

03:29PM  3   will be required to be disclosed to OPR and the AUSO office

03:29PM  4   in the WDNY based on the ongoing investigation of Gerace.

03:29PM  5      Should you need any additional information, please

03:29PM  6   contact S.A. Joseph Bongiovanni.

03:29PM  7      Thank you for your attention to this matter.

03:29PM  8   Q.  So, with regard to Phil Domiano, did you investigate

03:29PM  9   Casullo with regard to his relationship to Phil Domiano?

03:29PM  10  A.  I did not.

03:29PM  11  Q.  Did you understand Phil Domiano to also have a nickname

03:29PM  12  of Vegas Phil?

03:29PM  13  A.  I've never heard that.

03:29PM  14  Q.  Are you aware of the relationship between Casullo and

03:29PM  15  Domiano at all?

03:29PM  16  A.  I don't know to what extent, no.

03:29PM  17  Q.  You just never looked into it?

03:30PM  18  A.  Correct.

03:30PM  19          **MR. SINGER:**  Ms. Champoux, if we can un-expand out of

03:30PM  20  this.  Go to the second page.

03:30PM  21          I'm sorry, if we can bring that exhibit down.

03:30PM  22          Do you want to take a break, Judge?

03:30PM  23          **THE COURT:**  Sure.  It's as good a time any.

03:30PM  24          So, folks, please remember my instructions.  Don't

03:30PM  25  communicate about the case with anyone including each other.

03:30PM   1   Don't make up your mind.

03:30PM   2           See you back here in about 15, 20 minutes.

03:30PM   3           (Jury excused at 3:30 p.m.)

03:30PM   4       **THE COURT:** Okay. Anything before we break,

03:30PM   5   Ms. Chalbeck?

03:30PM   6       **MS. CHALBECK:** Not the government.

03:31PM   7       **THE COURT:** Anything before we break?

03:31PM   8       **MR. SINGER:** No, Your Honor. Thank you.

03:31PM   9       **THE COURT:** Great. See you in about 15, 20 minutes.

03:31PM  10       **THE CLERK:** All rise.

03:31PM  11           (Off the record at 3:31 p.m.)

03:51PM  12           (Back on the record at 3:51 p.m.)

03:51PM  13           (Jury not present.)

03:51PM  14       **THE CLERK:** All rise.

03:51PM  15       **THE COURT:** Please be seated.

03:51PM  16       **THE CLERK:** We are back on the record for the

03:51PM  17   continuation of the jury trial in case number 19-cr-227,

03:51PM  18   United States of America versus Joseph Bongiovanni.

03:51PM  19           All counsel and parties are present.

03:51PM  20       **THE COURT:** Okay. Anything that we need to do before

03:51PM  21   we resume?

03:51PM  22       **MS. CHALBECK:** Not from the government, Judge.

03:51PM  23       **MR. SINGER:** No, Your Honor.

03:51PM  24       **THE COURT:** Okay. Let's bring them back, please,

03:51PM  25   Pat.

03:52PM   1            (Jury seated at 3:52 p.m.)

03:52PM   2            **THE COURT:**  The record will reflect that all our

03:53PM   3    jurors are present again.

03:53PM   4            I remind the witness that he's still under oath.

03:53PM   5            And you may continue, Mr. Singer.

03:53PM   6            **MR. SINGER:**  Thank you, Your Honor.

03:53PM   7            **BY MR. SINGER:**

03:53PM   8    Q.  All right.  So, Mr. Carpenter, I want to move on to a

03:53PM   9    different subject.  So let's get back to the voluntary

03:53PM  10    interview that you conducted with Mr. Bongiovanni back in

03:53PM  11    March of 2019.  All right?

03:53PM  12        So at that point in time, I think we reviewed,

03:53PM  13    Mr. Bongiovanni is retired from the DEA by a couple weeks,

03:53PM  14    several weeks at this point, correct?

03:53PM  15    A.  Yes.

03:53PM  16    Q.  And so you called him up to request whether or not he

03:53PM  17    wanted to come in and submit to an interview; is that right?

03:53PM  18    A.  Yes.

03:53PM  19    Q.  He was under no obligation to do that?

03:53PM  20    A.  Correct.

03:53PM  21    Q.  Like, he didn't work for the DEA anymore, so unlike other

03:53PM  22    agents who can't say no, he could say sorry, Dave, I just

03:53PM  23    don't feel like it?

03:53PM  24    A.  Yes.

03:53PM  25    Q.  But he said, you know what?  Like, I'll submit to the

03:53PM  1   interview, correct?

03:53PM  2   A.  Yes.

03:53PM  3   Q.  And this was a little bit different than the June 2019

03:53PM  4   interview, correct?

03:53PM  5   A.  How so?

03:53PM  6   Q.  Well, it happened at the U.S. Attorney's Office, right?

03:54PM  7   A.  Yes.

03:54PM  8   Q.  You didn't call up a SWAT team to escort Mr. Bongiovanni

03:54PM  9   to the March interview, correct?

03:54PM  10  A.  Correct.

03:54PM  11  Q.  He was never placed in handcuffs, correct?

03:54PM  12  A.  Correct.

03:54PM  13  Q.  Guns were never drawn?

03:54PM  14  A.  No.

03:54PM  15  Q.  No flash bang grenades were used?

03:54PM  16  A.  No.

03:54PM  17  Q.  So a little different, correct?

03:54PM  18  A.  Yes.

03:54PM  19  Q.  Okay.  So it's more of a professional business meeting;

03:54PM  20  is that a fair statement?

03:54PM  21  A.  Yes.

03:54PM  22  Q.  And you wanted to try to obtain some type of

03:54PM  23  incriminating statements from him at that point in time; is

03:54PM  24  that right?

03:54PM  25  A.  I wanted to obtain the truth from him.

03:54PM  1   Q.  All right.  So, you have it in a conference room at the

03:54PM  2   U.S. Attorney's Office; is that right?

03:54PM  3   A.  Yes.

03:54PM  4   Q.  There wasn't any type of recording equipment that was

03:54PM  5   contained in that office, correct?

03:54PM  6   A.  Correct.

03:54PM  7   Q.  So you've done interviews with people at police stations

03:54PM  8   before, right?

03:54PM  9   A.  Yes.

03:54PM  10  Q.  And oftentimes, they have some type of recording device

03:54PM  11  in an interview room?

03:54PM  12  A.  Yes, sir.

03:54PM  13  Q.  Which takes both audio and video recordings of an

03:54PM  14  interview?

03:54PM  15  A.  Yes.

03:55PM  16  Q.  And -- and that's something that can later be played back

03:55PM  17  in a courtroom?

03:55PM  18  A.  Yes.

03:55PM  19  Q.  But that wasn't something that you took advantage of to

03:55PM  20  conduct this interview, correct?

03:55PM  21  A.  Correct.

03:55PM  22  Q.  You didn't have any other type of recording equipment

03:55PM  23  that you used that that day to record the interview, correct?

03:55PM  24  A.  Correct.

03:55PM  25  Q.  And that's something that you have employed in other

03:55PM    1    aspects of this case; is that right?

03:55PM    2    A.   Yes.

03:55PM    3    Q.   So, for instance, do you remember interviewing another

03:55PM    4    DEA agent, Brian Chella?

03:55PM    5    A.   Yes, sir.

03:55PM    6    Q.   And that was in connection with this investigation as

03:55PM    7    well?

03:55PM    8    A.   Yes.

03:55PM    9    Q.   And you used a recording device for that -- for that

03:55PM    10   interview, correct?

03:55PM    11   A.   Yes.

03:55PM    12   Q.   But you didn't use one for him?

03:55PM    13   A.   Correct.

03:55PM    14   Q.   Sometimes, it comes up often, but we see on TV a lot of

03:55PM    15   state and local police officers wear body cams; are you

03:55PM    16   familiar with that?

03:55PM    17   A.   Yes.

03:55PM    18   Q.   And it kind of seems like it's ubiquitous nowadays.  As

03:55PM    19   far as your agency was concerned at Office of Inspector

03:55PM    20   General, did you wear a body cam when you went out into the

03:55PM    21   field?

03:55PM    22   A.   We did not have body cameras assigned to us at that time.

03:56PM    23   Q.   All right.  So the answer for the March 2019 interview is

03:56PM    24   no?

03:56PM    25   A.   Correct.

USA v Bongiovanni - Carpenter - Singer/Cross - 9/23/24

100

03:56PM    1    Q.  All right.  So during this particular March 2019

03:56PM    2    interview, you took handwritten notes, correct?

03:56PM    3    A.  Yes.

03:56PM    4    Q.  And it's not a verbatim record, but it's something that

03:56PM    5    you took contemporaneously with the answers that you were

03:56PM    6    given?

03:56PM    7    A.  Yes.

03:56PM    8    Q.  And so that's something that helps inform you about what

03:56PM    9    responses you got in response to your questions?

03:56PM    10   A.  Yes.

03:56PM    11   Q.  And it also contains kind of a general outline of the

03:56PM    12   points that you raised in your questions to Joseph

03:56PM    13   Bongiovanni?

03:56PM    14   A.  Yes.

03:56PM    15   Q.  Were there other agents that accompanied you during the

03:56PM    16   course of the March 2019 interview?

03:56PM    17   A.  OIG Agent David Fusco.

03:56PM    18   Q.  So it was you, Agent Fusco, Joseph Bongiovanni, and

03:56PM    19   anybody else in the room?

03:56PM    20   A.  No.

03:56PM    21   Q.  So just the three of you?

03:56PM    22   A.  Yes.

03:57PM    23   Q.  And I know that agents sometimes in their notes, they

03:57PM    24   have a practice of putting quotation marks around direct

03:57PM    25   statements made by a person they're interviewing?

03:57PM   1    A.  Yes.

03:57PM   2    Q.  Is that a practice that you use to make note of

03:57PM   3    statements that are made by a person during the course of an

03:57PM   4    interview?

03:57PM   5    A.  Yes.

03:57PM   6    Q.  And that's something that you used here as a practice,

03:57PM   7    correct?

03:57PM   8    A.  Yes.

03:57PM   9    Q.  So if those handwritten notes that you took during the

03:57PM  10    interview contained those quotation marks, it would be

03:57PM  11    consistent with what came out of his mouth?

03:57PM  12    A.  I recall some of them were exactly, and as you said, some

03:57PM  13    of them my notes were a summary of.  So I would put them

03:57PM  14    around places, and I knew as I was going back to my notes

03:57PM  15    what it was, yes.

03:57PM  16    Q.  Okay.  You also produced a report of investigation,

03:57PM  17    correct?

03:57PM  18    A.  Yes.

03:57PM  19    Q.  And I think the OIG refers to it as an MOI, a memorandum

03:57PM  20    of investigation?

03:57PM  21    A.  I believe so, yes.

03:57PM  22    Q.  And so that's something that you produce not during the

03:57PM  23    interview, but after the interview?

03:58PM  24    A.  Yes.

03:58PM  25    Q.  And you produced one of those after this interview; is

03:58PM    1    that right?

03:58PM    2    A.   Yes.

03:58PM    3    Q.   Now, there was a delay in getting that particular

03:58PM    4    memorandum approved by your supervisor; is that right?

03:58PM    5    A.   Yes.

03:58PM    6    Q.   It was almost 60 days before it got approved?

03:58PM    7    A.   I believe so, yes.

03:58PM    8    Q.   What was the reason for that delay?

03:58PM    9    A.   I can't recall specifically at the time what the

03:58PM   10    rationale was.  But I recall at the time our office was

03:58PM   11    overwhelmed with -- overwhelmed with paperwork, a lot of

03:58PM   12    investigations were going on.  I don't know what the specific

03:58PM   13    reason was.

03:58PM   14    Q.   Was this memorandum approved before your June 6th 2019

03:58PM   15    interview of Agent Bongiovanni?

03:58PM   16    A.   Yes.

03:58PM   17    Q.   And so the purpose of the MOI is to document the

03:58PM   18    interview, correct?

03:58PM   19    A.   Yes.

03:58PM   20    Q.   The details of what happened as far as the questions you

03:58PM   21    asked?

03:58PM   22    A.   Yes.

03:58PM   23    Q.   And the responses that were given by Mr. Bongiovanni

03:58PM   24    during the interview?

03:58PM   25    A.   Yes.

03:58PM    1    Q.  And so it's a tool to help you remember what transpired

03:58PM    2    several years ago, correct?

03:58PM    3    A.  Correct.

03:58PM    4    Q.  Because this interview happened in 2019 --

03:59PM    5    A.  Yes.

03:59PM    6    Q.  -- right?

03:59PM    7        We're in 2024 at this point.

03:59PM    8    A.  Yes.

03:59PM    9    Q.  And I know you've investigated a lot of cases in the

03:59PM   10    interim; is that right?

03:59PM   11    A.  Yes.

03:59PM   12    Q.  That includes cases working for OIG, right?

03:59PM   13    A.  Yes.

03:59PM   14    Q.  And it also includes cases after you left the OIG's

03:59PM   15    office?

03:59PM   16    A.  Correct.

03:59PM   17    Q.  I think I said that you left the OIG's office in the

03:59PM   18    spring of 2020?

03:59PM   19    A.  I left the Department of Justice in September of 2020,

03:59PM   20    yes.

03:59PM   21    Q.  And then you left to go to where again?  I'm sorry.

03:59PM   22    A.  TIGTA.  Treasury Inspector General for Tax

03:59PM   23    Administration.

03:59PM   24    Q.  And you continued to investigate matters for that entity,

03:59PM   25    correct?

03:59PM  1  A.  When I left OIG, I did, yes.  Now I'm a supervisor there,

03:59PM  2  yes.

03:59PM  3  Q.  And how long did you act as like a regular agent,

03:59PM  4  non-supervisor, investigating cases?

03:59PM  5  A.  Over three years.

03:59PM  6  Q.  And how many people do you think you've interviewed over

03:59PM  7  the course of your three years at TIGTA?

03:59PM  8  A.  Yes.  It's -- hundreds.

03:59PM  9  Q.  Okay.  So it's important to review both your notes and

04:00PM  10  the MOI to prepare yourself for your testimony today?

04:00PM  11  A.  Yes.

04:00PM  12  Q.  All right.  So with regard to the particular topics, I

04:00PM  13  want to go through some of those with you.

04:00PM  14      So one of the things you remarked about on direct was

04:00PM  15  that you wanted to delve into the particular relationship

04:00PM  16  between Joe Bongiovanni and Peter Gerace; is that right?

04:00PM  17  A.  Yes.

04:00PM  18  Q.  And so you related on direct that they knew each other

04:00PM  19  from a familial relationship that went back to the time that

04:00PM  20  they were kids?

04:00PM  21  A.  Yes.

04:00PM  22  Q.  And that's something that continued when they were

04:00PM  23  teenagers and into their early 20s?

04:00PM  24  A.  Yes.

04:00PM  25  Q.  Mr. Bongiovanni indicated that he would hang out with

04:00PM   1   Peter Gerace bartending and that kind of thing in their 20s?

04:00PM   2   A.  Yes.

04:00PM   3   Q.  But then after he joined the DEA and moved away, the

04:00PM   4   relationship kind of deteriorated, right?

04:00PM   5   A.  Yes.

04:00PM   6   Q.  There's a period of time where they were not really

04:00PM   7   speaking too much?

04:00PM   8   A.  Yes.

04:00PM   9   Q.  And that was because Mr. Bongiovanni was not in Buffalo?

04:00PM   10   A.  Correct.

04:00PM   11   Q.  And Peter Gerace was still here?

04:01PM   12   A.  Yes.

04:01PM   13   Q.  And then Mr. Bongiovanni also indicated to you that when

04:01PM   14   he moved back to Buffalo and joined the DEA office in

04:01PM   15   Buffalo, there was a rekindling of that relationship, for

04:01PM   16   lack of a better word?

04:01PM   17   A.  Yes.

04:01PM   18   Q.  And they would have more contact than they had over the

04:01PM   19   last several years?

04:01PM   20   A.  Yes.

04:01PM   21   Q.  And that's something that continued on for a couple

04:01PM   22   years?

04:01PM   23   A.  Yes.

04:01PM   24   Q.  Now according to the -- according to your testimony,

04:01PM   25   Mr. Bongiovanni denied that he and Peter Gerace were close

04:01PM    1    friends, quote, unquote; is that right?

04:01PM    2    A.  Yes.

04:01PM    3    Q.  And so the close friends, that's not something that's a

04:01PM    4    direct quote inside your notes, correct?

04:01PM    5    A.  Correct.

04:01PM    6    Q.  That's not a term, actually, that Mr. Bongiovanni even

04:01PM    7    used to describe his relationship with Peter Gerace, correct?

04:01PM    8    A.  I recall that -- I recall that phrase, yes, that's why

04:01PM    9    it's in the report.

04:01PM   10    Q.  Well, do you recall the phrase "inner circle," sir?

04:01PM   11    A.  That's in the notes, yes.

04:01PM   12    Q.  Yeah.  That's in the notes.  And that's in the quotation

04:02PM   13    marks in your notes, correct?

04:02PM   14    A.  I'd have to see my notes, but yes.

04:02PM   15    Q.  I'm going to withdraw that question because it's actually

04:02PM   16    not in quotation marks, so my apologies on that.

04:02PM   17        But it's in your notes about the inner circle, correct?

04:02PM   18    A.  Correct.

04:02PM   19    Q.  And that, to your understanding, is a term

04:02PM   20    Mr. Bongiovanni used to describe his relationship vis-à-vis

04:02PM   21    Peter Gerace, right?

04:02PM   22    A.  Yes.

04:02PM   23    Q.  Whether or not Peter Gerace was in his inner circle or

04:02PM   24    not, he answered to that question, or I guess in response to

04:02PM   25    your question about how close he was, that Peter Gerace is

04:02PM    1    not in my inner circle, right?

04:02PM    2    A.  He said he was not a close friend, correct.

04:02PM    3    Q.  Did he say anything about him being in the inner circle,

04:02PM    4    sir?

04:02PM    5    A.  No.

04:02PM    6    Q.  He didn't say that at all?

04:02PM    7    A.  He denied that.

04:02PM    8    Q.  He denied that?

04:02PM    9    A.  Yeah.

04:02PM   10    Q.  But he used the term "inner circle."  That's what I'm

04:02PM   11    getting at.

04:02PM   12    A.  I recall close friends.

04:02PM   13    Q.  You recall close friends and not inner circle?

04:03PM   14    A.  Correct.

04:03PM   15    Q.  Why is inner circle reflected in your handwritten notes

04:03PM   16    about the interview?

04:03PM   17    A.  As I was taking notes, as I said earlier, it was a

04:03PM   18    summary of what was being said.  And as I was writing it

04:03PM   19    down, that's what I wrote down.  And then when I reviewed my

04:03PM   20    notes later, I recalled it being close friends.

04:03PM   21    Q.  Okay.  So, you recall testifying in a previous hearing in

04:03PM   22    this matter, correct?

04:03PM   23    A.  Yes.

04:03PM   24    Q.  And you recall talking about how inner circle is a term

04:03PM   25    that he used, right?

04:03PM      1    A.  I don't recall that.

04:03PM      2    Q.  You don't recall that.

04:03PM      3          **MR. SINGER:**  I direct counsel's attention to 3595CW

04:04PM      4    at page 66, starting on line 13.

04:04PM      5          **BY MR. SINGER:**

04:04PM      6    Q.  Do you recall giving the following answers to the

04:04PM      7    following questions in a previous hearing back in March of

04:04PM      8    2024, sir?

04:04PM      9        "Question:  You talked earlier about how Mr. Bongiovanni

04:04PM     10    stated to you that Peter Gerace was not in his inner circle

04:04PM     11    of friends; do you remember saying that on direct?

04:04PM     12        "Answer:  Yes.

04:04PM     13        "Question:  An inner circle of friends that you recall

04:04PM     14    was something that he said by --

04:04PM     15        "Answer:  Correct.

04:04PM     16        " -- by Mr. Bongiovanni, because you remember that was

04:04PM     17    something that was quoted.

04:04PM     18        "Answer:  Yes.

04:04PM     19        "Inside your report, right?

04:04PM     20        "Answer:  Yes.

04:04PM     21        "So the inner circle of friends was something that

04:04PM     22    Mr. Bongiovanni used in his interview with you, right?

04:04PM     23        "Answer:  Yes.

04:04PM     24        "And close friends is not something he used directly in

04:04PM     25    his interview with you, correct?

04:05PM    1        "Answer:  I can't recall him using it or not."

04:05PM    2        Do you remember giving those questions and answers, sir?

04:05PM    3    A.  Yes.

04:05PM    4    Q.  So I'll ask you again:

04:05PM    5        Inner circle was a term that Joe Bongiovanni used during

04:05PM    6    your interview in March of 2019, correct?

04:05PM    7    A.  I recall the phrase close friends.

04:05PM    8    Q.  So, Mr. Bongiovanni, when you interviewed him, he gave

04:05PM    9    you a number of different reasons why Peter Gerace was not in

04:05PM   10    his inner circle or a close friend of his, correct?

04:05PM   11    A.  Yes.

04:05PM   12    Q.  And he told you that, you know, kind of sum and

04:05PM   13    substance, if he saw Peter Gerace out, he'd buy him a drink

04:05PM   14    or he'd have a drink with him in a bar; is that right?

04:06PM   15    A.  Yes.

04:06PM   16    Q.  But Peter Gerace was not someone who was invited to his

04:06PM   17    wedding, correct?

04:06PM   18    A.  Yes.

04:06PM   19    Q.  Correct?

04:06PM   20    A.  Yes.

04:06PM   21    Q.  Not someone who he ever went over to Peter Gerace's

04:06PM   22    house, correct?

04:06PM   23    A.  Correct.

04:06PM   24    Q.  Did you ask Joe Bongiovanni when he was responding to

04:06PM   25    these questions and giving you descriptions about why Peter

04:06PM    1    Gerace was not in his inner circle or a close friend, how

04:06PM    2    many times he met out Peter Gerace?

04:06PM    3    A.  I don't recall asking him that.

04:06PM    4    Q.  And we talked earlier about how you didn't have the text

04:06PM    5    messages and the phone calls prior to your March 2019

04:06PM    6    interview?

04:06PM    7    A.  Correct.

04:06PM    8    Q.  So you didn't ask him any specific questions about that

04:06PM    9    either, correct?

04:06PM   10    A.  Correct.

04:06PM   11    Q.  So he didn't have the opportunity to respond back and

04:06PM   12    clarify any thoughts you had in your head about why it was

04:06PM   13    inconsistent with what you believe the relationship is?

04:06PM   14    A.  At the time of the interview, I was only asking him and

04:06PM   15    he was explaining to me what it was.  I didn't have any other

04:06PM   16    references to go by.

04:07PM   17    Q.  Okay.  Did you ask him about what his relationship -- Joe

04:07PM   18    Bongiovanni's definition was of a close friend or being in

04:07PM   19    the inner circle was?

04:07PM   20    A.  I did not.

04:07PM   21    Q.  Now, as an investigator, you're taught to ask clarifying

04:07PM   22    questions for things that are important to your interview,

04:07PM   23    correct?

04:07PM   24    A.  Follow-up questions if necessary, yes.

04:07PM   25    Q.  Um-hum.  And you'd agree with me that learning about the

04:07PM    1    way Joe Bongiovanni defines "close friends" or "inner circle"

04:07PM    2    is something that's important to the interview, correct?

04:07PM    3    A.  Could be, yes.

04:07PM    4    Q.  It could be?

04:07PM    5    A.  Could be, yes.

04:07PM    6    Q.  Because it's going to help clarify what he means by we're

04:07PM    7    not close friends, or we're not in the inner circle, correct?

04:07PM    8    A.  Yes.

04:07PM    9    Q.  But you didn't do that?

04:07PM   10    A.  No.

04:07PM   11    Q.  So, another thing you testified to on direct was that

04:08PM   12    Mr. Bongiovanni told you about how Peter Gerace was a, quote,

04:08PM   13    unquote, police groupie; is that right?

04:08PM   14    A.  Yes.

04:08PM   15    Q.  And that's something that he offered as a reason as to

04:08PM   16    why he was not that close to Peter Gerace, correct?

04:08PM   17    A.  Yes.

04:08PM   18    Q.  And your understanding of that, based on your

04:08PM   19    conversation with Mr. Bongiovanni, was that Mr. Gerace

04:08PM   20    sometimes would suck up to police; is that right?

04:08PM   21    A.  Yes.

04:08PM   22    Q.  And Mr. Bongiovanni, as you understood it, was a law

04:08PM   23    enforcement officer during the duration of this relationship

04:08PM   24    that they had, correct?

04:08PM   25    A.  Yes.

04:08PM  1  Q.  And so he had some concerns about whether Peter Gerace

04:08PM  2  was being a friend to him, or just sucking up to him because

04:08PM  3  he was a police officer, right?

04:08PM  4  A.  Yes.

04:08PM  5  Q.  And that's something that would be reflective of a

04:08PM  6  person's feeling about whether they were close with someone,

04:08PM  7  right?

04:08PM  8  A.  Correct.

04:08PM  9  Q.  It would be reflective of whether or not a person was

04:08PM  10  within an inner circle, correct?

04:08PM  11  A.  Correct.

04:08PM  12  Q.  I mean, you're a law enforcement officer, correct?

04:08PM  13  A.  Yes.

04:08PM  14  Q.  You've been a law enforcement officer for almost

04:09PM  15  20 years?

04:09PM  16  A.  Yes.

04:09PM  17  Q.  I'm sure you've had people try to suck up to you

04:09PM  18  sometimes based on your position when they learn what you do?

04:09PM  19  A.  Yes.

04:09PM  20  Q.  You wouldn't consider those type of people to be close to

04:09PM  21  you, would you?

04:09PM  22  A.  No.

04:09PM  23  Q.  They wouldn't be in your inner circle either, correct?

04:09PM  24  A.  No.

04:09PM  25  Q.  You also talked about the vacation.  And I think we saw

04:09PM   1   one of the pictures up.  That picture in 2011 of the vacation

04:09PM   2   to Las Vegas?

04:09PM   3   A.  Yes.

04:09PM   4   Q.  That's something that came up during the course of your

04:09PM   5   interview of Mr. Bongiovanni, correct?

04:09PM   6   A.  Yes.

04:09PM   7   Q.  And what Mr. Bongiovanni reported to you is that that was

04:09PM   8   not something that was planned, correct?

04:09PM   9   A.  Yes.

04:09PM   10  Q.  And that particular trip, at that point in time in 2019,

04:09PM   11  I mean, that was eight and a half years ago?

04:09PM   12  A.  I'm sorry, what year was that?

04:09PM   13  Q.  2011?

04:09PM   14  A.  What was -- can you repeat the question again.

04:09PM   15  Q.  Certainly.  So the particular trip to Vegas that we saw

04:09PM   16  in that one picture, that was August of 2011, correct?

04:09PM   17  A.  Yes.

04:09PM   18  Q.  And you had your interview in March of 2019?

04:09PM   19  A.  Yes.

04:09PM   20  Q.  So that was about eight and a half years ago that that

04:10PM   21  happened, correct?

04:10PM   22  A.  Yes.

04:10PM   23  Q.  Mr. Bongiovanni stated to you that he didn't coordinate

04:10PM   24  any type of flights together with Peter Gerace on that trip,

04:10PM   25  correct?

04:10PM 1    A.  Yes, that's correct.

04:10PM 2    Q.  He indicated to you that it was a party that was planned

04:10PM 3    to celebrate the recent engagement of his sister-in-law?

04:10PM 4    A.  I don't recall him giving a reason for the trip.

04:11PM 5    Q.  Did you investigate the flights they took out to

04:11PM 6    Las Vegas?

04:11PM 7    A.  I did not.

04:11PM 8    Q.  Now, one of the things we went through a little bit in

04:11PM 9    detail was initiating contact with Peter Gerace; do you

04:11PM 10   recall testifying to that on direct?

04:11PM 11   A.  Yes.

04:11PM 12   Q.  So as far as initiation of contact was concerned, those

04:11PM 13   were not Joe Bongiovanni's words, correct?

04:11PM 14   A.  Correct.

04:11PM 15   Q.  Like, he did not say:  I did not initiate contact with

04:11PM 16   Peter Gerace, correct?

04:11PM 17   A.  That's correct.

04:11PM 18   Q.  Those are your words?

04:11PM 19   A.  That was -- those are my words in a question which he --

04:11PM 20   I asked him, did you ever initiate contact with Peter Gerace?

04:11PM 21   He denied it.

04:11PM 22   Q.  Did you explain what you meant by that?

04:11PM 23   A.  No.

04:12PM 24   Q.  Did you ask any clarifying questions?

04:12PM 25   A.  No.

04:12PM    1   Q.  Did you provide a timeframe as to what you were asking

04:12PM    2   about when you asked him about whether or not he initiated

04:12PM    3   contact, quote, unquote?

04:12PM    4   A.  No.

04:12PM    5   Q.  Now, you were aware as part of your investigation that

04:12PM    6   Mr. Bongiovanni was directed to not have contact with Peter

04:12PM    7   Gerace in October of 2018?

04:12PM    8   A.  I don't recall any specific direction that he was not to

04:12PM    9   have contact with him, no.

04:12PM   10   Q.  You don't recall his supervisors telling him don't have

04:12PM   11   contact with Peter Gerace because he's under investigation,

04:12PM   12   he's a target?

04:12PM   13   A.  I don't recall any -- I don't recall that, no.

04:12PM   14   Q.  Do you recall the memoranda that he wrote twice regarding

04:12PM   15   contact he had with Peter Gerace in the fall of 2018,

04:12PM   16   correct?

04:12PM   17   A.  Yes.

04:12PM   18   Q.  Do you recall whether or not those are directed towards

04:12PM   19   why he was communicating with Peter Gerace?

04:13PM   20   A.  Yes.

04:13PM   21   Q.  But you don't recall that his leadership told him to

04:13PM   22   cease contact at this time?

04:13PM   23   A.  Correct.

04:13PM   24        **MR. SINGER:**  Ms. Champoux, can you please bring up

04:13PM   25   Government Exhibit 97.

| | | |
|---|---|---|
| 04:13PM | 1 | **THE COURT:**  Is this -- |
| 04:13PM | 2 | **MR. SINGER:**  This is in evidence. |
| 04:13PM | 3 | Ms. Champoux, can you please zoom in on the date |
| 04:13PM | 4 | portion? |
| 04:13PM | 5 | **BY MR. SINGER:** |
| 04:13PM | 6 | Q.  So you reviewed this memoranda as part of your |
| 04:13PM | 7 | investigation, right, Mr. Carpenter? |
| 04:13PM | 8 | A.  Yes. |
| 04:13PM | 9 | Q.  This particular memorandum is dated November 1, 2018? |
| 04:13PM | 10 | A.  Yes. |
| 04:13PM | 11 | **MR. SINGER:**  If you can un-expand out of that, |
| 04:13PM | 12 | Ms. Champoux. |
| 04:13PM | 13 | **BY MR. SINGER:** |
| 04:13PM | 14 | Q.  It's going Greg Yensan; is that correct? |
| 04:13PM | 15 | A.  Looks like -- yes, Gregory Yensan. |
| 04:13PM | 16 | Q.  And Greg Yensan, yours understanding, was Joe |
| 04:13PM | 17 | Bongiovanni's direct supervisor at that time? |
| 04:13PM | 18 | A.  Yes. |
| 04:13PM | 19 | Q.  It's also going to a person by the name of Ed Orgon? |
| 04:14PM | 20 | A.  Yes. |
| 04:14PM | 21 | Q.  And he was the person who was in command of the Buffalo |
| 04:14PM | 22 | office at the time? |
| 04:14PM | 23 | A.  Yes. |
| 04:14PM | 24 | Q.  So not the first-line supervisor, but Mr. Bongiovanni's |
| 04:14PM | 25 | second-line supervisor? |

04:14PM    1    A.  Correct.

04:14PM    2          **MR. SINGER:**  If we can expand in on the first

04:14PM    3    paragraph, Ms. Champoux?

04:14PM    4          **BY MR. SINGER:**

04:14PM    5    Q.  Can you please read that, sir?

04:14PM    6    A.  It was brought to my attention that Peter Gerace had

04:14PM    7    become a target of a federal investigation.

04:14PM    8        Based on the intelligence I have received, I have

04:14PM    9    attempted to terminate all contact with Gerace.

04:14PM   10        It should be known that any contact I have had with

04:14PM   11    Gerace in the past was minimal, in-person contact, and

04:14PM   12    primarily consisted of a random telephone communication based

04:14PM   13    on the fact we were childhood friends.

04:14PM   14        I would sometimes randomly encounter Gerace at a

04:14PM   15    restaurant or golf outing, and have not made personal plans

04:14PM   16    to meet him social in years.

04:14PM   17    Q.  Does that help refresh your memory about why he wrote

04:14PM   18    this memorandum?

04:14PM   19          **MS. CHALBECK:**  Objection, Your Honor.  The witness

04:14PM   20    lacks personal knowledge as to Mr. Bongiovanni's motivations

04:15PM   21    in writing the memorandum.

04:15PM   22          **THE COURT:**  So, sustained to the form of the

04:15PM   23    question.  You can ask.

04:15PM   24          **MR. SINGER:**  Certainly.

04:15PM   25          **BY MR. SINGER:**

04:15PM   1   Q.   So the first sentence in that particular memorandum talks

04:15PM   2   about it being brought to Mr. Bongiovanni's attention that

04:15PM   3   Peter Gerace had become a target of a federal investigation,

04:15PM   4   correct?

04:15PM   5   A.   Yes.

04:15PM   6   Q.   And the second sentence in that paragraph talks about how

04:15PM   7   he attempted to terminate contact with Gerace based on that

04:15PM   8   reason, correct?

04:15PM   9   A.   Yes.

04:15PM   10   Q.   So, again, based on your investigation, did you become

04:15PM   11   familiar that he was directed to not have contact with Peter

04:15PM   12   Gerace in the fall of 2018?

04:15PM   13   A.   I have nothing specific that DEA supervisors told him not

04:15PM   14   to the contact Peter Gerace.

04:15PM   15   Q.   You just don't know?

04:15PM   16   A.   Correct.

04:15PM   17   Q.   Okay.

04:15PM   18        MR. SINGER:   Ms. Champoux, if we can un-expand out of

04:15PM   19   that.  And if we can expand on the second two paragraphs.

04:16PM   20   Actually, the bottom two, as well, thank you.

04:16PM   21        BY MR. SINGER:

04:16PM   22   Q.   Sir, do you mind reading this for the jury, please?

04:16PM   23   A.   Sure.

04:16PM   24   Q.   Thank you.

04:16PM   25   A.   Over the past several months, I have received a series of

04:16PM   1   phone calls from Gerace which I did not answer.

04:16PM   2       On October 23rd and October 27th, 2018, I received a

04:16PM   3   series of text messages from Gerace, which was out of the

04:16PM   4   ordinary.

04:16PM   5       In the aforementioned text messages, Gerace seemed very

04:16PM   6   concerned by my failure to return his calls or text messages,

04:16PM   7   and was questioning why I did not return a social text

04:16PM   8   inquiry.

04:16PM   9       In an effort to maintain a sense of normal activity, and

04:16PM   10  with the hopes of not alerting Gerace that something may be

04:16PM   11  wrong, I returned a text and stated that I was working,

04:16PM   12  quote, midnights, unquote, and was sorry for my large gaps of

04:16PM   13  no communication.

04:16PM   14      I hoped -- I hoped that this reply would satisfy Gerace's

04:17PM   15  curiosity as to my absence of returning calls and texts.

04:17PM   16      Please see the attached text messages.

04:17PM   17      I have reported this unsolicited contact with Gerace to

04:17PM   18  my group supervisor, Gregory Yensan, and will continue to

04:17PM   19  avoid any future contact.

04:17PM   20  Q.  So in this part of the memorandum, Mr. Bongiovanni is

04:17PM   21  talking about how he's trying to avoid contact with Gerace?

04:17PM   22  A.  Correct.

04:17PM   23  Q.  And about how, based on the messages that he was

04:17PM   24  receiving, that he did make a response to Mr. Gerace?

04:17PM   25  A.  Yes.

04:17PM    1    Q.  But it wasn't a genuine response, correct?

04:17PM    2    A.  According to this memo, correct.

04:17PM    3    Q.  And your understanding was that Peter Gerace was under

04:17PM    4    investigation at that point in time by the DEA, correct?

04:17PM    5    A.  Yes.

04:17PM    6    Q.  He was a target of an investigation back in the fall of

04:17PM    7    2018?

04:17PM    8    A.  Actually, I don't know what was going on with the Gerace

04:17PM    9    investigation at the time.

04:18PM   10    Q.  You just don't know?

04:18PM   11    A.  Correct.

04:18PM   12    Q.  All right.

04:18PM   13            MR. SINGER:  So we can take that down, and move on to

04:18PM   14    the second page, Ms. Champoux.

04:18PM   15            BY MR. SINGER:

04:18PM   16    Q.  So we've been through some of these messages before,

04:18PM   17    you've been through these messages, too, correct, sir?

04:18PM   18    A.  I reviewed these messages, yes.

04:18PM   19    Q.  So these particular messages were sent out in the June

04:18PM   20    2018 timeframe, these are regarding the meet-up at Sunset

04:18PM   21    Bay?

04:18PM   22    A.  Yes.

04:18PM   23    Q.  And they were -- where they run into each other at Tom

04:18PM   24    Doctor's house?

04:18PM   25    A.  Yes.

04:18PM    1          MR. SINGER:  So, Ms. Champoux, can we advance to

04:18PM    2    page 12 of the document.

04:18PM    3          BY MR. SINGER:

04:18PM    4    Q.  And your review of the messages previous to this show

04:18PM    5    there's some invites to a Pharaoh's golf outing that occurs

04:18PM    6    back in July?

04:18PM    7    A.  Yes.

04:18PM    8    Q.  And then there's a gap in the messages, correct?

04:18PM    9    A.  Yes.

04:18PM    10    Q.  There's not responses going back and forth between Peter

04:18PM    11    Gerace and Joe Bongiovanni at that time?

04:19PM    12    A.  Correct.

04:19PM    13    Q.  And then we have messages that start to get exchanged

04:19PM    14    back on Tuesday, October 23rd; is that right?

04:19PM    15    A.  Yes.

04:19PM    16          MR. SINGER:  If you could advance to the next page,

04:19PM    17    Ms. Champoux.

04:19PM    18          BY MR. SINGER:

04:19PM    19    Q.  And so these particular messages is what Mr. Bongiovanni

04:19PM    20    is referring to in his memorandum, correct, sir?

04:19PM    21    A.  Yes.

04:19PM    22    Q.  Where Peter Gerace is asking him, hey, are you alive?

04:19PM    23    Did you get a new phone?  Is everything all right?

04:19PM    24    A.  What was the question?

04:19PM    25    Q.  He's asking whether he or not he's still alive?

04:19PM   1   A.  Yes.

04:19PM   2   Q.  He's asking whether or not he got a new phone?

04:19PM   3   A.  Correct.

04:19PM   4   Q.  He's asking whether or not he moved out of town?

04:19PM   5   A.  Correct.

04:19PM   6   Q.  So it appears on your examination of the messages, that

04:19PM   7   there hasn't really been a lot of phone contact between Joe

04:19PM   8   Bongiovanni and Peter Gerace for a while, right?

04:19PM   9   A.  Correct.

04:19PM  10   Q.  And it looks like there was a never a response to the

04:19PM  11   initial message, correct?

04:19PM  12   A.  Correct.

04:19PM  13   Q.  Peter Gerace then follows up with another text; is that

04:19PM  14   correct?

04:20PM  15   A.  It looks like a few hours later, correct.

04:20PM  16         **MR. SINGER:**  Can we go to next page, Ms. Champoux.

04:20PM  17         **BY MR. SINGER:**

04:20PM  18   Q.  And then this darker message here, this is a response

04:20PM  19   that Mr. Bongiovanni provided Peter Gerace at that time?

04:20PM  20   A.  Yes.

04:20PM  21   Q.  And that's consistent with what he writes in the memo,

04:20PM  22   correct?

04:20PM  23   A.  Yes.

04:20PM  24   Q.  Peter Gerace looks like he responds back, correct?

04:20PM  25   A.  Yes.

04:20PM    1    Q.  And then Mr. Bongiovanni sends back another response.

04:20PM    2    Hope all is well.  You're not the only one mad at me, LOL?

04:20PM    3    A.  Yes.

04:20PM    4         MR. SINGER:  Can we move forward to the next page,

04:20PM    5    Ms. Champoux?

04:20PM    6         BY MR. SINGER:

04:20PM    7    Q.  And it looks like Mr.  Gerace responds, I'm not mad,

04:20PM    8    brother, just keep in touch?

04:20PM    9    A.  Yes.

04:20PM    10    Q.  So it appears, based on what you've read in these text

04:20PM    11    messages, that Peter Gerace is no longer concerned about the

04:20PM    12    lack of contact?

04:20PM    13    A.  Correct.

04:21PM    14         MR. SINGER:  Bring that down, Ms. Champoux.  If we

04:21PM    15    can go to Government Exhibit 98 in evidence.

04:21PM    16         BY MR. SINGER:

04:21PM    17    Q.  So this is another memorandum that you reviewed as part

04:21PM    18    of your investigation, sir?

04:21PM    19    A.  Yes.

04:21PM    20    Q.  And this was another memo that Mr. Bongiovanni submitted

04:21PM    21    to DEA leadership at the Buffalo office regarding Peter

04:21PM    22    Gerace and contact with him?

04:21PM    23    A.  Correct.

04:21PM    24    Q.  And this was submitted after the November 1st, 2018

04:21PM    25    memorandum that we looked at?

04:21PM  1    A.  Yes.

04:21PM  2    Q.  This was submitted on December 10th, of 2018?

04:21PM  3    A.  Correct.

04:21PM  4    Q.  And this is going to Mr. Bongiovanni's second-line

04:21PM  5    supervisor, Edward Orgon, the RAC of the office?

04:21PM  6    A.  Yes.

04:21PM  7         **MR. SINGER:**  Ms. Champoux if we can expand on the

04:21PM  8    first sentence in the first paragraph, please.

04:21PM  9         **BY MR. SINGER:**

04:21PM  10   Q.  Can you please read that for the jury, sir?  Thank you.

04:22PM  11   A.  On December 10th, 2018, I received an incoming phone call

04:22PM  12   from Peter Gerace and ignored the call.

04:22PM  13       Immediately following the call from Gerace, I received

04:22PM  14   another incoming call from the 716-525-6511, and I ignored

04:22PM  15   the call because I did not recognized the number.

04:22PM  16       Immediately after my failure to answer the aforementioned

04:22PM  17   calls, I received a series of text messages from Gerace out

04:22PM  18   of the ordinary and over a span of a couple minutes.

04:22PM  19       In the text messages, Gerace seemed very concerned, and

04:22PM  20   in his text Gerace asked me to text back, quote, on the

04:22PM  21   number they just called you on, unquote.

04:22PM  22       Gerace immediately followed the call with another text

04:23PM  23   which read, quote, ASAP, unquote.

04:23PM  24       **MR. SINGER:**  Ms. Champoux, if we can un-expand out of

04:23PM  25   that?  And can we expand on the paragraph below, please?

04:23PM   1        **BY MR. SINGER:**

04:23PM   2   Q.  Sorry, Mr. Carpenter, you're going to be my narrator

04:23PM   3   today.  Would you mind reading this paragraph again?

04:23PM   4   A.  I'll put my radio voice on then.

04:23PM   5   Q.  You sound great.

04:23PM   6   A.  In an effort to maintain a sense of normal activity, and

04:23PM   7   with hopes of not alerting Gerace that something may be

04:23PM   8   wrong, I responded and called the number 716-525-6511.

04:23PM   9        Gerace answered the phone, and I was agitated, and asked

04:23PM  10   Gerace why was he calling me over and over.

04:23PM  11        I then asked Gerace why he was calling me from a

04:23PM  12   different number.

04:23PM  13        Gerace stated that the 716-525-6511 belonged to his

04:23PM  14   girlfriend.

04:23PM  15        I stated that I did not respond to his calls and texts

04:24PM  16   because I was in court.

04:24PM  17        At that time, Gerace stated that he needed to tell me

04:24PM  18   something important, but he didn't want to talk on the phone.

04:24PM  19        I told Gerace that it was fine to talk on the phone, and

04:24PM  20   asked Gerace what was the problem?

04:24PM  21        Gerace stated that he, Gerace, was told that I was being

04:24PM  22   watched.

04:24PM  23        I asked Gerace who was watching me?

04:24PM  24        Gerace responded that he heard I was being watched by

04:24PM  25   internal affairs.

04:24PM  1    I responded is that so?

04:24PM  2    I asked Gerace who was giving him this information?

04:24PM  3    At that time, Gerace seemed to stumble and said that this

04:24PM  4  information was told to him by somebody he encountered while

04:24PM  5  he was dining or drinking at Salvatore's restaurant and

04:24PM  6  hotel.

04:24PM  7    Gerace stated that he did not recall the person's name.

04:24PM  8    Again, I asked Gerace, who said I was being -- excuse me,

04:25PM  9  who said I was being watched by internal affairs?

04:25PM  10    Again, Gerace failed to identify his source.

04:25PM  11    At that time, I told Gerace that his information was

04:25PM  12  quote, bullshit, unquote.

04:25PM  13    I also told Gerace that DEA does not even have a bureau

04:25PM  14  of internal affairs.

04:25PM  15         **MR. SINGER:**  If we can un-expand out of that,

04:25PM  16  Ms. Champoux.  If we can capture that last part of the

04:25PM  17  paragraph on the bottom page.

04:25PM  18         **BY MR. SINGER:**

04:25PM  19  Q.  Go ahead and take your time, Mr. Carpenter.

04:25PM  20    Don't worry, you're reading less than Frank DiCarlo, so

04:25PM  21  you're all good.

04:25PM  22    Can you please read that part of the paragraph?

04:25PM  23  A.  Gerace stated that the person believes that internal

04:25PM  24  affairs is watching me because Gerace and I have been friends

04:25PM  25  since we were kids, and now he owns Pharaoh's Gentlemen's

04:25PM    1    Club.

04:25PM    2        I responded that yes, we have been friends for years, but

04:26PM    3    I never came into your club.

04:26PM    4        Gerace said he agrees.

04:26PM    5            **MR. SINGER:**  And then if we can un-expand out of

04:26PM    6    that, and move to the next page, Ms. Champoux.

04:26PM    7            Can you expand on the remaining paragraphs?  So it

04:26PM    8    starts up with Gerace on that page.

04:26PM    9            **BY MR. SINGER:**

04:26PM   10    Q.  Thank you very much, Mr. Carpenter.  I'll leave it to

04:26PM   11    you.

04:26PM   12    A.  Gerace reiterated that we are friends.  And the reason

04:26PM   13    for the call was that Gerace was looking out for me.

04:26PM   14        I responded that there is nothing going on, and his

04:26PM   15    information was false.

04:26PM   16        Gerace sent me a text shortly after the conclusion of the

04:26PM   17    telephone call, and in sum and substance, stated that, quote,

04:26PM   18    we haven't talked in a while, but he considered me one of his

04:26PM   19    best friends, and that he always had my back, unquote.

04:26PM   20        As a continued effort to maintain a sense of normal

04:26PM   21    activity, I texted Gerace back.  Quote, we have been friends

04:26PM   22    for 25 years, bud, all good, unquote.

04:27PM   23        On December 8th, 2018, a received a reply text from

04:27PM   24    Gerace.  Quote, you mean 36 years, unquote.

04:27PM   25        I have and will report all contact with Gerace to a DEA

04:27PM   1   supervisor, like I have in the past, and will in the future,

04:27PM   2   should unsolicited communications with Gerace occur.

04:27PM   3   Q.  Thank you, Mr. Carpenter.

04:27PM   4        MR. SINGER:  Ms. Champoux, will you mind un-expanding

04:27PM   5   out of that?  And can we move to the next page in the

04:27PM   6   document?

04:27PM   7        BY MR. SINGER:

04:27PM   8   Q.  So you recall when you reviewed this memorandum,

04:27PM   9   Mr. Carpenter, that you also took a look at the text messages

04:27PM  10   that were appended to it?

04:27PM  11   A.  Yes.

04:27PM  12   Q.  And these particular text messages we're looking at right

04:27PM  13   now are the ones that are being referenced inside the

04:27PM  14   narrative above; is that correct?

04:27PM  15   A.  Yes.

04:27PM  16        MR. SINGER:  If we can move to the next page,

04:27PM  17   Ms. Champoux.

04:28PM  18        BY MR. SINGER:

04:28PM  19   Q.  And, again, this is a continuation of that conversation

04:28PM  20   that was referenced?

04:28PM  21   A.  Yes.

04:28PM  22   Q.  And so when Mr. Bongiovanni is talking about the

04:28PM  23   friendship that he has with Peter Gerace at this particular

04:28PM  24   time, there's a context to it, correct?

04:28PM  25   A.  Yes.

04:28PM   1   Q.  And that context is being explained in the memorandum

04:28PM   2   above?

04:28PM   3   A.  Yes.

04:28PM   4        MR. SINGER:  Can we move on to the next page,

04:28PM   5   Ms. Champoux?

04:28PM   6        Oh, yeah, just a little.  That is the last page.

04:28PM   7   Excuse me.  And we can bring that down, Ms. Champoux.

04:28PM   8        BY MR. SINGER:

04:28PM   9   Q.  So, you read these memoranda prior to going into the

04:28PM  10   March 2019 interview, right?

04:28PM  11   A.  Yes.

04:28PM  12   Q.  And I know you talked about on direct several text

04:28PM  13   messages that are in addition to these, correct, that you

04:28PM  14   looked at?

04:28PM  15   A.  Yes.

04:28PM  16   Q.  That was in Government Exhibit 310D?

04:28PM  17   A.  I believe that's the exhibit.

04:28PM  18   Q.  And that's the longer string of text messages that go

04:28PM  19   from 2015 all the way to 2018?

04:29PM  20   A.  Yes.

04:29PM  21   Q.  And as far as those text messages, you were asked a

04:29PM  22   number of questions about those text messages.  So I just

04:29PM  23   want to go kind of quickly go through those.

04:29PM  24        The government talked to you about Saint Patrick's Day

04:29PM  25   party invitation that occurred, correct?

04:29PM   1    A.  Yes.

04:29PM   2    Q.  That occurred back in 2015?

04:29PM   3    A.  Yes.

04:29PM   4    Q.  They also talked to you about the text message in 2015

04:29PM   5    that related to Mr. Gerace wanted to give Joe Bongiovanni a

04:29PM   6    gift; do you remember that?

04:29PM   7    A.  Yes.

04:29PM   8    Q.  And you're aware of the fact that Mr. Bongiovanni was

04:29PM   9    married, correct?

04:29PM  10    A.  Yes.

04:29PM  11    Q.  You're aware of the fact that Peter Gerace did not attend

04:29PM  12    the wedding, correct?

04:29PM  13    A.  Yes.

04:29PM  14    Q.  Are you aware of the fact that that's what the gift that

04:29PM  15    Peter Gerace wanted to give Joe Bongiovanni is referenced in

04:29PM  16    that email or text message?

04:29PM  17    A.  I was not.

04:29PM  18    Q.  The government also talked to you about another July 2015

04:29PM  19    invitation regarding a birthday that was going on for

04:29PM  20    Mr. Bongiovanni?

04:29PM  21    A.  Yes.

04:30PM  22    Q.  And that was at the house followed by Boss Restaurant?

04:30PM  23    A.  Yes.

04:30PM  24    Q.  And then I think there was another text message that was

04:30PM  25    referenced in August of 2015 where Mr. Bongiovanni asked him,

04:30PM  1    you know, if I needed to send you a letter, what's your

04:30PM  2    address?

04:30PM  3    A.  Yes.

04:30PM  4    Q.  And that's after that birthday party, correct?

04:30PM  5    A.  Yes.

04:30PM  6    Q.  It's after the text where Peter Gerace is talking about

04:30PM  7    providing some type of gift to Mr. Bongiovanni?

04:30PM  8    A.  Yes.

04:30PM  9    Q.  Do you know what the particular reference is being made

04:30PM  10   as far as why Mr. Bongiovanni wants to send him a letter?

04:30PM  11   A.  No.

04:30PM  12   Q.  Could it be a thank you though?

04:30PM  13   A.  I don't know the context.

04:30PM  14   Q.  Well, you just saw those two messages that the government

04:30PM  15   brought to your attention on direct, correct?

04:30PM  16   A.  Yes.

04:30PM  17          **MS. CHALBECK:**  Objection, argumentative.

04:30PM  18          **THE COURT:**  Overruled.

04:30PM  19          **BY MR. SINGER:**

04:30PM  20   Q.  Another message that the government brought you through

04:30PM  21   was something that occurred back in June of 2016 regarding

04:30PM  22   Peter Gerace's parents having some type of anniversary or

04:31PM  23   birthday party; is that right?

04:31PM  24   A.  I don't know.  There was an event with the parents,

04:31PM  25   correct.

04:31PM    1    Q.  But you don't know what the particular event was?

04:31PM    2    A.  No.

04:31PM    3    Q.  In your review of the text messages, it's a fair

04:31PM    4    statement that the contact between Joe Bongiovanni and Peter

04:31PM    5    Gerace starts to drop off moving through 2016 and into 2017

04:31PM    6    and 2018, correct?

04:31PM    7    A.  I'm not exactly sure the frequency of the drop off, but I

04:31PM    8    can't say for sure on that.

04:31PM    9    Q.  Okay.  So, I know you reviewed these messages, but you

04:31PM   10    can't say for certain whether or not contact between the two

04:31PM   11    dropped off?

04:31PM   12    A.  Around that timeframe, correct.

04:31PM   13    Q.  You can't say whether or not Mr. Bongiovanni's initiation

04:31PM   14    of contact dropped off?

04:31PM   15    A.  Correct.

04:31PM   16    Q.  You can't say whether or not Peter Gerace's initiation of

04:31PM   17    contact was greater than Mr. Bongiovanni?

04:32PM   18    A.  Correct.

04:32PM   19    Q.  Because you just didn't count out the messages yourself?

04:32PM   20    A.  Yes.

04:32PM   21    Q.  The government talked about some phone logs and phone

04:32PM   22    calls that were made between Peter Gerace and Joe

04:32PM   23    Bongiovanni; is that right?

04:32PM   24    A.  Yes.

04:32PM   25    Q.  Those phone logs were not something that you reviewed

04:32PM    1    prior to your April 29 -- sorry, prior to your March 2019

04:32PM    2    interview?

04:32PM    3    A.  Correct.

04:32PM    4    Q.  But those are ones that you reviewed in some degree

04:32PM    5    before today?

04:32PM    6    A.  Yes.

04:32PM    7    Q.  Did you go through all the times that were -- Peter

04:32PM    8    Gerace and Joe Bongiovanni were in contact?

04:32PM    9    A.  I can't say about all of them.

04:32PM   10    Q.  Did you count out the times that Peter Gerace called Joe

04:32PM   11    Bongiovanni?

04:32PM   12    A.  I did not.

04:32PM   13    Q.  Did you count out the number of times that Joe

04:32PM   14    Bongiovanni called Peter Gerace?

04:32PM   15    A.  No.

04:32PM   16    Q.  Did you cross-reference those calls with the text

04:32PM   17    messages to figure out who was calling who and why?

04:33PM   18    A.  The call logs indicate who was calling who.

04:33PM   19    Q.  All right.  Well, how about those text messages you

04:33PM   20    reviewed.  You reviewed those, right?

04:33PM   21    A.  Correct.

04:33PM   22    Q.  And they posed questions, Peter Gerace poses questions to

04:33PM   23    Joe Bongiovanni, right?

04:33PM   24    A.  Yes.

04:33PM   25    Q.  Joe Bongiovanni poses questions to Peter Gerace?

04:33PM   1   A.  Yes.

04:33PM   2   Q.  And sometimes there are references in those text messages

04:33PM   3   to call me?

04:33PM   4   A.  Yes.

04:33PM   5   Q.  Did you cross-reference to see whether or not the phone

04:33PM   6   logs match up with those text messages in any way?

04:33PM   7   A.  I did not.

04:33PM   8       MR. SINGER:  Ms. Champoux, can you bring up

04:33PM   9   Government Exhibit 426-1.

04:33PM   10      BY MR. SINGER:

04:33PM   11  Q.  So we talked about this particular picture on direct,

04:33PM   12  correct?

04:33PM   13  A.  Yes.

04:33PM   14  Q.  And your understanding this was this picture was taken

04:33PM   15  more than ten years ago prior to your interview in March of

04:33PM   16  2019?

04:33PM   17  A.  Yes.

04:33PM   18  Q.  Not very recent, you would agree with me, correct?

04:33PM   19  A.  Yes.

04:33PM   20      MR. SINGER:  You can bring that down, Ms. Champoux.

04:34PM   21      Can you bring up 490A please?

04:34PM   22      MS. CHAMPOUX:  490A.

04:34PM   23      MR. SINGER:  490A, as in alpha.

04:34PM   24      BY MR. SINGER:

04:34PM   25  Q.  This is another picture you talked about on your direct;

04:34PM  1    is that correct?

04:34PM  2    A.  Yes, sir.

04:34PM  3    Q.  And this particular picture, it's got a date stamp on it

04:34PM  4    of August 2011, correct?

04:34PM  5    A.  Yes.

04:34PM  6    Q.  And this was something that was more than eight years

04:34PM  7    before the interview you conducted in March of 2019?

04:34PM  8    A.  Correct.

04:34PM  9    Q.  Not very recent?

04:34PM  10   A.  Correct.

04:34PM  11          **MR. SINGER:**  You can bring that down, Ms. Champoux.

04:34PM  12          **BY MR. SINGER:**

04:34PM  13   Q.  So when you asked Mr. Bongiovanni, getting back to your

04:34PM  14   interview in March of 2019, about initiation of contact, you

04:34PM  15   testified that you didn't provide him any type of timeframe;

04:34PM  16   is that right?

04:34PM  17   A.  Ever.

04:34PM  18   Q.  But when you're talking about this with him, this is

04:34PM  19   after all those memoranda that we just talked about occurred,

04:34PM  20   correct?

04:34PM  21   A.  Um-hum.  Yes.

04:35PM  22   Q.  So the November 1st, 2018 memorandum was filed with the

04:35PM  23   DEA, right?

04:35PM  24   A.  Yes.

04:35PM  25   Q.  And in that memoranda, Mr. Bongiovanni indicated that he

USA v Bongiovanni - Carpenter - Singer/Cross - 9/23/24

136

04:35PM    1    was made aware that Peter Gerace was a target of

04:35PM    2    investigation?

04:35PM    3    A.   Yes.

04:35PM    4    Q.   And the December 10th memoranda that was filed on Peter

04:35PM    5    Gerace, do you remember seeing that?

04:35PM    6    A.   Yes.

04:35PM    7    Q.   That occurred prior to the March 2019 interview, correct?

04:35PM    8    A.   Yes.

04:35PM    9    Q.   Where he's explaining why he had particular contact with

04:35PM   10    Peter Gerace?

04:35PM   11    A.   Yes.

04:35PM   12    Q.   And whether or not he initiated those contacts?

04:35PM   13    A.   I don't recall the initiated -- I'm sorry, can you

04:35PM   14    clarify the question?

04:35PM   15    Q.   Certainly.  So inside of those memoranda, he's explaining

04:35PM   16    whether he initiated contact with Mr. Gerace, correct?

04:35PM   17    A.   I don't think he clarified if he was initiating or not,

04:35PM   18    but --

04:35PM   19    Q.   Okay.  But he's indicating why he's responding back to

04:35PM   20    the messages, correct?

04:35PM   21    A.   Correct.

04:35PM   22    Q.   Why he's responding back to these calls?

04:35PM   23    A.   Yes.

04:35PM   24    Q.   So it appears, since he's noting his response, that Peter

04:35PM   25    Gerace is initiating contact on those times, correct?

04:35PM  1   A.  Yes.

04:35PM  2   Q.  And that's what's in his head during this March 2019

04:36PM  3   interview, correct?

04:36PM  4        MS. CHALBECK:  Objection, Your Honor.  I -- perhaps

04:36PM  5   to form, if not to personal knowledge.  I think it's -- what's

04:36PM  6   in the defendant's head?

04:36PM  7        THE COURT:  Yeah, sustained.

04:36PM  8        BY MR. SINGER:

04:36PM  9   Q.  You'd agree with me that when you had this interview in

04:36PM  10  March of 2019, it's after all these memoranda are written,

04:36PM  11  correct?

04:36PM  12  A.  Yes, sir.

04:36PM  13  Q.  Several months after that?

04:36PM  14  A.  Yes.

04:36PM  15  Q.  And you discussed the memoranda, correct?

04:36PM  16  A.  Yes.

04:36PM  17  Q.  So as part the March 2019 interview, there was also

04:36PM  18  discussion about overdoses, and Peter Gerace, and whether or

04:36PM  19  not he made a phone call to Joe Bongiovanni; do you remember

04:36PM  20  that?

04:36PM  21  A.  Yes.

04:36PM  22  Q.  And you asked him that question because this is one of

04:36PM  23  the allegations that Agent Casullo levied against Joe

04:37PM  24  Bongiovanni, correct?

04:37PM  25  A.  Correct.

04:37PM   1   Q.  And this is one of the allegations that Joe Bongiovanni

04:37PM   2   denied inside the memoranda that we read before the break,

04:37PM   3   correct?

04:37PM   4   A.  Yes.

04:37PM   5   Q.  So, part of your investigation was into, hey, what

04:37PM   6   happened with this, correct?

04:37PM   7   A.  Yes.

04:37PM   8   Q.  And, so, you asked the question about whether or not

04:37PM   9   Peter Gerace called Joe Bongiovanni during an active overdose

04:37PM  10   situation, correct?

04:37PM  11   A.  Correct.

04:37PM  12   Q.  Do you remember the exact words you used when you asked

04:37PM  13   him that question?

04:37PM  14   A.  I don't recall the exact words.  But I know he denied it

04:37PM  15   happening.

04:37PM  16   Q.  Okay.  So he denied that it happened.  But he provided

04:37PM  17   you other information about conversations that he did have

04:37PM  18   with Gerace, correct?

04:37PM  19   A.  Correct.

04:37PM  20   Q.  And what he indicated to you was that he did receive

04:37PM  21   calls in the past from Peter Gerace, correct?

04:37PM  22   A.  Yes.

04:37PM  23   Q.  They were not in an emergent situation of someone

04:37PM  24   overdosing, correct?

04:37PM  25   A.  Correct.

04:37PM   1   Q.  But given his line of work, he was concerned that if a

04:37PM   2   patron or employee overdosed at Pharaoh's Gentlemen's Club,

04:38PM   3   what should he do, correct?

04:38PM   4        MS. CHALBECK:  Objection to form.  And lack of

04:38PM   5   personal knowledge as to what Mr. Bongiovanni was concerned

04:38PM   6   about.

04:38PM   7        THE COURT:  Yeah, sustained Mr. Singer.  You keep

04:38PM   8   asking the questions that way.  You can't ask them that way.

04:38PM   9        MR. SINGER:  I got it, Judge.

04:38PM  10        BY MR. SINGER:

04:38PM  11   Q.  What was explained to you was Peter Gerace had concerns

04:38PM  12   about an employee or patron overdosing at the club?

04:38PM  13   A.  Yes.

04:38PM  14   Q.  And that was the reason for the contact with

04:38PM  15   Mr. Bongiovanni?

04:38PM  16   A.  Yes.

04:38PM  17   Q.  And what Mr. Bongiovanni told Peter Gerace was that he

04:38PM  18   should get certified in Narcan?

04:38PM  19   A.  Yes.

04:38PM  20   Q.  But he denied anything about telling Peter Gerace get the

04:38PM  21   stripper out of there, or something to that effect, correct?

04:38PM  22   A.  Correct.

04:38PM  23   Q.  You also talked about on direct the question about how

04:39PM  24   Mr. Bongiovanni denied ever witnessing Peter Gerace consume

04:39PM  25   or use narcotics; do you recall that?

USA v Bongiovanni - Carpenter - Singer/Cross - 9/23/24

140

04:39PM   1   A.  Yes.

04:39PM   2   Q.  So, that particular part of your testimony, it's not

04:39PM   3   consistent with your notes, correct?

04:39PM   4   A.  My handwritten notes may reflect a different wordage, but

04:39PM   5   the report reflects consume narcotics.

04:39PM   6   Q.  Yeah.  So for instance, your notes reflect that you asked

04:39PM   7   Mr. Bongiovanni whether or not you've ever seen Peter Gerace

04:39PM   8   with drugs, correct?

04:39PM   9   A.  I believe that's what they reflect, yes.

04:39PM  10   Q.  And he responded back to that answer in the negative,

04:39PM  11   correct?

04:39PM  12   A.  Yes.

04:39PM  13   Q.  And you'd agree with me that seeing someone with drugs

04:39PM  14   versus seeing someone use drugs, that's something that's

04:39PM  15   different, correct?

04:39PM  16   A.  Yes.

04:39PM  17   Q.  But the way you reported it in your testimony was that

04:39PM  18   he'd never seen Gerace use drugs; is that right?

04:39PM  19   A.  Yes.

04:39PM  20   Q.  You also talked about the short leash comment; is that

04:39PM  21   right?

04:40PM  22   A.  Yes.

04:40PM  23   Q.  Now your handwritten notes, they differ from your report,

04:40PM  24   correct?

04:40PM  25   A.  Yes.

04:40PM    1    Q.  The short port of that short leash is omitted from your

04:40PM    2    notes, correct?

04:40PM    3    A.  Correct.

04:40PM    4    Q.  It your notes, it's just reflected as leash, correct?

04:40PM    5    A.  Yes.

04:40PM    6    Q.  So are you paraphrasing there, sir?

04:40PM    7    A.  No.

04:40PM    8    Q.  That's something that you believe that Mr. Bongiovanni

04:40PM    9    told you directly in the interview?

04:40PM   10    A.  Yes.

04:40PM   11    Q.  Even though it's not reported in your notes?

04:40PM   12    A.  Correct.

04:40PM   13    Q.  Now, with regard to the racial comment that Special Agent

04:40PM   14    Casullo made allegations about.  You talked to

04:40PM   15    Mr. Bongiovanni about that, as well, correct?

04:40PM   16    A.  Correct.

04:40PM   17    Q.  And we talked about the memorandum, that's something he

04:40PM   18    denied ever happening, correct?

04:40PM   19    A.  Correct.

04:40PM   20    Q.  With regard to Ron Serio, I think the government asked

04:41PM   21    you almost a dozen times whether or not you ever used the

04:41PM   22    name Ron Serio in your March 2019 interview; do you remember

04:41PM   23    that?

04:41PM   24    A.  Yes.

04:41PM   25    Q.  And I think on each and every occasion, you said no, I

04:41PM  1    never used the name Ron Serio?

04:41PM  2    A.  Correct.

04:41PM  3    Q.  So, as far as Ron Serio's concerned, you also testified

04:41PM  4    that prior to this particular interview, you had some type of

04:41PM  5    meeting or call with Special Agent Ryan from HSI; is that

04:41PM  6    right?

04:41PM  7    A.  Yes.

04:41PM  8    Q.  And your testimony today is that during this particular

04:41PM  9    call, or meeting, Agent Ryan gave you seven different names

04:41PM  10   of people to ask about during your March 2019 interview,

04:41PM  11   correct?

04:41PM  12   A.  Yes.

04:41PM  13   Q.  And you testified today that Agent Ryan asked you to do

04:41PM  14   this, but never brought out any reasoning as to why he wanted

04:41PM  15   you to ask about these names?

04:41PM  16   A.  Correct.

04:41PM  17   Q.  Did you take any notes about these particular names prior

04:41PM  18   to the March 2019 interview?

04:42PM  19   A.  Not that I recall, no.

04:42PM  20   Q.  How did you remember all these names?

04:42PM  21   A.  I did, I -- I can't say how.

04:42PM  22   Q.  Yeah, I mean, I guess, would it be difficult to memorize

04:42PM  23   these names if you were never provided any context as to why

04:42PM  24   they were relevant to ask about?

04:42PM  25   A.  I'm -- I remember the names from the interview, I'm not

04:42PM   1   sure what --

04:42PM   2   Q.  And you remember talking about earlier about how you have

04:42PM   3   a particular investigation that's separate and apart from

04:42PM   4   Agent Ryan's investigation, correct?

04:42PM   5   A.  Yes.

04:42PM   6   Q.  It was the intent of both of you not to cross streams,

04:42PM   7   correct?

04:42PM   8   A.  Yes.

04:42PM   9   Q.  And the reason for that is that you didn't want to do

04:42PM  10   anything to alert Agent Bongiovanni to the fact that he was

04:42PM  11   under investigation vis-à-vis the Ron Serio investigation,

04:42PM  12   correct?

04:42PM  13   A.  That's part of the reason, yes.

04:42PM  14   Q.  And so as far as these names are concerned, one of the

04:42PM  15   names that you know, T.S. is associated with the Joe

04:43PM  16   Bongiovanni investigation -- sorry, the Ron Serio

04:43PM  17   investigation, correct?

04:43PM  18   A.  I know that now, correct.

04:43PM  19   Q.  But you claim that you didn't know that back in March of

04:43PM  20   2019?

04:43PM  21   A.  Correct.

04:43PM  22   Q.  But you knew when you were asking that question in the

04:43PM  23   interview when you got the response from Agent Bongiovanni it

04:43PM  24   was related to the Ron Serio investigation, right?

04:43PM  25   A.  I cannot recall his answer offhand regarding that name.

04:43PM      1    Q.  Would taking a look at your notes help refresh your

04:43PM      2    memory about that?

04:43PM      3    A.  It would.

04:43PM      4    Q.  So I'm going to direct your attention to page 10 of

04:43PM      5    Government Exhibit 3595 Bravo Victor.

04:43PM      6         I'll make two Xs on the page, sir.

04:43PM      7         When you're done, take a look at that, please look up at

04:43PM      8    me.

04:44PM      9         I'm going to take that away from you, Mr. Carpenter.

04:44PM     10         Did that help refresh your memory as to what was said

04:44PM     11    vis-à-vis T.S.?

04:44PM     12    A.  Yes.

04:44PM     13    Q.  All right.  So T.S., he was someone who Mr. Bongiovanni,

04:44PM     14    unlike some of the other people you asked about, did know

04:44PM     15    about, correct?

04:44PM     16    A.  Yes.

04:44PM     17    Q.  And he was someone who Mr. Bongiovanni was familiar about

04:44PM     18    because he was the target of a controlled buy that

04:44PM     19    Mr. Bongiovanni attempted during the Ron Serio investigation,

04:44PM     20    correct?

04:44PM     21    A.  What I recall in the interview, refreshed from my notes,

04:44PM     22    is that he was tried to be recruited as a source of

04:44PM     23    information, but wasn't successful.

04:44PM     24    Q.  So your notes reflect that he was being recruited as a

04:45PM     25    source of information?

04:45PM  1    A.   That's what I believe I just read, yes.

04:45PM  2    Q.   And do you recall talking to Mr. Bongiovanni about the

04:45PM  3    fact that -- that R.K. was used for an attempted controlled

04:45PM  4    buy of T.S.?

04:45PM  5    A.   I don't recall the part of the conversation.

04:45PM  6    Q.   Don't recall that part of the conversation?

04:46PM  7         Do you remember testifying in a previous hearing back in

04:46PM  8    March of 2024?

04:46PM  9    A.   I do.

04:46PM  10        MR. SINGER:   I'll direct counsel's attention to

04:46PM  11   Exhibit 3595CW at 97, line 11.

04:46PM  12        BY MR. SINGER:

04:46PM  13   Q.   Do you remember giving the following responses to the

04:46PM  14   following questions:

04:46PM  15        "Question:   And in his response -- referring to

04:46PM  16   Mr. Bongiovanni -- was is that he knew that the person was

04:46PM  17   someone associated with someone they were trying to buy drugs

04:46PM  18   from when they had R.K. as a source, correct?

04:46PM  19        Answer:   Yes, I believe so."

04:46PM  20        Do you remember giving that answer, sir?

04:46PM  21   A.   Yes.

04:46PM  22   Q.   So, T.S., as explained to you by Mr. Bongiovanni, was

04:46PM  23   somebody who they were trying do a controlled buy through

04:46PM  24   R.K. through, correct?

04:46PM  25   A.   Yes.

04:46PM  1    Q.  And that was relating to the Ron Serio investigation,

04:46PM  2    correct?

04:46PM  3    A.  I'm not sure what it was related to.

04:46PM  4    Q.  Well, you know now, correct?

04:46PM  5    A.  Okay.

04:47PM  6    Q.  I'm asking you.  You know now?

04:47PM  7    A.  I don't know much -- I don't really know anything about

04:47PM  8    the Ron Serio investigation.

04:47PM  9    Q.  You just don't know?

04:47PM  10   A.  I never was a part of it.

04:47PM  11   Q.  So, kind of fast forwarding back to June of 2019, you sit

04:47PM  12   down with Mr. Bongiovanni again at his house, correct?

04:47PM  13   A.  Yes.

04:47PM  14   Q.  And that's after the SWAT team entered and cleared the

04:47PM  15   house?

04:47PM  16   A.  Yes, sir.

04:47PM  17   Q.  After the flash bang was let off, correct?

04:47PM  18   A.  Yes.

04:47PM  19   Q.  After he's placed in handcuffs, correct?

04:47PM  20   A.  I don't know if he was placed in handcuffs, I wasn't part

04:47PM  21   of that.

04:47PM  22   Q.  Were you down the street like Agent Ryan waiting for the

04:47PM  23   SWAT team to get finished clearing the house?

04:47PM  24       I'm sorry you I didn't hear your answer on that.

04:47PM  25   A.  Yes.

USA v Bongiovanni - Carpenter - Singer/Cross - 9/23/24
147

04:47PM    1    Q.  Thank you.  So you sit down and talk to him, and the

04:47PM    2    topic of Ron Serio comes up, correct?

04:48PM    3    A.  Correct.

04:48PM    4    Q.  And one of things that happens was that Mr. Bongiovanni

04:48PM    5    pointed to you and said, you know, I know that's the focus of

04:48PM    6    your investigation in some way, because we talked about it in

04:48PM    7    March of 2019, correct?

04:48PM    8    A.  Yes.

04:48PM    9    Q.  And, so, you testified that that just didn't seem

04:48PM    10   correct, right?

04:48PM    11   A.  Yes.

04:48PM    12   Q.  Based on the fact that you did not use the name Ron Serio

04:48PM    13   back in March of 2019?

04:48PM    14   A.  Correct.

04:48PM    15   Q.  But you would agree with me that you did use the name

04:48PM    16   T.S., correct?

04:48PM    17   A.  I did.

04:48PM    18   Q.  And Mr. Bongiovanni is the case agent on the Ron Serio

04:48PM    19   investigation, correct?

04:48PM    20   A.  I believe so, yes.

04:48PM    21   Q.  And I know that you don't know much about the case, but

04:48PM    22   safe to say if he's the case agent, he's going to know a lot

04:48PM    23   about the case?

04:48PM    24   A.  I hope so.

04:48PM    25   Q.  And so if you drop names that are relevant to the case,

04:48PM   1   that's going to alert him to what's going on in the

04:48PM   2   investigation, correct?

04:48PM   3   A.   Drop a name, yes.

04:48PM   4   Q.   And back in March of 2019, you said that your focus was I

04:49PM   5   want to learn information about Peter Gerace --

04:49PM   6   A.   Um-hum.

04:49PM   7   Q.   -- and your with relationship him, correct?

04:49PM   8   A.   Yes.

04:49PM   9   Q.   And I also want to talk to you about the racial comments

04:49PM   10  that Tony Casullo allege you made, right?

04:49PM   11  A.   Yes.

04:49PM   12  Q.   But then you also start talking about other names that

04:49PM   13  Curtis Ryan gave you, correct?

04:49PM   14  A.   Yes, sir.

04:49PM   15  Q.   And one of those names being T.S.?

04:49PM   16  A.   Correct.

04:49PM   17  Q.   And you know you may not know 100 percent, but you'd

04:49PM   18  agree with me that there's some relationship that T.S. has to

04:49PM   19  the Ron Serio investigation, right?

04:49PM   20  A.   I believe so.  I can't say for certain.

04:49PM   21  Q.   All right.  And as far as the June 2019 interview is

04:49PM   22  concerned, so, you testified on direct that you believe that

04:49PM   23  Agent Bongiovanni at that point in time was calm during the

04:49PM   24  interview; is that right?

04:49PM   25  A.   Yes.

USA v Bongiovanni - Carpenter - Singer/Cross - 9/23/24
149

04:49PM   1    Q.  And that's just after the house gets raided by a bunch of

04:49PM   2    tactical officers, correct?

04:49PM   3    A.  Yes.

04:49PM   4    Q.  Right after the flash bang was used, correct?

04:49PM   5    A.  I wouldn't say right after, but after.

04:49PM   6    Q.  After for some period of time, correct?

04:49PM   7    A.  Yes.

04:49PM   8    Q.  But you would agree with me that the context of the

04:50PM   9    interview was much different than the one back in March of

04:50PM  10    2019, right?

04:50PM  11    A.  Yes, sir.

04:50PM  12    Q.  There was no invitation to this particular interview,

04:50PM  13    correct?

04:50PM  14    A.  There was.

04:50PM  15    Q.  Well, did you call him up in advance and say, hey, Joe,

04:50PM  16    would you mind meeting up with me again?

04:50PM  17    A.  He was asked if he wanted to have a voluntary interview

04:50PM  18    with us in June.

04:50PM  19    Q.  And what I asked you was did you extend an invitation in

04:50PM  20    advance and say, hey, would you mind coming down and speaking

04:50PM  21    with me about this situation?

04:50PM  22    A.  No.

04:50PM  23    Q.  So you didn't do that, right?

04:50PM  24    A.  No.

04:50PM  25    Q.  You didn't say, hey, it's purely voluntary for you to

04:50PM 1    kind of sit down and do this.

04:50PM 2    A.  We did.

04:50PM 3    Q.  Talked to him at that morning and time about that?

04:50PM 4    A.  He knew it was voluntary, yes.

04:50PM 5    Q.  Okay.  And you talked about Frank Parisi is somebody who

04:50PM 6    came up; do you remember that, sir?

04:50PM 7    A.  Yes.

04:50PM 8    Q.  And it was somebody who was discussed inside this June

04:50PM 9    2019 interview, correct?

04:50PM 10   A.  Yes.

04:50PM 11   Q.  And you talked about the particular number that Frank

04:50PM 12   Parisi had, correct?

04:51PM 13   A.  Yes.

04:51PM 14        MR. SINGER:  And Ms. Champoux, can we bring up

04:51PM 15   Government Exhibit 358A, please?  And can we do a search for

04:51PM 16   481-8111.

04:51PM 17        MS. CHALBECK:  Yeah, you can't do that in the

04:51PM 18   submarked.

04:51PM 19        MR. SINGER:  I'm sorry.  I can do it on my copy.

04:51PM 20        MR. COOPER:  You have to go to the PDF.

04:51PM 21        BY MR. SINGER:

04:51PM 22   Q.  Don't worry, we don't need to do that.

04:51PM 23        So you talked about this one particular call happening in

04:51PM 24   the March 2014 timeframe?

04:51PM 25   A.  Yes.

04:51PM  1    Q.  This is the four-minute call that was incoming to Joe

04:51PM  2    Bongiovanni, correct?

04:51PM  3    A.  Yes.

04:51PM  4    Q.  But you've also reviewed the records of the phone calls

04:51PM  5    between Mr. Bongiovanni and Mr. Parisi moving forward,

04:51PM  6    correct?

04:51PM  7    A.  I did not review all those records, correct.

04:51PM  8    Q.  Do you have any reason to disagree that that's the only

04:51PM  9    phone call in the records?

04:51PM  10   A.  I don't have any information other than that one phone

04:52PM  11   call.

04:52PM  12   Q.  So you didn't look?

04:52PM  13   A.  Correct.

04:52PM  14        **MR. SINGER:**  May I just have a minute, Judge?

04:52PM  15        **THE COURT:**  Sure.

04:52PM  16        **MR. SINGER:**  Thank you, Agent Carpenter.  And thanks

04:52PM  17   for being a narrator today.  I appreciate it.

04:52PM  18        **THE WITNESS:**  Want my book on tape?

04:52PM  19        **THE COURT:**  Any redirect?

04:52PM  20        **MS. CHALBECK:**  Yes, Your Honor.

04:52PM  21

04:52PM  22            **REDIRECT EXAMINATION BY MS. CHALBECK:**

04:53PM  23   Q.  Just now on cross-examination, you were asked questions

04:53PM  24   regarding the June 9th, 2019 interview; do you recall

04:53PM  25   generally that topic?

04:53PM    1    A.   Yes.

04:53PM    2    Q.   And I think specifically Mr. Singer asked you if prior to

04:53PM    3    that interview, you called Mr. Bongiovanni up and said, hey,

04:53PM    4    do you want to sit for a voluntary interview?  Do you recall

04:53PM    5    being asked that question?

04:53PM    6    A.   Yes.

04:53PM    7    Q.   When law enforcement is investigating a criminal target

04:53PM    8    and they're preparing to execute a search warrant, do they

04:53PM    9    tip the target of the search warrant off before they execute

04:53PM   10    it?

04:53PM   11    A.   No.

04:53PM   12    Q.   Why is that?

04:53PM   13    A.   So that the search warrant would be a surprise in order

04:53PM   14    to preserve any evidence and prevent the destruction of if.

04:53PM   15    Q.   And speaking of evidence, when law enforcement searched

04:53PM   16    this defendant's home, did they find the box containing the

04:53PM   17    Ron Serio file in his basement?

04:54PM   18    A.   Yes.

04:54PM   19    Q.   Is that why you didn't call him up beforehand and say,

04:54PM   20    hey, do you want to have an interview on this date?

04:54PM   21    A.   Yes.

04:54PM   22    Q.   I'm going to go back to the March 29, 2019 interview.

04:54PM   23    You were asked questions on cross-examination about whether

04:54PM   24    Mr. Bongiovanni, or whether you asked Mr. Bongiovanni if he

04:54PM   25    had ever seen Peter Gerace consume narcotics or whether he

04:54PM    1    had ever seen Peter Gerace with narcotics; do you recall

04:54PM    2    being asked that question?

04:54PM    3    A.  Yes.

04:54PM    4    Q.  Can someone consume narcotics if they don't -- if they're

04:54PM    5    not with narcotics?

04:54PM    6    A.  No.

04:54PM    7    Q.  Are your notes, like, a shorthand to help you remember

04:54PM    8    what someone says?

04:54PM    9    A.  Yes.

04:54PM    10   Q.  Did Mr. Bongiovanni say that he did not see Peter Gerace

04:55PM    11   consume narcotics?

04:55PM    12   A.  To my memory, that's correct.

04:55PM    13   Q.  You were also asked questions on cross-examination about

04:55PM    14   photos that Mr. Bongiovanni was in with Peter Gerace; do you

04:55PM    15   recall being asked those questions?

04:55PM    16   A.  Yes.

04:55PM    17   Q.  And I think specifically Mr. Singer asked you about

04:55PM    18   Government Exhibit -- I think it was 426-1, which is a 2005

04:55PM    19   aerial photograph, and 490A from 2011.  Do you recall being

04:55PM    20   asked those questions?

04:55PM    21   A.  The Las Vegas photograph?

04:55PM    22   Q.  Yes.

04:55PM    23   A.  Correct, I recall.

04:55PM    24            MS. CHALBECK:  Ms. Champoux, can we pull up

04:55PM    25   Government Exhibit 127.

04:55PM   1          **BY MS. CHALBECK:**

04:55PM   2    Q.   I think Mr. Singer was asking you about whether those

04:55PM   3    photographs that I just referenced were, like, far back in

04:55PM   4    time; do you recall being asked that?

04:55PM   5    A.   Yes.

04:55PM   6    Q.   Did Mr. Bongiovanni ever tell you in any of your

04:55PM   7    conversations with him about this photograph with him and

04:55PM   8    Peter Gerace from 2018?

04:55PM   9    A.   No.

04:56PM  10    Q.   Is 2018 closer in time to 2019 than 2011?

04:56PM  11    A.   Yes.

04:56PM  12    Q.   Not a lot of distance there temporally; is that fair?

04:56PM  13    A.   Correct.

04:56PM  14    Q.   You were also asked on cross-examination, and this was in

04:56PM  15    reference to Government Exhibit 310D about questions that

04:56PM  16    Peter Gerace would ask the defendant, and some questions that

04:56PM  17    the defendant would ask to Peter Gerace; do you recall being

04:56PM  18    asked those questions?

04:56PM  19    A.   I'm sorry, yeah.

04:56PM  20          **MS. CHALBECK:**  Ms. Champoux, can we please pull up

04:56PM  21    310D, as in David, and go to page 42.

04:56PM  22          **BY MS. CHALBECK:**

04:56PM  23    Q.   Mr. Carpenter, on May 4th, 2017, do you see like an

04:57PM  24    incoming audio attachment?

04:57PM  25    A.   Yes.

04:57PM  1    Q.  Excuse me, an audio attachment in this?

04:57PM  2    A.  I do.

04:57PM  3          **MS. CHALBECK:**  Ms. Champoux, can we pull up

04:57PM  4    Government Exhibit 311?  Can we play that, Ms. Champoux?

04:57PM  5          (Audio was played.)

04:57PM  6          **MS. CHALBECK:**  Thank you, Ms. Champoux.

04:57PM  7          **BY MS. CHALBECK:**

04:57PM  8    Q.  Mr. Carpenter, were you able to hear that Peter Gerace

04:57PM  9    asked this defendant about how law enforcement could track a

04:58PM  10   drug dealer's TracFone?

04:58PM  11   A.  Yes.

04:58PM  12   Q.  Is that an example of the kinds of questions that Peter

04:58PM  13   Gerace would ask him?

04:58PM  14   A.  Yes.

04:58PM  15         **MS. CHALBECK:**  And, Ms. Champoux, can we go back to

04:58PM  16   Government Exhibit 310D, to page 42 again.

04:58PM  17         Could we scroll down, maybe it's page 43.

04:58PM  18         May I have one moment, Your Honor?

04:58PM  19         **THE COURT:**  Sure.

04:58PM  20         **MS. CHALBECK:**  Thank you, Ms. Champoux.

04:58PM  21         **BY MS. CHALBECK:**

04:58PM  22   Q.  So we zoomed into the text message from May 4, 2017.  Do

04:59PM  23   you see a response that Mr. Bongiovanni gave to Peter Gerace

04:59PM  24   in answering his question?

04:59PM  25   A.  I do.

04:59PM  1   Q.  Please read that into the record, Mr. Carpenter.

04:59PM  2   A.  Yes.  But you would need a warrant to get a ping order.

04:59PM  3   Q.  I think earlier you had testified that one of the objects

04:59PM  4   of the investigation was to determine if this defendant

04:59PM  5   provided Peter Gerace law-enforcement sensitive information;

04:59PM  6   is that correct?

04:59PM  7   A.  Yes.

04:59PM  8   Q.  Is this an example of the defendant providing Peter

04:59PM  9   Gerace law-enforcement sensitive information?

04:59PM  10  A.  Yes.

04:59PM  11          **MS. CHALBECK:**  Thank you, Ms. Champoux.

04:59PM  12          **BY MS. CHALBECK:**

04:59PM  13  Q.  Elsewhere in Government Exhibit 310D, on

04:59PM  14  cross-examination you were asked about the gift that Peter

04:59PM  15  Gerace references in a text message; do you recall being

04:59PM  16  asked questions about that?

04:59PM  17  A.  Yes.

04:59PM  18  Q.  Do you have any idea what that gift is that Peter Gerace

04:59PM  19  was referencing?

05:00PM  20  A.  No.

05:00PM  21          **MS. CHALBECK:**  Ms. Champoux, can we please pull up

05:00PM  22  Government Exhibit 98.  And can we please zoom in on the

05:00PM  23  second paragraph.

05:00PM  24          **BY MS. CHALBECK:**

05:00PM  25  Q.  Mr. Carpenter, on cross-examination, you were asked

05:00PM    1    questions about what the defendant said in this memorandum

05:00PM    2    regarding his telling of a phone call he had with Peter

05:00PM    3    Gerace; do you recall being asked those questions?

05:00PM    4    A.  Yes.

05:00PM    5    Q.  Do you have any idea if a single word of this story is

05:00PM    6    true?

05:00PM    7    A.  I do not.

05:00PM    8    Q.  Pivoting back to your March 29th interview, you were

05:01PM    9    asked on cross-examination about whether you had clarified to

05:01PM    10   the defendant what you meant when you asked him if he had

05:01PM    11   ever initiated contact with Peter Gerace; do you recall being

05:01PM    12   asked that question?

05:01PM    13   A.  Yes.

05:01PM    14   Q.  At the time that you interviewed this defendant, did you

05:01PM    15   feel like you needed a dictionary to explain what initiated

05:01PM    16   contact meant?

05:01PM    17   A.  No.

05:01PM    18   Q.  You were also asked on cross-examination questions about

05:01PM    19   what you meant or what the defendant meant by close friend.

05:01PM    20   What those terms mean; do you recall being asked questions

05:02PM    21   about that?

05:02PM    22   A.  Yes.

05:02PM    23   Q.  And I think one of the series of questions Mr. Singer

05:02PM    24   asked you was whether someone being a suck-up to a member of

05:02PM    25   law enforcement might be a reason why that law enforcement

05:02PM    1    officer would try to keep some distance between themselves

05:02PM    2    and that other person; do you recall that?

05:02PM    3    A.   Yes.

05:02PM    4    Q.   Kind of in that same line of hypothetical, is complaining

05:02PM    5    about your wife consistent with close friendship?

05:02PM    6    A.   I only complain about mine to close friends.

05:02PM    7    Q.   Is that consistent or inconsistent with keeping someone

05:02PM    8    at an arms length?

05:02PM    9    A.   I'm not sure -- I'm not sure of the --

05:02PM   10    Q.   That was a badly -- a poorly-phrased question.  I'll ask

05:02PM   11    again, or I'll try.

05:03PM   12        Is complaining about one's spouse consistent or

05:03PM   13    inconsistent with keeping someone at arms length?

05:03PM   14    A.   That topic tends to build trust in a relationship, so

05:03PM   15    it's opposite of keeping somebody at arms length.

05:03PM   16    Q.   You were also asked on cross-examination questions about

05:03PM   17    the timeline that took for your supervisor to approve the

05:03PM   18    memorandum of investigation that you authored in relation to

05:03PM   19    that March 29th interview; do you recall being asked those

05:03PM   20    questions?

05:03PM   21    A.   Yes.

05:03PM   22    Q.   To be clear, did you write and draft the memorandum of

05:03PM   23    investigation within a handful of days of your interview with

05:03PM   24    this defendant?

05:03PM   25    A.   Yes.

05:03PM   1   Q.   Okay.   And it just took a while for it to be approved by

05:03PM   2   a supervisor?

05:03PM   3   A.   Correct.

05:03PM   4   Q.   You were also asked, I think, a series of questions about

05:04PM   5   DARTS.

05:04PM   6   A.   Yes.

05:04PM   7   Q.   Do you recall being asked questions about DARTS?

05:04PM   8   A.   Yes.

05:04PM   9   Q.   I think one of the specific questions you were asked was

05:04PM   10  whether there was any record of this defendant searching

05:04PM   11  DARTS, like, as a -- DARTS is a search engine; do you recall

05:04PM   12  being asked that?

05:04PM   13  A.   Yes.

05:04PM   14  Q.   Do you even know if DARTS is searchable?

05:04PM   15  A.   I do not.

05:04PM   16  Q.   You've never been a DEA agent, right?

05:04PM   17  A.   Correct.

05:04PM   18  Q.   Have you even ever used DARTS?

05:04PM   19  A.   No.

05:04PM   20  Q.   Who would know more about DARTS, you or Inspector Francis

05:04PM   21  DiCarlo with the DEA?

05:04PM   22  A.   Mr. DiCarlo.

05:04PM   23  Q.   Similarly, if the defendant had -- withdrawn.

05:05PM   24       You were asked questions on cross-examination about

05:05PM   25  whether this defendant did something specific with DARTS; do

05:05PM    1    you recall that?

05:05PM    2    A.  Yes.

05:05PM    3    Q.  If the defendant had intel analysts putting telephone

05:05PM    4    numbers into DARTS, and those intel analysts said putting

05:05PM    5    this telephone number in per S.A. Bongiovanni's instructions,

05:05PM    6    would you necessarily have seen that on your search?

05:05PM    7            MR. SINGER:  Objection.

05:05PM    8            Actually, I'll withdraw it, Judge.  I'm sorry.

05:05PM    9            BY MS. CHALBECK:

05:05PM    10    Q.  You can answer the question.

05:05PM    11    A.  It relates to Bongiovanni's -- the defendant's use of

05:05PM    12    DARTS?  No, it would not have come up.

05:05PM    13    Q.  You were also asked questions on cross-examination about

05:06PM    14    T.S.; do you recall being asked that?

05:06PM    15    A.  Yes.

05:06PM    16    Q.  And I think Mr. Singer showed you T.S.'s confidential

05:06PM    17    informant, like, paperwork; do you recall that?

05:06PM    18    A.  Yes.

05:06PM    19    Q.  And I think the case agent or the special agent who

05:06PM    20    worked with T.S. was someone by the name of Mike Hill; do you

05:06PM    21    recall that?

05:06PM    22    A.  Yes.

05:06PM    23    Q.  Do you know that Mike Hill worked closely with this

05:06PM    24    defendant?

05:06PM    25    A.  No.

Case 1:19-cr-00227-LJV-MJR    Document 1325    Filed 10/27/24    Page 161 of 172
USA v Bongiovanni - Carpenter - Chalbeck/Redirect - 9/23/24

161

05:06PM    1    Q.  You were also asked questions on cross-examination about

05:06PM    2    a memorandum that this defendant authored regarding Special

05:06PM    3    Agent Tony Casullo and his brother-in-law, Phil Domiano; do

05:07PM    4    you recall being asked those questions?

05:07PM    5    A.  Yes.

05:07PM    6    Q.  And I think that memorandum contained a series of

05:07PM    7    photographs about Phil Domiano and Tony Casullo; do you

05:07PM    8    recall reading that and describing it to the jury?

05:07PM    9    A.  Yes.

05:07PM   10    Q.  Did this defendant ever produce a memorandum containing

05:07PM   11    photographs of him and Peter Gerace?

05:07PM   12    A.  No.

05:07PM   13    Q.  So those three photographs that we've seen during your

05:07PM   14    testimony today, you didn't see those in a memorandum

05:07PM   15    authored by this defendant when he was talking about his

05:07PM   16    relationship with Peter Gerace?

05:07PM   17    A.  Correct.

05:07PM   18    Q.  Speaking of that memorandum regarding Tony Casullo, in it

05:07PM   19    the defendant denies using racial slurs; do you recall seeing

05:07PM   20    that in the memorandum?

05:08PM   21    A.  Yes.

05:08PM   22    Q.  Did this defendant also deny ever initiating contact with

05:08PM   23    Peter Gerace?

05:08PM   24    A.  He denied ever initiating contact with Peter Gerace.

05:08PM   25         **MS. CHALBECK:**  I don't have any further redirect,

05:08PM  1  Your Honor.

05:08PM  2              **THE COURT:**  Anything more, Mr. Singer?

05:08PM  3

05:08PM  4              **RECROSS-EXAMINATION BY MR. SINGER:**

05:08PM  5  Q.  Do you remember being asked by Ms. Chalbeck about whether

05:08PM  6  you tip off someone when you're doing a search warrant, sir?

05:08PM  7  A.  Yes, sir.

05:08PM  8  Q.  And the answer to that question was no?

05:08PM  9  A.  Correct.

05:08PM  10  Q.  But one of the things that do you after the search

05:08PM  11  warrant is you try to interview people, correct?

05:08PM  12  A.  Yes.

05:08PM  13  Q.  And one of the reasons why you do that is because they're

05:08PM  14  rattled, correct?

05:08PM  15  A.  No, because they're there.

05:08PM  16  Q.  So there's no tactic that goes into we'll open someone's

05:08PM  17  door in the middle of the morning, and then asking them to be

05:08PM  18  interviewed right after that?

05:08PM  19  A.  For interview tactic?  No.

05:08PM  20  Q.  That's not a police tactic, sir?

05:08PM  21  A.  As it relates for -- it's done, I don't know if it's an

05:08PM  22  effective one.

05:09PM  23  Q.  How many police interviews have you done after a search

05:09PM  24  warrant was executed?

05:09PM  25  A.  I can't recall offhand.

05:09PM    1    Q.  Are we talking about five or ten?  Or what do you think?

05:09PM    2    A.  Probably -- probably ten.  Tennish.  Somewhere like that,

05:09PM    3    yes.

05:09PM    4    Q.  And you've seen people after a warrant is executed in

05:09PM    5    that fashion, correct?

05:09PM    6    A.  After the fashion of Mr. Bongiovanni's?  No.

05:09PM    7    Q.  You've never seen a warrant executed like that one?

05:09PM    8    A.  No.

05:09PM    9    Q.  So that was the first time you've ever seen this?

05:09PM   10    A.  With -- the first time a flash bang was used, yes.

05:09PM   11    Q.  And you would agree with me that Agent Ryan is an

05:09PM   12    experienced law enforcement officer, correct?

05:09PM   13    A.  Yes.

05:09PM   14    Q.  More experienced than you at that point in time?

05:09PM   15    A.  Yes.

05:09PM   16    Q.  More experience with doing interviews right after that

05:09PM   17    type of search warrant is executed?

05:09PM   18    A.  I don't know how many he's done at that point after a

05:09PM   19    search warrant.

05:09PM   20    Q.  But more experienced than just the one that you did that

05:09PM   21    one particular day, correct?

05:09PM   22    A.  Yes.

05:09PM   23    Q.  With regard to the photo number 127 that the government

05:10PM   24    asked you about --

05:10PM   25         MR. SINGER:  Ms. Champoux, can we bring that up,

05:10PM    1    please?

05:10PM    2         **BY MR. SINGER:**

05:10PM    3    Q.  Do you remember being asked about this on redirect, sir?

05:10PM    4    A.  Yes.

05:10PM    5    Q.  So this particular photo, Ms. Chalbeck asked you whether

05:10PM    6    or not Mr. Bongiovanni ever brought this up during the

05:10PM    7    interview, right?

05:10PM    8    A.  Correct.

05:10PM    9    Q.  Did you ask him any specific questions about this

05:10PM   10    particular photograph, sir?

05:10PM   11    A.  No.

05:10PM   12    Q.  And one of the reasons why you didn't ask any questions

05:10PM   13    about that, because this came out of his cell phone text

05:10PM   14    messages, correct?

05:10PM   15    A.  I believe so, yes.

05:10PM   16    Q.  Which were not in your possession back at that time in

05:10PM   17    April of 2019, correct?

05:10PM   18    A.  March of 2019.

05:10PM   19    Q.  March of 2019?

05:10PM   20    A.  Correct.

05:10PM   21    Q.  All right.  That was the reason why you didn't ask him

05:10PM   22    about this particular photo, you didn't know about it,

05:10PM   23    correct?

05:10PM   24    A.  Correct.

05:10PM   25    Q.  But did you have any particular discussion about this one

05:10PM    1   date in June of 2018 that Mr. Bongiovanni and Mr. Gerace saw

05:10PM    2   each other?

05:10PM    3   A.  Is this -- probably some context to what one this one is.

05:11PM    4   Is the lake?  It was at the lake?

05:11PM    5   Q.  Yes.  You knew about it, correct?

05:11PM    6   A.  I knew they met up at the lake, yes.

05:11PM    7   Q.  And you knew about that because Government Exhibit 97,

05:11PM    8   which is the memorandum -- the first one that Mr. Bongiovanni

05:11PM    9   wrote, was right about this incident, correct?

05:11PM   10   A.  Yes.

05:11PM   11   Q.  He shared all the text messages about it, correct?

05:11PM   12   A.  He shared text messages, correct.

05:11PM   13   **MR. SINGER:**  Ms. Champoux, can we please bring this

05:11PM   14   one down, and bring up Government Exhibit 97 again.

05:11PM   15   **BY MR. SINGER:**

05:11PM   16   Q.  And so the text messages that follow this one page

05:11PM   17   memorandum --

05:11PM   18   **MR. SINGER:**  Start scrolling, Ms. Champoux, until we

05:11PM   19   get to page 9.

05:11PM   20   **BY MR. SINGER:**

05:11PM   21   Q.  -- they talk about what leads up to this meeting between

05:11PM   22   Gerace and Bongiovanni at Sunset Bay on June 30th of 2018?

05:11PM   23   A.  Yes.

05:11PM   24   Q.  And it talks about what they were talking about before it

05:11PM   25   happened, correct?

| | | |
|---|---|---|
| 05:11PM | 1 | A.  Yes. |
| 05:11PM | 2 | Q.  And when we get to, you know, you reviewed all these |
| 05:11PM | 3 | different messages, right? |
| 05:11PM | 4 | A.  Yes. |
| 05:11PM | 5 | Q.  And they're talking about traffic and concerts that are |
| 05:12PM | 6 | going on, correct? |
| 05:12PM | 7 | A.  Correct. |
| 05:12PM | 8 | Q.  But when we get to page 9 of this particular exhibit, |
| 05:12PM | 9 | Peter Gerace up at the top says I'm thinking about taking |
| 05:12PM | 10 | them down, referring to the girls he's with, to RiverWorks. |
| 05:12PM | 11 | Last time I was there was with you and Lindsay.  Then he |
| 05:12PM | 12 | states, went to the Dock of the Bay, remember that?  Helped |
| 05:12PM | 13 | Lindsay through the parking lot.  You read that, correct? |
| 05:12PM | 14 | A.  Yes. |
| 05:12PM | 15 | Q.  And then do you see a response from Mr. Bongiovanni |
| 05:12PM | 16 | saying, yes, I do.  Have fun.  Be safe, correct? |
| 05:12PM | 17 | A.  Correct. |
| 05:12PM | 18 | Q.  So at that point in time, Mr. Bongiovanni doesn't think |
| 05:12PM | 19 | that Peter Gerace is coming, correct? |
| 05:12PM | 20 | **MS. CHALBECK:**  Objection. |
| 05:12PM | 21 | **THE COURT:**  Sustained. |
| 05:12PM | 22 | **BY MR. SINGER:** |
| 05:12PM | 23 | Q.  Did you ask any particular questions about this one day |
| 05:12PM | 24 | in the meeting that you had? |
| 05:12PM | 25 | A.  No. |

05:12PM    1    Q.  Never came up in the interview in March?

05:12PM    2    A.  No.

05:12PM    3    Q.  But you're aware the memorandum is written about it,

05:12PM    4    correct?

05:12PM    5    A.  Correct.

05:12PM    6    Q.  You could have asked?

05:12PM    7    A.  I could have.

05:12PM    8    Q.  But you never did?

05:12PM    9    A.  Correct.

05:12PM   10    Q.  And since that conversation never came up as a topic,

05:12PM   11    Mr. Bongiovanni didn't raise that with you, correct?

05:12PM   12    A.  He had the opportunity to explain that when he was

05:13PM   13    explaining his friendship with him, yes.

05:13PM   14    Q.  But you never asked him about that one particular day,

05:13PM   15    correct?

05:13PM   16    A.  Correct.

05:13PM   17    Q.  You were also asked about this one particular TracFone

05:13PM   18    and whether a warrant needs -- is needed for a ping order,

05:13PM   19    remember that?

05:13PM   20    A.  Yes.

05:13PM   21    Q.  And so Ms. Chalbeck phrased it as being law-enforcement

05:13PM   22    sensitive information; do you recall that, sir?

05:13PM   23    A.  Yes.

05:13PM   24    Q.  So, with regard to whether or not someone needs a

05:13PM   25    warrant, that's not really law-enforcement sensitive

05:13PM  1   information at all, correct?

05:13PM  2   A.   The context and the methods used to obtain information is

05:13PM  3   considered law-enforcement sensitive, yes.

05:13PM  4   Q.   Could Mr. Gerace go to an attorney and ask, hey, is there

05:13PM  5   a possibility that a warrant's required to get a ping order

05:13PM  6   on a phone?

05:13PM  7   A.   Yes.

05:13PM  8   Q.   I mean, you go to counsel inside of your office as an

05:13PM  9   investigator all the time, right --

05:13PM  10   A.   Yes.

05:13PM  11   Q.   -- to ask legal questions?

05:13PM  12   A.   Yes, sir.

05:13PM  13   Q.   Because lawyers generally have answers to questions on

05:13PM  14   legal matters, right?

05:13PM  15   A.   Yes.

05:13PM  16   Q.   And they generally know about the law of whether or not

05:13PM  17   the Fourth Amendment requires a warrant for particular things

05:14PM  18   to happen, correct?

05:14PM  19   A.   Correct.

05:14PM  20   Q.   So Mr. Gerace could have gotten the answer from a lawyer,

05:14PM  21   correct?

05:14PM  22   A.   Yes.

05:14PM  23   Q.   And I don't possess, as a lawyer, any type of specific

05:14PM  24   law-enforcement sensitive information, right?

05:14PM  25   A.   Through your career, I assume you have.

05:14PM    1    Q.  But when it comes to what the law says about warrants, I

05:14PM    2    can just look it up in a law book, right?

05:14PM    3    A.  Correct.

05:14PM    4    Q.  And that's not law-enforcement sensitive information if

05:14PM    5    it's published in the public, correct?

05:14PM    6    A.  Correct.

05:14PM    7    Q.  All right.  Mr. Gerace also could have Googled that

05:14PM    8    answer, right?

05:14PM    9    A.  Sure.

05:14PM   10    Q.  Did you ever Google a legal question before?

05:14PM   11    A.  I've Googled a lot of things, I don't know legal

05:14PM   12    questions.

05:14PM   13    Q.  Did you ever see someone Google a legal question before?

05:14PM   14    A.  Actually, I Googled law once.  I'll take that back.

05:14PM   15    Q.  Okay.  So you at least try Google legal questions

05:14PM   16    sometimes yourself, correct?

05:14PM   17    A.  Correct.

05:14PM   18    Q.  And that's another particular place that Mr. Gerace could

05:14PM   19    have found that answer out, correct?

05:14PM   20    A.  Yes.

05:14PM   21    Q.  And you're a police officer, right?

05:14PM   22    A.  Yes.

05:14PM   23    Q.  You've been in law enforcement for several years at this

05:14PM   24    point, correct?

05:14PM   25    A.  Yes.

| | | |
|---|---|---|
| 05:14PM | 1 | Q.  You have people who ask you legal questions as a law |
| 05:15PM | 2 | enforcement officer, correct? |
| 05:15PM | 3 | A.  Yes. |
| 05:15PM | 4 | Q.  So that's not outside the ordinary, right? |
| 05:15PM | 5 | A.  To be asked questions, no. |
| 05:15PM | 6 | **MR. SINGER:**  Okay.  Thank you.  I have no further |
| 05:15PM | 7 | questions, Judge. |
| 05:15PM | 8 | **THE COURT:**  Anything else? |
| 05:15PM | 9 | **MS. CHALBECK:**  Yes, briefly, Your Honor. |
| 05:15PM | 10 | |
| 05:15PM | 11 | **RE-REDIRECT EXAMINATION BY MS. CHALBECK:** |
| 05:15PM | 12 | Q.  Mr. Carpenter, in that recording that Peter Gerace sent |
| 05:15PM | 13 | to the defendant, was he asking whether warrants worked on |
| 05:15PM | 14 | TracFones? |
| 05:15PM | 15 | A.  I believe so. |
| 05:15PM | 16 | Q.  That's a little bit different than the questions that |
| 05:15PM | 17 | Mr. Singer was asking you just now, wouldn't you say? |
| 05:15PM | 18 | A.  Yes. |
| 05:15PM | 19 | Q.  Is the question whether warrants work on TracFones |
| 05:15PM | 20 | something that's law-enforcement sensitive? |
| 05:15PM | 21 | A.  Yes. |
| 05:15PM | 22 | Q.  Finally, you were asked on recross-examination questions |
| 05:15PM | 23 | about the nature of the interview on June 9th, 2019; do you |
| 05:16PM | 24 | recall that? |
| 05:16PM | 25 | A.  Yes. |

05:16PM   1   Q.  When you interviewed this defendant on March 29th, 2019,

05:16PM   2   so just a few months earlier, and you told him that was

05:16PM   3   voluntary, remind the jury what he said?

05:16PM   4   A.  He stated that as a law enforcement officer with 20-plus

05:16PM   5   years of experience, he knew his rights.

05:16PM   6           **MS. CHALBECK:**  That's it.

05:16PM   7           **MR. SINGER:**  Nothing further, Judge.

05:16PM   8           **THE COURT:**  You can step down.

05:16PM   9           **THE WITNESS:**  Thank you, Your Honor.

         10           (Witness excused at 5:16 p.m.)

         11           (Excerpt concluded at 5:16 p.m.)

         12           *    *    *    *    *    *    *

         13

         14                   **CERTIFICATE OF REPORTER**

         15

         16           In accordance with 28, U.S.C., 753(b), I

         17   certify that these original notes are a true and correct

         18   record of proceedings in the United States District Court for

         19   the Western District of New York on September 23, 2024.

         20

         21                    s/ Ann M. Sawyer
                               Ann M. Sawyer, FCRR, RPR, CRR
         22                    Official Court Reporter
                               U.S.D.C., W.D.N.Y.
         23

         24

         25

1

2                    **TRANSCRIPT INDEX**

3          **EXCERPT - EXAMINATION OF DAVID CARPENTER**

4                      **SEPTEMBER 23, 2024**

5

6

7    **W I T N E S S**                              **P A G E**

8    **D A V I D   C A R P E N T E R**            2

9      DIRECT EXAMINATION BY MS. CHALBECK:         2

10     CROSS-EXAMINATION BY MR. SINGER:            63

11     REDIRECT EXAMINATION BY MS. CHALBECK:       151

12     RECROSS-EXAMINATION BY MR. SINGER:          162

13     RE-REDIRECT EXAMINATION BY MS. CHALBECK:    170

14

15

16

17

18

19

20

21

22

23

24

25