09:23AM

1
                **UNITED STATES DISTRICT COURT**
                **WESTERN DISTRICT OF NEW YORK**

2

    _____

3
**UNITED STATES OF AMERICA,**

                          Case No. 1:19-cr-227

4
            Plaintiff,        (LJV)

v.

5
                          September 24, 2024

**JOSEPH BONGIOVANNI,**

6

            Defendant.

7
    _____

8
  **TRANSCRIPT EXCERPT - EXAMINATION OF ANTHONY CASULLO - DAY 1**

9
     **BEFORE THE HONORABLE LAWRENCE J. VILARDO**
          **UNITED STATES DISTRICT JUDGE**

10
**APPEARANCES:**           **TRINI E. ROSS, UNITED STATES ATTORNEY**
                   **BY: JOSEPH M. TRIPI, ESQ.**

11
                      **NICHOLAS T. COOPER, ESQ.**
                      **CASEY L. CHALBECK, ESQ.**

12
                  Assistant United States Attorneys
                  Federal Centre, 138 Delaware Avenue

13
                  Buffalo, New York 14202
                  For the Plaintiff

14

                  **SINGER LEGAL PLLC**

15
                  **BY: ROBERT CHARLES SINGER, ESQ.**
                  80 East Spring Street

16
                  Williamsville, New York 14221
                    And

17
                  **LAW OFFICES OF PARKER ROY MacKAY**
                  **BY: PARKER ROY MacKAY, ESQ.**

18
                  3110 Delaware Avenue
                  Kenmore, New York 14217

19
                    And
                  **OSBORN, REED & BURKE, LLP**

20
                  **BY: JOHN J. GILSENAN, ESQ.**
                  120 Allens Creek Road

21
                  Rochester, New York 14618
                  For the Defendant

22
**PRESENT:**            **BRIAN A. BURNS,** FBI Special Agent

23
                  **MARILYN K. HALLIDAY,** HSI Special Agent
                  **KAREN A. CHAMPOUX,** USA Paralegal

24

**LAW CLERK:**          **REBECCA FABIAN IZZO, ESQ.**

25

|   |   |
|---|---|
| 1 | <u>**COURT DEPUTY CLERK:**</u>    **COLLEEN M. DEMMA / JENNIFER L. VERNEN** |
| 2 | <u>**COURT REPORTER:**</u>         **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 3 |                                  Robert H. Jackson Federal Courthouse<br>2 Niagara Square |
| 4 |                                  Buffalo, New York  14202<br>Ann_Sawyer@nywd.uscourts.gov |
| 5 |   |
| 6 |                    *    *    *    *    *    *    * |
| 7 |   |
| 8 |           (Excerpt commenced at 10:35 a.m.) |

10:35AM   9    (Jury is present.)

10:35AM   10    **THE COURT:**  The government can call its next witness.

10:35AM   11    **MR. COOPER:**  Thank you, Judge, the government calls

10:35AM   12    Anthony Casullo.

10:35AM   13

10:35AM   14    **A N T H O N Y   C A S U L L O**, having been duly called and

10:36AM   15    sworn, testified as follows:

10:36AM   16    **MR. COOPER:**  Judge, what time are you looking to

10:36AM   17    break this morning?

10:36AM   18    **THE COURT:**  About 11, I guess.

10:36AM   19    **MR. COOPER:**  Great.  Thank you.

10:36AM   20

10:36AM   21                **DIRECT EXAMINATION BY MR. COOPER:**

10:36AM   22    Q.  Good morning, sir.

10:36AM   23    A.  Good morning.

10:36AM   24    Q.  Can you please introduce yourself to the jury?

10:36AM   25    A.  Yes, my name is Anthony Casullo.

| | | |
|---|---|---|
| 10:36AM | 1 | Q.  And where do you live currently? |
| 10:36AM | 2 | A.  I live in Clarence, New York. |
| 10:36AM | 3 | Q.  How long have you lived in this area? |
| 10:36AM | 4 | A.  I initially grew up in Buffalo, moved away, and came back |
| 10:36AM | 5 | to Buffalo about 2015.  Moved the family back before me |
| 10:36AM | 6 | around 2012, but I came back about 2015. |
| 10:36AM | 7 | Q.  Okay.  And we're going to get into that timeline in a |
| 10:36AM | 8 | little more detail later.  You said you grew up here? |
| 10:36AM | 9 | A.  That's correct. |
| 10:37AM | 10 | Q.  What neighborhood did you grow up in? |
| 10:37AM | 11 | A.  I grew up in Kenmore, New York. |
| 10:37AM | 12 | Q.  Where did you go to school at? |
| 10:37AM | 13 | A.  I went to high school at Saint Joseph's Collegiate |
| 10:37AM | 14 | Institute.  Saint Joe's. |
| 10:37AM | 15 | Q.  What year did you graduate from Saint Joe's Collegiate? |
| 10:37AM | 16 | A.  1985. |
| 10:37AM | 17 | Q.  Are you working right now? |
| 10:37AM | 18 | A.  I am currently working. |
| 10:37AM | 19 | Q.  What kind of work do you do? |
| 10:37AM | 20 | A.  My job is as -- the title is a subject matter expert for |
| 10:37AM | 21 | law enforcement investigations.  So what that means is I work |
| 10:37AM | 22 | for a U.S. contract company, it's a veteran-owned contract |
| 10:37AM | 23 | company.  And we have technical engineers that build border |
| 10:37AM | 24 | security systems for the government, foreign governments, |
| 10:37AM | 25 | through the State Department.  Our contract is through the |

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

10:37AM  1    State Department.  And I advise them on how to build border

10:37AM  2    security systems from an investigative perspective.

10:37AM  3    Q.  How long have you had that work for?

10:37AM  4    A.  Since August of 2023.  So a little over a year now.

10:37AM  5    Q.  What did you do before that?

10:37AM  6    A.  Before that, I had an approximately 33-year career in law

10:38AM  7    enforcement, working for several different agencies.

10:38AM  8    Q.  Let's kind of walk through that.  Where did your career

10:38AM  9    in law enforcement start, sir?

10:38AM  10   A.  So my first job in law enforcement started after I

10:38AM  11   graduated from Canisius College.  I worked for the

10:38AM  12   Immigration Service.  I was hired in December 1990 and worked

10:38AM  13   there for about six years.

10:38AM  14   Q.  After the Immigration Service for six years, what did you

10:38AM  15   do next?

10:38AM  16   A.  From there, I accepted a job as a police officer in the

10:38AM  17   Town of Tonawanda in the area where I grew up, Kenmore is

10:38AM  18   part of Tonawanda.  And I decided to leave the Immigration

10:38AM  19   Service and become a police officer.

10:38AM  20   Q.  How long were you a police officer in the Town of

10:38AM  21   Tonawanda?

10:38AM  22   A.  About three years.

10:38AM  23   Q.  What did you do after that?

10:38AM  24   A.  After that, I was hired as a special agent by the DEA,

10:38AM  25   Drug Enforcement Administration.

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24
5

10:38AM  1   Q.  Can you describe for the jury, give us like a general

10:38AM  2   timeframe, when did you get hired on by the DEA?

10:38AM  3   A.  Yeah.  I was hired on -- I believe I started the academy

10:38AM  4   summer of 1999.

10:39AM  5   Q.  You said you started the academy.  Is that like a formal

10:39AM  6   training?

10:39AM  7   A.  Right.  I went through formal training in Quantico,

10:39AM  8   Virginia.  It was four months.  Upon graduation, came back to

10:39AM  9   Buffalo, which is the office that I hired out of for a short

10:39AM  10  period of time, I think it was 30 days, and reported for my

10:39AM  11  first assignment in Las Vegas, Nevada.

10:39AM  12  Q.  Do you get to pick where you're assigned when you

10:39AM  13  graduate from the DEA academy?  How does that work?

10:39AM  14  A.  How it works, at least when I was hired, it may have

10:39AM  15  changed, but when I was hired, when they offer you the job,

10:39AM  16  you don't know where you're going to go.  So you accept the

10:39AM  17  job not knowing.

10:39AM  18      When I was at the academy, maybe week six, they give a

10:39AM  19  list to your class.  So if there's 50 students in a class,

10:39AM  20  there's a list of 50 slots.  And you, along with your other

10:39AM  21  students with no instructors, you all pick where you want to

10:39AM  22  go, and pick three choices.

10:40AM  23      So if everybody picks the same, then a lot of people

10:40AM  24  aren't going to get what they want.  They're doing that

10:40AM  25  intentionally to see how you work with your class, how you

10:40AM    1    get along.

10:40AM    2        I was lucky, we had a good class, a lot of good slots.

10:40AM    3    And so I got Las Vegas.

10:40AM    4    Q.  Was Las Vegas a spot you desired for a specific reason?

10:40AM    5    A.  Yes, my wife grew up in Buffalo, did not want to leave

10:40AM    6    Buffalo, was happy about the job but not about moving.  And

10:40AM    7    she had a brother that lived in Las Vegas and family that

10:40AM    8    lived there.  Well, the brother lived there and her parents

10:40AM    9    spent a lot of time there.

10:40AM   10        So I chose that as a first choice to make things good at

10:40AM   11    home, I guess, and it worked out.

10:40AM   12    Q.  Is Las Vegas a large office for the DEA?

10:40AM   13    A.  It's a district office.  So there's divisional offices

10:40AM   14    which are the biggest offices, and underneath the division

10:40AM   15    there's a district office and a resident office.  So Vegas is

10:41AM   16    a district office of the Los Angeles field division, so it's

10:41AM   17    a midsized office, one of the bigger midsized offices.

10:41AM   18    Q.  Okay.  And we've heard a lot about all the different

10:41AM   19    types of work that special agents at the DEA do, so we're

10:41AM   20    going to skip that section here and we're gonna move on.

10:41AM   21        How long were you at the Las Vegas district office for --

10:41AM   22    A.  Right.

10:41AM   23    Q.  -- the first time?

10:41AM   24    A.  So I was there twice.  Well, the first time, I reported

10:41AM   25    initially in December of 1999.  And I stayed there until -- I

10:41AM   1   believe it was June of 2002.

10:41AM   2   Q.  Okay.  And what caused you to transition out of the

10:41AM   3   Las Vegas office around June of 2002?

10:41AM   4   A.  So when I applied to DEA, which was around the time I was

10:41AM   5   a police officer, I think it was even before that.  I applied

10:41AM   6   to the FBI at the same timeframe.  I got hired at DEA first

10:41AM   7   when I was halfway through the process with FBI, was very

10:41AM   8   happy with DEA, they're both great agencies.

10:41AM   9       And then 9/11 happened while I was an agent in Las Vegas.

10:42AM  10   Like some other people I knew in law enforcement, I felt

10:42AM  11   strongly about what happened.  I wanted to work

10:42AM  12   counterterrorism investigations, and spoke to my wife about

10:42AM  13   it, said there might be a chance that we could move back

10:42AM  14   east.

10:42AM  15       So I contacted the FBI in Las Vegas, reopened my

10:42AM  16   application.  I was halfway through the process.  And I

10:42AM  17   actually applied with the FBI and CIA.  And I was hired by

10:42AM  18   FBI within six months.

10:42AM  19       I went back -- or, I went through the panel interview,

10:42AM  20   phase two testing, I believe within -- maybe six or seven

10:42AM  21   months I was hired by the FBI as a special agent.

10:42AM  22   Q.  Was kind of switching gears there and pursuing a career

10:42AM  23   with the FBI because you wanted to work on those

10:42AM  24   counterterrorism cases?

10:42AM  25   A.  Yes.

10:42AM  1   Q.  Did you expect there would be more of an opportunity for

10:42AM  2   you to do that at the FBI than at the DEA?

10:43AM  3   A.  Yeah.  FBI was the, still is today, the lead federal law

10:43AM  4   enforcement agency in terrorism investigations.  They run the

10:43AM  5   JTTF, which is the Joint Terrorism Task Force.  And they're

10:43AM  6   the lead agency in those investigations.

10:43AM  7   Q.  Did you ultimately go through Quantico and receive a

10:43AM  8   posting or a position at the FBI as a special agent?

10:43AM  9   A.  Yes.  Yes, I did.  I was hired and went to the academy

10:43AM  10  for the FBI, I believe it was June of 2002.  So, it wasn't

10:43AM  11  even a year after 9/11.

10:43AM  12      And so same thing with FBI, they don't tell you initially

10:43AM  13  where you're going, you find out when you're there.  Their

10:43AM  14  process is a little different.  You list all the field

10:43AM  15  divisions that they have from 1 all the way down to -- I

10:43AM  16  can't remember how many they had, maybe there were 30 of

10:43AM  17  them.  You rank them 1 through 30 with the choice that you

10:43AM  18  want most at the top.

10:43AM  19      I put Buffalo first, and I put the Charlotte field

10:43AM  20  division second, and I can't remember after that.  And I was

10:44AM  21  chosen for the Charlotte field division initially.

10:44AM  22      But they said if you have a prior law enforcement

10:44AM  23  experience, you can go to one of their smaller offices, which

10:44AM  24  is called a resident agency in the FBI, similar to the DEA

10:44AM  25  with resident office.

10:44AM    1     And that's exactly what happened to me.  About two weeks

10:44AM    2    later, I was informed that I was selected to go to

10:44AM    3    Fayetteville, North Carolina, which I knew nothing of.

10:44AM    4    Q.  Okay.  So you were initially told Charlotte, and then it

10:44AM    5    was switched to a smaller satellite office inside the

10:44AM    6    Charlotte area of operation called Fayetteville?

10:44AM    7    A.  Yeah.  It was within the Charlotte division, a resident

10:44AM    8    office.  It was a small office.  There were only other three

10:44AM    9    other agents that were there.

10:44AM   10     I was told because of my law enforcement background that

10:44AM   11    me and two other agents were going to small offices like

10:44AM   12    this.  And that's where I went.

10:44AM   13    Q.  Was that small, kind of, four-agent office in

10:44AM   14    Fayetteville a dramatic difference from what you had

10:44AM   15    experienced in the Las Vegas division in the DEA?

10:44AM   16    A.  Yeah.  It was -- it was very different.  With DEA, I was

10:45AM   17    in a larger group-type setting where I worked on a task

10:45AM   18    force, a gang task force, with officers from the Las Vegas

10:45AM   19    Police Department.  I believe three were ten of us at the

10:45AM   20    time in a group.  So you work closely in a group-type

10:45AM   21    environment working cases.

10:45AM   22     This with the FBI was pretty different.  There were just

10:45AM   23    three of us.  There was a fourth agent there doing something

10:45AM   24    different for headquarters.  So a lot of times, you were on

10:45AM   25    your own doing leads, following leads that were given,

10:45AM  1   working with local agencies.

10:45AM  2       There were a lot of bank robberies.  There was very

10:45AM  3   little terrorism work.  I think I covered one lead where I

10:45AM  4   interviewed a cook, an Iraqi cook at a Waffle House before

10:45AM  5   the U.S. invaded Iraq.  It wasn't what I thought in terms of

10:45AM  6   a task force that I was used to.

10:45AM  7   Q.  Did you immediately bring your family from Las Vegas out

10:45AM  8   to that Fayetteville office?

10:45AM  9   A.  No.  No.  I didn't -- told my wife don't sell the house

10:46AM  10  yet until we figure this out.  Fayetteville was a smaller

10:46AM  11  town.  It was just outside of Fort Bragg.  And I just said

10:46AM  12  let me see how this works out, because I had two years to go

10:46AM  13  back to DEA without having to reapply essentially, or go

10:46AM  14  through the academy.  And that's essentially what happened.

10:46AM  15  Q.  So you said you had two years to go back to DEA, so is it

10:46AM  16  fair to say that within the confines of the rules, if you

10:46AM  17  changed your mind you could have gone back any time within

10:46AM  18  two years?

10:46AM  19  A.  There was still a process involved but not an entire

10:46AM  20  process.  It was like a modified process, and one where I

10:46AM  21  wouldn't have to go back through the DEA academy all over

10:46AM  22  again.  But I had just gone through in '99, and then I had

10:46AM  23  gone through with the FBI in 2002.  So I wasn't gonna do it a

10:46AM  24  third time.  So I had that two-year window.

10:46AM  25  Q.  Did you ultimately decide to go back to DEA?

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

11

| | | |
|---|---|---|
| 10:46AM | 1 | A.  I did, yep. |
| 10:46AM | 2 | Q.  Where did you go back to? |
| 10:47AM | 3 | A.  So when I first reached out to DEA, it was supervisors |
| 10:47AM | 4 | that I had worked with, one in particular that was a |
| 10:47AM | 5 | supervisor in Las Vegas when I was on the task force.  He was |
| 10:47AM | 6 | at headquarters, and he was familiar with the people in |
| 10:47AM | 7 | Washington, which is where ultimately I'd be hired back from. |
| 10:47AM | 8 | And he told me that he knew the special agent in charge in |
| 10:47AM | 9 | LA, and that he had spoken to her, and that I would go back |
| 10:47AM | 10 | to Las Vegas once they were done processing the application. |
| 10:47AM | 11 | And that's what happened.  I went back to Vegas. |
| 10:47AM | 12 | Q.  On that second stretch in Vegas, how long did you stay |
| 10:47AM | 13 | there and work there for? |
| 10:47AM | 14 | A.  So I would have been back in Vegas, it would have been |
| 10:47AM | 15 | summer of 2003.  And then I stayed in Vegas until I believe |
| 10:47AM | 16 | it was December of 2013. |
| 10:47AM | 17 | Q.  So about ten years? |
| 10:47AM | 18 | A.  Yeah. |
| 10:47AM | 19 | Q.  Okay.  And eventually as your kids got older, were you |
| 10:48AM | 20 | hoping to come back to the Buffalo area? |
| 10:48AM | 21 | A.  So our plan initially was to come back to Buffalo the |
| 10:48AM | 22 | first opportunity we had.  But we decided to stay a little |
| 10:48AM | 23 | bit longer.  We -- we formed some roots there with friends |
| 10:48AM | 24 | and family and our kids growing up there, so we stayed there |
| 10:48AM | 25 | a while. |

Case 1:19-cr-00227-LJV-MJR    Document 1335    Filed 11/02/24    Page 12 of 261
USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

12

10:48AM    1    But at the end of the day, we still wanted to come back

10:48AM    2    home.  This is where I was from, my wife was from, and we

10:48AM    3    wanted our kids to go to school in New York State, which had

10:48AM    4    a much better education system.

10:48AM    5    And they were getting older, high school age, so that was

10:48AM    6    the time when I started applying to come back.

10:48AM    7    Q.  Okay.  And when you say applying to come back, was that

10:48AM    8    to come back to the New York field division generally?

10:48AM    9    A.  For me, it was -- you know, Buffalo was the goal, which

10:48AM   10    was part of the New York field division, and there were other

10:48AM   11    offices that they had offered me which I ultimately took.

10:48AM   12    Because at time when I wanted to come back to Buffalo,

10:48AM   13    there were no vacancies, they had a full office.  They were

10:49AM   14    waiting for someone to retire.

10:49AM   15    They offered me -- I believe it was Plattsburgh,

10:49AM   16    New York, then New York City, to get back into the field

10:49AM   17    division.  And I chose to go to New York City.

10:49AM   18    Q.  Were you -- was it represented to you that if you came

10:49AM   19    back to New York, once a spot opened in Buffalo you would be

10:49AM   20    able to transition there?

10:49AM   21    A.  So the same supervisor that knew the woman -- the agent

10:49AM   22    in charge in LA who was my first supervisor, knew the agent

10:49AM   23    in charge in New York.  Because he was an agent in charge in

10:49AM   24    San Diego, they all knew each other pretty well, that's the

10:49AM   25    way the agency works.  He had specifically spoken to the

10:49AM     1    agent in charge in New York City.

10:49AM     2        And they said have him come back, work in New York.  As

10:49AM     3    soon as there's a vacancy in Buffalo, we'll transfer him.

10:49AM     4    And that's exactly what happened.

10:49AM     5    Q.   Did you bring your family with you to New York City, or

10:49AM     6    what happened to them?

10:49AM     7    A.   I bought our house in Clarence in 2012.  And then still

10:49AM     8    wasn't sure -- still wasn't assigned to New York yet.  It was

10:50AM     9    back and forth about Buffalo, not being an opening in

10:50AM    10    Buffalo, so I decided to buy the house anyways.

10:50AM    11        So I spent a little time in Vegas while I had the house

10:50AM    12    in Buffalo and my family was in Buffalo.  And then went to

10:50AM    13    New York field division for almost two years, and then came

10:50AM    14    back.

10:50AM    15        So there was a timeframe where I had a house in Clarence,

10:50AM    16    New York, but lived in an apartment in New York City while I

10:50AM    17    worked until I was transferred back, and then just moved back

10:50AM    18    to our house.

10:50AM    19    Q.   During that timeframe when your family's living in the

10:50AM    20    house in Clarence and you're assigned to work in the City of

10:50AM    21    New York, did you make some trips back to Buffalo to kind of

10:50AM    22    visit with your family when you could?

10:50AM    23    A.   Yeah, I tried to come home as much as possible.  I had

10:50AM    24    four kids at home and a wife, so as much as I could, yeah.

10:50AM    25    Q.   Okay.  And we're going to cover this in more detail in a

| | | |
|---|---|---|
| 10:50AM | 1 | little bit, that topic of making trips home.  But generally, |
| 10:50AM | 2 | on those trips when you're coming back to Buffalo from |
| 10:50AM | 3 | New York City, did you get to meet and start interacting with |
| 10:50AM | 4 | some of the agents that worked in DEA Buffalo resident |
| 10:51AM | 5 | office? |
| 10:51AM | 6 | A.  When I came home -- |
| 10:51AM | 7 | Q.  When you were coming back to Buffalo kind of on these |
| 10:51AM | 8 | trips, did you meet or interact with any of the DEA Buffalo |
| 10:51AM | 9 | agents? |
| 10:51AM | 10 | A.  Not -- not so much then.  I mean, I had known a lot of |
| 10:51AM | 11 | the Buffalo agents from when I lived in Las Vegas, we'd come |
| 10:51AM | 12 | home for summers because my family still lived in Buffalo, my |
| 10:51AM | 13 | mother, my father, my sisters, nieces, nephews, things like |
| 10:51AM | 14 | that.  So we spent almost every summer in Buffalo.  It was |
| 10:51AM | 15 | during that timeframe that -- I had a close friend that was a |
| 10:51AM | 16 | classmate from the academy who worked in Buffalo, so there |
| 10:51AM | 17 | were times in the summer that I'd meet him out with other |
| 10:51AM | 18 | agents from Buffalo. |
| 10:51AM | 19 | Q.  Okay.  So I think I missed up my own timeline there.  So |
| 10:51AM | 20 | it's when you're working out in Vegas, but visiting Buffalo |
| 10:51AM | 21 | over the summers, that you met some of the Buffalo agents; is |
| 10:51AM | 22 | that correct? |
| 10:51AM | 23 | A.  Yeah, that's more accurate. |
| 10:51AM | 24 | Q.  Okay.  Did there come a time ultimately when you got that |
| 10:51AM | 25 | transfer you were promised back to the Buffalo resident |

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

15

| | | |
|---|---|---|
| 10:51AM | 1 | office? |
| 10:51AM | 2 | A.  Yes, I was eventually transferred back to Buffalo. |
| 10:51AM | 3 | Q.  Okay.  Are there a couple of different groups that you |
| 10:51AM | 4 | can be assigned to in the Buffalo resident office? |
| 10:51AM | 5 | A.  So at that time there were three groups.  I think there |
| 10:52AM | 6 | still are.  So they had them numbered, my number is D-57, |
| 10:52AM | 7 | D-58, and then a tactical diversion squad which worked more |
| 10:52AM | 8 | pharmaceutical-type cases.  And I was assigned group D-57. |
| 10:52AM | 9 | Q.  We've heard some discussion during the trial about the |
| 10:52AM | 10 | agent group and the task force group.  Does that sound |
| 10:52AM | 11 | familiar to you? |
| 10:52AM | 12 | A.  There is an agent group.  It's called -- it was called |
| 10:52AM | 13 | the agent group, D-57, because it was mostly agents, but |
| 10:52AM | 14 | there were task force officers on it as well.  So it was a |
| 10:52AM | 15 | mix of agents and some local police officers assigned to DEA. |
| 10:52AM | 16 | And then the official task force group is D-58, which has |
| 10:52AM | 17 | more task force officers and less agents. |
| 10:52AM | 18 | Q.  So when you initially came to the Buffalo resident |
| 10:52AM | 19 | office, you were in D-57, which is sometimes colloquially |
| 10:52AM | 20 | referred to as the agent group? |
| 10:52AM | 21 | A.  Yes. |
| 10:52AM | 22 | Q.  Okay.  While you worked at the DEA, what kinds of cases |
| 10:52AM | 23 | did you investigate? |
| 10:52AM | 24 | A.  During my whole career? |
| 10:52AM | 25 | Q.  During your whole career. |

10:53AM    1    A.    Yeah.  I worked a wide range of cases.  From street-level

10:53AM    2    gang narcotics cases with violent gang members to Mexican

10:53AM    3    drug-trafficking organizations that operate at the mid level,

10:53AM    4    to international cases where I traveled to Colombia, Panama,

10:53AM    5    Nicaragua, probably traveled overseas on nine occasions.  So

10:53AM    6    I worked them from top all the way to international cases.

10:53AM    7              **MR. COOPER:**  Judge, I know I'm a couple minutes

10:53AM    8    early, but I think this is a good time for me to break, if

10:53AM    9    you're --

10:53AM   10              **THE COURT:**  That's fine.

10:53AM   11              **MR. COOPER:**  Thank you.

10:53AM   12              **THE COURT:**  We'll take our morning break now.  Please

10:53AM   13    remember my instructions about not talking about the case even

10:53AM   14    with each other and not making up your mind.

10:53AM   15              See you back here in about 15 minutes or so.

10:53AM   16              (Jury excused at 10:53 a.m.)

10:54AM   17              **THE COURT:**  Anything for the record before we break?

10:54AM   18              **MR. COOPER:**  No, Your Honor.

10:54AM   19              **THE COURT:**  Anything?

10:54AM   20              **MR. SINGER:**  No, Your Honor.

10:54AM   21              **THE COURT:**  Okay.  We'll see you in about 15 minutes

10:54AM   22    or so.

10:54AM   23              (Off the record at 10:54 a.m.)

11:16AM   24              (Back on the record at 11:16 a.m.)

11:16AM   25              (Jury not present.)

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

| | | |
|---|---|---|
| 11:16AM | 1 | **THE CLERK:**  All rise. |
| 11:16AM | 2 | **THE COURT:**  Please be seated. |
| 11:16AM | 3 | **THE CLERK:**  We are back on the record for the |
| 11:16AM | 4 | continuation of the jury trial in case number 19-cr-227, |
| 11:16AM | 5 | United States of America versus Joseph Bongiovanni. |
| 11:16AM | 6 | All counsel and parties are present. |
| 11:16AM | 7 | **THE COURT:**  Ready to go. |
| 11:16AM | 8 | **MR. COOPER:**  Yes, Judge. |
| 11:16AM | 9 | **THE COURT:**  Anything from the defense? |
| 11:16AM | 10 | **MR. SINGER:**  No, sorry. |
| 11:16AM | 11 | **THE COURT:**  Great.  Okay.  Let's bring them in, |
| 11:16AM | 12 | please, Pat. |
| 11:16AM | 13 | And let's get our witness back. |
| 11:18AM | 14 | (Witness and Jury seated at 11:18 a.m.) |
| 11:18AM | 15 | **THE COURT:**  The record will reflect that all our |
| 11:18AM | 16 | jurors, again, are present. |
| 11:18AM | 17 | I remind the witness that he's still under oath. |
| 11:19AM | 18 | And you may continue, Mr. Cooper. |
| 11:19AM | 19 | **MR. COOPER:**  Thank you, Judge. |
| 11:19AM | 20 | **BY MR. COOPER:** |
| 11:19AM | 21 | Q.  You may have a seat.  Thank you. |
| 11:19AM | 22 | When we broke, I think we left off talking about the |
| 11:19AM | 23 | different types of investigations that you worked on at the |
| 11:19AM | 24 | DEA during the course of your career; is that right? |
| 11:19AM | 25 | A.  Correct. |

| | |
|---|---|
| 11:19AM | 1 |
| 11:19AM | 2 |
| 11:19AM | 3 |

11:19AM   1   Q.   Okay.  And I want to ask you specifically, at any point

11:19AM   2   during your career, did you get the opportunity to work on

11:19AM   3   organized crime cases?

11:19AM   4   A.   I did.

11:19AM   5   Q.   Okay.  And when was the first time that you got the

11:19AM   6   chance to work on an organized crime case?

11:19AM   7   A.   It was in Las Vegas, when I worked in Las Vegas.

11:19AM   8   Q.   Okay.  And can you just describe for the jury generally

11:19AM   9   how did that come up that you got the opportunity to start

11:19AM   10   working on an O.C. case?

11:19AM   11   A.   Sure.  So I think it was around 2004.  My supervisor in y

11:19AM   12   group at the time, he used to work in New York City before he

11:19AM   13   became a supervisor, and he had worked organized crime cases,

11:19AM   14   drug-related organized crime cases with DEA when he was in

11:19AM   15   New York City.

11:19AM   16       So when he came to Las Vegas, he still had an interest in

11:20AM   17   working those types of cases.  So that's how I initially

11:20AM   18   became involved.

11:20AM   19   Q.   When you initially became involved in working on those

11:20AM   20   cases, did you develop an interest for it?

11:20AM   21   A.   Oh, yeah.  Yeah.  I thought it was interesting.  It was

11:20AM   22   different than some of the other cases that I had worked in

11:20AM   23   Las Vegas, so, yes, I did find it interesting.

11:20AM   24   Q.   We're going to cover in some detail that topic a little

11:20AM   25   more.  But first, I want to ask you about the

| | | |
|---|---|---|
| 11:20AM | 1 | responsibilities that you have as a DEA special agent. |
| 11:20AM | 2 | When you become a DEA special agent, do you take an oath? |
| 11:20AM | 3 | A.  Yes, you do. |
| 11:20AM | 4 | Q.  Generally, what do you promise when you take that oath? |
| 11:20AM | 5 | MR. SINGER:  Objection as cumulative at this time. |
| 11:20AM | 6 | We've heard the same testimony from several witnesses. |
| 11:20AM | 7 | MR. COOPER:  Judge, I can come up on it and argue it. |
| 11:20AM | 8 | THE COURT:  Yeah, come on up. |
| 11:20AM | 9 | (Sidebar discussion held on the record.) |
| 11:21AM | 10 | MR. COOPER:  So, I think it's about a 30-second |
| 11:21AM | 11 | answer or less.  And the reason that I think it's important to |
| 11:21AM | 12 | have it come in through this witness is because it's not so |
| 11:21AM | 13 | much about whether the jury has heard the testimony, it's |
| 11:21AM | 14 | about what this witness's understanding of that oath is. |
| 11:21AM | 15 | And so it's -- this is a witness that's gonna be |
| 11:21AM | 16 | subjected to heavy attack.  He was subjected to heavy attack |
| 11:21AM | 17 | at the last trial.  And so I think it's appropriate for a |
| 11:21AM | 18 | 30-second answer to let him answer this. |
| 11:21AM | 19 | MR. SINGER:  And again, it's cumulative, Judge. |
| 11:21AM | 20 | We've heard it through six or seven witnesses at this time. |
| 11:21AM | 21 | Every single DEA witness cannot come up here and talk about |
| 11:21AM | 22 | the same -- |
| 11:21AM | 23 | THE COURT:  I think Mr. Cooper's given me a good |
| 11:21AM | 24 | reason why this witness should be allowed to testify or to |
| 11:21AM | 25 | talk about this. |

| | | |
|---|---|---|
| 11:21AM | 1 | **MR. COOPER:**  Thank you. |
| 11:21AM | 2 | (Sidebar discussion ended.) |
| 11:21AM | 3 | **THE COURT:**  The objection is overruled. |
| 11:21AM | 4 | **BY MR. COOPER:** |
| 11:21AM | 5 | Q.  Generally, what did you promise to do when you took that |
| 11:21AM | 6 | oath at the DEA? |
| 11:21AM | 7 | A.  Generally, to enforce the drug laws of the United States, |
| 11:21AM | 8 | to protect the United States and the U.S. Constitution from |
| 11:21AM | 9 | all enemies, foreign and abroad. |
| 11:22AM | 10 | Q.  Was there any part of that oath that told you that you |
| 11:22AM | 11 | should pick and choose who you investigate based on the color |
| 11:22AM | 12 | of their skin? |
| 11:22AM | 13 | A.  No, absolutely not. |
| 11:22AM | 14 | Q.  Was there a DEA policy that existed while you worked |
| 11:22AM | 15 | there about investigating people based on the color of their |
| 11:22AM | 16 | skin? |
| 11:22AM | 17 | A.  Yes, of course. |
| 11:22AM | 18 | Q.  What was that policy? |
| 11:22AM | 19 | A.  That that could not be a determining factor of who was |
| 11:22AM | 20 | gonna be involved in your investigation.  It couldn't be |
| 11:22AM | 21 | based on race. |
| 11:22AM | 22 | Q.  How about ethnicity, or where somebody's from?  Is that |
| 11:22AM | 23 | something that you're allowed to make the determining factor |
| 11:22AM | 24 | in whether or not to investigate someone? |
| 11:22AM | 25 | A.  No.  Absolutely not.  And it's been that way throughout |

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

11:22AM  1   my entire law enforcement career.  Wherever I've worked,

11:22AM  2   whether it was Immigration Service, the DEA, the FBI, I

11:22AM  3   worked at the State Attorney General's Office at the end of

11:22AM  4   my career, that's consistent throughout anybody I worked for.

11:22AM  5   Q.  You told us a moment ago that eventually you came back

11:22AM  6   and you were assigned to group D-57 in the Buffalo resident

11:22AM  7   office.  When did you return and start working in group D-57

11:23AM  8   at the Buffalo resident office?

11:23AM  9   A.  So I came back December of 2015.  I came back to Buffalo

11:23AM  10  and was assigned to D-57.

11:23AM  11  Q.  Do you know a person by the name of Joseph Bongiovanni?

11:23AM  12  A.  Yes, I do.

11:23AM  13  Q.  How do you know that person?

11:23AM  14  A.  I know -- I know him because we worked together in group

11:23AM  15  D-57 when I was an agent.

11:23AM  16  Q.  Is he in court today?

11:23AM  17  A.  Yes, he is.

11:23AM  18  Q.  Can you point him out and identify something he's wearing

11:23AM  19  for the record?

11:23AM  20  A.  He's wearing a gray suit and light blue tie, sitting

11:23AM  21  between his attorneys.

11:23AM  22        MR. COOPER:  For the record, the witness has

11:23AM  23  identified the defendant.

11:23AM  24        THE COURT:  It does.

11:23AM  25        MR. COOPER:  Thank you.

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 11:23AM  | 1  | **BY MR. COOPER:**                                           |
| 11:23AM  | 2  | Q.  How long did you work with the defendant at the DEA?     |
| 11:23AM  | 3  | A.  In general?  While I was in that group?  Or --           |
| 11:23AM  | 4  | Q.  The total time that you worked with, you know, with him  |
| 11:23AM  | 5  | at the DEA, regardless of whether you were in the same group |
| 11:23AM  | 6  | or not.                                                      |
| 11:23AM  | 7  | A.  Oh.  So I started in Buffalo in December of 2015, and I  |
| 11:24AM  | 8  | retired in March of 2022.                                    |
| 11:24AM  | 9  | Q.  Did he retire before you did?                            |
| 11:24AM  | 10 | A.  I believe so, yes.                                        |
| 11:24AM  | 11 | Q.  Okay.                                                     |
| 11:24AM  | 12 | A.  Yes.                                                      |
| 11:24AM  | 13 | Q.  So if the defendant retired in January or February of    |
| 11:24AM  | 14 | 2019, would your time working with him be from December of   |
| 11:24AM  | 15 | '15 when you arrived, until January or February of '19?      |
| 11:24AM  | 16 | A.  Yes.                                                      |
| 11:24AM  | 17 | Q.  Okay.  Three and a half or four years?                   |
| 11:24AM  | 18 | A.  Correct.                                                  |
| 11:24AM  | 19 | Q.  Okay.  When you first arrived in group D-57, was the     |
| 11:24AM  | 20 | defendant in that same group with you?                       |
| 11:24AM  | 21 | A.  Yes.                                                      |
| 11:24AM  | 22 | Q.  You mentioned earlier that there's three groups, D-57 and |
| 11:24AM  | 23 | D-58 are two of them.  What's the third group?               |
| 11:24AM  | 24 | A.  The third one is called a tactical diversion squad, TDS. |
| 11:24AM  | 25 | They primarily investigate the diversion of pharmaceutical   |

11:25AM    1    drugs, some cases that involve pharmacies, doctors, things

11:25AM    2    like that.

11:25AM    3    Q.   If an agent works in the pharmaceutical group or the

11:25AM    4    diversion group, as you've described it, do you know if they

11:25AM    5    still have access to DEA databases?

11:25AM    6    A.   Yeah.  It's the same as in other groups as far as what

11:25AM    7    they have access to.

11:25AM    8    Q.   Okay.  So if an agent was working in the diversion group,

11:25AM    9    could they still access on the deconfliction databases at the

11:25AM   10    DEA?

11:25AM   11    A.   Yes.  They can.  I think it's pretty much every system.

11:25AM   12    They may have even more access because of the types of cases.

11:25AM   13    But as me as an agent in an enforcement group, they have the

11:25AM   14    same access to things that I do.

11:25AM   15    Q.   Okay.  Did all those groups -- 57, and 58, and TDS

11:25AM   16    tactical diversion -- did they all work in the same office?

11:25AM   17    A.   It was the same building.  I believe I was on the fifth

11:25AM   18    floor with -- so 57 and 58 were on the same floor.  And the

11:25AM   19    TDS group just was a floor beneath us in the same building.

11:25AM   20    Q.   Can you describe for this jury your relationship with the

11:26AM   21    defendant when you first started working at the DEA Buffalo

11:26AM   22    resident office in December of 2015?

11:26AM   23    A.   Yeah.  It was fine.  We knew each other a little bit

11:26AM   24    before.  So it was -- it was fine.

11:26AM   25    Q.   You said "we knew each other a little bit before."  Can

```
11:26AM    1   you describe what you mean by that?
11:26AM    2   A.  So, those times when I mentioned I would come home in the
11:26AM    3   summer and see people from the Buffalo office, I met Joe at
11:26AM    4   least once, maybe twice, when I was out with friends from the
11:26AM    5   DEA Buffalo office while I was still working in Vegas.
11:26AM    6   Q.  Okay.  And so were those interactions generally like
11:26AM    7   social interactions?
11:26AM    8   A.  Yeah, just social interactions.  We were out.  And I
11:26AM    9   can't remember specifically what it was, I think -- I can't
11:26AM   10   remember, I think was one was a DEA party somewhere in
11:26AM   11   downtown Buffalo.
11:26AM   12   Q.  Once you came back to start working at the DEA Buffalo
11:26AM   13   resident office, did you ever work together with the
11:26AM   14   defendant on investigations?
11:26AM   15   A.  We did.  We did.  We were partners when I first came back
11:27AM   16   to Buffalo.
11:27AM   17   Q.  Did you get along with him at that time?
11:27AM   18   A.  Yes.
11:27AM   19   Q.  Did you have any negative feelings towards him at that
11:27AM   20   time?
11:27AM   21   A.  No, I did not.
11:27AM   22   Q.  Did that relationship that you had with the defendant
11:27AM   23   that you've just described, did that change over time?
11:27AM   24   A.  Yes, it did.  It did.
11:27AM   25   Q.  Without getting into the specifics right now, did that
```

11:27AM  1    relationship change because of some things this defendant

11:27AM  2    said to you?

11:27AM  3    A.  Yes, it did.

11:27AM  4    Q.  All right.  We're going to get there in a minute.

11:27AM  5        Sitting here today, Mr. Casullo, can you tell the jury

11:27AM  6    how you feel about the defendant today?

11:27AM  7    A.  I have -- I have no feelings.  I'm hollow inside.  I've

11:27AM  8    gone through a lot of feelings through this whole thing.

11:27AM  9    It's been very difficult.  But at this point, I have no

11:27AM  10   relationship with him whatsoever.  Just hollow inside.

11:28AM  11   Q.  I want to pivot now and talk about a person by the name

11:28AM  12   of Michael Masecchia.  Do you know that name?

11:28AM  13   A.  Yes, I do.

11:28AM  14   Q.  How do you know that name?

11:28AM  15   A.  I know that name from -- well, first, I had heard that

11:28AM  16   name growing up when I grew up in Kenmore/Tonawanda, when I

11:28AM  17   was in college and worked out at a gym called Fitness

11:28AM  18   Factory.  The guy who walked in and out, walked behind the

11:28AM  19   counter, meet with the owner, I remember asking someone I was

11:28AM  20   working out with, who is that guy?  And they said it was Mike

11:28AM  21   Masecchia.

11:28AM  22       I never met him, never spoke to him, but I had remembered

11:28AM  23   that.

11:28AM  24       And then fast forward to 2004, he became a target of our

11:28AM  25   investigation in Las Vegas.

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

26

11:28AM   1    Q.  So 2004, you were working in the Las Vegas district

11:28AM   2    office; is that correct?

11:28AM   3    A.  Yes.

11:28AM   4    Q.  And you said that Mike Masecchia became a target of an

11:28AM   5    investigation you had out there; is that correct?

11:28AM   6    A.  That's correct.

11:28AM   7    Q.  Can you describe generally what your investigation in

11:28AM   8    Las Vegas had to do with Mike Masecchia here in the Buffalo

11:29AM   9    area?

11:29AM   10   A.  Yes.  At the time, the information we had was that

11:29AM   11   Michael Masecchia was a school teacher in Buffalo, New York,

11:29AM   12   and that he was going to be moving to Las Vegas, and he was

11:29AM   13   going to be living in a house that was owned by one of the

11:29AM   14   targets that we were looking at.

11:29AM   15        We were looking at a group of people.  Most of the people

11:29AM   16   that were part of what we were looking at at the time were

11:29AM   17   either from Buffalo or their parents were from Buffalo, and

11:29AM   18   they were living together in Las Vegas.  They were living in

11:29AM   19   Las Vegas.  And they were associated with each other, and the

11:29AM   20   people that we're looking at.

11:29AM   21        And it was a drug investigation at the time.  So, it had

11:29AM   22   a drug nexus.  And I -- I can't remember that specific time

11:29AM   23   if it had organized crime ties -- yes, it did.  Because some

11:29AM   24   of the targets, their family members and some of the things

11:29AM   25   that were in our intelligence database indicated that there

11:29AM    1    were ties to organized crime through the family and through

11:29AM    2    who they were, different things.

11:29AM    3    Q.  So did you have an initial investigation into

11:30AM    4    Las Vegas-based targets where Masecchia's name came up?

11:30AM    5    A.  Yeah.  We were initially looking at a group of people.

11:30AM    6    Q.  Okay.  And was that group of people in your investigation

11:30AM    7    associated with Italian Organized Crime?

11:30AM    8    A.  Yes.  Either they were, the people we were looking at, or

11:30AM    9    their family was.  One particular -- yeah.

11:30AM    10   Q.  I'll ask a more general question.

11:30AM    11   A.  Sure.

11:30AM    12   Q.  Was there kind of a nexus to organized crime in the

11:30AM    13   investigation that you were working?

11:30AM    14   A.  Absolutely.

11:30AM    15   Q.  Okay.  As a result of learning this information that

11:30AM    16   Masecchia might be moving out to Las Vegas, did you

11:30AM    17   coordinate with or involve any other DEA offices around the

11:30AM    18   country?

11:30AM    19   A.  We did.  Discussing the case with my supervisor, we

11:30AM    20   thought it would be a good idea, since we saw ties back to

11:30AM    21   Buffalo either through family members or through phone

11:30AM    22   records, to contact the Buffalo office.

11:30AM    23       My supervisor asked me if I knew any agents in the

11:30AM    24   Buffalo office, which I said I did.

11:30AM    25       I had a particular friend that was a classmate from the

11:31AM    1    academy that was working in Buffalo, his name is Mike Hill,

11:31AM    2    and that's who I wanted to reach out to.

11:31AM    3    Q.  Is that a normal thing to do on an investigation at the

11:31AM    4    DEA is, you know, reach out to another district office or

11:31AM    5    resident office if something comes up that's kind of tied to

11:31AM    6    that location?

11:31AM    7    A.  Yeah.  It happens all the time.  If you're lucky, someone

11:31AM    8    in your office already has a contact there, someone that they

11:31AM    9    have some rapport with or worked with before.  And I did in

11:31AM   10    this case.

11:31AM   11        So, yeah, I mean, that happens all the time.  That's how

11:31AM   12    you coordinate cases.

11:31AM   13    Q.  And how can coordinating cases like that help an

11:31AM   14    investigation?

11:31AM   15    A.  Well, especially at the DEA where the majority of the

11:31AM   16    cases were multi jurisdictional, they weren't just in the

11:31AM   17    place we were working.  A lot of times they had ties to

11:31AM   18    another state, another city, another country.

11:31AM   19        And since I'm not physically working in that place, it

11:31AM   20    was extremely beneficial to have agents that did that you

11:31AM   21    could call on the phone and that could assist you in your

11:31AM   22    investigation.

11:31AM   23    Q.  You mentioned that you planned to reach out to a special

11:31AM   24    agent named Mike Hill because you knew that person from the

11:32AM   25    academy; is that right?

| | | |
|---|---|---|
| 11:32AM | 1 | A.  Yeah.  Mike and I met at the DEA academy when we were |
| 11:32AM | 2 | going through as basic agent trainees. |
| 11:32AM | 3 | Q.  Okay.  And so did you ultimately reach out to that |
| 11:32AM | 4 | person, Mike Hill, from the DEA in Buffalo? |
| 11:32AM | 5 | A.  I did. |
| 11:32AM | 6 | Q.  Did you discuss the case that you had involving Masecchia |
| 11:32AM | 7 | with him? |
| 11:32AM | 8 | A.  Yeah.  Generally, gave an idea of what we had going on in |
| 11:32AM | 9 | Las Vegas. |
| 11:32AM | 10 | Q.  At the time that you called Mike Hill and spoke about |
| 11:32AM | 11 | Masecchia, did he seem to know what you were talking about? |
| 11:32AM | 12 | Or were you telling him about it for the first time? |
| 11:32AM | 13 | A.  Yeah.  Mike -- it was all new to Mike.  Mike didn't have |
| 11:32AM | 14 | anything.  I was telling him what we had. |
| 11:32AM | 15 | Q.  Okay.  And after you called Mike Hill at the DEA in |
| 11:32AM | 16 | Buffalo to tell him what you had going on into Mike |
| 11:32AM | 17 | Masecchia, did you receive a phone call from someone else in |
| 11:32AM | 18 | the DEA Buffalo office about that case? |
| 11:32AM | 19 | A.  I did. |
| 11:32AM | 20 | Q.  Who called you? |
| 11:32AM | 21 | A.  Joe Bongiovanni. |
| 11:32AM | 22 | Q.  Were you expecting that call? |
| 11:32AM | 23 | A.  No.  It was unsolicited.  I wasn't expecting it.  Mike |
| 11:32AM | 24 | never mentioned that someone was gonna call me, so I didn't |
| 11:33AM | 25 | expect it. |

| | | |
|---|---|---|
| 11:33AM | 1 | Q.  All right.  I want to focus in on that conversation. |
| 11:33AM | 2 | You said the defendant called you after your conversation |
| 11:33AM | 3 | with Mike Hill; is that correct? |
| 11:33AM | 4 | A.  Correct. |
| 11:33AM | 5 | Q.  So is this after you had told Mike Hill that you were |
| 11:33AM | 6 | investigating Mike Masecchia? |
| 11:33AM | 7 | A.  Yes. |
| 11:33AM | 8 | Q.  When the defendant calls you, describe that conversation |
| 11:33AM | 9 | for the jury.  Walk us through it. |
| 11:33AM | 10 | A.  Okay.  So I received a call.  I believe it was on my cell |
| 11:33AM | 11 | phone.  And when I answered it, he said it was Joe |
| 11:33AM | 12 | Bongiovanni.  It kind of caught me off guard. |
| 11:33AM | 13 | But he said that he had heard through Mike Hill that we |
| 11:33AM | 14 | were working on investigation, and that Michael Masecchia's |
| 11:33AM | 15 | name came up.  And that he knew Michael Masecchia from |
| 11:33AM | 16 | growing up in North Buffalo.  And that he could -- his name |
| 11:33AM | 17 | couldn't be on any reports, but he could possibly help |
| 11:33AM | 18 | providing information. |
| 11:34AM | 19 | He also mentioned that he had heard that this -- I |
| 11:34AM | 20 | thought it was the Erie County Sheriff's Department was |
| 11:34AM | 21 | investigating Masecchia for operating an outdoor marijuana |
| 11:34AM | 22 | grow operation in the Southern Tier of New York, south of the |
| 11:34AM | 23 | city. |
| 11:34AM | 24 | Q.  When the defendant called you and told you he could help |
| 11:34AM | 25 | but he couldn't put his name on any reports, did that stick |

11:34AM    1    out in your memory?

11:34AM    2    A.   Yeah, it sticks out.

11:34AM    3    Q.   Why?

11:34AM    4    A.   It sticks out.  I mean, there are occasions where you may

11:34AM    5    know someone that comes up in an investigation, but you're

11:34AM    6    either in or your out.  You're not both.

11:34AM    7         You can't -- you provide information, you're a witness.

11:34AM    8    If you're a witness, your name has to be on a report.  You're

11:34AM    9    either in or your out.

11:34AM    10        And what I mean by that is if a determination is made

11:34AM    11    that you can be involved, and that there is no conflict of

11:34AM    12    interest, then you work that investigation.  You provide

11:34AM    13    information, you're a witness, your name goes on reports.

11:34AM    14        If you can't, then you shouldn't be involved at all.  You

11:35AM    15    shouldn't be calling people.  You shouldn't be providing

11:35AM    16    information.  You probably should have a discussion with the

11:35AM    17    supervisor in your group saying, hey, there's a conflict of

11:35AM    18    interest here.  Our group's gonna work this, then I probably

11:35AM    19    shouldn't be involved in this case.

11:35AM    20        So, that's my experience.

11:35AM    21    Q.   During that conversation with the defendant, did you

11:35AM    22    provide at least some general information about what you at

11:35AM    23    the DEA in Las Vegas were working on?

11:35AM    24    A.   Yeah.  Generally, and at that point, we didn't have a,

11:35AM    25    like, a -- it was at the beginning stages of the

11:35AM    1    investigation, it progressed afterwards.  But the beginning

11:35AM    2    stages provided general information that we had phone

11:35AM    3    records, and we were looking at phone records, and there were

11:35AM    4    some 716 area code Buffalo numbers were coming up that I

11:35AM    5    could pass to them that hopefully they could maybe identify

11:35AM    6    and help us expand the investigation.

11:35AM    7        We would do the Vegas side, they would do the Buffalo

11:35AM    8    side.  And working jointly together, again, collaborate and

11:36AM    9    expand the investigation.

11:36AM    10   Q.  Now, you mentioned at the beginning of this series of

11:36AM    11   questions about your phone call with the defendant that he

11:36AM    12   told you that he knew Mike Masecchia from growing up; is that

11:36AM    13   correct?

11:36AM    14   A.  Yeah.  I believe from growing up in North Buffalo area.

11:36AM    15   Q.  Did the defendant tell you during that phone call that he

11:36AM    16   was friends with Mike Masecchia?

11:36AM    17   A.  No.

11:36AM    18   Q.  Did he tell you during that phone call that he and Mike

11:36AM    19   drove to college together every day?

11:36AM    20   A.  No.

11:36AM    21   Q.  That didn't come up?

11:36AM    22   A.  No.  No, it did not.

11:36AM    23   Q.  You told us a few moments ago that what kind of started

11:36AM    24   your contact with the Buffalo office and Mike Hill generally

11:36AM    25   was that you expected Mike Masecchia to be moving out to the

11:36AM   1   Las Vegas area where you had an investigation going on,

11:36AM   2   right?

11:37AM   3   A.   Yeah.  At the time, that was the information we had, that

11:37AM   4   he was going to be moving out.

11:37AM   5   Q.   After you called the Buffalo office and conveyed that

11:37AM   6   information, did Mike Masecchia ever end up moving to the

11:37AM   7   Las Vegas area?

11:37AM   8   A.   Yeah -- to the best of our knowledge working that case,

11:37AM   9   no, we never saw him out there.  We conducted extensive

11:37AM  10   surveillance.  He was never identified as being out there.

11:37AM  11   We never -- we eventually went up on a wiretap on telephones.

11:37AM  12   We never intercepted any telephone calls with him.  So, no.

11:37AM  13   Q.   Did the defendant ever call you back after that first

11:37AM  14   phone call and offer more information about Masecchia?

11:37AM  15   A.   No.

11:37AM  16   Q.   Did you eventually close your investigation into

11:37AM  17   Masecchia?

11:37AM  18   A.   We did at some point.

11:37AM  19   Q.   Now, we spoke a moment ago about your call to Mike Hill.

11:37AM  20   Did you learn that after your call to Mike Hill, he opened a

11:37AM  21   kind of a collateral or parallel case in DEA Buffalo?

11:37AM  22   A.   Yeah.  So, we had a case open.  Our file title was

11:38AM  23   Michael Masecchia, because at the time we thought he was

11:38AM  24   moving out to Vegas.  And Mike Hill opened a criminal file as

11:38AM  25   well with the same file title, Michael Masecchia.  So, yeah.

11:38AM    1    I wouldn't -- it was kind of a parallel investigation,

11:38AM    2    but there were two criminal investigations, one open in

11:38AM    3    Buffalo, one open in Vegas.

11:38AM    4    Q.  Once those two investigations into the same target are

11:38AM    5    opened, does it cause some of the reports to be shared

11:38AM    6    between the offices?

11:38AM    7    A.  Yeah.  What typically happens is if you're working

11:38AM    8    closely with an office, you can either provide the reports to

11:38AM    9    them at the time using the fax machine, send them to that

11:38AM   10    agent in the office so they had an idea of what was going on.

11:38AM   11        Or you could write on the report, there was a section on

11:38AM   12    a DEA-6 a report of investigation a distribution section

11:38AM   13    where you could put another office and another agent.  So

11:38AM   14    when that report went through the process of being approved

11:39AM   15    and distributed, it could go -- it could go to that agent

11:39AM   16    automatically through the process.

11:39AM   17    Q.  Are you aware of whether some of the reports from your

11:39AM   18    Vegas file ended up being distributed to the Buffalo office?

11:39AM   19    A.  Yes.  Yes.

11:39AM   20    Q.  Were they?

11:39AM   21    A.  Yes.

11:39AM   22    Q.  Now you later came to work in the Buffalo office.  As an

11:39AM   23    agent working in a group in the Buffalo office, would you

11:39AM   24    have access to the reports in different case files around the

11:39AM   25    office if you wanted to go look at them?

| | | |
|---|---|---|
| 11:39AM | 1 | A.  Oh, yeah.  Yes.  I mean, you're working in a specific |
| 11:39AM | 2 | group, but yeah, there was a file room, and yes. |
| 11:39AM | 3 | In the case management system, you -- you had access to |
| 11:39AM | 4 | your cases.  But the physical files were in a case file room. |
| 11:39AM | 5 | All the agents had access to that room. |
| 11:39AM | 6 | Q.  Okay.  So the answer is yes, you could access the |
| 11:39AM | 7 | physical file as an agent? |
| 11:39AM | 8 | A.  Absolutely. |
| 11:39AM | 9 | Q.  Did you learn ultimately that the DEA Buffalo also closed |
| 11:40AM | 10 | their file into Masecchia? |
| 11:40AM | 11 | A.  Yep.  At some point.  Ours was still going on and |
| 11:40AM | 12 | progressing, and they closed theirs before ours at some |
| 11:40AM | 13 | point. |
| 11:40AM | 14 | Q.  Got it.  Did Masecchia end up getting charged in your |
| 11:40AM | 15 | case back in 2004? |
| 11:40AM | 16 | A.  No. |
| 11:40AM | 17 | Q.  I want to talk now about 2009 and fast forward a second. |
| 11:40AM | 18 | In 2009 were you still working at the DEA? |
| 11:40AM | 19 | A.  Yes, in Las Vegas. |
| 11:40AM | 20 | Q.  As far as you're aware, was the defendant a DEA special |
| 11:40AM | 21 | agent in Buffalo in 2009? |
| 11:40AM | 22 | A.  To the best of my knowledge. |
| 11:40AM | 23 | Q.  I'd like to show Government Exhibit 12B in evidence.  I |
| 11:40AM | 24 | believe in evidence.  Got those reading glasses ready? |
| 11:41AM | 25 | A.  Yeah. |

| | | |
|---|---|---|
| 11:41AM | 1 | Q.  We're looking at Government Exhibit 12B here. |
| 11:41AM | 2 | **MR. COOPER:**  And I'm going to ask, Ms. Champoux, |
| 11:41AM | 3 | first if we can zoom in on the top one third of the screen |
| 11:41AM | 4 | here, just to make it a little easier for Tony. |
| 11:41AM | 5 | **BY MR. COOPER:** |
| 11:41AM | 6 | Q.  Is this a DEA-6 opening a case? |
| 11:41AM | 7 | A.  Yes, case initiation. |
| 11:41AM | 8 | Q.  Okay.  And what's the date the 6 was prepared? |
| 11:41AM | 9 | A.  This DEA-6 was prepared on June 8th, 2009. |
| 11:41AM | 10 | Q.  Okay.  And who drafted this DEA-6 according to box 5 on |
| 11:41AM | 11 | the left there? |
| 11:41AM | 12 | A.  It was drafted by Task Force Agent Cory Higgins. |
| 11:41AM | 13 | Q.  And who's the file title? |
| 11:41AM | 14 | A.  The file title of the case is Mark Suppa. |
| 11:41AM | 15 | **MR. COOPER:**  You can zoom out of that, Ms. Champoux. |
| 11:41AM | 16 | Can you zoom in on the basis of investigation |
| 11:41AM | 17 | section. |
| 11:41AM | 18 | **BY MR. COOPER:** |
| 11:42AM | 19 | Q.  I'm not going to have you read the whole thing, but is |
| 11:42AM | 20 | this DEA-6 generally about marijuana grows in the Southern |
| 11:42AM | 21 | Tier area of New York? |
| 11:42AM | 22 | A.  Yes. |
| 11:42AM | 23 | **MR. COOPER:**  You can zoom out of that, Ms. Champoux. |
| 11:42AM | 24 | Scroll to the next page, please. |
| 11:42AM | 25 | Can you zoom in on targets of investigation all the |

| | | |
|---|---|---|
| 11:42AM | 1 | way to the bottom of indexing?  Thank you.  That's perfect. |
| 11:42AM | 2 | **BY MR. COOPER:** |
| 11:42AM | 3 | Q.  Can you see this, sir? |
| 11:42AM | 4 | A.  Yes, I can. |
| 11:42AM | 5 | Q.  Can you read -- |
| 11:42AM | 6 | A.  Yes. |
| 11:42AM | 7 | Q.  That's all right.  Just speak right into the mic for me. |
| 11:42AM | 8 | Yeah. |
| 11:42AM | 9 | Can you read who the targets of Cory Higgins's |
| 11:42AM | 10 | investigation were? |
| 11:42AM | 11 | A.  Targets of investigation will be Mark Suppa, Matt Suppa, |
| 11:42AM | 12 | and Mike Masecchia, and others involved in this drug |
| 11:42AM | 13 | organization. |
| 11:42AM | 14 | Q.  This indexing section at the bottom, is that an area to |
| 11:42AM | 15 | list information about the people you're investigating? |
| 11:42AM | 16 | A.  Yeah.  Typically, you would -- you would put your targets |
| 11:42AM | 17 | down there in the indexing section. |
| 11:42AM | 18 | Q.  Is Mike Masecchia listed as a target there? |
| 11:42AM | 19 | A.  Yes, he is. |
| 11:43AM | 20 | Q.  Does it identify him as a possible partner or partner to |
| 11:43AM | 21 | Mark Suppa? |
| 11:43AM | 22 | A.  Yes, according to this report, he's a partner to Mark |
| 11:43AM | 23 | Suppa and possible money launderer. |
| 11:43AM | 24 | Q.  And I apologize, I misspoke.  I think that name is -- no, |
| 11:43AM | 25 | it's Mark Suppa.  Is Mark Suppa indexed? |

11:43AM   1   A.  Yes, he is.

11:43AM   2   Q.  Is Matt Suppa indexed?

11:43AM   3   A.  Yes.

11:43AM   4          MR. COOPER:  You can zoom out of that, Ms. Champoux,

11:43AM   5   and just leave the report up, please.

11:43AM   6          BY MR. COOPER:

11:43AM   7   Q.  In 2009, my question specifically is, in the year 2009,

11:43AM   8   were you ever made aware that Cory Higgins was investigating

11:43AM   9   Mike Masecchia for drug trafficking?

11:43AM  10   A.  No.

11:43AM  11   Q.  You didn't know that?

11:43AM  12   A.  No, not at that time.

11:43AM  13   Q.  Now, you told us a few minutes ago that the defendant

11:43AM  14   called you in 2004 about your Masecchia case.

11:43AM  15       Did the defendant ever call you in 2009 to discuss

11:43AM  16   Masecchia?

11:44AM  17   A.  No.

11:44AM  18   Q.  Did the defendant ever call you and say.  Hey, reach out

11:44AM  19   to Cory Higgins, he's investigating your guy Mike Masecchia?

11:44AM  20   A.  No.

11:44AM  21   Q.  Were you ever asked to share information about your

11:44AM  22   earlier 2004 Masecchia case with Cory Higgins?

11:44AM  23   A.  No.

11:44AM  24   Q.  Had you spoken with the defendant about your Masecchia

11:44AM  25   case before this 2009 investigation in Buffalo?

11:44AM  1    A.   Yeah.   When we first opened our case and they were

11:44AM  2    considering opening theirs.

11:44AM  3         **MR. COOPER:**   You can take that down, please,

11:44AM  4    Ms. Champoux.

11:44AM  5         **BY MR. COOPER:**

11:44AM  6    Q.   All right.   We're going to fast forward again for a

11:44AM  7    moment here.   And now I want to talk with you about your

11:44AM  8    first year in the Buffalo office around 2015.   December of

11:44AM  9    2015 is when you arrived, right?

11:44AM  10   A.   Correct.

11:44AM  11   Q.   When you arrive, did ever hear the name Ron Serio?

11:44AM  12   A.   At some point, I did.

11:44AM  13   Q.   Okay.   Did the hear the defendant talking about Ron

11:45AM  14   Serio?

11:45AM  15   A.   I did, in a conversation with him.

11:45AM  16   Q.   Okay.   And what did the defendant say to you about his --

11:45AM  17   or, about Mr. Serio in around 2015?

11:45AM  18   A.   Generally, it was in a conversation around -- I think it

11:45AM  19   was at Joe's desk.   He had a file on his desk, it was a

11:45AM  20   criminal file, DEA criminal file.   It was about that thick,

11:45AM  21   so it was pretty thick.

11:45AM  22        And I can't remember if he mentioned it to me or I asked

11:45AM  23   him about it.   But he said that he had a case on a big

11:45AM  24   organization, on the Serio organization, which was Ron and

11:45AM  25   Tom Serio.

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

| | | |
|---|---|---|
| 11:45AM | 1 | So, generally, that's what the conversation was. |
| 11:45AM | 2 | Q.  And you didn't arrive in Buffalo until December of '15; |
| 11:45AM | 3 | is that correct? |
| 11:45AM | 4 | A.  Correct. |
| 11:45AM | 5 | Q.  So this conversation had to have occurred either December |
| 11:45AM | 6 | of 2015 or after, right? |
| 11:45AM | 7 | A.  Correct. |
| 11:45AM | 8 | Q.  Okay.  Based on the conversation you had with the |
| 11:45AM | 9 | defendant where he told you he had a big case on these guys, |
| 11:45AM | 10 | did it -- was he representing to you that this was an active |
| 11:46AM | 11 | or open case? |
| 11:46AM | 12 | MR. SINGER:  Objection. |
| 11:46AM | 13 | MR. COOPER:  He was a participant in the |
| 11:46AM | 14 | conversation. |
| 11:46AM | 15 | THE COURT:  Hang on.  Overruled. |
| 11:46AM | 16 | THE WITNESS:  Could you repeat the question, please? |
| 11:46AM | 17 | BY MR. COOPER: |
| 11:46AM | 18 | Q.  Yeah.  Was the defendant representing to you, when he |
| 11:46AM | 19 | said I've got a big case on these guys, that he had an active |
| 11:46AM | 20 | case into Serio? |
| 11:46AM | 21 | A.  Yes. |
| 11:46AM | 22 | Q.  Was that how you took it when he said it to you? |
| 11:46AM | 23 | A.  My belief was it was an open case. |
| 11:46AM | 24 | MR. COOPER:  Ms. Champoux, can we please bring up |
| 11:46AM | 25 | Government Exhibit 8B as in boy in evidence. |

| | | |
|---|---|---|
| 11:46AM | 1 | Can you zoom in on the top third of the page there? |
| 11:46AM | 2 | Yeah.  Thanks. |
| 11:46AM | 3 | **BY MR. COOPER:** |
| 11:46AM | 4 | Q.  Is this a DEA-6 called a case closing? |
| 11:46AM | 5 | A.  Yes, it is. |
| 11:46AM | 6 | Q.  And what's the date that it's prepared? |
| 11:46AM | 7 | A.  That date is January 28th, 2015. |
| 11:46AM | 8 | Q.  Is that, you know, give or take a month, is that about a |
| 11:46AM | 9 | year before this conversation that you had in December of |
| 11:47AM | 10 | 2015? |
| 11:47AM | 11 | A.  Yes. |
| 11:47AM | 12 | **MR. COOPER:**  You can zoom out of that, Ms. Champoux. |
| 11:47AM | 13 | **BY MR. COOPER:** |
| 11:47AM | 14 | Q.  Who authored this report, sir? |
| 11:47AM | 15 | A.  Joseph Bongiovanni. |
| 11:47AM | 16 | Q.  And as you sit here today, do you know this Wayne |
| 11:47AM | 17 | Anderson file title to be associated with the defendant's |
| 11:47AM | 18 | purported Ron Serio investigation? |
| 11:47AM | 19 | A.  Yes. |
| 11:47AM | 20 | Q.  Did he tell you in that conversation that he closed the |
| 11:47AM | 21 | file eleven months or twelve months earlier? |
| 11:47AM | 22 | A.  On this Wayne Anderson case? |
| 11:47AM | 23 | Q.  On his Serio investigation.  Did the defendant tell you, |
| 11:47AM | 24 | hey, it's been closed for a year? |
| 11:47AM | 25 | A.  Oh, no.  No. |

| | | |
|---|---|---|
| 11:47AM | 1 | Q.  He didn't say that? |
| 11:47AM | 2 | A.  No. |
| 11:47AM | 3 | MR. COOPER:  Okay.  You can take that down, |
| 11:47AM | 4 | Ms. Champoux. |
| 11:47AM | 5 | BY MR. COOPER: |
| 11:47AM | 6 | Q.  Mr. Casullo, we've been talking quite a bit about Mike |
| 11:48AM | 7 | Masecchia.  During that conversation where the defendant |
| 11:48AM | 8 | tells you that he's got a big case into these guys including |
| 11:48AM | 9 | Ron Serio, does he tell you Mike Masecchia came up in the |
| 11:48AM | 10 | case? |
| 11:48AM | 11 | A.  No. |
| 11:48AM | 12 | Q.  He didn't say that? |
| 11:48AM | 13 | A.  No. |
| 11:48AM | 14 | Q.  Now you guys kind of had a connection from years earlier |
| 11:48AM | 15 | about Mike Masecchia, right? |
| 11:48AM | 16 | A.  Yes. |
| 11:48AM | 17 | Q.  The name Mike Masecchia didn't come up when the defendant |
| 11:48AM | 18 | told you about his Serio case? |
| 11:48AM | 19 | A.  No. |
| 11:48AM | 20 | Q.  If it had, that would have been of interest to you, |
| 11:48AM | 21 | right? |
| 11:48AM | 22 | A.  Yeah.  That would have been interesting. |
| 11:48AM | 23 | Q.  Did the defendant tell you that he got toll records for |
| 11:48AM | 24 | Mike Masecchia? |
| 11:48AM | 25 | A.  No. |

| | | |
|---|---|---|
| 11:48AM | 1 | Q. Did he tell you that he ran his subscriber information? |
| 11:48AM | 2 | A. No. |
| 11:48AM | 3 | Q. Did he tell you he caused him to be entered into DARTS? |
| 11:48AM | 4 | A. No. |
| 11:48AM | 5 | Q. Did he ask you to help him work on that Serio case? |
| 11:48AM | 6 | A. No. |
| 11:48AM | 7 | Q. And this was back when you guys got along, right? |
| 11:48AM | 8 | A. Yes. |
| 11:48AM | 9 | Q. You didn't have any problem with him at that time? |
| 11:48AM | 10 | A. No. |
| 11:48AM | 11 | Q. To your knowledge, did he have any problem with you at |
| 11:48AM | 12 | that time? |
| 11:48AM | 13 | A. No. |
| 11:48AM | 14 | Q. Had you worked other cases together at that time period? |
| 11:49AM | 15 | A. Again, I can't remember when that exact conversation took |
| 11:49AM | 16 | place, but, yes, we had worked -- I can't remember if our |
| 11:49AM | 17 | wiretap investigation was going on at the time where we were |
| 11:49AM | 18 | partners, or another case where we did a controlled delivery |
| 11:49AM | 19 | together, but we had worked together. |
| 11:49AM | 20 | Q. Were you in the same group with him? |
| 11:49AM | 21 | A. Oh, yes. |
| 11:49AM | 22 | Q. Did he ever tell you, hey, Tony, I'm just too busy to do |
| 11:49AM | 23 | surveillance on this, maybe you could help me?  Did that ever |
| 11:49AM | 24 | happen? |
| 11:49AM | 25 | A.  No. |

11:49AM    1    Q.   At the DEA, what's the deconfliction database used by

11:49AM    2    agents called?

11:49AM    3    A.   It's called DARTS, D-A-R-T-S.  It's an acronym, I can't

11:49AM    4    remember what it stands for.

11:49AM    5    Q.   That's all right.

11:49AM    6         If you enter a phone number into DARTS, and someone else

11:49AM    7    has already entered that phone number into DARTS, what

11:50AM    8    happens?

11:50AM    9    A.   It generally, if you enter a number to see if anybody

11:50AM   10    else is looking at the same phone number, possibly the same

11:50AM   11    targets, if someone has already entered that number in, I'll

11:50AM   12    get a response back on that system, DARTS, on a screen, and

11:50AM   13    it will show on the screen the case that it overlaps with.

11:50AM   14         So the other person that ran it, it will have their case

11:50AM   15    number.  It will have the case agent's name.  Maybe the

11:50AM   16    analyst that the agent's working with.

11:50AM   17         There's a remarks section, so if it was another DEA case,

11:50AM   18    it will be a, like, a short synopsis of why they put it into

11:50AM   19    the system.

11:50AM   20         But you could also have deconflictions with other

11:50AM   21    agencies outside of DEA, like FBI or Homeland Security.  It

11:50AM   22    was like the same way.  It would have the agent's name or the

11:50AM   23    analyst's name, but you could not read the remarks section if

11:50AM   24    it was another agency.

11:50AM   25         And then in addition to that, you would have an email

| | | |
|---|---|---|
| 11:50AM | 1 | that would be automatically generated that would go to your |
| 11:51AM | 2 | inbox showing the same overlap. |
| 11:51AM | 3 | Like, the same thing that I'm looking at on the screen, I |
| 11:51AM | 4 | also get an email that shows the same thing. |
| 11:51AM | 5 | And it works that way on the other end where if somebody |
| 11:51AM | 6 | runs a number that you put in, that will go to the agent that |
| 11:51AM | 7 | initially put it in.  So there's emails going on both ends. |
| 11:51AM | 8 | So both people are aware that there's an overlap. |
| 11:51AM | 9 | Q.  Is the purpose of that DARTS deconfliction system to |
| 11:51AM | 10 | encourage DEA agents to share information with one another? |
| 11:51AM | 11 | A.  Yes, it's to collaborate, it's to coordinate, to expand |
| 11:51AM | 12 | investigations, officer safety.  All of those types of |
| 11:51AM | 13 | things. |
| 11:51AM | 14 | Q.  So hypothetically, if I put John -- if I was a DEA agent |
| 11:51AM | 15 | and I put John Smith into DARTS, and then a year later you a |
| 11:51AM | 16 | DEA agent puts John Smith into DARTS, am I gonna get an email |
| 11:51AM | 17 | telling me that Tony Casullo just ran John Smith in DARTS? |
| 11:51AM | 18 | A.  Yeah, it will be an email going both ways. |
| 11:51AM | 19 | Q.  Are then you gonna get an email as well? |
| 11:51AM | 20 | A.  Yes. |
| 11:51AM | 21 | Q.  And is the purpose of that to encourage you and me to |
| 11:51AM | 22 | talk to each other? |
| 11:51AM | 23 | A.  Yes, absolutely, to put each other in contact with each |
| 11:52AM | 24 | other. |
| 11:52AM | 25 | Q.  Are those deconfliction emails auto-generated by the |

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

| | | |
|---|---|---|
| 11:52AM | 1 | DARTS system? |
| 11:52AM | 2 | A.  Yes, they are. |
| 11:52AM | 3 | Q.  I'm holding what's marked for identification as |
| 11:52AM | 4 | Exhibit 26B, 26C, 26D, 26E, 26I, and 26M, as in Mary. |
| 11:52AM | 5 | **MR. COOPER:**  May I approach the witness? |
| 11:52AM | 6 | **THE COURT:**  You may. |
| 11:52AM | 7 | **BY MR. COOPER:** |
| 11:52AM | 8 | Q.  Take a moment, sir, and look at those.  And once you've |
| 11:53AM | 9 | had a chance to review all six of them, look back up at me. |
| 11:53AM | 10 | A.  Just quickly go through them? |
| 11:53AM | 11 | Q.  Yeah.  I want to know if you recognize them.  So take |
| 11:53AM | 12 | however much time you need, and see if you recognize them. |
| 11:54AM | 13 | Do you recognize those documents, sir? |
| 11:54AM | 14 | A.  Yeah, I know what they are. |
| 11:54AM | 15 | Q.  Are those DARTS deconfliction or emails? |
| 11:54AM | 16 | A.  Yes. |
| 11:54AM | 17 | Q.  Were you a recipient or initiator on each of those |
| 11:54AM | 18 | deconfliction notices? |
| 11:54AM | 19 | A.  I would have to look through to make sure that I was on |
| 11:54AM | 20 | every one of these, but -- |
| 11:54AM | 21 | Q.  Got it.  That's fine.  We'll take them one at a time, |
| 11:54AM | 22 | but -- |
| 11:54AM | 23 | A.  Yep. |
| 11:54AM | 24 | Q.  -- earlier we talked about how the conflict emails or the |
| 11:54AM | 25 | deconfliction emails are auto-generated; is that correct? |

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

11:55AM    1    A.  Right.

11:55AM    2    Q.  Are those examples of the auto-generated deconfliction

11:55AM    3    emails from DARTS?

11:55AM    4    A.  Yes.

11:55AM    5         **MR. COOPER:**  So these are already in evidence, Judge,

11:55AM    6    so I'm going to ask if I can approach the witness again.

11:55AM    7         **THE COURT:**  Sure.

11:55AM    8         **MR. COOPER:**  Thank you.

11:55AM    9         **BY MR. COOPER:**

11:55AM    10    Q.  May I have those back, Tony?

11:55AM    11         **MR. COOPER:**  And, Ms. Champoux, if we can pull up 26B

11:55AM    12    as in boy.

11:55AM    13         I'm sorry, ma'am.  26E.  I misspoke.

11:55AM    14         **BY MR. COOPER:**

11:55AM    15    Q.  All right.  So I just want to take a moment here to kind

11:55AM    16    of orient ourselves to what we're looking at.

11:55AM    17       At the top of this document, this is kind of the top of

11:55AM    18    an email generally, is that what that looks like to you?

11:55AM    19    A.  Yeah, it looks like the header information.

11:55AM    20    Q.  Okay.  Ask where it says from, the name Joseph

11:55AM    21    Bongiovanni is listed; is that correct?

11:55AM    22    A.  Yes, it is.

11:55AM    23    Q.  Now based on your experience using DARTS, receiving DARTS

11:56AM    24    deconflictions, is this an example of an email that's

11:56AM    25    auto-generated from DARTS?

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

11:56AM    1    A.   This looks that.  But the part at the top, I mean, this

11:56AM    2    whole thing is an auto-generated DARTS deconfliction.  But

11:56AM    3    the header at the top looks like something different.

11:56AM    4    Q.   Got it.  That's what I want to focus on here is at the

11:56AM    5    top, is this an actual email versus an auto-generated DARTS

11:56AM    6    deconfliction email?

11:56AM    7    A.   From looking at this, this looks to me on August 21st,

11:56AM    8    2018, Joe Bongiovanni looks like he forwarded this to Gregory

11:56AM    9    Yensan.

11:56AM    10   Q.   Okay.  And so do you see here where it says sent from my

11:56AM    11   iPhone?

11:56AM    12   A.   Yes.

11:56AM    13   Q.   That's not a common part of the auto-generated DARTS

11:56AM    14   deconflictions, right?

11:56AM    15   A.   No.

11:56AM    16   Q.   Underneath that, where it says begin forwarded message,

11:56AM    17   does this appear to be an auto-generated DARTS deconfliction

11:56AM    18   based on an entry that Curtis Ryan made into DARTS?

11:56AM    19   A.   Yes.

11:56AM    20   Q.   Where it says an investigative overlap was created by; is

11:57AM    21   that a reference to the fact that two people have looked into

11:57AM    22   the same number or target?

11:57AM    23   A.   Yes.

11:57AM    24   Q.   Below that, where it says DARTS request found, is that a

11:57AM    25   list of the different times that that target or number has

11:57AM    1    come up in DARTS?

11:57AM    2    A.    Yeah, that's where the overlaps are.

11:57AM    3    Q.    Okay.  What does it say right underneath DARTS requests

11:57AM    4    found?

11:57AM    5    A.    It is the responsibility of overlapped parties to contact

11:57AM    6    one another for sharing of information.

11:57AM    7    Q.    Is that the purpose of DARTS?

11:57AM    8    A.    Yes.

11:57AM    9    Q.    Where it says Trinity item here, what is the Trinity item

11:58AM   10    that's being referenced there?

11:58AM   11    A.    So, that's the telephone number that's being queried

11:58AM   12    through the system.

11:58AM   13    Q.    Okay.

11:58AM   14          MR. COOPER:  Ms. Champoux, if we can zoom in on this

11:58AM   15    bottom portion here for a second.

11:58AM   16          BY MR. COOPER:

11:58AM   17    Q.    So the Trinity item that's listed in Government Exhibit

11:58AM   18    26 Echo on the first page, the first one, Trinity item 1, is

11:58AM   19    a phone number 716-578-0544; is that correct?

11:58AM   20    A.    Correct.

11:58AM   21    Q.    Okay.  And then you said underneath that, it's going to

11:58AM   22    list the different times that that number's been run in

11:58AM   23    DARTS?

11:58AM   24    A.    Right.  So the first entry with Curtis Ryan, that shows

11:58AM   25    the individual that's running the number at that point.  So,

11:59AM    1    on that date.  And then his remarks.

11:59AM    2        And then beneath it were if that number was ever run

11:59AM    3    before.

11:59AM    4    Q.  Got it.  So let's work our way from the top, down.

11:59AM    5        The date that Curtis Ryan runs this number in DARTS,

11:59AM    6    what's that date?

11:59AM    7    A.  August 21st, 2018.

11:59AM    8    Q.  Okay.  And does he put -- what does he put in the remarks

11:59AM    9    section?

11:59AM   10    A.  Numbers associated with Ron Serio DTO.

11:59AM   11    Q.  Okay.  And did that cause a conflict in DARTS that

11:59AM   12    generated a deconfliction email?

11:59AM   13    A.  Yes, it did.

11:59AM   14    Q.  With what case?

11:59AM   15    A.  With case number C2-13-0026.

11:59AM   16    Q.  Okay.  And what date was the entry made for this phone

11:59AM   17    number in that case number?

11:59AM   18    A.  March 20th, 2013.

11:59AM   19        **MR. SINGER:**  Judge, I'm sorry to interrupt.  Can we

11:59AM   20    take a five-minute break?  I apologize.

11:59AM   21        **THE COURT:**  Yeah.  Let's take a quick break.

11:59AM   22        Please remember my instructions.  Don't discuss the

11:59AM   23    case with anyone, including each other.  Don't make up your

12:00PM   24    minds.

12:00PM   25        See you back here in just a few minutes.

| | | |
|---|---|---|
| 12:00PM | 1 | (Jury excused at 12:00 p.m.) |
| 12:01PM | 2 | **THE COURT:**  Mr. Singer ran out, so I'll ask you, |
| 12:01PM | 3 | Mr. MacKay, anything from the defense? |
| 12:01PM | 4 | **MR. MacKAY:**  I have nothing to offer on my behalf, |
| 12:01PM | 5 | Judge. |
| 12:01PM | 6 | **THE COURT:**  Great.  Anything, Mr. Cooper? |
| 12:01PM | 7 | **MR. COOPER:**  No, Judge, thank you. |
| 12:01PM | 8 | **THE COURT:**  We'll wait for Mr. Singer to get back and |
| 12:01PM | 9 | resume. |
| 12:01PM | 10 | (Off the record at 12:01 p.m.) |
| 12:01PM | 11 | (Back on the record at 12:06 p.m.) |
| 12:06PM | 12 | (Jury not present.) |
| 12:06PM | 13 | **THE COURT:**  Are we ready to go? |
| 12:06PM | 14 | **MR. SINGER:**  Yes, Judge. |
| 12:06PM | 15 | **THE COURT:**  Are we ready to go? |
| 12:06PM | 16 | **MR. COOPER:**  Yes, sir. |
| 12:06PM | 17 | **THE COURT:**  Okay.  Let's bring them back. |
| 12:07PM | 18 | (Jury seated at 12:07 p.m.) |
| 12:07PM | 19 | **THE COURT:**  The record will reflect that all our |
| 12:07PM | 20 | jurors are present again. |
| 12:07PM | 21 | Mr. Cooper, you may continue. |
| 12:07PM | 22 | **MR. COOPER:**  Thank you, Judge. |
| 12:07PM | 23 | **BY MR. COOPER:** |
| 12:07PM | 24 | Q.  So, Special Agent Casullo, where we left off was talking |
| 12:07PM | 25 | about 26E. |

12:07PM  1    MR. COOPER:  And, Ms. Champoux, I asked if you could

12:07PM  2  bring that back up.  Awesome.

12:07PM  3    BY MR. COOPER:

12:07PM  4  Q.  And we were looking at this Trinity item for a number

12:07PM  5  ending in 0544, right?

12:08PM  6  A.  Yes.

12:08PM  7  Q.  And that's the number that generated the conflict?

12:08PM  8  A.  Yes.

12:08PM  9  Q.  And then we said the top line here is Curtis Ryan running

12:08PM  10  the number on August 21st of 2018, right?

12:08PM  11  A.  Correct.

12:08PM  12  Q.  And we read his remarks.  And then the next line down is

12:08PM  13  the number that conflicted with Curtis Ryan's DARTS entry,

12:08PM  14  right?

12:08PM  15  A.  Yes.

12:08PM  16  Q.  And that entry occurred on March 20th of 2013; is that

12:08PM  17  correct?

12:08PM  18  A.  Correct.

12:08PM  19  Q.  And where it says request ran by, who does it list as the

12:08PM  20  person who ran the request?

12:08PM  21  A.  Justin R. Borst.

12:08PM  22  Q.  Do you know him to be an intelligence analyst at the DEA?

12:08PM  23  A.  Yeah, he was a National Guard analyst assigned to our

12:08PM  24  office.

12:08PM  25  Q.  Okay.  Now, what do the remarks say for that second entry

12:08PM    1    for March 20th, 2013?

12:08PM    2    A.  Number part of ongoing narcotics investigation in contact

12:08PM    3    with target number 716-830-3226, per S.A. Bongiovanni.

12:09PM    4    Q.  Now, based on your experience working at the DEA and

12:09PM    5    working specifically in the Buffalo office, as well, does

12:09PM    6    this "per S.A. Bongiovanni" indicate to you that Bongiovanni

12:09PM    7    caused Borst to run this number in DARTS?

12:09PM    8    A.  Yeah.  In my experience, that would mean instead of

12:09PM    9    running the deconflictions himself, so you can run them

12:09PM   10    yourself as an agent, or if you're working with an analyst,

12:09PM   11    an analyst can help run those numbers for you, that you would

12:09PM   12    ask the analyst to help and run those numbers for you.

12:09PM   13        What an analyst typically would do is put per whoever

12:09PM   14    asked them to do it.

12:09PM   15    Q.  Now, I want to pause on that document for a second.

12:09PM   16        **MR. COOPER:**  And, Ms. Champoux, if we could take this

12:09PM   17    down, and pull up Government Exhibit 8A.

12:09PM   18        **BY MR. COOPER:**

12:09PM   19    Q.  Is this case number, C2-13-0026, the same case number as

12:10PM   20    that DARTS entry from March of 2013 that we just looked at?

12:10PM   21    A.  Yes.

12:10PM   22        **MR. COOPER:**  Can you take that down, Ms. Champoux?

12:10PM   23        And if we can go to Government Exhibit 100A.1 in

12:10PM   24    evidence.

12:10PM   25        And if you can click on image 0491.

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

54

| | | |
|---|---|---|
| 12:10PM | 1 | **BY MR. COOPER:** |
| 12:10PM | 2 | Q.  Do you see this phone number here, sir, 716-830-3226? |
| 12:10PM | 3 | A.  Yes. |
| 12:10PM | 4 | Q.  What's the name above that phone number? |
| 12:10PM | 5 | A.  Ron Serio. |
| 12:11PM | 6 | **MR. COOPER:**  Ms. Champoux, can you take that down and |
| 12:11PM | 7 | bring us back to 26 Echo, please. |
| 12:11PM | 8 | And if we can zoom in on the bottom section here |
| 12:11PM | 9 | again?  Thanks. |
| 12:11PM | 10 | **BY MR. COOPER:** |
| 12:11PM | 11 | Q.  Is that the same phone number here listed in the remarks |
| 12:11PM | 12 | section of Bongiovanni's deconfliction of this phone number? |
| 12:11PM | 13 | A.  Yes. |
| 12:11PM | 14 | Q.  So you can correct me if I'm wrong, but I want to see if |
| 12:11PM | 15 | we understand this.  The 716-578-0544 number was ran in DARTS |
| 12:11PM | 16 | in March of 20th of 2013 as a number that was in contact with |
| 12:11PM | 17 | Ron Serio's phone number; is that right? |
| 12:11PM | 18 | A.  Correct. |
| 12:11PM | 19 | **MR. COOPER:**  Can you take that down, Ms. Champoux, or |
| 12:11PM | 20 | zoom out for now?  Thank you. |
| 12:12PM | 21 | Judge, if I could just have one second to get a page |
| 12:12PM | 22 | number? |
| 12:12PM | 23 | **THE COURT:**  Yep. |
| 12:12PM | 24 | **BY MR. COOPER:** |
| 12:12PM | 25 | Q.  Special Agent Casullo, as you sit here today, do you know |

12:12PM  1  who that 0544 phone number belongs to?

12:12PM  2  A.  No.

12:12PM  3  Q.  Okay.  If you looked at phone records like subscriber

12:12PM  4  information, would that help you know that information?

12:12PM  5  A.  Yes.

12:12PM  6  Q.  Okay.  That's all right.  We're going to come back in

12:13PM  7  just a second.  I want to move on.

12:13PM  8      MR. COOPER:  Ms. Champoux, can we pull up 26D as in

12:13PM  9  David.

12:13PM  10      BY MR. COOPER:

12:13PM  11  Q.  All right.  And looking just at the first page of this

12:13PM  12  document, sir, is this another auto-generated DARTS

12:13PM  13  deconfliction?

12:13PM  14  A.  Yes, it is.

12:13PM  15  Q.  Down here at the bottom of page 1, who's the person who

12:13PM  16  generated the investigative overlap?

12:13PM  17  A.  That's me.

12:13PM  18  Q.  Does it tell you when that investigative overlap was

12:13PM  19  created?

12:13PM  20  A.  March 13th, 2019.

12:13PM  21      MR. COOPER:  Ms. Champoux, if we can go to page 4 of

12:13PM  22  this document.

12:13PM  23      BY MR. COOPER:

12:13PM  24  Q.  All right.  At the top line of page 4 here, is this a

12:14PM  25  reference to a number that you put in DARTS on March 13th of

12:14PM    1    2019?

12:14PM    2    A.  Yes, it is.

12:14PM    3    Q.  Okay.  And what did you put in your remarks section?

12:14PM    4    A.  Numbers in contact with Frank Bifulco.

12:14PM    5    Q.  Okay.  Do you know Frank Bifulco to have a nickname or

12:14PM    6    alias?

12:14PM    7    A.  Yes, sir.

12:14PM    8    Q.  What was it?

12:14PM    9    A.  Butchie.

12:14PM   10    Q.  Okay.  And was he, in the law enforcement community, at

12:14PM   11    that time believed to be associated with Italian Organized

12:14PM   12    Crime?

12:14PM   13    A.  Yes.

12:14PM   14    Q.  Let's look down at the third item.

12:14PM   15         What's the date of that third item for that

12:14PM   16    deconfliction?

12:14PM   17    A.  March 20th, 2013.

12:14PM   18    Q.  What's the file number?

12:14PM   19    A.  C2-13-0026.

12:14PM   20    Q.  Okay.  And who ran that entry into DARTS on March 20th,

12:14PM   21    2013?

12:14PM   22    A.  Justin Borst.

12:14PM   23    Q.  Okay.  And can you read the remarks section for his

12:14PM   24    entry?

12:14PM   25    A.  Number part of ongoing narcotics investigation in contact

12:14PM   1   with target number 716-830-3226, per S.A. Bongiovanni.

12:15PM   2   Q.  Okay.  And is that 3226 number the same phone number for

12:15PM   3   Ron Serio that we looked at in Government Exhibit 100A.1 a

12:15PM   4   moment ago?

12:15PM   5   A.  Yes, I believe so.

12:15PM   6   Q.  And that file number, C2-13-0026, is that the same file

12:15PM   7   number for the Wayne Anderson file title that we looked at in

12:15PM   8   Exhibit 8A a moment ago?

12:15PM   9   A.  Yes.

12:15PM  10   Q.  I know there's a lot of phone numbers on these.  The

12:15PM  11   phone number underneath your name, is that your contact

12:15PM  12   information?

12:15PM  13   A.  That's my DEA-issued cell phone number.

12:15PM  14   Q.  Is the purpose of having that number listed on here to

12:16PM  15   kind of encourage coordination if someone from a different

12:16PM  16   office reaches out?

12:16PM  17   A.  Yes.

12:16PM  18   Q.  Okay.  Got it.

12:16PM  19        **MR. COOPER:**  Can you scroll up a bit, Ms. Champoux?

12:16PM  20   Right there is perfect.

12:16PM  21        **BY MR. COOPER:**

12:16PM  22   Q.  What's the phone number that's being run in DARTS that

12:16PM  23   causes that deconfliction generation?

12:16PM  24   A.  I believe it's 716-866-2687.

12:16PM  25   Q.  Okay.

12:16PM    1          MR. COOPER:  Ms. Champoux, can we zoom in on that for

12:16PM    2    a second in the top here?

12:16PM    3          BY MR. COOPER:

12:16PM    4    Q.  Does that help?

12:16PM    5    A.  Yes.

12:16PM    6    Q.  Go ahead, read the number for us.

12:16PM    7    A.  716-866-2687.

12:16PM    8    Q.  Okay.

12:16PM    9          MR. COOPER:  You can zoom out of that, Ms. Champoux.

12:16PM   10    And if we can go back to Government Exhibit 8A.

12:17PM   11          And this time, go to page 347.

12:17PM   12          BY MR. COOPER:

12:17PM   13    Q.  Does the phone number that's listed on 26D match the

12:17PM   14    phone number that's listed on Government Exhibit 8A, page

12:17PM   15    347, under user information here?

12:17PM   16    A.  Yes, it does.

12:17PM   17    Q.  And whose phone number is that associated with according

12:17PM   18    to this record?

12:17PM   19    A.  Paul Francoforte.

12:17PM   20    Q.  Do you know that person to have an alias or another name

12:17PM   21    they go by?

12:17PM   22    A.  Yes.

12:17PM   23    Q.  What's that?

12:17PM   24    A.  Hot Dog.

12:17PM   25    Q.  Okay.  And is it -- is that person's reputation in the

12:17PM   1   law enforcement community one of being associated with or

12:17PM   2   involved in organized crime?

12:17PM   3   A.  Yes.

12:17PM   4        MR. COOPER:  You can take down 8A, please,

12:17PM   5   Ms. Champoux.

12:17PM   6        Let's go back to 26D for a moment.  Page 4.

12:17PM   7        And then just scroll up a tiny bit.  Yeah, perfect.

12:18PM   8   Thank you, ma'am.

12:18PM   9        BY MR. COOPER:

12:18PM  10   Q.  Special Agent Casullo, when you run Hot Dog's phone

12:18PM  11   number in DARTS, does that cause the other agents who have

12:18PM  12   previously entered Hot Dog's phone number in DARTS to get

12:18PM  13   notified?

12:18PM  14   A.  Yes.

12:18PM  15   Q.  Even if it's six years later like this is?

12:18PM  16   A.  Yes.

12:18PM  17   Q.  Is that how DARTS is designed to function?

12:18PM  18   A.  Yes, it is.

12:18PM  19        MR. COOPER:  We can take down 26D.

12:18PM  20        And if you wouldn't mind bringing up 26M, as in

12:18PM  21   Michael now.

12:18PM  22        BY MR. COOPER:

12:18PM  23   Q.  Are we looking at another example of a DARTS

12:18PM  24   deconfliction email, sir?

12:18PM  25   A.  Yes, it is.

12:18PM    1    Q.  And is it again you who generated the conflict here?

12:18PM    2    A.  Yes.

12:18PM    3            MR. COOPER:  Can we go to page 2, Ms. Champoux?

12:18PM    4    Thank you.  And let's -- I want to go now towards the bottom

12:19PM    5    of this page, Trinity item, the bottom third of page 2.  If

12:19PM    6    you can zoom in on that, Ms. Champoux.  Thank you.

12:19PM    7            BY MR. COOPER:

12:19PM    8    Q.  What's the number that was entered into DARTS on this

12:19PM    9    deconfliction notice?

12:19PM   10    A.  716-984-5198.

12:19PM   11    Q.  Okay.  Let's work our way through here, again, at the

12:19PM   12    top, is this the time that you ran the number into DARTS?

12:19PM   13    A.  Yes.

12:19PM   14    Q.  What was the date that you did that?

12:19PM   15    A.  January 15th, 2019.

12:19PM   16    Q.  Okay.  And on the right in the remarks section, what did

12:19PM   17    you list there?

12:19PM   18    A.  Numbers in contact with Amherst, New York marijuana

12:19PM   19    trafficker, Dennis Tripi.

12:20PM   20    Q.  Underneath that, can you walk us through the second row

12:20PM   21    in this deconfliction?

12:20PM   22    A.  Yes, starting with the date?

12:20PM   23    Q.  Yep, that's perfect.

12:20PM   24    A.  The date listed is March 20th, 2013.  The case number is

12:20PM   25    C2-13-0026.  That number was ran by Justin Borst.  And the

12:20PM    1    remarks indicate number part of ongoing narcotics

12:20PM    2    investigation in contact with 716-830-3226 per

12:20PM    3    S.A. Bongiovanni.

12:20PM    4    Q.  Okay.  And do you read what's written in that second row

12:20PM    5    to indicate that according to Special Agent Bongiovanni, this

12:20PM    6    phone number in the top left corner was in contact with Ron

12:20PM    7    Serio's phone number?

12:20PM    8    A.  Correct.

12:20PM    9    Q.  Now, again, this is an example of six years later, a

12:20PM   10    notification or a deconfliction being generated from a number

12:21PM   11    that you ran; is that correct?

12:21PM   12    A.  Correct.

12:21PM   13    Q.  Okay.  Would that cause the defendant to be notified

12:21PM   14    according to DARTS?

12:21PM   15    A.  Yes.

12:21PM   16         MR. COOPER:  Ms. Champoux, if we can take that down

12:21PM   17    and pull up 26B as in Bravo.

12:21PM   18         BY MR. COOPER:

12:21PM   19    Q.  Same thing, sir, another deconfliction email.

12:21PM   20    A.  Yes.

12:21PM   21    Q.  Okay.  And is this one, again, generated by something

12:21PM   22    that you did up here at the top?

12:21PM   23    A.  Yes, it is.

12:21PM   24         MR. COOPER:  Okay.  And if we scroll down,

12:21PM   25    Ms. Champoux, to page 2.

| | | |
|---|---|---|
| 12:21PM | 1 | Let's zoom in on this top Trinity item here. |
| 12:21PM | 2 | **BY MR. COOPER:** |
| 12:21PM | 3 | Q.  What's the number that you ran here? |
| 12:21PM | 4 | A.  716-390-5553. |
| 12:21PM | 5 | Q.  What's the date that you ran that? |
| 12:21PM | 6 | A.  August 2nd, 2018. |
| 12:21PM | 7 | Q.  And what did you put in the remarks section when you ran |
| 12:22PM | 8 | that phone number? |
| 12:22PM | 9 | A.  Numbers in contact with marijuana trafficker Anthony |
| 12:22PM | 10 | Gerace. |
| 12:22PM | 11 | Q.  Had that number that you ran ever been put into DARTS |
| 12:22PM | 12 | before? |
| 12:22PM | 13 | A.  Yes, it was. |
| 12:22PM | 14 | Q.  When? |
| 12:22PM | 15 | A.  March 20th, 2013. |
| 12:22PM | 16 | Q.  Who did it? |
| 12:22PM | 17 | A.  Justin Borst. |
| 12:22PM | 18 | Q.  What did he write in the remarks section? |
| 12:22PM | 19 | A.  Number part of ongoing investigation in contact with |
| 12:22PM | 20 | target number 716-578-5296 per S.A. Bongiovanni. |
| 12:22PM | 21 | **MR. COOPER:**  Ms. Champoux, if you can zoom out of |
| 12:22PM | 22 | that, but keep the exhibit up. |
| 12:22PM | 23 | And then on the right, if you can pull up next to |
| 12:22PM | 24 | this Government Exhibit 8A.  And go to page 287. |
| | 25 | |

12:22PM    1        **BY MR. COOPER:**

12:22PM    2    Q.  Okay.  So the number that's listed in the remarks section

12:22PM    3    here is 716-578-5296; did I get that right?

12:23PM    4    A.  Correct.

12:23PM    5    Q.  Do you see that listed on this subscriber information

12:23PM    6    subpoena return on page 287 of Government Exhibit 8A?

12:23PM    7    A.  Yes.

12:23PM    8    Q.  Who's that phone number associated with according to this

12:23PM    9    subscriber information subpoena return?

12:23PM   10    A.  Thomas Serio.

12:23PM   11    Q.  Now, in your DARTS deconfliction --

12:23PM   12        **MR. COOPER:**  Can you leave this up, please?

12:23PM   13        **BY MR. COOPER:**

12:23PM   14    Q.  In your DARTS deconfliction, who did you say that Thomas

12:23PM   15    Serio was in contact with?

12:23PM   16    A.  Anthony Gerace.

12:23PM   17    Q.  Is that based upon phone records that you had received?

12:23PM   18    A.  Yes.  Oh, I'm sorry, which number are we looking at?

12:23PM   19    Which Trinity number?

12:23PM   20    Q.  Oh, okay.  So, Trinity number here at the top.

12:23PM   21    A.  Yes, 390-5553.

12:23PM   22    Q.  That was a number in your investigation that was in

12:23PM   23    contact with Anthony Gerace, right?

12:24PM   24    A.  Correct.

12:24PM   25    Q.  And I think I misspoke, but in the bottom here, does that

12:24PM     1    indicate that that same phone number ending in 5553 was also

12:24PM     2    in contact with Tom Serio's phone number?

12:24PM     3    A.   Yes.

12:24PM     4    Q.   Okay.  And did this cause a deconfliction to notify the

12:24PM     5    defendant when you ran this number in DARTS?

12:24PM     6    A.   Yes.

12:24PM     7    Q.   And do your remarks essentially tell the other people who

12:24PM     8    put that number in what you were working on, what you're

12:24PM     9    doing?

12:24PM    10    A.   Yes.

12:24PM    11           **MR. COOPER:**  If we can pull up 26I, please.

12:24PM    12           **BY MR. COOPER:**

12:24PM    13    Q.   Is this another deconfliction email?

12:24PM    14    A.   Yes, it is.

12:24PM    15    Q.   Okay.  And is this one dated November 9, 2018?

12:24PM    16    A.   Yes.

12:24PM    17           **MR. COOPER:**  If we can go to page 3, please,

12:24PM    18    Ms. Champoux.

12:24PM    19           Let's look at the second Trinity item that's listed.

12:25PM    20    Thank you, ma'am.

12:25PM    21           **BY MR. COOPER:**

12:25PM    22    Q.   Can you see that better now?

12:25PM    23    A.   Yes.

12:25PM    24    Q.   What's the date there?

12:25PM    25    A.   November 9, 2018?

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

12:25PM   1   Q.  Okay.  Underneath that, can you see an earlier DARTS

12:25PM   2   entry that showed up related to that same phone number ending

12:25PM   3   in 7760?

12:25PM   4   A.  Yes.

12:25PM   5   Q.  Okay.  And what's the case number for that?

12:25PM   6   A.  C2-13-0026.

12:25PM   7   Q.  Is it entered by Borst again?

12:25PM   8   A.  Yes.

12:25PM   9   Q.  Do the remarks indicate that that was done on behalf of

12:25PM  10   Special Agent Bongiovanni again?

12:25PM  11   A.  Yes.

12:25PM  12   Q.  And is that 578-5296 phone number in the remarks section

12:25PM  13   the same phone number for Tom Serio that we were just looking

12:25PM  14   at?

12:25PM  15   A.  Yes.

12:25PM  16   Q.  Would this DARTS deconfliction have caused the defendant

12:26PM  17   to be notified that someone else ran this number that was in

12:26PM  18   contact with Tom Serio?

12:26PM  19   A.  Yes.

12:26PM  20        MR. COOPER:  You can take that down, please,

12:26PM  21   Ms. Champoux.  And I think last but not least, Government

12:26PM  22   Exhibit 26C as in Charlie.

12:26PM  23        BY MR. COOPER:

12:26PM  24   Q.  Is this another deconfliction email?

12:26PM  25   A.  Yes.

| 12:26PM | 1 | **MR. COOPER:** Can we zoom in on the bottom part of |
| 12:26PM | 2 | page 1 here, Ms. Champoux, the first Trinity item? |
| 12:26PM | 3 | **BY MR. COOPER:** |
| 12:26PM | 4 | Q. What date did you run this phone number? |
| 12:26PM | 5 | A. August 2nd, 2018. |
| 12:26PM | 6 | Q. And is the phone number that you're running that same |
| 12:26PM | 7 | 578-5296 phone number? |
| 12:26PM | 8 | A. Yes. |
| 12:26PM | 9 | Q. Is that associated with Tom Serio? |
| 12:26PM | 10 | A. Yes. |
| 12:26PM | 11 | Q. When you ran that number on August 2nd, 2018, what did |
| 12:26PM | 12 | you put in your remarks? |
| 12:26PM | 13 | A. Number part of ongoing marijuana investigation. I |
| 12:27PM | 14 | remember running this one. |
| 12:27PM | 15 | Q. Okay. And are there two DARTS entries beneath that, or |
| 12:27PM | 16 | two rows beneath that indicating prior DARTS entries for |
| 12:27PM | 17 | Mr. Serio's phone number? |
| 12:27PM | 18 | A. Yes. |
| 12:27PM | 19 | Q. Okay. We're going to go backwards in time, so we'll go |
| 12:27PM | 20 | to the bottom one first. Is that March 12th of 2013? |
| 12:27PM | 21 | A. Yes. |
| 12:27PM | 22 | Q. Who entered that one on March 12th, 2013? |
| 12:27PM | 23 | A. Stephen Bevilacqua. |
| 12:27PM | 24 | Q. Is he another intel analyst at the DEA at that time? |
| 12:27PM | 25 | A. He's a DEA analyst, yeah. |

12:27PM  1    Q.  And what did Analyst Bevilacqua put in the remarks

12:27PM  2    section of his March 12th, 2013 entry?

12:27PM  3    A.  Narcotics investigation number for Thomas Serio per

12:27PM  4    S.A. Bongiovanni.

12:27PM  5    Q.  Okay.  And then even before that in time, was there an

12:27PM  6    entry earlier from July 6 of 2012?

12:27PM  7    A.  Yes.

12:27PM  8    Q.  Was that a different case number from the one we just

12:27PM  9    looked at?

12:27PM  10   A.  Yes.

12:27PM  11   Q.  The one we just looked at, was that same 13-0026, right?

12:28PM  12   A.  Yes.

12:28PM  13   Q.  And then this middle one is a 12-0090; is that correct?

12:28PM  14   A.  Correct.

12:28PM  15   Q.  Was that ran by Justin Borst?

12:28PM  16   A.  Yes.

12:28PM  17   Q.  And does he say that was per Special Agent Nastoff?

12:28PM  18   A.  Yes, he does.

12:28PM  19   Q.  Okay.  And that's about a year, give or take a few

12:28PM  20   months, before the defendant causes Bevilacqua to run that

12:28PM  21   number, right?

12:28PM  22   A.  Correct.

12:28PM  23         **MR. COOPER:**  You can zoom out of that, Ms. Champoux.

12:28PM  24   Leave it up for now.

         25

| | | |
|---|---|---|
| 12:28PM | 1 | **BY MR. COOPER:** |
| 12:28PM | 2 | Q.  Sir, was there a time when you got phone records for a |
| 12:28PM | 3 | person named Anthony Gerace? |
| 12:28PM | 4 | A.  Yes, I subpoenaed those records. |
| 12:28PM | 5 | Q.  Okay.  And what caused you to subpoena phone records for |
| 12:28PM | 6 | Anthony Gerace? |
| 12:28PM | 7 | A.  I subpoenaed those records on several occasions, I |
| 12:28PM | 8 | believe.  Early on, he came up in the investigation when I |
| 12:29PM | 9 | was investigating Peter Gerace.  It's Peter Gerace's brother. |
| 12:29PM | 10 | Through conversations with agents in my group at the time, |
| 12:29PM | 11 | Chris Wisniewski mentioned that -- |
| 12:29PM | 12 | **MR. SINGER:**  Objection, hearsay. |
| 12:29PM | 13 | **MR. COOPER:**  I'll ask a follow-up question. |
| 12:29PM | 14 | **THE COURT:**  Well, just -- let me take a look at this. |
| 12:29PM | 15 | **MR. COOPER:**  Sure, Judge. |
| 12:29PM | 16 | **THE COURT:**  Yeah, sustained.  Don't tell us what -- |
| 12:29PM | 17 | Why don't you ask a follow-up question. |
| 12:29PM | 18 | **BY MR. COOPER:** |
| 12:29PM | 19 | Q.  So, Special Agent Casullo, at one point, did you run |
| 12:29PM | 20 | Anthony Gerace's phone records or, you know, subpoena his |
| 12:29PM | 21 | phone records related to the burglary at Michael Sinatra's |
| 12:29PM | 22 | house? |
| 12:29PM | 23 | A.  I did, yes.  Yes. |
| 12:29PM | 24 | Q.  You did that? |
| 12:29PM | 25 | A.  Yes. |

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

| | | |
|---|---|---|
| 12:29PM | 1 | Q. Okay. When you did that, did that cause the defendant to |
| 12:29PM | 2 | get notified that you had ran Anthony Gerace's phone number |
| 12:29PM | 3 | in DARTS? |
| 12:29PM | 4 | A. Could you show me that specific -- |
| 12:29PM | 5 | Q. Sure. |
| 12:29PM | 6 | A. -- deconfliction? |
| 12:29PM | 7 | Is this the one you're speaking of? |
| 12:29PM | 8 | MR. COOPER: You can take that down for a second, |
| 12:29PM | 9 | Ms. Champoux. |
| 12:30PM | 10 | THE WITNESS: Okay. |
| 12:30PM | 11 | BY MR. COOPER: |
| 12:30PM | 12 | Q. Let's work -- let's work through it this way, sir. |
| 12:30PM | 13 | Did there come a time after you ran Anthony Gerace's |
| 12:33PM | 14 | phone records in DARTS when the defendant came up to discuss |
| 12:33PM | 15 | that with you? |
| 12:33PM | 16 | A. Oh, yes. |
| 12:33PM | 17 | Q. Okay. Can you tell the jury about that? |
| 12:33PM | 18 | A. Sure. Yeah. |
| 12:33PM | 19 | So I ran Anthony Gerace's phone records on different |
| 12:33PM | 20 | occasions, once early on I believe in 2016, then again in |
| 12:33PM | 21 | August 2018 I believe, and then again afterwards in -- I |
| 12:33PM | 22 | think it was, like, January of 2019. |
| 12:33PM | 23 | When I ran them in 2019, Anthony Gerace's phone records, |
| 12:33PM | 24 | it was related to the burglary at Michael Sinatra's house. |
| 12:33PM | 25 | Prior to that, I was running them specifically on the |

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

70

12:33PM    1    investigation of marijuana related to Anthony Gerace.

12:33PM    2      So, I believe it was the August 2018 when I ran Anthony

12:33PM    3    Gerace's phone records, on that occasion Bongiovanni came

12:33PM    4    over to my desk to speak to me.

12:33PM    5    Q.  What was his demeanor like when he came over to your desk

12:33PM    6    to speak to you?

12:33PM    7    A.  So, he walked over to our side of the group, which was

12:33PM    8    different from D-57.  I saw him walk in.  I saw him glance

12:33PM    9    towards my desk.

12:33PM   10      I believe at the time I was talking to Curtis Ryan from

12:33PM   11    Homeland Security, who was my partner during the

12:33PM   12    investigation of Anthony and Peter Gerace, at some point.

12:33PM   13      And he walked in to the part of the office where the

12:33PM   14    secretaries sat, and spoke to one of the secretaries, and

12:33PM   15    then came out.  And then he paced back.

12:33PM   16      And he did this, like, several times, and I'm noticing

12:33PM   17    this.

12:33PM   18      At some point, Curtis Ryan walks away, and then he came

12:33PM   19    over to my desk.

12:33PM   20      And when he came over to my desk, I can't remember if he

12:33PM   21    was holding the actual DARTS deconfliction or not, he came

12:33PM   22    over he said I noticed that you're running deconflictions for

12:33PM   23    Anthony Gerace.  It came up in your investigation, whatever

12:33PM   24    his words were, related to Anthony Gerace and the

12:33PM   25    deconfliction.

12:33PM   1      And he said, which -- at the time, I was pretty unsettled

12:33PM   2    of.  So, he mentions that he -- his wife is friends with

12:33PM   3    Anthony Gerace on Facebook or his friend group.  That he

12:33PM   4    couldn't help in the investigation, but his wife could

12:33PM   5    because they knew -- because she knew these people through

12:33PM   6    Facebook.  And that he has his loads of marijuana delivered

12:33PM   7    to him behind Santora's.  Has -- Anthony Gerace also supplies

12:33PM   8    his friends with cocaine.  And you better hurry up and

12:33PM   9    investigate him before they make marijuana legal.

12:33PM  10    Q.  When the defendant told you that, you better hurry up and

12:33PM  11    investigate Anthony Gerace before they make marijuana legal,

12:33PM  12    did you get the impression that he was mocking you for

12:33PM  13    investigating that?

12:33PM  14    A.  Mocking me.  I don't know if that was his way of trying

12:33PM  15    to dissuade me from investigating Anthony Gerace, but, yes.

12:33PM  16    Q.  Did the defendant -- you mentioned that the defendant

12:33PM  17    told you some information about where Anthony Gerace was

12:33PM  18    getting his loads of marijuana delivered; do you remember

12:33PM  19    that?

12:33PM  20    A.  Yes.

12:33PM  21    Q.  Did he tell you why he wasn't investigating Anthony

12:33PM  22    Gerace if he knew where he was getting loads of marijuana

12:33PM  23    delivered?

12:33PM  24    A.  No.

12:33PM  25    Q.  Did you want to continue that conversation?

| | | |
|---|---|---|
| 12:33PM | 1 | A.  No.  Not at all.  I was squirming.  I was squirming. |
| 12:33PM | 2 | Q.  You said you were squirming.  Were you uncomfortable |
| 12:33PM | 3 | sitting there? |
| 12:33PM | 4 | A.  Extremely uncomfortable. |
| 12:33PM | 5 | Q.  Speaking of being uncomfortable, let's stay on this topic |
| 12:34PM | 6 | for a second. |
| 12:34PM | 7 | Have you testified at a previous proceeding before? |
| 12:34PM | 8 | A.  Yes. |
| 12:34PM | 9 | Q.  Okay.  Before you testified at the prior proceeding, |
| 12:34PM | 10 | before you came into this courtroom and sat in that chair, |
| 12:34PM | 11 | were you sitting outside in the hallway? |
| 12:34PM | 12 | A.  Are you talking about the -- |
| 12:34PM | 13 | Q.  The prior proceeding when you testified -- |
| 12:34PM | 14 | A.  Yes. |
| 12:34PM | 15 | Q.  -- in this courtroom -- |
| 12:34PM | 16 | A.  Yes. |
| 12:34PM | 17 | Q.  -- in that chair, were you sitting outside in the |
| 12:34PM | 18 | hallway? |
| 12:34PM | 19 | A.  Yeah, there was several occasions. |
| 12:34PM | 20 | Q.  Okay.  Was there an occasion while you were sitting |
| 12:34PM | 21 | outside in the hallway before getting in that chair to offer |
| 12:34PM | 22 | testimony that the defendant came over to you and made some |
| 12:34PM | 23 | comments to you? |
| 12:34PM | 24 | A.  He was walking by me as I was sitting with Special Agent |
| 12:34PM | 25 | Ralph Joseph. |

12:34PM  1  Q.  Did the defendant say something to you?

12:34PM  2  A.  Oh, he did, in --

12:34PM  3  Q.  And what did he say to you?

12:34PM  4  A.  In passing, he said that, what are you?  His protection?

12:34PM  5      Talking to me, and Ralph Joseph from the FBI.

12:34PM  6  Q.  Did that make you uncomfortable?

12:34PM  7  A.  Extremely uncomfortable.  Very unsettling.

12:34PM  8  Q.  Was that right before you came to sit in a chair just

12:34PM  9  like this one and offer testimony?

12:34PM  10  A.  Between breaks of testimony.  I was just testifying, and

12:35PM  11  getting ready to go back on and testify.

12:35PM  12  Q.  All right.  We're going to move on for a second.

12:35PM  13      I want to talk to you about a name Mark Vitale.  Are you

12:35PM  14  familiar with that name?

12:35PM  15  A.  I am.

12:35PM  16      MR. COOPER:  Ms. Champoux, if we can go to Government

12:35PM  17  Exhibit 100A.1, please, and pull up a PDF entitled Vitale

12:35PM  18  Sprint sub info.

12:35PM  19      Just if we can zoom out a couple of clicks there.

12:35PM  20  That's perfect.  Thank you.

12:35PM  21      BY MR. COOPER:

12:35PM  22  Q.  Do you see this document in front of you, sir?

12:35PM  23  A.  Yes.

12:35PM  24  Q.  Does this appear to be a response back from Sprint

12:35PM  25  regarding the subpoena that you issued?

| | | |
|---|---|---|
| 12:35PM | 1 | A.  Yes. |
| 12:35PM | 2 | Q.  Is it addressed to you at the top here? |
| 12:35PM | 3 | A.  Yes, it is. |
| 12:35PM | 4 | Q.  Okay.  Does this document indicate that at some point, |
| 12:36PM | 5 | you had caused a subpoena to be generated for phone records |
| 12:36PM | 6 | related to Mark Vitale? |
| 12:36PM | 7 | A.  I'm sorry, could you repeat that? |
| 12:36PM | 8 | Q.  Does that document indicate you, at some point, had |
| 12:36PM | 9 | caused a subpoena to be issued for Mark Vitale's phone |
| 12:36PM | 10 | records? |
| 12:36PM | 11 | A.  Does it say Mark Vitale? |
| 12:36PM | 12 | MR. COOPER:  Ms. Champoux, can you scroll down? |
| 12:36PM | 13 | Pause right there. |
| 12:36PM | 14 | BY MR. COOPER: |
| 12:36PM | 15 | Q.  Do you see the name listed here in the account details |
| 12:36PM | 16 | section? |
| 12:36PM | 17 | A.  Yes. |
| 12:36PM | 18 | Q.  And what's the name that's listed there? |
| 12:36PM | 19 | A.  Michelle Vitale. |
| 12:36PM | 20 | Q.  Is that the same last name as Mark Vitale that I'm asking |
| 12:36PM | 21 | you about? |
| 12:36PM | 22 | A.  Yes. |
| 12:36PM | 23 | Q.  And is the date range of these phone records |
| 12:36PM | 24 | November 2015 to December of 2015? |
| 12:36PM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 12:36PM | 1 | MR. COOPER:  You can scroll back up to the first |
| 12:37PM | 2 | page. |
| 12:37PM | 3 | BY MR. COOPER: |
| 12:37PM | 4 | Q.  Does this appear to you to be a subpoena for Vitale's |
| 12:37PM | 5 | toll records? |
| 12:37PM | 6 | A.  Again, I don't remember this specifically, but yes. |
| 12:37PM | 7 | Q.  Okay.  It has your name on it, right? |
| 12:37PM | 8 | A.  Yes. |
| 12:37PM | 9 | Q.  Okay.  And the name for the subscriber information has |
| 12:37PM | 10 | the last name Vitale -- |
| 12:37PM | 11 | A.  Yes. |
| 12:37PM | 12 | Q.  -- is that right? |
| 12:37PM | 13 | A.  Yes. |
| 12:37PM | 14 | Q.  Okay.  And do you have any reason to think you didn't run |
| 12:37PM | 15 | this subpoena for Vitale subscriber? |
| 12:37PM | 16 | A.  No. |
| 12:37PM | 17 | Q.  Okay.  The document that we're looking at, the PDF |
| 12:37PM | 18 | entitled to Vitale Sprint sub info.PDF, do you know where |
| 12:37PM | 19 | this document was recovered from, sir? |
| 12:37PM | 20 | A.  No. |
| 12:37PM | 21 | Q.  Is there any legitimate law enforcement reason that you |
| 12:37PM | 22 | know of for the defendant to have had this subpoena return |
| 12:37PM | 23 | for a subpoena that you issued related to Mark Vitale in his |
| 12:37PM | 24 | basement after he retired? |
| 12:37PM | 25 | MR. SINGER:  Objection, speculation. |

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

| | | |
|---|---|---|
| 12:37PM | 1 | **THE COURT:**  Overruled. |
| 12:37PM | 2 | **BY MR. COOPER:** |
| 12:37PM | 3 | Q.  Any legitimate law enforcement reason for that, sir? |
| 12:38PM | 4 | A.  No. |
| 12:38PM | 5 | **MR. COOPER:**  You can take that down, Ms. Champoux. |
| 12:38PM | 6 | **BY MR. COOPER:** |
| 12:38PM | 7 | Q.  I want to speak with you now briefly about a person named |
| 12:38PM | 8 | Tom Mozg.  Do you know that person? |
| 12:38PM | 9 | A.  Yes. |
| 12:38PM | 10 | Q.  Is it your understanding that he works as an intelligence |
| 12:38PM | 11 | agent for Customs and Border Protection? |
| 12:38PM | 12 | A.  Yes, for the border patrol. |
| 12:38PM | 13 | Q.  Okay.  Was there a time in the summer of 2016 where you |
| 12:38PM | 14 | attended a meeting with Tom Mozg about a target he was |
| 12:38PM | 15 | investigating named Joe Bella? |
| 12:38PM | 16 | A.  Yes. |
| 12:38PM | 17 | Q.  Generally during that meeting, did Tom Mozg share |
| 12:38PM | 18 | information with you that he had into in his investigation |
| 12:38PM | 19 | into Bella? |
| 12:38PM | 20 | A.  Yes. |
| 12:38PM | 21 | Q.  Had he started to work up kind of contacts about who |
| 12:38PM | 22 | Bella was in contact with? |
| 12:38PM | 23 | A.  Yes.  It was a, like, an organizational chart that we do |
| 12:39PM | 24 | during investigations, showing targets and how they're |
| 12:39PM | 25 | related to each other.  And there were numerous targets on |

12:39PM  1    there, and Joe Bella was part of it.

12:39PM  2    Q.  Okay.  Did the defendant end up coming to that meeting?

12:39PM  3    A.  Yes.

12:39PM  4    Q.  Did he mention during that meeting whether he knew Joe

12:39PM  5    Bella or anything about that?

12:39PM  6    A.  No.

12:39PM  7    Q.  Did he mention that he saw Joe Bella socially at The

12:39PM  8    Crocodile Bar?

12:39PM  9    A.  No.

12:39PM  10           MR. SINGER:  Objection to the form of the question.

12:39PM  11           MR. COOPER:  I'm asking --

12:39PM  12           MR. SINGER:  Assumes a fact not in evidence.

12:39PM  13           MR. COOPER:  I'm asking if the defendant said

12:39PM  14    something during a meeting.  That's the only way to find out.

12:39PM  15           THE COURT:  Overruled.

12:39PM  16           BY MR. COOPER:

12:39PM  17    Q.  Did the defendant, when he walked into the meeting, say,

12:39PM  18    hey, Tom, your target of investigation, I see him sometimes

12:39PM  19    socially at The Crocodile Bar?

12:39PM  20           MR. SINGER:  Objection to the form of the question.

12:39PM  21    Seeing him socially, Judge, that wasn't established in the

12:39PM  22    evidence.

12:39PM  23           THE COURT:  Whether it was established or not, he's

12:39PM  24    asking whether the defendant said that to him.

12:39PM  25           So, and the jury understands that that facts assumed

12:39PM  1  in a question, and I've instructed them before and I'll

12:39PM  2  instruct them again, and I'll instruct them right now, facts

12:40PM  3  that are assumed in a question are not necessarily true

12:40PM  4  because they're assumed in the question.  Okay?

12:40PM  5         So the question is:  Did the defendant say that he

12:40PM  6  saw Joe Bella socially in The Crocodile Bar?

12:40PM  7         The objection to that question is overruled.

12:40PM  8         **BY MR. COOPER:**

12:40PM  9  Q.  Did he say that during the meeting, sir?

12:40PM  10  A.  No.

12:40PM  11  Q.  Did he say anything about knowing Joe Bella at all during

12:40PM  12  the meeting?

12:40PM  13  A.  No.

12:40PM  14  Q.  During the course of your career, Special Agent Casullo,

12:40PM  15  have you ever had an agent mention during a deconfliction

12:40PM  16  meeting or an intelligence-sharing meeting that they knew a

12:40PM  17  subject or a target, or had seen them at a bar or a social

12:40PM  18  setting?

12:40PM  19  A.  Yeah, I've had that come up before.

12:40PM  20  Q.  Okay.  Is it common for an agent to bring that up during

12:40PM  21  a meeting like that, if it happens?

12:40PM  22  A.  If it happened, it would be common for them to mention

12:41PM  23  that they know a certain individual.

12:41PM  24  Q.  Okay.

12:41PM  25  A.  If a name comes up or you know someone during an

| | | |
|---|---|---|
| 12:41PM | 1 | investigation, yes. |
| 12:41PM | 2 | Q.  Do drugs sometimes get distributed at bars? |
| 12:41PM | 3 | A.  To the best of my knowledge and experience, yes. |
| 12:41PM | 4 | Q.  Has that come up during some of your DEA investigations |
| 12:41PM | 5 | in your career? |
| 12:41PM | 6 | A.  It has for me in my career. |
| 12:41PM | 7 | Q.  All right.  Let's move on from that, and let's talk about |
| 12:41PM | 8 | Peter Gerace, okay? |
| 12:41PM | 9 | A.  Yes. |
| 12:41PM | 10 | Q.  Do you know who Peter Gerace is? |
| 12:41PM | 11 | A.  Yes, I do. |
| 12:41PM | 12 | Q.  How do you know who Peter Gerace is? |
| 12:41PM | 13 | A.  I know Peter Gerace because I graduated from Saint Joe's |
| 12:41PM | 14 | High School with him in 1985. |
| 12:41PM | 15 | Q.  Okay.  When you went to high school, between 1981 and |
| 12:41PM | 16 | 1985, were you friends with Peter Gerace? |
| 12:41PM | 17 | A.  No. |
| 12:41PM | 18 | Q.  After you graduated from high school, when you were in |
| 12:41PM | 19 | your late teens and early 20s, were you friends with Peter |
| 12:41PM | 20 | Gerace? |
| 12:41PM | 21 | A.  No. |
| 12:41PM | 22 | Q.  In your mid 20s, were you friends with Peter Gerace? |
| 12:41PM | 23 | A.  No. |
| 12:41PM | 24 | Q.  How about your late 20s, sir? |
| 12:41PM | 25 | A.  No. |

12:41PM    1    Q.  When you were in your early 30s, were you friends with

12:41PM    2    Peter Gerace?

12:41PM    3    A.  No.

12:41PM    4    Q.  How about your mid 30s?

12:41PM    5    A.  No.

12:41PM    6    Q.  How about your late 30s?

12:41PM    7    A.  No.

12:41PM    8         MR. SINGER:  Objection, Judge.  I think we get the

12:41PM    9    idea.

12:41PM    10        THE COURT:  Sustained.

12:41PM    11        BY MR. COOPER:

12:41PM    12   Q.  At any point in your entire life, sir, have you ever been

12:42PM    13   friends with Peter Gerace?

12:42PM    14        MR. SINGER:  Objection.  Cumulative.

12:42PM    15        MR. COOPER:  It's a different question.

12:42PM    16        THE COURT:  No, no, that is a different question.

12:42PM    17        BY MR. COOPER:

12:42PM    18   Q.  I'll ask again.  Sir, at any point during your -- how old

12:42PM    19   are you?

12:42PM    20   A.  I am 57.

12:42PM    21   Q.  At any point in the 57 years that you've been on planet

12:42PM    22   Earth, have you ever been friends with Peter Gerace?

12:42PM    23   A.  No.

12:42PM    24   Q.  Do you have a family member who's friends with Peter

12:42PM    25   Gerace?

12:42PM    1    A.  Yes.

12:42PM    2    Q.  Who's that family member?

12:42PM    3    A.  My wife's brother, Phil Domiano, is friends with Peter

12:42PM    4    Gerace.

12:42PM    5    Q.  Can you describe your relationship with Mr. Domiano?

12:42PM    6    A.  I do not have a talking -- I -- I do not have a

12:42PM    7    relationship with Phil Domiano.  We don't talk.  He's not

12:42PM    8    allowed at our house.  And I haven't seen him in years.

12:42PM    9        And my wife won't even bring up his name in front of me.

12:42PM   10    Q.  Do you know or believe Mr. Domiano to associate with

12:43PM   11    people that you don't approve of?

12:43PM   12    A.  Yes, I believe so.

12:43PM   13    Q.  Has your relationship with Mr. Domiano influenced how you

12:43PM   14    do your job at the DEA in any way?

12:43PM   15    A.  No.

12:43PM   16    Q.  While we're on the topic of Phil Domiano and Peter

12:43PM   17    Gerace, let's bring up Government Exhibit 99.

12:43PM   18            MR. COOPER:  Ms. Champoux, can you zoom in on the top

12:43PM   19    one third of this document down to the exhibit sticker?

12:43PM   20            You've got to get the very top, too, for me.  I'm

12:43PM   21    sorry.

12:43PM   22            BY MR. COOPER:

12:43PM   23    Q.  Have you seen this before today?

12:43PM   24    A.  When I testified before.

12:43PM   25    Q.  You've looked at this before, right?

12:43PM   1   A.  Yes.

12:43PM   2   Q.  Does this appear to be a DEA memorandum?

12:43PM   3   A.  Yes, it is.

12:43PM   4   Q.  Okay.  And what's the subject line of the memorandum?

12:43PM   5   A.  Communication with Peter Gerace by Special Agent Anthony

12:44PM   6   Casullo and Phil Domiano.

12:44PM   7   Q.  What's the date the memorandum was drafted?

12:44PM   8   A.  January 28th, 2019.

12:44PM   9   Q.  Now we're going to cover the comments in a little bit,

12:44PM  10   and the -- what you reported.

12:44PM  11       But by January 28th of 2019, had you already reported

12:44PM  12   that this defendant made race-related comments in front of

12:44PM  13   you?

12:44PM  14   A.  Yes.

12:44PM  15   Q.  You had already reported that?

12:44PM  16   A.  Yes.

12:44PM  17   Q.  Who wrote the memo?

12:44PM  18   A.  S.A. Joseph Bongiovanni.

12:44PM  19   Q.  And who did he send it to?

12:44PM  20   A.  To Edward A. Orgon, the resident agent in charge in

12:44PM  21   charge of the Buffalo office.

12:44PM  22           MR. COOPER:  You can zoom out of that, please,

12:44PM  23   Ms. Champoux.

12:44PM  24       Let's look at the second sen -- zoom in on the first

12:44PM  25   paragraph, please.

| | | |
|---|---|---|
| 12:44PM | 1 | **BY MR. COOPER:** |
| 12:45PM | 2 | Q.  Do you see the second sentence that says:  In that past, |
| 12:45PM | 3 | S.A. Bongiovanni has verbally informed you, my group |
| 12:45PM | 4 | supervisor Greg Yensan, and our ASAC David T. Zon, of |
| 12:45PM | 5 | information confirming the friendship of Domiano, Casullo, |
| 12:45PM | 6 | and Gerace; do you see that, sir? |
| 12:45PM | 7 | A.  I see that. |
| 12:45PM | 8 | Q.  Are you friends with Phil Domiano? |
| 12:45PM | 9 | A.  No. |
| 12:45PM | 10 | Q.  Is that a lie, when it's written in that report? |
| 12:45PM | 11 | A.  That is a lie. |
| 12:45PM | 12 | Q.  Are you friends with Peter Gerace, sir? |
| 12:45PM | 13 | A.  No. |
| 12:45PM | 14 | Q.  Is it a lie when it's written in this memorandum? |
| 12:45PM | 15 | A.  That is a lie. |
| 12:45PM | 16 | **MR. COOPER:**  We can zoom out of that paragraph, |
| 12:45PM | 17 | please, Ms. Champoux. |
| 12:45PM | 18 | Can you zoom in on the second paragraph, please? |
| 12:45PM | 19 | **BY MR. COOPER:** |
| 12:46PM | 20 | Q.  Do you see this?  Can you read this out loud for the |
| 12:46PM | 21 | jury? |
| 12:46PM | 22 | A.  Yes.  S.A. Bongiovanni has personally witnessed |
| 12:46PM | 23 | S.A. Casullo meeting and drinking socially with Peter Gerace |
| 12:46PM | 24 | alone at the Big Ditch Brewery and later at Tappo Italian |
| 12:46PM | 25 | Restaurant in Buffalo, New York at approximately 9:45 p.m. on |

12:46PM    1    the evening of June 13th, 2015.

12:46PM    2    Q.  Sir, is that the truth, or is that a lie?

12:46PM    3    A.  That is a lie.

12:46PM    4    Q.  Can you tell the jury what actually happened there?

12:46PM    5    A.  Yes, I can.

12:46PM    6    Q.  Explain it to them.

12:46PM    7    A.  So, on that date of June 13th, 2015, that, I believe, is

12:46PM    8    the date of my high school reunion for Saint Joe's.  It was

12:46PM    9    our 30-year reunion.

12:46PM   10        I was still working in New York City.  I would come home

12:46PM   11    on weekends when I could to visit my family.

12:46PM   12        On this particular weekend, we had our high school

12:46PM   13    reunion, which I attended.  While I was at the reunion, Peter

12:46PM   14    Gerace was there.  We probably had about 50 classmates that I

12:47PM   15    can remember, approximately, at the reunion.

12:47PM   16        At some point, Peter started talking to me.  And he had

12:47PM   17    mentioned that Bongiovanni was across the street at Tappo

12:47PM   18    Restaurant, and if I wanted to go see him.

12:47PM   19        And I said no, initially, I did not want to walk across

12:47PM   20    the street with Peter Gerace.

12:47PM   21        He mentioned it a second time.  Like, he asked me again

12:47PM   22    right after that, and I said no.

12:47PM   23        And then he mentioned that he's across the street with my

12:47PM   24    brother, let's just walk across the street.  It's right over

12:47PM   25    there.  Which it is, it is right across the street, and I

12:47PM    1    agreed.  I wanted to see with my own eyes that he was hanging

12:47PM    2    out with Anthony Gerace.

12:47PM    3      So I walked across the street with Peter.  We walked into

12:47PM    4    Tappo Restaurant.  And at the bar was sitting Joe Bongiovanni

12:47PM    5    and it was three or four other individuals that I didn't

12:47PM    6    recognize.

12:47PM    7      When we walked up to Joe, he looked extremely surprised

12:47PM    8    to see me.  It looked like he wanted to crawl under the bar.

12:48PM    9      He had said, what are you doing here, I thought you're

12:48PM   10    working in New York?

12:48PM   11      I said I am, I'm working in New York, and I'm home on the

12:48PM   12    weekend for my high school reunion.

12:48PM   13      I can't remember what he said right after that, but

12:48PM   14    shortly thereafter he said -- he introduced me to the other

12:48PM   15    people that he was with.  The first person that he introduced

12:48PM   16    me to, which was right next to him, was Anthony Gerace.

12:48PM   17      Anthony Gerace, this is Tony Casullo.

12:48PM   18      Looked at him -- I looked at him.  He tried to avoid eye

12:48PM   19    contact with me.  Shook his hand.

12:48PM   20      He introduced me to the other individuals who I can't

12:48PM   21    remember because I was kind of fixated on Anthony Gerace.

12:48PM   22    Shook their hands.

12:48PM   23      Had a couple moments of conversation.  I can't remember

12:48PM   24    how long.  Not long, maybe several minutes.

12:48PM   25      And Joe agreed to walk back across to our reunion.  I

12:48PM    1    said I want to get back to the reunion.  And me, Peter

12:48PM    2    Gerace, and Bongiovanni walked back over to Tappo's, there's

12:49PM    3    an outside area and an inside, I believe at the time.  The

12:49PM    4    reunion was in both locations, but most people were outside.

12:49PM    5    We walked back into the outside area.

12:49PM    6        I walked off into my group of friends, which were more

12:49PM    7    like the hockey guys that I played with.  And Bongiovanni

12:49PM    8    kind of faded off into a group with other people.  I remember

12:49PM    9    one particular individual that I went to high school with

12:49PM    10   that was a football player, I remember them hugging each

12:49PM    11   other because they must have known each other.

12:49PM    12       And, yeah, that's pretty much it.

12:49PM    13   Q.  When this sentence says that Special Agent Bongiovanni

12:49PM    14   witnessed you, Tony Casullo, drinking socially with Peter

12:49PM    15   Gerace alone, is that true?

12:49PM    16   A.  That's a lie.

12:49PM    17   Q.  Did that happen?

12:49PM    18   A.  No.

12:49PM    19   Q.  Who was alone drinking with Anthony Gerace?

12:49PM    20   A.  It was Joe Bongiovanni with Anthony Gerace and two or

12:49PM    21   three other individuals.

12:49PM    22           MR. COOPER:  You can zoom out of that, Ms. Champoux.

12:50PM    23   Take down Exhibit 99.  Thank you.

12:50PM    24           BY MR. COOPER:

12:50PM    25   Q.  During your time at the DEA, did you ever attempt to

12:50PM    1    investigate Peter Gerace?

12:50PM    2    A.   Yes.

12:50PM    3    Q.   Did that investigation include Pharaoh's Gentlemen's

12:50PM    4    Club?

12:50PM    5    A.   Yes.

12:50PM    6    Q.   Was there actually something that was said to you by a

12:50PM    7    different person at your high school reunion that was a part

12:50PM    8    of what made you interested in investigating Peter Gerace?

12:50PM    9    A.   That was part of it.

12:50PM   10    Q.   Okay.  So that -- what someone else said to you, did that

12:50PM   11    form part of the reason why you pursued an investigation into

12:50PM   12    Peter?

12:50PM   13    A.   Oh, yes.

12:50PM   14    Q.   Can you tell the jury what that person said to you?

12:50PM   15    A.   I had one particular classmate who works for the district

12:50PM   16    attorney's office in a law enforcement capacity as a

12:50PM   17    prosecutor.  He had told me that --

12:50PM   18            MR. SINGER:  Objection, hearsay.

12:50PM   19            MR. COOPER:  Judge, I can come up?

12:50PM   20            THE COURT:  Well, so, this is being offered for the

12:50PM   21    reason why this witness did what he did in investigating Peter

12:50PM   22    Gerace.  It's not being offered for the truth.  So, again, you

12:50PM   23    can't assume that what the person said to him is true.  You're

12:51PM   24    being told this only insofar as it prompted this witness to do

12:51PM   25    something.  Okay?

12:51PM  1      The objection is sustained in part and overruled in

12:51PM  2  part.  We can go on.

12:51PM  3          **MR. COOPER:**  Thank you, Judge.

12:51PM  4          **BY MR. COOPER:**

12:51PM  5  Q.  Go on, tell them what this person said to you.

12:51PM  6  A.  So the one classmate who is a friend of mine from high

12:51PM  7  school also grew up in Tonawanda, anyways, he was a

12:51PM  8  prosecutor, may still be, at the District Attorney's Office.

12:51PM  9  He told me that he heard that Peter Gerace was videotaping

12:51PM  10  all the people coming in his club.

12:51PM  11      And I took it as in order to blackmail people.  He had

12:51PM  12  recordings of people with strippers, and he said Peter's

12:51PM  13  recording everybody that's going in there, you know.

12:51PM  14      I was, like, no, I didn't know that.

12:51PM  15      I had an another classmate tell me, screaming at me with

12:51PM  16  his group of friends that they were all gonna go to Pharaoh's

12:51PM  17  and snort coke off strippers' asses.

12:51PM  18  Q.  Is that something that you were gonna -- you were

12:51PM  19  interested in going to do?

12:52PM  20  A.  No.  No.

12:52PM  21  Q.  Not the social activity for you, sir?

12:52PM  22  A.  No.

12:52PM  23  Q.  Okay.  Did you hear people say that?

12:52PM  24  A.  I heard my classmate say it directly to me.  He actually

12:52PM  25  said, hey, Casullo, we're all going over to Pharaoh's to

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24
89

12:52PM    1    sniff coke off strippers' asses.

12:52PM    2    Q.  Okay.  Did that impact your interest in investigating

12:52PM    3    Peter and Pharaoh's?

12:52PM    4    A.  Yes.

12:52PM    5    Q.  Did the fact that you went to high school with Peter have

12:52PM    6    anything to do with whether or not you were going to

12:52PM    7    investigate him?

12:52PM    8    A.  No.

12:52PM    9    Q.  Were you his friend?

12:52PM    10   A.  No.

12:52PM    11   Q.  What year did you begin your investigation into Peter

12:52PM    12   Gerace?

12:52PM    13   A.  It was, I believe, the summer of 2016.  Maybe June of

12:52PM    14   2016, approximately.

12:52PM    15   Q.  So just to get this timeline squared aware here, you

12:52PM    16   arrived in the Buffalo resident office at the very end of

12:52PM    17   2015; is that right?

12:52PM    18   A.  It was September of 2015.

12:52PM    19   Q.  Okay.  So the fall of 2015?

12:52PM    20   A.  Yes.

12:52PM    21   Q.  Okay.  And so within your first year in the Buffalo

12:53PM    22   office, you begin an investigation into Peter Gerace; is that

12:53PM    23   correct?

12:53PM    24   A.  Yes.

12:53PM    25   Q.  Were you aware at the time you began that investigation

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

12:53PM    1    that Mr. Gerace had previously been convicted of a felony?

12:53PM    2    A.   Yes.

12:53PM    3    Q.   When you first began that investigation into Peter

12:53PM    4    Gerace, what investigative step did you take?

12:53PM    5    A.   Before I did anything, I mentioned it to my supervisor,

12:53PM    6    Greg Yensan.

12:53PM    7        I mentioned, hey, how do you feel about if we take a look

12:53PM    8    at start investigating Peter Gerace?  And he said he thought

12:53PM    9    it was a good idea.  That we may --

12:53PM   10            **MR. SINGER:**  Objection, hearsay.

12:53PM   11            **MR. COOPER:**  Judge, I don't even think it's offered

12:53PM   12    for its truth, it's about how he got to be investigating

12:53PM   13    Peter.

12:53PM   14            **THE COURT:**  Hang on.

12:53PM   15            Well, why don't you answer the question he asked,

12:54PM   16    which is:  What investigative steps did you take?

12:54PM   17            **MR. COOPER:**  I'll ask some more specific questions

12:54PM   18    and see if we can avoid -- we'll just get through it.

12:54PM   19            **BY MR. COOPER:**

12:54PM   20    Q.   Did you, when you decided to investigate Peter Gerace, go

12:54PM   21    and discuss that with your supervisor?

12:54PM   22    A.   Yes.

12:54PM   23    Q.   Why did you do that, sir?

12:54PM   24    A.   Because when you start an investigation, you as the agent

12:54PM   25    you have freedom -- in my experience, had the freedom to open

12:54PM    1    the investigation.  But you coordinated that with your

12:54PM    2    supervisor.

12:54PM    3        And I've worked in an acting capacity as a supervisor for

12:54PM    4    many years.  A supervisor does not want to be blinded by an

12:54PM    5    investigation that they're not even aware of, or an

12:54PM    6    investigation that's open.  They want to be aware, like most

12:54PM    7    supervisors.

12:54PM    8        So in the normal course of business, I had that

12:54PM    9    discussion with my supervisor.  Hey, what do you think about

12:54PM   10    this?  What's your opinion?  Because this is what I'd like to

12:54PM   11    do.  I'd like to start looking into this, his club, and him.

12:54PM   12        And he agreed.  He said, I don't know if we will seize a

12:55PM   13    lot of drugs directly from Gerace.  I don't consider him,

12:55PM   14    like, a higher-level trafficker, and this is Greg talking,

12:55PM   15    but that through the investigation hopefully we can identify

12:55PM   16    a source of supply.  And, yeah, that we should look into

12:55PM   17    this.

12:55PM   18    Q.  Is that what you do at the DEA is work your way up

12:55PM   19    towards sources of supply?

12:55PM   20    A.  Yes.

12:55PM   21    Q.  You want to get the bigger drug targets?

12:55PM   22    A.  Yes.

12:55PM   23    Q.  Okay.  At some point, did you make a determination that

12:55PM   24    you were going to subpoena Peter Gerace's phone records?

12:55PM   25    A.  Yeah, and I mentioned that to Greg as well.

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

| 12:55PM | 1 | **THE COURT:**  Mr. Cooper, when it's a good time to |
| 12:55PM | 2 | break, we should break. |
| 12:55PM | 3 | **MR. COOPER:**  10/4, Judge. |
| 12:55PM | 4 | **THE COURT:**  Now? |
| 12:55PM | 5 | **MR. COOPER:**  Yes, sir. |
| 12:55PM | 6 | **THE COURT:**  Let's do it.  Remember my instructions. |
| 12:55PM | 7 | And look it, I'm as sick of saying this just as you |
| 12:55PM | 8 | are of hearing this, but I do it because it's so darn |
| 12:56PM | 9 | important. |
| 12:56PM | 10 | Don't communicate about the case with anyone.  Don't |
| 12:56PM | 11 | read, watch, or listen to any news coverage, if there is any, |
| 12:56PM | 12 | while the case is in progress.  And don't make up your mind |
| 12:56PM | 13 | until you finally start deliberating. |
| 12:56PM | 14 | See you back here at 2:00.  Thanks. |
| 12:56PM | 15 | (Jury excused at 12:56 p.m.) |
| 12:57PM | 16 | **THE COURT:**  Okay.  Anything before we break? |
| 12:57PM | 17 | **MR. COOPER:**  No, thank you. |
| 12:57PM | 18 | **THE COURT:**  Anything before we break? |
| 12:57PM | 19 | **MR. SINGER:**  No, Your Honor. |
| 12:57PM | 20 | **THE COURT:**  Okay.  Mr. Casullo, please do not discuss |
| 12:57PM | 21 | anything about your testimony with anyone during the break. |
| 12:57PM | 22 | **THE WITNESS:**  Yes, Judge. |
| 12:57PM | 23 | **THE COURT:**  Okay.  See you back at 2:00. |
| 12:57PM | 24 | **MR. COOPER:**  Thank you, Judge. |
| 12:57PM | 25 | **THE CLERK:**  All rise. |

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

| | | |
|---|---|---|
| 12:57PM | 1 | (Off the record at 12:57 p.m.) |
| 02:06PM | 2 | (Back on the record at 2:06 p.m.) |
| 02:06PM | 3 | (Jury not present.) |
| 02:06PM | 4 | **THE CLERK:**  All rise. |
| 02:06PM | 5 | **THE COURT:**  Please be seated. |
| 02:06PM | 6 | **THE CLERK:**  We are back on the record for the |
| 02:06PM | 7 | continuation of the jury trial in case number 19-cr-227, |
| 02:06PM | 8 | United States of America versus Joseph Bongiovanni. |
| 02:06PM | 9 | All counsel and parties are present. |
| 02:06PM | 10 | **THE COURT:**  Ready to go? |
| 02:06PM | 11 | **MR. COOPER:**  Yes, Judge. |
| 02:06PM | 12 | **THE COURT:**  Anything? |
| 02:06PM | 13 | **MR. SINGER:**  No, Judge. |
| 02:06PM | 14 | **THE COURT:**  Okay.  Great.  Let's bring them in, |
| 02:06PM | 15 | please. |
| 02:08PM | 16 | (Jury seated at 2:08 p.m.) |
| 02:08PM | 17 | **THE COURT:**  The record will reflect that all our |
| 02:08PM | 18 | jurors are present. |
| 02:08PM | 19 | I remind the witness that he's still under oath. |
| 02:08PM | 20 | And, Mr. Cooper, you may continue. |
| 02:08PM | 21 | **MR. COOPER:**  Thank you, Judge. |
| 02:08PM | 22 | **BY MR. COOPER:** |
| 02:08PM | 23 | Q.  Special Agent Casullo, before the break, we had covered a |
| 02:08PM | 24 | bunch of different DARTS deconfliction notices, and I think |
| 02:08PM | 25 | the first one that we covered -- I kind of lost my place, and |

02:08PM    1    I want to pivot back to that real quick.

02:08PM    2         MR. COOPER:  Ms. Champoux, if we can pull up 26E as

02:08PM    3    in echo.

02:08PM    4         And then on the right side of the screen, ma'am, can

02:08PM    5    you pull up Government Exhibit 8A.

02:08PM    6         BY MR. COOPER:

02:08PM    7    Q.  So on the left side of your screen, Special Agent

02:09PM    8    Casullo, can you see this was that first DARTS deconfliction

02:09PM    9    that we looked at that looks like it was forwarded from the

02:09PM    10   defendant to Greg Yensan on August 21st of 2018?

02:09PM    11   A.  Correct.

02:09PM    12        MR. COOPER:  Ms. Champoux, can we scroll down the

02:09PM    13   next page, please?  Thank you.

02:09PM    14        BY MR. COOPER:

02:09PM    15   Q.  So earlier I had you look at the first set of Trinity

02:09PM    16   items in the first set of deconflictions.  I want to --

02:09PM    17        MR. COOPER:  Stop scrolling.  Can we go back down.

02:09PM    18   Thank you.

02:09PM    19        BY MR. COOPER:

02:09PM    20   Q.  -- I want to focus you in now on this next Trinity item

02:09PM    21   that I just circled.  Do you see the phone number there,

02:09PM    22   716-812-0664?

02:09PM    23   A.  Yes.

02:09PM    24   Q.  Okay.  And is that the phone number that's being entered

02:09PM    25   into DARTS that's causing the conflict that we see inside the

02:09PM     1   box here?

02:09PM     2   A.  Yes.

02:09PM     3   Q.  Okay.

02:09PM     4        MR. COOPER:  Ms. Champoux, on Exhibit 8A, if you can

02:09PM     5   go to page 134, please.  And can you move the cursor, ma'am?

02:10PM     6   Thank you.

02:10PM     7        BY MR. COOPER:

02:10PM     8   Q.  Do you see, Special Agent Casullo, the name down here

02:10PM     9   that's associated with this subscriber information subpoena

02:10PM    10   return?

02:10PM    11   A.  Yes.

02:10PM    12   Q.  What's the name?

02:10PM    13   A.  Michael Masecchia.

02:10PM    14   Q.  And down here where it lists account contact numbers,

02:10PM    15   what's the phone number that's listed?

02:10PM    16   A.  716-812-0664.

02:10PM    17   Q.  And if we pivot back now to Government Exhibit 26E, is

02:10PM    18   this a deconfliction for Mike Masecchia's phone number?

02:10PM    19   A.  Yes.

02:10PM    20   Q.  Did Curtis Ryan run that number on August 21st of 2018?

02:10PM    21   A.  Yes, he did?

02:10PM    22   Q.  Before that, are there entries for Mike Masecchia's phone

02:10PM    23   number into DARTS in case file number C2-13-0026?

02:10PM    24   A.  Yes.

02:10PM    25   Q.  Did those occur in March and April of 2013?

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24
96

```
02:10PM    1   A.  Yes.

02:10PM    2   Q.  Are those entered by an intel analyst on behalf of

02:11PM    3   Special Agent Bongiovanni?

02:11PM    4   A.  Yes.

02:11PM    5   Q.  Does that show up as a number that's in contact with this

02:11PM    6   Ron Serio phone number that we looked up earlier?

02:11PM    7   A.  I can't remember Serio's number, but it's 716-830-3226.

02:11PM    8   Q.  Okay.  And so if we looked that up earlier and that was

02:11PM    9   Serio's number, that would be saying this Mike Masecchia

02:11PM   10   number on the top here was in contact with this 830-3226

02:11PM   11   phone number; is that right?

02:11PM   12   A.  Correct.

02:11PM   13        MR. COOPER:  All right.  Thanks, Ms. Champoux.  You

02:11PM   14   can take those two down now.

02:11PM   15        BY MR. COOPER:

02:11PM   16   Q.  All right.  And then pivoting back to where we left off,

02:11PM   17   excuse me, we spoke about your investigation into Peter

02:11PM   18   Gerace; do you remember I was talking about that?

02:11PM   19   A.  Yes.

02:11PM   20   Q.  Now earlier you mentioned that part of the predication

02:11PM   21   for your investigation, some of the things that led you to

02:11PM   22   initiate that investigation, were some comments that were

02:11PM   23   made by your classmates at your reunion; do you remember

02:12PM   24   that?

02:12PM   25   A.  Yes.
```

02:12PM   1   Q.  Now your reunion, wasn't that before you came back to

02:12PM   2   Buffalo?

02:12PM   3   A.  Yes.

02:12PM   4   Q.  Okay.  So when you hear those things, are you still

02:12PM   5   working at the New York City office?

02:12PM   6   A.  Yes.

02:12PM   7   Q.  Were you planning to come back to Buffalo when you were

02:12PM   8   at that reunion?

02:12PM   9   A.  I hadn't heard yet.  I mean, the plan was all along to

02:12PM  10   come back to Buffalo.  But at that point, I had no idea when

02:12PM  11   I was coming back.

02:12PM  12   Q.  Okay.  And so my question was at the time you're hearing

02:12PM  13   those things from your classmates, is it your hope to one day

02:12PM  14   come back and work in the Buffalo office?

02:12PM  15   A.  Yes.

02:12PM  16   Q.  But at the time, were you still in New York City?

02:12PM  17   A.  Yes.

02:12PM  18   Q.  Did you file that information away in your brain in case

02:12PM  19   you came back to work in Buffalo?

02:12PM  20   A.  Oh, I remembered.

02:12PM  21   Q.  Okay.  And when you came back in fall of 2015, and you

02:12PM  22   started working in Buffalo, did you still remember what had

02:12PM  23   happened months earlier in the class reunion?

02:12PM  24   A.  Oh, sure.

02:12PM  25   Q.  Okay.  Now, where we left off, I was talking about

| | | |
|---|---|---|
| 02:12PM | 1 | Gerace's phone records; do you remember that? |
| 02:12PM | 2 | A.  Yes. |
| 02:12PM | 3 | Q.  Did you make a decision that you were going to subpoena |
| 02:13PM | 4 | Peter Gerace's phone records? |
| 02:13PM | 5 | A.  I did. |
| 02:13PM | 6 | Q.  Okay.  And did you have a discussion with your supervisor |
| 02:13PM | 7 | about doing that? |
| 02:13PM | 8 | A.  Yes. |
| 02:13PM | 9 | Q.  Tell this jury why you decided to talk to your supervisor |
| 02:13PM | 10 | about pulling Peter Gerace's phone records. |
| 02:13PM | 11 | A.  Again, if you're going to start an investigation, a new |
| 02:13PM | 12 | investigation, you should talk to the supervisor so they know |
| 02:13PM | 13 | what's going on so they're not blindsided by some subpoena |
| 02:13PM | 14 | that comes across their desk or information that comes across |
| 02:13PM | 15 | their desk. |
| 02:13PM | 16 | If I were to complete the online process to do a |
| 02:13PM | 17 | subpoena, it would have to be approved by a supervisor.  So |
| 02:13PM | 18 | he needed to be aware of what was going on. |
| 02:13PM | 19 | And also, genuinely, I wanted his opinion on it as well, |
| 02:13PM | 20 | and any feedback that he could give. |
| 02:13PM | 21 | Q.  Did there come a time when discussing Peter Gerace's |
| 02:13PM | 22 | phone records with your supervisor that the defendant |
| 02:13PM | 23 | Mr. Bongiovanni came up? |
| 02:13PM | 24 | A.  Did his phone number come up? |
| 02:13PM | 25 | Q.  No.  Did you discuss with your supervisor Mr. Bongiovanni |

| | | |
|---|---|---|
| 02:13PM | 1 | in the context of Peter Gerace's phone records? |
| 02:13PM | 2 | A.  Yeah.  Before I subpoenaed the numbers, I had a |
| 02:14PM | 3 | conversation with Greg. |
| 02:14PM | 4 | Q.  Can you describe your conversation with Greg to this jury |
| 02:14PM | 5 | about before you subpoenaed the phone numbers that involved |
| 02:14PM | 6 | this defendant. |
| 02:14PM | 7 | A.  Yes. |
| 02:14PM | 8 | MR. SINGER:  Judge, I'd just want to -- I object to |
| 02:14PM | 9 | hearsay.  If Mr. Casullo is going to share what he said to |
| 02:14PM | 10 | Yensan, that's allowable.  But I just want to make sure we're |
| 02:14PM | 11 | not talking about what Yensan said back. |
| 02:14PM | 12 | THE COURT:  I'm not sure why -- why is -- why there a |
| 02:14PM | 13 | difference between what he said and what Yensan said? |
| 02:14PM | 14 | MR. COOPER:  If we're going to argue it, I'd ask that |
| 02:14PM | 15 | we come up to the bench. |
| 02:14PM | 16 | THE COURT:  Okay.  Yeah, come on up. |
| 02:14PM | 17 | (Sidebar discussion held on the record.) |
| 02:14PM | 18 | MR. SINGER:  So if you remember back at the last |
| 02:14PM | 19 | trial, Mr. Casullo sometimes goes on for a little while. |
| 02:14PM | 20 | THE COURT:  I know.  Yeah, he's doing that now. |
| 02:14PM | 21 | MR. SINGER:  So if he's testifying about -- about I |
| 02:14PM | 22 | told Greg Yensan X, Y, Z -- |
| 02:14PM | 23 | THE COURT:  Yes. |
| 02:14PM | 24 | MR. SINGER:  -- I don't have an objection to that. |
| 02:14PM | 25 | He's here, I can cross-examine him. |

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

02:14PM    1          But if he's talking about what Yensan said in he

02:14PM    2    response, that's the problem, Judge, that's hearsay.

02:14PM    3          **THE COURT:**  They're both hearsay.  They're both

02:14PM    4    hearsay.

02:15PM    5          **MR. COOPER:**  So here's the reason.

02:15PM    6          **THE COURT:**  Go ahead.

02:15PM    7          **MR. COOPER:**  It impacts -- the discussions that he

02:15PM    8    has with his supervisor are contexts surrounding the decision

02:15PM    9    to order the phone records, and things that come up

02:15PM    10   afterwards.  There's no question that it's gonna come up that

02:15PM    11   the defendant's phone shows up in Peter Gerace's tolls.

02:15PM    12   There's gonna be -- there's gonna be extensive direct and

02:15PM    13   extensive cross on the consternation that that caused by the

02:15PM    14   defendant.

02:15PM    15         The fact that Mr. Casullo discussed that with his

02:15PM    16   supervisor in advance is probative.

02:15PM    17         What Tony says to his supervisor is, hey, I think,

02:15PM    18   you know, I expect, in sum and substance, hey, Bongiovanni's

02:15PM    19   phone number might show up if I order these records.  Is it

02:15PM    20   okay if I do that?

02:15PM    21         **THE COURT:**  Hang on.

02:15PM    22         **MR. SINGER:**  So, yeah, I don't have an issue, and I

02:15PM    23   didn't object last time to him sharing the fact that his boss

02:15PM    24   that I have a concern that Joe might show up in these records

02:15PM    25   and, you know, he ran with it, and he reported it back to his

| | | |
|---|---|---|
| 02:15PM | 1 | boss Joe did show up in the records.  Like, that's part of the |
| 02:15PM | 2 | narrative.  I get that, Judge, and I didn't object to that. |
| 02:16PM | 3 | **THE COURT:**  What's Yensan gonna say? |
| 02:16PM | 4 | **MR. COOPER:**  So, I don't -- word for word, I don't |
| 02:16PM | 5 | recall, so I'm not positive.  But I expect that what the |
| 02:16PM | 6 | testimony will be is that Yensan says we'll deal with it, go |
| 02:16PM | 7 | ahead and do it, which is a directive, it's not hearsay. |
| 02:16PM | 8 | **THE COURT:**  Right, that's not hearsay. |
| 02:16PM | 9 | **MR. SINGER:**  So I didn't object to that. |
| 02:16PM | 10 | **THE COURT:**  (Indecipherable.) |
| 02:16PM | 11 | **MR. COOPER:**  It didn't come in yet, I expect so. |
| 02:16PM | 12 | **MR. SINGER:**  If that's the extent of it, then -- |
| 02:16PM | 13 | **THE COURT:**  Why don't you lead a little bit, because |
| 02:16PM | 14 | he does go on and on. |
| 02:16PM | 15 | **MR. COOPER:**  Sure. |
| 02:16PM | 16 | **THE COURT:**  So why don't you lead -- you're going |
| 02:16PM | 17 | gonna object to that? |
| 02:16PM | 18 | **MR. SINGER:**  No, I won't object to leading. |
| 02:16PM | 19 | **THE COURT:**  Let him lead to get this stuff in. |
| 02:16PM | 20 | **MR. COOPER:**  Sure. |
| 02:16PM | 21 | **MR. SINGER:**  Thank you. |
| 02:16PM | 22 | (End of sidebar discussion.) |
| 02:16PM | 23 | **THE COURT:**  Okay.  So the objection is withdrawn. |
| 02:16PM | 24 | The question is withdrawn.  So let's ask another question. |
| | 25 | |

02:16PM      1            **BY MR. COOPER:**

02:16PM      2    Q.  Sure.  So Mr. Casullo, I'm going to ask you some leading

02:16PM      3    or more specific questions now, and just answer specifically

02:16PM      4    what I'm asking; is that fair?

02:16PM      5    A.  Yes.

02:16PM      6    Q.  Okay.  There came a time when you went to have a

02:16PM      7    discussion with Greg Yensan about the fact that you were

02:16PM      8    gonna be doing a subpoena for Peter Gerace's phone records,

02:16PM      9    right?

02:16PM     10    A.  Yes.

02:16PM     11    Q.  Okay.  And Greg Yensan at that time was your supervisor,

02:16PM     12    right?

02:16PM     13    A.  Correct.

02:16PM     14    Q.  And you told him, hey, I plan to run Peter Gerace's phone

02:17PM     15    records, right?

02:17PM     16    A.  Yes.

02:17PM     17    Q.  Did you tell Greg Yensan during that conversation that

02:17PM     18    you thought that this defendant's phone number might show up

02:17PM     19    in Peter Gerace's phone records?

02:17PM     20    A.  Yes.

02:17PM     21    Q.  Okay.  Did Greg Yensan respond to that?

02:17PM     22    A.  Yeah, he did.

02:17PM     23    Q.  Yes, he did?

02:17PM     24    A.  Yes, he did.

02:17PM     25    Q.  Did he give you a directive essentially that said go

02:17PM    1    ahead and do it, and we'll handle it?

02:17PM    2    A.  Yes.  He said run the -- order the tolls, and if his

02:17PM    3    phone number comes up, let me know.

02:17PM    4    Q.  At the time that you went to your supervisor, Greg

02:17PM    5    Yensan, and informed him that you were planning to do this

02:17PM    6    subpoena and that you thought the defendant's phone number

02:17PM    7    might show up in Peter Gerace's records, were you doing that

02:17PM    8    because you wanted to get the defendant in trouble?

02:17PM    9    A.  No.

02:17PM   10    Q.  Did you have any issue with the defendant at the time?

02:17PM   11    A.  No.

02:17PM   12    Q.  Did you ultimately issue a subpoena and get Peter

02:17PM   13    Gerace's phone records?

02:17PM   14    A.  I did.

02:17PM   15    Q.  Did Peter Gerace's phone records -- and, again, now we're

02:18PM   16    talking -- give me a timeframe here, this is when your

02:18PM   17    investigation is beginning?

02:18PM   18    A.  I think it was June of 2016, beginning of June.

02:18PM   19    Q.  Okay.  So in June of 2016 when you order Peter Gerace's

02:18PM   20    phone records by subpoena, did you see who he was in contact

02:18PM   21    with?

02:18PM   22    A.  I eventually did, yes.

02:18PM   23    Q.  Okay.  Did you get responses back from the subpoena?

02:18PM   24    A.  Got the response back from the subpoena, and then we

02:18PM   25    generated a list of the numbers that the Gerace number was in

02:18PM  1    contact with.

02:18PM  2    Q.  Okay.  Was the defendant's phone number one of the phone

02:18PM  3    numbers that Peter Gerace's phone was in contact with?

02:18PM  4    A.  Yes.

02:18PM  5    Q.  When you saw that the defendant and Mr. Gerace had been

02:18PM  6    in contact with one another, describe for the jury what you

02:18PM  7    did at that point.

02:18PM  8    A.  I brought it to Greg's attention.  I brought him the toll

02:18PM  9    records over, and said here.  Essentially.

02:18PM  10   Q.  Was that consistent with what he had asked you to do

02:18PM  11   during your prior conversion?

02:18PM  12   A.  Yes.

02:18PM  13   Q.  Was getting those records a part of your investigation

02:19PM  14   into Peter Gerace for drug trafficking?

02:19PM  15   A.  Yeah.  That's a normal part of investigations.  Getting

02:19PM  16   phone records to see who the person that you're looking at is

02:19PM  17   in contact with to get an idea of the drug-trafficking

02:19PM  18   organization, possible other criminals who

02:19PM  19   drug traffickers -- that your person that you're looking at

02:19PM  20   is in contact with.  That's the way investigators and

02:19PM  21   analysts start building out their investigation.

02:19PM  22   Q.  After you got that subpoena, saw the defendant's phone --

02:19PM  23   phone in contact with Peter Gerace's phone, and provided it

02:19PM  24   to your supervisor, Greg Yensan, did you notice a difference

02:19PM  25   in how the defendant started acting towards you?

02:19PM    1    A.  Oh, yes.

02:19PM    2    Q.  Can you describe that for the jury?

02:19PM    3    A.  Yeah.  Shortly thereafter, he essentially stopped talking

02:19PM    4    to me.  I could tell he was upset and he wasn't talking to

02:19PM    5    me.  And the prior to that, it wasn't like that.

02:19PM    6    Q.  Okay.  So, are you working in group D-57 at this time?

02:19PM    7    A.  Yes.

02:19PM    8    Q.  Is Joe Bongiovanni in group D-57?

02:19PM    9    A.  Yes.

02:19PM   10    Q.  Okay.  Is that about, give or take, about a dozen agents

02:19PM   11    and TFOs that work in the group?

02:20PM   12    A.  Yeah, maybe.

02:20PM   13    Q.  Okay.  So is that kind of a small number of people that

02:20PM   14    are working together?

02:20PM   15    A.  Yeah, I mean, that's a typical size of a group.  And we

02:20PM   16    were in a small space.

02:20PM   17    Q.  Do you see each other all the time at work?

02:20PM   18    A.  Daily.

02:20PM   19    Q.  You interact with each other frequently in a group like

02:20PM   20    that?

02:20PM   21    A.  Yeah.

02:20PM   22    Q.  Was it obvious to you that something was different

02:20PM   23    between you and the defendant after you ran that subpoena?

02:20PM   24    A.  Yeah, it was obvious to me.

02:20PM   25    Q.  Was it comfortable for you?

02:20PM      1    A.  No, it was uncomfortable.  I hadn't even been back to the

02:20PM      2    office for a year.  I had worked a prior case with him that

02:20PM      3    was extremely successful, so yeah, it was uncomfortable.

02:20PM      4    Q.  Did you want to try to clear the air, so to speak?

02:20PM      5    A.  Yeah.  Yeah.  I wasn't looking to get him into trouble.

02:20PM      6    I was targeting an individual, or beginning to.  And I wasn't

02:20PM      7    trying to get anybody in trouble.

02:20PM      8    Q.  Describe for the jury what you did to try to clear the

02:20PM      9    air.

02:20PM     10    A.  I asked him if he'd be willing to speak with me in the

02:20PM     11    conference room.  In our group -- in our group, which is

02:20PM     12    maybe 12 desks, and then a supervisor's office, there's also

02:21PM     13    a conference room off to the side that had a closed door.

02:21PM     14    Q.  So you've described for the jury here that after you run

02:21PM     15    this subpoena, there's a noticeable difference in how the

02:21PM     16    defendant interacts with you; is that correct?

02:21PM     17    A.  Yes.

02:21PM     18    Q.  After that noticeable difference starts, do you ask the

02:21PM     19    defendant if he'll come and speak with you about it?

02:21PM     20    A.  I did.  I asked -- I asked him if he'd be willing to talk

02:21PM     21    to me in the conference room, and he agreed.

02:21PM     22    Q.  And we're going to go into some detail about that

02:21PM     23    conversation.  But before we get there, does that day and

02:21PM     24    that conversation, does that stick out in your mind?

02:21PM     25    A.  Yes.

02:21PM   1    Q.  We're talking about the summer of 2016, right?

02:21PM   2    A.  Yes.

02:21PM   3    Q.  It's 2024, it's eight years later.  Is it still fresh in

02:21PM   4    your mind?

02:21PM   5    A.  I still remember it well.

02:21PM   6    Q.  When you went over and asked the defendant if he'd be

02:21PM   7    willing to speak with you, did he agree?

02:21PM   8    A.  He agreed.

02:21PM   9    Q.  Where did the conversation occur?

02:21PM  10    A.  In the conference room.  We walked into the conference

02:21PM  11    room.

02:21PM  12    Q.  Was there anybody else in there at the time?

02:21PM  13    A.  No, it was just Joe and I.  And I shut the door, so the

02:22PM  14    door was closed.

02:22PM  15    Q.  Did you invite anyone else in?

02:22PM  16    A.  No.

02:22PM  17    Q.  Did you want it to be a private conversation?

02:22PM  18    A.  Yes.

02:22PM  19    Q.  You mentioned that you shut the door; is that correct?

02:22PM  20    A.  That's correct.

02:22PM  21    Q.  Once you shut the door, who spoke first?

02:22PM  22    A.  It was me.  I told him that I didn't want him -- I

02:22PM  23    noticed that he was upset, and that I wasn't trying to get

02:22PM  24    him in trouble essentially.  I ordered the records, but I'm

02:22PM  25    not trying to get you in any type of trouble.

02:22PM    1    Q.  When you said those words to the defendant, did the

02:22PM    2    defendant respond?

02:22PM    3    A.  He did.

02:22PM    4    Q.  I want to take this step by step, so just one thing at a

02:22PM    5    time.  Tell the jury, what was the first thing the defendant

02:22PM    6    said to you when you mentioned to him you weren't trying to

02:22PM    7    get him in trouble?

02:22PM    8    A.  He said this is bullshit.

02:22PM    9    Q.  Was he calm when he said that?

02:22PM   10    A.  No, he was upset.  He was visibly upset.

02:22PM   11    Q.  Upset, like he was crying?  Or upset, like he was angry?

02:22PM   12    A.  No, he wasn't crying.  He was like, angry upset.

02:23PM   13    Q.  When he said this is bullshit, was his voice -- tone of

02:23PM   14    voice, like volume, conversational or elevated?

02:23PM   15    A.  No, it was elevated.  He wasn't screaming, but it was

02:23PM   16    elevated.

02:23PM   17    Q.  After the defendant says to you this is bullshit, in an

02:23PM   18    elevated voice, who's the next person to speak after that?

02:23PM   19    You or him?

02:23PM   20    A.  It was him.

02:23PM   21    Q.  What did he say after that?

02:23PM   22    A.  He said, that kid called me when a stripper overdosed in

02:23PM   23    his club.  And I told him to get her out of there.

02:23PM   24    Q.  Was the defendant worked up when he said that to you?

02:23PM   25    A.  Yes.

02:23PM   1   Q.  Was he elevated?

02:23PM   2   A.  Yes.

02:23PM   3   Q.  Was he angry?

02:23PM   4   A.  Yeah, he was definitely excited.

02:23PM   5   Q.  You mentioned that the defendant said to you, that kid

02:23PM   6   called me.

02:23PM   7       In the context of your conversation, who was "that kid"

02:23PM   8   referring to?

02:23PM   9   A.  Peter Gerace.

02:23PM  10   Q.  Do those -- were those his exact words to the best of

02:23PM  11   your ability?

02:23PM  12   A.  Yes.

02:23PM  13   Q.  Does that stand out in your memory eight years later?

02:23PM  14   A.  Oh, it does.  I mean, even the word "kid."  Calling

02:23PM  15   someone a kid, but yes.

02:24PM  16   Q.  After the defendant told you, that kid called me when a

02:24PM  17   stripper overdosed, and I told him to get her out of there,

02:24PM  18   what -- what was your immediate reaction to hearing that?

02:24PM  19   A.  Just shock.  Trying to process what he had just said.

02:24PM  20   Why he had just said that.  It came completely unsolicited.

02:24PM  21   And I was blindsided.

02:24PM  22   Q.  When you walked into the conference room to try to clear

02:24PM  23   the air, were you expecting that -- that type of topic to

02:24PM  24   come up?

02:24PM  25   A.  No, not at all.

02:24PM  1   Q.  Were you taken aback by that?

02:24PM  2   A.  Yes.  I was reeling, is a good way to describe it.

02:24PM  3   Q.  After the defendant said that Peter Gerace, or that kid,

02:24PM  4   had called him when a stripper overdosed, and he told him to

02:24PM  5   get her out of there, who spoke next?  You or the defendant?

02:24PM  6   A.  He did.

02:24PM  7   Q.  What did he say after that?

02:24PM  8   A.  He said, isn't he friends with your brother-in-law?

02:24PM  9   Referring to my wife's brother, Phil Domiano.

02:24PM  10  Q.  That's break that down.

02:24PM  11     Isn't he friends with your brother-in-law; who's the "he"

02:24PM  12  in that sentence?

02:24PM  13  A.  Gerace.

02:24PM  14  Q.  Okay.  And when the defendant said, isn't he friends with

02:25PM  15  your brother-in-law, what was the defendant's tone of voice

02:25PM  16  when he said that to you?

02:25PM  17  A.  Very direct.  I mean, almost accusatory.  I -- I -- I

02:25PM  18  took it as what does that have to do with anything.

02:25PM  19  Q.  Was it phrased as a question?  Was it inquisitorial?

02:25PM  20  A.  More rhetorical.  Almost like accusatory.

02:25PM  21     Almost like, hey, if you want to start looking up phone

02:25PM  22  numbers and my name's brought up, then here you go.  He's

02:25PM  23  friends with your brother-in-law.

02:25PM  24     That's how I took it.

02:25PM  25  Q.  Who spoke next after the defendant said, isn't he friends

02:25PM  1  with your brother-in-law?

02:25PM  2  A.  I did.

02:25PM  3  Q.  What did you say?

02:25PM  4  A.  I said, yeah.  Yeah, he is.  And my brother-in-law's

02:25PM  5  caused me and my family a lot of problems in the past.

02:25PM  6  Q.  After you said that, who spoke next?

02:25PM  7  A.  Bongiovanni.

02:25PM  8  Q.  What did he say?

02:25PM  9  A.  He said, do you hate Italians?

02:25PM  10  Q.  Now you described what his demeanor was like when the

02:25PM  11  conversation started.  What was the defendant's demeanor like

02:26PM  12  when he said to you, do you hate Italians?

02:26PM  13  A.  He was still very direct, upset.

02:26PM  14  Q.  In the context of the conversation that you were having

02:26PM  15  with the defendant, what did you interpret his meaning by, do

02:26PM  16  you hate Italians?

02:26PM  17  A.  His meaning was to me, Peter Gerace is Italian, and he

02:26PM  18  didn't want me to investigate Italians.  He didn't want me to

02:26PM  19  investigate Gerace, essentially.

02:26PM  20      He could say Italians, but it was Gerace, that's how I

02:26PM  21  took it.

02:26PM  22  Q.  Who spoke next, you or the defendant?

02:26PM  23  A.  I did.

02:26PM  24  Q.  And what did you say?

02:26PM  25  A.  And I said, no, no, I don't hate Italians.  I'm of

| | | |
|---|---|---|
| 02:26PM | 1 | Italian descent, my wife is of Italian descent, my kids are, |
| 02:26PM | 2 | my grandparents are.  I mean, that's ridiculous.  It's silly. |
| 02:26PM | 3 | But it wasn't silly, because he had a point. |
| 02:26PM | 4 | Q.  After you said no, I don't hate Italians.  My wife's |
| 02:27PM | 5 | Italian, I'm Italian, who spoke next after that? |
| 02:27PM | 6 | A.  He did. |
| 02:27PM | 7 | Q.  What did the defendant say? |
| 02:27PM | 8 | A.  He said a horrible racial slur and statement. |
| 02:27PM | 9 | Q.  All right.  Special Agent Casullo, I'm going to ask you, |
| 02:27PM | 10 | use the words that the defendant said -- withdrawn. |
| 02:27PM | 11 | I'm going to ask you to recount what the defendant said |
| 02:27PM | 12 | to you, but do not say the racial slur words in this |
| 02:27PM | 13 | courtroom.  But recount for the jury what the defendant said |
| 02:27PM | 14 | to you at that part in the conversation. |
| 02:27PM | 15 | A.  He said that we should be investigating -- and he used |
| 02:27PM | 16 | the "N word" to refer to black people, and he used the "S |
| 02:27PM | 17 | word" to refer to Hispanic people. |
| 02:27PM | 18 | Q.  When the defendant told you that you should be |
| 02:27PM | 19 | investigating "N words" and "S words," what was his tone of |
| 02:27PM | 20 | voice like? |
| 02:27PM | 21 | A.  A little more quiet.  He wasn't screaming.  He almost |
| 02:27PM | 22 | said it -- he said it quietly. |
| 02:27PM | 23 | Q.  Compared with earlier in the conversation, did he lower |
| 02:27PM | 24 | his voice when he said that? |
| 02:28PM | 25 | A.  Yes, he did. |

02:28PM   1   Q.  Were you inside of a federal law enforcement workplace at

02:28PM   2   that point?

02:28PM   3   A.  Yes.

02:28PM   4   Q.  When the defendant told you that you should be

02:28PM   5   investigating "N words" and "S words," what was your

02:28PM   6   immediate reaction?

02:28PM   7   A.  Again, reeling again.  At this point, I'm trying to

02:28PM   8   process basically everything that's happening.  And saying

02:28PM   9   this is a different person who I just worked an eight month,

02:28PM  10   extremely successful investigation from.

02:28PM  11       This is a different person that I met in the summer, who

02:28PM  12   was typically respectful and polite.

02:28PM  13       This was someone that was different from someone that I

02:28PM  14   considered to an extent a friend, a coworker, and someone

02:28PM  15   that I trusted.  It was someone I didn't know.

02:28PM  16   Q.  Were you shocked when you heard that?

02:28PM  17   A.  I was shocked.  Shocking.

02:28PM  18   Q.  Who's the next person that spoke after the defendant told

02:28PM  19   you you should be investigate "N words" and "S words?"

02:28PM  20   A.  I did.  At this point, I'm in the mode of trying to stay

02:28PM  21   calm, not trying to overreact.  Not trying to make it like

02:29PM  22   I'm overly concerned, although -- although I am.

02:29PM  23       And I said, I think we should be investigating all

02:29PM  24   criminals.

02:29PM  25   Q.  What -- at that moment in the conversation when you

02:29PM    1    respond to the remark the defendant say to you, you say we

02:29PM    2    should be investigating all criminals, what's your goal at

02:29PM    3    that point in the conversation?

02:29PM    4    A.  I'm at the point where I am, like, I want to get out of

02:29PM    5    the conference room at this point.

02:29PM    6       I want to get out at the point we're not -- where he is

02:29PM    7    not overly alarmed about how I'm feeling about all of this.

02:29PM    8       I'm trying to process it.  I'm trying to figure this out.

02:29PM    9    I'm trying to do this in my head of how can I get out of this

02:29PM   10    situation essentially.

02:29PM   11    Q.  After you told the defendant that you should be

02:29PM   12    investigating criminals, all criminals, who spoke next, you

02:29PM   13    or the defendant?

02:29PM   14    A.  He did.

02:29PM   15    Q.  What did he say?

02:29PM   16    A.  It kind of started to walk back at that point, which was

02:29PM   17    good.  It's what I was hoping for at some point.

02:30PM   18       And he had said that Gerace wasn't a trafficker, he was

02:30PM   19    more of a white-collar type, fraud-type criminal.  He was

02:30PM   20    more of a drug user.  And that if he was dirty, he'd nail him

02:30PM   21    to the wall.

02:30PM   22    Q.  When the defendant told you that if Gerace was dirty,

02:30PM   23    he'd nail him to the wall, did you believe that?

02:30PM   24    A.  No.

02:30PM   25    Q.  Was it consistent with the context of your conversation

02:30PM   1   leading up to that point?

02:30PM   2   A.  No, based on everything that was said before that, it was

02:30PM   3   completely inconsistent with everything prior.

02:30PM   4   Q.  Did you argue with him about that --

02:30PM   5   A.  No --

02:30PM   6   Q.  -- and continue the conversation?

02:30PM   7   A.  -- I was happy to hear that.  It was a way out, and a way

02:30PM   8   to walk back the conversation, so that I could hopefully walk

02:30PM   9   out at some point.

02:30PM   10  Q.  What did you do next?  Who spoke next?  Let me ask you

02:30PM   11  that.

02:30PM   12  A.  At that point, it's towards the end, and he also

02:30PM   13  mentioned -- I can't remember exactly what was said after

02:30PM   14  that, other than he mentioned at some point shortly after

02:30PM   15  that and towards the end of the conversation that his

02:30PM   16  parents -- his mother and father were going to be going to a

02:31PM   17  50-year reunion for Gerace's parents, like either that night

02:31PM   18  or the next day.

02:31PM   19      Which in my head I'm, like, completely unaware that he

02:31PM   20  was that close with his family, that his parents were that

02:31PM   21  close with his family.

02:31PM   22      I mean, and that's how it was from the beginning.  I had

02:31PM   23  no idea that he was that close with this person.  But I found

02:31PM   24  out certain things through that conversation, that's for

02:31PM   25  sure.

02:31PM      1   Q.  Special Agent Casullo, you mentioned that when the

02:31PM      2   defendant said to you, do you hate Italians?  You interpreted

02:31PM      3   him to be talking about Gerace; is that correct?

02:31PM      4   A.  Yes.

02:31PM      5   Q.  This conversation that you have with the defendant in the

02:31PM      6   conference room, was Gerace the only topic that came up?

02:31PM      7   A.  No.

02:31PM      8   Q.  I mean, this was a conversation that -- let me rephrase

02:31PM      9   that question.

02:31PM     10       When you started the conversation, it was about clearing

02:31PM     11   the air because of the Gerace subpoena, right?

02:31PM     12   A.  Correct.

02:31PM     13   Q.  And when the defendant said that kid called me, was that

02:31PM     14   a comment about Gerace?

02:31PM     15   A.  Yes.

02:31PM     16   Q.  And when he said isn't he friends with your

02:31PM     17   brother-in-law, was that a comment about Gerace?

02:31PM     18            MR. SINGER:  Objection, asked and answered.

02:31PM     19            MR. COOPER:  It's a different question.

02:32PM     20            THE COURT:  Overruled.

02:32PM     21            BY MR. COOPER:

02:32PM     22   Q.  Was that a comment about Gerace?

02:32PM     23   A.  Yes.

02:32PM     24   Q.  And did the fact that the whole conversation up to that

02:32PM     25   point had been about Gerace cause you to believe that the

02:32PM    1    comment, what, do you hate Italians, was also about Gerace?

02:32PM    2    A.   Yes, of course.

02:32PM    3    Q.   Did you walk out of that room with the impression that

02:32PM    4    the defendant wanted you to stop investigating Gerace?

02:32PM    5    A.   Oh, he did not want me to investigate Peter Gerace.  That

02:32PM    6    was one thing that was clear when that conversation ended.

02:32PM    7    Q.   In June of 2016, at the time of this conversation in the

02:32PM    8    conference room, how long had you been a special agent in the

02:32PM    9    Buffalo resident office?

02:32PM    10   A.   So June of 2016, I got there September of '15.  So you're

02:32PM    11   talking about nine months maybe.

02:32PM    12   Q.   Had the defendant been in the Buffalo office much longer

02:32PM    13   than you?

02:32PM    14   A.   Oh, yeah.  I think almost his whole career except for a

02:32PM    15   year he spent in Florida, I believe, Orlando, I think.

02:33PM    16   Q.   Special Agent Casullo, when you walked out of that

02:33PM    17   conference room after the defendant made those remarks to

02:33PM    18   you, did you walk down the hallway to a supervisor's office

02:33PM    19   and report it?

02:33PM    20   A.   No.  I did not.

02:33PM    21   Q.   Did you wait a long time before you ever told anybody

02:33PM    22   about what the defendant said to you in that conference room?

02:33PM    23   A.   I waited a long time to tell anybody in a managerial

02:33PM    24   position.  I did tell other agents that I was close friends

02:33PM    25   with that I had worked with, one that was working in Miami

02:33PM   1   who was my field training agent.

02:33PM   2              **MR. SINGER:**  Objection, hearsay.

02:33PM   3              **MR. COOPER:**  I don't believe hearsay is telling who

02:33PM   4   you spoke to about something.

02:33PM   5              **THE COURT:**  Hang on.

02:33PM   6              Yeah, overruled.

02:33PM   7              **BY MR. COOPER:**

02:33PM   8   Q.  You mentioned that you told a couple of associates at the

02:33PM   9   DEA over time; is that correct?

02:33PM   10  A.  Yeah, several close -- close friends and fellow agents.

02:34PM   11  Q.  Did there come a time ultimately when you reported it to

02:34PM   12  your management?

02:34PM   13  A.  Yes.

02:34PM   14  Q.  About how much time passed from the time the defendant

02:34PM   15  said those things to you in the conference room until you

02:34PM   16  reported it to management?

02:34PM   17  A.  I think it was about two years, it was kind of long.

02:34PM   18  Q.  I want you to explain to the jury why you didn't walk

02:34PM   19  down the hall when you heard that and report it to your

02:34PM   20  supervisor.  Tell them.

02:34PM   21  A.  Well, several reasons.  Trying to process everything at

02:34PM   22  the same time, or all at once.

02:34PM   23     Concerned, now knowing he's a lot closer with Gerace than

02:34PM   24  I knew he was.  That he was possibly going to tell Gerace

02:34PM   25  that I was investigating him.  That definitely crossed my

02:34PM  1  mind.

02:34PM  2     It crossed my mind of -- I'm still trying to figure out

02:34PM  3  what he means about a stripper overdosing at the club and he

02:34PM  4  called him.  Why a criminal is calling a DEA agent about a

02:34PM  5  stripper overdosing?  I don't know.  Like, to me, that's not

02:34PM  6  something that's normal.

02:34PM  7     Is there something more to that?  Is there possibly a

02:35PM  8  crime involved?  Is there some type of cover up?  I don't

02:35PM  9  know.  I'm trying to process all this.

02:35PM 10     And at the same time, in a very selfish way, I knew from

02:35PM 11  past experience if you're an agent and you're telling

02:35PM 12  supervisors about someone that's using racial slurs, and as

02:35PM 13  horrible as this is, that there's -- there's backlash to

02:35PM 14  that.

02:35PM 15     There's backlash from your management, because they think

02:35PM 16  that you're a troublemaker, that the office is gonna come

02:35PM 17  under spotlight, and that they're gonna be possibly

02:35PM 18  investigated.

02:35PM 19     You are questioned by other agents, that they think

02:35PM 20  you're a snitch, snitching on another agent.

02:35PM 21     That thin blue line thing, it -- it certainly factors in.

02:35PM 22  And I knew that.

02:35PM 23     I had known other agents, very good agents, that came

02:35PM 24  forth and said things to people in particular that were

02:35PM 25  fantastic agents, and I saw what they went through.  I saw

02:35PM   1   what happened to their reputation.  I saw what happened to

02:35PM   2   their career.  Both had to leave offices and go and work in

02:35PM   3   other places because it was so horrible.

02:35PM   4       So I was very aware of that.  So in a selfish way,

02:36PM   5   instead of doing the right thing, and maybe focusing on an

02:36PM   6   investigation as opposed to the right thing of going forth

02:36PM   7   and saying what he said to me, which was absolutely racist

02:36PM   8   and that he is a racist, I didn't do that.  I didn't do that.

02:36PM   9   Q.  Were you worried about being ostracized in the office

02:36PM  10   that you had just joined?

02:36PM  11   A.  100 percent.

02:36PM  12   Q.  Were you worried about being isolated in a place that you

02:36PM  13   had finally gotten back to?

02:36PM  14   A.  Yes.  I was there less than a year.  Even though I had

02:36PM  15   been an agent for all these years, I was new to Buffalo.  And

02:36PM  16   a lot of the agents had been there a long time.

02:36PM  17   Q.  Looking back, do you think you should have walked down

02:36PM  18   the hall and reported it to a supervisor immediately?

02:36PM  19   A.  Yes.  I should have reported that to someone in

02:36PM  20   management immediately, and I didn't.

02:36PM  21   Q.  After that meeting, can you describe for the -- for the

02:36PM  22   jury the context of -- actually, withdrawn.

02:36PM  23       Before we get there, after that conference room

02:36PM  24   conversation with the defendant where he says these things to

02:37PM  25   you, did you personally hear from Peter Gerace?

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

02:37PM   1   A.  So, about two or three weeks after that, I got a phone

02:37PM   2   call from a 716 number on my personal cell phone.  Didn't

02:37PM   3   recognize the number.  And I answered the phone.  And someone

02:37PM   4   said, hey, what's up agent?  Or something to that effect.

02:37PM   5      And I said, who is this?  And he said, it's Peter Gerace.

02:37PM   6      So, yeah, I got a phone call about three weeks later from

02:37PM   7   Peter Gerace.

02:37PM   8   Q.  Were you expecting that?

02:37PM   9   A.  No.  No, I wasn't.  Peter Gerace had never called me in

02:37PM   10   any entire life.  And he called me about two or three weeks

02:37PM   11   after that to tell me in a social conversation, how are you

02:37PM   12   doing?  Oh, I'm in Ellicottville, and I saw a friend of

02:37PM   13   yours, that I didn't even know he knew was a friend of mine.

02:37PM   14   And that he just wanted to call and tell me.

02:37PM   15      And I said, okay, that's great.  And, yeah, ended the

02:37PM   16   conversation shortly after that.

02:37PM   17      And 100 percent took note of that.  And I did report that

02:38PM   18   to a supervisor.

02:38PM   19   Q.  Did you believe that was a coincidence that Peter Gerace

02:38PM   20   called you two or three weeks after this defendant made those

02:38PM   21   comments to you in the conference room?

02:38PM   22   A.  No.

02:38PM   23         **MR. SINGER:**  Objection, speculation.

02:38PM   24         **THE COURT:**  Sustained.

       25

| | | |
|---|---|---|
| 02:38PM | 1 | **BY MR. COOPER:** |
| 02:38PM | 2 | Q.  In your whole life, before that, had Peter Gerace ever |
| 02:38PM | 3 | called you? |
| 02:38PM | 4 | A.  Never. |
| 02:38PM | 5 | **MR. SINGER:**  Objection, asked and answered. |
| 02:38PM | 6 | **THE COURT:**  Overruled. |
| 02:38PM | 7 | **BY MR. COOPER:** |
| 02:38PM | 8 | Q.  After the defendant said those things to you in the |
| 02:38PM | 9 | conference room, did he call you within a month after that? |
| 02:38PM | 10 | A.  No, it was a couple weeks. |
| 02:38PM | 11 | Q.  Okay.  Do you know how Peter Gerace got your phone |
| 02:38PM | 12 | number? |
| 02:38PM | 13 | A.  Yes.  Yes. |
| 02:38PM | 14 | Q.  Can you describe that to the jury? |
| 02:38PM | 15 | A.  So I gave Peter Gerace my phone number. |
| 02:38PM | 16 | Years prior, when I was in New York City, I was home on a |
| 02:38PM | 17 | weekend from Buffalo.  Typically, I would drive in on a |
| 02:38PM | 18 | Friday, come home late, and there's no dinner at home.  So I |
| 02:38PM | 19 | stopped at Brennan's Tavern, which is on Transit, that no |
| 02:38PM | 20 | longer -- I think it's closed now, to get some wings. |
| 02:39PM | 21 | And then I called my wife and to say I'm gonna stop at |
| 02:39PM | 22 | Brennan's to get wings before I come home. |
| 02:39PM | 23 | And she had told me that her brother, who living in |
| 02:39PM | 24 | Buffalo at that time, he moved from Las Vegas back to Buffalo |
| 02:39PM | 25 | while I was in New York City, was up there with another |

02:39PM   1   friend.  I said okay.

02:39PM   2       So I went to Brennan's.  And sure enough, when I walked

02:39PM   3   in, I saw her brother.  He was at the bar.  It wasn't as bad

02:39PM   4   at that point that it is now, and afterwards.  So this is

02:39PM   5   somewhere maybe around -- I'm in New York between maybe 2013,

02:39PM   6   2014 timeframe.  So I said hi to him when I walked in.

02:39PM   7       I ordered my wings.  He was there with his other friend,

02:39PM   8   who I also knew, too, from growing up prior before I even met

02:39PM   9   my wife's family.

02:39PM   10      And about 15 minutes later, and he never told me this,

02:39PM   11  Peter Gerace came walking in to the bar and walked up to us.

02:39PM   12  Q.  When you say he never told me, who is the "he" in that

02:39PM   13  sentence?

02:39PM   14  A.  My brother-in-law never mentioned while I was sitting

02:40PM   15  there having wings that Peter Gerace was gonna be showing up.

02:40PM   16  That Peter was meeting him there.  He showed up.

02:40PM   17  Q.  What happened when Peter showed up?

02:40PM   18  A.  He showed up, caught me off guard obviously.  A little

02:40PM   19  annoyed, feeling that why didn't you mention this to me?

02:40PM   20  Because Peter Gerace isn't someone I want to hang out with.

02:40PM   21  And, yeah.

02:40PM   22      Peter just joined the conversation.  And it was towards

02:40PM   23  the end of my time having wings there.  And while I was

02:40PM   24  there, my wife called me wondering where I was at.

02:40PM   25      And I answered the phone, and told her I was just having

02:40PM   1   wings, I was finishing them, that her brother was there, and

02:40PM   2   that I was going to be coming home shortly.

02:40PM   3   Q.   How did Peter Gerace ultimately get your phone number as

02:40PM   4   a result of that?

02:40PM   5   A.   So at the end of the conversation, caught pretty much off

02:40PM   6   guard, Peter Gerace asked me for my cell phone number.  And I

02:40PM   7   couldn't think quick enough for a reason why not to give it

02:40PM   8   to him, so I gave him my personal cell phone number.

02:40PM   9   Q.   From the time in, like, 2012 or 2013, whenever you said

02:40PM   10  that meeting was at the wing restaurant, until the summer of

02:41PM   11  2016, did Peter Gerace ever call you.

02:41PM   12  A.   Never.

02:41PM   13  Q.   Did he ever text you?

02:41PM   14  A.   He did text me once after -- when I gave him that number

02:41PM   15  at the bar that night he texted me, I can't remember.  Maybe

02:41PM   16  it was six months afterwards.  I remember it was during a

02:41PM   17  snowstorm, because I was shovelling snow, and I got a text

02:41PM   18  message again from a 716 number, probably the same number, I

02:41PM   19  don't know, because it wasn't saved in my phone.  And it said

02:41PM   20  the same thing, hey, what's up how's things in New York?

02:41PM   21      And I texted back, who is this?  And he said it was Peter

02:41PM   22  Gerace.

02:41PM   23      So the only other time he ever reached out to me or

02:41PM   24  communicated with me was that time which was before I moved

02:41PM   25  back from New York to Buffalo.  And it was text message.

02:41PM  1    Q.  In that text message, did you carry on months-long

02:41PM  2    conversations with him?

02:41PM  3    A.  No, it was very short.  Very short.  Things are fine in

02:41PM  4    New York.  I'm home for the weekend type thing, and that was

02:41PM  5    it.

02:41PM  6    Q.  Did you ever meet him out and hang out with him?

02:41PM  7    A.  No.

02:41PM  8    Q.  Did you ever invite him to your birthday party?

02:42PM  9    A.  No.

02:42PM  10   Q.  Can you describe for the jury the context of how you

02:42PM  11   ultimately report to a DEA supervisor the comments that the

02:42PM  12   defendant made to you in the conference room in June of 2016?

02:42PM  13   A.  We were at the U.S. Attorney's Office for a meeting

02:42PM  14   regarding the investigation of Peter Gerace and Anthony

02:42PM  15   Gerace.  And this was after -- this was after I pulled the

02:42PM  16   phone records, this was after a proffer I conducted with an

02:42PM  17   individual who mentioned Joe was passing informant's names.

02:42PM  18   This was after I found a report where Joe was calling Peter

02:42PM  19   Gerace his informant in a report that I gave to the U.S.

02:42PM  20   Attorney's Office and said this is a fake report.

02:42PM  21       It was at that point that I told them that we had had

02:42PM  22   this conversation, and Joe used those racial slurs that I

02:42PM  23   described, and said what he said about the stripper

02:43PM  24   overdosing and Gerace calling him about it.

02:43PM  25   Q.  Was that conversation that you had with the defendant and

02:43PM    1    the things he said to you in the conference room something

02:43PM    2    that you had kind of buried inside you for a long time?

02:43PM    3    A.   Yeah.  I mean, the only people that I shared that with

02:43PM    4    were close fellow agents.  And, yeah, it was difficult.

02:43PM    5    Q.   Was it comfortable to bring it up to a supervisor at the

02:43PM    6    DEA?

02:43PM    7    A.   No.  No.  Because I knew.  I knew where it was gonna go.

02:43PM    8    That's exactly where it went afterwards.

02:43PM    9    Q.   What do you mean by that?

02:43PM   10    A.   I mean that I knew would go to internal affairs, which is

02:43PM   11    where it should go.  And those things that I mentioned with

02:43PM   12    fellow agents, many of those things happened to me in my

02:43PM   13    office.

02:43PM   14    Q.   Did you get ostracized?

02:43PM   15    A.   I was -- there were numerous things that happened.  I was

02:43PM   16    no longer the acting supervisor for my group, his backup.

02:44PM   17        I was supposed to be going to a leadership class that I

02:44PM   18    no longer was selected to go to.  Which was bad enough, but

02:44PM   19    then from a personal perspective, people in the office

02:44PM   20    started to ignore me.

02:44PM   21        People that I had known for years stopped talking to me.

02:44PM   22        One task force officer in particular, who I had known

02:44PM   23    20 years, I went to the police academy with her, who I

02:44PM   24    considered a friend, when I was walking into the office

02:44PM   25    actually crossed the street go to the other side of the road.

02:44PM    1        Agents in my office making snide remarks about the U.S.

02:44PM    2    Attorney's Office knowing that I was working cases with

02:44PM    3    people at the U.S. Attorney's Office, one agent saying that

02:44PM    4    we should take a crane to the U.S. Attorney's Office.

02:44PM    5        Another agent saying in front of me about my partner,

02:44PM    6    Curtis Ryan, who had to leave the office because of the same

02:44PM    7    type of treatment, that he was a rat bastard and some day

02:45PM    8    he'd get his.

02:45PM    9        And this is after having -- I've been in law enforcement

02:45PM   10    at that point 20-something years, a DEA agent 20-something

02:45PM   11    years, and it was devastating.  I mean, the leadership, not

02:45PM   12    being a supervisor?  No big deal.  Whatever.

02:45PM   13        But to have people think those things of me and to be

02:45PM   14    treated that way, and I saw it coming.  And I knew it.  And I

02:45PM   15    knew it.  And my wife saw it --

02:45PM   16    Q.  Sir, were those all things that you were worried about

02:45PM   17    before you reported it?

02:45PM   18    A.  Those are all things that I knew.  I had seen it before.

02:45PM   19    Q.  Did all those things happen to you after you reported it?

02:45PM   20    A.  Yes.  Those things I mentioned were the things that

02:45PM   21    happened.  I went to the point of, thankfully, my group at

02:45PM   22    the time in the task force was working a wiretap

02:45PM   23    investigation.  It got to the point that it was so unbearable

02:45PM   24    that I volunteered for all the nightshifts so I wouldn't have

02:45PM   25    to go to into the office.  I just went straight out on a

02:45PM    1    surveillance so I wouldn't have to deal with this.

02:46PM    2    Q.  Has it been a pleasant experience for you since you

02:46PM    3    reported those things?

02:46PM    4    A.  It was horrible.  It was horrible.  Yeah.  It was -- it

02:46PM    5    was a low point in my career.

02:46PM    6        It still bothers me.  And I've been retired from DEA for

02:46PM    7    over two years, and it -- it still bothers me.

02:46PM    8    Q.  At some point after the comments that the defendant makes

02:46PM    9    to you in the June 2016 conference room meeting, does the

02:46PM   10    investigation into Peter Gerace pick up steam again?

02:46PM   11    A.  Yeah, after that, not like right after that.  It was

02:46PM   12    somewhere in like early 2017 maybe that I worked an

02:46PM   13    investigation.  And then we worked an investigation, Joe

02:46PM   14    Bongiovanni was initially somewhat involved at that point.

02:46PM   15    We were not totally not communicating at this point.

02:46PM   16        But then we started targeting an individual who he was

02:46PM   17    familiar with, and he told me he didn't want to be part of it

02:47PM   18    anymore, and he didn't trust the informant, who was already

02:47PM   19    providing us good information.  So he wasn't working with me

02:47PM   20    anymore at that point.

02:47PM   21    Q.  Did there come a time when you conducted a proffer

02:47PM   22    interview of an individual named Kevin Myszka?

02:47PM   23    A.  Yes.

02:47PM   24    Q.  Did that kind of reignite the Peter Gerace investigation?

02:47PM   25    A.  Yes, that was it.  So that case, the person that he knew

02:47PM   1   was Kevin Myszka.  We arrested Kevin Myszka, my group did.

02:47PM   2   And he wasn't case agent with me at this point, but he was

02:47PM   3   still in the group.  And we arrested Kevin Myszka, and he

02:47PM   4   ended up cooperating.

02:47PM   5       And we conducted several interviews of Kevin Myszka.  And

02:47PM   6   during those interviews, I didn't know if he knew Gerace or

02:47PM   7   not, but at that point I'm looking for anybody that can

02:47PM   8   provide intel, like an informant or a source.

02:47PM   9       And Kevin Myszka, from what I knew and from the

02:47PM  10   investigation, I knew that he grew up in Amherst, New York.

02:47PM  11   I knew the Geraces lived -- Peter and Anthony both, I think,

02:48PM  12   lived in Amherst, New York.  Anthony was somewhere around the

02:48PM  13   same age as Kevin Myszka.

02:48PM  14       So long story short, I asked him.  I asked him if he was

02:48PM  15   familiar with Pharaoh's and the Geraces, and he was.  He was.

02:48PM  16   Q.  Did Myszka, without getting into the details of what he

02:48PM  17   said, did Myszka provide some information about Gerace?

02:48PM  18   A.  He did, yep.

02:48PM  19   Q.  Okay.  In the course of your investigation into Peter

02:48PM  20   Gerace, did you look in DEA databases for any other reports

02:48PM  21   that referenced Peter Gerace?

02:48PM  22   A.  I did.  After meeting with the U.S. Attorney's Office, we

02:48PM  23   had a coordinating meeting at some point.  The prosecutor was

02:48PM  24   willing to look at historical information.  So not just

02:48PM  25   current, like, current wiretap information if we were

02:48PM   1   listening to a phone, or an informant that was providing

02:48PM   2   realtime.  The prosecutor was willing to take historical

02:48PM   3   information that occurred basically at any time to build an

02:48PM   4   investigation.

02:48PM   5       That was new to me.  A lot of the prosecutors in Vegas

02:48PM   6   didn't work cases that way.  They were more into the

02:48PM   7   realtime-type investigation, mostly wiretaps, because that's

02:48PM   8   predominantly what I worked so that's what I did.

02:48PM   9       I went back to the office, and I searched for historical

02:49PM   10  reporting on Peter and Anthony Gerace.

02:49PM   11  Q.  Okay.

02:49PM   12      MR. COOPER:  Can we pull up Government Exhibit 30A in

02:49PM   13  evidence.

02:49PM   14      BY MR. COOPER:

02:49PM   15  Q.  I think earlier during a longer answer that you gave, you

02:49PM   16  mentioned a -- you called it a fake report that you found.

02:49PM   17  Is this what you were talking about?

02:49PM   18  A.  Yes.  Yes.

02:49PM   19  Q.  Did you find this report when you went back to pull up

02:49PM   20  old reports mentioning the name Peter Gerace?

02:49PM   21  A.  Yes, I did.

02:49PM   22  Q.  When you found this report, did you produce it to the

02:49PM   23  U.S. Attorney's Office?

02:49PM   24  A.  Yes, I did.

02:49PM   25  Q.  Who drafted this report?

02:49PM    1    A.  Joseph Bongiovanni.

02:49PM    2    Q.  What's the subject of the report?

02:49PM    3    A.  Information offer by Peter Gerace regarding narcotics

02:49PM    4    investigation.

02:49PM    5    Q.  What's the date the report was prepared?

02:49PM    6    A.  November 6th, 2009.

02:49PM    7    Q.  Do you see a sentence starting here, the second sentence

02:49PM    8    of paragraph 2, that indicates that Gerace has acted as a

02:49PM    9    confidential source and has been able to provide information

02:50PM   10    regarding individuals in this case file and other narcotic

02:50PM   11    investigations in the past.

02:50PM   12    A.  Yes.  I see that.

02:50PM   13    Q.  Who wrote those words?

02:50PM   14    A.  Joseph Bongiovanni.

02:50PM   15         **MR. COOPER:**  You can take that down, Ms. Champoux.

02:50PM   16         **BY MR. COOPER:**

02:50PM   17    Q.  Why did you bring this report to the U.S. Attorney's

02:50PM   18    Office?

02:50PM   19    A.  Well, first, I was tasked with pulling up historical

02:50PM   20    reporting.  Peter Gerace was a target of the investigation.

02:50PM   21    But more importantly, at this point, based on how that report

02:50PM   22    was written, I -- I believed it to be a fake report.

02:50PM   23         You don't mention an individual by name if they were a

02:50PM   24    confidential source before, you refer to them as a

02:50PM   25    deactivated confidential source.  Those names are highly

02:50PM    1    protected.

02:51PM    2        But even more, I knew it was his friend.  You're not

02:51PM    3    allowed to even sign someone up and run an informant that's a

02:51PM    4    personal friend.

02:51PM    5        There were multiple things on the report.  You refer to

02:51PM    6    an informant by an informant number.  An agent that's out of

02:51PM    7    the academy, and I was a field training agent --

02:51PM    8            MR. SINGER:  Your Honor, I'm going to object as to

02:51PM    9    nonresponsive at this point.

02:51PM   10            THE COURT:  So, Mr. Casullo, please listen to the

02:51PM   11    questions and just answer the question that he's asking you.

02:51PM   12            THE WITNESS:  Yes, Judge.

02:51PM   13            THE COURT:  Ask another question.

02:51PM   14            MR. COOPER:  Yes, Judge.

02:51PM   15            BY MR. COOPER:

02:51PM   16    Q.  After -- you were describing some of the reasons why you

02:51PM   17    submitted this report to the U.S. Attorney's Office.  Was one

02:51PM   18    of the reasons that they had asked you to look up historical

02:51PM   19    reporting on Peter Gerace?

02:51PM   20    A.  Yes.

02:51PM   21    Q.  Was that part of the investigative plan in that case?

02:51PM   22    A.  Yes, it was.

02:51PM   23    Q.  Did you look up the report as part of the investigative

02:51PM   24    plan?

02:51PM   25    A.  Yes, I did.

02:51PM    1    Q.  When you saw what was written in the report, did it

02:51PM    2    strike you as suspicious and odd?

02:51PM    3    A.  Yes.

02:51PM    4    Q.  Did you forward it along to the U.S. Attorney's Office?

02:52PM    5    A.  Yes.

02:52PM    6    Q.  Were you doing that because you wanted to target the

02:52PM    7    defendant in any way?

02:52PM    8    A.  No.

02:52PM    9    Q.  After you brought that report to the U.S. Attorney's

02:52PM   10    Office, did the defendant ever approach you about doing that?

02:52PM   11    A.  Yes, he did.

02:52PM   12    Q.  What did he say?

02:52PM   13    A.  He came over and he said -- to my desk again, when I was

02:52PM   14    alone, caught me off guard, I didn't see him.  I was in a

02:52PM   15    task force group at this time.

02:52PM   16        He came to my desk and he said, what is this, I hear you

02:52PM   17    sent some bullshit report that I wrote years ago over to the

02:52PM   18    U.S. Attorney's Office, over to Joe Tripi?

02:52PM   19    Q.  What was his demeanor like?

02:52PM   20    A.  He was angry, and said I don't trust that guy.

02:52PM   21    Q.  Does the DEA work basically on all their cases with the

02:52PM   22    U.S. Attorney's Office?

02:52PM   23    A.  The majority of them.

02:52PM   24    Q.  Okay.  Is it strange or unusual for a DEA agent to send a

02:52PM   25    DEA report about a suspected drug dealer to the U.S.

02:52PM    1    Attorney's Office?

02:52PM    2    A.  No, we do it all the time.

02:52PM    3    Q.  I want to just get a timeline down to clear up.

02:53PM    4       You mentioned that the conversation in the conference

02:53PM    5    room is June of 2016, right?

02:53PM    6    A.  Yes.

02:53PM    7    Q.  Okay.  Earlier, we spoke before the break about an

02:53PM    8    interaction where you had run Anthony Gerace's tolls, and the

02:53PM    9    defendant came over and made some comments to you about

02:53PM   10    Anthony Gerace; do you remember that?

02:53PM   11    A.  I do.

02:53PM   12    Q.  That's the time when you were first with Curtis Ryan, and

02:53PM   13    after Curtis Ryan walks away the defendant comes over to you;

02:53PM   14    is that right?

02:53PM   15    A.  Yes.

02:53PM   16    Q.  Okay.  That occurred after the conversation in June of

02:53PM   17    2016; is that right?

02:53PM   18    A.  With Anthony Gerace -- regarding Anthony Gerace?

02:53PM   19    Q.  Yes.

02:53PM   20    A.  Yes.

02:53PM   21    Q.  Okay.  And so when you described for the jury earlier

02:53PM   22    that that conversation and the comments that the defendant

02:53PM   23    made to you about Anthony Gerace made you feel like you

02:53PM   24    wanted to squirm, I think is what you said, is that in the

02:53PM   25    context of this conversation about Peter Gerace from June of

02:53PM    1    2016?

02:53PM    2    A.  It was in the context of everything that had occurred up

02:53PM    3    to that point.

02:53PM    4    Q.  Okay.  So that Anthony Gerace thing happens after the

02:54PM    5    conference room conversation, right?

02:54PM    6    A.  Yes.  Yes.  Years.  I think it was two years.

02:54PM    7    Q.  I want to talk with you about July of 2018 now, and an

02:54PM    8    individual named Ron Serio.  Are you aware of that person?

02:54PM    9    A.  Yes.

02:54PM   10    Q.  Did you know about July of 2018 that Ron Serio had

02:54PM   11    previously been arrested by the ECSO, the Erie County

02:54PM   12    Sheriff's Office and the FBI?

02:54PM   13    A.  At some point, I was made aware of that.

02:54PM   14    Q.  Okay.  And did you attend a proffer with Ron Serio in

02:54PM   15    July of 2018?

02:54PM   16    A.  Yes, I did.

02:54PM   17    Q.  Did the U.S. Attorney's Office set up that proffer

02:54PM   18    meeting?

02:54PM   19    A.  Yes, they did.

02:54PM   20    Q.  Did prosecutors that were handling that proffer tell you

02:54PM   21    to join the proffer?

02:54PM   22    A.  Yes, they did.

02:54PM   23    Q.  After the proffer happened, did you ever get a chance to

02:55PM   24    look at the defendant's purported Serio case file?

02:55PM   25    A.  Yeah.  Yeah.  I asked my supervisor at the time in the

02:55PM 1    task force group if I could look at that file.

02:55PM 2    Q.  Why did you do that?

02:55PM 3    A.  Because we were looking at Anthony Gerace and individuals

02:55PM 4    that -- the reason we went to proffer Serio was because I

02:55PM 5    found a report on Anthony Gerace where Serio proffered that

02:55PM 6    he had supplied Anthony Gerace marijuana in the past.

02:55PM 7        So based on that, I told Curtis we should go over and

02:55PM 8    interview Serio again.  So I did.

02:55PM 9        So I wanted to look at the Serio file because I could see

02:55PM 10   that they were connected at this point.

02:55PM 11   Q.  Okay.  What, if anything, did you notice about the

02:55PM 12   defendant's file on Serio as you reviewed it?

02:55PM 13   A.  I -- I went through it.  I retrieved the file from the

02:55PM 14   DEA file room.  I went to the DEA-6 section, the reports of

02:55PM 15   investigation, which is where the narratives are in terms of

02:55PM 16   like a surveillance or an undercover report.  I wanted to

02:56PM 17   read through those to see if there were any undercover

02:56PM 18   purchases of narcotics, informant briefings, things that were

02:56PM 19   more proactive, operational-type reports.

02:56PM 20        MR. COOPER:  Ms. Champoux, can we pull up 8A-6.

02:56PM 21        BY MR. COOPER:

02:56PM 22   Q.  Is this a list of all the 6s that were contained in that

02:56PM 23   DEA case file into Serio?

02:56PM 24   A.  I -- I don't know for sure.

02:56PM 25   Q.  Okay.

02:56PM    1    **MR. COOPER:**  You can take it down, Ms. Champoux.

02:56PM    2         **BY MR. COOPER:**

02:56PM    3    Q.  After the proffer, did you learn that you could no longer

02:56PM    4    be a case agent investigating Peter Gerace or Ron Serio?

02:56PM    5    A.  There was a point when I was told to no longer -- that I

02:56PM    6    was no longer going to be involved in the investigation of

02:56PM    7    Peter Gerace.

02:56PM    8    Q.  Was that after you reported the race-related comments

02:56PM    9    that the defendant made to you in the conference room?

02:56PM    10   A.  It was after that.  I was called in to a meeting with our

02:56PM    11   resident agent in charge and my supervisor, told several

02:56PM    12   things and one of them was that I was off the Gerace

02:57PM    13   investigation.

02:57PM    14   Q.  Were you happy about that?

02:57PM    15   A.  No.  No.  No, things were starting to progress at that

02:57PM    16   point.  And we had some really good information.  So I was

02:57PM    17   upset about it.

02:57PM    18   Q.  Okay.  Did you understand why the decision was being

02:57PM    19   made?

02:57PM    20   A.  Not so much at the time, but I eventually understood why

02:57PM    21   afterwards.

02:57PM    22   Q.  Is that because you had become a fact witness in the

02:57PM    23   investigation?

02:57PM    24   A.  Yes.  Yes.

02:57PM    25   Q.  Okay.

02:57PM    1          **MR. COOPER:**  Just one second, please, Judge.

02:57PM    2          **THE COURT:**  Sure.

02:58PM    3          **BY MR. COOPER:**

02:58PM    4  Q.  Just a few more questions to close up here, Special Agent

02:58PM    5  Casullo.

02:58PM    6      That Serio proffer that you attended that we discussed,

02:58PM    7  did that occur on July 20th of 2018?

02:58PM    8  A.  It could have, I don't remember the exact date.  But

02:58PM    9  around that timeframe.

02:58PM   10  Q.  Okay.  Did you -- when you reported the race-related

02:58PM   11  comments from the June 2016 conference room interaction, was

02:58PM   12  that to the U.S. Attorney's Office as well as your supervisor

02:58PM   13  from the DEA?

02:58PM   14  A.  Yes.

02:58PM   15  Q.  At the same time?

02:58PM   16  A.  Yeah, it was a meeting at the U.S. Attorney's Office, and

02:58PM   17  my supervisor was present.

02:58PM   18  Q.  Who was your supervisor that was present?

02:58PM   19  A.  Jim McHugh.

02:58PM   20  Q.  Okay.  And did that meeting where you reported those

02:58PM   21  race-related comments happen on or about August 1st, 2018?

02:58PM   22  A.  Yeah, it certainly could have been around that time.

02:58PM   23  Q.  Was it after that Serio proffer happened?

02:58PM   24  A.  Yes.

02:58PM   25  Q.  Okay.  The last thing I want to speak with you about is

02:58PM    1    one of the comments that were made during that June 2016

02:58PM    2    conference room discussion with the defendant.

02:58PM    3        The one about that kid called me when a dancer overdosed

02:58PM    4    at the club, and I told him to get her out of there.

02:59PM    5        Does the DEA investigate drug overdoses?

02:59PM    6    A.  Oh, yes.

02:59PM    7    Q.  Okay.  Is that something that happened in 2016?  Did the

02:59PM    8    DEA investigate overdoses back in 2016?

02:59PM    9    A.  Oh, yes.

02:59PM   10    Q.  Okay.  Are those some of the most serious crimes that the

02:59PM   11    DEA investigates?

02:59PM   12    A.  They can be, if someone dies.

02:59PM   13    Q.  If a person overdoses, can the DEA investigate who

02:59PM   14    provided that person the drugs?

02:59PM   15    A.  Oh, absolutely.

02:59PM   16    Q.  Okay.  And is that conduct that's chargeable in federal

02:59PM   17    court?

02:59PM   18    A.  It can be.

02:59PM   19    Q.  Okay.  Is the DEA charged with investigating overdoses

02:59PM   20    related to drug distribution?

02:59PM   21    A.  In terms of enforcing the U.S. drug laws, yes.

02:59PM   22    Q.  Is there a U.S. drug law about drug overdoses?

02:59PM   23    A.  I don't know specific to drug overdoses, but specific to

02:59PM   24    drug trafficking and possession of narcotics and those types

02:59PM   25    of things.

| | | |
|---|---|---|
| 02:59PM | 1 | Q.  Okay.  So if someone is dealing drugs, and it causes an |
| 02:59PM | 2 | overdoes, is that within what the DEA is charged with |
| 03:00PM | 3 | investigating? |
| 03:00PM | 4 | A.  Yes. |
| 03:00PM | 5 | Q.  Did the defendant tell you that during his conversation |
| 03:00PM | 6 | with Gerace, he had started investigating that overdose? |
| 03:00PM | 7 | A.  No. |
| 03:00PM | 8 | MR. COOPER:  I have no further direct, Judge.  Thank |
| 03:00PM | 9 | you. |
| 03:00PM | 10 | THE COURT:  Mr. Singer? |
| 03:00PM | 11 | |
| 03:00PM | 12 | CROSS-EXAMINATION BY MR. SINGER: |
| 03:00PM | 13 | Q.  We can start.  I just want to lock down a couple of |
| 03:00PM | 14 | dates, Mr. Casullo.  So I'm going to hand you of a copy of |
| 03:00PM | 15 | what's marked as Government Exhibit 3557U. |
| 03:00PM | 16 | I'm going to hand you page 4 of that.  It's a narrative. |
| 03:01PM | 17 | I'll just ask you to review that, please, see if that helps |
| 03:01PM | 18 | refresh your memory as to the exact date you sat down at the |
| 03:01PM | 19 | U.S. Attorney's Office. |
| 03:01PM | 20 | MR. TRIPI:  Can you repeat the exhibit? |
| 03:01PM | 21 | MR. SINGER:  3557U. |
| 03:01PM | 22 | BY MR. SINGER: |
| 03:01PM | 23 | Q.  Does that help refresh your memory as to the date you met |
| 03:01PM | 24 | at the U.S. Attorney's Office, sir? |
| 03:01PM | 25 | A.  It says August 1st, 2 -- yes. |

03:01PM  1   Q.  I don't want to ask you what it says?

03:01PM  2   A.  Yes.

03:01PM  3   Q.  Does it refresh --

03:01PM  4   A.  Yes.

03:01PM  5   Q.  And that date was August 1st?

03:01PM  6   A.  August 1st.

03:01PM  7   Q.  So the conversation that you allege you had in the

03:01PM  8   conference room at the DEA with Mr. Bongiovanni, that occurs

03:01PM  9   in June of 2016 sometime?

03:01PM  10  A.  Yes.

03:01PM  11  Q.  The conversation that you have at your desk regarding

03:02PM  12  Anthony Gerace, that occurs in August of 2018?

03:02PM  13  A.  I believe so.

03:02PM  14  Q.  The proffer that you have with Ron Serio, that occurs

03:02PM  15  prior to the August 1st U.S. Attorney's Office meeting,

03:02PM  16  right?

03:02PM  17  A.  Yes.

03:02PM  18  Q.  And I know Mr. Cooper threw a date at you of July 20th of

03:02PM  19  that proffer.  I'll throw the same date out with you.  Do you

03:02PM  20  have any reason to disagree with both of us that's when that

03:02PM  21  happened?

03:02PM  22  A.  No.

03:02PM  23  Q.  Okay.  All right.

03:02PM  24  A.  Sir, and just -- unless I read that wrong, I believe it

03:02PM  25  says on or about.  On or about.  I could be wrong.  If I look

03:02PM    1    at it again, but it says on or about.

03:02PM    2    Q.  So I'll hand you back 3557U.  I'll just direct your

03:02PM    3    attention to that last full paragraph, first sentence.

03:02PM    4    A.  Yep.  It's on.  It's not on or about.  Yep.  Sorry.

03:02PM    5    Q.  So I'm going to take that away from you.

03:02PM    6        So you're confident at this point August 1st, 2018 is

03:02PM    7    that date you met at the U.S. Attorney's Office?

03:02PM    8    A.  Yeah, based on that report.

03:02PM    9    Q.  Okay.  All right.  Perfect.

03:03PM   10        So you start your career with the DEA in 1999; is that

03:03PM   11    right?

03:03PM   12    A.  1999.  July of '99.

03:03PM   13    Q.  And your first duty station was Las Vegas, correct?

03:03PM   14    A.  It was.

03:03PM   15    Q.  And part of your duties at DEA Las Vegas was you

03:03PM   16    investigated narcotics-related crimes, correct?

03:03PM   17    A.  Yes.

03:03PM   18    Q.  So some of those investigations you mentioned involved

03:03PM   19    figures, because law enforcement had a belief, also had an

03:03PM   20    association or nexus to Italian Organized Crime?

03:03PM   21    A.  For me, that came up.  Yep.

03:03PM   22    Q.  And that was because one of your bosses, I think he had

03:03PM   23    worked in the LA division at some point; is that right?

03:03PM   24    A.  New York.

03:03PM   25    Q.  New York?

03:03PM    1    A.  Yep.

03:03PM    2    Q.  He investigated crimes involving potential IOC

03:03PM    3    connections, as well?

03:03PM    4    A.  He did.

03:03PM    5    Q.  And that was something you that he brought to the office

03:03PM    6    out in Vegas?

03:03PM    7    A.  He did.  Again, he was a supervisor, but there were

03:03PM    8    several cases --

03:03PM    9    Q.  Okay.

03:03PM   10    A.  -- that he was involved in in one way or another.

03:03PM   11    Q.  And some of those cases they involve possible IOC nexuses

03:04PM   12    in Vegas that you worked on?

03:04PM   13    A.  Yes.

03:04PM   14    Q.  That's how you got exposed to those type of cases?

03:04PM   15    A.  Yes.

03:04PM   16    Q.  All right.  So as part of your work out in Vegas, in

03:04PM   17    2004, your investigation into other drug traffickers who had

03:04PM   18    a potential IOC nexus to Buffalo as well, that identified

03:04PM   19    Mike Masecchia as a potential target of the investigation?

03:04PM   20    A.  He was at some point.

03:04PM   21    Q.  Okay.  And so the way I understood it was that Michael

03:04PM   22    Masecchia had some type of connection to people in Las Vegas

03:04PM   23    you were looking at who came from Buffalo at one point in

03:04PM   24    time?

03:04PM   25    A.  Pretty much.

03:04PM   1    Q.   Or they had relatives back in Buffalo?

03:04PM   2    A.   They were relatives, yeah.

03:04PM   3    Q.   All right.  So Mike Masecchia at that point in time, he's

03:04PM   4    not living in Las Vegas, correct?

03:04PM   5    A.   No.  To the best of my knowledge, no.

03:04PM   6    Q.   Yes.  Because you took a look and made sure that he

03:04PM   7    wasn't living in Vegas, correct?

03:04PM   8    A.   We were doing surveillance and we never saw him there.

03:04PM   9    Q.   So you come to a belief, based on intelligence you

03:05PM  10    received, that Michael Masecchia may be moving out to

03:05PM  11    Las Vegas at some point in the future?

03:05PM  12    A.   Correct.

03:05PM  13    Q.   And that was potentially to live at a relative's house in

03:05PM  14    Las Vegas, correct?

03:05PM  15    A.   He was supposed to move into a house one of the people

03:05PM  16    that we were targeting, and I believe through marriage they

03:05PM  17    were related somehow.

03:05PM  18    Q.   And so that's why you ended up calling Special Agent Mike

03:05PM  19    Hill at the Buffalo office, correct?

03:05PM  20    A.   We did, because we knew Masecchia was from Buffalo, he

03:05PM  21    was a school teacher there.  And at that point we had pulled

03:05PM  22    phone records on some of the targets we were looking at in

03:05PM  23    Las Vegas, and some of those targets were in contact with 716

03:05PM  24    phone numbers.

03:05PM  25    Q.   Yeah.  And so you mentioned on direct that Special Agent

03:05PM    1    Hill, he's somebody who you went to the academy with,

03:05PM    2    correct?

03:05PM    3    A.   Yes, sir.

03:05PM    4    Q.   Somebody that you trusted, correct?

03:05PM    5    A.   Yes.

03:05PM    6    Q.   He was someone who was located locally in Buffalo at the

03:05PM    7    time?

03:05PM    8    A.   He was.

03:05PM    9    Q.   He worked in the Buffalo office right here?

03:05PM    10   A.   Yes.

03:05PM    11   Q.   Right down the street?

03:05PM    12   A.   Yes.

03:05PM    13   Q.   And you had no reason to believe that Mike Masecchia was

03:05PM    14   living in Las Vegas, right?

03:06PM    15   A.   Not at that point.

03:06PM    16   Q.   But you did have reason to believe that he was living in

03:06PM    17   Buffalo, correct?

03:06PM    18   A.   At that point, we still thought he was in Buffalo.

03:06PM    19   Q.   So naturally you would reach out to the office closest to

03:06PM    20   him to see if they could help you out with the investigation

03:06PM    21   you're conducting?

03:06PM    22   A.   Yes.

03:06PM    23   Q.   So Agent Mike Hill, you briefed him on the investigation

03:06PM    24   that was ongoing in Las Vegas, right?

03:06PM    25   A.   Yeah, gave him a general idea of it.

03:06PM   1   Q.  And you gave him a little better understanding of how

03:06PM   2   Mike Masecchia related to the investigation in Las Vegas,

03:06PM   3   correct?

03:06PM   4   A.  Yes.

03:06PM   5   Q.  And you also told him that Mike Masecchia was somebody

03:06PM   6   who you believe was residing in the Buffalo area?

03:06PM   7   A.  Believed that he was still in Buffalo, and possibly

03:06PM   8   moving out to Vegas.

03:06PM   9   Q.  And that was based on the intelligence you received,

03:06PM   10   correct?

03:06PM   11   A.  At the time.

03:06PM   12   Q.  And it was also based on the phone numbers that you had

03:06PM   13   looked up associated with Mike Masecchia, right?

03:06PM   14   A.  Yeah.  I don't remember at that point if we had

03:06PM   15   Masecchia's number identified at that point.  So what I can

03:06PM   16   say is that the targets that we were looking at in Vegas at

03:06PM   17   that time were in contact with some 716 numbers.  I don't

03:07PM   18   remember if Masecchia was one of them at that point.

03:07PM   19   Q.  All right.  So, sum and substance is that you asked

03:07PM   20   Special Agent Hill, since he was located in Buffalo and Mike

03:07PM   21   Masecchia was located in Buffalo, to investigate Mike

03:07PM   22   Masecchia and see what nexus he and you could draw to what

03:07PM   23   was going on in Vegas, correct?

03:07PM   24   A.  Yeah.  To see if they could identify the phone numbers

03:07PM   25   that we were providing them, and to see what they could

03:07PM    1    develop on Masecchia as well.

03:07PM    2    Q.  So Mike Hill, he opens up a file title Mike Masecchia in

03:07PM    3    Buffalo, correct?

03:07PM    4    A.  He eventually did, yep.

03:07PM    5    Q.  That's a new investigation that's different from yours,

03:07PM    6    but related?

03:07PM    7    A.  Correct.

03:07PM    8    Q.  And I think we've been through this before in the trial,

03:07PM    9    but when you have a situation like that, agents tend to

03:07PM   10    cross-reference reports they write on their file to the other

03:07PM   11    file in existence at the different office?

03:07PM   12    A.  That's correct.

03:07PM   13    Q.  So you were doing that for your Vegas reports, you were

03:07PM   14    cross-referencing them to the Buffalo file?

03:07PM   15    A.  Yes.

03:07PM   16    Q.  And Mike -- sorry, Michael Hill, he was cross-referencing

03:08PM   17    his reports he wrote here to your file?

03:08PM   18    A.  He should have been.  I can't remember if he did for

03:08PM   19    sure, or if he was just faxing them to me.  But either way, I

03:08PM   20    was getting the reports.

03:08PM   21    Q.  You so you were getting the information about what they

03:08PM   22    were doing here in Buffalo?

03:08PM   23    A.  Yes.

03:08PM   24    Q.  And your understanding was that what they were doing here

03:08PM   25    in Buffalo is they had subpoenaed records to figure out

03:08PM  1   whether the phone numbers you had in Vegas were associated

03:08PM  2   with Mike Masecchia, correct?

03:08PM  3   A.  It wasn't specific to Mike, it was here's a list of 716

03:08PM  4   numbers.  Can you identify these numbers, and see who they

03:08PM  5   belong to, if it's other criminals or whoever.  It wasn't

03:08PM  6   specific to Mike.

03:08PM  7       But again, we gave him the information on Mike as well to

03:08PM  8   see what they could develop on Mike.

03:08PM  9   Q.  Okay.  And then eventually at some point in time you

03:08PM  10  receive a call from Special Agent Bongiovanni about Mike

03:08PM  11  Masecchia, correct?

03:08PM  12  A.  I did.

03:08PM  13  Q.  So he called you up, I think you said, it was a little

03:08PM  14  out of the blue, right?

03:08PM  15  A.  Unexpected.

03:08PM  16  Q.  And it was unexpected because you had spoken with Mike

03:08PM  17  Hill who you were good friends with based on your academy

03:09PM  18  relationship?

03:09PM  19  A.  Unexpected because I would have expected Mike to give me

03:09PM  20  a heads-up if anybody was going to call me.

03:09PM  21  Q.  All right.  But Mike didn't give you a heads-up about

03:09PM  22  that, right?

03:09PM  23  A.  He didn't.

03:09PM  24  Q.  But you're aware of the fact that Agent Bongiovanni at

03:09PM  25  the time works in the same group as Mike Hill, right?

03:09PM   1   A.  I don't know if I knew that when I initially spoke to

03:09PM   2   Mike, but I found out after Bongiovanni called me.

03:09PM   3   Q.  All right.  And, I mean, you've been in the DEA at that

03:09PM   4   point in time for a couple years, but you had a 20-year-plus

03:09PM   5   career, correct?

03:09PM   6   A.  Total?

03:09PM   7   Q.  Yeah.

03:09PM   8   A.  Yes.

03:09PM   9   Q.  Okay.  And it's not uncommon for people who work in the

03:09PM  10   same group to assist other agents with investigations they

03:09PM  11   might not be the case agent on, right?

03:09PM  12   A.  That's not uncommon.

03:09PM  13   Q.  All right.  So, Agent Bongiovanni gives you a call, and

03:09PM  14   he mentions, hey, you know, I know Mike Masecchia based on

03:09PM  15   the fact that I grew up with him and went to school with him,

03:09PM  16   correct?

03:09PM  17   A.  He said that.

03:09PM  18   Q.  And, you know, that's not something that's uncommon in

03:09PM  19   the City of Buffalo, right?

03:09PM  20   A.  No.

03:09PM  21   Q.  You're from here, correct?

03:09PM  22   A.  Yes.

03:09PM  23   Q.  In fact, you testified on direct that you knew who Mike

03:09PM  24   Masecchia was before you even started the investigation,

03:09PM  25   right?

03:10PM    1    A.  Correct.

03:10PM    2    Q.  That was based on the fact that you grew up in the North

03:10PM    3    Buffalo area?

03:10PM    4    A.  I grew up in Kenmore.

03:10PM    5    Q.  Yeah, Kenmore, I'm sorry.  But you went to the Fitness

03:10PM    6    Factory gym; is that right?

03:10PM    7    A.  That's correct.

03:10PM    8    Q.  And that's where you had seen Mike Masecchia?

03:10PM    9    A.  That's the first time I ever saw him.

03:10PM   10    Q.  And you're familiar with him based on seeing him at the

03:10PM   11    gym?

03:10PM   12    A.  Pretty much.

03:10PM   13    Q.  Okay.  So Mr. Bongiovanni, during that phone call, he

03:10PM   14    mentions this information, correct, that he has.  That I know

03:10PM   15    him, I grew up with him?

03:10PM   16    A.  I grew up with him -- to the effect that I grew up with

03:10PM   17    him in North Buffalo.

03:10PM   18    Q.  And he also mentions that based on what he's heard, the

03:10PM   19    Erie County Sheriff's Office has some type of investigation

03:10PM   20    going on into marijuana grow operations somewhere in the

03:10PM   21    Southern Tier of New York?

03:10PM   22    A.  Related to Masecchia.

03:10PM   23    Q.  Correct.  Related to Mike Masecchia, right?

03:10PM   24    A.  Yes.

03:10PM   25    Q.  And so your case out in Vegas, it involves obviously a

03:10PM     1   drug nexus, correct?

03:10PM     2   A.  Correct.

03:10PM     3   Q.  And your case also involves a potential nexus with

03:11PM     4   Italian Organized Crime, right?

03:11PM     5   A.  Yes.  Yep.

03:11PM     6   Q.  At that point in time, Mr. Bongiovanni provided you

03:11PM     7   information about there may be a drug nexus that perhaps

03:11PM     8   exists out here, correct?

03:11PM     9   A.  Yeah, specific to what we said about the outdoor grows.

03:11PM    10   Q.  And that might have some relationship to the targets

03:11PM    11   you're looking at in Vegas, right?

03:11PM    12   A.  It gave us a drug nexus that we didn't have before.  We

03:11PM    13   didn't have that knowledge before regarding Masecchia.

03:11PM    14   Q.  So that was valuable information, right?

03:11PM    15   A.  It was good intelligence.

03:11PM    16   Q.  And when you got this call, did you ask him any specific

03:11PM    17   questions about what he knew about Mike Masecchia based on

03:11PM    18   the fact that they grew up?

03:11PM    19   A.  No, we really didn't talk much -- I'm sorry, specific to

03:11PM    20   what?  Could you ask that again?

03:11PM    21   Q.  Sure.  Did you ask him any specific questions about -- so

03:11PM    22   you just said that you grew up with Mike Masecchia, what can

03:11PM    23   you tell me about him?  Did you ever ask him a question about

03:11PM    24   that?

03:11PM    25   A.  No, we really didn't talk much about that, other than him

03:12PM    1    providing what he provided, about him possibly being involved

03:12PM    2    with the outdoor marijuana grows and the Erie County

03:12PM    3    Sheriff's Office was investigating that, I don't think I

03:12PM    4    asked many questions.

03:12PM    5    Q.  Did you note that in any type of report that you had on

03:12PM    6    the case?

03:12PM    7    A.  Did I note what?

03:12PM    8    Q.  The conversation you had with Agent Bongiovanni?

03:12PM    9    A.  I did not do a DEA-6 specific to the conversation with

03:12PM   10    Joe Bongiovanni.

03:12PM   11    Q.  Was there a reason why you didn't do that?

03:12PM   12    A.  Yeah.  It really wasn't that long of a conversation.  At

03:12PM   13    the time, I didn't think it was that significant other than

03:12PM   14    the intelligence regarding the outdoor grow, but I chose not

03:12PM   15    to.

03:12PM   16    Q.  So, you hang up the phone with him, correct?

03:12PM   17    A.  At some point.

03:12PM   18    Q.  And your understanding is that Mike Hill continues to try

03:12PM   19    to work the telephone numbers that you provided him?

03:12PM   20    A.  He said he would look into the telephone numbers.  And at

03:12PM   21    some point I don't know if he said at the time they were

03:12PM   22    going to open up a case, but they would start looking at it.

03:12PM   23    Q.  To your understanding, though, the Mike Masecchia

03:13PM   24    connection to who you're looking at in Vegas never really

03:13PM   25    materializes, right?

03:13PM   1   A.   To the best of our knowledge, he never moved out to

03:13PM       Vegas.

03:13PM   3   Q.   Yeah.   There are a couple reasons for that.   One of those

03:13PM   4   reasons is that Mike Masecchia never moves out to Vegas,

03:13PM   5   right?

03:13PM   6   A.   Again, to the best of my knowledge.   We never saw him out

03:13PM   7   there, so I don't think he did.

03:13PM   8   Q.   Another reason you provided on direct that Mike

03:13PM   9   Masecchia, when you're doing these wire intercepts, never

03:13PM   10  shows up on the wire intercepts?

03:13PM   11  A.   We never intercepted him on the wire.

03:13PM   12  Q.   Another reason why you provided is that you were not

03:13PM   13  really interested in investigating the drug nexus that may

03:13PM   14  exist in the Southern Tier, correct?

03:13PM   15  A.   That wouldn't be something that we would do.   That would

03:13PM   16  be something that the Buffalo office would do.

03:13PM   17  Q.   It's out of your jurisdiction, for lack of a better term?

03:13PM   18  A.   Yeah.   Operationally, that's for them to do, not us.

03:13PM   19  Q.   You're over in Vegas, and they're up here in New York

03:13PM   20  and --

03:13PM   21  A.   Yep.

03:13PM   22  Q.   -- you're not going to pick up a marijuana grow up in

03:13PM   23  New York?

03:13PM   24  A.   That would be something they would do.

03:13PM   25  Q.   Now if your investigation revealed there was marijuana

03:13PM   1   being transported from New York down to Vegas, that's

03:14PM   2   something you might be interested in, right?

03:14PM   3   A.   That would be of more interest at that point, because

03:14PM   4   then there's more of a direct nexus to Vegas in terms of a

03:14PM   5   drug nexus.

03:14PM   6   Q.   And Mike Hill never informs you that the Sheriff's Office

03:14PM   7   investigation into this grow yielded any results, correct?

03:14PM   8   A.   I never heard about it again.  Mike never mentioned it.

03:14PM   9   Q.   As far as the phone number that you provided, Mike Hill

03:14PM  10   provides you information that nothing really materializes on

03:14PM  11   those either, correct?

03:14PM  12   A.   They subpoenaed the phone numbers.  I think they

03:14PM  13   identified some of the phone numbers.  But they never got to

03:14PM  14   the point that they were actually working a wiretap

03:14PM  15   investigation.

03:14PM  16   Q.   So, safe to say that Mike Masecchia connection to your

03:14PM  17   2004 Vegas investigation really doesn't go anywhere, right?

03:14PM  18   A.   As far as regarding Masecchia?  No.  We never saw him.

03:14PM  19   We never got him on our wires.  We never indicted him.

03:14PM  20   Q.   And as far as I guess the conversation you had, one of

03:15PM  21   the things you mentioned, Mr. Casullo, was that

03:15PM  22   Mr. Bongiovanni mentioned to you that he could not have his

03:15PM  23   name associated with the file; is that right?

03:15PM  24   A.   He said he couldn't have his name on any reports.

03:15PM  25   Q.   And, you know, the reason why he gave to you that

03:15PM    1    was that he grew up with this guy who lives in North Buffalo,

03:15PM    2    and sometimes he sees him, right?

03:15PM    3    A.  I don't know if he sees him, or not.  But he mentioned

03:15PM    4    that he grew up with him, and that he knew him.

03:15PM    5    Q.  And they live in the same area to your understanding,

03:15PM    6    correct?

03:15PM    7    A.  He mentioned North Buffalo.  I don't know if Masecchia

03:15PM    8    still lived in North Buffalo at the time, but again, they

03:15PM    9    grew up together.  I don't know if they were currently close

03:15PM    10   in terms of geographic location or not.

03:15PM    11   Q.  Yeah.  So, for instance, you mentioned earlier that you

03:15PM    12   went to the Fitness Factory when you lived back in Buffalo?

03:15PM    13   A.  Yes.

03:15PM    14   Q.  You saw Mike Masecchia at the Fitness Factory?

03:15PM    15   A.  I did, several times.

03:15PM    16   Q.  And so your understanding of the investigation is

03:15PM    17   obviously as investigations are ongoing, the information

03:15PM    18   that's possessed by a law enforcement agency is secret,

03:16PM    19   correct?

03:16PM    20   A.  It's considered law enforcement sensitive.

03:16PM    21   Q.  And that's not something that's disclosed to the target

03:16PM    22   of an investigation at that time, correct?

03:16PM    23   A.  No.

03:16PM    24   Q.  But after someone is charged with a crime, they're

03:16PM    25   entitled to discovery, correct?

03:16PM    1    A.   There's a discovery process where those reports would be

03:16PM    2    turned over.

03:16PM    3    Q.   Yeah.  And so after someone is charged with a crime, a

03:16PM    4    defense attorney like me makes a discovery request to the

03:16PM    5    government, right?

03:16PM    6    A.   Correct.

03:16PM    7    Q.   And then the reports that you generate as a result of

03:16PM    8    your investigation onto that target, they get turned over to

03:16PM    9    the defense, correct?

03:16PM    10    A.   That's correct.

03:16PM    11    Q.   And the defendant in a criminal case has the right to

03:16PM    12    review those materials to help his or her defense attorney

03:16PM    13    prepare a case, right?

03:16PM    14    A.   Correct.

03:16PM    15    Q.   So at that point in time, they can look at the reports

03:16PM    16    and see someone's name on it, right?

03:16PM    17    A.   Correct.

03:16PM    18    Q.   Like, you had this situation pop up in the Myszka case,

03:16PM    19    correct?

03:16PM    20    A.   Could you be more specific?

03:16PM    21    Q.   Certainly.  So as part of the investigation you had into

03:16PM    22    Kevin Myszka, a person associated with Kevin Myszka was a

03:16PM    23    person by the name of Wolfson?

03:16PM    24    A.   Jordan Wolfson.

03:17PM    25    Q.   Jordan Wolfson.  And there was a connection that you had

03:17PM    1    to Jordan Wolfson completely divorced from your

03:17PM    2    responsibilities at the DEA, correct?

03:17PM    3    A.   Found out afterwards.

03:17PM    4    Q.   Right.  So Jordan Wolfson was someone who I think was --

03:17PM    5    your children were on the same sports team as his children?

03:17PM    6    A.   Correct.

03:17PM    7    Q.   And, you know, if your name showed up on a report where

03:17PM    8    Jordan Wolfson was a target, that would create a little bit

03:17PM    9    of an awkward situation, right?

03:17PM   10    A.   I did write a report with his name.

03:17PM   11    Q.   Um-hum.  And if Jordan Wolfson got a report, that's

03:17PM   12    something that would potentially create an awkward situation,

03:17PM   13    right?

03:17PM   14    A.   It would be awkward.

03:17PM   15    Q.   And so, you know, kind of going back to Mr. Bongiovanni

03:17PM   16    and your conversation with him in 2004, that may be a reason

03:17PM   17    why he said, hey, I just don't want to have my name on --

03:17PM   18         **MR. COOPER:**  Objection as to there may be a reason

03:17PM   19    why, Judge, he's asking him to speculate.

03:17PM   20         **THE COURT:**  No, I think it's fair in this context.

03:17PM   21    Overruled.

03:17PM   22         **THE WITNESS:**  Could you repeat the question, please?

03:17PM   23         **BY MR. SINGER:**

03:17PM   24    Q.   Sure.  And so going back to 2004, going back to Joe

03:17PM   25    Bongiovanni's conversation with you in 2004, for the same

03:17PM      1   reason, he might have had some concerns about being on a

03:17PM      2   report involving Mike Masecchia?

03:17PM      3   A.  It could be.

03:18PM      4            **MR. SINGER:**  3:30, Judge?  Or --

03:18PM      5            **THE COURT:**  Any time.  Well, I was thinking around

03:18PM      6   3:40 actually.

03:18PM      7            **MR. SINGER:**  Sure.

03:18PM      8            **THE COURT:**  Which would be about a halfway split.

03:18PM      9            **MR. SINGER:**  I can keep going, Judge, no problem.

03:18PM     10            **BY MR. SINGER:**

03:18PM     11   Q.  So, your case doesn't involve Masecchia in 2005, but it

03:18PM     12   does result in arrests of some targets that you're looking

03:18PM     13   into out in Vegas?

03:18PM     14   A.  It did, ultimately.

03:18PM     15   Q.  And those individuals are eventually charged and

03:18PM     16   convicted?

03:18PM     17   A.  They were charged, and they were convicted, correct.

03:18PM     18   They pled, I believe.

03:18PM     19   Q.  So you were also asked about the 2009 time period of a

03:18PM     20   Buffalo DEA file opened up on Masecchia; do you remember

03:18PM     21   that, sir?

03:18PM     22   A.  I do.

03:19PM     23   Q.  And this was is the Mark Suppa file?

03:19PM     24   A.  Yes.

03:19PM     25            **MR. SINGER:**  Ms. Champoux, can we bring up Government

03:19PM    1    Exhibit 12B, please?  As in boy.

03:19PM    2              **BY MR. SINGER:**

03:19PM    3    Q.  This is what we were talking about that you saw on

03:19PM    4    direct, sir?

03:19PM    5    A.  Yes.

03:19PM    6    Q.  And so the Suppa file, to your understanding, was opened

03:19PM    7    up by an individual by the name of Task Force Officer Cory

03:19PM    8    Higgins?

03:19PM    9    A.  Correct.

03:19PM   10    Q.  And Cory Higgins, he was somebody, based on the report

03:19PM   11    you're looking at in 12B, you don't know Cory Higgins before

03:19PM   12    you moved back to Buffalo, right?

03:19PM   13    A.  I don't know if I ever met Cory Higgins before I came

03:19PM   14    back.  I may have met him, again, coming home during summers.

03:19PM   15    I can't remember if I knew him or not.

03:19PM   16    Q.  But, like, 2009 time period, you guys don't know each

03:19PM   17    other to the extent where you would contact each other on,

03:19PM   18    like, a personal level?

03:19PM   19    A.  No.

03:19PM   20    Q.  All right.  So he works, based on the report, in a group

03:19PM   21    D-58?

03:20PM   22    A.  Correct.

03:20PM   23    Q.  So D-58 opens up an investigation into marijuana grows

03:20PM   24    with the target of Mark Suppa, correct?

03:20PM   25    A.  That's correct.

03:20PM    1            MR. SINGER:  If we can move to the second page of

03:20PM    2    this document, Ms. Champoux.  Thank you.

03:20PM    3            And if we can blow up the indexing section.

03:20PM    4            BY MR. SINGER:

03:20PM    5    Q.  So, the government asked -- I think the term was used,

03:20PM    6    did anyone ask you about Mike Masecchia, and they referred to

03:20PM    7    as "your guy;" do you remember that?

03:20PM    8    A.  I don't remember the exact words, but generally, I

03:20PM    9    remember what you're talking about.

03:20PM   10    Q.  And I think the question that was asked is why nobody

03:20PM   11    contacted about "your guy" when Mike Masecchia all of a

03:20PM   12    sudden came under investigation in 2009; do you recall that?

03:20PM   13    A.  Generally, yes.

03:20PM   14    Q.  All right.  So, Mike Masecchia, at that point in time in

03:20PM   15    2009, wasn't living out in Las Vegas, correct?

03:20PM   16    A.  Not to the best of my knowledge.  We weren't

03:21PM   17    investigating him, so I have no idea.

03:21PM   18    Q.  Yeah.  And so that's what I'm getting at.  Your case that

03:21PM   19    you opened up that involved Mike Masecchia in 2004, that was

03:21PM   20    closed?

03:21PM   21    A.  That was closed.

03:21PM   22    Q.  Like, many years prior to 2009, correct?

03:21PM   23    A.  I don't remember the exact year, but maybe 2006.  Maybe.

03:21PM   24    Around there.

03:21PM   25    Q.  So at that point, possibly three or more years?

USA v Bongiovanni - Casullo - Singer/Cross - 9/24/24

03:21PM  1    A.  Yeah.

03:21PM  2    Q.  And so at that point in time, you really don't have any

03:21PM  3    reason to discuss Mike Masecchia, correct?

03:21PM  4    A.  That all depends.

03:21PM  5    Q.  Yeah.  It depends.  So, like, for instance, your case

03:21PM  6    file is closed, right?

03:21PM  7    A.  My case file was closed at that point.

03:21PM  8    Q.  But just because a case file is closed doesn't mean that

03:21PM  9    you never, ever look at a target of investigation again,

03:21PM  10   correct?

03:21PM  11   A.  No.  Right.  That's correct.

03:21PM  12   Q.  Yeah.  So, like, if a new lead develops on a target of

03:21PM  13   investigation, and the case file is closed, you can open up

03:21PM  14   the case file again, correct?

03:21PM  15   A.  Possibly.  Depending on the facts.

03:21PM  16   Q.  Yeah, it depends on the nature of the lead, right?

03:22PM  17   A.  Correct.

03:22PM  18   Q.  So if a lead develops something that's fruitful for you

03:22PM  19   to use, you can reopen the case file, correct?

03:22PM  20   A.  You could.

03:22PM  21   Q.  But if the lead is not something that's really useful,

03:22PM  22   you're probably gonna make the decision, well, I'm gonna just

03:22PM  23   keep this closed, because it's not going to help me, correct?

03:22PM  24   A.  Yeah.  If there's nothing new that would help us, then we

03:22PM  25   wouldn't open a case.

03:22PM   1    Q.  All right.  So going back to the opening of this case

03:22PM   2    file.  Your understanding is that Joe Bongiovanni was not

03:22PM   3    involved in Cory Higgins's investigation into Mike Masecchia

03:22PM   4    in 2009, right?

03:22PM   5    A.  I don't know that.

03:22PM   6    Q.  You have no idea?

03:22PM   7    A.  I don't -- I don't even know what group he's in at that

03:22PM   8    point.

03:22PM   9    Q.  Okay.  So you don't know if Joe Bongiovanni is in group

03:22PM  10    D-57 or D-58?

03:22PM  11    A.  No.

03:22PM  12    Q.  You don't know if they have, you know, the same group?

03:22PM  13    A.  No.

03:22PM  14    Q.  So, you at least know that Cory Higgins works in D-58

03:22PM  15    this time, correct?

03:22PM  16    A.  He's a task force officer.  And based on the report,

03:22PM  17    again, because there's task force officers in both groups,

03:22PM  18    but that's, like, the formal task force group.

03:23PM  19        But reading that report, I can certainly see that he was

03:23PM  20    assigned to D-58.

03:23PM  21    Q.  Okay.  So as far as Higgins is concerned, when Higgins

03:23PM  22    opens up this particular file, he indexes three people,

03:23PM  23    correct?

03:23PM  24    A.  Correct.

03:23PM  25    Q.  So the first person that's is in that indexing section,

USA v Bongiovanni - Casullo - Singer/Cross - 9/24/24

163

03:23PM    1    that's Mark Suppa?

03:23PM    2    A.  That's correct.

03:23PM    3    Q.  And Suppa is the file title on this case, correct?

03:23PM    4    A.  That's correct.

03:23PM    5    Q.  Yeah.  See it right up there?

03:23PM    6    A.  Now I do.

03:23PM    7    Q.  August 3?

03:23PM    8    A.  Yep.  Now I do.

03:23PM    9    Q.  Okay.  Perfect.  So he's the file title, so naturally

03:23PM   10    he's gonna be number 1 in the indexing section, right?

03:23PM   11    A.  It doesn't have to be, but that makes sense, right.

03:23PM   12    Q.  And so as far as entry into the system, it looks like --

03:23PM   13    where it says negative here, and you have this other number

03:23PM   14    appearing right up here, it looks like Mark Suppa didn't have

03:23PM   15    a NADDIS number back in 2009 when this file was opened up?

03:23PM   16    A.  If it says negative, then based on what I'm reading here,

03:23PM   17    then he didn't have a NADDIS number.

03:24PM   18    Q.  So it looks like when the electronic system kind of

03:24PM   19    caught up to the paperwork, the NADDIS number, which is that

03:24PM   20    circle on the right, was entered onto the DEA-6, right?

03:24PM   21    A.  That's what it looks like.

03:24PM   22    Q.  And the same thing for Matt Suppa, who's the second

03:24PM   23    indexing person there?

03:24PM   24    A.  Correct.

03:24PM   25    Q.  Looks like negative NADDIS number at first, right?

USA v Bongiovanni - Casullo - Singer/Cross - 9/24/24

164

| | | |
|---|---|---|
| 03:24PM | 1 | A.  Correct. |
| 03:24PM | 2 | Q.  But then the NADDIS number was entered, correct? |
| 03:24PM | 3 | A.  Yeah, same as for Mark. |
| 03:24PM | 4 | Q.  But it appears like Mike Masecchia does have a NADDIS |
| 03:24PM | 5 | number, correct? |
| 03:24PM | 6 | A.  Based on how this is written.  If he didn't, or they |
| 03:24PM | 7 | couldn't find it, it should say negative. |
| 03:24PM | 8 | Q.  And naturally, he should have a NADDIS number, correct, |
| 03:24PM | 9 | sir? |
| 03:24PM | 10 | A.  Oh, I know -- I know that we had him indexed in our case. |
| 03:24PM | 11 | Q.  Yeah.  That's exactly what I'm getting at. |
| 03:24PM | 12 | So that when you opened up an investigation into Mike |
| 03:24PM | 13 | Masecchia in Las Vegas in 2004, when you indexed him, and he |
| 03:24PM | 14 | didn't have a NADDIS number, you made sure he got a NADDIS |
| 03:24PM | 15 | number, correct? |
| 03:24PM | 16 | A.  And that's what I remember, that he doesn't have a NADDIS |
| 03:24PM | 17 | number.  And that I identified him, indexed him, and then he |
| 03:25PM | 18 | got the NADDIS number. |
| 03:25PM | 19 | Q.  And so when someone gets a NADDIS number in the DEA |
| 03:25PM | 20 | system, it's not local to the particular office you're in, |
| 03:25PM | 21 | correct? |
| 03:25PM | 22 | A.  No, that's a NADDIS number. |
| 03:25PM | 23 | The way it should work is if someone's previously |
| 03:25PM | 24 | identified a target, they would describe them in the indexing |
| 03:25PM | 25 | section.  When that report gets approved and goes through the |

03:25PM    1   administrative process, at some point a NADDIS number should

03:25PM    2   be assigned to that target.  So it's specific to that target.

03:25PM    3   Q.  So, Masecchia has a NADDIS number.  And your experience

03:25PM    4   as a DEA agent, when someone has a NADDIS number you can look

03:25PM    5   up in the NADDIS system why they received a NADDIS number in

03:25PM    6   the past, right?

03:25PM    7   A.  If someone has a NADDIS number, you can go in and check

03:25PM    8   the system or pull up that NADDIS record based on that NADDIS

03:25PM    9   number.  And it should, in that record, present some facts

03:25PM   10   about the previous case that that name was involved in.

03:25PM   11   Q.  Correct.  So when someone has one NADDIS number, if they

03:26PM   12   have three cases opened up under the same NADDIS number, they

03:26PM   13   are going to have three different cases associated with their

03:26PM   14   NADDIS number, right?

03:26PM   15   A.  It should.  And there's times where people make a

03:26PM   16   mistake, and they don't do it properly.

03:26PM   17       And then sometimes there's multiple NADDIS numbers

03:26PM   18   assigned to an individual.

03:26PM   19       And then in that case, you have to sort it out, request a

03:26PM   20   merging of the records.  That happens on occasion.

03:26PM   21   Q.  Yeah, we heard about that in this case.

03:26PM   22       But in this situation, it looks like Mike Masecchia has a

03:26PM   23   NADDIS number, right?

03:26PM   24   A.  Based on what I'm looking at here, the fact that it

03:26PM   25   doesn't say negative like that should, the way the process

03:26PM    1    should work is if you run a name and you don't find that name

03:26PM    2    in the system, you should write "NADDIS negative."

03:26PM    3        So based on what I'm seeing here, I don't know, but this

03:26PM    4    is weird because there's something redacted before negative.

03:26PM    5    I don't know why that would be redacted, because it's

03:26PM    6    consistent with a NADDIS number.

03:26PM    7        So I don't know why they put something redacted, and then

03:26PM    8    negative.  It should just be NADDIS negative.

03:27PM    9        But it looks like all three here had numbers, because

03:27PM    10   there's a redaction for all three.  So that's why I don't

03:27PM    11   understand.

03:27PM    12           **MR. COOPER:**  Judge, I'm just going to object.  I

03:27PM    13   think if we can come up, we can maybe work this out.

03:27PM    14           **MR. SINGER:**  I'm done with my questioning on this

03:27PM    15   point, Judge.

03:27PM    16           **THE COURT:**  Okay.  So the objection is overruled.

03:27PM    17           Go ahead.

03:27PM    18           **MR. COOPER:**  Okay.  We'll deal with it on our

03:27PM    19   redirect.  Thanks.

03:27PM    20           **BY MR. SINGER:**

03:27PM    21   Q.  So since there's a NADDIS entered in the system, Cory

03:27PM    22   Higgins is the case agent to your understanding, correct?

03:27PM    23   A.  He wrote the case initiation, so it's most likely that

03:27PM    24   he's the case agent.

03:27PM    25   Q.  So he could have picked up the phone and made a call to

03:27PM   1   you, right?

03:27PM   2   A.  If Cory Higgins ran Michael Masecchia in NADDIS, and that

03:27PM   3   NADDIS number -- and found a NADDIS number, which was the

03:27PM   4   same NADDIS number that I had him indexed under, then he

03:27PM   5   could see that there -- and I'm trying to remember this, when

03:27PM   6   you run a NADDIS number, you could see the other office that

03:27PM   7   had that person indexed.

03:27PM   8       So you can investigate.  You could then take that case

03:28PM   9   number and run it in the system and see who the case agents

03:28PM  10   were.

03:28PM  11   Q.  And so that would lead back to you, right, because you

03:28PM  12   were one --

03:28PM  13   A.  I was --

03:28PM  14   Q.  -- of the case agents?

03:28PM  15   A.  -- one of the case agents.

03:28PM  16   Q.  And so he could have made a phone call to Las Vegas, and

03:28PM  17   said, hey, what's up with this Mike Masecchia investigation

03:28PM  18   you had going on in 2004, right?

03:28PM  19   A.  If Cory Higgins want to do the research on that NADDIS

03:28PM  20   number, he could go through that process I just mentioned.

03:28PM  21   Q.  And the same thing is true with Mike Hill's

03:28PM  22   investigation, correct?

03:28PM  23       So Mike Hill opened up a separate investigation to yours

03:28PM  24   out of DEA Buffalo --

03:28PM  25   A.  Correct.

03:28PM   1    Q.  -- office in 2004, to your understanding, correct?

03:28PM   2    A.  Correct.

03:28PM   3    Q.  So that case investigation and case number would have

03:28PM   4    been associated with a NADDIS number for Mike Masecchia?

03:28PM   5    A.  Especially since we were coordinating so closely.

03:28PM   6        And from what I remember, Mike was aware that we indexed

03:28PM   7    him.  And so when he indexed him, he used our NADDIS number.

03:28PM   8    Q.  So Cory Higgins could have, not just picked up the phone,

03:28PM   9    he could have walked down the hallway and talked to Mike

03:28PM  10    Hill, right?

03:28PM  11    A.  Again, if he ran that number, which was the same NADDIS

03:29PM  12    number that we had Michael Masecchia indexed under, it should

03:29PM  13    be the same number that they had, though he -- what should

03:29PM  14    happen is he would see that that NADDIS number is related to

03:29PM  15    both the Las Vegas case and the Buffalo case.

03:29PM  16    Q.  All right.  So, you never received any call from Cory

03:29PM  17    Higgins in 2009, correct?

03:29PM  18    A.  I never received a call from Cory.

03:29PM  19    Q.  You didn't receive any call from anyone out of the

03:29PM  20    Buffalo office regarding the 2009 Suppa investigation

03:29PM  21    involving Mike Masecchia, correct?

03:29PM  22    A.  No.

03:29PM  23    Q.  Did anyone get indicted for failing to do that, to your

03:29PM  24    knowledge, sir?

03:29PM  25    A.  Did anyone -- what, sir?

03:29PM    1    Q.  Did anyone get indicted for failing to do that, to your

03:29PM    2    knowledge?

03:29PM    3    A.  Indicted?

03:29PM    4    Q.  Yeah.  Did anyone get charged with a felony for not

03:29PM    5    calling you up in 2009 to talk to you about your 2004

03:29PM    6    Masecchia investigation?

03:29PM    7            MR. COOPER:  Objection, Judge.

03:29PM    8            THE COURT:  Yeah, sustained.

03:29PM    9            MR. SINGER:  We can move on, Judge.

03:29PM   10            BY MR. SINGER:

03:29PM   11    Q.  So, in December of 2015, you said that you moved back to

03:30PM   12    the Buffalo office, correct?

03:30PM   13    A.  December of -- no, I'm sorry.  September of '15, it was.

03:30PM   14    Q.  It's September of '15?

03:30PM   15    A.  September of '15, correct.  It was right around Labor

03:30PM   16    Day, I remember.

03:30PM   17    Q.  All right.  So September of 2015, not December, is when

03:30PM   18    you moved back to Buffalo?

03:30PM   19    A.  September '15 is when I got assigned to the Buffalo

03:30PM   20    office.

03:30PM   21    Q.  And so the government asked you whether or not Joe

03:30PM   22    Bongiovanni, at that point in time you got back to the DEA

03:30PM   23    office in Buffalo, asked you any questions about how your

03:30PM   24    2004 Mike Masecchia investigation went; do you remember that?

03:30PM   25            MR. COOPER:  Objection.  I didn't ask that question.

03:30PM    1            **THE COURT:**  Then he can answer.  Overruled.

03:30PM    2            **THE WITNESS:**  I'm sorry, sir, could you ask the

03:30PM    3    question again, please?

03:30PM    4            **BY MR. SINGER:**

03:30PM    5    Q.  Sure.  When you got back to the DEA office --

03:30PM    6    A.  Yes.

03:30PM    7    Q.  -- in September of 2015 --

03:30PM    8    A.  Yes.

03:30PM    9    Q.  -- moving forward --

03:30PM   10    A.  September of '15, yep.

03:30PM   11    Q.  -- from September 2015 moving forward, your testimony was

03:30PM   12    that Joe Bongiovanni never asked you about your 2004 Mike

03:31PM   13    Masecchia investigation?

03:31PM   14    A.  No.

03:31PM   15    Q.  Never asked you?

03:31PM   16    A.  No.

03:31PM   17    Q.  And as far as that particular investigation was

03:31PM   18    concerned, were you aware that the -- the Ron Serio file was

03:31PM   19    closed several months before you got back to Buffalo, sir?

03:31PM   20    A.  No.  My belief was that it was still open, based on what

03:31PM   21    he told me when I saw the file sitting on his desk.

03:31PM   22    Q.  Oh, I understand that that's what you believed, sir.

03:31PM   23         But do you know that that investigation was closed in

03:31PM   24    January of 2015 --

03:31PM   25    A.  No.

| | | |
|---|---|---|
| 03:31PM | 1 | Q.  -- before you got to the office? |
| 03:31PM | 2 | A.  No.  He told me he had an open case on him. |
| 03:31PM | 3 | Q.  Well, he didn't say that he had an open case. |
| 03:31PM | 4 | **MR. COOPER:**  Objection.  Argumentative. |
| 03:31PM | 5 | **BY MR. SINGER:** |
| 03:31PM | 6 | Q.  You testified earlier -- |
| 03:31PM | 7 | **MR. COOPER:**  Objection.  Argumentative. |
| 03:31PM | 8 | **THE COURT:**  Well, yes, you can ask a question, |
| 03:31PM | 9 | Mr. Singer, you can't testify, so -- |
| 03:31PM | 10 | **MR. SINGER:**  No problem. |
| 03:31PM | 11 | **BY MR. SINGER:** |
| 03:31PM | 12 | Q.  You testified earlier on direct, sir, that Joe |
| 03:31PM | 13 | Bongiovanni, you took from what he told you that the case was |
| 03:31PM | 14 | still open; do you remember that? |
| 03:31PM | 15 | **MR. COOPER:**  Objection as to the form of the |
| 03:31PM | 16 | question. |
| 03:31PM | 17 | **THE COURT:**  No overruled. |
| 03:31PM | 18 | **MR. COOPER:**  Joe Bongiovanni took from what he told |
| 03:32PM | 19 | you earlier? |
| 03:32PM | 20 | **MR. SINGER:**  That's not what I said, Judge. |
| 03:32PM | 21 | **MR. COOPER:**  Read it back. |
| 03:32PM | 22 | **THE COURT:**  Ask another question. |
| 03:32PM | 23 | **MR. SINGER:**  Certainly. |
| 03:32PM | 24 | **BY MR. SINGER:** |
| 03:32PM | 25 | Q.  You took from the conversation -- you testified earlier |

03:32PM   1    on direct you took from the conversation you had with Joe

03:32PM   2    Bongiovanni that Joe Bongiovanni had a case file open with

03:32PM   3    the Serios still; do you remember testifying to that?

03:32PM   4    A.  That was my -- that was my belief after a conversation

03:32PM   5    with Joe at his desk.

03:32PM   6    Q.  But you don't know the official status of the

03:32PM   7    investigation, whether it was open or closed at that point in

03:32PM   8    time?

03:32PM   9    A.  No.

03:32PM   10   Q.  No.  You don't.

03:32PM   11   A.  I -- I don't know the official status, other than what he

03:32PM   12   had told me.

03:32PM   13   Q.  Yes.  You surmised, based on your conversation, that it

03:32PM   14   was open, but you didn't know at the time.

03:32PM   15   A.  I believe, based on what he told me, that it was an open

03:32PM   16   case.

03:32PM   17   Q.  And so the 2004 investigation that you conducted into

03:32PM   18   Mike Masecchia, that really didn't produce any results,

03:32PM   19   right?

03:32PM   20   A.  My investigation?

03:32PM   21   Q.  Yes.

03:32PM   22   A.  Our Las Vegas investigation?

03:32PM   23   Q.  Yes.

03:32PM   24   A.  It had results, yes.

03:32PM   25   Q.  Well, I'm talking about vis-à-vis Mike Masecchia.  Like,

03:32PM    1    you didn't --

03:32PM    2    A.  We never indicted Michael Masecchia.

03:32PM    3    Q.  And you didn't really gather any information about him

03:33PM    4    engaging in criminal activity either, correct?

03:33PM    5    A.  No.

03:33PM    6    Q.  Never caught him on a wire, right?

03:33PM    7    A.  Never caught him on a wire.

03:33PM    8    Q.  You never caught him on any type of phone logs?

03:33PM    9    A.  Again, at the time, I don't know if we had Michael

03:33PM   10    Masecchia's number identified, so his number could have been

03:33PM   11    on a phone logs.  I just don't remember if we had it

03:33PM   12    identified at that point.

03:33PM   13    Q.  Yeah.  So, basically, even if Mr. Bongiovanni asked you,

03:33PM   14    hey, how did the 2004 investigation go, there was really

03:33PM   15    nothing much to say, right?

03:33PM   16    A.  No.  If you asked it the way you just said, I would say

03:33PM   17    it was extremely successful, because we indicted several

03:33PM   18    people.  Identified a source of supply.

03:33PM   19    Q.  Again, sir, I'm not asking you questions about other

03:33PM   20    targets in that investigation.

03:33PM   21    A.  You didn't say specifically Mike Masecchia.

03:33PM   22    Q.  I'm asking you about Mike Masecchia.

03:33PM   23    A.  But you didn't say that --

03:33PM   24         **THE COURT:**  Let's stop the back and forth, folks.

03:33PM   25    Questions and answers please.

03:33PM   1          **BY MR. SINGER:**

03:33PM   2   Q.  Mike Masecchia in 2004, your investigation didn't reveal

03:33PM   3   any results, right?

03:33PM   4   A.  Correct.

03:33PM   5   Q.  So telling Mr. Bongiovanni about your 2004 investigation

03:33PM   6   regarding Mike Masecchia really wasn't worth much at all,

03:33PM   7   correct?

03:34PM   8          **MR. COOPER:**  Objection as to form of the question,

03:34PM   9   whether it was worth much at all.

03:34PM  10          **THE COURT:**  The objection to the form of the question

03:34PM  11   is sustained.

03:34PM  12          **BY MR. SINGER:**

03:34PM  13   Q.  Your conversation with Mr. Bongiovanni about the case

03:34PM  14   file in 2015; do you remember that?

03:34PM  15   A.  The conversation about the Serio case file.

03:34PM  16   Q.  Yes.

03:34PM  17   A.  Yes.

03:34PM  18   Q.  Mike Masecchia, you investigated him in 2004, right?

03:34PM  19   A.  Yes, we did.

03:34PM  20   Q.  You didn't have anything produced as far as results

03:34PM  21   regarding Mike Masecchia in that investigation, right?

03:34PM  22   A.  No, we didn't.

03:34PM  23   Q.  The 2015 conversation that you had with Mr. Bongiovanni

03:34PM  24   about the Ron Serio file didn't involve the name Mike

03:34PM  25   Masecchia, right?

03:34PM  1    A.   He never brought up Masecchia.

03:34PM  2    Q.   And even if he did, there wasn't really much for you to

03:34PM  3    report about in 2004 of Mike Masecchia, right?

03:34PM  4          **MR. COOPER:**  Objection as to the relevance of that,

03:34PM  5    Judge.

03:34PM  6          **THE COURT:**  Overruled.

03:34PM  7          **THE WITNESS:**  If he had brought up Michael Masecchia

03:34PM  8    when I was at his desk for that conversation, that would have

03:34PM  9    been of interest to me.

03:35PM  10         **BY MR. SINGER:**

03:35PM  11   Q.   I'm not asking whether it was of interest to you, sir.

03:35PM  12   A.   Yep.

03:35PM  13   Q.   What I'm asking you is that you didn't have much

03:35PM  14   information to report to him in 2015 about what you did in

03:35PM  15   2004; is that right?

03:35PM  16   A.   Yeah, we didn't do much with Michael Masecchia.  Nothing

03:35PM  17   came of -- not much came of Michael Masecchia during that

03:35PM  18   2000 investigation in Las Vegas.

03:35PM  19   Q.   Thank you.

03:35PM  20         **MR. SINGER:**  I think it's a good time for a break,

03:35PM  21   Judge.

03:35PM  22         **THE COURT:**  Okay.  So let's take a break, folks.

03:35PM  23         Remember my instructions.  Don't communicate about

03:35PM  24   the case, even with each other.  Don't make up your minds.

03:35PM  25         See you back here in about 15 minutes or so.

USA v Bongiovanni - Casullo - Singer/Cross - 9/24/24

| | | |
|---|---|---|
| 03:35PM | 1 | (Jury excused at 3:35 p.m.) |
| 03:35PM | 2 | **THE COURT:**  Okay.  You can step down, sir. |
| 03:36PM | 3 | You're not to talk with anybody about your testimony |
| 03:36PM | 4 | during the break. |
| 03:36PM | 5 | **THE WITNESS:**  Yes, sir. |
| 03:36PM | 6 | **THE COURT:**  Anything? |
| 03:36PM | 7 | **MR. SINGER:**  No, Judge. |
| 03:36PM | 8 | **THE COURT:**  Anything from the government? |
| 03:36PM | 9 | **MR. COOPER:**  No, thank you, Judge. |
| 03:36PM | 10 | **THE COURT:**  Okay.  Great.  See you in about 15, 20 |
| 03:36PM | 11 | minutes or so. |
| 03:36PM | 12 | **THE CLERK:**  All rise. |
| 03:36PM | 13 | (Off the record at 3:36 p.m.) |
| 03:51PM | 14 | (Back on the record at 3:51 p.m.) |
| 03:51PM | 15 | (Jury not present.) |
| 03:51PM | 16 | **THE CLERK:**  All rise. |
| 03:51PM | 17 | **THE COURT:**  Please be seated. |
| 03:51PM | 18 | **THE CLERK:**  We are back on the record for the |
| 03:51PM | 19 | continuation of the jury trial in case number 19-cr-227, |
| 03:52PM | 20 | United States of America versus Joseph Bongiovanni. |
| 03:52PM | 21 | All counsel and parties are present. |
| 03:52PM | 22 | **THE COURT:**  Are you ready to go? |
| 03:52PM | 23 | **MR. SINGER:**  Ready to go. |
| 03:52PM | 24 | **THE COURT:**  Are you going to finish this afternoon? |
| 03:52PM | 25 | **MR. SINGER:**  Oh, yeah.  No, I anticipate that.  I |

03:52PM   1   think Mr. Cooper and I were saying that maybe we have time to

03:52PM   2   go through a direct of the next witness, maybe not.

03:52PM   3          **THE COURT:**  Okay.  Good.

03:52PM   4          Anything from the government?

03:52PM   5          **MR. COOPER:**  I actually cut the next witness because

03:52PM   6   I thought we were finishing on Mr. Casullo today based on

03:52PM   7   where I ended.

03:52PM   8          **MR. SINGER:**  Yeah.  But what we talked about is maybe

03:52PM   9   there would be 15 or 20 minutes left over.

03:52PM  10          Mr. MacKay -- just so you know, Judge, Mr. MacKay,

03:52PM  11   he's got some hearing that he's, like, I need to get out of

03:52PM  12   here at 5:30.

03:52PM  13          **THE COURT:**  I understand that.  So we'll quit a

03:52PM  14   little early if we have to.  Not a big deal.

03:52PM  15          Okay.  Anything else?

03:52PM  16          **MR. COOPER:**  Yeah, just one thing, Judge.  There was

03:52PM  17   a question and there was an objection sustained, and I just

03:52PM  18   want to make sure it's not gonna happen again, which is

03:52PM  19   questions about prosecutorial charging decisions.

03:52PM  20          We briefed this.  The Court made a pretrial ruling

03:53PM  21   that that wasn't something that was going to be gotten into.

03:53PM  22   The question has no basis other than that.  It's a question

03:53PM  23   about this defendant, it reeks of jury nullification, and so I

03:53PM  24   just want to confirm that it was a slipup and it's not going

03:53PM  25   to happen again.

| | | |
|---|---|---|
| 03:53PM | 1 | **THE COURT:**  Yeah, I sustained the objection, and |
| 03:53PM | 2 | there was no answer to the question, so no harm done. |
| 03:53PM | 3 | **MR. COOPER:**  Okay.  Then I'm good to go. |
| 03:53PM | 4 | **THE COURT:**  Okay.  Let's bring them in, please, Pat. |
| 03:53PM | 5 | Let's get the witness back, too. |
| 03:54PM | 6 | (Witness and Jury seated at 3:54 p.m.) |
| 03:54PM | 7 | **THE COURT:**  The record will reflect that all our |
| 03:54PM | 8 | jurors again are present. |
| 03:54PM | 9 | I remind the witness that he's still under oath. |
| 03:54PM | 10 | And you may continue, Mr. Singer. |
| 03:54PM | 11 | **MR. SINGER:**  Thank you, Judge. |
| 03:54PM | 12 | **BY MR. SINGER:** |
| 03:54PM | 13 | Q.  All right.  So, Mr. Casullo, I want to get into a couple |
| 03:54PM | 14 | of exhibits that the government showed you. |
| 03:54PM | 15 | **MR. SINGER:**  So, Ms. Champoux, is it possible to |
| 03:54PM | 16 | bring up Government Exhibit 26E as in echo, please. |
| 03:54PM | 17 | And if we can turn to page 2.  And blow up the middle |
| 03:55PM | 18 | section, please. |
| 03:55PM | 19 | **BY MR. SINGER:** |
| 03:55PM | 20 | Q.  So, you recall being asked some questions about 26C, |
| 03:55PM | 21 | correct, sir? |
| 03:55PM | 22 | A.  Yes. |
| 03:55PM | 23 | Q.  And this particular part on page 2 of 26C, this is one of |
| 03:55PM | 24 | the DARTS reports regarding phone numbers, correct? |
| 03:55PM | 25 | A.  Yes. |

USA v Bongiovanni - Casullo - Singer/Cross - 9/24/24

03:55PM  1   Q.  And the particular phone number on the top left corner,

03:55PM  2   that's a number that was associated with Mike Masecchia,

03:55PM  3   right?

03:55PM  4   A.  Yes.

03:55PM  5   Q.  So this particular entry shows three different things, so

03:55PM  6   I want to go through them.

03:55PM  7       So the first thing it shows, moving down from the bottom,

03:55PM  8   is that that particular number was entered into DARTS --

03:55PM  9   sorry, I'm going out of order here.  My apologies.

03:55PM  10      Let's start with the middle section.

03:55PM  11      So middle section indicates that the particular number up

03:55PM  12  in the upper left, that was entered into the DARTS system on

03:56PM  13  3/20/2013, correct?

03:56PM  14  A.  Correct.

03:56PM  15  Q.  And then the second entry with regard to this number that

03:56PM  16  appears in the bottom part, the 4/19/2013 entry, correct?

03:56PM  17  A.  Correct.

03:56PM  18  Q.  And so the difference between entry number 1 and entry

03:56PM  19  number 2 is that it appears like this entry indicates that

03:56PM  20  the subscriber of that number still has yet to be identified,

03:56PM  21  right?

03:56PM  22  A.  It just says number part of ongoing narcotics

03:56PM  23  investigation in contact with that number.

03:56PM  24  Q.  Okay.

03:56PM  25  A.  So I don't know if he got subscriber back, or not

03:56PM  1   identified.  I just know based on the remarks, it says in

03:56PM  2   contact with that number.

03:56PM  3   Q.  All right.  And then this particular entry for the second

03:56PM  4   entry in the bottom of 4/19/2013 entry, that indicates that

03:56PM  5   it's a number that belongs to Mike Masecchia, correct?

03:56PM  6   A.  Correct.

03:56PM  7   Q.  So roughly about a month later, there's a name associated

03:56PM  8   with the number?

03:57PM  9   A.  That's what it looks like.

03:57PM  10  Q.  And then the third entry which appears up at the top,

03:57PM  11  that's an entry that's put in associating that number with

03:57PM  12  the Ron Serio DTO?

03:57PM  13  A.  Correct.

03:57PM  14  Q.  So the first two entries, they involve the same case

03:57PM  15  number, correct?

03:57PM  16  A.  Correct.

03:57PM  17  Q.  The C2-13-0026 number?

03:57PM  18  A.  Yes.

03:57PM  19  Q.  And that's the Wayne Anderson file, to your

03:57PM  20  understanding, sir?

03:57PM  21  A.  I don't remember exactly, but it could be.

03:57PM  22  Q.  Okay.  You don't have any reason to disagree with me

03:57PM  23  that's the Wayne Anderson file, right?

03:57PM  24  A.  No.

03:57PM  25  Q.  And then the number that appears in that third entry

03:57PM    1    entered an Agent Ryan, that's a different case file number,

03:57PM    2    correct?

03:57PM    3    A.   That's different.

03:57PM    4    Q.   And so that particular entry was put into DARTS

03:57PM    5    8/21/2018?

03:57PM    6    A.   Correct.

03:57PM    7    Q.   All right.  So the government asked you a couple

03:57PM    8    questions about DARTS, and I just want to review for the jury

03:57PM    9    how it is all this gets in here.

03:57PM   10        So this first entry for 3/20/2013, there's no name

03:58PM   11    associated with the telephone number up at the top left yet,

03:58PM   12    correct?

03:58PM   13    A.   Based on the second one and the remarks section, there's

03:58PM   14    no -- there's not a name associated with it based on the

03:58PM   15    remarks.

03:58PM   16    Q.   But then that changes a month later like we talked about,

03:58PM   17    right?

03:58PM   18    A.   Correct.

03:58PM   19           **MR. SINGER:**  So, Ms. Champoux, can we bring down this

03:58PM   20    exhibit.  And can we bring up Government Exhibit 100A.1,

03:58PM   21    please?  And can we open up the file C Baker toll analysis.

03:58PM   22           Baker C toll analysis.

03:58PM   23           **THE COURT:**  This is in evidence?

03:58PM   24           **MR. SINGER:**  This is in evidence, Judge.

03:58PM   25           And if we can move to the next page, Ms. Champoux.

03:59PM   1          **BY MR. SINGER:**

03:59PM   2   Q.  So, you're familiar with what this document is, right,

03:59PM   3   sir?

03:59PM   4   A.  Yes.  It's a frequency report.

03:59PM   5   Q.  Yeah.  So this is also referred to as a hot list?

03:59PM   6   A.  Yes.

03:59PM   7   Q.  And the hot list is being run on this particular number

03:59PM   8   up here?

03:59PM   9   A.  Yes.

03:59PM   10   Q.  That's the 830-3226 number?

03:59PM   11   A.  Correct.

03:59PM   12   Q.  And you're familiar, based on your direct, that's the

03:59PM   13   number associated with Ron Serio, correct?

03:59PM   14   A.  Again, I can't remember but --

03:59PM   15   Q.  No reason to disagree with me on that though, right, sir?

03:59PM   16   A.  No.

03:59PM   17   Q.  Okay.  It appears like this particular hot list is run on

03:59PM   18   3/19/2013; is that right?

03:59PM   19   A.  Looks like it.

03:59PM   20          **MR. SINGER:**  And, Ms. Champoux, can we advance to

03:59PM   21   page 3 of the document, please?

03:59PM   22          **BY MR. SINGER:**

03:59PM   23   Q.  So row 23 up at the top, do you see that row, sir?

03:59PM   24   A.  Yes.

04:00PM   25   Q.  The number that appears in the DARTS entry, the

04:00PM    1    716-812-0664 number, that appears in this hot list?

04:00PM    2    A.  Correct.

04:00PM    3    Q.  And you see the dialed name entry there?

04:00PM    4    A.  Correct.

04:00PM    5    Q.  What does it reflect again?

04:00PM    6    A.  No subscriber.

04:00PM    7    Q.  And in your understanding of doing these over the course

04:00PM    8    of your 20-plus-year career, what that means is that at that

04:00PM    9    point in time when you're running the hot list, there's no

04:00PM    10   subscriber associated with that number yet, correct?

04:00PM    11   A.  Yeah.  Typically, yes.

04:00PM    12   Q.  And that's different than line 34 here where Mark Kagan

04:00PM    13   is listed?

04:00PM    14   A.  Correct.

04:00PM    15   Q.  And what that means is that DEA possesses information

04:00PM    16   when they run this hot list that that number is associated

04:00PM    17   with Mark Kagan, correct?

04:00PM    18   A.  It most likely means that a subpoena came back, and that

04:00PM    19   number has a subscriber to that particular person.

04:00PM    20   Q.  Yeah.  And that's what I'm getting at.

04:00PM    21       So to figure out the no subscribers when you got a hot

04:00PM    22   list, the next step in the process is either you or an intel

04:01PM    23   analyst sends a subpoena to the phone company to figure out

04:01PM    24   who is the subscriber to that number you don't know, right?

04:01PM    25   A.  Right.

04:01PM  1   Q.  So as far as DARTS is concerned, we took a look at it

04:01PM  2   just a moment ago, but on Exhibit 26E, with that particular

04:01PM  3   entry regarding the Mike Masecchia number, the first entry

04:01PM  4   doesn't indicate who that number's associated with, correct?

04:01PM  5   A.  Right.

04:01PM  6   Q.  All it says is that it's associated with having calls in

04:01PM  7   place with the Ron Serio number, right, the 3226 number?

04:01PM  8   A.  Right.

04:01PM  9   Q.  And so the next step in the process is that an intel

04:01PM  10  analyst or an agent is going to send a subpoena off to figure

04:01PM  11  out who is the subscriber to that number that we don't know

04:01PM  12  at this point?

04:01PM  13  A.  That's how it should work.

04:01PM  14  Q.  And so when you enter a number into DARTS, what usually

04:01PM  15  happens is you -- you subpoena that record, right?

04:01PM  16  A.  You subpoena that record -- when you run a number in

04:01PM  17  DARTS, you don't have to subpoena the record, you can just

04:01PM  18  run it to see if there's an overlap.  Or, you can take it one

04:02PM  19  step further and then subpoena that number.

04:02PM  20  Q.  Yeah.  And that looks like that's what napped that case,

04:02PM  21  right?  So 26E, remember looking back at it, the 3/20/2013

04:02PM  22  entry?

04:02PM  23  A.  It says no subscriber.  It could, I mean, if that was

04:02PM  24  run, it could be that they just didn't get the subscriber

04:02PM  25  back from the phone company.  But based on what this says

04:02PM    1    here, there's no information available in PenLink that lists

04:02PM    2    subscriber to that phone.

04:02PM    3        PenLink is different than DARTS.  So this isn't DARTS,

04:02PM    4    this is PenLink, a system where you put the numbers and keep

04:02PM    5    track of the numbers.

04:02PM    6    Q.  Yeah, we talked about PenLink before.

04:02PM    7    A.  Okay.  Got you.

04:02PM    8    Q.  So when a subscriber's information is retrieved from a

04:02PM    9    subpoena sent to a phone company, DEA agents or analysts can

04:02PM   10    enter that phone number and subscriber information into

04:02PM   11    PenLink, right?

04:02PM   12    A.  Yes.

04:02PM   13    Q.  And PenLink is what essentially populates the hot list

04:02PM   14    with this is who this number belongs to, correct?

04:02PM   15    A.  Yeah.  Again, when they get that subpoena back, an

04:02PM   16    analyst should update PenLink.

04:03PM   17    Q.  Um-hum.

04:03PM   18    A.  Hopefully they do it quickly, so that's how it should

04:03PM   19    work.

04:03PM   20    Q.  Yeah.  And as far as the subpoena is concerned, so to

04:03PM   21    obtain a subpoena on a particular number, DARTS is used for

04:03PM   22    that as well, right?

04:03PM   23    A.  Yeah.  It the process is automated through DARTS.

04:03PM   24    Q.  So when an analyst or an agent wants to figure out who a

04:03PM   25    subscriber to line 23 belongs to, right, they enter into

04:03PM    1    DARTS information to request a subpoena for the cell phone,

04:03PM    2    correct?

04:03PM    3    A.   If they want to request a subpoena, they would do it

04:03PM    4    through DARTS.  So they would put the number into DARTS, it

04:03PM    5    would show if there is or isn't a deconfliction, and then you

04:03PM    6    can take it one step further to request the subscriber

04:03PM    7    information.

04:03PM    8         MR. SINGER:  All right.  So if we can go back to

04:03PM    9    26 -- actually, why don't we -- can we close out of this one

04:03PM    10   document, Ms. Champoux?

04:03PM    11        And if we could go to a different document, 100A.1.

04:03PM    12   If we can go to the 4/19/13 subscriber list.

04:04PM    13        And if we can advance to page 2, please.

04:04PM    14        BY MR. SINGER:

04:04PM    15   Q.   So, with regard to that 812-0664 number, do you see that,

04:04PM    16   sir?

04:04PM    17   A.   Yes.

04:04PM    18   Q.   It appears like there was information that was obtained

04:04PM    19   pursuant to subpoena to populate PenLink with Michael

04:04PM    20   Masecchia being the subscriber on that number, correct?

04:04PM    21   A.   Correct.

04:04PM    22   Q.   And that happens on 4/19 of 2013?

04:04PM    23   A.   That hot list was run on 4/19/2013.

04:04PM    24   Q.   All right.

04:04PM    25        MR. SINGER:  So if we can close out of this exhibit

USA v Bongiovanni - Casullo - Singer/Cross - 9/24/24

187

04:04PM    1    and go back to 26E, Ms. Champoux.  And go back to page 2.

04:05PM    2            And blow up that middle section again, please.

04:05PM    3            **BY MR. SINGER:**

04:05PM    4    Q.  All right.  So you saw the initial hot list that was run

04:05PM    5    on Ron Serio's number on 3/19/2013?

04:05PM    6    A.  Correct.

04:05PM    7    Q.  And so it looks like what happened was that an intel

04:05PM    8    analyst or an agent, it looks like in this case Justin Borst,

04:05PM    9    intel analyst, right?

04:05PM    10   A.  Yes.

04:05PM    11   Q.  Entered this particular number as being associated with

04:05PM    12   Ron Serio's number?

04:05PM    13   A.  In contact with that number, correct.

04:05PM    14   Q.  And then it looks like based on as far as the subscriber

04:05PM    15   list, they received information regarding who owned that 0664

04:05PM    16   number in April of 2013, correct?

04:05PM    17   A.  I can't remember, but --

04:05PM    18   Q.  Well, you recall that the second document we looked at,

04:05PM    19   that was the information on the 4/19/2013 subscriber list,

04:05PM    20   right?

04:05PM    21   A.  Yes.

04:05PM    22   Q.  And you see the same date right here, correct?

04:06PM    23   A.  Yep.

04:06PM    24   Q.  And you see an association between this number up here

04:06PM    25   and Mike Masecchia, correct?

04:06PM   1   A.   Yes.

04:06PM   2   Q.   So it appears like on 4/19/2013, there was an update into

04:06PM   3   DARTS to associate that number with Mike Masecchia, correct?

04:06PM   4   A.   Correct.

04:06PM   5   Q.   And that's how this information gets into the system in

04:06PM   6   DARTS, correct?

04:06PM   7   A.   That's how it gets into DARTS, correct.

04:06PM   8   Q.   Like, you as an agent don't just go up to a computer and

04:06PM   9   type in this number belongs to Mike Masecchia, right?   It

04:06PM   10  doesn't work that way, right?

04:06PM   11  A.   What do you mean?

04:06PM   12  Q.   So when you want to get a number associated with someone

04:06PM   13  in DARTS that you don't know, you have to subpoena

04:06PM   14  information, correct?

04:06PM   15  A.   That's the first thing you should do is a subpoena.   But

04:06PM   16  you also have to take into consideration that a lot of -- in

04:06PM   17  my experience, a lot of times subscriber will come back to a

04:06PM   18  fictitious name, or someone that doesn't use the phone.   It

04:06PM   19  could be a girlfriend, it could be just a bogus name.   Which

04:06PM   20  I've had that experience, too.   Where someone lists Tony

04:07PM   21  Stark, who's a character from a movie.   That was very

04:07PM   22  frequent out in Las Vegas.

04:07PM   23       So subscriber isn't like an end-all be-all.

04:07PM   24       Actually, when I was out in Las Vegas, it was more often

04:07PM   25  than not that when subscriber came back on the targets we

04:07PM   1    were looking at, it wasn't the real name of the target.  So

04:07PM   2    what would you do to further that to try to identify the

04:07PM   3    phone --

04:07PM   4    Q.  You'd do a little more investigation, right, sir?

04:07PM   5    A.  You use CHARMS, you run it through CHARMS and local/

04:07PM   6    county systems to see if there's a police report tied to that

04:07PM   7    number.  So if you identified the number that way, you could

04:07PM   8    put it into DARTS in the remarks section based on that

04:07PM   9    information.  You wouldn't be specific in the remarks and say

04:07PM  10    that, you would put it how it was put here.  Number belonging

04:07PM  11    to.

04:07PM  12        So, it wasn't from the subpoena, it was from however else

04:07PM  13    you identify it.  So that was my point.

04:07PM  14    Q.  Yeah.  So it's subscriber information is one part of the

04:07PM  15    process, right?

04:07PM  16    A.  It could be.

04:07PM  17    Q.  Further investigation is another part of the process?

04:07PM  18    A.  Could be.

04:07PM  19    Q.  And when you're confident that that number is associated

04:07PM  20    with somebody else, you update the system accordingly, right?

04:07PM  21    A.  You should.

04:08PM  22    Q.  But it's not a situation where somebody just types a

04:08PM  23    number into DARTS, gives it a name, and that's it, right?

04:08PM  24    A.  No, you should have information on why you're saying it

04:08PM  25    belongs to a specific person.  If you don't -- even if you

04:08PM   1   don't put why in the remarks section, you need to have a

04:08PM   2   reason why.  You just can't put any random name.

04:08PM   3   Q.  So as far as this particular entry, so we know the 2013

04:08PM   4   entry, right?

04:08PM   5   A.  2013, correct.

04:08PM   6   Q.  But then there's the other entry that occurs in August of

04:08PM   7   2018, correct?

04:08PM   8   A.  That is correct.

04:08PM   9   Q.  And that particular entry is put into the system by

04:08PM  10   Curtis Ryan; is that right?

04:08PM  11   A.  That is correct.

04:08PM  12   Q.  Curtis Ryan, at that point in time, he's a task force

04:08PM  13   officer at the DEA working in D-58, correct?

04:08PM  14   A.  He was assigned to that group, and still using the system

04:08PM  15   as that.  There was a time where he left because of this full

04:08PM  16   investigation, and I don't remember when.  But according to

04:08PM  17   this --

04:08PM  18   Q.  Is the answer yes?

04:08PM  19   A.  Yes.

04:08PM  20   Q.  Okay.  And you were in D-58 at that point in time,

04:08PM  21   correct?

04:09PM  22   A.  I was still in D-58, correct.

04:09PM  23   Q.  All right.  So based on the fact that Ryan enters this

04:09PM  24   number into the DARTS system on 8/21/2018, kind of like we

04:09PM  25   talked about before, because Mr. Bongiovanni's associated

04:09PM    1   with that number in other contexts, he's gonna get an alert,

04:09PM    2   right?

04:09PM    3   A.  Yes.

04:09PM    4        MR. SINGER:  So if we could un-expand out of that,

04:09PM    5   Ms. Champoux, And go back to the first page.

04:09PM    6        If we can just blow up this one particular section

04:09PM    7   right here.

04:09PM    8        BY MR. SINGER:

04:09PM    9   Q.  So, that's why he shows up as one of the two people in

04:09PM   10   this email, correct?

04:09PM   11   A.  So in this email, it looks like -- from looking at this,

04:09PM   12   Curtis runs the number, but the deconfliction goes to those

04:09PM   13   listed people.

04:09PM   14   Q.  Correct.  And Joe Bongiovanni is one of those people?

04:10PM   15   A.  Correct.

04:10PM   16   Q.  So this would have alerted Mr. Bongiovanni that Curtis

04:10PM   17   Ryan was investigating Mike Masecchia in some capacity --

04:10PM   18   A.  It would have.

04:10PM   19   Q.  -- back in August of 2018, correct?

04:10PM   20   A.  It would have alerted him based on the deconfliction that

04:10PM   21   Curtis Ryan was investigating that number, because he doesn't

04:10PM   22   put it in his comments who it belongs to.

04:10PM   23        But it -- when you read the comments, it just says

04:10PM   24   whatever's said, a general statement about being part of the

04:10PM   25   Serio investigation.  He doesn't mention specifically who

04:10PM   1   that phone belongs to.

04:10PM   2           MR. SINGER:  And if you can un-expand out of that,

04:10PM   3   Ms. Champoux.

04:10PM   4           BY MR. SINGER:

04:10PM   5   Q.  And we talked about this on direct, but you noted how

04:10PM   6   Mr. Bongiovanni forwards this particular message to Greg

04:10PM   7   Yensan; is that right?

04:10PM   8   A.  That's what it looks like.

04:10PM   9   Q.  And Greg Yensan at that time, he's the G.S., so he's the

04:10PM   10  group supervisor for D-57?

04:10PM   11  A.  57.

04:10PM   12  Q.  He as your old boss, right?

04:10PM   13  A.  My old boss.

04:10PM   14  Q.  And he's Mr. Bongiovanni's current boss?

04:10PM   15  A.  Yes.

04:10PM   16  Q.  So he obviously had awareness of this, because he

04:11PM   17  forwards it off to his boss the same day, correct?

04:11PM   18  A.  He forwarded it to him.

04:11PM   19          MR. SINGER:  Can you bring that exhibit down,

04:11PM   20  Ms. Champoux, and can you bring up Exhibit 26D as in dog.

04:11PM   21          All right.  So this is another exhibit that the

04:11PM   22  government asked you about.

04:11PM   23          Ms. Champoux, can we scroll in between pages 3 and 4?

04:11PM   24          BY MR. SINGER:

04:11PM   25  Q.  All right.  So we were talking about this one particular

04:11PM   1   entry right here; do you remember that?

04:11PM   2   A.   Yes.

04:11PM   3   Q.   And that was the number up there that 866-2687 number

04:11PM   4   that was associated with Hot Dog, correct?

04:11PM   5   A.   Again, I can't remember specifically.  I have no reason

04:11PM   6   to doubt you that's Hot Dog's number.

04:11PM   7   Q.   All right.  So it looks like -- kind of going.  Through

04:11PM   8   the entries here, this number for Hot Dog is entered into

04:11PM   9   DARTS on 3/20/2013.

04:12PM   10  A.   Correct.

04:12PM   11        **MR. SINGER:**  Ms. Champoux, can we close out of this

04:12PM   12  exhibit and go back to 100A.1.

04:12PM   13        And can we open up the C Baker phone analysis.  I

04:12PM   14  think it's still in the PDF.  All right.  Perfect.

04:12PM   15        And if we can go to line -- can we go to page 3,

04:12PM   16  again?  Looks like we're there.  Thank you very much.

04:12PM   17        **BY MR. SINGER:**

04:12PM   18  Q.   So I direct your attention to line 38, sir.

04:12PM   19  A.   Yes.

04:12PM   20  Q.   That number that we're dealing with in the DARTS entry,

04:12PM   21  that appears on this hot list, correct?

04:12PM   22  A.   Correct.

04:12PM   23  Q.   And that's that 3/19/2013 date that we were talking about

04:12PM   24  previously with Mike Masecchia's cell number?

04:12PM   25  A.   Correct.

04:12PM    1    Q.  So, once again, it indicates that there's no subscriber

04:12PM    2    information for that number on 3/19/2013, correct?

04:12PM    3    A.  According to this document, no.

04:12PM    4    Q.  So it appears like that particular number doesn't have a

04:13PM    5    subscriber associated with it in PenLink at that time the

04:13PM    6    report is run, correct?

04:13PM    7    A.  That's what it looks like.

04:13PM    8    Q.  So the natural thing that would happen would be that to

04:13PM    9    enter that number into PenLink or to figure out who it's

04:13PM   10    from, there would a subpoena sent to the cell phone company,

04:13PM   11    correct?

04:13PM   12    A.  You should send a subpoena out and like -- that would be

04:13PM   13    the first step typically.

04:13PM   14    Q.  And that's something that enters the number into DARTS,

04:13PM   15    correct?

04:13PM   16    A.  When you request a subpoena, you have to do that through

04:13PM   17    DARTS, correct.

04:13PM   18         MR. SINGER:  All right.  So, Ms. Champoux, can we go

04:13PM   19    back to 26D, please?

04:13PM   20         And if we could go down to page 5, please.

04:13PM   21         BY MR. SINGER:

04:13PM   22    Q.  So, we saw where that number was entered back in 2013.

04:13PM   23    Now I want to direct your attention down to a different

04:14PM   24    entry.  Do you see the one down at the bottom?

04:14PM   25    A.  I do.

04:14PM    1            MR. SINGER:  Ms. Champoux, is it possible to blow

04:14PM    2    that up for everybody?

04:14PM    3            BY MR. SINGER:

04:14PM    4    Q.  So, this particular entry doesn't say DARTS, it says

04:14PM    5    DICE.  So, I think we had some testimony about DICE, but just

04:14PM    6    to kind of review what it is.  So DICE is a different version

04:14PM    7    of DARTS, for lack of a better word?

04:14PM    8    A.  It's the acronym that's used for agencies outside of DEA,

04:14PM    9    it's essentially the same system.

04:14PM   10    Q.  Yeah.  So DEA has a telephone number deconfliction system

04:14PM   11    named DARTS, right?

04:14PM   12    A.  Correct.

04:14PM   13    Q.  And other federal agencies other than DEA have the same

04:14PM   14    system, but it's named DICE?

04:14PM   15    A.  Pretty much.

04:14PM   16    Q.  And what you said was that DICE and DARTS interact,

04:14PM   17    right?

04:14PM   18    A.  They do.  I don't know if they interact from a technical

04:14PM   19    perspective, but they're essentially the same system.

04:14PM   20    Q.  Yeah.  The systems speak to each other, is what I'm

04:15PM   21    getting at.

04:15PM   22    A.  Okay.

04:15PM   23    Q.  The only difference is is that if you run a number in

04:15PM   24    DARTS you can get back information about the number and the

04:15PM   25    request and who the agents associated with the number is,

USA v Bongiovanni - Casullo - Singer/Cross - 9/24/24

196

| | | |
|---|---|---|
| 04:15PM | 1 | you're just not gonna get back the remarks, correct? |
| 04:15PM | 2 | A.  If it's outside DEA, correct? |
| 04:15PM | 3 | Q.  Okay.  So for this particular number, this 561-801-0221 |
| 04:15PM | 4 | number, we talked about Tom Serio in your direct testimony; |
| 04:15PM | 5 | do you remember that? |
| 04:15PM | 6 | A.  We did. |
| 04:15PM | 7 | Q.  And there were two different numbers associated with Tom |
| 04:15PM | 8 | Serio, correct? |
| 04:15PM | 9 | A.  To the best of my recollection. |
| 04:15PM | 10 | Q.  And this is one of the cell numbers associated with Tom |
| 04:15PM | 11 | Serio, right? |
| 04:15PM | 12 | A.  Again, I don't remember the specific numbers.  I don't |
| 04:15PM | 13 | doubt you. |
| 04:15PM | 14 | Q.  Understand.  So as far as this number is concerned, it |
| 04:15PM | 15 | looks like there were two other entries entered into DICE, |
| 04:15PM | 16 | correct? |
| 04:15PM | 17 | A.  There were two, yes. |
| 04:15PM | 18 | Q.  And so as far as the entries are concerned, it looks like |
| 04:15PM | 19 | the first one happens on October 14th of 2015? |
| 04:15PM | 20 | A.  Yes. |
| 04:16PM | 21 | Q.  And it looks like the agent associated with that entry is |
| 04:16PM | 22 | Charles Tolias? |
| 04:16PM | 23 | A.  Charles Tolias. |
| 04:16PM | 24 | Q.  And it looks like he works for the Department of Homeland |
| 04:16PM | 25 | Security? |

04:16PM    1    A.   That's what it looks like.

04:16PM    2    Q.   And so that entry was put in place at that point in time,

04:16PM    3    and the way the system works is that if he enters this

04:16PM    4    number, based on the fact that it's associated in some way

04:16PM    5    with other investigations, Joe Bongiovanni would get alerted

04:16PM    6    of that, correct?

04:16PM    7    A.   If he had put this number in.  If this -- if he had put

04:16PM    8    in number in previously, then he would get an alert.

04:16PM    9    Q.   Okay.  It looks like there's a second entry that

04:16PM   10    Mr. Tolias puts into it that occurs on February 2nd of 2017,

04:16PM   11    correct?

04:16PM   12    A.   Correct.

04:16PM   13    Q.   And that would occurred -- that would have caused another

04:16PM   14    alert to be sent to Agent Bongiovanni, correct?

04:16PM   15    A.   Again, if he had put that number in previously, that's

04:16PM   16    how it should work.

04:16PM   17    Q.   All right.  And so this one particular date that we're

04:16PM   18    talking about here, that is roughly about two months before

04:16PM   19    Ron Serio was arrested, correct?

04:16PM   20    A.   I don't remember.  I don't doubt you.

04:17PM   21    Q.   Yeah.  You don't have any reason to disagree that Ron

04:17PM   22    Serio was arrested in April of 2017?

04:17PM   23    A.   No.

04:17PM   24    Q.   Okay.

04:17PM   25         **MR. SINGER:**  Ms. Champoux, if we can un-expand out of

04:17PM   1   that, and if we move back to page 3 and 4 please, split.

04:17PM   2   Thank you.

04:17PM   3              **BY MR. SINGER:**

04:17PM   4   Q.  So getting back to this one number involving Hot Dog.

04:17PM   5       So it looks like on 1/7 of 2019, you enter in Hot Dog's

04:17PM   6   number into DARTS, correct?

04:17PM   7   A.  So, yes.

04:17PM   8   Q.  And what you note in your notes about that phone number

04:17PM   9   is that you believe that that phone number is associated with

04:17PM  10   a person you're investigating at the time, Michael Sinatra;

04:17PM  11   is that correct?

04:17PM  12   A.  So, right.  So I ran it on two separate occasions.  The

04:17PM  13   first time I ran it, I just had it as a phone number in

04:17PM  14   contact with Michael Sinatra.  Correct.

04:17PM  15   Q.  Correct.

04:17PM  16   A.  Correct.

04:17PM  17   Q.  And this is an alert that Mr. Bongiovanni would have

04:18PM  18   received, correct?

04:18PM  19   A.  Again, I'd have to see the email distribution.  If he put

04:18PM  20   that number in prior, then he should.

04:18PM  21   Q.  Well, you'd agree me that it was --

04:18PM  22   A.  Oh, sorry, I didn't see that.

04:18PM  23   Q.  No problem.

04:18PM  24   A.  Yes.

04:18PM  25   Q.  So he would have received an alert, correct?

04:18PM   1    A.  Yes.

04:18PM   2    Q.  And this occurs roughly a month before Mr. Bongiovanni

04:18PM   3    retires from the DEA?

04:18PM   4    A.  So I put it in January of 2019.  I don't remember when he

04:18PM   5    retired.

04:18PM   6    Q.  Is there any reason to disagree --

04:18PM   7    A.  No.

04:18PM   8    Q.  -- that he retired on February 1st 2019?

04:18PM   9    A.  No.

04:18PM  10    Q.  That's about a month or so before, correct?

04:18PM  11    A.  Correct.

04:18PM  12        MR. SINGER:  If we can bring up Government Exhibit

04:18PM  13    26M as in Mike, Ms. Champoux.  If we can go to page 2.

04:18PM  14        BY MR. SINGER:

04:18PM  15    Q.  This one particular number right here, do you see that,

04:18PM  16    sir?

04:18PM  17    A.  Yes.

04:18PM  18    Q.  So it looks like the initial entry of this number occurs

04:19PM  19    on 3/20/2013?

04:19PM  20    A.  Correct.

04:19PM  21    Q.  And that was associated with Ron Serio's number --

04:19PM  22    A.  Yes, sir.

04:19PM  23    Q.  -- in the Ron Serio investigation?

04:19PM  24    A.  Yes.

04:19PM  25    Q.  It appears like you also entered that number into the

USA v Bongiovanni - Casullo - Singer/Cross - 9/24/24

04:19PM   1    system in 2019, January 15th of 2019 to be more exact?

04:19PM   2    A.  Correct.

04:19PM   3    Q.  And so based on the fact that the same number is entered,

04:19PM   4    and Mr. Bongiovanni has entered that number before, he's

04:19PM   5    going to receive an alert on that, correct?

04:19PM   6    A.  Correct.

04:19PM   7    Q.  This person, if you recall, associated with this number

04:19PM   8    up here -- I have a lot of circles going on here, so let me

04:19PM   9    clear it out for a second.

04:19PM   10       This number up here was associated with a person named

04:19PM   11   Dennis Tripi; do you remember that?

04:19PM   12   A.  I remember Dennis Tripi, but I don't know if that's his

04:19PM   13   number.

04:19PM   14       From my comments, it just says numbers in contact with

04:19PM   15   Dennis Tripi.  So it looks like from this DARTS request, that

04:20PM   16   number was a number in contact with Dennis Tripi.

04:20PM   17   Q.  Okay.  Yeah, I think I got that wrong, so my apologies.

04:20PM   18       This number up here is associated with calling a number

04:20PM   19   that Dennis Tripi uses, correct?

04:20PM   20   A.  Yes.  That's a number that's in contact with Dennis

04:20PM   21   Tripi.

04:20PM   22   Q.  Dennis Tripi, he's someone, based on your law enforcement

04:20PM   23   experience, that is a cousin with a person by the name of

04:20PM   24   Frank Tripi?

04:20PM   25   A.  From my investigation, yes.

04:20PM    1    Q.  And Frank Tripi, he's somebody who has been alleged to

04:20PM    2    have nexuses with drug trafficking?

04:20PM    3    A.  Correct.

04:20PM    4    Q.  He's also someone who is alleged to have some type of

04:20PM    5    nexus to Italian Organized Crime up here in Buffalo?

04:20PM    6    A.  Correct.

04:20PM    7    Q.  And in Bongiovanni receives this particular notification

04:20PM    8    two weeks about before his retirement?

04:20PM    9    A.  Correct.

04:20PM   10          MR. SINGER:  If we can bring down this exhibit,

04:20PM   11    Ms. Champoux, and go to Exhibit 26B.

04:21PM   12          And if we can advance to page 2, please.

04:21PM   13          If we can expand up on the top part, Ms. Champoux.

04:21PM   14          BY MR. SINGER:

04:21PM   15    Q.  And so on this particular entry, same kind of thing.

04:21PM   16    Looks like 3/20/2013 is when this one number goes into the

04:21PM   17    DARTS system for the first time?

04:21PM   18    A.  Correct.

04:21PM   19    Q.  And that's associated with the Ron Serio investigation?

04:21PM   20    A.  Correct.

04:21PM   21    Q.  Based on --

04:21PM   22    A.  I'm sorry.  Let me look at that number part of --

04:21PM   23          Again, I don't remember the file titles for those

04:21PM   24    specific cases.  C2-13-0026, if that's Serio or Wayne

04:21PM   25    Anderson, and it doesn't say in the remarks.  So I don't know

04:21PM  1  which case that relates to.

04:21PM  2  Q.  No, I got you.  But you do recall that that's Tom Serio's

04:21PM  3  other cell phone number?  Like, we looked at the other 561

04:22PM  4  number, but this is the other one?

04:22PM  5  A.  It could be, I'm sorry, I just don't remember all of the

04:22PM  6  different numbers, who they belong to.

04:22PM  7  Q.  No reason to disagree with me, though, right?

04:22PM  8  A.  No.

04:22PM  9  Q.  Okay.  So, during your time, it looked like you ran this

04:22PM  10  particular number up here in the top left?

04:22PM  11  A.  Correct.

04:22PM  12  Q.  You also did a hot list on that, correct?

04:22PM  13  A.  I may have.  I don't know.  You could show me the hot

04:22PM  14  list, I don't know if I did a hot list or not.

04:22PM  15  Q.  No problem.  But at any rate, that number up in the top

04:22PM  16  left you found to be associated and in contact with Anthony

04:22PM  17  Gerace, correct?

04:22PM  18  A.  Based on my remarks in the remarks section.  So that

04:22PM  19  number is in contact with Anthony Gerace.

04:22PM  20  Q.  And so this is an alert that Mr. Bongiovanni would

04:22PM  21  receive based on the fact that there's a match between the

04:22PM  22  numbers?

04:22PM  23  A.  Yes.

04:22PM  24       MR. SINGER:  If we could un-expand out of that,

04:22PM  25  Ms. Champoux.

| | | |
|---|---|---|
| 04:22PM | 1 | **BY MR. SINGER:** |
| 04:23PM | 2 | Q.  So you talked about how when you started investigating |
| 04:23PM | 3 | Anthony Gerace back in August of 2018, Joe Bongiovanni walked |
| 04:23PM | 4 | up to your desk at some point in time, right? |
| 04:23PM | 5 | A.  I started investigating Anthony Gerace in the summer of |
| 04:23PM | 6 | '16. |
| 04:23PM | 7 | Q.  Yeah.  No, I think you made that clear that you started |
| 04:23PM | 8 | your initial investigation in 2016, correct? |
| 04:23PM | 9 | A.  Yes.  I ran his tolls, I believe once then, and once |
| 04:23PM | 10 | August of '18.  And then I think again in January of '19. |
| 04:23PM | 11 | Q.  Yeah.  When you ran the tolls back in 2016, Joe |
| 04:23PM | 12 | Bongiovanni didn't talk to you about Anthony Gerace at all, |
| 04:23PM | 13 | correct? |
| 04:23PM | 14 | A.  Correct. |
| 04:23PM | 15 | Q.  But when you ran the tolls in 2018, that's when you say |
| 04:23PM | 16 | that Joe Bongiovanni came up to you, correct? |
| 04:23PM | 17 | A.  Correct. |
| 04:23PM | 18 | Q.  I think it was the conversation you had cited at first |
| 04:23PM | 19 | you were talking with Special Agent Ryan at your desk; is |
| 04:23PM | 20 | that right? |
| 04:23PM | 21 | A.  Yes. |
| 04:23PM | 22 | Q.  And Joe was passing back and forth, pacing back and |
| 04:23PM | 23 | forth? |
| 04:23PM | 24 | A.  Couple times, up near where the secretaries were. |
| 04:23PM | 25 | Q.  And eventually Ryan leaves your desk? |

04:23PM    1    A.  Correct.

04:23PM    2    Q.  You were alone?

04:23PM    3    A.  I was alone.

04:23PM    4    Q.  And then Mr. Bongiovanni walks up to the desk?

04:24PM    5    A.  He did.

04:24PM    6    Q.  And that's where you state that he makes these comments

04:24PM    7    in a sarcastic tone; is that right?

04:24PM    8    A.  He did.  About, you better hurry up and investigate him

04:24PM    9    before -- you better hurry up and arrest him before they make

04:24PM   10    marijuana legal, is what he said.  Towards the end.

04:24PM   11    Q.  And so that was the conversation that made you squirm,

04:24PM   12    right?

04:24PM   13    A.  I was very uncomfortable when he came over to my desk at

04:24PM   14    that point.

04:24PM   15    Q.  So this, based on the DARTS entries, appears to have

04:24PM   16    occurred on or about August 2nd of 2018, right?

04:24PM   17    A.  I that was the date.

04:24PM   18    Q.  So same day you believe it was?

04:24PM   19    A.  Yeah, it was definitely within that timeframe.  Either on

04:24PM   20    that day, or shortly thereafter.

04:24PM   21    Q.  All right.  So based on your direct testimony, that

04:24PM   22    encounter occurs after the Ron Serio proffer, correct?

04:24PM   23    A.  I don't remember the exact date, but I think it was July

04:24PM   24    of '18.

04:24PM   25    Q.  Yeah, July 20th of 2018?

04:24PM    1    A.  So it would have happened afterwards.

04:25PM    2    Q.  It also happened after the meeting you had at the U.S.

04:25PM    3    Attorney's Office on August 1st of 2018?

04:25PM    4    A.  If that was the date, I believe it was after that

04:25PM    5    meeting.

04:25PM    6    Q.  Yeah, remember --

04:25PM    7    A.  Yes.

04:25PM    8    Q.  -- before we started today, I gave you the document to

04:25PM    9    help refresh your memory that it was on August 1st, 2018,

04:25PM   10    that you met with the U.S. Attorney's Office?

04:25PM   11    A.  Based on that document, yes.

04:25PM   12    Q.  And that's when you made the allegations regarding the

04:25PM   13    racial comments?

04:25PM   14    A.  Yes.

04:25PM   15    Q.  That's where you made the allegations regarding the

04:25PM   16    stripper overdosing, correct?

04:25PM   17    A.  Yes.

04:25PM   18    Q.  That's where you presented the document, the 30A

04:25PM   19    document, to the U.S. Attorney's Office, right?

04:25PM   20    A.  No, I sent that over before that.

04:25PM   21    Q.  Sent it before?

04:25PM   22    A.  Yep.

04:25PM   23    Q.  Okay.  So all those things happened before this

04:25PM   24    conversation between you and Bongiovanni about this DARTS

04:25PM   25    entry --

04:25PM   1    A.  Yes, sir.

04:25PM   2    Q.  -- on Anthony Gerace?

04:25PM   3    A.  Yes.

04:25PM   4    Q.  And you believed him to be potentially guilty of federal

04:25PM   5    crimes at that point in time, right?

04:25PM   6         MR. COOPER:  Objection.  I just don't know who the

04:25PM   7    "he" is in the question.

04:25PM   8         BY MR. SINGER:

04:25PM   9    Q.  Sure.  So you suspected Agent Bongiovanni of being guilty

04:26PM  10    of maybe taking bribes from Ron Serio at that point in time?

04:26PM  11         MR. COOPER:  Objection.  Objection.

04:26PM  12         THE COURT:  Hold on.

04:26PM  13         MR. COOPER:  I'd ask to approach to explain my

04:26PM  14    objection.

04:26PM  15         THE COURT:  Come on up.

04:26PM  16         (Sidebar discussion held on the record.)

04:26PM  17         MR. COOPER:  I'm not sure what answer is going to

04:26PM  18    come out, because I don't think this was covered last time.

04:26PM  19    But what I'm concerned about coming out is this witness's

04:26PM  20    opinion.  The way the question was phrased is you thought he

04:26PM  21    was guilty of federal crimes at that point.

04:26PM  22         I don't think this witness offering an opinion about

04:26PM  23    that is the way trials are supposed to work.  The jury is

04:26PM  24    going to decide whether the defendant is guilty of federal

04:26PM  25    crimes.  So I'm uncomfortable with --

| | | |
|---|---|---|
| 04:26PM | 1 | **MR. SINGER:**  So I changed the question up to you |
| 04:26PM | 2 | suspected him of committing a federal crime or taking bribes. |
| 04:26PM | 3 | **THE COURT:**  Okay. |
| 04:26PM | 4 | **MR. SINGER:**  So, like, I'm just trying to establish |
| 04:26PM | 5 | that's what was in his frame of reference or his state of mind |
| 04:26PM | 6 | at the time that this conversation occurs. |
| 04:26PM | 7 | **THE COURT:**  Okay.  You don't have an objection to |
| 04:27PM | 8 | that. |
| 04:27PM | 9 | **MR. COOPER:**  No, I want to be -- protect the record |
| 04:27PM | 10 | and be cautious that the witness shouldn't offer an opinion |
| 04:27PM | 11 | about his -- |
| 04:27PM | 12 | **MR. SINGER:**  Yeah. |
| 04:27PM | 13 | **MR. COOPER:**  Thank you. |
| 04:27PM | 14 | **THE COURT:**  Ask another question. |
| 04:27PM | 15 | (Sidebar discussion ended.) |
| 04:27PM | 16 | **THE COURT:**  The objection is withdrawn.  The question |
| 04:27PM | 17 | is withdrawn. |
| 04:27PM | 18 | Mr. Singer will ask another question. |
| 04:27PM | 19 | **BY MR. SINGER:** |
| 04:27PM | 20 | Q.  So, at -- at the time that you had this conversation |
| 04:27PM | 21 | regarding Anthony Gerace, you suspected that Joe Bongiovanni |
| 04:27PM | 22 | may have engaged in misconduct vis-à-vis Ron Serio, right? |
| 04:27PM | 23 | A.  Correct. |
| 04:27PM | 24 | Q.  And he makes this comment to you about Anthony Gerace in |
| 04:27PM | 25 | a sarcastic tone of you better hurry up on your |

04:27PM    1    investigation, right, sir?

04:27PM    2    A.  Better hurry up and arrest him before they make marijuana

04:27PM    3    legal.

04:27PM    4    Q.  And you also stated on direct that he provided

04:27PM    5    information about, hey, this is where Anthony Gerace gets

04:27PM    6    marijuana shipments, right?

04:27PM    7    A.  Yes.

04:27PM    8    Q.  Or that he deals cocaine to his friends, correct?

04:27PM    9    A.  Yes.

04:27PM   10    Q.  But you didn't put that into a DEA-6?

04:27PM   11    A.  I didn't put any of that in a DEA-6.  I think I put it in

04:27PM   12    an email to myself, but never in a 6.

04:27PM   13    Q.  So you didn't report that conversation to anybody who was

04:28PM   14    investigating --

04:28PM   15    A.  I believe from what I remember, I spoke to Curtis Ryan

04:28PM   16    about that.

04:28PM   17    Q.  Okay.  Did he write a DEA-6 about it?

04:28PM   18    A.  I have no idea.

04:28PM   19    Q.  No idea?

04:28PM   20    A.  I don't know if he wrote a DEA-6.  He may have been

04:28PM   21    writing reports regarding this investigation at this point

04:28PM   22    after the Serio proffer in his HSI case management system,

04:28PM   23    because of what was said about Bongiovanni passing names in

04:28PM   24    that proffer.

04:28PM   25    Q.  And you didn't go to your G.S., Jim McHugh, and make an

04:28PM  1   allegation about, oh, my God, this just happened.  Can you

04:28PM  2   believe this, Jim?

04:28PM  3   A.  I didn't go to Jim McHugh, I sent an email to myself.

04:29PM  4          **MR. SINGER:**  Ms. Champoux, can you bring up

04:29PM  5   Government Exhibit 26C, please.

04:29PM  6          All right.  So, if we can expand in on this first

04:29PM  7   entry, Ms. Champoux, please?

04:29PM  8          Thank you.

04:29PM  9          **BY MR. SINGER:**

04:29PM  10  Q.  All right.  So, this is that 578-5296 number that we were

04:29PM  11  talking about previously, correct?

04:29PM  12  A.  Okay.

04:29PM  13  Q.  That's the one associated with Tom Serio, that's the

04:29PM  14  other cell phone number, correct?

04:29PM  15  A.  I believe you.

04:29PM  16  Q.  It states it right down there, correct?

04:29PM  17  A.  Correct.

04:29PM  18  Q.  So it looks like this number first went into the system

04:29PM  19  on 3/12/2013?

04:29PM  20  A.  Based on what I'm looking at here, yes.

04:29PM  21  Q.  Oh, sorry.  You know what?  I think both of us are wrong.

04:29PM  22  My apologies.

04:29PM  23  A.  Are there more?

04:29PM  24  Q.  Let's look at this middle section first.

04:29PM  25          7/6/2012, do you see that date, sir?

04:30PM    1    A.  Yes.

04:30PM    2    Q.  It appears that was the first time this particular number

04:30PM    3    was entered into the DARTS system?

04:30PM    4    A.  Correct.

04:30PM    5    Q.  And it appears like at that point in time, it was

04:30PM    6    indicating that it was part of an ongoing narcotics

04:30PM    7    operation, correct?

04:30PM    8    A.  Correct.

04:30PM    9    Q.  And it looks like the number at that point in time still

04:30PM   10    had not been positively identified as Tom Serio's?

04:30PM   11    A.  Just says possibly belonging to Tom Serio per --

04:30PM   12    Q.  And in your experience, that -- when it's not definitive

04:30PM   13    who was the subscriber to that particular number, someone's

04:30PM   14    going to put in a clarifier in there, correct?

04:30PM   15    A.  I'm sorry, sir, what's your question?

04:30PM   16    Q.  Yeah, I'm sorry, we had some coughing going on in the

04:30PM   17    background.

04:30PM   18        So when someone enters into DARTS and they're not

04:30PM   19    100 percent positive who the subscriber to the number is,

04:30PM   20    they'll put in a little bit of a clarifier, like a possibly

04:30PM   21    belonging to?

04:30PM   22    A.  Knowing Shane Nastoff, he was very specific about what he

04:30PM   23    wrote at times.  For whatever the reason was, he wrote

04:30PM   24    possibly belonging to.  I don't know what the facts were at

04:31PM   25    the time.

04:31PM    1    Q.  Yeah, you weren't at the office back in 2012, right, sir?

04:31PM    2    A.  No.  No.  I would put it either belongs to, or it

04:31PM    3    doesn't.

04:31PM    4    Q.  Okay.  That's what you do, but this is the way it reads,

04:31PM    5    right, sir?

04:31PM    6    A.  It is the way it reads.

04:31PM    7    Q.  And it appears like this particular number eventually is

04:31PM    8    identify as belonging to Tom Serio, correct?

04:31PM    9    A.  That is correct.

04:31PM    10   Q.  And the first person to start investigating this was

04:31PM    11   Shane Nastoff back in July of 2012, correct?

04:31PM    12   A.  That's what it looks like.

04:31PM    13   Q.  And the number comes up again for the second time on the

04:31PM    14   bottom entry, correct?

04:31PM    15   A.  It does.

04:31PM    16   Q.  That's entered into the DARTS system on 3/12/2013?

04:31PM    17   A.  Correct.

04:31PM    18   Q.  And it's a different case number, correct?

04:31PM    19   A.  Correct.

04:31PM    20   Q.  This particular case number is associated with Wayne

04:31PM    21   Anderson, correct?

04:31PM    22   A.  I just can't remember the cases who they belong to, so

04:31PM    23   it's either Wayne Anderson or Serio, I believe.  One or the

04:31PM    24   other.  If you say it's Wayne Anderson, I believe you.

04:31PM    25   Q.  Okay.  And this particular number is different, correct?

04:31PM    1    A.  It is.

04:31PM    2    Q.  And so the third entry in the system appears up at the

04:32PM    3    top, correct?

04:32PM    4    A.  Third, at the top.  Correct.

04:32PM    5    Q.  And that particular entry is entered by you, correct?

04:32PM    6    A.  That is correct.

04:32PM    7    Q.  That entry occurs on 8/2/2018, correct?

04:32PM    8    A.  Correct.

04:32PM    9    Q.  So, the same date that you ran the Anthony Gerace number

04:32PM   10    or association, I should say?  I'm sorry.

04:32PM   11    A.  It was the same hot list, I believe.  I just changed the

04:32PM   12    remarks.

04:32PM   13    Q.  All right.  You indicated that that number is part of an

04:32PM   14    ongoing marijuana investigation that you were in charge of?

04:32PM   15    A.  I did that for a specific reason, different than the

04:32PM   16    first time I ran the first batch, when I said it was specific

04:32PM   17    to Anthony Gerace.

04:32PM   18    Q.  And this particular entry indicates that you ran that

04:32PM   19    under a different case number, correct?

04:32PM   20    A.  I can't remember what I ran it under with the other case.

04:32PM   21    Q.  Okay.  But I'm referring to this particular document

04:32PM   22    right here, sir.

04:32PM   23    A.  Oh, this case is different than the other two, correct.

04:32PM   24    Q.  Yeah.  And this was a number that Joe Bongiovanni would

04:32PM   25    have received an alert on based on the overlap, correct?

04:32PM    1    A.  Correct.

04:33PM    2            MR. SINGER:  If we can un-expand out of this,

04:33PM    3    Ms. Champoux.  And if we go to the second page of the

04:33PM    4    document.  Pause right there.  If question blow up this one

04:33PM    5    section here.

04:33PM    6            BY MR. SINGER:

04:33PM    7    Q.  So, similarly looking at in other government exhibits,

04:33PM    8    this is the Tom Serio cell number we're talking about, right?

04:33PM    9    A.  If you say it's his number, I believe you.

04:33PM   10    Q.  Yeah.  And it looks like Charles Tolias, he's the HSI

04:33PM   11    officer, correct?

04:33PM   12    A.  Yes, someone in DHS I'm guessing, with HSI.

04:33PM   13    Q.  And he runs a request in the DICE system for this number

04:33PM   14    on 10/14/2015?

04:33PM   15    A.  Correct.

04:33PM   16    Q.  And given the overlap, this is a notification that would

04:33PM   17    have been received by Joe Bongiovanni, correct?

04:33PM   18    A.  If he had entered it previously.

04:34PM   19            MR. SINGER:  Yeah.  And if we can un-expand out of

04:34PM   20    that, Ms. Champoux.  And just move up to the first page again.

04:34PM   21            BY MR. SINGER:

04:34PM   22    Q.  And he entered it previously, correct?

04:34PM   23    A.  Correct.

04:34PM   24    Q.  So he would have received a notification, correct?

04:34PM   25    A.  Yes.

04:34PM     1    Q.  So, at the time you would have -- I'm sorry, Joe

04:34PM     2    Bongiovanni would have received information that you were

04:34PM     3    investigating Tom Serio?

04:34PM     4    A.  When I ran it in August of '18, he would have received an

04:34PM     5    alert.

04:34PM     6         MR. SINGER:  All right.  You can take that down,

04:34PM     7    Ms. Champoux.  Thank you.

04:34PM     8         BY MR. SINGER:

04:34PM     9    Q.  So the government also asked you about a 2016 meeting

04:34PM    10    that you had with Tom Mozg; do you remember that?

04:34PM    11    A.  Yes.

04:34PM    12    Q.  So this was a meeting that Mr. Mozg reached out to you

04:34PM    13    regarding a target of his investigation, correct?

04:34PM    14    A.  He did.  Well, he didn't -- I don't -- he didn't reach

04:34PM    15    out to me initially.  I believe he -- either he or his

04:35PM    16    analyst reached out to our analyst, Steve Bevilacqua.  And

04:35PM    17    then Steve reached out to me.

04:35PM    18    Q.  Okay.  So someone from Customs and Border Protection

04:35PM    19    reached out to someone at DEA --

04:35PM    20    A.  Yeah.

04:35PM    21    Q.  -- possibly the intel analyst?

04:35PM    22    A.  Either Tom or his analyst reached out to Steve

04:35PM    23    Bevilacqua.

04:35PM    24    Q.  Okay.  And then the intel analyst that worked at DEA,

04:35PM    25    Steve Bevilacqua, Bevo I think we've heard him referred to,

04:35PM  1   yes?

04:35PM  2   A.  Bevo, yes.

04:35PM  3   Q.  Bevo reaches out to you saying, hey, I got a call from

04:35PM  4   guys over at CBP, and they want to talk to you about Joe

04:35PM  5   Bella?

04:35PM  6   A.  Yeah, it wasn't to me.  Like, they were asking for me.

04:35PM  7   For some reason, Steve reached out to me either because of

04:35PM  8   something he thought I was working on before.  It was kind of

04:35PM  9   generally, hey, would you be willing to talk to Tom about

04:35PM  10  this?  I was like, yeah, sure.

04:35PM  11  Q.  Okay.  And so a meeting is arranged at the DEA office to

04:35PM  12  meet up with Tom, correct?

04:35PM  13  A.  It was.

04:35PM  14  Q.  And you recall that Bongiovanni wasn't present for the

04:36PM  15  first part of the meeting, at some point in time Joe

04:36PM  16  Bongiovanni walks into the meeting?

04:36PM  17  A.  Shortly -- yeah, it wasn't long after the meeting

04:36PM  18  started.

04:36PM  19  Q.  And both of you, you're working in D-57 at the time,

04:36PM  20  correct?

04:36PM  21  A.  Yeah, what was the date again?

04:36PM  22  Q.  2016 is the best, I think, that we've heard?

04:36PM  23  A.  2016.  In summer of 2016, was it, the meeting with Tom?

04:36PM  24  Q.  I'm asking you.  What do you recall?

04:36PM  25  A.  It was when I was still in D-57.

04:36PM     1    Q.  Okay.  You recall that.

04:36PM     2    A.  And it's -- it's very possible that it would have been

04:36PM     3    summer of '16.

04:36PM     4    Q.  All right.  And you remember that at that time that you

04:36PM     5    had the meeting with Tom Mozg, you and Mr. Bongiovanni -- you

04:36PM     6    were still working together?

04:36PM     7    A.  Yeah, we were still talking.

04:36PM     8    Q.  Okay.  And so at this particular meeting, you recall that

04:36PM     9    Mr. Mozg presents you with some information that he has as

04:36PM    10    far as intelligence?

04:36PM    11    A.  Yes.  I believe he had a chart.

04:36PM    12    Q.  So some type of chart that he presents you showing

04:36PM    13    connections between certain people?

04:36PM    14    A.  Correct.

04:37PM    15    Q.  And at the meeting, you're conversing back with Tom Mozg;

04:37PM    16    is that right?

04:37PM    17    A.  Yeah, we were conversing.  Tom did the presentation, and

04:37PM    18    I listened.

04:37PM    19    Q.  Okay.  Joe Bongiovanni, he's listening to the same

04:37PM    20    presentation?

04:37PM    21    A.  Correct.  After he came in, correct.

04:37PM    22    Q.  And there's nothing that you recall that was out of the

04:37PM    23    ordinary at this meeting, right?

04:37PM    24    A.  To me, there was nothing out of the ordinary.

04:37PM    25    Q.  And at the end of the meeting, you and Joe make the

04:37PM   1   collective decision of great information, but not something

04:37PM   2   we can use at this time, correct?

04:37PM   3          MR. COOPER:  Object to the form of the question.

04:37PM   4          THE COURT:  Overruled.

04:37PM   5          MR. COOPER:  It's calling for hearsay on behalf of

04:37PM   6   his client, Judge.

04:37PM   7          MR. SINGER:  I'm not calling for any hearsay, Judge.

04:37PM   8          THE COURT:  No, overruled.  Overruled.

04:37PM   9          THE WITNESS:  I'm sorry, could you ask it --

04:37PM   10          BY MR. SINGER:

04:37PM   11   Q.  Certainly.  At the end of the meeting, you and Joe come

04:37PM   12   to the collective conclusion of this is nice information, but

04:37PM   13   it's not something we can use?

04:37PM   14   A.  Joe and I had a conversation after Tom left that unless

04:37PM   15   there was an informant involved, or they were up on a wire,

04:38PM   16   that there really wasn't a lot that we could do with it at

04:38PM   17   that point.  We were in agreement that it was good

04:38PM   18   intelligence, but we wanted something more proactive to go

04:38PM   19   on.  And we had just finished a wire, we were still busy with

04:38PM   20   different things.

04:38PM   21   Q.  Yeah, so that particular wire, I'm going to ask you a few

04:38PM   22   questions and we're gonna pause on that for a second.  So

04:38PM   23   that wire involved a target of investigations named

04:38PM   24   Ramos-Ramos?

04:38PM   25   A.  The file title for that was Jonathan Ramos-Ramos.

| | | |
|---|---|---|
| 04:38PM | 1 | Q.  Okay.  That Ramos-Ramos, that was a wire that took a |
| 04:38PM | 2 | significant amount of work; is that right? |
| 04:38PM | 3 | A.  I believe it was maybe six, eight months. |
| 04:38PM | 4 | Q.  That's something that you and Joe Bongiovanni worked on |
| 04:38PM | 5 | hand in hand? |
| 04:38PM | 6 | A.  We were partners on that case. |
| 04:38PM | 7 | Q.  And right when this meeting was occurring, that |
| 04:38PM | 8 | investigation had not officially concluded, but it was on the |
| 04:38PM | 9 | tail end of it? |
| 04:38PM | 10 | A.  When, the meeting with Tom? |
| 04:38PM | 11 | Q.  Um-hum? |
| 04:38PM | 12 | A.  I can't remember.  I think it was like shortly after we |
| 04:38PM | 13 | did our takedowns.  It was towards the tail end of it. |
| 04:38PM | 14 | Q.  And when you complete an operation that large, there's a |
| 04:39PM | 15 | lot of paperwork associated with that? |
| 04:39PM | 16 | A.  There is. |
| 04:39PM | 17 | Q.  So there's a lot of things to do on the back end of the |
| 04:39PM | 18 | investigation, correct? |
| 04:39PM | 19 | A.  That is correct. |
| 04:39PM | 20 | Q.  Yeah, it's not like after the arrest and takedown, you |
| 04:39PM | 21 | can just drop the file and say, all right, I'm all done? |
| 04:39PM | 22 | A.  No, there was still work to do. |
| 04:39PM | 23 | Q.  Okay.  As far as Mr. Mozg was concerned, did you believe |
| 04:39PM | 24 | that he was gonna continue his investigation? |
| 04:39PM | 25 | A.  I don't remember him specifically saying that, but just |

04:39PM    1    based on the overall circumstances, all the work that he had

04:39PM    2    done, his interest in it, that he would continue on.

04:39PM    3    Q.  And fair to say one of reasons why it would probably

04:39PM    4    continue on is that it involved some type of cross-border

04:39PM    5    activity?

04:39PM    6    A.  From what I remember, there was cross border marijuana

04:39PM    7    trafficking involved.

04:39PM    8    Q.  And working for Customs and Border Protection, that's

04:40PM    9    something that that's right in their swing lane, right?

04:40PM   10    A.  Yes.

04:40PM   11    Q.  So even though you and Joe felt not the need continue on

04:40PM   12    and help in that investigation, you felt like it was going to

04:40PM   13    get resolved?

04:40PM   14        **MR. COOPER:**  Judge, objection again to how the

04:40PM   15    defendant felt.

04:40PM   16        **MR. SINGER:**  I asked about --

04:40PM   17        **THE COURT:**  No, no, no, yeah, overruled.

04:40PM   18        **THE WITNESS:**  Sorry?

04:40PM   19        **BY MR. SINGER:**

04:40PM   20    Q.  So you felt that that investigation was gonna get

04:40PM   21    resolved in some fashion?

04:40PM   22    A.  I thought that Tom would continue doing what he was

04:40PM   23    doing.  I have no idea if it was gonna get resolved.

04:40PM   24      I think that's why he brought it to us, is because he was

04:40PM   25    kind of at a roadblock and a standstill, and he needed

USA v Bongiovanni - Casullo - Singer/Cross - 9/24/24
220

04:40PM  1    additional assistance, and that's why he was reaching out to

04:40PM  2    us.

04:40PM  3        So I have no idea if he was able to further it.  I was

04:40PM  4    under the belief that's why he brought it to us.  I felt kind

04:40PM  5    of bad afterwards that we didn't provide him with more

04:40PM  6    assistance.  But, again, for the reasons that I mentioned,

04:41PM  7    that's how we ended it.

04:41PM  8    Q.  I understand.  So, one of the other things that the

04:41PM  9    government asked you about was an incident that occurred when

04:41PM  10   you previously testified in a hearing in this matter outside

04:41PM  11   in the hallway?

04:41PM  12   A.  Correct.

04:41PM  13   Q.  All right.  So I want to go through for a little bit.

04:41PM  14       So you had mentioned that this occurred during a break in

04:41PM  15   your testimony, right?

04:41PM  16   A.  I testified.  It was a break.  Right.  So it was in -- it

04:41PM  17   was break during testimony.

04:41PM  18   Q.  Yeah.  It was a break in the day, correct?

04:41PM  19   A.  Yes.

04:41PM  20   Q.  Like, I didn't finish your cross-examination during that

04:41PM  21   first hearing --

04:41PM  22   A.  No.

04:41PM  23   Q.  -- so we all went home for the night and came back in the

04:41PM  24   morning?

04:41PM  25   A.  No.

04:41PM  1   Q.  And you came back in the morning, and you were waiting

04:41PM  2   around for court to get started?

04:41PM  3   A.  I think I had already testified, and then there was a

04:41PM  4   break.  So it wasn't, like, right in the morning in the

04:41PM  5   beginning of the day.  But it was the next day, it was the

04:41PM  6   second day.

04:41PM  7   Q.  All right.  So this meeting -- this -- this incident

04:41PM  8   occurred right next to the men's room entrance, correct?

04:41PM  9   A.  Pretty much.

04:41PM  10  Q.  Yeah.  You're sitting on a bench that's right next to the

04:42PM  11  men's room hallway that everybody walks by, correct?

04:42PM  12  A.  Pretty -- yes.

04:42PM  13  Q.  And the men's room, it's not like a designated men's room

04:42PM  14  for witnesses or the defense team, it's just a public

04:42PM  15  restroom, right?

04:42PM  16  A.  Best of my knowledge, it's a restroom that anybody can

04:42PM  17  use on this floor.

04:42PM  18  Q.  All right.  And you recall that you used the restroom at

04:42PM  19  one point in time before Mr. Bongiovanni came up and made a

04:42PM  20  comment to you, correct?

04:42PM  21  A.  He walked in on me while I was using the bathroom.

04:42PM  22  Q.  Okay.  All right.  So you were using the bathroom, right?

04:42PM  23  A.  Correct.

04:42PM  24  Q.  You were alone?

04:42PM  25  A.  I was alone in the bathroom, and he walked -- like, I

04:42PM   1   didn't see his face, but I believe it was him.

04:42PM   2   Q.  Okay.  So he walks into the bathroom and sees you using

04:42PM   3   the facilities?

04:42PM   4   A.  I'm using the facilities.  He walks into the bathroom

04:42PM   5   where the door is for that part of the bathroom.

04:42PM   6   Q.  Okay.  And then he walks back out, correct?

04:42PM   7   A.  He made an exasperated comment -- not comment, but

04:42PM   8   exasperated sound, and walked out.

04:43PM   9   Q.  Yeah.  Because, you know, safe to say that you don't want

04:43PM   10  to be in the same spot as him?

04:43PM   11  A.  It was uncomfortable.

04:43PM   12  Q.  He doesn't want to be in the same spot as you?

04:43PM   13  A.  I don't know, I'm guessing.

04:43PM   14  Q.  Yeah.  And one of the things that we do in court to kind

04:43PM   15  of avoid those situations is that the government assigns

04:43PM   16  someone to be a witness keeper, for lack of a better word?

04:43PM   17  A.  I'm not sure I understand.

04:43PM   18  Q.  Sure.  So, when you come in and testify as a witness in a

04:43PM   19  case like this, you're given a handler, right?

04:43PM   20  A.  I have had one in the past, and other times I haven't.

04:43PM   21  But for this case, I have.

04:43PM   22  Q.  And that's to help tell you, hey, you need to go into the

04:43PM   23  courtroom at this point in time, right?

04:43PM   24  A.  Yeah.  Pretty much the logistics of, hey, yeah, it's time

04:43PM   25  for you to testify.  Or -- sure.

04:43PM  1   Q.  Okay.  And, so, you have this uncomfortable encounter

04:43PM  2   inside the bathroom because you guys are in the same place

04:43PM  3   together, and he walks out, right?

04:43PM  4   A.  He walked out.  I finished using the bathroom and came

04:43PM  5   out and sat on the bench --

04:44PM  6   Q.  Um-hum.

04:44PM  7   A.  -- with Ralph Joseph from the FBI.

04:44PM  8   Q.  Yeah.  And Ralph Joseph, he was a person who was assigned

04:44PM  9   to be there with you?

04:44PM  10  A.  That, I have no idea.  Ralph Joseph is a personal friend.

04:44PM  11  We worked in the same task force together at the FBI.  I

04:44PM  12  don't think he was assigned -- I have no idea if he was there

04:44PM  13  and assigned to me.  I thought.

04:44PM  14  Q.  He's sitting next to you?

04:44PM  15  A.  He's sitting next to me.

04:44PM  16  Q.  And then you state that at that point in time when you're

04:44PM  17  sitting down on the bench next to the bathroom,

04:44PM  18  Mr. Bongiovanni had to use the facilities at that point in

04:44PM  19  time, walks back towards the bathroom, right?

04:44PM  20  A.  He walked back towards the bathroom.

04:44PM  21  Q.  And then you state that he says something to the effect

04:44PM  22  of, is this your security?

04:44PM  23  A.  Something like is he your protection?

04:44PM  24      I thought it was protection.  Or are you his protection?

04:44PM  25      I believe it was are you his protection?

04:44PM    1    Q.  Okay.  Because at the point in time when he walks into

04:44PM    2    the bathroom when you're there alone, like, you don't have

04:44PM    3    anybody with you, right?

04:44PM    4    A.  I'm alone at that point.

04:44PM    5    Q.  And it's an awkward situation for both of you, correct?

04:44PM    6    A.  It was for me.

04:45PM    7    Q.  All right.  So then he notices that you have someone

04:45PM    8    sitting next to you, correct?

04:45PM    9    A.  After he walks out of the bathroom back towards court.

04:45PM   10    Q.  And he makes this comment, correct?

04:45PM   11    A.  Correct.

04:45PM   12    Q.  And then after making the comment, he walks into the

04:45PM   13    bathroom?

04:45PM   14    A.  No, I believe it was he used the bathroom, and as he used

04:45PM   15    the bathroom and is walking back to court is when he made the

04:45PM   16    comment.

04:45PM   17    Q.  Okay.  So he makes the comment walking by you after using

04:45PM   18    the facilities?

04:45PM   19    A.  Yes.

04:45PM   20    Q.  And that's it, right?

04:45PM   21    A.  He made that comment and walked off.

04:45PM   22    Q.  Okay.  All right.  So, I want to shift gears a little

04:45PM   23    bit.

04:45PM   24        You get back to the Las Vegas office after a short stint

04:45PM   25    with the FBI, right?

04:45PM    1    A.    Correct.

04:45PM    2    Q.    So you're there from roughly 2003 until about 2013?

04:45PM    3    A.    2000 -- so summer of 2003 until December of '13, I

04:46PM    4    believe.

04:46PM    5    Q.    And then you try to make it back here to Buffalo, so you

04:46PM    6    bring the family back to Buffalo, and you go down to the

04:46PM    7    New York City office?

04:46PM    8    A.    Yeah.  And I spent a little time here in Vegas even

04:46PM    9    before I went to New York while they were in -- until I

04:46PM    10    figured out where in the New York division I was gonna go.

04:46PM    11        They initially offered me Plattsburgh.  I told them no,

04:46PM    12    which I think annoyed them.  And then I had an option to go

04:46PM    13    to New York.

04:46PM    14    Q.    No I get, I get it.

04:46PM    15    A.    So I went to New York.

04:46PM    16    Q.    So you're down in New York for roughly about a two-year

04:46PM    17    period, right?

04:46PM    18    A.    Correct.

04:46PM    19    Q.    And then after the two years, when a Buffalo position

04:46PM    20    opens up, in September of 2015, you move back here to the

04:46PM    21    Buffalo office?

04:46PM    22    A.    It was September of '15 when I came back.

04:46PM    23    Q.    All right.  So we went through a little bit of this

04:46PM    24    before, so it will be quick.

04:46PM    25        So you get back to Buffalo in September of '15, and

| 04:46PM | 1 | you're assigned to D-57, right? |
| 04:46PM | 2 | A.   Correct. |
| 04:46PM | 3 | Q.   Mr. Bongiovanni is in that group at that point in time, |
| 04:46PM | 4 | right? |
| 04:46PM | 5 | A.   He was. |
| 04:46PM | 6 | Q.   You guys worked some investigations when you first get |
| 04:46PM | 7 | started, correct? |
| 04:47PM | 8 | A.   We did a controlled delivery investigation which was just |
| 04:47PM | 9 | a short investigation.  And then shortly after that, we |
| 04:47PM | 10 | worked a long-term Ramos-Ramos investigation. |
| 04:47PM | 11 | Q.   Okay.  And at that point in time, the group supervisor of |
| 04:47PM | 12 | D-57 is Greg Yensan? |
| 04:47PM | 13 | A.   Correct. |
| 04:47PM | 14 | Q.   So he's your boss, and Joe Bongiovanni's boss, correct? |
| 04:47PM | 15 | A.   Correct. |
| 04:47PM | 16 | Q.   And I think one of the things that you took note of was |
| 04:47PM | 17 | that generally speaking, the Buffalo office did not |
| 04:47PM | 18 | investigate a lot of marijuana-based narcotics offenses, |
| 04:47PM | 19 | correct? |
| 04:47PM | 20 | A.   When I got to the Buffalo office, excuse me, I did not |
| 04:47PM | 21 | witness a lot of marijuana investigations in D-57 at that |
| 04:47PM | 22 | time. |
| 04:47PM | 23 | Q.   I think your -- your experience with the group was that |
| 04:47PM | 24 | they tended to focus more on cocaine, crack cocaine, heroin, |
| 04:47PM | 25 | fentanyl-type cases? |

04:47PM  1   A.  The majority of the cases when I got there were -- I took

04:47PM  2   note of powder cocaine, because I had not worked many powder

04:48PM  3   cocaine investigations out west, because it was mostly

04:48PM  4   methamphetamine.

04:48PM  5       The U.S. Attorney's Office wanted larger amounts because

04:48PM  6   they were so busy with federal investigations to prosecute.

04:48PM  7       So I took note of it was mostly powder cocaine

04:48PM  8   investigations.  I don't know if it was crack.  I don't

04:48PM  9   remember much -- it was mostly powder cocaine.

04:48PM  10  Q.  All right.  And so you two continued working forward, and

04:48PM  11  then I think summer of 2016 a little friction starts to

04:48PM  12  develop, correct, between you two?

04:48PM  13  A.  Correct.

04:48PM  14  Q.  And that's based on you opening up the investigation into

04:48PM  15  Peter Gerace, correct?

04:48PM  16  A.  Well, when I started investigating Peter Gerace.

04:48PM  17  Q.  Based on the fact that the phone call logs that you run

04:48PM  18  on Gerace come back with Joe Bongiovanni's number --

04:48PM  19  A.  Correct.

04:48PM  20  Q.  -- that's something you informed Greg Yensan about,

04:48PM  21  correct?

04:48PM  22  A.  I made Greg aware of it.

04:48PM  23  Q.  And at that point in time, I think you testified that you

04:48PM  24  noticed that Mr. Bongiovanni's demeanor towards you changed?

04:48PM  25  A.  It did.

04:48PM    1    Q.  He was kind of giving you the cold shoulder in the

04:49PM    2    office?

04:49PM    3    A.  Correct.

04:49PM    4    Q.  All right.  So before we get into that, I want to go back

04:49PM    5    a little bit more in time to before you got to the office.

04:49PM    6        So June of 2015, that's when this reunion for Saint Joe's

04:49PM    7    Collegiate Institute happens, correct?

04:49PM    8    A.  It was -- I think it was June.  It was before I came

04:49PM    9    back, summer of '15.

04:49PM   10    Q.  So summer of '15 is when this -- I realize you may not

04:49PM   11    remember the date, but it occurs in the summer --

04:49PM   12    A.  Correct.

04:49PM   13    Q.  -- before you get back here officially in Buffalo?

04:49PM   14    A.  Yes.

04:49PM   15    Q.  And so Peter Gerace is part of your graduating class,

04:49PM   16    class of '85, right?

04:49PM   17    A.  He is, yes.

04:49PM   18    Q.  And so he was at the reunion that night?

04:49PM   19    A.  He was.

04:49PM   20    Q.  And you were at the reunion that night?

04:49PM   21    A.  I was.

04:49PM   22    Q.  And there were other people in your class at the reunion

04:49PM   23    that night, correct?

04:49PM   24    A.  I believe 50, somewhere around there.

04:49PM   25    Q.  And so I'm assuming everyone from the old class is

04:49PM    1    socializing back and forth, correct?

04:49PM    2    A.   Yeah, for the most part.

04:49PM    3    Q.   This was over at Big Ditch?

04:49PM    4    A.   Big Ditch.

04:49PM    5    Q.   So everyone's drinking beers and catching up?

04:49PM    6    A.   People were drinking beers, yep.

04:49PM    7    Q.   And so at some point in time, Peter Gerace comes up to

04:50PM    8    you, correct?

04:50PM    9    A.   Correct.

04:50PM   10    Q.   And he mentions, based on your testimony, that -- that

04:50PM   11    Joe Bongiovanni is over at Tappo with his brother, and you

04:50PM   12    guys should go on over there and go check it out?

04:50PM   13    A.   Correct.

04:50PM   14    Q.   And I think you stated that initially you declined the

04:50PM   15    invitation?

04:50PM   16    A.   Correct.

04:50PM   17    Q.   But Peter Gerace insisted that you come, and you

04:50PM   18    eventually agreed?

04:50PM   19    A.   Correct.

04:50PM   20    Q.   Big Ditch and Tappo are not really that far away from

04:50PM   21    each other, right?

04:50PM   22    A.   I believe they're right across the street from each

04:50PM   23    other.

04:50PM   24    Q.   Yeah.  And so you, at that point in time, you go over to

04:50PM   25    Tappo, and you see Joe Bongiovanni, correct?

04:50PM  1   A.  Walk in, and Joe's at the bar.

04:50PM  2   Q.  And you said that what you noticed was that he tried to

04:50PM  3   crawl under a table, or looked like he was gonna crawl under

04:50PM  4   a table?

04:50PM  5   A.  He looked very uncomfortable, almost like he wanted to

04:50PM  6   crawl under the table.  Uncomfortable seeing me there, that's

04:50PM  7   how I perceived it.

04:50PM  8   Q.  So you perceived that he was uncomfortable seeing you?

04:51PM  9   A.  That was my perception.  Like he was surprised to see me

04:51PM  10  and uncomfortable to see me.

04:51PM  11  Q.  Okay.  So was it surprise or uncomfortable?  Because

04:51PM  12  those are two different things.

04:51PM  13  A.  Both.

04:51PM  14          MR. COOPER:  Objection.

04:51PM  15          THE COURT:  Basis?

04:51PM  16          MR. COOPER:  Argumentative.

04:51PM  17          THE COURT:  No.

04:51PM  18          MR. COOPER:  Surprised or uncomfortable.

04:51PM  19          THE COURT:  No, overruled.  Overruled.

04:51PM  20          BY MR. SINGER:

04:51PM  21  Q.  So was it surprise or uncomfortable, sir?

04:51PM  22  A.  I think kind of both.

04:51PM  23  Q.  So kind of both?

04:51PM  24  A.  Yes.

04:51PM  25  Q.  All right.  So, you claim that -- that Anthony Gerace was

USA v Bongiovanni - Casullo - Singer/Cross - 9/24/24

04:51PM  1    sitting at the table with three other people with Joe

04:51PM  2    Bongiovanni?

04:51PM  3    A.  So it was at the bar.  There was Joe, and then I believe

04:51PM  4    three or four people next to him.  And Anthony Gerace was one

04:51PM  5    of those people.

04:51PM  6    Q.  All right.  So this is June of 2015, right?

04:51PM  7    A.  This is the night of the reunion.

04:51PM  8    Q.  Before you moved back here, correct?

04:51PM  9    A.  Before I moved back.

04:51PM  10   Q.  Before you started with the DEA here?

04:51PM  11   A.  Before I started in Buffalo.

04:51PM  12   Q.  And well before you open your investigation into Anthony

04:51PM  13   Gerace, correct?

04:51PM  14   A.  It was -- yes, it was before.  Yes.

04:51PM  15   Q.  Yeah.  And you didn't really know who Anthony Gerace was

04:51PM  16   at that point, correct?

04:51PM  17   A.  Just -- I'd never met him before, and it was Peter's

04:51PM  18   brother.

04:51PM  19   Q.  But you remember testifying on direct that you were

04:52PM  20   fixated on Anthony Gerace when you got introduced to him?

04:52PM  21   A.  Yeah.  Yeah.  I was pretty much focused more on Anthony

04:52PM  22   because he was Peter's brother.

04:52PM  23   Q.  But why would you be fixated on someone who you didn't

04:52PM  24   investigate at that point in time?

04:52PM  25   A.  Because he was Peter's brother.

04:52PM  1    Q.  Okay.  So the reason why you were fixated on Anthony

04:52PM  2    Gerace at that time is because he was Peter's brother?

04:52PM  3    A.  Pretty much.

04:52PM  4    Q.  So you say that after Tappo, everyone walks back -- you,

04:52PM  5    Joe, and Peter -- to Big Ditch again?

04:52PM  6    A.  Back to Big Ditch across the street.

04:52PM  7    Q.  And eventually you say that you kind of separate yourself

04:52PM  8    from Peter Gerace?

04:52PM  9    A.  Yeah.  Again, I -- I had friends from playing hockey at

04:52PM  10   Saint Joe's who I stayed close with.  So I kind of went off

04:52PM  11   more off to that group, while Joe and Peter went into a

04:52PM  12   group.  And I just remember a couple of the football players

04:52PM  13   that I knew.

04:52PM  14   Q.  Okay.  And then at some point at this party, you

04:53PM  15   testified on direct that one of your classmates states, hey,

04:53PM  16   we're all going over to Pharaoh's to blow coke off strippers

04:53PM  17   asses.  Do you want to come, Tony?

04:53PM  18   A.  He didn't say do you want to come, Tony?  But he did say

04:53PM  19   what you said before that.

04:53PM  20       He said we're all going to Pharaoh's to snort coke off

04:53PM  21   strippers asses.

04:53PM  22   Q.  So did this individual yell this out to the group?

04:53PM  23   A.  He was standing with several other individuals, and said

04:53PM  24   it loudly enough where as other people that were with him

04:53PM  25   even snickered.

04:53PM   1   Q.  Okay.  So, just to kind of resettle a little, we're at a
04:53PM       Catholic school reunion, right?
04:53PM   3   A.  It is a Catholic -- well, Saint Joe's is a Catholic
04:53PM   4   institution.  Christian Brothers.
04:53PM   5   Q.  There are 50 people who graduated from Saint Joe's at
04:53PM   6   this event.
04:53PM   7   A.  There were approximately 50 people that were at that
04:53PM   8   party that I remember.
04:53PM   9   Q.  And you guys are the class of 1985 at that point, right?
04:53PM  10   A.  '85.
04:53PM  11   Q.  So we're not talking about a bunch of 20-year olds who
04:54PM  12   just got out of college or just graduated high school, right?
04:54PM  13   A.  No, we were much older than that.
04:54PM  14   Q.  Yeah.  We're talking about a bunch of middle-aged guys,
04:54PM  15   right?
04:54PM  16   A.  Pretty much.
04:54PM  17   Q.  And one of these middle-aged guys yells out, hey, we're
04:54PM  18   all gonna go to Pharaoh's and blow coke off of a stripper's
04:54PM  19   ass?
04:54PM  20   A.  Yes, he did.
04:54PM  21   Q.  Who was this guy who said that?
04:54PM  22   A.  His name is John Maher.  And he passed away from COVID.
04:54PM  23   Q.  Did you report him to authorities?
04:54PM  24   A.  No.
04:54PM  25   Q.  Well, he just admitted to a federal narcotics crime.

04:54PM    1    A.  He stated what he stated, and I did not report it.

04:54PM    2         Did I report it to who, sir?

04:54PM    3    Q.  Authorities.

04:54PM    4    A.  Meaning, did I report it to my agency?  Or the Buffalo

04:54PM    5    Police Department?

04:54PM    6    Q.  Yeah.  So, you're a DEA agent, right?

04:54PM    7    A.  Correct.

04:54PM    8    Q.  You have federal law enforcement authority?

04:54PM    9    A.  Yep.

04:54PM   10    Q.  You're vested with the power to arrest people?

04:54PM   11    A.  Correct.

04:54PM   12    Q.  Did you call up DEA Buffalo and say, hey, there's gonna

04:54PM   13    be drug activity going on at Pharaoh's, we need to send

04:54PM   14    agents over there to bust this up?

04:55PM   15    A.  No, I didn't report that.

04:55PM   16    Q.  Did you report that this one individual who unfortunately

04:55PM   17    passed away from COVID, before he passed away from COVID, did

04:55PM   18    you report him as to this is a person who we need to

04:55PM   19    investigate for narcotics crimes?

04:55PM   20    A.  No, I did not.

04:55PM   21    Q.  Why not?

04:55PM   22    A.  I didn't know John in the past even being involved with

04:55PM   23    cocaine, so I was kind of surprised.  So I chose not to.  I

04:55PM   24    never knew John was even that type of person until he said

04:55PM   25    that.

04:55PM      1    Q.  So Peter Gerace, you didn't really have a good

04:55PM      2    relationship with him, right?

04:55PM      3    A.  Peter was -- yeah, he wasn't -- he wasn't a friend of

04:55PM      4    mine, and he's a convicted felon.  He'd been in trouble

04:55PM      5    before.  And the belief amongst a lot of the classmates was

04:55PM      6    he was involved heavily with cocaine.

04:55PM      7    Q.  Okay.  So you know that.  This classmate says we're all

04:55PM      8    gonna go over and blow cocaine off a stripper's ass at

04:55PM      9    Pharaoh's?

04:55PM     10    A.  Correct.

04:55PM     11    Q.  Did you report that Pharaoh's may be involved in drug

04:55PM     12    activity based on what you heard?

04:55PM     13    A.  I did not report that.

04:55PM     14    Q.  But you have this belief that Peter Gerace is involved in

04:56PM     15    illegal activity, right?

04:56PM     16    A.  What I stated about him being a convicted felon and

04:56PM     17    involved with cocaine --

04:56PM     18    Q.  Yeah.

04:56PM     19    A.  -- that was my belief at the time.

04:56PM     20    Q.  So that was the belief, right?

04:56PM     21    A.  Yep.

04:56PM     22    Q.  And then someone confirms the belief that you had that

04:56PM     23    there's cocaine activity going on at Peter Gerace's

04:56PM     24    establishment, right?

04:56PM     25    A.  He said that they were gonna go there and snort coke off

04:56PM    1    strippers asses.

04:56PM    2    Q.  But you don't do anything to intervene?

04:56PM    3    A.  I listened, and didn't do anything, and remembered it.

04:56PM    4    Q.  Yeah.  I think you said you filed it away in your brain,

04:56PM    5    right?

04:56PM    6    A.  Yes.

04:56PM    7    Q.  But that's all you did?

04:56PM    8    A.  That's all I did.

04:56PM    9    Q.  And then when you get back to Buffalo in September of

04:56PM   10    2015, you don't open up an investigation into your classmate

04:56PM   11    who made this statement, right?

04:56PM   12    A.  No.

04:56PM   13    Q.  You don't open up an investigation into Peter Gerace,

04:56PM   14    correct?

04:56PM   15    A.  I did not start investigating Peter Gerace until the

04:56PM   16    summer of 2016.

04:56PM   17    Q.  Yeah, so a year later, right?

04:57PM   18    A.  Year later.

04:57PM   19    Q.  Did you lose it in the file in your brain?

04:57PM   20    A.  No.

04:57PM   21    Q.  Just took you a year to open up an investigation?

04:57PM   22    A.  That's when I chose to do it.

04:57PM   23    Q.  And that that was the first time really that this

04:57PM   24    incident ever really made it to the light of day, right?

04:57PM   25    A.  It made it to the light of day -- what do you mean?

04:57PM    1    Q.  Sure.  So I guess when you opened up the Peter Gerace

04:57PM    2    file, did you document this incident at your reunion inside

04:57PM    3    the case opening DEA-6?

04:57PM    4    A.  We never opened a case on Peter.  It never got to an

04:57PM    5    actual open case file.  There was no case initiation.

04:57PM    6       We did open a case under Anthony Gerace at some point,

04:57PM    7    which we closed shortly thereafter because of what came up

04:57PM    8    during the Serio proffer.  And it was agreed amongst DEA and

04:57PM    9    HSI management to only have an open file on Anthony Gerace at

04:57PM   10    HSI because of what was said about Joe.

04:57PM   11    Q.  Okay.  But you never opened up a file vis-à-vis this

04:58PM   12    incident on anybody?

04:58PM   13    A.  An actual file was never opened up on Peter Gerace, it

04:58PM   14    was opened up under Anthony Gerace.

04:58PM   15    Q.  And you never reported this to anybody?

04:58PM   16    A.  And it was closed shortly thereafter for the reasons that

04:58PM   17    I said.

04:58PM   18    Q.  And you never reported this to anybody?

04:58PM   19    A.  This was never documented in a DEA-6.

04:58PM   20    Q.  All right.  So getting back at the friction that starts

04:58PM   21    to develop between you and Joe Bongiovanni.

04:58PM   22       So, the friction's caused by your desire to look into

04:58PM   23    Peter Gerace's phone records, right?

04:58PM   24    A.  It was when I started investigating Peter.

04:58PM   25    Q.  And the fact that Joe Bongiovanni's phone records -- or,

USA v Bongiovanni - Casullo - Singer/Cross - 9/24/24
238

04:58PM    1    sorry, phone number comes back in those records, right?

04:58PM    2    A.   His phone number came up in the phone records.

04:58PM    3    Q.   So you talked a little bit about the first steps that

04:59PM    4    you've taken in this type of investigation.

04:59PM    5         So one of the first steps is that you subpoena Peter

04:59PM    6    Gerace's phone records, right?

04:59PM    7    A.   Correct.

04:59PM    8    Q.   And that's a common first step in DEA investigations,

04:59PM    9    right?

04:59PM    10   A.   Yeah.  That's a common first step in any investigation.

04:59PM    11   Q.   Yeah.  And so, you know, you talked about how before you

04:59PM    12   did this, you had a conversation with G.S. Yensan about, hey,

04:59PM    13   this is what I'm prepared to do, and I just want to give you

04:59PM    14   a heads-up because Joe Bongiovanni's number may come up in

04:59PM    15   this, correct?

04:59PM    16   A.   We did have a conversation.

04:59PM    17   Q.   And Yensan says move forward, or words to that effect?

04:59PM    18   A.   Greg said subpoena the tolls, see if his number comes up,

04:59PM    19   and if it does, just come bring it to me.  Essentially.

04:59PM    20   Q.   So you get the subpoena return back, his number's in

04:59PM    21   there, correct?

04:59PM    22   A.   Yes.

04:59PM    23   Q.   And then you go over to Yensan and inform G.S. Yensan

04:59PM    24   that, hey, his number was in there?

04:59PM    25   A.   Yeah, I think I actually gave him the hot list.

04:59PM   1   Q.  Okay.  And so this is something that you indicated caused
05:00PM   2   Mr. Bongiovanni's behavior to change?
05:00PM   3   A.  Yeah.  He stopped talking to me essentially.
05:00PM   4   Q.  Yeah.  So it's obvious that Yensan spoke to him about it
05:00PM   5   in some fashion?  Or he found out, Mr. Bongiovanni?
05:00PM   6   A.  Greg told me that he had --
05:00PM   7   Q.  Yeah, I'm not interesting in what he said.
05:00PM   8   A.  Okay.
05:00PM   9   Q.  But your understanding was at some point in time,
05:00PM  10   Mr. Bongiovanni found out about this?
05:00PM  11   A.  Based on Joe's behavior towards me, it was my belief that
05:00PM  12   Greg said something to him.
05:00PM  13   Q.  Okay.  And, so, with regard to the investigation,
05:00PM  14   separate from Joe you get the subpoena return, correct?
05:00PM  15   A.  So I get a subpoena return back on the Peter Gerace
05:00PM  16   number.
05:00PM  17   Q.  And, again, you talked about how you analyzed the
05:00PM  18   records, you ran a hot list on them, correct?
05:00PM  19   A.  I think I had an analyst give me a hot list back.
05:00PM  20   Q.  So that was under an effort to figure out who was it that
05:00PM  21   Peter Gerace was talking to, correct?
05:00PM  22   A.  Yes.
05:00PM  23   Q.  And as far as the next step in the investigation, is
05:01PM  24   usually to figure out, okay, well, if Peter Gerace is
05:01PM  25   associated with these people, how can we potentially develop

05:01PM   1   an informant?

05:01PM   2   A.   That could be a step in that process.

05:01PM   3   Q.   Did you investigate any of the names of the individuals

05:01PM   4   that came back off that hot list?

05:01PM   5   A.   So, from what I remember, is at that point, I was

05:01PM   6   speaking with a detective from the Amherst Police Department,

05:01PM   7   JoAnn DiNoto.  Because he -- started to live in Amherst, who

05:01PM   8   was introduced to me by Greg Yensan, who worked with her

05:01PM   9   previously, and so they --

05:01PM   10  Q.   Sir, just --

05:01PM   11  A.   -- we did a workup -- she did a workup on the phone

05:01PM   12  numbers to try to identify the phone numbers.

05:01PM   13  Q.   Okay.  So she tried to identify who those phone numbers

05:01PM   14  were?

05:01PM   15  A.   She did.

05:01PM   16  Q.   And as far as those phone numbers are concerned, did you

05:01PM   17  interview anyone based on those phone numbers that you

05:01PM   18  received back?

05:01PM   19  A.   I don't remember us interviewing anybody.  I just

05:01PM   20  remember some of the names that were identified.

05:01PM   21  Q.   So you didn't interview any of the employees at the club?

05:01PM   22  A.   No.

05:01PM   23  Q.   You didn't interview any type of strippers at the club?

05:02PM   24  A.   No, we never got to that point.

05:02PM   25  Q.   You didn't identify any type of patrons at the club?

05:02PM    1    A.   No.  And, again, from my past experience, that's not how

05:02PM    2    I would typically proceed with an investigation.

05:02PM    3        I would not go out and start interviewing people right at

05:02PM    4    the start of an investigation out of fear that those people

05:02PM    5    that we interviewed would go back and tell Peter Gerace that

05:02PM    6    they're being questioned by the DEA.

05:02PM    7        I typically chose other routes.  I --

05:02PM    8    Q.   Okay.

05:02PM    9    A.   I try to develop informants.  That's how it typically

05:02PM   10    worked, even if I had to wait.

05:02PM   11    Q.   Yeah.  And so I guess in developing informants, did you

05:02PM   12    conduct any surveillance at Pharaoh's Gentlemen's Club?

05:02PM   13    A.   No, we did not conduct surveillance.

05:02PM   14    Q.   So you didn't sit in the parking lot and take note of the

05:02PM   15    license plates that were going in and out of the club?

05:02PM   16    A.   I never did.  I'm not sure if anybody else did.

05:02PM   17    Q.   Did you ever direct anybody or yourself go to Pharaoh's

05:02PM   18    to determine whether or not there was drug dealing activity

05:02PM   19    that you could observe?

05:02PM   20    A.   I never directed anybody to do that.

05:02PM   21    Q.   Do you ever conduct any type of surveillance outside of

05:02PM   22    Peter Gerace's house?

05:02PM   23    A.   I never did.

05:02PM   24    Q.   Did you ever coordinate with any other agencies other

05:03PM   25    than JoAnn DiNoto at APD to determine if they had any

05:03PM    1    information vis-à-vis Peter Gerace?

05:03PM    2    A.  It was just I believe the Amherst Police Department at

05:03PM    3    that point.  Oh, I'm sorry.  And Homeland Security.  And

05:03PM    4    Homeland Security.

05:03PM    5        It was TJ Webb from Homeland Security that began to

05:03PM    6    supply me with information on Anthony Gerace.

05:03PM    7    Q.  Yeah.  But I'm talking about Peter Gerace right now.

05:03PM    8    A.  And I'm trying to remember if TJ gave us information on

05:03PM    9    Peter or not.  I can't remember if TJ had information on

05:03PM   10    Peter or not, as well.  But definitely Anthony.

05:03PM   11    Q.  Did you try any type of undercover buys at Pharaoh's

05:03PM   12    Gentlemen's Club?

05:03PM   13    A.  We didn't, because we had no informants.

05:03PM   14    Q.  Did you do any type of trash pulls at Pharaoh's

05:03PM   15    Gentlemen's Club?

05:03PM   16    A.  No.  We did no trash pulls.

05:03PM   17    Q.  How about Peter Gerace's house, did you do any --

05:03PM   18    A.  I'm sorry, TJ Webb may have done a trash pull.

05:03PM   19    Q.  Are you sure about that?

05:04PM   20    A.  No, I'm not sure about that.

05:04PM   21    Q.  Okay.  Well --

05:04PM   22    A.  I didn't do a trash pull.  And DEA in my group did not do

05:04PM   23    a trash pull.

05:04PM   24    Q.  How about at Peter Gerace's house?  Did you perform any

05:04PM   25    trash pulls there?

USA v Bongiovanni - Casullo - Singer/Cross - 9/24/24

243

05:04PM    1    A.  No.

05:04PM    2    Q.  How about a pole camera?  Did you install any type of

05:04PM    3    pole camera at Pharaoh's Gentlemen's Club?

05:04PM    4    A.  No, not at that point.

05:04PM    5    Q.  What about at Peter Gerace's house?

05:04PM    6    A.  Pole camera at his house?

05:04PM    7    Q.  Correct.

05:04PM    8    A.  No.

05:04PM    9    Q.  Did you apply for any type of Title III wiretaps?

05:04PM    10   A.  Oh, we weren't even close to that.  That is -- was very

05:04PM    11   far off.  You can't just jump to apply for wiretaps.

05:04PM    12   Q.  Yeah, it takes a lot of steps before you get to that

05:04PM    13   stage.

05:04PM    14   A.  100 percent.  We weren't even remotely close to that.

05:04PM    15   Q.  How about pen registers?

05:04PM    16   A.  Nope.  We did not apply for a pen register.  We were just

05:04PM    17   ordering tolls.

05:04PM    18   Q.  And I think you testified, you know, that one of the main

05:04PM    19   ways that you developed cases is that you try to look for an

05:04PM    20   informant, or develop an informant, correct?

05:04PM    21   A.  Hopefully over time that may work out.

05:04PM    22   Q.  And so this particular investigation, fair to say, it

05:04PM    23   laid dormant for a little bit of time?

05:05PM    24   A.  Yeah.  It wasn't very active after my conversation with

05:05PM    25   Joe.

05:05PM   1   Q.  And it doesn't mean that you weren't working on other

05:05PM   2   files at the time, right, sir?

05:05PM   3   A.  I was working on other cases.

05:05PM   4   Q.  Yeah, like Ramos-Ramos?

05:05PM   5   A.  Ramos-Ramos.  Ramos-Ramos was already over, and I believe

05:05PM   6   we were still cleaning it up.  We were still up on phones and

05:05PM   7   going out and doing surveillance and purchases, but I don't

05:05PM   8   think it was closed yet.  So there was still some work most

05:05PM   9   likely to be done at that point.

05:05PM  10   Q.  Yeah.  So the file was open for a period of time, it was

05:05PM  11   dormant for a period of time, right?

05:05PM  12   A.  It was -- on who?

05:05PM  13   Q.  On Peter Gerace.

05:05PM  14   A.  We never opened a file.  It was the beginning stages,

05:05PM  15   like I mentioned before.  So after the conversation with Joe

05:05PM  16   in the conference room, I did not do much at that point.

05:05PM  17   Q.  Okay.  But it seems like you didn't really do much at all

05:05PM  18   for other reasons too, right?

05:05PM  19   A.  What do you mean?

05:05PM  20   Q.  Well, we went through a list of investigative steps that

05:05PM  21   you didn't take, right?

05:05PM  22   A.  I -- I didn't do the things that I mentioned that you

05:06PM  23   asked me about.

05:06PM  24   Q.  Um-hum.  So, in 2017, in January of 2017, things --

05:06PM  25   things change, right?

05:06PM    1    A.  We conducted a proffer, and someone had information.

05:06PM    2    Q.  Yeah.  So Kevin Myszka gets arrested, right?

05:06PM    3    A.  Kevin gets arrested.

05:06PM    4    Q.  And that was based on an operation that you had involving

05:06PM    5    him, correct?

05:06PM    6    A.  Yep, and the Amherst Police Department.

05:06PM    7    Q.  And so as part of a search warrant that was executed in

05:06PM    8    that operation, you gain a lot of evidence against Kevin

05:06PM    9    Myszka, correct?

05:06PM   10    A.  I think it was a firearm and some cocaine and a scale.

05:06PM   11    Q.  And so that provides an opportunity for you to seek a

05:06PM   12    proffer interview of potentially -- through Kevin Myszka,

05:06PM   13    correct?

05:06PM   14    A.  He eventually agreed to conduct proffers through his

05:06PM   15    attorney.

05:06PM   16    Q.  And that would provide you an opportunity to develop the

05:06PM   17    source that you were lacking in that operation, correct?

05:06PM   18    A.  Possibly.  I mean, for me, my personal opinion was he was

05:06PM   19    already arrested.  I didn't know if other people knew that he

05:06PM   20    was arrested.

05:06PM   21        Typically we try -- I have in past experience, we try to

05:06PM   22    get someone to cooperate quickly after they're arrested, so

05:07PM   23    not many people would know.  But in his case, it had gone on

05:07PM   24    for months.

05:07PM   25        So for me it was like maybe he can provide some

05:07PM    1    intelligence.  I didn't know if he could do anything

05:07PM    2    proactive, because I felt that he was already exposed at that

05:07PM    3    point.

05:07PM    4    Q.  Okay.  But you do sit down with him, and you have

05:07PM    5    information that Kevin Myszka provides you that's valuable to

05:07PM    6    your Peter Gerace investigation, right?

05:07PM    7    A.  He mentions things about Peter Gerace and cocaine and

05:07PM    8    Pharaoh's, correct.  And Anthony Gerace.

05:07PM    9    Q.  And that's much more than you had when you started off

05:07PM    10   looking at Peter Gerace?

05:07PM    11   A.  Yes, it was an actual person that I'm interviewing

05:07PM    12   providing information.

05:07PM    13   Q.  And Kevin Myszka eventually leads you to other people who

05:07PM    14   potentially could be used as confidential sources, correct?

05:07PM    15   A.  Kevin Myszka led us to buys with an individual.  And then

05:07PM    16   based on those buys, we went up on a wiretap on his phone.

05:07PM    17   Q.  Yeah.  So, like, Jeff Anzalone was one of those people?

05:07PM    18   A.  Jeff Anzalone.

05:07PM    19   Q.  And then Jeff Anzalone eventually developed another

05:08PM    20   source, K.L., correct?

05:08PM    21   A.  I know of K.L.  I don't know how she was developed.  I

05:08PM    22   thought we had developed her.

05:08PM    23       I didn't know Jeff Anzalone -- I don't know what you mean

05:08PM    24   by Jeff Anzalone helped develop.

05:08PM    25   Q.  Sure.  Well, at least, Jeff Anzalone, you understood him

05:08PM   1   to be a patron of Pharaoh's Gentlemen's Club, right?

05:08PM   2   A.   At the time of the -- yes, from the Myszka proffers, I

05:08PM   3   believe Anzalone was one of the people that went there.

05:08PM   4   Q.   And you understood him to be a cocaine user, correct?

05:08PM   5   A.   Yes.

05:08PM   6   Q.   And you understood him to be someone who could

05:08PM   7   potentially purchase cocaine at Pharaoh's Gentlemen's Club,

05:08PM   8   correct?

05:08PM   9   A.   I don't know if we got to that point with him being able

05:08PM   10  to purchase cocaine.  I can't remember from the proffer.  It

05:08PM   11  could have came up in the proffer.

05:08PM   12  Q.   All right.

05:08PM   13  A.   Kevin could have said that he was with him when they

05:08PM   14  purchased it, I just don't remember.

05:08PM   15  Q.   Okay.  But, you know, potentially, like, your

05:08PM   16  investigation with this break with Kevin Myszka finally

05:08PM   17  provides you something to move forward with in that

05:08PM   18  investigation, right?

05:08PM   19  A.   Again, what he had said based on the proffer and what we

05:09PM   20  documented about being at Pharaoh's and getting cocaine, I

05:09PM   21  can't remember if it was Peter or Anthony, like, that was

05:09PM   22  beneficial.

05:09PM   23  Q.   Okay.  All right.  So, kind of moving forward through

05:09PM   24  2016 to 2017, your relationship deteriorates over the course

05:09PM   25  of time with Agent Bongiovanni, correct?

05:09PM  1    A.   We just stopped working cases together.  We still spoke,

05:09PM  2    but we stopped working as partners on cases.

05:09PM  3    Q.   Yeah.  Things are awkward between you based on what

05:09PM  4    happened in June, correct?

05:09PM  5    A.   Well, that was an initially it.  But then for me, what

05:09PM  6    stopped it the most was when he said he couldn't continue on

05:09PM  7    with the Kevin Myszka investigation because he didn't trust

05:09PM  8    the informant.  And he had met Kevin at a party in Toronto.

05:09PM  9         So when he said he didn't want to be involved anymore at

05:09PM  10   that point, it was like it's probably best that we just part

05:09PM  11   ways at this point.

05:09PM  12   Q.   Okay.  So you continued to work in D-57 for a period of

05:09PM  13   time, right?

05:09PM  14   A.   I did, yes.

05:09PM  15   Q.   But things aren't improving between Bongiovanni and

05:09PM  16   yourself?

05:09PM  17   A.   Things are what?

05:09PM  18   Q.   Things are not improving between Bongiovanni and

05:10PM  19   yourself, correct?

05:10PM  20   A.   It wasn't like that.  It wasn't like -- Joe wasn't

05:10PM  21   confrontational.  He wasn't rude.  He wasn't -- we still

05:10PM  22   spoke.  He just worked cases, I believe, with Joe Palmieri

05:10PM  23   again, and I was working with another task force officer.  So

05:10PM  24   it wasn't like they weren't improving, we just went our

05:10PM  25   separate ways.

USA v Bongiovanni - Casullo - Singer/Cross - 9/24/24

05:10PM   1   Q.  Yeah.  And eventually you get transferred over to D-58?

05:10PM   2   A.  I requested a transfer through the resident agent in

05:10PM   3   charge to go work in D-58.

05:10PM   4   Q.  And so that transfer, that occurs sometime in June or the

05:10PM   5   summer of 2018, correct?

05:10PM   6   A.  I don't know.  I -- I can't remember.  What I can

05:10PM   7   remember is that I spent approximately maybe a couple years

05:10PM   8   in 57.  So, if I started in September of '15, so, summer of

05:10PM   9   '17.  It could have been the beginning of '18, somewhere

05:10PM   10  around the beginning of '18.  Approximately.

05:10PM   11  Q.  At least what you do remember, sir, is that your transfer

05:10PM   12  over to D-58, that occurs before the Ron Serio proffer in

05:11PM   13  July 20 of 2018?

05:11PM   14  A.  Yes.

05:11PM   15  Q.  It occurs before you met with the U.S. Attorney's Office

05:11PM   16  on August 1st, 2018?

05:11PM   17  A.  Yes.

05:11PM   18  Q.  And it occurs months before that stuff, right?

05:11PM   19  A.  Yes.

05:11PM   20  Q.  Those meetings, I should say.

05:11PM   21  A.  Yes, I'm pretty sure.

05:11PM   22  Q.  All right.  So you're working over in D-58 at that point

05:11PM   23  in time in 2018.  And is that when you start to work a little

05:11PM   24  bit with Curtis Ryan?

05:11PM   25  A.  Correct.

05:11PM  1    Q.  Because he's also a member of D-58 at that time?

05:11PM  2    A.  Part of D-58, and he sits directly across from me.

05:11PM  3    Q.  And I think at one point, you two were talking about

05:11PM  4    investigations that you're running, and you start talking

05:11PM  5    about the Anthony Gerace investigation?

05:11PM  6    A.  So the reason I spoke to Curtis about that was it was

05:11PM  7    after I believe I received a call from the U.S. Attorney's

05:11PM  8    Office saying that they were opening a file on Anthony and

05:11PM  9    Peter Gerace.

05:11PM  10   Q.  Yeah.  And so with regard to Anthony Gerace, you learned

05:11PM  11   at some point in time there was a nexus between Anthony

05:11PM  12   Gerace and Ron Serio; is that right?

05:12PM  13   A.  I did.  Yes.  Correct.

05:12PM  14   Q.  The nexus was -- is that there was belief, based on Ron

05:12PM  15   Serio's proffer interviews, that Ron Serio was either selling

05:12PM  16   or receiving marijuana from Anthony Gerace?

05:12PM  17   A.  From the proffer, Ron Serio stated that he had supplied

05:12PM  18   Anthony Gerace marijuana.

05:12PM  19   Q.  And so, based on that information, you had an

05:12PM  20   investigation open into Anthony Gerace for a while, correct?

05:12PM  21   A.  Again, we didn't have an actual case file opened, it was

05:12PM  22   similar to Peter, but I had subpoenaed phone records and

05:12PM  23   whatnot.

05:12PM  24   Q.  All right.  And you saw this as an opportunity to at

05:12PM  25   least obtain intelligence regarding Anthony Gerace, correct?

05:12PM    1    A.  I told Curtis we should go back and reinterview Ron Serio

05:12PM    2    and ask him about Anthony Gerace.

05:12PM    3    Q.  And so prior to the July 20, 2018 proffer with Ron Serio,

05:12PM    4    you started preparing yourself to go into that proffer,

05:12PM    5    right?

05:12PM    6    A.  Not really.

05:12PM    7    Q.  So, you just went in there and decided to ask him some

05:12PM    8    questions, and -- did you prepare at all, sir?

05:13PM    9    A.  It wasn't really a formal preparing.  Curtis and I just

05:13PM   10    kind of went in there and said let's see where this goes.

05:13PM   11    Let's try to focus on Anthony Gerace, because he didn't --

05:13PM   12    since my focus was Anthony Gerace, it wasn't Curtis's, I

05:13PM   13    brought it to the attention of Curtis, hey, let's go in and

05:13PM   14    ask him specifically about Anthony Gerace.

05:13PM   15    Q.  Okay.

05:13PM   16    A.  So in terms of a plan, that was -- that was mostly it.

05:13PM   17    Q.  Okay.  And this was important because, kind of like Peter

05:13PM   18    Gerace, up until that point you didn't conduct any type of

05:13PM   19    surveillance regarding Anthony Gerace, right?

05:13PM   20    A.  I don't think we did much at that point.  I, again, I

05:13PM   21    spoke to TJ Webb more.

05:13PM   22    Q.  I got it.  But --

05:13PM   23    A.  No, I never conducted surveillance on Anthony Gerace.

05:13PM   24    Q.  You didn't conduct any type of trash pulls?

05:13PM   25    A.  No.

05:13PM    1    Q.  No pole cams?

05:13PM    2    A.  I didn't.

05:13PM    3    Q.  No pen registers?

05:13PM    4    A.  I didn't.

05:13PM    5    Q.  You got the phone records, but --

05:13PM    6    A.  Phone records.

05:13PM    7    Q.  -- that was it?

05:13PM    8    A.  Phone records and some reports, I believe, from TJ Webb

05:14PM    9    from Homeland Security, yeah.

05:14PM   10    Q.  And the same kind of situation where you're waiting for

05:14PM   11    some insider to provide you information that you might be

05:14PM   12    able to use?

05:14PM   13    A.  Trying to develop a human source.

05:14PM   14    Q.  Okay.  Because that's important to DEA investigations,

05:14PM   15    right?

05:14PM   16    A.  That's very important, and that was something that I was

05:14PM   17    very familiar with.  That was my way of working.

05:14PM   18    Q.  Okay.  So the 7/20/2018 proffer, you attend that proffer,

05:14PM   19    correct?

05:14PM   20    A.  I can't remember the date, but I believe you.

05:14PM   21    Q.  And then when you attend that proffer, this is the

05:14PM   22    proffer where Ron Serio raises allegations about Joe

05:14PM   23    Bongiovanni receiving money in exchange for information,

05:14PM   24    correct?

05:14PM   25    A.  All I -- when I was in that proffer, I wasn't part of the

05:14PM    1    proffer where he mentioned bribes and money.  I was part of

05:14PM    2    the proffer in what I remember was that Joe Bongiovanni was

05:14PM    3    passing names of informants.  And he named three names.

05:14PM    4        So, during that proffer, there was nothing mentioned

05:14PM    5    about bribes or money, it was the passing of those

05:15PM    6    informants' names.

05:15PM    7    Q.  And so following this proffer, you knew about this

05:15PM    8    information, correct?

05:15PM    9    A.  We what?

05:15PM   10    Q.  You knew about this information?

05:15PM   11    A.  So, I heard what I heard during the proffer.

05:15PM   12    Q.  And you were working at D-58 at that time?

05:15PM   13    A.  Still in D-58.

05:15PM   14    Q.  G.S. Jim McHugh was the group supervisor or boss?

05:15PM   15    A.  He was the group supervisor, correct.

05:15PM   16    Q.  He was the boss for both you and Curtis Ryan?

05:15PM   17    A.  Correct.

05:15PM   18    Q.  And after hearing that information, you decide we both

05:15PM   19    need to go back and report this to G.S. McHugh, correct?

05:15PM   20    A.  Correct.

05:15PM   21    Q.  And you guys do do that, correct?

05:15PM   22    A.  We did.

05:15PM   23    Q.  After you make this report to G.S. McHugh, you asked

05:15PM   24    G.S. McHugh for permission to take a look at the Ron Serio

05:15PM   25    file that Joe Bongiovanni worked on?

05:15PM   1   A.  Not during that meeting.  But at some point after that

05:15PM   2   meeting with Jim, I asked Jim other things initially.

05:15PM   3   Q.  And so with regard to this particular file, you said that

05:15PM   4   you went to the file room?

05:15PM   5   A.  So I asked Jim, would it be okay if I went and retrieved

05:16PM   6   the Serio file from the file room to look at it.  Because of

05:16PM   7   the proffer that we had just done, and to look through the

05:16PM   8   file.  And he said yes, it was okay.

05:16PM   9   Q.  And you get this file, and you start going through the

05:16PM  10   DEA-6s, correct?

05:16PM  11   A.  Went mostly through the DEA-6s.  I saw there were lots of

05:16PM  12   subpoenas, which I chose not to go through.  I went right to

05:16PM  13   the DEA-6s, and started going through the 6s.

05:16PM  14   Q.  So you went through the subpoenas -- sorry, you went

05:16PM  15   through the DEA-6s and read those, right?

05:16PM  16   A.  Quickly.

05:16PM  17   Q.  You read the DEA-6s quickly.  And as far as the

05:16PM  18   subpoenas, you never looked through any of them?

05:16PM  19   A.  There were a lot of subpoenas.  Again, it was a thick

05:16PM  20   file, but I did not go through all the subpoenas.  I may have

05:16PM  21   briefly gone through some of them, but I didn't spend a lot

05:16PM  22   of time going through the subpoenas.

05:16PM  23   Q.  Did you gain an understanding of what the subpoenas were

05:16PM  24   directed to?

05:16PM  25   A.  Can -- what do you mean?

05:16PM  1    Q.  Well, you looked through the subpoenas quickly, right,

05:17PM  2    sir?

05:17PM  3    A.  I looked through the subpoenas quickly.

05:17PM  4    Q.  Did you see whether they were directed at phones,

05:17PM  5    utilities, something else?

05:17PM  6    A.  Oh, I'm sorry, phones.  They were phones.

05:17PM  7    Q.  So they were phones?

05:17PM  8    A.  Mostly phones, from what I remember.

05:17PM  9    Q.  What about utilities, did ever see any subpoenas directed

05:17PM  10   towards utilities?

05:17PM  11   A.  I don't remember.

05:17PM  12   Q.  So you mentioned that this was the paper file, correct?

05:17PM  13   A.  This was the case file.  So there's two case files,

05:17PM  14   right?  The actual case file, and then a mirror case file

05:17PM  15   which is the U.S. Attorney's copy.

05:17PM  16   Q.  Okay.

05:17PM  17   A.  So it was the actual case file.

05:17PM  18      I don't remember if it was the AUSA copy for the U.S.

05:17PM  19   Attorney's Office, or the actual criminal file for DEA.

05:17PM  20   Q.  Okay.  But you're familiar with the fact that there are

05:17PM  21   also files on the share drive in the DEA system, correct?

05:17PM  22   A.  So, who do you mean?

05:17PM  23   Q.  Sure.  So the DEA has a computer system, I'm not sure at

05:17PM  24   that point if it was CMS or something else, but --

05:17PM  25   A.  So at that point, there's a case management system called

USA v Bongiovanni - Casullo - Singer/Cross - 9/24/24

256

| | | |
|---|---|---|
| 05:17PM | 1 | Impact. |
| 05:17PM | 2 | Q.  Okay.  So there was a -- there was a computer system that |
| 05:17PM | 3 | the DEA has, right? |
| 05:17PM | 4 | A.  It was a case management system called Impact. |
| 05:18PM | 5 | Q.  Okay.  And Impact is something that's put up on a server |
| 05:18PM | 6 | by the DEA, right? |
| 05:18PM | 7 | A.  Again, I don't want to go too far technically because -- |
| 05:18PM | 8 | Q.  Yeah. |
| 05:18PM | 9 | A.  -- I'm just not that knowledgeable.  But it's an |
| 05:18PM | 10 | automated case management system that sits on a server.  And |
| 05:18PM | 11 | depending on what group you're in, you have access to your |
| 05:18PM | 12 | own group's case management system. |
| 05:18PM | 13 | Q.  Correct. |
| 05:18PM | 14 | A.  Like, I can access case management through that system |
| 05:18PM | 15 | for my group but not another group, unless I get permission |
| 05:18PM | 16 | to do that through management. |
| 05:18PM | 17 | Q.  And your experience as a DEA agent is that there's a |
| 05:18PM | 18 | paper file that's kept inside the file room, right? |
| 05:18PM | 19 | A.  There's the actual -- it's changed now. |
| 05:18PM | 20 | Q.  Yeah, I know, but back then -- |
| 05:18PM | 21 | A.  Yes. |
| 05:18PM | 22 | Q.  -- let's just focus on that period of time back in 2008. |
| 05:18PM | 23 | A.  Yep.  There's the hard-copy file. |
| 05:18PM | 24 | Q.  Okay. |
| 05:18PM | 25 | A.  And then the case management system. |

05:18PM  1   Q.  And case management system file that's on the computer?

05:18PM  2   A.  That's automated, yes.

05:18PM  3   Q.  Did you look at the case management system?

05:18PM  4   A.  I didn't have access to it, because the file was in group

05:18PM  5   D-57.

05:18PM  6   Q.  So you never looked through any of that, correct?

05:18PM  7   A.  That I don't have access -- I didn't have access to those

05:18PM  8   cases, because that was a D-57 case.

05:19PM  9   Q.  Did you asks G.S. McHugh for permission to look at the

05:19PM  10  electronic file?

05:19PM  11  A.  No, just the case file.

05:19PM  12  Q.  And you stated that you also took a look at DEA files

05:19PM  13  concerning Peter Gerace; is that right?

05:19PM  14  A.  It wasn't files.  So you'd have to be more specific.

05:19PM  15  Q.  Sure.  So you looked for any type of DEA-6s or entries

05:19PM  16  with regard to Peter Gerace?

05:19PM  17  A.  I searched through a process called a DEA electronic file

05:19PM  18  room, which searches all DEA-6s agency-wide.  And I did a

05:19PM  19  search under Peter Gerace and Anthony Gerace, both.

05:19PM  20  Q.  Okay.  And that's when you found the entry for

05:19PM  21  November 6th of 2009; is that right?

05:19PM  22  A.  Which report is that?

05:19PM  23       **MR. SINGER:**  Sure.  So, Ms. Champoux, can we put up

05:19PM  24  Government Exhibit 30A on the screen, please.

05:19PM  25       **THE WITNESS:**  Yes.

| | | |
|---|---|---|
| 05:19PM | 1 | **BY MR. SINGER:** |
| 05:19PM | 2 | Q.  This is what you found in the system, correct, sir? |
| 05:19PM | 3 | A.  Yes, correct. |
| 05:19PM | 4 | Q.  And after you found this one particular document, you |
| 05:19PM | 5 | sent this over to the U.S. Attorney's Office? |
| 05:19PM | 6 | A.  I eventually sent it to the U.S. Attorney's Office, or |
| 05:20PM | 7 | gave it to them.  I can't remember which. |
| 05:20PM | 8 | Q.  And everything that we're talking about, that all occurs |
| 05:20PM | 9 | before the 8/1/2018 meeting that you had at the U.S. |
| 05:20PM | 10 | Attorney's Office? |
| 05:20PM | 11 | A.  This happens before -- are you talking about the |
| 05:20PM | 12 | coordination meeting?  Or the one where I had said what Joe |
| 05:20PM | 13 | had said about the racial comments? |
| 05:20PM | 14 | Q.  Yes, I'm talking about the racial comments meeting. |
| 05:20PM | 15 | A.  So, yes, I had done that before that meeting at the U.S. |
| 05:20PM | 16 | Attorney's Office. |
| 05:20PM | 17 | Q.  Okay. |
| 05:20PM | 18 | **MR. SINGER:**  Judge, I think this is probably a good |
| 05:20PM | 19 | time to stop. |
| 05:20PM | 20 | **THE COURT:**  Yeah.  We're not going to finish this |
| 05:20PM | 21 | witness today obviously. |
| 05:20PM | 22 | **MR. SINGER:**  Great. |
| 05:20PM | 23 | **THE COURT:**  Folks, we'll stop for the day now. |
| 05:20PM | 24 | Please remember my instructions about not communicating about |
| 05:20PM | 25 | the case.  Don't use tools of technology to research anything |

05:20PM    1    about the case.  In fact, don't try to learn anything about

05:20PM    2    the case outside the courtroom whatsoever.  And don't use

05:20PM    3    tools of technology to communicate about the case.

05:20PM    4         If there's any news coverage about the case, don't

05:21PM    5    read it or watch it or listen to it.  If there's anything on

05:21PM    6    the internet, don't look at that.  And don't make up your mind

05:21PM    7    until you start deliberating.

05:21PM    8         We'll see you tomorrow morning at 9:30.  We'll go

05:21PM    9    until 5 tomorrow.  And then 9:30 to 5 again on Thursday.

05:21PM   10    Maybe you can watch a replay of the Bills game tonight, it

05:21PM   11    might be on.

05:21PM   12         Thanks, everybody.

05:21PM   13         (Jury excused at 5:21 p.m.)

05:21PM   14         **THE COURT:**  Okay.  Anything before we break from the

05:21PM   15    government?

05:21PM   16         **MR. COOPER:**  No, thank you.

05:21PM   17         **THE COURT:**  From the defense?

05:21PM   18         **MR. SINGER:**  No, Your Honor.

05:21PM   19         **THE COURT:**  So tomorrow morning, I want everybody to

05:21PM   20    come prepared to discuss scheduling, what time we're gonna do

05:21PM   21    the conference on Friday, when we're gonna sum up, and when

05:21PM   22    we're gonna charge.  I'd like to have a plan in place tomorrow

05:22PM   23    morning.  So why don't you come in ten minutes early, and

05:22PM   24    we'll try do that before -- can you do that, Mr. Singer?

05:22PM   25         **MR. SINGER:**  I can get there, Judge, as long as my

USA v Bongiovanni - Casullo - Singer/Cross - 9/24/24

05:22PM    1    child doesn't miss the bus like today.

05:22PM    2            **THE COURT:**  Yeah.  Okay.  So ten minutes early, and

05:22PM    3    we'll talk about that before we talk with the jury.  Okay?

05:22PM    4            **MR. COOPER:**  Thanks, Judge.

05:22PM    5            **THE COURT:**  Thanks, everybody.

05:22PM    6            (Proceedings concluded at 5:22 p.m.)

05:22PM    7            *        *        *        *        *

           8

           9

          10

          11

          12

          13

          14                    **CERTIFICATE OF REPORTER**

          15

          16            In accordance with 28, U.S.C., 753(b), I

          17    certify that these original notes are a true and correct

          18    record of proceedings in the United States District Court for

          19    the Western District of New York on September 24, 2024.

          20

          21                    s/ Ann M. Sawyer
                                _____
                                Ann M. Sawyer, FCRR, RPR, CRR
          22                    Official Court Reporter
                                U.S.D.C., W.D.N.Y.
          23

          24

          25

## TRANSCRIPT INDEX

### EXCERPT - EXAMINATION OF ANTHONY CASULLO - DAY 1

### SEPTEMBER 24, 2024

**W I T N E S S**                                      **P A G E**

**A N T H O N Y    C A S U L L O**                        2

  DIRECT EXAMINATION BY MR. COOPER:                   2

  CROSS-EXAMINATION BY MR. SINGER:                   140