08:51AM

1
                 **UNITED STATES DISTRICT COURT**
                **WESTERN DISTRICT OF NEW YORK**

2

_____

3  **UNITED STATES OF AMERICA,**

                        Case No. 1:19-cr-227

4           Plaintiff,         (LJV)

  v.

5                       September 26, 2024

  **JOSEPH BONGIOVANNI,**

6

           Defendant.

7

8      **TRANSCRIPT EXCERPT - EXAMINATION OF BRIAN BURNS - DAY 1**
        **BEFORE THE HONORABLE LAWRENCE J. VILARDO**

9            **UNITED STATES DISTRICT JUDGE**

10  **APPEARANCES:**        **TRINI E. ROSS, UNITED STATES ATTORNEY**
                     **BY: JOSEPH M. TRIPI, ESQ.**

11                        **NICHOLAS T. COOPER, ESQ.**
                      **CASEY L. CHALBECK, ESQ.**

12                  Assistant United States Attorneys
                Federal Centre, 138 Delaware Avenue

13                  Buffalo, New York 14202
                For the Plaintiff

14

                **SINGER LEGAL PLLC**

15                  **BY: ROBERT CHARLES SINGER, ESQ.**
                80 East Spring Street

16                  Williamsville, New York 14221
                  And

17                  **LAW OFFICES OF PARKER ROY MacKAY**
                **BY: PARKER ROY MacKAY, ESQ.**

18                  3110 Delaware Avenue
                Kenmore, New York 14217

19                    And
                **OSBORN, REED & BURKE, LLP**

20                  **BY: JOHN J. GILSENAN, ESQ.**
                120 Allens Creek Road

21                  Rochester, New York 14618
                For the Defendant

22

  **PRESENT:**           **BRIAN A. BURNS,** FBI Special Agent

23                  **MARILYN K. HALLIDAY,** HIS Special Agent
                **KAREN A. CHAMPOUX,** USA Paralegal

24

  **LAW CLERK:**        **REBECCA FABIAN IZZO, ESQ.**

25

| | | |
|---|---|---|
| 1 | **COURT DEPUTY CLERK:** | **COLLEEN M. DEMMA** |
| 2 | **COURT REPORTER:** | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 3 | | Robert H. Jackson Federal Courthouse |
| | | 2 Niagara Square |
| | | Buffalo, New York  14202 |
| 4 | | Ann_Sawyer@nywd.uscourts.gov |

5

6                    *    *    *    *    *    *    *

7

02:54PM    8          (Excerpt commenced at 2:54 p.m.)

02:54PM    9          (Jury seated at 2:54 p.m.)

02:54PM   10          **THE COURT:**  The record will reflect that all our

02:54PM   11   jurors are present.  As I said, we'll go to 5 tonight, and

02:54PM   12   talk a little bit at 5 about what the plan is for next week.

02:54PM   13          The government can call its next witness.

02:54PM   14          **MR. COOPER:**  Thank you, Judge.  The government calls

02:54PM   15   FBI Special Agent Brian Burns.

02:54PM   16

02:54PM   17   **B R I A N   B U R N S**, having been duly called and sworn,

02:55PM   18   testified as follows:

02:55PM   19          **MR. COOPER:**  May I inquire, Judge?

02:55PM   20          **THE COURT:**  You may.

02:55PM   21

02:55PM   22               **DIRECT EXAMINATION BY MR. COOPER:**

02:55PM   23   Q.  Good afternoon, Special Agent Burns.  Can you introduce

02:55PM   24   yourself to the jury?

02:55PM   25   A.  Sure, my name is Brian Burns.

| | | |
|---|---|---|
| 02:55PM | 1 | Q.  Okay.  Where did you grow up? |
| 02:55PM | 2 | A.  Buffalo, Tonawanda area. |
| 02:55PM | 3 | Q.  All right.  And can you tell the jury a little bit about |
| 02:55PM | 4 | your educational background? |
| 02:55PM | 5 | A.  Yes, I graduated with a bachelor's in science and a |
| 02:55PM | 6 | pharmacy degree, I was a practicing pharmacist, and I |
| 02:55PM | 7 | received an MBA in health care administration.  And then I |
| 02:55PM | 8 | joined the FBI in October of 1998. |
| 02:55PM | 9 | Q.  Okay.  So before joining the FBI in 1998, had you worked |
| 02:56PM | 10 | kind of a first career as a pharmacist? |
| 02:56PM | 11 | A.  Yes.  I was a licensed pharmacist for three years. |
| 02:56PM | 12 | Q.  Okay.  And at some point you switched from pharmacist to |
| 02:56PM | 13 | FBI special agent; is that right? |
| 02:56PM | 14 | A.  That's correct. |
| 02:56PM | 15 | Q.  I don't think we have time today for the story, so we're |
| 02:56PM | 16 | gonna move on.  Do you get some training when you join the |
| 02:56PM | 17 | FBI? |
| 02:56PM | 18 | A.  I sure do. |
| 02:56PM | 19 | Q.  Okay.  And I don't want to spend too much time there |
| 02:56PM | 20 | either, but 30,000-foot-view, what kind of training do you |
| 02:56PM | 21 | receive to become an FBI special agent? |
| 02:56PM | 22 | A.  You go to Quantico, Virginia.  They teach you |
| 02:56PM | 23 | constitutional law, how to effect arrests, effect arrests, |
| 02:56PM | 24 | they teach you firearms, they teach you tactical training, |
| 02:56PM | 25 | surveillance training, they teach you all the different |

02:56PM    1    programs that the FBI has jurisdiction over, interviewing

02:56PM    2    techniques, kind of, you come out with a lot more skills

02:56PM    3    related to investigations than you ever had before.

02:56PM    4    Q.   Okay.  And in addition to that initial training at

02:56PM    5    Quantico, do you kind of continue throughout your career to

02:56PM    6    learn more from working with experienced agents?

02:56PM    7    A.   Absolutely.

02:56PM    8    Q.   Did that happen in your career?

02:57PM    9    A.   Yes.

02:57PM   10    Q.   Okay.  After you finish at Quantico, where is your first

02:57PM   11    posting?

02:57PM   12    A.   Memphis, Tennessee.  The FBI office in Memphis,

02:57PM   13    Tennessee.

02:57PM   14    Q.   What year did you start in Memphis, Tennessee?

02:57PM   15    A.   1999, February.

02:57PM   16    Q.   And how long were you there for?

02:57PM   17    A.   Approximately ten years, January of 2008.

02:57PM   18    Q.   Okay.  And during your time in the Memphis, Tennessee

02:57PM   19    office with the FBI, did you start working in narcotics

02:57PM   20    investigations?

02:57PM   21    A.   Yeah, primarily when I was first assigned down there I

02:57PM   22    worked narcotics investigations.

02:57PM   23    Q.   Okay.  And eventually did you transition into doing

02:57PM   24    public corruption work?

02:57PM   25    A.   Yeah, we worked a number of, it segued from narcotics

02:57PM    1    investigations into law enforcement corruption involving

02:57PM    2    narcotics.  So, basically police officers assisting drug

02:57PM    3    dealers.  And then I kind of moved on to some elected

02:57PM    4    officials, so I predominantly worked public corruption in my

02:57PM    5    career.

02:57PM    6    Q.  Okay.  And when you -- eventually after 2008, did you

02:57PM    7    leave the Memphis office?

02:57PM    8    A.  Yes.

02:57PM    9    Q.  Where'd you come?

02:57PM    10   A.  I came back to Buffalo, to my hometown.

02:58PM    11   Q.  Have you been back in the Buffalo, New York field office

02:58PM    12   from 2008 until the present?

02:58PM    13   A.  Yes, I was in Niagara Falls, we had a small office there

02:58PM    14   for a bit.  And then I, once they closed that, I moved to the

02:58PM    15   Buffalo main office here.

02:58PM    16   Q.  What group are you in at the FBI?

02:58PM    17   A.  The white collar crime, it's WC1 group.

02:58PM    18   Q.  Does the white collar crime group work on predominantly

02:58PM    19   public corruption cases?

02:58PM    20   A.  Yeah, they have economic fraud, healthcare fraud, a

02:58PM    21   number of other ones.  But public corruption does fall under

02:58PM    22   the white collar program.

02:58PM    23   Q.  Got it.  We're gonna jump right in now, enough about your

02:58PM    24   background.  I want to talk to you -- we heard yesterday from

02:58PM    25   a person named Jason Pierini from Customs and Border Patrol

02:58PM  1    and about the defendant traveling with Paul Francoforte.  Do

02:58PM  2    you remember reviewing those records yesterday?

02:58PM  3    A.  Yes, I do.

02:58PM  4    Q.  Okay.  And Paul Francoforte, we've heard quite a bit

02:58PM  5    about that person, right?

02:58PM  6    A.  We certainly have.

02:58PM  7    Q.  What's that person's nickname?

02:58PM  8    A.  It's Hot Dog.

02:58PM  9    Q.  Okay.  Is Hot Dog believed by law enforcement to be

02:58PM  10   associated with Italian Organized Crime?

02:58PM  11   A.  Yes.  He is.

02:58PM  12        **MR. MacKAY:**  Objection, cumulative.

02:58PM  13        **THE COURT:**  Overruled.

02:58PM  14        **BY MR. COOPER:**

02:59PM  15   Q.  Is Hot Dog's date of birth October 21st, 1948?

02:59PM  16   A.  Yes, it is.

02:59PM  17   Q.  Okay.

02:59PM  18        **MR. COOPER:**  Ms. Champoux, can you pull up on the

02:59PM  19   left Government Exhibit 393, and on the right Government

02:59PM  20   Exhibit 3713A?

02:59PM  21        **BY MR. COOPER:**

02:59PM  22   Q.  All right.  Special Agent Burns, on the left side of your

02:59PM  23   screen here, can you circle Hot Dog for us?

02:59PM  24   A.  Paul Francoforte.

02:59PM  25   Q.  On that same exhibit that's Government Exhibit 393, can

02:59PM  1   you circle the person who has a reputation in the law

02:59PM  2   enforcement community for being the former boss of Italian

02:59PM  3   Organized Crime in Buffalo?

02:59PM  4   A.   Joseph Todaro Sr.

02:59PM  5   Q.   Okay.  Special Agent Burns, on the right side of the

02:59PM  6   screen, can you circle the names of the two people that were

02:59PM  7   crossing the border together on November 29th, 2012?

02:59PM  8   A.   Mr. Francoforte and the defendant.

02:59PM  9   Q.   Okay.

02:59PM 10        MR. COOPER:   Ms. Champoux, can we zoom in on the

02:59PM 11   names there on 3713A, just all the way across to the right?

03:00PM 12      That's perfect, thank you.

03:00PM 13        BY MR. COOPER:

03:00PM 14   Q.   So on November 29th, 2012, the two people crossing the

03:00PM 15   border together are P. Francoforte, with a date of birth of

03:00PM 16   10/21/48, and Joseph Samuel Bongiovanni; is that correct?

03:00PM 17   A.   That's correct.

03:00PM 18   Q.   Okay.

03:00PM 19        MR. COOPER:   Can you zoom out of that?

03:00PM 20        BY MR. COOPER:

03:00PM 21   Q.   Do you know what they were doing crossing the border

03:00PM 22   together?

03:00PM 23   A.   I have no idea.

03:00PM 24   Q.   Okay.  Special Agent Burns, I want to talk about

03:00PM 25   something else that happened in late November of 2012.  When

03:00PM  1    did the New York State Police arrest Wayne Anderson with bulk

03:00PM  2    marijuana and U.S. currency?

03:00PM  3    A.  November 25th, 2012.

03:00PM  4    Q.  Is that about four days before this border crossing?

03:00PM  5    A.  Yes, it is.

03:00PM  6    Q.  Based on your review of the entire C2-13-0026 case file,

03:00PM  7    when did the defendant begin looking into Wayne Anderson's

03:00PM  8    arrest?

03:00PM  9    A.  Based on my review, 11/26/2012.

03:01PM  10   Q.  Is that the very day after he was arrested?

03:01PM  11   A.  The day after.

03:01PM  12   Q.  Okay.  When did the defendant write his first DEA report

03:01PM  13   regarding the Anderson arrest?

03:01PM  14   A.  November 28th, 2012.

03:01PM  15   Q.  Is that the day before he travels to Canada with Hot Dog?

03:01PM  16   A.  That's accurate.

03:01PM  17   Q.  Okay.  Has there been any indication during this trial

03:01PM  18   that the marijuana seizure at Wayne Anderson's house was

03:01PM  19   associated with Ron Serio?

03:01PM  20   A.  Ron Serio testified that the -- that marijuana was his

03:01PM  21   marijuana being delivered to Wayne Anderson's residence.

03:01PM  22   Q.  Okay.

03:01PM  23         **MR. COOPER:**  You can take those down, Ms. Champoux.

03:01PM  24         If we can pull up Government Exhibit 8M in evidence?

25

Case 1:19-cr-00227-LJV-MJR    Document 1336    Filed 11/03/24    Page 9 of 128
USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

9

| | | |
|---|---|---|
| 03:01PM | 1 | **BY MR. COOPER:** |
| 03:01PM | 2 | Q.  Do you see this, sir? |
| 03:01PM | 3 | A.  Yes, did I do. |
| 03:01PM | 4 | Q.  Is this the first report that's generated in file |
| 03:01PM | 5 | C2-13-0026? |
| 03:01PM | 6 | A.  Yes.  The first DEA-6. |
| 03:01PM | 7 | Q.  Okay.  And does that same file number ultimately become |
| 03:01PM | 8 | the defendant's reported investigation into Ron Serio? |
| 03:01PM | 9 | A.  Yes, it does. |
| 03:01PM | 10 | Q.  Okay. |
| 03:02PM | 11 | **MR. COOPER:**  Ms. Champoux, can you take that down and |
| 03:02PM | 12 | go to Government Exhibit 8A at page 347? |
| 03:02PM | 13 | **BY MR. COOPER:** |
| 03:02PM | 14 | Q.  Special Agent Burns, is this a subpoena return for |
| 03:02PM | 15 | subscriber information from the defendant's case file |
| 03:02PM | 16 | C2-13-0026? |
| 03:02PM | 17 | A.  From the paper file, yes, it is. |
| 03:02PM | 18 | Q.  Okay.  And you see the case number up here at the top? |
| 03:02PM | 19 | A.  Yes, I do. |
| 03:02PM | 20 | Q.  And whose subscriber information is the defendant causing |
| 03:02PM | 21 | to be subpoenaed in this subpoena? |
| 03:02PM | 22 | A.  Paul Francoforte, a/k/a Hot Dog. |
| 03:02PM | 23 | Q.  Same guy he's crossing the border with? |
| 03:02PM | 24 | A.  That's correct. |
| 03:02PM | 25 | Q.  When did the defendant receive this subpoena response |

03:02PM     1    providing Hot Dog's subscriber information?

03:02PM     2    A.   March 21st, 2013.

03:02PM     3    Q.   Okay.  Is that about four months after he went to Canada

03:02PM     4    with him?

03:02PM     5    A.   Yes, it is.  Approximately.

03:02PM     6    Q.   In any of the -- did you review that whole case file in

03:03PM     7    Government Exhibit 8A?

03:03PM     8    A.   Yes, paper file, the shared drive, as well as the file

03:03PM     9    from the basement at 85 Adler, the defendant's residence.

03:03PM    10    Q.   Okay.  So let's take -- 8A is the paper file was

03:03PM    11    ultimately scanned and made into a PDF; is that right?

03:03PM    12    A.   That's correct.

03:03PM    13    Q.   Did you review everything in there?

03:03PM    14    A.   Yes, I have.

03:03PM    15    Q.   Government Exhibit 8, that's the electronic file that the

03:03PM    16    DEA maintained, right?

03:03PM    17    A.   The shared drive, yes.

03:03PM    18    Q.   Did you review everything in there?

03:03PM    19    A.   Yes, I have.

03:03PM    20    Q.   Okay.  The file that the defendant had in his basement

03:03PM    21    after he retired, did you review everything in that?

03:03PM    22    A.   Yeah, 100A-1, I think it was.

03:03PM    23    Q.   Okay.  Did the defendant ever mention Hot Dog in any of

03:03PM    24    his DEA-6 reports in this case?

03:03PM    25    A.   Not in any of the DEA-6s.

Case 1:19-cr-00227-LJV-MJR    Document 1336    Filed 11/03/24    Page 11 of 128
USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

11

03:03PM    1    Q.  Did the defendant ever index Hot Dog or Paul Francoforte

03:03PM    2    in any of the DEA-6 reports?

03:03PM    3    A.  Not in any of the DEA-6 reports.

03:03PM    4    Q.  By causing a subpoena to be issued for Hot Dog's

03:03PM    5    subscriber information, would that cause Hot Dog's phone

03:03PM    6    number to be entered into the DARTS deconfliction database?

03:03PM    7    A.  Yes, it would.

03:03PM    8    Q.  Have you reviewed Government Exhibit 358, the defendant's

03:04PM    9    phone records from December 2013 until January 2019?

03:04PM   10    A.  Yes, I have.

03:04PM   11    Q.  Okay.  Did the defendant have phone contact with Hot Dog?

03:04PM   12    A.  Yes, he did.

03:04PM   13    Q.  Okay.  And has the jury already looked at those phone

03:04PM   14    records and that contact?

03:04PM   15    A.  Yes.

03:04PM   16    Q.  Okay.  How many times did the defendant have phone

03:04PM   17    contact with Hot Dog?

03:04PM   18    A.  Between the time, the frame you reference was 50 times.

03:04PM   19    Q.  50 times?

03:04PM   20    A.  That's correct.

03:04PM   21    Q.  Okay.  What was the earliest phone call between the

03:04PM   22    defendant and Hot Dog in the records that begin on November

03:04PM   23    2013?

03:04PM   24    A.  The records begin November 13th, the first call is

03:04PM   25    December 2013.

03:04PM    1    Q.  Okay.  And you just said the records begin November 13th,

03:04PM    2    did you mean November of 2013?

03:04PM    3    A.  Oh, I'm sorry, right.  It was 2013, yes.

03:04PM    4    Q.  Okay.  And the first phone call is in what month?

03:04PM    5    A.  It's December.  The very next month.

03:04PM    6    Q.  About how long was that first call that shows up in the

03:04PM    7    phone records that we have?

03:04PM    8    A.  I believe it was ten minutes.

03:04PM    9    Q.  Was the defendant's purported investigation into Ron

03:04PM   10    Serio and his drug trafficking still open in December of

03:05PM   11    2013?

03:05PM   12    A.  Yes, it was.

03:05PM   13    Q.  Before that ten minute December 2013 phone call between

03:05PM   14    the defendant and Hot Dog, had Hot Dog's phone number already

03:05PM   15    shown up in the defendant's purported Ron Serio

03:05PM   16    investigation?

03:05PM   17    A.  Repeat that question?

03:05PM   18    Q.  Sure.  So the subpoena return is from March 21st, 2013,

03:05PM   19    right?

03:05PM   20    A.  Yes.

03:05PM   21    Q.  Is that nine months before the phone call that you see in

03:05PM   22    December of 2013?

03:05PM   23    A.  Yes, it is.

03:05PM   24    Q.  Okay.

03:05PM   25            MR. COOPER:  Ms. Champoux, can we please go to the

03:05PM 1  papers that were scanned from the box that was found in the

03:05PM 2  defendant's basement in 2019, it's 100A.1, please.  And please

03:05PM 3  click on the PDF entitled 716-830-3226 hot sheet.  You got it.

03:05PM 4  Yep.

03:05PM 5          **BY MR. COOPER:**

03:05PM 6  Q.  Special Agent Burns, what are we looking at here?

03:05PM 7  A.  It's a hot sheet, the records of the phone calls from the

03:05PM 8  subpoena returns.

03:05PM 9  Q.  Okay.  And is it in the name of an individual according

03:06PM 10 to -- okay, this 3226 phone number, was that subscribed to an

03:06PM 11 individual's name?

03:06PM 12 A.  Yes.

03:06PM 13 Q.  Whose name?

03:06PM 14 A.  Christopher Baker.

03:06PM 15 Q.  Okay.  Was Baker identified as a member of Serio's

03:06PM 16 drug-trafficking organization?

03:06PM 17 A.  Yes, he was.

03:06PM 18 Q.  Did Ron Serio testify that the phone number ending in

03:06PM 19 3226 was actually his phone number, but subscribed in the

03:06PM 20 name of his drug associate, Chris Baker?

03:06PM 21 A.  Yes, that was the phones he was utilizing, one of the

03:06PM 22 phones he was utilizing.

03:06PM 23 Q.  Okay.  Does Paul Francoforte, a/k/a Hot Dog, show up on

03:06PM 24 this hot sheet from April 19th of 2013?

03:06PM 25 A.  Is he in this?

03:06PM    1         **MR. COOPER:**  You can scroll down to the next page,

03:06PM    2    Ms. Champoux.

03:06PM    3         **THE WITNESS:**  There it is, yeah.  Paul Francoforte.

03:06PM    4         **BY MR. COOPER:**

03:06PM    5    Q.  Can you just touch the screen so the jury can see where

03:06PM    6    you're looking?  Okay.

03:06PM    7         So you made a blue mark about halfway down page 2 of this

03:06PM    8    document.  In this hot sheet, so, the run date is April 19th,

03:07PM    9    2013, and it looks like a timeframe from February 14th to

03:07PM   10    March 6th, so give or take two and a half weeks, how many

03:07PM   11    phone calls did Paul Francoforte have with Ron Serio?

03:07PM   12    A.  14.

03:07PM   13    Q.  Okay.  Does the hot sheet here list the same phone number

03:07PM   14    for Hot Dog that the defendant had 50 phone calls with in his

03:07PM   15    phone records?

03:07PM   16    A.  Yes, it does.

03:07PM   17    Q.  That's that 866-2687 phone number?

03:07PM   18    A.  That's correct.

03:07PM   19    Q.  Okay.  Do those 50 phone calls between December 2013 and

03:07PM   20    January 2019 include both incoming calls, so that's from

03:07PM   21    Hot Dog to Joe Bongiovanni, and outgoing calls from Joe

03:07PM   22    Bongiovanni to Hot Dog?

03:07PM   23    A.  Yes, they do.

03:07PM   24    Q.  Two-way street, sir?

03:07PM   25    A.  Absolutely.

03:07PM    1    Q.  Okay.

03:07PM    2         **MR. COOPER:**  Ms. Champoux, can we please go to

03:07PM    3    Government Exhibit 26D as in David at page 4, please?

03:07PM    4         **BY MR. COOPER:**

03:08PM    5    Q.  Is this a DARTS deconfliction notification?

03:08PM    6    A.  Yes, it is.

03:08PM    7    Q.  Okay.  Do you recognize this?

03:08PM    8    A.  Yes, I do.

03:08PM    9    Q.  Did you see this when Special Agent Casullo was sitting

03:08PM    10   on the stand testifying?

03:08PM    11   A.  Yes, I did.

03:08PM    12   Q.  Okay.  And is this on page 4 here --

03:08PM    13        **MR. COOPER:**  If you could just scroll up a tiny bit,

03:08PM    14   Ms. Champoux?

03:08PM    15        **BY MR. COOPER:**

03:08PM    16   Q.  -- is this a DARTS deconfliction related to that same

03:08PM    17   phone number, 866-2687?

03:08PM    18   A.  Yes, number 4, Paul Francoforte.

03:08PM    19   Q.  Okay.  That's Hot Dog up there?

03:08PM    20   A.  That's Hot Dog.

03:08PM    21   Q.  Okay.  And does this indicate here that his number showed

03:08PM    22   up in a deconfliction as being in contact with Frank Bifulco?

03:08PM    23   A.  Yes, it does.

03:08PM    24   Q.  Does that guy have a nickname?

03:08PM    25   A.  Yeah.  That's Butchie --

03:08PM   1   Q.  Okay?

03:08PM   2   A.  -- Bifocal, a/k/a Butchie.

03:08PM   3   Q.  Is Butchie Bifocal, did he have a reputation at this time

03:08PM   4   for being involved in Italian Organized Crime?

03:08PM   5   A.  Absolutely.

03:08PM   6   Q.  Okay.  Did this DARTS deconfliction cause the defendant

03:08PM   7   to be notified that Special Agent Casullo ran the phone

03:09PM   8   number for Hot Dog on January 7th, of 2019?

03:09PM   9   A.  Yes, it did.

03:09PM  10   Q.  Is that how DARTS deconflictions work?

03:09PM  11   A.  Yes, the line below.

03:09PM  12   Q.  Okay.  And so, you indicated the line below.  Can you see

03:09PM  13   here, a DARTS deconfliction involving a case the defendant

03:09PM  14   worked on?

03:09PM  15   A.  Yes.

03:09PM  16   Q.  And is that the same Ron Serio investigation we've been

03:09PM  17   talking about?

03:09PM  18   A.  Yes, it is.

03:09PM  19   Q.  Okay.  After Tony Casullo ran Hot Dog's number in DARTS

03:09PM  20   on January 7, 2019, did Joe Bongiovanni have a phone call

03:09PM  21   with Hot Dog?

03:09PM  22   A.  Yes, he did.

03:09PM  23   Q.  When was that?

03:09PM  24   A.  Oh, it was, I believe, oh, was it the --

03:09PM  25   Q.  Do you remember about how long after the DARTS

03:09PM    1    deconfliction was run the phone call happens?

03:09PM    2    A.  Oh, a few days.  A few days after.

03:09PM    3    Q.  Okay.

03:09PM    4         **MR. COOPER:**  Ms. Champoux, if we can go to Government

03:09PM    5    Exhibit 358.

03:10PM    6         Yep, open that top PDF.

03:10PM    7         I'm sorry, ma'am, I didn't realize you were waiting

03:10PM    8    for me.

03:10PM    9         And then scroll all the way to the bottom of the

03:10PM    10   document.

03:10PM    11        **THE COURT:**  This is in evidence?

03:10PM    12        **MR. COOPER:**  Yes, Your Honor, it is.

03:10PM    13        And we're looking for January of 2019, Ms. Champoux,

03:10PM    14   so go right towards the bottom.

03:10PM    15        Oh, I'm sorry, ma'am.

03:10PM    16        Will you take down the PDF and in the same

03:10PM    17   Exhibit 358 it's the Volte spreadsheet here, thank you.  And I

03:10PM    18   think it's line 2155, or, 2511 maybe.

03:10PM    19        Keep scrolling.  Looking for January 28th.  Yep, here

03:10PM    20   we go.  Just expand those columns for me.

03:10PM    21        Ms. Champoux, can you just expand out the columns for

03:10PM    22   me real quick?

03:10PM    23        **BY MR. COOPER:**

03:11PM    24   Q.  Okay.  And I'm looking at 2511 here, Special Agent Burns,

03:11PM    25   can you see that row?

Case 1:19-cr-00227-LJV-MJR   Document 1336   Filed 11/03/24   Page 18 of 128
USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

18

03:11PM   1   A.  Yes, I can.

03:11PM   2   Q.  Okay.  Is that a January 28th, 2019 phone call?

03:11PM   3   A.  Yes, it is.

03:11PM   4   Q.  Is that a phone call between the defendant and Hot Dog?

03:11PM   5   A.  Yes, it is.

03:11PM   6   Q.  Is that about 7:03 p.m.?

03:11PM   7   A.  Yes, it is.

03:11PM   8   Q.  Is that about three weeks after the defendant was

03:11PM   9   notified that Special Agent Casullo was running Hot Dog's

03:11PM  10   number in DARTS?

03:11PM  11   A.  Yeah, not three days, as I stated, three weeks.

03:11PM  12        MR. COOPER:  Okay.  You can take that exhibit down,

03:11PM  13   Ms. Champoux.

03:11PM  14        BY MR. COOPER:

03:11PM  15   Q.  Special Agent Burns, between November of 2013 when the

03:11PM  16   defendant's phone records start until January 28th, 2015,

03:11PM  17   when the defendant formally closes the Ron Serio

03:11PM  18   investigation, how many phone contacts occur between the

03:11PM  19   defendant and Hot Dog?

03:11PM  20   A.  19.

03:11PM  21   Q.  Okay.

03:11PM  22        MR. COOPER:  Ms. Champoux, can you take that exhibit

03:11PM  23   down?  I'm looking for 100B, thank you.

03:11PM  24        BY MR. COOPER:

03:12PM  25   Q.  I'm going to hand you what's in evidence as Government

03:12PM   1   Exhibit 100E-2; do you recognize that, sir?

03:12PM   2   A.  Yes, I do.

03:12PM   3   Q.  Where was that recovered from?

03:12PM   4   A.  Mr. Bongiovanni's residence.

03:12PM   5   Q.  Okay.  And what does it say inside?

03:12PM   6   A.  You want the inside?

03:12PM   7   Q.  Yep.  Just the handwritten.

03:12PM   8   A.  Just the handwriting portion?  Love, Hot Dog and Lynn.

03:12PM   9   Honored to be your friends.  Many years of happiness.

03:12PM  10   Q.  Okay.

03:12PM  11        **MR. COOPER:**  May I approach, Judge?

03:12PM  12        **THE COURT:**  Sure.

03:12PM  13        **MR. COOPER:**  Thank you.  Thank you.

03:12PM  14        **BY MR. COOPER:**

03:12PM  15   Q.  That wedding card, was that recovered from the same house

03:12PM  16   where the defendant had a file in his basement with that

03:12PM  17   guy's phone number listed in the subscriber returns?

03:12PM  18   A.  Yes, it was.

03:12PM  19   Q.  Okay.  We're gonna switch gears for a second, I want to

03:12PM  20   talk about a place called Gables bar.  Are you familiar with

03:13PM  21   that place?

03:13PM  22   A.  Yes, I am.

03:13PM  23   Q.  Okay.  Did you hear testimony from Lou Selva and Ron

03:13PM  24   Serio that they were tipped off that bartenders at Gables

03:13PM  25   were the subject of an ongoing investigation by federal law

03:13PM    1    enforcement?

03:13PM    2    A.  Yes, I was.

03:13PM    3    Q.  Did you hear Special Agent Shane Nastoff testify that the

03:13PM    4    defendant made a comment to him referencing that Anastasia

03:13PM    5    said that Bongo screwed him over?

03:13PM    6           MR. MacKAY:  Judge, I'm going to object at this point

03:13PM    7    to the hearsay, that it's, you know, he's testifying

03:13PM    8    essentially to what another witness said before already.  And

03:13PM    9    it's being offered for the truth of the matter, is that what

03:13PM   10    was said here.

03:13PM   11           MR. COOPER:  So, Judge, I would --

03:13PM   12           THE COURT:  This is foundational, right?

03:13PM   13           MR. COOPER:  It's foundational, we had the same

03:13PM   14    obviously previously and --

03:13PM   15           THE COURT:  Yeah, yeah.  Overruled.

03:13PM   16           BY MR. COOPER:

03:13PM   17    Q.  Did you hear Nastoff testify at this trial that the

03:13PM   18    defendant made a comment to him referencing that Anthony

03:13PM   19    Anastasia said Bongo screwed him over?

03:13PM   20    A.  Yes, I did.

03:13PM   21    Q.  Do you remember that?

03:13PM   22    A.  Yes, I do.

03:13PM   23    Q.  Okay.  Where is Gables bar located at?

03:13PM   24    A.  It's closed now, but it was on Hertel Avenue in North

03:13PM   25    Buffalo.  Close proximity to Colvin Avenue.

03:14PM    1    Q.   Okay.  Is Gables known to be frequented by any specific

03:14PM    2    group of people?

03:14PM    3    A.   During the course of the investigation you're referring

03:14PM    4    to, it was members of IOC would meet there.

03:14PM    5    Q.   Okay.  Was that a bar known to be frequented by law

03:14PM    6    enforcement?

03:14PM    7    A.   Some law enforcement officers.

03:14PM    8    Q.   All right.  So let's talk about 2009.

03:14PM    9         In 2009, were you involved in an FBI investigation into

03:14PM   10    Italian Organized Crime and public corruption?

03:14PM   11    A.   Yes, I was.

03:14PM   12    Q.   Okay.  Was Gables a part of that investigation?

03:14PM   13    A.   Yes, it was.

03:14PM   14    Q.   Describe how.

03:14PM   15    A.   It was the Safe Streets Task Force was looking at the

03:14PM   16    drug angle.  And essentially a couple of the bartenders,

03:14PM   17    their long-time employees, Steven Brucato and Anthony

03:14PM   18    Anastasia, were distributing cocaine out of the bar and in

03:14PM   19    proximity to the bar, they both lived near there.

03:14PM   20         Additionally, we had evidence, and that's kind of where

03:14PM   21    my part came in, they had evidence of certain law enforcement

03:14PM   22    officers would frequent there, were utilizing cocaine.

03:14PM   23         Additionally, there was information there were -- some

03:14PM   24    law enforcement information was being released, sensitive law

03:15PM   25    enforcement information, so it was kind of a drug/public

Case 1:19-cr-00227-LJV-MJR    Document 1336    Filed 11/03/24    Page 22 of 128
USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

22

03:15PM    1    corruption/organized crime case.

03:15PM    2    Q.  Okay.  Was Tom Doctor was one of the law enforcement

03:15PM    3    officers that came up as a subject of your investigation?

03:15PM    4    A.  Yes, he was.

03:15PM    5    Q.  Did the FBI ultimately arrest Anthony Anastasia --

03:15PM    6    A.  Yes, they did.

03:15PM    7    Q.  -- related --

            8    A.  I'm sorry.

            9         **MR. COOPER:**  Yes, ma'am.  You're trying to rush.  I

           10    know we're trying to --

           11         **THE WITNESS:**  My fault.

           12         **BY MR. COOPER:**

           13    Q.  Wait for me to finish asking the question.

           14    A.  Yeah, my fault.  I'm sorry.

           15    Q.  Did the FBI ultimately arrest Anthony Anastasia related

03:15PM   16    to that investigation?

03:15PM   17    A.  Yes, they did.

03:15PM   18    Q.  Okay.  Did he waive and agree to cooperate temporarily?

03:15PM   19    A.  Yes, he did agree.

03:15PM   20    Q.  Did he ultimately cooperate?

03:15PM   21    A.  Not for very long, and he began distributing narcotics

03:15PM   22    again.

03:15PM   23    Q.  Okay.  Did there come a time when you became aware of a

03:15PM   24    DEA investigation occurring around the same time with your

03:15PM   25    FBI investigation?

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24
23

03:15PM  1  A.  Yeah, it was kind of shortly thereafter Anastasia got on

03:15PM  2  the DEA radar.

03:15PM  3  Q.  Okay.  I want to move on past that now.

03:16PM  4      Was Shane Nastoff the agent that was working that DEA

03:16PM  5  investigation shortly after the FBI one ended?

03:16PM  6  A.  Yes.

03:16PM  7  Q.  Okay.

03:16PM  8  A.  He was the case agent on it.

03:16PM  9  Q.  Got it.  Now I want to move on.

03:16PM  10     January 2019, were you working in the white collar unit

03:16PM  11  of the FBI at that time?

03:16PM  12  A.  Yes, I was.

03:16PM  13  Q.  Did there come a time when you received a brief on the

03:16PM  14  investigation into Joseph Bongiovanni?

03:16PM  15  A.  Yes, I did.

03:16PM  16  Q.  Okay.  Who was at that briefing?

03:16PM  17  A.  It was the -- my executive management.  So my special

03:16PM  18  agent in charge, assistant special agent in charge, my

03:16PM  19  supervisor, couple other agents, HSI's senior management,

03:16PM  20  along with Case Agent Curtis Ryan and Marilyn Halliday.

03:16PM  21     Additionally, the -- from the U.S. Attorney's Office was

03:16PM  22  AUSA Tripi, along with the first -- the U.S. Attorney,

03:16PM  23  J.P. Kennedy.  The first assistant, Joseph Guerra.  And I

03:17PM  24  think there was a couple other ones.

03:17PM  25  Q.  Was the day of the briefing the day that you first became

03:17PM    1    aware of the investigation into then Special Agent Joseph

03:17PM    2    Bongiovanni?

03:17PM    3    A.   Yes.

03:17PM    4    Q.   Who made you aware of the investigation?

03:17PM    5    A.   J.P. Kennedy contacted, we met, and that's how I became

03:17PM    6    aware.

03:17PM    7    Q.   Was he the U.S. Attorney back at that time?

03:17PM    8    A.   Yes, he was.

03:17PM    9    Q.   After that briefing, did you become the lead agent

03:17PM    10   assigned from the FBI for that investigation?

03:17PM    11   A.   Yes, I did.

03:17PM    12   Q.   Do you know, you mentioned the name already actually, but

03:17PM    13   did you work with Curtis Ryan?

03:17PM    14   A.   Yes, I did.

03:17PM    15   Q.   Okay.  And was he from a different agency, Homeland

03:17PM    16   Security?

03:17PM    17   A.   Yes.

03:17PM    18   Q.   Was he involved in the investigation at that time?

03:17PM    19   A.   Yes, he and Marilyn -- Special Agent Marilyn Halliday

03:17PM    20   were the HSI kind of front or lead investigators on it, is

03:17PM    21   the accurate way to say it.

03:17PM    22   Q.   Okay.  And would it be fair to say based on your

03:17PM    23   understanding when you joined the investigation, that Special

03:17PM    24   Agent Halliday and Special Agent Ryan had been working it

03:17PM    25   already for some time?

03:17PM   1    A.  Yes, it was quite --

03:17PM   2    Q.  By June of 2019, so about six months later, had you

03:18PM   3    become increasingly more involved in the investigation over

03:18PM   4    time?

03:18PM   5    A.  Yes.

03:18PM   6    Q.  From 2019 until we're sitting here right now, has the FBI

03:18PM   7    continued to work on this investigation?

03:18PM   8    A.  Yes, extensively.

03:18PM   9    Q.  Would you describe it as a joint investigation with

03:18PM  10    Homeland Security?

03:18PM  11    A.  Definitely.

03:18PM  12    Q.  And with the Office of the Inspector General?

03:18PM  13    A.  That's correct.

03:18PM  14    Q.  Are you familiar with different witnesses in the case?

03:18PM  15    A.  Yes.

03:18PM  16    Q.  Are you familiar with the evidence in the case?

03:18PM  17    A.  Intimately.

03:18PM  18    Q.  Were you present for the search warrant that was executed

03:18PM  19    at Joseph Bongiovanni's residence?

03:18PM  20    A.  Yes, I was.

03:18PM  21    Q.  Okay.  Do you see Joe Bongiovanni in court?

03:18PM  22    A.  Yes, I do.

03:18PM  23    Q.  Can you identify him for the record?

03:18PM  24    A.  He's at the table in between his attorneys wearing a red

03:18PM  25    tie and a blue shirt.

03:18PM 1     **MR. COOPER:**  For the record, Judge, the witness

03:18PM 2  identified the defendant.

03:18PM 3          **THE COURT:**  The record does reflect that.

03:18PM 4          **MR. COOPER:**  Thank you.

03:18PM 5          **BY MR. COOPER:**

03:18PM 6  Q.  Were you also present for the search of Mike Masecchia's

03:18PM 7  residence on August 23rd, 2019?

03:18PM 8  A.  Yes.  I participated in the search and interviewed

03:18PM 9  Mr. Masecchia briefly.

03:18PM 10 Q.  Okay.  And just remind me, at Masecchia's residence, did

03:18PM 11 law enforcement recover guns?

03:19PM 12 A.  Yes, there were a number of firearms that were recovered.

03:19PM 13 Q.  Did they recover money?

03:19PM 14 A.  Yeah, a significant sum of currency, U.S. currency was

03:19PM 15 recovered.

03:19PM 16 Q.  Was there some drugs recovered there as well?

03:19PM 17 A.  Yes, drugs recovered as well.

03:19PM 18 Q.  Did Masecchia ever agree to cooperate?

03:19PM 19 A.  He did not.

03:19PM 20 Q.  All right.  We're going to switch gears again.

03:19PM 21      Have you reviewed Ron Serio's contacts stored in his

03:19PM 22 phone in Government Exhibit 46?

03:19PM 23 A.  Yes, I have.

03:19PM 24 Q.  Have you reviewed the defendant's contacts report from

03:19PM 25 his post-retirement phone ending in 2784, contained in

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24
27

03:19PM  1  Government Exhibit 109F as in Frank?

03:19PM  2  A.  Yes, I have.

03:19PM  3  Q.  Have you reviewed Lou Selva's contact report contained in

03:19PM  4  Government Exhibit 208D as in David?

03:19PM  5  A.  Yes, I have.

03:19PM  6  Q.  Okay.  We just discussed that you've reviewed --

03:19PM  7  withdrawn.

03:19PM  8      Have you reviewed Peter Gerace's contacts contained in

03:19PM  9  Government Exhibit 310AT?

03:19PM  10  A.  Yes, I have.

03:19PM  11  Q.  Have you reviewed Joe Bella's contacts contained in

03:19PM  12  Government Exhibit 312E?

03:19PM  13  A.  Yes, I have.

03:19PM  14  Q.  Okay.  You mentioned that you reviewed the contacts from

03:20PM  15  the defendant's post retirement phone.  Did you review the

03:20PM  16  contacts that were stored in his DEA phone ending in 0966?

03:20PM  17  A.  No, we'd be unable to.

03:20PM  18  Q.  Why?

03:20PM  19  A.  That phone was wiped before it was turned in.

03:20PM  20  Q.  I'm handing you now --

03:20PM  21      **MR. COOPER:**  Or, actually, I'm just going ask

03:20PM  22  Ms. Champoux, for the witness only please, if you can pull up

03:20PM  23  Government Exhibit 367 for identification.

03:20PM  24      **BY MR. COOPER:**

03:20PM  25  Q.  Do you recognize this, sir?

03:20PM    1    A.  Yeah, it's a chart of cell phone that's overlapping

03:20PM    2    contacts between the phones we just discussed.

03:20PM    3    Q.  Okay.  So I asked you about a whole bunch of different

03:20PM    4    phone contacts exhibits and whether you reviewed them, and

03:20PM    5    you said yes; is that right?

03:20PM    6    A.  That's accurate.

03:20PM    7    Q.  Was this chart created to show some of the common

03:20PM    8    contacts that exist between all those people's phones?

03:20PM    9    A.  Yeah, the overlapping contacts from their contacts in the

03:20PM   10    phones.

03:20PM   11    Q.  Does this fairly and accurately depict overlapping

03:20PM   12    contacts contained in the phone extractions from phones

03:20PM   13    belonging to the defendant, Lou Selva, Ron Serio, Peter

03:21PM   14    Gerace, and Joe Bella?

03:21PM   15    A.  Yes, it does.

03:21PM   16    Q.  Okay.

03:21PM   17            **MR. COOPER:**  I'd offer 367 into evidence, Judge.

03:21PM   18            **MR. MacKAY:**  No objection.

03:21PM   19            **THE COURT:**  Received without objection.

03:21PM   20            **(GOV Exhibit 367 was received in evidence.)**

03:21PM   21            **MR. COOPER:**  Can we just publish this briefly,

03:21PM   22    please?

03:21PM   23            **THE CLERK:**  You're all set.

03:21PM   24            **MR. COOPER:**  Thank you, ma'am.

          25

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

03:21PM  1        **BY MR. COOPER:**

03:21PM  2    Q.  All right.  We're going to work our way through some of

03:21PM  3    this, but just quickly to orient everybody, this left-hand

03:21PM  4    section here, is this the different people stored as contacts

03:21PM  5    in the phones?

03:21PM  6    A.  Yes, it is.

03:21PM  7    Q.  And these names along the top, are these the different

03:21PM  8    phones that these names were found in?

03:21PM  9    A.  They were in their contacts in those phones, you just

03:21PM 10    referenced the exhibits.

03:21PM 11    Q.  Okay.  And then where there's Xs, does that indicate that

03:21PM 12    a name on the left shows up in a phone on the right?

03:21PM 13    A.  That's correct.

03:21PM 14    Q.  Okay.  Let's go to the bottom of the chart first.  What's

03:21PM 15    the name all the way at the bottom, on the left?

03:21PM 16    A.  Frank Tripi.

03:21PM 17    Q.  Okay.  And does Frank Tripi's name show up in Ron Serio's

03:21PM 18    phone?

03:21PM 19    A.  Ron Serio's, yes.

03:21PM 20    Q.  And just to be clear, is Frank Tripi the person that was

03:22PM 21    the main target of Chris Clark's draft OCDETF report?

03:22PM 22    A.  Yes, he was.

03:22PM 23    Q.  Was that found in the defendant's basement?

03:22PM 24    A.  It was.

03:22PM 25    Q.  Okay.  How about is Frank Tripi a contact in Peter

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

03:22PM    1    Gerace's phone?

03:22PM    2    A.  Yes, he is.

03:22PM    3    Q.  How about Joe Bella?

03:22PM    4    A.  He is, as well.

03:22PM    5    Q.  Okay.  Did the defendant have contact with Frank Tripi in

03:22PM    6    his phone records?

03:22PM    7    A.  Yes, he did.

03:22PM    8    Q.  All right.  Let's move on.

03:22PM    9        Do you see the name Paul Francoforte, Hot Dog, that we

03:22PM   10    talked about earlier?

03:22PM   11    A.  Yes.

03:22PM   12    Q.  Okay.  Is he stored as a contact in Serio's phone?

03:22PM   13    A.  Serio's, yes.

03:22PM   14    Q.  Is he in the defendant's phone?

03:22PM   15    A.  Yes, he is.

03:22PM   16    Q.  Is he in Peter Gerace's phone?

03:22PM   17    A.  Yes, he is.

03:22PM   18    Q.  Do you see the line marked Frank Parisi?

03:22PM   19    A.  Yes, I do.

03:22PM   20    Q.  Okay.  Is he stored in a contact in all the phones on

03:22PM   21    this chart?

03:22PM   22    A.  Yes, he is.

03:22PM   23    Q.  Is Lou Selva stored as a contact in the defendant's

03:22PM   24    phone?

03:22PM   25    A.  In the defendant's, yes.

03:23PM   1    Q.  Okay.  And is Lou Selva stored as a contact in Ron

03:23PM   2    Serio's phone?

03:23PM   3    A.  Yes, he is.

03:23PM   4    Q.  Okay.

03:23PM   5         MR. COOPER:  Ms. Champoux, can you take that down

03:23PM   6    please?

03:23PM   7         BY MR. COOPER:

03:23PM   8    Q.  We're gonna shift gears again now.

03:23PM   9    A.  Okay.

03:23PM  10    Q.  Was there ultimately a search warrant conducted at

03:23PM  11    Pharaoh's Gentlemen's Club?

03:23PM  12    A.  Yes, there was in December of 2019.

03:23PM  13    Q.  Okay.  Have you heard testimony in the course of this

03:23PM  14    trial about whether or not there were cameras at Pharaoh's at

03:23PM  15    different times?

03:23PM  16    A.  Yes, I have.

03:23PM  17    Q.  Were you present for the search warrant in December of

03:23PM  18    2019?

03:23PM  19    A.  Yes.  I conducted --

03:23PM  20    Q.  Are you aware --

03:23PM  21    A.  I'm sorry.  I conducted interviews and was present for

03:23PM  22    the search warrant.

03:23PM  23    Q.  Are you aware of whether DVRs were recovered?

03:23PM  24    A.  Yes.

03:23PM  25    Q.  How many?

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

32

03:23PM    1    A.  Three DVRs were recovered.

03:23PM    2    Q.  Were they reviewed by the investigative team?

03:23PM    3    A.  Yes, they were.

03:23PM    4    Q.  Okay.  Are you aware of how long the DVRs stored footage

03:23PM    5    for?

03:23PM    6    A.  One of the DVRs stored footage for seven weeks, and the

03:23PM    7    other two was only for two weeks each.

03:23PM    8    Q.  Okay.  And at the time those DVRs were taken into law

03:23PM    9    enforcement custody, it was the year 2019, right?

03:24PM    10   A.  In December of 2019.

03:24PM    11   Q.  So almost the very end of the year in 2019?

03:24PM    12   A.  That's correct.

03:24PM    13   Q.  Okay.  Based on what you told the jury about how long

03:24PM    14   those DVRs stored footage for, would it be fair to say that

03:24PM    15   they didn't contain any footage from 2013?

03:24PM    16   A.  No.  No footage.

03:24PM    17   Q.  How about 2014?

03:24PM    18   A.  No footage.

03:24PM    19   Q.  How about 2015?

03:24PM    20   A.  No footage.

03:24PM    21   Q.  How about 2016?

03:24PM    22   A.  No footage.

03:24PM    23   Q.  How about 2017?

03:24PM    24   A.  No footage.

03:24PM    25   Q.  How about 2018?

03:24PM      1    A.  No footage.

03:24PM      2    Q.  Okay.  We're going to move on again now, and we're gonna

03:24PM      3    talk about case number C2-13-0026.  Have you heard that

03:24PM      4    number before?

03:24PM      5    A.  Many times.

03:24PM      6    Q.  Okay.  Have you reviewed the official file?

03:24PM      7    A.  Yes, I have.

03:24PM      8    Q.  The paper file?

03:24PM      9    A.  Yes, I have.

03:24PM     10    Q.  The electronic file?

03:24PM     11    A.  Yes, I have.

03:24PM     12    Q.  Are you intimately familiar with the reports and contents

03:24PM     13    of that file?

03:24PM     14    A.  Very much so.

03:24PM     15    Q.  Did you review the electric -- the working file that was

03:24PM     16    found in the defendant's basement?

03:24PM     17    A.  Yes, I did.

03:24PM     18    Q.  Okay.

03:24PM     19          **MR. COOPER:**  Ms. Champoux, if we can go to

03:24PM     20    Government Exhibit 8A very quickly, the full 8A.

03:24PM     21          **BY MR. COOPER:**

03:24PM     22    Q.  8A, is that the paper file that's scanned in?

03:25PM     23    A.  That is.

03:25PM     24          **MR. COOPER:**  Can you scroll down to page 3, please,

03:25PM     25    Ms. Champoux?

03:25PM 1          **BY MR. COOPER:**

03:25PM 2  Q.  The third page of 8A, is this a, essentially a checklist

03:25PM 3  of the DEA-6s contained in that file?

03:25PM 4  A.  Yes, it is.

03:25PM 5  Q.  Okay.  And are you aware of whether this page from

03:25PM 6  Government Exhibit 8A is marked, submarked as 8A-6?

03:25PM 7  A.  It is 8A-6.

03:25PM 8          **MR. COOPER:**  Okay.  Ms. Champoux, you can take that

03:25PM 9  down, please?

03:25PM 10         **BY MR. COOPER:**

03:25PM 11 Q.  And I'm going to hand you a big version of 8A-6 which is

03:25PM 12 already in evidence.  Thank you.

03:25PM 13         **MR. COOPER:**  Parker, do you need to see it?

03:25PM 14         **MR. MacKAY:**  Oh, I can see it.

03:25PM 15         **MR. COOPER:**  Okay, great.

03:25PM 16         **THE JURORS:**  (Laughter.)

03:25PM 17         **MR. COOPER:**  Can you put that up there?

03:25PM 18         Can we close the blinds?

03:25PM 19         **THE CLERK:**  Yes, we can.

03:25PM 20         **MR. COOPER:**  I'm sorry to be a pain.

03:26PM 21         **THE CLERK:**  You're okay.

03:26PM 22         **BY MR. COOPER:**

03:26PM 23 Q.  All right.  We're going to run through some questions

03:26PM 24 about this now.

03:26PM 25         Is it your understanding that this DEA-6 summary

03:26PM  1   report -- or, I'm sorry, that this DEA-6 case status report

03:26PM  2   lists all the 6s in the file?

03:26PM  3   A.  It does.

03:26PM  4   Q.  All right.

03:26PM  5        MR. COOPER:  Ms. Champoux, on the screen for

03:26PM  6   everybody, can you pull up what's in evidence as Government

03:26PM  7   Exhibit 8M again?

03:26PM  8        BY MR. COOPER:

03:26PM  9   Q.  Is this a DEA-6 summary report, Special Agent Burns?

03:26PM  10  A.  Yes, it is.

03:26PM  11  Q.  Is it the first 6 contained in the file?

03:26PM  12  A.  It is.

03:26PM  13  Q.  Okay.  And if you look over there on the giant 8A-6, do

03:26PM  14  you see a summary report reflected at the top of that

03:26PM  15  checklist?

03:26PM  16  A.  Yes, the 11/28/2012 date submitted.

03:26PM  17  Q.  Okay.  And is that the report that we're looking at on

03:26PM  18  our screens here, Government Exhibit 8M?

03:26PM  19  A.  Yes, it is.

03:26PM  20  Q.  Okay.  So I want to talk to you about the case file as it

03:27PM  21  relates to investigation into Ron Serio, okay?

03:27PM  22  A.  Certainly.

03:27PM  23  Q.  So I'm going to focus most of my questions here around

03:27PM  24  the investigation into Ron Serio.

03:27PM  25        Does the summary report in 8M mention Ron Serio or the

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

36

03:27PM    1    Serio drug-trafficking organization at all?

03:27PM    2    A.  It does not.

03:27PM    3    Q.  You mentioned that you've reviewed all the different

03:27PM    4    iterations of the file for C2-13-0026.  Is there any

03:27PM    5    explanation at all in any of the material that you've

03:27PM    6    reviewed indicating what the defendant's basis was for

03:27PM    7    linking Wayne Anderson's arrest to the Ron Serio

03:27PM    8    investigation?

03:27PM    9    A.  None whatsoever that I can identify.

03:27PM    10   Q.  Now outside the confines of the file, did you hear Ron

03:27PM    11   Serio testify in this courtroom that he was expecting a

03:27PM    12   shipment of marijuana to be delivered to Wayne Anderson on

03:27PM    13   his behalf?

03:27PM    14   A.  Yes, he testified to that.

03:27PM    15   Q.  I'm going to hand you a marker, sir.

03:27PM    16         **MR. COOPER:**  May I approach, Judge?

03:27PM    17         **THE COURT:**  Sure.

03:27PM    18         **BY MR. COOPER:**

03:27PM    19   Q.  So no mention of Serio in this summary report from

03:28PM    20   November 28, 2012?

03:28PM    21   A.  No, sir.

03:28PM    22   Q.  Can you cross it off for us?

03:28PM    23       Okay.  Let's move on to the next one.

03:28PM    24       Is it your understanding that Wayne Anderson was caught

03:28PM    25   by the New York State Police receiving hundreds of pounds of

03:28PM    1   marijuana?

03:28PM    2   A.  Yes, on November 25th, 2012, it was 269 pounds of

03:28PM    3   marijuana I believe.

03:28PM    4   Q.  Okay.  And was there significant amount of currency

03:28PM    5   seized from him as well?

03:28PM    6   A.  Yeah, I believe it was $27,000.

03:28PM    7   Q.  Okay.  Have you reviewed Wayne Anderson's criminal

03:28PM    8   history?

03:28PM    9   A.  Yes, I have.

03:28PM   10   Q.  Okay.  Was he ever convicted of any criminal offense

03:28PM   11   related to the 2012 marijuana arrest?

03:28PM   12   A.  He was not.

03:28PM   13   Q.  I want to direct --

03:28PM   14       MR. COOPER:  Ms. Champoux, if you can pull up 8A and

03:28PM   15   go to page 72.

03:28PM   16       BY MR. COOPER:

03:28PM   17   Q.  Who signed this document?

03:28PM   18   A.  Joseph, the defendant.  Joseph Bongiovanni.

03:28PM   19   Q.  Okay.  And what did the defendant, Joseph Bongiovanni,

03:28PM   20   report about the resolution of Wayne Anderson's marijuana

03:28PM   21   arrest in box 23?

03:28PM   22   A.  The defendant disposition report, box 23, on January 4th,

03:29PM   23   2015, Anderson pled in New York State Court and sentenced to

03:29PM   24   36-month probation.

03:29PM   25   Q.  Is the information that's written by the defendant in

03:29PM   1   box 23 of this defendant disposition report consistent with

03:29PM   2   Wayne Anderson's criminal history?

03:29PM   3   A.   No.   Wayne Anderson's criminal history does not show that

03:29PM   4   he was convicted nor -- he was not convicted, he can't be

03:29PM   5   sentenced.

03:29PM   6   Q.   Okay.   Did Wayne Anderson testify in this courtroom about

03:29PM   7   whether he ever cooperated in relation to his arrest?

03:29PM   8   A.   Yes, he did.

03:29PM   9   Q.   What did -- did he testify that he did not cooperate in

03:29PM  10   relation to that arrest?

03:29PM  11   A.   Yes, he testified not cooperate.

03:29PM  12   Q.   Did Wayne Anderson testify that he was never convicted of

03:29PM  13   anything related to that arrest?

03:29PM  14   A.   Yes, he did.

03:29PM  15   Q.   Okay.

03:29PM  16        MR. COOPER:   Ms. Champoux, can you move to page 19

03:29PM  17   now of Government Exhibit 8A?

03:29PM  18        BY MR. COOPER:

03:29PM  19   Q.   Is this a DEA-6 summary report for acquisition of

03:29PM  20   U.S. currency seized from Wayne Anderson?

03:29PM  21   A.   Yes, it is.

03:29PM  22   Q.   What's the date that this report was prepared?

03:30PM  23   A.   January 17th, 2013.

03:30PM  24   Q.   Was the defendant the author of it?

03:30PM  25   A.   No.   Clinton Calloway, TFO.

03:30PM   1   Q.  Okay.  So, this document from January 17th, 2013, is it

03:30PM   2   documented up there on 8A-6, the case status checklist?

03:30PM   3   A.  Let's see.

03:30PM   4   Q.  From 1/17/2013?

03:30PM   5   A.  1/17/2013.  I see it, yes.

03:30PM   6   Q.  Is it up there?

03:30PM   7   A.  Yeah, the cross file through me off.

03:30PM   8   Q.  Okay.  Tell you what, we're going to work from top to

03:30PM   9   bottom straight down that document, okay?  Can you cross that

03:30PM  10   one off?

03:30PM  11   A.  Yes.

03:30PM  12   Q.  The one you just crossed off, that didn't mention Ron

03:30PM  13   Serio at all, right?

03:30PM  14   A.  It did not.

03:30PM  15   Q.  We're going to move on now.

03:30PM  16        **MR. COOPER:**  Ms. Champoux, if you can pull up

03:30PM  17   Government Exhibit 8K?

03:30PM  18        **BY MR. COOPER:**

03:30PM  19   Q.  Do you recognize 8K, Special Agent Burns?

03:30PM  20   A.  Yes, I do.

03:30PM  21   Q.  Is this a DEA-6 report of investigation?

03:30PM  22   A.  Yes, it is.

03:30PM  23   Q.  What's the date it was written?

03:30PM  24   A.  Date prepared is February 7, 2013.

03:31PM  25   Q.  Were you present for the testimony of New York State

03:31PM      1    Police Investigator O'Rourke?

03:31PM      2    A.   Yes, I was.

03:31PM      3    Q.   Did he testify that he was trying to set up a proffer

03:31PM      4    interview with Wayne Anderson?

03:31PM      5         MR. MacKAY:  Objection.  Hearsay.

03:31PM      6         THE COURT:  Yeah, sustained.  And look it, I'll let

03:31PM      7    you ask foundational questions with respect to testimony at

03:31PM      8    the trial, but you're not going to have this witness repeat

03:31PM      9    what other witnesses testified to.

03:31PM     10         MR. COOPER:  Understood, Judge.

03:31PM     11         BY MR. COOPER:

03:31PM     12    Q.   Does this report, Government Exhibit 8K, does this make

03:31PM     13    reference to Investigator O'Rourke looking to set up a

03:31PM     14    proffer interview with Wayne Anderson?

03:31PM     15    A.   Yes, it does.

03:31PM     16    Q.   Did O'Rourke testify in this courtroom in the chair

03:31PM     17    you're sitting in right now?

03:31PM     18    A.   Yes, he did.

03:31PM     19    Q.   Does this DEA-6 make any mention at all of Ron Serio?

03:31PM     20    A.   Does not.

03:31PM     21    Q.   Okay.  Can you go cross it off?

03:31PM     22         MR. COOPER:  Ms. Champoux --

03:31PM     23         BY MR. COOPER:

03:31PM     24    Q.   I'm sorry, Special Agent Burns, can you see 8A-6 from

03:32PM     25    where you're sitting?

03:32PM 1    A.  Yes, I can.

03:32PM 2    Q.  The next entry down from February 22, 2013, does that

03:32PM 3    reference an X file or cross file from C2-12-0090?

03:32PM 4    A.  Yes, it does.

03:32PM 5    Q.  Are you familiar with that report?

03:32PM 6    A.  Yes, I am.

03:32PM 7    Q.  Did the defendant draft it?

03:32PM 8    A.  That one was drafted by Shane Nastoff.

03:32PM 9    Q.  Okay.  Did it have anything to do with the defendant's

03:32PM 10   investigative activity into Ron Serio?

03:32PM 11   A.  Not into Ron Serio, no.

03:32PM 12   Q.  Okay.  Was that Shane Nastoff's report about information

03:32PM 13   he got from his CS?

03:32PM 14   A.  That's correct.

03:32PM 15   Q.  Did Shane Nastoff, based upon your review of the file,

03:32PM 16   cause that information to be conveyed to the defendant?

03:32PM 17   A.  Yes.  The cross file was in both, that DEA-6 went into

03:32PM 18   both files.

03:32PM 19   Q.  Is there any DEA-6 or anything in the file at all

03:32PM 20   indicating that the defendant ever followed up on that

03:32PM 21   information to further his investigation in any way?

03:32PM 22   A.  There is not.

03:32PM 23   Q.  Would it be fair to say that the entry from February 22,

03:32PM 24   2013, documents Shane Nastoff's investigative work and not

03:33PM 25   anything that the defendant did?

03:33PM    1    A.  That's accurate.

03:33PM    2    Q.  Okay.  Can you cross it off for us?

03:33PM    3        All right.  I want to work through the next one down now.

03:33PM    4            MR. COOPER:  Ms. Champoux, can you please pull up

03:33PM    5    Government Exhibit 8I?

03:33PM    6            BY MR. COOPER:

03:33PM    7    Q.  Is this the initial debriefing of R.K.?

03:33PM    8    A.  Yes, it is.

03:33PM    9    Q.  Have you reviewed this document?

03:33PM   10    A.  Yes, I have.

03:33PM   11    Q.  Tell the jury who drafted it.

03:33PM   12    A.  Joseph Bongiovanni drafted it.

03:33PM   13    Q.  What was the date R.K. was interviewed?

03:33PM   14    A.  5 -- May 2nd, 2013.

03:33PM   15    Q.  Okay.  That's the date the report was prepared, right?

03:33PM   16    A.  Right.

03:33PM   17    Q.  What date was R.K. interviewed?

03:33PM   18    A.  4/30/2013.

03:33PM   19    Q.  Got it.  Who does the defendant list as other people

03:33PM   20    involved in the interview of R.K.?

03:33PM   21    A.  Special Agent Shane Nastoff, and the G.S. Supervisor John

03:33PM   22    Flickinger.

03:33PM   23    Q.  Does Government Exhibit 8I indicate that R.K. had access

03:33PM   24    to the leaders of the Ron Serio drug-trafficking

03:33PM   25    organization?

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

43

03:33PM    1    A.  Yes, it does.

03:33PM    2    Q.  Okay.  Does 8I indicate that R.K. had access to other

03:34PM    3    members or associates of the Serio organization?

03:34PM    4    A.  Yes, it does.

03:34PM    5    Q.  Is that report drafted on May 2nd, 2013, reflected on

03:34PM    6    Government Exhibit 8A-6?

03:34PM    7    A.  Yes, it is.

03:34PM    8    Q.  All right.  Can we cross that one off?

03:34PM    9        Special Agent Burns, after that May 2nd, 2013, report,

03:34PM    10   the initial debriefing of R.K., what's the next entry on

03:34PM    11   Government Exhibit 8A-6?

03:34PM    12   A.  The June 18th, 2013 DEA-6 surveillance at 82 Sycamore

03:34PM    13   Street.

03:34PM    14   Q.  Okay.  Other than the initial debriefing of R.K., is

03:34PM    15   there any other DEA-6 anywhere in the file indicating that

03:34PM    16   R.K. was ever debriefed again?

03:34PM    17   A.  There is not.

03:34PM    18   Q.  Okay.  I mean, you looked through the whole file

03:34PM    19   yourself, right?

03:34PM    20   A.  Yes, I have.

03:34PM    21   Q.  Is it just missing from the checklist?

03:34PM    22   A.  No, it's not.  There is not a DEA-6 in that file.

03:35PM    23   Q.  Nothing?

03:35PM    24   A.  Nothing.

03:35PM    25   Q.  Let's move on to the June 18th, 2013, surveillance at

03:35PM    1    82 Sycamore Street.  Ms. Champoux's got 8H up on the screen

03:35PM    2    for us.

03:35PM    3        Special Agent Burns, who drafted this report?

03:35PM    4    A.  The defendant, Joseph Bongiovanni.

03:35PM    5    Q.  Who did he list as other officers?

03:35PM    6    A.  Special Agent David Leary.

03:35PM    7    Q.  Okay.  And did you see Dave Leary come in this courtroom

03:35PM    8    and sit in the chair you're in and testify?

03:35PM    9    A.  Yes, I did.

03:35PM   10    Q.  Was he the person who was actually conducting the

03:35PM   11    surveillance based on what's written in Government

03:35PM   12    Exhibit 8H?

03:35PM   13    A.  Yes, he was.

03:35PM   14    Q.  Okay.  Does the DEA-6, 8H, does that indicate that the

03:35PM   15    defendant did the surveillance?

03:35PM   16    A.  No, it does not.

03:35PM   17    Q.  Were you present when Special Agent Leary testified that

03:35PM   18    the defendant told him to break off his surveillance and come

03:35PM   19    back to 82 Sycamore, or come back to the DEA from 82 Sycamore

03:35PM   20    Street?

03:35PM   21    A.  Yes, I was.

03:35PM   22            **MR. MacKAY:**  Objection.  Hearsay.

03:35PM   23            **THE COURT:**  Yeah, sustained.  The jury will strike

03:36PM   24    that one.

          25

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 03:36PM  | 1  | **BY MR. COOPER:**                                           |
| 03:36PM  | 2  | Q.  Okay.  Let's get a little more into the warehouse that's |
| 03:36PM  | 3  | referenced here.  Are you familiar with this warehouse at 82 |
| 03:36PM  | 4  | Sycamore Street?                                             |
| 03:36PM  | 5  | A.  Yes, I am.                                               |
| 03:36PM  | 6  | Q.  Okay.  Is that the -- that warehouse at 82 Sycamore      |
| 03:36PM  | 7  | Street, did the FBI ultimately seize pounds of MDMA from that|
| 03:36PM  | 8  | warehouse?                                                   |
| 03:36PM  | 9  | A.  The FBI did.                                             |
| 03:36PM  | 10 | Q.  Okay.  And was that from a consented search --           |
| 03:36PM  | 11 | A.  Yes.                                                     |
| 03:36PM  | 12 | Q.  -- granted by -- sorry.  Was that a consent search where |
| 03:36PM  | 13 | consent was granted by Ron Serio?                           |
| 03:36PM  | 14 | A.  Yes, it was.                                             |
| 03:36PM  | 15 | Q.  Okay.  All right.  We're going to stay on the topic of   |
| 03:36PM  | 16 | that warehouse for a second.                                |
| 03:36PM  | 17 | To set the tone for the next line of questions, were you    |
| 03:36PM  | 18 | present when Ron Serio testified that he and Rob Rine staged |
| 03:36PM  | 19 | a fake raid to rob T.S. of drugs?                           |
| 03:37PM  | 20 | A.  Yes.                                                     |
| 03:37PM  | 21 | Q.  Okay.  Now remind the jury, Ron Serio, did he explain    |
| 03:37PM  | 22 | where they got a fake search warrant from?                  |
| 03:37PM  | 23 | A.  Yes, he did.                                             |
| 03:37PM  | 24 | Q.  Where?                                                   |
| 03:37PM  | 25 | A.  From a detective.  Rob Rine got it from a detective from |

03:37PM    1    the Town of Tonawanda Police Department.

03:37PM    2    Q.  Okay.  Did the defendant have any partners at the DEA who

03:37PM    3    worked for the Town of Tonawanda Police Department?

03:37PM    4    A.  Yes, he did.

03:37PM    5    Q.  Who?

03:37PM    6    A.  Joseph Palmieri.

03:37PM    7    Q.  Was he a detective?

03:37PM    8    A.  He was.

03:37PM    9    Q.  Is Palmieri in fact the same partner that looked up

03:37PM    10   police reports related to the Wayne Anderson arrest the day

03:37PM    11   after he was arrested?

03:37PM    12   A.  Yes, he was.

03:37PM    13   Q.  Did --

03:37PM    14        **MR. COOPER:**  Can we go to Exhibit 8A, Ms. Champoux,

03:37PM    15   and go ahead to page 77, please?

03:37PM    16        **BY MR. COOPER:**

03:37PM    17   Q.  What are we looking at here, Special Agent Burns?

03:37PM    18   A.  This is a Buffalo Police Department booking data sheet

03:37PM    19   that was in the 8A file.

03:37PM    20   Q.  Is this related to Wayne Anderson, November 25, 2012,

03:37PM    21   arrest?

03:37PM    22   A.  Yeah, for the arrest from New York State Police with the

03:37PM    23   marijuana.

03:37PM    24        **MR. COOPER:**  Ms. Champoux, if you can zoom in on the

03:37PM    25   top-right corner of the document, those four lines?

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

03:37PM   1        **BY MR. COOPER:**

03:37PM   2    Q.  What was the date that this was printed, sir?

03:38PM   3    A.  November 26th, 2012.

03:38PM   4    Q.  Okay.  Is that the day after Anderson was arrested?

03:38PM   5    A.  That's correct.

03:38PM   6        **MR. COOPER:**  You can zoom out of that please,

03:38PM   7    Ms. Champoux.

03:38PM   8        **BY MR. COOPER:**

03:38PM   9    Q.  Who's listed as the person that printed this?

03:38PM   10   A.  Joseph Palmieri.

03:38PM   11   Q.  Is that same Town of Tonawanda detective we've been

03:38PM   12   talking about?

03:38PM   13   A.  That's correct.

03:38PM   14       **MR. COOPER:**  You can zoom out of that, or take that

03:38PM   15   down, please, Ms. Champoux.

03:38PM   16       And can we please pull up 8H again?

03:38PM   17       Can you zoom in on the details section, please?

03:38PM   18       **BY MR. COOPER:**

03:38PM   19   Q.  Special Agent Burns, do you have professional experience

03:38PM   20   conducting surveillance in criminal investigations?

03:38PM   21   A.  Yes, quite a bit.

03:38PM   22   Q.  Did you do it when you used to work narcotics cases?

03:39PM   23   A.  All the time.

03:39PM   24   Q.  Is surveillance generally a solo activity, or is that

03:39PM   25   something that agents generally do in groups?

03:39PM    1    A.   It depends.  It might be solo if you're just going by

03:39PM    2    grab a tag or see if there's any cars there.  But to do a

03:39PM    3    full-blown surveillance, you need multiple vehicles, maybe

03:39PM    4    air support, that's to do a real surveillance, a full

03:39PM    5    surveillance you do need those assets.

03:39PM    6    Q.   Okay.  Would you -- would you expect in order to do a

03:39PM    7    lengthy, full surveillance as you've described it, that you'd

03:39PM    8    want to have a bunch of agents present for that?

03:39PM    9    A.   Absolutely.

03:39PM   10    Q.   Can that help follow vehicles if they show up and leave?

03:39PM   11    A.   Certainly.

03:39PM   12    Q.   Based on your surveillance, based on your experience, is

03:39PM   13    surveillance more effective on a narcotics target when it

03:39PM   14    involves a group of agents or officers?

03:39PM   15    A.   Certainly.  Absolutely.

03:39PM   16    Q.   Is there always a risk associated with doing any

03:39PM   17    surveillance of being made or identified?

03:39PM   18    A.   Yes.  I mean, the more vehicles you have out there, the

03:39PM   19    less likely, but it's always a risk.

03:39PM   20    Q.   Is that something you're trained to prevent from

03:40PM   21    happening?

03:40PM   22    A.   Yes, different techniques, set up cars in different

03:40PM   23    parallel streets or air support, those are ways to kind of

03:40PM   24    mitigate the chances of being caught or --

03:40PM   25    Q.   Does using multiple agents and officers to conduct

03:40PM    1    surveillance assist in avoiding that detection?

03:40PM    2        **MR. MacKAY:**  Objection.  Cumulative at this point

03:40PM    3    about surveillance.

03:40PM    4        **THE COURT:**  Yeah, sustained.

03:40PM    5        **BY MR. COOPER:**

03:40PM    6    Q.  Based upon your training and experience, does the risk of

03:40PM    7    getting burned or made on surveillance prevent law

03:40PM    8    enforcement from using surveillance as a technique

03:40PM    9    altogether?

03:40PM   10        **MR. MacKAY:**  Objection, same, Judge.

03:40PM   11        **MR. COOPER:**  Judge --

03:40PM   12        **THE COURT:**  Sustained.  This is -- this is -- we've

03:40PM   13    been through all this.

03:40PM   14        **MR. COOPER:**  No, I don't -- Judge, I don't want to.

03:40PM   15        **THE COURT:**  Come on up, come on up, come on up.

03:40PM   16        (Sidebar discussion held on the record.)

03:40PM   17        **MR. COOPER:**  Judge, I just want to ask for, I guess,

03:40PM   18    some latitude.  I know that it's late in the afternoon, and I

03:40PM   19    know that we lost a half a day yesterday.

03:40PM   20        **THE COURT:**  No, no, no.  I'm not -- I am not

03:41PM   21    sustaining these objections because I want to get through

03:41PM   22    this.  As a matter of fact, you're wasting time up here at the

03:41PM   23    bench.  I just think we've been through this a number of

03:41PM   24    times.

03:41PM   25        **MR. COOPER:**  I don't know that I've asked -- I think

03:41PM    1    that the questions about whether the risk of getting burned

03:41PM    2    prevents you from using surveillance as a technique, I don't

03:41PM    3    think I've asked that question.  It's in my script from

03:41PM    4    Brian's direct the last trial, I don't think I've asked that

03:41PM    5    of another witness.  And so I understand if people want to

03:41PM    6    keep it moving, so do I, but --

03:41PM    7             THE COURT:  Who testified to this?

03:41PM    8             MR. MacKAY:  I believe Leary himself, regarding

03:41PM    9    surveillance experience.

03:41PM   10             MR. SINGER:  Nastoff.

03:41PM   11             MR. COOPER:  We spend more time with the objection

03:41PM   12    than --

03:41PM   13             THE COURT:  I'll give you a little latitude, I'll let

03:41PM   14    you ask this question, but nothing else.

03:41PM   15             MR. COOPER:  I'm trying to move it quickly.

03:41PM   16             THE COURT:  I understand it.  And again, that's

03:41PM   17    not -- my goal here is not to move it quickly.  My goal here

03:41PM   18    is to give the defense and to give you enough latitude to

03:42PM   19    prove the case and give the defendant a fair trial.

03:42PM   20             (Indecipherable.)

03:42PM   21             COURT REPORTER:  I can't hear you.

03:42PM   22             THE COURT:  If we go past Tuesday or Wednesday or

03:42PM   23    Thursday, or 2027, my rulings are not going to be based on

03:42PM   24    timing, they're going to based on what I think the right

03:42PM   25    ruling is.

03:42PM    1          And so when I think we are beating a horse into the

03:42PM    2    ground that's been shot several times already, I'm going to

03:42PM    3    sustain the objections.

03:42PM    4          I understand what you're saying.  I think maybe

03:42PM    5    you're right on this getting burned thing, so I will give you

03:42PM    6    some latitude on that.  But on stuff that we've had several

03:42PM    7    DEA agents testify about, you're not going to go through

03:42PM    8    again.

03:42PM    9          **MR. COOPER:**  Understood, Judge.  Thank you.

03:42PM    10         **THE COURT:**  Okay.

03:42PM    11         (Sidebar discussion held on the record.)

03:42PM    12         **THE COURT:**  So the objection to the last question is

03:42PM    13    overruled.

03:42PM    14         **MR. COOPER:**  Thank you, Judge.

03:42PM    15         **BY MR. COOPER:**

03:42PM    16    Q.  Does the chance of getting burned stop you from using

03:42PM    17    surveillance as a technique altogether?

03:42PM    18    A.  No, in my experience, it does happen from time to time,

03:43PM    19    but usually the narcotics traffickers continue to distribute

03:43PM    20    narcotics, maybe they're a little more aware.

03:43PM    21    Q.  Based on your experience doing surveillance, can seeing

03:43PM    22    someone show up at a location that you're doing surveillance

03:43PM    23    on and then leave with someone else, go away, can that be a

03:43PM    24    situation where you can rapidly advance your investigation?

03:43PM    25    A.  Absolutely.

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

52

03:43PM    1    Q.  How?

03:43PM    2    A.  Well, I mean, seeing somebody leave from a target's

03:43PM    3    residence or business, it's suspected they possibly have some

03:43PM    4    sort of narcotics on them.  You can -- we use the term, like,

03:43PM    5    "pick them off" on a traffic stop quite a ways from the

03:43PM    6    location, and then if they have drugs on them, then now you

03:43PM    7    have some leverage over 'em.  And if they don't, then they

03:43PM    8    will just believe it was just a traffic stop and they'll go

03:43PM    9    on their way, and you haven't really burned up your case.

03:43PM   10    Q.  You mentioned sitting on a drug dealer's residence.  Can

03:43PM   11    you use a surveillance technique to wait for customers to

03:44PM   12    arrive to a drug dealer's residence?

03:44PM   13    A.  Yes.

03:44PM   14    Q.  Is that something that's done?

03:44PM   15    A.  Yeah, sitting on a place.

03:44PM   16    Q.  If you catch a customer leaving with drugs, can you flip

03:44PM   17    'em?

03:44PM   18    A.  Absolutely.

03:44PM   19    Q.  What's it mean to flip 'em?

03:44PM   20    A.  It just means if you catch them with narcotics, you now

03:44PM   21    have leverage over them, and you can work up the -- work up

03:44PM   22    the ladder so to speak.

03:44PM   23    Q.  Is that how narcotics investigations work?

03:44PM   24    A.  Yeah.  That's kind of a hallmark of narcotics.

03:44PM   25    Q.  If you're -- have you been at the location, that area

03:44PM  1   around 82 Sycamore Street, you're familiar with that

03:44PM  2   location?

03:44PM  3   A.  Very familiar.

03:44PM  4   Q.  If you're standing outside of 82 Sycamore Street, can you

03:44PM  5   see the DEA office building at the Electric Tower?

03:44PM  6   A.  Yeah, it's a couple blocks from there.

03:44PM  7   Q.  Okay.

03:44PM  8        MR. COOPER:  You can take this down please,

03:44PM  9   Ms. Champoux?

03:44PM  10       BY MR. COOPER:

03:44PM  11  Q.  Other than this DEA-6, where Dave Leary did surveillance

03:44PM  12  on the Ron Serio case, are there any other DEA-6s anywhere in

03:44PM  13  the file about the defendant doing surveillance in the case?

03:45PM  14  A.  There is no other DEA-6 about any surveillance.

03:45PM  15  Q.  None at all?

03:45PM  16  A.  None at all.

03:45PM  17  Q.  Okay.  Can you go cross that one off?

03:45PM  18      So we crossed off the one DEA-6 related to surveillance

03:45PM  19  in the file.  We have six entries left; is that right?

03:45PM  20  A.  That's correct, yes.

03:45PM  21  Q.  The first five entries that are left from the

03:45PM  22  September 11th, 2013, till November 4th, 2014, are those all

03:45PM  23  called case status?

03:45PM  24  A.  Yes, they are.

03:45PM  25  Q.  Okay.  So if I used the term "substantive DEA-6" as a 6

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24
54

03:45PM    1    documenting something like the surveillance at 82 Sycamore

03:45PM    2    Street, will you understand that to be different from a DEA-6

03:45PM    3    report that's a quarterly update on the case called a case

03:45PM    4    status?

03:45PM    5    A.   Yes.

03:45PM    6    Q.   So just so we have our terminology clear.  After the

03:45PM    7    DEA-6 of the work Dave Leary did in the case, surveilling

03:46PM    8    82 Sycamore Street, is there a single substantive DEA-6 for

03:46PM    9    the next two years?

03:46PM   10    A.   There is not.

03:46PM   11    Q.   Is there another debriefing of R.K. that we're missing

03:46PM   12    there?

03:46PM   13    A.   There is not.

03:46PM   14    Q.   How about a DEA-6 that says, hey, I can't find R.K.

03:46PM   15    anywhere?  Is that anywhere in the --

03:46PM   16    A.   There is no DEA-6 to that effect.

03:46PM   17    Q.   Any DEA-6s about trying to locate grow operations?

03:46PM   18    A.   No DEA-6s about investigative steps taken towards that.

03:46PM   19    Q.   Okay.  Any DEA-6s that are documenting financial

03:46PM   20    investigations?

03:46PM   21         MR. MacKAY:  Objection.  Asked and answered, based on

03:46PM   22    the prior -- the witness's prior answer.

03:46PM   23         THE COURT:  No, I'll allow this.

03:46PM   24         THE WITNESS:  Sorry.

          25

03:46PM      1              **BY MR. COOPER:**

03:46PM      2    Q.  Any DEA-6s about financial investigation being conducted

03:46PM      3    or the results of it?

03:46PM      4    A.  There's no DEA-6 that relates to that.

03:46PM      5              **MR. COOPER:**  Ms. Champoux, can we pull up what's in

03:46PM      6    evidence as Government Exhibit 22I?

03:46PM      7              **BY MR. COOPER:**

03:47PM      8    Q.  You see in the middle of this document the defendant

03:47PM      9    sends an email on May 23rd, 2013, saying thank you, Scott.

03:47PM     10    We're making strides on the street.  We will report soon.

03:47PM     11         Do you see that?

03:47PM     12    A.  I'm familiar with that.

03:47PM     13    Q.  Okay.  Are there any documents, any DEA-6s documenting

03:47PM     14    buys that occurred in this case?

03:47PM     15    A.  No.

03:47PM     16    Q.  To be clear, is there one document indicating that there

03:47PM     17    was an attempt made to get funding for a buy?

03:47PM     18    A.  Yeah, there are documents to that effect.

03:47PM     19    Q.  Okay.  Any indication that that was followed up on in any

03:47PM     20    way?

03:47PM     21    A.  Documents -- there's no indication that buys were

03:47PM     22    attempted.

03:47PM     23    Q.  Okay.  Any reports documenting attempted controlled phone

03:47PM     24    calls in any way?

03:47PM     25    A.  No DEA-6s to that effect.

03:47PM   1    Q.  Okay.

03:47PM   2         MR. COOPER:  You can take that down please,

03:47PM   3    Ms. Champoux.  And if we can pull up Government Exhibit 8G as

03:47PM   4    in George.

03:47PM   5         BY MR. COOPER:

03:47PM   6    Q.  All right.  Is this the September 11th, 2013, case status

03:48PM   7    report, sir?

03:48PM   8    A.  Yes, it is.

03:48PM   9    Q.  Okay.  Let's work through this one a little bit.

03:48PM   10        MR. COOPER:  Can you zoom in on paragraph 2,

03:48PM   11   Ms. Champoux?

03:48PM   12        BY MR. COOPER:

03:48PM   13   Q.  Do you see a reference in this paragraph to several

03:48PM   14   surveillances?

03:48PM   15   A.  Yes, I do.

03:48PM   16   Q.  Are there any DEA-6s in the file to support the fact that

03:48PM   17   several surveillances were done?

03:48PM   18   A.  The only DEA-6 related to surveillance is the one

03:48PM   19   involving Special Agent Leary.

03:48PM   20   Q.  Okay.  Did you see some pictures in the electronic case

03:48PM   21   file?

03:48PM   22   A.  I saw three pictures.

03:48PM   23   Q.  Three pictures?

03:48PM   24   A.  Yes, three.

03:48PM   25   Q.  Three total?

03:48PM  1    A.  That's, yeah, as I recall, just the three.

03:48PM  2    Q.  Okay.  Earlier you described --

03:48PM  3    A.  I mean, pictures, there's booking pictures, things like

03:48PM  4    that.

03:48PM  5    Q.  I'm talking about pictures, like photographs that look

03:48PM  6    like a --

03:48PM  7    A.  Possible surveillance?

03:48PM  8    Q.  Sure, correct.

03:48PM  9    A.  Yes.

03:48PM  10   Q.  Okay.  And you described earlier in an answer, the

03:48PM  11   difference between kind of a quick solo activity to grab

03:48PM  12   tags, I think you said, or a full-blown surveillance; is that

03:48PM  13   right?

03:49PM  14   A.  Yes, sir.

03:49PM  15   Q.  The three -- three pictures that you saw in the

03:49PM  16   electronic file, are those consistent in your experience with

03:49PM  17   a full-blown surveillance?

03:49PM  18           **MR. MacKAY:**  Objection, improper opinion.

03:49PM  19           **THE COURT:**  Overruled.

03:49PM  20           **BY MR. COOPER:**

03:49PM  21   Q.  How many surveillances have you done in your career?

03:49PM  22   A.  Hundreds.  Hundreds.

03:49PM  23   Q.  Okay.  Do pictures get taken on surveillance?

03:49PM  24   A.  Yeah, absolutely.

03:49PM  25   Q.  Have you gone to grab tags off cars before in your

03:49PM   1   career?

03:49PM   2   A.  Yeah, and we take pictures of the license plates.

03:49PM   3   Q.  Okay.  And so with that foundation, is taking one single

03:49PM   4   picture of one single vehicle consistent in your experience

03:49PM   5   with a full surveillance at a location?

03:49PM   6   A.  Not a full surveillance, no.

03:49PM   7   Q.  Okay.  And are there any 6s documenting several, meaning

03:49PM   8   multiple, surveillances?

03:49PM   9   A.  No, there's not.

03:49PM  10   Q.  Okay.  You see the second sentence here that says agents

03:49PM  11   have utilized air surveillance with the ECSO chopper?

03:49PM  12   A.  Yes.

03:49PM  13   Q.  Did you -- do you understand that reference to ECSO

03:50PM  14   chopper to be a reference to the Erie County Sheriff's

03:50PM  15   Office?

03:50PM  16   A.  Yes.

03:50PM  17   Q.  Okay.

03:50PM  18   A.  I do.

03:50PM  19   Q.  And actually it says it right there, Erie County

03:50PM  20   Sheriff's Office chopper, right?

03:50PM  21   A.  Yep.

03:50PM  22   Q.  Okay.  Did you see Captain Kevin Caffery come in here and

03:50PM  23   testify?

03:50PM  24   A.  Yes, I did.

03:50PM  25   Q.  Okay.  Is it your understanding that he works for the --

03:50PM  1  worked for the Erie County Sheriff's Office?

03:50PM  2  A.  Yeah, he was the lead captain.

03:50PM  3  Q.  Are you familiar with the exhibits that have been

03:50PM  4  received into evidence related to the pilot's log from the

03:50PM  5  Erie County Sheriff's Office Helicopter?

03:50PM  6  A.  Yes, I am.

03:50PM  7  Q.  Based on your review of that record which is in evidence,

03:50PM  8  does it indicate that the helicopter was grounded for

03:50PM  9  maintenance on September 11th?

03:50PM  10  A.  Yes, it does.

03:50PM  11  Q.  Okay.  And does it show all the flights before this

03:50PM  12  September 11th DEA-6?

03:50PM  13  A.  Yes.

03:50PM  14  Q.  That are contained in the log?

03:50PM  15  A.  Yes, it does.

03:50PM  16  Q.  Any reference to the Ron Serio drug-trafficking

03:50PM  17  organization?

03:50PM  18  A.  There's not a reference to that.

03:51PM  19  Q.  Any reference to Joseph Bongiovanni contained anywhere in

03:51PM  20  the log going up in the helicopter?

03:51PM  21  A.  No, absolutely not.

03:51PM  22  Q.  Okay.  Does this report also mention waiting for GPS,

03:51PM  23  waiting for -- let's see, where is it -- waiting for approval

03:51PM  24  from the United States Attorney's Office to use GPS trackers?

03:51PM  25  Do you see that?

03:51PM   1   A.  Yes, I do.

03:51PM   2   Q.  Did you hear AUSA Lynch testify about that?

03:51PM   3   A.  Yes, I did.

03:51PM   4   Q.  And Special Agent Leary, he came in the courtroom and

03:51PM   5   testified too, right?

03:51PM   6   A.  He did.

03:51PM   7   Q.  Okay.  Would it be fair to say that there are some things

03:51PM   8   mentioned in this case status report, some investigative

03:51PM   9   steps that the defendant claims in this report to have taken

03:51PM  10   that aren't supported by any of the prior DEA-6s that are in

03:51PM  11   the file?

03:51PM  12   A.  That's accurate.

03:52PM  13   Q.  Okay.  You can get up and cross that one off for me,

03:52PM  14   please.

03:52PM  15           **MR. COOPER:**  And, Ms. Champoux, if we can please pull

03:52PM  16   up Government Exhibit -- let's see, actually, hold off for

03:52PM  17   just one second.  Yeah.  It's 8F, ma'am.

03:52PM  18           **BY MR. COOPER:**

03:52PM  19   Q.  All right.  After the September 11th, 2013, case status

03:52PM  20   report, what's the next case status report in the file?

03:52PM  21   A.  12/31/2013 case status.

03:52PM  22   Q.  And in the three-and-a-half-month period between those

03:52PM  23   two case status reports, is there any investigative activity

03:52PM  24   documented in the file at all?

03:52PM  25   A.  There's no DEA-6s to that effect.

Case 1:19-cr-00227-LJV-MJR    Document 1336    Filed 11/03/24    Page 61 of 128
USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

61

03:52PM    1    Q.  All right.  Can you see okay?  Or do you need to zoom in?

03:52PM    2    A.  No, I can see.

03:52PM    3    Q.  Okay, great.  Is Remus Nowak mentioned in this

03:52PM    4    December 31, 2013, case status report?

03:52PM    5    A.  Yes, he is.

03:52PM    6    Q.  Okay.  And is there any document anywhere in the file

03:53PM    7    that you reviewed that you were able to find explaining the

03:53PM    8    predication, the basis, for saying that Remus Nowak is

03:53PM    9    believed to be a member or involved with the Ron Serio

03:53PM   10    drug-trafficking organization?

03:53PM   11    A.  None whatsoever.

03:53PM   12    Q.  Okay.  Up until this point, is it fair to say that the

03:53PM   13    main DTO being investigated is called the Serio DTO or Ron

03:53PM   14    Serio DTO; is that fair?

03:53PM   15    A.  That's fair.

03:53PM   16    Q.  Okay.  Does it mention that there's an in-depth financial

03:53PM   17    analysis of the records of Duncan Motor Car Sales being

03:53PM   18    conducted?

03:53PM   19    A.  Yes, it does.

03:53PM   20    Q.  Did you look at Exhibit 22, Scott Deming's log of his

03:54PM   21    work on the case?

03:54PM   22    A.  Yes, I did.

03:54PM   23    Q.  Any mention of Duncan Motor Car Sales in there?

03:54PM   24    A.  There is not.

03:54PM   25    Q.  Any mention of Remus Nowak in there?

03:54PM    1    A.  There is not.

03:54PM    2    Q.  All right.  Can we go over to 8A-6 and cross this one off

03:54PM    3    from December 31st, 2013?

03:54PM    4           MR. COOPER:  And let's pull up Government Exhibit 8E

03:54PM    5    as in echo, please.

03:54PM    6           BY MR. COOPER:

03:54PM    7    Q.  Is this the very next report in the file after 12/31/13?

03:54PM    8    A.  It's the next DEA-6.

03:54PM    9    Q.  Okay.  What's the date of this report?

03:54PM    10   A.  April 7th, 2014.

03:54PM    11   Q.  Is this a substantive DEA-6 or another case status?

03:54PM    12   A.  Just a case status.

03:54PM    13   Q.  Okay.

03:54PM    14          MR. COOPER:  Ms. Champoux, can you zoom in on just

03:54PM    15   paragraph 2 here?

03:54PM    16          BY MR. COOPER:

03:54PM    17   Q.  Any reference to Ron Serio there at all?

03:54PM    18   A.  No, there's not.

03:55PM    19   Q.  Is this paragraph entirely focused on Remus Nowak?

03:55PM    20   A.  It is.

03:55PM    21          MR. COOPER:  And if you zoom out of that, please,

03:55PM    22   and zoom in on paragraph 3, briefly?

03:55PM    23          BY MR. COOPER:

03:55PM    24   Q.  Is that basically repeating the same information from the

03:55PM    25   report we just looked at a second ago in 8F?

03:55PM    1    A.  It's very, very similar.

03:55PM    2    Q.  Okay.

03:55PM    3            MR. COOPER:  You can zoom out of that, please.

03:55PM    4            BY MR. COOPER:

03:55PM    5    Q.  Does the case status report indicate that Nowak is a

03:55PM    6    major money-laundering source for the Serio DTO?

03:55PM    7    A.  Yes, it does.

03:55PM    8    Q.  Are there any reports or any information contained in the

03:55PM    9    file that explains the source of the statement that Remus

03:55PM   10    Nowak is a major money-laundering source for the Serio DTO?

03:55PM   11    A.  There are none.

03:55PM   12    Q.  By this time, April 7th of 2014, had the defendant

03:55PM   13    already closed out his confidential source in the case?

03:55PM   14    A.  Yes, he had.

03:55PM   15    Q.  Had that happened way back in July of 2013?

03:55PM   16    A.  July 30th.

03:55PM   17    Q.  Okay.

03:55PM   18    A.  2013.

03:55PM   19    Q.  Are we still -- is the defendant still referring to the

03:56PM   20    DTO that's being investigated as the Serio DTO in this

03:56PM   21    report?

03:56PM   22    A.  In this report, yes.

03:56PM   23    Q.  Okay.  See that?

03:56PM   24    A.  Yep.  There it is.

03:56PM   25    Q.  Okay.  You can go cross off the April 7th report, please.

03:56PM    1      All right.  We're working our way through the file here.

03:56PM    2    Let's move to Government Exhibit 8D as in David.  Is this

03:56PM    3    another case status report?

03:56PM    4    A.  Yes, it is.

03:56PM    5    Q.  So no DEA-6s in between April and July of 2014?

03:56PM    6    A.  None.

03:56PM    7    Q.  No surveillances?

03:56PM    8    A.  No surveillances.

03:56PM    9    Q.  No controlled calls?

03:56PM   10    A.  No DEA-6s to that effect.

03:56PM   11    Q.  Okay.

03:56PM   12        MR. COOPER:  Can we zoom in on paragraph 2, please,

03:57PM   13    Ms. Champoux?

03:57PM   14        BY MR. COOPER:

03:57PM   15    Q.  Can you read that sentence to the jury?

03:57PM   16    A.  Agents continue to work with Amherst PD in an effort to

03:57PM   17    infiltrate the Remus Nowak DTO.

03:57PM   18    Q.  Has the defendant now renamed the drug-trafficking

03:57PM   19    organization into the Remus Nowak DTO?

03:57PM   20    A.  Yes.  In this paragraph, he has.

03:57PM   21    Q.  Okay.  That's different than the Ron Serio DTO, right?

03:57PM   22    A.  That's correct.

03:57PM   23    Q.  Okay.  And an earlier report that we just looked at, it

03:57PM   24    said Remus Nowak was working with Ron Serio, right?

03:57PM   25    A.  That's correct.

03:57PM    1    Q.  Laundering his money for him, right?

03:57PM    2    A.  That's what it said.

03:57PM    3    Q.  Okay.  And was there any basis in the file that you

03:57PM    4    reviewed for how the Ron Serio DTO became the Remus Nowak

03:57PM    5    DTO?

03:57PM    6    A.  None that I found.

03:57PM    7    Q.  Okay.

03:57PM    8         MR. COOPER:  You can zoom out of that, please,

03:57PM    9    Ms. Champoux.

03:57PM   10         BY MR. COOPER:

03:57PM   11    Q.  Does it have the same case number?

03:57PM   12    A.  Yeah, the C2-13-0026.

03:57PM   13    Q.  Okay.  I want to set the stage for the next question that

03:57PM   14    I'm going to ask you.

03:57PM   15         Did you hear Ron Serio testify about a time that he was

03:57PM   16    unloading marijuana at Mark Falzone's house and Mike

03:58PM   17    Masecchia was there, and Mike Masecchia left; do you remember

03:58PM   18    that?

03:58PM   19    A.  Yes, I do.

03:58PM   20    Q.  Okay.  Does Remus Nowak have a residence near Mark

03:58PM   21    Falzone?

03:58PM   22    A.  Yes, in close proximity.

03:58PM   23    Q.  Okay.

03:58PM   24    A.  Their backyards essentially abut, based on the review of

03:58PM   25    the area, or the maps I looked at.

03:58PM   1   Q.  In paragraph 3 of Government Exhibit 8D is this, again,

03:58PM   2   kind of a regurgitation of the data from the prior case

03:58PM   3   status report?

03:58PM   4   A.  Yes, it's very similar.

03:58PM   5   Q.  Okay.  All right.  Let's cross off the July 7th report,

03:58PM   6   and we'll work our way through the last case status.

03:58PM   7        MR. COOPER:  Ms. Champoux, if you can pull up

03:58PM   8   Government Exhibit 8C, please?

03:58PM   9        BY MR. COOPER:

03:58PM  10   Q.  Same case file, right?

03:59PM  11   A.  Yes, it is.

03:59PM  12   Q.  What's that date this report is prepared?

03:59PM  13   A.  November 4th, 2014.

03:59PM  14   Q.  How's the investigation going at this time?

03:59PM  15   A.  It's pending closure.

03:59PM  16   Q.  Okay.  And on November 4th of 2014, paragraph 3, does the

03:59PM  17   defendant write this investigation is pending closure?

03:59PM  18   A.  Yes, he does.

03:59PM  19   Q.  Okay.  And is Ron Serio indexed in this report?

03:59PM  20   A.  Serio, yes, he's indexed in that report.

03:59PM  21   Q.  Okay.  Is Mike Masecchia indexed in the report?

03:59PM  22   A.  He is not.

03:59PM  23   Q.  How about Lou Selva?

03:59PM  24   A.  He is not.

03:59PM  25   Q.  How about Hot Dog?

03:59PM   1   A.  He is not.

03:59PM   2   Q.  Okay.  To be clear, does this 8C, does this document any

03:59PM   3   investigative activity?

03:59PM   4   A.  It does not.

03:59PM   5   Q.  Okay.  Can you cross it off of the list there for us?

03:59PM   6          MR. COOPER:  And then finally, Ms. Champoux, if we

04:00PM   7   can pull up 8B as in Bravo.

04:00PM   8          BY MR. COOPER:

04:00PM   9   Q.  Special Agent Burns, what's the date that this report's

04:00PM   10   prepared?

04:00PM   11   A.  January 28th, 2015.

04:00PM   12   Q.  About two months after that November case status that we

04:00PM   13   just looked at?

04:00PM   14   A.  Yes, approximately.

04:00PM   15   Q.  Okay.  Is this formally closing the case?

04:00PM   16   A.  Yes, it is now closed.

04:00PM   17   Q.  Does Ron Serio get indexed in the case closure?

04:00PM   18   A.  The only -- it's Wayne Anderson and Damien Abbate.

04:00PM   19   Q.  So, no Ron Serio?

04:00PM   20   A.  No Ron Serio.

04:00PM   21   Q.  No Mike Masecchia?

04:00PM   22   A.  No Mike Masecchia.

04:00PM   23   Q.  No Lou Selva?

04:00PM   24   A.  No Lou Selva.

04:00PM   25   Q.  Okay.  Special Agent Burns, other than the initial

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

68

| | | |
|---|---|---|
| 04:00PM | 1 | debriefing of R.K., and Dave Leary's surveillance at 82 |
| 04:00PM | 2 | Sycamore Street, are there any 6s documenting a substantive |
| 04:00PM | 3 | investigative activity that happened in this case file? |
| 04:00PM | 4 | A.  None at all. |
| 04:00PM | 5 | Q.  There were multiple other agents, based on your review of |
| 04:01PM | 6 | the report, the initial debriefing of R.K., were there |
| 04:01PM | 7 | multiple other agents present for that activity? |
| 04:01PM | 8 | A.  For the debrief? |
| 04:01PM | 9 | Q.  For the initial debriefing of R.K.. |
| 04:01PM | 10 | A.  Yes, Special Agent DA -- Shane Nastoff and John |
| 04:01PM | 11 | Flickinger. |
| 04:01PM | 12 | Q.  Okay.  And then Dave Leary did the surveillance at |
| 04:01PM | 13 | Sycamore, right? |
| 04:01PM | 14 | A.  That's correct. |
| 04:01PM | 15 | Q.  So were there any 6s documenting some investigative |
| 04:01PM | 16 | action that the defendant did himself? |
| 04:01PM | 17 | A.  No substantive. |
| 04:01PM | 18 | Q.  In the file, was Lou Selva's phone number subpoenaed for |
| 04:01PM | 19 | subscriber information? |
| 04:01PM | 20 | A.  Yes, it was. |
| 04:01PM | 21 | Q.  Okay.  And how about Mike Masecchia's? |
| 04:01PM | 22 | A.  Several numbers, believe, for Masecchia were subpoenaed. |
| 04:01PM | 23 | Q.  Did that cause their numbers to be entered into the DARTS |
| 04:02PM | 24 | deconfliction database? |
| 04:02PM | 25 | A.  Yes, it would have. |

04:02PM  1    Q.  Did they ever get mentioned in any DEA-6 report in this

04:02PM  2    case file?

04:02PM  3    A.  Not one.

04:02PM  4    Q.  Okay.  Can you cross off the case closure for me, please?

04:02PM  5        All right.  So, we've worked our way through the DEA-6s

04:02PM  6    contained in C2-13-0026; is that right?

04:02PM  7    A.  That's accurate.

04:02PM  8    Q.  All right.

04:02PM  9        **MR. COOPER:**  Ms. Champoux, you can take down

04:02PM  10   Exhibit 8B, please.

04:02PM  11       **BY MR. COOPER:**

04:02PM  12   Q.  Special Agent Burns, during the course of trial prep in

04:02PM  13   this case, did you work to develop some charts to summarize

04:02PM  14   the voluminous evidence and testimony that the jury has heard

04:02PM  15   over the last two months?

04:02PM  16   A.  Yes, I did.

04:02PM  17   Q.  Okay.  Generally did you work with Homeland Security

04:02PM  18   Investigations and the U.S. Attorney's Office to create kind

04:02PM  19   of two different types of charts?

04:02PM  20   A.  Yes, over many months.

04:02PM  21       **MR. COOPER:**  Judge, may I approach and just take

04:02PM  22   this off the --

04:02PM  23       **THE COURT:**  Of course.

04:02PM  24       **MR. COOPER:**  Thank you.

04:03PM  25       On the witness's screen only please, can I pull up

04:03PM   1    Government Exhibit 552?

04:03PM   2              **BY MR. COOPER:**

04:03PM   3    Q.  Do you recognize what's on the screen in front of you?

04:03PM   4    A.  Yes, I do.

04:03PM   5    Q.  Is this one of the charts that you worked to create?

04:03PM   6    A.  It is one of the charts.

04:03PM   7    Q.  Okay.  And generally, what does Government Exhibit 552

04:03PM   8    summarize?

04:03PM   9    A.  Generally, it summarizes the voluminous testimony and

04:03PM   10   evidence that's been introduced at this trial, and it puts

04:03PM   11   the connections between 58 individuals whose names have been

04:03PM   12   mentioned in the course of this trial.

04:03PM   13   Q.  Okay.  Have there been a ton of names mentioned during

04:03PM   14   the two months and change trial that we've been in?

04:03PM   15   A.  A whole bunch.

04:03PM   16   Q.  Okay.  And does what you've created in Government

04:03PM   17   Exhibit 552 show connections that exist between some of those

04:03PM   18   different names that have come up based on testimony and

04:04PM   19   evidence that's come in during this trial?

04:04PM   20   A.  Yes.

04:04PM   21   Q.  Did you keep an index that shows the either testimony or

04:04PM   22   evidence that supports each connection that you've put on

04:04PM   23   this summary chart?

04:04PM   24   A.  Yes, a lengthy index.

04:04PM   25   Q.  Did you update that lengthy index as the trial was going

04:04PM  1   on?

04:04PM  2   A.  Yes, constantly.

04:04PM  3   Q.  Keep track of the testimony?

04:04PM  4   A.  Yes, I did.

04:04PM  5   Q.  Did you keep track of the exhibits?

04:04PM  6   A.  Yes, I did.

04:04PM  7   Q.  Have you updated that index as the trial's gone on?

04:04PM  8   A.  Yes, I have.

04:04PM  9   Q.  Okay.  How many connections total are documented in

04:04PM  10  Government Exhibit 552?

04:04PM  11  A.  179.

04:04PM  12  Q.  Okay.  And how many different people are -- or names are

04:04PM  13  reflected on that chart?

04:04PM  14  A.  58.

04:04PM  15  Q.  Okay.  You said 179 connections, should it actually be

04:04PM  16  180?

04:04PM  17  A.  Yes.

04:04PM  18  Q.  Okay.  As the trial was going on, did you realize another

04:04PM  19  connection that existed, but the chart had already been

04:04PM  20  finalized at that point?

04:04PM  21  A.  Yeah, just the other day.

04:04PM  22  Q.  Did that happen this week?

04:04PM  23  A.  Yes, it did.

04:04PM  24  Q.  Okay.

04:04PM  25  A.  We weren't going to print it again.

04:05PM   1   Q.  Okay.  To be clear, does the chart that you're looking at

04:05PM   2   list every single name of every single person that's come up

04:05PM   3   during the trial?

04:05PM   4   A.  No, not at all.

04:05PM   5   Q.  Okay.  Was the first day of testimony in this trial taken

04:05PM   6   on August 5, 2024?

04:05PM   7   A.  Yes, it was.

04:05PM   8   Q.  Is it currently September 26th of 2024?

04:05PM   9   A.  Yes, it is.

04:05PM   10  Q.  Okay.  Approximately how many witnesses, including

04:05PM   11  yourself and the transcript of R.K., have testified during

04:05PM   12  this trial?

04:05PM   13  A.  62.

04:05PM   14  Q.  Would it be fair to say that this case involves

04:05PM   15  information about dozens and dozens of different individuals?

04:05PM   16  A.  Absolutely.

04:05PM   17  Q.  Did you create Government Exhibit 552 to fairly and

04:05PM   18  accurately summarize the testimony and evidence from this

04:05PM   19  trial as it relates to the existence of connections between

04:05PM   20  certain individuals listed on your chart?

04:05PM   21  A.  Yes.

04:06PM   22        MR. COOPER:  Judge, if I could just have one moment?

04:06PM   23        THE COURT:  Sure.

04:06PM   24        MR. COOPER:  Okay.  So I think to make everything

04:06PM   25  faster, we'd like to come up real quick if that's okay with

| | | |
|---|---|---|
| 04:06PM | 1 | Your Honor. |
| 04:06PM | 2 | **THE COURT:**  Sure, come on up. |
| 04:06PM | 3 | (Sidebar discussion held on the record.) |
| 04:06PM | 4 | **MR. COOPER:**  Parker and I spoke during the break |
| 04:06PM | 5 | about trying to move things along today.  And one of the ways |
| 04:06PM | 6 | that we talked about doing that is not having me go through |
| 04:06PM | 7 | the foundation of all 180, 179 connections on the chart.  He |
| 04:06PM | 8 | agreed to that.  It's a significant timesaving measure.  So I |
| 04:06PM | 9 | wanted to make a record of that. |
| 04:06PM | 10 | He's going to cross-examine on the chart, but I'm not |
| 04:06PM | 11 | going to do all of them as the foundation. |
| 04:06PM | 12 | **THE COURT:**  You're going to offer the chart now and |
| 04:06PM | 13 | you're not going to object? |
| 04:06PM | 14 | **MR. MacKAY:**  Yes, I'm not stipulating, but I'm not |
| 04:07PM | 15 | going to object. |
| 04:07PM | 16 | **THE COURT:**  Great.  Perfect. |
| 04:07PM | 17 | **MR. COOPER:**  Thank you, Judge. |
| 04:07PM | 18 | (End of sidebar discussion.) |
| 04:07PM | 19 | **MR. COOPER:**  So with that foundation, Judge, the |
| 04:07PM | 20 | government would offer Government Exhibit 552 into evidence, |
| 04:07PM | 21 | but I don't want to publish it yet, if that's okay. |
| 04:07PM | 22 | **MR. MacKAY:**  No objection to admission. |
| 04:07PM | 23 | **THE COURT:**  It's received without objection. |
| 04:07PM | 24 | **MR. COOPER:**  Thank you, Judge. |
| 04:07PM | 25 | **(GOV Exhibit 552 was received in evidence.)** |

04:07PM    1            **BY MR. COOPER:**

04:07PM    2    Q.  Special Agent Burns, did you also create essentially a

04:07PM    3    duplicate of that exhibit, which has been given the name

04:07PM    4    Exhibit Number 553?

04:07PM    5    A.  Yes, I did.

04:07PM    6    Q.  Okay.  And is it fair to say Government Exhibit 552 has

04:07PM    7    got a lot of lines on it?

04:07PM    8    A.  A whole bunch.

04:07PM    9    Q.  Okay.  And did Government Exhibit 553 layer that over the

04:07PM   10    course of five or six different pages to make it a little

04:07PM   11    easier to take in?

04:07PM   12    A.  Yes, it did.

04:07PM   13    Q.  Okay.  Other than the fact that it's layered over five or

04:07PM   14    six different pages, does Government Exhibit 553 contain the

04:07PM   15    same data that's in 552?

04:07PM   16    A.  Yes, it does.

04:07PM   17            **MR. COOPER:**  Okay.  With that foundation, I'd offer

04:07PM   18    553 into evidence.

04:07PM   19            **MR. MacKAY:**  No objection.

04:07PM   20            **THE COURT:**  Received without objection.

04:08PM   21            **(GOV Exhibit 553 was received in evidence.)**

04:08PM   22            **MR. COOPER:**  Thank you.

04:08PM   23            Ms. Champoux, if you can pull up Government

04:08PM   24    Exhibit 553 for the witness.

04:08PM   25            Okay.  And, Ms. Demma, I'd ask that we publish that

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24
75

| 04:08PM | 1 | for the jury. |
| 04:08PM | 2 | **THE CLERK:**  You're all set. |
| 04:08PM | 3 | **MR. COOPER:**  Thank you. |
| 04:08PM | 4 | **BY MR. COOPER:** |

04:08PM  5   Q.  Can you see this, sir?

04:08PM  6   A.  Yes, I can.

04:08PM  7   Q.  Okay.  Are the gray boxes all around this chart different

04:08PM  8   names that have come up during the trial?

04:08PM  9   A.  Yeah, those are the 58 I referenced earlier.

04:08PM  10  Q.  Okay.  And then are there some color-coded boxes

04:08PM  11  starting -- let's start with the color red; do you see that

04:08PM  12  one?

04:08PM  13  A.  Yes.

04:08PM  14  Q.  Who's in that box?

04:08PM  15  A.  That's the defendant, Joseph Bongiovanni.  It's the

04:08PM  16  exhibit -- the photograph of him in the classic Buick

04:08PM  17  automobile.

04:08PM  18  Q.  Okay.  Is that photo from Government Exhibit 109AB?

04:08PM  19  A.  Yes, it is.

04:08PM  20  Q.  All right.  And then Lou Selva, is he listed in blue

04:08PM  21  there?

04:08PM  22  A.  Yes, he is.

04:08PM  23  Q.  Ron Serio, is he in green?

04:08PM  24  A.  Yes, he is.

04:08PM  25  Q.  Does Mike Masecchia have a black-colored box?

04:08PM    1    A.  Yes, he does.

04:08PM    2    Q.  And does Peter Gerace have a yellow-colored box?

04:08PM    3    A.  Yes, he does.

04:08PM    4    Q.  Okay.  Are there some lines coming out from the

04:08PM    5    defendant's picture there?

04:08PM    6    A.  Yes, there is.

04:08PM    7    Q.  What do those lines signify?

04:08PM    8    A.  Connections between the defendant and these individuals.

04:09PM    9    Q.  Now to be clear, you haven't followed the defendant

04:09PM    10   around for his whole life to know about that, right?

04:09PM    11   A.  Yes.

04:09PM    12   Q.  What'd you base those lines off of?

04:09PM    13   A.  On the voluminous testimony and the voluminous exhibits

04:09PM    14   in this, that have come -- entered into evidence at this

04:09PM    15   trial.

04:09PM    16   Q.  Okay.  Excuse me.

04:09PM    17       Now we mentioned before, we didn't put every single name

04:09PM    18   that was mentioned during the trial on the chart; is that

04:09PM    19   correct?

04:09PM    20   A.  No, I -- that would have been almost impossible.

04:09PM    21   Q.  Okay.  And did you pick a selection of the names that

04:09PM    22   came up during the course of the trial?

04:09PM    23   A.  Yes, I did.

04:09PM    24   Q.  And does this summarize the testimony and evidence with

04:09PM    25   respect to the selection of names are on the chart?

04:09PM  1   A.  Yes, it does.

04:09PM  2   Q.  Okay.  Is there a line from the defendant to Lou Selva?

04:09PM  3   A.  Yes, there is.

04:09PM  4   Q.  Okay.  And is there a line from the defendant to Peter

04:09PM  5   Gerace?

04:09PM  6   A.  Yes, there is.

04:09PM  7   Q.  How about the defendant and Mark Suppa?

04:09PM  8   A.  Yes, there is.

04:09PM  9   Q.  How about the defendant and John Suppa?

04:09PM  10  A.  Yes, there is.

04:09PM  11  Q.  How about the defendant and Frank Burkhart?

04:09PM  12  A.  Yes, there is.

04:10PM  13  Q.  How about the defendant and Wayne Anderson?

04:10PM  14  A.  Yes, there is.

04:10PM  15  Q.  Do you see all those lines?

04:10PM  16  A.  I sure do.

04:10PM  17  Q.  Okay.

04:10PM  18       MR. COOPER:  Ms. Champoux, if we can scroll on to the

04:10PM  19  next page.

04:10PM  20       BY MR. COOPER:

04:10PM  21  Q.  We're on page 2 now.  Does this list the connections

04:10PM  22  between Ron Serio in green and the other individuals on the

04:10PM  23  chart?

04:10PM  24  A.  Yes, it does.

04:10PM  25  Q.  Okay.  I want to talk about some of the connections in

04:10PM    1    common here, okay?

04:10PM    2    A.  Okay.

04:10PM    3    Q.  Let's start with Joe Bella at the top.

04:10PM    4        Is Joe Bella a person that's listed as a connection in

04:10PM    5    common between Ron Serio and the defendant?

04:10PM    6    A.  Yes.

04:10PM    7    Q.  How about Wayne Anderson?

04:10PM    8    A.  Yes.

04:10PM    9    Q.  How about Frank Burkhart?

04:10PM   10    A.  Yes.

04:10PM   11    Q.  How about Bobby R.K.?

04:10PM   12    A.  Yes.

04:10PM   13    Q.  How about John Suppa?

04:10PM   14    A.  Yes.

04:10PM   15    Q.  And Mark Suppa?

04:10PM   16    A.  Yes.

04:10PM   17    Q.  What about Joe Tomasello?

04:10PM   18    A.  Yes.

04:10PM   19    Q.  Okay.  Now, we're not going to go through every single

04:10PM   20    one, try to keep it moving here.

04:10PM   21            **MR. COOPER:**  Ms. Champoux, if you can scroll to the

04:10PM   22    next page.

04:10PM   23            **BY MR. COOPER:**

04:10PM   24    Q.  Okay.  Do you see some black lines that just appeared on

04:10PM   25    553?

04:10PM    1    A.  Yes, I do.

04:10PM    2    Q.  Okay.  Does this show some of Masecchia's connections to

04:11PM    3    individuals?

04:11PM    4    A.  Yes, it does.

04:11PM    5    Q.  Does Masecchia also have a connection to Bella?

04:11PM    6    A.  Yes, he does.

04:11PM    7    Q.  Does he have a connection to Butchie Bifocals?  Up at the

04:11PM    8    top there.

04:11PM    9    A.  Yes, he does.

04:11PM   10    Q.  Okay.  How about Wayne Anderson?

04:11PM   11    A.  Yes, he does.

04:11PM   12    Q.  Does Masecchia also have a connection to Mark Suppa?

04:11PM   13    A.  Yes, he does.

04:11PM   14    Q.  And is that a connection that Masecchia, Serio, and the

04:11PM   15    defendant all share in common?

04:11PM   16    A.  It is.

04:11PM   17    Q.  How about Joe Tomasello?  Is that a connection that

04:11PM   18    Masecchia, Serio, and the defendant all share in common?

04:11PM   19    A.  Yes, it is.

04:11PM   20    Q.  How about Sal Volpe?

04:11PM   21    A.  Yes, it is.

04:11PM   22    Q.  How about Anthony Gerace?  That's over at the top, maybe

04:11PM   23    four or five inches down the chart.  Do you see Anthony

04:11PM   24    Gerace's gray box?

04:11PM   25    A.  Yes, I do.

04:11PM   1   Q.  Does he have a connection to the defendant?

04:11PM   2   A.  He sure does.

04:11PM   3   Q.  Okay.  And does the chart reflect a connection between

04:11PM   4   Masecchia and Anthony Gerace?

04:11PM   5   A.  Yes, it does.

04:11PM   6   Q.  How about between Ron Serio and Anthony Gerace?

04:12PM   7   A.  Yes, it does.

04:12PM   8   Q.  I was gonna ask you about Peter, but I don't think we're

04:12PM   9   there yet.

04:12PM  10        **MR. COOPER:**  So let's go to the next page,

04:12PM  11   Ms. Champoux.

04:12PM  12        **BY MR. COOPER:**

04:12PM  13   Q.  Do the blue lines indicate Lou Selva's connections to

04:12PM  14   some of those same individuals?

04:12PM  15   A.  Yes, it does.

04:12PM  16   Q.  Okay.  And do we see some of the same connections in

04:12PM  17   common that now include Lou Selva?

04:12PM  18   A.  Yes, we do.  In blue.

04:12PM  19   Q.  Sal Volpe?

04:12PM  20   A.  Yes.

04:12PM  21   Q.  How about Mark Suppa?

04:12PM  22   A.  Yes.

04:12PM  23   Q.  How about John Suppa?

04:12PM  24   A.  Yes.

04:12PM  25        **MR. COOPER:**  Ms. Champoux, if we can go to the next

04:12PM    1    page, please?

04:12PM    2        **BY MR. COOPER:**

04:12PM    3    Q.  All right.  And the yellow lines that just popped up, are

04:12PM    4    those Peter Gerace's connections on the chart?

04:12PM    5    A.  Yes, they are.

04:12PM    6    Q.  Okay.  Are there a lot of connections that are on the

04:12PM    7    left side of the chart that are connections based on the

04:12PM    8    testimony and evidence in the trial, summarized in this chart

04:12PM    9    between both Peter Gerace and the defendant?

04:12PM    10   A.  On the left-hand side?

04:12PM    11   Q.  On the left-hand side over here.

04:12PM    12   A.  Yep.  Yes.

04:12PM    13   Q.  Do you see that?

04:12PM    14   A.  Absolutely.

04:12PM    15   Q.  Okay.  Is Tom Doctor a connection in common?

04:13PM    16   A.  Yes, it is.

04:13PM    17   Q.  How about Anthony Gerace?

04:13PM    18   A.  Yes, he is.

04:13PM    19   Q.  Does everyone -- does Anthony Gerace have connections to

04:13PM    20   the defendant, Peter, Ron, and Mike on this chart?

04:13PM    21   A.  Yes, he does.

04:13PM    22   Q.  Okay.  How about Frank Tripi?  Does Frank Tripi have a

04:13PM    23   connection to Peter Gerace?

04:13PM    24   A.  Peter Gerace, yes, he does.

04:13PM    25   Q.  How about Hot Dog?  Is Hot Dog on the chart?

| | | |
|---|---|---|
| 04:13PM | 1 | A.  Yes, he is. |
| 04:13PM | 2 | Q.  Haven't said his name yet.  Do you see Hot Dog there? |
| 04:13PM | 3 | A.  I do see Hot Dog. |
| 04:13PM | 4 | Q.  Does Hot Dog have a connection to the defendant? |
| 04:13PM | 5 | A.  Yes, he does. |
| 04:13PM | 6 | Q.  And they went to Canada together, right? |
| 04:13PM | 7 | A.  That's accurate. |
| 04:13PM | 8 | Q.  How about a connection to Ron Serio? |
| 04:13PM | 9 | A.  Yes. |
| 04:13PM | 10 | Q.  Now, is there one -- is there one more page after this |
| 04:14PM | 11 | one? |
| 04:14PM | 12 | A.  There is one more page. |
| 04:14PM | 13 | Q.  Okay.  And does that add a whole bunch more lines on to |
| 04:14PM | 14 | the chart? |
| 04:14PM | 15 | A.  Yes, it does. |
| 04:14PM | 16 | Q.  Is that last page here going to be gray-colored lines? |
| 04:14PM | 17 | A.  It will be. |
| 04:14PM | 18 | Q.  The gray-colored lines, what do they signify? |
| 04:14PM | 19 | A.  The connections between the different individuals. |
| 04:14PM | 20 | Q.  Okay. |
| 04:14PM | 21 | A.  Their names. |
| 04:14PM | 22 | Q.  So initially, you've color coded different people's |
| 04:14PM | 23 | connections; is that right? |
| 04:14PM | 24 | A.  That's correct. |
| 04:14PM | 25 | Q.  Are the gray connections basically all the remaining |

04:14PM    1    connections contained on the chart?

04:14PM    2    A.  That's correct.

04:14PM    3    Q.  Okay.  And does that show how some of these gray box

04:14PM    4    people are connected to each other?

04:14PM    5    A.  That's accurate.

04:14PM    6    Q.  Okay.

04:14PM    7          MR. COOPER:  And, Ms. Champoux, can we go to the

04:14PM    8    final page?

04:14PM    9          BY MR. COOPER:

04:14PM    10   Q.  Gets pretty complex with all the lines on it, right?

04:14PM    11   A.  It certainly does.

04:14PM    12   Q.  Okay.  Was your goal in creating this chart to try to

04:14PM    13   help take this out of the brain and onto a piece of paper?

04:14PM    14   A.  Yeah, the voluminous testimony, as well as the voluminous

04:14PM    15   exhibits.

04:14PM    16   Q.  Okay.

04:14PM    17          MR. COOPER:  Ms. Champoux, you can take that down,

04:14PM    18   please.

04:14PM    19          BY MR. COOPER:

04:15PM    20   Q.  All right.  You told us before there were two different

04:15PM    21   types of charts.  Was that one of them?

04:15PM    22   A.  Yes, that was the connections one.

04:15PM    23   Q.  Let's talk about the other one now.

04:15PM    24          MR. COOPER:  Ms. Champoux, for the witness only, can

04:15PM    25   we bring up Government Exhibit 551?

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

84

04:15PM    1    **BY MR. COOPER:**

04:15PM    2    Q.  Can you see that on your screen?

04:15PM    3    A.  Yes, I can.

04:15PM    4    Q.  Okay.  And is this one of the charts that you worked with

04:15PM    5    HSI and the U.S. Attorney's Office to generate?

04:15PM    6    A.  Yes, extensively.

04:15PM    7    Q.  Okay.  What does Government Exhibit 551 summarize?

04:15PM    8    A.  It summarizes some of the exhibits that came into

04:15PM    9    evidence at this trial as they relate to the charged -- the

04:15PM    10    counts in this indictment, and the specific incidents in this

04:15PM    11    indictment --

04:15PM    12    Q.  Okay.

04:15PM    13    A.  -- during this trial.

04:15PM    14    Q.  Okay.  So, counts are contained in an indictment, right?

04:15PM    15    A.  They are.

04:15PM    16    Q.  And the indictment is not evidence, right?

04:15PM    17    A.  It is not evidence.

04:15PM    18    Q.  Okay.  Does the chart that you're looking at, 551,

04:15PM    19    summarize some of the exhibits in evidence and which counts

04:16PM    20    in the indictment they relate to?

04:16PM    21    A.  Yes.  It summarizes 66 of the exhibits which are some of

04:16PM    22    the exhibits in evidence, and the counts they relate to.

04:16PM    23    Q.  Now, have there been hundreds and hundreds of exhibits

04:16PM    24    that have been actually introduced into evidence at this

04:16PM    25    trial?

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24
85

| | | |
|---|---|---|
| 04:16PM | 1 | A.  Yes, there have been. |
| 04:16PM | 2 | Q.  Is that thousands or tens of thousands of pages? |
| 04:16PM | 3 | A.  Definitely. |
| 04:16PM | 4 | Q.  Are the 11 charged counts in -- are there 11 charged |
| 04:16PM | 5 | counts in the indictment in this trial? |
| 04:16PM | 6 | A.  There is. |
| 04:16PM | 7 | Q.  Okay.  Are the -- do the counts charged in the indictment |
| 04:16PM | 8 | span a period of years, from 2005 until 2019? |
| 04:16PM | 9 | A.  They do. |
| 04:16PM | 10 | Q.  Okay.  And do those counts arise out of a series of |
| 04:16PM | 11 | different incidents or occurrences over that 14-year period? |
| 04:16PM | 12 | A.  They do. |
| 04:16PM | 13 | Q.  Do the counts charged in the indictment relate to various |
| 04:16PM | 14 | different investigations? |
| 04:16PM | 15 | A.  They do. |
| 04:16PM | 16 | Q.  Okay.  Have members of all those different various law |
| 04:16PM | 17 | enforcement agencies come and testified at this trial? |
| 04:16PM | 18 | A.  Yes, they have. |
| 04:16PM | 19 | Q.  Does that include DEA agents? |
| 04:16PM | 20 | A.  It does. |
| 04:16PM | 21 | Q.  HSI agents? |
| 04:16PM | 22 | A.  It does. |
| 04:16PM | 23 | Q.  CBP officers? |
| 04:17PM | 24 | A.  It does. |
| 04:17PM | 25 | Q.  OIG agents? |

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24
86

04:17PM   1   A.  Yes, it does.

04:17PM   2   Q.  FBI agents like yourself?

04:17PM   3   A.  Certainly.

04:17PM   4   Q.  IRS agents?

04:17PM   5   A.  Yes.

04:17PM   6   Q.  U.S. Probation?

04:17PM   7   A.  Yes.

04:17PM   8   Q.  The U.S. Attorney's Office, like AUSAs and paralegals?

04:17PM   9   A.  That's accurate.

04:17PM   10  Q.  How about local police, like the Amherst Police?

04:17PM   11  A.  Yes.

04:17PM   12  Q.  And the Town of Tonawanda?

04:17PM   13  A.  Yes.

04:17PM   14  Q.  The Erie County Sheriff's Office?

04:17PM   15  A.  Yes.

04:17PM   16  Q.  And the New York State Police?

04:17PM   17  A.  Yes.

04:17PM   18  Q.  Okay.  So lots of different agencies that have come up,

04:17PM   19  right?

04:17PM   20  A.  That's correct.

04:17PM   21  Q.  How many different exhibits are listed on Exhibit 551?

04:17PM   22  A.  66.

04:17PM   23  Q.  Okay.  That's not every exhibit that was entered into

04:17PM   24  evidence, right?

04:17PM   25  A.  No, there's quite a bit more.

| | | |
|---|---|---|
| 04:17PM | 1 | Q.  Okay.  Does 551 provide a table of contents, so to speak, |
| 04:17PM | 2 | for the exhibits as they relate to different counts charged |
| 04:17PM | 3 | in the indictment? |
| 04:17PM | 4 | A.  It does. |
| 04:17PM | 5 | MR. COOPER:  Judge, can I come over and speak to |
| 04:17PM | 6 | co-counsel quickly? |
| 04:18PM | 7 | THE COURT:  Of course. |
| 04:18PM | 8 | MR. COOPER:  I'm sorry, opposing counsel. |
| 04:18PM | 9 | Judge, I've spoken with opposing counsel, and with |
| 04:18PM | 10 | that foundation now, I'm going to offer Exhibit 551 into |
| 04:18PM | 11 | evidence. |
| 04:18PM | 12 | MR. MacKAY:  No objection, Judge. |
| 04:18PM | 13 | THE COURT:  It's received without objection. |
| 04:18PM | 14 | MR. COOPER:  Thank you. |
| 04:18PM | 15 | **(GOV Exhibit 551 was received in evidence.)** |
| 04:18PM | 16 | MR. COOPER:  And we can publish this one on the |
| 04:18PM | 17 | screen, but I'm going to get a version because the print is |
| 04:18PM | 18 | very small. |
| 04:18PM | 19 | **BY MR. COOPER:** |
| 04:18PM | 20 | Q.  Special Agent Burns, can you see Government Exhibit 551? |
| 04:18PM | 21 | A.  Yes. |
| 04:18PM | 22 | Q.  All right.  If you need to stay standing, you can stay |
| 04:18PM | 23 | standing.  Just keep your voice up, okay? |
| 04:18PM | 24 | A.  It might be easier off -- |
| 04:18PM | 25 | Q.  Okay.  Easier off the teleprompter, you think? |

04:19PM    1    A.  Yeah.

04:19PM    2    Q.  Got it.

04:19PM    3    A.  See how it goes.

04:19PM    4    Q.  That's fine, let's work off of that.

04:19PM    5        I want to get oriented to the chart first, and then we

04:19PM    6    can zoom in if we need to.

04:19PM    7        In the center is that same photo from Government Exhibit

04:19PM    8    109AB?

04:19PM    9    A.  Yes, from the Buick.

04:19PM   10    Q.  Okay.  Are there 12 lines going out from that photograph

04:19PM   11    to 12 different gray boxes?

04:19PM   12    A.  There is.

04:19PM   13    Q.  Okay.  And generally, what do those gray boxes signify?

04:19PM   14    A.  They're kind of -- we'll use a book analogy.  They're

04:19PM   15    kind of chapters in the trial or in the case, different

04:19PM   16    chapters.

04:19PM   17    Q.  Are they referenced to different incidents that have come

04:19PM   18    up during the course of the trial?

04:19PM   19    A.  Specific incidents, and then how they tied to the counts

04:19PM   20    in the indictment.  Overt acts.

04:19PM   21    Q.  Okay.  Do you see lines between the photograph of the

04:19PM   22    defendant and the gray boxes?

04:19PM   23    A.  Yes, I do.

04:19PM   24    Q.  Okay.  And are the various Count or Counts related to

04:19PM   25    each gray box listed in the line?

04:19PM   1   A.  Right, to each of those incidents.

04:19PM   2   Q.  Okay.  All the way along the outside of the chart are

04:19PM   3   there a number of different logos and names?

04:20PM   4   A.  There is.

04:20PM   5   Q.  Are those names representative of law enforcement or

04:20PM   6   other government witnesses who testified at the trial?

04:20PM   7   A.  They are.

04:20PM   8   Q.  Okay.  Are there lines connecting each of those

04:20PM   9   individuals to the gray box, to one or more of the gray

04:20PM  10   boxes?

04:20PM  11   A.  Yes, there is.

04:20PM  12   Q.  Okay.  And primarily, what's listed on the lines between

04:20PM  13   the witnesses and the gray boxes?

04:20PM  14   A.  For the most part, it's some of the exhibits have been

04:20PM  15   admitted at trial with the exception, there's two informants

04:20PM  16   referenced on the left-hand side of the chart, and then on

04:20PM  17   the top there's one line that doesn't have an exhibit related

04:20PM  18   to it.

04:20PM  19   Q.  Okay.  Generally it's exhibits, and in two instances on

04:20PM  20   the left here it's -- it's informant names; is that correct?

04:20PM  21   A.  That's accurate.

04:20PM  22   Q.  And for Pete Lepiane, there's nothing, right?

04:20PM  23   A.  That's correct.

04:20PM  24   Q.  Okay.  Let's quickly try to work our way through this

04:20PM  25   chart.

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

90

| 04:20PM | 1 | MR. COOPER: Ms. Champoux, if you can just zoom in |
| 04:20PM | 2 | on the top third or just the center here for Lepiane to |
| 04:21PM | 3 | Kasprzyk, like that, yeah.  Just down to the photograph of |
| 04:21PM | 4 | the defendant, thank you. |
| 04:21PM | 5 | BY MR. COOPER: |
| 04:21PM | 6 | Q.  All right.  Can you see the grey box entitled Gerace '09 |
| 04:21PM | 7 | probation search? |
| 04:21PM | 8 | A.  Yes, I can. |
| 04:21PM | 9 | Q.  Okay.  Which Count or Counts of the indictment is that |
| 04:21PM | 10 | incident related to? |
| 04:21PM | 11 | A.  It relates to Count 2, and overt acts 19, 20, 21, 22, 36, |
| 04:21PM | 12 | as well as Count 5. |
| 04:21PM | 13 | Q.  Okay.  Is Count 2 charging the conspiracy to defraud the |
| 04:21PM | 14 | United States involving the defendant and Peter Gerace? |
| 04:21PM | 15 | A.  That is Count 2. |
| 04:21PM | 16 | Q.  And is Count 2 charging the drug distribution conspiracy |
| 04:21PM | 17 | involving the defendant and Peter Gerace? |
| 04:21PM | 18 | A.  Yes, it does. |
| 04:21PM | 19 | THE COURT:  I think you meant Count 5. |
| 04:21PM | 20 | THE WITNESS:  Count 5. |
| 04:21PM | 21 | MR. COOPER:  Oh, I apologize. |
| 04:21PM | 22 | THE COURT:  You said Count 2 twice. |
| 04:21PM | 23 | MR. COOPER:  I apologize, Judge. |
| 04:21PM | 24 | THE COURT:  That's okay. |
| 04:21PM | 25 | MR. COOPER:  Lack of sleep. |

04:21PM    1        **BY MR. COOPER:**

04:21PM    2    Q.   Count 5, is that the drug distribution between the

04:21PM    3    defendant and Peter Gerace?

04:21PM    4    A.   That is.  I didn't catch it either, it is Count 5.

04:21PM    5    Sorry.

04:21PM    6    Q.   Okay.  What law enforcement witnesses are listed on the

04:22PM    7    chart related to the Gerace '09 probation search?

04:22PM    8    A.   New York -- or, Western District of New York Probation

04:22PM    9    Officer Peter Lepiane, FBI Special Agent Thomas Herbst, and

04:22PM   10    DEA Supervisor Dale Kasprzyk.

04:22PM   11    Q.   Did each of those people testify at the trial?

04:22PM   12    A.   They did.

04:22PM   13    Q.   Okay.  And which exhibits are listed there between the

04:22PM   14    gray box entitled Gerace '09 probation search and Special

04:22PM   15    Agent Herbst?

04:22PM   16    A.   Exhibit 30A, which is a DEA-6, dated 11/6/2009.  It's a

04:22PM   17    report related to the information offered by Gerace.

04:22PM   18    Q.   Is that the same exhibit listed with respect to

04:22PM   19    G.S. Kasprzyk?

04:22PM   20    A.   It is.

04:22PM   21    Q.   Okay.  We're going to move on, and I'm gonna try to work

04:22PM   22    my way around to the right.

04:22PM   23        **MR. COOPER:**   So, Ms. Champoux, if you can zoom in

04:22PM   24    now, and get me this gray box all the way through to Anthony

04:22PM   25    Casullo?  Maybe just the top right corner of the document,

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24
                                                                            92

04:22PM    1   starting from -- no, we've got to start from further to the

04:22PM    2   left, ma'am.

04:22PM    3       Yeah, there you go.  And then down.  There you go.

04:22PM    4       That's perfect, thank you.

04:22PM    5           **BY MR. COOPER:**

04:22PM    6   Q.  Can you see the next gray box to the right here, Special

04:23PM    7   Agent Casullo investigation of Gerace?

04:23PM    8   A.  Yes, I do.

04:23PM    9   Q.  Okay.  What counts are between that gray box and the

04:23PM   10   defendant's photo?

04:23PM   11   A.  That's Count 2, overt acts 25 and 33.  Count 5 and

04:23PM   12   Count 11.

04:23PM   13   Q.  All right.  We already covered Count 2 and 5.  Let's talk

04:23PM   14   about Count 11.

04:23PM   15       Is that the count charging false statements made to OIG

04:23PM   16   on March 29th, 2019?

04:23PM   17   A.  Yes, it is.

04:23PM   18   Q.  Okay.  What law enforcement witness is listed on the

04:23PM   19   chart related to that gray box?

04:23PM   20   A.  DEA Special Agent Anthony Casullo.

04:23PM   21   Q.  Okay.  And which exhibits are listed between the gray box

04:23PM   22   entitled Casullo investigation of Gerace and the witness

04:23PM   23   bubble for Special Agent Casullo?

04:23PM   24   A.  Do them together.  DARTS deconfliction notices,

04:23PM   25   Exhibit 26B, 26C, 26D, 26E.

04:23PM   1      Additionally, there's Exhibit 99, which is the

04:23PM   2   January 28th, 2019, memo drafted by the defendant.  And

04:23PM   3   again, that same exhibit that I just mentioned, the 30A from

04:23PM   4   November 6th, 2009.

04:24PM   5   Q.  Okay.

04:24PM   6        MR. COOPER:  We can stay right in that zoom, you

04:24PM   7   don't have to get out of it, Ms. Champoux.

04:24PM   8        BY MR. COOPER:

04:24PM   9   Q.  What's the next grey box down?

04:24PM  10   A.  That's Gerace memos authored by defendant and submitted

04:24PM  11   to DEA, and defendant's subsequent statements to HSI Special

04:24PM  12   Agent Curtis Ryan.

04:24PM  13   Q.  Okay.  And what Counts does that relate to on the line

04:24PM  14   between that gray box and the defendant?

04:24PM  15   A.  Count 2, overt acts 23, 27, 29, 30, 31, as well as

04:24PM  16   Count 8, 9, and 10.

04:24PM  17   Q.  Okay.  We covered Count 2.

04:24PM  18      Is Count 8 charging obstruction of justice related to a

04:24PM  19   November 1, 2018, DEA memo?

04:24PM  20   A.  Yes.

04:24PM  21   Q.  Is Count 9 charging obstruction of justice related to a

04:24PM  22   December 10, 2018, DEA memo?

04:24PM  23   A.  Yes, it is.

04:24PM  24   Q.  Is Count 10 a charge of obstruction of justice related to

04:24PM  25   a January 28th, 2019, DEA memo?

04:24PM    1    A.   Yes.

04:24PM    2    Q.   What law enforcement witness is listed on this chart

04:24PM    3    related to that gray box?

04:24PM    4    A.   Curtis Ryan, special agent, HSI.

04:24PM    5    Q.   Okay.  And I'm not going to have you read the whole list,

04:25PM    6    but are there a list of exhibits in between that gray box and

04:25PM    7    Curtis Ryan?

04:25PM    8    A.   Yes, there is.

04:25PM    9    Q.   Okay.

04:25PM    10         MR. COOPER:  Ms. Champoux, if you can get out of

04:25PM    11   this zoom here.  And go to the -- capture this portion of the

04:25PM    12   chart in the zoom, please?

04:25PM    13         THE WITNESS:  That will work.

04:25PM    14         Sorry, I said that will work, I didn't mean to speak

04:25PM    15   out loud.  Sorry.

04:25PM    16         BY MR. COOPER:

04:25PM    17   Q.   Okay.  What's the next gray box down after the one we

04:25PM    18   just reviewed?

04:25PM    19   A.   Defendant statements to OIG.

04:25PM    20   Q.   Okay.  Special Agent Burns, which Count or Counts are

04:25PM    21   listed on the chart next to that gray box?

04:25PM    22   A.   That's Count 11.

04:25PM    23   Q.   All right.  And we -- Count 11, is that a count charging

04:25PM    24   false statements made to OIG on March 29th, 2019?

04:26PM    25   A.   It is.

04:26PM    1    Q.  What law enforcement witness is listed on the chart

04:26PM    2    related to this gray box?

04:26PM    3    A.  David Carpenter.

04:26PM    4    Q.  Okay.  And does it list some of the exhibits, a summary

04:26PM    5    of the exhibits that relate to that incident -- next to Dave

04:26PM    6    Carpenter's name?

04:26PM    7    A.  Yes, it does.

04:26PM    8    Q.  Okay.  What's the next gray box down?

04:26PM    9    A.  That's the DEA Gambino investigation, 2008.

04:26PM   10    Q.  Okay.  And is that on the chart, does that have Count 2

04:26PM   11    listed next to that prong?

04:26PM   12    A.  Yes, it does.

04:26PM   13    Q.  And who's the law enforcement witness listed to the right

04:26PM   14    there?

04:26PM   15    A.  Christopher Wisniewski.

04:26PM   16    Q.  Okay.  Is he a DEA special agent that came and testified

04:26PM   17    in -- two months ago at the --

04:26PM   18    A.  Yeah, very early in the trial, Special Agent Chris

04:26PM   19    Wisniewski testified.

04:26PM   20    Q.  And the next one down, the next gray box, what do we have

04:26PM   21    listed there?

04:26PM   22    A.  That's Agent Mozg's investigation of Bella.

04:26PM   23    Q.  Okay.  And what Count or Counts are linked to that on

04:26PM   24    Government Exhibit 551?

04:26PM   25    A.  Count 1, overt act 52.

04:27PM  1   Q.  Okay.  And does it list a number of exhibits related to

04:27PM  2   that gray box?

04:27PM  3   A.  It does.

04:27PM  4   Q.  Okay.

04:27PM  5           MR. COOPER:  And, Ms. Champoux, if we can zoom out

04:27PM  6   now?  And now we're going to move on to the top left corner,

04:27PM  7   and if you can zoom in to catch this portion for me.  A little

04:27PM  8   more to the right.

04:27PM  9           That's perfect, ma'am, thank you.

04:27PM  10          BY MR. COOPER:

04:27PM  11  Q.  All right.  Can you see -- oops.  Starting now from the

04:27PM  12  top and working left, do you see a gray box entitled

04:27PM  13  Operation Past Due?

04:27PM  14  A.  Yes, I do.

04:27PM  15  Q.  Okay.  And is that linked to a Count 1 on this chart?

04:27PM  16  A.  Yeah, overt act 55.

04:27PM  17  Q.  Okay.  And who's the law enforcement witness coming off

04:27PM  18  of that gray box?

04:27PM  19  A.  DEA Task Force Officer Christopher Clark.

04:27PM  20  Q.  Okay.  And are there some exhibits listed with respect to

04:27PM  21  Chris Clark and the gray box Operation Past Due?

04:27PM  22  A.  Yeah, the Tripi OCDETF proposal, and the defendant's

04:27PM  23  phone records.

04:27PM  24  Q.  Tripi?

04:27PM  25  A.  Tripi OCDETF proposal and -- and the defendant's phone

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

97

04:27PM    1    records.

04:27PM    2    Q.  Okay.  And the next one down, the next gray box, is that

04:28PM    3    entitled CBP investigation into cross-border drug activity?

04:28PM    4    A.  Yes, it is.

04:28PM    5    Q.  Is that also linked to Count 1 on this chart?

04:28PM    6    A.  Overt act 23, yes.

04:28PM    7    Q.  Okay.  And if you see the law enforcement witness, who's

04:28PM    8    listed there for that gray box?

04:28PM    9    A.  The law enforcement witness is Custom and Border Patrol

04:28PM    10   Officer Larry Jay.

04:28PM    11   Q.  Okay.  And we talked, excuse me, we talked about this

04:28PM    12   right at the beginning when we were laying some foundation.

04:28PM    13   Are there any exhibits listed for that line between Larry Jay

04:28PM    14   and the gray box?

04:28PM    15   A.  Not for that one, just the informant's name.

04:28PM    16   Q.  Okay.  So that's the name, J.D.?

04:28PM    17   A.  Yeah, that's correct.

04:28PM    18   Q.  Was J.D. a witness who testified at this trial as well?

04:28PM    19   A.  Yes, he was.

04:28PM    20   Q.  Okay.  And we're going to move down to the next gray box.

04:28PM    21   What do you have there?

04:28PM    22   A.  Town of Ton -- TTPD, referring to Town of Tonawanda

04:28PM    23   Police Department, referral of C.S. to DEA.

04:28PM    24   Q.  Okay.  And we've seen Count 1 a number of times.  Just to

04:28PM    25   be clear, is Count 1 the count charging conspiracy to defraud

04:29PM    1    the United States involving the defendant, Mike Masecchia,

04:29PM    2    and others?

04:29PM    3    A.   Yes, it is.

04:29PM    4    Q.   Okay.

04:29PM    5    A.   Count 3 and 4 on that one, as well.

04:29PM    6    Q.   Yep.  Who's the law enforcement that's listed with

04:29PM    7    respect to the TTPD referral of C.S. to DEA?

04:29PM    8    A.   It was Detective Thomas Oswald from the Town of Tonawanda

04:29PM    9    Police Department.

04:29PM    10   Q.   Okay.  And what's listed between that gray box and the

04:29PM    11   witness bubble for Intelligence Agent Tom Oswald, or

04:29PM    12   Detective Tom Oswald?

04:29PM    13   A.   C.C.

04:29PM    14   Q.   Okay.  Is that another name of an informant?

04:29PM    15   A.   It was.

04:29PM    16   Q.   Okay.  What's the next gray box down after that?

04:29PM    17   A.   TFO -- so, Task Force Officer Higgins investigation into

04:29PM    18   Masecchia's Southern Tier grow.

04:29PM    19   Q.   Okay.  And what Count or Counts is that linked to on the

04:29PM    20   Government Exhibit 551?

04:29PM    21   A.   In Count 1, manners and means, 4 and 5, Count 3 and

04:30PM    22   Count 4.

04:30PM    23   Q.   Okay.  Who's the law enforcement witness that's listed

04:30PM    24   for that gray box?

04:30PM    25   A.   It's -- what is his title, he's with -- he's a DEA task

04:30PM    1    force officer, I just don't recall his -- it was detective,
04:30PM    2    but I don't know what his highest rank is.
04:30PM    3    Q.  Okay.  We'll call him Cory Higgins, how about that?
04:30PM    4    A.  That works.
04:30PM    5    Q.  Okay.  And are there some exhibits listed with respect to
04:30PM    6    the line between Cory Higgins--
04:30PM    7    A.  Yes.
04:30PM    8    Q.  -- and the gray box for his investigation?
04:30PM    9    A.  There is.
04:30PM    10   Q.  Okay.  And just to focus here for a second, do some of
04:30PM    11   those, is one of those Exhibits 8A?
04:30PM    12   A.  It is.
04:30PM    13   Q.  Is that, like, really long a number of pages, that
04:30PM    14   document?
04:30PM    15   A.  8A I believe is, without looking at it exactly, is over
04:30PM    16   400 pages, but I'd have to see it.  It's hundreds of pages.
04:30PM    17   Q.  Okay.  And was part of the summary that you created here
04:30PM    18   to make reference to specific page numbers inside of
04:30PM    19   Government Exhibit 8A?
04:30PM    20   A.  Right.  So in 8A, it's going through it, if you pull up
04:30PM    21   those page numbers 134, 135, 155, they're contained in 8A.
04:31PM    22   Q.  Got it.  Let's move on to the next gray box down.  What's
04:31PM    23   that gray box entitled?
04:31PM    24   A.  The Wayne Anderson arrest.
04:31PM    25   Q.  Okay.  And what Count or Counts are on the line between

04:31PM   1   the defendant's photo and that gray box?

04:31PM   2   A.  Count 1, overt acts 24, 25, 50, Count 3, Count 4,

04:31PM   3   Count 6, and Count 7.

04:31PM   4   Q.  Okay.  And who's the law enforcement witness that's

04:31PM   5   listed with respect to that gray box?

04:31PM   6   A.  New York State Police Investigator Mike O'Rourke.

04:31PM   7   Q.  Okay.  And are there some exhibits listed with respect to

04:31PM   8   that Wayne Anderson arrest gray box?

04:31PM   9   A.  Yes, there is.

04:31PM  10   Q.  Okay.

04:31PM  11          MR. COOPER:  And, Ms. Champoux, if you can zoom out

04:31PM  12   of that, please?

04:31PM  13          BY MR. COOPER:

04:31PM  14   Q.  Now, we're going to work our way to the bottom of the

04:31PM  15   chart, but first --

04:31PM  16          MR. COOPER:  Let's zoom in on this first here.  In

04:31PM  17   the center, thank you.

04:31PM  18          BY MR. COOPER:

04:31PM  19   Q.  That gray box at the bottom is called Serio

04:31PM  20   investigation; is that right?

04:31PM  21   A.  That is correct.

04:31PM  22   Q.  And does this list all the counts related to that gray

04:32PM  23   box on Government Exhibit 551?

04:32PM  24   A.  Those all relate to the Serio investigation box.

04:32PM  25   Q.  Okay.

04:32PM      1              **MR. COOPER:**  Ms. Champoux, you can zoom out of that.

04:32PM      2    And let's just zoom in maybe on half of it for the left first,

04:32PM      3    yep.  That's perfect, thank you, ma'am.

04:32PM      4              **BY MR. COOPER:**

04:32PM      5    Q.  Let's work our way quickly from left to right here, on

04:32PM      6    the far left of this Serio investigation gray box, who are

04:32PM      7    the two law enforcement officers listed?

04:32PM      8    A.  It's Lieutenant JoAnn DiNoto, as well as Detective Robert

04:32PM      9    Cottrell.  JoAnn DiNoto was with the Amherst Police

04:32PM     10    Department, and Bob Cottrell was a task force officer with

04:32PM     11    the DEA Safe Streets Task Force, or FBI Safe Streets Task

04:32PM     12    Force.

04:32PM     13    Q.  Okay.  And does it list a number of exhibits between the

04:32PM     14    gray box entitled Serio investigation and JoAnn DiNoto and

04:32PM     15    Bob Cottrell?

04:32PM     16    A.  It does.

04:32PM     17    Q.  Okay.  And let's move on now to the next line over, who's

04:32PM     18    the next law enforcement officer listed?

04:33PM     19    A.  Now inspector, DEA Inspector Shane Nastoff.

04:33PM     20    Q.  Okay.  And are there a number of exhibits listed with

04:33PM     21    respect to the line between the gray box of Serio

04:33PM     22    investigation and witness Shane Nastoff?

04:33PM     23    A.  Yeah, exhibits DEA documents.

04:33PM     24    Q.  Okay.  And are those generally exhibits that Shane

04:33PM     25    Nastoff testified about when he was here?

Case 1:19-cr-00227-LJV-MJR   Document 1336   Filed 11/03/24   Page 102 of 128
USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

102

04:33PM   1   A.   Yes, he did.

04:33PM   2   Q.   Okay.  And let's look at the next line down, who's that?

04:33PM   3   A.   That's special agent -- well, now, Supervisor DEA Mark

04:33PM   4   Gentile.

04:33PM   5   Q.   Okay.  He was just here earlier today, right?

04:33PM   6   A.   Yeah.  Just yeah, this morning and afternoon.

04:33PM   7   Q.   Okay.  And is that source deactivation form for R.K.

04:33PM   8   listed as an exhibit between Mark Gentile and the box

04:33PM   9   entitled Serio investigation?

04:33PM   10   A.   Yeah, it's Exhibit 9E-3 we spoke extensively about.

04:33PM   11   Q.   Okay.  Let's look at the next one.  Who's the next law

04:33PM   12   enforcement witness listed?

04:33PM   13   A.   The next one is Special Agent David Leary with the DEA.

04:33PM   14   Q.   Okay.  And are there a number of exhibits listed here

04:33PM   15   with respect to the Serio investigation and Dave Leary in

04:34PM   16   between them?

04:34PM   17   A.   There's a number of them, I believe the Exhibit 525 has

04:34PM   18   not been put into evidence yet, though.

04:34PM   19   Q.   Got it.

04:34PM   20        MR. COOPER:   Ms. Champoux, can we pull up for a

04:34PM   21   moment Government Exhibit 525 for the witness only?

04:34PM   22        BY MR. COOPER:

04:34PM   23   Q.   Do you recognize this, sir?

04:34PM   24   A.   I certainly do.

04:34PM   25   Q.   What do you recognize it to be?

04:34PM   1   A.   It's a Google Maps or Earth, and it basically documents

04:34PM   2   the difference between the Electric Tower and 82 Sycamore,

04:34PM   3   the Electric Tower being the DEA office at -- in the time of

04:34PM   4   DEA-6 and then the 82 Sycamore warehouse of Serio.

04:34PM   5   Q.   Okay.  And so earlier I asked you if you could see the

04:34PM   6   Electric Tower from 82 Sycamore because I was trying to save

04:34PM   7   some time.  But does Government Exhibit 525 fairly and

04:34PM   8   accurately depict a Google Maps map of the distance between

04:34PM   9   those two locations?

04:34PM   10  A.   Yes, it does.

04:34PM   11  Q.   Okay.

04:34PM   12       MR. COOPER:  With that foundation, I'd offer 525

04:34PM   13  into evidence.

04:35PM   14       MR. MacKAY:  No objection.

04:35PM   15       THE COURT:  Received without objection.

04:35PM   16       **(GOV Exhibit 525 was received in evidence.)**

04:35PM   17       MR. COOPER:  Okay.  Can we publish that briefly,

04:35PM   18  Ms. Champoux.

04:35PM   19       BY MR. COOPER:

04:35PM   20  Q.   Okay.  Is that about how far the two locations are from

04:35PM   21  one another?

04:35PM   22  A.   Yeah, as I testified, just a couple blocks.

04:35PM   23  Q.   Okay.

04:35PM   24       MR. COOPER:  Ms. Champoux, can we take that down

04:35PM   25  please, and pull up 551 again?  And we'll work our way again

04:35PM    1    from the left, yep.  Thank you.

04:35PM    2            BY MR. COOPER:

04:35PM    3    Q.  All right.  So 525, are we in evidence now?

04:35PM    4    A.  Just check.  Yes.  Those are all those exhibits are in

04:35PM    5    evidence.

04:35PM    6    Q.  All right.  Thank you, sir.  And the next name that we

04:35PM    7    can see here, who's that?

04:35PM    8    A.  Annette Skinner.

04:35PM    9    Q.  Okay.  And what do we have listed on the exhibits between

04:35PM   10    Serio investigation and Annette Skinner?

04:35PM   11    A.  Annette Skinner was a -- U.S. Attorney's Office

04:35PM   12    paralegal, and there are exhibits related to her.

04:35PM   13    Q.  Okay.

04:35PM   14            MR. COOPER:  And you can zoom out of that,

04:35PM   15    Ms. Champoux.

04:35PM   16            And let's go now, you know, all of the way to the

04:35PM   17    right.  Perfect, ma'am.  Thank you.

04:35PM   18            BY MR. COOPER:

04:35PM   19    Q.  All right.  Working again from left to right.  The next

04:35PM   20    two law enforcement witnesses listed Scott Deming and Charlie

04:36PM   21    Tolias?

04:36PM   22    A.  Yeah, Scott Deming is a financial investigator for the

04:36PM   23    U.S. Attorney's Office, and Charlie Tolias is a special agent

04:36PM   24    with HSI.

04:36PM   25    Q.  Okay.  And then are there a number of exhibits listed

04:36PM    1   between the gray box entitled Serio investigation and the

04:36PM    2   bubble for Scott Deming?

04:36PM    3   A.   Yes.  Significant number of emails and other exhibits.

04:36PM    4   Q.   Okay.  And then between Scott Deming and Charlie Tolias,

04:36PM    5   are there a couple more exhibits listed?

04:36PM    6   A.   There's two exhibits listed on there.

04:36PM    7   Q.   Got it.  Next to them, who do we have?

04:36PM    8   A.   Captain Kevin Caffery from the Erie County Sheriff's

04:36PM    9   Office.

04:36PM   10   Q.   Okay.  Are there a number of exhibits listed between the

04:36PM   11   gray box and Captain Kevin Caffery?

04:36PM   12   A.   Yes.  The 8G, and as well as 407, 407A and B.

04:36PM   13   Q.   Okay.  Were you present when Captain Kevin Caffery

04:36PM   14   testified?

04:36PM   15   A.   I was.

04:36PM   16   Q.   Did all those exhibits come up while he was testifying?

04:36PM   17   A.   They did.

04:36PM   18   Q.   Okay.

04:36PM   19        **MR. COOPER:**  Let's move to the right.

04:36PM   20        We're almost there, move to the right one more.

04:36PM   21        **BY MR. COOPER:**

04:36PM   22   Q.   What do we have?

04:36PM   23   A.   That is Assistant United States Attorney Timothy Lynch

04:36PM   24   from the U.S. Attorney's Office.

04:36PM   25   Q.   Okay.  Is he a witness who testified at this trial?

04:36PM    1    A.  He did.

04:37PM    2    Q.  Are there a number of exhibits listed between the gray

04:37PM    3    box entitled Serio investigation and the box for Tim Lynch?

04:37PM    4    A.  Yep, there's four exhibits referenced between those.

04:37PM    5    Q.  Okay.  And finally, now, all the way on the right at the

04:37PM    6    bottom, who's that?

04:37PM    7    A.  That's IRS Special Agent David Turri from the criminal

04:37PM    8    division.

04:37PM    9    Q.  And can you read the exhibit that's listed between Serio

04:37PM    10    investigation and the box for IRS Special Agent Dave Turri?

04:37PM    11    A.  That's Exhibit 22S, the date is July 11th, 2013, it's an

04:37PM    12    email from Turri to the defendant and a portion of the email

04:37PM    13    is from the email, drawn from the email is the quote, Mike

04:37PM    14    Masecchia is an associate and possibly a made member of the

04:37PM    15    Buffalo LCN family, end quote.

04:37PM    16    Q.  Okay.

04:37PM    17        **MR. COOPER:**  You can zoom out of that, please,

04:37PM    18    Ms. Champoux.

04:37PM    19        Judge, I have good news.  We're definitely going to

04:38PM    20    finish the direct today.

04:38PM    21        Can you give me one second to review my notes here?

04:38PM    22        **BY MR. COOPER:**

04:38PM    23    Q.  Just a couple of nits to gather up before I sit down,

04:38PM    24    Special Agent Burns.

04:38PM    25    A.  No problem.

04:38PM    1    Q.  Have you heard the name Mike Sinatra come up during the

04:38PM    2    course of this trial?

04:38PM    3    A.  Yes, I have.

04:38PM    4    Q.  Are you aware of any relation that that person has to

04:38PM    5    Hot Dog?

04:38PM    6    A.  Mike Sinatra?

04:38PM    7    Q.  Mike Sinatra.

04:38PM    8    A.  Yeah, the relationship -- so, Paul Francoforte, Hot Dog,

04:38PM    9    his long-time partner, romantic, I guess, common-law wife,

04:39PM   10    something like that, they're not married, but they've been

04:39PM   11    together for a long time.  Her daughter married Michael

04:39PM   12    Sinatra a few years back.

04:39PM   13    Q.  So is there some familial or semi-familial connection

04:39PM   14    between Michael Sinatra and Hot Dog?

04:39PM   15    A.  Yes, there is.

04:39PM   16    Q.  Okay.  When we were talking about 552 earlier, the chart

04:39PM   17    with all the lines on it, remember that?

04:39PM   18    A.  Yeah, the connections.

04:39PM   19    Q.  Okay.

04:39PM   20         MR. COOPER:  Ms. Champoux, can you pull up 552 for

04:39PM   21    one second?

04:39PM   22         BY MR. COOPER:

04:39PM   23    Q.  When we were laying foundation, you indicated that there

04:39PM   24    was one that you realized this week was missing from the

04:39PM   25    chart; is that correct?

04:39PM  1   A.  That's one I would have wanted to have on there.

04:39PM  2   Q.  Okay.  What's the connection that you wish you would have

04:39PM  3   caught before earlier this week?

04:39PM  4   A.  It's Paul Francoforte, Hot Dog, and Frank Bifulco a/k/a

04:40PM  5   Butchie Bifocals, there's a connection between those two.

04:40PM  6   Q.  All right.  Let's draw the line just to satisfy you

04:40PM  7   there.  You see that line there?

04:40PM  8   A.  That makes me feel better, Mr. Cooper.

04:40PM  9   Q.  Okay.  And does Government Exhibit 26D, a DARTS

04:40PM  10  deconfliction entry that shows Paul Francoforte's number

04:40PM  11  showing up in Butch Bifocal's phone records?

04:40PM  12  A.  Right, yeah.  The deconfliction notification indicated

04:40PM  13  that those two were in telephonic communication.

04:40PM  14  Q.  Okay.

04:40PM  15  A.  Based on the toll records.

04:40PM  16  Q.  And did you -- I asked you this before, but did you keep

04:40PM  17  an index with respect to -- is that an example of what was

04:40PM  18  kept in your index, that built this chart out?

04:40PM  19  A.  Yeah.  Exhibits and testimony would just go along as

04:40PM  20  somebody testified to it.  And then additionally, if there

04:40PM  21  was an exhibit that tied people together, a contact, phone

04:40PM  22  contact, someone would be in somebody's phone contact would

04:40PM  23  be an example.  So we built it or built it out of the

04:40PM  24  evidence that was admitted at this trial throughout the --

04:40PM  25  since August 5th.

04:40PM  1    Q.  Okay.

04:40PM  2           **MR. COOPER:**  Ms. Champoux, can you take that down,

04:40PM  3    please?

04:41PM  4           Can I just have one second?

04:41PM  5           No further direct, Judge.  Thank you.

04:41PM  6           **THE COURT:**  Mr. MacKay.

04:41PM  7

04:41PM  8                   **CROSS-EXAMINATION BY MR. MacKAY:**

04:41PM  9    Q.  Okay.  Good afternoon Special Agent Burns, how are you?

04:41PM  10   A.  Tired.

04:41PM  11   Q.  You and me both.

04:41PM  12   A.  You look tired, Mr. MacKay.

04:41PM  13   Q.  You and I have come to know each other fairly well over a

04:41PM  14   number of months; fair to say?

04:41PM  15   A.  Definitely fair to say.

04:41PM  16   Q.  And that's because you occupy a unique position that no

04:41PM  17   other witness in this trial occupies; is that fair to say?

04:41PM  18   A.  I mean, I think Marilyn Halliday -- Special Agent

04:41PM  19   Halliday --

04:41PM  20   Q.  Well, the two of you occupy the position I'm talking

04:41PM  21   about, right?

04:41PM  22   A.  Correct.

04:41PM  23   Q.  You are what are called summary witnesses, in a fashion

04:41PM  24   that sit here, you get to see all the evidence, you get to

04:41PM  25   testify in the trial, correct?

04:42PM    1    A.  That's correct.

04:42PM    2    Q.  All of other witnesses go through a process called

04:42PM    3    sequestration where they're not allowed to hear any of the

04:42PM    4    other testimony, they come in and give their testimony,

04:42PM    5    correct?

04:42PM    6    A.  That's accurate.

04:42PM    7    Q.  Okay.  So, that's sort of what led you to be here in the

04:42PM    8    seat today?

04:42PM    9    A.  That's accurate.

04:42PM   10    Q.  Okay.  But you're not just here to summarize everything,

04:42PM   11    correct?

04:42PM   12    A.  Ummm --

04:42PM   13    Q.  Well, let me reword that.

04:42PM   14        You also had some actual fact investigation in this case,

04:42PM   15    correct?

04:42PM   16    A.  Oh, yeah.  Quite a bit.  Search warrants and --

04:42PM   17    Q.  Let's start with some of that first.

04:42PM   18    A.  Okay.

04:42PM   19    Q.  We'll go way back --

04:42PM   20    A.  Okay.

04:42PM   21    Q.  -- to 2009, 2010, that's about the time you come back to

04:42PM   22    Buffalo, correct?

04:42PM   23    A.  January 2008, but I was going back and forth, had some

04:42PM   24    trials in Memphis.

04:42PM   25    Q.  Right.  So about that time, though, you land in the FBI's

04:42PM   1   office here in Buffalo, and eventually you get involved in an

04:42PM   2   investigation surrounding Gables, correct?

04:42PM   3   A.  That's correct.

04:42PM   4   Q.  And that centers on a few different people, one of them

04:42PM   5   Steve Brucato, correct?

04:42PM   6   A.  Correct.

04:42PM   7   Q.  And there's Anthony Anastasia, correct?

04:42PM   8   A.  Correct.

04:42PM   9   Q.  And the other one is Joe Mesi, correct?

04:43PM  10   A.  That's correct.

04:43PM  11   Q.  And apart from that, too, is there's suspicion that

04:43PM  12   there's several law enforcement officials that might be

04:43PM  13   frequenting the bar, number 1, involved in drug use, correct?

04:43PM  14   A.  That's accurate.

04:43PM  15   Q.  Number 2, passing information, correct?

04:43PM  16   A.  That's correct.

04:43PM  17   Q.  And to be clear, Joe Bongiovanni's name never came up in

04:43PM  18   that investigation, correct?

04:43PM  19   A.  No, not in that investigation.

04:43PM  20   Q.  Now, what happens is, ultimately FBI makes an arrest of

04:43PM  21   the three individuals that I talked about, correct?

04:43PM  22   A.  That's correct.

04:43PM  23   Q.  They swoop in on two of them, and they find a third one

04:43PM  24   doing cocaine at one of the houses, correct?

04:43PM  25   A.  There's -- they were arrested at separate times.  But the

04:43PM   1   one individual starts cooperating, and then the third

04:43PM   2   individual, Mr. Mesi, is doing cocaine at Mr. Brucato's

04:43PM   3   house.

04:43PM   4   Q.   Okay.  And so just so the jury understands, we use the

04:43PM   5   term "arrest."  FBI swoops in, and they arrest them in the

04:43PM   6   sense they put them in handcuffs and detain them, correct?

04:43PM   7   A.   Yeah.  "Detain" is probably a better -- arrest/detain.

04:44PM   8   Q.   Yeah.  They're detained.  But they're not arrested in the

04:44PM   9   sense that they go down to jail that night and charges are

04:44PM  10   filed, correct?

04:44PM  11   A.   Right.  It would be detained.  Right.  An arrest -- it

04:44PM  12   depends what you want to talk about, but you're right, an

04:44PM  13   arrest would involve subsequent to the arrest processing at

04:44PM  14   the U.S. Marshal's or the Erie County --

04:44PM  15   Q.   Right.  So long story short, these three individuals all

04:44PM  16   leave the scene that day, correct?

04:44PM  17   A.   Right.  And, again, they weren't all the same day.

04:44PM  18   Q.   Scene of the arrest, I'll say.

04:44PM  19   A.   Yeah, that's -- that's more accurate.

04:44PM  20   Q.   They're back into the community after this law

04:44PM  21   enforcement action?

04:44PM  22   A.   That's correct.

04:44PM  23   Q.   Joe Mesi becomes an FBI cooperator, correct?

04:44PM  24   A.   He does.

04:44PM  25   Q.   Anthony Anastasia becomes a cooperator, but kind of only

04:44PM    1    for a little while, correct?

04:44PM    2    A.   Yeah, he didn't -- he fell off the program.

04:44PM    3    Q.   Okay.  Now the sort of catch-and-release scenario, that's

04:44PM    4    relatively common in federal law enforcement investigations?

04:44PM    5    A.   It can be.  It's situational depending on the target and

04:44PM    6    are they under indictment.  There's a lot of factors, but

04:44PM    7    that does happen --

04:44PM    8    Q.   Right.

04:45PM    9    A.   -- from time to time when you're --

04:45PM   10    Q.   It's not uncommon to release people who are arrested back

04:45PM   11    into the community, and then potentially follow up later with

04:45PM   12    charges, correct?

04:45PM   13    A.   Follow up later with charges, and make them a cooperator,

04:45PM   14    yeah, that's very common.

04:45PM   15    Q.   Or perhaps never charge them, correct?

04:45PM   16    A.   Yeah, that happens.  Certainly.

04:45PM   17    Q.   Okay.  And when you're doing these sort of arrests, you

04:45PM   18    know, this is not like a knock on the door and, hi, how are

04:45PM   19    you doing; fair to say?

04:45PM   20    A.   These particular ones?  That wasn't -- I was only present

04:45PM   21    for the Mesi one --

04:45PM   22    Q.   Okay.

04:45PM   23    A.   -- so I can't say exactly how the other ones went down.

04:45PM   24    Q.   Fair to say, though, the usual course of business is, you

04:45PM   25    know, a number of law enforcement officials descend on a

04:45PM     1    house, correct?

04:45PM     2    A.  Yeah, it can be.

04:45PM     3    Q.  And in your experience, executing both search warrants

04:45PM     4    and arrest warrants in these sort of scenarios, neighbors

04:45PM     5    often take an interest in what's going on, correct?

04:45PM     6    A.  Yeah, correct.

04:45PM     7    Q.  You often have to keep them away from a scene, correct?

04:45PM     8    A.  Sometimes.

04:45PM     9    Q.  Obviously, the neighbors know, you know, who their

04:45PM    10    neighbors are at the house, correct?

04:45PM    11    A.  That's correct.

04:45PM    12    Q.  And specifically, with Anthony Anastasia and Brucato,

04:46PM    13    they're known to work at the neighborhood bar in North

04:46PM    14    Buffalo, Gables, correct?

04:46PM    15    A.  Yeah, they both were long-time bartenders, managers at

04:46PM    16    Gables.

04:46PM    17    Q.  Yeah.  And Gables, fair to say, is a neighborhood bar in

04:46PM    18    the North Buffalo area?

04:46PM    19    A.  Yeah, it was, yes.

04:46PM    20    Q.  Yeah, at one point it was.  And, so, after the arrest,

04:46PM    21    both of these individuals go back to the bartending business

04:46PM    22    at Gables, correct?

04:46PM    23    A.  Yes.  Yeah.  Brucato, definitely.  Anastasia, I'm not as

04:46PM    24    familiar, but yeah, he did.

04:46PM    25    Q.  Okay.  Now at that same point in time, you knew Mike

04:46PM   1   Masecchia to be a general resident of the North Buffalo area,

04:46PM   2   correct?

04:46PM   3   A.  Yeah, he was definitely a North Buffalo guy.

04:46PM   4   Q.  Yeah, I mean, he -- at the time he maintained a residence

04:46PM   5   on Colvin Boulevard, correct?

04:46PM   6   A.  I don't want to commit to being at that time, but he was

04:46PM   7   a longtime resident.  He might have been on Colvin at that

04:47PM   8   time.

04:47PM   9   Q.  Yeah, I mean, fair to say he had a reputation for

04:47PM  10   patronizing the bars in North Buffalo?

04:47PM  11   A.  Definitely.

04:47PM  12   Q.  Grew up in that neighborhood, correct?

04:47PM  13   A.  Mike Masecchia, yes.

04:47PM  14   Q.  Yes.  Okay.  Now, fast forward a little bit, just so we

04:47PM  15   can clarify, this is entirely an FBI operation, correct?

04:47PM  16   A.  At that point, yes.

04:47PM  17   Q.  Right.  So up to the arrest and after for a while,

04:47PM  18   there's no DEA involvement, correct?

04:47PM  19   A.  No, none at all.

04:47PM  20   Q.  Because this is an investigation that originally began

04:47PM  21   with FBI, correct?

04:47PM  22   A.  Safe Streets Task Force and, yeah, myself on the public

04:47PM  23   corruption side.

04:47PM  24   Q.  Drugs and public corruption, correct?

04:47PM  25   A.  Correct.

04:47PM    1    Q.  Okay.  Fast forward a little bit, and come to learn DEA

04:47PM    2    separately arrests Anthony Anastasia, correct?

04:47PM    3    A.  That's correct.

04:47PM    4    Q.  And it's about the 2011 timeframe?

04:47PM    5    A.  Yeah, because we go -- '10, 2010 was our investigative --

04:47PM    6    and the arrest you're referring to, and then the 2011 was

04:47PM    7    Shane Nastoff.

04:47PM    8    Q.  And at that time in 2011, it's because Anthony Anastasia

04:48PM    9    is drug dealing, correct?

04:48PM   10    A.  Yes.

04:48PM   11    Q.  And he's out in the community, correct?

04:48PM   12    A.  Right.  He's back doing that, correct.

04:48PM   13    Q.  As you were starting to say, he's back out doing what

04:48PM   14    he's doing before?

04:48PM   15    A.  Correct.

04:48PM   16    Q.  And DEA makes an arrest of him, correct?

04:48PM   17    A.  That's correct.

04:48PM   18    Q.  And you understood Shane Nastoff to be the agent who

04:48PM   19    arrests him, correct?

04:48PM   20    A.  Yeah.  He utilized a source, and --

04:48PM   21    Q.  Okay.

04:48PM   22    A.  -- ultimately arrests and detains him I think.

04:48PM   23    Q.  Right.  Yeah.  And just so remind the source, we may have

04:48PM   24    heard him before, is Richard Himbury, correct?

04:48PM   25    A.  That's correct.

USA v Bongiovanni - Burns - MacKay/Cross - 9/26/24

04:48PM   1   Q.  Now ultimately that creates problems with FBI because

04:48PM   2   there's a little bit of deconfliction that has to be dealt

04:48PM   3   with, correct?

04:48PM   4   A.  I don't say problem, I mean, it happens all the time

04:48PM   5   where another agency or another investigative or police

04:48PM   6   department or somebody has, you know, I just don't like the

04:48PM   7   word "problem," but yes, it necessitates a deconfliction and

04:48PM   8   kind of who's -- what are we gonna charge this person with,

04:48PM   9   what's your purpose of the investigation.  Deconfliction.

04:48PM   10  Q.  Well, and when I use the word "problem" here, one of the

04:48PM   11  issues that arose was that when DEA and FBI deconflicted,

04:49PM   12  there were concerns about whether the new DEA investigation

04:49PM   13  would compromise the FBI CI, correct?

04:49PM   14  A.  Absolutely.

04:49PM   15  Q.  And that CI was Joe Mesi, correct?

04:49PM   16  A.  That's correct, yes.

04:49PM   17  Q.  So deconfliction is done to make sure these

04:49PM   18  investigations are completely separated, correct?

04:49PM   19  A.  That's correct.

04:49PM   20  Q.  And that DEA doesn't learn about Joe Mesi, correct?

04:49PM   21  A.  I wasn't present for the deconfliction, so I don't know

04:49PM   22  who knew what.  I wasn't at that meeting.

04:49PM   23  Q.  But to your understanding, the intention was to keep

04:49PM   24  these two investigations entirely separate, correct?

04:49PM   25  A.  I wouldn't feel comfortable testifying because I wasn't

04:49PM    1    at that deconfliction meeting, so I don't know what was, you

04:49PM    2    know, I kind of was working with Mesi and Safe Streets was

04:49PM    3    involved in that deconfliction.

04:49PM    4    Q.  Ultimately there is a deconfliction that takes place,

04:49PM    5    correct?

04:49PM    6    A.  Right, and I'm not present for that.

04:49PM    7    Q.  Yeah.  And Dan Bradley the FBI --

04:49PM    8    A.  Yes.

04:49PM    9    Q.  -- is part of it?

04:49PM   10    A.  That's correct.

04:49PM   11    Q.  And did you understand Shane Nastoff to be part of that

04:49PM   12    from the DEA end?

04:49PM   13    A.  Yes.

04:50PM   14    Q.  And then it's supervised in some fashion by the members

04:50PM   15    of the U.S. Attorney's Office?

04:50PM   16    A.  Yeah, I believe based on the document I reviewed, AUSA

04:50PM   17    Joseph Guerra was part of that.

04:50PM   18    Q.  Okay.  And, you know, your understanding because of the

04:50PM   19    way the investigation ultimately proceeded, the decision was

04:50PM   20    made we can't charge -- DEA can't charge Anastasia based on

04:50PM   21    anything back in 2011 because that could implicate the FBI's

04:50PM   22    investigation, correct?

04:50PM   23    A.  I wasn't privy.  I would believe that if Anastasia

04:50PM   24    pleads, Anastasia had, you know, wanted -- if they had to

04:50PM   25    indict him and bring him to trial, I suspect they would have

04:50PM   1   brought that evidence from the previous one to make the

04:50PM   2   strongest case.

04:50PM   3   Q.  Okay.  But ultimately, Brucato's not charged -- I'm

04:50PM   4   sorry, Anastasia is not charged for what occurs in 2011 with

04:50PM   5   the FBI investigation, correct?

04:50PM   6   A.  I haven't seen his plea agreement, but I think that's

04:50PM   7   accurate.

04:50PM   8   Q.  Right.  I mean, do you have any reason to disagree with

04:50PM   9   me that he's ultimately charged for what happens that the DEA

04:51PM  10   arrest him for, correct?

04:51PM  11   A.  I just can't without seeing the charge of what he pled to

04:51PM  12   and understanding what was the relevant conduct was, what was

04:51PM  13   included in there.

04:51PM  14   Q.  Sure.  And we can move on.

04:51PM  15   A.  Okay.

04:51PM  16   Q.  But as you sit here today, you had no direct knowledge

04:51PM  17   that any names of any FBI CIs were shared with DEA, correct?

04:51PM  18   A.  I had no knowledge.

04:51PM  19   Q.  I mean, because you were weren't part of the

04:51PM  20   deconfliction meeting between DEA and FBI, correct?

04:51PM  21   A.  That's correct.

04:51PM  22   Q.  And, you know, whatever trickled down to you or however

04:51PM  23   you know it, you have no knowledge that FBI passed the name

04:51PM  24   of their CI to DEA, correct?

04:51PM  25   A.  Repeat that again?  I'm sorry.

04:51PM    1    Q.  It might have been a bad question.

04:51PM    2        To your knowledge, you never know whether DEA learned

04:51PM    3    about Joe Mesi being an informant, correct?

04:51PM    4    A.  They may have, based on some other -- or, like, Dave

04:51PM    5    Turri would have been aware.  Mesi and --

04:51PM    6    Q.  I'm not asking, like, who might have been aware of what.

04:51PM    7    But as far as you know, as you sit here today, I mean, you

04:51PM    8    weren't present with any of the deconfliction --

04:52PM    9    A.  I wasn't.

04:52PM   10    Q.  -- meetings.  Okay.

04:52PM   11        And it happened all through the United States Attorney's

04:52PM   12    Office, correct?

04:52PM   13    A.  I can't speak to that.  I don't know the communication

04:52PM   14    between Dan Bradley -- Special Agent Dan Bradley and Special

04:52PM   15    Agent Shane Nastoff.

04:52PM   16    Q.  And then from there, you have no specific knowledge of

04:52PM   17    anything that occurs on the DEA side of things, correct?

04:52PM   18    A.  Other than what I've heard through this trial.

04:52PM   19    Q.  Right.  I mean, so as you're going forward in the years

04:52PM   20    2011, 2012, '13, '14, you don't know anything about what's

04:52PM   21    going on about the DEA investigation, correct?

04:52PM   22    A.  I do not.

04:52PM   23    Q.  Okay.  And just a reminder, throughout all that time,

04:52PM   24    Steve Brucato is still out in the community uncharged with a

04:52PM   25    crime, correct?

04:52PM    1    A.  I wasn't active in that part of the investigation, I

04:52PM    2    mean, I -- I believe he was not charged, I just can't say

04:52PM    3    definitively whether.

04:52PM    4    Q.  Do you understand that Steve Brucato was never ultimately

04:52PM    5    charged in relation?

04:52PM    6    A.  That's what I believe, yeah, I understand that.

04:53PM    7    Q.  Okay.  You participate in the Pharaoh's search in 2019,

04:53PM    8    correct?

04:53PM    9    A.  In December, yes.

04:53PM    10   Q.  Yeah.  So that's after Joseph Bongiovanni charged,

04:53PM    11   correct?

04:53PM    12   A.  Yes.

04:53PM    13   Q.  And part of your duties at that search were to collect

04:53PM    14   evidence, correct?

04:53PM    15   A.  Mostly, I interviewed the manager, John Ermin a/k/a Tommy

04:53PM    16   O, that -- my predominant job was to interview that manager.

04:53PM    17   Q.  Okay.  Well, so in some capacity, though, you came to

04:53PM    18   learn or you did it yourself that DVRs were recovered from

04:53PM    19   Pharaoh's, correct?

04:53PM    20   A.  Yes.  I was aware that those DVRs were recovered, and

04:53PM    21   they had been reviewed.  But specifically that day, my job

04:53PM    22   that day was to --

04:53PM    23   Q.  And you found they were working insofar as they captured

04:53PM    24   the footage, correct?

04:53PM    25   A.  Yes, they captured the footage that I discussed on my

04:54PM    1    direct testimony.

04:54PM    2    Q.  Okay.  So, at least when you were there in December of

04:54PM    3    2019, it appears there were working cameras of Pharaoh's

04:54PM    4    going back at least, say, seven weeks?

04:54PM    5    A.  Well, one of the DVRs went back seven weeks, and the

04:54PM    6    other two went back two weeks.

04:54PM    7    Q.  Okay.

04:54PM    8    A.  And they had a bunch of cameras attached to them.

04:54PM    9    Q.  Yeah, I mean, so you observed that there were a number of

04:54PM   10    cameras throughout the facility, correct?

04:54PM   11    A.  I didn't personally observe, because I was really focused

04:54PM   12    on my interview.  But, yeah, in the reviewing the DVR, the

04:54PM   13    investigative team is aware that there were multiple cameras.

04:54PM   14    Q.  And you can see it based on, like, the number --

04:54PM   15    A.  Yeah.

04:54PM   16    Q.  -- of different cameras that shows in the DVR, correct?

04:54PM   17    A.  Yeah, that's accurate.

04:54PM   18         **MR. MacKAY:**  Judge, now might be a got time to stop.

04:54PM   19         **THE COURT:**  So let's do it.

04:54PM   20         And, folks, I want to -- don't jump up quite yet.

04:54PM   21    Let's talk a minute about next week.

04:54PM   22         So, there's still a chance that we're going to be on

04:54PM   23    track for what I said earlier, even with the delays that we

04:54PM   24    had.  So I'd like you to come in at 8:30 on Monday and be

04:54PM   25    prepared to stay until 5:30.  And be prepared to do the same

| | | |
|---|---|---|
| 04:55PM | 1 | thing on Tuesday.  It may not be necessary, but it may.  And |
| 04:55PM | 2 | if we're close, because it's, like, dominoes right?  There's |
| 04:55PM | 3 | so many moving parts that if we go past a certain point, we're |
| 04:55PM | 4 | gonna -- the delays are gonna be more substantial. |
| 04:55PM | 5 | So I want to try to get this done if we can so that |
| 04:55PM | 6 | the lawyers can sum up to you, as I said before, on Tuesday. |
| 04:55PM | 7 | If that's impossible, it's impossible, and we'll deal |
| 04:55PM | 8 | with it.  But it will just make things go a whole lot easier |
| 04:55PM | 9 | and more streamlined if we can. |
| 04:55PM | 10 | So the long and the short of it is come in at 8:30. |
| 04:55PM | 11 | In fact, come in earlier.  You know, today we planned on 8:30 |
| 04:55PM | 12 | and we couldn't because of traffic, so try to come in earlier |
| 04:55PM | 13 | so that you're here waiting.  I'll be here earlier, I promise. |
| 04:55PM | 14 | And we'll try to start right at 8:30.  And be prepared to go |
| 04:55PM | 15 | to 5:30, maybe even with a short lunch, again, depending on |
| 04:55PM | 16 | how things go, maybe the same thing on Tuesday. |
| 04:55PM | 17 | And then Wednesday, we're definitely starting at |
| 04:56PM | 18 | 8:30.  Although, probably won't have to go past 5:00, but |
| 04:56PM | 19 | definitely starting at 8:30.  Okay? |
| 04:56PM | 20 | And because we're in the home stretch now, please |
| 04:56PM | 21 | remember my instructions, and -- don't blow it now, folks. |
| 04:56PM | 22 | Don't use tools of technology to communicate with anyone about |
| 04:56PM | 23 | the case.  Don't communicate with anyone about the case in any |
| 04:56PM | 24 | way at all. |
| 04:56PM | 25 | At the football game on Sunday night when you folks |

04:56PM   1   are at your football parties watching the Bills and the

04:56PM   2   Ravens, you know, don't talk about this case.  People are

04:56PM   3   going to ask you, don't talk to them about it.  Don't try to

04:56PM   4   learn anything about this case outside the courtroom either

04:56PM   5   with tools of technology, or books, or maps, or anything.

04:56PM   6          And don't read, watch, or listen to any news coverage

04:56PM   7   of the case while the trial is still in progress.  Don't make

04:56PM   8   up your mind until you start deliberating.  Okay?

04:56PM   9          Everybody have a wonderful weekend.  We will see you

04:56PM   10  on Monday morning at 8:30.  Get a good night's sleep on Sunday

04:57PM   11  night.  Drive carefully.

04:57PM   12          (Jury excused at 4:57 p.m.)

04:57PM   13          **THE COURT:**  Okay.  Anything?

04:57PM   14          **MR. COOPER:**  Just one thing, Judge.  The blow-up of

04:57PM   15  8A-6 that we had Special Agent Burns mark off, I think for

04:57PM   16  record purposes for any potential matter beyond the trial, we

04:57PM   17  should mark that and preserve it.

04:57PM   18          **THE COURT:**  Oh, I do, too.

04:57PM   19          **MR. COOPER:**  Okay.  So it's -- I would suggest to the

04:57PM   20  Court so that it's distinguishable from 8A-6, which is also

04:57PM   21  available in electronic, is to mark it 8A-6.1, like, period 1.

04:58PM   22  Are you good with that?

04:58PM   23          **MR. MacKAY:**  I think that's good, Judge.  We've used

04:58PM   24  that notation already.

04:58PM   25          **THE COURT:**  We have?

04:58PM   1          **MR. MacKAY:**  No, I meant generally.

04:58PM   2          **THE COURT:**  Oh, okay.  Okay.  So then fine, yes.

04:58PM   3          **MR. COOPER:**  Okay.  Great.  So we'll amend that, I'll

04:58PM   4   do it with Parker after, we'll amend the exhibit sticker.

04:58PM   5          **THE COURT:**  Okay, good.

04:58PM   6          Anything from the defense?

04:58PM   7          **MR. SINGER:**  I actually have one thing.

04:58PM   8          So on Agent Gentile's -- I think it was re-redirect,

04:58PM   9   Mr. Tripi got up and presented him a handwriting, I guess,

04:58PM   10  exemplar of trying to draw out Agent Gentile's signature.

04:58PM   11         **THE COURT:**  Um-hum.

04:58PM   12         **MR. SINGER:**  I'd like a copy of that so I can present

04:58PM   13  that to my expert.

04:58PM   14         **MR. TRIPI:**  Oh, sure.  I have to find that.

04:58PM   15         **THE COURT:**  Yeah, absolutely.  And we should preserve

04:58PM   16  that, too.

04:58PM   17         **MR. TRIPI:**  I'll rip the page out.

04:58PM   18         **THE COURT:**  That was just shown to him, not the jury?

04:58PM   19         **MR. TRIPI:**  Yeah, it was just shown to him.

04:58PM   20         **THE COURT:**  Find it, Mr. Tripi.

04:58PM   21         **MR. TRIPI:**  What's that?

04:58PM   22         **THE COURT:**  I said find it.

04:58PM   23         **MR. TRIPI:**  I'm looking, Judge, I'm looking.

04:58PM   24         **MR. COOPER:**  Oh.  It's already ripped out.

04:58PM   25         **MR. TRIPI:**  No, that's not it.  I knew it was on a

04:59PM    1    half sheet of paper.

04:59PM    2            **THE COURT:**  Are we ready?  Okay.  Great.

04:59PM    3            Okay.  Anything else folks?  See you at 11:00

04:59PM    4    tomorrow.  11:00 tomorrow.

04:59PM    5            Are you going to be here, Mr. Bongiovanni, tomorrow?

04:59PM    6            **THE DEFENDANT:**  Do you want me to?

04:59PM    7            **THE COURT:**  That is up to you and your lawyers.  It's

04:59PM    8    the charge conference, so that is up to you and your lawyers.

04:59PM    9            **THE DEFENDANT:**  I don't want to -- I want to make

04:59PM    10   sure I'm good with you.

05:00PM    11           **THE COURT:**  No, no, no, you're always fine with me.

05:00PM    12   But you guys can make that call.

05:00PM    13           **MR. SINGER:**  Yeah, we talked to Mr. Bongiovanni, and

05:00PM    14   since it's purely a legal discussion and it may only last

05:00PM    15   frankly a half hour or less, we're gonna waive his appearance.

05:00PM    16           **THE COURT:**  Your lips to God's ears.

05:00PM    17           **MR. SINGER:**  I'm not making any promises, Judge.

05:00PM    18           **THE COURT:**  I know, I know, I know.

05:00PM    19           Okay, thanks.  See you tomorrow morning.

05:00PM    20           **MR. TRIPI:**  Judge, I handed up the note.

05:00PM    21           **THE COURT:**  Yes.

05:00PM    22           **MR. TRIPI:**  Maybe Ms. Demma can be kind enough to

05:00PM    23   make a couple copies.

05:00PM    24           **THE COURT:**  That's what she just said she's going to

05:00PM    25   do.

05:00PM 1     **THE CLERK:** Are we going to mark this as a Court

05:00PM 2 exhibit?

05:00PM 3     **MR. SINGER:** Yes, Court exhibit.

05:00PM 4     **MR. TRIPI:** Court exhibit.

05:00PM 5     **THE CLERK:** I think we're at 8.

05:00PM 6     (Proceeding concluded at 5:00 p.m.)

7          *    *    *    *    *    *    *

8

9

10

11              **CERTIFICATE OF REPORTER**

12

13          In accordance with 28, U.S.C., 753(b), I

14 certify that these original notes are a true and correct

15 record of proceedings in the United States District Court for

16 the Western District of New York on September 26, 2024.

17

18              s/ Ann M. Sawyer
                Ann M. Sawyer, FCRR, RPR, CRR
19              Official Court Reporter
                U.S.D.C., W.D.N.Y.

20

21

22

23

24

25

1

2                          **TRANSCRIPT INDEX**

3           **EXCERPT - EXAMINATION OF BRIAN BURNS - DAY 1**

4                        **SEPTEMBER 26, 2024**

5

6     **W I T N E S S**                          **P A G E**

7     **B R I A N    B U R N S**                  2

8        DIRECT EXAMINATION BY MR. COOPER:        2

9        CROSS-EXAMINATION BY MR. MacKAY:         109

10

11

12    **E X H I B I T S**                          **P A G E**

13    GOV Exhibit 367                              28

14    GOV Exhibit 552                              74

15    GOV Exhibit 553                              74

16    GOV Exhibit 551                              87

17    GOV Exhibit 525                              103

18

19

20

21

22

23

24

25