1              UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF NEW YORK
2
   _____
3  UNITED STATES OF AMERICA,
                                Case No. 1:19-cr-227
4                  Plaintiff,              (LJV)
   v.
5                              September 25, 2024
   JOSEPH BONGIOVANNI,
6
   _____Defendant._____
7

8    TRANSCRIPT EXCERPT - EXAMINATION OF ANTHONY CASULLO - DAY 2
            BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                  UNITED STATES DISTRICT JUDGE

10 APPEARANCES:          TRINI E. ROSS, UNITED STATES ATTORNEY
                        BY: JOSEPH M. TRIPI, ESQ.
11                          NICHOLAS T. COOPER, ESQ.
                            CASEY L. CHALBECK, ESQ.
12                      Assistant United States Attorneys
                        Federal Centre, 138 Delaware Avenue
13                      Buffalo, New York 14202
                        For the Plaintiff
14
                        SINGER LEGAL PLLC
15                      BY: ROBERT CHARLES SINGER, ESQ.
                        80 East Spring Street
16                      Williamsville, New York 14221
                          And
17                      LAW OFFICES OF PARKER ROY MacKAY
                        BY: PARKER ROY MacKAY, ESQ.
18                      3110 Delaware Avenue
                        Kenmore, New York 14217
19                        And
                        OSBORN, REED & BURKE, LLP
20                      BY: JOHN J. GILSENAN, ESQ.
                        120 Allens Creek Road
21                      Rochester, New York 14618
                        For the Defendant
22
   PRESENT:             BRIAN A. BURNS, FBI Special Agent
23                      MARILYN K. HALLIDAY, HSI Special Agent
                        KAREN A. CHAMPOUX, USA Paralegal
24
   LAW CLERK:           REBECCA FABIAN IZZO, ESQ.
25

| | |
|---|---|
| 1 | **COURT DEPUTY CLERK:**   **COLLEEN M. DEMMA** |
| 2 | **COURT REPORTER:**       **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 3 |                          Robert H. Jackson Federal Courthouse<br>2 Niagara Square<br>Buffalo, New York  14202 |
| 4 |                          Ann_Sawyer@nywd.uscourts.gov |
| 5 | |
| 6 |                 *    *    *    *    *    *    * |
| 7 | |
| 8 |        (Excerpt commenced at 9:42 p.m.) |
| 9 |        (Jury is present.) |

09:42AM  10        **THE COURT:**  The record will reflect that all our

09:42AM  11  jurors are here.

09:42AM  12         I remind the witness that he's still under oath.

09:42AM  13         And, Mr. Singer, you may continue.

09:42AM  14

09:42AM  15  **A N T H O N Y   C A S U L L O**, having been previously duly

09:42AM  16  called and sworn, continued to testify as follows:

09:42AM  17

09:42AM  18             **(CONT'D) CROSS-EXAMINATION BY MR. SINGER:**

09:42AM  19  Q.  Good morning, Mr. Casullo.

09:42AM  20  A.  Good morning.

09:42AM  21  Q.  So yesterday we left off going through some of the events

09:42AM  22  that led up to that August 1, 2018 meeting you had with the

09:42AM  23  U.S. Attorneys, correct?

09:42AM  24  A.  Correct.

09:42AM  25  Q.  So I want to get a little bit more into that particular

09:43AM 1  meeting.  At that meeting, there were a number of prosecutors

09:43AM 2  involved in the case; is that right?

09:43AM 3  A.  At that meeting, so this was the meeting that my

09:43AM 4  supervisor attended?

09:43AM 5  Q.  That's correct, yes.  G.S. McHugh was there?

09:43AM 6  A.  G.S. McHugh and AUSA Tripi, I believe.

09:43AM 7  Q.  Okay.

09:43AM 8  A.  He was there, I don't know if there was anybody else.

09:43AM 9  Q.  Okay.  So you remember that G.S. McHugh was with you at

09:43AM 10  the meeting?

09:43AM 11  A.  Yes.

09:43AM 12  Q.  Do you recall that you were at the meeting?

09:43AM 13  A.  Yes.

09:43AM 14  Q.  You recall that AUSA Tripi was at the meeting?

09:43AM 15  A.  Correct.

09:43AM 16  Q.  Could there have been other people at the meeting

09:43AM 17  possibly?

09:43AM 18  A.  I can't remember.

09:43AM 19  Q.  Okay.  And -- and you went into the meeting under the

09:43AM 20  understanding that you were there to discuss the Anthony

09:43AM 21  Gerace/Peter Gerace investigation?

09:43AM 22  A.  Correct.

09:43AM 23  Q.  So, when you get there and you sit down at the conference

09:43AM 24  table, you don't immediately start discussing what's going on

09:43AM 25  with that part of the investigation, right?

| | | |
|---|---|---|
| 09:43AM | 1 | A.  I don't remember how it started. |
| 09:43AM | 2 | Q.  But you do recall that AUSA Tripi raised a concern with |
| 09:44AM | 3 | you regarding your brother-in-law, Phil Domiano? |
| 09:44AM | 4 | A.  Yes. |
| 09:44AM | 5 | Q.  And so we've learned a little bit about Phil Domiano |
| 09:44AM | 6 | yesterday on direct, so he's your brother-in-law, right? |
| 09:44AM | 7 | A.  Correct. |
| 09:44AM | 8 | Q.  He's your wife's brother? |
| 09:44AM | 9 | A.  Yes. |
| 09:44AM | 10 | Q.  You had mentioned that he had been a little bit of a |
| 09:44AM | 11 | thorn in your side, for lack of a better word, during the |
| 09:44AM | 12 | duration with your with relationship your wife? |
| 09:44AM | 13 | A.  Pretty much. |
| 09:44AM | 14 | Q.  He's somebody who you don't really like a lot, correct? |
| 09:44AM | 15 | A.  We don't talk. |
| 09:44AM | 16 | Q.  And he's someone that your wife doesn't necessarily get |
| 09:44AM | 17 | along with either? |
| 09:44AM | 18 | A.  I wouldn't say that.  I mean, it's her brother, so she |
| 09:44AM | 19 | talks to him. |
| 09:44AM | 20 | Q.  But a little less based on her relationship with you? |
| 09:44AM | 21 | A.  Yeah.  Probably. |
| 09:44AM | 22 | Q.  You talked about how, you know, from time to time you |
| 09:44AM | 23 | would see him, right? |
| 09:44AM | 24 | A.  Yeah. |
| 09:44AM | 25 | Q.  Yeah, so for instance, like when you lived out in |

09:44AM  1    Las Vegas, Phil Domiano lived out in Las Vegas, correct?

09:44AM  2    A.  Correct.

09:44AM  3    Q.  And he's someone who you'd see from time to time at

09:44AM  4    family events?

09:44AM  5    A.  Correct.

09:44AM  6    Q.  That kind of thing?

09:44AM  7    A.  Yep.

09:44AM  8    Q.  And when you would return to Buffalo, when he was living

09:45AM  9    in Buffalo, you'd run into him here, correct?

09:45AM  10   A.  So he came back to Buffalo when I was in New York for

09:45AM  11   several months, so yeah, I'd seen him several times when I'd

09:45AM  12   come when I'd come back on weekends.

09:45AM  13   Q.  Yeah, you talked about the one time where -- where you

09:45AM  14   went over to Brennan's to get some chicken wings, right?

09:45AM  15   A.  Correct.

09:45AM  16   Q.  And Phil Domiano was there, correct?

09:45AM  17   A.  Yes.

09:45AM  18   Q.  And then Peter Gerace came in shortly thereafter?

09:45AM  19   A.  Yes.

09:45AM  20   Q.  And that's when Peter Gerace passed you his cell phone

09:45AM  21   contact number -- or sorry, took yours?

09:45AM  22   A.  Gave him mine, yes.

09:45AM  23   Q.  Right.  So -- so Phil, he lived here at one point in time

09:45AM  24   back in 2014 into 2015, correct?

09:45AM  25   A.  Yeah.  It was, again, I can't remember if it was like six

09:45AM    1    months exact timeframe but it was while I was in New York

09:45AM    2    City which was, what, December of 2013 up until September of

09:45AM    3    2015.  So --

09:45AM    4    Q.  And at that point in time when he has back here in

09:45AM    5    Buffalo, you'd -- he had taken a job with Peter Gerace at

09:45AM    6    Pharaoh's Gentlemen's Club, correct?

09:45AM    7    A.  I found that out, yes.

09:45AM    8    Q.  He was a manager over there, correct?

09:46AM    9    A.  That's what I was told.

09:46AM   10    Q.  So Domiano, besides having this connection to Peter

09:46AM   11    Gerace up here in Buffalo, he also had some connections to

09:46AM   12    some more unsavory people involved in narcotics back in Las

09:46AM   13    Vegas; is that right?

09:46AM   14    A.  That's what I believe.

09:46AM   15    Q.  And you also believe that he had some connections or

09:46AM   16    relationships with people you believe to have IOC connections

09:46AM   17    in Vegas, correct?

09:46AM   18    A.  I think so.

09:46AM   19    Q.  So, at the meeting, AUSA Tripi tells you that he has some

09:46AM   20    concerns about your continued involvement in investigating

09:46AM   21    the case because Phil Domiano pops up as part of their

09:46AM   22    investigation, correct?

09:46AM   23    A.  Again, I don't remember exactly what he said, but there

09:46AM   24    was a concern, yeah.

09:46AM   25    Q.  And a particular concern was -- is that the investigators

| | | |
|---|---|---|
| 09:46AM | 1 | were focusing in on possible overdoses and they believed that |
| 09:46AM | 2 | Phil may have been involved as a manager at the same time |
| 09:47AM | 3 | that a woman may have overdosed at Pharaoh's? |
| 09:47AM | 4 | A.  That's not how it was presented to me. |
| 09:47AM | 5 | Q.  You don't remember that part? |
| 09:47AM | 6 | A.  I remember it was presented to me that there was a police |
| 09:47AM | 7 | report where they found a woman in a parking lot and she was |
| 09:47AM | 8 | unconscious at the time.  And the police were called.  When |
| 09:47AM | 9 | the police got there, I think they came, too, and I believe |
| 09:47AM | 10 | Phil Domiano was present or a witness, but was on the police |
| 09:47AM | 11 | report. |
| 09:47AM | 12 | Q.  And so in this situation, your brother-in-law, he's on |
| 09:47AM | 13 | the police report revolving around this incident, correct? |
| 09:47AM | 14 | A.  That's what I was told. |
| 09:47AM | 15 | Q.  And he's working for Peter Gerace who's the target of the |
| 09:47AM | 16 | investigation, correct? |
| 09:47AM | 17 | A.  Which I found out afterwards. |
| 09:47AM | 18 | Q.  And, so, Peter Gerace, at that point in time, there might |
| 09:47AM | 19 | be information that Phil Domiano, your brother-in-law, |
| 09:47AM | 20 | possesses regarding Peter Gerace, right? |
| 09:47AM | 21 | A.  At that time -- |
| 09:47AM | 22 | Q.  Yes. |
| 09:47AM | 23 | A.  -- when he was interviewed?  I mean, possibly.  I mean, |
| 09:47AM | 24 | logically, I would think so if he was -- |
| 09:48AM | 25 | Q.  And he also might possess information regarding Pharaoh's |

09:48AM  1   Gentlemen's Club based on his relationship with Gerace and

09:48AM  2   working there as a manager, right?

09:48AM  3   A.  I think he would.

09:48AM  4   Q.  And, so this would put you in a position because you may

09:48AM  5   be either using your brother-in-law as a witness against

09:48AM  6   Peter Gerace, right?

09:48AM  7   A.  I'm confused with that question now.

09:48AM  8   Q.  Sure.  So -- so, let's say Phil Domiano had absolutely

09:48AM  9   nothing to do with this girl found in the parking lot?

09:48AM  10  A.  Okay.

09:48AM  11  Q.  He's still a witness to that, correct?

09:48AM  12  A.  Based on the police report that I saw, he was a witness.

09:48AM  13  Q.  And he's your brother-in-law, right?

09:48AM  14  A.  And he's my brother-in-law.

09:48AM  15  Q.  And you're the lead investigator in the case at the time,

09:48AM  16  right?

09:48AM  17  A.  At which time?

09:48AM  18  Q.  At the time that you're sitting down, talking to AUSA

09:48AM  19  Tripi --

09:48AM  20  A.  Yes.

09:48AM  21  Q.  -- on August 1st, 2018?

09:48AM  22  A.  Yeah, yes, yep.

09:48AM  23  Q.  And on top of that, let's say Phil Domiano has something

09:48AM  24  that's -- that's not innocent involved in this situation in

09:48AM  25  the parking lot at Pharaoh's, right?

09:48AM  1    Let's say that he doesn't have that.  You'd be

09:48AM  2  potentially investigating your brother-in-law as a target,

09:48AM  3  correct?

09:49AM  4  A.  Again, based on the circumstances, if it had something to

09:49AM  5  do with Pharaoh's or Peter Gerace, yeah, that would be a

09:49AM  6  conflict.

09:49AM  7  Q.  And so, that was the concern that AUSA Tripi announced to

09:49AM  8  you that morning, correct?

09:49AM  9  A.  Pretty much, that was my understanding.

09:49AM  10  Q.  Because I think yesterday you talked about how you're

09:49AM  11  either in or out of a case when you know someone who's

09:49AM  12  subject to the investigation, right?

09:49AM  13  A.  Yeah.  One way or another, you have a discussion with

09:49AM  14  your supervisor if you think there is a conflict and then a

09:49AM  15  decision is made either to keep you in or not.

09:49AM  16  Q.  And you said yesterday that, you know, if -- if you know

09:49AM  17  someone who's a potential target or witness in the

09:49AM  18  investigation, that that's something that puts you on

09:49AM  19  outside, correct, you have to stop doing what you're doing?

09:49AM  20  A.  Again -- again, it depends.  I mean, that's a discussion

09:49AM  21  with your supervisor and you discuss it.

09:49AM  22  Q.  So there's no clear line when you're related to a

09:49AM  23  potential witness or a target in an investigation that says

09:49AM  24  all stop, you can't investigate anymore?

09:50AM  25  A.  I wouldn't say there's a clear line.  There's a

09:50AM  1   discussion with the supervisor, and then the supervisor and

09:50AM  2   usually an assistant special agent in charge, there would be

09:50AM  3   a discussion, and they would decide to either keep you in the

09:50AM  4   investigation depending on the circumstances or not, or if

09:50AM  5   something else occurred going forward that you could possibly

09:50AM  6   be removed.  It just depends on the situation.

09:50AM  7   Q.  So that morning, you explained to AUSA Tripi and the

09:50AM  8   others at the -- the meeting that -- that you don't believe

09:50AM  9   there's a conflict based on what you're told, correct?

09:50AM  10  A.  Could you be more specific?

09:50AM  11  Q.  Certainly.  So, based on, after AUSA Tripi announces his

09:50AM  12  concerns to you in this meeting, you tell him that you don't

09:50AM  13  believe there's a conflict that requires your removal from

09:50AM  14  the case?

09:50AM  15  A.  Again, I never told him that at that time.  I don't

09:50AM  16  remember the exact conversation in terms of the words, but

09:50AM  17  I -- I don't believe I told him that I shouldn't be involved

09:50AM  18  at that point.

09:50AM  19  Q.  You don't -- you don't believe that you told him you

09:50AM  20  should continue involvement at that time?

09:50AM  21  A.  That I should continue involvement?

09:50AM  22  Q.  Yes.

09:50AM  23  A.  I was still involved at that time.

09:51AM  24  Q.  And you believed at that point in time, notwithstanding

09:51AM  25  what you learned about Domiano, in this incident, you should

09:51AM   1   continue forward as being the investigator in the case,

09:51AM   2   correct?

09:51AM   3   A.  Well, there was a discussion shortly after that where my

09:51AM   4   supervisors did remove me.

09:51AM   5   Q.  Well, I'm not interested in that discussion later.  What

09:51AM   6   I'm asking about is the August 1st, 2018 meeting.  And at

09:51AM   7   that meeting, notwithstanding what AUSA Tripi told you, you

09:51AM   8   stated that you believe you should remain on the

09:51AM   9   investigation?

09:51AM  10   A.  Again, I don't remember those exact words, but I

09:51AM  11   certainly didn't tell him at that time that I should be

09:51AM  12   removed from the investigation.

09:51AM  13   Q.  Okay.  So you don't recall saying something to the effect

09:51AM  14   of, hey, I should -- I should remain here, notwithstanding

09:51AM  15   what -- what I learned about Domiano?

09:51AM  16   A.  I don't think that was really the words of the

09:51AM  17   conversation.

09:51AM  18   Q.  But -- but, you -- you -- you do remember not saying

09:51AM  19   anything to the effect of I should be off this case at this

09:51AM  20   point?

09:51AM  21   A.  Well, again, with AUSA Tripi there and my supervisor, I

09:51AM  22   did not say I should be off this investigation.

09:52AM  23   Q.  So, going a little bit backwards to the summer of 2016,

09:52AM  24   we talked yesterday about how you opened the investigation

09:52AM  25   into Peter Gerace and one of the first things you did was --

| | | |
|---|---|---|
| 09:52AM | 1 | was run his telephone information? |
| 09:52AM | 2 | A.  Pulled tolls, excuse me. |
| 09:52AM | 3 | Q.  And that resulted in information being discovered that |
| 09:52AM | 4 | Joe Bongiovanni was in contact with Peter Gerace by |
| 09:52AM | 5 | telephone? |
| 09:52AM | 6 | A.  Correct. |
| 09:52AM | 7 | Q.  And that's something that you alerted G.S. Yensan about, |
| 09:52AM | 8 | correct? |
| 09:52AM | 9 | A.  Correct. |
| 09:52AM | 10 | Q.  And then after that, you noticed that Agent Bongiovanni |
| 09:52AM | 11 | was giving you the cold shoulder around the office? |
| 09:52AM | 12 | A.  Yes. |
| 09:52AM | 13 | Q.  And so at that point in time, you made the decision |
| 09:52AM | 14 | that -- I gotta try to smooth things over here? |
| 09:52AM | 15 | A.  Correct. |
| 09:52AM | 16 | Q.  And that's when you offered an invitation to Agent |
| 09:52AM | 17 | Bongiovanni to come meet you in the conference room at the |
| 09:52AM | 18 | DEA, correct? |
| 09:52AM | 19 | A.  Correct. |
| 09:52AM | 20 | Q.  So you talked a little bit about the conference room.  So |
| 09:52AM | 21 | that's something -- that's a room inside the -- the general |
| 09:53AM | 22 | area where everyone works at the DEA? |
| 09:53AM | 23 | A.  Right.  So on that side of the group, D-57, we had our |
| 09:53AM | 24 | own conference room that was just off the hallway.  So I |
| 09:53AM | 25 | consider on the side of D-57, but anybody could use it. |

09:53AM  1    Q.  Yeah, it's just a regular conference room where you guys

09:53AM  2    would have your weekly meetings or regular meetings?

09:53AM  3    A.  Right.

09:53AM  4    Q.  And this is not like a soundproof room or interview room

09:53AM  5    for a suspect, right?

09:53AM  6    A.  I mean, I have no idea if it's soundproof or not.

09:53AM  7    Q.  Just a good old-fashioned conference room?

09:53AM  8    A.  It's just a conference room.

09:53AM  9    Q.  So, you invite Joe to meet you in the conference room and

09:53AM  10   he accepts the invitation?

09:53AM  11   A.  Pretty much, yeah.

09:53AM  12   Q.  The two of you walk into the room?

09:53AM  13   A.  Yes.

09:53AM  14   Q.  The door's closed?

09:53AM  15   A.  I believe I shut the door.

09:53AM  16   Q.  And that's when you two discuss what happened, correct?

09:53AM  17   A.  Correct.

09:53AM  18   Q.  And so you talked about how you -- you did this and you

09:53AM  19   weren't trying to get him in trouble in any way, right?

09:53AM  20   A.  Correct.

09:53AM  21   Q.  And he said something to the effect of, you know, this is

09:53AM  22   bullshit?

09:53AM  23   A.  Yes.

09:53AM  24   Q.  So he was displeased with what's happening as a result of

09:54AM  25   you looking into Peter Gerace?

09:54AM    1    A.  I mean, based on what he said.

09:54AM    2    Q.  And, so, this was something you didn't talk to

09:54AM    3    Mr. Bongiovanni about before sitting down with Greg Yensan

09:54AM    4    and deciding to subpoena the toll records, correct?

09:54AM    5    A.  No.

09:54AM    6    Q.  Like you didn't give him a heads-up, like, hey, you know,

09:54AM    7    I'm going open an investigation, I'm going to get subpoena

09:54AM    8    records for Peter Gerace's phone number, you didn't tell

09:54AM    9    him --

09:54AM   10    A.  No, I didn't discuss that with Joe.

09:54AM   11    Q.  That was only something that he learned after the fact,

09:54AM   12    correct?

09:54AM   13    A.  I'm sorry.

09:54AM   14    Q.  Sure.  That was only something he learned about after it

09:54AM   15    was done, correct?

09:54AM   16    A.  Learned about?

09:54AM   17    Q.  After you subpoenaed the records --

09:54AM   18    A.  I'm sorry, but what are you asking that I learned about?

09:54AM   19    Q.  I'm not asking you.  I'm asking it was only something

09:54AM   20    Mr. Bongiovanni learned about after you ran the subpoena,

09:54AM   21    correct?

09:54AM   22    A.  I don't know when he learned about it.  Based on my

09:54AM   23    conversations with Greg Yensan, Greg said that he --

09:54AM   24    Q.  Again I'm not interested in what Mr. Yensan said?

09:54AM   25    A.  Yeah, I don't know when Joe learned about it.

09:54AM  1    Q.   Okay.

09:54AM  2         MR. COOPER:  Judge, I'm going to object at this

09:55AM  3    point.  The question is about what Mr. Bongiovanni knew and

09:55AM  4    when he knew it.  The witness is trying to answer, and

09:55AM  5    Mr. Singer is cutting him off.

09:55AM  6         THE COURT:  No.

09:55AM  7         MR. COOPER:  That's the question that's asked.

09:55AM  8         THE COURT:  I don't -- I don't think he's cutting him

09:55AM  9    off.  The objection is overruled.

09:55AM  10        Go ahead, next question.

09:55AM  11        BY MR. SINGER:

09:55AM  12   Q.   So -- so you do know that after you sit down with Greg

09:55AM  13   Yensan and talk to him about Joe's number came up, Joe's

09:55AM  14   behavior towards you changes, correct?

09:55AM  15   A.   Correct.

09:55AM  16   Q.   So that would indicate to you that he found out at some

09:55AM  17   point, right?

09:55AM  18   A.   Correct.

09:55AM  19   Q.   And this is something that -- that caught him by

09:55AM  20   surprise; fair statement?

09:55AM  21        MR. COOPER:  Objection as to what caught the

09:55AM  22   defendant by surprise.  How could he know that?

09:55AM  23        THE COURT:  Caught the defendant by surprise?  Is

09:55AM  24   that what you're asking?

09:55AM  25        MR. SINGER:  Yes.

09:55AM    1          **THE COURT:**  Sustained.

09:55AM    2          **BY MR. SINGER:**

09:55AM    3    Q.  So, again, you didn't tell Mr. Bongiovanni that you were

09:55AM    4    running subpoenas on Mr. Gerace's phone before you did it,

09:55AM    5    right?

09:55AM    6    A.  I didn't tell him.

09:55AM    7    Q.  Okay.  So, one of the things after Mr. Bongiovanni said

09:55AM    8    it was bullshit that you talked about yesterday on direct was

09:56AM    9    that he told you something to the effect of that Peter Gerace

09:56AM   10    is -- is not a drug dealer, he's a drug abuser, right?

09:56AM   11    A.  In sum and substance.

09:56AM   12    Q.  And another thing you testified about was that when you

09:56AM   13    were having this conversation, Mr. Bongiovanni said something

09:56AM   14    to the effect of this kid called me up when a stripper was

09:56AM   15    overdosing at the club and I told her to get her out of

09:56AM   16    there?

09:56AM   17    A.  Correct.

09:56AM   18    Q.  And, so, this particular conversation that you had, you

09:56AM   19    weren't recording this conversation, right?

09:56AM   20    A.  No.

09:56AM   21    Q.  You weren't taking notes during this conversation, right?

09:56AM   22    A.  No.

09:56AM   23    Q.  You weren't taking any notes after the conversation,

09:56AM   24    correct?

09:56AM   25    A.  Not right after.  It was down the road.

09:56AM 1   Q.  Yeah.  So what I'm getting at is like after you left the

09:56AM 2   meeting, you didn't jot down on a pad, this is what I said to

09:56AM 3   Joe and this is what Joe said?

09:56AM 4   A.  No.

09:56AM 5   Q.  You didn't write a report about this, right?

09:57AM 6   A.  No.

09:57AM 7   Q.  So your memory is that -- is that Joe had told Gerace to

09:57AM 8   get the person out of there who's overdosing?

09:57AM 9   A.  And I told, what I said, is what it was.

09:57AM 10  Q.  Do you recall any type of discussion about Narcan?

09:57AM 11  A.  Absolutely not.

09:57AM 12  Q.  You don't recall any discussion about Narcan coming up

09:57AM 13  during your conversation in the conference room?

09:57AM 14  A.  Absolutely 100 percent no.

09:57AM 15  Q.  When Joe told you based on what you stated in direct

09:57AM 16  yesterday that -- that Peter Gerace should get her out of

09:57AM 17  there, did you follow up with any questions?

09:57AM 18  A.  No, I was in shock.

09:57AM 19  Q.  So you never asked what do you mean by that?

09:57AM 20  A.  No.  I was in shock what he had just said to me.

09:57AM 21  Q.  Do you know if Joe Bongiovanni was referring to calling

09:58AM 22  911?

09:58AM 23  A.  That never was said.

09:58AM 24  Q.  Do you know if the "get her out of there" comment

09:58AM 25  referred to get that person medical attention?

09:58AM    1    A.   That was never said.

09:58AM    2    Q.   Do you know if the comment "get her out of there"

09:58AM    3    referred to get that person to a hospital?

09:58AM    4    A.   That was never said.

09:58AM    5    Q.   And you never asked any follow-up questions to understand

09:58AM    6    what that meant, right?

09:58AM    7    A.   No, I was too in shock that a convicted felon had just

09:58AM    8    called a DEA agent about a stripper overdosing in his club,

09:58AM    9    and I was trying to process that.

09:58AM    10   Q.   Okay.  You would agree with me at least that keeping a

09:58AM    11   person at Pharaoh's Gentlemen's Club who has overdosed inside

09:58AM    12   the club is not really going to provide them much help,

09:58AM    13   right?

09:58AM    14   A.   My belief, if someone is overdosing, you don't move them

09:58AM    15   and you call paramedics.  That is my experience based on

09:59AM    16   being a police officer, based on training that I've had, and

09:59AM    17   first responder training.  That's my belief.

09:59AM    18   Q.   That's what I'm getting at.

09:59AM    19   A.   That's what you do.  You call someone that is a

09:59AM    20   paramedic, 911, someone that could attend to that person.

09:59AM    21   Q.   That's what I'm getting at, is that -- is that if there's

09:59AM    22   no medical attention available at Pharaoh's Gentlemen's Club,

09:59AM    23   that person's not gonna get any help by remaining there,

09:59AM    24   correct?

09:59AM    25   A.   Oh, no, you -- you call someone.  They remain there.

| | | |
|---|---|---|
| 09:59AM | 1 | That could become a crime scene if someone's overdosing. |
| 09:59AM | 2 | Q.  And, again, that's not the question I asked, sir. |
| 09:59AM | 3 | A.  Okay. |
| 09:59AM | 4 | Q.  What I asked you is that if there's no medical attention |
| 09:59AM | 5 | available at Pharaoh's Gentlemen's Club, keeping that person |
| 09:59AM | 6 | at Pharaoh's Gentlemen's Club is not gonna get them any help, |
| 09:59AM | 7 | right? |
| 09:59AM | 8 | A.  What's going to get them help is by calling someone for |
| 09:59AM | 9 | help. |
| 09:59AM | 10 | Q.  I agree.  Because there's no medical attention, to your |
| 09:59AM | 11 | understanding, at Pharaoh's Gentlemen's Club, right? |
| 09:59AM | 12 | A.  I have no idea. |
| 09:59AM | 13 | Q.  And when you heard this comment, you're processing it, |
| 09:59AM | 14 | you said, right? |
| 09:59AM | 15 | A.  Trying to. |
| 10:00AM | 16 | Q.  What's going through your head when you're trying to |
| 10:00AM | 17 | process what was said? |
| 10:00AM | 18 | A.  That a convicted felon had just called a DEA agent about |
| 10:00AM | 19 | a stripper overdosing at his club.  And why would that -- why |
| 10:00AM | 20 | would that even happen?  Why -- to me, as a DEA agent, |
| 10:00AM | 21 | receiving phone calls from someone that is a convicted felon |
| 10:00AM | 22 | about someone overdosing for what purpose, what purpose could |
| 10:00AM | 23 | I possibly serve at that moment to help that situation? |
| 10:00AM | 24 | Common sense tells me that you would call a paramedic to help |
| 10:00AM | 25 | someone that's overdosing, not call a DEA agent that |

10:00AM   1   investigates narcotics crimes.  It doesn't even make sense to

10:00AM   2   me.

10:00AM   3   Q.  So, is it a fair statement that you inferred some type of

10:00AM   4   nefarious purpose behind the call?

10:00AM   5   A.  At the end of that meeting, trying to process everything,

10:00AM   6   that was one of the things I was trying to process.  If he

10:00AM   7   was being called for some possible nefarious purpose such as

10:01AM   8   covering up an overdose, that Gerace might be calling him as

10:01AM   9   a convicted felon, a DEA agent to figure out how to deal with

10:01AM  10   this situation.

10:01AM  11       Not for the health of the person that had overdosed,

10:01AM  12   which to me is common sense, but because a stripper overdosed

10:01AM  13   in a strip club of a convicted felon that's running that club

10:01AM  14   somehow, and that is a huge problem for that person.

10:01AM  15   Q.  So, it seems like there's a couple of things going on.

10:01AM  16   So I want to break that down.

10:01AM  17       So on one hand, we just talked is this call by Peter

10:01AM  18   Gerace to Joe Bongiovanni not for help, right?  That's one

10:01AM  19   thing that's going on in your head?

10:01AM  20   A.  Possibly.

10:01AM  21   Q.  Another thing that's going on in your head is why would

10:01AM  22   Peter Gerace not pick up the call -- a phone and call 911,

10:01AM  23   and instead pick up the phone and call Joe Bongiovanni?

10:01AM  24   That's not going to get Peter Gerace help, correct?

10:01AM  25   A.  Why is he calling Joe Bongiovanni based on those

10:01AM    1    circumstances.

10:01AM    2    Q.  So, there's this back and forth that you're having in

10:02AM    3    your mind as you're trying to process this between is it

10:02AM    4    Peter Gerace called Joe Bongiovanni and you don't get the

10:02AM    5    point of that?  Or Peter Gerace called Joe Bongiovanni and

10:02AM    6    there's something nefarious behind it, right?

10:02AM    7    A.  It is the shock of hearing it, first of all.  And then

10:02AM    8    during the moments afterwards and within that timeframe of

10:02AM    9    trying to process that whole thing.

10:02AM   10    Q.  And I -- is it a fair statement that one of the reasons

10:02AM   11    you have this back and forth in your mind when you're trying

10:02AM   12    to process what you were told is that you knew Joe

10:02AM   13    Bongiovanni for several months at that point in time,

10:02AM   14    correct?

10:02AM   15    A.  I had known Joe since I met him years ago when I would

10:02AM   16    come home in the summer.

10:02AM   17    Q.  Yeah, but as far as like a working relationship, you had

10:02AM   18    known him for a longer period of time in the office for

10:02AM   19    several months at that point?

10:02AM   20    A.  Several months.

10:02AM   21    Q.  I think you mentioned that you -- you worked a couple

10:02AM   22    different cases together when you first got up to the DEA in

10:02AM   23    Buffalo in September of 2015?

10:02AM   24    A.  Correct.

10:02AM   25    Q.  And, so, you know, there's some trust that you developed

10:03AM    1    between Agent Bongiovanni when you worked together?

10:03AM    2    A.  Correct.

10:03AM    3    Q.  And so that's something that's influencing this back and

10:03AM    4    forth?

10:03AM    5    A.  It's -- it's bothersome to me.

10:03AM    6    Q.  So after this comment's made, you two continued to

10:03AM    7    converse, correct?

10:03AM    8    A.  For a little bit.

10:03AM    9    Q.  And one of the things you talked about yesterday was that

10:03AM    10   at some point, Mr. Bongiovanni accused you of having some

10:03AM    11   type of Italian-American bias, correct?

10:03AM    12   A.  He asked if I hated Italians.

10:03AM    13   Q.  And so you're Italian-American, correct?

10:03AM    14   A.  I am.

10:03AM    15   Q.  He's Italian-American, correct?

10:03AM    16   A.  Yes.

10:03AM    17   Q.  And so if one Italian-American is accusing another

10:03AM    18   Italian-American of anti-Italian-American bias, that's

10:03AM    19   something that would strike you as odd off the bat?

10:03AM    20   A.  I found what he said to me as highly insulting.

10:04AM    21   Q.  Okay.  So, you drew that comment as an insult, correct?

10:04AM    22   A.  I found it insulting.  And I also at the same time found

10:04AM    23   it concerning as if he was trying to convince me not to

10:04AM    24   investigate Peter Gerace.

10:04AM    25   Q.  All right.  So you drew two negative inferences from that

10:04AM   1   comment that was made, correct?

10:04AM   2   A.   Based on what I just told you, those two negative

10:04AM   3   inferences.

10:04AM   4   Q.   And then after this comment back and forth when you deny

10:04AM   5   that you have a bias like that, that's when you allege that

10:04AM   6   Mr. Bongiovanni made this racial remark about who the DEA

10:04AM   7   should be investigating, correct?

10:04AM   8   A.   It was shortly after that.  First he asked if Gerace was

10:04AM   9   friends with my brother-in-law, and then made the racial

10:04AM   10  comments.

10:04AM   11  Q.   Now you stated yesterday on direct that when you two

10:04AM   12  first get into the conference room, Joe Bongiovanni's angry,

10:04AM   13  right?

10:04AM   14  A.   Again, he's not talking to me.

10:04AM   15  Q.   But when you get into the conference room, you can see

10:05AM   16  that he's visibly upset, correct?

10:05AM   17  A.   Based on him saying this is bullshit, he seemed upset.

10:05AM   18  Q.   Mr. Cooper asked you, is he upset crying or upset mad.

10:05AM   19  And you said it's not crying, it's mad; remember that?

10:05AM   20  A.   Yeah.

10:05AM   21  Q.   So he's mad in that meeting, right?

10:05AM   22  A.   Yeah, I would say upset.

10:05AM   23  Q.   He's saying it's bullshit to start right off the bat,

10:05AM   24  correct?

10:05AM   25  A.   Correct.

| | | |
|---|---|---|
| 10:05AM | 1 | Q.  And your guy's voices are not -- you know, just sitting |
| 10:05AM | 2 | there and just having a normal conversation, correct? |
| 10:05AM | 3 | A.  We're not screaming at each other. |
| 10:05AM | 4 | Q.  But things are elevated as you said yesterday on direct? |
| 10:05AM | 5 | A.  The mood -- the mood, and there was tension, is elevated. |
| 10:05AM | 6 | Q.  Okay.  So -- so, he's elevated, he's mad, he's angry, |
| 10:05AM | 7 | right? |
| 10:05AM | 8 | A.  He seems upset. |
| 10:05AM | 9 | Q.  He's saying things in an upset tone to you, correct? |
| 10:05AM | 10 | A.  He did initially. |
| 10:05AM | 11 | Q.  And when you testified on direct yesterday, you mentioned |
| 10:05AM | 12 | that when he made this racial remark, that he lowered his |
| 10:05AM | 13 | voice; do you remember saying that? |
| 10:05AM | 14 | A.  I do. |
| 10:05AM | 15 | Q.  And so unlike all the other comments that were being made |
| 10:06AM | 16 | back and forth between you and him, he lowered his tone of |
| 10:06AM | 17 | voice at this point in time? |
| 10:06AM | 18 | A.  Again, I don't know about all of the comments at the |
| 10:06AM | 19 | beginning when he came in and said this is bullshit and then |
| 10:06AM | 20 | spouted out about Gerace calling him when a stripper |
| 10:06AM | 21 | overdosed at his club.  That was more animated in terms of |
| 10:06AM | 22 | being upset. |
| 10:06AM | 23 | I'd have to go through it step by step based on what I |
| 10:06AM | 24 | believe was the point that he calmed down. |
| 10:06AM | 25 | Q.  So -- |

USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

25

10:06AM   1    A.  That the tone was lowered at some point.

10:06AM   2    Q.  So -- so, it's your testimony that when he made this

10:06AM   3    racial comment, his -- he was calmer?

10:06AM   4    A.  His tone of his voice was quieter.  I wouldn't call it a

10:06AM   5    whisper, but it was toned down and quieter.

10:06AM   6    Q.  So, after this comment is made, you know it's wrong,

10:06AM   7    right?

10:06AM   8    A.  Well, absolutely.  Again, in shock, trying to process

10:07AM   9    that a federal agent had just said that to me.  So, yes, I do

10:07AM   10   know it's wrong.

10:07AM   11   Q.  Okay.  So unlike the comment about the stripper and get

10:07AM   12   her out of there, you don't have this back and forth in your

10:07AM   13   mind of what does this mean?  What is Joe trying to

10:07AM   14   communicate to me, right?

10:07AM   15   A.  I -- I knew very much so what he was trying to

10:07AM   16   communicate.

10:07AM   17   Q.  And so the racial remark doesn't have that back and forth

10:07AM   18   in your head.  You just know right off the bat, that's

10:07AM   19   something that's not appropriate?

10:07AM   20   A.  It's shocking, and it's wrong, and he does not want me to

10:07AM   21   investigate Peter Gerace.

10:07AM   22   Q.  So, the time that this comment was made, you allege that

10:07AM   23   was June of 2016, correct?

10:07AM   24   A.  Yeah.  Whatever I testified to that timeframe.

10:07AM   25   Q.  And you'd been in the DEA at that point in time for about

USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

10:07AM    1    15 years, a little bit more?

10:07AM    2    A.   So -- approximately.

10:07AM    3    Q.   And when you're in the DEA for that period of time,

10:08AM    4    there's trainings that you go to as far as racial

10:08AM    5    sensitivity, right?

10:08AM    6    A.   We had ethics training at the DEA academy.  I don't know

10:08AM    7    if there was ongoing training.  I believe there was diversity

10:08AM    8    training that we had throughout the year, possibly.  I don't

10:08AM    9    remember specifically, but it wouldn't be uncommon.

10:08AM    10    Q.   Yeah, so I mean, like, you started at the DEA in 1999,

10:08AM    11    you went to the academy, right?

10:08AM    12    A.   Correct.

10:08AM    13    Q.   You had the ethics training there?

10:08AM    14    A.   Yes.

10:08AM    15    Q.   But, you know, safe to say, things changed over the

10:08AM    16    course of 15 years, 16 years, when you get up to 2016,

10:08AM    17    correct?

10:08AM    18    A.   What's changed?

10:08AM    19    Q.   As far as trainings that you received in the DEA?

10:08AM    20    A.   I continued to receive training over those years.

10:08AM    21    Q.   And racial sensitivity training, that's -- that's a

10:08AM    22    training that went on, maybe not in 1999 as much as it did

10:08AM    23    later in your career; is that right?

10:08AM    24    A.   Again, with DEA, we had it at the academy.  I can't

10:08AM    25    specifically remember specific training with DEA.  I did have

Case 1:19-cr-00227-LJV-MJR   Document 1337   Filed 11/03/24   Page 27 of 103
USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

27

| | | |
|---|---|---|
| 10:08AM | 1 | more afterwards when I went to the State Attorney General's |
| 10:09AM | 2 | Office, which was different. |
| 10:09AM | 3 | Q.  Okay.  Let's just focus -- |
| 10:09AM | 4 | A.  After -- |
| 10:09AM | 5 | Q.  -- let's just focus in on DEA. |
| 10:09AM | 6 | A.  Sure. |
| 10:09AM | 7 | Q.  So your understanding of DEA policy is that if a fellow |
| 10:09AM | 8 | officer in the DEA makes a comment like that, that's |
| 10:09AM | 9 | something that you need to report, correct? |
| 10:09AM | 10 | A.  Correct. |
| 10:09AM | 11 | Q.  And it's not something that you hold onto and try to |
| 10:09AM | 12 | process, the reporting rules are you need to report that to a |
| 10:09AM | 13 | supervisor, correct? |
| 10:09AM | 14 | A.  Correct. |
| 10:09AM | 15 | Q.  And you're clear in the policy -- you're clear on that |
| 10:09AM | 16 | policy in June of 2016, correct? |
| 10:09AM | 17 | A.  Yes. |
| 10:09AM | 18 | Q.  But you don't report it following your conversation, |
| 10:09AM | 19 | right? |
| 10:09AM | 20 | A.  No, I didn't. |
| 10:09AM | 21 | Q.  Walking out of that meeting, you were torn a little bit |
| 10:09AM | 22 | about is that comment about the stripper and get her out of |
| 10:09AM | 23 | there something that Peter Gerace made the phone call to the |
| 10:09AM | 24 | wrong person, or made the phone call to someone who might be |
| 10:09AM | 25 | engaged in illegal misconduct with Peter Gerace, right? |

10:09AM  1   A.  What do you mean "the wrong person?"

10:10AM  2   Q.  So you mentioned that one of the reasons why you were

10:10AM  3   trying to process what that call meant is that why would

10:10AM  4   Peter Gerace call Joe Bongiovanni?  Why wouldn't he just call

10:10AM  5   911; do you remember testifying about that a few moments ago?

10:10AM  6   A.  Yeah, I was completely caught off guard.

10:10AM  7   Q.  And the other part of it was is Peter Gerace calling Joe

10:10AM  8   Bongiovanni because Joe Bongiovanni has some involvement in

10:10AM  9   this or has some type of involvement in a coverup, right?

10:10AM  10  A.  Possibly.

10:10AM  11  Q.  And so that's going back and forth in your head at that

10:10AM  12  point in time.  When is it that you resolve what the nature

10:10AM  13  of that comment was?

10:10AM  14  A.  The nature of the stripper overdosing?

10:10AM  15  Q.  Yes.

10:10AM  16  A.  I -- I didn't.  I didn't.  I had no idea what he was

10:10AM  17  talking about.

10:10AM  18  Q.  So you didn't walk out of that meeting and then make a

10:10AM  19  decision a day or so later that this was for a bad purpose,

10:10AM  20  right?

10:10AM  21  A.  I never made a conscious decision that I can remember.

10:10AM  22  But I can tell you that I was believing more in this being a

10:10AM  23  bad thing about Gerace calling a DEA agent for help.  And in

10:11AM  24  my opinion at the time, help to cover something up.

10:11AM  25  Q.  And that was based on the fact that in addition to this

Case 1:19-cr-00227-LJV-MJR    Document 1337    Filed 11/03/24    Page 29 of 103
USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

29

10:11AM   1   one particular comment about the stripper and get her out of

10:11AM   2   there, there was also this racial remark that you allege

10:11AM   3   happened in the conversation, right?

10:11AM   4   A.   Both those took place in that conversation.

10:11AM   5   Q.   And so if you have both those together, why isn't it that

10:11AM   6   you go to the supervisor and report all of it at that time?

10:11AM   7   A.   Sure.  Sure.  Very confused.  Trying to process the whole

10:11AM   8   situation.  In shock.  Dealing -- sorry to use the term -- a

10:11AM   9   shit sandwich situation and not knowing what to do.

10:11AM   10       I genuinely did not know as an experienced agent how to

10:11AM   11   deal with that situation.

10:11AM   12   Q.   Would you agree with me that you didn't have, like, any

10:11AM   13   type of long-standing allegiance to Joe Bongiovanni back in

10:11AM   14   June of 2016?

10:12AM   15   A.   I have no idea what you mean, Mr. Singer.  If you

10:12AM   16   could --

10:12AM   17   Q.   Sure.

10:12AM   18   A.   -- explain that.

10:12AM   19   Q.   So you worked with him for a few months; is that right?

10:12AM   20   A.   I worked with him for several months on a couple cases,

10:12AM   21   long-term investigation at that point is probably eight

10:12AM   22   months that I'm in the DEA office in Buffalo.

10:12AM   23   Q.   And you said that before you joined the office in

10:12AM   24   September of 2015, you met Mr. Bongiovanni from time to time

10:12AM   25   at a social event that you may have attended?

USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

30

10:12AM    1    A.  Correct.

10:12AM    2    Q.  So you didn't grow up with him, right?

10:12AM    3    A.  I did not.

10:12AM    4    Q.  You weren't friends with him, correct?

10:12AM    5    A.  I never knew Joe Bongiovanni until I got hired by DEA.

10:12AM    6    Q.  When you got up here in September of 2016, it wasn't like

10:12AM    7    you guys were hanging out after work, buddy-buddy, right?

10:12AM    8    A.  Joe and I didn't do that.

10:12AM    9    Q.  Your families weren't together after hours, correct?

10:12AM   10    A.  No.

10:12AM   11    Q.  And so is it a fair statement that you didn't have any

10:12AM   12    type of long-standing allegiance to Joe Bongiovanni in June

10:12AM   13    of 2016 when you alleged these comments were made?

10:12AM   14    A.  Based on how you explained that, no.

10:12AM   15    Q.  And we know based --

10:12AM   16    A.  The term "allegiance," though, again, that's -- I'm

10:13AM   17    agreeing with what you just said, but that term "allegiance"

10:13AM   18    is not a term that I would use to describe that.

10:13AM   19        I had an allegiance to a fellow agent that I worked with.

10:13AM   20        I had an allegiance to somebody that was my partner that

10:13AM   21    had the same badge as I did, enforcing laws that we were

10:13AM   22    sworn to do.

10:13AM   23        I had an allegiance to someone that I conducted search

10:13AM   24    warrants with and went through doors with, trusting someone

10:13AM   25    to have my back in situations that are extremely dangerous,

10:13AM   1    trusting someone that I interviewed informants with that were

10:13AM   2    providing sensitive information.

10:13AM   3        So "allegiance" isn't a term I would use.

10:13AM   4        I did not hang out with Joe in the way that you explained

10:13AM   5    it, but yeah, I had an allegiance through the job of being

10:13AM   6    fellow agents together and partners during a case.

10:13AM   7    Q.   Okay.  So you had an allegiance based on your working

10:13AM   8    relationship; is that fair to say?

10:13AM   9    A.   Correct.

10:13AM   10   Q.   And, so, it's also a fair statement based on your direct

10:13AM   11   testimony that -- that you had a comfort -- sorry, strike

10:13AM   12   that.

10:13AM   13       You were not incapable of making reports about Joe

10:14AM   14   Bongiovanni to your boss, right?

10:14AM   15   A.   What do you mean by "incapable?"

10:14AM   16   Q.   So -- so one of the things that we went over on cross and

10:14AM   17   you went over on direct is that when you had a concern that

10:14AM   18   Joe's phone number would show up in Peter Gerace's phone

10:14AM   19   during the subpoena, you didn't just kind of hide that or do

10:14AM   20   nothing, right?

10:14AM   21   A.   No, that wasn't as big a deal as what I was dealing with.

10:14AM   22   Q.   Okay.  But -- but you -- you had comfort in going to your

10:14AM   23   boss, G.S. Yensan, to report that concern, correct?

10:14AM   24   A.   I wouldn't use the term "comfort," but I went to Greg

10:14AM   25   with that uncomfortable conversation.

USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

10:14AM    1    Q.  You were not incapable of discussing that with

10:14AM    2    G.S. Yensan?

10:14AM    3    A.  I discussed that with Yensan.

10:14AM    4    Q.  Because you had some trust that G.S. Yensan would give

10:14AM    5    you some advice on what to do, correct?

10:14AM    6    A.  I just knew that it was better to tell him beforehand not

10:14AM    7    even knowing if it would come up and just address it then.

10:14AM    8    Q.  Yeah.  Like, G.S. Yensan was not some stranger to you at

10:14AM    9    that point in time, right?

10:14AM    10    A.  No.  No, he was my supervisor.

10:14AM    11    Q.  And at -- at one point in time, he actually made you the

10:14AM    12    acting G.S. when he was no longer in the office, correct?

10:15AM    13    A.  Yeah.  I don't think it was at that point, but at some

10:15AM    14    point when I was in D-57, I was.

10:15AM    15    Q.  So there's some trust that you have with G.S. Yensan,

10:15AM    16    correct?

10:15AM    17    A.  Yes.

10:15AM    18    Q.  And there's some trust that G.S. Yensan has with you,

10:15AM    19    correct?

10:15AM    20    A.  Correct.

10:15AM    21    Q.  Yet you still chose not to raise this conversation and

10:15AM    22    the allegations you make in it with G.S. Yensan back in June

10:15AM    23    of 2016?

10:15AM    24    A.  No, that was a big jump from phone -- a phone number

10:15AM    25    being in contact with a convicted felon.

10:15AM   1    To me at the time, processing that was poor judgment.

10:15AM   2  Poor judgment of friends, poor judgment to continue to

10:15AM   3  associate with a convicted felon.

10:15AM   4    What I had just heard afterwards in that conference room

10:15AM   5  to me was beyond anything else I ever experienced in my law

10:15AM   6  enforcement career in dealing with a situation like that.

10:15AM   7    And I had no clue on how to process that, not even how to

10:15AM   8  deal with that, to the point that I, at some point, called

10:15AM   9  only fellow agents that had trained me to mention certain

10:15AM  10  things because I had no idea what to do.  No idea what to do.

10:16AM  11  How to handle that bad, bad situation as I explained it, a

10:16AM  12  shit sandwich.

10:16AM  13  Q.  And after all those conversations, you still chose not to

10:16AM  14  report it?

10:16AM  15  A.  No, I didn't.  No one gave me specific instructions and

10:16AM  16  things like that.  They listened to me, and I still chose not

10:16AM  17  to.

10:16AM  18  Q.  So when you raised this fact of this conversation at the

10:16AM  19  August 1st, 2018 meeting, you spoke about this after AUSA

10:16AM  20  Tripi asked you if there was a concern about Phil Domiano

10:16AM  21  being involved in this case; do you recall that?

10:16AM  22  A.  Again, I don't remember his exact words, but it was

10:16AM  23  brought up and my belief was there was a concern, so --

10:16AM  24  Q.  And you recall also telling prosecutors that -- that you

10:16AM  25  had a concern that possibly what Bongiovanni told you in that

USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

34

| | | |
|---|---|---|
| 10:16AM | 1 | June 2016 conversation had a link to what Domiano may have |
| 10:16AM | 2 | been involved in? |
| 10:16AM | 3 | A.  Possibly.  Based on the circumstances of that girl being |
| 10:16AM | 4 | found in a parking lot, that it's possible that that could |
| 10:17AM | 5 | have been an overdose.  It could have been related back to |
| 10:17AM | 6 | what I was initially told.  I don't know.  I mean, but it was |
| 10:17AM | 7 | something that I mentioned. |
| 10:17AM | 8 | Q.  And as you talked about on direct yesterday, this was the |
| 10:17AM | 9 | very first time that you raised this allegation to anyone, |
| 10:17AM | 10 | correct? |
| 10:17AM | 11 | A.  It was the very first time that I had said it in front of |
| 10:17AM | 12 | a DEA supervisor or anybody at the U.S. Attorney's Office. |
| 10:17AM | 13 | Q.  So G.S. McHugh was with you at that meeting, correct? |
| 10:17AM | 14 | A.  He was. |
| 10:17AM | 15 | Q.  And he wasn't aware that you were gonna make this |
| 10:17AM | 16 | comment, correct? |
| 10:17AM | 17 | A.  No. |
| 10:17AM | 18 | Q.  AUSA Tripi wasn't aware you were gonna make this comment, |
| 10:17AM | 19 | correct? |
| 10:17AM | 20 | A.  Not to my knowledge. |
| 10:17AM | 21 | Q.  And when you make this particular comment, that kind of |
| 10:17AM | 22 | puts the meeting on hold for a little bit? |
| 10:17AM | 23 | A.  What do you mean? |
| 10:17AM | 24 | Q.  Sure.  So, I mean, this is a pretty substantial |
| 10:17AM | 25 | revelation that you just made about Agent Bongiovanni on |

USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

35

10:17AM 1  August 1st, 2018, correct?

10:17AM 2  A.  I agree.

10:17AM 3  Q.  Your supervisor, who was sitting next to you, was caught

10:17AM 4  completely off guard, right?

10:17AM 5  A.  He was.

10:17AM 6  Q.  AUSA Tripi was surprised by the comment, correct?

10:18AM 7  A.  Again, I don't know if he was surprised, but --

10:18AM 8  Q.  But this all of a sudden dominated the remainder of the

10:18AM 9  conversation in that meeting; is that right?

10:18AM 10  A.  I don't know how much we spoke after that.  I think -- I

10:18AM 11  think it was a little bit.  I don't remember specifically

10:18AM 12  what of, but the meeting ended shortly after that.

10:18AM 13  Q.  All right.  So, when you made this allegation, again,

10:18AM 14  just so we're all tight with the timeline, this was after the

10:18AM 15  Ron Serio July 20, 2018 proffer, correct?

10:18AM 16  A.  Correct.

10:18AM 17  Q.  And in that proffer, again, Ron Serio implicated Joe

10:18AM 18  Bongiovanni providing information to him in some capacity?

10:18AM 19  A.  Something to the effect of Joe passing names of DEA

10:18AM 20  informants.

10:18AM 21  Q.  So you're aware of that, correct?

10:19AM 22  A.  I was.

10:19AM 23  Q.  This was after you conducted your investigation into the

10:19AM 24  Ron Serio file; is that right?

10:19AM 25  A.  I don't remember specifically when I looked through the

10:19AM    1    Ron Serio file.

10:19AM    2    Q.  We talked on cross yesterday --

10:19AM    3    A.  Okay.

10:19AM    4    Q.  -- that you took that step before you went into the

10:19AM    5    August 1st, 2018 meeting; do you remember that?

10:19AM    6    A.  I believe so.  Again, I'm sure you could show me, but I

10:19AM    7    have no reason to doubt what you're telling me.

10:19AM    8    Q.  All right.  And it was also after you took a look into

10:19AM    9    whether Peter Gerace showed up in any type of DEA reports and

10:19AM   10    you found Exhibit 30A that we looked at yesterday?

10:19AM   11    A.  Yes.  Yes.

10:19AM   12    Q.  So all those things occurred after you made this comment

10:19AM   13    to AUSA Tripi, correct?

10:19AM   14    A.  No, they occurred before.

10:19AM   15    Q.  They all -- yes, I'm sorry.  They all occurred before you

10:19AM   16    made this comment to AUSA Tripi on August 1st, 2018?

10:19AM   17    A.  Correct.

10:19AM   18    Q.  So, Mr. Casullo, your investigation into Peter Gerace,

10:20AM   19    eventually you're removed, you said, correct?

10:20AM   20    A.  I was told at some point that I would not be involved in

10:20AM   21    the investigation of Peter Gerace.

10:20AM   22    Q.  And I think you stated on direct that at first you didn't

10:20AM   23    really kind of understand the reason why, but later you came

10:20AM   24    to understand the reason why was because you were a witness

10:20AM   25    in the matter and could not investigate anymore?

USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

10:20AM    1    A.  Yes.

10:20AM    2    Q.  As far as your case into Peter and Anthony Gerace that

10:20AM    3    existed before this time, Joe Bongiovanni didn't take any

10:20AM    4    steps to prevent you from continuing your investigation,

10:20AM    5    correct?

10:20AM    6    A.  What do you mean?

10:20AM    7    Q.  Sure.  So -- so, you continued to take a look at Peter

10:20AM    8    Gerace in 2016, 2017, and onward, correct?

10:20AM    9    A.  I continued, it's not so much after the meeting with Joe,

10:21AM    10    but after a phone call from the U.S. Attorney's Office.

10:21AM    11    Q.  Well, we went through yesterday that in 2016, you didn't

10:21AM    12    perform any type of trash pulls or pole cams or pen

10:21AM    13    registers, things like that, right?

10:21AM    14    A.  Correct.

10:21AM    15    Q.  That your focus was to try to develop some type of

10:21AM    16    confidential source that you could use to dig inside the

10:21AM    17    organization?

10:21AM    18    A.  That was my hope.

10:21AM    19    Q.  And you didn't interview any strippers or anything along

10:21AM    20    those lines, but eventually Kevin Myszka came along?

10:21AM    21    A.  Correct.

10:21AM    22    Q.  And Kevin Myszka had information relevant to Peter Gerace

10:21AM    23    and Pharaoh's Gentlemen's Club, right?

10:21AM    24    A.  Yeah.  I found that out during the proffer, correct.

10:21AM    25    Q.  And you don't have any information that Mr. Bongiovanni

10:21AM     1   prevented you from doing anything to exploit that information

10:21AM     2   that Kevin Myszka can gave you, correct?

10:21AM     3   A.  I have no idea.

10:21AM     4   Q.  He didn't stop you from using Kevin Myszka to develop

10:21AM     5   sources, vis-à-vis Peter Gerace, right?

10:21AM     6   A.  I have no idea if Joe even was aware that we were doing

10:21AM     7   proffers and that Kevin was cooperating with us.  I have no

10:22AM     8   idea.  I wasn't working with him at that point, and I

10:22AM     9   certainly wasn't going to ask him to go to the proffer.

10:22AM    10   Q.  But everything continued forward as normal after you got

10:22AM    11   the information from Kevin Myszka, correct?

10:22AM    12   A.  So we conducted several proffers and he mentioned it, I

10:22AM    13   believe, in two, maybe all of them.  I can't remember for

10:22AM    14   certain.  So we conducted proffers, and Myszka provided

10:22AM    15   information.  So as far as things going forward as normal --

10:22AM    16   Q.  Yeah.

10:22AM    17   A.  -- is what we said, in -- in what way?

10:22AM    18   Q.  You still investigate Peter Gerace as you wanted,

10:22AM    19   correct?

10:22AM    20   A.  I conducted those proffers and got that information from

10:22AM    21   Myszka.

10:22AM    22   Q.  Like, nothing that Joe Bongiovanni did prevented you from

10:22AM    23   going into the Ron Serio proffer to talk about Anthony

10:22AM    24   Gerace, correct?

10:22AM    25   A.  So nothing prevented me -- yeah, I don't think Joe was

USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

39

10:22AM  1    aware that I was going to do that.

10:22AM  2    Q.  And then when you start running the DARTS entries in the

10:22AM  3    beginning of August of 2018, it's after the Serio interview,

10:22AM  4    after this August 1st meeting, you mentioned that -- that Joe

10:23AM  5    came up to you and you had a conversation that made you

10:23AM  6    squirm; do you remember testifying to that?

10:23AM  7    A.  Regarding the Anthony Gerace deconfliction.

10:23AM  8    Q.  And you still continued to investigate Anthony Gerace,

10:23AM  9    correct?

10:23AM  10   A.  For a short period of time, yeah.  Because I was removed

10:23AM  11   shortly after that.  So --

10:23AM  12   Q.  And other officers in the DEA and HSI continued to

10:23AM  13   investigate Anthony Gerace, correct?

10:23AM  14   A.  The only person I know that continued to investigate

10:23AM  15   Anthony Gerace was Curtis Ryan from Homeland Security --

10:23AM  16   Q.  And you're --

10:23AM  17   A.  -- who had left our office.

10:23AM  18   Q.  And your understanding is that -- is that eventually

10:23AM  19   Agent Ryan towards the end of January executed a search

10:23AM  20   warrant in Anthony Gerace's house, correct?

10:23AM  21   A.  Curtis Ryan and Homeland Security Investigations executed

10:23AM  22   a search warrant at Anthony Gerace's house at some point.  I

10:23AM  23   wasn't involved, so I don't know the specifics.

10:23AM  24   Q.  And all that happened before Joe Bongiovanni retired,

10:23AM  25   correct?

10:23AM   1   A.  Again, you'd have to give me the timeline.

10:23AM   2   Q.  Sure.  So if he retired on February 1st of 2019 --

10:23AM   3   A.  Yep.

10:23AM   4   Q.  -- all that happened before he retired, right?

10:24AM   5   A.  So that's when he retired.  And when was the search

10:24AM   6   warrant executed?

10:24AM   7   Q.  The search warrant was executed at the end of January of

10:24AM   8   2019.

10:24AM   9   A.  Okay.  Correct.

10:24AM   10  Q.  You started looking into Michael Sinatra --

10:24AM   11  A.  So, at some --

10:24AM   12  Q.  -- for burglary?

10:24AM   13  A.  So, at some point, yeah, I received a report from Scott

10:24AM   14  Sprague regarding a burglary.  So initially I didn't know it

10:24AM   15  had anything to do with Michael Sinatra, I just knew it was a

10:24AM   16  burglary.

10:24AM   17  Q.  And you came to learn that that burglary that happened on

10:24AM   18  New Year's Day, 2019, that's something that involved Mike

10:24AM   19  Sinatra, correct?

10:24AM   20  A.  I did learn that at some point, correct.

10:24AM   21  Q.  And that's something that you started to investigate as

10:24AM   22  well, correct?

10:24AM   23  A.  Correct.

10:24AM   24  Q.  You started to enter phone numbers into DARTS, correct?

10:24AM   25  A.  I did.

10:24AM  1   Q.  And we went through how he received notifications about

10:24AM  2   that, right?

10:24AM  3   A.  About what?

10:24AM  4   Q.  About -- about you entering information into DARTS,

10:24AM  5   correct?

10:24AM  6   A.  Correct.

10:24AM  7   Q.  And you continued that investigation unabated, correct?

10:24AM  8   A.  I continued to do that investigation on Sinatra with

10:25AM  9   Curtis Ryan.

10:25AM  10  Q.  And the first time that you make this report about that

10:25AM  11  June 2016 conversation you had with Mr. Bongiovanni was after

10:25AM  12  he was already under investigation, correct?

10:25AM  13  A.  After he was already under investigation by who?

10:25AM  14  Q.  By you, right?

10:25AM  15  A.  I wasn't investigating Joe Bongiovanni.  I was

10:25AM  16  investigating Peter Gerace.  I was investigating Anthony

10:25AM  17  Gerace.  I was not investigating Joseph Bongiovanni.

10:25AM  18  Q.  So you were at the July 20, 2018 proffer, correct?

10:25AM  19  A.  Correct.

10:25AM  20  Q.  That's where Ron Serio made allegations against Joe

10:25AM  21  Bongiovanni, correct?

10:25AM  22  A.  Correct.

10:25AM  23  Q.  You're aware of those, and you reported those to your

10:25AM  24  bosses, correct?

10:25AM  25  A.  We went back and spoke to Jim McHugh.

10:25AM   1   Q.  And you understood that that was going to result in an

10:25AM   2   investigation into Joe Bongiovanni, right?

10:25AM   3   A.  Well, that was the point of the conversation, how we were

10:25AM   4   going to handle that.  And it was decided at that point that

10:26AM   5   that information would be opened in a -- or, included in a

10:26AM   6   Homeland Security Investigation, not a DEA investigation.

10:26AM   7   Q.  Okay.  And so Mr. Bongiovanni, when you walked in on

10:26AM   8   August 1st, 2018, and disclosed the June 2016 conversation,

10:26AM   9   was under investigation, right?

10:26AM  10   A.  Again, could you please --

10:26AM  11           **THE COURT:**  Mr. Singer, we need to take a break now.

10:26AM  12           **MR. SINGER:**  Certainly, Judge.

10:26AM  13           **THE COURT:**  So please, folks, remember my

10:26AM  14   instructions about not communicating about the case even with

10:26AM  15   each other, not making up your mind.

10:26AM  16           See you back here in about ten or 15 minutes.

10:26AM  17           (Jury excused at 10:26 a.m.)

10:27AM  18           **MR. MacKAY:**  Yes, Judge, Mr. Bongiovanni flagged me

10:27AM  19   for an emergency --

10:27AM  20           **THE COURT:**  Okay.  Fine, fine.  Okay.  Anything

10:27AM  21   before we break?

10:27AM  22           **MR. MacKAY:**  No thank you.

10:27AM  23           **MR. SINGER:**  No, Judge.

10:27AM  24           **THE COURT:**  Okay.  We'll see you in about ten or 15

10:27AM  25   minutes.

USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

43

| | | |
|---|---|---|
| 10:27AM | 1 | **THE CLERK:**  All rise. |
| 10:27AM | 2 | (Off the record at 10:27 a.m.) |
| 10:42AM | 3 | (Back on the record at 10:42 a.m.) |
| 10:42AM | 4 | (Jury not present.) |
| 10:42AM | 5 | **THE CLERK:**  All rise. |
| 10:42AM | 6 | **THE COURT:**  Please be seated. |
| 10:42AM | 7 | **THE CLERK:**  We are back on the record for the |
| 10:42AM | 8 | continuation of the jury trial in case number 19-cr-227, |
| 10:43AM | 9 | United States of America versus Joseph Bongiovanni. |
| 10:43AM | 10 | All counsel and parties are present. |
| 10:43AM | 11 | **THE COURT:**  Okay.  Are we ready to resume? |
| 10:43AM | 12 | **MR. SINGER:**  Yes, Judge. |
| 10:43AM | 13 | **MR. COOPER:**  Yes, Judge. |
| 10:43AM | 14 | **THE COURT:**  Let's bring them back, please. |
| 10:43AM | 15 | Let's get the witness back in. |
| 10:44AM | 16 | (Witness and Jury seated at 10:44 a.m.) |
| 10:44AM | 17 | **THE COURT:**  The record will reflect that all our |
| 10:44AM | 18 | jurors are present. |
| 10:44AM | 19 | I remind the witness he's still under oath. |
| 10:44AM | 20 | Mr. Singer, you may continue. |
| 10:44AM | 21 | **MR. SINGER:**  Thank you. |
| 10:44AM | 22 | **BY MR. SINGER:** |
| 10:44AM | 23 | Q.  So, again, Mr. Casullo, you -- you -- you made an |
| 10:44AM | 24 | official report about the June 2016 conversation that you |
| 10:44AM | 25 | allegedly had with Mr. Bongiovanni not until August 1st of |

10:44AM    1    2018, correct?

10:44AM    2    A.   I -- I wrote a memo, but I never turned it in.

10:45AM    3    Q.   And that official report was made to AUSA Tripi and

10:45AM    4    G.S. McHugh who were in your presence, correct?

10:45AM    5    A.   I -- I can't remember who it was made through.  I think

10:45AM    6    it was made through my chain of command, which would have

10:45AM    7    been Jim McHugh and Ed Orgon, I believe -- maybe, I think,

10:45AM    8    all the way up to ASAC Zon.

10:45AM    9    Q.   But it was at that meeting that you disclosed this for

10:45AM   10    the first time officially?

10:45AM   11    A.   It was at that meeting that we previously discussed.

10:45AM   12    Q.   And that's a conversation in which you allege that

10:45AM   13    Mr. Bongiovanni reported an overdose or possible overdose at

10:45AM   14    Pharaoh's Gentlemen's Club, correct?

10:45AM   15    A.   Based on what I said.

10:45AM   16    Q.   That same conversation in which you allege that he used

10:45AM   17    the "N" and the "S" word to talk about investigations,

10:45AM   18    correct?

10:45AM   19    A.   Yes.

10:45AM   20    Q.   When all your training and reporting told you that you

10:45AM   21    should report the contents of that conversation immediately,

10:45AM   22    correct?

10:45AM   23    A.   Correct.

10:45AM   24    Q.   When all the training that you went to and the other

10:45AM   25    people you talked to about this went to, said they should

10:45AM    1    report the same thing, correct?

10:45AM    2    A.  What about the other people?

10:46AM    3    Q.  You said that you talked to other people in your office

10:46AM    4    and elsewhere about what was said in that June 2016

10:46AM    5    conversation, right?

10:46AM    6    A.  There were several close friends, correct.

10:46AM    7    Q.  And some of them were DEA agents, correct?

10:46AM    8    A.  I believe they were -- almost all of them were DEA

10:46AM    9    agents.

10:46AM    10   Q.  And those people went to the same training that you went

10:46AM    11   to, correct?

10:46AM    12   A.  They went to the academy.  I don't know if they had the

10:46AM    13   same training, but --

10:46AM    14   Q.  And -- and they were aware of the duty to report those

10:46AM    15   things to their supervisor when they learned them, correct?

10:46AM    16   A.  They should have been.

10:46AM    17   Q.  And all of this happened after AUSA Tripi told you that

10:46AM    18   Phil Domiano was somebody who could cause you to get

10:46AM    19   conflicted off of the Peter Gerace investigation?

10:46AM    20   A.  It came up during that meeting.

10:46AM    21        **MR. SINGER:**  Thank you, I have no further questions,

10:46AM    22   Judge.

10:46AM    23        **THE COURT:**  Redirect, Mr. Cooper?

10:46AM    24        **MR. COOPER:**  Yes, Judge, thank you.

10:46AM    25

| | | |
|---|---|---|
| 10:46AM | 1 | **REDIRECT EXAMINATION BY MR. COOPER:** |
| 10:47AM | 2 | Q.  What have you gained from reporting what the defendant |
| 10:47AM | 3 | said to you in June of 2016 to the U.S. Attorney's Office and |
| 10:47AM | 4 | Jim McHugh?  What got better in your life? |
| 10:47AM | 5 | A.  It got worse. |
| 10:47AM | 6 | Q.  Anything?  A single benefit? |
| 10:47AM | 7 | A.  Not a single thing.  It made my career much more |
| 10:47AM | 8 | difficult for the remaining years that I was at DEA, to the |
| 10:47AM | 9 | point that I was actually allowed to go work on a task force |
| 10:47AM | 10 | at the FBI office for my last, I believe, year and a half on |
| 10:47AM | 11 | an organized crime task force outside the DEA office. |
| 10:47AM | 12 | Q.  Did you make it up? |
| 10:47AM | 13 | A.  Did I -- |
| 10:47AM | 14 | Q.  Did you make up what the defendant said to you in |
| 10:47AM | 15 | conference room? |
| 10:47AM | 16 | A.  Absolutely not. |
| 10:47AM | 17 | Q.  Did you invent it because you wanted to get attention? |
| 10:48AM | 18 | A.  Absolutely not. |
| 10:48AM | 19 | Q.  Were you cross-examined for, like, six hours over the |
| 10:48AM | 20 | last two days? |
| 10:48AM | 21 | A.  Yes, sir. |
| 10:48AM | 22 | Q.  I'm estimating there. |
| 10:48AM | 23 |     Was that fun? |
| 10:48AM | 24 | A.  No. |
| 10:48AM | 25 | Q.  Did you have a good time? |

10:48AM    1    A.  No.

10:48AM    2    Q.  Was this the second time that you've testified at a

10:48AM    3    proceeding in this case?

10:48AM    4    A.  Yes.

10:48AM    5    Q.  Did you get cross-examined in that case?

10:48AM    6    A.  Yes.

10:48AM    7    Q.  Was that a lot of fun?

10:48AM    8    A.  No.

10:48AM    9    Q.  Did reporting it cause you to not be allowed to work on

10:48AM    10   the investigation?

10:48AM    11   A.  Yes.

10:48AM    12   Q.  As you sit here today, do you feel remorse that you

10:48AM    13   didn't report it right away?

10:48AM    14   A.  I should have reported that.  Based on the racial

10:48AM    15   comments alone, let alone the other things, I should have, in

10:48AM    16   hindsight.  I was dealing with a shitty situation, and I did

10:48AM    17   the best I could.

10:48AM    18   Q.  Are you a perfect person?

10:48AM    19   A.  Absolutely not.

10:49AM    20   Q.  I want to talk about some things that you discussed

10:49AM    21   yesterday on cross-examination starting with this Mike

10:49AM    22   Masecchia 2004 Las Vegas investigation.

10:49AM    23       Defense counsel asked you some questions about the

10:49AM    24   conversation that you had with the defendant when the

10:49AM    25   defendant called you in 2004 about Mike Masecchia.

10:49AM    1        Do you remember Mr. Singer asking you about that?

10:49AM    2    A.    Yes.

10:49AM    3    Q.    Now, on direct exam, I asked you an open-ended question,

10:49AM    4    and I said tell the jury about the conversation you had with

10:49AM    5    the defendant, what did the defendant say.

10:49AM    6        Do you remember me asking you that?

10:49AM    7    A.    Yes.

10:49AM    8    Q.    And in your own words, you described that the defendant

10:49AM    9    said he grew up with Mike Masecchia, and that his name

10:49AM   10    couldn't be on any reports; is that correct?

10:49AM   11    A.    In sum and substance, yes.

10:49AM   12    Q.    Okay.    I asked you whether the defendant told you that he

10:49AM   13    was friends with Mike Masecchia, and you said no on direct;

10:49AM   14    is that right?

10:49AM   15    A.    Correct.

10:49AM   16    Q.    I asked you whether the defendant told you that he drove

10:49AM   17    to college with Mike Masecchia every day, and you said no; is

10:49AM   18    that correct?

10:49AM   19    A.    Correct.

10:49AM   20    Q.    Later when Mr. Singer came up to ask you questions on

10:49AM   21    cross in the form of his question, he asked you whether the

10:50AM   22    defendant told you that he grew up with Mike, and that he

10:50AM   23    went to school with him.

10:50AM   24        Do you remember Mr. Singer asking you that question?

10:50AM   25    A.    Kind of.

10:50AM  1    Q.  What's that?

10:50AM  2    A.  Could you repeat it?

10:50AM  3    Q.  Sure.  When Mr. Singer asked you questions, he asked you

10:50AM  4    in the form of his question if the defendant told you during

10:50AM  5    that 2004 phone call that he went to school with Mike

10:50AM  6    Masecchia.

10:50AM  7        Do you remember Mr. Singer asking you that?

10:50AM  8    A.  Yes.

10:50AM  9    Q.  Did the defendant say that to you in the 2004

10:50AM  10   conversation?

10:50AM  11   A.  He said that they were from North Buffalo.

10:50AM  12   Q.  Okay.  He said they grew up together?

10:50AM  13   A.  Yep.

10:50AM  14   Q.  On that same topic, you were asked questions regarding

10:50AM  15   the information that the defendant told you about Masecchia

10:50AM  16   being investigated by the sheriffs for a marijuana grow in

10:50AM  17   the Southern Tier; do you remember that?

10:50AM  18   A.  Yes.

10:50AM  19   Q.  And you described that as, quote, good intelligence; is

10:50AM  20   that right?

10:50AM  21   A.  Correct.

10:50AM  22   Q.  Was there anything that you could do in Las Vegas to

10:50AM  23   investigate Mike Masecchia for grows in the Southern Tier of

10:51AM  24   New York?

10:51AM  25   A.  No.

10:51AM    1    Q.  You described it as good intelligence.  If the defendant

10:51AM    2    had been tipping Mike Masecchia off about investigations into

10:51AM    3    his marijuana grows in the Southern Tier, would you still

10:51AM    4    consider the information the defendant conveyed to you to be

10:51AM    5    good intelligence?

10:51AM    6            **MR. SINGER:**  Objection.

10:51AM    7            **THE COURT:**  Basis of the objection?

10:51AM    8            **MR. SINGER:**  Assumes a hypothetical and speculation.

10:51AM    9            **MR. COOPER:**  Judge, there were lots of hypotheticals

10:51AM   10    on cross.  I'm --

10:51AM   11            **THE COURT:**  Hang on, hang on, hang on.

10:51AM   12            Overruled.

10:51AM   13            **BY MR. COOPER:**

10:51AM   14    Q.  If the defendant was tipping Mike Masecchia off about

10:51AM   15    investigations at the same time that he's telling you, hey,

10:51AM   16    the sheriffs are looking at him for a grow, would it still be

10:51AM   17    good intelligence?

10:51AM   18    A.  No.

10:51AM   19    Q.  Would it be useless intelligence?

10:51AM   20    A.  Yes.

10:51AM   21    Q.  Defense counsel asked you some questions on cross about

10:51AM   22    reasons why the defendant, this defendant, might not have

10:52AM   23    wanted his name on reports related to Masecchia; do you

10:52AM   24    remember that?

10:52AM   25    A.  Yes.

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24          51

| | | |
|---|---|---|
| 10:52AM | 1 | Q.  Do you have any clue, any personal knowledge, as to why |
| 10:52AM | 2 | this defendant didn't want his name on reports? |
| 10:52AM | 3 | A.  I had no personal knowledge. |
| 10:52AM | 4 | Q.  You don't know what's in his head, right? |
| 10:52AM | 5 | A.  No. |
| 10:52AM | 6 | Q.  Defense counsel asked you if one possibility was because |
| 10:52AM | 7 | that would be awkward; do you remember being asked that? |
| 10:52AM | 8 | A.  Yes. |
| 10:52AM | 9 | Q.  Is another possibility because the defendant was tipping |
| 10:52AM | 10 | Mike Masecchia off about investigations -- |
| 10:52AM | 11 | **MR. SINGER:**  Objection. |
| 10:52AM | 12 | **BY MR. COOPER:** |
| 10:52AM | 13 | Q.  -- so he didn't want to be on the paperwork? |
| 10:52AM | 14 | **THE COURT:**  Hang on.  Stop. |
| 10:52AM | 15 | Basis? |
| 10:52AM | 16 | **MR. SINGER:**  First off, lack of personal knowledge, |
| 10:52AM | 17 | Judge.  Secondly, speculation. |
| 10:52AM | 18 | **MR. COOPER:**  So, Judge, yesterday the question was |
| 10:52AM | 19 | asked -- |
| 10:52AM | 20 | **MR. SINGER:**  Judge, if we're going to argue -- |
| 10:52AM | 21 | **THE COURT:**  Stop.  Let me read it, first. |
| 10:52AM | 22 | Okay.  Come on up. |
| 10:52AM | 23 | (Sidebar discussion held on the record.) |
| 10:53AM | 24 | **MR. COOPER:**  So, I objected yesterday, I believe, to |
| 10:53AM | 25 | the question being asked when we were getting into asking Tony |

10:53AM  1   to speculate about why the defendant might have not wanted his

10:53AM  2   name on reports.  You overruled the objection.

10:53AM  3        Counsel's question was asking him if it was possible

10:53AM  4   that the reason he didn't want his name on the reports is

10:53AM  5   because it's awkward.

10:53AM  6        On redirect, I want to explore if another possibility

10:53AM  7   is because he's corrupt.

10:53AM  8        **MR. SINGER:**  So -- so the basis of my question was

10:53AM  9   the conversation that he had with Bongiovanni.

10:53AM  10       Bongiovanni, as he related in his direct as well as

10:53AM  11  on cross, told him he didn't want his report -- he didn't want

10:53AM  12  his name on the report because he grew up with this guy.

10:53AM  13       **THE COURT:**  Right.

10:53AM  14       **MR. SINGER:**  And so I was alliterating for the jury

10:53AM  15  why it was that an agent in DEA would have such concerns.  And

10:53AM  16  Agent Casullo, I brought up an analogous example of the Peter

10:53AM  17  Gerace investigation where his friend's -- sorry, his daughter

10:53AM  18  had a friend on the soccer team which made things awkward for

10:54AM  19  his name being on the report.

10:54AM  20       **THE COURT:**  Right.

10:54AM  21       **MR. SINGER:**  Also, that he grew up in North Buffalo

10:54AM  22  and that would make it awkward.

10:54AM  23       And that's all that I got into, Judge.  I didn't get

10:54AM  24  into the hypotheticals of if this was happening this way.  So

10:54AM  25  if he wants to ask --

10:54AM    1            **THE COURT:**  Why can't he ask another -- go ahead.

10:54AM    2            **MR. SINGER:**  Yeah.  So if the government wants to ask

10:54AM    3    a question based on what I asked during my cross-examination,

10:54AM    4    that's within the scope, they can ask him why was it that you

10:54AM    5    talked about how it would be awkward for your daughter to be

10:54AM    6    on the same soccer team as a target of investigation, or if

10:54AM    7    you went to the same gym as somebody and lived in the same

10:54AM    8    community, that's fair game.

10:54AM    9            But this is completely outside the scope.

10:54AM   10            **MR. COOPER:**  That's -- that's his narrative.

10:54AM   11            **THE COURT:**  Stop.  Stop.  Stop.  Stop.

10:54AM   12            Why isn't it -- so you say one reason why he might

10:54AM   13    not want his name on the report is because he's got a

10:54AM   14    connection, social connection to this guy.  And you wouldn't

10:54AM   15    want to see his name in the report.  Right?

10:54AM   16            Why isn't -- why isn't a legitimate question is

10:54AM   17    another reason because he was tipping him off?

10:55AM   18            **MR. SINGER:**  So, because, my question was not based

10:55AM   19    on a hypothetical.  My question was based on a direct answer

10:55AM   20    the witness gave on direct testimony regarding what Joe told

10:55AM   21    him about why he didn't want his name on the report.

10:55AM   22            This question is different.  This question is a

10:55AM   23    hypothetical.

10:55AM   24            **THE COURT:**  No, I don't think so.  I don't think so.

10:55AM   25    No, no, no.  And then I'll -- I think you opened the door to

10:55AM    1    him suggesting that there might be other reasons why, and --

10:55AM    2    and I'm going to allow it.

10:55AM    3                (End of sidebar discussion.)

10:55AM    4            **THE COURT:**  The objection is overruled.

10:55AM    5            **BY MR. COOPER:**

10:55AM    6    Q.  We'll start that question again.

10:55AM    7        Defense counsel asked you if one possibility why this

10:55AM    8    defendant wouldn't want his name on reports is because it

10:55AM    9    might be awkward for him.

10:55AM    10       Do you remember Mr. Singer asking you that question?

10:55AM    11   A.  I do.

10:55AM    12   Q.  Is another possibility is because the defendant was

10:55AM    13   tipping off Mike Masecchia about investigations, and he

10:55AM    14   didn't want his name on the paperwork?

10:55AM    15   A.  That's certainly possible.

10:55AM    16   Q.  Okay.  You don't know, right?

10:55AM    17   A.  I don't.

10:55AM    18   Q.  You were asked some questions about -- on cross about the

10:56AM    19   Cory Higgins 2009 investigation into Mike Masecchia back in

10:56AM    20   Buffalo on cross.

10:56AM    21       Do you remember those questions?

10:56AM    22   A.  Yes.

10:56AM    23   Q.  And you and Mr. Singer went back and forth for a few

10:56AM    24   minutes about whether Masecchia was indexed with a NADDIS

10:56AM    25   number or not on that form, right?

10:56AM  1  A.  Correct.

10:56AM  2  Q.  And it was difficult to tell because the paper you were

10:56AM  3  looking at was redacted, right?

10:56AM  4  A.  It was.

10:56AM  5  Q.  A black line drawn over it?

10:56AM  6  A.  Yep.

10:56AM  7       MR. COOPER:  Okay.  Ms. Champoux, can we pull up

10:56AM  8  what's in evidence as Government Exhibit 12A.

10:56AM  9       BY MR. COOPER:

10:56AM  10  Q.  Is this the same ROI DEA-6 you were looking at yesterday?

10:56AM  11  A.  This is a case closing.

10:56AM  12  Q.  And this related to that 2009 Masecchia investigation

10:56AM  13  from Cory Higgins, right?

10:56AM  14  A.  Yeah.  Same case, case closing.

10:56AM  15       MR. COOPER:  Can we go to page 2, Ms. Champoux.

10:57AM  16  Page 3.  Page 4.  There we go.  We're good on page 4.

10:57AM  17       BY MR. COOPER:

10:57AM  18  Q.  Do you see Mike Masecchia here, is he indexed?

10:57AM  19  A.  He is indexed.

10:57AM  20  Q.  Does he have a NADDIS number?

10:57AM  21  A.  He does.

10:57AM  22  Q.  That clears that up a little bit without the redaction,

10:57AM  23  right?

10:57AM  24  A.  Correct.

10:57AM  25       MR. COOPER:  Okay.  You can take that down,

10:57AM    1    Ms. Champoux.  Thanks.

10:57AM    2              BY MR. COOPER:

10:57AM    3    Q.  Were you -- you were asked some questions on cross about

10:57AM    4    whether you ever got a call from the defendant in '09 putting

10:57AM    5    you in touch with Cory Higgins because he was investigating

10:57AM    6    Masecchia at that time, right?

10:57AM    7    A.  Correct.

10:57AM    8    Q.  Okay.  And during that cross, Mr. Singer suggested to you

10:57AM    9    that you wouldn't have had any useful information to provide

10:57AM   10    because your investigation was closed before 2009.

10:57AM   11         Do you remember that?

10:57AM   12    A.  I remember.

10:57AM   13    Q.  Do DEA agents commonly share historical information about

10:57AM   14    targets with each other?

10:57AM   15    A.  Yes.

10:57AM   16    Q.  Does that help further investigations?

10:57AM   17    A.  It certainly could.

10:58AM   18    Q.  Does the fact that your file was closed mean that your

10:58AM   19    brain has no information about Mike Masecchia in it?

10:58AM   20    A.  No.

10:58AM   21    Q.  Did you know people he was supposed to be coming out to

10:58AM   22    Vegas to associate with?

10:58AM   23    A.  I did.

10:58AM   24    Q.  Did you have a case on those people?

10:58AM   25    A.  Yes.

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24    57

10:58AM    1    Q.  Is it possible, based on your experience as a DEA agent,

10:58AM    2    that things you knew could have helped Cory Higgins?

10:58AM    3    A.  Possibly.

10:58AM    4    Q.  Did the defendant know that the Vegas office had a file

10:58AM    5    opened to Masecchia in 2004?

10:58AM    6    A.  Yes.

10:58AM    7    Q.  Did he know that the Buffalo office had a file opened

10:58AM    8    into Masecchia in 2004?

10:58AM    9    A.  Yes.

10:58AM    10   Q.  Are you aware of whether the defendant ever approached

10:58AM    11   Cory Higgins and actually spoke to him about the

10:58AM    12   investigation into Masecchia?

10:58AM    13   A.  I wasn't aware until Cory Higgins told me --

10:58AM    14   Q.  Okay.

10:58AM    15   A.  -- at some point.

10:58AM    16   Q.  Do you have personal knowledge of whether that happened

10:58AM    17   or not?

10:58AM    18   A.  No.

10:58AM    19   Q.  Do you know what the defendant -- do you have personal

10:58AM    20   knowledge of what that conversation was?

10:58AM    21   A.  Not personal knowledge.

10:58AM    22   Q.  Would Cory Higgins know that?

10:58AM    23   A.  Cory Higgins should know that.

10:58AM    24   Q.  Yep.  Next I want to talk with you about the conversation

10:59AM    25   you had with this defendant about his Ron Serio case in 2015.

10:59AM    1    Do you remember being asked about that on cross?

10:59AM    2    A.  Yes.

10:59AM    3    Q.  Defense counsel asked you some questions on cross about

10:59AM    4    that fall 2015 conversation when the defendant talked to you

10:59AM    5    about his investigation of Ron Serio.

10:59AM    6    Do you remember being asked questions about that?

10:59AM    7    A.  Yes.

10:59AM    8    Q.  And Mr. Singer asked you whether you knew the file to be

10:59AM    9    closed already by the time the defendant said those things to

10:59AM   10    you; do you remember that?

10:59AM   11    A.  I remember.

10:59AM   12    Q.  Okay.  And at the time you were having that conversation

10:59AM   13    with the defendant, he's telling you all about his big Ron

10:59AM   14    Serio file.

10:59AM   15    Did you know it to be closed at that time?

10:59AM   16    A.  No.

10:59AM   17    Q.  The way the defendant discussed the case with you, was he

10:59AM   18    representing to you that the case was open?

10:59AM   19    A.  Yes.

10:59AM   20         **MR. COOPER:**  Ms. Champoux, can we pull up Government

10:59AM   21    Exhibit 8B, please?

10:59AM   22         **BY MR. COOPER:**

10:59AM   23    Q.  This report's called a case closing, right?

10:59AM   24    A.  Yes.

10:59AM   25    Q.  I think we looked at it on direct.  It's written by Joe

11:00AM    1    Bongiovanni, correct?

11:00AM    2    A.  Correct.

11:00AM    3    Q.  And the date it's prepared is January 28th, 2015, right?

11:00AM    4    A.  Correct.

11:00AM    5    Q.  Okay.  And the file number is C2-13-0026, right?

11:00AM    6    A.  Correct.

11:00AM    7    Q.  January of 2015 is at least six months, seven months

11:00AM    8    before you had that conversation with the defendant, right?

11:00AM    9    A.  Correct.

11:00AM    10   Q.  When he was telling you all about his Serio case, did he

11:00AM    11   pull out the case closing and say, Tony, my case has actually

11:00AM    12   been closed for six months?

11:00AM    13   A.  No.

11:00AM    14   Q.  He didn't say that?

11:00AM    15   A.  No.

11:00AM    16        MR. COOPER:  Ms. Champoux, can we take that down,

11:00AM    17   please.

11:00AM    18        BY MR. COOPER:

11:00AM    19   Q.  Defense counsel asked you a bunch of questions about

11:00AM    20   that.  He pressed you on it, but you maintained on

11:00AM    21   cross-examination that the defendant represented to you that

11:00AM    22   his case was still open; is that correct?

11:00AM    23   A.  Correct.

11:00AM    24        MR. COOPER:  Ms. Champoux, can we pull up Government

11:00AM    25   Exhibit 22Q.  Can we zoom in on this middle email here?

| | | |
|---|---|---|
| 11:00AM | 1 | That's the one. |
| 11:00AM | 2 | **BY MR. COOPER:** |
| 11:00AM | 3 | Q.  What's the date of this email, Special Agent Casullo? |
| 11:01AM | 4 | A.  July 28th, 2015. |
| 11:01AM | 5 | Q.  Is that after January 28th, 2015? |
| 11:01AM | 6 | A.  Yes. |
| 11:01AM | 7 | Q.  About six months later? |
| 11:01AM | 8 | A.  Yes. |
| 11:01AM | 9 | Q.  Read what the defendant wrote to Scott Deming six months |
| 11:01AM | 10 | after he closed his Serio file. |
| 11:01AM | 11 | A.  Scott, I am not working on the case with Charlie Tolias. |
| 11:01AM | 12 | We are and have been working on this case currently.  We |
| 11:01AM | 13 | never stopped.  I would appreciate if you not share any info |
| 11:01AM | 14 | relevant to this DEA investigation with DHS until we could |
| 11:01AM | 15 | coordinate.  Thank you for the message.  S.A. Bongiovanni. |
| 11:01AM | 16 | Q.  Okay.  So I guess it's fair to say you weren't the only |
| 11:01AM | 17 | person to whom this defendant represented he had an active |
| 11:01AM | 18 | investigation into Ron Serio months after he had already |
| 11:01AM | 19 | closed the file, right? |
| 11:01AM | 20 | **MR. SINGER:**  Objection to the form of the question. |
| 11:01AM | 21 | **THE COURT:**  Sustained to the form of the question. |
| 11:01AM | 22 | **BY MR. COOPER:** |
| 11:01AM | 23 | Q.  How many years were you a DEA agent, sir? |
| 11:01AM | 24 | A.  Approximately 23. |
| 11:01AM | 25 | Q.  In the 23 years of experience that you have as a DEA |

11:02AM    1    agent, is it your interpretation of this email that the

11:02AM    2    defendant is representing that his file into Serio is still

11:02AM    3    open?

11:02AM    4            **MR. SINGER:**  Objection to speculation.

11:02AM    5            **THE COURT:**  Overruled.

11:02AM    6            **THE WITNESS:**  Yes.

11:02AM    7            **BY MR. COOPER:**

11:02AM    8    Q.  Not a lot of room for interpretation, right?

11:02AM    9            **MR. SINGER:**  Objection.

11:02AM   10            **BY MR. COOPER:**

11:02AM   11    Q.  We are and have been --

11:02AM   12            **THE COURT:**  Sustained.

11:02AM   13            **BY MR. COOPER:**

11:02AM   14    Q.  Do you see the sentence, we are and have been working on

11:02AM   15    this case currently?

11:02AM   16    A.  Yes.

11:02AM   17    Q.  Do you see the sentence, we never stopped?

11:02AM   18    A.  Yes.

11:02AM   19    Q.  And then do you see the sentence where he says, hey,

11:02AM   20    don't share any of my information with DHS?

11:02AM   21    A.  Yes.

11:02AM   22    Q.  Okay.  That's six months after he closed the file, right?

11:02AM   23    A.  Approximately.

11:02AM   24    Q.  Almost to the day, right, July 28th, 2015?

11:02AM   25    A.  Yes.

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

| | | |
|---|---|---|
| 11:02AM | 1 | **MR. COOPER:**  You can take that down, Ms. Champoux. |
| 11:02AM | 2 | **BY MR. COOPER:** |
| 11:02AM | 3 | Q.  On the same topic during cross-examination, you mentioned |
| 11:02AM | 4 | that it would have been of interest to you to learn that Mike |
| 11:02AM | 5 | Masecchia had come up during the defendant's Ron Serio |
| 11:02AM | 6 | investigation; is that right? |
| 11:03AM | 7 | A.  Yes. |
| 11:03AM | 8 | Q.  During that conversation, did the defendant say to you, |
| 11:03AM | 9 | hey, that target that we both worked on back in '04, Mike |
| 11:03AM | 10 | Masecchia, he's all over Ron Serio's tolls.  Do you want to |
| 11:03AM | 11 | help me investigate that? |
| 11:03AM | 12 | A.  No. |
| 11:03AM | 13 | Q.  He didn't say that to you? |
| 11:03AM | 14 | A.  No. |
| 11:03AM | 15 | Q.  If he had said that to you, if he had mentioned Mike |
| 11:03AM | 16 | Masecchia at all, would you have taken an interest in |
| 11:03AM | 17 | furthering that investigation? |
| 11:03AM | 18 | A.  100 percent. |
| 11:03AM | 19 | Q.  All right.  Don't want to spend too much time on DARTS |
| 11:03AM | 20 | deconflictions but we're going to do a little bit. |
| 11:03AM | 21 | **MR. COOPER:**  Ms. Champoux, can we pull up 26D, as in |
| 11:03AM | 22 | David, on the left and Government Exhibit 8A on the right. |
| 11:03AM | 23 | All right.  And on 26D, can you scroll between pages |
| 11:03AM | 24 | 3 and 4.  Yep, that's perfect. |
| 11:03AM | 25 | And then on 8A, can you please go to page 347. |

11:04AM    1    **BY MR. COOPER:**

11:04AM    2    Q.  All right.  That number on the left on the DARTS here for

11:04AM    3    the Trinity item, 716-866-2687.  Is that the same number

11:04AM    4    that's listed here on the subscriber return for Paul

11:04AM    5    Francoforte?

11:04AM    6    A.  Yes.

11:04AM    7    Q.  Is Paul Francoforte Hot Dog?

11:04AM    8    A.  That's how I know him.

11:04AM    9    Q.  When you ran Hot Dog's phone number in DARTS on

11:04AM   10    January 7th, 2019, and March 13th, 2019, did that cause the

11:04AM   11    defendant to be notified that you were looking at his phone

11:04AM   12    number in an investigation?

11:04AM   13    A.  Yes.

11:04AM   14    Q.  Okay.  Special Agent Casullo, I want you to remember the

11:04AM   15    date for me that you ran the DARTS in January.  Look at it

11:04AM   16    right now.  What's the date in January that you ran him in

11:04AM   17    DARTS?

11:04AM   18    A.  January 7th, 2019.

11:04AM   19    Q.  All right.  Keep that in your mind, okay?

11:05AM   20    A.  Yes.

11:05AM   21       **MR. COOPER:**  Ms. Champoux, can you take this down and

11:05AM   22    pull up Government Exhibit 358, the Excel spreadsheet Volty

11:05AM   23    records, and we're going to go to line 2511.

11:05AM   24       **BY MR. COOPER:**

11:05AM   25    Q.  This is the defendant's phone records, sir.

Case 1:19-cr-00227-LJV-MJR    Document 1337    Filed 11/03/24    Page 64 of 103
USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

64

| | | |
|---|---|---|
| 11:05AM | 1 | Do you see a call on line 2511 from January 28th, 2019? |
| 11:05AM | 2 | A.  Okay.  I'm looking at it.  And I see Hot Dog's number.  I |
| 11:05AM | 3 | don't know the other number that it's in contact with. |
| 11:05AM | 4 | Q.  Okay.  If -- if the 718 -- 716-818-0966 number belongs to |
| 11:05AM | 5 | the defendant, is this an example of a phone call about three |
| 11:05AM | 6 | weeks after you ran Hot Dog's number in DARTS between the |
| 11:05AM | 7 | defendant and Hot Dog? |
| 11:05AM | 8 | A.  Yes. |
| 11:05AM | 9 | MR. SINGER:  Object to form of the question, Judge. |
| 11:05AM | 10 | Misstates the evidence. |
| 11:05AM | 11 | THE COURT:  You can get into that on recross. |
| 11:05AM | 12 | Overruled. |
| 11:05AM | 13 | BY MR. COOPER: |
| 11:05AM | 14 | Q.  Let's -- let's take our time with it.  You're familiar |
| 11:05AM | 15 | with phone records, right, sir? |
| 11:06AM | 16 | A.  Yes. |
| 11:06AM | 17 | Q.  Are these phone records? |
| 11:06AM | 18 | A.  Call detail records, phone records, correct. |
| 11:06AM | 19 | Q.  Does this show when one party is calling another? |
| 11:06AM | 20 | A.  Yes. |
| 11:06AM | 21 | Q.  In -- I always mess this up, in column A, is that the |
| 11:06AM | 22 | date and time that a call was made? |
| 11:06AM | 23 | A.  Correct. |
| 11:06AM | 24 | Q.  Okay.  And in columns D, E, and F, is it listing the |
| 11:06AM | 25 | phone numbers involved in the call? |

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

| | | |
|---|---|---|
| 11:06AM | 1 | A.  That is correct. |
| 11:06AM | 2 | Q.  Okay.  January 28th, 2019, is about three weeks after |
| 11:06AM | 3 | January 7th, 2019; is that correct? |
| 11:06AM | 4 | A.  Correct. |
| 11:06AM | 5 | Q.  716-866-2687 is Hot Dog's phone number according to the |
| 11:06AM | 6 | subscriber information that we just looked at on Government |
| 11:06AM | 7 | Exhibit 8A, page 347; is that right, sir? |
| 11:06AM | 8 | A.  That's correct. |
| 11:06AM | 9 | Q.  Okay.  Do you know if 716-818-0966 is the defendant's |
| 11:06AM | 10 | phone number? |
| 11:06AM | 11 | A.  I can't remember his number. |
| 11:06AM | 12 | MR. COOPER:  Okay.  We'll take a break for one |
| 11:06AM | 13 | second. |
| 11:07AM | 14 | Is there a stipulation for phone records? |
| 11:07AM | 15 | Oh, it is -- it's stipulated?  Can you get me that? |
| 11:07AM | 16 | MS. CHAMPOUX:  Yes. |
| 11:07AM | 17 | MR. COOPER:  Thank you. |
| 11:07AM | 18 | I'm going to read Court Exhibit 5 for a moment, |
| 11:07AM | 19 | Judge, with your permission. |
| 11:07AM | 20 | THE COURT:  Sure. |
| 11:07AM | 21 | MR. COOPER:  This is paragraph 1 of a Joint Trial |
| 11:07AM | 22 | Stipulation. |
| 11:07AM | 23 | THE COURT:  This is a stipulation? |
| 11:07AM | 24 | MR. COOPER:  Yes, Judge. |
| 11:07AM | 25 | THE COURT:  Okay. |

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

66

| | | |
|---|---|---|
| 11:07AM | 1 | **MR. COOPER:**  On or about February 1, 2019, the |
| 11:07AM | 2 | defendant turned in his DEA-issued Apple iPhone cellular |
| 11:07AM | 3 | telephone assigned phone number 716-818-0966, and I'm going to |
| 11:07AM | 4 | stop reading it there. |
| 11:07AM | 5 | **BY MR. COOPER:** |
| 11:07AM | 6 | Q.  Is that the same phone number that's listed in those |
| 11:07AM | 7 | phone records, sir? |
| 11:07AM | 8 | A.  Yes. |
| 11:07AM | 9 | Q.  Calling Hot Dog or receiving a call from Hot Dog? |
| 11:07AM | 10 | A.  Correct. |
| 11:07AM | 11 | **MR. COOPER:**  You can take that down, Ms. Champoux. |
| 11:07AM | 12 | **BY MR. COOPER:** |
| 11:07AM | 13 | Q.  That's about three weeks after you ran Hot Dog in DARTS, |
| 11:07AM | 14 | right? |
| 11:07AM | 15 | A.  Correct. |
| 11:07AM | 16 | Q.  Do you know what the defendant talked to Hot Dog about on |
| 11:08AM | 17 | the phone? |
| 11:08AM | 18 | A.  No. |
| 11:08AM | 19 | **MR. COOPER:**  Ms. Champoux, let's pivot and go to the |
| 11:08AM | 20 | PDF from Government Exhibit 358 entitled 190131677bills.PDF. |
| 11:08AM | 21 | Can you Control F and search 716-866-2687. |
| 11:08AM | 22 | **BY MR. COOPER:** |
| 11:08AM | 23 | Q.  In the top-right corner of your screen here, can you see |
| 11:08AM | 24 | when we search Hot Dog's phone number, how many times he |
| 11:08AM | 25 | shows up in the defendant's phone records? |

11:08AM    1    A.  It says find 1 of 50, I don't know if that's what you're

11:08AM    2    talking about.

11:08AM    3    Q.  Do you see the highlighted entry here from December 2nd?

11:08AM    4    A.  I see that.  Correct.

11:08AM    5    Q.  Okay.  Is that Hot Dog's phone number?

11:08AM    6    A.  Yes.

11:08AM    7            MR. COOPER:  Ms. Champoux, can you click the next

11:08AM    8    button?

11:09AM    9            BY MR. COOPER:

11:09AM   10    Q.  Is this 2/21 Hot Dog's phone number?

11:09AM   11    A.  That's correct.

11:09AM   12    Q.  Okay.  Now it says 2 of 50 in the top right?

11:09AM   13    A.  Correct.

11:09AM   14    Q.  Do you understand this to mean that there's 50 instances

11:09AM   15    of Hot Dog and the defendant in phone contact in the

11:09AM   16    defendant's phone records?

11:09AM   17    A.  Now, I do.

11:09AM   18    Q.  Is that a yes?

11:09AM   19    A.  That's yes.

11:09AM   20            MR. COOPER:  Okay.  Thank you.  You can take that

11:09AM   21    down, Ms. Champoux.

11:09AM   22            BY MR. COOPER:

11:09AM   23    Q.  Do you know what they talked about on those 50 phone

11:09AM   24    calls?

11:09AM   25    A.  No.

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24
68

11:09AM   1   Q.  You were asked some questions on that same topic of DARTS

11:09AM   2   generally about in the ordinary course of a DEA

11:09AM   3   investigation, if you would first do a subpoena for

11:09AM   4   subscriber information, and then later have a DARTS entry

11:09AM   5   that identifies the name of the user of the phone.

11:09AM   6       Do you remember those questions?

11:09AM   7   A.  Yes.

11:09AM   8   Q.  That's one way to learn someone's phone number, right?

11:09AM   9   To do a subpoena for subscriber information?

11:09AM   10  A.  Oh, yes.

11:09AM   11  Q.  Okay.  Is another way to learn someone's phone number

11:10AM   12  other than doing a law enforcement subpoena to just call that

11:10AM   13  person 50 times on the phone?

11:10AM   14  A.  Yes.

11:10AM   15  Q.  Now, I'm not asking whether you're supposed to do this,

11:10AM   16  but is it possible, humanly possible, for a DEA agent to

11:10AM   17  cause a subpoena for subscriber information to be issued for

11:10AM   18  a phone number when they already know that the phone belongs

11:10AM   19  to a person because they have a personal relationship with

11:10AM   20  them?

11:10AM   21  A.  Oh, yes.

11:10AM   22  Q.  That's humanly possible?

11:10AM   23  A.  Yes.

11:10AM   24  Q.  Would that cause the same DEA agent to be notified if

11:10AM   25  someone else in law enforcement ran that number in DARTS or

| | | |
|---|---|---|
| 11:10AM | 1 | DICE? |
| 11:10AM | 2 | A.  Yes. |
| 11:10AM | 3 | Q.  Was the defendant notified that you ran Hot Dog's number |
| 11:10AM | 4 | in DARTS in January of 2019? |
| 11:10AM | 5 | A.  Yes. |
| 11:10AM | 6 | Q.  All right.  We're going to move on now.  I'm going to |
| 11:10AM | 7 | hand you -- actually, what's in evidence as Government |
| 11:10AM | 8 | Exhibit 100D-2.  Just take a look at this.  Did you ever see |
| 11:11AM | 9 | that before, sir? |
| 11:11AM | 10 | A.  I don't believe so. |
| 11:11AM | 11 | Q.  Open it up.  Take a look at it. |
| 11:11AM | 12 | A.  I've never seen this. |
| 11:11AM | 13 | Q.  Okay.  Can you close it real quick, look at the front. |
| 11:11AM | 14 | What's it say on the front? |
| 11:11AM | 15 | A.  Wedding day, congratulations on your wedding day. |
| 11:11AM | 16 | **MR. COOPER:**  May I approach, Judge? |
| 11:11AM | 17 | **THE COURT:**  Yes, you may. |
| 11:11AM | 18 | **MR. COOPER:**  May I have that back?  Thanks. |
| 11:11AM | 19 | May I have the ELMO, Ms. Demma? |
| 11:11AM | 20 | **BY MR. COOPER:** |
| 11:11AM | 21 | Q.  This is what's in evidence as Government Exhibit 100D-2, |
| 11:11AM | 22 | I'm going to publish it for the jury. |
| 11:11AM | 23 | Is this the front of a card? |
| 11:11AM | 24 | A.  Yes. |
| 11:12AM | 25 | Q.  Does it appear to be a wedding card, based on your life |

11:12AM  1   experience?

11:12AM  2   A.  Yes.

11:12AM  3   Q.  Does it have a handwritten note at the bottom?

11:12AM  4   A.  Yes, it does.

11:12AM  5   Q.  What's it say?

11:12AM  6   A.  Love, Hot Dog and Lynn.  Honored to be your friends.

11:12AM  7   Many years of happiness.

11:12AM  8   Q.  When you ran Hot Dog's number in DARTS, did the defendant

11:12AM  9   come up to you and say, hey, I'm actually friends with

11:12AM  10  Hot Dog?

11:12AM  11  A.  No.

11:12AM  12  Q.  That didn't happen?

11:12AM  13  A.  No.

11:12AM  14  Q.  Do you know where that wedding card was recovered from,

11:12AM  15  sir?

11:12AM  16  A.  No.

11:12AM  17  Q.  Okay.  Special Agent Casullo, you were asked some

11:13AM  18  questions by Mr. Singer about whether you ever reported the

11:13AM  19  comments that the defendant made to you about investigating

11:13AM  20  Anthony Gerace in 2018; do you remember that?

11:13AM  21  A.  I'm sorry, could you repeat that?

11:13AM  22  Q.  Yeah.  Absolutely.

11:13AM  23      You were asked on cross-examination by defense counsel if

11:13AM  24  you ever reported the comments that the defendant made to you

11:13AM  25  about your investigation into Anthony Gerace.

11:13AM   1       Do you remember him asking you about that?

11:13AM   2   A.  Yes.

11:13AM   3   Q.  Did you report that to a federal grand jury when you

11:13AM   4   testified in May of 2020?

11:13AM   5   A.  Yes.

11:13AM   6   Q.  Did you report it to Special Agent Ryan and AUSA Tripi

11:13AM   7   before you ever went in the grand jury?

11:13AM   8   A.  Yes.

11:13AM   9   Q.  Okay.

11:13AM   10      **MR. COOPER:**  Ms. Champoux, can we go to 26C real --

11:13AM   11   real quick.

11:13AM   12          You can scroll down just a bit.  Thanks.

11:13AM   13          That's fine, just to get the bottom there.

11:14AM   14      **BY MR. COOPER:**

11:14AM   15   Q.  On cross-examination, while you were being cross-examined

11:14AM   16   about this document, sir, in response to a question you said,

11:14AM   17   hey, there was a reason that I kept my -- my remarks general.

11:14AM   18   There was a specific reason I did that.  And then the

11:14AM   19   questioning moved on.

11:14AM   20      Explain to the jury, what's the specific reasoning that

11:14AM   21   you kept your remarks general here?

11:14AM   22   A.  Because I didn't want Joe Bongiovanni knowing that I was

11:14AM   23   running tolls on Anthony Gerace.

11:14AM   24   Q.  Okay.  Had that gone poorly the first time it happened?

11:14AM   25   A.  Yes.

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

72

11:14AM    1    Q.  Did there come a time where you were notified that the

11:14AM    2    defendant had been complaining about you making mention of

11:14AM    3    Italian Organized Crime in your DARTS entries?

11:14AM    4            MR. SINGER:  Object to the hearsay.

11:14AM    5            THE COURT:  Sustained.

11:14AM    6            BY MR. COOPER:

11:14AM    7    Q.  Did you stop mentioning Italian Organized Crime in your

11:14AM    8    DARTS entries at some point?

11:14AM    9    A.  Yes, I was told to by my supervisor, Jim McHugh.

11:15AM    10   Q.  Okay.  Without getting into what Jim McHugh said to you,

11:15AM    11   did Jim McHugh explain to you why he was telling you to stop

11:15AM    12   doing that?

11:15AM    13   A.  Yes, he did.

11:15AM    14   Q.  Was that a directive from Jim McHugh?

11:15AM    15   A.  Yes.

11:15AM    16   Q.  What did Jim McHugh say to you?

11:15AM    17   A.  He said that Ed Orgon, the resident agent in charge --

11:15AM    18           MR. SINGER:  Objection to hearsay.

11:15AM    19           MR. COOPER:  It's a directive, Judge, I just asked

11:15AM    20   him.

11:15AM    21           THE COURT:  It sounds like he's going to say

11:15AM    22   something that Ed Orgon said to him.

11:15AM    23           MR. COOPER:  Okay.

11:15AM    24           THE COURT:  That sounds like there's going to be

11:15AM    25   hearsay within hearsay based on where he's going.  Maybe not.

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

11:15AM 1    So -- so, if you want to continue to explore, but he -- again,

11:15AM 2    there's got to be --

11:15AM 3            **MR. COOPER:**  Sure.

11:15AM 4            **THE COURT:** -- an exception to hearsay for every bit

11:15AM 5    of hearsay.  You understand that?

11:15AM 6            **MR. COOPER:**  I do, Judge.  Thank you.

11:15AM 7            **BY MR. COOPER:**

11:15AM 8    Q.  Was the defendant brought up in your conversation with

11:15AM 9    Jim McHugh?

11:15AM 10   A.  Yes.

11:15AM 11           **MR. COOPER:**  Okay.  That's fine, we'll move on.

11:15AM 12           Can you take that down, Ms. Champoux.

11:15AM 13           **BY MR. COOPER:**

11:16AM 14   Q.  You were asked some questions by Mr. Singer about whether

11:16AM 15   you saw a lot of marijuana cases in the DEA Buffalo resident

11:16AM 16   office.

11:16AM 17       Do you remember those questions?

11:16AM 18   A.  Correct.

11:16AM 19   Q.  Based on how many years total did you work in the DEA

11:16AM 20   Buffalo resident office?

11:16AM 21   A.  From September of 2015 until I retired in March of 2022.

11:16AM 22   So a little bit less than seven years.

11:16AM 23   Q.  Okay.  And in the little bit less than seven years that

11:16AM 24   you spent in the DEA in Buffalo specifically, would a drug

11:16AM 25   dealer making millions of dollars and living in a giant

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

| | | |
|---|---|---|
| 11:16AM | 1 | mansion be the sort of thing the DEA Buffalo resident office |
| 11:16AM | 2 | would be very interested in investigating? |
| 11:16AM | 3 | A.  Absolutely. |
| 11:16AM | 4 | Q.  How about kilo-level cocaine traffickers? |
| 11:16AM | 5 | A.  Absolutely. |
| 11:16AM | 6 | **MR. COOPER:**  Ms. Champoux, can we pull up Government |
| 11:17AM | 7 | Exhibit 8I real quick? |
| 11:17AM | 8 | **BY MR. COOPER:** |
| 11:17AM | 9 | Q.  Do you see the subject of this report? |
| 11:17AM | 10 | A.  I -- yes, I see it. |
| 11:17AM | 11 | Q.  Is it an initial debriefing of a source? |
| 11:17AM | 12 | A.  Yes, it is. |
| 11:17AM | 13 | Q.  Is it in that same file number 13-0026? |
| 11:17AM | 14 | A.  Yes. |
| 11:17AM | 15 | Q.  Did the defendant write this report? |
| 11:17AM | 16 | A.  Yes. |
| 11:17AM | 17 | Q.  Does it talk about kilogram quantities of cocaine? |
| 11:17AM | 18 | A.  Yes. |
| 11:17AM | 19 | Q.  And hundreds of pounds of marijuana? |
| 11:17AM | 20 | A.  Yes. |
| 11:17AM | 21 | Q.  Is that the sort of thing the DEA in Buffalo would be |
| 11:17AM | 22 | interested investigating based on your experience? |
| 11:17AM | 23 | A.  Absolutely. |
| 11:17AM | 24 | Q.  Do you have supervisors in your experience pushing you |
| 11:17AM | 25 | off of kilo-level coke cases? |

| | | |
|---|---|---|
| 11:17AM | 1 | A.  No. |
| 11:17AM | 2 | Q.  That doesn't happen? |
| 11:17AM | 3 | A.  No. |
| 11:17AM | 4 | **MR. COOPER:**  You can take that down, Ms. Champoux. |
| 11:17AM | 5 | **BY MR. COOPER:** |
| 11:17AM | 6 | Q.  How about people possessing drugs and firearms together? |
| 11:17AM | 7 | A.  Oh, yes. |
| 11:17AM | 8 | Q.  Is that something the DEA in Buffalo is interested in? |
| 11:17AM | 9 | A.  Yes. |
| 11:17AM | 10 | Q.  How about people arranging international shipments of |
| 11:18AM | 11 | hundreds of pounds of marijuana? |
| 11:18AM | 12 | A.  Yes. |
| 11:18AM | 13 | Q.  Does the DEA clip people on the sidewalk for smoking a |
| 11:18AM | 14 | joint?  Is that what they arrest people for? |
| 11:18AM | 15 | A.  Oh, no. |
| 11:18AM | 16 | Q.  How about shipment of hundreds of pounds of marijuana, |
| 11:18AM | 17 | does that get on the DEA's radar? |
| 11:18AM | 18 | A.  Yes. |
| 11:18AM | 19 | Q.  How about a school teacher dealing hundreds of pounds of |
| 11:18AM | 20 | marijuana? |
| 11:18AM | 21 | A.  Absolutely. |
| 11:18AM | 22 | Q.  Would that be of interest to the DEA in Buffalo? |
| 11:18AM | 23 | A.  Absolutely. |
| 11:18AM | 24 | Q.  How about members and associates of Italian Organized |
| 11:18AM | 25 | Crime being involved in the distribution of hundreds of |

11:18AM    1    pounds of marijuana?

11:18AM    2            **MR. SINGER:**  Object to the cumulative at this point,

11:18AM    3    Judge.

11:18AM    4            **THE COURT:**  Overruled.

11:18AM    5            **BY MR. COOPER:**

11:18AM    6    Q.  How about people, members, and associates of IOC being

11:18AM    7    involved in the distribution of hundreds of pounds of

11:18AM    8    marijuana?

11:18AM    9    A.  Absolutely.

11:18AM    10   Q.  When you were asked those questions by Mr. Singer on

11:18AM    11   cross about whether the DEA seemed to do -- to do a lot of

11:18AM    12   marijuana cases, are all the things I just mentioned things

11:18AM    13   the DEA would have prioritized while you were there?

11:18AM    14   A.  Absolutely.

11:18AM    15   Q.  Mr. Singer asked you some questions -- we're gonna move

11:19AM    16   on to this 2015 high school reunion.

11:19AM    17       Mr. Singer asked you some questions about why you didn't

11:19AM    18   report your classmate for saying they were gonna snort

11:19AM    19   cocaine off of strippers' asses.

11:19AM    20       Do you remember being asked why you didn't report your

11:19AM    21   classmate for making that comment?

11:19AM    22   A.  Yes.

11:19AM    23   Q.  Is making that comment against the law?

11:19AM    24   A.  No.

11:19AM    25   Q.  Once you came back to Buffalo, was it your intention to

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

| | | |
|---|---|---|
| 11:19AM | 1 | investigate drug trafficking by Peter Gerace occurring at |
| 11:19AM | 2 | Pharaoh's? |
| 11:19AM | 3 | A.  Yes. |
| 11:19AM | 4 | Q.  Did you in fact start pursuing that within a year of |
| 11:19AM | 5 | arriving in Buffalo? |
| 11:19AM | 6 | A.  Yes. |
| 11:19AM | 7 | Q.  Is the DEA's primary focus to investigate drug dealers |
| 11:19AM | 8 | and not guys going through a mid-life crisis talking about |
| 11:19AM | 9 | sniffing cocaine off of a stripper's bottom? |
| 11:19AM | 10 | A.  Yes. |
| 11:19AM | 11 | Q.  Okay.  And you pursued an investigation into Gerace up |
| 11:19AM | 12 | until the point that the defendant stopped you in your tracks |
| 11:19AM | 13 | during that conference room interaction, right? |
| 11:20AM | 14 | MR. SINGER:  Objection, misstates the evidence. |
| 11:20AM | 15 | THE COURT:  Overruled. |
| 11:20AM | 16 | BY MR. COOPER: |
| 11:20AM | 17 | Q.  You started an investigation into Gerace, right? |
| 11:20AM | 18 | A.  Correct. |
| 11:20AM | 19 | Q.  You ran phone tolls, right? |
| 11:20AM | 20 | A.  Yes. |
| 11:20AM | 21 | Q.  After you did that, you had the conversation with the |
| 11:20AM | 22 | defendant in the conference room, right? |
| 11:20AM | 23 | A.  Yes. |
| 11:20AM | 24 | Q.  Is it your -- was it your impression during that |
| 11:20AM | 25 | conversation in the conference room that the defendant was |

11:20AM    1    trying to deter you from investigating Gerace?

11:20AM    2    A.   Yes.

11:20AM    3    Q.   Was it your impression that the shit sandwich, as you

11:20AM    4    described it, that he dumped on you by saying the things that

11:20AM    5    he said to you, did that cause you to just walk away from it

11:20AM    6    for a while?

11:20AM    7    A.   It -- it certainly did.

11:20AM    8    Q.   Did you ultimately start working on it again when you

11:20AM    9    found out that the U.S. Attorney's Office had a file open on

11:20AM   10    Gerace?

11:20AM   11    A.   I started working it more at that point.

11:20AM   12    Q.   You testified that a few weeks after the conversation

11:21AM   13    that you had with the defendant in the conference room where

11:21AM   14    the defendant pressured you to stop investigating Gerace,

11:21AM   15    that Gerace called you out of the blue; is that what

11:21AM   16    happened?

11:21AM   17    A.   That's correct.

11:21AM   18    Q.   Okay.  Do you know Peter Gerace's phone number at that

11:21AM   19    time at least to be 716-725-1931?

11:21AM   20    A.   I don't know his number.

11:21AM   21    Q.   Okay.

11:21AM   22         **MR. COOPER:**  Ms. Champoux, can I get Court Exhibit 5,

11:21AM   23    ma'am.  Thank you.

11:21AM   24         Can we pull up 359, Ms. Champoux.  I'm sorry, I've

11:22AM   25    got you running around, 359 in evidence.  And if you can go to

11:22AM    1    subscriber information.  Thank you.

11:22AM    2           Can we just expand column A for me, ma'am.  Okay.

11:22AM    3           **BY MR. COOPER:**

11:22AM    4    Q.  And, sir, in column A of Government Exhibit 359, the

11:22AM    5    Excel spreadsheet called Subscriber Information, do you see

11:22AM    6    the phone number listed 716-725-1931.

11:22AM    7    A.  Yes.

11:22AM    8    Q.  Okay.  And in the names listed in columns M, as in

11:22AM    9    Michael, and N, as in Nancy, what are the names listed there?

11:22AM    10   A.  Peter Gerace.

11:22AM    11   Q.  Have you looked at subscriber records before testifying,

11:22AM    12   like, have you done that your whole career?

11:22AM    13   A.  Yes.

11:22AM    14   Q.  Is that phone number in column A associated with Peter

11:22AM    15   Gerace based on this record?

11:22AM    16   A.  Yes.

11:22AM    17   Q.  Okay.  So let's remember that number, 725-1931.

11:23AM    18          **MR. COOPER:**  You can take that down, Ms. Champoux.

11:23AM    19          And if we can go back to Government Exhibit 358, the

11:23AM    20   PDF.

11:23AM    21          Go to page 349, please.  Thank you.

11:23AM    22          **BY MR. COOPER:**

11:23AM    23   Q.  So at the very top here, this is a phone bill, right?

11:23AM    24   A.  Correct.

11:23AM    25   Q.  At the very top here, is this a bill that's due in August

11:23AM   1   of 2016?

11:23AM   2   A.  Correct.

11:23AM   3   Q.  Based on your experience, does that mean that these are

11:23AM   4   calls made leading up to August of 2016?

11:23AM   5   A.  Yes.

11:23AM   6   Q.  Okay.  And let's -- on page 349, let's look for a phone

11:23AM   7   call from June 25, 2016, with that same 725-1931 phone

11:23AM   8   number.

11:23AM   9       Do you see the first one there?

11:23AM  10   A.  Yes, I do.

11:23AM  11   Q.  And we've already established that this 818-0966 number,

11:23AM  12   that's the defendant's phone number, right?

11:23AM  13   A.  Correct.

11:23AM  14   Q.  Okay.  On June 25 of 2016, is that after the

11:24AM  15   confrontation in the conference room, sir?

11:24AM  16   A.  Yes.

11:24AM  17   Q.  And is there a phone call here for one minute incoming

11:24AM  18   from Peter Gerace to Joe Bongiovanni?

11:24AM  19   A.  Yes.

11:24AM  20   Q.  Okay.  How about the next one down, June 25, 11:51, one

11:24AM  21   minute later, another -- oh, I'm sorry, the first one was

11:24AM  22   outgoing, the second one, do you see an incoming call here

11:24AM  23   from Peter to Joe?

11:24AM  24   A.  Yes.

11:24AM  25   Q.  And it says incoming call here, right?

11:24AM  1   A.  Right, correct.

11:24AM  2          **MR. COOPER:**  And then if you can scroll down or

11:24AM  3   highlight just a little lower.

11:24AM  4          **BY MR. COOPER:**

11:24AM  5   Q.  Seven hours later at 8:43 p.m., is there an outgoing call

11:24AM  6   from the defendant to Peter Gerace that lasted about two

11:24AM  7   minutes?

11:24AM  8   A.  Yes.

11:24AM  9   Q.  Is that within weeks of the confrontation in the

11:24AM  10  conference room?

11:24AM  11  A.  Yes.

11:24AM  12  Q.  Do you know what they talked about on those phone calls?

11:24AM  13  A.  No.

11:24AM  14  Q.  So when Mr. Singer asked you all those questions about

11:24AM  15  whether the defendant did anything to hamper your

11:24AM  16  investigation of Gerace, do you know whether he did or not?

11:25AM  17  A.  No.

11:25AM  18         **MR. COOPER:**  You can take that exhibit down,

11:25AM  19  Ms. Champoux.  Thank you.

11:25AM  20         **BY MR. COOPER:**

11:25AM  21  Q.  You did some work on a Peter Gerace investigation in

11:25AM  22  2016, but were stopped pretty quickly; is that fair to say?

11:25AM  23  A.  Yes.

11:25AM  24  Q.  You got started doing some work on Gerace, Peter and

11:25AM  25  Anthony, in 2018; is that right?

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

82

11:25AM  1   A.  Correct.

11:25AM  2   Q.  Was Curtis Ryan the primary person who was working on

11:25AM  3   that Gerace investigation?

11:25AM  4   A.  Yes.

11:25AM  5   Q.  Okay.  Was Curtis Ryan the person coordinating with the

11:25AM  6   United States Attorney's Office about that investigation?

11:25AM  7   A.  At -- at which point, sir?

11:25AM  8   Q.  Was Curtis -- based on your awareness, if you know, was

11:25AM  9   Curtis Ryan the primary person who was coordinating with the

11:25AM  10  U.S. Attorney's Office on that case?

11:26AM  11  A.  Yes.

11:26AM  12  Q.  After you made the report on August 1st of 2018 to AUSA

11:26AM  13  Tripi and Jim McHugh about the comments that the defendant

11:26AM  14  had made to you in 2016, did you later submit to multiple

11:26AM  15  interviews by OIG?

11:26AM  16  A.  Yes.

11:26AM  17  Q.  Did you tell them the truth?

11:26AM  18  A.  Yes.

11:26AM  19  Q.  Did you tell this jury the truth?

11:26AM  20  A.  Yes.

11:26AM  21  Q.  You were asked questions on cross-examination about

11:26AM  22  whether Phil Domiano was brought up at that meeting; do you

11:26AM  23  remember that?

11:26AM  24  A.  Yes.

11:26AM  25  Q.  Did the fact that Phil Domiano was brought up at that

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

11:27AM    1    meeting have anything to do with what you disclosed during

11:27AM    2    that meeting about what the defendant said to you?

11:27AM    3    A. No.

11:27AM    4    Q. You were asked questions on cross-examination about Phil

11:27AM    5    Domiano's association with Peter Gerace and whether if you as

11:27AM    6    an agent had a relationship with the subject or target.

11:27AM    7    And in response to those questions, you said agents -- an

11:27AM    8    agent should meet with a supervisor and a decision would be

11:27AM    9    made; do you remember that?

11:27AM    10    A. Yes.

11:27AM    11    Q. Okay. Is it the agent's responsibility to bring that to

11:27AM    12    the attention of a supervisor?

11:27AM    13    A. The conflict of interest?

11:27AM    14    Q. Yes.

11:27AM    15    A. Yes.

11:27AM    16    Q. Okay. Is it the agent's responsibility to tell the truth

11:27AM    17    about the nature and extent of that relationship?

11:27AM    18    A. Yes.

11:28AM    19    **MR. COOPER:** Ms. Champoux, can we pull up three

11:28AM    20    different exhibits, 127, 490A, and 426-1.

11:28AM    21    And on the bottom left here, can you zoom in on just

11:28AM    22    the right side of the photograph with defendant and Peter?

11:28AM    23    No, just the right side of the photograph.

11:28AM    24    All right. Move that over a little bit. Perfect.

11:28AM    25    And then on the bottom right, can you zoom in on the

| | | |
|---|---|---|
| 11:28AM | 1 | right half of the photograph?  Perfect.  Thank you. |
| 11:28AM | 2 | Move that over.  Awesome. |
| 11:28AM | 3 | **BY MR. COOPER:** |
| 11:28AM | 4 | Q.  Do you see these pictures on the screen in front of you, |
| 11:28AM | 5 | sir? |
| 11:28AM | 6 | A.  Yes. |
| 11:28AM | 7 | Q.  You were asked some questions about the conversation that |
| 11:28AM | 8 | you had with the defendant in the conference room in June of |
| 11:28AM | 9 | 2016. |
| 11:28AM | 10 | Do you remember being asked those questions? |
| 11:28AM | 11 | A.  Yes. |
| 11:28AM | 12 | Q.  You were asked questions about whether the defendant said |
| 11:28AM | 13 | anything about Narcan.  Did he say anything about Narcan? |
| 11:28AM | 14 | A.  No. |
| 11:28AM | 15 | Q.  You were asked questions about the meaning of the words |
| 11:29AM | 16 | "get her out of there."  Do you remember being asked what |
| 11:29AM | 17 | those words mean? |
| 11:29AM | 18 | A.  Yes. |
| 11:29AM | 19 | Q.  Did the defendant use the words in the meeting with you, |
| 11:29AM | 20 | "I told him to call 911"? |
| 11:29AM | 21 | A.  No. |
| 11:29AM | 22 | Q.  Did he say "I told him to call the police"? |
| 11:29AM | 23 | A.  Absolutely not. |
| 11:29AM | 24 | Q.  Did he say "I told him to call an ambulance"? |
| 11:29AM | 25 | A.  No. |

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

| | | |
|---|---|---|
| 11:29AM | 1 | Q.  Did he say "I told him to get Narcan"? |
| 11:29AM | 2 | A.  No. |
| 11:29AM | 3 | Q.  What did the defendant tell you that he told Peter Gerace |
| 11:29AM | 4 | when he called him and said a stripper was overdosing at his |
| 11:29AM | 5 | club? |
| 11:29AM | 6 | A.  To get her out of there. |
| 11:29AM | 7 | Q.  When you heard him say it, did that make you think it had |
| 11:29AM | 8 | a nefarious purpose? |
| 11:29AM | 9 | A.  Yes. |
| 11:29AM | 10 | MR. COOPER:  Ms. Champoux, I want to play Government |
| 11:29AM | 11 | Exhibit 311 now, and I guess do it with the microphone so that |
| 11:29AM | 12 | it plays from the beginning, please. |
| 11:29AM | 13 | MR. SINGER:  Judge, object to outside the scope at |
| 11:29AM | 14 | this point. |
| 11:29AM | 15 | MR. COOPER:  I can come up and argue it if you want. |
| 11:30AM | 16 | 311 is the voicemail. |
| 11:30AM | 17 | THE COURT:  Yeah, come on up. |
| 10:52AM | 18 | (Sidebar discussion held on the record.) |
| 11:30AM | 19 | MR. COOPER:  So my -- |
| 11:30AM | 20 | THE COURT:  This is the voicemail? |
| 11:30AM | 21 | MR. COOPER:  Yeah, about tracker phone.  So my |
| 11:30AM | 22 | response is that the cross-examination was targeted towards |
| 11:30AM | 23 | saying, hey, there's alternative, innocent explanations for |
| 11:30AM | 24 | the comments that the defendant made. |
| 11:30AM | 25 | I'm contextualizing that with another exhibit that's |

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

| | | |
|---|---|---|
| 11:30AM | 1 | in evidence.  So the objection to outside of the scope, |
| 11:30AM | 2 | it's -- it's not an exhibit that Mr. Singer chose to use, but |
| 11:30AM | 3 | it's an exhibit that supports the government's theory of the |
| 11:30AM | 4 | case.  I don't believe it's outside the scope, Judge. |
| 11:30AM | 5 | THE COURT:  Yeah, so why isn't that in response to |
| 11:30AM | 6 | your cross? |
| 11:30AM | 7 | MR. SINGER:  I don't think it is.  We're getting so |
| 11:30AM | 8 | far afield at this point in time. |
| 11:30AM | 9 | If you're going to allow them retry their entirety of |
| 11:30AM | 10 | their case at this point in time on cross-examination, it's |
| 11:30AM | 11 | outside the scope, Judge.  I didn't bring it up, it doesn't |
| 11:30AM | 12 | have anything to do with it. |
| 11:30AM | 13 | MR. COOPER:  He brought up the motive for the comment |
| 11:30AM | 14 | and I'm combatting that with other evidence.  That's redirect. |
| 11:31AM | 15 | THE COURT:  Overruled. |
| 11:31AM | 16 | (End of sidebar discussion.) |
| 11:31AM | 17 | THE COURT:  Overruled.  You can -- you can proceed. |
| 11:31AM | 18 | MR. COOPER:  Ms. Champoux, can you play 311, please. |
| 11:31AM | 19 | Listen. |
| 11:31AM | 20 | (Exhibit 311, audio, was played.) |
| 11:31AM | 21 | MR. COOPER:  Can we turn the volume up a little bit, |
| 11:31AM | 22 | please?  Thank you, ma'am. |
| 11:31AM | 23 | Can we try that one more time, Ms. Champoux? |
| 11:31AM | 24 | MR. SINGER:  Objection. |
| 11:31AM | 25 | THE COURT:  Yes, sustained. |

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

11:31AM  1    MR. COOPER:  I don't know that it was audible.

11:31AM  2    BY MR. COOPER:

11:31AM  3  Q.  Were you able to hear that, sir?

11:31AM  4  A.  Most of it.

11:31AM  5  Q.  Okay.  Did you catch the words -- all the words that were

11:31AM  6  being said?

11:31AM  7  A.  About tracking a phone.

11:31AM  8  Q.  Okay.  Did you recognize the voices on the call?

11:31AM  9  A.  I recognized the person making the call.

11:32AM  10  Q.  Or the voice on the call, I'm sorry.  Whose voice did you

11:32AM  11  recognize?

11:32AM  12  A.  Peter Gerace.

11:32AM  13  Q.  Okay.  And what did Peter Gerace say in that recording?

11:32AM  14  A.  Asking something about trying to track a phone, how you

11:32AM  15  could track a phone for him.

11:32AM  16  Q.  Did you hear him say, hey, Joe, it's Peter?

11:32AM  17  A.  Yes.

11:32AM  18  Q.  Did you hear him ask whether the police were able to ping

11:32AM  19  a TracFone like they do with drug dealers?

11:32AM  20  A.  Yes.

11:32AM  21    MR. COOPER:  Can we go to Government Exhibit 310D,

11:32AM  22  please.  Can we go to page 42, ma'am.

11:32AM  23    Can you zoom in on the gray box in the middle there.

11:32AM  24    BY MR. COOPER:

11:32AM  25  Q.  Can you see a text message responding to an audio

11:32AM   1   recording here?

11:32AM   2   A.   Yes.

11:32AM   3   Q.   What's it say?

11:32AM   4   A.   Yes, but you would need a warrant to get a ping order.

11:32AM   5          **MR. COOPER:**  Okay, you can take that down,

11:33AM   6   Ms. Champoux.

11:33AM   7          **BY MR. COOPER:**

11:33AM   8   Q.   Before just now, had you ever heard that audio recording

11:33AM   9   before?

11:33AM  10   A.   No.

11:33AM  11   Q.   Had you ever seen that text message before?

11:33AM  12   A.   No.

11:33AM  13   Q.   Did that help you contextualize the comments the

11:33AM  14   defendant made to you in the conference room in 2016?

11:33AM  15          **MR. SINGER:**  Objection.

11:33AM  16          **THE COURT:**  Basis?

11:33AM  17          **MR. SINGER:**  Could we come up.  Judge?

11:33AM  18          **THE COURT:**  Sure, come on up.

11:33AM  19          (Sidebar discussion held on the record.)

11:33AM  20          **MR. SINGER:**  So if I understand the question, Judge,

11:33AM  21   Mr. Cooper's asking the witness whether something that he

11:33AM  22   heard for the first time now can help him contextualize a

11:33AM  23   conversation and how he contextualizes it back in 2016.  So

11:33AM  24   you can't use -- it's apples and oranges.  You can't use it

11:33AM  25   that way.

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

| | | |
|---|---|---|
| 11:33AM | 1 | **MR. COOPER:**  No, I disagree. |
| 11:33AM | 2 | So on cross-examination, Mr. Singer tried to suggest |
| 11:33AM | 3 | repeatedly that there were two possible things, and you were |
| 11:33AM | 4 | grappling with what it was.  And he was grappling with it at |
| 11:34AM | 5 | the time. |
| 11:34AM | 6 | I just played an exhibit that's in evidence, and |
| 11:34AM | 7 | asked him if that helped contextualize what he heard back in |
| 11:34AM | 8 | 2016. |
| 11:34AM | 9 | **THE COURT:**  (Indecipherable.) |
| 11:34AM | 10 | **MR. COOPER:**  The judge said link it to the cross and |
| 11:34AM | 11 | you can do it. |
| 11:34AM | 12 | **THE COURT:**  (Indecipherable.)  I hope we're wrapping |
| 11:34AM | 13 | up. |
| 11:34AM | 14 | **MR. COOPER:**  I have one more -- |
| 11:34AM | 15 | **MR. SINGER:**  Here's the problem is that it's an |
| 11:34AM | 16 | argument question, Judge, all right? |
| 11:34AM | 17 | When I asked questions about what he was grappling |
| 11:34AM | 18 | with, I asked him what was going through your head in 2016 in |
| 11:34AM | 19 | the conference room. |
| 11:34AM | 20 | This is asking him about something that never |
| 11:34AM | 21 | occurred in the conference room, didn't even occur in 2016, |
| 11:34AM | 22 | and he's asking -- |
| 11:34AM | 23 | (Simultaneous talking.) |
| 11:34AM | 24 | **MR. SINGER:**  It has nothing to do with it. |
| 11:34AM | 25 | **THE COURT:**  (Indecipherable.) |

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

90

| | | |
|---|---|---|
| 11:34AM | 1 | **MR. COOPER:** It's tried -- so the cross-examination |
| 11:34AM | 2 | was trying to suggest through the witness, instead of arguing |
| 11:34AM | 3 | on summation, trying to suggest through the witness that the |
| 11:34AM | 4 | witness thought that there was a potential nefarious purpose |
| 11:34AM | 5 | or a potential not nefarious purpose. |
| 11:34AM | 6 | **THE COURT:** Yes. |
| 11:34AM | 7 | **MR. COOPER:** The witness has been played an exhibit |
| 11:35AM | 8 | in evidence, and I'm asking if that contextualized what he |
| 11:35AM | 9 | heard in 2016 for him. |
| 11:35AM | 10 | **THE COURT:** But again, what -- what Mr. Singer's |
| 11:35AM | 11 | questions were directed to is what he thought at that time, |
| 11:35AM | 12 | not what he thinks now. And what he thinks now, why is that |
| 11:35AM | 13 | relevant? It's what he thought at the time, right? Why is -- |
| 11:35AM | 14 | why is what he thinks about it now relevant. |
| 11:35AM | 15 | What the jury thinks about it now is what's relevant, |
| 11:35AM | 16 | not this witness. |
| 11:35AM | 17 | **MR. COOPER:** I'll move on. |
| 11:35AM | 18 | **THE COURT:** So I'll sustain the objection. |
| 11:35AM | 19 | (End of sidebar discussion.) |
| 11:35AM | 20 | **THE COURT:** The objection is sustained. |
| 11:35AM | 21 | Next question, please. |
| 11:35AM | 22 | **BY MR. COOPER:** |
| 11:35AM | 23 | Q. At the time that you had that conversation with the |
| 11:35AM | 24 | defendant in the conference room, did you know that that |
| 11:35AM | 25 | audio recording existed? |

| 11:35AM | 1 | A.  No. |
|---------|---|---------|

11:35AM  2  Q.  Had you ever heard it before?

11:35AM  3  A.  No.

11:35AM  4  Q.  So when Mr. Singer asked you on cross-examination about

11:35AM  5  whether there were alternative explanations for it and he

11:35AM  6  could have meant get her to a hospital, were you basing it on

11:36AM  7  what you knew at the time?

11:36AM  8  A.  Yes.

11:36AM  9  Q.  At the time, did you think it was nefarious?

11:36AM  10  A.  Yes.

11:36AM  11          **MR. COOPER:**  May I just have one second, Judge.

11:37AM  12          **BY MR. COOPER:**

11:37AM  13  Q.  You were asked -- finally, you were asked some questions

11:37AM  14  on cross-examination about when you chose to come forward

11:37AM  15  with the information that you heard from the defendant's

11:37AM  16  mouth in 2016.

11:37AM  17      Do you remember being asked about that?

11:37AM  18  A.  Yes.

11:37AM  19  Q.  And about why you waited?

11:37AM  20  A.  Yes.

11:37AM  21  Q.  And about DEA policy that requires you to report it,

11:37AM  22  right?

11:37AM  23  A.  Yes.

11:37AM  24  Q.  Should you have reported it?

11:37AM  25  A.  Yes.

USA v Bongiovanni - Casullo - Singer/Recross - 9/25/24

| | | |
|---|---|---|
| 11:37AM | 1 | Q.  Okay.  Did hearing Ron Serio describe that the defendant |
| 11:37AM | 2 | had passed the names of informants, was that an impetus to -- |
| 11:37AM | 3 | to have you come forward with the information that you knew |
| 11:37AM | 4 | about what the defendant said to you related to Peter Gerace? |
| 11:37AM | 5 | A.  Definitely part of it. |
| 11:37AM | 6 | **MR. COOPER:**  Okay.  I have no further redirect. |
| 11:37AM | 7 | **THE COURT:**  Anything more, Mr. Singer? |
| 11:37AM | 8 | |
| 11:37AM | 9 | **RECROSS-EXAMINATION BY MR. SINGER:** |
| 11:37AM | 10 | Q.  You talked a little bit on redirect, sir, about your |
| 11:38AM | 11 | August 1st, 2018 report about the conversation in June 2016. |
| 11:38AM | 12 | Do you remember testifying to that a few minutes ago? |
| 11:38AM | 13 | A.  Yes. |
| 11:38AM | 14 | Q.  And Mr. Cooper asked you about when you reported this, |
| 11:38AM | 15 | whether you knew about whether you were going to be removed |
| 11:38AM | 16 | from a case because of a conflict; do you remember that? |
| 11:38AM | 17 | A.  Yeah.  What was the specific question he asked? |
| 11:38AM | 18 | Q.  The basic fact is is that when you reported this in 2018, |
| 11:38AM | 19 | you didn't know you were going to be removed from the Peter |
| 11:38AM | 20 | Gerace case at that time, correct? |
| 11:38AM | 21 | A.  I didn't know I would ultimately be removed. |
| 11:38AM | 22 | Q.  I mean, you didn't even think you were gonna be removed |
| 11:38AM | 23 | from the case, right, because you had a conversation with |
| 11:38AM | 24 | Mr. Tripi where you said you didn't think you had a reason to |
| 11:38AM | 25 | be removed, right? |

11:38AM    1    A.  Well, that's Mr. Tripi.  I had no idea what my own

11:38AM    2    management would do.  And I knew that it would go back, and

11:38AM    3    it would go through our chain of command, all the way up to

11:38AM    4    the top.  So I had no idea what was gonna happen at that

11:38AM    5    point.

11:38AM    6    Q.  All right.  So you had no idea what was gonna happen at

11:38AM    7    the point, right?

11:38AM    8    A.  No, because DEA -- I knew it would go through the chain

11:38AM    9    of command at DEA.

11:38AM   10    Q.  So, you got asked on redirect as well about you testified

11:39AM   11    that you -- you didn't have a clue as to why Joe Bongiovanni

11:39AM   12    wanted his name off the reports.

11:39AM   13        Do you remember taking about that, sir?

11:39AM   14    A.  I remember talking about it.

11:39AM   15    Q.  But you knew exactly why, right?

11:39AM   16    A.  What was my testimony?

11:39AM   17    Q.  Joe Bongiovanni told you why he didn't want to be on

11:39AM   18    those reports, correct?

11:39AM   19    A.  He said he knew those people from -- he knew him from

11:39AM   20    growing up.  You're talking about when I --

11:39AM   21    Q.  Yes.

11:39AM   22    A.  -- about Mike Masecchia?  He knew him from North Buffalo.

11:39AM   23    Q.  So you do have a clue as to why he didn't want to be on

11:39AM   24    those reports, correct, sir?

11:39AM   25    A.  Based on what he told me.

11:39AM    1    Q.  Mr. Cooper asked you about that 2009 Mike Masecchia

11:39AM    2    investigation.  The case agent on that case was Cory Higgins,

11:39AM    3    right?

11:39AM    4    A.  Yes.

11:39AM    5    Q.  Cory Higgins never called you up, correct?

11:39AM    6    A.  No.

11:39AM    7    Q.  And you were shown something which confirmed that the

11:39AM    8    NADDIS entry that you put in back in 2004, that was in the

11:39AM    9    system when Cory Higgins opened up the report, correct?

11:39AM    10   A.  So I was shown a NADDIS number from that report, and

11:39AM    11   there was a NADDIS number next to Masecchia.  I don't know if

11:39AM    12   it's the same NADDIS number I had, but it showed a NADDIS

11:39AM    13   number after Michael Masecchia's name.

11:39AM    14   Q.  Yep.  And so Higgins could have looked up your past

11:40AM    15   investigation and called you, right?

11:40AM    16   A.  I mean, part of the process is to search a name that

11:40AM    17   you're targeting in the DEA intelligence system to see if

11:40AM    18   anyone else has been working on that case.

11:40AM    19   Q.  Yep.  And he could have done that, and he didn't do it

11:40AM    20   because, he never called you, right?

11:40AM    21   A.  He never called me.

11:40AM    22   Q.  And you had no information that Joe Bongiovanni was ever

11:40AM    23   involved in that investigation, correct?

11:40AM    24   A.  Involved?

11:40AM    25   Q.  Yes.  He was never investigating that case, correct?

11:40AM    1    A.  Not to my knowledge.

11:40AM    2    Q.  You don't even know today whether he even knew about the

11:40AM    3    case, right?

11:40AM    4    A.  Again, what I said before about Cory Higgins telling me.

11:40AM    5    Q.  I got you.

11:40AM    6         MR. SINGER:  So, Ms. Champoux, can you bring up

11:40AM    7    Exhibit 22Q, please?

11:40AM    8         BY MR. SINGER:

11:40AM    9    Q.  So Mr. Cooper showed you this exhibit; do you remember

11:40AM    10   this, sir?  Talking about the center section.

11:40AM    11   A.  That part I -- yep.

11:40AM    12   Q.  Yeah, about how in 2015, Joe Bongiovanni was talking

11:41AM    13   about still looking into Ron Serio; do you remember that?

11:41AM    14   A.  Yeah.  What I have circled here, I remember this.

11:41AM    15   Q.  And we talked about on your cross-examination how just

11:41AM    16   because a case is closed doesn't mean that a DEA agent loses

11:41AM    17   interest in a target they weren't able to develop a case on,

11:41AM    18   right?

11:41AM    19   A.  Possibly.

11:41AM    20   Q.  Yeah, so for instance, like -- like Peter Gerace, you

11:41AM    21   never really officially opened a file on him, right, as a

11:41AM    22   subject title.

11:41AM    23   A.  I did not.

11:41AM    24   Q.  But you still had interest in him, right?

11:41AM    25   A.  Yes.

11:41AM    1    Q.  And you were just waiting for the right time and place to

11:41AM    2    open up an investigation, correct?

11:41AM    3    A.  Once I have enough information that I believe to open a

11:41AM    4    case.

11:41AM    5    Q.  Mr. Cooper --

11:41AM    6            **MR. SINGER:**  You can take that down, Ms. Champoux.

11:41AM    7            **BY MR. SINGER:**

11:41AM    8    Q.  -- Mr. Cooper asked you questions about Mike Masecchia

11:41AM    9    and whether that was brought up in your 2015 or 2016

11:41AM    10   conversation with Mr. Bongiovanni about the Ron Serio file.

11:41AM    11       Do you remember that, sir?

11:41AM    12   A.  Yes.

11:41AM    13   Q.  And you had mentioned that you had interest in the fact

11:41AM    14   that Mike Masecchia was involved in that investigation,

11:41AM    15   correct?

11:41AM    16   A.  I would have been interested in that if I knew.

11:41AM    17   Q.  So -- so, let's go back to the Ron Serio.  You were told

11:42AM    18   about Ron Serio, right?

11:42AM    19   A.  He mentioned Ron Serio with the file on his desk, that

11:42AM    20   conversation.

11:42AM    21   Q.  Yeah, and he told you it was a big case?

11:42AM    22   A.  Yep.

11:42AM    23   Q.  And did you say to him something like, hey, Joe, this

11:42AM    24   sounds awesome.  Let's go out and investigate this right now.

11:42AM    25   Open it up.  Did you say that?

11:42AM   1   A.  No.

11:42AM   2   Q.  You talked a little bit about Government Exhibit 311 that

11:42AM   3   you were played; do you remember that, sir?

11:42AM   4   A.  Just that recent audio call?

11:42AM   5   Q.  Yes.

11:42AM   6   A.  Yes.

11:42AM   7   Q.  And the substance of that was that Peter Gerace was

11:42AM   8   asking a question about whether the police could track a

11:42AM   9   phone; do you remember that?

11:42AM  10   A.  Yep.

11:42AM  11   Q.  And you've been a law enforcement officer for a really

11:42AM  12   long time, right?

11:42AM  13   A.  Yes.

11:42AM  14   Q.  Have you had friends and family ask you questions about

11:42AM  15   the law?

11:42AM  16   A.  Different questions, yeah.

11:42AM  17   Q.  So that's not just something that comes out of the blue,

11:42AM  18   right?

11:42AM  19   A.  Yes.  Specific question like that, never had that

11:42AM  20   experience before, but I've had people ask me questions about

11:42AM  21   the law in the past.

11:42AM  22   Q.  Thank you.

11:43AM  23       And with regard to the June 2016 conversation, Mr. Cooper

11:43AM  24   asked you whether you inferred a nefarious purpose to that

11:43AM  25   conversation; do you remember that?

11:43AM     1    A.   Yes.

11:43AM     2    Q.   But your testimony on cross was you were conflicted,

11:43AM     3    right?

11:43AM     4    A.   Feeling multiple things.

11:43AM     5    Q.   Yeah.  Like in one hand, you thought maybe there's a

11:43AM     6    nefarious purpose to this, right?

11:43AM     7    A.   Yes.

11:43AM     8    Q.   But on the other hand, you weren't really sure?

11:43AM     9    A.   I was confused.

11:43AM    10    Q.   And you sat with that, and you struggled with that for

11:43AM    11    about two years, right?

11:43AM    12    A.   I sat with it, and things changed along the way.

11:43AM    13    Q.   Um-hum.  But at first, you were sitting there not knowing

11:43AM    14    whether there was a nefarious purpose or not, right?

11:43AM    15    A.   Correct.

11:43AM    16    Q.   So to say on redirect that you inferred a nefarious

11:43AM    17    purpose immediately, that would be incorrect, right?

11:43AM    18    A.   Again, I don't remember the exact words about inferring

11:43AM    19    that immediately, but I did infer that at some point during

11:43AM    20    that process.

11:43AM    21    Q.   But not immediately?

11:43AM    22    A.   Again, I'm not comfortable saying it immediately.  I

11:43AM    23    mean, he said it, and that became part of my thought process.

11:44AM    24    So immediately would be, I guess, when he says it.

11:44AM    25    Q.   And you didn't take any action like we talked about,

11:44AM  1    right?

11:44AM  2    A.  No.

11:44AM  3    Q.  And as far as Peter Gerace is concerned, back in 2016,

11:44AM  4    the government asked you whether or not this June 2016

11:44AM  5    conversation in any way strayed you away from the Peter

11:44AM  6    Gerace case.

11:44AM  7        Do you remember that?

11:44AM  8    A.  Yes.

11:44AM  9    Q.  So we went through a number of things on

11:44AM  10   cross-examination about what was happening at that time.  So

11:44AM  11   one of the things we went through, and we went through it

11:44AM  12   again a few moments ago, is you never officially opened a

11:44AM  13   file title on Peter Gerace back in 2016, right?

11:44AM  14   A.  No.

11:44AM  15   Q.  So you didn't even have an open investigation at that

11:44AM  16   time, correct?

11:44AM  17   A.  It was like the beginning stages of the things that I

11:44AM  18   mentioned, but not an actual case file open on Gerace.

11:44AM  19   Q.  Correct.  And you had other active cases ongoing at that

11:44AM  20   time, right?

11:44AM  21   A.  Yeah.  It was during the timeframe -- I think it was at

11:44AM  22   the end of that wire case with the State Attorney General's

11:44AM  23   Office.

11:44AM  24   Q.  Yeah, we mentioned that the Ramos-Ramos case was

11:44AM  25   concluding, but there was a lot of work to conclude that,

USA v Bongiovanni - Casullo - Singer/Recross - 9/25/24

100

| | | |
|---|---|---|
| 11:45AM | 1 | right? |
| 11:45AM | 2 | A.   Yes. |
| 11:45AM | 3 | Q.   And that was all ongoing at that time? |
| 11:45AM | 4 | A.   It was during that time frame. |
| 11:45AM | 5 | Q.   And those were all the things that we went through that |
| 11:45AM | 6 | prevented you from going out and conducting surveillance and |
| 11:45AM | 7 | pole cameras and things like that, correct? |
| 11:45AM | 8 | A.   I don't agree with that.  That's not what prevented me |
| 11:45AM | 9 | from doing it. |
| 11:45AM | 10 | Q.   Okay.  But you didn't do those things, right? |
| 11:45AM | 11 | A.   I didn't do those things. |
| 11:45AM | 12 | Q.   And most importantly, you talked about how at that point |
| 11:45AM | 13 | in time in 2016 you had not developed a CI with regard to |
| 11:45AM | 14 | Peter Gerace, correct? |
| 11:45AM | 15 | A.   I had not. |
| 11:45AM | 16 | Q.   And that was something that you described in your own |
| 11:45AM | 17 | testimony was something that was critically important to |
| 11:45AM | 18 | developing a lot of different cases, right? |
| 11:45AM | 19 | A.   For me, I believe that. |
| 11:45AM | 20 | Q.   And in this particular situation vis-à-vis Peter Gerace, |
| 11:45AM | 21 | that didn't happen until Myszka came in in 2017 to start |
| 11:45AM | 22 | proffering, correct? |
| 11:45AM | 23 | A.   Correct. |
| 11:45AM | 24 | Q.   And then you got information that was useful to you to |
| 11:45AM | 25 | help develop further investigation, correct? |

11:45AM    1    A.  Correct.

11:45AM    2    Q.  The CI that you never had, so to speak?

11:45AM    3    A.  It was someone that was a human source that was talking

11:45AM    4    about Peter and illegal activity.

11:45AM    5    Q.  And that helped move the investigation forward, correct?

11:45AM    6    A.  It did.

11:45AM    7           **MR. SINGER:**  Okay.  Thank you.  I have no further

11:46AM    8    questions, Judge.

11:46AM    9

11:46AM    10           **RE-REDIRECT EXAMINATION BY MR. COOPER:**

11:46AM    11    Q.  Just one.  On that Exhibit 311, the audio recording, at

11:46AM    12    the time that that audio recording was made and responded to

11:46AM    13    by a text message by the defendant, Peter Gerace was a

11:46AM    14    convicted felon at that time, right?

11:46AM    15    A.  I believe so.

11:46AM    16    Q.  Peter Gerace had been a convicted felon since the late

11:46AM    17    '90s or early 2000s, right, sir?

11:46AM    18    A.  That's my understand.

11:46AM    19    Q.  Mr. Singer asked you if it was common, not out of the

11:46AM    20    ordinary, for friends and family to ask questions about law

11:46AM    21    enforcement stuff, right?

11:46AM    22    A.  Correct.

11:46AM    23    Q.  Did you ever have a convicted felon ask you if law

11:46AM    24    enforcement has the technological ability to ping TracFones?

11:46AM    25    A.  No.

11:46AM    1    Q.  No?

11:46AM    2          **MR. COOPER:**  Nothing further, Judge.

11:46AM    3          **THE COURT:**  Anything more?

11:46AM    4          **MR. SINGER:**  Nothing further, Judge.

11:46AM    5          **THE COURT:**  You can step down, sir.

11:46AM    6          **THE WITNESS:**  Thank you.

11:46AM    7          (Witness excused at 11:46 a.m.)

         8          (Excerpt concluded at 11:46 a.m.)

         9          *       *       *       *       *       *       *

       10

       11

       12

       13             **CERTIFICATE OF REPORTER**

       14

       15          In accordance with 28, U.S.C., 753(b), I

       16    certify that these original notes are a true and correct

       17    record of proceedings in the United States District Court for

       18    the Western District of New York on September 25, 2024.

       19

       20

       21          s/ Ann M. Sawyer

                   Ann M. Sawyer, FCRR, RPR, CRR

       22          Official Court Reporter

                   U.S.D.C., W.D.N.Y.

       23

       24

       25

**TRANSCRIPT INDEX**

**EXCERPT - EXAMINATION OF ANTHONY CASULLO - DAY 2**

**SEPTEMBER 25, 2024**

**W I T N E S S**                                    **P A G E**

**A N T H O N Y   C A S U L L O**                          2

  (CONT'D) CROSS-EXAMINATION BY MR. SINGER:          2

  REDIRECT EXAMINATION BY MR. COOPER:               46

  RECROSS-EXAMINATION BY MR. SINGER:                92

  RE-REDIRECT EXAMINATION BY MR. COOPER:           101