UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- vs. -                                        Case No. 19-CR-227-LJV

JOSEPH BONGIOVANNI,

*Defendant.*

## DEFENDANT JOSEPH BONGIOVANNI'S
## RULE 29 MOTION

**The Law Office of Parker R. MacKay**
Parker R. MacKay, Esq.
3110 Delaware Avenue
Kenmore, New York 14217
(716) 803-8166
Parker@MacKayLawOffice.com



Robert C. Singer, Esq.
80 East Spring Street
Williamsville, New York 14221
(716) 222-3288
rob@singerlegalpllc.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES.............................................................. ii

PRELIMINARY STATEMENT ......................................................... 1

ARGUMENT............................................................................ 3

    I.    Standard ..................................................................... 3

    II.   The Convictions on Counts 1 and 3 Cannot Stand Because
         the Government Failed to Prove Agreements, and, Even
         if it Did, the Government Did Not Prove the Conspiracies
         Alleged in the Indictment. ............................................... 4

      A.   Introduction................................................................ 4

      B.   The Conviction on Count 1 Cannot Stand Because §371
         Does Not Permit the Government to Prove Differing Conduct
         for the Two Prongs, and the Conspiracy Proved was not the
         Conspiracy Alleged. ...................................................... 6

      C.   A Conviction on Count 1 under the Defraud Prong of §371
         also Cannot Stand Because the Elements of a *Klein* Conspiracy
         Were Not Proven and Proof of the Commission of an Overt Act
         is Lacking. ............................................................... 16

      D.   Count 3 Cannot Stand Because the Object of the Conspiracy
         was Unclear and Proof of Agreement was Likewise Lacking...................... 27

      E.   In the Alternative, Only Count 3 Can Stand. .............................. 31

    III.  The Evidence on Count 6 is Insufficient Considering
         the Jury's Rejection of a Bribery Theory and Connection
         to the Ron Serio DTO. ................................................... 32

    IV.  The Evidence Cannot Support a Conviction on Count 7
         Because the Statements in the Relevant DEA-6 Memorandum
         were Factually True. ..................................................... 37

    V.   The Proof on Count 8 is Insufficient Given that Bongiovanni's
         Representations About His Relationship With Gerace
         Were Substantially True in Context. ...................................... 43

    VI.  The Proof on Count 10 is Insufficient Given that Bongiovanni's
         Representations About His Relationship with Gerace Were
         Substantially True in Context. ........................................... 46

    VII.  The Conviction on Count 11 Cannot Stand Because Bongiovanni's
         Statement was the Answer to a Vague Question in Context...................... 50

    CONCLUSION .............................................................. 52

## TABLE OF AUTHORITIES

**Cases**

*Blumenthal v. United States*, 332 U.S. 539 (1947) ............................. 28

*Direct Sales Co. v. United States*, 319 U.S. 703 (1943) ....................... 29

*Ex parte Bain*, 121 U.S. 1 (1887) ........................................... 13

*Iannelli v. United States*, 420 U.S. 770 (1975) ............................. 17

*Jackson v. Virginia*, 443 U.S. 307 (1979) ..................................... 3

*Stirone v. United States*, 361 U.S. 212 (1960) .............................. 13

*United States v. Anderson*, 747 F.3d 51 (2d Cir. 2014) ...................... 20

*United States v. Ballistrea*, 101 F.3d 827 (2d Cir. 1996) ................... 18

*United States v. Bernstein*, 533 F.2d 775 (2d Cir. 1976) .................... 12

*United States v. Bertolotti*, 529 F.2d 149 (2d Cir. 1975) ..................... 9

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ............... 10, 16

*United States v. Brown*, 692 F.2d 345 (5th Cir. 1982) ....................... 27

*United States v. Caldwell*, 989 F.2d 1056 (9th Cir. 1993) ................... 18

*United States v. Castelin*, 597 Fed. App'x. 22 (2d Cir. 2015) ................. 3

*United States v. Ceballos*, 340 F.3d 115 (2d Cir. 2003) ..................... 30

*United States v. Cianchetti*, 315 F.2d 584 (2d Cir. 1963) ................... 30

*United States v. Concord Mgmt. & Consulting LLC*, 347 F. Supp. 3d 38
   (D.D.C. 2018) .............................................................. 22

*United States v. Cote*, 544 F.3d 88 (2d Cir. 2008) ............................ 3

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994) ...................... 30

*United States v. D'Amelio*, 683 F.3d 412 (2d Cir. 2012) ...................... 8

*United States v. Danielson*, 199 F.3d 666 (2d Cir. 1999) ..................... 8

*United States v. Desimone*, 119 F.3d 217 (2d Cir. 1997) ..................... 29

*United States v. Falcone*, 109 F.2d 579 (2d Cir. 1940) ...................... 30

*United States v. Frank*, 156 F.3d 332 (2d Cir. 1998) ......................... 8

*United States v. Gall*, 1996 WL 684404 (D.Conn. Aug. 12, 1996) ............. 24

*United States v. Gallishaw*, 428 F.2d 760 (2d Cir. 1970) ................ 17, 28

*United States v. Huezo*, 546 F.3d 174 (2d Cir. 2008) ........................ 17

*United States v. Kerik*, 615 F.Supp.2d 256 (S.D.N.Y. 2009) .............. 50, 52

*United States v. Klein*, 247 F.2d 908 (2d Cir. 1957) .......................... 4

*United States v. Koschuk*, No. 09-CR-323S, 2010 WL 4703504
   (W.D.N.Y. Nov. 19, 2010) ................................................... 3

*United States v. Lighte*, 782 F.2d 367 (2d Cir. 1986) ....................... 50

*United States v. Liu*, No. 19-CR-804 (VEC), 2022 WL 443846
   (S.D.N.Y. Feb. 14, 2022) ................................................... 18

*United States v. Lorenzo*, 534 F.3d 153 (2d Cir. 2008) ....................... 4

*United States v. McDonough*, 56 F.3d 381 (2d Cir. 1995) ...................... 7

*United States v. Minarik*, 875 F.2d 1186 (6th Cir. 1989) ................. 9, 16

*United States v. Monaco*, 194 F.3d 381 (2d Cir. 1999) ....................... 17

*United States v. Mulheren*, 938 F.2d 364 (2d Cir.1991) ...................... 30

*United States v. Provenzano*, 615 F.2d 37 (2d Cir. 1980) .................... 17

*United States v. Puzzo*, 928 F.2d 1356 (2d Cir. 1991) ............................................. 29

*United States v. Reyes*, 302 F.3d 48 (2d Cir. 2002) ............................................. 30

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ............................................. 8

*United States v. Rigas*, 605 F.3d 194 (3d Cir. 2010) ............................................. 9

*United States v. Rosenblatt*, 554 F.2d 36 (2d Cir. 1977)................................passim

*United States v. Rowland*, 826 F.3d 100 (2d Cir. 2016) ............................................. 42

*United States v. Sanchez-Mata*, 925 F.2d 1166 (9th Cir. 1991) ............................ 29

*United States v. Scop*, 846 F.2d 135 (2d Cir. 1988) ............................................. 24

*United States v. Smith*, 789 F.2d 196 (3rd Cir. 1986) ............................................. 12

*United States v. Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) ...................................... 28

*United States v. Story*, 891 F.2d 988 (2d Cir. 1989)............................................. 27

*United States v. Upton*, 856 F. Supp. 727 (E.D.N.Y. 1994) ...................................... 11

*United States v. Valle*, 807 F.3d 508 (2d Cir. 2015) ............................................. 4

*United States v. Vernace*, 811 F.3d 609 (2d Cir. 2016) ............................................. 29

*United States v. Weiss*, 752 F.2d 777 (2d Cir. 1985)............................................. 14

*United States v. Whiteford*, 676 F.3d 348 (3d Cir. 2012) ...................................... 18

*United States v. Wiley*, 846 F.2d 150 (2d Cir. 1988) ............................................. 29

## Statutes

18 U.S.C. § 1001 ........................................................................................................ 50

18 U.S.C. § 1519 ........................................................................................................ 39

18 U.S.C. § 3282 ........................................................................................................ 24

18 U.S.C. § 371 ....................................................................................................... 4, 6

21 U.S.C. § 841 ........................................................................................................ 27

21 U.S.C. § 844 ........................................................................................................ 27

21 U.S.C. § 846 ..................................................................................................... 5, 27

## Other Authorities

Dep't of Justice Criminal Resource Manual ........................................................... 10

## Rules

FED. R. CRIM. P. 29 ...................................................................................................... 3

## PRELIMINARY STATEMENT

In the wake of his first trial, Defendant Joseph Bongiovanni was retried on the remaining counts for which a mistrial was not granted.  At the conclusion of the retrial, the jury convicted him of one count of conspiracy to defraud the United States (Count 1), one count of a narcotics conspiracy (Count 3), four counts of obstruction of justice (Counts 6-8, 10), and one count of a false official statement (Count 11).[1]  The jury acquitted Bongiovanni of the substantive count of bribery (Count 4) and one count of obstruction (Count 9), as well as conspiring to defraud the United States and participate in a narcotics conspiracy with Peter Gerace, Jr. (Counts 2 and 5).

As to Count 3, the jury found that the amount of marijuana that was reasonably foreseeable to Bongiovanni in the narcotics conspiracy was less than 50 kilograms.  The jury also delivered several notes right before the verdict focusing on a specific interaction Bongiovanni had with his best friend Lou Selva at Selva's residence whereat Bongiovanni supposedly smelled marijuana and Selva told him something in response.  Reading the convictions together with the acquittals, the special finding, and the jury notes reveals that the jury did not believe Bongiovanni took bribes and protected the Ron Serio Drug Trafficking Organization ("DTO"), but rather believed Bongiovanni joined limited conspiracies with his best friend only.

---

[1] Count number, page and paragraph references herein are to the redacted indictment used for the retrial.  ECF No. 1193.

Given this conclusion, the conspiracy convictions on Counts 1 and 3 cannot stand for several reasons. *First*, because the law on 18 U.S.C. § 371 permits the government to allege a set of conduct satisfying both the offense prong and defraud prong of §371 in the same count without duplicity issues, the corollary is that it may *not* allege (and prove) disparate conduct as to the two different prongs *as to the same indictment count*. Here, where the government alleged a set of facts and theory of bribery that was sufficient to sustain convictions under either the offense prong or defraud prong, it cannot sustain a conviction under only the defraud prong where the jury rejected bribery and instead found to an entirely different agreement not contemplating bribery. Had the government wished to convict Bongiovanni on a theory of non-bribery-based conspiracy to defraud, it needed to do so with a separate count. *Second*, even if not, on both conspiracy counts the proof differed markedly from the indictment theory and failed to establish the objects and scope of the conspiracy and knowing agreement thereto. Specifically, the proof regarding the narcotics conspiracy in Count 3 failed to show that Bongiovanni was aware of Selva's possession of marijuana with an intent to distribute because all Bongiovanni did was supposedly smell marijuana, in response to which Selva told him "what was going on"—the specifics of which were never clarified.

Further, the proof was insufficient on each of the obstruction counts pertaining to DEA-6 memoranda because the statements therein were either factually true or at odds with the theory the jury did not believe in acquitting Bongiovanni on the bribery count. Likewise, those counts arising from statements

in internal memoranda to supervisors about Peter Gerace were based upon statements that were substantially true in context and cannot have acted to obstruct. Finally, the false official statement conviction cannot stand because, in context, Bongiovanni's statement was the answer to a vague question.

## ARGUMENT

### I.    Standard

"After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a). "The focus of a Rule 29 motion therefore falls on the sufficiency of the evidence presented in the government's case-in-chief." *United States v. Koschuk*, No. 09-CR-323S, 2010 WL 4703504, at *1 (W.D.N.Y. Nov. 19, 2010) (citation omitted). The standard is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Castelin*, 597 Fed. App'x. 22 (2d Cir. 2015); *accord Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

A district court should not grant a Rule 29 motion by rejecting the government's proof as not credible. *See United States v. Cote*, 544 F.3d 88, 99-100 (2d Cir. 2008). However, as the Second Circuit has explained: "In any criminal trial there is always some evidence of guilt, otherwise there could not have been a prosecution.

> While we defer to a jury's assessments with respect to credibility, conflicting testimony, and the jury's choice of the competing inferences that can be drawn from the evidence, specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty. If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt."

*United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (emphasis in original)

(citing *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (internal

quotation marks omitted)).

## II.     The Convictions on Counts 1 and 3 Cannot Stand Because the Government Failed to Prove Agreements, and, Even if it Did, the Government Did Not Prove the Conspiracies Alleged in the Indictment.

### A.     Introduction

Count 1 of the indictment charged a conspiracy to defraud the United States

under both prongs of 18 U.S.C. § 371, one prong being by bribery of a public official

(under the "offense" prong of §371), and the other prong being by interfering with

and obstructing with the rights of the DEA by means of deceit, craft, and trickery

(i.e., a *Klein* conspiracy pursuant to *United States v. Klein*, 247 F.2d 908 (2d Cir.

1957) under the "defraud" prong of §371). *See* Ind. at 4-5. As relevant here, the

jury acquitted Bongiovanni of the substantive offense of bribery in Count 4.

Because Count 4 incorporated Count 1's allegations, the plain reading of the

theory—and what was abundantly clear at trial—was that the Ron Serio DTO was

the source of the alleged $250,000 in bribes.

Count 3 charged a 21 U.S.C. § 846 narcotics conspiracy pertaining to "Michael Masecchia and others," but the jury's special finding on this count limited the total marijuana weight reasonably foreseeable to Bongiovanni to less than 50 kgs.  *See* Verdict, ECF No. 1285 at 4.  As relevant here, before delivering the verdict, the jury asked for testimony about the indoor and outdoor grow operations run by Bongiovanni's best friend Lou Selva and for testimony about when Bongiovanni was at Selva's residence.  *See* ECF No. 1284 (Court Exs. 20 and 21). Reading the convictions, the acquittals, testimony about various grow operation yields, and the special finding together, the plain import is that the jury did not believe Bongiovanni was taking bribes to protect the Ron Serio DTO, but that he did *something* for his best friend upon revelation that he was operating a comparatively small indoor grow operation at his residence.  What Bongiovanni specifically knew—and what he subsequently did—were not established to support convictions on these counts.

Bongiovanni's supposed knowledge of the basement grow operation came from Lou Selva's testimony that Bongiovanni came by his residence at some point when he was operating a marijuana grow in the basement and that he smelled marijuana.  Selva testified that in response he "told [Bongiovanni] what was going on."  Tr. of Selva, 8/28/24 at 44.  He did *not* testify that Bongiovanni personally observed the grow operation on this single occasion.  Selva placed this incident within a four-year timeframe of 2014 to 2017, as he was unclear when it happened. Tr. of Selva, 8/29/24 at 193.  Although Selva testified at length about the details of

grow operations—both indoors at his home and outdoors in the Southern Tier with members of the Ron Serio DTO—he never testified to exactly what he disclosed to Bongiovanni at his residence. He did not, for instance, testify that he told Bongiovanni that the basement marijuana grow was related in any way to Ron Serio's broader operations. Selva testified that, in the moment, Bongiovanni did not arrest Selva but that he said: "Be careful. Watch your utilities. Limit your movement." Tr. of Selva, 8/28/24 at 44. Selva followed that advice. Tr. of Selva, 8/28/24 at 45.

### B. The Conviction on Count 1 Cannot Stand Because §371 Does Not Permit the Government to Prove Differing Conduct for the Two Prongs, and the Conspiracy Proved was not the Conspiracy Alleged.

"The general federal conspiracy statute prohibits conspiracies 'to commit any offense against the United States' or 'to defraud the United States . . . in any manner or for any purpose.' These two clauses of the statute overlap when *the object of a conspiracy* is a fraud on the United States *that also violates a specific federal statute*." *United States v. Rosenblatt*, 554 F.2d 36, 40 (2d Cir. 1977) (internal citation omitted, emphasis added). Thus, the object(s) of the conspiracy charged must fit under both prongs of §371: what is sufficient as to one must be sufficient as to both for the entire count to be proper.

Use of §371's defraud prong creates its own set of problems:

> When the government proceeds under the conspiracy-to-defraud clause, in cases that could as easily have been brought under the "offense" clause, the courts must be alert to subtle attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions. The terms "conspiracy" and "defraud," when used together, have a

> peculiar susceptibility to a kind of tactical manipulation which shields from view very real infringements on basic values of our criminal law. Accordingly, conspiracy-to-defraud prosecutions are scrutinized carefully."

*Id.* (internal citations and quotation marks omitted). As the Second Circuit

explained:

> The potential for abuse in allowing the government to manipulate a prosecution by easy access to the conspiracy-to-defraud clause is clear. The crime of conspiracy to defraud is broader and less precise than that of conspiracy to commit a particular offense. By invoking the former, the scope of the conspiracy appears to increase [ . . . ] *In addition, the government might opt for a single conspiracy-to-defraud indictment in cases where there is doubt concerning whether a single conspiracy or multiple conspiracies have been committed.*

*Id.* at 41, n.6 (emphasis added). It is with all this that the Second Circuit concluded

as follows:

> We hold that when the government proceeds under the conspiracy-to-defraud clause it must plead and prove an agreement with respect to the essential nature of the alleged fraud. Thus, just as the particular offense must be specified under the "offense" branch, the fraudulent scheme must be alleged and proved under the conspiracy-to-defraud clause.

*Id.* at 42.

Perhaps most fundamentally, the wording of Count 1 forecloses conviction

insofar as it was worded as Bongiovanni conspiring "with Michael Masecchia and

others, known and unknown" and was premised upon a complex theory of bribery.

It is well settled that *objects* of a conspiracy may be charged in the conjunctive. *See*

*United States v. McDonough*, 56 F.3d 381, 390 (2d Cir. 1995) ("Where there are

several ways to violate a criminal statute, . . . federal pleading requires that an indictment charge in the conjunctive to inform the accused fully of the charges. A conviction under such a statute will be sustained if the evidence indicates that the statute was violated in any of the ways charged.") (citations, quotations, brackets, and ellipsis omitted). But the wording here does not speak to the objects of the conspiracy; it speaks to the specific member(s) with whom Bongiovanni allegedly conspired—and it implies a fundamentally different conspiracy than the one the jury appears to have found. This, along with nuances of §371 charging, worked either a variance or constructive amendment of the indictment.

"A variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Frank*, 156 F.3d 332, 337 n.5 (2d Cir. 1998) (emphasis omitted). "An indictment has been constructively amended when the trial evidence [. . .] operates to broaden the possible bases for conviction from that which appeared in the indictment." *United States v. Rigas*, 490 F.3d 208, 225 (2d Cir. 2007) (alterations, quotation marks and citations omitted). Constructive amendment is a *per se* violation of the Grand Jury Clause of the Fifth Amendment requiring reversal. *United States v. D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012). "The critical determination is whether the allegations and the proof substantially correspond." *United States v. Danielson*, 199 F.3d 666, 670 (2d Cir. 1999) (citation and internal quotation marks omitted). "When convictions have been obtained on the theory that all defendants were members of a single

conspiracy although, in fact, the proof disclosed multiple conspiracies, the error of variance has been committed." *United States v. Bertolotti*, 529 F.2d 149, 154 (2d Cir. 1975) (citations omitted).

These principles take on even more importance where a single count alleges both prongs of §371. Although its holding has been discussed and limited over the years in certain ways by different courts, *United States v. Minarik*, 875 F.2d 1186 (6th Cir. 1989), made an important observation about the reach of §371:

> Cases arising under § 371 have avoided creating multiple offenses under the two clauses. These precedents, taken together, show that § 371 creates one crime that may be committed in *one of two* alternate ways. Such a conclusion is entirely consistent with the rule requiring courts to give penal statutes a narrow interpretation. Thus an individual whose alleged wrongful agreement is covered by the offense clause (because covered by a specific offense defined by Congress), as well as arguably by the broad defraud clause, cannot be convicted or punished for both.

*Id.* at 1193-94 (emphasis in original); *accord United States v. Rigas*, 605 F.3d 194, 210-11 (3d Cir. 2010) (citing cases). The Second Circuit, in discussing principles from *Minarik*, said this:

> Although it is recognized that the government may not obtain two convictions or punish the defendant twice for the same conduct by alleging violations of both the defraud and offense clauses of the conspiracy statute, it may simultaneously prosecute *the same conduct* under both clauses.

*United States v. Bilzerian*, 926 F.2d 1285, 1301-02 (2d Cir. 1991) (internal citations omitted, emphasis added).[2]  All of this means that a set of conduct that could arguably satisfy both the offense prong and the defraud prong of §371 can be charged under *either* prong or *both* prongs in a single count, but one set of conduct that is alleged under one prong cannot stand alongside a factually separate set of conduct alleged under the other prong *in the same count*.  Indeed, *Bilzerian*'s facts reflect this: his convictions arose from three fraudulent stock schemes—even though they all ran through the same broker-dealer—but Bilzerian was charged with a §371 count for each separate scheme.  *See id.* at 1289-91.  It is with these principles in mind that the conviction on Count 1 cannot stand—be it because of duplicity, variance, or amendment.

To begin, there was testimony that Lou Selva and Michael Masecchia were themselves jointly involved in the Ron Serio DTO, and that Bongiovanni separately knew them going back years (to varying degrees).  But the jury did not find Bongiovanni to be connected to the Ron Serio DTO or Italian Organized Crime ("IOC") members and associates by bribery, and it did not impute to Bongiovanni reasonable foreseeability of any of the marijuana dealt by and attributable to Michael Masecchia, Ron Serio, or the larger Serio DTO.  Yet looking at the entire indictment, a clear charging theme emerges: Bongiovanni joined a conspiracy based

---

[2] Department of Justice prosecutors are advised to be aware of the ramifications of *Minarik* in charging §371.  *See* Dep't of Justice Criminal Resource Manual § 923.

on bribery that centered around his connection to Michael Masecchia and, by extension, to Masecchia's and others' purported connection to IOC.

For example, Masecchia—previously a named defendant—is one of the only names in the indictment.  *See* Ind. at 2 ¶ 5.  In contrast, almost all the co-conspirators/IOC members we heard about at this trial are not even named in the indictment, other than Peter Gerace, Jr., whom the jury found was not an associate of Bongiovanni.  And when the manner and means of Count 1 is described in the indictment, *all* of the allegations set forth by the government to specify "the essential nature of the alleged fraud," *Rosenblatt*, 554 F.2d at 42, speak about committing acts to defraud in exchange for "bribes," *see* Ind. at 5-9 ¶¶7-9, 12-13, 20, "payments received," *see id.* at ¶¶5-6, 10, 14-15, or for the purpose of "ingratiat[ing] himself" with "Masecchia" and others believed to be "connected to or associated with IOC," *see id.* at ¶¶4-10, 12, 17, 20.  Moreover, there is no allegation about the incident where Bongiovanni allegedly discovered marijuana at Lou Selva's residence in the whole of a speaking indictment that recites numerous specific events and actions.  As further proof of that, the government joined both the conspiracy and substantive bribery counts in the indictment, *see id.* at 4-5 ¶2, thus alerting all to a common plan.  *See United States v. Upton*, 856 F. Supp. 727, 733 (E.D.N.Y. 1994) ("Joinder of a conspiracy count with substantive counts arising from the conspiracy is proper because the conspiracy charge provides a common link and demonstrates the extension of a common plan."), citing *United States v.*

*Bernstein*, 533 F.2d 775, 789 (2d Cir.), *cert. denied* 429 *U.S.* 998 (1976)); *United States v. Smith*, 789 F.2d 196, 206 (3rd Cir.), *cert. denied*, 479 *U.S.* 1017 (1986).

To that end, Bongiovanni was on notice about a conspiracy to defraud the United States "*with Michael Masecchia* and others. . . ." Ind. at 4 ¶ 2 (emphasis added). The "with" before Masecchia's name, and the choice to draft the indictment in this fashion, put Bongiovanni on notice that he could be convicted if the government proved Bongiovanni joined a conspiracy with Masecchia. Further, the principles in *Minarik* and related cases also put Bongiovanni on notice that he could be convicted of Count 1 based on the jury believing 1) he conspired with Masecchia to commit the substantive offense of bribery *or* 2) conspired with Masecchia to defraud the DEA via a *quid pro quo* agreement *subsumed in a bribery scheme*. No doubt, conspiring to bribe a DEA official in exchange for something defrauds an agency of the United States by way of the disloyalty of its agent just as much as it amounts to a conspiracy to commit the substantive offense of bribery—so that conduct neatly fits under either prong of Count 1. But for *both* theories of liability under Count 1, the government set forth a conspiracy that was centered around and motivated by *the payment/receipt of bribes*. Thus, Mr. Bongiovanni's criminal liability under the defraud prong required a connection to Masecchia and the receipt of such payments, not something short of that. As a result, the indictment did *not* put Bongiovanni on notice that he could be convicted of a conspiracy under the

defraud prong that did *not* include Masecchia and was *not* based on bribery.[3]  And therein lies the problem with the jury's conviction on Count 1 in this case: it was predicated on a defraud theory not voted on by the grand jury or explained in the indictment.  *See, e.g., Ex parte Bain*, 121 U.S. 1, 7 (1887) (holding that a criminal defendant has a substantive right to be tried only on the charges contained in the indictment returned by the grand jury); *Stirone v. United States*, 361 U.S. 212, 216-17 (1960) (same).

Just the same, the government cannot argue that the trial proof was sufficient to convict because it is somehow a subset of Count 1's total allegations, as that same subset of allegations would be insufficient to convict on its own under the offense prong as bribery.  That is, what can't sustain bribery can't defraud in this instance—and the government chose to anchor its charge on the offense prong to bribery, and for that charge to be the only conspiracy to defraud charge in the entire indictment.  *However*, because some things *can* defraud—but not be bribery—that subset of conduct *might* have been sufficient to convict if the government had charged a separate §371 count with only a *Klein* conspiracy that better explained Bongiovanni's potential liability even in the absence of a bribery scheme.  Because it did not, the conviction cannot stand.  The Second Circuit's discussion in *Rosenblatt*

---

[3] To drive the point home, consider if Masecchia had still been a defendant at trial alongside Bongiovanni.  Had the jury convicted Masecchia and believed he conspired to bribe Bongiovanni with Serio (Count 1), and that he was part of the larger narcotics conspiracy with Serio (Count 3)—which it inevitably would have given the overwhelming proof as to Masecchia's conduct with Serio—the verdict that was delivered in the retrial as to Bongiovanni would clearly illustrate the situation of a jury finding the existence of multiple conspiracies.

confirms this.  The breadth of the defraud prong "merely relates to the types of criminal conduct that may be prosecuted.  It does not eliminate the requirement that there must be an agreement as to the same type of conduct."  *Rosenblatt*, 554 F.2d at 41.

There is also a component of prejudice to all of this.  *See generally United States v. Weiss*, 752 F.2d 777, 787 (2d Cir. 1985) ("While variances are subject to the harmless error rule and require a showing of prejudice to the defendant, constructive amendments are generally considered prejudicial per se.") (citations omitted).  Here, the government elected to specifically charge the substantive offense of bribery under the offense prong.  Doing so, under *Minarik* and *Bilzerian*, the government was bound to apply that same substantive theory and facts for the defraud prong of §371 on the same count.  Accordingly, Mr. Bongiovanni proceeded to trial on Count 1 believing this was a bribery trial and fashioned a defense accordingly—one that was ultimately successful as to the bribery allegations and substantive charge.  Had the defense been aware Bongiovanni could be convicted of the *very same §371 conspiracy charge* based not on bribery but, instead, on a limited interaction with his best friend and knowledge of a basement marijuana grow operation, the defense might have been fashioned differently.  Bongiovanni might, for instance, have taken the stand to address limited issues of proof about that interaction while not subjecting himself to the full onslaught of the prosecutor about the entire scope of the alleged bribery scheme—especially because nothing

about that interaction from Lou Selva's testimony invoked anything about bribery. The defense also may have structured arguments and examinations differently.

An example of the defense's predicament is necessary to illustrate the confusion.  The defense was aware from Selva's prior statements that he would claim that Bongiovanni smelled marijuana at his residence once, and that Bongiovanni supposedly gave Selva minimal advice on what to do.  That singular allegation makes sense when seen in the context of the broader DTO and bribery scheme as alleged: it was just a small part in a larger operation of which Bongiovanni was allegedly part of for years, a singular example of him taking care of a larger DTO.  Thus, a defense was crafted against the entire bribery scheme whereby if the bribes and information exchange allegations could be disproven, the entire conspiracy would fall with all its smaller parts—hence, why Mr. Singer closed with the theme of "show me the money."  The defense did not anticipate that it would have to separately defend against the notion that such a singular event—or any other event in eleven bracketed years of a DEA career or personal life—could serve to establish a conspiracy *even where* bribery was disproved.  And while it was true that the government has commented at times during this case that Bongiovanni could be convicted even if he never took bribes, that idea squares entirely with the concept that one can be convicted of conspiracy without being convicted of the substantive offense.  That pronouncement does not equate to the idea that Bongiovanni was to be on notice that *any* violation of his oath of office

within an eleven-year timespan related in *some* way to the allegations in the indictment could result in a conviction for conspiracy to defraud.

At bottom, the problem with this count reflects the inverse of the problem the court identified in *Minarik*. "In *Minarik*, prosecution solely under the defraud clause—despite the existence of a specific statutory offense governing the conduct—led to substantial confusion and prejudiced the defendant's ability to prepare for trial." *Bilzerian*, 926 F.2d at 1301 (citing *Minarik*, 875 F.2d at 1189-90). Here, the government will seek to uphold a conviction under the defraud clause that was charged alongside a specific statutory offense that would *not* encompass the same conduct. Thus, unlike *Minarik*, had the government charged a non-bribery-based conspiracy in a separate §371 *Klein* conspiracy count, Bongiovanni would have been on fair notice that a separate set of conduct, that did not invoke bribery, could still convict him for a conspiracy to defraud the United States. Accordingly, the indictment did not put Mr. Bongiovanni on fair notice of a theory of liability under the defraud prong that did not include Masecchia and bribery in violation of the Fifth Amendment. In addition, the proof was insufficient to sustain Count 1 as charged because the jury's conviction did not rely on a connection to Masecchia and bribery. For these reasons, the conviction should be overturned.

### C. A Conviction on Count 1 under the Defraud Prong of §371 also Cannot Stand Because the Elements of a *Klein* Conspiracy Were Not Proven and Proof of the Commission of an Overt Act is Lacking.

As already noted, the conviction on Count 1 cannot have rested on the §371 offense prong theory that Bongiovanni was bribed, as he was acquitted of the

bribery charge.[4]  So that leaves the *Klein* conspiracy against the DEA.  "To prove conspiracy, the government must show that the defendant agreed with another to commit the offense" and "that he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy." *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) (quoting *United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999)) (internal quotation mark omitted).  A defendant must "know what kind of criminal conduct was in fact contemplated." *United States v. Gallishaw*, 428 F.2d 760, 763 n.1 (2d Cir. 1970).  "(A)greement is the essential evil at which the crime of conspiracy is directed" and it "remains the essential element of the crime."  *Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975).  "Thus, it is clear that a general agreement to engage in unspecified criminal conduct is insufficient to identify the essential nature of the conspiratorial plan." *Rosenblatt*, 554 F.2d at 39.  It is "not merely a vague agreement 'to do something wrong' ".  *United States v. Provenzano*, 615 F.2d 37, 44 (2d Cir. 1980) (quoting *Rosenblatt*, 554 F.2d at 38-40).

Particular to a *Klein* conspiracy, "[T]he government [must] show (1) [that defendant] entered into an agreement (2) to obstruct a lawful function of the government (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy."  *United States v. Ballistrea*, 101 F.3d 827, 832 (2d

---

[4] To be sure, there is no rational view of the evidence that Bongiovanni merely *conspired* to accept a bribe but did not accept a bribe.  The bulk of the government's case, and Lou Selva's testimony, rested on the idea that payments did indeed flow to Bongiovanni.

Cir. 1996) (quoting *United States v. Caldwell*, 989 F.2d 1056, 1059 (9th Cir. 1993) (alterations in original). "[A] *Klein* conspiracy reaches only activity committed with the requisite *mens rea* of deceitful or dishonest conduct." *United States v. Liu*, No. 19-CR-804 (VEC), 2022 WL 443846, at *3 (S.D.N.Y. Feb. 14, 2022), *aff'd*, No. 22-1082, 2022 WL 14177192 (2d Cir. Oct. 25, 2022). And the defendant must intend to harm the federal government. *United States v. Whiteford*, 676 F.3d 348, 359 (3d Cir. 2012) (explaining that of the "offense" prong and "defraud" prong of §371, only the latter requires intent to harm federal government).

Initially, it is important to reiterate how the indictment framed the manner and means of Count 1's conspiracy in terms of Bongiovanni's actions to defraud in exchange for "bribes," *see* Ind. at 5-9 ¶¶7-9, 12-13, 20 , "payments received," *see id.* at ¶¶5-6, 10, 14-15, or for the purpose of "ingratiat[ing] himself" with "Masecchia" and others believed to be "connected to or associated with IOC," *see id.* at ¶¶4-10, 12, 17, 20. In other words, to meet the requirement that Bongiovanni agreed to obstruct a lawful function of the government "by deceitful or dishonest means," the government pled those "deceitful or dishonest means" as stemming from the bribes that Bongiovanni allegedly received from Masecchia to commit other acts of deceit and dishonesty (e.g., falsifying DEA reports, opening a sham investigation, entering names into deconfliction databases). Yet conduct based on the bribery scheme alleged in the indictment was expressly *rejected* by the jury in its vote to acquit Mr. Bongiovanni on Count 4. This is why the proof on Count 1 involving the defraud prong is insufficient to sustain a conviction and the jury's verdict cannot be squared

with the indictment and the instructions provided by the Court to guide deliberations.

Likewise, based on the verdict and the questions posed by the jury during deliberations, it appears the jury voted to convict Mr. Bongiovanni on Count 1 for protecting Lou Selva and not reporting to the DEA that Selva was growing marijuana in his residence. Beyond not being pled in the indictment,[5] this theory of liability cannot result in a verdict of guilty because such conduct does not meet the elements of a *Klein* conspiracy under the defraud prong of §371.

*First*, when the bribery scheme aimed at protecting the Serio DTO and Masecchia is removed from consideration—because the jury rejected it—the government failed to prove any other "agreement" between Selva and Bongiovanni to defraud the DEA. At both trials, Selva never stated that he and Bongiovanni had a "side deal" or that Selva made a separate agreement with Bongiovanni to defraud the DEA so that Bongiovanni would not report Selva's residential marijuana grow (or any other misconduct) to the DEA. For example, Selva never testified that Bongiovanni agreed not to report Selva because Selva agreed to pay/paid

---

[5] As explained in the prior section, unidentified deceit that does not amount to bribery involves a completely different theory—and, thus, a completely different scope of agreement. And resort to that theory invokes the problem identified by the Second Circuit that use of the defraud prong—because it is "broader and less precise than that of conspiracy to commit a particular offense" it can improperly expand the apparent reach of the conspiracy to encompass what may be multiple conspiracies. *Rosenblatt*, 554 F.2d at 41, n.6. Accordingly, the Court, in looking in hindsight at trial proof, must be mindful of what the indictment set out on the front end to prove and not allow the concept of "agreement" in a conspiracy to sweep so wide as to encompass anything tangentially related to the indictment's allegations.

Bongiovanni a bribe or a portion of his grow proceeds separate from the Masecchia/Serio bribery scheme rejected by the jury. Selva also did not state that he offered to provide Bongiovanni a portion of the marijuana grown at his house in exchange for Bongiovanni's agreement not to report the grow. This was required to prove an agreement to defraud, but no such evidence was produced at this trial independent of the Masecchia/Serio DTO bribery scheme alleged in the indictment. All the evidence showed was that Bongiovanni smelled marijuana in Selva's house and that Selva admitted to Bongiovanni that his house smelled like marijuana because Selva was growing marijuana in his house. This is not proof of an "agreement" to defraud the DEA because, as the Second Circuit has made clear, "a defendant's mere presence at the scene of a crime, his general knowledge of criminal activity, or his simple association with others engaged in a crime are not, in themselves, sufficient to prove the defendant's criminal liability for conspiracy." *United States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014).

Even taking as true that Bongiovanni provided cursory advice to Selva in the moment when he learned about the basement grow operation (e.g., watch your utility usage), this does not serve to establish a *Klein* agreement to defraud the DEA by way of failing to investigate Lou Selva either. *See* Ind. at 5 ¶ 4. Once again, the provision of this advice cannot be linked to an *agreement* between Selva and Bongiovanni that was *independent* of the Masecchia/Serio DTO bribery scheme that was pled in the indictment and rejected by the jury. At best, this evidence shows that Bongiovanni wished that his best friend not get caught and cautioned

Selva about how to be careful. And while it may be indicative of passive approval of (or ambivalence towards) Selva's illegal actions, it does not establish a mutual understanding of or agreement between Selva and Bongiovanni to defraud the DEA and harm the federal government.[6]

*Second*, this evidence is also insufficient under the "deceit and dishonest means" element of a *Klein* conspiracy. In the indictment, the government described in detail the "deceitful and dishonest" acts purportedly engaged in by Bongiovanni. Most of these acts included filing false DEA reports, misleading investigators, opening sham investigations, and entering names into deconfliction databases. Yet, the government (and the Court) cannot rely on these purported acts as a basis to sustain the jury's conviction on Count 1 in this case because the jury did not base its verdict on those acts. As made clear during deliberations and the announcement of the verdict, the jury's verdict hung on Bongiovanni protecting his friend only by failing to report his indoor grow to the DEA. Defrauding of the DEA on this basis was pled in the indictment, but liability on this theory requires proof of a duty to report. As the D.C. Circuit explained:

> Section 371 does not "make it a federal crime to do *anything* . . . with the goal of making the government's job

---

[6] At best, this particular conduct can be classified as Bongiovanni *deciding himself* to obstruct justice by not reporting on his friend (assuming Bongiovanni had a legal duty to report his observations to the DEA). However, Count 1 does not charge a substantive count of Obstruction of Justice aimed at Bongiovanni's conduct alone; rather, it charges a Conspiracy between Bongiovanni and others to defraud the DEA. Since a conspiracy punishes an agreement between two or more persons to commit an offense, even if the jury believed that Bongiovanni made a personal decision not to report his friend, that is insufficient to prove a conviction on Count 1 because the government did not prove Selva joined in any agreement to do this.

> more difficult." *Caldwell*, 989 F.2d at 1060.  It covers only
> agreements to obstruct government functions by "deceit,
> craft or trickery, or . . . means that are dishonest."
> *Hammerschmidt*, 265 U.S. at 188 . . . . [A] failure to
> disclose information can only be deceptive—and thus
> serve as the basis for a § 371 violation—if there is a legal
> duty to disclose the information in the first place.  *United
> States v. Murphy*, 809 F.2d 1427, 1431 (9th Cir. 1987)
> ("Where the regulations implementing the Act
> [administered by the agency] do not impose a duty to
> disclose information, failure to disclose is not conspiracy
> to defraud the government.").

*See United States v. Concord Mgmt. & Consulting LLC*, 347 F. Supp. 3d 38, 48

(D.D.C. 2018) (emphasis in original).

Looking to the DEA's mission statement, Gov't Ex. 7, there is nothing that

overtly ties Bongiovanni's official business with the DEA to investigation of a small-

scale marijuana grow operation of unknown size and use by a best friend.  Rather,

the DEA's mission statement explicitly identifies targets as "*major violators* of the

controlled substance laws *operating at interstate and international levels*" and

"criminals and drug gangs who perpetrate violence in our communities."  *Id.*

(emphasis added).  At trial, the government failed to prove that Bongiovanni had a

duty to report on personal grows.  The government also failed to prove that Selva

was a violent criminal or that Selva showed Bongiovanni the size of the particular

grow inside of his house that Bongiovanni smelled.  And, as evidenced by the

specific finding in Count 3 regarding the weight of marijuana involved in the

narcotics conspiracy, the jury specifically rejected Bongiovanni's awareness of the

grow in Selva's basement having any connection to a large-scale marijuana

operation, in general, or the marijuana operation of the Serio DTO, in particular.

Thus, there was no evidence that Bongiovanni knew that Selva was growing a large quantity of marijuana in his basement for the purpose of "interstate and international" distribution that would trigger a duty to report it to the DEA. Absent such proof, there was no duty to report Selva's basement grow and there is no proof of a conspiracy involving "deceitful and dishonest means."

Relying on this particular event for a conviction also raises another deficiency: there is no proof of an overt act being taken after the alleged agreement. As the Court made clear in its instructions to the jury, to find Mr. Bongiovanni guilty of Count 1, the jury was required to find at least one overt act occurred after October 31, 2014.   In his testimony, Selva could only vaguely place the interaction where Bongiovanni smelled the marijuana at his house and failed to report it to the DEA as "between that that timeframe of 2014, '16, '17," tr. of Selva 8/29/24 at 193. Count 1's overt acts (¶¶ 21-58) break down as follows:

- 19 indisputably occur *before* 2014 (¶¶ 24-42)

- 3 more conjunctively tie action to bribes—the theory rejected by the jury (¶¶ 22, 23, 46)

- 7 concern the C2-13-0026 investigation into the Ron Serio DTO—a connection rejected by the jury in the special finding (¶¶ 43-45, 47-50)

- 1 concerns Bongiovanni's 2016 interaction with HSI SA Tom Mozg and discussion of the names Joe Bella and Bobby Missana, i.e., not at all about Selva (¶ 52)

- 1 concerns a 2016 party in Toronto having nothing to do with Lou Selva (¶ 51)

- 1 concerns possession of *cocaine* or observing others possess, use, and distribute *cocaine*, not the same narcotic that was the focus of the jury's conviction (¶ 53)

- 1 concerns wiping a cell phone upon retirement in 2019 (¶ 54)

- 1 concerns removal of the C2-13-0026 file in 2019[7] (¶ 55)

- 1 concerns Bongiovanni's supposed advice to Selva about a cover story—but the testimonial answer framing this alleged overt act was couched in terms of bribery, which was rejected (¶ 56)

- 1 concerns Bongiovanni's supposed coaching of Selva after the execution of a search warrant at his residence in 2019, but this alleged coaching involved protection of the bribery scheme that was rejected by the jury (¶ 57)

- 1 concerns Masecchia's possession of contraband in 2019—a connection rejected by the jury (¶ 58).

Parsing the overt acts along with the Court's charge that the jury must find one overt act to have occurred after October 31, 2014 leaves very little to support the finding of an overt act occurring on or after October 31, 2014.  *See United States v. Gall*, 1996 WL 684404, at *3 n.2 (D.Conn. Aug. 12, 1996) ("The crime of conspiracy under 18 U.S.C. § 371 is governed by the five-year statute of limitations provided for in 18 U.S.C. § 3282." (citing *United States v. Scop*, 846 F.2d 135, 138 (2d Cir. 1988))).

*First*, practically all of the overt acts alleged in the indictment have nothing to do with not reporting Selva's marijuana grow and, instead, are focused on events and actions centered around protection of Masecchia, the Serio DTO, and others based on the bribery scheme that was rejected by the jury.

---

[7] Lou Selva's connections to the C2-13-0026/Wayne Anderson file predated 2014. *See*, *e.g.*, Gov't Ex. 8A at 197 (subpoena return).

*Second*, Paragraph 54's allegation of wiping a DEA cell phone was tied to the protection of persons involved in the bribery scheme rejected by the jury, not Selva and his individual marijuana grow.  This act has no logical connection to hiding the Selva marijuana grow, as the contents of the phone contained no evidence of Bongiovanni's alleged "smelling" of it or efforts to hide it from the DEA.  DEA also was aware of Bongiovanni's friendship with Selva, so wiping a phone was not hiding their relationship.

*Third*, Paragraph 55's allegation of removing the Wayne Anderson working file from the DEA Buffalo office was, once again, tied to the protection of persons involved in the bribery scheme rejected by the jury, not Selva and his individual marijuana grow.  This act has no logical connection to hiding the Selva marijuana grow as the contents of the working file contained no evidence of Bongiovanni's alleged "smelling" of marijuana, utility information on Selva's Rebecca Park address, or efforts to hide this home grow from the DEA.

*Fourth*, Paragraph 56's allegation of "coaching" Selva also related to the rejected bribery scheme.  In his testimony, while Selva discussed supposed reassurances Bongiovanni made in terms of what to do if Selva was ever arrested, the questions asked by the prosecution framed the answers given in terms of the bribery scheme:

> Q. Before I go further, during your discussions with the defendant *while he's having your back and taking bribes*, did you and the defendant during that time period ever discuss what you should say if anyone ever came to question you?

> A. Yes.
>
> Q. What did the defendant tell you to say if any other member of law enforcement ever tried to question you?
>
> A. He said to reach out to him immediately, and he would coach me. But, to say I was his informant. I was working as an informant for him.

Tr. of Selva 8/28/24 at 128-29 (emphasis added). Because the context of this exchange was about protecting a bribery scheme and the bribery scheme was rejected by the jury, the conjunctive nature of the question implies the jury rejected the entirety of this exchange as incredible. That is, to say, that the jury did not believe such a conversation ever happened.

*Fifth*, Paragraph 57's allegation that Bongiovanni coached Selva about how to respond to an arrest might, at first blush, appear appealing, but, at that time, the context of the discussion made clear that this was no longer about simply avoiding Selva's arrest for growing marijuana (as he had stopped by then), or about defrauding the DEA by not investigating Selva (since Bongiovanni did not work for the DEA at that time, he had no duty of loyalty to the DEA and was not in a position to defraud the DEA anymore). The context of this conversation was about keeping the whole house (i.e., the Serio DTO) from proverbially falling down from an investigation by HSI, OIG and the FBI into alleged bribery.

In summary, because the bribery scheme was rejected by the jury, it does not follow that any of these overt acts furthered the scheme to defraud that the jury appears to have settled upon to convict Bongiovanni on Count 1 (i.e., an agreement

to protect Selva from arrest about marijuana growing in his house). Moreover, as discussed above, Bongiovanni's act of not reporting Selva cannot form the basis of a conspiracy conviction because there was no "agreement" (this would have been Bongiovanni's decision alone) and there was no "deceitful and dishonest conduct" (there was no duty to report based on the facts known to Bongiovanni). At best, Selva's testimony about Bongiovanni finding out about a marijuana grow in Selva's house and not telling the DEA about it is proof of a substantive obstruction offense (that is not an agreement), and, at worst, proof of a conspiracy entirely different than the one charged in Count 1. For these reasons, the Court should find that insufficient proof exists to support a conviction on Count 1.

### D.  Count 3 Cannot Stand Because the Object of the Conspiracy was Unclear and Proof of Agreement was Likewise Lacking.

For many of the same reasons as Count 1, the evidence cannot support a conviction for 21 U.S.C. § 846 under Count 3 based upon possession with intent to distribute under 21 U.S.C. § 841. Because the extent of what Bongiovanni knew was unclear, the trial lacked proof that he conspired to help Selva possess any marijuana he grew with an intent to distribute it. At best, it could establish only knowledge of Selva's simple possession under 21 U.S.C. § 844.

"The only elements of a section 846 narcotics conspiracy offense are the existence of a conspiracy and the defendant's willful joining it." *United States v. Story*, 891 F.2d 988, 992 (2d Cir. 1989) (citing *United States v. Brown*, 692 F.2d 345, 348 (5th Cir. 1982)). "A conspiracy involves an agreement by at least two parties to achieve a particular illegal end." *United States v. Stavroulakis*, 952 F.2d 686, 690

(2d Cir. 1992). "While the conspirators need not agree on every detail of their venture, there must be proof beyond a reasonable doubt that they agreed on the 'essential nature of the plan.'" *Id.* (quoting *Blumenthal v. United States*, 332 U.S. 539, 557 (1947)). Therefore, a court must "focus on the essence of the underlying illegal objective to determine whether the conspirators agreed on 'what kind of criminal conduct was in fact contemplated.'" *Id.* (quoting *Gallishaw*, 428 F.2d at 763 n.1).

Here, as to Selva's basement grow operation, even accepting Bongiovanni smelled marijuana and was told something about "what was going on," the scope of the conspiracy was not established insofar as the bounds of "what was going on" were never clarified to Bongiovanni. Selva did not explicitly testify that he told Bongiovanni how much marijuana he was growing, or even that he was growing marijuana for the purpose of distribution—an important point considering marijuana can be grown for personal use and that Selva testified to using marijuana with Bongiovanni in his early 20s. *See* tr. of Selva 8/27/24 at 27. Although Selva told the jury extensively about the scope of the marijuana grow in his basement, that does not serve to fill the gap on what Bongiovanni could have or did reasonably know. Indeed, Selva testified about that same interaction and exclaimed that one could only "faintly smell [marijuana]" because he had an ionizer and a ventilation system hooked up through the dryer vent. Tr. of Selva 8/28/24 at 44. A faint smell of marijuana cannot be assumed by itself to reveal a large grow operation.

From that, a jury could conclude that Selva only confirmed he was growing an unspecified amount of marijuana in his basement at that time, and that it was for his own use. Had there been testimony that Selva vehemently did not use marijuana, an inference might follow that Bongiovanni would have to conclude Selva was growing marijuana to sell it. But where there was testimony that Bongiovanni knew Selva smoked marijuana, it does not follow that Bongiovanni knowingly joined a conspiracy to distribute marijuana if all he was told was that some amount of marijuana was being grown by his best friend at his own home. *Cf. Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943) (evidence of knowledge of conspiracy must be unequivocal); *United States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997) ("An individual defendant's membership in a conspiracy may not be established simply by his presence at the scene of a crime, nor by the fact he knows that a crime is being committed."), *cert. denied*, 525 U.S. 874 (1998); *United States v. Sanchez-Mata*, 925 F.2d 1166, 1168 (9th Cir. 1991) ("knowledge that drugs are present is not enough to prove involvement in a drug conspiracy").

It is true that inferences must be resolved in the government's favor on a Rule 29 motion. *See United States v. Puzzo*, 928 F.2d 1356, 1361 (2d Cir. 1991). However, "[w]here the Government asks the jury to find an element of the crime through inference, the jury may not be permitted to conjecture or to conclude upon pure speculation. . . ." *United States v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016) (cleaned up). A conviction based on speculation and surmise is impermissible. *See United States v. Wiley*, 846 F.2d 150, 155 (2d Cir. 1988). "Therefore, the

government must do more than introduce evidence 'at least as consistent with innocence as with guilt.' " *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir.1991)). Because it was never clarified that Bongiovanni knew the full bounds of "what" was going on, a conviction cannot be upheld on speculation that Selva revealed all to Bongiovanni.

Membership in the conspiracy also cannot be established by any deliberate ignorance on Bongiovanni's part. *See United States v. Reyes*, 302 F.3d 48, 55 (2d Cir. 2002) (conscious avoidance doctrine can establish defendant's knowledge of the aims of conspiracy but not defendant's intent to participate). In the context of a §846 conspiracy, Bongiovanni's mere failure to investigate or report something to law enforcement also cannot serve to establish membership. Courts have also looked to whether a defendant had a stake in the venture to ascertain agreement because "[t]here must be something more than mere knowledge, approval of or acquiescence in the object or the purpose of the conspiracy." *United States v. Cianchetti*, 315 F.2d 584, 588 (2d Cir. 1963); *see generally United States v. Ceballos*, 340 F.3d 115, 123 (2d Cir. 2003); *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir.), *aff'd*, 311 U.S. 205 (1940). Here, absent the receipt of bribes, there was no evidence of Bongiovanni standing to gain anything upon discovering his best friend grew an unspecified amount of marijuana at his house, other than seeing that best friend not get arrested—but this was a benefit that inured to Selva only

Finally, like the argument as to Count 1, there is a variance/amendment issue preventing conviction on Count 3. Count 3, like Count 1, alleged a conspiracy "*with Michael Masecchia* and others, known and unknown," and it incorporated the allegations from Count 1. Ind. at 26 ¶¶ 1-2 (emphasis added). Count 1 (and the corresponding trial evidence) set forth a clear picture of the large Ron Serio DTO, with one vector to Bongiovanni being Masecchia's supposed delivery of bribe payments (and occasional receipt of information). Selva claimed to be the other vector via provision/receipt of information—but only routing back through Masecchia. Thus, although Selva was also a member of the DTO, the story behind this narcotics conspiracy was that Bongiovanni conspired "with Michael Masecchia" by those bribe payments to link up with the alleged narcotics operation. These allegations did not contemplate an entirely separate conspiracy whereby Bongiovanni conspired solely with Lou Selva about a limited grow operation at his own residence, *without* involvement of Michael Masecchia, *without* taking bribes, *without* involvement in the larger DTO's operations, and possibly as many as 9 years from when the indictment's alleged timeframe began. On that basis, Count 3 cannot stand.

      **E.    In the Alternative, Only Count 3 Can Stand.**

Putting all of the above together, in the alternative, if the Court believes that Bongiovanni could reasonably determine that the narcotics conspiracy was one based on possession with intent to distribute, and agreed to join such conspiracy with Lou Selva, and that such conspiracy is fairly encompassed in allegations of

Count 3, then only Count 3 can stand as sufficient because conviction on Count 1 would be precluded, as the proven facts are not one of a bribery scheme. As discussed, because Count 1 is premised on a bribery theory under its offense prong, its defraud prong must match a similar theory. Count 1 cannot support a conspiracy factually proven on an explicit rejection of bribery.

### III. The Evidence on Count 6 is Insufficient Considering the Jury's Rejection of a Bribery Theory and Connection to the Ron Serio DTO.

Count 6 charged obstruction of justice for the authoring of a November 4, 2014 DEA-6 memorandum, specifically, that Mr. Bongiovanni made "false and misleading statements . . . relating to the status of a drug trafficking investigation in DEA Case Number C2-13-0026 and the viability and credibility of the confidential source . . . in order to close the DEA file and investigation into the organization" therein. Count 2 also contained a similar overt act:

> 48. On or about November 4, 2014, in preparation for closing DEA Case Number C2-13-0026, the defendant BONGIOVANNI prepared a DEA 6 report wherein he made false, fraudulent, fictitious, and misleading statements as follows: "The confidential informant associated with this case/file is no longer viable and can not provide credible information in furtherance of this investigation. This agent will not [*sic*] prepare this case for closure.

Ind. at 15 ¶ 48. Thus, read together, and as framed by the evidence at trial, the government's theory was that Bongiovanni lied in this memorandum about Robert Kaiser's viability as a source to disguise the notion he could actually be used further to investigate.

The November 4, 2014 DEA-6 was received in evidence as Government Exhibit 8C. The "details" substantive section of the memorandum states the following:

<u>DETAILS</u>

1. Reference is made to all DEA-6 ROIs written to this case/file.
2. The confidential informant associated with this case/file is no longer viable and can not provide credible information in furtherance of this investigation. This agent will not prepare this case for closure.
3. This investigation in pending closure.

The remaining sections of the report contain various required administrative data, such as the author, file number, file title, G-DEP identifier, date of report preparation, etc.:

| U.S. Department of Justice<br>Drug Enforcement Administration | | | | |
|---|---|---|---|---|
| **REPORT OF INVESTIGATION** | | | Page 1 of 1 | |
| 1. Program Code | 2. Cross File | Related Files | 3. File No.<br>C2-13-0026 | 4. G-DEP Identifier<br>YCM2B |
| 5. By: Joseph S Bongiovanni, SA<br>At: Buffalo RO | ☐ ☐ ☐ ☐ ☐ | | 6. File Title<br>ANDERSON, Wayne | |
| 7. ☐ Closed  ☐ Requested Action Completed<br>☐ Action Requested By: | | | 8. Date Prepared<br>11-04-2014 | |
| 9. Other Officers: | | | | |
| 10. Report Re: Case Status | | | | |

The bottom section of the report contains the agent's and supervisor's names and signatures:

| 11. Distribution:<br>Division | 12. Signature (Agent)<br>Joseph S Bongiovanni, SA | 13. Date<br>11-04-2014 |
|---|---|---|
| District | 14. Approved (Name and Title)<br>John P Flickinger, GS | 15. Date<br>11.04.2014 |
| Other | | |
| DEA Form - 6<br>(Jul. 1996) | **DEA SENSITIVE**<br>Drug Enforcement Administration | |

The middle, indexing section contained NADDIS numbers for Ron Serio and Remus Nowak:

```
INDEXING

  1. SERIO, Ronald - Naddis - 778033.
  2. NOWAK, Remus, aka "REMO" - Naddis - 4459481, Owner of DUNCAN MOTOR
     CAR SALES.
```

It is clear from parsing the jury's verdict, its answers to the special finding, and questions preceding the verdict, that the jury did not believe Mr. Bongiovanni to be involved with or protecting the Ron Serio DTO generally. Rather, the limited special finding regarding the marijuana weight on the narcotics conspiracy conviction in Count 3 translates to a belief that Bongiovanni protected his best friend, Lou Selva, in some fashion. Were it otherwise and the jury believed Bongiovanni was connected directly to the Ron Serio DTO, the jury would have found that a far larger amount of drug weight was reasonably foreseeable by Bongiovanni.

With that in mind, there is no evidence that Bongiovanni could protect Lou Selva by diverting Robert Kaiser as an informant. Kaiser never once mentioned Selva in his testimony or claimed to have any access to Selva (*see* Gov't Ex. 3520F[8]). Rather, Kaiser claimed access to Ron Serio through people he knew, specifically Tom Sibick and Frank Burkhardt (*see* Gov't Ex. 3520F at 7, 43). No other evidence at trial suggested Kaiser was in a position to make contact with Lou Selva if it is to

---

[8] Kaiser's testimony from the first trial was reproduced as 3500 material and read at the retrial due to his death by that time.

be believed that Bongiovanni was not protecting the Ron Serio DTO—and thus had

no knowledge that Selva was connected to that organization.

Selva testified about his provision of Kaiser's name to Bongiovanni, and that

Kaiser was one of the names he provided Bongiovanni from Serio.  Specifically, on

redirect examination, Selva testified as follows:

> Q. But Kaiser wasn't doing anything to harm you?
>
> A. He was doing nothing to harm me at that time, correct.
> Not harm me, harm the organization.

Tr. of Selva, 8/29/24 at 356.

To take Selva's testimony at face value would have meant that the jury

believed Bongiovanni was protecting the Ron Serio DTO—which it explicitly

rejected.  It would therefore be logically impossible for the jury to conclude that

Bongiovanni *only* shielded Kaiser from Selva while not doing the same for the Serio

DTO if Bongiovanni did, in fact, shut Kaiser down as a confidential source.  As

there was no other evidence that Kaiser independently had a connection to Selva,

Bongiovanni's closing of the C2-13-0026/Wayne Anderson file and actions toward

Robert Kaiser could not have been obstructive actions to protect Lou Selva.

There was evidence at trial that Selva's name appeared in at least one

subpoena return in the C2-13-0026/Wayne Anderson file paperwork, among

hundreds of pages of names and numbers.  Testimony revealed that the subpoena

and DARTS entry process, contrary to the government's theory, was not so much of

a pointed, directed process but more of a cascading series of automated entries,

often facilitated by intelligence analysts.  There was also evidence that someone ran

a license plate associated with Lou Selva.  But even the existence of this evidence in

the Wayne Anderson file does not serve to make the connection that Bongiovanni

diverted Kaiser from investigating Selva—because Kaiser otherwise had no

connection to Selva alone but through the Serio DTO.  Moreover, there was

significant evidence that Kaiser lost his usefulness as an informant due to drug

court entry commitments and subsequent incarceration—facts that the government

could not contest.

Finally, and perhaps most importantly, the November 4, 2014 DEA-6 was

written at a time when it was unclear, based on the jury's verdict, that Bongiovanni

had any supposed knowledge of Lou Selva's home grow marijuana operation.  Selva,

on cross examination, placed the time when Bongiovanni stopped by his residence

and smelled marijuana as somewhere between 2014 and 2017.  Tr. of Selva, 8/29/24

at 193.  Thus, if the smell of marijuana at Selva's residence was the hook to make

Bongiovanni aware of potential illegal activity of Selva, then there is no evidence

this event occurred at a point in time when Kaiser was ever a viable source.  In line

with Selva's testimony, Kaiser was closed out as a source at least one year and as

many as four years *before* Bongiovanni ever became aware of Selva's marijuana

operation.[9]

---

[9] The special finding by the jury regarding the marijuana weight also makes clear
that the jury did not impute the weight of any of the Selva-associated *outdoor*
marijuana grows to Bongiovanni, thus implying the jury did believe Bongiovanni
had knowledge of that operation, because the combined weights of the outdoor
grows far exceeded the 50 kilogram special finding.  Accordingly, the evidence does
not support the conclusion that Bongiovanni knew about Selva's outdoor grow

IV.   **The Evidence Cannot Support a Conviction on Count 7 Because the Statements in the Relevant DEA-6 Memorandum were Factually True.**

Count 7 charged obstruction of justice for the authoring of a January 28, 2015 DEA-6 memorandum, specifically, that Mr. Bongiovanni made "false and misleading statements . . . relating to the status of a drug trafficking investigation in DEA Case Number C2-13-0026 and the viability and credibility of the confidential source" therein.

The January 28, 2015 DEA-6 was received in evidence as Government Exhibit 8B.  The "details" substantive section of the memorandum states the following:

> **DETAILS**
>
> 1. Reference is made to all DEA-6 ROIs written to this case/file.
> 2. No Drug or Non-Drug evidence were retained in this case. All Defendant dispositions have been completed via form DEA 210. There are on fugitives in this case.
> 3. This case is now closed.

The remaining sections of the report contain various required administrative data, such as the author, file number, file title, G-DEP identifier, date of report preparation, etc.:

---

operations and, as a result, diverted Kaiser to prevent the DEA from investigating those grows.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | | Page 1 of 1 | |
|---|---|---|---|---|
| 1. Program Code | 2. Cross File | Related Files | 3. File No. C2-13-0026 | 4. G-DEP Identifier YCM2B |
| 5. By: Joseph S Bongiovanni, SA At: Buffalo RO | ☐ ☐ ☐ ☐ | | 6. File Title ANDERSON, Wayne | |
| 7. ☒ Closed ☐ Requested Action Completed ☐ Action Requested By: | ☐ | | 8. Date Prepared 01-28-2015 | |
| 9. Other Officers: | | | | |
| 10. Report Re: Case Closing | | | | |

The bottom section of the report contains the agent's and supervisor's names and signatures:

| 11. Distribution: Division District Other | 12. Signature (Agent) Joseph S Bongiovanni SA | 13. Date 01-28-2015 |
|---|---|---|
| | 14. Approved (Name and Title) John P Flickinger | 15. Date 01·30·2015 |

DEA Form    - 6          DEA SENSITIVE
(Jul. 1996)        Drug Enforcement Administration

Testimony about the report revealed that it was a "closing" DEA-6, i.e. the final DEA-6 in a case file facilitating the administrative close-out of the file, after which point the file was no longer an active file to be worked.

The government's arguments at trial about the relevance of this DEA-6 are best summarized in the Manner and Means section of the indictment's Count 1 conspiracy charge:

> 14.    It was part of the conspiracy that, after feigning legitimate investigation for a period of time so that information about his coconspirators, and anyone seeking to cooperate against them, would be funneled towards him, the defendant BONGIOVANNI closed the DEA file related to drug traffickers under defendant BONGIOVANNI's paid protection knowing that, even with the file closed, he would continue to receive de-confliction notices related to individuals under his protection.

-38-

15.    It was part of the conspiracy that, even after the defendant BONGIOVANNI closed the DEA file related to drug traffickers under the defendant BONGIOVANNI's paid protection, he continued to represent to others in law enforcement that he had an active investigation in an effort to dissuade other members of law enforcement from commencing and developing an investigation of his friends, associates, and coconspirators.

Thus, as framed by the indictment, this report was used to close the C2-13-0026/Wayne Anderson case file when Bongiovanni, in line with his sworn duties, should have kept the file open, more vigorously investigated the Serio DTO, and attempted to use a Robert Kaiser as a source, who claimed access to the DTO.

18 U.S.C. § 1519 makes it a crime when, in conjunction with an intent element, one "knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object. . . ."  Conceding that the DEA-6 is a "record" or "document," there is no evidence that Bongiovanni took any of these actions in preparing the memorandum.  He did not alter or destroy any record; he was the one who created the original record.  Nothing was mutilated, concealed or covered up in the record; the government exhibit reflects a true and accurate copy of the prepared memorandum, and there was no testimony Bongiovanni physically changed it in any way.  So, the question comes down to whether he falsified something or made a false entry in the record.

The written statements in the report themselves cannot support a §1519 charge because each one is undeniably factually true.  The top section of the report included the author's name (Joseph Bongiovanni), the file number (C2-13-0026), the G-DEP identified (YCM2B), the file title (Wayne Anderson), the date prepared (01-

28-2015), and the subject ("Case Closing").  Each of those reflects a fact that was neither contested nor subject to debate about its truth.  Bongiovanni unquestionably authored the report; it was filed under the relevant case name and number (neither of which were falsified); and there was no debate about the date the report was prepared and that it concerned the closure of the C2-13-0026/Wayne Anderson file.  Thus, there is no "statement" here that could be considered "false or misleading" in any fashion.

The "details" section of the memorandum likewise contains statements that are either truisms or factually correct statements.  The first point about reference being made to "all DEA-6 ROIs" is a truism reflecting, like all DEA-6s in any file, that all prior DEA-6s may be consulted if needed.  The second point likewise reflects facts that were never contested: no drug or non-drug evidence was ever retained by the DEA in the Wayne Anderson case.  Testimony from State Police Investigator Michael O'Rourke confirmed that Bongiovanni and his partner never took custody of any evidence seized during the Wayne Anderson arrest by State Police to further any DEA investigation, and the case file paperwork reflects that State Police maintained custody of all evidence "pursuant to their rules and regulations" (*see* Gov't Ex. 8A at 65-66).  Although there was testimony that Bongiovanni incorrectly (or, in the light most favorable to the government, falsely) reported Wayne Anderson as being convicted and sentenced to probation (as his co-defendant

Damien Abbate was)[10], there is no dispute Bongiovanni "completed" all defendant dispositions in DEA-210 forms as the report reflects (*see* Gov't Ex. 8A at 71-72). Finally, there was no debate that there were, in fact, no fugitives from the C2-13-0026/Wayne Anderson file (because charges were never filed). The third point reflects a similar truism that the C2-13-0026/Wayne Anderson file was closed as of the date of the memorandum. There was no debate that the file was, in fact, closed. Indeed, the government's theory was specifically premised on Bongiovanni closing the file. While there was testimony from both government and defense witnesses about interest being maintained in closed files for the purpose of later opening them, there is no debate that the C2-13-0026/Wayne Anderson file went through the administrative closure process by the filing of this DEA-6 memorandum. The "indexing" section contains Wayne Anderson's and Damien Abbate's names and NADDIS numbers. There was no testimony at trial that any of the NADDIS numbers were incorrect. Finally, the bottom section contains names and signatures, none of which were contested as being forged or incorrect. Having established that the literal statements in the DEA-6 are true or truisms, the question remains whether Bongiovanni *created* the DEA-6 to embody false representations.

---

[10] Importantly, Count 7 does not criminalize the statement made in the DEA-210 form (Gov't Ex. 8A at 71-72); rather, the count criminalizes the DEA-6 form (Gov't Ex. 8B). Since the contents of the DEA-6 form/Gov't Exhibit 8B are true, that is the reason the conviction cannot stand.

*United States v. Rowland*, 826 F.3d 100 (2d Cir. 2016), holds that a defendant may violate §1519 "by *creating* a document that is false or that misrepresents the truth." *Id.* at 109 (emphasis added). Again, the government's theory was that Bongiovanni closed out the case file to move attention away from the Serio DTO and bury a confidential source. In that sense, it is the administrative "closure" of the file that represents the obstructive action. But even taking the evidence to support that theory in the light most favorable to the government, Bongiovanni falsified nothing in *creating* the closing report because he did, in fact, close out the case file. This is important because Count 7 criminalizes the *contents* of the form rather than the *act* of closing the Wayne Anderson investigation.

In *Rowland*, the Second Circuit analyzed contracts that misrepresented relationships between the defendant and others insofar as they explicitly and intentionally did not reflect the true, discussed arrangement by the parties. *See id.* at 110. The court noted that:

> If Rowland had written a memo to his file purporting to summarize the negotiations in this misleading way (that is, as business rather than political consulting), we think it plain that the memo would properly have been treated as a "falsified" document: that is, it would have misrepresented the conversations on which it was based.

*Id.*

Thus, under this theory, intentional misrepresentation of the real, discussed arrangement in a document created by the defendant established §1519 liability. Here, that theory does not work because Bongiovanni never misrepresented anything in producing the report. Even conceding that Bongiovanni possessed the

obstructive *mens rea* in creating the DEA-6 report to facilitate closing the file in support of a criminal plan, liability is only established where the *actus reus* is that of making a false statement. Bongiovanni did, in fact, make a conscious decision to close out the C2-13-0026/Wayne Anderson file (for whatever reason, criminal or non-criminal) and did, in fact, close the file out via this DEA-6 memorandum—those are undeniable truths.[11] And because the report does not speak to why the file was closed, its creation does not misrepresent some hidden motive or ulterior plan— even if it did ultimately facilitate an improper plan. In sum, because nothing about the words on the face of Government Exhibit 8B is factually false, and the report was not created in support of falsely portraying something else, the *actus reus* of §1519 is not met.

## V.    The Proof on Count 8 is Insufficient Given that Bongiovanni's Representations About His Relationship With Gerace Were Substantially True in Context.

Count 8 charged obstruction of justice by making "false and misleading statements in a memorandum relating to the nature of his relationship and extent of his communication [with Gerace . . .]" in a November 1, 2018 internal DEA memorandum to supervisors. That memorandum was received in evidence as Government Exhibit 97.

---

[11] The government's theory cannot seriously be based on the idea that Bongiovanni should have noted in the DEA-6 that he was closing out the C2-13-0026/Wayne Anderson file to shield the Serio DTO from investigation and prosecution, and that the "false statement" was in omitting such information.

As relevant to the argument here, Mr. Bongiovanni was acquitted of all substantive conduct related to Peter Gerace, Jr.  The retrial jury found him not guilty of participating in conspiracies to defraud the United States (Count 2) and to possess with intent to distribute controlled substances (Count 5) as related to Gerace.  Count 2 contained an overt act about this memorandum:

> 29. On or about November 1, 2018, the defendant BONGIOVANNI authored and submitted an internal DEA memorandum in which he made false and misleading statements as follows: "It should be known that any contact I have had with [Gerace] in the past was
> minimal in-person contact and primarily consisted of random telephonic communication based on the fact we were childhood friends. I would sometimes randomly encounter [Gerace] at a restaurant or golf outing and have not made plans to meet him socially in several years."

Ind. at 24.  Thus, viewing Count 8 alongside Count 2's overt act, the government's theory was that Bongiovanni's false/misleading statements went to misrepresentation of the contact he had in the past, that it primarily consisted of random telephonic communication based on the fact they were childhood friends, that he would sometimes randomly encounter Gerace at a restaurant or golf outing, and/or that they had not made plans to meet socially in several years.

The above content in the November 1, 2018 memorandum was undeniably true.  Proof of anything other than minimal in-person contact was lacking, particularly when considering Bongiovanni's description was not limited to a time frame that could support false representation of explicit contact.  While it is true that there was proof going back to the mid-2000s that Bongiovanni and Gerace were social in ways, for instance in taking a trip together to Las Vegas in 2011, and going

on a double date in 2005, some of that contact pre-dated known revelations to the DEA, e.g., a 2008-2009 operation where Special Agent Chris Wisniewski testified his superiors permitted Bongiovanni to do a "cold approach" of Gerace, given their childhood friendship.

The proof otherwise was that Bongiovanni and Gerace stayed in touch periodically through the years via text message and occasional telephone call. More specifically, as the defense argued in summation, Bongiovanni "initiated" contact with Gerace approximately 23 times between 2014 and February 2017 (the last time phone records demonstrate Bongiovanni contacting Gerace independent of a response to Gerace) when, in contrast, Gerace "initiated" contact with Bongiovanni on more than 100 occasions from 2014 to February 2019. Moreover, when Bongiovanni learned of SA Casullo's investigation of Gerace in Summer 2016, the evidence showed how Bongiovanni's behavior towards Gerace changed, such as having minimal in-person contact with Gerace after 2015 (only two in-person meetings in 2016 (a dinner and Gerace's parent's anniversary) and one in-person meeting on June 30, 2018 (at Sunset Bay)), Gerace initiating *all* contact after February 2017, and Bongiovanni *never* calling Gerace on the phone again after November 2017. The content of those calls and messages was before the jury, and the substance of those messages supported the description of a relationship based on childhood friendship.

Finally, by November 2018, it was true that the last time any planned social meetings occurred was in Summer 2016 (the dinner and the anniversary party).

*See* Gov't Ex. 310D at 24, 27-29.  In between then and November 2018, there was an occasional text about getting lunch, but nothing transpired.  Given that these statements were true, or *substantially* true when considering the imprecise language and lack of dates or timeframes, nothing in the exhibit rises to the level of false or misleading.

Beyond that, there is no intent to obstruct evident in this memo.  As noted, Bongiovanni was acquitted of having any conspiratorial relationship with Gerace. Thus, the jury did not believe that the government had met its burden in two ways: that he was engaged in a conspiracy to facilitate drug behavior at (or associated with) Pharaoh's Gentlemen's Club, or that he betrayed his official duty to the United States in some way to protect Peter Gerace.  Said another way, the jury rejected the evidence that Bongiovanni and Gerace had an improper relationship. So, if Count 8 is premised upon Bongiovanni obstructing by way of obscuring an allegedly improper relationship with Gerace, upholding this conviction would require the Court to find what the jury rejected.

## VI.    The Proof on Count 10 is Insufficient Given that Bongiovanni's Representations About His Relationship with Gerace Were Substantially True in Context.

Count 10 charged obstruction of justice by making "false and misleading statements in a memorandum relating to the nature of his relationship and extent of his communications with Peter Gerace Jr. [in order. . .] to misrepresent the true nature of the relationship between [Bongiovanni] and Peter Gerace Jr. and to misrepresent the true nature of the relationship between Peter Gerace, Jr. and

[DEA Special Agent Anthony Casullo]" in a January 28, 2019 internal DEA
memorandum to supervisors.[12]  That memorandum was received in evidence as
Government Exhibit 99, and this conduct also appears as an overt act in Count 2.
*See* Ind. at 25 ¶ 31.  There is insufficient proof to support a conviction on either
basis alleged in Count 10.

Regarding the first allegation that Bongiovanni misrepresented his
relationship with Peter Gerace, Jr., the contents of the memorandum do not discuss
Bongiovanni's relationship to Gerace at all.  *See* Gov't Ex. 99. As such, the jury
could not have convicted Bongiovanni of Count 10 based on this allegation.
Regarding the second allegation that Bongiovanni misrepresented Casullo's
relationship with Gerace, Bongiovanni reported in the January 28, 2019
memorandum that he had previously reported to DEA leadership his belief that
Casullo, Phil Domiano (Casullo's brother-in-law and a former PGC manager), and
Gerace shared a "friendship."  *See id.* at 1.  Bongiovanni also reported in the
memorandum that he had witnessed Casullo and Gerace drinking socially at Tappo
Restaurant and Big Ditch Brewery back in June 2015.  *See id.*  Bongiovanni also
attached Facebook screenshots and pictures of a high school reunion showing

---

[12] It is important to note for purposes of analyzing this conviction that the
indictment *does not* charge Mr. Bongiovanni with obstructing justice because he
denied in the memorandum that he ever stated to SA Casullo that the DEA should
not investigate Italian-Americans and instead investigate other racial groups.  *See*
Ind. at 32-33 & Gov't Ex. 99 at 1.  As a result, the focus of the Court should remain
on the allegations set forth in the indictment only: 1) that Bongiovanni
misrepresented his relationship with Peter Gerace, Jr. and 2) that Bongiovanni
misrepresented Casullo's relationship with Peter Gerace, Jr.

Gerace and Casullo in proximity to each other to corroborate his belief about Casullo.   SA Casullo pushed back at trial about any friendship he had with Domiano and Gerace, disclaiming that he was friendly with either of them.  That said, as noted above, the government's theory was that this memorandum misrepresented the true nature of the relationship between Gerace and Casullo. Here, the evidence was lacking.

The first paragraph of the memorandum states that Bongiovanni previously reported his belief of a "friendship" existing between Casullo, Domiano, and Gerace to GS Greg Yensan, RAC Ed Orgon, and ASAC David Zon, and that Domiano was a former manager at PGC.  The government presented no evidence at trial which questioned the veracity of these statements.  The second paragraph speaks to an observation Bongiovanni made in June 2015, that, from an objective perspective, was true: Bongiovanni saw Gerace and Casullo socialize.  Although Casullo expressed at trial that he went to Tappo with Gerace "unwillingly" and tried not to socialize with Gerace much at Big Ditch, the observation reported by Bongiovanni was undeniably true: Gerace and Casullo were together on June 13, 2015 drinking at Big Ditch and Tappo.  The fourth paragraph simply reflects Bongiovanni's understanding that he needed to provide this information in light of an ongoing investigation into Gerace.  Again, this also is a true statement.  Thus, when Bongiovanni made these statements, the statements were either objectively true or Bongiovanni believed that the statements were true.  Under such circumstances,

Bongiovanni lacked the requisite intent to obstruct justice and the conviction goes against the weight of the evidence.

A second problem also causes this conviction to fail: It was legally impossible for Bongiovanni to obstruct justice in either his, Gerace's, or the PGC investigation by submitting this memorandum because, well before the time the memorandum was submitted, SA Casullo was not responsible with investigating Bongiovanni or Gerace/PGC. The memorandum was written on January 28, 2019, four days before Bongiovanni was scheduled to retire from DEA. Testimony at trial established that the genesis of corruption allegations about Bongiovanni was a July 20, 2018 proffer of Ron Serio, and, thereafter, DEA was walled off from the Bongiovanni investigation and HSI and SA Curtis Ryan took over the investigation. Not long after that proffer, on August 6, 2018 SA Casullo was removed and insulated from the Bongiovanni investigation as well as the Peter Gerace, Jr./Pharaoh's Gentlemen's Club investigation. Action to remove Casullo from the Gerace/PGC investigation was taken by DEA Buffalo RAC Ed Orgon based on the racial allegations Casullo raised in connection with Bongiovanni and Bongiovanni's comments on the Gerace investigation in 2016. Thereafter, SA Casullo's only further connection to Bongiovanni after Casullo's removal from the Serio and Gerace/PGC investigations was the pending DEA Office of Professional Responsibility ("OPR") investigation arising from alleged racial remarks that Casullo reported on August 1, 2018. However, as noted previously, comments in the

memorandum regarding this investigation cannot be a basis for conviction because such a basis for obstruction is not charged in the indictment.

Thus, if the theory was that Bongiovanni was trying to obstruct an ongoing *criminal* investigation into Gerace by provision of misinformation about Gerace and Casullo's relationship, Casullo was removed from the investigation almost *six months before*, so commenting poorly, even falsely, about Casullo could not have obstructed anything.  For these reasons, the conviction on Count 10 was erroneous because the government failed to prove its case.

## VII.    The Conviction on Count 11 Cannot Stand Because Bongiovanni's Statement was the Answer to a Vague Question in Context.

Count 11 charged a false statement to an agency of the United States in violation of 18 U.S.C. § 1001(a)(2).  The jury found that Bongiovanni lied only about the fact that he "did previously initiate contact with Peter Gerace Jr."  This count arose from Bongiovanni's interview with OIG Special Agent David Carpenter on March 29, 2019.

Bongiovanni's statement was an answer to a question posed by SA Carpenter.  To that end, "[w]hen a line of questioning is so vague as to be fundamentally ambiguous, the answers associated with the questions posed may be insufficient as a matter of law to support the perjury conviction."  *United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986); *accord United States v. Kerik*, 615 F.Supp.2d 256, 271 (S.D.N.Y. 2009).  Because this issue may be one of legal

sufficiency, "a reviewing court may override a jury determination." *Lighte*, 782 F.2d at 375.

SA Carpenter discussed in his testimony that one of the purposes of the March 29th interview was to explore the relationship between Bongiovanni and Gerace. SA Carpenter testified how Bongiovanni discussed that his relationship with Gerace had gone back a long way to childhood, how they had bartended together, how they had reconnected after his return from Florida, etc. Thus, before Carpenter even posed the question about initiating contact, the topics of conversation had already elicited admissions that the relationship had gone back a long time and was rooted in growing up together—something necessarily implying contact going both ways. Moreover, SA Carpenter's questions were admittedly framed by the memoranda that Bongiovanni wrote near the end of his career— memoranda in which Bongiovanni admitted contact with Gerace, including calling him back. *See* Gov't Exs. 97-99. Beyond that, there was evidence at trial that DEA superiors (via SA Chris Wisniewski) permitted Bongiovanni to make outreach to Gerace in the form of a "cold approach" back in 2008-2009, which necessarily implies Bongiovanni's initiation of contact with Gerace.

It is through this lens that SA Carpenter asked whether Bongiovanni had *ever* initiated contact with Gerace. Although the question would appear straightforward on its face, when complicated by the prior discussion, it is anything but—and it comes across as paradoxical in context with what had previously been discussed. Without the provision of a timeframe or methods of contact, or indeed *any*

narrowing of the question, it is so wide-ranging that when it collides with the admitted contact between Bongiovanni and Gerace, it becomes unclear what the question calls for in the face of a longstanding friendship. Because the test is an objective one, *see Kerik*, 615 F.Supp.2d at 272 n.20, the Court must look to how Bongiovanni would have understood it—and to do so, the Court must consider everything else discussed. Thus, as in *Kerik*, when a question is not narrowed in some way, it may become fundamentally problematic. In *Kerik*, the court was troubled by the defendant being asked whether there was anything "embarrassing" he would not want to public to know about. *Id.* at 273-74. By not narrowing the question to specific associations or affiliations or time frames, the court believed the question read like a fishing expedition. *Id.* at 274. The same is true here. Accordingly, the question here was too vague to support a conviction for a false official statement.

## <u>CONCLUSION</u>

For all the foregoing reasons, the Court should grant a judgment of acquittal on the aforementioned counts pursuant to Rule 29.


Dated: February 24, 2025
     Kenmore, New York           Respectfully submitted,

           <u>S/PARKER R. MacKAY</u>

           <u>S/ROBERT C. SINGER</u>

           *Attorneys for Joseph Bongiovanni*