1

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

2

_____

3  **UNITED STATES OF AMERICA,**

Case No. 1:19-cr-227
4                    Plaintiff,                    (LJV)

v.

5                                        September 23, 2024

**JOSEPH BONGIOVANNI,**

6

_____ Defendant. _____

7

8    **TRANSCRIPT EXCERPT - EXAMINATION OF RONALD SERIO - DAY 3**
            **BEFORE THE HONORABLE LAWRENCE J. VILARDO**
9                    **UNITED STATES DISTRICT JUDGE**

10  **APPEARANCES:**          **TRINI E. ROSS, UNITED STATES ATTORNEY**
                            **BY: JOSEPH M. TRIPI, ESQ.**
11                               **NICHOLAS T. COOPER, ESQ.**
                                **CASEY L. CHALBECK, ESQ.**
12                          Assistant United States Attorneys
                            Federal Centre, 138 Delaware Avenue
13                          Buffalo, New York 14202
                            For the Plaintiff

14
                            **SINGER LEGAL PLLC**
15                          **BY: ROBERT CHARLES SINGER, ESQ.**
                            80 East Spring Street
16                          Williamsville, New York 14221
                                And
17                          **LAW OFFICES OF PARKER ROY MacKAY**
                            **BY: PARKER ROY MacKAY, ESQ.**
18                          3110 Delaware Avenue
                            Kenmore, New York 14217
19                              And
                            **OSBORN, REED & BURKE, LLP**
20                          **BY: JOHN J. GILSENAN, ESQ.**
                            120 Allens Creek Road
21                          Rochester, New York 14618
                            For the Defendant

22
    **PRESENT:**               **BRIAN A. BURNS,** FBI Special Agent
23                          **MARILYN K. HALLIDAY,** HSI Special Agent
                            **KAREN A. CHAMPOUX,** USA Paralegal

24
    **LAW CLERK:**             **REBECCA FABIAN IZZO, ESQ.**
25

1    **COURT DEPUTY CLERK:   COLLEEN M. DEMMA**

2    **COURT REPORTER:        ANN MEISSNER SAWYER, FCRR, RPR, CRR**
                              Robert H. Jackson Federal Courthouse
3                            2 Niagara Square
                              Buffalo, New York  14202
4                            Ann_Sawyer@nywd.uscourts.gov

5

6                     *    *    *    *    *    *    *

7

09:49AM      8          (Excerpt commenced at 9:49 a.m.)

09:49AM      9          (Jury seated at 9:49 a.m.)

09:50AM     10          **THE COURT:**  Okay.  Good morning, everyone.

09:50AM     11          **ALL PARTIES:**  Good morning, the record will reflect

09:50AM     12   that all our jurors are present again.  We'll go until 5:30

09:50AM     13   today and tomorrow, and then until 5 on Wednesday and

09:50AM     14   Thursday, we'll be down on Friday.

09:50AM     15          I remind the witness that he's still under oath.

09:50AM     16          And, Mr. MacKay, you may continue.

09:50AM     17

09:50AM     18   **R O N A L D   S E R I O,** having been previously duly called

09:50AM     19   and sworn, continued to testify as follows:

09:50AM     20

09:50AM     21          **(CONT'D) CROSS-EXAMINATION BY MR. MacKAY:**

09:50AM     22   Q.  All right.  Good morning, Mr. Serio.

09:50AM     23   A.  Good morning.

09:50AM     24   Q.  I kind of realized I was talking a little quickly at the

09:50AM     25   end of Friday, so we might have flown through some stuff and

09:50AM 1   I want to go back and clarify some things to get us

09:50AM 2   recentered here.

09:50AM 3           All right.  So you told us after Wayne Anderson's

09:50AM 4   arrest in November of 2012, you hard stopped drug dealing,

09:51AM 5   correct?

09:51AM 6   A.  Correct.

09:51AM 7   Q.  So you're out for about six months or so, correct?

09:51AM 8   A.  Yes.

09:51AM 9   Q.  And then you reconnect with Mark Kagan, correct?

09:51AM 10  A.  Correct.

09:51AM 11  Q.  At that time, you understand you're getting marijuana

09:51AM 12  from Jarrett Guy, but it's through Mark Kagan, correct?

09:51AM 13  A.  Correct.

09:51AM 14  Q.  Now after about six months of that, you cut Mark Kagan

09:51AM 15  out completely, and it's all through Jarrett Guy going

09:51AM 16  forward, correct?

09:51AM 17  A.  Right.

09:51AM 18  Q.  Now, so that puts you at about the end of 2013 or early

09:51AM 19  2014?

09:51AM 20  A.  Correct.

09:51AM 21  Q.  Okay.  And so the first half of 2013 when you're out of

09:51AM 22  the game, you're not receiving any shipments at your house,

09:51AM 23  correct?

09:51AM 24  A.  Correct.

09:51AM 25  Q.  You're not doing packaging or anything like that at your

09:51AM    1    house?

09:51AM    2    A.  Correct.

09:51AM    3    Q.  And I'm talking about 697 Lebrun.

09:51AM    4    A.  Correct.

09:51AM    5    Q.  So you know there's no drug activity going on at that

09:52AM    6    address, correct?

09:52AM    7    A.  Correct.

09:52AM    8    Q.  You're not running around to grow operations or anything

09:52AM    9    like that, correct?

09:52AM   10    A.  Correct.

09:52AM   11    Q.  Because you were trying to put as much distance between

09:52AM   12    you and drug dealing activity at that time, correct?

09:52AM   13    A.  Correct.

09:52AM   14    Q.  Okay.  I think I covered this but, you know, moving into

09:52AM   15    2015, you are going to the casino a lot, correct?

09:52AM   16    A.  Correct.

09:52AM   17    Q.  And you're getting flagged at secondary inspection,

09:52AM   18    correct?

09:52AM   19    A.  Correct.

09:52AM   20    Q.  But you're never receiving any directions through Mike

09:52AM   21    Masecchia about how to avoid or mitigate that, correct?

09:52AM   22    A.  Correct.

09:52AM   23    Q.  Now, in October of 2015 --

09:52AM   24         **MR. MacKAY:**  Ms. Champoux, can we show Government

09:52AM   25    Exhibit 22Q?

09:52AM  1      **BY MR. MacKAY:**

09:52AM  2  Q.  So about this timeframe, summer of 2015, you're not

09:52AM  3  receiving any information that DHS or HSI is looking into

09:53AM  4  you, correct?

09:53AM  5  A.  Correct.

09:53AM  6      **MR. MacKAY:**  We can take that down, Ms. Champoux.

09:53AM  7      **BY MR. MacKAY:**

09:53AM  8  Q.  Okay.  Now, I want to go through a couple properties that

09:53AM  9  were associated with you, I think.

09:53AM  10      **MR. MacKAY:**  Ms. Champoux, can we show Government

09:53AM  11  Exhibit 42A-30.

09:53AM  12      **BY MR. MacKAY:**

09:53AM  13  Q.  And I think we covered this on direct.  This was a tote

09:53AM  14  box you had with the keys to various rental properties,

09:53AM  15  correct?

09:53AM  16  A.  Correct.

09:53AM  17  Q.  So all the properties in this tote, you either owned

09:53AM  18  directly or indirectly, correct?

09:53AM  19  A.  Correct.

09:53AM  20  Q.  Now, so 42 Norwalk.  That's not on there.  But is that a

09:53AM  21  property you own?

09:53AM  22  A.  42 Norwalk?  No.

09:53AM  23  Q.  That was not?

09:53AM  24  A.  Well, maybe at some point I might have bought and sold it

09:53AM  25  years ago.

09:53AM 1   Q. Okay. Yeah, I just want to touch on that.

09:53AM 2      I think you told us on direct that one of the ways you

09:53AM 3   did grow operations was to buy a property, correct?

09:54AM 4   A. Correct.

09:54AM 5   Q. And when you're in the rehab and flipping stage, that's

09:54AM 6   when you do the grow operation, correct?

09:54AM 7   A. Correct.

09:54AM 8   Q. And then that might only be for, like, one or two grows,

09:54AM 9   correct?

09:54AM 10   A. Correct.

09:54AM 11   Q. Remind us again, how long is an indoor grow?

09:54AM 12   A. About two and a half months a cycle.

09:54AM 13   Q. So you're talking about five months a house might be used

09:54AM 14   for the grow operations, if you're doing that sort of method

09:54AM 15   for flipping property?

09:54AM 16   A. Correct.

09:54AM 17   Q. And then after that, it would be just legitimate rental

09:54AM 18   property, correct?

09:54AM 19   A. Correct.

09:54AM 20   Q. Okay. Now, 467 Tacoma, this circle that's in the upper

09:54AM 21   left of the tote. That was one of your properties, correct?

09:54AM 22   A. Correct.

09:54AM 23   Q. Was there ever a grow operation located there, to your

09:54AM 24   recollection?

09:54AM 25   A. No.

09:54AM 1    Q. Okay. Now I'm circling in the bottom, 469 Tacoma. That

09:54AM 2    was -- would that be, like, a neighboring property?

09:54AM 3    A. Yes.

09:54AM 4    Q. Okay. No grow operation at that location?

09:54AM 5    A. No. At this time period, I wasn't growing in any of

09:55AM 6    these houses. It was more early on.

09:55AM 7    Q. Sure. And were there any grow operations associated with

09:55AM 8    that -- those properties if you can recall?

09:55AM 9    A. No, just Sycamore and Michigan.

09:55AM 10   Q. Okay. Yeah. And so Sycamore and Michigan, that's the

09:55AM 11   joint warehouses on the corner of Sycamore and Michigan,

09:55AM 12   correct?

09:55AM 13   A. Correct.

09:55AM 14   Q. Now, for those properties, you had stopped growing at

09:55AM 15   that location in 2010?

09:55AM 16   A. Correct.

09:55AM 17   Q. You had done some earlier attempts at it, but then no

09:55AM 18   more growing after 2010?

09:55AM 19   A. Correct.

09:55AM 20   Q. Now, moving forward after 2010, I think you told us

09:55AM 21   occasionally you might receive a delivery there, correct?

09:55AM 22   A. Correct.

09:55AM 23   Q. But you never really stored drugs there, correct?

09:55AM 24   A. Very rarely.

09:55AM 25   Q. Yeah, I mean, I think what you told us on direct is while

09:55AM    1    you might unload something there, you generally took it right

09:55AM    2    immediately to your Lebrun residence, correct?

09:55AM    3    A.  Correct.

09:55AM    4    Q.  And the MDMA pills we went through the pictures of, that

09:55AM    5    was sort of an anomaly?

09:56AM    6    A.  Correct.

09:56AM    7    Q.  By that I mean you weren't generally an MDMA dealer,

09:56AM    8    correct?

09:56AM    9    A.  Correct.

09:56AM   10    Q.  Your source of supply, Jarrett Guy, at the time had said

09:56AM   11    basically can you offload these for me, and you weren't able

09:56AM   12    to do that?

09:56AM   13    A.  Correct.

09:56AM   14    Q.  So you stuck them up under kind of a bump-out in the

09:56AM   15    drywall above the door, correct?

09:56AM   16    A.  Correct.

09:56AM   17    Q.  But otherwise, you know, moving forward from 2010, that

09:56AM   18    location was primarily -- the Sycamore-Michigan location is

09:56AM   19    used primarily for your legitimate real estate and property

09:56AM   20    rental businesses, correct?

09:56AM   21    A.  Correct.

09:56AM   22    Q.  That's why we saw on those photos there's a lot of, like,

09:56AM   23    raw materials for rehab there, correct?

09:56AM   24    A.  Correct.

09:56AM   25    Q.  It wasn't like you were keeping large duffle bags of

09:56AM 1 marijuana at that location?

09:56AM 2 A.  Correct.

09:56AM 3 Q.  If ever anything was unloaded, it was there for only a

09:56AM 4 brief period of time, correct?

09:56AM 5 A.  Correct.

09:56AM 6 Q.  Now I want to ask you about another name, Robert Mettal.

09:56AM 7 Is that somebody were you ever associated with?

09:56AM 8 A.  Yes.

09:56AM 9 Q.  In what capacity?

09:56AM 10 A.  Like 30 years ago, I got marijuana from him.

09:57AM 11 Q.  Okay.  But moving into, like, the 2008 and forward

09:57AM 12 timeframe, you were never associated with him?

09:57AM 13 A.  I was friends with him.

09:57AM 14 Q.  Okay.  Friends, but -- because I know there's a lot of

09:57AM 15 overlap between friends and associates.  Was he specifically

09:57AM 16 just a friend, not drug associate?

09:57AM 17 A.  Yes, specifically a friend.

09:57AM 18 Q.  Okay.

09:57AM 19 A.  Maybe an occasion or two, we would try to get a couple

09:57AM 20 pounds of marijuana, but besides that --

09:57AM 21 Q.  Okay.  Yeah, sorry, I made that question a lot longer

09:57AM 22 than it needed to be.

09:57AM 23     You wouldn't consider him one of your inner circle drug

09:57AM 24 associates, correct?

09:57AM 25 A.  Correct.

09:57AM    1    Q.   Okay.   Now Jarrett Guy, we talked about him.

09:57AM    2        **MR. MacKAY:**   Ms. Champoux, you can take 42A-30 down.

09:57AM    3        **BY MR. MacKAY:**

09:57AM    4    Q.   So Jarrett Guy enters the picture fully for you kind of

09:57AM    5    end of 2013 into 2014, correct?

09:57AM    6    A.   Correct.

09:57AM    7    Q.   And I think you told us Friday that you never passed the

09:57AM    8    names of any of your sources to Mr. Masecchia, correct?

09:57AM    9    A.   Correct.

09:57AM   10    Q.   Now your understanding of the operation was, though, you

09:57AM   11    would be protected when shipments were coming in?

09:57AM   12    A.   Correct.

09:58AM   13    Q.   And those would be periodically, correct?

09:58AM   14    A.   Correct.

09:58AM   15    Q.   But I think you told us with Jarrett Guy, it wasn't

09:58AM   16    always, like, same time every month, correct?

09:58AM   17    A.   Correct.

09:58AM   18    Q.   You might get a phone call, and it could vary around the

09:58AM   19    time of the month, correct?

09:58AM   20    A.   Correct.

09:58AM   21    Q.   And the phone call would often just alert you it will be

09:58AM   22    coming in in a few days or something, correct?

09:58AM   23    A.   Correct.

09:58AM   24    Q.   It was never a hard schedule, you're working on this day

09:58AM   25    of the month, this location, we're getting drugs, correct?

09:58AM  1    A.  Correct.

09:58AM  2    Q.  And at that point in time, you never passed any of those

09:58AM  3    dates or anything to Mr. Masecchia?

09:58AM  4    A.  Correct.

09:58AM  5    Q.  Now, at this time, though, your understanding was

09:58AM  6    Mr. Masecchia was going to ensure that any shipments or

09:58AM  7    couriers coming to Buffalo were going to be looked out for,

09:58AM  8    correct?

09:58AM  9    A.  Correct.

09:58AM  10   Q.  So that it was your understanding that the way this

09:58AM  11   operation would work, was that if there was something that

09:58AM  12   had been flagged with one of these couriers, you would get a

09:58AM  13   notice to maybe back off?

09:59AM  14   A.  Correct.

09:59AM  15   Q.  Okay.  Now, remind me again.  Jarrett Guy starts with

09:59AM  16   packages in the mail, correct?

09:59AM  17   A.  Correct.

09:59AM  18   Q.  And over time, dealing with just the packages in the

09:59AM  19   mail, some of those didn't arrive, correct?

09:59AM  20   A.  Correct.

09:59AM  21   Q.  And you never got any tip-offs about those, correct?

09:59AM  22   A.  Correct.

09:59AM  23   Q.  You never received any information on the back end, like,

09:59AM  24   hey, here's the agency that took these packages, correct?

09:59AM  25   A.  Correct.

09:59AM 1 Q. Then I think moving forward from the packages, it becomes

09:59AM 2 the U-Hauls, correct?

09:59AM 3 A. Correct.

09:59AM 4 Q. And that's when he's got couriers bringing the U-Hauls

09:59AM 5 into town, correct?

09:59AM 6 A. Correct.

09:59AM 7 Q. About the 2016 timeframe, one of those actually gets

09:59AM 8 arrested, correct? Or was it --

09:59AM 9 A. No. U-Hauls?

09:59AM 10 Q. Yeah. Do you recall there was an arrest of a courier in

09:59AM 11 2016?

09:59AM 12 A. I don't recall. Maybe. But it definitely wasn't a

09:59AM 13 U-Haul though.

09:59AM 14 Q. Do you recall if it was one of the tractor-trailers?

09:59AM 15 A. No.

09:59AM 16 Q. Okay. So you don't recall if a -- one of Jarrett Guy's

10:00AM 17 couriers being arrested at any point in time?

10:00AM 18 A. Through the mail, yes.

10:00AM 19 Q. Okay. Well, and so explain that. What does a courier

10:00AM 20 through the mail mean?

10:00AM 21 A. You get a hotel room, and then they would have the

10:00AM 22 package mailed to the hotel room. I believe two of those got

10:00AM 23 arrested.

10:00AM 24 Q. Okay. I think in the drug business, let's use maybe a

10:00AM 25 different term. When I say "courier," I mean somebody who's

10:00AM 1   kind of running the drugs from point A to point B.  Are you

10:00AM 2   talking about someone who goes and gets the package and

10:00AM 3   brings it to a location?

10:00AM 4   A.  Yes.

10:00AM 5   Q.  Maybe that's a courier, but what I'm thinking of is

10:00AM 6   somebody who will pick up a package at a location that it

10:00AM 7   might be mailed to, and then take it to the actual location

10:00AM 8   to where the drugs are going to end up; is that what you're

10:00AM 9   talking about?

10:00AM 10  A.  Yes.

10:00AM 11  Q.  And you're saying in your timeframe when packages were

10:00AM 12  coming through the mail from Jarrett Guy, there were two

10:00AM 13  people arrested doing that, correct?

10:00AM 14  A.  Correct.

10:00AM 15  Q.  And, again, you never received any heads-up on that,

10:00AM 16  correct?

10:00AM 17  A.  Correct.

10:01AM 18  Q.  And you never received any information on the back end of

10:01AM 19  those arrests of who had arrested those individuals, correct?

10:01AM 20  A.  Correct.

10:01AM 21  Q.  Okay.  Now, Anthony Gerace.  You had never received any

10:01AM 22  information about him being looked into as an oxycodone

10:01AM 23  trafficker, correct?

10:01AM 24  A.  Correct.

10:01AM 25  Q.  You never received any information -- well, strike that.

10:01AM 1    I think we talked about on Monday, you're -- the reason

10:01AM 2   you started wanting to receive more protection and spend

10:01AM 3   money followed Dave Gambino's arrest in late 2009, correct?

10:01AM 4   A.   Correct.

10:01AM 5   Q.   You never came to learn that in connection with that same

10:01AM 6   investigation into Dave Gambino, that Anthony Gerace had

10:01AM 7   actually sat down and proffered, correct?

10:01AM 8   A.   Correct.

10:01AM 9   Q.   So what I mean is, you were never told through Mike

10:01AM 10   Masecchia that, hey, Anthony Gerace has gone in and talked

10:01AM 11   about people, correct?

10:01AM 12   A.   Later on, after I started dealing with Anthony, Mike told

10:02AM 13   me.

10:02AM 14   Q.   Okay.  But at that point in time, back around Dave

10:02AM 15   Gambino's arrest and the timeframe that follows that, you

10:02AM 16   never heard about, correct?

10:02AM 17   A.   Correct.

10:02AM 18   Q.   Okay.  And just to remind us, you dealt with Anthony

10:02AM 19   Gerace all the way up to, what?  Late 2016?

10:02AM 20   A.   To the time of my arrest.

10:02AM 21   Q.   Okay.  So you were still dealing with Anthony Gerace

10:02AM 22   right up until about April of 2017?

10:02AM 23   A.   Correct.

10:02AM 24   Q.   The name J.D., you were never provided a name -- that

10:02AM 25   name as an informant, correct?

| | | |
|---|---|---|
| 10:02AM | 1 | A.  Correct. |
| 10:02AM | 2 | Q.  Okay.  Let's talk about R.K., he's one of the names you |
| 10:02AM | 3 | said you were provided as an informant, correct? |
| 10:02AM | 4 | A.  Correct. |
| 10:02AM | 5 | Q.  Now, you got that information from Mike Masecchia, |
| 10:02AM | 6 | correct? |
| 10:02AM | 7 | A.  Correct. |
| 10:02AM | 8 | Q.  Do you recall also learning from Frank Burkhart that he |
| 10:02AM | 9 | knew -- that Frank Burkhart knew R.K. was an informant? |
| 10:03AM | 10 | A.  No, I learned from R.K. later on that he was an |
| 10:03AM | 11 | informant. |
| 10:03AM | 12 | Q.  Okay.  Yeah, so that's what I want to talk about.  In |
| 10:03AM | 13 | 2015, there's a situation, you're in your car, I think it's |
| 10:03AM | 14 | Kenmore Avenue, and R.K. jumps right into it, correct? |
| 10:03AM | 15 | A.  Yes, correct. |
| 10:03AM | 16 | Q.  And at that point in time, he tells you, hey, I'm an |
| 10:03AM | 17 | informant, correct? |
| 10:03AM | 18 | A.  Correct. |
| 10:03AM | 19 | Q.  And he asks you for some money, correct? |
| 10:03AM | 20 | A.  Correct. |
| 10:03AM | 21 | Q.  And you gave him some money, right?  Correct? |
| 10:03AM | 22 | A.  Correct. |
| 10:03AM | 23 | Q.  And then kind of just said go away? |
| 10:03AM | 24 | A.  Correct. |
| 10:03AM | 25 | Q.  Now, but you were also aware, though, sometime before, |

| | | |
|---|---|---|
| 10:03AM | 1 | that he'd been arrested for robbing the Poster Art store on |
| 10:03AM | 2 | Elmwood, correct? |
| 10:03AM | 3 | A.  Correct. |
| 10:03AM | 4 | Q.  And after that point in time, he didn't come around |
| 10:03AM | 5 | anymore, correct? |
| 10:03AM | 6 | A.  Correct. |
| 10:03AM | 7 | Q.  But you don't learn he's an informant until, like, a |
| 10:03AM | 8 | while after that, correct? |
| 10:03AM | 9 | A.  Correct. |
| 10:03AM | 10 | Q.  Okay.  So would that be fair to say you learned he's an |
| 10:03AM | 11 | informant later in 2013? |
| 10:03AM | 12 | A.  Correct.  Well, mid -- |
| 10:03AM | 13 | Q.  Let me try to -- |
| 10:03AM | 14 | **MR. TRIPI:**  Objection, I'd like the witness to be |
| 10:04AM | 15 | able to finish answering. |
| 10:04AM | 16 | **MR. MacKAY:**  I'm going to ask him a question to |
| 10:04AM | 17 | center that. |
| 10:04AM | 18 | **MR. TRIPI:**  He was answering a question. |
| 10:04AM | 19 | **THE COURT:**  Hang on. |
| 10:04AM | 20 | He said mid.  He -- |
| 10:04AM | 21 | The question was:  So would that be fair to say that |
| 10:04AM | 22 | you learned he's an informant later in 2013? |
| 10:04AM | 23 | And the witness said:  Correct.  Well, mid -- |
| 10:04AM | 24 | **MR. TRIPI:**  Sounded like there was going to be more |
| 10:04AM | 25 | of the answer. |

10:04AM 1    **THE COURT:** Well, you can ask that on --

10:04AM 2    **MR. TRIPI:** Okay.

10:04AM 3    **THE COURT:** -- redirect.

10:04AM 4    **MR. TRIPI:** Withdraw. Thank you.

10:04AM 5    **THE COURT:** Go ahead.

10:04AM 6    **BY MR. MacKAY:**

10:04AM 7    Q. So if we're talking mid 2013, would that be kind of after

10:04AM 8    the timeframe you start dealing back with Mark Kagan?

10:04AM 9    A. Correct.

10:04AM 10   Q. Okay. All right. Now, Mario Vacanti. Remind us, when

10:04AM 11   did you learn he's an informant?

10:04AM 12   A. No, Mario was not an informant.

10:04AM 13   Q. I'm sorry, yeah. Let me withdraw that.

10:04AM 14      When did you learn there was an investigation into Mario

10:05AM 15   Vacanti?

10:05AM 16   A. 2015.

10:05AM 17   Q. Okay. And again that comes through Mike Masecchia,

10:05AM 18   right?

10:05AM 19   A. Correct.

10:05AM 20   Q. And he tells you that Mario Vacanti is being investigated

10:05AM 21   for money laundering, correct?

10:05AM 22   A. Correct.

10:05AM 23   Q. And he provides some specific information about a person

10:05AM 24   whom Mario Vacanti is owed money by, correct?

10:05AM 25   A. Correct.

10:05AM    1    Q.  And that was Paul Humphries, correct?

10:05AM    2    A.  Correct.

10:05AM    3    Q.  He says he owes him $4,000, correct?

10:05AM    4    A.  Correct.

10:05AM    5    Q.  At that point in time, you didn't ask, like, how does

10:05AM    6    anybody know who owes money, correct?

10:05AM    7    A.  Did I ask?

10:05AM    8    Q.  Yeah.

10:05AM    9    A.  No.

10:05AM   10    Q.  Okay.  You just took the information as sort of gospel

10:05AM   11    that he was being investigated, correct?

10:05AM   12    A.  Correct.

10:05AM   13    Q.  So this information -- oh, sorry.  Now, you had been

10:05AM   14    dealing with Mario Vacanti for quite some time though,

10:05AM   15    correct?

10:05AM   16    A.  A year.  A little over a year.

10:05AM   17    Q.  Yeah.  So I want to talk about Mario.

10:05AM   18        Mario, you recall, he was arrested and charged in federal

10:06AM   19    court in about 2011, correct?

10:06AM   20    A.  Correct.

10:06AM   21    Q.  And then he ultimately pleads guilty, and do you recall

10:06AM   22    him being on supervised release into 2014?

10:06AM   23    A.  I knew that he was on, at some point he was, but I didn't

10:06AM   24    know when I met him that he was still on supervised release.

10:06AM   25    Q.  Okay.  So if -- if -- when do you think you met Mario

| | | |
|---|---|---|
| 10:06AM | 1 | Vacanti? |
| 10:06AM | 2 | A.  It was sometime in 2014. |
| 10:06AM | 3 | Q.  Okay.  And then -- |
| 10:06AM | 4 | **MR. TRIPI:**  I didn't hear that, I'm sorry. |
| 10:06AM | 5 | **THE WITNESS:**  Sometime in 2014. |
| 10:06AM | 6 | **MR. TRIPI:**  Thank you. |
| 10:06AM | 7 | **BY MR. MacKAY:** |
| 10:06AM | 8 | Q.  Okay.  And ultimately is it fair to say he becomes part |
| 10:06AM | 9 | of your inner circle? |
| 10:06AM | 10 | A.  Correct. |
| 10:06AM | 11 | Q.  Okay.  And he was a name you passed along to Mike |
| 10:06AM | 12 | Masecchia to get to Joe Bongiovanni? |
| 10:06AM | 13 | A.  Correct. |
| 10:06AM | 14 | Q.  Now, and then again, you think it's sometime in 2015 that |
| 10:06AM | 15 | you learn that there's an investigation into him, correct? |
| 10:06AM | 16 | A.  Correct. |
| 10:06AM | 17 | Q.  But after the -- and at that point in time, you backed |
| 10:06AM | 18 | off your drug activity with him, correct? |
| 10:06AM | 19 | A.  Correct. |
| 10:06AM | 20 | Q.  But with Mario Vacanti, there was also a money-laundering |
| 10:06AM | 21 | component, correct? |
| 10:06AM | 22 | A.  Correct. |
| 10:06AM | 23 | Q.  You laundered money for him, right? |
| 10:06AM | 24 | A.  Correct. |
| 10:06AM | 25 | **THE COURT:**  Could you pull the microphone a little |

10:07AM 1    closer to you, Mr. Serio?

10:07AM 2            **THE WITNESS:**  Oh, sorry.

10:07AM 3            **MR. MacKAY:**  Sorry.

10:07AM 4            **BY MR. MacKAY:**

10:07AM 5    Q.  The question was:  You had laundered money for him,

10:07AM 6    correct?

10:07AM 7    A.  Correct.

10:07AM 8    Q.  And you did it by way of the trans -- purchase and

10:07AM 9    transfer of homes?

10:07AM 10   A.  Correct.

10:07AM 11   Q.  Trying to make that a shortened version of it, but you

10:07AM 12   cleaned the money by buying homes with him, correct?

10:07AM 13   A.  Correct.

10:07AM 14   Q.  And ultimately they get sold off, correct?

10:07AM 15   A.  Correct.

10:07AM 16   Q.  Now, after you hear that Mario Vacanti's under

10:07AM 17   investigation, you ceased drug-dealing activities with him?

10:07AM 18   A.  Correct.

10:07AM 19   Q.  But you still continue to deal with him throughout 2015

10:07AM 20   and 2016, correct?

10:07AM 21   A.  I don't know about 2015 -- not 2015, I was still friends

10:07AM 22   with him and hung out with him a lot.

10:07AM 23   Q.  Okay.  But, so let's try to place this because we have

10:07AM 24   seasons here in Buffalo we can use.

10:07AM 25       When do you think, in the year of 2015, you learn that

10:07AM     1   Mario Vacanti is potentially under investigation?

10:07AM     2   A.  It was either late spring, early summer.

10:08AM     3   Q.  Getting towards mid --

10:08AM     4   A.  Yeah, it was warm outside, I remember that.

10:08AM     5   Q.  Okay.  But after that point in time, you still have

10:08AM     6   substantial contact with Mario Vacanti, correct?

10:08AM     7   A.  Yeah.

10:08AM     8   Q.  Yeah.  Would you have any reason to doubt me that, you

10:08AM     9   know, from November 2015 to September 2016, you had 165

10:08AM    10   telephone calls with him?

10:08AM    11   A.  Correct.

10:08AM    12   Q.  Okay.  So you're still dealing with him in a

10:08AM    13   money-laundering component after the drug activity, correct?

10:08AM    14   A.  Yeah, we were working on a property.  Yes.

10:08AM    15   Q.  Yeah, there were two properties ultimately that you deal

10:08AM    16   with him, correct?

10:08AM    17   A.  Correct.

10:08AM    18   Q.  It's 165 Wardman, correct?

10:08AM    19   A.  Correct.

10:08AM    20   Q.  And I think the other one is 180 North Park?

10:08AM    21   A.  Correct.

10:08AM    22   Q.  And were those, I mean, those were properties that

10:08AM    23   involved sort of the transfer of drug money in some fashion,

10:08AM    24   correct?

10:08AM    25   A.  Correct.

10:08AM    1    Q.  I mean, those were money-laundered properties, correct?

10:08AM    2    A.  Correct.

10:08AM    3    Q.  Now, you also told us about Gables bar and hearing some

10:09AM    4    information about what was going on there, correct?

10:09AM    5    A.  Correct.

10:09AM    6    Q.  Were you able, in any fashion, to date when that

10:09AM    7    happened?

10:09AM    8    A.  I'm sorry, I didn't hear --

10:09AM    9    Q.  Are you able to date when that happened at all?

10:09AM   10    A.  Not specifically.

10:09AM   11    Q.  Okay.  Again, using some of the reference points, you

10:09AM   12    know, we've talked about different figures and things were

10:09AM   13    happening, can you tell us what it was before or after, by

10:09AM   14    any chance?

10:09AM   15    A.  That, I can't remember.

10:09AM   16    Q.  Okay.  Do you think was closer in time to your arrest, or

10:09AM   17    closer in time to the beginning of your operations?

10:09AM   18    A.  I would say midpoint.

10:09AM   19    Q.  Okay.

10:09AM   20    A.  2013 to '15, somewhere in there.

10:09AM   21    Q.  I guess, so if we're talking about, well, let's do it

10:09AM   22    this way.

10:09AM   23        We know in early 2013, you're out of the drug game for

10:09AM   24    first half of 2013, correct?

10:09AM   25    A.  Correct.

10:09AM    1    Q. Do you think it was after that, or before that?

10:09AM    2    A. That was after that, I believe.

10:09AM    3    Q. Okay. Now, you learned information about an individual

10:09AM    4    named Steve who's a bartender there, correct?

10:09AM    5    A. Correct.

10:09AM    6    Q. I think you told us on direct, it really didn't mean much

10:09AM    7    to you because you didn't deal with these individuals,

10:10AM    8    correct?

10:10AM    9    A. Correct.

10:10AM   10    Q. I mean, you were -- did you grow up in North Buffalo?

10:10AM   11    A. In Tonawanda.

10:10AM   12    Q. Okay. But you owned a sub shop on Hertel Avenue for some

10:10AM   13    time?

10:10AM   14    A. Correct.

10:10AM   15    Q. I mean, fair to say you were familiar with the North

10:10AM   16    Buffalo neighborhood?

10:10AM   17    A. Yes.

10:10AM   18    Q. But you knew Mike Masecchia to have sort of a deeper

10:10AM   19    connection to North Buffalo, correct?

10:10AM   20    A. Correct.

10:10AM   21    Q. He had grown up there, correct?

10:10AM   22    A. Correct.

10:10AM   23    Q. Before he moved into your Huntington property, he

10:10AM   24    maintained a residence on Colvin Boulevard, correct?

10:10AM   25    A. Correct.

10:10AM 1 Q. That was 407 Colvin, correct?

10:10AM 2 A. I believe he lived in North Tonawanda for a long time. I

10:10AM 3 think on Colvin was earlier on.

10:10AM 4 Q. Okay. But you know he did maintain a residence on

10:10AM 5 Colvin, correct?

10:10AM 6 A. Yeah, at some point.

10:10AM 7 Q. Okay. You know, kind of, in the vicinity of, like,

10:10AM 8 Tacoma and Colvin?

10:10AM 9 A. Yes.

10:10AM 10 Q. Kind of if we're trying to give the jury a picture,

10:10AM 11 probably a -- one long block south of Hanna's Frosty Treats?

10:11AM 12 A. Sounds right.

10:11AM 13 Q. Okay. And that location where Mike Masecchia lived,

10:11AM 14 that's basically one long block and a short block over to

10:11AM 15 Gables bar, correct?

10:11AM 16 A. Correct.

10:11AM 17 Q. Gables is on Hertel, kind of just around the corner from

10:11AM 18 Colvin, correct?

10:11AM 19 A. Correct.

10:11AM 20 Q. And you knew Mike Masecchia throughout the years to

10:11AM 21 socialize in the North Buffalo neighborhood, correct?

10:11AM 22 A. Correct.

10:11AM 23 Q. That was kind of his area to go out, correct?

10:11AM 24 A. Correct.

10:11AM 25 Q. You know, his local watering holes were that

10:11AM      1    neighborhood, correct?

10:11AM      2    A. Correct.

10:11AM      3    Q. And you knew him to know a lot of people in North

10:11AM      4    Buffalo, correct?

10:11AM      5    A. Correct.

10:11AM      6    Q. So not only was he sort of a guy who was always out and

10:11AM      7    about in the North Buffalo area, but he was also a school

10:11AM      8    teacher in the City of Buffalo, correct?

10:11AM      9    A. Correct.

10:11AM    10    Q. Now, when Mike Masecchia told you this information about

10:11AM    11    Gables, he never told you specifically where he got it,

10:11AM    12    correct?

10:11AM    13    A. I was just assuming, correct.

10:11AM    14    Q. Yeah. So, I mean, so he never told you this was

10:12AM    15    information I got from Joe Bongiovanni, correct?

10:12AM    16    A. Correct.

10:12AM    17    Q. So as you sit here today, you don't know whether he

10:12AM    18    was just telling you neighborhood gossip, correct?

10:12AM    19    A. Correct.

10:12AM    20    Q. You don't know whether he actually learned that from the

10:12AM    21    individuals at Gables himself by going to that bar, correct?

10:12AM    22    A. Correct.

10:12AM    23    Q. Okay. Lou Selva. He's an individual that, for you, he

10:12AM    24    sort of comes into the picture about what time? 2008? 2009?

10:12AM    25    A. Correct.

10:12AM    1    Q.  And how do you first get involved with him?

10:12AM    2    A.  Through Mike.

10:12AM    3    Q.  Okay.  So, I just want to walk through that.

10:12AM    4        Your connection to Lou Selva is through Mike Masecchia,

10:12AM    5    correct?

10:12AM    6    A.  Correct.

10:12AM    7    Q.  When you met him, you understood him to have some

10:12AM    8    involvement with whatever Mike Masecchia was doing out in the

10:12AM    9    Southern Tier?

10:12AM   10    A.  Correct.

10:12AM   11    Q.  You didn't previously know Lou Selva in any fashion,

10:12AM   12    correct?

10:12AM   13    A.  I mean, I met him a couple times.  Like, I knew him, I

10:12AM   14    knew who he was, he knew who I was.

10:12AM   15    Q.  Yeah.  We put that in kind of the friends category?

10:13AM   16    A.  Yeah.

10:13AM   17    Q.  Or maybe even not friends, but just somebody from being

10:13AM   18    out and about?

10:13AM   19    A.  Yeah, acquaintance.

10:13AM   20    Q.  Now, you believed he was a coke head, correct?

10:13AM   21    A.  Correct.

10:13AM   22    Q.  And your understanding, again, of what Mike Masecchia

10:13AM   23    presented to this operation was he was gonna be the one who

10:13AM   24    talked to Mr. Bongiovanni and get the information, correct?

10:13AM   25    A.  Lou was.

10:13AM 1    Q.  Yes.

10:13AM 2    A.  Correct.

10:13AM 3    Q.  And he'd relay it to Mike Masecchia, correct?

10:13AM 4    A.  Correct.

10:13AM 5    Q.  Who would get it back to you, correct?

10:13AM 6    A.  Correct.

10:13AM 7    Q.  And now you understand Lou Selva to be Mike Mas -- I'm

10:13AM 8    sorry, to be Joe Bongiovanni's best friend, correct?

10:13AM 9    A.  Correct.

10:13AM 10   Q.  But again, just remind the jury, I think you said it on

10:13AM 11   direct, you never met Joe Bongiovanni, correct?

10:13AM 12   A.  Correct.

10:13AM 13   Q.  You were never -- there was never any situation where you

10:13AM 14   and he sat down, correct?

10:13AM 15   A.  Correct.

10:13AM 16   Q.  Never any situation where you, Mike Masecchia, and him

10:13AM 17   sat down, correct?

10:13AM 18   A.  Correct.

10:13AM 19   Q.  Same with you, Lou Selva, and Mr. Bongiovanni, you never

10:13AM 20   had any sort of sit-down, correct?

10:14AM 21   A.  Correct.

10:14AM 22   Q.  Now, at some point in time, Mr. Selva becomes involved in

10:14AM 23   the negotiations about the payments, correct?

10:14AM 24   A.  Correct.

10:14AM 25   Q.  In what fashion?

10:14AM 1    A.  I really -- Mike -- it was between him and Mike.  So, I

10:14AM 2    really didn't know too much about that.

10:14AM 3    Q.  Okay.  But I guess what I'm saying is that at some point

10:14AM 4    in time, there are discussions where -- between you and

10:14AM 5    Mr. Masecchia where Lou Selva is present, too, correct?

10:14AM 6    A.  Correct.

10:14AM 7    Q.  This would occur at the Western Door Steak House?

10:14AM 8    A.  Correct.

10:14AM 9    Q.  And that's in -- was that in context of sort of bumping

10:14AM 10   the payments up to $4,000?

10:14AM 11   A.  I believe so.

10:14AM 12   Q.  And recall, if you can, what was Lou Selva sort of

10:14AM 13   bringing to the table in this conversation?

10:14AM 14   A.  Just that, I mean, he really wasn't saying much.

10:14AM 15   Q.  Okay.  Again, Mike Masecchia is sort of the primary

10:14AM 16   negotiator in all this?

10:14AM 17   A.  Correct.

10:14AM 18   Q.  And but previous --

10:14AM 19   A.  It really wasn't a negotiation.  It was just him telling

10:14AM 20   me that it was going to be bumped up.

10:14AM 21   Q.  Okay.  So, yeah --

10:15AM 22   A.  So it wasn't, like, hashing out details or anything.  It

10:15AM 23   was just, all right, for 2,000 more, he'll take care of you.

10:15AM 24   Q.  Okay.  So at that point in time, Mike Masecchia is sort

10:15AM 25   of presenting you, I don't want to call it, like, a

10:15AM    1    take-it-or-leave-it offer, but he's saying this is what it's

10:15AM    2    gonna be now?

10:15AM    3    A.    Yes.

10:15AM    4    Q.    And at that point in time, I think we talked about this

10:15AM    5    on Friday, you had been paying Mike Masecchia for about a

10:15AM    6    year?

10:15AM    7    A.    Correct.

10:15AM    8    Q.    Because those start, I think you said, it was late 2010

10:15AM    9    the payments start?

10:15AM   10    A.    Correct.

10:15AM   11    Q.    And then they ramp up and sort of a year later when you

10:15AM   12    start dealing with Santiago Gale, correct?

10:15AM   13    A.    Correct.

10:15AM   14    Q.    So this information with Mike Masecchia, Lou Selva and

10:15AM   15    you, that all occurs late 2011 or so?

10:15AM   16    A.    Fall.  About fall 2011, I believe.

10:15AM   17    Q.    Okay.  In proximity to when you start dealing with

10:15AM   18    Santiago Gale?

10:15AM   19    A.    Correct.

10:15AM   20    Q.    Okay.  Now, after you initially start the payments

10:16AM   21    through Mike Masecchia, you understood Lou Selva to still

10:16AM   22    have an ongoing part in the -- the grow operations that were

10:16AM   23    going on down in the Southern Tier, correct?

10:16AM   24    A.    Correct.

10:16AM   25    Q.    But going forward, I think if I understand you correctly,

10:16AM 1  you didn't really have hands-on dealings with those

10:16AM 2  operations down there, correct?

10:16AM 3  A.  Correct.

10:16AM 4  Q.  I think you said you clipped some plants at one point in

10:16AM 5  time, correct?

10:16AM 6  A.  Correct.

10:16AM 7  Q.  I think was that in about the 2009 timeframe?

10:16AM 8  A.  Around then.

10:16AM 9  Q.  But going forward, the only real connection you would

10:16AM 10  have to those activities was to purchase the marijuana once

10:16AM 11  it was done being grown, correct?

10:16AM 12  A.  Correct.

10:16AM 13  Q.  Now, moving forward, at some point in time you set up a

10:16AM 14  grow operation in Lou Selva's house, correct?

10:16AM 15  A.  Correct.

10:16AM 16  Q.  I think that's the one you told us takes about a couple

10:16AM 17  days, correct?

10:16AM 18  A.  Correct.

10:16AM 19  Q.  And then you really don't have any more specific dealings

10:16AM 20  with how that operation is being run, correct?

10:16AM 21  A.  Correct.

10:16AM 22  Q.  It's just another source of marijuana for you to take

10:17AM 23  when it's done, correct?

10:17AM 24  A.  Correct.

10:17AM 25  Q.  And then at some point in time in late 2016, about 15

10:17AM   1   pounds of the marijuana you were storing at Lou Selva's house

10:17AM   2   comes out missing, correct?

10:17AM   3   A.  Correct.

10:17AM   4   Q.  And, you know, your experience in the drug business is

10:17AM   5   oftentimes when things come up missing, you've been ripped

10:17AM   6   off, fair to say?

10:17AM   7          **MR. TRIPI:**  Objection, speculation.

10:17AM   8          **THE COURT:**  No, overruled.

10:17AM   9          **THE WITNESS:**  I mean, in the business, yes.  But also

10:17AM   10  it could have been my mistake, so I didn't make any

10:17AM   11  accusations.

10:17AM   12         **BY MR. MacKAY:**

10:17AM   13  Q.  Okay.  But as you sit here today, do you believe you were

10:17AM   14  ripped off?

10:17AM   15  A.  It's questionable.  I won't say for sure I was because,

10:17AM   16  like I said, it could have been my own mistake.

10:17AM   17  Q.  Okay.  Now, just to give the jury a street estimate,

10:17AM   18  15 pounds of marijuana, about how much is that worth at that

10:17AM   19  time?

10:17AM   20  A.  At that time, about, yeah, $30,000.

10:17AM   21  Q.  After that point in time, you no longer dealt with Lou

10:18AM   22  Selva, correct?

10:18AM   23  A.  Correct.

10:18AM   24  Q.  No longer stored marijuana at his house, correct?

10:18AM   25  A.  Correct.

10:18AM   1   Q.  No longer had any direct dealings with him, correct?

10:18AM   2   A.  Correct.

10:18AM   3   Q.  However, just to be clear, the payments to Mike Masecchia

10:18AM   4   continue all the way up to the time of your arrest, correct?

10:18AM   5   A.  Correct.

10:18AM   6   Q.  So those payments are ongoing up in April of 2017,

10:18AM   7   correct?

10:18AM   8   A.  Correct.

10:18AM   9   Q.  But no further dealings with Lou Selva, correct?

10:18AM  10   A.  Correct.

10:18AM  11   Q.  Okay.  I just want to go back to Mike Masecchia for a

10:18AM  12   second.

10:18AM  13       He's the one that initially proposes the payments to

10:18AM  14   Mr. Bongiovanni, correct?

10:18AM  15   A.  Correct.

10:18AM  16   Q.  Now, you purchased your Lebrun home in approximately

10:18AM  17   November of 2011?

10:18AM  18   A.  Correct.

10:18AM  19   Q.  And you spent about a year renovating that, correct?

10:18AM  20   A.  Correct.

10:18AM  21   Q.  Now at some point in time, you enter into sort of a

10:18AM  22   rent-to-own arrangement with Mike Masecchia?

10:18AM  23   A.  Correct.

10:18AM  24   Q.  Can you date that in terms of what I just talked about?

10:18AM  25   A.  Sometime in 2012, I believe.

10:19AM   1   Q.   Fair to say, like, after the Lebrun house is done and

10:19AM   2   after you're out of Huntington?

10:19AM   3   A.   Oh, yes.

10:19AM   4   Q.   Okay.  So after you move out of Huntington, you rent that

10:19AM   5   to Mike Masecchia, correct?

10:19AM   6   A.   Correct.

10:19AM   7   Q.   With an understanding that the rent is going towards

10:19AM   8   ultimately --

10:19AM   9   A.   The mortgage.

10:19AM  10   Q.   -- the mortgage.

10:19AM  11        Yeah, can you describe that for the jury, how you set it

10:19AM  12   up?

10:19AM  13   A.   So, I sold it to him for, I believe, $400,000.

10:19AM  14        I owed 2-, around 2- or 220- on it.  And he gave me

10:19AM  15   $50,000 down.  And I gave him a two-year time period to get a

10:19AM  16   mortgage, and then pay off the remaining -- the equity in the

10:19AM  17   house.

10:19AM  18        And at that time, he was just to pay the mortgage.  And

10:19AM  19   then once he got the -- his own mortgage, then he would stop

10:19AM  20   paying it.

10:19AM  21   Q.   But he ultimately never got a mortgage on that, correct?

10:19AM  22   A.   Correct.

10:19AM  23   Q.   And he ultimately didn't pay you, correct?

10:19AM  24   A.   Correct.

10:19AM  25   Q.   And you ultimately had to evict him from that property,

10:20AM 1  correct?

10:20AM 2  A.  Yes.

10:20AM 3  Q.  You also learned at some point that he bought a condo in

10:20AM 4  Florida?

10:20AM 5  A.  Yes, sir.

10:20AM 6  Q.  And did you learn that a substantial amount of cash was

10:20AM 7  found at the Huntington address -- I'm sorry, withdrawn.

10:20AM 8     Did you come to find out later that a substantial amount

10:20AM 9  of cash was found when he was arrested?

10:20AM 10  A.  Correct.

10:20AM 11  Q.  Okay.  Now, you understood him to have some sort of

10:20AM 12  dealings in some fashion with Remus Nowak correct?

10:20AM 13  A.  Correct.

10:20AM 14  Q.  I'm using the term "dealings," but it's fair to say they

10:20AM 15  didn't -- it seemed to you like they didn't really like each

10:20AM 16  other, correct?

10:20AM 17  A.  Correct.

10:20AM 18  Q.  And you never really understood what that was about,

10:20AM 19  correct?

10:20AM 20  A.  No.  They had some dealings, and then all of a sudden he

10:20AM 21  didn't like him.

10:20AM 22  Q.  Okay.

10:20AM 23  A.  He really didn't elaborate into it.

10:20AM 24  Q.  And when you said all of a sudden he didn't like him, did

10:20AM 25  that occur when you were dealing with Mr. Masecchia?

10:20AM   1   A.  Correct.

10:20AM   2   Q.  At some point in time when you and Mr. Masecchia are

10:20AM   3   dealing with each other, you understand there's a break with

10:20AM   4   Remus Nowak, correct?

10:21AM   5   A.  Correct.

10:21AM   6   Q.  And then moving forward in time with Remus Nowak, you

10:21AM   7   come to find out that potentially he lives next to your

10:21AM   8   friend Mark Falzone, correct?

10:21AM   9   A.  Correct.

10:21AM   10   Q.  And that comes up in a situation where Mike Masecchia

10:21AM   11   basically says I gotta get out of here because Remus lives

10:21AM   12   next door?

10:21AM   13   A.  Correct.

10:21AM   14   Q.  And that's kind of further down the line from when you

10:21AM   15   first knew Mr. Masecchia and Mr. Nowak were dealing with each

10:21AM   16   other, correct?

10:21AM   17   A.  Correct.

10:21AM   18   Q.  Okay.  Now in all the years that you were paying

10:21AM   19   Mr. Masecchia, you were never provided with any sort of cover

10:21AM   20   story to use, correct?

10:21AM   21   A.  Correct.

10:21AM   22   Q.  You were never told any sort of excuse to use if law

10:21AM   23   enforcement talked to you, correct?

10:21AM   24   A.  Correct.

10:21AM   25   Q.  You were never given any sort of situation to portray

10:21AM 1 yourself as if law enforcement asked you about

10:21AM 2 Mr. Bongiovanni, correct?

10:21AM 3 A. Correct.

10:21AM 4 Q. And ultimately, when you're arrested in April of 2017,

10:21AM 5 you asked to see Joe Bongiovanni, correct?

10:21AM 6 A. Correct.

10:22AM 7 Q. And at that time, I think you describe you were pretty

10:22AM 8 pissed off about what happened, correct?

10:22AM 9 A. Correct.

10:22AM 10 Q. You had thought you had this protection, and here you

10:22AM 11 were being arrested, correct?

10:22AM 12 A. Correct.

10:22AM 13 Q. But then you're asked by the officer who you're talking

10:22AM 14 to, are you his informant, correct?

10:22AM 15 A. Correct.

10:22AM 16 Q. And just to be clear, that was not a cover story that you

10:22AM 17 were ever provided that you should invoke if -- if arrested,

10:22AM 18 correct?

10:22AM 19 A. Correct.

10:22AM 20 Q. All right. Paul Francoforte, he's a gambling buddy of

10:22AM 21 yours, correct?

10:22AM 22 A. Correct.

10:22AM 23 Q. He's not a drug associate in any fashion, correct?

10:22AM 24 A. Correct.

10:22AM 25 Q. You dealt with him -- strike that.

10:22AM 1    You met -- where did you meet him, at the casino?

10:22AM 2  A.  At the casino.

10:22AM 3  Q.  Just kind of sat down at a table, he happened to be

10:22AM 4  gambling next to you?

10:22AM 5  A.  Correct.

10:22AM 6  Q.  Kind of struck up a friendship as gamblers over the

10:22AM 7  years?

10:22AM 8  A.  Yes.  We also had mutual friends.

10:22AM 9  Q.  Okay.  So did that sort of facilitate talking and

10:23AM 10  becoming friends?

10:23AM 11  A.  Yes.

10:23AM 12  Q.  But through all your years dealing with Paul Francoforte,

10:23AM 13  he was only ever a gambling buddy, correct?

10:23AM 14  A.  Correct.

10:23AM 15  Q.  I mean, good enough friends though that you did go to the

10:23AM 16  Mohegan Sun for a tournament with him?

10:23AM 17  A.  Correct.

10:23AM 18  Q.  But again, he wasn't there for any drug-related behavior,

10:23AM 19  correct?

10:23AM 20  A.  Correct.

10:23AM 21  Q.  All right.  So I want to go through some of the folks

10:23AM 22  that were in your inner circle.

10:23AM 23    Chris Baker, correct?

10:23AM 24  A.  Correct.

10:23AM 25  Q.  Jacob Martinez, correct?

10:23AM  1  A.  Correct.

10:23AM  2  Q.  Jay Campbell, correct?

10:23AM  3  A.  Correct.

10:23AM  4  Q.  Jimmy Rivera?

10:23AM  5  A.  Correct.

10:23AM  6  Q.  Jay Molecki?

10:23AM  7  A.  Correct.

10:23AM  8  Q.  Mike Hardick?

10:23AM  9  A.  Well, he wasn't a drug associate, he worked for me.

10:23AM  10  Q.  Okay.  So -- so Mike Hardick is not a drug associate,

10:23AM  11  correct?

10:23AM  12  A.  Correct.

10:23AM  13  Q.  But he's involved in the real estate operations, correct?

10:23AM  14  A.  Correct.

10:23AM  15  Q.  Okay.  And to be clear, is he ever involved in any of the

10:23AM  16  operations that you recall where you're flipping the houses

10:24AM  17  and using them as grow houses?

10:24AM  18  A.  No, he was not.

10:24AM  19  Q.  Okay.  So he's really just a friend, correct?

10:24AM  20  A.  Correct.

10:24AM  21  Q.  And well, I said friend, but you also --

10:24AM  22  A.  Employed him.

10:24AM  23  Q.  He was an employee?

10:24AM  24  A.  Correct.

10:24AM  25  Q.  All right.  Mike Moynihan, is he --

10:24AM  1  A.  Yes.

10:24AM  2  Q.  -- one of your associates?

10:24AM  3  A.  Correct.

10:24AM  4  Q.  Inner circle?

10:24AM  5  A.  Yes.

10:24AM  6  Q.  Anthony Greco?

10:24AM  7  A.  Yes, correct.

10:24AM  8  Q.  And Anthony Greco, you also had some dealings with some

10:24AM  9  of your opiates, correct?

10:24AM  10  A.  Correct.

10:24AM  11  Q.  You would buy and sell from each other when you needed

10:24AM  12  them?

10:24AM  13  A.  Correct.

10:24AM  14  Q.  Matt LoTempio?

10:24AM  15  A.  Correct.

10:24AM  16  Q.  Inner circle?

10:24AM  17  A.  Yes.

10:24AM  18  Q.  Okay.  Anthony Mayo?

10:24AM  19  A.  Yes.

10:24AM  20  Q.  I think we talked about Mario Vacanti.  But 2014, for a

10:24AM  21  while, he was part of your inner circle?

10:24AM  22  A.  Yes.

10:24AM  23  Q.  Okay.  But not before 2014?

10:24AM  24  A.  No, not before 2014.

10:24AM  25  Q.  Because you wouldn't have met before then, correct?

10:24AM     1    A.  Correct.

10:24AM     2    Q.  Mark Falzone?

10:24AM     3    A.  Yes.

10:24AM     4    Q.  When I'm saying this, I'm saying he's inner circle?

10:25AM     5    A.  Yes.

10:25AM     6    Q.  Okay.  Mike Buttitta?

10:25AM     7    A.  I won't say inner circle, he was more of a friend.  I

10:25AM     8    occasionally sold him marijuana, just small amounts.

10:25AM     9    Q.  Okay.  Let's explore that.  So did he work at all with

10:25AM    10    your property businesses?

10:25AM    11    A.  No.

10:25AM    12    Q.  Okay.  But he was not really a distributor for you?

10:25AM    13    A.  He would take, like, a pound here and there.

10:25AM    14    Q.  Okay.  But not, like, when you say here and there, if you

10:25AM    15    had to estimate, how many times did you ever give him a

10:25AM    16    pound?

10:25AM    17    A.  Maybe ten times.

10:25AM    18    Q.  Okay.  Was he ever a name that you passed to Mike

10:25AM    19    Masecchia to have looked out for?

10:25AM    20    A.  I might have, but I'm not 100 percent sure.

10:25AM    21    Q.  Okay.  John Robinson, part of your inner circle?

10:25AM    22    A.  Yes.

10:25AM    23    Q.  He's a distributor for you?

10:25AM    24    A.  Yes.

10:25AM    25    Q.  Passed his name to Mike Masecchia?

10:25AM    1    A.   Yes.

10:25AM    2    Q.   Okay.  T.S.  Part of your inner circle?

10:25AM    3    A.   Yes, at one point.

10:25AM    4    Q.   Okay.  And I think we went through it, but ultimately

10:25AM    5    there's a point in time, looks like we've got something on

10:25AM    6    the screen.

10:26AM    7              **MR. MacKAY:**  I'm sorry, Judge, it looked like there

10:26AM    8    was an exhibit that popped up, I didn't know.

10:26AM    9              **THE CLERK:**  It did not go to the jury.

10:26AM   10              **MR. TRIPI:**  Sorry about that.

10:26AM   11              **THE CLERK:**  That's okay, I shut it off.

10:26AM   12              **BY MR. MacKAY:**

10:26AM   13    Q.   All right.  So T.S., ultimately your relationship falls

10:26AM   14    off with him, correct?

10:26AM   15    A.   Correct.

10:26AM   16    Q.   And just to remind the jury, he wasn't really a source of

10:26AM   17    supply so much as just a plug to somebody else, correct?

10:26AM   18    A.   Yes, he was in between.

10:26AM   19    Q.   Right.  So he hooks you up with Santiago Gale, correct?

10:26AM   20    A.   Well, he was a go-between.  I met with Santiago Gale

10:26AM   21    once, but he --

10:26AM   22    Q.   But after --

10:26AM   23    A.   -- dealt with Santiago.

10:26AM   24    Q.   -- sort of the initial setup with Santiago Gale,

10:26AM   25    everything goes through T.S. for that source, correct?

| | | |
|---|---|---|
| 10:26AM | 1 | A.  Correct. |
| 10:26AM | 2 | Q.  And I think we talked about it, you never provided |
| 10:26AM | 3 | Santiago Gale's name to Mike Masecchia, correct? |
| 10:26AM | 4 | A.  Correct. |
| 10:26AM | 5 | Q.  Do you recall providing T.S.'s name to Mike Masecchia? |
| 10:27AM | 6 | A.  Yes. |
| 10:27AM | 7 | Q.  Now at some point in time, you come to learn that T.S. |
| 10:27AM | 8 | had been or was an informant, correct? |
| 10:27AM | 9 | A.  Correct. |
| 10:27AM | 10 | Q.  And approximately what timeframe did that occur? |
| 10:27AM | 11 | A.  I want to say late 2013. |
| 10:27AM | 12 | Q.  Okay.  So, by that time, you're exclusively dealing with |
| 10:27AM | 13 | the -- that's the Mark Kagan/Jarrett Guy timeframe, correct? |
| 10:27AM | 14 | A.  Correct. |
| 10:27AM | 15 | Q.  You had stopped dealing with T.S. quite some time before, |
| 10:27AM | 16 | correct? |
| 10:27AM | 17 | A.  Correct. |
| 10:27AM | 18 | Q.  Okay.  Because, again, you were out of the -- the drug |
| 10:27AM | 19 | game after the Wayne Anderson arrest, correct? |
| 10:27AM | 20 | A.  Correct. |
| 10:27AM | 21 | Q.  Now, back when you were dealing with T.S., my question |
| 10:27AM | 22 | was, did you -- you passed his name to Joe Bongiovanni to |
| 10:27AM | 23 | look out for? |
| 10:27AM | 24 | A.  Correct. |
| 10:27AM | 25 | Q.  Okay.  Now, you never came to learn that he had been a |

10:27AM   1   source at that point in time when you passed the name,

10:27AM   2   correct?

10:27AM   3   A.  Correct.

10:27AM   4   Q.  It wasn't until much later that you hear that he's an

10:27AM   5   informant, correct?

10:27AM   6   A.  Correct.

10:27AM   7   Q.  So if you're dealing with T.S., I think did we establish

10:28AM   8   that's approximately 2011 to 2012?

10:28AM   9   A.  Correct.

10:28AM  10   Q.  And that's the timeframe you passed his name to Mike

10:28AM  11   Masecchia, correct?

10:28AM  12   A.  Correct.

10:28AM  13   Q.  But at that point in time, you never received any

10:28AM  14   information that he was actually a DEA confidential source

10:28AM  15   back in 2009, correct?

10:28AM  16   A.  Correct.

10:28AM  17   Q.  All right.  Kelly Brace, he was the individual you were

10:28AM  18   ultimately arrested with, correct?

10:28AM  19   A.  Correct.

10:28AM  20   Q.  Part of your inner circle?

10:28AM  21   A.  He was an associate, yes.

10:28AM  22   Q.  He distributed for you, correct?

10:28AM  23   A.  Yes.

10:28AM  24   Q.  Passed his name to Mike Masecchia?

10:28AM  25   A.  Yes.

10:28AM 1 Q. Okay. Dave Siwek, does that name have any meaning to

10:28AM 2 you?

10:28AM 3 A. No.

10:28AM 4 Q. Okay. How about Dave Mitchkay? Does that name have any

10:28AM 5 meaning to you?

10:28AM 6 A. Yes.

10:28AM 7 Q. Okay. Who was he?

10:28AM 8 A. He was a friend that I had a falling out with, but we did

10:28AM 9 heroin together.

10:28AM 10 Q. Okay. He was never, like, one of your distributors,

10:28AM 11 correct?

10:28AM 12 A. Correct.

10:28AM 13 Q. And when you -- with your drug use, I want to center

10:28AM 14 that. Dave Mitchkay, when were you doing heroin with him?

10:28AM 15 A. I believe it was 2014.

10:29AM 16 Q. Okay. And then ultimately you have this falling out, and

10:29AM 17 there's no more contact with Dave Mitchkay?

10:29AM 18 A. Correct.

10:29AM 19 Q. So he was only really ever a personal use -- somebody you

10:29AM 20 used personally with, correct?

10:29AM 21 A. Correct. Well, he used to get the heroin for me at some

10:29AM 22 point.

10:29AM 23 Q. Okay. But when we gets it for you, this is in

10:29AM 24 personal-use amounts, correct?

10:29AM 25 A. Correct.

10:29AM 1 Q. You didn't understand him to be like a distributor in

10:29AM 2 some fashion, correct?

10:29AM 3 A. No. Correct.

10:29AM 4 Q. He's not a source of supply for drugs?

10:29AM 5 A. Correct.

10:29AM 6 Q. And he's not a part of your inner circle, correct?

10:29AM 7 A. Correct.

10:29AM 8 Q. He's just somebody you would do drugs with for a period

10:29AM 9 of time, correct?

10:29AM 10 A. Correct.

10:29AM 11 Q. Okay. So, I went through a number of -- of names in the

10:29AM 12 inner circle. Those are the ones you passed to Mike

10:29AM 13 Masecchia, correct?

10:29AM 14 A. Correct.

10:29AM 15 Q. And you expected those to go to Joe Bongiovanni, correct?

10:29AM 16 A. Correct.

10:29AM 17 Q. Okay. David Oddo, he was not in your inner circle,

10:29AM 18 correct?

10:29AM 19 A. Correct.

10:29AM 20 Q. You did not like David Oddo, correct?

10:29AM 21 A. Correct.

10:29AM 22 Q. Why?

10:29AM 23 A. I just -- I met him once, and he was just an arrogant --

10:30AM 24 he just seemed like a jerk.

10:30AM 25 Q. And because of that, you didn't like him?

10:30AM  1   A.  Correct.

10:30AM  2   Q.  And -- and never dealt with him directly, correct?

10:30AM  3   A.  Correct.

10:30AM  4   Q.  Meaning that he was never a distributor for you, correct?

10:30AM  5   A.  Correct.

10:30AM  6   Q.  And you weren't buying drugs from him?

10:30AM  7   A.  Correct.

10:30AM  8   Q.  At some point in time though, you learned from Anthony

10:30AM  9   Gerace that Gerace might be getting drugs from him, correct?

10:30AM  10  A.  Correct.

10:30AM  11  Q.  But, again, you never dealt directly with David Oddo?

10:30AM  12  A.  Correct.

10:30AM  13  Q.  Jeremie Jones, do you even recognize that name?

10:30AM  14  A.  Yes.

10:30AM  15  Q.  Who do you recognize him as?

10:30AM  16  A.  He was a drug dealer that was friends with Mike Piazza.

10:30AM  17  Q.  Okay.  But he was not part of your network, correct?

10:30AM  18  A.  Correct.

10:30AM  19  Q.  I mean, I think you told us on direct your ultimate goal

10:30AM  20  was to control all the marijuana trade in Buffalo?

10:30AM  21  A.  Correct.

10:30AM  22  Q.  But as you knew it, even while you were operating, there

10:30AM  23  were other drug networks in Buffalo that had been

10:30AM  24  established?

10:30AM  25  A.  Correct.

10:31AM  1   Q.  And you as a drug dealer knew who the other drug dealers

10:31AM  2   were, correct?

10:31AM  3   A.  Correct.

10:31AM  4   Q.  But so the jury understands, not all drug dealers deal

10:31AM  5   with each other?

10:31AM  6   A.  Correct.

10:31AM  7   Q.  There are sometimes rivalries between drug dealers,

10:31AM  8   correct?

10:31AM  9   A.  Correct.

10:31AM  10  Q.  For example, David Oddo, you didn't even have a rivalry

10:31AM  11  with him, correct?

10:31AM  12  A.  Correct.

10:31AM  13  Q.  You just didn't like the guy and stayed away from him,

10:31AM  14  correct?

10:31AM  15  A.  Correct.

10:31AM  16  Q.  Jeremie Jones was another drug dealer.  Would you even

10:31AM  17  consider him a rival?

10:31AM  18  A.  He sold to people that I knew, so somewhat.

10:31AM  19  Q.  Okay.  But he was not somebody's name you ever passed to

10:31AM  20  Mike Masecchia to look out for, correct?

10:31AM  21  A.  Correct.

10:31AM  22  Q.  Because he's not part of your network, correct?

10:31AM  23  A.  Correct.

10:31AM  24  Q.  Okay.  The name Charles Butera, do you even know who that

10:31AM  25  person is?

10:31AM 1   A.   No.

10:31AM 2   Q.   That's not a name you passed to Mike Masecchia to give to

10:31AM 3   Joe Bongiovanni, correct?

10:31AM 4   A.   Correct.

10:31AM 5   Q.   Mike Sinatra, he was not part of your organization,

10:31AM 6   correct?

10:31AM 7   A.   Correct.

10:31AM 8   Q.   You knew who he was sort of in the -- I think you used

10:31AM 9   the term acquaintance?

10:31AM 10   A.   I never -- I don't even know what he looks like. I never

10:32AM 11   met him. I just know that Anthony Gerace was friends with

10:32AM 12   him.

10:32AM 13   Q.   Okay. So your sole dealings with Michael Sinatra, I

10:32AM 14   shouldn't even call them dealings, the only way you know

10:32AM 15   about Michael Sinatra is you know he was friends with Anthony

10:32AM 16   Gerace, correct?

10:32AM 17   A.   Correct.

10:32AM 18   Q.   He was never a name you passed to Mike Masecchia to have

10:32AM 19   looked out for, correct?

10:32AM 20   A.   Correct.

10:32AM 21   Q.   Because you're not dealing in any fashion in the drug

10:32AM 22   game with Michael Sinatra, correct?

10:32AM 23   A.   Correct.

10:32AM 24   Q.   Okay. So I want to finish up.

10:32AM 25       Now, I think you've described yourself at times as high

10:32AM 1 functioning when you were on substances, correct?

10:32AM 2 A. Correct.

10:32AM 3 Q. And you started using marijuana when you were young,

10:32AM 4 correct?

10:32AM 5 A. Correct.

10:32AM 6 Q. That escalated into use of cocaine, correct?

10:32AM 7 A. Correct.

10:32AM 8 Q. And ultimately, you get into opiates, correct?

10:32AM 9 A. Correct.

10:32AM 10 Q. Starts with heroin?

10:33AM 11 A. Excuse me?

10:33AM 12 Q. Does it start with heroin?

10:33AM 13 A. It starts with Lortabs.

10:33AM 14 Q. Okay. But when you couldn't get the opiates, you were

10:33AM 15 ultimately sort of filling in that gap with heroin, correct?

10:33AM 16 A. Correct.

10:33AM 17 Q. And now do you recall how much heroin were you using per

10:33AM 18 day if you couldn't get any pills?

10:33AM 19 A. Well, it escalated. I didn't start off using that much.

10:33AM 20 But towards the end, it was 2 to 3 grams a day.

10:33AM 21 Q. Now, and when your opiate use escalated, you were using

10:33AM 22 40 or more oxy pills a day, correct?

10:33AM 23 A. Correct.

10:33AM 24 Q. I think you told us at one point in time, you get a

10:33AM 25 shipment of about 16,000 pills from Jarrett Guy, correct?

| | | |
|---|---|---|
| 10:33AM | 1 | A.  It was four shipments over a period of time of 4,000. |
| 10:33AM | 2 | Q.  So 4 times 4, you ultimately get $16,000 oxy pills from |
| 10:33AM | 3 | Jarrett Guy? |
| 10:33AM | 4 | A.  Yes. |
| 10:33AM | 5 | Q.  And I think your testimony was you used about three |
| 10:34AM | 6 | quarters of those? |
| 10:34AM | 7 | A.  Correct. |
| 10:34AM | 8 | Q.  And it would have been about a two-year timeframe? |
| 10:34AM | 9 | A.  Correct. |
| 10:34AM | 10 | Q.  So the math would be about 12,000 pills in two years? |
| 10:34AM | 11 | A.  Correct. |
| 10:34AM | 12 | Q.  But I think you've testified, though, that the way you |
| 10:34AM | 13 | would balance your substance use is you would level yourself |
| 10:34AM | 14 | out with cocaine, correct? |
| 10:34AM | 15 | A.  Correct. |
| 10:34AM | 16 | Q.  And I think it was your testimony that on the day of your |
| 10:34AM | 17 | arrest, you had leveled yourself out before going to Kelly |
| 10:34AM | 18 | Brace's house, correct? |
| 10:34AM | 19 | A.  Probably.  I don't remember saying that, but -- |
| 10:34AM | 20 | Q.  Yeah, well -- |
| 10:34AM | 21 | A.  Yeah. |
| 10:34AM | 22 | Q.  -- rather than what you said, I'm asking what you did at |
| 10:34AM | 23 | that point in time. |
| 10:34AM | 24 | A.  Well, I just woke up, so yeah, I did opiates. |
| 10:34AM | 25 | **MR. MacKAY:**  Okay.  So for the witness only can we |

10:34AM   1   show defense Exhibit W.

10:34AM   2          BY MR. MacKAY:

10:34AM   3   Q.   Okay.  Do you recognize that as a fair and accurate

10:34AM   4   depiction of, sort of, your mugshot right after you're

10:34AM   5   arrested?

10:34AM   6   A.   Yes.

10:34AM   7   Q.   Okay.  And that's a fair and accurate depiction of what

10:35AM   8   you looked like on your day of your arrest, correct?

10:35AM   9   A.   Yes.

10:35AM  10          MR. MacKAY:   Defense moves for admission of Defense

10:35AM  11   Exhibit W.

10:35AM  12          MR. TRIPI:   No objection.

10:35AM  13          THE COURT:   Received without objection.

10:35AM  14          (DFT Exhibit W was received in evidence.)

10:35AM  15          MR. MacKAY:   All right.  And can we show that to the

10:35AM  16   jury, Ms. Demma?

10:35AM  17          THE CLERK:   You're all set.

10:35AM  18          BY MR. MacKAY:

10:35AM  19   Q.   And, again, I'm not doing this to embarrass you or

10:35AM  20   anything.  I think you said you're now seven and a half years

10:35AM  21   sober, correct?

10:35AM  22   A.   Correct.

10:35AM  23   Q.   And for what all of us do in this courtroom, that's quite

10:35AM  24   remarkable.  But, you know, fair to say you were at a very

10:35AM  25   different state of mind at the time of your arrest, correct?

10:35AM 1    A. Correct.

10:35AM 2    Q. The worst day of your life, correct?

10:35AM 3    A. Yes.

10:35AM 4    Q. That kind of was the culmination of all the years of drug

10:35AM 5    use, correct?

10:35AM 6    A. Correct.

10:35AM 7    Q. And you had to work quite hard to turn that around to be

10:35AM 8    here as you sit here today, correct?

10:35AM 9    A. Correct.

10:35AM 10   Q. And you've also had a lot of time to go over what's

10:35AM 11   happened in your case, correct?

10:35AM 12   A. Correct.

10:35AM 13   Q. I mean, you've met with the government many times over

10:35AM 14   the years, correct?

10:35AM 15   A. Correct.

10:35AM 16   Q. And you've looked at a lot of in evidence in this case,

10:35AM 17   correct?

10:35AM 18   A. Correct.

10:35AM 19   Q. And you've, you know, had a chance to look back at what

10:35AM 20   happened, correct?

10:36AM 21   A. Correct.

10:36AM 22   Q. And as you sit here today, can you even say whether any

10:36AM 23   money you paid to Mike Masecchia got to Joe Bongiovanni?

10:36AM 24   A. Are you asking my personal opinion, or a fact?

10:36AM 25   Q. Yeah, as a fact, can you say that as you sit here today?

10:36AM    1    A.   I cannot say that.

10:36AM    2    Q.   Now your opinion, I think you've given it earlier, is

10:36AM    3    that you believed this all worked because you were never

10:36AM    4    arrested over those years, correct?

10:36AM    5    A.   Correct.

10:36AM    6    Q.   But you also, as you sit here today, don't know that it

10:36AM    7    wasn't dumb luck, correct?

10:36AM    8    A.   Correct.

10:36AM    9         **MR. MacKAY:**  Okay.  Can I just have a moment,

10:36AM   10    Your Honor?

10:36AM   11         **THE COURT:**  Sure.

10:36AM   12         **MR. MacKAY:**  I have nothing further, Your Honor.

10:36AM   13         **THE COURT:**  Any redirect?

10:36AM   14         **MR. TRIPI:**  Yeah, I do.  Can we get a brief

10:36AM   15    five-minute break, though, Judge?  I apologize --

10:36AM   16         **THE COURT:**  No, that's okay.

10:36AM   17         **MR. TRIPI:**  -- I need a comfort break.

10:36AM   18         **THE COURT:**  Yep.  Yep.  We will take our mid-morning

10:36AM   19    break now.

10:36AM   20         **MR. TRIPI:**  I'm sorry about that.

10:36AM   21         **THE COURT:**  No, that's not a problem.  So we'll take

10:36AM   22    our mid-morning break now.

10:36AM   23         So please, folks, remember my instructions about not

10:36AM   24    communicating about the case even with each other, and not

10:37AM   25    making up your mind.

| | | |
|---|---|---|
| 10:37AM | 1 | We'll see you back here in about ten or 15 minutes. |
| 10:37AM | 2 | (Jury excused at 10:37 a.m.) |
| 10:37AM | 3 | **THE COURT:** Anything for the record? |
| 10:37AM | 4 | **MR. TRIPI:** No, Your Honor, thank you. |
| 10:37AM | 5 | **THE COURT:** Anything for the record? |
| 10:37AM | 6 | **MR. MacKAY:** No, Your Honor. |
| 10:37AM | 7 | **THE COURT:** Okay. We'll see you in about ten or 15 |
| 10:37AM | 8 | minutes. |
| 10:37AM | 9 | **THE CLERK:** All rise. |
| 10:37AM | 10 | (Off the record at 10:37 a.m.) |
| 10:37AM | 11 | (Back on the record at 10:50 a.m.) |
| 10:50AM | 12 | (Jury not present.) |
| 10:50AM | 13 | **THE CLERK:** All rise. |
| 10:50AM | 14 | **THE COURT:** Please be seated. |
| 10:50AM | 15 | **THE CLERK:** We are back on the record for the |
| 10:50AM | 16 | continuation of the jury trial in case number 19-cr-227, |
| 10:50AM | 17 | United States of America versus Joseph Bongiovanni. |
| 10:50AM | 18 | All counsel and parties are present. |
| 10:50AM | 19 | **THE COURT:** Okay. Are we ready? |
| 10:50AM | 20 | **MR. TRIPI:** Yes, thanks. |
| 10:50AM | 21 | **THE COURT:** Anything? |
| 10:50AM | 22 | **MR. MacKAY:** No, Your Honor. |
| 10:50AM | 23 | **THE COURT:** Let's bring them in, please. |
| 10:50AM | 24 | We can bring the witness back in, as well. |
| 10:51AM | 25 | (Jury seated at 10:51 a.m.) |

10:51AM    1    **THE COURT:** The record will reflect that all our

10:51AM    2    jurors are again present.

10:51AM    3      I remind the witness that he's still under oath.

10:51AM    4      And, Mr. Tripi, you may begin your redirect.

10:51AM    5    **MR. TRIPI:** Thank you, Judge.

10:51AM    6

10:51AM    7      **REDIRECT EXAMINATION BY MR. TRIPI:**

10:52AM    8    Q. Good morning.

10:52AM    9    A. Good morning.

10:52AM   10    Q. Okay. I'd like to just pick up where Mr. MacKay maybe

10:52AM   11    started today, and then we'll go to some other areas, okay?

10:52AM   12    A. Okay.

10:52AM   13    Q. I think around beginning of the cross-examination today,

10:52AM   14    Mr. MacKay was asking you questions about timeframes. And

10:52AM   15    specifically timeframes, he asked you a question about after

10:52AM   16    the Wayne Anderson arrest. He asked you if you did a hard

10:52AM   17    stop to drug dealing for about six months, and then picked up

10:52AM   18    back in late 2013; do you remember that?

10:52AM   19    A. Yes.

10:52AM   20    Q. Okay. And by "hard stop," you understood him in this

10:52AM   21    courtroom to mean no drug dealing at all, right?

10:52AM   22    A. Yes.

10:52AM   23    Q. Okay. Back on March 7th, 2019, you did testify before a

10:52AM   24    federal grand jury; is that right?

10:52AM   25    A. Yes.

10:52AM  1  Q.  And you were under oath, right?

10:52AM  2  A.  Yes.

10:52AM  3  Q.  And that was about, I don't know, five or so years ago,

10:52AM  4  right?

10:53AM  5  A.  Yes.

10:53AM  6  Q.  And you were asked questions in that grand jury under

10:53AM  7  oath about timeframes; do you remember that?

10:53AM  8  A.  Yes.

10:53AM  9  Q.  And regarding the timeframes surrounding the Wayne

10:53AM  10  Anderson direct, I'm directing counsel's attention to

10:53AM  11  Exhibit 3536M at page 57.  We're going to be reviewing lines

10:53AM  12  2 through 6.

10:53AM  13      Were you asked this question, and did you give this

10:53AM  14  answer:

10:53AM  15      "And did you sell at all?  Or did you just decrease the

10:53AM  16  amounts?  What did you do?

10:53AM  17      "Answer:  I decreased the amounts for, like, six months.

10:53AM  18  I didn't do anything, then I started selling a little bit

10:53AM  19  again, and just went back to it."

10:53AM  20      Were you asked that question, and did you give that

10:53AM  21  answer in grand jury?

10:53AM  22  A.  Yes.

10:53AM  23  Q.  Okay.  So, now I'm going to circle back.

10:53AM  24      After Anderson's arrest, did you still have customers who

10:53AM  25  relied upon you?

10:53AM   1   A.   Yes.

10:53AM   2   Q.   Did you still have product?

10:53AM   3   A.   Yes.

10:53AM   4   Q.   When you talked about laying low, did that laying low

10:54AM   5   relate to receiving large interstate shipments?

10:54AM   6   A.   Yes.

10:54AM   7   Q.   So you didn't hard stop altogether, right?

10:54AM   8   A.   Correct.

10:54AM   9   Q.   Okay.  All right.  Now you were asked a whole bunch of

10:54AM  10   questions about the details of the operation and certain

10:54AM  11   specifics about what Mr. Bongiovanni, through Masecchia and

10:54AM  12   Selva, did or didn't tell you about; do you remember those

10:54AM  13   questions on cross?

10:54AM  14   A.   Yes.

10:54AM  15   Q.   Did you care much about the specifics about how the

10:54AM  16   defendant was keeping law enforcement away from you?

10:54AM  17   A.   No.

10:54AM  18   Q.   Did you care how he found out about Mario Vacanti's

10:54AM  19   investigation and that Paul Humphries was talking about him?

10:55AM  20   A.   No.

10:55AM  21   Q.   Did you care how he knew specifically that R.K. was an

10:55AM  22   informant?

10:55AM  23   A.   No.

10:55AM  24   Q.   Were you told R.K. was the defendant's informant?

10:55AM  25   A.   Yes.

10:55AM     1    Q.  Did that reassure you that R.K. was neutralized as a

10:55AM     2    threat to your organization?

10:55AM     3    A.  Yes.

10:55AM     4    Q.  Did you care how the defendant knew T.S. was an

10:55AM     5    informant?

10:55AM     6    A.  No.

10:55AM     7    Q.  Were you grateful to get that information?

10:55AM     8    A.  Yes.

10:55AM     9    Q.  Did you think that that information was worth the money

10:55AM    10    you were paying?

10:55AM    11    A.  Yes.

10:55AM    12    Q.  If the defendant was shutting down informants --

10:55AM    13    withdrawn?

10:55AM    14       Was the defendant shutting down informants, disclosing

10:55AM    15    their identity, and making sure they weren't harming your

10:55AM    16    organization the type of protection you were paying for?

10:55AM    17    A.  Yes.

10:55AM    18    Q.  When you get the information about R.K. and T.S., did it

10:55AM    19    prove to you that you were getting exactly what you paid for?

10:55AM    20    A.  Yes.

10:55AM    21    Q.  You were asked some questions about shipments.  Did any

10:56AM    22    of the truckloads, of either U-Haul or tractor-trailers

10:56AM    23    intended for you, other than that one Wayne Anderson

10:56AM    24    shipment, so any of the Jarrett Guy trucks, U-Hauls and

10:56AM    25    trucks, did any of those truckloads ever get picked off?

10:56AM  1   A.  No.

10:56AM  2   Q.  Any of the U-Haul trucks ever get picked off?

10:56AM  3   A.  No.

10:56AM  4   Q.  Did any of the drivers ever get arrested?

10:56AM  5   A.  No.

10:56AM  6   Q.  Did you ever get stopped coming or going from New York to

10:56AM  7   pick up U-Hauls?

10:56AM  8   A.  No.

10:56AM  9   Q.  Did your warehouse at 82 Sycamore and 6 Michigan ever get

10:56AM  10  raided?

10:56AM  11  A.  No.

10:56AM  12  Q.  Did your Range Rover, before the Erie County Sheriffs and

10:56AM  13  FBI arrested you, did your Range Rover or any other vehicle

10:56AM  14  you ever had during the time period of this conspiracy ever

10:56AM  15  get stopped and searched?

10:56AM  16  A.  Just at the border when I was crossing to gamble, but

10:56AM  17  besides that, no.

10:56AM  18  Q.  Okay.  Did anyone ever knock on your door at 697 Lebrun

10:56AM  19  and try to ask you questions?

10:56AM  20  A.  No.

10:57AM  21  Q.  Did the defendant ever come to your house and try to talk

10:57AM  22  to you?

10:57AM  23  A.  No.

10:57AM  24  Q.  Did Mark Falzone's house ever get raided?

10:57AM  25  A.  No.

10:57AM  1   Q.  Before Homeland Security and Special Agent Curtis Ryan,

10:57AM  2   who you're familiar with, searched Mike Masecchia's house,

10:57AM  3   prior to that, did Mike Masecchia's house ever get raided?

10:57AM  4   A.  No.

10:57AM  5   Q.  Before Special Agent Marilyn Halliday was part of the

10:57AM  6   search team Lou Selva's house, did his house ever get raided?

10:57AM  7   A.  No.

10:57AM  8   Q.  Did any of your phones ever get tapped?

10:57AM  9   A.  Not to my knowledge.

10:57AM 10   Q.  And you were never told that your phone was tapped,

10:57AM 11   right?

10:57AM 12   A.  Correct.

10:57AM 13   Q.  And that was information you were paying for, to get a

10:57AM 14   heads-up on that, right?

10:57AM 15   A.  Yes.

10:57AM 16   Q.  Was that all of the part of the protection you were

10:57AM 17   paying for from this defendant?

10:57AM 18   A.  Yes.

10:57AM 19   Q.  Are you convinced based upon all of those facts that you

10:57AM 20   were getting protection from the defendant?

10:57AM 21   A.  Yes.

10:57AM 22   Q.  Did you rely upon all of that in your day-to-day life?

10:57AM 23   A.  Yes.

10:57AM 24   Q.  Did it in fact allow you to become complacent and drive

10:58AM 25   around with pounds of marijuana in your vehicle, and over

10:58AM  1   $20,000?

10:58AM  2   A.  Yes.

10:58AM  3   Q.  By 2017, were you pretty fearless?

10:58AM  4   A.  Pretty much.

10:58AM  5   Q.  Now, we talked about Wayne Anderson's arrest in November

10:58AM  6   of 2012.  Did you provide phone numbers to Masecchia to pass

10:58AM  7   to Selva, and for Selva to give to Bongiovanni after Anderson

10:58AM  8   was arrested?

10:58AM  9   A.  Yes.

10:58AM  10  Q.  Is Wayne Anderson also friends with Anthony Gerace?

10:58AM  11  A.  Yes.

10:58AM  12  Q.  Did you want to make sure you, your phones, and your

10:58AM  13  close associates were okay?

10:58AM  14  A.  Yes.

10:58AM  15  Q.  Did you continue to pass numbers while you were dealing

10:58AM  16  with Jarrett Guy?

10:58AM  17  A.  Yes.

10:58AM  18  Q.  Was that window after Wayne Anderson was arrested a prime

10:58AM  19  time for you to pass numbers along to make sure everyone was

10:58AM  20  okay?

10:58AM  21  A.  Yes.

10:58AM  22  Q.  Was that the window when you were providing numbers for

10:58AM  23  this defendant to check on?

10:58AM  24  A.  Yes.

10:58AM  25  Q.  And as you estimated in your testimony last week, this

10:59AM    1    was in late 2012 going into 2013; is that right?

10:59AM    2    A.   Correct.

10:59AM    3    Q.   Now, back in '08, '09, when this whole thing was started,

10:59AM    4    and then leading into when your payments started in 2010 as

10:59AM    5    you've testified, did Masecchia tell you at that time the

10:59AM    6    defendant could find information out on the computer?

10:59AM    7    A.   Yes.

10:59AM    8    Q.   What did you understand that to mean?

10:59AM    9    A.   That he had just some access to some database that he

10:59AM   10    could find out information.

10:59AM   11    Q.   Was that good enough for you?

10:59AM   12    A.   Yes.

10:59AM   13    Q.   Did you care what the database was called?

10:59AM   14    A.   No.

10:59AM   15    Q.   Did you care how the defendant searched the database?

10:59AM   16    A.   No.

10:59AM   17    Q.   Did you care how the data was manipulated?

10:59AM   18    A.   No.

10:59AM   19    Q.   As time went on, it begins with you, Selva, and

10:59AM   20    Masecchia, but as time went on, did other members, close

11:00AM   21    members, friends and family, learn that the defendant was

11:00AM   22    providing information looking out for you?

11:00AM   23    A.   Yes.

11:00AM   24    Q.   Did that include your brother Tom?

11:00AM   25    A.   Yes.

11:00AM    1    Q. Did that include your best friend Mark Falzone?

11:00AM    2    A. Yes.

11:00AM    3    Q. Did that include your wife Lauren?

11:00AM    4    A. Yes.

11:00AM    5    Q. Did that include your sister-in-law Adrian?

11:00AM    6    A. Yes.

11:00AM    7    Q. When you're up here and you're testifying about

11:00AM    8    timeframes, are you estimating to the best of your ability?

11:00AM    9    A. Yes.

11:00AM    10    Q. But are they just that, estimates?

11:00AM    11    A. Yes.

11:00AM    12    Q. Have you thought a lot about this case and done your best

11:00AM    13    to think about timeframes and be accurate for this jury?

11:00AM    14    A. Yes.

11:00AM    15    Q. Regardless of whether you're off a month or two here or

11:00AM    16    there, or even three or four months, did everything you said

11:00AM    17    happen --

11:00AM    18    A. Yes.

11:00AM    19    Q. -- during the course of this conspiracy that you were

11:00AM    20    paying the defendant?

11:00AM    21    A. Yes.

11:00AM    22    Q. Once you were rolling with Jarrett Guy, from 2013 on to

11:01AM    23    the end, did you move more product than ever?

11:01AM    24    A. Yes.

11:01AM    25    Q. Did you make more money than ever?

11:01AM  1   A.  Yes.

11:01AM  2   Q.  Did Masecchia make more money than ever?

11:01AM  3   A.  Yes.

11:01AM  4   Q.  Were you still dealing with Jarrett Guy in April of 2017?

11:01AM  5   A.  Yes.

11:01AM  6   Q.  Was Masecchia making at least $240,000 or more dollars

11:01AM  7   per year with you?

11:01AM  8   A.  Yes.

11:01AM  9   Q.  How does that amount compare with any amount that he

11:01AM  10  would have stolen from you?

11:01AM  11  A.  It wasn't worth it for him.

11:01AM  12  Q.  What was his nickname for you?

11:01AM  13  A.  Greenie.

11:01AM  14  Q.  Is that because you were good at making money for the

11:01AM  15  group?

11:01AM  16  A.  Yes.

11:01AM  17  Q.  Now, you were asked questions about a guy named G.R. last

11:01AM  18  week, I think, by Mr. MacKay; do you remember that?

11:01AM  19  A.  Yes.

11:01AM  20  Q.  Now, during direct, and maybe during cross, you had

11:01AM  21  indicated that there were a number of informants' names,

11:01AM  22  maybe more than ten, passed to you, but some of them didn't

11:02AM  23  mean much to you because you weren't dealing with them; is

11:02AM  24  that right?

11:02AM  25  A.  Correct.

11:02AM  1   Q.  Now, your brother Tom and Mike Masecchia, did they have

11:02AM  2   their own relationship?

11:02AM  3   A.  Not as close as mine and Mike's.

11:02AM  4   Q.  Did they have an ability to speak to one another?

11:02AM  5   A.  Yes.

11:02AM  6   Q.  For example, when you went to Las Vegas with Masecchia,

11:02AM  7   that was you, Tom, and Mike, right?

11:02AM  8   A.  Correct.

11:02AM  9   Q.  They had each other's phone number?

11:02AM  10  A.  Yes.

11:02AM  11  Q.  Mike knew where Tom lived?

11:02AM  12  A.  Yes.

11:02AM  13  Q.  Tom knew where Mike lived?

11:02AM  14  A.  Yes.

11:02AM  15  Q.  Mike would come to your debt shop?

11:02AM  16  A.  Occasionally.

11:02AM  17  Q.  The point is, if Masecchia wanted to tell your brother

11:02AM  18  Tom something, he could meet with him directly; is that

11:02AM  19  right?

11:02AM  20  A.  Yes.

11:02AM  21          MR. MacKAY:  Objection, speculation.

11:02AM  22          MR. TRIPI:  Common sense, Judge.

11:02AM  23          THE COURT:  And you can make that common sense

11:02AM  24  argument to the jury.

11:02AM  25          MR. TRIPI:  Sounds good.

11:02AM 1       **THE COURT:** Sustained.

11:02AM 2       **BY MR. TRIPI:**

11:02AM 3  Q.  Regarding -- I'd like to switch gears to Mark Vitale's

11:03AM 4  arrest.  Was your interest following that arrest to find out

11:03AM 5  if Vitale talked about you, and if you were okay?

11:03AM 6  A.  Yes.

11:03AM 7  Q.  And what did you find out?

11:03AM 8  A.  That I was okay.

11:03AM 9  Q.  And how did you find it out?

11:03AM 10 A.  Through Mike Masecchia.

11:03AM 11 Q.  And what was your understanding of who Masecchia got the

11:03AM 12 information from?

11:03AM 13 A.  Joe Bongiovanni.

11:03AM 14 Q.  Did Masecchia even know who Vitale was before you said,

11:03AM 15 hey, a guy I sell to, Vitale, get arrested?

11:03AM 16 A.  No.

11:03AM 17 Q.  Is that normal in a drug conspiracy?  Some people at the

11:03AM 18 top sometimes don't know people at the bottom?

11:03AM 19 A.  Correct.

11:03AM 20 Q.  And Mike was at the top?

11:03AM 21 A.  Yes.

11:03AM 22 Q.  So I'd like to go through a number of people who were

11:03AM 23 involved in some capacity in your drug organization, whether

11:03AM 24 it be grows, trips to New York City, helping you unload,

11:04AM 25 distribution, whatever it may be.  Okay?

| | | |
|---|---|---|
| 11:04AM | 1 | A.  Yes. |
| 11:04AM | 2 | Q.  You were never arrested by this defendant, correct? |
| 11:04AM | 3 | A.  Correct. |
| 11:04AM | 4 | Q.  Your brother Tom was never arrested by this defendant? |
| 11:04AM | 5 | A.  Correct. |
| 11:04AM | 6 | Q.  How about Mike Masecchia? |
| 11:04AM | 7 | A.  Correct. |
| 11:04AM | 8 | Q.  No? |
| 11:04AM | 9 | A.  No.  No, he wasn't. |
| 11:04AM | 10 | Q.  Lou Selva? |
| 11:04AM | 11 | A.  No. |
| 11:04AM | 12 | Q.  Joe Tomasello? |
| 11:04AM | 13 | A.  No. |
| 11:04AM | 14 | Q.  Wayne Anderson? |
| 11:04AM | 15 | A.  No. |
| 11:04AM | 16 | Q.  Sal Volpe? |
| 11:04AM | 17 | A.  No. |
| 11:04AM | 18 | Q.  Dave Hersey? |
| 11:04AM | 19 | A.  No. |
| 11:04AM | 20 | Q.  Mike Moynihan? |
| 11:04AM | 21 | A.  No. |
| 11:04AM | 22 | Q.  Mark Falzone? |
| 11:04AM | 23 | A.  No. |
| 11:04AM | 24 | Q.  John Robinson? |
| 11:04AM | 25 | A.  No. |

| | | |
|---|---|---|
| 11:04AM | 1 | Q. Adrian Fina? |
| 11:04AM | 2 | A. No. |
| 11:04AM | 3 | Q. Lauren Fina? |
| 11:04AM | 4 | A. No. |
| 11:04AM | 5 | Q. Paul Francoforte? |
| 11:04AM | 6 | A. No. |
| 11:04AM | 7 | Q. Mike Piazza? |
| 11:04AM | 8 | A. No. |
| 11:04AM | 9 | Q. Jimmy Rivera? |
| 11:04AM | 10 | A. No. |
| 11:04AM | 11 | Q. Mark Kagan? |
| 11:04AM | 12 | A. No. |
| 11:04AM | 13 | Q. T.S.? |
| 11:04AM | 14 | A. No. |
| 11:04AM | 15 | Q. Matt LoTempio? |
| 11:04AM | 16 | A. No. |
| 11:04AM | 17 | Q. Jarrett Guy? |
| 11:04AM | 18 | A. No. |
| 11:04AM | 19 | Q. Frank Burkhart? |
| 11:04AM | 20 | A. No. |
| 11:04AM | 21 | Q. Anthony Gerace? |
| 11:04AM | 22 | A. No. |
| 11:04AM | 23 | Q. Now even though he lives in Vancouver, Canada, Special |
| 11:04AM | 24 | Agent Curtis Ryan tried to work on an investigation and get |
| 11:04AM | 25 | to the point where he could arrest Jarrett Guy; is that |

11:04AM 1 right?

11:04AM 2 A.  Correct.

11:04AM 3 Q.  As you understand it, were there some logistical issues

11:05AM 4 due to the fact that he's tucked away in Canada?

11:05AM 5 A.  Correct.

11:05AM 6 Q.  Did you help as much as you could?

11:05AM 7 A.  Yes.

11:05AM 8 Q.  That same list of people, did any of them ever come back

11:05AM 9 and say, hey, Defendant Bongiovanni -- Joe Bongiovanni at the

11:05AM 10 DEA tried to interview me?

11:05AM 11 A.  No.

11:05AM 12 Q.  Fast forward when Homeland Security in about 2020 tried

11:05AM 13 to interview Mark Falzone, did he come back and say I got

11:05AM 14 interviewed by Homeland Security?

11:06AM 15 A.  Yes.

11:06AM 16 Q.  You were told about the types of surveillance trucks that

11:06AM 17 the DEA and law enforcement use, do you remember that?

11:06AM 18 A.  Yes.

11:06AM 19 Q.  Did you ever notice any surveillance trucks setting up

11:06AM 20 outside your house on Lebrun?

11:06AM 21 A.  No.

11:06AM 22 Q.  Did you ever notice any surveillance trucks sitting

11:06AM 23 outside your warehouse at 608 Michigan and 82 Sycamore?

11:06AM 24 A.  No.

11:06AM 25 Q.  Did you ever notice any surveillance around Mark

11:06AM    1   Falzone's house?

11:06AM    2   A.   No.

11:06AM    3   Q.   Those were all places that had drug activity from 2008

11:06AM    4   all the way up before the sheriffs arrested you, correct?

11:06AM    5   A.   Correct.

11:06AM    6   Q.   Now you remember on direct, you had mentioned that most

11:06AM    7   times when you went to 82 Sycamore or 6 Michigan, not all the

11:06AM    8   time but most times, it was something drug related; is that

11:06AM    9   fair to say?

11:06AM   10   A.   Yes.

11:06AM   11   Q.   Is that accurate?

11:06AM   12   A.   Yes.

11:06AM   13   Q.   Okay.  So if you were to do the math, June 2013 is a

11:07AM   14   little more than six months after Wayne Anderson was arrested

11:07AM   15   in November of 2012, right?

11:07AM   16   A.   Yes.

11:07AM   17   Q.   And based upon the fact that most times you go there are

11:07AM   18   drug related, if you were observed in June of 2013 at

11:07AM   19   82 Sycamore, is it likely you would have been involved in

11:07AM   20   drug activity at that time?

11:07AM   21   A.   Yes.

11:07AM   22        MR. MacKAY:  Objection.  Assumes a fact not in

11:07AM   23   evidence.

11:07AM   24        MR. TRIPI:  I'm asking about his own personal --

11:07AM   25        THE COURT:  No, no, no.  Hang on.  Hang on.

11:07AM  1      I'm going to sustain the objection to the form of the

11:07AM  2  question because I -- that's a very complex question.  So he

11:07AM  3  can --

11:07AM  4          **BY MR. TRIPI:**

11:07AM  5  Q.  In June of 2013, when you went to 82 Sycamore, were you

11:07AM  6  involved in drug activity there?

11:07AM  7  A.  Yes.

11:07AM  8  Q.  In June of 2013, were you taking loads of drugs that had

11:07AM  9  been delivered there?

11:07AM 10  A.  Yes.

11:07AM 11  Q.  In the event you were observed by DEA on surveillance,

11:07AM 12  were you involved in drug activity in June of 2013 at

11:08AM 13  82 Sycamore?

11:08AM 14  A.  Yes.

11:08AM 15          **MR. MacKAY:**  Objection.

11:08AM 16          **MR. TRIPI:**  I'm asking him what he was involved in.

11:08AM 17          **THE COURT:**  Sustained.  No, no, no.  You asked him

11:08AM 18  that.  That's a different question.  Sustained.

11:08AM 19          And the jury will strike the answer to the question

11:08AM 20  that I sustained the answer to earlier.

11:08AM 21          **BY MR. TRIPI:**

11:08AM 22  Q.  Just because this is muddled, in June of 2013 at 82

11:08AM 23  Sycamore, were you involved in drug activity?

11:08AM 24  A.  Yes.

11:08AM 25  Q.  In June of 2013, were you getting shipments from Jarrett

| | | |
|---|---|---|
| 11:08AM | 1 | Guy? |
| 11:08AM | 2 | A.  Yes. |
| 11:08AM | 3 | Q.  And that's more than six months after Wayne Anderson was |
| 11:08AM | 4 | arrested, even if you laid low for a bit, right? |
| 11:08AM | 5 | A.  Yes. |
| 11:08AM | 6 | Q.  You were asked about some -- there was some discussion |
| 11:09AM | 7 | today I think about mail couriers -- we'll drop the use of |
| 11:09AM | 8 | the term "courier" -- some one or two packages that Jarrett |
| 11:09AM | 9 | Guy mailed to a hotel got -- the person who went to pick up |
| 11:09AM | 10 | the marijuana got arrested; is that right? |
| 11:09AM | 11 | A.  Correct. |
| 11:09AM | 12 | Q.  Okay.  Now, the way the drug operation was set up, did |
| 11:09AM | 13 | you know the true name of the person going to pick up the |
| 11:09AM | 14 | packages? |
| 11:09AM | 15 | A.  No. |
| 11:09AM | 16 | Q.  The way your dealings with Jarrett Guy was set up, did |
| 11:09AM | 17 | the person going to pick up the package know it was intended |
| 11:09AM | 18 | for you? |
| 11:09AM | 19 | A.  No. |
| 11:09AM | 20 | Q.  Is that an important way of how a large-scale |
| 11:09AM | 21 | distribution operation like yours operates? |
| 11:09AM | 22 | A.  Yes. |
| 11:09AM | 23 | Q.  Explain that for the jury. |
| 11:09AM | 24 | A.  Well, everything's a need-to-know basis.  You usually |
| 11:09AM | 25 | don't use your real names or anything like that, in case |

11:10AM    1    something like that happens, the person receiving the package

11:10AM    2    wouldn't be able to identify me.

11:10AM    3    Q.   So in that context, in that situation, where the people

11:10AM    4    who didn't know you and didn't know the marijuana was

11:10AM    5    intended for you got arrested, was there any need for you to

11:10AM    6    run and tell Masecchia to inform Bongiovanni about that?

11:10AM    7    A.   No.

11:10AM    8    Q.   Explain why not.

11:10AM    9    A.   Because there was an agreement between the supplier and

11:10AM   10    the people receiving it.  And I didn't know their names, and

11:10AM   11    they didn't know mine, so there was no reason for it.

11:10AM   12    Q.   So the risk was on Jarrett Guy's end, not yours?

11:10AM   13    A.   Correct.

11:10AM   14    Q.   Is that sort of consistent with your initial decision to

11:10AM   15    proffer with the government and try to point all of the

11:10AM   16    direction towards Jarrett Guy --

11:10AM   17    A.   Yes.

11:10AM   18    Q.   -- and protect yourself and the people you were directly

11:11AM   19    dealing with in your organization?

11:11AM   20    A.   Yes.

11:11AM   21    Q.   You were asked some questions today about Anthony Gerace;

11:11AM   22    do you remember those?

11:11AM   23    A.   Yes.

11:11AM   24    Q.   And during a response to one of the questions, I think

11:11AM   25    you said you were asked about Anthony Gerace proffering; do

11:11AM    1    you remember that question by Mr. MacKay?

11:11AM    2    A.   Yes.

11:11AM    3    Q.   And I think you said later, after I dealt with Anthony,

11:11AM    4    Masecchia told you that Anthony Gerace had proffered; do you

11:11AM    5    remember that?

11:11AM    6    A.   Yes.

11:11AM    7    Q.   Was that closer in time to your arrest when you learned

11:11AM    8    that?

11:11AM    9    A.   It was kind of after I started dealing with him, because

11:11AM   10    Mike was not happy about it.

11:11AM   11    Q.   So 2016 timeframe?

11:11AM   12    A.   Correct.

11:11AM   13    Q.   Now, do you remember -- do you recall that Wayne

11:11AM   14    Anderson -- do you recall being informed that Wayne Anderson

11:12AM   15    had told Masecchia not to worry because Anthony didn't talk

11:12AM   16    about anyone you guys cared about?

11:12AM   17              **MR. MacKAY:**  Objection to hearsay.

11:12AM   18              **MR. TRIPI:**  This would be 801(d)(2)(E), Your Honor.

11:12AM   19    And they opened the door.

11:12AM   20              **THE COURT:**  Yes.  Overruled.

11:12AM   21              **THE WITNESS:**  Yes.

11:12AM   22              **BY MR. TRIPI:**

11:12AM   23    Q.   Okay.  So there's a discussion between you and Masecchia.

11:12AM   24    And Masecchia tells you about Anthony proffering.

11:12AM   25         And who's the one, you or Masecchia, that talks about the

11:12AM   1   fact that Anderson passed along that Anthony didn't talk

11:12AM   2   about anyone you guys cared about?

11:12AM   3   A.   Was it -- I'm sorry, I don't understand the --

11:12AM   4   Q.   Who said, you or Masecchia, who said that Wayne Anderson

11:12AM   5   had advised that Anthony didn't talk about anyone you guys

11:12AM   6   would care about?

11:12AM   7   A.   I believe Mike did.

11:12AM   8   Q.   Mike told you that?

11:12AM   9   A.   Yes.

11:12AM  10   Q.   And Anthony and Wayne Anderson are friends?

11:12AM  11   A.   Yes.

11:12AM  12   Q.   And Anthony was involved in your organization?

11:13AM  13   A.   Yes.

11:13AM  14   Q.   Even though Mike wasn't happy about that?

11:13AM  15   A.   Correct.

11:13AM  16   Q.   It happened anyway?

11:13AM  17   A.   Yes.

11:13AM  18   Q.   Did you and Mike have a big fight about it, or just a

11:13AM  19   discussion?

11:13AM  20   A.   Just a discussion.

11:13AM  21   Q.   Is not talking about anyone you really cared about what

11:13AM  22   you were trying to do in your initial proffer when you talked

11:13AM  23   about Jarrett Guy to the exclusion of Masecchia, Bongiovanni,

11:13AM  24   Selva, Anthony Gerace, Mark Falzone, John Robinson, and

11:13AM  25   others?

11:13AM 1   A.  Yes.

11:13AM 2   Q.  When you told Vacanti about the Paul Humphries

11:14AM 3   information, did Vacanti cut Paul Humphries out?

11:14AM 4   A.  Yes.

11:14AM 5   Q.  Did that satisfy you?

11:14AM 6   A.  Yes.

11:14AM 7   Q.  Did you keep dealing with Vacanti after that?

11:14AM 8   A.  Eventually.  We kind of stopped for a little bit, but

11:14AM 9   eventually I started dealing with him again.

11:14AM 10  Q.  How long did you take a break from him for?

11:14AM 11  A.  Probably, I'd be estimating, six months.

11:14AM 12  Q.  Okay.  When you estimate six months, could it be four?

11:14AM 13  Could it be eight?

11:14AM 14  A.  Yes.

11:14AM 15  Q.  Okay.  Mr. MacKay asked you some questions about, you

11:14AM 16  know, the amount of people Masecchia knows in North Buffalo,

11:14AM 17  and it was in the context of questions about Gables and

11:14AM 18  Steven Brucato and Joe Mesi; do you remember that?

11:15AM 19  A.  Yes.

11:15AM 20  Q.  Masecchia didn't work at the DEA, correct?

11:15AM 21  A.  Correct.

11:15AM 22  Q.  The defendant did?

11:15AM 23  A.  Yes.

11:15AM 24  Q.  Random bartenders and people in North Buffalo other than

11:15AM 25  the defendant didn't work at the DEA?

11:15AM 1  A. Correct.

11:15AM 2  Q. Mr. MacKay said -- asked you a question about not dealing

11:15AM 3  with Lou Selva after the -- after the 50 pounds of marijuana

11:15AM 4  came up missing at his house in late 2016; do you remember

11:15AM 5  that?

11:15AM 6  A. Yes.

11:15AM 7  Q. I just want to define that. Does that simply mean you

11:15AM 8  stopped storing marijuana there?

11:15AM 9  A. Yes.

11:15AM 10  Q. Lou Selva was still involved in the bribery and passing

11:15AM 11  information; is that correct?

11:16AM 12  A. Correct.

11:16AM 13  Q. You were asked questions about ultimately evicting Mike

11:16AM 14  Masecchia from 125 Huntington; do you remember those

11:16AM 15  questions?

11:16AM 16  A. Yes.

11:16AM 17  Q. Was that eviction process consummated years after you

11:16AM 18  were arrested?

11:16AM 19  A. Yes.

11:16AM 20  Q. Was that after you were cooperating against Masecchia?

11:16AM 21  A. Yes.

11:16AM 22  Q. Was that after it was clear to you that you were gonna be

11:16AM 23  sitting here some day maybe talking about Mike Masecchia?

11:16AM 24  A. Yes.

11:16AM 25  Q. Did that have any bearing on any of the realtime

| | | |
|---|---|---|
| 11:16AM | 1 | decisionmaking that happened prior to your arrest? |
| 11:16AM | 2 | A.  No. |
| 11:16AM | 3 | Q.  You were asked the question by Mr. MacKay, and he said |
| 11:16AM | 4 | now you were never given a cover story that you were the |
| 11:16AM | 5 | defendant's C.I., you were never given that cover story to |
| 11:16AM | 6 | tell; do you remember that question? |
| 11:16AM | 7 | A.  Yes. |
| 11:16AM | 8 | Q.  Based upon your experience and participation in the |
| 11:17AM | 9 | conspiracy, would a story that you were Joe's C.I. work if |
| 11:17AM | 10 | the defendant was pretending to investigate you guys? |
| 11:17AM | 11 | **MR. MacKAY:**  Objection. |
| 11:17AM | 12 | **THE COURT:**  Sustained. |
| 11:17AM | 13 | **BY MR. TRIPI:** |
| 11:17AM | 14 | Q.  Do you know if Masecchia or Anthony Gerace, who had his |
| 11:17AM | 15 | own relationship with Bongiovanni as you've talked about, |
| 11:17AM | 16 | ever passed other names to Bongiovanni? |
| 11:17AM | 17 | **MR. MacKAY:**  Objection.  Calls for speculation. |
| 11:17AM | 18 | **THE COURT:**  No, the question is does he know. |
| 11:17AM | 19 | **BY MR. TRIPI:** |
| 11:17AM | 20 | Q.  Do you know one way or the other? |
| 11:17AM | 21 | A.  No, I don't. |
| 11:17AM | 22 | Q.  You said you had mutual friends with Paul Francoforte. |
| 11:17AM | 23 | Who were those mutual friends? |
| 11:17AM | 24 | A.  Frank Parisi, Angelo Natali. |
| 11:18AM | 25 | Q.  From gambling, did you know Francoforte to also be |

11:18AM 1 friends with Todaro Sr.?

11:18AM 2 A.  Yes.

11:18AM 3 Q.  And what was Todaro's Sr.'s reputation?  Remind the jury.

11:18AM 4 A.  That he was the leader of the Italian Mafia.

11:18AM 5 Q.  Okay.  In discussing your inner circle, Mr. MacKay

11:18AM 6 mentioned a name that I don't think I asked you about,

11:18AM 7 Anthony Greco?

11:18AM 8 A.  Yes.

11:18AM 9      **MR. TRIPI:**  Ms. Champoux, can we pull up Government

11:18AM 10 Exhibit 8A at page 194, please.

11:18AM 11      **BY MR. TRIPI:**

11:18AM 12 Q.  There's a name Michael Greco there.  Is that person

11:18AM 13 related to Anthony Greco?

11:18AM 14 A.  I don't know.

11:19AM 15      **MR. TRIPI:**  You can take that down.

11:19AM 16      **BY MR. TRIPI:**

11:19AM 17 Q.  Do you know Mike Greco?

11:19AM 18 A.  No.  Anthony has a brother, I'm not sure what his name

11:19AM 19 is, though.

11:19AM 20 Q.  And in your experience in the drug trade, sometimes

11:19AM 21 people register phones in other people's names?

11:19AM 22 A.  Yes.

11:19AM 23 Q.  You did that with Chris Baker, right?

11:19AM 24 A.  Yes.

11:19AM 25 Q.  You were asked questions about whether you liked David

11:19AM  1   Oddo or not, right?

11:19AM  2   A.  Yes.

11:19AM  3   Q.  Whether you liked him or not, was he Anthony Gerace's

11:19AM  4   cocaine supplier?

11:19AM  5   A.  Yes.

11:19AM  6   Q.  What year did you learn that, approximately?

11:19AM  7   A.  I want to say it was 2015.

11:19AM  8   Q.  Was it your understanding that Oddo and Gerace had a

11:19AM  9   long-standing relationship?

11:19AM  10  A.  Yes.

11:19AM  11  Q.  You were asked about Jeremie Jones; do you remember that?

11:20AM  12  A.  Yes.

11:20AM  13  Q.  And I think you said he was a drug dealer that was

11:20AM  14  friends with Mike Piazza?

11:20AM  15  A.  Yes.

11:20AM  16  Q.  Was Mike Piazza the one who introduced you to Mark Kagan?

11:20AM  17  A.  Yes.

11:20AM  18  Q.  Was Mark Kagan the one that introduced you to Jarrett

11:20AM  19  Guy?

11:20AM  20  A.  Yes.

11:20AM  21  Q.  Was Mark Kagan the one who supplied you with a portion of

11:20AM  22  marijuana for a time?

11:20AM  23  A.  Yes.

11:20AM  24  Q.  So through the nexus from Piazza to Kagan to Jarrett Guy,

11:20AM  25  Jeremie Jones had some connection to your network, correct?

| | | |
|---|---|---|
| 11:20AM | 1 | A.  Yes. |
| 11:20AM | 2 | Q.  If Jeremie Jones were on a wiretap with Mike Piazza, is |
| 11:20AM | | there a chance that you might be caught on a wiretap? |
| 11:20AM | 4 | **MR. MacKAY:**  Objection. |
| 11:20AM | 5 | **THE COURT:**  Sustained. |
| 11:20AM | 6 | **BY MR. TRIPI:** |
| 11:20AM | 7 | Q.  Did you talk to Mike Piazza on the phone? |
| 11:20AM | 8 | A.  Yes. |
| 11:20AM | 9 | Q.  Mike Piazza's friends with Jeremie Jones, yes? |
| 11:20AM | 10 | A.  Yes. |
| 11:20AM | 11 | Q.  Are you following that math? |
| 11:20AM | 12 | A.  Yes. |
| 11:20AM | 13 | Q.  Was Michael Sinatra good friends with Anthony Gerace? |
| 11:20AM | 14 | A.  Yes. |
| 11:20AM | 15 | Q.  Anthony Gerace was part of your network? |
| 11:21AM | 16 | A.  Yes. |
| 11:21AM | 17 | Q.  Is that the same math with Jeremie Jones and Mike Piazza? |
| 11:21AM | 18 | A.  Yes. |
| 11:21AM | 19 | Q.  They put a picture up of you much heavier and in much |
| 11:21AM | 20 | worse condition, right? |
| 11:21AM | 21 | A.  Yes. |
| 11:21AM | 22 | Q.  Were you still a good businessman back then? |
| 11:21AM | 23 | A.  Yes. |
| 11:21AM | 24 | Q.  Did you pay attention to details back then? |
| 11:21AM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 11:21AM | 1 | Q. Do you believe your mind's even clearer now? |
| 11:21AM | 2 | A. Yes. |
| 11:21AM | 3 | Q. Have you done your best to tell this jury everything |
| 11:21AM | 4 | truthful to the best of your ability? |
| 11:21AM | 5 | A. Yes. |
| 11:21AM | 6 | Q. Was a single person ever associated with your |
| 11:21AM | 7 | organization arrested or interviewed by this defendant? |
| 11:21AM | 8 | A. No. |
| 11:21AM | 9 | Q. Was a single location associated with your operation and |
| 11:21AM | 10 | Masecchia's operation ever searched by this defendant? |
| 11:21AM | 11 | A. No. |
| 11:21AM | 12 | Q. To your knowledge, not a single phone was tapped, |
| 11:21AM | 13 | correct? |
| 11:21AM | 14 | A. Correct. |
| 11:21AM | 15 | Q. Not a single truck pulled over? |
| 11:21AM | 16 | A. Correct. |
| 11:21AM | 17 | Q. Not a single load seized, other than Wayne Anderson's |
| 11:22AM | 18 | shipment? |
| 11:22AM | 19 | A. Correct. |
| 11:22AM | 20 | Q. And you did you understand that to be seized by the state |
| 11:22AM | 21 | police? |
| 11:22AM | 22 | A. Yes. |
| 11:22AM | 23 | Q. Not the DEA? |
| 11:22AM | 24 | A. Correct. |
| 11:22AM | 25 | Q. During the time were bribing the defendant, were multiple |

11:22AM    1    informants identified and disclosed to you?

11:22AM    2    A.   Yes.

11:22AM    3    Q.   Is that because, in fact, the defendant was protecting

11:22AM    4    you?

11:22AM    5    A.   Yes.

11:22AM    6             MR. MacKAY:   Objection.

11:22AM    7             THE COURT:   Sustained.

11:22AM    8             BY MR. TRIPI:

11:22AM    9    Q.   Is that the protection you were paying for?

11:22AM   10    A.   Yes.

11:22AM   11    Q.   And who were you paying it for?

11:22AM   12    A.   For Joe Bongiovanni.

11:22AM   13             MR. TRIPI:   I have nothing further, Judge.

11:22AM   14             THE COURT:   Mr. MacKay?

11:22AM   15

11:22AM   16             RECROSS-EXAMINATION BY MR. MacKAY:

11:22AM   17    Q.   All right.  Mr. Serio, so we talked a little bit about

11:22AM   18    the 2013 timeframe, and whether you were doing things or not

11:22AM   19    during that timeframe, correct?

11:22AM   20    A.   Correct.

11:22AM   21    Q.   And in response to my questions, I asked you whether

11:22AM   22    there was a hard stop on drug activity, and you said no --

11:22AM   23    you said there was, correct?

11:22AM   24    A.   Correct.

11:22AM   25    Q.   And then Mr. Tripi asked you some questions, and you

11:23AM    1    walked that back a little bit, correct?

11:23AM    2    A.   Correct.  I was also -- there's a lot to remember, so

11:23AM    3    sometimes I make mistakes.

11:23AM    4    Q.   There is.  And is it fair to say that when I walked you

11:23AM    5    through questions, I talked about events that have occurred

11:23AM    6    in order, correct?

11:23AM    7    A.   Correct.

11:23AM    8    Q.   I'm not raising my voice here to you, am I?

11:23AM    9    A.   No.

11:23AM   10    Q.   I don't control any recommendation that you get in

11:23AM   11    response to your sentencing, correct?

11:23AM   12    A.   Correct.

11:23AM   13    Q.   Meaning that when you go to be sentenced, one component

11:23AM   14    of the recommendation of jail time you get comes from the

11:23AM   15    government, correct?

11:23AM   16    A.   I believe so.

11:23AM   17    Q.   Although, ultimately, your sentencing judge controls what

11:23AM   18    you get, correct?

11:23AM   19    A.   Correct.

11:23AM   20    Q.   All right.  So, you were asked some questions on redirect

11:23AM   21    about Anthony Gerace and who he might know; do you remember

11:23AM   22    that?

11:23AM   23    A.   Yes.

11:23AM   24    Q.   You never made it a point to look out for Anthony

11:23AM   25    Gerace's friends through your connection to Joe Bongiovanni,

| | | |
|---|---|---|
| 11:23AM | 1 | correct? |
| 11:23AM | 2 | A.  Correct. |
| 11:23AM | 3 | Q.  Okay.  Now, you were asked some questions about |
| 11:23AM | 4 | connections to your network, for example, that Jeremie Jones |
| 11:24AM | 5 | might have, correct? |
| 11:24AM | 6 | A.  Correct. |
| 11:24AM | 7 | Q.  I mean, do you understand that to be somebody could be |
| 11:24AM | 8 | calling somebody, could be calling somebody, could be calling |
| 11:24AM | 9 | somebody, could be calling you? |
| 11:24AM | 10 | A.  Correct. |
| 11:24AM | 11 | Q.  Okay.  So, but you have no dealings with Jeremie Jones, |
| 11:24AM | 12 | correct? |
| 11:24AM | 13 | A.  Correct. |
| 11:24AM | 14 | Q.  Okay.  Now, you talked about an eviction process with |
| 11:24AM | 15 | Mike Masecchia.  That was finalized after your arrest, |
| 11:24AM | 16 | correct? |
| 11:24AM | 17 | A.  Correct. |
| 11:24AM | 18 | Q.  But that was the culmination of him not paying for years |
| 11:24AM | 19 | though, correct? |
| 11:24AM | 20 | A.  Correct. |
| 11:24AM | 21 | Q.  Okay.  Now, you were asked about the folks at Gables at |
| 11:24AM | 22 | the bar, and you learned that there was an investigation, |
| 11:24AM | 23 | correct? |
| 11:24AM | 24 | A.  Correct. |
| 11:24AM | 25 | Q.  Do you know, in fact, that several of those individuals |

11:24AM 1  were arrested in early 20 -- I'm sorry, late 2011?

11:24AM 2  A.  I don't know.

11:24AM 3  Q.  Okay.  So as you sit here today, you can't say whether

11:24AM 4  Mike Masecchia asked one of those individuals, and he was

11:24AM 5  told that they were by -- by those individuals themselves

11:24AM 6  that they were arrested?

11:24AM 7  A.  Correct.

11:24AM 8  Q.  Okay.  Do you understand my question?

11:25AM 9  A.  Yes.

11:25AM 10 Q.  Yeah.  You can't rule out that Mike Masecchia just asked

11:25AM 11 these guys, and they said he was arrested?

11:25AM 12 A.  Correct.

11:25AM 13 Q.  And then he passed that information back to you in the

11:25AM 14 guise of there's an investigation on these guys, correct?

11:25AM 15 A.  Correct.

11:25AM 16 Q.  But Mike Masecchia did not like Anthony Gerace, correct?

11:25AM 17 A.  Correct.

11:25AM 18 Q.  Do you really know as you sit here why?

11:25AM 19 A.  Not particularly.

11:25AM 20 Q.  Okay.  But at some point in time he tells you Mario --

11:25AM 21 somebody's cooperating -- I'm sorry -- there's an

11:25AM 22 investigation into Mario Vacanti, correct?

11:25AM 23 A.  Correct.

11:25AM 24 Q.  You talked a little bit about some packages sort of

11:25AM 25 getting clipped out of the process when the people going to

11:25AM 1 pick them up were arrested, correct?

11:25AM 2 A.  Correct.

11:25AM 3 Q.  Ultimately, and the way this works so the jury

11:25AM 4 understands, is packages get mailed to a location and

11:25AM 5 somebody goes to pick them up, correct?

11:25AM 6 A.  Correct.

11:25AM 7 Q.  And ultimately, they have to get back to you in some

11:25AM 8 fashion, correct?

11:25AM 9 A.  Correct.

11:25AM 10 Q.  So, you know, even if it's passed through several people,

11:26AM 11 ultimately the person picking up the drugs in Buffalo has to

11:26AM 12 pass it to somebody to get to you, correct?

11:26AM 13 A.  Correct.

11:26AM 14 Q.  Now you never provided the names of any of these folks to

11:26AM 15 Mr. Masecchia to look out for, correct?

11:26AM 16 A.  Correct.

11:26AM 17 Q.  You didn't provide the times of these shipments, correct?

11:26AM 18 A.  Correct.

11:26AM 19 Q.  You didn't provide the expected dates of any shipment,

11:26AM 20 correct?

11:26AM 21 A.  Correct.

11:26AM 22 Q.  Okay.  Now, and I think Mr. Tripi asked you some

11:26AM 23 questions about June 2013, about whether there was drug

11:26AM 24 activity at 82 Sycamore and the 608 Michigan location; do you

11:26AM 25 remember that?

11:26AM  1   A.  Yes.

11:26AM  2   Q.  At that point in time, you're just starting to get back

11:26AM  3   in with Mark Kagan, correct?

11:26AM  4   A.  Correct.

11:26AM  5   Q.  You had not taken any shipments or any sort of large

11:26AM  6   deliveries prior to that, correct?

11:26AM  7   A.  Correct.

11:26AM  8   Q.  And these shipments, though, they were not coming to the

11:26AM  9   82 Sycamore, 608 Michigan warehouse, correct?

11:26AM  10  A.  Not directly.

11:26AM  11  Q.  Okay.

11:26AM  12  A.  I pick it up, and then I would bring it there.

11:26AM  13  Q.  But you wouldn't store it there, correct?

11:27AM  14  A.  Correct.

11:27AM  15  Q.  It was never there for very long, correct?

11:27AM  16  A.  Correct.

11:27AM  17  Q.  Ultimately, the location they end up back in was the 697

11:27AM  18  Lebrun, correct?

11:27AM  19  A.  Correct.

11:27AM  20  Q.  And these were shipments through the mail at that point

11:27AM  21  in time, correct?

11:27AM  22  A.  No.

11:27AM  23  Q.  At --

11:27AM  24  A.  For 82 Sycamore?

11:27AM  25  Q.  Yeah.

11:27AM    1    A.   No, that would be if I went and picked up -- so they

11:27AM    2    would drive U-Haul, I would go pick up the U-Haul, and then I

11:27AM    3    would bring it to 82 Sycamore.

11:27AM    4    Q.   Okay.  So I want to get that timeline correct, because

11:27AM    5    what you told me on cross was when you -- when you start back

11:27AM    6    up with Mark Kagan it's through the mail, correct?

11:27AM    7    A.   I don't specifically remember that.

11:27AM    8    Q.   Okay.  Well, that's what I'm trying to get to.  When you

11:27AM    9    go back with Mark Kagan after your time off from the Wayne

11:27AM   10    Anderson arrest --

11:27AM   11    A.   Yes, well it was a variety of ways.

11:27AM   12    Q.   Okay.

11:27AM   13    A.   It wasn't just one specific way every time.

11:27AM   14    Q.   Okay.  Well, again, I want to separate it.  The

11:27AM   15    tractor-trailers come later, correct?

11:27AM   16    A.   Yes, that's correct.

11:27AM   17    Q.   And I guess what I thought we talked about on cross was

11:27AM   18    before the tractor-trailers, there were U-Haul trucks,

11:28AM   19    correct?

11:28AM   20    A.   Correct.

11:28AM   21    Q.   And I thought what we talked about was before the U-Haul

11:28AM   22    trucks, there were packages in the mail, correct?

11:28AM   23    A.   Correct.

11:28AM   24    Q.   Okay.  So that's what I'm trying to get at, is the summer

11:28AM   25    of 2013 that's still exclusively the mail, correct?

11:28AM 1    A.  I can't say for sure.

11:28AM 2    Q.  Okay.  But you really haven't started many of the U-Haul

11:28AM 3    shipments, correct?

11:28AM 4    A.  Yeah, there wouldn't have been a lot of them.

11:28AM 5    Q.  Okay.  Now you were asked about a meeting or a trip out

11:28AM 6    to Las Vegas with your brother and Mike Masecchia, correct?

11:28AM 7    A.  Correct.

11:28AM 8    Q.  That was not drug related, correct?

11:28AM 9    A.  Correct.

11:28AM 10   Q.  That was because you guys were all involved in the debt

11:28AM 11   collection industry, correct?

11:28AM 12   A.  Correct.

11:28AM 13   Q.  There's an annual sort of debt collection conference out

11:28AM 14   there, correct?

11:28AM 15   A.  Correct.

11:28AM 16   Q.  Now Mr. Tripi asked you some questions about your brother

11:28AM 17   in dealings with Michael Masecchia, do you remember those?

11:28AM 18   A.  Yes.

11:28AM 19   Q.  Fair to say they had some dealings in the debt collection

11:28AM 20   business, correct?

11:28AM 21      Well, yeah, what do you explain what, if any, connection

11:29AM 22   they had?

11:29AM 23   A.  Well, in the debt collection, Mike Masecchia knew Marty

11:29AM 24   Mazzara.  We went out to Vegas with my brother, Mike

11:29AM 25   Masecchia and myself to talk to talk to Marty Mazzara.

11:29AM  1   Q.  Is Marty, in this industry, a debt buyer?

11:29AM  2   A.  Correct.

11:29AM  3   Q.  Okay.  And what that means is that, well, just explain

11:29AM  4   what a debt buyer means for a debt collection agency and how

11:29AM  5   that all works, that relationship?

11:29AM  6   A.  Somebody buys the debt from the banks for pennies on the

11:29AM  7   dollar, and then they resell it to people that collect on it.

11:29AM  8   Q.  Okay.  So when you were dealing with the stuff out in

11:29AM  9   Vegas with Mazzara, that's all debt collection stuff,

11:29AM  10  correct?

11:29AM  11  A.  Correct.

11:29AM  12  Q.  It's not drug related, correct?

11:29AM  13  A.  Yes.

11:29AM  14  Q.  Okay.  You know, as you understood it, in all these

11:29AM  15  years, you were the only person who had a direct route to Joe

11:29AM  16  Bongiovanni through payments, correct?

11:29AM  17  A.  Correct.

11:29AM  18  Q.  You know, your brother never came to you and said, hey,

11:29AM  19  by the way, I learned information separately, correct?

11:29AM  20  A.  Correct.

11:29AM  21  Q.  Okay.  So we talked about the 2013 timeframe.  And I

11:30AM  22  think in response to Mr. Tripi's redirect questions, you said

11:30AM  23  you weren't receiving any large shipments in early 2013,

11:30AM  24  correct?

11:30AM  25  A.  Correct.

11:30AM 1  Q.  You were in a -- and this is where I compared you said

11:30AM 2  you had done a hard stop, correct?

11:30AM 3  A.  Correct.

11:30AM 4  Q.  Is it fair to say in that time period you were really

11:30AM 5  just getting rid of what you had?

11:30AM 6  A.  I would get small shipments, I believe.  I really don't

11:30AM 7  remember too much with that.

11:30AM 8  Q.  Okay.  But who would you have been getting the shipments

11:30AM 9  from in early 2013 if you hadn't hooked back up with Mark

11:30AM 10 Kagan?

11:30AM 11 A.  Well, Jacob Martinez would also get marijuana

11:30AM 12 occasionally, too.

11:30AM 13 Q.  Okay.  So these are kind of like some of your --

11:30AM 14 withdrawn.

11:30AM 15     Some of the folks you dealt with had their own sources of

11:30AM 16 supply, correct?

11:30AM 17 A.  Correct.

11:30AM 18 Q.  I think you talked about, you know, sometimes there would

11:30AM 19 be this mutual exchange, correct?

11:30AM 20 A.  Correct.

11:30AM 21 Q.  You know, maybe if somebody had it, you would get it from

11:30AM 22 them or vice versa, correct?

11:30AM 23 A.  Correct.

11:30AM 24 Q.  That's all that's really going on kind of after the Wayne

11:30AM 25 Anderson arrest, correct?

| | | |
|---|---|---|
| 11:30AM | 1 | A. Correct. |
| 11:30AM | 2 | Q. We're talking small amounts, correct? |
| 11:30AM | 3 | A. Correct. |
| 11:31AM | 4 | Q. But I think the term Mr. Tripi used was the prime, quote, |
| 11:31AM | 5 | unquote, prime time after Wayne Anderson's arrest when you |
| 11:31AM | 6 | would have given a lot of numbers, you said? |
| 11:31AM | 7 | A. Yes. |
| 11:31AM | 8 | Q. Okay. But actually, I mean, the time you ramp up your |
| 11:31AM | 9 | organization of payments, that comes about a year earlier, |
| 11:31AM | 10 | correct? |
| 11:31AM | 11 | A. Correct. |
| 11:31AM | 12 | Q. And, you know, it's your testimony, though, that |
| 11:31AM | 13 | throughout all of the years you were providing numbers, |
| 11:31AM | 14 | correct? |
| 11:31AM | 15 | A. Correct. |
| 11:31AM | 16 | Q. Okay. And T.S., he was a number you provided back in |
| 11:31AM | 17 | 2011, correct? |
| 11:31AM | 18 | A. Correct. |
| 11:31AM | 19 | Q. That's, you know, again, just to orient you, that's the |
| 11:31AM | 20 | time you're dealing with Santiago Gale, correct? |
| 11:31AM | 21 | A. Correct. |
| 11:31AM | 22 | **MR. MacKAY:** Okay. Ms. Champoux, can we show |
| 11:31AM | 23 | Government Exhibit 16. |
| 11:31AM | 24 | Can we blow up the top part. |
| | 25 | |

11:32AM    1    **BY MR. MacKAY:**

11:32AM    2    Q. Okay. Do you see T.S.'s name at the top?

11:32AM    3    A. Yes.

11:32AM    4    Q. You were told, or I think you told us that your

11:32AM    5    understanding from Mr. Masecchia was that Joe Bongiovanni

11:32AM    6    could go on a computer and just look things up, correct?

11:32AM    7    A. Correct.

11:32AM    8    **MR. MacKAY:** So will you take this down,

11:32AM    9    Ms. Champoux, can we go to page 3? Can we blow up the bottom

11:32AM   10    portion? We can just do it all. Okay. Change the color

11:32AM   11    here.

11:32AM   12    **BY MR. MacKAY:**

11:32AM   13    Q. Do you see that entry that indicates that T.S. was a C.S.

11:32AM   14    from January 30th, 2009 to September 2009?

11:32AM   15    A. Yes.

11:32AM   16    Q. Okay. When you provided T.S.'s name in 2011, you never

11:32AM   17    got that information, correct?

11:32AM   18    A. Correct.

11:32AM   19    Q. It's years later that you hear about that, correct?

11:32AM   20    A. Correct.

11:33AM   21    **MR. MacKAY:** You can take that down, Ms. Champoux.

11:33AM   22    Thank you.

11:33AM   23    I think that's all I have, Judge. Thank you.

11:33AM   24    **THE COURT:** Anything more, Mr. Tripi?

11:33AM   25    **MR. TRIPI:** Just very briefly, Judge. Just a couple.

**RE-REDIRECT EXAMINATION BY MR. TRIPI:**

11:33AM 1

11:33AM 2 Q. Following up on that T.S. information, was T.S.'s name

11:33AM 3 asked to be checked to determine whether or not he was an

11:33AM 4 informant in or about 2013?

11:33AM 5 A. Yes.

11:33AM 6 Q. And who was the one that asked Bongiovanni to check on

11:33AM 7 that?

11:33AM 8 A. Mike Masecchia.

11:33AM 9 Q. And what triggered the curiosity as to whether T.S. was

11:33AM 10 an informant in 2013?

11:33AM 11 A. Just wanted to know.

11:33AM 12 Q. Was T.S. a connection to R.K.?

11:33AM 13 A. Yes. Yes.

11:33AM 14 Q. Was R.K. an informant?

11:33AM 15 A. Yes.

11:33AM 16 Q. Regarding your brother and Masecchia, earlier you've

11:34AM 17 talked about Butchie Bifocal?

11:34AM 18 A. Yes.

11:34AM 19 Q. Did he work at your brother's debt collection agency?

11:34AM 20 A. They owned one together.

11:34AM 21 Q. Okay. And that's Masecchia's godfather?

11:34AM 22 A. Yes.

11:34AM 23 Q. And Butchie was, by reputation, in the Mafia?

11:34AM 24 A. Yes.

11:34AM 25 Q. Okay. You were asked questions again about Anthony

11:34AM 1  Gerace.  Do you know of your own personal knowledge whether

11:34AM 2  or not someone else paid the defendant to protect Gerace and

11:34AM 3  his family?

11:34AM 4  A.  No.

11:34AM 5  Q.  As to your sentence, ultimately is that up to your

11:34AM 6  sentencing judge, Judge Sinatra?

11:34AM 7  A.  Yes.

11:34AM 8  Q.  Is it your understanding he could have access to all of

11:34AM 9  your testimony --

11:34AM 10  A.  Yes.

11:35AM 11  Q.  -- and review it and determine the appropriate sentence?

11:35AM 12  A.  Correct.

11:35AM 13  Q.  It's not up to me?

11:35AM 14  A.  Correct.

11:35AM 15       **MR. TRIPI:**  Okay.  I have nothing further.

11:35AM 16       **THE COURT:**  Anything more.

11:35AM 17       **MR. MacKAY:**  No, Your Honor.

11:35AM 18       **THE COURT:**  Okay.  You can step down, sir.  Thank

11:35AM 19  you.

11:35AM 20       **THE WITNESS:**  Thank you.

11:35AM 21       (Witness excused at 11:35 a.m.)

      22       (Excerpt concluded at 11:35 a.m.)

      23          *     *     *     *     *     *     *

      24

      25

1

2                       **CERTIFICATE OF REPORTER**

3

4               In accordance with 28, U.S.C., 753(b), I

5    certify that these original notes are a true and correct

6    record of proceedings in the United States District Court for

7    the Western District of New York on September 23, 2024.

8

9

10                            s/ Ann M. Sawyer
                              Ann M. Sawyer, FCRR, RPR, CRR
11                            Official Court Reporter
                              U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2               **TRANSCRIPT INDEX**

3    **EXCERPT - EXAMINATION OF RONALD SERIO - DAY 3**

4            **SEPTEMBER 23, 2024**

5

6

7  **W I T N E S S**                 **P A G E**

8  **R O N A L D  S E R I O**        2

9    (CONT'D) CROSS-EXAMINATION BY MR. MacKAY:   2

10   REDIRECT EXAMINATION BY MR. TRIPI:   55

11   RECROSS-EXAMINATION BY MR. MacKAY:   83

12   RE-REDIRECT EXAMINATION BY MR. TRIPI:   95

13

14

15  **E X H I B I T**                **P A G E**

16  DFT Exhibit W        51

17

18

19

20

21

22

23

24

25