UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

             Plaintiff,

v.

JOSEPH BONGIOVANNI,

             Defendant.

_____

Case No. 1:19-cr-227
(LJV)

September 20, 2024

TRANSCRIPT EXCERPT - EXAMINATION OF RONALD SERIO - DAY 2
BEFORE THE HONORABLE LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**

**TRINI E. ROSS, UNITED STATES ATTORNEY**
**BY: JOSEPH M. TRIPI, ESQ.**
   **NICHOLAS T. COOPER, ESQ.**
   **CASEY L. CHALBECK, ESQ.**
Assistant United States Attorneys
Federal Centre, 138 Delaware Avenue
Buffalo, New York 14202
For the Plaintiff

**SINGER LEGAL PLLC**
**BY: ROBERT CHARLES SINGER, ESQ.**
80 East Spring Street
Williamsville, New York 14221
  And
**LAW OFFICES OF PARKER ROY MacKAY**
**BY: PARKER ROY MacKAY, ESQ.**
3110 Delaware Avenue
Kenmore, New York 14217
  And
**OSBORN, REED & BURKE, LLP**
**BY: JOHN J. GILSENAN, ESQ.**
120 Allens Creek Road
Rochester, New York 14618
For the Defendant

**PRESENT:**

**BRIAN A. BURNS,** FBI Special Agent
**MARILYN K. HALLIDAY,** HSI Special Agent
**KAREN A. CHAMPOUX,** USA Paralegal

**LAW CLERK:**

**REBECCA FABIAN IZZO, ESQ.**

<u>**COURT DEPUTY CLERK:**</u>  **COLLEEN M. DEMMA**

<u>**COURT REPORTER:**</u>  **ANN MEISSNER SAWYER, FCRR, RPR, CRR**
Robert H. Jackson Federal Courthouse
2 Niagara Square
Buffalo, New York  14202
Ann_Sawyer@nywd.uscourts.gov

\*     \*     \*     \*     \*     \*     \*

09:45AM          (Excerpt commenced at 9:45 a.m.)

09:45AM          (Witness and Jury seated at 9:45 a.m.)

09:45AM          **THE COURT:**  Good morning, everyone.

09:45AM          **ALL PARTIES:**  Good morning.

09:45AM          **THE COURT:**  The record will reflect that all our

09:45AM  jurors are present.  I did my best not to get sick, but wasn't

09:45AM  able to pull through.

09:45AM          So, okay -- and the mask is just a precaution.  I'm

09:45AM  told that because I've been symptom-free and fever-free for 48

09:45AM  hours, I don't even need to wear it, but I worry about other

09:45AM  people.  And, so, I'm wearing this just to protect others

09:46AM  because I think it's a minor inconvenience, and the -- the

09:46AM  incremental safety for others is more important than, you

09:46AM  know, my convenience in not wearing it.  I hate wearing it.  I

09:46AM  hate wearing it.  But I'd rather have people safe, and me in

09:46AM  an unpleasant situation rather than expose people to being

09:46AM  ill.

09:46AM          So, we will go until 4:30 today.  I have to --

09:46AM  someplace to go, so I have to leave at 4:30, so we're going to

09:46AM   1   leave at 4:30 today, we'll be on every day next week except

09:46AM   2   Friday, next Friday we'll be down.  And then we will likely

09:46AM   3   continue the following week because of the various illnesses

09:46AM   4   and other things that have delayed things.  And I apologize,

09:46AM   5   we are so grateful for you folks.  I know it's even worse than

09:46AM   6   you thought it was going to be, but it's beyond our control.

09:47AM   7   You know, when I woke up on Tuesday morning and took my

09:47AM   8   temperature, I said, uh-oh, this is not going to be good.  And

09:47AM   9   called my doctor and got the instructions and did -- followed

09:47AM  10   his instructions and so here we are.  So, so let's get

09:47AM  11   started.

09:47AM  12              I remind the witness he's still under oath.

09:47AM  13              And, Mr. Tripi, you can continue.

09:47AM  14         **MR. TRIPI:**  Thank you very much, Your Honor.

09:47AM  15

09:47AM  16   **R O N A L D   S E R I O**, having been previously duly called

09:47AM  17   and sworn, continued to testify as follows:

09:47AM  18

09:47AM  19              **(CONT'D) DIRECT EXAMINATION BY MR. TRIPI:**

09:47AM  20   Q.  Good morning, Mr. Serio.

09:47AM  21   A.  Good morning.

09:47AM  22   Q.  We last left off on Monday, I just kind of want to --

09:47AM  23   because it's been a few days, I want to recap where we left

09:47AM  24   off, okay?

09:47AM  25         We had talked about 2008 and 2009, you described the

09:47AM 1 operations, distribution, and money you and Masecchia and

09:47AM 2 others were earning during that timeframe. And it was during

09:47AM 3 that timeframe when Masecchia told you, in sum and substance,

09:47AM 4 that Bongiovanni would look out --

09:47AM 5 A. Correct.

09:47AM 6 Q. -- right?

09:47AM 7 Then you described a conversation that happened in your

09:48AM 8 garage I think at 125 Huntington, which was sometime after a

09:48AM 9 roundup that included some people you knew, including David

09:48AM 10 Gambino and Sam Vacanti; is that right?

09:48AM 11 A. Yes.

09:48AM 12 Q. And as you understood it, those people were charged

09:48AM 13 federally?

09:48AM 14 A. Yes.

09:48AM 15 Q. And I think you described that in your garage, you and

09:48AM 16 Masecchia discussed paying the defendant $2,000 per month for

09:48AM 17 information into investigation -- about investigations and

09:48AM 18 informants; is that right?

09:48AM 19 A. Correct.

09:48AM 20 Q. Okay. All right. And the payments were to be made

09:48AM 21 monthly, and the information was to flow through Lou Selva;

09:48AM 22 is that right?

09:48AM 23 A. Correct.

09:48AM 24 Q. Now, I want to pick it up from there and the discussion,

09:48AM 25 okay?

09:48AM 1   A.  Okay.

09:48AM 2   Q.  What did Mr. Masecchia tell you was the reason that the

09:48AM 3   primary contact and information would flow through Lou Selva?

09:48AM 4   A.  Because Lou was best friends with Joe. So, it looked

09:49AM 5   better for -- well, Lou was always around Joe. So instead of

09:49AM 6   Mike, who was a drug dealer, they didn't want me to meet him

09:49AM 7   because I was a drug dealer.

09:49AM 8   Q.  So, to sum it up, sort of less conspicuous to deal with

09:49AM 9   Lou and Joe, as opposed to you and Mike and Joe?

09:49AM 10   A.  Yes.

09:49AM 11   Q.  All right. Now, what approximate year did the payments

09:49AM 12   of $2,000 begin to the best of your ability?

09:49AM 13   A.  It was 2010.

09:49AM 14   Q.  Okay. By that point in time, was it your understanding

09:49AM 15   through Mike that Joe had been looking out since about 2008?

09:49AM 16   A.  Yes.

09:49AM 17   Q.  Approximately how long did the payment level persist at

09:49AM 18   the $2,000 per month rate?

09:49AM 19   A.  It's about an around a year, less than a year.

09:50AM 20   Q.  Okay. Eventually, after that, did it bump up?

09:50AM 21   A.  Yes.

09:50AM 22   Q.  What did it bump up to?

09:50AM 23   A.  To $4,000.

09:50AM 24   Q.  So an additional $2,000 per month?

09:50AM 25   A.  Correct.

09:50AM    1    Q.   So in those years of 2010 into 2011, did your and

09:50AM    2    Masecchia's operations continue to expand?

09:50AM    3    A.   Yes.

09:50AM    4    Q.   Describe for the jury generally, and then I'll get more

09:50AM    5    specific in my questions, but generally explain for them how

09:50AM    6    your operations with Mr. Masecchia continued to expand in

09:50AM    7    2010 and 2011.

09:50AM    8    A.   Well, I developed a new connection where I was able to

09:50AM    9    get larger quantities of marijuana.

09:50AM   10    Q.   So were you moving more volume?

09:50AM   11    A.   Correct.

09:50AM   12    Q.   Were the people selling for you also moving more product

09:50AM   13    for you?

09:50AM   14    A.   Yes.

09:50AM   15    Q.   How much more product were you able to get?

09:50AM   16    A.   About a extra hundred to 200 pounds a month.

09:50AM   17    Q.   And generally, by way of rough estimate, what's the value

09:51AM   18    of that extra hundred, let's say, 200 pounds of marijuana?

09:51AM   19    A.   Profit-wise?

09:51AM   20    Q.   Your cost, and then profit-wise.

09:51AM   21    A.   So the cost around that time was around $3,000, I

09:51AM   22    believe.  And my profit would be anywhere from 20- to 50,000

09:51AM   23    on every hundred.

09:51AM   24    Q.   So your cost is $3,000 a pound?

09:51AM   25    A.   Yes, and I'd sell it for between 32- to 35-.

09:51AM 1  Q.  So, you would make 2- to $500 per pound?

09:51AM 2  A.  Correct.

09:51AM 3  Q.  So as you scale up your operations, you and others

09:51AM 4  working with you were earning more money?

09:51AM 5  A.  Correct.

09:51AM 6  Q.  Was this in addition to the indoor grows that you had at

09:51AM 7  your warehouse, at Suppa's house, and the outdoor grows that

09:52AM 8  Masecchia had going on?

09:52AM 9  A.  Correct.  Well, in 2010, I stopped at my warehouse.

09:52AM 10  Q.  So part of 2010, you were in the warehouse, and then it

09:52AM 11  stopped?

09:52AM 12  A.  Correct.

09:52AM 13  Q.  What part of 2010 did you stop the warehouse operation?

09:52AM 14  A.  It was, I believe, in the winter.  Once the winter was

09:52AM 15  over.

09:52AM 16  Q.  Winter towards the beginning of 2010, or winter towards

09:52AM 17  the end of 2010?

09:52AM 18  A.  The beginning of 2010.

09:52AM 19  Q.  Okay.  We're in Buffalo, so we have to specify; right?

09:52AM 20  A.  Yes.

09:52AM 21  Q.  All right.  Were you also selling cocaine during those

09:52AM 22  timeframes?

09:52AM 23  A.  In 2008 I was.

09:52AM 24  Q.  After 2008, would you sell it intermittently here and

09:52AM 25  there?

| | | |
|---|---|---|
| 09:52AM | 1 | A. Starting 2013, I did. |
| 09:52AM | 2 | Q. Okay. So you took a gap of '09 through to the beginning |
| 09:52AM | 3 | of 2013, you took a break on cocaine? |
| 09:52AM | 4 | A. Correct. |
| 09:53AM | 5 | Q. What amounts of cocaine, just so we can go back, were you |
| 09:53AM | 6 | selling in 2008 on a consistent basis? |
| 09:53AM | 7 | A. Ounces. I would get maybe a quarter or a half a key. |
| 09:53AM | 8 | Q. And then break it down into ounces? |
| 09:53AM | 9 | A. Correct. |
| 09:53AM | 10 | Q. And then in 2013, how did that look in terms of your |
| 09:53AM | 11 | cocaine distribution? |
| 09:53AM | 12 | A. Because I was, I developed a -- a new connection, and I |
| 09:53AM | 13 | was trading marijuana for the cocaine. So, it wasn't super |
| 09:53AM | 14 | consistent, but I would sell ounces. Or even if my friends |
| 09:53AM | 15 | wanted, like, 3-and-a-half grams or something like that. |
| 09:53AM | 16 | Q. And that picked up in 2013? |
| 09:53AM | 17 | A. Correct. |
| 09:53AM | 18 | Q. And who was that connection? |
| 09:53AM | 19 | A. Jimmy Rivera. |
| 09:53AM | 20 | Q. By the time you and Masecchia discussed making $2,000 per |
| 09:54AM | 21 | month payments to the defendant and paying him for |
| 09:54AM | 22 | information about investigation and informants, were you and |
| 09:54AM | 23 | Masecchia both feeling more exposed as a result of your |
| 09:54AM | 24 | continuing operations, expanding your operations? |
| 09:54AM | 25 | A. Yes. |

09:54AM 1    Q.  Did you believe around that time there was more risk of

09:54AM 2    an informant infiltrating your group?

09:54AM 3    A.  Yes.

09:54AM 4    Q.  Why did you believe that?

09:54AM 5    A.  Well, as you deal with more people, you have more chances

09:54AM 6    of being exposed.

09:54AM 7    Q.  Were the $2,000 monthly payments to Defendant Bongiovanni

09:54AM 8    and the information exchanges set on -- scheduled on set days

09:54AM 9    of the month?

09:55AM 10   A.  No, it was generally in the beginning of the month.  It

09:55AM 11   wasn't a specific day.  I see Mike all the time, so --

09:55AM 12   Q.  I'm sorry, I stepped over you, continue.

09:55AM 13   A.  Oh.  Well, I used to see Mike all the time, so if it was

09:55AM 14   in the beginning of the month, whatever day it was, I would

09:55AM 15   just give it to him.

09:55AM 16   Q.  So it wasn't like every Tuesday.

09:55AM 17   A.  No.

09:55AM 18   Q.  The first of the month, or whatever?

09:55AM 19   A.  No.

09:55AM 20   Q.  Okay.  But somewhere generally near the beginning?

09:55AM 21   A.  Correct.

09:55AM 22   Q.  Now, if something arose off schedule, in other words not

09:55AM 23   in the beginning of the month, not around the time of the

09:55AM 24   payment, not around the time of the defendant's meeting with

09:55AM 25   Lou Selva, that's what I mean by off schedule, okay?

09:55AM  1  A.  Yes.

09:55AM  2  Q.  If something arose off schedule from Mr. Selva's monthly

09:55AM  3  meeting with Defendant Bongiovanni, did Masecchia indicate to

09:55AM  4  you that he could get ahold of Bongiovanni?

09:55AM  5  A.  Yes.

09:55AM  6  Q.  What did he advise you in that record?

09:55AM  7  A.  I don't understand.

09:55AM  8  Q.  How did you know that Masecchia would be able to

09:55AM  9  independently get ahold of Bongiovanni?

09:56AM  10  A.  Well, he didn't specifically say it, but sometimes he

09:56AM  11  would say that he seen Joe.  So I assumed that he had had

09:56AM  12  contact with him.

09:56AM  13  Q.  And when he would say -- sometimes when Mr. Masecchia

09:56AM  14  would say he had seen Joe, was that on a -- on a -- a time of

09:56AM  15  the month that was different from when the payments were?

09:56AM  16  A.  I'm not sure.

09:56AM  17  Q.  Okay.

09:56AM  18  A.  Well, yeah, he used to hang out at M.T. Pockets, and

09:56AM  19  sometimes they would be there together.

09:56AM  20  Q.  Okay.  Is M.T. Pockets a bar on Hertel --

09:56AM  21  A.  Correct.

09:56AM  22  Q.  -- in North Buffalo?

09:56AM  23  A.  Yes.

09:56AM  24  Q.  So, were there times when something came up unexpectedly

09:56AM  25  where you knew Masecchia was able to get the information that

09:56AM 1   you wanted directly from Bongiovanni?

09:56AM 2   A.   Yes.

09:56AM 3   Q.   Can you give this jury two examples?

09:57AM 4   A.   The one time I believe with Mario Vacanti, and -- I'm

09:57AM 5   drawing a blank.

09:57AM 6   Q.   Okay.  I'll ask some more specific questions a little bit

09:57AM 7   later, okay?

09:57AM 8   A.   Yes.

09:57AM 9   Q.   I'll get into more detail.  But was there a situation

09:57AM 10  with an individual named Mark Vitale?

09:57AM 11  A.   Yes, that's the other time.

09:57AM 12  Q.   Can you describe what happened with Mark Vitale and what

09:57AM 13  you asked Masecchia to do?

09:57AM 14  A.   Mark Vitale's house got raided, and I asked Mike to find

09:57AM 15  out if everything was okay.

09:57AM 16  Q.   And what did you mean by "find out if everything was

09:57AM 17  okay?"

09:57AM 18  A.   If Mark was cooperating against me, or said my name, or

09:57AM 19  if there was an investigation on me.

09:57AM 20  Q.   And when you told Mike to see if everything was okay,

09:57AM 21  who -- who were you directing Mike to check with?

09:57AM 22  A.   To Joe Bongiovanni.

09:58AM 23  Q.   Is that an example of a situation that popped up

09:58AM 24  unexpectedly?

09:58AM 25  A.   Yes.

09:58AM  1   Q.  Was there another situation like similar to that when you

09:58AM  2   learned that Wayne Anderson had been arrested?

09:58AM  3   A.  Correct.

09:58AM  4   Q.  Is that a situation that arose unexpectedly?

09:58AM  5   A.  Yes.

09:58AM  6   Q.  I'll get into that in more detail, but is that -- is that

09:58AM  7   a situation where you asked Mike to check on the situation?

09:58AM  8   A.  Yes.

09:58AM  9   Q.  And who were you instructing or asking Mike to check

09:58AM  10  with?

09:58AM  11  A.  Joe Bongiovanni.

09:58AM  12  Q.  And what were you informed after you asked Mike to check

09:58AM  13  into that?

09:58AM  14  A.  That everything was okay.

09:58AM  15  Q.  Okay.  We'll get into those in more specifics in a little

09:58AM  16  bit.

09:58AM  17  A.  Okay.

09:58AM  18  Q.  When did you -- approximately when did you buy your house

09:58AM  19  on Lebrun?

09:58AM  20  A.  It was 2011.

09:58AM  21  Q.  And is that when you began renovating it in the manner

09:59AM  22  that you described Monday?

09:59AM  23  A.  Correct.

09:59AM  24  Q.  Now, by approximately 2011, were you -- were you having

09:59AM  25  your marijuana shipped by trucking across country to you from

09:59AM    1    Santiago Gale?

09:59AM    2    A.   Yes.

09:59AM    3    Q.   Now I just want to take a step back.  In March, in

09:59AM    4    another proceeding in this matter of this year, did you

09:59AM    5    mistakenly estimate during some testimony that you dealt with

09:59AM    6    Santiago Gale in 2012?

09:59AM    7    A.   Yes.

09:59AM    8    Q.   Subsequent to that testimony, did you -- did you review

09:59AM    9    documents indicating Mr. Gale was arrested in 2012 and was in

09:59AM   10    custody?

09:59AM   11    A.   Correct.

09:59AM   12    Q.   Did that refresh your recollection as to the timeline?

09:59AM   13    A.   It did.  I got confused because at the time I wasn't

09:59AM   14    aware that he got arrested.  So, I was still dealing with

09:59AM   15    T.S.  So I didn't know if T.S. had a different connection or

09:59AM   16    they had an agreement.

09:59AM   17       I only met Santiago once, so everything was through Tom.

10:00AM   18    So if they didn't want to stop, they obviously wouldn't tell

10:00AM   19    me that he got arrested.

10:00AM   20    Q.   Okay.  So, we'll break that down a little bit.

10:00AM   21       But, by 2011, you're dealing with Santiago Gale?

10:00AM   22    A.   Yes.

10:00AM   23    Q.   Can you describe how you were introduced to Santiago

10:00AM   24    Gale?

10:00AM   25    A.   Through T.S.

10:00AM  1   Q.  And who is T.S.?

10:00AM  2   A.  He's a friend of Frank Burkhart that -- I knew Frank

10:00AM  3   Burkhart, and Frank Burkhart introduced me to T.S.

10:00AM  4   Q.  And is Frank Burkhart someone you dealt marijuana with?

10:00AM  5   A.  Yes.

10:00AM  6   Q.  Is Frank Burkhart someone who was also friends with R.K.?

10:00AM  7   B.K.?

10:00AM  8   A.  Correct.

10:00AM  9   Q.  Now, when you -- I think you touched a little bit on

10:00AM  10  Monday, but when you negotiated with Santiago Gale, can you

10:00AM  11  describe in a little more detail for the jury how you did

10:00AM  12  that?

10:00AM  13  A.  I met him in New York City, and I just tried to convince

10:00AM  14  him -- because he also had shipments going to Boston, and I

10:01AM  15  wanted to take all the shipments.  So I said it would be

10:01AM  16  safer to give it all to me because I had a DEA agent on the

10:01AM  17  payroll.

10:01AM  18  Q.  Was T.S. with you for that meeting?

10:01AM  19  A.  Yes.

10:01AM  20  Q.  Was Frank Burkhart?

10:01AM  21  A.  Yes.

10:01AM  22  Q.  And what was your purpose for mentioning that you had a

10:01AM  23  DEA agent on payroll in that negotiation?

10:01AM  24  A.  To make him feel more comfortable that we had an insider,

10:01AM  25  in case there was any investigations or anything.

10:01AM    1    Q.  During your discussion with Santiago Gale, did he

10:01AM    2    indicate to you where the marijuana would be coming from?

10:01AM    3    A.  Out of Utah.  Well, it comes from California, then they

10:01AM    4    would have to ship it to Vegas or Utah in small amounts, and

10:01AM    5    then take it from there.

10:01AM    6    Q.  In total, what was the amount of the marijuana shipments

10:01AM    7    that you were negotiating?

10:01AM    8    A.  Around 200 pounds.

10:01AM    9    Q.  Was that an increase from the monthly amount you had been

10:01AM   10    getting from Mark Kagan?

10:01AM   11    A.  Yes.

10:02AM   12    Q.  Remind the jury, what was the amount you had been getting

10:02AM   13    monthly from Mark Kagan?

10:02AM   14    A.  50 pounds a month.

10:02AM   15    Q.  So basically you're up -- you're upping that supply

10:02AM   16    stream by 400 percent?

10:02AM   17    A.  Correct.

10:02AM   18    Q.  Or four times the amount?

10:02AM   19    A.  Yes.

10:02AM   20    Q.  Okay.  You touched on it a moment ago.  What was Santiago

10:02AM   21    Gale's delivery method going to be for you to receive the

10:02AM   22    marijuana?

10:02AM   23    A.  Through to the tractor-trailer.

10:02AM   24    Q.  A moment ago you said they would get it to Utah or

10:02AM   25    Las Vegas and then put it into trucks.  Can you explain that?

10:02AM 1 A.  Well, because coming out of California, they look for

10:02AM 2 large trucks, so they take it in smaller amounts so that it's

10:02AM 3 less conspicuous.  And then they bring it to a warehouse and

10:02AM 4 they store it there.  Then they put it on the big trucks.

10:02AM 5 Q.  So from California, a number of little trucks travel to

10:03AM 6 Utah or Las Vegas?

10:03AM 7 A.  Correct.

10:03AM 8 Q.  And the loads are broken up smaller?

10:03AM 9 A.  From California to Vegas or Utah.  And then from there,

10:03AM 10 you put them in a tractor-trailer.

10:03AM 11 Q.  So then it gets consolidated on to a large truck?

10:03AM 12 A.  Correct.

10:03AM 13 Q.  Okay.  In terms of that delivery method, did it create a

10:03AM 14 larger delivery window for you?

10:03AM 15    Do you understand my question?

10:03AM 16 A.  Yes.  Because I didn't have direct contact with Santiago

10:03AM 17 Gale, so in -- but T.S., it wasn't specific either, it was

10:03AM 18 he'll be within a three-day timeframe, so --

10:03AM 19 Q.  You just had to be ready for a call within a three-day

10:03AM 20 window?

10:03AM 21 A.  Correct.

10:03AM 22 Q.  And contrast that with Mark Kagan.  Mark Kagan was

10:03AM 23 delivering it himself?

10:03AM 24 A.  Yes, he would call me when he was leaving, and then he'd

10:03AM 25 be there within seven hours.

10:03AM    1    Q.  So, you knew -- did you basically know if Kagan wasn't

10:03AM    2    there within seven hours, something was wrong?

10:04AM    3    A.  Yes.

10:04AM    4    Q.  Okay.  Did you know the different drivers that were going

10:04AM    5    to be coming to you from Utah or Las Vegas --

10:04AM    6    A.  No.

10:04AM    7    Q.  -- for Santiago Gale?

10:04AM    8    A.  No.

10:04AM    9    Q.  How would you remain in contact with either Gale or --

10:04AM   10    who was your point of contact when the deliveries were

10:04AM   11    coming?

10:04AM   12    A.  It was T.S.

10:04AM   13    Q.  Okay.

10:04AM   14    A.  I only met Gale once and spoke to him once.

10:04AM   15    Q.  Okay.  So, T.S. was handling the logistics of the

10:04AM   16    delivery to you?

10:04AM   17    A.  Correct.

10:04AM   18    Q.  Were you and he using burner phones?

10:04AM   19    A.  Yes.

10:04AM   20    Q.  By the time you're dealing with Gale, are you -- are you

10:04AM   21    done dealing with Mark Kagan?

10:04AM   22    A.  Yes.

10:04AM   23    Q.  Had he lost his ability to supply you?

10:04AM   24    A.  Correct.

10:04AM   25    Q.  Do you know why?

10:04AM    1    A.  He didn't really explain.

10:04AM    2    Q.  Okay.  So with large delivery windows and not personally

10:05AM    3    knowing the person driving it to you, did that create more

10:05AM    4    uncertainty for you?

10:05AM    5    A.  Yes.

10:05AM    6    Q.  Did that create an interest for you in obtaining more

10:05AM    7    information and more vigilance from this defendant?

10:05AM    8    A.  Yes.

10:05AM    9    Q.  I'm going to circle back to that in just a moment.  But

10:05AM   10    when you were coordinating the receipt of the 200-pound

10:05AM   11    shipments of marijuana with T.S., where would you receive

10:05AM   12    delivery of the trucks?

10:05AM   13    A.  He would bring it -- he would go meet whoever, and then

10:05AM   14    he'd bring it to me at my house.

10:05AM   15    Q.  So T.S. unloaded it from the larger truck to a smaller

10:05AM   16    vehicle?

10:05AM   17    A.  Correct.

10:05AM   18    Q.  And when you said T.S. would bring it to your house, what

10:05AM   19    house is that?

10:05AM   20    A.  It would be on 697 Lebrun.

10:05AM   21    Q.  Okay.  And when T.S. would deliver the 200 pounds, would

10:06AM   22    you provide payment at that point, or were you being fronted

10:06AM   23    the marijuana?

10:06AM   24    A.  Sometimes I'd give some cash, but I was also being

10:06AM   25    fronted.

10:06AM 1 Q. So you'd provide partial payment?

10:06AM 2 A. Yes.

10:06AM 3 Q. In total, how many 200-pound shipments did you receive

10:06AM 4 from Santiago Gale through T.S.?

10:06AM 5 A. I'd say at least five, if not ten.

10:06AM 6 Q. And you're partnered up with Mike Masecchia at this

10:06AM 7 point?

10:06AM 8 A. Yes.

10:06AM 9 Q. Fair to say he's involved in all aspects of your

10:06AM 10 operation?

10:06AM 11 A. Yes.

10:06AM 12 Q. In 2011, did you also travel to Las Vegas with

10:06AM 13 Mr. Masecchia?

10:06AM 14 A. Yes.

10:06AM 15 Q. Did your brother Tom go with you?

10:06AM 16 A. Yes.

10:06AM 17 Q. I'd like to take a step back from the Santiago Gale

10:07AM 18 distribution for a moment and ask a few more questions about

10:07AM 19 Mr. Masecchia and his connections, okay?

10:07AM 20 A. Okay.

10:07AM 21 Q. Over -- over time, through Masecchia, have you had

10:07AM 22 sit-downs with several individuals that he introduced you to

10:07AM 23 that you understood to be connected to Italian Organized

10:07AM 24 Crime?

10:07AM 25 A. Yes.

10:07AM 1 Q. And were those sit-downs arranged by Mr. Masecchia to see

10:07AM 2 if you could acquire even more sources of supply for

10:07AM 3 marijuana?

10:07AM 4 A. Yes.

10:07AM 5 Q. In one of the meetings, did you sit down with Masecchia

10:07AM 6 and Butchie Bifocal?

10:07AM 7 A. Yes.

10:07AM 8 Q. And who did you discuss getting marijuana from at that

10:07AM 9 time?

10:07AM 10 A. From Percy Gamble, I'm not sure -- is it Percy Gamble? I

10:07AM 11 know his name is Percy, in Canada.

10:07AM 12 Q. As you understood it, was Percy connected to Italian

10:08AM 13 Organized Crime?

10:08AM 14 A. Yes.

10:08AM 15 Q. What was the general timeframe of that meeting and

10:08AM 16 discussion?

10:08AM 17 A. It was 2014, I believe.

10:08AM 18 Q. Okay. So we fast forwarded a little bit?

10:08AM 19 A. Yes.

10:08AM 20 Q. Ultimately, did you determine Percy's prices were too

10:08AM 21 high?

10:08AM 22 A. Yes.

10:08AM 23 Q. And did you feel like you had a better connection at that

10:08AM 24 time?

10:08AM 25 A. Yes.

10:08AM  1   Q. Why did you feel like his prices were too high and you

10:08AM  2   didn't want to go with him?

10:08AM  3   A. Well, because I was -- it was the same price in Canada,

10:08AM  4   and I was responsible for getting it over, as the price that

10:08AM  5   I get it delivered to me in Buffalo.

10:08AM  6   Q. So you were responsible for transport over an

10:08AM  7   international border?

10:08AM  8   A. Correct.

10:08AM  9   Q. At some point, did you also have a sit-down with a guy

10:08AM  10  named John Catanzaro?

10:08AM  11  A. Yes.

10:08AM  12  Q. Approximately when was that?

10:08AM  13  A. That was somewhere in the early 2000s.

10:08AM  14  Q. So, much earlier in your career?

10:08AM  15  A. Yes.

10:08AM  16  Q. What was your understanding of the relationship,

10:09AM  17  familial, or otherwise, between Butchie Bifulco and Mike

10:09AM  18  Masecchia?

10:09AM  19  A. It was Mike's godfather.

10:09AM  20  Q. Was it your understanding that Butchie was a member of

10:09AM  21  Italian Organized Crime in Buffalo?

10:09AM  22  A. Yes.

10:09AM  23  Q. That was his reputation?

10:09AM  24  A. Yes.

10:09AM  25  Q. What did Mike tell you, if anything, about his father's

10:09AM 1 connection to Italian Organized Crime in Buffalo?

10:09AM 2 A. That his father was connected to organized crime.

10:09AM 3 Q. At some point during your partnership with Masecchia out

10:09AM 4 of curiosity, did you ask him questions about what it took to

10:09AM 5 become a made person?

10:09AM 6 A. Yes.

10:09AM 7 Q. What was Masecchia's response to you?

10:10AM 8 A. He told me to just shut up and keep making money.

10:10AM 9 Q. Working with Masecchia, was your ultimate goal to control

10:10AM 10 the entire marijuana market in Buffalo?

10:10AM 11 A. Yes.

10:10AM 12 Q. Getting back to Santiago Gale.

10:10AM 13    Did you discuss this new delivery method, the large

10:10AM 14 trucks, did you discuss that delivery method with Masecchia?

10:10AM 15 A. Yes.

10:10AM 16 Q. What did Masecchia say about that?

10:10AM 17 A. Well, I just asked him to ask Joe to be more vigilant

10:10AM 18 about shipments coming in from Utah or Las Vegas.

10:10AM 19 Q. And when you asked Masecchia to make sure Joe was more

10:10AM 20 vigilant about trucks coming in from Utah or Las Vegas, what

10:10AM 21 were you asking for?

10:10AM 22 A. Just to see if that -- if he hears anything about

10:11AM 23 shipments coming in that are about to be busted.

10:11AM 24 Q. What did Mike say when you made that request?

10:11AM 25 A. He said he'd talk to Joe.

10:11AM    1    Q.  Meaning Joe Bongiovanni?

10:11AM    2    A.  Yes.

10:11AM    3    Q.  Would you say you and -- both you and Masecchia were

10:11AM    4    highly motivated to make sure those trucks made it in safely?

10:11AM    5    A.  Yes.

10:11AM    6    Q.  After Masecchia told you he would talk to Joe, eventually

10:11AM    7    did he come back and tell you what Defendant Bongiovanni

10:11AM    8    said?

10:11AM    9    A.  Yes.

10:11AM   10    Q.  What did Masecchia explain to you?

10:11AM   11    A.  He said that he would do it, but I'd have to pay another

10:11AM   12    $2,000 a month.

10:11AM   13    Q.  Based on your discussions with Masecchia, was Lou Selva

10:11AM   14    also part of that negotiation?

10:12AM   15    A.  Yes.

10:12AM   16    Q.  So did you want information about investigations into

10:12AM   17    cross-country trucking?

10:12AM   18    A.  Correct.

10:12AM   19    Q.  Did you want information about informants?

10:12AM   20    A.  Correct.

10:12AM   21    Q.  Did you want assurances there were no wiretaps on your

10:12AM   22    and Masecchia's main phones?

10:12AM   23    A.  Correct.

10:12AM   24    Q.  Did you want assurance that none of your main associates

10:12AM   25    had their phones tapped?

10:12AM  1    A.  Correct.

10:12AM  2    Q.  Did you want -- did you expect and did you want a

10:12AM  3    heads-up if anyone was looking at your residence at 697

10:12AM  4    Lebrun?

10:12AM  5    A.  Correct.

10:12AM  6    Q.  Now, as you're working with Santiago Gale through T.S.,

10:12AM  7    eventually did you provide access to T.S. to your warehouse

10:13AM  8    at 82 Sycamore?

10:13AM  9    A.  Yes.

10:13AM  10   Q.  What was the reason you provided access to T.S. to your

10:13AM  11   warehouse at 82 Sycamore?

10:13AM  12   A.  It was to store his motorcycles.  To store his

10:13AM  13   motorcycle.

10:13AM  14   Q.  He rides motorcycles?

10:13AM  15   A.  Yes.

10:13AM  16   Q.  He asked you if he can keep his motorcycle there?

10:13AM  17   A.  Correct.

10:13AM  18   Q.  I think it faded out.  Can you just repeat it again?

10:13AM  19   A.  Correct.

10:13AM  20   Q.  Sometimes the mic's not working.

10:13AM  21       At some point in or around 2011, did you -- did you find

10:13AM  22   out that T.S. was actually storing firearms and a decent

10:13AM  23   amount of marijuana at your warehouse?

10:13AM  24   A.  Yes.

10:13AM  25   Q.  How did you find that out?

10:13AM   1   A. My friend Rob Rine told me.

10:13AM   2   Q. Who's Rob Rine? I don't know if we've heard that name

10:14AM   3   yet.

10:14AM   4   A. A friend of mine that I used to hang out with.

10:14AM   5   Q. Is he someone who knew T.S.?

10:14AM   6   A. Yes.

10:14AM   7   Q. After Rob Rine told you T.S. was storing just more than

10:14AM   8   his motorcycle at your warehouse, what did you do?

10:14AM   9   A. I robbed him.

10:14AM   10   Q. Did you get upset?

10:14AM   11   A. Yes, I got real upset.

10:14AM   12   Q. Were you -- why were you upset T.S. was storing guns and

10:14AM   13   marijuana at your warehouse?

10:14AM   14   A. Because he didn't --

10:14AM   15       I don't think the microphone is on.

10:14AM   16   Q. Yeah. Can you just try to speak up? Do your best.

10:14AM   17   A. Okay. Well, because he didn't tell me that he was

10:14AM   18   storing it there, so it made me angry. And I also stored

10:14AM   19   tools there, and my father and some of my employees would go

10:14AM   20   there for my real estate.

10:14AM   21   Q. So, you had actual real estate projects you were working

10:14AM   22   on?

10:15AM   23   A. Yes.

10:15AM   24   Q. Your father is the one who taught you carpentry?

10:15AM   25   A. Correct.

10:15AM    1    Q. So when you learned that he had marijuana and guns in

10:15AM    2    there, you weren't happy with that at that time?

10:15AM    3    A. I was not.

10:15AM    4    Q. So, did you -- did you and Rob Rine come up with a ruse

10:15AM    5    to take that marijuana and those guns?

10:15AM    6    A. Yes.

10:15AM    7    Q. What was the ruse you came up with?

10:15AM    8    A. Rob Rine knew a Tonawanda police detective, and he

10:15AM    9    made -- and the detective made a fake warrant to make it look

10:15AM   10    like the warehouse got raided.

10:15AM   11    Q. Did Rine ever tell you who this Town of Tonawanda

10:15AM   12    detective was?

10:15AM   13    A. No.

10:15AM   14    Q. Did Rine show you, like, what looked like a legitimate

10:15AM   15    search warrant?

10:15AM   16    A. Yes.

10:15AM   17    Q. So how did you guys use this fake search warrant to take

10:15AM   18    that marijuana and those guns?

10:15AM   19    A. Well, Rob was at my house, and he called T.S. over and he

10:15AM   20    showed him the warrant. And he kept Tom at my house while he

10:16AM   21    was there, and I broke in the safe.

10:16AM   22    Q. And so how much marijuana did you take, remove?

10:16AM   23    A. It was 29 pounds and a MAC-10 gun.

10:16AM   24    Q. As you understood it, was that marijuana that had come

10:16AM   25    from Santiago Gale?

10:16AM 1  A.  Yes.

10:16AM 2  Q.  Ultimately, what did you do with that MAC-10 gun?

10:16AM 3  A.  Gave it to Mike Masecchia.

10:16AM 4  Q.  What did you do with the 29 pounds of marijuana?

10:16AM 5  A.  I sold it.

10:16AM 6       THE COURT:  Colleen, can you call somebody to get

10:16AM 7  this fixed?

10:16AM 8       THE CLERK:  Yeah, I texted them, Judge.  They can do

10:16AM 9  it the background.

10:16AM 10       BY MR. TRIPI:

10:16AM 11  Q.  What did -- sorry?

10:16AM 12       THE COURT:  I apologize for interrupting.  I want to

10:16AM 13  get this thing fixed, though.

10:16AM 14       MR. TRIPI:  No, it's okay, Judge.  Yeah.

10:16AM 15       THE COURT:  Maddening.

10:16AM 16       MR. TRIPI:  Work with us, do your best to keep your

10:16AM 17  voice up until we get that remedied, okay?

10:16AM 18       THE WITNESS:  Okay.  No problem.

10:16AM 19       MR. TRIPI:  Sometimes you might yell at us when it

10:16AM 20  gets plugged back in, but we'll do our best.

10:16AM 21       BY MR. TRIPI:

10:16AM 22  Q.  Did -- did you and Rob Rine sort of gloss it over with

10:17AM 23  Santiago Gale -- withdrawn -- with T.S.?

10:17AM 24  A.  Gloss over the --

10:17AM 25  Q.  Did T.S. know that you actually took the marijuana right

10:17AM 1  away?

10:17AM 2  A.  At the time, no.

10:17AM 3  Q.  Okay.  Did he have to answer for that marijuana with his

10:17AM 4  boss, Santiago Gale, if you know?

10:17AM 5  A.  I believe so.  Well, he owed him the money.

10:17AM 6  Q.  Okay.  Eventually, did you and T.S. continue to work

10:17AM 7  together after that?

10:17AM 8  A.  A little bit.  A few times.

10:17AM 9  Q.  Eventually, did you pay -- withdrawn.

10:17AM 10      **MR. MacKAY:**  I'm sorry, I just didn't hear the

10:17AM 11  answer.

10:17AM 12      **MR. TRIPI:**  He said a little bit.

10:17AM 13      **THE CLERK:**  Judge, I think I can hook up a wireless

10:17AM 14  mic and I'll shut his mic off.

10:17AM 15      **MR. TRIPI:**  Hold that thought, and we'll pick it up.

10:17AM 16      **THE CLERK:**  I'm sorry.

10:17AM 17      **MR. TRIPI:**  No, you're good.

10:18AM 18      **BY MR. TRIPI:**

10:18AM 19  Q.  Eventually did T.S., over time, sort of put two and two

10:18AM 20  together and figure that you took the weed?

10:18AM 21  A.  Yes.

10:18AM 22  Q.  Did you make it up to him?  Did you pay him back some

10:18AM 23  money?

10:18AM 24  A.  I did pay him back some money.

10:18AM 25  Q.  How much money did you pay back T.S.?

10:18AM   1   A.  Around 30,000.

10:18AM   2         **MR. MacKAY:**  I'm sorry, what was the number?

10:18AM   3         **THE WITNESS:**  30,000.

10:18AM   4         **BY MR. TRIPI:**

10:18AM   5   Q.  After that event and Santiago Gale was no longer in the

10:18AM   6   picture as a supplier, did T.S. sort of travel back and forth

10:18AM   7   from Utah back into New York?

10:18AM   8   A.  Yes.

10:18AM   9   Q.  Did you continue to work with him getting marijuana

10:18AM  10   through him at times?

10:19AM  11   A.  Yes.

10:19AM  12   Q.  As time went on, did he also travel to you, with you and

10:19AM  13   Masecchia to New York City?

10:19AM  14   A.  Yes.

10:19AM  15   Q.  Was that to obtain marijuana?

10:19AM  16   A.  Yes.

10:19AM  17   Q.  Was that after you had made a connection with Jarrett

10:19AM  18   Guy?

10:19AM  19   A.  Yes.

10:19AM  20   Q.  Okay.  I'll get more into the Jarrett Guy distribution in

10:19AM  21   a moment.  But at this juncture, who introduced you to

10:19AM  22   Jarrett Guy?

10:19AM  23   A.  Mark Kagan.

10:19AM  24   Q.  That was the same Mark Kagan who used to supply you,

10:19AM  25   himself directly, correct?

10:19AM 1   A.  Yes.

10:19AM 2   Q.  Where did you first meet Jarrett Guy?

10:19AM 3   A.  In New York City.

10:19AM 4         **THE WITNESS:**  This mic isn't working now.

10:19AM 5         **MR. SINGER:**  I'm having difficulty hearing anything,

10:19AM 6   Judge, sorry.

10:19AM 7         **THE COURT:**  You really have to keep your voice up.  I

10:19AM 8   think both -- it's not the microphone, it's the whole sound

10:20AM 9   system, it shuts down.

10:20AM 10         **MR. TRIPI:**  Got you.

10:20AM 11         **BY MR. TRIPI:**

10:20AM 12   Q.  Mark Kagan's in New York City, did you say?

10:20AM 13   A.  Yes.

10:20AM 14         **MR. TRIPI:**  Mine seems to be working, so I'm just --

10:20AM 15         **THE WITNESS:**  Yeah.

10:20AM 16         **BY MR. TRIPI:**

10:20AM 17   Q.  And approximately when was that meeting?

10:20AM 18   A.  That was late 2012, I believe.

10:20AM 19   Q.  Okay.  Now, as time's going on, you're moving on from

10:20AM 20   Santiago Gale.  Late 2012, you deal with Jarrett Guy.

10:20AM 21      In November of 2012, did you arrange a source of supply

10:20AM 22   that was coming in through Frank Burkhart?

10:20AM 23   A.  Yes.

10:20AM 24   Q.  And who was going to be receiving delivery of that

10:20AM 25   marijuana intended to you?

10:20AM  1  A.  Wayne Anderson.

10:20AM  2  Q.  Okay.  I'm going to get to that next.

10:20AM  3     But by this point in time, by 2012, you've been paying

10:21AM  4  the defendant for several years now, right?

10:21AM  5  A.  Yes.

10:21AM  6  Q.  And I think you said by 2011 or so, it had bumped up to

10:21AM  7  about $4,000 a month?

10:21AM  8  A.  Yes.

10:21AM  9  Q.  Over time, did you provide names of associates of yours

10:21AM  10  that were distributing controlled substances, marijuana, to

10:21AM  11  Mike Masecchia, to pass along to Lou Selva and ultimately to

10:21AM  12  the defendant?

10:21AM  13  A.  Yes.

10:21AM  14  Q.  How would you provide the names and phone numbers of your

10:21AM  15  associates that you wanted their phones checked out?

10:21AM  16  A.  I'd give them to Mike Masecchia.

10:21AM  17  Q.  Did you write it on a list?

10:21AM  18  A.  Yes.

10:21AM  19  Q.  Did you give that list to Masecchia?

10:21AM  20  A.  Yes.

10:21AM  21  Q.  Was it your understanding Masecchia was going to pass

10:21AM  22  that list to Selva?

10:21AM  23  A.  Yes.

10:21AM  24  Q.  Ultimately for the defendant to check it out?

10:21AM  25  A.  Yes.

10:21AM 1  Q.  Was John Robinson someone's phone number you provided?

10:21AM 2  A.  Yes.

10:21AM 3  Q.  Was Chris Baker someone's phone number you provided?

10:22AM 4  A.  Yes.

10:22AM 5  Q.  Was Mike Buttitta someone's phone number you provided?

10:22AM 6  A.  Yes.

10:22AM 7  Q.  Was Mark Vitale someone's phone number you provided?

10:22AM 8  A.  Yes.

10:22AM 9  Q.  Was Mark Falzone someone's phone number you provided?

10:22AM 10  A.  Yes.

10:22AM 11  Q.  Was Mario Vacanti?

10:22AM 12  A.  Yes.

10:22AM 13  Q.  Was Jay Campbell?

10:22AM 14  A.  Yes.

10:22AM 15  Q.  I haven't asked you about Jay Campbell yet.  Who was

10:22AM 16  that?

10:22AM 17  A.  That was just another person I dealt with.

10:22AM 18  Q.  And what type of drugs did you deal with Jay Campbell?

10:22AM 19  A.  Just marijuana.

10:22AM 20  Q.  Okay.  Was Mike Moynihan someone's name and phone number

10:22AM 21  you provided?

10:22AM 22  A.  Yes.

10:22AM 23  Q.  Now, eventually did Moynihan start living at 697 Lebrun

10:22AM 24  with you?

10:22AM 25  A.  Yes.

10:22AM    1    Q.  What year was that?

10:22AM    2    A.  That was, I believe, 2015.

10:22AM    3    Q.  Okay.  But he had been a close friend of yours basically

10:22AM    4    your whole adult life?

10:22AM    5    A.  Yes.

10:22AM    6    Q.  Was Adrian Fina someone's name and phone number you

10:22AM    7    provided?

10:22AM    8    A.  Yes.

10:22AM    9    Q.  Did you provide your main cell phone number?

10:22AM   10    A.  Yes.

10:22AM   11    Q.  Did Masecchia provide his main cell phone number?

10:22AM   12    A.  I would assume.

10:22AM   13    Q.  Did Masecchia provide your brother Tom's main cell phone

10:23AM   14    number?

10:23AM   15    A.  Yes.

10:23AM   16    Q.  Can you estimate how many lists and numbers you passed

10:23AM   17    along over time?

10:23AM   18    A.  I'd be guessing.  But I would say at least five.

10:23AM   19    Q.  Was it more than one?

10:23AM   20    A.  It's definitely more than one.

10:23AM   21    Q.  Okay.  Was your purpose in passing those lists to make

10:23AM   22    sure your phone was not on a wiretap?

10:23AM   23    A.  Correct.

10:23AM   24    Q.  Did you know people by that point in your drug dealing

10:23AM   25    career who, in the past, had been caught on a wiretap?

10:23AM 1  A.  Yes.

10:23AM 2  Q.  Who were some people that you knew in life that had been

10:23AM 3  caught on wiretaps, as you understood it?

10:23AM 4  A.  I know that Dave Gambino was.

10:23AM 5  Q.  Okay.  Now, you mentioned Wayne Anderson just a moment

10:23AM 6  ago.  I'd like to delve into that a little more, okay?

10:24AM 7  A.  Yes.

10:24AM 8  Q.  I think as you indicated Monday, you were consistently

10:24AM 9  looking for additional sources of supply?

10:24AM 10  A.  Correct.

10:24AM 11  Q.  In short, did you believe you had an ability to move as

10:24AM 12  much marijuana as you could get your hands on?

10:24AM 13  A.  Yes.

10:24AM 14  Q.  So, who is Wayne Anderson?

10:24AM 15  A.  Wayne Anderson was a friend of Frank Burkhart.  Also a

10:24AM 16  friend of Mike Masecchia.

10:24AM 17  Q.  Who introduced you to Wayne Anderson?

10:24AM 18  A.  I met Wayne years before through Mike Buttitta.  But just

10:24AM 19  saying hi, nothing -- no business.

10:24AM 20  Q.  By November of 2012, approximately how long had you known

10:24AM 21  Wayne Anderson?

10:24AM 22  A.  2012?  Probably 15 years.

10:24AM 23  Q.  Okay.  What was your understanding of how well Mike

10:25AM 24  Masecchia and Wayne Anderson knew each other?

10:25AM 25  A.  That they grew up together.

10:25AM　1　Q.　Did you have any understanding of the relationship

10:25AM　2　between Wayne Anderson and the defendant?

10:25AM　3　A.　No, I did not.

10:25AM　4　Q.　Did you have any understanding of the relationship

10:25AM　5　between Lou Selva and Wayne Anderson?

10:25AM　6　A.　No, I did not.

10:25AM　7　Q.　Okay.　But you knew Frank Burkhart and Mike Masecchia

10:25AM　8　were friends with Wayne Anderson?

10:25AM　9　A.　Correct.

10:25AM　10　Q.　Now, in or about November of 2012, did you learn that

10:25AM　11　Wayne Anderson and Damien Abbate were arrested?

10:25AM　12　A.　Yes.

10:25AM　13　Q.　You touched on this a little bit earlier today, but who

10:25AM　14　told you they were arrested?

10:25AM　15　A.　It was Mike Masecchia.

10:25AM　16　Q.　Do you know how Masecchia learned it initially?

10:25AM　17　A.　That he was driving by the general area, Wayne lives off

10:25AM　18　of Elmwood.

10:25AM　19　Q.　The day they got arrested, did you and Masecchia have an

10:26AM　20　understanding that a load of marijuana was coming in intended

10:26AM　21　for you?

10:26AM　22　A.　Yes.

10:26AM　23　Q.　Did you know it was coming that day?

10:26AM　24　A.　I didn't know it was coming that day.

10:26AM　25　Q.　Okay.　Who was handling the logistics of the delivery and

10:26AM    1    receipt?

10:26AM    2    A.  Wayne Anderson.

10:26AM    3    Q.  What did Masecchia tell you when he -- withdrawn.

10:26AM    4        Did Masecchia indicate that he saw police activity at

10:26AM    5    Anderson's house?

10:26AM    6    A.  Yes.

10:26AM    7    Q.  What did he tell you when he -- when he talked to you?

10:26AM    8    A.  When I met up with him, that he was just going to find

10:26AM    9    out if everything was okay.

10:26AM   10    Q.  So initially, I guess that's a poor question on my part,

10:26AM   11    initially did Masecchia call you and set up a meeting?

10:26AM   12    A.  Yes.

10:26AM   13    Q.  You didn't talk about it over the phone?

10:26AM   14    A.  No.

10:26AM   15    Q.  Where did you meet to discuss the police activity at

10:26AM   16    Anderson's house?

10:26AM   17    A.  I believe it was my house.

10:26AM   18    Q.  When you say "my house," are you referencing 697 Lebrun?

10:26AM   19    A.  Yes.

10:27AM   20    Q.  Did you meet with Masecchia the same day he saw the

10:27AM   21    police activity?

10:27AM   22    A.  Yes.

10:27AM   23    Q.  What was your discussion with Masecchia about the police

10:27AM   24    activity at Wayne Anderson's house that he observed?

10:27AM   25    A.  Just that I was concerned.

10:27AM 1 Q. What did Masecchia say to you?

10:27AM 2 A. That he was in gonna find out what was going on.

10:27AM 3 Q. Find out from who?

10:27AM 4 A. Joe Bongiovanni.

10:27AM 5 Q. Did you want to know if everything was going to be okay?

10:27AM 6 A. Yes.

10:27AM 7 Q. After you had that initial discussion, the same day that

10:27AM 8 Masecchia saw the police activity at Wayne Anderson's house,

10:27AM 9 did Masecchia get back to you with word from the defendant?

10:27AM 10 A. The next day.

10:28AM 11 Q. What did Masecchia tell you?

10:28AM 12 A. He said everything's okay.

10:28AM 13 Q. What was your understanding of how Masecchia determined

10:28AM 14 everything was okay?

10:28AM 15 A. That he contacted Lou, and Lou talked to Joe.

10:28AM 16 Q. But the person who talked to you was Masecchia?

10:28AM 17 A. Yes.

10:28AM 18 Q. After Masecchia told you everything was okay, did anyone

10:28AM 19 from the DEA ever come and ask you questions about Wayne

10:28AM 20 Anderson's marijuana seizure?

10:28AM 21 A. No.

10:28AM 22 Q. Did Defendant Joe Bongiovanni ever come to you and ask

10:28AM 23 you questions about Wayne Anderson or the marijuana seizure?

10:28AM 24 A. No.

10:28AM 25 Q. Even though you were advised everything was okay, did you

10:29AM  1  pause your operations for a little bit?

10:29AM  2  A.  Yes.

10:29AM  3  Q.  Is this the same window of time you were starting to

10:29AM  4  negotiate with Jarrett Guy?

10:29AM  5  A.  Yes.

10:29AM  6  Q.  After a brief delay, did you start back up?

10:29AM  7  A.  Yes.

10:29AM  8  Q.  And, I guess, start back up distributing?

10:29AM  9  A.  Correct.

10:29AM  10  Q.  Now I think on Monday you said sometime around 2012 or

10:29AM  11  2013, Masecchia took a break from those outdoor grows; do you

10:29AM  12  remember that?

10:29AM  13  A.  Yes.

10:29AM  14  Q.  Was that break that Masecchia took from the outdoor grows

10:29AM  15  in Angelica and Franklinville, was that after the Wayne

10:30AM  16  Anderson arrest, if you know?

10:30AM  17  A.  Yes.  I believe it was Humphrey, not Angelica.

10:30AM  18  Q.  Is Humphrey a town in the Cattaraugus County area?

10:30AM  19  A.  Correct.

10:30AM  20  Q.  Is it somewhere near Morgan Hollow Road?

10:30AM  21  A.  Yes.  It's, like, the next town over.

10:30AM  22  Q.  Okay.  After you laid low for a little bit, did you

10:30AM  23  continue up and -- and consummate the relationship,

10:30AM  24  distribution activity with Jarrett Guy?

10:30AM  25  A.  Yes.

10:30AM 1   Q. In terms of an estimate, would you estimate that you

10:30AM 2   dealt with Jarrett Guy, the person based out of Vancouver,

10:31AM 3   Canada, as your main supplier from approximately, you know,

10:31AM 4   beginning of 2013 after that Wayne Anderson situation until

10:31AM 5   your arrest in April of 2017?

10:31AM 6   A. Correct.

10:31AM 7   Q. Can you describe for the jury the different shipment

10:31AM 8   methods that, how -- how -- how drugs got to you from Jarrett

10:31AM 9   Guy?

10:31AM 10   A. From Jarrett Guy, sometimes it would just be maybe 50

10:31AM 11   pounds to hold me over, someone would drive it. Sometimes it

10:31AM 12   would come wrapped in big bales of mulch. And then sometimes

10:31AM 13   there was tractor trailers where they were hidden in the

10:31AM 14   floorboards, where there was a hydraulic lift that would

10:31AM 15   lifted the floor up.

10:31AM 16   Q. For a period, did some shipments come by the U.S. Postal

10:32AM 17   Service, right in the mail?

10:32AM 18   A. Yes, they had a hotel, they would have a courier stay at

10:32AM 19   the hotel and just mail it to the courier.

10:32AM 20   Q. What do you mean by a courier?

10:32AM 21   A. Just somebody that they paid to sign for the packages.

10:32AM 22   Q. Okay. As you understood it did some of those, or one, or

10:32AM 23   more of those shipments get intercepted?

10:32AM 24   A. Yes.

10:32AM 25   Q. Did a courier get arrested, if you know?

10:32AM 1   A.  Yes.

10:32AM 2   Q.  But the investigation never progressed past the courier?

10:32AM 3   A.  No.

10:32AM 4   Q.  So, then I'd like you to go into more detail.  Describe

10:32AM 5   the different shipping methods using vehicles and trucks and

10:32AM 6   the routes, if you can describe that for the jury.

10:32AM 7   A.  So, for the mulch, it would start in Vancouver.  And they

10:32AM 8   would, like, kind of shrink wrap a bale of mulch.  It was 4

10:32AM 9   foot by 4 foot by 4 foot.  And you cut it open, the marijuana

10:33AM 10  would just fall out, the mulch would fall out and you'd pick

10:33AM 11  through it.  And that would come from Vancouver to Kean,

10:33AM 12  New Jersey.  And then from Kean, New Jersey they would have a

10:33AM 13  U-Haul truck bring it to me here.

10:33AM 14      And then the other -- with the tractor-trailer, it would

10:33AM 15  start off in Vancouver to Toronto.  And would come over the

10:33AM 16  border, and I would have it at a loading dock and unload it.

10:33AM 17  Q.  Okay.  And were there times with using the mulch method

10:33AM 18  where they would shrink wrap the mulch, are you saying the

10:33AM 19  mulch was a cover load for the marijuana?

10:33AM 20  A.  Yes.

10:33AM 21  Q.  So, if that truck got pulled over, it would look like

10:33AM 22  someone is transporting a bale of mulch?

10:33AM 23  A.  Correct.

10:33AM 24  Q.  And the marijuana was in shrinkwrapped packages hidden

10:33AM 25  inside the mulch?

10:33AM 1    A.  Correct.

10:33AM 2    Q.  Were they 1- or 2-pound packages?

10:33AM 3    A.  1-pound packages.

10:33AM 4    Q.  Now, you indicated with the mulch method that the trucks

10:34AM 5    went to Kean, New Jersey, and then were transferred to a

10:34AM 6    U-Haul?

10:34AM 7    A.  Yes.

10:34AM 8    Q.  Were there times, though, when you would also, yourself,

10:34AM 9    travel with others to the New York City area to take delivery

10:34AM 10   as opposed to the U-Haul driving to Buffalo?

10:34AM 11   A.  Yes.

10:34AM 12   Q.  Okay.  So that involved how many trips to New York City

10:34AM 13   for you to pick up marijuana, would you estimate?

10:34AM 14   A.  I'd say at least 20.

10:34AM 15   Q.  20 on the low end?

10:34AM 16   A.  On the low end.

10:34AM 17   Q.  And then you described another delivery method that was

10:34AM 18   in larger tractor-trailer trucks from Vancouver to Toronto.

10:34AM 19   And then how would they get into Buffalo?

10:34AM 20   A.  They would just cross the border, the truck driver.

10:34AM 21   Q.  Was there -- was there sort of high-tech hydraulics used

10:34AM 22   to hide the marijuana in these trucks?

10:34AM 23   A.  Yes.

10:34AM 24   Q.  Explain that for the jury.  How did it get over the

10:35AM 25   border?

10:35AM     1    A.   So they would take the back plate --

10:35AM     2         How they got over the border, or once they got it?

10:35AM     3    Q.   How was the marijuana concealed?

10:35AM     4    A.   It was concealed under the floorboards, because they said

10:35AM     5    there was an anomaly that x-ray couldn't detect it.

10:35AM     6    Q.   And when you would receive it from these larger

10:35AM     7    tractor-trailer trucks, how would you receive the marijuana?

10:35AM     8    How did you get it out of this -- this location?

10:35AM     9    A.   I loaded it into my car and take it out.

10:35AM    10    Q.   How did it get from in between the floorboards?

10:35AM    11    A.   Oh.  We'd take off the back plate, and we hook up a

10:35AM    12    battery, and it would lift the floor up and then we'd remove

10:35AM    13    the marijuana.

10:35AM    14    Q.   So there was, like, a hydraulic lift?

10:35AM    15    A.   Correct.

10:35AM    16    Q.   So the manner in which it was concealed in those trucks

10:35AM    17    successfully defeated whatever was set up at the border to

10:35AM    18    detect it?

10:35AM    19    A.   Yes.

10:36AM    20    Q.   I'd like to hone in on the portions of the -- the time

10:36AM    21    where you had to go to actually to New York City to meet and

10:36AM    22    get the marijuana.  Okay?

10:36AM    23    A.   Yes.

10:36AM    24    Q.   Did Jarrett Guy have different people that you would meet

10:36AM    25    with in the New York City area when it came time to pick up?

10:36AM 1  A.  Yes.

10:36AM 2  Q.  Did you go to different parts of New York City?

10:36AM 3  A.  Yes.

10:36AM 4  Q.  Did you go there with different people helping you on

10:36AM 5  those trips?

10:36AM 6  A.  Yes.

10:36AM 7  Q.  Just generally, when you had to go to New York City to

10:36AM 8  pick up marijuana, how would you structure the trips?  And

10:36AM 9  when would you go?  And did you have a technique for getting

10:36AM 10  the weed back safely?

10:36AM 11  A.  I would personally drive the marijuana, because I only

10:36AM 12  trusted myself to do it.  But I'd have someone follow me in

10:36AM 13  case law enforcement got behind me to kind of do something to

10:36AM 14  get them pulled over to deflect from me.

10:37AM 15  Q.  So to -- to put a finer point on it, did -- did you have

10:37AM 16  other people come with you as, like, a follow car?

10:37AM 17  A.  Yes.

10:37AM 18  Q.  Over time, had a number of different people gone with you

10:37AM 19  to New York City to pick up marijuana?

10:37AM 20  A.  Yes.

10:37AM 21  Q.  Did it involve two vehicles in the way you just described

10:37AM 22  every time?

10:37AM 23  A.  Yes.

10:37AM 24  Q.  Who did you have discussions with that that was a better

10:37AM 25  way to do it?

10:37AM   1   A.  The people that I was going with.

10:37AM   2   Q.  Is Mike Masecchia someone who went on those trips with

10:37AM   3   you?

10:37AM   4   A.  Yes.

10:37AM   5   Q.  How many times did Masecchia travel with you to pick up

10:37AM   6   marijuana from New York City?

10:37AM   7   A.  At least five, not more than ten.

10:37AM   8   Q.  So between five and ten?

10:37AM   9   A.  Yes.

10:37AM   10  Q.  Did Mark Falzone go with you?

10:38AM   11  A.  Yes.

10:38AM   12  Q.  How many times did Mark Falzone go with you?

10:38AM   13  A.  He was probably less than five.

10:38AM   14  Q.  Did Mike Moynihan go with you?

10:38AM   15  A.  Yes.

10:38AM   16  Q.  How many times did he go with you?

10:38AM   17  A.  Over five.

10:38AM   18  Q.  Did T.S. go with you?

10:38AM   19  A.  Yes.

10:38AM   20  Q.  How many times did he go?

10:38AM   21  A.  A couple times.

10:38AM   22  Q.  When T.S. went with you, was there one trip where

10:38AM   23  Masecchia also went?

10:38AM   24  A.  Yes.

10:38AM   25  Q.  And these trips with Masecchia -- and this trip with

10:38AM    1    Masecchia and T.S., you're getting sourced now by Jarrett

10:38AM    2    Guy; is that right?

10:38AM    3    A.   No, that time, T.S. knew somebody that was like a new

10:38AM    4    connection that he was trying out.

10:38AM    5    Q.   Okay.  How many times -- you said a couple of times on

10:38AM    6    the other occasion that T.S. went with you?

10:38AM    7    A.   Yes.

10:38AM    8    Q.   Did "a couple" mean two?

10:38AM    9    A.   Sorry?

10:38AM   10    Q.   Are you estimating?  How many times for T.S.?

10:39AM   11    A.   Two times.

10:39AM   12    Q.   On the other occasion, was it weed you were getting from

10:39AM   13    Guy?

10:39AM   14    A.   Yes.

10:39AM   15    Q.   Okay.  Did John Robinson go with you?

10:39AM   16    A.   Yes.

10:39AM   17    Q.   How many times?

10:39AM   18    A.   A few times.

10:39AM   19    Q.   On one of those trips, did Adrian Fina and your wife

10:39AM   20    Lauren go?

10:39AM   21    A.   Yes.

10:39AM   22    Q.   Could it have been three times for John Robinson?

10:39AM   23    A.   Yes.

10:39AM   24    Q.   Are you estimating here?

10:39AM   25    A.   Yeah, I'm estimating.

10:39AM    1    Q.  Did Mario Vacanti go with you?

10:39AM    2    A.  Yes.

10:39AM    3    Q.  How many times would you estimate he went?

10:39AM    4    A.  More than five.

10:39AM    5    Q.  More than five?

10:39AM    6    A.  Yes.

10:39AM    7    Q.  Did Matt LoTempio go with you?

10:39AM    8    A.  Yes.

10:39AM    9    Q.  How many times?

10:39AM   10    A.  More than five.

10:39AM   11    Q.  How many times did Lauren and Adrian go with you?

10:39AM   12    A.  Just a few times.

10:39AM   13    Q.  When they went, would they generally go together?

10:40AM   14    A.  Yes.

10:40AM   15    Q.  Did Anthony Gerace go with you?

10:40AM   16    A.  One time, I believe.

10:40AM   17    Q.  Anybody else I haven't asked you about that went with

10:40AM   18    you?

10:40AM   19    A.  Not that I can think of.

10:40AM   20    Q.  For the shipments that Guy was arranging to Buffalo, what

10:40AM   21    were the amounts of marijuana?

10:40AM   22    A.  Between 100 and 300.

10:40AM   23    Q.  Now, when you didn't have to go to New York City to get

10:40AM   24    it from Guy or his connection there, and when it came in

10:40AM   25    U-Hauls in the mulch as you described, did you take delivery

10:40AM    1    of the U-Haul shipments at various locations?

10:40AM    2    A.   Yes.

10:40AM    3    Q.   What different locations did you take delivery of the

10:41AM    4    U-Haul method where it was -- where it was hidden in the

10:41AM    5    mulch?

10:41AM    6    A.   My house, 697 Lebrun.  The 82 Sycamore location.  And

10:41AM    7    Mark Falzone's house at 377 Englewood.

10:41AM    8    Q.   So those are the locations for the U-Haul method,

10:41AM    9    correct?

10:41AM   10    A.   Yes.

10:41AM   11    Q.   Now, for the large tractor-trailers, did you need a

10:41AM   12    loading dock to be able to deal with what you were dealing

10:41AM   13    with when it came on the big trucks?

10:41AM   14    A.   Yes.

10:41AM   15    Q.   Did you know somebody who had a loading dock?

10:41AM   16    A.   Anthony Gerace.

10:41AM   17    Q.   How many times did you -- well, withdrawn.

10:41AM   18         Where was Anthony Gerace's loading dock?

10:41AM   19    A.   On Aero Drive in Cheektowaga, I believe.

10:41AM   20    Q.   And how many times did Anthony work with you to help you

10:41AM   21    unload at his loading dock?

10:41AM   22    A.   I believe it was three times.

10:41AM   23    Q.   Were those all 300-pound shipments in the big trucks?

10:42AM   24    A.   Yes.

10:42AM   25    Q.   Okay.  All right.  I want to get into a little more

10:42AM   1    specifics now.

10:42AM   2        You indicated Mark Falzone was someone who helped you --

10:42AM   3    in addition to traveling, he helped you unload shipments in

10:42AM   4    Buffalo; is that right?

10:42AM   5    A.   Correct.

10:42AM   6    Q.   You said his house is at 377 Englewood?

10:42AM   7    A.   Yes.

10:42AM   8    Q.   Is that in the Town of Tonawanda?

10:42AM   9    A.   Yes.

10:42AM   10   Q.   Did you pay Mark Falzone for helping you unload?

10:42AM   11   A.   Yes.

10:42AM   12   Q.   What'd you pay him?

10:42AM   13   A.   It was like $500, and he had first choice of whatever he

10:42AM   14   wanted of the marijuana.

10:42AM   15   Q.   Okay.  How many times did you take delivery at 377

10:42AM   16   Englewood at Falzone's house?

10:42AM   17   A.   I want to say maybe three times.

10:42AM   18   Q.   And was there an occasion when you were there unloading

10:43AM   19   with Falzone and Mike Masecchia briefly?

10:43AM   20   A.   Yes.

10:43AM   21   Q.   Describe that occasion.

10:43AM   22   A.   He was -- Mike came there, but then he said that this guy

10:43AM   23   Remus lived across, butting up to Mark's backyard.  And I

10:43AM   24   don't know, something happened between the two of them, so he

10:43AM   25   didn't want to be there.

10:43AM  1   Q.  So, just to elaborate on that, once Masecchia realized

10:43AM  2   Falzone lived near this guy Remus, he left?

10:43AM  3   A.  Yes.

10:43AM  4   Q.  Did it seem like they had some dispute between the two of

10:43AM  5   them?

10:43AM  6   A.  Yes.

10:43AM  7   Q.  Do you know the guy Remus's last name?  If you know?

10:43AM  8   A.  I think Nowak.  Novac, Nowak.

10:43AM  9   Q.  Describe generally how you unloaded the marijuana that

10:43AM  10  was in the mulch at Mark Falzone's house.

10:44AM  11  A.  We would push the box to the edge of the -- of the truck,

10:44AM  12  push it off, and then cut it open.  And then the mulch would

10:44AM  13  fall apart.

10:44AM  14  Q.  Are we talking, like, a heavy shrinkwrapped --

10:44AM  15  A.  Yes.

10:44AM  16  Q.  -- you know, pile of mulch?

10:44AM  17  A.  Yes.

10:44AM  18  Q.  Would it take some time to work it off the truck?

10:44AM  19  A.  Not too much with two of us.  But it was in a cardboard

10:44AM  20  box.  So it was shrinkwrapped in a cardboard box on a pallet,

10:44AM  21  so it was kind of easier to slide.

10:44AM  22  Q.  So you got it off the back?

10:44AM  23  A.  Yes.

10:44AM  24  Q.  And when it would fall, then what would you do?

10:44AM  25  A.  I would cut it open, and then the mulch would fall out

10:44AM   1   everywhere.  And then we'd pick through it to retrieve the

10:44AM   2   marijuana.

10:44AM   3   Q.  Did you take some deliveries at Falzone's house in 2013?

10:44AM   4   Or what year?

10:44AM   5   A.  I think it was, like, '14, '15.

10:44AM   6   Q.  Okay.  You indicated you took delivery at 82 Sycamore,

10:45AM   7   your warehouse?

10:45AM   8   A.  Yes.

10:45AM   9   Q.  How many times did you take delivery there?

10:45AM  10   A.  I'd say, like, four times.

10:45AM  11   Q.  Before I get to 82 Sycamore, on those other occasions

10:45AM  12   other than the one occasion you talked about where it was

10:45AM  13   you, Falzone, and Masecchia briefly, who else helped you and

10:45AM  14   Masecchia unload -- withdrawn.

10:45AM  15       Who else helped you and Falzone unload at Falzone's

10:45AM  16   house?

10:45AM  17   A.  I believe it was Matt LoTempio.  Either Matt LoTempio or

10:45AM  18   Mike Moynihan.  I'm not sure.

10:45AM  19   Q.  Okay.  All right.  Now I'd like to move on to 82

10:45AM  20   Sycamore.  I think you just said you took delivery at your

10:45AM  21   warehouse about four times?

10:45AM  22   A.  Yes.

10:45AM  23   Q.  Using the U-Haul/mulch method?

10:45AM  24   A.  Correct.

10:45AM  25   Q.  Who were the people who helped you unload at 82 Sycamore?

10:46AM 1   A.  I believe it was Matt LoTempio and Mark Falzone.

10:46AM 2   Q.  Same deal?  You're paying them to help you unload, and

10:46AM 3   giving them first choice on the marijuana?

10:46AM 4   A.  Yes.

10:46AM 5        **MR. TRIPI:**  Bear with me one moment.

10:46AM 6        Ms. Champoux, can we pull up again 51A-7?

10:46AM 7        **THE COURT:**  In evidence?

10:46AM 8        **MR. TRIPI:**  It is in evidence, Your Honor, thank you.

10:46AM 9        **BY MR. TRIPI:**

10:46AM 10  Q.  Okay.  We looked at this on Monday.  This is your

10:46AM 11  warehouse at 82 Sycamore?

10:46AM 12  A.  Yes.

10:46AM 13       **MR. TRIPI:**  Ms. Champoux, could we sort of zoom in on

10:46AM 14  this portion of it, and make it a little larger?

10:46AM 15       **BY MR. TRIPI:**

10:46AM 16  Q.  Okay.  Can you see that pretty well?

10:46AM 17  A.  Yes.

10:46AM 18  Q.  Describe for the jury where the U-Haul would pull up for

10:47AM 19  you to take delivery.

10:47AM 20  A.  It couldn't fit in it, so I would back it right up to

10:47AM 21  this door right here as close as possible.

10:47AM 22  Q.  So basically, what was your purpose for pulling it up

10:47AM 23  backed in as close as possible to that garage door?

10:47AM 24  A.  Because I had to push it off so no one could see.  And

10:47AM 25  once I got it off, closed the garage door.

10:47AM   1   Q.  So you're -- was your purpose to limit the amount of --

10:47AM   2   A.  Exposure.

10:47AM   3   Q.  -- exposure?

10:47AM   4   A.  Yes.

10:47AM   5          **THE COURT:**  For the record, you circled the garage

10:47AM   6   door that -- if -- could we zoom out for just one second?

10:47AM   7          **MR. TRIPI:**  Go ahead, Ms. Champoux.  Could you zoom

10:47AM   8   out?

10:47AM   9          **THE COURT:**  It's really the only garage door in the

10:47AM   10  photo.

10:47AM   11         **MR. TRIPI:**  Near the left-hand side of the photo.

10:47AM   12         **THE COURT:**  Near the left side, yes.

10:47AM   13         **MR. TRIPI:**  Thank you, Your Honor.

10:47AM   14         **BY MR. TRIPI:**

10:47AM   15  Q.  And was it generally the same method where you had to

10:47AM   16  push the load off the back, cut it open, and then transfer

10:47AM   17  the packaged marijuana to your vehicle?

10:48AM   18  A.  Yes.

10:48AM   19  Q.  How many vehicles would it take between your vehicle and

10:48AM   20  the people helping you to get it back to where you were

10:48AM   21  bringing it?

10:48AM   22  A.  It depends.  Sometimes two.

10:48AM   23  Q.  And would you bring -- where would you store the

10:48AM   24  marijuana after you got it unloaded, both at Mark Falzone's

10:48AM   25  house and at 82 Sycamore, where would you bring it to store

10:48AM  1  it?

10:48AM  2  A.  At my house.

10:48AM  3  Q.  697 Lebrun?

10:48AM  4  A.  Yes.

10:48AM  5  Q.  As we got into 2014, did you -- did you also store it at

10:48AM  6  Lou Selva's house for a period of time?

10:48AM  7  A.  Yes.

10:48AM  8  Q.  I'm going to circle back to that, okay?  All right.

10:48AM  9     Did you also take delivery directly at your house at 697

10:48AM  10 Lebrun?

10:48AM  11 A.  Yes.

10:49AM  12 Q.  And can you describe where you, you know, where you would

10:49AM  13 receive it, and how -- how that would work at your house?

10:49AM  14 A.  Are you talking about the U-Hauls?

10:49AM  15 Q.  Yes.

10:49AM  16 A.  U-Hauls, I'd back it into where my garage area was.

10:49AM  17    At one time it was wood pellets, like the burning

10:49AM  18 pellets.  And one time it was mulch.

10:49AM  19 Q.  Was there an occasion where -- withdrawn.

10:49AM  20    Did -- did the individuals drive the U-Haul directly to

10:49AM  21 your house, or did they drive the U-Haul to a nearby location

10:49AM  22 where you took the U-Haul from there?

10:49AM  23 A.  I'd meet them at Denny's on Main Street by Harlem, and

10:49AM  24 then I would take the U-Haul.  I didn't want the drivers

10:49AM  25 knowing where I lived.

10:49AM  1  Q.  Okay.  Explain that in a little more detail for the jury,

10:49AM  2  please.

10:49AM  3  A.  So, we set up a time, and I'd go meet them at Denny's.

10:49AM  4  And they would wait at Denny's while I took the truck, went

10:49AM  5  back to my house, pushed it out the back of the truck, and

10:49AM  6  then brought the truck back to them.

10:49AM  7  Q.  And what, if anything, would you give the couriers sort

10:50AM  8  of as collateral while you took the shipments?

10:50AM  9  A.  I would just leave my car with them.

10:50AM  10  Q.  So did you give them your car keys?

10:50AM  11  A.  Yes.

10:50AM  12  Q.  What kind of car were you driving?

10:50AM  13  A.  A Range Rover.

10:50AM  14  Q.  How long did the process of unloading generally take?

10:50AM  15  A.  Well, it was just getting it off the back of the truck.

10:50AM  16  So that point, it would take me -- I'd be back in 20 minutes,

10:50AM  17  a half hour.

10:50AM  18  Q.  Who were the different people who helped you unload at

10:50AM  19  your house at 697 Lebrun?

10:50AM  20  A.  Believe Jacob Martinez helped me once, and Mark and Matt.

10:50AM  21  Mark Falzone and Matt LoTempio.

10:50AM  22  Q.  Okay.  By 2015, had you developed a friendship with

10:51AM  23  Anthony Gerace?

10:51AM  24  A.  Yes.

10:51AM  25  Q.  When did you first meet him?

10:51AM   1   A.   In 2015.

10:51AM   2   Q.   How did you meet him?

10:51AM   3   A.   I had a payment processing company, and my brother asked

10:51AM   4   me to process payments for him because he had a collection

10:51AM   5   agency.

10:51AM   6   Q.   Who had a collection agency?

10:51AM   7   A.   Anthony Gerace did.

10:51AM   8   Q.   Okay.  Did you guys become relatively close during that

10:51AM   9   time?

10:51AM   10  A.   Yes.

10:51AM   11  Q.   Did that relationship continue up till your arrest?

10:51AM   12  A.   Yes.

10:51AM   13  Q.   Were there times when Anthony Gerace would supply you

10:51AM   14  marijuana from his supplier?

10:51AM   15  A.   Yes.

10:51AM   16  Q.   Were there times when you supplied him marijuana?

10:51AM   17  A.   Yes.

10:51AM   18  Q.   A moment ago, you mentioned that when you used the larger

10:51AM   19  tractor-trailer method, you unloaded at Anthony's unloading

10:52AM   20  dock at Aero Drive; do you remember that?

10:52AM   21  A.   Yes.

10:52AM   22  Q.   Okay.  I'm going to hand up two exhibits, Government

10:52AM   23  Exhibit 489A and 489B.

10:52AM   24       Do you recognize what's depicted in Government Exhibit

10:52AM   25  489A and 489B?

10:52AM   1   A.   Yes.

10:52AM   2   Q.   What do you recognize that to be?

10:52AM   3   A.   That is where Anthony had his cabinet store and the

10:52AM   4   docks, the docks all the way to the right is the one we

10:52AM   5   unloaded it at.

10:52AM   6   Q.   Is that his location at -- on Aero Drive that you

10:52AM   7   utilized?

10:52AM   8   A.   Yes.

10:52AM   9   Q.   Does it fairly and accurately depict sort of a view from

10:52AM   10  the street, and an aerial overhead view of that location --

10:52AM   11  A.   Yes.

10:52AM   12  Q.   -- on Aero Drive?

10:52AM   13  A.   Yes.

10:52AM   14        **MR. TRIPI:**  Government offers 489A and 489B into

10:52AM   15  evidence, Your Honor.

10:52AM   16        **MR. MacKAY:**  No objection.

10:52AM   17        **THE COURT:**  Received without objection.

10:53AM   18        **MR. TRIPI:**  Thank you.

10:53AM   19    **(GOV Exhibits 489A and 489B were received in evidence.)**

10:53AM   20        **MR. TRIPI:**  Ms. Champoux, can we please publish both

10:53AM   21  of these exhibits side by side, 489A and B?

10:53AM   22        **BY MR. TRIPI:**

10:53AM   23  Q.   All right.  Looking at 489A on the left there, is that an

10:53AM   24  aerial view of Anthony Gerace's property on Aero Drive?

10:53AM   25  A.   Yes.

10:53AM   1        **MR. TRIPI:**  Ms. Champoux, can we zoom in on 489A for

10:53AM   2   a moment and make it larger for them?

10:53AM   3        **BY MR. TRIPI:**

10:53AM   4   Q.  Do you see the area where the tractor-trailer truck would

10:53AM   5   be pulled in for unloading?

10:53AM   6   A.  Yes.

10:53AM   7   Q.  Can you use the Telustrator function and circle it for

10:53AM   8   us?

10:53AM   9   A.  It was that bay.

10:53AM  10        **MR. TRIPI:**  May the record reflect the witness placed

10:53AM  11   a circle to the portion of the parking lot near the grass

10:53AM  12   line, sort of the last trucking bay, going left to right from

10:53AM  13   the back of the building.

10:54AM  14        **BY MR. TRIPI:**

10:54AM  15   Q.  Is that about a right description?

10:54AM  16   A.  Yes.

10:54AM  17   Q.  Okay.

10:54AM  18        **MR. TRIPI:**  We can zoom out of that, Ms. Champoux.

10:54AM  19        **BY MR. TRIPI:**

10:54AM  20   Q.  And 489B, that just depicts the view from the front of

10:54AM  21   the building?

10:54AM  22   A.  Yes.

10:54AM  23   Q.  Street view?

10:54AM  24   A.  Yes.

10:54AM  25        **MR. TRIPI:**  You can take those down, thank you.

**BY MR. TRIPI:**

Q.   How many times would you say, I think you indicated three times you unloaded marijuana at that location; is that right?

A.   Correct.

Q.   How would you and Anthony get the marijuana from that trucking bay to your house at 697 Lebrun?

A.   We would drive it in our vehicles.

Q.   And what vehicle were you using?

A.   A Range Rover.

Q.   And what vehicle was he using?

A.   Tahoe.

Q.   So between those SUVs, was there enough space to transport it?

A.   Yes.

Q.   How would you conceal it in your Range Rover?

A.   In garbage bags.

Q.   Is that the same concealment method in Anthony's vehicle?

A.   Yes.

Q.   Is it a relatively short drive from that location on Aero Drive to your house?

A.   Yes, about ten minutes.

Q.   Okay.  When you were discussing distribution activity with Anthony, did you tell him where your source of supply was coming from?

A.   Yes.

10:55AM 1 Q. What'd you tell him?

10:55AM 2 A. Vancouver.

10:55AM 3 Q. Did he tell you -- when you would be receiving marijuana

10:55AM 4 from him, did he tell you where his source of supply was

10:55AM 5 located?

10:55AM 6 A. Yes.

10:55AM 7 Q. What did he tell you?

10:55AM 8 A. New York City.

10:55AM 9 Q. And would you guys do that back and forth to fill gaps in

10:55AM 10 time between shipments?

10:55AM 11 A. Yes.

10:55AM 12 Q. Eventually, between the 2015 time period and your arrest

10:56AM 13 in 2017, did Jarrett Guy start sending along fake oxycodone?

10:56AM 14 A. Yes.

10:56AM 15 Q. Was it OxyContin, or oxycodone?

10:56AM 16 A. OxyContin.

10:56AM 17 Q. Okay. And were those fentanyl pills?

10:56AM 18 A. Yes.

10:56AM 19 Q. Did you also distribute -- did you also distribute some

10:56AM 20 of those pills to Anthony Gerace?

10:56AM 21 A. Yes.

10:56AM 22 Q. Who were some of the other people that you distributed

10:56AM 23 those pills to?

10:56AM 24 A. Jacob Martinez, Anthony Greco.

10:56AM 25 Q. Did Anthony Gerace start using those pills?

10:56AM  1  A.  Yes.  That's -- that's why he took them.  They were all

10:56AM  2  users.

10:56AM  3  Q.  All three of those people used?

10:56AM  4  A.  Yes.

10:56AM  5  Q.  Okay.  I'd like to shift gears for a moment here.

10:57AM  6      Over the years that information that you requested was

10:57AM  7  passed back to you from Selva and Masecchia as part of this

10:57AM  8  bribery scheme, did you feel you were getting -- did you feel

10:57AM  9  you were getting a good return on your monthly bribery

10:57AM  10  investment to Defendant Bongiovanni?

10:57AM  11  A.  Yes.

10:57AM  12  Q.  Did you feel like the information you were getting back

10:57AM  13  was authentic?

10:57AM  14  A.  Yes.

10:57AM  15  Q.  Did you rely on that information in your dealings with

10:57AM  16  drug traffickers?

10:57AM  17  A.  Yes.

10:57AM  18  Q.  Did the information you were receiving inform your

10:57AM  19  decisionmaking?

10:57AM  20  A.  Yes.

10:57AM  21  Q.  Now, earlier in your testimony, you indicated that one of

10:57AM  22  the things you were interested in were the names of potential

10:57AM  23  informants, right?

10:57AM  24  A.  Yes.

10:58AM  25          **MR. TRIPI:**  Now my mic's cutting out.  Sorry, Judge.

10:58AM 1      **THE COURT:** That's alright.

10:58AM 2      **BY MR. TRIPI:**

10:58AM 3 Q. Over the years, were different names provided to you over

10:58AM 4 time as being potential informants?

10:58AM 5 A. Yes.

10:58AM 6 Q. Approximately how many times do you think that happened

10:58AM 7 where names were passed to you from Bongiovanni through

10:58AM 8 Masecchia to you, about informants?

10:58AM 9 A. I would say at least ten, but a lot of them weren't

10:58AM 10 relevant. Actually, probably way more than ten.

10:58AM 11 Q. So let's break that down.

10:58AM 12    More than ten names came to your attention, but -- but

10:58AM 13 many of them were not relevant. Explain what you mean to the

10:58AM 14 jury.

10:58AM 15 A. They had nothing to do with my operation or me, so they

10:58AM 16 didn't mean anything. I didn't know the people.

10:58AM 17 Q. So, do you even remember the names that were not really

10:58AM 18 relevant to you?

10:58AM 19 A. No.

10:58AM 20 Q. Are you familiar with a bar named Gables on Hertel in

10:59AM 21 North Buffalo?

10:59AM 22 A. Yes.

10:59AM 23 Q. Was there information passed to you that an individual

10:59AM 24 named Steven Brucato was supplying cocaine to a person named

10:59AM 25 Joe Mesi?

10:59AM  1   A.  Yes.

10:59AM  2   Q.  Now did you deal with either of those two people?

10:59AM  3   A.  No.

10:59AM  4   Q.  Who passed you that information?

10:59AM  5   A.  Mike Masecchia.

10:59AM  6   Q.  Where did he get the information from?

10:59AM  7   A.  Joe Bongiovanni.

10:59AM  8   Q.  What did Masecchia tell you?

10:59AM  9   A.  Just to stay away from Gables.  But I didn't go to

10:59AM 10   Gables, so it wasn't relevant to me.

10:59AM 11   Q.  Now, did you know who Joe Mesi was?

10:59AM 12   A.  I've heard of him.  I don't know him personally.

10:59AM 13   Q.  Why do you remember that name?

10:59AM 14   A.  Because he was a professional boxer.

10:59AM 15   Q.  For a period of time in the sort of early 2000s, was he

10:59AM 16   relatively popular or famous in this area?

10:59AM 17   A.  Yes.

10:59AM 18   Q.  Is that why you remember his name?

10:59AM 19   A.  Yes.

11:00AM 20   Q.  What drug was the investigation involving Brucato and

11:00AM 21   Mesi?

11:00AM 22   A.  Cocaine.

11:00AM 23   Q.  Okay.  Do you remember approximately what year you

11:00AM 24   learned that Brucato and Mesi were investigation -- under

11:00AM 25   investigation as related to Gables bar?

11:00AM   1   A.   I want to say it was, I don't know, between 2013, 2015.

11:00AM   2   Q.   So that window of time?

11:00AM   3   A.   Yeah.  It wasn't relevant, so I really don't remember.

11:00AM   4   Q.   That's your best estimate?

11:00AM   5   A.   Yes.

11:00AM   6        MR. TRIPI:  Your Honor, when would you like our

11:00AM   7   morning break to be?

11:00AM   8        THE COURT:  I think this is as good a time as any.

11:00AM   9        I have a -- we have to break for lunch at about

11:00AM  10   12:30, so I think this is a good time to break for our morning

11:01AM  11   break.

11:01AM  12        Please remember my instructions about not talking

11:01AM  13   about the case even with each other and not making up your

11:01AM  14   mind.

11:01AM  15        We'll see you back here in about ten or 15 minutes.

11:01AM  16        (Jury excused at 11:01 a.m.)

11:01AM  17        THE COURT:  Okay.  Anything we need to do before we

11:01AM  18   break?

11:01AM  19        MR. MacKAY:  No, Your Honor.

11:01AM  20        MR. TRIPI:  No, thank you, Judge.

11:01AM  21        THE COURT:  Okay, thanks.  We'll see you folks in

11:01AM  22   about ten or 15 minutes.

11:01AM  23        (Off the record at 11:01 a.m.)

11:26AM  24        (Back on the record at 11:26 a.m.)

11:26AM  25        (Jury not present.)

11:26AM    1            **THE CLERK:**  All rise.

11:26AM    2            **THE COURT:**  Please be seated.

11:26AM    3            **THE CLERK:**  We are back on the record for the

11:26AM    4    continuation of the jury trial in case number 19-cr-227,

11:26AM    5    United States of America versus Joseph Bongiovanni.

11:26AM    6            All counsel and parties are present.

11:26AM    7            **THE COURT:**  Okay.  Anything from the defense?

11:26AM    8            **MR. MacKAY:**  No, Your Honor.

11:26AM    9            **THE COURT:**  Anything from the government?

11:26AM   10            **MR. TRIPI:**  No, thanks, Judge.

11:26AM   11            **THE COURT:**  How much longer?

11:26AM   12            **MR. TRIPI:**  I'm definitely going to be going after

11:26AM   13    lunch.

11:26AM   14            **THE COURT:**  Oh.

11:26AM   15            **MR. TRIPI:**  I would say probably I might be able to

11:26AM   16    turn over the witness by 2:30.

11:26AM   17            **THE COURT:**  Okay.  Fine.

11:26AM   18            **MR. TRIPI:**  About two hours.

11:26AM   19            **THE COURT:**  And if we spill over, we spill over.

11:26AM   20    That's, you know, what we do, we do.

11:26AM   21            Okay.  Let's bring them back in, please, Pat.

11:26AM   22            **MR. TRIPI:**  I'll try to be quicker than that, but I'm

11:26AM   23    trying to be realistic.

11:27AM   24            (Jury seated at 11:27 a.m.)

11:27AM   25            **THE COURT:**  The record will reflect that all our

11:27AM    1    jurors are present.

11:28AM    2              I remind the witness that he's still under oath.

11:28AM    3              Mr. Tripi, you may continue.

11:28AM    4              **MR. TRIPI:**  Thank you.

11:28AM    5              **BY MR. TRIPI:**

11:28AM    6    Q.  Okay.  Mr. Serio, we mentioned the name R.K. a few times.

11:28AM    7    I want to go into more detail about him, okay?

11:28AM    8    A.  Yes.

11:28AM    9    Q.  Who was R.K.?

11:28AM   10    A.  R.K. was Frank Burkhart's friend.

11:28AM   11    Q.  And how did you know R.K.?

11:28AM   12    A.  Through Frank Burkhart.  He would bring him around

11:28AM   13    sometimes.

11:28AM   14    Q.  Was R.K. also friends with T.S.?

11:28AM   15    A.  Yes.

11:28AM   16    Q.  Was Mr. R.K. around you and other members of your

11:28AM   17    organization?

11:28AM   18    A.  Yes.

11:28AM   19    Q.  Who else was he around?

11:28AM   20    A.  I'm not exactly sure.  Maybe someone that was at my house

11:28AM   21    that I dealt with when Frank and Robert came there.

11:28AM   22    Q.  Has Mr. R.K. been to your residence at 697 Lebrun?

11:28AM   23    A.  Yes.

11:28AM   24    Q.  About how many times, approximately?

11:28AM   25    A.  About five times.

11:28AM 1 Q. Have you been engaged in marijuana transactions when

11:29AM 2 Mr. R.K. was at your house?

11:29AM 3 A. Yes.

11:29AM 4 Q. Have you been engaged in those transactions in his

11:29AM 5 presence?

11:29AM 6 A. Yes.

11:29AM 7 Q. About how many times?

11:29AM 8 A. I'd say probably five times.

11:29AM 9 Q. What amounts were you distributing in Mr. R.K.'s

11:29AM 10 presence?

11:29AM 11 A. Somewhere between 5 to 20 pounds.

11:29AM 12 Q. Who were you transacting with when Mr. R.K. was present

11:29AM 13 at your house?

11:29AM 14 A. Frank Burkhart.

11:29AM 15 Q. Do you know if some of the marijuana was intended for

11:29AM 16 Mr. R.K.?

11:29AM 17 A. I believe so.

11:29AM 18 Q. Eventually, were you notified that R.K. was a DEA

11:29AM 19 informant?

11:29AM 20 A. Yes.

11:29AM 21 Q. Prior to learning that R.K. was a DEA informant, was --

11:30AM 22 was R.K. someone that you wanted checked out because he had

11:30AM 23 been arrested?

11:30AM 24 A. No, I didn't give his name.

11:30AM 25 Q. Did you know R.K. had been arrested?

11:30AM  1   A.  Yes.

11:30AM  2   Q.  How did you find out?

11:30AM  3   A.  I seen it on the news that he robbed Poster Art.

11:30AM  4   Q.  That he what?

11:30AM  5   A.  Robbed Poster Art on Elmwood.  That he broke the window

11:30AM  6   and burglarized it.

11:30AM  7   Q.  When you -- when you were informed Mr. R.K. was an

11:30AM  8   informant, was anyone else present?

11:30AM  9   A.  Oh, Mike Masecchia told me.

11:30AM  10  Q.  Where did Masecchia tell you?

11:30AM  11  A.  At my house, 697 Lebrun.

11:30AM  12  Q.  Was it just the two of you?

11:30AM  13  A.  Yes.

11:30AM  14  Q.  Was it a private conversation?

11:30AM  15  A.  Yes.

11:30AM  16  Q.  Was it important to you to keep those kind of

11:30AM  17  conversations contained?

11:30AM  18  A.  Yes.

11:30AM  19  Q.  What did Masecchia tell you about R.K.?

11:31AM  20  A.  That he was a DEA informant.

11:31AM  21  Q.  Who did Masecchia tell you R.K. was an informant for,

11:31AM  22  specifically, at DEA?

11:31AM  23  A.  Joe Bongiovanni.

11:31AM  24      **MR. TRIPI:**  Ms. Champoux, can we pull up Government

11:31AM  25  Exhibit 9E-2, please?

11:31AM 1         **BY MR. TRIPI:**

11:31AM 2 Q. Mr. Serio, can you read the big capital lettered bold

11:31AM 3 words that are above that black line?

11:31AM 4 A. Confidential source agreement.

11:31AM 5 Q. Okay.

11:31AM 6         **MR. TRIPI:** Ms. Champoux, can we go to the second

11:31AM 7 page of that?

11:31AM 8         **BY MR. TRIPI:**

11:31AM 9 Q. Do you see a signature line for the confidential source?

11:31AM 10 A. Yes.

11:31AM 11 Q. Does it look like the name R.K. to you?

11:31AM 12 A. Yes.

11:31AM 13 Q. Are his initials R.K.?

11:31AM 14 A. Yes.

11:31AM 15 Q. Do you see a name for a controlling investigator there?

11:32AM 16 A. Yes.

11:32AM 17 Q. Does it look like the name Joe Bongiovanni?

11:32AM 18 A. Yes.

11:32AM 19 Q. Have you ever seen that document before this moment in

11:32AM 20 time?

11:32AM 21 A. No.

11:32AM 22         **MR. TRIPI:** We can take that down.

11:32AM 23         **BY MR. TRIPI:**

11:32AM 24 Q. To be clear, before you were specifically informed by

11:32AM 25 Mike Masecchia that R.K. was a DEA informant, would you have

11:32AM    1   sold him marijuana in exchange for money?

11:32AM    2   A.  Yes.

11:32AM    3   Q.  Before you were specifically informed that R.K. was this

11:32AM    4   defendant's informant, would you have sold him cocaine in

11:32AM    5   exchange for money if you had cocaine available for sale?

11:32AM    6   A.  Yes.

11:32AM    7   Q.  After you were specifically informed that R.K. was this

11:32AM    8   defendant's informant, did you stay away from him?

11:33AM    9   A.  Yes.

11:33AM   10   Q.  Did other people in your organization stay away from him?

11:33AM   11   A.  Yes.

11:33AM   12   Q.  Did you tell others to stay away from R.K.?

11:33AM   13   A.  Yes.

11:33AM   14   Q.  By being informed that R.K. was this defendant's DEA

11:33AM   15   informant, did that neutralize the risk, in your mind, that

11:33AM   16   R.K. posed to your organization?

11:33AM   17   A.  Yes.

11:33AM   18   Q.  Was R.K. ever over at your house ever again after you

11:33AM   19   were informed that defendant was R.K.'s DEA handling agent?

11:33AM   20   A.  No.

11:33AM   21   Q.  I'd like to move on to T.S.

11:33AM   22      Eventually, in proximity to the time where you were

11:33AM   23   advised that Mr. R.K. was an informant, were you advised that

11:34AM   24   T.S. was an informant?

11:34AM   25   A.  Yes.

11:34AM  1   Q.  By the time that you were informed that T.S. was an

11:34AM  2   informant, had he traveled to New York City with you and

11:34AM  3   Masecchia?

11:34AM  4   A.  No.

11:34AM  5   Q.  Before you were advised T.S. --

11:34AM  6   A.  Oh.

11:34AM  7   Q.  -- was an informant, had he previously traveled with you?

11:34AM  8   A.  Yes.

11:34AM  9   Q.  Okay.  Who told you T.S. was an informant?

11:34AM  10  A.  Mike Masecchia.

11:34AM  11  Q.  What specific information did Masecchia tell you about

11:34AM  12  T.S.?

11:34AM  13  A.  That he was a DEA informant.

11:34AM  14  Q.  After that, did you stay away from T.S.?

11:34AM  15  A.  Yes.

11:34AM  16  Q.  Did those in your organization stay away from T.S.?

11:34AM  17  A.  Yes.

11:34AM  18  Q.  Did you ensure he no longer dealt with you or had access

11:34AM  19  to your products?

11:34AM  20  A.  Yes.

11:34AM  21  Q.  Did you ensure that he no longer dealt with you or had

11:34AM  22  access to your warehouse?

11:34AM  23  A.  Yes.

11:34AM  24  Q.  Did you take him on any more trips to New York City for

11:34AM  25  drugs?

| | | |
|---|---|---|
| 11:34AM | 1 | A.   No. |
| 11:34AM | 2 | Q.   Did you try to get any drugs from him after that? |
| 11:35AM | 3 | A.   No. |
| 11:35AM | 4 | Q.   Was that valuable information to you that you believed |
| 11:35AM | 5 | protected you? |
| 11:35AM | 6 | A.   Yes. |
| 11:35AM | 7 | Q.   Were those disclosures as to both R.K. and T.S. made |
| 11:35AM | 8 | after you were already dealing with Sant -- withdrawn -- with |
| 11:35AM | 9 | Jarrett Guy? |
| 11:35AM | 10 | A.   Yes. |
| 11:35AM | 11 | Q.   Were they made after you were informed about the -- the |
| 11:35AM | 12 | seizure and arrest of Wayne Anderson? |
| 11:35AM | 13 | A.   Yes. |
| 11:35AM | 14 | Q.   Is that the type of information you expected to receive |
| 11:35AM | 15 | for the money you were paying this defendant? |
| 11:35AM | 16 | A.   Yes. |
| 11:35AM | 17 | **MR. TRIPI:**  Can we pull up 9E-2 again?  Let's go to |
| 11:35AM | 18 | page 2. |
| 11:35AM | 19 | **BY MR. TRIPI:** |
| 11:35AM | 20 | Q.   Do you see the dates of these signatures, April 29th, |
| 11:36AM | 21 | 2013? |
| 11:36AM | 22 | A.   Yes. |
| 11:36AM | 23 | Q.   Is it -- is that within the timeframe that you were |
| 11:36AM | 24 | informed Mr. R.K. was an informant? |
| 11:36AM | 25 | A.   Yes, I believe a little after that. |

| | | |
|---|---|---|
| 11:36AM | 1 | Q.  Same year? |
| 11:36AM | 2 | A.  Yes. |
| 11:36AM | 3 | MR. TRIPI:  We can take that down. |
| 11:36AM | 4 | BY MR. TRIPI: |
| 11:36AM | 5 | Q.  After you learned about R.K. and T.S. being informants, |
| 11:36AM | 6 | did some time go by before you learned more information about |
| 11:36AM | 7 | a threat to your organization? |
| 11:36AM | 8 | A.  Yes. |
| 11:36AM | 9 | Q.  After you learned about R.K. and T.S. being informants, |
| 11:36AM | 10 | did you receive information that Mario Vacanti was under |
| 11:36AM | 11 | investigation? |
| 11:36AM | 12 | A.  Yes. |
| 11:36AM | 13 | Q.  Tell the jury who Mario Vacanti was in the context of |
| 11:36AM | 14 | your organization. |
| 11:36AM | 15 | A.  Mario Vacanti was one of the -- one of my major |
| 11:37AM | 16 | customers. |
| 11:37AM | 17 | Q.  Would he take a lot of the product you were supplying and |
| 11:37AM | 18 | distribute it? |
| 11:37AM | 19 | A.  Yes. |
| 11:37AM | 20 | Q.  On a monthly basis, how much marijuana was Mario Vacanti |
| 11:37AM | 21 | distributing for you? |
| 11:37AM | 22 | A.  It depends.  I would say on a slow month, 50 pounds at |
| 11:37AM | 23 | least. |
| 11:37AM | 24 | Q.  And in a high month? |
| 11:37AM | 25 | A.  Maybe 150. |

11:37AM    1    Q.  So in business terms, he was one of your major sales

11:37AM    2    reps?

11:37AM    3    A.  Yes.

11:37AM    4    Q.  At the time you received this information about Mario

11:37AM    5    Vacanti, where was he living?

11:37AM    6    A.  He was living in my brother's carriage house, at 81

11:37AM    7    Lebrun Circle.

11:37AM    8    Q.  Is that basically a short drive down the street from

11:37AM    9    where you were living at 697 Lebrun?

11:37AM    10   A.  Yes.

11:37AM    11   Q.  Your brother Tom had a house and a carriage house behind

11:38AM    12   it?

11:38AM    13   A.  Correct.

11:38AM    14   Q.  For those who don't know, what's a carriage house?

11:38AM    15   A.  It's where the garage is, and there's an apartment over

11:38AM    16   the garage, or beside the garage, on that case.

11:38AM    17   Q.  So Mario Vacanti was living on the same property as your

11:38AM    18   brother Tom?

11:38AM    19   A.  Correct.

11:38AM    20   Q.  Who told you the information about Mario Vacanti?

11:38AM    21   A.  Mike Masecchia.

11:38AM    22   Q.  Who did he get the information from?

11:38AM    23   A.  Joe Bongiovanni.

11:38AM    24   Q.  Was there -- was Lou Selva involved at all in passing

11:38AM    25   that information?

11:38AM  1    A.  I believe so.

11:38AM  2    Q.  What did Masecchia tell you about Mario Vacanti being

11:38AM  3    under investigation?

11:38AM  4    A.  That he was being investigated for money-laundering, and

11:38AM  5    then he gave the name of the person cooperating against

11:38AM  6    Mario, which was Paul Humphries, which was Mario's

11:38AM  7    half-sister's boyfriend.  And he said that -- Paul Humphries

11:38AM  8    said that he owed him $4,000, and I believe that was it.  But

11:38AM  9    when I told Mario, he was shocked that I knew that he owed

11:38AM  10   him $4,000.

11:38AM  11   Q.  All right.  Let's break that down a little bit.

11:38AM  12       Where does Masecchia tell you that Mario Vacanti's under

11:39AM  13   investigation regarding his dealings with Paul Humphries?

11:39AM  14   A.  I believe it's either my house or Mike's house.

11:39AM  15   Q.  When you heard that, what did you do?

11:39AM  16   A.  I went and seen Mario.

11:39AM  17   Q.  Did you do it right away?

11:39AM  18   A.  Yes.

11:39AM  19   Q.  Was it important to notify him right away?

11:39AM  20   A.  Yes.

11:39AM  21   Q.  When you went to Mario's house, you're talking about the

11:39AM  22   carriage house behind your brother's residence?

11:39AM  23   A.  Correct.

11:39AM  24   Q.  Describe your conversation with Mario Vacanti.

11:39AM  25   A.  I just said that I heard that he's being -- that he's

11:39AM 1 under investigation for money-laundering, and that someone

11:39AM 2 named Paul Humphries was cooperating against him. And that's

11:39AM 3 when he said that it was his half-sister's ex-boyfriend.

11:39AM 4 Q. Did you give him specifics about what that information

11:39AM 5 was?

11:39AM 6 A. Yes, that -- he said that he got marijuana from Mario,

11:39AM 7 and that he owed him $4,000.

11:39AM 8 Q. So in that context, Humphries was providing information?

11:39AM 9 A. Yes.

11:39AM 10 Q. Did Vacanti confirm the accuracy of the information you

11:39AM 11 passed to him?

11:39AM 12 A. Yes.

11:40AM 13 Q. Did he thank you for it?

11:40AM 14 A. Yes.

11:40AM 15 Q. Did you give him any advice?

11:40AM 16 A. To stop selling the marijuana.

11:40AM 17 Q. Take a pause?

11:40AM 18 A. Yes.

11:40AM 19 Q. Did you take a pause in distributing to him?

11:40AM 20 A. I did.

11:40AM 21 Q. What year was this, approximately?

11:40AM 22 A. 2015.

11:40AM 23 Q. Is that the kind of information you expected to receive

11:40AM 24 from the defendant for what you were paying?

11:40AM 25 A. Yes.

11:40AM   1   Q. Did you rely on that information?

11:40AM   2   A. Yes.

11:40AM   3   Q. Did you stop for a period distributing to Mario Vacanti

11:40AM   4   to make sure that that would blow over?

11:40AM   5   A. Yes.

11:40AM   6   Q. Did you know whether Vacanti stopped dealing with Paul

11:40AM   7   Humphries?

11:40AM   8   A. Yes, he did.

11:40AM   9   Q. Vacanti never got arrested, did he?

11:41AM   10   A. No.

11:41AM   11   Q. In terms of some general information that was passed to

11:41AM   12   you over time, was information passed to you about the types

11:41AM   13   of vehicles the DEA used on surveillance?

11:41AM   14   A. Yes.

11:41AM   15   Q. Who passed you that information?

11:41AM   16   A. Mike Masecchia.

11:41AM   17   Q. Where did that information come from?

11:41AM   18   A. Joe Bongiovanni.

11:41AM   19   Q. Was Lou Selva involved in that chain of information being

11:41AM   20   passed?

11:41AM   21   A. Yes.

11:41AM   22   Q. What were you told about the different types of

11:41AM   23   surveillance vehicles the DEA used?

11:41AM   24   A. To look out for utility vehicles that are lingering

11:41AM   25   around all the time.

11:41AM  1    Q.   Is that something you did as you lived at that big house

11:41AM  2    on 697 Lebrun?

11:41AM  3    A.   Yes.

11:41AM  4    Q.   Being on the corner with all those windows, did you have

11:41AM  5    a good vantage point of both streets that intersected around

11:42AM  6    you?

11:42AM  7    A.   Yes.

11:42AM  8    Q.   Were you vigilant?

11:42AM  9    A.   Yes.

11:42AM  10   Q.   Earlier you talked about passing of lists of names and

11:42AM  11   phone numbers.  Were the parameters and people involved in

11:42AM  12   your organization passed along to Defendant Bongiovanni?

11:42AM  13   A.   Yes.

11:42AM  14   Q.   Why was that important for you to do?

11:42AM  15   A.   To make sure that nobody else applying was being

11:42AM  16   investigated.

11:42AM  17   Q.   Was it your intent to maximize the defendant's ability to

11:42AM  18   look out for you?

11:42AM  19   A.   Yes.

11:42AM  20   Q.   Earlier we touched on you storing some marijuana at Lou

11:42AM  21   Selva's house in or about 2014; is that right?

11:42AM  22   A.   Yes.

11:42AM  23   Q.   By that point in time, had you set up a grow operation to

11:43AM  24   make plants grow to adulthood at Lou's house?

11:43AM  25   A.   Yes.

11:43AM 1  Q.  Talk about your decision -- withdrawn.

11:43AM 2     Talk about the discussions you had about setting up a

11:43AM 3  full-scale grow operation in Selva's basement?

11:43AM 4  A.  Just Mike asked me to build the room.

11:43AM 5  Q.  At Selva's house?

11:43AM 6  A.  Yes.

11:43AM 7  Q.  So did you go to Selva's house?

11:43AM 8  A.  Yes, I did.

11:43AM 9  Q.  Who was with you?

11:43AM 10  A.  Just me, Mike and Lou.

11:43AM 11  Q.  And did you guys talk?

11:43AM 12  A.  Yes.

11:43AM 13  Q.  Did you talk about why a decision was being made to set

11:43AM 14  up a full grow in Selva's house?

11:43AM 15  A.  Just that they wanted to.

11:43AM 16  Q.  Talk about the work you did that there.  Tell the jury.

11:43AM 17  A.  I ran all the electricity, and I spaced the lights and

11:43AM 18  hung four lights there, and $CO_2$ generator and an air filter

11:44AM 19  to clean the air.

11:44AM 20  Q.  How long did this work take you?

11:44AM 21  A.  Like, two days.

11:44AM 22  Q.  How many plants did you set up to grow there?

11:44AM 23  A.  It was usually 12 to 15 a light.  So probably around 60

11:44AM 24  plants.

11:44AM 25  Q.  What was the arrangement in terms of monetary

11:44AM   1   compensation or split between the three of you?

11:44AM   2   A.   Well, they were gonna split it, and I would just -- my

11:44AM   3   cut would be getting it at a cheaper price and selling it.

11:44AM   4   Q.   So it increased your capacity to move marijuana?

11:44AM   5   A.   Yes.

11:44AM   6   Q.   What, if anything, did Lou Selva say about setting up a

11:44AM   7   grow at his house as it related to Defendant Bongiovanni?

11:44AM   8   A.   That he would be good because if there was any

11:44AM   9   investigation, he would get a heads-up.

11:44AM   10   Q.   Was this grow operation at Selva's house set up and

11:45AM   11   continuous for several years?

11:45AM   12   A.   Yes.

11:45AM   13   Q.   Do you know how many years it went on for?

11:45AM   14   A.   That, I don't know.

11:45AM   15   Q.   After you set up the grow, did you also start storing

11:45AM   16   some marijuana at Selva's house?

11:45AM   17   A.   Occasionally.

11:45AM   18   Q.   Describe your discussions with Selva about storing

11:45AM   19   marijuana at his house.

11:45AM   20   A.   That I would pay -- well, that it was a good idea to

11:45AM   21   store it there, because if they were being investigated, he

11:45AM   22   would get the heads-up from Joe.

11:45AM   23   And then I paid Lou $50 on every pound, and Mike 100 if

11:45AM   24   he dropped it off to people for me.

11:45AM   25   Q.   During the timeframe where you were setting up a grow in

11:46AM    1    Lou's basement to grow plants to maturity, and during the

11:46AM    2    timeframe you were storing marijuana there, did you ever have

11:46AM    3    a discussion where Lou Selva relayed to you the defendant's

11:46AM    4    views on enforcing marijuana laws?

11:46AM    5    A.   That he wasn't -- he didn't believe that --

11:46AM    6    Q.   Can you use names, please?

11:46AM    7    A.   Oh.  Lou told me that Joe Bongiovanni said that marijuana

11:46AM    8    wasn't something that he cared to investigate.

11:46AM    9    Q.   Now as you understood it, had Lou been involved in the

11:47AM   10    operation going all the way back to 2008, clipping at the

11:47AM   11    Morgan Hollow road location?

11:47AM   12    A.   Yes.  I believe even before that, he was involved.

11:47AM   13    Q.   He's known Masecchia a long time?

11:47AM   14    A.   Yes.

11:47AM   15    Q.   Now at some point, did some marijuana, as far as you

11:47AM   16    understood it, come up missing at Lou's house?

11:47AM   17    A.   Yes.

11:47AM   18    Q.   Do you know specifically how or why?

11:47AM   19    A.   No, I don't.

11:47AM   20    Q.   Did you ever bring it up to Lou or Mike?

11:47AM   21    A.   No, I didn't know for sure, and I didn't want to accuse

11:47AM   22    anybody without evidence.

11:47AM   23    Q.   Did you know whether it was your mistake or their

11:47AM   24    mistakes?

11:47AM   25    A.   I felt pretty strongly that it was one of their mistakes,

11:47AM 1 but it's possible that it could have been mine, that's why I

11:47AM 2 didn't say anything.

11:47AM 3 Q. Did you ever have any problems with Lou or Mike?

11:47AM 4 A. No.

11:48AM 5 Q. Did you guys always get along?

11:48AM 6 A. Yes.

11:48AM 7 Q. Did business continue as usual between the three of you

11:48AM 8 after that?

11:48AM 9 A. Yes.

11:48AM 10 Q. Did you know Lou to have, like, adult-age kids, as well?

11:48AM 11 A. I believe he's got one daughter.

11:48AM 12 Q. Okay.  Regarding Mark Vitale, I'd like to focus you in on

11:48AM 13 that, we talked a little bit about it earlier, okay?

11:48AM 14 A. Yes.

11:48AM 15 Q. In or about December of 2015, I think you mentioned you

11:48AM 16 learned he was arrested?

11:48AM 17 A. Yes.

11:48AM 18 Q. Can you describe how you were supplying Vitale through

11:48AM 19 other people, for the jury?

11:48AM 20 A. I was at first giving it to my sister-in-law, Adrian

11:48AM 21 Fina.  And then eventually her boyfriend John Robinson was

11:48AM 22 supplying him.

11:48AM 23 Q. Was it -- whose decision was it to switch the person who

11:49AM 24 would provide Vitale the marijuana?

11:49AM 25 A. It was my decision.

11:49AM 1 Q. Why did you make the decision to switch from Fina to

11:49AM 2 Robinson as the person who would deal with Vitale?

11:49AM 3 A. Because my sister-in-law stole some Adderall that I had,

11:49AM 4 and I didn't want her in my house anymore.

11:49AM 5 Q. Okay. So basically, I think I said this Monday or

11:49AM 6 earlier, you gave that account to John Robinson to put it in

11:49AM 7 business terms?

11:49AM 8 A. Yes.

11:49AM 9 Q. How many years had you been supplying Mark Vitale through

11:49AM 10 either Adrian or John Robinson?

11:49AM 11 A. It was a couple years, two years.

11:49AM 12 Q. How much marijuana would he get from you routinely?

11:49AM 13 A. Not quite sure. I know he'd take, like, maybe 2 to

11:50AM 14 5 pounds. Sometimes I would give her maybe 5 pounds, or

11:50AM 15 Adrian 5 pounds, or John would take 10, 15 pounds. And I

11:50AM 16 don't know exactly the amounts that they were giving to

11:50AM 17 different people.

11:50AM 18 Q. That was pretty regularly though?

11:50AM 19 A. Yes.

11:50AM 20 Q. Who did you initially learn in our around December of

11:50AM 21 2015 that Mark Vitale had been arrested from?

11:50AM 22 A. Through my ex-wife.

11:50AM 23 Q. Your wife Lauren?

11:50AM 24 A. Yes.

11:50AM 25 Q. That's Adrian's sister?

11:50AM  1    A.  Yes.

11:50AM  2    Q.  What did you do when you learned that Vitale had been

11:50AM  3    arrested?

11:50AM  4    A.  I went and seen Mike.  Masecchia.

11:50AM  5    Q.  What did you want to know?

11:50AM  6    A.  I wanted to know if everything was okay.

11:50AM  7    Q.  What did you tell Masecchia?

11:50AM  8    A.  Told him that Mark Vitale's -- I heard that his house got

11:50AM  9    raided, and to check on and see if everything's okay.

11:50AM  10   Q.  Did Masecchia know who Vitale was?

11:51AM  11   A.  No.

11:51AM  12   Q.  Did you explain it to him?

11:51AM  13   A.  Yes.

11:51AM  14   Q.  What did you tell him about who Vitale was?

11:51AM  15   A.  I said that John Robinson was supplying Vitale through

11:51AM  16   me.

11:51AM  17   Q.  Did Mike Masecchia know who John Robinson was?

11:51AM  18   A.  Yes.

11:51AM  19   Q.  When you explained the significance of Vitale to

11:51AM  20   Masecchia, did he confirm that he would find out?

11:51AM  21   A.  Yes.

11:51AM  22   Q.  Who was he going to find out from?

11:51AM  23   A.  From Joe Bongiovanni.

11:51AM  24   Q.  What did Masecchia report back to you regarding that

11:51AM  25   situation?

11:51AM   1   A.   That everything was okay.

11:51AM   2   Q.   How much time elapsed from when you asked Masecchia to

11:51AM   3   find out about Vitale's arrest to when he reported back to

11:51AM   4   you that everything's okay?

11:51AM   5   A.   I believe it was the next day.

11:51AM   6   Q.   So it was pretty quick?

11:51AM   7   A.   Yes.

11:51AM   8   Q.   At that time of the Vitale arrest, did you know Joe

11:52AM   9   Bongiovanni's partner at DEA?  Did you know the name of who

11:52AM  10   his partner was?

11:52AM  11   A.   No.

11:52AM  12   Q.   Earlier, I talked -- we talked a little bit about when

11:52AM  13   you met Anthony Gerace in approximately 2015.  And I asked

11:52AM  14   you about supplying each other back and forth, and we went

11:52AM  15   through sort of the tractor-trailers that he helped you

11:52AM  16   unload.  But I don't think I asked you this.  I would like to

11:52AM  17   circle back.

11:52AM  18       Approximately how many times from 2015 on did you supply

11:53AM  19   Anthony Gerace with marijuana?

11:53AM  20   A.   Say, maybe ten times.

11:53AM  21   Q.   Okay.  And how many times did he supply you with

11:53AM  22   marijuana?

11:53AM  23   A.   Maybe around the same.

11:53AM  24   Q.   Okay.  And what was, like, an average amount that you

11:53AM  25   would supply Anthony?

11:53AM 1 A. Anywhere between 10 to 30 pounds. Nothing too much. The

11:53AM 2 same thing, it was just kind of to fill in gaps.

11:53AM 3 Q. And how much would he supply you?

11:53AM 4 A. About the same. Actually sometimes more because

11:53AM 5 sometimes he wasn't able to get rid of his, so I would get

11:53AM 6 rid of his for him.

11:53AM 7 Q. So if you're providing him 10 to 30 pounds, what's, like,

11:53AM 8 a range that he would provide you?

11:53AM 9 A. Anywhere from 10 to 50.

11:53AM 10 Q. And you said it was to fill in gaps. I think you covered

11:53AM 11 it earlier, but just --

11:53AM 12 A. If I got -- if I was out of marijuana, or if Anthony was

11:53AM 13 out of marijuana, we would help each other out.

11:53AM 14 Q. So you could keep supplying your customers?

11:54AM 15 A. Correct.

11:54AM 16 Q. Did you and Anthony also use cocaine together at times?

11:54AM 17 A. Yes.

11:54AM 18 Q. Did you ever provide him with any cocaine when you were

11:54AM 19 together?

11:54AM 20 A. I can't remember specifically, but I would imagine so.

11:54AM 21 Q. Did he ever provide you with cocaine when you were

11:54AM 22 together?

11:54AM 23 A. I would imagine so.

11:54AM 24 Q. Did you use opiates together at times?

11:54AM 25 A. All the time.

11:54AM   1   Q.  Did that -- was that often the fentanyl pills that you

11:54AM   2   talked about earlier?

11:54AM   3   A.  Yes.

11:54AM   4   Q.  Did you also on occasion sniff heroin with him?

11:54AM   5   A.  Yes.

11:54AM   6   Q.  And on an occasion when you did cocaine together, did he

11:54AM   7   snort some cocaine, then immediately make a statement about

11:54AM   8   David Oddo?

11:54AM   9   A.  Yes.

11:54AM  10   Q.  What did Anthony Gerace say after he snorted cocaine and

11:54AM  11   then immediately made a statement about David Oddo?

11:54AM  12   A.  He said --

11:55AM  13         **MR. MacKAY:**  Objection, hearsay.

11:55AM  14         **MR. TRIPI:**  It's not.  I can --

11:55AM  15         **THE COURT:**  Come on up, let me find out what it is.

11:55AM  16         (Sidebar discussion held on the record.)

11:55AM  17         **THE COURT:**  So, I recognize this objection could be

11:55AM  18   hearsay.  Let's find out.

11:55AM  19         **MR. TRIPI:**  It's -- I think it's admissible on

11:55AM  20   multiple fronts, Your Honor, that are exceptions to hearsay.

11:55AM  21         First, it's a present-sense impression.  The

11:55AM  22   contemporaneity ensures the reliability, because there's no

11:55AM  23   time for deliberate fabrication.  So it's -- he's immediately

11:55AM  24   sniffing and then making a comment about the quality of David

11:55AM  25   Oddo's cocaine, is what I expect to come out.

11:55AM 1        Additionally, by the time Anthony Gerace discloses,

11:55AM 2   as the conversation elaborates, he discloses his cocaine

11:55AM 3   supplier, they're already heavily involved in a multi-narcotic

11:55AM 4   distribution conspiracy.

11:55AM 5        **THE COURT:**  Even though they're co-conspirators?

11:55AM 6        **MR. TRIPI:**  Yeah.  Even though the primary drug is

11:55AM 7   marijuana, they're involved in other drugs together.

11:55AM 8        **THE COURT:**  I'm not so sure I agree with him in the

11:55AM 9   first point, but the second point --

11:56AM 10       **MR. MacKAY:**  So, so, what I think he's disclosing is

11:56AM 11  I get my cocaine from Oddo.  What -- what I think he's

11:56AM 12  disclosed is Anthony Gerace gets his cocaine from Oddo.

11:56AM 13       We've heard before on other trial that Serio does not

11:56AM 14  like Oddo, doesn't deal with him.  So he's not really part of

11:56AM 15  his network.

11:56AM 16       So this is really kind of this fringe thing that's

11:56AM 17  where Anthony Gerace is saying, yeah, I get my cocaine here

11:56AM 18  from Dave Oddo.  It doesn't -- it doesn't connect him to Ron

11:56AM 19  Serio, because again, Ron Serio has said I don't like Dave

11:56AM 20  Oddo, I don't deal with him, he's not part of my network.

11:56AM 21       Because I asked him at the prior trial was he part of

11:56AM 22  your network, he says no.

11:56AM 23       **MR. TRIPI:**  It doesn't matter.  Two narcotic

11:56AM 24  co-conspirators who supply one another cocaine.

11:56AM 25       Earlier I asked Mr. Serio, did you disclose your --

| | | |
|---|---|---|
| 11:56AM | 1 | where your product was coming from?  And he said yes. |
| 11:56AM | 2 | So these are the types of conversations that foster |
| 11:56AM | 3 | trust between co-conspirators. |
| 11:56AM | 4 | **THE COURT:**  There's no question that -- that Anthony |
| 11:57AM | 5 | Gerace and this defendant are involved in a conspiracy |
| 11:57AM | 6 | together. |
| 11:57AM | 7 | **MR. MacKAY:**  Correct. |
| 11:57AM | 8 | **THE COURT:**  There's no doubt that Anthony Gerace is |
| 11:57AM | 9 | supplying the cocaine to this defendant to use. |
| 11:57AM | 10 | **MR. MacKAY:**  For use, yes. |
| 11:57AM | 11 | **THE COURT:**  Yeah.  So Anthony Gerace saying here's |
| 11:57AM | 12 | where I got this cocaine from, and it's good stuff, how is |
| 11:57AM | 13 | that not a statement of a co-conspirator? |
| 11:57AM | 14 | They don't have to -- Serio and Oddo don't have to |
| 11:57AM | 15 | know each other, or like each other, or have any connection |
| 11:57AM | 16 | with each other. |
| 11:57AM | 17 | **MR. MacKAY:**  Well, I mean, I think it also raises the |
| 11:57AM | 18 | 403 confusion ground, because part of the government's theory |
| 11:57AM | 19 | is somehow David Oddo's name is on this Ron Serio file, he's |
| 11:57AM | 20 | somehow wrapped up in all of this. |
| 11:57AM | 21 | But that connection is broken, and he doesn't come in |
| 11:57AM | 22 | as part -- he's not someone who's working with Ron Serio. |
| 11:57AM | 23 | **THE COURT:**  That's an argument you can make.  I'm |
| 11:57AM | 24 | going to overrule the objection. |
| 11:57AM | 25 | **MR. TRIPI:**  I'm sorry. |

11:57AM 1           (End of sidebar discussion.)

11:57AM 2      **THE COURT:**  The objection is overruled.

11:58AM 3      **BY MR. TRIPI:**

11:58AM 4  Q.  After -- after Anthony snorted the cocaine and made a

11:58AM 5  statement about David Oddo, my question was:  What did

11:58AM 6  Anthony say immediately at that point?

11:58AM 7  A.  That David Oddo gets the best cocaine.  Sells the best

11:58AM 8  cocaine.

11:58AM 9  Q.  Did that indicate to you that Oddo was someone who

11:58AM 10  supplied Anthony with cocaine?

11:58AM 11  A.  Yes.

11:58AM 12  Q.  When you and Anthony would talk, did he ever offer to

11:58AM 13  hook you up with any type of suppliers that you needed beyond

11:58AM 14  marijuana, if the need arose?

11:58AM 15  A.  Excuse me?

11:58AM 16  Q.  Did Anthony ever offer to hook you up with other sources

11:58AM 17  of supply for other products if -- if you were interested?

11:58AM 18  A.  No.

11:58AM 19  Q.  But if you wanted cocaine from Anthony, you could get it

11:59AM 20  from him?

11:59AM 21  A.  Yes.

11:59AM 22  Q.  And you knew who his supplier was?

11:59AM 23  A.  Yes.

11:59AM 24  Q.  Now, through Anthony, did you meet his brother Peter

11:59AM 25  Gerace?

11:59AM   1   A.  Not through Anthony.  I met his brother once when I was

11:59AM   2   at a business meeting and he was at the same restaurant, and

11:59AM   3   a person I was with knew him.

11:59AM   4   Q.  Who were you with at this business meeting?

11:59AM   5   A.  My brother, and Larry Schiavi.

11:59AM   6   Q.  Who's that name?  Larry, what?

11:59AM   7   A.  Schiavi.

11:59AM   8   Q.  Did your brother know Peter Gerace?

11:59AM   9   A.  No.

11:59AM  10   Q.  Larry Schiavi?

11:59AM  11   A.  Yeah, I don't know how to spell it.

11:59AM  12   Q.  Okay.  That was going to be my question.

11:59AM  13       At some point after you met Peter Gerace, did you and

11:59AM  14   Anthony have a night where you went to Pharaoh's?

11:59AM  15   A.  One time.

11:59AM  16   Q.  Did you know Peter to be the owner?

11:59AM  17   A.  Yes.

11:59AM  18   Q.  Were you and Anthony using drugs that night?

11:59AM  19   A.  Yes.

11:59AM  20   Q.  What type of drugs were you and Anthony using at

11:59AM  21   Pharaoh's that night?

11:59AM  22   A.  Heroin.

11:59AM  23   Q.  Did you also use cocaine that night?

12:00PM  24   A.  I believe so.

12:00PM  25   Q.  Is that what you would do sometimes, use heroin and then

12:00PM 1 use cocaine to sort of level out?

12:00PM 2 A. Yeah, yes.

12:00PM 3 Q. Where did you and Anthony use the drugs that you were

12:00PM 4 using in Pharaoh's that night?

12:00PM 5 A. In the bathroom.

12:00PM 6 Q. Was Peter there that night?

12:00PM 7 A. No.

12:00PM 8 Q. When Anthony Gerace traveled with you to New York City to

12:00PM 9 procure marijuana, was the trip you took with him, was Mark

12:00PM 10 Falzone there?

12:00PM 11 A. Yes.

12:00PM 12 Q. Did Anthony Gerace eventually -- did you provide him

12:00PM 13 direct access to your residence?

12:00PM 14 A. Yes.

12:00PM 15 Q. So, did you -- did you have a gate at the driveway?

12:00PM 16 A. Yes.

12:00PM 17 Q. How would you get past the gate?

12:00PM 18 A. There was a pass code where you punched it in.

12:00PM 19 Q. Did you give Anthony that code?

12:01PM 20 A. Yes.

12:01PM 21 Q. And then did he have a key to your house?

12:01PM 22 A. He had a -- in the back door I had electronic locks, so

12:01PM 23 he had the code.

12:01PM 24 Q. Okay. Why did you give Anthony direct access to your

12:01PM 25 residence at 697 Lebrun?

12:01PM 1  A.  Because sometimes when I wasn't around, if he wanted

12:01PM 2  pills -- because he was a heavy user and he was going through

12:01PM 3  withdrawal -- I'd say go and just -- to my house and go in

12:01PM 4  there and get it.

12:01PM 5  Q.  Would the same apply for marijuana if he wanted

12:01PM 6  marijuana?

12:01PM 7  A.  Yes.

12:01PM 8  Q.  So you had a high level of trust with Anthony?

12:01PM 9  A.  Yes.

12:01PM 10  Q.  Did Anthony tell you he was also friends with Joe

12:01PM 11  Bongiovanni?

12:01PM 12  A.  I don't remember him saying that, but I wound up knowing

12:01PM 13  that he was.

12:01PM 14  Q.  Do you remember how you learned it?

12:01PM 15  A.  Through Mike Masecchia.

12:01PM 16  Q.  During times when you were around Anthony Gerace, did he

12:02PM 17  ever brag about his family?

12:02PM 18  A.  Yes.

12:02PM 19  Q.  In what regard?

12:02PM 20  A.  Just that they were connected.

12:02PM 21  Q.  And what did you understand that to mean?

12:02PM 22  A.  Meaning in the Mafia.

12:02PM 23  Q.  Did Anthony tell you who his grandfather was?

12:02PM 24  A.  Yes.

12:02PM 25  Q.  Who was that?

12:02PM  1    A.  Joe Todaro.

12:02PM  2    Q.  Senior?

12:02PM  3    A.  Yes.

12:02PM  4    Q.  By reputation, what was his reputation?

12:02PM  5           **MR. MacKAY:**  Objection, cumulative at this point.

12:02PM  6           **MR. TRIPI:**  As to Todaro Sr. Is my specific question.

12:02PM  7           **THE COURT:**  Overruled.

12:02PM  8           **THE WITNESS:**  That he was the head of the Mafia.

12:02PM  9           **BY MR. TRIPI:**

12:02PM  10   Q.  Did you interpret the manner in which Anthony talked

12:02PM  11   about his family as -- as bragging?

12:02PM  12   A.  Yes.

12:02PM  13   Q.  Now, I'd like to direct you to the day of your arrest on

12:02PM  14   April 18th, 2017.  Okay?

12:02PM  15   A.  Yes.

12:02PM  16   Q.  Were you arrested at Kelly Brace's house during a drug

12:03PM  17   deal?

12:03PM  18   A.  Yes.

12:03PM  19   Q.  Tell the jury what you did earlier that day, and how you

12:03PM  20   ended up getting arrested, and then I'll follow up.

12:03PM  21   A.  Earlier that day, Kelly called me and said that he needed

12:03PM  22   20 pounds.  So, I went to his house -- well, I talked to him

12:03PM  23   at his house, that's when he told me.

12:03PM  24      Then I believe I went to Grimsby, then Lebrun, because I

12:03PM  25   had the marijuana in two different spots, and then I went

12:03PM 1    back to his house.

12:03PM 2    Q.  Okay.  Let me ask you a question.  I don't think you've

12:03PM 3    mentioned Grimsby yet.  Did you own a house at 91 Grimsby?

12:03PM 4    A.  I rented a house at 91 Grimsby.

12:03PM 5    Q.  You rented it there?  Were you storing marijuana at both

12:03PM 6    those locations?

12:03PM 7    A.  Yes.

12:03PM 8    Q.  If you mentioned it, I forgot, so I apologize.

12:03PM 9         How much marijuana did Kelly Brace want?

12:03PM 10   A.  20 pounds.

12:03PM 11   Q.  So you had to go to the two locations to get it?

12:03PM 12   A.  Correct.

12:03PM 13   Q.  And then what happened?

12:03PM 14   A.  Then I got arrested.

12:04PM 15   Q.  After you got the marijuana, did you go back to Kelly's

12:04PM 16   house?

12:04PM 17   A.  Yes.  Yes, I went back to Kelly's house, and that's where

12:04PM 18   I got arrested.

12:04PM 19   Q.  And did he live at 370 Huntington?

12:04PM 20   A.  I'm not sure the address, but he lived on Huntington.

12:04PM 21   Q.  Was it in the City of Buffalo?

12:04PM 22   A.  Yes.

12:04PM 23   Q.  Okay.  Describe what happened in more specifics when you

12:04PM 24   got arrested.

12:04PM 25   A.  They came up the driveway.  I had to get on the ground.

12:04PM    1    And then they separated us, they brought me into the kitchen

12:04PM    2    and then took Kelly into another room.

12:04PM    3    Q.   Did they approach -- did law enforcement approach you

12:04PM    4    after you had brought the drugs out of your vehicle?

12:04PM    5    A.   Yes.  The garbage bag was in the garage in front of me

12:04PM    6    and Kelly.

12:04PM    7    Q.   Okay.  When you were brought into the kitchen, did you

12:04PM    8    know what law enforcement agency it was at that point?

12:04PM    9    A.   No.

12:04PM   10    Q.   And I think Monday you indicated you were a little upset?

12:04PM   11    A.   Yes.

12:05PM   12    Q.   Did you ask the law enforcement law officer for somebody?

12:05PM   13    A.   Joe Bongiovanni.

12:05PM   14    Q.   What exactly did you say to the officer who you were

12:05PM   15    talking with?

12:05PM   16    A.   I believe I said, Do you know Joe Bongiovanni?

12:05PM   17    Q.   And what was that officer's response in that

12:05PM   18    conversation?

12:05PM   19    A.   Yes.  Why, do you work for him?

12:05PM   20        Or do you -- do you work for him, meaning am I an

12:05PM   21    informant for him.

12:05PM   22    Q.   At that point, what did you do?

12:05PM   23    A.   I asked for my lawyer, and I didn't say anything else.

12:05PM   24    Q.   Why were you asking?  In your mind, why were you asking

12:05PM   25    for Joe Bongiovanni?

12:05PM 1  A. Well, I was pissed. And I just wanted to talk to him.

12:05PM 2  Q. Did you think he could help you?

12:05PM 3  A. Yes.

12:05PM 4  Q. Okay. I'm going to show you some photographs. Let me

12:05PM 5  just get these together.

12:05PM 6    This first batch is going to be 13 photos, I'll list them

12:05PM 7  for the record and then hand them up.

12:06PM 8  A. Okay.

12:06PM 9  Q. 41. Government Exhibit 41A-1, A-2, A-3 -- I'm sorry, I'm

12:06PM 10 only going to show you four, and 41A-13.

12:06PM 11   Okay? So again for the record, that's 41A-1, 2, 3, and

12:06PM 12 41A-13.

12:06PM 13   Do you recognize Government Exhibits 41A-1, 2, 3 and 13?

12:06PM 14 A. Yes.

12:06PM 15 Q. What do you recognize those to be?

12:06PM 16 A. The garage at Kelly's house, the bag of marijuana, and

12:06PM 17 the marijuana in the bag, and then my Range Rover.

12:06PM 18 Q. Okay. Do those all fairly and accurately depict your

12:07PM 19 Range Rover as is depicted that day, as well as the bag of

12:07PM 20 marijuana that was in Kelly Brace's garage that you brought

12:07PM 21 there?

12:07PM 22 A. Yes.

12:07PM 23     **MR. TRIPI:** The government offers 41A-1, 2, 3 and 13,

12:07PM 24 Your Honor.

12:07PM 25     **MR. MacKAY:** No objection.

12:07PM  1    **THE COURT:**  They are all admitted without objection.

12:07PM  2    **MR. TRIPI:**  Thank you.

12:07PM  3    **(GOV Exhibits 41A-1, 2, 3 and 13 were received in evidence.)**

12:07PM  4    **MR. TRIPI:**  Ms. Champoux, can we publish these for

12:07PM  5    the jury starting with 41A-1, and can we just split it with

12:07PM  6    41A-2, move it along a little bit?

12:07PM  7    **BY MR. TRIPI:**

12:07PM  8    Q.  Okay.  On the left we have Government Exhibit 41A-2 on

12:07PM  9    your screen, and on the right we have 41A, sorry, 41A-1 on

12:07PM  10   the left, 41A-2 on the right.

12:07PM  11       Starting with the photo on the left, Mr. Serio, can you

12:07PM  12   tell the jury what they're looking at there?

12:07PM  13   A.  At my Range Rover.

12:07PM  14   Q.  Is that parked next to someone else's vehicle?

12:07PM  15   A.  Kelly Brace's vehicle.

12:07PM  16   Q.  Okay.  So, you pulled into his backyard?

12:08PM  17   A.  Correct.

12:08PM  18   Q.  And 41A-2, what is that?

12:08PM  19   A.  That is the bag of marijuana.

12:08PM  20   Q.  Okay.  And you said how much was in there?

12:08PM  21   A.  20 pounds.  Either 19 or 20.

12:08PM  22   **MR. TRIPI:**  Okay.  Ms. Champoux, can we take those

12:08PM  23   down and publish 41A-3 and 41A-13, please?

12:08PM  24   **BY MR. TRIPI:**

12:08PM  25   Q.  And tell the jury what they're looking at there.

12:08PM 1  A.  The marijuana that was in the garbage bag in the garage.

12:08PM 2  Q.  And is that how the marijuana was packaged, you know,

12:08PM 3  after it would be delivered from Jarrett Guy?

12:08PM 4  A.  Yes.

12:08PM 5  Q.  Are those each 1-pound bags?

12:08PM 6  A.  Yes.

12:08PM 7      **MR. TRIPI:**  We can take that down, Ms. Champoux,

12:08PM 8  thank you.

12:08PM 9      **BY MR. TRIPI:**

12:08PM 10 Q.  And as you understand it, after you were taken into

12:09PM 11 custody that day, did law enforcement, the Erie County

12:09PM 12 Sheriffs, ultimately obtain search warrants for your house at

12:09PM 13 697 Lebrun, as well as your property at 91 Grimsby?

12:09PM 14 A.  Yes.

12:09PM 15 Q.  I'm going to hand you up some photos.  These are going to

12:09PM 16 be Government Exhibits 41A-1 through 42A-32.  With the

12:10PM 17 exception of 42A-10, I'm going to take that one out.  So,

12:10PM 18 poor quality.  So 42A-1 through 9, and then 11 through 32 is

12:10PM 19 what I'm handing up.

12:10PM 20     Take a moment look through those, when you're done,

12:10PM 21 please look up.

12:11PM 22     Mr. Serio, do you recognize 42A-1 through 9 and 42A-11

12:11PM 23 through 32?

12:11PM 24 A.  Yes.

12:11PM 25 Q.  Generally, do those all depict your residence at 697

12:12PM 1  Lebrun and the various items that were observed and seized by

12:12PM 2  law enforcement that day?

12:12PM 3  A.  Yes.

12:12PM 4  Q.  Do they all fairly and accurately depict things you had

12:12PM 5  and locations in your house that day?

12:12PM 6  A.  Yes.

12:12PM 7        **MR. TRIPI:**  The government offers Exhibit 42A-1

12:12PM 8  through 9, and 42A-11 through 32, Your Honor.

12:12PM 9        **MR. MacKAY:**  No objection.

12:12PM 10       **THE COURT:**  Received without objection.  They're

12:12PM 11  admitted without objection.

12:12PM 12       **MR. TRIPI:**  Thank you.

12:12PM 13  **(GOV Exhs 42A-1 to 9, 42A-11 to 32 were received in evidence.)**

12:12PM 14       **MR. TRIPI:**  Ms. Champoux, let's start, I guess, I

12:12PM 15  want to pull up 42A-33, which is already in evidence.

12:12PM 16       **BY MR. TRIPI:**

12:12PM 17  Q.  So this is the scene, front view, front of your house

12:12PM 18  from Lebrun?

12:12PM 19  A.  Yes.

12:12PM 20       **MR. TRIPI:**  Okay.  Let's go to 42A-1, Ms. Champoux.

12:12PM 21       **BY MR. TRIPI:**

12:12PM 22  Q.  I guess we're starting in a -- some type of drawer, but

12:12PM 23  is that some ammo you had in your house?

12:12PM 24  A.  Yes.

12:12PM 25       **MR. TRIPI:**  Let's go to 42A-2.

12:12PM 1      **BY MR. TRIPI:**

12:12PM 2   Q.  Tell the jury what's depicted here.

12:13PM 3   A.  That's my closet, my front foyer, and bags of marijuana.

12:13PM 4   Q.  This is on the first floor of the residence?

12:13PM 5   A.  Yes.

12:13PM 6      **MR. TRIPI:**  Let's go to 42A-3.

12:13PM 7      **BY MR. TRIPI:**

12:13PM 8   Q.  And tell the jury what's depicted there.

12:13PM 9   A.  It's an AR-15.

12:13PM 10  Q.  Did you have that for your protection because you were

12:13PM 11  involved in drug dealing?

12:13PM 12  A.  Yes.

12:13PM 13  Q.  And because you stored drugs and money at your house?

12:13PM 14  A.  Yes.

12:13PM 15  Q.  Okay.

12:13PM 16     **MR. TRIPI:**  Let's go to 42A-4, please.

12:13PM 17     **BY MR. TRIPI:**

12:13PM 18  Q.  Is that just a close-up of some of the specifics of the

12:13PM 19  firearm?

12:13PM 20  A.  Yes.

12:13PM 21     **MR. TRIPI:**  Let's go to 42A-3.  Or, 5, I'm sorry.

12:13PM 22     **BY MR. TRIPI:**

12:13PM 23  Q.  What's depicted there?

12:13PM 24  A.  Marijuana.

12:13PM 25  Q.  And what part of your house is that generally?

12:13PM     1    A.   That's my laundry room.

12:13PM     2              **MR. TRIPI:**  Okay.  Let's go to 42A-6.

12:13PM     3              **BY MR. TRIPI:**

12:13PM     4    Q.   Is that a view of some of the marijuana in the bag that

12:14PM     5    was in the prior photo?

12:14PM     6    A.   Correct.

12:14PM     7              **MR. TRIPI:**  Let's go to 42A-7.

12:14PM     8              **BY MR. TRIPI:**

12:14PM     9    Q.   Is that another view of that foyer room where you had

12:14PM    10    some marijuana?

12:14PM    11    A.   Yes.

12:14PM    12              **MR. TRIPI:**  Let's go to 42A-8.

12:14PM    13              **BY MR. TRIPI:**

12:14PM    14    Q.   And what are we looking at here?

12:14PM    15    A.   Marijuana.

12:14PM    16    Q.   Is that looking into some of the bags that are in that

12:14PM    17    front foyer?

12:14PM    18    A.   Yes.

12:14PM    19    Q.   After you would take the marijuana in the 1-pound bags,

12:14PM    20    would you generally transfer it into black bag, garage bags

12:14PM    21    or boxes?

12:14PM    22    A.   Yes.

12:14PM    23    Q.   Okay.

12:14PM    24              **MR. TRIPI:**  Let's go to 42A-9.

           25

12:14PM 1      **BY MR. TRIPI:**

12:14PM 2    Q.  Are those just some discarded packaging material?

12:14PM 3    A.  Yes.

12:14PM 4    Q.  Is that for marijuana that you reweighed and then

12:14PM 5    repackaged?  Or can you describe how that ends up in your

12:14PM 6    house for the jury?

12:14PM 7    A.  Yes, sometimes I would take the marijuana, if it weighed

12:15PM 8    over a pound, and I would take the extra out and then reseal

12:15PM 9    it, and then sometimes I would have extra bags.

12:15PM 10   Q.  Okay.

12:15PM 11          **MR. TRIPI:**  Let's go to 42A-11.

12:15PM 12          **BY MR. TRIPI:**

12:15PM 13   Q.  And can you tell the jury what they're looking at there?

12:15PM 14   A.  Those are packages of 2 pounds of marijuana, low-grade

12:15PM 15   marijuana.

12:15PM 16   Q.  What's the difference between the 2-pound packages and

12:15PM 17   the 1-pound packages that we've seen?

12:15PM 18   A.  The 2-pound packages are cheaper.  They're usually around

12:15PM 19   600 a pound, where the other ones are 2,000 a pound.  And

12:15PM 20   those come from Mexico, versus the higher grade is grown

12:15PM 21   either in Vancouver or California.

12:15PM 22   Q.  Was the low-grade marijuana from Mexico also sourced

12:15PM 23   through Jarrett Guy?

12:15PM 24   A.  Jarrett Guy, and also a few times Jacob Martinez.

12:15PM 25   Q.  Okay.

12:15PM  1    **MR. TRIPI:** Let's go to 42A-12.

12:15PM  2          **BY MR. TRIPI:**

12:16PM  3    Q.  More magazines for your gun?

12:16PM  4    A.  Yes.

12:16PM  5          **MR. TRIPI:** Let's go to 42A-13.

12:16PM  6          **BY MR. TRIPI:**

12:16PM  7    Q.  Is that a scale?

12:16PM  8    A.  Yes.

12:16PM  9    Q.  What did you use that for?

12:16PM  10   A.  To weigh the marijuana.

12:16PM  11         **MR. TRIPI:** Let's go to 42A-14.

12:16PM  12         **BY MR. TRIPI:**

12:16PM  13   Q.  What's that?

12:16PM  14   A.  Money counter.

12:16PM  15   Q.  Why did you need that?

12:16PM  16   A.  To count the money.

12:16PM  17         **MR. TRIPI:** Let's go to 42A-15.

12:16PM  18         **BY MR. TRIPI:**

12:16PM  19   Q.  Tell the jury, generally, what's depicted in that photo?

12:16PM  20   A.  Various pills.

12:16PM  21   Q.  What various types of pills are there?

12:16PM  22   A.  Methadone, oxycodone, and OxyContin.

12:16PM  23         **MR. TRIPI:** Okay.  Let's go to 42A-16.  And 42A-17.

12:16PM  24         **BY MR. TRIPI:**

12:16PM  25   Q.  Does that generally depict some more pills that were in

| | | |
|---|---|---|
| 12:16PM | 1 | your house? |
| 12:16PM | 2 | A.  Yes. |
| 12:16PM | 3 | **MR. TRIPI:**  Let's go to 42A-18. |
| 12:17PM | 4 | **BY MR. TRIPI:** |
| 12:17PM | 5 | Q.  Does that depict more ammunition? |
| 12:17PM | 6 | A.  Yes. |
| 12:17PM | 7 | **MR. TRIPI:**  Let's go to 42A-19. |
| 12:17PM | 8 | **BY MR. TRIPI:** |
| 12:17PM | 9 | Q.  Is that a close-up of some ammunition in a magazine? |
| 12:17PM | 10 | A.  Yes. |
| 12:17PM | 11 | **MR. TRIPI:**  Let's go to 42A-20. |
| 12:17PM | 12 | **BY MR. TRIPI:** |
| 12:17PM | 13 | Q.  Is that some more of the marijuana packaging as you've |
| 12:17PM | 14 | previously described? |
| 12:17PM | 15 | A.  Yes. |
| 12:17PM | 16 | Q.  Cut open bags? |
| 12:17PM | 17 | A.  Yes. |
| 12:17PM | 18 | **MR. TRIPI:**  Let's go to 42A-21. |
| 12:17PM | 19 | **BY MR. TRIPI:** |
| 12:17PM | 20 | Q.  What's that? |
| 12:17PM | 21 | A.  It's a cocaine residue and marijuana residue. |
| 12:17PM | 22 | Q.  Is that a plate? |
| 12:17PM | 23 | A.  Yes. |
| 12:17PM | 24 | Q.  Is that a plate that you had in, like, a bar area? |
| 12:17PM | 25 | A.  Yes. |

12:17PM    1    Q.  So that was something that you would put lines of cocaine

12:17PM    2    on?

12:17PM    3    A.  Correct.

12:17PM    4    Q.  Were there times when you had people over and people used

12:17PM    5    cocaine up there?

12:17PM    6    A.  Yes.

12:17PM    7            **MR. TRIPI:**  Let's go to 42A-22.

12:17PM    8            **BY MR. TRIPI:**

12:17PM    9    Q.  And what's depicted there?

12:18PM   10    A.  Empty bags of marijuana.

12:18PM   11            **MR. TRIPI:**  Let's go to 42A-23.

12:18PM   12            **BY MR. TRIPI:**

12:18PM   13    Q.  You were a big gambler, right?

12:18PM   14    A.  Yes.

12:18PM   15            **MR. TRIPI:**  Let's go to 42A-24.

12:18PM   16            **BY MR. TRIPI:**

12:18PM   17    Q.  And again, is that more empty packaging for marijuana?

12:18PM   18    A.  Yes.

12:18PM   19    Q.  Is this in your basement?

12:18PM   20    A.  Yes.

12:18PM   21            **MR. TRIPI:**  Let's go to 42A-25.

12:18PM   22            **BY MR. TRIPI:**

12:18PM   23    Q.  What's depicted there?

12:18PM   24    A.  An air filter.

12:18PM   25    Q.  Okay.  Now, I think Monday you talked about having a

12:18PM  1   marijuana grow at 697 Lebrun?

12:18PM  2   A.  Yes.

12:18PM  3   Q.  Does 42A-25 depict the area where you had the plants

12:18PM  4   growing?

12:18PM  5   A.  Yes.

12:18PM  6   Q.  It looks like there's some, like, racks at the ceiling.

12:18PM  7   Were those part of the grow, or is that where you hung the

12:18PM  8   lights?

12:18PM  9   A.  That's the structure of the house, because on top of it

12:18PM  10  was a tile floor.  So back then, they used to have beams like

12:19PM  11  that to pour the concrete and the tile.  But that's where I

12:19PM  12  hung the lights, off the beams.

12:19PM  13  Q.  How many plants did you have in your basement there?

12:19PM  14  A.  I want to say it was, like, under 100.

12:19PM  15  Q.  Under 100?

12:19PM  16  A.  Yep.

12:19PM  17  Q.  Was it 100 because you knew the mandatory minimum and you

12:19PM  18  were living there?

12:19PM  19  A.  No, at that point it was because I couldn't fit more in

12:19PM  20  there, so --

12:19PM  21  Q.  Couldn't fit any more?

12:19PM  22  A.  No.

12:19PM  23          **MR. TRIPI:**  Let's go to 42A-26.

12:19PM  24          **BY MR. TRIPI:**

12:19PM  25  Q.  What's -- what's that?

12:19PM   1   A.  It's a timer for the lights.

12:19PM   2   Q.  Okay.  Did you set something like that up in Lou Selva's

12:19PM   3   basement, too?

12:19PM   4   A.  Yeah, every place I set something up, I did that.

12:19PM   5   Q.  What was the purpose of having them on a timer?

12:19PM   6   A.  Because they have to be turned on and off at the same

12:19PM   7   time in sync for -- for it to work, for it to go into the

12:19PM   8   budding cycle.

12:19PM   9   Q.  When you were doing -- setting up these grows, were you

12:19PM   10  cognizant of triggering any red flags with the utility

12:20PM   11  companies?

12:20PM   12  A.  Yes.

12:20PM   13  Q.  How did you learn about that?

12:20PM   14  A.  I think one time I -- I was doing it in the early 2000s,

12:20PM   15  and I had too many lights, and then National Grid wanted to

12:20PM   16  put in a demand meter because there was so much electricity.

12:20PM   17  Which a demand meter, it measures the amount of usage every

12:20PM   18  15 minutes so it could track at what times.  And then if

12:20PM   19  you're doing 12 hours on, 12 hours off every day, and then

12:20PM   20  switch to 18/6, they can see and trigger red flags.

12:20PM   21  Q.  Would the demand meter, would the meter reader come to

12:20PM   22  the house more often?

12:20PM   23  A.  No, at the same time.  But it's just they can see the --

12:20PM   24  the usage of energy in specific times.

12:20PM   25  Q.  Okay.  So you wanted to avoid that?

12:20PM 1  A.  Yes.  Because if you have zero electricity on at -- for

12:20PM 2  12 hours, and then electricity going for 12 hours on, then

12:20PM 3  that's usually a sign of a marijuana grow.

12:20PM 4  Q.  So how did you avoid that by setting up this timer?

12:21PM 5  A.  Well, I would just do enough lights to keep it under the

12:21PM 6  demand meter.  That's why some places I'd only do six lights

12:21PM 7  or four lights, because -- I forgot what the wattage is, if

12:21PM 8  you go over a certain wattage, then they put the demand meter

12:21PM 9  in.  Or if it's a residence, then they investigate it.

12:21PM 10  Q.  So you knew the wattage that you needed to stay below?

12:21PM 11  A.  Correct.

12:21PM 12  Q.  What other tactics did you use to make sure you didn't

12:21PM 13  use a lot of energy, to stay below the wattage?

12:21PM 14  A.  I would turn lights on -- the lights on at night because

12:21PM 15  then it would keep the air conditioning low and the fans low,

12:21PM 16  because the temperatures drop at night versus the daytime.

12:21PM 17  So you use less cooling doing it that way.

12:21PM 18  Q.  So, so your house was using less energy, legitimate --

12:21PM 19  legitimate energy for other house functions?

12:21PM 20  A.  Correct.

12:21PM 21  Q.  Okay.

12:21PM 22      **MR. TRIPI:**  Let's go to 42A-27.

12:21PM 23      **BY MR. TRIPI:**

12:21PM 24  Q.  Is this what you built to walk into for the grow in the

12:22PM 25  basement?

12:22PM 1  A.  I was going to refinish the basement, and that room was

12:22PM 2  already there.  I kind of just put drywall in front of it to

12:22PM 3  kind of block it off.

12:22PM 4  Q.  Okay.  So behind that drywall is where the marijuana

12:22PM 5  plants were growing?

12:22PM 6  A.  Correct.

12:22PM 7          **MR. TRIPI:**  Let's go to 42A-28.

12:22PM 8          **BY MR. TRIPI:**

12:22PM 9  Q.  Here, do we see basically more packaging material?

12:22PM 10  A.  Yes.

12:22PM 11          **MR. TRIPI:**  Let's go to 42A-29.

12:22PM 12          **BY MR. TRIPI:**

12:22PM 13  Q.  Did you have a shotgun, somewhere?

12:22PM 14  A.  At some point, I did.

12:22PM 15  Q.  Okay.  That's a round of shotgun ammunition?

12:22PM 16  A.  Correct.

12:22PM 17          **MR. TRIPI:**  Let's go to 42A-30.

12:22PM 18          **BY MR. TRIPI:**

12:22PM 19  Q.  What are we looking at here?

12:22PM 20  A.  Those were a key holder for some of the properties that I

12:22PM 21  had.

12:22PM 22  Q.  Were those rental properties, or what were they?

12:22PM 23  A.  Rental properties.

12:22PM 24  Q.  Okay.  And we see the key holders for 82 Sycamore and 608

12:23PM 25  Michigan; is that right?

| | | |
|---|---|---|
| 12:23PM | 1 | A.  Correct. |
| 12:23PM | 2 | Q.  Did you ever have any other marijuana grows at any of |
| 12:23PM | 3 | those locations? |
| 12:23PM | 4 | A.  No. |
| 12:23PM | 5 | Q.  Okay.  So those are strictly rentals? |
| 12:23PM | 6 | A.  Correct. |
| 12:23PM | 7 | Q.  Including 132 Rhode Island? |
| 12:23PM | 8 | A.  Well, that actually was -- I was holding a mortgage for |
| 12:23PM | 9 | somebody, and I had to foreclose on it. |
| 12:23PM | 10 | Q.  Who were you holding the mortgage for? |
| 12:23PM | 11 | A.  For Jay Camacho, I believe. |
| 12:23PM | 12 | Q.  Who? |
| 12:23PM | 13 | A.  Jay Camacho. |
| 12:23PM | 14 | Q.  And who's that? |
| 12:23PM | 15 | A.  A friend of mine. |
| 12:23PM | 16 | Q.  Is that someone who worked for you at your debt |
| 12:23PM | 17 | collection agency? |
| 12:23PM | 18 | A.  Correct. |
| 12:23PM | 19 | Q.  Okay.  So the only drug premises that you held out of |
| 12:23PM | 20 | these properties, would it be accurate to say, was 82 |
| 12:23PM | 21 | Sycamore and 608 Michigan? |
| 12:23PM | 22 | A.  Correct. |
| 12:23PM | 23 | **MR. TRIPI:**  Can we go to 42A-31? |
| 12:24PM | 24 | **BY MR. TRIPI:** |
| 12:24PM | 25 | Q.  And, again, we see more empty packaging for marijuana |

12:24PM    1    there?

12:24PM    2    A.  Yes.

12:24PM    3             **MR. TRIPI:**  How about 42A-32.

12:24PM    4             **BY MR. TRIPI:**

12:24PM    5    Q.  The last photo in this set.  That's another view of the

12:24PM    6    same key thing?  Sorry about that.

12:24PM    7    A.  Yes.

12:24PM    8             **MR. TRIPI:**  We'll take that down, Ms. Champoux.

12:24PM    9             **BY MR. TRIPI:**

12:24PM   10    Q.  Now you've also had an opportunity to review all of the

12:24PM   11    evidence that was seized from your house as depicted in those

12:24PM   12    photos, correct?

12:24PM   13    A.  Correct.

12:24PM   14    Q.  All right.  I've handed up Government Exhibit 53,

12:24PM   15    Mr. Serio.  Have you seen that before?

12:24PM   16    A.  Yes.

12:24PM   17    Q.  Is that a portion of the marijuana and packaging material

12:24PM   18    that was seized from your residence at 697 Lebrun, as we've

12:25PM   19    just seen in some of the photos there?

12:25PM   20    A.  Yes.

12:25PM   21    Q.  Other than the fact that it's now in a government bag and

12:25PM   22    has some labelling on it, is it in the same or substantially

12:25PM   23    same condition today as when it was recovered from your

12:25PM   24    house?

12:25PM   25    A.  Yes.

12:25PM 1 Q. I'm going hand you up some other exhibits, we're going to

12:25PM 2 try to do the speed round to get this in before lunch, okay?

12:25PM 3 A. Okay.

12:25PM 4     **MR. TRIPI:** For the record, Your Honor, I'm going to

12:25PM 5 hand up Exhibit 57, 58, 56, sorry, I'm out of order here. 55,

12:25PM 6 54, and 59.

12:25PM 7     **THE COURT:** So that's 54 through 59?

12:25PM 8     **MR. TRIPI:** Yeah. I said them out.

12:25PM 9     **THE COURT:** That's okay.

12:25PM 10     **MR. TRIPI:** I just tried to make it harder for

12:25PM 11 everyone, Judge.

12:25PM 12     **THE COURT:** Well, yeah, I'm just showing you I was

12:26PM 13 paying attention.

12:26PM 14     **MR. TRIPI:** So 53 to 59. I'm showing now 45 to 59.

12:26PM 15     **BY MR. TRIPI:**

12:26PM 16 Q. Look through those, Mr. Serio.

12:26PM 17 Do you recognize Exhibits 54 through 59?

12:26PM 18 A. Yes.

12:26PM 19 Q. Did you see those items in some of the photos we just

12:26PM 20 looked at?

12:26PM 21 A. Yes.

12:26PM 22 Q. What do you recognize Exhibits 54 through 59 to contain?

12:26PM 23 A. To contain methadone, various opiates, and Adderall.

12:26PM 24 Q. And were those depicted in the photos we saw?

12:26PM 25 A. Yes.

12:26PM   1   Q.  Other than the fact that they're now in those bags and

12:26PM   2   they've, you know, been packaged up by law enforcement, do

12:26PM   3   you recognize them to be in the same or substantially same

12:27PM   4   condition today as when they were in your house?

12:27PM   5   A.  Yes.

12:27PM   6   Q.  Do some of them have your name on the packaging?

12:27PM   7   A.  Yeah, the prescription bottle I believe.

12:27PM   8   Q.  Okay.  Some of those drugs were prescribed?

12:27PM   9   A.  I think the -- no, I think it was before there was one.

12:27PM  10   Q.  So those were old prescription bottles?

12:27PM  11   A.  Yes.

12:27PM  12        MR. TRIPI:  Judge, with that foundation, we'll offer

12:27PM  13   Exhibits 54 through 59, as well.

12:27PM  14        MR. MacKAY:  No objection.

12:27PM  15        THE COURT:  Received without objection.

12:27PM  16     **(GOV Exhibits 53 through 59 were received in evidence.)**

12:27PM  17        MR. TRIPI:  Just going to publish what I've put into

12:27PM  18   evidence, Judge.

12:27PM  19        Oh, I'm offering 53 as well.

12:27PM  20        MR. MacKAY:  No objection, as well.

12:27PM  21        THE COURT:  That's okay.  They're all received

12:27PM  22   without objection.

12:27PM  23        MR. TRIPI:  Publishing first Exhibit 53.  54.  55.

12:28PM  24        BY MR. TRIPI:

12:28PM  25   Q.  Mr. Serio, what are these orange ones, Exhibit 55?

12:28PM    1    A.   I'm not quite sure.

12:28PM    2    Q.   You don't remember?

12:28PM    3    A.   No.

12:28PM    4         **MR. TRIPI:**   Now publishing 56.

12:28PM    5         Publishing 57.

12:28PM    6         And 58 and 59.

12:28PM    7         Judge, I think this is probably a good spot if you're

12:28PM    8    ready to break for lunch.

12:28PM    9         **THE COURT:**   Yeah, perfect time.  So we'll break for

12:28PM   10    lunch.

12:29PM   11         Please remember my instructions.  Don't communicate

12:29PM   12    about the case with anyone including each other.  Don't use

12:29PM   13    tools of technology to communicate about the case or research

12:29PM   14    the case.  Don't read, or watch, or listen to any news

12:29PM   15    coverage if there is any while the trial is in progress.  And

12:29PM   16    don't make up your mind about anything until you start

12:29PM   17    deliberating.

12:29PM   18         Let's come back about 1:30, maybe 1:40, we'll say

12:29PM   19    1:40.  Okay?  We'll see you then.

12:29PM   20         (Jury excused at 12:29 p.m.)

12:29PM   21         **THE COURT:**   Anything before we break from the

12:29PM   22    government?

12:29PM   23         **MR. TRIPI:**   No, Your Honor.  Just we'll be moving

12:29PM   24    into the last property after the break.  I want to assure you

12:30PM   25    I've curated it down from 99 photos that we did last time down

| | | |
|---|---|---|
| 12:30PM | 1 | to 25. |
| 12:30PM | 2 | **THE COURT:** That sounds pretty good. |
| 12:30PM | 3 | **MR. TRIPI:** Yeah, I just want to let you know I did |
| 12:30PM | 4 | that. |
| 12:30PM | 5 | **THE COURT:** Okay. Anything from the defense? |
| 12:30PM | 6 | **MR. MacKAY:** No, Your Honor. |
| 12:30PM | 7 | **THE COURT:** Okay. We'll see you back here in about |
| 12:30PM | 8 | an hour and ten minutes. Thanks, everybody. |
| 12:30PM | 9 | **MR. MacKAY:** Thanks, Judge. |
| 12:30PM | 10 | (Off the record at 12:30 p.m.) |
| 01:47PM | 11 | (Back on the record at 1:47 p.m.) |
| 01:47PM | 12 | (Jury not present.) |
| 01:47PM | 13 | **THE CLERK:** All rise. |
| 01:47PM | 14 | **THE COURT:** Please be seated. |
| 01:47PM | 15 | **THE CLERK:** We are back on the record for the |
| 01:47PM | 16 | continuation of the jury trial in case number 19-cr-227, |
| 01:47PM | 17 | United States of America versus Joseph Bongiovanni. |
| 01:47PM | 18 | All counsel and parties are present. |
| 01:47PM | 19 | **THE COURT:** Okay. Anything we need to do before we |
| 01:47PM | 20 | resume, Mr. Tripi? |
| 01:47PM | 21 | **MR. TRIPI:** Not from the government. |
| 01:47PM | 22 | **THE COURT:** Mr. MacKay? |
| 01:47PM | 23 | **MR. MacKAY:** No, Your Honor. No. |
| 01:47PM | 24 | **THE COURT:** Okay. Let's get the witness back in. |
| 01:47PM | 25 | And let's bring the jurors back in, please, Pat. |

| | | |
|---|---|---|
| 01:48PM | 1 | (Jury seated at 1:48 p.m.) |
| 01:49PM | 2 | **THE COURT:** Okay. The record will reflect that all |
| 01:49PM | 3 | our jurors are, again, present. |
| 01:49PM | 4 | Folks, I think I told you we have a hard stop today |
| 01:49PM | 5 | at 4:30 because of my schedule. But next week, we may try to |
| 01:49PM | 6 | go to 5:30 more often than not, so if you come in in the |
| 01:49PM | 7 | morning and you can't stay until 5:30, let me know, okay? |
| 01:49PM | 8 | Because we're going to try to make up a little time by going |
| 01:49PM | 9 | until 5:30, get a couple hours in extra, okay? |
| 01:49PM | 10 | I remind the witness he's still under oath. |
| 01:49PM | 11 | Mr. Tripi, you may continue. |
| 01:49PM | 12 | **MR. TRIPI:** Thank you, Your Honor. |
| 01:49PM | 13 | **BY MR. TRIPI:** |
| 01:49PM | 14 | Q. Mr. Serio, I'd like to move on to the April 18th, 2017 |
| 01:49PM | 15 | search of your property at 91 Grimsby. |
| 01:49PM | 16 | Ultimately, are you aware that items were located and |
| 01:49PM | 17 | seized there by members of the Erie County Sheriff's Office? |
| 01:50PM | 18 | A. Yes. |
| 01:50PM | 19 | Q. I'm going to hand you up a number of exhibits. These are |
| 01:50PM | 20 | going to be photographs. I'll state them for the record and |
| 01:50PM | 21 | then I'll hand them up. |
| 01:50PM | 22 | I'm going to hand you Government Exhibit 43A-78, 43A-71, |
| 01:50PM | 23 | 43A-1, 43A-2, 43A-8, 43A-9, 43A-10, 43A-14, 43A-15, 43A-17, |
| 01:50PM | 24 | 43A-19, 43A-20, 43A-22, 43A-36, 43A-37, 43A-39, 43A-40, |
| 01:51PM | 25 | 43A-45, 43A-46, 43A-47, 43A-49, 43A-73, 43A-80, 43A-81, |

01:51PM   1   43A-82, 43A-84.  I'm going to hand you up all those exhibits

01:51PM   2   I've just listed, okay?

01:51PM   3       Take a moment, look at these, and when you're done please

01:51PM   4   look up.

01:51PM   5               **MR. MacKAY:**  Is 3 and 4 --

01:51PM   6               **MR. COOPER:**  No, Parker.

01:51PM   7               **MR. TRIPI:**  No, I skipped over those.

01:52PM   8               **MR. COOPER:**  Also, no.

01:52PM   9               **MR. MacKAY:**  Okay.  Good.  I got them all.  Thanks.

01:52PM   10              **BY MR. TRIPI:**

01:52PM   11  Q.  Do you recognize what's depicted in those exhibits?

01:52PM   12  A.  Yes.

01:52PM   13  Q.  Do each of those exhibits fairly and accurately depict

01:52PM   14  your property that you had at 91 Grimsby, as well as items

01:52PM   15  that you had stored at the location, as of the date of your

01:52PM   16  arrest on April 18th, 2017?

01:52PM   17  A.  Yes.

01:52PM   18  Q.  Do they all fairly and accurately depict the items and

01:52PM   19  the property as it existed that day?

01:53PM   20  A.  Yes.

01:53PM   21              **MR. TRIPI:**  The government offers that list that I've

01:53PM   22  read into the record, Your Honor.

01:53PM   23              **MR. MacKAY:**  No objection.

01:53PM   24              **THE COURT:**  They are all received without objection.

01:53PM   25              **MR. TRIPI:**  Thank you, Your Honor.

01:53PM    1        **(GOV Exhibits 43A-78, 43A-71, 43A-1, 43A-2,**

01:53PM    2         **43A-8, 43A-9, 43A-10, 43A-14, 43A-15, 43A-17,**

01:53PM    3          **43A-19, 43A-20, 43A-22, 43A-36, 43A-37, 43A-39,**

01:53PM    4          **43A-40, 43A-45, 43A-46, 43A-47, 43A-49, 43A-73,**

01:50PM    5     **43A-80, 43A-81, 43A-82, 43A-84 were received in evidence.)**

01:53PM    6        **MR. TRIPI:**  Ms. Champoux, can we publish these, and

01:53PM    7  starting with 43A-78?

01:53PM    8        **BY MR. TRIPI:**

01:53PM    9  Q.  Okay.  Is that just an overall front view of the

01:53PM   10  residence, Mr. Serio?

01:53PM   11  A.  Yes.

01:53PM   12  Q.  And this is located in Kenmore, New York, Grimsby?

01:53PM   13  A.  Tonawanda.

01:53PM   14  Q.  Okay.  What street does Grimsby run off of?

01:53PM   15  A.  Colvin.

01:53PM   16  Q.  Okay.

01:53PM   17        **MR. TRIPI:**  Let's move on to 43A-1, please.

01:53PM   18        **BY MR. TRIPI:**

01:53PM   19  Q.  Tell the jury what they're looking at here.

01:53PM   20  A.  Packaged marijuana.

01:53PM   21  Q.  Is this a cabinet inside the house?

01:53PM   22  A.  Yes, in the kitchen.

01:53PM   23  Q.  Kitchen cabinet?

01:53PM   24        **MR. TRIPI:**  Let's go to 43A-2.

          25

01:53PM     1        **BY MR. TRIPI:**

01:54PM     2   Q.   Is that more of the packaged marijuana that was in the

01:54PM     3   house?

01:54PM     4   A.   Yes.

01:54PM     5        **MR. TRIPI:**   Let's go to 43A-8.

01:54PM     6        **BY MR. TRIPI:**

01:54PM     7   Q.   And what is that?

01:54PM     8   A.   A scale and scissors.

01:54PM     9   Q.   And what did you use the scale and the scissors for?

01:54PM    10   A.   The scale was to weigh the marijuana.   And the scissors,

01:54PM    11   sometimes marijuana might be leafy, I'd have to trim it a

01:54PM    12   little bit.

01:54PM    13        **MR. TRIPI:**   Let's go to 43A-10.

01:54PM    14        **BY MR. TRIPI:**

01:54PM    15   Q.   Tell the jury what's depicted in that part of the kitchen

01:54PM    16   cabinet.

01:54PM    17   A.   Adderall and cocaine.   Adderall is in the prescription

01:54PM    18   bottles, and cocaine is in the package to the right.

01:54PM    19   Q.   Is -- did I circle the cocaine in that image?

01:54PM    20   A.   Yes.

01:54PM    21        **MR. TRIPI:**   May the record reflect the cocaine is

01:54PM    22   furthest towards the right of the photo.

01:54PM    23        Okay.   I skipped over 43A-9.   Let's go back to that

01:55PM    24   for just a moment.

         25

01:55PM     1     **BY MR. TRIPI:**

01:55PM     2     Q. And what is that?

01:55PM     3     A. A vacuum sealer to repackage the marijuana.

01:55PM     4     **MR. TRIPI:** Okay. Let's go to 43A-14.

01:55PM     5     **BY MR. TRIPI:**

01:55PM     6     Q. Is that a close-up of that same cocaine in the kitchen?

01:55PM     7     A. Yes.

01:55PM     8     **MR. TRIPI:** Let's go to 43A-15.

01:55PM     9     **BY MR. TRIPI:**

01:55PM   10     Q. Is that that vacuum sealer with some marijuana as it

01:55PM   11     looked before it was pulled out?

01:55PM   12     A. Yes.

01:55PM   13     **MR. TRIPI:** Let's go to 43A-17.

01:55PM   14     **BY MR. TRIPI:**

01:55PM   15     Q. Do you know what that is?

01:55PM   16     A. It looks to be a bag of marijuana.

01:55PM   17     **MR. TRIPI:** Let's go to 43A-19.

01:55PM   18     **BY MR. TRIPI:**

01:55PM   19     Q. What is that?

01:55PM   20     A. It's Mark Falzone's address and Social Security Number.

01:55PM   21     Q. And is that the address where you had marijuana delivered

01:55PM   22     several times from Jarrett Guy?

01:55PM   23     A. Yes.

01:55PM   24     Q. And you talked about that earlier today, right?

01:55PM   25     A. Yes.

01:55PM    1          MR. TRIPI:  Okay.  Let's go to 43A-20.

01:55PM    2          BY MR. TRIPI:

01:55PM    3   Q.  Is that more marijuana that was inside the residence?

01:56PM    4   A.  Yes.

01:56PM    5          MR. TRIPI:  Let's go to 43A-22.

01:56PM    6          BY MR. TRIPI:

01:56PM    7   Q.  What is that?

01:56PM    8   A.  Those look like the fentanyl pills.

01:56PM    9   Q.  So, earlier in your testimony, you talked about the pills

01:56PM   10   that you would distribute to Anthony Gerace and I think a

01:56PM   11   couple other people you mentioned?

01:56PM   12   A.  Yes.

01:56PM   13   Q.  And pills that you also used.  Is that what you were

01:56PM   14   talking about?

01:56PM   15   A.  Yes.

01:56PM   16          MR. TRIPI:  Let's go to 43A-36.

01:56PM   17          BY MR. TRIPI:

01:56PM   18   Q.  What is that?

01:56PM   19   A.  That's a ledger with people that owed me money.

01:56PM   20   Q.  Okay.  Is that for drugs that you had provided?

01:56PM   21   A.  Yes.

01:56PM   22   Q.  Now, in that ledger, did you list out payments you were

01:56PM   23   making to DEA Bongiovanni in your ledger?

01:56PM   24   A.  No.

01:56PM   25   Q.  Why didn't you do that?

01:56PM    1    A.  That was a fixed cost.

01:56PM    2    Q.  Explain what that means for the jury.

01:56PM    3    A.  It was the same amount every month, so there's no point

01:56PM    4    to write it down.

01:56PM    5            **MR. TRIPI:**  Let's go to 43A-37.

01:56PM    6            **BY MR. TRIPI:**

01:56PM    7    Q.  What is that?

01:57PM    8    A.  My tax returns.

01:57PM    9    Q.  And does that reflect the amount of money you were making

01:57PM   10    from your businesses?

01:57PM   11    A.  Yes.

01:57PM   12    Q.  That year you were claiming over a thousand -- excuse

01:57PM   13    me -- over $1 million in adjusted gross income?

01:57PM   14    A.  Correct.

01:57PM   15            **MR. TRIPI:**  Let's go to 43A --

01:57PM   16            **BY MR. TRIPI:**

01:57PM   17    Q.  That's not including the money you made selling drugs,

01:57PM   18    correct?

01:57PM   19    A.  Correct.

01:57PM   20            **MR. TRIPI:**  Let's go to 43A-39.

01:57PM   21            **BY MR. TRIPI:**

01:57PM   22    Q.  Is that another scale inside of a drawer?

01:57PM   23    A.  Yes.

01:57PM   24            **MR. TRIPI:**  Let's go to 43A-40.

          25

01:57PM    1    **BY MR. TRIPI:**

01:57PM    2    Q.  What are those?

01:57PM    3    A.  Marijuana seeds.

01:57PM    4    Q.  So we've talked about indoor grows you set up, we've

01:57PM    5    talked about outdoor grows.  Are these the type of seeds you

01:57PM    6    would use?

01:57PM    7    A.  Yes.

01:57PM    8    Q.  Where would you get the seeds from?

01:57PM    9    A.  Canada.

01:57PM   10         **MR. TRIPI:**  Let's go to 43A-45.

01:57PM   11         **BY MR. TRIPI:**

01:57PM   12    Q.  Is that a look inside one of those black garbage bags

01:58PM   13    with more marijuana in it?

01:58PM   14    A.  Yes.

01:58PM   15         **MR. TRIPI:**  Let's go to 43A-46.

01:58PM   16         **BY MR. TRIPI:**

01:58PM   17    Q.  Is that another look inside a black bag with more

01:58PM   18    marijuana?

01:58PM   19    A.  Yes.

01:58PM   20         **MR. TRIPI:**  Let's go to 43A-47.

01:58PM   21         **BY MR. TRIPI:**

01:58PM   22    Q.  Were you also storing some items in the garage?

01:58PM   23    A.  Yes.

01:58PM   24    Q.  Is this a view into the garage?

01:58PM   25    A.  Yes.

01:58PM    1          MR. TRIPI:  Let's go to 43A-49.

01:58PM    2              BY MR. TRIPI:

01:58PM    3    Q.  How would you use those boxes?

01:58PM    4    A.  I put the marijuana in those to trans -- transport them.

01:58PM    5    Q.  Why did you put the marijuana in, like, U-Haul boxes?

01:58PM    6    A.  Just either garbage bags or U-Haul, less conspicuous if I

01:58PM    7    had to walk out of the house with a U-Haul box.

01:58PM    8          MR. TRIPI:  Okay.  Let's go to 43A-73.

01:58PM    9              BY MR. TRIPI:

01:58PM   10    Q.  Is that another scale, like, the third scale we've seen

01:58PM   11    inside the property?

01:58PM   12    A.  Yes.

01:58PM   13    Q.  Were all the scales used essentially to weigh marijuana

01:59PM   14    or other drugs?

01:59PM   15    A.  Yes.

01:59PM   16          MR. TRIPI:  Let's go to 43A-80.

01:59PM   17              BY MR. TRIPI:

01:59PM   18    Q.  Is this a view inside another bag, a garbage bag with

01:59PM   19    more of that marijuana we talked about?

01:59PM   20    A.  Yes.

01:59PM   21          MR. TRIPI:  Let's go to 43A-81.

01:59PM   22              BY MR. TRIPI:

01:59PM   23    Q.  Again, another view of more marijuana?

01:59PM   24    A.  Yes.

01:59PM   25          MR. TRIPI:  Let's go to 43A-82.

01:59PM   1              **BY MR. TRIPI:**

01:59PM   2   Q.  And this one, the packaging's a little different from

01:59PM   3   some of the other photos of marijuana; is that right?

01:59PM   4   A.  Yes.

01:59PM   5   Q.  Is this another example of the lower-grade marijuana?

01:59PM   6   A.  Correct.

01:59PM   7   Q.  So, the see-through bags that we saw packaged in the

01:59PM   8   see-through bags, that was higher quality?

01:59PM   9   A.  Yes.

01:59PM  10   Q.  And the -- this sort of brown wrapping is, like,

01:59PM  11   lower-grade marijuana?

01:59PM  12   A.  Correct.

01:59PM  13   Q.  And you sold it at different price points?

01:59PM  14   A.  Yes.

01:59PM  15              **MR. TRIPI:**  Let's go to 43A-84.

01:59PM  16              **BY MR. TRIPI:**

02:00PM  17   Q.  Was this another box inside the residence with more of

02:00PM  18   the higher-grade marijuana?

02:00PM  19   A.  Yes.

02:00PM  20   Q.  Okay.  Now, have you reviewed all the physical items of

02:00PM  21   evidence that were recovered from 91 Grimsby prior to today?

02:00PM  22   A.  Yes.

02:00PM  23   Q.  Okay.  I'm going to hand you up government exhibits in a

02:00PM  24   moment, I'll read them into the record now.  265, 268, 269,

02:00PM  25   270, 275, 276, 279, 280, 281A, 281B, 271, I apologize I'm out

02:00PM 1  of numerical order now, 273, 266, and 272, for now.

02:01PM 2      Okay?  I'm going to hand those up to you now.

02:01PM 3          **MR. TRIPI:**  I'm going to start with handing up

02:01PM 4  specifically 264 and 265, Your Honor.

02:01PM 5          **BY MR. TRIPI:**

02:01PM 6  Q.  Mr. Serio, you've seen those items before today; is that

02:01PM 7  right?

02:01PM 8  A.  Yes.

02:01PM 9  Q.  Can you confirm for this jury those are some of the items

02:01PM 10  of marijuana that we just saw in the photographs that were

02:01PM 11  inside 91 Grimsby?

02:01PM 12  A.  Yes, they are.

02:01PM 13  Q.  I'm going to hand you up 269 now.

02:02PM 14      Do you recognize 269 also to be more of the marijuana

02:02PM 15  that was inside 91 Grimsby?

02:02PM 16  A.  Yes.

02:02PM 17  Q.  Okay.  Handing up 272.  Do you recognize Exhibit 272 to

02:02PM 18  be more of the marijuana stored inside of your residence at

02:02PM 19  91 Grimsby?

02:02PM 20  A.  Yes.

02:02PM 21  Q.  Are each of these exhibits, I'll repeat them for the

02:02PM 22  record, 265, 264, 269, and 272, other than the fact that

02:03PM 23  they're in new packaging, in the same or substantially same

02:03PM 24  condition as you had them at your residence --

02:03PM 25  A.  Yes.

| | | |
|---|---|---|
| 02:03PM | 1 | Q.  -- at 91 Grimsby? |
| 02:03PM | 2 | A.  Yes. |
| 02:03PM | 3 | **MR. TRIPI:**  The government offers those exhibits, |
| 02:03PM | 4 | Your Honor. |
| 02:03PM | 5 | **MR. MacKAY:**  No objection. |
| 02:03PM | 6 | **THE COURT:**  Received without objection. |
| 02:03PM | 7 | **(GOV Exhibit 265, 264, 269, 272 were received in evidence.)** |
| 02:03PM | 8 | **MR. TRIPI:**  I'm going to publish them starting with |
| 02:03PM | 9 | 265. |
| 02:03PM | 10 | Next, I've got 272 and 264. |
| 02:03PM | 11 | **JUROR:**  (Indecipherable) of the garbage bags that were |
| 02:03PM | 12 | found? |
| 02:03PM | 13 | **MR. TRIPI:**  A juror asked a question, Judge. |
| 02:03PM | 14 | **THE COURT:**  No.  So, folks, you can't ask that.  You |
| 02:04PM | 15 | folks cannot ask questions. |
| 02:04PM | 16 | **JUROR:**  I'm sorry. |
| 02:04PM | 17 | **THE COURT:**  Yeah, you folks cannot ask questions. |
| 02:04PM | 18 | You can ask questions of me, but not of the lawyers, okay? |
| 02:04PM | 19 | **MR. TRIPI:**  One moment, Judge. |
| 02:04PM | 20 | I'm going to ask the same question, I've cleared it |
| 02:04PM | 21 | by counsel. |
| 02:04PM | 22 | **BY MR. TRIPI:** |
| 02:04PM | 23 | Q.  This -- this black bag that we see in Exhibit 265, is |
| 02:04PM | 24 | it -- is that an example of one of the black garbage bags |
| 02:04PM | 25 | that you stored the marijuana in? |

| | | |
|---|---|---|
| 02:04PM | 1 | A.  Yes. |
| 02:04PM | 2 | Q.  Thank you. |
| 02:04PM | 3 | **MR. TRIPI:**  And now publishing Exhibit 269. |
| 02:05PM | 4 | **BY MR. TRIPI:** |
| 02:05PM | 5 | Q.  Next I'd like to hand up Exhibit 267, Mr. Serio. |
| 02:05PM | 6 | Do you recognize that? |
| 02:05PM | 7 | A.  Yes. |
| 02:05PM | 8 | Q.  Are those green fentanyl pills that were fake OxyContin? |
| 02:05PM | 9 | A.  Yes. |
| 02:05PM | 10 | Q.  Same question.  Other than being in this packaging that |
| 02:05PM | 11 | law enforcement put it in, is it in the same or substantially |
| 02:05PM | 12 | same condition as when was in your residence at 91 Grimsby? |
| 02:05PM | 13 | A.  Yes. |
| 02:05PM | 14 | **MR. TRIPI:**  The government offers 267, Your Honor. |
| 02:05PM | 15 | **MR. MacKAY:**  No objection. |
| 02:05PM | 16 | **THE COURT:**  Received without objection. |
| 02:05PM | 17 | **(GOV Exhibit 267 was received in evidence.)** |
| 02:05PM | 18 | **BY MR. TRIPI:** |
| 02:05PM | 19 | Q.  Next I'm going to hand up Exhibit 266.  Do you recognize |
| 02:06PM | 20 | Exhibit 266? |
| 02:06PM | 21 | A.  Yes. |
| 02:06PM | 22 | Q.  What is that? |
| 02:06PM | 23 | A.  Cocaine. |
| 02:06PM | 24 | Q.  Is that the cocaine we saw in the kitchen cabinet in 91 |
| 02:06PM | 25 | Grimsby in that photo? |

02:06PM  1  A.  Yes.

02:06PM  2  Q.  Other than the fact that it's now repackaged per law

02:06PM  3  enforcement, is it in the same condition as it was in your

02:06PM  4  residence?

02:06PM  5  A.  Yes.

02:06PM  6        **MR. TRIPI:**  The government offers 266, Your Honor.

02:06PM  7        **MR. MacKAY:**  No objection.

02:06PM  8        **THE COURT:**  Received without objection.

02:06PM  9        **(GOV Exhibit 266 was received in evidence.)**

02:06PM  10        **BY MR. TRIPI:**

02:06PM  11  Q.  Now, Mr. Serio, you've been dealing with cocaine for a

02:06PM  12  long time?

02:06PM  13  A.  Yes.

02:06PM  14  Q.  Over time, does it sometimes change color a little bit?

02:06PM  15  A.  Yes.

02:06PM  16  Q.  Does this appear to have changed color just a little bit

02:06PM  17  from when you had it?

02:06PM  18  A.  Yes.

02:06PM  19  Q.  Can you explain why that happens?

02:06PM  20  A.  Because there's acetone in it, and over time the acetone

02:06PM  21  turns the -- the white cocaine turns beige.

02:06PM  22  Q.  And what is acetone used for in the context of cocaine

02:06PM  23  distribution?

02:06PM  24  A.  It's to make it hard again.  When someone cuts it, they

02:07PM  25  grind it up, put the cut in, put acetone on it, clamp it, and

02:07PM  1    then it becomes a rock again.

02:07PM  2    Q.  Now, you said "cut."  What is "cut" in the context of

02:07PM  3    cocaine?

02:07PM  4    A.  It's usually -- they use inositol, which is a vitamin,

02:07PM  5    and it's relatively cheap.  It makes, say, 1 ounce into

02:07PM  6    2 ounces, so you double your profit.

02:07PM  7    Q.  Is it basically another white powder people mix into the

02:07PM  8    cocaine to make it look like more cocaine?

02:07PM  9    A.  Yes.

02:07PM  10   Q.  Okay.  And could the amount of cut impact the quality of

02:07PM  11   the cocaine?

02:07PM  12   A.  Yes.

02:07PM  13          **MR. TRIPI:**  Publishing 266, Your Honor.

02:07PM  14          **BY MR. TRIPI:**

02:07PM  15   Q.  Now, in those photos we just went through, there were

02:07PM  16   several scales; is that right?

02:08PM  17   A.  Yes.

02:08PM  18   Q.  I'm going to hand you up Exhibits 270 and 275.

02:08PM  19        Do you recognize Exhibits 270 and 275?

02:08PM  20   A.  Yes.

02:08PM  21   Q.  What are those?

02:08PM  22   A.  Those are scales.

02:08PM  23   Q.  Are those the scales in the photos that we just saw a few

02:08PM  24   moments ago that were seized from 91 Grimsby?

02:08PM  25   A.  Yes.

02:08PM    1      **MR. TRIPI:** The government offers 270 and 275,

02:08PM    2    Your Honor.

02:08PM    3      **MR. MacKAY:** No objection.

02:08PM    4      **THE COURT:** Received without objection.

02:08PM    5      **(GOV Exhibits 270, 275 were received in evidence.)**

02:08PM    6      **BY MR. TRIPI:**

02:08PM    7    Q. Does one bag have two of the scales, and the other just

02:08PM    8    one?

02:08PM    9    A. Yes.

02:08PM   10    Q. Next I'm going to hand you 271 and 274.

02:09PM   11    Do you recognize Exhibits 271 and 274?

02:09PM   12    A. Yes.

02:09PM   13    Q. What do you recognize those to be?

02:09PM   14    A. Adderall.

02:09PM   15    Q. Were these in the prescription bottles that we saw in

02:09PM   16    some of the photos?

02:09PM   17    A. Yes.

02:09PM   18    Q. Other than the fact that the packaging's been changed

02:09PM   19    because it's in law enforcement possession now, are these the

02:09PM   20    same items that were in those pictures that you testified

02:09PM   21    about?

02:09PM   22    A. Yes.

02:09PM   23      **MR. TRIPI:** The government offers 274 and 271,

02:09PM   24    Your Honor.

02:09PM   25      **MR. MacKAY:** No objection.

02:09PM   1          **THE COURT:**  They're received without objections.

02:09PM   2          **(GOV Exhibits 271, 274 were received in evidence.)**

02:09PM   3          **MR. TRIPI:**  Thank you.

02:09PM   4          **BY MR. TRIPI:**

02:09PM   5   Q.  What would you use the Adderall for, Mr. Serio?

02:09PM   6   A.  Just a -- it was a stimulant, because I have ADD.  But

02:09PM   7   they cut off my prescriptions, so I used to buy it on the

02:09PM   8   street.

02:09PM   9   Q.  How did the Adderall mix with or impact when you used the

02:10PM  10   other pills, the opiates?

02:10PM  11   A.  It would bring me up.  It's -- it's more like a cleaner

02:10PM  12   cocaine.

02:10PM  13   Q.  Okay.  Earlier, I think maybe Monday, you described

02:10PM  14   levelling off?

02:10PM  15   A.  Yes.

02:10PM  16   Q.  Is Adderall a drug you would take after you used opiates

02:10PM  17   to kind of wake yourself up?

02:10PM  18   A.  Yes.

02:10PM  19   Q.  Do you call that "levelling off?"

02:10PM  20   A.  Yes.

02:10PM  21   Q.  I'm handing up Exhibit 268.  Do you recognize Exhibit

02:10PM  22   268?

02:10PM  23   A.  Yes.

02:10PM  24   Q.  What do you recognize it to be?

02:10PM  25   A.  Marijuana seeds.

02:10PM    1    Q.  Were those the marijuana seeds we saw in the photo not

02:10PM    2    too long ago?

02:10PM    3    A.  Yes.

02:10PM    4    Q.  Again, other than the fact that it's in law enforcement

02:10PM    5    custody now, in their packaging, are they in the same or

02:10PM    6    substantially same condition today as when they were in your

02:10PM    7    residence at 91 Grimsby?

02:10PM    8    A.  Yes.

02:10PM    9         MR. TRIPI:  The government offers 268, Your Honor.

02:10PM   10         MR. MacKAY:  No objection.

02:10PM   11         THE COURT:  Received without objection.

02:10PM   12         (GOV Exhibit 268 was received in evidence.)

02:10PM   13         MR. TRIPI:  Thank you.  Publishing for the jury.

02:11PM   14         BY MR. TRIPI:

02:11PM   15    Q.  Mr. Serio, does each seed in there represent one

02:11PM   16    marijuana plant?

02:11PM   17    A.  Yes.

02:11PM   18    Q.  Handing up Exhibit 276.  Actually, placing it on the

02:11PM   19    floor next to him, Mr. Serio, can you see that sufficiently?

02:11PM   20    A.  Yes.

02:11PM   21    Q.  Is Exhibit 276 there the same marijuana and boxed that's

02:11PM   22    depicted in Exhibit 43A-84?

02:11PM   23    A.  Yes.

02:11PM   24    Q.  Again, other than the fact it's in law enforcement

02:11PM   25    custody and has some other labelling on it, is it in the same

02:12PM 1 or substantially same condition today as when it was in 91

02:12PM 2 Grimsby?

02:12PM 3 A. Yes.

02:12PM 4     **MR. TRIPI:** The government offers 276, Your Honor.

02:12PM 5     **MR. MacKAY:** No objection.

02:12PM 6     **THE COURT:** Received without objection.

02:12PM 7     **(GOV Exhibit 276 was received in evidence.)**

02:12PM 8     **MR. TRIPI:** I'm going to try to publish it for the

02:12PM 9 jury without spilling it everywhere this time.

02:12PM 10     **BY MR. TRIPI:**

02:12PM 11 Q. How many pounds do you think are in this box, Mr. Serio?

02:12PM 12 A. Probably 20 or 30. Probably 20.

02:12PM 13 Q. So I shouldn't be struggling this much?

02:12PM 14     I'm next handing up 277, 278, and 279.

02:12PM 15     Do you recognize 277, 278, and 279?

02:13PM 16 A. Yes.

02:13PM 17 Q. What do you recognize that to be?

02:13PM 18 A. Marijuana.

02:13PM 19 Q. Is that more of the marijuana that was seized from inside

02:13PM 20 the premises at 91 Grimsby on April 18th, 2017?

02:13PM 21 A. Correct.

02:13PM 22 Q. Other than the fact that it's now packaged in law

02:13PM 23 enforcement packaging, is it in the same or substantially

02:13PM 24 same condition today as when it was seized?

02:13PM 25 A. Yes.

02:13PM 1 Q. Now, does that also include a couple duffle bags and

02:13PM 2 garbage bags that the marijuana was in?

02:13PM 3 A. Correct.

02:13PM 4     **MR. TRIPI:** The government offers Exhibits 277, 278,

02:13PM 5 and 279, Your Honor.

02:13PM 6     **MR. MacKAY:** No objection.

02:13PM 7     **THE COURT:** They are received without objection.

02:13PM 8     **(GOV Exhibits 277, 278, 279 were received in evidence.)**

02:13PM 9     **MR. TRIPI:** Publishing them for the jury. The first

02:13PM 10 up is 277. Next we'll do 278 and 279 together, Your Honor.

02:14PM 11     **BY MR. TRIPI:**

02:14PM 12 Q. Last, I'm going to hand up 281A and B.

02:14PM 13     Take a look in there. Do you recognize Exhibit 281A and

02:14PM 14 281B?

02:14PM 15 A. Yes.

02:14PM 16 Q. Is that more of the marijuana that was seized from inside

02:15PM 17 91 Grimsby?

02:15PM 18 A. Yes.

02:15PM 19 Q. Is it in the same or substantially same condition today

02:15PM 20 as the last time you saw it --

02:15PM 21 A. Yes.

02:15PM 22 Q. -- other than the fact that it's repackaged by law

02:15PM 23 enforcement?

02:15PM 24 A. Yes.

02:15PM 25     **MR. TRIPI:** The government offers 281A and B,

02:15PM  1    Your Honor.

02:15PM  2            **MR. MacKAY:**  No objection.

02:15PM  3            **THE COURT:**  Received without objection.

02:15PM  4        **(GOV Exhibits 281A, 281B were received in evidence.)**

02:15PM  5            **MR. TRIPI:**  Thank you.  Publishing it for the jury.

02:15PM  6            **BY MR. TRIPI:**

02:15PM  7    Q.  All right.  Now, your Range Rover was seized by law

02:15PM  8    enforcement, impounded that day?

02:15PM  9    A.  Correct.

02:15PM  10   Q.  Did you have some stuff in there, too?

02:15PM  11   A.  Yes.

02:15PM  12   Q.  Did you have some money?

02:15PM  13   A.  Yes.

02:15PM  14   Q.  Did you have some evidence of your drug dealing in there?

02:15PM  15   A.  Yes.

02:15PM  16   Q.  Okay.  I'm going to hand up a few more photos, Government

02:16PM  17   Exhibits 43A-93, 43A-94, 43A-95, 43A-96, 43A-97, 43A-98, and

02:16PM  18   43A-99.

02:16PM  19       Take a moment and look at these.  When you're done, look

02:16PM  20   back at me.

02:16PM  21       Do you recognize -- pardon me -- what's depicted in those

02:16PM  22   photos?

02:16PM  23   A.  Yes.

02:16PM  24   Q.  What is that?

02:16PM  25   A.  That is marijuana, money, and cell phones.

02:16PM   1   Q.  All as were contained inside your Range Rover on

02:16PM   2   April 18th, 2017?

02:16PM   3   A.  Correct.

02:17PM   4   Q.  Do they fairly and accurately depict your Range Rover and

02:17PM   5   the items you had in it the day you were arrested,

02:17PM   6   April 18th, 2017?

02:17PM   7   A.  Yes.

02:17PM   8        **MR. TRIPI:**  The government offers those Exhibits,

02:17PM   9   Your Honor.

02:17PM  10        **MR. MacKAY:**  No objection.

02:17PM  11        **THE COURT:**  Received without objection.

02:17PM  12        **(GOV Exhibits 43A-93, 43A-94, 43A-95, 43A-96,**

02:17PM  13    **43A-97, 43A-98, and 43A-99 were received in evidence.)**

02:17PM  14        **MR. TRIPI:**  Thank you.  Ms. Champoux, can we start

02:17PM  15   with 43A-93?

02:17PM  16        **BY MR. TRIPI:**

02:17PM  17   Q.  This is the front shot of your Range Rover and your

02:17PM  18   license plate?

02:17PM  19   A.  Yes.

02:17PM  20        **MR. TRIPI:**  Let's go to 43A-94, Ms. Champoux.

02:17PM  21        **BY MR. TRIPI:**

02:17PM  22   Q.  Tell the jury what they're looking at here.

02:17PM  23   A.  A pound of marijuana.

02:17PM  24   Q.  And how would you conceal it in your Range Rover?

02:17PM  25   A.  The back seat folds up, and I put it in there and put it

02:17PM   1   back down.

02:17PM   2   Q.  Okay.

02:17PM   3         **MR. TRIPI:**  Let's go to 43A-99.

02:17PM   4         **BY MR. TRIPI:**

02:17PM   5   Q.  Is that another view or angle of how you would conceal

02:17PM   6   the marijuana in the vehicle?

02:17PM   7   A.  Yes.

02:17PM   8         **MR. TRIPI:**  All right.  Let's go to 43A-96.

02:17PM   9         **BY MR. TRIPI:**

02:18PM   10  Q.  And what's depicted there?

02:18PM   11  A.  A box of money.

02:18PM   12  Q.  How much money were you driving around with,

02:18PM   13  approximately?

02:18PM   14  A.  I think it was 20-, 22,000.

02:18PM   15        **MR. TRIPI:**  Ms. Champoux, can we go to 43A-97?

02:18PM   16        **BY MR. TRIPI:**

02:18PM   17  Q.  Is that the money?

02:18PM   18  A.  Yes.

02:18PM   19  Q.  Closer view?

02:18PM   20      And did you also have multiple cell phones with you in

02:18PM   21  the car?

02:18PM   22  A.  Yes.

02:18PM   23        **MR. TRIPI:**  Can we go to 43A-98.

02:18PM   24        **BY MR. TRIPI:**

02:18PM   25  Q.  Okay.  What do we see here?

02:18PM   1    A.  Three cell phones.

02:18PM   2    Q.  All right.  I'm going to work from the top, down.

02:18PM   3        First -- first one that I indicated to you, the top of

02:18PM   4    the screen, top of the photo down, what's that one?

02:18PM   5    A.  An iPhone.  It was one of my personal ones, I think it

02:18PM   6    was broke, though.

02:18PM   7    Q.  Okay.  And now there's another one next to that.  What is

02:18PM   8    that?

02:18PM   9    A.  That was another personal iPhone.

02:19PM  10    Q.  iPhone?

02:19PM  11        And then the third one down, is that a Samsung flip

02:19PM  12    phone?

02:19PM  13    A.  Yes.

02:19PM  14    Q.  What type of phone was that?

02:19PM  15    A.  It's a burner phone.

02:19PM  16    Q.  Okay.  With respect to the phones depicted, this Samsung

02:19PM  17    and the iPhone that we see the screens on, did you consent to

02:19PM  18    a search of those phones ultimately, for the FBI to search

02:19PM  19    those phones?

02:19PM  20    A.  Yes.

02:19PM  21    Q.  And did you do that, you know, with your lawyer's

02:19PM  22    knowledge and consent as well?

02:19PM  23    A.  Yes.

02:19PM  24    Q.  We'll get back to those phones in a moment.

02:19PM  25        But were those -- were the cell phone and the iPhone

02:19PM 1   extracted in terms of the content, the text messages and call

02:19PM 2   logs that you had?

02:20PM 3   A.  Yes.

02:20PM 4   Q.  Have you reviewed those items?

02:20PM 5   A.  Correct.

02:20PM 6   Q.  Okay.  We'll go into those in a little bit, okay?

02:20PM 7           **MR. TRIPI:**  You can take that down, Ms. Champoux.

02:20PM 8           **BY MR. TRIPI:**

02:20PM 9   Q.  Now before I get more sort of fully into those phones, I

02:20PM 10  want to ask you a couple questions, though, okay?

02:20PM 11  A.  Okay.

02:20PM 12  Q.  So, from late 2012 to 2015, were marijuana and cocaine

02:20PM 13  distribution activities happening at your house at 697

02:20PM 14  Lebrun?

02:20PM 15  A.  Yes.

02:20PM 16  Q.  Was that happening in 2013?

02:20PM 17  A.  Yes.

02:20PM 18  Q.  Was that happening in 2014?

02:20PM 19  A.  Yes.

02:20PM 20  Q.  Was that happening in 2015?

02:20PM 21  A.  Yes.

02:20PM 22  Q.  Did it continue in 2016?

02:20PM 23  A.  Yes.

02:20PM 24  Q.  2017?

02:20PM 25  A.  Yes.

02:20PM  1  Q.  Were people that were part of your distribution network

02:20PM  2  coming and going?

02:20PM  3  A.  Yes.

02:20PM  4  Q.  Were U-Hauls utilized to deliver marijuana to that

02:21PM  5  property?

02:21PM  6  A.  Yes.

02:21PM  7  Q.  Were you making trips from that property to New York City

02:21PM  8  and back that were drug related?

02:21PM  9  A.  Yes.

02:21PM  10  Q.  In that window of time, did you also store marijuana at

02:21PM  11  Lou Selva's house?

02:21PM  12  A.  Yes.

02:21PM  13  Q.  At times, were drugs delivered to 82 Sycamore, your

02:21PM  14  warehouse?

02:21PM  15  A.  Yes.

02:21PM  16  Q.  Were a whole bunch of other people selling marijuana and

02:21PM  17  other drugs you supplied?

02:21PM  18  A.  Yes.

02:21PM  19  Q.  At times, were you driving around with money and drugs in

02:21PM  20  your vehicle?

02:21PM  21  A.  Yes.

02:21PM  22  Q.  Were you storing firearms and marijuana in your house?

02:21PM  23  A.  Yes.

02:21PM  24  Q.  Were you paying Defendant Bongiovanni monthly to protect

02:21PM  25  you because you were doing all of that?

02:21PM   1   A.   Yes.

02:21PM   2   Q.   By that point in time, was Mike Masecchia making about --

02:21PM   3   how much was he making about per month with you?

02:22PM   4   A.   At least 20,000.

02:22PM   5   Q.   How much were you making a month?

02:22PM   6   A.   Depends.  Anywhere, 75-, 150,000.  Sometimes more.

02:22PM   7           **MR. TRIPI:**  Ms. Champoux, can we pull up Government

02:22PM   8   Exhibit 145, please?

02:22PM   9           I'd like that go to paragraph 12A.  Actually, let's

02:22PM  10   go back to first page for a moment.

02:22PM  11           **BY MR. TRIPI:**

02:22PM  12   Q.   Mr. Serio, the -- the residence and the location here is

02:22PM  13   not important, but can you read what it says under the

02:22PM  14   address?

02:22PM  15   A.   Located in the Western New York --

02:22PM  16   Q.   No, right here.  I'm going to circle it.

02:22PM  17   A.   Oh, okay.  Federal law enforcement officer.

02:22PM  18   Q.   No.  The big bold capital sentence.

02:22PM  19   A.   Oh.  Application for search warrant.

02:22PM  20   Q.   Okay.  And do you see the date here?

02:23PM  21   A.   April 14, 2017.

02:23PM  22   Q.   Okay.  So that's about four days before you're arrested?

02:23PM  23   A.   Yes.

02:23PM  24   Q.   And do you see the name of the agent associated with this

02:23PM  25   application?

02:23PM 1    A.   Yes.

02:23PM 2    Q.   What's the name?

02:23PM 3    A.   Joseph Bongiovanni.

02:23PM 4         **MR. TRIPI:**  Ms. Champoux, let's go to paragraph 12A,

02:23PM 5    please.

02:23PM 6         **BY MR. TRIPI:**

02:23PM 7    Q.   Have you ever seen this document before, Mr. Serio?

02:23PM 8    A.   I believe at the last trial.

02:23PM 9    Q.   Okay.  I want you to read paragraph 12A from the word "my

02:23PM 10   discussions," and then continue reading into paragraph,

02:23PM 11   subparagraph A.

02:23PM 12   A.   My discussions with other experienced special agents and

02:23PM 13   task force officers of the DEA, I have learned --

02:23PM 14   Q.   Can you move the mic towards you so we can hear?

02:23PM 15   A.   I'm sorry.

02:23PM 16   Q.   That's okay.

02:23PM 17   A.   My discussions with other experienced special agents and

02:24PM 18   task force officers of the DEA, I have learned:

02:24PM 19       A.   That narcotics traffickers frequently maintain at

02:24PM 20   their residence or place of business, or at residences of

02:24PM 21   other drug associates, amounts of controlled substances and

02:24PM 22   large amounts of currency on hand in order to maintain and

02:24PM 23   finance their ongoing narcotics business.

02:24PM 24        **MR. TRIPI:**  Ms. Champoux, next to this document, can

02:24PM 25   we pull up Exhibits 43A-80 and 43A-82?

02:24PM    1              **BY MR. TRIPI:**

02:24PM    2    Q.  Are those images of controlled substances you had stored

02:24PM    3    in your residence, 43A-80 and 82?

02:24PM    4    A.  Yes.

02:24PM    5              **MR. TRIPI:**  Ms. Champoux, can we take down 43A-80 and

02:24PM    6    82 and put up 42A-11?  We need to keep up 12A, though.

02:25PM    7    42A-11.

02:25PM    8              **BY MR. TRIPI:**

02:25PM    9    Q.  Is 42A-11 marijuana you had in 697 Lebrun?

02:25PM   10    A.  Yes.

02:25PM   11              **MR. MacKAY:**  Judge, I'm going to object.  Can we

02:25PM   12    approach on this line of questioning?

02:25PM   13              **THE COURT:**  Sure, come on up.

02:25PM   14              (Sidebar discussion held on the record.)

02:25PM   15              **MR. MacKAY:**  I think it's something akin to a 403

02:25PM   16    objection, that he's sort of trying to compare the evidence

02:25PM   17    and then get the jury to make a legal conclusion about whether

02:25PM   18    there's probable cause based on what a separate search warrant

02:25PM   19    embodies in its -- in its terms.

02:25PM   20              But, so what he's doing is going through the

02:26PM   21    paragraphs in the search warrant that he used to support

02:26PM   22    probable cause, and then comparing them to what's found.

02:26PM   23              I think that's asking the jury to make an improper

02:26PM   24    legal conclusion to assume it's probable cause that

02:26PM   25    Mr. Bongiovanni would have found or should have found through

02:26PM   1    a search warrant.

02:26PM   2        **MR. TRIPI:**  All I'm doing is using evidence that's in

02:26PM   3    through a witness showing them photos that are in, things that

02:26PM   4    were seized from him, and showing another document that's also

02:26PM   5    in evidence.  I'm not asking the jury -- I'm not arguing at

02:26PM   6    all right now, I'm just going through evidence.  It's fully

02:26PM   7    appropriate.

02:26PM   8        **THE COURT:**  Yeah, I think that argument he made might

02:26PM   9    be inappropriate, but I think the fact that he's shown that

02:26PM  10    Mr. Bongiovanni says these are things that from my experience

02:26PM  11    I know that drug dealers do, and then shows that this

02:26PM  12    gentleman, who's a drug dealer, is doing that, I don't see any

02:26PM  13    problem with that.

02:26PM  14        **MR. MacKAY:**  I think if it's -- I mean, I understand

02:26PM  15    the Court's analysis.  I think if it goes further in any sort

02:27PM  16    of questioning about that, then I think that certainly crossed

02:27PM  17    the line into --

02:27PM  18        **THE COURT:**  It might.  It might.  And I would

02:27PM  19    consider it then.  But I don't -- I'm not hearing any reason I

02:27PM  20    would sustain the objection now.

02:27PM  21        **MR. MacKAY:**  Right.  And you know what?  I don't know

02:27PM  22    how long we're going to go on this, but I know we did have

02:27PM  23    Paul Parisi go through the search warrant already and what's

02:27PM  24    in there, so --

02:27PM  25        **THE COURT:**  I -- I don't think it's crossed any lines

02:27PM    1    so far, so I'm going to overrule the objection.

02:27PM    2         **MR. MacKAY:**  Thank you.

02:27PM    3              (End of sidebar discussion.)

02:27PM    4         **THE COURT:**  The objection is overruled.

02:27PM    5         **MR. TRIPI:**  Can we pull that back up, please,

02:27PM    6    Ms. Champoux?

02:27PM    7              **BY MR. TRIPI:**

02:27PM    8    Q.  So did you keep drugs and money at your residence?

02:27PM    9    A.  Yes.

02:27PM   10         **MR. TRIPI:**  Let's pull up Exhibit 145 at

02:28PM   11    paragraph 12B.

02:28PM   12              Did we lose our equipment?  Okay.

02:28PM   13              **BY MR. TRIPI:**

02:28PM   14    Q.  Can you read that paragraph B, please?

02:28PM   15    A.  That narcotics traffickers frequently maintain books,

02:28PM   16    records, receipts, notes, ledgers, airline tickets, money

02:28PM   17    orders, and other papers relating to transport -- to the

02:28PM   18    transportation, ordering, sale, and distribution of

02:28PM   19    controlled substances, including butyrfentanyl.

02:28PM   20    Q.  You can skip the butyrfentanyl part.

02:28PM   21    A.  Okay.

02:28PM   22    Q.  Continue reading from "furthermore."

02:28PM   23    A.  Furthermore, I know that the aforementioned books,

02:28PM   24    records, receipts, notes, ledgers, et cetera, are generally

02:28PM   25    maintained where the traffickers have ready access to them,

02:28PM 1  such as a residence.

02:28PM 2  Q.  Did you keep records, receipts, notes, and ledgers at

02:28PM 3  your residences?

02:28PM 4  A.  Yes.

02:28PM 5        MR. TRIPI:  Ms. Champoux, can we pull up exhibits

02:28PM 6  next to this 43A-36 and 37?

02:29PM 7        BY MR. TRIPI:

02:29PM 8  Q.  In 43A-37, do we see some of your tax documents?

02:29PM 9  A.  Yes.

02:29PM 10 Q.  And 43A-36, do we see a ledger that you had at 91

02:29PM 11 Grimsby?

02:29PM 12 A.  Yes.

02:29PM 13       BY MR. TRIPI:  We can pull down 43A-37 and 36,

02:29PM 14 Ms. Champoux.

02:29PM 15       And let's go to paragraph 12-C of Exhibit 145,

02:29PM 16 please.

02:29PM 17       Give me one second, Judge.  Sorry.

02:29PM 18       BY MR. TRIPI:

02:29PM 19 Q.  Can you read paragraph 12-C?

02:29PM 20 A.  That it is common for dealers to secrete contraband,

02:29PM 21 proceeds of drug sales, and records of drug transactions in

02:29PM 22 secure locations within the residence.

02:29PM 23 Q.  Did you keep contraband, proceeds, and money from drug

02:29PM 24 sales, and records of your transactions at your residences?

02:29PM 25 A.  Yes.

02:30PM    1    Q.  Let's read 12-D.

02:30PM    2    A.  That persons involved in drug trafficking or significant

02:30PM    3    drug traffickers conceal proceeds of drug sales, records of

02:30PM    4    drug transactions, firearms, ammunition, caches of drugs,

02:30PM    5    large amounts of currency, financial instruments, keys for

02:30PM    6    safe deposit boxes, precious metals, jewelry, and other items

02:30PM    7    of value, and/or proceeds of drug transactions and/or of

02:30PM    8    evidence of financial transactions relating to obtaining,

02:30PM    9    transferring, secreting, or spending large sums of money made

02:30PM   10    from engaging in narcotics trafficking in their residence and

02:30PM   11    other secure locations, including at the residence of their

02:30PM   12    drug associates and/or family members, in order to conceal

02:30PM   13    them from law enforcement authorities.

02:30PM   14    Q.  Did you keep firearms and other records consistent with

02:30PM   15    what you just read in that paragraph at 697 Lebrun?

02:30PM   16    A.  Yes.

02:31PM   17    Q.  Did you keep it at 91 Grimsby?

02:31PM   18    A.  Yes.

02:31PM   19    Q.  Did you keep drugs at times at 82 Sycamore?

02:31PM   20    A.  Yes.

02:31PM   21    Q.  Did you put 82 Sycamore in the name of a family member to

02:31PM   22    conceal it from yourself?

02:31PM   23    A.  Yes.

02:31PM   24    Q.  Who was that family member again?

02:31PM   25    A.  Sam Tedesco.

02:31PM 1 Q. Can we read 12-B, please?

02:31PM 2 A. That narcotics traffickers commonly maintain records of

02:31PM 3 telephone calls and billing statements, addresses, or

02:31PM 4 telephone numbers in books or papers which reflects names,

02:31PM 5 addresses, and telephone numbers of their associates in their

02:31PM 6 narcotics trafficking organization, as well as photographs of

02:31PM 7 themselves and their drug-trafficking associates.

02:31PM 8 Q. Did you keep names and addresses of people in your

02:31PM 9 organization in your possession?

02:31PM 10 A. Yes.

02:31PM 11 Q. Were a lot of those stored in your phone?

02:31PM 12 A. Yes.

02:31PM 13 Q. Can you read paragraph 12-F, please?

02:31PM 14 A. That traffickers in Schedule I and II controlled

02:31PM 15 substances commonly keep paraphernalia for manufacturing,

02:32PM 16 packaging, weighing, processing and distributing of

02:32PM 17 Schedule I and II controlled substances.

02:32PM 18 Q. Did you keep packaging material in your properties?

02:32PM 19 A. Yes.

02:32PM 20 Q. Did you keep heat sealers in your properties?

02:32PM 21 A. Yes.

02:32PM 22 Q. Did you keep money counters in your properties?

02:32PM 23 A. Yes.

02:32PM 24 Q. Were all those things you used as part of your drug

02:32PM 25 trade?

02:32PM   1   A.   Yes.

02:32PM   2   Q.   Did you keep scales in your property?

02:32PM   3   A.   Yes.

02:32PM   4   Q.   Can you read paragraph 12-G?

02:32PM   5   A.   That I'm aware -- that I am aware that the courts have

02:32PM   6   recognized that unexplained wealth is prohibitive of evidence

02:32PM   7   of crimes motivated, at least in part by greed, in particular

02:32PM   8   trafficking in controlled substances, I am also aware.

02:32PM   9        **MR. TRIPI:**  Ms. Champoux, can we go on to page 11 so

02:32PM  10   we can scroll down a little bit?

02:32PM  11        **BY MR. TRIPI:**

02:32PM  12   Q.   It continues up here, Mr. Serio.

02:33PM  13   A.   That many courts have found that weapons, including

02:33PM  14   firearms and ammunition, are among the tools of the trade in

02:33PM  15   narcotics businesses.

02:33PM  16   Q.   Did you have evidence of wealth in your residences?

02:33PM  17   A.   Yes.

02:33PM  18   Q.   Was your residence itself evidence of wealth?

02:33PM  19   A.   Yes.

02:33PM  20   Q.   Did you have firearms and ammunition inside 697 Lebrun?

02:33PM  21   A.   Yes.

02:33PM  22   Q.   Could we read -- last one I want to read here is 12-I.

02:33PM  23   A.   That in my experience that drug traffickers routinely

02:33PM  24   register their personal vehicles or vehicles used as

02:33PM  25   conveyances for drug trafficking in the names of persons

02:33PM   1   other than themselves.  This practice is routinely done for

02:33PM   2   the purpose of deceiving law enforcement as to the identity

02:33PM   3   of the true owner or operator of the vehicle, and to protect

02:33PM   4   the vehicle from possible seizure or future litigation.

02:33PM   5   Q.  In terms of -- I asked you about 82 Sycamore and 608

02:34PM   6   Michigan, that property was in the name of a relative?

02:34PM   7   A.  Correct.

02:34PM   8   Q.  Okay.

02:34PM   9        **MR. TRIPI:**  You can take that down, Ms. Champoux.

02:34PM  10        **BY MR. TRIPI:**

02:34PM  11   Q.  By the time you had been arrested, had you been working

02:34PM  12   directly in a partnership with Mike Masecchia since 2008?

02:34PM  13   A.  Yes.

02:34PM  14   Q.  You never got arrested between 2008 and April of 2017?

02:34PM  15   A.  No.

02:34PM  16   Q.  Did Masecchia ever get arrested?

02:34PM  17   A.  No.

02:34PM  18   Q.  Had you made millions of dollars?

02:34PM  19   A.  Yes.

02:34PM  20   Q.  Was Masecchia doing well?

02:34PM  21   A.  Yes.

02:35PM  22        **MR. TRIPI:**  Just a moment, please.

02:35PM  23        I just need a moment to get organized, Your Honor,

02:35PM  24   I'm sorry.

02:35PM  25        Ms. Champoux, for a few moments can we keep up

02:36PM    1    Government Exhibit 43A-89 on the screen?

02:36PM    2         **BY MR. TRIPI:**

02:36PM    3    Q.  Mr. Serio, I'm going to start by handing up Government

02:36PM    4    Exhibit 48.  I've taken it out of the envelope.  Can you take

02:36PM    5    a look at that?

02:36PM    6         Do you recognize Exhibit 48 to be your Samsung flip phone

02:36PM    7    that's depicted in Government Exhibit 43A-98?

02:36PM    8    A.  Yes.

02:36PM    9    Q.  Can you just push that to the side for me for a moment?

02:37PM   10         Next I'm going to hand up Government Exhibit 44.

02:37PM   11         Can you look at Exhibit 44 for me?

02:37PM   12         Do you recognize that?

02:37PM   13    A.  Yes.

02:37PM   14    Q.  What do you recognize it to be?

02:37PM   15    A.  My broken iPhone.

02:37PM   16    Q.  Is this the iPhone with the crack that we see right there

02:37PM   17    with the screen on?

02:37PM   18    A.  I think it's the top iPhone.  The piece is missing right

02:37PM   19    there.

02:37PM   20    Q.  All right.  Well that one, if that was the one that was

02:37PM   21    able to be extracted, is it the one in the middle then?

02:37PM   22    A.  Yes.

02:37PM   23    Q.  Okay.  I'm going to hand you up Government Exhibits 45

02:37PM   24    and 46.

02:37PM   25         Do you remember looking at that CD that's Government

02:37PM  1   Exhibit 45?

02:37PM  2   A.  Yes.

02:37PM  3   Q.  Do you remember reviewing that and confirming it's the

02:38PM  4   contents of your iPhone that you consented for the FBI to

02:38PM  5   search?

02:38PM  6   A.  Yes.

02:38PM  7   Q.  And with respect to Government Exhibit 46, I want you to

02:38PM  8   look at that for a moment.

02:38PM  9       With respect to Government Exhibit 46, do you recognize

02:38PM  10  that to be contacts that you had stored in your iPhone?

02:38PM  11  A.  Yes.

02:38PM  12  Q.  Do those fairly and accurately depict a number of the

02:38PM  13  contacts stored in your iPhone, not all of them, but a number

02:38PM  14  of them?

02:38PM  15  A.  Yes.

02:38PM  16  Q.  Now I'd like to hand you up Government Exhibit 49.  It's

02:38PM  17  a printout.  Have you looked at that before today?

02:38PM  18  A.  Yes.

02:38PM  19  Q.  Do you recognize Exhibit 49 to be extracted information

02:38PM  20  from the Samsung flip phone?

02:38PM  21  A.  Yes.

02:39PM  22          **MR. TRIPI:**  Your Honor, the government's going to

02:39PM  23  offer just Government Exhibit 46 and 49, so the extraction

02:39PM  24  reports.

02:39PM  25          **MR. MacKAY:**  No objection to those two exhibits.

02:39PM   1    **THE COURT:** They're received without objection.

02:39PM   2    **(GOV Exhibits 46, 49 were received in evidence.)**

02:39PM   3    **BY MR. TRIPI:**

02:39PM   4  Q.  I'd like to work through some of these, through

02:39PM   5  Exhibit 46 a little bit, Mr. Serio, okay?

02:39PM   6    **MR. TRIPI:** We can take down 43A-98, Ms. Champoux.

02:39PM   7  And if we can please pull up Government Exhibit 46?

02:39PM   8    **BY MR. TRIPI:**

02:40PM   9  Q.  Again, do you recognize this to be contacts that you had

02:40PM  10  stored in your iPhone?

02:40PM  11  A.  Yes.

02:40PM  12    **MR. TRIPI:** Ms. Champoux, can we please zoom in on

02:40PM  13  maybe the first four of them so that we can see it better?

02:40PM  14    **BY MR. TRIPI:**

02:40PM  15  Q.  All right.  I'd like to go through some of these, entry

02:40PM  16  number 1, who is that?

02:40PM  17  A.  Angelo Natali.

02:40PM  18  Q.  And you have an entry number for him there?

02:40PM  19  A.  Yes.

02:40PM  20  Q.  Entry number 2, who is that?

02:40PM  21  A.  Anthony Gerace.

02:40PM  22  Q.  And you have a phone number listed for him there?

02:40PM  23  A.  Yes.

02:40PM  24  Q.  Is he actually entries number 2 and 3?

02:40PM  25  A.  Correct.

02:40PM     1    Q.   And that's the Anthony Gerace that you've been discussing

02:40PM     2    earlier; is that right?

02:40PM     3    A.   Yes.

02:40PM     4    Q.   Okay.  Entry number 4, Anthony Mayo, who is that?

02:40PM     5    A.   Another associate of mine.

02:40PM     6    Q.   You've mentioned him before; is that right?

02:40PM     7    A.   Yes.

02:40PM     8    Q.   Is he someone you would get -- distribute those pills to?

02:40PM     9    A.   No, that would be Anthony Greco.

02:41PM    10    Q.   Okay.  Anthony Mayo, what was his role?

02:41PM    11    A.   Just marijuana.

02:41PM    12    Q.   Distributor?

02:41PM    13    A.   Yes.

02:41PM    14    Q.   Okay.  Let's go to lines 5, and 6.

02:41PM    15         You have an entry there for Ash S.  Who is that?

02:41PM    16    A.   I'm not quite sure because them contacts were also in

02:41PM    17    my -- my wife's contacts were my contacts.

02:41PM    18    Q.   Did your wife know an Ashley Schuh?

02:41PM    19    A.   Yes.

02:41PM    20    Q.   Do you believe that to be the entry for that Ash S?

02:41PM    21    A.   Could possibly, because there was another Ash S that

02:41PM    22    lived in one of my apartments.

02:41PM    23         **MR. TRIPI:**  All right.  Can we that down and just for

02:41PM    24    the witness only.

           25

02:41PM  1       **BY MR. TRIPI:**

02:41PM  2   Q.  I'm going to see if I can refresh your recollection and

02:41PM  3   have you look at Government Exhibit 3536BA.

02:41PM  4       **MR. TRIPI:**  If we can go to page 83?

02:41PM  5       **BY MR. TRIPI:**

02:41PM  6   Q.  Read that to yourself.  And then let me know -- look back

02:41PM  7   at me when you're done reading it, okay?

02:42PM  8   A.  Okay.

02:42PM  9       **MR. TRIPI:**  Take that down, Ms. Champoux.

02:42PM  10      **BY MR. TRIPI:**

02:42PM  11  Q.  Did that refresh your recollection who -- as to who you

02:42PM  12  believe Ash S is in your phone?

02:42PM  13  A.  Yes.

02:42PM  14  Q.  And who do you believe that to be?

02:42PM  15  A.  Ashley Schuh.

02:42PM  16  Q.  Would that be the sister of Defendant Bongiovanni's wife?

02:42PM  17  A.  Yes.

02:42PM  18  Q.  Did your brother at a certain point, Tom, have a

02:42PM  19  relationship with Ashley Schuh?

02:42PM  20  A.  Yes.

02:42PM  21  Q.  Describe that relationship for the jury.

02:42PM  22  A.  It wasn't a good relationship.

02:42PM  23  Q.  When was it?

02:42PM  24  A.  That was 2016 into '17.

02:42PM  25  Q.  Were you still involved in all these distribution

02:42PM    1    activities at that point?

02:42PM    2    A.  Yes.

02:42PM    3    Q.  Did Ms. Schuh stay at that carriage house that your

02:42PM    4    brother had?

02:42PM    5    A.  Yes.

02:42PM    6    Q.  So she basically lived on the premises, right?

02:42PM    7    A.  Yes.

02:42PM    8    Q.  Was that after Mario Vacanti had moved out of the

02:42PM    9    carriage house?

02:42PM   10    A.  Correct.

02:42PM   11    Q.  Okay.  So for all intents and purposes, Ashley Schuh

02:43PM   12    lived at your brother's property?

02:43PM   13    A.  Correct.

02:43PM   14    Q.  He lived in the main house, and she lived in the carriage

02:43PM   15    house?

02:43PM   16    A.  Correct.

02:43PM   17        **MR. TRIPI:**  Okay.  Let's pull Exhibit 46 back up,

02:43PM   18    Ms. Champoux, and I'd like to, if you can highlight 6, 7, and

02:43PM   19    8 for me, or zoom in, I should say, or -- not 6.  I'm sorry,

02:43PM   20    7, 8 and 9.  I'm sorry about that.

02:43PM   21        **BY MR. TRIPI:**

02:43PM   22    Q.  All right.  7 and 8, you have an entry for Baker; is that

02:43PM   23    right?

02:43PM   24    A.  Yes.

02:43PM   25    Q.  Two entries, looks like the same phone number each time

02:43PM 1  though, right?

02:43PM 2  A.  Correct.

02:43PM 3  Q.  Now, earlier you indicated Chris Baker's number was one

02:43PM 4  of the numbers you passed along to make sure it was clear,

02:43PM 5  right?

02:43PM 6  A.  Yes.

02:43PM 7       **MR. TRIPI:**  Ms. Champoux, can we pull up Government

02:43PM 8  Exhibit -- next to this, Exhibit 8A at page 354?

02:43PM 9       **BY MR. TRIPI:**

02:43PM 10 Q.  Do you see a document here with a date of March 13th,

02:44PM 11 2023?

02:44PM 12 A.  Yes.

02:44PM 13 Q.  2013, excuse me.

02:44PM 14 A.  Yes.

02:44PM 15 Q.  By that point, you're dealing with Jarrett Guy, correct?

02:44PM 16 A.  Correct.

02:44PM 17 Q.  Do you see a name of a financially liable party,

02:44PM 18 Christopher Baker?

02:44PM 19 A.  Yes.

02:44PM 20 Q.  Do you see a phone number that was associated with you?

02:44PM 21 A.  Yes.

02:44PM 22 Q.  716-830-3226?

02:44PM 23 A.  Correct, that was my phone number.

02:44PM 24 Q.  So you had your phone in Baker's name, right?

02:44PM 25 A.  Yes.

02:44PM 1 Q. So if we go back to Exhibit 145, remember those

02:44PM 2 paragraphs that talked about putting things in other people's

02:44PM 3 name?

02:44PM 4 A. Yes.

02:44PM 5 Q. Did you have your phone in Chris Baker's name?

02:44PM 6 A. I did.

02:44PM 7 Q. But we also see a contact home phone number here, which

02:44PM 8 is, I should say for the record, your phone number under user

02:44PM 9 information was 716-830-3226, correct?

02:45PM 10 A. Yes.

02:45PM 11 Q. Now, in the contact home phone for this document we're

02:45PM 12 looking at, there's another phone number there, do you see

02:45PM 13 that?

02:45PM 14 A. Yes.

02:45PM 15 Q. Can you read that out loud?

02:45PM 16 A. 716-816-6849.

02:45PM 17 Q. Is that the same number you had in your phone for Chris

02:45PM 18 Baker?

02:45PM 19 A. Yes.

02:45PM 20     **MR. TRIPI:** Okay. And we can take -- well, I'll just

02:45PM 21 clear that screen. Keep that up for a moment, Ms. Champoux.

02:45PM 22     **BY MR. TRIPI:**

02:45PM 23 Q. Next I'd like you to look at Government Exhibit 46.

02:45PM 24     **MR. TRIPI:** If we can zoom in on line 9.

25

02:45PM 1    **BY MR. TRIPI:**

02:45PM 2   Q.  Do you see that exhibit?

02:45PM 3   A.  Yes.

02:45PM 4   Q.  Is that a phone number, two phone numbers you had for

02:45PM 5   R.K. or Bob R.K.?

02:45PM 6   A.  Yes.

02:45PM 7   Q.  That's the person you were tipped off, the defendant's

02:45PM 8   informant, right?

02:45PM 9   A.  Correct.

02:45PM 10       **MR. TRIPI:**  Okay.  We can unzoom that Ms. Champoux.

02:45PM 11  Just for the record, actually, zoom back in.  I should --

02:45PM 12       **BY MR. TRIPI:**

02:46PM 13  Q.  Can you tell us what the two phone numbers you had in

02:46PM 14  your phone for Mr. R.K. were?

02:46PM 15  A.  716-605-2778, and 716-935-0252.

02:46PM 16       **MR. TRIPI:**  Okay.  Ms. Champoux, next to this exhibit

02:46PM 17  can we pull up Exhibit 9E-4, please?

02:46PM 18       I'd like to keep 46 up, thank you.

02:46PM 19       **BY MR. TRIPI:**

02:46PM 20  Q.  Do you see what this says at the top?

02:46PM 21  A.  Confidential source establishment.

02:46PM 22  Q.  Now, have you ever seen this document before?

02:46PM 23  A.  This is -- earlier today?

02:46PM 24  Q.  If you haven't seen it today, have you seen it before?

02:46PM 25  A.  No.

02:46PM   1   Q.  Okay.

02:46PM   2         **MR. TRIPI:**  Keep those up, Ms. Champoux.

02:46PM   3         I need 9E-4.

02:46PM   4         Give me just a moment here.

02:47PM   5         Can we zoom in right there, please?

02:47PM   6         **BY MR. TRIPI:**

02:47PM   7   Q.  Do you see a telephone number listed on Exhibit 9E-4?

02:47PM   8   A.  Yes.

02:47PM   9   Q.  What's that number?

02:47PM   10  A.  716-935-0252.

02:47PM   11        **MR. TRIPI:**  Now, Ms. Champoux, can you please zoom

02:47PM   12  in at the top where it has the name?

02:47PM   13        **BY MR. TRIPI:**

02:47PM   14  Q.  Under box 1, do you see name of source there?

02:47PM   15  A.  Source?

02:47PM   16  Q.  Right here.

02:47PM   17  A.  Oh, R.K.

02:47PM   18  Q.  Okay.  Is 716-935-0252 the same phone number you had for

02:47PM   19  R.K.?

02:47PM   20  A.  Yes.

02:47PM   21  Q.  One of the two numbers, right?

02:47PM   22  A.  Correct.

02:47PM   23        **MR. TRIPI:**  Okay.  We can take those down.  Can we

02:48PM   24  go back to 46, please?  And can we zoom in on 10, 11, and 12.

02:48PM   25

02:48PM    1              **BY MR. TRIPI:**

02:48PM    2    Q.  10, you have an entry for Butch, who is that?

02:48PM    3    A.  Butchie Bifocal.

02:48PM    4    Q.  Is that the person who was Mr. Masecchia's godfather?

02:48PM    5    A.  Yes.

02:48PM    6    Q.  Is that the person you testified earlier was a member of

02:48PM    7    Italian Organized Crime?

02:48PM    8    A.  Yes.

02:48PM    9    Q.  Is that a phone number you had for him?

02:48PM   10    A.  Yes.

02:48PM   11    Q.  What's that phone number?

02:48PM   12    A.  Area code 716-316-2169.

02:48PM   13    Q.  Now, below that, you have two entries for Buttitta with

02:48PM   14    the same phone number, is that Mike Buttitta?

02:48PM   15    A.  Correct.

02:48PM   16    Q.  Is that someone who you talked about earlier who would

02:48PM   17    get marijuana from you?

02:48PM   18    A.  Yes.

02:48PM   19         **MR. TRIPI:**  Okay.  Ms. Champoux, can we go down to

02:48PM   20    entries 13 and 14?

02:49PM   21              **BY MR. TRIPI:**

02:49PM   22    Q.  We've talked about Frank Burkhart earlier; is that right?

02:49PM   23    A.  Yes.

02:49PM   24    Q.  What phone number did you have for Frank Burkhart?

02:49PM   25    A.  716-256-8066.

02:49PM    1    **MR. TRIPI:** Ms. Champoux -- actually, let me ask

02:49PM    2    another question.

02:49PM    3    **BY MR. TRIPI:**

02:49PM    4    Q. Did he own a tattoo shop?

02:49PM    5    A. Yes.

02:49PM    6    Q. What was it called?

02:49PM    7    A. Hardcore Tattoo.

02:49PM    8    Q. Where was it located?

02:49PM    9    A. On Elmwood Avenue.

02:49PM   10    **MR. TRIPI:** All right, Ms. Champoux, let's go to

02:49PM   11    Government Exhibit 8A at page 357.

02:49PM   12    **BY MR. TRIPI:**

02:49PM   13    Q. Do you see a document there in the top left corner that

02:49PM   14    has a date of March 13th, 2013?

02:49PM   15    A. Yes.

02:49PM   16    Q. Do you see at the top it says subscriber information?

02:49PM   17    A. Yes.

02:49PM   18    Q. Do you see where it says financially liable party?

02:49PM   19    A. Yes.

02:49PM   20    Q. Do you see the name there?

02:50PM   21    A. Hardcore Tattoo Studio.

02:50PM   22    Q. Do you see the address?

02:50PM   23    A. 902 Elmwood Avenue.

02:50PM   24    Q. Is that where Frank Burkhart's tattoo studio was?

02:50PM   25    A. Yes.

| | | |
|---|---|---|
| 02:50PM | 1 | Q. Do you see a user information with a phone number? |
| 02:50PM | 2 | A. Is it -- |
| 02:50PM | 3 | Q. Down there. |
| 02:50PM | 4 | A. 716-578-6917. |
| 02:50PM | 5 | **MR. TRIPI:** Let's go back to Exhibit 46, |
| 02:50PM | 6 | Ms. Champoux, and pull up 13. Entry 13. |
| 02:50PM | 7 | **BY MR. TRIPI:** |
| 02:50PM | 8 | Q. Is that a different phone number than you had for -- |
| 02:50PM | 9 | A. Yes. |
| 02:50PM | 10 | Q. -- for him? |
| 02:50PM | 11 | **MR. TRIPI:** Okay. Let's take that down. Next I'd |
| 02:50PM | 12 | like to -- we can take down, no, leave 8A up. We'll need it |
| 02:50PM | 13 | in just a second. |
| 02:50PM | 14 | Let's zoom in on Exhibit 46 at 16 and 17. |
| 02:51PM | 15 | **BY MR. TRIPI:** |
| 02:51PM | 16 | Q. Is that an individual you know named Frank Parisi? |
| 02:51PM | 17 | A. Yes. |
| 02:51PM | 18 | Q. What phone number did you have for him? |
| 02:51PM | 19 | A. Area code 716-481-8111. |
| 02:51PM | 20 | **MR. TRIPI:** And let's go to 18 and 19, please. |
| 02:51PM | 21 | **BY MR. TRIPI:** |
| 02:51PM | 22 | Q. Who is at entry 18 and 19? |
| 02:51PM | 23 | A. Frank Tripi. |
| 02:51PM | 24 | Q. And what phone number did you have for him? |
| 02:51PM | 25 | A. 716-429-6445. |

02:51PM 1  Q. And is that someone that you would communicate with?

02:51PM 2  A. Yes.

02:51PM 3  Q. Is that someone that you spoke with and who has been at

02:51PM 4  your house at 697 Lebrun?

02:51PM 5  A. Yes.

02:51PM 6  Q. Is that someone you texted with?

02:51PM 7  A. Yes.

02:52PM 8       MR. TRIPI: Let's go to boxes 20 and 21.

02:52PM 9       BY MR. TRIPI:

02:52PM 10 Q. Focusing in on 21, do you see that entry?

02:52PM 11 A. Yes.

02:52PM 12 Q. Is Hot Dog, Paul Francoforte?

02:52PM 13 A. Correct.

02:52PM 14 Q. What number did you have for him?

02:52PM 15 A. 716-866-2687.

02:52PM 16 Q. Okay.

02:52PM 17      MR. TRIPI: Ms. Champoux, in Exhibit 8A, can we go to

02:52PM 18 page 347?

02:52PM 19      BY MR. TRIPI:

02:52PM 20 Q. Do you see at the top left it has a date of March 21st,

02:52PM 21 2013?

02:52PM 22 A. Yes.

02:52PM 23 Q. This is looking at Exhibit 8A at page 347?

02:52PM 24 A. Yes.

02:52PM 25 Q. Do you see that it says subscriber information?

02:52PM   1   A.   Subscriber information?  Yes.

02:52PM   2   Q.   Under the box labeled financially liable party, do you

02:52PM   3   see Paul Francoforte's name?

02:52PM   4   A.   Financially -- yes.

02:53PM   5   Q.   If you go down a couple boxes to the user information, do

02:53PM   6   you see a phone number there?

02:53PM   7   A.   Yes.

02:53PM   8   Q.   What phone number do you see?

02:53PM   9   A.   716-866-2687.

02:53PM  10   Q.   Is that the same phone number you had for Paul

02:53PM  11   Francoforte, Hot Dog?

02:53PM  12   A.   Yes.

02:53PM  13        **MR. TRIPI:**  Ms. Champoux, you can take down 8A, and

02:53PM  14   if you can pull up 26J at page 7?

02:53PM  15        And, Ms. Champoux, we need to go to page 7.  Thank

02:53PM  16   you.

02:53PM  17        **BY MR. TRIPI:**

02:53PM  18   Q.   Looking at Exhibit 26J at page 7.  You've never seen that

02:53PM  19   before, correct?

02:53PM  20   A.   No.

02:53PM  21   Q.   Okay.  But do you see that phone number, 716-866-2687,

02:53PM  22   right here?

02:53PM  23   A.   Yes.

02:53PM  24   Q.   Is that the same phone number you had for Paul

02:54PM  25   Francoforte?

02:54PM    1    A.  Yes.

02:54PM    2           MR. TRIPI:  We can take down 26J, Ms. Champoux.

02:54PM    3           All right.  I'd like to go to Exhibit 46, please, and

02:54PM    4    let's work through entries 22 to 25.

02:54PM    5           BY MR. TRIPI:

02:54PM    6    Q.  We've already talked about Hot Dog.  23, is that a phone

02:54PM    7    number you had for Jacob Martinez?

02:54PM    8    A.  Yes.

02:54PM    9    Q.  Is 24 a different number you had for him?

02:54PM   10    A.  Yes.

02:54PM   11    Q.  And is 25 a duplicate of the phone number you had in

02:54PM   12    entry 23?

02:54PM   13    A.  Yes.

02:54PM   14           MR. TRIPI:  Let's go to 26, 27, and 28.

02:54PM   15           BY MR. TRIPI:

02:54PM   16    Q.  Looking at 27, who's that?

02:54PM   17    A.  Jarrett Guy.

02:54PM   18    Q.  Is he the Jarrett Guy we've been talking about who was

02:54PM   19    the supplier from Vancouver, Canada?

02:55PM   20    A.  Yes.

02:55PM   21    Q.  Is that a main phone number you had for him?

02:55PM   22    A.  Yes.

02:55PM   23    Q.  Did you guys also communicate on burners?

02:55PM   24    A.  Yes.

02:55PM   25    Q.  28, who is that?

02:55PM  1   A.   Jimmy Rivera.

02:55PM  2   Q.   And you've talked about him already?

02:55PM  3   A.   Yes.

02:55PM  4   Q.   What phone number did you have for him?

02:55PM  5   A.   716-364-2163.

02:55PM  6        **MR. TRIPI:**  Ms. Champoux, let's go 29 through 31,

02:55PM  7   let's say.

02:55PM  8        **BY MR. TRIPI:**

02:55PM  9   Q.   All right.  Entry number 31 is the one I want to focus

02:55PM  10  on.  Who's that?

02:55PM  11  A.   John Robinson.

02:55PM  12  Q.   And you've talked about John Robinson's role in your

02:55PM  13  organization already; is that right?

02:55PM  14  A.   Correct.

02:55PM  15  Q.   What phone number did you have for him?

02:55PM  16  A.   716-481-8002.

02:55PM  17       **MR. TRIPI:**  Okay.  Ms. Champoux, I'd like to take

02:55PM  18  this down just for a moment, and go over to 100A.1, please.

02:56PM  19       And I'd like you to go to 716-481-8002 toll analysis.

02:56PM  20  It's one up from there.  Thank you.

02:56PM  21       **BY MR. TRIPI:**

02:56PM  22  Q.   Do you see that marker at the top of the page there that

02:56PM  23  seems to have written a phone number?

02:56PM  24  A.   Yes.

02:56PM  25  Q.   Is that John Robinson's phone number?

02:56PM 1   A.  Yes.

02:56PM 2       MR. TRIPI:  Okay.  Let's take that down,

02:56PM 3   Ms. Champoux, and let's go back to Exhibit 46.  And let's

02:56PM 4   highlight 32 through 35.

02:56PM 5       BY MR. TRIPI:

02:57PM 6   Q.  Number 35, you have an entry for a John Suppa?

02:57PM 7   A.  Yes.

02:57PM 8   Q.  What number do you have for him?

02:57PM 9   A.  716-553-7365.

02:57PM 10      MR. TRIPI:  Okay.  Ms. Champoux, can we take -- pull

02:57PM 11  up Exhibit 8A at page 158?

02:57PM 12      BY MR. TRIPI:

02:57PM 13  Q.  Do you see on this document, Exhibit 8A at page 158, a

02:57PM 14  location, 1195 Hertel Avenue?

02:57PM 15  A.  Yes.

02:57PM 16  Q.  Is that a premises you knew to be associated with John

02:57PM 17  Suppa?

02:57PM 18  A.  Yes.

02:57PM 19  Q.  Is that where you set up a grow?

02:57PM 20  A.  Yes.

02:57PM 21  Q.  Do you see a phone number, 716-553-7365?

02:57PM 22  A.  Correct.

02:57PM 23  Q.  Is that the phone number you had for John Suppa?

02:57PM 24  A.  Yes.

02:57PM 25      MR. TRIPI:  Okay.  We can take down Exhibit 8A and

| | | |
|---|---|---|
| 02:57PM | 1 | let's go back to 46, Ms. Champoux.  And let's go 37 through |
| 02:58PM | 2 | the bottom of that page.  37 to 42. |
| 02:58PM | 3 | **BY MR. TRIPI:** |
| 02:58PM | 4 | Q.  Kelly Brace, we talked about him.  He was whose house you |
| 02:58PM | 5 | were at when you were arrested, right? |
| 02:58PM | 6 | A.  Yes. |
| 02:58PM | 7 | Q.  41, Krista Masecchia, who's that? |
| 02:58PM | 8 | A.  That's Mike Masecchia's wife. |
| 02:58PM | 9 | Q.  And an entry 42, you have a phone number for her? |
| 02:58PM | 10 | A.  Yes. |
| 02:58PM | 11 | **MR. TRIPI:**  Let's go to 43 through, say, 46. |
| 02:58PM | 12 | **BY MR. TRIPI:** |
| 02:58PM | 13 | Q.  We've talked about Krista Masecchia.  44, 45, 46, those |
| 02:58PM | 14 | are different emails you had for your own wife, correct? |
| 02:58PM | 15 | A.  Correct. |
| 02:58PM | 16 | **MR. TRIPI:**  Let's go to 47 through, say, 51. |
| 02:58PM | 17 | **BY MR. TRIPI:** |
| 02:59PM | 18 | Q.  Look at 48.  Is that an entry for Mark Falzone? |
| 02:59PM | 19 | A.  Yes. |
| 02:59PM | 20 | Q.  What phone number did you have for Mark Falzone? |
| 02:59PM | 21 | A.  I believe that might be -- because it says Leah, that's |
| 02:59PM | 22 | Mark's girlfriend. |
| 02:59PM | 23 | Q.  Okay.  Okay.  He had a girlfriend named -- |
| 02:59PM | 24 | A.  Leah. |
| 02:59PM | 25 | Q.  -- Leah?  Okay.  We'll go to below that, entry number 50, |

02:59PM    1    you have an entry for a Lou Selva?

02:59PM    2    A.   Correct.

02:59PM    3    Q.   Is that the Lou Selva we've been talking about?

02:59PM    4    A.   Yes.

02:59PM    5    Q.   And you're -- the phone number you had for him was

02:59PM    6    716-903-1654?

02:59PM    7    A.   Correct.

02:59PM    8         **MR. TRIPI:**  Ms. Champoux, can we pull up Exhibit 8A

02:59PM    9    and go to page 197.

02:59PM   10         **BY MR. TRIPI:**

02:59PM   11    Q.   Do you see a document there that has Lou Selva's name and

02:59PM   12    his -- the phone number, 716-903-1654, at Exhibit A at

02:59PM   13    page 197?

02:59PM   14    A.   Yes.

02:59PM   15    Q.   Same phone number you had for Lou Selva?

03:00PM   16    A.   Yes.

03:00PM   17         **MR. TRIPI:**  Okay.  We can take down Exhibit 8A,

03:00PM   18    Ms. Champoux.

03:00PM   19         **THE COURT:**  Mr. Tripi, do you think you're going to

03:00PM   20    be a while?

03:00PM   21         **MR. TRIPI:**  On the plus side, Judge, we are wrapping

03:00PM   22    up relatively soon, but yes, this is a good time.

03:00PM   23         **THE COURT:**  Please remember my instructions about not

03:00PM   24    communicating about the case, not talking with each other.

03:00PM   25         See you back here in 15 minutes.

03:00PM    1         **MR. TRIPI:**  Thank you.

03:00PM    2         (Jury excused at 3:00 p.m.)

03:00PM    3         **THE COURT:**  Anything for the record?

03:00PM    4         **MR. TRIPI:**  No, Your Honor.

03:00PM    5         **MR. MacKAY:**  No, Your Honor.

03:00PM    6         **THE COURT:**  Okay.  We'll see you in ten or 15

03:01PM    7  minutes.

03:01PM    8         **THE CLERK:**  All rise.

03:17PM    9         (Back on the record at 3:17 p.m.)

03:17PM   10         (Jury not present.)

03:17PM   11         **THE CLERK:**  All rise.

03:17PM   12         **THE COURT:**  Please be seated.

03:17PM   13         **THE CLERK:**  We are back on the record for the

03:17PM   14  continuation of the jury trial in case number 19-cr-227,

03:18PM   15  United States of America versus Joseph Bongiovanni.

03:18PM   16         All counsel and parties are present.

03:18PM   17         **THE COURT:**  Anything for the record before we bring

03:18PM   18  the jury back?

03:18PM   19         **MR. TRIPI:**  No, Your Honor.

03:18PM   20         **MR. MacKAY:**  Just one thing with the timing, Judge.

03:18PM   21  I think Mr. Tripi indicated he's probably going somewhere

03:18PM   22  around another half hour with this witness.

03:18PM   23         **MR. TRIPI:**  I'm hoping not, but, yeah.

03:18PM   24         **MR. MacKAY:**  But I appreciate the Court wanting to

03:18PM   25  squeeze every minute out of everything, and I can start on my

03:18PM   1   cross.  Is the Court open if, like, I get near a subject

03:18PM   2   change maybe a little bit early, if we get near a subject

03:18PM   3   change in the cross-examination to break for the day, just

03:18PM   4   because this witness so large and the subject tends to be so

03:18PM   5   large, in chunks.

03:18PM   6          **THE COURT:**  I've got no problem with breaking where

03:18PM   7   you want to break.

03:18PM   8          **MR. MacKAY:**  Okay.

03:18PM   9          **THE COURT:**  I have a hard stop at 4:30.  Any time

03:18PM  10   between 4 and 4:30, I'm fine with.

03:18PM  11          **MR. MacKAY:**  Okay, thank you.

03:18PM  12          **THE COURT:**  Okay.  So ready to go?

03:18PM  13          **MR. TRIPI:**  Yes, Judge.

03:18PM  14          **THE COURT:**  Let's bring them back, please, Pat.

03:20PM  15          (Jury seated at 3:20 p.m.).

03:20PM  16          **THE COURT:**  The record will reflect that all our

03:20PM  17   jurors are present again.

03:20PM  18          I remind the witness he's still under oath.

03:20PM  19          Mr. Tripi, you may continue.

03:20PM  20          **MR. TRIPI:**  Thank you, Your Honor.

03:20PM  21          Ms. Champoux, in Exhibit 46, can we zoom in on rows

03:20PM  22   55 and 56?

03:20PM  23          **BY MR. TRIPI:**

03:20PM  24   Q.  All right.  Is that the entry you had for Mark Falzone?

03:20PM  25   A.  Yes.

03:21PM 1    Q. What number did you have for him?

03:21PM 2    A. Area code 716-208-5678.

03:21PM 3         **MR. TRIPI:** Ms. Champoux, could we go Exhibit 8A at

03:21PM 4    page 325, please?

03:21PM 5         **BY MR. TRIPI:**

03:21PM 6    Q. Do you see Mark Falzone's name on the account billing for

03:21PM 7    this phone number?

03:21PM 8    A. Yes.

03:21PM 9    Q. And do you see some subscriber details with a personal

03:21PM 10    telephone number and a number under it?

03:21PM 11    A. Yes.

03:21PM 12    Q. What's that number there?

03:21PM 13         **MR. TRIPI:** Ms. Champoux, can you move the cursor a

03:21PM 14    little bit?

03:21PM 15         **THE WITNESS:** 716-208-5678.

03:21PM 16         **BY MR. TRIPI:**

03:21PM 17    Q. Is that the same number you had for Mark Falzone?

03:21PM 18    A. Correct.

03:21PM 19    Q. Okay.

03:21PM 20         **MR. TRIPI:** We can take down 8A for just a moment.

03:21PM 21    Next I'd like to zoom in on Exhibit 46. Rows 58 and 59.

03:22PM 22         **BY MR. TRIPI:**

03:22PM 23    Q. Is that an entry you had for Mark Kagan?

03:22PM 24    A. Yes.

03:22PM 25    Q. What phone number did you have for him?

03:22PM  1   A.  Area code 941-993-6367.

03:22PM  2   Q.  And I don't want to go through everything you said about

03:22PM  3   Mark Kagan, but was he one of your suppliers that you talked

03:22PM  4   about earlier in your testimony?

03:22PM  5   A.  Correct.

03:22PM  6        MR. TRIPI:  Ms. Champoux, can we pull up Exhibit 8A

03:22PM  7   at page 370?

03:22PM  8        BY MR. TRIPI:

03:22PM  9   Q.  Do you see an entry there for Mark Kagan under

03:22PM  10  financially liable party with a phone number, contact home

03:22PM  11  phone 941-993-6367 on Exhibit 8A at page 370?

03:22PM  12  A.  Yes.

03:22PM  13  Q.  And do you also see that under that same phone number

03:23PM  14  under the user information section?

03:23PM  15  A.  Yes.

03:23PM  16  Q.  Okay.

03:23PM  17        MR. TRIPI:  Could we go to Exhibit 46 again?  I'd

03:23PM  18  like to go to row 64.

03:23PM  19        BY MR. TRIPI:

03:23PM  20  Q.  And whose phone number is that?

03:23PM  21  A.  Matt Suppa.

03:23PM  22  Q.  And was it his property where the grows were in the

03:23PM  23  Southern Tier?

03:23PM  24  A.  No, that's Mark Suppa.

03:23PM  25  Q.  Is that his brother?

03:23PM 1    A.   Correct.

03:23PM 2    Q.   What number did you have for Matt?

03:23PM 3    A.   716-553-0099.

03:23PM 4    Q.   Okay.

03:23PM 5         **MR. TRIPI:**  Ms. Champoux, can we pull up Exhibit 8A

03:23PM 6    and go to page 201?  And could you zoom in on that box up at

03:23PM 7    the top?

03:23PM 8         **BY MR. TRIPI:**

03:24PM 9    Q.   Do you see the name, last name Matthew -- or, excuse me,

03:24PM 10   last name Suppa, first name Matthew, third row down, fourth

03:24PM 11   row down?

03:24PM 12   A.   Fourth row down, yes.

03:24PM 13   Q.   And do you see a phone number 716-553-0099?

03:24PM 14   A.   Yes.

03:24PM 15   Q.   Is that the same phone number you had for Matt Suppa?

03:24PM 16   A.   Correct.

03:24PM 17   Q.   Right above that, do you see an entry for a David Hersey?

03:24PM 18   A.   Yes.

03:24PM 19   Q.   Is that one of the people you also said was involved in

03:24PM 20   the outdoor grows?

03:24PM 21   A.   Yes.

03:24PM 22        **MR. TRIPI:**  Okay.  We can take that down,

03:24PM 23   Ms. Champoux.  You can clear the screen.

03:24PM 24        Next I'd like to go to 68.  Row 68 on Exhibit 46.

25

03:24PM    1            **BY MR. TRIPI:**

03:24PM    2    Q.  Again, we see that name Mike Buttitta, was he one of your

03:24PM    3    customers?

03:24PM    4    A.  Yes.

03:24PM    5            **MR. TRIPI:**  Okay.  Let's zoom out of that.  Let's go

03:25PM    6    below that to row number 69 and 70, please.

03:25PM    7            **BY MR. TRIPI:**

03:25PM    8    Q.  Whose phone number is that?

03:25PM    9    A.  Mike Masecchia.

03:25PM   10    Q.  Okay.  What phone number did you have as the main phone

03:25PM   11    number for Masecchia?

03:25PM   12    A.  Area code 716-812-0664.

03:25PM   13    Q.  Now was that his stable phone?

03:25PM   14    A.  Yes.

03:25PM   15    Q.  Did he have other burner phones that you guys would use?

03:25PM   16    A.  Yes.

03:25PM   17    Q.  Okay.

03:25PM   18            **MR. TRIPI:**  Ms. Champoux, let's go to Exhibit 8A at

03:25PM   19    page 204.

03:25PM   20            **BY MR. TRIPI:**

03:25PM   21    Q.  Okay.  Do you see that box there?

03:25PM   22    A.  Yes.

03:25PM   23    Q.  The first box says Trinity remarks.  Can you read what

03:25PM   24    the rest of it says?

03:25PM   25    A.  Numbers part of ongoing narcotics investigation in

03:25PM   1   contact with Michael Masecchia, area code 716-812-0664, per

03:26PM   2   S.A. Bongiovanni.

03:26PM   3   Q.  Now you've never seen those documents before, correct?

03:26PM   4   A.  No.

03:26PM   5   Q.  But that's the phone number you had for Mike Masecchia,

03:26PM   6   right?

03:26PM   7   A.  Correct.

03:26PM   8          **MR. TRIPI:**  And we can zoom out of that,

03:26PM   9   Ms. Champoux.  I'd like to zoom in on rows 71 and 72.

03:26PM  10          **BY MR. TRIPI:**

03:26PM  11   Q.  Is that the Mike Moynihan you've talked about in your

03:26PM  12   testimony that lived with you for a time and helped with the

03:26PM  13   distribution activity?

03:26PM  14   A.  Yes.

03:26PM  15   Q.  And what phone number did you have for him?

03:26PM  16   A.  Area code 716-573-2174.

03:26PM  17          **MR. TRIPI:**  Ms. Champoux, can we go to Exhibit 8A at

03:26PM  18   page 239 to 240.  Stop there.  Stop there.

03:26PM  19          **BY MR. TRIPI:**

03:27PM  20   Q.  On page 239, do you see that same phone number where it

03:27PM  21   says subject number?

03:27PM  22   A.  Yes.

03:27PM  23   Q.  What's that phone number?

03:27PM  24   A.  716-573-2174.

03:27PM  25   Q.  That's the phone number you had for Moynihan?

03:27PM   1   A.  Correct.

03:27PM   2   Q.  And down below on page 240, do you see an old address

03:27PM   3   associated with Mike Moynihan?

03:27PM   4   A.  Yes.

03:27PM   5           **MR. TRIPI:**  Okay.  Ms. Champoux, we can close out of

03:27PM   6   that for a moment.

03:27PM   7           Let's go to row 73 and 74.  And zoom in there on

03:27PM   8   Exhibit 46, please.

03:27PM   9           **BY MR. TRIPI:**

03:27PM  10   Q.  Who's that?

03:27PM  11   A.  Rob Rine.

03:27PM  12   Q.  Is that the individual you talked about earlier in your

03:27PM  13   testimony who helped you take the marijuana that belonged to

03:27PM  14   Santiago Gale that T.S. stored in your warehouse?

03:27PM  15   A.  Correct.

03:28PM  16   Q.  What phone number did you have for him?

03:28PM  17   A.  716-510-2974.

03:28PM  18   Q.  And would Rine also get marijuana from you and distribute

03:28PM  19   it?

03:28PM  20   A.  Occasionally.

03:28PM  21   Q.  Okay.  What number did you have for him again?

03:28PM  22   A.  716-510-2974.

03:28PM  23           **MR. TRIPI:**  Ms. Champoux, can we pull up Exhibit 8A

03:28PM  24   at page 314?

         25

03:28PM   1        **BY MR. TRIPI:**

03:28PM   2   Q.  Do you see the name Robert Rine on that page?

03:28PM   3   A.  Yes.

03:28PM   4   Q.  Do you see an address?

03:28PM   5   A.  Yes.

03:28PM   6   Q.  Was that an address you knew to be his?

03:28PM   7   A.  That's his parents' address.

03:28PM   8   Q.  Okay.  And do you see a subject number which was the same

03:28PM   9   phone number you had for Rob Rine?

03:28PM  10   A.  Yes.

03:28PM  11   Q.  510-2974?

03:28PM  12   A.  Correct.

03:28PM  13        **MR. TRIPI:**  On Exhibit 46, can we zoom in on rows 75

03:28PM  14   and 76?

03:28PM  15        **BY MR. TRIPI:**

03:29PM  16   Q.  Was that a phone number you had for Sal Volpe?

03:29PM  17   A.  Yes.

03:29PM  18   Q.  What phone number is that?

03:29PM  19   A.  Area code 561-945-2273.

03:29PM  20   Q.  And was Mr. Volpe involved in the outdoor aspects of the

03:29PM  21   marijuana grow with Masecchia?

03:29PM  22   A.  Yes.

03:29PM  23        **MR. TRIPI:**  Ms. Champoux, can we pull up Exhibit 222J

03:29PM  24   for a moment?

         25

03:29PM    1    **BY MR. TRIPI:**

03:29PM    2    Q. Do you see Sal Volpe in 222J which is in evidence?

03:29PM    3    A. Yes. He's on the left.

03:29PM    4    Q. Far left in the gray shirt?

03:29PM    5    A. Correct.

03:29PM    6    Q. Who's in the middle?

03:29PM    7    A. Mike Masecchia.

03:29PM    8    Q. Who's on the right?

03:29PM    9    A. Lou Selva.

03:29PM   10    **MR. TRIPI:** Okay. Let's take that down. All right.

03:29PM   11    Just a moment.

03:29PM   12    **THE COURT:** So, folks, we're just going to have to

03:29PM   13    take a quick break. I have a phone call that I need to

03:29PM   14    handle.

03:29PM   15    **MR. TRIPI:** Oh, okay.

03:29PM   16    **THE COURT:** And I apologize very much for this, it's

03:29PM   17    only going to take five minutes. Give me five minutes, I'll

03:30PM   18    go handle it, and I'll be right back.

03:30PM   19    (Jury excused at 3:30 p.m.)

03:30PM   20    **THE COURT:** Okay. I'll be right back, folks, sorry.

03:30PM   21    **MR. TRIPI:** No problem.

03:33PM   22    (Off the record at 3:30 p.m.)

03:33PM   23    (Back on the record at 3:33 p.m.)

03:33PM   24    (Jury not present.)

03:33PM   25    **THE COURT:** Are we ready?

| | | |
|---|---|---|
| 03:33PM | 1 | **MR. TRIPI:**  Yes, Judge. |
| 03:33PM | 2 | **THE COURT:**  Defense ready, too? |
| 03:33PM | 3 | **MR. MacKAY:**  Yes. |
| 03:33PM | 4 | **THE COURT:**  Let's bring them back. |
| 03:34PM | 5 | (Jury seated at 3:34 p.m.) |
| 03:34PM | 6 | **THE COURT:**  I'm sorry, folks.  The record will |
| 03:34PM | 7 | reflect that all jurors are present again. |
| 03:34PM | 8 | I remind the witness he's still under oath. |
| 03:34PM | 9 | Mr. Tripi, you may continue. |
| 03:34PM | 10 | **MR. TRIPI:**  Thank you, Your Honor. |
| 03:34PM | 11 | Ms. Champoux, on Exhibit 46, can you zoom in on rows |
| 03:34PM | 12 | 81 and 82? |
| 03:34PM | 13 | **BY MR. TRIPI:** |
| 03:34PM | 14 | Q.  And does 81 -- we're looking at row 81, does that have a |
| 03:34PM | 15 | phone number, a 561 number for your brother Tom? |
| 03:34PM | 16 | A.  Yes. |
| 03:34PM | 17 | **MR. TRIPI:**  Ms. Champoux, can we pull up Government |
| 03:34PM | 18 | Exhibit 8A page 365? |
| 03:35PM | 19 | **BY MR. TRIPI:** |
| 03:35PM | 20 | Q.  Do you see your brother Tom's name under the financially |
| 03:35PM | 21 | liable party portion of that? |
| 03:35PM | 22 | A.  Yes. |
| 03:35PM | 23 | Q.  And do you see that number 561-801-0221 in the user |
| 03:35PM | 24 | information section? |
| 03:35PM | 25 | A.  Yes. |

03:35PM  1   Q.  And was that a main phone number used by your brother?

03:35PM  2   A.  Yes.

03:35PM  3   Q.  Again, at times did he use burner phones?

03:35PM  4   A.  Yes.

03:35PM  5       **MR. TRIPI:**  Okay.  Ms. Champoux, can we also bring

03:35PM  6   up Exhibit 100A.1?  And can you click on 561-801-0221,

03:35PM  7   Serio T toll analysis?

03:35PM  8       **BY MR. TRIPI:**

03:35PM  9   Q.  And is this that same phone number that you had for your

03:35PM  10  brother, 561-801-0221, highlighted in purple?

03:35PM  11  A.  Yes.

03:35PM  12  Q.  Do you also see in row 15 that phone number 481-8022

03:36PM  13  associated with John Robinson that we looked at earlier?

03:36PM  14  A.  Yes.

03:36PM  15  Q.  And do you see a name in the upper right-hand corner

03:36PM  16  written there?

03:36PM  17  A.  Bongo.

03:36PM  18  Q.  Are the names of Chris Baker, Frank Burkhart, Tom Serio,

03:36PM  19  John Robinson, Lou Selva, Mark Falzone, Mark Kagan, Mike

03:36PM  20  Moynihan, Robert Rine, and the Suppas, names that you

03:36PM  21  understood to be passed along to Bongiovanni over time?

03:36PM  22  A.  Besides Matt Suppa.

03:36PM  23  Q.  All of the rest of those names, yes?

03:36PM  24  A.  Yes.

03:36PM  25  Q.  All the rest of those names came from you?

03:36PM    1    A.   Yes.

03:36PM    2    Q.   The phone numbers that we looked at?

03:36PM    3    A.   Yes.

03:36PM    4    Q.   You wanted to make sure all those were good?

03:36PM    5    A.   Yes.

03:37PM    6    Q.   Up until your arrest, were those phones all clear as far

03:37PM    7    as you understood it?

03:37PM    8    A.   Yes.

03:37PM    9    **MR. TRIPI:**   Ms. Champoux, can we pull up Government

03:37PM   10    Exhibit 8A at page 307?   So we can take 100A.1 down.

03:37PM   11    **BY MR. TRIPI:**

03:37PM   12    Q.   Did you indicate that there was a Jay Campbell that you

03:37PM   13    would sell -- sell product to?

03:37PM   14    A.   Yes.

03:37PM   15    Q.   Do you see a name with an email associated with a Jason

03:37PM   16    Campbell there?

03:37PM   17    A.   Yes.

03:37PM   18    Q.   Do you see a phone number associated with that record?

03:37PM   19    A.   Yes.

03:37PM   20    Q.   And who is Jason Campbell again?

03:37PM   21    A.   He would sell marijuana for me.

03:37PM   22    Q.   Okay.   Is that a name and a number you passed along over

03:38PM   23    time?

03:38PM   24    A.   Yes.

03:38PM   25    **MR. TRIPI:**   You can take those down, Ms. Champoux.

03:38PM   1          **BY MR. TRIPI:**

03:38PM   2   Q.  All right.  I'd like to just briefly talk about your

03:38PM   3   Samsung burner phone, you looked at that as Exhibit 49.  That

03:38PM   4   is in evidence; do you remember that?

03:38PM   5   A.  Yes.

03:38PM   6   Q.  And you've looked at that before, correct?

03:38PM   7   A.  Yes.

03:38PM   8   Q.  Fair to say as it relates to that phone, there's a

03:38PM   9   limited amount of actual information in terms of your

03:38PM  10   contacts in that phone?

03:38PM  11   A.  Correct.

03:38PM  12   Q.  Minimal amount of actual names?

03:38PM  13   A.  Yes.

03:38PM  14   Q.  Is it basically just call logs that you were using to

03:38PM  15   coordinate drug meetings?

03:38PM  16   A.  Yes.

03:38PM  17   Q.  Does it have some cryptic text messaging?

03:38PM  18   A.  Yes.

03:38PM  19          **MR. TRIPI:**  Okay.  Ms. Champoux, I want to pull up

03:38PM  20   Government Exhibit 8A one more time.  I'd like to go to

03:39PM  21   page 6.  Can you zoom in, first of all, box 5, can we zoom in

03:39PM  22   on that?

03:39PM  23          **BY MR. TRIPI:**

03:39PM  24   Q.  Can you read who this is by, Mr. Serio?

03:39PM  25   A.  Joseph Bongiovanni.

03:39PM   1   Q.  Okay.

03:39PM   2        **MR. TRIPI:**  Zoom out of there.

03:39PM   3        And can you zoom in on box -- I think that's

03:39PM   4   number 8, Ms. Champoux?

03:39PM   5        **BY MR. TRIPI:**

03:39PM   6   Q.  Do you see a date listed where this was prepared?

03:39PM   7   A.  Yes.

03:39PM   8   Q.  And what date was that?

03:39PM   9   A.  It was July 7th, 2014.

03:39PM  10   Q.  At that time, you were still getting marijuana from

03:39PM  11   Jarrett Guy, right?

03:39PM  12   A.  Correct.

03:39PM  13   Q.  And that year you're storing marijuana at Lou Selva's

03:39PM  14   house?

03:39PM  15   A.  Yes.

03:39PM  16        **MR. TRIPI:**  Okay.  Can we zoom out of that,

03:39PM  17   Ms. Champoux?  Can you zoom in on paragraph 3?

03:39PM  18        **BY MR. TRIPI:**

03:40PM  19   Q.  Can you read that out loud for the jury?

03:40PM  20   A.  Agents have identified Remus Nowak AKA Remo in a prior

03:40PM  21   DEA investigation C2-98-0030 for trafficking in multiple

03:40PM  22   kilograms of marijuana.

03:40PM  23        Nowak is believed to be a major marijuana distributor and

03:40PM  24   money-laundering source for the Ron Serio DTO.

03:40PM  25        Nowak is an owner of Duncan Motor Car Sales located at

03:40PM 1   2030 Delaware Avenue, Buffalo, New York.

03:40PM 2     Agents have initiated in-depth financial analysis of the

03:40PM 3   financial records of Duncan Motor Car Sales in efforts to

03:40PM 4   expose money-laundering and structuring practices.

03:40PM 5   Q. Okay. I have a question for you. See where it says --

03:40PM 6   that second sentence you read, Nowak is believed to a major

03:40PM 7   marijuana and distributor and money-laundering source the

03:40PM 8   Serio DTO; do you see that?

03:40PM 9   A. Yes.

03:40PM 10   Q. Do you understand Serio DTO to reference your drug

03:41PM 11   organization?

03:41PM 12   A. Correct.

03:41PM 13   Q. Was Remus Nowak ever a money-laundering source for your

03:41PM 14   organization?

03:41PM 15   A. No.

03:41PM 16   Q. Was he ever part of your organization, your and

03:41PM 17   Masecchia's organization, in any way, shape, or form?

03:41PM 18   A. No.

03:41PM 19   Q. In fact, by the time you were involved, was he -- did you

03:41PM 20   believe him to be an enemy of Mike Masecchia's?

03:41PM 21   A. Yes.

03:41PM 22   Q. So is that sentence true at all? Nowak is believed to be

03:41PM 23   a major distributor and money-laundering source for the Serio

03:41PM 24   DTO?

03:41PM 25   A. Completely false.

03:41PM   1   Q.   Who laundered your money?

03:41PM   2   A.   Myself.

03:41PM   3   Q.   Through your businesses?

03:41PM   4   A.   Correct.

03:41PM   5   Q.   As you've described for this jury?

03:41PM   6   A.   Yes.

03:41PM   7         **MR. TRIPI:**   Okay.   We can zoom out of that, and I'd

03:41PM   8   like to go to page Exhibit 8A at page 7.   Can we zoom in on

03:41PM   9   box 5?

03:41PM  10         **BY MR. TRIPI:**

03:41PM  11   Q.   Do you see who wrote this?

03:41PM  12   A.   Joseph Bongiovanni.

03:41PM  13         **MR. TRIPI:**   Can we zoom out of that?

03:41PM  14         Can we zoom in on box number 8, please?

03:41PM  15         **BY MR. TRIPI:**

03:42PM  16   Q.   Do you see the date this was prepared?

03:42PM  17   A.   April 7th, 2014.

03:42PM  18   Q.   You are still getting marijuana from Jarrett Guy?

03:42PM  19   A.   Correct.

03:42PM  20   Q.   You're still storing marijuana in multiple locations to

03:42PM  21   include Lou Selva's house?

03:42PM  22   A.   Correct.

03:42PM  23   Q.   And you set up a grow in Lou Selva's basement?

03:42PM  24   A.   Correct.

03:42PM  25   Q.   Okay.

03:42PM    1      **MR. TRIPI:**  Zoom out of that.

03:42PM    2           Can you zoom in on paragraph 3 again?

03:42PM    3      **BY MR. TRIPI:**

03:42PM    4   Q.  I won't have you read the whole thing, but take a look at

03:42PM    5   that for a moment.  Is that basically the same paragraph you

03:42PM    6   just read in that other document?

03:42PM    7   A.  Looks like the same exact.

03:42PM    8   Q.  That second sentence, Nowak is believed to be a major

03:42PM    9   marijuana distributor and money-laundering source for the

03:42PM   10   Serio DTO; is that true or false?

03:42PM   11   A.  False.

03:42PM   12   Q.  Was he ever your money-launderer?

03:42PM   13   A.  No.

03:42PM   14   Q.  Again, you laundered your own money?

03:42PM   15   A.  Correct.

03:42PM   16   Q.  At all times referencing these documents, you looked at

03:42PM   17   two different dates, was it your understanding Remus Nowak

03:43PM   18   was an enemy of Mike Masecchia?

03:43PM   19   A.  Yes.

03:43PM   20   Q.  From approximately 2008 through April 18th, 2017, while

03:43PM   21   you were partners with Mike Masecchia, what was your

03:43PM   22   understanding of why you and he were able to progress that

03:43PM   23   long without being disrupted by law enforcement?

03:43PM   24   A.  Because of his relationship with Joe Bongiovanni.

03:43PM   25   Q.  During that time, were you, for the majority of the

03:43PM   1   portion of that time, were you paying him money?

03:43PM   2   A.   Yes.

03:43PM   3   Q.   To this defendant?

03:43PM   4   A.   Correct.

03:43PM   5   Q.   When you negotiated with suppliers and referenced having

03:43PM   6   a DEA agent on your payroll in your negotiation with Santiago

03:43PM   7   Gale, who were you referencing?

03:43PM   8   A.   Joe Bongiovanni.

03:43PM   9   Q.   Did you rely upon the information Bongiovanni provided

03:43PM  10   about R.K.?

03:43PM  11   A.   Yes.

03:43PM  12   Q.   Did you rely upon the information he provided about T.S.?

03:44PM  13   A.   Yes.

03:44PM  14   Q.   Did you rely on the information he provided about Mario

03:44PM  15   Vacanti?

03:44PM  16   A.   Yes.

03:44PM  17   Q.   Up through your arrest, you were you and Masecchia close?

03:44PM  18   A.   Yes.

03:44PM  19   Q.   Were you friends?

03:44PM  20   A.   Yes.

03:44PM  21   Q.   Were you business partners?

03:44PM  22   A.   Yes.

03:44PM  23   Q.   Was Masecchia making more than 20,000 per month working

03:44PM  24   with you?

03:44PM  25   A.   Yes.

03:44PM 1 Q. How much total would you estimate in bribe payments you

03:44PM 2 made to Masecchia for Bongiovanni to pass information that

03:44PM 3 you wanted, from Lou Selva to Masecchia?

03:44PM 4 A. At least a quarter million dollars.

03:44PM 5 Q. Is that on the low end?

03:44PM 6 A. Yes.

03:44PM 7 Q. What's on the high end?

03:44PM 8 A. Maybe 3-, 350-.

03:44PM 9 Q. And your activity was uninterrupted until you were

03:44PM 10 arrested by the Erie County Sheriffs on April 18th, 2017?

03:44PM 11 A. Correct.

03:44PM 12 **MR. TRIPI:** Just a moment, Your Honor.

03:45PM 13 Nothing further, Judge.

03:45PM 14 **THE COURT:** Mr. MacKay.

03:45PM 15

03:45PM 16 **CROSS-EXAMINATION BY MR. MacKAY:**

03:45PM 17 Q. Good afternoon, Mr. Serio.

03:45PM 18 A. Good afternoon.

03:45PM 19 Q. All right. So, you just ended your testimony on direct.

03:45PM 20 You believe this arrangement worked, or the proof of that was

03:45PM 21 that you were never arrested until you were, correct?

03:45PM 22 A. Correct.

03:45PM 23 Q. Meaning that from whenever you allegedly started paying

03:45PM 24 Mr. Bongiovanni, you never had any issues until you were

03:45PM 25 arrested, correct?

03:45PM   1   A.  Correct.

03:45PM   2   Q.  As you sit here though, you don't know that wasn't dumb

03:46PM   3   luck not being arrested, correct?

03:46PM   4   A.  Correct.

03:46PM   5   Q.  For example, some of these individuals you've talked

03:46PM   6   about, they've gone on to start separate businesses and were

03:46PM   7   in the drug business originally, correct?

03:46PM   8   A.  Correct.

03:46PM   9   Q.  And some of them opened prominent restaurants in the City

03:46PM  10   of Buffalo, correct?

03:46PM  11   A.  If you say so, I don't know specifically.

03:46PM  12   Q.  Well, Chris Baker went on to -- to open a bar, correct?

03:46PM  13   A.  Correct.

03:46PM  14   Q.  Opened with Joe Gugino, correct?

03:46PM  15   A.  Correct.

03:46PM  16   Q.  Both of those gentleman were individuals who were big in

03:46PM  17   the drug game, correct?

03:46PM  18   A.  Correct.

03:46PM  19   Q.  And ultimately they were never arrested, correct?

03:46PM  20   A.  Correct.

03:46PM  21   Q.  Now, when you first started talking to Mike Masecchia

03:46PM  22   about this about this payment arrangement, you had concerns

03:46PM  23   about how this would actually be facilitated on

03:46PM  24   Mr. Bongiovanni's end, correct?

03:46PM  25   A.  More so just the -- how to tell about the informants, I

03:46PM  1    just had a question about.

03:46PM  2    Q.  Well, I mean, I think you testified on direct you had

03:46PM  3    concerns about how it would reach so far to reach everybody,

03:46PM  4    correct?

03:47PM  5    A.  Correct.

03:47PM  6    Q.  And you asked Mr. Masecchia some questions about that,

03:47PM  7    correct?

03:47PM  8    A.  Correct.

03:47PM  9    Q.  And he never really got back to you about that, correct?

03:47PM  10   A.  Correct.

03:47PM  11   Q.  Throughout the whole that time that this payment

03:47PM  12   arrangement was going on, Mr. Masecchia never told you about

03:47PM  13   any of the details about how Mr. Bongiovanni was doing

03:47PM  14   whatever he was supposedly doing, correct?

03:47PM  15   A.  Correct.

03:47PM  16   Q.  Now, we just covered it, so while it's fresh in our mind

03:47PM  17   let's talk about some of these things with the phones.

03:47PM  18        You were shown a number of phone contacts, and you recall

03:47PM  19   going through those?

03:47PM  20   A.  Correct.

03:47PM  21        **MR. MacKAY:**  Ms. Champoux, can we pull up Government

03:47PM  22   Exhibit 100A.1, and can we go to the Baker C toll analysis?

03:47PM  23        **THE COURT:**  This is in evidence?

03:47PM  24        **MR. MacKAY:**  This is in evidence, Your Honor.

03:47PM  25        **BY MR. MacKAY:**

03:47PM 1    Q.  So, while that's pulling up, do you recall that the way

03:47PM 2    you were asked question was you were shown a bunch of

03:47PM 3    contacts that came out of your iPhone, correct?

03:47PM 4    A.  Correct.

03:47PM 5    Q.  And then you were comparing them with other documents on

03:47PM 6    the other side to see if they match the same number, correct?

03:47PM 7    A.  Correct.

03:48PM 8    Q.  Now, it's your testimony, the documents that were

03:48PM 9    typically on the right-hand side of the screen, you had never

03:48PM 10   seen those before, correct?

03:48PM 11   A.  Correct.

03:48PM 12   Q.  Now, I'm going to direct your attention to another

03:48PM 13   document I expect you probably have never seen before.  Do

03:48PM 14   you recognize what's in front of you?

03:48PM 15   A.  No.

03:48PM 16   Q.  Okay.  That does, although at the top here highlighted,

03:48PM 17   does have Chris Baker name; do you see that?

03:48PM 18   A.  Correct.

03:48PM 19   Q.  The phone number though further down about middle of the

03:48PM 20   page, that's your -- your phone number, the 830-3226 number,

03:48PM 21   correct?

03:48PM 22   A.  Correct.

03:48PM 23   Q.  Do you understand looking at this, that this is a

03:48PM 24   subpoena return to the DEA?

03:48PM 25   A.  I don't know.

03:48PM 1   Q.  You don't know, because you've never seen one of these

03:48PM 2   before, correct?

03:48PM 3   A.  Correct.

03:48PM 4        MR. MacKAY:  Ms. Champoux, can we go to the next

03:48PM 5   page?  Can you rotate that, please?

03:48PM 6        BY MR. MacKAY:

03:48PM 7   Q.  Do you know what this document is here in front of you

03:48PM 8   now?

03:48PM 9   A.  No.

03:48PM 10  Q.  Do you understand this to be a document generated by the

03:48PM 11  DEA that shows all of the numbers that are calling or being

03:48PM 12  called by your phone number?

03:48PM 13  A.  I've never seen it before.

03:48PM 14  Q.  You've never seen one of those before, correct?

03:49PM 15  A.  Correct.

03:49PM 16  Q.  Okay.  Now, the subpoena return, well --

03:49PM 17       MR. MacKAY:  Ms. Champoux, can we pull up Government

03:49PM 18  Exhibit 8A?  Okay.  Can we go to -- can we word search?  Let's

03:49PM 19  just word search Campbell, for example.

03:49PM 20       MS. CHAMPOUX:  I don't think you can word search

03:49PM 21  while trial is in progress.

03:49PM 22       MR. MacKAY:  Oh, you know what?  I can do this.

03:49PM 23       I'll tell you exactly what page.

03:49PM 24       Please go to page 307.

        25

03:49PM  1    **BY MR. MacKAY:**

03:49PM  2    Q.  Okay.  You recall seeing this on your direct when you

03:49PM  3    were talking about Jay Campbell?

03:49PM  4    A.  Yes.

03:49PM  5    Q.  As you sit here today, you don't know what this document

03:50PM  6    is, correct?

03:50PM  7    A.  Correct.

03:50PM  8    Q.  But do you understand, or would you -- let's do it this

03:50PM  9    way.  See at the top it says subscriber details?

03:50PM  10   A.  Yes.

03:50PM  11   Q.  Okay.  And then you saw Jason Campbell's name there,

03:50PM  12   correct?

03:50PM  13   A.  Correct.

03:50PM  14   Q.  That's Jay Campbell's full name, correct?

03:50PM  15   A.  Correct.

03:50PM  16   Q.  And you see a phone number there, correct?

03:50PM  17   A.  Correct.

03:50PM  18   Q.  Again, this is an internal DEA document.  You've never

03:50PM  19   seen one of those before, correct?

03:50PM  20   A.  Correct.

03:50PM  21   Q.  Now, it was your testimony, though, that you passed a

03:50PM  22   number of names to Michael Masecchia to pass to Joe

03:50PM  23   Bongiovanni, correct?

03:50PM  24   A.  Correct.

03:50PM  25   Q.  That occurred over a number of years, correct?

03:50PM   1    A.  Correct.

03:50PM   2    Q.  That wasn't all at one point in time, you gave him one

03:50PM   3    list of all sorts of names, correct?

03:50PM   4    A.  Correct.

03:50PM   5           MR. MacKAY:  Okay.  You can take that down,

03:50PM   6    Ms. Champoux, for now.

03:50PM   7           BY MR. MacKAY:

03:50PM   8    Q.  So I want to talk a little bit about your sort of supply

03:51PM   9    timeline that you've got going on for major sources of supply

03:51PM  10    for marijuana.

03:51PM  11        So you -- you hook up with Mike Masecchia and sort of

03:51PM  12    ramp up operations with him somewhere around the 2008

03:51PM  13    timeframe, correct?

03:51PM  14    A.  Correct.

03:51PM  15    Q.  Now, I think you told us on direct what caused the real

03:51PM  16    concern and ultimately moving towards paying Mr. Masecchia to

03:51PM  17    pay Mr. Bongiovanni was your concern about interest in your

03:51PM  18    operation after your friend Dave Gambino got arrested,

03:51PM  19    correct?

03:51PM  20    A.  Correct.

03:51PM  21    Q.  Meaning that, you know, before Dave Gambino's arrest, you

03:51PM  22    weren't considering any sort of payments, correct?

03:51PM  23    A.  Well, yeah.  Correct.

03:51PM  24    Q.  But then after his arrest, that's sort of when

03:51PM  25    conversations occur about forming some sort of arrangement,

03:51PM 1 correct?

03:51PM 2 A. Correct. But I didn't bring it up. Mike brought it up

03:51PM 3 to me.

03:51PM 4 Q. Okay. But, yeah. So, I want to orient this in time,

03:51PM 5 though. This occurs after Dave Gambino's arrest, correct?

03:52PM 6 A. Correct.

03:52PM 7 Q. And you'd have no reason disagree with me Mr. Gambino was

03:52PM 8 arrested and indicted in federal court in November of 2009?

03:52PM 9 A. Yes.

03:52PM 10 Q. So if we use that as a date, your payments to Mike

03:52PM 11 Masecchia occur after that point in time, correct?

03:52PM 12 A. Correct.

03:52PM 13 Q. And if it's November, do you think they maybe started in

03:52PM 14 early 2010, perhaps?

03:52PM 15 A. Early 2010? I believe it was late 2010.

03:52PM 16 Q. Late 2010? Okay. So late 2010 is when you start paying

03:52PM 17 Mr. Masecchia, correct?

03:52PM 18 A. Correct.

03:52PM 19 Q. Okay. And then it's your testimony, I think, if I recall

03:52PM 20 on direct, that you paid the $2,000 sum for about a year,

03:52PM 21 correct?

03:52PM 22 A. Correct.

03:52PM 23 Q. And then it ramps up to 4,000 a month, correct?

03:52PM 24 A. Correct.

03:52PM 25 Q. Now, again, I think you told us on direct the reason that

03:52PM    1    it sort of increases is because your operations increased,

03:52PM    2    correct?

03:52PM    3    A.   Correct.

03:52PM    4    Q.   That's about the time where you start getting involved

03:52PM    5    with marijuana from the West Coast via Santiago Gale,

03:52PM    6    correct?

03:52PM    7    A.   Correct.

03:52PM    8    Q.   So sometime in about 2011 is when you then hook up with

03:53PM    9    Santiago Gale, correct?

03:53PM   10    A.   Correct.

03:53PM   11    Q.   But you only ever met him once though, correct?

03:53PM   12    A.   Correct.

03:53PM   13    Q.   Your contact to Santiago Gale is through T.S., correct?

03:53PM   14    A.   Correct.

03:53PM   15    Q.   Now, so, then comes a point in time where you're getting

03:53PM   16    loads of marijuana from out west that you understand to be

03:53PM   17    coming from Santiago Gale, correct?

03:53PM   18    A.   Correct.

03:53PM   19    Q.   And then did you later come to learn that Santiago Gale

03:53PM   20    was arrested in January of 2012?

03:53PM   21    A.   Correct.

03:53PM   22    Q.   Okay.  Now after that point in time -- well, strike that.

03:53PM   23         You didn't immediately learn of his arrest, correct?

03:53PM   24    A.   I didn't know of his arrest until much later.

03:53PM   25    Q.   Okay.  Because you continued to deal basically with T.S.,

03:53PM 1 correct?

03:53PM 2 A. Correct.

03:53PM 3 Q. But after Santiago Gale's arrested, your only contact for

03:53PM 4 marijuana out west is through T.S., correct?

03:53PM 5 A. Correct.

03:53PM 6 Q. And, I mean, do you know the deal, do you know the

03:53PM 7 details of where he was sourcing the marijuana from after

03:54PM 8 Santiago Gale's arrest?

03:54PM 9 A. No.

03:54PM 10 Q. Okay. Now ultimately, you and T.S. have a breakdown in

03:54PM 11 relationship, correct?

03:54PM 12 A. Correct.

03:54PM 13 Q. And it has to do with him storing marijuana at your

03:54PM 14 warehouse, correct?

03:54PM 15 A. Correct.

03:54PM 16 Q. And we won't go through all the details again, but

03:54PM 17 basically he tells you he's going to store the motorcycle

03:54PM 18 there, and you find out he's got marijuana and a machine gun

03:54PM 19 there, correct?

03:54PM 20 A. Correct.

03:54PM 21 Q. Now at the point in time that this happens, you assume

03:54PM 22 it's Santiago Gale's marijuana, correct?

03:54PM 23 A. Correct.

03:54PM 24 Q. Because you had only ever known him to be the plug to

03:54PM 25 Santiago Gale, correct?

03:54PM 1  A.  Correct.

03:54PM 2  Q.  Now, ultimately, you and Rob Rine devise this plan, and

03:54PM 3  steal his marijuana, correct?

03:54PM 4  A.  Correct.

03:54PM 5  Q.  And after that, you're done dealing with T.S., correct?

03:54PM 6  A.  No, I still dealt with him a few times after that.

03:54PM 7  Q.  Few times?

03:54PM 8  A.  Yeah.

03:54PM 9  Q.  Now, this would be in approximately 2012?

03:54PM 10  A.  Correct.

03:54PM 11  Q.  Because we're talking now the trailing timeframe after

03:54PM 12  Santiago Gale is arrested, correct?

03:54PM 13  A.  Correct.

03:55PM 14  Q.  So the few more times you deal with T.S. are 2012?

03:55PM 15  A.  2012, into 2013.

03:55PM 16  Q.  Okay.  Now, but in 2012, in November of 2012, Wayne

03:55PM 17  Anderson's arrested, correct?

03:55PM 18  A.  Correct.

03:55PM 19  Q.  And you had a connection to the marijuana Mr. Anderson

03:55PM 20  was going to receive in some fashion, correct?

03:55PM 21  A.  Correct.

03:55PM 22  Q.  Was really -- is it fair to say it was actually indirect

03:55PM 23  through Frank Burkhart?

03:55PM 24  A.  Yes.

03:55PM 25  Q.  But, you know, ultimately it didn't -- it was supposed to

03:55PM  1  involve Wayne Anderson in some fashion, correct?

03:55PM  2  A.  Yes.  Correct.

03:55PM  3  Q.  Now, after Wayne Anderson's arrest, you take some steps

03:55PM  4  to have Mike Masecchia look into that, correct?

03:55PM  5  A.  Correct.

03:55PM  6  Q.  Now do you recall that what actually, sort of, concerned

03:55PM  7  you after that arrest was a lawyer talking about your name

03:55PM  8  being brought up in connection with Wayne Anderson?

03:55PM  9  A.  Correct.

03:55PM  10  Q.  Now as a response to that, to the arrest and the general

03:55PM  11  circumstances after that, you took some time off from drug

03:56PM  12  behavior, drug dealing, correct?

03:56PM  13  A.  Correct.

03:56PM  14  Q.  And do you recall that it was almost about a year before

03:56PM  15  you got fully back into the business?

03:56PM  16  A.  It was probably six months, and then full, yeah, a year

03:56PM  17  when I was --

03:56PM  18  Q.  Yeah, let's walk through that.

03:56PM  19      So, after Wayne Anderson's arrest, it's a hard stop on

03:56PM  20  drug dealing for you, correct?

03:56PM  21  A.  Correct.

03:56PM  22  Q.  You're afraid at that time?

03:56PM  23  A.  Correct.

03:56PM  24  Q.  So then you take about at least six months of time

03:56PM  25  completely off of drug dealing, correct?

03:56PM 1    A.  Correct.

03:56PM 2    Q.  And then after that point in time, about six months after

03:56PM 3    the arrest you start to reengage with an old guy you dealt

03:56PM 4    with name Mark Kagan, correct?

03:56PM 5    A.  Correct.

03:56PM 6    Q.  And he's a guy that's down in New York City, correct?

03:56PM 7    A.  Correct.

03:56PM 8    Q.  To remind the jury sort of on the front end of some drug

03:56PM 9    dealing, before you really got involved with this payment

03:56PM 10   arrangement you had used Mark Kagan as a source some time

03:56PM 11   ago, correct?

03:56PM 12   A.  Correct.

03:56PM 13   Q.  Approximately what, 2008 timeframe?

03:56PM 14   A.  Correct.

03:56PM 15   Q.  So, you use him in 2008, and kind of disappears from your

03:57PM 16   radar for a while, correct?

03:57PM 17   A.  Correct.

03:57PM 18   Q.  And you pick him up back in about mid 2013 or so?

03:57PM 19   A.  Correct.

03:57PM 20   Q.  And then you deal with him exclusively for about six

03:57PM 21   months, correct?

03:57PM 22   A.  Correct.

03:57PM 23   Q.  And then six months after that, you get introduced to

03:57PM 24   Jarrett Guy, correct?

03:57PM 25   A.  Well, I got introduced to Jarrett Guy before when I

03:57PM 1   stopped.  And then I reconnected with Mark Kagan, and Mark

03:57PM 2   Kagan was going through Jarrett Guy.

03:57PM 3   Q.  Okay.

03:57PM 4   A.  But then I wind up cutting Mark Kagan out.

03:57PM 5   Q.  Okay, yeah.  That's what I'm just trying to clarify.

03:57PM 6   A.  Okay.

03:57PM 7   Q.  So, again, so for the six months after Ron -- I'm sorry.

03:57PM 8   For the six months after the Wayne Anderson arrest, it's just

03:57PM 9   flat no drug dealing, correct?

03:57PM 10  A.  Correct.

03:57PM 11  Q.  And then -- then it's Mark Kagan is your contact for a

03:57PM 12  while, but you know at that point in time he's getting his

03:57PM 13  weed from Jarrett Guy, correct?

03:57PM 14  A.  Correct.

03:57PM 15  Q.  So, for the next six months after that, you're dealing

03:58PM 16  really with Mark Kagan, but you understand it's Jarrett Guy's

03:58PM 17  weed, correct?

03:58PM 18  A.  Correct.

03:58PM 19  Q.  And then so six months of that, and then you completely

03:58PM 20  cut Mark Kagan out, and it's Jarrett Guy all the way,

03:58PM 21  correct?

03:58PM 22  A.  Correct.

03:58PM 23  Q.  So, Jarrett Guy -- and when you start going to Jarrett

03:58PM 24  Guy exclusively, that's -- that starts with the mail,

03:58PM 25  correct?

03:58PM     1   A.   Correct.

03:58PM     2   Q.   And then some time later, it expands to the -- the U-Haul

03:58PM     3   trucks, we'll call them the mid-sized trucks, right?

03:58PM     4   A.   Yes.

03:58PM     5   Q.   And then ultimately expands to the full-size

03:58PM     6   tractor-trailers, correct?

03:58PM     7   A.   Correct.

03:58PM     8   Q.   And that's sort of the thing that's going on right about

03:58PM     9   the time you get arrested, correct?

03:58PM    10   A.   Correct.

03:58PM    11   Q.   Okay.  So, again, just to summarize that, it goes Mark

03:58PM    12   Kagan in the middle of 2013, correct?

03:58PM    13   A.   Correct.

03:58PM    14   Q.   Towards about the end of 2013, and then it's exclusively

03:58PM    15   Jarrett Guy, correct?

03:58PM    16   A.   Correct.

03:59PM    17   Q.   And it's packages first, correct?

03:59PM    18   A.   Correct.

03:59PM    19   Q.   U-Haul second, correct?

03:59PM    20   A.   Correct.

03:59PM    21   Q.   And tractor-trailers third, correct?

03:59PM    22   A.   Correct.

03:59PM    23   Q.   Okay.  Now --

03:59PM    24        **MR. MacKAY:**  I'm going to try to squeeze in another

03:59PM    25   subject, Judge.

03:59PM   1        **THE COURT:**  Okay.

03:59PM   2        **BY MR. MacKAY:**

03:59PM   3    Q.  Now, the way this arrangement worked is you made payments

03:59PM   4    to Mike Masecchia, correct?

03:59PM   5    A.  Correct.

03:59PM   6    Q.  You understood from what -- how he explained it,

03:59PM   7    ultimately, those payments would be -- would make their way

03:59PM   8    to Joe Bongiovanni, correct?

03:59PM   9    A.  Correct.

03:59PM  10    Q.  But the information would come back ultimately through

03:59PM  11    Mike Masecchia to you, correct?

03:59PM  12    A.  Correct.

03:59PM  13    Q.  You understood that as you were told, the information

03:59PM  14    might be filtered from Joe Bongiovanni to Lou Selva to Mike

03:59PM  15    Masecchia, correct?

03:59PM  16    A.  Correct.

03:59PM  17    Q.  But ultimately, it's Mike Masecchia who also forms the

04:00PM  18    back end of the relationship of the information getting back

04:00PM  19    to you, correct?

04:00PM  20    A.  Correct.

04:00PM  21    Q.  Now, this was always word of mouth, correct?

04:00PM  22    A.  Correct.

04:00PM  23    Q.  You were never shown any DEA documents, correct?

04:00PM  24    A.  Correct.

04:00PM  25    Q.  I mean, some of the documents you've seen here are the

04:00PM  1   first time you've ever seen them, correct?

04:00PM  2   A.  Correct.

04:00PM  3   Q.  Now, you had the exclusive relationship, as you

04:00PM  4   understood it, paying Joe Bongiovanni, correct?

04:00PM  5   A.  Correct.

04:00PM  6   Q.  Now you have a brother who also was in the drug game and

04:00PM  7   at some point in time, correct?

04:00PM  8   A.  Correct.

04:00PM  9   Q.  But he did not have a separate sort of payment

04:00PM  10  arrangement or anything going through to Joe Bongiovanni,

04:00PM  11  correct?

04:00PM  12  A.  Correct.

04:00PM  13  Q.  You were the sole exclusive route to and from information

04:00PM  14  of payments of Joe Bongiovanni, correct?

04:00PM  15  A.  Correct.

04:00PM  16  Q.  Okay.  Now, in setting up this arrangement, the purpose

04:00PM  17  was that you wanted to make sure your operation was

04:00PM  18  protected, correct?

04:01PM  19  A.  Correct.

04:01PM  20  Q.  First, is it fair to say it sort of arose from a personal

04:01PM  21  fear right after Dave Gambino's arrest?

04:01PM  22  A.  Correct.

04:01PM  23  Q.  And then as you scale up the operation size about a year

04:01PM  24  later, you want to make sure everybody around you is

04:01PM  25  connected, correct?

04:01PM    1    A.  Correct.

04:01PM    2    Q.  Protected, correct?

04:01PM    3    A.  Correct.

04:01PM    4    Q.  Okay.  Now, Santiago Gale, we talked about him, he was

04:01PM    5    one of your main sources of supply at one point in time,

04:01PM    6    correct?

04:01PM    7    A.  Correct.

04:01PM    8    Q.  If you had to estimate for, what, about a year or so?

04:01PM    9    A.  Correct.

04:01PM   10    Q.  And you were moving a fair amount of product for him,

04:01PM   11    correct?

04:01PM   12    A.  Correct.

04:01PM   13    Q.  I forgot the number, if you can remind us --

04:01PM   14    A.  200.

04:01PM   15    Q.  -- about how much?

04:01PM   16    A.  200 pounds.

04:01PM   17    Q.  200 pounds a month?

04:01PM   18    A.  Yes.

04:01PM   19    Q.  Now, you didn't even learn about his arrest until much

04:01PM   20    later, correct?

04:01PM   21    A.  Correct.

04:01PM   22    Q.  How'd you learn about his arrest?

04:01PM   23    A.  Through the government.

04:01PM   24    Q.  Through the government?

04:01PM   25    A.  Through a proffer.

04:01PM 1  Q.  Okay.  So, what you're telling the jury is you didn't

04:01PM 2  even learn that Santiago Gale had been arrested until after

04:01PM 3  your arrest and you were in discussions with the government,

04:02PM 4  correct?

04:02PM 5  A.  Correct.

04:02PM 6  Q.  And so in January of 2012, you had no realtime

04:02PM 7  information that Santiago Gale had been arrested by the DEA,

04:02PM 8  correct?

04:02PM 9  A.  Correct.

04:02PM 10  Q.  Prior to his arrest, you never received any tip-off that

04:02PM 11  he was under investigation by DEA, correct?

04:02PM 12  A.  Correct.

04:02PM 13  Q.  You had no -- not received any information that he had

04:02PM 14  been arrested out in Utah by DEA Utah, correct?

04:02PM 15  A.  Well, I never gave his name.

04:02PM 16  Q.  Okay.

04:02PM 17  A.  I don't give the supplier names.

04:02PM 18  Q.  Okay.  But, so -- so it's your testimony you never passed

04:02PM 19  along any of your supplier names to -- through Mike Masecchia

04:02PM 20  to Joe Bongiovanni?

04:02PM 21  A.  Correct.

04:02PM 22  Q.  Okay.  And so, it's your testimony you did not pass along

04:02PM 23  Mark Kagan's name?

04:02PM 24  A.  Correct.

04:02PM 25  Q.  And you didn't pass along Santiago Gale's name, correct?

04:02PM    1    A.   Correct.

04:02PM    2    Q.   Okay.  Now, John Robinson.  He's a name that --

04:03PM    3         Let's word it differently.  He dated your ex

04:03PM    4    sister-in-law, correct?

04:03PM    5    A.   Correct.

04:03PM    6    Q.   And he was one of your associates, correct?

04:03PM    7    A.   Correct.

04:03PM    8    Q.   He sold you for, correct?

04:03PM    9    A.   Correct.

04:03PM   10    Q.   He did not supply you, correct?

04:03PM   11    A.   Correct.

04:03PM   12    Q.   But it's your testimony he's a name you provided to -- to

04:03PM   13    Joe Bongiovanni, correct?

04:03PM   14    A.   Correct.

04:03PM   15    Q.   And when I say that, just so we're clear, what I'm saying

04:03PM   16    is you provided to Mike Masecchia, and with the intention of

04:03PM   17    going through to Joe Bongiovanni, correct?

04:03PM   18    A.   Correct.

04:03PM   19    Q.   Just in case I misspeak, that's what I'm intending to

04:03PM   20    communicate.

04:03PM   21    A.   Okay.

04:03PM   22    Q.   Now, you come to learn that Mark Vitale is arrested in

04:03PM   23    December of 2015, correct?

04:03PM   24    A.   Correct.

04:03PM   25    Q.   And you had never received any information prior to his

04:03PM 1 arrest that he was the subject of any investigation, correct?

04:03PM 2 A. Correct.

04:03PM 3 Q. You had not received any information that members of

04:03PM 4 Buffalo DEA were looking into his phones in any fashion,

04:03PM 5 correct?

04:04PM 6 A. Correct.

04:04PM 7 Q. Never received any information that Mr. Bongiovanni's

04:04PM 8 partner, Joe Palmieri, had any connection to an

04:04PM 9 investigation, correct?

04:04PM 10 A. Correct.

04:04PM 11 Q. In fact, you learned about the arrest I think you

04:04PM 12 testified on direct, who was it from?

04:04PM 13 A. From my ex-wife.

04:04PM 14 Q. Okay. So your ex-wife told you, correct?

04:04PM 15 A. Correct.

04:04PM 16 Q. Okay. Do you recall testifying in a prior proceeding

04:04PM 17 here? Do you recall sitting and testifying in a prior

04:04PM 18 proceeding here?

04:04PM 19 A. Yes.

04:04PM 20 Q. Do you recall -- so, I mean, I just want to be clear,

04:04PM 21 it's your testimony that it's your ex-wife, Lauren, who told

04:04PM 22 you about Mark Vitale's arrest?

04:04PM 23 A. Correct.

04:04PM 24 Q. Okay. We'll come back to that. I lost my place here.

04:05PM 25 You were never provided with the name Corey Cannizzo as

04:05PM    1    an informant, correct?

04:05PM    2    A.   Correct.

04:05PM    3    Q.   That's -- that's not a name you ever heard before,

04:05PM    4    correct?

04:05PM    5    A.   Correct.

04:05PM    6    Q.   Okay.  All right.  The Suppas.

04:05PM    7         Those were individuals who dealt with in the context of

04:05PM    8    the outdoor grows, correct?

04:05PM    9    A.   Correct.

04:05PM   10    Q.   And I think you testified you also helped set up an

04:05PM   11    indoor grow for John Suppa, correct?

04:05PM   12    A.   Correct.

04:05PM   13    Q.   Do you recall the address of that?

04:05PM   14    A.   I don't recall the address.  It's the second building in

04:05PM   15    from the corner of Fairchild and Hertel.

04:05PM   16    Q.   Okay.

04:05PM   17         **MR. MacKAY:**  Ms. Champoux, can we show Government

04:05PM   18    Exhibit 8, 1195 Hertel.Jpeg?  Government Exhibit 8, 1195

04:05PM   19    Hertel.

04:06PM   20         **BY MR. MacKAY:**

04:06PM   21    Q.   Is that the building?

04:06PM   22    A.   Yes.

04:06PM   23    Q.   Okay.  So just to be clear, that's the building in the

04:06PM   24    picture that you set up an indoor grow operation at, correct?

04:06PM   25    A.   Yes.

04:06PM   1    Q.  And what year was that?

04:06PM   2    A.  That was in 2009.

04:06PM   3    Q.  Okay.  Now, you never received any information that back

04:06PM   4    in 2009, the Suppas were the subject of a DEA investigation,

04:06PM   5    correct?

04:06PM   6    A.  Correct.

04:06PM   7        MR. MacKAY:  You can take that down, Ms. Champoux,

04:06PM   8    thank you.

04:06PM   9        BY MR. MacKAY:

04:06PM  10    Q.  Now Mike Masecchia informed you, though, that he had a --

04:06PM  11    had some plants seized down in the Southern Tier quite a long

04:06PM  12    time before that, correct?

04:06PM  13    A.  Correct.

04:06PM  14    Q.  Sometime in the early 2000s?

04:06PM  15    A.  Correct.

04:06PM  16    Q.  Okay.  But in the, you know, when you're getting more

04:06PM  17    involved with Mr. Masecchia around 2009, he never alerts you

04:06PM  18    that he knows about a DEA investigation into him, correct?

04:06PM  19    A.  Correct.

04:06PM  20    Q.  Now, you talked about -- you had a heavy gambling habit,

04:06PM  21    correct?

04:07PM  22    A.  Correct.

04:07PM  23    Q.  That goes back, I mean, when you did start that?

04:07PM  24    A.  Heavy gambling?  Late 2010, early 2011.

04:07PM  25    Q.  Okay.  Approximately the time you really starting to ramp

04:07PM   1   up the income?

04:07PM   2   A.   Yes.

04:07PM   3   Q.   For example, that corresponds about the time you buy the

04:07PM   4   Lebrun house, correct?

04:07PM   5   A.   Correct.

04:07PM   6   Q.   And then moving into about 2015, you are starting to get

04:07PM   7   stopped at the border a lot, correct?

04:07PM   8   A.   Correct.

04:07PM   9   Q.   Because you are -- you're giving information about

04:07PM   10   gambling activity, correct?

04:07PM   11   A.   Correct.

04:07PM   12   Q.   And you're subjected to a number of secondary

04:07PM   13   inspections, correct?

04:07PM   14   A.   Correct.

04:07PM   15   Q.   And around that point in time, you never received any

04:07PM   16   tip-off about any agency looking into you, correct?

04:07PM   17   A.   Correct.

04:07PM   18   Q.   Even going back further into the 2018 timeframe, you

04:07PM   19   never received any information about whether your finances

04:07PM   20   were being subpoenaed, correct?

04:07PM   21   A.   Correct.

04:07PM   22   Q.   Whether your M&T Bank accounts were being subpoenaed,

04:07PM   23   correct?

04:08PM   24   A.   Correct.

04:08PM   25   Q.   Okay.  And in October of 2015, you never received any

04:08PM   1   information that HSI was looking into you, correct?

04:08PM   2   A.  Correct.

04:08PM   3   Q.  In a -- in a financial investigation, correct?

04:08PM   4   A.  Correct.

04:08PM   5   Q.  Okay.  Now, you talked about an individual named Joe

04:08PM   6   Plevniak.

04:08PM   7   A.  Correct.

04:08PM   8   Q.  You laundered some money for him, correct?

04:08PM   9   A.  Correct.

04:08PM  10   Q.  He dealt drugs separately and apart from you, correct?

04:08PM  11   A.  Correct.

04:08PM  12   Q.  But you helped him at least on a couple of occasions to

04:08PM  13   launder some of that drug money, correct?

04:08PM  14   A.  Correct.

04:08PM  15   Q.  You were never made aware that HSI was looking into Joe

04:08PM  16   Plevniak, correct?

04:08PM  17   A.  Correct.

04:08PM  18   Q.  And was Joe Plevniak a name you ever provided to

04:08PM  19   Mr. Masecchia?

04:08PM  20   A.  No.

04:08PM  21   Q.  Okay.  Now, let's go to early 2013.

04:08PM  22       The name G.R., do you even know that name as you sit here

04:08PM  23   today?

04:08PM  24   A.  No.

04:08PM  25   Q.  Okay.  I just want to -- did you and your brother

04:09PM  1   ultimately have a falling out at some point in time?

04:09PM  2   A.   Yes.

04:09PM  3   Q.   When was that approximately?

04:09PM  4   A.   I believe that was 2013.  And I didn't talk to him for

04:09PM  5   two years.

04:09PM  6   Q.   Okay.  What prompted that?

04:09PM  7   A.   We just got into a fight, and we kind of split up the

04:09PM  8   collection agency.  And I felt like I was forced out, so I

04:09PM  9   was kind of pissed off.

04:09PM  10  Q.   Yeah.  Let's kind of walk through that.  Beginning of

04:09PM  11  2013?

04:09PM  12  A.   Possibly.

04:09PM  13  Q.   Okay.  But this is not involving any of the drug

04:09PM  14  business, correct?

04:09PM  15  A.   Correct.

04:09PM  16  Q.   And it sounds like what you're telling us it had to do

04:09PM  17  with arguments regarding your collections businesses,

04:09PM  18  correct?

04:09PM  19  A.   Yeah, we had a different style of managing, and we would

04:09PM  20  argue a lot.

04:09PM  21  Q.   Right up to that point in time you and your brother owned

04:09PM  22  collections agencies together, correct?

04:09PM  23  A.   Correct.

04:09PM  24  Q.   But it sounds like a management style difference

04:09PM  25  triggered that, and you went your own separate ways, correct?

04:09PM    1    A.  Correct.

04:09PM    2    Q.  And as a result of that, you didn't speak to him for two

04:10PM    3    years, correct?

04:10PM    4    A.  Correct.

04:10PM    5    Q.  So in 2013, you didn't provide any information about any

04:10PM    6    informant talking about him, correct?

04:10PM    7    A.  Correct.

04:10PM    8    Q.  You didn't tell him that he was gonna be the subject of

04:10PM    9    any controlled calls of DEA, correct?

04:10PM   10    A.  Correct.

04:10PM   11    Q.  And as you sit here today, like I said, you never even

04:10PM   12    heard the name G.R., correct?

04:10PM   13    A.  Correct.

04:10PM   14    Q.  So fair to say you never passed the name G.R. to your

04:10PM   15    brother Tom Serio?

04:10PM   16    A.  Correct.

04:10PM   17         **MR. MacKAY:**  Judge, now might be a good time to stop.

04:10PM   18         **THE COURT:**  Fine.

04:10PM   19         Okay, folks.  So we're at another weekend, and you

04:10PM   20    know my message, right?  When you're at dinner with family on

04:10PM   21    Sunday, don't talk about the case.  Don't talk about the case

04:10PM   22    at all with anyone at any time over the weekend.

04:10PM   23         Don't read or watch or listen to any news coverage if

04:10PM   24    there is any while the trial is in progress.  Don't use tools

04:10PM   25    of technology to communicate about the case or to research

04:10PM 1  anything about the case.  Don't try to learn anything about

04:11PM 2  the case outside the courtroom.  And don't make up your mind

04:11PM 3  until you start deliberating.

04:11PM 4        We'll see you back here at 9:30 on Monday morning.

04:11PM 5  Again, we'll go until 5:30, unless somebody's got a real

04:11PM 6  problem doing that.  And we'll do that Monday, Tuesday,

04:11PM 7  Wednesday, and Thursday next week.

04:11PM 8        And when I say 5:30, I mean a hard stop at 5:30.

04:11PM 9  We'll go between 5 and 5:30 rather than, you know, approaching

04:11PM 10  5:00 and end.  Okay?

04:11PM 11        Thanks, everybody.  Have a good weekend.  Drive

04:11PM 12  carefully.  And get a good night's sleep on Sunday.

04:11PM 13        (Jury excused at 4:11 p.m.)

04:12PM 14        **THE COURT:**  Anything we need to do before we break?

04:12PM 15        **MR. TRIPI:**  Not from the government, Your Honor.

04:12PM 16        **MR. MacKAY:**  No, Your Honor.

04:12PM 17        **THE COURT:**  We'll see you folks.

04:12PM 18        Mr. Serio, don't talk to anybody about your testimony

04:12PM 19  between now and Monday.  In fact, don't talk to anybody about

04:12PM 20  your testimony while you're still testifying, okay?

04:12PM 21        **THE WITNESS:**  Okay.

04:12PM 22        **THE COURT:**  Thank you.

04:12PM 23        **MR. TRIPI:**  Judge, just a point of clarification.

04:12PM 24  Clearly, we're not going to talk to him, he has his own

04:12PM 25  lawyer.

04:12PM 1      **THE COURT:** Mr. Serio, you can always talk to your

04:12PM 2 lawyer, you can always, always, always talk to your lawyer.

04:12PM 3      Thank you, Mr. Tripi.

04:12PM 4      **MR. TRIPI:** I wanted to clarify that, we certainly

04:12PM 5 won't talk to him.

04:12PM 6      **THE COURT:** Yeah, no, no. Thank you for that

04:12PM 7 clarification.

04:12PM 8      Colleen, were you trying to direct my attention.

04:12PM 9      **THE CLERK:** Pat was trying to get Ann's attention,

04:12PM 10 but she couldn't hear.

04:12PM 11      **THE COURT:** Oh.

04:12PM 12      **THE CLERK:** So that's why I was trying to get her

04:12PM 13 attention. Sorry.

04:12PM 14      **THE COURT:** Okay. Okay. We'll see everybody on

04:12PM 15 Monday morning. Thank you. All.

04:12PM 16      **MR. TRIPI:** Thank you, Your Honor. Continue to feel

04:12PM 17 better, and thanks for grinding it out today.

04:12PM 18      **THE COURT:** Yeah, thank you. Thanks.

04:13PM 19      (Excerpt concluded at 4:13 p.m.)

20      *    *    *    *    *    *    *

21

22

23

24

25

1

2                    **CERTIFICATE OF REPORTER**

3

4              In accordance with 28, U.S.C., 753(b), I

5    certify that these original notes are a true and correct

6    record of proceedings in the United States District Court for

7    the Western District of New York on September 20, 2024.

8

9

10                        s/ Ann M. Sawyer
                          Ann M. Sawyer, FCRR, RPR, CRR
11                        Official Court Reporter
                          U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2 **TRANSCRIPT INDEX**

3 **EXCERPT - EXAMINATION OF RONALD SERIO - DAY 2**

4 **SEPTEMBER 20, 2024**

5

6

7 **W I T N E S S** **P A G E**

8 **R O N A L D   S E R I O** 3

9   (CONT'D) DIRECT EXAMINATION BY MR. TRIPI: 3

10   CROSS-EXAMINATION BY MR. MacKAY: 191

11

12 **E X H I B I T S** **P A G E**

13 GOV Exhibits 489A and 489B 56

14 GOV Exhibits 41A-1, 2, 3 and 13 97

15 GOV Exhibits 42A-1 to 9, 42A-11 to 32 99

16 GOV Exhibits 53 through 59 113

17 GOV Exhibits 43A-78, 43A-71, 43A-1, 43A-2, 118

18 43A-8, 43A-9, 43A-10, 43A-14, 43A-15, 43A-17,

19 43A-19, 43A-20, 43A-22, 43A-36, 43A-37, 43A-39,

20 43A-40, 43A-45, 43A-46, 43A-47, 43A-49, 43A-73,

21 43A-80, 43A-81, 43A-82, 43A-84

22 GOV Exhibits 265, 264, 269, 272 127

23 GOV Exhibit 267 128

24 GOV Exhibit 266 129

25 GOV Exhibits 270, 275 131

1  GOV Exhibits 271, 274                                    132

2  GOV Exhibit 268                                          133

3  GOV Exhibit 276                                          134

4  GOV Exhibits 277, 278, 279                               135

5  GOV Exhibits 281A, 281B                                  136

6  GOV Exhibits 43A-93, 43A-94, 43A-95, 43A-96,             137

7  43A-97, 43A-98, and 43A-99

8  GOV Exhibits 46, 49                                      154

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25