IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

        v.                                      19-CR-227-LJV

JOSEPH BONGIOVANNI,

           Defendant.

_____

## RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 29

## <u>TABLE OF CONTENTS</u>

**PAGE NO.**

Introduction ................................................................................................ 1

I. Factual Background ................................................................................. 2

A. The Defendant's Protection of the Ron Serio Drug Trafficking Organization ........... 3

   1. The Principal Members of the Serio DTO ........................................ 3

   2. The Defendant's Affection for his Friends, Affinity for Italian Organized Crime, Financial Stress, and Racism Motivated his Corrupt Conduct ........................... 7

   3. The Defendant's inquiry into the Las Vegas Field Division's investigation targeting Masecchia ...................................................................................... 8

   4. Masecchia Advertised to Serio that the Defendant was Protecting him ............... 9

   5. Selva, on behalf of Masecchia and Serio, Offered the Defendant Bribe Money in Exchange for Protection for the whole DTO ................................................... 10

   6. The Defendant Offered Advice and Feedback to Selva on how to Avoid Law Enforcement Detection ............................................................................ 12

   7. The Creation and Use of the "Wayne Anderson" DEA File ............................ 16

     a. The New York State Police Arrest of Wayne Anderson ............................... 16

     b. The Defendant Formally Opens a Sham Investigation into Anderson through DEA File C2-13-0026 ................................................................................. 18

       i. The Defendant's Misappropriation of Law Enforcement Deconfliction Databases ......................................................................................... 19

       ii. The False and Misleading Reports Authored by the Defendant in the Wayne Anderson Case File ........................................................................... 22

   8. The Defendant's continued efforts to protect the Serio DTO after closing the Anderson/C2-13-0026 file ......................................................................... 35

   9. The Defendant's awareness of Selva's indoor grow operation .......................... 38

   10. Events after Ron Serio's Arrest by the ECSO on April 18, 2017 ....................... 39

i

B.  The Defendant's Relationship with Peter Gerace ....................................................41

   1.  The Defendant's friendship with Gerace ...........................................................41

   2.  Gerace's operation of Pharaoh's as a drug-involved premises...........................44

   3.  The Defendant's December 2005 disclosure of search warrant information to Gerace ............................................................................................................45

   4.  Gerace advises a cocaine dealer that she can use the defendant's business card if she needs to get out of trouble....................................................................45

   5.  The Defendant's intervention in a DEA investigation targeting Gerace ............46

   6.  The Defendant's intervention in an FBI investigation targeting Gerace ............47

   7.  The Defendant's confrontation with Special Agent Casullo regarding Gerace ...50

   8.  The Defendant's advice to Gerace regarding ping warrants..............................51

   9.  The Defendant's receipt of DARTS notices regarding Anthony Gerace.............52

   10. The Defendant's November 10, 2018, DEA Memorandum ...............................53

   11. The Defendant's January 28, 2019, DEA Memorandum ...................................54

   12. The Defendant's retirement and voluntary interview with the DOJ Office of Inspector General.............................................................................................55

   13. The search of the Defendant's residence and his interview with federal law enforcement ...................................................................................................56

C.  The Duties of a DEA Agent ...................................................................................57

II.  Legal Frameworks ..................................................................................................57

A.  The Rule 29 Standard ............................................................................................57

B.  Applying the Rule 29 Standard in Connection to Conspiracy Convictions.............59

C.  Applying the Rule 29 Standard in Split Verdict Cases ...........................................61

III.  Analysis ..................................................................................................................63

A.  The Defendant's Motion for a Judgment of Acquittal on Count 1 should be Denied
.................................................................................................................64

    1.  The Defendant arguments are foreclosed by Supreme Court and Second Circuit precedent ...........................................................................................66

    2.  The Defendant had notice of the conspiracy alleged in Count 1 ........................71

    3.  Count 1 did not allege multiple conspiracies and does not violate the doctrine of duplicity..............................................................................................76

    4.  There was no constructive amendment or variance...........................................81

    5.  A rational jury could find that the defendant committed both objects of the conspiracy alleged in Count 1 ...........................................................85

        a.  A rational jury could conclude that the defendant conspired with others to defraud the DEA...........................................................................85

        b.  A rational jury could conclude that the defendant conspired to accept bribes. .................................................................................................93

    6.  The government proved an overt act in furtherance of the conspiracy after October 31, 2014 ..................................................................................95

B.  The evidence adduced at trial permitted a rational jury to convict the defendant of the narcotics conspiracy charged in Count 3.............................................................97

C.  The evidence adduced at trial permitted a rational jury to convict the defendant of falsifying evidence as charged in Counts 6 and 7...................................................100

D.  The evidence adduced at trial permitted a rational jury to convict the defendant of Count 8 ...................................................................................................105

E.  The evidence adduced at trial permitted a rational jury to convict the defendant of Count 10 .................................................................................................109

F.  The evidence adduced at trial permitted a rational jury to convict the defendant of Count 11 .................................................................................................112

Conclusion.........................................................................................................118

**INTRODUCTION**

On October 10, 2024, after a six-week trial, a jury found the defendant, Joseph Bongiovanni, a former Special Agent with the Drug Enforcement Administration, guilty of the following crimes: Conspiracy to Defraud the United States and Commit Bribery (Count 1); Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances (Count 3); four counts of Obstruction of Justice (Counts 6, 7, 8, and 10); and False Statements or Representations to an Agency of the United States (Count 11). On the remaining counts, including a second Conspiracy to Defraud and Commit Bribery (Count 2), substantive bribery (Count 4), a second Narcotics Conspiracy (Count 5), and one count of Obstruction of Justice (Count 9), the jury entered a verdict of not guilty.[1]

These convictions stemmed from the defendant's decision to knowingly protect and shield the very people he swore an oath to investigate and charge: drug traffickers. As part of his protection scheme, the defendant neutralized, and unmasked the identities of, confidential sources and potential witnesses; provided drug traffickers with information about law enforcement sensitive techniques, activities, and investigations; and offered advice and cover stories to help his drug dealing coconspirators continue their criminal activities unabated for years.

Among the sixty-two government witnesses were several narcotics coconspirators and beneficiaries of the defendant's protection scheme, including the his former best friend; members of federal, state, and local law enforcement—including former and current employees of the United States Attorney's Office—whom the defendant misled and lied to

---

[1] *See* Jury Verdict, ECF No. 1285, (dated Oct. 10, 2025).

both in person and in writing; and, investigators with the FBI, Department of Justice Office of the Inspector General (DOJ-OIG), and Homeland Security Investigations (HSI) who exposed the defendant's far-reaching web of corruption.   Three-hundred-and-sixty-five government exhibits—including falsified reports and memoranda, and misleading emails, authored by the defendant—supported their testimony.

The defendant invites the Court to assume, as he does, that his acquittals on some counts cabins its sufficiency-of-the-evidence review as to his convictions on others.   From there, he asks the Court to follow his lead in carving up, ignoring, and reweighing the evidence in the light most favorable to him—not the government.   But both efforts run counter to the Court's review under Rule 29 and have been soundly rejected by Supreme Court and Second Circuit caselaw for the better part of a century.   A fair and legally accurate application of the Rule 29 standard results in only one conclusion: the evidence entitled a rational jury to convict this defendant for the crimes he committed.   Accordingly, the Court should deny the defendant's motion.

## I.   FACTUAL BACKGROUND

The evidence at trial roughly fell into one of two categories: proof regarding the defendant's protection of his drug-trafficking friends, Michael Masecchia and Louis Selva, and a principal in their drug organization, Ron Serio; and proof regarding his corrupt relationship with Peter Gerace, Jr., the owner of Pharoah's Gentlemen's Club, a local strip club home to rampant drug use and prostitution services.   Though these two categories sometimes overlap—for example, Gerace's younger brother, Anthony, was a member of Serio's drug trafficking organization—our discussion of the facts generally coheres to this evidentiary bifurcation.

A.    **The Defendant's Protection of the Ron Serio Drug Trafficking Organization**

The six-week trial focused largely on the defendant's misuse of his position as a DEA Special Agent to protect the very drug traffickers he swore an oath to investigate and charge. In particular, the defendant offered protection to Ron Serio's Drug Trafficking Organization (the "Serio DTO"), which included several of his close friends. The following discussion details some of the Serio DTO's major participants, their relationship with the defendant, the defendant's motivations for protecting the DTO, how that protection took shape, and how the defendant responded to Ron Serio's arrest in April 2017.

1.    **The Principal Members of the Serio DTO**

Though by no means an exhaustive list, the principal figures of the Serio DTO were Ronald Serio ("Serio"), who headed the drug distribution; Thomas Serio ("Tom Serio"), Ronald's brother; Michael Masecchia ("Masecchia"), who was a DTO leader reputedly connected to Italian Organized ("IOC") crime; Louis Selva ("Selva"); and Wayne Anderson ("Anderson"). Apart from the Serio brothers, the defendant was personal friends with each of these drug traffickers.

Serio headed the Serio DTO from the early 2000s, when he began selling relatively small quantities of marijuana, until his arrest in April 2017, at which time he was earning close to $1 million annually in the drug trade.[2] Serio's initial foray into drug dealing began through Masecchia, for whom, through a middleman, Serio began selling marijuana.[3] By the time he entered his early twenties, Serio had learned how to grow marijuana.[4] At the same

---

[2]    Tr. Tran., at 6, ECF No. 1464, (dated Sept. 16, 2024) (Test. Ron Serio).

[3]    *Id.* 12.

[4]    *Id.* at 7.

time, he entered the real estate business, purchasing and then flipping houses for profit.[5]  Due to Buffalo's poor climate, Serio combined these two pursuits and began growing marijuana indoors in the homes he was renovating.[6]

Serio's operations expanded, and between 2008 and 2017, Serio headed a full-fledged DTO that grew "thousands" of marijuana plants for distribution and distributed approximately 10,000 pounds of marijuana.[7]  During this period of expansion, Serio's narcotics portfolio diversified: Serio admitted to distributing 5 kilos or more of cocaine and also acquired four shipments containing 4,000 pills each of fentanyl-laced oxycodone pills, that he used for both personal consumption and distribution.[8]  To supply his growing enterprise, Serio sourced narcotics from large-scale distributors based out of New York City, Utah, and Vancouver, Canada,[9] and enlisted the help of numerous other drug dealers, including Anthony Gerace, to distribute his products.[10]  By 2011, Serio was earning approximately $1 million a year from his narcotics business.[11]

Masecchia, the man Serio once worked for, became one of his closest business partners.[12]  By day, Masecchia served his community as a Buffalo school teacher.[13]  But, like

---

[5]     *Id.*

[6]     *Id.*

[7]     *Id.* at 16.

[8]     *Id.* at 17.

[9]     *Id.* at 21–22.

[10]    *Id.* at 88.

[11]    *Id.* at 42.

[12]    *Id.* at 13.

[13]    Serio, *supra* Day 1, at 12–13.

the defendant, Masecchia lived a double life by trafficking drugs with Serio. Initially, Masecchia supplied Serio with "10, 20 pounds" of marijuana from an outdoor grow operation he ran with Selva.[14]  Serio, however, helped Masecchia establish multiple indoor marijuana grows, which increased the entire DTO's profit margin.[15]

Masecchia was not a bad ally for Serio to have: in the community, Masecchia had a reputation of being "connected" to IOC.[16]  Masecchia was also connected in other ways— namely, to the defendant, who was a close friend from childhood into  adulthood.[17] Masecchia disclosed his relationship with the defendant directly to Serio, telling his business partner that "he grew up with" the defendant, "and . . . that [the defendant] would tell him . . . what to look out for" to evade detection by law enforcement.[18]

Selva, however, was even closer to the defendant than Masecchia, and was, by all accounts, his best friend.  Selva and the defendant grew up in the same neighborhood, attended the same elementary schools.  This closeness continued throughout their teenage years, during which time Selva and the defendant used drugs, like marijuana and cocaine.[19] To be sure, for a brief period in early adulthood, Selva and the defendant's paths diverged: Selva had a short-lived career in the Air Force and then attended, but did not graduate from,

---

[14]     *Id.* at 71.

[15]     *See id.* at 72–75.

[16]     *Id* at 13.

[17]     *See* Tr. Tran., at 18–19, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva) (testifying that Masecchia and the defendant attended college together and "were . . . close"); *id.* at 4–7 (testifying that he and the defendant grew up and went to school together).

[18]     *Id.*

[19]     *See* Tr. Tran., at 27, ECF No. 1177, (dated Aug. 27, 2024) (Test. Louis Selva) (testifying that Selva used cocaine and marijuana with the defendant).

college in Arizona, while the defendant got married, joined law enforcement, and rose through the ranks to become a DEA Special Agent in Orlando, Florida.  But their lives once again converged after marital difficulties brought the defendant back to Buffalo, where Selva had returned some years prior to work in sales and the local bar scene.[20]  As the two reunited, their drug use resumed, thus marking the defendant's initial descent into corruption.[21]

Finally, one additional member of the Serio DTO merits discussion: Anderson.  Though he denied it, Anderson was part of the Serio DTO, having received 200 pounds of marijuana destined for Serio in November of 2012.[22]  Like Masecchia and Selva, Anderson grew up with the defendant, having met him through Masecchia, and would "drink" and "party" with him during early adulthood.[23]  The defendant's friendship with Anderson continued "through the years," and Anderson, along with Masecchia and Selva, attended the defendant's "stag party"—Buffalo's version of a bachelor party—in 2013, shortly before the defendant married his second wife.[24]

---

[20]    *Id.* at 48.

[21]    *See* Tr. Tran., at 27, ECF No. 1177, (dated Aug. 27, 2024) (Test. Louis Selva) (testifying that Selva used cocaine and marijuana with the defendant); *id.* at 45–46 (testifying that the defendant stated that he used cocaine as a DEA agent and not marijuana because cocaine only stayed in one's system for 72 hours); *id.* at 51 (testifying that he used cocaine at bars with the defendant); *id.* at 68–69 (testifying that he used cocaine with Tom Doctor—another member of law enforcement—and the defendant); *id.* at 89 (testifying that his use of cocaine with the defendant gave him the confidence to discuss bribes with the defendant).

[22]    *See* Tr. Tran., at 17, ECF No. 1157, (dated Aug. 8, 2024) (Test. Wayne Anderson) ("Q: And you didn't have any drug-dealing relationship with Ron Serio? A: No."); Tr. Tran., at 30–31, ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio) ("Q: In November of 2012, did you arrange a source of supply that was coming in through Frank Burkhart? A: Yes.  Q: And who was going to be receiving delivery of that marijuana intended to you? A: Wayne Anderson.")

[23]    Tr. Tran., at 3, ECF No. 1157, (dated Aug. 8, 2024) (Test. Wayne Anderson).

[24]    *Id.* at 5; Tr. Tran., at 25, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva) (testifying that the defendant's "stag party" occurred in 2013).

As discussed *infra*, the New York state police arrested Anderson in November of 2012 for that 200-pound marijuana shipment, an event that prompted the defendant to open a DEA file into Anderson where he purported to investigate him, Serio, Masecchia, and Selva.

### 2. The Defendant's Affection for his Friends, Affinity for Italian Organized Crime, Financial Stress, and Racism Motivated his Corrupt Conduct

Four potent factors converged to motivate the defendant's betrayal of his oath as a federal law enforcement officer. First, the defendant's affection for his childhood friends resulted in him feeling torn between his personal loyalties and his duties as a DEA Special Agent.[25] Adding to the defendant's internal conflict, was his longstanding admiration for reputed members of La Cosa Nostra, his pride in his family's social connections to IOC, and his willingness to associate with Masecchia notwithstanding his knowledge of Masecchia's reputed involvement in Buffalo's criminal underworld.[26] The defendant was also under considerable financial strain: divorce proceedings required the defendant to pay child support and spousal maintenance, and his only child also suffered from health conditions requiring expensive treatment.[27] And, finally, as the defendant's contentions conversation with DEA Special Agent Anthony Casullo during the summer of 2016 revealed, the defendant believed that federal law enforcement should focus on investigating "the 'N word' . . . and the 'S

---

[25]    *See* Tr. Tran., at 16–17, ECF No. 1320, (dated Sept. 13, 2024) (Test. M. U.) (testifying that the defendant felt conflicted between DEA job responsibilities and the people he grew up with).

[26]    *See* Tr. Tran., at 30–31, ECF No. 1177, (dated Aug. 27, 2024) (Test. Louis Selva) (testifying that he and the defendant showed respect to individuals potentially connected to Italian Organized Crime); *id.* at 32–33 (testifying that the defendant talked about his father's friends who were connected to Italian Organized Crime, and the defendant's father played cards at "The Club," a reputed Italian Organized Crime hangout on Hertel Avenue in North Buffalo); *id.* at 40 (describing the defendant's refences to an uncle in Las Vegas connected to Italian Organized Crime); *id.* at 41 (describing that the defendant dated the daughter of a reputed made man in the Buffalo Italian Organized Crime family).

[27]    *See* Tr. Tran., at 7–18, ECF No. 1154, (dated Aug. 8, 2024) (Test. JoAnn Delucia).

word,'" racial epithets used to refer to African American and Hispanic people, instead of Italians.[28]

### 3.    The Defendant's inquiry into the Las Vegas Field Division's investigation targeting Masecchia

With these motivations in mind, the defendant's corruption crept from his personal drug-use with Selva to intervening in investigations targeting Masecchia.  For example, in 2004, the defendant caught wind that the DEA's Las Vegas Field Division was investigating Masecchia for organized-crime-related drug-trafficking and received intelligence that Masecchia intended to move to Las Vegas to continue his trafficking activities.[29]  Upon learning of the investigation into Masecchia, the defendant called the DEA case agent, Special Agent Anthony Casullo, who then worked out of the Las Vegas Field Division but would ultimately join the defendant in the Buffalo Field Division years later.  Trying to be helpful, Special Agent Casullo volunteered details about his investigation into Masecchia to the defendant.[30]  But the defendant never disclosed to Special Agent Casullo that he was close childhood friends with Masecchia, or that their friendship continued into the defendant's early adulthood when they both attended the University of Buffalo together, even though such disclosures were necessary to ensure that the DEA agents are well-positioned to investigate

---

[28]    Tr. Tran., at 111–112, ECF No. 1335, (dated Sept. 24, 2024) (Test. Anthony Casullo).

[29]    *See* Tr. Tran., at 44, 81–82, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva) (explaining as far back as their late 20s, the defendant and Selva discussed whether Mike Masecchia was an IOC member; that Masecchia later confirmed his status to Selva; that Selva reported Masecchia's status as an IOC member to the defendant; and that the defendant knew of Masecchia's status as an IOC figure and marijuana trafficker); *id.* at 104–05 (testifying that Mike Masecchia, Wayne Anderson and others were at the defendant's stag party (Buffalo's version of a bachelor party) at a local bar, Iron Works, in 2014); *see also* Tr. Tran., at 16–17, ECF No. 1213, (dated Sept. 4, 2024) (Test. Dave Turri) (testifying that he, an IRS Special Agent detailed to the DEA, emailed the defendant informing him that Masecchia "is an associate and possibly a made member of the Buffalo LCN family); Gov. Ex. 22S (Turri's email to The defendant).

[30]    *See* Tr. Tran., at 27–33, ECF No. 1335, (dated Sept. 24, 2024) (Test. Anthony Casullo) (testifying about a conversation with the defendant and Masecchia never moving to Las Vegas).

8

criminal activity fairly and impartially.[31]   And, ultimately, Las Vegas's investigation into Masecchia went nowhere: rather than move to Las Vegas, Masecchia stayed put in Buffalo, where the Las Vegas Field Division lacked jurisdiction to meaningfully investigate him.[32]

### 4.    Masecchia Advertised to Serio that the Defendant was Protecting him

By 2007, Masecchia and Serio entered discussions to become more formal, coordinated drug trafficking partners.[33]   According to Serio, in vouching for the security of his operations, Masecchia advertised that the defendant would give a "heads up" if there was an investigation on him.[34]   Echoing Serio, Selva similarly testified that  he joined Masecchia's large-scale marijuana operation around 2008 based on his belief that the defendant was already protecting Masecchia.[35]

### 5.    Selva, on behalf of Masecchia and Serio, Offered the Defendant Bribe Money in Exchange for Protection for the whole DTO

Both Selva and Serio testified that, even though the defendant was looking out for the group for free, eventually the DTO wanted to expand the protection the defendant provided and formalize an arrangement with the defendant.   To that end, Selva approached the

---

[31]    *Id.* at 32 (testifying that the defendant did not disclose that he was friends with Masecchia, or that he drove to college together with Masecchia)

[32]    *Id.* at 33 (testimony that, after Casullo's phone call with the defendant, Masecchia was never observed in the Las Vegas area, was never intercepted on the wire, and the investigation into Masecchia in Las Vegas was eventually closed).

[33]    *See* Tr. Tran., at 69–72, ECF No. 1464, (dated Sept. 16, 2024) (Test. Ron Serio) (stating that, in or about the fall of 2007, [Serio] started having a direct relationship with Masecchia regarding marijuana distribution, ultimately becoming Masecchia's sole distributor).

[34]    *Id.* at 79–80 (testifying that Masecchia assured him that the defendant would give a heads up if he [Masecchia] was being investigated, which gave Serio comfort that there was "extra protection").

[35]    *See* Tr. Tran., at 85, ECF No. 1177, (dated Aug. 27, 2024) (Test. of Louis Selva) ("Q: Before you became involved [in the grow operation], did you have a belief that Bongiovanni was already looking out for Masecchia . . . ? . . . . A: Yes.  I mean, like I mentioned, it was—he was aware of it because it was going on prior to that, from the '90s, so yes, I believe[d] he had his best interest."); *id.* at 89–97.

defendant and offered the defendant cash in exchange for his protection of Serio and the other members of the DTO, including himself and Masecchia.[36]  Specifically, Selva testified that he and Masecchia, who had already received the green light from Serio, discussed offering the defendant $2,000 a month in exchange for his protection.[37]  Selva was confident that he could take that offer to the defendant without consequence, owing to their close personal friendship and shared drug use.[38]

When Selva pitched the offer to the defendant, the defendant initially turned him down, though as he reassured Selva that he would "have his back".[39]  Selva, Masecchia, and Serio, however, were undeterred.  After that initial rejection, Selva and the defendant met again, and Selva asked the defendant "[i]f he'd give[n] any thought" to their previous conversation and emphasized how the money could "help him get through the situation he's involved in with his finances," namely, expenses stemming from his divorce coupled with the general costs of living.[40]  Though the defendant was "hesitant," he ultimately agreed.[41]

The terms of the protection were clear.  In exchange for the $2,000 a month, the defendant agreed to alert the DTO "[i]f there w[ere] any investigations, if anybody was hot

---

[36]      *See* Tr. Tran., at 89–97, ECF No. 1177, (dated Aug. 27, 2024) (Test. Louis Selva) (describing his initial approach to the defendant, offering money in exchange for protection); *see also* Tr. Tran., at 2–7, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva) (describing the negotiation with the defendant of bribe payments for protection, and The defendant's agreement), *see* Tr. Tran., at 91–94, ECF No. 1464, (dated Sept. 16, 2024) (Test. Ron Serio) (stating that he agreed to pay $2,000 per month in bribes to the defendant in exchange for protection).

[37]      *Id.* at 88–89.

[38]      *Id.* at 88–89.

[39]      *See* Tr. Tran., at 2–7, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva) (describing the negotiation with the defendant of bribe payments for protection, and's the defendant's agreement).

[40]      Tr. Tran., at 3–7, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva).

[41]      *See id.*

or followed, if anyone had been busted [and] had mentioned names," if there were "informants that are working with agencies," and if law enforcement generally know of "[a]nything pertaining to" the DTO's activities.[42]  The defendant accepted these conditions, and advised Selva that he would "have his eyes open" and, "going forward," would "let [the DTO] know" if it was at risk.[43]

Masecchia would deliver the defendant the money, because "Ron was paying Mike"— a dynamic Selva alerted the defendant to when he told him that the ultimate source of the money was Serio, the guy at "the top" who had been "cashing [him and Masecchia] out and providing the cash for" the defendant's payment.[44]  However, due to Masecchia's suspected involvement in Italian Organized Crime, the defendant's meetings with Masecchia were intended to be "brief."[45]  Because meeting with Selva would raise fewer eyebrows, and because the defendant already regularly met with Selva, any information the defendant had to share would be provided principally to him.[46]

At some point several years later, the price for the defendant's protection increased.[47] As Selva explained, the DTO's operations were expanding, and with new entrepreneurial frontiers came increased risk.[48]  The defendant agreed to continue "keep[ing] a watchful eye

---

[42]    *Id.*

[43]    *Id.*

[44]    *Id.*

[45]    *Id.*

[46]    *See generally id.* at 14–25.

[47]    *Id.* at 14–25; *see also* Tr. Tran., at 198–199, ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio).

[48]    *See* Tr. Tran., at 15–16, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva).

on" the DTO and would report "if something unusual happened", but the price would increase to $4,000 per month.[49]  Among the other services the defendant would provide, he agreed to look into whether "ICE"—Immigrations and Custom Enforcement, a sister agency of Homeland Security Investigations—were tapping the DTO's phones; ensure that Serio and Masecchia's drug-related travels were not on any agency's investigative radar; and continue to vigilantly protect the organization from penetration by informants and confidential sources.[50]  Until his arrest, Serio was satisfied with the defendant's protection and the information he received of the defendant's work through Masecchia: from roughly 2008 until 2017, Serio was confident that the DTO's principals were not under investigation.[51]

### 6.    The Defendant Offered Advice and Feedback to Selva on how to Avoid Law Enforcement Detection

While receiving—and agreeing to receive—payments, the defendant offered general advice to Selva about law enforcement tactics and procedures that could help him evade detection.  Generally, the defendant education Selva on how law enforcement obtained wiretaps and how to avoid being captured on a wiretap;[52] how law enforcement conducts physical surveillance;[53] which specific vehicles the DEA uses in surveillance operations;[54] how federal law enforcement pools information from myriad investigative agencies by using task

---

[49]    *Id.* at 16–19.

[50]    *Id.* at 18–19.

[51]    *See* Tr. Tran., at 17–18, 92–94, ECF No. 1464, (dated Sept. 16, 2024) (Test. Ron Serio) *see also* Tr. Tran., at 23–24, ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio).

[52]    *See* Tr. Tran., at 66–68, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva).

[53]    *Id.* at 68–69.

[54]    *Id.* at 70–72.

force officers;[55] how the DEA checks utilities to look for energy usage patterns that might alert them to suspected grow operations—something particularly relevant to Selva, who grew marijuana for Serio in his basement;[56] how the DEA utilizes GPS trackers in a drug investigation;[57] and how law enforcement, generally, investigates banking activity.[58]

Selva relayed this information to Serio, often through Masecchia.[59] Moreover, and as discussed in greater detail *infra*, the defendant communicated specific investigative information to Selva to protect the Serio DTO, including:

- Selva conveyed that Masecchia, Serio, and others were traveling to NYC for marijuana, and described the route they were taking, to make sure law enforcement was not onto their travel patterns. The defendant gave Selva the "all clear."[60]

- The defendant reported to Selva that ██████ ████ and ██████ ████ were DEA informants.[61]

- After Serio passed a list of phone numbers to Selva to provide to the defendant, the defendant confirmed that none of the numbers were on wire taps.[62]

- The defendant confirmed that no one was tracking tractor trailer trucks containing narcotics en route to New York from British Columbia and California.[63]

---

[55]     *Id.* at 72–74.

[56]     *Id.* at 75–76.

[57]     *Id.* at 77.

[58]     *Id.* at 77–79.

[59]     *See generally id.*, at 66–80.

[60]     *Id.* at 81–82.

[61]     *Id.* at 83; *see id.* at 90–96, *see also* Tr. Tran., at 245, ECF No. 1179, (dated Aug. 29, 2024) (Test. Louis Selva) (testifying that the defendant told Selva that ████ was the defendant's informant).

[62]     *See* Tr. Tran., at 83–84, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva); *see also* Gov. Ex. 100A.1.

[63]     *Id.* at 84-85.

- The defendant advised Selva that Masecchia should "be careful, change his patterns, change [his] routine," in connection with the DEA's use of GPS trackers. Masecchia changed his patterns as a result.[64, 65]

- The defendant advised Selva that there was financial investigation into Serio involving the IRS, which information Selva passed along to Masecchia for Serio.[66]

- The defendant advised Selva that ███████ ███████ was a DEA confidential source.[67]

- The defendant advised Selva about specific information related to an investigation into Mario Vacanti, Serio's associate and a member of the Serio DTO, which Selva passed along to Masecchia to alert Serio.[68]

- The defendant advised Selva when investigation into Serio and Masecchia was over, and specific details as to why the investigation was closed.[69]

Serio corroborated Selva's testimony in several respects, including that the defendant

received information about the DTO's organization, membership, and drug trafficking

---

[64]     *Id.* at 84–85.

[65]     Selva described that the GPS trackers were on Masecchia's vehicles. *Id.* at 85. However, AUSA Timothy Lynch testified that using GPS trackers on Masecchia's vehicle was discussed during a meeting attended by the defendant during a meeting at the U.S. Attorney's Office. *See* Tr. Tran., at 17–19, ECF No. 1226, (dated Sept. 6, 2024) (Test. Tim Lynch). As a result, the government argued on summation that Selva likely conflated that the defendant told him a GPS tracker was being used on Masecchia's vehicle, with the fact that it was only discussed but no GPS tracker was ever utilized on Masecchia's (or anyone else's) vehicle. *See* Tr. Tran., at 95, ECF No. 1463, (dated Oct. 2, 2024) (Gov. Summation).

[66]     *See* Tr. Tran., at 86, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva). This testimony is consistent with testimony from IRS Special Agent David Turri, who was also a DEA Task Force Officer. *See* Tr. Tran., at 5, and 8–9, ECF No. 1213, (dated Sept. 4, 2024) (Test. David Turri).

[67]     *See* Tr. Tran., at 86–89, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva) (testifying that the defendant told Selva to stay away from ███████ and that ███████ was an informant after Selva had ███████ remediate mold in Selva's basement as a result of moisture damage from the marijuana grow operation.); *see also* Tr. Tran., at 8, and 24–25, ECF No. 1156, (dated August 8, 2024) (Test. ███████ ███████ (corroborating that he was in fact a DEA informant that worked with the defendant, and that he later worked in Selva's basement remediating damage from moisture).

[68]     *See* Tr. Tran., at 97–98, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva).

[69]     *Id.* at 99–100.

operations, including grow operations, transportation routes, and distribution methods;[70] law enforcement sensitive information usually flowed from the defendant back to Serio through Selva;[71] Selva's house was used to grow and store marijuana on behalf of the organization;[72] he wanted information about whether anyone in the drug organization had their phones tapped; he paid the defendant through Masecchia;[73] the amount paid to the defendant increased from $2,000 per month to $4,000 per month;[74] the defendant disclosed the identities of DEA confidential sources, including ████ ████ and ████ ████[75] and when a potential threats to the organization emerged, such as the arrests of Anderson and Mark Vitale, another DTO associate, Serio was reassured that arrests would not harm the drug organization because of the defendant's assistance.[76]

### 7.    The Creation and Use of the "Wayne Anderson" DEA File

#### a.    The New York State Police Arrest of Wayne Anderson

On November 25, 2012, the New York State Police ("NYSP") arrested Anderson after successfully executing a controlled delivery of 200 pounds of marijuana. That controlled delivery did not involve the DEA but, rather, was the product of quick cooperation between the NYSP and their counterparts in Illinois. Specifically, the Illinois State Police conducted

---

[70]    Tr. Tran., at 28, 73-74, 76-79, ECF No. 1464, (dated Sept. 16, 2024) (Test. Ron Serio).

[71]    Tr. Tran., at 17–18, 74–75, 92–93, ECF No. 1464, (dated Sept. 16, 2024) (Test. Ron Serio); *see also* Tr. Tran., at 4–5, ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio).

[72]    Tr. Tran., at 28–31, ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio).

[73]    Tr. Tran., at 5–6, 23–24, ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio)

[74]    Tr. Tran., at 5–6, 23–24, ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio).

[75]    Tr. Tran., at 8–9, 65–72 ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio).

[76]    Tr. Tran., at 10–12, 34–38, 72–76, 81–84, 190–91, ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio); Tr. Tran., at 59-62, 66, ECF No. 1468, (dated Sept. 23, 2024) (Test. Ron Serio).

a traffic stop and intercepted two individuals transporting the marijuana.[77]  The Illinois State Police soon learned that the marijuana was en route to Buffalo, New York, so, they did what any law enforcement organization intent on busting drug traffickers would do: they enlisted the help of their colleagues in New York to conduct a controlled delivery.[78]  The NYSP successfully delivered the marijuana to two individuals, Anderson and Damien Abate.[79] NYSP arrested Anderson and NYSP Investigator Michael O'Rourke attempted to interview him in an unsuccessful effort to secure his cooperation.[80]

The following day, the defendant acquired information about Anderson's arrest and the 200-pound seizure through his DEA partner, and almost immediately reached out to Investigator O'Rourke.[81]  When the defendant first contacted Investigator O'Rourke, he told him that Anderson's case "might be tied to something we [i.e., the DEA] are working on" and could be linked to organized crime.[82]  During a subsequent meeting with Investigator O'Rourke, the defendant caused O'Rourke to believe that he would either secure Anderson's

---

[77]     Tr. Tran., at 10, ECF No. 1158, (dated Aug. 8, 2024) (Test. Michael O'Rourke).

[78]     Tr. Tran., at 11, ECF No. 1158, (dated Aug. 8, 2024) (Test. Michael O'Rourke).

[79]     *See* Tr. Tran., at 2–7, ECF No. 1157, (dated Aug. 8, 2024) (Test. Wayne Anderson) (describing relationships with the defendant and Masecchia); *see also* Tr. Tran., at 55 – 56, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva) (describing Wayne Anderson relationship to the defendant).

[80]     *See* Tr. Tran., at 16 – 17, ECF No. 1158, (dated Aug. 8, 2024) (Test. Michael O'Rourke) (describing post-arrest effort to pitch cooperation and Anderson's lack of interest); *see also* Tr. Tran., at 9 – 10, ECF No. 1157, (dated Aug. 8, 2024) (Test. Wayne Anderson) (explaining that he did not agree to cooperate with NYSP and the defendant never asked him to become a DEA informant).

[81]     *See* Tr. Tran., at 12, 30–31, 34–38, ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio) (describing Masecchia communications with him about the Anderson arrest); *see also* Tr. Tran., at 18 – 19, ECF No. 1158, (dated Aug. 8, 2024) (Test. Michael O'Rourke) (describing how the defendant called him to schedule a meeting about the Anderson arrest, and about the subsequent in-person meeting about 1 day after the phone call); Ex. 8A at 77.

[82]     *See* Tr. Tran., at 19, ECF No. 1158, (dated Aug. 8, 2024) (Test. Michael O'Rourke).

cooperation or charge him federally to leverage his cooperation.[83]   At no point did the defendant disclose to Investigator O'Rourke that he was friends with, or otherwise socially connected to, Anderson.[84]

For his part, Serio was concerned after learning of Anderson's arrest.   But Masecchia contacted Serio and told him that he was going to contact the defendant "to find out what happened."[85]   Reporting back the next day, Masecchia reported reassured Serio that "everything is ok."[86]  And, at least for a time, it was.

### b. The Defendant Formally Opens a Sham Investigation into Anderson through DEA File C2-13-0026

Though Serio was not privy to the details of it, the jury heard from, and saw, numerous witnesses and exhibits illustrating how the defendant's double agency worked—that is, how the defendant used his position and power as a DEA Special Agent to both neutralize the immediate threat to Serio's DTO posed by Anderson's arrest and wield law enforcement tools to proactively protect the trafficking operation.   To both ends, the defendant opened a case into Anderson, identified by file number C2-13-0026 (the "Anderson/C2-13-0026 file"), and through that file purported to investigate his friends and co-conspirators, including Anderson,

---

[83]     *See* Tr. Tran., at 19–24, ECF No. 1158, (dated Aug. 8, 2024) (Test. Michael O'Rourke) (describing statements the defendant made during their in-person meeting about Anderson); *see also* Tr. Tran., at 45–47, ECF No. 1170, (dated Aug. 14, 2024) (Test. Shane Nastoff) (describing leveraging cooperation in federal cases); *id.* at 49–55 (describing Exs. 8M and 8A pg. 67, a DEA report authored by the defendant, as indicating that Anderson's case was being adopted federally); Tr. Tran., at 13, ECF No. 1226, (dated Sept. 6, 2024) (Test. Timothy Lynch) (explaining that the USAO-WDNY had never opened a file on Wayne Anderson).

[84]     *See* Tr. Tran., at 24–25, ECF No. 1158, (dated Aug. 8, 2024) (Test. Michael O'Rourke).

[85]     Tr. Tran., at 37, ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio).

[86]     *Id.*

17

Masecchia, and Selva, who were either members of the Serio DTO, reputed members of the Buffalo LCN family, or both.[87]

By purporting to investigate these individuals, the defendant was able to make good on his promise to protect the Serio DTO in two critical respects. First, the open DEA file afforded the defendant access to law enforcement deconfliction databases which he, in turn, misappropriated to alert him if any other law enforcement agency investigated members or associates of the Serio DTO. Second, the open Anderson file enabled the defendant to lay claim to investigations into the Serio DTO, and effectively sideline other agencies that might seek to build a case into the organization. In opening a file, however, the defendant was required to generate reports documenting his investigative activity. As detailed below, the defendant falsified several of the reports in the Anderson/C2-13-0026 file, which doubled as a historical catalog of the defendant's corrupt protection of the Serio DTO.

### i.    The Defendant's Misappropriation of Law Enforcement Deconfliction Databases

In certain respects, the mechanics of the defendant's double-agency were simple. The defendant received relevant numbers from Selva, who explained that he would pass lists of names and numbers originating from Serio to the defendant to make sure nobody on the list was on a wiretap—including the main phones associated with Serio and Masecchia.[88] The

---

[87]    *See* Tr. Tran., at 26–27, ECF No. 1170, (dated Aug. 14, 2024) (Test. Shane Nastoff) (describing that the Wayne Anderson case file was opened sometime around 2012 and that the defendant was the lead case agent). *See also Id.* at 80–82 (describing that the Wayne Anderson case file [Gov. Ex. 8A, pgs. 129–134] contained subpoena returns for Mike Masecchia's phone number). *See also Id.* at 88 – 89 (describing that the Wayne Anderson case file [Gov. Ex. 8A, pg. 197] contained subpoena returns for Louis Selva's phone number); *See* Tr. Tran., at 9, ECF No. 1336, (dated Sept. 26, 2024) (Test. Brian Burns) (describing that the Wayne Anderson case file [Gov. Ex. 8A, pg. 347] contained subpoena returns for Paul Francoforte a/k/a Hot Dog's phone number); *id.* at 6 (describing that "Hot Dog" is believed by law enforcement to be associated with Italian Organized Crime). *See also* Tr. Tran., ECF No. 1464, (dated Sept. 16, 2024) (Test. Ron Serio) (describing that Hot Dog was a gambling buddy of his).

[88]    *See* Tr. Tran., at 49–65, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva) (describing

defendant then caused the issuance of DEA administrative subpoenas seeking telephone records for numbers subscribed to by Selva, Masecchia, the Serio brothers, and others.[89]  By issuing subpoenas, the defendant became automatically linked to those individuals in DARTS, the DEA's telephone-number deconfliction system.[90]  The defendant did not limit this tripwire technique to DARTS.  On January 4, 2013, approximately one-and-a-half-months after the defendant opened the Anderson/C2-13-0026 file, he caused the Serio brothers and David Oddo, another associate of the Serio DTO, to be entered into Safety-Net, the New York State law enforcement deconfliction system.[91]

In the right hands, deconfliction systems enable law enforcements to conserve resources and protect the integrity of investigative operations by alerting the case agent if someone from a different agency already has an active investigation into a target.[92]  Specifically, once subpoenas are issued, deconfliction systems like DARTS and Safety-Net would automatically issue a notice if any other DEA agent, or any other law enforcement database coordinating with DARTS, queried or tapped the telephone numbers associated

---

that Mike [Masecchia] and Ron [Serio] wanted Selva to check with the defendant to make sure that their main phone numbers were cleared); *see also* Gov. Ex. 100A.1 (DARTS emails and cell phone information).

[89]      *See generally*, Gov. Ex. 8A

[90]  *See* Tr. Tran., at 36, ECF No. 1161, (dated Aug. 12, 2024) (Test. Francis DiCarlo) (explaining that DARTS is a deconfliction system used for telephone numbers where an agent can enter a suspect's number and thereby get notified if somebody has previously entered that number into DARTS); *id.* at 77 (describing that subscriber record subpoena responses alone are sufficient to set up DARTS deconfliction); *see also* Tr. Tran., at 67–68, ECF No. 1168, (dated Aug. 13, 2024) (Test. Francis DiCarlo) (explaining that DARTS associates an agent with a phone number based upon the agent who entered the number, or, if entered by an intel analyst, linking the case agent in the "narrative" section).

[91]      *See* Gov. Ex. 100A.1, PDF- "SafetyNet Submission", pages 2–4.

[92]      *See* Tr. Tran., at 35–36, ECF No. 1161, (dated Aug. 12, 2024) (Test. Francis DiCarlo).

with the subpoena.[93, 94]  The absence of any such alert was evidence that the target was not being investigated by another agency.  Though deconfliction systems were designed to trigger efficient coordination from within, and between, agencies, in the wrong hands they could be used as an obstructive tripwire.  Case in point: upon causing the issuance of subpoenas for numbers associated with the Serio DTO, the defendant received notice whenever anyone from within the DEA queried or subpoenaed those same numbers, which helped him both ensure that no number was being tapped and prompt him to proactively protect the organization, just as Serio had requested.[95]

In addition to numbers connected to Selva, Masecchia, and the Serio brothers, the defendant subpoenaed numbers belonging to Christopher Baker, Mark Falzone, Paul "Hot Dog" Francoforte, Frank Burkhardt, Wayne Anderson, Michael Mazzara (a relative of Masecchia), Krista Masecchia, David Hersey, Matthew Suppa, Jason Campbell, Robert Rine, Michael Moynihan, Mark Kagan, Adrian Fina, Michael Buttita, Mark Suppa.[96]  Selva confirmed that virtually all of these individuals was a friend or associate of the defendant, Masecchia, and Serio.

---

[93]    *See id.* at 35, 76–77.

[94]    *See* Tr. Tran., at 71–75, ECF No. 1245, (dated Sept. 11, 2024) (Test. Curtis Ryan) (describing what SafetyNet is and how it works as a deconfliction tool).

[95]    *See* Tr. Tran., at 64–66 and 82–83, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva) (describing how lists of phone numbers were passed along to The defendant to check for wiretaps); *see also* Tr. Tran., at 35–36 and 76–77, ECF No. 1161, (dated Aug. 12, 2024) (Test. Francis DiCarlo) (explaining DARTS); *See* Tr. Tran., at 63–68, ECF No. 1245, (dated Sept. 11, 2024) (Test. Curtis Ryan) (going through DARTS in the file, Ex. 100A.1); Tr. Tran., at 10–11, 15–18, 68–69, ECF No. 1336, (dated Sept. 26, 2024) (Test. Brian Burns) (same); *see also See* Tr. Tran., at 49 – 65, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva) (describing that Mike [Masecchia] and Ron [Serio] wanted Selva to check with the defendant to make sure that their main phone numbers were cleared); *see also* Tr. Tran., at 23–24, ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio) (describing that he wanted assurances from the defendant that none of his and Masecchia's main phones, or the phones of his main associates, were wiretapped.)

[96]    *See* Gov. Ex. 8A at 134 (Masecchia subpoena).

The defendant was in contact with several of these telephone numbers he had caused to be subpoenaed.  For example, in or about March 2013, the defendant also caused the issuance of a subpoena for telephone records belonging to Hot Dog, another reputed IOC associate in Buffalo.[97]  A review of the defendant's own telephone records, however, revealed that the defendant was in telephonic contact with Hot Dog later that year, in December 2013.[98]  That contact was not a one-off: the records revealed over fifty calls or attempted calls between Hot Dog and the defendant between 2013 and 2018.  What's more, the defendant drove to Canada with Hot Dog the day *after* opening the Anderson/C2-13-0026 file he used to subpoena Hot Dog's information.[99]

---

[97]      *See* Gov. Ex. 8A at 347 (Paul "Hot Dog" Francoforte Subpoena); Tr. Tran., at 228–29, ECF No. 1244, (dated Sept. 10, 2024) (Test. Curtis Ryan); Tr. Tran., at 7 – 8, ECF No. 1336, (dated September 26, 2024) (Test. Brian Burns) (The defendant traveled to Canada with Hot Dog about 4 days after Wayne Anderson's arrest in November 2012); Gov. Exs. 393, 3713A.

[98]      *See* Tr. Tran., at 131–31, ECF No. 1246, (dated Sept. 12, 2024) (Test. Curtis Ryan); Gov. Ex. 358 (the defendant's telephone records).

[99]      *See* Gov. Ex. 3713A (border crossing document showing the defendant crossing into the United States from Canada with Hot Dog).

Similarly, in June of 2013, the defendant caused the issuance of a subpoena into Selva's telephone number, notwithstanding the fact that Selva was the defendant's best friend.[100]    But telephone records between the defendant and Selva revealed consistent, extensive activity between Selva and the defendant throughout the majority of the Anderson/C2-13-0026 file's lifespan.



### ii.    The False and Misleading Reports Authored by the Defendant in the Wayne Anderson Case File

Other records and documents within the Anderson/C2-13-0026 file contained statements contradicted by witnesses and omissions contrary to DEA policy and practice.

---

[100]        *See* Gov. Ex. 8A at 197 (Subpoena return for Louis Selva).

First, just days after Anderson's arrest, the defendant authored a DEA-6 "Summary Report" on or about November 28, 2012. In the report, the defendant wrote that the Anderson case was "Pending Federal Charges Title 21 USC 841, 846" in the Western District of New York:[101]

> **VIOLATIONS**
>
> New York PL 221.30 Criminal Possession of Marijuana over 10 pounds. Interstate trafficking of marijuana over 100 lbs. Pending Federal Charges Title 21 USC 841, 846.
>
> **JUDICIAL DISTRICT**
>
> Western District of New York.

However, as Assistant United States Attorney Timothy Lynch testified, the U.S. Attorney's Office for the Western District of New York never opened a file on Anderson, a telling absence considering federal prosecutors are required "to open up an investigative file" once they "start working on a case."[102] Anderson, himself, testified that he was never charged federally for the 200-pounds of marijuana seized from his residence and, moreover, was never asked to cooperate.[103]

Within a month, the defendant added the Serio brothers to the Anderson/C2-13-0026 file through a DEA-202. A DEA-202 is a "personal identifier form" used by agents to identify "subjects" of an investigation and articulate the investigative "details" the agent has on that

---

[101]      Gov. Ex. 8M.

[102]      *See* Gov. Ex. 8M; Tr. Tran., at 13, ECF No. 1226, (dated Sept. 6, 2024) (Test. Timothy Lynch) (explaining that the USAO-WDNY had never opened a file on Wayne Anderson); *id.* at 7.

[103]      *See* Tr. Tran., at 10–12, ECF No. 1157, (dated Aug. 8, 2024) (Test. Wayne Anderson) (stating "No. Never." when asked if the defendant ever asked him to become an informant, and that the case was never charged federally).

subject.[104]  For every DEA-202, there is a "corresponding [DEA-] 210" that agents must generate to "document[] the outcome for that subject."[105]

DEA Special Agent Shane Nastoff testified that the defendant never provided any details in the DEA-202s identifying the bases for the Serios' inclusion in the Anderson file.[106] Likewise, FBI Special Agent Brian Burns testified that, after reviewing the electronic and physical iterations of the Andereson/C2-13-0026 file, he found no material evincing the Serios' inclusion.[107]  Stated otherwise, one reviewing the Anderson/C2-13-0026 file, would have no idea how Anderson's drug trafficking activity was at all linked to the Serios, notwithstanding the fact that the defendant was purportedly investigating the Serios in clear connection to Anderson.

The absence of any apparent factual predication for the Serios' inclusion in the Anderson file was inconsistent with DEA's file management procedures. According to Special Agent Nastoff, files needed to contain the factual predication for a trafficking target's inclusion so that other people looking at the file would understand why certain individuals were being targeted, or subjected, to investigation.[108]

---

[104]    *See* Tr. Tran., at 32, ECF No. 1161, (dated Aug. 12, 2024) (Test. Frank DiCarlo).

[105]    *Id.* at 33.

[106]    *See* Tr. Tran., at 60 – 63, ECF No. 1170, (dated Aug. 14, 2024) (Test. Shane Nastoff).

[107]    Tr. Tran., at 36, ECF No. 1336, (dated Sept. 26, 2024) (Test. Brian Burns).

[108]    *See* Tr. Tran., at 32, ECF No. 1170, (dated Aug. 14, 2024) (Test. Shane Nastoff) ("Q. Does there need to be a reason, a link, between the people to investigate them in the same file? A. Yes, there needs to be a drug nexus, and there needs to be an association between the individuals. Q. Is that supposed to be documented in the . . . 202? A. It should be, yes."); *id.* at 64–65 (explaining that the DEA's practice is to explain the "involvement of the individual" as "the organization" under investigation—that is, to explain "why they're being put in the file").

Next, in a DEA-6 "Case Status" report authored on February 7, 2013, the defendant wrote that he spoke with Investigator O'Rourke—the NYSP officer who arrested Anderson—as follows.[109]

> 2. On January 4, 2013, SA Bongiovanni spoke with New York State Police investigator Michael O'Rourke regarding the status of defendant Wayne ANDERSON. NYPD Inv. O'Rourke stated he was waiting for a proffer interview with ANDERSON and ANDERSON's attorney in the near future. AUSA Mike McCabe may seek Federal Indictment of ANDERSON in the near future. This investigation continues.

Investigator O'Rourke, however, testified that he neither spoke with the defendant nor Assistant United States Attorney Mike McCabe about the Anderson case.[110] He also testified that was never waiting to schedule a proffer interview with Anderson, something federal investigators—like the defendant—would ordinarily oversee.[111]

For a time, the Anderson threat appeared neutralized. Then, in March of 2013, an Amherst Police Lieutenant, Joanne DiNoto, received a phone call from one of the defendant's colleagues about Serio, who lived in a mansion in Amherst.[112] Not too long after hearing about Serio, Lt. DiNoto learned of ███ ████ who, following an arrest of his own, offered

---

[109]    Gov. Ex. 8K. In the report, the defendant stated: "Reference is made to all DEA 6-ROIs written to this case/file." As a result, he incorporated the misleading and false statements and representations contained in Gov. Ex. 8M by reference.

[110]    *See* Tr. Tran., at 24, ECF No. 1158, (dated Aug. 8, 2024) (Test. Michael O'Rourke) (testifying that he never set up a proffer meeting or tried to set up a proffer meeting with AUSA Mike McCabe at the USAO); *see also*, Tr. Tran., at 53 – 55, ECF No. 1170, (dated Aug. 14, 2024) (Test. Shane Nastoff) (describing what a proffer is, how one is set up, and expressing that it is the case agent's responsibility to set up a proffer, and that it would not make sense to expect a local law enforcement officer to do that).

[111]    *See* Tr. Tran., at 13, ECF No. 1226, (dated Sept. 6, 2024) (Test. Timothy Lynch) (explaining that the USAO-WDNY had never opened a file on Wayne Anderson).

[112]    *See* Tr. Tran., at 5, ECF No. 1147 (dated Aug. 7, 2024) (Test. Joanne DiNoto)

to provide information into Serio.[113]  Upon learning of ███ potential as a source into Serio's DTO, Lt. DiNoto called the defendant and arranged to transfer ███ to the DEA, so that the DEA could utilize him as a confidential source into the Serio DTO.[114]

According to a confidential source debriefing report, the defendant activated ███ as a DEA confidential source on April 30, 2013, for a one-year term, and assigned him his confidential source number: CS-13-144841.[115]  The DEA uses numbers to refer to their confidential sources because, as DEA Office of Professional Responsibility Inspector Francis DiCarlo explained, a confidential source's identity is the DEA's "most guarded secret," and protecting it paramount to the DEA's mission of enforcing the drug laws of the United States.[116]

Soon thereafter, the defendant and Special Agent Nastoff met with ███ to learn about the information he was willing to provide the DEA.[117]  That debriefing centered on the Serio DTO and ███ ability to penetrate it.[118]  ███ information was legit: both he and Serio confirmed that ███ knew where Serio lived; had been present at Serio's residence for

---

[113]     *Id.* at 8–9.

[114]     *See id.* at 8–11.

[115]     *See* Gov. Exs. 8I, 9E-2.

[116]     *See* Tr. Tran., at 43, ECF No. 1161, (dated Aug. 12, 2024) (Test. Frank DiCarlo); Tr. Tran., ECF No. 1480, (dated Aug. 7, 2024) (Test. ███ ███ as read into evidence by FBI Special Agent Adam Penna); Tr. Tran., at 91–92, ECF No. 1170, (dated Aug. 14, 2024) (Test. Shane Nastoff) (stating that, as a confidential source, you're putting essentially your life at risk . . . for the fear of retaliation of cooperating against somebody for the government, and that maintaining the secrecy of a confidential source's identity is taken seriously at the DEA); *see also* Gov. Exs. 9, 9E-2, 9E-3, 9E-4, and 9F.

[117]     *See* Tr. Tran., at 120–126, ECF No. 1170, (dated Aug. 14, 2024) (Test. Shane Nastoff) (describing the initial debriefing of R.K.)

[118]     *Id.*; *see also* Gov. Ex. 8I.

marijuana transactions; and that ███ could have purchased drugs from Serio.[119]  Moreover, ███ had previously told Amherst Police Department officials that Serio and another co-conspirator, Burkhart, would travel to New York City once a month and return with $200,000, details that Lt. DiNoto conveyed to the defendant.[120]

Yet rather than utilize ███ to infiltrate the Serio DTO, the defendant used him to investigate a different drug dealer.[121]  Soon after, the defendant deactivated ███ as a confidential source.  According to the "Confidential Source Deactivation" form the defendant authored, the defendant *verbally* notified ███ that he was closing him as a source on July 30, 2013—approximately ten months prior to the expiration of his term as a confidential source and just a few months *after* he signed ███ up as a confidential source in late April.[122]

In explaining why he was closing ███ as a source, the defendant wrote that ███ could "no longer provide services or information for any open investigation."[123]  At that time, however, the defendant's purported investigation into Anderson and Serio was in full swing.

---

[119]    *See* Court Exhibit 3, Tr. Tran., ECF No. 1480, (dated Aug. 7, 2024) (Test. R.K.) (███ testified that he could have "got to anybody" in Serio's organization at the time he was told by the defendant that he was being closed as a source); *see also* Tr. Tran., at 65–69, ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio) (testifying that R.K. had been present at his house for drug transactions before, that he learned from Masecchia that the defendant had told Masecchia that R.K. was an informant, and that before he had learned R.K. was an informant he would have sold drugs to him).

[120]    *See* Tr. Tran., at 10, ECF No. 1147 (dated Aug. 7, 2024) (Test. Joanne DiNoto).

[121]    *See* Court Exhibit 3, Tr. Tran., at 19, ECF No. 1480, (dated Aug. 7, 2024) (Test. R.K.) (describing that the defendant used him to make buys into a drug dealer who was not associated with Serio).

[122]    *See Id.* at 19–20; *see also* Gov. Ex. 9E-3.  The closure became official on September 9, 2013, well over a month after the defendant verbally notified ███ of his deactivation.

[123]    Gov. Ex. 8I

The defendant did not cite any performance issues related to ████ to the contrary he graded ████ performance as "very positive" for the work he had performed, as pictured below:[124]



Other irregularities regarding ████ closure abounded. Special Agent Nastoff, who was technically the co-case agent with the defendant handling ████ testified that he had never seen the ████ deactivation form until becoming involved as a witness in the defendant's trial, and that he would not have signed the form had it been presented to him back in 2013.[125]

---

[124]    Gov. Ex. 9E-3 (highlighting added).

[125]    *See* Tr. Tran., at 147–50, ECF No. 1170, (dated Aug. 14, 2024) (Test. Shane Nastoff) (indicating that he had never seen the ████ deactivation form until becoming involved as a witness in the Bongiovanni

Regarding the deactivation paperwork, itself, the jury heard from DEA Group Supervisor Mark Gentile that his signature, which was adjacent to Special Agent Nastoff's type-written name, was forged.[126] Then, on August 1, 2013, the day after the defendant closed ███ as a source, he sent an email to Scott Deming, the U.S. Attorney's Office Financial Investigator, who was investigating Serio for money laundering. In that email, the defendant stated that he was "very close on the drug end"—that is, that his narcotics investigation was progressing and close to resolving—even though he *just* closed the one and only informant he had into the Serio DTO the day before:[127]

| | |
|---|---|
| **From:** | Bongiovanni, Joseph S. |
| **To:** | Deming, Scott (USANYW); Yensan, Gregory R. (DEA-US); Flickinger, John P. (DEA-US); Bevilacqua, Stephen P. (DEA-US) |
| **Subject:** | Re: Serio Properties |
| **Date:** | Thursday, August 1, 2013 5:55:35 PM |

Scott thank you for the real estate info the purchase of the second property on LeBrun by Tom Serio is significant. We are very close on the drug end

Selva offered insight as to what was *actually* going on with ███ According to Selva, the defendant outed ███ as a confidential source to him; Selva, in turn, reported ███ status as a source to Masecchia; and Masecchia ultimately informed Serio.[128] ███ notably, was not the only confidential source the defendant burned to Selva. During the same time-

---

case, and that he would not have signed the form if it had been presented to him back in 2013).

[126]    *See* Tr. Tran., at 26–27, ECF No. 1478, (dated Sept. 26, 2024) (Test. Mark Gentile) (stating that he believes that "somebody tried to duplicate my signature" on Gov. Ex. 9E-3); *see id.* at 71 (Q: So we talked a little bit about this form on direct, sir. You claim that this signature that's on this form down in block 12 is not your signature? A: That's correct.).

[127]    Gov. Ex. 22P.

[128]    *See* Tr. Tran., at 89–96, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva) (describing the defendant exposing ███ Tr. Tran., at 65–69, ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio) (testifying that R.K. had been present at his house for drug transactions before, that he learned from Masecchia that the defendant had told Masecchia that ███ was an informant, and that before he had learned ███ was an informant he would have sold drugs to him).

period in which the defendant opened and maintained the Anderson/C2-13-0026 file, the

defendant exposed the identities of two additional DEA confidential sources.  Specifically,

the defendant cautioned Selva to avoid ███ ████████ because ████████ was a

confidential source, and further notified him that ████ ████ another Serio associate, was

feeding information to law enforcement.[129]

The next report came approximately one month later, on June 18, 2013, but was not

authored by the defendant but, rather, DEA Special Agent David Leary.[130]  By way of

background, the defendant kept a large, brown file on his desk with the name Serio

prominently featured, and represented to other agents that he was actively working on the

Serio investigation.[131]  One day, Special Agent David Leary offered to help the defendant

locate a warehouse connected to Serio that the defendant claimed he could not locate.[132]

Special Agent Leary quickly located the warehouse, which was close to the DEA

office.  When he did, Special Agent Leary observed a pickup truck associated with Tom

Serio.[133]  Because Special Agent Leary observed activity consistent with drug trafficking, he

asked the defendant to dispatch additional agents so that they could effectively surveil the

---

[129]    *See* Tr. Tran., at 86–96, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva) (testifying that the defendant disclosed ████ ████████ and ███ identities); Tr. Tran., at 65–71, ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio) (being provided ███ and ███ identities along with others whose names he cannot remember); Gov. Exs. 17A–17E (confidential source documents pertaining to ████████ Gov. Ex. 16 (confidential source profile record pertaining to ████

[130]    Gov. Ex. 8H.

[131]    *See* Gov. Ex. 100A; (*see e.g.,* Gov. Ex 22P); *see also* Tr. Tran., at 23 – 24, ECF No. 1219, (dated Sept. 5, 2024) (Test. David Leary); Tr. Tran., at 114–115, ECF No. 1472, (dated Sept. 6, 2024) (Test. David Leary)

[132]    *See* Tr. Tran., at 29–30, ECF No. 1219, (dated Sept. 5, 2024) (Test. David Leary) (describing offering to help find the warehouse).

[133]    *Id.* at 33–43.

truck.[134]  The defendant denied Special Agent Leary's request.  Not only that, the defendant instructed Special Agent Leary to end his surveillance and return to the DEA office.[135]  Just as well, at no point had the defendant advised Special Agent that he closed ███ his only confidential source into the Serio DTO.  As Special Agent Leary later explained, he never would have initiated surveillance if he knew that the defendant had closed his informant because it would have been a waste of time.[136]

On September 11, 2013, two days after formally—as opposed to, verbally—closing ███ as a source, the defendant authored another case status report in the Anderson/C2-13-0026 file.[137]  In the report, the defendant stated that that agents were awaiting approval from the United States Attorney's Office for approval of tracker warrants, and that agents had "utilized air surveillance with the Erie County Sheriffs [sic] office chopper" to locate properties and locations believed to be utilized by the Serio DTO, as follows:[138]

---

[134]    *Id.* at 36–37.

[135]    *Id.*

[136]    Tr. Tran., at 123, ECF No. 1472, (dated Sept. 6, 2024) (Test. David Leary).

[137]    *See* Gov. Ex. 8G. In the report, the defendant incorporated by reference his prior reports, and therefore incorporated the prior false statements contained in the other DEA-6s.

[138]    *Id.*

DETAILS

```
1. Reference is made to all DEA-6 ROIs written to this case/file.
2. Agents initiated several surveillences in effort to identify multiple
   properties and locations believed to be utilized by the Ronald SERIO
   DTO to cultivate 300+ marijuana grows. Agents have utilized air
   surveillence with the Erie County Sheriffs Office chopper and have
   also drafted GPS affidavits for warrants to attach GPS trackers on
   certain vehicles believed to be utilized by members of the SERIO DTO
   as conveyances for narcotics trafficking. Agents are presently
   waiting for approval from the United States Attorney's Office (WDNY)
   to utilized GPS trackers to aid in the investigation. Agents have
   initiated in-depth financial analysis of the financial records of
   Ronald and Thomas SERIO by the IRS in efforts to exposed money
   laundering and structuring practices.
3. This investigation continues.
```

However, as Special Agent Leary testified, neither the defendant nor any other DEA employee requested GPS trackers for the purported investigation into the Serio DTO. And Special Agent Leary would know, because he was the agent in charge of maintaining and assigning GPS trackers to other agents, researching target vehicles, and installing the trackers on target vehicles.[139] Moreover, no one from the DEA ever submitted a GPS tracker warrant application to the U.S. Attorney's Office for review and approval.[140] For that reason, the DEA never had to "wait" for any applications to be approved.

Additionally, the former Captain of the Erie County Sheriff's Office helicopter, Kevin Caffery, explained that had never met the defendant, let alone flown a mission for him, and that the mission reflected in the defendant's report would have required a detailed debriefing

---

[139]    *See* Tr. Tran., at 14–29, ECF No. 1219, (dated Sept. 5, 2024) (Test. Dave Leary).

[140]    *See* Tr. Tran., at 18–21, ECF No. 1226, (dated Sept. 6, 2024) (Test. Timothy Lynch).

with him as the captain.[141]  Captain Caffery's flight logs corroborated his testimony that ECSO never surveilled outdoor grow sites connected with the Serio DTO.[142]

Approximately two months later, on December 31, 2013, the defendant authored another Case Status report in the Anderson/C2-13-0026 file.[143]  In it, the defendant represented that agents had initiated several surveillances connected to the Serio DTO.[144] However, the only surveillance documented in the file was that conducted by Special Agent Leary, whom the defendant diverted back to the DEA after he observed Serio's brother.[145]

Additionally, the defendant reported that an individual named Remus Nowak was believed to be "a major marijuana trafficker and money launderer for the Serio DTO."[146]  The jury heard from multiple witnesses that Nowak was never involved in the Serio DTO and, in fact, was Masecchia's nemesis.[147]  Just as importantly, the Anderson file contained no documentary basis—such as a DEA-202—linking Nowak to Anderson or Serio, in violation of DEA policy, practice, and procedure.[148]

---

[141]    This statement is supported by the undersigned counsels' recollection of the testimony provided by Captain Kevin Caffery.  The transcript of Captain Caffery's testimony is presently unavailable.  Hereinafter, the government will cite to Captain Caffery's testimony as "Caffery Test. (dated Sept. 9, 2024) (Tran. Presently Unavailable)".

[142]    *See* Gov. Ex. 407 (aviation logbook from 4/30/13 to 10/5/13) and 407B.

[143]    In the report, the defendant incorporated by reference his prior reports, and therefore incorporated the prior false statements contained in the other DEA-6s.

[144]    Gov. Ex. 8G.

[145]    *See* Tr. Tran., at 56, ECF No. 1336, (dated Sept. 26, 2024) (Test. Brian Burns) (stating that the only DEA 6 in the file related to surveillance is the one involving SA Leary)

[146]    *See* Gov. Ex. 8F.

[147]    *See, e.g.,* Tr. Tran., at 48–49, ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio) (describing an instance where Masecchia left Falzone's residence because Nowak was nearby and explaining that there had been a dispute between Masecchia and Nowak in the past); *see* Tr. Tran., at 187, ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio) (Nowak was not a part of the Serio DTO and was enemies with Masecchia).

[148]    *See* Gov. Ex. 8A, *generally* (*i.e.,* there are no DEA 202 reports adding Nowak officially to the

The next three reports authored by the defendant were each brief Case Status reports. First, on April 7, 2014, the defendant wrote that Nowak was believed to be "a major marijuana trafficker and money launderer for the Serio DTO."[149] The defendant reiterated this claim on July 7, 2014, when he again represented that Nowak was believed to be "a major marijuana trafficker and money launderer for the Serio DTO."[150]  Then, on November 4, 2014, the defendant wrote that "confidential informant associated with this case/file is no longer viable and can not provide credible information in furtherance of this investigation," as follows:[151]

> 2. The confidential informant associated with this case/file is no longer viable and can not provide credible information in furtherance of this investigation. This agent will not prepare this case for closure.

The only confidential source opened in the Anderson file, however, was ███ and the defendant verbally deactivated him on July 30, 2013, well over one year before the defendant wrote that the "confidential information associated with th[e] case/file is no longer viable."[152]

On January 28, 2015, the defendant prepared a DEA 6 report closing the Anderson/C2-13-0026 file.[153]  In paragraph 2 of Government Exhibit 8B, the defendant wrote

---

file, and no reports documenting any basis for the defendant's assertions in Gov. Ex. 8F).

[149]    In the report, the defendant incorporated by reference his prior reports, and therefore incorporated the prior false statements contained in the other DEA-6s.

[150]    In the report, the defendant incorporated by reference his prior reports, and therefore incorporated the prior false statements contained in the other DEA-6s.

[151]    Gov. Ex. 8C.

[152]    Gov. Ex. 9E-3 and Gov. Ex. 8C.

[153]    In the report, the defendant incorporated by reference his prior reports, and therefore incorporated the prior false statements contained in the other DEA-6s.

that "[a]ll defendant dispositions have been completed via form 210."[154]  That same day, the defendant reported that Anderson had been convicted and sentenced in state court in connection with the 200 pounds of marijuana seized from his residence, as pictured below:[155]

| FBI NCIC DATA | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **16. NAME (As Appears on FD-249)**<br>ANDERSON, Wayne | | | | | **17. NAME, ADDRESS, ORI NUMBER OF FD-249 CONTRIBUTOR**<br>ORI#: NYDEA0200 - C2 - Buffalo, NY | | | | | |
| **18. DATE OF BIRTH**<br>09-14-1966 | **19. FBI NUMBER**<br>154902CA1 | **20. DATE OF ARREST**<br>11-25-2012 | | | | | | | | |
| **21. CHARGES AS REPORTED ON FD-249** | | | **DISPOSITION \*** | | **22. NEW CHARGES NOT PREVIOUSLY REPORTED ON FD-249** | | | | **DISPOSITION \*** | |
| | DRUG TYPE | | C | A | D | | DRUG TYPE | | C | A | D |
| E | CCE | | | | | E | CCE | | | | |
| R | RICO | | | | | R | RICO | | | | |
| M | Manufacture | | | | | M | Manufacture | | | | |
| I [X] | Importation | M2 - Marijuana (Domestic Or: | [X] | | | I | Importation | | | | |
| C | Conspiracy | | | | | C | Conspiracy | | | | |
| D | Distribution | | | | | D | Distribution | | | | |
| G | Possession with Intent | | | | | G | Possession with Intent | | | | |
| P | Possession (Simple) | | | | | P | Possession (Simple) | | | | |
| O | Other | | | | | O | Other | | | | |
| \* Check "C" for Convicted, "A" for Acquitted, or "D" for Dismissed | | | | | | | | | | |
| **23. REMARKS**<br>On January 6, 2015 - ANDERSON plead in NEW York State court and sentenced to 36 months probation. | | | | | | | | | | |

Anderson, however, was never prosecuted, convicted, or sentenced of any crime in connection with his receipt of the 200 pounds of marijuana on November 25, 2012.[156]

### 8.    The Defendant's continued efforts to protect the Serio DTO after closing the Anderson/C2-13-0026 file

Even after the defendant closed the Anderson/C2-13-0026 file, he continued to vigilantly protect the Serio DTO.  First, in July of 2015, the U.S. Attorney Office's Financial Investigator, Scott Deming, reached out to the defendant after learning the HSI Special Agent Charles Tolias was investigating Serio's bank activity.[157]  Deming, trying to be helpful to

---

[154]    *See* Gov. Ex. 8B.

[155]    Gov. Ex. 8A (highlighting added).

[156]    *See* Tr. Tran., at 12, ECF No. 1157, (dated Aug. 8, 2024) (Test. Wayne Anderson) (explaining that his charges were dismissed); *see* Tr. Tran., at 37, ECF No. 1336, (dated Sept. 26, 2024) (Test. Brian Burns) (describing that there was no conviction or sentence for Anderson in connection with the above-reported disposition).

[157]    Gov. Ex. 22Q.

Special Agent Tolias's investigation, reminded the defendant that he had "numerous accounts identified for the Serios," and noted that he could "certainly share the info".[158]  In response, the defendant wrote:

---

**From:** Bongiovanni, Joseph S. [mailto:Joseph.S.Bongiovanni@usdoj.gov]
**Sent:** Tuesday, July 28, 2015 4:06 PM
**To:** Deming, Scott (USANYW)
**Cc:** Flickinger, John P. (DEA)
**Subject:** RE: Serio


Scott

I am not working on the case with Charlie Tolias. We are and have been working on this case currently. We never stopped. I would appreciate if you not share any info relevant to this DEA investigation with DHS until we could coordinate. Thank you for the message.

SA Bongiovanni

---

Though the defendant intimated that he would try to coordinate with the Department of Homeland Security on its investigation into Serio, Special Agent Tolias explained that neither the defendant nor anyone else from DEA ever reached out to him to pool resources or share material.[159]  Special Agent Tolias also testified that his investigation into Serio went nowhere.[160]

The defendant next leaped to protect the Serio DTO approximately five months later. On December 10, 2015, a Town of Tonawanda Detective, Thomas Oswald, executed a search warrant at the residence of Mark Vitale—a marijuana trafficker who Serio supplied through

---

[158]    *Id.*

[159]    This statement is supported by the undersigned counsels' recollection of the testimony provided by HSI Special Agent Charles Tolias.  The transcript of Special Agent Tolias' testimony is presently unavailable.  Hereinafter, the government will cite to Special Agent Tolias's testimony as "Tolias Test. (dated Sept. 5, 2024) (Tran. Presently Unavailable)".

[160]    *Id.*

an intermediary, John Robinson—after receiving information from ▮▮ ▮▮▮▮▮ who agreed to become an informant and help the Town of Tonawanda Police Department obtain a search warrant for Vitale's residence.[161] Robinson was Serio's employee, had traveled with Serio to New York City on drug runs and distributed marijuana for Serio.[162]

After police executed the search warrant at Vitale's residence, Vitale reported the events to Robinson and they both reported the details to Serio's then-wife, Lauren.[163] Once Serio learned about the search warrant, Serio informed Masecchia and generally described Vitale's connection to their distribution activities.[164] According to Serio, Masecchia checked with the defendant to find out information about any exposure related to the Vitale search warrant and Masecchia reported that "everything was ok."[165]

At the same time, Robinson was nervous about the fact that Vitale's residence had been searched.[166] As Robinson was in the process of destroying and removing evidence, another of Serio's drug-associates reassured him not to worry because "Ron has Joe Bong"— that is, that Serio was receiving protection from the defendant.[167] And, indeed, the defendant

---

[161]    This statement is supported by the undersigned counsels' recollection of the testimony provided by Town of Tonawanda Police Department Detective Thomas Oswald and the government's argument at trial. The transcript of Detective Oswald's testimony is presently unavailable. Hereinafter, the government will cite to Detective Oswald's testimony as "Oswald Test. (dated Sept. 13, 2024) (Tran. Presently Unavailable)".

[162]    *See* Tr. Tran., at 20–31, ECF No. 1479, (dated Sept. 16, 2024) (Test. John Robinson) (describing trips to New York City with Serio); *id.* at 38–42 (describing supplying Mark Vitale with marijuana supplied by Serio).

[163]    *Id.* at 50–57.

[164]    *See* Tr. Tran., at 81–84, ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio).

[165]    *Id.*

[166]    *See* Tr. Tran., at 51, ECF No. 1479, (dated Sept. 16, 2024) (Test. John Robinson)

[167]    *Id.* at 52.

injected himself into the Town of Tonawanda Police Department's investigation, assumed control of Detective Oswald's informant into Vitale, and then proceeded to never use the informant—just as he did with ███████ [168]

### 9.    The Defendant's awareness of Selva's indoor grow operation

The jury also heard evidence that the defendant visited Selva's residence while Selva maintained an indoor marijuana grow operation for Serio. Selva described how the defendant came over his house while Selva was growing plants on behalf of the organization, as follows:

> Q.    While you had a marijuana grow operation as a part of the organization in your basement, did the defendant ever come over your house?
>
> A.    Yes.
>
> Q.    Did you have a discussion with him about what you had going on in your house?
>
> A.    Yes.
>
> Q.    Describe that for the jury.
>
> A.    Told him I — he smelled it. It had a — even though we had an ionizer, which helps with the smell, and then we had a ventilation hooked up through the — it went through my vent dryer, my dryer going outside, Ron had this suction system. But it still -- you could still faintly smell it. He smelled it, and I told him what was going on.
>
> Q.    What did he say?
>
> A.    Be careful. Watch your utilities. Limit your movement. My kids were older at that time, they were still coming around, and I was very cautious when they came over of when I had them, so —

---

[168]    *See* Oswald Test. (dated Sept. 13, 2024) (Tran. Presently Unavailable). This statement is further supported by the undersigned counsels' recollection of the testimony provided by ███ ████████ Detective Oswald's confidential informant. The transcript of Mr. ████████ testimony is presently unavailable. Hereinafter, the government will cite to Mr. ████████ testimony as "████████ Test. (dated Sept. 11, 2024) (Tran. Presently Unavailable)."

Q.    He didn't arrest you on the spot?

A.    No.[169]

### 10.    Events After Ron Serio's Arrest by the ECSO on April 18, 2017

The Erie County Sheriff's Office ultimately arrested Serio on April 18, 2017.[170]  The Sheriff's Office intentionally did not run their operation resulting in Serio's arrest through law enforcement deconfliction systems.[171]  Masecchia informed Selva of Serio's arrest and ordered Selva to "start clearing things out".[172]  Selva then called the defendant to find out what happened; Selva and the defendant spoke on the phone and then met in person, consistent with their established protocol.[173]  The defendant explained that the Sheriff's Office arrested Serio, and that he did not know about it beforehand.[174]  The defendant then advised Selva that if anyone asked him about Serio he would just "play stupid."[175] The two further discussed

---

[169]    *See* Tr. Tran., at 43–45, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva); *id.* at 46–47 (testifying that Serio and Masecchia helped him start the grow and they would split profits).  Though not contested by the defendant, the Second Circuit has determined that 'making an arrest' or 'making a decision about whether to issue a desk appearance ticket to the arrestee' are the 'sort of specific, formal exercises of government power that can constitute official acts.'" *United States v. Menendez*, No. (S4) 23-CR-490 (SHS), 2024 WL 5103452, at *14 (S.D.N.Y. Dec. 13, 2024) (quoting *United States v. Reichberg*, 5 F.4th at 233, 249 (2d Cir. 2021)).

[170]    *See* Tr. Tran., at 93–117, ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio).

[171]    This statement is supported by the undersigned counsels' recollection of the testimony provided by Erie County Sherriff deputy Daniel Granville.  The transcript of Granville's testimony is presently unavailable.  Hereinafter, the government will cite to Granville's testimony as "Granville Test. (dated Sept. 16, 2024) (Tran. Presently Unavailable)."

[172]    *See* Tr. Tran., at 125, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva).

[173]    *See Id.* at 125–132; *see also* Gov. Ex 358 at 443 (defendant's phone records).

[174]    *See* Tr. Tran., at 129–30, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva); *see also* Granville Test. (dated Sept. 16, 2024) (Tran. Presently Unavailable) (testifying that ECSO did not notify the defendant before investigating Serio for approximately two weeks, searching his properties, and arresting Serio in conjunction with the FBI).

[175]    *See* Tr. Tran., at 131–32, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva).

how Selva should act if he was approached, including pretending that Selva was the defendant's confidential informant.[176]

Federal law enforcement ultimately arrested Selva, too. When that occurred, the defendant began acting differently around Selva. Specifically, the defendant snuck up on Selva leaving the gym, approached him outside a post office while driving a vehicle different than his ordinary vehicle, and leaving a bottle of Crown Royal on Selva's porch without any in-person interaction.[177] The defendant also saw Selva in traffic and invited him to meet and walk along a bike bath in Tonawanda.[178] During the walk, the defendant asked Selva if investigators asked about him, which made Selva nervous—as though the defendant was feeling Selva out to see if he cooperated.[179] During the conversation, the defendant commented to Selva: "you can go back into sales," and reminded Selva that he should pretend to be the defendant's informant—a tactic Selva explained to the jury that he tried to implement until he failed his polygraph.[180]

---

[176]    *See id.* at 132–33 (discussing that the 'pretend-to-be-an-informant' ruse had worked in the past when the defendant protected Peter Gerace from FBI Special Agent Herbst's investigation back in 2009); *see* Footnote 210, *infra*, (describing how Special Agent Herbst believed that Gerace was the defendant's confidential source and, for that reason, ceased his investigation into Gerace).

[177]    *Id.* at 218–220.

[178]    *Id* at 213–216.

[179]    *Id.*

[180]    *Id.* Government Exhibits 551 and 552 are attached hereto as **Exhibit A**, as visual aids summarizing of the conspiracy and supporting evidence. These exhibits were introduced and explained during the testimony of FBI Special Agent Brian Burns. *See* Tr. Tran., at 74, 87, *see* ECF No. 1336, (dated Sept. 26, 2024) (Test. Brian Burns).

### B.    The Defendant's Relationship with Peter Gerace

The focus of the investigation into the defendant expanded to include the defendant's relationships with Peter and Anthony Gerace, two other people from the defendant's childhood and early adulthood who became drug distributors.  The Gerace brothers were the grandsons of the local, reputed head of the Buffalo LCN family.  Peter Gerace ("Gerace") operated Pharoah's Gentlemen's Club ("Pharoah's"), a site of rampant drug use, and Anthony Gerace was part of the Serio DTO.  Gerace was long the subject of federal narcotics investigations, none of which resulted in any charges until the instant indictment.  For present purposes, evidence of Gerace's operation of Pharoah's, the defendant's December 2005 disclosure of search warrant information to Gerace, Gerace's directive to a cocaine user to call upon the defendant to get out of trouble, the defendant's repeated interventions on investigations targeting Gerace, the defendant's contentious conversation with Special Agent Casullo concerning Gerace, the defendant's advice to Gerace regarding ping warrants, and, finally, the defendant's longstanding friendship with Gerace forms the factual bedrock of the defendant's convictions for Counts 6, 7, 8, 10, and 11, which all relate to obstruction of justice and false statements the defendant committed in connection with Gerace.

### 1.    The Defendant's friendship with Gerace

Selva was not the only friend the defendant reconnected with upon his return to Buffalo.  The defendant also grew up with Gerace and was close friends with him throughout childhood and into early adulthood.[181]  Following the defendant's divorce, he began dating

---

[181]    *See* Tr. Tran., at 62–63, ECF No. 1177, (dated Aug. 27, 2024) (Test. Louis Selva); Tr. Tran., at 173, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva).

again and, consistent with the photographs below, would, respectively from left to right, double-date, vacation, and party with Gerace:



Gov. Ex. 426-1 (from left to right): Defendant with his former girlfriend, Gerace, and RuthAnn Arida in 2005



Gov. Ex. 490A: Vacation in Las Vegas in 2011.



Gov. Ex. 127: Party at a Cottage in the Summer of 2018

The defendant and Gerace also regularly communicated by telephone. Government Exhibit 310D, for example, reflected a text message conversation between the defendant and Gerace that contained 391 messages from January 2015 until February 2019, an average of 97 texts per year or 8 text messages per month. Additionally, a data analysis of the defendant and Gerace's call detail records revealed that the defendant and Gerace had monthly phone calls essentially until the defendant learned he was under investigation in approximately the Fall of 2018, as depicted in a visual aid entered into evidence, as follows:



As FBI Data Analyst Greg Machin, who created the above summary chart explained, the chart does not account for text messages, including the text reflected in Government Exhibit 310D, or other electronic communications between the defendant and Gerace. Nor did it account for any in-person communications between the two. On that score, according

to witnesses Selva, ██ ████████ █████████ █████████ and █████████ the defendant and Gerace also socialized with one another at Pharoah's.  Some of those interactions are confirmed by the defendant's own text messages with Gerace.  Specifically, in or about July 13, 2015, the defendant advised Gerace that he was "[l]eaving [his] office now," to which Gerace replied, "ok" and "[e]mployee ent on Aero," a clear reference to the Pharoah's employee entrance off of Aero Drive in Cheektowaga, New York.[182]  Additionally, the defendant's text messages confirm that on or about April 1, 2018, the defendant told Gerace that he would "come see [him] at [P]haroah's".[183]

The defendant's friendship with Gerace also involved mutual drug use.  Just a few months after texting Gerace that he would see him at Pharoah's, the defendant consumed cocaine with Gerace, ██████ ████ and the defendant's DEA partner in the summer of 2018 at a cottage party.[184]  Hunt was shown a picture of herself, Gerace, the defendant, and others at the party, and asked to circle the individuals she consumed cocaine with. ████ circled the defendant, the defendant's former DEA partner, and Gerace.[185]

## 2.    Gerace's operation of Pharoah's as a drug-involved premises

The defendant's visits to Pharoah's were probative not just of his friendship with Gerace but also of his awareness of Gerace's criminal activities.  From 2005 until at least 2019, Gerace operated Pharoah's as a drug-involved premises.  During that period, as multiple witnesses explained, drug use at Pharoah's was rampant and ubiquitous, occurring

---

[182]    Gov. Ex. 310D at 10.

[183]    *Id.* at 54.

[184]    *See* Tr. Tran., at 30–32, ECF No. 1186, (dated Sept. 3, 2024) (Test. P.H.).

[185]    Gov. ex. 127.

openly on the floor, as well as in bathrooms, offices, and dressing rooms.  For his part, the defendant even authored a DEA report the reflected his knowledge that federal law enforcement agencies like the FBI were investigating Gerace in connection with Pharoah's, and that Gerace had knowledge of kilo-level cocaine distribution in the Buffalo area.[186]

### 3. The Defendant's December 2005 disclosure of search warrant information to Gerace

In December 2005, the defendant was present for a search at the residence of a drug dealer, Craig Border, who had previously dated Gerace's then girlfriend, Ruthann Arida. Border testified that he had intimate photos of Arida in his apartment but that, after the search, the photos had gone missing, even though they were not drug related.  Gerace later confronted Arida about the photos found in Border's apartment during an argument.[187]

### 4. Gerace advises a cocaine dealer that she can use the defendant's business card if she needs to get out of trouble

Gerace would also advertise his proximity to the defendant to others involved in the drug-trade.  ████████████ for example, worked at Pharoah's and dated Gerace periodically for several years.[188]  Through (and with) Gerace, Potrzebowski began using cocaine.[189]  Sometimes Gerace dispatched ██████████ to act as a drug runner for him; other

---

[186]    *See* Tr. Tran., at 49–53 and 87–88, ECF No. 1215, (dated Sept. 5, 2024) (Test. K.L.) (observed the defendant at Pharoah's on three occasions); Tr. Tran., at 19, ECF No. 1145, (dated Aug. 7, 2024) (Test. A.P.) (met the defendant at Pharoah's); Tr. Tran., at 63–65, ECF No. 1177, (dated Aug. 27, 2024) (Test. Louis Selva) (went to Pharoah's with the defendant); Test. ████ ████████ (dated Sept. 11, 2024), (Tran. Presently Unavailable) (testifying to seeing the defendant at Pharoah's); *see generally* Tr. Tran., (dated Aug. 5, 2024) (Test. Peter Lepiane) (Gerace was on Probation and the defendant reached out on Gerace's behalf when Gerace was in trouble with U.S. Probation); Gov. Ex. 30A.

[187]    *See* Tr. Tran., at 7–8, ECF No. 1323, (dated Sept. 16, 2024) (Test. Craig Border) (describing the photos and testifying that they went missing after the search); Tr. Tran., at 91–92, ECF No. 1321, (dated Sept. 13, 2024) (Test. R.A.).

[188]    Tr. Tran., at 6–7, ECF No. 1145, (dated Aug. 7, 2024) (Test. A.P.).

[189]    *Id.* at 8.

times, Potrzebowski would sell cocaine herself to fund her habit.[190]   Gerace introduced Potrzebowski to the defendant while he visited Pharaoh's and, sometime after meeting the defendant, Gerace handed her the defendant's business card and directed her to "use it to get of trouble."[191]

### 5.    The Defendant's intervention in a DEA investigation targeting Gerace

Gerace's apparent belief that his friendship with the defendant could shield himself and others from criminal liability was not without predication.   In December 2008, the defendant injected himself into yet another investigation, this one involving Gerace. Specifically, DEA Special Agent Chris Wisniewski was investigating a drug-trafficking organization led by David Gambino in connection with a broader file into Matthew Scalia numbered C2-06-0120.[192]   A confidential source drew an organizational chart of the Gambino's DTO that identified Gerace as a member of an enterprise involving "Russians[,] coke[,] pills[,] weed[,] [and] guns."[193]   Special Agent Wisniewski discussed the investigation inside the DEA office within earshot of the defendant.[194]   Upon hearing of Gerace's status *vis-à-vis* the investigation, the defendant, unprompted, told Special Agent Wisniewski that he knew Gerace "from the old neighborhood" and "could do a cold approach to see if he will cooperate with us."[195]

---

[190]    *Id.* at 25–26.

[191]    *Id.* at 19 (Gerace handed her Joe [Bongiovanni]'s card and said that "if I ever got in trouble, that I could use it to get out of trouble").

[192]    *See* Gov. Ex. 30B at 1.

[193]    *See* Gov. Ex. 30B at 2.

[194]    *See* Tr. Tran., at 22, 24, ECF No. 1144, (dated Aug. 7, 2024) (Test. Christopher Wisniewski).

[195]    *Id.* at 24.

A cold approach involves asking someone if they want to cooperate with an ongoing investigation without first charging them with a crime.[196]  In terms of investigative techniques, the tactic is risky: if the individual declines to cooperate, the cold approach can burn the investigation by alerting the individual to the investigation's existence and their status as a subject or target in it.  When the defendant approached Special Agent Wisniewski with the idea of cold approaching Gerace, he did not disclose the full extent of his relationship with Gerace—*viz.*, that they were close friends, that they went on double-dates together, or that they exchanged social phone calls and text messages.[197]  Had he, Special Agent Wisniewski would have likely reported the information about the defendant's relationship with Gerace to a DEA supervisor.[198]  After purportedly conducting the cold approach, the defendant reported back: Gerace "is not going to help us."[199]

### 6.    The Defendant's intervention in an FBI investigation targeting Gerace

Less than a year later, the defendant intervened in a second investigation involving Gerace.  On October 31, 2009, the U.S. Probation Office for the Western District of New York ("USPO")  conducted a search of Pharoah's based upon investigation and information provided by the FBI that Gerace was involved in drug distribution.[200]  USPO had jurisdiction to effectuate the search because Gerace was a convicted felon on supervised release.[201]  After

---

[196]     *See id.* at 24–26.

[197]     *See id.* at 26–27.

[198]     *See id.* at 27, 58–59.

[199]     *Id.* at 27–28.

[200]     *See* Tr. Tran., at 15–16, (dated Aug. 5, 2024) (Test. Peter Lepiane)

[201]     *See id.*

the search, Gerace was drug-tested and tested positive for cocaine.[202]  Gerace subsequently called the defendant who, according to Selva, "stepped in" for Gerace to help him.[203]

Specifically, the defendant called U.S. Probation Officer Peter Lepiane and stated that Gerace "had been a confidential source of information in the past and that Gerace wanted to cooperate with the DEA," to lessen his exposure with USPO based upon his pending probation violation.[204]  The defendant repeated these claims much in a November 6, 2009 DEA-6 report he authored in the same Matthew Scalia/CS-06-0120 file operated by Special Agent Wisniewski.[205]  Unlike what the defendant told Special Agent Wisniewski about Gerace—that is, that Gerace would not help them with their investigation—the defendant stated in this report that Gerace "ha[d] acted as a confidential source and has been able to provide information regarding individuals in this case file and other narcotic[s] investigation[s] in the past."[206]  Additionally, the defendant indicated that Gerace had information about substantial cocaine dealers he would be willing to share for consideration on his pending supervised release violation.[207]

When the defendant submitted the report for his supervisor, Dale Kasprzyk's, approval, he never disclosed the closeness of his relationship with Gerace.[208]  Had he done

---

[202]    *Id.* at 18.

[203]    *See* Tr. Tran., at 65, ECF No. 1177, (dated Aug. 27, 2024) (Test. Louis Selva).

[204]    *See* Tr. Tran., at 20, (dated Aug. 5, 2024) (Test. Peter Lepiane)

[205]    *See* Gov. Ex. 30A at 1.

[206]    *Id.* at 1.

[207]    Gov. Ex. 30A at 2.

[208]    Tr. Tran., at 50–51, (dated Aug. 6, 2024) (Test. Dale Kasprzyk).

so, Kasprzyk would not have permitted the defendant to deal or interface with Gerace.[209] Nevertheless, based upon the defendant's false and misleading representations, Kasprzyk directed the defendant to arrange for Gerace to be interviewed by the FBI, the agency that fed USPO the information that led to Gerace's supervised release violation.

In particular, the defendant arranged a meeting to discuss Gerace with FBI Special Agent Thomas Herbst, who was spearheading a narcotics investigation into Gerace that he hoped would result in Gerace's cooperation in a larger investigation into several cold-case murders.[210] Though the defendant was purportedly there to assist Special Agent Herbst, his conduct left Special Agent Herbst with the indelible impression that Gerace was, in fact, the defendant's confidential source. In particular, the defendant shrouded the meeting in a degree of secrecy by specifically instructing Special Agent Herbst not to bring his partner to the meeting.[211] Once at the meeting, the defendant told Special Agent Herbst that he had known Gerace, whom he referred to as "this kid", for a long time. When the defendant finally introduced Gerace to Special Agent Herbst, the meeting was so lacking in substance and meaningless, and the defendant's conduct so secretive, that Special Agent Herbst concluded that that Gerace was the defendant's confidential source.[212] And because DEA would have proverbial territory over investigating and charging their confidential sources when they commit crimes, Special Agent Herbst dropped his investigation into Gerace.[213]

---

[209]    *See id.*

[210]    *See* Tr. Tran., at 17, (dated Aug. 6, 2024) (Test. Thomas Herbst).

[211]    *Id.* at 18–19.

[212]    *Id.* at 30.

[213]    *See id.*

Though the defendant, verbally and in writing, represented to others that Gerace was a confidential source, and acted vis-à-vis Special Agent Herbst consistent with those representations, DEA Inspector Francis DiCarlo confirmed that Gerace was never a confidential source or DEA witness of any kind.[214]

### 7. The Defendant's confrontation with Special Agent Casullo regarding Gerace

By 2016, Special Agent Casullo—the Las Vegas Field Division agent who once targeted Masecchia—moved back to Buffalo and had his sights set on Gerace after hearing at his high school reunion, which Gerace attended, that Gerace was taping people at Pharoah's engage in illegal activity, including drugs, and blackmailing them.

As an initial step, Special Agent Casullo subpoenaed Gerace's telephone records, which revealed that the defendant had been in telephonic contact with Gerace. Special Agent Casullo alerted a supervisor, and the defendant soon found out that Special Agent Casullo was investigating his friend.[215] These circumstances led to a heated exchange between Special Agent Casullo and the defendant that resulted, for the former, an unmistakable conclusion: "If there was one thing that was clear, it was that the defendant didn't want [him] to investigate Peter Gerace."[216]

Special Agent Casullo initiated the conversation, which occurred in a private conference room, by attempting to mollify the defendant: at trial he testified telling the

---

[214]    *See* Tr. Tran., at 51, ECF No. 1161, (dated Aug. 12, 2024) (Test. Francis DiCarlo); *see also* Tr. Tran., at 50, (dated Aug. 6, 2024) (Test. Dale Kasprzyk).

[215]    Tr. Tran., at 103–104, ECF No. 1335, (dated Sept. 24, 2024) (Test. Anthony Casullo).

[216]    *Id.* at 117.

defendant that he was "not trying to get [him] in trouble."[217]  But the defendant was irate.  He exclaimed: "This is bullshit!"[218]  And then he continued: "That kid called me when a stripper overdosed in the club.  And I told him to get her out of there."[219]  The defendant then pivoted, and asked Special Agent Casullo to confirm that Gerace was "friends with [his] brother-in-law," Phil Domiano.[220]  Special Agent Casullo readily acknowledged that Gerace and Domiano were friends—and that his "brother-in-law ha[d] caused [him] and [his] family a lot of problems in the past."[221]

Then the defendant lowered his voice and asked, accusatorily, "Do you hate Italians?"  Special Agent Casullo replied, "no," noting that he, too, was Italian.  And then the defendant declared that "[w]e should be investigating N*****s and S***s," using racial slurs for black and Hispanic people.[222]  Special  Casullo responded that DEA should be investigating all criminals.  Nevertheless, the defendant's conduct shocked Special Agent Casullo, and he paused his investigation into Gerace for several years.

### 8.    The Defendant's advice to Gerace regarding ping warrants

Learning of Special Agent Casullo's investigation into Gerace in the summer of 2016 did not deter the defendant from associating or discussing law enforcement material with Gerace 11 months later.  Specifically, on May 4, 2017, Gerace left the defendant a voice

---

[217]    *Id.* at 106.

[218]    *Id.* at 108.

[219]    *Id.*

[220]    *Id.* at 110.

[221]    *Id.* at 111.

[222]    *See Id.* at 107–117.

memo on his phone asking about law enforcement's ability to "ping" Trac Fones that "drug dealers" use.[223]  Trac Fones, often referred to as burner phones, are regularly used by drug dealers to thwart law enforcement's attempts to investigate drug activity.[224]  After receiving the voice message, the defendant responded by text and advised Gerace that police can ping a Trac Phone but would need a warrant.[225]  Law enforcement's ability to ping certain phones, including Trac Fones that many drug dealers may believe are untraceable, is a sensitive technique that members of law enforcement do not openly share with members of the public.

### 9.    The Defendant's receipt of DARTS notices regarding Anthony Gerace

The defendant also received automatically generated emails from DARTS regarding Anthony Gerace's telephone number.[226]  Those emails alerted him to when other investigators, such as Special Agent Casullo, began investigating the Gerace brothers for narcotics trafficking involving marijuana, cocaine, and oxycodone. Yet again, call records show that the defendant was in telephonic contact with Anthony Gerace in 2014, 2016, and 2017.[227]  Additionally, Kevin Myszka, an associate of the Gerace brothers, testified that the defendant was at a weekend party in Toronto with, among others, Anthony Gerace, wherein there was obvious cocaine use behaviors.[228]

---

[223]    *See* Gov. Ex. 311.

[224]    *See* Tr. Tran., at 142, ECF No. 1244, (dated Sept. 10, 2024) (Test. Curtis Ryan).

[225]    Gov. Ex. 310D at 42.

[226]    *See* Gov. Ex.  26E at 1–2 (regarding telephone number 716-799-7724, which subscribed to by Anthony Gerace).

[227]    Gov. Ex. 368C (Summary Exhibit Regarding Telephonic Contact Between the defendant and Anthony Gerace).

[228]    *See generally* Tr. Tran., ECF No. 1229, (dated Sept. 9, 2024) (Test. Kevin Myszka).  Anthony Gerace was linked to the Serio/Masecchia/Selva drug trafficking through the testimony of Louis Selva and Ron Serio.  *See* Tr. Tran., at 22–23, ECF No. 1464, (dated Sept. 16, 2024) (Test. Ron Serio) (stating that Anthony

###### 10.    The Defendant's November 10, 2018, DEA Memorandum

Law enforcement began investigating the defendant shortly after Serio's arrest in April 2017, when Serio disclosed during a proffer that the defendant had provided his DTO with the names of informants.[229]  Thereafter, Special Agent Casullo found the defendant's report from the Matthew Scalia/C2-06-0120 file wherein the defendant represented that Gerace had been his confidential source.[230]  Following this revelation, Special Agent Casullo reported to his supervisors the defendant's Summer 2016 racist comments and disclosure about the overdosing dancer at Gerace's club.[231]

By the Fall of 2018, the defendant became aware that his relationship with Peter Gerace was under scrutiny.[232]  The defendant expressed concerns about Special Agent Casullo to Selva and Kasprzyk.[233]  Then, on November 10, 2018, the defendant wrote an unsolicited DEA memorandum to his DEA supervisors titled: "Communications with Peter GERACE Between June 30-October 27, 2018."[234]  In the memorandum, the defendant stated:

> It was brought to my attention that Peter Gerace had become a target of a federal investigation.  Based on the intelligence I have received, I have attempted to terminate all contact with Gerace.  It should be known that *any contact* I have had with Gerace in the past was *minimal* in person

---

Gerace was a friend of his, and someone that he had a drug supply relationship with).

[229]    *See* Tr. Tran., at 10–18, ECF No. 1244, (dated Sept. 10, 2024) (Test. Curtis Ryan).

[230]    Tr. Tran., at 130–32, ECF No. 1335, (dated Sept. 24, 2024) (Test. Anthony Casullo).

[231]    *See id.*; Tr. Tran., at 178, ECF No. 1244, (dated Sept. 10, 2024) (Test. Curtis Ryan).

[232]    Gov. Ex. 97; *see also* Tr. Tran., at 138–139, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva).

[233]    *See* Tr. Tran., at 159, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva) (describing walking with the defendant at Delaware Park and the defendant expressing concerns); *see also* Tr. Tran., at 26–57, ECF No. 1244, (dated Sept. 10, 2024) (Test. Curtis Ryan) (describing the search warrants executed at the residences of Anthony Gerace and Michael Sinatra, another drug dealer connected to the defendant).

[234]    Gov. Ex. 97.

contact and *primarily consisted* of a *random* telephonic communication based on the fact we were childhood friends. I would sometimes *randomly encounter* Gerace at a restaurant or golf outing and have not made personal plans to meet with him socially in several years.[235]

The defendant did not offer how "it was brought to [his] attention" that Gerace had become the target of a federal investigation.[236] Attached to the defendant's memorandum were text messages between himself and Gerace between June 30, 2018 and October 27, 2018.[237] However, the defendant neither provided text messages he had with Gerace dating back to at least January 2015 nor those post-dating October 27, 2018, and running until February 2019.[238]

### 11. The Defendant's January 28, 2019, DEA Memorandum

The defendant authored a second unsolicited DEA memorandum to his supervisors on January 28, 2019, titled, "Communications with Peter GERACE by Special Agent Anthony Casullo and Phil Domiano."[239] In the first paragraph, the defendant stated that he had verbally informed DEA "of information confirming the *friendship* of Domiano, Casullo, and Gerace."[240] In the second paragraph, the defendant stated that he observed SA Casullo "meeting and drinking socially with Peter Gerace *alone* at the Big Ditch Brewery and later Tappo Italian Restaurant in Buffalo, N.Y. at approximately 9:45 p.m. on the evening of June

---

[235]    *Id.* (emphases added).

[236]    *See id.*

[237]    *See id.*

[238]    *See* Gov. Ex. 310D.

[239]    *See* Gov. Ex. 99.

[240]    Gov. Ex. 99 (emphasis added).

13, 2015."[241]  In the third paragraph, the defendant generally complained about the manner in which Special Agent Casullo reported the defendant's racist statements wherein the defendant stated that they "should be investigating "S***s and N*****s,"" and denied making the statement.[242]  And in the fourth paragraph, the defendant stated that he was forwarding the memorandum so that ultimately SA Casullo would be investigated.[243]

### 12. The Defendant's retirement and voluntary interview with the DOJ Office of the Inspector General

The defendant retired from the DEA soon after federal law enforcement searched Anthony Gerace's home in January of 2019.[244]  In the immediate leadup to the defendant's retirement, he wiped his DEA-issued cell phone, which he used to communicate with Selva, Gerace, and others, like Hot Dog.[245]  In early March of 2019, Department of Justice, Office of the Inspector General, Special Agent David Carpenter called the defendant inviting him to sit for a voluntary interview.[246]  That interview ultimately occurred on March 29, 2019.[247]

Special Agent Carpenter specifically limited the interview was limited to aspects of the investigation related to the defendant's relationship with Peter Gerace.[248]  During the

---

[241]    *Id.* (emphasis added).

[242]    *Id.*

[243]    *Id.*

[244]    *See* Tr. Tran., at 216, ECF No. 1244, (dated Sept. 10, 2024) (Test. Curtis Ryan) (describing the proximity of the Anthony Gerace search warrant to the defendant's retirement).

[245]    *See* J. Stipulation, Court Ex. 5, (dated Aug. 26, 2024).

[246]    *See* Tr. Tran., at 11, ECF No. 1325, (dated Sept. 23, 2024) (Test. David Carpenter) (testifying that he called the defendant on the phone and invited him to participate in a voluntary interview).

[247]    *See generally id.* at 26 (noting that the interview occurred on March 29, 2019).

[248]    *See id.* at 15 (testifying that his interview of the defendant did not focus on the "Serio leg of the investigation").

interview, the defendant advised Special Agent Carpenter that he tried to "keep" Gerace, whom he described as a "police groupie," "at an arm's length."[249]  In addition, the defendant stated that he tried to keep Gerace on a "short leash" so that he could obtain evidence to investigate Pharoah's.  And, just as critically, he denied ever going to Gerace's home, ever seeing him consume narcotics, and ever initiating contact with Gerace.[250]  At no point did the defendant disclose that he double dated or vacationed with Gerace, and to the extent he acknowledged being in Las Vegas with Gerace, the defendant explained their encounter was entirely coincidental.[251]

As Special Agent Carpenter explained, understanding whether the defendant ever initiated contact with Mr. Gerace was important to accurately understanding the nature of their relationship: was it "a one-way or [a] two-way street"?  Did "communication flow[] both ways"?  Did "one of them reach[] out more than the other"?  Did one of the "ignor[e] . . . communication"?[252]  All of that, in Special Agent Carpenter's view, was material to understanding whether the defendant had an improper relationship with Gerace.

### 13.  The search of the defendant's residence and his interview with federal law enforcement

On June 6, 2019, federal law enforcement executed a search warrant at the defendant's residence where they recovered the hard-copy Anderson/C2-13-0026 file from the defendant's basement.  That same day, the defendant gave a voluntary interview to Homeland

---

[249]    *Id.* at 30–32.

[250]    *Id.* at 31–32.

[251]    *Id.* at 40–41.

[252]    *Id.* at 42–43 (emphasis added).

Security Investigations Special Agent Curtis Ryan.[253]  During the interview, the defendant made several false statements and representations evincing his consciousness of guilt, including a statement for which he was convicted of 18 U.S.C. § 1001(a)(1) during his first trial, namely, that he removed the hard copy version of the Anderson/C2-13-0026 file from the DEA on February 1, 2019—his last day in the office—and kept it in his house because he thought it would come up again and wanted to verify everything was on the up and up.[254]

### C.    The Duties of a DEA Agent

The lawful functions of the DEA are to enforce that nations drugs laws, and to investigate, arrest, and help to prosecute individuals and groups involved in drug activity. The DEA's mission and the defendant's oath and duties required him to enforce the drug laws of the United States fairly and impartially, free from favoritism and corruption, by investigating, arresting and helping to prosecute individuals and groups involved in drug trafficking.[255]

## II.    LEGAL FRAMEWORKS

### A.    The Rule 29 Standard

A motion for a judgment of acquittal may be granted after the close of evidence on either side if the evidence is insufficient to sustain a conviction. FED. R. CRIM. P. 29(a).  But "a defendant challenging the sufficiency of the evidence 'bears a heavy burden,'" *United States*

---

[253]    *See* Tr. Tran., at 203–239, ECF No. 1244, (dated Sept. 10, 2024) (Test. Curtis Ryan)

[254]    *See* Tr. Tran., at 56–63, ECF No. 1325, (dated Sept. 23, 2024) (Test. David Carpenter) (describing the defendant's interview with HSI Special Agent Curtis Ryan on June 6, 2019); Tr. Tran., at 203–239, ECF No. 1244, (dated Sept. 10, 2024) (Test. Curtis Ryan) (describing the defendant's interview on June 6, 2019); Tr. Tran., at 3–15, ECF No. 1245, (dated Sept. 11, 2024) (Test. Curtis Ryan) (similar).

[255]    *See* Gov. Ex. 5 (DEA Oath of Office); Gov. Ex. 6 (DEA Appointment Affidavit); Gov. Ex. 7 (DEA Mission Statement).

*v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021) (quoting *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017)), because rather than considering the evidence on a blank slate, the Court must review it "in the light most favorable to the government." *United States v. Alcius*, 952 F.3d 83, 86 (2d Cir. 2020) (quoting *United States v. Pierce*, 785 F.3d 832, 838 (2d Cir. 2015)); *see generally United States v. Puzzo*, 928 F.2d 1356, 1361 (2d Cir. 1991) (discussing this well-established standard).

In practice, this means that courts must "defer to the jury's rational determinations of the weight of the evidence, the credibility of the witnesses, and choice of the competing inferences that can be drawn from the evidence." *United States v. White*, 7 F.4th 90, 101 (2d Cir. 2021) (internal punctuation omitted); *see United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) ("It is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory[,] and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony."); *see also United States v. Cote*, 544 F.3d 88, 99–100 (2d Cir. 2008) (Sotomayor, J.) (reversing the district court's judgment of acquittal where the district court acquitted, in pertinent part, on "purported inconsistencies" and noting that such inconsistencies go "to the weight the jury should accord the evidence" and did not in that case "justify the grant of a judgment of acquittal"). Likewise, courts must appreciate that "the evidence need not have excluded every possible hypothesis of innocence." *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992); *see United States v. Jackson*, 345 F.3d 59, 66 (2d Cir. 2003) (same).

A note on inferences: "An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019). Impermissible

speculation, on the other hand, is "a *complete absence* of probative facts to support the conclusion reached." *Lavender v. Kurn*, 327 U.S. 645, 653 (1946) (emphasis added). The former requires deference, whereas the latter does not. *See Pauling*, 924 F.3d at 656.

Taken altogether, the court may grant a Rule 29 motion "*only* if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Mickens*, No. 20-258, 2021 WL 3136083, at *3 (2d Cir. July 26, 2021) (quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (emphasis added); *see Pitre*, 960 F.2d at 1120. Conversely, the court *must* sustain the jury's verdict "if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Mangano*, 128 F.4th 442, 464–65 (2d Cir. 2025) (internal quotations omitted).

### B.    Applying the Rule 29 Standard in Connection to Conspiracy Convictions

Deference to the jury's verdict "is especially important when reviewing a conviction of conspiracy […] because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Pitre*, 960 F.2d 1112, 1120–21 (2d Cir. 1992) (citations omitted). "[O]nce a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming." *Id.* at 1121.

A conspiracy is a partnership crime, distinct from a substantive offense, and features its own elements and penalties. *See Iannelli v. United States*, 420 U.S. 770, 777 (1975) ("Traditionally the law has considered conspiracy and the completed substantive offense to be separate crimes. Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act."); *Pinkerton v. United States*, 328 U.S. 640, 644 (1946) ("A

conspiracy is a partnership in crime. It has ingredients, as well as implications, distinct from the completion of the unlawful project." (internal citations omitted)). As such, it "poses distinct dangers quite apart from those of the substantive offense." *Iannelli*, 420 U.S. at 778.

This deference is not transformed into skepticism due to the existence of inconsistent verdicts between conspiracy charges and related substantive offenses. *See United States v. Chen*, 378 F.3d 151, 164 (2d Cir. 2004) (acquittal on substantive count does not prevent conviction on conspiracy count unless the proof required to prove the substantive charge and conspiracy are identical); *United States v. Maracle*, 282 F. App'x 891, 894 (2d Cir. 2008) (unpublished) (substantive and conspiracy charges with different elements required different proof). In this vein, a court within the Second Circuit has aptly observed: "[s]ince 1910, the Supreme Court and the Second Circuit have adhered to the view that the Government may charge and prove a conspiracy to defraud an agency of the United States under 18 U.S.C. § 371 without charging or proving any separate or overlapping substantive violation of a criminal statute." *United States v. Lingat*, No. 1:21-CR-573-MKV, 2024 WL 3594565, at *5 (S.D.N.Y. July 30, 2024).

Finally, regarding multiple object conspiracy charges, "when a defendant is convicted of a multiple object conspiracy by a general verdict, the conviction is sustainable if one of the conspiratorial objects is supported by the evidence, even if the other is not." *United States v. Duncan*, 42 F.3d 97, 105 (2d Cir. 1994) (citing *Griffin v. United States*, 502 U.S. 46, 49 (1991)); *see also United States v. Bilzerian*, 926 F.2d 1285, 1301–02 (2d Cir. 1991) ("A conspiracy conviction based on a multi-object conspiracy may be upheld so long as evidence is sufficient with respect to at least one of the criminal objectives.").

### C.    Applying the Rule 29 Standard in Split-verdict Cases

Finally, we address a question prompted by each of the defendant's many Rule 29 arguments: does an acquittal on one count assert an issue or fact preclusive effect on the Court's evaluation of the evidence undergirding the defendant's counts of conviction, as the defendant appears to assume?  For one hundred years, the answer has been no.

In *Dunn v. United States*, 284 U.S. 390 (1932), the Supreme Court held that a criminal defendant convicted by a jury on one count could not attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count.  Speaking through Justice Holmes, the Court stated:

> Consistency in the verdict is not necessary.  Each count in an indictment is regarded as if it was a separate indictment.  If separate indictments had been presented against the defendant for possession and for maintenance of a nuisance, and had been separately tried, the same evidence being offered in support of each, an acquittal on one could not be pleaded as *res judicata* of the other. Where the offenses are separately charged in the counts of a single indictment the same rule must hold.

*Id.* at 393.

In arriving at that conclusion, the Court looked to another leading jurist, Judge Learned Hand, who, on behalf of the Second Circuit, wrote that

> [t]he most that can be said in such cases [involving inconsistent verdicts] is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.  We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.

*Steckler v. United States*, 7 F. 59, 60 (2d Cir. 1925).

*Steckler*'s insight has endured for a century.  In *United States v. Powell*, the Supreme Court expressly rejected the defendant-respondent's position "that principles of res judicata

or collateral estoppel should apply to verdicts rendered by a single jury, to preclude acceptance of a guilty verdict . . . count where the jury acquits the defendant of the predicate felony." 469 U.S. 57, 64 (1984). The Court's bright-line rule that a defendant may "not upset" purportedly inconsistent verdicts "embodies a prudent acknowledgment of a number of factors," including that inconsistent verdicts may reflect a jury's "mistake, compromise, or [act of] lenity." *Id.* at 65. And whereas the defendant always enjoys the right to appeal a conviction, no such corollary right exists for the government "if it wishes to correct the jury's error." *Id.* "Inconsistent verdicts therefore present a situation where 'error', in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored." *Id.*

Such uncertainty does not double as an invitation to "subject to review" the jury's "collective judgment." *Id.* at 66. The "individualize assessment[s] of the reason[s] for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." *Id.* Because the jury's collective judgment is final and unreviewable, courts and litigants, both the government and the defense, "must accept the . . . judgment." *Id.* at 67. "A contrary conclusion would require speculation into what transpired in the jury room," an intrusion upon "the jury's sovereign space" that courts "properly avoid." *Yeager v. United States*, 557 U.S. 110, 122 (2009). And as the Supreme Court demonstrated just last year, this principle of letting inconsistent verdicts coexist operates to the benefits of defendants, too. *See McElrath v. Georgia*, 601 U.S. 87 (2024). In *McElrath*, the Supreme Court reversed a state supreme court's vacatur of *acquittals* that were inconsistent with counts of conviction supported by explicit factual findings and held that "[o]nce there has been an acquittal, our cases prohibit any speculation about the reasons for

a jury's verdict—even when there are specific jury findings that provide a factual basis for such speculation—because it is impossible for a court to be certain about the ground for the verdict without improperly delving into the jurors' deliberations." *Id.* at 97 (internal quotations omitted).

These principles also shape the court's evaluation of the sufficiency of the evidence. *See Powell*, 469 U.S. at 67. As *Powell* cautioned, sufficiency review "should not be confused with the problems caused by inconsistent verdicts." *Id.* Sufficiency "review involves assessment by the courts of whether *the evidence adduced at trial* could support any rational determination of guilty beyond a reasonable doubt." *Id.* (emphasis added). This analysis is entirely "*independent* of the jury's determination that evidence on another count was insufficient." *Id.* (emphasis added). Indeed, where a jury reaches seemingly inconsistent results, "principles of collateral estoppel—which are predicated on the assumption that the jury acted rationally and *found certain facts in reaching its verdict*—are no longer useful." *Id.* at 68 (emphasis added). For those reasons, "acquittals . . . have no issue-preclusive effect on charges that yielded convictions," let alone a factual-preclusive effect on sufficiency review. *Bravo-Fernandez v. United States*, 580 U.S. 5, 8 (2016) (Ginsburg, J.).

## III.  ANALYSIS

The defendant's Rule 29 motion challenges each of his seven convictions, often raising multiple arguments in support of each bid for vacatur. Globally, the defendant's motion fails because it imports principles of res judicata and issue-and-fact preclusion into sufficiency review, where, per Second Circuit and Supreme Court caselaw, they have no welcome. A proper sufficiency review shows that a rational jury could, based on the "evidence adduced at trial" convict the defendant of each of his counts of conviction: conspiracy to defraud the

United States (Count 1); Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances (Count 3); four counts of Obstruction of Justice (Counts 6, 7, 8, and 10); and False Statements or Representations to an Agency of the United States (Count 11). *Powell*, 469 U.S. at 67. And to the extent the defendant raises other challenges—lack of notice, multiplicity, duplicity, constructive amendment, prejudicial variance, and the like—each of those arguments fail, too, as byproducts of his erroneous fact-preclusion theory and in their own right. Accordingly, the defendant's motion should be denied in its entirety and the jury's verdict affirmed.

### A. The Defendant's Motion for a Judgment of Acquittal on Count 1 Should be Denied.

The defendant first challenges his conviction on Count 1.[256] Count 1 charged a conspiracy to defraud the United States. Red. Indict., at 4, ECF No. 1193, (filed Sept. 11, 2024). That conspiracy alleged two objects: (i) to defraud the DEA by interfering with and obstructing its lawful, legitimate functions and (ii) to commit bribery.[257]

The defendant's challenges to Count 1 are best read with a hub-and-spoke model in mind. The central hub from which the defendant's myriad arguments extend is that the jury's acquittal of his substantive bribery offense means that it could not have convicted him of conspiring to commit bribery, Count 1's second object, or considered such conspiracy when evaluating his guilt under the defraud clause. This argument, which sounds in principles of collateral estoppell, urges that the jury's acquittal exerts some kind of issue-or-fact preclusive effect cabining the Court's evaluation of the evidence on Rule 29 review.

---

[256] On October 10, 2024, the jury rendered a general guilty verdict on Count 1. *See* Jury Verdict, ECF. No. 1285, at 2 (dated Oct. 10, 2024)

[257] *See* Red. Indict., at 1–17, ECF No. 1193, (filed Sept. 11, 2024).

From there, the defendant articulates his various spokes. First among them is his apparent contention that the fact of the jury's acquittal on the substantive bribery charge is proof positive that it must have rejected Count 1's bribery conspiracy object and convicted of him of a conspiracy to defraud that was not alleged in the indictment. Specifically, he contends that, as a matter of law, the government "may not allege (and prove) disparate conduct as to the two different prongs"—that is, the offense prong and defraud prong of § 371—"as to the same indictment count." Rule 29 Mot., at 2. Then he gestures at the concept of duplicity, and claims—again, without citation—that "one set of conduct that is alleged under one prong cannot stand *alongside* a factually separate set of conduct alleged under the other prong in the same count." *Id.* at 14 (emphasis added and original emphases omitted). The defendant never quite spells out what he means by "factually separate . . . conduct" but his arguments next invoke two related principles: (1) that he lacked notice of the essential nature of the conspiracy alleged in Count 1; and (2) that the conspiracy alleged here contains multiple—or, in his words, duplicative—conspiracies requiring his acquittal. *See id.* at 16–19. His bottom-line conclusion, however, is that the jury, owing to its acquittal on the substantive bribery charge, could not have convicted him conspiring to accept bribes and it was required to convict of him of a form of defrauding the United States connected to "the receipt of [bribe] payments, not something short of that." R. 29 Mot., at 16. After that, the defendant next claims that the government did not sufficiently prove that he committed an overt act in furtherance of the conspiracy. *See id.* at 23–27.

The defendant's central thesis, however, is wrong—and as the hub collapses, so too do the spokes. Because the evidence adduced at trial permitted a rational jury to conclude that

the defendant committed both objects of the conspiracy, the Court should deny the defendant's motion as to Count 1.

### 1. The Defendant's arguments are foreclosed by Supreme Court and Second Circuit precedent.

At bottom, the defendant assumes that the jury's acquittal of his substantive bribery offense means that it could not have convicted him of conspiring to commit bribery, Count 1's second object, or considered such conspiracy when evaluating his guilt under the defraud clause. *See* R. 29 Mot., at 16–17. Consider, for example, the defendant's insistence that evidence of the bribery conspiracy cannot factor into the Court's consideration of the conspiracy to defraud the United States because "conduct based on the bribery scheme . . . was expressly *rejected* by the jury in its vote to acquit [the defendant] in Count 4." *Id.* at 22. Or look at the defendant's speculation that the jury must have convicted him on Count 1 "for protecting [ ] Selva and not reporting to the DEA that Selva was growing marijuana in his residence." *Id.* at 23. To the extent the defendant so much as acknowledges the multiple false reports he authored in the Anderson file, he urges that the Court "cannot rely on these purported acts as a basis to sustain the jury's conviction on Count 1 . . . because the jury did not base its verdict on those acts." *Id.* at 25. The problem for the defendant is that the animating principle of his entire brief, and the lynchpin to all his arguments against Count 1—*viz.*, that the jury's acquittal of Count 4, the substantive bribery count, exerts some kind of issue-or-fact-preclusive effect as to the Court's evaluation of Count 1—is wrong thrice over.

First, as discussed above, Rule 29 review requires courts to consider whether the "evidence adduced at trial" permits "any" rational jury to find the defendant guilty. *Powell*, 469 U.S. at 67. It does not ask the Court to identify the pieces of evidence that the defendant's *specific* jury must have credited and discredited to reconcile its seemingly conflicting verdicts.

This is so because, as Judge Hand explained one hundred years ago, an acquittal can reflect the jury's "assumption of a power which they had no right to exercise, but to which they were disposed through lenity." *Steckler v. United States*, 7 F.2d 59, 60 (2d Cir. 1925).

Though *Steckler* focused on how inconsistent verdicts may prejudice the government, the Supreme Court's recent decision in *McElrath*, illustrates that the danger inherent to meddling with jury verdicts, and guessing what occurred during deliberations, travels down a two-way street. 601 U.S. 87, 89 (2024). In that case, Georgia courts had nullified a jury's acquittal of the defendant and authorized his retrial. *Id.* The Supreme Court reversed, explaining that "[o]nce there has been an acquittal, our cases prohibit *any* speculation about the reasons for a jury's verdict. . . 'because it is impossible for a court to be certain about the ground for the verdict without improperly delving into the jurors' deliberations.'" *Id.* at 98 (quoting *Smith v. United States*, 599 U.S. 236, 252–53 (2023)).

It is precisely because "the inconsistent verdicts may favor the criminal defendant as well as the [g]overnment" that courts decline to "review . . . such convictions . . . ." *Powell*, 469 U.S. at 65. These principles preclude courts from "inquiring into a jury's thought processes," and, by extension, prohibit this Court from engaging in the guesswork, surmise, "indeterminable speculation," and mental gymnastics that the defendant does throughout his brief. *United States v. Zane*, 495 F.2d 683, 689–90 (2d Cir. 1974); *United States v. Acosta*, 17 F.3d 538, 544–45 (2d Cir. 1994) ("Even assuming that the verdict against Acosta was inconsistent with the verdicts as to his codefendants, we find no basis for relief, for it has long been established that inconsistency in jury verdicts of guilty on some counts and not guilty on others is not a ground for reversal of the verdicts of guilty."); *cf. United States v. Mahaffy*, 499 F. Supp. 2d 291, 296 (E.D.N.Y. 2007) (Weinstein, J.) ("The difficulty of applying collateral

estoppel in criminal cases lies primarily in the first step of the inquiry. '[I]t usually cannot be determined with any certainty upon what basis the previous jury reached its general verdict.'" (quoting *United States v. Gugliaro*, 501 F.2d 68, 70 (2d Cir. 1974))). As such, insofar as the defendant's entire sufficiency challenge proceeds from suggestions of what the jury "rejected", what the jury "must" have believed, and what the jury "base[d] its verdict on", it fails under established, black-letter law. R. 29 Mot., at 22, 23, 25.

Second and separately, the defendant misapprehends the law of both bribery and conspiracy when he urges that his "criminal liability under the defraud prong [of § 371] required . . . the receipt of [bribe] payments, not something short of that." R. 29 Mot., at 16. The defendant's discussion of the "defraud prong" refers to one of the two clauses of § 371 creating criminal liability. Specifically, § 371 punishes a conspiracy that has either or both of two objects: "to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose." 18 U.S.C. § 371; *see United States v. Ballistra*, 101 F.3d 827, 831 (2d Cir. 1996); Rule 29 Mot., at 6 (discussing § 371's two "prongs"). In this way, § 371 "prohibits two distinct types of conspiracies[:] conspiracies to defraud the United States and conspiracies to commit an offense against the United States." *Bilzerian*, 926 F.2d at 1301. The "defraud clause" is "broader" than its "offense clause" counterpart, which "governs a conspiracy to commit a specific offense[] defined elsewhere in the federal criminal code", and instead "covers agreements to interfere with or to obstruct [the] government's lawful functions", *id.*, and interfere with "integrity of the United States and its agencies", *United States v. Nersesian*, 824 F.2d 1294, 1313 (2d Cir. 1987).

Under *Iannelli*, a jury may convict a defendant of conspiring to commit a crime without convicting the defendant of committing the substantive crime. 420 U.S. at 777. The First

Circuit's application of *Iannelli* in *United States v. Previte* is instructive as to why the jury's acquittal of substantive bribery in this case affords the defendant no relief. 648 F.2d 73 (1st Cir. 1981). Specifically, in *Previte*, the defendant was charged with conspiring to defraud the United States and to commit violations of 18 U.S.C. §§ 201(f)–(g), proscribing the giving and receiving of gratuities by public officials. *Id.* at 75. The defendant was also charged with receiving bribes in violation of § 201(c). *Id.* The jury convicted the defendant of the conspiracy charge but acquitted on the substantive bribery counts. *See id.* On appeal, the defendant argued that the jury's acquittal on the substantive bribery count required, as a matter of law, an acquittal on the conspiracy charge. *See id.* at 76.

The First Circuit disagreed. Citing *Iannelli*, the court explained that "a conviction on the substantive gratuity offenses charged as the object of the conspiracy to which th[e] indictment refer[ed] could be sustained *without an agreement*, thus rendering the *conspiracy indictment* sufficient" under Supreme Court precedent. *Id.* at 79 (emphases added). In other words, because the elements of conspiracy to receive gratuities differed from that of receiving them, the jury could convict on conspiracy while simultaneously acquitting on the substantive charge. *See id.*

That logic applies here, too, not only because there is a difference between agreeing to accept bribes and, in the defendant's words, actual "receipt of [bribe] payments," but also because the elements of substantive bribery differ from those of bribery conspiracy such that, unlike the substantive bribery charge for which the defendant was acquitted, the defendant did not need to accept a single bribe for the jury to find him guilty of Count 1 based upon Object 2—the bribery conspiracy. *See* R. 29 Mot., at 16; Count 1 at ¶¶ 2(a), (b); *see also United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404 (1999) (bribery "requires a

69

showing that something of value was corruptly given, offered, or promised to a public official (as to the giver) or corruptly demanded, sought, received, accepted, or agreed to be received or accepted by a public official (as to the recipient) with intent, *inter alia,* "to influence any official act" (giver) or in return for "being influenced in the performance of any official act" (recipient)."); *United States v. Murray*, 618 F.2d 892, 898 (2d Cir. 1980) ("The essence of the crime of conspiracy is an agreement to put into effect an illegal project."); *United States v. Andrews*, 166 F. App'x 571, 572-73 (2d Cir. 2006) (Sum. Order) (affirming conviction for conspiracy to bribe a public official and rejecting a defense claim of retroactive misjoinder predicated upon the defendant's claim of spillover prejudice due to acquittal of substantive bribery count).

Accordingly, far from requiring the jury to accept that the defendant "recei[ved]" bribes to convict on Count 1, the law permitted the jury to convict the defendant of conspiring with others to commit bribery provided it found he "joined the conspiracy with an awareness of . . . the basic aims and purposes of the unlawful agreement." *See* Final Jury Inst., at 92; *accord United States v. Rosenblatt*, 554 F.2d 36, 39 (2d Cir. 1977) ("'Agreement is the essential evil at which the crime of conspiracy is directed' and it 'remains the essential element of the crime.'" (quoting *Iannelli*, 420 U.S. at 777 n. 10); *Rosenblatt*, 554 F.2d at 39 (explaining that convictions for conspiracy require the defendant to know of the "essential nature of the conspiratorial plan").

Third, Supreme Court precedent establishes that the jury could have found the defendant guilty of defrauding the United States—the first object of the conspiracy—even if it *did not* find that the defendant conspired to accept bribes. *See Griffin*, 502 U.S. at 58–60; *Duncan*, 42 F.3d at 105; *Bilzerian*, 926 F.2d at 1301–02 ("A conspiracy conviction based on a

multi-object conspiracy may be upheld so long as [the] evidence is sufficient with respect to at least one of the criminal objects.").  In so ruling, the *Griffin* Court approvingly quoted the Seventh Circuit, explaining:

> It is one thing to negate a verdict that, while supported by evidence, may have been based on an erroneous view of the law; it is another to do so merely on the chance—remote, it seems to us—that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient.

*Id.* at 59–60 (quoting *United States v. Townsend*, 924 F.2d 1385, 1414 (7th Cir. 1991)).  As explained *infra* Sec. III(A)(5)(a), a rational jury could find that the defendant conspired to defraud the United States.  So, even if the defendant was correct and the jury rejected the bribery conspiracy object of the conspiracy alleged in Count 1, his bid for vacatur fails for no other reason than the fact that it is foreclosed by Supreme Court precedent.  Consequently, the defendant's arguments should be rejected by this Court.

## 2.    The Defendant had notice of the conspiracy alleged in Count 1.

From these faulty premises, the defendant avers that he lacked notice of the scope of the conspiracy alleged in Count 1.  *See* R. 29 Mot., at 16–17 (arguing that because his "liability under the defraud prong required a connection to . . . the receipt of [bribes] . . . the indictment did *not* put [him] on notice that he could be convicted of a conspiracy under the defraud prong that . . . was *not* based on bribery").  Though every background premise of his assertion is wrong, the defendant's discussion of caselaw in support of this claim is equally dubious.  Specifically, the defendant cites *Rosenblatt* and claims, with little analysis, that the jury's conviction on Count 1 "was predicated on a theory not voted on by the grand jury or explained in the indictment."  R. 29 Mot., at 17.

Not only is this argument again premised upon the incorrect supposition that speculation of the jury's deliberations is proper on Rule 29 review, *see Powell*, 429 U.S. at 67, *Rosenblatt*, has zero application to this case. In *Rosenblatt*, the defendant was improperly convicted of conspiracy to defraud the United States because the government failed to plead or prove the essential nature of the fraud. *See Rosenblatt*, 554 F.2d at 41 ("It is an elementary principle of criminal pleading, that where the definition of an offense, whether it be at common law or by statute, "includes generic terms, it is not sufficient that the indictment shall charge the offense in the same generic terms as in the definition; but it must state the species, it must descend to particulars.").

Additionally, the "government stipulated . . . that Rosenblatt did not know the truth about [his co-conspirator's] activities" and the co-conspirator "led him to believe that the checks" the government accused him of laundering in a manner that defrauded the United States "were valid." *Id.* at 38. More specifically, the co-conspirator "told Rosenblatt that the purpose of the laundering operation was to help some payees evade taxes and to help other payees conceal kickbacks on government contracts." *Id.* The result, at trial, was that "both men agreed to defraud the United States, but neither agreed on the type of fraud." *Id.* Though the government urged the Second Circuit to affirm on the basis that Rosenblatt had intended to defraud the United States, the court rejected that argument considering the government's stipulation that Rosenblatt never agreed to the "central nature of the conspiracy" the government had alleged. *Id.* at 40–41.

This case is markedly different. The Indictment here clearly pleaded objects of the conspiracy and, as to the defraud prong (*see* Count 1 at ¶2(a)(i)-(ii)), alleged with specificity:

**COUNT 1**

**(Conspiracy to Defraud the United States)**

**The Grand Jury Further Charges That:**

1. The allegations of the Introduction are repeated and re-alleged and incorporated by reference as if set forth fully herein.

2. Beginning in or about 2008 and continuing until in or about August 2019, the exact dates being unknown, in the Western District of New York, and elsewhere, the defendant, **JOSEPH BONGIOVANNI**, did knowingly, willfully, and unlawfully combine, conspire, and agree with Michael Masecchia and others, known and unknown:

 a. to defraud the United States and the Drug Enforcement Administration (DEA), an agency of the United States, by interfering with and obstructing by means of deceit, craft, and trickery, the lawful and legitimate governmental functions and rights of the DEA, that is:

 i. the right to have its business and its affairs, and the transaction of the official business of the DEA conducted honestly and impartially, free from corruption, fraud, improper and undue influence, dishonesty, unlawful impairment and obstruction; and

 ii. the right to the conscientious, loyal, faithful, disinterested and unbiased services, decisions, actions and performance of his duties by the defendant, **JOSEPH BONGIOVANNI**, in his official capacity as a DEA SA free from corruption, partiality, improper influence, bias, dishonesty and fraud in dealing with the DEA and other law enforcement agencies;

The indictment also contained a detailed introduction, manner and means, and overt acts such that, unlike *Rosenblatt*, there is no question as to the contours of the charged conspiracy. For these reasons, the defendant was on notice of the "essential nature of the plan." *Rosenblatt*, 554 F.2d at 38.

And unlike in *Rosenblatt*, this case does not feature a government stipulation that the defendant lacked knowledge (which was important to part of the Second Circuit's analysis in *Rosenblatt*) of certain critical aspects of the agreement. Instead, it features a jury verdict wherein, to convict, the jury had to agree that the defendant knew of the essential nature of the agreement. *See* Final Jury Inst., at 92.

The defendant also cites the Sixth Circuit's decision in *United States v. Minarik*, 875 F.2d 1186 (6th Cir. 1989) for the proposition that he lacked "fair notice" of the government's theory of his liability under the defraud clause. *See* R. 29 Mot., at 20. But *Minarik*, too, is

73

inapposite.  In *Minarik*, the indictment charged the defendants with conspiring "to defraud the United States by impeding, obstructing, and defeating the lawful functions of the Department of the Treasury" following a single act of fraud acted upon the IRS.  875 F.2d at 1188.  The court overturned a jury verdict finding the defendants guilty of conspiracy to defraud the United States where the prosecution repeatedly changed the theory of the case throughout the proceeding before ultimately resting, on appeal, on the theory the defendants conspired to conceal assets from the Internal Revenue Service after receiving notice of assessment for taxes owed.  875 F.2d at 1187.  Recognizing a conspiracy under § 371 could be broad enough to be covered by both the defraud clause and the offense clause, the *Minarik* court reasoned "[o]nly by treating conspiracies to commit specific offenses exclusively under the offense clause of § 371 can multiple convictions and unnecessary confusion be avoided." *Id.* at 1194.  Thus, the court found the conviction for conspiracy to defraud the United States could not stand where the prosecution's ultimate theory of the case rested on conspiracy to violate a detailed tax statute.  *Id.* at 1196.

The Sixth Circuit later recognized the limited applicability of *Minarik*'s holding.  *See United States v. Mohney*, 949 F.2d 899, 903 (6th Cir. 1991) ("*Minarik*, then, by its own language, as well as by implication, created a limited rule to remedy the particular concerns raised by the facts of that case."); *United States v. Khalife*, 106 F.3d 1300, 1304 (6th Cir. 1997).  The Second Circuit has also characterized *Minarik*'s propositions as "unpersuasive." *Bilzerian*, 926 F.2d at 1301–02.

Regardless, the Sixth Circuit's decision in *Khalife* confirms that the defendant's reliance on *Minarik* is displaced.  In *Khalife*, the court identified three distinguishing characteristics: the confusion resulting from the prosecution's shifting theories of the case, the

limited nature of the act on which the conspiracy to defraud was predicated, and the lack of adequate notice due to the technical nature of the tax statute the defendants were alleged to have violated.  106 F.3d at 1304.  None of the factors supporting *Minarik* are evident here.[258]

First, the defendant's retrial was nearly identical to his initial trial, and thus the defendant had uncommonly detailed notice of the government's proof and theory in advance of the second trial.  Second, and relatedly, the government did not vacillate among theories of the case—the central problem in *Minarik*—but, rather, was consistent that the defendant's corrupt agreement to protect his friends and accept bribes reflected both fraud on the United States and a conspiracy to commit bribery.  *See United States v. Hurley*, 957 F.2d 1, 3 (1st Cir. 1992) (recognizing that "the primary problem in *Minarik* was not that the government charged defendants under the defraud clause, but that it repeatedly shifted its theory of the case").  Indeed, the defendant does not even allege that the government shifted its prosecutorial theory.  Third, whereas the indictment in *Minarik* alleged a general conspiracy to defraud the Treasury stemming from one act that could have been charged as a substantive tax crime, the defendant's indictment uses specific language, identifies the agency impeded, and explains how, and by whom, the agency was impeded in a detailed overview of the conspiracy's manner and means and a robustly detailed section of overt acts.  *See Mohney*, 949 F.2d at 904.  The indictment's detailed overview of the conspiracy reflected the reality that the defendant "participated in a longstanding and wide-ranging scheme to deceive" the DEA.  *Hurley*, 957 F.2d at 4.  And, *contra* the circumstances of *Minarik*, "[o]nly the defraud clause c[ould] adequately cover all the nuances of a conspiracy of the magnitude this case addresses."  *United*

---

[258]     Additionally, the government notes that where, as here, a defendant alleges a defect in the indictment, Rule 12(b)(3)(B)(iii) requires him to make a motion to dismiss prior to trial.  The defendant never filed such a motion before either *Bongiovanni I* or *Bongiovanni II*, and thus has arguably waived this argument.

*States v. Sturman*, 951 F.2d 1446, 1473 (6th Cir. 1991). As such, the indictment gives more than sufficient notice to the defendant as to the offense charged and provided him with sufficient information with which to prepare an adequate defense. Accordingly, the Court should the defendant's argument that the that the jury's conviction on Count 1 violated principles of notice.

### 3.    Count 1 did not allege multiple conspiracies and does not violate the doctrine of duplicity.

Relatedly, the defendant also appears to vaguely assert that Count 1 alleged multiple, duplicative conspiracies. *See* R. 29 Mot., at 10 (arguing that § 371 does not permit the government to prove differing conduct" under the statute's two clauses); *id.* (arguing that "the objects of the conspiracy charged must fit under both prongs of § 371: what is sufficient as to one must be sufficient as to both for the entire count to be proper"); *id.* at 14 (invoking the concept of "duplicity"); *id.* at 17 ("[B]ecause some things *can* defraud—but not be bribery— that subset of conduct *might* have been sufficient to convict if the government had *charged a separate § 371 count with only a Klein conspiracy that better explained [the defendant's] potential liability*" (third emphasis added)); *id.* at 17 n. 3 (arguing that there was "clearly . . . multiple conspiracies" alleged in Count 1). Taken altogether, the defendant appears to imply that Count 1 contains multiple, duplicative conspiracies. Insofar as the defendant claims that Count 1 alleges multiple conspiracies, the Court should reject his argument, as it conflates the existence of a conspiracy's multiple objects with the existence of multiple conspiracies. Finally, insofar as the defendant relatedly contends that Count 1 is duplicative, it should deem that argument waived and, for reasons similar to the above, meritless.

First, by way of brief background, under § 371 the government is permitted to prosecute the *same* conduct under both clauses. *See Bilzerian*, 926 F.2d at 1301–02 ("Although

it is recognized that the government may not obtain two convictions or punish the defendant twice for the same conduct by alleging violations of both the defraud and offense clauses of the conspiracy statute, it may simultaneously prosecute the same conduct under both clauses." (internal citations omitted)).

Just as well, the government may allege *different* objects as part of the *same* conspiracy. For example, in *United States v. Manton*, the government charged Martin Manton, by then a retired Second Circuit judge, in a single count Indictment of the following: (1) conspiring to commit offenses against the United States, to wit, by "corruptly to endeavor to influence, obstruct, and impede the due administration of justice in suits pending before certain courts of the United States"; and (2) conspiring to "defraud the United States of and concerning its right to have the lawful functions of the judicial power . . . exercised and administered free from unlawful impairment and obstruction, and more particularly its right to the conscientious, faithful, disinterested, and unbiased judgment and action of defendant Manton" as he sat on the Second Circuit. *Id.* at 837. The indictment further alleged that Manton:

> was a stockholder in, or wholly or substantially owned or controlled, a number of corporations, some of which are named; that Fallon[, Manton's co-conspirator,] was an intimate acquaintance of Manton; that the conspirators knew that certain cases would be, during the course of the conspiracy, pending in and before the Circuit Court of Appeals for the Second Circuit and certain district courts; that several cases, named and described, were pending from time to time in these courts between the years 1930 and 1939, in the decision of which Manton participated; that it was a part of the conspiracy that Fallon would hold himself out as intimately acquainted with Manton and would represent to litigants and parties interested in these and other cases that, by reason of such association and intimacy, he could and would procure action favorable to such litigants and parties; that Fallon would seek out litigants and parties interested in these cases and would be sought by them for the purpose of having Fallon procure such action, in virtue of Manton's office, position, power and influence; that Manton would

77

> accept and receive and agree to accept and receive sums of money as
> gifts, loans and purported loans in return for such action, and would
> corruptly act in each of these cases without regard to the merits.

*Id.*

On appeal, Manton argued that "the indictment sets forth in one count a number of distinct conspiracies" and, furthermore, that "the indictment [was] bad for duplicity because it allege[d] that the conspiracy contemplated the violation of a criminal statute and also the defrauding of the United States." *Id.* at 838, 839. The Second Circuit dispensed with both arguments. It concluded that that there was a single "conspiracy to obstruct the administration of justice and to defraud the United States . . . to be consummated by sale of judicial action to all willing to pay the price," and that Manton's appeal "confuse[d] the conspiracy, which was one, with its aims, which were many." *Id.* Moreover, the singular conspiracy at issue "constitute[d] the offense irrespective of the *number or variety of objects* which the conspiracy seeks to attain, *or whether any of the ultimate objects be attained or not*." *Id.* (emphases added). Manton's related duplicity argument did not fare much better: quoting the Supreme Court, the Second Circuit reminded its former colleague that "[t]he conspiracy . . . is the crime, and that is one, however diverse its objects." *Id.* at 839 (cleaned up).

The defendant's complaints of "differing conduct" under § 371's two clauses are just euphemisms for the "distinct" and duplicative "conspiracies" arguments rejected by the Second Circuit in *Manton*. *Compare id.* at 378–79, *with* Rule 29 Mot., at 10 ("§ 371 does not permit the government to prove differing conduct for the" offense clause and the defraud clause). That is why, despite significant effort, the defendant acknowledges that his argument, at bottom, sounds in multiplicity and duplicity. But those invocations are equally uncompelling.

Count 1 did not allege multiple, distinct conspiracies. Rather, it alleged a "general conspiracy, continuous in operation[,] and single in character, . . . constituting an agreement between [the defendant] and [others] by the terms of which," the defendant's co-conspirators, who included his close friends, would receive from the defendant "corrupt [law enforcement] action by him favorable to the[ir] interests." *Manton*, 102 F.2d at 838; *see* Red. Indict., at 4–17. This conduct rightfully implicated each of § 371's two clauses: the defendant's fraud deprived the DEA of its "right to the conscientious, loyal, faithful, disinterested, and unbiased services . . .", just as Manton's conduct deprived the federal judiciary of the same, and his corrupt agreement to provide protection to his co-conspirators in exchange for money implicated a bribery offense in the same way that Manton's touched upon obstructive of justice offenses. *Compare* Red. Indict., at 4(a)(ii), 4(c), *with Manton*, 102 F.2d at 836 (noting that Manton's conviction involved a conspiracy to "obstruct the administration of justice").

That "some [other] things"—presumably, the defendant's falsification of reports, burning of informants, manipulation of law enforcement colleagues, and "violations of [the defendant's] oath of office within an eleven-year timespan"—"might" also "have been sufficient to convict" on a "separate § 371 count" charging "only" under the defraud clause, R. 29 Mot., at 17, 19–20, is of no moment because those very behaviors were, like the bribery never charged under the offense clause in *Manton*, the ways in which the defendant "consumat[ed]" the corrupt agreement he had with his coconspirators, *Manton*, 107 F.2d at 839. Moreover, even if the jury did not accept the bribery conspiracy—a conclusion the Court, under Rule 29 review, cannot accept—it would not matter because the Court must sustain the conviction under Count 1 if the evidence supports but one of the conspiracy's objects. *See Griffin*, 502 U.S. at 58–60.

Nor does Count 1 violate the doctrine of duplicity. On this score, the defendant's duplicity argument is waived across multiple vectors. First, the defendant's invocation of duplicity is untimely, and it is well-settled that a defendant's failure to timely "object[ ] to duplicity is waived if not raised before trial or, at the least, before verdict." *United States v. Droms*, 566 F.2d 361, 363 (2d Cir. 1977); FED. R. CRIM. P. 12(b)(3) (listing a "duplicity" challenge to an indictment as among the "objections" that "*must be raised by pretrial motion*" (emphasis added)). The defendant's failure to raise a duplicity challenge is particularly inexcusable given that the text of Count 1 extensively lays out the two objects of the conspiracy and the defendant sat through an entire trial where a prior jury hung on Count 1. The defendant's re-trial on Count 1 involved substantially the same proof and the same prosecutorial theories; at no point did the defendant claim that Count 1 was somehow defective under a theory of duplicity. But that is not all: the argument is further waived for wont of development, as the defendant refers to duplicity, outright, only in passing and never cultivates a fulsome duplicity argument. *See Roman v. City of Mount Vernon*, No. 21-CV-2214 (KMK), 2023 WL 8719968, at *14 (S.D.N.Y. Dec. 18, 2023). Thus, the Court should deem the defendant's duplicity argument waived.

However, even assuming *arguendo* that defendant properly presents his duplicity argument, it still fails on the merits. Consistent with the law of § 371 prosecutions, a single conspiracy may contain multiple objects without becoming duplicitous. *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992); *Ballistrea*, 101 F.3d at 835; *United States v. Chang*, No. 18-CR-00681 (NGG), 2024 WL 2817494, at *17 (E.D.N.Y. May 31, 2024) (Gaurifis, J.) (When the charge is conspiracy, "an indictment is not duplicitous simply because it alleges that the conspiracy had multiple objects, and as long as the essence of the alleged crime is carrying

out a single scheme to defraud, then aggregation is permissible." (quoting *United States v. Ralston*, No. 19-CR-774 (JSR), 2022 WL 769257, at *7 (S.D.N.Y. Mar. 14, 2022) (Rakoff, J.))); *United States v. Hwa*, No. 18-CR-538 (MKB), 2021 WL 11723583, at *38 (E.D.N.Y. Sept. 3, 2021) ("[A] defendant may properly be charged with participating in a single conspiracy with multiple objects."); *United States v. Beech–Nut Nutrition Corp.*, 659 F. Supp. 1487, 1491–92 (E.D.N.Y.1987) (denying motion to dismiss indictment count on grounds that it alleged multiple conspiracies, finding that the indictment on its face alleged a "single conspiracy with multiple objects," and holding that "[w]hether the evidence adduced at trial supports the single conspiracy alleged in Count One is a question which must be resolved at trial") (citing *United States v. Alessi*, 638 F.2d 466, 472 (2d Cir. 1980)); *United States v. Szur*, No. 97–CR–108, 1998 WL 132942, at *11 (S.D.N.Y. Mar. 20, 1998) ("[S]ince the Indictment on its face sufficiently alleges a single conspiracy, the question of whether a single or multiple conspiracies exist is a question for the jury and is not a basis to dismiss the conspiracy count."). The defendant offers no basis to depart from these established principles. As such, the Court should reject the defendant's assertion that Count 1 alleged multiple and/or duplicative conspiracies.

### 4. There was no constructive amendment or variance.

Lastly, and again springing from the same faulty premises discussed above, the defendant argues that the proof at trial varied from Count 1's allegations and that the government constructively amended Count 1. *See* R. 29 Mot., at 12. Specifically, the defendant appears to argue that the jury convicted him due to "a limited interaction with his best friend and knowledge of a basement marijuana grow operation," and that he had insufficient notice of this incident because it was not alleged as an overt act. *Id.* at 18, 15.

Relatedly, the defendant appears to contend that the proof at trial effected a variance from the indictment's identification of the "specific member(s) with whom [the defendant] . . . conspired," namely, Masecchia. *Id.* at 11–12. In that respect, the defendant appears to assume, once more, that the jury convicted on a theory of conspiracy with Selva separate and apart from Masecchia and Serio. Both arguments proceed from the same incorrect assumption that principles of *res judicata*, collateral estoppell, and issue-and-fact-preclusion apply on Rule 29 review where juries render split verdict. *See, e.g.*, *id.* (making assumptions about what "the jury appears to have found"). Because the defendant's amendment argument proceeds from these faulty premises, the Court should pay it little mind.

But even putting those issues aside, the defendant's contentions fail because the proof at trial did not vary from that charged in the indictment. Likewise, the prosecution did not constructively amend Count 1 because the evidence at trial concerned the same elaborate scheme to defraud the United States and conspiracy to commit bribery as was described in the indictment.

A variance occurs when the evidence adduced at trial proves facts "materially different" than the facts alleged in an indictment. *United States v. Zingaro*, 858 F.2d 94, 98 (2d Cir. 1988). In most instances a variance will not require granting a judgment of acquittal, because the Second Circuit has "permitted significant flexibility in proof, provided that the defendant was given notice of the 'core of criminality' to be proven at trial." *United States v. Heimann*, 705 F.2d 662, 666 (2d Cir.1983) (quoting *United States v. Sindona*, 636 F.2d 792, 797–98 (2d Cir. 1980)). A variance only warrants entry of a judgment of acquittal when it results in "substantial prejudice" to the defendant. *See United States v. Rigas*, 490 F.3d 208, 226 (2d Cir. 2007); *United States v. McDermott*, 918 F.2d 319, 326 (2d Cir. 1990). To determine

whether a variance is prejudicial, the court must decide "whether the variance infringes on the 'substantial rights' that indictments exist to protect—'to inform an accused of the charges against him so that he may prepare his defense and to avoid double jeopardy.'" *United States v. Dupre*, 462 F.3d 131, 141 (2d Cir.2006) (quoting *United States v. D'Anna*, 450 F.2d 1201, 1204 (2d Cir. 1971)).

An amendment of the indictment differs from a variance in important ways. An indictment has been constructively amended "when the government's presentation of evidence and the district court's jury instructions combine to modify essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury." *United States v. Vebeliunas*, 76 F.3d 1283, 1290 (2d Cir. 1996) (internal quotations omitted); *United States v. D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012) ("To prevail on a constructive amendment claim, a defendant must demonstrate that the terms of the indictment are in effect altered by the presentation of evidence . . . which so modif[ies] essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." (internal quotation marks omitted))). That is, "[a]n amendment of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed upon them." *United States v. Frank*, 156 F.3d 332, 338 n.5 (2d Cir. 1998). The most significant difference between a variance and a constructive amendment is that the latter is a *per se* violation of the Fifth Amendment requiring no showing of prejudice. *Id.* But this is a difficult showing to make, as the Second Circuit has "consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at

trial." *United States v. Patino*, 962 F.2d 263, 266 (2d Cir. 1992) (internal quotation marks omitted).

The defendant's claims of variance should be rejected because the "allegation[s] [in the indictment] and the proof substantially correspond[ed]," the defendant was not misled as to the character of the charges against him, and he has not been deprived of his right to be protected against another prosecution. *Dupre*, 462 F.3d at 142. Once more, Count 1 alleged, in considerable detail, the nature, manner and means, and overt acts taken in furtherance of the charged conspiracy. As explained *infra*, there was overwhelming evidence to convict the defendant apart from his visit to Selva's home while it housed one of Serio's indoor grow operations. That the visit was not alleged as a separate overt act, when it does not have to be alleged as an overt act, did not effect a variance.[259] To the contrary, the prosecution is not precluded "from proving other unalleged over acts falling squarely within the charged scheme." *Salmonese*, 352 F.3d at 621. The Court should also reject the defendant's argument that the evidence at trial effected a variance from Count 1's allegations as to a conspiracy between himself and Masecchia. As explained *infra*, a rational jury could, based on overwhelming evidence, find a conspiracy between the defendant and Masecchia. That the defendant seeks on Rule 29 review to characterize his convictions through legally deficient and self-interested lens, and otherwise engage in "endless surmise" as to what the jury must have credited or not credited does not mean that the *evidence adduced at trial* effected a variance. *Zane*, 495 F.2d at 691; *Powell*, 469 U.S. at 67.

---

[259]    This conduct falls within the allegations set forth in, at a minimum, Count 1, Manner and Means ¶¶ 4 through 8, and Overt Act ¶¶ 23, 53.

By that same token, the defendant cannot persuasively claim that the prosecution constructively amended Count 1.  There is no deviation between the text of the indictment and the jury instructions, just as there is no deviation between the jury instructions and the "essence of the crime".  *D'Aemlio*, 683 F.2d at 417.  Similarly, neither the Court nor the prosecution modified an "essential element" of the crime.  *Id.*  Instead, the defendant's entire theory of constructive amendment follows from the "mental gymnastics" he engages in to reconcile the jury's verdicts with a theory of legally liability unsupported by viewing the facts in the light most favorable to the government.  *Zane*, 495 F.2d at 691.  The Court should reject the defendant's attempts to invent amendment where there is none in the proof.  Accordingly, these components of the defendant's challenges to Count 1 also fail.

### 5.    A rational jury could find that the defendant committed both objects of the conspiracy alleged in Count 1.

Contrary to the defendant's arguments, the evidence adduced at trial permitted a rational jury to conclude that he committed both objects of the conspiracy alleged in Count 1: the conspiracy to defraud the DEA and the conspiracy to commit bribery.  Accordingly, the defendant's challenge to Count 1 should be denied.

### a.    A rational jury could conclude that the defendant conspired with others to defraud the DEA.

There was ample evidence from which a rational jury could conclude that the defendant conspired with Michael Masecchia and others, known and unknown, to defraud the DEA—that is, to engage in a *Klein* conspiracy.  *See* Count 1, ¶¶2(a)(i)–(ii).  To prove a *Klein* conspiracy, the government must show "(1) that [the] defendant entered into an agreement (2) to obstruct a lawful function of the Government (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy." *United States v. Coplan*,

703 F.3d 46, 61 (2d Cir. 2012) (quoting *Ballistrea*, 101 F.3d at 832). A rational jury could conclude that the government proved each of these four elements beyond a reasonable doubt.

For starters (and taking the elements out of order), a rational jury could have found that "[t]he lawful functions and official duties of DEA [Special Agents] included, but were not limited to, initiating and conducting investigations; interviewing witnesses and DEA confidential sources; protecting the identity of witnesses and DEA confidential sources; protecting the integrity, confidentiality, and operational security of federal and state investigations; collecting and preserving evidence; preparing truthful and accurate DEA memoranda and reports; preparing search warrant and criminal complaint affidavits, documenting information that was helpful to current and future DEA investigations; arresting individuals who had violated federal and state drug laws; preparing and proposing DEA cases for prosecution; and acting with honesty and integrity in their representations and communications with prosecutors and other members of law enforcement."[260]

The evidence at trial permitted a rational jury to find that the defendant entered into an agreement to obstruct these lawful functions. With respect to the agreement, a rational the jury could have found an express agreement between the defendant and Selva who, acting in his capacity as a Serio DTO member, offered the defendant bribes in exchange for his protection of the Serio DTO, and where the defendant agreed to have Selva's "back" for free.[261] The jury also could have found that the defendant agreed to obstruct the DEA's lawful

---

[260]    *See* Ind., Intro. at ¶8, and Count 1 at ¶1.

[261]    *See* Tr. Tran., at 2–7, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva) (describing the negotiation with the defendant of bribe payments for protection, and the defendant's agreement).

functions for money.[262] Though Selva's testimony offered proof of an explicit agreement, a rational jury could have also concluded that the defendant entered into an implied agreement to protect Selva and Masecchia.  Specifically, a rational jury could have found that, at minimum, the defendant and Masecchia had an implied agreement dating back to at least the DEA Las Vegas office's investigation into Masecchia wherein the defendant would use his position to protect Masecchia.[263]

But even if the jury did not consider that evidence, it could have concluded that the defendant and Selva, whom the defendant knew to be a Serio DTO associate, entered into an implied agreement in which the defendant would obstruct the DEA's lawful functions when the defendant shared with Selva over repeated, regular meetings both general and specific law enforcement sensitive information relevant to the DTO.  *Cf. United States v. Aleskerova*, 300 F.3d 286, 293 (2d Cir. 2002) ("A defendant's knowing and willing participation in a conspiracy may be inferred from, for example, [his] presence at critical stages of the conspiracy that could not be explained by happenstance, . . . a lack of surprise when discussing the conspiracy with others, . . . [or] evidence that the defendant participated in conversations directly related to the substance of the conspiracy; possessed items important to the conspiracy; or received or expected to receive a share of the profits from the conspiracy.");

---

[262]    *See* Tr. Tran., at 88–89, ECF No. 1177, (dated Aug. 27, 2024) (Test. of Louis Selva).

[263]    *See* Tr. Tran., at 79–80, ECF No. 1464, (dated Sept. 16, 2024) (Test. Ron Serio); Tr. Tran., at 85, ECF No. 1177, (dated Aug. 27, 2024) (Test. of Louis Selva) ("Q: Before you became involved [in the grow operation], did you have a belief that Bongiovanni was already looking out for Masecchia . . . ? . . . . A: Yes.  I mean, like I mentioned, it was — he was aware of it because it was going on prior to that, from the '90s, so yes, I believe[d] he had his best interest.").  *See also* Tr. Tran., at 27 – 33, ECF No. 1335, (dated Sept. 24, 2024) (Test. Anthony Casullo) (testimony about conversation with the defendant and Masecchia never moving to Las Vegas); *id.* at 32 (stating that the defendant did not disclose that he was friends with Masecchia, or that he drove to college together with Masecchia); *id.* at 33 (testimony that, after Casullo's phone call with the defendant, Masecchia was never observed in the Las Vegas area, was never intercepted on the wire, and the investigation into Masecchia in Las Vegas was eventually closed).

*Landesman*, 17 F. 4th at 320 ("Both the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence.").

The jury could also find that the defendant did, in fact, obstruct the DEA's lawful functions. In addition to finding that the defendant shared general and specific information regarding law enforcement investigative techniques with Selva, it could have concluded that the defendant weaponized his status as a DEA Special Agent, and his access to DEA resources, to protect the Serio DTO.

For example, with respect to the defendant's misuse of the Anderson/C2-13-0026 file, a rational jury could have found that the defendant authored false and misleading reports, including reports that falsely stated Anderson was facing federal charges, reports that falsely stated he had had discussions with the U.S. Attorney's Office about seeking a federal indictment against Anderson and that Investigator O'Rourke was setting up a proffer with Anderson's counsel, reports that falsely stated that agents had "utilized air surveillance with the [ECSO] chopper" to locate grow sites associated with the Serio DTO, reports that he was awaiting USAO approval for previously-submitted GPS tracker warrants, reports that falsely stated that agents had conducted multiple surveillances of the Serio properties, reports that falsely stated that Remus Nowak—who, in truth and in fact, was Masecchia's nemesis—was a major marijuana trafficker and money launderer for the Serio DTO, reports that falsely stated that investigators were working toward "wire intercepts" into the Serio DTO, reports that falsely stated that the confidential source was no longer viable, and reports that falsely stated that Anderson had pleaded guilty to, and been sentenced for, a marijuana offense in New York state court. In that same vein, a rational jury could have concluded that the

defendant added the Serio brothers to the Anderson file, which was done without any apparent predication, because he *knew* based on *his* involvement in the conspiracy that Anderson was connected to the Serios.

Indeed, a rational jury could have found that the defendant's fraudulent investigation of Anderson and the broader Serio DTO served four purposes: (1) it ensured Anderson was not cooperating; (2) it ensured that further investigation of the marijuana shipment to Anderson would not link back to Masecchia and Serio; (3) it ensured that any information about Anderson would be funneled to the defendant—enhancing his ability to protect the group; and (4) it provided the defendant a sham file to issue subpoenas in order to set up a system whereby the defendant would receive DARTS deconfliction notices for individuals and associates he was protecting in perpetuity.

A rational jury could also conclude that the defendant thwarted the investigative activities of his law enforcement colleagues to protect the Serio DTO. Specifically, a rational jury could conclude that the defendant pulled Special Agent Leary off surveillance after Special Agent Leary identified Tom Serio's vehicle at a warehouse that the Serios used for storing drugs precisely because he did not want Special Agent Leary to develop facts that might inculpate the Serios in a bona fide criminal investigation. Moreover, a rational jury could conclude that the defendant asked Deming, the USAO financial investigator, specifically not to share his financial workup of Serio with HSI Special Agent Tolias, who was pursuing a white-collar investigation, precisely because he did not want Tolias to make headway into Serio. And if that was not enough, a rational jury could find that the defendant injected himself into the Town of Tonawanda's investigation into Vitale, one of the marijuana traffickers supplied by Serio, after Masecchia inquired about the organization's exposure of

the Tonawanda police department's search warrant into Vitale's residence.  A rational jury could have further found that the defendant's efforts to take control into the Town of Tonawanda's confidential source into Vitale, only to never use him, effectively shuttered any further investigation into Vitale and Serio.

Similarly, a rational jury could have found that the defendant closed and outed confidential sources associated with the Serio DTO to protect the organization and, ultimately, himself.  Specifically, a rational jury could have found that the defendant closed ██████ as a confidential source to ensure that ██████ did not provide *anyone* with cooperation into the Serio drug organization—and that he outed ██████ as a source to Selva precisely to eliminate ██████ as a threat to the Serio DTO.  From this and other evidence, the evidence was more than sufficient for the jury to rationally conclude that the defendant: made false statements and representations to other members of law enforcement, including his colleagues at the DEA; ensured that ██████ did not cooperate against anyone connected to the Serio DTO because cooperation into any member had the potential to expose every member (including Selva, Serio, Masecchia, and ultimately the defendant); and, exposed ██████ status as a DEA confidential source to Selva in order protect Serio, Masecchia, Selva, and others connected to their drug distribution activities.  Simply put, the defendant's agreement to disclose the identity of ██████ as a DEA confidential source—information that Selva explained to the defendant that Masecchia and Serio wanted in exchange for the bribes[264]—

---

[264]    *See* Tr. Tran., at 3–7, 90–96, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva); (explaining that Masecchia and Serio wanted to know if there were any informants, and that the defendant disclosed that ██████ was a confidential source); Tr. Tran., at 23–24, ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio). (explaining that he wanted to know if there were any informants, and that he was later advised that ██████ was an informant).

is, on its own, sufficient for the jury to find the defendant guilty of Count 1 (under either of the objectives).

A rational jury could likewise find that the defendant outed ██████ and ████ as confidential sources to Selva to help protect Selva, Masecchia, and other members of the Serio DTO. By providing Selva with the identities of informants, a rational jury could conclude that the defendant betrayed his oath and duties and exposed the DEA's most guarded secrets to a drug trafficker. Moreover, a rational jury could conclude from the defendant's exposure of the DEA's most guarded secret—the identities of confidential sources—to Selva that he knew that Selva was someone with an interest in learning the identities of confidential sources—*viz.*, the Selva was a drug trafficker. When paired with the fact that the defendant caused the subpoena of Selva's telephone number in connection with the Anderson file, through which the defendant ran his sham investigation into the broader Serio DTO, a rational jury could further conclude that the defendant knew of Selva's role in the Serio DTO.

The defendant's conduct *after* Serio's arrest in April 2017 also provided the jury ample fodder from which it could rationally have concluded that the defendant conspired with Masecchia and others to defraud the DEA. Recall that after Serio's arrest, Masecchia directed Selva to find out what had happened. When Selva spoke to the defendant the next day, the defendant explained that Serio's arrest had resulted from an ECSO investigation that he had been unaware of—which was, indeed, what had occurred. A rational jury could thus conclude that the defendant's participation in this conversation was, itself, evidence that the defendant had conspired with Selva to protect the Serio DTO, as there was no other reason for the defendant to discuss why he was unaware of ECSO's investigation into the Serio. This conclusion is further supported by the defendant's other comments to Selva. Specifically, a

rational jury could find that the defendant's assertion to Selva that he would "play stupid" if asked about Serio's arrest was evidence that honest, truthful statements from the defendant to his law enforcement colleagues would implicate him in Serio's drug trafficking organization.

In that respect, a rational jury could also conclude that the defendant made numerous false statements to federal law enforcement in June 2019 when HSI searched his residence and found the physical Serio casefile in his basement, including a statement for which he was convicted of 18 U.S.C. § 1001(a)(1) during his first trial, namely, that he removed the Serio working file regarding the Anderson/C2-13-0026 file from the DEA on February 1, 2019, his last day in the office, and kept it in his house because it was an old case and he thought it would come up again and he wanted to verify everything was on the up and up.[265]  The jury was permitted to conclude that the defendant's false statements, and his removal and concealment of the file was evidence of his consciousness of guilt on Count 1, and part of his scheme to conceal his protection of drug traffickers in violation of his oath and duties enforce and uphold the nation's drug laws as a member of the DEA.

In sum, a rational jury could have found that the defendant's intentional and knowing protection of drug traffickers, to include his exposure of DEA confidential sources, abuse of deconfliction databases, fabrication of evidence, authorship of false reports and misleading emails, and lies to fellow agents and law enforcement colleagues lying is the antithesis of a

---

[265]    *See* Jury Verdict, ECF No. 880, (dated April 12, 2024) (guilty verdict for Count 13 in *Bongiovanni I* for Obstruction of Justice related to removal and concealment for the Serio working file (C2-13-0026) and other DEA and law enforcement sensitive documents); *see also* Tr. Tran., at 56–63, ECF No. 1325, (dated Sept. 23, 2024) (Test. David Carpenter) (describing the defendant's interview with HSI Special Agent Curtis Ryan on June 6, 2019); Tr. Tran., at 203–239, ECF No. 1244, (dated Sept. 10, 2024) (Test. Curtis Ryan); Tr. Tran., at 3–15, ECF No. 1245, (dated Sept. 11, 2024) (Test. Curtis Ryan) (describing the defendant's interview on June 6, 2019).

DEA agent's oath and duty to uphold the rule of law and acting with integrity in their personal and professional actions.[266]  Based upon this and other evidence, there was sufficient for a rational jury to infer that the defendant violated his oath and duty to uphold the rule of law and to act with integrity in his personal and professional actions.[267]  Accordingly, the Court should deny the defendant's Rule 29 challenge as to Count 1's defraud object.

### b.    A rational jury could conclude that the defendant conspired to accept bribes.

The defendant also challenges the sufficiency of the evidence with respect to the conspiracy to accept bribes objective of the § 371 conspiracy charged in Count 1.  Specifically, the defendant argues that "there is no rational review of the evidence that [the defendant] . . . conspired to accept a bribe but did not accept a bribe."  R. 29 Mot., at 21 n. 4.  To the contrary, because a rational jury could conclude that the defendant conspired to accept bribes, the Court should also reject the defendant's sufficiency challenge to the second object of Count 1, the conspiracy to accept bribes, even though the Court may uphold the defendant's conviction "so long as the evidence is sufficient with respect to at least one of the criminal objects." *Bilzerian*, 926 F.2d at 1301–02.

Here, as noted earlier, the government was required to prove, in addition to the elements of conspiracy, that the defendant (1) demanded, sought, received, or agreed to receive or accept something of value; (2) that at the time, the defendant was a public official; and (3) that the defendant did so with the corrupt intent of being induced to do an act or to omit to do an act in violation of his official duty.  Final Jury Inst., at 140.

---

[266]    *See* Red. Indict., Intro. at ¶6, Count 1 at ¶1.

[267]    *See id.*

A rational jury could have concluded that the government proved those elements beyond a reasonable doubt. Based upon the evidence described above, there was more than sufficient evidence from which a rational jury could conclude that the defendant conspired with Michael Masecchia and others, known and unknown to:

> b. directly and indirectly, corruptly to give, offer, and promise a thing of value to a public official, with intent to induce the performance of an official act and to induce a public official to do an act and omit to do an act in violation of his lawful duty, as opportunities arose, in violation of Title 18, United States Code, Section 201(b)(1)(C); and

> c. directly and indirectly, corruptly to demand, seek, receive, accept, and agree to receive and accept, a thing of value personally, in return for being influenced in the performance of an official act and for being induced to do an act and omit to do an act in violation of official duty, as opportunities arose, in violation of Title 18, United States Code, Section 201(b)(2)(A) and 201(b)(2)(C).[268]

Even though direct evidence of a conspiracy is rare, *see Friedman*, 854 F.2d at 554, there was compelling direct and circumstantial evidence of the defendant's agreement to provide protection to his co-conspirators, that is, to be influenced in the performance of an official act and for being induced to do an act and omit to do an act in violation of official duty, as opportunities arose, in violation of Title 18, United States Code, Section 201(b)(2)(A) and 201(b)(2)(C).  For example, Selva's testimony detailed how the defendant "joined the conspiracy with an awareness of at least some of the basic aims and purposes of the unlawful agreement."  *See* Final Jury Inst. at 92; *See Cote*, 544 F.3d at 93 (discussing the Rule 29 standard).

Specifically, Selva testified that he negotiated bribe payments of, initially, $2,000 a month with the defendant on behalf of the Serio DTO (including Masecchia).  Selva further

---

[268]  *Id.* at Count 1 at ¶¶ 2(a), (b).

explained that in exchange for the monthly payment, the defendant would provide information about investigations and informants. Though, at first, the defendant displayed reluctance, he told Selva that he would "have his back". In the context of the defendant's role as a DEA Special Agent—and in view of the defendant's extensively documented, fraudulent investigation of the Serio DTO through the Anderson casefile—a rational jury could conclude that the defendant's statement to Selva that he would "have his back" was in reference to the defendant's performance of official acts—*viz.*, his use of DEA resources and his actions as a DEA Special Agent.

A jury could find that the defendant did, indeed, think about Selva's offer and ultimately agreed to have Selva's back—and the larger DTO's—in exchange for money: as Selva testified, after the initial meeting where the defendant agreed to protect, at minimum, Selva, he and the defendant met again. It was during this second meeting to negotiate bribes, that, according to Selva, the defendant agreed to provide protection and information in exchange for cash.[269] A jury could further find that the defendant later agreed to accept $4,000 per month in exchange for payments, as the Serio DTO's operations expanded.[270] Accordingly, there was more than sufficient for a rational jury to conclude that the defendant agreed to accept bribes and thus conspired to commit bribery.

### 6.   The government proved an overt act in furtherance of the conspiracy after October 31, 2014.

The defendant's last challenge to Count 1 centers on his allegation that the government failed to prove an overt act after October 31, 2014. *See* R. 29 Mot., at 27–31. Specifically, the

---

[269]    *See* Tr. Tran., at 3–7, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva).

[270]    *Id.* at 18–19.

defendant contends that, because the jury must have convicted him of Count 1 on the basis that he did not report Selva's grow operation to the DEA, none of the overt acts supported by the evidence occurring after his artificially narrow articulation of the conspiracy count.  *See generally id.* at 27 ("Relying on [the defendant's failure to report Selva's indoor grow operation] for a conviction also raises another deficiency: there is no proof of an overt act being taken after the alleged agreement."); *id.* at 27–28 (rejecting all overt acts that "hav[e] nothing to do with . . . Selva" or relates to "testimon[y] . . . couched in terms of bribery, which was rejected").  The defendant also claims that the Court cannot consider his removal of the Anderson/C2-13-0026 file in 2019 because "Selva's connections to the . . . file predated 2014." *Id.* at 28 n. 7.  These arguments fail for three reasons.

First, and again, the defendant's entire challenge launches from faulty premises. As even the defendant concedes, his removal of the Anderson/C2-13-0026 file in 2019 is but one of several alleged overt acts to occur well after October 31, 2014.[271] *See* R. 29 Mot., at 28. The only reason why the defendant does not admit that this overt act (and others) "counts" is because it "ha[s] nothing to do with [his failure to] report[] Selva's marijuana grow and, instead, are focused on events and actions . . . based on the bribery scheme that was rejected by the jury." *Id.*  Though the defendant purports to have insight into what the jury must, and must not, have believed, the Supreme Court and Second Circuit flatly prohibit this sort of indeterminable guesswork by courts on Rule 29 review.  *See McElrath*, 601 U.S. at 98; *Powell*, 469 U.S. at 65; *Zane*, 495 F.2d at 690; *Steckler*, 7 F.2d at 60; *Mahaffy*, 499 F. Supp. 2d at 296. Because there is simply no legal basis to credit the defendant's declaration that the jury

---

[271]    *See* Red. Indict., at 16, Count 1 ¶ 55.

rejected the bribery conspiracy, this alone is grounds to reject the defendant's challenge to the government's proof as to the defendant's commission of an overt act.

Second, even assuming *arguendo* that the jury convicted on Count 1 based exclusively on the defraud clause, his argument still fails. A rational jury could have concluded that the defendant agreed with his drug-trafficking friends to obstruct the DEA's investigations into their illicit activities without ever agreeing to accept money, in which case, the defendant's removal of the Anderson/C2-13-0026 file furthered the agreement by concealing the paper trail of the defendant's corruption from legitimate law enforcement review.

Third, and finally, beyond the removal of the file, however, a rational jury could conclude that the government proved 11 overt acts after October 31, 2014. *See* Count 1 at ¶¶ 22–58; Appendix A (Chart of Overt Acts). Overt Acts 27 and 28, *see* Count 1 at ¶¶ 48–49, also constitute the conduct underlying the jury's guilty verdicts on Counts 6 and 7, respectively. Based upon all the foregoing, there is ample evidence that the defendant or other members of the conspiracy committed overt acts as part of the conspiracy after October 31, 2014. Accordingly, the Court should reject the defendant's argument that he must be acquitted on Count 1 for want of proof of an overt act occurring after October 31, 2014.

**B.    The evidence adduced at trial permitted a rational jury to convict the defendant of the narcotics conspiracy charged in Count 3.**

Turning to Count 3, the narcotics conspiracy, the defendant argues that it "cannot stand because the object of the conspiracy was unclear and [the] proof of [an] agreement was likewise lacking." R. 29 Mot., at 31. Specifically, the defendant contends that the "trial lacked proof" that he "conspired to help Selva possess any marijuana he grew with an intent to distribute it" and, at best, "could establish only [his] knowledge of Selva's simple possession under 21 U.S.C. § 844." *Id.* The Court should reject this argument. Based on the same proof

discussed above, the jury could rationally conclude that the defendant conspired to distribute controlled substances in violation of 21 U.S.C. § 846.[272]

To convict the defendant of Count 3, the government had to prove two elements: (1) that two or more people entered into the unlawful agreement charged in the indictment; and (2) that the defendant knowingly and willfully joined and became a member of the conspiracy. *See* Final Jury Inst., at 114.  As a part of the Court's instruction, the jury was required to make a finding as to the amount of marijuana the defendant was responsible for under *Apprendi v. New Jersey*, wherein the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. 466, 490 (2000). However, as the Court stated in its final instructions, the jury could only address the issue of marijuana quantity if it agreed that the defendant entered into the narcotics conspiracy.  *See* Final Jury Inst. at 133.

The government satisfied this burden.  Specifically, as the government argued to the jury, when the defendant became aware of Selva's grow operation, he could have arrested Selva on the spot, and arrested Masecchia and Serio in short order.  But Selva and Masecchia knew that the defendant would never arrest them or compromise their drug trafficking operations because the defendant expressly agreed to, at minimum, protect Selva from law enforcement scrutiny.  In that respect, when viewed in context of the volumes of evidence summarized above as to Count 1—including defendant's statement to Selva reassuring Selva that he would have Selva's back, the information the defendant passed to Selva about informants, investigative techniques, and defendant's warnings to Selva to alert Masecchia to

---

[272]     Count 3 incorporated the allegations of Count 1 by reference.  *See* Red. Indict., at 26 ¶ 1.

be careful because law enforcement was on to him—there is compelling evidence in support of the jury's verdict on Count 3. *See Landesman*, 17 F.4th at 320 ("Both the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence.).

The defendant would have the Court ignore its own instructions and reverse the jury verdict because the jury did not find the defendant guilty of the amounts of marijuana, 1000 kilograms or 100 kilograms, which would have triggered a mandatory minimum term of imprisonment for Count 3. This request is perverse, as it asks the Court to declare that a defendant is entitled to an acquittal of a narcotics conspiracy count whenever a defendant is not convicted of a drug quantity triggering a mandatory minimum term of imprisonment. It also, once more, is premised upon the erroneous supposition that Courts are to view the facts not in the light most favorable to the government but in a manner that reconciles convictions with acquittals and minimizes the defendant's culpability. The former finds no support in the law, and the latter has been expressly rejected by the Second Circuit and Supreme Court for the better part of a century. *See, e.g.*, *Steckler*, 7 F.2d at 60.

Based upon the evidence summarized above, there can be no cognizable claim that the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt. *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999). The jury chose among competing inferences and rendered a verdict of guilty on Count 3. *See United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). Accordingly, the defendant's motion to dismiss Count 3 should be denied.

### C.    The evidence adduced at trial permitted a rational jury to convict the defendant of falsifying evidence as charged in Counts 6 and 7.

The defendant's next challenges his convictions on Counts 6 and 7.  Counts 6 and 7 charged the defendant with obstruction of justice pursuant to Title 18, United States Code, Section 1519 in connection with a false and misleading statements in DEA 6 reports he authored on November 4, 2014 and January 28, 2015, respectively, relating to the viability and credibility of ███ the confidential source who could penetrate the Serio DTO, and the status of a drug trafficking investigation in the Anderson/C2-13-0026 file.  As to Count 6, the defendant argues that the "evidence . . . is insufficient considering the jury's rejection of a bribery theory and connection to the Ron Serio DTO."  R. 29 Mot., at 36.  Regarding Count 7, the defendant contends that "the evidence cannot support a conviction . . . because the statements in the relevant DEA-6 memorandum were factually true."  *Id.* at 41.  Neither argument is persuasive.

First, as with his other claims, the defendant's sufficiency challenge as to Count 6 is impermissibly premised upon his purported insight into the jury's decision-making process and the suggestion that an acquittal of substantive bribery functions asserts an "issue-preclusive effect on charges that yielded convictions."  *Bravo-Fernandez*, 580 U.S. at 8.  It does not.  *See id.*  Accordingly, the entire premise of the defendant's challenge to his conviction as to Count 6 is wrong.

Second, the evidence was sufficient to support his conviction.  To convict the defendant of Counts 6 and 7, the government needed to prove three elements: (1) that the defendant altered or falsified or destroyed or mutilated or concealed or covered up or made a false entry in any record, document, or object that can be used to preserve information as alleged in the indictment; (2) that the defendant acted knowingly; and (3) that the defendant

acted with the intent to impede, obstruct, or influence an investigation of matter within the jurisdiction of a department or agency of the United States Government.  Final Jury Inst., at 159.

The Second Circuit's decision in *United States v. Rowland* offers insight into the nature of these elements.  There, Second Circuit analyzed the meaning of the term "falsify" and observed that "[d]ictionary definitions thus confirm that, in common usage, it is acceptable to say that someone "falsifies" a document when he creates a document that misrepresents the truth." *Id.* at 108.  The *Rowland* court concluded that "a defendant may violate § 1519 by creating a document that is false or *that misrepresents the truth—that is, was falsified." Id.* at 109 (emphasis added) (punctuation modified).  Indeed, in the court's view, Congress enacted § 1519 "to apply broadly to any acts to destroy or fabricate physical evidence so long as they are done with the intent to obstruct, impede or influence the investigation or proper administration of any matter, and such matter is within the jurisdiction of an agency of the United States." *Id.* at 109.  Turning to its analysis of the contracts at issue in *Rowland*, the court held that "[b]ecause the jury was entitled to conclude that both the Greenberg and Foley contracts were 'falsified' in the sense that they were created to misrepresent the true relationships among the parties, Rowland's convictions under § 1519 stand." *Id.* at 111.

Consistent with *Rowland*, the evidence at trial permitted a rational jury to conclude that the defendant falsified his November 2014 DEA-6 report.  Regarding the first element, the jury could also rationally conclude that the defendant's assertion that "[t]he confidential informant associated with th[e] [C2-13-0026] case/file is no longer viable and can not provide

credible information in furtherance of this investigation" was false.[273]  For starters, the defendant's statement that the confidential source was "no longer viable" implies that █████ had once been a viable informant.  However, the jury could rationally conclude that █████ was *never* viable as a DEA confidential source to infiltrate the Serio DTO because, for the reasons explained *supra*, the defendant conspired to protect the Serio DTO from investigation and promptly outed █████ as a confidential source to the organization to protect it.

Likewise, a jury could rationally conclude that the defendant's statement that █████ could "not provide credible information in furtherance of" his investigation into Serio was equally false because as █████ and Serio both testified, █████ had credible, accurate information into the DTO and could have made drug buys into Serio prior to the defendant outing him as a source to the DTO.[274]  The jury could further conclude that the defendant intentionally he signed █████ up as a confidential source to neutralize his ability to inform on the Serio DTO, which he ensured by outing █████ as an informant to Selva, who then told Masecchia, who then told Serio.  Indeed, a rational jury could conclude that by signing █████ up as a DEA confidential source, the defendant ensured that the Amherst Police Department would not use █████ to infiltrate the Serio DTO.  Additionally, a jury could rationally find that, after securing control of █████ with himself as the handling agent, the defendant promptly outed █████ as a confidential source to the drug organization through Selva.

---

[273]    Gov. Ex. 8C.

[274]    *See* Court Exhibit 3, Tr. Tran., ECF No. 1480, (dated Aug. 7, 2024) (Test. R.K.) (█████ testified that he could have "got to anybody" in Serio's organization at the time he was told by the defendant that he was being closed as a source); *see also* Tr. Tran., at 65–69, ECF No. 1467, (dated Sept. 20, 2024) (Test. Ron Serio) (testifying that R.K. had been present at his house for drug transactions before, that he learned from Masecchia that the defendant had told Masecchia that R.K. was an informant, and that before he had learned R.K. was an informant he would have sold drugs to him).

The jury could also view the defendant's interactions with his law enforcement partners vis-à-vis ███ as indicative of his corrupt scheme. In particular, a jury could find that when the defendant deactivated ███ on July 30, 2013, he intentionally withheld the fact of ███ deactivation from Nastoff, ███ co-controlling agent, so that Nastoff would not question the defendant about the deactivation.[275] The jury could also credit testimony from Gentile that the defendant effectively forged his signature to push through the deactivation paperwork.[276]

Thus, the jury could rationally conclude that (i) there was nothing confidential at all about ███ status as a DEA source to the very drug organization that the defendant was pretending to investigation; (ii) the defendant's statement that ███ could no longer provide credible information into the Serio DTO was false; and (iii) the defendant's authorship of the November 4, 2014, DEA-6 implying otherwise was part of his knowing and intentional effort to obstruct legitimate investigation into the Serio DTO. Accordingly, the Court should reject the defendant's sufficiency challenge as to Count 6.

Likewise, the Court should reject the defendant's efforts to overturn his conviction as to Count 7. In the defendant's view, every statement in the January 28, 2015, DEA-6 report upon which his conviction is based is factually true, and thus the jury could not convict him of falsifying the report. *See* R. 29 Mot., at 43–44. To the contrary, a rational jury could have found that several of the defendant's representations were false and misleading.

---

[275]    *See* Tr. Tran., at 147–150, ECF No. 1170, (dated Aug. 14, 2024) (Test. Shane Nastoff) (indicating that he had never seen the ███ deactivation form until becoming involved as a witness in the Bongiovanni case, and that he would not have signed the form if it had been presented to him back in 2013).

[276]    *See* Tr. Tran., at 26–27, ECF No. 1478, (dated Sept. 26, 2024) (Test. Mark Gentile) (stating that he believes that "somebody tried to duplicate my signature" on Gov. Ex. 9E-3); *see id.* at 71 (Q: So we talked a little bit about this form on direct, sir. You claim that this signature that's on this form down in block 12 is not your signature? A: That's correct.).

First, a jury could rationally conclude that the defendant's statement that "[a]ll defendant dispositions"—plural—"have been completed via form 210" was false, as the jury could rationally find that the defendant fabricated the DEA-210 for Anderson, which stated that Anderson had been convicted and sentenced for a marijuana charge in New York State court.[277]   Anderson himself readily admitted that he received the 200 pounds of marijuana without legal consequence.   Moreover, Anderson was the sole purported defendant with a completed disposition, notwithstanding the fact that the defendant's January report inflates the investigation's success.  Put simply, the defendant represented that there were multiple defendants with a disposition—there were not—and that Wayne Anderson was one of them—he was not.  The jury was thus permitted to conclude that, when the defendant wrote otherwise in paragraph 2 and represented that multiple dispositions were completed, in the Anderson/C2-13-0026 file, the defendant created a document and wrote it in a manner to misrepresent the truth.

Moreover, the January 28, 2015, DEA-6 made "Reference is made to all DEA-6 ROIs written to this case/file."[278]  As such, the jury was also permitted to find that the defendant incorporated prior false statements into each report (Gov. Ex. 8C & 8B) as follows:

> (a) that the case was adopted federally and pending federal charges in the Western District of New York.  *See* Gov. Ex. 8M;
>
> (b) that NYSP Investigator O'Rourke was waiting for a proffer interview with Wayne Anderson and that AUSA McCabe may seek a federal indictment in the near future. *See* Gov. Ex. 8K;

---

[277]    *See* Gov. Ex. 8B; *see also See* Tr. Tran., at 12, ECF No. 1157, (dated Aug. 8, 2024) (Test. Wayne Anderson) (explaining that his charges were dismissed); Tr. Tran., at 37, ECF No. 1336, (dated Sept. 26, 2024) (Test. Brian Burns) (describing that there was no conviction or sentence for Anderson in connection with the above-reported disposition).

[278]    *See* Gov. Ex. 8B.

(c) that the FBI, New York State Police, and New York Attorney General's Office were all participating in the investigation and "working towards wire intercepts." *See* Gov. Ex. 8I;[279]

(d) that the Erie County Sheriff's Office helicopter had been utilized to conduct aerial surveillance into the Serio DTO. *See* Gov. Ex. 8G;

(e) that GPS tracker search warrants had been prepared, submitted to the U.S. Attorney's office, and the defendant was awaiting approval of the GPS tracker warrants. *See id.*; and,

(f) that Remus Nowak was a major marijuana distributor and money launderer for the Serio DTO. *See* Gov. Exs. 8D, 8E, and 8F.

For the reasons explained *supra* regarding Count 1, Sec. III(A)(5)(a)–(b), the jury could have rationally concluded that each of these statements was false. Consequently, the evidence adduced at trial sufficiently supports the defendant's conviction on Count 7. Accordingly, the defendant's challenges to both Count 6 and Count 7 should be denied.

**D.    The evidence adduced at trial permitted a rational jury to convict the defendant of Count 8.**

Next, the defendant challenges his conviction as to Count 8. Count 8 charged obstruction of justice in violation of § 1519 for the defendant's authorship of false and misleading statements in a November 1, 2018, DEA internal memorandum relating to the nature of his relationship and extent of his communication with Gerace.[280] In the defendant's view, he must be acquitted because "the proof on Count 8 is insufficient given that [his]

---

[279]    The evidence established that the file, and the lack work in the file, *see* Gov. Ex. 8A, was wholly inconsistent with the investigative work necessary to pursue a wiretap. There were no pen registers, no controlled evidence purchases, no surveillances except for the single surveillance completed by Special Agent Leary that the defendant directed Special Agent Leary to abort; no trash pulls; and generally, a dearth of investigative work in the file. As a result, the jury was permitted to conclude that the defendant was not working towards wire intercepts, that the defendant's work in the file was a sham, and that he is guilty of Count 1.

[280]    *See generally* Gov. Ex. 97; Tr. Tran., ECF Nos. 1244, 1245, 1246, (dated Sept. 10–12, 2024) (Test. Curtis Ryan); Tr. Tran., ECF Nos. 1329, 1330, (dated Sept. 25–26, 2024) (Test. Gregory Machin); Tr. Tran., ECF No 1320, (dated Sept. 13, 2024) (Test. M.U.).

representations about his relations hip with [Peter] Gerace were substantially true in context." R. 29 Mot. at 47. Once more, the defendant's argument turns on an impermissible reweighing of the evidence which, viewed in the light most favorable to the government, was sufficient to sustain the defendant's conviction.

As relevant here, the defendant's November 1, 2018, memorandum contained the following statements:

> a. that "any contact [the defendant] [ ] had with Gerace in the past was minimal in person contact and primarily consisted of a random telephonic communication based on the fact we were childhood friends"
>
> b. the defendant would "sometimes randomly encounter Gerace at a restaurant or golf outing and ha[d] not made personal plans to meet him socially in several years."

A rational jury could have concluded that these statements were false. For starters, contrary to the defendant's claim that his "in person contact" with Gerace was minimal, and that his telephonic contact with Gerace was "random . . . [and] based on the fact" that the two were "childhood friends," a rational jury could have concluded that the defendant regularly socialized with Gerace, that his childhood friendship with Gerace persisted through adulthood, and sometimes involved cocaine use, and that the two had sustained, regular telephonic communication.

Specifically, the jury reviewed multiple photographs of the defendant and Gerace socializing with various girlfriends they had over the years. One photograph, taken in the summer of 2005, showed the defendant and Gerace with their then-girlfriends. The defendant's ex-fiancé testified that the defendant was close with Gerace and their double dates were always planned.[281] Several years later, in 2011, the defendant was again photographed

---

[281]     Gov. Ex. 426-1.

with Gerace, this time in Las Vegas, where Gerace's ex-girlfriend, testified that she and Gerace planned to meet the defendant for a vacation.[282]  Then, in the summer of 2018, the defendant and Gerace were again photographed standing adjacent to one another at a party.[283]  In addition to photographs depicting the defendant and Gerace socializing with one another over the course of thirteen years, telephone records—including 391 text messages between January 2015 and February 2019, as well as call records often depicting monthly phone calls over the course of several years—demonstrated sustained communication between the two.

Some of those text messages corroborated witness testimony establishing that the defendant was no stranger to Gerace's strip club, Pharoah's, a site of rampant drug use and prostitution.[284]  In particular, text messages between the defendant and Gerace from July of 2015 show Gerace instructing the defendant to enter Pharoah's through the employee entrance.[285]  Other text messages, from April 2018, evince that the defendant made plans to see Gerace "at pharaohs" [sic].[286]  Simply, this is not the stuff of the "random encounters" that the defendant represented in his official DEA memorandum.  And that the defendant believes that the jury *should* have viewed these messages through the lens of "support[ing] [his] description of a relationship based on childhood friendship" R. 29 Mot., at 49, does not mean

---

[282]    Gov. Ex. 490A.

[283]    Gov. Ex. 127.

[284]    *See* Tr. Tran., at 49–53 and 87–88, ECF No. 1215, (dated Sept. 5, 2024) (Test. K.L.) (observed the defendant at Pharoah's on three occasions); Tr. Tran., at 19, ECF No. 1145, (dated Aug. 7, 2024) (Test. A.P.) (met the defendant at Pharoah's); Tr. Tran., at 63–65, ECF No. 1177, (dated Aug. 27, 2024 (Test. Louis Selva) (went to Pharoah's with the defendant); Test. ▮▮▮▮ ▮▮▮▮ (Tran. Presently Unavailable) (testifying to seeing the defendant at Pharoah's).

[285]    Gov. Ex. 310D at 10.

[286]    *Id.* at 54.

that the jury was required to do so: a rational jury could have as easily (in the government's view, more easily) conclude that the enduring in-person contact and sustained telephonic activity between the defendant and Gerace revealed a close adult friendship between the two men, and that such friendship extended beyond discussions about their childhood

A jury could also rationally conclude that the defendant made these false statements to obstruct or influence the Department of Justice's Office of the Inspector General's investigation into him.  By November 2018, for instance, the defendant was aware that internal investigators were scrutinizing his relationship with Gerace.[287]  And, as the jury heard, for good reason, too: Gerace learned that law enforcement recovered photographs of his then-girlfriend from a search warrant in which the defendant was involved and provided a cocaine user and dealer with the defendant's business card and directed her to call the defendant if she ever needed to "get out of trouble".[288]  Additionally, the defendant used a dubious "cold approach" technique to approach Gerace after he was implicated in a DEA investigation—thereby alerting him that he was under investigation—all without disclosing the full scope of his relationship with Gerace to his DEA colleagues.[289]  What's more, the defendant misrepresented Gerace as his confidential source to FBI Special Agent Herbst, effectively neutralizing the FBI's investigation into Gerace; erupted at Special Agent Casullo upon learning that he was investigating Gerace; and provided insight into how law

---

[287]    Gov. Ex. 97; *see also* Tr. Tran., at 138–139, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva).

[288]    Tr. Tran., at 19, 25–26, ECF No. 1145, (dated Aug. 7, 2024) (Test. A.P.).

[289]    *See* Tr. Tran., at 22, 24, 27, 58–59, ECF No. 1144, (dated Aug. 7, 2024) (Test. Christopher Wisniewski).

enforcement could track burner phones used by drug dealers—such as Trac Fones—through an audio message from May 2017.[290]

The defendant's efforts to undermine this evidence all fall flat. It is of no moment, as the defendant contends, *see* R. 29 Mot., at 50, that the jury acquitted him of conspiring with Gerace to defraud the United States, because "[s]ufficiency-of-the-evidence review . . . . should be independent of the jury's" acquittal on another count. *Powell*, 469 U.S. at 67. Thus, the defendant's assertion that the jury "did not believe" evidence that the defendant "betrayed his official duty . . . in some way to protect [ ] Gerace" is nothing more than the kind of "guesswork" of the jury's deliberative process that courts may not engage in. *Yeager*, 557 U.S. at 122. Moreover, it is just as possible that the jury acquitted the defendant of the Gerace-related-conspiracy charges because it did not find sufficient proof of an *agreement* between the defendant and Gerace—not because it believed the defendant did not corruptly intervene on Gerace's behalf, and thus had a motive to obstruct the Department of Justice's investigation into his relationship with Gerace. At bottom, however, because neither the parties nor the court may speculate about possible reasons for the jury's acquittals, the acquittals lack any issue-or-fact-preclusive effect as to the Court's consideration of the evidence undergirding the defendant's convictions on other counts. And, here, because sufficient evidence adduced at trial supported each element of the § 1519 offense alleged in Count 8, the defendant's challenge to that conviction should be denied.

**E.    The evidence adduced at trial permitted a rational jury to convict the defendant of Count 10.**

---

[290]    *See* Gov. Exs. 310D at 42, 311; *see also See* Tr. Tran., at 142, ECF No. 1244, (dated Sept. 10, 2024) (Test. Curtis Ryan).

The defendant's penultimate challenge focuses on Count 10.  Like Count 8, Count 10 alleged that the defendant obstructed justice by making "false and misleading statements in a memorandum relating to the nature of his relationship with [Gerace] . . . to misrepresent the true nature of the relationship between [himself] and [ ] Gerace [] and to misrepresent the true nature of the relationship between [ ] Gerace [] and [Special Agent] Casullo" in a memorandum he authored on January 28, 2019.[291]  The defendant argues that the evidence is insufficient to sustain his conviction for two reasons.  First, he claims that "the jury could not have convicted [him]" on the basis that he "misrepresented his relationship . . . with [ ] Gerace" because "the contents of the memorandum do not discuss" their "relationship at all." R. 29 Mot., at 51.  Second, the defendant urges that each of the statements he made in the memorandum were literally true.  *See id.* at 51–53.  Because the defendant misapprehends the nature of his charge, as well as the evidence supporting it, his arguments must be rejected.

In its entirety, Count 10 alleged that:

> On or about January 28, 2019, in the Western District of New York, the defendant, **JOSEPH BONGIOVANNI**, did knowingly falsify and make false entries in a record and document with intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the Drug Enforcement Administration, Homeland Security Investigations, the Department of Justice, Office of Inspector General, and the Federal Bureau of Investigation, agencies of the United States, that is, the defendant, **JOSEPH BONGIOVANNI**, in an investigation regarding the nature of the relationship between the defendant and individuals involved in drug trafficking activities, including Peter Gerace Jr., and the drug trafficking activities of such individuals, made false and misleading statements in a memorandum relating to the nature of his relationship and extent of his communications with Peter Gerace Jr., in order to cover up, mislead, create a false justification for, and misrepresent the true relationship

---

[291]     *See* Tr. Tran., at 81–87, ECF No. 1335, (dated Sept. 24, 2024) (Test. Anthony Casullo) (reviewing Gov. Ex. 99, testifying that the statements the defendant made in the memorandum about Casullo are lies, and explaining that, he saw the defendant at Tappo Restaurant associating with Anthony Gerace and others).

> between the defendant **JOSEPH BONGIOVANNI** and Peter Gerace
> Jr. and to misrepresent the true nature of the relationship between Peter
> Gerace Jr. and a DEA Special Agent known to the Grand Jury.
> **All in violation of Title 18, United States Code, Section 1519.**[292]

Viewing "the evidence in its totality, not in isolate," a rational jury could have concluded that the defendant's January 28, 2019, memorandum contained false and misleading statements, and, thus, constituted a falsified document under § 1519.  For starters, a rational jury could have concluded that the defendant's first sentence was *not* literally true— *viz.*, that the defendant was "writing to inform [his supervisors] of information that he . . . acquired regarding the social affiliation and recent communications with [ ] Gerace by [Special Agent] [ ] Casullo and [Special Agent] Casullo's brother-in-law Phil Domiano."[293] That is because, consistent with the evidence outlined previously, a rational jury could have concluded that the defendant was trying to divert attention away from his own corrupt relationship with Gerace and undermine his colleague's credibility, a critical objective since Special Agent Casullo had first-hand knowledge of the defendant's racism and efforts to protect Gerace.  Because a rational jury could have concluded that the defendant's stated purpose for writing the memorandum was false, it could have concluded both that the record was falsified *and* that the defendant acted with corrupt intent.

Likewise, a jury could have rationally concluded that the defendant's representations about Special Agent Casullo's purported private meeting with Gerace were also literally false. Recall that the defendant wrote that he had "personally witness[ed] [Special Agent] Casullo

---

[292]    *See* Red. Indict., at 32–33, ECF No. 1193, (dated Sept. 11, 2024).

[293]    Gov. Ex. 99 (capitalization omitted); *see also* Tr. Tran., at 81–87, ECF No. 1335, (dated Sept. 24, 2024) (Test. Anthony Casullo) (reviewing Gov. Ex. 99, testifying that the statements The defendant made in the memorandum about Casullo are lies, and explaining that he was not friends with Peter Gerace or Phil Domiano).

*meeting* and drinking *socially* with [ ] Gerace *alone* at the Big Ditch Brewery and later at Tappo Italian Restaurant."[294]  The jury could have concluded that the defendant's characterization was literally false in light to Special Agent Casullo's testimony that he saw Gerace at a high school reunion attended by dozens of other people at Big Ditch Brewery and that it was Gerace who invited Special Agent Casullo across the street to Tappo to meet the defendant, who was socializing with Peter Gerace's drug-dealing younger brother and Serio DTO associate, Anthony Gerace.[295]  A jury rationally could have thus concluded that at no point was Special Agent Casullo drinking and dining "alone" with Gerace, contrary to the defendant's representations.

But even if the jury did not find the defendant's statements to be literally false, it could have found the entire memorandum misleading for reasons like those described above.  *See, e.g.*, *Rowland*, 826 F.3d at 110 ("If Rowland had written a memo to his file purporting to summarize the negotiations in this misleading way (that is, as business rather than political consulting), we think it plain that the memo would properly have been treated as a 'falsified' document."); *accord United States v. Sampson*, 898 F.3d 287, 301 (2d Cir. 2018) (concluding misleading conduct, even when literally true, is chargeable under § 1503).  That alone is sufficient to sustain the defendant's conviction on Count 10.  Accordingly, the defendant's sufficiency challenge to Count 10 should be denied.

**F.    The evidence adduced at trial permitted a rational jury to convict the defendant of Count 11.**

---

[294]    Gov. Ex. 99 (emphases added)

[295]    *See* Tr. Tran., at 81–87, ECF No. 1335, (dated Sept. 24, 2024) (Test. Anthony Casullo).

Lastly, the defendant challenges his conviction on Count 11. Count 11 charged the defendant of making a false statement to an agency of the United States in violation of 18 U.S.C. § 1001(a)(2). The jury concluded that the defendant lied to DOJ-OIG Special Agent David Carpenter when he stated that he had never initiated contact with Gerace.[296] The defendant contends that his "conviction on Count 11 cannot stand because [his] statement was the answer to a vague question in context." R. 29 Mot., at 54. Because the defendant's vagueness challenge is waived, Special Agent Carpenter's question was not vague, and because the evidence sufficiently established that the defendant violated § 1001(a)(2), the defendant's motion as to Count 11 should be denied.

First, insofar as the defendant seeks to levy vagueness challenge in the model of *United States v. Kerik*, 615 F. Supp. 2d 256 (S.D.N.Y. 2009), the Court should deem his claim waived. Federal Rule of Criminal Procedure 12(b)(3)(B)(iii) instructs that motions alleging an indictment's lack of specificity must be made prior to trial. The defendant's argument is that his statement is vague because it followed, in his view, an ambiguous question. *See* R. 29 Mot., at 55–56. But these are the very arguments that defendants are required to make prior to trial through a Rule 12 motion. Indeed, the very case the defendant relies on in support for his bid to overturn his false statement conviction, *United States v. Kerik*, involved a *pre-trial* motion to dismiss under Rule 12. 615 F. Supp. 2d at 260, 271.

In that case, the defendant argued that the false statement with which he was charged came on the heels of a "fundamentally ambiguous question." *Id.* at 271. Specifically, the defendant's false statement counts charged that he failed to disclose information that might

---

[296]     *See* Jury Verdict, at 12, ECF No. 1285, (dated Oct. 10, 2025).

be embarrassing to him, his family, or the President of the United States. *Id.* The defendant argued that "the veracity of his answers to questions about 'embarrassment' cannot, as a matter of law, be assessed objectively." *Id.* at 272. The district court agreed, concluding—pre-trial—that the term "embarrassing" is "open to interpretation," "fundamentally ambiguous," and "may not serve as a predicate for the false statement charges" in the indictment. *Id.* at 272, 274.

The defendant's argument echoes that in *Kerik*. The defendant urges that his denial of ever initiating contact with Gerace was vague and that Special Agent Carpenter's "question" was so wide-ranging as to "timeframe" and "methods of contact" that it was "fundamentally problematic"—that is, fundamentally vague. R. 29 Mot. at 55–56. It makes little sense to bless the defendant's attempts to raise post-trial an argument that, under the authority he cites, he could have asserted prior to the jury's empanelment. Rule 12, after all, operates to prevent this kind of "sandbagging": "remaining silent about [an] objection and belatedly raising the error only if the case does not conclude in his favor." *Puckett v. United States*, 556 U.S. 129, 134 (2009).

But even if the Court entertained the defendant's challenge to Count 11, *Kerik* is inapposite because Special Agent Carpenter's question was not "fundamentally ambiguous." In this Circuit, "[a] question is fundamentally ambiguous when it 'is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony.'" *Lighte*, 782 F.2d at 375 (quoting *United States v. Lattimore*, 127 F. Supp. 405, 410 (D.D.C. 1955)).

The meaning of the word "ever" is not something over which "men of ordinary intellect" could disagree. *Lighte*, 782 F.2d at 375. The term "ever" means "at any time."[297] Accordingly, Special Agent Carpenter's question to the defendant as to whether he had "ever" initiated contact with Gerace was not fundamentally ambiguous. This conclusion is especially supported by the defendant's sophistication as a twenty-year federal law enforcement veteran. Based upon the defendant's experience and in the context of their conversation, Special Agent Carpenter did not need to read a dictionary for the defendant to understand the meaning of the terms Special Agent Carpenter used.[298] Moreover, unlike in *Kerik*, the defendant's false statement did not relate to something subjective and indeterminable, such as another person's (i.e., the President's) embarrassment. Rather, it related to an objective truth—*viz.*, whether the defendant did, or did not, ever initiate contact with Gerace.

Lastly, the evidence enabled a rational jury to find the defendant guilty of Count 11. To prove Count 11, the government was required to prove the following five elements:

> (1) that on or about the date specified in the indictment, Mr. Bongiovanni made a statement or representation; (2) that the statement or representation was material; (3) that the statement or representation was false, fictitious, or fraudulent; (4) that the false, fictitious, or fraudulent was made knowingly and willfully; and, (5) that the statement or representation was made within the jurisdiction of the government of the United States.

Final Jury Instr., at 166.

---

[297]   *See Ever*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/ever, (last accessed Apr. 12, 2025).

[298]   Tr. Tran., at 157, ECF No. 1325, (dated Sept. 23, 2024) (Test. David Carpenter).

A rational jury could conclude that the evidence satisfied these elements. Specifically, a rational jury could have credited Special Agent Carpenter's testimony that he asked the defendant, "Did you ever initiate contact with Peter Gerace," and that the defendant replied, "No" during their March 29, 2019, interview.[299] A rational jury could have concluded that the defendant's denial was false because Special Agent Carpenter testified about dozens of examples, in calls and in texts, of the defendant initiating contact with Gerace.[300] At all times, Special Agent Carpenter testified the calls and texts were inconsistent with the statements and representations The defendant made to Special Agent Carpenter during the interview.[301] Accordingly, there was ample evidence from which the jury could determine the defendant's denial of ever initiating contact with Gerace was false.

A rational jury could also conclude that the statement was material, because it had the effect of minimizing and obfuscating the very kind of corrupt relationship between the defendant and Gerace that law enforcement was scrutinizing.[302] Relatedly, a jury could find that the statement was intentional and willful. *See Lighte*, 782 F.2d at 373 ("Although probing a declarant's intent poses difficulties, circumstantial evidence, including proof of a motive to falsify, often may serve to convince a reasonable juror beyond a reasonable doubt of a witness' criminal intent."). Here, the defendant abruptly retired under a cloud of suspicion

---

[299]    *See id.* at 43 (Q: What did the defendant say to you about his contact with Peter Gerace? A: He denied ever initiating contact.); *id.* at 75 (Q: And one of the questions that you asked in the interview was whether Mr. Bongiovanni initiated contact, quote, unquote, with Peter Gerace, right? A: Yes).

[300]    *Id.* at 43–52 (reviewing Gov. Ex. 358-A and outlining the number of calls and text messages where the defendant initiated contact with Peter Gerace)

[301]    *See generally id.*

[302]    *Id.* at 31 (describing why the topic of the defendant initiating contact with Peter Gerace was important to Carpenter's investigation).

surrounding his relationship with Gerace that included his submission of false and misleading memoranda about his relationship with Gerace as he prepared to leave the DEA;[303] wiped his DEA-issued cell phone;[304] and complained to witnesses that he was concerned about Special Agent Casullo (who the defendant knew wanted to investigate Gerace).[305]  And in the same conversation with Special Agent Carpenter, the defendant minimized or omitted evidence that he and Gerace went on a planned vacation together,[306] double-dated,[307] attended parties together,[308] and called each other regularly.[309] Each of these omissions and minimizations provided the jury with circumstantial evidence—and the necessary context—from which they could properly conclude that, when the defendant was asked if he ever initiated contact with the defendant, his false denial was knowing, willful, and motivated by corrupt intent. Accordingly, the defendant's motion to dismiss Count 11 pursuant to Rule 29 should be denied.

---

[303]     *See* discussion of Counts 8 and 10, *supra*.

[304]     *See* J. Stipulation, Court Ex. 5.

[305]     *See generally* Tr. Tran., ECF No. 1335, (dated Sept. 24, 2024) (Test. Anthony Casullo).*; see also* Tr. Tran., at 138–139, ECF No. 1178, (dated Aug. 28, 2024) (Test. Louis Selva) (describing that the defendant was concerned about Casullo); *see also* Tr. Tran., at 93, (dated Aug. 6, 2024) (Test. Dale Kasprzyk). (explaining that after he retired the defendant was seeking a job at M&T Bank through Kasprzyk and, during discussions, The defendant was "very concerned" about SA Casullo).

[306]     *See* Ex. 490A; *see also* Tr. Tran., at 11–19, ECF No. 1324, (dated Sept. 23, 2024) (Test. ███ ████ (describing the pre-planned vacation to Las Vegas including the defendant and Gerace and their significant others).

[307]     *See* Ex. 426-1; *see also* Tr. Tran., at 9 – 15, ECF No. 1320, (dated Sept. 13, 2024) (Test. M.U.) (describing going on double-dates with the defendant and his friend Peter Gerace).

[308]     *See* Gov. Ex. 310D at 5; *id.* at 15.

[309]     *See* Gov. Ex. 396G; *see also* Gov. Exs. 358, 358A.

## CONCLUSION

For all the foregoing reasons, and based upon all evidence adduced at trial, the defendant's Rule 29 Motion should be denied in its entirety.


DATED:  Buffalo, New York, April 14, 2025.


                                        MICHAEL DIGIACOMO
                                        United States Attorney


BY:    s/JOSEPH M. TRIPI
           s/NICHOLAS T. COOPER
           s/CASEY L. CHALBECK
           Assistant United States Attorney
           United States Attorney's Office
           Western District of New York
           138 Delaware Avenue
           Buffalo, New York 14202