09:37AM

1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK
2

   _____
3  UNITED STATES OF AMERICA,

                                          Case No. 1:19-cr-227
4                    Plaintiff,                      (LJV)
   v.
5                                         September 16, 2024

   JOSEPH BONGIOVANNI,
6

   _____Defendant._____
7

8        TRANSCRIPT EXCERPT - EXAMINATION OF D.J. GRANVILLE
           BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                  UNITED STATES DISTRICT JUDGE

10 APPEARANCES:          TRINI E. ROSS, UNITED STATES ATTORNEY
                         BY: JOSEPH M. TRIPI, ESQ.
11                           NICHOLAS T. COOPER, ESQ.
                             CASEY L. CHALBECK, ESQ.
12                       Assistant United States Attorneys
                         Federal Centre, 138 Delaware Avenue
13                       Buffalo, New York 14202
                         For the Plaintiff
14

                         SINGER LEGAL PLLC
15                       BY: ROBERT CHARLES SINGER, ESQ.
                         80 East Spring Street
16                       Williamsville, New York 14221
                           And
17                       LAW OFFICES OF PARKER ROY MacKAY
                         BY: PARKER ROY MacKAY, ESQ.
18                       3110 Delaware Avenue
                         Kenmore, New York 14217
19                         And
                         OSBORN, REED & BURKE, LLP
20                       BY: JOHN J. GILSENAN, ESQ.
                         120 Allens Creek Road
21                       Rochester, New York 14618
                         For the Defendant
22

   PRESENT:              BRIAN A. BURNS, FBI Special Agent
23                       MARILYN K. HALLIDAY, HSI Special Agent
                         KAREN A. CHAMPOUX, USA Paralegal
24

   LAW CLERK:            REBECCA FABIAN IZZO, ESQ.
25

1    **COURT DEPUTY CLERK:    COLLEEN M. DEMMA**

2    **COURT REPORTER:        ANN MEISSNER SAWYER, FCRR, RPR, CRR**

3                            Robert H. Jackson Federal Courthouse
                             2 Niagara Square
                             Buffalo, New York  14202

4                            Ann_Sawyer@nywd.uscourts.gov

5                            *    *    *    *    *    *    *

6

7            (Excerpt commenced at 12:27 p.m.)

12:27PM    8            (Jury is present.)

12:27PM    9            **THE COURT:**  You can call your next witness.

12:27PM    10           **MR. COOPER:**  Thanks, Judge, the government calls

12:27PM    11   D.J. Granville.

12:27PM    12

12:27PM    13   **D. J.  G R A N V I L L E**, having been duly called and sworn,

12:28PM    14   testified as follows:

12:28PM    15           **MR. COOPER:**  May I inquire, Judge?

12:28PM    16           **THE COURT:**  You may.

12:28PM    17

12:28PM    18               **DIRECT EXAMINATION BY MR. COOPER:**

12:28PM    19   Q.  Good afternoon, sir.  How are you?

12:28PM    20   A.  Good.  How are you?

12:28PM    21   Q.  I'm well.

12:28PM    22       Can you introduce yourself to the jury?

12:28PM    23   A.  DJ Granville, currently the Chief of Narcotics and

12:28PM    24   Intelligence with the Erie County Sheriff's Office.

12:28PM    25   Q.  And Chief Granville, where did you grow up at?

12:28PM   1   A.  City of Buffalo.

12:28PM   2   Q.  Have you had a career in law enforcement leading up to

12:28PM   3   your current position as the Chief of Narcotics and

12:28PM   4   Intelligence?

12:28PM   5   A.  Yes.

12:28PM   6   Q.  Can you describe for them a kind of 30,000-foot view how

12:28PM   7   you progressed up to that role?

12:28PM   8   A.  I started in and around August of 1998 with the Buffalo

12:28PM   9   Housing Police.  I was there for approximately seven years.

12:28PM   10  The majority of that time was spent at the FBI, what's now

12:28PM   11  the Safe Streets Task Force.

12:28PM   12     They then closed up shop, disbanded the department.

12:28PM   13  I got hired by the NFTA police in 2005 or so.  I was there

12:28PM   14  for approximately three years.  And then got picked up by the

12:29PM   15  Sheriff's Office.

12:29PM   16  Q.  So would you have been picked up by the Sheriff's Office

12:29PM   17  sometime around 2008?

12:29PM   18  A.  Yes.

12:29PM   19  Q.  And what different roles have you held in the Sheriff's

12:29PM   20  Office between '08 and 2024?

12:29PM   21  A.  I was an undercover deputy for a bit.  I was a road

12:29PM   22  patrol officer for a little while, a detective in narcotics,

12:29PM   23  senior detective in narcotics, and then ultimately the

12:29PM   24  position I'm in now.

12:29PM   25  Q.  Got it.  Between the time that you spent as a detective,

| 12:29PM | 1 | a senior detective, and the chief, how long have you been |
| 12:29PM | 2 | involved in narcotics-related investigations? |
| 12:29PM | 3 | A.  14, 15 years. |
| 12:29PM | 4 | Q.  During the course of that time, have you worked with |
| 12:29PM | 5 | confidential sources? |
| 12:29PM | 6 | A.  Yes. |
| 12:29PM | 7 | Q.  Have you worked on different types of drug investigations |
| 12:29PM | 8 | like different substances? |
| 12:29PM | 9 | A.  Yes. |
| 12:29PM | 10 | Q.  Have you worked weed cases? |
| 12:29PM | 11 | A.  Yes. |
| 12:29PM | 12 | Q.  Have you worked cocaine cases? |
| 12:29PM | 13 | A.  Yes. |
| 12:29PM | 14 | Q.  Have you worked heroin cases? |
| 12:29PM | 15 | A.  I have. |
| 12:29PM | 16 | Q.  During the course of that experience, have you obtained |
| 12:30PM | 17 | search warrants? |
| 12:30PM | 18 | A.  Yes. |
| 12:30PM | 19 | Q.  Have you participated in the execution of search |
| 12:30PM | 20 | warrants? |
| 12:30PM | 21 | A.  I have. |
| 12:30PM | 22 | Q.  I asked you a moment ago about handling confidential |
| 12:30PM | 23 | sources.  Have you -- have you had a confidential source |
| 12:30PM | 24 | during the course of your career where the person didn't |
| 12:30PM | 25 | presently have any information, but you kept him open anyway? |

12:30PM     1    A.  Yes.

12:30PM     2    Q.  Okay.  Why would you do that, keep someone open?

12:30PM     3    A.  Just -- it -- it would -- it would depend.  If -- if it

12:30PM     4    was somebody specifically that was working for, you know,

12:30PM     5    money, or something like that, we would -- we would keep

12:30PM     6    them open only because it wasn't like there was a court case

12:30PM     7    that was being adjudicated or something along those lines.

12:30PM     8    Q.  Got it.  Now, if somebody -- if you keep an informant

12:30PM     9    open, can they develop information in the future that could

12:30PM    10    be useful to you in a future investigation?

12:30PM    11    A.  Yes.

12:30PM    12    Q.  Does that happen, informants learn things out on the

12:30PM    13    street over time and bring them to you?

12:30PM    14    A.  Yes.

12:30PM    15    Q.  Okay.  And if an informant does have a court case, can

12:31PM    16    you work with state and federal prosecuting authorities to

12:31PM    17    keep them open if you wanted to?

12:31PM    18    A.  Yes.

12:31PM    19    Q.  Is that something that happens with frequency?

12:31PM    20    A.  It has, yes.

12:31PM    21    Q.  What were your roles as a senior detective in the

12:31PM    22    narcotics unit of the Erie County Sheriff's Office?

12:31PM    23    A.  I supervised the day-to-day activities of detectives and

12:31PM    24    deputies that were assigned to narcotics.

12:31PM    25    Q.  Okay.  And during the course of your career, both as a

| 12:31PM | 1 | detective, senior detective, and chief, can you estimate for |
| 12:31PM | 2 | the jury about how many different search warrants you've |
| 12:31PM | 3 | participated in executing? |
| 12:31PM | 4 | A.   North of a thousand. |
| 12:31PM | 5 | Q.   How many different search warrants have you participated |
| 12:31PM | 6 | in drafting or worked on cases where a search warrant was |
| 12:31PM | 7 | drafted? |
| 12:31PM | 8 | A.   Hundreds. |
| 12:31PM | 9 | Q.   Are you aware of the different sorts of investigative |
| 12:32PM | 10 | techniques that can be used to obtain a search warrant in a |
| 12:32PM | 11 | drug case? |
| 12:32PM | 12 | A.   Yes. |
| 12:32PM | 13 | Q.   Can that include information from an informant? |
| 12:32PM | 14 | A.   Yes. |
| 12:32PM | 15 | Q.   Can it include information you develop by going out and |
| 12:32PM | 16 | doing surveillance? |
| 12:32PM | 17 | A.   Yes. |
| 12:32PM | 18 | Q.   Hey, is going out and doing surveillance an important |
| 12:32PM | 19 | part of a drug investigation? |
| 12:32PM | 20 | **MR. MacKAY:**  Objection, 403 cumulative at this point |
| 12:32PM | 21 | with this line. |
| 12:32PM | 22 | **THE COURT:**  Sustained. |
| 12:32PM | 23 | **MR. COOPER:**  I'll move on, Judge. |
| 12:32PM | 24 | **BY MR. COOPER:** |
| 12:32PM | 25 | Q.   During the time that you've worked on narcotics cases, is |

12:32PM    1    it your understanding that there's sometimes a nexus between

12:32PM    2    narcotics cases and -- and violent crimes like burglary or

12:32PM    3    robbery?

12:32PM    4    A.   Yes.

12:32PM    5    Q.   Okay.  And do you work at the Erie County Sheriff's

12:32PM    6    Office with other law enforcement partners when investigating

12:32PM    7    certain criminal activity?

12:32PM    8    A.   Yes.

12:32PM    9    Q.   Do you sometimes work with the Buffalo police?

12:32PM   10    A.   Yes.

12:32PM   11    Q.   Do you sometimes work with the State police?

12:33PM   12    A.   Yes.

12:33PM   13    Q.   And do you also sometimes work with federal law

12:33PM   14    enforcement agencies?

12:33PM   15    A.   Yes, we do.

12:33PM   16    Q.   You mentioned earlier that you had earlier in your career

12:33PM   17    worked on the FBI, Safe Streets Task Force; is that correct?

12:33PM   18    A.   That's correct.

12:33PM   19    Q.   Does the Erie County Sheriff's Office work with the FBI,

12:33PM   20    Safe Streets Task Force?

12:33PM   21    A.   Yes.

12:33PM   22    Q.   In your experience working on narcotics investigations,

12:33PM   23    are large-scale narcotics traffickers subject to being

12:33PM   24    victimized for burglary or robbery more than the average

12:33PM   25    person?

| | | |
|---|---|---|
| 12:33PM | 1 | A.  Yes, they are. |
| 12:33PM | 2 | Q.  Why is that? |
| 12:33PM | 3 | A.  Because they tend to possess, whether it's large amounts |
| 12:33PM | 4 | of U.S. currency, large quantities of drugs, jewelry, or |
| 12:33PM | 5 | items that are of value. |
| 12:33PM | 6 | Q.  I want to speak with you now about a specific |
| 12:34PM | 7 | investigation.  Did there come a time in 2017 when you began |
| 12:34PM | 8 | working with the FBI, Safe Streets Task Force that led |
| 12:34PM | 9 | ultimately to an individual named Ron Serio? |
| 12:34PM | 10 | A.  Yes. |
| 12:34PM | 11 | Q.  Can you describe for the jury how that investigation |
| 12:34PM | 12 | began and what led it in the direction of Ron Serio?  Tell |
| 12:34PM | 13 | them about that. |
| 12:34PM | 14 | A.  The FBI in and around 2017 brought a confidential |
| 12:34PM | 15 | informant to us who described in great detail plans that |
| 12:34PM | 16 | individuals were making to rob Ron Serio who resided at an |
| 12:34PM | 17 | address in -- on Lebrun in the Town of Amherst.  And he was |
| 12:34PM | 18 | also utilizing a secondary address on West Grimsby.  And the |
| 12:34PM | 19 | intent was they were gonna rob Mr. Serio of his alleged drugs |
| 12:34PM | 20 | and money at those two locations. |
| 12:34PM | 21 | Q.  When law enforcement became aware that there was a plan |
| 12:35PM | 22 | being discussed or in place to rob Ron Serio, is that the |
| 12:35PM | 23 | sort of thing that you, in law enforcement, can sit and watch |
| 12:35PM | 24 | and wait for it to happen? |
| 12:35PM | 25 | A.  No. |

12:35PM  1   Q.  Why not?

12:35PM  2   A.  It's very dangerous.  Not only to -- not only for us, but

12:35PM  3   for the intended victims, whether they're drug dealers or

12:35PM  4   not, of the robbery.  And it's dangerous to the community.

12:35PM  5   Q.  So what did you decide to do at that point with the

12:35PM  6   information that you had?

12:35PM  7   A.  We -- we conducted surveillance of the Lebrun Road

12:35PM  8   address.

12:35PM  9   Q.  Okay.  And just to kind of generally put a timeframe on

12:35PM  10  this, are we talking about sometime in April of 2017?

12:35PM  11  A.  Yes.

12:35PM  12  Q.  From the time that you first received this information,

12:35PM  13  from -- who did you receive that information from again?

12:35PM  14  A.  It was from the FBI who was dealing with a confidential

12:35PM  15  informant.

12:35PM  16  Q.  Got it.  From the time that you initially received that

12:35PM  17  information from the FBI until the time that you got out

12:35PM  18  doing surveillance, how much time are we talking about?

12:36PM  19  A.  It was less than two weeks.

12:36PM  20  Q.  Okay.  In that timeframe, did you -- were you a

12:36PM  21  supervisor or a chief at that point, do you recall?

12:36PM  22  A.  I believe I was the senior detective.

12:36PM  23  Q.  Got it.  And as the senior detective, did you supervise

12:36PM  24  the surveillances that were done in that -- in that

12:36PM  25  investigation?

| | | |
|---|---|---|
| 12:36PM | 1 | A.  I did. |
| 12:36PM | 2 | Q.  Was there surveillance done on Ron Serio? |
| 12:36PM | 3 | A.  There was. |
| 12:36PM | 4 | Q.  Okay.  And where was he living at at that time? |
| 12:36PM | 5 | A.  He was living on Lebrun in the Town of Amherst. |
| 12:36PM | 6 | Q.  And is Lebrun the name of the street? |
| 12:36PM | 7 | A.  Yes. |
| 12:36PM | 8 | Q.  Okay.  Do you recall what that address looked like? |
| 12:36PM | 9 | A.  I do. |
| 12:36PM | 10 | Q.  Okay. |
| 12:36PM | 11 | **MR. COOPER:**  Ms. Champoux, can we pull up what's in |
| 12:36PM | 12 | evidence as Government Exhibit 42A-33. |
| 12:36PM | 13 | **BY MR. COOPER:** |
| 12:36PM | 14 | Q.  Do you recognize that? |
| 12:36PM | 15 | A.  I do. |
| 12:36PM | 16 | Q.  What is that? |
| 12:36PM | 17 | A.  That's the address in which Ron Serio was living. |
| 12:36PM | 18 | Q.  Now at the time you got this information from the FBI |
| 12:36PM | 19 | that there was this planned robbery, did you have an open |
| 12:36PM | 20 | file investigating Ron Serio? |
| 12:37PM | 21 | A.  No. |
| 12:37PM | 22 | Q.  Did you jump out and do some surveillance? |
| 12:37PM | 23 | A.  We ultimately did, yes. |
| 12:37PM | 24 | Q.  And was this the location where Ron Serio was living when |
| 12:37PM | 25 | you began that in April of 2017? |

12:37PM    1    A.  Yes.

12:37PM    2    Q.  You described for us a moment ago that your investigation

12:37PM    3    started with some surveillance.  Can you describe how it

12:37PM    4    progressed from there?

12:37PM    5    A.  Information was given to us by the FBI via the

12:37PM    6    confidential informant that there was an individual on

12:37PM    7    Huntington in the City of Buffalo that was involved in drug

12:37PM    8    activity with Mr. Serio.

12:37PM    9    Q.  What did you do at that point?

12:37PM   10    A.  We developed probable cause for a search warrant for that

12:37PM   11    address on Huntington.

12:37PM   12    Q.  How did you do that?

12:37PM   13    A.  Just based on the informant's observations and

12:37PM   14    reliability, we were able to bring that person in front of a

12:38PM   15    judge who then authorized a search warrant for an address on

12:38PM   16    Huntington.

12:38PM   17    Q.  Got it.  Now, did you continue to do surveillance on both

12:38PM   18    that location at Huntington and the location at Lebrun that

12:38PM   19    we're looking at here?

12:38PM   20    A.  Yes.

12:38PM   21    Q.  Did you do surveillance simultaneously on both those

12:38PM   22    locations?

12:38PM   23    A.  We did.

12:38PM   24    Q.  I want to direct your attention now to April 18th of

12:38PM   25    2017.

| | | |
|---|---|---|
| 12:38PM | 1 | Did there come a time when your surveillance observed Ron |
| 12:38PM | 2 | Serio arriving at that Huntington address that you just |
| 12:38PM | 3 | described a moment ago? |
| 12:38PM | 4 | A.  Yes. |
| 12:38PM | 5 | Q.  Were you present -- which of those surveillances were you |
| 12:38PM | 6 | participating in? |
| 12:38PM | 7 | A.  I was present on Lebrun, and we had other deputies and |
| 12:38PM | 8 | agents over at Huntington. |
| 12:38PM | 9 | Q.  Describe for the jury what you observed with respect to |
| 12:38PM | 10 | Mr. Serio's activity that day, April 18, 2017. |
| 12:38PM | 11 | A.  I observed Mr. Serio arrive at the address on Lebrun |
| 12:39PM | 12 | while we were -- while we had surveillance on the residence. |
| 12:39PM | 13 | A short time later, he departed and traveled to the vicinity |
| 12:39PM | 14 | of the Huntington address in the City of Buffalo. |
| 12:39PM | 15 | Q.  Got it.  And were you in constant communication with the |
| 12:39PM | 16 | other members of law enforcement on your team that were doing |
| 12:39PM | 17 | the surveillance out at Huntington? |
| 12:39PM | 18 | A.  Yes. |
| 12:39PM | 19 | Q.  Okay.  Did you come to learn that Serio ultimately |
| 12:39PM | 20 | arrived at that address on -- on Huntington? |
| 12:39PM | 21 | A.  Yes. |
| 12:39PM | 22 | Q.  What occurred when Ron Serio arrived at that address on |
| 12:39PM | 23 | Huntington? |
| 12:39PM | 24 | **MR. MacKAY:**  Objection, calls -- I'm sorry, yeah.  It |
| 12:39PM | 25 | calls for hearsay because I think he's not present at |

| | | |
|---|---|---|
| 12:39PM | 1 | Huntington. |
| 12:39PM | 2 | **MR. COOPER:**  Judge, if we can come up real quick, |
| 12:39PM | 3 | I -- |
| 12:39PM | 4 | **THE COURT:**  Sure. |
| 12:39PM | 5 | (Sidebar discussion held on the record.) |
| 12:39PM | 6 | **MR. COOPER:**  So, I went through this at a high level |
| 12:39PM | 7 | last time.  I think that the purpose was to avoid calling, you |
| 12:40PM | 8 | know, a parade of additional witnesses.  And so he's |
| 12:40PM | 9 | informed -- my understanding is he's informed generally about |
| 12:40PM | 10 | their operations.  It causes him to take the further actions |
| 12:40PM | 11 | that he takes. |
| 12:40PM | 12 | I don't think it's in dispute what -- what happened. |
| 12:40PM | 13 | So if you want to call five more witnesses -- |
| 12:40PM | 14 | **MR. MacKAY:**  Yeah, and I think if it's just a general |
| 12:40PM | 15 | overview, I think -- |
| 12:40PM | 16 | **THE COURT:**  So you're going to withdraw the objection |
| 12:40PM | 17 | to the question? |
| 12:40PM | 18 | **MR. MacKAY:**  Yeah.  I mean, I guess my only concern |
| 12:40PM | 19 | is, is a limiting instruction necessary if it's about what he |
| 12:40PM | 20 | does, what prompts him to do that.  I mean -- |
| 12:40PM | 21 | **THE COURT:**  I'm happy to give a limiting instruction, |
| 12:40PM | 22 | but Mr. Cooper is saying that all that's going to do is make |
| 12:40PM | 23 | you call a witness.  So -- so if you want to withdraw the |
| 12:40PM | 24 | objection now and then object when it gets too far into the |
| 12:40PM | 25 | weeds for you -- |

| | | |
|---|---|---|
| 12:40PM | 1 | **MR. MacKAY:** Yeah, that -- that might be the better |
| 12:40PM | 2 | route, because I think -- I know, you're calling it Adam Day |
| 12:40PM | 3 | as well, too, who talks about the -- I think it's getting |
| 12:40PM | 4 | Anthony Gerace on -- |
| 12:40PM | 5 | **MR. COOPER:** Correct. And that's not where this is |
| 12:40PM | 6 | headed. |
| 12:40PM | 7 | **MR. MacKAY:** This is just about what's found at |
| 12:41PM | 8 | Lebrun -- or, at Huntington? |
| 12:41PM | 9 | **MR. COOPER:** At Huntington, right. |
| 12:41PM | 10 | **MR. MacKAY:** Yeah, okay. Yeah. |
| 12:41PM | 11 | I'll do it that way, Judge. I'll withdraw the |
| 12:41PM | 12 | current objection. I think it's too specific. |
| 12:41PM | 13 | (End of sidebar discussion.) |
| 12:41PM | 14 | **THE COURT:** The objection has been withdrawn. So you |
| 12:41PM | 15 | can re-ask if you want. |
| 12:41PM | 16 | **BY MR. COOPER:** |
| 12:41PM | 17 | Q. We -- I asked you a moment ago if you were in contact |
| 12:41PM | 18 | with the other members of your surveillance team; is that |
| 12:41PM | 19 | correct? |
| 12:41PM | 20 | A. That's correct. |
| 12:41PM | 21 | Q. Okay. And so there's people at different locations, |
| 12:41PM | 22 | right? |
| 12:41PM | 23 | A. That's correct. |
| 12:41PM | 24 | Q. Is it important for you, as the supervising detective, to |
| 12:41PM | 25 | be aware of the different things that are going on? |

12:41PM   1    A.  It is.

12:41PM   2    Q.  Did you become aware during that day, April 18th of 2017,

12:41PM   3    that Ron Serio arrived at 370 Huntington Avenue?

12:41PM   4    A.  Yes.

12:41PM   5    Q.  And did you become aware that there was an exchange that

12:41PM   6    occurred of duffle bags at that location?

12:41PM   7    A.  Yes.

12:41PM   8    Q.  Okay.  Ultimately, was a search warrant executed at

12:42PM   9    370 Huntington?

12:42PM   10   A.  Yes.

12:42PM   11   Q.  Okay.  And does that mean law enforcement kind of

12:42PM   12   converges on that location?

12:42PM   13   A.  That's correct.

12:42PM   14   Q.  Was Serio present when that happened?

12:42PM   15   A.  He was.

12:42PM   16   Q.  Was he arrested?

12:42PM   17   A.  He was.

12:42PM   18   Q.  Was the other individual at the house also arrested?

12:42PM   19   A.  Yes.

12:42PM   20   Q.  Were drugs recovered?

12:42PM   21   A.  Yes.

12:42PM   22   Q.  What kind of drugs were recovered?

12:42PM   23   A.  Cocaine and marijuana.

12:42PM   24   Q.  And was there a large amount of U.S. currency recovered

12:42PM   25   as well?

Case 1:19-cr-00227-LJV-MJR    Document 1531    Filed 05/07/25    Page 16 of 51
USA v Bongiovanni - Granville - Cooper/Direct - 9/16/24

16

12:42PM    1    A.   Yes.

12:42PM    2    Q.   Now, at the moment where Ron Serio was arrested at that

12:42PM    3    370 Huntington address, did you already have a search warrant

12:42PM    4    for the house on Lebrun?

12:42PM    5    A.   No.

12:42PM    6    Q.   Did you get one?

12:42PM    7    A.   We did.

12:42PM    8    Q.   Did you get one for a separate property on West Grimsby

12:42PM    9    Street in addition to Lebrun?

12:42PM   10    A.   Yes, we did.

12:42PM   11    Q.   And was that an address or a location that you also

12:42PM   12    believed to be associated with Ron Serio based on your

12:42PM   13    investigation?

12:42PM   14    A.   Yes.

12:42PM   15    Q.   Were those warrants that you just described for

12:43PM   16    697 Lebrun and the address on West Grimsby, were they

12:43PM   17    executed on the very day of the warrant at Huntington?

12:43PM   18    A.   They were.

12:43PM   19    Q.   Were you present for one of those?

12:43PM   20    A.   I was.

12:43PM   21    Q.   Which one?

12:43PM   22    A.   Lebrun.

12:43PM   23    Q.   We have 42A-33 up on the screen.  This is the house on

12:43PM   24    Lebrun, 697 Lebrun, right?

12:43PM   25    A.   That's correct.

12:43PM    1    Q.  Would you describe that as a mansion?

12:43PM    2    A.  I would, yes.

12:43PM    3    Q.  What was it like on the inside?

12:43PM    4    A.  It was gorgeous.  Very gaudy.  The house was beautiful.

12:44PM    5         **MR. COOPER:**  Ms. Champoux, if we can take that down,

12:44PM    6    please, and pull up 42A-35.

12:44PM    7         **THE COURT:**  Also in evidence, right?

12:44PM    8         **MR. COOPER:**  Yes, Judge.  I'm sorry.

12:44PM    9         **BY MR. COOPER:**

12:44PM   10    Q.  Can you see this, sir?

12:44PM   11    A.  I do.

12:44PM   12    Q.  Do you recognize this to be an aerial view of that

12:44PM   13    property at 697 Lebrun?

12:44PM   14    A.  I do.

12:44PM   15    Q.  Do you recall what kind of vehicle Ron Serio was driving

12:44PM   16    when he went over to the house on Huntington?

12:44PM   17    A.  It was a Range Rover.

12:44PM   18    Q.  Did you personally search that Range Rover?

12:44PM   19    A.  No.

12:44PM   20    Q.  Did you become aware later that a large amount of U.S.

12:44PM   21    currency was recovered from the Range Rover?

12:44PM   22    A.  I did.

12:44PM   23         **MR. COOPER:**  You can take that down, Ms. Champoux.

12:44PM   24    Thank you.

          25

| | | |
|---|---|---|
| 12:45PM | 1 | **BY MR. COOPER:** |
| 12:45PM | 2 | Q.  Did you have any difficulty obtaining search warrants to |
| 12:45PM | 3 | search the properties at Lebrun and West Grimsby? |
| 12:45PM | 4 | **MR. MacKAY:**  Objection. |
| 12:45PM | 5 | **THE COURT:**  Sustained. |
| 12:45PM | 6 | **BY MR. COOPER:** |
| 12:45PM | 7 | Q.  How many days of surveillance do you think it took before |
| 12:45PM | 8 | you got those search warrants? |
| 12:45PM | 9 | **MR. MacKAY:**  Objection to form.  He said he thinks, |
| 12:45PM | 10 | or if he's estimating. |
| 12:45PM | 11 | **THE COURT:**  No, overruled. |
| 12:45PM | 12 | **BY MR. COOPER:** |
| 12:45PM | 13 | Q.  Do you know how many minutes you spent doing |
| 12:45PM | 14 | surveillance, sir? |
| 12:45PM | 15 | A.  No. |
| 12:45PM | 16 | Q.  Do you know how many hours, exactly? |
| 12:45PM | 17 | A.  No. |
| 12:45PM | 18 | Q.  How much surveillance -- estimate, please, for the |
| 12:45PM | 19 | jury -- how much surveillance do you think you did before you |
| 12:45PM | 20 | arrested Ron Serio? |
| 12:45PM | 21 | A.  It was a -- it was a few days of sporadic surveillance. |
| 12:45PM | 22 | Sometimes hours at a time, sometimes minutes. |
| 12:45PM | 23 | Q.  Do you know a person by the name of Anthony Gerace? |
| 12:45PM | 24 | A.  I do. |
| 12:45PM | 25 | Q.  Have you ever met that person before? |

USA v Bongiovanni - Granville - Cooper/Direct - 9/16/24

19

| | | |
|---|---|---|
| 12:46PM | 1 | A.   Yes. |
| 12:46PM | 2 | Q.   Where did you meet that person? |
| 12:46PM | 3 | A.   On the day we arrested Ron Serio. |
| 12:46PM | 4 | Q.   Can you tell the jury, how did -- how did you end up |
| 12:46PM | 5 | meeting Anthony Gerace on the same day that you arrested Ron |
| 12:46PM | 6 | Serio? |
| 12:46PM | 7 | A.   Mr. Gerace was observed departing the Lebrun Road |
| 12:46PM | 8 | address.  He was traffic stopped a distance away by a marked |
| 12:46PM | 9 | police vehicle, and was found in possession of a small |
| 12:46PM | 10 | quantity of pills which later turned out to be fentanyl. |
| 12:46PM | 11 | Mr. Gerace was transported back to our offices for |
| 12:46PM | 12 | debriefing and was interviewed by a couple of our deputies. |
| 12:46PM | 13 | Q.   Now, the investigation from the time that you gained this |
| 12:47PM | 14 | information about the purported robbery until the time that |
| 12:47PM | 15 | Ron Serio was arrested, I think you described it as lasting a |
| 12:47PM | 16 | couple of weeks; is that correct? |
| 12:47PM | 17 | A.   That's correct. |
| 12:47PM | 18 | Q.   Okay.  When you ultimately searched Ron Serio's house, |
| 12:47PM | 19 | did you seize large amounts of drugs? |
| 12:47PM | 20 | A.   We did. |
| 12:47PM | 21 | Q.   Did you seize firearms? |
| 12:47PM | 22 | A.   We did. |
| 12:47PM | 23 | Q.   Who were you partnered with in working on that |
| 12:47PM | 24 | investigation into Ron Serio? |
| 12:47PM | 25 | A.   The FBI, Safe Streets Task Force. |

12:47PM  1          **MR. COOPER:**  May I just have one moment, Judge?

12:47PM  2          **THE COURT:**  Sure.

12:48PM  3          **By MR. COOPER:**

12:48PM  4   Q.  So I just asked you who you were working with on -- on

12:48PM  5   this investigation into Ron Serio, and you said FBI, Safe

12:48PM  6   Streets Task Force?

12:48PM  7   A.  Yes.

12:48PM  8   Q.  I want to put a finer point on it.

12:48PM  9       Did you contact the DEA and tell them, hey, we're looking

12:48PM  10  at Ron Serio?

12:48PM  11  A.  No.

12:48PM  12  Q.  Did you contact this defendant and tell him, hey, we're

12:48PM  13  looking at Ron Serio?

12:48PM  14  A.  No.

12:48PM  15  Q.  Was your coordination exclusively with the FBI, Safe

12:48PM  16  Streets Task Force?

12:48PM  17  A.  It was.

12:48PM  18          **MR. COOPER:**  No further direct.  Thank you, Judge.

12:48PM  19          **THE COURT:**  Cross?

12:48PM  20          **MR. MacKAY:**  Judge, do you want me to start or --

12:48PM  21          **THE COURT:**  Yeah, I think so.

12:48PM  22          **MR. MacKAY:**  Okay.

12:48PM  23          **THE COURT:**  Did you need --

12:48PM  24

        25

| | | |
|---|---|---|
| 12:48PM | 1 | **CROSS-EXAMINATION BY MR. MacKAY:** |
| 12:48PM | 2 | Q.  All right.  Good afternoon, Chief Granville.  I'll get |
| 12:48PM | 3 | you started here on cross-examination before we need to take |
| 12:49PM | 4 | our break. |
| 12:49PM | 5 | Okay.  Let's start back from the end. |
| 12:49PM | 6 | You didn't contact DEA, correct? |
| 12:49PM | 7 | A.  That's correct. |
| 12:49PM | 8 | Q.  Now, in your experience in law enforcement with sheriffs, |
| 12:49PM | 9 | with NFTA, with, I think you said, housing police, everybody, |
| 12:49PM | 10 | you're familiar, generally, with deconfliction, correct? |
| 12:49PM | 11 | A.  That's correct. |
| 12:49PM | 12 | Q.  Easy way to describe it, say, it's -- it's -- there's |
| 12:49PM | 13 | systems to allow one law enforcement agency or investigative |
| 12:49PM | 14 | individual to find out if somebody else or some other agency |
| 12:49PM | 15 | is looking into an individual, correct? |
| 12:49PM | 16 | A.  That's correct. |
| 12:49PM | 17 | Q.  You can look in -- a law enforcement officer can look in |
| 12:49PM | 18 | the system and see if that person's a target or a subject or |
| 12:49PM | 19 | has had any other dealings with another case out there with |
| 12:49PM | 20 | another agency; is that fair to say? |
| 12:49PM | 21 | A.  Yes. |
| 12:49PM | 22 | Q.  Now, fair to say, though, that your practice as Chief of |
| 12:50PM | 23 | Narcotics at the Erie County Sheriff's Office, you don't |
| 12:50PM | 24 | particularly like using deconfliction? |
| 12:50PM | 25 | A.  That's correct. |

12:50PM  1    Q.  Yeah, you kind of smiled a little bit there.  Do you want

12:50PM  2    to tell the jury why?

12:50PM  3    A.  We -- we found that the databases that we utilize are

12:50PM  4    oftentimes stats driven or -- or driven by like a -- like a

12:50PM  5    fishing pond where other agencies are just plucking people in

12:50PM  6    there just to attach themselves to a case or -- or otherwise.

12:50PM  7    Q.  You know, I want to work -- I want to work through a bit,

12:50PM  8    you know, why that might concern you.

12:50PM  9        Is it, when you say "stats driven," is it fair to

12:50PM  10   interpret that that you've had experiences where other

12:50PM  11   agencies have come in and kind of poached a target of yours

12:50PM  12   when you used deconfliction?

12:50PM  13   A.  Yes.

12:50PM  14   Q.  And I used the slang term "poached."  Can you kind of

12:50PM  15   explain what we're talking about here?

12:50PM  16   A.  It's -- it's a -- we've -- we've had cases where we've

12:50PM  17   developed some information or probable cause that could lead

12:51PM  18   to that person's arrest in very short order.  And we've

12:51PM  19   plunked that name into a deconfliction service that -- that

12:51PM  20   we all utilize.  And the brakes are put on because somebody

12:51PM  21   has a longer-term investigation or already has that person

12:51PM  22   identified in that system.

12:51PM  23   Q.  And have you had experience where you've, say, built up a

12:51PM  24   lot of investigative hours on a subject, perhaps even made an

12:51PM  25   arrest, and another agency comes in and takes over the

| | | |
|---|---|---|
| 12:51PM | 1 | investigation? |
| 12:51PM | 2 | A.  Yes. |
| 12:51PM | 3 | Q.  Okay.  And you said these databases, sometimes in your |
| 12:51PM | 4 | opinion, are stat driven, correct? |
| 12:51PM | 5 | A.  That's correct. |
| 12:51PM | 6 | Q.  So connect those two actions.  Is it fair to say that |
| 12:51PM | 7 | what happens then if another agency comes in and takes over |
| 12:51PM | 8 | your investigation, they sort of get the, quote, unquote, |
| 12:51PM | 9 | stat for that investigation? |
| 12:51PM | 10 | A.  Technically, yes. |
| 12:51PM | 11 | Q.  And they might recover -- if there's contraband or assets |
| 12:51PM | 12 | forfeited, they might get the -- the benefit of doing that? |
| 12:52PM | 13 | A.  That's correct. |
| 12:52PM | 14 | Q.  Meaning that the new agency that comes in and sort of |
| 12:52PM | 15 | poaches the target, if there's assets to be recovered, they |
| 12:52PM | 16 | might take the assets despite all the work your agency's been |
| 12:52PM | 17 | done, correct? |
| 12:52PM | 18 | A.  That's correct. |
| 12:52PM | 19 | Q.  And that's a practice you've noticed in your years of law |
| 12:52PM | 20 | enforcement, correct? |
| 12:52PM | 21 | A.  Yes, sir. |
| 12:52PM | 22 | Q.  And as I started to say earlier, when -- your practice |
| 12:52PM | 23 | has been you don't like to use deconfliction for those |
| 12:52PM | 24 | reasons, correct? |
| 12:52PM | 25 | A.  That's correct. |

12:52PM    1    Q.  So, going back to 2017, you didn't perform any

12:52PM    2    deconfliction because of that reason?

12:52PM    3    A.  That was part of it, yes.

12:52PM    4    Q.  Okay.  And you had had a senior role in the Erie County

12:52PM    5    Sheriff's Office narcotics unit by that time, correct?

12:52PM    6    A.  That's correct.

12:52PM    7    Q.  I think you described yourself as sort of the senior

12:52PM    8    detective, correct?

12:52PM    9    A.  That's correct.

12:52PM   10    Q.  You had been that in that role for a few years by that

12:52PM   11    time?

12:52PM   12    A.  At least a couple of years, yes.

12:52PM   13    Q.  And you had started to establish that policy where you

12:52PM   14    weren't going to use deconfliction, correct?

12:53PM   15    A.  That's correct.

12:53PM   16    Q.  And fair to say in your dealings with other law

12:53PM   17    enforcement agencies in that time, it became known that, you

12:53PM   18    know, you specifically, and the sheriffs, weren't going to

12:53PM   19    use deconfliction?

12:53PM   20    A.  It was known that I wasn't a fan of the database.

12:53PM   21        It was also known that if, in fact, there was a

12:53PM   22    deconfliction, we weren't -- we weren't necessarily going to

12:53PM   23    play by the rules.

12:53PM   24    Q.  Okay.  So, yeah, let me explore that.  Meaning that, it

12:53PM   25    was -- your testimony here is that in the law enforcement

12:53PM    1    community, other agencies knew that even if there was a

12:53PM    2    deconfliction, you might go after that target anyway,

12:53PM    3    correct?

12:53PM    4         **MR. COOPER:**  Judge, I'm going to object at this point

12:53PM    5    to what other agencies knew.  I don't think there's a

12:53PM    6    foundation for that that's been laid.

12:53PM    7         **MR. MacKAY:**  I'm just clarifying what he said and how

12:53PM    8    he reached that opinion.

12:53PM    9         **THE COURT:**  I think he's allowed to explore what he

12:53PM   10    said and how he reached that opinion, so I'm going to

12:53PM   11    overruled the objection.

12:53PM   12         **MR. MacKAY:**  I'm sorry, Ann.  Can we read that

12:53PM   13    question back?

12:53PM   14         (The above-requested question was then read by the

12:54PM   15    reporter.)

12:54PM   16         **THE WITNESS:**  That's correct.

12:54PM   17         **BY MR. MacKAY:**

12:54PM   18    Q.  Okay.  And specifically there were instances of you and

12:54PM   19    the sheriff's department doing that prior to this point in

12:54PM   20    time, correct?

12:54PM   21    A.  That's correct.

12:54PM   22    Q.  Meaning just, so again, it's crystal clear to the jury,

12:54PM   23    what you're describing is a situation where you or members of

12:54PM   24    the Sheriff's Office would see a target or individual in a

12:54PM   25    deconfliction database that was already marked by another

12:54PM   1    agency, yet you would still go after that target and do your

12:54PM   2    own investigation?

12:54PM   3    A.   That's correct.

12:54PM   4    Q.   Potentially without even contacting the other agency

12:54PM   5    that's in the database?

12:54PM   6    A.   It -- it -- that's correct.  The majority of the time we

12:55PM   7    would reach out to the agency.  There was nothing to hide

12:55PM   8    here, it's just that we were moving forward.

12:55PM   9    Q.   Okay.  And if the -- and in your experience with doing

12:55PM   10   this, sometimes even if the agency reached back and explained

12:55PM   11   the scope of your investigation, you would at times just

12:55PM   12   ignore that and still go after the target, correct?

12:55PM   13   A.   Correct.

12:55PM   14   Q.   Okay.  Okay.  So I want to focus you now on this April

12:55PM   15   2017 time period.  I want to walk through kind of what the

12:55PM   16   steps are.

12:55PM   17        **MR. MacKAY:**  I mean, Judge, this might be a good time

12:55PM   18   to stop.

12:55PM   19        **THE COURT:**  Yeah, I think this is probably a good

12:55PM   20   time to break.

12:55PM   21        **MR. MacKAY:**  We'll pick this up in a few minutes.

12:55PM   22        **THE COURT:**  So, folks, please remember my

12:55PM   23   instructions about not discussing the case with anyone

12:55PM   24   including each other.  Don't use tools of technology to

12:55PM   25   research anything about the case or to communicate about the

| | | |
|---|---|---|
| 12:55PM | 1 | case.  And don't read, watch, or listen to any news coverage, |
| 12:55PM | 2 | if there is any, while the case is still on trial.  Don't make |
| 12:55PM | 3 | up your mind about anything until you start deliberating. |
| 12:56PM | 4 | We'll see you back here at about -- about 2:00. |
| 12:56PM | 5 | Thanks very much. |
| 12:56PM | 6 | (Jury excused at 12:56 p.m.) |
| 12:56PM | 7 | THE COURT:  Anything from the government before we |
| 12:56PM | 8 | break? |
| 12:56PM | 9 | MR. COOPER:  No, Judge. |
| 12:56PM | 10 | THE COURT:  From the defense? |
| 12:56PM | 11 | MR. MacKAY:  No, Your Honor. |
| 12:56PM | 12 | THE COURT:  Okay.  We'll see you folks at 2:00. |
| 12:56PM | 13 | (Off the record at 12:56 p.m.) |
| 02:11PM | 14 | (Back on the record at 2:11 p.m.) |
| 02:11PM | 15 | (Jury not present.) |
| 02:12PM | 16 | THE CLERK:  All rise. |
| 02:12PM | 17 | THE COURT:  Please be seated. |
| 02:12PM | 18 | THE CLERK:  We are back on the record for the |
| 02:12PM | 19 | continuation of the jury trial in case 19-cr-227, United |
| 02:12PM | 20 | States of America versus Joseph Bongiovanni. |
| 02:12PM | 21 | All counsel and parties are present. |
| 02:12PM | 22 | THE COURT:  Okay.  So two related things.  Juror |
| 02:12PM | 23 | Number 1 cannot be here on Friday the 27th, which is a week |
| 02:12PM | 24 | from this Friday. |
| 02:12PM | 25 | THE CLERK:  Correct. |

02:12PM    1        **THE COURT:**  And number 2, the juror is asking about

02:12PM    2    next week's schedule, whether we're going to be going all next

02:12PM    3    week.

02:12PM    4        So, thoughts?

02:12PM    5        **MR. COOPER:**  Yes, please.

02:12PM    6        **THE COURT:**  The government's not going to rest until

02:12PM    7    when?

02:12PM    8        **MR. COOPER:**  Judge, our expectation right now is

02:12PM    9    probably next Wednesday, possibly next Thursday.  Kind of

02:12PM   10    depends on how long some of the -- we have two lengthier

02:12PM   11    witnesses left, and so some of it's up in the air with how

02:12PM   12    long those witnesses go, but I --

02:12PM   13        **THE COURT:**  So we're going to spill into the first

02:12PM   14    week of October?

02:12PM   15        **MR. COOPER:**  I think we're going to rest, like, the

02:13PM   16    25th-ish, and then I don't know how long the defense case is.

02:13PM   17    It's quite possible that week of September 30th, October 1,

02:13PM   18    October 2, I imagine they'll be deliberating, yeah.

02:13PM   19        **THE COURT:**  Right.  Okay.

02:13PM   20        **MR. SINGER:**  Yeah.  So Mr. MacKay and I were talking

02:13PM   21    last week and also a little bit this afternoon, just because

02:13PM   22    we have some out-of-town witnesses, so we're trying to figure

02:13PM   23    out the flights.  So -- so no Friday the 27th?

02:13PM   24        **THE COURT:**  Right.

02:13PM   25        **MR. SINGER:**  Yeah.  So I guess if we are going to

02:13PM    1    start up on the 25th, we do have some local witnesses that we

02:13PM    2    could call, and maybe get one of the shorter out-of-town

02:13PM    3    witnesses done, and maybe leave the other one for Monday the

02:13PM    4    30th.

02:14PM    5            One question I do have, Judge.  So let's say we -- we

02:14PM    6    close our case, and this case gets sent to the jury around

02:14PM    7    October 2nd or so.  So before this trial existed, like, I

02:14PM    8    booked a trip with my wife which I promised her that I would

02:14PM    9    go on, like, otherwise, I'm going to face some repercussions.

02:14PM    10           I leave Friday on a flight at -- on the 4th of

02:14PM    11   October at, like, 1:30, 2:00.  I don't know if the jury is

02:14PM    12   going to be done by that point in time.  If they are not, what

02:14PM    13   should I tell my wife at this point?  It's basically --

02:14PM    14           **THE COURT:**  I'm the last person you should ask that.

02:14PM    15           **MR. SINGER:**  I know.  I know, Judge.

02:14PM    16           **MR. TRIPI:**  Part of your orders assigned --

02:14PM    17           **MR. SINGER:**  Because ultimately, you know -- if we

02:14PM    18   could go off the record for a second -- I'm going to blame

02:14PM    19   you.

02:14PM    20           **THE COURT:**  I don't blame you.  Yeah, been there,

02:14PM    21   done that.  I mean, you know, I -- I -- I understand, I get

02:15PM    22   it.  I under -- I understand.  I more than understand.  But,

02:15PM    23   you know, I -- I don't know.  Let's -- let's jump off that

02:15PM    24   bridge when we come to it.  I -- yeah, I -- I -- I don't know.

02:15PM    25   I sympathize with you, but I don't know.  And we'll worry

02:15PM    1    about that at the time, okay?

02:15PM    2         **MR. COOPER:**  Judge, on the subject of scheduling,

02:15PM    3    Mr. Singer said he might be able to get some local witnesses

02:15PM    4    up the 25th, and then he mentioned the next Monday,

02:15PM    5    September 30th.  But we would -- we would be working on

02:15PM    6    September 26th, which is a Thursday, right, I mean?

02:15PM    7         **THE COURT:**  Yes.

02:15PM    8         **MR. SINGER:**  Yeah.  I just -- I don't want to fly

02:15PM    9    someone in who potentially is gonna be going over the day, and

02:15PM   10    then they're not going to be able to --

02:15PM   11         **THE COURT:**  Well, you got to -- you got to weigh that

02:15PM   12    against your wife, against -- you know, I mean, there's

02:15PM   13    lots -- lots of things you have to weigh into that.

02:15PM   14         **MR. SINGER:**  Yeah.  No, I mean, we can fill -- we can

02:15PM   15    fill the 26th.

02:15PM   16         **MR. COOPER:**  Okay.

02:15PM   17         **THE COURT:**  Okay.

02:15PM   18         **MR. SINGER:**  It's just --

02:15PM   19         **THE COURT:**  Okay.  Well, I will tell them that we --

02:15PM   20    we may well spill over to the week of September 30th.  And

02:15PM   21    we'll be down the 27th.

02:16PM   22         **MR. SINGER:**  Understood.

02:16PM   23         **THE COURT:**  Okay.  Great.  Anything else before we

02:16PM   24    bring them in?

02:16PM   25         **MR. MacKAY:**  No, Your Honor.

02:16PM   1                **MR. COOPER:**  No, thank you, Judge.

02:16PM   2                **THE COURT:**  Let's bring them in, please, Pat.

02:16PM   3           I apologize to you for -- for that, but we've got to

02:16PM   4    keep the jury apprised of what's going on.  I hate to waste

02:16PM   5    your time.

02:16PM   6                **MR. COOPER:**  No, I appreciate that.

02:16PM   7           (Jury seated at 2:16 p.m.)

02:17PM   8                **THE COURT:**  Okay.  The record will reflect that all

02:17PM   9    our jurors are present again.

02:17PM  10           So I understand that one juror cannot be here on

02:17PM  11    Friday the 27th, so we will be down on Friday the 27th.

02:17PM  12           You folks have asked about where we are in terms of

02:17PM  13    scheduling.  We're getting there.  But we -- we -- given the

02:17PM  14    fact that we're going to be down on the 27th, we may very well

02:17PM  15    spill over into the next week, so we'll be going Monday,

02:17PM  16    Tuesday, Wednesday, Thursday of next week, and -- and we may

02:17PM  17    spill over and will probably will spill over into the

02:17PM  18    following, okay?  Okay.

02:17PM  19           I remind the witness he's still under oath.

02:17PM  20           And you may continue.

02:17PM  21                **BY MR. MacKAY:**

02:18PM  22    Q.  Good afternoon, again, Chief Granville.

02:18PM  23    A.  Hi.

02:18PM  24    Q.  Before I get into the actual Serio investigation and the

02:18PM  25    steps that were taken, I want talk about confidential

02:18PM    1    informants generally.  I think you said on direct, you've had

02:18PM    2    experience using them throughout your career, correct?

02:18PM    3    A.  That's correct.

02:18PM    4    Q.  Quite a lot of experience?

02:18PM    5    A.  Yes.

02:18PM    6    Q.  Fair to say they often form an important part of an

02:18PM    7    investigation?

02:18PM    8    A.  They do.

02:18PM    9    Q.  Okay.  And I think you were talking about some stuff

02:18PM   10    with, like, money and charges.  Fair to say that when using a

02:18PM   11    confidential informant, usually there has to be incentive for

02:18PM   12    the informant to work with you?

02:18PM   13    A.  Generally, yes.

02:18PM   14    Q.  Meaning that, you know, if they're -- if they're not

02:18PM   15    getting something out of it, they're not going to put

02:18PM   16    themselves in -- in harm's way or any risk; fair to say?

02:18PM   17    A.  That's v correct.

02:18PM   18    Q.  Meaning that, you know, while on one hand you might have

02:18PM   19    the sources of information of people who give, like,

02:18PM   20    tips that -- that -- that's one category of people who

02:19PM   21    provide information to law enforcement in your experience,

02:19PM   22    correct?

02:19PM   23    A.  Correct.

02:19PM   24    Q.  On the other hand, people who go out and do, like,

02:19PM   25    controlled buys and things like that, those are a little bit

02:19PM  1  different category, correct?

02:19PM  2  A.  That's correct.

02:19PM  3  Q.  Those are the ones that usually there has to be something

02:19PM  4  in it for them or they're not going to put themselves in

02:19PM  5  harm's way, correct?

02:19PM  6  A.  That's correct.

02:19PM  7  Q.  And I think you described two different things.  One can

02:19PM  8  be that the C.I. is getting money, correct?

02:19PM  9  A.  Correct.

02:19PM  10  Q.  The other one can be that the C.I. is working off some

02:19PM  11  sort of charges, correct?

02:19PM  12  A.  That's correct.

02:19PM  13  Q.  And what "working off charges" means is that the C.I. is

02:19PM  14  providing information and doing work in the hopes that those

02:19PM  15  charges that -- that your agency will advocate for them in

02:19PM  16  some fashion in the court case, correct?

02:19PM  17  A.  That's correct.

02:19PM  18  Q.  And I think you -- you were asked a question about --

02:19PM  19  from Mr. Cooper about keeping cases open; do you recall that?

02:19PM  20  A.  I do.

02:19PM  21  Q.  Yeah.  So, for example, a C.I. comes to you and you work

02:19PM  22  with them for a little bit of time, and you might have some

02:20PM  23  success; that's one thing that can happen, correct?

02:20PM  24  A.  That's correct.

02:20PM  25  Q.  And is it fair to say that ultimately, you know, it's

02:20PM  1  you, as the C.I.'s handlers, it's in your discretion on when

02:20PM  2  you want to take things to the prosecution?

02:20PM  3  A.  That's correct.

02:20PM  4  Q.  And then in your experience ultimately it's the

02:20PM  5  prosecution who decides, you know, where cases end up in the

02:20PM  6  court system, correct?

02:20PM  7  A.  That's correct.

02:20PM  8  Q.  Okay.  So let's fast forward to April of 2017.

02:20PM  9      I think you said on direct, this whole investigation that

02:20PM  10  culminates in the arrest of Ron Serio and everything we've

02:20PM  11  been talking about, I think you termed that it was a couple

02:20PM  12  weeks that it took?

02:20PM  13  A.  That's correct.

02:20PM  14  Q.  From, say -- what I mean is, from start to the date of

02:20PM  15  arrest, we're talking no more than a couple weeks, correct?

02:20PM  16  A.  That's correct.

02:20PM  17  Q.  Okay.  So let's start at the very beginning.

02:20PM  18      So your understanding, a confidential informant of some

02:20PM  19  sort came into the FBI, correct?

02:21PM  20  A.  That's correct.

02:21PM  21  Q.  The -- the C.I. did not come into the Sheriff's, correct?

02:21PM  22  A.  That's correct.

02:21PM  23  Q.  Because you, as senior detective at the time in the Erie

02:21PM  24  County Sheriff's Office narcotics unit, you received some

02:21PM  25  contact from FBI, correct?

02:21PM    1    A.  That's correct.

02:21PM    2    Q.  Do you recall why sheriffs are contacted in particular as

02:21PM    3    the agency?

02:21PM    4    A.  I don't.

02:21PM    5    Q.  Okay.  In your experience, does the Sheriff's Office do a

02:21PM    6    lot of marijuana operations?

02:21PM    7    A.  We've done just as much as the next guy.

02:21PM    8    Q.  Okay.  But as you sit here, you don't know why, for --

02:21PM    9    why the outreach came from FBI to Sheriff's, correct?

02:21PM   10    A.  That's correct.

02:21PM   11    Q.  And specifically you were dealing with the FBI Special

02:21PM   12    Agent Jason Galle?

02:21PM   13    A.  That's correct.

02:21PM   14    Q.  Okay.  So if you understood it, the C.I. who had sort of

02:21PM   15    started all this, he was an FBI C.I., correct?

02:21PM   16    A.  That's correct.

02:21PM   17    Q.  And then from there, you began the Sheriff's Office

02:21PM   18    component of the investigation, correct?

02:22PM   19    A.  That's correct.

02:22PM   20    Q.  And you're working it jointly with FBI, correct?

02:22PM   21    A.  Correct.

02:22PM   22    Q.  And what that involves is, fair to say, some background

02:22PM   23    information on the targets?

02:22PM   24    A.  That's correct.

02:22PM   25    Q.  Because -- but you had said on direct, though, that the

02:22PM    1    C.I. was reliable, correct?

02:22PM    2    A.   He proved to be reliable.

02:22PM    3    Q.   Did you know whether he was -- I mean, when the C.I. was

02:22PM    4    passed to you, or you came to understand it was a C.I., had

02:22PM    5    you had any understanding on whether the C.I. had done prior

02:22PM    6    operations for FBI?

02:22PM    7    A.   I was unaware of that.

02:22PM    8    Q.   Okay.  You just don't know what -- what that C.I. did

02:22PM    9    before?

02:22PM   10    A.   That's correct.

02:22PM   11    Q.   Okay.  But ultimately, you developed some fairly specific

02:22PM   12    information from the C.I., correct?

02:22PM   13    A.   That's correct.

02:22PM   14    Q.   Target being Ron Serio, a drug dealer, correct?

02:22PM   15    A.   That's correct.

02:22PM   16    Q.   There's some information of some individuals -- specific

02:22PM   17    individuals who are going to rob Ron Serio, correct?

02:22PM   18    A.   That's correct.

02:22PM   19    Q.   And there's a location that's identified by the C.I. on

02:23PM   20    Huntington where there's drug activity, correct?

02:23PM   21    A.   That's correct.

02:23PM   22    Q.   That's the 370 Huntington address, correct?

02:23PM   23    A.   That's correct.

02:23PM   24    Q.   Without getting into name naming, that address was the

02:23PM   25    address of one of the guys who was going to rob Ron Serio,

USA v Bongiovanni - Granville - MacKay/Cross - 9/16/24

37

02:23PM 1    correct?

02:23PM 2    A.  Not to my knowledge.

02:23PM 3    Q.  Okay.  But he -- he -- do you recall him having some

02:23PM 4    involvement in the process?  In the plan process, we'll call

02:23PM 5    it.

02:23PM 6    A.  I don't recall.

02:23PM 7    Q.  Okay.  So in any event, you -- I think you told us you do

02:23PM 8    a couple days of surveillance, correct?

02:23PM 9    A.  That's correct.

02:23PM 10   Q.  And what you testified is at least on the day of the

02:23PM 11   April 18th, 2017, you were surveilling the Lebrun, the Lebrun

02:23PM 12   mansion, correct?

02:23PM 13   A.  That's correct.

02:23PM 14   Q.  So just so the jury understands, there's -- on that day,

02:23PM 15   on April 18th, 2017, there's police activity that's occurring

02:23PM 16   at the Lebrun mansion, correct?

02:23PM 17   A.  That's correct.

02:23PM 18   Q.  And then simultaneously there's police activity occurring

02:23PM 19   at 370 Huntington, correct?

02:24PM 20   A.  Correct.

02:24PM 21   Q.  And as both you and the FBI and Sheriff's Office, you're

02:24PM 22   coordinating activity between those two locations, correct?

02:24PM 23   A.  That's correct.

02:24PM 24   Q.  And the way it goes down is that Ron Serio's Range Rover

02:24PM 25   is seen leaving Lebrun, correct?

02:24PM    1    A.  Correct.

02:24PM    2    Q.  And then it's seen going to 370 Huntington, correct?

02:24PM    3    A.  That's correct.

02:24PM    4    Q.  And officers at that location observe what appears to be

02:24PM    5    some sort of bag exchange, correct?

02:24PM    6    A.  That's correct.

02:24PM    7    Q.  Now, prior to that point in time, in your surveillance of

02:24PM    8    the Lebrun house, you had not seen anything that specifically

02:24PM    9    pointed to drug activity at that location, had you?

02:24PM   10    A.  That's fair to say.

02:24PM   11    Q.  Right.  You hadn't seen, like, any of that same activity

02:24PM   12    that occurred at Huntington occurring at Lebrun, correct?

02:24PM   13    A.  Correct.

02:24PM   14    Q.  Like bag exchanges, correct?

02:24PM   15    A.  Correct.

02:24PM   16    Q.  You -- you had not seen anybody perform any sort of,

02:24PM   17    like, drug transaction or passing of drugs at Lebrun,

02:24PM   18    correct?

02:25PM   19    A.  That's correct.

02:25PM   20    Q.  So, okay, let's go back to -- to Huntington.

02:25PM   21        There's the bag exchange, and Ron Serio and another

02:25PM   22    individual are arrested, correct?

02:25PM   23    A.  That's correct.

02:25PM   24    Q.  Now, at that point in time, there's no warrant for the

02:25PM   25    Lebrun property, correct?

| | | |
|---|---|---|
| 02:25PM | 1 | A.   That's correct. |
| 02:25PM | 2 | Q.   The -- the warrant is for the Huntington property, |
| 02:25PM | 3 | correct? |
| 02:25PM | 4 | A.   That's correct. |
| 02:25PM | 5 | Q.   So at that point in time, warrant's executed, Ron Serio |
| 02:25PM | 6 | and this other individual are arrested, correct? |
| 02:25PM | 7 | A.   That's correct. |
| 02:25PM | 8 | Q.   And there's some searching of the vehicle and the |
| 02:25PM | 9 | property and contraband is recovered there, correct? |
| 02:25PM | 10 | A.   That's correct. |
| 02:25PM | 11 | Q.   And then what happens next is the other individual other |
| 02:25PM | 12 | than Ron Serio, he's flipped and used to get a search warrant |
| 02:25PM | 13 | for the Lebrun house, correct? |
| 02:25PM | 14 | A.   That's correct. |
| 02:25PM | 15 | Q.   And he's also used to get a search warrant for the |
| 02:25PM | 16 | Grimsby Avenue, Kenmore house, correct? |
| 02:25PM | 17 | A.   That's correct. |
| 02:25PM | 18 | Q.   Okay.  So, again, just so it's clear, those warrants for |
| 02:25PM | 19 | those two locations, Lebrun and Grimsby, did not exist prior |
| 02:26PM | 20 | to the execution of the Huntington -- Huntington Avenue |
| 02:26PM | 21 | search warrant, correct? |
| 02:26PM | 22 | A.   That's correct. |
| 02:26PM | 23 | Q.   Right.  And at that point in time, fair to say, prior to |
| 02:26PM | 24 | execution of the Huntington Avenue warrant, there wasn't |
| 02:26PM | 25 | probable cause from what you had seen to get any warrant at |

| | | |
|---|---|---|
| 02:26PM | 1 | Lebrun, correct? |
| 02:26PM | 2 | A.  That's correct. |
| 02:26PM | 3 | Q.  It was the -- the seizure of the drugs and the |
| 02:26PM | 4 | circumstances under which they're seized and everything |
| 02:26PM | 5 | leading up to that Huntington, in combination with what that |
| 02:26PM | 6 | individual later tells you that helps you to get the warrant |
| 02:26PM | 7 | for the later two addresses, correct? |
| 02:26PM | 8 | A.  That's correct. |
| 02:26PM | 9 | Q.  Okay.  And then from there, the warrants are then |
| 02:26PM | 10 | executed at both Lebrun and Grimsby, correct? |
| 02:26PM | 11 | A.  That's correct. |
| 02:26PM | 12 | Q.  And further contraband is discovered at both of those |
| 02:26PM | 13 | addresses, correct? |
| 02:26PM | 14 | A.  That's correct. |
| 02:26PM | 15 | Q.  Okay.  Now, separate and apart from that, you're |
| 02:26PM | 16 | surveying the Lebrun house and you see an individual you |
| 02:26PM | 17 | later learned to be Anthony Gerace leave the residence, |
| 02:26PM | 18 | correct? |
| 02:27PM | 19 | A.  That's correct. |
| 02:27PM | 20 | Q.  You didn't stop him, but a traffic stop was effectuated |
| 02:27PM | 21 | for him some distance away, correct? |
| 02:27PM | 22 | A.  Correct. |
| 02:27PM | 23 | Q.  And that's in a very short time period -- I mean, can you |
| 02:27PM | 24 | locate that in time -- withdrawn.  Let me start over. |
| 02:27PM | 25 | He leaves the Lebrun property.  That's about the same |

02:27PM   1   time the Huntington warrant is executed?

02:27PM   2   A.  It was in and around the same time.

02:27PM   3   Q.  Close in time, though?

02:27PM   4   A.  That's correct.

02:27PM   5   Q.  Okay.  And then ultimately you then encounter Anthony

02:27PM   6   Gerace in person back at the Sheriff's Office, correct?

02:27PM   7   A.  That's correct.

02:27PM   8   Q.  And he's -- he's subjected to an interview there,

02:27PM   9   correct?

02:27PM   10  A.  Correct.

02:27PM   11  Q.  And in the process, he drops a name of an official,

02:27PM   12  correct?

02:27PM   13  A.  That's correct.

02:27PM   14  Q.  And that was Dan Derenda, correct?

02:27PM   15  A.  That's correct.

02:27PM   16  Q.  And you knew him to be the chief of -- I'm sorry, the

02:27PM   17  Commissioner of the Buffalo Police at the time, correct?

02:28PM   18  A.  That's correct.

02:28PM   19  Q.  But in response to that, did you pick up the phone and

02:28PM   20  call Derenda?

02:28PM   21  A.  No.

02:28PM   22  Q.  Okay.  But ultimately -- no -- no special treatment is

02:28PM   23  given to Anthony Gerace just because he dropped that name,

02:28PM   24  correct?

02:28PM   25  A.  That's correct.

| 02:28PM | 1 | Q. And, I mean, you were there for the entirety of Anthony |

02:28PM  1  Q.  And, I mean, you were there for the entirety of Anthony

02:28PM  2  Gerace's interview, correct?

02:28PM  3  A.  That's correct.

02:28PM  4  Q.  Never mentioned the name Joe Bongiovanni, correct?

02:28PM  5  A.  That's correct.

02:28PM  6      **MR. MacKAY:**  I think that's all the questions I have,

02:28PM  7  Judge.  Thank you.

02:28PM  8      **THE COURT:**  Any redirect?

02:28PM  9      **MR. COOPER:**  Just briefly.  If I may have one second,

02:28PM  10  Judge?  Just briefly, Judge.

02:29PM  11

02:29PM  12          **REDIRECT EXAMINATION BY MR. COOPER:**

02:29PM  13  Q.  At the time you were interviewing Anthony Gerace in the

02:29PM  14  Erie County Sheriff's Office, that was at -- at a local

02:29PM  15  police agency is where he was being interviewed, right?

02:29PM  16  A.  That's correct.

02:29PM  17  Q.  Okay.  And he had been arrested by a local police agency

02:29PM  18  or county-level police agency, right?

02:29PM  19  A.  That's correct.

02:29PM  20  Q.  And did he ask for a person who was affiliated with a

02:29PM  21  local or county police agency?

02:29PM  22  A.  He did.

02:29PM  23  Q.  Okay.  You were asked some questions on cross-examination

02:29PM  24  towards the end there about kind of what ultimately led to

02:29PM  25  the arrest of Ron Serio.  I just want to kind of go over that

02:29PM    1    one more time.

02:29PM    2        Around April of 2017, did you become aware of information

02:29PM    3    that Ron Serio was a drug dealer?

02:30PM    4    A.  Yes.

02:30PM    5    Q.  Did you and other members of the Sheriff's Office do

02:30PM    6    surveillance?

02:30PM    7    A.  We did.

02:30PM    8    Q.  Did you use one vehicle and one deputy to do that

02:30PM    9    surveillance?

02:30PM    10   A.  No.

02:30PM    11   Q.  Why not?

02:30PM    12   A.  Drug dealers are oftentimes surveillance conscious.

02:30PM    13   They're very well aware of their surroundings, and it's

02:30PM    14   important to, you know, rotate vehicles, switch vehicles,

02:30PM    15   things of that nature.

02:30PM    16   Q.  Can using extra deputies help with that?

02:30PM    17   A.  Yes.

02:30PM    18   Q.  Does using multiple vehicles help with that?

02:30PM    19   A.  It does.

02:30PM    20   Q.  Is that how you at the Erie County Sheriff's Office did

02:30PM    21   the surveillance of Ron Serio?

02:30PM    22   A.  We did.

02:30PM    23   Q.  Did you set up surveillance at his house?

02:30PM    24   A.  We did.

02:30PM    25   Q.  Did he get in his vehicle and leave his house?

USA v Bongiovanni - Granville - Cooper/Redirect - 9/16/24

44

| | | |
|---|---|---|
| 02:30PM | 1 | A.  Ultimately, yes. |
| 02:30PM | 2 | Q.  Did members of the Erie County Sheriff's Office follow |
| 02:30PM | 3 | him when he left his house? |
| 02:30PM | 4 | A.  We did. |
| 02:30PM | 5 | Q.  Did they watch where he went? |
| 02:30PM | 6 | A.  Yes. |
| 02:30PM | 7 | Q.  Did that help further your investigation? |
| 02:30PM | 8 | A.  It did. |
| 02:30PM | 9 | Q.  Did you ultimately observe him show up at some -- |
| 02:31PM | 10 | withdrawn. |
| 02:31PM | 11 | Did members of the Erie County Sheriff's Office |
| 02:31PM | 12 | ultimately observe him show up at 370 Huntington and exchange |
| 02:31PM | 13 | duffle bags of drugs? |
| 02:31PM | 14 | A.  Yes. |
| 02:31PM | 15 | Q.  Did that all start with surveillance at his house at |
| 02:31PM | 16 | 697 Lebrun? |
| 02:31PM | 17 | A.  Yes.  Based upon the surveillance and the information |
| 02:31PM | 18 | that we had received from the same confidential informant |
| 02:31PM | 19 | connecting 370 Huntington to the Lebrun Road address, it just |
| 02:31PM | 20 | corroborated everything that was being said. |
| 02:31PM | 21 | Q.  Was 697 Lebrun hard to find? |
| 02:31PM | 22 | A.  No. |
| 02:31PM | 23 | Q.  Was Ron Serio in his Range Rover hard to follow? |
| 02:31PM | 24 | A.  No. |
| 02:31PM | 25 | Q.  You were asked some questions about your feelings about |

02:31PM   1   deconfliction databases, and you indicated that you don't --

02:31PM   2   you choose not to use those; is that correct?

02:32PM   3   A.  That's correct.

02:32PM   4   Q.  To be clear, though, if there was a deconfliction

02:32PM   5   database that you would use at the Erie County Sheriff's

02:32PM   6   Office, would that be SafetyNet?

02:32PM   7   A.  Yes.

02:32PM   8   Q.  Okay.  You don't put people into DARTS, do you?

02:32PM   9   A.  No.

02:32PM  10   Q.  Mr. MacKay asked you some questions on cross-examination

02:32PM  11   about other agencies being aware of your feelings about

02:32PM  12   deconfliction databases; do you remember being asked those

02:32PM  13   questions?

02:32PM  14   A.  I do.

02:32PM  15   Q.  Have you ever had a discussion with the defendant about

02:32PM  16   whether you used deconfliction databases or not?

02:32PM  17   A.  I don't recall.

02:32PM  18   Q.  Do you -- do you have any reason to believe that he would

02:32PM  19   know whether or not you used deconfliction databases?

02:32PM  20   A.  I -- I don't know.

02:32PM  21   Q.  You have no personal knowledge of what's inside his head,

02:32PM  22   right?

02:32PM  23   A.  That's correct.

02:32PM  24   Q.  Okay.  You were asked some questions about the activity

02:32PM  25   that you observed while you were posted up at 697 Lebrun; do

USA v Bongiovanni - Granville - Cooper/Redirect - 9/16/24

02:33PM  1    you recall that?

02:33PM  2    A.  Yes.

02:33PM  3    Q.  Anthony Gerace was observed leaving 697 Lebrun, right?

02:33PM  4    A.  That's correct.

02:33PM  5    Q.  And he was traffic stopped?

02:33PM  6    A.  He was.

02:33PM  7    Q.  And he had drugs on him?

02:33PM  8    A.  He did.

02:33PM  9    Q.  He had fentanyl pills, right?

02:33PM  10   A.  That's correct.

02:33PM  11   Q.  When you set up surveillance on a -- on the home of a

02:33PM  12   target, is it a common narcotics investigation tactic to try

02:33PM  13   to look for people coming and going frequently?

02:33PM  14   A.  Yes.

02:33PM  15   Q.  And when you traffic stopped Anthony Gerace as he left

02:33PM  16   the location, is that a consistent, common practice in

02:33PM  17   narcotics investigations?

02:33PM  18   A.  It is.

02:33PM  19   Q.  Did you find drugs on Anthony Gerace?

02:33PM  20   A.  We did.

02:33PM  21   Q.  Is that the sort of investigative activity that can help

02:33PM  22   further probable cause for a search warrant?

02:33PM  23   A.  Yes.

02:33PM  24   Q.  Was that hard to do?

02:33PM  25   A.  No.

| | | |
|---|---|---|
| 02:33PM | 1 | Q.  And Anthony Gerace -- ultimately, are you aware of |
| 02:34PM | 2 | whether he was charged with respect to the fentanyl pills |
| 02:34PM | 3 | that were seized from him? |
| 02:34PM | 4 | A.  He was. |
| 02:34PM | 5 | Q.  Where was he charged? |
| 02:34PM | 6 | A.  With the U.S. Attorney's Office. |
| 02:34PM | 7 | Q.  Is that here in federal court? |
| 02:34PM | 8 | A.  Yes. |
| 02:34PM | 9 | **MR. COOPER:**  Just one second please, Judge? |
| 02:34PM | 10 | **THE COURT:**  Sure. |
| 02:34PM | 11 | **BY MR. COOPER:** |
| 02:34PM | 12 | Q.  Just a couple more follow-up questions. |
| 02:34PM | 13 | That individual -- you were asked some questions about |
| 02:34PM | 14 | the police activity that took place at 370 Huntington.  Was |
| 02:35PM | 15 | the individual who Serio interacted with there named Kelly |
| 02:35PM | 16 | Brace? |
| 02:35PM | 17 | A.  Yes. |
| 02:35PM | 18 | Q.  Okay.  And then I also wanted to ask you, with respect to |
| 02:35PM | 19 | the Anthony Gerace charges that came here to federal court, |
| 02:35PM | 20 | did you turn the evidence that you had from the traffic stop |
| 02:35PM | 21 | over to federal law enforcement authorities? |
| 02:35PM | 22 | **MR. MacKAY:**  Objection, beyond the scope about the |
| 02:35PM | 23 | Gerace prosecution. |
| 02:35PM | 24 | **MR. COOPER:**  Judge, the topic of the Anthony Gerace |
| 02:35PM | 25 | came up during cross. |

02:35PM    1        **THE COURT:**  I'll allow it -- I'll allow it.

02:35PM    2        **BY MR. COOPER:**

02:35PM    3    Q.  Did you turn the evidence that you got over to the feds?

02:35PM    4    A.  Yes.

02:35PM    5        **MR. COOPER:**  Okay.  I have no further redirect,

02:35PM    6    Judge.  Thank you.

02:35PM    7        **MR. MacKAY:**  Brief, Judge.

02:35PM    8

02:35PM    9            **RECROSS-EXAMINATION BY MR. MacKAY:**

02:35PM    10   Q.  All right.  Chief Granville, I'll try to get you out of

02:35PM    11   here quick.

02:35PM    12       You said on redirect, I think when you were talking about

02:35PM    13   the search warrant execution at 370, that everything you saw

02:35PM    14   sort of corroborated something, correct?

02:35PM    15   A.  That's correct.

02:35PM    16   Q.  In other words, you had reason to believe that there was

02:36PM    17   going to be drug activity at 370 Huntington based on what you

02:36PM    18   knew already in the investigation, correct?

02:36PM    19   A.  That's correct.  We were in possession of a search

02:36PM    20   warrant for that address.

02:36PM    21   Q.  Right, you had already -- so fair to say prior to that

02:36PM    22   date and time when that activity is observed, there had

02:36PM    23   already been probable cause that you had developed

02:36PM    24   specifically related to that address, correct?

02:36PM    25   A.  That's correct.

02:36PM    1    Q.   And specifically as to that individual, Kelly Brace,

02:36PM    2    correct?

02:36PM    3    A.   Correct.

02:36PM    4    Q.   And Kelly Brace is the individual who lived at that

02:36PM    5    address, correct?

02:36PM    6    A.   That's correct.

02:36PM    7    Q.   Okay.  So in sum and substance, it wasn't a surprise that

02:36PM    8    bags were exchanged at that address, correct?

02:36PM    9    A.   No.

02:36PM    10           MR. MacKAY:  Okay.  Nothing further, Your Honor.

02:36PM    11

02:36PM    12              **RE-REDIRECT EXAMINATION BY MR. COOPER:**

02:36PM    13    Q.   Even if you hadn't had a search warrant yet at that

02:36PM    14    point, if you had followed Ron Serio to 370 Huntington, would

02:36PM    15    you have observed him engaging in drug activity regardless of

02:37PM    16    whether there was a warrant already?

02:37PM    17    A.   Yes, we would have.

02:37PM    18    Q.   Just by doing the surveillance?

02:37PM    19    A.   That's correct.

02:37PM    20           **MR. COOPER:**  I have no further questions, Judge.

02:37PM    21           **MR. MacKAY:**  Nothing further, Your Honor.

02:37PM    22           **THE COURT:**  You can step down.  Thank you.

02:37PM    23           (Witness excused at 2:37 p.m.)

           24           (Excerpt concluded at 2:37 p.m.)

           25           *     *     *     *     *     *     *

1

2                   **CERTIFICATE OF REPORTER**

3

4                   In accordance with 28, U.S.C., 753(b), I

5    certify that these original notes are a true and correct

6    record of proceedings in the United States District Court for

7    the Western District of New York on September 16, 2024.

8

9

10                          s/ Ann M. Sawyer
                            Ann M. Sawyer, FCRR, RPR, CRR
11                          Official Court Reporter
                            U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          **TRANSCRIPT INDEX**

3          **EXCERPT - EXAMINATION OF D.J. GRANVILLE**

4                        **SEPTEMBER 16, 2024**

5

6

7     **W I T N E S S**                              **P A G E**

8     **D. J.  G R A N V I L L E**                    2

9        DIRECT EXAMINATION BY MR. COOPER:            2

10       CROSS-EXAMINATION BY MR. MacKAY:            21

11       REDIRECT EXAMINATION BY MR. COOPER:         42

12       RECROSS-EXAMINATION BY MR. MacKAY:          48

13       RE-REDIRECT EXAMINATION BY MR. COOPER:      49

14

15

16

17

18

19

20

21

22

23

24

25