IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

———————————————————————

UNITED STATES OF AMERICA,

        v.                               19-CR-227

JOSEPH BONGIOVANNI,

               Defendant.

———————————————————————

## GOVERNMENT'S RESPONSES TO THE DEFENDANT'S OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT

**THE UNITED STATES OF AMERICA**, by and through its attorneys, Michael DiGiacomo, United States Attorney for the Western District of New York, Joseph M. Tripi, Assistant United States Attorney, of counsel, hereby files this response to the defendant's objections to the Pre-Sentence Investigation Report (PSR), s*ee* ECF No. 1567.

## INTRODUCTION

The PSR has appropriately calculated the sentencing guidelines in this case. *See also* ECF Nos. 1503, 1566. The defendant's objections to the PSR suffer from a myriad of flaws that flow from the same flawed premises that infected the defendant's Rule 29 motion. *See e.g.,* ECF No. 1487 at 2 (*e.g.,* "[H]e asks the Court to follow his lead in carving up, ignoring, and reweighing the evidence in the light most favorable to him—not the government."). Just as the defendant's arguments lacked merit in the context of a Rule 29 sufficiency review— they also lack merit in the context of the Court's consideration of the Sentencing Guidelines and sentencing factors under Title 18, United States Code, Section 3553(a).

First, objections to a PSR are not a proxy to re-try counts of conviction on paper, or to amplify a deficient Rule 29 motion. In this regard, the defendant fails to recognize that the burden of proof at sentencing—preponderance of the evidence—is much lower than the burned of proof—beyond a reasonable doubt—at trial. Moreover, while failing to apply the proper burden of proof to sentencing guidelines and departures, the defendant also misapprehends the breadth and scope of information the Court may consider at sentencing. From there, the defendant repeatedly makes bold and baseless claims that the defendant was "acquitted" of conduct underlying certain counts of conviction whereas, in reality, the defendant simply wants the court to ignore certain damaging pieces of evidence and compelling factual detail underlying his counts of conviction. Indeed, the defendant, who describes his convictions as "discrete acts," *see* ECF No. 1567 at 2, wholly fails to acknowledge that he was convicted of, among other things, jointly undertaken criminal activity, that is, *conspiracy* to defraud the United States and to accept bribes (Count 1) and *conspiracy* to possess with intent to distribute controlled substances (Count 3), and disregards how those and other convictions properly result in the calculations set forth in the PSR.

Second, while paying lip service to the Sentencing Guidelines and the manner in which courts determine relevant conduct, the defendant's objections gloss over the fact that the PSR may arrive at proper calculations through application of more than subsection of guideline of § 1B1.3. Moreover, his arguments pertaining to the reasonable foreseeability requirement under § 1B1.3(a)(1)(B) ignore the preponderance of evidence standard applicable to sentencing calculations and seemingly advocates for the application of a non-existent "actual

knowledge" requirement—rather than the applicable "reasonable foreseeability" requirement.

Third, the defendant misapprehends that the Court's guidelines calculations are not constrained by the proof at trial, and that courts are guided to consider all relevant conduct, including uncharged conduct, hearsay, and other information bearing upon the defendant's history and characteristics. Moreover, while mischaracterizing certain evidence and facts underlying the defendant's counts of conviction as "acquitted conduct," the defendant nevertheless fails to grapple with how the recent amendments to the guidelines continue to acknowledge that "certain conduct underlies both an acquitted charge and the instant offense of conviction," and as such "the court is in the best position to determine whether such overlapping conduct establishes, in whole or in part, the instant offense of conviction and therefore qualifies as relevant conduct." *See* Application Note § 1B1.3(c), comment (n. 10).

Fourth, the defendant essentially requests that U.S. Probation rewrite the PSR consistent with his spin of the facts, and for the Court to conduct a line-by-line review of the PSR when none is required by the Second Circuit.[1]

Overall, the defendant's objections endeavor to artificially limit the Court's consideration of the facts, details, and background. The defendant's objections all must fail because relevant conduct, and the information the Court may consider at sentencing, is

---

[1] U.S. Probation is required to conduct a presentence investigation and to submit a presentence report to the court. *See* Guideline § 6A1.1; *see also* FED R. CRIM. P. 32(C). U.S. Probation is an arm of the court and, in this case, they considered, among other things, a myriad of trial transcripts.

neither constrained by the government's proof at trial, nor the defendant's *ad hoc* attempt to artificially limit the evidence, facts, details, and background relevant to the defendant's sentencing.  As set forth below and in the government's sentencing statement, *see* ECF No. 1566, the Court should apply the calculations set forth in the PSR, *see* ECF No. 1503.

## THE GOVERNING LAW

Title 18, United States Code, Section 3661 provides that "[N]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of establishing an appropriate sentence."

Title 18, United States Code, Section 3553(a) requires that the Court impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)].  In determining the sentence, the Court must consider, among other things, the nature and circumstances of the offenses, and the history and characteristics of the defendant.

In executing these statutory responsibilities, the Court is obligated to:  (1) identify the Guidelines range supported by the facts; (2) treat the Guidelines as advisory; and (3) consider the Guidelines together with the other factors outlined in 18 U.S.C. § 3553(a).  *United States v. Ratoballi,* 452 F.3d 127, 131-32 (2d Cir. 2006).

In order to "consider" the Sentencing Guidelines, as required by 18 U.S.C. § 3553(a)(4), the Court must determine the applicable Guideline range in the same manner as

before the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), which essentially rendered the Sentencing Guidelines advisory. *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005). An error in determining the applicable Guideline range or the availability of departure authority would be the type of procedural error that could render a sentence unreasonable on appellate review. *United States v. Selioutsky*, 409 F.3d 114, 118 (2d Cir. 2005). In fact, on appeal, the Second Circuit will view as "inherently suspect a non-Guidelines sentence that rests primarily on factors that are not unique or personal to a particular defendant." *United States v. Ratoballi*, 452 F.3d at 133. "[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be [upheld as] reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006).

In *Rita v. United States*, 551 U.S. 338, 346-47 (2007), the Supreme Court held that in reviewing a properly calculated within-Guidelines sentence, an appellate court may apply a presumption of reasonableness. While the Court stressed that the presumption is an appellate court presumption, and "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply," *Id.*, at 339, the Court's reasoning is helpful in determining whether a Guidelines sentence is "sufficient, but not greater than necessary, to comply with the purposes" of the sentencing statute.

Specifically, the Court observed that "the sentencing statutes envision both the sentencing judge and the [Sentencing] Commission as carrying out the same [18 U.S.C.] § 3553(a) objectives . . . ." *Rita*, 551 U.S. at 348. Thus, "the Guidelines, insofar as practicable,

5

reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.*, at 350. Accordingly, ". . . when the judge's discretionary decision accords with the Commission's view of the appropriate application of § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable." *Id.* at 351. *See also Crosby*, 397 F.3d at 113 ("it is important to bear in mind that *Booker*[ ] and Section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."). *Cf.*, *United States v. Sindima*, 488 F.3d 81, at 87 (2d Cir. 2007) (while a district court may impose a non-Guidelines sentence based upon Section 3553(a) factors already accounted for in the Guidelines range, it must explain "why a Guidelines sentence did not sufficiently account for those factors[.]").

## THE PREPONDERANCE OF THE EVIDENCE STANDARD APPLIES TO SENTENCING, AND THE COURT HAS BROAD AUTHORITY TO CONSIDER INFORMATION RELEVANT TO SENTENCING

Determining relevant conduct requires a court to find all facts relevant to the sentencing guidelines range and to make a determination as to which range applies. *See* U.S.S.G. § 1B1.1. The standard of proof required is a preponderance of the evidence. *United States v. Salazar*, 489 F.3d 555, 558 (2d Cir. 2007); *United States v.* Garcia, 413 F.3d 201, 220 n. 15 (2d Cir. 2005); *United States v. Guerra*, 888 F.2d 247, 251 (2d Cir. 1989). The preponderance of evidence standard is satisfied simply when a fact to be proven is more probable than not. *United States v. Stimpson,* 113 F.4th 350, 354 (3d Cir. 2024); *United States v. Mathis*, 216 F.3d 18, 28 (D.C. Cir. 2000). The much more stringent standard of proof to convict a defendant at trial—proof beyond a reasonable doubt—does not apply to determining relevant conduct under the sentencing guidelines. *Salazar*, 489 F.3d at 557-58 (citing U.S.S.G.

§ 6A1.3 (commentary) ("The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.").  Sentencing proceedings are not "second trials," *United States v. Fatico*, 603 F.2d 1053, 1057 (2d Cir. 1979), and a court may use hearsay statements in determining sentence, *United States v. Lee*, 818 F.2d 1052, 1055 (2d Cir. 1997).  The sentencing court's discretion is "largely unlimited either as to the kind of information he may consider, or the source from which it may come," and "[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination."  *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989) (citations omitted); [2] *see also* 18 U.S.C. § 3661; *Witte v. United States*, 515 U.S. 389, 397–401 (1995) (noting that sentencing courts have traditionally considered wide range of information without the procedural protections of a criminal trial, including information concerning uncharged criminal conduct, in sentencing a defendant within the range authorized by statute); *Nichols v. United States*, 511 U.S. 738, 747–48 (1994) (noting that district courts have traditionally considered defendant's prior criminal conduct even when the conduct did not result in a conviction).

---

[2] As set forth above, Title 18 U.S.C. § 3661 provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  Moreover, Federal Evidence Rule 1101 provides that the rules of evidence to not apply to sentencing, and the Supreme Court has long held that the use of hearsay at sentencing does not violate due process. *Williams v. Oklahoma*, 358 U.S. 576, 584 (1959); *see also Williams v. New York*, 337 U.S. 241, 246-51 (1949) (citing with approval "the 'age-old practice of seeking information from out-of-court sources to guide [a court's] judgment toward a more enlightened and just sentence.'"); *United States v. Simmons*, 164 F.3d 76, 79 (2d Cir. 1998).

## § 1B1.3 RELEVANT CONDUCT

The Sentencing Guidelines § 1B1.3 provides that the base offense level, specific offense characteristics, and Chapter Three adjustments are determined by reference to: offense conduct the defendant committed or aided and abetted, *see* § 1B1.3(a)(1)(A); "in the case of jointly undertaken activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, *whether or not charged as a conspiracy*), all acts and omissions of others that were— (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; *that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense*;" *see* § 1B1.3(a)(1)(B) (emphasis added); with respect to a wide variety of offenses (including drug and fraud offenses), "all acts described in subsections (1)(A) and (1)(B) that were part of the same course of conduct or common scheme or plan as the offense of conviction;" *see* § 1B1.3(a)(2); "all harm that resulted from the acts or omissions in subsections (1)(A) and (1)(B), above, and all harm that was the object of such acts and omissions, *see* § 1B1.3(a)(3); and, "any other information specified in the applicable guidelines, *see* § 1B1.3(a)(4).

In the case of a jointly undertaken criminal activity, such as the criminal activity underlying the defendant's protection of drug traffickers underlying his convictions on Counts 1 and 3, another's acts and omissions are relevant conduct when the act or omission is (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity.  *See* § 1B1.3(a)(1)(B)(i)-(iii).  In determining the defendant's accountability for the conduct of others

under subsection (a)(1)(B), the sentencing court "must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (*i.e.*, the scope of the specific conduct and objectives embraced by the defendant's agreement)." U.S.S.G. § 1B1.3(a)(1)(B), comment. (n.3). "Under the relevant conduct principles of subsection 1B1.3(a)(1)(B), all reasonably foreseeable acts ... of others in furtherance of [a] conspiracy may be taken into account to determine a defendant's sentence." *United States v. Mulder*, 273 F.3d 91, 118 (2d Cir. 2001) (quoting *United States v. Molina,* 106 F.3d 1118, 1121 (2d Cir.1997) (internal quotation marks omitted)). However, the court must make two particularized findings. First, it must determine "the scope of the criminal activity agreed upon by the defendant." *United States v. Studley,* 47 F.3d 569, 573 (2d Cir. 1995). Second, it "must make a particularized finding as to whether the activity was foreseeable to the defendant." *Id.* at 574. In this vein, the Second Circuit has identified a range of factors that may be relevant to assessing the scope of jointly undertaken criminal activity, including:

> [A]ny explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and other participants; whether the participants pool their . . . resources, or whether they work independently; whether the defendant assisted in designing *and* executing the illegal scheme; and what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct.

*United States v. Pica*, 106 F.4th 197, 201-202 (2d Cir. 2024) (quoting *Studley,* 47 F.3d at 575) (punctuation modified and emphasis omitted).[3]

---

[3] As described *infra*, nothing in the recent amendments to § 1B1.3(c) change these core considerations, and as a result, at a minimum even under the amendment there is "certain conduct underlies both an acquitted charge and the instant offense of conviction," and as such "the court is in the best position to determine whether such overlapping conduct establishes, in whole or in part, the instant offense of conviction and therefore qualifies as relevant conduct." *See* Application Note § 1B1.3(c), comment (n. 10).

As set forth above, relevant conduct under U.S.S.G. § 1B1.3(a)(2) also requires the court to consider "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction."    "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*. § 1B1.3, comment. (n. 5(B)(ii)); *see also United States v. Walsh*, 119 F.3d 115, 121 (2d Cir. 1997) (common accomplices and *modus operandi* rendered acts part of a common scheme or plan even though the acts were not directly related to the offense of conviction*)*.   "Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses."  § 1B1.3, comment. (n. 5(B)(ii)); *see also United States v. Perdomo*, 927 F.2d 111, 114-15 (2d Cir. 1991) (acts not part of a common scheme or plan may nevertheless constitute relevant conduct as part of the same course of conduct).  The "course of conduct" principle is "broader" than "common scheme or plan" and captures conduct that does not bear on substantial connections "in terms of participants or overall plan." *United States v. Shonubi*, 998 F.2d 84, 89 (2d Cir. 1993). The Second Circuit has held that § 1B1.3(a)(2) "is to be interpreted broadly." *United States v. Silkowski*, 32 F.3d 682, 688 (2d Cir. 1994).

The Sentencing Commission has also explained that "[i]n certain cases, a defendant may be accountable for particular conduct under more than one subsection of this guideline. If a defendant's accountability for particular conduct is established under one provision of this guideline, it is not necessary to review alternative provisions under which such accountability might be established." *See* § 1B1.3, comment. (n. 2). "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range. The range of information that may be considered at sentencing is broader than the range of information upon which the applicable sentencing range is determined." *See* § 1B1.3, comment. (background)

## EVALUATING ACQUITTED CONDUCT

A concept that remains unchanged by the recent amendments to Guideline § 1B1.3 is the court's authority to consider conduct under 18 U.S.C. §3661. *See 2024 Amendments to the Sentencing Guidelines, Policy Statements, and Official Commentary* at 2 ("nothing in the Guidelines Manual abrogates a court's authority under 18 U.S.C. § 3661.").[4] In turn, Title 18, United States Code, Section 3661 provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of establishing an appropriate sentence." The amendment adds another caveat, that is, that "cases in which certain conduct underlies both an acquitted charge and the instant offense of conviction […], the court is in the best position to determine whether such overlapping conduct establishes,

---

[4] Available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202405_RF.pdf

in whole or in part, the instant offense of conviction and therefore qualifies as relevant conduct." *See* Application Note to § 1B1.3(c), comment. (n. 10).

## GROUPING RULES

Sentencing Guideline § 3D1.2 delineates how courts are to consider closely related counts. Specifically, "[a]ll counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:[5]

(a)    When counts involve the same victim and the same act or transaction.

(b)    When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

(c)    When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d)    When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

---

[5] The narcotics and obstruction related offenses at issue in this case group under this rule.

## ABUSE OF TRUST OR USE OF SPECIAL SKILL

Pursuant to Sentencing Guidelines Section 3B1.3, "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." The adjustment applies when the offense is a conspiracy as long as the court "determines with reasonable certainty that the defendant actually intended to use his or her special skill or position of trust." *United States v. Downing,* 297 F.3d 52, 65 (2d Cir. 2002). The Second Circuit applies a two-pronged test to determine whether this enhancement applies: "(1) whether the defendant occupied a position of trust from the victim's perspective and (2) whether that abuse of trust significantly facilitated the commission or concealment of the offense." *United States v. Huggins*, 844 F.3d 118, 124 (2d Cir. 2016) (internal quotations omitted); *see also United States v. Nuzzo,* 385 F.3d 109, 115 (2d Cir. 2004). "For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult)." *See* § 3B1.3, comment. (n. 1). This adjustment applies to a member of law enforcement who uses his position to facilitate and conceal the drug distribution conspiracy in which they participated. *United States v. Alston,* 899 F. 3d 135, 151-52 (2d Cir. 2018) (applying the enhancement where a police officer helped to ensure that a fellow police officer did not search an individual during a traffic stop to find drugs, and where the police officer provided his PBA card to a drug trafficker to help the drug trafficker avoid suspicion when the police officer was not able to intervene personally on the drug trafficker's behalf). In *Alston*, the Second Circuit aptly observed: "It is difficult to imagine a more obvious 'abuse of trust' than Alston's use of his authority: he held that authority as a privilege of his

position as a New York City police officer, and he used that authority to help a drug trafficking criminal evade detection and capture." *Id.* at 152.

## OBSTRUCTION OF JUSTICE

Guidelines Section 3C1.1 provides a two-level increase in the offense level where the defendant willfully obstructs justice with respect to the investigation, prosecution, or sentencing of the offense of conviction, or attempts to do so. "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." *See* § 3C1.1, comment. (n. 1). Examples of conduct covered under this enhancement include: "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation;" "concealing" or "directing" another to conceal evidence that is material to an official investigation; and, "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense." *See* § 3C1.1, comment. (n. 4). "Material evidence, fact, statement, or information, as used in this section, means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." *See* § 3C1.1, comment. (n. 6). The threshold for materiality is "conspicuously low" and there is no requirement for the obstruction to succeed. *United States v. Gershman*, 31 F.4th 80, 103 (2d Cir. 2022). "[T]he defendant is accountable for the defendant's own conduct and for conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused." *See* § 3C1.1, comment. (n. 9). This enhancement clearly applies where a defendant's conduct

involves willfully warning others of law enforcement's investigation, s*ee United States v. Cassiliano*, 137 F.3d 742, 746-47 (2d Cir. 1998); where a defendant attempts to have his friends lie to law enforcement in support of a false alibi, *see United States v. Feliz,* 286 F.3d 118, 120-21 (2d Cir. 2002); and, producing or creating false documents, *see United States v. Harris*, No. 23-6811, 2025 WL 18131, at *2 (2d Cir. Jan. 2, 2025) (Summary Order).

## *APPRENDI* DOES NOT APPLY TO SENTENCING GUIDELINE ENHANCEMENTS

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that any fact that increases the penalty for a crime beyond the statutory maximum, other than a prior conviction must be submitted to a jury and proved beyond a reasonable doubt. *Apprendi* does not apply to sentencing guideline enhancements. *United States v. Norris*, 281 F.3d 357, 360-61 (2d Cir. 2002). As set forth above, the standard for sentencing enhancements, including enhancements based upon drug weight, is a preponderance of the evidence (*i.e.*, more likely than not). *See Salazar*, 489 F.3d at 557-58; *see also United States v. Gigante,* 94 F.3d 53, 56 (2d Cir.1996).

## LINE-BY-LINE CHALLENGES TO THE PSR

The Court is not required to "perform a line-by-line review of the PSR," so long as it "resolve[s] the substantive challenges" thereto. *United States v. Reiss,* 186 F.3d 149, 156-57 (2d Cir. 1999).

## RELEVANT CONDUCT VERSUS § 3553(a) FACTORS

"[W]hen a sentencing court turns from calculating a guideline range to determining a

sentence, it may consider any information 'concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.'" *United States v. Escobar*, 542 F. App'x 38, 40 (2d Cir. 2013) (quoting *United States v. Broxmeyer*, 699 F.3d 265, 268 (2d Cir. 2012) and 18 U.S.C. § 3661).

## ARGUMENT

### I.    The Defendant was not Convicted of Discrete Acts and the PSR has Properly Calculated the Relevant Conduct Based Upon Converted Drug Weight

Regarding the drug weight attributable to the defendant in the PSR, the defendant erroneously argues that he was convicted of discrete acts, and that those acts amount to no more than "a discrete conspiracy" with Lou Selva only, which amounts to a drug weight of less than 50 kilograms of marijuana.  *See* ECF No. 1567 at 8. However, the defendant's objections fail to contend with the actual evidence in the case, the preponderance of the evidence standard applicable to the sentencing guidelines, and the scope of the jointly undertaken activity encompassed by the defendant's conduct.

### i.    The scope of the jointly undertaken criminal activity under § 1B1.3(a)(1)[6]

The preponderance of the evidence, based upon the trial testimony and exhibits at trial, and the information available to the Court and U.S. Probation established that the defendant

---

[6] The government incorporates the facts set forth in its response to the defendant's Rule 29 motion, *see* ECF No. 1487 (unredacted), as though set forth fully herein.  Unless otherwise noted, specific citations to trial testimony can be found in ECF No. 1487.

was involved in a decades long scheme to protect drug dealers who were his friends, and who the defendant believed had ties to Italian Organized Crime, as alleged in Counts 1 and 3.

The evidence established that the defendant's corrupt protection spanned from at least 2008 and continued through the defendant's arrest in 2019—as the corrupt DEA agent who orchestrated protection of the DTO, the defendant was pivotal to the continuity and success of the conspiracies in which he was convicted. Both Lou Selva and Ron Serio, members of the conspiracies in which the defendant was convicted, testified in sum and substance that, even though the defendant was initially looking out for and protecting the group for free (*i.e.,* by protecting Selva and Masecchia respectively), eventually the drug trafficking organization wanted to expand the protection the defendant provided and formalize an arrangement with the defendant.  To that end, and as instructed by Michael Masecchia, Selva approached the defendant and offered to pay the defendant cash bribes in exchange for his protection of Serio and the other members of the DTO, including himself and Masecchia.

Specifically, Selva testified that he and Masecchia, who had already received the green light from Serio, discussed offering the defendant $2,000 a month in exchange for his protection.  When Selva made the initial offer to the defendant, the defendant initially turned him down, but he reassured Selva that he would "have his back."  After being fully debriefed as to where the marijuana grow operations were and who was involved—by having Selva's back the defendant was effectively protecting the DTO.  However, after that initial rejection, Selva and the defendant met again, and Selva asked the defendant "[i]f he'd give[n] any thought" to their previous conversation and emphasized how the money could "help him get

17

through the situation he's involved in with his finances," namely, expenses stemming from his divorce coupled with the general costs of living. Though the defendant was "hesitant," he ultimately agreed to provide the DTO protection.

As to the defendant's agreement—the evidence was clear and the agreement was broad. In exchange for the $2,000 a month, the defendant agreed to alert the DTO "[i]f there w[ere] any investigations, if anybody was hot or followed, if anyone had been busted [and] had mentioned names," if there were "informants that are working with agencies," and if law enforcement generally know of "[a]nything pertaining to" the DTO's activities. The defendant accepted these conditions, and advised Selva that he would "have his eyes open" and, "going forward," would "let [the DTO] know" if it was at risk. Thereafter, Selva and the defendant met at least monthly and, during said meetings, the defendant provided general and specific information that enabled the DTO to persist and thrive for approximately a decade. Selva dutifully passed along the information he acquired to Masecchia and Serio, while Bongiovanni worked on his end to ensure that no threats were posed to the DTO by other members of law enforcement or by confidential informants.

Consistent with Lou Selva and Ron Serio's trial testimony, and even though he did not testify at trial, in his plea agreement, Michael Masecchia acknowledged that the defendant provided law enforcement sensitive information to protecting Masecchia and others, which enabled them to continue their substantial drug trafficking activities. A portion of Masecchia's plea agreement is excerpted as follows:

**FACTUAL BASIS**

4.    The defendant and the government agree to the following facts, which form the basis for the entry of the pleas of guilty including relevant conduct:

a.    The defendant admits and agrees that he has been involved, with others, in the possession with intent to distribute, and distribution of, marijuana since at least 1999, and continuing until on or about August 23, 2019, at which time the defendant was arrested by federal agents at his residence, located at 5907 Main Street, Williamsville, New York. The defendant's conduct included repeated distribution of quantities of marijuana trafficked into the Western District of New York, to individuals operating in the Buffalo, New York area and its suburbs. The defendant also admits and agrees that he and others have participated in marijuana grow operations in Ellicottville and Franklinville, in Cattaraugus County, New York, for harvesting and distribution to marijuana to resellers and users. The defendant further admits that, between at least 1999 and August 23, 2019, he has possessed firearms to protect his person, proceeds, and property where he stored marijuana and currency and, therefore, that he possessed firearms in furtherance of his marijuana distribution activities.

b.    The defendant further admits and agrees that, at various times, codefendant Joseph Bongiovanni, a former DEA agent in the Buffalo, New York resident office, has provided law enforcement sensitive information, including the names of potential cooperators and whether or not MASECCHIA and others were under federal investigation, to enable MASECCHIA and others to continue in their marijuana distribution activities undetected by other members of law enforcement.

c.    On August 23, 2019, agents and officers from HSI, FBI, the Erie County Sheriff's Office, and the Niagara County Sheriff's Office executed a search warrant at 5907 Main Street, Williamsville, New York. At that time, MICHAEL MASECCHIA, his wife, and their two children were present at the residence. Agents spoke to MASECCHIA in the front yard of the residence while a tactical team completed the initial search of the residence. Agents questioned MASECCHIA about firearms and controlled substances present in the residence. MASECCHIA related there were several firearms located in his bedroom. He also stated there was a small amount of marijuana in his nightstand. MASECCHIA stated he had numerous firearms under his bed and one firearm in a case between the mattress and box spring of his bed. One of the agents asked

*See* ECF No. 68 at 3. Masecchia's plea attestations, which are consistent with the vast quantity of evidence the Court heard during two trials, are appropriate for the Court to consider in the context of the defendant's sentencing. *See* 18 U.S.C. § 3661; *see also Lee,* 818 F.2d 1052, 1055 (the court may consider hearsay at sentencing).

Indeed, both Selva and Serio testified at multiple trials, in sum and substance, that Masecchia would deliver the defendant the money to the defendant, because, as Selva put it, "Ron was paying Mike"— a dynamic Selva alerted the defendant to when he told him that the ultimate source of the money was Serio, the guy at "the top" who had been "cashing [him

and Masecchia] out and providing the cash for" the defendant's payment. However, due to Masecchia's suspected involvement in Italian Organized Crime, the defendant's meetings with Masecchia were intended to be "brief." Because meeting with Selva would raise fewer eyebrows, and because the defendant already regularly met with Selva, any information the defendant had to share would be provided principally to him.

As both Selva and Serio testified, after a couple of years, the price for the defendant's protection increased. As Selva explained, the DTO's operations were expanding, and with it came increased risk. Masecchia was particularly concerned with ICE, and trial evidence including Ron Serio's testimony established that ICE had recently been involved in a round-up of individuals involved in drug distribution wherein law enforcement utilized wiretaps. As a result, the defendant agreed to report "if something unusual happened," and agreed to be more vigilant, but the price would increase to $4,000 per month. Around this time, the expansion in the DTO's drug activity included cross-country and international trucking shipments of marijuana—which included quantities of fentanyl pills inside the marijuana loads, and drug runs to New York City.

The trial evidence further established that once the drugs arrived in Buffalo, Serio handled distribution activity through his network of dealers, and Selva continued his role in the outdoor grows, storing marijuana for the DTO at his residence, and growing marijuana plants inside his residence for distribution. Among the other services the defendant would provide, he agreed to look into whether there were wiretaps on DTO member phones; ensure that Serio and Masecchia's drug-related travels were not on any agency's investigative radar;

and to continue to vigilantly protect the organization from penetration by informants and confidential sources. Serio was satisfied with the defendant's protection and the information he received through Masecchia and Selva from roughly 2008 until he was arrested in April 2017.

After Serio was arrested by the Erie County Sheriff's Office (ECSO) on April 18, 2017, the defendant advised Selva what he knew about the Serio arrest, explained that it was the ECSO, that the defendant was unaware of the investigation before Serio was arrested (because it was a short investigation and they did not notify the defendant), and then the defendant coached Lou Selva on what to say if he was ever approached by law enforcement. In particular, the defendant instructed Selva to lie to law enforcement, that is, the defendant told Selva that if a member of law enforcement were to approach Selva, Selva should use a false cover story and advise law enforcement that Selva was being recruited by the defendant to be the defendant's confidential informant. This was a false cover story that the defendant later reiterated to Selva that he should use after the defendant's house was searched by law enforcement on June 6, 2019.[7]

To be sure, as described ECF No. 1487 and through testimony and exhibits at trial, explicitly and implicitly through his conduct, established the defendant's agreement corruptly to protect the DTO in a variety of ways. For example:

- The defendant protected the DTO against informants.

---

[7] As Selva explained at the trials, not long after Selva's house was searched by law enforcement on August 23, 2029, Selva attempted to implement the defendant's instructions. During a polygraph interview conducted by Homeland Security Investigations, Selva and tried to claim that Selva was the defendant's informant, which resulted in a failed polygraph.

- The defendant misled members of law enforcement, including the Amherst Police Department, DEA, and the United States Attorney's Office.

- The defendant signed Robert Kaiser up as the defendant's DEA confidential source, and then promptly exposed Kaiser's status as a confidential source (CS) to Selva, who passed that critical information along to the DTO's principal members—Masecchia and Serio.

- The defendant, after exposing Kaiser's identity as a CS to the DTO, ensured that Kaiser provided no cooperation against the Serio DTO and promptly used Kaiser to investigate an individual unconnected to the Serio DTO.

- The defendant, after using Kaiser to investigate another individual, prematurely closed Kaiser as a CS and forged DEA Special Agent Mark Gentile's name on the CS deactivation form. Thereafter, the defendant continued to mislead other members of the DEA (such as David Leary, Shane Nastoff, Dave Turri, and the supervisor who signed off on false reports---John Flickinger), into believing he had a CS active in the case when he did not.

- The defendant misled the New York State Police into adopting an investigation into Wayne Anderson, who was arrested during a controlled delivery involving 200 pounds of marijuana intended for the DTO, and then ensured that he stifled further investigation into Wayne Anderson by creating a sham file (C2-13-0026) purporting to investigate Wayne Anderson, and the Serio DTO.

- The defendant, using the sham file that he opened (C2-13-0026) created a myriad a false and misleading DEA reports (including the reports underlying the convictions on Counts 6 and 7) to commit and conceal the conspiracies.

- The defendant continually misled co-workers and misused DEA databases (such as the DARTS database) to set up deconflictions to alert him if members of the conspiracy were under investigation by other members of the DEA or federal law enforcement.

- The defendant used the DEA DARTS deconflictions that he caused to be set up to confirm for the DTO that no DTO members—including principal members Ron Serio and Michael Masecchia—were captured on law enforcement wiretaps.

- The general advice that the defendant provided, which Selva frequently passed along to the DTO, included: how law enforcement obtained

wiretaps; how to avoid being captured on a wiretap; specific vehicles and techniques the DEA use in surveillance; how law enforcement conducts surveillance; how the DEA uses task force officers to aid their investigations; how the DEA checks utilities to look for energy usage patterns that might alert them to suspected grow operations; how the DEA utilizes GPS trackers in a drug investigation; and how law enforcement, generally, investigates banking activity.

- The specific information the defendant provided included: the identities of three DEA CSs (including Kaiser); confirmation that no members of law enforcement were tracking tractor trailer trucks from California and British Columbia intended for Buffalo; advised Selva about GPS trackers and their [contemplated] use in the investigation (around the same time Assistant United States Attorney Timothy C. Lynch recommended the technique as a means to investigate the DTO in a meeting attended by the defendant); advising Selva about financial investigation into Serio—a principal member of the DTO; advising Selva that a member of the DTO, Mario Vacanti, was under investigation, and, informing Selva when investigation into the DTO was closed.

- When federal law enforcement began to scrutinize the defendant, and to investigate the conspiracies, the defendant not only coached Lou Selva to lie to conceal the criminal activity, but the defendant also personally made a myriad of false statements to conceal the conspiracies and his involvement in them.

In sum, the defendant played a critical role in the continued success of all aspects of the conspiracies, and the evidence—direct and circumstantial—presented over the course of two six-week trials, which included sixty-two government witnesses and three-hundred sixty-five government exhibits, established, *see Gigante supra*, that the broad scope of the defendant's conspiratorial agreements were as described in Counts 1 and 3 of the indictment and detailed in the PSR. *See Pica*, 106 F.4th at 201-202 (quoting *Studley*, 47 F.3d at 575) (the scope of the agreement includes "[a]ny explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and other participants; whether the participants pool their . . . resources, or whether they work independently; whether the defendant assisted in designing

*and* executing the illegal scheme; and what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct.").

### ii.    The criminal activity was reasonably foreseeable to the defendant

As a principal member of the conspiracy and the one responsible for carrying out protection of the DTO, the criminal activity, including the drug amount, was foreseeable to the defendant.

First, as to the drug amounts involved, Lou Selva specifically advised the defendant that the drug trafficking involved outdoor marijuana grow operations in the Southern Tier; indoor marijuana grow operations at Selva's residence; trips to New York City by Serio and Masecchia to procure marijuana; and tractor trailer truckloads of marijuana traveling across the country from California and internationally from British Columbia, Canada. From this evidence alone, it was reasonably foreseeable that the DTO was engaged in distributing thousands of pounds of marijuana for many years.

Second, the New York State Police arrest of Wayne Anderson, a member of the DTO under the defendant's protection, involved 200 pounds of marijuana in a single shipment that was intercepted coming across the country by the Illinois State Police intended for Wayne Anderson, and was delivered as part of a controlled delivery to Wayne Anderson by the New York State Police (NYSP). The evidence established at trial, and as summarized in the government's response to the defendants Rule 29 motion, *see* ECF No. 1487 at 15-18, describes how the defendant protected the DTO by misleading the NYSP into relinquishing

the Wayne Anderson investigation to the defendant.  Once the defendant stifled the immediate threat posed by the NYSP to the DTO, the defendant opened and used the Wayne Anderson file, C2-13-0026, to broaden his ability to protect the DTO through use of DEA databases and to ensure all law enforcement leads as potential cooperators that could threaten the DTO were funneled to him.  The single shipment of 200 pounds of marijuana is 90.7 kilograms of marijuana, and the defendant's actions and conduct in connection with this event further demonstrates that the defendant knew—and it was *at least* reasonably foreseeable—that he was protecting a large-scale drug operation.

Third, Robert Kaiser advised the defendant that the Serio DTO was involved in trafficking cocaine and marijuana.  Kaiser described Ron Serio and his brother as "leaders of a large drug organization capable of trafficking multi-kilogram quantities of cocaine and hundreds of pounds of marijuana in Buffalo, New York."  Kaiser further advised the defendant that he was asked to transport narcotics on behalf of the organization from areas in New York City and California to Buffalo.[8]  From this evidence, it was reasonably foreseeable to the defendant that the drug amounts included at least 5 kilograms of cocaine and very large quantities of marijuana.

Fourth, as part of his scheme to open Kaiser as his informant, control Kaiser, and ultimately expose Kaiser's identity to the DTO via Lou Selva, the defendant had to write a DEA report documenting the information Kaiser provided to the DEA during his initial

---

[8] *See* Gov. Ex. 81; *see also* testimony of Robert Kaiser and Shane Nastoff (verifying the information Kaiser provided to agents, including the defendant, during his initial debriefing on April 30, 2013).

debriefing.  *See e.g.,* Gov. Exs. 8I and 9E-2.  Portions of the reports the defendant authored are excerpted as follows:



In the same DEA 6 report authored by the defendant, the defendant indicated that Ron Serio's brother previously was arrested in 1998 in connection with trafficking approximately 5

kilograms of cocaine, and that Ron Serio had purchased a million dollar mansion and was

spending large quantities of currency at area casinos, as follows:

FINANCIAL RELATED INFORMATION

1.DEA Agents are coordinating the investigation with the AUSA WDNY, the
Office of the New York State Attorney General, the New York State Police,
the Buffalo FBI, and the Buffalo IRS and working towards wire
intercepts. Ron SERIO is believed to be involved in extremely large cash
transactions in the Buffalo area and also owns multiple properties,
including a million dollar residence/mansion in Williamsville, NY.  The CS
also believes SERIO is spending large quantities of cacseh,
approximately $10,000 to $20,000 U.S. currency, in area casinos.  Ron
SERIO's brother, Thomas SERIO, was previously arrested and convicted of
trafficking 5 kilograms of Cocaine by the State of New York.

Moreover, through Kaiser, the defendant knew the DTO had access to firearms, as the

defendant wrote in his CS Establishment report, *see* Gov. Ex. 9E-4, as follows:

Robert E. KAISER resides in Buffalo, NY. KAISER is has developed several friendships with individuals with the
Ronald SERIO drug trafficking organization. KAISER is cooperating for credit in lieu of pending New York
State charges for burglary. KAISER has been approached by SERIO and Robert MATTAL in the past to assist the
SERIO DTO in transporting and safeguarding cocaine, marijuana, and firearms from California and New York City
to Buffalo, New York. [9]

Fifth, Ron Serio testified consistent with the drug amounts detailed in the PSR, *see*

ECF No. 1503 at ¶ 59, that he was involved in distributing 10,000 pounds (4,536 kilograms

of converted drug weight) of marijuana, at least 5 kilograms of cocaine (1000 kilograms of

converted drug weight, and 16,000 fentanyl pills (12,800 kilograms of converted drug weight),

which U.S. Probation calculated as 10,000 to 30,000 kilograms of converted drug weight.

---

[9] There was also testimony and photos admitted into evidence establishing that Masecchia, Serio, and
Selva—members of the DTO the defendant was protecting, all had firearms during the course of the
charged conspiracies.

Sixth, in a search warrant affidavit admitted in evidence at trial, *see* Gov. Ex. 145, the defendant explained his training and experience with regard to investigating drug traffickers and trafficking organizations, which included the defendant's description of his knowledge of drug trafficking methods and the way drug traffickers keep and store drugs, proceeds, paraphernalia, and that firearms are the tools of the drug trafficking trade. Thus, as a highly trained DEA agent, and based upon the information that Selva and Kaiser had provided the defendant, it was reasonably foreseeable to the defendant that a large scale drug organization, such as the Serio/Masecchia DTO that he was protecting, is frequently involved in the distribution of a myriad of controlled substances.

Seventh, Ron Serio was charged by a publicly filed criminal complaint (Case No. 17-M-5172) following his arrest on April 18, 2017. The criminal complaint described the drugs seized from his residences. In particular, the publicly filed complaint affidavit described the drugs (including pills, cocaine, and marijuana), money, and firearm seized from Serio's properties at 697 Lebrun Road, 91 Grimsby Road, as well as the drugs at 370 Huntington and inside Serio's vehicle. After Serio's arrest, the defendant discussed Serio's arrest with Lou Selva and explained that the defendant was unaware of the investigation because it was conducted by the Erie County Sheriff's Office (in conjunction with the FBI). Thereafter, the defendant continued to make efforts to conceal the conspiracy, which included instructing Lou Selva about what to say if Selva was approached by law enforcement.[10]

---

[10] Moreover, Mark Falzone testified at Trial #1, that after Serio's arrest, Falzone met with Masecchia to discuss the matter and Masecchia stated, in sum and substance, that "my guy" [Bongiovanni] said Ron was not on any [law enforcement] radars. Thereafter, while the Court did not permit Falzone to further testify at trial, Falzone's interviews and grand jury testimony establish, in sum and substance, that Falzone attended a meeting with Masecchia and Tom Serio wherein they discussed who could

"The drug quantity attributable to a defendant knowingly participating in a drug distribution conspiracy" includes not only the specific narcotics acquired in "transactions in which he participated directly," but also those acquired in "transactions in which he did not personally participate, but where he knew of the transactions or they were reasonably foreseeable to him." *United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019). The evidence in this case establishes that the defendant knew about repeated large-scale drug shipments and transactions, and that he agreed to protect the DTO from investigation, arrest, and prosecution. Thus, the defendant knew or could reasonably foresee that the drug amounts set forth in the PSR over the course of the narcotics conspiracy, *see Pauling*, 924 F.3d at 657.

The evidence firmly establishes that cocaine and marijuana were not only reasonably foreseeable to the defendant—but were directly known by the defendant to be controlled substances trafficked by the DTO that he was protecting. Regarding the fentanyl pills and the attendant drug weight (16,000 fentanyl pills and 12,800 kilograms of converted drug weight), even if the Court does not find them to be relevant conduct under § 1B1.3(a)(1)(B), they are nevertheless countable as relevant conduct under § 1B1.3(a)(2), which requires the court to consider "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." The evidence established that all shipments of fentanyl pills were mixed in with the large shipments of marijuana that were unquestionably established to be *at least* a preponderance of the evidence—under the defendant's protection. The fentanyl pills were part of a common scheme or plan—they were in the same drug

---

be the informant and Masecchia advised who was on the "no fly list," which indicated to Falzone that others would remain under Bongiovanni's protection whereas Falzone would not.

shipments as the marijuana—and thus they were substantially connected by common accomplices, a common purpose, and similar *modus operandi*. § 1B1.3, comment (n. 5(B)(ii)); *see also Walsh*, 119 F.3d at 121.  Additionally, the fentanyl pills are relevant conduct because they were part of the same course of conduct because they were substantially connected and were part of ongoing series of offenses that included the other controlled substances the defendant was directly aware the DTO was distributing (cocaine and marijuana) with his protection. § 1B1.3, comment (n. 5(B)(ii)); *see also Perdomo*, 927 F.2d at 114-15 (acts not part of a common scheme or plan may nevertheless constitute relevant conduct as part of the same course of conduct);  *Shonubi*, 998 F.2d at 89 (2d Cir. 1993); *Silkowski*, 32 F.3d 682, 688 (§ 1B1.3(a)(2) "is to be interpreted broadly.").


Finally, to the extent the defendant endeavors to invoke the *Apprendi* drug amount found by the jury at trial to limit the defendant's relevant conduct, his argument is foreclosed by binding Second Circuit precedent.  *See Norris,* 281 F.3d at 360-61 *(Apprendi* does not apply to sentencing guideline enhancements).


## II.    <u>Responses to the Defendant's Objections to Part A of the Draft PSR</u>

### [Responding to Defense Point II]

The U.S. Probation Office has reviewed a considerable amount of information, including a substantial amount of trial transcripts, and has appropriately included the information in the PSR.  To the extent the defendant endeavors to take U.S. Probation to task for writing the facts in a similar fashion to the indictment, the indictment is what the Court read to the jury that rendered the guilty verdicts.  Moreover, as described in detail in ECF No.

1487, the government presented proof regarding every aspect of the conspiracy charged in Count 1, including the Manner and Means and the Overt Acts.  Furthermore, the U.S. Probation Office is not obligated to write the PSR in a manner consistent with defense spin, or *ad hoc* arguments, and the Court is not required to conduct a line-by-line review of the PSR in the manner the defendant suggests so long as "resolve[s] the substantive challenges." *Reiss,* 186 F.3d at 156-57. The information described in the PSR is appropriate, based upon the evidence, and is proper forth the Court's consideration under Title 18, United States Code, Section 3661, the applicable provisions Sentencing Guidelines, including § 1B1.3, and Second Circuit authority.  Turning to the defendant's specific objections, the government responds as follows:

- **Paragraph 12:** The defendant's objections are not substantive and should be denied.  The portions the defendant requests to be stricken were proven by *at least* a preponderance of the evidence—and it is information the Court has already heard, which should be included in the PSR.  *See 18 U.S.C. § 3661; see also Reiss,* 186 F.3d at 156-57.

- **"The Defendant's Role/Acts in the Masecchia-Serio DTO":** The defendant's objections are not substantive and should be denied.  Moreover, Masecchia was a named coconspirator in the counts of conviction, and the defendant personally made referenced to the Serio DTO in various DEA reports that he authored.  The PSR is accurate, and the information should be included in the PSR.  *See 18 U.S.C. § 3661; see also Reiss,* 186 F.3d at 156-57.

- **Paragraphs 13-15**: The defendant's objections should be denied.  The defendant continues to advance his baseless claim that he was convicted of conspiracy to

protect Lou Selva only even though Count 1 and 3 specifically name Michael Masecchia as a codefendant. The proof established that the defendant protected a large-scale drug organization, which included Masecchia, Serio, Selva, and others. The defendant's claims that the jury "acquitted" the defendant of protecting individuals connected to IOC, or that he was "acquitted" of exposing confidential informants are not anchored in reality, as described above and in ECF No. 1487.

- **Paragraphs 16-18**: The defendant's objections should be denied. There was substantial testimony from Lou Selva and Ron Serio, corroborated by a myriad of exhibits and other witnesses, which established that the defendant was involved in an agreement to accept at least $250,000 in bribes over a period from approximately 2008 until 2017. The defendant was not "acquitted" of conspiracy to commit bribery, it was one of the objectives of the conspiracy of conviction in Count 1. *See also* ECF No. 1487. Moreover, even if the testimony of Selva and Serio regarding bribes was to be improperly construed as an "acquittal"—which it is not—the information should remain in the PSR. As set forth above, Title 18, United States Code, Section 3661 provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of establishing an appropriate sentence." Moreover, "cases in which certain conduct underlies both an acquitted charge and the instant offense of conviction […], the court is in the best position to determine whether such overlapping conduct establishes, in whole or in part, the instant offense of conviction and therefore qualifies as relevant conduct." *See* Application Note to §

1B1.3(c), comment. (n. 10).   The defendant's objections and request to strike should be denied along with the defendant's request to add additional information to those paragraphs.  *See Reiss, 186 F.3d at 156-57.*

- **Paragraph 19:**   The defendant's objection is based upon his self-serving and unsupported claim that the government did not prove his motive. To the contrary, there was ample evidence presented of the defendant's motive, and the PSR correctly captures the motive established by the evidence. The defendant's objections and request to strike should be denied along with the defendant's request to add additional information to those paragraphs.  *See* 18 U.S.C. § 3661; *see also Reiss,* 186 F.3d at 156-57; *Carmona*, 873 F.2d at 574 ("[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination.").

- **Paragraphs 20-21**:   The defendant's objections to these paragraphs rely upon his desire to have the Court disregard the testimony in heard through two trials that the defendant provided Lou Selva with a cover story-*i.e.*, that Selva was Bongiovanni's informant—in the event law enforcement approached Selva after Serio's arrest in 2017 and again after the search warrant executed at the defendant's residence in 2019.   U.S. Probation accurately captured the substance of the testimony and evidence that this Court heard, and the defendant's refrain that he was only convicted of conspiracy with Lou Selva (based on the jury's *Apprendi* finding of the marijuana drug amount), should be rejected. *See* 18 U.S.C. § 3661; *see also Reiss,* 186 F.3d at 156-57; *Carmona*, 873 F.2d at 574 ("[a]ny information or circumstance shedding light on the defendant's background, history and behavior

may properly be factored into the sentencing determination."); *Norris*, 281 F.3d at 360-61 (*Apprendi* does not apply to sentencing guideline enhancements).

- **Paragraph 22**:  The defendant's objections to this paragraph amount to semantics, and the fact that the defendant and Masecchia have known each other since childhood is not inconsistent with what U.S. Probation wrote in the PSR.  The defendant's objection should be denied.   *See* 18 U.S.C. § 3661; *see also Reiss,* 186 F.3d at 156-57; *Carmona*, 873 F.2d at 574 ("[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination.").

- **Paragraph 23-28**:  The defendant's objections to these paragraphs are meritless.  All the information contained in the paragraphs is based upon trial testimony and exhibits the Court observed during the course of two trials, including from, among others, witnesses Anthony Casullo, Lou Selva, Ron Serio, Wayne Anderson, Robert Kaiser, Mark Falzone (Trial #1), through DEA records and documents, and Michael Masecchia's plea agreement (*see* ECF No. 68).   The defendant's objections to these paragraphs should be denied.  *See* 18 U.S.C. § 3661; *see also Reiss,* 186 F.3d at 156-57; *Carmona*, 873 F.2d at 574 ("[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination."); *Salazar*, 489 F.3d at 557-58 (preponderance of the evidence is the standard of proof under the sentencing guidelines).

- **Paragraphs 29-32**: The defendant's objections again baselessly claim that he was "acquitted" of allegations and facts underlying Count 1.   These paragraphs are

consistent with the trial evidence—in both trials—and the nature of the negotiations, bribery, and information the defendant the defendant provided while protecting the DTO.  The defendant's objections should be denied, and the paragraphs should properly remain in the PSR.  *See* 18 U.S.C. § 3661; *see also Reiss,* 186 F.3d at 156-57; *Carmona*, 873 F.2d at 574 ("[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination."); *Salazar*, 489 F.3d at 557-58 (preponderance of the evidence is the standard of proof under the sentencing guidelines).

- **Paragraphs 33-34**: The defendant's objections to these paragraphs, except for pointing out that Kaiser was signed up as a DEA CS in April 2013 (as opposed to April 2017), are the defendant's attempt to artificially strike relevant information that was introduced at trial.  The defendant's objections and requested rewrites should be denied.  *See* 18 U.S.C. § 3661; *see also Reiss,* 186 F.3d at 156-57; *Carmona*, 873 F.2d at 574 ("[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination."); *Salazar*, 489 F.3d at 557-58 (preponderance of the evidence is the standard of proof under the sentencing guidelines).

- **Paragraphs 35-37**: The defendant's objections lack merit.  Ron Serio testified that the marijuana shipped to Wayne Anderson's residence and seized by the NYSP were intended for his distribution.  Serio testified that he met with Masecchia and, within a day or so, Masecchia confirmed that everything was under control.  In the meantime, the evidence established that, as described above and in ECF No. 1487,

the defendant adopted the Wayne Anderson case by misleading the NYSP into believing the case would either be charged federally or that the defendant would leverage potential federal charges to get Wayne Anderson to cooperate.  Moreover, NYSP Michael O'Rourkle' trial testimony, in context, established that Bongiovanni pretended to want to adopt Wayne Anderson's state case because it could further investigation into organized crime—the plain inference is that Anderson had a connection to organized crime.  An example beyond the portion excerpted by the defendant's objections follows:

```
 6   Q.  Was there any discussion by the defendant about wanting
 7   to use Mr. Anderson as a -- as a -- seek his cooperation?
 8   A.  Definitely to seek his cooperation.  And that's always --
 9   that's always the goal with the defendant facing significant
10   charges.  Even, you know, not that significant charges, we're
11   always looking for this defendant, "we" meaning law
12   enforcement, looking for a defendant to cooperate in the
13   investigation.
14   Q.  Do you recall what you said in response to the
15   defendant's interest in having Wayne Anderson to use to
16   cooperate?
17   A.  Yes.
18   Q.  What did you tell the defendant?
19   A.  By all means, of course.  You know, we'd be more than
20   happy to let this case, you know, be adopted by you if you
21   can take it to a federal level and more significant case, use
22   Mr. Anderson to tie in to other investigations that you're
23   working on including organized crime, we would have no
24   objection to it.
```

*See* Tr. at 22:6-24, Aug. 8, 2024 (Test., O'Rourke).  Clearly, when two members of law enforcement are discussing Wayne Anderson's ability to cooperate in organized crime investigations—it is because the participants in the conversation have an understanding that Anderson is associated with organized crime.  The information U.S. Probation included in paragraph 35-37 is accurate and based upon trial testimony and exhibits.[11]  The defendant's objections and proposed rewrites to these paragraphs should be denied.  *See* 18 U.S.C. § 3661; *see also Reiss,* 186 F.3d at 156-57; *Carmona*, 873 F.2d at 574 ("[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination."); *Salazar*, 489 F.3d at 557-58 (preponderance of the evidence is the standard of proof under the sentencing guidelines).

- **Paragraph 38:** The defendant's objections again baselessly claim that he was "acquitted" of allegations and facts underlying Count 1.  This paragraph is consistent with the trial evidence—in both trials—including the trial testimony and exhibits related to Scott Deming's testimony.  The paragraph is also consistent with the trial testimony of HSI Special Agent Charles Tolias, who corroborated Deming's testimony regarding the fact that Bongiovanni did not share any information with HSI about Serio (even after Bongiovanni "closed" the file).  The defendant's objections should be denied, and the paragraphs should properly remain in the PSR. *See* 18 U.S.C. § 3661; *see also Reiss,* 186 F.3d at 156-57; *Carmona*, 873 F.2d at 574 ("[a]ny information or circumstance shedding light on the

---

[11] The government produced and made available all trial exhibits to U.S. Probation.

defendant's background, history and behavior may properly be factored into the sentencing determination."); *Salazar*, 489 F.3d at 557-58 (preponderance of the evidence is the standard of proof under the sentencing guidelines).

- **Paragraph 39:** The defendant's objections again baselessly claim that he was "acquitted" of allegations and facts underlying Count 1. This paragraph is consistent with the trial evidence—in both trials—including the exhibits and testimony from DEA TFO Dave Turri and Assistant United States Attorney Timothy Lynch. The defendant's objections should be denied, and the paragraphs should properly remain in the PSR. *See* 18 U.S.C. § 3661; *see also Reiss,* 186 F.3d at 156-57; *Carmona*, 873 F.2d at 574 ("[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination."); *Salazar*, 489 F.3d at 557-58 (preponderance of the evidence is the standard of proof under the sentencing guidelines).

- **Paragraph 40**: The government addressed the typographical error in this paragraph in ECF No. 1566. The substance of this paragraph should indicate that the defendant continued falsely to pretend that he had an active informant in the file from April 30, 2013, until at least November 4, 2014, which is when the defendant wrote the false and misleading DEA 6 report underlying his conviction on Count 6, *see* Gov. Ex. 8C, as follows:

U.S. Department of Justice
Drug Enforcement Administration

### REPORT OF INVESTIGATION

Page 1 of 1

| 1. Program Code | 2. Cross File | Related Files | 3. File No. C2-13-0026 | 4. G-DEP Identifier YCM2B |
|---|---|---|---|---|
| 5. By: Joseph S Bongiovanni, SA At: Buffalo RO | ☐ ☐ ☐ ☐ ☐ | | 6. File Title ANDERSON, Wayne | |
| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | | | 8. Date Prepared 11-04-2014 | |
| 9. Other Officers: | | | | |
| 10. Report Re: Case Status | | | | |

DETAILS

1. Reference is made to all DEA-6 ROIs written to this case/file.
2. The confidential informant associated with this case/file is no longer viable and can not provide credible information in furtherance of this investigation. This agent will not prepare this case for closure.
3. This investigation in pending closure.

Both Robert Kaiser and Ron Serio testified, in sum and substance, that Kaiser could have made drug purchases from Serio—except for the fact the defendant, unbeknownst to Kaiser at the time, exposed his identity to the DTO.

- **Paragraph 41**: The defendant's objection relies upon the inaccurate claim that he was "acquitted" of abusing cocaine. The defendant was not acquitted of any such charge, but he was convicted of Count 1, which alleged in part:

> 20.    It was part of the conspiracy that the defendant **BONGIOVANNI** would conceal his possession, use, and distribution of controlled substances, the bribes he received, and the assistance he provided to his friends, associates, coconspirators, and individuals who he believed were members of, connected to, or associated with IOC.

*See* Indictment, ECF No. 1193, Count 1, Manner and Means at ¶ 20.

53.     At various times while the defendant **BONGIOVANNI** was a DEA SA assigned to the Buffalo Resident Office, he possessed, used and distributed, and observed others possess, use, and distribute, cocaine.

*Id. at* Count 1, Overt Act ¶ 53.  Moreover, while the government addressed the timeframes in its filing, *see* paragraph 41 in ECF No. 1566, the paragraph encapsulates the trial testimony regarding the defendant's drug use at various locations and times as a DEA agent and the circumstances described at trial by Kevin Myszka regarding the defendant's presence in Toronto in 2016 where there was readily apparent cocaine use amongst the group of individuals that included Bongiovanni, in part, as follows:

```
 9   Q.  I want to stay with that topic of the kind of -- the
10   cocaine use that was occurring during that weekend while you
11   were there.
12       Was that apparent based on how you were doing it?  Was it
13   obvious what you were doing?
14   A.  Yes.
15   Q.  Can you describe for the jury what you mean by that?  How
16   is it obvious what you were doing that weekend?
17   A.  I mean, if we were out at dinner, getting up multiple
18   times, go to the bathroom.  I mean, just the way -- talking
19   to people and nonchalantly giving it to people to go back and
20   forth.  I mean, to me, it would be obvious that we were.
```

*See* Tr., at 35:9-20, Sept. 9, 2024 (Test. Myszka).

```
1    Q.  Is getting up and going back and forth to the bathroom
2    from the bar a bunch of times a behavior that's consistent
3    with cocaine use?
4    A.  Yes.
5    Q.  Is the kind of hand-to-hand passing off of the bag, as
6    you just described it, consistent with cocaine use?
7    A.  Yes.
8    Q.  Are you a trained federal agent in observing drug crimes?
9    A.  No.
10   Q.  Was it obvious to you that cocaine was being used?
11   A.  Yes.
```

*Id.* at 36:1-9.

The defendant's objections to paragraph 41 should be denied, and the paragraph should properly remain in the PSR. *See* 18 U.S.C. § 3661; *see also Reiss,* 186 F.3d at 156-57; *Carmona*, 873 F.2d at 574 ("[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination."); *Salazar*, 489 F.3d at 557-58 (preponderance of the evidence is the standard of proof under the sentencing guidelines).[12]

- **Paragraph 43**: The defendant's objections are based upon speculative claims about what the jury believed and did not believe and, as a result, the objections are meritless. The government addressed the timeframes pertaining to this paragraph in ECF No. 1566, but overall the paragraph summarizes the nature of law enforcement information that the defendant passed along to Selva, who further

---

[12] The government has no objection to the minor correction regarding to when his wife graduated nursing school.

passed it along to Masecchia and Serio. The defendant's objections to paragraph 41 should be denied, and the paragraph should properly remain in the PSR. *See* 18 U.S.C. § 3661; *see also Reiss,* 186 F.3d at 156-57; *Carmona*, 873 F.2d at 574 ("[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination."); *Salazar*, 489 F.3d at 557-58 (preponderance of the evidence is the standard of proof under the sentencing guidelines.

- **Paragraph 44:** The defendant's objections are, yet again, based upon the erroneous claim that the jury convicted him of Count 1, but "acquitted" him of cherry-picked conduct underlying Count 1.  The defendant's objection to this paragraph, like many others, are baseless in the context of sentencing. The defendant's objections to this paragraph should be denied, and it should remain in the PSR. *See* 18 U.S.C. § 3661; *see also Reiss,* 186 F.3d at 156-57; *Carmona*, 873 F.2d at 574 ("[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination."); *Salazar*, 489 F.3d at 557-58 (preponderance of the evidence is the standard of proof under the sentencing guidelines).

- **Paragraphs 45-51**:  The defendant's objections to these paragraphs lack merit as the information set forth therein was established through the testimony of Ron Serio, photographs depicting items seized, physical drugs moved into evidence, and trial stipulations regarding various controlled substances, *see* Court Exhibit 7. Moreover, the defendant's objections rely on the baseless claim that he was "acquitted" of cherry-picked and damaging conduct underlying Count 1, and all

of his objections premised on the "acquitted conduct rule" lack merit. As detailed in Section I, *supra*, the PSR has accurately included the drugs, and the converted drug weight, in the PSR in accordance with Sentencing Guidelines § 1B1.3. *See* 18 U.S.C. § 3661; *see also Reiss,* 186 F.3d at 156-57; *Carmona*, 873 F.2d at 574 ("[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination."); *Norris*, 281 F.3d at 360-61 (*Apprendi* does not apply to sentencing guideline enhancements).[13,14,15]

---

[13] To the extent the defendant avers the conspiracy ended in 2016, the claim is sophistry. Ron Serio was not arrested until April 2017, and thereafter the defendant continued efforts to conceal and protect the full scope of the conspiracy, including by coaching Selva to lie, and by lying himself to investigators on June 6, 2019. Count 1, of which the jury convicted the defendant, alleged the conspiracy continued from "Beginning in or about 2008 and continuing until in or about August 2019, the exact dates being unknown," and the proof established the defendant was a core member of the conspiracy for the duration of that time.

[14] Regarding the defendant's objections to firearms—the defendant ignores that he was specifically advised and wrote in reports that the DTO had a nexus to firearms, as described in Section I, *supra*. Moreover, the defendant neglects to mention that in his affidavit in support of a search warrant, *see* Gov. Ex. 145, he swore to the contents of an affidavit in federal court that he was aware that firearms are a tool of the drug trade. In this regard, the firearms that were possessed by his coconspirators, Serio, Masecchia, and Selva, were reasonably foreseeable to the defendant. *See Mulder*, 273 F.3d at 118 ("Under the relevant conduct principles of subsection 1B1.3(a)(1)(B), all reasonably foreseeable acts ... of others in furtherance of [a] conspiracy may be taken into account to determine a defendant's sentence."). Finally, the defendant wholly failed to address that the firearms also constitute relevant conduct under Guidelines § 1B1.3(a)(2), which provides an additional basis to count the firearms and ammunition as relevant conduct.

[15] To the extent that the defendant claims that $22,000 inside his vehicle was double-counting because the money came from Kelly Brace, that assertion is unsupported. In particular, Serio testified regarding his arrival at Brace's house at 370 Huntington to deliver marijuana, as follows: "I pulled my vehicle in the backyard. I take out a garbage bag of marijuana. Me and Kelly are talking. I believe he went in the house for a minute to grab the money. And then when he came back out, that's when law enforcement arrested us." See Tr., at 45-46, Sept. 9, 2024 (Serio, Test.). There was no testimony about an actual money exchange, and there is no testimony that the $22,000 inside Serio's vehicle at the time of his arrest came from Kelly Brace. Accordingly, U.S. Probation did not "double-count" the currency and marijuana.

- **Paragraphs 52-56:** The defendant's objections again baselessly claim that he was "acquitted" of allegations and facts underlying Count 1. This paragraph is consistent with the trial evidence—in both trials—including the exhibits and testimony from Ron Serio, Lou Selva, HSI Special Agent Curtis Ryan, DEA Sa Anthony Casullo, Mark Falzone (Trial #1), Jeremiah Lenihan, and FBI SA Brian Burns. The defendant's objections to these paragraphs should be denied, and the paragraphs should remain in the PSR. *See* 18 U.S.C. § 3661; *see also Reiss,* 186 F.3d at 156-57; *Carmona*, 873 F.2d at 574 ("[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination."); *Salazar*, 489 F.3d at 557-58 (preponderance of the evidence is the standard of proof under the sentencing guidelines).

- **Paragraphs 57-58**: These paragraphs describe items seized from codefendant Masecchia's residence during the charged conspiracy and as detailed in Count 1, Overt Act 58. These items were also described in Mascecchia's plea agreement, *see* ECF No. 63, and the trial testimony of HSI SA Curtis Ryan. The defendant's claim that this overt act amounts to "acquitted conduct" is baseless. The information is properly included in the PSR. *See* Sentencing Guidelines § 1B1.3; *see also* 18 U.S.C. § 3661; *Reiss,* 186 F.3d at 156-57; *Carmona*, 873 F.2d at 574; *Salazar*, 489 F.3d at 557-58.

- **Paragraph 59**: The defendant's objections to this paragraph lack merit. The defendant was convicted, not acquitted, of Counts 1 and 3. As described in Section I, *supra*, the PSR properly calculated the relevant conduct converted drug weight under § 1B1.3 and the applicable sub-divisions. The information is properly

44

included in the PSR.  *See* Sentencing Guidelines § 1B1.3; *see also* 18 U.S.C. § 3661; *Reiss,* 186 F.3d at 156-57; *Carmona,* 873 F.2d at 574; *Salazar*, 489 F.3d at 557-58; *Norris,* 281 F.3d at 360-61.

- **Paragraphs 60-70**:  The defendant's objections seeking to excise or re-write these paragraphs lack merit.  The information in each of the paragraphs in the PSR is based upon trial testimony and exhibits and are relevant to the defendant's convictions on Counts 8, 10, and 11, and Counts 8 and 10, which charge obstruction of justice, each incorporate the allegations of Count 2 by reference. The obstruction of justice counts alleged that the defendant obstructed investigation into the relationship between the defendant and Peter Gerace Jr., and the investigation into drug trafficking activities narcotics of Peter Gerace Jr.  In order to sentence the defendant appropriately for this conduct, the PSR must necessarily describe the drug trafficking activity that occurred at Pharaohs involving codefendant Peter Gerace, including circumstances related to the overdosing dancer as described in the testimony of DEA SA Antony Casullo (describing his heated discussion with Bongiovanni about Gerace and Pharaohs). The defendant's objections to these paragraphs should be denied.  *See* Sentencing Guidelines § 1B1.3; *see also* 18 U.S.C. § 3661; *Reiss,* 186 F.3d at 156-57; *Carmona*, 873 F.2d at 574; *Salazar*, 489 F.3d at 557-58.

- **Paragraph 75:**  The defendant's objections lack merit.  The paragraph describes the search warrant conducted at the defendant's residence, and statements the defendant made, including the false statement for which the defendant was convicted in Count 15 during Trial #1. The defendant's objections to this

paragraph should be denied. *See* Sentencing Guidelines § 1B1.3; *see also* 18 U.S.C. § 3661; *Reiss,* 186 F.3d at 156-57; *Carmona*, 873 F.2d at 574; *Salazar*, 489 F.3d at 557-58.

- **Paragraphs 76-77**: The defendant's objections lack merit. In order to sentence the defendant appropriately for this conduct underlying the defendant's convictions for obstruction of justice (Counts 8 and 10), and for making material false statements (Count 11), the PSR must necessarily describe the drug trafficking activity that occurred at Pharaohs involving codefendant Peter Gerace and the defendant's relationship with Peter Gerace. Moreover, relevant conduct under § 1B1.3 does not hinge upon whether the defendant was charged or convicted of conspiracy because "in the case of jointly undertaken activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, *whether or not charged as a conspiracy*), all acts and omissions of others that were— (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; *that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.*" *See* § 1B1.3(a)(1)(B) (emphasis added). The defendant's objections to this paragraph should be denied. *See also* 18 U.S.C. § 3661; *Reiss,* 186 F.3d at 156-57; *Carmona*, 873 F.2d at 574; *Salazar*, 489 F.3d at 557-58.

- **Paragraphs 77-78[16]**:    The defendant's objections should be denied.    The information set forth in these paragraphs was delineated in the exhibits and trial testimony of Stephanie Bifano during Trial #1, and it does not matter that the testimony was not re-represented by the government during Trial #2.  The Court's assessment of relevant conduct, and the defendant's history and characteristics, is not limited by the proof the government presented at Trial #2. Moreover, the conduct delineated in these paragraphs constitute evidentiary detail, not "acquitted conduct".  These paragraphs simply provide information related to the defendant's motive, and are based upon the financial investigation that the Court heard testimony about during Trial #1.  The defendant's objections to this paragraph should be denied.  *See* Sentencing Guidelines § 1B1.3; *see also* 18 U.S.C. § 3661; *Reiss,* 186 F.3d at 156-57; *Carmona*, 873 F.2d at 574; *Salazar*, 489 F.3d at 557-58.

- **Paragraph 80**:  The evidence in this case involves a corrupt DEA Agent who protected drug dealers in violation of his oath and duty.  The PSR is correct to state that "the Western New York community as a whole becomes the victim of illicit drug use and drug distribution. This area is plagued with violence, shootings, unintentional overdoses and various types of crimes that are related to drug distribution. Although the defendant was not directly involved in any acts of violence, involvement in drug distribution contributes to the victimization of the residents."  Moreover, as the Second Circuit observed in *Alston*, "It is difficult to imagine a more obvious 'abuse of trust' than Alston's use of his authority: he held

---

[16] The defendant's objections reference "Financial Investigation" information set forth in paragraphs 76-77, but the substances discuss paragraphs 78-79.

that authority as a privilege of his position as a New York City police officer, and he used that authority to help a drug trafficking criminal evade detection and capture." 899 F. 3d at 152. The Court should properly consider the impact of the defendant's abuse of trust in helping to victimize the Western New York community by helping drug dealers by protecting them from investigation, arrest, and prosecution by legitimate members of law enforcement. *See* 18 U.S.C. § 3661; *Carmona*, 873 F.2d at 574; *Salazar*, 489 F.3d at 557-58.

- **Paragraph 81**: The defendant's objection again improperly characterizes the information as "acquitted conduct". Paragraph 81 references the defendant's counts of conviction in Counts 3, 6-8, 10-11, 13, and 15 and the factual summary supporting the obstruction of justice enhancement applicable to the counts and groups. Here, the counts include drug trafficking conspiracy, obstruction of justice, and making materially false statements to law enforcement. The defendant's objections to this paragraph should be denied. *See* Sentencing Guidelines § 1B1.3; *see also* 18 U.S.C. § 3661; *Reiss,* 186 F.3d at 156-57; *Carmona*, 873 F.2d at 574; *Salazar*, 489 F.3d at 557-58. An obstruction of justice enhancement is also appropriate where, as here, the defendant urged his coconspirator (Lou Selva) to lie to law enforcement where, if believed, it could have significantly hindered the investigation. As set forth above, the threshold for materiality is "conspicuously low" and there is no requirement for the obstruction to succeed, *Gershman*, 31 F.4th at 103, and a "defendant is accountable for the defendant's own conduct and for conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused." *See* § 3C1.1, comment. (n. 9). This enhancement

clearly applies where a defendant's conduct involves willfully warning others of law enforcement's investigation, s*ee Cassiliano*, 137 F.3d at 746-47; where a defendant attempts to have his friends lie to law enforcement in support of a false alibi, *see Feliz,* 286 F.3d at 120-21; and, producing or creating false documents, *see Harris*, at 2025 WL 18131, at *2. In sum, the defendant obstructed justice in virtually every way an individual can do so, and his objections and proposed rewrites to this paragraph should be denied.

## III.    Responses to the Defendant's Objections to Guideline Calculations

### a.  The PSR Properly Grouped the Offenses

### [Responding to Defendant's Point IIIA]

The defendant's objections to the grouping set forth in the PSR are not entirely clear. Nevertheless, U.S. Probation correctly grouped the offenses in Counts 1 and 3 (Count Group 1) because the counts "are connected by the common criminal objective or constitute part of a common scheme or plan, namely, to facilitate drug trafficking activities related to the Masecchia DTO (Count 3)". Simply, the defendant's protection and the drug trafficking where inter-connected and symbiotic—which is why the defendant, who never personally sold drugs, was charged and convicted of a drug trafficking conspiracy. Guidelines § 3D1.2(b) provides, "When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan," the counts should be grouped. Here, according to the evidence established at trial and as detailed in the PSR, the overarching scheme was for the defendant to protect the DTO for the DTO to continue to exist selling distributing drugs and, as such, the counts that are "part of

a single course of conduct with a single criminal objective and represent essentially one composite harm […] even if they constitute legally distinct offenses occurring at different times." *See* § 3D1.2, comment. (n. 4).  Moreover, the obstruction-related offenses, Counts 6-7, 11, and 13 (Count Group 2), were all obstruction-related conduct that were a part of the same series of transactions underlying Counts 1 and 3 (Count Group 1) and, as a result, Count Groups 1 and 2 are properly grouped.  Indeed, the offenses comprising Count Group 2 were all charged Overt Acts in Count 1, which were incorporated by reference into Count 3.  Accordingly, paragraphs 84 through 86 all accurately describe the basis for the manner in which U.S. Probation grouped the counts.[17]

### b.  Defendant's Objections to the Drug Weight

The government has responded to the defendant's objections to the converted drug weight, *see* Section I, *supra*.

### c.  Defendant's Objections to the Firearm Specific Offense Characteristic

Pursuant to Guidelines § 2D1.1(b)(1), U.S. Probation applied a 2 level increase to the offense level calculated in Count Group 1.  "The enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons. The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." § 2D1.1(b)(1), comment. (n. 11).  Guidelines § 1B1.3 provides that the defendant is accountable for all acts and omissions of his codefendants that were (i) within the scope of the jointly undertaken criminal activity,

---

[17] The defendant does not appear to object to Count Group 3, which includes Counts 8, 10, and 15.

(ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense" *See* § 1B1.3(a)(1)(B).    As described above, Robert Kaiser provided information to the defendant that members of the Serio DTO were connected to firearms.  *See* Gov. Exs. 8I and 9E-4, *supra*.  Moreover, as a trained DEA agent, the defendant has sworn to a federal magistrate judge in support of a search warrant that drug dealers possess firearms, and that they are among the tools of the drug trade, at follows:

> d.    That persons involved in drug trafficking or significant drug traffickers conceal proceeds of drug sales, records of drug transactions, firearms, ammunition, caches of drugs, large amounts of currency, financial instruments, keys for safe deposit boxes, precious metals, jewelry, and other items of value and/or proceeds of drug transactions and/or evidence of financial transactions relating to obtaining, transferring, secreting or spending large sums of money made from engaging in narcotics trafficking in their residences and in other secure locations, including at the residences of their drug associates and/or family members,  in order to conceal them from law enforcement authorities;

> g.    That I am aware that the Courts have recognized that unexplained wealth is probative evidence of crimes motivated, at least in part, by greed, in particular, trafficking in controlled substances. I am also aware

10

---

> that many Courts have found that weapons, including firearms and ammunition, are among the "tools of the trade" in the narcotics business; and

*See* Gov. Ex. 145 at ¶12(d), (g).  As a result, the presence of firearms at the residences of Masecchia, Serio, and Selva, which were locations where drugs were stored and recovered, was reasonably foreseeable.  As a result, the PSR appropriately apple the two-level enhancement pursuant to Guideline § 2D1.1(b)(1).  *See also United States v. Soto,* 959 F.2d 1181, 1187 (2d Cir. 1992).

### d. Substantial Interference, with the Administration of Justice, Guideline § 2J1.2(b)(2)

Under Guideline § 2J1.2(b)(2), "Substantial interference with the administration of justice includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources." § 2J1.2(b)(2), comment. (n. 1).  As detailed *infra*, in ECF No. 1487 and the PSR, the defendant engaged in conduct that caused FBI SA Thomas Herbst to prematurely terminate his felony investigation into the defendant and Pharaohs in 2009.  Moreover, in June 2016, as detailed *infra* and in ECF No. 1487 and the PSR, the defendant engaged in conduct that caused DEA SA Anthony Casullo to prematurely terminate his investigation into Peter Gerace in June of 2016. Accordingly, the U.S. Probation Office appropriately applied § 2J1.2(b)(2).

### e. Adjustment for Role in the Offense for Abusing a Position of Trust Related to Peter Gerace (Count Group 3)

Pursuant to Sentencing Guidelines Section 3B1.3, "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." The adjustment applies

when the offense is a conspiracy as long as the court "determines with reasonable certainty that the defendant actually intended to use his or her special skill or position of trust." *United States v. Downing,* 297 F.3d 52, 65 (2d Cir. 2002).  The Second Circuit applies a two-pronged test to determine whether this enhancement applies: "(1) whether the defendant occupied a position of trust from the victim's perspective and (2) whether that abuse of trust significantly facilitated the commission or concealment of the offense." *United States v. Huggins*, 844 F.3d 118, 124 (2d Cir. 2016) (internal quotations omitted); *see also United States v. Nuzzo,* 385 F.3d 109, 115 (2d Cir. 2004). "For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult)." *See* § 3B1.3, comment. (n. 1).  This adjustment applies to a member of law enforcement who uses his position to facilitate and conceal the drug distribution conspiracy in which they participated. *Alston,* 899 F. 3d at 151-52 (applying the enhancement where a police officer helped to ensure that a fellow police officer did not search an individual during a traffic stop to find drugs, and where the police officer provided his PBA card to a drug trafficker to help the drug trafficker avoid suspicion when the police officer was not able to intervene personally on the drug trafficker's behalf).  Here, in connection with Peter Gerace, the Court heard testimony supporting this enhancement in several ways.

First, through the testimony of DEA SA Christopher Wisniewski, the Court heard evidence supporting the conclusion that the defendant learned that DEA SA Wisniewski was conducting a drug trafficking investigation, and that Gerace's name was coming up in the

investigation.  As a result, the defendant used a "cold approach" ruse to warn Gerace about the investigation.

Second, through the testimony of Amy P., the Court learned that the defendant had business cards, and that Peter Gerace provided the defendant's business card to Amy P., a person who was then involved in cocaine use and distribution, with instructions that she could use the defendant's business card to get out of trouble.

Third, through the testimony of former FBI Special Agent Thomas Herbst, U.S. probation Officer Peter Lepiane, former DEA Group Supervisor (GS) Dale Kasprzyk, DEA Inspector Francis Dicarlo, and Gov. Ex. 30A, the Court heard testimony and observed evidence sufficient to conclude that the defendant injected himself into an FBI and U.S. Probation investigation into Gerace and Pharaohs to protect the defendant.  In this regard, the evidence established that the defendant made false and misleading statements in a November 2009, DEA 6 report, *see* Gov. Ex. 30A, and that he mislead FBI SA Herbst and his supervisor, GS Kasprzyk.  From this evidence the Court may properly conclude that, by concealing the true nature of Gerace's relationship to the defendant, and misleading FBI SA Herbst to believe that Gerace was the defendant's DEA CS, the defendant caused the FBI to abandon investigation of Gerace in 2009—permitting Gerace's conduct to continue for approximately another decade until other members of law enforcement began to investigate Gerace.  In this vein, Lou Selva also testified that the defendant admitted that he helped Gerace out in connection with U.S. Probation.

Fourth, the defendant engaged in conversation with DEA SA Casullo—including making gross remarks that the DEA should be investigating N***s and S***s—which caused SA Casullo to cease pursuing investigation of Gerace in June 2016.

Fifth, during that same conversation with Casullo, referenced above, the defendant revealed that Gerace contacted the defendant when a dancer was overdosing at Pharaohs, and the defendant instructed Gerace to "get her out of there."

Sixth, the defendant authored false memoranda and made false statements with respect to his relationship with Gerace, *see* Counts 8, 10, 11, 15.

Unquestionably, through his conduct, the defendant made the detection of the offenses related to Gerace, and the defendant's responsibility for the offenses more difficult.  *See* § 3B1.3, comment. (n. 1).  Therefore, the two-level increase should apply to the Gerace Count Group 3.[18]  Here, as in *Alston,* it is difficult to imagine a more obvious abuse of trust than the defendant's use of his position of trust and authority to help Gerace remain free to distribute drugs for over a decade.

### f.   The Defendant's Guideline Calculations

For the reasons set forth above, in ECF No. 1487, and the PSR, the defendant's proposed guideline calculations are inapplicable.  Moreover, *assuming arguendo* that the drug

---

[18] The defendant has not objection to inclusion of this enhancement under Count Groups 1 and 2.

amount did not result in the highest offense level—thereby driving the guidelines calculations—the calculations would be driven by the relevant conduct and guidelines related to the $250,000 in bribes encompassed in Count 1.  *See* U.S.S.G §§ 2C1.1.[19]

The defendant's remaining objections to Parts C, D, E and F of the PSR should be denied for the reasons described above, and as set forth in the PSR.[20]

## CONCLUSION

The defendant's objections to the PSR should be denied.

DATED:  Buffalo, New York, July 2, 2025

                               MICHAEL DIGIACOMO
                               United States Attorney


                    BY:    s/JOSEPH M. TRIPI
                               Assistant United States Attorney
                               United States Attorney's Office
                               Western District of New York
                               138 Delaware Avenue
                               Buffalo, New York  14202
                               716/843-5839
                               Joseph.Tripi@usdoj.gov

---

[19] For example, guidelines § 2C1.1(a) provides a base offense level of 14 because the defendant was a public official, and §2C1.1(b)(2) (which applies §2B1.1) adds 12 levels based upon the bribery amount. As a result, at a minimum, before any other adjustments under Chapter 3 are applied, the defendant would start at offense level 26.  These basic calculations are merely set forth as an example of one of the many ways the defendant's guidelines calculations are incorrect, and should not be construed as a complete calculation of the defendant's offense related to bribery as the driver of the guidelines.

[20] Attached hereto for the Court's convenience is **Appendix A**, which summarizes some of the trial evidence that was submitted in support of various Overt Acts set forth in Count 1.

## APPENDIX A — OVERT ACTS CHART

| OVERT ACT NUMBER | DESCRIPTION | WITNESSES | EXHIBITS |
|---|---|---|---|
| 1<br><br>Count 1<br>Paragraph 22 | Between in or about 2008 and in or about 2017, Masecchia, working with others, paid the defendant BONGIOVANNI, who accepted, bribes on a recurring basis totaling approximately at least $250,000 in United States currency in exchange for protection from arrest and prosecution. | Lou Selva<br>Ron Serio<br>Curtis Ryan<br>Brian Burns<br>Mark Falzone<br>John Robinson | 8<br>8A-8M<br>100<br>100A<br>100A.1<br>100B.5<br>109 (series)<br>143A-1<br>145<br>200A (series)<br>201<br>208 (series)<br>209<br>213 (series)<br>264-281B<br>296A-B |
| 3<br><br>Count 1<br>Paragraph 24 | On or about November 25, 2012, the defendant BONGIOVANNI learned that friends and associates of individuals paying him bribes were arrested by the New York State Police in relation to the seizure of marijuana, U.S. currency, and other items, and the defendant BONGIOVANNI began acquiring information about the arrests and made arrangements to open a DEA case to take control of the case from the New York State Police. | Ron Serio<br>Lou Selva<br>Mike O'Rourke | 100A<br>100A.1<br>8<br>8A-8M |
| 4<br><br>Count 1<br>Paragraph 25 | On or about November 28, 2012, the defendant BONGIOVANNI authored a DEA 6 summary report and caused the initiation of DEA Case Number C2-13-0026. | Ron Serio<br>Lou Selva<br>Mike O'Rourke<br>Shane Nastoff | 8M (Summary Report 11/28/12)<br>100A<br>100A.1<br>8<br>8A-8N |
| 5<br><br>Count 1<br>Paragraph 26 | On or about December 24, 2012, the defendant BONGIOVANNI caused the preparation of DEA 202 forms adding target names to the file in DEA Case Number C2-13-0026, including the names of drug traffickers and associates who were paying him bribes. | Shane Nastoff<br>David Leary<br>Louis Selva<br>Ron Serio | 8A-1<br>8A-3<br>8A-4 |
| 6<br><br>Count 1<br>Paragraph 27 | On or about December 24, 2012, the defendant BONGIOVANNI caused the DEA preparation and entry of three (3) separate DEA 202 forms in DEA Case Number C2-13-0026 with signatures that do not belong to the DEA Special Agent listed as the co-case agent on the DEA 202 form. | Shane Nastoff<br>Lou Selva<br>Ron Serio<br>Dave Leary | 8A-1<br>8A-3<br>8A-4 |
| 7<br><br>Count 1<br>Paragraph 28 | In or about January 2013, the defendant BONGIOVANNI submitted names, including the names of drug traffickers and associates who were paying him bribes, and the defendant's contact information, to "Safety-Net," a state de-confliction system. | Mike O'Rourke | 100A<br>100A.1 (Safety-Net documents)<br>8A-3<br>8A-4<br>8K |

| 8 Count 1 Paragraph 29 | In or about April 2013, the defendant BONGIOVANNI became aware of an individual, known to the Grand Jury, who could cooperate against the drug traffickers paying the defendant BONGIOVANNI bribes, and the defendant BONGIOVANNI signed up the individual as a DEA confidential source ("CS") with himself as the handling agent. | Joanne Dinoto Robert Cottrell Robert Kaiser[1] Shane Nastoff Mark Gentile Francis DiCarlo Ron Serio Lou Selva | 8I 9 9E-1 9E-2 9E-3 9E-4 |
|---|---|---|---|
| 10 Count 1 Paragraph 31 | On or about May 2, 2013, in DEA Case Number C2-13-0026, the defendant BONGIOVANNI indexed names related to individuals who were paying the defendant BONGIOVANNI bribes to give the appearance of legitimate investigation and so that DEA de-confliction database procedures would alert him if other members of law enforcement were investigating the individuals and associates of individuals who were paying the defendant BONGIOVANNI bribes. | Shane Nastoff John Flickinger Brian Burns Curtis Ryan Ron Serio | 8 8A 8I 100A 100A.1 |
| 11 Count 1 Paragraph 32 | Between on or about April 29, 2013, and on or about September 9, 2013, the defendant BONGIOVANNI ensured that the CS provided no cooperation against the drug traffickers who were paying him bribes, and on September 9, 2013, the defendant BONGIOVANNI caused the completion of form DEA-512(d) deactivating the DEA CS. | Lou Selva Ron Serio Robert Kaiser (SA Adam Penna) Shane Nastoff Scott Deming Dave Turri Mark Gentile Joanne DiNoto | 8 8A 9 9C 9E-2 9E-3 9E-4 9F |
| 12 Count 1 Paragraph 33 | On or about May 23, 2013, defendant BONGIOVANNI sent an email regarding DEA Case Number C2-13-0026 to members of the United States Attorney's Office, Western District of New York, and a Special Agent with the Internal Revenue Service (IRS) stating that "we are making strides in the street and will report back soon." | Scott Deming | 22-22S |
| 13 Count 1 Paragraph 34 | On or about June 18, 2013, a fellow DEA agent conducted surveillance on a warehouse in Buffalo, New York that was controlled by a coconspirator who was a source of bribe payments to the defendant BONGIOVANNI, and after the fellow DEA agent made relevant observations, the fellow DEA agent was advised by the defendant BONGIOVANNI to discontinue the surveillance. | David Leary | 8H |
| 14 Count 1 Paragraph 35 | On or about July 11, 2013, the defendant BONGIOVANNI received an email from a fellow member of law enforcement advising him, in part, that "Masecchia is an associate and possibly made member of the Buffalo LCN family," an IOC group operating in Buffalo, New York, and elsewhere. | David Turri Lou Selva | 22S |

---

[1] The transcript of Kaiser's trial testimony in *Bongiovanni I* was read into the record by FBI SA Adam Penna.

| 15 Count 1 Paragraph 36 | On or about July 16, 2013, the defendant BONGIOVANNI sent an email to members of the United States Attorney's Office, Western District of New York, and a Special Agent with the IRS, and copied his supervisor in the DEA Buffalo Resident Office, that read in part "we are working on GPS warrant for trackers to locate these grow operation [sic] a CI [confidential informant] reported they are turning the grow over in 8 to 9 weeks. Joe." | Scott Deming | 22F 22 |
|---|---|---|---|
| 16 Count 1 Paragraph 37 | On or about July 30, 2013, defendant BONGIOVANNI notified the DEA CS he/she would be deactivated as a DEA CS pursuant to BONGIOVANNI's entry in Confidential Source Deactivation form DEA-512d. | Robert Kaiser (Adam Penna) Mark Gentile Scott Deming | 9E-3 22P |
| 17 Count 1 Paragraph 38 | On September 9, 2013, the defendant BONGIOVANNI de-activated the CS who had an ability to cooperate in DEA Case Number C2-13-0026, and falsely stated in the "Confidential Source Deactivation" form DEA-512d, "The CS can no longer provide services or information for any open investigation." | Robert Kaiser (Adam Penna) Mark Gentile Lou Selva Ron Serio Shane Nastoff David Leary John Flickinger | 9E-3 9E-4 |
| 18 Count 1 Paragraph 39 | On or about September 9, 2013, the defendant BONGIOVANNI caused the preparation and entry of "Confidential Source Deactivation" form DEA-512d with a false and fraudulent signature line for the co-case agent. | Robert Kaiser (Adam Penna) Mark Gentile | 9E-3 |
| 19 Count 1 Paragraph 40 | On or about September 11, 2013, the defendant BONGIOVANNI prepared a DEA 6 report in DEA Case Number C2-13-0026 wherein he made false, fraudulent, fictitious, and misleading statements as follows: "Agents are presently waiting for approval from the United States Attorney's Office (WDNY) to utilized [sic] GPS trackers to aid in the investigation." | Timothy Lynch Kevin Caffery | 8G 135 |
| 20 Count 1 Paragraph 41 | On or about September 26, 2013, the defendant BONGIOVANNI met with other members of law enforcement and an Assistant United States Attorney at the United States Attorney's Office for the Western District of New York regarding in DEA Case Number C2-13-0026 during which meeting, specific investigative techniques were discussed. | Timothy Lynch Lou Selva David Leary | 8G |
| 21 Count 1 Paragraph 42 | On or about December 31, 2013, the defendant BONGIOVANNI made false and misleading statements in a DEA 6 report in DEA Case Number C2-13-0026. | Ron Serio Brian Burns | 8F |
| 22 Count 1 Paragraph 43 | On or about April 7, 2014, the defendant BONGIOVANNI made false and misleading statements in a DEA 6 report in DEA Case Number C2-13-0026. | Ron Serio Brian Burns | 8E |
| 23 | On or about July 7, 2014, the defendant BONGIOVANNI made false and misleading | Ron Serio Brian Burns | 8D |

| | | | |
|---|---|---|---|
| Count 1<br>Paragraph 44 | statements in a DEA 6 report in DEA Case Number C2-13-0026. | | |
| 24<br><br>Count 1<br>Paragraph 45 | Between on or about April 30, 2013, and on or about November 4, 2014, the defendant BONGIOVANNI made false representations regarding DEA Case Number C2-13-0026 to others in law enforcement that he did not have a source who could provide information about the locations of marijuana grow operations being controlled and operated by those who were paying the defendant BONGIOVANNI bribes.[2] | Scott Deming<br>Dave Turri<br>David Leary | |
| 25<br><br>Count 1<br>Paragraph 46 | Between in or about 2008 and in or about 2017, during routine and recurring meetings with individuals paying the defendant BONGIOVANNI bribes, the defendant BONGIOVANNI passed along information regarding specific techniques utilized or being considered by other members of law enforcement in DEA Case Number C2-13-0026. | Lou Selva<br>Ron Serio | |
| 26<br><br>Count 1<br>Paragraph 47 | During conversation with other members of law enforcement involved in the investigation of DEA Case Number C2-13-0026, the defendant BONGIOVANNI falsely stated that he did not have a confidential informant and, as a result, marijuana grow locations could not be located to further the investigation in DEA Case Number C2-13-0026. | David Leary<br>Dave Turri<br>Scott Deming | |
| 27<br><br>Count 1<br>Paragraph 48 | On or about November 4, 2014, in preparation for closing DEA Case Number C2-13-0026, the defendant BONGIOVANNI prepared a DEA 6 report wherein he made false, fraudulent, fictitious, and misleading statements as follows: "The confidential informant associated with this case/file is no longer viable and can not provide credible information in furtherance of this investigation. This agent will not [sic] prepare this case for closure." | David Leary<br>Dave Turri<br>Scott Deming<br>Mark Gentile<br>Shane Nastoff<br>Robert Kaiser (Adam Penna)<br>JoAnne Dinoto<br>Robert Cottrell<br>Lou Selva<br>Ron Serio | 8C |
| 28<br><br>Count 1<br>Paragraph 49 | On or about January 28, 2015, the defendant BONGIOVANNI prepared a DEA 6 report in DEA Case Number C2-13-0026 officially closing the DEA file related to investigation of individuals and associates of individuals who were paying him bribes. | David Leary<br>Dave Turri<br>Scott Deming<br>Mark Gentile<br>Shane Nastoff<br>Robert Kaiser (Adam Penna)<br>JoAnne Dinoto<br>Robert Cottrell<br>Lou Selva<br>Ron Serio | 8B |

---

[2] Contrast with Gov. Ex. 9E-2, 9E-3, and 9E-4, and the testimony of Robert Kaiser (as read by FBI SA Adam Penna) and Ron Serio.

| | | | |
|---|---|---|---|
| 29<br><br>Count 1<br>Paragraph 50 | On or about January 28, 2015, the defendant BONGIOVANNI prepared a DEA 210 form "Defendant Disposition Report" wherein he made false, fraudulent, fictitious, and misleading statements as follows: "On January 6, 2015- [name redacted] plead in New York State court and sentenced (sic) to 36 months probation." | Wayne Anderson<br>Mike O'Rourke<br>Brian Burns | 8A |
| 30<br><br>Count 1<br>Paragraph 51 | On or about February 21, 2016, the defendant BONGIOVANNI attended a party in Toronto, Canada with friends and associates involved in possession, use, and distribution of cocaine. | Kevin Myszka<br>Brian Burns | 126 |
| 31<br><br>Count 1<br>Paragraph 52 | In or about August 2016, the defendant BONGIOVANNI used his position as a DEA SA in an attempt to dissuade a member of a different federal law enforcement agency from investigating some of the defendant BONGIOVANNI's friends and associates. | Thomas Mozg<br>Anthony Casullo | |
| 32<br><br>Count 1<br>Paragraph 53 | At various times while the defendant BONGIOVANNI was a DEA SA assigned to the Buffalo Resident Office, he possessed, used and distributed, and observed others possess, use, and distribute, cocaine. | Lou Selva<br>Phlycia Hunt | 127 |
| 33<br><br>Count 1<br>Paragraph 54 | On or about February 1, 2019, the defendant BONGIOVANNI's last day as a DEA SA in the Buffalo Resident Office due to his retirement from the DEA, the defendant caused his DEA issued cellular telephone to be wiped clean such that all data was deleted from the telephone. | Cheryl Panzarella<br>Dave Carpenter | |
| 34<br><br>Count 1<br>Paragraph 55 | On a date unknown to the Grand Jury, but before on or about February 1, 2019, without authorization or permission, the defendant BONGIOVANNI removed the DEA working file in DEA Case Number C2-13-0026, which contained DEA database information (including de-confliction database information), administrative subpoenas and responses, cellular telephone toll analysis, and other DEA records and property, including an Organized Crime Drug Enforcement Task Forces investigation initiation form for Operation Past Due, from the DEA Buffalo Resident Office and stored and concealed this DEA property in the basement of his residence. | Curtis Ryan<br>Brian Burns<br>Francis DiCarlo<br>Christopher Clark<br>Shane Nastoff | 100<br>100A<br>100A.1 |
| 35<br><br>Count 1<br>Paragraph 56 | During the course of the conspiracy, defendant BONGIOVANNI advised a coconspirator, who was working with Masecchia and known to the Grand Jury, of a cover story for their interactions, that is, if anyone [in law enforcement] ever questioned [the coconspirator] he should say that defendant BONGIOVANNI was talking to [the conspirator] about becoming defendant BONGIOVANNI's informant. | Lou Selva | |
| 36<br><br>Count 1 | At times, including an occasion following the execution of a federal search warrant at defendant BONGIOVANNI's residence on June 6, 2019, | Lou Selva | |

| Paragraph 57 | defendant BONGIOVANNI met with a coconspirator, who was working with Masecchia and is known to the Grand Jury, and advised the coconspirator that if he was ever approached [by law enforcement] "I'll coach you on it, I'll get you prepared." | | |
|---|---|---|---|
| 37<br><br>Count 1<br>Paragraph 58 | On or about August 23, 2019, Masecchia possessed quantities of marijuana, cocaine, and other controlled substances, $27,950 in bundled U.S. currency, eight firearms, various rounds of ammunition, and drug paraphernalia at 5907 Main Street, Williamsville, New York. | Curtis Ryan | 222G<br>222I<br>222J |