UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                            Case No. 19-CR-227-1-LJV

JOSEPH BONGIOVANNI,

        Defendant.

---

## DEFENDANT JOSPEH BONGIOVANNI'S REPLY TO THE GOVERNMENT'S RESPONSE IN OPPOSITION TO MR. BONGIOVANNI'S <u>OBJECTIONS TO THE DRAFT PRESENTENCE REPORT</u>

**THE LAW OFFICE OF PARKER R. MACKAY**
Parker R. MacKay, Esq.
3110 Delaware Avenue
Kenmore, NY 14217
Ph: (716) 803-8166
Fx: (716) 408-1651
Em: Parker@MacKayLawOffice.com



Robert C. Singer, Esq.
80 East Spring Street
Williamsville, New York 14221
(716) 222-3288
rob@singerlegalpllc.com

*Attorneys for Joseph Bongiovanni*

**Preliminary Statement**

Based on the briefing, it is obvious that the parties have two fundamentally different views of the verdict in this case. In its opposition, the government continues to portray itself as the ultimate victor, believing that it proved every allegation in the indictment. It claims the defense has engaged in "spin, or *ad hoc* arguments" when explaining what the jury's verdict means, when, in reality, that is exactly what the government has done since its first press conference following the verdict. At its core, the government is unable and unwilling to accept that the verdict(s) in this case were not resounding victories and did not vindicate the core of its sweeping bribery and corruption allegations. The juries' acquittals of Mr. Bongiovanni on multiple counts and the most serious allegations prove that. This is why the PSR must be amended and acquitted conduct be removed from consideration at sentencing.

**Argument**

I. **The *Apprendi* findings in Count 3 constitute an acquittal of the larger Masecchia-Serio allegations in Count 1. USSG § 1B1.3(c) precludes using acquitted drug weight to determine the guidelines in this case.**

In *Apprendi v. New Jersey,* the Supreme Court held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey,* 530 U.S. 466, 490 (2000). Later, in *Alleyne v. United States*, the Supreme Court extended the *Apprendi* rule to mandatory minimums by holding that "any fact that increases the mandatory minimum is an element [of the offense] that must be submitted to the jury" and proved beyond a reasonable doubt. *See Alleyne v. United States*, 570 U.S. 99, 103 (2013). *Apprendi, Alleyne,* and their progeny establish that the drug quantity involved in an offense **is an element of the offense** for the purposes of determining a maximum sentence and minimum sentence, and, therefore a court may not enhance a sentence above a statutory maximum or impose a statutory minimum based on drug quantity unless

the drug quantity was charged in the indictment and proved to the jury beyond a reasonable doubt. *See United States v. Luciano,* 311 F.3d 146, 150-51 (2d Cir. 2002); *United States v. Thomas,* 274 F.3d 655, 663 (2d Cir. 2001) (en banc); *United States v. Gonzalez,* 420 F.3d 111, 131 (2d Cir. 2005).

What all these cases stand for is the proposition that when a jury fails to find a fact in a case or an element in the case which the government attempts to prove at trial, the failure of the government to prove this fact or element constitutes *an acquittal. See, e.g., McElrath v. Georgia,* 601 U.S. 87, 94 (2024) ("[O]ur cases have defined an acquittal to encompass any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense.") (citation omitted). For this reason, a jury's special finding regarding a drug type and quantity – particularly one, like here, in which the jury found a *massively different* quantity of marijuana than was alleged in the indictment and attempted to be proven by the government at trial – constitutes *an acquittal* on the conduct involving a larger quantity of marijuana because the government specifically chose to put that quantity to the jury by charging a mandatory minimum.

When the government makes this choice, a jury's finding that the government failed to prove a threshold drug amount beyond a reasonable doubt is a definitive finding that a defendant is not guilty – or acquitted of – the larger offense and quantity. This finding of the jury is one that may not simply be brushed aside and disregarded. This is because, as explained more fully below, acquittals have long been "accorded special weight" in our system of justice as a check by the People against the power of the Executive and the Judiciary. *See United States* v. *DiFrancesco*, 449 U. S. 117, 129 (1980)

### A. The Second Circuit's holding in *United States v. Norris* is no longer authoritative.

The government opposes this view relying on *United States v. Norris* which held, in 2002, that *Apprendi* does not apply to sentencing guideline enhancements. *See* ECF 1578 at 15, 30,

33-34 (citing *Norris,* 281 F.3d 357, 360-61 (2d Cir. 2002). Reliance on *Norris* is misplaced for several reasons.

First, the holding in *Norris* rested upon the assumption that guideline ranges and statutory maximum sentences were different for purposes of the *Apprendi* rule. *See id.* ("[W]e do not believe [the Guidelines] ranges are statutory maximums for purposes of applying the rule of *Apprendi.*"). But the Second Circuit decided *Norris* years prior to the Supreme Court's holdings in *Blakely v. Washington* and *United States v. Booker* which held differently. In *Blakely v. Washington,* 542 U.S. 296 (2004), the Supreme Court established that the "statutory maximum" for purposes of the Sixth Amendment's jury trial right is *not* always the maximum set forth by the penal statute violated by the defendant. As *Blakely* explained:

> Our precedents make clear . . . that the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant* . . . . In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment and the judge exceeds his proper authority.

*Blakely,* 542 U.S. at 303-04 (emphasis in original) (internal citation omitted). A few months later in *United States v. Booker*, the Supreme Court extended *Blakely* to the guidelines and clarified that:

> More important than the language used in our holding in *Apprendi* are the principles we sought to vindicate. Those principles are unquestionably applicable to the Guidelines. . . . Regardless of whether the legal basis of the accusation is in a statute or in guidelines promulgated by an independent commission, the principles behind the jury trial right are equally applicable.

*Booker*, 543 U.S. 220, 239 (2005). Thus, the holdings in *Blakely* and *Booker* undermine the core assumption upon which the holding in *Norris* rests.

Second, the passage of the Acquitted Conduct Rule into law in November 2024 further undermined *Norris*. USSG § 1B1.3(c) fundamentally changed how federal courts are permitted to use acquitted conduct to calculate the guidelines. In that regard, USSG § 1B1.3(c) abrogated years of prior cases which held that courts were permitted to use acquitted conduct when determining the guidelines. Thus, USSG § 1B1.3(c) abrogated *Norris*.

Third, using *Norris* to block the intended effect of USSG § 1B1.3(c) runs contrary to the view of several members of the Supreme Court who have highlighted the weight a jury finding should be accorded and who have outright questioned the fairness of using acquitted conduct, found by a judge, that was not found by a jury, as a means of increasing a defendant's sentence. As Justice Sotomayor opined in *McClinton v. United States*:

> Juries are democratic institutions called upon to represent the community as "a bulwark between the State and the accused," and their verdicts are the tools by which they do so. *Southern Union Co.* v. *United States*, 567 U. S. 343, 350 (2012) (internal quotation marks omitted); *see also Blakely* v. *Washington*, 542 U. S. 296, 305-306 (2004) ("Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary"). Consistent with this, juries were historically able to use acquittals in various ways to limit the State's authority to punish, an ability that the Founders prized. With an acquittal, the jury as representative of the community has been asked by the State to authorize punishment for an alleged crime and has refused to do so.
>
> This helps explain why acquittals have long been "accorded special weight," *United States* v. *DiFrancesco*, 449 U. S. 117, 129 (1980), distinguishing them from conduct that was never charged and passed upon by a jury. This special weight includes traditionally treating acquittals as inviolate, even if a judge is convinced that the jury was "mistaken." *Id.* at 130.
>
> The argument for acquitted-conduct sentencing is generally based on standards of proof. . . . Yet there is a tension between this narrower conception of an acquittal and the manner in which juries historically used acquittals. *See Jones*, 526 U. S., at 245-246; *see also Blakely*, 542 U. S., at 305-306 (jury trial "is no mere procedural formality, but a fundamental reservation of power in our constitutional structure").

> Further, an acquittal could also reflect a jury's conclusion that the State's witnesses were lying and that the defendant is innocent of the alleged crime. In that case, it is questionable that a jury's refusal to authorize punishment is consistent with the judge giving the defendant additional years in prison for the same alleged crime. The fact is that even though a jury's specific reasons for an acquittal will typically be unknown, the jury has formally and finally determined that the defendant will not be held criminally culpable for the conduct at issue. So far as the criminal justice system is concerned, the defendant "has been set free or judicially discharged from an accusation; released from a charge or suspicion of guilt." *State v. Marley*, 321 N. C. 415, 424, 364 S. E. 2d 133, 138 (1988) (internal quotation marks and alterations omitted).
>
> There are also concerns about procedural fairness and accuracy when the State gets a second bite at the apple with evidence that did not convince the jury coupled with a lower standard of proof. Even defendants with strong cases may understandably choose not to exercise their right to a jury trial when they learn that even if they are acquitted, the State can get another shot at sentencing.
>
> Finally, acquitted-conduct sentencing also raises questions about the public's perception that justice is being done, a concern that is vital to the legitimacy of the criminal justice system . . . .

*McClinton v. United States*, 143 S. Ct. 2400, 2401-03 (2023) (Sotomayor, J., concurring) (citations omitted).

In *McClinton*, Justices Kavanaugh, Gorsuch, and Barrett echoed Justice Sotomayor's concerns stating that "[t]he use of acquitted conduct to alter a defendant's Sentencing Guidelines range raises important questions." *See id.* at 2403 (Statement of Kavanaugh, J., with whom Gorsuch, J. and Barrett, J. join, respecting the denial of certiorari). While the three ultimately deferred granting certiorari on this issue until after the Sentencing Commission consideration of the acquitted conduct rule, their views are consistent with previous opinions and cases on the subject. *See, e.g., United States v. Bell*, 808 F.3d 926, 928 (D.C. Cir. 2015) (Kavanaugh, J., concurring in denial of rehearing en banc) ("Allowing judges to rely on acquitted or uncharged conduct to impose higher sentences than they otherwise would impose seems a dubious infringement of the rights to due process and to a jury trial."); *United States v. Sabillon-Umana*, 772 F.3d 1328, 1331 (10th Cir. 2014)

(Gorsuch, J.) ("We admit the proper order of operations we've outlined rests in part on a questionable foundation. It assumes that a district judge may either decrease or increase a defendant's sentence (within the statutorily authorized range) based on facts the judge finds without the aid of a jury or the defendant's consent. It is far from certain whether the Constitution allows at least the second half of that equation.") (citing *Jones v. United States*, 574 U.S. 948, 948 (2014) (Scalia, J., joined by Ginsburg & Thomas, JJ., dissenting from denial of certiorari) ("It unavoidably follows [from existing precedent] that any fact necessary to prevent a sentence from being substantively unreasonable—thereby exposing the defendant to the longer sentence—is an element that must be either admitted by the defendant or found by the jury. It *may* not be found by a judge."); *Yeager v. United States*, 557 U.S. 110, 122-23 (2009) (commending the "unassailable" finality of jury acquittal even if based on an "egregiously erroneous foundation"); *Burks v. United States*, 437 U.S. 1, 16 (1978) ("[W]e necessarily afford absolute finality to a jury's verdict of acquittal—no matter how erroneous its decision.").

In the final analysis, the government clearly does not like the new acquitted conduct rule because it strips prosecutors of the opportunity to get a "second bite at the apple," when, as here, the government failed to prove the totality of its case. Bur that does not mean that the government, the probation department, or the Court are free to disregard USSG § 1B1.3(c) by using acquitted drug quantities to calculate the guidelines post-November 2024. Doing so would ignore the plain import of the jury's response to the special interrogatories and disregard the jury's conclusion that the government failed to prove a quantity of marijuana that *only* was consistent with the jury also believing that Mr. Bongiovanni's participated and conspired with the greater Masecchia-Serio DTO as a whole. Drawing such a conclusion, contrary to the verdict, would run not just contrary to the guidelines, but it would be fundamentally unfair as well.

**B. Reliance on 18 U.S.C. § 3661 also is misplaced. USSG § 1B1.3(c) controls acquitted conduct in the context of guideline calculations now.**

The government also relies on 18 U.S.C. § 3661 for the proposition that *Apprendi*-based findings are not applicable to guideline determinations. *See* ECF 1578 at 33-34, 43. Reliance on Section 3661 also is misplaced. While Section 3661 may have allowed what the government argues for previous to last year, the promulgation of the Acquitted Conduct Rule in November 2024 changed the law and the guidelines. Post-November 2024, the laws governing what may considered for determining the guidelines calculations are different *and narrower* (i.e., courts may not consider acquitted conduct to calculate a defendant's guidelines range). Thus, the government's view, taken to its logical end, would require a finding that Section 3661 trumps USSG § 1B1.3(c), effectively reading USSG § 1B1.3(c) out of the guidelines altogether. But such a reading would lead to an absurd result – i.e., USSG § 1B1.3(c) having no effect at all. Neither Congress nor the Sentencing Commission[1] (or the courts, for that matter) intended such a result. Consequently, this argument fails.

---

[1] For example, the policy statement at USSG § 6A1.3 clarified that sentencing courts remain free to consider acquitted conduct in imposing a sentence in consultation with the 18 U.S.C. § 3553(a) sentencing factors. USSG § 6A1.3 ("[N]othing in the Guidelines Manual abrogates a court's authority under 18 U.S.C. § 3661.") And in pubic meetings discussing the amendment, the Sentencing Commission noted that while the "amendment precludes consideration of acquitted conduct in the context of calculating the guidelines, a court may still consider acquitted conduct when imposing a sentence. *See* Vice Chair Claire Murray, Remarks at United States Sentencing Commission Public Meeting, Apr. 17, 2024, available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20240417/transcript.pdf. Notwithstanding such commentary, the defense does not concede that this view is Constitutionally sound because use of acquitted conduct *at any point* of the sentencing process violates the Fifth and Sixth Amendments to the Constitution. We believe that justices, including those on the Supreme Court, are increasingly moving towards this conclusion even in the absence of direct precedent on the issue. *See, e.g., Erlinger v. United States*, 602 U.S. 821, 831 (2024) (holding that the Fifth and Sixth Amendments ensure that a judge's authority to punish a defendant "'must deriv[e]' wholly from, and remain always 'control[led]' by, the jury and its verdict.") (quoting Blakely, 542 U.S. at 306). As the Supreme Court made clear: "[t]hese principles represent not 'procedural formalit[ies]' but 'fundamental reservation[s] of power' to the American people. By requiring the Executive Branch to prove its charges to a unanimous jury beyond a

**II.    The government's belief that it proved all of the manner and means and overt acts in Count 1 at trial holds no support in reality, or otherwise.**

At the heart of its argument in multiple filings, the government continues to advance the narrative that conviction on Count 1 equates to a finding that each and every manner and means/overt act alleged was proven, such that Mr. Bongiovanni must be punished for them. This would include, among other allegations: the acceptance of bribes; the protection of Serio, Selva, Masecchia and others both during the conspiracy and after Serio's arrest; the disclosure of informants; the provision of cover stories; the use and possession of controlled substances while a DEA agent, and protecting IOC associates such as Masecchia and others who trafficked tons of marijuana into Buffalo. This position is at odds with specific findings of the jury. As discussed above, the finding on Count 3 proves that the jury unanimously *did not find* a weight of marijuana consistent with the scope of the alleged agreement in the larger Masecchia-Serio DTO that was the government attempted to prove at trial:

> **Part A**
>
> We, the jury, unanimously find that the amount of the mixture and substance containing marijuana that was reasonably foreseeable to the defendant as being within the scope of the agreement was: *(mark only one)*
>
> ___ 1000 kilograms or more
> ___ between 100 kilograms and 1000 kilograms
> ___ between 50 kilograms and 100 kilograms
> _X_ less than 50 kilograms

---

reasonable doubt, the Fifth and Sixth Amendments seek to mitigate the risk of prosecutorial overreach and misconduct, including the pursuit of 'pretended offenses' and 'arbitrary convictions' . . . . By requiring a unanimous jury to find every fact essential to an offender's punishment, those amendments similarly seek to constrain the Judicial Branch, ensuring that the punishments courts issue are not the result of a judicial 'inquisition' but are premised on laws adopted by the people's elected representatives and facts found by members of the community." *Erlinger,* 602 U.S. at 832 (citations omitted). Thus, to the extent this Court may rely on acquitted conduct to fashion Mr. Bongiovanni's sentence pursuant to Sections 3661 and 3553(a) here, irrespective of using acquitted conduct to determine his guidelines range, the defense hereby objects to using acquitted conduct in this fashion, too.

*See* ECF 1285 at 4.  Simply put, there was no logical way to find this amount unless the jury unanimously acquitted Mr. Bongiovanni of engaging in the conspiracy with Serio and Masecchia and limited its finding to Selva's basement grow only.  Likewise, the finding on Count 4 proves that the jury unanimously *did not find* that Mr. Bongiovanni accepted bribes in exchange for protecting the larger Masecchia-Serio DTO:

<u>COUNT 4</u>

(PUBLIC OFFICIAL ACCEPTING A BRIBE IN VIOLATION OF
TITLE 18, UNITED STATES CODE, SECTION 201(B)(2)(C))

How do you find as to the defendant, Joseph Bongiovanni, on Count 4?
   X    NOT GUILTY                    ____ GUILTY

*See* ECF 1285 at 5.  This finding also undermines the government's sweeping argument that every manner and means and overt act charged in Count 1 was believed and proven.  Simply put, the jury would not have acquitted on this count had it believed the entirety of the government's case.

Moreover, this position is at odds with the law of what a general verdict means.  The Second Circuit has a "stated preference for special interrogatories in particularly complex criminal cases."  *United States v. Ogando*, 968 F.2d 146, 149 (2d Cir. 1992); *see also United States v. Pimentel*, 346 F.3d 285, 305 (2d Cir. 2003) ("[W]e also strongly encourage the use of special verdict forms in cases alleging multiple racketeering acts to facilitate appellate review.").  However, special verdicts are otherwise disfavored in criminal cases.  *See United States v. Coonan*, 839 F.2d 886, 891 (2d Cir. 1988).  In the case of a general verdict, like here, the law of collateral estoppel counsels why the government's view is wrong.  As the Court instructed the jury on Count 1, "[t]he government is not required to prove all of the overt acts alleged in the indictment."  *See* Jury Charge at 101.  Consistent with this instruction, the Supreme Court has said:

> A general verdict of the jury or judgment of the court without special findings does not indicate which of the means charged in the indictment were found to have been used in effectuating the conspiracy. And since all of the acts charged need not be proved for conviction, *such a verdict does not establish that defendants used all of the means charged or any particular one.*

*Emich Motors Corp. v. Gen. Motors Corp.*, 340 U.S. 558, 569 (1951) (internal citation omitted, emphasis added). This concept has been invoked, in one instance for example, by criminal defendants convicted by general verdict of a §371 offense, who were later sued, to permissibly assert that several of the charged §371 overt acts fell outside the applicable civil statute of limitations. *See Aramony v. United Way of America*, No. 96 Civ. 3962(SAS), 1998 WL 205331, at *7 n.9 (S.D.N.Y. Apr. 27, 1998) ("Because the jury returned a general verdict of guilty on the conspiracy count, it is impossible to determine the facts which the jury found in connection with the charge."), *reconsideration denied* 1998 WL 324874 (S.D.N.Y. Jun. 18, 1998).

The same holds true here. "In the case of a criminal conviction based on a jury verdict of guilty, issues which were essential to the verdict must be regarded as having been determined by the judgment." *Emich*, 340 U.S. at 568. As a result, those issues that were *not* essential to the verdict cannot be determined by the judgment. To take just one issue, the government has maintained the position in closing arguments and post-trial briefing that Mr. Bongiovanni could be convicted of Count 1 even without the bribery component (which the defense has contested). To accept that as true means that the bribery allegations were not essential to the verdict, and, thus, were not determined by the judgment.

And while the law of collateral estoppel concerns the interpretation of judgments—something different than the question of sentencing relevant conduct—courts' instructions on what to do are just as apt. "Under these circumstances what was decided by the criminal judgment must be determined by the trial judge [. . .], upon an examination of the record, including the pleadings, the evidence submitted, the instructions under which the jury arrived at its verdict, and any opinions

of the courts." *Id.* at 569.  This Court sat through two lengthy jury trials about Mr. Bongiovanni's conduct.  It grappled with jury notes.  It has reviewed post-trial briefing and heard arguments on the issues.  It is in the best position to understand that while the government threw many things at the wall, few stuck, to include the core of the government's allegations that Mr. Bongiovanni protected a marijuana conspiracy, involving far more than 1000 kilograms of marijuana, in exchange for $250,000 in bribes.  The jury explicitly rejected this narrative. To perpetuate a false narrative that the jury did not do so is analogous to a petulant child discounting reality by covering his ears and eyes and yelling "no, no, no" at the top of his lungs. The Court should not succumb to such lunacy.

### III.   The government's claims regarding Peter Gerace find even more contradiction in the record.

Consistent with the authorities above, the government's position regarding Peter Gerace is even more tenuous.  Collectively, the jury and the Court acquitted Mr. Bongiovanni of engaging in a narcotics conspiracy, engaging in a conspiracy to defraud and accept bribes from Peter Gerace, of accepting bribes from Peter Gerace, and lying on a DEA memorandum on December 10, 2018.  This finding proves that the jury did not believe the core of the government's allegations against Mr. Bongiovanni to include protecting Peter Gerace, Anothony Gerace, and associates of the Gerace DTO; using narcotics while a DEA agent; failing to report or investigate the alleged overdose call at PGC; and, using racial slurs in front of SA Casullo.  In short, the jury rejected the allegations made by SA Casullo, Nigro, Myszka, several drug-addicted strippers, and many other questionable accusers the government presented in its case.  The force of these acquittals cannot be overlooked, even if the government wants to dismiss these significant losses after-the-fact.

The jury also made special findings which rejected a host of allegations involving Gerace.  In Count 15, the jury acquitted Mr. Bongiovanni of allegations surrounding Peter Gerace,

Anthony Gerace, Michael Sinatra, the 2016 Toronto Party, and the 2009 Peter Gerace cooperation allegation, limiting its finding to the Serio Working File only:

**COUNT 15**
(FALSE STATEMENTS TO AN AGENCY OF THE UNITED STATES IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1001(A)(2))

How do you find as to the defendant, Joseph Bongiovanni, on Count 15?

X GUILTY      ___ NOT GUILTY

*If and only if you find the defendant guilty on Count 15, proceed to Question 1 below. If you find the defendant not guilty on Count 15, proceed to the final instructions section.*

**Question 1**

Indicate the materially false statement(s) that you unanimously find the defendant guilty of making as charged in Count 15 (mark all that apply):

___ Denied he was in a close relationship with Peter Gerace Jr.;
___ That he had not spoken with Peter Gerace Jr. in over a year;
___ That he had never attended a party with Anthony Gerace;
___ That he never socialized with Michael Sinatra, and they never went on any trips together;
___ That Michael Sinatra's number was in the defendant's telephone because Michael Sinatra had done the defendant's landscaping;
___ That Peter Gerace Jr. once tried to cooperate with the DEA and that the defendant recused himself at the time because he knew Peter Gerace Jr. personally;
___ That Peter Gerace Jr. and the defendant were together, with others, a few years ago at Lake Erie around the 4th of July by chance encounter;
X That he kept the file regarding DEA Case Number C2-13-0026 in his house because it was an old case and he thought it would come up again and the defendant wanted to verify everything was on the up and up;
___ That Peter Millitello was the source in DEA Case Number C2-13-0026.

16

*See* ECF 880 at 16-17.  On Count 11, the jury acquitted Mr. Bongiovanni of witnessing Peter Gerace consume narcotics and of the Casullo allegation that Gerace called Mr. Bongiovanni when a person at PGC was allegedly overdosing:

**COUNT 11**
(FALSE STATEMENTS TO AN AGENCY OF THE UNITED STATES IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1001(A)(2))

How do you find as to the defendant, Joseph Bongiovanni, on Count 11?

___ NOT GUILTY      X GUILTY

*If and only if you find the defendant guilty on Count 11, proceed to Question 1 below. If you find the defendant not guilty on Count 11, proceed to the next page.*

**Question 1**

Indicate the materially false statement(s) that you unanimously find the defendant guilty of making as charged in Count 11 (mark all that apply):

___ Denied ever witnessing Peter Gerace, Jr. ever consume narcotics;
___ Denied that Peter Gerace Jr. ever called him while a staff member or customer was actively overdosing at the gentlemen's club operated by Peter Gerace Jr.;
X Denied ever initiating contact with Peter Gerace Jr.

*See* ECF 1285 at 12. At sentencing, the government believes these findings also are meaningless and should be disregard entirely in favor of a narrative the government twice failed to prove. But the guidelines, case law, and the Constitution say otherwise. Consistent with these authorities, the Court should decline the government's invitation.

As argued previously, the jury limited its findings regarding Peter Gerace to what Mr. Bongiovanni did – and many others did – when questioned about his relationship to Peter Gerace: he minimized the relationship and his contact with Gerace. The jury found these statements to be false in Counts 8, 10, and 11. That is where punishment should begin and end.

### IV. Mr. Bongiovanni did not cause SA Herbst, USPO Lepiane, or SA Casullo to "abandon" their investigations into Peter Gerace.

In its response, the government argues that Mr. Bongiovanni should be subject to Abuse of Trust and Substantial Interference Adjustments for his conduct relating to Peter Gerace. *See* ECF 1578 at 52-55. The defense previously objected to imposition of these adjustments and stands by those objections. *See* PSR Objections at 38-41. Notably, the government's arguments fail to counter the specifics of those arguments. To the extent the government proffers that the Court should consider SA Herbst's FBI "investigation" into Peter Gerace, the defense does not believe this provides a sufficient reason to apply these enhancements, either.

SA Herbst's FBI "investigation" into Peter Gerace – and that term should be used loosely, at best – did not involve Peter Gerace directly. As he testified at trial, SA Herbst's focus, and that of the FBI, was investigating a collection of cold-case murders that he believed had an IOC-nexus. When a source would pop up over the years that could provide a way to break-open this investigation, SA Herbst took a passing interest in the possible source. But these investigations ranked on the lowest rung of his investigative portfolio and were not a priority of his direct supervisor, either. In fact, when Amherst Police pulled over two strippers for a DWI in Amherst in

2007-08 and SA Herbst's task force partner learned that these women were linked to PGC and obtained statements from them regarding Peter Gerace and narcotics, SA Herbst *never acted* on the information. Later, in 2009, USPO Lepiane invited SA Herbst to a search of PGC to build rapport with Gerace. That did not pan out. And when GS Kasprzyk called the FBI to hand off Gerace to the FBI, SA Herbst conducted *one follow-up* with Mr. Bongiovanni. When the meeting did not reveal that Gerace was willing to "spill the beans" and assist the FBI with breaking-open these cold cases, SA Herbst *never* followed up again. SA Herbst did not even follow up with USPO Lepiane who was his original point of contact for Gerace. In short, SA Herbst "investigation" into Peter Gerace went nowhere because of his own lack of initiative (and that of the FBI) to investigate Gerace. Inaction also stemmed from a lack of initiative on behalf of Peter Gerace to act as an informant since, as USPO Lepiane made clear, once Gerace was not facing jail due to his violation of supervised release, Gerace's motivation for cooperating fizzled. Furthermore, there was no "closure" or "abandonment" of the Gerace investigation. As SA Herbst testified, he closed nothing because he never wrote a single report about Gerace *at all*. This is why these adjustments do not apply.

Dated: July 11, 2025
  Williamsville, New York

| | |
|---|---|
| **THE LAW OFFICE OF PARKER R. MACKAY** | **SINGER LEGAL PLLC** |
| *Attorneys for Joseph Bongiovanni* | *Attorneys for Joseph Bongiovanni* |
| By: s/Parker R. MacKay | By: s/Robert C. Singer |
|   Parker R. MacKay, Esq. |   Robert C. Singer, Esq. |
| 3110 Delaware Avenue | 80 East Spring Street |
| Kenmore, NY 14217 | Williamsville, New York 14221 |
| Ph: (716) 803-8166 | (716) 222-3288 |
| Fx: (716) 408-1651 | rob@singerlegalpllc.com |
| Em: Parker@MacKayLawOffice.com | |