UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

     v.

JOSEPH BONGIOVANNI,

        Defendant.

19-CR-227-LJV-MJR
DECISION & ORDER

---

On April 12, 2024, the defendant, Joseph Bongiovanni, was convicted following a jury trial on one count of obstructing justice in violation of 18 U.S.C. § 1519 (count 13) and one count of making false statements to an agency of the United States in violation of 18 U.S.C. § 1001(a)(2) (count 15). Docket Item 880. Bongiovanni was acquitted on another count of obstructing justice (count 12), *id.*, and this Court declared a mistrial on the other 12 counts, *see* Docket Item 867. The Court later granted a judgment of acquittal on one count of accepting a bribe as a public official in violation of 18 U.S.C. § 201(b)(2) (count 5). Docket Item 1077. The remaining 11 counts were retried beginning in July 2024. *See* Docket Items 1095 and 1193.

Following the second trial, the jury convicted Bongiovanni on one count of conspiring to defraud the United States in violation of 18 U.S.C. § 371 (count 1); one count of conspiring to possess with intent to distribute and to distribute controlled substances, including less than 50 kilograms of marijuana, in violation of 21 U.S.C. § 846 (count 3); four counts of obstructing justice in violation of 18 U.S.C. § 1519 (counts 6-8 and 10); and one count of making false statements to an agency of the United States in violation of 18 U.S.C. § 1001(a)(2) (count 11). Docket Item 1285. The

jury acquitted Bongiovanni on a second count of conspiring to defraud the United States in violation of 18 U.S.C. § 371 (count 2); one count of accepting a bribe as a public official in violation of 18 U.S.C. § 201(b)(2)(c) (count 4); a second count of conspiring to possess with intent to distribute and to distribute controlled substances in violation of 21 U.S.C. § 846 (count 5); and another count of obstructing justice in violation of 18 U.S.C. § 1519 (count 9).  Docket Item 1285.  The conspiracy acquittals involved an alleged agreement to protect Peter Gerace, Jr., a codefendant whose trial had been severed from Bongiovanni's.  *See* Docket Item 1193 at 17-26, 28.[1]

On April 25, 2025, the United States Probation Office filed a Presentence Investigation Report ("PSR") calculating Bongiovanni's United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range.  Docket Item 1503.  Both Bongiovanni and the government objected to the PSR.  Docket Items 1566 and 1567.  More specifically, Bongiovanni contends that: (1) the calculation of the drug weight on count 3 should be "at most . . . 10-20 pounds of marijuana," Docket Item 1567 at 38; (2) the counts should be divided into two rather than three groups, *id.* at 34-38; (3) the two-level firearm enhancement should not be applied, *id.* at 38-39; and (4) the two-level abuse of public trust enhancement should not be applied to the Gerace-related counts, *id.* at 41-42.  The government disagrees with Bongiovanni's arguments and also contends that the three-level manager enhancement should be applied.[2]  Docket Item 1566 at 4-7.

---

[1] Page numbers in docket citations refer to ECF pagination.

[2] In addition, both parties objected to the PSR's inclusion of numerous specific facts.  *See generally* Docket Items 1566 and 1567.  As the Court explained at oral argument, it will not rule on each of these objections individually, as it is not the Court's role to rewrite the PSR.  *See United States v. Reiss*, 186 F.3d 149, 156-57 (2d Cir. 1999) (explaining that district court is not required to "perform a line-by-line review of the PSR").  That being said, the revised PSR should make clear that any "facts" involving

This Court heard oral argument on both sides' objections and reserved decision.  *See* Docket Item 1588.

For the reasons that follow, this Court sustains in part and overrules in part Bongiovanni's objections to the PSR, Docket Item 1567, and overrules the government's objection to the PSR, Docket Item 1566.  More specifically, the Court finds that (1) the counts should be divided into two rather than three groups, (2) Bongiovanni's relevant conduct involves at least 400 kilograms but less than 700 kilograms of converted drug weight, (3) the firearm enhancement was properly applied, (4) the abuse of public trust enhancement was properly applied as to the group of counts related to Gerace, and (5) the PSR properly declined to apply the manager aggravating-role enhancement.  The United States Probation Office shall revise the PSR accordingly by **October 31, 2025**.

## DISCUSSION[3]

I.    **LEGAL PRINCIPLES**

A.    **Sentencing Guidelines Calculation**

The now-advisory Guidelines, *see United States v. Booker*, 543 U.S. 220 (2005), are the requisite starting point for a district court's determination of a sentence.  *See Rita v. United States*, 551 U.S. 338, 350 (2007).  Under the Guidelines, a defendant's sentencing range is calculated using a base offense level; any adjustments to that level

---

conduct on which Bongiovanni was acquitted are the government's allegations, not proven conduct.

[3] The Court assumes the reader's familiarity with the factual background and will recount only those facts necessary to explain its opinion.

based on specific offense characteristics, the defendant's role in the offense, and whether the defendant accepted responsibility for the offense; and the defendant's criminal history category.  *See* U.S.S.G. § 1B1.1(a).

### B.    Relevant Conduct and Drug Weight

The base offense level for violating the underlying statute charged in count 3—21 U.S.C. § 841(a)(1)—is driven by the drugs involved and their weight.  *See* U.S.S.G. § 2D1.1(c).  The relevant weight is not limited to that of the drugs for which the defendant was convicted, however, and can include the weight of all drugs connected to the defendant's relevant conduct.  *See United States v. Madkour*, 930 F.2d 234, 237 (2d Cir. 1991); *see also Booker*, 543 U.S. at 233-35.

"[I]n the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy)," relevant conduct includes:

> all acts and omissions of others that were—
>
> > (i) within the scope of the jointly undertaken criminal activity,
> >
> > (ii) in furtherance of that criminal activity, and
> >
> > (iii) reasonably foreseeable in connection with that criminal activity[]
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1)(B); *see also United States v. Molina*, 106 F.3d 1118, 1121 (2d Cir. 1997) ("Under the relevant conduct principles of subsection 1B1.3(a)(1)(B), all

'reasonably foreseeable acts and omissions of others' in furtherance of the conspiracy may be taken into account to determine a defendant's sentence.").

Thus, to determine relevant conduct with respect to jointly undertaken criminal activity, "the district court must make two particularized findings." *United States v. Mulder*, 273 F.3d 91, 118 (2d Cir. 2001). "First, it must determine 'the scope of the criminal activity agreed upon by the defendant.'" *Id.* (quoting *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995)). "Second—and only if it finds that the scope of the activity to which the defendant agreed was sufficiently broad to include the conduct in question—the court 'must make a particularized finding as to whether the activity was foreseeable to the defendant.'" *Id.* (quoting *Studley*, 47 F.3d at 574). With respect to drug quantity, "[t]he defendant need not have actual knowledge of the exact quantity of narcotics involved in the entire conspiracy; rather, it is sufficient if he could reasonably have foreseen the quantity involved." *United States v. Snow*, 462 F.3d 55, 72 (2d Cir. 2006).

The Guidelines also provide that "solely with respect to offenses of a character for which [section] 3D1.2(d) would require grouping of multiple counts," relevant conduct includes "all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). And the Guidelines state that "[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction." *Id.* § 1B1.3(c).

### C.    Evidentiary Standards in Sentencing

Even though a defendant is adjudged guilty by the time of sentencing, the defendant's due process rights are not checked at the courtroom door.  *See United States v. Pugliese*, 805 F.2d 1117, 1122 (2d Cir. 1986).  On the contrary, the sentencing court must balance the defendant's procedural rights against the defendant's guilt and the need to impose a fair punishment.  *See id.*

Under Federal Rule of Criminal Procedure 32, prior to sentencing a court must "rule on [any] dispute [regarding the PSR] or determine that a ruling is unnecessary either because the matter will not affect sentencing[] or because the court will not consider the matter in sentencing."  Fed. R. Crim. P. 32(i)(3)(B).  A court is not required to "perform a line-by-line review of the PSR," however, as long as it "resolve[s] the substantive challenges" to it.  *United States v. Reiss*, 186 F.3d 149, 156-57 (2d Cir. 1999).

A sentencing court has broad discretion in deciding what information to consider: So long as the defendant is afforded an opportunity to respond and information has some indicia of reliability to ensure that it is likely accurate, such information is fair game, and the formal rules of evidence do not apply.  *United States v. Concepcion*, 983 F.2d 369, 387-88 (2d Cir. 1992); U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").  By the same token, "[u]nreliable allegations shall not be considered" by the sentencing court.  U.S.S.G. § 6A1.3 cmt.  And if the reliability of certain information is challenged, corroborating evidence can help the court determine

whether the information is, in fact, reliable. *United States v. Romano*, 825 F.2d 725, 728-29 (2d Cir. 1987); *United States v. Fatico*, 579 F.2d 707, 713 (2d Cir. 1978).

At a trial, the government must prove a defendant's guilt beyond a reasonable doubt; at a sentencing hearing, on the other hand, the government must prove the relevant facts only by a preponderance of the evidence. *See United States v. Salazar*, 489 F.3d 555, 557 (2d Cir. 2007) (per curiam). Drug weight, like any other sentencing factor, is determined by a preponderance of the evidence. *See United States v. Cordoba-Murgas*, 233 F.3d 704, 708 (2d Cir. 2000).

## II.    THE PSR'S CALCULATIONS

The PSR divided the counts on which Bongiovanni was convicted into three groups. The first group included counts 1 and 3, which the PSR "grouped for [G]uideline calculation purposes because they involve[d] the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." Docket Item 1503 at ¶ 84 (citing U.S.S.G. § 3D1.2(b)). More specifically, the PSR explained, "these counts are connected by the common criminal objective or constituting part of a common scheme or plan, namely, to facilitate the continued drug trafficking activities related to the [Serio Drug Trafficking Organization ('DTO')]." *Id.* The second group included counts 6, 7, 11, and 13. *Id.* at ¶ 85. The PSR grouped those counts because they were "connected by the common criminal objective or constituting part of a common scheme or plan to obstruct the investigation into the drug trafficking activities related to the [Serio] DTO." *Id.* Finally, the third group included counts 8, 10, and 15, which the PSR grouped because they were "connected by the common criminal objective or constituting part of a common

7

scheme or plan to obstruct the investigation into the drug trafficking activities related to Peter Gerace[,] Jr., a closely related investigation." *Id.* at ¶ 87.

For group 1, the PSR found that Bongiovanni's relevant conduct "involved the converted drug weight of at least 10,000 to 30,000 kilograms," for a base offense level of 34. *Id.* at ¶ 89. The PSR then added three two-level enhancements: possession of a firearm, *id.* at ¶ 90; abuse of public trust, *id.* at ¶ 92; and obstruction of justice, *id.* at ¶ 93, resulting in a base offense level of 40, *id.* at ¶ 94.

The PSR "grouped together" groups 1 and 2 "for [G]uideline calculation purposes because [group 2] embodies conduct that is treated as a specific offense characteristic in, or other adjustment to" the counts in group 1 "(namely, Obstructing or Impeding the Administration of Justice" under U.S.S.G. § 3C1.1)." *Id.* at ¶ 86. The PSR then explained that "the offense level applicable to a group is the offense level[] . . . for the most serious of the counts comprising the [g]roup"—here, count 3. *Id.* So the PSR found a base offense level of 40 for groups 1 and 2 combined. *See id.* at ¶¶ 86, 88-94.

For group 3, the PSR started with a base offense level of 14 under U.S.S.G. § 2J1.2. Docket Item 1503 at ¶ 95. The PSR then added a three-level enhancement for "substantial interference with the administration of justice" and a two-level enhancement for abuse of public trust, for a total offense level of 19. *Id.* at ¶¶ 96-100.

The PSR explained that under U.S.S.G. § 3D1.4, the greater offense level of the two groups applies and, because the total offense level for group 3 was "9 or more levels less serious," it is disregarded. Docket Item 1503 at ¶ 101. The PSR then subtracted two levels for a total offense level of 38 because Bongiovanni meets the criteria at U.S.S.G. § 4C1.1(a)(1)-(11) for a zero-point offender. Docket Item 1503 at

¶ 105.  Ultimately, the PSR calculated a Guidelines range of 235 months to 293 months based on an offense level of 38 and a criminal history category of I.  *Id.* at ¶ 117.

## III.    BONGIOVANNI'S OBJECTIONS

### A.    Drug Weight

Count 3 charged that Bongiovanni conspired "to possess with intent to distribute, and to distribute, 1000 kilograms or more of a mixture and substance containing marijuana . . . and cocaine."  Docket Item 1193 at 26.  The jury convicted Bongiovanni on count 3 but determined that "less than 50 kilograms" of marijuana "was reasonably foreseeable to [him] as being within the scope of the agreement."  Docket Item 1285 at 4.  The jury was not asked to determine whether—and, if so, how much—cocaine was involved in the conspiracy.  *See id.*

Count 3 charged Bongiovanni with a drug conspiracy involving what the government called the Serio DTO.  *See, e.g.*, Docket Item 1578 at 21-23.  Based on the trial testimony of Ron Serio, a principal in that organization, the PSR calculated that "at least 10,000 kilograms but less than 30,000 kilograms of converted drug weight is the amount involved in [Bongiovanni]'s relevant conduct."  Docket Item 1503 at ¶ 59.  More specifically, the PSR found that Bongiovanni's relevant conduct included 5,120 grams of fentanyl (12,800 kilograms of converted drug weight), 10,000 pounds of marijuana (4,536 kilograms of converted drug weight), and five kilograms of cocaine (1,000 kilograms of converted drug weight).  *Id.*

Bongiovanni objects, arguing, among other things, that the PSR's determination violates the acquitted conduct rule.  Based on the jury's verdict, Bongiovanni says, his relevant conduct includes "at most, what [his friend] Lou Selva testified . . . was growing

in [Selva's] basement," which "included 40-50 plants that yielded 10-20 pounds of marijuana." Docket Item 1567 at 30. "10-20 pounds of marijuana converts to 4.5-9 kilograms of marijuana," Bongiovanni explains, which would result in "a base offense level of 12 (if the Court credits Selva's testimony that the grow yielded 12 pounds/5.4 kilograms or more of marijuana) or [a] base offense level of 10 (if the Court credits Selva's testimony that the grow yielded 10-11 pounds/4.5-4.9 kilograms of marijuana)." *Id.* The government responds that the PSR correctly calculated the drug weight. *See* Docket Item 1578 at 16-30.

As the Second Circuit has explained, "the scope of conduct for which a defendant can be held accountable under the [Guidelines] is significantly narrower than the conduct embraced by the law of conspiracy." *United States v. Rigo*, 649 F. App'x 107, 108 (2d Cir. 2016) (summary order) (quoting *United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir. 1991)). "This is because 'the emphasis in substantive conspiracy liability is the scope of the *entire conspiracy,*' while 'the emphasis under [the Guidelines] is the scope of the *individual defendant's* undertaking.'" *Id.* (quoting *United States v. Spotted Elk*, 548 F.3d 641, 673-74 (8th Cir. 2008)). "As the commentary to the relevant section of the Guidelines explains, 'the accountability of the defendant for the acts of others is limited by the scope of his or her agreement to jointly undertake the particular criminal activity. Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct' for sentencing purposes." *Id.* (quoting U.S.S.G. § 1B1.3 cmt. n.3(B)). By the same token, acts that were within the scope of the agreement but not

reasonably foreseeable to the defendant also may not be included as relevant conduct. *See* U.S.S.G. § 1B1.3.

### 1.    The Scope of Activity that Bongiovanni Jointly Undertook

As explained above, the Court first must determine whether "the scope of the activity to which the defendant agreed was sufficiently broad to include the conduct in question."  *See Mulder*, 273 F.3d at 118 (citing *Studley*, 47 F.3d at 574).  "[T]hat the defendant is aware of the scope of the overall operation is not enough to hold him accountable for the activities of the whole operation."  *Studley*, 47 F.3d at 575.  Rather, "[t]he relevant inquiry is what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct."  *Id.*

As the government observes, there was testimony from Selva and Serio, as well as admissions in the plea agreement of Michael Masecchia and exhibits presented at trial, suggesting that Bongiovanni "explicitly and implicitly through his conduct, [agreed] corruptly to protect the [Serio] DTO in a variety of ways," including:

- "protect[ing] the DTO against informants";

- "misle[ading] members of law enforcement, including the Amherst Police Department, DEA, and the United States Attorney's Office";

- "sign[ing] Robert Kaiser up as [Bongiovanni]'s DEA confidential source[ ('CS')] and then promptly expos[ing] Kaiser's status as a [CS] to Selva, who passed that critical information along to the DTO's principal members—Masecchia and Serio";

- "after exposing Kaiser's identity as a CS to the DTO, ensur[ing] that Kaiser provided no cooperation against the Serio DTO and promptly us[ing] Kaiser to investigate an individual unconnected to the Serio DTO";

- "after using Kaiser to investigate another individual, prematurely clos[ing] Kaiser as a CS and forg[ing] DEA Special Agent Mark Gentile's name on the CS deactivation form";

- "continu[ing] to mislead other members of the DEA (such as David Leary, Shane Nastoff, Dave Turri, and the supervisor who signed off on false reports—John Flickinger), into believing [that Bongiovanni] had a CS active in the case when he did not";

- "creating a sham file (C2-13-0026) purporting to investigate Wayne Anderson[] and the Serio DTO" after Anderson "was arrested during a controlled delivery involving 200 pounds of marijuana intended for the DTO";

- "using the sham file that he opened (C2-13-0026) [to] create[] a myriad [of] false and misleading DEA reports";

- "continually misle[ading] co-workers and misus[ing] DEA databases (such as the DARTS database) to set up deconflictions to alert [Bongiovanni] if members of the conspiracy were under investigation by other members of the DEA or federal law enforcement";

- "us[ing] the DEA DARTS deconflictions that [Bongiovanni] caused to be set up to confirm for the DTO that no DTO members—including principal members Ron Serio and Michael Masecchia—were captured on law enforcement wiretaps";

- Providing "general advice" on avoiding law enforcement detection to Selva, "which Selva frequently passed along to the DTO";

- providing "specific information" to the DTO, including: disclosing "the identities of three DEA CSs (including Kaiser); confirm[ing] that no members of law enforcement were tracking tractor trailer trucks from California and British Columbia intended for Buffalo; advis[ing] Selva about GPS trackers and their [contemplated] use in the investigation . . . ; advising Selva that a member of the DTO, Mario Vacanti, was under investigation[;] and[] informing Selva when investigation into the DTO was closed";

- coaching "Selva to lie to conceal the criminal activity" and "personally ma[king] a myriad of false statements to conceal the conspiracies and his involvement in them."

*See* Docket Item 1578 at 21-23.[4]

Bongiovanni argues, as he did in support of his Rule 29 motion, that the jury's drug-weight finding on count 3 demonstrates that his role in the conspiracy was limited to protecting Selva's basement grow. But as this Court recently found in denying Bongiovanni's Rule 29 motion, "the only thing the Court can glean from the jury's verdict is that the government failed to prove that more than 50 kilograms of marijuana was reasonably foreseeable to Bongiovanni as part of the conspiracy." *United States v.*

---

[4] The government's brief also recounts trial testimony about bribes that Bongiovanni was given in exchange for this protection. *See* Docket Item 1578 at 17-20. But the jury acquitted Bongiovanni of accepting bribes, and the Court therefore will not consider the evidence of bribery in analyzing Bongiovanni's relevant conduct. *See* U.S.S.G. § 1B1.3(c).

*Bongiovanni*, 2025 WL 2462445, at *4 (W.D.N.Y. Aug. 27, 2025).  And "that does not, as Bongiovanni claims, permit the inference that the jury found only that he protected Selva's small grow operation or that the government's proof on Bongiovanni's involvement in the Serio DTO conspiracy was lacking."  *See id.*

On the contrary, there was ample evidence at trial suggesting that Bongiovanni was aware of more than just Selva's basement grow.  As the government observes, Selva testified that he had "specifically advised [Bongiovanni] that the drug trafficking involved outdoor marijuana grow operations in the Southern Tier; indoor marijuana grow operations at Selva's residence; trips to New York City by Serio and Masecchia to procure marijuana; and tractor trailer truckloads of marijuana traveling across the country from California and internationally from British Columbia, Canada."  Docket Item 1578 at 24.  What is more, Bongiovanni completed a DEA-6 form in which he reported that Kaiser had told him that Serio and Serio's brother, Thomas, were "known to [Kaiser] as leaders of a large drug trafficking organization capable of trafficking multi-kilogram quantities of cocaine and [h]undreds of pounds of marijuana in Buffalo."  *See id.* at 25-26.  Additionally, the 2012 New York State Police ("NYSP") "arrest of Wayne Anderson, a member of the [Serio] DTO . . . , involved 200 pounds of marijuana."  *Id.* at 24; *see* Docket Item 1487 at 19.  And following that arrest, there was evidence that Bongiovanni "misle[d] the NYSP into relinquishing the . . . Anderson investigation to [Bongiovanni]."  Docket Item 1578 at 24-25.

Based on all that, this Court finds by a preponderance of the evidence that "the scope of the activity to which [Bongiovanni] agreed was sufficiently broad to include" the actions of the Serio DTO.  *See Mulder*, 273 F.3d at 118 (citing *Studley*, 47 F.3d at 574).

But that does not end the inquiry.  The drug weight for which Bongiovanni was responsible still must be reasonably foreseeable to him.  In other words, although this Court finds that Bongiovanni agreed to protect the Serio DTO in a wide-ranging manner such that he jointly undertook the full scope of the actions taken in furtherance of the conspiracy, that does not mean that he could reasonably foresee all its actions.  *See* U.S.S.G. § 1B1.3(a)(1)(B).

### 2.    The Amount of Drugs Reasonably Foreseeable to Bongiovanni

The question, then, is how much of the Serio DTO's drug trafficking activity was reasonably foreseeable to Bongiovanni.  As explained above, the government contends, and the PSR found, that Bongiovanni should be held responsible for all the drugs that the Serio DTO distributed.  Bongiovanni, by contrast, contends that he is responsible only for Selva's basement grow.  For the reasons that follow, the Court finds that the correct amount is somewhere between the two extremes.

#### a.    Marijuana

First, the Court agrees with Bongiovanni that under the acquitted conduct rule, it cannot attribute more marijuana to him than the jury found.[5]  *See* U.S.S.G. § 1B1.3(c). So the marijuana that can be included in Bongiovanni's relevant conduct is no more

---

[5] As the government observes, the Guidelines provide that in "cases in which certain conduct underlies both an acquitted charge and the instant offense of conviction . . . , the [district] court is in the best position to determine whether such overlapping conduct establishes, in whole or in part, the instant offense of conviction and therefore qualifies as relevant conduct."  *See* U.S.S.G. § 1B1.3 cmt. n.10.  Here, however, the jury clearly acquitted Bongiovanni of the specific conduct of conspiring to distribute more than 50 kilograms of marijuana, and this Court sees no reason to find that such conduct "establishes, in whole or in part" the conspiracy to defraud on which Bongiovanni also was convicted.  *See id.* § 1B1.3(c).

than 49.9 kilograms.  Based on the evidence described above, including Anderson's arrest with 200 pounds (over 90 kilograms) of marijuana, *see supra* Section II.A.1, and mindful of the preponderance of the evidence standard, the Court finds that the full amount of marijuana permissible under the jury's verdict—49.9 kilograms—was foreseeable to Bongiovanni as being part of the conspiracy.

b.     *Cocaine*

The Court agrees with the government, however, that marijuana is not the only drug reasonably foreseeable to Bongiovanni as part of the conspiracy.  Count 3 charged that Bongiovanni conspired "to possess with intent to distribute, and to distribute, 1000 kilograms or more of a mixture and substance containing marijuana . . . *and cocaine*." Docket Item 1193 at 26 (emphasis added).  The jury was not asked to determine how much cocaine was reasonably foreseeable to Bongiovanni as part of the conspiracy, so—unlike the marijuana—there is no amount of cocaine that would run afoul of the acquitted conduct rule.  Therefore, the question is this: what amount of cocaine, if any, was reasonably foreseeable to Bongiovanni as part of the conspiracy for which he was convicted.  And the Court makes that determination by a preponderance of the evidence.  *See Cordoba-Murgas*, 233 F.3d at 708.

As explained above, Serio testified that he had "distributed at least 5 kilograms of cocaine (1,000 kilograms of converted drug weight)," and the PSR therefore attributed that amount to Bongiovanni as relevant conduct.  *See* Docket Item 1503 at 18.  But just because Serio testified as to what *he* distributed does not necessarily mean that the full amount should be included in Bongiovanni's relevant conduct.  Before adding that in, the Court must have some evidence that Bongiovanni knew about or could reasonably have foreseen that amount.  *See Studley*, 47 F.3d at 574.

16

The evidence demonstrates that Bongiovanni knew that the Serio DTO was seeking customers "for multiple kilograms of cocaine." *See* Docket Item 1578 at 25-26; *see also id.* (Bongiovanni's stating in DEA-6 that Kaiser told him that Serio and his brother were "known to [Kaiser] as leaders of a large drug trafficking organization capable of trafficking multi-kilogram quantities of cocaine"). From this, the Court finds that Bongiovanni could reasonably foresee at least 2 kilograms of cocaine as being part of the conspiracy. And, although a closer call, the Court finds that there is not sufficient evidence to find that more than 2 kilograms was foreseeable.

It is true, as the government observes, that the DEA-6 report also noted that Robert Mettal—another member of the Serio DTO—"was arrested in a New York State cocaine investigation along with Thomas Serio in 1998 with approximately 5 kilograms of cocaine." *Id.* at 26-27 (some capitalization omitted). But Mettal's and Serio's prior acts—which occurred a decade before the alleged start of the conspiracy—are insufficient for this Court to find, even by a preponderance of the evidence, that Bongiovanni could reasonably foresee that those individuals would again distribute that quantity. *See* Docket Item 1193 at 26 (charging Serio DTO conspiracy beginning in 2008). Indeed, the Second Circuit has cautioned against using the past acts of a conspirator as a basis for finding reasonable foreseeability. *Cf. Mulder*, 273 F.3d at 119-20 (finding that "district court's original basis for finding foreseeability—the use of violence by coalition members in other circumstances—was inadequate" and ordering that "[o]n remand, the district court may not find that [a] murder was foreseeable to [the defendants] solely because [coalition] members committed other violent acts").

Thus, the Court finds that Bongiovanni's relevant conduct includes 2 kilograms of cocaine as part of the conspiracy charged in count 3.

        *c.*     *Fentanyl*

As noted above, the PSR also included "5,120 grams (12,800 kilograms of converted drug weight)" of fentanyl based on Ron Serio's testimony that he "had four large shipments of counterfeit pills containing fentanyl, with 4,000 pills per shipment, for a total of 16,000 pills." *See* Docket Item 1503 at ¶ 49. But there is a dearth of evidence demonstrating that Bongiovanni could reasonably foresee—let alone that he knew—that Serio also was trafficking fentanyl pills.

Indeed, the government does not even attempt to argue that Bongiovanni knew or could reasonably foresee the fentanyl pills. *See* Docket Item 1578 at 29 (arguing that "[t]he evidence firmly establishes that *cocaine and marijuana* were not only reasonably foreseeable to the defendant—but were directly known by the defendant to be controlled substances trafficked by the DTO that he was protecting" (emphasis added)). Instead, the government says that "even if the Court does not find [the fentanyl pills] to be relevant conduct under [section] 1B1.3(a)(1)(B), they are nevertheless countable as relevant conduct under [section] 1B1.3(a)(2), which requires the court to consider 'all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction.'" Docket Item 1578 at 29. More specifically, the government contends that "[t]he evidence established that all shipments of fentanyl pills were mixed in with the large shipments of marijuana that were unquestionably established to be[—by] *at least* a preponderance of the evidence— under [Bongiovanni]'s protection." *Id.* And the government suggests that "the fentanyl pills are relevant conduct because they were part of the same course of conduct

18

because they were substantially connected and were part of ongoing series of offenses that included the other controlled substances the defendant was directly aware the DTO was distributing (cocaine and marijuana) with his protection." *Id.* at 30.

Under section 1B1.3(a)(1), relevant conduct must either be acts or omissions that the defendant "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused," U.S.S.G. § 1B1.3(a)(1)(A), or it must meet the criteria for "jointly undertaken criminal activity" outlined in section 1B1.3(a)(1)(B). Section 1B1.3(a)(2)—on which the government relies—states that for grouped counts, "all acts and omissions *described in subdivisions (1)(A) and (1)(B) above* that were part of the same course of conduct or common scheme or plan as the offense of conviction" also are included in relevant conduct. *Id.* § 1B1.3(a)(2) (emphasis added). Thus, to qualify as relevant conduct as part of a "course of conduct or common scheme or plan," the conduct still must meet the criteria in either U.S.S.G. § 1B1.3(a)(1)(A) or (a)(1)(B). And that makes sense because it ensures that a defendant is punished only for acts that he personally participated in or that were reasonably foreseeable as part of a conspiracy. *See Rigo*, 649 F. App'x at 108 (explaining that focus of Guidelines calculation "is the scope of the *individual defendant's* undertaking" (citation omitted)).

Here, however, there is no evidence that Bongiovanni "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused" the fentanyl distribution. *See* U.S.S.G. § 1B1.3(a)(1)(A). Rather, the evidence demonstrated that as part of the conspiracy, Bongiovanni generally helped the Serio DTO evade detection. Therefore, to be counted as relevant conduct, the fentanyl must meet the standard for "jointly undertaken criminal activity," including being reasonably foreseeable to

Bongiovanni. *See id.* § 1B1.3(a)(1)(B). And because there was scant, if any, evidence that Bongiovanni could reasonably foresee that Serio was distributing fentanyl, Bongiovanni cannot be sentenced based on the fentanyl drug weight.

* * *

This Court therefore finds that under the Guidelines, the drug weight for which Bongiovanni is responsible on count 3 includes 49.9 kilograms of marijuana (49.9 kilograms of converted drug weight) and 2 kilograms of cocaine (400 kilograms of converted drug weight), for a total of 449.9 kilograms of converted drug weight. That puts his relevant conduct in the range of at least 400 kilograms but less than 700 kilograms of converted drug weight, which results in a base offense level of 26. *See* U.S.S.G. § 2D1.1(c)(7).

## B.    Grouping

The Guidelines provide that

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

(a)    When counts involve the same victim and the same act or transaction.

(b)    When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

(c)    When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d)    When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

U.S.S.G. § 3D1.2.

As explained above, the PSR divided the counts into three groups: counts 1 and 3 (the conspiracy counts related to the Serio DTO); counts 6, 7, 11, and 13 (the obstruction counts related to the Serio DTO); and counts 8, 10, and 15 (the Gerace-related counts). *See* Docket Item 1503 at ¶¶ 83-107. Bongiovanni argues that instead of three groups, the counts should be in two groups: one involving Gerace and the other involving Selva and the Serio DTO. But as explained above, the PSR ultimately combined groups 1 and 2—that is, all the counts related to the Serio DTO—for its Guidelines calculation*, see id.* at ¶ 86, and the government does not object to that grouping, *see* Docket Item 1578 at 50. So as far as the final Guidelines calculation is concerned, Bongiovanni's objection does not appear to make a difference.

That being said, this Court agrees with Bongiovanni that—to the extent it matters—the counts should be divided into two groups: one involving the counts related to the Serio DTO and the other involving the counts related to Gerace. Beginning with the opening statements by both sides, Bongiovanni's trial focused on two separate conspiracies in which Bongiovanni's alleged role was to cover his coconspirators' tracks. Thus, this is not like a case where a defendant distributed drugs and then lied about it. Here, the obstruction counts stem from the same conduct that underlies the conspiracy counts. Indeed, the government concedes that "the obstruction-related offenses, [c]ounts 6[, ]7, 11, and 13 ([g]roup 2), were all obstruction-related conduct that were a part of the same series of transactions underlying [c]ounts 1 and 3 ([g]roup 1)." *Id.* And because the conspiracy counts and the obstruction counts concerning the Serio

DTO involve the same victim and the same acts and transactions, they are properly grouped under U.S.S.G. § 3D1.2.

### C.    Firearm Enhancement

The PSR applied a two-level enhancement because "a dangerous weapon (including a firearm) was possessed by multiple members of the conspiracy," including Serio and Masecchia.  Docket Item 1503 at ¶ 90 (citing U.S.S.G. § 2D1.1(b)(1)).  The Guidelines provide that this enhancement "reflects the increased danger of violence when drug traffickers possess weapons" and "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  U.S.S.G. § 2D1.1 cmt. n.11.  As with the drug weight calculation, the question is whether any coconspirator's possession of a dangerous weapon was reasonably foreseeable to Bongiovanni.  *See id.* § 1B1.3(a)(1)(B).

Bongiovanni again asks this Court to infer from the jury's verdict on count 3 that he was convicted only of "protecting Selva and his basement grow" and therefore that "attribution of the firearms to . . . Bongiovanni would be improper."  Docket Item 1567 at 28; *see also id.* at 38 (Bongiovanni's arguing that he "was acquitted of conspiring with Ron Serio and Michael Masecchia, so applying this specific offense characteristic based on Serio's or Masecchia's possession of a firearm is improper and violates U.S.S.G. § 1B1.3(c)").  The Court rejects this argument for the same reason it did with respect to Bongiovanni's Rule 29 motion.  *See Bongiovanni*, 2025 WL 2462445, at *4.  But there still remains the question of whether there is sufficient evidence for this Court to find that Bongiovanni could reasonably foresee that his coconspirators would possess firearms in furtherance of the conspiracy.

As the government observes, the report Bongiovanni prepared in connection with Kaiser's work as a confidential source noted that "Kaiser provided information to the defendant that members of the Serio DTO were connected to firearms." *See* Docket Item 1578 at 51. More specifically, the report stated that "Kaiser has been approached by Serio and Robert Mattal in the past *to assist the Serio DTO* in transporting and safeguarding cocaine, marijuana, *and firearms* from California and New York City to Buffalo, New York." *Id.* at 27 (some capitalization omitted) (emphasis added) (quoting Gov. Ex. 9E-4). The government also notes that "as a trained DEA agent, [Bongiovanni] has sworn to a federal magistrate judge in support of a search warrant that drug dealers possess firearms, and that they are among the tools of the drug trade." *Id.* at 51.

The fact that Bongiovanni generally knew that drug dealers often use firearms is not sufficient—by itself—to make a particularized finding that Bongiovanni could reasonably foresee that the Serio DTO he agreed to protect possessed firearms. But combined with the information above about Bongiovanni's knowledge of the Serio DTO's transporting firearms, and again mindful of the preponderance of the evidence standard, the Court finds that Bongiovanni could have reasonably foreseen that members of the Serio DTO whom he agreed to protect possessed firearms in connection with the narcotics conspiracy. Thus, the PSR properly applied the firearm enhancement.

### D.    Abuse of Public Trust with Respect to Counts 8, 10, and 11

The Guidelines provide for a two-level enhancement "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly

facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3 "For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult)." *Id.*, cmt. n.1 (italics omitted). The Second Circuit applies a two-pronged test to determine whether the abuse of public trust enhancement applies: "(1) whether the defendant occupied a position of trust from the victim's perspective and (2) whether that abuse of trust significantly facilitated the commission or concealment of the offense." *United States v. Huggins*, 844 F.3d 118, 124 (2d Cir. 2016) (internal quotation marks omitted); *see also United States v. Nuzzo*, 385 F.3d 109, 115 (2d Cir. 2004).

Bongiovanni argues that the PSR improperly applied this enhancement to counts 8, 10, and 11. *See* Docket Item 1567 at 41. With respect to count 11 (Bongiovanni's minimizing his contacts with Gerace in an interview with Special Agent David Carpenter on March 29, 2019), Bongiovanni notes that he "committed this act when he was retired from the DEA, so, at least at the time of this offense, [he] no longer occupied a position of public trust and this enhancement should not apply." *Id.* For count 8 (obstruction of justice based on memorandum dated November 1, 2018, minimizing relationship with Gerace) and count 10 (obstruction of justice based on memorandum dated January 28, 2019, misrepresenting Special Agent Anthony Casullo's relationship with Gerace), Bongiovanni acknowledges that he held a position of public trust at the relevant time but argues that the evidence did not demonstrate that his "position of public trust 'significantly facilitated the commission or concealment of the offense.'" *Id.* (quoting U.S.S.G. § 3B1.3).

The government counters that "it is difficult to imagine a more obvious abuse of trust than the defendant's use of his position of trust and authority to help Gerace remain free to distribute drugs for over a decade."  Docket Item 1578 at 55.  But Bongiovanni was acquitted both of conspiring with Gerace to defraud the United States and of conspiring with Gerace to distribute drugs.  With respect to Gerace, Bongiovanni was convicted only of obstructing justice by putting false information about his and Gerace's relationship into memoranda and making false statements.  Thus, those acts are the only ones this Court will consider with respect to the enhancement.

After carefully considering those acts, however, the Court agrees with the government that with respect to counts 8 and 10, Bongiovanni's position as a DEA agent "contributed in some significant way to . . . making the detection of the offense [and Bongiovanni's] responsibility for the offense more difficult."[6]  U.S.S.G. § 3B1.3 cmt. n.1.  In particular, on those two counts, Bongiovanni was convicted of obstructing justice by making false and misleading statements in internal DEA memoranda he wrote about his and Casullo's relationship with Gerace.  Because Bongiovanni was a sworn DEA agent, those memoranda had more credibility and weight than, for example, a letter mailed to the DEA by a civilian.  His position of trust therefore "increase[d] his chances of succeeding or of avoiding detection," and the enhancement therefore applies.  *See*

---

[6] The Court agrees with Bongiovanni that the government has not established that the enhancement should apply to count 11 in light of the fact that he was no longer a DEA agent at the time of the interview in which he made false statements.  Ultimately, however, the offense level for the grouped counts will be the highest offense level in the group, *see* U.S.S.G. § 3D1.3(a), so this will not make a difference in Bongiovanni's Guidelines calculation.

*United States v. Sampson*, 898 F.3d 287, 313 (2d Cir. 2018) (quoting *United States v. Fritzson*, 979 F.2d 21, 22 (2d Cir. 1992)).

## IV.    GOVERNMENT'S OBJECTION

The government also objects to the PSR, arguing that an additional three-level enhancement for an aggravating role under U.S.S.G. § 3B1.1(b) should be added to Bongiovanni's offense level.  That section provides that "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels."  U.S.S.G. § 3B1.1(b).  "A defendant may properly be considered a manager or supervisor if he 'exercised some degree of control over others involved in the commission of the offense or played a significant role in the decision to recruit or to supervise lower-level participants.'" *United States v. Blount*, 291 F.3d 201, 217 (2d Cir. 2002) (alterations omitted) (quoting *Ellerby v. United States*, 187 F.3d 257, 259 (2d Cir. 1998)).

The Court agrees with Bongiovanni that there was no evidence demonstrating that he played the role of a manager in the conspiracy.  Instead, the evidence suggested that he "occupied a singular role in this conspiracy and 'controlled' nobody else."  *See* Docket Item 1577 at 14.

The government confuses evidence that Bongiovanni *provided advice to* Selva about how to evade detection with evidence that Bongiovanni *controlled* Selva.  For example, the government notes that Bongiovanni gave "repeated directives to Selva [to] pretend that [Bongiovanni] was recruiting Selva to be an informant in the event law enforcement approached Selva and questioned him about the criminal conspiracy."  Docket Item 1566 at 5.  Similarly, the government says that Bongiovanni preferred "to

meet with Selva to provide information" and that Bongiovanni controlled "certain details he provided to Selva to pass along to other co-conspirators." *Id.* But the fact that Bongiovanni gave Selva suggestions about how to avoid detection and controlled the information flow to Selva do not demonstrate that Bongiovanni "exercise[d] some degree of control *over*" Selva. *See Blount*, 291 F.3d at 217 (emphasis added) (quoting *Ellerby*, 187 F.3d at 259). There is no evidence, for example, that Selva was required by anyone to follow Bongiovanni's suggestions or that there would be consequences from others in the conspiracy for failing to do so.

The Court therefore finds that the government has not proved by a preponderance of the evidence that Bongiovanni had control over others in the organization or that he played a significant role in recruiting or supervising lower-level participants. And the Court therefore overrules the government's objection to the PSR's failure to include an aggravating role enhancement.

## CONCLUSION

For all those reasons, this Court sustains in part and overrules in part Bongiovanni's objections to the PSR, Docket Item 1567, and overrules the government's objection to the PSR, Docket Item 1566. More specifically, the Court finds that (1) the counts should be grouped into two rather than three groups, (2) Bongiovanni's relevant conduct involves at least 400 kilograms but less than 700 kilograms of converted drug weight, (3) the firearm enhancement was properly applied, (4) the abuse of public trust enhancement was properly applied as to the group of counts related to Gerace, and (5) the PSR properly declined to apply the manager

27

enhancement.[7]  The United States Probation Office shall revise the PSR consistent with this decision and order by **October 31, 2025**.  The Court will issue a text order scheduling Bongiovanni's sentencing.

       SO ORDERED.

       Dated:   October 10, 2025
                 Buffalo, New York

                                       */s/ Lawrence J. Vilardo*
                                       LAWRENCE J. VILARDO
                                       UNITED STATES DISTRICT JUDGE

---

[7] As explained above, *see supra* note 2, the Court declines to rule on the parties' many objections to PSR's recitation of the facts.  Consistent with this opinion, however, the revised PSR should make clear that any "facts" involving conduct on which Bongiovanni was acquitted are the government's allegations, not proven conduct.