UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                Plaintiff,

    v.                                    Case No. 19-CR-227-1-LJV

JOSEPH BONGIOVANNI,

                Defendant.

---

**DEFENDANT JOSEPH BONGIOVANNI'S MOTION FOR PARTIAL
RECONSIDERATION OF THE COURT'S DECISION & ORDER
<u>ON PRESENTENCE REPORT OBJECTIONS (ECF 1632)</u>**

**THE LAW OFFICE OF PARKER R. MACKAY**
Parker R. MacKay, Esq.
3110 Delaware Avenue
Kenmore, NY 14217
Ph: (716) 803-8166
Fx: (716) 408-1651
Em: Parker@MacKayLawOffice.com



Robert C. Singer, Esq.
80 East Spring Street
Williamsville, New York 14221
(716) 222-3288
rob@singerlegalpllc.com

*Attorneys for Joseph Bongiovanni*

## Preliminary Statement

In its October 10, 2025 decision and order (ECF 1632), this Court found that the Guidelines for Mr. Bongiovanni's conviction on Count 3 should reflect foreseeability of two kilograms of cocaine as relevant conduct. *See* ECF 1632 at 17-18. The Court also found that the firearm enhancement pursuant to USSG § 2D1.1(b)(1) should apply because Mr. Bongiovanni was reasonably aware of members of the Serio DTO possessing firearms. *See id.* at 22-23. Rather than rely on knowledge directly imparted to Mr. Bongiovanni, the Court anchored these findings of foreseeability to information provided to Mr. Bongiovanni by Robert Kaiser in a one-off debrief session *preceding* Mr. Bongiovanni's failed attempt(s) to use Kaiser as an informant to infiltrate the Serio DTO. But Kaiser was not, by his own admission, a member of the Serio DTO, and Ron Serio's own trial testimony discounted Kaiser's connection to the DTO. The Court also believes that it is not permitted to infer, "speculate," or "guess" about the nature of the jury's inconsistent verdicts on Counts 1 and 3 at sentencing based upon the holdings in *United States v. Acosta*, 17 F.3d 538, 545 (2d Cir. 1994) and *United States v. Powell*, 469 U.S. 57 (1984) which preclude such inquiry in the Rule 29/sufficiency context. As set forth below, the Court's rulings on these two items are clearly erroneous and a manifest injustice. For this reason, the Court should reconsider its ruling and reach a different conclusion.

## Standard for Reconsideration of a Prior Decision

Generally, a district court may modify pre-trial rulings and interlocutory orders at any time before final judgment. *See In re United States*, 733 F.2d 10, 13 (2d Cir. 1984). Reconsideration of a prior decision generally is justified in any one of the following three circumstances: (1) an intervening change in controlling law; (2) new evidence; or (3) the need to correct a clear error of law or to prevent manifest injustice. *See Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d

1245, 1255 (2d Cir.1992); *see also Shrader v. CSZ Trans., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)

("reconsideration will generally be denied unless the moving party can point to controlling decisions

or data that the court overlooked – matters, in other words, that might reasonably be expected to

alter the conclusion reached by the court"); *Amerisure Ins. Co. v. Laserage Tech. Corp.*, No. 96-CV-6313,

1998 WL 310750, *1 (W.D.N.Y. Feb. 12, 1998) (*citing United States v. Adegbite*, 877 F.2d 174,178 (2d

Cir. 1989)).  "In the context of a motion for reconsideration, manifest injustice is defined as an error

committed by the trial court that is direct, obvious, and observable." *Dejesus v. Malloy*, 582 F. Supp.

3d 82, 85 (W.D.N.Y. 2022) (quoting *Corpac v. Rubin & Rothman*, 10 F. Supp. 3d 349, 354 (E.D.N.Y.

2013) (citation modified).


## Argument

I.    **The Court's reliance on Kaiser is clearly erroneous and manifestly unjust.  Kaiser was not a member of the Serio DTO and never produced credible information about cocaine being dealt by the Serio DTO.**

In its decision and order, the Court correctly opined that "just because Serio testified

as to [the amount of cocaine] *he* distributed," such testimony, standing alone, is insufficient to prove

Mr. Bongiovanni's knowledge of the Serio DTO distributing cocaine.  Accordingly, the Court

correctly understood there must exist "some evidence that [Mr.] Bongiovanni knew about or could

reasonably have foreseen" some amount of cocaine was part of the narcotics conspiracy involving

the Serio DTO to attribute a quantity of cocaine to Mr. Bongiovanni for purposes of sentencing.  *See*

ECF 1632 at 16 (citing *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995)).

The trial evidence did not prove that Mr. Bongiovanni learned about or should have

foreseen cocaine distribution from his interactions with actual members of the Serio DTO.  First,

Serio testified that he *never* directly communicated with Mr. Bongiovanni during the conspiracy.

Thus, the trial evidence did not prove actual knowledge or reasonable foreseeability of any intent to

possess and distribute cocaine through Serio's testimony.  Second, the trial evidence proved that neither Lou Selva nor Michael Masecchia – the core conspirators in the Serio DTO with whom Mr. Bongiovanni purportedly communicated – discussed cocaine distribution with Mr. Bongiovanni. Thus, the trial evidence did not establish a route to actual knowledge or reasonable foreseeability through either Selva or Masecchia.  Third, no other member of the Serio DTO testified that he/she discussed Serio DTO cocaine distribution with Mr. Bongiovanni, so a route to Mr. Bongiovanni's knowledge/reasonable foreseeability was not established through another member of the Serio DTO, either.

Since the evidence described above does not support a finding of actual knowledge or reasonable foreseeability, the Court, instead, relied on information communicated to Mr. Bongiovanni by Robert Kaiser, an individual who *was not* a member of the Serio DTO, to find that distribution of at least two kilograms of cocaine was reasonably foreseeable to Mr. Bongiovanni. This conclusion is clearly erroneous and manifestly unjust for several reasons.

**A. Kaiser did not (and could not) possess insider knowledge of the Serio DTO's cocaine-dealing activities because he never was a member of the Serio DTO and never witnessed cocaine transactions.  It is unreasonable to conclude that his unverified claims imparted knowledge or foreseeability to Mr. Bongiovanni.**

The Court links Mr. Bongiovanni's foreseeability of cocaine-dealing to Robert Kaiser, but this conclusion is faulty.  First, Kaiser was not a member of the Serio DTO.  Kaiser testified only to the fact that, in 2013, he "knew" Ron Serio for approximately two years:

```
16   Q.  How long had you known Ron Serio?

17   A.  Two years.
```

### ###

```
5   Q.  And the reason for that was that you weren't very close
6   with Ron Serio at that point in time, correct?
7   A.  No, I wasn't.  It's not like we're hand in hand, but I
8   knew him.
```

Kaiser 2/20/24 Testimony at 14, 45.  Moreover, the connection between Ron Serio and Kaiser was indirect and nothing more than mere presence at Serio's home.  As Kaiser and Serio testified at trial, Kaiser knew Serio through his friendship with Frank Burkhardt:

```
18  Q.  Okay.  So at the time that you're going over to the Serio
19  house, you're going over there because you're friends with
20  Frank Burkhardt, right?
21  A.  Yeah.
```

Kaiser 2/20/24 Testimony at 43.

```
6   Q.  Is Frank Burkhart someone who was also friends with
7   Robert Kaiser?  Bobby Kaiser?
8   A.  Correct.
```

### ###

```
9   Q.  Who was Robert Kaiser?
10  A.  Robert Kaiser was Frank Burkhart's friend.
11  Q.  And how did you know Robert Kaiser?
12  A.  Through Frank Burkhart.  He would bring him around
13  sometimes.
```

ECF 1473 (Serio 9/20/24 Testimony) at 14, 65.  Consequently, because Kaiser is not (and was not) an insider with specific knowledge about the Serio DTO's cocaine dealing activities, it does not logically follow that information Kaiser communicated to Mr. Bongiovanni imparted knowledge or reasonable foreseeability about cocaine dealing to Mr. Bongiovanni.  Kaiser always was an outsider who communicated *his* unverified beliefs to Mr. Bongiovanni, and absent verification, such beliefs cannot impart knowledge or *reasonable* foreseeability.

Second, while Kaiser and Serio offered differing versions of their narcotics relationship at trial (Kaiser claimed to have purchased marijuana from Ron Serio, whereas Ron Serio said he never sold directly to Kaiser), both were consistent at trial that Kaiser's observations of narcotics dealing (or a direct buy from Ron Serio) were limited to *marijuana* only and never cocaine:

```
 1   Q.  Have you been engaged in marijuana transactions when
 2   Mr. Kaiser was at your house?
 3   A.  Yes.
 4   Q.  Have you been engaged in those transactions in his
 5   presence?
 6   A.  Yes.
 7   Q.  About how many times?
 8   A.  I'd say probably five times.
 9   Q.  What amounts were you distributing in Mr. Kaiser's
10   presence?
11   A.  Somewhere between 5 to 20 pounds.
12   Q.  Who were you transacting with when Mr. Kaiser was present
13   at your house?
14   A.  Frank Burkhart.
15   Q.  Do you know if some of the marijuana was intended for
16   Mr. Kaiser?
17   A.  I believe so.
```

ECF 1473 (Serio 9/20/24 Testimony) at 66.

```
12  Q.  And you testified earlier that you had mentioned a couple
13  of different drug transactions you may have been involved
14  with him; is that right?
15  A.  Yeah.
16  Q.  What kind of buys were you doing with Ron Serio at that
17  time?
18  A.  Just marijuana.
19  Q.  Just marijuana?
20  A.  Yeah.
21  Q.  How many pounds of marijuana were you purchasing?
22  A.  4 or 5.
23  Q.  4 or 5 pounds?
24  A.  Yeah.
```

Kaiser 2/20/24 Testimony at 32.  Thus, it does not logically follow that information communicated

by Kaiser to Mr. Bongiovanni imparts knowledge or *reasonable* foreseeability about cocaine dealing to

Mr. Bongiovanni when Kaiser had no direct knowledge of such activities.

> **B.  Mr. Bongiovanni tried – and failed – to verify Kaiser's claims.  Unverified claims of an informant do not reasonably impart knowledge or foreseeability.  And Kaiser's claims were proven to be lies or groundless by the trial evidence.**

Notwithstanding the absence of evidence that actual insiders provided information

to Mr. Bongiovanni about cocaine dealing in the Serio DTO, the Court's decision (and the

government's argument) links Mr. Bongiovanni's *reasonable* foreseeability of cocaine dealing to

information provided by Kaiser in Kaiser's April 2013 DEA debrief.  The DEA-6 documents

Kaiser's claims about cocaine dealing as follows:

<u>DRUG RELATED INFORMATION</u>

1. On 04-30-13, SA Joseph Bongiovanni, SA Shane Nastoff, and GS John Flickinger debriefed CS-13-144841 (hereafter referred to as the "CS"), at the Buffalo Resident Office. The CS stated that he/she could approach several different cocaine and marijuana associates in the Ronald SERIO DTO in Buffalo,NY and make cocaine and marijuana purchases. The CS stated that Ronald SERIO and his brother, Thomas SERIO are known to the CS as leaders of a large drug trafficking organization capable of trafficking multi-kilogram quantities of cocaine and Hundreds of pounds of marijuana in Buffalo, NY. Agents have identified several persons within the SERIO DTO including Robert METTAL, Thomas SIBICK, Thomas SERIO, David ODDO and Christopher BAKER in this investigation. The CS stated that he/she could contact SIBICK and METTAL in person and order any specific quantity of cocaine and marijuana.

2. In addition, the CS stated that he/she has been approached by Thomas SIBICK to accept and store narcotics in a stash location on behalf of the DTO. The CS was also asked to be a driver on behalf of the organization to transport narcotics from areas in New York City and California to Buffalo. The CS has recently met with Robert METTAL who was a prior SOS of the organization. In sum and substance, METTAL asked the CS to "find customers" for multiple kilograms of cocaine. METTAL is able to provide the cocaine from an unknown supply in New York City. It should be known that METTAL was arrested in a New York State cocaine investigation along with Thomas SERIO in 1998 with approximately 5 kilograms of cocaine.

### 

METTAL was sentenced to approximately 10 years, and Thomas SERIO was sentenced to 3 years. The CS stated that most of the members of METTAL's organization either cooperated or are no longer viable. The CS stated that METTAL only trusts Thomas SERIO because SERIO was the only person who did not cooperate against him. The CS stated that METTAL and Thomas SERIO are once again trafficking cocaine and are looking for the CS to assist in the distribution.

*See* GE 8I at 1-2; *see also* ECF 1632 at 17 (citing ECF 1578 at 25-26 and GE 8I). Summarized, the claims relate to Tom Serio, Tom Sibick, and Robert Mettal as being members of the Serio DTO and dealing/supplying cocaine. None of these claims were verified or proven. And, more importantly, on their face, Kaiser's claims also alleged that the Serio DTO had a different structure of relationships than actually existed. This further divorces Kaiser claims from reality.

      **i.**     **The law requires police to verify information provided by unproven informants to establish reasonable suspicion and probable cause. No less of a standard should apply here, particularly when the burden of proof is higher.**

Initially, it is important to note that the Court cannot (and should not) attribute reasonable foreseeability to Mr. Bongiovanni based on Kaiser's claims alone. This is because Kaiser was an unproven informant who was not an insider, so drawing this link requires something more than just taking Kaiser at his word. Firstly, a disputed fact that increases a guideline determination

must be proven by a preponderance of the evidence. *See* USSG § 6A1.3, Commentary. Secondly, Kaiser's unverified claims would not be accorded much weight under similar circumstances when the burden of proof is lower than a preponderance of the evidence.

   For example, if Mr. Bongiovanni presented Kaiser's information to this Court for the purpose of obtaining a warrant to search Serio's residence, the Court would not just take Kaiser at his word and issue a warrant. First, Kaiser was not a presumptively reliable citizen informant. *See, e.g., Caldarola v. Calabrese*, 298 F.3d 156, 165–66 (2d Cir. 2002) (holding that a private citizen informant is a separate type of informant who provides information that is "presumptively reliable"). Instead, Kaiser was cooperating with the DEA to secure a better outcome in a pending burglary case. Thus, he possessed a motive to lie that may color his information. *See, e.g., United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004) ("[W]e have also cautioned that a criminal informer is less reliable than an innocent bystander with 'no apparent motive to falsify . . . .'") (citation omitted). Second, Kaiser did not have a successful track-record with the DEA. Absent a track record or reputation, his veracity remained questionable. *See, e.g., Adams v. Williams*, 407 U.S. 143, 146-47 (1972) (explaining how a previous track-record of providing good information bolsters an informant's veracity). Third, Kaiser was not an insider or someone who provided predictive information. Under such circumstances, Kaiser's information would not establish "reasonable suspicion" or "probable cause" absent additional investigative efforts to verify Kaiser's claims. *See, e.g., Adams*, 407 U.S. 147; *United States v. Elmore*, 482 F.3d 172, 179-81 (2d Cir. 2007) (discussing the holdings in *Gates* and *Aguilar/Spinelli* as applied to informants and the requirement for independent investigation to establish veracity and basis of knowledge in the search context). Consistent with those authorities, the trial evidence established that Mr. Bongiovanni undertook such efforts, but further investigation did not lead to success. Consequently, if Kaiser's information did not even establish a basis for reasonable suspicion and probable cause, then it cannot establish reasonable

foreseeability by a preponderance of the evidence.  Drawing such a conclusion is unreasonable, clearly erroneous, and manifestly unjust.

        **ii.**      **Efforts to verify Kaiser's claims regarding Robert Mettal failed and the trial evidence disproved Kaiser's claims.**

        Mr. Bongiovanni attempted to verify Kaiser's claims about the Serio DTO by directing Kaiser to call Robert Mettal.  The trial evidence proved that Kaiser called Mettal on three occasions, but as the defense demonstrated in closing, Kaiser never was successful in connecting with Mettal:



*See* GE 100A.1 and GE 9E-4.

        Furthermore, even if Kaiser did reach Mettal, it *would not* have verified Kaiser's claim that Mettal was part of the Serio DTO and a supplier of cocaine to Serio.  As Serio testified at trial, Mettal *was not* a source of supply or an associate of his *for the last 30 years*, and even when Serio did associate with Mettal, Mettal supplied Serio with *marijuana*, not cocaine:

```
 6   Q.  Now I want to ask you about another name, Robert Mettal.
 7   Is that somebody were you ever associated with?
 8   A.  Yes.
 9   Q.  In what capacity?
10   A.  Like 30 years ago, I got marijuana from him.
11   Q.  Okay.  But moving into, like, the 2008 and forward
12   timeframe, you were never associated with him?
13   A.  I was friends with him.
14   Q.  Okay.  Friends, but -- because I know there's a lot of
15   overlap between friends and associates.  Was he specifically
16   just a friend, not drug associate?

17   A.  Yes, specifically a friend.
18   Q.  Okay.
19   A.  Maybe an occasion or two, we would try to get a couple
20   pounds of marijuana, but besides that --
21   Q.  Okay.  Yeah, sorry, I made that question a lot longer
22   than it needed to be.
23       You wouldn't consider him one of your inner circle drug
24   associates, correct?
25   A.  Correct.
```

ECF 1473 (Serio 9/23/24 Testimony) at 9.  Thus, not only were Kaiser's claims about Mettal being part of the Serio DTO and a cocaine supplier to the Serio DTO proven to be lies at trial, but Mr. Bongiovanni possessed nothing to verify those claims.  Instead, it appears that Kaiser communicated a belief about Mettal *being associated with Ron Serio* because of Mettal's past association with Tom Serio in 1998.  *See* GE 8I at 2 ("The CS has met with Robert Mettal who was a prior SOS for the organization.").  But as this Court correctly opined, "Mettal's and [Tom] Serio's prior acts—which occurred a decade before the alleged start of the conspiracy—are insufficient for this Court to find, even by a preponderance of the evidence, that Bongiovanni could reasonably foresee that those individuals would again distribute that quantity."  *See* ECF 1632 at 17.

Just the same, the information Kaiser provided information speaks to a disconnect between the Serio brothers, as Kaiser relayed that Robert Mettal supposedly only trusted Tom Serio

at the time (April 2013). Thus, while the report speaks to Kaiser defining both Serio brothers as the leaders of an organization "capable" of trafficking cocaine, the fact that Kaiser reported that Mettal wanted Kaiser to find customers for "multiple kilograms of cocaine" does not support a connection to Tom Serio, let alone to the Serio DTO; instead, it speaks to independent activity involving Mettal only, which is consistent with the trial evidence that proved how Mettal was not part of the Serio DTO. This speaks to why Mr. Bongiovanni could not (and did not) reasonably foresee a connection to cocaine dealing through Kaiser's information. Moreover, the connection between the Serio brothers proved even more ambiguous at trial. Ron Serio testified that that he was not dealing cocaine from approximately 2008 to 2013 and that he split from his brother Tom in early 2013 due to a business dispute. And when Ron Serio started dealing cocaine again, Serio testified that his source of supply was Jimmy Rivera not Mettal or Tom Serio. *See* ECF 1473 (Serio 9/20/24 Testimony) at 7-8, 215-16. As a result, none of Kaiser's claims about Mettal or Tom Serio can be used to prove *reasonable* foreseeability of cocaine dealing by a preponderance of the evidence.

### iii.    Efforts to verify Kaiser's claims regarding Thomas Sibick failed and the trial evidence disproved Kaiser's claims.

The same is true of Kaiser's claims about Tom Sibick. Kaiser claimed to Mr. Bongiovanni that Sibick was a cocaine-dealing associate of the Serio DTO. As the defense pointed out in summations, when Mr. Bongiovanni attempted to verify Kaiser's claims, the trial evidence proved that two controlled meetings were attempted between Kaiser and Sibick, but never materialized because Sibbick, according to Kaiser himself, got "nervous" and did not trust him:



*See* Kaiser Testimony at 38-40; GE 8A at 28-38.  On top of that, as GS Flickinger testified at trial, DEA superiors also failed to fund the operations.  Thus, once again, Mr. Bongiovanni was left with nothing to verify Kaiser's claims about Serio dealing cocaine with or through Sibick.[1]

What's more, the trial evidence proved that Sibick's dealings with Ron Serio were only ever as a middle-man to Santiago Gale, Serio's *marijuana* supplier, for some period of time:

> 18  Q.  And just to remind the jury, he wasn't really a source of
>
> 19  supply so much as just a plug to somebody else, correct?
>
> 20  A.  Yes, he was in between.

### ###

> 13  Q.  Your contact to Santiago Gale is through Tom Sibick,
>
> 14  correct?
>
> 15  A.  Correct.

---

[1] This sequence is similar to DEA SA Shane Nastoff's failed attempt to use CS John Robinson to connect with Tom Serio.  As Nastoff testified, he directed Robinson to call Tom Serio because Robinson stated that Tom Serio dealt narcotics.  Nastoff hoped to bust Tom Serio using Robinson, but when Robinson called, Tom Serio made no incriminating admissions.  As a result, Nastoff had nothing to confirm Robinson's allegations and ceased pursuing the lead.  Just as it would be improper to attribute knowledge to Nastoff about Tom Serio based on Robinson's unverified claim, it is improper to attribute knowledge to Mr. Bongiovanni based on Kaiser's unverified claim.

*See* ECF 1468 (Serio 9/23/24 Testimony) at 41; ECF 1473 at 199. In fact, Serio never identified Sibick as a cocaine associate or supplier. Such evidence, again, completely undermines Kaiser's claims and places them in the category of unverified and unconnected speculation, which simply cannot establish *reasonable* foreseeability on Mr. Bongiovanni's part by a preponderance of the evidence.

The trial evidence also cast doubt about whether Sibick and Ron Serio dealt with each other in 2013. Kaiser claimed that, in his experience, Sibick was a regular associate of Ron Serio when he debriefed with the DEA in April 2013. Yet, at trial, Ron Serio's testimony on this claim was contradicted by other evidence, ambiguous, and not well-established. For example, Serio testified at trial that after Santiago Gale's arrest in January 2012 he dealt with Tom Sibick a "few more times" in 2012 and into 2013 before he had a falling out with him arising from Sibick storing a machine gun at his warehouse. However, Serio also placed the falling out as happening in 2011 when linking it to other events. *Compare* ECF 1473 (Serio 9/20/24 testimony) at 24-25 (discussing 2011) *with Id.* at 199-201 (discussing 2012-2013). Thus, Serio's own testimony was ambiguous about whether he still dealt with Sibick anymore by the time Kaiser came into the DEA in April 2013. This discrepancy casts doubt not just on the veracity of Serio's claim that he was involved with Sibick in 2013, but also on Kaiser's claim that Sibick has a connection to the Serio DTO in April 2013. As a result, the Serio-Sibick relationship in Summer 2013 as well as Kaiser's claim about the relationship existing at that time was not proven at trial by a preponderance of the evidence. This makes it impossible to draw a link between Kaiser's unverified information and Mr. Bongiovanni's *reasonable* foreseeability of cocaine dealing.

        iv.    **Kaiser's claims about Tom Serio dealing cocaine also were unverified and unsupported.**

During his debrief, Kaiser claimed that Tom Serio was dealing "multi-kilogram" quantities of cocaine in coordination with Robert Mettal and was "looking" for Kaiser to "assist in

the distribution." *See* GE 8I at 1-2.  The trial evidence contradicted Kaiser's claim.  As argued

above, the trial evidence proved that Mettal was not a part of the Serio DTO and that Kaiser never

connected with Mettal. *See* Section I(B)(ii), *supra.*  Furthermore, as documented in a DEA-6 written

by Special Agent Shane Nastoff, when DEA attempted to investigate Tom Serio in February 2013,

the investigation involved marijuana, not cocaine:

> **DRUG RELATED INFORMATION**
>
> 1. On February 22, 2013, DEA Confidential Source 12-142208 (CS) met with
> SA Shane Nastoff, SA David Leary, TFO Eric Herrington, and GS John
> Flickinger, at the DEA Buffalo Resident Office.  During the meeting, the
> CS had advised that he/she had been speaking with Thomas SERIO on a
> regular basis.  The CS advised that SERIO was a high grade marijuana
> source of supply to the Buffalo, NY area.  Furthermore, the CS stated that
> during a previous conversation, SERIO had offered to sell him/her high
> grade marijuana in pound quantities.  It should be noted that SERIO is
> currently a target of investigation in DEA Case C2-13-0026.  The CS also
> provided the below information regarding SERIO's drug trafficking
> activities.

*See* GE 8J at 1.  This DEA-6 was cross-referenced to DEA File C2-13-0026 (the Wayne Anderson

file) and provided to Mr. Bongiovanni.  Thus, with Kaiser not producing information about Tom

Serio and cocaine, the only thing the trial evidence proved that Mr. Bongiovanni was reasonably

aware about regarding Tom Serio's drug-dealing was that Tom was a *marijuana dealer*, just like his

brother, Ron Serio — and it was unclear whether Ron and Tom Serio were even still working

together at the time. *See* Section I(B)(ii), *supra.*  This does not prove *reasonable* foreseeability of

cocaine dealing by a preponderance of the evidence.

> **v.     Verification is key to believability (and foreseeability).  Here, there is none.**

Under the guidelines, relevant conduct must include acts that are *reasonably*

foreseeable to the defendant.  Here, it is not reasonable to include the Serio DTO's cocaine dealing

activities in what was foreseeable to Mr. Bongiovanni based solely on Kaiser's unverified claims.

First, as the trial evidence established, at the time he cooperated with the DEA, Kaiser was a long-

time felon and drug addict who was facing a new felony, actively using heroin/fentanyl, and

progressing towards drug court (a mechanism that would be used to get him clean).  His credibility

was unproven and questionable, leaving Mr. Bongiovanni (or anyone else) with no reason to trust him.[2]  Second, as multiple experienced DEA agents confirmed at trial, confidential informants say a lot in their debriefs to curry favor with prosecutors and law enforcement officers, but the veracity of those claims lies in actionable results.  Otherwise, the information provided is nothing but unverified hearsay that cannot establish reasonable suspicion or probable cause.  And if unverified hearsay cannot meet those low evidentiary thresholds, then unverified hearsay cannot establish *reasonable* foreseeability by a preponderance of the evidence.  The Court's reliance on Kaiser's statements alone to prove reasonable foreseeability of cocaine does not comport with guideline requirements.  As such, increasing Mr. Bongiovanni's base offense level on Kaiser's information is clearly erroneous and manifestly unjust.

### C. Mention of David Oddo and Chris Baker in the DEA-6 were not based on information provided by Kaiser and cannot lead to reasonable foreseeability of cocaine.

The DEA-6 documenting Kaiser's April 2013 debrief mentions two other persons – David Oddo and Chris Baker – who the DEA believed were connected to the Serio DTO:

> kilogram quantities of cocaine and Hundreds of pounds of marijuana in Buffalo, NY.  Agents have identified several persons within the SERIO DTO including Robert METTAL, Thomas SIBICK, Thomas SERIO, David ODDO and Christopher BAKER in this investigation.  The CS stated that he/she could contact SIBICK and METTAL in person and order any specific quantity of cocaine and marijuana.

*See* GE 8I at 1.  Mentioning these names in the DEA-6 cannot lead to reasonable foreseeability of cocaine activity involving the Serio DTO, either.  First, this information *was not* provided to the

---

[2] Kaiser's credibility did not increase over time.  As the trial evidence proved, Kaiser absconded from drug court based on his non-compliance and inability to stop using illegal narcotics.  *See* DE V.5 at 4-6.  In 2017, Kaiser was resentenced as a second felony offender to 2-4 years in prison because of his failures in drug court and elsewhere.  *See id.*  And as Ron Serio testified, in 2015 Kaiser stated that he was willing to act as a double agent and tip off Serio while acting as an informant.  *See* ECF 1468 at 15-16.  When this is combined with the fact that Kaiser suffered a fatal overdose between Trial #1 and Trial #2, there is little reason to find that Mr. Bongiovanni should have trusted Kaiser without first verifying his information.

DEA or Mr. Bongiovanni by Kaiser; rather, as the DEA-6 explicitly states, this information is based upon the beliefs of DEA agents. Second, Kaiser did not tell the DEA that he could purchase cocaine from Oddo or Baker. As a result, nothing tied Oddo and Baker to cocaine activity and the Serio DTO. Third, Mr. Bongiovanni did not believe that Oddo and Baker distributed cocaine. In the case of Oddo, Mr. Bongiovanni explicitly stated as much on a DEA-202 form he prepared for Oddo by documenting that Oddo was a marijuana trafficker:



*See* GE 8A at 57. Fourth, while Baker had a connection to Ron Serio and was part of the Serio DTO, Oddo was not a member of the Serio DTO at all – Ron Serio did not even like him. *See* ECF 1468 (Serio 9/23/24 Testimony) at 45-46. Thus, the information possessed by DEA and the belief communicated in the DEA-6 by Mr. Bongiovanni regarding Oddo's link to the Serio DTO was not even correct. This does not prove *reasonable* foreseeability of cocaine dealing by a preponderance of the evidence, either.

### D. The trial evidence did not establish "two kilograms" of cocaine were reasonably foreseeable to Mr. Bongiovanni. The Court's estimate is anchored to nothing in the record.

The Court's determination that "two kilograms" were reasonably foreseeable to Mr. Bongiovanni lacks any connection to concrete evidence in the record. For example, the Court correctly rejected the government's assertion that the actions of Mettal and Tom Serio in 1998 can be used to establish reasonable foreseeability because these past activities cannot be used to establish present conduct. *See* ECF 1632 at 17. The Court correctly rejected basing this conclusion on a prepared introductory remark by Ron Serio in his trial testimony about he and his associates dealing at least "five kilograms" of cocaine, *see* ECF 1466 at 16, because this estimate is anchored to nothing

more than a guess and, more importantly, fails to link Serio's actions/belief to Mr. Bongiovanni's knowledge or foreseeability. *See* ECF 1632 at 16. But the same is true of Kaiser's claims.

As argued above, Kaiser's information cannot establish reasonable foreseeability for "two kilograms" of cocaine for several reasons. First, Kaiser's information was unverified by Mr. Bongiovanni. Second, Kaiser's information was completely undermined by the trial evidence – which proved that Kaiser's claims were false, at worst, or ungrounded assumptions, at best. Without this evidence, the Court's conclusion that "two kilograms" of cocaine were reasonably foreseeable to Mr. Bongiovanni rests on nothing – empirical or otherwise.

While the Court may approximate the quantity of narcotics for the guidelines when quantity is not based on a specific seizure, *see* USSG § 2D1.1, Commentary Note 5, the guidelines require the Court to anchor its finding – particularly when, as here, the finding causes such a significant increase in sentencing exposure – to *something* which proves reasonable foreseeability by a preponderance of the evidence, *see* USSG § 6A1.3, Commentary. Here, the Court does not identify *any* specific evidence that was proven by a *preponderance of the evidence* to support this finding, so its ruling does not abide by the requirements of the guidelines. This is clearly erroneous. What's more, the Court's ruling increases Mr. Bongiovanni's base offense level for Count Group 1 from 12 to 26 – a *14-level increase* that adds at least *four years* to the suggested guideline range (before any adjustments or enhancements are added). In light of this substantial increase in sentencing exposure, case law counsels this Court to proceed cautiously. *See, e.g., United States v. Cordoba-Murgas*, 233 F.3d 704, 708 (2d Cir. 2000) ("[I]n certain cases, the enhancement of a sentence based upon a defendant's 'relevant conduct,' if done without regard to the weight of the evidence proving the relevant conduct, may result in a total term of incarceration which is excessive, inappropriate, and unintended under Sentencing Guidelines."); *United States v. Gigante*, 94 F.3d 53, 56 (2d Cir. 1996) ("With regard to upward adjustments, a sentencing judge should require that the weight of the factual record justify a

sentence within the adjusted Guidelines range.  In doing so, the Court may examine whether the conduct underlying multiple upward adjustments was proven by a standard greater than that of preponderance, such as clear and convincing or even beyond reasonable doubt where appropriate.").  Failing to correct this error will cause a manifestly unjust result at sentencing.  As a result, the Court must correct this error prior to sentencing.

**E. The Court is not legally required to find *any* quantity of cocaine is part of Mr. Bongiovanni's relevant conduct.  And the jury's verdict does not suggest that the jury found that the conspiracy involved cocaine, either.**

In its ruling, the Court placed emphasis on the fact that Count 3 included an allegation that the conspiracy involved "marijuana . . . *and cocaine*."  ECF 1632 at 16 (emphasis in original).  Yet, the fact that the indictment alleged cocaine and the jury convicted Mr. Bongiovanni of Count 3 does not suggest the jury believed this allegation.  As the Court remarked in its instructions:

> THE INDICTMENT CHARGES THAT THE OBJECTIVE OF THE CONSPIRACY IN COUNT 3 WAS TO DISTRIBUTE OR TO POSSESS WITH INTENT TO DISTRIBUTE **MARIJUANA OR COCAINE**.  IF YOU FIND THAT MR. BONGIOVANNI CONSPIRED TO DISTRIBUTE OR CONSPIRED TO POSSESS WITH THE INTENT TO DISTRIBUTE **EITHER MARIJUANA OR COCAINE, OR BOTH CONTROLLED SUBSTANCES**, THAT IS SUFFICIENT TO SATISFY THIS OBJECTIVE.  **BUT YOU ALL MUST AGREE UNANIMOUSLY AS TO THE CONTROLLED SUBSTANCE OR CONTROLLED SUBSTANCES INVOLVED.**

*See* Jury Instructions (emphasis added).  Thus, the jury could very well have settled on the marijuana allegation only.  The defense believes this is exactly what happened based the reasons set forth in our objections to the Draft PSR and in our Rule 29 motion.  This is another reason why including any amount of cocaine as part of Mr. Bongiovanni's relevant conduct is clearly erroneous and a manifest injustice.

**II.    The evidence cited by the Court to apply the firearm enhancement to Count Group 1 does not support such a finding.  Kaiser did not state these things in his DEA debrief.**

The trial record lacks evidence which establishes Mr. Bongiovanni's actual knowledge of the possession of a firearm by Serio DTO members because, similar to allegations involving cocaine distribution, neither Serio nor Masecchia, Selva, or any other member of the Serio DTO communicated this fact to Mr. Bongiovanni.  Consequently, to apply this specific offense characteristic, the Court (and the government) relies upon information purportedly communicated to Mr. Bongiovanni by Kaiser in his April 2013 debrief about the Serio DTO possessing, transporting, and safeguarding firearms.  *See* ECF 1632 at 23 (citing ECF 1578 at 51 and GE 9E-4). This conclusion is clearly erroneous because Kaiser never said this and GE 9E-4 – the document the Court (and the government) rely upon to reach this conclusion – does not report what Kaiser told the DEA in his debrief accurately.

There is a conflict between GE 8I (the DEA-6 documenting what Kaiser said in his April 30, 2013 debrief) and GE 9E-4 (the DEA-512 documenting Kaiser's establishment as a confidential source).  GE 8I reports the following about what Kaiser told the DEA about firearms:

> 3. It should be noted that the CS has provided valuable information which included an unknown source of supply of automatic handguns and Assault rifles that the CS claims he/she could have transported from San Diego.
>
> NON DRUG RELATED CRIMINAL INFORMATION
>
> 1. SA Bongiovanni and SA Nastoff asked the CS about his/her knowledge of other criminal activities other than drug trafficking including homicides, arson, robberies and firearms trafficking.  The CS stated that other than the California source  for firearms, he/she did not have any information to offer at that time. The CS stated that he/she would ask local sources in an attempt to gain information of the above stated nature to assist Agents in the future.

*See* GE 8I at 2.  In summary, Kaiser told the DEA that he knew about **an unknown source of supply of handguns and rifles located in California** (not Ron Serio or one of his associates) that Kaiser claimed **he could work with to transport firearms from California** (not in New York State).  *See id.*  This entry does not mention *anything* about Ron Serio or the Serio DTO having a

connection to or involvement with handguns, rifles, or the unknown source of supply of firearms in California.

In contrast, GE 9E-4 states the following about firearms:

> **39. Remarks**                           Risk Assessment Completed ☐ N/A ☒ Yes  Date Completed: 05-02-2013
> Robert E. KAISER resides in Buffalo, NY. KAISER is has developed several friendships with individuals with the Ronald SERIO drug trafficking organization. KAISER is cooperating for credit in lieu of pending New York State charges for burglary. **KAISER has been approached by SERIO and Robert MATTAL in the past to assist the SERIO DTO in transporting and safeguarding** cocaine, marijuana, and **firearms from California and New York City to Buffalo, New York.**

*See* GE 9E-4 at 2.  When GE 9E-4 is compared to GE 8I, the statement in GE 9E-4 is proven to be an incorrect summarization of what Kaiser told the DEA in his debrief, and, in any event, the statement in GE 9E-4 is not supported by *any* fair reading of the trial evidence.  First, as GE 8I explicitly states, neither Ron Serio nor Robert Mettal approached Kaiser and asked him to transport firearms from California and New York City to Buffalo.  The *only* thing that Kaiser told he DEA in his April 2013 debrief about "transportation from California and New York City to Buffalo" related to being asked by an unidentified member of the Serio DTO to transport *narcotics*, not firearms:

> 2. In addition, the CS stated that he/she has been approached by Thomas SIBICK to accept and store narcotics in a stash location on behalf of the DTO. **The CS was also asked to be a driver on behalf of the organization to transport narcotics from areas in New York City and California to Buffalo.**  The CS has recently met with Robert METTAL who was a prior SOS

*See* GE 8I at 1.  And this was confirmed by Kaiser at trial.  In his testimony, Kaiser never mentioned *anything* about firearms and confined his remarks about "transporting" to narcotics only:

```
13    A.  There was -- because I knew a kid named Thomas Sibick who

14    was a, you know, doing a lot of things.  So they, you know,

15    if I helped them get him, I'd get some help on my case.

16    Q.  And at that time, who was Thomas Sibick connected to as

17    far as you knew doing those things?

18    A.  Ron Serio.

19    Q.  And when you say "doing things," what are you referring

20    to?

21    A.  Marijuana, cocaine.

22    Q.  What about marijuana and cocaine?

23    A.  Just had a lot of it, transported it.

24    Q.  So transporting, as in distribution?

25    A.  Yeah.
```

*See* Kaiser 2/20/24 Testimony at 7.  Second, the DEA-6 (GE 8I) does not attribute the request for

Kaiser to act as a driver for the Serio DTO to Ron Serio or Robert Mettal; rather, according to the

DEA-6, Kaiser does not name the person who made this request of him.  This fact casts further

doubt on the validity of the statement in the DEA-512 (GE 9E-4) because the trial evidence did not

prove that Kaiser acted as a driver for the Serio DTO.  Third, the trial evidence established that

Robert Mettal *was not* a member of the Serio DTO.  *See* Section I(B)(ii), *supra*.  The trial evidence

further established that neither Ron Serio nor any other member of the Serio DTO approached

Kaiser to transport narcotics – or anything else – on behalf of the Serio DTO because Kaiser was

not a member of the Serio DTO.  *See* Section I(B)(i), *supra*.  These facts weaken the validity of the

statement in GE 9E-4 even more.

What appears to have happened here is that the information Kaiser provided about

firearms during his debrief – which implicated a different source, in a different state, who had no

connection to the Serio DTO, Ron Serio, or Robert Mettal – was documented properly in the DEA-

6 (GE 8I) and, then, incorrectly copied and summarized in a different document, the DEA-512 (GE

9E-4), which conflated narcotics information Kaiser provided about Ron Serio and Robert Mettal

with the firearm information provided about the unknown source in California. A scrivener's error like this cannot reasonably form the basis to apply a firearm enhancement at sentencing. Simply put, a copying error does not prove reasonable foreseeability of firearm possession by a preponderance of the evidence.

Absent reliance on GE 9E-4, the record lacks *anything* else to support this enhancement. For example, the Court correctly rejected the government's argument that Mr. Bongiovanni's mere experience as a DEA agent or his affirmation that guns are frequently tools of the drug trade are not enough, standing alone, to conclude that it was reasonably foreseeable to Mr. Bongiovanni that the Serio DTO possessed firearms. *See* ECF 1632 at 23 (citing ECF 1578 at 51). The Court's citation to *United States v. Soto* does not cure this defect, either. In *Soto*, the Second Circuit concluded that firearm possession was reasonably foreseeable to a defendant because in the location where the defendant was arrested, narcotics, narcotics paraphernalia, and "three types of various caliber ammunition were strewn about the apartment in plain view." *United States v. Soto*, 959 F.2d 1181, 1187 (2d Cir. 1992). Here, there is no evidence in the record which establishes that Mr. Bongiovanni made such observations like the defendant in *Soto*.

The Court (and the government) cannot cite to any other evidence establishing reasonable foreseeability. This is because the record *does not* contain such evidence. As a result, the Court clearly erred when it concluded otherwise and applied this specific offense characteristic. Moreover, the inclusion of this specific offense characteristic increases Mr. Bongiovanni's suggested guideline sentence by *two-levels* which accounts for approximately *one additional year in prison*. To prevent a manifestly unjust result at sentencing, the Court must correct this error prior to sentencing.

III.    **The Court's decision to disregard the inconsistent verdict and the jury's actions at the conclusion of this trial is not proper.  At sentencing, the Court can (and should) consider this verdict and what the jury said.**

    In the context of the cocaine and firearm findings discussed above, the Court concluded that it could not make reasonable inferences about the jury's finding vis-à-vis Count 3 – that less than 50 kilograms of marijuana was involved in the conspiracy – and apply those inferences to questions about Mr. Bongiovanni's reasonable foreseeability of cocaine and firearms possession, in particular, or a proper sentence, in general.  *See* ECF 1632 at 13-14 (narcotics context) and 22 (firearms context).  In making this conclusion, the Court opined that it is restricted from doing so during sentencing or when determining the sentencing guidelines because of the holdings in *United States v. Acosta*, 17 F.3d 538, 545 (2d Cir. 1994) and *United States v. Powell*, 469 U.S. 57 (1984) which preclude a district court from "speculating" about what the jury "really meant" in the legal sufficiency/Rule 29 context.  *See id.* (citing ECF 1617 at 6-8).  This conclusion is clearly erroneous and should be reconsidered.

  A.  **Statutes and case law make clear that the restriction set forth in *Acosta* and *Powell* do not apply at sentencing.**

    At least two reasons exist to disregard *Acosta* and *Powell* at sentencing.  First, sentencing and determining the guidelines during sentencing are a fundamentally different endeavor than conducting a legal sufficiency inquiry.  During legal sufficiency review pursuant to Rule 29, "[a] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'"  *See United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982)).  The Court also "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor."  *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (quoting *United States v.*

*Martoma*, 894 F.3d 64, 72 (2d Cir. 2017)).  And the defendant is tasked with surmounting a "heavy burden" during sufficiency review.  *United States v. Santos*, 449 F.3d 93, 102 (2d Cir. 2006).  The same standard *does not* apply to determining factual matters and the applicable sentencing guidelines at sentencing.  At sentencing and when determining the guidelines, the existence of a fact impacting the sentence must be proven by a preponderance of the evidence.  *See* USSG § 6A1.3, Commentary; *see also United States v. Concepcion,* 983 F.2d 369, 388 (2d Cir. 1992).  The Court gives the government *no deference* and often (as here) assigns the burden of proof to the government.  The evidence also is not viewed in the "light most favorable" to the government.  Inferences are not required to be drawn in the government's favor, either.  This is why no analogy can be drawn between sentencing and sufficiency review.

Second, contrary to the Court's ruling, statutes and case law do not tie the Court's hands during sentencing as they do during sufficiency review.  Principally, 18 U.S.C. § 3661 provides that "*[n]o limitation* shall be placed on the information concerning the background, character, *and conduct* of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." (emphasis added).  As the Second Circuit has opined:

> Even before *Booker*, the Supreme Court specifically cited § 3661 in concluding that the law afforded reviewing courts no basis "to invent a blanket prohibition against considering certain types of evidence at sentencing."  *United States v. Watts*, 519 U.S. 148, 152 (1997); *see also United States v. Concepcion*, 983 F.2d 369, 387 (2d Cir. 1992) ("It had been established long before the advent of the Guidelines that the sentencing court could properly take into account any information known to it.").

*United States v. Jones*, 531 F.3d 163, 172 n.6 (2d Cir. 2008).  The Second Circuit also has made clear that a district judge is "largely unlimited either as to the kind of information he may consider, *or the source from which it may come*."  *United States v. Ryan*, 806 F.3d 691, 693 (2d Cir. 2015) (emphasis added).

In ruling that it is confined to the same bounds in sentencing as it is during sufficiency review, the Court placed an unnecessary (and unprecedented) restraint on its power. A review of relevant legal authorities neither supports this constraint nor reveals authority supporting the existence of such a constraint. Defense counsels' exhaustive search of case law failed to reveal any opinion consistent with the Court's approach here. For these reasons, the Court should reconsider its approach and do exactly what the defense requests during sentencing.

**B. The Court cannot disregard the pressure that its *Allen* charge placed upon the jurors' shoulders. This instruction forced a verdict in a case in which the jury was aware of a prior mistrial. The jury endeavored to deliver a verdict as instructed, but with limits.**

At Trial #2, the jury deliberated for approximately four days. Deliberations in Trial #2 followed a similar path as deliberations in Trial #1. The jury deliberated for about two and a half days (the afternoon of October 3rd, the full day of October 7th, and most of the day of October 8th), until announcing it was deadlocked. For example, at approximately 3:00 p.m. on October 8th, the jury sent a note asking what to do if it could not reach a unanimous verdict as to every charge. *See* ECF 1281-1. In response, the Court instructed the jury that it would provide instructions if that became an issue. *See* ECF 1643 at 10. On October 9, 2024, the jury reconvened for deliberations at 9:00 a.m. Thirty minutes later, the jury sent a note to the Court stating that it could not reach a unanimous verdict on all charges and requested instruction. *See* ECF 1282. The Court called in the parties to discuss what it identified as three options: 1) do nothing; 2) reread the instruction regarding unanimity; and/or 3) provide an *Allen* charge. *See* ECF 1644 at 2-3. The government proposed taking a "several-step process" which involved rereading the unanimity charge first, following up with an *Allen* charge second, and concluding with a partial verdict charge third. *See id.* at 4. Neither of these options were satisfactory to the defense. *See id.* at 5. The defense had concerns about a second jury finding itself in the same territory as the first jury. As a

result, the defense moved for a mistrial to protect Mr. Bongiovanni's right to a fair trial and fair

verdict. *See* ECF 1644 at 5. The Court denied the defense request. *See id.* This decision forced the

defense to choose between one of the three "options" laid out by the Court – an unanimity charge

that would further extend deliberations, an *Allen* charge that the defense viewed as coercive, or a

Partial Verdict charge that could provide a mechanism to get a partial verdict but further permit the

jury to deliberate. None of these "options" were desirable. Left with a Hobson's choice, the

defense asked the Court to provide an *Allen* charge. *See id.* at 5. The government requested that the

Cout give the unanimity instruction. *See id.* at 5-9. The Court chose to deliver an *Allen* charge to the

jury that was modified from Trial #1 to include some favorable language for the government. *See id.*

at 9-25.

Approximately 30 minutes later, the jury sent another note asking the Court to clarify

the effect of not agreeing on all counts. *See* ECF 1282-1. In response, the Court gave a partial

verdict instruction and directed the jury to continue deliberations. *See* ECF 1644 at 35-36. Unlike

Trial #1, the jury did not quickly send another note indicating a further impasse and a desire to

deliver a partial verdict; instead, after deliberating for another three hours, the jury delivered its third

note of the day requesting a readback of some testimony of Lou Selva about the marijuana grows in

which Selva was involved:

*See* ECF 1282-2.  The Court considered the note and the jury was discharged at the end of the day.

On October 10, 2024, the jury returned at 9:00 a.m.  The parties discussed which portions of Lou Selva's testimony would be read back to the jury.  *See* ECF 1645.  The Court made its decision and portions of Lou Selva's testimony were read back to the jury.  *See id.*  Following lunch, the jury reached a unanimous verdict that convicted Mr. Bongiovanni of Counts 1 and 3, among others, but acquitted Mr. Bongiovanni of bribe-taking and engaging in a marijuana conspiracy that involved more than 50 kilograms of marijuana, among others.

As the Supreme Court has made clear, "any criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body."  *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988).  While a court can deliver an *Allen* charge to a jury that is deadlocked, *see United States v. Ruggiero*, 928 F.2d 1289, 1299 (2d Cir. 1991) and *Lowenfield*, 484 U.S. at 237-38 & n.1 (collecting cases), "[t]he propriety of an *Allen*-type charge depends on whether it tends to coerce undecided jurors into reaching a verdict by abandoning without reason conscientiously held doubts," *United States v. Robinson*, 560 F.2d 507, 517 (2d Cir. 1977) (in banc).  Ultimately, the provision of an *Allen* charge depends upon the context and circumstances in which the charge is administered.  *See Lowenfield*, 484 U.S. at 237 (quoting *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam)).  Here, the context and circumstances militated against giving an *Allen* charge and, instead, declaring a mistrial as the defense requested.

The verdict delivered in Trial #2 was a direct result of the *Allen* and Partial Verdict charges delivered by the Court.  The jury in Trial #2 was in a different position than the jury in Trial #1.  More specifically, the jurors in Trial #1 were not aware (and, thus, never considered) that Mr. Bongiovanni was mis-tried previously.  In contrast, the jurors in Trial #2 stated in voir dire that many were aware of Mr. Bongiovanni being tried previously because of the media attention surrounding Trial #1.  Some jurors also were aware how the jury in Trial #1 did not return a full

verdict.  This is important.  For example, the Court emphasized in its *Allen* charge to the jury in Trial #2 that "no other jury" would be in a better position to reach a verdict in Mr. Bongiovanni's case.  However, this instruction is dubious and belied by the fact that another jury, in the same position as the jurors in Trial #2, tried *and* failed to reach a unanimous verdict previously.  The jurors in Trial #2 knew this.  Fearing that it would leave this unenviable task to a third jury if the jury did not reach a verdict on all counts, the jurors in Trial #2 compromised and came to whatever conclusions they could reach so as not to subject another group of citizens to this laborious and long trial.  This is why the jury settled on Mr. Bongiovanni protecting Lou Selva in reaching its verdict.

### C.  The jury's questions were specific and limited the scope of Mr. Bongiovanni's conviction to the conduct involving his best friend only.  This conclusion is plain.

The defense is not "speculating" about the jury's focus on Lou Selva.  This conclusion is unimpeachable given the nature and context of the jury's notes and its findings.  The jury's request to hear portions of Lou Selva's testimony relating to what Mr. Bongiovanni allegedly observed/smelled at Selva's Rebecca Park residence and what Selva grew in an outdoor grow in the Southern Tier was what the jury chose to focus on immediately prior to delivering its verdict.



*See* ECF 1282-2.  The jury's verdict corresponds to this particular focus.

The jury's acquittal on Count 4 proves that the jury unanimously *did not find* that Mr. Bongiovanni accepted bribes in exchange for protecting the larger Masecchia-Serio DTO:

**COUNT 4**

**(PUBLIC OFFICIAL ACCEPTING A BRIBE IN VIOLATION OF
TITLE 18, UNITED STATES CODE, SECTION 201(B)(2)(C))**

**How do you find as to the defendant, Joseph Bongiovanni, on Count 4?**

  X    NOT GUILTY             \_\_\_\_  GUILTY

*See* ECF 1285 at 5.  The jury could not have reached this verdict if it unanimously agreed that Mr. Bongiovanni protected the larger Serio DTO since bribes were the lynchpin to Mr. Bongiovanni's involvement in a protection scheme that extended beyond Selva, his best friend.

The jury's finding on Count 3 proves that the jury unanimously *did not find* a weight of marijuana consistent with the scope of an agreement to protect the larger Serio DTO:

**Part A**

**We, the jury, unanimously find that the amount of the mixture and substance containing marijuana that was reasonably foreseeable to the defendant as being within the scope of the agreement was:** *(mark only one)*

\_\_\_ **1000 kilograms or more**
\_\_\_ **between 100 kilograms and 1000 kilograms**
\_\_\_ **between 50 kilograms and 100 kilograms**
 X  **less than 50 kilograms**

*See* ECF 1285 at 4.  The Serio DTO dealt *thousands* of kilograms of marijuana.  Ron Serio and others testified to this fact at length.  Consequently, there is no logical way to find this amount unless the jury unanimously agreed to limit Mr. Bongiovanni's culpability to Selva and his basement grow only.

This conclusion does not require speculation.  This conclusion does not require a "leap of faith."  The Court also is not restricted from drawing this conclusion during sentencing.  The jury made this finding clear in its verdict.  The government prefers to disregard it because this conclusion does not fit a government-constructed narrative that prosecutors won a resounding victory at trial.  The Court should not be dissuaded from doing what is right, correct, and fair at

sentencing, simply because the conclusion offends the U.S. Attorney's Office or runs contrary

to a self-serving government press release.  What the jury concluded is plain from the questions

asked and the verdict delivered.


Dated:  December 5, 2025
       Buffalo, New York

**THE LAW OFFICE OF PARKER R. MACKAY**
*Attorneys for Joseph Bongiovanni*

By:    s/Parker R. MacKay
      Parker R. MacKay, Esq.
3110 Delaware Avenue
Kenmore, NY 14217
Ph: (716) 803-8166
Fx: (716) 408-1651
Em: Parker@MacKayLawOffice.com

**SINGER LEGAL PLLC**
*Attorneys for Joseph Bongiovanni*

By:    s/Robert C. Singer
      Robert C. Singer, Esq.
80 East Spring Street
Williamsville, New York 14221
(716) 222-3288
rob@singerlegalpllc.com