UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

JOSEPH BONGIOVANNI,

    Defendant.

19-CR-227-LJV-MJR
DECISION & ORDER

---

    Before the Court is a motion for reconsideration filed by the defendant, Joseph Bongiovanni. Docket Item 1649. Bongiovanni asks this Court to reconsider its decision on several objections to the Presentence Investigation Report ("PSR"). *See id.* More specifically, he argues that "[t]he Court's reliance on [Robert] Kaiser is clearly erroneous and manifestly unjust," *see id.* at 3-19; "[t]he evidence cited by the Court to apply the firearm enhancement to Count Group 1 does not support such a finding," *see id.* at 20-23; and "[t]he Court's decision to disregard the inconsistent verdict and the jury's actions at the conclusion of this trial is not proper," *see id.* at 24-31.[1] After careful consideration, the Court rejects each of these arguments and denies Bongiovanni's motion for reconsideration.

## **LEGAL PRINCIPLES**

    "Motions for reconsideration brought in criminal cases are assessed under the civil reconsideration standard, since there is no express criminal procedure provision for

---

[1] Page numbers in docket citations refer to ECF pagination.

such motions." *United States v. Stevens*, 2021 WL 48516, at *1 (W.D.N.Y. Jan. 6, 2021) (citing *United States v. Larson*, 2013 WL 6196292, at *2 (W.D.N.Y. Nov. 27, 2013)), *aff'd*, 857 F. App'x 44 (2d Cir. 2021) (summary order).  "Reconsideration is generally justified in any one of the following three circumstances: (1) an intervening change in controlling law; (2) new evidence; or (3) the need to correct a clear error of law or to prevent manifest injustice." *Id.* (citing *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)); *see also Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (explaining that "reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court").

## DISCUSSION[2]

As an initial matter, the Court notes that Bongiovanni does not raise new arguments or identify anything that this Court overlooked.  Instead, he essentially rehashes arguments that this Court already has considered and rejected.  Nonetheless, the Court has again carefully considered each of his arguments, and for the reasons explained previously, *see generally* Docket Item 1632, as well as those outlined below, finds that they do not change the Court's calculus.

---

[2] The Court assumes the reader's familiarity with the factual background and will refer to the facts only as necessary to explain its analysis.

**I.    DRUG WEIGHT**

Bongiovanni spills a great deal of ink attacking the credibility of his confidential source, Robert Kaiser, and the reliability of information Kaiser gave Bongiovanni about the amount and kinds of drugs the Serio DTO was distributing.  *See* Docket Item 1649 at 3-19.  To start, it is important to keep in mind that the government's burden of proof at sentencing is by a preponderance of the evidence.  *See United States v. Salazar*, 489 F.3d 555, 557 (2d Cir. 2007) (per curiam).  This Court found that—based on what Kaiser told Bongiovanni and what Bongiovanni memorialized on DEA forms—the government had shown by a preponderance of the evidence that certain amounts and kinds of drugs were reasonably foreseeable to Bongiovanni as part of the Serio DTO.  *See* Docket Item 1632 at 9-20.

Bongiovanni argues that because Kaiser was not a member of the Serio DTO, Kaiser could not have had reliable information about it.  *See* Docket Item 1649 at 4-7.  But there is nothing in the record suggesting that Bongiovanni had doubts about that information when he signed Kaiser up as a confidential source.  On the contrary, Bongiovanni indicated that Kaiser's performance was "very positive."  Gov. Ex. 9E-3.

What is more, the government's theory—which the jury seems to have accepted—was that Bongiovanni used Kaiser to investigate a drug dealer who was unaffiliated with the Serio DTO because Bongiovanni did not want Kaiser to implicate the Serio DTO.  *See* Docket Item 1488 at 31.  That would have been unnecessary if, as Bongiovanni suggests, Kaiser had no ability to get any useful information about the Serio DTO.

Bongiovanni also says that this Court's calculation of two kilograms of cocaine "is anchored to nothing in the record."  Docket Item 1649 at 17.  Not so.  The Court's

estimate was anchored in Kaiser's statement that the Serio DTO was distributing "multiple kilograms" of cocaine. *See id.* at 12. "Multiple" means at least two.

In fact, Bongiovanni himself authored a DEA-6 report stating that Robert Mettal and Thomas Serio—members of the Serio DTO—previously had been "arrested in a New York State cocaine investigation . . . in 1998 with approximately [five] kilograms of cocaine." *See* Gov. Ex. 8I at 1. Despite Bongiovanni's knowledge of those prior arrests, the Court did not attribute to Bongiovanni all five kilograms of cocaine that Ronald Serio testified were within the scope of the conspiracy. *See* Docket Item 1632 at 17 ("But Mettal's and [Thomas] Serio's prior acts—which occurred a decade before the alleged start of the conspiracy—are insufficient for this Court to find, even by a preponderance of the evidence, that Bongiovanni could reasonably foresee that those individuals would again distribute that quantity."). But those prior arrests, coupled with the information provided by Kaiser, certainly showed by a preponderance of the evidence that Bongiovanni knew the Serio DTO to deal in cocaine. And so the Court chose to apply the minimum amount of cocaine supported by Kaiser's statements to Bongiovanni: two kilograms. And the Court has no reason to second guess that conclusion.

## II.   FIREARM ENHANCEMENT

There is no dispute that members of the Serio DTO possessed firearms; the question is whether possession of those firearms was reasonably foreseeable to Bongiovanni. This Court previously found that it was, and it based that finding largely on a DEA report that Bongiovanni wrote. *See* Docket Item 1632 at 22-23. In that report, Bongiovanni said that Kaiser told Bongiovanni that "Kaiser ha[d] been

approached by Serio and Robert Mattal in the past to *assist the Serio DTO* in transporting and safeguarding cocaine, marijuana, *and firearms* from California and New York City to Buffalo, New York." Gov. Ex. 9E-4 at 2 (emphasis added); *see* Docket Item 1632 at 23. The Court further noted that, as the trial evidence demonstrated, Bongiovanni was a trained DEA agent who knew that firearms "are among the tools of the drug trade." *See* Docket Item 1632 at 23. And that, "combined with the information from the DEA report about the Serio DTO specifically, supported a finding that the conspiracy's possession of firearms was reasonably foreseeable to Bongiovanni." *See id.*

Bongiovanni argues that the DEA report cited above, Gov. Ex. 9E-4, which documented Kaiser's establishment as a confidential source, was inconsistent with Gov. Ex. 8I, the DEA-6 report "documenting what Kaiser said in his April 30, 2013 debrief." Docket Item 1649 at 20. More specifically, Gov. Ex. 8I documented that Kaiser had provided information about "an unknown source of supply of automatic handguns and Assault rifles that [Kaiser] claim[ed he] could have transported from San Diego." Gov. Ex. 8I at 2. But according to this report, Kaiser "stated that other than the California source for firearms, [he] did not have any information to offer at that time" regarding firearms trafficking. *Id.* Thus, Bongiovanni says that the information in Gov. Ex. 9E-4 on which this Court relied is no more than "[a] scrivener's error." Docket Item 1649 at 23.

The Court has carefully considered this argument but ultimately finds it unpersuasive. First, Bongiovanni wrote the report. *See* Gov. Ex. 9E-4 at 3. So it was not some other agent's "scrivener's error"; it was Bongiovanni's own statement that

5

firearms were associated with the Serio DTO.  Moreover, as the government observed and this Court previously found, Bongiovanni's knowledge as a DEA agent that trafficking of large drug quantities often involves firearms bolsters the conclusion that Bongiovanni could reasonably foresee that members of the Serio DTO possessed firearms.  *See* Docket Item 1632 at 23.

The Second Circuit's decision in *United States v. Soto*, 959 F.2d 1181 (2d Cir. 1992) supports this conclusion.  There, the Second Circuit found that "[g]iven the large quantity of narcotics and narcotics paraphernalia in the apartment where [the defendant] was arrested, and given the fact that three types of various caliber ammunition were strewn about the apartment in plain view, . . . the district court's determination that possession [of firearms] was reasonably foreseeable was [not] clearly erroneous."  *Id.* at 1187.  In reaching that conclusion, the panel relied on two cases from other circuits that found it proper to infer the reasonable foreseeability of possession of a firearm from transactions involving large drug quantities.  *See United States v. Bianco*, 922 F.2d 910, 913 (1st Cir. 1991) (finding that district court "permissibly relied on the value and amount of the marijuana, which these appellants had reason to believe would be involved in their joint criminal venture, for its inference that a codefendant's possession of a firearm was reasonably foreseeable to appellants" (emphasis omitted)); *United States v. Garcia*, 909 F.2d 1346, 1350 (9th Cir. 1990) ("In light of the large amount of drugs involved in this case, [coconspirator]'s possession of the gun was reasonably foreseeable.").  Although Bongiovanni correctly notes that there was no evidence that he saw any drug or firearm in "plain view" as the defendant did in *Soto, see* Docket Item 1649 as 23, that is not the point.  Rather, the point is that Bongiovanni, a trained DEA

agent experienced in narcotic investigations, could reasonably foresee his coconspirator's possession of firearms in connection with a drug operation involving multiple kilograms of cocaine and over a hundred pounds of marijuana that also were reasonably foreseeable to him.  *See* Docket Item 1632 at 15-18.  And that is especially so when he wrote a DEA report referring to firearms and the standard of proof is by a preponderance of the evidence, not beyond a reasonable doubt.

### III.     COURT'S "DISREGARD" OF THE JURY'S "INCONSISTENT VERDICT"

Finally, Bongiovanni contends that "[t]he Court's decision to disregard the inconsistent verdict and the jury's actions at the conclusion of this trial is not proper." Docket Item 1649 at 24-31.   More specifically, he argues that neither *United States v. Acosta*, 17 F.3d 538 (2d Cir. 1994), nor *United States v. Powell*, 469 U.S. 57 (1984), prevents this Court from "speculating" about the jury's thought process in the context of sentencing.  *See* Docket Item 1649 at 24.  "In ruling that it is confined to the same bounds in sentencing as it is during sufficiency review," Bongiovanni says, "the Court placed an unnecessary (and unprecedented) restraint on its power."  *Id.* at 26.  And without that restraint, Bongiovanni says, this Court should read the tealeaves in the jury's verdict.

The Court agrees with Bongiovanni that the standard at sentencing is different than on a Rule 29 motion.  And in referring back to its Rule 29 decision when deciding Bongiovanni's sentencing objections, *see* Docket Item 1632 at 13, 22, the Court did not mean to imply that the standards were the same.  But the evidence on which the government relied in opposing both motions overlapped significantly.  And that evidence

supported the Court's conclusion that the jury's verdict did not necessarily mean what Bongiovanni says it meant.

In the context of the sentencing objections, the Court carefully reviewed the evidence and the jury verdict in light of Bongiovanni's argument.  As it must, the Court made its findings by a preponderance of the evidence.  And based on that review, the Court found by a preponderance of the evidence that "there was ample evidence at trial suggesting that Bongiovanni was aware of more than just [Lou] Selva's basement grow."  *See id.* at 14.  The Court again has reviewed that finding in light of Bongiovanni's motion for reconsideration.  But nothing in that motion changes the Court's conclusion.

## **CONCLUSION**

For all those reasons, Bongiovanni's motion for reconsideration, Docket Item 1649, is DENIED.  Sentencing will proceed as scheduled on January 21, 2026.  *See* Docket Item 1639.


SO ORDERED.

Dated:   January 8, 2026
         Buffalo, New York


            */s/ Lawrence J. Vilardo*
            LAWRENCE J. VILARDO
            UNITED STATES DISTRICT JUDGE