UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

            Plaintiff,

      v.

JOSEPH BONGIOVANNI,

            Defendant.

**REDACTED PUBLIC VERSION**

Case No. 19-CR-227-1-LJV

---

**DEFENDANT JOSEPH BONGIOVANNI'S
SENTENCING MEMORANDUM**

**THE LAW OFFICE OF PARKER R. MACKAY**
Parker R. MacKay, Esq.
3110 Delaware Avenue
Kenmore, NY 14217
Ph: (716) 803-8166
Fx: (716) 408-1651
Em: Parker@MacKayLawOffice.com



Robert C. Singer, Esq.
80 East Spring Street
Williamsville, New York  14221
(716) 222-3288
rob@singerlegalpllc.com

*Attorneys for Joseph Bongiovanni*

**Introduction**

For all of his life, Joseph Bongiovanni has lived a humble, family-centric existence. He did all of the things that a parent teaches you to do. He took care of his wife, parents, and children. He paid his bills. He saved money for retirement. He owned a house. He was employed. He did not live flashy. He went to church. He invested his time in helping others. All of this came to a screeching halt when he was accused of bribery and corruption eight years ago.

In 2018, Ron Serio a drug-dealing opioid addict – the antithesis of everything that Joe Bongiovanni was and is – claimed that he paid Mr. Bongiovanni bribes for protection and information. After this claim was made, a fellow DEA Agent, Anthony Casullo, accused Mr. Bongiovanni of making racial slurs and protecting Peter Gerace. Mr. Bongiovanni's best friend, Louis Selva, would later claim that he solicited Mr. Bongiovanni for protection. And then a host of other dubious accusers followed. Over the course of the next few years, the U.S. Attorney's Office would accuse Mr. Bongiovanni of entering into two sweeping protection schemes, accepting bribes in excess of $250,000, and protecting drug-dealers, mobsters, and others.

Mr. Bongiovanni could not believe that he was accused of such crimes. He maintained his innocence and made preparations to go to trial. He waited five years to get to trial. In 2024, the government tried this case twice. During the first trial, the government secured two minor convictions and Mr. Bongiovanni was acquitted of another offense, but the jury deadlocked on the remaining counts. During the second trial, jurors deliberated for several days until they announced that they could not reach a verdict on all counts. After the Court urged the jury to come to a decision, the jury relented and delivered a split verdict. Mr. Bongiovanni was acquitted of accepting bribes from anyone – gone was the core of the government's argument concerning Mr. Bongiovanni's alleged motive to engage in these schemes. The jury also acquitted Mr. Bongiovanni of conspiring to protect Peter Gerace – another core part of the government's

case.  However, the jury did find Mr. Bongiovanni guilty of some counts – engaging in a conspiracy to defraud the DEA as well as a narcotics conspiracy that involved an amount of marijuana inconsistent with the sweep of the conspiracy counts and protection of the entire Serio DTO.  The jury also found Mr. Bongiovanni guilty of obstruction and making false statements relating to DEA reports and memoranda.

Following the verdict, the government paraded to the media, just like it did prior to trial, claiming that it had proven everything that it accused Mr. Bongiovanni of doing.  But as this Court determined previously, the verdict was not that sweeping.  Following this trial, the Court sometimes has agreed with what the defense believes the jury decided.  Other times, the Court has not.  And now the Court is charged with determining a just sentence, in the context of a complicated case with an unclear verdict.

As set forth below, Joseph Bongiovanni is a polite and loving individual.  He is a decorated law enforcement officer and a brave hero.  He is a father and husband.  He is a person who, in the jury's eyes, made a poor choice to try and protect his best friend Lou Selva, minimized his relationship with Peter Gerace, and filed inaccurate or misleading police reports and internal memos.  These are not convictions worthy of substantial punishment.  Joseph Bongiovanni also is not a man who requires a substantial punishment because of the nature of the verdict, the costs of incarceration to Mr. Bongiovanni and society, and the substantial punishment this case and six years of monitoring and home incarceration have occasioned on Mr. Bongiovanni already.  As a result, the Court should consider imposing a shorter custodial sentence than currently suggested by the guidelines or other punishments in the alternative to jail.

## Argument

### A.  Who is Joseph Bongiovanni?

Joe is the son of Maria Bongiovanni.  Joe has two sisters, Lisa and Marla, who are close in age to Joe.  For the first several years of his life, Joe lived with his mother, siblings, and biological father, Joseph Mule, who was abusive and frequently absent.  When Joe was a young boy, Maria left her husband and divorced him.  As a result, Joe took on duties to care for his mother and sister well beyond his years.  *See* Exhibit A.3 at 1-3.  A divorce was difficult and rare in the early 1970's, but Maria did what she needed to do to protect herself and her children.  When Maria separated from Mule, it was the last that Joe ever saw of his biological father.

Following the divorce, Maria met Federick Bongiovanni.  Maria and Fred got married and Fred served as a father to Joe, Lisa, and Marla.  The children took his last name and never looked back.  The Bongiovannis resided in and raised their children in the West Side of the City of Buffalo.  Over time, Fred and Maria purchased a duplex located at 221 Lovering in North Buffalo.  In this home, the Bongiovannis raised their children.  The Bongiovannis were a hard-working family.  Fred was employed at the Buffalo Sewer Authority and Fred and Maria worked in a family-owned restaurant, Scotty's Tavern.  In the summers, Fred was the proprietor of a clam stand.  During his formative years, Joe was taught the value of hard-work and an honest paycheck, first by observing his parents, and, later, by working for them and others in the business.  As Joe got older, his parents got out of the restaurant business.  Fred continued with the Sewer Authority.  Maria took a job as a secretary.  Fred and Maria would work in these positions until they retired.

As a teenager, Joe attended Catholic School.  He played football and worked part-time.  In 1982, Joe graduated Cardinal O'Hara High School in Tonawanda, NY.  After graduating from Cardinal O'Hara, Joe worked in a staff position with the Buffalo Common Council and at the Sewer Authority.  In 1984, Joe also pursued his college degree.  He commenced his studies at SUNY

Buffalo and was associated with the college from 1984 to 1987. While in college, Joe worked as a part-time bartender to support himself. In 1987, Joe took some time off from his studies. He worked several seasonal civil service jobs at the Water authority, Parking Enforcement, the Aud, and others.

In 1991, Joe returned to college and attended Canisius College from 1991 to 1993. He did better in his studies, but remained more focused on pursuing his career. Joe wanted to get into law enforcement. Joe was impressed with the impact an officer could have in the community. During college, Joe pursued a degree in criminal justice to help him advance towards that goal. Before obtaining his Bachelor's Degree, Joe took a civil service exam. Joe scored high enough to be considered for a deputy position with the Erie County Sheriff's Office. Joe took the position and went to the police training academy in 1993. After graduating from the academy, Joe was assigned to the Corrections Department. He worked as a deputy at the local jail and downtown holding center. The work was difficult, dangerous, and draining. Joe appreciated the opportunity the job provided him to serve the community, but desired to do more.

Joe enrolled at Medaille College and attended night classes to finish his degree. Joe juggled the competing responsibilities of work and school by putting his nose to the grindstone. He would study at night when prisoners were locked in their cells and asleep. He found time to study on his days off and before and after shifts. In 1995, all of Joe's hard work paid off. He graduated from Medaille College with a Bachelor's of Science Degree in Liberal Studies. His cumulative GPA was 3.58 and Joe made the Dean's List is last semester. *See* Exhibit G. Joe was ecstatic because a college degree opened the door to a career opportunity that he really wanted to pursue.

In the 1990s, the DEA frequently was in the news. Operations that targeted drug cartel members in Columbia and Mexico were publicized as successes in the war on drugs, but, back home, cities and communities within the United States saw a rise in crime, particularly violent crime,

that had its roots in dealing drugs, obtaining drugs, or both. To arm federal law enforcement with more resources, Congress appropriated additional funding to hire special agents. Joe saw these solicitations. He was attracted to the DEA as a career choice based on the work performed and the benefits and pay. The duties of a DEA special agent were far more exciting and less monotonous than a corrections deputy. Joe applied to the DEA for a position. He was accepted and started his career in 1998.

Before starting his career in law enforcement, Joe met JoAnn Delucia. JoAnn was from Buffalo as well. The two got along and started a relationship. In 1994, Joe and JoAnn tied the knot. The two were married and continued to reside in Buffalo. In 1997, Joe and JoAnn welcomed their first child, a daughter the couple named Chelsea. This was a blessing beyond words. JoAnn was close to her family. The prospect of moving away from Buffalo was scary. This prospect did not materialize until Joe graduated from the DEA academy in 1998 and was assigned to the Orlando, Florida Field Office. JoAnn joined her husband on this adventure and the two moved to Florida.

Professionally, Joe excelled in Florida. He gelled with his new DEA partners. He



performed exciting work that had an impact on the war on drugs, locally as well as nationally (Florida was an entry-point for narcotics smuggled from Mexico and South America into the United States, specifically, in DEA parlance called a "High Intensity Drug Trafficking Area"). Joe became an agent who was certified to help conduct air operations focused on surveillance and interdictions (above).

Personally, things were more challenging at home. Joe was working to further his new career. Being a DEA special agent is not a 9-to-5 job. Joe was required to work nights, weekends, and overtime. As a junior agent in the office, he got the less-desirable shifts. As Joe and JoAnn worked to navigate life and their marriage as new parents, in a city distant from family, as Joe worked many hours, tragedy struck. JoAnn's sister in Buffalo had a massive heart attack and died. JoAnn's sister's husband could not take care of three children alone. Neither could JoAnn's mother, who also needed assistance. And JoAnn could not help her family from Florida. Joe and JoAnn discussed options. Joe could request a transfer to the DEA office in Buffalo, but that was not something that would happen overnight. It also was something that Joe did not desire. Either way, JoAnn needed to get home. JoAnn left Florida and returned to Buffalo. JoAnn took Chelsea, who only was a toddler. This was an event that would cause strain on Joe and JoAnn's relationship.

Joe's request for a transfer to DEA Buffalo was approved in 2001. He departed Orlando with mixed emotions (Right (Joe's farewell ceremony in Florida)). The transfer would reunite Joe with his daughter. It also would bring Joe back to Buffalo and his family and friends in the city. But this was not the best professional option for Joe.



It also was not enough to save his marriage. The damage was done in Orlando. Months of separation did not heal those differences. Joe and JoAnn filed for divorce and Joe moved back with his parents, renting the upper unit of 221 Lovering.

Over the course of the next decade, Joe worked to establish himself at the DEA Buffalo office. Joe was a field agent who did not toil in the office building cases – that was not his  strength. Instead, Joe worked the streets, participating in drug busts and warrant executions as well as developing sources for controlled buys. Joe worked to maintain his relationship with Chelsea. He interacted with his young daughter as much as he could. He provided support payments to JoAnn regularly, who was the primary custodial parent of Chelsea based, in part, on Joe's irregular work hours. As this Court learned during the trial, Joe also made payments in excess of his obligations to send his daughter to Catholic school and other activities. Joe and JoAnn had their differences about who should pay for braces and other expenditures, but nothing outside the norm of what divorcees bicker over who share a child in common. Joe also dated again. In 2009, Joe posted an advertisement to rent the lower unit of 221 Lovering (his parents moved to a rental and sold 221 Lovering to Joe in 2008). The prospective tenant was a woman named Lindsay Schuh. When Maria Bongiovanni met Lindsay for the first time during a visit to her son's house, Maria told Joe that he was going to marry Lindsay. Joe dismissed the remark, but a mother's intuition is nothing to dismiss. Over the course of the next year, Joe and Lindsay started a relationship. The two moved in together after Lindsay's lease expired in 2010.

7

There was a lot going on when Lindsay and Joe moved in together. Lindsay had a son, Matty, from a previous relationship. Matty was a growing boy who needed a father-figure and support. Lindsay was in the process of pursuing her nursing degree. She was going to school and needed support as well. Joe supported Lindsay and Matty, forming a fatherly bond with Matty and supporting Lindsay as she pursued her degree. Over the next few years, Joe and Lindsay's relationship blossomed. The couple got engaged and moved from 221 Lovering into a split-level home in Tonawanda. Lindsay started work as a nurse. The couple got married in a destination wedding in Cabo San Lucas. The Bongiovanni's picked Cabo because



the venue provided them a cheaper alternative to host a wedding than in Buffalo. Chelsea was in high-school. Matty became a teenager. It was an exciting time for the newlyweds.

As this Court has learned, the last decade was not all peaches and cream. Joe came under investigation following the allegations levied by Ron Serio and Tony Casullo. As he approached retirement eligibility after serving as a special agent for 20 years with the DEA, Joe became increasingly marginalized at work. DEA superiors and colleagues, who went under the microscope of investigations themselves, distanced themselves from Joe. Joe was told that the U.S. Attorney advised DEA that he could not testify anymore. Joe no longer had a desire to work in the streets anymore. Part of that had to do with years of police-related stress. Dealing with dangerous suspects and being the primary agent who entered an unknown location during a search has a cost. Part of that had to do with the environment. If superiors and colleagues did not have his back in

the office, then how could Joe trust that these people would have his back in the streets.  After Joe was denied a transfer to the Diversion Group, a DEA group that investigated doctors and pharmacies in a white-collar environment, Joe discussed things with Lindsay and decided to submit his retirement papers.  Joe retired from the DEA in January 2019 ending a 20-year career.  When Joe's federal service is combined with his service at the Erie County Sheriff's Office and in the City of Buffalo, Joe Bongiovanni devoted almost all of his adult life to serving and protecting our community.  Most people cannot say that.

Over the course of several years, the government and others have levied some awful accusations about Joe Bongiovanni.  Unfit parent.  Bribe-taker.  Mob-lover.  Racist.  Failure.  As the verdict made clear, these allegations were not believed.  At trial, it often is difficult for the jury to understand the full story of the defendant because the rules of evidence generally preclude character evidence.  At sentencing, when character evidence is not precluded, the Court (and others) can now take notice of the full-picture of who Joseph Bongiovanni is and is not.

### i.   Joe Bongiovanni is a loving and supportive father.

Joe did not raise Chelsea as her custodial parent.  This had nothing to do with being unfit or unsupportive.  It had to do with gender.  In New York and nationwide, mothers are awarded primary custody[1] and more parenting time[2] than men in drastically larger percentages.  It had to do with work.  Joe worked an unpredictable schedule and was the primary bread-winner in the parenting relationship.  It had to do with an agreement between Joe and JoAnn that this was in the best interests of Chelsea based on Joe's work schedule and other factors.  But it was not

---

[1] *See* "Custodial Mother and Fathers and their Child Support: 2017," U.S. Census Bureau (May 2020), available at:
https://www.census.gov/content/dam/Census/library/publications/2020/demo/p60-269.pdf (last accessed 1/5/26) (showing that mother have primary custody in approximately 80% of cases).
[2] *See* "How much custody time does Dad get in your state?, CustodyXChange (2018), available at: https://www.custodyxchange.com/topics/research/dads-custody-time-by-state.php (last accessed 1/5/26) (showing the Dads average only 30.4% of parenting time in New York).

reflective of Joe being a bad father as the government has maliciously alleged in the past. Joe was a

committed parent who had a positive impact on Chelsea's life. As Chelsea recounts:

> Growing up, my father was a consistent and loving presence in my life. He was the one who
> taught me how to play sports, not only as a fun activity but as a way to learn discipline,
> teamwork, and resilience. These early life lessons have shaped the person I am today. Beyond
> sports, some of my fondest memories include our family outings to theme parks, watching old-
> fashioned movies together, and taking long bike rides. These moments, though simple, helped
> create a strong bond between us and taught me the value of family, joy, and commitment.

*See* Exhibit A.1 at 12.

Joe also had an impact on Lindsay's son, Matty. Matty was not Joe's biological

father, but Joe served an invaluable role in Matty's upbringing as his step-father throughout most of

Matty's life. As Matty recounts:

> My mother had me when she was just 17. She worked exhausting jobs and did everything
> she could to provide for me on her own. When Joe came into our lives, he never tried to
> replace anyone. He simply stepped in and gave us the stability, care, and love we never had.
> He helped babysit me so my mom could go back to school and become a nurse. He helped
> shape me into the man I am today, teaching me the value of respect, honesty, and hard work
> which were the qualities he lived out every day.
>
> ###
>
> When I was around 14, I was a chubby, unsure kid. Joe saw that I needed guidance, not
> judgment. He got me my first gym membership. He trained me. He taught me about
> nutrition, discipline, confidence, and hard work. That became one of the most important
> turning points in my life.
>
> When I was 16 or 17, my biological father, Matthew Maglietto, passed away unexpectedly
> from a drug overdose. It devastated me and my mom. Joe helped us try to find answers. He
> reached out to people. He cared. He was already in my life before my dad passed, but after
> that, he became the rock we stood on.

*See* Exhibit A.1 at 13-14.

### ii.  Joe Bongiovanni is a caring and supportive son.

Fred and Maria are Joe's parents. This Court met Maria Bongiovanni when she

testified at Trial #1. The Court did not meet Fred because he died in 2023 prior to trial. Joe had a

special bond to his parents. Joe was their tenant when he returned to Buffalo in 2001. Joe was their

landlord when Fred and Maria ended their lease in Clarence, NY and moved back into 221 Lovering

in 2013.  As Joe's parents aged, Joe did not abandon his mother and father.  Joe did not delegate

care to an aide or nursing home.  Joe personally helped his parents.

        Fred and Maria Bongiovanni developed chronic diseases in their later years that

limited strength and mobility.  Fred went into renal and heart failure.  To stay alive, Fred required

dialysis several times a week.  Maria suffered from lupus and was confined to a walker after nine

back surgeries, so she also needed help.  Joe's sister Lisa did not live in New York.  His sister Marla

lived in the Southtowns, so she was not as close to Fred and Maria as Joe.  As the eldest sibling, Joe

shouldered the bulk of the care responsibilities.  When Fred could no longer drive, Joe drove his

father to dialysis and his mother and father to appointments with specialists during his lunch and

other times he was off-duty.  He dropped food off at his parents' home.  He shoveled.  He

monitored their health and lives.  He did their laundry.  This was taxing.  As Lindsay recalls:

> Between working, taking care of our family and his responsibilities at home, Joe would soon become the primary caretaker for his parents. Joe's mother, who you met at the first trial, could not drive due to extensive disabilities, and relied on Joe's father to get her to from her appointments. Joe's father became ill with congestive heart failure and end stage renal disease that eventually led to dialysis treatments 3 days a week. Trying to coordinate his parents' insurmountable number of doctor appointments, inpatient hospitalizations, surgeries, unforeseen emergency room trips and making sure there was always someone readily available fell on Joe and his sister Marla. These were especially trying time for Joe and Marla because they were both working full-time and Marla lived father away in the South towns. Still, Joe continued managing all the stress of sick parents and extra responsibility barely taking time off work. That is what you do for the people you love, and

*See* Exhibit A.1 at 2.  During this same period, Joe had responsibilities at work and in his own

household.  Like any son or daughter in this position, Joe had to make sacrifices.  He did not work

wire cases and other assignments with odd hours or out-of-state travel; instead, he focused on local

buy/bust operations.  Attending to his parents prevented Joe from being a part of some of the

assignments that he regularly volunteered for during the first two-thirds of his career at the DEA.

But it was the right thing to do in Joe's mind.

After this case was indicted, Joe was placed on pretrial supervision.  This made attending to his parents demands difficult.  Joe persevered and worked with pretrial supervisors to make things workable, but the situation was far from perfect.  In 2023, Fred Bongiovanni died.  Joe was not there by his father's side.  As Lindsay recalls:

> through the years. It was heartbreaking watching Joe blame himself for being unable to bring his dad home to care for him in his final days. Unable to honor his father's wishes of dying at home with family by his side, because an ankle monitor and curfew restricted Joe's ability to care for him. Joe's second lawyer would then become ill with his own health

*See* Exhibit A.1 at 7.  Later, when the Court placed Joe into home confinement, Joe was not able to care for his mother at all.  Maria became Marla's sole responsibility.

Many adult children who are faced with the demands of aging parents outsource care to agencies and third-parties.  Often, children of parents with health problems choose to do so to give themselves more time to focus on work and other responsibilities.  However, delegating care responsibilities to others is expensive.  Sometimes, doing so is uncomfortable and dispassionate.  Joe chose to do it himself at a cost to his own ambitions.  That is commendable.  It is a testament to who he is as a person and son.

### iii.  Joseph Bongiovanni is a wonderful husband.

Joe's first marriage to JoAnn failed not because he was abusive or a womanizer but because of circumstance.  Sometimes, that happens.  In the United States, nearly 4 in 10 first marriages end in divorce.  When Joe married for a second time in 2015, his marriage to Lindsay was as strong as they come.  Joe's love for his wife is remarked upon in countless character letters submitted to this Court.  He is an amazingly supportive husband.  Prior to the wedding, Joe sacrificed for Lindsay so that she could realize the totality of her career aspirations.  This case has tested the bond between Joe and Lindsay in ways most people can never (and will never) understand.  The Bongiovannis' marriage has endured because of love.

### iv.  Joseph Bongiovanni was a capable DEA agent and law enforcement officer.

Prosecutors as well as former DEA colleagues went to great lengths before, during, and after trial to cast Special Agent Bongiovanni as an inept officer.  This is (and was) a false narrative, constructed by the government to sully Special Agent Bongiovanni's reputation and constructed by former DEA colleagues in desperation to protect themselves from strong-arm prosecutors or to settle scores with someone they did not like personally.  The defense was very limited in what it could present at trial, but the evidence in this memorandum disproves the negative narrative presented about Special Agent Bongiovanni beyond a reasonable doubt.

As set forth above, Special Agent Bongiovanni started his law enforcement career at the Erie County Sheriff's Office.  He served as a deputy in corrections for several years until applying to the DEA for a position as a special agent.  Special Agent Bongiovanni graduated from the DEA Academy in 1998.  His family came to graduation.  As his sister Lisa recounts:

> Over the years I watched Joe grow up and become a devoted father and a committed member of the Drug Enforcement Administration.  My family was in attendance to Joe's graduation from Quantico Virginia we could never be prouder of Joe's commitment to his work. Joe was proud of his work that was founded on integrity and commitment to being a member of the DEA family. It was this sense of integrity that helped me develop a strong committed to nursing.  I use that strength and commitment Joe taught me to help navigate my own professional career in nursing. My family was incredibly proud when Joe made the

*See* Exhibit A.1 at 10.

Special Agent Bongiovanni started his career in Orlando, Florida.  After receiving "Acceptable" remarks on his first performance review, Special Agent Bongiovanni was rated as "Significantly Exceeds Requirements" – the second highest performance rating – in 2000 and 2001. *See* Exhibit B.1 at 1-11.  At the end of his tour in Florida, Special Agent Bongiovanni received an

award for his contributions to the High Intensity Drug Trafficking Area

("HIDTA") Heroin Group. *See id.* at 13 (right). 

        Upon his transfer to DEA Buffalo, Special Agent

Bongiovanni was supervised by then-Group Supervisor Dale Kasprzyk.  GS

Kasprzyk gave Special Agent Bongiovanni the "Significantly Exceeds

Requirements" rating on this review. *See id.* at 14-15.  He became a Trauma

Team Member at DEA Buffalo, helping fellow agents cope with job-related

stress and grief. *See id.* at 16.  Special Agent Bongiovanni investigated significant cases at DEA

Buffalo.  Special Agent Bongiovanni primarily targeted heroin and cocaine traffickers.  Operations

that Special Agent Bongiovanni led or participated in removed dangerous drugs from our

community.  He was adept at discovering hidden drug compartments in vehicles also known as

"traps."  Records recovered from his personal files show that he received accolades and



congratulations from the DEA New York Division Special Agent-in-Charge, the ASAC overseeing

DEA Buffalo, the District Attorney and U.S. Attorney in Buffalo, and AUSAs and DEA

supervisors. *See id.* at 18-30; *see also* Exhibit B.2 at 1-26.

        Special Agent Bongiovanni was the recipient of numerous awards.  In 2003, 2004,

and 2005, Special Agent Bongiovanni received Special Awards of Honor from the International

Narcotic Enforcement Officers Association.  *See* Exhibit B.1 at 23-25; Exhibit B.2 at 1, 10.  In 2003,



Special Agent Bongiovanni received the DEA Special Act or Service award.  *See* Exhibit B.1 at 22.

In 2008, Special Agent Bongiovanni was presented an Organized Crime Drug Enforcement Task

Force Award for his work on Operation Shell Game.  *See* Exhibit B.2 at 13-15 (picturing AUSA

Timothy Lynch (left) and SA Bongiovanni (right)).




Special Agent Bongiovanni's hard work at DEA Buffalo continued throughout the

remainder of his career.  While the DEA was "unable" to recover Special Agent Bongiovanni

performance evaluations for his service in Buffalo – and Mr. Bongiovanni only has copies of some

of his earlier evaluations produced on paper – one document recovered from Special Agent

Bongiovanni's personal files written by then RAC Jon Flickinger proves that he continued to be rated as "Significantly Exceeds Expectations" in 2014 and 2015. *See id.* at 17. Special Agent Bongiovanni's work on the Militello overdose case in 2013 – that naysayers at this trial derided as "simple" and a "subterfuge" – received high praise from the New York Division and DEA HQ Administrators. Militello's 30-year sentence adjudged in 2015 was deemed "historic, marking the first [] drug dealer who ['s] product led to the death of another [to be] prosecuted." *See id.* at 19. A Staff Coordinator at DEA Headquarters personally emailed Special Agent Bongiovanni remarking "[t]his is the best [Significant Enforcement Activity Report] I have read this year. Tremendous Work!" *See id.* at 18. The DEA Chief of Operations emailed Special Agent Bongiovanni in 2016 regarding his work on the Ramos-Ramos narcotics case. *See id.* at 21-24.

Special Agent Bongiovanni may not have been the same hard-charging agent in the last third of his career that he was in the first two-thirds of his career, but that is not abnormal. As we age, the responsibilities of marriage, caring for parents, and life make balancing our careers difficult. Some prioritize their career over family. Others choose family. For Special Agent Bongiovanni, family always came first. The grind of the job and office politics also played a role. Like many law enforcement officers, Special Agent Bongiovanni was exposed to traumatic and dangerous events throughout his career. This caused Special Agent Bongiovanni to develop PTSD. PTSD made his job even more difficult. Special Agent Bongiovanni was not a manager or a "paper agent" who could hide behind a desk. He was a field agent and, as a result, took on the dangerous work. Family and life stressors may have kept him out of the running for work-related awards in the 2010s, but Special Agent Bongiovanni did not join the DEA to put trophies on a bookshelf; rather, he joined the DEA to serve. And his record of clearing cases – important ones to this community and nationally – and the informal recognition he received in emails is a testament to his honorable service as a law enforcement officer.

### v. Joseph Bongiovanni is a hero.

On November 16, 2012, Joseph Bongiovanni was driving in his car. As he passed through the intersection of Amherst Street and Delaware Avenue, he noticed smoke coming from the windows of a three-story apartment building. Joe did not pick up his phone and wait for the fire department. Realizing the gravity of the situation, Joe, as a first-responder, reacted and leapt into action immediately. Joe pulled his car onto the front lawn of the building. The scene was chaos. Residents were running out of the building in their pajamas. As Joe emerged from his car, a female resident of the building hit the ground. She dove out her second-story window to escape the inferno. Joe treated this victim and got her to safety. Flames, billowing smoke, and the thud of a human hitting the earth is enough to paralyze most people. But not Joseph Bongiovanni.



In street clothes and without the assistance of any fire-fighting equipment, Joe ran into the burning edifice with two off-duty firefighters, Robert Carnevale and Jeff Kane, who also happened to drive by the scene. Bongiovanni, Carnevale, and Kane worked feverishly to evacuate residents from the building. Climbing through choking, smoke-filled hallways, mostly on their bellies because of the toxic fumes that filled hallways and apartments, the trio evacuated dozens of residents trapped in the building. The only thing that stopped these heroes was smoke, so intense, that it prevented Bongiovanni, Carnevale, and Kane from seeing and breathing. Four residents, including the woman who fell from the second floor, were injured in the blaze. But for the heroic actions of Bongiovanni, Carnevale, and Kane, injuries and loss could have been much greater.

The residents of the apartment building were young and old, black, white, and brown, and of differing religions and backgrounds. Some witnesses in this trial accused Mr. Bongiovanni of being a racist and greedy. Joe's heroic actions on November 16, 2012 contradict that false narrative. As Robert Carnevale aptly summarized:

> our neighborhood caught fire. Without hesitation—and also off duty —Joe and I ran into that burning structure together to help evacuate residents who were trapped inside. There was no protective gear, no backup, no time to consider personal risk. Joe's first instinct was to run toward danger, not away from it, simply because he saw people in need.
>
> That moment, though just one in his decades-long career, speaks volumes about the kind of person Joe is. He didn't act because of a badge, a paycheck, or recognition. He acted because that's who he is —a protector, a public servant, and above all, a man of tremendous integrity and courage.

*See* Exhibit A.2 at 35-36.

For the heroism Joe displayed on November 16, 2012, Joe was one of two DEA




Special Agents in the United States who were awarded a Bravery Award from the Federal Law Enforcement Officers Association. *See* Exhibit C. at 3-5. Joe also received a 2012 Hero Award from the One Hundred Club of Buffalo & Western New York.



*See id.* at 6-7. The Erie County Clerk and Assemblyman (now-Mayor) Sean Ryan also bestowed a Special Commendation for Bravery Award on Joe in 2013. *See id.* at 8-9.

This Court does not have many bonafide heroes who stand before it during sentencing in a criminal case.  Joseph Bongiovanni is one of those heros, and the Court should not forget that.   The residents of 960 Amherst Street that Joe saved never will.

**vi.  Joe Bongiovanni is not a ███████████.**

The government attempted at trial to paint Joe as an ███████████.  This Court determined that these allegations were irrelevant.  The same should hold true now.  More specifically, the government argues now (as it did previously) that Mr. Bongiovanni ████████ ████████████████████████████, and then pressured ██ to drop the case.  This is (and always was) a false accusation levied by a person of lackluster integrity.

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

██████████████ Even Lou Selva counseled his friend about extricating himself from the relationship.  ███████████████████████████████████

█████████████████████████ chose to do the right thing and drop the case by not participating.  That is what happened.  ████████████████████████████

███████████████████████████████ That is where this tale fails.

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████.  *See* Exhibit D (filed under seal).



.  The Court should not put any stock in these spurious allegations.  The character letters submitted in this memorandum and the testimony of Lindsay Bongiovanni and JoAnn Delucia belie ████████'s lies ████████████ ████.

### vii. Joseph Bongiovanni did not solicit Cory Higgins to write a false police report.

The government continues to credit the claim of Mr. Higgins that Mr. Bongiovanni purportedly solicited him to write a false report about an accident to submit an insurance claim.  This accusation continues to suffer from the same deficiencies today that led this Court, at trial, to disallow the presentation of this evidence.  First, Mr. Higgins *never* reported this misconduct until *after* the investigation into Mr. Bongiovanni commenced.  We heard a lot about "duty" throughout

two trials.  If Mr. Higgins actually was asked to do this, then why did he not report it in 2009?

Afterall, it was his duty to make such a report and, according to the narrative set forth by

prosecutors in this trial, an agent's failure to take such action makes him an incredible, corrupt liar.

Whether the Court believes the government's duty argument or not, a failure to report or document

this allegation in 2009 makes Higgins' after-the-fact claim dubious.  Second, as cross-examination

revealed at trial, Higgins' claim followed Higgins' awareness that he opened and closed an

investigation in 2009 that could have located the Suppa outdoor grow operation.  If Mr. Higgins was

more diligent in his 2009 investigation, then he could have broken open the Serio case himself.

When this came to light in 2019-2020, Mr. Higgins – like other agents in the DEA Buffalo office

who had any connection to Mr. Bongiovanni or the Serio case – feared being sidelined, being

accused of misconduct, or both.  But offering the government a story about Mr. Bongiovanni

purportedly engaging in another fraud allayed those concerns.  That is the context in which this false

report story emerged.

       In other words, this claim smacks of self-preservation.  If the Court recalls,

Mr. Higgins went even further than that.  He also claimed that Mr. Bongiovanni "stole" the antenna

from his government vehicle.  Whether these tales were offered to placate investigators, to save

himself, or to smear a person he did not like because of a perceived affront about an antenna, the

Court should not be convinced that these allegations hold any truth.  These allegations are false and

always were.

       **viii.    Joseph Bongiovanni is not a racist.**

       The government accused Mr. Bongiovanni of racial animus at trial using a claim

made by Tony Casullo that, in 2016, Mr. Bongiovanni purportedly told Casullo, in a closed-door

meeting between the two men only, that the DEA should be investigating racial minorities rather

than Italians.  The jury rejected this allegation at trial, but the government desires to resurrect it

again at sentencing.  This allegation always has been flawed and the Court should not believe it now.

    If Casullo truly did overhear such slurs in 2016, then he should have reported it right

away.  That was his "duty," was it not?  At trial, Casullo claimed that his failure to report this slur

stemmed from a lack of backbone and fear of being ostracized.  Those excuses ring hollow.  This

allegation, like the ones made by Higgins, was made *after* this investigation commenced.  Here,

Casullo did not raise this allegation until *after* Ron Serio accused Mr. Bongiovanni of malfeasance.

Conveniently, dropping this allegation then opened a door for Casullo to protect himself.  As

Lindsay Bongiovanni recounts, Casullo had a secret:

> This case has damaged Joe and our family. It all started in 2018, when Joe's
> colleague Tony Casullo made a retaliatory accusation that Joe was a racist, completely
> catching Joe off guard. It bothered Joe, he worked side by side with people of all ethnic
> backgrounds and valued the relationships with all of them. Tony Casullo's behavior on
> arrest warrants concerned Joe time after time, these concerns were brought to the
> attention of Joe's group supervisor. Tony repeatedly did things that made Joe question not
> only his own safety but the safety of other agents. To give some examples, Joe was arresting
> a larger individual who was putting up a struggle when a fentanyl bag belonging to this
> arrestee broke open and became airborne. Tony was with Joe that day and sat in his
> government issued vehicle watching the whole struggle go down, any other agent in Joe's
> office would have come to his assistance to make sure a fellow colleague didn't get injured.
> Another time, Joe and other agents were executing a search warrant and Joe found Tony
> hiding in a closet while the others cleared the property watching out for each other's safety.
> Yet another instance, while Joe served as a spotter in a surveillance helicopter, Joe
> observed Tony failing to respond to an arrest signal arriving only after, everyone was already
> on the scene. Joe didn't report this to his supervisor right away like he should have but he
> did let Tony know his concerns, when this behavior did not change and only worsened
>
> 4
>
> that's when Joe reported it to his group supervisor. Joe had to work on the same floor as

*See* Exhibit A.1 at 4-5.[3]  Tony Casullo harbored bias and animus against Mr. Bongiovanni because

Mr. Bongiovanni, who was a fearless field agent all of his career, questioned Casullo's fortitude

openly to superiors.  This makes Casullo's after-the-fact allegation incredible.

---

[3] Prior to trial, the government served the Group Supervisor aware of this conflict with a Subject
Letter, foreclosing his participation at this trial.  That was convenient, for Casullo and the
government.

It also is worth noting that other agents – some of whom are no friends of Mr. Bongiovanni – have never corroborated Casullo's claim that Mr. Bongiovanni was a racist in other contexts. If Mr. Bongiovanni operated that way in the office, outside of the office, or socially, then others would have inevitably come out of the woodwork to make similar claims of bias. Nobody else did. That is telling.

Mr. Bongiovanni has fervently denied this allegation since it was levied because it is false. Racists do not run into burning buildings to save their Black and Brown neighbors. On November 16, 2012, Mr. Bongiovanni risked his life for people who were not Italian. The only thing Joe thought about when he entered that inferno was the humanity of the occupants trapped inside the building. Joe's actions that day are consistent with a person who is not a racist. The character letters submitted with this memorandum speak about a person who does not fit the profile of a racist, either. That is why this claim is false.

### ix. Joseph Bongiovanni did not disclose the identities of DEA confidential informants or DEA methods of investigation.

The government and the PSR state that Mr. Bongiovanni disclosed the identities of multiple DEA informants. The government also continues to argue that Mr. Bongiovanni disclosed methods of investigation. These allegations rest exclusively on the testimony of Lou Selva, Ron Serio, and Robert Kaiser. As this Court witnessed at trial, these allegations fail to pass muster.

In the cases of sources that Mr. Bongiovanni allegedly disclosed to Selva and, by extension, Serio, the Court observed *twice* at trial how, after years of government trial preparation meetings, these two witnesses could never agree on what names Mr. Bongiovanni purportedly passed along. Apart from two CIs – Kaiser and Thomas Sibick – Selva and Serio constantly contradicted each other, with one claiming that Mr. Bongiovanni shared other names. And even their claims about Kaiser and Sibick were dubious, at best.

Kaiser was a known drug heroin addict who had an open, highly-publicized burglary case that disappeared without a jail sentence. Selva and Serio knew this because Kaiser was a well-known entity in the neighborhood as well as in their social circles. The non-jail sentence did not happen by happenstance or magic. As every criminal knows, when felony charges do not result in jail for a street-criminal with a record like Kaiser, it is because of cooperation. This is why Kaiser was not trusted and it was easy for Selva and Serio to later claim that he was identified as a CI by Mr. Bongiovanni to save themselves. What's more, Selva was friends with the victim Runfola's family, so he knew about Kaiser's role in the case. And Serio testified at trial that Kaiser *told him that he was a CI* in 2015, making this claim even easier for Serio to make. As for Sibick, he also was a known entity. He had prior convictions and served time in jail. And he was not trusted by Serio because of the falling out they had over his use of one of Serio's warehouses. They were easy people for Selva and Serio to claim were disclosed *after* they found themselves under federal investigation.

Kaiser also claimed that Mr. Bongiovanni disclosed his identity as a CI relating to the Militello case. These claims are false. What this heroin addict, who overdosed and died between the two trials in this case, failed to remember is that Militello would have learned about his identity when discovery was disclosed in Militello's case. Further, it is overwhelmingly likely that Militello already knew that Kaiser was the informant in his case based on the fact that Kaiser was the *only* other person with Robert Runfola (the victim) when Militello dealt the deadly drugs to Kaiser and Runfola. Kaiser also discussed the death with Militello in a controlled call. Thus, it would not take any serious amount of thought for Militello (or other people) to deduce that Kaiser was the CI and to spread this fact in the community.

The claim that Mr. Bongiovanni disclosed methods of investigation was even more outlandish. This claim is based principally on Selva's testimony wherein he claimed that Mr. Bongiovanni told him to "stay of the phone," "watch out for vehicles with tinted windows,"

"watch your utilities," and the like. This testimony was comical at times because the alleged methods warned about were so obvious that even a child would know about them. And like the CI-disclosure claims, Serio could not corroborate them. This is why the evidence does not prove that Mr. Bongiovanni disclosed sources and methods as part of the convictions in this case.

**B. The conduct that led to the convictions in this case.**

The defense has offered its view on the verdicts in this case in several post-trial filings. While we will not belabor the arguments here, a few points are worth making.

*First*, it can be safely said that the verdicts delivered in these two trials are not the sweeping victories the government claims they are. In Trial #1, the jury could not reach a verdict on the bribery and corruption charges that form the core of criminality alleged in the indictment. The only thing the jury agreed on was that 1) Mr. Bongiovanni did not "wipe" his DEA cell phone (acquittal on Original Count 12) and 2) Mr. Bongiovanni improperly removed the Serio "working file" from the office upon his retirement and, subsequently, was untruthful with agents when questioned about his reason for doing so (convictions on Counts 13 and 15). So, the counts of conviction relate to removing a file without authorization and lying about it. In Trial #2, the jury acquitted Mr. Bongiovanni 1) of taking bribes[4] and conspiring to protect Peter Gerace and Pharaoh's Gentlemen's Club (Counts 2 and 5) and 2) of taking bribes from Ron Serio (Count 4). The jury convicted Mr. Bongiovanni of conspiring to defraud the DEA and engaging in a narcotics conspiracy (Counts 1 and 3), but it does not logically follow that the jury believed the full scope of the charged offense, as the marijuana finding in Count 3 logically limits, to some degree, what Mr. Bongiovanni could have foreseen, actually saw, or did. How much more and to what extent the jury concluded that Mr. Bongiovanni was involved or knew about persons beyond Selva is unclear.

---

[4] The Court dismissed the substantive bribery count involving bribe-taking from Peter Gerace (Original Count 6) in between trials. *See* ECF 1077.

But again, it can safely be said that the jury did not believe Mr. Bongiovanni was responsible for a wide-ranging protection scheme that encompassed each and every action the government sought to attribute to him. As for Counts 6 and 7, the jury appears to have convicted on these counts (both involving the closure of the Serio investigation) based on the fact that it had to find an overt act occurring after the statute of limitations. Because Selva was never clear what date Mr. Bongiovanni allegedly smelled marijuana in his apartment – prior to October 30, 2014 (outside the statute of limitations for an over act in Count 1) or after October 31, 2014 (inside the statute of limitation for an over act in Count 1) – the jury settled on these substantive offenses to resolve the issue.

*Second*, the convictions in Counts 8 and 11 relate to Joe not being truthful and attempting to minimize the nature and extent of his contacts with Peter Gerace. And the conviction in Count 10 involves Joe attempting to obstruct the investigation into Peter Gerace by stating that Tony Casullo also had contact with Gerace via Casullo's brother-in-law, Phil Domiano (who worked for Gerace at PGC). The defense has argued previously that the evidence is insufficient on Counts 8 and 11 and there can be no obstruction on Count 10 because Casullo had not been investigating Gerace since 2018 when he was removed from the investigation. The Court disagreed with those arguments. We respectfully disagree, but, at a minimum, believe the greater story of ongoing background tensions between Mr. Bongiovanni and Casullo (and within the Buffalo DEA office, in general, at the time) mitigates these convictions, or at least removes them from the realm of insidious behavior. Ultimately, the core of criminality involved in these offenses relates to Mr. Bongiovanni being untruthful in DEA internal memoranda about 1) his Gerace contacts to protect himself and 2) Casullo's Gerace contacts to throw shade on Casullo after Casullo accused him of wrong-doing (i.e. a tit-for-tat).

*Third*, we continue to take issue with the Court's determination that it was "reasonably foreseeable" for Mr. Bongiovanni to know about two kilograms of cocaine and

possession of firearms as within the scope of the conspiracy. That said, the Court's decision appears to recognize that, at worst, Mr. Bongiovanni's foreseeability arises from his generalized knowledge of drug trafficking behavior as a DEA special agent and second-hand reports of activity, rather than from his direct involvement in trafficking behavior. In other words, the Court's decision rightfully insulates Mr. Bongiovanni's behavior from the worst of Ron Serio's. The raw application of USSG § 2D1.1 does not account for this, but the Court can account for this nuance at sentencing.

In the end, the core of criminality alleged in the indictment involved massive bribe-taking and sweeping corruption in exchange for the protection of two high-level drug dealers and their syndicates. After the conclusion of two trials, the greater narrative alleged by the government was not proven. The juries did not believe that Mr. Bongiovanni took bribes. How much, and to what extent, the jury's verdict implies that Mr. Bongiovanni protected Serio and his partners is unclear. What is clear is that both juries faulted Mr. Bongiovanni at least for not reporting his friend to authorities and not taking efforts to investigate Serio more, minimizing to agents his true contacts with Peter Gerace, misrepresenting Casullo's connections with Peter Gerace, and removing the working file for the office and lying about it. These are crimes, but hardly the more significant ones that the government attempted (and twice failed) to prove at trial.

**C. The guideline calculations in this case – as they currently exist – improperly exaggerate Mr. Bongiovanni's sentencing exposure. They do not provide a proper barometer for what a fair sentence should look like in this case.**

The PSR sets the guideline range in this case at 97-121 months. Truth and honesty offenses *never* receive decade-long prison sentences. And fraud offenses rarely receive decade-long prison sentences, either. This is because such crimes usually are committed by older professionals who do not have a criminal history. Mr. Bongiovanni and the convictions in this case track those demographics.

What's more, the guideline range in this case primarily is driven by narcotics – more specifically, the cocaine amount that the Court determined was "reasonably foreseeable" by Mr. Bongiovanni not because he was told about cocaine by Selva or saw it with his own eyes, but because Kaiser made this allegation to Mr. Bongiovanni during a proffer (that was never corroborated). Using the narcotics guidelines to establish a base offense level is unjust because the core of this case always has been about fraud and corruption, as opposed to narcotics. This is why the government harped on Mr. Bongiovanni's "duty" and status as a DEA agent rather than just being a guy who helped others distribute drugs. The government fell short of proving serious public corruption when the jury acquitted Mr. Bongiovanni of taking bribes. Bribe-taking or the receipt of an alternative financial benefit is the essence of public corruption and drives high sentences, but the jury did not believe that happened. What the jury determined was the core of criminality in this case was fraud and marijuana. If fraud and marijuana are the core of what the jury believed happened here – and those convictions drive the guidelines more than the truth and honesty convictions – then the types of sentences associated with fraud and marijuana offenses are much more instructive about what range a prospective sentence should look like in this case.

According to data kept by the United States Sentencing Commission ("USSC"), most defendants convicted of fraud offenses have little or no criminal history and the average sentence length in custody over the last five years is approximately 22 months and almost always less than the guideline range. *See* Exhibit E at 1-2. For marijuana offenses, more than two-



Fraud guideline minimums and averages

thirds of defendants have little or no criminal history, the average sentence length in custody over the last five years has increased from 29 months in FY20 to 37 months in FY24[5], and 75% of sentences are less than 60 months:



USSC data regarding Marijuana sentence length and guideline minimums and averages

*See id.* at 3-4.  Once again, the actual sentence is almost always less than the guideline range.  *See id.*

Another data-point worth considering is the fact that Mr. Bongiovanni is a "zero-point offender" under the guidelines.  According to the USSC, 90.3% of "zero-point offenders" are sentenced to less than 5 years in prison with the average



"Zero-point" offender sentence lengths

---

[5] The increase in the average sentence for a marijuana offense over the last five years is curious. USSC data does not fully explain the reason behind this increase.  Data shows that 41% of defendants convicted of a marijuana offense have mandatory minimums of at least five years associated with the conviction.  Of those defendants, approximately one-quarter are not relieved of the mandatory minimum penalty.  This increase in aggregate time adjudged may be related to the fact that more defendants received greater penalties and/or minimum sentences than in years past. Whatever the explanation, the Court should consider how the government recently rescheduled Marijuana, downgrading the narcotic from Schedule I to Schedule III.  USSC data and the guidelines have not caught up with this change.  *See* Section E(v), *infra.*  The rescheduling of marijuana as a less dangerous narcotic should lead to a lower sentence, not a higher sentence, in this case and others.

term of imprisonment being 19 months.  *See id.* at 5-6.  All of this data suggests that a non-guideline

sentence closer to 20-30 months is the more appropriate starting point in this case rather than 97-

121 months.  A 20-30-month range also corresponds with the range advocated for by the defense in

previous submissions.  *See* ECF 1576 at 42-44 (calculating the guideline range as 21-27 months).

      While the jury settled on a theory of fraud that did not involve bribery and, in the

view of the defense, the convictions did not involve two kilograms of cocaine, either, the USSC data

regarding bribery and powder cocaine sentences may be of some value because it also demonstrates

how the suggested guideline numbers in the PSR are overstated.  For example, in bribery cases,



offenders with little or no criminal history
averaged a jail sentence of 20 months that, in the
majority of cases, was below the guidelines.  *See id.*
at 7-8.  In powder cocaine cases, the average
sentence imposed was 64 months and below the
guidelines – but the Court should keep in mind
that, unlike the other offenses discussed

Bribery guideline minimums and averages

previously, one-third of the defendants in powder

cocaine cases had a higher criminal history (which skews sentences higher) and in half of all cases,

courts sentence defendants to less than 60 months in prison:



Powder Cocaine guideline minimums and averages and sentence lengths

*See id.* at 9-10.  Thus, even when these more serious offenses are considered, the numbers are still half as much as the guideline range calculated in this case.

The USSC interactive data analyzer provides even more granularity.  *See* https://ida.ussc.gov/analytics/saw.dll?Dashboard (last accessed: 12/1/25).  In considering marijuana, fraud, bribery, and powder cocaine offenses, the interactive data analyzer is able to account for sentences involving offenders similar to Mr. Bongiovanni.  The tool also provides data not just regarding average imprisonment length, but also median imprisonment length.  This is important because the average (mean) is the sum of all data points divided by the count, representing the dataset's total value spread out evenly, while the median is the exact middle value when data is sorted, representing the 50th percentile.  Unlike the average which is great for symmetric data, but skewed by very high or low numbers (outliers), the median is unaffected by extreme outliers, making the median a better indicator of the "typical" sentence.

When the interactive data tool sorts for offenders who, like Mr. Bongiovanni, are U.S. Citizens, over 60 years old, with a college degree, and a Criminal History Category of I, the tool produces the following results for prison sentences for all offenders convicted of marijuana, fraud, bribery, and powder cocaine offenses for the last ten fiscal years:

## Marijuana Offenses

### Average and Median Imprisonment Length
Fiscal Year 2015,2016,2017,2018,2019,2020,2021,2022,2023,2024



The figure includes the 17 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) were included in the sentence average computations as 470 months. The information in this figure does not include probation or conditions of confinement as described in USSG §5C1.1.
FILTER:
Fiscal Year: 2015,2016,2017,2018,2019,2020,2021,2022,2023,2024; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: Over 60; Citizenship: U.S. Citizen; Education: College graduate or more; Crime Type: Drug Trafficking; Guideline: All; Drug Type: Marijuana; Sentencing Zone: All; Criminal History: I; Career Offender Status: Exclude Career Offenders

### Distribution of Imprisonment Length
Fiscal Year 2015,2016,2017,2018,2019,2020,2021,2022,2023,2024



The figure includes the 17 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure.
FILTER:
Fiscal Year: 2015,2016,2017,2018,2019,2020,2021,2022,2023,2024; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: Over 60; Citizenship: U.S. Citizen; Education: College graduate or more; Crime Type: Drug Trafficking; Guideline: All; Drug Type: Marijuana; Sentencing Zone: All; Criminal History: I; Career Offender Status: Exclude Career Offenders

## Fraud Offenses

### Average and Median Imprisonment Length
Fiscal Year 2015,2016,2017,2018,2019,2020,2021,2022,2023,2024



The figure includes the 1,448 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) were included in the sentence average computations as 470 months. The information in this figure does not include probation or conditions of confinement as described in USSG §5C1.1.
FILTER:
Fiscal Year: 2015,2016,2017,2018,2019,2020,2021,2022,2023,2024; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: Over 60; Citizenship: U.S. Citizen; Education: College graduate or more; Crime Type: Fraud/Theft/Embezzlement; Guideline: All; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: Exclude Career Offenders

### Distribution of Imprisonment Length
Fiscal Year 2015,2016,2017,2018,2019,2020,2021,2022,2023,2024



The figure includes the 1,448 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure.
FILTER:
Fiscal Year: 2015,2016,2017,2018,2019,2020,2021,2022,2023,2024; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: Over 60; Citizenship: U.S. Citizen; Education: College graduate or more; Crime Type: Fraud/Theft/Embezzlement; Guideline: All; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: Exclude Career Offenders

## Bribery Offenses

### Average and Median Imprisonment Length
Fiscal Year 2015,2016,2017,2018,2019,2020,2021,2022,2023,2024



The figure includes the 235 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) were included in the sentence average computations as 470 months. The information in this figure does not include probation or conditions of confinement as described in USSG §5C1.1.
FILTER:
Fiscal Year: 2015,2016,2017,2018,2019,2020,2021,2022,2023,2024; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: Over 60; Citizenship: U.S. Citizen; Education: College graduate or more; Crime Type: Bribery/Corruption; Guideline: All; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: Exclude Career Offenders

### Distribution of Imprisonment Length
Fiscal Year 2015,2016,2017,2018,2019,2020,2021,2022,2023,2024



The figure includes the 235 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure.
FILTER:
Fiscal Year: 2015,2016,2017,2018,2019,2020,2021,2022,2023,2024; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: Over 60; Citizenship: U.S. Citizen; Education: College graduate or more; Crime Type: Bribery/Corruption; Guideline: All; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: Exclude Career Offenders

**Powder Cocaine Offenses**



*See* Exhibit E at 11-14.  As the data shows, **the "typical" prison sentence in all of these cases involving offenders who are similar to Mr. Bongiovanni <u>is approximately 23 months</u>.**  That is why the term of incarceration set forth in the guidelines does not reflect a fair benchmark of punishment in this case.  This data also proves how the government's request of 15 years is unmoored to reality.

### D.  Why a variance from the 97-121-month guideline range suggested in this case is warranted.

A district court is responsible for determining the applicable guidelines sentencing range pursuant to the United States Sentencing Guidelines.  *See Gall v. United States*, 552 U.S. 38, 39 (2007).  In *United States v. Booker*, the Supreme Court determined that the Guidelines are advisory. *See Booker,* 543 U.S. 220, 245-46 (2005).  And although no longer mandatory, the Guidelines continue to function as "the starting point and the initial benchmark" for sentencing, *Gall*, 552 U.S. at 46, 49, and should be given "respectful consideration," *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  Thus, "if the Guidelines represent the *initial* step in sentencing, they are no longer the stopping point." *United States v. Genao*, 869 F.3d 136, 147 (2d Cir. 2017) (emphasis in original).

After consulting the Guidelines, a sentencing court performs an "individualized assessment" of the defendant and the facts of the case.  *See Gall*, 552 U.S. at 50.  This analysis is

guided by "[r]easonableness" and an "individualized application of the statutory sentencing factors" listed in 18 USC § 3553(a).  *See United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (*citing Gall*, 552 U.S. at 46-47); *Kimbrough*, 552 U.S. at 113 (Scalia, J., concurring) ("[T]he district court is free to make its own reasonable application of the § 3553(a) factors, ***and to reject (after due consideration) the advice of the Guidelines***.) (emphasis added).

Pursuant to the "parsimony clause" in section 3553(a), a court is to "impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth" in § 3553.  *See* 18 U.S.C. § 3553(a); *see also Dorvee*, 616 F.3d at 182.  Section 3553(a) includes a list of "factors" a court is to consider when determining the appropriate sentence:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law; and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [by the Guidelines;]

(5) any pertinent policy statements [issued by the Sentencing Commission;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

*See* 18 U.S.C. § 3553(a).

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). A court's sentencing decision should be informed and guided by mercy and compassion. *See United States v. Blarek*, 7 F.Supp.2d 192, 210 (E.D.N.Y. 1998). While these principles are not specifically delineated as sentencing rationales, they are evidenced by the federal sentencing statute's mandate that a court impose the lowest possible penalty to accomplish the goals of sentencing. *Id.*; 18 U.S.C. § 3553(a). "The notion that undue harshness should be avoided by those sitting in judgment has long been a part of the human fabric and spirit. Lenity is often the desirable route." *Id.*

Finally, a sentencing court need not follow the sentencing range suggested by the Guidelines if it disagrees with a relevant policy reflected in the Guidelines. *See Spears v. United States*, 555 U.S. 261, 264 (2009) (stating that "the point of *Kimbrough*" was to "recogni[ze] [the] district courts' authority to vary from the crack cocaine Guidelines based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case"). This authority is at its greatest when the offense Guideline at issue is not the product of the Sentencing Commission's empirical analysis and technical expertise. Here, Joseph Bongiovanni faces a suggested guideline sentence of 97-121 months. The specific facts of this case warrant a variance from that guideline range for several reasons.

> i.    **Mr. Bongiovani's history and characteristics differ markedly from most criminal defendants that this Court sentences.**

Mr. Bongiovanni is a college graduate and decorated law enforcement officer. He is a bona fide hero who risked his life and ran into a burning building to rescue dozens of people. He comes from a stable, loving family who supports him indelibly. He owns a home. He has no

criminal history.  He is not a substance abuser.  He is 61 years old and retired.  Most courts, rarely, if ever, sentence a defendant with such a resume.  And when courts do sentence a defendant with Mr. Bongiovanni's resume, judges do not impose decade-long sentences.  This is an important benchmark the Count should use as a starting point instead of the obtuse guideline range in the PSR that is greater than necessary to realize the goals of sentencing.

> ii. **The offenses of conviction and the theories of conviction decided by the jury are not offenses and conduct that warrant (or necessitate) a long custodial sentence.  Doing so is unjust and disparate.**

The law requires this court to fashion a sentence that reflects the serious of the offense and provides for punishment that is "just."  A ten- or fifteen-year prison sentence does not do that.  As argued above, the offenses of conviction are not as serious as the criminality alleged in the indictment.  *See* Section B, *supra*.  The jury did not believe that Mr. Bongiovanni took bribes from anyone or that he engaged in a sweeping protection scheme involving Peter Gerace, PGC, the mafia, and others.  Counts 1 and 3 involve an act of omission – failing to report a crime or investigate a crime.  As to what the jury did or did not agree upon regarding an act of commission involving Counts 1 and 3 (bribe-taking, active support, etc.), the verdict provides little clarity which, at bottom, makes it difficult to make such a finding against Mr. Bongiovanni that may justify a significant custodial sentence.  The remaining counts involve truth and honesty offenses and similar misconduct which do not receive long jail terms.  *See* Section C, *supra*.  Consequently, the sentencing landscape in this case is not one that suggests a significant jail term.  This is where the guidelines and the government's request occasion an injustice.

The government's sentencing request is premised on acquitted conduct – which the guidelines prohibit this Court from considering – and punishment and retribution for the sweeping conduct it alleged, but failed to prove at two trials.  As a result, the government's request is defective because it seeks societal retribution for conduct that *was not proven* at trial and *rejected* by two juries.

The inability (or unwillingness) of the government to acknowledge this fact has placed the government in a position where it is requesting a sentence that is not commensurate with the convictions.  Stated another way, prosecutors' blind hatred for Mr. Bongiovanni drives the request. If this Court adjudges a punishment of that magnitude, it will take the government's invitation to over-step in this case and adjudge a punishment that is unjust and disproportionate.  Doing so is not just unfair – such action violates 18 U.S.C. § 3553(a)(2) & (6) by adjudging a sentence that is disparate and greater than necessary.

> ### iii. Mr. Bongiovanni's is 61 years old and retired from the DEA.  He cannot commit these types of offenses again, and even if he could, his risk of recidivism is lower than all defendants sentenced in the federal courts. Therefore, the necessity to protect society is remote.

Prison is a tool used by courts not just for punishment and retribution, but to protect society as well.  *See* 18 U.S.C. § 3553(a)(2)(C).  When a court adjudges a custodial sentence to incapacitate an offender for a long-period, it does so to lessen the risk to society of danger and harm because an offender in jail cannot reoffend.  But a sentence based on incapacity is justified only when there is a corresponding risk of re-offending.  If the risk of reoffending is small, then the justification for incapacity disappears.  In this case, the criminality stems from Mr. Bongiovanni being employed as a DEA agent.  In 2019, Mr. Bongiovanni retired from the DEA.  The DEA is not going to hire him back.  After this prosecution, neither is another law enforcement agency. Thus, his opportunity to commit crimes analogous to the ones in this case and the corresponding risk that he can/will do so again *is zero*.  This fact does not support a need for protection through incapacity.

Furthermore, whether Mr. Bongiovanni obtains employment elsewhere or just remains retired, the likelihood and risk that he will commit another offense, analogous or otherwise, is infinitesimally small.  Not only does Mr. Bongiovanni lack a criminal history or other indicators of recidivism, but as an offender gets older, he ages out of crime and is "substantially" less likely to

recidivate.  *See* U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (last accessed: 11/20/25). This assumption applies to rearrest, reconviction, and reincarceration.  *See id.* at 22-23.  At 61 years old, Mr. Bongiovanni statistically is **un**likely to recidivate.  Simply put, he does not pose a risk to society.  This is another reason why the long custodial sentence suggested by the guidelines or advocated for by the government does not enjoy empirical support.  The empirical evidence suggests that such a sentence is *greater than necessary* to meet the goals of sentencing.  This provides a basis for the Court to have a policy disagreement with the suggested guideline sentence, vary from the guidelines, and adjudge a substantially different sentence.



*Fig. 14* Reconviction Rates for Recidivism Study Offenders by Age at Release

### E. Several other considerations suggest that a non-guidelines sentence as well as a sentence that includes nominal jail time – or an alternative to jail altogether – is sufficient in this case.

This case is a unique one, both inside this district and outside of it.  When it is difficult to find analogous cases or circumstances that normally are found in the average case, the landscape is ripe for a disagreement with the guidelines.  This case has several unique features that the Court should consider when determining Mr. Bongiovanni's sentence.  Ignoring them risks an unjust result.

i. **Unrelenting publicity has cast Mr. Bongiovanni into the status of a pariah or victim.  Everyone has formed an opinion about him.  He is incapable of hiding from such notoriety or resuming his old life.**

This case remains one of the most reported upon criminal cases in the history of Buffalo.  The community is as split about this case and the verdict as prosecutors and defense counsel are about the propriety of the prosecution and results.  Whether community members believe that Mr. Bongiovanni is innocent or guilty is beside the point – everyone knows who Mr. Bongiovanni is and everyone has formed an opinion about him.  Unlike most criminal defendants, Mr. Bongiovanni is unable to integrate back into this community without someone recognizing him.  This means he is incapable of resuming his past life.  This is a penalty and curse that will follow him forever and long-after he completes his sentence, whatever the sentence may be.  This makes Mr. Bongiovanni different than most defendants sentenced by this Court.

ii. **Because of the slow progress of this case, Mr. Bongiovanni has been supervised for over six years and incarcerated in his home for 16 months.  These restrictions on his liberty are a punishment that has already been served prior to sentencing.**

This case originally was indicted on Halloween 2019.  Mr. Bongiovanni surrendered on these charges in November 2019.  Immediately thereafter, Mr. Bongiovanni had restrictions placed on his life by the Court.  He could not travel outside of this district.  He constantly was monitored by a probation officer.  He had to submit to electronic monitoring that tracked his movements and whereabouts and a curfew that confined him to his house at night.  He was followed and surveilled by law enforcement.  This went on for more than half a decade and continues to present day.

Mr. Bongiovanni envisioned an opportunity to get to trial within months or even a year.  That hope quickly was dashed when COVID-19 shut down society and ground the court-system to a halt.  After pandemic shutdowns waned and Mr. Bongiovanni's legal representation was sorted out, the government stopped the progress of his case by interposing two superseding

indictments and adding co-defendant Peter Gerace, which slowed progress even more. When

Mr. Bongiovanni's former retained counsel fell ill in 2023, progress towards trial was delayed again.

And when the government chose to investigate one of Gerace's counsel, another delay was had.

During this period of more than four years, Mr. Bongiovanni toiled under his court-

imposed restrictions. These restrictions did not just weigh on Mr. Bongiovanni mentally, but



physically as well. Electronic monitoring devices dug into his skin causing bleeding and rashes (left). The government opposed changing these restrictions notwithstanding how side-effects of cancer treatments and age made wearing these devices painful.

After the verdict in Trial #2 was announced, the Court imposed home confinement. Mr. Bongiovanni has sat as a prisoner in his home ever since the

second verdict was announced *16 months ago*. Home incarceration is not easy. You cannot leave

your house except for court appearances and medical treatment. At all other times, you must stay

inside. You cannot take a walk in your backyard. You cannot go to church. You cannot shop for

groceries. You cannot go to work. Lindsay Bongiovanni has witnessed the hardships and

summarized them as follows:

40

Since 2024, my husband has spent every day under house arrest. Before that, he spent years on an ankle monitor restricting him to Erie and Niagara counties with a strict curfew. I am sure that some people think this is not a hardship, but I am sure that none of these people have ever sat down and thought about how restrictive house arrest truly is. Joe cannot leave our home unless he gets permission from probation ahead of time. Permission is only granted for medical appointments and to go to the post office once a month to pay for his ankle monitor. This means that Joe cannot walk out of the door and even go outside for a few minutes. We have a golden retriever (Buddy) who is older and no longer mobile like he once was. We live in a split-level home, so our dog cannot walk outside by himself anymore and go to the bathroom. Under house arrest, Joe cannot even bring our dog into our backyard to use the bathroom. He must open the door to the patio and hope our dog can crawl back to the doorway. My husband cannot go out in the sun in the summertime. He cannot mow our lawn. He cannot get the mail from our mailbox. He cannot shovel snow from our driveway and sidewalk. He cannot walk or run outside to exercise. He cannot go to church. He cannot drive to his elderly mother's house and care for her. He cannot jump in the car and respond to a family emergency, He cannot go to his rental property to maintain the property and respond to tenants' needs. He cannot go to the bank. He cannot accompany me to doctors appointments. He cannot go to the grocery store and shop for food. To put things into perspective, over the last year and half my

7

husband has left the house 20 times to go to court and to doctors' appointments. Every other minute he has spent inside our house.

This is not easy. We do not live in a mansion. We do not have a fancy home gym like the government tried to portray during the trial. All the pictures displayed at trial that were taken during the raid of our home to not tell a full story. The treadmill and rowing machine are broken. Replacing them is not a cost we can absorb right now. My son Matthew is a young adult with a full-time job. I work 12.5-hour nursing shifts several days a week. Our family members also work. Joe's few friends cannot visit or call Joe all the time. As a result, Joe spends most of his time alone in silence. To kill time, my husband constructs and paints model cars and boats in the basement, because he has nothing else to do.

*See* Exhibit A.1 at 7-8.

Mr. Bongiovanni was shunned well-before this prosecution commenced and ostracized ever since the indictment went public. These restrictions were an additional penalty that Mr. Bongiovanni has served, every day, for the last six years. People confined in federal prison get the opportunity to go outside and see the sun. Prisoners get access to exercise areas, education, and

work opportunities.  The opportunities exist because courts and society have determined that not providing a prisoner such basic opportunities is unhuman, cruel, and unusual punishment. Apparently, those rules do not apply to home confinement.

Most people never experience what it is like to serve time in prison.  But most people in our community did experience, to some degree, what it is like to serve time in home confinement during the COVID-19 pandemic.  The boredom and claustrophobia that all of us developed as shut-ins in our own homes drove most people over the edge.  Millions of Americans developed mental-illness and depression as a result of COVID-19-shutdowns.  Spending every hour with your family is not always a smooth ride.  But unlike Mr. Bongiovanni, we got to leave the house for a walk, for a cigarette in our backyard, or just for a moment of alone-time.  And all of our "sentences" ended in about a month after travel restrictions got lifted.  That is why home confinement is a significant punishment that cannot be dismissed or understated.  When this 16-month punishment is combined with six years of monitoring and restrictions on liberty, it is clear that Mr. Bongiovanni has been serving time in this case years before he was convicted in 2024 and ever since.  This separates Mr. Bongiovanni from the average defendant.  The Court must factor into the analysis this punishment when fashioning a fair sentence.

### iii. Mr. Bongiovanni is a former DEA agent and a high-profile defendant. Sending him to federal prison will place him in great danger.  The BOP cannot protect him and protective custody will make prison even harsher.

There is only one type of prisoner that is hated more than cooperators or sex offenders: Cops.  Prisons often house sex offenders and cooperators together, reasoning that since both of types of offenders are disliked and targeted by members of the general population, they will face less danger if housed together.  The same does not hold true for prisoners with law enforcement backgrounds.  All prisoners universally hate cops.  So, a cop in prison has no one to congregate with; instead, cops face the wrath of all.

In this case, Mr. Bongiovanni will not just have to deal with this if sentenced to federal prison. On top of this threat, he will have to deal with being incarcerated in the same system where the same people he and the DEA worked to put away are the majority of the population. According to available data, 42% of prisoners serving time in federal prison were convicted of narcotics offenses.[6] The next largest percentage of prisoners serving time in federal prison were convicted of firearm and other weapon offenses. *See* Note 6, *supra*. In total, this population constitutes 64% of the federal prison population. These are the people the DEA helps put away. These are the people Mr. Bongiovanni put away. And there is nowhere Mr. Bongiovanni can hide from them.

Moreover, Mr. Bongiovanni is a high-profile defendant. His case was widely publicized in Western New York and also made the national news. High-profile prisoners also are at greater risk of harm in federal prison. This is one of the reasons why the BOP recently broke protocol a moved Ghislaine Maxwell to a minimum-security prison at which she was not eligible to be housed. According to Deputy Attorney General Todd Blanche, Maxwell was moved because "[s]he was suffering numerous and numerous threats against her life."[7] Stated another way, the #2 law enforcement officer in the Nation openly admitted that the BOP cannot keep high-profile prisoners safe in most federal prisons. As a high-profile defendant, Mr. Bongiovanni faces the same risk to his safety that the BOP, in most locations, cannot adequately protect.

If it is too dangerous for Mr. Bongiovanni to get assigned to general population or a specialized pod with cooperators and sex offenders, then his only option is to request protective

---

[6] *See* "Inmate Statistics – Offenses," U.S. Bureau of Prisons, available at: https://www.bop.gov/about/statistics/statistics_inmate_offenses.jsp (last accessed 1/4/26).
[7] *See* Madhani & Licon, "Deputy AG Todd Blanche says Ghislaine Maxwell was transferred to a minimum-security prison because of 'numerous threats against her life,'" FORTUNE, Dec. 21, 2025, available at: https://fortune.com/2025/12/21/ghislaine-maxwell-transfer-minimum-security-prison-threats-epstein-files/ (last accessed 1/2/26).

custody.  Administrative segregation in federal prisons is the equivalent of solitary confinement.

Prisoners housed in administrative segregation are locked in their cells 23 hours a day.  They leave

their cell for one hour a day for the purpose of exercise, but the options are small.  Administratively

segregated prisoners cannot go out to the yard; instead, they are given access to a small space,

usually walled, and sometimes without access to fresh air and sun.  This area is used to "get loose,"

prior to being locked in a cell for another 23 hours.  Administratively segregated prisoners do not

have access to other prisoners, so their ability to socialize with other human beings is limited.

Often, the only interactions administratively segregated prisoners have with other humans is with

correctional and medical staff.  Administratively segregated prisoners also do not have the ability to

attend prison programs or work programs.  But all of this segregation and isolation does not

guarantee safety.

Administrative segregation also comes with costs.  Studies consistently show that

imprisonment in solitary confinement is associated with damaging psychological and physiological

consequences.[8]  Sensory deprivation, lack of human interaction, and physical restrictions can cause

anxiety, insomnia, hallucinations, paranoia, decreased brain function, withdrawal, and sensitivity to

external stimuli.  *See* Note 8, *supra*.  The situation is worse for Mr. Bongiovanni because he already

suffers from PTSD. In other words, Mr. Bongiovanni's time in prison will be more difficult and

isolating than home confinement ever was and worse and more dangerous than the average federal

prisoner.

---

[8] *See, e.g.,* Chadick, Carly D., Ashley B. Batastini, Samuel J. Levulis, and Robert D. Morgan, "The Psychological Impact of Solitary: A Longitudinal Comparison of General Population and Long-Term Administratively Segregated Male Inmates." LEGAL AND CRIMINOLOGICAL PSYCHOLOGY 23 (2): 101–16 (2018), available at: https://doi.org/10.1111/lcrp.12125; Grassian, Stuart, "Psychopathological Effects of Solitary Confinement." AMERICAN J. OF PSYCHIATRY 140 (11): 1450–54 (2018); Craig Haney, "The Psychological Effects of Solitary Confinement: A Systematic Critique." CRIME AND JUSTICE 47 (1): 365–416 (2018), available at: https://doi.org/10.1086/696041.

The Court cannot correct for an instance of danger after the fact, when it is too late and Mr. Bongiovanni is injured in prison—and the §3553(a) factors do not contemplate injury as a component of incarceration.  In the Eastern District, a court granted a compassionate release application by an inmate who had been assaulted, suffered a fractured eye socket, and did not receive adequate medical follow-up care.  As that court stated: "In the end, the most important part of the instant Section 3553(a) analysis is that the most 'effective manner' of correctional treatment in this case did not include a fractured eye socket."  *United States v. Griffin*, No. 22-CR-408 (EK), 2024 WL 2891686, at *3 (E.D.N.Y. June 10, 2024).  Specifically, the defendant in *Griffin* had warned BOP staff that he did not feel safe and requested to be moved, only for that request to be denied and to be assaulted the next day.  *See id.*  To reserve until a 61-year-old man – a good man who otherwise lived a life of service – is injured is too late, unjust, and would amount to cruel and unusual punishment.

### iv. The conditions in prison are spartan and medical care is inadequate.  For prisoners who, like Mr. Bongiovanni, are older and have pre-existing medical issues, prison is a harsh punishment and, sometimes, a death sentence.

In 2004, the United States Department of Justice released the results of a study on the impact of incarceration on elderly, chronically ill, and terminally ill inmates in federal and state prisons.[9]  In 2016, the Department of Justice's Office of the Inspector General published a revised report on the impact of an aging inmate population in federal prisons.[10]  Both reports state that in federal prison, an inmate over fifty years old is considered an "elderly inmate."  *See* 2016 DOJ report at 1 (citing the 2004 DOJ Report).  Although in the free world, fifty years old is considered relatively

---

[9] U.S. Dept. of Justice, National Inst. of Corrections, "Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and terminally Ill Inmates (2004 ed.)," available at http://www.nicic.org/downloads/pdf/2004/018735.pdf ("2004 DOJ Report).
[10] U.S. Dept. of Justice, "Office of Inspector General: The Impact of an Aging Inmate Population on the Federal Bureau of Prisons (Rev. 2016)" ("2016 DOJ Report").

young to be classified as "elderly," *see* 2004 DOJ Report at 8, according to the Department of

Justice, "[s]everal studies, including on published by the *American Journal of Public Health,* state that an

inmate's physiological age averages 10-15 years older than his or her chronological age due to the

combination of stresses associated with incarceration and the conditions that he or she may have

been exposed to prior to incarceration."[11]  This includes "stress experienced by new inmates trying

to survive the prison experience unharmed" and stress associated with trying to "avoid

confrontations" with staff and other inmates.  *See* 2004 DOJ Report at 8-9.

　　　　　The physical infrastructure of federal prisons also makes serving time in federal

prison difficult for older inmates.  The 2016 DOJ Report found that federal prisons do not provide

"elderly" inmates with a "safe, humane, cost-efficient, and appropriately secure" living environment.

*See* 2016 DOJ Report at 23-30.  Chief among these problems is unavailability of lower bunks, which

older inmates with physical limitations need to avoid injury, or simply to be able to get in and out of

bed.  *Id.* at 24.  Older inmates, including older inmates with physical conditions that cause them pain

and limit their mobility are forced to climb up to an upper bunk to sleep or just to relax, which can

be a difficult and dangerous maneuver.[12]  And the "external infrastructure of some institutions, such

as uneven terrain or narrow sidewalks, makes it difficult and sometimes unsafe for aging inmates,

particularly those with mobility issues, to move within the premises."[13]

---

[11] 2016 DOJ Report, pp. 1-2 ("During our review, BOP officials and staff agreed that the combination of these factors expedites the aging process.  A Clinical Director told us that most aging inmates have preexisting conditions and are sicker than the general population, they appear to be older than their actual age") (citing B. Williams, et al., "Aging in Correctional Custody: Setting a Policy Agenda for Older Prisoner Health Care," *American Journal of Public Health* 102, no. 8 (August 2012): 1475-81, p. 3.).

[12] *Id.* ("For example, a Warden told us that aging inmates are sometimes assigned to an upper bunk out of necessity, which could be a problem for aging inmates because climbing into an upper bunk is not always easy. During our visits to BOP institutions, we observed upper bunks that did not have ladders or steps, which required inmates to climb on desks, chairs, or makeshift pedestals to access the upper bunks.").

[13] *Id.* at 29 ("A Clinical Director said some housing units are far from the cafeteria, on uneven terrain, and become dangerous in snow or inclement weather.").

Based on these conditions, at least one study has concluded that there is a two-year decline in life expectancy for every year served in prison.[14]  In another study commissioned by the National Institutes of Health, researchers noted how incarcerated individuals have a notable decrease in life expectancy when compared to the general population and concluded that "we estimate that incarceration's adult mortality excess translates into a loss of between *4 and 5 years* of life expectancy at age 40."[15]

One of the reasons life-expectancy declines for federal prisoners is because federal prisons struggle to deliver basic health care to inmates.  These struggles are summarized in an Amicus Brief filed last year in the Court of Appeals for the Third Circuit by several retired BOP officials.  *See* Exhibit F [*hereinafter*, the "Rutherford Amicus Brief"].  As the Rutherford Amicus Brief documents:

- Reports and testimony from the GAO, the DOJ OIG, and the BOP's own consultants in 2008, 2015, 2016, 2017, 2024, and 2025 document systemic problems with the cost and delivery of medical care to the inmate population in federal prisons.  *See* Rutherford Amicus Brief at 6-7.

- BOP struggles to hire and retain healthcare professionals.  Only approximately 80% of authorized positions are filled across BOP, but this concerning statistic understates the problem in at least four ways: 1) it conceals facility-by-facility variation because some

---

[14] *See* Patterson EJ, "The dose-response of time served in prison on mortality: New York State, 1989-2003," AM. J. PUBLIC HEALTH, 2013 Mar; 103(3):523-8, available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC3673515/; *see also United States v. Jenkins,* 854 F.3d 181, 186 n.2 (2d Cir. 2017) (citing the Patterson study and remarking that "we do know that, as a statistical matter, the life expectancy of an incarcerated person drops significantly for each year of incarceration.").

[15] *See* Daza, Palloni, & Jones, "The Consequences of Incarceration for Mortality in the United States," DEMOGRAPHY, 2020 Apr; 57(2):577-598. available at https://pmc.ncbi.nlm.nih.gov/articles/PMC7710643/#ref-list1.

facilities have fewer than 50% of authorized positions filled; 2) it ignores the fact that many "filled" positions are functionally vacant due to leaves, resulting in health care employees having to serve too many patients (in one example, one doctor had 941 inmate patients) or being pulled to serve correctional duty because correctional staff shortages); 3) the number of "authorized" healthcare positions is itself inadequate – less than 60% of the number of positions recommended by internal and external analyses – a of the "recommended" positions, slightly fewer than half are filled; and 4) it fails to account for the shortage of outside contractors willing to provide diagnostic testing and other routine healthcare services to prisoners. *See id.* at 7-9.

- Overstretched healthcare staff are forced to prioritize medical crises that consume more time and resources and leave less acute problems to fester until those problems turn into new medical crises. *Id.* at 9.

Mr. Bongiovanni is 61 years old. This is significantly older than a typical inmate serving a sentence of incarceration in the Federal Bureau of Prisons. *See* Federal Bureau of Prisons Statistics – Age, available at https://www.bop.gov/about/statistics/statistics_inmate_age.jsp (last accessed 12/20/25. Currently, only 3.5% of federal inmates are between 61-65 years old and only 3% of the population is over 65 years old. *See id.* The authorities above make clear how serving a sentence as an older inmate is more difficult. There also does not appear to be any legitimate dispute that federal prisons are unable to provide older prisoners with appropriate, quality, and necessary health care. This creates issues for Mr. Bongiovanni. As documented in the PSR, Mr. Bongiovanni has certain medical conditions that require regular care on monitoring:

- *Melanoma.* Mr. Bongiovanni was diagnosed with Stage 1 melanoma in 2021. The cancer could have spread to his lymph nodes necessitating surgery in 2022. Since 2022,

Mr. Bongiovanni has been in remission, but requires bi-annual scans at Roswell Park to ensure that he remains cancer-free.

-  Colorectal screenings/colonoscopies are an important part of his regimen.

- The condition currently is treated with medication, but future complications can require surgical intervention.

- Regular cancer screening is recommended to monitor the condition.

- Left untreated, this condition can worsen and cause an aneurysm.

- ███████████████████████████████████████████████████

    Currently, the condition is being monitored to determine whether surgery or non-invasive ultrasound procedures are required to treat the condition.  ███████████
    ████████████████████████████

- *PTSD, Depression, & Anxiety.*  Mr. Bongiovanni has been treated for these mental health conditions ████████████████████████████.  These conditions relate to ██████████████████████████, on-the-job trauma associated with his service as a law enforcement officer, and the effects of his current legal situation and this case.  Mr. Bongiovanni manages these conditions through counseling and prescription medication.

    These conditions complicate the incarceration of Mr. Bongiovanni because the conditions require regular care and monitoring that the BOP is unable to provide.  For example, Mr. Bongiovanni requires bi-annual cancer screening for melanoma and other conditions that put him at an increased risk for developing cancer.  As the Rutherford Amicus Brief documents, while BOP policy requires colorectal screening of inmates between the ages of 45 and 75 on an annual basis, an OIG investigation revealed that regularly does not happen and screening is delayed when ordered (if ever):

prisoners between the age of 45 and 75.[23]  However, less than two-thirds of inmates at average risk are even offered an initial screening,[24] and most of BOP's facilities screen half or fewer of their average-risk inmates.[25]  Like healthcare services staffing rates, the screening rate varies dramatically by facility, from 94% at one high-performing facility to 0% at another.[26]  BOP healthcare providers told OIG that after positive screens, they aim to provide colonoscopies within one to four months, or faster in urgent cases; the actual median wait time is seven months.[27]  Unsurprisingly, a significant cause of low screening rates is staff vacancies.[28]  Per the report, vacancies directly and indirectly affect screening rates: directly, because facilities experience "significant variations in their screening rates depending on whether the Health Services position typically responsible for CRC screening [i]s filled"; and indirectly, because "staffing shortages often mean that employees have to prioritize addressing urgent medical needs and daily responsibilities, such as medication delivery and sick call, over preventive care."[29]

*See* Rutherford Amicus Brief at 10 (internal citations omitted).  Such a haphazard and deplorable record reveals that it is unlikely that Mr. Bongiovanni will receive such scans as he does now outside of prison.  This places Mr. Bongiovanni at risk of developing cancer in prison and the BOP discovering it too late.  That is a death sentence.  This is precisely why one author of the 2016 DOJ Study opined that when aging prisoners are no threat to public safety, they should be released under supervision, to ensure that care is provided at a lower cost in the community and BOP's finite resources can be devoted to younger inmates with less (and less expensive) medical needs.[16]

Mr. Bongiovanni is not a threat to public safety.  The Court should heed this advice.

---

[16] 2016 DOJ Report at 10-16; *see also* Thomas Williams, "Number of Older Inmates Grows, Stressing Prisons," NEW YORK TIMES (Jan. 26, 2012).

Mr. Bongiovanni also suffers from PTSD, depression, and anxiety. Incarceration, particularly long-term incarceration, is destructive when, as here, the defendant has mental health concerns. Countless studies prove that Federal prisons are ill-equipped to provide treatment for mental health to incarcerated inmates. Even more concerning, the BOP is *reducing* the care it delivers to inmates suffering from mental health conditions. *See, e.g.,* C. Thompson & T. Eldridge, *Treatment Denied: The Mental Health Crisis in Federal Prisons* (2018), THE MARSHALL PROJECT,



Low treatment rates in federal prisons

The largest prison systems in the country have far higher rates of treatment for serious mental illness than the federal prison system, which only classifies 3 percent of its population as needing regular treatment.

California — 30%
New York — 21%
Texas — 20%
Federal — 3%

Source: Federal Bureau of Prisons and corrections agencies in Texas, California and New York

available at: https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons?ref=hp-1-100 (last accessed: 11/30/2020). Mr. Bongiovanni suffers from PTSD that is directly connected to his law enforcement service. Over 20+ years, Mr. Bongiovanni witnessed murders and overdose deaths. He saw a woman dive from a burning building. He was the primary agent who went through hundreds of doors during searches, not knowing what was on the other side. This uncertainty led him to call his mother routinely to say "Love you, Ma." He did this to remind her that he loved her because he came to work not knowing if it would be the last day he could say that. A long-term sentence – in a location where he is unlikely to receive care for his PTSD, depression, and anxiety and face constant threats that will make those conditions worse – does more harm than good. This is another reason this case is ripe for a policy disagreement with the guidelines as well as the government's requested sentence.

The conclusion here is not complicated: The combination of Mr. Bongiovani's age and physical health mean that a sentence of imprisonment will be a more severe form of punishment for him—by many orders of magnitude—than it would be for a younger, healthier defendant. A variance will properly account for this fact.

### v. The recent downgrade of Marijuana to Schedule III from Schedule I makes the guideline calculations in this case even more unreliable.

Since 2022, our government has taken several steps to re-schedule marijuana from a Schedule I controlled substance to a Schedule III controlled substance. The motivation to take such action stems from recognition in the Executive and Legislative Branches that marijuana has valuable medical uses and is not as highly addictive and dangerous as other narcotics listed in Schedules I and II. Action to reschedule marijuana currently is stalled and has remained stalled throughout 2025. But last month, President Trump directed the Attorney General to expedite rescheduling. This should result in marijuana being reduced to a Schedule III substance in the coming months.[17]



The rescheduling of marijuana from a Schedule I to Schedule III substance has implications for sentencing in this case. For example, federal drug schedules classify controlled substances based on the level of danger the controlled substance poses to the public. A Schedule I controlled substance poses the most danger. A Schedule V controlled substance poses the least danger. A Schedule III controlled substance falls within the middle. Generally, controlled substance offenses provide greater penalties for Schedule I controlled substances than their Schedule III

---

[17] *See* Federal Marijuana Rescheduling: Policy & Process, available at: https://moritzlaw.osu.edu/faculty-and-research/drug-enforcement-and-policy-center/research-and-grants/policy-and-data-analyses/federal-marijuana-rescheduling (last accessed 1/3/26).

counterparts. *Compare* 21 U.S.C. § 841(b)(1)(C) (providing for a maximum punishment of 20 years for a Schedule I and II offense) *with* §(b)(1)(E)(i) (providing for a maximum punishment of not more than 10 years for a Schedule III offense). Thus, when marijuana is re-scheduled, the penalty scheme will be amended downward as well.

When this occurs, the guidelines also will be amended. Under the current guidelines, the drug equivalency tables use marijuana as a baseline. All drugs are provided an equivalency quotient to marijuana for purposes of calculating a converted drug weight in multi-substance cases (like this one). These equivalencies were formulated by the USSC under the framework of marijuana being a Schedule I substance and, thus, one of the most dangerous drugs. When marijuana is reclassified downward, its equivalency to other controlled substances in Schedules I and II will be less. This will equate to a lower guideline score in this and other federal cases.

Today, nothing has changed to reflect this in the guidelines. However, the Court is not powerless to act. As case law makes clear, the Court can account for this change by declaring a policy disagreement and using a variance to fashion a fairer sentence. The Court should do that here because, as currently constructed, the guidelines do not account for this inevitable change and, as a result, suggest a higher guideline sentence than warranted.

#                  #                  #

As set forth above, varying from the guideline suggested sentence in this case is justified under the unique facts of this case and this defendant. Long-term incapacitation in jail clearly is not a proper response.

### F. What is a proper sentence in this case?

The Court should use 23 months as baseline sentence in this case and then decide how such time is best served – either in jail or in a different form of custody/supervision other than jail.

*First*, as the data in Section C, *supra*, makes clear, the median sentences to imprisonment that offenders who are similar in age, education level, and criminal history to Mr. Bongiovanni, is approximately 23 months. A lot that has to do with the fact that older people with a high-level of education and no (or de minimis) criminal history have a low risk of recidivism. As a result, long custodial sentences are not required to protect society from or to deter future misconduct of these types of people. On top of that, courts understand that sentencing an older person to prison is a greater penalty than sentencing a younger person to prison because the facilities are rough and the medical care is unavailable and inadequate. That is one reason why a long custodial sentence in this case is unfair, disproportionate, and too costly (both to Mr. Bongiovanni and the Bureau of Prisons).

*Second*, a prison sentence also is a more significant penalty for Mr. Bongiovanni based on his status as a retired law enforcement officer. Prison for an older ex-cop is dangerous. Beyond having to react to or cope with threats to physical security – which is dire – an older ex-cop like Mr. Bongiovanni will suffer the mental scars of such anxiety and the debilitating consequences of long-term solitary isolation because administrative segregation is the only mechanism available to keep Mr. Bongiovanni safe. This is another reason that militates against a long-term custodial sentence.

*Third*, if a median sentence is approximately 23 months, the Court needs to take into account how Mr. Bongiovanni's resume is much different than the typical defendant sentenced in federal court. He is a bona fide hero with a long-record of courageous public service. He enjoys strong family support which will aid his rehabilitation. All of these facts suggest the median sentence may not be a fair sentence.

*Fourth*, the sentencing data detailed in Section C, *supra*, does not account for the imminent changes to the re-scheduling of marijuana discussed in Section E(v), *supra*. All of these

changes will **reduce** what a sentence to imprisonment looks like in this case and all others. If marijuana is a less dangerous drug, then the punishment in this case should be less than the current numbers suggest is proportional – numbers which are premised on marijuana being the most dangerous drug, which it is not.

*Fourth*, the Court needs to account for the punishment it already has adjudged in this case. **16 months of home incarceration is a very long time to serve.** As detailed in Section E(ii), *supra*, home confinement is no walk in the park. It is highly restrictive – and in some cases, more restrictive – than jail. This punishment has had an effect on Mr. Bongiovanni. His wife has witnessed it. Perhaps even this Court has witnessed it during recent appearances. When this punishment is combined with the restrictions placed on Mr. Bongiovanni's liberty by this Court in the four years preceding the trials – that also caused physical pain and other hardships – it is responsible to conclude that Mr. Bongiovanni has served an impactful and significant sentence already. Also worthy of note is that Mr. Bongiovanni has maintained a **100% track record of compliance with all restrictions placed on him over the last six years.** Such good behavior normally is rewarded, both in jail or outside of it.

*Fifth*, strict adherence to the guidelines disregards other means at this Court's disposal to advance deterrence, respect for the law, and protection of society. The law directs courts to consider all options at its disposal. *See* 18 USC §3553(a)(2)(D) & (a)(3). In this case, other options at the Court's disposal other than jail include community confinement and supervised release that includes additional home confinement. Both of these options afford punishment and strict supervision of Mr. Bongiovanni (to ensure protection of society, respect for the law, and specific deterrence) while at the same time keeping Mr. Bongiovanni safe – outside of solitary confinement and linked to medical care that is far superior than what he will receive in prison.

## Conclusion

This case presents difficult choices for everyone, not just the Court. It is difficult to fashion a fair sentence when the full scope of two juries' verdicts is not clear. It is difficult to fashion a fair sentence when a defendant, with a resume like Mr. Bongiovanni's, stands before the Court. It is difficult to fashion a fair sentence when the defendant has been subject to long-term punishment prior to sentencing in the form of court conditions, home confinement, social isolation, and unwanted notoriety. But, on balance, when the Court considers the data and the facts, it is not difficult to understand how the suggested guideline range and the government's request for sentence is wildly unfair, disproportionate, and unnecessary. For the reasons set forth above, this Court should impose a sentence of home incarceration for twelve (12) months (which will equate to a 28-month-home-incarceration term plus 4 years of liberty restrictions and curfews) or, in the alternative, a sentence of community confinement for six (6) months and home confinement for six (6) months, attached to a term of probation of 1-5 years as determined by the Court; a community service requirement or fine as part of the probation term; and, a mandatory assessment of $900.00. If the Court decides to impose a custodial sentence, then the Court should impose a one year and one day sentence (which will equate to a 28-month custodial and home incarceration term plus 4 years of liberty restrictions and curfews); two (2) years of supervised release; no fine; and, a mandatory assessment of $900.00

Dated: January 12, 2026
        Buffalo, New York

**THE LAW OFFICE OF PARKER R. MACKAY**
*Attorneys for Joseph Bongiovanni*

By:    s/Parker R. MacKay
        Parker R. MacKay, Esq.
3110 Delaware Avenue
Kenmore, NY 14217
Ph: (716) 803-8166
Em: Parker@MacKayLawOffice.com

**SINGER LEGAL PLLC**
*Attorneys for Joseph Bongiovanni*

By:    s/Robert C. Singer
        Robert C. Singer, Esq.
80 East Spring Street
Williamsville, New York 14221
(716) 222-3288
rob@singerlegalpllc.com